1                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE NORTHERN DISTRICT OF OHIO
2                       EASTERN DIVISION AT CLEVELAND

3       ------------------------------X
        IN RE:                        :   Case No. 1:17-md-2804
4                                     :
        NATIONAL PRESCRIPTION         :
5       OPIATE LITIGATION             :
                                      :   **VOLUME 28**
6       CASE TRACK THREE              :   JURY TRIAL
                                      :   *(Pages 7042 - 7336)*
7                                     :
                                      :
8                                     :
                                      :
9                                     :   *November 15, 2021*
        ------------------------------X
10

11

12              TRANSCRIPT OF <u>JURY TRIAL PROCEEDINGS</u>

13

14          HELD BEFORE THE HONORABLE DAN AARON POLSTER

15

16              SENIOR UNITED STATES DISTRICT JUDGE

17

18

19

20      Official Court Reporter:        Heather K. Newman, RMR, CRR
                                        United States District Court
21                                      801 West Superior Avenue
                                        Court Reporters 7-189
22                                      Cleveland, Ohio 44113
                                        216.357.7035
23

24
        Proceedings recorded by mechanical stenography; transcript
25      produced by computer-aided transcription.

```
 1   APPEARANCES:

 2

 3   For the Plaintiffs:            Peter H. Weinberger, Esq.
                                    SPANGENBERG, SHIBLEY & LIBER
 4                                  1001 Lakeside Avenue, Ste. 1700
                                    1900 East Ninth Street
 5                                  Cleveland, Ohio 44114
                                    216-696-3232
 6
                                    W. Mark Lanier, Esq.
 7                                  Rachel Lanier, Esq.
                                    THE LANIER LAW FIRM
 8                                  6810 FM 1960 West
                                    Houston, Texas 77069
 9                                  813-659-5200

10                                  Frank L. Gallucci, III, Esq.
                                    PLEVIN & GALLUCCI COMPANY, LPA
11                                  The Illuminating Building
                                    Suite 2222
12                                  55 Public Square
                                    Cleveland, Ohio 44113
13                                  216-861-0804

14                                  Salvatore C. Badala, Esq.
                                    Maria Fleming, Esq.
15                                  NAPOLI SHKOLNIK
                                    360 Lexington Ave., 11th Floor
16                                  New York, New York 10017
                                    212-397-1000
17
                                    Laura S. Fitzpatrick, Esq.
18                                  SIMMONS HANLY CONROY
                                    112 Madison Avenue, 7th Floor
19                                  New York, NY 10016
                                    (212) 784-6400
20

21
     For Walgreen Defendants:       Kaspar J. Stoffelmayr, Esq.
22                                  Brian C. Swanson, Esq.
                                    Katherine M. Swift, Esq.
23                                  BARTLIT BECK LLP
                                    54 West Hubbard Street, Ste.300
24                                  Chicago, Illinois 60654
                                    312-494-4400
25
```

```
 1   APPEARANCES (Cont'd):

 2

 3   For CVS Defendants:          Eric R. Delinsky, Esq.
                                  Graeme W. Bush, Esq.
 4                                Paul B. Hynes, Jr., Esq.
                                  Alexandra W. Miller, Esq.
 5                                ZUCKERMAN SPAEDER - WASHINGTON
                                  Suite 1000
 6                                1800 M Street, NW
                                  Washington, DC 20036
 7                                202-778-1831

 8   For Walmart                  John M. Majoras, Esq.
     Defendants:                  JONES DAY - COLUMBUS
 9                                Suite 600
                                  325 John H. McConnell Blvd.
10                                Columbus, Ohio 43215
                                  614-281-3835
11
                                  Tara A. Fumerton, Esq.
12                                Tina M. Tabacchi, Esq.
                                  JONES DAY - CHICAGO
13                                Suite 3500
                                  77 West Wacker
14                                Chicago, Illinois 60601
                                  312-782-3939
15

16   ALSO PRESENT:                David Cohen, Special Master

17                                    - - - - -

18

19

20

21

22

23

24

25
```

1                        **I N D E X**

2                                                         **PAGE**

3     APPEARANCES.......................................7043

4     CHARGE TO THE JURY................................7059

5     CLOSING ARGUMENT BY PLAINTIFFS....................7080

6     AFTERNOON SESSION.................................7181

7     CLOSING ARGUMENT BY DEFENDANT WALGREENS...........7183

8     CLOSING ARGUMENT BY DEFENDANT WALMART.............7265

9     CLOSING ARGUMENT IN REBUTTAL BY THE PLAINTIFFS.....7302

10    CONCLUSION OF CHARGE TO THE JURY..................7324

11    CERTIFICATE.......................................7336

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
08:40:03   1                    (In court at 8:40 a.m.)

08:40:03   2                    COURTROOM DEPUTY:  All rise.

08:40:09   3               THE COURT:  All right.  Good morning.

08:40:11   4    Everyone can be seated.

08:40:12   5         First, I want to make sure that the exhibits have been

08:40:16   6    finalized.

08:40:17   7         Robert, you've been given what you need, and it's

08:40:20   8    finalized?

08:40:22   9                    COURTROOM DEPUTY:  Not yet.  They're getting

08:40:25  10    them now.

08:40:26  11               THE COURT:  Well. . .

08:40:32  12         What's the status of the exhibits, please?  I want to

08:40:36  13    make sure that's been --

08:40:38  14               MS. FUMERTON:  So, Your Honor, this is

08:40:39  15    Tara Fumerton for Walmart.

08:40:40  16         I believe, at least -- I have a thumb drive that I'm

08:40:43  17    actually currently handing -- that I can hand to Mr. Pitts.

08:40:47  18               THE COURT:  All right.  Is that -- everyone

08:40:48  19    has reviewed that thumb drive and it's fully accurate, is

08:40:52  20    that right, from the plaintiffs' standpoint?

08:40:54  21               MS. FUMERTON:  These are the --

08:40:54  22               THE COURT:  Please, from the plaintiffs'

08:40:56  23    standpoint, is that right?

08:41:02  24               MS. FITZPATRICK:  Good morning, Your Honor.

08:41:04  25    Laura Fitzpatrick.
```

08:41:05  1        We have reviewed what is on the defendants' flash

08:41:08  2    drive and it looks correct.  The plaintiffs would like to

08:41:10  3    check one more things on ours, just given some of the

08:41:13  4    redactions that CVS counsel has asked for just to triple

08:41:16  5    check, and then we'll provide the flash drive as soon as

08:41:19  6    that's done.

08:41:20  7                THE COURT:  There are two flash drives?  I'm

08:41:22  8    confused.

08:41:22  9                MS. FUMERTON:  Yes, Your Honor.

08:41:24 10                COURTROOM DEPUTY:  One from each side.

08:41:25 11                THE COURT:  All right.  Has the defendants

08:41:26 12    examined the plaintiffs' flash drive?

08:41:30 13                MR. SWANSON:  Yes, Your Honor, we have.

08:41:31 14                THE COURT:  All right.  That's -- all right.

08:41:32 15        The other defendants have, Walmart's and Walgreens

08:41:36 16    have examined the plaintiffs' flash drive?

08:41:39 17                MR. SWANSON:  Yes, Your Honor, for Walgreens.

08:41:41 18                MS. FUMERTON:  Yes, Your Honor, for Walmart.

08:41:43 19                THE COURT:  All right.  Now, the defendants

08:41:44 20    have three flash drives or one?

08:41:47 21                MS. FUMERTON:  One, Your Honor.

08:41:48 22                THE COURT:  All right.  And the plaintiffs

08:41:49 23    have to examine one more thing; is that right?

08:41:52 24                MS. FITZPATRICK:  Yes, Your Honor.  Only on

08:41:54 25    our flash drive.  We just want to triple check three of the

08:41:58 1    documents.

08:41:58 2                THE COURT:  You examined the defendants flash

08:42:00 3    drive, and is it fully accurate?

08:42:02 4                MS. FITZPATRICK:  We -- Your Honor, yes.

08:42:03 5                THE COURT:  All right.  Then make sure that

08:42:05 6    both flash drives are given to Mr. Pitts.

08:42:08 7          All right.  What are the issues on the slides?

08:42:13 8                MS. SWIFT:  Your Honor, Kate Swift for

08:42:14 9    Walgreens.

08:42:15 10         We have one issue to raise with respect to the

08:42:17 11   plaintiffs' slides.  There are a number of slides that

08:42:20 12   include on the face of the slides juror questions, which we

08:42:24 13   believe is improper.  It's pandering, Your Honor.

08:42:29 14                MR. WEINBERGER:  Your Honor, these -- there's

08:42:30 15   no effort to pander.  These are -- these were --

08:42:33 16                THE COURT:  Well --

08:42:34 17                MR. WEINBERGER:  These were questions that

08:42:36 18   were on the ELMO that were part -- that are part of the

08:42:40 19   record.

08:42:40 20                THE COURT:  Well, wait a minute.  The

08:42:41 21   questions are not part of the record, Mr. Weinberger.

08:42:44 22                MR. WEINBERGER:  Well, they were --

08:42:45 23                THE COURT:  Well, they're not.  So the

08:42:47 24   questions are not part of the record.  The jurors --

08:42:49 25                MR. WEINBERGER:  Well, they were part of the

08:42:50  1    transcript, Your Honor.

08:42:51  2              THE COURT:  The jurors were told to disregard

08:42:53  3    all questions.

08:42:54  4         Are you playing -- I mean, are you playing an answer?

08:42:57  5    I don't understand.  What is the purpose of putting a --

08:43:01  6    what is the purpose of putting any question on a slide?

08:43:05  7              MR. LANIER:  Your Honor, the purpose for

08:43:07  8    putting the question on the slide is so that the jury can

08:43:10  9    see what they've already seen in court because they were all

08:43:12 10    placed on an overhead in court.

08:43:14 11              THE COURT:  That's -- the question's not

08:43:16 12    evidence, all right.

08:43:18 13              MR. LANIER:  No, Your Honor, but --

08:43:19 14              THE COURT:  What is the purpose of a question

08:43:20 15    being on a slide?

08:43:21 16              MR. LANIER:  The purpose of the question is so

08:43:22 17    that I can remind the jury that these were the issues and

08:43:26 18    the questions that were addressed within the framework of

08:43:29 19    the various witnesses and remind them what the testimony was

08:43:31 20    in regards to each of those questions.

08:43:34 21              MS. SWIFT:  Your Honor, the questions do not

08:43:36 22    remind the jurors of what the testimony was.

08:43:37 23              THE COURT:  Well --

08:43:41 24              MR. LANIER:  It's something that they've

08:43:42 25    already seen.

08:43:43  1          THE COURT:  No.  All right.  I will only

08:43:44  2  permit a question to be placed in -- on the screen,

08:43:51  3  whatever, if it is immediately followed by an answer that

08:43:55  4  was admissible.

08:43:56  5          MR. LANIER:  Okay.

08:43:56  6          THE COURT:  Then I'll permit that.  But I'm

08:43:58  7  not going to permit a naked question --

08:44:00  8          MR. LANIER:  Okay.

08:44:01  9          THE COURT:  -- whether it's a lawyer's --

08:44:01 10          MR. WEINBERGER:  It's not as if we're going to

08:44:03 11  give the answers.

08:44:04 12          THE COURT:  I made it clear.  Whether --

08:44:06 13  whether it's a lawyer question or a juror question, they're

08:44:09 14  not evidence.  So if it's immediately followed by an

08:44:13 15  answer --

08:44:14 16          MR. LANIER:  That makes sense, Your Honor.

08:44:15 17          THE COURT:  -- I'll permit it.

08:44:16 18          MR. LANIER:  We'll either do that or we'll

08:44:19 19  take them out.

08:44:20 20      That's fair.

08:44:20 21          THE COURT:  All right.

08:44:21 22      Is that acceptable?

08:44:22 23          MS. SWIFT:  Yes.  Thanks very much,

08:44:23 24  Your Honor.

08:44:24 25          THE COURT:  All right.  So that's number --

08:44:26 1    that was Walgreens' issue.

08:44:38 2          Were there any other defense issues?

08:44:40 3                  MS. FUMERTON:  Your Honor, Tara Fumerton for

08:44:42 4    Walmart.

08:44:43 5          We have two slides that we continue to have an issue

08:44:45 6    with plaintiffs.

08:44:45 7                  THE COURT:  Well, let me see the slides,

08:44:48 8    please.

08:45:29 9                  MS. FUMERTON:  So, Your Honor, there's one

08:45:30 10   issue that goes across two slides, and then one of the

08:45:32 11   slides has another issue.  So the first issue is this being

08:45:35 12   unaware of cases stating legal requirements.

08:45:38 13         First of all, it's not accurate as to what the

08:45:40 14   testimony was where both witnesses did have some familiarity

08:45:45 15   with the underlying cases.  But as far as what the actual

08:45:48 16   legal requirements are, we think it's inappropriate to sort

08:45:51 17   of be, again, using these cases as suggesting what the legal

08:45:54 18   requirements are.  So we object to that.

08:45:57 19                 THE COURT:  Well, there's a -- it's on a slide

08:46:01 20   with Ms. Hiland, unaware of cases stating legal

08:46:04 21   requirements, and with Nelson, unaware of *Holiday* case with

08:46:07 22   its legal requirements.

08:46:10 23                 MS. FUMERTON:  Yes, Your Honor.  So that's the

08:46:13 24   same issue with both of those slides.

08:46:20 25                 MR. LANIER:  Your Honor, I think one of the

08:46:21  1    arguments that's being made by the defendants is that these

08:46:24  2    cases are not legal requirements.  That's not the judge --

08:46:28  3    that's not the witness's decision, that's not the jury's

08:46:31  4    decision, that's your decision.  But assuming that --

08:46:34  5                THE COURT:  Well, I'm not advising the jury on

08:46:36  6    anything like this.

08:46:38  7                MR. LANIER:  Agreed.

08:46:38  8                THE COURT:  That's not something for them

08:46:40  9    to -- so that's not correct, Mr. Lanier.  I'm not telling

08:46:42  10   the jury --

08:46:45  11               MR. WEINBERGER:  But, Your Honor, so with

08:46:47  12   respect to Ms. Hiland.

08:46:48  13               THE COURT:  The legal requirements there

08:46:50  14   were --

08:46:50  15               MR. WEINBERGER:  With respect to Ms. Hiland,

08:46:52  16   she was asked about the *East Main* case, for example, and

08:46:55  17   whether she knew about it.  And the case, as published in

08:46:58  18   the Federal Register as Demetra Ashley said is notice to the

08:47:03  19   defendants about certain standards that they have to apply

08:47:07  20   with respect to the CSA.

08:47:09  21       The *East Main* case a 2010 case that talked about red

08:47:13  22   flags, and she was asked about that and was not aware of it.

08:47:16  23       Similarly, Nelson was asked about the *Holiday* case --

08:47:20  24   obviously, it's been discussed a lot in this courtroom --

08:47:23  25   and he was not aware of those requirements.  So it's the

08:47:27  1    standards published by the case as a result of enforcement

08:47:31  2    actions brought by the DEA, and these slides are a

08:47:38  3    reflection of, you know, witnesses who were involved in

08:47:41  4    regulatory compliance being unaware of them.

08:47:44  5         MS. FUMERTON:  Well, and again, I disagree

08:47:46  6    with his characterization.

08:47:47  7         THE COURT:  All right.  I'm going to allow --

08:47:48  8    you can come back and say anything you want, Ms. Fumerton,

08:47:53  9    in your argument, that, you know, they weren't required to

08:47:56 10    do anything, the case didn't apply to Walmart, you know,

08:47:59 11    whatever -- you can say whatever you want.  This is what

08:48:02 12    these witnesses said.  Okay?

08:48:03 13         MS. FUMERTON:  Respectfully, Your Honor, it's

08:48:06 14    not what the witnesses said.  The witnesses said that, in

08:48:08 15    fact, Mr. Nelson had received it.  There's two documents

08:48:10 16    they had admitted where there were legal -- the *Holiday* case

08:48:16 17    was, in fact, sent to Mr. Nelson and that's why they were

08:48:18 18    questioning him about it.

08:48:19 19         THE COURT:  All right.  I believe he said he

08:48:21 20    was unaware of really -- not familiar with the case and not

08:48:25 21    aware what, if anything, it said or whatever.  What, if any,

08:48:32 22    guidance he was supposed to take from it.  He was generally

08:48:34 23    not knowledgeable about it.  Okay?

08:48:36 24         MS. FUMERTON:  Well, again, I disagree.

08:48:37 25         MR. WEINBERGER:  Well, then you can argue

08:48:39  1    that.

08:48:39  2                    THE COURT:  Then argue it, that it doesn't

08:48:41  3    matter.  Okay?

08:48:41  4                    MS. FUMERTON:  But I also think it's

08:48:44  5    inconsistent with, again, when we are now saying what the

08:48:46  6    legal requirements are.  Now with a question you're going to

08:48:48  7    essentially having Mr. Lanier arguing that these cases

08:48:50  8    somehow have certain legal requirements and legal --

08:48:57  9    essentially effect with respect to these issues in this

08:48:59 10    case, and it's inappropriate for Mr. Lanier to be

08:49:01 11    instructing the jury as to what is the law.  That's

08:49:04 12    something this Court should do.

08:49:05 13                    THE COURT:  All right.  I've got a problem

08:49:06 14    with legal requirements.  Just cross out legal requirements.

08:49:06 15    All right?

08:49:12 16                    MR. LANIER:  How about if I -- who's unaware

08:49:13 17    of the *Holiday* case.  Nelson was generally unaware of the

08:49:16 18    *Holiday* case.  All right?  And Ms. Hiland was generally

08:49:20 19    unaware of cases.  I mean, she may have heard it, but she

08:49:23 20    was unaware of what they said or any import from it.  So you

08:49:28 21    can -- so it's the legal requirements, because it's not

08:49:34 22    clear that the case imposed any legal requirement on anyone

08:49:36 23    in this case.  All right?  It was not directed there.  So

08:49:40 24    just cross out legal requirements.

08:49:42 25                    MS. FUMERTON:  Thank you, Your Honor.

08:49:42  1          And then just one last thing on the Mr. Nelson slide.

08:49:46  2     The last bullet point said, "Emphasize sales over complying

08:49:50  3     with the 2011 MOA requirements."  The MOA came in for a

08:49:54  4     limited purpose with respect to notice.  It also does not

08:49:56  5     actually have any sort of requirements relating to what --

08:50:02  6     they're purporting as -- these analyzing the argument --

08:50:03  7               THE COURT:  Well, this is argument.  You can

08:50:05  8     respond to the -- you know, you can respond any way you

08:50:10  9     want.  I'm not going to change that.

08:50:12 10               MS. FUMERTON:  Thank you, Your Honor.

08:50:14 11               MR. LANIER:  So, Your Honor, to make sure I've

08:50:16 12     done this in a way that is right by your ruling, what I did

08:50:21 13     on Mr. Nelson is I -- or, yeah, let me make sure I've got it

08:50:28 14     right.

08:50:28 15               THE COURT:  Just say unaware of *Holiday* case.

08:50:30 16               MR. LANIER:  Yeah, I put unaware of the

08:50:32 17     *Holiday* case for Mr. Nelson, and for Ms. Hiland, instead of

08:50:36 18     just unaware of cases, what I did for her is said unaware of

08:50:44 19     the -- oh, crud.  Here it is.  "Unaware of cases stating

08:50:51 20     standards."

08:50:53 21        Can I do that?

08:50:54 22               MS. FUMERTON:  No.  Your Honor, I think that's

08:50:56 23     the same objection we would have.

08:50:57 24               MR. LANIER:  Well, it's not legal

08:50:59 25     requirements.  These are certainly at least standards.

08:51:01  1                    MS. FUMERTON:  Well, standard --

08:51:02  2                    THE COURT:  Well, the problem is, unaware of

08:51:04  3     cases doesn't -- I don't know --

08:51:06  4                    MR. LANIER:  That doesn't mean anything.

08:51:07  5                    THE COURT:  -- if it means anything.  Put a --

08:51:09  6     you know, put the name of the case, the one that involved

08:51:11  7     Walmart.  All right?

08:51:13  8                    MS. FUMERTON:  Well, that's part of the

08:51:14  9     problem, Your Honor, is none of these involved Walmart.

08:51:17 10                    MR. LANIER:  Well, they all apply to Walmart

08:51:20 11     in the sense that these are --

08:51:22 12                    THE COURT:  Well, put she's unaware of

08:51:24 13     *Holiday*.  Okay?  Unaware of the *Holiday* case.

08:51:25 14                    MS. FUMERTON:  She actually testified -- and

08:51:26 15     Mr. Lanier has this testimony in front of him, but the --

08:51:28 16     she actually testified she was aware of *Holiday* and read it.

08:51:31 17     Specifically, I think Mr. Weinberger was talking about the

08:51:33 18     *East Main* case.

08:51:35 19                    MR. LANIER:  *East Main* and others.

08:51:36 20                    MS. FUMERTON:  If he wants to put she's

08:51:38 21     unaware of *East Main*, I think that's fine.

08:51:40 22                    THE COURT:  All right.  Put unaware of *East

08:51:42 23     Main* case.

08:51:42 24                    MR. LANIER:  All right.  Or I could -- yeah.

08:51:46 25     I think it wasn't just *East Main* case, it was others as

08:51:49  1    well.

08:51:49  2         How about, "Unaware of DEA notice cases"?

08:51:51  3              MS. FUMERTON:  No, Your Honor.

08:51:52  4              THE COURT:  I don't know what that means.

08:51:53  5              MR. LANIER:  Okay.

08:51:53  6              THE COURT:  All right?  If you want to refer

08:51:55  7    to a -- she was unaware of the *East Main* case.  If there was

08:51:58  8    another specific case you asked her about --

08:52:00  9              MR. LANIER:  Then I'll just say it in

08:52:02 10    argument.  I'll make the change on the slide.  Because I

08:52:04 11    said, I assume you've read the *East Main Ohio Pharmacy* case?

08:52:08 12         She said, I'm not sure.

08:52:09 13         Are you familiar with the *Town Wood Pharmacy* case?

08:52:11 14         I don't know that I'm familiar with that.

08:52:12 15         You know, it was -- those were the questions.  But

08:52:15 16    I'll just say, "Unaware of *East Main* case," and then I'll

08:52:19 17    mention the others, but I won't have it on the slide.

08:52:22 18              THE COURT:  All right.  Okay.  Were there any

08:52:28 19    other objections to the plaintiffs' slides?

08:52:33 20              MR. HYNES:  Your Honor, CVS and the plaintiffs

08:52:36 21    worked out our objections, so there's nothing to raise with

08:52:39 22    you.

08:52:39 23              THE COURT:  All right.  Fine.

08:52:41 24         And I take it there weren't any objections from the

08:52:43 25    plaintiffs' side to any of the defendants' slides?

08:52:46  1                    MR. LANIER:  Oh, there were, Your Honor, but,

08:52:48  2      I mean, my view of the world is, this is fair argument, and

08:52:51  3      so --

08:52:51  4                    THE COURT:  Okay.

08:52:52  5                    MR. LANIER:  -- I'm not going to make the

08:52:54  6      objections to theirs that they make to mine because I think

08:52:57  7      that that's -- you know, I mean, look, they'll do a slide

08:53:01  8      like this (indicating), what plaintiffs needed to prove, and

08:53:04  9      they're going to recast the law.  Okay?  I mean, that's

08:53:08  10     their argument.  I think that it's a legal argument that

08:53:12  11     they're making, and they're putting themselves in the

08:53:14  12     position of saying what the law is, but my view is, if I'm a

08:53:17  13     lawyer, I ought to be able to handle it, so I'll just --

08:53:20  14                    THE COURT:  Fine.  Right.  If you think

08:53:22  15     they're misstating the instructions, then you can respond

08:53:26  16     to.  If I think they are, I won't let them say that.

08:53:29  17                    MR. LANIER:  Okay.  That's good enough for me,

08:53:31  18     Your Honor.  Thank you.

08:53:31  19                    THE COURT:  So both sides better be careful if

08:53:34  20     you're saying what the -- you know, what specifically the

08:53:36  21     plaintiffs have to prove, that it's tied to the

08:53:38  22     instructions, because if not, I'll -- I'll have to

08:53:42  23     interrupt.

08:53:42  24                    MR. LANIER:  I'm more than happy with that

08:53:45  25     understanding, and I will bide my time and my tongue.

## Charge to the Jury

08:53:53  1          THE COURT:  I mean, the whole point of my

08:53:55  2    providing the instructions in advance and reading them is so

08:53:58  3    that everyone knows that.

08:53:59  4          MR. LANIER:  Um-hmm.

08:54:04  5          THE COURT:  So, again, it's my intention to

08:54:06  6    read the final instructions, pages 1 through 27, and then

08:54:11  7    stop, and then we'll have Mr. Lanier's opening -- closing.

08:55:03  8          SPECIAL MASTER COHEN:  Just a reminder,

08:55:04  9    please, everybody silence your phones and devices.

08:55:11  10          THE COURT:  So I guess we have one empty chair

08:55:13  11    for Mr. Handly and one for Professor McGovern just in honor

08:55:20  12    of both of their contributions to the MDL, and it's very

08:55:28  13    appropriate.

08:57:40  14              (Brief pause in proceedings).

08:58:45  15          THE COURT:  Okay.  You can bring in the jury.

09:02:44  16              (Brief pause in proceedings.)

09:06:35  17              (Jury returned to courtroom.)

09:07:10  18                 CHARGE TO THE JURY

09:07:10  19          THE COURT:  Okay.  Please be seated, ladies

09:07:12  20    and gentlemen.

09:07:16  21      All right.  Good morning, ladies and gentlemen.  I

09:07:18  22    hope you all had a good weekend.

09:07:22  23      I'm going to begin this morning by reading most of my

09:07:29  24    final instructions, Pages 1 to 27.  I have given each of you

09:07:36  25    a copy.  If you wish to follow along while I read, you may,

7060

## Charge to the Jury

09:07:40  1    but, of course, you don't have to.  Each of you will have a

09:07:42  2    copy of the final instructions for using -- for use in your

09:07:51  3    deliberations.

09:07:51  4        Members of the jury, you have heard all of the

09:07:53  5    evidence, and it's now time for me to instruct you about the

09:07:55  6    law that you must follow in deciding this case.

09:07:58  7        I will start by explaining your duties and the general

09:08:01  8    rules that apply in every civil case.

09:08:03  9        Then I will explain the elements or parts of the

09:08:08 10    claims that the plaintiffs assert against the defendants.

09:08:11 11    As I have explained before, there are two plaintiffs in this

09:08:14 12    case:  Lake County, Ohio, and Trumbull County, Ohio.

09:08:20 13    Further, there are three defendants in this case:  Walgreens

09:08:23 14    Company; CVS Pharmacy, Inc., and Walmart Inc.

09:08:30 15        After I explain the elements of the claims that the

09:08:32 16    two plaintiffs assert against the three defendants, the

09:08:35 17    lawyers will present their closing arguments.

09:08:36 18        Following closing arguments, I will explain the rules

09:08:40 19    that you must follow during your deliberations in the jury

09:08:43 20    room and the interrogatories and verdicts that you may

09:08:46 21    return.

09:08:47 22        Please listen very carefully to everything that I say.

09:08:55 23        It is your duty as jurors to follow the law as stated

09:08:58 24    in the instructions of the Court and to apply the rules of

09:09:00 25    law so given to the facts as you find them from the evidence

## Charge to the Jury

09:09:03  1     in the case.

09:09:04  2          You have two main duties as jurors:  The first one is

09:09:08  3     to decide what the facts are from the evidence that you saw

09:09:12  4     and heard here in court.  Deciding what the facts are is

09:09:16  5     your job, not mine, and nothing I have said or done during

09:09:19  6     this trial was meant to influence your decision about the

09:09:23  7     facts in any way.

09:09:24  8          Your second duty is to take the law that I give you,

09:09:28  9     apply it to the facts, and decide if each plaintiff has

09:09:32 10     proven by a preponderance of the evidence that each

09:09:36 11     defendant is liable.  It is my job to instruct you about the

09:09:39 12     law, and you are bound by the oath you took at the beginning

09:09:43 13     of the trial to follow the instructions that I give you,

09:09:46 14     even if you personally disagree with them.  This includes

09:09:50 15     the instructions that I gave you during the trial and these

09:09:53 16     instructions.  All the instructions are important, and you

09:09:56 17     should consider them together as a whole.

09:09:58 18          The lawyers will talk about the law during their

09:10:03 19     arguments.  But if what they say is different from what I

09:10:05 20     say, you must follow what I say.  What I say about the law

09:10:09 21     controls.

09:10:09 22          Perform these duties fairly.  Do not let any bias,

09:10:14 23     sympathy, or prejudice that you may feel toward one side or

09:10:18 24     the other influence your decision in any way.

09:10:20 25          All parties are equal in the eyes of the law.

## Charge to the Jury

09:10:24  1   Corporations stand on equal footing, and size is not to be

09:10:28  2   considered. Both the parties and the public expect that you

09:10:31  3   will carefully and impartially consider all of the evidence

09:10:34  4   in the case, follow the law as stated by the Court, and

09:10:38  5   reach a just decision regardless of the consequences.

09:10:41  6       In a civil action like this one, plaintiffs are

09:10:48  7   required to prove all the elements of their claim by a

09:10:50  8   preponderance of the evidence. This duty is known as the

09:10:55  9   burden of proof. To establish something by the

09:11:00 10   preponderance of the evidence, or by a preponderance of the

09:11:02 11   evidence, means to prove that something is more likely true

09:11:05 12   than not true.

09:11:05 13       A preponderance of the evidence is the greater weight

09:11:08 14   of the evidence; that is, evidence that you believe because

09:11:12 15   it outweighs or overbalances in your mind the evidence

09:11:15 16   opposed to it. A preponderance means evidence that is more

09:11:19 17   probable, more persuasive, more likely, or of greater

09:11:23 18   probative value. Remember, it is the quality of the

09:11:26 19   evidence that must be weighed, not the quantity of evidence.

09:11:29 20       This standard does not require proof to an absolute

09:11:34 21   certainty, since proof to an absolute certainty is seldom

09:11:39 22   possible in any case.

09:11:40 23       You may also have heard of the term "proof beyond a

09:11:44 24   reasonable doubt." That is a stricter standard of proof

09:11:46 25   that applies in criminal cases only. It does not apply in

**Charge to the Jury**

09:11:49 1   civil cases like this one.  You should, therefore, put it

09:11:52 2   out of your minds.

09:11:53 3        In determining whether any fact in issue has been

09:11:57 4   proved by a preponderance of the evidence you may, unless

09:12:00 5   otherwise instructed, consider the testimony of all

09:12:03 6   witnesses, regardless of who may have called them, and all

09:12:07 7   exhibits received in evidence, regardless of who may have

09:12:10 8   produced them.

09:12:11 9        If the weight of the evidence is equally balanced, or

09:12:15 10  if you are unable to determine which side of an issue has

09:12:17 11  the preponderance, then the party who has the burden of

09:12:21 12  proof has not established that issue by a preponderance of

09:12:24 13  the evidence.

09:12:25 14       You must make your decision based only on the evidence

09:12:30 15  that you saw and heard here in court.  Do not let rumors,

09:12:34 16  suspicions, or anything else that you may have even or heard

09:12:39 17  outside of court influence your decision in any way.

09:12:41 18       Evidence is all the testimony received from the

09:12:45 19  witnesses including depositions, the exhibits admitted

09:12:48 20  during the trial, the stipulations that the lawyers agreed

09:12:50 21  to, and any facts which the Court requires you to accept as

09:12:54 22  true.

09:12:54 23       Nothing else is evidence.  The lawyers' statements and

09:12:58 24  arguments are not evidence.  If you remember the facts

09:13:01 25  differently from the way the attorneys have stated them, you

**Charge to the Jury**

09:13:04  1    should base your decision on what you remember.  The

09:13:07  2    lawyers' questions and objections are not evidence.  My

09:13:10  3    legal rulings are not evidence, and my comments and

09:13:15  4    questions are not evidence.

09:13:15  5         During the trial I may have not let you hear the

09:13:18  6    answers to some of the questions that the lawyers asked.

09:13:21  7    And I may have ordered you to disregard things you saw or

09:13:24  8    heard, or I struck things from the record.  You must

09:13:28  9    completely ignore all these things.  Do not even think about

09:13:32 10    them.  Do not speculate about what a witness might have

09:13:35 11    said.  You may not draw any inference from an unanswered

09:13:39 12    question, nor may you consider testimony which has been

09:13:42 13    stricken in reaching your decision.  Make your decision

09:13:45 14    based only on the evidence, as I have defined it here and

09:13:48 15    nothing else.

09:13:51 16         You should use your common sense in weighing the

09:13:53 17    evidence.  Consider it in light of your everyday experience

09:13:57 18    with people and events and give it whatever weight you

09:14:00 19    believe it deserves.  If your experience tells you that

09:14:03 20    certain evidence reasonably leads to a conclusion, you are

09:14:06 21    free to reach that conclusion.

09:14:10 22         Now, some of you may have heard the terms "direct

09:14:13 23    evidence" and "circumstantial evidence."

09:14:15 24         Direct evidence is evidence like the testimony of an

09:14:17 25    eyewitness that, if you believe it, directly proves a fact.

7065

## Charge to the Jury

09:14:21  1   If a witness testifies that he saw it raining outside, and

09:14:25  2   you believe him, that would be direct evidence that it was

09:14:27  3   raining.

09:14:28  4       Circumstantial evidence is a chain of circumstances

09:14:30  5   that indirectly proves a fact.  If someone walks into the

09:14:34  6   courtroom wearing a raincoat covered with drops of water and

09:14:37  7   carrying a wet umbrella, that would be circumstantial

09:14:41  8   evidence from which you could conclude that it was raining.

09:14:44  9       It is your job to decide how much weight to give the

09:14:48 10   direct and circumstantial evidence.  The law makes no

09:14:51 11   distinction between the weight that you should give to

09:14:54 12   either one; the law does not say that one is better evidence

09:14:57 13   than the other.  You should consider all the evidence, both

09:15:00 14   direct and circumstantial, and give it whatever weight you

09:15:03 15   believe it deserves.

09:15:04 16       The law permits you to draw reasonable inferences from

09:15:10 17   the evidence that has been presented.  Inferences are

09:15:12 18   deductions or conclusions, which reason and common sense

09:15:14 19   lead the jury to draw from facts which have been established

09:15:18 20   by the evidence in the case.

09:15:20 21       In other words, while you should consider only the

09:15:23 22   evidence in the case, you are not limited solely to what you

09:15:26 23   see and hear as the witnesses testify.  You are permitted to

09:15:30 24   draw from facts which you have -- which you find have been

09:15:34 25   proved reasonable inferences that you feel are justified in

**Charge to the Jury**

09:15:39  1    light of your common experience.

09:15:40  2       Another part of your job as jurors is to decide how

09:15:46  3    credible, or believable, each witness was.  This is your

09:15:49  4    job, not mine.  It is up to you to decide if a witness's

09:15:55  5    testimony was believable and how much weight you think it

09:15:57  6    deserves.  You are free to believe everything that a witness

09:16:00  7    said, or only part of it, or none of it at all.  But you

09:16:03  8    should act reasonably and carefully in making these

09:16:05  9    decisions.

09:16:05 10       Let me suggest some things for you to consider in

09:16:11 11    evaluating each witness's testimony.

09:16:12 12       First, ask yourself if the witness was able to clearly

09:16:19 13    see or hear the events.  Sometimes even an honest witness

09:16:22 14    may not have been able to see or hear what was happening and

09:16:25 15    may make a mistake.

09:16:26 16       Ask yourself how good the witness's memory seemed to

09:16:29 17    be.  Did the witness seem able to accurately remember what

09:16:32 18    happened?

09:16:33 19       Ask yourself if there was anything else that may have

09:16:36 20    interfered with the witness's ability to perceive or

09:16:38 21    remember the events.

09:16:39 22       Ask yourself how the witness acted while testifying.

09:16:44 23    Did the witness appear honest?  Or did the witness appear to

09:16:47 24    be lying?

09:16:47 25       Ask yourself if the witness had any relationship to

## Charge to the Jury

09:16:51 1   plaintiffs or defendants or anything to gain or lose from

09:16:54 2   the case that might influence the witness's testimony.

09:16:58 3       Ask yourself if the witness had any bias, prejudice,

09:17:01 4   or reason for testifying, that might cause the witness to

09:17:05 5   lie or to slant the testimony in favor of one side or the

09:17:08 6   other.

09:17:08 7       Ask yourself if the witness testified inconsistently

09:17:13 8   while on the witness stand, if the witness said or did

09:17:16 9   something, or failed to say or do something at any other

09:17:20 10  time that is inconsistent with what the witness said while

09:17:26 11  testifying.

09:17:26 12      If you believe that the witness was inconsistent, ask

09:17:29 13  yourself if this makes the witness's testimony less

09:17:31 14  believable.  Sometimes it may; other times it may not.

09:17:35 15  Consider whether the inconsistency was about something

09:17:39 16  important, or about some unimportant detail.

09:17:41 17      Ask yourself if it seemed like an innocent mistake or

09:17:45 18  if it seemed deliberate.

09:17:46 19      Ask yourself how believable the witness's testimony

09:17:49 20  was in light of all the other evidence.  Was the witness's

09:17:52 21  testimony supported or contradicted by other evidence that

09:17:56 22  you found believable?  If you believe that a witness's

09:17:59 23  testimony was contradicted by other evidence, remember that

09:18:02 24  people sometimes forget things.  Even two honest people who

09:18:06 25  witness the same event may not describe it exactly the same

**Charge to the Jury**

09:18:09  1    way.

09:18:10  2         These are only some of the things that you may

09:18:12  3    consider in deciding how believable each witness was.  You

09:18:16  4    may also consider other things that you think shed some

09:18:19  5    light on the witness's believability.  Use your common sense

09:18:22  6    and your everyday experience in dealing with other people,

09:18:26  7    and then decide what testimony you believe and how much

09:18:30  8    weight you think it deserves.

09:18:31  9         Opinion testimony.

09:18:34 10         You've heard the testimony of numerous individuals,

09:18:38 11    sometimes referred to as expert witnesses, who offered their

09:18:42 12    professional opinions about the matters at issue in this

09:18:44 13    lawsuit.  You do not have to accept their opinions.  In

09:18:48 14    deciding how much weight to give each opinion, you should

09:18:51 15    consider the witness's qualifications and how they reached

09:18:55 16    their conclusions.

09:18:56 17         Also, consider the other factors discussed in these

09:19:00 18    instructions for weighing the credibility of witnesses.

09:19:03 19         If you decide that the opinion of an expert witness is

09:19:07 20    not based upon sufficient education and experience, or if

09:19:11 21    you conclude that the reasons given in support of the

09:19:13 22    opinion are not sound, or if you feel that an expert

09:19:16 23    witness's opinion is outweighed by other evidence, you may

09:19:20 24    disregard the opinion entirely.

09:19:21 25         Remember that you alone decide how much of a witness's

**Charge to the Jury**

09:19:25   1    testimony to believe, and how much weight it deserves.

09:19:27   2         One more thing about witnesses.  Sometimes jurors

09:19:33   3    wonder if the number of witnesses who testified makes any

09:19:36   4    difference.  Do not make any decisions based only on the

09:19:39   5    number of witnesses who testified.  What is more important

09:19:41   6    is how believable the witnesses were and how much weight you

09:19:45   7    think their testimony deserves.  Concentrate on that, not

09:19:48   8    the numbers.

09:19:49   9         Certain charts and summaries have been shown to you in

09:19:54 10    order to help explain the facts disclosed by books, records,

09:19:58 11    and other documents that are in evidence in this case.

09:20:01 12         However, these charts or summaries are not, in and of

09:20:05 13    themselves, evidence or proof of the facts.  If the charts

09:20:07 14    or summaries do not correctly reflect facts or figures shown

09:20:11 15    by the evidence in the case, you should disregard them.

09:20:13 16         There is one more general subject that I want to talk

09:20:20 17    take you about before I begin explaining the elements of the

09:20:22 18    claims.  The lawyers for both sides objected to some of the

09:20:25 19    things that were said or done during the trial.  Do not hold

09:20:27 20    that against either side.  The lawyers have a duty to object

09:20:32 21    whenever they think that something is not permitted by the

09:20:34 22    Rules of Evidence.  Those rules are designed to make sure

09:20:37 23    that both sides receive a fair trial.

09:20:39 24         And do not interpret my rulings on their objections as

09:20:42 25    any indication of how I think I --- of how I think the case

7070

## Charge to the Jury

09:20:49 1 should be decided. My rulings were based on the Rules of

09:20:54 2 Evidence, not on how I feel about the case. Remember that

09:20:56 3 your decision must be based only on the evidence that you

09:20:59 4 saw and heard here in court.

09:21:01 5       That concludes the part of my instructions explaining

09:21:08 6 your duties and the general rules that apply in every civil

09:21:10 7 case. In a moment, I will explain the elements of

09:21:13 8 plaintiffs' claims. But before I do that, I want to mention

09:21:16 9 the following:

09:21:18 10       Each of the defendants are corporations. Corporations

09:21:22 11 can be held liable for their acts or omissions, just as you

09:21:25 12 or I can. As corporations, they can act, or fail to act,

09:21:29 13 only through their officers and employees. The conduct of

09:21:33 14 an officer or employee acting within the scope of his or her

09:21:37 15 employment should be treated as the conduct of the

09:21:40 16 corporation.

09:21:41 17       During my summary of the plaintiffs' claims, I will

09:21:45 18 often use the word "person" or "persons." Please bear in

09:21:48 19 mind that for all of these claims, corporations are

09:21:50 20 considered persons. Each person, including each

09:21:53 21 corporation, is considered a separate person under the law

09:21:58 22 whose liability must be separately determined.

09:22:00 23       I will now instruct you on the elements of plaintiffs'

09:22:07 24 public nuisance claims.

09:22:07 25       Each plaintiff alleges that each defendant dispensed

7071

**Charge to the Jury**

09:22:12  1   opioid products in a manner that endangered public health or

09:22:16  2   safety, thereby creating a public nuisance.  Specifically,

09:22:19  3   each plaintiff claims that each defendant substantially

09:22:22  4   contributed to an oversupply of legal prescription opioids

09:22:27  5   and to diversion of those opioids into the illicit market

09:22:31  6   outside of appropriate medical channels, thereby endangering

09:22:36  7   public health or safety.

09:22:36  8       Let me define for you the legal term "public

09:22:41  9   nuisance."  A public nuisance is an unreasonable inference

09:22:45 10   with a right held by the public in common that is ongoing

09:22:48 11   today.  A public nuisance includes an unreasonable

09:22:56 12   interference with public health or public safety.

09:22:58 13       A right common to the general public is a right or an

09:23:00 14   interest that belongs to the community at large.  It is a

09:23:02 15   right that is collective in nature.  A public right is

09:23:05 16   different from an individual right that everyone has, like

09:23:08 17   the right not to be assaulted or defrauded.

09:23:11 18       For a defendant to be held liable for creating a

09:23:15 19   public nuisance, a plaintiff must show, by the greater

09:23:17 20   weight of the evidence, that the defendant did one or both

09:23:20 21   of the following two things:

09:23:22 22       First, the defendant engaged in intentional conduct

09:23:26 23   that caused a significant and ongoing interference with a

09:23:30 24   public right to health or safety;

09:23:32 25       Or two, the defendant engaged in unlawful conduct that

## Charge to the Jury

09:23:36 1  caused a significant and ongoing interference with a public

09:23:40 2  right to health or safety.

09:23:42 3      Please remember that you are being asked to determine

09:23:45 4  only whether one or more of the defendants created a public

09:23:50 5  nuisance.  You are not being asked to determine whether

09:23:52 6  there should be a remedy for this claim, or what that remedy

09:23:59 7  should be.  If you find that one or more of the defendants

09:24:01 8  created a public nuisance, the Court will determine the

09:24:03 9  remedy.

09:24:07 10     Now, let me define some of the terms I just used.  One

09:24:10 11  of those terms is "intentional conduct."

09:24:13 12     Intentional conduct occurs when a person acts with the

09:24:17 13  purpose to produce a specific result.  A person intends an

09:24:21 14  act when that act is done purposely, not accidently.  The

09:24:26 15  intent with which a person acts is known only to that

09:24:29 16  person.

09:24:30 17     There are two ways to prove a person's intentional

09:24:33 18  conduct.  One, when a person expresses their intent to

09:24:36 19  others.  Or two, when a person somehow indicates their

09:24:39 20  intent by their conduct.

09:24:40 21     For you to find that a person engaged in intentional

09:24:44 22  conduct, it is enough that the person intended to act and

09:24:47 23  knew, or was substantially certain, that the circumstances

09:24:51 24  resulting from that act would interfere with public health

09:24:54 25  or public safety.  It is not necessary for you to find that

**Charge to the Jury**

09:24:58  1     the person intended to cause a public nuisance.

09:25:00  2          If a person learns that circumstances resulting from

09:25:05  3     their conduct interfere with public health or public safety,

09:25:09  4     and the person continues that conduct, then the subsequent

09:25:13  5     conduct is intentional.

09:25:16  6          Settlement agreements.

09:25:18  7          You have heard testimony about settlements that

09:25:21  8     certain defendants entered into with the DEA, the Drug

09:25:26  9     Enforcement Administration.  This settlement evidence has

09:25:28 10     been admitted for a limited purpose.  You may consider these

09:25:32 11     settlements only to the extent you believe they bear on what

09:25:36 12     notice or knowledge the defendant received as a result of

09:25:39 13     the settlements, or to the extent you believe they bear on

09:25:43 14     the defendants' intent.  You may not infer liability or draw

09:25:46 15     any conclusions about a defendant's potential liability in

09:25:50 16     this case based upon the fact that it entered into those

09:25:54 17     settlements.

09:25:55 18          Employee conversations.

09:25:58 19          You have heard testimony from one or more of the

09:26:01 20     defendants' employees about conversations they testified

09:26:05 21     they had with officials from State Boards of Pharmacy.  This

09:26:10 22     evidence has been admitted for a limited purpose.  You may

09:26:13 23     consider their recollections of those conversations as

09:26:18 24     evidence of the defendants' own knowledge or intent.  You

09:26:21 25     may not consider the testimony as evidence of any official

7074

**Charge to the Jury**

09:26:24  1    policy of any Board of Pharmacy.

09:26:26  2         Now, let me define the term "unlawful conduct."

09:26:33  3         Unlawful conduct can occur either by acting in a

09:26:37  4    certain way that is prohibited by law, or by failing to act

09:26:41  5    in a certain way that is required by law.  Specifically,

09:26:45  6    unlawful conduct occurs when a person engages in conduct

09:26:49  7    that is prohibited by a statute, ordinance, or regulation

09:26:53  8    that controls safety.  And unlawful conduct also occurs when

09:26:57  9    a statute, ordinance, or regulation that controls safety

09:27:01 10    requires a person to engage in certain conduct, but the

09:27:05 11    person fails to do so.

09:27:07 12         The person does not need to know their conduct is

09:27:10 13    unlawful for an unlawful act to occur.

09:27:12 14         A law controls safety if it imposes specific legal

09:27:17 15    requirements for the protection of the health, safety, or

09:27:20 16    welfare of others.  The Federal and Ohio Controlled

09:27:25 17    Substances Acts and their accompanying regulations are laws

09:27:27 18    that control safety.

09:27:28 19         Conduct that is fully authorized by a statute,

09:27:32 20    ordinance, or regulation cannot create a public nuisance

09:27:36 21    because it is lawful conduct.  But if a person's conduct

09:27:39 22    does not comply with what is authorized by law, then that

09:27:42 23    conduct may be unlawful conduct.

09:27:44 24         Plaintiffs contend each defendant's conduct with

09:27:48 25    respect to their dispensing of controlled substances did not

**Charge to the Jury**

09:27:53 1    comply with the Federal and Ohio Controlled Substances Acts

09:27:57 2    and their accompanying regulations.  Prescription opioids

09:28:01 3    are controlled substances within the meaning of Federal and

09:28:04 4    Ohio law and regulations.

09:28:05 5         The Federal and Ohio Controlled Substances Acts and

09:28:10 6    their accompanying regulations do not require strict or

09:28:13 7    perfect compliance.  Only substantial compliance is

09:28:16 8    required.  In other words, not every act that is in

09:28:20 9    violation of the law can be a public nuisance.  Only

09:28:23 10   unlawful conduct that causes a significant interference with

09:28:27 11   a public right to health or safety can be a public nuisance.

09:28:34 12        Under both Federal and Ohio laws and regulations,

09:28:38 13   entities that are authorized to dispense controlled

09:28:40 14   substances are required to provide effective controls and

09:28:43 15   procedures to guard against theft and diversion.

09:28:46 16        A prescription for a controlled substance must be

09:28:49 17   issued for a legitimate medical purpose by a doctor, or

09:28:53 18   other registered prescriber, acting in the usual course of

09:28:57 19   his or her professional practice.  The Federal and Ohio

09:29:02 20   Controlled Substances Acts and their accompanying

09:29:05 21   regulations also provide that the pharmacist who fills the

09:29:09 22   prescription has a corresponding responsibility for proper

09:29:14 23   dispensing of controlled substances for a legitimate medical

09:29:16 24   purpose.  The corresponding responsibility for proper

09:29:20 25   dispensing of valid prescription extends to the pharmacy

7076

**Charge to the Jury**

09:29:24  1    itself.

09:29:25  2         A violation of the corresponding responsibility occurs

09:29:29  3    when a person knowingly fills or allows to be filled an

09:29:33  4    illegitimate prescription.  In this context, knowingly

09:29:38  5    includes when a person acts with deliberate ignorance or

09:29:43  6    willful blindness to information in their possession.

09:29:46  7         Public nuisance-causation.

09:29:51  8         Under either of the two ways of proving public

09:29:55  9    nuisance; that is, showing intentional conduct or unlawful

09:29:58  10   conduct, a plaintiff must prove by the greater weight of the

09:30:02  11   evidence that a defendant's conduct caused an interference

09:30:05  12   with a right to public health or safety that is ongoing

09:30:08  13   today.  Let me explain something about causation.

09:30:11  14        You may find a defendant liable only if you conclude

09:30:16  15   the defendant was a proximate cause of a public nuisance.  A

09:30:21  16   public nuisance may be proximately caused by a defendant's

09:30:24  17   act or failure to act.  A defendant's conduct proximately

09:30:28  18   caused a public nuisance if the circumstances that

09:30:32  19   constitute the nuisance are the natural and foreseeable

09:30:36  20   result of that conduct.

09:30:37  21        There may be more than one proximate cause of a public

09:30:40  22   nuisance, but causes that are merely incidental are not

09:30:43  23   proximate causes.  To be a proximate cause, the acts or

09:30:46  24   omissions of a defendant must be a substantial factor in

09:30:51  25   producing circumstances that unreasonably interfere with a

**Charge to the Jury**

09:30:57  1    public right to health or safety.

09:30:59  2         An individual defendant's conduct need not be

09:31:01  3    independently capable, all by itself, of causing the public

09:31:04  4    nuisance.  There may be multiple causes of a public

09:31:07  5    nuisance.  The fact that some other cause or causes combined

09:31:11  6    with the defendant's conduct in creating the public nuisance

09:31:14  7    does not relieve that defendant from liability if the

09:31:17  8    plaintiff can prove that the conduct the defendant engaged

09:31:20  9    in was a substantial factor in creating the public nuisance.

09:31:25 10         A defendant's conduct is substantial if a reasonable

09:31:28 11    person would regard that conduct as the cause, or one of the

09:31:32 12    material, meaningful, or considerable causes, of the

09:31:36 13    nuisance.  If you find that the conduct of any defendant

09:31:39 14    proximately caused a public nuisance, it is not a defense to

09:31:43 15    liability that some other entity may also be to blame.

09:31:47 16         In addition, the plaintiff must show by the greater

09:31:53 17    weight of the evidence that the conduct a defendant engaged

09:31:55 18    in could reasonably be expected to cause an interference

09:31:59 19    with public health or safety.  A defendant does not,

09:32:01 20    however, need to foresee that their conduct would lead to

09:32:04 21    the specific nuisance that occurred.

09:32:06 22         I have instructed you that a public nuisance is an

09:32:11 23    unreasonable interference with a right held by the public in

09:32:14 24    common, and I have used the phrase, significant interference

09:32:16 25    with a public right to health or safety.  Let me define the

## Charge to the Jury

09:32:21 1    terms "significant" and "unreasonable."

09:32:22 2         An interference with a public right may range from a

09:32:27 3    petty annoyance to serious harm.  An interference with a

09:32:31 4    public right is not significant or unreasonable if it causes

09:32:35 5    only a relatively slight amount of inconvenience.

09:32:38 6         An interference with a public right is significant or

09:32:41 7    unreasonable if it causes greater harm than the public

09:32:45 8    should be required to bear, considering all the

09:32:47 9    circumstances.  When you consider whether an interference

09:32:51 10   with a public right is significant or unreasonable, some of

09:32:55 11   the factors you may consider include the nature, extent, and

09:32:59 12   duration of the interference, and the social value of the

09:33:03 13   defendant's conduct.

09:33:07 14        When rendering your verdict on the plaintiffs' claims

09:33:10 15   of public nuisance, you must consider each claim against

09:33:13 16   each defendant separately.  In other words, you must

09:33:16 17   independently decide each separate plaintiff's claim against

09:33:20 18   each separate defendant.

09:33:22 19        Thus, if you find that a particular plaintiff has

09:33:24 20   proved its public nuisance claim by the greater weight of

09:33:27 21   the evidence against a particular defendant, then your

09:33:30 22   verdict must be for that plaintiff and against that

09:33:33 23   defendant.

09:33:33 24        Similarly, if you find that a particular plaintiff has

09:33:37 25   failed to prove its public nuisance claim by the greater

## Charge to the Jury

09:33:40 1    weight of the evidence against a particular defendant, then

09:33:44 2    your verdict must be against that plaintiff and for that

09:33:47 3    defendant.

09:33:47 4       To repeat:  You must independently decide each

09:33:51 5    separate plaintiff's claim against each separate defendant

09:33:55 6    and render your verdict accordingly.  Just because you find

09:33:58 7    in favor of one plaintiff or one defendant does not mean you

09:34:01 8    must find in favor of any other plaintiff or any other

09:34:05 9    defendant.

09:34:05 10       The verdict forms will guide you through this process.

09:34:08 11       So those of you who were following along, if you just

09:34:12 12    put aside your instructions now, and we will have the final

09:34:17 13    arguments of counsel.

09:34:20 14       The way this works, because the plaintiff has the

09:34:23 15    burden of proof, the plaintiff will go first, and the rules

09:34:26 16    permit the plaintiff to reserve a small amount of time for

09:34:30 17    rebuttal.

09:34:31 18       So Mr. Lanier will proceed, and I anticipate his

09:34:35 19    arguments will take the balance of the morning.  He will

09:34:39 20    take a mid-morning break at a convenient time.  And then

09:34:43 21    after lunch, we will have, in turn, the final arguments of

09:34:47 22    each of the three defendants.

09:34:49 23       So, Mr. Lanier, you may proceed, please.

09:35:15 24          MR. LANIER:  I think my mic is on, Your Honor.

09:35:21 25    No, it's not.

**Closing Argument - Lanier**

09:35:22 1          Mr. Pitts, you got the magic.  Thank you.

09:35:22 2                  CLOSING ARGUMENT BY PLAINTIFFS

09:35:38 3          MR. LANIER:  All right.  Your Honor, may it

09:35:39 4  please this Court, counsel, clients, ladies and gentlemen of

09:35:48 5  the jury, I feel like I've kind of gotten to know y'all a

09:35:52 6  little bit.  Not because we've had a chance to visit, but

09:35:55 7  because I see what you wear, I see the masks, I watch you

09:36:01 8  walk in, I watch you walk out, I know when some are

09:36:03 9  celebrating birthdays -- by the way, Pete Weinberger is 71

09:36:09 10  today.  Side note.

09:36:11 11          I know when some of you are celebrating birthdays.  I

09:36:14 12  know when you're ready for a break.  I've gotten to know you

09:36:18 13  some, and I'm sure you've gotten to know me some.  You've

09:36:22 14  gotten used to my accent, I hope.  My vocabulary is probably

09:36:27 15  a little different than a lot of folks around here.  But

09:36:31 16  I've taken a lot of solace in getting to try this case to

09:36:43 17  you.

09:36:43 18          The judge picked so many people because he expected --

09:36:46 19  and, frankly, I think all of us expected -- to lose people

09:36:50 20  in the process of this.  This is a long trial.  And there's

09:36:53 21  a lot that can come to you in your plate, whether it's

09:36:57 22  school or whether it's whatever job you've got or whatever

09:37:00 23  you're doing.  And the rules require us to keep at least 6

09:37:06 24  people.  So the judge had us loaded where we could lose 8

09:37:10 25  people and still keep a verdict.  And yet, here you are.

**Closing Argument - Lanier**

09:37:17  1    And we've got you here because you're so blasted interested

09:37:24  2    in this, and that's so apparent to us.  And I hope it does

09:37:32  3    not escape your awareness that what you're about is a very

09:37:40  4    important case.  It's part of a larger picture where we're

09:37:44  5    trying to figure out who's responsible and to what degree

09:37:49  6    for the opioid epidemic that plagues not just Northeastern

09:37:58  7    Ohio, but, frankly, plagues most places within the country.

09:38:03  8         And within the framework of that, His Honor has carved

09:38:05  9    out this case to give us a chance to focus on what

09:38:10  10   ultimately now are these three chain pharmacies.  Because

09:38:14  11   they claim to take no responsibility:  none, zero, zip.  And

09:38:22  12   yet we think they play a significant role in this as that

09:38:27  13   last line of defense, and so we've come forward to try this

09:38:33  14   case.

09:38:33  15        I've been honored to be asked to lead this trial.

09:38:35  16   I've been so ably assisted.  I mean, y'all know what Pete's

09:38:40  17   done, and you know I'm going to brag on my daughter for what

09:38:43  18   she's done.  But I want to tell you Maria Fleming,

09:38:46  19   Ms. Fleming has taken care of all of the exhibits in this

09:38:49  20   case and making sure that we've got them, that they've been

09:38:52  21   admitted into evidence, that we've got our objections.  Her

09:38:55  22   job.  Frank Gallucci's job, just incredible what he's done

09:39:00  23   working on this.  And so I come to you with a host of people

09:39:05  24   out there that have worked so hard on this case for years

09:39:09  25   now.

### Closing Argument - Lanier

09:39:12  1    But what you're about is something of supreme

09:39:16  2  importance.  Even before this trial you'd never heard of the

09:39:20  3  *Holiday*, I suspect.  *Holiday* was a seminal case.  It came

09:39:25  4  out of Florida.  It was against CVS.  Two of their

09:39:30  5  pharmacies down there had some major problems.  And that

09:39:36  6  case was one that was published in the Federal Register so

09:39:41  7  that everybody would be on notice about what it said.  And

09:39:46  8  what it said was profound.  You'll have a redacted version

09:39:52  9  back there that you can look at and read yourself.

09:39:55  10    But what you're about here is not only every bit as

09:40:01  11  important as the *Holiday* case.  What you're about here is

09:40:05  12  something that's even more important.  Because you're going

09:40:07  13  to make decisions, and those decisions will be reported.

09:40:15  14  And the reporting of those decisions will set up the

09:40:18  15  standards by which these chain pharmacies and independent

09:40:21  16  pharmacies must act.

09:40:25  17    You are actually sitting in the seat now as finders of

09:40:29  18  fact to determine what the facts are that answer these

09:40:34  19  questions to determine what is permissible in our society

09:40:39  20  within the framework of the law and what is not.  That's an

09:40:45  21  awesome, awesome responsibility, but it's an awesome,

09:40:51  22  awesome opportunity.  And that's. . . that's what's driven

09:41:00  23  our team.  Because we've shouldered that opportunity and

09:41:07  24  responsibility up till now, but today I hand it off.

09:41:09  25    I was talking to my wife this morning as we were

**Closing Argument - Lanier**

09:41:12 1    getting ready to come over here, and I said, you know,

09:41:15 2    Becky, this is like, you know, it's one of those football

09:41:22 3    games -- I'm not talking Browns.  We don't talk about that

09:41:25 4    today, but it's one of those football games where -- and by

09:41:30 5    the way, I'd like to go on the record and say I am not a

09:41:34 6    Dallas Cowboy fan.  If there is any doubt, just because I'm

09:41:37 7    from Texas, I like it when they lose, and I'd just like to

09:41:39 8    make that clear.  You may hate me.  I am a Kansas City fan,

09:41:45 9    but I am not a Dallas Cowboy fan.

09:41:47 10       But regardless, there comes a point where in

09:41:51 11   someplace, the quarterback hands off the ball, someone else

09:41:54 12   starts running with it, or he throws the ball, and at that

09:41:58 13   point all he can kind of do is watch.

09:42:04 14       Well, today, I get to hand this to y'all, and I'm

09:42:10 15   done.  Y'all get to figure out what's okay and what's not.

09:42:15 16   Y'all get to decide.  Y'all get to form maybe the most

09:42:21 17   seminal case in pharmaceutical history, in pharmacy history,

09:42:26 18   dealing with the Controlled Substances Act.  That's you.

09:42:30 19       And so what we're about here today is something that's

09:42:33 20   real important.  I've put together a PowerPoint presentation

09:42:37 21   here.  It -- some of these slides you've seen before, but

09:42:40 22   this is just sort of the national crisis.  And this has

09:42:47 23   national ramifications.  It's not the kind of thing where

09:42:51 24   people will say years down the road, oh, that only pertained

09:42:54 25   to those three pharmacies in Northeastern Ohio in Lake and

**Closing Argument - Lanier**

09:42:58  1    Trumbull County.  No, this will have ramifications all

09:43:01  2    around the United States of America.

09:43:03  3         And, so, as you examine it, and you examine this

09:43:06  4    opioid crisis, which His Honor has just done a Yeoman's job

09:43:11  5    over the years of trying to administer this massive beast of

09:43:16  6    litigation.  Hand-selected to do so, I might add.  And what

09:43:24  7    we've learned and what you've gotten a glimpse of as they've

09:43:28  8    talked about the different parties that have been sued

09:43:30  9    before and what's happened to this and what's happened to

09:43:32 10    that is as we try to sort through this very complicated

09:43:36 11    beast to determine who needs to be at the table to assess

09:43:40 12    their share of responsibility.  And that's what we're here

09:43:46 13    to try to find out.

09:43:47 14         And so I suggested to you in opening that this is a

09:43:50 15    bit like a connect-the-dots picture, and if you don't

09:43:56 16    connect all of the dots, you don't get the right picture.

09:44:00 17    We can't describe the opioid mess and leave out some of the

09:44:04 18    dots.  I said -- and I think it was heard wrong, it

09:44:13 19    certainly was misrepresented to you -- I said that a

09:44:18 20    pharmacist is not a gumball machine, that they have more

09:44:24 21    responsibility than simply taking your money and giving you

09:44:27 22    your pills.  They have more responsibility than simply

09:44:31 23    looking at your prescription and determining did you forge

09:44:35 24    it.  They have more responsibility than simply calling the

09:44:38 25    doctor and saying, are you sure.  They go to school for

**Closing Argument - Lanier**

09:44:44   1    years and years and take all of these things.  They have to

09:44:47   2    take a test to get a license.  The test, I might add, that

09:44:53   3    for decades was overseen by the National Boards of Pharmacy,

09:45:00   4    Carmen Catizone.  But when you start looking at all of the

09:45:05   5    different parties responsible, then you begin to see more

09:45:09   6    fully what the true picture is, and that's the zebra in my

09:45:12   7    illustration.

09:45:13   8         So the question becomes, CVS pharmacy, are they part

09:45:17   9    of the problem?

09:45:20  10         The question becomes, Walgreens, are they part of the

09:45:25  11    problem?

09:45:26  12         Walmart, are they a part of the problem?

09:45:29  13         Now, the pharmacies, they don't mind telling you that

09:45:32  14    pharmacies can be a part of the problem.  Because they'll

09:45:36  15    point the finger at Franklin, and they'll point the finger

09:45:40  16    at Overholt's.  They'll tell you pharmacies have

09:45:44  17    responsibilities.  They'll tell you they can be part of the

09:45:46  18    problem.  They're just saying, not me.  And that's what you

09:45:52  19    get to sit here and decide.  And the judge says you do that

09:45:57  20    by the preponderance of the evidence.  That means the

09:46:00  21    greater weight of credible evidence.  That means that I've

09:46:05  22    got to show that it's more likely than not that they were

09:46:14  23    the contributing part of the problem, that they have to be

09:46:18  24    under the law.

09:46:19  25         So I've got to show that.

**Closing Argument - Lanier**

09:46:21  1          Now, I think we've done it not just by the greater
09:46:24  2    weight of credible evidence.  I think we've done it
09:46:27  3    tremendously.  And I'm going to march through that with you.
09:46:33  4    But if you get back in that jury room and you start hashing
09:46:37  5    this out with each other and someone says, you know, I'm not
09:46:41  6    sure that that's totally proven, you can remind the other
09:46:47  7    jurors that they can have 49 percent doubt and still vote
09:46:50  8    for the counties in this case.  I mean, this is a
09:46:57  9    preponderance of the evidence, and the judge gives a really
09:47:00  10   clear instruction on that.
09:47:01  11         So you're not going to be totally surprised, but,
09:47:04  12   yeah, I've got a road map for closing argument.  I'm sorry.
09:47:07  13         I'll pass it out.
09:47:11  14         Juan, could I please have the ELMO.
09:47:18  15         Juan, it looks like it has frozen our photograph.  Do
09:47:22  16   we have an ability to unfreeze it?
09:47:31  17         And if not, I'll just stand up and hold it.  I get to
09:47:34  18   stand close to the jury, but if you can figure out how to
09:47:37  19   make that work, that would be wonderful.
09:47:43  20         Ah.  Juan Wilson.  Write it down.  He's going to be
09:47:48  21   famous.
09:47:49  22         So here is your -- a little bit bigger -- your closing
09:47:55  23   argument road map.
09:47:58  24         I've got three stops along the way.  I want to talk
09:48:01  25   about a recap of the trial.  And somewhere in there we'll

**Closing Argument - Lanier**

09:48:06   1   have our morning break.  And then I want to talk about the

09:48:10   2   judge's questions and instructions that have been shown to

09:48:13   3   you.

09:48:14   4        Now, don't die over this, but the judge has given each

09:48:19   5   side 3 hours today to argue.  So the way mine is divided up,

09:48:24   6   I've got 2 and a half hours.  I hope to finish by the lunch

09:48:27   7   break.  And then once I'm done, each of the defendants have

09:48:32   8   up to 3 hours when you add it all together.  So they don't

09:48:36   9   get 3 hours apiece.  But that's my road map.  I don't know

09:48:39  10   what order they'll go in, and I don't know how much.  But

09:48:42  11   we'll detour from what I'm doing for you to hear from CVS,

09:48:46  12   Walmart, and Walgreens.  And then we'll come back to me, and

09:48:48  13   I'll save 30 minutes at the end of the day to recap a grand

09:48:53  14   finale, if you will, having heard their arguments, I get a

09:48:59  15   chance to respond.  And that's the way the rules are set up.

09:49:03  16        So in opening I told you that we were --

09:49:06  17        Juan, why don't we go back to the PowerPoint, please.

09:49:11  18        In opening I told you that we were binge watching --

09:49:13  19   and that was the theme -- you've been binge watching

09:49:16  20   opioids.  This is a chance for you to get your popcorn, if

09:49:19  21   you eat it this early in the morning, sit back, because

09:49:21  22   we're going to finish binge watching in closing argument the

09:49:24  23   opioid trial as I review the evidence, and we're going to do

09:49:26  24   it with those three stops, the recap, the questions, and

09:49:29  25   then the finale at the end.  But we'll start with the recap.

7088

**Closing Argument - Lanier**

09:49:32  1      So if I was going to recap opioid epidemic episode 1

09:49:35  2  recap, where would I start?  Do you realize how many

09:49:38  3  witnesses you've heard?  I've been working on this case for

09:49:42  4  what seems to be a lifetime, and I couldn't remember all the

09:49:46  5  witnesses you've heard.  I don't -- I admire that you're

09:49:51  6  taking notes.  Did you know some judges do not let jurors

09:49:54  7  take notes?

09:49:55  8      I can't understand how they could ever do this,

09:49:57  9  Your Honor, but I thank you that you've given them that

09:49:59 10  chance.

09:49:59 11      Because he is driving for you to be in the best

09:50:04 12  position you can to make a fair and just decision.  That's

09:50:09 13  why he's made the rulings he's made.  Sometimes I have been

09:50:12 14  so frustrated with him and his rulings, I'm sure the other

09:50:15 15  side has as well, but he's just calling those balls and

09:50:19 16  strikes.  He doesn't care about anything except trying to

09:50:21 17  get to what's right.  And that's why we're here right now.

09:50:24 18      So instead of just doing this hodgepodge, I thought I

09:50:27 19  would just walk through the witnesses basically in the order

09:50:29 20  in which they came.  I have taken out the Giant Eagle

09:50:33 21  witnesses.  I'm not allowed to tell you why Giant Eagle is

09:50:37 22  not a part of this case anymore, it shouldn't be an issue,

09:50:40 23  but they're not.

09:50:41 24      I've also taken out the dispense -- the distribution

09:50:45 25  part of this case.  Frankly, we were running out of time to

## Closing Argument - Lanier

09:50:50  1    try and put it all together, and so we decided that we would

09:50:53  2    just look and focus in on the dispensing.  And that's what

09:50:57  3    we're doing at this point.  So one or two witnesses will be

09:51:01  4    missing in my recap here because of that.

09:51:03  5        But the first witness I put on the stand was

09:51:06  6    Tom Davis.  He was vice president of pharmacy services for

09:51:09  7    CVS.  CVS is now seated right over there (indicating) at

09:51:14  8    that back table.  And he talked, and he said a few things.

09:51:18  9    I don't think his testimony was as full as I would have

09:51:21  10   liked it to have been because he was very limited in what he

09:51:25  11   knew, even though he was a vice president of pharmacy

09:51:29  12   services.

09:51:30  13       Now, he did admit that opioid abuse and addiction is a

09:51:34  14   devastating issue.  I did get that from him.

09:51:36  15       He also -- got some documents, and you're not going to

09:51:41  16   be stunned to find out I have some documents to show you as

09:51:44  17   we go along.  You'll also hear from him that he was the one

09:51:50  18   who had Michelle Travassos and Nicole Harrington worked for

09:51:56  19   him.  So you heard from both of them.  He was their boss.

09:51:58  20       But he wasn't really tuned in beyond that.  He knew

09:52:02  21   about CVS's multiple settlements.  We had testimony from him

09:52:06  22   that he knew about CVS selling prescription data to IMS.

09:52:14  23   They would take the prescription data and sell it to another

09:52:19  24   service company.  And so we had that kind of testimony from

09:52:26  25   him.

### Closing Argument - Lanier

09:52:26  1      But after he finished the stand, we went from him to

09:52:30  2   Anna Lembke.  Dr. Lembke.  She's one of the most impressive

09:52:35  3   people I've ever had the honor of putting on the stand.  I

09:52:38  4   started trying cases -- I got out of law school in 1984.  So

09:52:42  5   I've been doing this for 37 years.  I've been fortunate

09:52:49  6   enough to try cases from California to New Jersey and all

09:52:55  7   points in between.  She's one of the best witnesses I've

09:52:59  8   ever had a chance to put on.  So impressive.

09:53:04  9      I mean, she is someone who explained addiction, but I

09:53:09 10   do hope, you know, if you get a chance sometime -- all

09:53:13 11   right, look.  It's not like the most riveting reading, but

09:53:17 12   it's actually really captivating.  But she's like the one

09:53:22 13   that all of the podcasts turn to, the news turns to,

09:53:27 14   academia turns to, because this is her deal.  She's a

09:53:32 15   specialist in this.  She actually -- it's not an ivory tower

09:53:38 16   specialist.  She treats people on a regular weekly basis as

09:53:43 17   well as writes, researches, and lectures, and teaches,

09:53:49 18   trains the next generation of doctors.

09:53:51 19      And she explained opioid addiction to you.  She

09:53:53 20   explained this pleasure/pain balance.  She explained how

09:53:57 21   humans are designed to seek pleasure and avoid pain, but the

09:54:01 22   problem is something happens.  I'll tell you -- let me do it

09:54:05 23   this way.  Let me pull up some of the ELMO notes that we had

09:54:08 24   with her and look at what she had to say.

09:54:10 25      Mr. Wilson, can we go back to the iTiVo, please?

**Closing Argument - Lanier**

09:54:17  1    Thank you.

09:54:18  2        When I put her on the stand, she had this really great

09:54:22  3    ability to explain addiction.  And so she -- you'll recall

09:54:30  4    these notes, I expect.  She explained that dopamine is the

09:54:37  5    most important neurotransmitter.  I mean, she had the

09:54:42  6    science down, how it activates in our brain to reward and

09:54:47  7    motivate, and it's got this loop.  She explained how the

09:54:51  8    brain works hard to keep things level.  And so when all of a

09:54:55  9    sudden you're in pain, your brain's yelling for pleasure.

09:55:03 10    But you give it the pleasure with the opioids, and then it's

09:55:05 11    yelling for pain because it wants to equalize, and talked

09:55:05 12    about how the brain starts adapting, neuroadaptation she

09:55:11 13    called it.

09:55:12 14        She talked about how one of the -- let's see.  I've

09:55:16 15    got to scoot this over a little bit and make more room.

09:55:18 16        Thank you, Pete.

09:55:19 17        Opinion 10 of hers, that an increased supply of

09:55:25 18    prescription opioids contributed substantially to more

09:55:29 19    individuals, including newborns, becoming dependent on

09:55:35 20    opioids, increasing their risk for opioid-related morbidity

09:55:40 21    and mortality.  The dependence effect.

09:55:43 22        She talked about how -- that's in addition to

09:55:46 23    addiction, that dependence is not addiction, but it's an

09:55:47 24    adaptation with withdrawal.

09:55:49 25        And I thought it was so very important how she

7092

**Closing Argument - Lanier**

09:55:52  1   explained all of this, because in the process, do you

09:55:54  2   remember what she did about side effects of opioid

09:55:57  3   dependence and addiction?

09:56:00  4        Depression.  Not thinking as clearly.  Increased pain.

09:56:08  5        Think back about the pharmacists who talked about, you

09:56:11  6   know, we had Ms. Stossel who talked about that one fellow

09:56:16  7   who is just getting mountains and mountains of

09:56:18  8   prescriptions, and she said, well, yeah, but I could tell he

09:56:21  9   was in pain.

09:56:21 10        And I asked her, do you know if maybe that was

09:56:23 11   withdrawal as opposed to he needs more opioids?  Well, she

09:56:31 12   didn't know.

09:56:31 13        This was the fellow who was getting his prescriptions

09:56:35 14   from a doctor who, yeah, he says he's a rehabilitation

09:56:40 15   doctor, but the first thing he lists is he's a hormone

09:56:43 16   doctor.  And yet hormonal imbalance is yet another trait,

09:56:48 17   side effect, of opioid dependence and addiction.

09:56:52 18        And so she talked about all of this.  She explained

09:56:54 19   how important it is, and she explained, most importantly in

09:56:57 20   our case here, that the increased supply of prescription

09:57:02 21   opioids contributed substantially to more individuals

09:57:07 22   becoming addicted to opioids and transitioning from

09:57:10 23   prescription opioids to illicit sources.

09:57:13 24        You start out on prescription opioids.  They're easy

09:57:18 25   to access.  You can get them from the medicine cabinet.  You

**Closing Argument - Lanier**

09:57:21  1    can get them from a friend.  You can get them from any

09:57:24  2    oversupply where they're still out there and not being used.

09:57:27  3    And you take them, and you get addicted, and you can buy

09:57:30  4    more on the street until, all of a sudden, the sources start

09:57:34  5    drying up.  And then the price becomes so high, it's cheaper

09:57:38  6    to buy heroin, or it's cheaper to buy street fentanyl, or

09:57:42  7    it's cheaper to buy some other street opiate because you've

09:57:46  8    got to get the opiate satisfaction.

09:57:47  9         And that's what it is.  And it's a biological problem.

09:57:50  10        She gave us this chart about how all patterns of

09:57:53  11   prescription opioid use lead to heroin, whether it's medical

09:57:58  12   use or non-medical use.

09:58:01  13        And this isn't what she made up.  This is something

09:58:04  14   she grabbed from the Journal of Addiction Medicine, and she

09:58:07  15   cited it accordingly.  But she left no question.  She said

09:58:12  16   there's no doubt a cause and effect relationship exists

09:58:14  17   between the oversupply of prescription opioids and the

09:58:17  18   opioid epidemic.  And she said that in the last several

09:58:20  19   years it was more illegal drugs because the acts have moved

09:58:29  20   to those drugs.  But we have that.

09:58:31  21        And she not only testified to those things, even as an

09:58:32  22   early witness, she testified to the cause being, in part,

09:58:39  23   the actions of the chain pharmacy defendants in this case.

09:58:45  24        She expressed Opinion Number 2:  When a supply -- when

09:58:48  25   supply of an addictive drug is increased -- in other words,

**Closing Argument - Lanier**

09:58:51  1    there's more of it -- more people become addicted to and

09:58:55  2    suffer the harms of that drug.  Her example was alcohol and

09:58:59  3    prohibition.

09:59:00  4         Prescription opioids are as addictive as heroin, and

09:59:03  5    the defendants' conduct in promoting increased supply --

09:59:09  6    they were the spigot, they were the regulators, they were

09:59:12  7    the ones who were the last line of defense -- increased

09:59:15  8    supply of widespread access to prescription opioids has

09:59:19  9    resulted in an epidemic of opioid addiction and overdose

09:59:22 10    deaths.

09:59:23 11         She used this chart (indicating).  She showed you from

09:59:28 12    the CDC how you could parallel the increases in opioid sales

09:59:32 13    with opioid deaths and substance abuse treatment.

09:59:38 14         And you can look at the chart and you can see, it's

09:59:41 15    exactly what she said.  As the sales increased, the deaths

09:59:46 16    increased and the need for treatment increased.  It just

09:59:49 17    walks right through.

09:59:50 18         And are doctors to blame for this?  Oh, without a

09:59:54 19    doubt.  A lot of doctors.  99 percent.  Whatever the stat

09:59:59 20    may be.  I don't know if 99 percent means someone did an

10:00:02 21    actual study or if it just -- that's just your way of

10:00:05 22    saying, like, most of them.  99 percent.  I don't know.

10:00:11 23         But regardless, we know that those doctors were

10:00:14 24    influenced by Purdue Pharma and other manufacturers.  But we

10:00:21 25    also know that there were some doctors who just didn't seem

7095

**Closing Argument - Lanier**

10:00:24 1    to care.  And there were doctors in these counties who just

10:00:30 2    didn't seem to care.  And there were doctors in Florida who

10:00:35 3    just didn't seem to care.  And one of the Walgreens -- I

10:00:41 4    believe it's Walgreens.  We'll look at the prescription --

10:00:42 5    but one of the defendants, one of the prescriptions that we

10:00:45 6    looked at was a person saying, you know, I'm tired of

10:00:48 7    filling these drugs for this person who's going to the pain

10:00:50 8    doctor in Florida, as if there aren't good doctors around

10:00:56 9    here.  But they keep filling them anyway.

10:00:59 10        And, so, these doctors, yeah, they shouldn't be

10:01:03 11   writing all these prescriptions, but the pharmacies have a

10:01:05 12   role in it too.  Please understand, not one of these three

10:01:11 13   pharmacies are charitable foundations.  They are all for

10:01:21 14   profit companies.  No problem with that.  I'm an American.

10:01:26 15   I'm a believer in capitalism.  But they are all for profit.

10:01:34 16   They make money off every pill they sell.  And if they don't

10:01:39 17   want to do the work right to sell these pills, then let the

10:01:45 18   pharmacies that will do the work right get the business.

10:01:53 19        They don't have to sell C-II drugs.

10:01:56 20        And their idea of, well, we want to make sure that

10:01:59 21   patients are getting their medicine.  Well, patients can get

10:02:02 22   their medicines at pharmacies that do it right.  They don't

10:02:06 23   have to sell the drugs, they choose to sell the drugs.

10:02:13 24   They're not doing it pro bono.  Oh, we want to make sure you

10:02:14 25   get your medicine.  Here, we'll just you give you this at

### Closing Argument - Lanier

10:02:18  1   cost.  No, they're making money off every pill they sell.

10:02:22  2   They don't make money off a refusal to fill.

10:02:24  3        And so you see the sales.  You see the deaths.  And we

10:02:28  4   had it from Dr. Lembke who said, yes, there are certain

10:02:32  5   things that doctors know.  But there are certain things that

10:02:35  6   the pharmacists know that the doctors can't.

10:02:38  7        The pharmacists can have the physical impression of

10:02:41  8   whether the person's showing up drunk or not, whether the

10:02:44  9   person's showing up in withdrawal or not.

10:02:50 10        They have their own data.  They have a chance to look

10:02:53 11   through OARRS.  They have a chance to look through other

10:02:55 12   things.  They can look at the travel distance.  They can

10:02:58 13   look at the doctors that have been filling these

10:03:01 14   prescriptions.  They can get prescription histories.  They

10:03:04 15   can know if there's a pattern of prescribing.  They can see

10:03:07 16   when someone shows up with two prescriptions, one from one

10:03:10 17   doctor and one from another.

10:03:13 18        Those are unique things that the pharmacists know that

10:03:16 19   give them responsibility as well, and that's why ultimately

10:03:21 20   Dr. Lembke gave Opinion 14, that many parties bear

10:03:25 21   responsibility for the misrepresentation of safety and

10:03:29 22   efficacy, and the ubiquitous, the everywhere distribution of

10:03:34 23   prescription opioids, the unchecked dispensing of

10:03:37 24   prescription opioids, which resulted in the ongoing

10:03:44 25   epidemic.  To the extent other factors contributed, those

**Closing Argument - Lanier**

10:03:47  1    were exploited to increase of harm.

10:03:49  2         So you've got --

10:03:52  3         Juan, if we go back to the PowerPoint, please.

10:03:54  4         We've got Dr. Lembke, and she testified accordingly.

10:03:58  5    She testified about how heroin is -- is there a problem with

10:04:05  6    heroin apart from prescription opioids?  Was there a problem

10:04:08  7    with heroin before prescription opioids?  Yes.  I suspect

10:04:12  8    there were.

10:04:13  9         I remember when I was -- all right.  Some of you are

10:04:16 10    my age.  Some of y'all are too young and y'all are going to

10:04:22 11    laugh and say what on earth's he talking about.  But I can

10:04:24 12    remember when I was a kid there was a real popular group

10:04:27 13    called Three Dog Night, sang *Joy to the World*, *Jeremiah Was*

10:04:32 14    *a Bullfrog*, and all that stuff.  Chug Negroln, lead singer,

10:04:37 15    heroin, just destroyed the group and destroyed his career

10:04:39 16    for years at least.  That's not because of prescription

10:04:43 17    opioids.  People can go straight to heroin, and they can

10:04:45 18    just get caught in it and messed up in it.

10:04:48 19         We're not fussing that.

10:04:51 20         But we're also cognizant of the fact that people can

10:04:56 21    get started on prescription opioids, and the studies

10:04:59 22    indicate that a preponderance -- most of the people on

10:05:04 23    heroin that are dying got prescription opioids in their

10:05:06 24    start.  It's a complicated web, but opioids have a role

10:05:13 25    here.  She explained the same to be true with fentanyl.

**Closing Argument - Lanier**

10:05:15  1    So Dr. Lembke comes and explains the critical roles of

10:05:21  2    the pharmacies and how these pill bottles and this

10:05:25  3    oversupply.  You know, when someone goes to the dentist and

10:05:27  4    they should get 3 days, and the dentist writes them from

10:05:31  5    9 days or 10 days.  Well, what happens to the other 6 days

10:05:34  6    they sit in the pill cabinet?

10:05:38  7    And the thing about it is, is we're not talking here

10:05:41  8    about an oil change to your car.  We're talking about

10:05:46  9    something that has the ability to take your life.  We're

10:05:52 10    talking about something that has the ability to grab you by

10:05:56 11    the throat and change your brain chemistry.  It can take a

10:06:02 12    cucumber and turn it into a pickle.  And once you do that,

10:06:06 13    you're stuck with that pickle.  I have yet to see anybody

10:06:09 14    who can turn a pickle back into a cucumber.  And that's what

10:06:15 15    Dr. Lembke was explaining.  It alters your brain chemistry.

10:06:20 16    This is serious stuff.  And if anybody ought to know it,

10:06:23 17    it's the people who go to school for 5-plus years to learn

10:06:26 18    how these drugs work in the human body.

10:06:31 19    Doctors take a drug course or two, but that's all

10:06:34 20    these folks are learning is the drugs, what they do, and

10:06:38 21    what the law is around them.

10:06:42 22    So after Dr. Lembke, we brought in Carmen Catizone.

10:06:48 23    He described himself as a pharmacist from the South Side of

10:06:53 24    Chicago, I think.  First one in his family to go to college.

10:06:59 25    Do you remember when I was getting ready for him, I

7099

**Closing Argument - Lanier**

10:07:07 1  got to meet with him a little bit the night before.  And I

10:07:10 2  wanted to be able to tell you guys things about where he

10:07:13 3  lives and what his family's like.  Oh, no.  Because of the

10:07:19 4  death threats that he told you about from the stand, where

10:07:22 5  he has been used as a witness by the government to deal with

10:07:30 6  drug situations, he doesn't disclose that information so

10:07:35 7  readily.

10:07:37 8       But he was willing to come here.  He was willing to --

10:07:41 9  we retained him as an expert.  We hired him.  We paid him a

10:07:47 10  fair hourly wage to do the work.  But we had grabbed him

10:07:51 11  because he's the best we could find.

10:07:55 12       I mean, they could go get Dr. Wailes from California

10:07:59 13  and pay him 14, 1,395 an hour, when he's just a pain doctor

10:08:06 14  to come in and say Carmen doesn't know what he's talking

10:08:09 15  about.  But Carmen Catizone's the guy, for decades, the head

10:08:14 16  of the National Association of Boards of Pharmacy.  That

10:08:16 17  means the Ohio Board of Pharmacy, the Texas Board of

10:08:18 18  Pharmacy, the Michigan Board of Pharmacy, the New York Board

10:08:23 19  of Pharmacy, all of them together.  This is the guy.

10:08:25 20       This is the guy who testified about pharmacy standard

10:08:29 21  of care regarding red flags and documentation.  Because

10:08:33 22  that's ultimately what's involved here.  The -- I've had a

10:08:39 23  chance to look at the slides of the defense.  They've had a

10:08:43 24  chance to look at my slides.  I don't know what they're

10:08:47 25  going to say with those slides, but I'm going to surmise.  I

7100

**Closing Argument - Lanier**

10:08:51  1    suspect they're going to tell you there's no legal

10:08:54  2    requirement to document.

10:08:58  3         Well, what does the law have to say about this stuff?

10:09:01  4    You're going to hear about it, but I want to show you just

10:09:05  5    one of the principal parts of the law.  And this part of the

10:09:09  6    law comes from the Code of Federal Regulations.  This is

10:09:13  7    what it says.

10:09:14  8         It says specifically, all applicants, all

10:09:33  9    registrants -- these are companies that register to sell and

10:09:38 10    market in C-IIs -- shall provide effective controls and

10:09:46 11    procedures to guard against theft and diversion of

10:09:50 12    controlled substances.

10:09:52 13         Now, what is an effective control, an effective

10:10:00 14    procedure?  The law doesn't specify in that statute, that

10:10:05 15    regulation exactly what it is.  And they could ask, ask

10:10:10 16    Joe Rannazzisi, DEA man, does the law say that you -- is

10:10:14 17    there a regulation that says you must document?  He'll

10:10:22 18    answer honestly, no.

10:10:23 19         It was a regulation that says you must provide

10:10:25 20    effective controls and procedures.  And the DEA doesn't tell

10:10:31 21    you what that is.  Now, you find out from reading cases like

10:10:34 22    *Holiday*.  You find out from reading cases like *East Main*.

10:10:39 23    You'll find out from reading cases like Lake and Trumbull

10:10:45 24    because that's the decision that's being made.

10:10:48 25         We know that the State Board requires you to follow

**Closing Argument - Lanier**

10:10:52  1    standard of care, and we know that standard of care says you

10:10:56  2    document.  We know that the companies' policies that they

10:11:02  3    have put in place supposedly to meet this regulation say

10:11:05  4    document.  They say it's imperative to document.

10:11:13  5         But Carmen Catizone -- if we go back to the

10:11:17  6    PowerPoint, please -- Carmen Catizone testified about those

10:11:20  7    pharmacy standards of care and about the flags and the

10:11:23  8    documentation.  He said one thing that's clear.  It's a

10:11:27  9    no-brainer.  You must resolve red flags before you dispense

10:11:33  10   the drug.

10:11:35  11        Now, there's a host of red flags.  Some people have

10:11:39  12   identified 25, 26, 27 red flags.  We just culled it down to

10:11:45  13   16 or 17 that were easy to zoom in on based upon the

10:11:51  14   prescription data itself.  You know, a red flag of someone

10:11:54  15   showing up tanked when they're getting their drugs.  You

10:11:57  16   can't tell when that was there or not, you know.  Or three

10:12:00  17   people showing up in the same car.  That's not going to be

10:12:03  18   something we could go identify, even though those may be red

10:12:07  19   flags.

10:12:07  20        But Carmen Catizone said, that's a no-brainer.  You

10:12:10  21   got to resolve red flags before dispensing.  That's the

10:12:13  22   requirement.  That's the standard of care.  That's what

10:12:16  23   *Holiday* said.  That's what *East Main* said.  That's what a

10:12:20  24   number of cases have said.  That's just part of it.

10:12:24  25        And not only must you do that, but you must document

**Closing Argument - Lanier**

10:12:28  1    that resolution as well.  That's part of the Ohio Board of

10:12:34  2    Pharmacy regulations.  That's part of the policy, the

10:12:38  3    standard of care, I should say.  It's part of the standard

10:12:40  4    of care, not the regulation.  The regulation is you follow

10:12:43  5    the standard of care.  But it -- in essence, that's what it

10:12:49  6    is.

10:12:49  7        So you've got to document red flag resolution.  Any

10:12:54  8    companies know this.  They'll put witnesses on the stand

10:12:57  9    that say we don't do it.  But at the same time, they're

10:13:03 10    faced with their policies that say you're supposed do it

10:13:08 11    because those are the policies that live up to the law.

10:13:12 12        He looked at 1,800 to 2,000 actual prescriptions from

10:13:20 13    the counties, and that's 1,800 to 2,000 depending upon the

10:13:26 14    defendant.  Walmart only produced 1,800, but CVS, 2,000,

10:13:30 15    Walgreens, 2,000, over a 10-year time span, they were

10:13:33 16    totally randomly selected.  Nobody had their finger on the

10:13:36 17    scale.  Nobody was cherry picking.  Totally random selection

10:13:41 18    overseen by His Honor, overseen by the parties.  And then he

10:13:47 19    looked at them.  He studied each one individually, and he

10:13:50 20    saw that they fell short.  And he testified to that with

10:13:55 21    you.

10:13:55 22        If we go to the ELMO, please, Juan, to the iTiVo.

10:14:02 23        He was -- it's interesting to me.  Look at his

10:14:16 24    opinions for a moment.  See if this reminds you of what

10:14:19 25    happened those maybe days ago.  He started out talking about

**Closing Argument - Lanier**

10:14:21  1   the legal framework.  He explained --

10:14:23  2        Okay, Juan -- it did it again, so I'm going to turn

10:14:28  3   it -- I'm going to do what I saw you do.  You turned it off

10:14:31  4   and then you turned it on.

10:14:34  5        Look at that.  That's kind of scary.

10:14:40  6        See if these remind you of his testimony.

10:14:43  7        Opinion 1:  The practice of pharmacy is governed by

10:14:48  8   with well defined laws and regulations both at the national

10:14:52  9   and statewide levels.

10:14:54 10        He called it the most regulated profession.

10:14:56 11        He talked about how states require security systems

10:14:59 12   and backup systems and recordkeeping.

10:15:04 13        Pharmacy standard of care.  That means the standard

10:15:07 14   that any reasonable pharmacy is going to institute.

10:15:12 15        The DURs and other restrictions.  And he talked about

10:15:16 16   all of that.

10:15:17 17        And then he gave this third opinion.  He said that the

10:15:19 18   Federal -- which is the Controlled Substances Act -- and the

10:15:23 19   Ohio -- it's controlled substance laws and regulations that

10:15:26 20   require each defendant to maintain effective controls for a

10:15:33 21   closed system of distribution and dispensing that guards

10:15:37 22   against diversions.

10:15:38 23        That's just what the law is that I read you.  That's

10:15:41 24   what the law says they've got to do.

10:15:43 25        Now, what does that mean?

7104

## Closing Argument - Lanier

10:15:45  1    He testified that in terms of documentation, it's a

10:15:49  2  requirement of documentation.  He said the law gives this

10:15:54  3  broad statement that you must comply with all good practices

10:15:59  4  or practices of standards.

10:16:02  5    Now, if that's the law, a broad statement, then the

10:16:06  6  question is simply on whether or not someone's violated the

10:16:10  7  law, the question is simply, did they comply with all good

10:16:14  8  practices or practices of standards, which is what he was in

10:16:16  9  a position to testify to.

10:16:19 10    And he said that cases, *Holiday*, *East Main*, these

10:16:27 11  other cases, are decisions and conclusions and findings that

10:16:31 12  should be binding on others.  That's his view as a

10:16:35 13  pharmacist.

10:16:38 14    He said this was critical.  He said documentation is

10:16:45 15  critical because another pharmacist might need it.  He said

10:16:49 16  documentation is critical because when inspection shows red

10:16:54 17  flags resolved, then there's no diversion.  And so you've

10:16:56 18  got it there.  You've got proof.  But if there is theft or

10:17:03 19  diversion, people identify it and it will send a message.

10:17:05 20    I don't understand how this trial evolved into one

10:17:08 21  where they kept asking witnesses, are you required to

10:17:11 22  document?  Is there a specific regulation that says

10:17:13 23  document?  The regulation says do the standard of care.  Do

10:17:19 24  what you need to do.  But they don't iron out, use this

10:17:23 25  computer program, use this algorithm, use this -- no.

**Closing Argument - Lanier**

10:17:29  1      The law was written in 1970.  The regulations are in

10:17:35  2   place to explain that law and the requirements of it.  But

10:17:42  3   documentation, they know it's required.  Their own records

10:17:46  4   say it's required.  Their own policies say it's required.

10:17:49  5   Their own pharmacists say, yeah, we were taught that in

10:17:53  6   school, that you have to do it.  And yet, somehow lawyers

10:17:56  7   can turn it into something where, well, there might be a

10:18:01  8   little crack or a crevice here because the regulation

10:18:03  9   doesn't specifically say document.  It just says do the

10:18:06 10   standard of care, and let's -- standard of care is document.

10:18:11 11   Well, let's don't talk about that.

10:18:12 12      Did defendants comply with the obligations?  He looked

10:18:16 13   at the red flags.  He said the warning sign requires

10:18:20 14   additional review.  And you must resolve it before

10:18:23 15   dispensing, and that's a critical responsibility.  And so he

10:18:27 16   laid that out, and he laid it out in plain language.  And he

10:18:31 17   explained that legal framework.

10:18:33 18      And thank you, Maria.

10:18:35 19      And then he went beyond that, and he talked about the

10:18:38 20   corporate responsibility.  Don't just blame the pharmacists.

10:18:43 21   We're not in here.  Look, they put three pharmacists on the

10:18:46 22   stand at the end -- well, two.  One of them has just been

10:18:50 23   promoted to a supervisor or whatever.  But Mr. Cook,

10:18:55 24   Ms. Militello, and Ms. Stossel.  And y'all got to know me

10:18:59 25   during this trial.  You got to know me pretty well.  You got

**Closing Argument - Lanier**

10:19:11  1    to see me cross-examine a lot of people.  And I think you

10:19:13  2    can probably tell by my approach -- and I'm sorry, it's

10:19:21  3    transparent, I'm -- my wife always laugh that I've got no

10:19:25  4    chance of ever lying to her because she says you're reading

10:19:30  5    like a book.

10:19:30  6        But you would have seen me.  There are some other

10:19:34  7    witnesses that I did not view favorably, and I was probably

10:19:43  8    harsher to them in my cross-examination at times.  But those

10:19:49  9    three pharmacists, they're nice people.  I don't have any

10:19:52 10    distaste for them.  I appreciate what they're doing.  You

10:19:55 11    know, they got families, they live in the community.  I'm

10:20:00 12    not dumping on them.  But I will tell you this:  You can

10:20:03 13    hear them and hear what they're doing and see where the

10:20:07 14    company has failed.  You can see where the company has let

10:20:11 15    them down without adequate training, with inadequate

10:20:15 16    policies, with inadequate tools.

10:20:18 17        You know, I've got here a toolbox, and I've yet to

10:20:26 18    find out how Juan and Jessie got this past security.

10:20:30 19        Your Honor, I'm not sure.

10:20:32 20        But they're both marines, so they can do just about

10:20:36 21    anything there is.  That's what I've learned, but. . .

10:20:42 22    that's a hammer (indicating).  That's really, really useful

10:20:46 23    if you want to drive a nail, or if you want to pull the nail

10:20:50 24    out because it's a claw hammer.  Really good.  I do not

10:20:56 25    recommend using this, however, to change a light bulb.  Just

**Closing Argument - Lanier**

10:20:59  1      not the right tool.

10:21:01  2          You know, if you want to get a screw, if you take the

10:21:05  3      screw and use a hammer on it, not only is it going to

10:21:08  4      probably bend the screw until it's like a mega screw, but

10:21:12  5      because of those grooves it's just going to gut into that

10:21:14  6      and the screw is useless.  If you're going to put in a screw

10:21:17  7      and drive a screw, you're going to need a screwdriver.  A

10:21:20  8      different tool for a different job at a different time.

10:21:26  9          All of these tools, whether you look -- I got a tape

10:21:30 10      measure.  I can tell you the distance --

10:21:32 11          Excuse me, Your Honor.  And doggone it, this was

10:21:37 12      Mr. Weinberger's birthday gift.

10:21:40 13          The distance between me and my daughter right now, I

10:21:43 14      can tell you, is about 78 inches.  Really useful.  But this

10:21:49 15      is not going to help me drive a nail.

10:21:54 16          I mean, I tried to forward this part.  I didn't have a

10:22:01 17      hammer.  It really doesn't work.

10:22:02 18          The pharmacies are responsible for giving the tools

10:22:07 19      and the training to these pharmacists.

10:22:09 20          The pharmacies are the ones that have that legal

10:22:12 21      obligation there.  And that's why you've got this type of

10:22:19 22      testimony from Mr. Catizone.

10:22:24 23          Question:  Does a chain pharmacy corporation through

10:22:29 24      the control it exerts over its agent pharmacies,

10:22:35 25      pharmacists, and pharmacy employees, techs, et cetera, hold

**Closing Argument - Lanier**

10:22:41  1    responsibility for ensuring all dispensing of controlled

10:22:45  2    substances is carried out in accordance with the applicable

10:22:48  3    laws and lesions?

10:22:49  4        His answer was a profound yes, and he gave two

10:22:55  5    reasons:  The pharmacy is the registrant.  That's what the

10:22:58  6    law was talking about is the registrant's responsibility.

10:23:02  7    The pharmacy is the registrant, and the pharmacy is the

10:23:05  8    permit holder.

10:23:07  9        And so he went further, and he talked about how

10:23:10  10   corporate oversight, the corporation is who sets the

10:23:15  11   policies, they decide the number of staffing, they decide

10:23:18  12   when someone can take a break, they decide how much they're

10:23:22  13   going to pay, they decide the information system, they

10:23:26  14   decide the wait time policies and how quickly people are

10:23:29  15   supposed to get their prescriptions.  They monitor the

10:23:33  16   pharmacists to verify compliance.

10:23:37  17       Remember the CVS?  They even did a follow-up check to

10:23:42  18   see if people were complying.  Didn't have good results on

10:23:45  19   it either.  But that's all the corporate oversight.  That's

10:23:49  20   the issue here.

10:23:51  21       I don't ever want this to become a case that's written

10:23:54  22   up in the books as Lake and Trumbull, and the decision is

10:23:58  23   that Pharmacist Number 1 or Pharmacist Number 2 made a

10:24:03  24   mistake.  No, that's not what we're about.

10:24:06  25       And we're not about perfection either.  The judge has

**Closing Argument - Lanier**

10:24:09  1    that in the charge.  Look, you're not going to call them all

10:24:13  2    right.  A pharmacist isn't going to call them all right.  I

10:24:16  3    don't care --

10:24:16  4         I'm dating myself again, Your Honor.

10:24:18  5         The Amazing Kreskin.  Yeah.  I mean, it can be someone

10:24:21  6    who can read minds, and they're still going to mess up

10:24:25  7    occasionally.  That's not what we're here about.  We're here

10:24:29  8    about national policies that are in place where, bless her

10:24:32  9    heart, Ms. Stossel has to say, I've got a choice between

10:24:35 10    documenting or visiting with the patient about their care.

10:24:42 11         I'm like, well, why can't you do both?

10:24:45 12         Time.

10:24:46 13         Well, who sets the staff?  Who sets the metric of how

10:24:51 14    quickly you got to fill?  Who decides?

10:24:54 15         Well, Mark, or Mr. Lanier, we're a busy store.

10:24:59 16         Okay.  Well, maybe we can afford two pharmacists then

10:25:01 17    during those busy hours so that you can do your job right.

10:25:04 18         But that's not my complaint against her.  That's my

10:25:09 19    complaint against the corporation.  That's my complaint

10:25:11 20    against the oversight, because, as Mr. Catizone said, this

10:25:14 21    is top-down compliance.

10:25:16 22         You know, the corporation uses the data.  They know

10:25:20 23    the medicines that have been bought.  They know the

10:25:22 24    medicines that have been dispensed.  They've got track of

10:25:25 25    doctors.  They've got track of all of that.  They've got the

7110

**Closing Argument - Lanier**

10:25:28 1    policy that says do it in a certain time or not.  And that's

10:25:35 2    why corporate responsibility is so important here.

10:25:39 3        Mr. Catizone continued.  Corporate oversight includes

10:25:43 4    established practices of pharmacies that should incorporate

10:25:47 5    top-down compliance programs.  This is because the company's

10:25:51 6    got all of the pharmacy's info.  The aggregate data.  They

10:25:58 7    can identify trends.  They can say, this is a store.

10:26:00 8        Look, I asked the witnesses, did you know if your

10:26:03 9    store was listed as a top 20 store, or an over 20 supply

10:26:07 10   store?  Didn't even know.

10:26:12 11       The corporations have knowledge.  And they're the ones

10:26:15 12   who need to be giving that data to the pharmacists.

10:26:20 13       So the question becomes, Mr. Catizone, under your

10:26:26 14   practice, can a pharmacy absolve itself of its

10:26:29 15   responsibilities under the Controlled Substance Act by

10:26:33 16   placing unilateral responsibility on the pharmacist

10:26:35 17   dispensing the prescription?

10:26:37 18       Answer:  No.

10:26:40 19       Is a corporate chain pharmacy responsibile for its

10:26:44 20   operations including individual pharmacies?

10:26:46 21       Yes.

10:26:48 22       And its employees, they've got to supply the tools.

10:26:54 23       So within the framework of that, another question that

10:26:57 24   the judge is going to have that he just read to you on the

10:27:01 25   charge -- and we'll look at it a little bit more later on,

**Closing Argument - Lanier**

10:27:03  1    but it's a question of knowledge.  Because the law says that

10:27:07  2    this has to be a knowing violation.  And what does that

10:27:10  3    mean?  And the law says you can't willfully close your eyes

10:27:15  4    to it.  But these are knowing violations.  I mean, the

10:27:21  5    companies knew.  The companies, without a doubt, as Carmen

10:27:26  6    Catizone said, I would expect each defendant became aware

10:27:30  7    and remains aware of these requirements.

10:27:31  8        Understand, not everybody gets to sell opioids.  You

10:27:36  9    have to register.  You have to acknowledge yourself into

10:27:40 10    that system, and if you're doing that, you know that the

10:27:44 11    system requires you do things because you're opting into it.

10:27:48 12    You're saying, I want to be one of the people who does that

10:27:51 13    so I can make money off of it.

10:27:54 14        So, you know, this is something that the companies

10:27:58 15    clearly know.

10:27:59 16        This is something, you know, that -- these DEA

10:28:04 17    actions -- look, I really don't like getting speeding

10:28:11 18    tickets.  And I, when I was a younger man, got more than I

10:28:18 19    do now.  I used to be quite the aggressive driver.

10:28:26 20    Confession.

10:28:31 21        But I didn't get like a ticket every day.  I didn't

10:28:35 22    get a ticket every time I sped.  In fact, I dare say, I'd

10:28:41 23    get one about every 6 months at my height.  I, like -- after

10:28:47 24    you get about three of those and your insurance comes in,

10:28:50 25    you sort of start driving differently.  But I can remember

7112

**Closing Argument - Lanier**

10:28:54  1   getting 3 in a year and a half period one time.  But I

10:29:03  2   promise you I was speeding a lot more than that.

10:29:05  3       The DEA doesn't have the person power.  The DEA

10:29:07  4   doesn't have the resources.  The State Board of Ohio doesn't

10:29:12  5   have the persons, power, and resources.  The Lake County

10:29:17  6   Narcotic Task Force doesn't have it to go in and to do a

10:29:21  7   tear-it-up, tear-it-apart inspection on every pharmacy in

10:29:25  8   this country.

10:29:29  9       So they get tips, and they figure out where there's a

10:29:32  10  problem that they get alerted to, and they set up their

10:29:35  11  radar gun in there and they check it out.  And that's what

10:29:40  12  these cases are.  And I mean, the Ohio -- the Ohio *East Main*

10:29:46  13  case is an important case because it's Ohio.  The Florida

10:29:48  14  *Holiday* case is an important case because it's a Florida,

10:29:52  15  and we know that people were going down there from Ohio and

10:29:55  16  coming back with drugs and going down there.  I -- we know

10:29:59  17  all of that.

10:30:01  18      But the real reason those cases are important is

10:30:05  19  because they put everybody on notice.  They caught CVS down

10:30:14  20  there where they had the tip and went after them.  They

10:30:17  21  caught Walgreens.  They caught Walmart.

10:30:21  22      And you say, well, those aren't these stores in this

10:30:24  23  county.  No, but it's the company.  And I argue it's the

10:30:29  24  company's policies or failure to enforce policies.  And

10:30:38  25  that's why it becomes important.

**Closing Argument - Lanier**

10:30:40   1        I've used 55 minutes so far.

10:30:43   2        You know, the sad part is, Your Honor, I know you gave

10:30:46   3   us 3 hours because we begged and pleaded.  I could take

10:30:49   4   about 3 days if you'd let me, but I won't ask that.

10:30:52   5              THE COURT:  No.  No.

10:30:53   6              MR. LANIER:  Okay.

10:30:55   7        You know, and then Carmen Catizone, before I leave

10:30:59   8   him, let me just tell you, look at this, Opinion 7:  Each

10:31:02   9   defendant failed to timely implement and apply necessary

10:31:07  10   controlled substance diversion policies across its pharmacy

10:31:09  11   stores.

10:31:10  12        They did.  In these counties.

10:31:13  13        And he did that, and he reviewed their actions.  He

10:31:17  14   reviewed their prescriptions.  He looked at how long it took

10:31:19  15   them to make changes in their policies.

10:31:22  16        Do you y'all remember --

10:31:24  17        Juan, you got my sifters.

10:31:26  18        Y'all remember in opening, one of the examples I used,

10:31:31  19   and I won't get the flower back out, Your Honor, but one of

10:31:35  20   the examples that I used was the idea that initially the

10:31:40  21   holes were so big that their screening process was letting

10:31:45  22   through almost all the prescriptions.  And then the DEA

10:31:47  23   would slap them down or slap down someone else, and they'd

10:31:50  24   said, oh, my heavens, we're in trouble, and they'd get

10:31:54  25   something with smaller holes.  But it still wasn't adequate.

7114

**Closing Argument - Lanier**

10:31:59  1     And you saw this in the trial.  Oh, well, how about

10:32:03  2  that.  You saw this in the trial.  In fact, in the trial

10:32:06  3  what they'll do is they'll now take their current screen,

10:32:12  4  really, really fine mesh, and they'll use that current

10:32:16  5  screen and say, look, we've got the best screen in the

10:32:19  6  world.

10:32:20  7     And you've just got to say, yeah, guys, but it's a

10:32:23  8  little bit late.  You know, where was your screen in 2000 to

10:32:28  9  2010 when this crisis was really hitting its zenith at that

10:32:32 10  point, when people were getting addicted, when the babies

10:32:35 11  were being born?

10:32:36 12     Now, understand, this is a snowball problem.  This is

10:32:41 13  a problem that starts small and gets big.  Because as one of

10:32:45 14  your juror questions asked, the question was something along

10:32:48 15  the lines of, if someone was in an age group, in the 40 to

10:32:52 16  55, and then 10 years later wouldn't they still, a lot of

10:32:55 17  them, be in that age group with still problems?  And I was,

10:32:59 18  like, yeah, that's exactly right.

10:33:01 19     Because, you know, you get the babies that were born

10:33:05 20  to busted families or troubled families or absent families

10:33:09 21  and put into the foster system, and those babies are going

10:33:13 22  to be affected for the rest of their life.  They're going to

10:33:16 23  be affected in the community.  And it's going to snowball in

10:33:19 24  the community.  You get the babies that are born with the

10:33:20 25  addiction problem, and it affects their mental development,

7115

**Closing Argument - Lanier**

10:33:23   1   according to Dr. Lembke and others.  And they're not going

10:33:26   2   to do so well in school.  They're not going to do so well at

10:33:29   3   work.  And they're going to have trouble being a

10:33:31   4   contributing part of the community instead of a drain on the

10:33:34   5   community.

10:33:34   6       All of these are deep-rooted problems that happen when

10:33:38   7   the screens are big, and these companies should have been

10:33:44   8   the companies that were -- look, this common sense business

10:33:51   9   for a moment.

10:33:56 10       If I'm a pharmacy, mom and pop, small chain, whatever,

10:34:04 11   big chain, but let's stay mom and pop, or a small chain.  If

10:34:08 12   I'm a pharmacy and I'm going to do it right, it's going to

10:34:14 13   take longer than 15 minutes a prescription.  I'm going to

10:34:21 14   have to upset some of my customers because I'm going to have

10:34:24 15   to turn some of them away.  I'm going to have to tell some

10:34:27 16   of them, I'm sorry, I can't fill this prescription till

10:34:29 17   tomorrow because we can't get your doctor on the phone.  I'm

10:34:32 18   going to have to invest in a computer system that gives me

10:34:34 19   OARRS as soon as it comes up and not years later when it's

10:34:38 20   made mandatory.

10:34:39 21       If I'm going do it right, it's going to take time,

10:34:43 22   energy, money, and resources.  How am I going to compete

10:34:47 23   against the Walgreens, the Walmarts, and the CVS that can

10:34:55 24   pop up anywhere?

10:34:56 25       How am I going to compete if they're allowed to cut

7116

**Closing Argument - Lanier**

10:34:59 1    corners?

10:35:00 2        How am I going to compete if they don't have to have a

10:35:03 3    pharmacist to do it right?

10:35:04 4        How am I going to compete if they're using big screens

10:35:07 5    while I'm using a fine screen?

10:35:10 6        And I've got choices.  I can either quit practicing,

10:35:14 7    close my shop, or I can start taking the same shortcuts and

10:35:20 8    the same filters, or I guess I could sell to them.  But

10:35:30 9    that's the economics that are involved in this case.  That's

10:35:33 10   the common sense economics.

10:35:35 11       These companies should be the leaders.  They should be

10:35:38 12   the leaders out there.  They should be the ones in the year

10:35:41 13   2000 that say, hey, this ain't happening to us.  We've got

10:35:46 14   the screen and it's a tight screen.  And we shouldn't have

10:35:48 15   to hear them say, come into court, with this idea of, oh,

10:35:53 16   look, we had screens back in 1998 -- Walgreens will tell you

10:35:59 17   that in their closing -- well, yeah, but they were pretty

10:36:04 18   big holes on those screens.  Or else why would you have

10:36:08 19   changed it?  The fact that you had to change it time and

10:36:16 20   time and time again is because your screens are too big and

10:36:21 21   holes.

10:36:21 22       Okay.  Rachel is going to give me a note in a minute

10:36:24 23   that says I'm really blowing it on time so I got to keep

10:36:27 24   going.

10:36:27 25       Once controlled substances diversion policies were

7117

**Closing Argument - Lanier**

| | |
|---|---|
| 10:36:30 | 1 |
| 10:36:34 | 2 |
| 10:36:38 | 3 |
| 10:36:41 | 4 |
| 10:36:45 | 5 |
| 10:36:50 | 6 |
| 10:36:55 | 7 |
| 10:36:57 | 8 |
| 10:37:01 | 9 |
| 10:37:05 | 10 |
| 10:37:10 | 11 |
| 10:37:15 | 12 |
| 10:37:18 | 13 |
| 10:37:21 | 14 |
| 10:37:23 | 15 |
| 10:37:26 | 16 |
| 10:37:29 | 17 |
| 10:37:31 | 18 |
| 10:37:41 | 19 |
| 10:37:45 | 20 |
| 10:37:46 | 21 |
| 10:37:49 | 22 |
| 10:37:50 | 23 |
| 10:37:53 | 24 |
| 10:37:56 | 25 |

developed, each defendant then failed to monitor and enforce
the policies across their stores.

     We had pharmacists who came in who had never even
heard of some of the cases.  They didn't even know what was
going on.  They hadn't been trained in it.

     We had pharmacists coming in who thought
documentation, where it says it's imperative to document,
they thought that meant it was a suggestion.  They don't
understand the policy was, imperative means you must.

     But people's lives are important.  This is serious
stuff, and that's why when Carmen Catizone said each
defendant's local stores filled thousands of prescription
presenting red flags without evidence of resolving those,
that's a big deal.  That's a huge deal.

     Look at some of what he said.

     The red flags, you've got those.  I'm going to skip
those in the interest of time because I want you to see some
of the actual prescriptions.

     He got to each defendant's pharmacies in Lake and
Trumbull County filled thousands of prescriptions
representing red flags without evidence of resolving them.

     We went through the funnel with him.

     The funnel was -- all the funnel was was an
explanation of how he got to those prescriptions he looked
at.  And the funnel has become this huge discussion point

7118

**Closing Argument - Lanier**

10:38:00  1    because of the statistics of how many were bad and how many

10:38:05  2    weren't bad, and all the rest.  And Ms. Swift put up her

10:38:09  3    modified funnel where she argues that just 25 percent of the

10:38:12  4    prescriptions were bad or something like that.  I don't

10:38:15  5    care.  If 1 out of 5 isn't done right, that's massive.

10:38:22  6        I still think Carmen had it right.  I think his

10:38:25  7    numbers were right.  I think the 90 percent is right, but

10:38:28  8    you can take it at 20 percent.  We still have problems.

10:38:32  9        Like this.  Look at this.  This is an actual CVS note.

10:38:36 10    Credit card on file.  Use to pay.  Patient told me, person,

10:38:41 11    person, person, or like, like initials, doesn't live in

10:38:44 12    Florida, just travels there to see this for pain medicine.

10:38:49 13        How many people from Lake and Trumbull go, oh, I just

10:38:54 14    got to go to Florida, I got to go see a pain doctor to get

10:38:57 15    my opiate prescription?

10:38:59 16        I told them that they need to see a local pain

10:39:02 17    management for all pain medications next time.  This will be

10:39:06 18    our last time filling oxy 15, 30 milligrams for this person

10:39:10 19    from Dr. Hamies.

10:39:13 20        Well, why are you filling it this time?  And how many

10:39:16 21    times have you been filling?  But this is just typical and

10:39:23 22    it's not properly documented.

10:39:24 23        950 of the prescriptions contained no information

10:39:27 24    across all of these fields.  That's out of 2,000 for CVS.

10:39:30 25        Of these 950 prescriptions with nothing in the

**Closing Argument - Lanier**

10:39:35 1  relevant note fields, 686 also had nothing documented on the

10:39:38 2  hard copy.  34 percent of the sample.

10:39:44 3      Question:  Is dispensing of red flag prescriptions

10:39:47 4  without conducting adequate investigation or due diligence

10:39:50 5  likely to lead to diversion?

10:39:52 6      Yes.  That's cause.  That's causation.  It's also

10:39:57 7  proximate cause.  It tells you that it's foreseeable.  It

10:40:01 8  tells you that they knew it.

10:40:02 9      Walgreens.  508 days of oxycodone?

10:40:16 10     Where -- does it not strike you as bizarre that

10:40:20 11 Walgreens has got prescriptions like this in their 508 days,

10:40:24 12 and then they put on the stand, or the defense puts on the

10:40:28 13 stand, Mr. Hill, ex-DEA fellow.  By the way, nice guy.

10:40:34 14 Another one that I wasn't taking issue with.  I think he got

10:40:37 15 offended when I suggested that he shouldn't be paying that

10:40:40 16 service.  He ought to be able to bill the money himself

10:40:44 17 because he's -- brings a level of expertise, and he's got

10:40:49 18 something to say and I thought that was important.

10:40:52 19     But he, we get him on a live lecture that we play

10:40:56 20 where he says, if someone has a prescription for 6 months of

10:41:03 21 opioids, that person's an addict.

10:41:11 22     DEA guy knows it.  The expert they hire will say it,

10:41:14 23 and yet they're sitting on prescriptions of 508 days of oxy.

10:41:22 24 365 days in a year, unless it's leap year, 366 that year.

10:41:26 25 This is over a year and a half.

**Closing Argument - Lanier**

10:41:28  1       And then Walgreens relevant note fields, 1,237 were

10:41:33  2   blank across all comment fields, 61 percent of the samples.

10:41:37  3   Of the ones that were hard copies, 940, 47 percent blank.

10:41:43  4       And so, you know, well, they say you should look back

10:41:48  5   in the older notes fields.  Those are the ones that

10:41:51  6   disappear.

10:41:54  7       You've got the same problem.  I don't mean to let CVS

10:41:57  8   and Walmart off on this.  You can recall what all he said.

10:42:02  9       Your Honor, I know you wanted to take a break about

10:42:04 10   now, so I'm going to pause at this moment, and I will resume

10:42:09 11   when you're ready for me to.

10:42:12 12                   THE COURT:  Okay.  Thank you, Mr. Lanier.

10:42:13 13       Ladies and gentlemen, we'll take our mid-morning

10:42:16 14   break, 15 minutes, and then pick up with the balance of

10:42:19 15   Mr. Lanier's closing.

10:42:20 16       Thank you.

10:42:21 17         (Jury excused from courtroom at 10:42 a.m.)

10:42:52 18                   MR. DELINSKY:  Your Honor, may I be heard for

10:42:55 19   a moment when it's appropriate?

10:42:56 20                   THE COURT:  All right.  Close the backdoor,

10:42:57 21   please.

10:42:58 22       Everyone can be seated.

10:43:07 23       Yes, Mr. Delinsky.

10:43:08 24                   MR. DELINSKY:  Your Honor, I'm loathed to ever

10:43:10 25   interrupt counsel in closing argument.  We did not interrupt

10:43:14  1   in opening argument.  We didn't interpose objections, but

10:43:19  2   that hour crossed the line in several respects, and I feel

10:43:24  3   compelled to set forth my objections and in certain spots to

10:43:27  4   request curative instructions.

10:43:30  5        First, Your Honor, Mr. Lanier said that it is the job

10:43:33  6   of this jury to decide what is permissible for pharmacy

10:43:38  7   practice and what is not.

10:43:39  8        He called this the most seminal case in pharmacy

10:43:42  9   history under the Controlled Substances Act, and he told the

10:43:46 10   jury that it was up to them to set the standard for the

10:43:49 11   future.  And that is not at all what this case is about.

10:43:52 12        This case is about the elements of public nuisance.

10:43:55 13   It's not about setting new standards under the Controlled

10:43:59 14   Substances Act.  It's far from that, and I think we need a

10:44:01 15   curative instruction on that.  That's first.

10:44:05 16             MR. LANIER:  Can I answer that one first?

10:44:06 17             THE COURT:  Well, let's stay with that.  All

10:44:08 18   right.

10:44:08 19             MR. LANIER:  All right.  Your Honor, I have to

10:44:11 20   prove under public nuisance that this was illegal or

10:44:14 21   intentional, and so those are the issues that are involved

10:44:18 22   here.  And this is a huge, important case for that very

10:44:21 23   reason.  I don't think what I said was wrong at all.  I

10:44:25 24   think that what I said is dead-on accurate.

10:44:28 25             MR. DELINSKY:  But there's a difference --

10:44:29  1          THE COURT:  All right.  I think it's argument,

10:44:31  2    Mr. Delinsky.

10:44:32  3          MR. DELINSKY:  Okay.

10:44:32  4          THE COURT:  The issue in this case is what

10:44:36  5    if -- what is the obligation of a pharmacy under the

10:44:39  6    Controlled Substances Act --

10:44:40  7          MR. DELINSKY:  But, Your Honor.

10:44:41  8          THE COURT:  -- and did these pharmacies comply

10:44:44  9    with their obligation to have effective controls and

10:44:47 10    systems.  That's what the case is about, so. . .

10:44:49 11          MR. DELINSKY:  Your Honor, next --

10:44:51 12          MR. STOFFELMAYR:  Excuse me, Mr. Delinsky.

10:44:52 13       Judge, just -- just on that, I want to reiterate, we

10:44:55 14    heard your ruling.  I'm not asking you to reconsider at this

10:44:57 15    point.  But I do want to make you aware that I do expect we

10:45:02 16    will have to file a motion for a mistrial to preserve the

10:45:04 17    record because to ask the jurors to consider --

10:45:05 18          THE COURT:  Fine, file a motion.

10:45:06 19          MR. STOFFELMAYR:  To ask the jurors to

10:45:07 20    consider the impact of their decision beyond this case is

10:45:10 21    facially improper under every standard, I believe.

10:45:12 22          THE COURT:  Well, I -- that part of it is a

10:45:15 23    problem, all right?  I --

10:45:17 24          MR. STOFFELMAYR:  And there's no instruction

10:45:18 25    that undoes that harm.

10:45:20  1              MR. MAJORAS:  Walmart joins that, Your Honor.

10:45:22  2   This is --

10:45:22  3              THE COURT:  What do you want me to say?  All

10:45:24  4   right?  I mean, I will say again, they're not to decide

10:45:27  5   future cases; they're to decide this case, whether the

10:45:31  6   plaintiff has proved its case, these two counties against

10:45:35  7   these defendants.  That is it.  So I'll -- I will

10:45:41  8   reemphasize that.

10:45:43  9              MR. STOFFELMAYR:  But respectfully,

10:45:44 10   Your Honor, that couldn't possibly undue the harm.

10:45:47 11              MR. DELINSKY:  CVS concurs.

10:45:49 12              MR. MAJORAS:  Walmart agrees.

10:45:50 13              THE COURT:  All right.  Overruled.

10:45:52 14              MR. WEINBERGER:  Your Honor, just to --

10:45:53 15              THE COURT:  But, Mr. Lanier, I am cautioning

10:45:57 16   you, you've got to stay within bounds, and that was right on

10:46:01 17   the edge.

10:46:01 18              MR. LANIER:  Yes, Your Honor.  I will be very

10:46:02 19   careful, and I will not --

10:46:03 20              THE COURT:  And I will jump in.  The next time

10:46:05 21   I'll jump in myself.

10:46:06 22              MR. LANIER:  I will not get near that edge

10:46:07 23   again, Your Honor.

10:46:08 24              THE COURT:  Well, I will.  And I'm going to

10:46:09 25   have to tell the jury that -- figure out some way to tell

10:46:13  1    them that this is -- the only thing they're to decide in

10:46:18  2    this case is whether the two counties have proven this

10:46:21  3    particular case, public nuisance in these counties against

10:46:24  4    these defendants.

10:46:26  5              MR. LANIER:  And I'll make that abundantly

10:46:29  6    clear as well, Your Honor, so they hear it from my lips.

10:46:32  7              MR. DELINSKY:  Your Honor, the next issue was

10:46:33  8    the bolstering of Professor Lembke.

10:46:36  9         It is not appropriate for Mr. Lanier to get up and say

10:46:38 10    I've been trying cases for a long time.

10:46:40 11              THE COURT:  You should have objected there.  I

10:46:43 12    would have sustained it.

10:46:43 13         I agree, Mr. Lanier.

10:46:44 14              MR. LANIER:  Okay, Your Honor.

10:46:45 15              THE COURT:  You went -- I mean, obviously you

10:46:47 16    hired her and brought her in.  Okay.  We know that.  The

10:46:50 17    same way the defendants hired their experts and brought them

10:46:53 18    in.  But I don't think it's appropriate for either counsel

10:46:56 19    to essentially give testimonials for their experts.

10:46:59 20              MR. LANIER:  Okay.

10:47:00 21              THE COURT:  All right?  So --

10:47:02 22              MR. LANIER:  I will not do it again,

10:47:03 23    Your Honor.

10:47:04 24              MR. DELINSKY:  All right.  And, Your Honor,

10:47:05 25    moving on, I'd just like to preserve two objections that I

10:47:09  1    believe Your Honor's overruled, but I want to make it

10:47:11  2    abundantly clear.

10:47:12  3        Number one, Mr. Lanier made an argument that the

10:47:14  4    pharmacies had the choice not to sell these prescription

10:47:19  5    drugs.

10:47:19  6        I believe Your Honor determined in its -- in its

10:47:23  7    deciding evidentiary issues early on, decided that it would

10:47:28  8    not prohibit that kind of argument.  But we believe it's

10:47:31  9    improper --

10:47:31  10                THE COURT:  All right.  Fine.

10:47:32  11                MR. DELINSKY:  -- to suggest that a

10:47:33  12   pharmacist -- a pharmacy has the option of not carrying

10:47:37  13   legal medicine, and that has --

10:47:39  14                THE COURT:  I don't think he said that.  I

10:47:40  15   mean --

10:47:40  16                MR. DELINSKY:  That's exactly what he said,

10:47:41  17   Your Honor.

10:47:41  18                THE COURT:  -- obviously you don't have to

10:47:42  19   have a controlled substances license, but any pharmacy's got

10:47:46  20   to have one.  So I don't think he suggested that.

10:47:48  21                MR. DELINSKY:  He did, Your Honor.  He said

10:47:50  22   that the pharmacies have the option of not carrying these

10:47:54  23   drugs and choosing not to carry these drugs and they do it

10:47:57  24   for profit.  That's exactly what he said.

10:47:59  25                THE COURT:  Well, it's technically true, but

10:48:01  1    any pharmacy -- you can put out -- you can say in your

10:48:03  2    argument any pharmacy that does that would be out of

10:48:06  3    business.  And you're right.  So why don't you -- you can

10:48:09  4    get up and say that in your argument, Mr. Delinsky.

10:48:12  5                    MR. DELINSKY:  My second objection that I'd

10:48:14  6    like to preserve, Your Honor, goes to the effective controls

10:48:17  7    against theft and diversion regulation.

10:48:18  8        Your Honor knows we disagree with Your Honor's

10:48:21  9    interpretation of that regulation.  But to now read into

10:48:25  10   that regulation, which clearly on its face requires --

10:48:27  11   applies to security requirements.

10:48:29  12                   THE COURT:  Well, I think it's beyond that.

10:48:32  13   So, fine.  You can -- you can -- you want to get up and make

10:48:34  14   that argument, you can.  You can say it only -- that that

10:48:37  15   regulation does nothing more than deal with safety and

10:48:43  16   security and theft, you can say that.

10:48:45  17                   MR. WEINBERGER:  Your Honor, and that --

10:48:47  18   Mr. Delinsky's argument entirely contradicts the testimony

10:48:52  19   of Demetra Ashley, who was the head of diversion control

10:48:57  20   after Joe Rannazzisi.  She specifically -- I asked her about

10:49:01  21   this --

10:49:01  22                   THE COURT:  We don't have -- we're not arguing

10:49:03  23   the case here.  If Mr. Delinsky wants to make that argument,

10:49:05  24   he can.

10:49:05  25                   MR. DELINSKY:  And, lastly, Your Honor -- and

10:49:06  1    I understand my objection to be preserved -- there were a

10:49:10  2    few spots here, but I just want to single out one.

10:49:13  3         Mr. Lanier argued that DEA doesn't have the resources.

10:49:17  4              THE COURT:  Well, that's a fact.

10:49:18  5              MR. DELINSKY:  No.  But, Your Honor, it's not

10:49:19  6    a fact in evidence.

10:49:19  7              THE COURT:  I think it is.

10:49:21  8              MR. DELINSKY:  That was not asked of

10:49:23  9    Joe Rannazzisi.  It was not asked of Mr. --

10:49:24 10              THE COURT:  I think there was testimony of

10:49:26 11    many of the DEA witnesses as to what they do or don't do,

10:49:31 12    so --

10:49:31 13              MR. DELINSKY:  But, Your Honor, there was no

10:49:33 14    testimony about resources.  The fact of the matter is that

10:49:35 15    DEA learned -- or leverages millions and millions and

10:49:39 16    millions of dollars from the registrations of these

10:49:42 17    pharmacies and every pharmacy that registers for it.  They

10:49:45 18    have ample resources.  There's been no testimony on any of

10:49:48 19    this.

10:49:48 20         We need to keep these arguments to what's in the

10:49:50 21    record.  That was too far.  That was not an inference.  That

10:49:54 22    was not a fair inference from any evidence in the record.

10:49:56 23    We have --

10:49:57 24              THE COURT:  Well, I think it's a fact.  Okay?

10:49:59 25    But -- and I think there was -- I think there was testimony

10:50:01 1     about it.  But, remember, I said it's fair game to attack

10:50:06 2     the federal government.  There's a very wide strike zone.

10:50:09 3     So you want to attack the federal government, you can too.

10:50:12 4     It's fair -- it's fair game.

10:50:15 5               MR. MAJORAS:  Your Honor, John Majoras.

10:50:17 6          Just two quick points.  One on the issue about merely

10:50:21 7     by operating a business selling opioids, that's directly

10:50:25 8     counter to what the plaintiffs argued in Motion in Limine

10:50:27 9     Number 5 argument where they said, as a preliminary matter,

10:50:30 10    plaintiffs do not intend to argue that the pharmacy

10:50:33 11    defendants are liable based merely on the fact that they

10:50:36 12    distributed opioids.

10:50:37 13         It's Docket Number 3464, Page 15.

10:50:40 14              THE COURT:  Well, all right.  Mr. Lanier, you

10:50:41 15    better correct that.  All right?  If you -- I mean --

10:50:44 16              MR. LANIER:  I don't -- first of all, I need

10:50:46 17    to look at the Motion in Limine because if it reads the way

10:50:51 18    Mr. Majoras, it dealt with distribution, and I need to check

10:50:53 19    that.  But, obviously, I'm talking dispensing here, not

10:50:56 20    distribution.

10:50:56 21              THE COURT:  Well, if you --

10:50:57 22              MR. LANIER:  But I'll check.

10:50:58 23              THE COURT:  Well, if you in any -- I think you

10:51:01 24    were right on the edge of suggesting they did something

10:51:03 25    wrong by carrying them and dispensing --

```
10:51:07   1              MR. LANIER:  Again, no, no, no.  They didn't.
10:51:10   2   They didn't at all.  What I was trying to --
10:51:11   3              THE COURT:  And I think you've got to make
10:51:12   4   that clear.
10:51:12   5              MR. LANIER:  I'll make that clear, yeah,
10:51:14   6   because that's not my point.  I don't think they do anything
10:51:15   7   wrong by that.  It's a question of whether they do it
10:51:16   8   properly.
10:51:16   9              THE COURT:  Well, you were very -- you were
10:51:17  10   right on the edge there.
10:51:18  11              MR. LANIER:  I'll clarify that, Your Honor.
10:51:18  12              MR. MAJORAS:  And, Your Honor, my final point,
10:51:21  13   this is along the lines of bolstering the expert witness.
10:51:27  14   Discussions about whether I liked a witness or not to
10:51:30  15   cross-examine them harder or less than somebody I didn't
10:51:33  16   like, that's clearly inappropriate.  -
10:51:34  17              MR. LANIER:  Your Honor, I understand your
10:51:35  18   ruling on that.
10:51:36  19              THE COURT:  That was a problem -- Mr. Lanier,
10:51:38  20   that was a problem too.
10:51:39  21              MR. LANIER:  Yeah, and understanding that in
10:51:40  22   this court, I won't do it.  It was --
10:51:41  23              THE COURT:  Whether you like a witness, if you
10:51:43  24   think they -- they deserve some strong cross-examination,
10:51:47  25   you make them.  It has nothing to do whether you personally
```

| | | |
|---|---|---|
| 10:51:50 | 1 | like the witness. |
| 10:51:51 | 2 | MR. LANIER:  Okay.  I'll be careful about that |
| 10:51:53 | 3 | as well.  This is -- I apologize.  I -- Your Honor, it was |
| 10:51:58 | 4 | the same type of thing that was done in opening by |
| 10:52:02 | 5 | Ms. Sullivan, at least, but -- and in a lot of courts, |
| 10:52:04 | 6 | that's not a problem.  But if that's a problem here, I |
| 10:52:06 | 7 | don't -- I will stay totally away from that, and I won't do |
| 10:52:09 | 8 | that again. |
| 10:52:09 | 9 | THE COURT:  All right. |
| 10:52:10 | 10 | MR. LANIER:  Thank you. |
| 10:52:13 | 11 | THE COURT:  Okay.  Anything else? |
| 10:52:16 | 12 | Okay. |
| 10:52:17 | 13 | (Recess was taken from 10:52 a.m. till 11:07 a.m.) |
| 11:07:20 | 14 | COURTROOM DEPUTY:  All rise. |
| 11:08:09 | 15 | (Jury returned to courtroom.) |
| 11:10:41 | 16 | THE COURT:  All right.  Please be seated, |
| 11:10:43 | 17 | ladies and gentlemen. |
| 11:10:44 | 18 | Before -- before Mr. Lanier proceeds, I want to remind |
| 11:10:50 | 19 | you that your job as jurors is to decide the issues |
| 11:10:52 | 20 | presented in this case only.  It is not to decide anything |
| 11:10:57 | 21 | about any future case or any other case in the country. |
| 11:11:01 | 22 | You will decide only whether each plaintiff, |
| 11:11:05 | 23 | Lake County and Trumbull County, has proved its case against |
| 11:11:10 | 24 | each of the three defendants. |
| 11:11:11 | 25 | Thank you. |

**Closing Argument - Lanier**

11:11:11   1          MR. LANIER:  Thank you, Your Honor.

11:11:12   2       And that's exactly right.  You'll -- in fact, the

11:11:14   3   judge has tailored his questions to exactly what you'll

11:11:18   4   find.  And you'll read those.  He read you his instructions,

11:11:22   5   but ultimately he'll also give you --

11:11:24   6       I think it's four, Your Honor.

11:11:26   7       -- but he's got a set of questions that he'll ask you,

11:11:29   8   and that narrows down the focus on what this whole case is

11:11:33   9   about in front of you today.

11:11:35   10       And so I was marching through the recap of the trial.

11:11:37   11   I had made it through Carmen Catizone, and I had gotten to

11:11:40   12   the point where we looked at our first DEA witness, and that

11:11:43   13   was Joe Rannazzisi.

11:11:44   14       Now, Joe Rannazzisi is someone we called as a fact

11:11:48   15   witness to testify about the facts relative to the DEA when

11:11:51   16   he was the head of diversion control.

11:11:56   17       He was an interesting gentleman.  He testified that he

11:11:58   18   was not only at times a DEA agent and then ultimately the

11:12:02   19   director, but -- of the -- that diversion control unit, but

11:12:08   20   also a pharmacist and also a lawyer.  So he brought a unique

11:12:11   21   set of background skills to his job.  And we used him to

11:12:16   22   explain the legal system.  Legal system, and the

11:12:21   23   requirements that are registrants, the people who register

11:12:23   24   to do this -- to sell these drugs or work in these drugs.

11:12:28   25       And so within the area of that, he explained those

### Closing Argument - Lanier

11:12:31  1    legal requirements, and we can look briefly at his notes and

11:12:35  2    get an idea of what he had to say.

11:12:40  3         Mr. Wilson, we will -- let's see. . .

11:12:46  4         All right.  There we go.

11:12:47  5         You'll recall his experience.  It was pretty full.  He

11:12:52  6    had a lot of DEA experience.  We walked through all of that.

11:12:57  7    We explained all of that.

11:12:58  8         But then I started asking him about the corporation's

11:13:04  9    responsibility, in a sense as the head of the octopus with

11:13:07 10    all of the different stores that could report under that.

11:13:11 11         And then we asked him specifically about what he

11:13:14 12    understood the obligations to be for dispensers, for

11:13:19 13    pharmacies.  He talked about red flags.  He explained that

11:13:23 14    if there are red flags, you must resolve each one.  It might

11:13:27 15    start with a phone call to the doctor, but you could also

11:13:29 16    use your -- you also used your professional judgment.  If

11:13:33 17    there was a potential problem with the prescription of

11:13:35 18    distance, dosing, traveling in pairs, same people, and so

11:13:39 19    many more, then those red flags needed to be resolved.  And

11:13:42 20    he explained that.

11:13:43 21         He explained documentation, that there must be

11:13:48 22    documentation somewhere.  It was expected at the DEA.  Could

11:13:52 23    be in the patient profile, but somebody might come back and

11:13:55 24    need that documentation later.

11:13:56 25         He explained the knowing requirement, very much using

11:14:00  1    language akin to what His Honor has already read to you this

11:14:04  2    morning.  Knowing or having reason to know, he said, has

11:14:07  3    been clear since 1990, and you can't turn a blind eye.

11:14:11  4        He talked about the percentage testing, if it's

11:14:17  5    80 percent non-controlled to 20 percent controlled or less.

11:14:20  6    And we know in this case that it's less for these pharmacies

11:14:23  7    because they're doing a whole lot of non-controlled business

11:14:27  8    as well.  And he says that the DEA looked at the

11:14:30  9    percentages, but that wasn't the end-all.  That's not a

11:14:33 10    get-out-of-jail free card, you know, or Monopoly, go to --

11:14:37 11    advance token to wherever.  It's not an automatic move.

11:14:41 12    It's just one of the things looked at.

11:14:44 13        Corresponding responsibility he talked about when

11:14:47 14    presented with prescription, that some of them are going to

11:14:50 15    have red flags, and the pharmacist must resolve those red

11:14:53 16    flags before dispensing.

11:14:54 17        And then lastly, he talked about the pharmacy and the

11:14:59 18    pharmacist.  And he talked about how the pharmacy is the

11:15:02 19    registrant and is responsible.  The pharmacist conducts the

11:15:05 20    business of the pharmacy.  And so the pharmacy supplies the

11:15:13 21    drugs, the computers, the reference materials.  And the

11:15:15 22    pharmacist is responsible to practice, and the pharmacy is

11:15:18 23    responsible for what the pharmacist does.

11:15:21 24        So we got that from Joe Rannazzisi.  He came in and he

11:15:25 25    testified, and he made it real clear about these various

**Closing Argument - Lanier**

11:15:29  1    issues.

11:15:29  2            Juan, if we go back, please.

11:15:31  3            He also was the gentleman who actually issued show

11:15:35  4    cause orders.  I mean, he put them out under his signature.

11:15:39  5    He oversaw legal investigations that you've heard about in

11:15:43  6    this case, and he was emphatic that the pharmacies are

11:15:47  7    responsible for the actions of the pharmacists.  Can't turn

11:15:50  8    a blind eye to red flags.  Must resolve the red flags before

11:15:54  9    you distribute, et cetera.  And then used this line, that

11:15:58  10   the pharmacies are the last line of defense, the last line

11:16:03  11   of defense before these prescriptions go out and go forth.

11:16:09  12           And so within the framework of that we had his

11:16:11  13   testimony, and then we followed it with a Walgreens pharmacy

11:16:15  14   supervisor from Trumbull County, Brian Joyce.

11:16:18  15           Now, Mr. Joyce is one that was done, his examination

11:16:23  16   was done by Mr. Weinberger.  And Mr. Weinberger asked him

11:16:28  17   some pretty clear questions.  In the process though, let's

11:16:32  18   remember who he was.  He was someone who testified that

11:16:36  19   every pharmacist in Ohio knows about the epidemic.  He also

11:16:41  20   admitted that an oversupply of pills can lead to diversion.

11:16:46  21           See, that's one of these questions is, do they know or

11:16:49  22   have reason to know?  Is it foreseeable for causation?  And

11:16:53  23   he certainly gives us that as to Walgreens, at least.  But

11:16:58  24   he speaks of it in a way that should put everybody on

11:17:02  25   notice.

7135

**Closing Argument - Lanier**

11:17:02  1          He says, I never saw the need to review dispensing

11:17:05  2     reports.  So he didn't actually look intensely at the

11:17:10  3     reports of the people he was supervising for Walgreens.

11:17:15  4     Instead, what he says is, yeah, you know, we were

11:17:19  5     dispensing, and Dr. Veres, okay, every pharmacist in

11:17:24  6     Trumbull knew of Dr. Veres for decades.  And, yet, they're

11:17:29  7     doing what they're doing.

11:17:31  8          And he would say, well, I was okay because I was doing

11:17:34  9     a walkthroughs.  And my walkthroughs were adequate.  And his

11:17:39 10     walkthroughs were interesting.  It was the first time that

11:17:44 11     we -- Mr. Weinberger and I were cognizant of the idea that

11:17:50 12     he had on his computer notes from the walkthroughs that he

11:17:56 13     was routinely doing at all the pharmacies to check to make

11:17:58 14     sure that the pharmacists were doing their jobs right.

11:18:00 15          And so we got those computer notes in the middle of

11:18:02 16     trial, and you got a chance to see them.  They were

11:18:04 17     basically four notes, one in January 18th of 2019,

11:18:13 18     January 4th of 2019, the 15th and 16th, and July 30th.  And

11:18:23 19     none of them, none of them talked about how the pharmacists

11:18:31 20     were fulfilling their obligations, whether they were doing a

11:18:34 21     good job for a bad job.

11:18:36 22          So we were left with him.  And he answered a number of

11:18:40 23     questions that Mr. Weinberger put to him about -- let's look

11:18:51 24     at a couple of these.  The Target Drug Good Faith Dispensing

11:18:54 25     checklist.  Now, this was the checklist, you'll recall,

## Closing Argument - Lanier

11:18:57  1    Amy Stossel, the pharmacist for Walgreens at the end, didn't

11:19:00  2    even know really how to fill out.  She thought everything

11:19:03  3    was supposed to be checked no.  And then she thought it was

11:19:07  4    supposed to be half yes, half no.  And then when it was

11:19:10  5    pointed out to her they should all be yes, which is rather

11:19:15  6    provocative in itself.

11:19:16  7         But he testified that the Target Drug Good Faith

11:19:22  8    Dispensing checklist was Walgreens' method of documenting

11:19:24  9    the resolution of the red flags, which makes it really

11:19:27 10    interesting that the pharmacist they picked to come in here

11:19:31 11    doesn't know how to do it.

11:19:37 12         He says, if a Target Drug Good Faith Dispensing

11:19:40 13    checklist was not completed for an oxycodone prescription,

11:19:43 14    the policy was violated.  And yet we had a box of refusals

11:19:47 15    to fill.  We had a chance to try to see -- and at least a

11:19:50 16    couple of the examples we pulled out didn't have the Target

11:19:53 17    Drug Good Faith Dispensing, as I pointed out.

11:19:57 18         The Target Drug Good Faith Dispensing checklist was

11:20:00 19    not used to resolve red flags for hydrocodone.

11:20:08 20         The most prescribed opiate wasn't even listed by name.

11:20:13 21    It would have to come under the other category on their

11:20:16 22    Target Drug Good Faith Dispensing checklist.

11:20:19 23         And these were things he agreed to.  He agreed it

11:20:23 24    would be unlawful to fill a prescription that triggered a

11:20:26 25    red flag without requesting and reviewing an OARRS report.

7137

**Closing Argument - Lanier**

11:20:32  1    That's certainly been the law in Ohio under certain

11:20:35  2  conditions since 2011.

11:20:38  3    Let's keep moving on.  That was our first real taste

11:20:48  4  of the perspective that was brought by Brian Joyce.  And

11:20:53  5  we'll get to more of this in a moment.

11:20:55  6    But if we go back to the PowerPoint, at this point we

11:21:01  7  called Dr. McCann, Craig McCann, to the stand.

11:21:06  8    Now, Dr. McCann is the numbers' guy.  And they took

11:21:08  9  that massive set of ARCOS data, that massive database that

11:21:13  10  the DEA keeps, and plugged it into massive computers to

11:21:15  11  figure out and ultimately set up a database that anybody

11:21:18  12  could use to access this information, assuming you had the

11:21:21  13  right to access it.

11:21:22  14    And so within the framework of that, he's the data

11:21:25  15  expert that all the other data experts relied on.  They

11:21:30  16  didn't like the way he did the computations on the red

11:21:34  17  flags, but in terms of how many pills were being put out,

11:21:39  18  everybody goes to his data.  And he gave the number of pills

11:21:43  19  per person, per defendant in these counties per store per

11:21:47  20  year.  And you'll have that document back there.  It's one

11:21:55  21  that you will have seen, you'll remember.  It's a pretty

11:21:58  22  easy document to look at.

11:21:59  23    Here is the Walmart example.  Walmart.  He's got the

11:22:04  24  first page of dispensing of eight prescription opioids, and

11:22:10  25  it talks about how many average dosage units per capita were

7138

**Closing Argument - Lanier**

11:22:16  1    dispensed by Walmart within that time frame.  And then he

11:22:20  2    breaks it out and he talks about how Walmart, in this

11:22:25  3    example, dispensed oxycodone and hydrocodone by year.

11:22:30  4        And in Lake and Trumbull Counties, if you add them

11:22:33  5    together, or if you break them apart, you'll see it started

11:22:36  6    out at 1.26 per year in 2006.  It peaked in 2014 -- no, 2015

11:22:43  7    at -- no, 2016, at 3.22 pills per person.  Every man, woman,

11:22:52  8    child, infant, everybody, getting those pills just from

11:23:01  9    Walmart stores alone.

11:23:03  10    He didn't only give you Walmart figures, he also gave

11:23:06  11   you figures for the other defendants as well.  And so you

11:23:09  12   can look at those other defendants, and you can see the CVS

11:23:11  13   numbers and the Walgreens numbers, for example.

11:23:14  14       CVS, you've got the same basic layout of the front

11:23:23  15   sheet, as you'll look at it in the exhibits, but then you've

11:23:26  16   got it by year.  CVS peaked in 2013 -- no, 2012 at 8.66

11:23:35  17   tablets, pills, per person, per year.  Just from those

11:23:40  18   stores.  It's not counting all the other pharmacies that are

11:23:42  19   putting out drugs.  And so you've got that, and you've got

11:23:46  20   it broken out into Lake County and Trumbull County.

11:23:50  21       In Lake County you've got that year, 10.92 dosage

11:23:55  22   units per person in Lake County.

11:23:57  23       And then you've got 6.18 in Trumbull County.

11:24:03  24       So you've got that.  You can also look at it broken

11:24:06  25   out by stores so you can see which stores were really

**Closing Argument - Lanier**

11:24:10  1    putting out the numbers, and that becomes relevant later on.

11:24:15  2        So all of these pills were being put out there by CVS,

11:24:18  3    they're being put out there by Walmart, and they're being

11:24:21  4    put out by Walgreens as well.  And so we gave you proof of

11:24:25  5    the Walgreens numbers.  And the Walgreens numbers are very

11:24:30  6    much aligned with the others.

11:24:32  7        You will see they peaked in 2011 at 10.23 pills per

11:24:37  8    person.  They were much heavier in Trumbull County where

11:24:43  9    they were 10.87 that year, and 2014, they were 10.92.  2015,

11:24:52 10    they hit 13 pills per person in Trumbull County.

11:24:57 11        No one challenges the math on this.  It's the math.

11:25:01 12    It's 2 plus 2 is 4.  That's how much they were selling.

11:25:06 13        And their argument is, yeah, but compare us to others.

11:25:12 14    Okay?  Well, I don't know -- you know, I -- Rachel is one of

11:25:18 15    my five kids, one of our five kids -- sorry, Becky -- and it

11:25:23 16    was never a good excuse to say, well, I may be misbehaving,

11:25:29 17    but someone else did too.  I'm not focusing on anybody else

11:25:32 18    right now.  I'm focusing on these three pharmacies that

11:25:36 19    won't admit they did anything wrong.  That's who I'm

11:25:38 20    focusing on.  I'm not worried about the others.

11:25:41 21        And so these three pharmacies, they can't escape their

11:25:46 22    behavior by saying, okay, well, but we spread ours out among

11:25:50 23    11 stores, and if you don't add all of our stores together,

11:25:54 24    we don't look like we put out as many as some of the other

11:25:58 25    stores did.  No, that doesn't work.

**Closing Argument - Lanier**

11:26:02  1      And so we get that explanation from Dr. McCann.  He

11:26:05  2   not only did that, but he also then explained the

11:26:07  3   ramifications of Carmen Catizone's findings on red flags.

11:26:12  4      So you've got his findings on red flags where the best

11:26:16  5   he could say about documentation is what he said for

11:26:20  6   Walmart.  I think for Walmart he said that 90 percent or so

11:26:22  7   had some level of documentation, but he found the

11:26:25  8   documentation inadequate.  And then he looked at the others

11:26:28  9   and he found the others much worse in terms of where they

11:26:32 10   were just missing data, just totally missing.  And then what

11:26:36 11   Dr. McCann did is he said based mathematically on that

11:26:41 12   representative sample, you can make a determination that

11:26:44 13   this is a problem that spanned those 10 years, that it's a

11:26:48 14   fair and legitimate thing to say that in a random sampling,

11:26:53 15   we didn't just happen to get something that would not make

11:26:58 16   sense.

11:26:58 17      So within the framework of that, we then put

11:27:00 18   Brad Nelson on the stand.  Now, Brad Nelson was interesting.

11:27:03 19   He first testified by a deposition that I took, and we

11:27:07 20   played the deposition.  And later on His Honor allowed us to

11:27:09 21   call him by video hookup, and he was at his law -- lawyer's

11:27:13 22   office in Dallas, Texas.

11:27:16 23      And he used to work for Walmart.  He was a former

11:27:19 24   senior manager of controlled substance and regulatory

11:27:21 25   affairs.  He's the one whose job application said, when he

**Closing Argument - Lanier**

11:27:26  1    was applying to get that position, it said that the job

11:27:28  2    would be one to drive compliance.  And yet if you look at

11:27:33  3    his experience, he didn't really have any compliance

11:27:36  4    experience in terms of driving compliance to meet

11:27:40  5    regulations.

11:27:41  6         He was unaware of the *Holiday* case.  One of the

11:27:44  7    seminal cases.  He's the one who sent out that e-mail that

11:27:51  8    said, in essence -- I've synopsized it here -- emphasized

11:27:57  9    sales over complying with the 2011 MOA.  Walmart had entered

11:28:02 10    into a memorandum of understanding with the DEA that said,

11:28:04 11    we will do A, B, C, D, E, F, G, for the next X years.  And

11:28:10 12    when it was almost up, the stores were asking, or at least

11:28:13 13    one store had the question of do we need to be doing this,

11:28:16 14    and he's the one who sent the e-mail out that said the MOA's

11:28:21 15    almost up.  Right now your energy and your efforts are

11:28:27 16    better spent, in essence, driving sales.  And so we got that

11:28:30 17    from him.  He came back and testified live later, but that

11:28:35 18    testimony is absolutely devastating for Walmart.

11:28:39 19         The idea -- if you'll recall his testimony -- if we

11:28:44 20    can go over here for a moment.  This is the timeline that we

11:28:48 21    did with him.  He put his timeline up -- or I put this

11:28:53 22    timeline up through him, and we talked about how he took his

11:28:57 23    job.  But we talked about how *Holiday* was written up in the

11:29:01 24    Federal Register in 2012.  And we talked about how they had

11:29:07 25    the no blanket refusals to fill but how in 2013, there was a

**Closing Argument - Lanier**

11:29:11  1    concern that was being expressed by others that Walmart was

11:29:15  2    becoming a funnel in certain parts of the country for bad

11:29:19  3    prescriptions that were being filled there.

11:29:22  4        You know, he continued to do this work until he

11:29:30  5    finally was reassigned or quit.  But he was just absolutely

11:29:37  6    not qualified do the work by any stretch of the imagination.

11:29:43  7    And, frankly, he's the one who kept cut and pasting all of

11:29:46  8    his comments about what needed to be done or what didn't

11:29:49  9    need to be done.  And so we had his testimony next.

11:29:53  10        Juan, if we go back, please.  Thank you.

11:29:55  11        He also testified that when the registered pharmacists

11:30:00  12    expressed their fears and concerns about filling certain

11:30:03  13    prescriptions, he would just cut and paste that language

11:30:05  14    that said, oh, we're not allowed to do a blanket refusal to

11:30:09  15    fill.

11:30:11  16        We really pressed him on that.  Finally we found one

11:30:14  17    of their witnesses who said that she talked to two or three

11:30:16  18    or four Boards of Pharmacy, and nobody ever documented it,

11:30:19  19    but they said that you can't do a blanket refusal to fill.

11:30:24  20        I said, okay, well, has it ever been written down?

11:30:27  21        No.

11:30:27  22        And then y'all just started doing it?

11:30:30  23        Yes.

11:30:30  24        Did you ever talk to anybody in Ohio?

11:30:32  25        No.

**Closing Argument - Lanier**

11:30:33  1        And then we find in trial that there was an issue up

11:30:37  2    in Wisconsin or Michigan -- Wisconsin, but even that issue

11:30:43  3    wasn't a blanket refusal to fill for a doctor, it was for an

11:30:46  4    entire clinic.  And there were some overlying facts that

11:30:51  5    were unknown to anybody to talk about in that.

11:30:53  6        So we have this from him.  And he's the one who kept

11:30:56  7    the fill on even when Walmart was labeled a funnel for

11:31:01  8    C-IIs.

11:31:01  9        We then turned county specific to Trumbull County, and

11:31:05 10    we put Captain Tony Villaneuva on the stand.  Now,

11:31:10 11    Captain Villanueva was a sheriff's captain, or is a

11:31:15 12    sheriff's captain.  He was former commander of the opioid

11:31:18 13    task force.  And when he took the stand, he talked about the

11:31:18 14    effect of the epidemic in Trumbull County on courts, on

11:31:22 15    children, on crime, and on the community.

11:31:27 16        Because one of the things the judge has us -- we're

11:31:29 17    required to prove is that there is an epidemic that has

11:31:33 18    caused a public nuisance in each of these counties.

11:31:37 19        And so he talked also about some of his investigation

11:31:40 20    work.  And he talked about how he investigated using OARRS.

11:31:45 21    And he would find prescriptions that had been filled for

11:31:48 22    people who were specifically diverters by all three of the

11:31:54 23    pharmacies that were here.

11:31:55 24        Now, I say that.  I believe on that particular

11:31:58 25    prescription we were looking at, Walmart dispensed one of

**Closing Argument - Lanier**

11:32:02  1    the trinity drugs and not an actual opiate, if I'm

11:32:05  2    remembering it correctly.  But it's still there in OARRS

11:32:08  3    because it would be in there.

11:32:09  4        We then went to Walgreens senior director of

11:32:14  5    divisional, vice president for pharmacy compliance,

11:32:19  6    Natasha Polster.  She is the erase the notes lady.

11:32:21  7        She's the one who thought that the opioid epidemic

11:32:24  8    crisis problem really started in 2011, and yet has no

11:32:30  9    trouble saying delete the notes fields if the need is there.

11:32:35  10   Need being, not something simply malicious, but just, hey,

11:32:38  11   we need more room in the notes fields and there's a certain

11:32:42  12   number of characters.  That need.

11:32:44  13       She's the one who testified about that refusal to fill

11:32:48  14   box, but hadn't really looked into it.  And when I pulled

11:32:52  15   out some of the refusals to fill and showed the

11:32:56  16   inadequacies, she was kind of like, well, I didn't really

11:32:59  17   look at the box.  It was just put here.

11:33:02  18       She's also the one who put some changes in.  She

11:33:06  19   changed the size of the screens, but it was all slow motion

11:33:11  20   changes.  Takes years to change.  You know, a good example

11:33:18  21   of that is what she had to say -- in the interest of time,

11:33:26  22   I'll keep going.  If I have time, I'll do it in rebuttal,

11:33:29  23   but I want to get to the next witness.

11:33:31  24       The next witness was Caleb Alexander.  Caleb

11:33:35  25   Alexander.  Now, he's a doctor, he's a medical doctor.  But

11:33:37  1    he's also, in addition to a medical doctor who sees

11:33:40  2    patients, he's a pharmacoepidemiologist at Johns Hopkins.

11:33:45  3         So here he is.  He specializes in doing

11:33:52  4    pharmacoepidemiology.  I mean, this is his niche.  He deals

11:33:54  5    with patients who have opioid issues.  He prescribes opioids

11:33:58  6    on a limited basis.  He knows when to use them and when not

11:34:02  7    to.

11:34:02  8         He's got a massive CV with over 300 articles.  He's

11:34:07  9    been relied on by the government.  He's been relied on by

11:34:11  10   academia.  We brought him to you.  We set him before you.

11:34:15  11   And he confirmed the epidemic in the counties and confirmed

11:34:19  12   that it was caused by an oversupply of fills.

11:34:23  13        We've got to prove causation.  We've got to prove that

11:34:27  14   these three pharmacies were causative to substantial aspect

11:34:34  15   of -- or damage within this nuisance.  And so he's one of

11:34:40  16   our witnesses who did it.  Then he laid it out there and

11:34:43  17   explained that when you have an oversupply of pills, this is

11:34:47  18   what's going to happen.

11:34:49  19        Now, he's not the only one.  I'll come back and look

11:34:52  20   at some of these PowerPoint slides in a little bit when we

11:34:55  21   get to the charge -- or to the judge's instructions, but I

11:34:57  22   want to go to Dr. Kerry Keyes first.

11:35:02  23        Dr. Kerry Keyes is the epidemiologist at Columbia who

11:35:07  24   wrote the textbook on epidemiology used by so many schools

11:35:11  25   when they teach it.  She had been dealing with the opioid

7146

**Closing Argument - Lanier**

11:35:14  1    tragedy for over two decades, or right at two decades, since

11:35:18  2    the early 2000s.  She actually did it as a volunteer in

11:35:22  3    another occupation as she went to school to get her Ph.D. in

11:35:25  4    epidemiology so that she could address these types of

11:35:29  5    issues.

11:35:29  6         And she's the one who explained the three phases of

11:35:32  7    the epidemic.  They're written up in other places.  You can

11:35:35  8    find them in PowerPoints and articles and things, but she

11:35:38  9    explained them to us here in the courtroom.  And then she

11:35:40 10    also gave the national numbers and the local numbers so that

11:35:45 11    y'all would have those numbers in front of you to look at

11:35:48 12    and assess.

11:35:49 13         I'll deal with her PowerPoint slides in a little bit,

11:35:54 14    but I want you to remember that she explained why the

11:35:56 15    epidemic is sourced to the oversupply of prescription pills

11:36:00 16    and not the general misery of the community.

11:36:03 17         You may have been thinking, that may have even just

11:36:06 18    flown by you when she said that.  Like, why does that

11:36:09 19    matter?  The reason it matters is I knew they were going to

11:36:11 20    call Miller, Dr. Miller.  He was the Chicago economist.

11:36:18 21              MR. WEINBERGER:  Murphy.

11:36:19 22              MR. LANIER:  Murphy.  I've heard it both ways.

11:36:22 23    They were going to call Murphy the economist from

11:36:26 24    Chicago.

11:36:26 25         Thank you, birthday boy.

7147

**Closing Argument - Lanier**

11:36:29 1    And they were going to bring him in, and he was going

11:36:31 2    to say, oh, don't blame the oversupply of opioids.  Just say

11:36:35 3    the community is miserable.  Just say it's, you know, if it

11:36:41 4    wasn't opioids, they'd be doing something else.  It's just

11:36:43 5    the status of the community.

11:36:46 6    And so I asked her that.  And I had her explain ahead

11:36:49 7    of time why that's not true.  And she put up this chart, and

11:36:53 8    she compared it to the United States and showed how the

11:36:57 9    rates of opioid overdose deaths, sales and treatments from

11:37:01 10   1999 to 2010, all follow the same path.  It's not just in

11:37:09 11   Northeast Ohio.  It's not just misery there.

11:37:16 12   Then we put on the stand Brad Nelson.  And this was

11:37:18 13   the -- our chance to put him on live.  So he came back for a

11:37:23 14   second time.

11:37:24 15   He's the guy who did the registered pharmacist cut and

11:37:27 16   paste answers, who kept the fill on even when they were

11:37:31 17   labeled a funnel.  I've covered his testimony.  I won't

11:37:33 18   rehash it.

11:37:34 19   After him, we put on Michelle Travassos.  Now, she was

11:37:39 20   a deposition.  And you guys were paying great attention

11:37:42 21   during that deposition.  But I hope you remember the fact

11:37:45 22   that she knew of the DEA's enforcement action.  She knew, as

11:37:51 23   a CVS professional services manager, about that enforcement

11:37:55 24   action in Florida.  She was the one who helped -- and was

11:38:00 25   involved in the WaVe 2.0.  WaVe 2.0 was going to be their

**Closing Argument - Lanier**

11:38:07  1    computer system to help identify red flags, and initially

11:38:11  2    they had, like, 27 red flags and it would label -- and it

11:38:14  3    would flash them and they -- you know, you listen to the

11:38:16  4    testimony, and you just walk away thinking, all that flashed

11:38:20  5    way too many red flags for them, so they scaled it down to

11:38:22  6    three red flags that their computer will identify.  And it's

11:38:29  7    still not in place all over, still not working fully.  But

11:38:29  8    she talked about that.

11:38:33  9         She agreed that diverted opioids are a public health

11:38:37  10   risk.  So again, we've got CVS agreeing to this.  I think

11:38:40  11   all of the defendants without any question have all agreed

11:38:42  12   that it's a public health risk.

11:38:44  13        She knew about Dr. Veres and Dr. Torres, who in one

11:38:50  14   store alone were supplying 70 to 80 percent -- this is one

11:38:53  15   of our county stores -- 70 to 80 percent of the store's

11:38:59  16   prescriptions for hydro.

11:39:05  17        She talked about the RX Connect program, which was to

11:39:10  18   provide realtime assistance for red flags, but it was paused

11:39:14  19   in 2013 for reasons she didn't know.

11:39:18  20        She talked about the algorithm that would ID stores

11:39:20  21   with risky dispensing habits in Trumbull, the stores that

11:39:26  22   were filling too many prescriptions for Torres and Veres but

11:39:30  23   had no knowledge of anything that was done.

11:39:33  24        Then we looked specifically at Trumbull County in some

11:39:36  25   greater detail.  We put April Caraway on the stand to

**Closing Argument - Lanier**

11:39:41  1    testify.  She's the executive director of the Trumbull

11:39:44  2    County Mental Health & Recovery Board.  She testified that

11:39:46  3    2017 was the worst year ever with 135 overdose deaths.

11:39:52  4    1,250 overdoses, and she said this year's on track to be

11:39:57  5    worse.

11:39:58  6         And this becomes important because one of the judge's

11:40:00  7    instructions is a question of whether or not there's still a

11:40:03  8    nuisance today.  And there's no question but that there is.

11:40:05  9         She fights this epidemic daily.  She does it with

11:40:09 10    education.  She does it with treatment.  She does it with

11:40:13 11    drop boxes, Deterra bags, counseling.

11:40:16 12         Remember, she was asked even -- by y'all, one of you

11:40:19 13    asked her, is this the kind of thing where you have to be a

11:40:21 14    member of the -- or a citizen, a resident of the county to

11:40:25 15    benefit from some of the treatment options?

11:40:27 16         She said absolutely not.  We don't turn anybody away.

11:40:31 17    And they're trying desperately to try and help this problem

11:40:35 18    everywhere they can.

11:40:36 19         So we had her testimony here.

11:40:38 20         In addition to that, we had Kim Fraser come in from

11:40:42 21    Lake County.  Ms. Fraser is sitting here today.  She's the

11:40:45 22    executive director for the Lake County ADAMHS Board, and

11:40:47 23    she's worked as a licensed professional counselor for over

11:40:50 24    30 years in Lake County.

11:40:51 25         Thank you for all the good that you've done.  We

7150

**Closing Argument - Lanier**

11:40:53  1    appreciate it, Ms. Fraser.

11:40:54  2        But she also testified about the effect that the

11:40:58  3    opioid epidemic's had on the EMS, on fire, Children's

11:41:02  4    Services, county health department, local businesses and

11:41:04  5    more.

11:41:05  6        She's talked about the baby issues where there are

11:41:08  7    over a hundred grandparents that have become primary

11:41:11  8    caregivers and they're having to teach them how to do that.

11:41:16  9        We've got 8 grandkids, and we are really good for a

11:41:21 10    day or two.  It gets -- we got too old to do that parenting

11:41:28 11    thing all over again.  But you've got over a hundred

11:41:31 12    grandparents that have had to step in.  And there's --

11:41:34 13    that's a community harm.

11:41:37 14        So at that point in time, we rested and the defense

11:41:40 15    started putting on their case.  And who did they call?

11:41:42 16        They called Theresa Toigo.  And this was a deposition

11:41:48 17    that they played.  She was an associate director of the drug

11:41:51 18    and safety operations at the FDA.  And I'm still a bit

11:41:53 19    puzzled.  The FDA doesn't oversee chain pharmacies.  They

11:41:57 20    don't over say chain pharmacists.  She didn't have any

11:42:00 21    opinions on the responsibilities or the actions of

11:42:02 22    pharmacies.  And the FDA itself is limited in what they can

11:42:05 23    do once a drug is approved.  So she's not in a position to

11:42:08 24    really offer much except that the FDA approved these drugs.

11:42:11 25        And then they called George Pavlich.  Now, I tried to

**Closing Argument - Lanier**

11:42:16  1     find a better picture of dear Mr. Pavlich.  But because he

11:42:19  2     was appearing by video, the judge does not allow us to do

11:42:22  3     screenshots, so I couldn't get a picture of him like that

11:42:25  4     (indicating).  So I just went on the internet, and frankly,

11:42:28  5     having listened to him testify, I don't think he'd be

11:42:31  6     bothered too much by that picture.  So I'm throwing it up

11:42:34  7     there so you'll remember who he was.  But he hasn't been

11:42:37  8     hands-on in a decade.  He's a long-time retired fellow.

11:42:40  9          And he basically testified that the Ohio Board of

11:42:43 10     Pharmacy, when he was one of their investigators, they had

11:42:46 11     limited resources, they did limited reviews, and they got

11:42:50 12     limited insight.  And that's just the bottom line.

11:42:54 13          He did affirm that there are some bad doctors.  And he

11:42:57 14     didn't know about the particular filings of any of the

11:43:01 15     pharmacies.  He was kind of unknown on that kind of stuff.

11:43:06 16     But, even within the framework of that, he was able to say

11:43:11 17     that -- he's the one who did the Overholt's Pharmacy.  But

11:43:19 18     he did it off of a tip.  Even though he says that he would

11:43:24 19     be inspecting these pharmacies routinely, he never picked up

11:43:27 20     on Overholt's until he got a tip.  So his routine

11:43:30 21     inspections never picked up on a problem pharmacy.  And that

11:43:34 22     tells you the level of the limited review that they were

11:43:37 23     doing.

11:43:37 24          And then the defendants called, from the pain clinic

11:43:41 25     doctor in California, Dr. Robert Wailes.  This is a guy

**Closing Argument - Lanier**

11:43:45  1    who's charging almost $1,400 an hour.  He's the fellow that

11:43:51  2    was set up by a witness service that specializes in jury

11:43:56  3    persuasion and things like that.  And he comes out here, and

11:44:00  4    he basically spends almost a day trying to convince you that

11:44:06  5    everybody ought to be writing opioid prescriptions, and even

11:44:08  6    the trinity, because it's so important, and he does it

11:44:13  7    routinely, and you just got to make sure that your patients

11:44:16  8    are okay.

11:44:19  9         He was the one who was asked by one of you, did -- how

11:44:24 10    many of your patients have been addicted or dead?

11:44:28 11         And his replay was, in essence, I don't know.

11:44:32 12         And this -- this guy, this is the fellow who, on

11:44:36 13    cross-examination, I pointed out that his CV seems to be

11:44:40 14    inaccurate, that he swore under oath in his deposition that

11:44:44 15    he'd written an article when he hadn't written it, he was an

11:44:48 16    investigator.  That his CV says that he's board-certified by

11:44:51 17    an entity that doesn't even exist anymore, but he doesn't

11:44:54 18    list it as a former board certification.  This guy's just a

11:44:58 19    pain clinic doctor who writes a bunch of opioid

11:45:01 20    prescriptions, and he's coming in here trying to defend what

11:45:04 21    he's doing there.

11:45:07 22         And, you know, he tried to testify about red flags,

11:45:11 23    but he didn't understand red flags.  He didn't understand

11:45:13 24    the duties of a pharmacist or a pharmacy.  Well, you just

11:45:19 25    end up with, he's got a high percentage opiate pain center

**Closing Argument - Lanier**

11:45:25  1   with addicts, he admits, addicts, and others, regularly

11:45:29  2   getting opioids.  That was their counter to Dr. Lembke.

11:45:32  3       And I said to him -- you know, he kept saying I'm not

11:45:34  4   an ivory tower doctor, as if Dr. Lembke is an ivory tower

11:45:40  5   doctor.  She sees patients routinely.  She he's clinic days

11:45:45  6   multiple days a week.

11:45:46  7       He says, but I'm spending all my time treating

11:45:48  8   patients, that's why I don't write articles.

11:45:51  9       I was like, well, wait a minute.  They're talking

11:45:53  10  about your golf game at the opioid manufacturers, you got

11:45:57  11  time for that.  And you got time to be the delegate for the

11:46:00  12  pain clinic people.  And you got time to attend all these

11:46:03  13  meetings.  And you got time for -- you know, you're telling

11:46:06  14  us that your time with the California Medical Association is

11:46:08  15  going to take 20 percent, 30 percent of your time.  You have

11:46:12  16  time.  You just choose not to.

11:46:14  17      Oh, yeah, maybe.

11:46:15  18      And then, we had the DEA section chief of reporting,

11:46:19  19  Stacey Harper-Avilla, and she talked about how the DEA

11:46:25  20  controls quotas for opioid manufacturing.  There's no fuss

11:46:28  21  about that.  We said the same with Joe Rannazzisi, that the

11:46:32  22  DEA considered abuse and diversion.  No fuss about that.

11:46:34  23      You may decide, the defendants may point out, that the

11:46:37  24  DEA's got some responsibility for the opioid crisis because

11:46:41  25  they approved too high a quota.  Now, they may have.  I

7154

**Closing Argument - Lanier**

11:46:45  1      don't know.  But that does not excuse whether or not the

11:46:49  2      pharmacies -- you can't just point the finger at everybody

11:46:52  3      else.  You have to address your own conduct.

11:46:55  4          And so with Walmart, that was done when Susan Hiland

11:47:00  5      came to testify as the senior director, safety organization

11:47:03  6      of pharmacies.  Now, she's the one who testified that

11:47:07  7      they -- Walmart only made these changes to their POMs, their

11:47:13  8      pharmacy operation manual, after they entered into an

11:47:18  9      agreement with the DEA.  We're in phase 2 of the epidemic.

11:47:23 10      And not only that, then it still took them two years to do.

11:47:28 11          I asked her about cases from, like, the phase 1 of the

11:47:31 12      epidemic.  What about the *East Main* case?  She wasn't even

11:47:35 13      aware of it and all that it had to say about this and what

11:47:39 14      the company should be doing.

11:47:41 15          I asked her on the -- what about the Ohio blanket

11:47:44 16      refusal to fill, you know, position, and what are the Ohio

11:47:49 17      policies?  She didn't know.  She didn't have a clue.  Never

11:47:52 18      checked into that.

11:47:54 19          She came and she testified not knowing that their

11:47:58 20      company, Walmart, did not allow their pharmacists to access

11:48:02 21      OARRS for years.  They only allowed them to access it once

11:48:07 22      it became mandatory.  When Ohio changed and made it

11:48:12 23      mandatory, that's when all of a sudden Walmart changed their

11:48:17 24      policies.  But they were still having problems with their

11:48:20 25      system as of 2018.  They -- you know, they never specified

**Closing Argument - Lanier**

11:48:26  1    rules on the trinity combos and how they treat those until

11:48:30  2    post-2015.

11:48:35  3         And so we get Walmart's -- you know, this is all with

11:48:38  4    a legal obligation on this stuff to prevent diversion, to

11:48:43  5    have systems in place.

11:48:43  6         We have the Ohio Board of Pharmacy fellow, Trey

11:48:48  7    Edwards, and he came -- and he doesn't have the beard now

11:48:50  8    and so you might remember him unbearded -- but he was a

11:48:55  9    former agent with the Lake County Narcotics agency whose

11:48:59 10    wife is a pharmacist, and he came and he testified.  And he

11:49:04 11    said that the investigations they would do of these

11:49:06 12    pharmacies were years apart, and they were just a quick

11:49:10 13    snapshot of what was going on.

11:49:13 14         Don't let the pharmacies tell you we got a clean bill

11:49:17 15    of health so we were doing everything fine.  This is not

11:49:20 16    something where he never reviewed their corporate policies.

11:49:22 17    He never reviewed the volumes they were dispensing.  He

11:49:27 18    never reviews their refusals to fill.  So he gave you a very

11:49:30 19    limited snapshot of what it was.

11:49:31 20         And then we went to the vice president at Charles

11:49:35 21    River Associates.  Now, Charles River Associates is where

11:49:39 22    they got a number of their experts.

11:49:40 23         But Brunner is the guy who relied on Craig McCann for

11:49:44 24    his data.  He didn't understand how prescriptions worked

11:49:49 25    with red flags.  Just wasn't his niche.  He was brand new to

11:49:52  1    opioid litigation when -- opioid issues when he came into

11:49:56  2    opioid litigation.  Millions of dollars later, he comes to

11:50:00  3    testify, but really he doesn't have anything to add to the

11:50:03  4    equation.

11:50:04  5         We had CVS Nicci Harrington take the stand, Nicole

11:50:10  6    Harrington.  Now, she was someone who was a senior director,

11:50:15  7    or is a senior director of pharmacy services.  Her area

11:50:18  8    should be exactly what we're dealing with in this case, and

11:50:22  9    yet she was unaware of cases other than *Holiday* and *East*

11:50:28 10    *Main*, even though she was a pharmacist during the

11:50:31 11    *Medicine Shoppe* days of 2008 and some of these other cases.

11:50:35 12         She knows about *Holiday*, heavens, she ought to because

11:50:40 13    she got her job because of that case.  There was such a

11:50:42 14    problem within CVS, they created a new job for her to try to

11:50:46 15    fix this.

11:50:48 16         CVS, the corporate, agreed to settlement terms in the

11:50:52 17    *Holiday* case, and the corporation agreed to the settlement

11:50:56 18    terms for the entire corporation throughout the United

11:50:59 19    States.

11:51:00 20         And she became a new job within CVS to deal with these

11:51:06 21    problems at that point in time, but even as she talked about

11:51:11 22    what they'd been doing is they had changed their screen

11:51:14 23    sizes over the years, she had to agree that the actions

11:51:16 24    could have been taken years earlier.  That screen could have

11:51:19 25    been smaller during phase 1 or phase 2.

7157

**Closing Argument - Lanier**

11:51:22  1       She said that she was unaware that between 2006 and

11:51:26  2  2009 CVS dispensed over 10 million pills into these two

11:51:30  3  counties, over 10 million pills in that 4-year stretch.  She

11:51:38  4  wasn't aware of it.  Didn't know about it.

11:51:41  5       You know, she knew about the 2014 listing of red flags

11:51:45  6  but agreed it could have been done earlier.  She couldn't

11:51:48  7  give us a reason it couldn't, I should say.

11:51:51  8       She's the one who had the PowerPoint in 2015 that says

11:51:54  9  we were naive to think we were doing all we could.  And when

11:52:00 10  I probed her on this, her reaction was, well, when I said we

11:52:03 11  were naive to think we were doing all we could -- you'll get

11:52:06 12  this exhibit back there -- she meant -- she said, I meant

11:52:10 13  the community.  Even though this is a PowerPoint not for the

11:52:15 14  community, this is a PowerPoint about the community and the

11:52:20 15  responsibility of the companies in their communities.

11:52:24 16       So you look at it, and this is the one where she said,

11:52:30 17  when I started to really understand the tremendous growth of

11:52:34 18  the misuse of prescription drugs, I realized I may have been

11:52:36 19  naive to believe we were doing everything we could to reduce

11:52:39 20  the growth of this tragic problem.

11:52:43 21       This is her tragic problem, how many popping pills are

11:52:47 22  hurting people, how many it's killing.  This is her

11:52:49 23  PowerPoint.  And she says, well, when I said we, I meant the

11:52:52 24  community.  But you look at her we's in here, and all too

11:52:58 25  often her we's are CVS.

**Closing Argument - Lanier**

11:53:02  1      Let's join together and really make a difference.

11:53:04  2   Where do we start?  This is we.  This is her CVS

11:53:12  3   presentation.  This is a presentation that's not to the

11:53:14  4   community; this is a presentation that talks about DEA

11:53:18  5   regulations that require a controlled substance prescription

11:53:22  6   be issued for legitimate medical purposes.  This is one that

11:53:26  7   says pharmacists fail to satisfy this legal requirement when

11:53:28  8   they knew or should have known a prescription wasn't used

11:53:32  9   for a legitimate medical purposes.  Pharmacists cannot be

11:53:37 10   willfully blind.

11:53:44 11      This is about pharmacy.  This is about CVS, the we

11:53:47 12   here.  This is about what CVS is doing, their new red flag

11:53:51 13   approaches that should have been done years and years

11:53:54 14   earlier.

11:53:55 15      So -- thank you.

11:53:57 16      So as we go through here, then they put on

11:54:04 17   Kevin Murphy.  This is the fellow that is from Chicago.

11:54:06 18   This is the fellow who has no real opioid experience, other

11:54:09 19   than the $2 million his group received for their litigation

11:54:12 20   work.  He's an economist.  And he's the one who said

11:54:17 21   prescription opioids weren't the problem, it was the misery

11:54:20 22   in Northeastern Ohio.

11:54:26 23      That was offensive to a number of my clients and

11:54:29 24   others, I think, as I pointed out in cross-examination of

11:54:32 25   him.

7159

**Closing Argument - Lanier**

11:54:37  1      And then after that we had Dr. William Choi.  That is

11:54:40  2  a data analyst hired by CVS to look at their prescriptions.

11:54:43  3  He works for a group that's charged amounts unknown to him

11:54:53  4  in the Purdue bankruptcy, in addition to over 2 and a half

11:54:55  5  million that was charged in this litigation.

11:54:57  6      And he testified about red flags without reading any

11:54:59  7  of the cases on them, with no opiate experience, not reading

11:55:08  8  the defendants' policies, and that's -- this is who they

11:55:11  9  bring in to counter Carmen Catizone, who's Mr. National

11:55:16 10  Board of Pharmacy.

11:55:19 11      And not ending there, they then brought Walmart hired

11:55:22 12  a statistician, Mark Glickman.  Fascinating guy.  He knows

11:55:27 13  chess.  He knows the Beatles.  Knows magic.  But he doesn't

11:55:31 14  know opioids.  And I don't understand why he was brought in

11:55:39 15  here as their selection to testify.

11:55:41 16      But he's the one who put charts up where they avoided

11:55:45 17  dosage units in favor of MMEs because it makes the

11:55:49 18  defendants look better.

11:55:51 19      By the way, when they get up here and start using

11:55:53 20  charts any time they put up a chart, hold them accountable.

11:55:56 21  See if their charts say MMEs or dosage units.  Hold them

11:56:01 22  accountable.

11:56:03 23      He's the one who said -- you know, they had the pie

11:56:06 24  chart with just a small sliver being Walmart, and the

11:56:13 25  implication, I fear, was that Walmart was not significant.

**Closing Argument - Lanier**

11:56:16  1    And so I said to him, let's put on a pie chart, Lake and

11:56:22  2    Trumbull Counties, to the population of the United States.

11:56:25  3    And they're even smaller sliver, but you don't want to say

11:56:29  4    they're not significant.

11:56:29  5         And that's when he said, well, I don't say what's

11:56:32  6    significant and what isn't.

11:56:35  7         Then Robert Hill was called as a DEA witness, an

11:56:40  8    ex-DEA witness.  He was the executive assistant to Joe Rann

11:56:46  9    [sic].

11:56:46  10        Now, when he came, we had the letter where the DEA --

11:56:51  11   or the Department of Justice said that the DEA expressly

11:56:54  12   doesn't endorse his opinions nor do they reflect the

11:56:56  13   opinions of the DEA.  That's pretty strong.

11:57:03  14        But this is the fellow who said that they shouldn't be

11:57:05  15   on opioids longer than 6 months.

11:57:08  16        This is the fellow who was told by the law firm that

11:57:11  17   the DEA was contacted and would be present for his

11:57:13  18   testimony, but they weren't here.  And there was never any

11:57:16  19   document that showed that they rescinded what they had

11:57:18  20   written to that law firm, that they had not granted

11:57:21  21   authorization for him to come testify.

11:57:27  22        He did still agree that *Holiday* is the law.

11:57:30  23        And then we got to the pharmacists at the end of the

11:57:35  24   trial, and CVS put their pharmacist on, Kenneth Cook.  He

11:57:38  25   believes that the pharmacists he supervised in Lake County

**Closing Argument - Lanier**

11:57:41  1     performed to a good level.  And actually, that was kind of

11:57:44  2     when I pushed him on it even further.  My initial question

11:57:47  3     to him wasn't so limited.

11:57:51  4          You'll recall the note, perhaps, that I had with him.

11:57:58  5     I said, would you agree with me that there are good

11:58:01  6     pharmacists and not so good pharmacists?

11:58:05  7          He said, I don't agree.

11:58:07  8          And that's when I showed him the memo that he had

11:58:10  9     written up about the missing drugs, the missing narcotics.

11:58:22  10    And we talked about those.

11:58:23  11         And he said, I don't know if they were stolen, I don't

11:58:25  12    know if they were just missing, I don't know if they were

11:58:28  13    misdispensed.  We could never figure out what happened.  The

11:58:31  14    inventory just wasn't right.

11:58:33  15         I said, well, it's kind of hard to say that those

11:58:37  16    pharmacists are doing their job right, then, don't you

11:58:40  17    think?

11:58:40  18         But then as I continued to press him, I pressed him on

11:58:43  19    the opioid epidemic, and he said he hadn't seen one.  He's

11:58:45  20    heard that there may be a problem, but he said, thankfully

11:58:49  21    it hadn't affected any of his family or friends.

11:58:54  22         As I continued to ask him, he on his own, used the

11:58:59  23    term, I freaked out over the losses of the opioids in the

11:59:04  24    stores.  That's a -- that's an issue.

11:59:08  25         He's also the fellow who knew about Dr. Demangone's --

**Closing Argument - Lanier**

11:59:12  1    I'm trying to say his name right -- Demangone's reputation.

11:59:17  2    But knows that he, at least up to 2014 or '15, was still

11:59:21  3    filling his prescriptions.

11:59:23  4        Now, maybe what he wants us to understand is that once

11:59:26  5    he learned about his reputation, he quit filling them.  I

11:59:30  6    don't know.  But the stores sure didn't.

11:59:33  7        We did insert in here the deposition of

11:59:37  8    Demetra Ashley, DEA head of diversion control in Chicago.

11:59:39  9    She took Joe Rann's place.  She said that pharmacies are

11:59:44  10   required to provide effective controls and policies against

11:59:48  11   diversion.  That's the law.

11:59:49  12       She said that the DEA advised pharmacies, but the way

11:59:52  13   they do it is by posting their case decisions, so you could

11:59:57  14   read by *Holiday*, you could read about *Medicine Shoppe*, you

12:00:01  15   could read about *East Main*, because it's there.

12:00:04  16       She also said pharmacies are the last line of defense

12:00:07  17   and that this epidemic has been raging since -- or occurring

12:00:11  18   since the early 2000s.

12:00:14  19       We had two last pharmacists.  Walmart called

12:00:18  20   Lori Militello to the stand.  Now, she's the one who, when I

12:00:24  21   challenged her on all the different patients that she's seen

12:00:27  22   and got her to admit, she doesn't know all of those

12:00:29  23   patients.  She can't do it all by just knowing who walks in

12:00:32  24   the door.  She wasn't even aware of how many trinity

12:00:35  25   prescriptions she had filled.

7163

**Closing Argument - Lanier**

12:00:36  1    And she testified that she talked to other pharmacists

12:00:38  2   to get information, but when I probed her with it with her

12:00:42  3   deposition, what she had said under oath a few months ago,

12:00:44  4   she admitted that she basically only spoke with other

12:00:46  5   pharmacists about transfers of prescriptions.

12:00:53  6    And she also, bless her heart, wasn't aware of the

12:00:56  7   opioid problem, prescription problem, until the last several

12:00:59  8   years, even though she is been practicing pharmacy for a

12:01:04  9   long, long time.

12:01:04 10    She didn't know about Walmart's multiple year delay in

12:01:07 11   providing OARRS to its pharmacists.

12:01:09 12    She was unable to satisfactorily address how she was

12:01:15 13   dispensing trinity cocktails to a hormone doctor patient,

12:01:21 14   patient of a hormone doctor.  Now, yeah, his doctor title

12:01:24 15   also says rehab, so maybe that was it.  She didn't have it.

12:01:30 16    We did get Deborah Mack played.  She's the Walmart

12:01:38 17   senior director of compliance practices.  And she's the one

12:01:40 18   who testified by a deposition, then, that blanket refusals

12:01:44 19   to fill policies were based on limited undocumented

12:01:47 20   conversations with a handful of Boards of Pharmacies, but

12:01:47 21   not Ohio's.

12:01:48 22    And the judge has a special instruction in there, that

12:01:51 23   you're not to assume the truth of those matters as to what

12:01:54 24   those policies may or may not have been in those states, but

12:01:58 25   you can assume that that might have been information that

7164

**Closing Argument - Lanier**

12:02:00  1    went towards the formulation of a policy by Walmart.

12:02:05  2         But she clearly had no testimony about Ohio, even

12:02:10  3    within that framework.

12:02:11  4         And then our last witness of the trial was Walgreens'

12:02:15  5    local pharmacist, Amy Stossel.  And she recognized that

12:02:19  6    Walgreens was seen as a funnel, or at least I quizzed her on

12:02:23  7    it, a funnel for Dr. Demangone.  But she was very

12:02:27  8    comfortable with her dispensing of Dr. Demangone.

12:02:31  9         She was the one who said red flags aren't always red

12:02:37  10   flags.

12:02:37  11        She was the one who said -- admitted that she had

12:02:41  12   filled questionable prescriptions.  She was the one who

12:02:46  13   talked about that one fellow whose fentanyl patch came off,

12:02:49  14   who was one of the ones that Carmen Catizone pointed out was

12:02:53  15   just inundated with opiates.

12:02:57  16        And she said, well, you know, he came in hurting.

12:03:00  17        And I asked her, can you distinguish pain from

12:03:02  18   withdrawal symptoms?

12:03:03  19        She said, well, no.

12:03:05  20        She's worked for Walgreens for years and was unaware

12:03:08  21   of their DEA settlements?  Walgreens can settle with the

12:03:14  22   DEA, settlements that require them to do -- or settlements

12:03:18  23   that prompt them to put in new policies that require them to

12:03:21  24   train, that require them to have these policies in place,

12:03:24  25   and she doesn't even know about it?

**Closing Argument - Lanier**

12:03:31  1    And she claims to have known about red flags since the

12:03:34  2   mid 1990s.

12:03:35  3    Okay.  So that was it.

12:03:38  4    Oh, by the way, I would be remiss if I didn't tell you

12:03:42  5   she has also removed information from the notes fields, and

12:03:45  6   she's the one who didn't know how to fill out a Target Drug

12:03:48  7   Good Faith Dispensing -- that's the wrong initials -- should

12:03:51  8   be Target Drug Good Faith Dispensing checklist.  And did

12:03:56  9   admit that anybody filling a trinity is not doing it by

12:03:59 10   accident because you can see it.  You can see it in the

12:04:01 11   OARRS.

12:04:03 12    As for her documentation problems, she thought

12:04:05 13   imperative was a suggestion.

12:04:07 14    So with that, let's spend a little bit of time before

12:04:10 15   lunch looking at the instructions that the judge has for

12:04:14 16   you.  And in that regard, I want to not only put the

12:04:16 17   instructions down, but I want to talk to you about some of

12:04:19 18   the language and look at a couple of pieces of evidence that

12:04:22 19   may seem particularly relevant.

12:04:23 20    So the judge's instructions, he's already read them to

12:04:26 21   you, but you've got a copy.  There are a couple of things I

12:04:28 22   want to make sure that you're attentive to as you go back

12:04:33 23   there, recognizing that y'all are going to dialogue and get

12:04:42 24   debate, who remembers what, how, where, when, why, and

12:04:44 25   how -- what it should mean.  And so y'all go back there, but

7166

**Closing Argument - Lanier**

12:04:47  1    as you do, one of the first instructions that you'll see is

12:04:50  2    on Page 4 is this preponderance of the evidence, burden of

12:04:52  3    proof.

12:04:55  4         And this is the one that says I've got the obligation

12:04:57  5    to show something's more likely true than not.  Just that

12:05:00  6    greater weight.  Doesn't require proof to an absolute

12:05:06  7    certainly.  It doesn't require even proof beyond reasonable

12:05:09  8    doubt.  You can have a reasonable doubt.

12:05:11  9         And so I want you to go back there recognizing this,

12:05:15  10   not because I don't think we've proven this sufficiently.  I

12:05:22  11   think we've proven this to great conviction.  And I hope you

12:05:25  12   do too.  But there's a chance someone back in the room with

12:05:28  13   you may not see it the way you do, and so you're going to

12:05:31  14   need to be in a position to say, time out now.  This is

12:05:34  15   what's more likely than not.  That's the question.  That's

12:05:40  16   the burden.  And so I wanted to underscore that with you.

12:05:43  17        I also wanted to underscore with you a couple of other

12:05:46  18   things.  On Page 9 you're asked about the credibility of

12:05:50  19   witnesses.

12:05:54  20        I tried really hard to put on really strong witnesses

12:05:57  21   for you.  You know, these aren't my employees, though,

12:06:05  22   certainly some of them we reimbursed them for their time,

12:06:10  23   and I don't mean to detract from that at all.  And,

12:06:12  24   obviously, I think these companied need to put their

12:06:14  25   employees on the stand.  They've got it -- you've got to

**Closing Argument - Lanier**

12:06:17  1    hear from them.  But you do recognize that they are

12:06:19  2    employees, and this is a major case, and their bosses are

12:06:24  3    paying attention, you would hope.

12:06:31  4         So all of that is stuff you take into account, but it

12:06:34  5    specifically becomes important on expert testimony.  And

12:06:36  6    this is on Page 11 of the judge's instructions.  That you

12:06:40  7    don't have to accept the opinions of an expert.  If you

12:06:42  8    decide that the opinion is not based on sufficient education

12:06:45  9    and experience, you can disregard the opinion entirely.

12:06:48 10         Now, I hope you recall, I tried really hard with these

12:06:53 11    experts to give you their CVs, their resumes.  And

12:07:03 12    they're -- they're voluminous.  You know, Anna Lembke's

12:07:06 13    resume goes on for pages and pages and pages with all that

12:07:12 14    she's done.  Not just Anna Lembke.  Even Carmen Catizone

12:07:16 15    goes on for pages and pages and pages of all that he's done.

12:07:19 16         If you look at these witnesses, you look at Dr. Keyes,

12:07:23 17    the woman who wrote the book, and it just goes on for pages

12:07:26 18    and pages and pages.  These are people who --

12:07:32 19    Caleb Alexander, the Johns Hopkins guy, I mean, it's -- we

12:07:35 20    brought you some of the best in the world in these subjects.

12:07:39 21    And if you compare them to people like Dr. Wailes

12:07:45 22    (indicating), whose CV bleeds over just barely -- actually,

12:07:53 23    it goes all the way to the end of the third page.

12:07:57 24         Now, this is the CV that is claiming board

12:08:02 25    certification with an entity that no longer exists, that

**Closing Argument - Lanier**

12:08:05  1   lists -- you know, it just -- there's a difference.  And

12:08:12  2   it's not just him.  There are others.

12:08:15  3       You know, this is -- this is -- even William Choi,

12:08:18  4   look at what you had for him.  You know, look, not just even

12:08:24  5   the ones with the bigger resumes, like Murphy, look for

12:08:29  6   their work that had anything to do with this subject matter,

12:08:31  7   and it's, like, missing.  So that's what you've got on

12:08:34  8   expert opinion testimony.

12:08:36  9       In addition to that, there are a few other

12:08:38 10   instructions I want to draw your attention to.

12:08:40 11       Thank you.

12:08:40 12       One is corporate defendants on Page 16.

12:08:44 13       The conduct of an officer or employee acting within

12:08:48 14   the scope of his or her employment should be treated as the

12:08:52 15   conduct of the corporation.

12:08:54 16       So when we see conduct of employees, if it doesn't

12:08:59 17   measure up, if it's not adequate, that is imputed to the

12:09:03 18   organization for which they work.  And that's something you

12:09:07 19   should be taking into account.

12:09:09 20       Now, as we get to the actual law itself, it starts on

12:09:14 21   Page 17, where the judge talks about public nuisance law,

12:09:20 22   and in his introductory comments there are a couple of

12:09:23 23   things I'd like to draw your attention to.

12:09:24 24       First of all, he talks about how a public nuisance

12:09:28 25   includes an unreasonable interference with public health or

**Closing Argument - Lanier**

12:09:32  1    public safety.

12:09:34  2        I can't think that anybody's going to dispute whether

12:09:37  3    or not there's a public nuisance in these counties.  There

12:09:42  4    clearly has been.  The evidence isn't, oh, more likely than

12:09:47  5    not, it's overwhelming.  Whether Pharmacist Cook has seen it

12:09:51  6    or not, it's overwhelming.

12:09:55  7        So, then, I've got to show, in accordance with this,

12:09:59  8    two things.  I've got to show either one of two things.

12:10:03  9    I've got to show either one or two.  I have got to show that

12:10:07 10    either the defendant engaged in intentional conduct that

12:10:11 11    caused a significant and ongoing interference with this

12:10:17 12    public right, or that they engaged in unlawful conduct with

12:10:23 13    the same result.

12:10:25 14        I think we've done both.  The intentional element is

12:10:28 15    certainly met.  They weren't accidently dispensing opiates.

12:10:32 16    They knew what they were doing.  The pharmacists claimed to

12:10:35 17    have been trained.  The companies claimed to be supplying

12:10:39 18    adequate policies and procedures.  There was clearly

12:10:43 19    knowledge of what was going on in place.

12:10:46 20        The conduct, poor, inadequate, or superb, was

12:10:55 21    intentional conduct each step along the way.  Nobody was

12:10:58 22    ever accidently doing anything at all here.  This isn't

12:11:01 23    where someone accidently dumped a bunch of lead into the

12:11:04 24    water supply without realizing that the lead in the paint

12:11:08 25    that they dumped in or something like that.  This was

**Closing Argument - Lanier**

12:11:10  1   conduct that was understood and known from the beginning.

12:11:15  2   But it's also unlawful conduct.  And it only has to be one

12:11:18  3   or the other.

12:11:19  4        So if you're back there and you're saying, you know, I

12:11:21  5   think it was intentional because of this, that, and the

12:11:23  6   other, and someone says, no, I don't really see that,

12:11:27  7   remember, it can be unlawful instead.

12:11:29  8        The law -- now, does the law say you must document?

12:11:34  9   Well, no, and yes.  The law says you've got to follow

12:11:38 10   standard of care.  The law says you've got to do what is

12:11:43 11   reasonably to be done to prevent diversion.  And the

12:11:47 12   testimony after testimony after testimony, including the

12:11:50 13   defendants' policies at each of the three defendants says,

12:11:52 14   you must document.  It's imperative.  It must be done.  As

12:12:01 15   one of the witnesses said --

12:12:03 16        Who was our enforcement guy who said if it's not

12:12:06 17   documented, it's not done?

12:12:08 18                 MR. WEINBERGER:  Edwards.

12:12:09 19                 MR. LANIER:  Edwards.  Trey Edwards.  Called

12:12:12 20   by the defendants.  If it's not documented, didn't happen.

12:12:15 21   And that's just the way it is.

12:12:17 22        Now, you're not being asked to determine whether there

12:12:22 23   should be a remedy for this claim.  This may be the only

12:12:27 24   civil case you ever get called on where nobody's asking you

12:12:31 25   for money.  That's all in the Court's hands, what's got to

**Closing Argument - Lanier**

12:12:35  1    be done, what remedy there may be or may not be.  That's not

12:12:40  2    your question.

12:12:42  3        And I want to be really clear when I said that this is

12:12:44  4    a case that I believe has national ramifications, that's not

12:12:47  5    your concern either.  In answering the judge's questions,

12:12:52  6    your concern is these two counties and the actions of these

12:12:56  7    defendants as it has affected these two counties.  What

12:13:00  8    happens after that is not your concern.  All you've got do

12:13:05  9    is focus on that.  And that's what the judge is telling you

12:13:10 10    here.

12:13:11 11        Then the judge goes into great -- I don't want to

12:13:14 12    throw them at you -- on Page 19 where he talks a little bit

12:13:16 13    more about intentional conduct.  And he says this is conduct

12:13:20 14    done purposefully, not accidently.

12:13:23 15        Well, that's clearly what we've got here.

12:13:25 16        This is conduct where it says, it's not necessary for

12:13:27 17    you to find that the person intended to cause a public

12:13:30 18    nuisance.

12:13:33 19        You know, this is -- this is intent that they've got

12:13:37 20    to have intent.  They can't be doing this accidently.  And

12:13:40 21    the intent has to be one that's intentional conduct, that

12:13:45 22    they acted and knew or was substantially certain that

12:13:48 23    circumstances might interfere or would interfere.  It says

12:13:52 24    not might, would.

12:13:53 25        But I think all of their witnesses have said that.

**Closing Argument - Lanier**

12:13:56 1    They all know that diversion can interfere and can be a

12:13:59 2    problem.  They all know they have corresponding

12:14:02 3    responsibility.  They all know if they don't have the

12:14:05 4    policies in place, that they're not where they need to be.

12:14:11 5    And that's always been intentional with all of them.  It's

12:14:14 6    never been an accident.

12:14:15 7        Number 20, Page 20, talks about the settlement

12:14:21 8    agreements.

12:14:22 9        You know, we were allowed to bring settlement

12:14:25 10   agreements, some settlement agreements to you and show them

12:14:28 11   to you.  There were provisions that we're not allowed to

12:14:32 12   tell you about in those agreements.  Rightfully so.  Because

12:14:35 13   the agreements themselves are not proof that something wrong

12:14:38 14   was done by these defendants in these counties.  But what

12:14:43 15   they are is notice to the defendants of what's going on in

12:14:49 16   their pharmacies.  And it's also relevant to us to see how

12:14:54 17   they've affected national policy because some of the

12:14:58 18   settlement agreements we were allowed to show you where it

12:15:00 19   required some changes by these defendants on a national

12:15:03 20   basis.  That's in a memorandum of understanding with

12:15:09 21   Walmart.  That's the agreement that CVS had out of the

12:15:11 22   *Holiday* case.  That's the agreement that Walgreens had.

12:15:16 23   Required changes.

12:15:17 24       Employee conversations, Number 21.  This is the one I

12:15:21 25   talked to you about on that Boards of Pharmacy.

**Closing Argument - Lanier**

12:15:25  1    You've heard testimony from one or more of the

12:15:27  2    defendant employees about conversations with state boards of

12:15:30  3    pharmacies.  This evidence was admitted for a limited

12:15:32  4    purpose.  It's evidence of the defendants' knowledge or

12:15:35  5    intent, but not evidence of the official policy of any Board

12:15:42  6    of Pharmacy.  This idea that you couldn't do a blanket

12:15:44  7    refusal to fill, you don't have evidence of that being the

12:15:48  8    official policy of any state board, period.

12:15:51  9    Page 22 talks about the unlawful conduct.  Remember,

12:15:55 10    there are two different ways we can prove this:  One is

12:15:59 11    intentional, the other is unlawful.

12:16:01 12    Unlawful conduct, the judge said, can occur either by

12:16:05 13    acting in a certain way prohibited by law, or failing to act

12:16:09 14    in a certain way required by law.

12:16:12 15    Now, the law requires them to put processes into place

12:16:15 16    to stop diversion.  We contend that they didn't, especially

12:16:21 17    in a timely manner.

12:16:25 18    The judge said unlawful conduct occurs when a person

12:16:29 19    engages in a conduct prohibited by a statute, an ordinance,

12:16:33 20    a regulation that controls safety.  And we've given you

12:16:36 21    those.  We've given you the Controlled Substance Act and tis

12:16:41 22    requirements.  We've given you the regulations that were

12:16:42 23    formulated under that, and we've given you the

12:16:45 24    interpretation and application of those through various

12:16:47 25    cases that have been unfolded over time.

**Closing Argument - Lanier**

12:16:49  1      The person does not need to know their conduct is

12:16:54  2  unlawful for an unlawful act to occur.

12:16:56  3      That's in layman's parlance -- I say layman's.  We

12:17:00  4  learned it in law school.  Ignorance is no excuse, I think

12:17:07  5  is the way we learned it.  But I went to law school in

12:17:09  6  Texas, Texas Tech, in Lubbock, Texas, the Hub of the Plains.

12:17:14  7  You've probably heard of it.

12:17:14  8      The person does not need to know their conduct is

12:17:18  9  unlawful.

12:17:18  10      A law controls safety if it imposes specific legal

12:17:22  11  requirements for the protection of the health, safety, and

12:17:25  12  welfare of others.

12:17:27  13      That's what we've here.  That's -- this is -- this

12:17:30  14  is -- this is exactly what we have here.

12:17:33  15      And if a person's conduct does not comply with what's

12:17:36  16  authorized by law, that conduct may be unlawful conduct.

12:17:42  17      The judge adds this:  The Federal and Ohio Controlled

12:17:46  18  Substances Act and their accompanying regulations do not

12:17:48  19  require strict or perfect compliance.  This is what I was

12:17:52  20  saying to you earlier.  Pharmacists aren't going to call it

12:17:55  21  right every time.  And I'm not here nitpicking on one or

12:17:59  22  another.  But substantial requirement -- compliance is

12:18:06  23  required.

12:18:07  24      Only unlawful conduct that causes a significant

12:18:09  25  interference with a public right to health or safety can be

**Closing Argument - Lanier**

12:18:12  1    a public nuisance.

12:18:13  2         So we've got to ask what is significant.  All right?

12:18:19  3    I mean, I think if one life is lost, it's significant.  I

12:18:23  4    think if one family's destroyed, it's significant.  But

12:18:27  5    we're not dealing with one family.  We're not dealing with

12:18:30  6    one life.  We're dealing with over 10 million pills.  We're

12:18:34  7    dealing with something much beyond that, and the

12:18:37  8    significance I don't think should be an issue.

12:18:39  9         Unlawful -- this conduct is further given by the judge

12:18:43  10   on Page 23 where he talks about entities that are authorized

12:18:47  11   to dispense controlled substances are required to provide

12:18:51  12   effective controls and procedures to guard against theft and

12:18:55  13   diversion.  That's the law.  And the judge explains it.

12:19:02  14        And he also adds that the pharmacists who fills

12:19:05  15   prescriptions has that corresponding responsibility to make

12:19:08  16   sure it's a legitimate medical purpose, and that that proper

12:19:13  17   dispensing extends to the pharmacy itself.  It's not simply

12:19:18  18   the pharmacist.  It extends to the pharmacy.

12:19:23  19        So, final point here, it's got to be knowingly, but

12:19:29  20   knowingly includes when a person acts with deliberate

12:19:32  21   ignorance or willful blindness to information in their

12:19:36  22   possession.  And they were certainly aware that these drugs

12:19:40  23   were highly addictive.  That's what it means to be a

12:19:43  24   Schedule II drug.  They certainly were aware of the dangers.

12:19:46  25   They certainly were aware of the potential problems, and

**Closing Argument - Lanier**

12:19:49  1    they were aware of the risk of diversion.  So they can't be

12:19:54  2    willfully blind to any of that.

12:19:55  3         Now, the last couple of instruction pages that I want

12:19:57  4    to talk to you about --

12:19:58  5         And there are just a couple more, and then I'll sit

12:20:00  6    down, Your Honor.

12:20:01  7         -- is Page 24, causation.  Because the defendant's

12:20:06  8    conduct must have caused this interference, and the judge

12:20:09  9    says, let me explain something about causation.  There's

12:20:11 10    this legal word, proximate cause of a public nuisance.

12:20:15 11         Our youngest daughter, Sara, is in her first year of

12:20:18 12    law school right now.  She's taking torts, and one of the

12:20:21 13    things you learn in torts, you spend weeks on proximate

12:20:24 14    cause.  Y'all are getting it here and you didn't have to pay

12:20:28 15    tuition.  The judge has just given you a classic education

12:20:33 16    in proximate cause.

12:20:35 17         Here it is:  A defendant's conduct proximately caused

12:20:38 18    a public nuisance if the circumstances that constitute the

12:20:41 19    nuisance are the natural and foreseeable result of the

12:20:45 20    conduct.

12:20:46 21         In other words, it is natural and foreseeable if

12:20:50 22    there's going to be diversion that it's going to lead to

12:20:56 23    addiction and problems.  If there's going to be an

12:20:59 24    oversupply that can lead to diversion.  There's not anybody

12:21:04 25    who really challenged that.  Everybody -- witnesses for all

**Closing Argument - Lanier**

12:21:06 1    three defendants have admitted that they know that diversion

12:21:10 2    can lead to these problems, and that they are supposed to

12:21:16 3    safeguard against diversion.  Heavens, that's why we have

12:21:19 4    the Controlled Substances Act in the first place is because

12:21:20 5    this is foreseeable.

12:21:22 6         Now, here's the important.  There may be more than one

12:21:25 7    proximate cause of a public nuisance.  This goes back to,

12:21:30 8    you know, you flood the county with drugs or you flood your

12:21:33 9    house with water.  You can't say which bucket of water it

12:21:36 10   was that did the damage.  It's a bunch of them.  You know,

12:21:40 11   this was my analogy.  You've seen the same suit on me for

12:21:43 12   the last three weeks because I outgrew the other one that I

12:21:46 13   had to wear.  But it wasn't one cookie that did it.  I think

12:21:50 14   it was the lasagna.  I think it was the bread.  I think it

12:21:53 15   was the stack of cookies.  There is a place here that makes

12:21:56 16   a chocolate chip cookie that is to die for, or to diet for,

12:22:03 17   as the case may be.

12:22:04 18        To be a proximate cause, the acts or omissions -- and

12:22:07 19   the reason I say that is, look, I don't mind -- I blame the

12:22:10 20   doctors, I blame drug cartels, I blame the DEA, I blame the

12:22:15 21   FDA, I blame the Ohio Board of Pharmacy.  I blame a lot of

12:22:19 22   different people.  I certainly blame the manufacturers.  I

12:22:24 23   have no trouble and my witnesses have no trouble saying

12:22:27 24   there's a host of people to blame.  The question is, does it

12:22:32 25   include these chain pharmacies that you have in the

**Closing Argument - Lanier**

12:22:35  1      courtroom?  And that's what you're being asked here.

12:22:38  2           Are they a part of the cause?

12:22:43  3           An individual defendant's conduct doesn't have to be

12:22:46  4      independently capable, all by itself, of causing the public

12:22:50  5      nuisance.  There may be multiple causes of a public

12:22:55  6      nuisance.  It just needs to be a substantial factor, and

12:22:59  7      it's substantial if a reasonable person would regard it as

12:23:02  8      the cause or one of the material, meaningful, or

12:23:05  9      considerable causes, which I think certainly is the case

12:23:09 10      here.

12:23:09 11           And so as you get back there, if anybody fusses over

12:23:13 12      some of this with you as you look at the issues, just go

12:23:17 13      back to the language of the judge's charge.  This is -- this

12:23:22 14      is -- this is it.  This is your touchstone.  This is it.

12:23:28 15           A defendant doesn't have to foresee their conduct

12:23:31 16      would lead to the specific nuisance that occurred, it just

12:23:34 17      needs to be foreseeable.

12:23:35 18           And so within the framework of that, last two pages.

12:23:40 19      26.  Public nuisance.

12:23:42 20           Is an interference with a public right.  It's not --

12:23:47 21      oh, this is, when it's significant.

12:23:50 22           An interference with a public right may range from a

12:23:52 23      petty annoyance to a serious harm.

12:24:00 24           You got your neighbor who is not mowing his or her

12:24:04 25      grass, and it's growing up kind of tall, and it's messing up

**Closing Argument - Lanier**

12:24:08  1   your hayfever.  The odds are you're not going do that well

12:24:13  2   on a public nuisance case.  Okay?  This is not that kind of

12:24:18  3   a petty situation.  This is one where lives are changed,

12:24:22  4   families are altered, communities are devastated.  This is

12:24:26  5   serious.

12:24:26  6        An interference with a public right is not significant

12:24:29  7   or unreasonable if it causes only a relatively slight amount

12:24:32  8   of inconvenience.

12:24:34  9        An interference with a public right is significant or

12:24:38  10  unreasonable if it causes greater harm than the public

12:24:40  11  should be required to bear, considering all the

12:24:43  12  circumstances.

12:24:45  13       And that we have here.

12:24:46  14       So then the judge gives you your conclusion and tells

12:24:51  15  you what you will assign and what you will find, and I think

12:24:56  16  at some point at the end of the day he will give you the

12:24:58  17  questions that you will answer, and if need be, we'll talk

12:25:01  18  about those in my rebuttal.  But for now you have done the

12:25:06  19  road map, and we've done two of the stops.  We've done the

12:25:09  20  recap, we've done the judge's instructions.  My road map

12:25:12  21  detours from my closing for you to hear from CVS, Walmart,

12:25:15  22  and Walgreens after lunch, and then I'll give the finale at

12:25:19  23  the end of the day and y'all get the case.

12:25:21  24       So thank you, Your Honor, for letting me go this long.

12:25:24  25       Thank y'all for being so patient.

12:25:26   1                    THE COURT:  All right.  Thank you, Mr. Lanier.

12:25:29   2          And thanks, ladies and gentlemen, for extending

12:25:32   3    things, but I didn't want to break up the balance of the

12:25:37   4    closing.

12:25:38   5          So we will recess till 1:30.

12:25:40   6          Usual admonitions apply.  Do not discuss this case.

12:25:44   7    Do not encounter anything in the media.  And we will have

12:25:48   8    the closing arguments of Walgreens, Walmart, and CVS this

12:25:53   9    afternoon in whatever order they prefer, and then the last

12:25:57  10    few minutes of Mr. Lanier's closing.

12:25:59  11          So have a good lunch, and see you at 1:30.

12:26:03  12                    (Jury excused from courtroom.)

12:26:03  13          (Recess was taken from 12:26 p.m. till 1:29 p.m.)

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

| | | |
|---|---|---|
| 12:26:03 | 1 | AFTERNOON SESSION |
| 01:29:36 | 2 | (In open court at 1:29 p.m.) |
| 01:29:36 | 3 | COURTROOM DEPUTY: All rise. |
| 01:29:45 | 4 | MR. MAJORAS: Your Honor, before we begin, I |
| 01:29:46 | 5 | have one issue. John Majoras. |
| 01:29:48 | 6 | THE COURT: Okay. |
| 01:29:48 | 7 | MR. MAJORAS: We had talked about a potential |
| 01:29:50 | 8 | curative instruction related to the bolstering of expert |
| 01:29:53 | 9 | witnesses. You had not given that. I don't know whether |
| 01:29:55 | 10 | you ruled against that. If not, I do have a proposal that I |
| 01:29:59 | 11 | can hand up. |
| 01:29:59 | 12 | THE COURT: All right. What are you |
| 01:30:01 | 13 | suggesting? |
| 01:30:05 | 14 | MR. MAJORAS: I will hand this to you at the |
| 01:30:06 | 15 | other side. Ms. Fumerton will do it. |
| 01:30:14 | 16 | And I'll read it into the record. "It is up to you, |
| 01:30:16 | 17 | the jury, to decide the credibility of the witnesses you |
| 01:30:20 | 18 | have observed at trial. Counsel views of their own |
| 01:30:23 | 19 | witnesses, paid or unpaid, or of the other side's witnesses |
| 01:30:26 | 20 | are not evidence and are irrelevant. You should not |
| 01:30:28 | 21 | consider them in any way when rendering your verdict or |
| 01:30:31 | 22 | making your own determination regarding a witness' |
| 01:30:34 | 23 | credibility." |
| 01:30:52 | 24 | THE COURT: Well. . . |
| 01:30:53 | 25 | Well, this is what I'm going to say. I'm going to |

01:31:04  1    just say, "It is up to you, the jury, to decide the

01:31:07  2    credibility of the witnesses you have observed at trial.

01:31:10  3    Counsel's views of their own witnesses, paid or unpaid, or

01:31:15  4    of the other side's witnesses, are not evidence."

01:31:18  5         And I'll end it at that.

01:31:25  6              MR. MAJORAS:  Thank you, Your Honor.

01:31:25  7              THE COURT:  Because, you know, the rest is --

01:31:30  8    I think is surplusage.  I think we already -- I already have

01:31:34  9    a general instruction that counsel's questions and comments

01:31:37 10    aren't evidence, but I think in light of what was said, I

01:31:40 11    will -- I'll just read the first part.

01:31:42 12         Okay.  We can bring in the jury, please.

01:32:22 13              And the reason is the jury may consider what

01:32:25 14    counsel say.  They're free to consider it.  They're free to

01:32:29 15    reject.  So my point is that their views are not evidence.

01:32:32 16    Counsel's views are not evidence.

01:32:38 17              (Brief pause in proceedings.)

01:33:06 18         (Jury returned to courtroom at 1:33 p.m.)

01:33:06 19              THE COURT:  Please be seated.

01:33:10 20         All right.  Ladies and gentlemen, before we have the

01:33:14 21    final arguments of each of the defendants, I want to remind

01:33:19 22    you that it is up to you, the jury, to decide the

01:33:22 23    credibility of the witnesses you've observed at trial.

01:33:26 24    Counsel's views of their own witnesses, paid or unpaid, or

01:33:30 25    of the other side's witnesses, are not evidence.

**Closing Argument - Swanson**

01:33:34  1          Okay.  Who would begin?

01:33:37  2          Okay.  Mr. Swanson, for Walgreens.

01:33:48  3              CLOSING ARGUMENT BY DEFENDANT WALGREENS

01:33:48  4                  MR. SWANSON:  Thank you, Your Honor.

01:33:49  5          May it please the Court.

01:33:52  6          Good afternoon, ladies and gentlemen of the jury.

01:33:57  7          I haven't been before you for a bit.  Again, my name's

01:34:01  8  Brian Swanson, and I want to begin by letting you know that

01:34:05  9  it's been a real privilege, along with my partners, Kate and

01:34:12 10  Kaspar, to present our case to you on behalf of Walgreens

01:34:16 11  and its pharmacists.

01:34:18 12          Seems like a long time ago that Kaspar stood up and

01:34:23 13  told you in opening statements what we thought the evidence

01:34:25 14  was going to show in this trial.  But since that day, your

01:34:29 15  attention to this case, your patience, your curiosity, your

01:34:36 16  engagement has really been remarkable.  And our system of

01:34:39 17  justice doesn't work without folks like you who are willing

01:34:44 18  to step away from your daily lives and your jobs and your

01:34:49 19  activities and commit yourselves to resolving disputes,

01:34:54 20  really serious disputes like the one we have here.

01:34:58 21          So I want to begin on behalf of myself, my team, and

01:35:06 22  all of Walgreens by thanking you for your dedication to this

01:35:11 23  case.

01:35:11 24          Now, we've been here for a bit more than 6 weeks, and

01:35:15 25  I have about an hour in summation so I'm going to try to be

7184

**Closing Argument - Swanson**

01:35:18  1      as efficient as I can be and cover three main areas.

01:35:23  2          First thing I want to talk about is the issues that

01:35:26  3      you will decide in this case.  Then I want to talk a bit

01:35:30  4      about Walgreens, its conduct and some of the allegations

01:35:32  5      that have been made against us, and then finally, I want to

01:35:35  6      talk about plaintiffs' failure to prove.

01:35:46  7          So, for the first time this morning, with the Court's

01:35:49  8      instructions, you learned very specifically what issues

01:35:52  9      you're being asked to decide and what law will guide you in

01:35:55  10     making those decisions.  And you may have been surprised,

01:36:00  11     given the presentation that you've heard over the past

01:36:02  12     several weeks, that you're not going to be asked to decide

01:36:04  13     whether Walgreens' pharmacists always complied 100 percent

01:36:10  14     with our policies.  And you're not going to be asked to

01:36:13  15     decide whether Walgreens' pharmacists always followed best

01:36:18  16     practices, or whether any Walgreens' pharmacists ever acted

01:36:27  17     negligently in filling prescriptions.  You're not going to

01:36:30  18     be asked to decide whether chain pharmacies are part of the

01:36:32  19     problem, as Mr. Lanier stated in his closing arguments.

01:36:37  20         In deliberations you're going to be asked to decide

01:36:39  21     two very specific questions, and I want to talk to you about

01:36:42  22     those now.

01:36:44  23         This is the verdict form that you'll be given when you

01:36:48  24     go back to begin your deliberations.  And you'll be given

01:36:51  25     one for Lake County and one for Trumbull County, but they're

### Closing Argument - Swanson

01:36:54  1   going to have the same questions that you're going to be

01:36:56  2   asked to decide.

01:36:57  3         The first one is did Lake County or Trumbull County

01:37:01  4   prove, by the greater weight of the evidence, that

01:37:05  5   oversupply of legal prescription opioids and diversion of

01:37:08  6   those opioids into the illicit market outside of appropriate

01:37:13  7   medical channels is a public nuisance in Lake County?

01:37:18  8         You will be asked the same question for Trumbull

01:37:21  9   County.

01:37:21 10         So, in other words, the first question is whether

01:37:23 11   plaintiffs have proven that, one, there's an oversupply of

01:37:27 12   prescription opioids, that there's diversion of those same

01:37:32 13   opioids, and that -- and that that diversion constitutes a

01:37:37 14   public nuisance in the county today.

01:37:39 15         Now, only if you answer that question yes will you be

01:37:44 16   asked to answer the second question, did Lake County prove

01:37:47 17   by the greater weight of the evidence that any of the

01:37:50 18   following defendants -- so, Walgreens, Walmart, CVS --

01:37:53 19   engaged in intentional and/or illegal conduct which was a

01:37:58 20   substantial factor in producing the public nuisance that you

01:38:02 21   found exists in Question 1?

01:38:07 22         Now, you heard the jury instructions this morning, and

01:38:10 23   I want to focus on a couple that we believe are important

01:38:12 24   for you in evaluating these two questions.

01:38:19 25         The first you can see, you're going to be asked

## Closing Argument - Swanson

01:38:21  1    whether there was intentional conduct, and the Court has

01:38:25  2    defined intentional conduct for you, and Mr. Lanier

01:38:28  3    mentioned this in his closing as well.

01:38:31  4         Intentional conduct occurs when a person acts with the

01:38:34  5    purpose to produce a specific result.  And Mr. Lanier said,

01:38:40  6    well, that's easy, because clearly we intended to dispense

01:38:46  7    opioid medicines.  But that's not the question.  The

01:38:48  8    question is whether we intended to produce a specific

01:38:52  9    result.  The specific result is what they've alleged here,

01:38:56  10   the diversion of opioids, overdoses, deaths, abuse.  They

01:39:02  11   have to establish that we intended to produce those specific

01:39:05  12   results.

01:39:09  13        He talked about illegal or unlawful conduct, and we

01:39:13  14   also have the instruction on that.

01:39:16  15        A violation of the corresponding responsibility occurs

01:39:18  16   when a person knowingly fills or allows to be filled an

01:39:23  17   illegitimate prescription.  They have to show that we

01:39:29  18   knowingly dispensed opioids based on prescriptions that

01:39:31  19   didn't have a legitimate medical purpose.  Not simply that a

01:39:36  20   pharmacist dispensed a prescription that was not legitimate.

01:39:39  21   Okay?  They have to establish that we did that knowingly.

01:39:44  22        And, finally, even if you were to conclude that there

01:39:49  23   was a pharmacist who had knowingly dispensed an illegitimate

01:39:56  24   prescription, they'd have to prove -- we're not required to

01:40:03  25   perfect compliance, only substantial compliance is required.

## Closing Argument - Swanson

01:40:06  1    So even if you were to conclude that somebody had done

01:40:08  2    something wrong, we're not required to be perfect.

01:40:13  3        Now, I'm going to talk a lot more about these issues

01:40:16  4    and this law as we proceed down the road, but to start off,

01:40:19  5    I want to take a step back and look at the big picture in

01:40:25  6    the context of those questions that you have to answer and

01:40:28  7    the instructions that will guide you.

01:40:31  8        So here's what the undisputed evidence showed at

01:40:34  9    trial:

01:40:35 10        First of all, as pharmacies, we dispense medicines,

01:40:39 11    including opioid medicines.  We all knew that.  Those

01:40:43 12    medicines are approved for use by the FDA.  Every different

01:40:46 13    medication that we dispensed, Vicodin, fentanyl patches,

01:40:50 14    OxyContin, okay, the FDA has concluded that they have a

01:40:54 15    legitimate medical use.  And every expert witness who came

01:40:58 16    in for both sides acknowledged that these drugs are vitally

01:41:07 17    important for patients who need them.

01:41:09 18        These opioids medications, obviously, they are

01:41:12 19    regulated by the DEA.  You heard this morning and you heard

01:41:15 20    during trial the DEA sets the annual production quota for

01:41:18 21    opioid medicines every year.  They control the volume.

01:41:21 22        But the DEA also regulates pharmacies, like the chain

01:41:24 23    pharmacies.  All right?  If we want to dispense Class II

01:41:29 24    medications, we have to be registered with the DEA.  And you

01:41:32 25    heard from Mr. Rannazzisi and Ms. Ashley and others on that.

**Closing Argument - Swanson**

01:41:36  1    The Board of Pharmacy in Ohio, they separately

01:41:38  2    regulate the pharmacies here.  Right?  They license us.

01:41:42  3    They inspect us.  They work with us on investigations.

01:41:46  4    The opioid medicines that we dispense, they're all

01:41:51  5    prescribed by doctors who themselves are registered with the

01:41:54  6    DEA and licensed by the state board of medicine.  And you

01:41:58  7    heard throughout trial, again, Mr. Lanier mentioned this

01:42:01  8    morning, the vast, vast majority of those doctors are good

01:42:08  9    doctors.  They are trying to do right by their patients.

01:42:10  10   We also know -- we also know that Walgreens, Walmart,

01:42:13  11   and CVS pharmacies in Lake County and in Trumbull County

01:42:18  12   have not faced any enforcement actions from the FDA.  All

01:42:23  13   right?  Not once has the DEA suspended or revoked the

01:42:29  14   registration for any of our pharmacies in Lake County or

01:42:32  15   Trumbull County.  Not once.

01:42:35  16   Neither has state Board of Pharmacy.  Right?  They

01:42:38  17   license us.  Not once have any of our pharmacies in

01:42:43  18   Lake County or Trumbull County had our license suspended or

01:42:48  19   revoked by the state.

01:42:51  20   And it's not like our pharmacies fly under the radar

01:42:54  21   here.  Right?  We're the big chain pharmacies.  We interact

01:42:57  22   constantly with the Board of Pharmacy and with the DEA.

01:43:04  23   Now, nothing new here.  You've heard all of this.  None of

01:43:08  24   it's disputed.  Why does it matter?

01:43:10  25   It matters because as you now know from the

**Closing Argument - Swanson**

01:43:15  1   instructions that are going to govern your deliberations, in

01:43:17  2   order to prevail, the plaintiffs have to prove that our

01:43:21  3   dispensing conduct was so egregious that we intentionally

01:43:26  4   were illegally oversupplied enough opioid pills to harm

01:43:30  5   entire communities to cause a public nuisance, an opioid

01:43:39  6   epidemic, in Lake and Trumbull County.  That's what they

01:43:41  7   have to prove.

01:43:42  8        But if they were right, that chain pharmacies were

01:43:45  9   intentionally or illegally flooding these communities with

01:43:49 10   opioids that were being diverted, surely the DEA or the

01:43:55 11   Board of Pharmacy or local law enforcement would have

01:43:57 12   noticed.  They would have done something.  The DEA knows how

01:44:02 13   to act.

01:44:04 14        Mr. Lanier, this morning, said that their budget was

01:44:07 15   strained and they didn't have the resources to keep up with

01:44:10 16   what was going on in pharmacies.  Well, that's just not

01:44:12 17   right.

01:44:14 18        Mr. Rannazzisi, from the DEA, came in and testified.

01:44:18 19   He said the DEA had a budget of $400 million annually.  He

01:44:24 20   oversaw, personally, more than 300 people, and the DEA had

01:44:27 21   1,200 field personnel across the country who could inspect

01:44:32 22   pharmacies and who could -- who would know what was going

01:44:35 23   on.

01:44:36 24        We saw that the Board of Pharmacy and law enforcement,

01:44:39 25   we know what they do when they see suspicious activity

**Closing Argument - Swanson**

01:44:44  1    coming out of a pharmacy, they shut them down, like they did

01:44:48  2    with Overholt's.  Nothing like that happened with any of our

01:44:51  3    pharmacies in Lake County or Trumbull County.

01:44:53  4        And here's the thing, the plaintiffs could have

01:44:55  5    brought in any law enforcement officer or any Board of

01:44:58  6    Pharmacy agent, any member of the sheriff's department, any

01:45:01  7    local DEA officer, any narcotics agent to come in and talk

01:45:05  8    about the conduct of our pharmacists and our pharmacies, if

01:45:10  9    it were true, that we were intentionally or illegally

01:45:15 10    oversupplying these markets, or could have had someone talk

01:45:19 11    about our conduct today or 5 years ago or 10 years ago.

01:45:23 12        If such a person existed, plaintiffs could have

01:45:26 13    brought someone in from the counties to testify under oath

01:45:28 14    that our pharmacies were even a small fraction of the

01:45:32 15    problem in either county.  They brought in one law

01:45:36 16    enforcement officer.  You recall, he came up this morning,

01:45:40 17    Captain Tony Villaneuva.  By all accounts, he's a terrific

01:45:40 18    officer.  Right?  And I was reminded he was also on opioid

01:45:49 19    task force.  He does great things for his community in

01:45:51 20    Trumbull County trying to fight drug abuse.

01:45:55 21    Captain Villanueva didn't have a thing to say, not a thing

01:45:58 22    to say about any wrongful conduct of our pharmacies.  But we

01:46:08 23    saw in his communications with one of his deputies what he

01:46:11 24    felt about the problem in his county.

01:46:14 25        You recall seeing this, the e-mail from

7191

**Closing Argument - Swanson**

01:46:18   1   Joseph Dragovich to Mr. Villanueva, Captain Villanueva back

01:46:22   2   in 2019.  He said, it looks like we're in trouble with the

01:46:25   3   big three, cocaine, heroin, and fentanyl.  We need to take

01:46:30   4   down a few big dealers.

01:46:33   5         Talking about in 2019 the problem they were seeing in

01:46:37   6   Trumbull County, opioids, was heroin and was fentanyl.

01:46:42   7         Now, it's kind of ironic that it's the pharmacies who

01:46:47   8   called in more law enforcement officers to testify than the

01:46:50   9   plaintiffs did, but we did.  We brought in the two agents

01:46:54   10   from the Board of Pharmacy, Agent Pavlich and Agent Edwards.

01:47:01   11         Now, Mr. Lanier tried in closing to sort of downplay

01:47:08   12   the Board of Pharmacy, at least through their interactions

01:47:11   13   that they might have with us.  He said, well they only

01:47:14   14   inspect them once a year, and that's not enough to sort of

01:47:17   15   detect what's going on.  But you heard from them.  That's

01:47:19   16   not all that the Board of Pharmacy does.  They also conduct

01:47:23   17   investigations.  They conduct investigations of suspected,

01:47:28   18   excuse me, doctor shoppers.  Right?  The criminals who try

01:47:32   19   to go out and get prescriptions from different doctors and

01:47:34   20   get them filled.

01:47:35   21         And during those investigations they're going through

01:47:37   22   the PDMP data, they're going through OARRS.  They're trying

01:47:42   23   to figure out where these folks are filling their pills.

01:47:45   24   Right?  They know what pharmacies are doing.  It's not

01:47:48   25   invisible to the BOP what Walgreens, Walmart, and CVS are

### Closing Argument - Swanson

01:47:51 1   doing and what's being filled.  If they had suspicions, they

01:47:55 2   could have acted on those.

01:47:57 3        But neither of those individuals suggested that we had

01:48:00 4   any role in contributing to the crisis today.  Just the

01:48:04 5   opposite.  They both testified that the chain pharmacies

01:48:07 6   were their allies in fighting diversion, that when we saw

01:48:13 7   suspicious activity, we'd call them up so they could begin

01:48:17 8   investigations.  They both testified that our pharmacies

01:48:20 9   complied with the law, not violated it.

01:48:24 10       As you saw in the instructions, as jurors, you bring

01:48:27 11  your common sense to bear on the questions that you need

01:48:30 12  to -- that you're being asked to resolve, and when you

01:48:32 13  compare these facts on the ground in time versus the

01:48:36 14  allegations and the arguments that get presented to you at

01:48:38 15  trial by lawyers and experts, I think it shows that

01:48:42 16  plaintiffs' theory of liability doesn't hold together when

01:48:44 17  you consider what it is that plaintiffs actually have to

01:48:47 18  prove.

01:48:48 19       If we were acting with the intent to cause an opioid

01:48:54 20  epidemic in Lake County or Trumbull County, if we were

01:48:57 21  violating the law, you would have seen evidence of that from

01:49:01 22  law enforcement, or from the state regulators, or the

01:49:04 23  federal regulators.  But you didn't.

01:49:07 24       Okay.  I want to switch topics now and talk a little

01:49:12 25  bit about Walgreens and our conduct and the allegations that

## Closing Argument - Swanson

01:49:18  1    have been made against us.

01:49:19  2          I know that you all knew Walgreens coming into this

01:49:22  3    case.  I'm sure some or all of you had shopped there.  You

01:49:26  4    understand that we're pharmacies.  We have front store

01:49:30  5    operations, shampoo, your school supplies, but you can also

01:49:35  6    get your prescriptions filled.  But I hope that through

01:49:38  7    meeting and hearing from some of our people at different

01:49:41  8    levels in the organization you have a little bit better

01:49:44  9    sense of who we are and what we do, and in particular, I

01:49:50 10    hope that through the testimony, you have a sense of how

01:49:53 11    seriously our employees take their commitments to their

01:49:57 12    community.  So I want to reintroduce a few of them to you

01:50:00 13    from this morning.

01:50:01 14          The first is Amy Stossel.  This is her work picture.

01:50:06 15    She pulled down the mask.  You'd probably recognize her

01:50:09 16    better.  She was the last witness to testify.  She's a

01:50:12 17    Walgreens' pharmacist in Willoughby, Ohio.  And Ms. Stossel

01:50:17 18    testified that pharmaceutical diversion is a real concern to

01:50:22 19    her.  Of course it's a concern to her.  As she said, she's

01:50:27 20    living and raising her teenage son and her teenage daughter

01:50:31 21    in the community.

01:50:33 22          She testified about how important it is to Walgreens'

01:50:38 23    pharmacists that they consult with their patients and really

01:50:40 24    make sure their patients understand the medicines they're

01:50:44 25    taking.  And she said she always tried to take time to get

**Closing Argument - Swanson**

01:50:47  1    to know her patients and ensure that they understood the

01:50:50  2    medications that they were being prescribed.

01:50:53  3         She told you about Walgreens' pharmacists in the real

01:50:56  4    life process for evaluating a prescription and the steps

01:50:59  5    that they take in filling a prescription, the different

01:51:04  6    things that she might do to resolve red flags that presented

01:51:07  7    with prescriptions that she saw.  And as Mr. Lanier noted,

01:51:10  8    and she testified, red flags are something that she's been

01:51:13  9    familiar with since she was back in pharmacy school.

01:51:17 10         Now, during his closing this morning, I need to

01:51:21 11    correct something.  Mr. Lanier said that Ms. Stossel

01:51:25 12    admitted that she filled questionable prescriptions.  That's

01:51:30 13    what I wrote down.  And that's just false.  And if he had

01:51:34 14    evidence of that, he would have showed you the testimony,

01:51:36 15    but he didn't.

01:51:38 16         Ms. Stossel talked about her IntercomPlus dispensing

01:51:44 17    system and all the information that it contains to help

01:51:47 18    pharmacists exercise their corresponding responsibility.

01:51:49 19    And you might recall this slide from her testimony when she

01:51:53 20    was on the stand.  So you got to see, for example, you know,

01:51:58 21    how the prescription got scanned in, and if you can put on

01:52:03 22    the little Post-it note on the prescription, and you saw

01:52:05 23    that there was a spot for patients' comments and prescriber

01:52:09 24    comments where pharmacists could put in information that

01:52:12 25    they learned from the patient or the prescriber when they

**Closing Argument - Swanson**

01:52:15  1    communicated with them.  And there were little yellow

01:52:21  2    notepads, so if a pharmacist was coming in, they would know

01:52:23  3    if there were existent notes that they should be looking

01:52:27  4    when they were making a decision whether or not to fill.

01:52:29  5        Ms. Stossel also talked about our drug take back

01:52:32  6    kiosks at her store and about the free disposal pouches that

01:52:38  7    Walgreens offered to its customers, the commitment to

01:52:41  8    getting unused drugs off the streets so they can't be used

01:52:44  9    for medicine cabinet diversion.

01:52:47  10       Ms. Stossel is not some rogue pharmacist who cares

01:52:51  11   more about filling scripts than she does about the community

01:52:54  12   where she's raising her kids.  If the plaintiffs thought

01:52:59  13   that Walgreens hired those types of pharmacists, they would

01:53:03  14   have brought one in to testify so they can cross-examine

01:53:06  15   him.  But they didn't.  We heard from Ms. Stossel.  And

01:53:09  16   Ms. Stossel's not unique.  She's a typical Walgreens

01:53:12  17   pharmacist.

01:53:13  18       You saw this morning and heard from early in the case

01:53:19  19   Mr. Brian Joyce.  He was called by plaintiffs.  He was a

01:53:23  20   former district manager in Trumbull County.  He's recently

01:53:30  21   retired.  You'll recall he was also a licensed pharmacist

01:53:32  22   and he served on the Ohio Board of Pharmacy for a period of

01:53:35  23   time elected by Governor Strickland.

01:53:38  24       Mr. Joyce testified about the pharmacies in his

01:53:41  25   county, his interactions with law enforcement and the Board

### Closing Argument - Swanson

01:53:45 1  of Pharmacy agents when he encountered suspicious activity.

01:53:49 2  He was challenged about why he didn't put blanket refusals

01:53:53 3  on some doctors.  Why didn't Walgreens put blanket refusals

01:53:58 4  on some doctors, referring specifically to Dr. Veres, I

01:54:02 5  believe.

01:54:03 6      This is what he said:  He said, I don't think it's

01:54:06 7  good policy to cut any one doctor off completely because,

01:54:10 8  like I said, good doctors have a couple bad patients, bad

01:54:14 9  doctors have some good patients.

01:54:15 10      So why should you punish the folks that have

01:54:18 11  legitimate medical need for opioids or blood pressure or

01:54:21 12  insulin by just cutting them all off?

01:54:25 13      We live in a poor community where some folks walk to

01:54:29 14  the drugstore or take the bus to the drugstore.  It's a

01:54:32 15  major inconvenience when you are just carte blanche cut a

01:54:35 16  doctor off for -- cut a doctor off.  No more prescriptions

01:54:39 17  from Dr. Jones.

01:54:40 18      His view is that a pharmacist needs to take each

01:54:45 19  prescription as it comes to him or her, is to evaluate using

01:54:51 20  Good Faith Dispensing and make a decision based on the

01:54:54 21  prescription, not on the name of the doctor.

01:54:55 22      You recall that Agent Pavlich from the Board of

01:54:59 23  Pharmacy, what he had to say about Mr. Joyce.  He said

01:55:01 24  Mr. Joyce was an excellent pharmacist.  Always compliant.

01:55:05 25  Called the Board of Pharmacy if he had issues or concerns.

## Closing Argument - Swanson

01:55:09  1      Now, despite that, you might recall that Mr. Joyce was

01:55:13  2   also accused by the plaintiffs of putting profits over

01:55:15  3   patient safety.  And I hope you remember his reaction to

01:55:19  4   that charge and how offended he was as a pharmacist and a

01:55:24  5   Walgreens employee to be accused of that.

01:55:28  6      Tasha Polster.  She is our divisional vice president,

01:55:37  7   pharmacy quality, compliance, and patient safety.  She was

01:55:39  8   on the stand for 3 days, and she took some pretty aggressive

01:55:43  9   questioning from Mr. Lanier.  But she said some things that

01:55:46 10   I want to remind you about.  She talked about our Good Faith

01:55:50 11   Dispensing and Target Drug Good Faith Dispensing policies.

01:55:54 12   All right?  The policies that were targeted at helping

01:55:58 13   pharmacists execute their corresponding responsibility when

01:56:01 14   they filled opioid prescriptions.

01:56:04 15      Here's our policy from 1998.  You can see that it says

01:56:09 16   it's revised, so that's not the earliest policy, but it's

01:56:13 17   the earliest policy that we have in this case.  It says, the

01:56:17 18   pharmacist must use the elements of Good Faith Dispensing in

01:56:19 19   conjunction with the state and federal laws when they

01:56:23 20   dispense controlled substances.

01:56:26 21      You saw through these Good Faith Dispensing policies

01:56:31 22   that we were alerting our pharmacists to look for red flags

01:56:38 23   when they encountered prescriptions for opioid medicines.

01:56:43 24   And some of these will look familiar.  You see there's one

01:56:46 25   in there, look for unusual geographical distances between

**Closing Argument - Swanson**

01:56:50 1    patient, pharmacist, and prescriber, or look for numerous

01:56:54 2    controlled prescriptions being written by the same

01:56:58 3    prescriber or numerous prescribers.  All right?

01:57:01 4        Walgreens was identifying red flags for its

01:57:06 5    pharmacists to look out for diversion even before what

01:57:11 6    Mr. Lanier calls phase 1 of the opioid epidemic.  Remember,

01:57:17 7    he says phase 1 began in 1999.  This is our 1998 policy.

01:57:22 8    And what Mr. Lanier told you in opening was that his expert,

01:57:26 9    Mr. Catizone -- and this is a quote -- is going to say that

01:57:28 10    defendants should have had in place from the beginning, not

01:57:32 11    after they get sued, not after they get written up, but from

01:57:36 12    the very beginning, they're supposed to have red flag

01:57:39 13    policies, and they didn't.

01:57:41 14        Well, for Walgreens, at least, we know that's just not

01:57:45 15    true.

01:57:45 16        Now, we know that Walgreens -- and you've seen the

01:57:49 17    evidence through Ms. Polster -- they had these Good Faith

01:57:55 18    Dispensing policies all the way up through the current day.

01:57:56 19    And we continued to revise them and augment them.  We'd

01:58:01 20    introduce new red flags to be on the lookout for when we

01:58:04 21    learned of, you know, criminals becoming more sophisticated

01:58:07 22    in their efforts to divert pills.  I'm not going to spend a

01:58:11 23    lot of time on those policies here, because when you go back

01:58:13 24    to deliberate, you're going to have access to them and you

01:58:15 25    can look at them for yourselves.  And when you do, I hope

**Closing Argument - Swanson**

01:58:18 1    you'll ask yourself whether those policies, whether they

01:58:21 2    reflect a company that's intentionally or illegally trying

01:58:25 3    to oversupply opioids into Lake County and Trumbull County.

01:58:30 4         Now, a few other things that we learned from

01:58:34 5    Ms. Polster's testimony and the documents.  You recall, she

01:58:40 6    showed you some -- showed you a document and testified that

01:58:43 7    the Walgreens stores in Lake County and in Trumbull County

01:58:46 8    dispensed generally between 10 and 20 percent controlled

01:58:49 9    substances versus non-controlled.  And as Mr. Lanier said

01:58:52 10   this morning, that's below the DEA guidelines that you heard

01:58:55 11   from Mr. Rannazzisi.

01:58:58 12        She said that the cash payments for opioid

01:59:01 13   prescriptions at our stores in Lake County and Trumbull

01:59:06 14   County were all under 10 percent.  Most of the time they

01:59:08 15   were much lower.

01:59:09 16        Do you recall from Mr. Catizone, that's consistent

01:59:12 17   with the national average, that about 10 percent of the

01:59:14 18   population doesn't have insured -- insurance, so you would

01:59:17 19   expect about 10 percent of your patients coming to your

01:59:24 20   pharmacy would be paying in cash.

01:59:25 21        She also told you that Walgreens isn't perfect, but

01:59:28 22   she strove to be.

01:59:32 23        I think you know pharmacists face a difficult task.

01:59:35 24   They need to dispense opioid medicines to patients who are

01:59:38 25   legitimate and need them, and they need to try to figure out

**Closing Argument - Swanson**

01:59:43  1    who are the criminals who are trying get them but don't need

01:59:46  2    them.  We heard about those criminals through Agent Edwards

01:59:49  3    and Captain Villanueva.  And we weren't perfect.

01:59:52  4        But now you've heard the jury instructions that tell

01:59:54  5    you, the question isn't whether we were perfect; the

01:59:58  6    question is whether we were acting intentionally or

02:00:04  7    illegally, and none of the evidence supports that.

02:00:06  8        Now, along with the Walgreens' witnesses who came in,

02:00:08  9    you also learned a bit about Walgreens through the Board of

02:00:12 10    Pharmacy agents who came in and testified.  That's

02:00:16 11    Agent Edwards and Agent Pavlich.  Agent Edwards told you --

02:00:22 12    recall, Agent Edwards was also with the Lake County

02:00:25 13    Narcotics Agency and also with the Board of Pharmacy.  And

02:00:27 14    he told you that the pharmacists at Walgreens and the chain

02:00:29 15    pharmacies, they were always helpful.  They were always

02:00:32 16    helpful in providing leads for doctor shoppers or suspicious

02:00:37 17    doctors.  They were a real value to the Board of Pharmacy in

02:00:41 18    trying to thwart diversion.

02:00:42 19        Mr. Pavlich said that the pharmacists at Walgreens and

02:00:45 20    the other chain pharmacies, they always cooperated with him

02:00:49 21    and his investigations and his inspections.

02:00:53 22        At the end of the day, not a single person came into

02:00:56 23    court and identified a Walgreens pharmacist who failed to do

02:00:59 24    their job or fulfill their corresponding responsibility in

02:01:04 25    Lake County or Trumbull County.

## Closing Argument - Swanson

02:01:08  1        Millions of documents produced in this litigation.

02:01:10  2    You saw no evidence, none, of a Walgreens pharmacist in

02:01:13  3    Lake County or Trumbull County with a revoked or suspended

02:01:17  4    license.  No evidence of any disciplinary proceedings

02:01:22  5    against a Walgreens pharmacist in Lake or Trumbull County.

02:01:26  6    No evidence of a Walgreens pharmacy in Lake or Trumbull

02:01:30  7    County ever losing or having their license suspended.

02:01:33  8        Now, I want to take a minute to respond to a couple of

02:01:36  9    specific allegations that were lodged against us this

02:01:38 10    morning and really throughout the trial.  But before I do

02:01:42 11    that, I want to clear -- I want to clear something up.

02:01:46 12        If you recall in openings, and it came up again this

02:01:49 13    morning, Mr. Lanier said a couple things that I want to

02:01:52 14    remind you about.  One of the things he said in opening was

02:01:58 15    that Walgreens collected and sold patient data to a company

02:02:02 16    called IMS.  He said we collected and sold data, patient

02:02:08 17    data to IMS so that IMS could turn around and sell it to

02:02:11 18    drug manufacturers for use or marketing.  That's what he

02:02:14 19    told you.  There was actually an entire episode in one of

02:02:18 20    his early binge watching journey called where data makes

02:02:26 21    money, is what he called it.

02:02:27 22        And then he said Walgreens did studies to figure out

02:02:30 23    how long it should take for its pharmacists to fill a

02:02:32 24    prescription.  He said Walgreens wanted to make sure that

02:02:34 25    the patients had to wait long enough to go do some shopping,

## Closing Argument - Swanson

| | |
|---|---|
| 02:02:38 | 1 |

but no so long that they'd leave.  All right?  So we were
trying to stall patients so they'd buy from us while waiting
to get their prescription filled.  He said we did studies on
that.

     Neither one of those things is true, and in 6 weeks of
testimony and evidence, Mr. Lanier showed you no evidence
about either one.  And he's not going to show you today a
contract between IMS and Walgreens where we're selling
patient data to IMS.  And he's not going to show you a study
about how long we want our customers to wait, we want them
to wait long enough that they'll buy things at our store.
No evidence supports those allegations.  And I'll leave it
up to you to decide why he would say those things that he
can't prove.

     So now let's turn to a couple of the issues that he
did raise during the evidence, and he sort of touched on it
briefly, but I think they're worthy of response.

     The first thing he said was we were too little too
late on our policies, and that was kind of a refrain that
you heard throughout trial.  And the second thing he talked
about that I want to touch on is our filling for so-called
bad doctors, because we heard a lot about that through the
evidence.

     So, too little too late on our policies.  Well, you
saw just a couple moments ago that we had red flag policies

## Closing Argument - Swanson

02:04:03  1    at Walgreens all the way back to at least 1998, which,

02:04:06  2    again, is before phase 1 of the epidemic as plaintiffs'

02:04:11  3    experts have opined.  It's also well before the Florida

02:04:16  4    settlement that Mr. Lanier kept saying was what egged us on

02:04:21  5    to change our policies.

02:04:21  6         The IntercomPlus system that you saw, that's been in

02:04:24  7    place since 1997.

02:04:26  8         Now, sure, we made improvements over the years.

02:04:31  9    20-plus years, of course we made improvements.  I would hope

02:04:33 10    we did.  We tuned up our policies like Good Faith

02:04:38 11    Dispensing.  As an example, you might recall in 2012, we

02:04:41 12    made it a requirement that if your state had PDMPs, we had

02:04:44 13    to check those before you dispensed an opioid medicine.

02:04:47 14    Didn't matter if that was a state law or not, it was a

02:04:50 15    requirement of our pharmacists under our Good Faith

02:04:53 16    Dispensing Policy.

02:04:54 17         We improved our change.  We upgraded our computer

02:04:57 18    system.  We coached our pharmacists.  That's what companies

02:05:00 19    are supposed to do.  They're supposed to strive to improve.

02:05:09 20    None of it changes how our pharmacists have always worked

02:05:11 21    and the tools that they've had.  A company that continually

02:05:14 22    improves and updates its policies and practices is not a

02:05:18 23    company that's acting intentionally or illegally to cause an

02:05:26 24    opioid crisis.

02:05:27 25         There was a lot of talk -- it didn't come up much this

**Closing Argument - Swanson**

02:05:30 1    morning, but you heard a lot about it through trials -- or

02:05:31 2    through the trial about these so-called bad doctors that

02:05:33 3    plaintiffs said we filled for.  The first one I think came

02:05:36 4    up the most.  His name is Dr. Demangone.  You recall his

02:05:41 5    name coming up through trial.

02:05:43 6        Dr. Demangone is the same doctor who's currently

02:05:51 7    licensed by the state medical board practicing in

02:05:55 8    Willoughby, Ohio, and doesn't have any board actions against

02:05:57 9    him.  And doesn't have any board actions against him today.

02:06:01 10   And the plaintiffs haven't shown any disciplinary actions

02:06:04 11   against him or his clinic all through trial.

02:06:06 12       He also works at a clinic, Cleveland's Medical

02:06:10 13   Institute.  All right?  His clinic is currently licensed by

02:06:14 14   the Board of Pharmacy.  And he's a pain management doctor.

02:06:17 15   So you might recall when Agent Edwards was testifying, the

02:06:20 16   pain management clinics, they get inspected more frequently

02:06:23 17   than other clinics, every 1 to 2 years they get extra

02:06:28 18   scrutiny from the Board of Pharmacy.  Dr. Demangone and his

02:06:31 19   clinic are both currently licensed.

02:06:34 20       Now, Walmart and CVS, you might hear, they made a

02:06:42 21   decision at some point that they weren't going to fill

02:06:44 22   anymore for Dr. Demangone.  And that's okay.  But that's not

02:06:49 23   Walgreens' policy, as you've heard.  Our policy is to

02:06:53 24   evaluate each prescription independently and follow Good

02:06:59 25   Faith Dispensing.

**Closing Argument - Swanson**

02:06:59  1          What's important to remember here when they talk about

02:07:05  2     our filling for Dr. Demangone, plaintiffs haven't shown you

02:07:08  3     a single prescription that Walgreens filled for

02:07:13  4     Dr. Demangone that was written for an illegitimate medical

02:07:20  5     purpose.  They haven't shown you that.  They said we filled,

02:07:24  6     but they haven't shown you a prescription that they said was

02:07:26  7     for an illegitimate medical purpose.  They haven't showed

02:07:28  8     you a prescription that we filled for Dr. Demangone that

02:07:30  9     they claim was diverted.

02:07:31 10          Now, if plaintiffs wanted to, they could have sent a

02:07:34 11     subpoena out to Dr. Demangone, brought him in,

02:07:39 12     cross-examined him and let you evaluate for yourselves what

02:07:42 13     you thought about him and his practices.  They could have

02:07:46 14     brought in an expert who could have looked at the

02:07:49 15     prescriptions that we filled for Dr. Demangone and told you

02:07:51 16     if those prescriptions were good, bad, or otherwise.  They

02:07:54 17     didn't do either of those things.  What they want to do is

02:07:57 18     rely on innuendo and the characterization of him by the

02:08:02 19     plaintiffs' lawyers.  But what the plaintiffs' lawyers say

02:08:05 20     isn't evidence.  What I say isn't evidence.  What any of us

02:08:07 21     say isn't evidence.  It's testimony and documents and facts

02:08:11 22     that are evidence.

02:08:11 23          Dr. Veres.  We heard a lot about Dr. Veres.  What do

02:08:15 24     we know about him?

02:08:17 25          Well, we know that he's currently licensed by the

7206

**Closing Argument - Swanson**

02:08:20  1    state medical board in Ohio.  Ms. Harrington at CVS

02:08:25  2    testified to that.

02:08:26  3         We know that plaintiffs haven't shown us any evidence

02:08:29  4    that his license was ever suspended or revoked or that he

02:08:32  5    was ever subject to disciplinary proceedings by the state

02:08:36  6    board.

02:08:37  7         Now, we also know that Walgreens, and specifically

02:08:40  8    Mr. Joyce down in Trumbull County, he was aware of

02:08:44  9    Dr. Veres, and he specifically asked the folks at the state

02:08:47 10    Board of Pharmacy to check him out because we had seen a lot

02:08:51 11    of prescriptions from Dr. Veres.  This was Mr. Joyce's

02:08:55 12    testimony about Dr. Veres.

02:08:56 13         He wrote a lot of controlled substances prescriptions

02:09:00 14    and I -- I asked the state board guy about him.  I thought

02:09:02 15    he should look into this guy.  He did, and he got back to me

02:09:06 16    that Dr. Veres kept impeccable records.  He wasn't -- he

02:09:11 17    didn't give prescriptions early.  He wasn't giving crazy

02:09:14 18    high doses.  He maintained his staff in a good way.  The

02:09:18 19    guy -- the agent visited the office a couple times.

02:09:22 20         So he didn't think that Dr. Veres was a huge or

02:09:25 21    wasn't -- wasn't anything they could do anything about, but

02:09:28 22    he was one of those doctors that you definitely wanted to

02:09:31 23    take a -- wanted to look at his prescriptions carefully.

02:09:34 24         So that's what Walgreens did.  That's what it

02:09:37 25    continued to do.  They continued to be careful with

### Closing Argument - Swanson

02:09:42  1    Dr. Veres's prescriptions, look at them closely, check OARRS

02:09:46  2    and follow Good Faith Dispensing.

02:09:49  3        Mr. Joyce also testified that we refused plenty of

02:09:53  4    Dr. Veres's scripts even while we filled for others.  That's

02:09:57  5    not unlawful.  That's not intending to cause harm.

02:10:01  6        And as with Dr. Demangone, we know that plaintiffs

02:10:05  7    haven't identified a single prescription that we filled for

02:10:08  8    Dr. Veres that they claim was written for an illegitimate

02:10:10  9    medical purpose.

02:10:12 10        Last doctor I want to touch on real briefly is

02:10:16 11    Dr. Franklin.  You'll recall, he was the one who was

02:10:19 12    connected to Overholt's.  He was being investigated by the

02:10:22 13    Board of Pharmacy and he was murdered.  But he was under

02:10:27 14    investigation, intense investigation by the Board of

02:10:29 15    Pharmacy.  And when Mr. Pavlich and Mr. Edwards came in to

02:10:33 16    testify, we asked them about Dr. Franklin.  This is what

02:10:39 17    Mr. Edwards said.  I asked him this question when he was on

02:10:42 18    the stand:  As part of this investigation into Dr. Franklin,

02:10:46 19    did you come to the conclusion that every patient who was

02:10:48 20    going to see Dr. Franklin was a pill seeker?

02:10:52 21        Answer:  No.

02:10:52 22        Were some of the patients who went to see Dr. Franklin

02:10:56 23    legitimate patients with legitimate need?

02:10:57 24        I believe so.

02:10:59 25        And I raise that because that's an important point.

7208

**Closing Argument - Swanson**

02:11:06  1    Agents who came in here from the Board of Pharmacy, they're

02:11:09  2    the ones who are on the ground who actually know the doctors

02:11:12  3    in the community.  They're responsible for licensing the

02:11:15  4    pain doctors, or the clinics of the pain doctors.  And they

02:11:19  5    told you even some of these so-called bad doctors, the high

02:11:22  6    prescribers, the questionable doctors, they have good

02:11:25  7    patients who need care, who need to have their prescriptions

02:11:29  8    filled.

02:11:33  9         So at the end of the day, with Dr. Demangone and

02:11:36 10    Dr. Veres, all we know is that we filled prescriptions for

02:11:40 11    two doctors who are licensed by the state and registered

02:11:43 12    with the DEA.  That doesn't prove, I submit, anything.

02:11:47 13         Okay.  I want to turn now to some of the failures in

02:11:53 14    plaintiffs' case, particularly when it comes to causation.

02:11:59 15         You'll see that when they were trying to put together

02:12:02 16    their causation case, they leaned pretty heavily on the

02:12:06 17    analysis of doctor -- excuse me -- Mr. Catizone, and we

02:12:10 18    heard about him this morning.

02:12:11 19         I want to be clear, Mr. Catizone was the head of the

02:12:14 20    National Association of Board of Pharmacies.  That's a trade

02:12:19 21    organization.  Okay?  It's not the National Board of

02:12:23 22    Pharmacies.  It's the national -- it's -- the state boards

02:12:26 23    come together and it's a trade organization.  That's what he

02:12:30 24    was the head of.  He was he never a member of any Board of

02:12:33 25    Pharmacy.

**Closing Argument - Swanson**

02:12:33  1    And he acknowledged that he hasn't dispensed a

02:12:36  2  medication in 20 years or so.

02:12:38  3    You'll recall his red flag analysis.  We spent a whole

02:12:41  4  lot of time, a lot of back and forth on his red flag

02:12:44  5  analysis.  Here's the shortcoming with that analysis.

02:12:49  6  Nobody disputes that red flags are important.  Right?  We

02:12:54  7  can quibble about some of his specific red flags, whether

02:12:58  8  25 miles to a doctor is a legitimate red flag or not.  But

02:13:02  9  every pharmacist who came in and testified for Walgreens and

02:13:04  10  the other pharmacies, they said they're familiar with red

02:13:11  11  flags, and that they evaluate these red flags, questions,

02:13:14  12  concerns, with every prescription.  Every pharmacy had

02:13:17  13  policies that included red flags.  You saw ours back to

02:13:22  14  1998.

02:13:23  15    The issue with Mr. Catizone's analysis is not that

02:13:26  16  what he calls red flags are never red flags.  That's not the

02:13:29  17  problem.  The problem is his insistence that they are always

02:13:33  18  red flags.  And what you've heard from the pharmacists who

02:13:39  19  come in and testify is that his red flags, yeah, some of

02:13:42  20  them, they might be red flags sometimes.  Paying cash, that

02:13:44  21  might be a red flag.  It might not be.  It depends on the

02:13:47  22  circumstances.  The distance you travel to see your doctor

02:13:50  23  or go to your pharmacy, that can be a red flag, but it might

02:13:54  24  not be.  It depends on too many circumstances that

02:13:57  25  Mr. Catizone couldn't capture by just applying an algorithm

## Closing Argument - Swanson

02:14:01  1     across data.

02:14:02  2          Now, Mr. Catizone did make two very important

02:14:05  3     concessions that are relevant to his analysis that I want to

02:14:08  4     remind you about.  He talked about his -- all the red flags

02:14:14  5     being applied, and he was asked by Mr. Fumerton:  You agree

02:14:18  6     that just because a prescription flags under one of your 16

02:14:21  7     red flags, that doesn't mean that it was written for an

02:14:24  8     illegitimate medical purpose; right?

02:14:26  9          He agreed, that's correct.

02:14:28 10          Would you also agree that it does not mean that the

02:14:31 11     medicine that was dispensed to fill that prescription was

02:14:33 12     diverted?

02:14:36 13          He said correct, I agree with that.

02:14:37 14          So just because a prescription flagged on his

02:14:41 15     methodology doesn't mean that it was written for an

02:14:44 16     illegitimate medical purpose, and obviously it doesn't mean

02:14:46 17     that it was diverted.  It just meant it was a question, like

02:14:49 18     everyone -- like every pharmacist testified to.  It was a

02:14:52 19     concern.  It was reason to follow up.

02:14:54 20          So for Mr. Catizone, the sole issue became whether he

02:14:58 21     saw sufficient documentation to convince himself that the

02:15:03 22     pharmacists looking at the prescription had resolved that

02:15:06 23     red flag to Mr. Catizone's satisfaction.

02:15:08 24          So we talked a lot, a lot about documentation.  And

02:15:12 25     there was some confusion there because at first, as you'll

7211

**Closing Argument - Swanson**

02:15:17  1    recall, Mr. Catizone said that the documentation was

02:15:20  2    required under the Controlled Substances Act.  But then we

02:15:25  3    heard from the DEA witnesses who came in, Ms. Ashley and

02:15:30  4    Mr. Rannazzisi.

02:15:33  5        Ms. Ashley was asked, there's no federal requirement

02:15:36  6    to document the resolution of red flags?  Is that what you

02:15:39  7    said.

02:15:40  8        Answer:  To document the resolution, not that I

02:15:42  9    recall, no.

02:15:42  10       Mr. Rannazzisi, are you aware of any steps or

02:15:45  11   regulation from your time at the DEA that states that a

02:15:48  12   pharmacist must document the resolution of red flags on

02:15:51  13   prescriptions?

02:15:51  14       Answer:  Again, during my time at the DEA, I don't

02:15:56  15   recall any -- any document that states that, no.

02:16:00  16       So then Mr. Catizone said, well, it's actually, it's a

02:16:03  17   state law.  It's a state law requirement.  But you'll

02:16:06  18   notice, he didn't show you any statutes or any regulations

02:16:09  19   from Ohio that talked about documenting resolution of red

02:16:13  20   flags.

02:16:14  21       And then we had two witnesses who had come in to

02:16:17  22   testify who could have testified about such a state law,

02:16:20  23   such a statute, such a regulation if it existed.  We had the

02:16:24  24   two guys from the Board of Pharmacy come in.  And it's their

02:16:28  25   job to enforce the pharmacy laws and regulations in the

## Closing Argument - Swanson

02:16:31    1    state.  If there was a state law that required

02:16:34    2    documentation, they would have been asked about it and you

02:16:36    3    would have been told about it.  But they didn't ask them

02:16:39    4    about that.

02:16:40    5        Nobody who came in and testified identified a specific

02:16:46    6    Ohio statute, law, regulation that requires documentation.

02:16:52    7    Okay.  You didn't see it.

02:16:54    8        This is what Mr. Edwards, from the Board of Pharmacy

02:16:58    9    said about it.  First of all, it's a good practice to write

02:17:04   10    down your work when you're resolving a red flag; right?

02:17:07   11        Yes, correct.

02:17:08   12        Now, there's no dispute about that.  As you heard this

02:17:11   13    morning, we have it in our policy to document the resolution

02:17:13   14    of red flags.

02:17:14   15        Not necessarily required by law.  Good practice.

02:17:17   16        Correct.

02:17:18   17        Okay.  Now, a pharmacist could do the hard work and

02:17:21   18    the careful work to resolve a red flag but not write down

02:17:24   19    what she or he did; right?

02:17:27   20        The answer:  Correct.

02:17:29   21        Now, that last line is important because in this case,

02:17:33   22    there's not evidence of inadequate due diligence or that no

02:17:38   23    due diligence was performed on the prescriptions that

02:17:42   24    Mr. Catizone looked at if there wasn't documentation.  His

02:17:46   25    only point is that he can't tell if there's no

### Closing Argument - Swanson

02:17:49  1    documentation.  But nobody can say whether due diligence was

02:17:52  2    performed on those prescriptions or not.

02:17:56  3         And this is important because the plaintiffs can't

02:17:59  4    claim that we're violating a law if that law doesn't exist.

02:18:05  5         Okay.  So let's look a bit more at -- a bit more

02:18:08  6    closely in a bit more detail into plaintiffs' causation case

02:18:13  7    and where it fails.

02:18:15  8         As you've heard from the jury instructions, and as I

02:18:18  9    mentioned a bit earlier, in order to prevail, plaintiffs

02:18:21  10   have to prove that Walgreens was a substantial, a

02:18:27  11   substantial factor in causing the opioid epidemic in

02:18:30  12   Lake County and in Trumbull County.  And Mr. Lanier talks a

02:18:34  13   lot about volume.  But volume doesn't really tell you all

02:18:38  14   that much as we'll see.

02:18:40  15        So let's talk about Mr. Catizone's and Dr. McCann's

02:18:46  16   analysis for a moment.  Touched on this -- Mr. Lanier

02:18:48  17   touched on this earlier.

02:18:50  18        What happened is we produced all of our dispensing

02:18:52  19   data for opioid medicines from 2006 to 2019.  So 14 years

02:19:00  20   worth of data.  And what they did with that is Mr. Catizone

02:19:05  21   gave his 16 red flags that he talks about, he gave those to

02:19:09  22   Dr. McCann and then Dr. McCann created algorithms so that he

02:19:13  23   could run through that data and try to catch these red

02:19:17  24   flags.  And you'll recall, you know, Dr. McCann, he had to

02:19:21  25   fill in some gaps, and he made up some numbers.  But at the

7214

**Closing Argument - Swanson**

02:19:24  1    end of the day his computer system spit out the results.

02:19:28  2    Right?

02:19:29  3         Dr. McCann said, okay, this is the percentage of

02:19:33  4    defendants' opioid prescriptions that hit on red flags.  And

02:19:38  5    it was a little curious, but when Dr. McCann was on the

02:19:40  6    stand, Mr. Lanier didn't ask him what that percentage was.

02:19:45  7    Right?  It was at cross-examination when Ms. Swift was

02:19:48  8    asking questions that she asked Dr. McCann, what is that

02:19:52  9    percentage from the defendants that hit on red flags?

02:19:58 10         Ms. Swift:  So you want to figure out the percentage

02:20:01 11    of opioid prescriptions flagged for all the defendants, and

02:20:04 12    then they talk about some math.  What do you get for the

02:20:07 13    percentage?

02:20:08 14         19.14 percent.

02:20:10 15         So roughly 20 percent of the prescriptions that the

02:20:14 16    defendants filled for opioid medicines hit on one of

02:20:18 17    Mr. Catizone's red flags.  And then they confirmed that in

02:20:22 18    one of the drawings that there's that 19.14, you see that?

02:20:27 19    That's a flag opioid prescriptions.

02:20:32 20         So what that means is even by Mr. Catizone's analysis

02:20:36 21    and Dr. McCann's analysis, 80 percent, 80 percent of the

02:20:42 22    opioid prescriptions that we dispense weren't red flags.

02:20:47 23    They weren't concerns under Mr. Catizone's analysis.  Not

02:20:52 24    even Mr. Catizone says that we should have blocked or

02:20:54 25    refused to fill that 80 percent.

**Closing Argument - Swanson**

02:20:58  1    So when Mr. Lanier talks about volume, it's important

02:21:00  2    to remember that his own expert said that from our own data,

02:21:04  3    80 percent of what we dispensed was not problematic and not

02:21:07  4    a red flag.

02:21:12  5    So I put together a slide to show you how the

02:21:18  6    causation claim would work in this case using Mr. Catizone's

02:21:22  7    and Dr. McCann's analysis.

02:21:25  8    So you have on the top -- I've been linking it out to

02:21:29  9    what plaintiffs have to prove.  So you have our dispensing

02:21:32  10   data here at the top.  Right?  That then Dr. McCann and --

02:21:39  11   or Dr. McCann and Mr. Catizone then applied the red flags,

02:21:42  12   and so they could determine which of those prescriptions are

02:21:45  13   red flags and which are not red flags.  Right?

02:21:49  14   But then of the ones that are red flags, you have to

02:21:52  15   determine which of those are legitimate and which were not

02:21:57  16   legitimate.  Because as Mr. Catizone told you, just because

02:22:00  17   it's a red flag doesn't mean it's illegitimate.  You can

02:22:03  18   resolve a red flag.  So you have to put in the buckets which

02:22:08  19   of those flags are legitimate and which are not legitimate.

02:22:15  20   Right?  And then once you've determined which are not

02:22:17  21   legitimate, then they have to show -- if we dispense any

02:22:20  22   illegitimate prescriptions, did we do that knowingly or

02:22:24  23   intentionally.  They have to prove that.  And then they have

02:22:27  24   to show, for any of those flagged prescriptions that were

02:22:30  25   not legitimate that we knowingly dispensed, were they a

**Closing Argument - Swanson**

02:22:34 1    substantial factor in the current crisis in Lake County or

02:22:42 2    Trumbull County.

02:22:42 3        Okay.  That's how the causation chain works.  That's

02:22:44 4    what they need to show.

02:22:45 5        So let's look at what plaintiffs actually proved.

02:22:48 6        Again, he took the dispensing data.  They did the red

02:22:55 7    flags.  Said 80 percent were flagged.  20 percent -- or

02:23:00 8    80 percent were not flagged and 20 percent were flagged by

02:23:04 9    Dr. McCann.

02:23:06 10       So what about this 20 percent of flagged

02:23:10 11   prescriptions?  There's no witness who said that any of

02:23:12 12   those were illegitimate, only that they hit on Dr. McCann's

02:23:18 13   algorithm.

02:23:20 14       As far as we know, those 20 percent of prescriptions,

02:23:23 15   they're all legitimate.  They were red flags that could have

02:23:25 16   been resolved.  Certainly Mr. Catizone never said that those

02:23:32 17   20 percent were all illegitimate.

02:23:37 18       He doesn't have any idea what percentage of that

02:23:39 19   20 percent was written for a legitimate medical purpose

02:23:43 20   versus an illegitimate medical purpose.  And it's

02:23:49 21   plaintiffs' burden here to prove that we knowingly dispensed

02:23:53 22   illegitimate medicines.  That's their burden.

02:23:57 23       And Mr. Catizone's analysis doesn't do that.  There's

02:24:00 24   not any evidence to show that some number of those were

02:24:05 25   legitimate, some number were not legitimate.  And there's no

**Closing Argument - Swanson**

02:24:07  1    evidence to show that if any were illegitimate, that they

02:24:11  2    were a substantial factor of any crisis in the counties

02:24:15  3    today.

02:24:19  4         You've seen the instructions, right?  Plaintiffs have

02:24:23  5    to show that our conduct was a substantial factor in what's

02:24:27  6    going on in the counties today.  And there's a gap in the

02:24:31  7    evidence.  They can't show that we're a factor at all.

02:24:36  8         Okay.  The last thing I want to talk about is to again

02:24:39  9    take a step back and look at the true causes of the opioid

02:24:45 10    crisis in Lake County and in Trumbull County.

02:24:49 11         Remember Dr. Keyes?  We saw her picture earlier today.

02:24:52 12    She was the epidemiologist.  And she used the analogy of a

02:24:57 13    water tap and a spigot in her testimony.  You might remember

02:25:02 14    she was describing epidemiology, and she talked about that

02:25:05 15    well in London, remember, where people were contracting

02:25:10 16    cholera and the epidemiologists figured it out.

02:25:13 17         But then she came back to that analogy when she was

02:25:16 18    asked some questions by Mr. Lanier about how she said

02:25:21 19    pharmacies were the last line of defense, and then she

02:25:24 20    talked more about that spigot analogy.  She said that

02:25:28 21    pharmacies were the ones who can turn off that spigot.

02:25:32 22         So this is sort of the plaintiffs' view of the world

02:25:36 23    in this case, that you have a legal supply of opioids, and

02:25:40 24    pharmacies are down there responsible for controlling the

02:25:44 25    spigot and how much comes out.  But -- and, you know,

**Closing Argument - Swanson**

02:25:49  1    Mr. Lanier acknowledged this earlier today, plaintiffs' own

02:25:53  2    experts and their witnesses and plaintiffs themselves, they

02:25:55  3    told you about the real causes of the opioid epidemic in

02:25:59  4    Lake County and in Trumbull County.  They've told you what

02:26:02  5    the substantial factors are in their view.

02:26:08  6         Start with manufacturers.  Dr. Lembke.  We talked

02:26:11  7    about her this morning.  She was one of the first witnesses.

02:26:14  8    She talked, you'll recall, about how companies like

02:26:18  9    Purdue Pharma had gone out and misled doctors about the

02:26:22 10    addictive nature of these medications.  She didn't blame

02:26:25 11    pharmacies for the opioid problem until she got hired by

02:26:28 12    plaintiffs in this case.  But she wrote a book, you saw this

02:26:31 13    morning, back in 2016, where she blamed the manufacturers,

02:26:34 14    drug dealer M.D.  Right?

02:26:36 15         Dr. Keyes, the epidemiologist, she also said that

02:26:40 16    manufacturers are at fault for the opioid crisis.

02:26:43 17         So did Dr. Alexander.  You saw him.  He testified to

02:26:48 18    Congress about the same thing.  He didn't blame the

02:26:50 19    pharmacies, he blamed the manufacturers.

02:26:52 20         So all those people claimed that the manufacturers

02:26:54 21    should have turned off or turned down that spigot years ago.

02:26:59 22         FDA.  They approved every opioid medicine that we

02:27:04 23    dispense.

02:27:04 24         Dr. Keyes testified that if the DEA -- excuse me, the

02:27:09 25    FDA -- I'm missing a letter in there -- had done its job and

**Closing Argument - Swanson**

02:27:13  1    manufacturers had been more responsible, there wouldn't be

02:27:15  2    an opioid crisis today.

02:27:18  3          Dr. Lembke and Dr. Alexander, they agreed.  They

02:27:22  4    thought the FDA was too lax in approving these medications.

02:27:25  5    The FDA could have turned down this spigot by not approving

02:27:29  6    medicines or putting restrictions on their use.  Okay?

02:27:31  7          The DEA, we've heard a lot about them.  They set the

02:27:35  8    quotas for the volume of opioids that can be manufactured

02:27:38  9    every year.  They also register the doctors who can write

02:27:40 10    the prescriptions for opioids.  They have all this

02:27:44 11    interesting data in ARCOS that you heard about where they

02:27:47 12    can track where the pills are going and see if there's

02:27:49 13    suspicious activity.

02:27:51 14          Dr. Keyes faulted the DEA for the opioid epidemic.

02:27:56 15    Dr. Alexander told Congress that the DEA was at fault.  They

02:28:00 16    could have turned off or turned down the spigot at any time.

02:28:03 17    They could have reduced quotas.  They could have stopped

02:28:08 18    registering bad doctors.

02:28:09 19          Distributors.  You didn't hear a lot about them in

02:28:12 20    this case.  But the independent pharmacies like Overholt's

02:28:15 21    and the pill mills, if it ravaged these communities, they

02:28:19 22    need to get their supplies that comes through these

02:28:21 23    distributors.  Right?  Dr. Keyes said that these

02:28:23 24    distributors, they were a causal factor in the crisis in

02:28:26 25    Lake and Trumbull County.

**Closing Argument - Swanson**

02:28:27  1          State Board of Pharmacy, we've talked about them.

02:28:29  2     They license doctors who write -- excuse me -- they license

02:28:32  3     the pharmacies and they police the conduct of the bad

02:28:36  4     pharmacies like Overholt's.  They can turn down that spigot,

02:28:40  5     right, by not approving pharmacies or by like sniffing out

02:28:44  6     the bad ones.

02:28:45  7          The state medical board, they license the doctors who

02:28:48  8     write the prescriptions.  Right?  They discipline the bad

02:28:52  9     ones.  They control that spigot.  They can take away

02:28:55 10     licenses from the bad prescribers.

02:28:58 11          Here's the big one, the prescribers themselves, right?

02:29:01 12     We all know that it's the prescribers who control the

02:29:07 13     demand.  Pharmacists don't create demand.  We fill

02:29:09 14     prescriptions that are written by prescribers, and we know

02:29:11 15     the vast majority of these prescribers are good doctors.

02:29:14 16     But even good doctors, they write a lot of prescriptions.

02:29:18 17     Right?  Dr. Lembke said that.  Dr. Alexander said that.

02:29:22 18     Dr. Keyes said that.

02:29:23 19          Dr. Keyes said the crisis never would have happened if

02:29:26 20     the doctors didn't prescribe the way that they did.

02:29:30 21          Prescribers, they have the greatest control over the

02:29:36 22     spigot.

02:29:36 23          All right.  Let's talk about pharmacies.  We'll get

02:29:38 24     there.  Talk about pharmacies.  Not just the chain

02:29:40 25     pharmacies, it's also the independents; right?  Pharmacies

**Closing Argument - Swanson**

02:29:43  1    include the bad actors like Overholt's we heard about.

02:29:46  2    Nothing that Walgreens can do about Overholt's.  The Board

02:29:50  3    of Pharmacy can do something about them, the DEA can, but

02:29:53  4    Walgreens can't.

02:29:56  5         Right?  Those independent pharmacies, they have

02:29:59  6    control of that spigot.

02:30:00  7         But what we know is that the big problem in

02:30:03  8    Lake County and Trumbull County today is largely driven by

02:30:07  9    illegal and illicit drugs like heroin, like fentanyl, like

02:30:16 10    counterfeit pills.

02:30:19 11         Captain Villanueva, he spoke about all of these in his

02:30:22 12    testimony.

02:30:24 13         So when you look at all of this evidence and all of

02:30:27 14    these different actors, to claim that the chain pharmacies

02:30:31 15    control the spigot of all the opioids that are going down

02:30:34 16    into that basin is just not credible.

02:30:39 17         And when you think about Walgreens' role in all of

02:30:42 18    this, I want you to remember a couple of other things we

02:30:44 19    looked at.  Remember when Mr. Brunner came in and he showed

02:30:49 20    you some slides on market share.  Right?  So you go back.

02:30:55 21    Walgreens were just one of the many, many pharmacies in the

02:30:58 22    one -- in the one spigot, we have 14 and a half percent

02:31:05 23    market share combined in Lake County and in Trumbull County.

02:31:10 24         We're 13 out of 130 pharmacies in both of those

02:31:15 25    counties.

**Closing Argument - Swanson**

02:31:18  1     It's true that there can be more than one cause of a

02:31:21  2  nuisance, but the plaintiffs have to prove that Walgreens

02:31:25  3  was a substantial factor, and against all of this evidence,

02:31:30  4  they can't do that.

02:31:33  5     All right?  So with that in mind, I want to conclude

02:31:36  6  by returning to the verdict form that I showed you at the

02:31:39  7  beginning, the two questions that you're going to answer

02:31:43  8  when you begin your deliberations.

02:31:44  9     The first one, again, did the counties prove, by the

02:31:48  10  greater weight of the evidence, that oversupply of legal

02:31:50  11  prescription opioids, and diversion of those opioids into

02:31:54  12  the illicit market outside of appropriate medical channels,

02:31:57  13  is a public nuisance in Lake County?

02:32:01  14     Okay.  Did they prove there's oversupply, diversion,

02:32:05  15  and that that diversion is a public nuisance today?

02:32:09  16     The answer to that question is no.

02:32:13  17     You've heard that the opioid problem in Lake County

02:32:16  18  and Trumbull County today is driven by heroin, it's driven

02:32:20  19  by fentanyl, it's driven by fraudulent pills.  But even if

02:32:28  20  you answer yes to that question, if you -- some of you think

02:32:31  21  the answer to that question is yes, you still have to answer

02:32:34  22  Question 2.

02:32:38  23     Did Lake County prove, or Trumbull County prove, by

02:32:41  24  the greater weight of the evidence, that any of the

02:32:44  25  following defendants -- Walgreens -- engaged in intentional

## Closing Argument - Swanson

02:32:47  1   and/or illegal conduct which was a substantial factor in

02:32:53  2   producing the public nuisance that you found exists in

02:32:56  3   Question 1?

02:32:59  4        Plaintiffs have not proved that our conduct was either

02:33:07  5   intentional or illegal as those terms have been defined for

02:33:10  6   you by the Court.  And as we just went through, plaintiffs

02:33:14  7   haven't proven causation.  They haven't proven that

02:33:18  8   Walgreens was a substantial factor contributing to that

02:33:21  9   nuisance, so the answer to that question also is no.

02:33:28 10        I want to thank you again for your attention, not just

02:33:31 11   today, but for the past 6 weeks, and I really do appreciate

02:33:37 12   your service on this jury.

02:33:37 13        Thank you all very much.

02:33:51 14                THE COURT:  Thank you, Mr. Swanson.

02:33:53 15        We'll now have Mr. Delinsky for CVS.

02:34:18 16                MR. DELINSKY:  If you all can just give me one

02:34:20 17   second to get situated.

02:34:51 18        May it please the Court, ladies and gentlemen of the

02:34:59 19   jury, did CVS and its pharmacists in Lake and Trumbull

02:35:14 20   County, by filling prescriptions written by doctors for

02:35:20 21   medicine approved by the US FDA, act so egregiously as to

02:35:33 22   harm entire communities and the public at large in the two

02:35:40 23   counties?  Because plaintiffs bring a public nuisance claim,

02:35:50 24   that's the question before us, and that's the question that

02:36:00 25   Judge Polster has instructed us on.

**Closing Argument - Swanson**

02:36:01  1      I think I told you when I stood up for opening

02:36:04  2  statements that I'm really bad with technology, but it's

02:36:06  3  working, so bear with me.

02:36:09  4      Here's Judge Polster's instruction on public nuisance

02:36:13  5  to us.  A public nuisance is an unreasonable interference --

02:36:19  6  ongoing today -- with a right held by the public in common.

02:36:29  7      What does that mean?

02:36:30  8      Judge Polster tells us that too.

02:36:33  9      A right common to the general public is a right that

02:36:36  10  belongs to the community at large, the whole community.

02:36:40  11  It's a collective right.  It's more than an individual

02:36:44  12  right.  It's more than a collection of individual rights.

02:36:47  13  It's a right that runs to all of us, the whole community.

02:36:55  14      So let's return to the question:  Did CVS and its

02:37:02  15  pharmacies in Lake and Trumbull County, and its pharmacists

02:37:06  16  in Lake and Trumbull County, act so egregiously so as to

02:37:12  17  harm entire communities, so as to harm the public health of

02:37:18  18  the community at large?

02:37:25  19      No.  Absolutely not.

02:37:29  20      There are many reasons why.  Don't have a lot of time

02:37:34  21  today, but I'll walk through the main ones, hopefully.  But

02:37:37  22  let me start with where I'll -- where I'm going to end.  And

02:37:44  23  in candor, this may sound familiar.  It may sound familiar

02:37:49  24  because some points, some points require repeating.

02:37:57  25      It is the mission of the Ohio Board of Pharmacy and

**Closing Argument - Swanson**

02:38:05  1   the US DEA to oversee pharmacies, to scrutinize them, and to

02:38:16  2   protect the public.  And no amount of lawyering changes the

02:38:21  3   fact, no amount of excellent lawyering, changes the fact

02:38:30  4   that the Ohio Board of Pharmacy has all the data, that the

02:38:36  5   Ohio Board of Pharmacy is in the communities, that the

02:38:38  6   agents, like Agent Pavlich and Agent Edwards, know the

02:38:47  7   pharmacies and the pharmacists.  It's much more than

02:38:49  8   biannual inspections.

02:38:50  9        And if we learned anything from the *Holiday* case

02:38:54  10  against my client, against two CVS pharmacies down in

02:38:59  11  Florida, it's that law enforcement sees issues, and when

02:39:05  12  they do it acts.  Law enforcement took no action here.  Not

02:39:16  13  against CVS, not against Walgreens, not against Walmart.

02:39:22  14       Armed with all the data, armed with its presence in

02:39:31  15  the community and its knowledge of the community, law

02:39:34  16  enforcement found no misconduct by any CVS Pharmacy or

02:39:39  17  pharmacist in Lake and Trumbull County.  It just cannot be

02:39:46  18  that these CVS pharmacies in the counties systemically broke

02:39:52  19  the law for decades, harmed entire communities, and law

02:40:00  20  enforcement didn't see it and didn't take action.  That's

02:40:06  21  just not possible.  It cannot be.

02:40:11  22       We're not talking about a speeding infraction.  That's

02:40:16  23  not the allegation here.  The allegation here is harm to

02:40:21  24  entire communities over decades.  It's not possible law

02:40:28  25  enforcement didn't see it and wouldn't have taken action if

**Closing Argument - Swanson**

02:40:31  1   there was any action to take.

02:40:32  2        Faced with the impossible, did the plaintiffs bring to

02:40:46  3   court residents from the counties, witnesses from the

02:40:51  4   counties who said, hey, I was there, law enforcement got it

02:40:59  5   wrong, I saw CVS engaging in misconduct.  I saw, I witnessed

02:41:09  6   CVS feeding pills to people who shouldn't have gotten them.

02:41:16  7   We would expect to see residents come to court and saying

02:41:20  8   that, eyewitnesses, giving us the who, what, when, where of

02:41:25  9   what happened in these counties.  Did we get any of that?

02:41:27 10   We got none of it.  Not one witness on the ground came to

02:41:35 11   court and testified, I saw CVS, I saw Walmart, I saw

02:41:39 12   Walgreens engaging in misconduct in these counties.  Not

02:41:45 13   one.

02:41:49 14        Instead of building a case around eyewitnesses in the

02:41:55 15   county who interacted with CVS, experienced CVS, observed

02:42:02 16   the CVS pharmacies in Lake and Trumbull County, plaintiffs

02:42:11 17   built their case around expert witnesses, paid expert

02:42:18 18   witnesses.  In fairness, they have very long resumes.  But

02:42:28 19   they weren't here in the counties, and they weren't able to

02:42:30 20   talk about what happened here.

02:42:36 21        Plaintiffs have the burden of proof in this case.

02:42:38 22   They haven't proved their case.

02:42:41 23        Let me just take a pause.  I jumped into this a little

02:42:48 24   abruptly.  Thank you.  Thank you.  This was a very long

02:42:58 25   trial, and we -- none of us could have asked for a more

### Closing Argument - Swanson

02:43:06  1    attentive, for a harder working jury, and for a jury,

02:43:13  2    frankly, more patient with all the lawyering.  Our gratitude

02:43:21  3    for your service and your sacrifice runs very deep.  So

02:43:28  4    thank you.

02:43:34  5         I want to start in a similar place where I started in

02:43:40  6    my opening statement, with some framework, a framework that

02:43:48  7    I hope makes sense to you and that I hope you can use as you

02:43:52  8    filter the evidence once you begin your deliberations.

02:43:57  9         I want to be clear at the outside, this is framing.

02:44:01 10    It's not blank.  It's just a framework to consider.  And

02:44:07 11    let's start with the FDA.

02:44:11 12         Brian, Mr. Swanson said it.  All the medications we're

02:44:18 13    talking about here were approved by the U.S. Food and Drug

02:44:27 14    Administration.

02:44:27 15         We heard testimony from Theresa Toiga about this.  And

02:44:31 16    we know more today than we did in opening statements.  We

02:44:34 17    know that this approval was a decision made by a team of

02:44:43 18    medical officers, doctors -- let me look at my list --

02:44:48 19    chemists, biologists, pharmacologists, toxicologists,

02:44:52 20    statisticians, even lawyers at FDA.  They don't take their

02:44:57 21    approvals lightly.  That's what we learned from Ms. Toiga.

02:45:00 22         What else did we learn about FDA's approval, was that

02:45:04 23    FDA, in determining whether to approve opioid medications,

02:45:10 24    or any other medication, considered the risks.  Ms. Toiga

02:45:20 25    said the FDA considered the risks of addiction, the risks of

### Closing Argument - Swanson

02:45:24  1    overdose.  And the U.S. Government determined that the

02:45:27  2    medical benefits outweighed the risks and therefore approved

02:45:32  3    it.

02:45:34  4         There's more.  We learned more from Ms. Toiga.  We

02:45:38  5    learned that in 2013, FDA was asked to impose limits, limits

02:45:47  6    on the dose, the permissible dose of opioid medications.

02:45:53  7    Limits on the permissible duration, the length of time

02:45:57  8    people could go on opioid medications.  And we learned that

02:46:02  9    FDA determined that limits were not appropriate.

02:46:10  10        DEA authorized.

02:46:16  11        What do I mean by that?

02:46:19  12        DEA determined how much of these medications could be

02:46:24  13   manufactured and put into the market each year.  And these

02:46:32  14   are the amounts that the DEA approved.  And what I'd like to

02:46:37  15   focus your attention on is the travel.

02:46:41  16        Blue is hydrocodone, green is oxycodone.  And as you

02:46:46  17   can see, from 2003 all the way to 2013, DEA determined that

02:46:52  18   it was appropriate to increase the volume of opioid

02:47:00  19   medications that could be manufactured and put into the

02:47:02  20   market year after year after year all the way through 2013.

02:47:09  21   Then it plateaus and decreases.

02:47:14  22        We've heard a lot about volume in this case.  The

02:47:17  23   volume in the first instance is authorized by DEA itself.

02:47:23  24   And from Ms. Harper-Avilla we heard that in determining this

02:47:30  25   volume, DEA specifically considers the legitimate medical

7229

### Closing Argument - Swanson

02:47:33 1   need of the medications.

02:47:39 2       Doctor-prescribed.

02:47:45 3       My word.  We can't get more basic than this, so cut me

02:47:49 4   a little slack here.  But it's so important.

02:47:52 5       Neither CVS nor any of the other pharmacies were just

02:47:56 6   handing -- handing pills out to patients.  In every single

02:48:02 7   instance they were filling a prescription written by a

02:48:07 8   licensed doctor.

02:48:10 9       We heard from Kerry Keyes.  Doctors write the

02:48:15 10  prescription.  Doctors determine the drug.  Doctors

02:48:19 11  determine the dose.  Doctors determine the duration.

02:48:26 12  Doctors write the prescription.

02:48:29 13      What else did we learn about the doctors?

02:48:32 14      We learned from DEA, year after year after year in

02:48:39 15  statements that they repeated, all the way through present,

02:48:42 16  that the vast, vast majority of doctors write prescriptions

02:48:46 17  legitimately.  This comes from a 2006 DEA statement devoted

02:48:51 18  to the subject of pain medication.  The agency recognizes

02:48:55 19  that nearly every prescription issued by a physician in the

02:48:59 20  United States is for a legitimate medical purpose in the

02:49:03 21  usual course of professional practice.  Nearly every

02:49:08 22  prescription issued by a physician in the U.S. is for a

02:49:11 23  legitimate medical purpose.

02:49:16 24      Last framing point.  Pharmacist's job.

02:49:26 25      When we go to a pharmacy with a prescription from our

**Closing Argument - Swanson**

02:49:29  1    doctor, we expect to get it.  We expect the pharmacist to

02:49:38  2    fill it.  And I think we can all agree that the core job of

02:49:47  3    the pharmacist -- and we heard it from witnesses such as

02:49:49  4    Nicci Harrington from CVS -- the core job of the pharmacist

02:49:55  5    is to see to it that patients get the medicine that their

02:50:01  6    doctors say they need.  That's why we have pharmacists.

02:50:11  7         That's not to say there is another obligation as well.

02:50:14  8    There is another obligation as well, and we've learned a lot

02:50:17  9    about it.  The other obligation is the corresponding

02:50:19 10    responsibility to look for illegitimate prescriptions.  A

02:50:27 11    pharmacist is not only there to fill the prescriptions, the

02:50:30 12    pharmacist also has a responsibility to be on the lookout

02:50:33 13    for ones that might be illegitimate.  That's corresponding

02:50:35 14    responsibility, no doubt about it.  And that is a critical

02:50:40 15    responsibility.

02:50:49 16         But, again, nearly every prescription's legitimate.

02:50:52 17    Nearly every one is legitimate.  And a prescriptions that a

02:50:55 18    pharmacy/pharmacist may find to be illegitimate per DEA is

02:51:00 19    small, is small.

02:51:07 20         All right.  Now it's my turn to talk about CVS, and

02:51:14 21    you're going to see me tapping my phone, and I think you'll

02:51:19 22    probably all appreciate why.  We're on sharp time limits.

02:51:22 23    It's not that I'm checking texts.

02:51:25 24         I want to turn to CVS, and I want to turn to some

02:51:29 25    charts.  Okay?  And the charts teach us a lot about what the

7231

**Closing Argument - Swanson**

02:51:35  1   CVS pharmacies in Lake and Trumbull County are, and they

02:51:39  2   show -- they show us why these pharmacies are not what

02:51:44  3   plaintiffs say they are.  I'm going to move through these

02:51:46  4   pretty quick.  Okay?

02:51:48  5       The chart we're looking at now depicts, shows the

02:51:57  6   shared -- CVS's share of opioids dispensed in Trumbull

02:52:02  7   County using the ARCOS database.  Okay.  And this is

02:52:07  8   measured by MME.  I'm going to come back to that in one

02:52:10  9   second.  Okay?  But what this shows is CVS's -- the CVS's

02:52:16  10  percent of opioids dispensed in Trumbull County is less than

02:52:20  11  6 percent.  Of course meaning that more than 94 percent of

02:52:25  12  the opioids dispensed in Trumbull County come from other

02:52:28  13  pharmacies.

02:52:29  14      Okay.  Now, Mr. Lanier suggested using MME, which is

02:52:34  15  the measure of strength isn't honest.  He thinks we should

02:52:40  16  be using pills.  I think -- I think doing it by the number

02:52:46  17  of MMEs going to the community, equalizing it for strength,

02:52:51  18  a good way to do it.  He likes doing pills.  To be honest, I

02:52:55  19  don't care, okay?  And if you look at this document, it's

02:52:59  20  WMT-MDL-01541A, it has both.  And you can look at whether we

02:53:06  21  look at pills or dosage units, whether we look at MMEs, the

02:53:10  22  percentages go up, but not that much.  So whatever you think

02:53:13  23  is appropriate, I certainly don't mean to be cagey or

02:53:18  24  dishonest in any way.  It just doesn't matter that much.

02:53:23  25      Now we're moving to Lake County and CVS's share of the

**Closing Argument - Swanson**

02:53:28  1    opioids dispensed there are less than 18 percent.  CVS has

02:53:30  2    greater presence in Lake County.  But still, more than

02:53:32  3    82 percent of the opioids dispensed in Lake County come from

02:53:35  4    other pharmacies.

02:53:36  5        And then if you look at the both of the pharmacies

02:53:39  6    together -- or both of the counties together, and we've put

02:53:42  7    two databases here because we have access to two that enable

02:53:45  8    us to conduct this kind of analysis, the OARRS database and

02:53:48  9    the ARCOS database, it hovers between 10.4 percent and 11.9

02:53:59 10    percent, depending on the database.  Let's just call it

02:54:00 11    11 percent.  89 percent of the opioids dispensed into Lake

02:54:04 12    and Trumbull County are coming from other pharmacies.  And

02:54:06 13    why is this important?  I think Mr. Swanson already told us

02:54:09 14    so.

02:54:09 15        In considering whether CVS is a substantial cause of

02:54:16 16    any community-wide harm, this is one piece.  And let's step

02:54:20 17    back and remember about all the testimony we heard mostly

02:54:26 18    from plaintiffs' own experts, like Caleb Alexander and

02:54:34 19    Kerry Keyes.  There are many, many, many actors who played a

02:54:37 20    role in the opioid crisis.  Manufacturers.  Government

02:54:44 21    agencies.  Doctors.  Drug cartels.  But when you look at all

02:54:51 22    the -- all those external factors that have nothing do with

02:54:56 23    pharmacists, and then you look at the fact that CVS is

02:55:01 24    responsible -- or other pharmacies are responsible for

02:55:04 25    about, what, what did we call it, 89 percent of the opioids

7233

**Closing Argument - Swanson**

02:55:08 1    coming to the counties, it just doesn't add up to

02:55:11 2    substantial cause.

02:55:13 3         And there's one other piece to this, which is

02:55:18 4    Carmen Catizone only challenged 20 percent of the

02:55:25 5    prescriptions filled by CVS.  So this number comes way down.

02:55:30 6    It's not an apples-to-apples fit because we're talking MMEs

02:55:35 7    here and he was talking numbers of prescriptions.  But this

02:55:38 8    number is even far less than that.

02:55:41 9         We also have to consider the trend over time of the

02:55:46 10   opioid prescriptions that CVS filled.

02:55:49 11        We've all heard about the increase, okay, the increase

02:55:53 12   that runs through 2012.  The increase that coincides with

02:55:58 13   DEA increasing the quota, the increase that coincides with

02:56:05 14   doctors writing more and more opioid prescriptions.  We

02:56:08 15   haven't talked so much about the decrease, but CVS's

02:56:14 16   opioid -- the opioid prescriptions decrease sharply starting

02:56:19 17   in 2012.  By 2019, they're lower than where they started.

02:56:28 18        Why is this important?

02:56:30 19        Judge Polster has instructed us that today, that

02:56:35 20   today, what's happening in the communities today is

02:56:37 21   important.  The public nuisance claim is grounded in the

02:56:43 22   today.  And at the same time that CVS prescriptions are

02:56:48 23   going down -- and we've already looked at this -- this is

02:56:53 24   that e-mail chain with Captain Villanueva, the big three,

02:56:57 25   cocaine, heroin, and fentanyl, are going up and are driving.

**Closing Argument - Swanson**

02:57:07 1    And I don't think we have to take time to go through

02:57:09 2    more of these documents, but here's a similar one from the

02:57:12 3    Lake County ADAMHS Board that we looked at.

02:57:25 4    Mr. Lanier talked about heroin use, illegal opioids.

02:57:29 5    And some of his witnesses drew a connection between the use

02:57:33 6    of prescription opioids and the use of heroin.  This is a

02:57:40 7    place where I ask -- where I ask you to apply your common

02:57:45 8    sense and logic as you sift through the evidence.

02:57:49 9    CVS, nor any other pharmacy, is responsible for

02:57:56 10   illegal -- the use of illegal drugs, no matter how tragic

02:58:01 11   that may be.

02:58:02 12   And I'd like to remind you of testimony from

02:58:06 13   Kerry Keyes.  Professor Keyes testified that 3.5 percent of

02:58:17 14   the people who misuse prescription drugs, not who get them

02:58:23 15   from doctors and follow the instructions, people who misuse

02:58:28 16   or abuse prescription drugs, progress to heroin.

02:58:33 17   3.5 percent of people who misuse prescription drugs progress

02:58:39 18   to heroin.  The percentage of people who don't misuse it,

02:58:46 19   who don't abuse it and follow their doctor's instructions is

02:58:51 20   obviously a tiny fraction of that.

02:58:57 21   This case isn't about heroin.

02:59:01 22   All right.  Non-controlled medications.  Let me move

02:59:06 23   through this briefly.

02:59:09 24   We talked about this in opening statements, and I

02:59:14 25   think by now we all know what non-controlled medications

7235

**Closing Argument - Swanson**

02:59:16  1    are, the blood pressure, diabetes, antibiotics and the like.

02:59:23  2    And CVS's -- the CVS pharmacies in these two counties, its

02:59:27  3    volume of non-controlled medications dwarfs the volume of

02:59:35  4    medications it fills for the opioids.  It's 18 times larger.

02:59:38  5         And if you look at the trend, the volume of the

02:59:41  6    non-controlled prescriptions increase over time as well and

02:59:46  7    increases right up to 2018 before it dips.  So those are

02:59:49  8    going up as well.

02:59:55  9         We've talked about per capita computations.  The CVS

02:59:58 10    pharmacies in these two counties dispensed enough

03:00:02 11    non-controlled medicine to provide every man, woman, and

03:00:07 12    child with 132 pills.  It's a much larger volume.

03:00:15 13         Why is this important?  Why are we talking about

03:00:19 14    non-controlled medications in a case about opioid

03:00:21 15    medications?  Because this teaches us about the pharmacies.

03:00:25 16    This shows that these are everyday pharmacies trying to

03:00:32 17    serve the full needs of their patients, trying to fill all

03:00:38 18    the prescriptions no matter what type that their doctors say

03:00:43 19    they need.  And this is relevant to the case.

03:00:49 20         Judge Polster has instructed us that in considering

03:00:54 21    whether the burden on a right is significant or

03:01:01 22    unreasonable, the social value of defendants' conduct is an

03:01:07 23    appropriate consideration.

03:01:11 24         CVS was providing -- these CVS pharmacies were

03:01:16 25    providing social value by seeing to it that the patients in

### Closing Argument - Swanson

03:01:19  1    these communities got all the medication, no matter what

03:01:24  2    type that their doctor said that they needed.

03:01:26  3         Let's move to CVS witnesses.  I wish I had the time to

03:01:32  4    walk through in detail what each said.  I don't.  But

03:01:40  5    Tom Davis, Nicci Harrington, Ken Cook, they are who CVS is.

03:01:51  6    And I ask you to recall their testimony and think about it

03:01:56  7    as you sift through the issues.

03:01:58  8         Two things.  Nicci Harrington -- let me just point out

03:02:02  9    two quick things before I move on.  Nicci Harrington.

03:02:06 10    Ms. Harrington's the one who for 9 years has been devoted to

03:02:10 11    enhancing CVS's programs, working so hard to try to fight a

03:02:14 12    very difficult problem.  And, yes, her PowerPoint says we

03:02:23 13    need to do more.  I was naive to think we couldn't do more.

03:02:29 14    Isn't that exactly who we want in her position?  Isn't that

03:02:34 15    who we want?

03:02:36 16         And yes, Ken Cook freaked out when he came to the

03:02:41 17    pharmacy and there was a -- there was a pill -- there were

03:02:45 18    missing pills, a few hundred pills were missing.  He freaked

03:02:48 19    out.  And what did he do?  He called every law enforcement

03:02:51 20    agency he could think of.  He called the Board of Pharmacy.

03:02:54 21    He called Lake County Narcotics, he called DEA, and they all

03:02:58 22    descended on the pharmacy.  Isn't that exactly who we want

03:03:02 23    as a pharmacist, someone who takes things that seriously?

03:03:06 24         Again, I wish I could spend more time on them.  I

03:03:09 25    can't.  But I ask that do you consider their testimony.

7237

**Closing Argument - Swanson**

03:03:14  1       Now I want to move to the tools CVS used to put in

03:03:20  2   place to try to identify illegitimate prescriptions and to

03:03:26  3   monitor the dispensing of pain medications and the

03:03:32  4   controlled substances at the pharmacies.  And again, we're

03:03:33  5   going to move quick because we heard all about this from

03:03:36  6   Nicci Harrington.

03:03:38  7       Obviously, first are the pharmacists.  Pharmacists are

03:03:44  8   educated in pharmacy, licensed in pharmacy, required by law,

03:03:50  9   and trained to exercise corresponding responsibility.

03:03:58 10       They're guided by CVS supervisors and have been all

03:04:02 11   the way as far as back as Ms. Harrington could remember, and

03:04:06 12   she began in the '90s.  They're guided by CVS training, and

03:04:10 13   we've put in steps -- some of those trainings in evidence,

03:04:12 14   and they're guided by CVS policies, and we saw those

03:04:14 15   policies.  And plaintiffs may not like the wording of the

03:04:16 16   policies, but they made one thing clear, and they always

03:04:20 17   have, don't fill prescriptions if you think they may not be

03:04:24 18   legitimate.

03:04:26 19       Pharmacists are the number one tool.  They're the ones

03:04:29 20   not only with the professional judgment at the pharmacy

03:04:33 21   counter, but the ones who see the patient, talk to the

03:04:38 22   patient, and possess the human information that's necessary

03:04:42 23   to determine whether somebody should get the medicine that

03:04:46 24   their doctor says they need.  They're the number one tool.

03:04:48 25       Then we heard about RX Connect.  This is the computer

**Closing Argument - Swanson**

03:04:54  1    system in the pharmacies that CVS pharmacists have to use to

03:04:57  2    fill prescriptions.  And as we learned, going back more than

03:05:02  3    two decades, RX Connect is populated with patient data.

03:05:10  4         What do we mean by that?  For every patient, when a

03:05:13  5    pharmacist is processing the prescription, they see two

03:05:16  6    years of all the prescriptions that any CVS around the

03:05:19  7    country has filled for that patient.  They see the drug, the

03:05:23  8    amount, the doctor.  They see the patient's address.  They

03:05:26  9    see the patient's method of patient.  What they see is all

03:05:31 10    the data they need to identify red flags.  Cash.  Distance.

03:05:35 11    Cocktails.  Overlapping prescriptions.  It's all there, and

03:05:38 12    it has been there for 20 years.

03:05:44 13         You may remember Ms. Harrington saying this version of

03:05:47 14    RX Connect is the best OARRS system that CVS could possibly

03:05:51 15    build with its own data, and they put it in place 6 years

03:06:00 16    before the State of Ohio put OARRS in place.  And then over

03:06:03 17    the years RX Connect evolved.  There are now alerts we heard

03:06:08 18    about.  Early fills.  High dose alerts.  Cocktail alerts.

03:06:14 19    Forgery alerts.  CVS is -- right now is piloting additional

03:06:21 20    alerts.

03:06:22 21         We asked Ken Cook, do you need any more alerts, and he

03:06:25 22    said no, I have enough alerts, but we're still piloting some

03:06:29 23    more.

03:06:30 24         And we also heard about NarxCare that's now integrated

03:06:34 25    into RX Connect so that CVS Pharmacy right on the screen can

7239

**Closing Argument - Swanson**

03:06:38  1    get the information from OARRS that's filtered through

03:06:42  2    NarxCare.

03:06:42  3         Next tool, prescriber validation.  Let's not lose time

03:06:50  4    here.  Long story short, we've heard about this.  If a

03:06:53  5    prescriber has lost his or her -- a doctor has lost his or

03:06:57  6    her license, it's been suspended, revoked, it's expired, the

03:07:01  7    prescription's blocked.  Pharmacist can't fill it.  Runs off

03:07:04  8    a database that CVS updates on a weekly, if not more common

03:07:10  9    basis.  Just doesn't let the pharmacist fill the

03:07:11  10   prescription.

03:07:12  11        Prescriber suspension.

03:07:15  12        This is the program Nicci Harrington's group operates.

03:07:20  13   Beginning in 2012, in the wake of the *Holiday* case, CVS

03:07:25  14   built a cutting edge, first-of-its-kind program to review

03:07:31  15   doctors running algorithms through all of CVS's data four

03:07:36  16   times a year through all the doctors to see if there's any

03:07:39  17   prescribing patterns that may be a cause for concern, and

03:07:44  18   then the team investigates them.  Maybe it interviews the

03:07:48  19   doctor, and it determines whether that doctor should be

03:07:51  20   suspending.  And 850 doctors by now have been suspended

03:07:59  21   under this program.  And once they're suspended, it's just

03:08:03  22   like prescriber validation, pharmacist goes to fill the

03:08:06  23   prescription, blocked.  They can't fill it.  These two

03:08:06  24   programs working in tandem are just shedding off

03:08:09  25   prescriptions that don't even reach the pharmacist.  The

**Closing Argument - Swanson**

03:08:10  1   pharmacist can't fill it.  The most problematic ones.

03:08:13  2       Okay.  And remember, this is not a program without

03:08:16  3   controversy.  We talked about the *Hansen* case, and that's,

03:08:22  4   for those of you taking notes, CVS 04954.  This was the very

03:08:28  5   recent court case.  CVS had suspended an Ohio licensed pain

03:08:33  6   doctor practicing in Kentucky because his volume spiked and

03:08:37  7   CVS was uncomfortable with it.  The doctor sued CVS, and the

03:08:43  8   court said -- not this court, another court in Kentucky --

03:08:46  9   said, no, CVS, you went too far, you can't suspended this

03:08:49  10  doctor, you have to fill these prescriptions.  This is a

03:08:52  11  cutting edge program.  It's not without controversy.  But

03:08:56  12  it's another effort by CVS to assist its pharmacists in

03:09:00  13  trying to catch illegitimate prescriptions.

03:09:02  14      Store monitoring program.  Another program running off

03:09:05  15  algorithm.  Runs four times a year across the stores, all

03:09:13  16  CVS stores.  Is there anything aberrational?  And if there

03:09:16  17  is, if there's something that might be of concern that pops

03:09:19  18  in the algorithm, teams going to the store, interview the

03:09:22  19  pharmacists, look at the records, figure out if there is a

03:09:25  20  problem, or if there's an explanation, and if there's a

03:09:27  21  problem, they fix it.

03:09:28  22      Loss prevention monitoring.  A whole separate

03:09:33  23  algorithm run by a whole separate team, not under

03:09:36  24  Nicci Harrington, okay, that also runs an algorithm over

03:09:43  25  CVS's dispensing data, and if a concern pops, there's 200

**Closing Argument - Swanson**

03:09:45  1   loss prevention investigators throughout the country, they

03:09:49  2   descend on the store to see if there's an issue.

03:09:52  3       Maximum allowable quantities, NAQ.  Those are the

03:09:56  4   limits CVS computes, again, with algorithms.  There's a lot

03:10:00  5   of technology here, folks.  Setting limits on how much

03:10:05  6   oxycodone, how much hydrocodone CVS pharmacies can order,

03:10:11  7   keep in inventory, and dispense each month.  And the

03:10:14  8   pharmacy bumps up against that limit, no more.  The limit

03:10:20  9   triggers.  They can't go beyond it.

03:10:21  10      So what do we see here?

03:10:25  11      We see more than one layer of protection.  We see more

03:10:31  12  than one screen.  We see more than one filter.  We see many

03:10:37  13  layers of protection.  We see many layers of protection each

03:10:45  14  attacking the problem in different ways, often with

03:10:48  15  different people.

03:10:50  16      Are any one of these programs tools, perfect?  No, of

03:10:56  17  course not.  It's not the standard.  And we've been very

03:10:58  18  candid about that.  Together, are they perfect?  I would

03:11:02  19  never say that.  There's -- perfect's impossible.

03:11:11  20  Extensive?  Absolutely.  Absolutely.

03:11:18  21      Does a company like this -- did a company like this

03:11:22  22  act so egregiously so as to -- so as to harm entire

03:11:29  23  communities, so as to harm the public health of the

03:11:33  24  community at large?  No.  Absolutely not.

03:11:40  25      Too little too late?  No.

### Closing Argument - Swanson

03:11:47  1    The bedrock of this system is the pharmacists and the

03:11:53  2    data component of RX Connect.  Been in place for more than

03:11:58  3    two decades.

03:12:00  4    Prescriber validation, prescriber suspension, store

03:12:04  5    monitoring, in place for 9 years.  9 years, two decades.

03:12:11  6    As Judge Polster has instructed us, the case is

03:12:14  7    grounded in today.  It's not too little too late.

03:12:26  8    All right.  I'm going to turn away from CVS and turn

03:12:28  9    to plaintiffs' case.  Plaintiffs' proof.  And I want to

03:12:36  10    start with what it's not.

03:12:39  11    And, ladies and gentlemen, if you take two things

03:12:45  12    away, two things away from my argument this afternoon, this

03:12:51  13    is one of them.  I'll come back to the second one.  This is

03:12:54  14    one of them.

03:12:57  15    What's -- let's start with what plaintiffs' proof is

03:13:06  16    not.  If CVS harmed the community, you would expect

03:13:14  17    residents to be coming to court, to testify about what they

03:13:18  18    saw CVS do, who they saw CVS give opioids to, and the harm

03:13:28  19    that ensued.  It's a court case.  That's what you'd expect

03:13:34  20    to see.  There's none of that evidence here.  None.

03:13:41  21    Absolutely none.

03:13:43  22    The closest we got was Captain Villaneuva.  And

03:13:52  23    captain talked about, what's his name, Doug Winland.  And we

03:13:58  24    saw a document that CVS -- that he had obtained

03:14:01  25    prescriptions from CVS, and then we learned that he was

### Closing Argument - Swanson

03:14:06  1    prosecuted and convicted for engaging in deception in the

03:14:12  2    course of getting prescriptions filled.  He was prosecuted

03:14:15  3    for deceiving CVS and the other pharmacists where he got his

03:14:21  4    prescriptions filled.  That's the closest we get to

03:14:24  5    eyewitness on the ground evidence here.

03:14:28  6         What plaintiffs -- what plaintiffs offer instead is

03:14:34  7    just that, it's something instead of proof of what actually

03:14:42  8    happened on the ground from the mouths of residents of the

03:14:47  9    communities that you might expect to see in a case.

03:14:54 10         Case in point, Carmen Catizone.  Carmen Catizone.

03:15:08 11    Plaintiffs' whole case boils down to computer code, computer

03:15:13 12    analysis run by Carmen Catizone.  And the computer analysis

03:15:23 13    just doesn't work.  It doesn't work.

03:15:27 14         And let's start with what Mr. Catizone himself

03:15:30 15    recognized.  I'm going to skip through stuff.  I told you I

03:15:40 16    was -- there we go.

03:15:40 17         You agree that just because a prescription flags under

03:15:44 18    one of your 16 red flags, that does not mean it was written

03:15:50 19    for an illegitimate medical purpose; correct?

03:15:54 20         Correct.

03:15:56 21         That's Mr. Catizone's testimony.  Mr. Catizone

03:16:00 22    acknowledges his analysis does not identify illegitimate

03:16:08 23    prescriptions.  It identifies prescriptions that may contain

03:16:16 24    red flags, but it does not identify illegitimate

03:16:21 25    prescriptions that can't be filled.  And that's just the

### Closing Argument - Swanson

03:16:25  1    beginning of the problem.

03:16:27  2        If we learned anything in this trial, it is that we

03:16:32  3    can't accurately identify a red flag.  We can't accurately

03:16:39  4    determine if a red flag exists on a prescription without the

03:16:46  5    information about a patient that is known to the pharmacist.

03:16:53  6    Is the patient a regular?  Is she a regular to the pharmacy?

03:16:59  7    Is she employed?  If so, what does she do?  What's her

03:17:03  8    injury?  What condition is she suffering from?  Why is she

03:17:08  9    traveling a distance to Cleveland to see a doctor?  This is

03:17:14 10    all information that a pharmacist would know, but it's not

03:17:21 11    information that can be captured by computer analysis.  And

03:17:26 12    it's information that's needed to determine if there's a

03:17:29 13    real red flag on a prescription or not.  If we don't have

03:17:33 14    that information, we can't accurately measure if there's a

03:17:39 15    red flag.

03:17:39 16        And this is what we get.  We get a situation, which is

03:17:43 17    what we have here -- and these are the prescriptions

03:17:49 18    flagged, the prescriptions filled by CVS flagged by

03:17:52 19    Mr. Catizone's analysis.  His analysis flags prescriptions

03:17:58 20    written by 37 percent of prescribers, of the prescribers of

03:18:06 21    opioids at a time when DEA and Joe Rannazzisi is saying be

03:18:13 22    on the lookout for about 1 percent of doctors who may -- who

03:18:19 23    may not be writing prescriptions legitimately.  It doesn't

03:18:23 24    add up.  His analysis just sweeps too far.

03:18:26 25        What else do we see?

03:18:27  1        We see what Dr. Choi told us.  Dr. Choi explained that

03:18:34  2   70 percent of the CVS prescriptions flagged by Mr. Catizone

03:18:43  3   were of -- were below the lowest strength benchmark sent by

03:18:49  4   the -- set by the CDC.  Okay.  CDC has several benchmarks.

03:18:56  5   It has benchmarks that are higher than this lowest one that

03:19:02  6   are appropriate and permissible, but 70 percent of the CVS

03:19:05  7   prescriptions flagged by Mr. Catizone were below the lowest

03:19:09  8   strength benchmark.

03:19:14  9        70 percent flagged prescriptions are low strength.  It

03:19:25 10   just doesn't make sense.  The analysis just doesn't work to

03:19:30 11   identify actual red flags, and that's not the only flaw.

03:19:33 12        Documentation.  Documentation.  Documentation.

03:19:39 13        Mr. Catizone got that wrong too.  He just assumes that

03:19:45 14   if a pharmacist didn't write down a note about what she did

03:19:49 15   or he did to resolve a red flag, the pharmacist didn't

03:19:54 16   actually resolve the red flag, and that's not true.  It's

03:19:57 17   not accurate.  And we know this from Trey Edwards.  And this

03:20:01 18   is the same testimony that Mr. Swanson showed you.

03:20:04 19        A pharmacist could do the hard work and the careful

03:20:07 20   work to resolve a red flag but not write it -- write down

03:20:10 21   what he or she did; correct?

03:20:13 22        Correct.

03:20:14 23        That doesn't mean he or she didn't do it; correct?

03:20:18 24        Yes, correct.

03:20:19 25        It continuous.  This happens a lot with the old-timer

**Closing Argument - Swanson**

03:20:25  1    pharmacists; right?

03:20:26  2          It happens with all of them.

03:20:33  3          All pharmacists can resolve a red flag and not

03:20:35  4    necessarily write it down.

03:20:38  5          At the bottom, those who aren't good at documenting,

03:20:43  6    it doesn't necessarily mean they aren't good at resolving

03:20:47  7    the red flag?

03:20:49  8          Correct.

03:20:50  9          Mr. Catizone's assumption that if you didn't write it

03:20:54 10    down, you didn't resolve the red flag is just wrong.

03:20:57 11          And if we go to the CVS -- his CVS numbers, his

03:21:04 12    analysis of CVS notes, we learn even more.  This was the --

03:21:12 13    what Mr. Lanier used in court to summarize Mr. Catizone's

03:21:15 14    findings about CVS's notes, and you can see they're all

03:21:18 15    phrased in terms of the number of prescriptions that don't

03:21:21 16    contain notes.

03:21:23 17          But if you flip it, 1,314 do contain notes, nearly

03:21:29 18    66 percent of the CVS sample contain notes.  That's a large

03:21:38 19    percentage given that Mr. Catizone flags prescriptions that

03:21:41 20    don't even contain red flags in the first place.  It's a

03:21:44 21    large percentage when you indicate that he's only looking at

03:21:47 22    what he deems to be the relevant common fields -- comment

03:21:51 23    fields, and he's cutting off a swatch that he chooses not to

03:21:58 24    look at.

03:21:59 25          You may recall my cross-examination, my questioning of

**Closing Argument - Swanson**

03:22:02   1    Mr. Catizone.  We -- I picked two of those notes that

03:22:07   2    Mr. Lanier put up on the screen that were written by CVS

03:22:11   3    pharmacists and that Mr. Catizone labeled as the most

03:22:15   4    alarming.  And I went through with him the content of the

03:22:20   5    notes.  I reminded him of abbreviations, like ACME, which he

03:22:26   6    had forgotten.  I reminded him of what they meant.  We went

03:22:30   7    over how the notes reflect OARRS lookups.  We went over

03:22:39   8    information on the prescriptions.  And in both instances --

03:22:41   9    and I only had time for two -- he agreed that the notes

03:22:45  10    reflected good pharmacy work and the notes that's reflected

03:22:49  11    good documentation, and those were the only two notes we

03:22:53  12    could go through with him.

03:22:53  13        And let's end here with this.  This was one of the

03:22:56  14    prescriptions that we were talking about with him.  This was

03:23:00  15    one of the most alarming instances he went into the

03:23:04  16    examination, he was saying, because he didn't like the

03:23:07  17    caliber of the computer notes.  And what we learned was when

03:23:10  18    we actually looked at the prescription, we learned it was

03:23:12  19    written by an emergency room.  We learned that it was for

03:23:17  20    only 20 tablets or a 5-day supply.  And then what else did

03:23:22  21    we learn when we looked at the backside?  Is that the

03:23:26  22    pharmacist checked OARRS before electing to fill the

03:23:30  23    prescription from the emergency room for only 20 pills for

03:23:35  24    only a 5-day supply.

03:23:39  25        This isn't a red flag prescription, and the fact that

### Closing Argument - Swanson

03:23:42  1    this prescription was cut up in Mr. Catizone's analysis and

03:23:50  2    identified as one of the worst examples shows just how

03:23:55  3    broken his analysis is.  It shows just how broken his

03:24:02  4    analysis is.

03:24:07  5          Doctors.  Dr. Demangone.  Dr. Veres.  We've heard

03:24:17  6    those names.  And I have to speed up now unfortunately.

03:24:26  7          As you consider these doctors, as you consider what

03:24:30  8    Mr. Lanier argues about the doctors, as you consider what

03:24:35  9    documents say about the doctors and what people testified

03:24:38 10    about the doctor -- the doctors, ask these questions:

03:24:44 11          Were these doctors licensed by the State of Ohio?

03:24:56 12          Were they licensed or registered by the US DEA?

03:25:01 13          Had they ever been disciplined by either agency?

03:25:09 14          Did they hold positions in the community?

03:25:14 15          For instance, you may see in the documents that

03:25:17 16    Dr. Veres was the medical director of three nursing homes.

03:25:23 17          Were they board-certified?

03:25:29 18          Was CVS scrutinizing them and preparing documents

03:25:36 19    laying out what they were finding?

03:25:38 20          Was CVS struggling with the question about what to do,

03:25:41 21    whether to suspended?

03:25:44 22          And I would submit to you that if they were, that's a

03:25:47 23    good thing.

03:25:47 24          Did CVS ultimately stop filling their prescriptions?

03:25:57 25    And for both these doctors the answer is yes.  Maybe not as

**Closing Argument - Swanson**

03:26:03  1    fast as plaintiffs would like, but they stopped.

03:26:05  2         And I would just like to remind you of what Ken Cook

03:26:12  3    showed us.  This is the sign posted in Dr. Demangone's

03:26:15  4    office (indicating).  Do not fills prescriptions at CVS

03:26:18  5    because CVS isn't filling.

03:26:20  6         Most importantly, when we talk about these doctors,

03:26:28  7    did plaintiffs identify a single illegitimate prescription

03:26:37  8    written by any of the doctors that CVS filled wrongfully?

03:26:44  9    Did they identify a single one?

03:26:47 10         You can't decide this case in the abstract.  Did they

03:26:52 11    identify with all the data a single, illegitimate

03:26:57 12    prescription written by either of these two doctors that CVS

03:27:00 13    wrongfully filled?  I'll give you a preview.  The answer is

03:27:03 14    no.

03:27:04 15         Finally, the *Holiday* case.  The *Holiday* case.  We've

03:27:19 16    heard so much throughout this trial against the *Holiday*

03:27:23 17    case -- about the *Holiday* case against two CVS pharmacies

03:27:28 18    down in Florida.  We've also heard about other settlements

03:27:34 19    in other states that CVS reached with DEA.  They were all

03:27:45 20    serious matters.  No doubt about it.  And we've heard

03:27:52 21    testimony from Tom Davis and from Nicci Harrington about

03:27:55 22    just how seriously CVS took them.  But there's a truth.

03:28:06 23    There's a truth here that needs to be recognized.

03:28:12 24         The *Holiday* case involved a microscopic percentage of

03:28:19 25    CVS pharmacies.  The settlements involved a tiny percentage

**Closing Argument - Swanson**

03:28:25    1    of CVS pharmacies in only four other states.

03:28:31    2         Remember, Nicci Harrington told us there were 700 CVS

03:28:35    3    pharmacies in Florida alone at the time of the *Holiday* case.

03:28:39    4    The *Holiday* case was against only two of 700 in Florida.  It

03:28:45    5    did not involve 698 other CVS pharmacies in Florida.  When

03:28:51    6    you look nationwide at all 10,000 CVS pharmacies, the

03:28:54    7    *Holiday* case concerned less than one-tenth of one percent of

03:29:02    8    all CVS pharmacies.  And even more to the point, the *Holiday*

03:29:07    9    case and the settlements did not involve any CVS Pharmacy in

03:29:18   10    Lake or Trumbull County.  They did not involve any CVS

03:29:24   11    Pharmacy in the State of Ohio, and there's about 380 of

03:29:28   12    them.  It did not involve any CVS Pharmacy in the entire

03:29:34   13    midwest.

03:29:38   14         The *Holiday* case, the settlements have nothing to do

03:29:43   15    with whether the pharmacies, the CVS pharmacies in Lake and

03:29:50   16    Trumbull County, filled illegitimate prescriptions.  It just

03:29:52   17    has nothing do with it.

03:29:53   18         Now, plaintiffs say -- say the settlements show

03:30:00   19    national issues, national shortcomings.  They show notice of

03:30:05   20    that, even though they concern work of only a small number

03:30:09   21    of pharmacists in a small number of pharmacies in other

03:30:12   22    places.  But DEA didn't think they were illustrative of

03:30:17   23    national problems.  Otherwise, DEA would have taken national

03:30:21   24    action, here and elsewhere.  It didn't.

03:30:26   25         What the *Holiday* case does make clear is that when DEA

03:30:33 1    sees issues, it takes action, and the fact that DEA took no

03:30:39 2    action here in these counties tells us everything we need to

03:30:43 3    know.

03:30:53 4        This brings us to where we began.  If CVS pharmacists

03:31:00 5    engaged in the egregious community harm and conduct that

03:31:09 6    plaintiffs say, law enforcement would have taken action.

03:31:17 7    And the fact that law enforcement didn't, supplies the

03:31:22 8    answer to the question before us.

03:31:24 9        Plaintiffs say, well, Board of Pharmacy only inspected

03:31:28 10   the pharmacies, only conducted routine inspections once

03:31:32 11   every 2 or 3 years, but that's not the whole story, and we

03:31:37 12   know it.

03:31:38 13       As Trey Edwards told us, both the Lake County

03:31:43 14   Narcotics and the Ohio Board of Pharmacy were in the

03:31:47 15   pharmacies constantly.  They were receiving leads,

03:31:50 16   collecting leads, pursuing leads, getting to know the

03:31:55 17   pharmacy, the pharmacists on a first-name basis.

03:31:59 18       And as we also learned about the Board of Pharmacy,

03:32:02 19   and as we also learned about DEA, each agency had extensive

03:32:09 20   data.  They ran analytics on the data to identify possible

03:32:14 21   wrongdoing.  If CVS pharmacists in Lake and Trumbull

03:32:20 22   County -- counties were acting so egregiously so as to harm

03:32:24 23   the public health of entire communities, over the course of

03:32:28 24   decades, local law enforcement would have taken action,

03:32:34 25   Board of Pharmacy would have taken action, DEA would have

### Closing Argument - Swanson

03:32:39  1    taken action, and no amount of paid expert testimony and no

03:32:45  2    amount of computer -- computer models can overcome the fact

03:32:50  3    that law enforcement didn't.

03:32:56  4        Now's the hardest point for the lawyer.  And

03:33:03  5    Mr. Lanier referred to this.  We hand the case to you.

03:33:08  6    There's no more advocating.  It's now in your hands.

03:33:13  7        It's even harder for me than him because he gets to go

03:33:18  8    up last, and we don't get the opportunity to respond to what

03:33:23  9    he says.  So if you see me jumping around, you'll know he

03:33:27 10    said something that I take issue with.

03:33:34 11        But the most important check here isn't any of us.

03:33:41 12    Frankly, we're unimportant now.  The important check is you

03:33:50 13    as you assess plaintiffs' argument, plaintiffs' arguments,

03:33:54 14    as you assess the expert testimony, all the documents, as

03:33:58 15    you assess what Mr. Lanier says when gets up last.

03:34:04 16        We ask you to challenge what plaintiffs say just as

03:34:09 17    you should challenge what we say.  We ask you to think about

03:34:15 18    how we might respond.  And we ask you to consider the

03:34:23 19    framework that I've tried to layout today from FDA's

03:34:30 20    approval of the medicine, to DEA's approval of the volume,

03:34:38 21    to the licensed doctors who wrote the prescriptions, the

03:34:43 22    vast, vast majority of whom were doing so legitimately, to

03:34:49 23    the layers of tools CVS uses to try and catch illegitimate

03:34:55 24    prescriptions, to the fact that law enforcement never found

03:35:07 25    grounds for any action against any CVS Pharmacy or

**Closing Argument - Swanson**

03:35:12  1    pharmacist in Lake and Trumbull County.

03:35:17  2         Our final request to you is that you filter the

03:35:22  3    evidence, you filter the arguments through this framework

03:35:28  4    and through your recollection of the entirety of the

03:35:33  5    testimony and the entirety of the evidence.

03:35:38  6         Did CVS and its pharmacists in Lake and Trumbull

03:35:46  7    Counties act so egregiously so as to harm the public health

03:35:52  8    of entire communities?  Absolutely not.

03:35:59  9         Thank you.

03:36:09  10             THE COURT:  All right.  Thank you,

03:36:11  11   Mr. Delinsky.

03:36:12  12        All right.  Ladies and gentlemen, we'll take our

03:36:15  13   mid-afternoon break.  15 minutes.  And then we will have

03:36:18  14   Walmart's closing.

03:36:52  15             (Jury excused from courtroom at 3:36 p.m.)

03:36:52  16             MR. LANIER:  Your Honor, I have three matters

03:36:53  17   I need to put on the record.

03:36:54  18             THE COURT:  Wait a minute.

03:36:54  19        Do we have the plaintiffs' exhibits or is it still --

03:36:59  20   all right.  This is a huge problem.  All right.  That's all

03:37:03  21   I can say.  It's a huge problem.

03:37:07  22             MR. LANIER:  Thank you, Your Honor.

03:37:08  23        While on the subject of huge problems, I've three

03:37:12  24   things I need to say in response to the --

03:37:14  25             THE COURT:  Okay.  Sit down for a minute.

03:37:15  1                MR. LANIER:  Thank you.

03:37:15  2          -- in response to the closing argument that was just

03:37:19  3      done.

03:37:20  4          I'll start light and then get the heavier.

03:37:26  5          Light.  I was chided in this trial for saying that I

03:37:30  6      was running out of time at various places.  Mr. Delinsky

03:37:35  7      stood up in closing argument and said he only looked at two

03:37:38  8      of the prescriptions of Mr. Catizone because that's all he

03:37:41  9      had time for, when the defendants had more time than they

03:37:45 10      used in this trial.  And that's just flat wrong.  I'd like

03:37:49 11      to make that note on the record.

03:37:51 12          Second point.  Five times he said that I had to prove

03:37:57 13      that the defendants acted egregiously, so egregiously,

03:38:01 14      egregiously, egregiously, egregiously.  That's not the law.

03:38:06 15      It's not even remotely the law.

03:38:08 16                THE COURT:  Well, to be fair, you got to prove

03:38:12 17      intentionally or illegally.  Illegally may be worse than

03:38:15 18      egregiously.  So let's just move on.  All right?

03:38:17 19                MR. LANIER:  And then the third -- with all

03:38:19 20      due respect, yes, I'll move on, but it's still a wrong

03:38:25 21      statement of the law.

03:38:25 22                THE COURT:  Well, it --

03:38:27 23                MR. LANIER:  And it's one that, frankly, I'll

03:38:29 24      deal with, but it's there, and I want it on the record.

03:38:32 25                THE COURT:  As I said, egregiously may be a

03:38:35 1    lower standard than --

03:38:36 2              MR. LANIER:  Intentionally?

03:38:37 3              THE COURT:  -- than illegally.

03:38:38 4              MR. LANIER:  Okay.  But not than

03:38:40 5    intentionally, which is one of my burdens.  That's okay.  I

03:38:42 6    understand, Judge.

03:38:42 7         The third is the most important because it's a, in my

03:38:45 8    opinion, could easily be a game changer in this case.  I

03:38:51 9    think the Court was sandbagged.  I know that we were

03:38:53 10   sandbagged.

03:38:54 11        When I had Villanueva on the stand to testify about

03:38:57 12   specific prescriptions, he was not allowed to.  It was

03:38:59 13   objected to.  And on October 19th, on Page 10 of 285 -- or

03:39:07 14   no, actually, it's Page 2710 of the manuscript, I was trying

03:39:11 15   to get into that.  You specifically would not allow me to.

03:39:15 16   You said I'm not admitting any of these -- quote, I'm not

03:39:17 17   admitting any of these documents.  We're not focusing on any

03:39:21 18   prescriptions.

03:39:22 19        And so with that understanding, I didn't get into

03:39:25 20   them, and I wasn't allowed to put them on, and now I have

03:39:28 21   Mr. Delinsky up here saying I've never focused on a

03:39:31 22   prescription, I've never shown the prescriptions, I've never

03:39:34 23   shown the prescriptions filled by anybody on a bad

03:39:38 24   situation, I haven't shown, I haven't shown, I haven't

03:39:40 25   shown, I haven't shown an investigation, which Villanueva

03:39:43   1    was not allowed to go into in any depth either because of

03:39:47   2    the objection of the defendants.  And so I'm absolutely

03:39:51   3    hamstrung.

03:39:52   4        I believe the Court's been sandbagged.  We've

03:39:55   5    certainly be sandbagged.  And for that kind of an argument

03:39:58   6    to be made when I was specifically precluded from going into

03:40:02   7    that evidence is -- is -- I don't know how you even cure it,

03:40:06   8    but if there's a way to cure it, I'd like it cured.

03:40:09   9              MR. DELINSKY:  Your Honor, I'd just note that

03:40:10  10    it did come into evidence.  There was -- the back page of

03:40:13  11    the OARRS report came in that showed who -- what pharmacies

03:40:18  12    filled prescriptions for Mr. Winland.

03:40:20  13              MR. LANIER:  But it didn't show the

03:40:21  14    prescriptions.  The prescriptions were the three pages of

03:40:23  15    the OARRS sheet that didn't allow in that showed how many

03:40:26  16    times, what the prescriptions were, what the drugs were,

03:40:29  17    when they were being filled, the trinity cocktails, and all

03:40:32  18    the rest of that mess.

03:40:36  19              MR. WEINBERGER:  That was the Winland

03:40:37  20    investigation that Mr. Delinsky just got up and talked

03:40:40  21    about, which came into evidence.  No, you prevented us from

03:40:46  22    showing what --

03:40:46  23              THE COURT:  Mr. Delinsky, you created a

03:40:47  24    problem.  How do you want to fix it, or do you want me to

03:40:50  25    fix it?

03:40:50   1                      MR. WEINBERGER:  Well, I mean, it's still

03:40:51   2    obvious --

03:40:52   3                      THE COURT:  I'll let him get up and fix it, or

03:40:54   4    I'll fix it for him.

03:40:55   5                      MR. DELINSKY:  Judge, I don't think I

03:40:57   6    understand what the problem is, so maybe you can define it.

03:41:00   7                      THE COURT:  I think you just heard the last

03:41:01   8    discussion.  You want to fix it, or I'll have to fix it for

03:41:04   9    you, sir?  So you got 15 minutes.  Okay?  We're going to

03:41:07  10    take a break.

03:41:08  11                      MR. DELINSKY:  But, Judge, I don't --

03:41:09  12                      THE COURT:  You fix it; I'll fix it for you if

03:41:11  13    you don't.  All right?

03:41:12  14                      MR. LANIER:  Thank you, Judge.

03:41:12  15                      THE COURT:  If I don't get a good suggestion

03:41:14  16    from you as to how you're going to fix it, I'll come out and

03:41:18  17    fix it.

03:41:19  18                      MR. LANIER:  Thank you, Judge.

03:41:19  19                      THE COURT:  We're in recess.

03:41:21  20         (Recess was taken from 3:41 p.m. till 3:57 p.m.)

03:57:27  21                      COURTROOM DEPUTY:  All rise.

03:57:28  22                      THE COURT:  All right.  Everyone can be seated

03:57:29  23    for a minute.

03:57:29  24         All right.  Mr. Delinsky, do you have a suggestion?

03:57:33  25                      MR. DELINSKY:  Your Honor, I would like to

03:57:34 1    pass up two documents.

03:57:37 2              THE COURT:  Just want to know, do you have a

03:57:39 3    suggestion as to what I should say; yes or no?

03:57:41 4              MR. DELINSKY:  Judge, I don't know

03:57:42 5    understand --

03:57:42 6              THE COURT:  All right.  Here's what I'm going

03:57:44 7    to say.  I gave you your chance.  This is what I propose to

03:57:47 8    instruct the jury:

03:57:48 9         The Court and the parties all agreed before this trial

03:57:51 10   that the plaintiffs' case would not be based on evidence of

03:57:55 11   individual prescriptions and that plaintiffs would not

03:57:59 12   introduce evidence of any individual prescription they

03:58:02 13   claimed was illegitimate.  The jury is therefore to

03:58:06 14   disregard what Mr. Delinsky said about the absence of

03:58:10 15   evidence of any illegitimate prescription.

03:58:13 16             MR. DELINSKY:  Judge, that's just false.

03:58:14 17   We --

03:58:15 18             THE COURT:  Fine.

03:58:15 19             MR. DELINSKY:  We didn't agree to that.  We

03:58:17 20   sent our interrogatories for them asking that, and, judge,

03:58:20 21   we had argument with you after argument with you on our

03:58:24 22   telephonic status conferences where we said that's how we're

03:58:26 23   going to pursue our defense, and you said the defense can

03:58:29 24   try it any way they wanted to.  That's how plaintiffs

03:58:32 25   elected to prove this through aggregate proof.  We never

03:58:35 1    agreed to that whatever.  We put an interrogatory to them,

03:58:37 2    Interrogatory Number 25, asking them to identify the

03:58:40 3    illegitimate prescriptions.  They chose not to identify

03:58:42 4    them.  That's just an incorrect statement.  If that's go in,

03:58:45 5    I ask for a mistrial.  It's just not right.  We didn't agree

03:58:49 6    to that, and I don't think any of the other defendants

03:58:51 7    agreed to that.

03:58:53 8                    MR. MAJORAS:  No.

03:58:53 9                    MR. STOFFELMAYR:  No, it's always been our

03:58:54 10   position that they were required to do that and it was a

03:58:57 11   fatal defect in their case that they elected not to.

03:59:02 12                   MR. MAJORAS:  Walmart agrees.  Walmart agrees.

03:59:02 13                   MR. LANIER:  The problem we've got with this,

03:59:05 14   Your Honor, is --

03:59:05 15                   THE COURT:  I don't know what to say then.

03:59:07 16                   MR. LANIER:  Yeah.  No, no, no.  Here's the

03:59:08 17   reason we've got a problem, though.  The reason we've got a

03:59:11 18   problem is because when I offered the evidence to counter

03:59:14 19   what the defendants were trying to defend the case, they put

03:59:17 20   up a roadblock, and they said -- that's why I say they

03:59:22 21   sandbagged the Court.  They sandbagged you, they sandbagged

03:59:25 22   up.  But they put up a roadblock and told you that you

03:59:28 23   shouldn't allow us to show any individual prescription data

03:59:30 24   when, if that's the defense they were going to raise, I

03:59:33 25   certainly was entitled to attack their defense, and I'd have

7260

```
03:59:36  1    been entitled to put it in in that way.  That's a classic
03:59:39  2    sandbag.
03:59:40  3         And then for Mr. Delinsky to stand up here and to make
03:59:42  4    that kind of an argument is just to rub salt into the wound
03:59:49  5    of the sandbag.  I mean, I -- I'm beside myself trying to
03:59:53  6    figure out why on earth that argument would be made.
03:59:55  7              MR. DELINSKY:  And, Your Honor, I'm passing up
03:59:57  8    to you two things.  The first is the slide that Mr. Lanier
04:00:01  9    used this morning.
04:00:03 10              THE COURT:  All right.
04:00:04 11              MR. DELINSKY:  Which opened the door to this
04:00:06 12    very issue.  He talked about Mr. Winland and the
04:00:10 13    prescriptions filled by the pharmacies.
04:00:12 14         Then the next thing I'm handing up to you, Your Honor,
04:00:16 15    is a highlighted transcript of the page of the testimony
04:00:19 16    from Captain Villanueva whereby Captain Villanueva makes
04:00:23 17    crystal clear that he wasn't looking at the pharmacies.  He
04:00:27 18    has no opinion on whether the pharmacies did anything wrong.
04:00:31 19         We weren't precluding investigation of any
04:00:36 20    investigation of that for prescriptions that shouldn't have
04:00:38 21    been filled by the pharmacies.  He testified he had never
04:00:40 22    mentioned that.
04:00:41 23              MR. LANIER:  That's flat wrong, Your Honor.
04:00:42 24    He's got that testimony that he's offering you right now.
04:00:44 25         The point that I was trying to get into through Dr. --
```

04:00:47   1    or through Tony Villaneuva was the OARRS sheet that showed

04:00:50   2    the prescriptions.  I had other experts who would have

04:00:52   3    testified about the propriety of those prescriptions and

04:00:55   4    whether or not they were a problem, and that's what I was

04:00:57   5    never allowed to do.  I wasn't allowed to get in those

04:01:00   6    individual prescriptions that showed these stores filling

04:01:04   7    prescriptions that are blatantly wrong with blatant red

04:01:07   8    flags under the law.

04:01:08   9              MR. DELINSKY:  And, Your Honor, every single

04:01:10  10    one of those prescriptions was in our data.  It was produced

04:01:12  11    and available to them, every single one of them.

04:01:17  12              MR. WEINBERGER:  Your Honor --

04:01:18  13              MR. DELINSKY:  And hundreds of thousands more.

04:01:21  14              MR. WEINBERGER:  Your Honor, we didn't use the

04:01:22  15    slide that you just offered to the Court.

04:01:25  16              THE COURT:  What?

04:01:26  17              MR. WEINBERGER:  We did not use that slide.

04:01:28  18              MR. DELINSKY:  Yes, you did.

04:01:29  19              MR. WEINBERGER:  It was disclosed, but it was

04:01:30  20    never --

04:01:32  21              MR. DELINSKY:  Mr. Lanier referred to it --

04:01:32  22              MR. WEINBERGER:  It was never used -- it was

04:01:32  23    never used in his open and close.

04:01:36  24              MS. FUMERTON:  Absolutely.  We discussed this

04:01:37  25    prior to -- Pete, prior to it going up, and he absolutely

04:01:40  1    discussed it in his opening.

04:01:41  2                MR. WEINBERGER:  You may have discussed it.

04:01:42  3    I'm saying in his presentation he never used the slide.

04:01:46  4                MS. FUMERTON:  Absolutely.

04:01:47  5                THE COURT:  I don't remember seeing the slide.

04:01:48  6                MR. LANIER:  I did not use the slide.

04:01:49  7                MR. DELINSKY:  It was discussed, Your Honor.

04:01:50  8                MR. WEINBERGER:  It doesn't make any

04:01:51  9    difference.  It wasn't used.

04:01:54  10               THE COURT:  It was discussed --

04:01:56  11               MR. DELINSKY:  He discussed Winland in -- he

04:01:57  12   discussed Captain Villanueva's testimony on this.

04:01:59  13               THE COURT:  Well, he said something about

04:02:00  14   Captain Villanueva.

04:02:01  15               MR. WEINBERGER:  He never discussed that in

04:02:03  16   discussing Villanueva.

04:02:03  17               MR. DELINSKY:  He mentioned the fact that

04:02:05  18   Walmart only filled lorazepam or Diazepam or one of the

04:02:10  19   muscle relaxants.  Absolutely.

04:02:11  20               MR. WEINBERGER:  Not with respect to the

04:02:13  21   Winland investigation.

04:02:14  22               MR. DELINSKY:  That was the only one.

04:02:19  23               MR. MAJORAS:  It's that same document.

04:02:19  24                    (Simultaneous crosstalk.)

04:02:21  25               MR. DELINSKY:  Your Honor, we have been clear

04:02:22  1    from day one --

04:02:23  2              THE COURT:  All right.  Well, Mr. Lanier, I'll

04:02:25  3    let you say whatever you want to say.

04:02:26  4              MR. LANIER:  Okay.  Thank you, Judge.

04:02:28  5              THE COURT:  All right?

04:02:28  6              MR. WEINBERGER:  We have one other issue --

04:02:29  7    one other issue, Your Honor.

04:02:30  8              THE COURT:  You can't say -- you can't put

04:02:32  9    anything -- you can't refer to evidence that doesn't exist.

04:02:35 10              MR. LANIER:  And I won't do that.

04:02:36 11              THE COURT:  All right?

04:02:38 12              MR. LANIER:  I don't want him to put errors in

04:02:39 13    my case.  I don't want error in my case --

04:02:40 14              THE COURT:  That's what I -- I didn't mean.  I

04:02:43 15    meant you can -- you can say --

04:02:43 16                   (Simultaneous crosstalk).

04:02:43 17              MR. LANIER:  But I will.

04:02:44 18              THE COURT:  -- whatever you want to say in

04:02:45 19    response to Mr. Delinsky --

04:02:45 20              MR. LANIER:  I will.

04:02:46 21              THE COURT:  -- but you cannot put into

04:02:48 22    evidence what's not in the trial.

04:02:50 23              MR. LANIER:  I won't say something that's not

04:02:51 24    in evidence, but I will -- I will address it.

04:02:55 25              MR. WEINBERGER:  Speaking of that, Your Honor,

04:02:57  1    Mr. Swanson, during his closing on behalf of Walgreens, with

04:03:01  2    respect to whether or not Walgreens sold data, said that it

04:03:11  3    was not true that Walgreens sold patient data.  We know

04:03:18  4    that's an incorrect statement.  We know that's a

04:03:21  5    misrepresentation.

04:03:22  6        Now, it would be one thing for him to say there's no

04:03:25  7    proof that they did, but he said specifically, it is not

04:03:29  8    true.

04:03:30  9                THE COURT:  Well, there's evidence, and you

04:03:31 10    can refer to the evidence -- what the evidence in the case

04:03:34 11    is about that.

04:03:35 12                MR. WEINBERGER:  Okay.

04:03:35 13                THE COURT:  All right?

04:03:37 14                MR. SWANSON:  There's no evidence in the case,

04:03:38 15    Your Honor.

04:03:38 16                MR. LANIER:  Yes, there is.

04:03:40 17                THE COURT:  Well, I think there is, so,

04:03:41 18    Mr. Lanier -- f Mr. Lanier believes there's evidence, he can

04:03:43 19    recite it.

04:03:43 20                MR. LANIER:  Yep.

04:03:45 21                THE COURT:  All right?

04:03:45 22                MR. SWANSON:  He's not our witness, Mark.

04:03:50 23                THE COURT:  Whatever.

04:03:51 24        And I think, Mr. Swanson, you also were a little loose

04:03:54 25    with one of the instructions, all right, and if Mr. Lanier

**Closing Argument - Majoras**

04:03:56  1    wants to point that out, of course, he can, but ultimately

04:03:59  2    I'm going to give the instructions.

04:04:02  3         All right.  Let's bring the jury in.

04:05:25  4              (Jury returned to courtroom.)

04:05:35  5              THE COURT:  Okay.  Please be seated, ladies

04:05:38  6    and gentlemen.

04:05:38  7         We will now have Walmart's closing by Mr. Majoras.

04:05:43  8              CLOSING ARGUMENT BY DEFENDANT WALMART

04:05:43  9              MR. MAJORAS:  Thank you, Your Honor.

04:05:44 10         Good afternoon.  Let me get this adjusted so it's not

04:05:54 11    too loud.

04:05:54 12         Good afternoon.  On behalf of my colleagues, Tina and

04:06:00 13    Tara, who have tried this case with me, on behalf of my

04:06:02 14    client, Walmart, I want to thank all of you for your

04:06:04 15    attention that you've given to this case and the effort that

04:06:07 16    you so obviously put into it.

04:06:08 17         It's very important to all of us here to see that

04:06:12 18    attention and to understand that you are doing all you can

04:06:17 19    to understand the full extent of the evidence that's been

04:06:19 20    offered in this case.

04:06:21 21         I can't recall whether some of you may have served on

04:06:25 22    a jury before, but something that often surprises jurors the

04:06:31 23    first time they do it is we all rise when you come in.  When

04:06:34 24    the judge comes in, we all rise for the judge, but we do

04:06:35 25    that for the jury.  And we do that for two reasons:  One, we

## Closing Argument - Majoras

04:06:39  1    are honoring your service.  But importantly, we are

04:06:43  2    recognizing that you are the deciders of the facts here.

04:06:46  3    You are the decision makers here.  And so when you come into

04:06:49  4    the court, just like we do when -- we do rise for the

04:06:52  5    judge -- when you come into the court, we rise for that

04:06:54  6    reason.  And I want to thank you for that service.

04:06:57  7        In my discussion today, I want to do a number of

04:07:03  8    things.  I want to cover a number of areas, and I'm going to

04:07:07  9    try not to repeat too much because many of the things that

04:07:10  10   you heard from Mr. Delinsky and Mr. Swanson apply to Walmart

04:07:14  11   as well.  But there's something I want to talk about -- and

04:07:17  12   we've heard a lot of discussion about road maps in this

04:07:19  13   case.

04:07:19  14       I want to talk about something else that's on a map.

04:07:22  15   And it's something that every time we look out the windows

04:07:24  16   here it's so obvious to us, the importance of bridges.  We

04:07:28  17   see all the bridges that cross the Cuyahoga.  I think I

04:07:33  18   remember doing a boat tour of 21 bridges of Cuyahoga County

04:07:36  19   once -- of the Cuyahoga River once.

04:07:39  20       The significance is the plaintiffs, in their burden of

04:07:42  21   proof and what they have to demonstrate to you, is they've

04:07:45  22   got to bridge concepts.  They've got to be able to show that

04:07:48  23   there's conduct.  Then they've got to connect it to

04:07:50  24   causation.  They've got to connect a number of different

04:07:53  25   things here, and it's their burden of proof do that to prove

**Closing Argument - Majoras**

04:07:56  1      their case.

04:07:58  2           And I want to talk about a couple bridges in

04:08:00  3      particular that they clearly have not met.  And I'll go

04:08:04  4      through that in some detail.

04:08:07  5           But first I want to think back a little bit to when I

04:08:09  6      first had a chance to address you at the start of this case.

04:08:12  7      One of the things I said to you, that you'll be doing as a

04:08:15  8      juror, you ought to do as a juror, and it's kind of odd

04:08:18  9      sounding, is listen for what you won't be hearing.

04:08:22 10           And in this case in particular, as we look at what the

04:08:26 11      plaintiffs have tried to demonstrate about the chain

04:08:29 12      pharmacies in this case, what we haven't heard is what has

04:08:34 13      actually happened in Trumbull and Lake counties,

04:08:39 14      specifically with what the plaintiff -- with what the chain

04:08:41 15      pharmacies have done.  What have they done in terms of the

04:08:45 16      prescriptions they have dispensed over time?  Where have

04:08:47 17      they gone?  Have they been shown to go into the illicit

04:08:51 18      market?  Have they been shown to be diverted?

04:08:54 19           And if you look at the list of witnesses that the

04:08:56 20      plaintiffs brought in, in particular their experts, we

04:09:00 21      shouldn't be surprised that we didn't hear any of that.

04:09:04 22      Because they didn't come in equipped do that analysis.

04:09:07 23           If we could go to slide 44, please.

04:09:17 24           So this is -- this is Dr. McCann, the math person that

04:09:22 25      the plaintiffs called.

**Closing Argument - Majoras**

04:09:25 1          I said, you don't have any opinion that any of those

04:09:28 2     dosage units that are tallied up on this exhibit should not

04:09:30 3     have been dispensed in Lake and Trumbull County; correct,

04:09:34 4     sir?

04:09:34 5          He answered correct.

04:09:35 6          Let's go to our next slide.

04:09:37 7          This is Dr. Lembke.  And you can't identify any

04:09:41 8     specific prescription that was filled by any of the

04:09:43 9     defendant pharmacists in Lake and Trumbull County that was,

04:09:46 10    in fact, diverted, can you?

04:09:48 11         And she answered, again, I did not look at the data at

04:09:52 12    the county level specifically in Lake and Trumbull Counties.

04:09:55 13    I looked at it in the aggregate.

04:09:58 14         Our next slide.  She further testified.  Question:

04:10:03 15    But in terms of examining store by store how the pharmacists

04:10:06 16    behaved and whether or not it was proper, is that your area

04:10:10 17    of testimony?

04:10:11 18         Her answer:  On a store-by-store level?  That is for

04:10:14 19    the other experts.

04:10:16 20         Let's look at another expert.  Well, this is actually

04:10:21 21    Mr. Catizone -- or I'm sorry -- Mr. Rannazzisi.  I recognize

04:10:25 22    the picture, but I got the wrong name.

04:10:26 23         Mr. Rannazzisi was asked, if we focus again on Lake

04:10:30 24    and Trumbull Counties, it's true that you have no

04:10:32 25    information that any Walmart pharmacist ever knowingly

7269

**Closing Argument - Majoras**

04:10:35 1    filled a prescription for a pill mill in either county; is

04:10:39 2    that correct?

04:10:39 3        Answer:  No, I have never looked at any prescriptions

04:10:43 4    related to Lake and Trumbull County Walmart stores, no.

04:10:47 5        Next.  Mr. Rannazzisi again, this is when Mr. Lanier

04:10:54 6    was questioning him.  He said, do you know anything about --

04:10:57 7    I don't even know that you know the facts of our case.  Do

04:10:59 8    you know anything about that?

04:10:59 9        His answer, no, sir.

04:11:04 10        One more, please.

04:11:05 11        This is -- this is Dr. Alexander, another expert the

04:11:10 12    plaintiffs brought in.

04:11:11 13        Question:  Fair enough.  And, Dr. Alexander, you have

04:11:14 14    no evidence that any of these defendants filled any

04:11:16 15    prescription in Lake and Trumbull County that was not

04:11:19 16    legitimate?

04:11:20 17        Answer:  Well, I don't.  I wasn't asked to look at

04:11:23 18    that evidence.  It wasn't required for what I was asked do.

04:11:27 19    But I do not have that sort of evidence.

04:11:32 20        One more slide.

04:11:35 21        Dr. Alexander, question:  You also don't have any

04:11:38 22    evidence that any prescription filled by any of these

04:11:41 23    defendants in Lake and Trumbull County was diverted and

04:11:43 24    caused harm?

04:11:45 25        His answer, again, I do not.  That wasn't part of what

**Closing Argument - Majoras**

04:11:48  1    I was asked to do and wasn't required for me to answer the

04:11:51  2    two questions that I was asked to answer, which were

04:11:55  3    presented earlier.

04:11:56  4        And our final slide.  Not final, just of this section.

04:12:01  5        This is Dr. Keyes.  And maybe you haven't said this

04:12:05  6    today -- it was a question -- maybe you haven't said this

04:12:07  7    today, or even last week, but my understanding is that in

04:12:09  8    this case you have opinions about pharmacies generally, but

04:12:12  9    not about any specific pharmacy chain or pharmacy location;

04:12:15 10    is that correct?

04:12:16 11        And her answer is, that's correct.

04:12:21 12        The plaintiffs came into this case, their experts came

04:12:23 13    into this case without knowing the information specifically

04:12:27 14    in Lake and Trumbull County.  And they want you to base your

04:12:31 15    evidence on some broader set of -- I'm sorry, they want you

04:12:35 16    to base your decision on some broader set of evidence.

04:12:39 17        And as you think about the evidence, and you think

04:12:41 18    about what the plaintiffs have proven or failed to prove,

04:12:44 19    keep that in mind.  They didn't come in even expecting to

04:12:48 20    offer that proof.

04:12:51 21        And I'll talk about Mr. Catizone in a moment.  But

04:12:53 22    first let me go back to some of the bridges that I want to

04:12:55 23    talk about.  In one of the -- the first bridges relates to

04:13:00 24    the question that you're going to have to answer on the

04:13:02 25    verdict farm.  This is Question No. 1.

**Closing Argument - Majoras**

04:13:10  1    If you'll go to slide 1.

04:13:12  2    So this is, as we said, there's a question for both

04:13:15  3 Lake and Trumbull County, but they largely read the same.

04:13:18  4 And in answering this question, I want to focus on three key

04:13:21  5 words as you assess the evidence and make your decision.

04:13:26  6    Go to the next slide, please.

04:13:29  7    Did Lake and Trumbull County prove, by the greater

04:13:31  8 weight of the evidence, that oversupply of legal

04:13:35  9 prescription opioids and diversion of these opioids into the

04:13:39 10 illicit market outside of appropriate medical channels is a

04:13:45 11 public nuisance in Lake County?

04:13:49 12    So the first word I'd like to talk about is "is."

04:13:52 13 Simplest word on the screen.  And we -- you've heard some

04:13:56 14 discussion about it already.  Is means current.  And as

04:13:59 15 Judge Polster's already instructed, ongoing.  Is there an

04:14:02 16 ongoing public nuisance?

04:14:06 17    The second, "oversupply."

04:14:13 18    The public nuisance at issue here is -- that is on

04:14:16 19 your question is, is there currently an oversupply of

04:14:23 20 prescription opioids in these two counties that are being

04:14:25 21 diverted?  It's not a question of whether there are --

04:14:29 22 the -- what we've seen certainly, obviously, some of the

04:14:32 23 harms that drug use, both legal and otherwise, have caused

04:14:35 24 in these counties.  The question is, is there an oversupply

04:14:40 25 currently in these counties that the defendants are

7272

**Closing Argument - Majoras**

04:14:42  1    ultimately responsible for?

04:14:43  2         And then the final word is "diversion."  Is there

04:14:50  3    oversupply, and then is there diversion of that oversupply

04:14:53  4    currently ongoing in these counties?

04:14:55  5         And the evidence will demonstrate that the -- the

04:14:58  6    evidence will show that the plaintiffs have not demonstrated

04:15:01  7    that connection in this case.

04:15:05  8         At first when you read this instruction it seems like

04:15:09  9    there's a fairly obvious answer.  You've heard a lot about

04:15:12 10    the problems of addiction, problems of drug use in these

04:15:16 11    counties.  But it's not simply a question of is there a drug

04:15:22 12    problem in these counties.  It's a question of connecting.

04:15:25 13         Is there currently an oversupply in these counties of

04:15:28 14    prescription opioids that are being diverted today?

04:15:34 15         The testimony and evidence in this case cannot be

04:15:37 16    clearer, that the ongoing issues of concern in Lake and

04:15:42 17    Trumbull Counties revolve around the use of illicit drugs,

04:15:46 18    principally heroin and fentanyl, which is a particularly

04:15:50 19    lethal drug, especially when there is no way to know how

04:15:54 20    much might be present in the street dose.

04:15:58 21         Plaintiffs' witnesses told you, to the extent there is

04:16:00 22    a public nuisance today, it is a crisis of illicit fentanyl

04:16:04 23    imported into this country from China and Mexico and

04:16:07 24    supplied by illegal drugs and dealers on the street.

04:16:11 25         Go to slide 6, please.

**Closing Argument - Majoras**

04:16:13  1      This is -- this is Captain Villanueva.  We heard a

04:16:21  2  little bit about illegal fentanyl.  That's a problem in

04:16:24  3  Trumbull County; right?

04:16:24  4      His answer, currently it is.

04:16:30  5      Next slide.

04:16:32  6      This is from Ms. Caraway in Trumbull County.

04:16:36  7      In 2019, did you have an understanding that illicit

04:16:39  8  fentanyl was a cause of many of the harms that you've

04:16:41  9  testified to today?

04:16:43 10      Her answer, yes.

04:16:45 11      Next slide.

04:16:46 12      This is, again, Dr. Alexander.

04:16:49 13      And then you go on to say that the impact of illicit

04:16:52 14  fentanyl has been especially severe in the communities

04:16:54 15  relative to other areas in the United States; right?

04:16:57 16      He says yes.

04:16:58 17      So the impact of illicit fentanyl in Lake and Trumbull

04:17:01 18  County, in your view, has been especially severe?

04:17:04 19      His answer, yes.

04:17:07 20      Next slide.

04:17:10 21      Dr. Keyes.  Question:  Fentanyl is a significant cause

04:17:13 22  of the overdose burden in those two counties?

04:17:16 23      Her answer, in recent years, yes.

04:17:22 24      And then we called Professor Murphy.  Professor Murphy

04:17:27 25  is the economist from the University of Chicago.  And the

### Closing Argument - Majoras

04:17:30 1    reason we called in Professor Murphy is he discussed with

04:17:34 2    you, is he was going to talk about oversupply.  You've got

04:17:36 3    to understand the reasons that that has come about.  It's

04:17:39 4    not simply a matter of the pills just show up, or the drugs

04:17:42 5    just show up out of nowhere.  There's cause -- I'm sorry,

04:17:46 6    there's a demand and supply element to that.  And Dr. Murphy

04:17:49 7    testified about that.  And he testified in particular.  We

04:17:52 8    go to our next slide.

04:17:53 9         He says that the increase in misuse of and mortality

04:17:57 10   from illegal opioids is particular, heroin and fentanyl,

04:18:00 11   which has really been a big part of the story of what we've

04:18:03 12   seen in Ohio and these counties in particular, but the

04:18:06 13   United States as a whole even more in the recent years.

04:18:11 14        This is a clear example of the difference between what

04:18:14 15   the counties are seeing in recent times compared to what

04:18:17 16   they may have seen more than a decade ago.

04:18:20 17        You've heard plaintiffs talk about the three phases of

04:18:23 18   the opioid crisis.  Here's a slide that you've seen in

04:18:28 19   different ways.

04:18:29 20        And it shows very clearly, in the early stages of the

04:18:35 21   time period they talk about, phase 1 and phase 2 that you've

04:18:38 22   heard from the plaintiffs, the issue in terms of

04:18:44 23   prescription opioids, but those level off.  And what

04:18:47 24   happens?  We see the jump in the synthetic opioids, the

04:18:51 25   heroin, the fentanyl.  That's the problem in the counties

**Closing Argument - Majoras**

04:18:55  1    today.  And the plaintiffs need to bridge how you get to

04:18:59  2    those issues today as opposed to whether or not there's

04:19:03  3    actually an oversupply of prescription opioids.

04:19:07  4        Recognizing this reality, the plaintiffs strain to

04:19:16  5    imagine a bridge that connects prescription opioid use in

04:19:20  6    2010 to the illicit fentanyl overdoses in 2021.  It's

04:19:25  7    exceptionally long one and has no support.  If the cause of

04:19:29  8    the problem was, as plaintiffs say, an oversupply of

04:19:34  9    prescription opioids prior to 2010, they need to bridge the

04:19:39 10    earlier periods of the greatest supply to the ongoing

04:19:43 11    problems of today, the impact of the illegal drugs that have

04:19:46 12    hit the counties like a tsunami as Trumbull County's

04:19:52 13    Ms. Caraway testified.

04:19:53 14        Plaintiffs try to blame the pharmacies for the conduct

04:19:56 15    of drug dealers and other actors the pharmacies do not and

04:19:59 16    cannot control.  Ask yourself, is that reasonable?  It's

04:20:04 17    not.

04:20:05 18        The defendants, of course, have no role in those

04:20:08 19    illegal products, nor in the drug cartels that produce and

04:20:11 20    sell them.

04:20:13 21        Plaintiffs try to get around this with something that

04:20:15 22    has been described in a number of different ways during the

04:20:17 23    course of the trial, but seem to center on what has been

04:20:21 24    referred to as the gateway theory.  Most of this comes from

04:20:25 25    plaintiffs' epidemiologist, Dr. Keyes, and a bit from

**Closing Argument - Majoras**

| | | |
|---|---|---|
| 04:20:30 | 1 | Dr. Lembke. |
| 04:20:32 | 2 | They reviewed literature and concluded that prior use |
| 04:20:33 | 3 | of prescription opioids is associated with later use of |
| 04:20:36 | 4 | heroin and fentanyl.  But going back to the so-called first |
| 04:20:40 | 5 | wave, we heard extensive evidence that it was doctors, not |
| 04:20:44 | 6 | pharmacists, that drove the increase in demand for |
| 04:20:46 | 7 | prescription opioids.  Remember, there is no suggestion that |
| 04:20:51 | 8 | any prescription for opioids started with the pharmacists. |
| 04:20:57 | 9 | Doctors, not pharmacists, are the ones who are |
| 04:20:59 | 10 | responsible for making treatment determinations for their |
| 04:21:02 | 11 | patients, deciding whether to prescribe medication, |
| 04:21:04 | 12 | including opioids, and setting the dose and duration of |
| 04:21:08 | 13 | prescription opioids that patients receive.  Dr. Lembke |
| 04:21:12 | 14 | herself told that you most doctors honestly believe that |
| 04:21:19 | 15 | they were writing legitimate prescriptions. |
| 04:21:20 | 16 | Slide 14, please. |
| 04:21:22 | 17 | Her testimony, in the first decade and a half of this |
| 04:21:25 | 18 | century, most of the doctors who were writing opioid |
| 04:21:28 | 19 | prescriptions thought they were writing for a legitimate |
| 04:21:31 | 20 | medical purpose. |
| 04:21:35 | 21 | Speaking of doctors, you heard a number of different |
| 04:21:38 | 22 | names of doctors, Drs. Demangone, Veres, and Levin.  All |
| 04:21:46 | 23 | these doctors were licensed to practice by the State of Ohio |
| 04:21:49 | 24 | and registered by the DEA to prescribe opioids.  The way |
| 04:21:52 | 25 | plaintiffs repeatedly referenced the same names suggests |

**Closing Argument - Majoras**

04:21:54 1    that plaintiffs believe that these were bad doctors who

04:21:57 2    wrote illegitimate prescriptions.  Despite that, they have

04:22:01 3    never brought you any evidence of any law enforcement or

04:22:04 4    regulatory actions against them.  And remember, you heard

04:22:07 5    about how Walmart stopped filling Drs. Demangone, Levin, and

04:22:14 6    Veres.

04:22:14 7        If plaintiffs believed that those doctors were the

04:22:17 8    worst of the worst, the 1 percent or the .1 percent,

04:22:20 9    whatever number you want to use, that Mr. Rannazzisi was

04:22:23 10   talking about, why didn't plaintiffs make them part of this

04:22:25 11   case rather than simply bring their names up from time to

04:22:29 12   time?

04:22:29 13       Despite all their own evidence that drug manufacturers

04:22:35 14   and doctors changed the practices of the entire health care

04:22:39 15   industry in the early phases, plaintiffs want you to blame

04:22:43 16   the pharmacists, not only for phase 1, but also for each of

04:22:47 17   the later phases, the ones involving illegal drugs like

04:22:50 18   heroin and fentanyl.  The plaintiffs ask you to do so based

04:22:53 19   on the alleged gateway theory, between prescription drug use

04:22:57 20   and heroin use, and then a third connection between heroin

04:23:00 21   use and illegal fentanyl use seen in Lake and Trumbull

04:23:03 22   Counties today.

04:23:04 23       To support this allegation, Dr. Keyes testified about

04:23:08 24   the prevalence of prior prescription opioid use among

04:23:12 25   today's heroin users.  But she didn't even compare that to

7278

**Closing Argument - Majoras**

04:23:16  1    the prevalence of prescription opioid use among people who

04:23:19  2    did not go on to use heroin.  We heard this statistic a

04:23:24  3    little earlier from Mr. Delinsky that -- now I'm going to

04:23:27  4    flip it.  She talked about there are 3.5 percent of people

04:23:32  5    who use a prescription opioid went on to try heroin.  That

04:23:37  6    means 96.5 percent did not.

04:23:41  7          Is that -- is that evidence?  Does that prove the

04:23:44  8    gateway that they're talking about that you can say that the

04:23:47  9    prescription opioids later led directly to the illegal use

04:23:52  10   of heroin and fentanyl that is plaguing these counties

04:23:58  11   today?  It's not.

04:23:59  12         And for that reason, in looking at Question No. 1, for

04:24:02  13   both counties, Lake and Trumbull County, the answer is no,

04:24:06  14   they have not proven that the oversupply of prescription

04:24:10  15   opioids is what's causing the current ongoing public

04:24:14  16   nuisance in these two counties.  If anything, what they

04:24:18  17   proved is that prescription opioids have gone down over

04:24:22  18   time.

04:24:22  19         We've seen the slides demonstrating that starting in

04:24:27  20   about 2012 the use of prescription opioids went down as

04:24:32  21   doctors became more aware of the issues, as law enforcement

04:24:35  22   was able to get better at cracking down on pill mills, as

04:24:40  23   legislation changed so that you couldn't have the internet

04:24:43  24   pharmacies over time.

04:24:45  25         So in looking at Question No. 2 -- No. 1, I'm sorry --

**Closing Argument - Majoras**

04:24:48  1    looking at Question No. 1, look very closely at what you're

04:24:51  2    being asked to decide.  The question is whether there is an

04:24:55  3    oversupply of prescription opioids that is currently causing

04:24:58  4    the ongoing public nuisance in these two counties.  And it's

04:25:04  5    not.  The evidence is abundantly clear that the issues in

04:25:06  6    those counties are the illegal drugs that have led to the

04:25:10  7    spikes in overdose deaths and the problems of addiction that

04:25:13  8    those counties are -- these two counties are facing.

04:25:16  9         You heard from both sides that theories and

04:25:23 10    associations do not prove causation.  Even though they have

04:25:26 11    different backgrounds, Dr. Keyes the epidemiologist called

04:25:30 12    by the plaintiffs, and Professor Murphy, the economist,

04:25:34 13    agreed on this basic point.

04:25:36 14         Let's go to slide 17, please.

04:25:37 15         Dr. Keyes, question:  Everyone always says -- and it's

04:25:43 16    true, but maybe not that interesting -- association and

04:25:46 17    causation are not the same thing, obviously; correct?

04:25:49 18         She answered, causation is a subset of associations.

04:25:53 19         Question:  Some associations are causal and some are

04:25:57 20    not?

04:25:58 21         And she answered, that's right.

04:25:59 22         Then when Professor Murphy was on the stand, he was

04:26:03 23    questioned, when Dr. Keyes testified, and I believe she

04:26:05 24    wrote about in her opinion as well, she talked about

04:26:08 25    associations and causation.  How does that apply to your

**Closing Argument - Majoras**

04:26:11  1    analysis?

04:26:12  2         His response, well, there's two issues.  One is many

04:26:16  3    of the studies she relies on are really just associations.

04:26:20  4    They look at people who abuse cocaine -- I mean, I'm

04:26:23  5    sorry -- abuse heroin and ask, what else have you done?

04:26:26  6         Well, that doesn't tell me that was a causal factor

04:26:30  7    because I have somebody who, you know, has a propensity to

04:26:34  8    abuse substances, they're going to abuse this substance and

04:26:38  9    other substances.  It's not -- that's a correlation, not a

04:26:41 10    causation.

04:26:43 11         That's very important as you look at whether the

04:26:47 12    plaintiffs have been able to connect and build that bridge

04:26:50 13    between issues in the early 2000s and prescription supply in

04:26:54 14    the early 2000s to what's happening in the two counties

04:26:57 15    today.

04:26:58 16         And we also had Dr. Murphy talk to you about a variety

04:27:03 17    of other issues that lead to the supply being what it is.

04:27:07 18    Now, plaintiffs -- Mr. Lanier said, the only thing

04:27:10 19    Dr. Murphy did was he come in -- he came in and said, it's

04:27:14 20    all because north -- people in Northeastern Ohio are

04:27:17 21    suffering and that's -- that's the whole issue that he has

04:27:20 22    raised.  That's not it.

04:27:23 23         Dr. Murphy looked at all of the potential issues as to

04:27:26 24    why there may be an increase in opioid use, and then

04:27:28 25    ultimately in the illicit drugs, the illegal drugs.  And he

7281

**Closing Argument - Majoras**

04:27:33  1    looked at things such as the Part D, the Medicare Part D,

04:27:37  2    which made the prescription drugs less expensive and more

04:27:40  3    attainable.  The surveys that encouraged doctors or clinics

04:27:46  4    to prescribe opioids because they wanted to avoid patients

04:27:49  5    saying that they were in pain after they were treated.  And

04:27:51  6    yes, he looked at the socioeconomic conditions that affect

04:27:54  7    Northeast Ohio.  And he certainly did talk about the fact

04:27:58  8    that that has an impact and it can't be ignored.

04:28:02  9        Northeast Ohioans are pretty tough.  If we can't take

04:28:06 10    an analysis of what may lead to whether it's illegal drug

04:28:11 11    use or anything else, then I suggest that -- I'm not even

04:28:18 12    real sure what I suggest.  I think living in Northeast Ohio

04:28:21 13    doesn't concern me that we're not going to be able to look

04:28:24 14    at that closely and not get offended because someone's

04:28:29 15    looking at those economic conditions that might have led to

04:28:31 16    the drug use that we see and our affecting the counties

04:28:34 17    today.

04:28:34 18        Dr. Murphy also looked at some age groups.

04:28:40 19        Let's go to slide 18, please.  You may remember these.

04:28:49 20    These were the side by side.

04:28:50 21        But what he looked at, he said, okay, well, who's

04:28:52 22    getting the prescription opioids?  Who are the prescription

04:28:54 23    opioids patients?  And then what are we seeing in terms of

04:28:56 24    the age groups, the demographics of those who are overdosing

04:29:01 25    on heroin, heroin mortality?  And we saw that the opioid

7282

**Closing Argument - Majoras**

04:29:06  1   prescriptions are largely going to an older demographic.

04:29:09  2   And in particular, women 51 and over were getting the opioid

04:29:13  3   prescriptions in the 2001 to 2010 period.

04:29:16  4        And then as you look later, where the plaintiffs were

04:29:18  5   saying you can bridge this gap, what we're really seeing,

04:29:22  6   what we're seeing is that the heroin mortality is far more

04:29:25  7   prevalent among more -- among younger men.

04:29:29  8        That's not any kind of a statement that younger men

04:29:33  9   somehow can't handle what's happening in any kind of

04:29:36 10   economic issue in this part of the country.  What it's

04:29:40 11   showing you is that if the plaintiffs are trying to connect

04:29:42 12   where the prescription opioids are going to where the deaths

04:29:47 13   we're seeing in these kind -- in the United States, it's not

04:29:52 14   correlating.  It's not showing that connection that the

04:29:55 15   plaintiffs have to make.

04:29:56 16        The gateway theory is not one that the plaintiffs can

04:29:59 17   prove.  It's not one that you should be relying upon to

04:30:02 18   establish the causation that the plaintiffs must show in

04:30:04 19   this case.

04:30:11 20        If you look at slide 19, please.

04:30:15 21        So this is what Professor Murphy said.  He said, so if

04:30:18 22   somebody is looking to abuse drugs, if prescription opioids

04:30:21 23   aren't available, I'll go in another direction.  And one of

04:30:24 24   the directions you may go in would be to initiate on illegal

04:30:27 25   opioids, like heroin or fentanyl.

**Closing Argument - Majoras**

04:30:28  1          And so if your analysis is limited to a link between

04:30:31  2     prescription opioids and illegal opioids, and you ignore

04:30:34  3     that other pathway, then you may just initiate on heroin or

04:30:40  4     fentanyl -- that was my add -- you're missing a very

04:30:42  5     important part of the story.  You have to take that into

04:30:44  6     account to understand the overall impact.

04:30:46  7          If we go to the next slide.

04:30:49  8          This is what he ultimately showed in terms of a graph

04:30:54  9     that he presented to you where we see the increasing

04:30:58 10     mortality while the opioid shipments are going down.

04:31:05 11          This is current.  This is today.  We see this gap.  It

04:31:09 12     is an oversupply?  Have the plaintiffs demonstrated an

04:31:13 13     oversupply that is causing the issues that are being

04:31:15 14     experienced in Ohio and this these two counties?

04:31:20 15          This suggests otherwise.

04:31:23 16          Now, the second gap that the plaintiffs must bridge to

04:31:26 17     prove actual conduct by the -- the second gap plaintiffs

04:31:30 18     must bridge is to prove actual conduct by the defendants

04:31:33 19     that was either intended to cause a public nuisance or was

04:31:37 20     unlawful.  We heard some discussion about this earlier from

04:31:39 21     some of the others lawyers, so I'm not going to go into it

04:31:41 22     in great detail.

04:31:43 23          But pharmacists exercising their judgment in

04:31:46 24     dispensing prescriptions written by fully licensed and

04:31:48 25     registers doctors is obviously lawful conduct.  We need and

7284

**Closing Argument - Majoras**

04:31:52  1    we want professional pharmacists to carry out this critical

04:31:56  2    function in our health care system.  Without them, we would

04:31:59  3    not be able to obtain the medication that we need and that

04:32:03  4    our doctors, after carefully examining the patients, have

04:32:06  5    been able to prescribe, even if it does include opioids.

04:32:09  6         As Judge Polster instructed you this morning, conduct

04:32:15  7    fully authorized by statute, ordinance, or regulation cannot

04:32:18  8    create a public nuisance because it is lawful conduct.

04:32:22  9         The judge also made clear that the laws of regulation

04:32:29 10    apply to the dispensing of controlled substances require

04:32:32 11    substantial compliance.  That is not the same thing as

04:32:36 12    strict or perfect compliance.  Mistakes can be made.  That's

04:32:38 13    particularly important as we think about the judgments that

04:32:42 14    a pharmacist has to make.  Even Mr. Rannazzisi endorsed that

04:32:46 15    concept when he was working back at the DEA and was making

04:32:50 16    presentations to pharmacists.

04:32:51 17         Slide 23, please.

04:32:53 18         This was a slide that Mr. Rannazzisi used in his

04:32:58 19    presentations.  He says, you must use your professional --

04:33:02 20    and this is a presentation to pharmacists.  You must use

04:33:05 21    your professional judgment, training, and experience.  We

04:33:07 22    all make mistakes.

04:33:10 23         We talked about professional judgment -- or I talk

04:33:13 24    about professional judgment when I first had a chance to

04:33:15 25    address you at the start of this case.  And that ultimately

**Closing Argument - Majoras**

04:33:18  1    is what this case is about and what our pharmacists have

04:33:20  2    been doing at Walmart and what the other pharmacists that

04:33:23  3    you've heard from of the chain pharmacies.  Exercising

04:33:27  4    professional judgment.  Understanding the patient who is in

04:33:30  5    front of them.  Understanding the community.  Understanding

04:33:33  6    the doctors.

04:33:35  7        Mr. Lanier talked about Lori Militello, the Walmart

04:33:40  8    pharmacist, and said she didn't know all of the doctors in

04:33:44  9    Lake County where her Eastlake store is, and she

04:33:47  10   acknowledged that.  I don't know all the doctors.  She also

04:33:49  11   acknowledged, I don't know every single patient either.

04:33:52  12       But compare that to Mr. Catizone, who is the one that

04:33:56  13   talks about the red flags.  These are red flags, these are a

04:33:59  14   problem.  How many doctors does doctor -- does Mr. Catizone

04:34:03  15   know in Lake or Trumbull County?  Zero?  How many patients

04:34:11  16   has he seen coming before in him Lake or Trumbull County?

04:34:15  17   Zero.

04:34:15  18       So when we look at what the pharmacists testified

04:34:18  19   about and how they used their professional judgment

04:34:21  20   collectively between the three pharmacists, Mr. Cook and

04:34:25  21   Ms. Militello and Ms. Stossel, 60 years of experience

04:34:29  22   between them, that they're applying on a day-to-day basis

04:34:34  23   with patients and doctors that they recognize and know, and

04:34:39  24   yet, Mr. Catizone, from his office in Chicago, is going to

04:34:42  25   come in and say, no, this is how the red flags ought to be

7286

**Closing Argument - Majoras**

04:34:46  1    resolved.

04:34:47  2         And on top of that, he designs a red flag system that

04:34:50  3    he doesn't apply, he doesn't take his red flags and say,

04:34:53  4    okay, I can see there's a problem here or a problem there.

04:34:56  5    He gives it to Dr. McCann, the math guy.  The math guy knows

04:35:03  6    zero doctors in any of these counties.  The math guy knows

04:35:07  7    zero patients in any of these counties.  And the math guy

04:35:10  8    doesn't know pharmacy.  He's not a pharmacist.  He can't

04:35:14  9    make any independent judgment about whether a red flag was

04:35:18 10    appropriately filled or not to fill.  And, in fact,

04:35:24 11    Mr. Catizone's system is designed, it's a mechanical system

04:35:27 12    designed so that essentially, I need someone who can count

04:35:30 13    things so I'm going to give it to Dr. McCann.  Dr. McCann

04:35:32 14    can count these things and he's going to say, this is where

04:35:35 15    we see a problem in these counties.

04:35:36 16         Well, let's look to some of the testimony from

04:35:40 17    Ms. Militello, the Walmart pharmacist, who was here.  And we

04:35:43 18    talked with her about a couple of prescriptions that were

04:35:47 19    identified as red flags, the ones that she had filled.

04:35:51 20    Remember the one about hospice care?  It had hospice right

04:35:54 21    at the top of it.  It was written by a prescriber working in

04:35:59 22    the hospice business.

04:36:01 23         And Ms. Militello said, I can tell right away, what we

04:36:05 24    have here is he's putting together, or this doctor is

04:36:08 25    putting together a kit for end-of-life care.  There's

### Closing Argument - Majoras

04:36:11   1    certain drugs that a patient typically needs in a hospice.

04:36:16   2    Some of those are opioids.  Some of those might be benzos to

04:36:20   3    relax and help that patient go through that time in their

04:36:23   4    life.

04:36:24   5        Ms. Militello knows that right off the bat.  She can

04:36:26   6    tell that's what's happening.  She can tell that by looking

04:36:28   7    at the prescription, seeing hospice on it and knowing who

04:36:31   8    the doctor is.  None of the experts that the plaintiffs

04:36:35   9    brought in in this case can make that kind of assessment

04:36:38  10    when they're telling you what's a red flag and what's not.

04:36:41  11    What's a resolvable red flag or not.  And they don't do

04:36:46  12    that.  And ultimately, Mr. Catizone has to acknowledge that

04:36:49  13    he can't tell you that any of the prescriptions that he

04:36:52  14    flagged or said should have been flagged ultimately were

04:36:55  15    diverted, or were -- I'm sorry -- were ultimately written

04:36:59  16    for something other than an appropriate medical purpose.

04:37:03  17        A couple of the other prescriptions you saw.  What

04:37:05  18    about the dentist?  Someone going in for dental surgery.

04:37:12  19    Written a -- something to help them relax prior to the

04:37:15  20    surgery and then a couple of additional opioids for pain

04:37:19  21    treatment afterward.  That's the kind of thing that these

04:37:22  22    pharmacists know and recognize immediately upon seeing these

04:37:27  23    prescriptions, can make the judgment that this isn't a red

04:37:31  24    flag.  Can be.  If I see certain prescriptions, it can be a

04:37:33  25    red flag to me.  If I see certain numbers that are written,

**Closing Argument - Majoras**

04:37:37  1    it can be a red flag that I've got to investigate further.

04:37:41  2        But what Mr. Catizone does, and what he relies on

04:37:46  3    Dr. McCann to do, is simply say, these are red flags, and if

04:37:49  4    I don't see documentation telling me how they were resolved,

04:37:51  5    then that's a problem.  That's not a problem.  The problem

04:37:57  6    is if prescriptions are being filled that should not have

04:37:59  7    been filled.  And the way that the plaintiffs have analyzed

04:38:03  8    red flags and presented that to you doesn't answer that

04:38:05  9    question.

04:38:08  10       I want to talk to you about some of the additional

04:38:15  11   witnesses that you heard from Walmart and also from the

04:38:18  12   plaintiffs.

04:38:21  13       Ms. Militello was the pharmacist that you heard pretty

04:38:25  14   late in the trial, one of our last witnesses.  And she

04:38:29  15   talked about working at the Eastlake store and how she went

04:38:31  16   about her job, what she did.  Plaintiffs have tried to boil

04:38:36  17   that down into one or two things that she did, but she was

04:38:39  18   here explaining to you what it is and what it means to

04:38:41  19   exercise the professional judgment that a pharmacist has to

04:38:44  20   exercise.  And she put herself on the witness stand, even

04:38:50  21   knowing that she would get challenged on specific

04:38:52  22   prescriptions.  Why did you fill this?  What was your

04:38:54  23   thinking here?

04:38:57  24       And she responded.  There was a set of

04:39:01  25   prescriptions -- actually, there was one that was refused

**Closing Argument - Majoras**

04:39:05  1   that Ms. Militello was asked about where an individual had

04:39:08  2   come back on a number of different occasions for multiple

04:39:13  3   drugs and those prescriptions, some of which she filled.

04:39:16  4   And she explained to you, I contacted the doctor's office on

04:39:19  5   a number of different times.  I ran the OARRS reports.  This

04:39:22  6   is what I did to investigate what needed to be done here.

04:39:26  7        Now, you've been at this for 6 weeks, 7 weeks.  You've

04:39:30  8   learned an awful lot.  You've learned enough to say, are you

04:39:33  9   sure?  Is that right?  Or are you positive that you handled

04:39:36 10   that correctly?

04:39:37 11        And Ms. Militello said, yes, my judgment in that

04:39:40 12   situation, knowing what the doctor told me about that

04:39:42 13   patient, knowing the risk that that patient might commit

04:39:46 14   suicide that I'm hearing from the doctor, then these are

04:39:49 15   prescriptions that I'm going to fill.

04:39:51 16        Was it right or wrong to fill those prescriptions?

04:39:54 17   More importantly, was it illegal to fill those

04:39:56 18   prescriptions?  These are judgments.  These are judgments

04:40:00 19   that Ms. Militello made.  They're judgments that pharmacists

04:40:03 20   have to make at any time, or any day as prescriptions come

04:40:06 21   in knowing the information they have and what's available to

04:40:09 22   them.  And it's her diligence, her thought in doing that,

04:40:13 23   her exercise of the judgment across all of the prescriptions

04:40:17 24   that she filled.  That is the behavior that we want out of

04:40:21 25   pharmacists, even if one could question a particular one of

**Closing Argument - Majoras**

04:40:25  1    whether it was filled or not, or whether it should have been

04:40:27  2    filled or not.

04:40:28  3        Plaintiffs also talked to you about Mr. Nelson.

04:40:32  4    Mr. Lanier referred to Mr. Nelson as a devastating witness

04:40:35  5    for Walmart.  So let's think about what Mr. Nelson talked

04:40:40  6    about at great length.  And you heard the phrase cut and

04:40:44  7    paste today.  I think the phrase mantra was used pretty

04:40:48  8    frequently when the plaintiffs were examining Mr. Nelson.

04:40:51  9        And what was Mr. Nelson doing when he answered

04:40:54  10   questions from pharmacists in the field about how they

04:40:57  11   should go about performing their responsibilities and

04:41:00  12   whether or not there could be a blanket refusal to fill of a

04:41:04  13   particular doctor?

04:41:05  14       Our policy is, we don't have blanket refusals to fill.

04:41:08  15   What you should do is examine every prescription that comes

04:41:10  16   before you, use your professional judgment, use the policies

04:41:14  17   that we have in place at Walmart to assess that

04:41:17  18   prescription, and make a decision about whether it could be

04:41:20  19   filled.  If you don't fill it, we'll back you.  If you

04:41:24  20   decide that you don't want to fill a number of

04:41:26  21   prescriptions, we'll back you there too.

04:41:28  22       Is that so controversial that the advice given is take

04:41:33  23   every prescription and look at it and evaluate it and fill

04:41:36  24   it?

04:41:38  25       Let's do a comparison.  We heard Agent Edwards,

**Closing Argument - Majoras**

04:41:41  1    Trey Edwards, the former Lake County Narcotics agent and the

04:41:45  2    Board of Pharmacy witness.  And he talked about as, of

04:41:49  3    today's date, how to go about evaluating prescriptions.

04:41:53  4         And if we go to slide 56, please.

04:41:56  5         So on one side of this slide is going to be

04:42:01  6    Agent Edwards' testimony, and the other side is going to be

04:42:02  7    the information that Mr. Nelson wrote in his responses to

04:42:07  8    the pharmacists.  On the left side, if they are still

04:42:11  9    licensed, you know, if they still carry a valid, state

04:42:14 10    medical board of Ohio license to practice and they still

04:42:16 11    have their DEA number, then you're still permitted to

04:42:19 12    practice.

04:42:21 13         What does Mr. Nelson say?

04:42:22 14         At this point, this prescriber still has all the

04:42:25 15    necessary credentials to practice medicine.

04:42:28 16         It sounds pretty similar.

04:42:30 17         Let's go to the next slide.

04:42:31 18         Advice of Mr. Edwards, use your -- Agent Edwards, use

04:42:36 19    your professional judgment.

04:42:37 20         The advice of -- and the direction from Mr. Nelson,

04:42:41 21    exercise their professional judgment, referring to the

04:42:45 22    specific policies that Walmart has in place to help guide

04:42:47 23    them in that.

04:42:48 24         Go to the next slide.

04:42:49 25         Agent Edwards, use your professional judgment on each

**Closing Argument - Majoras**

04:42:54  1    individual prescription that you receive.

04:42:56  2          Mr. Nelson, the pharmacist is still allowed to refuse

04:43:00  3    to fill a prescription on an individual prescription basis.

04:43:04  4          Let's go to the next slide.

04:43:06  5          But when you're hearing from Mr. Nelson and what he

04:43:13  6    wrote the pharmacists when they're looking for advice on how

04:43:15  7    they should go about their job is exactly what Agent Edwards

04:43:19  8    is saying in 2021.  Why is that so controversial?  Why is

04:43:25  9    that so devastating that Mr. Nelson would offer that advice

04:43:29 10    to the pharmacists?

04:43:32 11          One of the things that the plaintiffs have talked

04:43:34 12    about is whether prescriptions -- or the blanket refusals to

04:43:39 13    fill are allowed by the Boards of Pharmacy that Mr. Nelson

04:43:43 14    talks about.  And we've already heard, again, some

04:43:45 15    discussion earlier about information that a number of

04:43:49 16    Walmart witnesses had talked about in conversations they had

04:43:54 17    with Boards of Pharmacy.

04:43:58 18          And it's true that those conversations don't say

04:44:04 19    whether the Board of Pharmacy had a rule or not, but as

04:44:07 20    Judge Polster has instructed, take a look at whether that

04:44:10 21    was something when Walmart came to their policy, was that

04:44:14 22    something that guided them in their decision-making?  Did

04:44:18 23    that show their intent of why they are telling their

04:44:21 24    pharmacists about Boards of Pharmacy?

04:44:22 25          Now, we heard the testimony of Debbie Mack.  And we

**Closing Argument - Majoras**

04:44:27  1    heard the testimony of Susanne Hiland.  Ms. Hiland testified

04:44:36  2    about her personal conversations with the Board of Pharmacy

04:44:41  3    in Texas.  She also talked about the Wisconsin action which

04:44:44  4    was filed against Walmart for not filling prescriptions from

04:44:47  5    a clinic.

04:44:48  6        Mr. Nelson testified about conversations his superior,

04:44:52  7    Mr. Coke, had with the North Carolina and the South Carolina

04:44:59  8    Boards.

04:45:00  9        And then Ms. Mack, we saw her testimony as presented

04:45:03 10    by video.  Ms. Mack testified about her conversations with

04:45:05 11    the Boards of Pharmacy in Texas, Oregon, California, Idaho,

04:45:09 12    Nevada, Oklahoma, Kansas, New Mexico.

04:45:15 13        So why is Walmart's policy that there's concern about

04:45:18 14    Boards of Pharmacy and why is Walmart telling their

04:45:21 15    individual pharmacists at that point in time that we don't

04:45:24 16    have a blanket refusals to fill, because that is the

04:45:27 17    information they have.  And the -- and the ultimate advice

04:45:32 18    on what their pharmacists should be doing is the advice that

04:45:35 19    any pharmacist should be able to follow and that they've

04:45:37 20    known since they were in pharmacy school.  Use your

04:45:41 21    judgment.  Look at issues, considerations that may concern

04:45:46 22    you about the prescription or about how the prescription is

04:45:48 23    presented to you, and then use your judgment in making that

04:45:51 24    decision to fill, just as Agent Edwards testified.

04:46:05 25        We also know from the testimony particularly that

7294

**Closing Argument - Majoras**

04:46:09  1    Ms. Hiland offered is that Walmart has -- Walmart has not

04:46:14  2    only hired excellent pharmacists like Ms. Militello, but has

04:46:17  3    also undertaken efforts to support its pharmacies --

04:46:21  4    pharmacists in the exercise of their judgment.

04:46:24  5        On this front, Ms. Hiland, who is a former Walmart

04:46:28  6    pharmacist herself, testified about the extensive training

04:46:30  7    that Walmart provides its pharmacists to supplement the

04:46:36  8    education they received in pharmacy school.

04:46:38  9        We brought you Walmart's pharmacy policies.  And we

04:46:41 10    keep hearing about when the policies were adopted, when they

04:46:44 11    came into effect.  Well, look at those policies.  They're in

04:46:46 12    evidence.  You can look at the policy manuals that were

04:46:50 13    referenced during the course of the testimony here.

04:46:54 14        If we go to slide 75, please.

04:46:57 15        So we started with the Connexus, the computer system.

04:47:04 16    We had great deal of testimony about the computer system and

04:47:08 17    how it adapted over time and as more information became

04:47:11 18    available, whether it was the PMP reports, whether it was

04:47:15 19    other information that was shared, including the blanket

04:47:19 20    refusals to fill, once those were permitted at Walmart, are

04:47:24 21    all available at the touch of the pharmacist.

04:47:26 22        The next slide.

04:47:27 23        We have POM 912, which was issued in January of 2005.

04:47:33 24    It includes indicators based on DEA Pharmacist's Manual.

04:47:36 25        We heard from Mr. Rannazzisi, I believe, that the DEA

### Closing Argument - Majoras

04:47:40  1    Pharmacist's Manual talks about indicators.  It doesn't use

04:47:44  2    red flags.  The same thing that Walmart had in its internal

04:47:47  3    policies.

04:47:47  4        Let's go to the next slide.

04:47:49  5        There were a number of portions of this particular

04:47:53  6    POM, this particular policy operating -- or pharmacy

04:47:57  7    operations manual that helped pharmacists looking at

04:47:59  8    indicators, what they should try to determine when there --

04:48:04  9    a prescription is presented to them.

04:48:05 10        Let's go to the next slide.

04:48:07 11        And it continues.  You may recall that as some point

04:48:10 12    Ms. Hiland was saying, I want to go to another page, let me

04:48:12 13    show you another page.  Well, it's all in there.

04:48:15 14        When allowed to look through it, you'll see the

04:48:18 15    materials that Walmart had in its policies available well

04:48:21 16    back to 2005, the systems available well before 2002.

04:48:25 17    Connexus was actually a second version of the computer

04:48:28 18    system that Walmart used.

04:48:30 19        Let's go to the next slide.

04:48:31 20        That in February of 2009, the POM 1311, which you

04:48:38 21    heard testimony about, expands the indicators that a

04:48:40 22    pharmacist should look at.  It explains the requirements for

04:48:43 23    proper patient-prescriber relationship.

04:48:45 24        We put these POMs into evidence so that you could see

04:48:48 25    them, not just simply hear about whether they were effective

**Closing Argument - Majoras**

04:48:51  1    or not effective.

04:48:53  2         Take a look at them.  You'll be able to have them in

04:48:57  3    evidence when -- if your questioning what Walmart was doing

04:48:59  4    with its pharmacists and what information it was providing

04:49:03  5    to its pharmacists.  Information, by the way, that someone

04:49:09  6    like Ms. Militello says, I've known about that since I

04:49:11  7    started practicing pharmacy.  And you heard that from the

04:49:14  8    other pharmacists in this case.

04:49:15  9         So I want to turn now to the final bridge that the

04:49:22 10    plaintiffs have to do -- have to prove to you and have to

04:49:25 11    build, and that's causation.  And we've heard about that

04:49:28 12    already.  We've heard that in the second question that

04:49:33 13    you're going to be asked to answer when you go into the jury

04:49:36 14    room to deliberate is the question as to whether or not the

04:49:40 15    individual pharmacies in this case were substantial causes

04:49:43 16    of the public nuisance, if you find there is one.

04:49:47 17         And it's very important to keep in mind that it

04:49:50 18    relates to each individual defendant.  There's evidence

04:49:53 19    about -- that differs among the defendants.  There's

04:49:56 20    evidence that the different defendants have put into the

04:49:58 21    record that have been brought by the plaintiffs in this

04:50:00 22    case.  So look closely at whether or not each of these

04:50:04 23    counties has individually been able to demonstrate that

04:50:08 24    Walmart, or any of the chain pharmacies, is a substantial

04:50:12 25    cause of a public nuisance.

**Closing Argument - Majoras**

04:50:15  1          And, yes, I want to talk about them.  Why wouldn't I?

04:50:23  2     It's important.

04:50:24  3          If we look at slide 82, please.

04:50:31  4          This is Mr. Glickman, who went through and did the

04:50:35  5     math, added up all of the information and the statistics and

04:50:38  6     presented them.  And he had concluded that Walmart's market

04:50:41  7     share of prescription opioids was 3.15 percent.  He was

04:50:46  8     asked, "Do you know if Mr. McCann -- Dr. McCann, agrees with

04:50:50  9     that calculation?"

04:50:51 10          "Yes, he does.  I mean, he said so in his deposition

04:50:54 11     testimony."

04:50:54 12          Let's go to the next slide.

04:50:55 13          And this is something I showed you -- well, it's a

04:50:59 14     little bit different because we have one less defendant now,

04:51:02 15     so we've changed some of the graphic.  But the importance

04:51:06 16     is -- it remains the same.

04:51:06 17          In this case, if you look at the -- Walmart's limited

04:51:10 18     presence in dispensing prescription opioids into Lake and

04:51:15 19     Trumbull County, because we've already said it's

04:51:17 20     3.15 percent, all of the defendants, together, are about

04:51:22 21     25 percent, which means about 72 percent aren't even in this

04:51:26 22     case in front of you.

04:51:27 23          Let's go to the next slide.

04:51:29 24          And then we get to a comparison to the independents.

04:51:33 25     And Mr. Lanier said, well, why are you comparing yourself to

**Closing Argument - Majoras**

04:51:36    1    independents?

04:51:36    2         I think it's very important to understand that the

04:51:39    3    reason to compare to independents is we know by looking at

04:51:43    4    this information where problems are.  We know who the bad

04:51:47    5    pharmacies are.  It's abundant in this slide where you see,

04:51:50    6    if you do a comparison of the three largest independents in

04:51:55    7    those two counties, just three stores, and you compare them

04:51:57    8    to all five Walmart stores, it's about five times as much

04:52:03    9    that they're selling in those stores.

04:52:06   10         And remember, pharmacies have an important role in

04:52:10   11    dispensing legal opioids written for an appropriate medical

04:52:13   12    purpose.  We need those pharmacies doing that.  The patients

04:52:16   13    who have been prescribed that treatment need pharmacies to

04:52:19   14    be able to do that.  So simply saying someone's a pharmacy

04:52:24   15    dispensing opioids doesn't answer the question.  The real

04:52:27   16    question when you look at oversupply is, who's putting out

04:52:30   17    so much that it's shocking?

04:52:32   18         Let's go to our next slide.

04:52:34   19         We looked at oxy 30, which we've heard in the

04:52:40   20    testimony is a particularly potent form of oxy and one that

04:52:44   21    is very popular, if that's the right word, in the illicit

04:52:48   22    markets.  And look again at the comparisons to the

04:52:50   23    independents, the three non-defendant independents, the ones

04:52:54   24    that aren't even in this case are showing 8.7, 9.8,

04:53:00   25    17.6 percent of all -- of the oxy 30 in these counties.

# Closing Argument - Majoras

04:53:04 1        Compare that to Walmart. .5 percent.  .2 percent.

04:53:08 2    .1 percent.  1 percent.  .1 percent.  Those are the five

04:53:11 3    Walmart stores in this case.

04:53:15 4        Now, Mr. Lanier said, watch, be careful if someone's

04:53:19 5    using MME.  Well, they should be using MME.  A -- a pill --

04:53:26 6    an opioid pill that does not have very much potency can't be

04:53:30 7    compared to an oxy 30 or an oxy 80, which is a huge pill.

04:53:37 8    An MME allows you to assess the amount -- not only the

04:53:40 9    numbers of pills that are being dispensed, but the potency

04:53:43 10   of those pills.  It's the appropriate measure, and that's

04:53:46 11   what we've shown you.

04:53:46 12       Let's go to the next slide.

04:53:48 13       So now the question is, given what Walmart has done

04:53:56 14   and given Walmart's limited presence, can it be a

04:54:00 15   substantial factor of any public nuisance that you might

04:54:05 16   find in Lake and Trumbull Counties.

04:54:07 17       Let's go to our next slide, please.

04:54:09 18       So, here, we've got two issues.  So if we started with

04:54:21 19   Walmart has 3.15 percent of the prescriptions and you go to

04:54:25 20   what Mr. Catizone and Dr. McCann identified, they said this

04:54:28 21   is the sliver, this is the narrow sliver that we have

04:54:35 22   determined raises questions of what Walmart has been

04:54:37 23   dispensing into those counties, so it's not all

04:54:41 24   3.15 percent.  If fact, what they determine, if you look at

04:54:43 25   the numbers, the math turns out that it's less than

**Closing Argument - Majoras**

04:54:46  1      1 percent that they even question.

04:54:49  2          So even taking them at full value, which we know that

04:54:52  3      can't be right because we saw those prescriptions, we saw

04:54:55  4      the hospice prescriptions, but even taking that at full

04:54:58  5      value, Walmart has .9 percent of the prescriptions dispensed

04:55:01  6      in these counties.  That is a significant concern, or a

04:55:07  7      significant issue that you ought to be thinking about

04:55:09  8      because the question is, are they a substantial factor.  And

04:55:13  9      this even understates it.  Because you have to look at all

04:55:16  10     the other factors that we've heard about during the course

04:55:19  11     of the testimony in this case.

04:55:23  12         The manufacturers, and what the manufacturers were

04:55:25  13     doing or saying and marketing about the product -- about

04:55:28  14     their products.  The question about rogue stores, like some

04:55:32  15     of the others that we saw that are just essentially look

04:55:35  16     like they're handing out a prescription opioids.  The

04:55:38  17     illegal cartels.  If you look at all of the issues, all of

04:55:44  18     the potential factors that may go into what the problems

04:55:48  19     that Trumbull and Lake County are seeing, you have to factor

04:55:54  20     all of those in.  It's not just the pharmacies; it's all of

04:55:57  21     these other factors.  And if you combine all that together,

04:56:00  22     that very small piece that the Walmart pharmacies have

04:56:02  23     responsibility for just among the pharmacies shrinks even

04:56:08  24     smaller.  It's minuscule.

04:56:10  25         You've heard the testimony.  You've seen the evidence.

## Closing Argument - Majoras

04:56:13  1    You know where the problems are with respect to the drug

04:56:16  2    issues in Lake and Trumbull Counties.  Walmart is not a

04:56:20  3    substantial factor.  It's not a substantial cause of any of

04:56:23  4    those issues.  It can't be.  And that's something that you

04:56:29  5    need to consider as you look to answer the second question

04:56:31  6    that you'll be asked on the juror -- on the jury verdict

04:56:34  7    form, which is if you found that there is a public nuisance

04:56:38  8    in Question 1, is Walmart, or all of these chain pharmacies,

04:56:44  9    a substantial cause, a substantial factor in causing that

04:56:49 10    public nuisance.  And the evidence in this case, and the

04:56:53 11    lack of evidence in this case, can point to only one

04:56:56 12    direction with respect to Walmart:  It is not.  It cannot be

04:57:00 13    a substantial factor in the issues that Lake and Trumbull

04:57:06 14    county are facing today.

04:57:08 15         Ladies and gentlemen, thank you.  I appreciate your

04:57:11 16    attention.  My client appreciates the attention you've given

04:57:14 17    throughout this case.

04:57:15 18         I will not be able to talk to you again.  Mr. Lanier

04:57:17 19    will be able to talk to you.  As I said, look at -- make

04:57:20 20    sure you see what the evidence is.  You'll be able to look

04:57:22 21    at the evidence when you're back in the jury room.  It's not

04:57:24 22    a matter of who's arguing the best or whose telling you what

04:57:27 23    happened.  Look at the evidence.  That's why there are a

04:57:31 24    number of folks on the jury so that collectively you can

04:57:33 25    look at the evidence and reach the conclusions based on the

04:57:36  1    evidence in this case.  And the evidence in this case will

04:57:38  2    lead you to the conclusion that on Question No. 1 there is

04:57:42  3    not an oversupply of prescription opioids causing diversion

04:57:47  4    in Lake and Trumbull County currently, ongoing, but even if

04:57:50  5    you get there, Walmart cannot be a substantial factor in

04:57:54  6    causing the nuisance that those counties may be facing.

04:58:01  7        Thank you.

04:58:10  8            MR. LANIER:  Your Honor, with your permission,

04:58:11  9    it will take me just a moment to move their stuff out of the

04:58:13  10   way and start mine.  If I could --

04:58:15  11            THE COURT:  Okay.  Very well.

04:58:19  12       Thank you, Mr. Majoras.

04:58:21  13            MR. MAJORAS:  Thank you.

04:58:22  14            MR. LANIER:  Yeah, I'll need Mr. -- I'll need

04:58:24  15   them to bring in and you then I'll also -- I'll try and move

04:58:29  16   this and then we need the iTiVo set up.

04:58:42  17            (Brief pause in proceedings).

05:00:22  18            MR. LANIER:  Your Honor, I've got 30 minutes?

05:00:24  19            THE COURT:  Very good, Mr. Lanier.

05:00:25  20       CLOSING ARGUMENT IN REBUTTAL BY THE PLAINTIFFS

05:00:25  21            MR. LANIER:  If it please the Court, ladies

05:00:27  22   and gentlemen -- oh, I need a microphone.

05:00:30  23       May it please the Court, ladies and gentlemen, y'all

05:00:37  24   win the "Patience of the Year Award."  Thank you so much.

05:00:40  25   I'm sorry I've got 30 minutes to go.  I couldn't have asked

**Closing in Rebuttal by Plaintiffs - Lanier**

05:00:43 1   Mr. Majoras to give me a better speech.  I've been waiting

05:00:45 2   to bring in my bridge.  And he challenged me to build a

05:00:49 3   bridge.  Oh, I got a bridge.  And he wants the bridge on

05:00:53 4   causation.  And he wants to stand up here and say, but we

05:00:57 5   did such a little bit in the county.  Of course, never mind

05:01:00 6   the fact that they had all those stores dotted right outside

05:01:03 7   the county that they're not counting.  But be that as it

05:01:07 8   may, this is my LEGO bridge.  And it's made up of hundreds

05:01:13 9   of LEGOs I suspect.  I haven't really counted.  Don't know

05:01:18 10  for sure.  But a lot.

05:01:19 11      Now, I built -- I had this bridge built by my guys

05:01:25 12  because when I walk out of the courthouse every day or walk

05:01:28 13  through the courthouse, I see this bridge right across there

05:01:31 14  or across the Cuyahoga River.  And I thought, boy, what a

05:01:39 15  splendid illustration for this case.  Because the defendants

05:01:42 16  are saying, especially Walmart, hey, we only put in, like,

05:01:46 17  6 percent, or 2 percent, or 5 percent, depends on what it is

05:01:51 18  of the opioids in the county.  How can we be a significant

05:01:54 19  part of the problem?

05:01:56 20      I thought, you know, that bridge has been built on

05:02:02 21  trestles.  And mercy, the entire community drives over it

05:02:06 22  all the time, or a portion of the community, just confident

05:02:12 23  that the people who made the steel trestles did so up to

05:02:17 24  code, up to snuff.

05:02:21 25      And you know, if they didn't, or let's say they did

## Closing in Rebuttal by Plaintiffs - Lanier

05:02:26  1    90 percent of them up to snuff, or 95 percent but two or

05:02:30  2    three of them are rotten.  If they're in the wrong place,

05:02:34  3    the community that's driving over that bridge, if you just

05:02:38  4    take out a couple (indicating), everything can fall.

05:02:46  5         You can't say just because you're only two of the

05:02:50  6    bricks -- and I nudged it a little bit.  I wanted to make

05:02:53  7    sure it fell for y'all.  I got to be honest here, right?  My

05:02:59  8    candor to the tribunal.  I didn't nudge it much, but I did

05:03:03  9    hit it with the top of my finger accidently on the top.

05:03:05 10    So -- so but as we were pulling those things out, you take

05:03:08 11    something out, and it's a question of whether or not it's

05:03:12 12    significant.

05:03:14 13         And so I listened to 3 hours, and I was very

05:03:18 14    frustrated because I have about -- Your Honor, about a

05:03:21 15    2-hour rebuttal here and you've given me 30 minutes and I've

05:03:24 16    spent 5 of it on the bridge, but I know that people know

05:03:32 17    this.  This is common sense.  You know, this is why, with

05:03:36 18    Murphy, their economist expert fellow, I used this study

05:03:41 19    with him.  And we did the math.  The study shows this is

05:03:47 20    implications of county-level variation in opioid

05:03:52 21    distribution and the adjusted models show a one-pill

05:03:57 22    increase in PC -- this is per capita pill volume -- a

05:04:06 23    one-pill increase was associated with a .2 percent increase

05:04:10 24    in ORDs -- ORDs are opioid related deaths -- per 100,000

05:04:22 25    population.

Closing in Rebuttal by Plaintiffs - Lanier

05:04:22  1      So if you've got 400,000, 450,000 in these counties,

05:04:28  2   you've suddenly got, for each pill you're pumping in, an

05:04:32  3   extra death, or .eighths of an extra death per year.

05:04:37  4      So you can look at Walmart, who's pumping in multiple

05:04:40  5   pills per capita, you can look at Walgreens, who's pumping

05:04:45  6   in multiple pills per capita, you can look at CVS, who's

05:04:49  7   pumping in multiple pills per capita, and you can figure

05:04:53  8   that proportionally they're responsible for deaths.

05:04:57  9      Now, His Honor gave us options on how to pursue our

05:05:02 10   case, and we chose to pursue our case on an overall

05:05:09 11   oversupply of prescriptions.  But that doesn't mean that we

05:05:14 12   weren't able to nitpick and we weren't able to look at

05:05:17 13   prescriptions, because we did.  But you don't have to get to

05:05:22 14   the prescription level to figure out that oversupply equals

05:05:26 15   problems.

05:05:28 16      Here's your finale road map (indicating).  We got to

05:05:31 17   get down the road quick.  We started with the bridge.

05:05:34 18   Whoops.  There we go.

05:05:36 19      We started with the bridge.  I want to talk about some

05:05:39 20   Walmart arguments, some CVS arguments, and then some

05:05:43 21   Walgreens arrangements.  And you're just going to have to

05:05:45 22   bear with me.  I'm going to go very fast, but y'all have

05:05:48 23   been taking vicious notes, some of you.  Some of you don't

05:05:52 24   take any notes at all.  And I think some days I don't take

05:05:55 25   notes, but some days I take vicious notes.  Today I took

### Closing in Rebuttal by Plaintiffs - Lanier

05:05:58  1    vicious notes so I'm going to give you what I got but I'm

05:06:02  2    going to need you to go back there with what you've got and

05:06:04  3    you got to help everybody remember the testimony.  Some

05:06:06  4    people do it better with notes, some people do it better

05:06:09  5    without notes.  But talking about Walmart, here we go.

05:06:11  6          Contrast to independent dispensing level.  Again, even

05:06:16  7    though I pointed this out to them in the trial, they ignored

05:06:19  8    everything I said about all of their other pharmacies that

05:06:22  9    surround these counties that pump into these counties and

05:06:27 10    they don't count any of those stores.  And that's just

05:06:32 11    elusive.  That's not fair to do.

05:06:34 12                     MR. MAJORAS:  Objection, Your Honor.

05:06:34 13                     MR. LANIER:  And no, MMEs is not the test.

05:06:39 14                     THE COURT:  Overruled.

05:06:39 15                     MR. LANIER:  I'm sorry, was something said?

05:06:40 16                     THE COURT:  I overruled the objection.

05:06:42 17                     MR. LANIER:  Oh, MMEs is not what they ought

05:06:44 18    to be looking at.  Look this doesn't say per MME.  This says

05:06:47 19    a one-pill increase in per capita.  That's what the academic

05:06:51 20    look is here in this article on drug and alcohol -- out of

05:06:54 21    drug and alcohol dependence on opioid distribution in county

05:06:58 22    levels.  And that's what they ought to be looking at, and

05:07:00 23    that's what we've given you.

05:07:01 24          An then, when he's talking about his bridge, he starts

05:07:05 25    playing hide-and-seek with you.  He says, look, do you

**Closing in Rebuttal by Plaintiffs - Lanier**

05:07:08  1   realize what happened here?  Here's some hide-and-seek.

05:07:11  2   Where was testimony about the county, McCann didn't talk

05:07:15  3   about county prescriptions.  Well, he can't.  He's not

05:07:18  4   qualified to.  He's a numbers geek.

05:07:21  5        Lembke didn't talk about them.  That's not her job

05:07:24  6   either.  We didn't hire her to do it.

05:07:26  7        Joe Rann, Alexander, Keyes, none of them talked about

05:07:31  8   it because it wasn't their job to.  That's hide-and-seek.

05:07:34  9        That's like in this trial, I didn't talk about

05:07:37 10   Johnson & Johnson's hip implants.  Okay.  Well, that's not

05:07:42 11   what I was hired to do here in this case.  I'm in here

05:07:46 12   representing these counties.

05:07:49 13        And then he said, now, they did have Carmen Catizone

05:07:54 14   look at it and we'll talk about that later, and that later

05:07:57 15   never really showed up about what the counties said.

05:08:01 16        So what do we have?  We have Carmen Catizone looking

05:08:05 17   at them and then, the next thing that I hear from him, from

05:08:10 18   Mr. Majoras, is a massive misstatement of the law.

05:08:15 19        So one of the greatest tools you've got when you go

05:08:17 20   back into the court -- into the deliberation, wherever you

05:08:21 21   will, is what the judge gives you.  Read the instructions.

05:08:25 22   He's a lawyer, but he's the only lawyer that's got full

05:08:28 23   credibility in this entire room.  And what he says is the

05:08:32 24   law.

05:08:36 25        And you read what he says because he doesn't say

## Closing in Rebuttal by Plaintiffs - Lanier

05:08:39  1    things like egregious.  I heard from Mr. Delinsky five

05:08:42  2    times, egregious, egregious, egregious.  Egregious ain't

05:08:46  3    anywhere in there.

05:08:48  4        Mr. Majoras said this -- this was a stunning new one

05:08:54  5    for me.  He said -- he put this up here, this part of the

05:08:58  6    charge on public nuisance.  And it says that -- "Let me

05:09:04  7    define for you the legal term 'public nuisance.'  A public

05:09:07  8    nuisance is an unreasonable interference with a right held

05:09:09  9    by the public in common that's ongoing today."  And

05:09:15 10    Mr. Majoras wants to try and turn this into a comment that

05:09:20 11    the interference is ongoing today.  But that's not what this

05:09:26 12    is talking about.  This is talking about a public nuisance

05:09:30 13    is an unreasonable interference with a right held by the

05:09:33 14    public in common that is ongoing today.  The public nuisance

05:09:37 15    has to be ongoing today.

05:09:39 16        In other words, if everything went wrong the way it

05:09:42 17    did in the first phase in 2000 to 2010, if that's resolved

05:09:48 18    itself and there's no longer a problem here today, God bless

05:09:51 19    America and Northeastern Ohio, we go home.  But if the

05:09:56 20    public nuisance was one that's still a problem today because

05:09:59 21    you're still having to deal with the children that were born

05:10:03 22    under those circumstances and the babies, and you've still

05:10:05 23    got to deal with the broken families, and you've still got

05:10:07 24    to deal with the people in jail, and you've still got to

05:10:10 25    deal with the crime, and you've still got to deal with the

## Closing in Rebuttal by Plaintiffs - Lanier

05:10:13   1   gateway effect, and you've still got to deal with all -- if

05:10:16   2   the nuisance is ongoing today, boom.  Yet for some reason he

05:10:22   3   misreads the law to you.  You can read that law when you get

05:10:25   4   back there.  You'll know what it says.

05:10:27   5       I don't have time to go through everything, but I will

05:10:32   6   add one more thing to what he said here.

05:10:34   7       I've used 10 minutes.  Okay.  Thank you, Rachel.

05:10:36   8       They talk about Edwards, Trey Edwards, the county --

05:10:42   9   the fellow with the Ohio board, and they don't show you this

05:10:46  10   part of his testimony.

05:10:47  11       "Isn't it true you regularly advise pharmacists if you

05:10:52  12   don't write it down, it didn't happen?"

05:10:55  13       Yep.  "That's common, yes."

05:10:59  14       Because what he said -- the question he played you, or

05:11:03  15   showed you was one that says just because they didn't write

05:11:06  16   it down doesn't mean they didn't do it; correct?  Well,

05:11:09  17   correct.  I mean, I'd say correct to that.  But it doesn't

05:11:12  18   mean they did do it.

05:11:16  19       They're not writing this stuff down and maybe they are

05:11:19  20   doing it, maybe they're not, but we know they're not doing

05:11:23  21   their job right because the standard of care for Ohio and

05:11:25  22   the standard of care within the companies is document.  And

05:11:30  23   if it's not documented, it didn't happen.

05:11:33  24       And as for his cut-and-paste with Trey Edwards, while

05:11:37  25   we're on the subject of Trey Edwards, he gave you this

### Closing in Rebuttal by Plaintiffs - Lanier

05:11:41  1   slide -- gave you this slide just now and said look how

05:11:44  2   close Brad Nelson is to Trey Edwards.

05:11:47  3        Oh, there's a huge difference.  You'll see Plaintiffs'

05:11:50  4   Exhibit 8068 when you go back there.  Here's the

05:11:53  5   cut-and-paste that Brad Nelson was fond of doing because

05:11:56  6   it's got the cut-and-paste on it.  Follows an e-mail like

05:11:59  7   this.  This is a topic -- this is the subject, "DEA and

05:12:07  8   Dr. Cocktails."

05:12:07  9        "This is a topic I think we need to start talking

05:12:10  10  about since it could result in hefty fines for our company

05:12:14  11  and for us personally.  I've heard, over the last few weeks,

05:12:19  12  that Kroger and Walgreens have started blocking doctors that

05:12:22  13  write excessively for certain meds, especially when

05:12:26  14  prescribed in conjunction with each other.  I spoke with a

05:12:29  15  Kroger pharmacist this morning and he mentioned that as of

05:12:32  16  October 1st the DEA was going after pharmacies and

05:12:35  17  pharmacists that continue to fill from these doctors that

05:12:38  18  prescribe them excessively.  What their definition of

05:12:42  19  excessive is, I'm not sure, but the Kroger pharmacist

05:12:46  20  mentioned that their home office determined who to block and

05:12:49  21  then blocked the pharmacies by installing a hard halt when

05:12:53  22  they tried to fill it.  This was in response to the DEA's

05:12:57  23  threatening" -- and we're not allowed to know what that

05:13:01  24  says -- "to their company if they continued.  So far they've

05:13:05  25  blocked four doctors in this area, Dr. Randall Wade being

### Closing in Rebuttal by Plaintiffs - Lanier

05:13:08   1   one of them, he mentioned two in the Denton area, I'm not

05:13:11   2   sure of the others.  We hear Dr. Wade's telling his patients

05:13:15   3   to go to Walmart because they'll still fill them, so he

05:13:18   4   knows about the block from the other stores.  My concern now

05:13:22   5   is that we as a company will start to accumulate this

05:13:25   6   suspect clientele and be in the same boat as Kroger and

05:13:30   7   Walgreens that are now trying to. . .

05:13:32   8       "As you know, some of these doctors have been around

05:13:35   9   for a long time.  It might be hard to dispute or prove

05:13:38  10   against the proper patient prescriber relationship, as

05:13:42  11   you'll always get a confirmation.  At this point, nothing

05:13:44  12   seems excessive or out of the ordinary, but I can see a

05:13:48  13   future on this one."  So do we or don't we?  And the answer,

05:13:52  14   cut-and-paste.  We are not allowed to corporate block.  We

05:13:57  15   tried to chase that down and it was hearsay.

05:14:00  16       Nothing in writing, and certainly nothing in Ohio.

05:14:03  17       And so you've got a situation with Walmart where I

05:14:07  18   trust you've got the timelines, I trust you can look at

05:14:10  19   these timelines and see what all was happening and when they

05:14:13  20   were a funnel, and when they had their agreements with the

05:14:16  21   DEA, and how long they lived up to those agreements with the

05:14:19  22   DEA, and how they made their changes and their adjustments,

05:14:23  23   and how it was too little too a little and how even

05:14:28  24   Susanne Hiland said on OARRS, in 2007, after OARRS has come

05:14:32  25   out, the next year -- it came out in 2006 -- "There are

### Closing in Rebuttal by Plaintiffs - Lanier

05:14:34  1    several states that allow access to the monitoring program.

05:14:38  2    We met with several operators, including Ron.  It was

05:14:45  3    decided we'd get a legal determination of whether or not to

05:14:46  4    provide or allow this access to our stores includes Ohio.

05:14:48  5    The opinion has been we will not grant access to these

05:14:52  6    databases."

05:14:53  7         Pharmacists aren't required to use it, why should we

05:14:56  8    give it to them?

05:14:57  9         And then once the requirement came in in 2011, they

05:15:01 10    changed.

05:15:02 11         I've got to move on.  Thank you, Rachel.

05:15:04 12         Let's move down the road -- thank you -- to CVS.

05:15:08 13         Now, Mr. Delinsky is generally a slow talker.  But he

05:15:17 14    covered a lot of ground today.  I want you to know that you

05:15:20 15    need to ignore what he said about the law and instead follow

05:15:25 16    what the judge said.  Mr. Delinsky said, did CVS and its

05:15:29 17    pharmacies in Lake and Trumbull County act so egregiously as

05:15:33 18    to harm entire communities?  That's not the judge's

05:15:35 19    instruction.

05:15:36 20         He said the Ohio Board of Pharmacy has all the data.

05:15:40 21         No, they don't.

05:15:42 22         He said there's never been any eyewitnesses to any

05:15:46 23    prescription problems or anything like that.  Where is a

05:15:50 24    local witness?

05:15:51 25         Captain Villanueva.

### Closing in Rebuttal by Plaintiffs - Lanier

05:15:54  1       Now, I wasn't able to show you the entire OARRS

05:15:56  2  report, but I was able to show you the synopsis of that

05:15:59  3  report for Doug Winland, who is convicted, not simply of

05:16:05  4  deceiving, but even beyond that.  But he's clearly a

05:16:09  5  diverter.  It was clear in the OARRS report, and he's

05:16:13  6  getting his prescriptions filled by CVS and Walgreens.

05:16:20  7       I mean, that's -- that's as direct as you're going to

05:16:23  8  get.

05:16:26  9       He said, no county investigation.

05:16:29  10       Well, first of all, ongoing investigations I don't

05:16:32  11  even know that I'd be allowed to get into.  But what we did

05:16:35  12  with our time that we had in this case is we drove home the

05:16:39  13  bigger picture.  And if we dealt with investigation by

05:16:43  14  investigation, I can guarantee you what they'd have done is

05:16:46  15  come in here and say, well, okay, that's five

05:16:49  16  investigations, that's seven suicides, so that's this, but

05:16:52  17  where's the bigger picture?  And so we opted to go with the

05:16:55  18  bigger picture in the time zone.  But you did see with

05:16:58  19  Doug Winland, one of the specific cases, one of the specific

05:17:01  20  investigations in this county.  You saw him having his

05:17:04  21  prescriptions filled at CVS.  You saw him at Franklin.  You

05:17:08  22  saw him at Overholt's.  You saw him at Rite Aid, and

05:17:12  23  Walgreens, Walgreens, Walgreens.  Walgreens.

05:17:17  24              UNIDENTIFIED SPEAKER:  Walmart.

05:17:18  25              MR. LANIER:  Walmart.  Last one's Walmart.

## Closing in Rebuttal by Plaintiffs - Lanier

05:17:18  1    Thank you.

05:17:19  2         You saw it.  The rest of the OARRS report had all of

05:17:24  3    the prescriptions and I didn't have that data to give you,

05:17:27  4    but I have this data to give you, the summation the judge

05:17:31  5    let us get into evidence and there it was.

05:17:33  6         So -- you know, and then the idea, well, but if there

05:17:40  7    was -- the company -- if the companies were doing something

05:17:43  8    wrong, surely the law enforcement would get them.  But even

05:17:48  9    Ms. Militello testified -- even Ms. Militello testified --

05:18:02 10    say it again, what?

05:18:04 11                   UNIDENTIFIED SPEAKER:  Turn it off and on.

05:18:06 12                   MR. LANIER:  Off and on.

05:18:09 13         Even -- look at that.  I'm telling you, Marines do it

05:18:14 14    right.

05:18:14 15         "How would you describe your interaction with law

05:18:18 16    enforcement officials in Lake County?"

05:18:19 17         "As far as Lake Narcotics, I thought it was great.  I

05:18:22 18    mean, we had a really good relation with them, we always

05:18:25 19    felt like, you know, they would address things pretty

05:18:28 20    promptly to the point, and then I think they got overrun."

05:18:32 21         They don't -- they don't investigate the pharmacies

05:18:36 22    unless they get a tip.

05:18:38 23         You had the guy with the shades, Pavlich, thank you,

05:18:42 24    you had Pavlich who was rightfully proud for shutting down

05:18:50 25    Overholt's, but he never picked up on Overholt's by doing

### Closing in Rebuttal by Plaintiffs - Lanier

05:18:53  1     his annual inspection.  It took a tip.

05:18:57  2         I would -- I would think that there's a good chance --

05:19:00  3     I don't know what the future holds.  That's not our

05:19:03  4     question.  Our question is simply this case right now.  And

05:19:07  5     so when you look at the blame game, don't look at -- yeah,

05:19:13  6     look all the over the place.  I have no trouble with that.

05:19:17  7     The question is, how can these pharmacies blame Overholt's

05:19:20  8     and how can they blame Franklin and take zero responsibility

05:19:25  9     themselves?  Zero.

05:19:28 10         How can they have policy -- oh, look, we had all of

05:19:31 11     those wonderful policies.  As Mr. Delinsky said, are we --

05:19:34 12     with all of these policies, are we the kind of company that

05:19:37 13     would ever do something so egregious?  And look, yes.

05:19:45 14         *Holiday*.  That was your company.

05:19:50 15         Maryland.  That was your company.

05:19:53 16         Walgreens in San Diego, that was your company.

05:19:56 17         Walmart, that was your company.

05:19:59 18         They've entered into settlement after settlement in

05:20:02 19     spite of all of these wonderful policies they tell you

05:20:06 20     they've got.  They still -- you know, you can take every one

05:20:10 21     of those wonderful screens -- Juan, this is because I

05:20:18 22     bragged on this iTiVo medicine.  We need a new one.

05:20:21 23         You can take all of these wonderful tools and it

05:20:25 24     didn't stop *Holiday*.  And it didn't stop the doctors in this

05:20:30 25     case that are bad-prescribing doctors.

## Closing in Rebuttal by Plaintiffs - Lanier

05:20:34  1      And they say, well, but *Holiday* didn't apply to us.

05:20:38  2      Oh, the *Holiday* settlement wasn't just two stores.

05:20:40  3  You'll see it as Plaintiffs' 8954.  But it's not just those

05:20:44  4  two stores.  It affected their policies, period.  This was

05:20:50  5  something where the company had to deal with it.  They

05:20:53  6  created a new job for it.

05:20:59  7      You know, I would -- I've got to move on.  I can't

05:21:04  8  move on.  I've used 20 minutes.  Okay.  I don't want to

05:21:07  9  shortchange Walgreens.  They get a full share.  But before I

05:21:12 10  leave Mr. Delinsky and CVS, I want to show you his hocus

05:21:16 11  pocus math.

05:21:19 12      Look at this.

05:21:20 13      He says we use MMEs.  Never mind that the data or the

05:21:27 14  article, for example, that shows the increased deaths that

05:21:29 15  happened based upon pills, never mind that.  We still want

05:21:34 16  to use MMEs.  And he says, but it really doesn't matter.

05:21:38 17  And I'm sitting -- he says, if you have any question, go

05:21:41 18  back and look at this chart, so Rachel grabbed the chart, or

05:21:46 19  Ms. Fitzpatrick did back there, grabbed the chart that he

05:21:49 20  said this is what it comes from.  He's showing MMEs so he

05:21:53 21  can get that 10.4 percent on the chart.

05:21:59 22      Whoops.  Hold on.  Hold on.  Hold on.

05:22:01 23      That 10.4 percent.  He's not showing you dosage units

05:22:06 24  where, all of a sudden, it's 40 percent more.  It's

05:22:13 25  14 percent.  That's 40 percent more than 10 percent.

### Closing in Rebuttal by Plaintiffs - Lanier

05:22:19 1    But he doesn't want to show that because you increase

05:22:23 2 that and all of a sudden it looks worse.

05:22:25 3    You know, look at this.  He put this one up there

05:22:28 4 (indicating).

05:22:30 5    Flagged prescribers, 37 percent.  He says there must

05:22:34 6 be a problem there because 99 percent of the doctors are

05:22:36 7 perfect.

05:22:36 8    There's not a problem.  The red flags happen

05:22:41 9 37 percent of the time, so you resolve them.

05:22:44 10    This is the metal detector analogy I gave you from

05:22:49 11 downstairs.  Maybe 37 percent of the people trip the metal

05:22:52 12 detector.  That does not mean 37 percent are trying to get a

05:22:56 13 knife in here because they're upset with the way the judge

05:22:59 14 sentenced their cousin.

05:23:02 15    Maybe 1 percent is.  Maybe .1 percent is.  I don't

05:23:06 16 know.  But I sure hope those CSOs downstairs are checking

05:23:10 17 everybody that goes through and if the 37 percent trip it,

05:23:13 18 they say, it might be your shoes, ma'am, it might be your

05:23:16 19 belt buckle, sir.  Do you have your cell phone in your

05:23:18 20 pocket?  Can you take your watch off and run back through?

05:23:25 21 That's just -- I mean, that's common sense.

05:23:29 22    Let's look at Walgreens.  Last stop.

05:23:34 23    Walgreens talked to you about a lot of different

05:23:40 24 stuff, the causation, things like that, and I don't have a

05:23:42 25 lot of time to get into it but I've covered it with the

## Closing in Rebuttal by Plaintiffs - Lanier

05:23:44  1    others, but there are a couple of things I want to add.

05:23:46  2         They said there's no problem filling with Dr. Veres.

05:23:49  3    We filled for Dr. Veres even though others didn't, even

05:23:52  4    though others quit because he had a license.  Well, pooey on

05:23:56  5    that.

05:23:57  6         Look at the background work CVS did on Dr. Veres and

05:24:02  7    ask yourself if maybe Walgreens should have done some of

05:24:05  8    this background work.

05:24:07  9         This is Plaintiffs' 8494.  And it looks at the Google

05:24:11 10    reviews.  And this is what the Google reviews said.

05:24:14 11         Now, may be true, may not be true.  But at least

05:24:17 12    they'd have been on notice if they'd have looked and they

05:24:22 13    could have investigated to see if it's true.  I've learned

05:24:25 14    Google reviews are not always true.

05:24:26 15         Here it is.  January 25th, 2016.  "My mother's a

05:24:30 16    patient of his and she literally walks around like a zombie.

05:24:35 17    She's been hospitalized multiple times with falls and for

05:24:37 18    being over-medicated.  So instead of lowering her dosages,

05:24:42 19    he doubled them.  There's no way he could actually be her

05:24:45 20    doctor and not realize what's going on.  Everybody in town

05:24:48 21    who's hooked on pain and anxiety meds are his patients.  So

05:24:52 22    if you want to become a full-blown drug addict, he's the man

05:24:54 23    to see."

05:24:56 24         I mean, do they check this stuff?  No.  Their answer

05:25:01 25    to you is, hey, he had a valid DEA license.  We'll be the

## Closing in Rebuttal by Plaintiffs - Lanier

05:25:08  1    gumball machines, spit it out.  We're not going to do any

05:25:13  2    work.  And that's absolutely horrible.

05:25:14  3         Look at the red flags that are here according to CVS's

05:25:17  4    investigation.  CVS investigates and says, hydrocodone, he's

05:25:22  5    volume 99.  He's in the top 99 percentile.  His share is 98.

05:25:28  6    Average red flags, he's in the 97th percentile.  Cocktails,

05:25:33  7    the 95th percentile.  26 percent with any benzo, and then he

05:25:39  8    prefers Valium.

05:25:40  9         Now, there's no board action on file, but come on.

05:25:48  10   But Walgreens' attitude was, hey, he's got a valid license,

05:25:52  11   we'll just fill those, we're not too worried about it.

05:25:55  12        You look at Joyce, even Joyce admitted, question by

05:26:00  13   Mr. Weinberger:  "You remember Dr. Veres, don't you?"

05:26:03  14        "Very well."

05:26:04  15        "What do you remember about him?"

05:26:06  16        "Dr. Veres has been a problem in the valley for a long

05:26:12  17   time."

05:26:12  18        That's Dr. Veres.

05:26:14  19        Rachel, how much time do I have?

05:26:19  20             MS. LANIER:  5 minutes.

05:26:20  21             MR. LANIER:  5 minutes.

05:26:21  22        He said there's no evidence that the Walgreens'

05:26:24  23   pharmacists failed do their job.  Sitting their thinking,

05:26:27  24   were you gone whether Carmen Catizone put the prescriptions

05:26:30  25   up there?  Did you not see 508 days of oxy?  And this is one

### Closing in Rebuttal by Plaintiffs - Lanier

05:26:38  1    that was filled.  This note was entered and then the

05:26:43  2    pharmacist filled it.  Did you not see how many were blank,

05:26:48  3    the relevant note fields?  Did you not see the other

05:26:52  4    prescriptions that were especially bad?  Did you not see

05:26:57  5    what Tasha Polster had to say?  This on the question of

05:27:02  6    intent.  Someone says, well, intent is something you've got

05:27:05  7    to show.  Yeah, the way the judge specifies it.  And so you

05:27:09  8    look at that charge, and you look at things that include

05:27:13  9    stuff like Page 19 down at the bottom.  Page 19 down at the

05:27:19  10   bottom says something significant.

05:27:22  11         If you will find it for me, please, Peter.

05:27:25  12         Meanwhile, I will tell you that these are the

05:27:29  13   people -- uh, 19.  He's fast, man.  It's his birthday.

05:27:33  14         Don't let anybody say someone 71 can't move quick,

05:27:36  15   Your Honor.

05:27:36  16         If a person learns that circumstances resulting from

05:27:39  17   their conduct interfere with public health or safety and the

05:27:43  18   person continues that conduct, the subsequent conduct is

05:27:47  19   intentional.  These companies knew what they were doing.

05:27:50  20   Florida put them on notice.  *Holiday* put them on notice.

05:27:52  21   Maryland put them on notice.  They knew their systems

05:27:55  22   weren't working, and yet they just kept with it.  They just

05:27:59  23   kept with them.  They'd make adjustments years later, but

05:28:03  24   they just kept with them.

05:28:04  25         You've got the documents from people like

**Closing in Rebuttal by Plaintiffs - Lanier**

05:28:07  1    Tasha Polster who recognized that there's a problem with

05:28:10  2    training, and she recognizes periodic training for all

05:28:14  3    retail employees for dispensing.  No such training exists

05:28:18  4    today.  This is 2010.

05:28:21  5         They recognized that, you know, they say, well, you

05:28:24  6    know, we had Good Faith Dispensing.  No, that's something

05:28:27  7    you relaunched in 2013, in June.  We relaunched our Good

05:28:34  8    Faith Dispensing Policy across the chain.

05:28:35  9         And then they monitored to see how it was doing, and

05:28:39 10    their per store random check was going south.  Results were

05:28:44 11    unfavorable because they weren't doing a good job.

05:28:48 12         So you get the jury instructions.  You get the verdict

05:28:53 13    forms.  And this is what they look like when the judge gives

05:28:56 14    them to you (indicating).

05:29:00 15         Did Lake County prove, by the greater weight of the

05:29:03 16    evidence, that oversupply of legal prescription opioids --

05:29:06 17    see, it's not a prescription-by-prescription analysis.  This

05:29:11 18    is oversupply -- and diversion of those opioids into the

05:29:15 19    illicit market outside of appropriate medical channels, is a

05:29:18 20    public nuisance?

05:29:19 21         They can trash the gateway theory all they want to,

05:29:22 22    but they didn't bring one single doctor or scientist to

05:29:26 23    address it.  Not one.

05:29:31 24         I think your answer to this should be yes, and I hope

05:29:39 25    that you see it the same way and those who -- if there's

### Closing in Rebuttal by Plaintiffs - Lanier

05:29:43  1   some that don't see it that way, please, those of you who

05:29:47  2   do, I want you to not beat them up, but really go after

05:29:51  3   them.  No, I'm joking.

05:29:52  4        You've got to debate this, though.  You've got to come

05:29:55  5   up with the right answer, and it takes all of you to do it.

05:29:58  6   And if you don't agree with me on this stuff, that's fine,

05:30:00  7   you voice your opinion and y'all will figure it out.  But

05:30:02  8   this is extremely serious.  And if you answer no, then

05:30:06  9   you've got to look at it for Trumbull County, it's the same

05:30:08 10   question, if you answer no to both, then the case is over.

05:30:12 11        But if you answer yes, then you've got to answer a

05:30:14 12   second question for each county, and that is, did we prove

05:30:18 13   that any of the following defendants engaged in intentional

05:30:21 14   and/or illegal conduct?  Read the charge.  It's your anchor

05:30:26 15   on what intentional is and what illegal is.

05:30:29 16        Remember the standard of care they have to live up to,

05:30:33 17   which was a substantial factor.  I'm telling you, if they

05:30:37 18   put out an extra pill, that's one-fifth of a person dead if

05:30:41 19   it's a per capita pill.  It's got to be per capita for the

05:30:45 20   whole county -- in producing the nuisance.  And I hope that

05:30:49 21   you will see to answer yes on that for each of the

05:30:52 22   defendants.

05:30:53 23        This is almost like the Target Drug Good Faith

05:30:59 24   Dispensing checklist.  You just need to say, yes, yes, yes,

05:31:01 25   yes, yes, if that's indeed the way you see the evidence, and

## Conclusion of Charge to the Jury

05:31:04  1    I hope it is.

05:31:04  2        So, I'm done.  My job was to give you evidence and get

05:31:08  3    to the truth.

05:31:12  4        My job was to do it within the rules and to do it

05:31:15  5    fairly and try to keep you from getting too bored along the

05:31:24  6    way.  And I don't know if I've done anything that's

05:31:26  7    offensive, just set that aside because this is about

05:31:29  8    something much bigger than me.  This is about something much

05:31:31  9    bigger.

05:31:32  10       And so I just hope and pray that this is something

05:31:34  11   where you're comfortable going back and doing what you need

05:31:37  12   do to figure this out, because the burden is now off of us

05:31:42  13   and it's entirely on y'all.  But we got all the faith and

05:31:46  14   confidence in the world in you, what you will and can do.

05:31:49  15       So I want to look each of you in the eye and say thank

05:31:54  16   you.  Thank you, thank you, thank you, thank you, thank

05:31:58  17   you -- still can't believe you ran so much faster than me,

05:32:04  18   it's not even funny -- thank you, thank you.  We had

05:32:08  19   Veterans Day while you were here.  Thank you for that as

05:32:10  20   well.  Thank you, thank you, thank you, and thank you very,

05:32:14  21   very much.

05:32:15  22       You guys have been outstanding, and I think I'm saying

05:32:18  23   that on behalf of all of the lawyers in here and all of the

05:32:20  24   clients in here.

05:32:22  25       So God bless you all.

**Conclusion of Charge to the Jury**

05:32:25  1          Thank you, Your Honor.

05:32:29  2               CONCLUSION OF CHARGE TO THE JURY

05:32:29  3          THE COURT:  All right.  Thank you, Mr. Lanier.

05:32:30  4      So, ladies and gentlemen, I just have a few minutes

05:32:32  5  left.  Those of you who were following along, I'm going to

05:32:37  6  pick up reading my final instructions on Page 28.

05:32:44  7      That concludes the part of my instructions explaining

05:32:49  8  the rules --

05:32:50  9          MR. STOFFELMAYR:  I'm sorry.  There's

05:32:50  10  something on the -- oh, it's gone now.  I apologize.  There

05:32:53  11  was something on the screen.

05:32:54  12          THE COURT:  All right.  Now let me finish up

05:32:56  13  by explaining some things about your deliberations in the

05:32:58  14  jury room:  The first thing that you should do in the jury

05:33:03  15  room is choose someone to be your foreperson.  This person

05:33:05  16  will help to guide your discussions and will be your

05:33:08  17  spokesperson for you here in court.

05:33:11  18      Once you are start deliberating, do not talk to the

05:33:14  19  courtroom deputy or to me or to anyone else about the case.

05:33:18  20  We must communicate in writing.  Write down your message,

05:33:21  21  have the foreperson sign it, and then give it to the

05:33:23  22  courtroom deputy.  He will give it to me, and I will respond

05:33:26  23  as soon as I can.  I may have to talk to the lawyers about

05:33:29  24  what you've asked, so it may take me some time to get back

05:33:32  25  to you.

## Conclusion of Charge to the Jury

05:33:33  1      One more thing about messages.  Do not ever write down

05:33:36  2  or tell anyone how you stand on your votes.  For example, do

05:33:39  3  not write down or tell anyone that you are split 6-6, or

05:33:44  4  8-4, or whatever your vote happens to be.  That should

05:33:47  5  remain secret until you are finished.

05:33:51  6      Juror notes.

05:33:52  7      Remember that if you elected to take notes during the

05:33:54  8  trial -- and I know many of you did -- your notes should be

05:33:57  9  used only as memory aids.  You should not give your notes

05:34:00 10  greater weight than your independent recollection of the

05:34:02 11  evidence.  You should rely upon your own independent

05:34:05 12  recollection of the evidence, or lack of evidence, and you

05:34:09 13  should not be unduly influenced by the notes of other

05:34:12 14  jurors.  Notes are not entitled to any more weight than the

05:34:16 15  memory or impression of each juror.

05:34:18 16      Whether you took notes or not, each of you must form

05:34:21 17  and express your own opinion as to the facts of the case.

05:34:25 18      Remember that you must make your decision based only

05:34:33 19  on the evidence that you saw and heard here in court.

05:34:36 20      During your deliberations, as I've instructed you for

05:34:38 21  the last 6, 7 weeks, you must not communicate with or

05:34:41 22  provide any information to anyone by any means about the

05:34:45 23  case.  You may not use any electronic device or media, such

05:34:49 24  as a telephone, cell phone, smartphone, iPhone, BlackBerry,

05:34:55 25  or computer, the internet, any internet service, or any text

## Conclusion of Charge to the Jury

05:34:58  1    or instant messaging service, any internet chatroom, blog,

05:35:01  2    or website such as Facebook, Instagram, LinkedIn, YouTube,

05:35:08  3    or Twitter to communicate to anyone any information about

05:35:11  4    this case or to conduct any research about this case until I

05:35:15  5    accept your verdict.

05:35:17  6        In other words, you cannot talk to anyone on the

05:35:19  7    phone, correspond with anyone, or electronically communicate

05:35:22  8    with anyone about this case.  You can only discuss the case

05:35:26  9    in the jury room with your fellow jurors during

05:35:29 10    deliberations.  I expect you will inform me as soon as you

05:35:33 11    become aware of another juror's violation of these

05:35:36 12    instructions.

05:35:36 13        You may not use these electronic means to investigate

05:35:41 14    or communicate about the case because it is important -- it

05:35:46 15    is essential -- that you decide this case based solely on

05:35:48 16    the evidence presented in this courtroom.  Information on

05:35:52 17    the internet or available through social media might be

05:35:55 18    wrong, incomplete, or inaccurate.  You are only permitted to

05:35:59 19    discuss the case with your fellow jurors during

05:36:02 20    deliberations because they've seen and heard the same

05:36:05 21    evidence that you have.

05:36:07 22        In our judicial system, it is important that you are

05:36:10 23    not influenced by anyone or anyone outside of this

05:36:15 24    courtroom -- anything or anyone outside of this courtroom.

05:36:17 25    Otherwise, your decision may be based on information known

### Conclusion of Charge to the Jury

05:36:20  1    only by you and not your fellow jurors or the parties in the

05:36:24  2    case.  This would unfairly and adversely impact the judicial

05:36:28  3    process.

05:36:28  4        You should know that if this admonition is violated,

05:36:33  5    there could be a mistrial.  A mistrial means that the case

05:36:36  6    is stopped before it is finished and must be retried at a

05:36:40  7    later date.  This can lead to a great deal of expense for

05:36:44  8    the parties and the Court.  No one wants to see money

05:36:47  9    wasted.  If a mistrial were to be declared based on a

05:36:51 10    violation of this admonition, the juror responsible could be

05:36:54 11    required to pay the cost of the first trial and could also

05:36:57 12    be punished for contempt of court.

05:37:00 13        In summary, make your decision based only on the

05:37:02 14    evidence that you saw and heard here in court.

05:37:10 15        Unanimous verdict.

05:37:10 16        Your verdict, whether it be for a plaintiff or a

05:37:13 17    defendant, must be unanimous.  This means that for you to

05:37:17 18    find for a specific plaintiff and against a specific

05:37:20 19    defendant, every one of you must agree that that specific

05:37:24 20    plaintiff has proved all the elements of its claim against

05:37:28 21    that specific defendant by a preponderance of the evidence.

05:37:31 22        Similarly, for you to find for a specific defendant

05:37:35 23    and against a specific plaintiff, every one of you must

05:37:39 24    agree that that specific plaintiff has failed to prove all

05:37:42 25    the elements of its claim against that specific defendant by

## Conclusion of Charge to the Jury

05:37:45   1   a preponderance of the evidence.

05:37:47   2        Either way, your verdict must be unanimous.

05:37:49   3        When you enter the jury room following the arguments,

05:37:55   4   you are free to talk about the case.  In fact, it is now

05:37:58   5   your duty to talk with each other about the evidence and to

05:38:00   6   make every reasonable effort you can to reach unanimous

05:38:04   7   agreement.  Talk with each other, listen carefully and

05:38:07   8   respectfully to each other's views, and keep an open mind as

05:38:12   9   you listen to what your fellow jurors have to say.  Try your

05:38:15 10   best to work out your differences.  Do not hesitate to

05:38:18 11   change your mind if you are convinced that other jurors are

05:38:21 12   right and you are wrong.

05:38:22 13        But do not ever change your mind just because other

05:38:25 14   jurors see things differently, or just to get the case over

05:38:29 15   with.  In the end, your vote must be exactly that, your own

05:38:34 16   vote.  It is important for you to reach unanimous agreement,

05:38:37 17   but only if you can do so honestly and in good conscience.

05:38:41 18        No one will be allowed to hear your discussions in the

05:38:44 19   jury room, and no record will be made of what you say.  So

05:38:49 20   you should all feel free to speak your minds.

05:38:51 21        Listen carefully to what everyone else has to say, and

05:38:54 22   then decide for yourself if the plaintiffs have proved its

05:38:59 23   claims or their claims by a preponderance of the evidence.

05:39:01 24   Your sole interest is to seek the truth from the evidence in

05:39:04 25   the case.

## Conclusion of Charge to the Jury

05:39:05  1    Now, the lawyers have talked about the verdict forms.

05:39:09  2    Mr. Pitts will give them to you.  They're very simple.

05:39:14  3    They're identical forms, one for Lake County and one for

05:39:16  4    Trumbull County.  And you've got the same questions for each

05:39:22  5    county.

05:39:23  6    Did Lake County prove, by the greater weight of the

05:39:25  7    evidence, that oversupply of legal prescription opioids and

05:39:29  8    diversion of these -- those opioids into the illicit market

05:39:33  9    outside of appropriate medical channels is a public nuisance

05:39:38 10    in Lake County?

05:39:39 11    You circle yes or no, and then everyone signs.

05:39:43 12    If you answer yes to Question 1, then you go to

05:39:47 13    Question 2, and then you have to decide if Lake County

05:39:51 14    proved, by the greater weight of the evidence, that any of

05:39:54 15    the following defendants engaged in intentional and/or

05:39:58 16    illegal conduct which was a substantial factor in producing

05:40:01 17    the public nuisance that you found exists in Question 1.

05:40:05 18    And then there is simply yes or no for each of the

05:40:09 19    three defendants.  You -- as I've instructed you, you must

05:40:12 20    consider the evidence against each different separately, and

05:40:14 21    then you vote separately on each defendant, CVS, Walgreens,

05:40:19 22    and Walmart, and each of you sign.

05:40:22 23    And then there are exactly identical forms for

05:40:27 24    Trumbull County.

05:40:28 25    Of course, if you answer no to Question No. 1, you're

## Conclusion of Charge to the Jury

05:40:32  1    done as to Lake County and you go to question -- to the

05:40:36  2    verdict forms for Trumbull County and do the same thing.

05:40:41  3         So you will take the verdict forms to the jury room,

05:40:44  4    and when you have reached unanimous agreement as to your

05:40:46  5    verdict, you will have your foreperson fill in each answer,

05:40:51  6    sign his or her name, date the form in the bottom right-hand

05:40:54  7    corner, and then the rest of you all sign.

05:40:58  8         Please complete these documents in ink.

05:41:05  9         Unless all of you agree, you may not return an answer

05:41:05  10   to any question.  After you have all signed the appropriate

05:41:08  11   documents, ring the jury buzzer -- or actually you -- here,

05:41:11  12   there may be a phone number you give because, again,

05:41:15  13   Judge Gwin has graciously allowed you to use -- all of us it

05:41:19  14   use his courtroom.  So when you notify us, we'll reconvene

05:41:24  15   the parties and counsel.

05:41:25  16        All right.  Each of you has a copy of these

05:41:32  17   instructions with you in the jury room for your assistance

05:41:34  18   during your deliberations, and these instructions should

05:41:37  19   answer any question that you have.  However, if during your

05:41:39  20   deliberations you should desire to communicate with the

05:41:41  21   Court, please reduce your message or question in writing,

05:41:46  22   signed by your foreperson, and pass the note to the

05:41:49  23   courtroom deputy, or one of my staff, who will bring it to

05:41:52  24   my attention.  I will then respond as promptly as possible,

05:41:56  25   either in writing or by having you return to the courtroom

## Conclusion of Charge to the Jury

05:41:59  1    so that I can address you orally.

05:42:01  2         Remember at all times, you are not partisans.  You are

05:42:06  3    judges - judges of the facts.  Your sole interest is to seek

05:42:09  4    the truth from the evidence in the case.

05:42:13  5         Let me finish up by repeating something that I said to

05:42:19  6    you earlier.  Nothing that I have said or done during this

05:42:21  7    trial was meant to influence your decision in any way.

05:42:24  8    Nothing said in these instructions is meant to suggest or

05:42:28  9    convey in any way what verdict I think you should find.

05:42:32 10    What the verdict shall be is the sole and exclusive duty and

05:42:37 11    responsibility of the jury.  You shall decide for yourselves

05:42:40 12    if either plaintiff has proved by a preponderance of the

05:42:44 13    evidence its claim against each of the defendants.

05:42:50 14         And now I have to do something somewhat unpleasant.

05:42:54 15    The rules of court require that a civil jury cannot be more

05:42:58 16    than 12 people.  You recall, we started with 14.  It's my

05:43:05 17    experience -- I don't think I've ever had a trial of this

05:43:07 18    length where we didn't lose one, two, or more jurors because

05:43:12 19    of illness, family emergencies, whatever.  We lost one juror

05:43:21 20    for something unfortunate, but not for illness.  The rest of

05:43:25 21    you, the 13 of you, have been here every single day no

05:43:28 22    matter what was happening in your lives, and you have our

05:43:30 23    utmost thanks and respect.  But there are 13 of you.  So

05:43:33 24    what I must need do now is excuse Juror 13.

05:43:38 25         Yes, sir, and I -- now, if I could rewrite the rules

## Conclusion of Charge to the Jury

05:43:41  1    and say it's juries of 13, I would, but I don't write those

05:43:45  2    rules, Congress does.  So you are excused with my -- our

05:43:50  3    thanks.

05:43:51  4         One thing, I would request that you continue to follow

05:43:55  5    the admonition until we notify you that the jury has reached

05:43:59  6    a verdict.  So that means you're not do any research or

05:44:04  7    Googling or checking, and you're not to talk to anyone else

05:44:07  8    about the trial.  We will notify you when the jury reaches a

05:44:10  9    verdict.

05:44:10  10        So, sir, thank you, you may be excused now.

05:44:15  11        All right.  At this point, I'm going to ask Mr. Pitts

05:44:20  12   to take the jurors over to Judge Gwin's courtroom and he'll

05:44:28  13   show you how you get in and out because from now on, that's

05:44:32  14   where you'll go.  And Mr. Pitts also will give you the jury

05:44:37  15   verdict forms and shortly will give you, I think there are

05:44:42  16   two jump drives, one with the plaintiffs' exhibits, one with

05:44:46  17   the defendants' exhibits, and he'll show you how to access

05:44:49  18   them.

05:44:49  19        Now, up to now, I've set the schedule.  I've told you

05:44:55  20   when to show up.  It's generally been 9:00 a.m.  I've ended

05:44:59  21   the day when I said we're done.  At this point, you all set

05:45:03  22   the schedule.  There's really only one rule.  That means you

05:45:07  23   all follow the same schedule.  So if you decide we're done

05:45:11  24   for the evening, we're done.  If you say, we're going to

05:45:13  25   start tomorrow at 9 o'clock, you wait till all 12 of you are

## Conclusion of Charge to the Jury

05:45:18  1    there and then you start.

05:45:21  2         So I don't know, if you want to start deliberating

05:45:23  3    today, that's fine.  If you want to break for the day,

05:45:26  4    that's fine.  If you want to think about it and go over into

05:45:31  5    Judge Gwin's courtroom and think about it a little, that's

05:45:35  6    fine.

05:45:36  7         I always excuse the jury personally at the end of the

05:45:40  8    day.  That's just my experience, and remind you of the

05:45:43  9    admonition.  I don't need to bring you in in the morning to

05:45:49 10    do that.

05:45:49 11         So. . . I guess, Mr. Pitts, if you want to take the

05:45:52 12    jury to Judge Gwin's courtroom, make sure you have

05:45:56 13    everything you need.

05:45:57 14         Thank you.

05:46:03 15      (Jury retired to the jury room to begin its deliberations

05:46:35 16       at 5:46 p.m.)

05:46:35 17              THE COURT:  If someone could close the

05:46:36 18    backdoor, please.

05:46:47 19         Okay.  It would not surprise me if the jury wants to

05:46:52 20    go home soon, but, again, they may not.  So. . . I guess I'd

05:47:00 21    appreciate it if everyone just stick around for a little

05:47:02 22    bit.  If they decide they want to leave, I'll bring them

05:47:05 23    back and excuse them for the evening.  If they decide they

05:47:08 24    want to deliberate for a long time, everyone doesn't have to

05:47:10 25    stay in the courtroom.  And -- or everyone, you can leave,

7334

| | | |
|---|---|---|
|05:47:16|1|because actually, I don't need all the lawyers here when I|
|05:47:19|2|excuse them at the end of the day.  I bring them in.  So no|
|05:47:22|3|one has to stick around.  If you want to, you may, but you|
|05:47:26|4|don't have to.  Because I don't require all the lawyers to|
|05:47:29|5|be here at the end of the day to bring them in and I give|
|05:47:32|6|them the admonition.|
|05:47:36|7|MR. DELINSKY:  Judge. . .|
|05:47:37|8|THE COURT:  Yes.|
|05:47:37|9|MR. DELINSKY:  Judge, do you have all our|
|05:47:40|10|contact information?  I know Special Master Cohen collected|
|05:47:42|11|it at the beginning of the case, but I don't want to leave|
|05:47:44|12|the courtroom --|
|05:47:45|13|THE COURT:  I've got a sheet, which I don't|
|05:47:47|14|think anyone's cell phones have changed.|
|05:47:49|15|MR. DELINSKY:  Okay.  Just want to|
|05:47:50|16|double-check, Your Honor.|
|05:47:51|17|THE COURT:  I see we've got it.  David has it.|
|05:47:54|18|Mr. Pitts has it.  So yes, I've got it, and, obviously, if|
|05:47:58|19|there are questions, I assemble everyone quickly.  I don't|
|05:48:03|20|do that without consulting everyone.  And obviously a|
|05:48:08|21|verdict.|
|05:48:11|22|Okay.  Well, have a good evening, everyone.|
|05:48:18|23|(Recess was taken at 5:48 p.m.)|
|05:57:20|24|THE CSO:  Could you all rise for the jury?|
|05:57:22|25|(Jury returned to courtroom at 5:57 p.m.)|

05:57:29  1                    THE COURT:  All right.  Please be seated.

05:57:31  2          Please be seated, ladies and gentlemen.

05:57:33  3          I understood mistakenly a number have left.

05:57:38  4          So you want to break for the evening; is that

05:57:40  5     correct?

05:57:40  6                    THE JURY:  Yes.

05:57:40  7                    THE COURT:  And what time are you convening

05:57:42  8     tomorrow?

05:57:44  9                    THE JURY:  9:30.

05:57:45 10                    THE COURT:  9:30.  Okay.

05:57:47 11          All right.  It's very important that you follow all of

05:57:50 12     my admonitions.

05:57:52 13          Do not discuss this case with anyone.

05:57:54 14          Do not encounter anything in the media, print,

05:57:58 15     electronic, whatever, or anything remotely close to the

05:58:01 16     case.

05:58:02 17          Make sure you don't begin deliberating tomorrow until

05:58:07 18     everyone's present.  If everyone's there a few minutes

05:58:09 19     before, you can start, but out of respect, don't start till

05:58:13 20     all 12 are there.

05:58:14 21          And, Mr. Pitts, if you would call the others and tell

05:58:17 22     them that.

05:58:18 23                    COURTROOM DEPUTY:  Yeah.  We've already talked

05:58:20 24     about that.

05:58:20 25                    THE COURT:  Okay.  Thanks, and have a good

05:58:22  1    evening.

05:58:26  2                      (Proceedings adjourned at 5:58 p.m.)

3

4                         **C E R T I F I C A T E**

5          I certify that the foregoing is a correct transcript
          of the record of proceedings in the above-entitled matter
6         prepared from my stenotype notes.

7              */s/ Heather K. Newman*                    *11-15-2021*
              HEATHER K. NEWMAN, RMR, CRR                  DATE
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25