UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>This document relates to:<br><br>*County of Lake, Ohio v. Purdue Pharma L.P., et al.*,<br>    Case No. 18-op-45032 (N.D. Ohio)<br><br>*County of Trumbull, Ohio v. Purdue Pharma, L.P., et al.*,<br>    Case No. 18-op-45079 (N.D. Ohio)<br><br>"Track 3 Cases" | **MDL No. 2804**<br>**Case No. 17-md-2804**<br>**Judge Dan Aaron Polster** |

**DEFENDANTS' JOINT MOTION FOR**
**<u>MISTRIAL BASED ON CLOSING ARGUMENT</u>**

Plaintiffs' counsel's improper and prejudicial statements during closing arguments require a mistrial.  *City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 756 (6th Cir. 1980).

## BACKGROUND

During closing argument, Plaintiffs' counsel told jurors that a decision for Plaintiffs would "set up the standards by which these chain pharmacies and independent pharmacies must act," and that such a decision would be "reported" and become a "seminal" decision with "national ramifications."  Dkt. 4153 at 7082–83 (Closing Trancript).  This was not an isolated statement.  Counsel repeatedly and expressly asked the jurors to consider and, in making their decision, to rely on, the ramifications of their decision well beyond the case before them.

All this started right when counsel's closing argument began:

> I hope it does not escape your awareness that what you're about is a very important case.  It's part of a larger picture where we're trying to figure out who's responsible and to what degree for the opioid epidemic that plagues not just Northeastern Ohio, but, frankly, plagues most places within the country.  And within the framework of that, His Honor has carved out this case to give us a chance to focus on what ultimately now are these three chain pharmacies.

*Id.* at 7081.  Counsel continued laying the groundwork:

> [W]hat you're about [to do] is something of supreme importance.  Even before this trial you'd never heard of the *Holiday*, I suspect.  *Holiday* was a seminal case . . . [and] was published in the Federal Register so that everybody would be on notice about what it said  And what it said was profound.

*Id.* at 7082.  And then counsel expressly asked the jury to "set up the standards" for an entire industry, in the "the most seminal case in pharmaceutical history":

> But what you're about here is not only every bit as important as the *Holiday* case.  What you're about here is something that's even more important.  Because you're going to make decisions, and those decisions will be reported.  And the reporting of those decisions will set up the standards by which these chain pharmacies and independent pharmacies must act.
>
> You are actually sitting in the seat now as finders of fact to determine what the facts are that answer these questions to determine what is permissible in our society within the

1

framework of the law and what is not. That's an awesome, awesome responsibility, but it's an awesome, awesome opportunity. And [that's] what's driven our team. Because we've shouldered that opportunity and responsibility up till now, but today I hand it off. . . .

[T]oday, I get to hand this to y'all, and I'm done. Y'all get to figure out what's okay and what's not. Y'all get to decide. Y'all get to form maybe the most seminal case in pharmaceutical history, in pharmacy history, dealing with the Controlled Substances Act. That's you. . . .

[T]his is just sort of the national crisis. And this has national ramifications. It's not the kind of thing where people will say years down the road, oh, that only pertained to those three pharmacies in Northeastern Ohio in Lake and Trumbull County. No, this will have ramifications all around the United States of America.

*Id.* at 7082–84.

Defendants' counsel objected to these statements, pointing out that "[t]o ask the jurors to consider the impact of their decision beyond this case is facially improper under every standard[.]" *Id.* at 7122. The Court eventually agreed that this "is a problem" because the jury is "not to decide future cases." *Id.* at 7122–23. The Court thought this improper statement could be cured by reminding the jurors that they are deciding only the cases before them. *Id.* at 7123.

The problem with that curative instruction, though, is that it did not address the actual problem or the actual prejudice. Plaintiffs' counsel did not tell the jury that it was going to decide other *cases*; he told them that the ramifications of *this case* would be to set the standards of conduct for these chain pharmacies and independent pharmacies, and that *this case* has ramifications nationwide. So simply telling the jury that it can decide only this case does not mitigate or address the core issue. Thus, "the curative instructions which the trial court eventually chose to give were plainly[] not sufficient to remove the probability of prejudice" from these statements, and Defendants must now move for a mistrial. *City of Cleveland*, 624 F.2d at 759 (internal quotation marks omitted).

2

Plaintiff's counsel, for his part, agreed with the Court's curative instruction, Dkt. 4053 at 7131, and later added that the jury's focus should not be on the "national ramifications" of the case but instead "these two counties and the actions of these defendants as it has affected these two counties." *Id.* at 7171. This half-hearted attempt to cure, however, does not even come close to retracting Plaintiffs' counsel's prior statements that the jury's role is to exercise an "awesome responsibility" to "form maybe the most seminal case in pharmaceutical history, in pharmacy history," and that counsel was handing off his policy-making hat to the jury to finish the job. *Id.* at 7082–84. In any event, this supposed cure came from counsel, not from the Court, and it came far too late in closing arguments to undo the prejudice caused by counsel's introductory framing.

This problem was only exacerbated by other improper and prejudicial statements that Plaintiffs' counsel made during closing arguments. Plaintiffs' counsel improperly suggested that Defendants' dispensing practices are the subject of multiple ongoing investigations in Lake and Trumbull Counties despite there being no evidence of any such investigations. Plaintiffs' counsel bolstered the credentials of Plaintiffs' own expert witness, while personally attacking Defendants' witnesses in a manner designed to inflame the jury's passions. Plaintiffs' counsel also suggested that Defendants should be held liable simply for not deciding to stop dispensing FDA-approved medications or, alternatively, for intentionally (but lawfully) dispensing such medications— theories abandoned previously by Plaintiffs and foreclosed by binding precedent of the Supreme Court and Sixth Circuit. Plaintiffs' counsel left the jury with the disingenuous implication that its decision would carry no financial consequences for the litigants and made other inflammatory comments. Collectively, Plaintiffs' counsel's series of improper statements warrant a mistrial.

3

# ARGUMENT

When it comes to "improper comments" made by plaintiff's counsel, the Court must declare a mistrial when there is a "reasonable probability that the verdict of a jury has been influenced by such [comments]." *City of Cleveland*, 624 F.2d at 755–56. Several categories of Plaintiffs' counsel's comments fit this bill—and together form an overwhelming case.

**1.** Statements telling the jury that it is deciding "the most seminal case in pharmaceutical history"—and asking the jury to "form" standards for "what is permissible in our society within the framework of the law and what is not," with "ramifications all around the United States of America"—are per se inappropriate and prejudicial enough to require a mistrial. Dkt. 4153 at 7082–84.[1]

Counsel's blatant "send a message" statements are improper. *See, e.g.*, *Caudle v. District of Columbia*, 707 F.3d 354, 361–62 (D.C. Cir. 2013) (holding improper the closing argument of

---

[1] Underscoring the significance of these highly improper comments to counsel's closing argument, those statements have already been prominently featured in national press coverage about the close of the trial:

> CLEVELAND, Nov 15 (Reuters) - Lawyers for pharmacy chains including CVS and Walgreens on Monday argued they were not to blame for the U.S. opioid epidemic, as jurors prepared to consider whether to hold them responsible for the devastation the drug crisis caused in two Ohio counties.
>
> Mark Lanier, a lawyer for Lake and Trumbull counties, told a federal jury in Cleveland that a verdict in the case against CVS Health Corp (CVS.N), Walgreens Boots Alliance Inc (WBA.O) and Walmart Inc (WMT.N) would have ramifications across the country.
>
> The trial is the first the pharmacy chains have faced in thousands of lawsuits by states and local governments seeking to hold them liable for an epidemic that U.S. health officials say has led to nearly 500,000 opioid overdose deaths over two decades.
>
> "You get to decide what will be the most seminal case in pharmacy history," Lanier said in his closing argument.

*E.g.*, Grant Segall, *Pharmacy chains defend actions as landmark U.S. opioid trial nears its end*, Reuters (Nov. 16, 2021), https://www.reuters.com/world/us/cvs-walgreens-walmart-set-closing-arguments-ohio-opioid-trial-2021-11-15/.

"[if you find for the plaintiffs], you preserve the rights not just of plaintiffs but of everyone" and "[b]y ensuring that plaintiffs are made whole for what they have endured, you ensure that others will be free to exercise their rights without fear"). This is especially so in the context of the opioid crisis—where the "fear surrounding the [crisis] undoubtedly influence[s] the jury" already. *United States v. Solivan*, 937 F.2d 1146, 1153 (6th Cir. 1991) (discussing societal fear surrounding War on Drugs). In this context, "[t]he substance of the statements made by [Plaintiffs' counsel] in this case were designed, both in purpose and effect, to arouse passion and prejudice and to inflame the jurors' emotions . . . by urging them to send a message and strike a blow to the drug problem." *Id.* That is obviously improper. *See, e.g.*, *United States v. Herring*, 641 F. App'x 451, 454 (6th Cir. 2016) (such an argument in closing "clearly [i]s improper").

Statements this egregious in such an already passion-filled case also deprive the defendants of a fair trial and come with an inherent probability of influencing the jury's verdict—thus warranting a mistrial. *See, e.g.*, *Solivan*, 937 F.2d at 1157; *see also, e.g.*, *City of Cleveland*, 624 F.2d at 755–56.

**2.** Several other statements made by Plaintiff's counsel underscore the impropriety of this "send a message" closing argument and collectively warrant a mistrial:

*First*, Plaintiffs' counsel misleadingly suggested to the jury that the litigation would not carry financial consequences for Defendants and that Plaintiffs did not have financial motive in pressing the lawsuit. Counsel argued to the jury that "[t]his may be the only civil case you ever get called on where nobody's asking you for money." Dkt. 4153 at 7170. But that is misleading in the extreme, designed to improperly secure a jury verdict. Plaintiffs' counsel is correct that any remedy stage of this trial would be conducted by the Court, not the jury. *See* Dkt. 3579 at 5. Still, counsel's statement that "nobody's asking you for money"—which of course is not in the Court's

5

jury instruction on remedies—could easily be interpreted as an assertion that Defendants face no risk of financial liability from an adverse jury verdict and Plaintiffs have little motivation to pursue a lawsuit other than unbridled altruism.  That is plainly wrong:  Plaintiffs seek an award of damages to "abate" the alleged public health harms in their Counties.  But Plaintiffs can receive such award only if the jury first returns a verdict in their favor during the liability phase—and Plaintiffs are, without question, seeking both.  It is thus highly misleading and disingenuous to leave the jury with the impression that its decision would not carry financial consequences for any of the litigants—and it unfairly makes it more likely for a jury to find for Plaintiffs.  *See Twachtman v. Connelly*, 106 F.2d 501, 508 (6th Cir. 1939) ("Counsel should not introduce extraneous matter before a jury or, by questions or remarks, endeavor to bring before it unrelated subjects.").

This error exacerbated counsel's "send a message" arguments:  If the jurors think "nobody's asking [them] for money," then they will be even *more* likely to use this case to "send a message"—as Plaintiffs' counsel put it, to "form" standards for "what is permissible in our society . . . and what is not," with "ramifications all around the United States of America."  *See* Dkt. 4153 at 7082–84.  This is not, therefore, a "case of a single, isolated, or inadvertent comment" but rather a "continuing pattern of misconduct" throughout closing arguments.  *City of Cleveland*, 624 F.2d at 758.  And just as in *City of Cleveland*, the Court's curative instructions—where any curative instruction was given at all—cannot cure the prejudice.  There is a "reasonable probability" that the verdict of the jury will "be[] influenced" by these improper statements, and the Court should grant a mistrial.  *Id.* at 756.

*Second*, counsel suggested without evidence that Defendants are the subject of multiple ongoing investigations in Lake and Trumbull Counties.  Counsel stated:

[Defense counsel] said, no county investigation.

6

> Well, first of all, ongoing investigations I don't even know that I'd be allowed to get into. But what we did with our time that we had in this case is we drove home the bigger picture. And if we dealt with investigation by investigation, I can guarantee you what they'd have done is come in here and say, well, okay, that's five investigations, that's seven suicides, so that's this, but where's the bigger picture? And so we opted to go with the bigger picture in the time zone.

Dkt. 4153 at 7313. This was highly improper and prejudicial. Plaintiffs cannot counter-argument that law enforcement in the two counties did not investigate Defendants by implying for the jury that there are ongoing investigations of Defendants that he was not "allowed to get into." There is no evidence that Defendants' pharmacies are the subject of a single ongoing investigation in Lake and Trumbull Counties—let alone five. Nor is there any evidence of seven suicides, and suggesting as much is inflammatory. Throughout the trial Plaintiffs referred to DEA investigations and settlements, which the Court permitted over Defendants' objections. Defendants responded by making the point that those investigations and settlements involved pharmacies outside Lake and Trumbull Counties and even outside Ohio. But Plaintiffs did not respond by attempting to introduce evidence of investigations or settlements involving Defendants' pharmacies in Lake and Trumbull Counties—because, again, no such evidence exists. It is wholly improper for Plaintiffs to imply in closing arguments that such evidence does exist.

Plaintiffs' counsel then took it a step further, suggesting to the jury that law enforcement investigations might be forthcoming *because* of this case. Counsel stated that law enforcement does not "investigate the pharmacies unless they get a tip." *Id.* at 7314–15. Counsel then stated that "I would think that there's a good chance – I don't know what the future holds. That's not our question. Our question is simply this case right now." *Id.* at 7315. Counsel's suggestion that "there's a good chance" Defendants' pharmacies in Lake and Trumbull Counties might be investigated in the future also had no evidentiary basis. It is wholly improper for Plaintiffs to make these arguments about investigations—current or in the future—when no such evidence exists.

7

The Court warned counsel that he must keep his arguments connected to the evidence at trial.  Dkt. 4153 at 7263 ("[Y]ou cannot put into evidence what's not in the trial.").  His failure to heed that warning is grounds for mistrial.  *See, e.g.*, *Caudle*, 707 F.3d at 363.

*Third*, counsel improperly vouched for Plaintiffs' expert witness Dr. Lembke while, at the same time, personally attacking Defendants' witnesses in a manner designed to inflame the jury's passions.  *See United States v. Acosta*, 924 F.3d 288, 300 (6th Cir. 2019) (ordering new trial after "improper vouching and bolstering" in closing argument, including "factual assertion[s]" about a witness's "reliability that had no basis in the evidence presented at trial and therefore invited the jury to believe [the expert] simply on the prosecutor's say-so"); *Hodge v. Hurley*, 426 F.3d 368, 378–79 (6th Cir. 2005) (noting that comments on credibility "not coupled with a more detailed analysis of the evidence . . . convey an impression to the jury that they should simply trust the State's judgment" that a witness is or is not credible).

With regard to Dr. Lembke in particular, counsel observed that she was "one of the most impressive people" he had ever "had the honor of putting on the stand" in the past "37 years" of his practicing law.  Dkt. 4153 at 7090.  Counsel noted that he had been "fortunate enough to try cases from California to New Jersey and all points in between" and that Dr. Lembke was "one of the best witnesses" he had "ever had a chance to put on."  *Id.*  "So impressive," counsel added as a coda.  *Id.*  Stressing that Dr. Lembke was not an "ivory tower specialist," counsel argued that she "treats people on a regular weekly basis as well as writes, researches, and lectures, and teaches, trains the next generation of doctors."  *Id*.

By contrast, counsel noted that there were "some other witnesses" that he "did not view favorably" and thus was "probably harsher to them in [his] cross-examination."  *Id.* at 7106.  He distinguished these witnesses from the three pharmacist witnesses who were "nice people," who

8

"got families," and who "live in the community." *Id.* Thus—unlike Defendants' other witnesses—counsel did not "have any [personal] distaste for them." *Id.*

Upon Defendants' objection, this Court acknowledged that the bolstering of Dr. Lembke and criticism of Defendants' witnesses was improper, noting that it was "[not] appropriate for either counsel to essentially give testimonials for their experts," *id.* at 7124, and that it was entirely irrelevant whether Plaintiff's counsel "personally like[d]" any given witness, *id.* at 7129–30. Again here, there was simply no legitimate purpose for any of this argument except to create a jury "inflamed by passion." *Bach v. First Union Nat'l Bank*, 149 F. App'x 354, 367 (6th Cir. 2005) (quoting *Groppi v. Wisconsin*, 400 U.S. 505, 511 n.12 (1971)).[2]

*Fourth*, Plaintiffs' counsel improperly suggested that the jury can rest liability on the "intentional" prong of Ohio public-nuisance law solely because Defendants "weren't accidently dispensing opiates"—and regardless of the lawfulness of that conduct under federal law. Dkt. 4153 at 7169. Counsel even went as far as to suggest that "superb" conduct could form the basis for liability based on intentional conduct because "[n]obody was ever accidently doing anything at all here." *Id.* Not only was that an incorrect statement of the law, but Plaintiffs also attempt an eleventh-hour bait-and-switch. Leading up to trial, Plaintiffs focused their case on proving that Defendants acted unlawfully by violating the CSA through distribution and/or dispensing, *not* on proving that Defendants can be held liable even for lawful conduct that complied with the CSA. *See, e.g.*, Dkt. 3366 at 18–34 (Plaintiffs' Opposition to Pharmacy Defendants' Motion to Dismiss).

---

[2] After Defendants objected, the Court offered a curative instruction, noting that it was "up to you, the jury, to decide the credibility of the witnesses you've observed at trial" and that "[c]ounsel's views of their own witnesses, paid or unpaid, or of the other side's witnesses, are not evidence." Dkt. 4153 at 7182. But "cautionary instructions are effective only up to a certain point," *City of Cleveland*, 624 F.2d at 759, and here Plaintiff's counsel had already displaced the jury's primary responsibility—weighing the credibility of witnesses—and tainted that process with his own personal biases.

9

But now Plaintiffs attempt to inject a completely novel legal theory at the last minute, after the evidence has closed, depriving Defendants of fair notice.

Even more, Plaintiffs' counsel did not pivot to intentional conduct outside of the scope of the CSA (for example, particular marketing or compensation) but instead to the heart of the CSA: the very *dispensing* of approved opioids. But penalizing Defendants for dispensing conduct that complied with the CSA would impermissibly expand public nuisance law. *See* Dkt. 4149 at 2. It would also "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" and thus would be preempted by federal law. *Arizona v. United States*, 567 U.S. 387, 399–400 (2012). Holding Defendants liable under Ohio public nuisance law for dispensing or distribution conduct that Congress considered and allowed under the CSA would "skew[]" the "delicate balance of statutory objectives" set by the Act: ensuring the availability of medically indicated therapeutics while, at the same time, limiting the improper use of controlled substances. *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 348 (2001). The theory is thus preempted and patently improper. *Id.*; *cf. Skrovig v. BNSF Ry. Co.*, 916 F. Supp. 2d 945, 964 (D.S.D. 2013) (recognizing that evidence related to a federally preempted claim causes "potential prejudice" and denying a mistrial on this ground only because a "claim withdrawal instruction was a less drastic remedy" that removed the potential prejudice).

*Fifth*, and relatedly, counsel suggested to the jury that Defendants should be held liable merely for dispensing opioid medications. "They don't have to sell C-II drugs," counsel stated. Dkt. 4153 at 7095. Again, he repeated: "They don't have to sell the drugs, they choose to sell the drugs." *Id.* This argument again runs counter to Plaintiffs' prior representations to Defendants and the Court that they "do not intend to argue that the Pharmacy Defendants are liable based merely on the fact that they distributed opioids." Dkt. 3464 at 15. Indeed, this Court relied upon

10

this very representation when ruling upon Defendants' motion *in limine*, noting that Plaintiffs' representation made the request to exclude this argument "moot." Dkt. 3546 at 26.³ The Court should not countenance Plaintiffs' strategic about-face in closing arguments—designed to improperly secure a jury verdict.

Plaintiffs tried to justify their about-face by arguing that their prior representation concerned only *distribution* conduct, not dispensing conduct. But there is no logical basis to distinguish between attempting to hold Plaintiffs liable under a "stop selling" distribution theory and a "stop selling" dispensing theory. In any event, regardless of Plaintiffs' prior representations, any insinuation that Defendants can be held liable simply for dispensing FDA-approved medications is contrary to the governing law of both the Supreme Court and the Sixth Circuit. In *Mutual Pharmaceutical Co. v. Bartlett*, 570 U.S. 472 (2013), the Supreme Court considered whether federal law, which "prohibit[ed] generic drug manufacturers from independently changing their drugs' labels," preempted a state law that would have required the generic drug manufacturer to change its drugs' labels (and thus violate federal law). *Id.* at 475. The Court concluded such state laws were preempted, and in reaching that conclusion it rejected the argument that the drug manufacturer could have avoided liability by choosing "not to make [the drug] at all." *Id.* at 488. The Court "reject[ed] this 'stop-selling' rationale as incompatible with [its] pre-emption jurisdiction," which presumed that actors are "not required to cease acting altogether in order to

---

³ Before denying the motion as moot, the Court noted in *dicta* that the "stop-selling" argument, which finds its roots in impossibility preemption, did not apply to the extent Plaintiffs argued that Defendants should impose liability for distributing opioids *in violation of the CSA*, as opposed to imposing liability for distributing opioids generally. The Court reasoned that it would "not [be] impossible for Pharmacy Defendants to" both distribute opioids and "comply with both the federal Controlled Substances Act and its Ohio state law equivalent." *See* Dkt. 3546 at 26. Accordingly, the "stop selling" line of cases—which are based on impossibility preemption—would not apply to conduct that violated the CSA. *Id.* However, counsel's comments during closing arguments clearly encompassed lawful dispensing; he was not simply arguing that Defendants could have chosen not to violate the CSA. Therefore, this *dicta* does not apply to counsel's statements.

11

avoid liability." *Id.*; *see also* Tentative Decision at 14, *State v. Purdue Pharma L.P.*, No. 30-2014-00725287 (Cal. Super. Ct. Orange Cnty. Nov. 1, 2021) (rejecting analogous opioids nuisance claim because "the Federal government and the California Legislature have already determined . . . the social utility of medically appropriate prescriptions outweighs the gravity of the harm inflicted by them and so is not 'unreasonable'").

In the wake of this Supreme Court precedent, the Sixth Circuit has recognized that the so-called "stop-selling" theory is not a valid theory of liability. *See, e.g.*, *In re Darvocet, Darvon, & Propoxyphene Prods. Liab. Litig.*, 756 F.3d 917, 925 (6th Cir. 2014) ("The *Bartlett* court rejected the 'stop selling' theory, namely that a generic manufacturer could have avoided the conflict between state and federal law by refraining from selling the drug."); *Strayhorn v. Wyeth Pharms., Inc.*, 737 F.3d 378, 398 (6th Cir. 2013) ("Nor can the plaintiffs proceed on a failure-to-withdraw or stop-selling theory, a theory recently rejected by the Supreme Court in *Bartlett*."). Yet the only plausible interpretation of Plaintiffs' counsel's statement that Defendants "don't have to sell the drugs" but instead "choose" to do so is that the jury is free to hold Defendants liable under this discredited and off-limits theory. *See* Dkt. 4153 at 7095.

*Finally*, Plaintiffs' counsel made a number of other deeply prejudicial and inflammatory statements, including a "joking" encouragement to jurors who agreed with him that, "if there's some that don't see it that way, please, those of you who do, I want you to not beat them up, but really go after them," *id.* at 7321–22. Such inflammatory statements are undeniably prejudicial to Defendants and could serve only to inflame the jury. Again, this is far from a "case of a single,

12

isolated, or inadvertent comment" but rather a case of a "continuing pattern" of prejudicial statements throughout closing arguments.  *City of Cleveland*, 624 F.2d at 758.

## CONCLUSION

For these reasons, the Court should declare a mistrial.


Dated:  November 16, 2021 　　　　　　　Respectfully submitted,

/s/  John M. Majoras
John M. Majoras
Benjamin C. Mizer
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Phone: (202) 879-3939
Fax: (202) 626-1700
E-mail: jmmajoras@jonesday.com
E-mail: bmizer@jonesday.com

Tina M. Tabacchi
Tara A. Fumerton
JONES DAY
77 West Wacker
Chicago, IL 60601
Phone: (312) 269-4335
Fax: (312) 782-8585
E-mail: tmtabacchi@jonesday.com
E-mail: tfumerton@jonesday.com

*Counsel for Walmart Inc.*

/s/ Eric R. Delinsky
Eric R. Delinsky
Alexandra W. Miller
Graeme W. Bush
Paul B. Hynes, Jr.
ZUCKERMAN SPAEDER LLP
1800 M Street NW, Suite 1000
Washington, DC 20036
Tel: (202) 778-1800
E-mail: edelinsky@zuckerman.com
E-mail: smiller@zuckerman.com
E-mail: gbush@zucerkman.com
E-mail: phynes@zuckerman.com

*Counsel for CVS Pharmacy, Inc., Ohio CVS Stores, L.L.C., CVS TN Distribution, L.L.C., CVS Rx Services, Inc., and CVS Indiana, L.L.C.*

/s/ Kaspar J. Stoffelmayr
Kaspar J. Stoffelmayr
Brian C. Swanson
Katherine M. Swift
Sharon Desh
Sten Jernudd
BARTLIT BECK LLP
54 West Hubbard Street
Chicago, IL 60654
Tel: (312) 494-4400
Fax: (312) 494-4440
kaspar.stoffelmayr@bartlitbeck.com
brian.swanson@bartlitbeck.com
kate.swift@bartlitbeck.com
sharon.desh@bartlitbeck.com
sten.jernudd@bartlitbeck.com

Alex J. Harris
BARTLIT BECK LLP
1801 Wewatta Street, 12th Floor
Denver, CO 80202
Tel: (303) 592-3100
Fax: (303) 592-3140
alex.harris@bartlitbeck.com

*Counsel for Walgreens Boots Alliance, Inc., Walgreen Co., and Walgreen Eastern Co., Inc.*

14

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that the foregoing document was served via the Court's ECF system on all counsel of record on November 16, 2021.

/s/ John M. Majoras
John M. Majoras
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Phone: (202) 879-3939
Fax: (202) 626-1700
E-mail: jmmajoras@jonesday.com

*Counsel for Walmart Inc.*