6491

1          IN THE DISTRICT COURT OF THE UNITED STATES
               FOR THE NORTHERN DISTRICT OF OHIO
2                      EASTERN DIVISION

3
    IN RE:                        Case No. 1:17-md-2804
4   NATIONAL PRESCRIPTION         Cleveland, Ohio
    OPIATE LITIGATION
5                                 November 8, 2021
    CASE TRACK THREE              9:00 A.M.
6

7
                        - - - - -
8

9                       **VOLUME 25**

10
                        - - - - -
11

12          TRANSCRIPT OF JURY TRIAL PROCEEDINGS,

13          BEFORE THE HONORABLE DAN A. POLSTER,

14             UNITED STATES DISTRICT JUDGE,

15                     AND A JURY.

16

17                      - - - - -

18

19

20  Official Court Reporter: Heather K. Newman, RMR, CRR
                             7-189 U.S. Court House
21                           801 West Superior Avenue
                             Cleveland, Ohio  44113
22                           216-357-7035

23

24  Proceedings recorded by mechanical stenography; transcript
    produced by computer-aided transcription.
25

```
 1    APPEARANCES:
      For the Plaintiffs:        Peter H. Weinberger, Esq.
 2                               Spangenberg, Shibley & Liber
                                 1001 Lakeside Avenue, Ste. 1700
 3                               1900 East Ninth Street
                                 Cleveland, Ohio   44114
 4                               216-696-3232

 5                               W. Mark Lanier, Esq.
                                 Rachel Lanier, Esq.
 6                               M. Michelle Carreras, Esq.
                                 The Lanier Law Firm
 7                               6810 FM 1960 West
                                 Houston, Texas    77069
 8                               813-659-5200

 9                               Frank L. Gallucci, III, Esq.
                                 Plevin & Gallucci Company, LPA
10                               The Illuminating Building
                                 Suite 2222
11                               55 Public Square
                                 Cleveland, Ohio   44113
12                               216-861-0804

13                               Salvatore C. Badala, Esq.
                                 Maria Fleming, Esq.
14                               Napoli Shkolnik
                                 360 Lexington Ave., 11th Floor
15                               New York, New York   10017
                                 212-397-1000

16
      For Walgreen Defendants:   Kaspar J. Stoffelmayr, Esq.
17                               Brian C. Swanson, Esq.
                                 Katherine M. Swift, Esq.
18                               Alex Harris, Esq.
                                 Sharon Desh, Esq.
19                               Bartlit Beck LLP
                                 54 West Hubbard Street, Ste.300
20                               Chicago, Illinois   60654
                                 312-494-4400
21
      For CVS Defendants:        Graeme W. Bush, Esq.
22                               Eric R. Delinsky, Esq.
                                 Alexandra W. Miller, Esq.
23                               Paul B. Hynes, Jr., Esq.
                                 Zuckerman Spaeder - Washington
24                               Suite 1000
                                 1800 M Street, NW
25                               Washington, DC   20036
                                 202-778-1831
```

6493

```
 1    For Walmart Defendants:   John M. Majoras, Esq.
                                Jones Day - Columbus
 2                              Suite 600
                                325 John H. McConnell Blvd.
 3                              Columbus, Ohio   43215
                                614-281-3835
 4
                                Tara A. Fumerton, Esq.
 5                              Tina M. Tabacchi, Esq.
                                Jones Day - Chicago
 6                              Suite 3500
                                77 West Wacker
 7                              Chicago, Illinois   60601
                                312-782-3939
 8

 9    ALSO PRESENT:             Special Master David Cohen

10

11                                   - - - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

6494

| | | |
|---|---|---|
| 08:35:12 | 1 | <u>Monday Session, November 8, 2021, at 9:00 A.M.</u> |
| 08:42:01 | 2 | COURTROOM DEPUTY:  All rise. |
| 08:42:02 | 3 | THE COURT:  Okay.  Everyone can be seated, |
| 08:42:04 | 4 | please. |
| 08:42:17 | 5 | MR. DELINSKY:  Your Honor, could I take one |
| 08:42:18 | 6 | thing off your plate real quick? |
| 08:42:20 | 7 | THE COURT:  Okay.  Sure. |
| 08:42:21 | 8 | MR. DELINSKY:  CVS filed a Motion to Strike |
| 08:42:25 | 9 | last night.  Plaintiffs filed an opposition.  I think |
| 08:42:27 | 10 | there's a likelihood that we can reach a compromise on that, |
| 08:42:30 | 11 | and we want to return to it at lunch or maybe after court |
| 08:42:33 | 12 | today as we all think about it. |
| 08:42:35 | 13 | THE COURT:  All right. |
| 08:42:35 | 14 | I hope -- that's fine.  I'll -- obviously one of the |
| 08:42:39 | 15 | things I was going to take up but we'll defer that.  I think |
| 08:42:43 | 16 | the plaintiffs have made clear they're not offering it into |
| 08:42:47 | 17 | evidence, so hopefully you can work that out. |
| 08:42:51 | 18 | MR. DELINSKY:  I think we're going to be able |
| 08:42:52 | 19 | to, Your Honor. |
| 08:42:53 | 20 | THE COURT:  All right.  All right. |
| 08:43:03 | 21 | Well, someone handed up two exhibits the plaintiffs |
| 08:43:09 | 22 | plan -- want to offer with Mr. Hill. |
| 08:43:15 | 23 | Are the defendants offering anything? |
| 08:43:17 | 24 | MR. DELINSKY:  No exhibits through Mr. Hill, |
| 08:43:20 | 25 | Your Honor. |

08:43:21  1              THE COURT:  All right.

08:43:21  2         The plaintiffs are offering 23011 and 01253.  Any

08:43:35  3    objection to those?

08:43:37  4              MR. DELINSKY:  We do -- we do have objections

08:43:39  5    to both, Your Honor.  The two exhibits -- I think I'll take

08:43:44  6    them in reverse order.  The first is the -- the ALJ opinion

08:43:49  7    and approved by the DEA administrator.  I think -- it's the

08:43:53  8    East Main key speaker.  Yeah.  So it's just a case, doesn't

08:43:57  9    involve CVS.  It's just a DEA case.  And I think this is the

08:44:04  10   first time we've had this issue come up.

08:44:06  11        We obviously are still working through two other

08:44:09  12   opinions that pertain to CVS in particular, but this is just

08:44:12  13   a case.  It's just a case particular --

08:44:15  14             THE COURT:  Well, it involves East Main Street

08:44:18  15   Pharmacy.  I mean, what -- it was used in his examination.

08:44:25  16        What's the objection?

08:44:27  17             MR. DELINSKY:  The objection, Your Honor, is

08:44:29  18   that the law should come from Your Honor as opposed to from

08:44:32  19   the jurors reading cases.

08:44:34  20             THE COURT:  Well. . . it's not coming in for

08:44:39  21   that purpose.  It came in -- he was a DEA expert and I think

08:44:46  22   he was talking about what -- DEA's positions.

08:44:51  23        Let me see the document, please.  What are the

08:44:53  24   plaintiffs offering it for?

08:44:55  25             MR. WEINBERGER:  So, in -- the issue was how

08:44:58  1   far back did red flags exist as far as the DEA was concerned

08:45:05  2   or DEA notice, and you'll recall he said that the first time

08:45:09  3   that red flags was used was in a PDAC in 2011.  And so he

08:45:15  4   was crossed on this document to demonstrate that there was a

08:45:20  5   decision that -- on a case that the DEA brought long before

08:45:24  6   I think 2010 or -- started in 2010.

08:45:27  7               THE COURT:  All right.

08:45:28  8       Well, I'm going to admit it over objection.  It's

08:45:32  9   relevant to DEA's enforcement.

08:45:36 10               MR. DELINSKY:  Your Honor, the next document

08:45:40 11   was the *Touhy* letter.  I understood that plaintiffs

08:45:46 12   introduced that for impeachment, for impeachment.

08:45:47 13               THE COURT:  No, it says 23011, Robert Hill

08:45:50 14   Track 3 Expert Report Response.

08:45:53 15               MR. WEINBERGER:  It's kind of mislabeled on

08:45:55 16   that.  This is the *Touhy* letter from August 11th, '20 --

08:46:01 17   August 12th, 2021.

08:46:03 18               THE COURT:  Well, I don't think this -- I

08:46:05 19   allowed you to cross-examine him with it, but I'm concerned

08:46:09 20   about admitting the document itself.  It's -- the document's

08:46:15 21   hearsay.

08:46:16 22       It's -- so why -- exactly what -- what's the purpose

08:46:26 23   of offering it as an exhibit?

08:46:27 24               MR. WEINBERGER:  To buttress the testimony and

08:46:33 25   the evidence that his opinions were not endorsed or embraced

08:46:40 1    by the DEA and they were his opinions only.

08:46:42 2                    THE COURT:  Well, the letter is hearsay.  I

08:46:46 3    allowed it in to impeach him but I'm not going to admit the

08:46:51 4    letter.

08:46:52 5                    MR. WEINBERGER:  Okay.

08:46:53 6                    MR. DELINSKY:  And, Your Honor, I, of course,

08:46:55 7    for about the 17th time in this trial, Your Honor, I erred.

08:47:00 8    There is one Hill exhibit.

08:47:01 9                    THE COURT:  Okay.

08:47:02 10                   MR. DELINSKY:  It is the testimony to Congress

08:47:09 11   of Robert Patterson, who at the time was the acting

08:47:12 12   administrator of the DEA.

08:47:14 13       We used one page of that.  We wouldn't seek to admit

08:47:18 14   the entire testimony.  It was a page that talked -- where he

08:47:21 15   says 99.99 percent of doctors are all trying to do right by

08:47:25 16   their patients.

08:47:26 17       We would propose to work with the plaintiffs to --

08:47:31 18   whether it's that page or the page before to capture the

08:47:34 19   question.

08:47:34 20                   THE COURT:  All right.  Any objection to that?

08:47:36 21                   MR. WEINBERGER:  Yes.  We object to that.

08:47:38 22   This document actually.  If memory serves me correctly,

08:47:42 23   there was an attempt to introduce this document previously

08:47:44 24   through another witness.

08:47:45 25       This is the testimony of Mr. Patterson who was head of

08:47:50  1    the DEA before Congress.  It's -- this isn't Hill's

08:47:59  2    testimony.  This has nothing to do with Hill or in terms

08:48:04  3    of --

08:48:04  4                    THE COURT:  Well, it -- if he authenticated as

08:48:09  5    DEA, let me see it.  When was this testimony given?

08:48:12  6                    MR. WEINBERGER:  May 8th, 2018.  I mean, he's

08:48:16  7    gone from the DEA at that point.

08:48:23  8                    MR. DELINSKY:  That is true, Your Honor.

08:48:24  9                    THE COURT:  All right.  I agree.

08:48:26 10         I'm not going to let -- there's been testimony about

08:48:28 11    it but I'm not going to let it in through him.  He's --

08:48:31 12                    MR. DELINSKY:  Understood, Your Honor.

08:48:32 13                    THE COURT:  He can't -- he can't testify to

08:48:35 14    what DEA's position was three or four years after he left.

08:48:47 15    So that takes care of Hill.

08:48:49 16         The plaintiffs have offered two with Dr. Murphy.  The

08:48:55 17    Case and Deaton article, 01666.  Any objection to that?

08:49:02 18                    MS. FUMERTON:  Yes, Your Honor.  We object to

08:49:03 19    it as hearsay.

08:49:04 20                    MR. WEINBERGER:  Your Honor, this was an

08:49:05 21    article that he cited and relied upon and he was

08:49:09 22    cross-examined on it.

08:49:10 23                    THE COURT:  Yeah.  All right.

08:49:11 24         That comes in over objection because he cited and

08:49:18 25    relied on it.  All right.

08:49:19  1          The next one is 17422.

08:49:23  2                  MS. FUMERTON:  And, Your Honor, we object to

08:49:24  3      this one as well.  Plaintiffs did not establish any

08:49:27  4      relevancy or foundation, and Dr. Murphy repeatedly denied

08:49:30  5      knowing anything about the document and refused to agree

08:49:32  6      with plaintiffs' framing of it.  It's also hearsay.

08:49:35  7                  MR. WEINBERGER:  So, to refresh your memory,

08:49:37  8      Your Honor --

08:49:37  9                  THE COURT:  Let me see the document.  I don't

08:49:39 10      --

08:49:39 11                  MR. WEINBERGER:  This was a PowerPoint that we

08:49:42 12      obtained in discovery, the 30(b)(6) deposition of the Ohio

08:49:45 13      State Medical Board.

08:49:47 14          It was -- the page that he was shown is the Ohio State

08:49:53 15      Medical Board's analysis of OARRS and people that ultimately

08:50:03 16      died from heroin or fentanyl, and the -- I could show you

08:50:09 17      the page, Your Honor.

08:50:13 18                  THE COURT:  No.  I don't see how this comes in

08:50:14 19      through him, so I'm not going to allow that.

08:50:17 20          Are the defendants offering anything through Dr.

08:50:22 21      Murphy?

08:50:22 22                  MS. FUMERTON:  No, Your Honor.

08:50:40 23                  THE COURT:  So it looks like the only

08:50:41 24      remaining witness is Glickman.  Anyone offering anything

08:50:44 25      through --

08:50:45   1                     MS. FUMERTON:  Yes, Your Honor.  May I

08:50:47   2     approach?

08:50:48   3                     THE COURT:  Okay.  Have the plaintiffs looked

08:50:58   4     at these?

08:51:00   5                     MR. WEINBERGER:  Yes, Your Honor, and we

08:51:01   6     notified defense counsel last night, I think it was, that we

08:51:05   7     were objecting to all of those -- all of these, and let me

08:51:08   8     tell you why.

08:51:08   9          These are -- these are his charts that were used

08:51:13  10     during the course of his direct examination.  They are not

08:51:19  11     1006 charts, in our view.  They are simply charts that

08:51:24  12     either -- that were derived directly from his report or that

08:51:28  13     he created from his report.  These are opinion charts.

08:51:32  14          These are -- this would be tantamount to admitting

08:51:36  15     portions of his expert report.  He certainly was entitled to

08:51:45  16     testify and use them and the defense counsel was entitled to

08:51:48  17     use them as demonstratives, but I don't believe the -- any

08:51:52  18     of these appropriately go to the jury.

08:51:54  19                     MS. FUMERTON:  And, Your Honor, we obviously

08:51:56  20     disagree with that.  We think these fall squarely within

08:51:59  21     Rule 1006 and Your Honor's prior rulings on this.  You have

08:52:02  22     admitted into evidence similar charts that were created by

08:52:05  23     Dr. McCann.  You know, he -- there's no question that he

08:52:09  24     testified about them.  There's no question that he laid the

08:52:12  25     foundation for them, and all they are are straightforward

08:52:14  1    summaries of voluminous data.  And so in our view, they fall

08:52:18  2    squarely within Rule 1006.

08:52:20  3         I will also note that we have been providing these for

08:52:22  4    months, frankly, with plaintiffs to let them know that we

08:52:25  5    were going to use them as Rule 1006 summaries and they never

08:52:28  6    asserted specific objections until now.

08:52:33  7                   MR. WEINBERGER:  Well --

08:52:33  8                   THE COURT:  I allowed -- I put in some summary

08:52:36  9    charts, plaintiffs put in some summary charts through

08:52:39 10    Dr. McCann and other witnesses.

08:52:40 11                   MR. WEINBERGER:  Well, to be clear, the charts

08:52:41 12    with respect to Dr. McCann are simply a compilation of the

08:52:50 13    dosage units per year, per defendant, per store.  That's it.

08:52:55 14    They're not -- they are not opinions of his.

08:53:01 15         These are -- these were -- these are simply purely

08:53:04 16    1006s.  Every one of these charts --

08:53:07 17                   THE COURT:  These charts aren't opinions,

08:53:09 18    Mr. Weinberger.

08:53:10 19                   MR. WEINBERGER:  Well, sure they are.

08:53:12 20    Every -- every one of them.

08:53:16 21                   THE COURT:  If they were opinions, I wouldn't

08:53:18 22    let them in.  They're -- they're summaries of data, and the

08:53:25 23    data is authentic.  A lot of is McCann's data.  Not an

08:53:30 24    opinion, like here's the --

08:53:32 25                   MR. WEINBERGER:  But many of them are limited

08:53:34 1    to -- are -- is data that he created limited information on,

08:53:42 2    including pie charts, to --

08:53:45 3                    THE COURT:  All right.  I'm allowing them all

08:53:48 4    in over objection.

08:53:49 5                    MR. WEINBERGER:  All right.

08:53:50 6                    THE COURT:  They're not opinions.  I mean,

08:53:54 7    here's the first one.  This isn't an opinion.  Annual

08:53:57 8    prescriptions dispensed by Walmart per capita for oxycodone

08:54:01 9    and hydrocodone, January '06 to March '18.  That's not an

08:54:05 10   opinion; that's a summary of -- summary or compilation of

08:54:09 11   data that everyone agrees is authentic.  It's not an

08:54:14 12   opinion.

08:54:19 13       So I'll admit all these over objection:  01536, 01539,

08:54:25 14   01540A, 01541A, 01549, 01550, 01553, 01555, 01577, 01581,

08:54:45 15   01582, 01583, 01584, and 01585.

08:54:58 16       Are the plaintiffs offering anything with Dr.

08:55:00 17   Glickman?

08:55:02 18                    MR. WEINBERGER:  No, Your Honor.

08:55:04 19                    THE COURT:  Okay.

08:55:08 20                    MR. HYNES:  Your Honor, Paul Hynes for CVS.

08:55:10 21       Can we raise, with your indulgence, one issue related

08:55:13 22   to an exhibit that was introduced through Nicci Harrington,

08:55:16 23   the CVS witness who testified on Wednesday?

08:55:20 24       The exhibit is P-00 --

08:55:23 25                    THE COURT:  If someone wants to give it to me.

08:55:25  1    I assume I admitted it already.

08:55:29  2              UNIDENTIFIED SPEAKER:  Here you go.  May I

08:55:30  3    approach?

08:55:30  4              THE COURT:  Yeah.

08:55:32  5              MR. WEINBERGER:  Which one are we. . .

08:55:47  6              MR. HYNES:  Your Honor, this is a document

08:55:49  7    that plaintiffs asked Ms. Harrington about during her

08:55:52  8    cross-examination.  It's a 45-page document.  She was asked

08:55:56  9    about two pages in the document.

08:56:00  10       There has been a practice throughout this trial when a

08:56:02  11   witness is asked about a voluminous document of admitting

08:56:06  12   only the pages that he or she was asked about.  And we would

08:56:10  13   just ask that the same practice be followed with respect to

08:56:12  14   this document.

08:56:13  15             THE COURT:  Well, I don't know.  What did we

08:56:14  16   discuss when this was --

08:56:15  17             MR. HYNES:  I put two pink tabs on the pages.

08:56:18  18             THE COURT:  I know, but we went through this

08:56:20  19   already with Harrington.  We took care of her.  SO what did

08:56:22  20   I rule on this document?

08:56:24  21             MR. HYNES:  Your Honor, you admitted the whole

08:56:26  22   document and we just neglected to bring this issue to your

08:56:29  23   attention, and we apologize for that oversight.

08:56:31  24             MR. WEINBERGER:  This wasn't the one that we

08:56:33  25   previously discussed, and we agreed just to the pages that

08:56:35 1    had her name on it.  I thought we --

08:56:39 2                    MR. HYNES:  Maybe we had.  There were a couple

08:56:41 3    documents.

08:56:42 4                    MR. WEINBERGER:  I thought this is the one we

08:56:44 5    agreed we were going to do the front page, which was the

08:56:46 6    e-mail --

08:56:47 7                    MR. HYNES:  No, that's different one.

08:56:49 8                    MR. DELINSKY:  But it was the same rule.

08:56:53 9                    MR. WEINBERGER:  Okay.  Laura's going to look

08:56:55 10   at it and then we'll --

08:56:57 11                   MR. DELINSKY:  We'll circle back on it?

08:56:59 12                   MR. WEINBERGER:  Yeah.

08:57:00 13                   MR. HYNES:  Your Honor, is that okay?

08:57:01 14                   THE COURT:  Yeah, I guess so.  So if you work

08:57:02 15   it out.

08:57:03 16       I've already admitted the document.  If you can agree

08:57:05 17   on -- I agree if this is a 40-page document and there was

08:57:08 18   only testimony about two pages --

08:57:11 19                   MR. HYNES:  Right.

08:57:12 20                   THE COURT:  That has been following my general

08:57:15 21   practice, it will be confusing for the jury to have a whole

08:57:19 22   lot of pages with -- not tied to anything.

08:57:21 23                   MR. HYNES:  And just so it's clear, we're not

08:57:23 24   trying to -- we're fine with the document coming in.  We're

08:57:26 25   just trying to keep it to those pages.  We're not trying to

08:57:28 1    change that.

08:57:29 2                    THE COURT:  All right.

08:57:31 3                    UNIDENTIFIED SPEAKER:  Your Honor, I feel

08:57:34 4    confident Mr. Hynes and I will be able to work that out.

08:57:37 5                    THE COURT:  All right.  Work it out.  All:

08:57:47 6    Right.

08:57:47 7        Last -- I spent a lot of time over the weekend coming

08:57:50 8    up with what I think is an accurate limiting instruction for

08:57:56 9    the testimony from several witnesses about conversations

08:57:59 10   they said they had with representatives of State Boards of

08:58:07 11   Pharmacy.

08:58:07 12       Unless someone convinces me it's wrong, I'm going to

08:58:14 13   go with that.  And I mean if someone thinks it's absolutely

08:58:16 14   wrong or that it's confusing and you've got some better

08:58:20 15   suggestion, I'd ask the parties to come up with something.

08:58:23 16   But since nothing was submitted, I did it myself with my

08:58:27 17   team's help.

08:58:30 18                    MR. MAJORAS:  Your Honor, we're still --

08:58:32 19                    THE COURT:  The plan is to add that to, I

08:58:34 20   think it's Page 22, right after the paragraph on settlement

08:58:37 21   agreements.

08:58:38 22                    MR. MAJORAS:  Your Honor, John Majoras.

08:58:40 23       We do object to the language.  I frankly am still

08:58:43 24   looking at it from this morning.  We will have something

08:58:46 25   back to the Court either a counterproposal or otherwise.

6506

08:58:49   1                    THE COURT:  You object to it?  What's --

08:58:51   2                    MR. MAJORAS:  Well, the primary one is the one

08:58:52   3        I mentioned the other day which is that I think it unfairly

08:58:55   4        points to specific witnesses and undermines their testimony

08:59:01   5        away from other rulings.

08:59:03   6             We've had hearsay rulings throughout the case that are

08:59:05   7        going to apply broadly, and we have not had the need for

08:59:09   8        this limiting instruction.  Doing it in a way that points to

08:59:11   9        specific witnesses unfairly undermines their testimony.  I

08:59:15  10        think there can be an instruction that is broad enough that

08:59:19  11        does not address specific testimony.

08:59:22  12                    THE COURT:  Well, I hear what you're saying

08:59:23  13        but I -- it might actually heighten the importance of it,

08:59:30  14        Mr. Majoras.

08:59:30  15             The jury might have completely forgotten about it and

08:59:32  16        now they're being pointed to it and now they'll all remember

08:59:36  17        it.

08:59:36  18             All it's saying is they can't take it as evidence of

08:59:39  19        what the official policy of the Board of Pharmacy was, and

08:59:42  20        that isn't what you offered it for.  You offered it for the

08:59:44  21        fact -- the fact that your employees had the conversations

08:59:49  22        and they acted in reliance on it.

08:59:54  23             So -- all right.  But I'll -- I don't know.  If you

08:59:57  24        object, fine.

08:59:57  25                    MR. WEINBERGER:  For the record, the

08:59:58 1    plaintiffs are comfortable with it and in terms of content

09:00:02 2    as well as instructing the jury after -- in the portion of

09:00:08 3    the jury instructions that you've suggested.

09:00:09 4                    THE COURT:  All right.  Well --

09:00:11 5                    MR. MAJORAS:  I'll get back to you shortly,

09:00:13 6    Your Honor, with either specific language or -- I take your

09:00:15 7    point.  I do recognize that issue.  And we're -- that's part

09:00:17 8    of the reason I'm wrestling with it.

09:00:19 9                    THE COURT:  This was different than some of

09:00:21 10   the other rulings I made.  And I don't think, Mr. Majoras,

09:00:26 11   I -- you know, nothing quite like this that I -- that

09:00:31 12   there's clearly a permissible purpose and clearly and

09:00:35 13   impermissible purpose, and the jury wouldn't necessarily

09:00:38 14   know that.  It wouldn't be apparent.

09:00:43 15       Quite frankly, it took me a while to figure out

09:00:46 16   exactly how to say it.  So, all right.

09:00:58 17       I guess the plaintiffs are going to file something by

09:01:02 18   middle of the day responding to the defendants' suggestions

09:01:04 19   for changes to the jury instructions.

09:01:07 20                   MR. WEINBERGER:  Yes, Your Honor.

09:01:09 21                   THE COURT:  I started looking at them, so I'll

09:01:11 22   look at what the plaintiffs say, and we'll get on that.

09:01:16 23       I don't know if you've given any more thought to the

09:01:20 24   time limits for closing arguments.  Again, I want to fit

09:01:25 25   this into a day.  I don't want to keep the jury real late.

09:01:28  1    It's also not fair to the person who's speaking last if it's

09:01:32  2    at 7 o'clock at night.  So I think you all can sort of

09:01:36  3    figure it out, but I'll -- I have some thoughts, but I'll

09:01:41  4    hear what you have to say.

09:01:43  5        I had one other thought, too.  Something's occurred

09:01:49  6    which I never would have predicted.  We've gone like

09:01:53  7    six weeks.  We've got one more week to go.  We have not lost

09:01:56  8    a single juror for illness, COVID, family issues, whatever.

09:02:01  9    I never would have predicted this.  I don't think anyone

09:02:03  10   would have.  We lost one juror but it was for that other

09:02:08  11   issue.

09:02:10  12               MR. LANIER:  Oh, yeah.

09:02:10  13               THE COURT:  Yeah.  So I'm slated to excuse

09:02:18  14   Juror No. 13.  I looked at the Rules.  The Rules say you

09:02:22  15   cannot have a jury of more than 12, and you can't have a

09:02:26  16   jury of less than six, but there's case law that, with the

09:02:30  17   parties' consent, you can take a verdict from less than six.

09:02:37  18       This is a pretty cohesive group, and I don't want to

09:02:41  19   do anything that fractures that cohesion.  And I would only

09:02:47  20   keep Juror No. 13 if everyone agrees because I had said

09:02:52  21   we're going to have 12 and, you know -- at least 12 and

09:02:58  22   whoever is left, 12 and under, would deliberate.  If there

09:03:01  23   were more than 12, those persons would be excused.

09:03:04  24       So I will stay with that, but if everyone -- everyone

09:03:10  25   is agreeable and will put it on the record to keep Number

6509

09:03:15  1    13, then we, in my view, the parties' consent, we can do it.

09:03:18  2         So I want you to think about it and I never

09:03:26  3    expected -- and look, something could still happen in the

09:03:29  4    next week, but I never would have predicted that everyone

09:03:32  5    would stay healthy.  I'm glad that occurred.  So you can

09:03:36  6    think about that.

09:03:43  7         I guess the last thing is someone suggested that at

09:03:49  8    closing argument, we do something to recognize two fine

09:03:54  9    people who we had at the beginning of this MDL and we no

09:03:58  10   longer have, Paul Hanley and Francis McGovern, and sort of

09:04:03  11   recognize them by having empty chairs somewhere.  And I

09:04:05  12   thought that was a real nice idea.

09:04:08  13        I mean, I guess Mr. Hanley would have sat somewhere on

09:04:13  14   the plaintiffs' -- plaintiffs' group and Francis would have

09:04:15  15   been over there with my team.  So I think we'll do that.

09:04:19  16        I think it's a nice -- very good gesture and

09:04:24  17   appropriate.  This MDL has been going almost exactly

09:04:27  18   four years, long time, and we've lost two -- at least two

09:04:34  19   very fine people along the way.

09:04:37  20        Okay.  Anything else anyone wants?

09:04:41  21             MR. DELINSKY:  Your Honor, two quick things.

09:04:45  22        Where you just ended, let me state the uncomfortable

09:04:48  23   thing because I agree it's a wonderful gesture.

09:04:51  24             THE COURT:  I wouldn't say anything to the

09:04:52  25   jury.

09:04:53  1                    MR. DELINSKY:  Yeah.  That's it, Your Honor.

09:04:54  2                    THE COURT:  I wasn't going to say anything to

09:04:56  3      the jury.

09:04:56  4                    MR. DELINSKY:  That was my only issue,

09:04:57  5      Your Honor.

09:04:57  6                    THE COURT:  No, Mr. Delinsky, I wasn't going

09:04:59  7      to say anything to the jury.  The jury, quite frankly,

09:05:02  8      wouldn't even know -- you know, there's no one in a chair.

09:05:04  9                    MR. DELINSKY:  Okay.

09:05:05 10                    THE COURT:  There have been empty chairs.  I

09:05:06 11      mean, they don't count the chairs.  No, I wouldn't -- you

09:05:11 12      know, I might mention it before the jury comes out.

09:05:13 13                    MR. DELINSKY:  Yeah, okay.

09:05:14 14                    THE COURT:  But I'm not going to say anything.

09:05:16 15                    MR. DELINSKY:  All right.  Thank you, Your

09:05:16 16      Honor.

09:05:16 17           The one other issue is in all the back and forth on

09:05:20 18      the limiting instructions, there hasn't been a reading yet

09:05:22 19      of the limiting instruction on the settlements.  That did

09:05:26 20      come in briefly on Friday and extensively -- not extensively

09:05:31 21      but with Ms. Harrington on Wednesday.

09:05:33 22           I would request this morning that the settlement

09:05:36 23      instruction be read.  I know it will be read on Monday, one

09:05:38 24      week from today as well, but I would make that request,

09:05:41 25      Your Honor.

09:05:44   1                    MR. WEINBERGER:  We would object to that.  We

09:05:48   2      believe it's adequate --

09:05:49   3                    THE COURT:  Well, I think at this point, since

09:05:50   4      I haven't read it, I'm going to do it in the final

09:05:53   5      instructions.  I think that's the key point, so I'll do it

09:05:57   6      then.

09:05:59   7                    MR. WEINBERGER:  Your Honor, for purposes of

09:06:03   8      planning, as I understand, the defendants intend to call one

09:06:13   9      pharmacist each, Cook and -- yes, and Stossel, and they

09:06:23  10      intend to play the deposition of Deborah Mack.

09:06:27  11           Is there anybody else -- any other depos --

09:06:30  12                    THE COURT:  I thought there was one other

09:06:32  13      short deposition.

09:06:34  14                    MR. STOFFELMAYR:  Ashley.

09:06:37  15                    MR. WEINBERGER:  You're going to do Ashley?

09:06:43  16           Okay.  Perhaps now's a time to raise this one issue

09:06:46  17      with respect to Amy.  Is it Amy Stossel who is the Walgreens

09:06:53  18      pharmacist, who is going to testify?

09:06:55  19           Her husband, who passed away from cancer about a year,

09:06:59  20      year and a half ago, was also a Walgreens pharmacist, whose

09:07:03  21      name has come up during the course of this testimony.  And

09:07:08  22      from what we understand, there -- Walgreens appropriately

09:07:17  23      did some things to help out the Stossel family and

09:07:19  24      recognized him, et cetera, et cetera.  And so we're going to

09:07:23  25      ask for a -- I'm sorry.

```
09:07:25   1                 MR. STOFFELMAYR:  It's not going to come up.

09:07:26   2                 MR. WEINBERGER:  Not going to come up.  Okay.

09:07:28   3         All right.  Takes care of that.

09:07:35   4                 THE COURT:  Was there one other defense expert

09:07:36   5    or maybe that was Mr. Hill?  I thought --

09:07:41   6                 MR. WEINBERGER:  Well, they had indicated the

09:07:42   7    possibility of calling an additional expert and have told us

09:07:45   8    over -- a Dr. Kessler.

09:07:47   9                 THE COURT:  Right, Dr. Kessler.

09:07:49  10                 MR. WEINBERGER:  Right.  And they've told us

09:07:51  11    they're not going to be calling him.

09:07:52  12                 THE COURT:  Okay.  I did remember correctly.

09:07:54  13                 MR. WEINBERGER:  We do intend to call, very

09:07:57  14    briefly, Carmen Catizone by videoconferencing, probably

09:08:05  15    first thing tomorrow morning as a rebuttal witness, a short

09:08:15  16    rebuttal.

09:08:15  17                 THE COURT:  Okay.  So it looks like the

09:08:17  18    defendants are going to finish today.  We've got -- or

09:08:21  19    tomorrow?

09:08:22  20                 MR. STOFFELMAYR:  Tomorrow morning at the

09:08:23  21    latest.

09:08:23  22                 THE COURT:  All right.  Tomorrow morning and

09:08:24  23    then we'll have Mr. Catizone.  So it looks like we should

09:08:29  24    most likely conclude the testimony tomorrow.

09:08:31  25                 MR. WEINBERGER:  Yes, Your Honor.
```

6513

09:08:31  1          THE COURT:  All right.  Fine.

09:08:34  2       Okay.  We can bring in the jury.

09:08:37  3              (Brief pause in proceedings.)

09:10:10  4          (Jury returned to courtroom at 9:10 a.m.)

09:10:39  5          THE COURT:  Okay.  Good morning, ladies and

09:10:41  6   gentlemen.  Everyone can be seated.

09:10:45  7          MS. SWIFT:  May it please the Court.

09:10:46  8          THE COURT:  I hope everyone had a good

09:10:48  9   weekend.

09:10:49 10       Yes, Ms. Swift.  Yes.

09:10:51 11          MS. MILLER:  Good morning, Your Honor.  Good

09:10:53 12   morning, ladies and gentlemen of the jury.

09:10:55 13       My name is Sasha Miller, and I represent CVS.  CVS

09:10:58 14   calls Kenneth Cook.

09:11:00 15          THE COURT:  All right.  Mr. Cook, if you could

09:11:02 16   please raise your hand, please.

09:11:04 17       Do you swear or affirm that the testimony you are

09:11:06 18   about to give will be the truth, the whole truth, and

09:11:08 19   nothing but the truth under pain and penalty of perjury?

09:11:10 20          THE WITNESS:  Yes, sir.

09:11:11 21          THE COURT:  Thank you.  And you may remove

09:11:13 22   your mask while testifying, please.

         23

         24

         25

**Cook - Direct/Miller**

<u>DIRECT EXAMINATION OF KENNETH COOK</u>

BY MS. MILLER

**Q**    Good morning, Mr. Cook.

**A**    Good morning.

**Q**    Let's start off with are you a pharmacist?

**A**    Yes, I am.

**Q**    And do you work for CVS?

**A**    I do.

**Q**    What is your current position with CVS?

**A**    As of last Monday, I am now a district leader with CVS Pharmacy.

**Q**    And what are your responsibilities as a district leader?

**A**    I oversee 14 CVS pharmacies as well as two CVS pharmacies inside of Target and am responsible just for their general operations.

**Q**    And where is the area that those stores are located, generally?

**A**    Canton area, Canton, Ohio.

**Q**    Now, prior to last Monday when you became a district leader, were you a pharmacist working for CVS?

**A**    That is correct.

**Q**    And for how long did you work as a pharmacist for CVS?

**A**    A little over nine years.

**Q**    And where were the CVS pharmacies where you worked?

**Cook - Direct/Miller**

| | | |
|---|---|---|
| 09:12:15 | 1 | **A**    I worked at five pharmacies in Lake County and two |
| 09:12:21 | 2 | pharmacies in Cuyahoga County. |
| 09:12:22 | 3 | **Q**    So primarily when you were working for CVS as a |
| 09:12:24 | 4 | pharmacist, your stores were located in Lake County? |
| 09:12:27 | 5 | **A**    Correct. |
| 09:12:28 | 6 |     When I first graduated, I did work for a couple months |
| 09:12:30 | 7 | in Pennsylvania. |
| 09:12:32 | 8 | **Q**    Now, let's back up a little more and tell the jury a |
| 09:12:35 | 9 | little more about you. |
| 09:12:36 | 10 |     Where were you born? |
| 09:12:37 | 11 | **A**    I was born right here in Mayfield Heights at Hillcrest |
| 09:12:42 | 12 | Hospital.  Same hospital my son, who's turning five on |
| 09:12:44 | 13 | Friday, was actually born at.  So things kind of came full |
| 09:12:49 | 14 | circle at that hospital for me. |
| 09:12:50 | 15 | **Q**    And are your parents from Ohio as well? |
| 09:12:52 | 16 | **A**    Yes. |
| 09:12:53 | 17 | **Q**    Do you have any siblings? |
| 09:12:55 | 18 | **A**    I do.  I have a sister, who's one year older than me |
| 09:12:59 | 19 | and a brother who is nine years my junior. |
| 09:13:01 | 20 | **Q**    And where did you grow up? |
| 09:13:02 | 21 | **A**    I spent the first 12 years of my life in Wickliffe, |
| 09:13:05 | 22 | Ohio, and right before high school, my family moved to |
| 09:13:08 | 23 | Mentor, Ohio. |
| 09:13:08 | 24 | **Q**    Did you attend high school in Mentor? |
| 09:13:10 | 25 | **A**    No.  I went to St. Ignatius high school right here in |

**Cook - Direct/Miller**

09:13:15  1    Cleveland.

09:13:15  2    **Q**    And when did you graduate from St. Ignatius?

09:13:18  3    **A**    2006.

09:13:19  4    **Q**    So is it fair to say you spent your entire childhood

09:13:21  5    in Lake County?

09:13:22  6    **A**    That is correct.

09:13:23  7    **Q**    What did you do after you graduated from St. Ignatius?

09:13:27  8    **A**    I went to Ducane University to attend pharmacy school.

09:13:33  9    **Q**    And where is you Ducane located?

09:13:35  10   **A**    Pittsburgh, Pennsylvania.

09:13:37  11   **Q**    Did you have any hesitation about moving to

09:13:39  12   Pittsburgh?

09:13:39  13   **A**    I -- as a loyal Browns fan, I did.  In two of the five

09:13:46  14   years I lived in Pittsburgh, the Steelers won two Super

09:13:51  15   Bowls but as a true Browns fan, I was always looking forward

09:13:53  16   to the draft and next year.  So I finally got to let them

09:13:56  17   have it a little bit last year, so it all paid off in the

09:13:59  18   end.

09:13:59  19   **Q**    When did you graduate from Ducane?

09:14:01  20   **A**    May of 2012.

09:14:03  21   **Q**    And what was your degree you had?

09:14:05  22   **A**    I had a doctor of pharmacy degree.

09:14:07  23   **Q**    Is that the degree you need in order to practice as a

09:14:10  24   pharmacist?

09:14:10  25   **A**    Correct, yes.

**Cook - Direct/Miller**

09:14:12  1    **Q**    And when you applied to Ducane, did you know you

09:14:14  2    wanted to be a pharmacist?

09:14:16  3    **A**    At the time of my application process, I was on the

09:14:19  4    fence between being a pharmacist and engineering school.

09:14:25  5    **Q**    And you -- but you applied to Ducane because you knew

09:14:28  6    that they had a pharmacy program; is that right?

09:14:31  7    **A**    That is correct.

09:14:31  8    **Q**    What made you eventually decide to become a

09:14:34  9    pharmacist?

09:14:35  10   **A**    So growing up, I had a close friend, whose mom was a

09:14:38  11   pharmacist for what at the time was Revco, which later would

09:14:41  12   become CVS Pharmacy.

09:14:43  13          Hearing her talk about her work in the community was

09:14:45  14   just very rewarding to me, coupled with, you know, the job

09:14:50  15   demand and my love of helping people, you know, getting out

09:14:54  16   there to help the community as well as my love of chemistry

09:15:00  17   and math all pointed me in the direction of pharmacy.

09:15:03  18   **Q**    So were you drawn to pharmacy in part because it would

09:15:06  19   allow you to interact with people daily?

09:15:08  20   **A**    Absolutely.

09:15:08  21   **Q**    Let's talk a little bit about your pharmacy education

09:15:11  22   and Ducane and sort of the subjects you studied.  How many

09:15:14  23   years was the program?

09:15:15  24   **A**    It was a six-year program.

09:15:17  25   **Q**    And did you have -- was there a course work element to

**Cook - Direct/Miller**

09:15:21 1   the program?

09:15:21 2   **A**    Yes.  There was five years of lecture course work as

09:15:26 3   part of that six-year program.

09:15:28 4   **Q**    And what are some of the courses that you took?

09:15:30 5   **A**    I mean, we took courses, you know, from

09:15:34 6   pre-requisites, such as, you know, calculus, organic

09:15:37 7   chemistry, chemistry, and then later on, to sum it up, it

09:15:43 8   would be called pharmacotherapy where we learned about

09:15:45 9   disease states, drugs in the disease states, how to treat

09:15:47 10  them, how they work on a chemical level.  I won't go into

09:15:50 11  too much detail.

09:15:52 12  **Q**    Did you also take some classes in pharmacy law?

09:15:54 13  **A**    I did.  We took two classes in pharmacy law at my time

09:15:58 14  at Ducane.

09:16:00 15  **Q**    And did your pharmacy law courses cover corresponding

09:16:04 16  responsibility?

09:16:04 17  **A**    Yes, to the best of my knowledge, they did.

09:16:06 18  **Q**    Did you take a class on pain management at Ducane?

09:16:08 19  **A**    Yes, I did.

09:16:10 20  **Q**    And did that class discuss the risks of pain medicine?

09:16:16 21  **A**    Yes.

09:16:16 22  **Q**    Did you learn about the chemistry as well of

09:16:19 23  prescription opioid medications?

09:16:20 24  **A**    Yes.

09:16:21 25  **Q**    And did you learn about the risks of addiction?

**Cook - Direct/Miller**

09:16:23  1    **A**    Yes.

09:16:24  2    **Q**    Were you also taught about the risks of overdose

09:16:27  3    associated with prescription --

09:16:29  4    **A**    Yes.

09:16:30  5    **Q**    -- opioids.

09:16:31  6          Now, you mentioned that you -- for five years, you

09:16:35  7    were engaged in course work.  Did you also do something

09:16:38  8    called rotations?

09:16:39  9    **A**    Yes, that is correct.

09:16:39  10    **Q**    And can you tell the jury a little bit about what a

09:16:42  11    rotation is?

09:16:42  12    **A**    Sure.

09:16:43  13          So my last year, my sixth year of pharmacy school, we

09:16:46  14    went into a variety of practice settings, from hospitals,

09:16:51  15    you know, in addition to the community pharmacy, just

09:16:54  16    variety of pharmacy settings to kind of experience, you

09:16:58  17    know, different areas of pharmacy before we graduated and

09:17:00  18    made any career decisions.

09:17:02  19          My joke I like to tell is we paid the school to work

09:17:05  20    for free that year.

09:17:07  21    **Q**    And did you enjoy that practical aspect of your

09:17:13  22    pharmacy education?

09:17:14  23    **A**    Absolutely.  100 percent.

09:17:16  24    **Q**    And why was that?

09:17:16  25    **A**    As I mentioned before, getting to see different areas

**Cook - Direct/Miller**

09:17:18 1    of pharmacy.  I worked in the neonatal intensive care unit,

09:17:23 2    pediatric intensive care unit, and it was just very

09:17:27 3    rewarding work.

09:17:28 4    **Q**    And was there another component of your education that

09:17:33 5    involved interning?

09:17:34 6    **A**    Yes.

09:17:34 7         So part of licensure requirements, both in Ohio and

09:17:39 8    Pennsylvania, was completion of internship hours.  So I

09:17:42 9    worked as an intern throughout my years with CVS Pharmacy.

09:17:46 10   **Q**    And so did you intern with CVS throughout the time

09:17:50 11   that you were at Ducane?

09:17:52 12   **A**    While I was at school, I worked predominantly over

09:17:56 13   summers and extended holiday breaks, not so much through the

09:17:59 14   actual school year.

09:18:00 15   **Q**    And where were the CVS pharmacies located where you

09:18:03 16   interned?

09:18:03 17   **A**    Majority of them -- majority of that time that I

09:18:06 18   interned was at the Mentor, Ohio, store, and then when I was

09:18:09 19   living outside of Buffalo at, you know, for a year, I worked

09:18:13 20   as an intern in there as well.

09:18:15 21   **Q**    And why were you in New York for that year?

09:18:17 22   **A**    My wife was actually finishing up pharmacy school in

09:18:21 23   Buffalo.

09:18:21 24   **Q**    So was your first job with CVS actually as an intern?

09:18:24 25   **A**    That is correct.

6521

**Cook - Direct/Miller**

09:18:25  1    **Q**    And approximately when were you -- did you start

09:18:28  2    interning for CVS?

09:18:29  3    **A**    May of 2008, roughly.

09:18:34  4    **Q**    What did you do as an intern?

09:18:37  5    **A**    My primary responsibilities were, you know, assisting

09:18:40  6    the pharmacists with just day-to-day operations of the

09:18:44  7    pharmacy.  So inputting prescriptions, you know, the

09:18:46  8    processing of prescriptions, you know, getting to know

09:18:50  9    patients.

09:18:50  10        As an intern, I had a little more responsibilities

09:18:53  11   than technician.  You know, later on in my career as an

09:18:57  12   intern, I was able to vaccinate, but predominantly I was

09:18:57  13   part of the pharmacy team, assisting patients, get their

09:19:05  14   medications.

09:19:05  15   **Q**    And you worked in conjunction with the pharmacist?

09:19:07  16   **A**    Absolutely.

09:19:07  17   **Q**    And also the pharmacy technicians?

09:19:10  18   **A**    That is correct.

09:19:10  19   **Q**    While you're interning at the CVS in Mentor, Ohio, did

09:19:14  20   you have an occasion to interact with Lake County Narcotics?

09:19:18  21   **A**    I did.

09:19:20  22   **Q**    And can you tell the jury about what happened?

09:19:24  23   **A**    It was a funny story.  I believe it was my first

09:19:26  24   summer there.  A patient had dropped off a prescription for

09:19:30  25   a high amount of pain medication for an opioid pain

**Cook - Direct/Miller**

09:19:34  1    medication, you know, said to us that she hasn't filled here

09:19:37  2    before, she was to the best of my knowledge from out of town

09:19:40  3    and didn't have insurance.

09:19:41  4        So, you know, the potential red flags, you know,

09:19:44  5    started building up even as an intern, you know, in the

09:19:47  6    first couple months on the job, I was able to recognize

09:19:51  7    that.

09:19:51  8        So I brought it up to the attention of my pharmacist

09:19:53  9    on duty at the time.  I believe it was Michelle.  We reached

09:19:57 10    out to Lake County Narcotics, who basically, for lack of a

09:20:01 11    better word, conducted a sting operation in the pharmacy.

09:20:05 12        So when the patient came back to fill the medication,

09:20:08 13    I had to -- I was tasked with stalling her.  I was the one

09:20:10 14    ringing the register at the time, so very uncomfortable for

09:20:13 15    me, but I kept her there until Lake County Narcotics could

09:20:16 16    arrive.

09:20:17 17        They ended up arresting her in the parking lot and

09:20:20 18    then both my pharmacist and I had to go to the parking lot

09:20:23 19    to identify that the person in the back of the police car

09:20:27 20    was, you know, this patient in question.  It was a fun day.

09:20:29 21  **Q**    Now, shifting gears from that interaction, was there

09:20:34 22    something else special that happened for you while you were

09:20:38 23    interning at the Mentor store?

09:20:40 24  **A**    Yes.  Very much so.

09:20:42 25  **Q**    And what happened?  Can you share that with the jury?

**Cook - Direct/Miller**

09:20:45  1    **A**      Yeah.

09:20:46  2         My first day working there, I walked in because I

09:20:48  3    needed directions to the drug testing facility as part of

09:20:52  4    like the pre-employment screening.  And there was a

09:20:54  5    technician working there named Natalie, who gave me

09:20:58  6    directions -- let's put it this way, I ended up in the right

09:21:01  7    city but nowhere near where I needed to be, in Willoughby is

09:21:06  8    where it ended up.

09:21:07  9         I was able to look past that minor infraction.  I

09:21:12  10   ended up marrying her, you know, several years later.  It

09:21:18  11   took me about four months to build up the courage to ask her

09:21:21  12   out, though.

09:21:21  13        So right when I was ready to go back to the school for

09:21:23  14   the summer, I finally asked her out and I figured worst case

09:21:28  15   scenario, if she said no, I would be back at school and

09:21:31  16   wouldn't have to focus on it so much.  But she said yes.

09:21:34  17   **Q**      Where did you end up getting married?

09:21:36  18   **A**      Willoughby Hills, Ohio.

09:21:38  19   **Q**      And where is Natalie from?

09:21:40  20   **A**      She's born and raised in Mentor her whole life.

09:21:44  21   Mentor, Ohio.

09:21:44  22   **Q**      Did you and Natalie grow up near each other?

09:21:48  23   **A**      So, yeah, funny story, we grew up about a four-minute

09:21:51  24   drive apart but we went to different high schools,

09:21:53  25   obviously.  So I never knew about her existence until the

6524

**Cook - Direct/Miller**

09:21:56  1   day I walked into that CVS back in May of '08.

09:21:59  2   **Q**   And now you've been married for how many years?

09:22:04  3   **A**   Nine years.

09:22:05  4   **Q**   And how many children --

09:22:06  5   **A**   A little over nine.  Got to get that right.

09:22:08  6   **Q**   You're almost to 10.  You're almost to 10.

09:22:11  7        And do you have a family?

09:22:13  8   **A**   I do, yes.  My parents are still in Northeast Ohio, as

09:22:18  9   is her family.

09:22:19  10  **Q**   And what about children?

09:22:20  11  **A**   I have three kids, Emily, who's eight, Ella, who is

09:22:24  12  six, and as I shared with you earlier, my son Aden, the

09:22:27  13  youngest, he's going to turn five this Friday.

09:22:29  14  **Q**   And tell us a little more about Natalie.  What does

09:22:34  15  she do?

09:22:34  16  **A**   She is also a pharmacist with CVS Pharmacy.  Her

09:22:39  17  current job title is a floater pharmacist, meaning she, you

09:22:42  18  know, fills in across the district where help is needed.

09:22:45  19       She predominantly works now at the Mentor, Ohio,

09:22:48  20  Target CVS location.

09:22:49  21  **Q**   All right.

09:22:50  22       So let's pick back up with so you've met your

09:22:54  23  soon-to-be wife, you're still in pharmacy school.  And what

09:22:58  24  year did you graduate from Ducane?

09:23:00  25  **A**   May of 2012.

**Cook - Direct/Miller**

09:23:02  1   **Q**     And after graduation, you had your pharmacy degree.

09:23:06  2        Was there another step you needed to take in order to

09:23:09  3   become a licensed pharmacist?

09:23:10  4   **A**     Yes.

09:23:11  5        So in addition to the degree, I had to pass two

09:23:13  6   licensing exams, one called the NAPLEX, which is the

09:23:17  7   National Pharmacy License Examination, and another one was

09:23:21  8   the law test.  It's either the MPJE or MJPE, I apologize, I

09:23:27  9   forgot which way it goes.  But yes, there were two exams I

09:23:31 10   had to take before I could practice pharmacy.

09:23:33 11   **Q**     And so one of those tests you said was a law exam.

09:23:36 12   Did that cover legal requirements for filling prescriptions?

09:23:38 13   **A**     Yes, it did.

09:23:39 14   **Q**     And so did you take those two tests while you were

09:23:42 15   still in Pennsylvania?

09:23:43 16   **A**     That is correct.

09:23:44 17   **Q**     And did you pass those tests?

09:23:45 18   **A**     I did.  I procrastinated taking them as long as

09:23:49 19   possible.  My wife signed me up back-to-back days to do

09:23:52 20   them, so I -- it was a stressful week, but yes.

09:23:56 21   **Q**     And ultimately, you became licensed as a pharmacist in

09:24:00 22   Pennsylvania?

09:24:00 23   **A**     That is correct.

09:24:02 24   **Q**     What about Ohio?

09:24:04 25   **A**     So I went through what's called reciprocation.  I

09:24:09 1   reciprocated my Pennsylvania license to Ohio.  So basically

09:24:13 2   I transferred my national pharmacy examination score to the

09:24:16 3   State of Ohio.  And then the other requirement I had was to

09:24:23 4   sit in front of the State Board of Pharmacy for I believe it

09:24:25 5   was about an eight-hour day where they went over Ohio law,

09:24:28 6   they went predominantly over OARRS and the OARRS

09:24:32 7   requirements, and then at the conclusion of that day, I was

09:24:34 8   granted my license to practice pharmacy in the State of

09:24:37 9   Ohio.

09:24:37 10  **Q**    And so are you currently licensed now in both

09:24:40 11  Pennsylvania and Ohio?

09:24:41 12  **A**    Correct, yes.

09:24:42 13  **Q**    Do you also need to take continuing education classes

09:24:45 14  to maintain your licenses?

09:24:48 15  **A**    Yes.

09:24:48 16  **Q**    And do you take classes on the legal requirements for

09:24:51 17  filling prescriptions?

09:24:52 18  **A**    Yes.

09:24:53 19  **Q**    As well as other --

09:24:55 20  **A**    As well as other CE's, yes.

09:24:57 21  **Q**    And have you ever been disciplined by the Ohio Board

09:25:00 22  of Pharmacy?

09:25:00 23  **A**    I have not.

09:25:01 24  **Q**    Have you ever been disciplined by the Pennsylvania

09:25:03 25  Board of Pharmacy?

**Cook - Direct/Miller**

09:25:04  1   **A**     I have not.

09:25:04  2   **Q**     And have you ever had either of your licenses

09:25:08  3   suspended?

09:25:09  4   **A**     No.

09:25:09  5   **Q**     What about has -- have either of your licenses been

09:25:14  6   revoked by either Board of Pharmacy?

09:25:16  7   **A**     No.

09:25:20  8   **Q**     All right.  Let's move now to your work as a CVS

09:25:22  9   pharmacist.

09:25:23  10      So we already discussed how you interned throughout

09:25:25  11  pharmacy school.  What was your first job as a pharmacist

09:25:29  12  with CVS?

09:25:30  13  **A**     So when I started in Pennsylvania, I was a floater

09:25:33  14  pharmacist as well, you know, just filling in at stores that

09:25:36  15  needed help.

09:25:37  16  **Q**     And where was that?

09:25:38  17  **A**     That was in Pennsylvania.  I worked from, anywhere

09:25:42  18  from Erie, Pennsylvania, to York, Pennsylvania for several

09:25:46  19  months.

09:25:47  20  **Q**     And up until your recent promotion, did you work for

09:25:51  21  CVS from that first pharmacy job in Pennsylvania until that

09:25:58  22  recent promotion?

09:25:59  23  **A**     Yes, I worked as a pharmacist with CVS, yep.

09:26:02  24  **Q**     And at some point, did you leave Pennsylvania and move

09:26:07  25  back to Ohio?

**Cook - Direct/Miller**

09:26:08  1    **A**    Yes.

09:26:09  2    **Q**    And where did you move to?

09:26:11  3    **A**    We moved right back to Mentor, Ohio.  My wife became

09:26:14  4    pregnant.  She didn't ask me about it -- no, but she got

09:26:18  5    pregnant.  And in late 2012, early 2013, we moved back to

09:26:23  6    Ohio.

09:26:24  7    **Q**    And so why did you move back?

09:26:27  8    **A**    My wife decided to get pregnant, so...

09:26:32  9    **Q**    And after she decided that, did you decide to be

09:26:37 10    closer to family for --

09:26:38 11    **A**    Absolutely.

09:26:39 12          So as I shared earlier, both my parents, her parents

09:26:42 13    are from Northeast Ohio.  Her brother and his family and her

09:26:46 14    sister and her family.  So it's a very tight knit community,

09:26:52 15    actually all living right in Lake County.

09:26:54 16    **Q**    And do you still live in Mentor?

09:26:56 17    **A**    I do.

09:26:57 18    **Q**    So since moving back to Northeast Ohio, have you

09:27:04 19    worked primarily at CVS pharmacies in Lake County?

09:27:06 20    **A**    Yes, primarily, that is correct.

09:27:08 21    **Q**    Have you worked at stores also in Cuyahoga County?

09:27:11 22    **A**    Yes.  I spent -- best of my knowledge, it was a little

09:27:14 23    over a year at two separate stores in Cuyahoga County.

09:27:16 24    **Q**    And focusing on your Lake County experience, how many

09:27:21 25    CVS pharmacies have you worked at in Lake County?

09:27:23  1    **A**      Five different pharmacies.

09:27:25  2    **Q**      And what was the first CVS Pharmacy that you worked at

09:27:29  3    as a pharmacist?

09:27:30  4    **A**      It was Store 3356 in Painesville City or sometimes

09:27:34  5    called Downtown Painesville.

09:27:36  6    **Q**      And were you the manager of that pharmacy?

09:27:38  7    **A**      Yes, I was the pharmacy manager.

09:27:40  8    **Q**      What was your title?

09:27:42  9    **A**      Pharmacy manager.

09:27:43  10   **Q**      And did you have management responsibility as the

09:27:50  11   pharmacy manager?

09:27:50  12   **A**      Yes.

09:27:51  13   **Q**      Did you also fill prescriptions?

09:27:52  14   **A**      Yes.

09:27:54  15   **Q**      Were you the pharmacy manager of the other Lake County

09:27:59  16   pharmacies where you worked?

09:28:00  17   **A**      Yes, I was.

09:28:01  18   **Q**      What was the next CVS Pharmacy you worked at?

09:28:07  19   **A**      So following Store 3356, I went to Store 3326 in

09:28:12  20   Mentor, Ohio, the store that it all began at, where I met my

09:28:16  21   wife at.

09:28:16  22   **Q**      All right.

09:28:18  23          Mr. Pitts, can I have the ELMO, please?

09:28:31  24   BY MS. MILLER:

09:28:32  25   **Q**      Mr. Cook, I'm showing you CVS-MDL-4037.  Do you

**Cook - Direct/Miller**

09:28:40 1  recognize the CVS store in this photo?

09:28:42 2  **A**     Yes, that is store 3326 in Mentor, Ohio.

09:28:45 3  **Q**     And how far is the store where you live?

09:28:47 4  **A**     I could walk there -- the house I grew up in, I could

09:28:51 5  walk there in 5 to 10 minutes.

09:28:52 6  **Q**     And this, I think you mentioned, is the store where

09:28:54 7  you met your wife as an intern?

09:28:56 8  **A**     Yes, that is correct.

09:29:02 9  **Q**     I'm showing you now CVS-MDL-04385.

09:29:15 10     Do you recognize the pharmacy in that photograph?

09:29:18 11  **A**     Yes, that is the interior of Store 3326.  I can go as

09:29:22 12  far as to tell you the technician ringing out that patient

09:29:24 13  of ours right there, her name is Kelsey.  I worked with her

09:29:28 14  for a long time.

09:29:28 15  **Q**     So has Kelsey been a pharmacy technician at the Mentor

09:29:33 16  store for how many years?

09:29:34 17  **A**     Several years, to the best of my knowledge, but she

09:29:37 18  would also help me if I needed, you know, assistance at

09:29:39 19  another one of my stores.  She was always someone willing to

09:29:42 20  step up.

09:29:43 21  **Q**     And after the store in Mentor, what was the next

09:29:47 22  pharmacy that you went to?

09:29:48 23  **A**     Following Mentor, I went to Store 05941, which is in

09:29:53 24  Painesville on Bacon Road.

09:30:06 25  **Q**     Mr. Cook, I'm going to show you -- I'm showing you

09:30:14  1    CVS-MDL-04400.

09:30:17  2         Do you recognize the CVS store in this photo?

09:30:21  3    **A**    Yes.  That is Store 05941 in Painesville, correct.

09:30:26  4    **Q**    And where in Painesville is that store located?

09:30:30  5    **A**    Bacon Road, also called North Ridge Road.

09:30:33  6    **Q**    Was this the second CVS Pharmacy in Painesville that

09:30:37  7    you worked at?

09:30:38  8    **A**    Yes.

09:30:39  9    **Q**    And how long did you spend at this Painesville store?

09:30:42 10    **A**    Best of my knowledge, it was, I would say a little

09:30:45 11    over four years.

09:30:46 12    **Q**    And after you left the Bacon Road, Painesville

09:30:52 13    location, where did you go next?

09:30:54 14    **A**    So following the Bacon Road location I -- was when I

09:31:00 15    went to Cuyahoga County for that period of a little over a

09:31:02 16    year.  It was Store 0 -- 3032 in Richmond Heights.

09:31:06 17    **Q**    And was there a second store in Cuyahoga County?

09:31:09 18    **A**    Yes.

09:31:10 19         So following several months, again, best of my

09:31:13 20    knowledge, several months at 3032, I went to Store 4350

09:31:17 21    right in Shaker Square in Cleveland.

09:31:19 22    **Q**    And after working at those Cuyahoga County stores, did

09:31:23 23    you go back to stores in Lake County?

09:31:25 24    **A**    That is correct.

09:31:26 25    **Q**    And can you just walk the jury through the next three

09:31:31  1    stores you worked at?

09:31:32  2    **A**    Certainly.

09:31:33  3        So when I was done at -- in the Shaker Square store, I

09:31:37  4    went to Store 7686, Mentor on the Lake, Ohio.  I was there

09:31:43  5    for a period of several months.  And then I went back to the

09:31:46  6    other Mentor location, which we referenced earlier, Store

09:31:50  7    3326.

09:31:53  8        Again, I was there for a period of several months, and

09:31:55  9    then ultimately ended up at Store 4351 in Willoughby, Ohio.

09:32:00 10    **Q**    Now, over the years at these Lake County pharmacies

09:32:04 11    where you worked, did you work with other pharmacists who

09:32:07 12    were also from Northeast Ohio?

09:32:11 13    **A**    Yes.

09:32:11 14    **Q**    And were those pharmacists also making their homes and

09:32:16 15    raising their families in Northeast Ohio?

09:32:18 16    **A**    Yes.

09:32:22 17    **Q**    Let's talk a little bit about what it actually is like

09:32:27 18    to be a pharmacist.  Okay?

09:32:31 19        What do you like most about being a pharmacist?

09:32:35 20    **A**    To sum it up, quite simply, it's helping the public,

09:32:40 21    helping you fine ladies and gentlemen, whether, you know,

09:32:41 22    you need a medication filled, a recommendation on an

09:32:44 23    over-the-counter product, even sometimes just to come in and

09:32:47 24    talk about your day while you're shopping, it's that

09:32:50 25    interaction with the public that really gives me that

**Cook - Direct/Miller**

09:32:52  1    immense job satisfaction on a day-to-day basis.

09:32:55  2    **Q**    Now, let's move to talking a little bit about your

09:32:58  3    patients and how you interact with them and know them.

09:33:01  4        Do you know some of your patients even before they

09:33:04  5    would walk into your pharmacy?

09:33:06  6    **A**    That is correct.

09:33:07  7        So, you know, minus my time in Pittsburgh and a year

09:33:11  8    in New York, a little over a year in New York, I spent the

09:33:15  9    better part of a quarter century in Lake County.  So prior

09:33:18 10    to starting at any store, I mean, I would see patients that

09:33:21 11    I recognize from elementary school, high school, you know,

09:33:25 12    my daughter's softball coaches, neighbors, friends,

09:33:29 13    relatives, absolutely.

09:33:31 14        Every store I was at there was, you know, a handful of

09:33:33 15    patients that I already knew.

09:33:35 16    **Q**    And was -- so is that pretty common over the course of

09:33:39 17    your career as a pharmacist?

09:33:40 18    **A**    Yes.

09:33:40 19    **Q**    And are there other patients that you came to know

09:33:44 20    after they started filling their prescriptions at your

09:33:48 21    pharmacies?

09:33:49 22    **A**    Yes.

09:33:50 23    **Q**    And can you, you know, tell the jury a little bit more

09:33:54 24    about how you got to know them?

09:33:56 25    **A**    Yeah.

**Cook - Direct/Miller**

09:33:57  1      So, I mean, honestly, it usually started over small

09:34:01  2   talk, just someone would come in with a Browns shirt or an

09:34:05  3   Indians shirt, Guardians shirt now, or a Cavs, you know,

09:34:08  4   Ohio State shirt, you just talk small talk, whether it be

09:34:12  5   about sports, weather.

09:34:14  6      When you got to see these patients more and more

09:34:17  7   often, so every month for a refill or every three months or

09:34:20  8   every couple weeks, you would learn more about them from

09:34:22  9   just simple conversations at the counter, at the register,

09:34:25 10   even on the phone.

09:34:26 11      I got to know about births in their family, deaths,

09:34:29 12   weddings, you know, all sorts of life events for them.

09:34:32 13   Q      And do you also talk about their medical conditions?

09:34:37 14   A      Of course, yes.

09:34:38 15   Q      And did you talk to them about treatments that they

09:34:42 16   were -- that they were receiving from their doctors?

09:34:44 17   A      Yes.

09:34:46 18   Q      Were most of your patients local residents?

09:34:49 19   A      Yes, I would say the majority of them were.

09:34:53 20   Q      And your patients were members of your community?

09:34:55 21   A      Yes.

09:34:56 22   Q      For the most part?

09:34:57 23   A      That is correct.

09:34:57 24      To this day, I can't go to Lowe's, Giant Eagle, Sam's

09:35:01 25   Club, you name it, without seeing someone that I know from

**Cook - Direct/Miller**

09:35:05  1    working all my years as a pharmacist.

09:35:07  2    **Q**    And were there patients you would see on a regular

09:35:09  3    basis?

09:35:10  4    **A**    Yes.

09:35:10  5    **Q**    And would patients bring in prescriptions for all

09:35:13  6    kinds of medications?

09:35:15  7    **A**    Absolutely.

09:35:17  8    **Q**    How about entire families, would entire families bring

09:35:21  9    their prescriptions to your pharmacies?

09:35:23  10   **A**    Oh, yes.  I got to know, yeah, children, wives,

09:35:27  11   husbands, grandparents, absolutely.

09:35:30  12   **Q**    And over the years working in Lake County, have you

09:35:35  13   become generally familiar with some of the prescribers that

09:35:39  14   fill prescriptions at your pharmacies?

09:35:41  15   **A**    Yes.  I would say I'm generally familiar with those

09:35:46  16   prescribers.

09:35:47  17   **Q**    And how would you get that information?

09:35:48  18   **A**    Just, number one, through conversations with the

09:35:52  19   offices, conversations with patients about the doctor, you

09:35:56  20   know, getting to see, like, you can tell who's the

09:35:59  21   cardiologist because they're prescribing, you know, a lot of

09:36:03  22   heart medication.

09:36:03  23        So honestly, it's just through conversation,

09:36:08  24   communications, and just experience.

09:36:09  25   **Q**    Does knowing your patients help you in your practice

**Cook - Direct/Miller**

09:36:12  1    as a pharmacist?

09:36:13  2    **A**    It absolutely does.

09:36:15  3    **Q**    And how?

09:36:19  4    **A**    You get to know, you know, what patients -- I mean, it

09:36:23  5    could be as simple as a drug allergy, you know, and then

09:36:25  6    they come asking for an over-the-counter recommendation and

09:36:28  7    oh, Mrs. Jones, I forgot, or that's right, you can't take

09:36:34  8    Claritin, for example.

09:36:34  9    You get to know their fears about taking medication

09:36:37  10   and how to work with them to ultimately, you know, get them

09:36:40  11   on their path to better health.

09:36:42  12   **Q**    And does knowing your patients also help you in

09:36:45  13   filling controlled substance prescriptions?

09:36:47  14   **A**    Yes.

09:36:57  15   **Q**    All right.  Let's move now to corresponding

09:36:59  16   responsibility.

09:36:59  17   The jury has heard a lot about corresponding

09:37:02  18   responsibility.  And just stepping back, the difference

09:37:05  19   between controlled and non-controlled substances, you're

09:37:07  20   familiar with those two terms; right?

09:37:10  21   **A**    Yes, of course.

09:37:11  22   **Q**    Can you give the jury some examples of non-controlled

09:37:14  23   substances?

09:37:14  24   **A**    So non-controlled medications would be your standard

09:37:18  25   maybe like a blood pressure medication, Lisinopril,

**Cook - Direct/Miller**

09:37:24  1    Metoprolol, Lipitor, Flonase nasal spray,

09:37:26  2    hydrochlorothiazide, like I mentioned Claritin earlier, the

09:37:30  3    vast majority of prescriptions on our shelves at CVS are for

09:37:34  4    non-controlled substances.

09:37:34  5    **Q**    And would you say the vast majority of prescriptions

09:37:38  6    you've filled over your career as a pharmacist were for

09:37:41  7    non-controlled substances?

09:37:41  8    **A**    Correct.  Yes, I would say that.

09:37:43  9    **Q**    Now, let's move into corresponding responsibility so

09:37:50  10   you can tell the jury a little bit about how you exercise

09:37:53  11   corresponding responsibility.

09:37:54  12   **A**    Okay.

09:37:57  13   **Q**    Do you fulfill corresponding responsibility -- your

09:38:01  14   corresponding responsibility on every controlled substance

09:38:03  15   prescription?

09:38:03  16   **A**    Yes.

09:38:04  17   **Q**    And how do you go about doing that?

09:38:08  18   **A**    Corresponding responsibility, I guess, you know, to me

09:38:14  19   it starts with a definition is when a patient presents a

09:38:17  20   prescription for a controlled substance, you know, resolving

09:38:20  21   any red flags that are discovered prior to that medication

09:38:23  22   ultimately reaching the hands of the public.

09:38:25  23   **Q**    And is part of your review also to see whether there

09:38:32  24   are any potential red flags?

09:38:36  25   **A**    That is correct, yes.

**Cook - Direct/Miller**

09:38:37  1    **Q**    And how do you go about doing that?

09:38:42  2    **A**    I mean, there's -- every controlled medication that's

09:38:46  3    handed to me, you know, has that risk of abuse, has that

09:38:50  4    risk of, you know, if it's in the wrong hands, you know,

09:38:53  5    it's not a good situation.

09:38:54  6        So how do I go about resolving red flags was the

09:38:59  7    question?

09:38:59  8    **Q**    No.  Let me ask -- let me ask this.  Let's start at

09:39:02  9    the beginning.

09:39:04  10        How do you decide what information to look at when

09:39:07  11   you're presented with a controlled substance prescription?

09:39:10  12   **A**    Sure.

09:39:11  13        So, number one, I mean, before we do anything with a

09:39:14  14   prescription, when they walk up with it, one of the signs we

09:39:18  15   look at is, you know, signs of opioid addiction, signs of,

09:39:23  16   you know, dependence, withdrawal, patients who are

09:39:27  17   demanding, might have, you know, pinpoint pupils.  If we can

09:39:30  18   identify those signs like right off the bat before I even

09:39:33  19   really put the prescription in my hand, you know, I know

09:39:36  20   that there is a potential red flag that might need to be

09:39:40  21   resolved.

09:39:41  22        Other than that, you know, there's -- really on a

09:39:44  23   case-by-case basis depends, you know, on what factors I'm

09:39:49  24   looking for or what might stand out on that prescription to

09:39:52  25   know which route to go to resolve any potential red flag.

09:39:57  1   **Q**    What information might you look at when you evaluate a

09:40:05  2   controlled substance prescription?

09:40:06  3   **A**    Well, the information, number one, like on the face of

09:40:09  4   the prescription, is it, you know, a prescriber that I'm

09:40:14  5   aware of, is it a patient that I'm aware of, you know,

09:40:18  6   moving into Rx Connect we can -- which is our pharmacy

09:40:23  7   operating system, I'm sorry, we can see like is this patient

09:40:26  8   from, you know, like 3 hours away, is it a Lake County

09:40:29  9   resident.

09:40:30  10      There's so many things we look at.  And I hate to keep

09:40:34  11  saying a case-by-case basis, but all of these checks are

09:40:36  12  kind of going on in my mind and my staff's mind at the same

09:40:39  13  time in evaluation every, you know, controlled medication

09:40:42  14  that gets presented to us.

09:40:43  15  **Q**    And you talked about it's a case-by-case basis.  So

09:40:48  16  you really have to look at the specific circumstances

09:40:51  17  presented by that prescription that's right in front of you;

09:40:54  18  right?

09:40:54  19  **A**    Absolutely.

09:40:55  20  **Q**    And you have different information available to you.

09:40:58  21  Let's start with Rx Connect, which I think you mentioned.

09:41:04  22      Where do you go to in Rx Connect to see information

09:41:08  23  about a patient?

09:41:09  24  **A**    I would access the patient's profile.

09:41:12  25  **Q**    And let's talk about some of the information you can

**Cook - Direct/Miller**

09:41:14  1    see in Rx Connect about a patient.  Okay?

09:41:17  2         Can you see the patient's address?

09:41:19  3    **A**    Yes.  I can see their current address and last known

09:41:24  4    addresses as well.  So if there's a patient who summers in

09:41:27  5    Florida, as is very common in Northeast Ohio, or who moved

09:41:30  6    up here, I can see any other addresses as well.

09:41:32  7    **Q**    And can you see whether the patient has insurance?

09:41:36  8    **A**    Yes.

09:41:36  9    **Q**    In Rx Connect?

09:41:38 10    **A**    Yes.

09:41:39 11    **Q**    Can you see the patient's age?

09:41:40 12    **A**    Yes.

09:41:42 13    **Q**    And does the Rx Connect patient profile provide you

09:41:48 14    with data on the patient's prescription history?

09:41:52 15    **A**    Yes.

09:41:53 16    **Q**    And how far back does that information go?

09:41:57 17    **A**    It goes two years back in the patient profile.

09:42:00 18    **Q**    And what prescriptions can you see?

09:42:04 19    **A**    Every prescription filled at CVS Pharmacy location.

09:42:08 20    **Q**    And so that would be both controlled substances and

09:42:11 21    non-controlled substances?

09:42:12 22    **A**    Correct.

09:42:19 23    **Q**    Can you see the doctor's name?

09:42:20 24    **A**    Yes.

09:42:20 25    **Q**    Can you see the doctor's address?

**Cook - Direct/Miller**

09:42:23  1    **A**      Not on the simple profile screen, but by just

09:42:28  2    selecting "V" to view and selecting the prescription I want

09:42:31  3    to view, then I can.

09:42:32  4    **Q**      And that information would be right there?

09:42:33  5    **A**      Correct.

09:42:34  6    **Q**      Can you see the doctor's DEA number?

09:42:37  7    **A**      Following the steps I just listed, yes, hitting "V" to

09:42:40  8    view it, yes.

09:42:41  9    **Q**      What happens if the doctor does not have a valid DEA

09:42:43  10   number?

09:42:44  11   **A**      So when I'm typing a prescription and the doctor does

09:42:47  12   not have a valid DEA number, my Rx Connect system has what's

09:42:52  13   called a block.  I cannot proceed with inputting that

09:42:54  14   prescription.

09:42:58  15   **Q**      Which means that you would be unable to fill a

09:43:00  16   prescription for a prescriber that does not have a valid DEA

09:43:04  17   number?

09:43:04  18   **A**      That is correct.  There's no way that I -- you know,

09:43:08  19   to override that, no way around it.  It just cannot be

09:43:11  20   filled.

09:43:11  21   **Q**      And I just want to clarify one thing.  When you said

09:43:14  22   you can look back and see the prescription history for a

09:43:17  23   patient for all the medications filled for the last two

09:43:20  24   years, is that chain wide?

09:43:22  25   **A**      Yes.  So I can see, yes, any CVS pharmacy location.

6542

**Cook - Direct/Miller**

09:43:31  1    **Q**    Do you also consider information you might already

09:43:34  2    know about patients?

09:43:36  3    **A**    Yes.  That does play a role.

09:43:45  4    **Q**    Does Rx Connect provide you with the information you

09:43:48  5    need to identify potential red flags?

09:43:50  6    **A**    Yes.

09:43:51  7    **Q**    Has it always?

09:43:52  8    **A**    Yes.

09:43:55  9    **Q**    What additional information might you look to outside

09:44:00 10    of the categories that we already discussed?

09:44:03 11    **A**    So outside of, you know, like the patient appearance

09:44:07 12    as well, you know, for signs of diversion, outside of what

09:44:10 13    we just listed in Rx Connect, we also have -- I'm sure you

09:44:14 14    guys have heard a lot about it -- is OARRS, which is

09:44:18 15    integrated right into your pharmacy work flow where we can

09:44:21 16    see, you know, controlled substance medications that are

09:44:23 17    filled at any CVS -- or, excuse me, any pharmacy in the

09:44:28 18    State of Ohio.

09:44:28 19    **Q**    And do you regularly check OARRS?

09:44:35 20    **A**    I do.

09:44:37 21    **Q**    And can you tell the jury a little bit more about how

09:44:40 22    OARRS helps you in your review of controlled substance

09:44:43 23    prescriptions?

09:44:43 24    **A**    Yes.

09:44:44 25         OARRS, again -- and what we're talking about here is

**Cook - Direct/Miller**

09:44:48  1   just a tool in the toolkit for me when I'm filling a

09:44:52  2   controlled substance medication.  Definitely one of the more

09:44:54  3   important tools, with just a couple.  You know, quick key

09:44:57  4   strokes, I can see every controlled substance filled for

09:44:59  5   that patient in the State of Ohio.

09:45:03  6        It tells me information not only the drug name, the

09:45:06  7   quantity, the day's supply, it goes so far as to tell me the

09:45:11  8   doctor who prescribed it, where that medication was filled

09:45:13  9   and even like the insurance that was applied when they

09:45:15  10  filled that medication.

09:45:16  11  **Q**    So let me follow up a little bit.  Let me go to Rx

09:45:22  12  Connect for a second and that prescription history.

09:45:24  13       Does Rx Connect provide you for prescriptions filled

09:45:28  14  at CVS pharmacies the same type of information about a

09:45:32  15  particular prescription, like drug name?

09:45:34  16  **A**    Correct, yes.

09:45:36  17  **Q**    What other information does Rx Connect provide you for

09:45:41  18  specific prescriptions filled at CVS pharmacies?

09:45:45  19  **A**    I can see the prescription number, the day it was

09:45:47  20  filled, the amount that the patient paid for the medication,

09:45:51  21  the insurance that was applied, be it, you know, cash,

09:45:55  22  insurance, Good RX.  I can see the doctor's name, the

09:46:01  23  directions, how many it was filled for -- I'm sorry if I'm

09:46:07  24  repeating myself.

09:46:08  25       There's a lot of information, but I think that covers

6544

**Cook - Direct/Miller**

09:46:10 1    most of it.

09:46:10 2    **Q**     And so we talked about OARRS.  In addition to OARRS,

09:46:14 3    what other information might you seek when you're evaluating

09:46:20 4    controlled substance prescriptions?

09:46:21 5    **A**     Yes.

09:46:21 6         So in addition to OARRS and the information in Rx

09:46:25 7    Connect, conversations with the prescriber regarding

09:46:28 8    potential red flags with the prescription and/or

09:46:31 9    conversations with the patient, him or herself regarding

09:46:35 10   potential red flags also, you know, play a role in filling

09:46:37 11   that medication.

09:46:39 12   **Q**     So after you've considered some amount of this

09:46:43 13   information in reviewing a particular prescription on a

09:46:47 14   case-by-case basis, what happens next?

09:46:51 15   **A**     Well, if, you know, I've identified no red flags, you

09:46:55 16   know, the and/or the red flags that did come up had been

09:46:58 17   resolved, we would proceed with, you know, filling that

09:47:01 18   medication for that patient.

09:47:03 19        If I had any reason to suspect, you know, misuse or I

09:47:09 20   had a red flag that I couldn't resolve, I would, you know,

09:47:12 21   practice my refusal to fill as part of corresponding

09:47:15 22   responsibility.

09:47:23 23   **Q**     In making your decision of whether to fill or not fill

09:47:28 24   a controlled substance prescription, do you use your

09:47:32 25   professional judgment as a pharmacist?

6545

**Cook - Direct/Miller**

09:47:33  1    **A**    Yes.

09:47:39  2    **Q**    And, again, those decisions you make based on a

09:47:41  3    case-by-case basis depending on the prescription and

09:47:46  4    circumstances before you?

09:47:47  5    **A**    That is absolutely correct.

09:47:49  6    **Q**    All right.

09:47:50  7         We talked a little just now about various tools that

09:47:56  8    you use in exercising your corresponding responsibility and

09:48:00  9    I just want to follow up a little bit.

09:48:04  10         Does CVS provide you with those tools to help you

09:48:09  11    evaluate prescriptions?

09:48:10  12    **A**    Yes.

09:48:11  13    **Q**    And do you consider Rx Connect one of those tools?

09:48:14  14    **A**    Yes.  Absolutely.

09:48:15  15         Like I said, I can identify fill histories, you know,

09:48:19  16    where the patient is from, amongst other things.  Absolutely

09:48:22  17    it's part of the tools -- part of the toolkit.

09:48:24  18    **Q**    And does Rx Connect also have alerts?

09:48:29  19    **A**    Yes.

09:48:30  20    **Q**    And can you give an example or two of an alert that Rx

09:48:37  21    Connect has?

09:48:37  22    **A**    So one -- an alert that might pop up, if a patient

09:48:41  23    goes -- presents with me a prescription for a controlled

09:48:44  24    medication that the system flags as too early, it will not

09:48:48  25    let me proceed with filling or, you know, my technician, it

09:48:52  1    will not allow him or her to proceed with typing that

09:48:54  2    prescription until, you know, it gets sent to me and I, you

09:48:57  3    know, see what is going on with it.

09:49:00  4         Another alert that comes to mind is the fraudulent

09:49:02  5    prescription alert.  Sometimes, you know, a doctor has their

09:49:07  6    DEA number stolen and people will try to call in fraudulent

09:49:10  7    prescriptions.  So, you know, in those cases, it will kind

09:49:12  8    of flash like, you know, be wary that this doctor for

09:49:17  9    controlled substances has had their DEA number stolen, you

09:49:19 10    know, evaluate them before you fill it.

09:49:21 11         Those are two that come to mind.

09:49:23 12    **Q**    And shifting from alerts to blocks, which I think we

09:49:26 13    touched on, are there -- is there a functioning in Rx

09:49:30 14    Connect where you can't fill for certain prescribers?  I

09:49:37 15    think you touched on DEA registration numbers and if those

09:49:40 16    are invalid you can't fill.

09:49:41 17    **A**    That is correct.

09:49:41 18    **Q**    And is there another circumstance where Rx Connect has

09:49:44 19    a block related to prescribers?

09:49:46 20    **A**    I have also seen it to where it will be -- again, this

09:49:50 21    is a hard stop.  I can't get by it.  A message will pop up.

09:49:56 22    It will say something along the lines of CVS pharmacy has

09:50:00 23    decided not to fill controlled medications for this

09:50:03 24    prescriber and, you know, we can't proceed with filling that

09:50:06 25    medication.

<b>Cook - Direct/Miller</b>

09:50:06  1    **Q**      And that other block would be based on an internal CVS

09:50:10  2    decision not to fill for a particular prescriber?

09:50:13  3    **A**      To the best my knowledge, yes, I would assume that's

09:50:18  4    why.

09:50:19  5    **Q**      We talked about -- we talked about OARRS and I just

09:50:21  6    want to circle back to that.

09:50:23  7           Is OARRS another tool that you use in evaluating

09:50:26  8    prescriptions?

09:50:26  9    **A**      Yes.

09:50:27 10    **Q**      And is there something called a NarxCare score that

09:50:35 11    appears in Rx Connect?

09:50:36 12    **A**      Yes.

09:50:37 13    **Q**      And does that NarxCare score appear right in Rx

09:50:42 14    Connect itself or do you have to go to another website to

09:50:44 15    see that score?

09:50:45 16    **A**      In the process of filling a controlled medication, it

09:50:47 17    shows up right on my screen.  I couldn't ignore it if I

09:50:51 18    wanted to.

09:50:51 19    **Q**      And what -- how do you use NarxCare as a tool?

09:50:57 20    **A**      So, to explain NarxCare, there's three components that

09:51:01 21    it really brings up.  Three -- based on three categories of

09:51:05 22    controlled medication.  There is stimulants, which would be

09:51:08 23    Adderall, Vyvanse, maybe controlled medications for ADHD.

09:51:13 24    There's opioids, which I'm sure everybody here is well

09:51:15 25    versed in now, and then there's also sedatives.

**Cook - Direct/Miller**

09:51:18 1      That would be maybe Zolpidem or Ambien.  Typically

09:51:23 2  medications that people use to -- maybe Ativan as well, to

09:51:26 3  relax or to fall asleep.

09:51:28 4      That -- those three scores individually show up on my

09:51:31 5  screen, regardless of the type of controlled medication I'm

09:51:34 6  filling.  It's a score, you know, calculated based on their

09:51:39 7  prior fill history through OARRS, but more importantly, what

09:51:43 8  I can use it for is if a patient presents to me with a brand

09:51:47 9  new pain script for a high dose medication and, you know,

09:51:50 10  they have no fill history with me, I can see that, okay, you

09:51:52 11  know, they've been getting it at the past down the street or

09:51:52 12  vice versa, if a patient presents with a dose pain

09:51:59 13  medication and I see well, this doesn't make sense, their

09:52:02 14  risk store, their narc score is 0, something's not right

09:52:06 15  here.

09:52:06 16      Again, it's just one tool that we use but that

09:52:08 17  information is right there before I even have to run a full

09:52:12 18  OARRS report and that risk score shows up.

09:52:15 19  **Q**     So it's just another tool in your toolkit?

09:52:18 20  **A**     Absolutely.

09:52:18 21  **Q**     That you use to evaluate prescriptions?

09:52:20 22  **A**     Yes.

09:52:21 23  **Q**     Let's talk a little about training.

09:52:23 24      Did CVS train you on the legal requirements for

09:52:27 25  filling prescriptions?

**Cook - Direct/Miller**

09:52:27  1    **A**    Yes, they did.

09:52:28  2    **Q**    And how often did CVS provide you with that training?

09:52:33  3    **A**    We have to do that training biannually, twice a year.

09:52:36  4    **Q**    And there was a general training on the filling of

09:52:39  5    prescriptions?

09:52:39  6    **A**    Oh, yes.

09:52:40  7         So when I first, yes, started with the company and

09:52:42  8    then again, I believe as a pharmacist, there was just

09:52:45  9    filling a prescription kind of 101, so to speak, yes.

09:52:51 10    **Q**    And also, did CVS provide you with training specific

09:52:55 11    to the filling of controlled substance prescriptions?

09:52:57 12    **A**    Yes.  That's what I was referencing.  That's the one

09:53:00 13    that's done twice a year every year.

09:53:01 14    **Q**    Do you also discuss corresponding responsibility in

09:53:04 15    your annual review with your supervisors?

09:53:06 16    **A**    Yes, I do.

09:53:07 17    **Q**    And can you tell the jury a little bit about that?

09:53:10 18    **A**    Yes.

09:53:11 19         So every year during my annual performance review, my

09:53:16 20    pharmacy supervisor and/or district leader will sit down

09:53:18 21    with me, not only to formally deliver my review for the

09:53:26 22    prior year, but also to discuss corresponding

09:53:27 23    responsibility, to ensure that I'm aware not only to

09:53:30 24    practice it, but I'm aware of its existence and that, you

09:53:33 25    know, CVS is not going to punish me for exercising, you

**Cook - Direct/Miller**

09:53:38  1    know, corresponding responsibility in a situation where I'm

09:53:40  2    uncomfortable filling a prescription.

09:53:42  3          So I sign a copy, give it to my boss to file, and then

09:53:45  4    a copy is -- I keep a copy and file it.

09:53:49  5    **Q**    So it's a reminder that CVS supports you in exercising

09:53:53  6    your corresponding responsibility?

09:53:54  7    **A**    Yes.

09:53:55  8    **Q**    But you already know that as a practicing CVS

09:53:58  9    pharmacist; correct?

09:53:59 10    **A**    I do.

09:54:01 11    **Q**    All right.  Let's move to community programs that

09:54:09 12    you've participated in or are aware of.

09:54:11 13    **A**    Okay.

09:54:12 14    **Q**    Are you aware of a program called Pharmacists Teach?

09:54:15 15    **A**    Yes.

09:54:16 16    **Q**    And can you tell the jury a little bit about

09:54:19 17    Pharmacists Teach?

09:54:19 18    **A**    Yeah.

09:54:20 19          So Pharmacists Teach is a general broad term that CVS

09:54:24 20    has when they send pharmacists to teach members of the

09:54:28 21    community about various subjects.  My wife and I did one at

09:54:33 22    a senior citizen home regarding the importance of medication

09:54:37 23    compliance, for example, as well as the importance of

09:54:40 24    vaccinations, you know, just staying up to date on your

09:54:43 25    medical records.  So that's one example.

**Cook - Direct/Miller**

09:54:47  1        Another example, you know, more applicable to this

09:54:50  2    trial, I've partaken in on -- I've probably done over

09:54:57  3    several days, to the best of my knowledge, about a dozen of

09:55:00  4    them called One Choice Changes Everything presentations.

09:55:03  5        So what that is is CVS sends its pharmacists into

09:55:06  6    local schools, specifically high schools, you know, the

09:55:08  7    teenage population, that statistically is more at risk to

09:55:14  8    abuse an opioid medication or any medication rather.  And we

09:55:18  9    go to, you know, local schools and teach them the importance

09:55:24 10    of that one choice, that one choice to not take that pill,

09:55:30 11    consequently also the one choice to take that pill, just

09:55:32 12    like the impacts it can have on that individual's life.

09:55:36 13        So I'm very passionate about it.  You know, living in

09:55:39 14    Mentor, I've done it exclusively at Mentor high school.  On

09:55:42 15    my off days, I volunteer to do it because it's something

09:55:45 16    that's important to me and CVS provided me with all the

09:55:48 17    resources I needed to make that presentation.

09:55:50 18    **Q**    And having made that presentation, I take it to high

09:55:54 19    schoolers in Mentor?

09:55:54 20    **A**    That is correct.

09:55:56 21    **Q**    Did you feel being in the room with those students,

09:56:02 22    that they -- you were able to communicate with them some of

09:56:06 23    the concerns surrounding prescription opioids?

09:56:09 24    **A**    Yeah.  I mean, talking to 16-year-olds, they're not

09:56:13 25    the most mature audience, but if I got through to one or two

**Cook - Direct/Miller**

09:56:17 1    of them, you know, obviously it was a good day.

09:56:20 2    **Q**    And did it -- did it feel like you did?

09:56:24 3    **A**    It did, absolutely.  I had, on one occasion -- and I

09:56:27 4    won't get into the specifics, but I had a young high

09:56:30 5    schooler at Mentor high school, a sophomore, approach me

09:56:33 6    after the program to, you know, discuss a situation that his

09:56:37 7    friend was going through.  So, I mean, that conversation

09:56:40 8    alone made it all worthwhile.

09:56:45 9    **Q**    Now, shifting gears a bit, are you familiar with Drug

09:56:51 10   Take Back kiosks or Take Back boxes?

09:56:54 11   **A**    Yes, I am.

09:56:54 12   **Q**    And the jury's heard a little bit about those, but can

09:56:57 13   you just remind them?

09:56:58 14   **A**    Yes.

09:56:59 15         So select CVS's, I've now been at three they had them,

09:57:04 16   including one at like the first stores in Northeast Ohio to

09:57:07 17   get it, but it is like an ATM size steel box where patients

09:57:11 18   can dispose of unused or unwanted, you know, expired

09:57:16 19   medication, kind of no questions asked.

09:57:17 20        We keep it locked when the pharmacy is closed; unlock

09:57:21 21   it during operational hours and, you know, you just drop it

09:57:24 22   in and go on your go on your day.

09:57:27 23        But it allows patients to -- you know, whether there's

09:57:29 24   a death in the family or just they're cleaning out their

09:57:32 25   medicine cabinet, they can just drop them off and they get

**Cook - Direct/Miller**

09:57:35  1    destroyed.

09:57:36  2    **Q**    And did you find that the members of your community

09:57:39  3    were making use of those disposal units?

09:57:42  4    **A**    Yes.

09:57:43  5         When I first started, obviously, it took a while for

09:57:46  6    people to recognize what it was.  You know, we had to check

09:57:50  7    the volume once weekly, but near the end, we were sending

09:57:53  8    back boxes at a pretty frequent pace.

09:57:55  9    **Q**    And what was your role in connection with the Drug

09:57:59 10    Take Back boxes?  What did you do?

09:58:01 11    **A**    So I -- as the pharmacy manager, I supervised that

09:58:04 12    program.  I was the one responsible for checking the volume,

09:58:07 13    as I just mentioned.

09:58:09 14         When it was full, I would close the kiosk, you know,

09:58:12 15    seal up the box and send it on its way.  And then the once

09:58:15 16    the box had been taken, I would set up the new liner, the

09:58:18 17    new box and reopen it for the public use.

09:58:20 18    **Q**    And just to make sure the jury understands, those

09:58:24 19    boxes, there's -- they're very secure; correct?

09:58:27 20    **A**    Yeah.  It's in a -- it's got -- in addition to the

09:58:31 21    locking drawer mechanism to drop the medication, it's got

09:58:36 22    two padlocks that lock the medication.  Each padlock has a

09:58:40 23    different key.  So it actually takes some time to get in

09:58:44 24    there, a lot of frustration.  But yes, they're -- I would

09:58:47 25    say they're secure.

**Cook - Direct/Miller**

09:58:48  1    **Q**    All right, Mr. Cook.  A few final questions for you.

09:58:54  2          Do you understand the risks associated with

09:58:58  3    prescription opioid medications?

09:59:00  4    **A**    I do understand those risks.

09:59:02  5    **Q**    And did you exercise corresponding responsibility on

09:59:07  6    every controlled substance prescription?

09:59:09  7    **A**    I did.

09:59:11  8    **Q**    Did CVS support you in exercising your corresponding

09:59:14  9    responsibility?

09:59:15 10    **A**    Yes.

09:59:17 11    **Q**    Did CVS indicate to you that it expected you to

09:59:22 12    exercise corresponding responsibility?

09:59:23 13    **A**    Yes.

09:59:26 14    **Q**    Did CVS indicate to you that it expected you to refuse

09:59:30 15    to fill prescriptions that you believed might be

09:59:37 16    illegitimate?

09:59:37 17    **A**    Yes.

09:59:38 18    **Q**    Did CVS indicate to you that this was required?

09:59:40 19    **A**    Yes.  Yeah.

09:59:41 20    **Q**    Did CVS provide you with the tools and information you

09:59:44 21    needed to exercise corresponding responsibility?

09:59:48 22    **A**    Yes.

09:59:49 23    **Q**    Did CVS ever pressure you to fill more opioid

09:59:54 24    prescriptions?

09:59:55 25    **A**    Absolutely not.

**Cook - Direct/Miller**

09:59:56 1   **Q**     Did CVS ever suggest to you that there was a limit on

10:00:01 2   how many controlled substance prescriptions you could refuse

10:00:03 3   to fill?

10:00:04 4   **A**     Absolutely not.

10:00:07 5   **Q**     How many years have you lived in Lake County?

10:00:11 6   **A**     The better part of 25 years, to the best of my

10:00:15 7   knowledge.

10:00:15 8   **Q**     And how many years have you practiced as a pharmacist

10:00:18 9   in Lake County?

10:00:19 10  **A**     Nine years.

10:00:21 11  **Q**     Is that the majority of your career?

10:00:22 12  **A**     Yes.

10:00:25 13  **Q**     And over the span of your career as a CVS pharmacist,

10:00:30 14  who are the patients that you have served?

10:00:32 15  **A**     My neighbors, my friends, people I see at church, my

10:00:36 16  community.

10:00:39 17  **Q**     Mr. Cook, do you believe you have done anything to

10:00:42 18  harm the people of Lake County?

10:00:45 19  **A**     Absolutely not.

10:00:46 20        The people I fill medications for are, like I said,

10:00:49 21  people I see at the grocery store, people I see when I'm out

10:00:52 22  and about with my kids.  I've -- no.

10:00:56 23  **Q**     Do you believe the pharmacies you've worked at have

10:00:59 24  done anything to harm the public in Lake County?

10:01:03 25  **A**     No.

6556

**Cook - Cross/Lanier**

10:01:05  1          MS. MILLER:  Thank you, Mr. Cook.  That's all

10:01:08  2    I have.

10:01:08  3                  THE WITNESS:  Thank you.

10:01:11  4                  THE COURT:  Anything from any of the other

10:01:14  5    defendants?

10:01:14  6                  MR. STOFFELMAYR:  No.  Thank you, Your Honor.

10:01:16  7                  MR. MAJORAS:  No.  Thank you, Your Honor.

10:01:16  8                  <u>CROSS-EXAMINATION OF KENNETH COOK</u>

10:01:36  9    BY MR. LANIER:

10:01:36 10    **Q**     Mr. Cook, my name is Mark Lanier.

10:01:39 11          I've not had the pleasure of meeting you before, but

10:01:41 12    it sounds to me like you've been a great pharmacist who has

10:01:44 13    done a lot of good work for the community and tried to help

10:01:46 14    make this world a better place.  And I want to say thank

10:01:50 15    you.

10:01:50 16    **A**     I appreciate it, sir.  Thank you.

10:01:51 17    **Q**     I've got a few questions, though, I need to ask you,

10:01:55 18    as I'm sure you've been warned.

10:01:57 19    **A**     I understand.  Yes.  Yes.

10:01:58 20    **Q**     All right.

10:01:59 21          As is typical for me at least, I give you a roadmap so

10:02:02 22    you got a clue of what I'm going to say and so the jury

10:02:05 23    does, and it's just a way to keep pace with what we're

10:02:09 24    doing.  Okay?

10:02:10 25    **A**     Yes, sir.

6557

**Cook - Cross/Lanier**

10:02:11  1    **Q**     Is that you?  Did I get you okay?

10:02:12  2    **A**     Yes.  That's my LinkedIn photo.  I recognize it.  Good

10:02:16  3    looking guy.

10:02:16  4    **Q**     Yeah.  Yeah.

10:02:17  5          So I want to talk to you about some basics, I want to

10:02:19  6    talk to you about some stores issues, I want to talk to you

10:02:22  7    about some limitations.  I think we can do this in

10:02:24  8    15 minutes.  Okay?

10:02:25  9    **A**     Yes, sir.  I'm remember.

10:02:26  10   **Q**     All right.

10:02:27  11         First of all, let's start with the basics.  These are

10:02:29  12   things I think you and I agree with each other on but I just

10:02:32  13   want to make sure we do.  I've got them up here.  We'll go

10:02:35  14   one at a time.

10:02:36  15         Would you agree with me there are good pharmacists and

10:02:39  16   not-so-good pharmacists?  There's a wide range.  Fair?

10:02:42  17   **A**     I would disagree with that, sir.

10:02:45  18   **Q**     You would disagree with that?  So --

10:02:48  19   **A**     Oh, go ahead.

10:02:49  20   **Q**     You don't think that there are pharmacists who's lost

10:02:53  21   their license, for example?

10:02:54  22   **A**     Well, sir, I can speak to, you know, my time at five

10:02:58  23   different CVS's in Lake County, specifically.  I've probably

10:03:01  24   had about a dozen or so staff pharmacists and pharmacists

10:03:04  25   who reported to me in my role as pharmacy manager.  At no

**Cook - Cross/Lanier**

10:03:09 1   point in time was I made aware or was I uncomfortable with

10:03:12 2   their dispensing of controlled medications or opioid

10:03:14 3   medications.

10:03:15 4       None of them lost their license.  None of them were

10:03:17 5   disciplined, and those are the pharmacists that I can speak

10:03:20 6   to.

10:03:20 7   **Q**    Okay.  And that's fair.

10:03:21 8       So you're speaking based upon the pharmacists you

10:03:24 9   know.  You're not saying blanket, there are no bad

10:03:28 10  pharmacists in the world.  Fair?

10:03:29 11  **A**    Yes.  I can only speak to what I know, sir.  Yes, sir.

10:03:32 12  **Q**    And if you look at the ones you know.  You know, for

10:03:34 13  example, there was a time when you needed to coach one of

10:03:36 14  the pharmacists in terms of narcotic wait times; right?

10:03:39 15  **A**    That was more on the -- yes.  Yeah.  There was that

10:03:43 16  one instance, yes.

10:03:44 17  **Q**    Yeah.  I mean, enough to where it made your annual

10:03:47 18  review, that you had to note in there that you had to coach

10:03:49 19  your partner with wait times for narcotics; right?

10:03:52 20  **A**    She, more or less, was just not wanting to deal with

10:03:56 21  the prescriptions, which is unfair because these patients

10:03:58 22  that do have a valid prescription for an opioid medication,

10:04:01 23  I mean, they're obviously in a high degree of pain.  So it

10:04:06 24  was more so ensuring that, you know these patients are able

10:04:08 25  to get their medications in a timely manner.

**Cook - Cross/Lanier**

10:04:10  1      That was my issue, not with her dispensing or filling

10:04:13  2   or anything like that.

10:04:15  3   **Q**    I'm going to pass up to you or ask Ms. Fleming to pass

10:04:19  4   up to you Plaintiff's Exhibit 21927, which is a section of

10:04:24  5   your year-end reviews.

10:04:27  6   **A**    Yes, I have it here.

10:04:28  7   **Q**    And if you look at what you had to say about your

10:04:31  8   colleague comments on Page 12, your comments were a little

10:04:36  9   bit different than the way you're saying it now, at least.

10:04:39 10   This is colleague comments.  This is your statement;

10:04:42 11   correct?

10:04:42 12   **A**    That is correct, yes, sir.

10:04:44 13   **Q**    "At times, I had to really coach my partner who would

10:04:48 14   have real challenges with the blue chips, like flu shots and

10:04:53 15   wait times for narcotics specifically, but I was able to

10:04:57 16   hold the team together throughout all this and make sure we

10:05:00 17   did not go off track from the CVS mission statement."

10:05:03 18      Do you see that?

10:05:03 19   **A**    Yes.

10:05:05 20           MS. MILLER:  Mark, I apologize for

10:05:06 21   interrupting.  I'm not sure.  Can you give us the Bates

10:05:11 22   label on the page you're referring to?

10:05:13 23           MR. LANIER:  Yeah.  The Bates label is 559,

10:05:16 24   but it is Plaintiffs' Exhibit 21927, Page 12.

10:05:21 25           MS. MILLER:  Oh, I'm sorry, we -- it looks

## Cook - Cross/Lanier

10:05:23  1    like we got two different exhibits.

10:05:26  2                    THE WITNESS:  Yeah, I don't have 559.

10:05:28  3                    MS. MILLER:  We don't have 559.

10:05:36  4                    MR. LANIER:  Okay.  We'll get you a copy.

10:05:38  5    BY MR. LANIER:

10:05:38  6    Q     Suffice it to say, do you remember -- I'll keep it up

10:05:41  7    on the screen so you can see it.  Do you remember this?

10:05:44  8    A     Vaguely, with all honesty.  I mean it was a long time

10:05:48  9    ago.

10:05:49 10                    MS. MILLER:  Mark, I apologize for

10:05:50 11    interrupting again.  But, do you have a hard copy for Mr.

10:05:53 12    Cook?  We're trying to pull it up.

10:05:56 13                    MR. LANIER:  Yeah.  I'll hand you one.

10:05:56 14    BY MR. LANIER:

10:05:59 15    Q     You remember this, sir?

10:06:00 16    A     Yeah.

10:06:03 17                    MR. LANIER:  Here you go.

10:06:04 18                    MS. MILLER:  Thank you so much.

10:06:05 19                    MR. LANIER:  You bet.

10:06:05 20    BY MR. LANIER:

10:06:06 21    Q     And all I'm driving at is, you know, there are -- you

10:06:11 22    will not agree with this.  Let's just make that note.  Don't

10:06:13 23    agree.  We'll come back to it with some more questions here

10:06:16 24    in a bit.

10:06:18 25          Would you at least agree with me that pharmacists rely

**Cook - Cross/Lanier**

10:06:21  1   on the companies for their policies and equipment and

10:06:30  2   recurrent training?

10:06:31  3   **A**    I mean, policies are specific to the company, I guess,

10:06:33  4   but training, I mean, I've gone through numerous continuing

10:06:38  5   education courses outside of CVS.  I don't rely on CVS for,

10:06:41  6   you know, training in that sense.

10:06:44  7   **Q**    Has CVS paid for those?

10:06:46  8   **A**    I've asked to be reimbursed for them and I've had no

10:06:50  9   problem getting reimbursed.  There's other ones that, you

10:06:52 10   know, my wife and I wanted to kind of just get away for a

10:06:55 11   weekend, do some continuing ed.  I, of course, never asked

10:06:58 12   for reimbursement for those, but...

10:07:00 13   **Q**    How about if we put some recurrent training?  Would

10:07:04 14   that be fair?

10:07:05 15   **A**    I would say that would be fair, some recurrent

10:07:08 16   training, yes.

10:07:09 17   **Q**    And would you agree with me that opioids are highly

10:07:11 18   addictive?

10:07:12 19   **A**    Absolutely, I would.

10:07:13 20   **Q**    And would you agree with me that the Lake County, at

10:07:16 21   least, has experienced opioid issues, problems, in the

10:07:21 22   community?

10:07:21 23   **A**    I mean, I can speak to my knowledge as a Lake County

10:07:25 24   resident for the better part of a quarter century.  I

10:07:29 25   personally have been blessed, sir, you know, not to have any

6562

**Cook - Cross/Lanier**

10:07:32 1    friends, families, neighbors, you know, colleagues that have

10:07:36 2    been affected by the opioid epidemic, but I understand that

10:07:39 3    there's families out there, you know, who have been

10:07:42 4    affected.  And I don't mean to make light of that, sir, but

10:07:45 5    like I say, from my experience, I have not seen it in the

10:07:49 6    county.  No, sir.

10:07:52 7  **Q**    Wow.

10:07:53 8         One Choice Changes Everything.  That's the name of the

10:07:56 9    speech you give at the high school?

10:07:57 10  **A**    Yes.  Yes, sir.

10:07:58 11  **Q**    Do you believe that?

10:08:00 12  **A**    You know, in that context, I absolutely do, sir,

10:08:03 13    especially with a very young population that can be

10:08:06 14    susceptible to making dumb decisions, as we all did when we

10:08:09 15    were that age.

10:08:10 16  **Q**    Would you agree then that one bad prescription filled

10:08:13 17    can have ripple effects in one's life?

10:08:15 18              MS. MILLER:  Objection.

10:08:16 19              THE COURT:  Overruled.

10:08:19 20              THE WITNESS:  One bad prescription filled can

10:08:21 21    have a ripple effect.  I mean, I -- I don't understand the

10:08:25 22    question.

10:08:25 23         I mean, the One Choice presentation, YOUR prior point

10:08:30 24    spoke primarily to, you know, teenagers who maybe got an

10:08:33 25    opioid prescription from the medicine cabinet that was

6563

**Cook - Cross/Lanier**

10:08:37  1   lawfully prescribed, lawfully issued for a valid medical

10:08:40  2   reason, not necessarily a 13-year-old getting a prescription

10:08:42  3   for Percocet.

10:08:44  4        So I don't know the specifics with that question.

10:08:47  5   BY MR. LANIER:

10:08:47  6   **Q**     All I'm driving at is if one choice can change

10:08:51  7   everything, then a bad prescription that's out there that

10:08:56  8   shouldn't be out there, that might lead to a choice, that

10:08:59  9   could change everything too.  Fair?

10:09:01  10  **A**     Well, but a good prescription can also have ripple

10:09:04  11  effects in one's life, too.  I mean --

10:09:06  12  **Q**     No question.  And a good choice can change things as

10:09:10  13  well; right?

10:09:10  14  **A**     A good choice does change things.

10:09:12  15  **Q**     But that didn't stop you from explaining to the high

10:09:16  16  school students that a bad choice can change everything;

10:09:19  17  right?

10:09:19  18  **A**     Correct.

10:09:19  19  **Q**     And the same is true from the position of a

10:09:21  20  pharmacist.  A bad choice on dispensing can change things as

10:09:25  21  well, can't it?

10:09:25  22  **A**     I'm not sure I --

10:09:27  23                 MS. MILLER:  Objection.

10:09:27  24                 THE COURT:  Overruled.

10:09:28  25                 THE WITNESS:  I'm not sure I can speak to

**Cook - Cross/Lanier**

10:09:30  1   that.  I'm confident when -- sir, when my name gets on the

10:09:34  2   bottle when I dispense a medication of any kind to my

10:09:37  3   patients, so I can't speak to the dispensing of like a bad

10:09:41  4   medication, so to speak.

10:09:42  5   BY MR. LANIER:

10:09:43  6   **Q**     All right.  Well then let's move down the road to the

10:09:45  7   store issues for a moment.  Okay?

10:09:46  8   **A**     Yes, sir.

10:09:47  9   **Q**     You've worked in a lot of stores, haven't you?

10:09:48  10  **A**     Yes, sir.

10:09:49  11  **Q**     And one of the stores that you worked at was in

10:09:53  12  Mentor; correct?

10:09:55  13  **A**     Two of them technically, sir, yes.

10:09:56  14  **Q**     But you worked at 3326.  True?

10:09:59  15  **A**     Yes, sir.  Both as an intern and as a pharmacist.

10:10:02  16  **Q**     All right.

10:10:09  17         I'm going to hand you a document.  I will hand you

10:10:13  18  Plaintiffs' Exhibit 21936.  It is a report from your store

10:10:20  19  about theft or potentially significant loss dating back to

10:10:25  20  2014, Store 3326, dealing with an initial notification of

10:10:35  21  controlled substance theft or potentially significant loss.

10:10:38  22         Do you see that?

10:10:40  23  **A**     Yes, sir.

10:10:40  24         To clarify what you just said, though, it was -- I

10:10:43  25  mean, I filled out this paperwork as I started at the store.

6565

**Cook - Cross/Lanier**

10:10:46  1    It wasn't my store, per se, like at the time of the loss.

10:10:49  2    **Q**    Not a problem.

10:10:50  3    **A**    Just to clarify.

10:10:51  4    **Q**    And if we look at it, upon taking over the CVS Store

10:10:57  5    33267, pharmacy manager Dan Blore started a narcotic

10:11:04  6    inventory of Schedule II medications for a change in

10:11:08  7    pharmacists in charge.

10:11:09  8         Do you see that?

10:11:10  9    **A**    Yes, sir.

10:11:11 10    **Q**    It was discovered many of the logbooks were off, both

10:11:15 11    positive and negative, for multiple medications.

10:11:19 12         Is that a good or bad thing?

10:11:22 13    **A**    Based on what we experienced, sir, it was definitely a

10:11:27 14    headache.

10:11:27 15    **Q**    Definitely what?

10:11:27 16    **A**    I said it was definitely a headache for us when we

10:11:30 17    first started there.

10:11:31 18    **Q**    No, not a headache.  I was asking is that a good thing

10:11:35 19    or a bad thing when we were talking about good pharmacists'

10:11:37 20    practices and bad pharmacists' practices, is it a good or a

10:11:41 21    bad thing if the logbooks are off for multiple medications?

10:11:44 22    **A**    Well, I think what we can agree on -- what we can

10:11:47 23    agree on, this is a bad thing when it comes to

10:11:50 24    recordkeeping, but this doesn't necessarily correlate to

10:11:53 25    corresponding responsibility and the practice of pharmacy by

**Cook - Cross/Lanier**

10:11:56  1    those particular pharmacists.

10:11:57  2    **Q**    Some narcotics were also not logged at all when

10:12:01  3    ordered.

10:12:01  4         Is that a good thing or bad thing?

10:12:03  5    **A**    In terms of recordkeeping, that is not a good thing,

10:12:05  6    no.

10:12:05  7    **Q**    Well, recordkeeping isn't simply something to do for

10:12:09  8    grins; you're taught back in school recordkeeping is

10:12:12  9    extremely important; correct?

10:12:14 10    **A**    We are taught the importance of recordkeeping, yes.

10:12:16 11    **Q**    And you're not only taught the importance of

10:12:18 12    recordkeeping, but you know, under the law, there are

10:12:21 13    certain records that have to be kept; right?

10:12:24 14    **A**    That is correct.  That's why the second we took over

10:12:26 15    the store we -- this is the first thing we did.

10:12:29 16    **Q**    Multiple NDCs, what's an NDC?

10:12:33 17    **A**    NDC is a National Drug Code.  It's specific to a

10:12:38 18    manufacturer and the drug name.  It's an 11-digit, you know,

10:12:43 19    sequence.  I won't get into the specifics of it.  I'll bore

10:12:46 20    you.  But essentially what that's saying is perhaps a

10:12:50 21    medication for, you know, like Cook Pharmaceuticals was

10:12:53 22    documented under Lanier Pharmaceuticals, if that makes sense

10:12:58 23    to you.

10:12:58 24    **Q**    Sure.

10:12:58 25         So multiple NDCs were logged under one NDC, which

10:13:03  1    further led to discrepancies in the logbook.

10:13:06  2         Good thing or a bad thing?

10:13:07  3    **A**    Again, from a recordkeeping point of view, it's not a

10:13:10  4    good thing but doesn't necessarily correlate to

10:13:13  5    prescriptions being filled without corresponding

10:13:15  6    responsibility.

10:13:15  7    **Q**    Well, but let's see what it might correlate to if wee

10:13:21  8    look at Plaintiffs' Exhibit 21937.

10:13:31  9         Do you have 21- you don't yet.  I'm sorry,

10:13:34 10    Ms. Fleming?

10:13:34 11    **A**    I have it, yes, sir.

10:13:35 12    **Q**    You got it?

10:13:36 13    **A**    Yes, sir.

10:13:36 14    **Q**    And this is a form that you submitted as a pharmacist

10:13:42 15    June 9th of 2014.  True?

10:13:45 16    **A**    I see that, yes, sir.

10:13:48 17    **Q**    And it deals with this same store, 3326; correct?

10:13:52 18    **A**    Yes, sir.

10:13:54 19    **Q**    And it's got the details of the theft or loss that we

10:13:58 20    were looking at before.  True?

10:14:02 21                    MS. MILLER:  Objection.

10:14:03 22                    THE COURT:  Overruled.

10:14:06 23                    THE WITNESS:  Yes.  It does list the details.

10:14:08 24    Yes, sir.

10:14:08 25    BY MR. LANIER:

**Cook - Cross/Lanier**

10:14:09  1   **Q**     And it says, "Enter the name and strength of the

10:14:14  2   controlled substance lost or stolen for the medication with

10:14:16  3   the largest quantity estimated to be lost at this time."

10:14:19  4        Do you see that?

10:14:19  5   **A**     Yes, sir, I do read that.

10:14:20  6   **Q**     And the answer is it's oxycodone; correct?

10:14:27  7   **A**     Yes, sir.

10:14:29  8   **Q**     And then it says, "Estimate the number of units," so

10:14:32  9   the quantity lost for the medication named in the field

10:14:37 10   above.  And it shows 220 pills lost; is that right?

10:14:42 11   **A**     Well, two things, sir.

10:14:44 12        Number one, as you highlighted it twice on your

10:14:46 13   screen, it is estimation.  Number two, we reported this as

10:14:52 14   soon as both Dan and I, we were kind of co-managing at the

10:14:57 15   time, just to clarify here.  The second we realized there

10:15:00 16   was a discrepancy, we reported it.

10:15:02 17        We voluntarily invited in the DEA, Lake County

10:15:05 18   Narcotics, and the Board of Pharmacy to assist us with our

10:15:08 19   investigation.  So yes, at the time our best estimate was it

10:15:10 20   was 220 Percocet.  I don't recall what it ended up being on

10:15:15 21   the back end, but we just wanted to get this paperwork going

10:15:17 22   and get the correct investigative, you know, regulatory

10:15:21 23   agencies in there as quickly as possible.

10:15:23 24   **Q**     So is this a good thing or a bad thing?

10:15:27 25   **A**     Again, it speaks to bad recordkeeping.  That doesn't

**Cook - Cross/Lanier**

10:15:30  1    necessarily mean that, you know, these 220 tablets were, you

10:15:34  2    know, on the street for illicit purposes.  What it means is

10:15:39  3    the pharmacist or pharmacists at the time were not up to

10:15:41  4    date with recordkeeping.

10:15:42  5    **Q**    Is that a good thing or a bad thing?

10:15:44  6    **A**    Well, as I stated before, yeah, the recordkeeping, not

10:15:46  7    a good thing.

10:15:47  8    **Q**    Well, not only recordkeeping, you don't know whether

10:15:50  9    these are stolen or whether they're lost, whether they were

10:15:55 10    over-dispensed, whether somebody put too many in, whether

10:16:00 11    somebody took some out.

10:16:01 12         You don't have a clue, do you?

10:16:02 13    **A**    Well, no, sir, and that's why at the time, both Dan

10:16:05 14    and I obviously were freaking out a little bit, for lack of

10:16:08 15    a better word.  And we called the DEA, we called Lake County

10:16:12 16    Narcotics, we called the Board of Pharmacy, and we had a

10:16:14 17    heck of a visit to figure out.

10:16:18 18         No -- to my knowledge, sir, no illicit dispensing, no

10:16:23 19    theft, no anything that you just referenced was discovered.

10:16:27 20    **Q**    Nobody knows.  They just disappeared?

10:16:31 21    **A**    Well -- and at the time, that's how many we thought we

10:16:33 22    lost.  I can't speak into how many ended up, you know, being

10:16:37 23    found on the back end.  But, again, that's why we freely

10:16:40 24    invited in those regulatory bodies to help work with them to

10:16:43 25    figure out the solution.

**Cook - Cross/Lanier**

10:16:44  1    **Q**      When I asked if there are good pharmacists and

10:16:47  2    not-so-good pharmacists, would you agree with me that a good

10:16:50  3    pharmacist is going do a good job of keeping up records,

10:16:54  4    especially on narcotics?  True?

10:16:59  5    **A**      I would say, yeah, a good pharmacist would have better

10:17:02  6    recordkeeping purposes.  But when you asked the question, I

10:17:04  7    was looking at in terms of corresponding responsibility as

10:17:07  8    it pertains to this.

10:17:09  9    **Q**      And if we look beyond that, the question was also

10:17:13  10   asked, "Enter the name and strength of the controlled

10:17:17  11   substance lost or stolen for the medication with the second

10:17:21  12   largest quantity."

10:17:23  13        Do you see that as well?

10:17:25  14   **A**      I do, yes, sir.

10:17:25  15   **Q**      And here, we've got another set of oxy tablets, don't

10:17:35  16   we?

10:17:35  17   **A**      Yes, I do see that.

10:17:36  18   **Q**      And this, the estimate was 101 that were lost or

10:17:40  19   stolen.

10:17:40  20        True?

10:17:40  21   **A**      Well, at the time, it was an estimation.  And in order

10:17:42  22   to get the DEA into our pharmacies to help us with our

10:17:45  23   investigation, we had to fill out this report.  So we filled

10:17:48  24   it out as best we could at the time.

10:17:50  25        I can't speak to what the final, you know, quantity

**Cook - Cross/Lanier**

10:17:53  1    ended up being.

10:17:55  2    **Q**    And I understand it says estimate.

10:17:58  3    **A**    Yes, sir.

10:17:58  4    **Q**    But it doesn't say 100.  It says 101.

10:18:02  5    **A**    Yeah.

10:18:02  6    **Q**    It's a pretty serious estimate.  Fair?

10:18:04  7    **A**    That's a pretty accurate estimation.

10:18:07  8    **Q**    Yeah.

10:18:07  9         And so all I'm driving at is we've got two different

10:18:11 10    sets of oxy.  We're at 321 tablets so far that are, quote,

10:18:16 11    lost or stolen; correct?

10:18:21 12    **A**    Yeah, that's the estimation on how much that was

10:18:24 13    potentially missing at the time.

10:18:28 14    **Q**    Well, what do you mean potentially missing.  This says

10:18:31 15    provide details, not of potential theft or loss, it says

10:18:34 16    provide details of theft or loss.

10:18:36 17         Do you see that?

10:18:36 18    **A**    Yes.

10:18:37 19         Well, again, we wanted this submitted right away just

10:18:40 20    to get the DEA, you know, boots on the ground in the store

10:18:43 21    with the Board of Pharmacy, with Lake County Narcotics so we

10:18:46 22    could work with them on the investigation just in case there

10:18:51 23    was something, you know, going on.

10:18:52 24         To my knowledge, you know, nothing was ever discovered

10:18:55 25    with it and we were told at the time, you know, just to --

6572

**Cook - Cross/Lanier**

10:18:58 1    **Q**    We're not allowed to get into what you were told.

10:19:01 2    **A**    Okay.

10:19:02 3    **Q**    That's hearsay.  So I don't want to elicit that.

10:19:05 4    **A**    Okay.

10:19:05 5    **Q**    So and then the third largest medication looks like

10:19:08 6    Vyvanse.  That's like an ADHD.  That's kind of an

10:19:11 7    amphetamine; right?

10:19:12 8    **A**    Yes, sir.

10:19:12 9    **Q**    It's also a controlled substance, isn't it?

10:19:14 10   **A**    Yes, sir.

10:19:15 11   **Q**    So you're missing 90 tablets of that.

10:19:17 12          Now, when we talk about this, you said, quote, you

10:19:21 13   were kind of freaking out, closed quote.

10:19:25 14          This is a -- this is not a cool deal, is it?

10:19:28 15   **A**    Well, no, sir.

10:19:30 16   **Q**    And, in fact, it's a serious problem from a number of

10:19:34 17   different perspectives, you might have these pills being

10:19:40 18   stolen; right?

10:19:40 19   **A**    There was never even evidence to support theft.

10:19:43 20   **Q**    Never any evidence it wasn't theft, was there?

10:19:46 21   **A**    To my knowledge, I can't speak to that, no.

10:19:48 22   **Q**    No.

10:19:49 23          And it might be something that was just lost,

10:19:54 24   miscounted, and not paid for, or something like that; right?

10:19:57 25   **A**    I can't speak to, yeah, what happened.

**Cook - Cross/Lanier**

10:20:00  1    **Q**    All you can speak to is that at that store, a bunch of

10:20:04  2    it disappeared; right?

10:20:06  3    **A**    I can speak to, yeah, at the time we took over, there

10:20:09  4    was, yes, those counts were unaccounted for at that time.

10:20:12  5    **Q**    And that's not the only time you've experienced things

10:20:15  6    like that at your stores.

10:20:17  7         True?

10:20:17  8    **A**    With regarding a loss of a controlled substance, no, I

10:20:21  9    filed this report before.

10:20:23 10    **Q**    And you filed it afterwards?

10:20:25 11    **A**    After -- after might be more accurate, yes, sir.

10:20:27 12    **Q**    Yeah.  I'm handing you Plaintiffs' Exhibit 20 -- well,

10:20:30 13    Ms. Fleming is handing you Plaintiffs' Exhibit 21938.

10:20:33 14         Here we've got in 2017, another entry from one of your

10:20:38 15    stores during the drug -- under drug loss.

10:20:41 16         Do you see that?

10:20:41 17    **A**    I do.

10:20:42 18    **Q**    And this is another one where you submitted it.  And

10:20:45 19    this time it's Percocet y'all have lost, another opiate;

10:20:49 20    right?

10:20:50 21    **A**    Correct.

10:20:50 22    **Q**    In fact, if we look on the back, you've got two

10:20:52 23    different kinds, you lost 33 units of one, and then 60 units

10:20:58 24    of the other; correct?

10:20:59 25    **A**    That is correct.

6574

**Cook - Cross/Lanier**

10:21:00  1    **Q**      And you're saying maybe this was just dispensing

10:21:04  2    errors or patients got too much; right?

10:21:09  3    **A**      I see that, yes, sir.

10:21:11  4    **Q**      Now, pharmacists aren't supposed to be handing out too

10:21:14  5    many opiates, are they?

10:21:16  6    **A**      No, sir.

10:21:16  7    **Q**      And so when we talked about whether or not there were

10:21:19  8    good pharmacists and not-so-good pharmacists, wouldn't you

10:21:22  9    agree realistically that there have been times where there

10:21:26 10    have been some issues in your stores?

10:21:30 11    **A**      Issues as in?

10:21:31 12    **Q**      Yeah.

10:21:32 13           Issues with proper dispensing and inventorying of

10:21:37 14    opiates.

10:21:38 15    **A**      I can -- I can agree with you that I have obviously

10:21:40 16    seen issues with the inventory of opioids, yes.

10:21:44 17    100 percent.

10:21:44 18    **Q**      All right.

10:21:45 19           Before we leave this stop on store issues, I want to

10:21:50 20    talk to you just a moment about staffing.

10:21:53 21    **A**      Yes, sir.

10:21:53 22    **Q**      Y'all have floaters that have to move from one store

10:21:56 23    to another; right?

10:21:57 24    **A**      Yes, sir.  That's how I started my career and what my

10:22:01 25    wife currently does for the company.

**Cook - Cross/Lanier**

10:22:03  1    **Q**    I understand Store 5941, you know which store that is?

10:22:06  2    **A**    Yes, sir.

10:22:07  3    **Q**    I understand right now that the pharmacy has even been

10:22:10  4    closed a good bit in that store with instructions for people

10:22:13  5    to go to Lake Shore Boulevard because of staffing issues;

10:22:17  6    right?

10:22:18  7    **A**    I'm personally not aware of that, no.

10:22:21  8    **Q**    You are unaware of that?

10:22:23  9              THE COURT:  Was there an objection?

10:22:27 10    I guess not.  Go ahead.  You may answer.

10:22:30 11    BY MR. LANIER:

10:22:30 12    **Q**    Are you unaware of that?

10:22:31 13    **A**    I am unaware of that, correct.

10:22:33 14    **Q**    All right.

10:22:34 15    So if I represent to you that we creeped on that store

10:22:36 16    yesterday and we went out to look at it just to get an idea,

10:22:39 17    and that that sign was up, that would be new to you?

10:22:42 18    **A**    That would be new to me, yes, sir.

10:22:44 19    **Q**    Okay.  You know the doctors well?

10:22:48 20    **A**    Generally speaking, yes.

10:22:49 21    **Q**    So you know about Dr. Veres?

10:22:52 22    **A**    Not that particular prescriber, no, sir.

10:22:55 23    **Q**    Do you know about Dr. Torres?

10:22:57 24    **A**    Not that prescriber, no, sir.

10:22:59 25    **Q**    Do you know about Dr. Escobar?

**Cook - Cross/Lanier**

10:23:02 1    **A**    No, sir.

10:23:02 2    **Q**    Do you know about Dr. Lazzarini?

10:23:06 3    **A**    Are these Lake County doctors?

10:23:08 4    **Q**    They're Lake and Trumbull?

10:23:10 5    **A**    Okay.

10:23:11 6    **Q**    They've had prescriptions filled both places.

10:23:13 7    **A**    Okay.  I am not familiar with that doctor, yes.

10:23:15 8    **Q**    Dr. Demangone?

10:23:17 9    **A**    Yes, I am familiar with that doctor.

10:23:18 10   **Q**    And you know about the issues with his opiates;

10:23:21 11   correct?

10:23:21 12   **A**    Yes, I'm aware of.

10:23:23 13   **Q**    And are you aware of whether or not you filled any of

10:23:25 14   his prescriptions?

10:23:26 15   **A**    I can speak to the fact that earlier on in my career

10:23:29 16   working in Lake County, I did.  At some point, to the best

10:23:33 17   of my knowledge in 2014, maybe early '15, I stopped, to the

10:23:38 18   best of my knowledge.

10:23:39 19   **Q**    Let's go to the last stop on the road.  That's

10:23:43 20   limitations.  And I want to ask you about some limitations.

10:23:47 21   And I've got some questions up here.  We'll go at them one

10:23:50 22   at a time.

10:23:50 23       Were you a pharmacist during what has been described

10:23:52 24   to the jury as Phase 1 of the opioid epidemic, from the late

10:23:59 25   '90s into 2009?

Cook - Cross/Lanier

10:24:00  1  **A**     No, sir.  I started as an intern in 2008, but I still

10:24:05  2  had, you know, my -- as I referenced in that story earlier,

10:24:08  3  you know, still was, you know, helping the pharmacy team

10:24:11  4  with, you know, opioid -- fraudulent opioid prescriptions.

10:24:14  5  **Q**     Well, were you a pharmacist with the responsibilities

10:24:18  6  of a pharmacist during Phase 2 if we define that as 2010 to

10:24:24  7  2012?

10:24:25  8  **A**     I became a licensed pharmacist in PA, best of my

10:24:29  9  knowledge, sir, probably around September of '12, so -- or

10:24:33  10  maybe August, something like that, but yeah, for the last

10:24:35  11  couple months of the year.

10:24:37  12  **Q**     Great.

10:24:38  13        And then would you agree with me that the tools that

10:24:42  14  CVS gives you today help prevent diversion, tools like

10:24:47  15  NarxCare, for example?

10:24:49  16        Would you agree?

10:24:50  17  **A**     I think they help us identify, I mean, not just

10:24:53  18  diversion, but also, yes, if a -- there's issues.  Yes.

10:24:57  19  Yes, I'll agree.

10:24:58  20  **Q**     Would you agree with me that Rx Connect has modified

10:25:01  21  over the years or decades since it first came out?

10:25:04  22  **A**     Yes.

10:25:08  23  **Q**     And when you were speaking about it, you're speaking

10:25:10  24  about it in today's incarnation.  Fair?

10:25:14  25  **A**     That is a fair assessment.

**Cook - Cross/Lanier**

10:25:15  1   **Q**     Now, in your legal training, did they cover the *East*

10:25:20  2   *Main* case with you?

10:25:20  3   **A**     Not to my knowledge, no, sir, that does not ring a

10:25:24  4   bell.

10:25:24  5   **Q**     Did they cover the *Holiday* CVS case?

10:25:27  6   **A**     No, sir.  That doesn't ring a bell to my knowledge.

10:25:30  7   **Q**     And it doesn't ring a bell even with you today, does

10:25:32  8   it?

10:25:32  9   **A**     No, sir.

10:25:41  10  **Q**     I want to try and understand Rx Connect one last time

10:25:44  11  even in today's incarnation.  Okay?

10:25:49  12  **A**     Yes, sir.

10:25:49  13  **Q**     In today's incarnation, let's talk about what I think

10:25:53  14  you can't see.  And you fix this if I've got it wrong.

10:25:55  15  Okay?

10:25:55  16  **A**     Okay.  I'm with you.

10:25:56  17  **Q**     Does it give you information about CVS's

10:26:01  18  investigations into suspicious prescribers?

10:26:05  19  **A**     No, sir.

10:26:08  20  **Q**     Does it give you information about CVS's analysts --

10:26:13  21  no, about CVS's analysis of store dispensing habits?

10:26:19  22  **A**     It does not, no, sir.

10:26:21  23  **Q**     Does it give you information about whether prescribers

10:26:25  24  are top volume prescribers for hydrocodone or oxycodone?

10:26:34  25  **A**     No.

6579

**Cook - Cross/Lanier**

10:26:36  1    **Q**     Does it give you information about whether doctors are

10:26:38  2    the top prescriber for a share of controlled drugs versus

10:26:42  3    non-controlled drugs?

10:26:46  4    **A**     I mean, like a pain management doctor obviously writes

10:26:50  5    a lot more of a controlled drug than a non-controlled drug.

10:26:53  6    I'm a little confused by the phrasing of that.

10:26:56  7    **Q**     But will your Rx Connect give you the information

10:26:58  8    about whether or not this doctor is a top prescriber for the

10:27:02  9    shared controlled versus uncontrolled, or is that something

10:27:05 10    you've just got to compute like oh, he's a pain doctor, it

10:27:09 11    makes sense?

10:27:10 12    **A**     It's something that, yeah, my years of practicing and

10:27:12 13    living in Lake County, like I can identify which prescriber

10:27:15 14    probably does write proportionately more controlled but does

10:27:19 15    the system provide that information, the answer is no.

10:27:22 16    **Q**     And does the system itself give you an alert for red

10:27:27 17    flags that might be determined by the system?

10:27:31 18    **A**     Well, the pharmacist practicing corresponding

10:27:35 19    responsibility is the one to identify a red flag.  I mean,

10:27:38 20    or a potential red flag, I should actually say.

10:27:41 21         I -- the computer system alerting me wouldn't make me

10:27:45 22    any more diligence in, you know, practicing my own

10:27:48 23    corresponding responsibility.

10:27:49 24         I'm aware of potential red flags, how to resolve them.

10:27:52 25    I really don't need the computer to tell me how to do it.

10:27:54  1    **Q**    All right.

10:27:55  2         That's whether or not you need it, but my question is

10:27:57  3    does the computer give it.

10:27:59  4    **A**    Well, and it depends, sir, like on your definition of

10:28:02  5    a red flag.  So let's say you want to tell me that a

10:28:06  6    patient, you know, who lives in Mentor who sees a specialist

10:28:10  7    in Akron for pain, you know, that medication, that patient

10:28:14  8    address, that doctor address is provided to me in Rx

10:28:16  9    Connect.

10:28:16  10   **Q**    The doctor's address is, but does it alert you as a

10:28:19  11   red flag, does it say -- some of the other defendants have

10:28:22  12   something that will show red or something like that.

10:28:24  13        Does it do that for you?

10:28:25  14   **A**    No, it doesn't do that, but again, being a

10:28:28  15   Lake County, an Ohio resident for the 25 years, I can tell

10:28:32  16   that particular potential red flag.

10:28:33  17   **Q**    Okay.  I'm at the end of the road.  Thank you again.

10:28:36  18   I wish you the best, especially with those three kids.

10:28:41  19   **A**    Yes.  Thank you.

10:28:42  20   **Q**    Um-hmm.

10:28:43  21             THE COURT:  Okay.  I think if any of the

10:28:45  22   jurors have any questions for Mr. Cook, if you'd provide

10:28:50  23   those to Mr. Pitts, we'll take our med-morning break and

10:28:54  24   then pick up with the juror questions and any counsel

10:28:57  25   follow-up questions.

**Cook - Redirect/Miller**

10:29:19   1                    (Brief pause in proceedings.)

10:29:19   2                    THE COURT:  Okay.  So we can take our break

10:29:21   3    now.

10:29:27   4                    (Jury excused from courtroom.)

10:31:21   5          (Recess was taken from 10:29 a.m. till 10:49 a.m.)

10:49:54   6                    COURTROOM DEPUTY:  All rise.

10:51:49   7                     (Jury returned to courtroom.)

10:52:10   8                    THE COURT:  Okay.  Please be seated.

10:52:14   9                    MS. MILLER:  May I proceed, Your Honor?

10:52:14  10                    THE COURT:  Yes.

10:52:15  11          Mr. Cook, I just want to remind you you're still under

10:52:17  12    oath from this morning.

10:52:18  13          And, Ms. Miller, you may proceed, please.

10:52:21  14                    THE WITNESS:  Thank you.

10:52:21  15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

**Cook - Redirect/Miller**

10:52:21  1    REDIRECT EXAMINATION OF KENNETH COOK

10:52:24  2  BY MS. MILLER:

10:52:24  3  **Q**    Mr. Cook, the jurors have some questions for you so

10:52:26  4  I'm just going to put them right up here.

10:52:28  5        Mr. Pitts, could I have the ELMO, please?

10:52:36  6        The first question from one of our jurors is do you

10:52:40  7  document refusal to fills or do you just hand the script

10:52:42  8  back to the patient?

10:52:47  9  **A**    That's a good question.

10:52:49 10        My general practice when I refuse to fill a

10:52:52 11  prescription, I will document on the hard copy the reason

10:52:54 12  why, whether it's something I found or whether it's

10:52:56 13  something I couldn't resolve.

10:52:58 14        Ultimately, the script is the property of the patient.

10:53:01 15  So unless, you know, it was voided by the doctor, we have to

10:53:04 16  hand that prescription back to the patient.

10:53:18 17  **Q**    Are controlled substance medications counted and

10:53:23 18  results logged daily?

10:53:27 19        Why don't we start with that question.

10:53:28 20  **A**    Okay.

10:53:29 21        So speaking to just -- I'll start with opioids.  They

10:53:33 22  are logged.  Inventory is once a month.  We do a handful of

10:53:36 23  counts a day, but by the end of like a month, we would have

10:53:40 24  inventoried the entire safe.

10:53:42 25        With controlled substance medications, yes, we also

**Cook - Redirect/Miller**

10:53:45  1    it's called a cycle count.  We count those.  Not every day,

10:53:49  2    but over the course of a month, they do get counted.

10:53:53  3    **Q**    And where do you record those inventory results?

10:53:57  4    **A**    Our inventory system is automated now.  It's part of

10:54:03  5    Rx Connect, like part of the system.  If I were to find a

10:54:06  6    discrepancy or there were an issue with inventory, it will

10:54:09  7    alert me, you know, that what I entered is incorrect, you

10:54:13  8    know, allowing me time to maybe go back and recount what I

10:54:17  9    counted.

10:54:17  10   **Q**    And the second juror question, are these counts double

10:54:22  11   checked by another person?

10:54:25  12   **A**    No.

10:54:26  13        However, over the course of the month, you know, you

10:54:28  14   will have multiple pharmacists counting them.  As pharmacy

10:54:32  15   manager, for example, it's not my sole responsibility.

10:54:36  16   There are -- it's the responsibility of the pharmacist on

10:54:38  17   duty that particular day when that count drops to get it

10:54:41  18   done.  So it's not double checked, per se, but it's not all

10:54:44  19   just done by me.

10:54:46  20   **Q**    As a CVS pharmacist, do you have to document

10:54:50  21   resolutions of red flags?  If so, where do you document

10:54:55  22   resolutions?

10:54:57  23   **A**    Yes.

10:54:58  24        So, yeah, CVS, part of their policy is, and part of my

10:55:02  25   training was to document the resolution of a red flag.

**Cook - Redirect/Miller**

10:55:06  1      Again, speaking to my early answer, it's my general

10:55:09  2  practice to -- documentation is typically done in the

10:55:11  3  patient profile in Rx Connect.  It can also be done on the

10:55:15  4  hard copy.

10:55:18  5      That's more so what I did back when I started, you

10:55:20  6  know, as a pharmacist before we could add notes to a patient

10:55:24  7  profile.  So either one of those options.

10:55:32  8  **Q**   And this is similar to one of the other juror

10:55:36  9  questions we had at the start.

10:55:37 10      If a CVS pharmacist decides to refuse to fill a

10:55:40 11  prescription, what is the process of that?  Are there

10:55:44 12  certain documents that have to be filled out?

10:55:47 13  **A**   So refusing to fill, again, so we're going to -- let's

10:55:52 14  -- in this hypothetical, say we're in a situation where

10:55:55 15  there's a red flag that I can't resolve.  I will just

10:55:59 16  communicate very clearly to the patient that, you know,

10:56:02 17  unfortunately, you know, there's an issue -- issue was

10:56:04 18  found, you know, filling this prescription, you know.  I

10:56:06 19  need more information on it.  We always give them the

10:56:09 20  option, you know, to leave the prescription until we can

10:56:11 21  resolve it.

10:56:14 22      In this situation, you know, it doesn't specifically

10:56:16 23  say, but, you know, I just -- I'm honest with the patient.

10:56:20 24  You know, you don't lie to them.  You just say, you know,

10:56:23 25  there's an issue, I have more questions, and I can't fill

**Cook - Redirect/Miller**

10:56:25  1   this at this time or I can't fill it until I hear back more

10:56:28  2   information from the doctor.

10:56:29  3        Documents that have to be filled out, not to my

10:56:33  4   knowledge.  There are circumstances if the prescription is

10:56:35  5   deemed to be fraudulent, then we are required to notify

10:56:40  6   Board of Pharmacy as well as local law enforcement.  But

10:56:43  7   assuming it's not a fraudulent prescription, there is no --

10:56:47  8   to my knowledge, there's no legal requirement for a refusal

10:56:50  9   to fill documentation.

10:57:02 10   **Q**    Do you have incidents where non-controlled medications

10:57:08 11   are missing in the hundreds?

10:57:12 12   **A**    Yes.

10:57:14 13        You know, we'll have people who misfile.  Controlled

10:57:20 14   medications, ladies and gentlemen, typically come in like a

10:57:22 15   bottle of a hundred or smaller, typically speaking.  Most of

10:57:24 16   your blood pressure medications, most of your diabetes

10:57:28 17   medications -- well, not most, but a good amount of them

10:57:31 18   come in bottles of 500 or a thousand.

10:57:34 19        So the discrepancy earlier, you know, yes, we do see

10:57:38 20   instances where non-controlled medications are missing,

10:57:40 21   could be on the wrong spot on the shelf.  Yes.  That does

10:57:44 22   happen.

10:57:47 23   **Q**    Are controlled substances, in your experience, the

10:57:51 24   medications that go missing most often when you check

10:57:55 25   inventory?

**Cook - Redirect/Miller**

10:57:56  1    **A**    So speaking to my experience, the answer is no.

10:57:59  2         Keep in mind, ladies and gentlemen, controlled

10:58:02  3    medications are a very, very small percentage of the

10:58:05  4    prescriptions that like I, as a pharmacist, fill on a

10:58:07  5    typical day.

10:58:08  6         The majority of scripts that we have, like an

10:58:11  7    inventory discrepancy, are non-controlled medications that

10:58:14  8    we fill far more often of.

10:58:16  9         For example, if I fill, you know, for those of you

10:58:19 10    familiar with, like, you know, Metformin for diabetes, we

10:58:24 11    fill maybe like a thousand tablets a day.  Over the course

10:58:27 12    of a month, that's extremely more likely to be off than a

10:58:30 13    controlled medication.

10:58:37 14    **Q**    And the final question, what does the yearly

10:58:44 15    evaluation process look like at CVS?  Who completes the

10:58:49 16    evaluations?  Rubric?  Are these evaluations tied to

10:58:54 17    maintaining licensure or just for CVS?

10:58:57 18    **A**    So, yes, the yearly evaluation process is typically

10:59:01 19    completed in March of April or the prior calendar year.

10:59:05 20    It's completed by my boss.

10:59:07 21         So when I was a pharmacist working in the store, it

10:59:09 22    was my pharmacy supervisor and/or district leader.  Now that

10:59:13 23    I'm a district leader, it's obviously a little different.

10:59:16 24         There is a rubric that they go off of based on various

10:59:21 25    aspects, ranging from like, you know, my -- like a score.

**Cook - Redirect/Miller**

10:59:25  1    There's also like my personality, you know, just my ability

10:59:28  2    to lead a team.

10:59:32  3         What is evaluated?  So again, -- and it's changed over

10:59:36  4    the years, it's evolved.  What's not evaluated anymore is

10:59:40  5    like work flow scores, how efficiently we're processing

10:59:43  6    prescriptions.

10:59:44  7         What's more evaluated, there's something called

10:59:46  8    community responsibility.  We have an independent auditor

10:59:50  9    team come in and audit our pharmacies on a monthly basis to

10:59:53  10   ensure -- try to find compliance with various things.

10:59:57  11   That's a component.

10:59:58  12        Service scores for the store are a component.  And

11:00:02  13   then there's also for lack of a better word, I don't know

11:00:05  14   what CVS calls it, like the human component, like my ability

11:00:08  15   as a leader.

11:00:09  16        So if I had a bad evaluation year based on what I

11:00:12  17   listed prior, they might say, well, you know, you're a good

11:00:15  18   guy, tough situation maybe.

11:00:19  19        Evaluation tied to continuing licensure?  No, it's

11:00:22  20   just for CVS.  I mean, if I did something bad enough to get

11:00:25  21   a -- you know, get my license suspended, I'm probably not

11:00:30  22   getting a yearly evaluation, but, no, that's just for

11:00:33  23   internal CVS purposes.

11:00:37  24   **Q**    All right.

11:00:37  25        I just have a few follow-up questions for you, Mr.

11:00:41  1    Cook.

11:00:41  2    **A**    Absolutely.

11:00:42  3    **Q**    I want to take you back for a moment to the

11:00:47  4    recordkeeping inventory-related issue that Mr. Lanier raised

11:00:52  5    with you at Store 3326.

11:00:54  6         Do you remember that?

11:00:55  7    **A**    I do remember, yes.

11:00:56  8    **Q**    And you had just assumed responsibility as the

11:01:02  9    pharmacy manager of 3326 when you discovered the paperwork

11:01:08 10    inventory issue; right?

11:01:08 11    **A**    That is correct.

11:01:10 12    **Q**    And you testified earlier that you contacted the DEA;

11:01:15 13    correct?

11:01:15 14    **A**    That is correct.

11:01:16 15    **Q**    You contacted the Board of Pharmacy?

11:01:18 16    **A**    Correct.

11:01:18 17    **Q**    Did you also contact Lake County Narcotics?

11:01:21 18    **A**    Yes, and I omitted to say I obviously also contacted

11:01:26 19    my CVS supervisor as well.

11:01:28 20    **Q**    And did all of those entities that you just named, did

11:01:31 21    they visit the store?

11:01:32 22    **A**    Yes.

11:01:34 23    **Q**    And did you work with them during those visits to

11:01:39 24    discuss the issue and share with them what you had learned?

11:01:42 25    **A**    Yes, we did.

**Cook - Redirect/Miller**

11:01:43  1  **Q**    Did you subsequently correct the paperwork issues?

11:01:46  2  **A**    Yes.

11:01:47  3  **Q**    And did any of those regulators issue any citations?

11:01:52  4  **A**    No, not to my knowledge, there was no citation.

11:01:57  5  **Q**    Any fines?

11:01:57  6  **A**    Not to my knowledge, no.

11:02:02  7  **Q**    Back to Rx Connect for just one moment.

11:02:05  8        Mr. Lanier was asking you a little bit about alerts in

11:02:09  9  Rx Connect.

11:02:10  10       Do you recall that?

11:02:11  11  **A**    I do recall that questioning.

11:02:12  12  **Q**    And just one question on this.

11:02:16  13       Do you feel you need any more alerts than you already

11:02:20  14  have to exercise corresponding responsibility?

11:02:23  15  **A**    I do not.

11:02:29  16  **Q**    Last, Mr. Cook.  Mr. Lanier also asked you about a

11:02:34  17  Dr.  David Demangone.

11:02:37  18       Do you recall that?

11:02:38  19  **A**    I recall that question.

11:02:39  20  **Q**    And you testified that around 2014, you stopped

11:02:43  21  filling controlled substance prescriptions for

11:02:48  22  Dr. Demangone; is that right?

11:02:48  23  **A**    To the best of my knowledge, that date is correct,

11:02:50  24  yes.

11:02:50  25  **Q**    And to the best of your knowledge, had others of your

11:02:53  1   colleagues at CVS also stopped filling prescriptions for

11:02:59  2   Dr. Demangone?

11:03:00  3   **A**     Yes, they had.

11:03:01  4   **Q**     Are you aware that Dr. Demangone has a sign in his

11:03:04  5   office regarding CVS?

11:03:06  6   **A**     Yes, I am aware of that sign.

11:03:07  7   **Q**     And what does that sign say?

11:03:09  8   **A**     It says -- taped, like right when you would walk in to

11:03:14  9   check in with your doctor's office where they might have all

11:03:16 10   those fliers, it says, "Do not fill RX at CVS," also says or

11:03:22 11   Walmart.

11:03:22 12   **Q**     And, Mr. Cook, I'm showing you CVS-MDL-04243.

11:03:31 13   **A**     Yes.

11:03:31 14   **Q**     Do you recognize this sign?

11:03:32 15   **A**     I do.  I recognize that sign.

11:03:34 16   **Q**     And is that the sign that you've seen in

11:03:38 17   Dr. Demangone's office?

11:03:38 18   **A**     Yes, I have personally seen that sign, yes.

11:03:42 19                   MS. MILLER:  Thank you very much, Mr. Cook.

11:03:44 20   That's all I have.

11:03:44 21                   THE WITNESS:  Thank you.

11:03:47 22                   THE COURT:  I assume nothing from any other

11:03:49 23   defendants?

11:03:50 24                   MR. STOFFELMAYR:  No, Your Honor.

11:03:51 25                   MR. MAJORAS:  No, sir.

**Cook - Recross/Lanier**

11:03:52  1              THE COURT:  All right.

11:03:52  2          Mr. Lanier, anything from you?

11:03:54  3              MR. LANIER:  I'm going to ask one -- one or

11:03:57  4    two quickies.

11:03:58  5              THE COURT:  All right.

11:04:03  6              RECROSS-EXAMINATION OF KENNETH COOK

11:04:05  7    BY MR. LANIER

11:04:05  8    **Q**    Did you do a check on this when you saw the sign?

11:04:08  9    When did you see it, by the way?

11:04:10  10   **A**    It was earlier this year.  Maybe several -- several

11:04:14  11   weeks ago to the best of my knowledge.

11:04:16  12   **Q**    Several weeks ago, getting ready to testify in this

11:04:19  13   case?

11:04:19  14   **A**    I actually was a pharmacist at 4351, across the street

11:04:23  15   at that time, and his office was literally across -- I'm

11:04:25  16   sorry.  I don't know the name of the street, so just figured

11:04:28  17   I'd pop in and see it.

11:04:29  18   **Q**    Well, yeah.  I understand.  And I'm not -- I don't

11:04:32  19   mean to fuss over it.  I'm just making sure I've got the

11:04:35  20   timing right.

11:04:35  21   **A**    Yes, sir, several weeks.

11:04:36  22   **Q**    Yeah.

11:04:37  23        But in the meantime, did you bother to check to see

11:04:39  24   whether or not the dosage data that y'all have given us

11:04:45  25   shows that CVS filled 2,765,660 dosage units for

**Cook - Recross/Lanier**

11:04:55  1    Dr. Demangone over the last number of years that y'all have

11:05:00  2    given us the data?

11:05:02  3                    MS. MILLER:  Objection.

11:05:04  4    **Q**    Did you look?

11:05:05  5                    THE COURT:  Overruled.

11:05:06  6                    THE WITNESS:  The question is did I look?

11:05:07  7    BY MR. LANIER:

11:05:08  8    **Q**    Yeah, to see how much y'all filled of the gentleman,

11:05:10  9    aside from just seeing the sign in his window now?

11:05:15 10                    MS. MILLER:  Objection, Your Honor.

11:05:17 11                    THE COURT:  Overruled.

11:05:17 12                    THE WITNESS:  With all due respect, I don't

11:05:19 13    know if I'd have access to that company-wide data.

11:05:23 14                    MR. LANIER:  Okay.  Thank you.

11:05:23 15          That's all I have, Your Honor.

11:05:24 16                    THE COURT:  Okay.  Thank you very much, sir.

11:05:27 17          We appreciate your testimony, and you may step down.

11:05:29 18                    THE WITNESS:  Thank you, Your Honor.

11:05:39 19                    MS. SWIFT:  Your Honor, may we proceed with

11:05:41 20    our next witness?

11:05:42 21                    THE COURT:  Yes, you may.

11:05:43 22                    MS. SWIFT:  The pharmacies call Demetra Ashley

11:05:46 23    by deposition.

11:05:47 24          Ms. Ashley worked at the Drug Enforcement

11:05:50 25    Administration for more than 30 years.  When she retired in

**Deposition of Demetra Ashley**

11:05:52  1   2018, she was a senior administrator in the DEA's Office of

11:05:56  2   Diversion Control, a similar role to the role that

11:06:01  3   Joe Rannazzisi held for a period of time before her.

11:06:06  4       During her career at DEA, Ms. Ashley also worked as a

11:06:09  5   diversion investigator in Detroit and Chicago for a number

11:06:12  6   of years and was head of the Chicago's field division before

11:06:15  7   moving to DEA headquarters.

11:06:17  8       The pharmacies questioning of Ms. Ashley is about

11:06:21  9   44 minutes long.  Plaintiffs' questioning is about

11:06:24 10   19 minutes long.

11:06:24 11                 DEPOSITION TESTIMONY OF DEMETRA ASHLEY

11:06:24 12   BY MS. SWIFT

11:06:35 13   Q     Good morning, Ms. Ashley.

11:06:37 14       My name is Kate Swift and I represent Walgreens.

11:06:40 15   Thank you for being with us here today.

11:06:42 16       My first question for you is do you live and work in

11:06:44 17   Chicago?

11:06:45 18   A     Yes.

11:06:47 19   Q     If I understand your resumè correctly, you worked at

11:06:50 20   the Drug Enforcement Administration for more than 30 years;

11:06:54 21   is that right?

11:06:54 22   A     Yes.

11:06:56 23   Q     Did you work as a DEA diversion investigator in both

11:07:01 24   Detroit and Chicago for a number of years?

11:07:03 25   A     Yes.

## Deposition of Demetra Ashley

11:07:05 1 **Q**     Were you also head of the Chicago field division for

11:07:08 2 the DEA for a number of years?

11:07:11 3 **A**     For diversion, yes.

11:07:13 4 **Q**     In that role as head of DEA's Chicago Field Division

11:07:18 5 Office For Diversion, were you in charge of diversion

11:07:22 6 control for five states?

11:07:24 7 **A**     Yes.

11:07:25 8 **Q**     Is that what you were doing from around 2007 until

11:07:29 9 2015?

11:07:30 10 **A**     Yes.

11:07:31 11 **Q**     I understand you also worked at DEA headquarters for a

11:07:35 12 number of years in different roles; is that right?

11:07:38 13 **A**     Yes.

11:07:39 14 **Q**     Were you the acting assistant administrator for DEA's

11:07:43 15 Office of Diversion Control for a period of time?

11:07:47 16 **A**     Yes.

11:07:49 17 **Q**     That was a senior executive role?

11:07:54 18 **A**     Senior executive, correct.

11:07:55 19 **Q**     When did you leave the DEA?

11:07:57 20 **A**     March of 2018.

11:07:58 21 **Q**     Ms. Ashley, in your experience, with more than

11:08:02 22 30 years at the DEA, is it your understanding that DEA

11:08:05 23 regulates medications that are classified as controlled

11:08:09 24 substances?

11:08:09 25 **A**     Yes.

**Deposition of Demetra Ashley**

11:08:10  1    **Q**    Does that include prescription opioid medications such

11:08:13  2    as oxycodone?

11:08:15  3    **A**    Yes.

11:08:16  4    **Q**    Can a doctor write a prescription for an opioid

11:08:19  5    medication without a DEA registration?

11:08:22  6    **A**    No.

11:08:26  7    **Q**    Do prescribers have to renew their DEA registration on

11:08:30  8    a regular basis?

11:08:31  9    **A**    Yes.

11:08:32 10    **Q**    Do you recall how often prescribers have to renew

11:08:36 11    their DEA registration?

11:08:38 12    **A**    Every three years.

11:08:40 13    **Q**    Can the DEA revoke a doctor's registration to

11:08:43 14    prescribe opioids if DEA determines that that prescriber's

11:08:48 15    doing so is not in the public interest?

11:08:51 16    **A**    Yes.

11:08:52 17    **Q**    Can the DEA investigate and recommend criminal charges

11:08:56 18    against doctors who write illegitimate prescriptions for

11:09:00 19    opioids?

11:09:00 20    **A**    Yes.

11:09:02 21    **Q**    What is a rogue pain clinic?

11:09:04 22    **A**    It's a clinic where they are likely operating -- we

11:09:11 23    used to call them pill mills, where there's, you know, lines

11:09:14 24    out the door and physicians are writing prescriptions, you

11:09:18 25    know, for no legitimate medical need, like, they're not --

**Deposition of Demetra Ashley**

11:09:21  1   they're not within compliance of the Controlled Substances

11:09:24  2   Act.

11:09:24  3   **Q**     Is a pill mill the same thing as a rogue pain clinic,

11:09:28  4   in your understanding?

11:09:29  5   **A**     Pretty much, yeah.

11:09:30  6   **Q**     At rogue pain clinics and pill mills, is it your

11:09:33  7   understanding, from your experience at the DEA, that doctors

11:09:37  8   were both writing and dispensing pain medications without a

11:09:40  9   legitimate medical purpose?

11:09:42  10  **A**     Yes, on some occasions, yes.

11:09:45  11  **Q**     Based on your experience at DEA, is it true that pill

11:09:50  12  mills were a problem all over the country in this time

11:09:54  13  frame?

11:09:54  14  **A**     Yeah, I think so.  Yes.

11:09:56  15  **Q**     Was that true in 2011, 2012, 2013, that pill mills

11:10:00  16  were a problem all over the country?

11:10:03  17  **A**     I believe so, yes.

11:10:08  18  **Q**     You already testified that rogue pain clinics are

11:10:11  19  basically the same thing as pill mills.

11:10:14  20       Is it fair to say that rogue pain clinics were also a

11:10:17  21  problem all over the country in the 2011, 2012, 20313 time

11:10:23  22  frame?

11:10:23  23  **A**     I believe so.

11:10:26  24  **Q**     Would you agree that rogue pain clinics and pill mills

11:10:30  25  were a big part of the prescription opioid problem in the

6597

**Deposition of Demetra Ashley**

11:10:34 1   2011, 2012, 2013 time frame?

11:10:37 2   **A**    Yes. I believe it was part of the problem, yes.

11:10:40 3   **Q**    Do you agree, based on your 30-plus years at DEA, that

11:10:44 4   pharmacy employees have been an important source of

11:10:47 5   cooperation and assistance in investigations of pill mills

11:10:50 6   over the years?

11:10:52 7   **A**    I believe they have been an important source, yes.

11:10:58 8           MS. SWIFT: This will be Exhibit 5 to the

11:11:00 9   deposition.

11:11:03 10   BY MS. SWIFT:

11:11:04 11   **Q**    Ms. Ashley, do you recognize what I marked as

11:11:07 12   Exhibit 5 as a statement that you gave to the Senate

11:11:13 13   Judiciary Committee in 2017?

11:11:17 14   **A**    Yes.

11:11:19 15   **Q**    If you turn to Page 4, I would like to ask you about

11:11:26 16   your statement in the bottom paragraph.

11:11:31 17       You told the Senate Judiciary Committee that since

11:11:35 18   2014, DEA has observed a decline in prescriptions written

11:11:38 19   for certain Schedule II opioids; is that right?

11:11:43 20   **A**    That's right.

11:11:50 21   **Q**    Would you agree that doctors in general stopped

11:11:52 22   writing so many opioid prescriptions in that time frame, not

11:11:55 23   just bad doctors who may have been operating out of a pill

11:11:59 24   mill or a pain clinic, a rogue pain clinic.

11:12:03 25       Would you agree with that?

**Deposition of Demetra Ashley**

11:12:03  1    **A**      Yeah, it's likely, yes.

11:12:05  2    **Q**      Following the decrease in doctors writing

11:12:10  3    prescriptions for opioids, DEA reduced the amount of opioids

11:12:15  4    that could be manufactured each year; correct?

11:12:20  5    **A**      Yeah.  But, again, that's part of the consideration.

11:12:23  6    But, yes, that did happen.

11:12:25  7    **Q**      In your statement to the Senate Judiciary Committee

11:12:31  8    that I marked as Exhibit 5, you said in October 2016, DEA

11:12:39  9    announced a 25 percent reduction or more in the 2017 APQs,

11:12:46 10    or quotas, for many prescription opioids, including

11:12:51 11    oxycodone, hydrocodone, fentanyl, hydromorphone and

11:12:55 12    morphine; correct?

11:12:55 13    **A**      Correct.

11:12:57 14    **Q**      You went on to say that hydrocodone was reduced to

11:13:02 15    66 percent of the previous year's 2016 level; correct?

11:13:07 16    **A**      Correct.

11:13:08 17    **Q**      Do you see that, what I've marked as Exhibit 6, is a

11:13:18 18    hearing transcript from the Committee on the Judiciary of

11:13:22 19    the House of Congress from May of 2018?

11:13:27 20    **A**      Okay.

11:13:28 21    **Q**      And if you'd look at Page 3, the table of contents,

11:13:33 22    you can see that the witnesses who testified, the first one

11:13:37 23    on the list is Robert W. Patterson, Acting Administrator,

11:13:42 24    Drug Enforcement Administration.

11:13:42 25             Do you see that?

**Deposition of Demetra Ashley**

11:13:44 1    **A**    Yes.

11:13:46 2    **Q**    Turn, if you would, please, to Page 32 of this hearing

11:13:53 3    transcript that I marked as Exhibit 6.

11:13:59 4        Do you see close to the top of the page where it says

11:14:03 5    Mr. Patterson?

11:14:04 6    **A**    Yes.

11:14:06 7    **Q**    Mr. Patterson testified, "I look at the vast majority

11:14:10 8    of doctors, 99.99 percent are all trying to do right by

11:14:16 9    their patients."

11:14:16 10       Do you agree with that statement based on your

11:14:18 11   experience at DEA?

11:14:20 12   **A**    I believe the vast majority, yes, are trying to do the

11:14:23 13   right thing, yes.

11:14:25 14   **Q**    When those vast majority of doctors who are trying to

11:14:29 15   do right by their patients, when they write prescriptions

11:14:32 16   for opioid medications, would you agree that it's

11:14:36 17   appropriate for pharmacists to fill those legitimate

11:14:39 18   prescriptions?

11:14:40 19   **A**    Sure, if they make an independent judgment, yeah.

11:14:44 20   Yes.

11:14:45 21   **Q**    And, in fact, would you also agree that part of DEA's

11:14:48 22   mission is to ensure an adequate supply of controlled

11:14:54 23   substance medications, including opioids, to meet the

11:14:56 24   legitimate medical needs of patients?

11:14:59 25   **A**    Yes.

**Deposition of Demetra Ashley**

11:15:00  1    **Q**    Would you agree, Ms. Ashley, that even if a doctor

11:15:04  2    does right by her patients and writes a legitimate

11:15:08  3    prescription, and the pharmacist properly fills that

11:15:12  4    prescription in her professional judgment, that it is a

11:15:16  5    legitimate prescription, even if those things both happen,

11:15:20  6    it is still possible for that medication to get into the

11:15:23  7    wrong hands through no fault of the pharmacist or the

11:15:26  8    doctor?

11:15:27  9    **A**    That is possible, yes.

11:15:29  10   **Q**    All right.

11:15:30  11          Turn back to what was -- it was in Exhibit Q.  So you

11:15:37  12   took it out of the envelope.  I'll tell you what it is on

11:15:41  13   the first page.

11:15:42  14   **A**    I tried to keep them organized.  Let's see.

11:15:46  15   **Q**    This is the one that was marked as Exhibit 1 and it's

11:15:51  16   your PowerPoint presentation that says Pharmacy Track, Drug

11:15:57  17   Enforcement Administration Regulations Update on the first

11:15:59  18   page.  It's got a green and blue banner.

11:16:02  19   **A**    This one, yes.

11:16:03  20   **Q**    Yeah.  That's it.  Okay.

11:16:04  21          We're going to go to Page 10 of Exhibit 1.  And I

11:16:09  22   should ask you, do you recall giving this presentation?

11:16:12  23   **A**    I don't specifically recall giving it, but I've -- I'm

11:16:15  24   familiar with this, I think.  I'm pretty certain it's me,

11:16:18  25   yeah, that gave this.

6601

### Deposition of Demetra Ashley

11:16:19 1 **Q**    On Page 10 of your presentation marked as Exhibit 1,

11:16:25 2 you wrote, "Most frequent method of obtaining pharmaceutical

11:16:29 3 controlled substance for non-medical use, friends and

11:16:33 4 family...for free," correct?

11:16:35 5 **A**    Yes.

11:16:36 6 **Q**    Would you agree with me that those prescriptions that

11:16:40 7 people may obtain from their friends or their family, those

11:16:43 8 prescriptions may have been legitimately written?

11:16:46 9 **A**    Yes.

11:16:48 10 **Q**    Would you agree with me that those prescriptions may

11:16:52 11 have been legitimately filled by a pharmacist?

11:16:54 12 **A**    Yes.

11:16:54 13 **Q**    Does the DEA, in your understanding, register every

11:16:58 14 pharmacy that dispenses controlled substances to patients?

11:17:04 15 **A**    Yes.

11:17:06 16         MS. SWIFT:  This will be Exhibit 8 to

11:17:08 17 Ms. Ashley's deposition.

11:17:10 18 BY MS. SWIFT:

11:17:10 19 **Q**    Ms. Ashley, do you see that this is the DEA's

11:17:13 20 Pharmacist's Manual that I marked as Exhibit 8?

11:17:15 21 **A**    Yes.

11:17:17 22 **Q**    Is the DEA's Pharmacist's Manual, is that, in your

11:17:23 23 experience, is that published guidance from DEA for

11:17:27 24 pharmacists on the Controlled Substances Act?

11:17:32 25 **A**    Yes.

**Deposition of Demetra Ashley**

11:17:34  1    **Q**    Do you see the heading "Renewal of Pharmacy

11:17:37  2    Registration" on Page 14?

11:17:39  3    **A**    Yes.

11:17:41  4    **Q**    It says, "A pharmacy registration must be renewed

11:17:44  5    every three years" --

11:17:46  6    **A**    Three years, okay.  Yes.

11:17:47  7    **Q**    Was that -- was the same true when you were at the

11:17:51  8    DEA?

11:17:52  9    **A**    Yes.

11:17:55  10   **Q**    Now, if you'll look at Page 18 of the Pharmacist's

11:18:04  11   Manual, do you see the heading, "Denial of Registration in

11:18:08  12   the Public Interest"?

11:18:09  13   **A**    Yes.

11:18:10  14   **Q**    Is it correct that DEA can deny a pharmacy a

11:18:15  15   registration if it -- if DEA deems that to be in the public

11:18:20  16   interest?

11:18:20  17   **A**    Yes.

11:18:23  18   **Q**    Was that also true when you were at the DEA?

11:18:25  19   **A**    Yes.

11:18:27  20   **Q**    Does DEA also have the authority to suspended or

11:18:32  21   revoke a pharmacy's DEA registration?

11:18:35  22   **A**    Yes.

11:18:37  23   **Q**    Does the DEA have the authority to inspect each

11:18:41  24   pharmacy that it registers in person and review its records?

11:18:46  25   **A**    Yes, they have the authority to do that.

**Deposition of Demetra Ashley**

11:18:49  1  **Q**    Does DEA have access to data regarding the pharmacy's

11:18:52  2  purchases and sales of controlled substances?

11:18:56  3  **A**    Yes.

11:18:57  4  **Q**    Ms. Ashley, based on your experience at DEA, does DEA

11:19:01  5  use the types of data that you just testified about, ARCOS

11:19:06  6  shipping data, state prescription monitoring data, to

11:19:09  7  investigate pharmacies?

11:19:11  8  **A**    Yes.

11:19:12  9  **Q**    Does DEA use that type of data to investigate doctors?

11:19:17 10  **A**    Yes.

11:19:18 11  **Q**    Does DEA use that type of data to investigate

11:19:20 12  individual patients?

11:19:23 13  **A**    I -- well, some of it, yes.  Not ARCOS, I don't think,

11:19:30 14  no, but PDMP, yes.

11:19:34 15  **Q**    Does DEA use that type of data to help ensure that

11:19:40 16  pharmacies are following the law?

11:19:42 17  **A**    Yes.

11:19:43 18  **Q**    DEA's regulation on the filling of controlled

11:19:50 19  substance prescriptions by pharmacists is called the

11:19:55 20  Corresponding Responsibility Regulation; is that right?

11:19:58 21  **A**    Yes.

11:20:00 22  **Q**    If you'll take a look in the Pharmacist's Manual,

11:20:05 23  which is Exhibit 8, at Page 42.

11:20:13 24    Do you see that the Corresponding Responsibility

11:20:16 25  Regulation is described there?

**Deposition of Demetra Ashley**

11:20:17 1    **A**    Yes.

11:20:17 2    **Q**    That regulation is 21 CFR 1306.04(a), correct?

11:20:24 3    **A**    Yes.

11:20:26 4    **Q**    The Corresponding Responsibility Regulation says that,

11:20:31 5    "A pharmacist has a corresponding responsibility for the

11:20:33 6    proper dispensing of controlled substances," correct?

11:20:37 7    **A**    Yes.

11:20:38 8    **Q**    That was true the entire time you were at the DEA as

11:20:42 9    well; right?

11:20:43 10   **A**    Correct.

11:20:45 11   **Q**    And the next paragraph of the Pharmacist's Manual, at

11:20:50 12   Page 42, DEA's guidance, is that, "A pharmacist is required

11:20:55 13   to exercise sound professional judgment and to adhere to

11:20:59 14   professional standards when making a determination about the

11:21:02 15   legitimacy of a controlled substance prescription," correct?

11:21:07 16   **A**    Correct.

11:21:08 17   **Q**    Do you agree with that, based on your experience at

11:21:11 18   DEA?

11:21:12 19   **A**    Yes, I agree with that.

11:21:14 20   **Q**    Would you agree that there are many ways a pharmacist

11:21:17 21   might satisfy herself that a prescription for a controlled

11:21:20 22   substance is legitimate?

11:21:22 23   **A**    Yes.

11:21:23 24   **Q**    For example, a pharmacist might talk to the patient

11:21:26 25   about a drug combination to make sure the patient

**Deposition of Demetra Ashley**

11:21:30 1  understands the potential side effects.  That's one way she

11:21:33 2  might resolve the red flag?

11:21:34 3  **A**     That's one way, yes.

11:21:36 4  **Q**     A pharmacist might also call the doctor to get a

11:21:38 5  better understanding of the prescription.

11:21:40 6          Would you agree with that?

11:21:41 7  **A**     I agree.

11:21:42 8  **Q**     The pharmacist might check the State Prescription Drug

11:21:45 9  Monitoring Program to see if the patient has been filling

11:21:48 10  similar prescriptions at other pharmacies.

11:21:49 11          Would you agree with that?

11:21:50 12  **A**     I agree.

11:21:51 13  **Q**     Would you agree that checking the State Prescription

11:21:55 14  Drug Monitoring Program may be required depending on state

11:21:58 15  law?

11:21:58 16  **A**     I agree.

11:21:59 17  **Q**     Would you agree with me that the pharmacist might

11:22:03 18  document what she did, particularly if she thinks there is a

11:22:07 19  red flag on a prescription?

11:22:09 20  **A**     I agree.

11:22:11 21  **Q**     Would you agree with me that there is no DEA

11:22:14 22  requirement that the pharmacist document the steps she takes

11:22:16 23  to resolve a red flag before filling a prescription?

11:22:24 24  **A**     A federal requirement, no, I don't think there is.

11:22:26 25  That they document it, that's what you're asking me?

### Deposition of Demetra Ashley

11:22:29  1   **Q**     Yes, that's what I asked you.

11:22:30  2   **A**     Yeah.

11:22:33  3   **Q**     There is no federal requirement to document the

11:22:35  4   resolution of red flags, is that what you said?

11:22:37  5   **A**     To document the resolution, not that I can recall, no.

11:22:41  6   **Q**     The pharmacist might look at a prescription for an

11:22:46  7   unusual quantity or combination of drugs and determine,

11:22:50  8   based on her knowledge of that patient, that the

11:22:53  9   prescription presents no issues.

11:22:54  10          Would you agree with that?

11:22:56  11  **A**     Based on her knowledge of that patient?

11:22:59  12  **Q**     Yes.

11:23:00  13  **A**     That they may decide to fill the prescription?  Yeah,

11:23:05  14  that's possible.  Yes.

11:23:06  15  **Q**     The pharmacist might determine that there is not a red

11:23:10  16  flag on that prescription based on her knowledge of the

11:23:11  17  patient, the doctor, or other circumstances.

11:23:14  18          Would you agree with that?

11:23:15  19  **A**     I agree.

11:23:16  20  **Q**     In the pharmacist's professional judgment, she might

11:23:21  21  determine that the prescription is legitimate and

11:23:25  22  appropriately fill it, even if it is for a large quantity of

11:23:29  23  opioids.

11:23:29  24          Would you agree with that?

11:23:31  25  **A**     Based on other knowledge?

## Deposition of Demetra Ashley

11:23:35 1     **Q**     Yes.

11:23:36 2     **A**     Yes, I do agree with that.

11:23:37 3     **Q**     The pharmacist might, in her professional judgment,

11:23:40 4     determine that a prescription is legitimate and

11:23:43 5     appropriately fill it even if it is for an unusual

11:23:46 6     combination of drugs.

11:23:47 7          Would you agree with that?

11:23:50 8     **A**     Yes.

11:23:51 9     **Q**     The pharmacist, in her professional judgment, might

11:23:54 10    determine that a prescription is legitimate and

11:23:58 11    appropriately fill it even if the patient traveled a long

11:24:02 12    distance to visit the doctor or the pharmacy?

11:24:08 13    **A**     Well, yeah, I guess there would be additional

11:24:13 14    information.  I mean, it would have to be additional

11:24:16 15    information, but sure, they may.

11:24:18 16    **Q**     The same is true even if the patient paid in cash; the

11:24:23 17    pharmacist might determine, in her professional judgment,

11:24:24 18    based on her knowledge, that that prescription is legitimate

11:24:27 19    and appropriately fill that prescription?

11:24:29 20    **A**     There are circumstances that would make that true,

11:24:32 21    yes.

11:24:32 22    **Q**     There may be any number of good reasons to fill a

11:24:35 23    prescription that was paid in cash.

11:24:36 24          Would you agree with that?

11:24:38 25    **A**     Yes.

6608

**Deposition of Demetra Ashley**

11:24:40  1    **Q**      If a prescription bears red flags, it does not

11:24:44  2    necessarily mean that it lacks a legitimate medical purpose.

11:24:47  3          Would you agree with that?

11:24:48  4    **A**      I agree with that.

11:24:49  5    **Q**      If a prescription bears a red flag, it does not

11:24:52  6    necessarily mean that a patient does not need that

11:24:55  7    medication to treat her condition.

11:24:56  8          Would you agree with that?

11:24:58  9    **A**      I agree with that.

11:24:59  10   **Q**      If a prescription bears red flags, it does not

11:25:02  11   necessarily mean that it will lead to diversion.

11:25:04  12         Would you agree with that?

11:25:06  13   **A**      I agree with that.

11:25:08  14   **Q**      The DEA does not have a requirement that a pharmacy

11:25:11  15   conduct a computer data analysis on its prescription records

11:25:16  16   before a pharmacist fills a prescription?

11:25:19  17   **A**      No, there is no -- that I'm aware of, that I can

11:25:22  18   recall, no.

11:25:23  19   **Q**      In your experience in more than 30 years at the DEA,

11:25:27  20   can you think of any published guidance by DEA suggesting

11:25:31  21   that pharmacies conduct computer data analysis on their

11:25:34  22   prescription records?

11:25:36  23   **A**      Published guidance, not that I recall.

11:25:39  24   **Q**      Would you agree with me, Ms. Ashley, that even if a

11:25:43  25   pharmacy has a computer system doing some sort of data

**Deposition of Demetra Ashley**

11:25:46  1    analysis, the pharmacist still has to exercise her

11:25:50  2    professional judgment before filling a prescription?

11:25:54  3    **A**    Yes, I agree with that.

11:25:55  4    **Q**    Based on your experience at DEA, is it true that State

11:26:00  5    Boards of Pharmacy are charged with investigating pharmacies

11:26:05  6    that don't follow the law?

11:26:06  7    **A**    Yes, I agree with that.

11:26:08  8    **Q**    Is it your understanding that State Boards of Pharmacy

11:26:10  9    are also law enforcement agencies?

11:26:14 10    **A**    I don't know that always.

11:26:16 11    **Q**    Do you know that that's sometimes the case, as in

11:26:19 12    Ohio?

11:26:19 13    **A**    Yes, I think it's sometimes the case, yes.

11:26:23 14    **Q**    Do you understand that State Board of Pharmacies do

11:26:25 15    revoke licenses when pharmacies violate the law?

11:26:29 16    **A**    Yes.

11:26:33 17    **Q**    Do you agree, Ms. Ashley, that internet pharmacies

11:26:35 18    were a significant problem for a period of time?

11:26:39 19    **A**    Yes, I agree with that.

11:26:41 20    **Q**    When it comes to the corresponding responsibility

11:26:46 21    obligation, would you agree with me, based on your

11:26:52 22    experience at DEA, that the law is the same for every

11:26:55 23    pharmacist, whether that pharmacist is employed by a large

11:26:57 24    chain like Walgreens or a single mom and pop pharmacy?

11:27:02 25    **A**    The law is the same, correct.

**Deposition of Demetra Ashley**

11:27:04  1    **Q**      Do the Controlled Substances Act and its regulations

11:27:08  2    require the same thing of every registered pharmacy, whether

11:27:12  3    that pharmacy is part of a big chain or stands all by

11:27:16  4    itself?

11:27:17  5    **A**      Yes.  The law is the same, yes.

11:27:20  6    **Q**      Ms. Ashley, in your time at the DEA, did DEA work with

11:27:24  7    pharmacy chains and pharmacy associations, like the National

11:27:28  8    Association of Boards of Pharmacy, to develop a consensus

11:27:33  9    around potential red flags a pharmacist might identify on a

11:27:39  10   controlled substance prescription?

11:27:40  11   **A**      Yes.

11:27:42  12                    MS. SWIFT:  This will be Exhibit 13.

11:27:46  13   BY MS. SWIFT:

11:27:46  14   **Q**      Is the document that I marked as Exhibit 13, is this a

11:27:49  15   consensus document that DEA worked on with the National

11:27:52  16   Association of Boards of Pharmacy and others on red flag

11:27:58  17   warning signs related to prescribing and dispensing

11:28:01  18   controlled substances?

11:28:03  19   **A**      Yes.

11:28:04  20   **Q**      You can -- you can see that there's a list of

11:28:06  21   stakeholders on the first page of this consensus document

11:28:10  22   that I marked as Exhibit 13.

11:28:11  23          Do you see that?

11:28:12  24   **A**      Yes.

11:28:13  25   **Q**      CVS, Walgreens, and Rite Aid are all listed among the

**Deposition of Demetra Ashley**

11:28:18  1   stakeholders on this consensus document about red flags;

11:28:25  2   correct?

11:28:25  3   **A**    Yes.

11:28:26  4   **Q**    There are also a number of organizations listed as

11:28:29  5   stakeholders on this consensus document, including the

11:28:32  6   American Medical Association.

11:28:33  7        Do you see that?

11:28:34  8   **A**    Yes.

11:28:36  9   **Q**    The National Association of Boards of Pharmacy is

11:28:38 10   listed.

11:28:38 11        Do you see that?

11:28:39 12   **A**    Yes.

11:28:40 13   **Q**    The National Association of Chain Drug Stores is

11:28:42 14   listed.

11:28:43 15        Do you see that?

11:28:45 16   **A**    Yes.

11:28:45 17   **Q**    And there are a number of other associations of

11:28:49 18   various types of healthcare providers.

11:28:52 19        Do you see that?

11:28:52 20   **A**    Yes.

11:28:55 21   **Q**    Do you agree, based on your career at DEA, that

11:29:00 22   putting together a document like this stakeholder's document

11:29:04 23   on red flag warning signs was a good thing for these

11:29:08 24   pharmacists -- pharmacies and other organizations to do?

11:29:11 25   **A**    Yes, I agree it was a good thing.

### Deposition of Demetra Ashley

11:29:13　1　**Q**　And I think you just testified that DEA worked with

11:29:17　2　these pharmacies and other organizations on this consensus

11:29:22　3　document; is that right?

11:29:22　4　**A**　That's right.

11:29:24　5　**Q**　If you take a look at the bottom of Page 2 of this

11:29:30　6　consensus document on red flags, at the very end of the last

11:29:39　7　paragraph, do you see where it says, "The consensus

11:29:44　8　document, however, is not to be construed as establishing

11:29:46　9　any standards of care" -- are you with me?

11:29:49　10　**A**　I do see it.

11:29:50　11　**Q**　"Consensus document, however, is not to be construed

11:29:53　12　as establishing any standard of care but considered as

11:29:57　13　general guidelines and as a reminder that healthcare

11:30:01　14　practitioners must comply with federal laws and regulations

11:30:03　15　and use their professional judgment when confronted with red

11:30:07　16　flag warnings and aberrant patient behaviors in regard to

11:30:13　17　controlled substance prescriptions."

11:30:15　18　　Do you agree with that statement?

11:30:17　19　**A**　Yes, I do.

11:30:18　20　**Q**　It's also consistent with what DEA put in its

11:30:22　21　Pharmacist's Manual that pharmacists must use their

11:30:25　22　professional judgment in determining what prescriptions to

11:30:28　23　fill.

11:30:28　24　　Would you agree with that?

11:30:29　25　**A**　Yes.

**Deposition of Demetra Ashley**

| | | |
|---|---|---|
| 11:30:31 | 1 | **Q**      You understand that pharmacies have sought guidance |
| 11:30:35 | 2 | from DEA from time to time on how to exercise their |
| 11:30:42 | 3 | corresponding responsibility? |
| 11:30:42 | 4 | **A**      Yes. |
| 11:30:44 | 5 |             MS. SWIFT:  This will be Exhibit 14. |
| 11:30:46 | 6 | BY MS. SWIFT: |
| 11:30:46 | 7 | **Q**      Just to orient you to what this document is, because |
| 11:30:51 | 8 | it's a couple of things, do you see that the first couple of |
| 11:30:54 | 9 | pages is a letter to DEA from the National Association of |
| 11:30:58 | 10 | Chain Drug Stores? |
| 11:31:00 | 11 | **A**      Yes. |
| 11:31:01 | 12 | **Q**      And then Pages -- starting at Page 3 and the rest of |
| 11:31:06 | 13 | the document is a response from DEA. |
| 11:31:10 | 14 |       Do you see that? |
| 11:31:10 | 15 | **A**      Yes. |
| 11:31:12 | 16 | **Q**      All right. |
| 11:31:13 | 17 |       Starting with the letter from the National Association |
| 11:31:15 | 18 | of Chain Drug Stores, do you understand that that's a |
| 11:31:21 | 19 | national organization that -- it is what it sounds like it |
| 11:31:28 | 20 | is, it's an association of large chain drug stores, like |
| 11:31:33 | 21 | Walgreens and others? |
| 11:31:34 | 22 | **A**      Yes. |
| 11:31:34 | 23 | **Q**      The National Association of Chain Drug Stores is |
| 11:31:38 | 24 | writing to DEA in July of 2019. |
| 11:31:40 | 25 |       Do you see that? |

**Deposition of Demetra Ashley**

11:31:41  1    **A**    Yes.

11:31:41  2    **Q**    And feel free to take your time to look at it if you

11:31:45  3    need to, but my first question is whether you agree with me

11:31:48  4    that in the second and third paragraph of this letter, the

11:31:52  5    Chain Drug Stores Group is asking for DEA's views on whether

11:31:57  6    there are legitimate medical reasons to prescribe so-called

11:32:02  7    trinity prescriptions, meaning a combination of an opioid, a

11:32:07  8    benzodiazapine, and a muscle relaxer.

11:32:11  9           Do you see that?

11:32:12  10   **A**    Oh, yeah, I do.  I see it.

11:32:14  11   **Q**    Would you agree with me that that's also known as a

11:32:18  12   cocktail prescription?

11:32:19  13   **A**    Yes, I agree.

11:32:22  14   **Q**    Then on the next page of the letter from the Chain

11:32:25  15   Drug Stores Group, the writer says, "To clear any confusion,

11:32:34  16   we ask that you provide guidance in writing."

11:32:37  17          Do you see that?

11:32:38  18   **A**    Yes.

11:32:39  19   **Q**    Okay.

11:32:42  20          And DEA's response follows that letter from the Chain

11:32:45  21   Drug Stores Group?

11:32:46  22          Do you see that?

11:32:47  23   **A**    Yes.

11:32:47  24   **Q**    The response is from November of 2019?

11:32:49  25   **A**    Yes.

**Deposition of Demetra Ashley**

11:32:53 1  **Q**      The -- at the very bottom of the third paragraph --

11:32:56 2  and please feel free to take your time to look at whatever

11:32:59 3  you want to -- but do you see at the bottom of the third

11:33:02 4  paragraph DEA responds to the Chain Drug Stores Group that,

11:33:07 5  "The DEA lacks the authority to issue guidelines that

11:33:11 6  constitute advice relating to the general practice of

11:33:14 7  medicine"?

11:33:16 8  **A**      Yes.

11:33:16 9  **Q**      Do you agree with that statement, based on your

11:33:19 10  experience at DEA?

11:33:20 11  **A**      I agree with that statement.

11:33:23 12  **Q**      The next paragraph, second sentence, DEA says to the

11:33:29 13  National Chain Drug Stores Group, "Federal law and DEA

11:33:33 14  regulations do not impose a specific quantitative minimum or

11:33:40 15  maximum limit on the amount of medication that may be

11:33:44 16  prescribed on a single prescription, or the duration of

11:33:48 17  treatment intended with the prescribed controlled

11:33:52 18  substance."

11:33:52 19       Do you see that?

11:33:53 20  **A**      Yes.

11:33:53 21  **Q**      Do you agree with that -- those statements?

11:33:56 22  **A**      I do.

11:33:59 23  **Q**      Do you agree that federal law and DEA regulations do

11:34:02 24  not impose a limit on the duration of treatment for a

11:34:06 25  prescribed controlled substance?

**Deposition of Demetra Ashley**

11:34:08  1   **A**    I agree with that, yes.

11:34:10  2   **Q**    And federal law and DEA regulations also do not impose

11:34:15  3   any maximum limit on the amount of medication that may be

11:34:18  4   prescribed on a single prescription.

11:34:20  5        You agree with that as well?

11:34:21  6   **A**    I agree with that, yes.

11:34:23  7   **Q**    Then the DEA attaches to its letter a Federal Register

11:34:28  8   notice from 2006 on dispensing controlled substances for the

11:34:32  9   treatment of pain.

11:34:33  10        Do you see that?

11:34:34  11  **A**    Yes.

11:34:35  12  **Q**    It's very hard to read in every copy that I could find

11:34:39  13  attached to the letter.  And, so, I have a better copy of

11:34:45  14  it.  I'm going with LL of your box.  This will be

11:34:52  15  Exhibit 15.

11:34:54  16        Do you have it in front of you, Ms. Ashley?

11:34:56  17  **A**    Yes.

11:34:57  18  **Q**    Okay.

11:35:00  19        Again, it's a Federal Register notice from

11:35:03  20  September 6th, 2006.  It says, "Department of Justice,

11:35:08  21  DEA -- or Drug Enforcement Administration, 21 CFR Part 1306,

11:35:13  22  dispensing controlled substances for the treatment of pain"?

11:35:15  23        Did I get all that correctly?

11:35:17  24  **A**    Yes.

11:35:18  25  **Q**    Okay.

**Deposition of Demetra Ashley**

11:35:19 1        Now, I'd like you to look at Page 3, which has at the

11:35:30 2    top of it, 52717.

11:35:33 3        Do you see that?

11:35:35 4   **A**    Page 3, the 52718?

11:35:39 5   **Q**    It's 52717 is what I'm going for.

11:35:43 6   **A**    Oh, okay.  Yes.

11:35:45 7   **Q**    Do you see at the heading at the bottom of the second

11:35:48 8   column that reads, "The Meaning of the Legitimate Medical

11:35:50 9   Purpose Requirement"?

11:35:52 10  **A**    Yes.

11:35:54 11  **Q**    Then if you carry that over to the third column, do

11:35:58 12  you see where DEA says, "Federal courts have long recognized

11:36:02 13  that it is not possible to expand on the phrase 'legitimate

11:36:06 14  medical purpose' in the usual course of professional

11:36:10 15  practice in a way that will provide definitive guidelines"?

11:36:14 16  **A**    Yes, I see that.

11:36:15 17  **Q**    Do you agree with that statement, based on your more

11:36:18 18  than 30 years at DEA?

11:36:19 19  **A**    I agree with that statement.

11:36:21 20  **Q**    DEA goes on to say, "There are no specific

11:36:25 21  guidelines."

11:36:26 22        Do you see that in the next paragraph?

11:36:28 23  **A**    I do.

11:36:29 24  **Q**    Do you agree with that statement?

11:36:31 25  **A**    I do.

**Deposition of Demetra Ashley**

11:36:32  1   **Q**    Then if you'll turn to the next page.  This one is the

11:36:43  2   page having 52718, and there's a heading, "Comments

11:36:47  3   Regarding the Use of Opioids."

11:36:48  4        Do you see that?

11:36:49  5   **A**    Yes.

11:36:50  6   **Q**    Under that heading it says that, "DEA recognizes that

11:36:56  7   physicians who specialize in the treatment of pain believe

11:36:58  8   the undertreatment of pain is of paramount concern and a

11:37:02  9   serious public health problem."

11:37:03 10        Do you see that?

11:37:04 11   **A**    Yes.  Yes.  Yes.  I see it.

11:37:07 12   **Q**    Okay.  Do you agree with that statement?

11:37:14 13   **A**    Yes.

11:37:17 14   **Q**    And still in that first column -- oh, sorry, on

11:37:22 15   Page 5.  So now I believe we should be on 52719.

11:37:29 16        In the middle of that first column do you see the

11:37:32 17   first paragraph that says, "First, one cannot provide"?

11:37:35 18   **A**    Yes.

11:37:37 19   **Q**    It says -- and this is DEA's statement -- "One cannot

11:37:41 20   provide an exhaustive and foolproof list of do's and don'ts

11:37:49 21   when it comes to prescribing controlled substances for pain

11:37:52 22   or any other medical purpose."

11:37:53 23        Do you agree with that statement?

11:37:55 24   **A**    Yes, I do.

11:37:58 25   **Q**    It goes on to say that, "Each patient's medical

6619

**Deposition of Demetra Ashley**

11:38:01 1    situation is unique and must be evaluated based on the

11:38:03 2    entirety of the circumstances."

11:38:04 3         Do you agree with that as well?

11:38:05 4    **A**    Yes, I do.

11:38:06 5    **Q**    Then on the third column of that same page, the first

11:38:11 6    full paragraph on the page where it says, "DEA recognizes."

11:38:15 7         Do you see that?

11:38:16 8    **A**    Yes.

11:38:16 9    **Q**    It says, "DEA recognizes that the overwhelming

11:38:20 10   majority of American physicians who prescribe controlled

11:38:23 11   substances do so for legitimate medical purposes.  In fact,

11:38:27 12   the overwhelming majority of physicians who prescribe

11:38:30 13   controlled substances do so in a legitimate manner and will

11:38:35 14   never warrant scrutiny by federal or state law enforcement

11:38:38 15   officials."

11:38:38 16        Do you agree with that statement?

11:38:39 17   **A**    Yes, I agree with that statement.

11:38:42 18   **Q**    In response to questions from doctors, this is the DEA

11:38:50 19   saying, we're not going to tell doctors what kind of

11:38:55 20   prescriptions they can and cannot write.

11:38:57 21        Would you agree with that?

11:38:58 22   **A**    Yes.

11:38:59 23   **Q**    In response to questions from pharmacies, the DEA also

11:39:03 24   said we're not going to tell pharmacists what prescriptions

11:39:07 25   they can and can't fill.

### Deposition of Demetra Ashley

11:39:09 1       Would you agree with that?

11:39:11 2  **A**    Can you repeat that?  Drug Enforcement Administration

11:39:13 3  is not going to tell...

11:39:17 4  **Q**    Pharmacists what prescriptions they can and can't

11:39:19 5  fill.

11:39:19 6  **A**    That's correct.  I mean, I should say I agree.

11:39:22 7  **Q**    Ms. Ashley, has the DEA ever imposed limits on the

11:39:26 8  amount of prescription opioids that may be prescribed or

11:39:28 9  dispensed for a patient, in your experience?

11:39:32 10  **A**    Not that I'm aware of.

11:39:34 11  **Q**    In your experience, has Drug Enforcement

11:39:36 12  Administration ever imposed any limit on the daily dose of a

11:39:39 13  prescription opioid that may be prescribed or dispensed for

11:39:42 14  a patient?

11:39:43 15  **A**    Not in my experience.

11:39:45 16  **Q**    In your experience, has DEA ever imposed any limits on

11:39:49 17  the strength of a prescription opioid medication that may be

11:39:52 18  prescribed or dispensed for a patient?

11:39:55 19  **A**    Not in my experience.

11:39:56 20  **Q**    In your experience, has DEA ever prohibited the

11:40:00 21  prescribing or dispensing of prescription opioids in

11:40:04 22  combination with other medications?

11:40:06 23  **A**    Not in my experience.

11:40:09 24  **Q**    Would you agree with me, Ms. Ashley, that people

11:40:13 25  suffering from pain should have access to prescription

**Deposition of Demetra Ashley - Cross/Weinberger**

11:40:16 1  opioid medication if a doctor determines that that's an

11:40:19 2  appropriate treatment?

11:40:20 3  **A**    I agree with that.

11:40:23 4              MS. SWIFT:  I've marked this one as Exhibit 16

11:40:26 5  to Ms. Ashley's deposition.

11:40:29 6  BY MS. SWIFT:

11:40:30 7  **Q**    Ms. Ashley, do you recognize this letter as one that

11:40:34 8  you wrote in April of 2017?

11:40:38 9  **A**    Yes.

11:40:39 10  **Q**    You were responding to concerns from a pain patient;

11:40:47 11  is that correct?

11:40:49 12  **A**    Yes.

11:40:50 13  **Q**    Do you understand, based on your experience at the DEA

11:40:54 14  in this time frame, that pain patients were having a harder

11:40:58 15  time getting access to pain medication?

11:41:02 16  **A**    I was -- yeah, I did -- did learn that, yes.

11:41:07 17  **Q**    Pain patients like this one were writing to DEA about

11:41:13 18  their concerns about getting access to the necessary pain

11:41:16 19  medication.  Is that true?

11:41:17 20  **A**    Yes, that's true.

11:41:17 21              CROSS-EXAMINATION OF DEMETRA ASHLEY

11:41:38 22  BY MR. WEINBERGER:

11:41:38 23  **Q**    Ms. Ashley, my name is Peter Weinberger, and I'm

11:41:44 24  privileged to represent the plaintiffs.  I have an

11:41:46 25  opportunity now to ask you questions, and so I'm going to go

6622

**Deposition of Demetra Ashley - Cross/Weinberger**

11:41:55  1    right to it.

11:41:55  2         And by the way, the questions that I'm going to ask

11:41:58  3    you today, in accordance with the parameters that have been

11:42:02  4    set by the Department of Justice are about your own personal

11:42:06  5    knowledge as a long-time employee of the Drug Enforcement

11:42:10  6    Administration.

11:42:11  7         Based upon your knowledge and experience at the DEA,

11:42:17  8    is it true that these defendants, Walgreens, CVS, Walmart,

11:42:24  9    Rite Aid, and Giant Eagle, are required to, quote, provide

11:42:30  10   effective controls and procedures to guard against the theft

11:42:34  11   and diversion of controlled substances, end quote?

11:42:39  12   **A**    Yes, that's correct.

11:42:39  13   **Q**    So what I just asked you about is what's contained in

11:42:43  14   the federal regulations, which were enacted as a result of

11:42:50  15   the Controlled Substances Act.  And it says, in Section (a),

11:42:54  16   "All applicants and registrants shall provide effective

11:42:58  17   controls and procedures to guard against theft and diversion

11:43:01  18   of controlled substances."

11:43:03  19        So this is the regulation that governs this, correct,

11:43:08  20   Ms. Ashley?

11:43:09  21   **A**    Correct.

11:43:11  22   **Q**    Each of these retail pharmacies, in your experience,

11:43:17  23   should know that controlled substances, like opioid

11:43:20  24   prescriptions, can be addictive.

11:43:24  25        True?

**Deposition of Demetra Ashley - Cross/Weinberger**

11:43:25   1    **A**     Yes, I agree with that.

11:43:26   2    **Q**     They should all know that opioid prescription drugs

11:43:30   3    can often be diverted.

11:43:33   4        True?

11:43:34   5    **A**     True, yes.

11:43:35   6    **Q**     And by diverted, we mean they can be stolen within the

11:43:41   7    pharmacies, by pharmacy employees or others, or can be used

11:43:45   8    by patients or individuals in ways not consistent with a

11:43:48   9    legitimate medical use.

11:43:49 10        True?

11:43:51 11    **A**     Yes.

11:43:51 12    **Q**     And if these five retail pharmacy companies have been

11:43:58 13    registrants for 30 years or more, they should have been well

11:44:05 14    aware of these risks associated with opioid prescription

11:44:11 15    medications for that entire period of time.

11:44:14 16        True? Do you agree with that?

11:44:17 17    **A**     Yes, I agree with that.

11:44:18 18    **Q**     And, frankly, that's why the Controlled Substances Act

11:44:21 19    was enacted. It was -- its purpose was to set up a closed

11:44:27 20    system where drug companies, including the defendant

11:44:35 21    pharmacies, were required to follow the rules to minimize

11:44:37 22    the risk of misuse and diversion of drugs, like opioid

11:44:40 23    prescriptions; correct?

11:44:42 24    **A**     Correct.

11:44:43 25    **Q**     Addiction, misuse, and diversion of opioid

6624

**Deposition of Demetra Ashley - Cross/Weinberger**

11:44:47  1    prescriptions pose a significant risk to the health and

11:44:55  2    safety of our communities across the nation.

11:44:57  3         Do you agree with that?

11:44:57  4    **A**    I agree with that.

11:44:58  5    **Q**    Diversion of opioid prescriptions is a danger to the

11:45:02  6    health and welfare of our cities and counties across the

11:45:05  7    country.

11:45:06  8         Do you agree with that?

11:45:07  9    **A**    I agree with that.

11:45:08  10   **Q**    So with respect to your personal knowledge over all

11:45:12  11   the years that you worked at the DEA, would you agree that

11:45:15  12   the DEA helps the defendants know the law and regulations

11:45:19  13   associated with dispensing opioid products?

11:45:24  14   **A**    Yes, I agree.

11:45:26  15   **Q**    The DEA sends out advisory letters.  True?

11:45:30  16   **A**    Yes, true.

11:45:31  17   **Q**    The DEA holds meetings with these defendant companies

11:45:35  18   from time to time to explain issues associated with

11:45:38  19   regulations about dispensing.  True?

11:45:42  20   **A**    Yes, it's true.

11:45:43  21   **Q**    The DEA publishes, in the Federal Register, the

11:45:49  22   results of enforcement actions brought against companies

11:45:51  23   that violate the dispensing regulations of the DEA -- of the

11:45:59  24   Controlled Substances Act?

11:46:00  25   **A**    Yes, that's true.

**Deposition of Demetra Ashley - Cross/Weinberger**

11:46:02  1    **Q**      With respect to dispensing enforcement actions that

11:46:05  2    have been brought against CVS and Walgreens and Walmart and

11:46:11  3    Rite Aid, isn't it true that the DEA publishes

11:46:18  4    adjudications, information about those enforcement actions?

11:46:22  5    **A**      In my personal recollection, yes.

11:46:23  6    **Q**      Well, as part of their obligation under a 1301.71 to

11:46:41  7    provide effective controls to guard against theft and

11:46:44  8    diversion, would you agree that these defendant pharmacies

11:46:46  9    corporately have an obligation to develop policies to train

11:46:49 10    pharmacists to comply with the regulations?

11:46:52 11    **A**      Yeah, I agree -- as part of that process, yes.

11:46:56 12    **Q**      Would you agree that the defendants are required to

11:46:58 13    develop and implement systems to provide the necessary tools

11:47:02 14    for their pharmacists to comply with the CSA regulations?

11:47:06 15    **A**      Yes.

11:47:08 16    **Q**      Would you agree that the defendants' pharmacist

11:47:14 17    training and the tools that they provide must be designed to

11:47:20 18    provide effective controls and procedures to prevent the

11:47:24 19    theft and diversion of opioids?

11:47:26 20    **A**      Yeah, I believe that's an obligation.

11:47:29 21    **Q**      Because if the training and the tools used by the

11:47:34 22    defendant corporations are not adequate, we run the risk of

11:47:41 23    opioid pills getting into the wrong hands and leading to

11:47:45 24    diversion; correct?

11:47:46 25    **A**      That's correct.

**Deposition of Demetra Ashley - Cross/Weinberger**

11:47:47  1  **Q**     And I think we've already -- I think you already agree

11:47:51  2  with me that diversion is dangerous to the health and safety

11:47:54  3  of our neighborhoods; correct?

11:47:56  4  **A**     That's correct.

11:47:56  5  **Q**     And diversion burdens our court systems, our law

11:47:59  6  enforcement community, and the social fabric of our

11:48:02  7  communities.  Agreed?

11:48:05  8       Do you agree with that?

11:48:06  9  **A**     Yes, I agree.

11:48:07  10  **Q**     And is it fair to say that this opioid epidemic, from

11:48:09  11  your knowledge at the DEA, had been going on since early

11:48:16  12  2000s.

11:48:17  13       The answer is yes; right?

11:48:19  14  **A**     It's fair to say that, yes.

11:48:21  15  **Q**     Yes.

11:48:22  16       And is it fair to say that any registrant, including

11:48:25  17  these five defendants, from your experience, knew or should

11:48:28  18  have known of the raging epidemic in opioid prescription

11:48:33  19  pills from the early 2000s on?

11:48:37  20  **A**     I believe they knew or should have known.

11:48:39  21  **Q**     And as registrants and dispensers of prescription

11:48:49  22  opioid medications, shouldn't the conduct of these

11:48:52  23  pharmacies have been -- shouldn't they have taken into

11:48:59  24  effect the fact that there was an ongoing epidemic of

11:49:05  25  prescription opioid pills in this country?

**Deposition of Demetra Ashley - Cross/Weinberger**

11:49:06  1    **A**    That would be my expectation, yes.

11:49:09  2    **Q**    And because of the danger and risk of prescription

11:49:12  3    opioid pills and the -- and its effect on the epidemic,

11:49:19  4    would you agree that these pharmacy companies should have

11:49:23  5    been extremely vigilant in ensuring that their employees

11:49:28  6    complied with the Controlled Substances Act?

11:49:30  7    **A**    I believe they should have been vigilant, yes.

11:49:33  8    **Q**    You're aware of the CSA regulation that requires the

11:49:41  9    defendants to store their dispensing data in their own

11:49:50  10   systems?

11:49:51  11   **A**    Yes.

11:49:52  12   **Q**    Can we agree, generally -- and we'll get into the red

11:49:57  13   flag systems a little bit later -- but can we agree,

11:50:01  14   generally, that many of the red flags associated with either

11:50:05  15   a prescriber profile or a patient profile company use data

11:50:11  16   to identify potential red flags?

11:50:14  17   **A**    Yes.

11:50:15  18   **Q**    And in terms of the pharmacy company's obligation to

11:50:24  19   establish appropriate controls to guard against diversion,

11:50:29  20   it would be reasonable to expect the pharmacies to access

11:50:34  21   their own databases to look for red flags; right?

11:50:39  22   **A**    That is reasonable, yes.

11:50:40  23   **Q**    And, particularly, if a pharmacy company is being

11:50:45  24   vigilant in the face of a raging prescriptions opioid pill

11:50:49  25   epidemic, access to that database of information would be

**Deposition of Demetra Ashley - Cross/Weinberger**

11:50:56  1    important; correct?

11:50:58  2    **A**    I agree it would be important, yes.

11:51:00  3    **Q**    Is it your understanding, based upon your years of

11:51:03  4    experience, that a pharmacy and its pharmacists have a

11:51:07  5    corresponding responsibility, in addition to the

11:51:12  6    prescriber's responsibility, to fill only opioid

11:51:15  7    prescriptions that are issued for a legitimate medical

11:51:17  8    purpose?

11:51:18  9    **A**    That is my understanding.

11:51:20  10   **Q**    The corresponding responsibility has been described by

11:51:23  11   the Drug Enforcement Agency, in your experience, as quote,

11:51:31  12   "the last line of defense to preventing opioid abuse and

11:51:34  13   diversion."

11:51:36  14        True?

11:51:36  15   **A**    That's true.

11:51:36  16   **Q**    And by last line of defense, that means -- what is

11:51:40  17   meant is it's the very last opportunity before the opioid

11:51:46  18   prescription pills gets into the hands of the patient or

11:51:50  19   gets on to the streets for the system to ensure that the

11:51:55  20   prescription is properly dispensed under the laws; correct?

11:52:00  21   **A**    It's my personal understanding that that is the last

11:52:03  22   decision-making before it's turned over to the end user,

11:52:10  23   correct.

11:52:10  24   **Q**    Also known as the last line of defense; correct?

11:52:15  25   **A**    Last line of defense.

### Deposition of Demetra Ashley - Cross/Weinberger

11:52:16  1    **Q**    So Exhibit 1 is what Ms. Swift showed you.  It's this

11:52:19  2    PowerPoint that -- where you were a presenter, apparently,

11:52:23  3    in 2016.  And I want to go over just a couple of pages of

11:52:28  4    it.

11:52:28  5         And you've entitled this "DEA and Pharmacy:  Working

11:52:32  6    Together to Prevent Prescription Drug Abuse."

11:52:37  7         Can we -- can we agree, based on your experience over

11:52:40  8    your many years at the DEA, that, you know, part of the

11:52:44  9    job -- of your job was to communicate with DEA's -- I'm

11:52:48 10    sorry, with pharmacy corporations, like these defendants,

11:52:51 11    and to cooperate with them and provide them, where

11:52:55 12    appropriate, proper guidance.

11:52:58 13         True?

11:52:59 14    **A**    Yes, that's true.

11:53:06 15    **Q**    And that's something that you strove do?

11:53:08 16    **A**    Yes, I is did.

11:53:10 17    **Q**    I'm interested in the use of the terminology "red

11:53:14 18    flag," based upon your experience, you know, as a layperson

11:53:17 19    not in this field.

11:53:19 20         I'm just interested, from your personal understanding,

11:53:22 21    does red flag mean stop and investigate?  Is that what using

11:53:26 22    that terminology means?

11:53:30 23    **A**    It means stop, pay attention, warning, yes.

11:53:33 24    **Q**    Let's look at -- are you familiar, as a DEA employee,

11:53:43 25    of "blue highway," the prescription of the "blue highway"?

### Deposition of Demetra Ashley - Cross/Weinberger

11:53:48  1    **A**     The term is familiar.  I see that, yes.

11:53:52  2    **Q**     And from your knowledge, Ms. Ashley, at the DEA, was

11:54:04  3    the DEA aware of the factor that patients were coming from

11:54:13  4    Ohio, Kentucky, Tennessee, Georgia, going down to Florida,

11:54:18  5    and getting prescriptions filled and then taking them back

11:54:22  6    to these other states?

11:54:24  7    **A**     I did not know independent of DEA, of my role --

11:54:29  8    **Q**     You became --

11:54:30  9    **A**     -- at DEA.

11:54:31  10   **Q**     You became generally aware of that in your position at

11:54:36  11   DEA, correct?

11:54:36  12   **A**     I became aware of it in my role at DEA, yes.

11:54:38  13   **Q**     And did you become aware, as part of your personal

11:54:43  14   experience at the DEA, that some of this pill migration or

11:54:50  15   traveling was from pill mills that were being dispensed at

11:54:56  16   the Walgreens and CVS Pharmacy facilities in Florida?

11:55:00  17   **A**     I recall that, yes.

11:55:02  18   **Q**     And some of the conduct at those CVS and Walgreens

11:55:06  19   stores were investigated, and the subject of enforcement

11:55:12  20   actions brought against those companies by the DEA.

11:55:15  21       Without going into details, isn't that true?

11:55:18  22   **A**     I am aware of that, yes.

11:55:19  23   **Q**     If you would pull out P-OD-WAG-00248.

11:55:32  24       This is a Settlement Agreement between the federal

11:55:36  25   government and CVS from 2015.  And I just want to -- first

**Deposition of Demetra Ashley - Cross/Weinberger**

11:55:49 1    of all, are you familiar with this Settlement Agreement, the

11:55:51 2    document itself?

11:55:53 3    **A**    I'm familiar with the Settlement Agreement with CVS.

11:55:57 4    **Q**    And if you go back to Page 2, Paragraph G, it says,

11:56:07 5    CVS -- and this is the corporation, CVS; right?

11:56:11 6    **A**    Yes.

11:56:12 7    **Q**    Not some individual pharmacist; right?

11:56:14 8    **A**    Correct.

11:56:15 9    **Q**    Does the agreement say that, that CVS is acknowledging

11:56:19 10   it has a corresponding responsibility?

11:56:21 11   **A**    Yes.

11:56:22 12   **Q**    Now, let's move to Walgreens for a moment, Ms. Swift's

11:56:29 13   client.

11:56:29 14        This is the press release from the Department of

11:56:39 15   Justice.

11:56:39 16        And were you generally familiar, as the -- and

11:56:43 17   personally knowledgeable about the -- this -- the settlement

11:56:47 18   of this enforcement action with Walgreens?

11:56:49 19   **A**    Yes, personally knowledgeable, yes.

11:56:51 20   **Q**    Well, did you -- do you know from your own personal

11:56:54 21   knowledge that the Department of Justice, in this press

11:56:59 22   release, had the ability -- or had allowed people who were

11:57:06 23   reading it the ability to link to the Walgreens memorandum

11:57:13 24   of agreement?

11:57:15 25        Well, certainly that's what it says on the document,

**Deposition of Demetra Ashley - Cross/Weinberger**

11:57:17  1    right?  That there's a link to it; right?  And it's in a pdf

11:57:23  2    form; right?

11:57:24  3    **A**    That's what it says, yes.

11:57:25  4    **Q**    Ms. Ashley, we talked about the fact that these

11:57:30  5    pharmacy defendants have a duty to provide tools to their

11:57:43  6    pharmacists to prevent diversion, generally speaking, under

11:57:49  7    1301.71; correct?

11:57:52  8         Do you agree with that?

11:57:53  9    **A**    Yes.

11:57:53 10    **Q**    Do you believe from your experience at the DEA that

11:57:58 11    that includes pharmacies providing a work environment for

11:58:04 12    their pharmacists that allows the pharmacists to fulfill

11:58:07 13    their corresponding responsibility?

11:58:10 14    **A**    Yeah, I agree with that.

11:58:11 15    **Q**    So that would include not imposing strict and

11:58:15 16    unreasonable time limits to fill prescriptions so that they

11:58:20 17    cannot have enough time to investigate red flags?

11:58:25 18    **A**    Yeah, that sounds unreasonable.

11:58:27 19    **Q**    Not -- and it would include not requiring quotas on

11:58:31 20    prescriptions filled.

11:58:32 21         True?

11:58:33 22    **A**    Yeah, that sounds unreasonable.

11:58:38 23    **Q**    It would require adequate staffing of the pharmacy to

11:58:41 24    allow enough pharmacists at these stores to fulfill their

11:58:44 25    corresponding responsibility.

**Deposition of Demetra Ashley - Redirect/Swift**

11:58:45 1    True?

11:58:46 2 **A** Yeah, I think that's important.

11:58:48 3 **Q** Ms. Ashley, those are all the questions I have.  Thank

11:58:50 4 you.

11:58:58 5      THE COURT:  Okay.  That was timed perfectly.

11:59:02 6      MS. SWIFT:  Your Honor, there's a little bit

11:59:03 7 of redirect.

11:59:04 8      THE COURT:  Oh, okay.  I apologize.

11:59:05 9      MS. SWIFT:  Recross.

11:59:06 10      THE COURT:  Then we should conclude it.

11:59:08 11 Sorry.

11:59:09 12      MS. SWIFT:  Thank you.

11:59:12 13     REDIRECT EXAMINATION OF DEMETRA ASHLEY

11:59:12 14 BY MS. SWIFT:

11:59:12 15 **Q** All right.

11:59:14 16    Ms. Ashley, do you see on the face of Exhibit 10, the

11:59:17 17 press release from the United States Attorney's Office in

11:59:19 18 the Southern District of Florida?  It says, in the first

11:59:23 19 paragraph that, "The settlement related to six Walgreens

11:59:28 20 retail pharmacies in Florida" -- in the first paragraph?

11:59:34 21 **A** Yes, that's what it says.

11:59:35 22 **Q** Ms. Ashley, if you would, pull out Exhibit 2, which is

11:59:41 23 your PowerPoint from 2013.

11:59:46 24 **A** I have it.

11:59:50 25 **Q** All right.

**Deposition of Demetra Ashley - Redirect/Swift**

| | | |
|---|---|---|
| 11:59:51 | 1 | If you would, turn to Page 34 of your 2013 PowerPoint, |
| 11:59:57 | 2 | which is the page that -- or one of the pages the |
| 12:00:01 | 3 | plaintiffs' lawyer asked you about before. |
| 12:00:02 | 4 | Do you remember that? |
| 12:00:04 | 5 | **A** Yes. |
| 12:00:06 | 6 | **Q** Actually, just to lead up to it, let's go back to 36. |
| 12:00:09 | 7 | I apologize. Just so it will make more sense if we start |
| 12:00:13 | 8 | with 36. |
| 12:00:15 | 9 | **A** Sure. I have it. |
| 12:00:16 | 10 | **Q** It says, "Georgia Example: Traditional Pain |
| 12:00:20 | 11 | Management Clinics." |
| 12:00:21 | 12 | Do you see that? |
| 12:00:22 | 13 | **A** I do. |
| 12:00:22 | 14 | **Q** And it says, "In years prior to 2009 and 2010, there |
| 12:00:26 | 15 | were 15 to 20 legitimate clinics." |
| 12:00:29 | 16 | Do you see that? |
| 12:00:29 | 17 | **A** Yes. |
| 12:00:30 | 18 | **Q** "Almost all owned by physicians, Accept Insurance, |
| 12:00:34 | 19 | Medicaid, Medicare, et cetera; patients need payments; |
| 12:00:38 | 20 | follow pain management guidelines; patients get a complete |
| 12:00:40 | 21 | physical work-up and exam; use physical therapy, other |
| 12:00:45 | 22 | treatment methods; prescribed drugs usually include |
| 12:00:50 | 23 | non-narcotics." |
| 12:00:50 | 24 | Do you see all of that? |
| 12:00:51 | 25 | **A** Yes. |

6635

**Deposition of Demetra Ashley - Redirect/Swift**

12:00:51  1    **Q**    Then if you go back to Page 38, it says, "Now, in

12:00:59  2    2012 -- approximately 125 rogue clinics owned by

12:01:04  3    non-physicians, and the owners:  Are from another state;

12:01:08  4    many are convicted felons; usually owned or operated a pain

12:01:12  5    clinic in another state; have ties to some type of organized

12:01:17  6    crime."

12:01:18  7         And then in the last bullet, it says, "If from

12:01:22  8    Florida, left not because of the Florida PMP, but due to new

12:01:26  9    pain clinic restrictions and no dispensing"?

12:01:28  10        Did I get all that correctly?

12:01:30  11   **A**    Yes.

12:01:30  12   **Q**    And is that consistent with your understanding from

12:01:32  13   your 30-plus years at the DEA of what happened with the

12:01:36  14   expansion of rogue pain clinics in this time frame?

12:01:44  15   **A**    Yeah, in general.  Yes.

12:01:46  16   **Q**    Flip ahead to Page 47, please.

12:01:52  17        This slide has a heading that says, "Utility of the

12:01:56  18   TDS's:  Operation Pill Nation."

12:01:59  19        Do you know what the acronym TDS stands for?

12:02:02  20   **A**    Yes.

12:02:02  21   **Q**    What does it stand for?

12:02:05  22   **A**    Tactical Diversion Squad.

12:02:07  23   **Q**    So this says, "Utility of the Tactical Diversion

12:02:10  24   Squads:  Operation Pill Nation."

12:02:13  25        Explain for me, please, if you could, what the

12:02:15  1    Tactical Diversions Squads were or are?

12:02:18  2    **A**    The Tactical Diversion Squads are groups within DEA

12:02:22  3    that have diversion investigators, special agents, and local

12:02:27  4    state law enforcement officers, and they work together on

12:02:32  5    diversion matters.

12:02:33  6    **Q**    What is Operation Pill Nation?

12:02:36  7    **A**    That was the title given to the initiative for the

12:02:39  8    Florida investigations.

12:02:42  9    **Q**    It says that, "DEA was working with other federal,

12:02:45 10    state, and local partners to start identifying, targeting

12:02:49 11    and investigating rogue pain clinics," correct?

12:02:52 12    **A**    Correct.

12:02:53 13    **Q**    It goes on to say that, "11 tactical diversion squads

12:03:00 14    from across the United States provided assistance," and that

12:03:03 15    there were 340 undercover buys from more than 48 clinics and

12:03:08 16    64 doctors, correct?

12:03:10 17    **A**    Correct.

12:03:13 18    **Q**    Then if you look at the next slide, slide 48, still

12:03:17 19    talking about Operation Pill Nation, the DEA's operation in

12:03:21 20    Florida, it says that there were 21 search warrants executed

12:03:25 21    at clinics, residences, and other locations in south Florida

12:03:32 22    and 25 people arrested on various federal and state drug and

12:03:35 23    money laundering charges, of which five were medical doctors

12:03:38 24    and five were pain clinic owners.

12:03:41 25        Is that consistent with your understanding of

12:03:43 1    Operation Pill Nation?

12:03:46 2    **A**    Yes.

12:03:50 3    **Q**    Exhibit 12 is a statement from Susan Langston, the

12:03:58 4    diversion program manager at the DEA's Miami Field Division

12:04:03 5    Office, before the Controlled Substance Standards Committee

12:04:04 6    of the Florida Board of Pharmacy and the Florida Department

12:04:06 7    of Health for a public meeting concerning issues with

12:04:10 8    patients filling prescriptions for controlled substances in

12:04:13 9    August of 2015, correct?

12:04:15 10    **A**    Yes.

12:04:16 11    **Q**    In that same paragraph, she goes on to say, "At that

12:04:20 12    time, most of the narcotic pain pills prescribed by those

12:04:25 13    pain pill physicians were dispensed directly from the pain

12:04:28 14    clinics and the involvement of a separate retail pharmacy

12:04:32 15    was not necessary."

12:04:36 16         Is that true based on your experience at DEA?

12:04:39 17    **A**    Yeah.  Yes, it is.

12:04:41 18    **Q**    Ms. Langston says to the Florida Board of Pharmacy in

12:04:49 19    this statement that the shift in the Florida law, "The new

12:04:53 20    law shifted the dispensing of most narcotic painkillers to

12:04:57 21    actual pharmacies.  The shift heightened pharmacists'

12:05:02 22    responsibilities and they were suddenly faced with

12:05:04 23    circumstances many never had dealt with before."

12:05:07 24         And my only question is whether you know that to be

12:05:09 25    true.

**Deposition of Demetra Ashley - Redirect/Swift**

12:05:09  1    **A**    Yeah.  Yes, I think that the legislation did change

12:05:15  2    things, yes.

12:05:16  3    **Q**    It goes on to say in the very next paragraph, "We

12:05:18  4    recognize that the vast majority of controlled substance

12:05:21  5    prescriptions are written by highly trained and ethical

12:05:24  6    medical professionals who are treating legitimate medical

12:05:27  7    conditions."

12:05:28  8         Do you agree with that?

12:05:29  9    **A**    I agree with that.

12:05:30  10   **Q**    She goes on, "We also recognize that the vast majority

12:05:34  11   of controlled substance prescriptions written by doctors are

12:05:37  12   for legitimate medical purposes and are issued in the usual

12:05:41  13   course of professional practice.  A great deal of the time a

12:05:44  14   red flag at a pharmacy can easily be explained, and once it

12:05:48  15   is resolved, there should be no problem filling that

12:05:50  16   prescription."

12:05:50  17        Do you agree with that?

12:05:51  18   **A**    Yeah, I agree with that.

12:05:54  19   **Q**    Ms. Langston says, "On behalf of DEA, although we ask

12:05:58  20   pharmacists to be on the look-out for suspicious activities

12:06:02  21   that may indicate drug abuse and diversion, we are not

12:06:04  22   asking pharmacists to be medical doctors."

12:06:06  23        Do you agree with that?

12:06:07  24   **A**    I agree with that.

12:06:10  25   **Q**    Ms. Ashley, do you have any personal knowledge of the

**Deposition of Demetra Ashley - Redirect/Swift**

12:06:13 1    dispensing systems used by Walgreens, CVS, Walmart, Rite

12:06:19 2    Aid, or Giant Eagle pharmacies?

12:06:23 3    **A**    Do you mean their platform for prescriptions?

12:06:26 4    **Q**    Yes.

12:06:27 5    **A**    No.

12:06:28 6    **Q**    Do you have any personal knowledge about what those

12:06:30 7    pharmacies do with the dispensing data that exists in those

12:06:34 8    systems?

12:06:38 9    **A**    Generally, but no.  I mean, in general, for DEA

12:06:42 10   purposes, I do.  The storage part of it, you mean?

12:06:45 11   **Q**    Well, what general knowledge do you have about what

12:06:49 12   pharmacies do with the data in their systems?

12:06:51 13   **A**    The only general knowledge I have is that they store

12:06:53 14   it and they have it available for DEA when we need it.

12:06:56 15   **Q**    And they can provide records to DEA upon request?  Is

12:06:59 16   that what you're getting at?

12:07:01 17   **A**    Yes.

12:07:02 18   **Q**    Do you have any other personal knowledge about what

12:07:05 19   pharmacies do with the dispensing data in their systems?

12:07:11 20   **A**    I don't.

12:07:13 21   **Q**    Would you agree that most people who take prescription

12:07:16 22   opioids pursuant to a doctor's prescription never use

12:07:20 23   heroin?

12:07:22 24   **A**    Yeah, I would agree with that.

12:07:24 25   **Q**    The Corresponding Responsibility Regulation, that's

**Deposition of Demetra Ashley - Redirect/Swift**

12:07:28  1    1306.04(a), correct?

12:07:32  2    **A**    Yes.

12:07:33  3    **Q**    The regulation states that, "The responsibility for

12:07:36  4    the proper prescribing and dispensing of controlled

12:07:41  5    substances is upon the prescribing practitioner."

12:07:43  6         That's the first half of that sentence; correct?

12:07:45  7    **A**    Correct.

12:07:46  8    **Q**    It goes on to say, "But a corresponding responsibility

12:07:51  9    rests with the pharmacist who fills the prescription,"

12:07:54 10    correct?

12:07:54 11    **A**    Correct.

12:07:57 12    **Q**    Then it goes on to say, "The person knowingly filling

12:08:02 13    such a purported prescription," it says, "The person

12:08:05 14    knowingly doing that is subject to penalties" for that.

12:08:09 15         Do you agree with that?

12:08:10 16    **A**    Yes, there has to be knowledge, yes.

12:08:12 17    **Q**    Would you agree with me, Ms. Ashley, that pharmacies

12:08:15 18    generally try to work with the DEA to ensure that they have

12:08:17 19    effective controls to prevent diversion?

12:08:19 20    **A**    I agree with that.

12:08:20 21    **Q**    Would you agree with me that pharmacies generally try

12:08:22 22    to work with the DEA to ensure that they are complying with

12:08:26 23    the law?

12:08:27 24    **A**    I agree with that.

12:08:28 25    **Q**    In your experience, do pharmacies try their best to

**Deposition of Demetra Ashley - Recross/Weinberger**

12:08:33 1   prevent the diversion of prescription opioids?

12:08:36 2   **A**   In general, yes.

12:08:40 3              MS. SWIFT:  Your Honor, I think there's

12:08:42 4   something like five minutes left.  If you want to take a

12:08:45 5   break now or finish it up.

12:08:46 6              THE COURT:  Well, all right.  I guess we

12:08:48 7   should -- we should probably --

12:08:52 8              MR. WEINBERGER:  It's two and a half matters.

12:08:54 9              THE COURT:  Well, I guess -- because I've got

12:08:56 10  two criminal matters, but let's finish this up, please.

12:09:00 11              RECROSS-EXAMINATION OF DEMETRA ASHLEY

12:09:00 12  BY MR. WEINBERGER:

12:09:01 13  **Q**   Ms. Ashley, a couple of follow-up questions after

12:09:04 14  Ms. Swift's redirect.

12:09:06 15       And then, finally, you were asked by Ms. Swift to go

12:09:11 16  back to the Exhibit 10, our Exhibit 10, Plaintiffs'

12:09:21 17  Exhibit 10, which is the press release from the Department

12:09:27 18  of Justice regarding the Walgreens settlement.

12:09:32 19       And she said -- she said, "Well, isn't it true,

12:09:36 20  Ms. Ashley, that this was limited to their conduct in

12:09:38 21  Florida."  Well, you know, once again, let's take a look at

12:09:46 22  the entire document and see if what she asked you about is

12:09:50 23  actually correct.

12:09:51 24       The second -- first paragraph, the second -- the very

12:09:53 25  last sentence in the first paragraph says, "The settlement

6642

**Deposition of Demetra Ashley - Redirect/Swift**

12:09:58  1    further resolves open civil investigations in the District

12:10:01  2    of Colorado, the Eastern District of Michigan, and the

12:10:05  3    Eastern District of New York, as well as civil

12:10:08  4    investigations by DEA field offices nationwide, pursuant to

12:10:14  5    the Controlled Substances Act."

12:10:15  6         Have I read that correctly?

12:10:17  7         Well, so, I've read that correctly; correct?

12:10:20  8    **A**    Yes, you read that correctly.

12:10:20  9              REDIRECT EXAMINATION OF DEMETRA ASHLEY

12:10:21 10    BY MS. SWIFT:

12:10:21 11    **Q**    Ms. Ashley, do you see the first full paragraph on

12:10:23 12    Page 2 of Exhibit 10?

12:10:29 13    **A**    Page 2, first full paragraph.  Yes, I do.

12:10:31 14    **Q**    It says, "The Settlement Agreement covers conduct that

12:10:34 15    was the subject of DEA's administrative actions and the U.S.

12:10:40 16    Attorney's Office civil penalty investigation."

12:10:41 17         Do you see that?

12:10:42 18    **A**    I do.

12:10:43 19    **Q**    More specifically, the settlement covers allegations

12:10:46 20    against Walgreens Jupiter Distribution Center and six

12:10:50 21    Walgreens retail pharmacies; correct?

12:10:53 22    **A**    That's what it says, yes.

12:10:54 23    **Q**    Would you agree with me that DEA's efforts through

12:11:00 24    Operation Pill Mill Nation curtailed diversion by many, many

12:11:05 25    rogue pain clinics and pill mills in Florida?

12:11:10  1     **A**     I agree with that.

12:11:16  2                 THE COURT:  Okay.  Thanks for going a little

12:11:20  3     longer.  We'll recess till 1:15.

12:11:25  4          Usual admonitions.  And then we'll pick up with

12:11:30  5     another defense witness.

12:11:31  6          Have a good lunch.

12:11:32  7                    (Jury excused from courtroom.)

12:12:01  8          (Recess was taken from 12:12 p.m. till 1:22 p.m.)

        9

       10

       11

       12

       13

       14

       15

       16

       17

       18

       19

       20

       21

       22

       23

       24

       25

01:21:55  1          Monday Session, November 8, 2021, at 1:22 P.M.

01:21:55  2                    COURTROOM DEPUTY:  All rise.

01:23:19  3                 (Jury returned to courtroom.)

01:23:39  4                    THE COURT:  Okay.  Please be seated.

01:23:42  5      I apologize for the delay.  This was on me.  I had two

01:23:47  6  complicated criminal matters to take care of during the noon

01:23:50  7  hour.

01:23:50  8      So, Mr. Majoras, you may call your next witness,

01:23:52  9  please.

01:23:53  10                    MR. MAJORAS:  Thank you, Your Honor.

01:23:55  11      John Majoras for Walmart.  Good afternoon, folks.

01:23:58  12      I'd like to call to the stand Lori Militello.

01:24:22  13                    THE COURT:  Good afternoon, Ms. Militello.  If

01:24:24  14  you could just raise your right hand, please.

01:24:26  15      Do you swear or affirm that the testimony you are

01:24:28  16  about to give will be the truth, the whole truth, and

01:24:30  17  nothing but the truth under pain and penalty of perjury?

01:24:33  18                    THE WITNESS:  I do.

01:24:34  19                    THE COURT:  Thank you.

01:24:34  20      Please be seated, and you may remove your mask while

01:24:38  21  testifying, please.

01:24:38  22                    THE WITNESS:  Thank you.

01:24:41  23                    THE COURT:  You may proceed, Mr. Majoras.

01:24:45  24                    MR. MAJORAS:  Thank you, Your Honor.

25

**Militello - Direct/Majoras**

01:24:46 1     <u>DIRECT EXAMINATION OF LORI MILITELLO</u>

01:24:46 2  BY MR. MAJORAS:

01:24:46 3  **Q**    Good afternoon, Ms. Militello.

01:24:47 4  **A**    Good afternoon.

01:24:47 5  **Q**    Thank you for joining us.  Why don't you introduce

01:24:49 6  yourself to the jury, please.

01:24:50 7  **A**    My name is Lori Militello.  I am a pharmacist for

01:24:55 8  25 years and worked with Walmart 23 of those.

01:24:59 9  **Q**    When did you get out of pharmacy school?

01:25:01 10  **A**    I graduated in 1994 with my bachelor's of science in

01:25:07 11  pharmacy.

01:25:08 12  **Q**    And when you graduated, we've heard quite a bit about

01:25:12 13  pharmacy school already, but when you graduated, did you

01:25:15 14  have to do some clinical work before becoming licensed?

01:25:22 15  **A**    Yes.  We had to do internships on our own and also we

01:25:26 16  did externship rotations, and we called them clerk ship

01:25:30 17  rotations through college, through university.

01:25:33 18  **Q**    And where did you do the rotations?

01:25:35 19  **A**    The rotations themselves or -- they were at some

01:25:36 20  independent pharmacies in the Toledo area, and also I did it

01:25:41 21  at the local hospital, Fremont Memorial, where I'm from.  I

01:25:47 22  did a rotation there, and then I also did one at Toledo

01:25:51 23  hospital.

01:25:51 24  **Q**    You said you're from Fremont?

01:25:52 25  **A**    From Fremont.

**Militello - Direct/Majoras**

01:25:53  1   **Q**      That's sort of Sandusky area?

01:25:56  2   **A**      Yeah, kind of right between here and Toledo.

01:25:59  3   **Q**      Okay.  And I'm sorry.  Where did you go to school?

01:26:01  4   **A**      I went to the University of Toledo.

01:26:03  5   **Q**      And you're not the only pharmacist in your family, are

01:26:06  6   you?

01:26:06  7   **A**      I am not the only pharmacist.  My husband is a

01:26:08  8   pharmacist.  My brother is a pharmacist.  My brother-in-law,

01:26:12  9   my husband's brother, is a pharmacist also.

01:26:15 10   **Q**      Did you meet your husband in pharmacy school?

01:26:17 11   **A**      I met him in high school.

01:26:19 12   **Q**      Oh, so you both decided to go to pharmacy school?

01:26:21 13   **A**      We did, yes.

01:26:22 14   **Q**      What was your decision process?  What made you want to

01:26:24 15   become a pharmacist?

01:26:25 16   **A**      At the time, I was in high school, I was actually

01:26:28 17   going to try to be a physical therapist, and I had actually

01:26:33 18   a career day where a pharmacist came in and spoke and

01:26:37 19   between her testimony of what a great job she thought it was

01:26:41 20   and what a fabulous experience she was having, and my

01:26:45 21   husband pursuing it at the time, my boyfriend, it was

01:26:49 22   something that I just thought would be a good fit for me.

01:26:54 23   **Q**      So you both became pharmacists out of school at

01:26:59 24   Toledo?

01:27:00 25   **A**      That is correct.

**Militello - Direct/Majoras**

01:27:00  1    **Q**      And did you receive any further education beyond that?

01:27:03  2    **A**      I did not.  I got my bachelor's and then I got my

01:27:06  3    pharmacy license and started practicing.

01:27:08  4    **Q**      How about your husband?

01:27:08  5    **A**      My husband went on to get his doctorate in pharmacy,

01:27:13  6    so it was at that time, an additional two years plus a year

01:27:16  7    of residency.  And so at that time, I worked while helping

01:27:20  8    him get through the rest of his doctorate.

01:27:22  9    **Q**      Do you have any kids?

01:27:23 10    **A**      We have two sons, 23 and 21, both at Ohio State.

01:27:28 11    **Q**      My kids are older than that and I still refer to them

01:27:32 12    as kids so I hope you don't mind.

01:27:34 13    **A**      Yes.

01:27:35 14    **Q**      What are they studying at Ohio State?

01:27:36 15    **A**      My oldest is a second-year dental student and my

01:27:39 16    youngest is graduating this year in environmental

01:27:42 17    engineering.

01:27:43 18    **Q**      Where do you and your husband live today?

01:27:45 19    **A**      Today we live in Lakewood.

01:27:46 20    **Q**      Just west of here?

01:27:47 21    **A**      Just west, yes.

01:27:48 22    **Q**      And where are you currently working as a Walmart

01:27:52 23    pharmacist?

01:27:53 24    **A**      Currently, I work at the Walmart Pharmacy in Eastlake.

01:28:02 25    **Q**      So how long have you been a Walmart pharmacist?

**Militello - Direct/Majoras**

01:28:02  1     **A**     I have been a Walmart pharmacist since right around,

01:28:04  2     since 1996 is when I started, December of '96.

01:28:06  3     **Q**     I shorted you a couple years.

01:28:08  4     **A**     You did.

01:28:08  5     **Q**     My apologies.

01:28:10  6     **A**     That's okay.

01:28:11  7     **Q**     It seems like 30.

01:28:12  8     **A**     Yeah.  Exactly.  Yeah.

01:28:13  9     **Q**     Take us, if you would, through sort of the history,

01:28:18  10    not necessarily in great detail but generally within Ohio

01:28:20  11    where you've worked in Walmart stores as a pharmacist.

01:28:23  12    **A**     In Walmart stores, I started out in Lima, Ohio, which

01:28:27  13    is on the western side of the state.

01:28:29  14    While I was there, I traveled between -- I worked

01:28:33  15    generally at the Lima, Walmart but also traveled to

01:28:38  16    Van Wert, Ottawa, Celina.

01:28:41  17    While I was there, I worked in those varies areas.

01:28:43  18    When we moved to Cleveland, we had friends from pharmacy

01:28:47  19    school that were connected to the Walmart here in Eastlake.

01:28:51  20    And that is how I started working at the Eastlake store.

01:28:55  21    But in my time period up here, I've worked at several

01:29:00  22    stores, Mentor, Madison, Macedonia, Great -- Great Northern,

01:29:05  23    North Olmsted, Elyria, Cleveland, kind of Medina, all over.

01:29:14  24    **Q**     So if you were to identify a particular Walmart store

01:29:17  25    where you spent most of your time, where would that be?

**Militello - Direct/Majoras**

01:29:19  1    **A**      It would be Eastlake.

01:29:21  2    **Q**      And Eastlake is east of here, just really right on the

01:29:25  3    Lake border?

01:29:26  4    **A**      Yeah, a straight shot east.

01:29:28  5    **Q**      Just outside of Euclid maybe?

01:29:31  6    **A**      Yes.

01:29:31  7    **Q**      And you mentioned a couple of other stores, Madison

01:29:34  8    and Mentor.  Those are both in Lake County; is that right?

01:29:36  9    **A**      That's correct.

01:29:40  10   **Q**      Where does your husband work?  Is he still a

01:29:42  11   pharmacist?

01:29:42  12   **A**      My husband is a clinical pharmacist.  He's down at the

01:29:46  13   Cleveland Clinic.

01:29:54  14   **Q**      I'd like to talk a little more about the Eastlake

01:29:57  15   store if we could.

01:29:58  16          Could you describe for us the community that the

01:30:00  17   Eastlake store is in?

01:30:01  18   **A**      The Eastlake store is in a kind of medium -- I would

01:30:09  19   say. . . mid-class neighborhood.  A lot of blue collar

01:30:13  20   working folks.  You know, a pretty tight-knit community, I

01:30:20  21   would say.

01:30:20  22   **Q**      What street in particular is it on in east -- in

01:30:22  23   Eastlake?

01:30:23  24   **A**      The Walmart pharmacy is on Vine Street.

01:30:26  25   **Q**      I'd like to get some understanding -- I'd like you to

**Militello - Direct/Majoras**

01:30:29  1   give the jury some understanding about as a pharmacist, how

01:30:32  2   you have gotten to know your patients and the community.

01:30:36  3   **A**     Well, it really started as soon as I started there.

01:30:39  4   The pharmacist that I did work with was really very outgoing

01:30:46  5   and very personal with all of his patients, and he kind of

01:30:50  6   just mentored me into that same type of mindset.  So I'm

01:30:55  7   very -- I like to be one-on-one with my patients.

01:30:58  8       I know very many of them by name and situation, and so

01:31:04  9   I've always felt like I have a really good relationship with

01:31:09  10  the people that I serve in the community.

01:31:11  11  **Q**     And how do you learn that over time if you're

01:31:14  12  essentially filling prescriptions?

01:31:16  13  **A**     Just in talking to the people.  It's not always about

01:31:19  14  medications.  Sometimes it's about life, other than that.

01:31:23  15  So I just try to touch base with them on, you know, all

01:31:27  16  different aspects as I'm, you know, talking to them maybe

01:31:31  17  about medications also.

01:31:33  18  **Q**     So I'd like to get a little bit of a better sense of

01:31:36  19  how the pharmacy at Walmart looks in case someone hasn't

01:31:39  20  been there.

01:31:40  21      First it -- so the pharmacy is within a much larger

01:31:45  22  Walmart store; is that right?

01:31:47  23  **A**     Yes, very much.

01:31:47  24  **Q**     If I were to walk into a Walmart, would I find the

01:31:51  25  pharmacy?

**Militello - Direct/Majoras**

01:31:51 1   **A**   At this point, we have a special set of doors labeled

01:31:54 2   pharmacy doors.  So we're right inside those doors to the

01:31:57 3   right, so right inside the main doors.

01:31:59 4   **Q**   So right up near the front of the store?

01:32:00 5   **A**   That's correct.

01:32:01 6   **Q**   Who else works in the pharmacy with you as a -- you're

01:32:04 7   a pharmacist.  Who else is up in the pharmacy with you?

01:32:06 8   **A**   Sometimes there is an overlapping pharmacist and we

01:32:11 9   generally always have at least two technicians usually and

01:32:17 10  potentially some cashiers as well.

01:32:19 11       So sometimes we have five technicians in a day, but

01:32:22 12  there's usually a small -- at least a small group of us back

01:32:26 13  there.

01:32:26 14  **Q**   And what is a tech?

01:32:28 15  **A**   A technician is at this point somebody who has been

01:32:31 16  certified through the State Board of Pharmacy to work in the

01:32:35 17  pharmacy, count medications, some of them are able to

01:32:40 18  immunize now, do basic screenings, that kind of thing.

01:32:44 19  **Q**   How many pharmacists are typically in the store at any

01:32:47 20  given time?

01:32:49 21  **A**   There's always one, obviously.  Sometimes there's some

01:32:53 22  overlap from anywhere to, I don't know, an hour to

01:32:58 23  four hours.

01:33:01 24  **Q**   In terms of the people or the person you report to,

01:33:07 25  who do you report to?  Is there a title or a person that you

**Militello - Direct/Majoras**

01:33:10  1     would report to?

01:33:11  2     **A**     My direct report is to my pharmacy manager.

01:33:14  3     **Q**     And does the pharmacy manager have responsibilities

01:33:16  4     outside the pharmacy itself?

01:33:21  5     **A**     I mean, on -- yeah.  They have things that they are

01:33:24  6     required to do that maybe don't deal with the day-to-day

01:33:28  7     business of the pharmacy, so there's certain things, you

01:33:34  8     know, they have to do at a managing level that maybe doesn't

01:33:37  9     have to do with filling prescriptions.

01:33:38 10     **Q**     And is there a separate store manager at the Walmart

01:33:41 11     in Eastlake?

01:33:42 12     **A**     Yeah, there is a store manager.

01:33:44 13     **Q**     So if you were to describe what the difference between

01:33:46 14     being a store manager versus the pharmacy manager?

01:33:48 15     **A**     The pharmacy manager is independently over the

01:33:51 16     pharmacy.  The store manager doesn't necessarily have any

01:33:54 17     jurisdiction over the pharmacy.

01:33:56 18     **Q**     Do you report at all to the store manager?

01:33:58 19     **A**     I do not.

01:34:00 20     **Q**     We've had a chance during the number of weeks that

01:34:02 21     we've been here to meet some of the other folks from

01:34:06 22     Walmart, including some colleagues who started as

01:34:07 23     pharmacists and then moved into field management or

01:34:11 24     headquarters.

01:34:12 25     **A**     Um-hmm.

**Militello - Direct/Majoras**

01:34:12  1  **Q**    You've been a pharmacist your entire career; right?

01:34:14  2  **A**    That is correct.

01:34:15  3  **Q**    What took you on that path as opposed to some other

01:34:18  4  path at Walmart?

01:34:19  5  **A**    Between raising my children, I mean, it was a job

01:34:24  6  where I was able to work a couple days a week easily and

01:34:29  7  still be able to be home with my kids.  It was also

01:34:34  8  something I wanted to be in the store with -- working with

01:34:39  9  the public and the community and not necessarily kind of

01:34:43  10  working in a home office or a management type position.

01:34:47  11  **Q**    So looking back over that 25 years, have you enjoyed

01:34:50  12  being a pharmacist?

01:34:51  13  **A**    I've enjoyed it.

01:34:54  14  **Q**    Why is that?

01:34:54  15  **A**    I've met a lot of really great people, people that I

01:34:57  16  felt counted on me, and so it's been a fulfilling career.

01:35:03  17  **Q**    In fact, if you weren't here today, where would you

01:35:05  18  be?

01:35:05  19  **A**    I'd be at work.

01:35:07  20  **Q**    One of the things that I'd like to do with you if you

01:35:10  21  could is I'd like to talk a little bit about the layout of

01:35:17  22  the pharmacy itself.  We haven't heard much about that

01:35:20  23  today.

01:35:20  24        And in preparing for your testimony, you and I helped

01:35:23  25  put together a slide to help you do that; is that right?

**Militello - Direct/Majoras**

01:35:25  1    **A**     That's correct.

01:35:26  2    **Q**     And if I put that up on the screen now, which is

01:35:30  3    DEM -- well, I may have the wrong title.  By the way, Ms.

01:35:34  4    Militello, you have a binder in front of you with documents

01:35:36  5    that I may ask you to take a look at.  But do you see the

01:35:41  6    screen well enough?

01:35:42  7    **A**     I see the screen.

01:35:43  8    **Q**     Okay.

01:35:44  9          So it -- what -- just generally, what is it that

01:35:47 10    you're showing here in this diagram?

01:35:50 11    **A**     It's just the basic layout of the pharmacy as far as

01:35:55 12    where we interact with the public and where we are kind of

01:35:59 13    doing our prescription filling and checking towards the back

01:36:03 14    of the pharmacy.

01:36:05 15    **Q**     Let me -- maybe we can walk through a little bit of a

01:36:08 16    situation where if a -- someone drops off a prescription and

01:36:11 17    then how it kind of works through the pharmacy.

01:36:13 18    **A**     Um-hmm.

01:36:14 19    **Q**     Before doing that, though, does Walmart have a

01:36:21 20    drivethrough at it's pharmacy?

01:36:23 21    **A**     Some do, we do not.

01:36:24 22    **Q**     So if someone's picking something up at your pharmacy

01:36:27 23    or dropping it, is it in person?

01:36:29 24    **A**     It is in person if they're dropping off a hard copy

01:36:34 25    prescription, but the doctor very commonly, now they send it

6655

**Militello - Direct/Majoras**

01:36:36  1   over the computer in what we call an e-script.  So that's

01:36:39  2   very common now as well.

01:36:40  3   **Q**     So in particular, I'd like to ask you some questions

01:36:42  4   about some of the security features at the pharmacy.

01:36:44  5        Are you familiar with those?

01:36:45  6   **A**     Yes.

01:36:45  7   **Q**     So let's go first to that door on the front left, the

01:36:49  8   one with the stop sign on it and --

01:36:51  9   **A**     Yes.

01:36:51  10  **Q**     And -- it looks like an old lock.  What security

01:36:55  11  features are involved with that door?

01:36:56  12  **A**     At the door, that's a dead bolt and a knob lock that

01:37:02  13  is present there so that -- and that shuts automatically so

01:37:06  14  that only pharmacy personnel with keys, which is a

01:37:10  15  pharmacist, can enter that door.

01:37:11  16  **Q**     So only the pharmacist has keys?

01:37:13  17  **A**     Yes.

01:37:14  18  **Q**     Do you carry it on you?

01:37:16  19  **A**     I do, on my key chain.

01:37:18  20  **Q**     Do you have a key right now?

01:37:19  21  **A**     I do.

01:37:20  22  **Q**     Okay.

01:37:21  23       So then to the right of that, as we're looking at it,

01:37:25  24  there are two, looks like windows with drop-offs?

01:37:30  25  **A**     That is correct.

**Militello - Direct/Majoras**

01:37:31 1   **Q**      And what happens there?

01:37:32 2   **A**      Drop off is where a customer that does have a

01:37:36 3   prescription or refill, say they sometimes bring in their

01:37:38 4   bottles for refills, that's where they would stop and talk

01:37:41 5   to usually a technician there, sometimes a pharmacist, and

01:37:48 6   get that process of prescription filling started there.

01:37:51 7   **Q**      And on the door itself, we have a stop sign there.  Is

01:37:54 8   there literally a stop sign on the door at the pharmacy?

01:37:56 9   **A**      Yes, there is literally a stop sign.  Yes.

01:37:58 10  **Q**      Looking again across the front, there are two windows

01:38:02 11  that say "consultation."  What happens at those windows?

01:38:06 12  **A**      Those are windows where if a person has a random

01:38:13 13  question, maybe about something that's out front or over the

01:38:15 14  counter, they can stop there and we will go over there to

01:38:18 15  talk with them.  Also, a patient that is picking up a

01:38:21 16  medication that is new to them or something that we need to

01:38:25 17  talk to them about is directed to that window so that we can

01:38:29 18  have a conversation.

01:38:31 19  **Q**      If you look around inside the pharmacy on the walls,

01:38:38 20  there are, looks like sort of black ovals on the walls in a

01:38:41 21  couple different places.

01:38:43 22  **A**      Yes.

01:38:43 23  **Q**      What are those?

01:38:43 24  **A**      Those are security cameras.

01:38:45 25  **Q**      And are they throughout the pharmacy the way this

01:38:49  1    drawing depicts them?

01:38:50  2    **A**    They're throughout the pharmacy on the walls, also on

01:38:53  3    the ceiling.

01:38:54  4    **Q**    How many do you have on the ceiling?

01:38:58  5    **A**    I can think of two for sure.

01:39:01  6    **Q**    So let's go -- let's go back through the pharmacist.

01:39:04  7           I think the person in the white coat, is that the

01:39:07  8    pharmacist?

01:39:08  9    **A**    That would represent a pharmacist, I think, yes.

01:39:10 10    **Q**    Is that where you spend most of your time?

01:39:12 11    **A**    I spend some of my time there, yes, certainly.

01:39:14 12    **Q**    So what's a pharmacist bench?

01:39:17 13    **A**    We consider the bench kind of where all the -- not the

01:39:26 14    filling necessarily but the checking of prescriptions and

01:39:30 15    bagging them for the front takes place.

01:39:33 16    **Q**    Is that just a traditional term that's used?

01:39:36 17    **A**    It is.

01:39:37 18    **Q**    For a pharmacist?

01:39:38 19    **A**    Yes.

01:39:39 20    **Q**    So we often talk about a Judge on a bench.  You've got

01:39:43 21    your own bench in the pharmacy?

01:39:44 22    **A**    Right.  Right.

01:39:45 23           If we're talking about the pharmacist being on the

01:39:47 24    bench, it usually means that they are working in the filling

01:39:49 25    process of the pharmacy for that day.

**Militello - Direct/Majoras**

01:39:51 1   **Q**    So you said that the pharmacist has the key to the

01:39:54 2   pharmacy.  What if the pharmacist has to leave the pharmacy?

01:39:57 3   **A**    If the pharmacist has to leave, then the pharmacy is

01:40:00 4   cleared out and locked.

01:40:03 5   **Q**    So if you had to run to your car to pick something up

01:40:06 6   during the middle of the day?

01:40:07 7   **A**    Yes.

01:40:07 8   **Q**    What would happen?

01:40:08 9   **A**    I would clear everybody out, lock the doors, and go

01:40:12 10  get my item.

01:40:14 11  **Q**    To the far right to the front, there's the -- there's

01:40:17 12  a steel shutter.  What is that showing us?

01:40:19 13  **A**    When we close at night or for lunch, that shutter is

01:40:26 14  directly behind the cash registers but in front of where we

01:40:30 15  store any filled prescriptions for pickup.  So that comes

01:40:35 16  down to shutter that area off so no one can gain access.

01:40:39 17  **Q**    So if I'm -- if I'm at the Walmart pharmacy in the

01:40:42 18  middle of the afternoon and the shutters are down, I'm

01:40:45 19  guessing the pharmacist's phone was in the car or something

01:40:48 20  like that?

01:40:48 21  **A**    Either that, or -- or lunch, yeah.

01:40:52 22  **Q**    Okay.

01:40:52 23       So when you leave, everything shuts down?

01:40:54 24  **A**    Yes.

01:40:55 25  **Q**    Why is that?

01:40:56  1    **A**      That's to guarantee security of the pharmacy and

01:41:01  2    what's in it.

01:41:02  3    **Q**      All right.

01:41:02  4            Looking to the back left wall, it looks like you don't

01:41:05  5    have to shut down the pharmacy if you need to use the

01:41:08  6    restroom.  Is that fair?

01:41:08  7    **A**      That is fair.

01:41:09  8    **Q**      Is that the only access to the restroom point that the

01:41:11  9    pharmacy and the pharmacy personnel are able to use?

01:41:13  10   **A**      That is the only restroom, right.  That's the only way

01:41:18  11   in right there.

01:41:19  12   **Q**      So looking back in some of the other items in our

01:41:22  13   drawing here, there are four shelves in the back.  What

01:41:25  14   are -- what are on those four shelves?

01:41:27  15   **A**      Those are what we call bays, in pharmacy term.  So

01:41:33  16   those contain the stock bottles of medications that we are

01:41:36  17   going to be using to fill prescriptions.

01:41:39  18   **Q**      So if you need to go pick something up to transfer

01:41:42  19   into a smaller bottle, that's where you start?

01:41:45  20   **A**      That's where we start.

01:41:46  21   **Q**      And at the pharmacist bench, we have -- we still have

01:41:50  22   some computers on there.

01:41:52  23   **A**      Right.

01:41:52  24   **Q**      We've had some testimony already about Connexus.

01:41:57  25   You're familiar with Connexus?

**Militello - Direct/Majoras**

01:41:58  1    **A**    Yes.

01:41:59  2    **Q**    That's the Walmart pharmacy computer system?

01:42:02  3    **A**    Software, yes.

01:42:03  4    **Q**    How often are you using Connexus on a daily basis?

01:42:06  5    **A**    All day, every workday.

01:42:08  6    **Q**    And so they're handy for your use when you're at the

01:42:11  7    pharmacist bench?

01:42:11  8    **A**    Absolutely.

01:42:12  9    **Q**    Are there other folks in the pharmacy who are using

01:42:15  10   the computer system?

01:42:16  11   **A**    I'm sorry.  Could you repeat?

01:42:17  12   **Q**    Sure.

01:42:18  13          Are there other folks working in the pharmacy who

01:42:20  14   might be using the computer system?

01:42:21  15   **A**    Yes.

01:42:22  16          Technicians and on occasion, the cashiers will use the

01:42:27  17   system as well.

01:42:29  18   **Q**    Are there aspects of the computer system that only you

01:42:33  19   can enter?

01:42:35  20   **A**    To enter into Connexus, you have to put a username and

01:42:39  21   password to gain access.

01:42:40  22   **Q**    And who has usernames and passwords?

01:42:43  23   **A**    Everybody has their own individual.

01:42:45  24   **Q**    And are there some aspects, though, of the Connexus

01:42:48  25   system that a pharmacist is only able to access?

**Militello - Direct/Majoras**

01:42:51  1    **A**     Certainly, yes.

01:42:52  2          So if a pharmacist is signed into a computer, we have

01:42:54  3    certain functions that we can do that nobody else can do.

01:42:58  4    **Q**     We've heard quite a bit about the OARRS PMP system.

01:43:02  5    You're familiar with that?

01:43:03  6    **A**     Yes.

01:43:03  7    **Q**     How long have you been able to access OARRS from your

01:43:06  8    computer?

01:43:06  9    **A**     I would say a good 10 years.

01:43:09 10    **Q**     What did you think about OARRS when it first became

01:43:12 11    available?

01:43:12 12    **A**     I thought it was a great program and I was happy to

01:43:15 13    see it implemented.  I mean, it's something that I use every

01:43:18 14    day working.

01:43:22 15    **Q**     Is there much communication going on in the pharmacy

01:43:24 16    or is everyone just kind of doing their own work?

01:43:26 17    **A**     It's a whole day of communication.  So that's

01:43:29 18    basically all we're doing is trying to make sure everybody

01:43:32 19    knows what's going on and relaying things between people

01:43:37 20    that work.  It's constant.

01:43:40 21    **Q**     And that includes between you and the techs as well as

01:43:43 22    the cashier?

01:43:44 23    **A**     That's between pharmacists, between pharmacist and

01:43:48 24    technicians, technicians and cashiers, cashiers and

01:43:53 25    technicians.  It's always.

01:43:55 1 **Q**    Why?

01:43:55 2 **A**    Because it's just important for everybody to be aware

01:43:57 3 and knowing if there's a situation that might need attention

01:44:02 4 for one reason or the other.

01:44:05 5 **Q**    How many pharmacists work on a regular basis at the --

01:44:10 6 let me tell you why I'm asking this.  I don't mean on any

01:44:13 7 given -- at a particular time.

01:44:14 8 **A**    Um-hmm.

01:44:14 9 **Q**    But overall, how many pharmacists work at the Eastlake

01:44:17 10 store?

01:44:17 11 **A**    In general, we have three steady pharmacists that are

01:44:21 12 working that store.

01:44:23 13 **Q**    Is there any communication among the pharmacists who

01:44:25 14 work in the Eastlake store?

01:44:26 15 **A**    Yeah, most definitely.

01:44:28 16 **Q**    Why is that?

01:44:29 17 **A**    Because we feel it's important for all of us to be on

01:44:33 18 the same page regarding certain things.  So we freely, you

01:44:38 19 know, talk about things, whether it's, you know, a specific

01:44:43 20 patient prescription, something we're concerned over,

01:44:46 21 something we want to make sure they know to pass on to a

01:44:49 22 patient, just all kinds of reasons.

01:44:51 23 **Q**    Has that changed at all over time in the 25 years

01:44:54 24 you've been there, the level of communication?

01:44:56 25 **A**    I think we've always communicated between pharmacists,

**Militello - Direct/Majoras**

01:45:00 1    always, yeah.

01:45:01 2    **Q**    Looking back to our drawing here, there's something

01:45:04 3    right in the middle called C-II safe.

01:45:07 4    **A**    Yes.

01:45:08 5    **Q**    What is that?

01:45:08 6    **A**    There is a locked safe that contains the controlled II

01:45:16 7    substances, and it's located behind the pharmacy bench.

01:45:18 8    **Q**    Who has access to that safe?

01:45:19 9    **A**    The pharmacist.

01:45:19 10   **Q**    Is that a key pad access?

01:45:22 11   **A**    It's a magnetic key that allows us access.

01:45:26 12   **Q**    And I don't want to get into particulars here for

01:45:33 13   security reasons, but is there some time-activation element

01:45:37 14   of safety about that safe?

01:45:37 15   **A**    There is, yes.

01:45:38 16   ███    ████████████████████████████████████████████

01:45:40 17   ███████████

01:45:40 18   ███    ██████████████████████████████████████████████

01:45:49 19   ████████████████████████████████████████

01:45:51 20   ███    ██████████████

01:45:52 21   ███    ██████████████████████████████████████████████

01:45:58 22   █████████████████████████████████████

01:46:00 23   **Q**    And then finally, there's the bagged prescription

01:46:07 24   shelf.  I think we've probably seen those before, but tell

01:46:10 25   us what that is.

**Militello - Direct/Majoras**

01:46:11  1    **A**     The bagged prescriptions are after the pharmacist has

01:46:14  2    completed their final visual check on the medication, it

01:46:19  3    goes into a plastic bag which hangs in a day, numerical

01:46:25  4    color order in the front of the pharmacy so that those can

01:46:29  5    be quickly obtained when a patient comes in to pick up their

01:46:36  6    medication.

01:46:36  7    **Q**     And I forgot to mention the motion detectors on the

01:46:39  8    back wall.

01:46:40  9    **A**     Yes.

01:46:40  10   **Q**     I think there's a couple of those.  How are those

01:46:43  11   used?

01:46:43  12   **A**     Those are in utilization from what I understand mostly

01:46:46  13   when the alarm is set and going, those motion detectors go

01:46:50  14   into effect to make sure there's no motion in the pharmacy.

01:46:52  15   **Q**     That's when the pharmacy has cleared out and is locked

01:46:55  16   up?

01:46:55  17   **A**     For the night, yeah.

01:46:56  18   **Q**     So if you had a chance to tell someone here's what I

01:46:59  19   do all day and we just went through the description,

01:47:01  20   anything else you want to share with the jury about the

01:47:03  21   drawing?

01:47:04  22   **A**     About the drawing. . . I guess the biggest thing is

01:47:09  23   it's -- everybody's standing still there and that rarely

01:47:13  24   happens on a regular day in the pharmacy.  But other than

01:47:17  25   that, I mean, it's just a -- it's a process that you kind of

### Militello - Direct/Majoras

01:47:24  1    work and hone over the years, so. . .

01:47:30  2    **Q**    Okay.

01:47:30  3         If we could take that down, I'm going to change

01:47:33  4    topics.  And again, this is something that we've had quite a

01:47:36  5    bit of information about this case, and that's the concept

01:47:39  6    of corresponding responsibility.

01:47:40  7         You're familiar with that?

01:47:41  8    **A**    I am familiar, yes.

01:47:42  9    **Q**    What does that mean to you in your practice as a

01:47:44 10    pharmacist?

01:47:45 11    **A**    I believe corresponding responsibility is for me, as a

01:47:49 12    pharmacist, in the process of filling prescriptions of any

01:47:53 13    sort, that I am filling them in -- pursuant to a

01:47:58 14    prescription from a medical doctor who has diagnosed a

01:48:03 15    patient, and that I'm dispensing them with the proper

01:48:06 16    information they need to take the medication correctly.

01:48:08 17    **Q**    And corresponding responsibility is often used when

01:48:12 18    we're talking about controlled substances; is that right?

01:48:14 19    **A**    Yes.

01:48:14 20    **Q**    Is it used in other situations as a pharmacist?

01:48:17 21    **A**    I feel it goes throughout your practice as a

01:48:19 22    pharmacist because you have a corresponding responsibility

01:48:22 23    to make sure anything you're dispensing is a proper

01:48:29 24    dispense.

01:48:29 25    **Q**    How long have you been aware that a pharmacist has a

**Militello - Direct/Majoras**

01:48:31 1     corresponding responsibility?

01:48:32 2     **A**     Since I graduated pharmacy school.

01:48:35 3     **Q**     Is that something you learn in pharmacy school?

01:48:37 4     **A**     Certainly, we -- yeah, certainly we learn that.

01:48:40 5     **Q**     On the times that you've been at Walmart, the

01:48:43 6     25 years, have you had training opportunities?

01:48:46 7     **A**     Oh, yes, we have.

01:48:49 8     **Q**     Could you tell us about those, please?

01:48:51 9     **A**     We've always had computer-based learning process.

01:48:57 10     They offer us continuing education through pharmacist's

01:49:02 11     letter.  They've given us opportunities to take continuing

01:49:07 12     education hours in other areas outside of computer-based

01:49:11 13     learning.

01:49:12 14     So they've provided us with situations and types of

01:49:23 15     trainings that we're able to kind of go through and look at.

01:49:28 16     And so we've had a lot of -- a lot of training throughout.

01:49:31 17     **Q**     As a licensed pharmacist, do you have continuing

01:49:33 18     education responsibilities to maintain your license?

01:49:35 19     **A**     Yes.

01:49:36 20     **Q**     Have you always been fully licensed for the last

01:49:39 21     25 years or since you graduated?

01:49:40 22     **A**     Yes.

01:49:41 23     **Q**     Has your license ever been suspended?

01:49:42 24     **A**     No.

01:49:43 25     **Q**     Any disciplinary measures taken against you by the

**Militello - Direct/Majoras**

01:49:48  1  Board of Pharmacy?

01:49:49  2  **A**     No.

01:49:49  3  **Q**     I should ask this, but you're licensed in Ohio?

01:49:52  4  **A**     Yes.

01:49:52  5  **Q**     Anywhere else?

01:49:53  6  **A**     No.

01:49:54  7  **Q**     Switching -- switching topics again, are you familiar

01:49:58  8  with the concept of red flags in --

01:50:02  9  **A**     Yes.

01:50:02  10  **Q**     In -- in performing your corresponding responsibility?

01:50:07  11  **A**     Yes, I am.

01:50:07  12  **Q**     What are red flags to you?

01:50:08  13  **A**     Red flags to me are situations in which you come

01:50:13  14  across filling prescriptions, for controlled substances

01:50:17  15  mainly, where something is an issue where it doesn't quite

01:50:25  16  fit with what you feel it should be and something that needs

01:50:29  17  to be resolved before you fill the prescription.

01:50:31  18  **Q**     During the time that you've been a pharmacist, has the

01:50:40  19  term red flags always meant the same thing?

01:50:42  20  **A**     Since I've been a pharmacist, not necessarily.  We

01:50:45  21  didn't really use that term when I first started practicing

01:50:48  22  pharmacy.

01:50:48  23  **Q**     What term did you use?

01:50:49  24  **A**     We didn't necessarily have a term other than it was a

01:50:53  25  situation where something in your pharmacist training has

**Militello - Direct/Majoras**

01:50:57  1    told you that something is not right here and that you need

01:50:59  2    to resolve it before you fill a prescription.

01:51:02  3    **Q**    And other than -- and maybe not using the term red

01:51:06  4    flags, was the process of resolving those situations the

01:51:10  5    same type of thing you're doing today?

01:51:11  6    **A**    Yes.

01:51:11  7    **Q**    Have you had tools available to you to help you in

01:51:15  8    doing that?

01:51:18  9    **A**    I've -- especially as things have evolved, certainly,

01:51:22 10    yes, but we've always used whatever tools were available

01:51:25 11    that were available to us to be able to make sound decisions

01:51:30 12    in what we filled.

01:51:33 13    **Q**    When you are evaluating prescriptions to assess

01:51:37 14    whether they're legitimate, is that an easy process?

01:51:40 15    **A**    Not always.

01:51:40 16    **Q**    Why?

01:51:41 17    **A**    There's a lot of factors that play into dispensing a

01:51:45 18    prescription, so it's not necessarily a cut-and-dry

01:51:49 19    situation where either it's a yes or a no.  There are a lot

01:51:52 20    of gray areas that you have to evaluate and use your best

01:51:57 21    professional judgment to decide whether you're going to fill

01:51:59 22    that or not fill that.

01:52:01 23    **Q**    So you said you've been doing this for 25 years.  How

01:52:04 24    does your experience play into helping you resolve --

01:52:09 25    determining whether a prescription is legitimate?

Militello - Direct/Majoras

01:52:11  1    **A**      Yeah, experience is I would -- it's a huge -- a huge

01:52:15  2    measure.  The more you've dealt with different situations,

01:52:19  3    different circumstances, different patients, you learn --

01:52:23  4    you learn a lot.  You learn what to look for.

01:52:27  5    **Q**      Can you give us examples of things that, because of

01:52:29  6    the position you're in now, you might be able to readily

01:52:32  7    assess because of your experience?

01:52:34  8    **A**      Just simply -- I mean one that sticks out most is I

01:52:37  9    know my patients.  So if I have a patient that's been

01:52:40  10   dealing with a newly diagnosed cancer and they have some

01:52:46  11   prescriptions that are from, you know, I don't know, out of

01:52:51  12   the area or a doctor that's kind of obscure that I have not

01:52:55  13   seen before, or it's for a combination of a couple things,

01:52:59  14   maybe to help quell their anxiety and also to help treat the

01:53:03  15   pain of their cancer, it's not something that necessarily is

01:53:05  16   going to cause me to throw up my hands and call the doctor

01:53:08  17   or say I'm not going to fill it.  It's something that I

01:53:11  18   evaluate and then talk to the patient about and -- it's just

01:53:16  19   something I can better evaluate.

01:53:18  20   **Q**      Just if you have a prescription where you don't know

01:53:22  21   the patient or maybe don't know the doctor or the doctor's

01:53:24  22   specialty, how are you able to learn more about that?

01:53:28  23   **A**      Mainly, obviously, we're going to utilize -- I will

01:53:33  24   utilize OARRS in that case for sure.  Also, we have a system

01:53:38  25   or a website available to us that we can look up physicians

**Militello - Direct/Majoras**

01:53:44 1  and we can tell specialties, we can tell licenses, so that's

01:53:49 2  a way.  And really by talking to the patient, calling the

01:53:54 3  doctor, if necessary.  So there are different things we can

01:53:57 4  do.

01:53:57 5  **Q**    How does the doctor's specialty or how can the

01:54:01 6  doctor's specialty help you in making a decision about a

01:54:03 7  prescription fill?

01:54:05 8  **A**    Well, for instance, if we have a doctor who is --

01:54:11 9  that's, you know, a doctor that I know is at Seidman Cancer

01:54:16 10  Center, that makes a big difference on whether I'm getting a

01:54:19 11  high dose opioid prescription from him or if I'm getting it

01:54:22 12  from a primary care provider or pediatrician for an adult or

01:54:28 13  something where I would say, you know, this needs more

01:54:31 14  attention.

01:54:31 15  **Q**    And the Seidman Cancer Center, that's part of the

01:54:35 16  University Hospital system?

01:54:35 17  **A**    It is, yes.

01:54:36 18  **Q**    What about if a doctor has a specialty as being a pain

01:54:41 19  medicine specialist?

01:54:42 20  **A**    Yes.

01:54:42 21  **Q**    Does that give you any information?

01:54:43 22  **A**    Oh, certainly it gives us a background as to why the

01:54:48 23  patient is, you know -- what the patient is experiencing

01:54:54 24  potentially that is causing them to have to see a doctor of

01:54:57 25  this capacity and then what's being prescribed.

**Militello - Direct/Majoras**

01:55:00  1   **Q**     And we briefly mentioned Connexus.  As I said, another

01:55:06  2   witness has talked about it, but what is it that Connexus

01:55:09  3   can tell you, the computer system can tell you?

01:55:11  4   **A**     Oh, my goodness.  Connexus has a lot of different -- I

01:55:15  5   mean abilities that we can use, just beyond being able to

01:55:20  6   look up patients' histories at our pharmacy, doctors,

01:55:28  7   medication usage, notes from other pharmacists.  I mean

01:55:37  8   there's a lot of other abilities that we have just by having

01:55:39  9   Connexus in front of us.

01:55:40  10  **Q**     Going back to the times when it's difficult to make

01:55:43  11  the call or you get a close call on a prescription whether

01:55:47  12  to fill, why not just refuse it?

01:55:50  13  **A**     I can't always just refuse it.  I feel like I have to

01:55:53  14  talk to the patient and I have to do what's in the best

01:55:55  15  interest of the patient.

01:55:57  16      So if in professional judgment, after going through

01:56:01  17  things and kind of evaluating the whole thing I still feel

01:56:06  18  it's better for the patient to get that prescription, I

01:56:09  19  don't feel it's ethical for me to say no, I'm not going to

01:56:13  20  fill it.

01:56:14  21  **Q**     Have you ever been concerned that you may have gotten

01:56:16  22  your judgment wrong?

01:56:19  23  **A**     I'm sure there are always those possibilities of that

01:56:22  24  happening, so, yeah.  There's probably certain times where,

01:56:25  25  boy, I hope I called that right, but in my heart when I

6672

**Militello - Direct/Majoras**

01:56:28 1    filled it, I felt that I did.

01:56:31 2    **Q**    Have you ever felt any pressure from Walmart to fill

01:56:34 3    any prescriptions that you did not feel comfortable filling?

01:56:36 4    **A**    No.

01:56:38 5    **Q**    Has Walmart ever placed time limits on you as to how

01:56:42 6    quickly you need to fill a prescription?

01:56:43 7    **A**    I've never felt any pressure about how fast I have to

01:56:47 8    fill a prescription.  If I feel it needs extra attention,

01:56:50 9    I've given it the extra attention it needs.

01:56:54 10   **Q**    Are you familiar with the term "refusal to fill"?

01:56:57 11   **A**    Yes.

01:56:58 12   **Q**    What is that?

01:56:59 13   **A**    "Refusal to fill" is if we have gone over the

01:57:03 14   information that we have available and we have decided that

01:57:07 15   this is not a prescription that I feel comfortable filling,

01:57:11 16   I can refuse that fill.  And subsequently, I would fill out

01:57:15 17   a form stating that fact.

01:57:17 18   **Q**    And what happens with the form?

01:57:19 19   **A**    It's submitted to the home office.

01:57:22 20   **Q**    Is that available to any other pharmacists in the

01:57:26 21   computer system that Walmart operates?

01:57:28 22   **A**    Yes, it is available through Archer.  So if I do

01:57:32 23   refuse a specific prescription or basically prescriber, that

01:57:36 24   is able to be seen as to why I refused that prescriber.

01:57:41 25   **Q**    And you mentioned the Archer system.  And again, we've

### Militello - Direct/Majoras

01:57:44  1  heard some testimony about that.  That system came into

01:57:47  2  place around 2015; is that right?

01:57:49  3  **A**    I believe so, yes.

01:57:50  4  **Q**    So prior to that, how would pharmacists, how did you

01:57:53  5  as a pharmacist at the Walmart pharmacy learn information

01:57:57  6  about refusals to fill before the computer system had it?

01:58:00  7  **A**    Well, at that time, we didn't necessarily have a

01:58:03  8  specific name for them, but we would talk between

01:58:06  9  pharmacists, both Walmart pharmacists and also pharmacies

01:58:10 10  that maybe were in our area, the, you know, pharmacy down

01:58:15 11  the street or surrounding us within a two-mile radius.

01:58:19 12       We'd kind of give them a call and feel out if they had

01:58:23 13  had any experience with that prescriber or patient or

01:58:25 14  whatever that might be.

01:58:27 15  **Q**    So why would you contact another pharmacy?

01:58:31 16  **A**    Because it was just gathering information in a way

01:58:37 17  that we had available to us to kind of be part of our

01:58:42 18  evaluation process for filling.

01:58:44 19  **Q**    Did you have pharmacist friends at other pharmacies?

01:58:47 20  **A**    Certainly acquainted, we were acquainted with each

01:58:51 21  other, yeah.

01:58:52 22  **Q**    And how would you make a decision as to when is the

01:58:54 23  right time to talk to another pharmacy or another

01:58:57 24  pharmacist?

01:58:58 25  **A**    It would depend on the issue that we were having with

Militello - Direct/Majoras

01:59:03  1   a particular prescription.  If it was something that really

01:59:06  2   did not sit well, then we would call -- I would call around

01:59:10  3   and say, you know, I'm not sure if you've ever filled

01:59:15  4   anything for this patient, but have you had any experience

01:59:19  5   with them, or this prescriber, have you had any experience

01:59:23  6   with this prescriber, just to find out if that was something

01:59:27  7   on anyone else's radar.

01:59:30  8   Q    Would you ever get contacts in reverse, someone else

01:59:32  9   calling you?

01:59:33  10  A    Yes.

01:59:33  11  Q    And did you find those to be useful?

01:59:35  12  A    Certainly, yeah.

01:59:36  13  Q    Why?

01:59:36  14  A    Um-hmm.  It was just another way to gather

01:59:40  15  information.  So if somebody else was questioning something,

01:59:43  16  that would definitely be put in the files of the brain just

01:59:49  17  for future reference.

01:59:52  18  Q    In your work as a pharmacist in the Eastlake store,

01:59:55  19  have you had to have contacts with law enforcement

01:59:58  20  individuals?

01:59:59  21  A    Yes.

01:59:59  22  Q    Why?

02:00:01  23  A    We would also contact Lake Narcotics fairly regularly

02:00:07  24  if there was a physician we had a question about, if there

02:00:09  25  was a patient that we were kind of concerned about, we would

02:00:13  1    contact Lake Narcotics to let them know that we were having

02:00:17  2    the concerns, maybe they had already had concerns from other

02:00:20  3    pharmacies as well, and they would let us know that.

02:00:23  4         So there was just a communication process with them.

02:00:25  5    Q    If you had a concern that a prescription was forged or

02:00:28  6    was fraudulent --

02:00:30  7    A    Yes.

02:00:30  8    Q    -- would you have contacts with the law enforcement

02:00:33  9    officials?

02:00:33  10   A    Yes.

02:00:33  11   Q    Same folks over at the Lake County Narcotics?

02:00:39  12   A    Right, yes.

02:00:40  13   Q    Anyone else?

02:00:41  14   A    Depends.

02:00:42  15        I never personally have had a case where the forgery

02:00:45  16   has gone to the point of the doctor having to fax us a

02:00:49  17   signed release that that indeed was forged and that we've

02:00:51  18   had to call in law enforcement other than that to take care

02:00:55  19   of the situation.

02:00:56  20        So I have never, but it can happen that way, too.

02:00:59  21   Q    We've all had a chance to meet Trey Edwards, who

02:01:03  22   testified earlier.

02:01:04  23        Do you know Mr. Edwards or Agent Edwards?

02:01:06  24   A    I do know him, yes.

02:01:06  25   Q    How do you know him?

6676

**Militello - Direct/Majoras**

02:01:08  1    **A**     When I first started, he was the Lake Narcotics agent

02:01:13  2    that would come into our store fairly regularly.

02:01:15  3    **Q**     Did you know that his wife was a pharmacist?

02:01:18  4    **A**     I did.  I know Jen.  She works at the Giant Eagle,

02:01:23  5    yep.

02:01:23  6    **Q**     How would you describe your interaction in

02:01:25  7    relationship with the law enforcement officials in

02:01:27  8    Lake County?

02:01:27  9    **A**     As far as Lake Narcotics, I thought it was great.  I

02:01:30 10    mean, we had a really good relationship with them, and we

02:01:35 11    always felt like, you know, they would address things pretty

02:01:40 12    promptly to a point, and then I think they got overrun.

02:01:45 13    **Q**     The -- oh, the narcotics enforcement group?

02:01:48 14    **A**     Yeah.

02:01:49 15    **Q**     Switching topics yet again, you talked about resolving

02:01:54 16    red flags.  And I'd like to talk to you now about

02:01:56 17    documentation.

02:01:57 18    **A**     Um-hmm.

02:01:57 19    **Q**     When you identify and take steps to resolve a red

02:02:02 20    flag, do you document it?

02:02:03 21    **A**     If I have taken a step to -- yes, to call, to work out

02:02:09 22    something that wasn't, you know, making sense or -- I would

02:02:14 23    try to document that, yes.

02:02:15 24    **Q**     You said when you take -- when you had taken steps.

02:02:17 25    Are there other ways, short of taking steps that you

02:02:22  1    described, that you can resolve red flags?

02:02:24  2    **A**    Yeah.  I mean, the red flags that are listed aren't

02:02:30  3    always generally a red flag, so they're listed as potential

02:02:33  4    red flags.

02:02:34  5         So sometimes I can look at a prescription and what may

02:02:37  6    be a red flag for a pharmacist that's visiting from, I don't

02:02:42  7    know, Toledo, they might have to call on that prescription.

02:02:47  8         I don't necessarily have to because I can work it out

02:02:49  9    in my process that I know it's a good prescription.

02:02:53  10   **Q**    So it sounds like there might be like a chicken or egg

02:02:56  11   problem; when is it a red flag versus when it's something

02:03:00  12   you're able to resolve right away.

02:03:01  13        How do you -- how do you do that?

02:03:03  14   **A**    I just evaluate the prescription for what it is, who's

02:03:06  15   writing it, who's the patient, what's the medication, how's

02:03:11  16   it being prescribed, how many tablets are being prescribed,

02:03:17  17   so what other medications does the patient take.

02:03:20  18   **Q**    You mentioned that when you take steps, you try to

02:03:23  19   document it.  What about if you were to check OARRS?

02:03:27  20   **A**    I document that I check, yes.

02:03:29  21   **Q**    All right.

02:03:31  22        And so we're clear on what documentation is as a

02:03:33  23   pharmacist, when you -- first of all, where do you document

02:03:36  24   that you checked OARRS?

02:03:38  25   **A**    Generally, I -- it's documented for sure on the

02:03:43 1    prescription, but also in Connexus.

02:03:45 2    **Q**    And when you put it in Connexus, give us an example of

02:03:49 3    what you'd actually type in, like the words or phrases?

02:03:52 4    **A**    Well, we kind of keep things kind of shorthand.  So

02:03:55 5    generally, I'll type in -- these days, I type in Narx

02:03:59 6    because we use a NarxCare application mostly, so then I'll

02:04:02 7    write Narx and then the date and my initials.

02:04:04 8    **Q**    So if someone were to look that up later, it would

02:04:09 9    come up -- let's talk about OARRS.  How would you abbreviate

02:04:12 10   OARRS?

02:04:12 11   **A**    Usually I abbreviated OARRS with just an O.

02:04:16 12   **Q**    So it would show O then what?

02:04:17 13   **A**    Then the date that I checked OARRS, and then my

02:04:20 14   initials.

02:04:20 15   **Q**    And is that standard at Walmart, that when something

02:04:23 16   is put into the system, you put your initials after it?

02:04:27 17   **A**    Yes.

02:04:31 18   **Q**    I'd like to walk you through a few prescriptions --

02:04:36 19   **A**    Sure.

02:04:37 20   **Q**    -- that you actually filled, and maybe that will help

02:04:40 21   even further explain to the jury how you go about analyzing

02:04:44 22   prescriptions as a pharmacist.

02:04:47 23        So, in the binder in front of you, you have -- you

02:04:49 24   have a binder with some tabs on it, 1 through 9, I believe.

02:04:54 25   **A**    I'm not seeing it.

Militello - Direct/Majoras

02:04:59  1   **Q**     Oh, it's coming.  It's on its way.

02:05:03  2   **A**     Okay.  Got it.  Okay.

02:05:13  3   **Q**     So what I'd like you to do is if you'll turn to Tab 1

02:05:16  4   of your binder -- and for the record, this is

02:05:27  5   WMT-MDL-01343-0501.

02:05:30  6         And before we blow that up so it's a little easier to

02:05:33  7   read, what is the difference between what's at the top of

02:05:35  8   the screen and the bottom of the screen?

02:05:42  9   **A**     Okay.

02:05:43  10        So the top of the screen is the actual -- it's called

02:05:49  11  On-Call Data but it was a faxing process.  So that is the

02:05:53  12  actual prescription, and the bottom part of the sheet is our

02:05:57  13  what we call an end-of-day label.

02:06:00  14  **Q**     What is the -- what is an end-of-day label, and what

02:06:03  15  does it do?

02:06:04  16  **A**     It helps sequentially file a prescription, and it's

02:06:07  17  got the pertinent information on that prescription.  It

02:06:11  18  tells the prescription number, patient, the date of birth

02:06:16  19  for the patient, the date it was filled, who actually --

02:06:22  20  what we call four point, which is a process before filling

02:06:26  21  where the pharmacist visually compares the prescription to

02:06:30  22  what's been input into Connexus.

02:06:34  23        So that's a four point.  It tells who did that.  It

02:06:37  24  tells who visual verifies, which means when the prescription

02:06:40  25  has been physically filled and it comes to the pharmacist

02:06:43  1    for that pharmacist to look at the label, the drug inside,

02:06:48  2    the name, all of that kind of thing.  So that's the visual

02:06:51  3    verify pharmacist.

02:06:52  4         And then the fill is the technician or potential

02:06:55  5    pharmacist who filled that prescription, so actually took

02:06:59  6    the stock bottle from the shelf and counted that out.  It

02:07:04  7    also --

02:07:04  8    **Q**    No --

02:07:06  9    **A**    I'm sorry.

02:07:07 10    **Q**    No.  I'm sorry.

02:07:07 11    **A**    It also gives the doctor's name, address, the DEA,

02:07:10 12    which is their Drug Enforcement Agency number, and the NPI,

02:07:17 13    which is a number used for prescribers, pharmacies,

02:07:22 14    pharmacist number, along with the drug.

02:07:24 15    **Q**    Just so we're clear, so this label, the end-of-day

02:07:26 16    label, that's something that you at the pharmacy put on to

02:07:29 17    the back of the prescription?

02:07:30 18    **A**    If it's a hard copy prescription, yes.  If it's a

02:07:34 19    medication that's sent by e-script, then it prints off at

02:07:39 20    end of day.

02:07:41 21    **Q**    I want to go back to the original prescription but

02:07:43 22    before we do that, since it's -- well, it disappeared.

02:07:47 23    Let's go to the original prescription, and we'll work our

02:07:49 24    way back.

02:07:50 25    **A**    Okay.

**Militello - Direct/Majoras**

02:07:54  1    **Q**    All right.

02:07:54  2        So what I'd really like you to do is take us through

02:07:57  3    how you, as a pharmacist, when you're looking at this, what

02:08:01  4    is some of the pertinent information that you are trying to

02:08:03  5    look at right away to help you in making your decision about

02:08:08  6    how to fill it?

02:08:10  7    **A**    Okay.

02:08:11  8        So the first thing that I would have noticed is that

02:08:14  9    it was a morphine prescription, and it came over as a fax.

02:08:18  10   And so that is not allowed to be done.  A fax cannot happen

02:08:22  11   unless it's a hospice patient or a long-term care patient.

02:08:27  12       So the first thing I would have looked for is to make

02:08:29  13   sure that that hospice patient was written on there because

02:08:33  14   by law, it has to be written on there.  So it was in the

02:08:37  15   notes.  So, therefore, I know it came from a hospice

02:08:41  16   facility for a hospice patient.

02:08:45  17   **Q**    So there's some handwriting at the top that also says

02:08:50  18   hospice patients, some initials and a date.  What's that?

02:08:52  19   **A**    That was just me verifying that I did see hospice

02:08:57  20   patient on the prescription itself that came over, and those

02:09:00  21   initials are my initials and the date that I filled the

02:09:02  22   prescription.

02:09:02  23   **Q**    So you said that one of the things you had to check is

02:09:05  24   because it's a fax, you were allowed to receive faxes from

02:09:09  25   hospice providers; correct?

### Militello - Direct/Majoras

02:09:10 1    **A**    Correct.

02:09:11 2    **Q**    Okay.

02:09:11 3         What else does that tell you about this particular

02:09:13 4    patient or this prescription, knowing it's from a hospice?

02:09:16 5    **A**    Well, the prescription itself is for morphine

02:09:24 6    solution.  And so right there, the way that it's written for

02:09:28 7    a bottle of morphine solution and to take it every hour in

02:09:32 8    that manner for shortness of breath or pain as needed, that

02:09:37 9    to me tells me that either, number one, they're at the very

02:09:41 10   end of life, or number two, that this was sent over in

02:09:46 11   combination with some other medications that they keep on

02:09:51 12   hand.  We call it a hospice kit, but that's a combination of

02:09:56 13   medications that are kept on hand at the hospice patient's

02:10:00 14   home so that when they are experiencing end-of-life symptoms

02:10:06 15   and issues, that they can immediately have these -- access

02:10:10 16   to these to be able to be given.

02:10:14 17   **Q**    So when you say a hospice kit, is that something

02:10:17 18   pre-packaged?

02:10:17 19   **A**    It's not pre-packaged.  We don't pre-package it, but

02:10:20 20   it is something that hospice orders usually in a sequential

02:10:25 21   format.  They'll order this group of medications so it's

02:10:28 22   available to the hospice nurse.

02:10:30 23   **Q**    Is there a -- here we have the morphine being taken by

02:10:33 24   mouth.  Is there something that you would typically expect

02:10:35 25   to be in a kit if that was ordered --

6683

**Militello - Direct/Majoras**

02:10:39  1   **A**     Yeah, definitely the morphine is one medication that's

02:10:42  2   generally ordered.  The Lorazepam or brand name is Ativan so

02:10:48  3   it's a benzodiazapine.  That's very often ordered for that

02:10:51  4   kit.

02:10:53  5        There's another drug called Hyoscyamine, which is for

02:10:56  6   excessive secretions.  So they'll very often put that liquid

02:11:00  7   in there for patients so that they have some relief from

02:11:03  8   that.

02:11:04  9        Sometimes haloperidol, which will calm agitation.  So

02:11:09  10  that's usually the group of them we might see.

02:11:11  11  **Q**     So looking further at the prescription in front of

02:11:16  12  you, there's some information we've talked about before with

02:11:19  13  the jury.  It's redacted so we can't get the personal health

02:11:21  14  information, but there's a date of birth that would be on

02:11:24  15  the prescription?

02:11:24  16  **A**     Um-hmm, yes.

02:11:25  17  **Q**     Is that something you look at, the date of birth of

02:11:28  18  the individual?

02:11:29  19  **A**     Certainly it's something we would take into account,

02:11:32  20  but hospice can happen at any point in life.  So it wouldn't

02:11:36  21  necessarily be any type of deciding factor.

02:11:42  22  **Q**     Anything else as we look at this that you think it

02:11:45  23  would be interesting to point out to the jury as you were --

02:11:48  24  as you would evaluate a script?

02:11:49  25  **A**     Well, the patient -- or the, I'm sorry, prescriber, is

**Militello - Direct/Majoras**

02:11:54 1    a prescriber whose address comes up as Ridge Road in Parma,

02:11:59 2    which is definitely not in Eastlake territory, but that is

02:12:04 3    because usually these hospice providers are out of an office

02:12:10 4    and they see the hospice patients.

02:12:13 5        So it's not anything unusual to see a centralized

02:12:17 6    office address like that on there.

02:12:19 7    **Q**    But -- so it's a centralized office but where might

02:12:22 8    the actual hospice care be?

02:12:25 9    **A**    At home.

02:12:26 10   **Q**    And you mentioned Parma.  That's just a little bit

02:12:29 11   southwest of downtown Cleveland?

02:12:31 12   **A**    Right, yes.

02:12:32 13   **Q**    Anything else that strikes you as noteworthy on this

02:12:37 14   prescription?

02:12:46 15   **A**    Not necessarily, no.

02:12:48 16   **Q**    Okay.  Let's turn back to the end-of-day label.  I

02:12:52 17   want to see if we could put out a few things there.

02:13:02 18       Thank you, Mr. Perry, for turning that right side up.

02:13:05 19       So you've covered some of this already, but tell us

02:13:08 20   what a four point is, the 4pt.  What is a four point to a

02:13:15 21   pharmacist?

02:13:15 22   **A**    To a pharmacist, as we're on the bench there, there's

02:13:17 23   a -- there's queues that we look at.  Four point is one of

02:13:23 24   those queues and it prioritizes, Connexus prioritizes those

02:13:26 25   queues and brings them up on our screen.

Militello - Direct/Majoras

02:13:28 1        So in the four-point process or the four-point queue,

02:13:32 2    the actual copy of the prescription, if it was a hard copy,

02:13:36 3    it's scanned into the system at the drop-off window.  If

02:13:41 4    it's an e-script, then that e-script is just what shows up

02:13:45 5    on our four point screen so that we can compare information

02:13:49 6    from the prescription itself to what we have input into

02:13:54 7    Connexus.

02:13:57 8    Q    And then you have the VV, which is visual

02:14:00 9    verification?

02:14:00 10   A    Correct.

02:14:00 11   Q    So how does that differ from the four point?

02:14:03 12   A    The visual verify is actually the process of the

02:14:07 13   pharmacist checking the physical drug itself, the bottle,

02:14:12 14   the label, make sure that all matches up.  And generally,

02:14:17 15   during the visual verify, for a prescription, I usually will

02:14:22 16   go back over the prescription itself to make sure that the

02:14:25 17   label reads properly.

02:14:28 18   Q    So when you have your initials as the LMI by VV, is

02:14:34 19   that the equivalent of saying that you're the pharmacist

02:14:36 20   that ultimately filled this prescription?

02:14:37 21   A    I'm the pharmacist that four-pointed it and also

02:14:41 22   visual verified that drug.  My technician filled it.

02:14:44 23   Q    By -- and by filling it, what is the technician

02:14:47 24   actually doing?

02:14:48 25   A    She is or he, but she in this case, is removing the

**Militello - Direct/Majoras**

02:14:52  1    stock bottle from the pharmacy shelf and then filling that

02:14:58  2    medication and placing it on a rack for us to check.

02:15:02  3          Now, in this case, it was morphine.  So she would have

02:15:05  4    to then come to me and say, I need morphine solution.  I

02:15:10  5    have to go to the safe.  ████████████████████████████

02:15:14  6    ████████████████████  and then I get that medication out.

02:15:18  7          If it's a medication where we need a count, she'll

02:15:23  8    generally do that initial count.  She will double count it,

02:15:28  9    and then I will triple count it when I get to it and back

02:15:31 10    count the stock bottle.

02:15:32 11    Q    So as you look at a prescription like this, and this

02:15:35 12    one was filled in 2013, anything about this prescription

02:15:37 13    that raises some flags or concerns to you?

02:15:40 14    A    No.

02:15:42 15    Q    Would you be surprised to know that you also filled a

02:15:45 16    prescription written by the same doctor for the same patient

02:15:49 17    for Lorazepam on the same day?

02:15:51 18    A    No.

02:15:52 19    Q    What is Lorazepam?

02:15:54 20    A    Lorazepam is a benzodiazapine used for anxiety.

02:15:59 21    Q    And why would that not surprise you?

02:16:03 22    A    Because as I mentioned earlier, a lot of times it's

02:16:05 23    issued to the patient for that hospice kit.  And also a

02:16:10 24    hospice patient, even if it's not for the kit, there's

02:16:14 25    usually an amount of anxiety that goes along with that

**Militello - Direct/Majoras**

02:16:18  1    process.  So that would not have raised any red flag for me.

02:16:21  2    **Q**    So if a -- one of the experts for the plaintiffs were

02:16:24  3    to say that this prescription has a red flag because it's a

02:16:28  4    combination of a benzo and an opioid, what's your response

02:16:37  5    to that?

02:16:37  6    **A**    I would say not in this case.

02:16:38  7    **Q**    Are there some cases where it would be?

02:16:40  8    **A**    Some cases it would be.

02:16:41  9    **Q**    And how do you go by differentiating which ones are

02:16:47  10   and which ones aren't?

02:16:47  11   **A**    By evaluating the prescription, the prescriber, the

02:16:50  12   patient, the diagnosis.

02:16:53  13   **Q**    Would you feel, if you filled both the Lorazepam and

02:16:58  14   the morphine prescriptions at the same time, would you feel

02:17:00  15   an obligation to write down why you did it and how you did

02:17:03  16   it?

02:17:04  17   **A**    No, I would not.

02:17:04  18   **Q**    Why not?

02:17:05  19   **A**    Because it's something that, in my practice of

02:17:09  20   pharmacy, that's not something that should raise -- it

02:17:13  21   doesn't raise a red flag to me.  So I wouldn't -- I wouldn't

02:17:16  22   document it.

02:17:17  23   **Q**    Okay.  Let's take a look at another prescription.

02:17:20  24         This is in Tab 2 of your binder.  And the -- for the

02:17:28  25   record, the number is WMT-MDL-01343_0110.

02:17:41  1      And then I'll also put in the record that we have an

02:17:44  2  additional, which I think is just the blowup of this,

02:17:48  3  WMT-MDL-01343-011.

02:17:55  4      And I'll actually look at mine to see if I said that

02:18:01  5  correctly.  And there's a reason why I do that because I was

02:18:04  6  wrong.  Okay.

02:18:04  7      Let's -- the second number I gave you is actually

02:18:07  8  going to be the end-of-day label.  Let's look first at what

02:18:10  9  we have in front of us.  And I'd like to really have you

02:18:14 10  kind of go through what you did with the prescription you

02:18:17 11  saw a moment ago.

02:18:17 12      What are -- if this is in front of you, what's

02:18:20 13  important, what are you looking at?  How are you evaluating

02:18:22 14  this?

02:18:22 15  **A**     For the prescription in front of me, the first thing I

02:18:26 16  would notice is the fact that it's a dental prescription, so

02:18:30 17  it's coming from a dentist.

02:18:32 18  **Q**     Why does that matter to you?

02:18:34 19  **A**     Because a dentist is likely in this case, with Ativan

02:18:39 20  like this, which is Lorazepam, which is used for anxiety,

02:18:45 21  they are likely to write this for a procedure that may

02:18:49 22  really make a patient nervous.  And so they will issue this,

02:18:54 23  as it looks like he did, for just a small amount, 12

02:19:02 24  tablets, which is in parenthesis, to cover three

02:19:07 25  appointments for the patient.  And the directions on that

### Militello - Direct/Majoras

02:19:10   1   read, "Two tablets the evening before going to bed and then

02:19:14   2   two tablets the hour before the procedure."

02:19:17   3        So -- and then they make sure they write on there to

02:19:21   4   not drive or use heavy machinery.  So that's just to make

02:19:24   5   sure the patient knows that they're going to need a driver.

02:19:27   6   Q    So let's do what I think will be pretty simple math.

02:19:31   7   There are three appointments, and it looks for each

02:19:34   8   appointment, the prescription is to take two tablets the

02:19:38   9   night before and then two tablets an hour before the

02:19:41  10   appointment; is that right?

02:19:42  11   A    That's right.

02:19:43  12   Q    So for three appointments, you would end up with 12

02:19:46  13   tablets; is that right?

02:19:46  14   A    That's correct.

02:19:52  15   Q    Anything else with this particular prescription that

02:19:54  16   you would be looking at?

02:19:55  17   A    The dentist is out of Great Northern, which is North

02:19:58  18   Olmsted, which is probably 40 minutes from Eastlake, but in

02:20:03  19   the case of dental prescriptions, sometimes people go to a

02:20:06  20   specific dentist to have a specific procedure.  So that

02:20:09  21   wouldn't have raised any type of issue or red flag for me.

02:20:12  22   Q    And you personally are familiar with North Olmsted?

02:20:15  23   A    I am, yeah.  That's where I worked on and off for a

02:20:18  24   few years after my first son was born.

02:20:22  25   Q    Okay.  So let's now turn to the next page, and I'll

Militello - Direct/Majoras

02:20:25  1   just make sure the record is clear on this.

02:20:27  2        This, in fact, is WMT-MDL-01343-09641.  Let's blow

02:20:38  3   that up.

02:20:39  4        Now, do you recognize this as the end-of-day label for

02:20:41  5   that prescription we just looked at?

02:20:47  6   **A**   Yes, that appears to be correct.

02:20:50  7   **Q**   So take us just quickly through.  Who did the four

02:20:53  8   point on this one?

02:20:54  9   **A**   The four point was done by a colleague -- well,

02:20:58 10   actually the pharmacy manager at that time.

02:21:00 11   **Q**   And the visual verify is you?

02:21:02 12   **A**   That's correct.

02:21:03 13   **Q**   Is it unusual that one pharmacist would do the four

02:21:07 14   point and another would do the visual verify?

02:21:10 15   **A**   No, not at all.

02:21:11 16   **Q**   And then the fill is by someone with the initials PAH?

02:21:15 17   **A**   That's a technician.

02:21:18 18   **Q**   And then also here, there's a -- the PAT, PAY, is that

02:21:24 19   patient pay?

02:21:24 20   **A**   That is correct, right.

02:21:25 21   **Q**   So what does that indicate?

02:21:27 22   **A**   I think that would be indicating how much the patient

02:21:30 23   actually did pay for the prescription.

02:21:32 24   **Q**   So $5.73, if I'm reading that correctly?

02:21:36 25   **A**   Yes.

**Militello - Direct/Majoras**

02:21:37 1    **Q**    Anything else about the end-of-day label that you

02:21:42 2    think is worth sharing?

02:21:47 3    **A**    Not -- not necessarily, no.

02:21:49 4    **Q**    Okay.

02:21:49 5         So taken together, the prescription and the end-of-day

02:21:53 6    label, any red flags or concerns to you about this?

02:21:56 7    **A**    No, not for me.

02:22:01 8    **Q**    So would it surprise you to know that on the same day,

02:22:09 9    from the same prescriber, the same dentist, there is another

02:22:13 10   medication that you filled for hydro APAP?

02:22:18 11   **A**    No, that would not surprise me.

02:22:19 12   **Q**    Okay.

02:22:19 13        So first let's go -- let's talk -- what is hydro APAP?

02:22:24 14   And I'll tell you the strength was 10/500 milligrams.

02:22:27 15   **A**    So that's hydrocodone, which is an opioid narcotic,

02:22:31 16   and then it's in combination with acetaminophen, which is

02:22:35 17   like Tylenol.

02:22:36 18   **Q**    And why would that not surprise you that would you

02:22:39 19   also see that prescription that day for this patient?

02:22:40 20   **A**    Because the patient is going in for three different

02:22:44 21   appointments.  So I would take into account that the

02:22:47 22   patient's having a procedure done that they very likely need

02:22:50 23   pain treatment for.

02:22:52 24   **Q**    So when you take those two together, does that raise a

02:22:55 25   red flag for you or a concern?

**Militello - Direct/Majoras**

02:22:57 1      **A**      It doesn't raise a concern.

02:22:59 2              It's worth noting to the patient that there are

02:23:03 3      certain risks involved, but it doesn't -- it doesn't create

02:23:08 4      a red flag that I would not fill that combination.

02:23:10 5      **Q**      So if one of the witnesses for the plaintiffs said,

02:23:13 6      wait, this is -- this is a red flag, what's your response?

02:23:15 7      **A**      That is not a red flag for me, no.

02:23:18 8      **Q**      But this is -- these two products are, again, a benzo

02:23:23 9      and a --

02:23:24 10     **A**      An opioid.

02:23:24 11     **Q**      -- an opioid?

02:23:26 12     **A**      Yes.

02:23:29 13     **Q**      What if -- what if we go back.  You saw the -- on the

02:23:37 14     end-of-day label, we mentioned the patient pay, the $5.73.

02:23:42 15     Does that raise an issue for you?

02:23:43 16     **A**      It does not raise an issue because sometimes patients

02:23:52 17     don't have prescription insurance.  And for this medication,

02:23:57 18     the way it was prescribed from the dentist, I'm thinking

02:24:01 19     that's something they're not going to forego because they

02:24:04 20     can't put it on a prescription insurance so they decided to

02:24:08 21     pay out of pocket for it.

02:24:10 22     **Q**      And I've been told that I, once again, made a mistake

02:24:14 23     in my label of the document.

02:24:17 24             So the label we're looking at, the end-of-day label is

02:24:21 25     WMT-MDL-01343_0111.

### Militello - Direct/Majoras

02:24:31  1      Your Honor, thank you.  Thank you to my colleagues.

02:24:33  2  Okay.

02:24:34  3      Let's take -- let's take a look at one more if you

02:24:36  4  would, please.  This should be behind Tab 3.  And I will

02:24:46  5  read into the record that this is WMT-MDL-01343_0963.  If we

02:25:02  6  could blow that up for Ms. Militello?

02:25:03  7      So let's do the same thing.  Take us through what you

02:25:05  8  think is, as you're looking at this, the information that

02:25:08  9  you think is useful to know as you're thinking about filling

02:25:10 10  it.

02:25:10 11  **A**    So the first thing, again, is noticing that it's

02:25:13 12  written by a DDS, which is a dentist prescription.  It's for

02:25:19 13  a pain medication, which certainly would not be anything

02:25:25 14  unusual.

02:25:31 15      It's for, I'm sorry, 25 tablets, which is a fairly low

02:25:34 16  amount for 2013.  It was a very reasonable amount, for sure.

02:25:39 17  **Q**    And this shows that the dosage is one tablet every

02:25:46 18  four to six hours.  So how many days of medication is this?

02:25:50 19  **A**    That's going to be probably five to seven days worth

02:25:58 20  of medication.

02:25:58 21  **Q**    Anything, as you look at a prescription from a dental

02:26:02 22  office of this nature, anything standing out to you as a

02:26:04 23  concern or a red flag?

02:26:07 24  **A**    As of 2013, no.

02:26:10 25  **Q**    So when you say as of 2013, why are you distinguishing

**Militello - Direct/Majoras**

02:26:13 1    that?

02:26:13 2    **A**    Because now, in 2021, there are acute pain guidelines

02:26:18 3    that have kind of been put in place that we might -- I

02:26:23 4    definitely would call to make sure that the patient is not

02:26:28 5    taking any more than four of those in a day for no longer

02:26:32 6    than seven days.  So there might have been a call made in

02:26:36 7    2021 regarding that.

02:26:37 8    **Q**    When did those acute pain guidelines come into place?

02:26:42 9    **A**    I'm going to say probably in the last five years.

02:26:44 10   **Q**    Let's turn to the next page in your binder.  This is

02:26:49 11   the end-of-day label.  WMT-MDL-01343_ 0964.  Blow that up,

02:27:02 12   please.  Okay.

02:27:06 13        This is the -- do you recognize this as the end-of-day

02:27:08 14   label for the prescription we just saw?

02:27:09 15   **A**    Yes, I do.

02:27:10 16   **Q**    And this means -- when you have a label like this, the

02:27:13 17   information would show you that the prescription was filled;

02:27:15 18   right?

02:27:16 19   **A**    Right, because there's a visual verify pharmacist on

02:27:19 20   that.

02:27:19 21   **Q**    And who's that?

02:27:20 22   **A**    That's me.

02:27:22 23   **Q**    And you also did the four point on this one; right?

02:27:25 24   **A**    I did.

02:27:26 25   **Q**    And here we have a patient pay and also shows a

**Militello - Direct/Majoras**

02:27:30  1    Number, $21.72?

02:27:33  2    **A**    Correct.

02:27:35  3    **Q**    Anything about this prescription, looking at the front

02:27:38  4    and the back of it, that raises some concerns to you as you

02:27:43  5    look back to 2013?

02:27:46  6    **A**    No.

02:28:05  7    **Q**    So if I were to tell you that on the same day you also

02:28:08  8    filled a prescription for diazepam, a 10-milligram, one --

02:28:17  9    one dose, a single pill for one day, would that surprise

02:28:19 10    you?

02:28:19 11    **A**    No.

02:28:20 12    **Q**    Why not?

02:28:21 13    **A**    Again, that's probably for a dose prior to a

02:28:24 14    procedure.

02:28:26 15    **Q**    Is that something -- is this type of combination of

02:28:31 16    medication something that you see in what you're doing as a

02:28:35 17    pharmacist at Walmart?

02:28:35 18    **A**    Yeah, I see it quite often.

02:28:37 19    **Q**    And what about specifically with respect to dentists?

02:28:40 20    **A**    Yes, quite often with dentists.

02:28:44 21    **Q**    So if someone were to say to you that there are red

02:28:47 22    flags because of the combination of the benzo and the

02:28:55 23    opioid, and the fact that the patient paid cash, what's your

02:28:57 24    response to that?

02:28:58 25    **A**    The patient paying cash, they were born in 1985 I can

**Militello - Direct/Majoras**

02:29:03  1   see, so in 2013, that may be a patient that did not have

02:29:09  2   prescription insurance.  So that really -- this prescription

02:29:13  3   and that combination would not give me any red flag.

02:29:17  4   **Q**   So didn't you write everything you just said on the

02:29:20  5   prescription back when you filled it?

02:29:21  6   **A**   Because when I was evaluating the prescription, it was

02:29:24  7   second nature to me to know those facts.

02:29:27  8   **Q**   When you say second nature, what's that based on?

02:29:31  9   **A**   My experience as a pharmacist and what I know about

02:29:34 10   those medications, I guess.

02:29:40 11   **Q**   Okay.  Again, switching topics a bit.  I'd like to

02:29:43 12   talk to you a little bit about when do you not fill a

02:29:45 13   prescription.  Is there a phrase that you use at Walmart as

02:29:48 14   a pharmacist for when you do not -- when you decide the

02:29:51 15   prescription should not be filled?

02:29:52 16   **A**   We consider that a refusal to fill.

02:29:54 17   **Q**   Does that also include instances where you believe

02:29:57 18   there's a forgery?

02:30:00 19   **A**   Oh, yes.  Yeah.

02:30:02 20   **Q**   But also times when you're just uncomfortable using

02:30:06 21   your corresponding responsibility and judgment; is that

02:30:07 22   right?

02:30:07 23   **A**   Yes.

02:30:17 24   **Q**   What do you do with a prescription when you refuse to

02:30:20 25   fill it?  Let's start a forged prescription, one that you

Militello - Direct/Majoras

02:30:24 1   think might be forged.  What do you do with that

02:30:26 2   prescription?

02:30:26 3   **A**     If it's a forged prescription, we would have to have

02:30:28 4   contact with the doctor, and we would have to have the

02:30:31 5   doctor confirm to us in writing that that was a forged

02:30:34 6   prescription.  And in that case, the prescription would then

02:30:37 7   be confiscated from the patient.

02:30:41 8   **Q**     And did you do anything else once you were -- you had

02:30:45 9   the belief that it was forged?

02:30:47 10  **A**     I mean, certainly we would contact law enforcement,

02:30:50 11  let them know that as soon as the doctor has confirmed it.

02:30:53 12  **Q**     What about a situation where you just were

02:30:57 13  uncomfortable filling it because you were not sure the

02:30:59 14  prescription was appropriately prescribed for legitimate

02:31:02 15  medical purpose?  What would you do with those

02:31:04 16  prescriptions?

02:31:06 17  **A**     With those prescriptions, I mean, we were not allowed

02:31:09 18  to just keep the prescription simply because we had a belief

02:31:13 19  in that manner.  So the prescription would have to be

02:31:17 20  returned to the patient.

02:31:19 21  **Q**     And do you do anything with the prescription so that

02:31:21 22  if the patient tries to fill it somewhere else, there's a

02:31:25 23  reference to it that they stopped at your pharmacy first?

02:31:30 24  **A**     So very often, there's maybe a sticker that had to be

02:31:36 25  peeled off or there may be some pharmacist writing on the

### Militello - Direct/Majoras

02:31:40  1    front of that prescription that would indicate to a pharmacy

02:31:42  2    that was getting it next that that has already been dropped

02:31:44  3    off at a pharmacy and not filled.

02:31:52  4    **Q**    You've heard of the phrase blanket refusal to fill?

02:31:54  5    **A**    I have.

02:31:55  6    **Q**    What is that?

02:31:55  7    **A**    Blanket refusal is when the pharmacist has taken it

02:31:59  8    upon themselves to refuse filling for a prescriber in

02:32:03  9    general.

02:32:04  10    So you have a prescriber you get prescriptions for.

02:32:06  11    You don't feel that they prescribe in a manner that is

02:32:11  12    appropriate so you decide that you are not going to fill

02:32:14  13    controlled prescriptions for that prescriber.

02:32:16  14    **Q**    And have you done that within your time as a

02:32:18  15    pharmacist at Walmart?

02:32:19  16    **A**    I did do it, yes.

02:32:20  17    **Q**    And, so, are there situations where you just have

02:32:24  18    concluded anything that comes in from a particular

02:32:26  19    prescriber, you're not going to fill?

02:32:28  20    **A**    In the case where I did it, it was that I was -- I was

02:32:32  21    trying to communicate with the prescriber and I was not

02:32:34  22    getting sufficient feedback from the prescriber, I was not

02:32:38  23    getting calls back from the prescriber themselves, so I felt

02:32:42  24    like I wasn't getting information that I was requesting and

02:32:47  25    so it was persistent.  So that's why I had put the blanket

**Militello - Direct/Majoras**

02:32:51 1    refusal in.

02:32:51 2    **Q**    And when you did that, do you know whether that

02:32:56 3    complied with Walmart policies at the time?

02:32:58 4    **A**    I'm sorry, if --

02:32:59 5    **Q**    Do you know whether that complied with Walmart

02:33:01 6    policies at the time?

02:33:02 7    **A**    It did, yes.

02:33:06 8    **Q**    You're also -- are you familiar with the phrase

02:33:09 9    corporate blocks?

02:33:10 10    **A**    I am.

02:33:10 11    **Q**    Have you ever felt you needed a corporate block to

02:33:12 12    help you decide whether to fill a prescription from a

02:33:16 13    particular prescriber?

02:33:19 14    **A**    It didn't really come down to whether I needed it.  It

02:33:22 15    is a situation where if that prescriber is blocked

02:33:25 16    corporately, we are not permitted to fill that prescription.

02:33:30 17    **Q**    At any point in time in your career at Walmart, if you

02:33:34 18    were to make decision after decision that you're not going

02:33:37 19    to fill a prescription from a particular provider, did you

02:33:41 20    feel comfortable doing that?

02:33:43 21    **A**    Yes.  If I felt that situation had arisen, yes.

02:33:47 22    **Q**    Ever get any push back from anyone that you shouldn't

02:33:50 23    be doing it that way?

02:33:51 24    **A**    No.

02:33:52 25    **Q**    Last topic I'd like to talk to you about is drug

02:33:55  1    disposal.

02:33:57  2         The jury's heard a bit about this issue from other

02:34:04  3    witnesses so I'd like to -- like you to help explain what

02:34:07  4    Walmart has done.

02:34:08  5         What is Dispose RX?

02:34:10  6    **A**    Dispose RX is a pre-packaged powder with directions

02:34:14  7    typed on the side that tells the patient if they have

02:34:17  8    remaining opioid medication or benzodiazapine or some type

02:34:21  9    of medication left that they don't want in their house, that

02:34:25 10    this powder can be added with warm water and then shaken up,

02:34:29 11    it deactivates the product and it can be disposed of.

02:34:40 12    **Q**    Why is Walmart offering that product?

02:34:43 13    **A**    It's a service to the patient to be able to get rid of

02:34:49 14    medications that they don't want anyone else having access

02:34:53 15    to in a responsible manner, and there are a lot of patients

02:34:59 16    that are very appreciative of Dispose RX.

02:35:01 17    **Q**    To go back to your drawing we had of your pharmacy,

02:35:04 18    there was a consulting window.

02:35:05 19    **A**    Yes.

02:35:06 20    **Q**    Is there any consulting that you do with your patients

02:35:09 21    about Dispose RX?

02:35:10 22    **A**    Yes.

02:35:10 23    **Q**    What's that?

02:35:11 24    **A**    I go through just what I just told you and that

02:35:15 25    they're getting an opioid prescription filled.  If you don't

**Militello - Direct/Majoras**

02:35:17   1   take all that medication, which we want you to take it for

02:35:20   2   the least amount of time possible at the lowest dose that's

02:35:24   3   treating your pain, and if you have tablets remaining after

02:35:27   4   that, that this Dispose RX can be utilized to help get rid

02:35:32   5   of that medication.

02:35:32   6   **Q**   How much does a Dispose RX kit cost?

02:35:35   7   **A**   It does not cost.

02:35:38   8            MR. MAJORAS:  Thank you, Ms. Militello.

02:35:40   9       Your Honor, I pass the witness.

02:35:41  10            THE COURT:  Okay.  I assume no questions from

02:35:44  11   CVS or Walgreens?

02:35:46  12            MR. STOFFELMAYR:  No, Your Honor.

02:35:47  13            MR. DELINSKY:  No.

02:35:47  14            THE COURT:  Okay.

02:35:47  15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

**Militello - Cross/Lanier**

02:35:47  1          CROSS-EXAMINATION OF LORI MILITELLO

02:36:25  2   BY MR. LANIER:

02:36:25  3   **Q**    All right.

02:36:27  4        My big question for you today, I want to make sure I'm

02:36:32  5   pronouncing your name right.  Militello?

02:36:36  6   **A**    Perfect.

02:36:37  7   **Q**    Okay.

02:36:38  8        Ms. Militello, my name is Mark Lanier.  I'm going to

02:36:40  9   take you on cross-examination for a while.  I've done a

02:36:42 10   little road map so that you've got an idea of where we're

02:36:46 11   going and the jury does as well.

02:36:48 12        I want to talk to you about some of the patients, and

02:36:53 13   I want to talk to you about some of the stores, and then I

02:36:56 14   want to talk to you about some of the policies.

02:36:58 15        Okay?

02:36:58 16   **A**    Okay.

02:36:59 17   **Q**    Let's start with patients.

02:37:02 18        So I had a chance to get our folks to run through the

02:37:05 19   dispensing data, the data that y'all provided to us, your

02:37:10 20   company provided to us, about the dispensing that you've

02:37:14 21   done and others have done in your stores.  Okay?

02:37:16 22   **A**    Okay.

02:37:17 23   **Q**    So, for example, the Eastlake store.  Do you know how

02:37:24 24   many unique patients you and other pharmacists have serviced

02:37:31 25   over the last, I think we have 14 years or so of dispensing

**Militello - Cross/Lanier**

02:37:35  1    data?

02:37:36  2    **A**    No, I don't.

02:37:38  3    **Q**    You talk about how important it is that you know your

02:37:41  4    patients and that you've gotten to know them.  Would you be

02:37:45  5    surprised to know that y'all have filled prescriptions for

02:37:48  6    11,628 different people?

02:37:53  7    **A**    I did not know that number.

02:37:55  8    **Q**    All right.

02:37:55  9          And would you agree with me there's no way you know

02:37:58  10   all of those 11,628 people?

02:38:01  11   **A**    There is no way.

02:38:02  12   **Q**    All right.

02:38:03  13         And there have been other stores you've worked at.  I

02:38:06  14   think you worked at Walmart 2197 for a while?

02:38:09  15   **A**    I don't know the store number, but. . .

02:38:12  16   **Q**    It's another one in the county.

02:38:14  17   **A**    Okay.

02:38:14  18   **Q**    And 13,200 different people there.  You wouldn't know

02:38:20  19   all of those either, would you?

02:38:22  20   **A**    I certainly wouldn't.

02:38:23  21   **Q**    And if we just counted the different doctors that have

02:38:25  22   filled prescriptions there, at the Eastlake store that we

02:38:30  23   were talking about, 5,168 different prescribers, there's no

02:38:37  24   way you know all of those.  Fair?

02:38:39  25   **A**    Not.

**Militello - Cross/Lanier**

02:38:40  1    **Q**    Okay.

02:38:41  2         So when we talk about knowing the doctors and the

02:38:44  3    patients, would it be fair to say that there are some you do

02:38:48  4    know, but there are many you do not know.  Fair?

02:38:54  5    **A**    Over the course of those years, yeah, that's fair.

02:38:56  6    **Q**    And that's magnified if the jury understands that

02:39:03  7    you've worked in so many different Walmarts, you don't --

02:39:06  8    you've lost count.

02:39:07  9         Fair?

02:39:08  10   **A**    Yeah.

02:39:08  11        The stores in other areas, I can't account for their

02:39:12  12   patients and doctors.

02:39:13  13   **Q**    What I mean by that, though, is you've been assigned,

02:39:18  14   some people call it floating, others call it a temporary,

02:39:22  15   but you've been assigned to go to different Walmarts?

02:39:24  16   **A**    Um-hmm.

02:39:25  17   **Q**    Over your years.  And some of them, you work in for a

02:39:28  18   day, and some of them a week, and some of them a month, but

02:39:31  19   you get -- you float around to different Walmarts.

02:39:33  20        Fair?

02:39:36  21   **A**    I mean, I work steadily in Eastlake.  So that's my

02:39:39  22   steady store, but I have floated to different stores to help

02:39:43  23   out, yes.

02:39:43  24   **Q**    Yeah.

02:39:44  25        In your deposition, when asked how many different

**Militello - Cross/Lanier**

02:39:47  1    Walmart pharmacies have you worked in, your answer was I

02:39:50  2    couldn't give you an accurate account because I've worked at

02:39:54  3    various pharmacies that need extra help or floated out to

02:39:58  4    pharmacies, and not just in Northeast Ohio, but all over the

02:40:02  5    State of Ohio; right?

02:40:03  6    **A**    Correct.

02:40:04  7    **Q**    And so not only might you not know all of the doctors

02:40:07  8    and patients in your store, but as you, or others float

02:40:12  9    around, you're going to be hit with patients and doctors

02:40:14  10   you've never heard of before.

02:40:16  11       Fair?

02:40:16  12   **A**    Yes.

02:40:17  13   **Q**    All right.

02:40:18  14       While we're dealing with patients -- by the way, how

02:40:23  15   did I do on that picture?

02:40:24  16   **A**    Great.

02:40:25  17   **Q**    All right.  That's you; right?

02:40:26  18   **A**    That's me.

02:40:26  19   **Q**    It looks like I cropped out your husband.  You go tell

02:40:30  20   him, he got cut.  All right?

02:40:34  21       While we're on this subject, I want to put into a

02:40:40  22   little fuller perspective an answer you gave earlier about

02:40:44  23   contacting other pharmacies and pharmacists.  Okay?

02:40:48  24   **A**    Okay.

02:40:48  25   **Q**    Now, you did give a deposition in this case a few

**Militello - Cross/Lanier**

02:40:51  1   months back; right?

02:40:52  2   **A**    Correct.

02:40:53  3   **Q**    And you took the same oath that His Honor gave to you

02:41:00  4   to tell the truth.  And you understood that we were getting

02:41:02  5   testimony from you that we could hold you to if you took the

02:41:06  6   stand here today; right?

02:41:07  7   **A**    Correct.

02:41:07  8   **Q**    All right.

02:41:07  9        So in that regard, do you recall being asked if you

02:41:10  10  know any of the other pharmacists that work at the other

02:41:13  11  pharmacies nearby?  And you said, "I know them to talk to

02:41:18  12  them; I don't know them personally."

02:41:20  13       Fair?

02:41:21  14  **A**    Fair.

02:41:22  15  **Q**    And then the question, "Under what circumstances would

02:41:26  16  you know them to talk to them?"

02:41:29  17       Do you remember what answer you gave?

02:41:31  18  **A**    I do not.

02:41:31  19  **Q**    You said, "We often talk during transfers of

02:41:37  20  prescriptions."

02:41:39  21       Remember that?

02:41:39  22  **A**    Yes.

02:41:40  23  **Q**    A transfer of prescription means you're getting

02:41:45  24  somebody that used to be filled at another store, or they're

02:41:49  25  getting somebody that you used to be filled at your store;

02:41:52  1    right?

02:41:52  2    **A**    Right.

02:41:52  3    **Q**    And then when asked, did you ever talk to them about

02:41:57  4    anything other than transfers of prescriptions, your answer

02:42:01  5    was, at this point, rarely anything about transfers.

02:42:07  6         Is that still your testimony today?

02:42:09  7              MR. MAJORAS:  Objection.  Improper

02:42:11  8    impeachment.  It's consistent.

02:42:13  9              THE COURT:  Overruled.

02:42:17 10    BY MR. LANIER:

02:42:17 11    **Q**    Is it?

02:42:18 12    **A**    We did talk during transfers, but we also -- I would

02:42:23 13    also discuss with them, or maybe another pharmacist in my

02:42:28 14    store would discuss with them and pass it along to me.  So

02:42:31 15    we did have a relationship with other pharmacists.

02:42:32 16    **Q**    But the answer, "Did you ever talk" -- here, let me

02:42:36 17    show it to you so you've got a chance to see it.  It's on

02:42:39 18    Page 83.

02:42:41 19         "Under what circumstances would you know them to talk

02:42:43 20    to them?

02:42:44 21         "We often talked during transfers of prescriptions.

02:42:47 22         "And do you remember talking to them about anything

02:42:50 23    other than transfers of prescriptions?

02:42:52 24         "At this point, rarely anything about transfers."

02:42:55 25         Is that still your testimony today?

**Militello - Cross/Lanier**

02:42:57  1    **A**    Yes, because at this point, we do barely talk to them

02:43:04  2    about anything but transfers.

02:43:06  3    **Q**    But just then later, just a couple questions or two

02:43:09  4    later, "Have you ever talked to any of these pharmacists

02:43:11  5    about problems with certain patients?"

02:43:14  6         Your answer was, "These pharmacists know" -- and those

02:43:17  7    may have been the ones right close to you, right?

02:43:21  8    **A**    Um-hmm.

02:43:21  9    **Q**    "Have you ever talked with any other pharmacists about

02:43:24 10    prescribers?

02:43:27 11         "Today?  No.

02:43:28 12         "What about since you started working at Store 1863?

02:43:31 13    Have you ever talked to other pharmacists about

02:43:34 14    prescribers?"

02:43:35 15         You said, "I have.

02:43:39 16         "What did you talk to them about?

02:43:41 17         "I don't recall at this point.

02:43:45 18         "Do you recall anything about those conversations?

02:43:46 19         "Not really at this point."

02:43:48 20         Is that still your testimony today, ma'am?

02:43:51 21    **A**    Yes.  I don't remember specific conversations.

02:43:54 22    **Q**    You were asked, "Do you remember recall talking to

02:43:58 23    them about, for example, forged or altered prescriptions?"

02:44:02 24         And you said, "I don't.

02:44:05 25         "Do you ever recall talking to them about prescribing

02:44:10  1    patterns?

02:44:10  2           "Potentially prescribing patterns.

02:44:13  3           "And who would you have talked to.

02:44:14  4           "I don't know.

02:44:14  5           "Do you recall generally what was discussed?

02:44:16  6           "I do not.

02:44:17  7           "Do you recall discussing with any of these

02:44:20  8    pharmacists opioids or opioid prescriptions?

02:44:22  9           "Potentially at one point.

02:44:27 10           "Do you recall who?

02:44:29 11           "No."

02:44:30 12           Is that still your testimony today?

02:44:32 13    **A**     Yes.

02:44:33 14    **Q**     All right.

02:44:33 15           So when you talked in response to Mr. Majoras'

02:44:38 16    questions about speaking with other pharmacists frequently,

02:44:41 17    is it safe for us to assume your answers under oath were

02:44:44 18    correct and you speak to them frequently about transfers of

02:44:48 19    prescriptions, maybe once about opioids?

02:44:52 20    **A**     We would speak to pharmacists about transfers, but

02:44:55 21    also if we had a concern, we would call other pharmacies in

02:44:58 22    the area regarding the concern.

02:45:00 23    **Q**     Well, now you've just said we at that point, and I can

02:45:03 24    only ask you about you personally.  So is your personal

02:45:08 25    testimony the same as it was several months ago when you

**Militello - Cross/Lanier**

02:45:10  1    were under oath?

02:45:11  2    **A**    Yes.

02:45:12  3    **Q**    Thank you.

02:45:13  4         Now, while we're dealing with patients, I want to do

02:45:17  5    one more thing.  You looked at a number of prescriptions

02:45:20  6    with Mr. Majoras, but I'd like to look at a few others,

02:45:26  7    please.  I'm going to have handed up to you Plaintiffs'

02:45:35  8    Exhibit 17572.

02:45:40  9         Do you have that, ma'am?

02:45:43  10   **A**    I do.

02:45:44  11   **Q**    And it's really small print so I'm going to have to

02:45:46  12   blow it up pretty good, and we'll have to move it around on

02:45:52  13   the screen a little to make it work.  But this is dealing

02:45:57  14   with a doctor, a prescriber, named Trevor Levin.

02:46:03  15   **A**    Um-hmm.

02:46:04  16   **Q**    Do you see that?

02:46:04  17   **A**    I do.

02:46:05  18   **Q**    And you remember him, don't you?

02:46:06  19   **A**    I do.

02:46:12  20   **Q**    Trevor Levin is someone that, in the comments here,

02:46:15  21   you've got -- by the way, this is your main store, Eastlake;

02:46:18  22   right?

02:46:18  23   **A**    It is.

02:46:19  24   **Q**    Prescriber is prescribing large amounts of

02:46:24  25   hydrocodone, Soma, Valium, for the same patient.  Is not

**Militello - Cross/Lanier**

02:46:29  1   cooperative in having discussions about patient therapy.

02:46:34  2   Not comfortable filling prescriptions from this doctor at

02:46:38  3   the quantities he prescribes.

02:46:41  4        Do you see that?

02:46:41  5   **A**   I see that.

02:46:42  6   **Q**   And so we see as of June 7th, 2018, you were not being

02:46:50  7   comfortable filling those prescriptions; right?

02:46:57  8   **A**   I don't know who made the comment.

02:46:58  9   **Q**   Okay.  So maybe you, maybe not you.  Fair?

02:47:00  10  **A**   I don't know.

02:47:02  11  **Q**   But we do know that if we keep looking, a few weeks

02:47:07  12  before, at the store in Mentor, the same note of this doctor

02:47:13  13  is made that his specialty is as a hormone fatigue and rehab

02:47:19  14  center, not as pain management, that he routinely writes for

02:47:25  15  cocktail of commonly abused drugs or combo, oxy, Soma,

02:47:32  16  Valium, with no other non-controlled substance prescriptions

02:47:36  17  presented by patient.

02:47:38  18        Do you see that as well?

02:47:39  19  **A**   I see that.

02:47:40  20  **Q**   That he's confrontational when asked questions and

02:47:44  21  concerns relating to the patient care.

02:47:46  22        Do you see that also?

02:47:53  23  **A**   Um-hmm, yes.

02:47:54  24  **Q**   All right.

02:47:55  25        And the reason I'm bringing this up is because we've

**Militello - Cross/Lanier**

02:47:57  1    got some other prescriptions that were filled by this doctor

02:48:00  2    or filled of this doctor that I'd like to talk to you about.

02:48:06  3    So I'm handing you Plaintiffs' Exhibit 21391, which is a

02:48:15  4    prescription, and it's one that was refused to fill

02:48:26  5    March 6th, 2017, over a year earlier.

02:48:29  6         Do you see this?

02:48:29  7    **A**    I see it.

02:48:32  8    **Q**    Now, is this your prescription?

02:48:36  9    **A**    It is not, no.

02:48:39  10   **Q**    We've got your name on this at one point.  Let's look

02:48:43  11   at the OARRS report together.

02:48:47  12        This is a classic OARRS report, isn't it?

02:48:50  13   **A**    Yes.

02:48:52  14   **Q**    And help the jury walk through some of this OARRS

02:48:55  15   report, please.

02:48:57  16        First of all, we've got the prescriber, and that's

02:49:02  17   this Trevor Levin fellow; right?

02:49:05  18   **A**    Right.

02:49:06  19   **Q**    And we've got here, if we blow this up a little bit

02:49:09  20   more, we've got him writing prescriptions, these three, all

02:49:14  21   on the same day.  True?

02:49:16  22   **A**    Yes.

02:49:17  23   **Q**    And it looks like these daily medicines, at least

02:49:22  24   these are 60 tablets; is that right?

02:49:25  25   **A**    Correct.  On the top, oxycodone.  It looks like it was

6713

**Militello - Cross/Lanier**

02:49:28  1   60.

02:49:29  2   **Q**    Yeah.  In fact, we can see it here.

02:49:31  3        He's written a prescription to be filled for 60

02:49:35  4   oxycodone, 90 carisoprodol?

02:49:44  5   **A**    Carisoprodol.

02:49:44  6   **Q**    That's exactly what I was not able to say.

02:49:50  7   Carisoprodol.

02:49:50  8        Now, this is a patient history report and yet, the

02:49:53  9   patient's got two different numbers.  Do you know why that

02:49:58 10   is?

02:49:58 11   **A**    No, I don't.

02:49:59 12   **Q**    All right.

02:50:00 13        We've got oxycodone, OxyContin, and carisoprodol.

02:50:05 14   What kind of a drug is carisoprodol?

02:50:08 15   **A**    It is a muscle relaxer.

02:50:15 16   **Q**    So that's part of the trinity cocktail.  You got two

02:50:17 17   of the three, don't you?

02:50:18 18   **A**    Correct.

02:50:19 19   **Q**    If you look at the next page, not only do we have --

02:50:22 20   and we're going to come back to these dates -- February,

02:50:26 21   oxycodone and OxyContin, 30 days of each -- or one and 60 of

02:50:33 22   the other, but if you go back to the next page of this

02:50:36 23   patient history, you've got diazepam for 90 days, is that --

02:50:44 24   or quantity 90.  So that's 30 days.  This is days; right?

02:50:48 25   **A**    Right.

6714

**Militello - Cross/Lanier**

02:50:49  1    **Q**    So you've got -- and diazepam, that's the third part

02:50:53  2    of the trinity.  That's the benzo, isn't it?

02:50:58  3    **A**    Yes, it is a benzodiazapine.

02:50:59  4    **Q**    So you've got, for this person, you've got for this

02:51:07  5    person prescriptions written all on the same day for the

02:51:14  6    trinity, don't you?

02:51:15  7    **A**    Yes.

02:51:17  8    **Q**    And these were filled at Walmart, weren't they?

02:51:22  9    **A**    Yes.

02:51:24  10   **Q**    And it's not just that February filling, but you can

02:51:28  11   go back and look, February 5th, and you've got another

02:51:34  12   oxycodone.  And this time, 150 tablets for 30 days; correct?

02:51:40  13   **A**    Yes.

02:51:41  14   **Q**    So you've got a 30-day prescription for oxy filled and

02:51:48  15   then 20 days later you've got another 30 days filled.  And

02:51:53  16   this is in the midst of getting the trinity filled; correct?

02:51:57  17   **A**    The oxycodone 30 is an immediate release tablet, and

02:52:01  18   the oxycodone that was filled on the 20th of February was an

02:52:06  19   extended-release oxycodone.

02:52:07  20   **Q**    Um-hmm.

02:52:07  21        So you've got an extended release and an immediate

02:52:11  22   release being written and filled at the same time?

02:52:13  23   **A**    Yeah, that's not unusual.

02:52:15  24   **Q**    You don't consider that a red flag?

02:52:17  25   **A**    No.

**Militello - Cross/Lanier**

02:52:25  1    **Q**    Hum.

02:52:26  2          Oxycodone, we go back to the 16th, on January 16th

02:52:30  3    you've got filled -- or written the same day, two different

02:52:37  4    oxycodone and another OxyContin for another 90 days.

02:52:41  5          Do you see that as well?

02:52:43  6    **A**    I don't see the 90-day.

02:52:45  7    **Q**    I'm sorry, 30 days.  It's 30, 60, 90.  My brain is

02:52:50  8    short-circuited.  For 30 days each.

02:52:53  9          Do you see that?

02:52:53 10    **A**    Yes.

02:52:54 11    **Q**    And we've also got, if we want to keep going back, a

02:52:58 12    filling that took place on January 16th and January 8th, all

02:53:05 13    within that same month, of the other two drugs in the

02:53:08 14    trinity; right?

02:53:09 15    **A**    Yes.

02:53:12 16    **Q**    All filled at Walmart, same store; correct?

02:53:17 17    **A**    Correct.

02:53:18 18    **Q**    And we can go back and we can look even further and

02:53:22 19    we're going to see earlier in January another 30 days.  So

02:53:26 20    now we've got for oxycodone 30, we've got 90 tablets filled

02:53:33 21    in less than two months.  We've got 90 days worth, excuse

02:53:38 22    me, not tablets; right?

02:53:39 23    **A**    You're looking at the oxycodone immediate release and

02:53:44 24    oxycodone extended release.  So those are two different

02:53:52 25    formulations.

**Militello - Cross/Lanier**

02:53:53  1  **Q**    Okay.

02:53:53  2  **A**    So that would not be looked at in that manner.  We

02:53:57  3  would look collectively at the immediate release and we

02:53:59  4  would look collectively at the extended release.

02:54:01  5  **Q**    Well, you can continue to look and go through this

02:54:04  6  list and you've got -- look at just December.  Just in the

02:54:09  7  month of December the fills, including another 30 for oxy

02:54:16  8  40's, another 30 for oxy '60s, diazepam 10's, oxycodone 21,

02:54:26  9  carisoprodol for 30, and diazepam for another 7, all, same

02:54:32  10  doctor; all, same month; all, same store, filled at Walmart.

02:54:39  11       True?

02:54:39  12  **A**    Correct.

02:54:44  13  **Q**    And we can go back to November.  And in November we're

02:54:48  14  going to see the same pattern filled (indicating).

02:55:00  15       Correct?

02:55:02  16  **A**    Yeah.  I mean, we're seeing the diazepam are being

02:55:07  17  filled. . . for some of them are 20 days, some of them are

02:55:19  18  7, I see.

02:55:19  19       So we also look at day supply in that instance.

02:55:22  20  **Q**    Right.

02:55:22  21       So if you look, for example, in December, you've got

02:55:24  22  the diazepam for 20 and also the diazepam for 7.  So you've

02:55:28  23  got 27 days in December of diazepam; right?

02:55:31  24  **A**    Okay.

02:55:31  25  **Q**    And you can go back to October, and you're going to

**Militello - Cross/Lanier**

02:55:36　1　　see the same cocktail, the same trinity being filled at

02:55:41　2　　Walmart in October, aren't you?

02:55:42　3　　**A**　　Yes.

02:55:42　4　　**Q**　　And you're going to see the same trinity being filled

02:55:45　5　　by Walmart in September, aren't you?

02:55:48　6　　**A**　　Yes.

02:55:49　7　　**Q**　　And the same trinity being filled by Walmart in

02:55:53　8　　August.

02:55:54　9　　　　True?

02:55:54 10　　**A**　　Correct.

02:55:54 11　　**Q**　　And the same trinity being filled by Walmart, with a

02:56:01 12　　few extras, in July.

02:56:03 13　　　　True?

02:56:03 14　　**A**　　Correct.

02:56:06 15　　**Q**　　I mean, in July, you've got oxy 60, 30 days.  You've

02:56:11 16　　got oxycodone 30's for 30 days.  You've got OxyContin 40's

02:56:17 17　　for 30 days, and OxyContin 60 for 30 days.

02:56:23 18　　　　They've got 120 days of oxy coming out that month,

02:56:27 19　　don't they?

02:56:29 20　　**A**　　He was -- he was using them in combination, so yes, he

02:56:33 21　　did.

02:56:33 22　　**Q**　　In combination with the rest of the trinity.  You've

02:56:36 23　　still got the carisoprodol and the diazepam; right?

02:56:39 24　　**A**　　That's correct.

02:56:41 25　　**Q**　　And we could keep going back, but suffice it to say

## Militello - Cross/Lanier

02:56:46  1    you've got the same issue happening.  Here, look at May

02:56:49  2    (indicating).

02:56:50  3         May's a monster month, isn't it?

02:56:59  4         Looking at April (indicating).

02:57:08  5         At some point, don't you think the alarm should have

02:57:11  6    sounded sooner?

02:57:12  7    **A**    We had conversations with the doctor multiple times

02:57:14  8    about that patient.  I also was familiar with that patient.

02:57:24  9    **Q**    And so this doctor is prescribing this trinity and

02:57:29 10    we're getting early refills, and we're on a lot of drugs for

02:57:35 11    well over a year before you finally said I'm not going to

02:57:42 12    fill any more of these.

02:57:43 13         True?

02:57:44 14    **A**    He wasn't getting early refills.

02:57:46 15    **Q**    Ma'am, are you sure?

02:57:47 16    **A**    Yeah.

02:57:48 17    **Q**    Define early refill by Walmart's standards.

02:57:52 18    **A**    Well, he was taking combinations of oxycodone.  So he

02:57:57 19    was taking extended-release formulations at a 40 and a

02:58:00 20    60-milligram to meet his pain need, and he was taking

02:58:05 21    30-milligram immediate release.

02:58:09 22    **Q**    Um-hmm.

02:58:10 23    **A**    So those prescriptions were not filled early, per se;

02:58:16 24    they were just being used in combination.

02:58:19 25    **Q**    Well, you say that.  If you look at the days, I think

**Militello - Cross/Lanier**

02:58:22  1   it might show a different story, but maybe I'm wrong.  So

02:58:26  2   let's look at it.

02:58:31  3       You've got this oxycodone 20 milligrams on the 25th of

02:58:39  4   February; right?

02:58:40  5   **A**   Correct.

02:58:41  6   **Q**   You've got OxyContin 60 on the 20th of February?

02:58:47  7   **A**   Correct.

02:58:48  8   **Q**   You've got oxycodone 30 on the 5th of February.  Is

02:58:53  9   that extended release or immediate?

02:58:54 10   **A**   That's immediate.

02:58:55 11   **Q**   And oxycodone 40.  Is that extended or immediate?

02:58:59 12   **A**   That's extended.

02:59:01 13   **Q**   And OxyContin 60.  Is that extended or immediate?

02:59:05 14   **A**   Extended.

02:59:09 15   **Q**   And then, again, its oxycodone 30.  That is. . .

02:59:15 16   **A**   Filled on January 7th and he filled it again on

02:59:18 17   February 5th.

02:59:19 18   **Q**   And so that's not overlapping in your mind because

02:59:23 19   you're within a day or two; right?

02:59:24 20   **A**   Right.  We would not take it directly up to the day.

02:59:28 21   **Q**   And then that is oxycodone 20, is that immediate?

02:59:32 22   **A**   Extended.

02:59:38 23   **Q**   OxyContin 60.  Immediate?

02:59:40 24   **A**   Extended.

02:59:42 25   **Q**   So you've got those two extended happening within

## Militello - Cross/Lanier

02:59:46 1    five days of each other?

02:59:49 2    **A**    Right.

02:59:50 3         Dr. Levin wrote those prescriptions on the same day

02:59:53 4    for him to use in combination to treat his pain.

03:00:02 5    **Q**    Now, Dr. Levin eventually becomes a doctor that you

03:00:06 6    quit filling for.

03:00:07 7         True?

03:00:08 8    **A**    That is correct.

03:00:08 9    **Q**    All right.  Let's move down the road.  I guess with

03:00:12 10   patients -- it's 3 o'clock.  Oh, oh.

03:00:16 11              MR. LANIER:  Am I supposed to quit, Judge?

03:00:19 12   I'm moving to the next stop.

03:00:20 13        What do you want me to do?  I'm great moving on.  I'm

03:00:23 14   great quitting.

03:00:24 15              THE COURT:  Well, about how long -- how much

03:00:27 16   longer is your next stop going to be?

03:00:29 17              MR. LANIER:  My next stop, I bet I can do it

03:00:31 18   in about 10 to 12 minutes.

03:00:32 19              THE COURT:  All right.

03:00:33 20              MR. LANIER:  Maybe --

03:00:34 21              THE COURT:  Why don't we complete that stop,

03:00:36 22   and then we'll break for the afternoon.

03:00:39 23   BY MR. LANIER:

03:00:39 24   **Q**    All right.

03:00:40 25        Ma'am, what I'd like do is look at stores real quick.

**Militello - Cross/Lanier**

03:00:43  1    Okay?

03:00:43  2    **A**    Okay.

03:00:43  3    **Q**    And I'll try to make this stop a brief one.  You know,

03:00:49  4    the jury's not heard this yet.  Wait until the end of trial

03:00:52  5    to hear this stuff.  What an over 20 store is; right?

03:00:57  6    **A**    I'm not familiar with that term.

03:00:59  7    **Q**    You're not familiar with the -- tell the jury how big

03:01:02  8    the bottles are that bring -- that have these drugs in them.

03:01:06  9          What are the size of the bottles, the pill jars?

03:01:10  10              MR. MAJORAS:  Objection; form to a particular

03:01:12  11   prescription pill.

03:01:14  12              MR. LANIER:  Well, I'll be more specific.

03:01:16  13   BY MR. LANIER:

03:01:17  14   **Q**    Oxycodone 5/325 milligrams?

03:01:24  15   **A**    Um-hmm, yes.

03:01:24  16   **Q**    Yeah.  What's -- what is that -- how many pills in a

03:01:28  17   bottle?

03:01:28  18   **A**    100.

03:01:30  19   **Q**    Now, did you know that your company decided that

03:01:35  20   stores should not get over 20 of those bottles within a

03:01:40  21   certain time period?  I think it was either weekly or twice

03:01:44  22   a week or something like that -- or twice a month or

03:01:46  23   something like that.

03:01:47  24              MR. MAJORAS:  Objection.  Foundation.

03:01:48  25   Distribution.

## Militello - Cross/Lanier

03:01:49  1          MR. LANIER:  No, it's not distribution.  This

03:01:50  2   is --

03:01:51  3          THE COURT:  Overruled.  Overruled.

03:01:52  4   BY MR. LANIER:

03:01:52  5   **Q**     Did you know about that, ma'am?

03:01:53  6   **A**     No, I was not aware of that.

03:01:55  7   **Q**     All right.  Let me ask you more specifically about

03:01:58  8   your store IN Eastlake.

03:02:02  9          Did you know out of all of the Walmart stores around

03:02:04 10   the country -- I'm going to show you Plaintiffs'

03:02:07 11   Exhibit 20889 -- did you know out of all of the Walmart

03:02:15 12   stores around the country in 2012, your Eastlake, Ohio,

03:02:19 13   store was noted for having a quantity of 37, an order -- or

03:02:27 14   an amount which exceeded the 20 bottles?

03:02:32 15          Did you know about that?

03:02:32 16   **A**     No.

03:02:34 17   **Q**     Did you know that your store was not only there, but

03:02:40 18   repeatedly is one of the top volume stores for oxy in the

03:02:45 19   entire nation?

03:02:47 20   **A**     No.

03:03:03 21   **Q**     So while you were working at Eastlake, nobody ever

03:03:06 22   told you that y'all had one of the highest volume oxy stores

03:03:14 23   in the country?

03:03:14 24   **A**     No.

03:03:16 25   **Q**     Okay.

**Militello - Cross/Lanier**

03:03:20  1          While we're at the store stop, one last set of

03:03:23  2     questions.

03:03:24  3          I looked at the layout here.  First of all, all

03:03:28  4     Walmarts are not laid out the same.  True?

03:03:29  5     **A**     Not exactly, no.

03:03:30  6     **Q**     Yeah.

03:03:33  7          So is there a section here where y'all keep the hard

03:03:36  8     copy scripts?

03:03:39  9     **A**     There's a section back behind in a drawer where

03:03:45 10     current kept.  The rest are kept in a locked cage in the

03:03:47 11     back.

03:03:48 12     **Q**     In the back --

03:03:49 13     **A**     Of the store, I'm sorry.  In the back of the store.

03:03:51 14     **Q**     So if you wanted to go check a hard script, you would

03:03:57 15     have to leave the pharmacy, go to another part of the store,

03:04:02 16     unlock the cabinet, pull out the hard prescription to look

03:04:06 17     at it, and then return back to the pharmacy?

03:04:10 18     **A**     I would pull it up on Connexus where I would be able

03:04:13 19     to look at the hard copy of the prescription.

03:04:15 20     **Q**     If there is a copy now in Connexus, but you've been

03:04:19 21     doing this for a long time.  They haven't always been on

03:04:21 22     Connexus, have they?

03:04:22 23     **A**     They have not.

03:04:23 24     **Q**     And so if we go back 10 years, you've got to go back

03:04:27 25     there and you've got to go find it; right?

03:04:30  1    **A**    If it's a case of needing to see the prescription,

03:04:33  2    yes, we would have to look at the filed prescription.

03:04:36  3    **Q**    Okay.

03:04:38  4                MR. LANIER:  Your Honor, that's my stop on

03:04:40  5    stores.  I can go to policies real quick if you want ME to

03:04:43  6    and then I'll be done.

03:04:44  7                THE COURT:  All right.  Why don't you wrap up

03:04:45  8    then.  That's fine.

03:04:46  9                MR. LANIER:  All right.

03:04:47 10    BY MR. LANIER:

03:04:47 11    **Q**    Policies.

03:04:53 12        Ma'am, you were not aware there was even an opioid

03:04:57 13    epidemic until the last several years.  True?

03:05:02 14    **A**    I know there's been a problem with people abusing

03:05:07 15    opioids for several years.

03:05:10 16    **Q**    Yeah.

03:05:12 17        But when you were asked in your deposition a few

03:05:15 18    months back, "When did you first become aware that there was

03:05:17 19    an opioid prescription problem," you would say -- you

03:05:20 20    answered, "I would say awareness, probably in the last

03:05:23 21    several years."

03:05:24 22        Right?

03:05:25 23                MR. MAJORAS:  Objection.  Consistent.

03:05:26 24                THE COURT:  Yeah.  Sustained.  That's what she

03:05:28 25    just said.

6725

**Militello - Cross/Lanier**

03:05:29  1           MR. LANIER:  Oh, I'm sorry, Judge.  I thought

03:05:31  2  she said there's -- okay.  "Been a problem with people

03:05:34  3  abusing opioids for several years" was your answer.

03:05:39  4  BY MR. LANIER:

03:05:39  5  **Q**    So you didn't understand the idea of an opioid

03:05:42  6  prescription problem until the last several years.  Fair?

03:05:46  7  **A**    To the extent of abuse, yes.  No.

03:05:49  8  **Q**    And so if we wanted to go back and look at practices,

03:05:52  9  say, in 2012, in 2012, things were quite different at

03:05:57  10  Walmart, weren't they?

03:06:02  11  **A**    In what way?

03:06:03  12  **Q**    Well, for example, in 2012, y'all had your technicians

03:06:07  13  filling opioid prescriptions, not just a registered

03:06:11  14  pharmacist.

03:06:12  15       True?

03:06:12  16  **A**    It's always been that way.  We've always had

03:06:16  17  technicians that count our opioid prescriptions.

03:06:20  18  **Q**    Well, to actually fill the controlled substance

03:06:24  19  prescription, that would have been a technician back in

03:06:26  20  2012, wouldn't it?

03:06:28  21  **A**    Yes, and it still is today.

03:06:31  22  **Q**    And those technicians don't have the same training

03:06:35  23  that a registered pharmacist does.

03:06:37  24       Fair?

03:06:38  25  **A**    Technicians are not trained as pharmacists, but they

**Militello - Cross/Lanier**

03:06:43  1    are trained to count the prescriptions.

03:06:45  2    **Q**   Well, but in 2012, an associate would be the one who's

03:06:52  3    checking out the opioid purchase.

03:06:55  4         True?

03:06:59  5    **A**   I'm sorry.  Could you repeat?

03:07:01  6    **Q**   Yes, ma'am.

03:07:02  7         In 2012, isn't it true y'all would have an associate

03:07:06  8    check out the customer for the opioid prescriptions?

03:07:11  9    **A**   In 2012 and today, yes.

03:07:13  10   **Q**   Okay.

03:07:15  11        And then in 2012, you could pick up an opioid

03:07:19  12   prescription without an ID, couldn't you?

03:07:22  13   **A**   Correct.

03:07:24  14   **Q**   And so if we go back to 2012, you've got associates,

03:07:33  15   pharm techs who are filling the prescriptions, associates,

03:07:35  16   cashiers, checking them out, and nobody even asking for an

03:07:39  17   ID.  That's the way the world was in Walmart pharmacy in

03:07:44  18   2012.

03:07:45  19        True?

03:07:52  20   **A**   Simplified, yes.  That's kind of how the process went.

03:08:03  21   **Q**   One last thing that occurred to me as you were giving

03:08:06  22   your direct examination question.  You were asked, "Have you

03:08:08  23   had tools available to you to help you do that," and it was

03:08:11  24   in the context of resolving red flags or situations,

03:08:14  25   whatever you might have called them at the time.

**Militello - Cross/Lanier**

03:08:16  1          Remember that?

03:08:17  2     **A**     Yes.

03:08:17  3     **Q**     And your answer was, "Especially as things have

03:08:21  4     evolved, certainly, yes, but we've always used whatever

03:08:27  5     tools were available to us."

03:08:29  6          True?

03:08:30  7     **A**     True.

03:08:31  8     **Q**     But a side note.  Everything has taken some time at

03:08:37  9     Walmart to become available as a tool for you to use.

03:08:41  10         Fair?

03:08:43  11    **A**     I mean, some things weren't even. . . OARRS was not

03:08:49  12    around back then.  NarxCare was not around back then.  So it

03:08:52  13    wasn't available for us to use.

03:08:55  14    **Q**     Well, OARRS is an interesting comment because did you

03:09:00  15    know that Walmart was four to five years late in allowing

03:09:04  16    y'all access to OARRS?

03:09:05  17              MR. MAJORAS:  Objection.  Misstates or

03:09:08  18    mischaracterizes testimony in evidence.

03:09:09  19              THE COURT:  Overruled.

03:09:10  20              THE WITNESS:  No, I did not know that.

03:09:11  21    BY MR. LANIER:

03:09:12  22    **Q**     In other words, OARRS came about in 2006, but it

03:09:15  23    wasn't until the -- late 2010, early 2011 range that your

03:09:20  24    store started being able to use OARRS.

03:09:23  25         Did you remember that?

**Militello - Cross/Lanier**

03:09:23  1      **A**      I did not.

03:09:24  2      **Q**      All right.

03:09:26  3           If you'd have had that tool available earlier, though,

03:09:28  4      I assume, like everything else, you would have used it.

03:09:31  5           Fair?

03:09:32  6      **A**      Fair.

03:09:33  7      **Q**      Okay.

03:09:34  8                MR. LANIER:  Your Honor, that's the end of the

03:09:36  9      road.

03:09:36 10           Thank you for letting me finish.

03:09:39 11           Ma'am, thank you for the work that you do do for the

03:09:41 12      community, and I wish you the very best.

03:09:43 13                THE COURT:  Okay.

03:09:44 14           Ladies and gentlemen, we'll take our mid-afternoon

03:09:49 15      break, but first, if you'd pass any questions you have for

03:09:52 16      Ms. Militello to Mr. Pitts, then counsel can review those

03:09:55 17      during the break.  And then we'll pick up in about

03:09:59 18      15 minutes with the balance of her testimony.

03:10:02 19                (Jury excused from courtroom.)

03:10:04 20           (Recess was taken from 3:10 p.m. till 3:27 p.m.)

03:27:03 21                COURTROOM DEPUTY:  All rise.

03:28:55 22                (Jury returned to courtroom.).

03:29:16 23                THE COURT:  Okay.  Please be seated.

03:29:18 24           And, Ms. Militello, you're still under oath from

03:29:21 25      before the break.

03:29:21  1          Mr. Majoras, you may continue, please.

03:29:23  2                  MR. MAJORAS:  Thank you, Your Honor.

03:29:23  3              REDIRECT EXAMINATION OF LORI MILITELLO

03:29:26  4    BY MR. MAJORAS:

03:29:26  5    **Q**    Good afternoon, again, Ms. Militello.

03:29:27  6          So at this point in the proceedings, after the lawyers

03:29:31  7    have had their first chance to talk to you, we get questions

03:29:33  8    from the jurors that the Judge invites them to submit.  They

03:29:36  9    write them out and we take them.

03:29:37 10    **A**    Okay.

03:29:38 11    **Q**    I'm going to put them on the screen, and I will read

03:29:40 12    them so we have them into the record.  Answer them best you

03:29:44 13    can.  If you know, great.  If you don't, just tell us that.

03:29:47 14    Okay?

03:29:47 15    **A**    Okay.

03:29:48 16    **Q**    So, first question, "What happens when a doctor tells

03:29:53 17    you to fill what is written?"

03:29:58 18    **A**    So, in general, any more doctors are very receptive at

03:30:05 19    kind of discussing the treatment plan for the patient.  We

03:30:09 20    try to just act as a partner with them instead of just

03:30:13 21    taking an order from them necessarily, although ultimately,

03:30:17 22    I mean, they are the one evaluating the patient, diagnosing

03:30:22 23    the patient, writing the prescription for the patient.

03:30:25 24          Most of them are still receptive at giving us

03:30:28 25    additional information if we ask for it.

03:30:32  1    **Q**    But who gets final say if they're telling you to fill

03:30:36  2    it and you don't want to fill it?

03:30:37  3    **A**    I get the final say on whether I want to or don't want

03:30:40  4    to, depending on whether I feel it's appropriate.

03:30:43  5    **Q**    Next question.

03:30:45  6         "Prior to OARRS, how did you research red flags?"

03:30:51  7    **A**    Well, it just depended on what I felt the red flag

03:30:59  8    was.  It could be as simple as talking to the doctor,

03:31:02  9    calling, discussing -- discussing with the patient what was

03:31:05  10   going on depending, on the red flag.

03:31:09  11        So there were ways to do it without OARRS.  We just

03:31:16  12   maybe had to use some different -- different ways that we

03:31:21  13   could ascertain the information that we were trying to find

03:31:23  14   out.

03:31:30  15   **Q**    "Is it true that for years that store has had a big

03:31:35  16   theft problem?  In fact, the Eastlake police had a mini

03:31:40  17   station there for a while, including the pharma products,

03:31:45  18   pharmacy products."

03:31:46  19   **A**    So I don't -- I don't know necessarily about the --

03:31:54  20   or, I'm sorry, the police mini station there.  The pharmacy

03:31:58  21   products, if you're speaking back behind the counter,

03:32:01  22   prescription products, that has never been an issue at our

03:32:04  23   Eastlake store.

03:32:07  24        I don't know what the level of theft is for sure out

03:32:11  25   front in the store itself.  I couldn't speak to that

**Militello - Redirect/Majoras**

03:32:14  1    necessarily.

03:32:19  2    **Q**    "If it's not a red flag for you but it does or is for

03:32:23  3    another pharmacist at your store, is that wrong?"

03:32:28  4    **A**    So every pharmacist is going to look at a prescription

03:32:31  5    and evaluate it with what they have experienced, what they

03:32:37  6    know about the patient, about the prescriber, about the

03:32:40  7    medication.

03:32:43  8        So a red flag for potentially a new graduate out of

03:32:47  9    pharmacy at our store versus one of us pharmacists that have

03:32:49 10    been there 20 years is different.  So it doesn't necessarily

03:32:56 11    mean there's anything wrong; it just means that's part of

03:32:59 12    their process.

03:33:00 13    **Q**    This question's actually pretty close but, "Have you

03:33:04 14    ever had a situation where two pharmacists interpreted a red

03:33:07 15    flag differently?"  And I'll read the whole thing.  "Meaning

03:33:10 16    you and another pharmacist disagreed on an issue, what might

03:33:14 17    be a problem/concern to one may not -- may not to another?

03:33:19 18    How is this handled?"

03:33:22 19    **A**    If there's two pharmacists at the store and we're both

03:33:26 20    in the filling process at that point in time, in general,

03:33:33 21    I -- I can't speak for every pharmacist.  I, as a

03:33:35 22    pharmacist, if there's a concern another pharmacist has, I

03:33:40 23    want them to be able to feel comfortable with that concern.

03:33:42 24        So if that's going to be the case, then we err on the

03:33:45 25    side of their caution.  And then I just have -- you know,

**Militello - Redirect/Majoras**

03:33:49 1    let them take the wheel on resolving the red flags that they

03:33:58 2    have.

03:33:58 3    **Q**    Now there's some feedback in the mic and to make sure;

03:34:02 4    it's not my phone, I'm going to put it over my counsel

03:34:04 5    table.

03:34:04 6    **A**    Okay.

03:34:12 7    **Q**    I hope that helps us.

03:34:13 8         Next question.  "Are dispensed prescriptions for

03:34:17 9    controlled substances that have not been picked up by the

03:34:20 10   patient yet stored in the controlled substance safe or in

03:34:25 11   the bagged prescription location?"

03:34:29 12   **A**    So the key word is, is -- they're not necessarily --

03:34:35 13   they're not dispensed, let's say; they're filled.  So if the

03:34:38 14   prescription is filled, then it is out front but behind the

03:34:43 15   gate.  So it's at a place where the cashier can readily

03:34:47 16   retrieve it, but it's not. . . it's still under a direct

03:34:54 17   supervision of the pharmacist because we're right there in

03:34:57 18   the pharmacy.  So although it is not in the safe, it's still

03:35:02 19   under direct supervision of the pharmacy -- pharmacist.

03:35:05 20   **Q**    I think we -- the next one is a similar question.

03:35:10 21   C-II safe.

03:35:11 22        "Are controlled substance prescription kept in the

03:35:15 23   C-II safe while they're waiting to be picked up or are they

03:35:19 24   on the shelf with the bagged prescriptions?"

03:35:21 25   **A**    They are hanging out front with bag prescriptions.

**Militello - Redirect/Majoras**

03:35:33  1    **Q**    A little small.

03:35:34  2         "You stated that in order for you to review a hard

03:35:37  3    copy of the prescription, you needed to go outside the

03:35:41  4    pharmacy in a locked cabinet.  Would that mean that you

03:35:44  5    would need to make everyone leave the pharmacy and lock it

03:35:48  6    up?  Why would these not be locked up in the pharmacy?"

03:35:52  7    **A**    For controlled substances, we -- we are generally able

03:35:56  8    to keep quite a large number back in the pharmacy area, but

03:36:02  9    due to space inhibitions, we are to store the majority of

03:36:07  10   old files -- sorry -- old files in the back of the store in

03:36:11  11   a locked cage.

03:36:13  12   **Q**    How often do you find yourself having to go back to

03:36:15  13   that area of the store?  That's my question.

03:36:18  14   **A**    I -- I've -- I very rarely -- I, myself, have never

03:36:24  15   had to go back there.

03:36:29  16   **Q**    Now, here's a couple of questions.  I'll try do them

03:36:32  17   one at a time.

03:36:37  18        "Do technicians have to abide by the CSA?  Are they

03:36:42  19   bound to adhere to corresponding responsibility?"

03:36:48  20   **A**    It's the pharmacist's responsibility to make sure

03:36:52  21   everyone in the pharmacy is abiding by the CSA.  So they are

03:37:00  22   part of our process of corresponding responsibility, but

03:37:03  23   they themselves are not responsible.

03:37:08  24   **Q**    "Would a hormone doctor write for C-IIs?"

03:37:15  25   **A**    Yeah.  He was treating him for a condition that -- he

**Militello - Redirect/Majoras**

03:37:23  1    was also rehab.  The patient that he was treating had severe

03:37:28  2    debilitating pain issues, and so that was part of his

03:37:32  3    treatment.

03:37:32  4    **Q**    How were -- this is my question.  How were you aware

03:37:35  5    of that?

03:37:35  6    **A**    Speaking to the patient, and the doctor, but -- both

03:37:40  7    of them.

03:37:40  8    **Q**    And what was the information you had after those

03:37:43  9    conversations?

03:37:44  10   **A**    Well, with the patient, I mean, he would -- he would

03:37:48  11   always look physically in pain in the line to pick up

03:37:53  12   prescription, he would generally be squatting on the floor

03:37:55  13   because he couldn't bear to stand and wait in line.

03:37:59  14        When I talked to the doctor about his condition, I was

03:38:02  15   told he's in such debilitating pain, that if his pain's not

03:38:07  16   treated properly, he's going to end up with such a quality

03:38:10  17   of life that either he's going to be, you know, living in

03:38:13  18   his basement for the rest of his life or potentially

03:38:17  19   committing suicide because he just can't -- he can't

03:38:20  20   physically handle it.

03:38:21  21   **Q**    We'll get back to some additional questions about

03:38:24  22   that, but let's go -- let's go through the juror questions.

03:38:26  23        So this one says, "Prior to dispensing, do pharmacists

03:38:32  24   check the medical doctor's specialty?"

03:38:38  25   **A**    Yeah.

### Militello - Redirect/Majoras

03:38:39  1      So we check -- we kind of do an overall check of the

03:38:44  2   prescription, and if we have additional questions as to what

03:38:47  3   the specialty might be, then certainly we look into that.

03:38:50  4   **Q**    And I think the next one relates to the information

03:38:55  5   you had seen in cross-examination about the dispensing.

03:38:59  6      It says -- I think this means, "January 8th equals

03:39:02  7   diazepam of 60 tablets.  January 16th equals" -- I don't

03:39:09  8   know if you could help me with the pronunciation, please?

03:39:11  9   **A**    Carisoprodol.

03:39:12  10  **Q**    "Carisoprodol of 90 tablets, and on January 22nd

03:39:15  11  equals OxyContin of 30 tablets.  180 pills in 15 days.  How

03:39:22  12  isn't this a red flag for a hormone M.D.?"

03:39:27  13  **A**    So the -- I mean, it's 180 tablets, but they're not

03:39:31  14  180 of the same type of tablet.  They are three medications

03:39:39  15  that are in a trinity treatment, I understand that.  But in

03:39:43  16  conversation with the doctor, in conversation with the

03:39:45  17  patient, the doctor expressed that he's trying to get this

03:39:51  18  patient's pain under control so that he can have some

03:39:54  19  quality of life.

03:39:55  20     So we look at each individual medication and how

03:39:59  21  that's being dispensed and time between dispensings, and

03:40:05  22  also take into account what changes the doctor was trying

03:40:09  23  make.

03:40:09  24  **Q**    So in looking -- and this, again, my question.  So in

03:40:12  25  looking at the prescriptions that you saw that Mr. Lanier

**Militello - Redirect/Majoras**

03:40:16  1    showed you for this patient, was that a red flag?

03:40:20  2    **A**    I mean, it was something that I wanted to confer with

03:40:25  3    the doctor about.  Certainly I wouldn't have filled that

03:40:28  4    without talking to the doctor or talking to the patient,

03:40:33  5    doing checks on OARRS, that kind of thing first.

03:40:36  6    **Q**    And I'm sorry if I asked this, but do you recall how

03:40:39  7    many conversations you had with the doctor about that

03:40:41  8    particular patient?

03:40:42  9    **A**    I don't recall the number of conversations.

03:40:45 10    **Q**    Was there more than one?

03:40:46 11    **A**    Yes.

03:40:57 12    **Q**    This also relates to the OARRS report for Dr. Levin's

03:41:01 13    Patient Number 9653.  It says, "The patient was written a

03:41:05 14    prescription for" -- that drug I can't pronounce --

03:41:08 15    "carisoprodol, on October 24, 2016, and waited to fill the

03:41:15 16    prescription until January 16, 2017.  Do you consider that a

03:41:21 17    red flag?"

03:41:22 18         And if you need to look at the form, I can show that

03:41:24 19    to you.

03:41:25 20    **A**    I think I still maybe have it.

03:41:28 21    **Q**    This is Plaintiffs' Exhibit 21391, and I think the

03:41:35 22    OARRS report starts on Page 0003.

03:41:48 23    **A**    Yeah.

03:41:49 24         In certain situations, I mean, certainly it would be a

03:41:52 25    red flag for a patient to have a prescription and then fill

03:41:54   1     it at a later time period, but because his OARRS report was

03:41:58   2     showing that he was not filling that medication anywhere

03:42:01   3     else but with us or in a timely manner, that didn't

03:42:08   4     necessarily cause a red flag to prohibit filling.

03:42:19   5     **Q**     Two more.  Two in the first one.

03:42:22   6          "Are you aware of any corporate blocks that Walmart

03:42:24   7     has in place for prescribers in Lake County?  How far back

03:42:28   8     in time do these blocks go?  What's the earliest block you

03:42:33   9     are aware of?"

03:42:35  10     **A**     So, yes, I am aware of corporate blocks for

03:42:39  11     prescribers in Lake County.  They've kind of progressed over

03:42:44  12     the years.

03:42:46  13          Earliest block that I'm aware of, corporate block,

03:42:53  14     probably four to five years ago, maybe.

03:43:00  15     **Q**     When are consultations with a pharmacist required?

03:43:12  16     **A**     So we request that any new prescription be given a

03:43:15  17     consultation.  So when a cashier checks that patient out,

03:43:18  18     that person out, the cashier will put the prescription bag

03:43:21  19     at our counsel window behind the counter and the pharmacist

03:43:26  20     will come over and discuss the medication with the patient.

03:43:28  21     **Q**     So those are the juror questions.  I want a few

03:43:34  22     follow-up of my own, particularly on what you just said.

03:43:38  23          When you say consultations for new prescription, is

03:43:41  24     that any type of medication?

03:43:41  25     **A**     Yes.

**Militello - Redirect/Majoras**

03:43:41 1   **Q**    So when you're dispensing a Schedule II controlled

03:43:46 2   substance, are there refills available for Schedule II

03:43:49 3   controlled substances?

03:43:50 4   **A**    There are not, no.

03:43:51 5   **Q**    So whenever a new one comes in, even if it's for the

03:43:54 6   same patient, how do you interpret that from your

03:43:57 7   consultation duties?

03:43:59 8   **A**    So we request that the patient be counseled on any

03:44:02 9   prescription that comes to us from the doctor.  So in that

03:44:06 10   case, we would ask that they be at the consultation window.

03:44:10 11   **Q**    Okay.

03:44:13 12      I want to go back to some questions you had about

03:44:16 13   technicians filling or pharmacists filling.

03:44:19 14      Do you recall those?

03:44:19 15   **A**    Yes.

03:44:20 16   **Q**    Okay.

03:44:20 17      First -- first question.  From -- in Walmart

03:44:24 18   terminology, when we saw -- maybe we can call one up.  If

03:44:28 19   you go to Tab 1 of your binder, and this is Walmart

03:44:43 20   MDL-013430501.  Let's get that up on the screen.

03:44:49 21           MR. LANIER:  Can we have a copy?

03:44:50 22           MS. FUMERTON:  We gave that to you already,

03:44:53 23   Mark.

03:44:54 24           MR. MAJORAS:  It's the same one I used earlier

03:44:56 25   in the exam.  And in particular if we could blow up the

03:45:00 1    bottom part, the end-of-day label.

03:45:09 2    BY MR. MAJORAS:

03:45:10 3    **Q**    Okay.  So if we look at the bold lettering in sort of

03:45:14 4    the top right where it says 4PT, that's the four point you

03:45:18 5    talked about earlier?

03:45:19 6    **A**    Right.

03:45:19 7    **Q**    Okay.  At the end of that is FIL, F-I-L.

03:45:22 8         Do you see that?

03:45:23 9    **A**    Yes.

03:45:23 10   **Q**    Okay.

03:45:23 11        What does it mean when it says FIL here?  What are --

03:45:27 12   what is that indicating?

03:45:28 13   **A**    It's the process where our technicians carry around a

03:45:37 14   handheld device where sequentially fills prioritized,

03:45:43 15   depending on time, will come up to their handheld machine.

03:45:48 16   So when it comes up, they will enter on the first drug,

03:45:50 17   which comes up on their screen.

03:45:52 18        They go take that drug off of the shelf.  They scan

03:45:55 19   the NDC or the UPC, the bar code on that bottle, which tells

03:46:00 20   them whether they have the right or wrong bottle of

03:46:03 21   medication.

03:46:04 22        Once it scans in, they take it to what we call the

03:46:08 23   filling pod, which in our pharmacy, there are three of those

03:46:12 24   across the prescription bottle bays.

03:46:16 25        And so they count the medication out there where a

03:46:19  1    label printer is on every pod.  The label prints out of that

03:46:24  2    printer.  And then they apply it to that bottle, put it in

03:46:28  3    the plastic bag they're working out of, and they move to the

03:46:31  4    next drug, if there is one in that order.

03:46:33  5        So once they've filled all the drugs or medications

03:46:37  6    for a patient in an order, that bag gets put to a rack for

03:46:43  7    the pharmacist to visually verify those medications.

03:46:46  8    Q    So in terms of what a technician might do in what your

03:46:51  9    terminology is the fill process, who is the person who

03:46:56  10   exercises corresponding responsibility over that particular

03:46:58  11   prescription?

03:46:58  12   A    The pharmacist.

03:46:58  13   Q    In what way?  How do we know that from what we look at

03:47:02  14   here?

03:47:03  15   A    The visual verify indicates the pharmacist has taken a

03:47:07  16   final look at the medication and in a Controlled II

03:47:14  17   substance like this, we've then triple counted that

03:47:17  18   substance and then we also back count the stock bottle of

03:47:23  19   that medication, and we inventory that directly into the

03:47:26  20   computer to make sure the counts are on.

03:47:30  21       And so we've also four-pointed that prescription,

03:47:32  22   which is comparing the data from the prescription to the

03:47:36  23   system entry.

03:47:39  24       So our responsibility lies in making sure that is

03:47:41  25   correct the whole way through.

**Militello - Redirect/Majoras**

03:47:42  1  **Q**    So going -- Mr. Lanier asked you some questions back

03:47:45  2  in 2012 about filling.  Were technicians filling

03:47:49  3  prescriptions in terms of doing the count and putting in the

03:47:51  4  bags the way you just described back then?

03:47:54  5  **A**    It was -- yeah.  They were doing the counts.  Back

03:47:58  6  then, we used backseats instead of bags, but yes, they would

03:48:02  7  still count the prescription.  The prescription would then

03:48:04  8  go into a basket, which would be put on a rack for the

03:48:07  9  pharmacist to then visually verify that medication.

03:48:09 10  **Q**    So even back in 2012, would a controlled substance be

03:48:15 11  dispensed at Walmart without a pharmacist looking at it?

03:48:19 12  **A**    No.

03:48:19 13  **Q**    And exercising his or her judgment?

03:48:21 14  **A**    No.

03:48:21 15  **Q**    Well, how did you do that back then that may or may

03:48:24 16  not be different from today?

03:48:26 17  **A**    I mean, the process is slightly different in how it

03:48:31 18  gets from Point A to Point B, but it still is the process of

03:48:37 19  us verifying prescription medication to label to

03:48:42 20  prescription, all of that has always been the same.

03:48:58 21          MR. MAJORAS:  Thank you, Ms. Militello.  I

03:49:00 22  appreciate your time this afternoon.

03:49:01 23      No further questions, Your Honor.

03:49:03 24          THE COURT:  Thank you, Mr. Majoras.

25

Militello - Recross/Lanier

03:49:03  1          RECROSS-EXAMINATION OF LORI MILITELLO

03:49:27  2    BY MR. LANIER

03:49:27  3    **Q**     Okay.  Just the last couple of things and you can head

03:49:37  4    home.

03:49:41  5          We talked about this person who was visiting the

03:49:44  6    hormone doctor, and you described him in Mr. Majoras's

03:49:51  7    questions to you as someone who came in and seemed to be in

03:49:55  8    severe pain?

03:49:56  9    **A**     Yes.

03:49:59 10    **Q**     Are you familiar at all with the symptoms of

03:50:02 11    withdrawal from opioid addiction?

03:50:05 12    **A**     Yes.

03:50:07 13    **Q**     Because the way you described him was a lot like

03:50:12 14    Dr. Lembke described withdrawal for --

03:50:16 15                   MR. MAJORAS:  Objection.

03:50:17 16                   MR. LANIER:  I haven't finished asking.

03:50:19 17                   THE COURT:  Overruled.

03:50:20 18    BY MR. LANIER:

03:50:20 19    **Q**     For opiate addiction.

03:50:22 20          Would you agree with such an assessment from a

03:50:24 21    perspective of a pharmacist?

03:50:26 22    **A**     I don't -- I don't agree with that, no.

03:50:30 23    **Q**     And I do know at least one time when he was there, you

03:50:32 24    also smelled alcohol on his breath?

03:50:34 25    **A**     I did not personally, no.

03:50:37 1    **Q**    Okay.

03:50:38 2         So, but you've seen that entry in the prescription

03:50:40 3    records as well; right?

03:50:43 4    **A**    Um. . . was that on something you just showed today?

03:50:47 5    **Q**    Yeah.  It was in the 21391, the refusal to fill.

03:50:53 6    Said, "The patient wouldn't wait for me to verify proper

03:50:55 7    relationship with the doctor for oxy 30-milligram

03:50:59 8    prescriptions per policy and smelled of alcohol."

03:51:03 9    **A**    Okay.  I see that that is written on there, yes.

03:51:06 10   **Q**    Yeah.  I'm just saying, at some point, did it trigger

03:51:12 11   in your brain this doesn't sound like a hormone therapy

03:51:15 12   problem?

03:51:19 13   **A**    The doctor's title of hormone, I mean, that's part of

03:51:23 14   his treatment scope, so there's more to it than just that.

03:51:32 15   But, yeah, I see what -- I see what the pharmacist here had

03:51:35 16   written.

03:51:37 17   **Q**    This is not the first time you'd had trouble with this

03:51:41 18   doctor and what he was doing.  True?

03:51:48 19        I'm handing you Plaintiff's 26767, and this is one

03:51:53 20   where you refused to fill several years earlier, and your

03:52:00 21   reason was that the morphine equivalent was 350 and the

03:52:04 22   doctor refused to deal with the pharmacy on the issue.

03:52:08 23        Do you see that?

03:52:09 24   **A**    I do see that.

03:52:11 25   **Q**    Down at the bottom, you said the patient has had

6744

**Militello - Recross/Lanier**

03:52:16 1    questionable tendencies in the past.  The morphine

03:52:20 2    equivalent for the patient is 350.

03:52:23 3         What is the morphine equivalent on the fellow that we

03:52:26 4    were talking about before that you said was in such agony?

03:52:32 5         Do you recall?

03:52:37 6    **A**    On this OARRS report, it reads 465.

03:52:40 7    **Q**    That's a lot more than the 350 that caused you not to

03:52:44 8    write for this fellow; right?  Fill for this fellow, excuse

03:52:48 9    me.

03:52:50 10        Right?

03:52:51 11   **A**    That's correct, yeah.

03:52:52 12   **Q**    And then the same doctor has no interest in dealing

03:52:57 13   with the pharmacy professionally.  Patient had prescription

03:53:02 14   for hydromorphone and filled a prescription for oxycodone.

03:53:06 15   I felt uncomfortable with the prospect of filling this

03:53:09 16   prescription.  In my professional judgment, denied filling.

03:53:13 17        Kudos to you for doing that, but, ma'am, this doesn't

03:53:17 18   hold a candle to this other fellow that years later you all

03:53:21 19   are filling for, does it?

03:53:23 20             MR. MAJORAS:  Objection.  Form.

03:53:24 21             THE COURT:  Overruled.

03:53:26 22             THE WITNESS:  It's a different patient, a

03:53:28 23   different situation, so every situation is unique.

03:53:32 24   BY MR. LANIER:

03:53:32 25   **Q**    Okay.

03:53:34  1        By the same token, if we're looking at your

03:53:36  2   situations, I tried to add up how many prescriptions over a

03:53:41  3   six-year period, from 2013 to 2018, that you personally

03:53:46  4   filled for the trinity.

03:53:48  5   **A**      Um-hmm.

03:53:49  6   **Q**      Would you be shocked to know that over 900 times, you

03:53:55  7   did so?

03:53:55  8                    MR. MAJORAS:  Objection.

03:53:56  9                    THE COURT:  Overruled.

03:53:57 10                    THE WITNESS:  I did not know the number of how

03:53:59 11   many times.

03:54:01 12                    MR. LANIER:  Okay.  That's all I've got,

03:54:03 13   Judge.  Thank you.

03:54:03 14        Thank you, ma'am.

03:54:05 15                    THE COURT:  Okay.  Thank you very much, ma'am.

03:54:07 16   You may be excused.

03:54:08 17                    THE WITNESS:  Thank you.

03:54:09 18                       (Witness excused.)

03:54:32 19                    THE COURT:  The defendants may call their next

03:54:34 20   witness, please.

03:54:57 21                    MS. FUMERTON:  Your Honor, may I proceed?

03:54:58 22                    THE COURT:  Yes.  Yes.  You may call your next

03:55:00 23   witness.

03:55:00 24                    MS. FUMERTON:  Thank you, Your Honor.

03:55:02 25        Walmart calls as its next witness, Debbie Mack by

03:55:08  1    video deposition designation.

03:55:11  2         Ms. Mack is a former Walmart employee of 31 years, who

03:55:14  3    joined Walmart as a pharmacist and worked her way up to

03:55:16  4    become a senior director in Walmart's Health and Wellness

03:55:20  5    Practice Compliance at Walmart's home office.

03:55:23  6         What will, be played for you is about 22 minutes of

03:55:27  7    Ms. Mack responding to questions from one of plaintiffs'

03:55:30  8    attorneys, Allison Gaffney.

03:55:34  9                   MR. WEINBERGER:  Your Honor --

03:55:36  10                   THE COURT:  Well, hold on.  Let's go on the

03:55:39  11   headset.

03:55:40  12                   MR. WEINBERGER:  Can we go on the. . .

03:55:43  13                   THE COURT:  Yeah.

03:55:54  14        (Proceedings at sidebar:)

03:55:54  15                   MR. WEINBERGER:  Your Honor, this is a

03:55:57  16   deposition that we, as you know, has been at issue that

03:56:01  17   we've objected to.  For -- and that they've done the

03:56:04  18   designations on.

03:56:05  19        For Ms. Fumerton to introduce this witness as the fact

03:56:11  20   that the plaintiffs' lawyer asked these questions is highly

03:56:16  21   inappropriate.

03:56:16  22                   THE COURT:  Well, Mr. Weinberger, I think they

03:56:19  23   recognize --

03:56:20  24                   MR. WEINBERGER:  It's not my voice.

03:56:21  25                   THE COURT:  Well --

03:56:22  1                    MR. WEINBERGER:  It's a woman's voice.  It's

03:56:23  2   not my voice.  This woman has never -- her voice has not

03:56:28  3   been on any videos, and --

03:56:30  4                    THE COURT:  Well, candidly, it doesn't matter

03:56:32  5   who's asking the questions.

03:56:34  6                    MR. WEINBERGER:  Well, the implication --

03:56:35  7   well, maybe that's what we need to say.

03:56:38  8                    THE COURT:  It's a Walmart employee so it

03:56:39  9   doesn't matter.

03:56:40 10                    MR. WEINBERGER:  Right, it's a Walmart

03:56:41 11   employee who we objected, whose deposition -- they should

03:56:43 12   have brought her in live.

03:56:44 13                    THE COURT:  Well, look.  It doesn't matter

03:56:46 14   who's asking the question.  The witness is presumably

03:56:50 15   telling the truth.  Okay?  So -- so the time's being charged

03:56:56 16   to Walmart.  They're calling her.  It doesn't matter who

03:56:59 17   asked the questions.  Walmart's designated this deposition.

03:57:01 18                    MR. WEINBERGER:  Well, then let's add to the

03:57:03 19   fact that this deposition was allowed because of a sanctions

03:57:07 20   motion.

03:57:07 21                    THE COURT:  I'm not going into any of that.

03:57:09 22   Walmart's calling Ms. Mack, a former employee, by video,

03:57:13 23   which they're allowed to do.  It doesn't matter who asked

03:57:15 24   the questions.

03:57:16 25        Okay.  Let's proceed.

### Deposition Testimony of Deborah Mack

03:57:17 1          MR. WEINBERGER:  Okay.

03:57:26 2          (Proceedings resumed in open court.)

03:57:26 3          DEPOSITION TESTIMONY OF DEBORAH MACK

03:57:26 4   BY MS. GAFFNEY:

03:57:40 5   Q    Ms. Mack, you worked for Walmart for 31 years; is that

03:57:44 6   correct?

03:57:44 7   A    That's correct.

03:57:48 8   Q    And you began working in Walmart Practice Compliance

03:57:55 9   Department in 2006; is that correct?

03:57:56 10  A    Yes.

03:57:58 11  Q    And in 2012, you became a Senior Director in the

03:58:03 12  Practice Compliance Department in Health and Wellness; is

03:58:08 13  that right?

03:58:08 14  A    Yes.

03:58:09 15  Q    How would you describe your responsibilities as the

03:58:12 16  Senior Director of Practice Compliance?

03:58:15 17  A    So I had 17 states that I was responsible for the

03:58:19 18  compliance requirement, and my main thing I had to do was

03:58:26 19  have a relationship with all the Boards of Pharmacy and so

03:58:29 20  the 17 different states.  And so Board of Pharmacy rules,

03:58:35 21  legislation, all that gets passed in each of those states

03:58:39 22  each year, being over an individual that was over controlled

03:58:48 23  substances and then also immunizations, vaccines, point of

03:58:53 24  care testing for -- that was for the whole company but all

03:58:56 25  the first roles was for 17 states.

**Deposition Testimony of Deborah Mack**

03:58:58  1    **Q**    Okay.  Thank you.

03:58:59  2         When you said being over an individual that was over

03:59:03  3    controlled substances, can you explain what that means?

03:59:07  4    **A**    The individual did the day-to-day working with asset

03:59:13  5    protection, anything that's happening in stores and

03:59:16  6    notifying the DEA and the states' controlled substance

03:59:24  7    agencies.

03:59:24  8    **Q**    Okay.  And who was that individual or individuals?

03:59:28  9    **A**    Shelley Tustison Nelson.

03:59:28  10   **Q**    And in your position, you were -- as a Senior

03:59:32  11   Director, you were in a higher management position than

03:59:38  12   Mr. Nelson; is that correct?

03:59:38  13   **A**    Yes.

03:59:39  14   **Q**    It reads, "Since 2015, pharmacists have been able to

03:59:43  15   search RTS across the company."

03:59:44  16        To your knowledge, is that an accurate statement?

03:59:58  17   **A**    To my knowledge, pharmacists could search it.  I don't

04:00:01  18   know exactly which year they began searching.

04:00:06  19   **Q**    Okay.

04:00:07  20        And do you know what programs pharmacists could use to

04:00:12  21   search RTF?  Was it Archer?

04:00:14  22   **A**    Yes.

04:00:15  23   **Q**    And how would you describe, in your own words, the

04:00:17  24   difference between a blanket refusal to fill and a corporate

04:00:20  25   block?

### Deposition Testimony of Deborah Mack

04:00:23 1 **A**      A blanket refusal to fill is when a pharmacist decides

04:00:28 2 I can't fill -- I will not fill prescriptions for X doctor,

04:00:33 3 and a corporate block is when the company sends something

04:00:38 4 down and blocks a particular doctor and nobody could fill

04:00:40 5 it.

04:00:41 6 **Q**      When you began your role as the Senior Director of

04:00:44 7 Practice Compliance in 2012, did Walmart permit its

04:00:48 8 pharmacists to impose blanket refusals to fill?

04:00:58 9 **A**      Walmart had stated that they wanted pharmacists to

04:01:00 10 look at every prescription before determining whether they

04:01:02 11 felt comfortable filling or not, but it was up to the

04:01:05 12 pharmacist if they filled a prescription.

04:01:08 13 **Q**      And were pharmacists in -- Walmart pharmacists in 2012

04:01:13 14 allowed to impose blanket refusal to fills on any and all

04:01:18 15 prescriptions coming from a particular prescriber?

04:01:24 16 **A**      They needed to look at each prescription first.  So

04:01:27 17 they -- they were supposed to look at each prescription

04:01:31 18 before making that determination.  I mean, that was true

04:01:35 19 when I came to Walmart 31 years ago.  The pharmacists always

04:01:40 20 had the say whether to fill a prescription or not.

04:01:43 21 **Q**      But they did not have the choice to impose a blanket

04:01:46 22 refusal to fill on a prescriber in 2012; is that correct?

04:01:50 23 **A**      It was always up to the pharmacist whether they filled

04:01:52 24 a prescription.

04:02:01 25 **Q**      Ms. Mack, I'm just asking whether pharmacists at

### Deposition Testimony of Deborah Mack

04:02:04 1    Walmart, in 2012, were permitted to impose a blanket refusal

04:02:07 2    to fill on a prescriber without looking at each prescription

04:02:11 3    individually.

04:02:13 4    **A**    At that time, I would say no, they needed to look at

04:02:15 5    every prescription.

04:02:17 6    **Q**    Ms. Mack, before the short break, we were discussing

04:02:20 7    the rationale for Walmart's prohibition on blanket refusals

04:02:24 8    to fill.

04:02:24 9        And without asking about the specifics of any

04:02:27 10   communication from counsel, I just want to clarify your

04:02:29 11   testimony for the record.

04:02:31 12       It's your testimony that the basis for the prohibition

04:02:34 13   on blanket refusals to fill was the advice of counsel?

04:02:37 14   **A**    I would say it was many things involved in that

04:02:43 15   early-on decision.  I personally had spoken to Board of

04:02:47 16   Pharmacy.  I know Susanne Hiland spoke to Boards of

04:02:51 17   Pharmacy.  We understood the corresponding responsibility of

04:02:54 18   pharmacists, and this guidance was out there for sure, too.

04:03:03 19       And, yes, I would say taken all that together, it made

04:03:08 20   up the discussion between attorneys and our team on blanket

04:03:12 21   refusals.

04:03:15 22   **Q**    When you say you personally had spoken to Boards of

04:03:19 23   Pharmacy, which Boards?

04:03:22 24   **A**    Texas Board of Pharmacy was the first one and the --

04:03:27 25   probably the main one.  And their opinion softened over

6752

**Deposition Testimony of Deborah Mack**

04:03:32  1   time.  But back then, the early 2000s, it was very much that

04:03:36  2   a pharmacist must look at every prescription before filling.

04:03:39  3   They could ultimately decide not to fill everything for

04:03:44  4   Dr. X, but they had to look at every prescription first.

04:03:48  5   **Q**    And were -- those conversations with the Texas Board

04:03:53  6   of Pharmacy, when did those take place?

04:03:59  7   **A**    I would say the first one for me was around 2007 or

04:04:04  8   2008.  I had multiple ones with the executive director at

04:04:11  9   that time, Gay Dodson.

04:04:13 10       And then years later, as their opinion started to

04:04:18 11   soften somewhat, I had additional conversation with the

04:04:25 12   chief attorney, Kerstin Arnold.

04:04:33 13   **Q**    When you say the chief attorney, was that at the Board

04:04:40 14   of Pharmacy?

04:04:40 15   **A**    Yes.

04:04:41 16   **Q**    And these discussions that you had over the years with

04:04:46 17   the Texas Board of Pharmacy, are they memorialized anywhere?

04:04:49 18   **A**    No, not -- I don't think they're memorialized anywhere

04:04:56 19   that's available or -- they're just -- they were verbal

04:05:00 20   conversations every time.

04:05:01 21   **Q**    And then after those verbal conversations, did you

04:05:05 22   ever communicate the content of that conversation in writing

04:05:08 23   to anyone at Walmart?

04:05:12 24   **A**    Not in writing, but I did communicate it.

04:05:16 25   **Q**    And how did you communicate it?

**Deposition Testimony of Deborah Mack**

04:05:22  1   **A**      In meetings as we were discussing this type of

04:05:27  2   information, I would communicate what I had learned from the

04:05:31  3   Board of Pharmacy.

04:05:32  4        There were other boards later on as well, but Texas

04:05:35  5   was the very first one.

04:05:36  6   **Q**      Other than the Texas Board of Pharmacy, did you have

04:05:42  7   communications with any other Boards of Pharmacy in which

04:05:46  8   they discussed the evidence on blanket refusal to fill?

04:05:54  9   **A**      The Oregon Board of Pharmacy, I spoke to them about

04:05:58 10   it.  California Board of Pharmacy, I spoke to them.  Idaho,

04:06:14 11   I spoke to them on several different issues.  But for sure

04:06:16 12   Oregon and California.

04:06:21 13   **Q**      And when did the conversation with the Oregon Board of

04:06:24 14   Pharmacy take place?

04:06:29 15   **A**      I could not possibly pinpoint the year for you.

04:06:35 16   **Q**      Could you --

04:06:36 17   **A**      Like I said, it was later than Texas, but I don't know

04:06:38 18   exactly when that occurred.

04:06:48 19   **Q**      And how about the conversations you referenced with

04:06:51 20   the California Board of Pharmacy; when did those take place?

04:06:56 21   **A**      Again, I don't know the date, but it was around the

04:07:01 22   time that California was.  It was later than Texas.  Texas

04:07:05 23   was the very first one.  I remember it extremely well.

04:07:09 24   **Q**      Okay.

04:07:11 25        Just to clarify for the record, you said it was around

6754

## Deposition Testimony of Deborah Mack

04:07:13  1   the time that California was.  Did you mean Oregon?

04:07:19  2   **A**    Oh, you're asking me about California.  So around the

04:07:23  3   time, Oregon, yes.

04:07:24  4   **Q**    Okay.

04:07:35  5        At what point did Walmart begin permitting its

04:07:39  6   pharmacists to impose blanket refusals to fill?

04:07:42  7   **A**    Well, they -- they could always refuse if they looked

04:07:48  8   at the prescription first.  So even blanket refusal to say

04:07:55  9   everything for Dr. X or Dr. Smith, if they looked at every

04:07:58 10   one of these prescriptions as they came in, they could

04:08:01 11   always decide not to fill.  I mean, the opportunity was

04:08:07 12   there, they just had to look at the prescription.

04:08:17 13   **Q**    At what point did Walmart permit its pharmacists to

04:08:20 14   refuse to fill all prescriptions from a prescriber without

04:08:23 15   looking at each prescription individually?

04:08:25 16   **A**    I would say the first time that the policy changed

04:08:29 17   somewhat to take out the blanket refusal.  I think that

04:08:36 18   might have been somewhere around 2015.

04:08:40 19   **Q**    And what was the basis for that change in 2015?

04:08:43 20   **A**    As I continued talking to Texas, they started

04:08:50 21   softening on their approach.  At first, their approach was a

04:08:53 22   pharmacist should look at every prescription before they

04:08:55 23   make a decision.  And then the -- well, I was at a Texas

04:09:01 24   Board meeting and I heard Kerstin Arnold, the attorney,

04:09:06 25   soften so much in that -- so much, you know, for that

**Deposition Testimony of Deborah Mack**

04:09:09  1      particular statement.

04:09:11  2          So I went up and talked to her afterwards and she

04:09:15  3      said, yes, if a pharmacist has already decided they can't

04:09:19  4      fill for Dr. Smith, they could blanket refuse that.  And

04:09:24  5      that was the first time I had ever heard a Board that

04:09:26  6      actually said do this without looking at every prescription.

04:09:29  7      So it was pretty monumental to me that I remember that.

04:09:34  8          And those are the types of things, you know, our team

04:09:37  9      would bring back and we would talk in these meetings with

04:09:40 10      the attorneys and things were evolving and things were

04:09:47 11      changing and we were updating policies and changing policies

04:09:51 12      and it wasn't flipping a light switch that all of a sudden,

04:09:55 13      you need to change it, but it was evolving over time.

04:09:58 14      **Q**      And when did that particular Texas Board meeting that

04:10:02 15      you've just described occur?

04:10:09 16      **A**      I don't know the actual date, but it was years after

04:10:13 17      2007.  2007 was the first time and then years later.  So I'm

04:10:21 18      going to say five or six, seven years later, this occurred.

04:10:25 19      And it had always -- I had always heard Texas say, look at

04:10:30 20      every prescription and then this was just very different

04:10:32 21      that day.  So I think their -- their opinion evolved over

04:10:36 22      time as well.

04:10:37 23      **Q**      Okay.  Ms. Mack, you mentioned communications with the

04:10:42 24      Texas, Oregon, California, and Idaho Boards of Pharmacy.

04:10:49 25      Were there any others that you communicated with regarding

**Deposition Testimony of Deborah Mack**

04:10:52  1    blanket refusals to fill?

04:10:55  2    **A**      Nevada.  Could have very possibly talked to Oklahoma,

04:11:11  3    Kansas, Oregon, Mexico about that because that was -- as

04:11:16  4    time was evolving, that was becoming a bigger topic of

04:11:22  5    conversation as I talked to different directors.

04:11:25  6    **Q**      And did you ever have any conversations with the Ohio

04:11:29  7    Board of Pharmacy regarding blanket refusals to fill?

04:11:33  8    **A**      I don't think so.  I mean, I did have Ohio for a very,

04:11:38  9    very short time, but I don't remember that ever being a

04:11:41 10    topic of conversation.

04:11:42 11    **Q**      And when you would have calls with representatives

04:11:44 12    from Boards of Pharmacy, what would be -- what would prompt

04:11:48 13    those calls?

04:11:49 14    **A**      Well, that was the major part of my job was working

04:11:54 15    with the executive directors and the Boards of Pharmacy.  So

04:11:57 16    whether it be to touch base and see what's going on in their

04:11:59 17    state or to ask questions, you know, what they tell their

04:12:06 18    pharmacists about this or that, it was just that was the

04:12:12 19    major communication tool.  We didn't -- I couldn't travel to

04:12:15 20    17 states and be at every Board of Pharmacy meeting.  So I

04:12:19 21    typically called them and talked to them about various

04:12:23 22    things.

04:12:23 23    **Q**      Okay.

04:12:24 24          So typically, you would initiate those calls to the

04:12:27 25    Board representatives?

6757

**Deposition Testimony of Deborah Mack**

04:12:28  1   **A**     I would say typically I called them, but they

04:12:30  2   definitely called me as well.

04:12:31  3   **Q**     Besides this -- the Texas Board meeting that you

04:12:35  4   described that indicated a possible change in position for

04:12:38  5   the Texas Board, did any other board of -- did any Boards of

04:12:44  6   Pharmacy communicate to you that it was okay to permit

04:12:48  7   blanket refusals to fill?

04:12:50  8   **A**     No.  That was the only board that I felt had a little

04:12:55  9   bit of a change of their opinion.

04:13:04 10   **Q**     Did the DEA ever communicate guidance on blanket

04:13:09 11   refusals to fill to you?

04:13:10 12   **A**     No.

04:13:15 13   **Q**     And when Walmart changed its policy on blanket

04:13:18 14   refusals to fill in 2015, were you involved in that policy

04:13:24 15   change?

04:13:25 16   **A**     Yes, I was.

04:13:27 17   **Q**     What was your involvement in the policy change?

04:13:31 18   **A**     My involvement would have been telling what -- what

04:13:40 19   I'd heard at the Texas Board of Pharmacy and, yeah, that

04:13:44 20   pharmacists have reached out occasionally wanting the

04:13:52 21   corporation to make some kind of decision for them.

04:13:53 22   **Q**     Do you send -- if a pharmacist had reached out

04:13:56 23   occasionally wanting the corporation to make some kind of

04:14:00 24   decision for them, could you describe what you mean by that?

04:14:06 25   **A**     Pharmacists called us, me, all the time.  Sometimes

## Deposition Testimony of Deborah Mack

04:14:13  1   through their market directors, sometimes through their

04:14:16  2   regional directors and sometimes they just picked up the

04:14:17  3   phone and called my office.

04:14:19  4       And I will say occasionally, pharmacists would say I

04:14:23  5   just wish -- or they would say, can Walmart decide we can't

04:14:28  6   fill these prescriptions, and I would go through the whole

04:14:33  7   policy of, you know, you're the pharmacist and you have --

04:14:39  8   you're at:  The store level, you know the patient, you know

04:14:41  9   the doctors, you're looking at the situation.  It's the

04:14:44 10   pharmacist's decision.

04:14:45 11       Walmart has never told its pharmacists what they had

04:14:49 12   to do.  They've prided themselves in letting the pharmacists

04:14:54 13   be the pharmacists.  Walmart didn't want to be the

04:14:56 14   pharmacists for them.

04:14:58 15       So that conversation would happen and typically when

04:15:02 16   we would hang up from that conversation, a pharmacist

04:15:05 17   understood their role much better and understood that they

04:15:08 18   really are the ones that are armed with what to do on the

04:15:15 19   case, you know.  Walmart is in Bentonville.  They don't

04:15:18 20   know.  And they never -- Walmart never wanted to tell the

04:15:21 21   pharmacists what to do.

04:15:25 22   Q    Ms. Mack, you are a registered pharmacist yourself; is

04:15:30 23   that correct?

04:15:30 24   A    Yes.

04:15:31 25   Q    Are you currently registered in Arkansas?

6759

**Deposition Testimony of Deborah Mack**

04:15:40  1  **A**   Yes.

04:15:41  2  **Q**   In any other states?

04:15:42  3  **A**   Texas.

04:15:42  4  **Q**   This is an e-mail from Shelley Tustison to you dated

04:15:47  5  October 22, 2013; correct?

04:15:48  6  **A**   Yes.

04:15:48  7  **Q**   And at that time, did you supervise Ms. Tustison?

04:15:51  8  **A**   Yes.

04:15:52  9  **Q**   And just looking at the -- the last sentence in the

04:15:56 10  first paragraph that begins, "Even after, even after the

04:16:01 11  pharmacist established that there's a doctor/patient

04:16:03 12  relationship, the pharmacist is still allowed to refuse a

04:16:06 13  prescription on an individual prescription basis.  No

04:16:09 14  blanket refusals are allowed by the Boards of Pharmacy."

04:16:15 15      Was that statement, "No blanket" -- the last part of

04:16:18 16  that statement, "No blanket refusals are allowed by the

04:16:21 17  Boards of Pharmacy," an accurate statement at this time,

04:16:24 18  which is 2013?

04:16:25 19  **A**   To my knowledge, at that time, there was not a board

04:16:28 20  that said you can blanket refuse a prescription.  But once

04:16:34 21  again, the first sentence also says, you know, you use your

04:16:37 22  professional judgment and if you want to refuse a

04:16:39 23  prescription, you refuse it.

04:16:42 24      And if that doctor writes so many that you've looked

04:16:45 25  at them, you want to refuse them all, you can refuse them

**Deposition Testimony of Deborah Mack**

04:16:47  1    all.

04:16:47  2    **Q**    And, in fact, Walmart in 2015 decided to permit

04:16:51  3    blanket refusals to fill; is that correct?

04:16:53  4    **A**    Yes, they did take it out of the policy and it was

04:16:59  5    more permitted, but this was 2013.  But once again, I don't

04:17:09  6    know if you're catching my point, but for the 31 years I

04:17:13  7    worked at Walmart, a pharmacist had the right to refuse to

04:17:17  8    fill a prescription.  And if I looked at 20 of Dr. Smith's

04:17:22  9    and I knew I wasn't going to fill it for Dr. Smith, at some

04:17:25  10   point, I would look at them much quicker and know that I

04:17:29  11   wasn't going to fill them.

04:17:31  12        So there wasn't anything making me think I had to fill

04:17:36  13   a prescription.  I filled based on the knowledge I had

04:17:40  14   surrounding that patient and that doctor and that

04:17:42  15   prescription.

04:17:43  16   **Q**    What is the basis for Walmart's prohibition on blanket

04:17:48  17   refusals to fill for pharmacists in Ohio?

04:17:50  18   **A**    I don't have the answer to that.

04:17:52  19   **Q**    Okay.

04:17:54  20        And we've been talking for a while about blanket

04:17:56  21   refusals to fill, so now we're talking about corporate

04:18:00  22   blocks, which as you've explained earlier, are different.

04:18:04  23        Did any representatives from Boards of Pharmacy ever

04:18:06  24   tell you that corporate blocks were not permitted?

04:18:12  25   **A**    Yes.

04:18:15  1    **Q**     And would those be the same Boards of Pharmacy that

04:18:19  2    you described earlier?

04:18:25  3         So just to clarify, you mentioned Texas, Oregon,

04:18:30  4    Nevada, Idaho and California.  Would those be the same, Ms.

04:18:37  5    Mack, for communications regarding corporate blocks?

04:18:41  6    **A**     Those would be the same and they would have -- the

04:18:48  7    discussion would have been around asking what is Walmart

04:18:53  8    doing, what is a corporate block.

04:18:56  9         And originally, I mean, when that first came out, as

04:19:03 10    Boards would call and talk about it, we would help them

04:19:06 11    understand that it varied -- it would be very rare in the

04:19:13 12    grand scheme of how many prescriptions there are that there

04:19:15 13    would be a corporate block, and there would have been a lot

04:19:17 14    of information put into whether to corporate block or not,

04:19:23 15    it wasn't -- and it wasn't -- it was very -- it was a

04:19:29 16    process.  But yes, those same types of states would have

04:19:35 17    talked about whether the pharmacist should do that or

04:19:41 18    Walmart itself could corporate block.

04:19:52 19              THE COURT:  Let's go on the headphones for a

04:19:54 20    second, please.

04:19:58 21                  (Proceedings at sidebar:)

04:20:02 22              THE COURT:  Okay.  I understand there's one

04:20:04 23    more pharmacist witness from Walgreens.

04:20:10 24              MR. SWANSON:  That's correct, Your Honor.

04:20:11 25              THE COURT:  Mr. Stoffelmayr, roughly how long

04:20:13  1    do you expect he or she to be?

04:20:15  2                    MR. STOFFELMAYR:  I think the direct will be

04:20:17  3    between one and two hours, so we would not expect to finish

04:20:20  4    the direct today.

04:20:22  5                    THE COURT:  Well. . .

04:20:24  6                    MR. STOFFELMAYR:  I'm happy to start or --

04:20:26  7                    THE COURT:  Then why don't we start and then

04:20:27  8    when you think it's a convenient break around, I don't know,

04:20:32  9    5:00, 5:15, somewhere in there, we'll do that.

04:20:36  10                   MS. SWIFT:  We will do that.  Thank you,

04:20:37  11   Judge.

04:20:37  12                   THE COURT:  Okay.

04:20:43  13              (Proceedings resumed in open court.)

04:20:43  14                   THE COURT:  Okay.  I think Walgreens has the

04:20:46  15   next witness.  Mr. Stoffelmayr.

04:20:49  16                   MR. STOFFELMAYR:  Thank you, Your Honor.

04:20:50  17         Walgreens calls Amy Stossel.

04:21:00  18                   THE COURT:  Yes, you're metallic.

04:21:02  19                   MR. STOFFELMAYR:  I thought I had gotten over

04:21:04  20   whatever the condition was but -- no, that's not me.

04:21:50  21                   THE COURT:  Good afternoon, Ms. Stossel.  If

04:21:52  22   you could raise your right hand, please.

04:21:54  23        Do you swear or affirm that the testimony you are

04:21:56  24   about to give will be the truth the whole truth and nothing

04:21:58  25   but the truth under pain and penalty of perjury?

Stossel - Direct/Stoffelmayr

04:22:00  1          THE WITNESS:  I do.

04:22:01  2          THE COURT:  Thank you.

04:22:01  3      And you may remove your mask while testifying, please.

04:22:04  4          THE WITNESS:  Thank you.

04:22:04  5          DIRECT EXAMINATION OF AMY STOSSEL

04:22:10  6  BY MR. STOFFELMAYR:

04:22:10  7  Q    All right.

04:22:11  8      Good afternoon, Ms. Stossel.  You and I have met, but

04:22:14  9  in case anyone has forgotten over the last five or

04:22:17 10  six weeks, I'm Kaspar Stoffelmayr again.  I represent

04:22:22 11  Walgreens.

04:22:22 12      Ms. Stossel, why don't you introduce yourself to the

04:22:25 13  jurors if you would.

04:22:25 14  A    Hi.  I'm Amy Stossel.  I'm a pharmacist at Walgreens.

04:22:32 15  Q    Let's get a couple things out of the way.

04:22:34 16      How long have you been a pharmacist at Walgreens?

04:22:37 17  A    I've worked at Walgreens for 25 years.

04:22:40 18  Q    Where do you live?

04:22:41 19  A    I live in Willoughby, Ohio.

04:22:44 20  Q    And that, I think everyone knows, that's in

04:22:46 21  Lake County; correct?

04:22:47 22  A    Correct.

04:22:48 23  Q    Where do you work?

04:22:50 24  A    I work at Walgreens in Willoughby, Ohio, actually.

04:22:53 25  Q    Okay.  Do you have any family?

6764

**Stossel - Direct/Stoffelmayr**

04:22:54  1    **A**    I do.

04:22:55  2    **Q**    Tell us about them if you would.

04:22:57  3    **A**    Sure.  Sure.

04:22:58  4          So I have a son, who's 14 years old, and I have a

04:23:02  5    daughter, who's 15 years old.

04:23:03  6    **Q**    Okay.  And where did you grow up; also in Lake County?

04:23:06  7    **A**    No.

04:23:07  8          Actually, I grew up in Marietta, Ohio, which is in

04:23:11  9    southern Ohio.

04:23:11  10   **Q**    And how does one get from Marietta, Ohio, to

04:23:15  11   Willoughby, Ohio?

04:23:17  12   **A**    Ah-ha.

04:23:18  13         So when I was in college, I met my husband, and he was

04:23:23  14   from Madison, Ohio.  And so after college, I moved to this

04:23:28  15   area where I've been for about 20 years.

04:23:31  16   **Q**    All right.

04:23:31  17         I've put up on the screen just sort of a little

04:23:35  18   overview of what I want to cover with you this afternoon and

04:23:38  19   I think we'll end up continuing tomorrow morning.

04:23:41  20         First thing we're going to do is talk a little bit

04:23:44  21   more about who is Amy Stossel so the jurors can hopefully

04:23:47  22   get to know you a little bit.

04:23:49  23         The jurors have heard a lot about Walgreens

04:23:51  24   pharmacists.  They've heard from some folks who used to be

04:23:56  25   working pharmacists at Walgreens but then moved to other

04:23:58  1   jobs, but you will be the first time the jurors have

04:24:01  2   actually met a real life working Walgreens pharmacist.  So I

04:24:05  3   want to spend a little time talking about who you are and

04:24:09  4   then having you explain to the jurors what is it like to

04:24:12  5   work as a pharmacist at Walgreens.

04:24:15  6        And the then last thing is we'll talk about what goes

04:24:17  7   on when you fill a controlled substances prescription at

04:24:21  8   Walgreens, which, again, the jurors have heard a lot about

04:24:24  9   but they haven't heard about it from the perspective of a

04:24:27 10   pharmacist who's actually filling those prescriptions.  All

04:24:29 11   right?

04:24:29 12   **A**    Okay.  Sure.

04:24:30 13   **Q**    Okay.

04:24:31 14        A little more about who is Amy Stossel.  Why did you

04:24:35 15   decide to become a pharmacist in the first place?

04:24:37 16   **A**    So when I was in high school, I actually went to my

04:24:45 17   local hospital where they had kind of like a candy striper

04:24:51 18   program.  It was called Medical Explorers.

04:24:52 19        One of my friends and I volunteered at our hospital.

04:24:54 20   I had to be like a freshman or sophomore in high school, and

04:24:58 21   we went around to different areas of the hospital and

04:25:00 22   volunteered.

04:25:01 23        One of the areas was in nursing.  And then one day,

04:25:06 24   there were no slots available to volunteer in the nursing,

04:25:10 25   and I ended up in the pharmacy of the hospital.  They kind

**Stossel - Direct/Stoffelmayr**

04:25:13  1   of really liked it.  It was interesting, and it really. . .

04:25:20  2   it really caught my attention.  I really liked it, and it

04:25:25  3   was very interesting to me so. . . that was what really

04:25:31  4   caught my eye.

04:25:31  5   **Q**      So did you then go to college to study pharmacy?

04:25:35  6   **A**      I did.  I went.

04:25:36  7   **Q**      Where did you go?

04:25:38  8   **A**      Yeah, I went to Ohio Northern University.

04:25:40  9   **Q**      Did you like it there?

04:25:41  10  **A**      I did, yeah.

04:25:44  11  **Q**      You said -- jump ahead a little bit.  But when you

04:25:47  12  were -- well, tell us about the pharmacy program.  Did you

04:25:50  13  do like a bachelor's degree and then pharmacy school?  Was

04:25:54  14  it -- go straight through, because I've heard there's all

04:25:56  15  kinds of different ways to end up with a pharmacy degree.

04:25:59  16  **A**      Yeah.

04:25:59  17          So when I was in college, actually the program was a

04:26:03  18  five-year program.  And one of the reasons why I chose Ohio

04:26:07  19  Northern University was because it was what's called a

04:26:10  20  zero-to-five program.

04:26:12  21          So when you apply to pharmacy school, you got into the

04:26:18  22  pharmacy program at the very beginning and you started off

04:26:22  23  in the program all the way through.  You were already in the

04:26:26  24  pharmacy program.  You didn't have to apply once you got in

04:26:29  25  the program.

**Stossel - Direct/Stoffelmayr**

04:26:29  1  **Q**    What time period are we talking about?  When did you

04:26:32  2  graduate from Ohio Northern?

04:26:33  3  **A**    Oh, sure.  I graduated from high school in 1991.  So I

04:26:38  4  started college in 1991 and graduated from college in 1996.

04:26:41  5  **Q**    All right.

04:26:42  6       And just to preview some of the topics we're going to

04:26:45  7  talk about later, when you were in pharmacy school at Ohio

04:26:48  8  Northern, did you learn about things like the corresponding

04:26:53  9  responsibility rules for pharmacists?

04:26:54 10  **A**    Yes.

04:26:55 11  **Q**    Did you learn about topics like red flags and how to

04:26:59 12  resolve them?

04:26:59 13  **A**    Yes.

04:27:02 14  **Q**    Just so we -- you know, I guess, know where you're

04:27:07 15  coming from, what does that mean to you?  When we say a red

04:27:10 16  flag, in your practice as a pharmacist, not in court but in

04:27:12 17  your real practice as a pharmacist, what does that mean to

04:27:15 18  you?

04:27:15 19  **A**    So, a red flag is just a reason I might be

04:27:18 20  uncomfortable with filling a prescription.

04:27:23 21  **Q**    Did they -- how did they teach you about red flags or

04:27:27 22  things that make you uncomfortable?  How do you learn about

04:27:29 23  that when you go to pharmacy school?

04:27:31 24  **A**    So in my last year of pharmacy school, I had one

04:27:33 25  specific class that we really talked about this a lot and

**Stossel - Direct/Stoffelmayr**

04:27:39  1    that class was a pharmacy in ethics class.  We talked about

04:27:43  2    red flags quite a bit in that class.

04:27:44  3    **Q**    When you go to pharmacy school, do you have -- I know

04:27:47  4    we've heard from other folks about rotations and about

04:27:50  5    internships, but do you also have like a lab class?

04:27:53  6    **A**    Yeah.

04:27:53  7         There were a lot of lab classes in college, actually.

04:27:56  8    **Q**    And did any of those touch on topics like dispensing

04:28:00  9    controlled substances and how to recognize if a prescription

04:28:03 10    raises concerns or it's okay to go ahead and fill it?

04:28:06 11    **A**    Yeah, we actually had a class called a pharmacy

04:28:10 12    practice lab class that we did a lot of that in that class.

04:28:17 13    **Q**    After pharmacy school, you did an internship; correct?

04:28:21 14    **A**    Um-hmm.

04:28:21 15    **Q**    Where did you do your internship?

04:28:23 16    **A**    At Walgreens.

04:28:24 17    **Q**    Where -- where was that Walgreens?  Was it over near

04:28:27 18    Toledo or where?

04:28:28 19    **A**    No.  That Walgreens was in Maple Heights.

04:28:30 20    **Q**    Okay.  And then when did you take your pharmacy boards

04:28:35 21    to get your license?

04:28:36 22    **A**    I took those pharmacy boards in 1996, in the summer.

04:28:40 23    **Q**    Did you pass?

04:28:41 24    **A**    I did.

04:28:41 25    **Q**    First time?

Stossel - Direct/Stoffelmayr

04:28:42 1    **A**    I did.

04:28:43 2    **Q**    Okay.

04:28:43 3    **A**    Yes.

04:28:45 4    **Q**    Have -- as a -- have you ever worked anywhere since

04:28:48 5    pharmacy school other than at a Walgreens?

04:28:51 6    **A**    No.  No, I've worked at -- started at Walgreens and

04:28:54 7    I've never left.

04:28:55 8    **Q**    What made you choose Walgreens?

04:28:58 9    **A**    So a couple different things.

04:29:01 10           My husband graduated a year before me in pharmacy

04:29:05 11   school.  He started off in Drug Mart and he was working 12

04:29:12 12   and 13-hour days at Drug Mart.  He would come home really

04:29:16 13   exhausted from those long days.  And so at Walgreens, when I

04:29:19 14   interviewed, most of the shifts at Walgreens were eight-hour

04:29:23 15   days.  I really liked the prospect of just working an

04:29:27 16   eight-hour day.  So that was one of the reasons.

04:29:30 17           I also liked the different locations of the stores at

04:29:33 18   Walgreens.  So that was another reason why I chose to work

04:29:37 19   there.

04:29:37 20   **Q**    In all your time at Walgreens, has it -- has it lived

04:29:41 21   up to your expectations as to what they told you it would be

04:29:43 22   like?

04:29:43 23   **A**    Yeah, it definitely has.

04:29:45 24   **Q**    What do you like most about being a Walgreens

04:29:48 25   pharmacist?

**Stossel - Direct/Stoffelmayr**

04:29:48  1   **A**     So I really like dealing with all of the different

04:29:53  2   people that come into my stores.

04:29:56  3        Over the years, I've seen a really diverse group of

04:29:59  4   people come into all of my different locations that I've

04:30:02  5   worked at.  I work with some really great people, store

04:30:09  6   managers, technicians.  I've encountered some really great

04:30:13  7   other employees that I've worked with at Walgreens.

04:30:16  8   **Q**     I know you've worked at a bunch of different stores

04:30:18  9   over the years, and we don't have to map out by store

04:30:22 10   number, store number, but can you just give us a sense, over

04:30:25 11   your time at Walgreens, how much of that time was spent in

04:30:29 12   stores at Lake County versus other counties in the area?

04:30:31 13   **A**     Sure.  I've probably spent about half of my time in

04:30:34 14   Lake County.

04:30:34 15   **Q**     Where would you have worked at the other half?

04:30:37 16   **A**     The other half, I've worked in Cuyahoga County.

04:30:41 17   **Q**     Kind of the eastern end, closer to Lake County or

04:30:43 18   where?

04:30:44 19   **A**     Yeah.  Most of the time when I wasn't in Lake County,

04:30:46 20   I worked in Euclid, Ohio.

04:30:49 21   **Q**     At some point during your Walgreens career, did you

04:30:52 22   get promoted to pharmacy manager?

04:30:55 23   **A**     I did.

04:30:55 24   **Q**     How quickly did that happen?

04:30:57 25   **A**     I was a pharmacist for about a year and a half, two

**Stossel - Direct/Stoffelmayr**

04:31:03 1   years.  And then I got promoted to a pharmacy manager.

04:31:05 2   **Q**   And how long did you work as a pharmacy manager?

04:31:07 3   **A**   I would say probably four or five years.

04:31:10 4   **Q**   Okay.  Then what, you got demoted?  How come you went

04:31:14 5   back to being a pharmacist?

04:31:15 6   **A**   I actually started a family.  I had my kids and so I

04:31:20 7   switched to more of a part-time role and didn't work as a

04:31:26 8   pharmacist manager during those years.

04:31:27 9   **Q**   So in a part time role, you couldn't be a pharmacist

04:31:30 10  manager, you had to step back to a staff pharmacist?

04:31:32 11  **A**   Right.

04:31:33 12       As a pharmacist manager, the Ohio law says that you

04:31:36 13  have to spend the majority of your time in the store and be

04:31:42 14  the primary pharmacist in that store, and in a part time

04:31:46 15  role, you wouldn't be able to be the primary pharmacist in

04:31:50 16  the store location.

04:31:51 17  **Q**   Are you working full time today?

04:31:53 18  **A**   I am.

04:31:54 19  **Q**   All right.  Tell us what we're looking at on the

04:32:00 20  screen there.

04:32:00 21  **A**   So this is a photo of my concurrent location in

04:32:05 22  Willoughby.  That's the store that I work at today.

04:32:07 23  **Q**   How long have you worked at this store on SOM Center

04:32:11 24  Road in Willoughby?

04:32:12 25  **A**   I've been at this location for about four years.

**Stossel - Direct/Stoffelmayr**

04:32:14  1    **Q**     I've seen a lot of pictures, been to a lot of

04:32:17  2    Walgreens, I've seen a lot of pictures of Walgreens.  This

04:32:20  3    is not the fanciest Walgreens in the State of Ohio.

04:32:23  4         Is it a good place to work?

04:32:24  5    **A**     It is.  It's a great store to work at.

04:32:27  6    **Q**     What makes it a great store to work at?

04:32:29  7    **A**     I have a great team at this location.  It's a very

04:32:33  8    busy location, which I like.

04:32:34  9    **Q**     Why do you like that, being at a busy store versus

04:32:37 10    somewhere a little more laid back?

04:32:38 11    **A**     I see a lot of patients at this store.  One of the

04:32:41 12    reasons that I went to pharmacy school in the first place

04:32:43 13    was to help people, and I can help a lot of different people

04:32:48 14    at this location because we see so many.

04:32:50 15    **Q**     I notice it says 24 hours, but it doesn't say 24-hour

04:32:55 16    pharmacy.  Is it a 24-hour store or a 24-hour pharmacy?

04:32:58 17         What -- what's the store -- what are the store hours?

04:33:00 18    **A**     So this is a 24-hour store location, but the pharmacy

04:33:06 19    is not open 24 hours.  Our pharmacy hours currently are 9:00

04:33:12 20    a.m. to 9:00 p.m.

04:33:13 21    **Q**     If -- if the pharmacy is open, 8:00 p.m. at night or

04:33:19 22    middle of the day, does there have to be a pharmacist there

04:33:23 23    on duty?

04:33:24 24    **A**     Correct.  If there -- the pharmacy is open, a

04:33:27 25    pharmacist must be there.

**Stossel - Direct/Stoffelmayr**

04:33:28  1    **Q**    If a pharmacist calls in sick and they can't find a

04:33:32  2    replacement, can they open that pharmacy?

04:33:34  3    **A**    No.

04:33:36  4    **Q**    Now, one day a week, you work at a different location;

04:33:39  5    correct?

04:33:39  6    **A**    Correct.

04:33:39  7    **Q**    What's -- what's that about?  What's that like?

04:33:42  8    **A**    So one day a week, I work at our specialty pharmacy,

04:33:45  9    which is located in downtown Cleveland on Chester Avenue.

04:33:49 10    **Q**    What is a specialty pharmacy?  What does that mean?

04:33:52 11    **A**    So, a specialty pharmacy deals with medications which

04:33:56 12    might be a little bit more expensive but are tailored to

04:34:00 13    specific medical conditions.

04:34:04 14         A lot of those medications are limited distribution

04:34:07 15    drugs, which means that they can only be distributed to

04:34:13 16    certain locations and certain stores.

04:34:15 17    **Q**    Are those some of the kinds of medications that are

04:34:18 18    very special handling requirements, like refrigeration or

04:34:21 19    things like that?

04:34:22 20    **A**    They can be, yes.

04:34:25 21    **Q**    All right.

04:34:26 22         Let's go back to a regular pharmacy, like your

04:34:29 23    pharmacy in Willoughby.  And I want to ask you a few

04:34:33 24    questions about when the pharmacy orders medications.  Okay?

04:34:35 25    **A**    Sure.

Stossel - Direct/Stoffelmayr

04:34:37  1    **Q**    Now, I think we heard a little bit about this but

04:34:41  2    probably weeks ago, there is an inventory management system

04:34:45  3    called SIMS; correct?

04:34:47  4    **A**    Yes, correct.

04:34:48  5    **Q**    Am I right that SIMS will automatically place orders

04:34:51  6    for the pharmacy based on what the computer system thinks is

04:34:54  7    the right inventory level?

04:34:56  8    **A**    Correct.

04:34:57  9    **Q**    So if it thinks you're supposed to have a hundred

04:35:00 10    pills and it sees that you're down to 40 pills, it will

04:35:03 11    order 60 for you; correct?

04:35:05 12    **A**    Correct.

04:35:06 13    **Q**    I'm sure that's an oversimplified example, but things

04:35:09 14    like that?

04:35:10 15    **A**    Um-hmm.

04:35:10 16    **Q**    Now, if you want to -- let's start with non-controlled

04:35:13 17    substances, say it's amoxicillin.

04:35:16 18         Say all the preschoolers in town are sick and you need

04:35:19 19    more amoxicillin.  Can you as a pharmacist on SOM Center

04:35:24 20    Road go into the system and order more amoxicillin for the

04:35:27 21    store?

04:35:27 22    **A**    Yes.

04:35:28 23    **Q**    Is there a -- any check on your ability to get more

04:35:31 24    antibiotics for the preschoolers?

04:35:33 25    **A**    No.  I can go in and place the order.

Stossel - Direct/Stoffelmayr

04:35:35  1   **Q**    All right.

04:35:35  2        What about it's a controlled substance?  If you have a

04:35:39  3   new patient and suddenly you need more morphine than you

04:35:44  4   generally have in stock, can you just go to the computer

04:35:48  5   system and say double our morphine order?

04:35:51  6   **A**    No.  It's a little more complicated.

04:35:52  7   **Q**    Tell us what happens.

04:35:54  8   **A**    So in order to place an order for additional

04:35:58  9   controlled substances, you do have to go into another part

04:36:04  10  of our computer system and request to order more of that

04:36:12  11  particular medication.

04:36:13  12  **Q**    And is that request just automatically granted?

04:36:17  13  **A**    No.  You --

04:36:18  14  **Q**    What happens?

04:36:19  15  **A**    You would request to order, let's say, two additional

04:36:24  16  bottles of Adderall and you would get a message back

04:36:32  17  immediately saying order approved or order not approved.

04:36:35  18  **Q**    Do you have any insight into what the limit is for

04:36:40  19  whether the order is going to be approved or whether you've

04:36:44  20  ordered too much and it gets not approved?

04:36:46  21  **A**    No, not at all.

04:36:47  22  **Q**    Do you have any way of finding out what the limit is?

04:36:49  23  Could you ask somebody?

04:36:50  24  **A**    No, not that I know of.

04:36:51  25  **Q**    All right.

**Stossel - Direct/Stoffelmayr**

04:36:52 1     If it says order not approved but you've got a patient

04:36:54 2 who needs that Adderall or needs that morphine, what are you

04:36:57 3 going to do next?

04:36:58 4 **A**     So, if it says order not approved, then I would have

04:37:01 5 to send a request to my direct supervisor and I would have

04:37:08 6 to fill out a form that would state exactly why I needed to

04:37:13 7 order more of this medication.

04:37:15 8 **Q**     And what happens next?

04:37:18 9 **A**     So that request, I believe, goes to the supervisor and

04:37:24 10 then it would also go to our corporate integrity department.

04:37:29 11 **Q**     And that's at the corporate offices in Illinois

04:37:31 12 somewhere?

04:37:31 13 **A**     Um-hmm.

04:37:32 14 **Q**     Okay.  And what do they do?

04:37:34 15 **A**     They would either approve or deny that request.

04:37:37 16 **Q**     Do they ever actually deny it or is it more of a

04:37:40 17 rubber stamp situation?

04:37:42 18 **A**     No, it actually gets denied.  I had one recently that

04:37:45 19 got denied.

04:37:46 20 **Q**     And what did you do?  How did you -- what did you do

04:37:50 21 for the patient if you couldn't order extra controlled

04:37:52 22 substances that they needed?

04:37:53 23 **A**     So I had to turn the patient away.

04:37:56 24 **Q**     What was the medication in that case?

04:37:58 25 **A**     It was called Datrana.  It's actually a patch that a

**Stossel - Direct/Stoffelmayr**

04:38:02  1    patient would wear for methylphenidate, which is a like an

04:38:09  2    Adderall stimulant medication.

04:38:11  3    **Q**    Okay.  That actually raises a -- you mentioned

04:38:14  4    Adderall a couple times.  We've been talking in this case

04:38:17  5    about controlled substances and mostly talking about

04:38:20  6    opioids, but what are some other controlled substances

04:38:23  7    besides opioids?

04:38:24  8    **A**    Sure.  So there are some different classes of

04:38:28  9    controlled substances.  Some are benzodiazapines, like

04:38:34 10    Valium or Xanax.  Those might be some that you've heard of.

04:38:40 11    There are also anabolic steroids, like testosterone.  There

04:38:47 12    are also -- there's a controlled substance that's an

04:38:49 13    antidiarrheal medication.  So there are many different types

04:38:54 14    of controlled substances.

04:38:56 15    **Q**    Since the day you left pharmacy school, have you

04:39:00 16    always known that controlled substances come with the risk

04:39:03 17    of addiction and abuse?

04:39:04 18    **A**    Yes.

04:39:06 19    **Q**    Since the day you left pharmacy school, have you

04:39:09 20    always known that controlled substances raise concerns about

04:39:12 21    diversion?

04:39:13 22    **A**    Yes.

04:39:16 23    **Q**    In the course of your practice, say in the course of a

04:39:19 24    day or a week, just ballpark, what percentage of the

04:39:23 25    prescriptions you fill are for controlled substances at a

**Stossel - Direct/Stoffelmayr**

04:39:26  1    store like your store on SOM Center Road?

04:39:30  2    **A**    I mean, I would say maybe 10 percent.

04:39:37  3    **Q**    And the rest of your prescriptions would be

04:39:39  4    non-controlled substances of all kinds?

04:39:40  5    **A**    Correct.

04:39:40  6    **Q**    What are the -- out of curiosity, at your store like

04:39:45  7    on SOM Center Road, what are the prescriptions you fill most

04:39:48  8    for these noncontrolled substance, what do you see people

04:39:51  9    come in for?

04:39:51  10   **A**    For noncontrolled substances?

04:39:53  11   **Q**    Yeah.

04:39:53  12   **A**    Diabetes medications, blood pressure medications.

04:39:56  13   Those are the big ones at my location.

04:40:02  14   **Q**    So your store, I'm not going to ask you to tell

04:40:05  15   everyone your home address, but how far away from the store

04:40:07  16   do you live?

04:40:07  17   **A**    I live about 10 minutes from my store.

04:40:09  18   **Q**    And that's where you're raising your teenage kids?

04:40:12  19   **A**    Um-hmm.

04:40:17  20   **Q**    Is it -- has there ever been a time when you weren't

04:40:21  21   concerned about the diversion of controlled substances or

04:40:23  22   opioids in the community where you're raising your kids?

04:40:26  23   **A**    No, not at all.

04:40:28  24   **Q**    Have you ever worked with a Walgreens pharmacist who

04:40:31  25   you thought wasn't concerned about diversion into the

**Stossel - Direct/Stoffelmayr**

04:40:34  1    community where they live and raise their families?

04:40:36  2    **A**    No.

04:40:37  3    **Q**    Have you ever had a manager or a field leadership or

04:40:44  4    anyone in the chain of command at Walgreens who you thought

04:40:46  5    wasn't concerned about drug diversion in your community?

04:40:49  6    **A**    No.

04:40:49  7    **Q**    If you felt that way, would you still work at

04:40:51  8    Walgreens?

04:40:52  9    **A**    No, probably not.

04:40:53  10   **Q**    All right.

04:40:58  11         We're going to -- I want to talk about a number of

04:41:01  12   topics.  This is just sort of a high-level list of topics

04:41:05  13   we're going to hit between now and sometime tomorrow morning

04:41:07  14   when you get off the stand.  Talk about training.

04:41:11  15         We'll talk about OARRS.  The jury's heard a lot about

04:41:15  16   OARRS but we want to talk about your experience.  Want to

04:41:17  17   hear about what actually goes on when you fill a

04:41:20  18   prescription, red flags, refusals, and then we'll end up

04:41:23  19   talking a little bit about some of your -- some of your

04:41:25  20   stories about working with law enforcement and, finally, the

04:41:29  21   drug disposal topics, which people have heard about.

04:41:32  22         Let's start with training.  When you joined -- so you

04:41:37  23   joined Walgreens 1996/97?

04:41:40  24   **A**    That's correct, 1996.

04:41:42  25   **Q**    Was there any kind of new hire training you had to go

**Stossel - Direct/Stoffelmayr**

04:41:45  1    through at Walgreens?

04:41:46  2    **A**    Yes.

04:41:47  3    **Q**    We heard from another witness that today.  It's a full

04:41:50  4    two weeks of new hire training.  Was it that intense back

04:41:53  5    then?

04:41:53  6    **A**    I don't believe so.  I don't remember the specifics,

04:41:56  7    but I don't think it was two weeks.

04:41:59  8    **Q**    Was it more than a day, more than an afternoon?

04:42:02  9    **A**    I believe that it was a few days.

04:42:03 10    **Q**    And did that new hire training, in the '90s, already

04:42:08 11    cover controlled substances dispensing?

04:42:10 12    **A**    Yes.

04:42:11 13    **Q**    Since -- since that time, since you joined the

04:42:15 14    company, do you have to do continuing education as a

04:42:17 15    pharmacist?

04:42:17 16    **A**    Yes.

04:42:18 17    **Q**    Are you allowed to choose the continuing education

04:42:21 18    topics that are most important to you for your practice?

04:42:24 19    **A**    Yes.

04:42:26 20    **Q**    Do those ever include controlled substances topics?

04:42:30 21    **A**    Yes, um-hmm.

04:42:32 22    **Q**    It's a -- you have to do, like, so many hours for

04:42:35 23    every year or every two years of continuing education?

04:42:37 24    **A**    Correct.

04:42:38 25    **Q**    Correct?

6781

**Stossel - Direct/Stoffelmayr**

04:42:38  1    **A**      Yes.

04:42:39  2    **Q**      Is there a requirement that some of those hours cover

04:42:43  3    legal obligations and that sort of thing?

04:42:45  4    **A**      Yes.  So after --

04:42:47  5    **Q**      Tell us about that.  Yeah.

04:42:48  6    **A**      Yeah.

04:42:49  7          So every two years, as a pharmacist, you're required

04:42:51  8    to complete continuing education hours.  Every two years,

04:42:55  9    you have to complete 40 hours of continuing education.  Two

04:43:03 10    of those hours, every two years, have to be on the law

04:43:06 11    topics.

04:43:07 12    **Q**      And do those law topics sometimes involve controlled

04:43:10 13    substances?

04:43:10 14    **A**      Correct.

04:43:12 15    **Q**      Since you joined Walgreens, have you done any further

04:43:17 16    company organized training on controlled substances

04:43:20 17    dispensing?

04:43:20 18    **A**      Yes.

04:43:20 19    **Q**      Tell us a little bit about that.

04:43:22 20    **A**      So there are -- within our computer system, there is a

04:43:30 21    learning and talent management portal where we receive

04:43:34 22    training through Walgreens.  We will receive training in

04:43:41 23    this portal on certain topics, and over this time that I've

04:43:47 24    been a pharmacist, we've received training in that portal on

04:43:52 25    a number of times for good faith dispensing or for

04:43:59  1   controlled substances.

04:44:00  2   **Q**     So the jury heard -- again, this is a couple weeks

04:44:04  3   ago, or maybe more now -- about a time period when Walgreens

04:44:08  4   decided that it was going to change the way training

04:44:14  5   happened so they would implement a special periodic training

04:44:17  6   program, say 2012, 2013.

04:44:20  7        If you think back to the periods you worked at

04:44:22  8   Walgreens before that, so 1996 up to 2010, '11, 'j12, was

04:44:26  9   there any training on controlled substances dispensing going

04:44:29 10   on back then?

04:44:30 11   **A**     Yes.

04:44:31 12   **Q**     So this wasn't something brand new for you when the

04:44:34 13   new training started in 2012 or 13?

04:44:36 14   **A**     No.

04:44:39 15   **Q**     What about when the company's controlled substances

04:44:44 16   dispensing policies get updated, how do you find out about

04:44:46 17   that?

04:44:47 18   **A**     So there are a number of ways in Walgreens that you

04:44:52 19   can find out about different policies.  Sometimes we'll

04:44:54 20   receive e-mails.  Sometimes my direct pharmacy manager will

04:45:00 21   tell me about different policies that have been updated.

04:45:05 22        There's also, in our computer system, another place

04:45:11 23   called Compass and Compass is where we receive a lot of our

04:45:15 24   company information and those policy updates will, a lot of

04:45:21 25   time, be in this place called Compass where that company

**Stossel - Direct/Stoffelmayr**

04:45:25  1    policy or company information resides.

04:45:28  2    **Q**    Have there been occasions whether there was a

04:45:32  3    significant update to policies where you had to do a

04:45:34  4    particular training module on the new policy to make sure

04:45:36  5    you understood it?

04:45:36  6    **A**    Yes.

04:45:37  7    **Q**    How often does that happen?

04:45:40  8    **A**    It happens all the time.  Any time that there is a

04:45:44  9    change in policy, any time that there is a new policy that

04:45:50 10    comes about, there are some new training modules that come

04:45:54 11    in that learning and talent management portal, and then

04:45:58 12    those trainings are required by us to be completed.

04:46:01 13    **Q**    And if you don't complete it, what happens?

04:46:04 14    **A**    I'm not sure.  I always get mine completed, so. . . I

04:46:09 15    don't know.

04:46:09 16    **Q**    You sound like a rule follower.  Okay.  All right.

04:46:13 17    Let me shift gears, and we'll talk to you a little bit about

04:46:16 18    OARRS.

04:46:17 19          And the jury has heard a lot about what OARRS is and

04:46:20 20    what it looks like, but I just want to ask you about your

04:46:24 21    personal experiences with it.  Okay?

04:46:25 22    **A**    Um-hmm.

04:46:26 23    **Q**    When you started practicing pharmacy in the late '90s,

04:46:31 24    did OARRS exist?

04:46:32 25    **A**    No.

**Stossel - Direct/Stoffelmayr**

04:46:33  1   **Q**      Do you know if anything even remotely like OARRS

04:46:37  2   existed any states in the country from what they taught you

04:46:39  3   in school?

04:46:40  4   **A**      No.

04:46:42  5   **Q**      The jury has heard that in 2011, the Board of Pharmacy

04:46:46  6   rules changed to require a pharmacist to check OARRS for

04:46:50  7   certain kinds of prescriptions.

04:46:51  8          Do you remember that?

04:46:52  9   **A**      Yes.

04:46:55 10   **Q**      Before 2011, when it became required to use OARRS, did

04:47:02 11   you ever use OARRS?

04:47:03 12   **A**      Yeah, I did.

04:47:09 13   **Q**      When did you first get access to OARRS?

04:47:11 14   **A**      So I actually got access to OARRS back in May of 2009,

04:47:17 15   but I applied much earlier than that.

04:47:19 16   **Q**      What do you mean?  Explain that.  You had to apply to

04:47:21 17   get access to OARRS?  Couldn't Walgreens just hand it to

04:47:24 18   you, say it's on the computer now, go ahead and use it?

04:47:26 19   **A**      Yeah.  It wasn't a Walgreens application process.  It

04:47:32 20   was an application process through the State Board of

04:47:37 21   Pharmacy.

04:47:37 22          So I had to actually apply through the State Board of

04:47:41 23   Pharmacy in order to obtain access to OARRS.

04:47:44 24   **Q**      When did you first apply to the Board of Pharmacy to

04:47:49 25   get access?

**Stossel - Direct/Stoffelmayr**

04:47:49 1  **A**     It was April of 2008.

04:47:50 2  **Q**     Forgive me for asking, but how do you remember April

04:47:54 3  of 2008?  That's pretty impressive?

04:47:56 4  **A**     I know.  I actually -- I actually looked it up to see

04:47:58 5  when I applied.  I still have the e-mails from the State

04:48:03 6  Board of Pharmacy.

04:48:04 7  **Q**     All right.  So you applied in 2008.  And when did they

04:48:07 8  give you access?

04:48:08 9  **A**     It was May -- May of 2009.  I actually got an e-mail

04:48:14 10  that told me your access has been approved.

04:48:16 11  **Q**     Why did it take a year for you to get access to OARRS?

04:48:20 12  **A**     I don't know.

04:48:20 13  **Q**     Was it anything -- Walgreens have anything do with the

04:48:23 14  delay?

04:48:24 15  **A**     No.

04:48:25 16      All of that was through the State Board of Pharmacy.

04:48:27 17  It was independent of Walgreens.

04:48:29 18  **Q**     So why -- if it wasn't required to use OARRS back

04:48:33 19  then, why would you want access to OARRS?  What made you do

04:48:36 20  that?

04:48:37 21  **A**     Well, I mean, I guess I'm kind of a geek, but it was

04:48:43 22  exciting when OARRS became available.  So OARRS, as you

04:48:51 23  know, has all of the information that patients have for

04:48:57 24  controlled substances.  So any prescriptions that they've

04:49:01 25  filled for controlled substances would all be listed in that

Stossel - Direct/Stoffelmayr

04:49:05  1    OARRS report.

04:49:07  2          Prior to having OARRS, that information was not

04:49:13  3    directly available within one screen on a computer.  There

04:49:18  4    was a lot more leg work that needed to be done in order to

04:49:22  5    obtain that information prior to filling a prescription.  So

04:49:27  6    to have all of that on one screen was kind of exciting.

04:49:30  7    **Q**    For you in your practice, was getting access to OARRS

04:49:36  8    back then, was it something that meant it took you longer to

04:49:39  9    fill a prescription or something that actually saved you

04:49:40 10    time?

04:49:41 11    **A**    Yeah, it would save you some time to --

04:49:44 12    **Q**    Explain how it would save time.  Because now you're

04:49:47 13    going on a computer screen and doing all that.

04:49:51 14    **A**    Well, with OARRS, of course, you're logging in, you're

04:49:54 15    putting in some information in order to generate the OARRS

04:50:01 16    report and pull it up on the screen.

04:50:02 17          So, yes, that takes a little bit of time.  But prior

04:50:06 18    to OARRS, if I had a question about a patient's medication,

04:50:13 19    let's say they were bringing in a prescription to me and I

04:50:18 20    wasn't certain that I had the full history in my Walgreens

04:50:21 21    computer, maybe there was a gap in their history and I

04:50:26 22    wasn't certain, gosh, they've gotten a prescription here in

04:50:32 23    January and in March, but where's their February

04:50:36 24    prescription, where were they filling it.  And I needed to

04:50:41 25    fill in that gap for myself, I might have to call the CVS

Stossel - Direct/Stoffelmayr

04:50:45  1    next door to me and say, hey, do you have this gentleman on

04:50:48  2    file, did you fill a prescription for this gentleman in

04:50:50  3    February, where were they getting their prescription filled?

04:50:54  4         And so it takes far longer to call a CVS next to me

04:51:00  5    and wait on hold and try to obtain that information or try

04:51:03  6    to call the prescriber's office to see, did you issue a

04:51:06  7    prescription for this person in February than it is to just

04:51:15  8    pull up that OARRS report.

04:51:16  9    Q    So even pharmacists have to wait on hold when they

04:51:18  10   call the pharmacy?

04:51:19  11   A    Yes.  Yes, we do.

04:51:20  12   Q    Okay.  I thought you had like a code.

04:51:23  13        When you went to get access to OARRS in the 4018 --

04:51:28  14   I'm sorry, 2008/2009 time period, were there any other

04:51:33  15   Walgreens pharmacists who were getting access to OARRS that

04:51:36  16   you knew about?

04:51:36  17   A    I'm sure there were.

04:51:38  18        I know my husband did, but I'm sure there were.

04:51:40  19   Q    Was your husband working at Walgreens during that

04:51:43  20   time?

04:51:43  21   A    He was.

04:51:44  22   Q    He had left Discount Drug Mart?

04:51:47  23   A    He did, yes.

04:51:47  24   Q    Did Walgreens ever do anything to try to discourage

04:51:50  25   you or your husband or other Walgreens pharmacists from

**Stossel - Direct/Stoffelmayr**

04:51:52  1    getting on OARRS before it was required?

04:51:54  2    **A**    No.

04:51:56  3    **Q**    We heard that there were some pharmacies where the

04:52:00  4    computer system, a pharmacist would work at, would, you

04:52:04  5    know, not allow them to check OARRS from the pharmacy

04:52:07  6    computer system, so they might have to use their phones or

04:52:10  7    something like that.

04:52:12  8         At Walgreens, were you able, right from the beginning,

04:52:15  9    to access OARRS through the computer terminal you work at?

04:52:18 10    **A**    Yes.

04:52:21 11    **Q**    Ever since you got access to OARRS in 2009, was there

04:52:25 12    ever a time when anyone at Walgreens told you they thought

04:52:29 13    it wasn't a good idea, they didn't want you checking OARRS,

04:52:33 14    anything like that?

04:52:34 15    **A**    No.

04:52:34 16    **Q**    Anyone ever tell you it was too expensive or took too

04:52:37 17    long?

04:52:37 18    **A**    No.

04:52:39 19    **Q**    All right.

04:52:42 20              MR. STOFFELMAYR:  Your Honor, if it's all

04:52:43 21    right, I'll cover one more topic and that will get us

04:52:46 22    between 5:00 and 5:15.

04:52:48 23              THE COURT:  That's good.

04:52:49 24    BY MR. STOFFELMAYR:

04:52:50 25    **Q**    All right.

**Stossel - Direct/Stoffelmayr**

04:52:50  1       Ms. Stossel, since you joined Walgreens back in 2006,

04:52:55  2  has Walgreens always had policies on controlled substances

04:52:59  3  dispensing?

04:53:00  4  **A**    Yes.

04:53:01  5  **Q**    At Walgreens, do they call that good faith dispensing

04:53:04  6  policies?

04:53:04  7  **A**    Yes.

04:53:05  8  **Q**    All right.  Let me show you one of these.

04:53:15  9       Your Honor -- and I've got copies for everybody --

04:53:17  10  this is exhibit WAG-MDL-18.  It's already in evidence.

04:53:40  11            MR. STOFFELMAYR:  Your Honor, may I approach

04:53:41  12  the witness?

04:53:41  13             THE COURT:  Sure.

04:53:44  14            MR. STOFFELMAYR:  Mr. Pitts, may I give you a

04:53:46  15  copy for the Judge?

04:53:59  16  BY MR. STOFFELMAYR:

04:54:00  17  **Q**    But my colleague, who is listening more carefully than

04:54:02  18  I am speaking, pointed out that I said you started at

04:54:05  19  Walgreens in 2006.  That's not correct, is it?

04:54:08  20  **A**    Oh, no.  I'm sorry.  1996.

04:54:10  21  **Q**    That's what I thought I said, but apparently not.

04:54:14  22       Do you have in front of you -- it's the same document

04:54:18  23  that's on the screen -- Exhibit 18, a 1998 version of the

04:54:22  24  Good Faith Dispensing Policy?

04:54:24  25  **A**    Correct.

**Stossel - Direct/Stoffelmayr**

04:54:25  1   **Q**    All right.

04:54:25  2        And I just want to focus us for a second, we're not

04:54:28  3   going to spend too long on this document, on this list here.

04:54:33  4        Is this a list of circumstances that, in your

04:54:37  5   parlance, in your practice, you might think of as red flags?

04:54:40  6   **A**    Yes.

04:54:41  7   **Q**    When you got a policy like this in 1998, was it

04:54:47  8   telling you anything you didn't already know from pharmacy

04:54:49  9   school?

04:54:50 10   **A**    No.

04:54:55 11   **Q**    Did you ever see this?  When Walgreens would give you

04:54:58 12   a policy like this, did you ever see it as a complete list

04:55:02 13   of the only circumstances that would make you uncomfortable

04:55:05 14   filling a prescription?

04:55:06 15   **A**    No.

04:55:08 16   **Q**    In your training in pharmacy school and your practice,

04:55:11 17   have you ever limited yourself to a concrete list and say

04:55:14 18   these are the things that make me uncomfortable and nothing

04:55:16 19   else could?

04:55:18 20   **A**    No.

04:55:18 21   **Q**    Well, why not?  Why wouldn't you just say here's my

04:55:21 22   list and that's all I worry about?

04:55:23 23   **A**    There's no concrete list.  It would be based on the

04:55:28 24   prescription in front of me and the patient that's in front

04:55:31 25   of me and the drug history and the patient information.

### Stossel - Direct/Stoffelmayr

04:55:36  1    There are so many things that I would take into account.

04:55:41  2    **Q**    All right.  Let's jump ahead to the 2012 policy.

04:56:18  3          Ms. Stossel, I've given you what's already in

04:56:22  4    evidence, it's exhibit WAG-MDL-304, a 2012 update to the

04:56:27  5    Good Faith Dispensing Policy.

04:56:28  6          Do you have that?

04:56:29  7    **A**    I do.

04:56:31  8    **Q**    And it's considerably longer than that policy we

04:56:34  9    looked at from 1998, isn't it?

04:56:37  10   **A**    Correct.

04:56:41  11   **Q**    All right.

04:56:42  12         I'm going to start -- we're not going to go through

04:56:45  13   this page by page, but I want to just kind of orient you to

04:56:52  14   the policy.

04:56:52  15         It begins with procedures for good faith dispensing of

04:56:57  16   controlled substances; correct?

04:56:58  17   **A**    Correct.

04:56:59  18   **Q**    And the first one is to ask for a patient ID.

04:57:03  19         Do you see that?

04:57:03  20   **A**    I do.

04:57:04  21   **Q**    So before 2012, if an unfamiliar person came in to

04:57:09  22   pick up a controlled substances prescription, would you

04:57:12  23   never check ID?

04:57:14  24   **A**    I would ask for the ID if I needed it.

04:57:17  25   **Q**    So this was -- was this something brand -- this was

**Stossel - Direct/Stoffelmayr**

04:57:20  1     not something brand new to your practice in 2012, like oh,

04:57:23  2     we got to start checking IDs now?

04:57:25  3     **A**     No.  No.

04:57:27  4     **Q**     Next one is prescriber.  "Confirm the prescriber has

04:57:31  5     the authority to prescribe controlled substances by

04:57:33  6     verifying the validity of prescriber information, the DEA

04:57:37  7     number, and the state license number."

04:57:39  8          Before they gave you a policy that says check to make

04:57:42  9     sure the prescriber has a valid DEA number, was that

04:57:46 10     something no one worried about?

04:57:49 11     **A**     We always worried about that.

04:57:52 12     **Q**     PDMP, you've been checking the PDMP since considerably

04:57:59 13     before 2012; correct?

04:58:00 14     **A**     Correct.

04:58:00 15     **Q**     And at this point in time, all your colleagues in Ohio

04:58:04 16     were checking the PDMP as well; right?

04:58:06 17     **A**     Correct.

04:58:07 18     **Q**     We'll talk a little later about data review and DUR

04:58:11 19     review.

04:58:12 20          The next page is -- there's several pages -- include a

04:58:17 21     much longer list of what you might consider red flags;

04:58:20 22     correct?

04:58:21 23     **A**     Yes.

04:58:22 24     **Q**     Here's one we've heard a lot about, unusual geographic

04:58:27 25     distance.  What does that mean to you in your practice?

**Stossel - Direct/Stoffelmayr**

04:58:30  1    **A**      So that would mean a distance between the patient and

04:58:40  2    the prescriber, or a distance between the patient and the

04:58:45  3    pharmacy that might make me uncomfortable.

04:58:50  4    **Q**      In your practice, might make me uncomfortable or

04:58:53  5    unusual, how many miles is that?  Is it 30 miles?  Is it

04:58:56  6    20 miles?  Is it 150 miles?  What counts?

04:59:00  7    **A**      It really depends on the situation.  There's no

04:59:08  8    concrete number that would make me pause or make me

04:59:12  9    uncomfortable.

04:59:14  10   **Q**      All right.

04:59:16  11         We're not going to go through all of these, but let me

04:59:19  12   ask it this way.  Even in the 2012 policy where you've got

04:59:24  13   this much longer list of, call them red flags, call them

04:59:28  14   things that might make you uncomfortable, was it telling you

04:59:31  15   about any factors that you weren't already -- hadn't already

04:59:35  16   learned about in pharmacy school?

04:59:37  17   **A**      No.

04:59:38  18   **Q**      Did you treat this much longer list as the complete

04:59:43  19   list of all the things you had to think about that might

04:59:48  20   make you uncomfortable?

04:59:49  21   **A**      No.

04:59:50  22   **Q**      Again, if I said why not, would you say the same thing

04:59:52  23   you said five minutes ago?

04:59:53  24   **A**      Yes.

04:59:56  25   **Q**      Okay.  I want to focus us on a couple things on this

**Stossel - Direct/Stoffelmayr**

05:00:01  1    page.

05:00:02  2         Section 6 says, document.  It is imperative that

05:00:08  3    pharmacists document all efforts used to validate good faith

05:00:11  4    dispensing?

05:00:12  5         Has that always been your understanding at Walgreens,

05:00:15  6    that they wanted you to document the steps you take to --

05:00:19  7    for lack of a better term -- resolve a red flag?  We've

05:00:22  8    heard people use that term.

05:00:23  9    A    Yes.

05:00:24 10    Q    Is that something they told you to do in pharmacy

05:00:27 11    school?

05:00:29 12    A    Yes.

05:00:35 13    Q    Let's go down a bit.  Pharmacist's action.

05:00:37 14         Now, do you see it says, "After reviewing the elements

05:00:40 15    of good faith and following the validation procedures, the

05:00:43 16    pharmacists must use his or her professional judgment to

05:00:46 17    determine how to proceed"?

05:00:46 18         Do you see that?

05:00:47 19    A    I do.

05:00:48 20    Q    And I want to -- I'll focus, I want to ask you about

05:00:51 21    the third one, but we'll just go through the first two real

05:00:54 22    quick.

05:00:54 23         The first one is dispense.  If everything checks out,

05:00:57 24    you're going to dispense the medication; is that right?

05:00:59 25    A    Correct.

6795

**Stossel - Direct/Stoffelmayr**

05:00:59  1    **Q**    Second one is if the prescriber tells you there's

05:01:02  2    something wrong with the prescription, what circumstance

05:01:05  3    could that happen?

05:01:06  4    **A**    So if you would -- if you would have a question about

05:01:11  5    a prescription, if a red flag was raised and you called the

05:01:16  6    prescriber to clarify something, and at the end of the

05:01:21  7    conversation, the prescriber says, "Please do not dispense

05:01:27  8    this prescription," then that's where this prescription then

05:01:30  9    becomes not valid to dispense.  So the prescriber has

05:01:34  10   essentially canceled that prescription.

05:01:36  11   **Q**    Would that -- would -- I'm sure there's lots of ways

05:01:39  12   that could happen.

05:01:41  13        Would a simple version of that be if a prescriber

05:01:43  14   says, "I've never heard of this person.  I didn't write the

05:01:46  15   prescription"?

05:01:46  16   **A**    Sure, yes.

05:01:47  17   **Q**    And in that case, are you going to dispense, ever?

05:01:50  18   **A**    No, I would not dispense that particular prescription.

05:01:53  19   **Q**    All right.  So let's focus on the third one here.

05:01:57  20   Refusal to dispense.

05:02:01  21        And it begins, "If the prescriber informs the

05:02:03  22   pharmacist that a prescription for a controlled substance is

05:02:07  23   valid."  So what does -- what does that tell you?  What's

05:02:13  24   this circumstance?  If the prescriber says it is valid, what

05:02:16  25   does that mean?

**Stossel - Direct/Stoffelmayr**

05:02:16 1  **A**    So that means if I were to call the prescriber in this

05:02:20 2  same scenario and the prescriber said to me, "Well, I see

05:02:26 3  your concern but I still would like you to go ahead and

05:02:30 4  dispense this prescription."

05:02:31 5  **Q**    And in your practice, have there been times like that

05:02:34 6  when you voiced a concern and a prescriber says, "I want you

05:02:37 7  to go ahead and fill it anyway"?

05:02:38 8  **A**    Yes.

05:02:39 9  **Q**    And then what is the rest of this telling you as a

05:02:43 10  Walgreens pharmacist, the -- what are they telling you?  How

05:02:47 11  do you interpret -- how do you understand this?

05:02:48 12  **A**    So it's saying to me that despite this instruction

05:02:54 13  from the doctor, I still want you to go ahead and dispense

05:02:57 14  this prescription, that I've determined that based on all of

05:03:03 15  these elements of good faith dispensing, that I still do not

05:03:08 16  feel comfortable dispensing this prescription and I am going

05:03:12 17  to refuse to dispense the prescription.

05:03:15 18  **Q**    And in your years at Walgreens, when situations --

05:03:20 19  well, let me ask you this.

05:03:21 20      Have you had situations like that come up, when a

05:03:23 21  doctor says, "I want you to fill the prescription," and you

05:03:25 22  still weren't comfortable?

05:03:26 23  **A**    Yes.

05:03:27 24  **Q**    And in those circumstances, what have you done if you

05:03:30 25  still weren't comfortable, despite the doctor saying you

**Stossel - Direct/Stoffelmayr**

05:03:32 1    need to fill this?

05:03:33 2    **A**    I've refused to dispense the prescription.

05:03:35 3    **Q**    And has Walgreens backed you up when that happened?

05:03:39 4    **A**    Yes.

05:03:40 5    **Q**    Have you ever received complaints from doctors in

05:03:44 6    situations like that?

05:03:45 7    **A**    Probably.

05:03:47 8    **Q**    Have your managers ever received complaints because

05:03:50 9    Stossel wouldn't fill a prescription that the doctor wanted

05:03:53 10   filled?

05:03:53 11   **A**    Probably.

05:03:54 12   **Q**    Have you ever gotten in trouble for that?

05:03:56 13                  MR. WEINBERGER:  Objection.

05:03:59 14                  MR. STOFFELMAYR:  What's the objection?

05:03:59 15                  THE COURT:  Overruled.

05:04:02 16   BY MR. STOFFELMAYR:

05:04:02 17   **Q**    Have you ever gotten in trouble for that?

05:04:03 18   **A**    No.

05:04:05 19   **Q**    Have you ever had your pay docked or your bonus

05:04:09 20   reduced because a doctor complained that you didn't fill a

05:04:11 21   prescription?

05:04:12 22   **A**    No.

05:04:15 23                  MR. STOFFELMAYR:  All right, Judge.  This

05:04:16 24   would be a pretty good breaking point if that's all right.

05:04:19 25                  THE COURT:  All right.  Very good.

05:04:20  1          Then ladies and gentlemen, we will break for the

05:04:24  2   evening.

05:04:25  3          Usual admonitions.  Don't read, listen, encounter

05:04:29  4   anything whatsoever regarding this case or anything close to

05:04:32  5   it in the media.  Do not discuss this case with anyone.

05:04:36  6          And we'll come back tomorrow morning with the balance

05:04:38  7   of this witness' testimony.

05:04:40  8          Have a good evening.

05:04:41  9             (Jury excused from courtroom at 5:04 p.m.)

05:05:23 10             THE COURT:  Okay.  Have a good evening, Ms.

05:05:25 11   Stossel.  We'll see you tomorrow morning.

05:05:27 12             THE WITNESS:  Okay.  Thank you.

05:05:28 13                (Witness excused.)

05:05:28 14             THE COURT:  If you'd close the back door,

05:05:31 15   please, and then I'll take up a few items.

05:05:43 16          All right.  So it's my understanding that when we

05:05:48 17   conclude with Ms. Stossel, the defendants are going to rest;

05:05:51 18   is that right?  We may have another witness.

05:05:54 19             MR. STOFFELMAYR:  Nope.  That's it.  I'm just

05:05:56 20   looking around to make sure no one's going to veto me, but

05:05:59 21   yes, that's our plan.

05:06:00 22             THE COURT:  Okay.  And then -- and then the

05:06:05 23   plaintiffs are planning to call Mr. Catizone, I think.

05:06:07 24             MR. LANIER:  At this point, Your Honor, we'll

05:06:10 25   caucus afterwards, but my temptation is no.

05:06:13  1            THE COURT:  All right.  Well, okay.  Either

05:06:19  2   way, we'll wrap up tomorrow morning.

05:06:21  3       Okay.  Well, then I want -- overnight, I'd like

05:06:28  4   counsel to work together on the documents for all the

05:06:34  5   witnesses we had today, Cook, Militello, and Stossel, the

05:06:46  6   ones we've done and the ones we have.  You'll know which

05:06:49  7   ones you're using, and then the two depositions, Ashley and

05:06:52  8   Mack, I don't know if the parties plan to put any in.  There

05:06:55  9   probably won't be many, so we can get those wrapped up

05:06:58 10   tomorrow.

05:07:00 11       Have you worked out that issue with Mr. Hill's video

05:07:07 12   clip or you're still working on that?

05:07:09 13            MR. LANIER:  We have worked it out,

05:07:10 14   Your Honor.

05:07:10 15            MR. DELINSKY:  Yeah, Your Honor, I can -- do

05:07:12 16   you want me to -- I think it probably makes sense to read

05:07:14 17   into the record.

05:07:14 18            THE COURT:  Okay.

05:07:15 19            MR. DELINSKY:  What we've agreed to just to

05:07:16 20   make sure there's no confusion.

05:07:17 21            THE COURT:  Okay.

05:07:18 22            MR. DELINSKY:  There will be no formal

05:07:19 23   striking of anything that has come in, okay, no instruction

05:07:24 24   to the jury is -- is number one.

05:07:28 25       Number two, there is an agreement that the use of Mr.

05:07:33  1    Hill's testimony that was provided after the video played,

05:07:39  2    okay, is appropriate for plaintiffs to use.  The video

05:07:47  3    itself will not be played any further.  I think that means

05:07:50  4    in closing argument.

05:07:51  5         It was only a demonstrative.  It's not in evidence

05:07:55  6    anyways.  It will not be played.

05:07:56  7         The content of the video will not be referenced other

05:08:01  8    than to the extent Mr. Hill, in his testimony afterwards,

05:08:07  9    you know, he confirmed it.

05:08:10  10        There's a few -- and that's the end of the agreement,

05:08:12  11   Your Honor.  There's two, I think, subtleties.  Mr. Lanier

05:08:17  12   said, and he was fair to say so, he may say, you saw the

05:08:21  13   video and then Mr. Hill testified.  That's fine.

05:08:25  14        On the flip side, there was some prejudicial

05:08:27  15   references in the video to death, and I think we're in

05:08:30  16   agreement, that will not be -- that was not the subject of

05:08:33  17   Mr. Hill's testimony after the video and that will not be

05:08:36  18   referenced or discussed in closing.

05:08:38  19             THE COURT:  Okay.

05:08:39  20             MR. LANIER:  I dare say Mr. Delinsky has it

05:08:42  21   right.

05:08:42  22             THE COURT:  Good.  Very good.

05:08:46  23        Okay.

05:08:47  24             MR. DELINSKY:  And thank you, Your Honor for

05:08:49  25   giving us the opportunity.

05:08:50  1              THE COURT:  Well, I'm glad you worked that

05:08:51  2    out.

05:08:52  3              MR. DELINSKY:  So I think, Your Honor, I don't

05:08:54  4    know if you want to withdraw the motion or declare it moot

05:08:57  5    or --

05:08:57  6              THE COURT:  Well, I'll just say it's now moot,

05:09:00  7    based on the discussion we just had.

05:09:02  8              MR. DELINSKY:  Okay.  Super, Your Honor.

05:09:04  9              THE COURT:  That's fine.

05:09:06 10              MR. DELINSKY:  Thank you.

05:09:07 11              THE COURT:  Okay.  All right.

05:09:08 12         So tomorrow we'll wrap up.  We'll deal with the

05:09:12 13    exhibits.

05:09:15 14         I want to -- I'll have to finalize what the time

05:09:19 15    limits are going to be for closing arguments.  We can take

05:09:24 16    that up tomorrow morning.

05:09:28 17         And then --

05:09:29 18              ^  PLAINTIFF'S COUNSEL:  Your Honor, in that

05:09:29 19    regard.  My general view, though, it's very apparent I used

05:09:34 20    and needed more time than the defense, but my general view

05:09:38 21    is I've always tried to live by that maximum that I can hold

05:09:45 22    myself to whatever they need.  So my goal would be to -- for

05:09:49 23    them to figure out what they need, I'll hold myself to that,

05:09:51 24    and I'll divide it in a way where it covers my rebuttal as

05:09:56 25    well as my close if that works.  So I'll leave it up to

05:10:00  1    them.

05:10:00  2        If they can prepare a suggestion to you, I won't buck

05:10:03  3    their suggestion.

05:10:10  4              THE COURT:  What are the defendants thinking?

05:10:11  5    Because I think it's important that we get this -- I don't

05:10:13  6    want to break this up in over 2 days.

05:10:17  7              MR. LANIER:  Agreed.

05:10:17  8              THE COURT:  So. . .

05:10:19  9              MR. DELINSKY:  Your Honor, if we could have

05:10:20 10    the night to discuss that.

05:10:22 11              THE COURT:  That's fine.  That's fine.

05:10:23 12              MR. DELINSKY:  Internally.  I want to look

05:10:25 13    back as to what the split was in opening and, Your Honor, in

05:10:30 14    other cases, there have been limits, too, on how much can be

05:10:34 15    used in rebuttal.  I know Mr. Lanier --

05:10:37 16              THE COURT:  Look, I -- I'm going to make sure

05:10:41 17    that substantial percentage of Mr. Lanier's time is on his

05:10:46 18    opening.

05:10:46 19              MR. DELINSKY:  Okay.

05:10:46 20              MR. LANIER:  Absolutely.  I've got to open

05:10:49 21    fully.  There's no gamesmanship.

05:10:51 22              THE COURT:  No, I've been around the block a

05:10:53 23    few times.

05:10:54 24              MR. LANIER:  Yeah.

05:10:54 25              THE COURT:  And it's not fair.

6803

05:10:56  1              MR. LANIER:  I will not disappoint you,

05:10:58  2      Your Honor.

05:11:01  3              MR. MAJORAS:  And we also want to make sure,

05:11:02  4      and I guess, with our being able to have rebuttal, we don't

05:11:06  5      want a repeat of what happened during opening where we got a

05:11:12  6      certain limitation on opening and then the defense --

05:11:15  7              THE COURT:  You can definitely follow these

05:11:17  8      because the opening was split over two days.

05:11:19  9              MR. WEINBERGER:  Right, but the defendants got

05:11:21 10      about -- my calculation was at least 45 minutes, if not more

05:11:25 11      than that, over what they had been allotted.

05:11:27 12              THE COURT:  Yeah.  Well that's why we've got

05:11:29 13      to be -- this time, I'm going to hold everyone because I do

05:11:33 14      not want to be going at seven o'clock at night.

05:11:38 15              MR. MAJORAS:  We understand, Your Honor.

05:11:39 16              THE COURT:  It's not fair to the jury and it's

05:11:40 17      not fair to whoever's there at 7 o'clock.

05:11:43 18              MR. LANIER:  Thank you, Judge.

05:11:43 19              THE COURT:  We'll figure out and again,

05:11:45 20      defendants, again, obviously, there are three parties.  A

05:11:49 21      lot of what you have to say is the same and you only need

05:11:52 22      one person to say it eloquently, so if you can figure this

05:11:56 23      out.  So we'll set that tomorrow.

05:11:58 24          And then I do want to figure out, you know, are we

05:12:02 25      going to just proceed, assuming we don't lose anyone between

6804

05:12:07 1    now and next Monday, excuse Juror 13 or if everyone agrees

05:12:10 2    to keep him, then we --

05:12:12 3                    MR. LANIER:  As plaintiffs, we would ask to

05:12:14 4    excuse him, excuse Juror No. 13.

05:12:16 5                    THE COURT:  All right.

05:12:16 6                    MR. LANIER:  I know it's a tough thing to do,

05:12:18 7    but we've got to get a unanimous verdict, and it's hard

05:12:22 8    enough with 12; 13 is -- percent harder.

05:12:28 9                    THE COURT:  No.  That's -- we'll proceed as we

05:12:33 10   had planned from the beginning.  That's fine.

05:12:35 11                   MR. DELINSKY:  Your Honor --

05:12:36 12                   MR. LANIER:  Your Honor, if I could ask one

05:12:38 13   more question with regards to this.

05:12:39 14      Is the Court okay if we set up that small screen right

05:12:44 15   here (indicating) like we did for opening and do the same

05:12:46 16   thing, or is that -- is that an anathema?

05:12:51 17                   MR. MAJORAS:  Did we conclude that didn't

05:12:53 18   interfere with -- we had a problem with the audio and I

05:12:55 19   don't know whether that was an issue or not.

05:12:58 20                   MR. LANIER:  Yeah, I think it worked fine for

05:12:59 21   everybody.  I think everybody used it.

05:13:01 22                   THE COURT:  I think it worked.

05:13:04 23                   MR. MAJORAS:  The court reporter had issues on

05:13:06 24   the headphones.  That's what I'm remembering.

05:13:08 25                   THE COURT:  Yeah.  We've got to -- why don't

05:13:11   1    we --

05:13:12   2                    MR. LANIER:  My only concern, Your Honor, is

05:13:14   3    it's helpful for the jury.

05:13:15   4                    THE COURT:  Okay.  It's okay.  Maybe someone

05:13:20   5    might bring it in Wednesday and test it out --

05:13:23   6                    MR. LANIER:  Perfect.

05:13:23   7                    THE COURT:  -- with the court reporter and

05:13:24   8    make sure we don't have any interference because I don't

05:13:30   9    want to have, you know, a delay Monday with that, so we'll

05:13:33  10    do a test.

05:13:34  11                    MR. MAJORAS:  We can do that, Your Honor.

05:13:35  12                    THE COURT:  We'll do a test Wednesday.  That's

05:13:36  13    fine.

05:13:38  14                    MR. LANIER:  We'll do that, Your Honor.

05:13:39  15                    MR. DELINSKY:  Your Honor, may I just be heard

05:13:40  16    on two quick items.  With regard to the alternate juror --

05:13:47  17                    THE COURT:  Right.

05:13:48  18                    MR. DELINSKY:  -- Juror No. 14. . .

05:13:50  19                    MR. LANIER:  13.

05:13:52  20                    MR. DELINSKY:  13?

05:13:53  21                    THE COURT:  I think it's actually 14.

05:13:55  22                    MR. DELINSKY:  My request would be that we

05:13:59  23    hold off on dismissing that --

05:14:02  24                    THE COURT:  Well, Mr. Delinsky, I'm going to

05:14:03  25    wait until --

05:14:04  1          MR. DELINSKY:  Yeah.  Correct.

05:14:05  2              THE COURT:  -- until the end of the day

05:14:07  3  Monday.

05:14:08  4              MR. DELINSKY:  Yes.  We're on the same page.

05:14:09  5              THE COURT:  It's after closing arguments and

05:14:11  6  after my instructions.  Literally it's the moment before the

05:14:15  7  jury goes out to deliberate.

05:14:16  8              MR. DELINSKY:  Yes.

05:14:17  9              THE COURT:  Because, you know, someone could

05:14:18 10  get sick.

05:14:19 11              MR. DELINSKY:  Yes.  Exactly.  Same.  Thank

05:14:22 12  you, Your Honor.

05:14:22 13              THE COURT:  It's not likely, but, so I wait

05:14:24 14  till the very end.

05:14:27 15              MR. DELINSKY:  Yeah.

05:14:27 16              THE COURT:  And then I will instruct him

05:14:31 17  essentially to continue following the rules and not to talk

05:14:34 18  to anyone until he knows there's a verdict and we'll tell

05:14:38 19  him.

05:14:38 20              MR. DELINSKY:  All right.

05:14:38 21              THE COURT:  I think that's a good idea.

05:14:40 22              MR. DELINSKY:  Thank you, Your Honor.

05:14:40 23              THE COURT:  That's what I generally do.

05:14:41 24              MR. DELINSKY:  Okay.

05:14:43 25          Your Honor, the second issue, and I raise this with

05:14:47  1    great timidity, okay.  We talked this morning about one of

05:14:54  2    the plaintiffs exhibits that Your Honor admitted through Mr.

05:14:57  3    Hill.  It was P1253, that was the *East Main* case.

05:15:02  4                    THE COURT:  Right.

05:15:02  5                    MR. DELINSKY:  And I think Mr. Lanier's use of

05:15:04  6    it was fair in that he was impeaching part of Mr. Hill's

05:15:08  7    testimony.

05:15:08  8        Mr. Hill was saying DEA systemically began educating

05:15:12  9    people on red flags one year, this is two years earlier.  It

05:15:15 10    contains the word red flags.

05:15:16 11        I think that's fair.  But throughout the day,

05:15:18 12    Your Honor, I've read the opinion and the complexity that I

05:15:21 13    see is that these opinions lay out in great detail the

05:15:26 14    complete record in the underlying cases.  And a lot of

05:15:29 15    collateral issues come in.  And to give Your Honor an

05:15:31 16    example, there's a reference in this opinion to what I think

05:15:36 17    plaintiffs have -- and other people refer to as the "blue

05:15:39 18    highway."  There's -- there's a discussion of pills coming

05:15:43 19    from Florida or doctors --

05:15:45 20                    THE COURT:  Let me see the opinion.  Maybe --

05:15:47 21                    MR. DELINSKY:  Sure, Your Honor.  It has some

05:15:48 22    of my highlights, but I don't think that matters.

05:15:51 23                    MR. LANIER:  And I'll be glad to go over that

05:15:53 24    with Mr. Delinsky.  I don't want anything in there that

05:15:56 25    doesn't belong in there.

05:15:56   1                 THE COURT:  All right.  Well, maybe we can
05:15:58   2    edit it.
05:15:58   3                 MR. LANIER:  Yeah.
05:15:59   4                 MR. DELINSKY:  I think that's fine,
05:16:01   5    Your Honor.
05:16:01   6                 THE COURT:  It was in for the reason
05:16:03   7    Mr. Lanier used it, not -- not to put in all the details and
05:16:09   8    contents of the case because the witness doesn't even know
05:16:12   9    that.
05:16:12  10                 MR. LANIER:  Correct.
05:16:12  11                 THE COURT:  So let's edit.
05:16:14  12                 MR. LANIER:  Yeah.  We don't need to waste
05:16:16  13    your time with that right now, Your Honor, until we have a
05:16:18  14    chance to work at it together.
05:16:19  15                 THE COURT:  All right.
05:16:20  16                 MR. WEINBERGER:  And we still have to work on
05:16:22  17    the CVS *Holiday* case.
05:16:23  18                 MR. LANIER:  Yeah.
05:16:24  19                 MR. WEINBERGER:  And what we're going to do
05:16:25  20    with that.
05:16:26  21                 THE COURT:  We're running out of time.
05:16:27  22                 MR. WEINBERGER:  Oh, I understand that,
05:16:29  23    Your Honor, and frankly the more -- the longer the trial
05:16:33  24    goes, the more of the CVS *Holiday* case gets, you know, read
05:16:36  25    into the record through witnesses.  So --

05:16:42 1                MR. DELINSKY:  We'll work on those,

05:16:43 2     Your Honor.

05:16:44 3                MR. WEINBERGER:  All right.  We'll work on it.

05:16:45 4                MR. DELINSKY:  Thank you both.

05:16:46 5                MR. MAJORAS:  Your Honor, John Majoras.  One

05:16:48 6     minor issue.

05:16:48 7         I have -- if I may approach in just a moment.  I have

05:16:52 8     put together, this would still be over our objection, but

05:16:55 9     some slight revisions to the language you had proposed on

05:16:58 10    the limiting instruction about the Boards of Pharmacy.  I'll

05:17:01 11    pass that to plaintiffs at the same time.  I'm not asking

05:17:03 12    for a decision on it right now, but something to consider.

05:17:05 13               THE COURT:  Well, I'll certainly look.  Let me

05:17:08 14    see it.

05:17:09 15               MR. MAJORAS:  You'll have -- the top paragraph

05:17:10 16    will be the one we're proposing with the ability to see how

05:17:13 17    it's changed in the lower paragraph.

05:17:14 18               THE COURT:  All right.  Well, let's. . .

05:17:22 19               MR. WEINBERGER:  While he's bringing that up,

05:17:24 20    Your Honor, are you -- in terms of finalizing exhibits, you

05:17:31 21    talked earlier about us having to get together and making

05:17:35 22    sure that --

05:17:36 23               THE COURT:  Right.  Right.

05:17:39 24               MR. WEINBERGER:  I think that if we could use

05:17:43 25    tomorrow afternoon to do that.

05:17:44  1           THE COURT:  Use tomorrow afternoon.  We should

05:17:46  2    wrap up tomorrow morning.  Tomorrow afternoon, people should

05:17:49  3    stay and go -- work with Mr. Pitts and Julian to go through

05:17:54  4    and make sure everything is the way it should be.  And I'm

05:18:00  5    particularly careful.

05:18:01  6       I had a criminal case where everyone assured me that

05:18:03  7    that had happened and something got in that shouldn't, and

05:18:08  8    we had a mistrial.  Now, it's not likely that will happen

05:18:13  9    here because that will happen to be the defendants' prior

05:18:15 10    record, which it was -- in a jury -- you're as old as I am.

05:18:22 11    A lot of things can happen and the jury came back and said,

05:18:26 12    the question was, "We don't recall seeing this exhibit in

05:18:29 13    the trial.  What is it?"

05:18:31 14       And the reason they didn't see it is it had no

05:18:34 15    business being there and so ended that trial.  So. . .

05:18:43 16           MR. HYNES:  Your Honor. . .

05:19:06 17           THE COURT:  Mr. Majoras, is there a reason

05:19:08 18    you're crossing out the descriptor that the testimony is

05:19:16 19    from one or more of the defendants' employees?  I mean,

05:19:20 20    that's -- that's the whole point.

05:19:23 21           MR. MAJORAS:  Well, Your Honor, the -- I think

05:19:25 22    the whole point is that there was testimony related to the

05:19:28 23    Board of Pharmacy.  My concern and our objection still

05:19:30 24    remains is that it prejudicially pinpoints particular

05:19:35 25    witnesses and calls into question those witnesses, but I

05:19:38  1    thought that was one way to address it.

05:19:43  2            MR. WEINBERGER:  Well, there certainly weren't

05:19:45  3    any conversations with --

05:19:46  4            THE COURT:  Well, you say you may consider

05:19:48  5    their recollections, but there's no -- it doesn't tie into

05:19:51  6    anyone.

05:19:53  7            MR. MAJORAS:  The witness's recommendation if

05:19:55  8    that helps, or, I'm sorry, recollection.  I gave away all my

05:19:58  9    copies, Your Honor.

05:19:58 10            THE COURT:  All right.  Well. . .

05:20:09 11            MR. WEINBERGER:  You know, particularly -- I

05:20:10 12    hate to beat a dead horse here, but particularly with the

05:20:14 13    confusion that was created by the introduction of this

05:20:20 14    testimony by Ms. Fumerton as if, you know, we were

05:20:27 15    endorsing --

05:20:27 16            THE COURT:  Well, I'm not -- I've seen this.

05:20:30 17       I'm inclined to stick with my language.  I think I

05:20:34 18    spent a lot of time on it.  I think it's important to -- so

05:20:42 19    the jury knows what I'm talking about, it's conversations

05:20:45 20    that certain defendants employees said they had with members

05:20:52 21    of Boards of Pharmacy.  And I do want to reference that

05:20:57 22    it's -- it's admissible as evidence of defendants.

05:21:06 23            MR. MAJORAS:  Your Honor, I think in

05:21:07 24    particular, the language they claimed they had certainly

05:21:12 25    raises suspicion or the way it's phrased as to whether or

05:21:17  1    not they even had the conversation.

05:21:19  2        Your Honor, as I said, we raised our objection.  I

05:21:21  3    understand the ruling.  These were my proposals.

05:21:34  4                THE COURT:  All right.  I agree.

05:21:36  5        I think I'm going to change claim to testify.  They

05:21:38  6    testified they had.  That's a more neutral statement.  I

05:21:41  7    agree.

05:21:41  8                MR. WEINBERGER:  We agree with that.

05:21:42  9                MR. MAJORAS:  Thank you, Your Honor.

05:21:44 10                THE COURT:  It wasn't my intent to cast

05:21:46 11    aspersions on it.

05:21:47 12        So we'll change -- that's a good suggestion.  We'll

05:21:50 13    change that.

05:22:01 14        Oh, are we likely to have, this last day, any

05:22:09 15    stipulations or admissions or answers to interrogatories?

05:22:14 16    We haven't had any.  If not, we can delete Pages 14 and 15.

05:22:20 17                MR. WEINBERGER:  I don't -- I don't

05:22:21 18    anticipate.

05:22:23 19                MR. LANIER:  We do not anticipate anything

05:22:24 20    from the plaintiffs' side.

05:22:25 21                THE COURT:  All right.

05:22:27 22                MR. STOFFELMAYR:  We had discussed potentially

05:22:29 23    reading one interrogatory.

05:22:30 24                THE COURT:  Well. . .

05:22:31 25                MR. STOFFELMAYR:  I think we're leaning

05:22:33  1    against it, but we should circle and make sure.

05:22:35  2                    THE COURT:  Well, if there is one, that stays

05:22:37  3    in.

05:22:37  4                    MR. STOFFELMAYR:  I think there will not be.

05:22:39  5                    THE COURT:  Stipulations are out.  If it's

05:22:40  6    not, it's out.  We'll cover it tomorrow.

05:22:51  7         Okay.  And I circulated the -- I read carefully the

05:22:57  8    defendants' submissions, which came in Friday on the jury

05:22:59  9    instructions and the plaintiffs', which came in today.  I

05:23:02 10    took some things from both.

05:23:06 11         We did a lot of work on it.  I'm comfortable with the

05:23:09 12    way it is.  Probably no one's completely happy, but I think

05:23:12 13    it's as accurate and as clear as I can make it.  But if

05:23:19 14    someone sees something they still think is really wrong,

05:23:23 15    we'll discuss it tomorrow. Okay.

05:23:28 16         Anything else anyone needs to bring up or wants to

05:23:31 17    bring up?

05:23:32 18         Okay.  Have a good evening.  We'll see you tomorrow.

         19                    COUNSEL EN MASSE:  Thank you, Your Honor.

         20                    (Proceedings adjourned at 5:23 p.m.)

         21

         22

         23

         24

         25

DIRECT EXAMINATION OF KENNETH COOK                    6514

CROSS-EXAMINATION OF KENNETH COOK                     6556

REDIRECT EXAMINATION OF KENNETH COOK                  6582

RECROSS-EXAMINATION OF KENNETH COOK                   6591

DEPOSITION TESTIMONY OF DEMETRA ASHLEY                6593

CROSS-EXAMINATION OF DEMETRA ASHLEY                   6621

REDIRECT EXAMINATION OF DEMETRA ASHLEY                6633

RECROSS-EXAMINATION OF DEMETRA ASHLEY                 6641

REDIRECT EXAMINATION OF DEMETRA ASHLEY                6642

DIRECT EXAMINATION OF LORI MILITELLO                  6645

CROSS-EXAMINATION OF LORI MILITELLO                   6702

REDIRECT EXAMINATION OF LORI MILITELLO                6729

RECROSS-EXAMINATION OF LORI MILITELLO                 6742

DEPOSITION TESTIMONY OF DEBORAH MACK                  6748


DIRECT EXAMINATION OF AMY STOSSEL                     6763

**C E R T I F I C A T E**

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter prepared from my stenotype notes.

/s/ Heather K. Newman                    11-8-2021
HEATHER K. NEWMAN, RMR, CRR                 DATE