**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

IN RE: NATIONAL PRESCRIPTION
OPIATE LITIGATION

This document relates to:

      *County of Lake, Ohio v. Purdue
      Pharma L.P., et al.*,
         Case No. 18-op-45032 (N.D. Ohio)

      *County of Trumbull, Ohio v. Purdue
      Pharma, L.P., et al.*,
         Case No. 18-op-45079 (N.D. Ohio)

"Track 3 Cases"

**MDL No. 2804
Case No. 17-md-2804
Judge Dan Aaron Polster**

**WALMART INC.'S MOTION FOR
JUDGMENT AS A MATTER OF LAW UNDER RULE 50(B)
<u>AND MEMORANDUM OF LAW IN SUPPORT</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

ARGUMENT ......................................................................................................................... 2

I.    NO REASONABLE JUROR COULD HAVE FOUND THAT WALMART
      ENGAGED IN UNLAWFUL OR INTENTIONAL, CULPABLE CONDUCT
      THAT CAUSED A PUBLIC NUISANCE ...................................................................... 2

      A.    No Reasonable Juror Could Have Found That Walmart Engaged in Unlawful
            Dispensing Conduct. ......................................................................................... 3

      B.    No Reasonable Juror Could Have Found That Walmart's Dispensing Conduct
            Caused the Alleged Harm. ................................................................................. 12

CONCLUSION ...................................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Anza v. Ideal Steel Supply Corp.*,
    547 U.S. 451 (2006)................................................................................................15

*Barnett v. Carr ex rel. Est. of Carr*,
    No. CA2000-11-219, 2001 WL 1078980 (Ohio Ct. App. Sept. 17, 2001)................................2

*Burnworth v. Harper*,
    672 N.E.2d 241 (Ohio Ct. App. 1996)................................................................................14

*Chaney v. Dreyfus Serv. Corp.*,
    595 F.3d 219 (5th Cir. 2010) ................................................................................................4

*City of Cincinnati v. Deutsche Bank Nat'l Tr. Co.*,
    863 F.3d 474 (6th Cir. 2017) ................................................................................................12

*Cleveland v. JP Morgan Chase Bank, N.A.*,
    No. 98656, 2013 WL 1183332 (Ohio App. Ct. Mar. 21, 2013) ............................................12

*First Equity Corp. of Fla. v. Standard & Poor's Corp.*,
    690 F. Supp. 256 (S.D.N.Y. 1988)................................................................................4

*Gaines v. Vill. of Wyo.*,
    72 N.E.2d 369 (Ohio 1947) ................................................................................................12

*Glob.-Tech Appliances, Inc. v. SEB S.A.*,
    563 U.S. 754 (2011)................................................................................................3, 4, 11

*In re Nat'l Prescription Opiate Litig.*,
    MDL 2804, 2020 WL 425965 (N.D. Ohio Jan. 27, 2020)................................................12

*In re Omnicare, Inc. Sec. Litig.*,
    769 F.3d 455 (6th Cir. 2014) ................................................................................................4

*Martin v. Cincinnati Gas & Elec. Co.*,
    561 F.3d 439 (6th Cir. 2009) ................................................................................................13

*Mizzaro v. Home Depot, Inc.*,
    544 F.3d 1230 (11th Cir. 2008) ................................................................................................4

*Schwartz v. Honeywell Int'l, Inc.*,
    102 N.E.3d 477 (Ohio 2018) ................................................................................................13

*Staub v. Proctor Hosp.*,
    562 U.S. 411 (2011)................................................................................................4

*Sutowski v. Eli Lilly & Co.*,
    696 N.E.2d 187 (Ohio 1998) ................................................................................................14

*United States v. Sci. Applications Int'l Corp.*,
    626 F.3d 1257 (D.C. Cir. 2010) ................................................................................................4

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Woodmont, Inc. v. Daniels*,
   274 F.2d 132 (10th Cir. 1959) ................................................................................5

**OTHER AUTHORITIES**

Black's Law Dictionary (11th ed. 2019)......................................................................2, 3

Restatement (Second) of Torts § 834  (1979).........................................................12, 13

G. Williams, Criminal Law § 57 (2d ed. 1961) ...........................................................3

## INTRODUCTION

Walmart is entitled to judgment as a matter of law under Rule 50(b) for all the reasons offered in Defendants' Joint Brief, which Walmart incorporates by reference.  Walmart is also entitled to judgment as a matter of law for the following additional reasons.[1]

*First*, no reasonable juror could have found that Walmart engaged in illegal dispensing conduct that caused a public nuisance in Plaintiffs' Counties.  Walmart has continually aimed to ensure proper dispensing and has worked tirelessly to help its pharmacists carry out their corresponding responsibility.  As Defendants explain in their Joint Brief, Plaintiffs insist that Walmart's policies created nuisance liability because they did not follow a particular "red flag" protocol that has no basis in the CSA.  Even worse, Plaintiffs offered no evidence that any of the so-called "red flag" prescriptions that Walmart had filled were *in fact* medically inappropriate or that those same specific prescriptions led to the alleged harm in Plaintiffs' Counties.

The crux of Plaintiffs' case against Walmart is that it should be held liable for: (1) an early policy that required its pharmacists to evaluate each prescription on a prescription-by-prescription basis, and exercise their professional judgment to determine whether they should fill each prescription, rather than deciding in advance that they did not wish to fill any prescription for a particular prescriber (in other words not allowing a "blanket refusal-to-fill"); and (2) not adopting a system in which its pharmacies shared refusal-to-fill data with one another.  Those arguments fail legally and factually.  Neither the CSA nor its regulations requires any such policy or system, and this Court's prior rulings have made that clear.  In any event, the evidence shows that Walmart *did* have a policy for not filling illegitimate prescriptions (as determined by the pharmacist's

---

[1] Walmart incorporates the arguments regarding the legal deficiencies in Plaintiffs' nuisance claim from the Joint Brief by reference.  Walmart does not waive its objections to the Court's prior rulings or jury instructions by advancing arguments based on them.  Those objections are stated in the Joint Brief and in Defendants' prior filings, including Defendants' submission on the Court's final jury instructions.

professional judgment and experience after reviewing the particular prescription at issue) and a system (Archer) for sharing refusal-to-fill information among Walmart pharmacies and pharmacists.

*Second*, no reasonable juror could have justified a verdict against Walmart based on the "intentional" prong of public nuisance.  As discussed more fully in Defendants' Joint Brief, Plaintiffs' sole argument under this prong was that Defendants intentionally dispensed opioid medications.  But because that dispensing conduct complied with the CSA, Plaintiffs' intentional conduct theory is both preempted under federal law and not cognizable under Ohio nuisance law.

*Third*, no reasonable juror could have found that Walmart caused a public nuisance in Plaintiffs' Counties.  Walmart's dispensing conduct accounted for only 3.15% of prescription opioids in Lake and Trumbull Counties from 2006 until 2014, so Walmart's five pharmacies cannot be considered a substantial factor increasing a public nuisance.  Moreover, Plaintiffs did not "identify any specific prescription that was filled by any of the [Walmart] pharmacists in Lake or Trumbull County that was, in fact, diverted," or any specific individual at Walmart who did anything wrong.  Dkt. 4005 at 804 (Oct. 7 trial tr., vol. 4).[2]

## ARGUMENT

I.  **NO REASONABLE JUROR COULD HAVE FOUND THAT WALMART ENGAGED IN UNLAWFUL OR INTENTIONAL, CULPABLE CONDUCT THAT CAUSED A PUBLIC NUISANCE.**

No reasonable juror could have found that Walmart engaged in either unlawful or intentional, culpable conduct.  *See, e.g.*, *Barnett v. Carr ex rel. Est. of Carr*, No. CA2000-11-219, 2001 WL 1078980, at *10–11 (Ohio Ct. App. Sept. 17, 2001); Black's Law Dictionary (11th ed.

---

[2] All trial citations are to ECF daily transcripts.

2019) (defining "culpable" as "guilty," "blameworthy," or "involving the breach of a duty").  Nor could they find that Walmart's conduct caused a public nuisance.

### A. No Reasonable Juror Could Have Found That Walmart Engaged in Unlawful Dispensing Conduct.

Any dispensing duties imposed on Walmart must derive from the CSA's text or its regulations.  At the motion-to-dismiss stage, however, this Court held that Walmart is subject to additional dispensing-related duties at the corporate level, including "an affirmative obligation to protect not only against diversion via theft but also other forms of diversion more broadly."  *See* Dkt. 3403 at 25; Dkt. 3499 at 15.  Walmart continues to disagree with that ruling.  *See, e.g.*, Dkt. 3439.  Even if that the law imposes those additional requirements, however, no reasonable juror could have found that Walmart violated them.  As the Court has recognized, Plaintiffs face a steep hurdle in showing a breach of dispensing-related duty: They must show that Walmart acted with "deliberate ignorance" or "willful blindness," not merely recklessly or negligently.  Dkt. 3499 at 7.  Plaintiffs have not shown that Walmart's policies fail the CSA's standard as interpreted by the Court because they have not shown willful blindness, and because mere aggregate numbers cannot show that kind of intent or culpable conduct.

To meet the high threshold of willful blindness, a defendant must have taken "deliberate actions to avoid confirming a high probability of wrongdoing[.]"  *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011) (citing G. Williams, Criminal Law § 57, p. 159 (2d ed. 1961)); *see also* Black's Law Dictionary (11th ed. 2019) (defining "willful blindness" as "[d]eliberate avoidance of knowledge").  The defendant must have essentially "actually known the critical facts"—by "subjectively believ[ing] that there is a high probability that a fact exists" and by taking "deliberate actions to avoid learning of that fact."  *Glob.-Tech Appliances*, 563 U.S. at 769.

Plaintiffs thus were required to present evidence that Walmart (1) believed its pharmacists were violating the CSA and (2) intentionally took actions to avoid learning about it.  *See id.*

Plaintiffs cannot carry that steep burden through a theory of "aggregate knowledge" across all Walmart employees.  The Supreme Court has explained that "the malicious mental state of one agent cannot generally be combined with the harmful action of another agent to hold the principal liable."  *Staub v. Proctor Hosp.*, 562 U.S. 411, 418 (2011).  That is, in seeking to establish corporate liability, Plaintiffs cannot rely on the mental states of disparate employees who played no role in the transaction or conduct in question.

Because "[a] corporation can be held to have a particular state of mind only when that state of mind is possessed by a single individual," *First Equity Corp. of Fla. v. Standard & Poor's Corp.*, 690 F. Supp. 256, 260 (S.D.N.Y. 1988), courts in many contexts have rejected using collective knowledge to establish corporate liability.  For example, the Fifth Circuit holds "as a general rule" that if "an essentially subjective state of mind is an element of a cause of action," it cannot "be met by a corporation's collective knowledge."  *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 241 (5th Cir. 2010).  Instead, that "state of mind" must "'actually exist' in at least one individual and not be imputed on the basis of general principles of agency."  *Id.*  Likewise, the D.C. Circuit has explained that the "collective knowledge" or "collective pool of information" possessed by a corporation's agents "provides an inappropriate basis for proof of scienter," and "expressed a good deal of skepticism about corporate intent theories that rely on aggregating the states of mind of multiple individuals."  *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1273–74, 1276 (D.C. Cir. 2010); *see also In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 477 (6th Cir. 2014) (rejecting collective knowledge in securities law context); *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1254 (11th Cir. 2008) (looking to mental states of individual corporate

officials); *Woodmont, Inc. v. Daniels*, 274 F.2d 132, 137 (10th Cir. 1959) (rejecting "composite knowledge" where state of mind was "essential").

Because a collective-knowledge theory is impermissible here, Plaintiffs had to produce evidence that *individual Walmart employees* were willfully blind to diversion, not that they would have been willfully blind if they knew what every other Walmart employee knew at a given moment in time.

But Plaintiffs cannot and did not produce that evidence.  Instead, the evidence at trial established that Walmart always acted to ensure proper dispensing and has worked tirelessly to help its pharmacists carry out their corresponding responsibility—ensuring that Walmart pharmacists were not willfully blind.

Susanne Hiland, a senior director for Walmart's patient safety organization, testified that Walmart required its pharmacists to exercise their professional judgment using all the information available to them and to not fill any prescription they believed was not issued for a legitimate medical purpose or was not in the best interest of the patient.  Dkt. 4109 at 5112–13 (Nov. 1 trial tr., vol. 20).  Walmart pharmacists were required to follow up and resolve any red flags before filling any controlled substance prescription.  *Id.* at 5113.  Walmart's Pharmacy Operation Manual 1311 confirmed that pharmacists were to exercise their professional judgment and to refuse to fill any prescription for which there is a red flag they could not resolve.  *Id.* at 5133.  In fact, pharmacists could refuse to fill every single controlled substance prescription from a particular prescriber, at all times, if their professional judgment so dictated.  *Id.* at 5152.

Walmart provided its pharmacists with the tools necessary to exercise their professional judgment effectively.  Walmart pharmacists used a computer system called Connexus to process prescriptions.  *Id.* at 5081.  Connexus provided pharmacists with the prescription history for any

given patient as well as the patient's allergies, medical conditions, and other demographic information, enabling pharmacists to conduct drug utilization reviews. *Id.* at 5084–85, 5090.

The Connexus tools menu provided pharmacists an easy link to access external resources. *Id.* at 5092. These resources included The Wire, an intranet that housed clinical and regulatory guidance from state boards of pharmacy as well as much of Walmart's training program (the Global Learning Management System) and Walmart's continuing education program and third party offerings (such as Pharmacist's Letter). *Id.* at 5098–5100. In 2010, and before any regulations required it to do so, Walmart provided pharmacists with access to the Ohio Automated Rx Reporting System ("OARRS"), Ohio's prescription drug monitoring program that catalogued all controlled substance dispensing. *Id.* at 5100; *see also* Dkt 4111 at 5390 (Nov. 2 trial tr., vol. 21) (describing inspection report from January 31, 2011, and noting that "Walmart pharmacists [were] now able to access OARRS"); Dkt. 4109 at 5100 (Nov. 1 trial tr., vol. 20). Walmart also provided its pharmacists access to the Archer system, which kept a record of prescriptions that pharmacists, in their professional judgment, refused to fill. Dkt. 4109 at 5096 (Nov. 1 trial tr., vol. 20). Walmart pharmacists could put a prescriber's DEA number into Archer and see all the prescriptions that Walmart pharmacists had refused to fill from that prescriber. *Id.* Finally, there were low-tech lines of communication as well. Walmart pharmacist Lori Militello testified that, before Archer's launch in 2015, it was common practice for Walmart pharmacists to contact other Walmart pharmacists in the area to relay their concerns to one another and ask each other for guidance on a particular prescriber or patient. Dkt. 4132 at 6673 (Nov. 8 trial tr., vol. 25). And in 2018, Walmart provided its pharmacists access to NarxCare, which is akin to a national prescription drug monitoring program. *Id.* at 5102. That is not willfully ignoring violations; it is consciously trying to prevent them.

6

The jury also heard testimony from Walmart pharmacist Militello, who confirmed her understanding that she had a corresponding responsibility to ensure that she was dispensing proper prescriptions.  *Id.* at 6665.  Militello explained that she felt comfortable refusing every prescription from a given provider if necessary.  *Id.* at 6699.  And she testified that Walmart provided her with the appropriate tools to exercise her corresponding responsibility, including patient details in Connexus, physician refusals-to-fill in Archer, and state-wide prescription history in Ohio's prescription drug monitoring program.  *Id.* at 6669–71, 6672–73.  She also told the jury about the various training and continuing education programs Walmart offered to its pharmacists.  *Id.* at 6666.

Finally, Deborah Mack, a senior director in Walmart's compliance department for health and wellness, confirmed that pharmacists were encouraged to refuse to fill a prescription if their professional judgment so dictated, and that Walmart pharmacists were never instructed to act contrary to their judgment.  *Id.* at 6750, 6758.  Mack likewise confirmed that a pharmacist could refuse to fill all prescriptions from a particular physician without issue, so long as each prescription was examined.  *Id.* at 6759–60 ("[Y]ou can refuse them all.").  And, similar to the other witnesses, she explained that pharmacists could search refusals-to-fill throughout the company through Archer.  *Id.* at 6749.

Defendants' Joint Brief explains why the three categories of evidence that Plaintiffs offered to establish scienter—the volume of opioid medications dispensed, the lack of a data-sharing requirement, and the lack of a "red-flags" documentation requirement—have no basis in the CSA and do not remotely suggest that Defendants acted with willful blindness.  All those arguments are incorporated here.

Plaintiffs, through their expert Dr. Craig McCann, have also introduced data about prescriptions with "red flags" that Walmart allegedly filled without proper documentation.  But Walmart's data expert, Dr. Mark Glickman, testified that these indicators were extremely sensitive with respect to Walmart prescriptions, flagging 3,587 out of 10,759 unique prescribers that had written opioid prescriptions filled by Walmart's stores in Lake and Trumbull Counties—meaning about one in three prescribers had at least one prescription that was flagged.  Dkt. 4124 at 6265 (Nov. 5 trial tr., vol. 24).  Such a screen does not correspond with DEA testimony that over 99% of prescribers do not overprescribe opioid medications.  Dkt. 4023 at 1781 (Oct. 13 trial tr., vol. 13); *see also* Dkt. 4111 at 5470 (Nov. 2 trial tr., vol. 21) (Ohio Board of Pharmacy Agent Trey Edwards testifying that the "vast majority of doctors are writing controlled substances prescriptions legitimately").  As CVS data expert, Dr. William Choi testified, "you have on one hand the statement that the vast majority of doctors are trying to do right by their patients, but then you see the flagging results from Mr. Catizone and Dr. McCann's methodology that is flagging more than one in three prescribers.  So the numbers are not reconciling."  Dkt. 4118 at 6111 (Nov. 4 trial tr., vol. 23).  And, as Defendants' pain management expert, Dr. Robert Wailes explained, this level of sensitivity would lead to "alert fatigue" because "if there's too many alerts, then you don't pay much attention to [them]."  Dkt. 4107 at 4986 (Oct. 29 trial tr., vol. 19).

Even more importantly, Plaintiffs have offered no evidence that those particular prescriptions (or any individual prescriptions) were illegitimate.  In fact, Plaintiffs' own experts testified that just because a prescription has one of their putative red flags does not reveal that it was written for an illegitimate medical purpose or that it should not have been filled.  Dkt. 4008 at 1208–09 (Oct. 8 trial tr., vol. 5).  Plaintiffs never even investigated these Walmart prescriptions on which they rely (or even a sample of them) to determine what portion, if any, should have been

refused.  *Id.* at 1290–91.  Nor did they offer any evidence that those prescriptions would not have been dispensed if only Walmart's pharmacists had documented prescriptions as Carmen Catizone testified that they should have.  *See id.* at 1290 (Catizone testifying that he "did not see any []" information" about Walmart's refusals-to-fill).  Plaintiffs thus relied on nothing but conjecture to suggest that *some unknown number* of Walmart prescriptions *must have been* improper.  And if that were not enough, Plaintiffs failed to show that these very same prescriptions caused the alleged harm in Lake and Trumbull Counties.

Plaintiffs also argued that Walmart's dispensing policies were legally deficient because they did not allow pharmacists to execute advance blanket refusals-to-fill for particular providers and instead required pharmacists to exercise their corresponding responsibility for each individual prescription presented from the physician.  *See, e.g.*, Dkt. 4078 at 3856 (Oct. 25 trial tr., vol. 15). But again, the CSA and its regulations do not mandate a particular system for handling refusals-to-fill.

Walmart also offered uncontroverted evidence that the reason it did not allow advance blanket refusals-to-fill at the time was that it was following the direction of state boards of pharmacy.  Mack testified that she spoke with the executive director of the Texas Board of Pharmacy around 2007 or 2008, in which the director instructed that pharmacists must consider each prescription on an individual basis.  Dkt. 4132 at 6752 (Nov. 8 trial tr., vol. 25).  This advice did not "soften[]" until "years later."  *Id.*  She also recalled having similar conversations with the Boards of Pharmacy of California, Idaho, Kansas, Nevada, New Mexico, Oklahoma and Oregon. *Id.* at 6753, 6756.  Those same Boards advised that corporate, top-down blocks of prescribers were also not permitted.  *Id.* at 6760–61.  Hiland also testified that she received similar advice as Mack did.  Dkt. 4109 at 5155 (Nov. 1 trial tr., vol. 20).  Adhering to the instruction of the primary

regulators of pharmacy standards—state pharmacy boards—cannot be considered "culpable" conduct.

The experience of one of Walmart's co-defendants illustrates the point.  When a CVS pharmacy suspended filling all prescriptions from a prescriber in Kentucky, a federal judge entered an injunction against CVS.  *See* CVS-MDL-04954; Dkt. 4115 at 5698–5702 (Nov. 3 trial tr., vol. 22).  The court order stressed that CVS "interfered with plaintiffs' relationships with their patients by refusing to fill prescriptions written by plaintiffs, and [CVS] has done so without evidence that plaintiffs have violated any law or professional protocol *related to such prescriptions*."  Dkt. 4115 at 5700 (Nov. 3 trial tr., vol. 22) (emphasis added).  Walmart's approach to blanket refusals-to-fill was thus well-grounded in the legal authorities, then and now.

In any event, Plaintiffs did not show that pharmacists—let alone pharmacists in Plaintiffs' Counties—declined to use their professional judgment and filled prescriptions they believed were likely to be diverted.  Indeed, almost all the evidence that Plaintiffs presented on Walmart's policy against blanket refusals-to-fill involved doctors and pharmacies far outside of Ohio.  Dkt. 4078 at 3892–3911 (Oct. 25 trial tr., vol. 15).  Plaintiffs also offered no evidence that prescriptions from any of these doctors made their way to Ohio or that they were diverted within Plaintiffs' Counties.  And though Plaintiffs point to one specific Ohio doctor mentioned in Brad Nelson's emails, Dr. Lalli, they offer no evidence that Walmart's pharmacies in Lake County or Trumbull County filled any opioid prescription from Dr. Lalli that was not in fact medically necessary, much less that a pharmacist did so in violation of his or her corresponding responsibility.  *See id.* at 3916–17.  More to the point, Plaintiffs have offered no evidence that if Walmart filled any Dr. Lalli prescription, it caused any harm in Lake County or Trumbull County.

As for data-sharing, Plaintiffs have suggested that Walmart violated the CSA by not sharing details of individual refusals-to-fill from one pharmacy to another. *See, e.g.*, *id.* at 3910 ("Q: Now, there's no way for the Walmart down the street to know the experiences of this Walmart pharmacist, is there?").  That argument is unfounded.  For one thing, this Court has expressly disavowed the claim that the CSA requires computerized data-sharing, at least as a general matter. *See* Dkt. 3499 at 7 ("[T]here is no absolute requirement, for example, that a pharmacy must conduct a computerized red-flag analysis of each prescription before filling it.").  And for another thing, Walmart *did* share such information from one pharmacy to another.  To take a few examples, Walmart provided its pharmacists with access to OARRS before it was required to do so; later provided its pharmacists with access to Archer and NarxCare; and maintained a practice whereby Walmart pharmacists would routinely contact other Walmart pharmacists in the area to relay their concerns to one another and ask each other for guidance on a particular prescriber or patient.

In the end, all of this is relevant to whether Walmart's pharmacists acted with the scienter this Court has held is required: willful blindness.  Plaintiffs' contention that Walmart could have done even more to prevent diversion does not establish that the steps that Walmart's pharmacists took were "deliberate actions" to "avoid confirming a high probability of wrongdoing."  *Glob.-Tech Appliances*, 563 U.S. at 769.  And, again, Plaintiffs were required to identify a particular employee who acted with willful blindness and could not rely on aggregating knowledge across individuals.  Plaintiffs failed to clear either of those hurdles.

Because Plaintiffs did not offer any legally sufficient evidence that Walmart engaged in unlawful dispensing conduct, and thus no reasonable juror could have found that it did so, judgment as a matter of law is warranted.

B.      **No Reasonable Juror Could Have Found That Walmart's Dispensing Conduct Caused the Alleged Harm.**

Even if Plaintiffs could establish that Walmart's dispensing conduct violated the CSA, or that Walmart engaged in intentional and culpable conduct, their case would still fail because they failed to establish causation.  "[T]he tort of public nuisance only reaches so far," *Cleveland v. JP Morgan Chase Bank, N.A.*, No. 98656, 2013 WL 1183332, at *3 (Ohio App. Ct. Mar. 21, 2013), and "not every failure to comply with [a regulation] amounts to a public nuisance," *City of Cincinnati v. Deutsche Bank Nat'l Tr. Co.*, 863 F.3d 474, 479 (6th Cir. 2017).  The plaintiff must show, in addition, that the violation substantially interfered with public health and safety and that the defendant was a "substantial factor" in causing the alleged harm.  Restatement (Second) of Torts § 834 cmt. d (1979).  Even then, "to support a verdict and judgment" for public nuisance, a plaintiff must "show[] by the evidence that the injury incurred was the *proximate result* of the maintenance of such nuisance." *Gaines v. Vill. of Wyo.*, 72 N.E.2d 369, 373 (Ohio 1947) (emphasis added); *accord* Am. Compl. ¶ 617.

*No evidence that Walmart dispensing amounted to a substantial factor.*  Plaintiffs failed to show that Walmart substantially interfered with the public health and safety or that Walmart was a substantial factor in causing Plaintiffs' alleged injuries.[3]  Walmart's expert witness, Dr. Mark Glickman, testified that Walmart's dispensing conduct accounted for only 3.15% of prescription opioids in Lake and Trumbull Counties from 2006 until 2014 by MME.  *See* Dkt. 4124 at 6236 (Nov. 5 trial tr., vol. 24).  By comparison, the three largest independent pharmacies in Plaintiffs'

---

[3] The Court has rejected analogous arguments about Walmart's distribution market share. *See In re Nat'l Prescription Opiate Litig.*, MDL 2804, 2020 WL 425965, at *2 (N.D. Ohio Jan. 27, 2020) (Polster, J.) (rejecting argument in Track 1B that Walmart's "market share of less than 1.3% of the total opioids distributed" was not substantial and noting that the Court has denied similar arguments for a market share of "only 0.03%").  Plaintiffs have now abandoned any distribution-based claims.

Counties accounted for 16.5% of prescription opioids by MME—resulting in over five times as many opioids by MME than the five Walmart pharmacies combined. *Id.* at 6243.

Although Defendants' DEA compliance expert Robert Hill viewed a "healthy [] controlled-prescription ratio" to be about 20%, Dkt 4124 at 6370 (Nov. 7 trial tr., vol. 24), each of Walmart's five pharmacies in Lake and Trumbull Counties was only around 10%, *id.* at 6252. Meanwhile Overholt's Pharmacy—the second largest independent pharmacy in the area—served as the designated dispenser for Dr. Peter Franklin, who was known for "prescribing exorbitant amounts" of controlled substances that did not "even come close to legitimate medical purpose[,]" and thus "contributed greatly" to the public health crisis in Lake and Trumbull Counties. Dkt. 4106 at 4571, 4586 (Oct. 28 trial tr., vol. 18); *id.* at 4580 (noting that "numerous prescriptions" written by Dr. Franklin "stated that the prescription should be filled only at Overholt's"). As the former Ohio Board of Pharmacy Agent George Pavlich testified, those independent pharmacies were the "least compliant" with Ohio law and regulations, while Walmart was among "the most compliant." *Id.* at 4546. While Pavlich could not recall a single Walmart pharmacy that had its license revoked in the 25 years he worked at the Ohio Board of Pharmacy, "there were numerous independent ones" that suffered that fate. *Id.* at 4547; *see also* Dkt. 4111 at 5349–50 (Nov. 2 trial tr., vol. 21) (Edwards also testifying that he could not recall the revocation of a Walmart pharmacy license). Walmart's dispensing conduct was thus not nearly material enough to have a "*substantial* impact" on the opioid crisis. *Schwartz v. Honeywell Int'l, Inc.*, 102 N.E.3d 477, 482 (Ohio 2018); *see Martin v. Cincinnati Gas & Elec. Co.*, 561 F.3d 439, 443 (6th Cir. 2009); Restatement § 834 cmt. d.

*No evidence of any particular Walmart wrongful prescriptions dispensed*. Plaintiffs state that Walmart's failure to identify illegitimate prescriptions caused their alleged harm. But they introduced no evidence of any particular illegitimate prescription—and no evidence, at any rate,

13

of what would have happened if Walmart had investigated and attempted to resolve "red flags" for any particular prescription flagged by Plaintiffs' experts. Without this evidence, Plaintiffs cannot "establish[] proximate cause" because they cannot show that Walmart "would have detected the presence" of illegitimate prescriptions, even assuming some existed. *Burnworth v. Harper*, 672 N.E.2d 241, 245 (Ohio Ct. App. 1996).

*No evidence of any diverted Walmart prescriptions*. Even if they had evidence of suspicious prescriptions that Walmart theoretically could have detected, Plaintiffs did not introduce evidence that any of those prescriptions were in fact diverted. Diversion is a key link in Plaintiffs' alleged causal chain. So, without evidence that controlled substances from *Walmart's* pharmacies were diverted, Plaintiffs cannot establish causation as to Walmart. And Plaintiffs must also establish proximate cause separately for each defendant. *See Sutowski v. Eli Lilly & Co.*, 696 N.E.2d 187, 190 (Ohio 1998). Whatever is true of the other pharmacies, it is clear that Plaintiffs cannot show actual diversion from Walmart's pharmacies, and cannot prove that a single pill left a single Walmart pharmacy illegally (*i.e.*, with knowledge or willful blindness to the fact that it was improper).

This omission is especially glaring given the trial evidence about independent causes of overdose burden in Lake and Trumbull Counties. For example, Dr. Katherine Keyes, Plaintiffs' own expert, testified that illicit opioids, including heroin, fentanyl, and counterfeit pills (largely trafficked into the United States from China and Mexico) independently contributed to the burden in Lake and Trumbull Counties. *See, e.g.*, Dkt. 4065 at 3684–88 (Oct. 22 trial tr., vol. 14). "Doctors shoppers," "medicine cabinet diversion," and theft also played a significant role. *Id.* at 3688–89; Dkt. 4090 at 4090 (Oct. 26 trial tr., vol. 16). Dr. Keyes even admitted that if the opioid manufacturers had "acted more responsibly" and FDA had "done its job," there would not have

been an opioid crisis.  Dkt. 4090 at 4153 (Oct. 26 trial tr., vol. 16).  Plaintiffs' expert, Dr. Caleb Alexander, for his part, agreed that he had testified that "the origins of the epidemic are multiple [] including unsubstantiated claims about the safety and effectiveness of opioids, multifaceted campaigns by pharmaceutical companies, and the failure of the FDA and DEA."  Dkt. 4064 at 3505 (Oct. 21 trial tr., vol. 13).

Defendants' causation expert, Dr. Kevin Murphy, confirmed this analysis.  Dr. Murphy testified that, ever since 2010, it has been "clearly nonprescription illicit opioids or illegal opioids that are generating the deaths" given that "prescription quantity is going down over this period of time, not up."  Dkt. 4118 at 5987 (Nov. 4 trial tr., vol. 23).  Dr. Murphy explained that "[i]t's not people overdosing on prescription opioids."  *Id.* at 5983.  Dr. Murphy also testified about other factors that have led to an increase in opioid use, including the creation of Medicare Part D for prescription drug coverage in 2006, *id.* at 5947, changes in the standard of care for treating pain, *id.* at 5955, and social and economic conditions in Lake and Trumbull Counties, including the decline in manufacturing and labor force participation, *id.* at 5975.  Walmart's dispensing thus cannot be the proximate cause of Plaintiffs' asserted injuries.  *See, e.g.*, *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458 (2006).

These confounding factors simply underscore the importance of establishing a specific causal link between Walmart's conduct and Plaintiffs' alleged harm.  Plaintiffs failed to do so and thus no reasonable juror could have found that Walmart's conduct proximately caused a public nuisance in Plaintiffs' Counties.  *See, e.g.*, Dkt. 4090 at 4089 (Oct. 26 trial tr., vol. 16) (Dr. Keyes agreeing that her opinions are "about pharmacies generally and not about any specific pharmacy").

## CONCLUSION

For these reasons, the Court should grant judgment as a matter of law in favor of Walmart.

Dated:  December 21, 2021                    Respectfully submitted,

                                             /s/  John M. Majoras
                                             John M. Majoras
                                             Benjamin C. Mizer
                                             JONES DAY
                                             51 Louisiana Avenue, N.W.
                                             Washington, DC 20001
                                             Phone: (202) 879-3939
                                             Fax: (202) 626-1700
                                             E-mail: jmmajoras@jonesday.com
                                             E-mail: bmizer@jonesday.com

                                             Tina M. Tabacchi
                                             Tara A. Fumerton
                                             JONES DAY
                                             77 West Wacker
                                             Chicago, IL 60601
                                             Phone: (312) 269-4335
                                             Fax: (312) 782-8585
                                             E-mail: tmtabacchi@jonesday.com
                                             E-mail: tfumerton@jonesday.com

                                             *Counsel for Walmart Inc.*

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that the foregoing document was served via the Court's

ECF system on all counsel of record on December 21, 2021.

/s/  John M. Majoras
John M. Majoras
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Phone: (202) 879-3939
Fax: (202) 626-1700
E-mail: jmmajoras@jonesday.com

*Counsel for Walmart Inc.*
