# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION<br><br>This document relates to:<br><br>    *County of Lake, Ohio v. Purdue Pharma L.P., et al.*,<br>      Case No. 18-op-45032 (N.D. Ohio)<br><br>    *County of Trumbull, Ohio v. Purdue Pharma, L.P., et al.*,<br>      Case No. 18-op-45079 (N.D. Ohio)<br><br>"Track 3 Cases" | **MDL No. 2804**<br>**Case No. 17-md-2804**<br>**Judge Dan Aaron Polster** |

## DEFENDANTS' JOINT MOTION FOR
## <u>NEW TRIAL UNDER RULE 59</u>

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 1

I.   DEFENDANTS ARE ENTITLED TO A NEW TRIAL BECAUSE THE
     VERDICT WAS AGAINST THE GREAT WEIGHT OF THE EVIDENCE ................... 2

II.  THE COURT SHOULD ORDER A NEW TRIAL BECAUSE THE TRIAL
     WAS UNFAIR AND PREJUDICIAL TO DEFENDANTS ........................................... 7

     A.   Defendants Are Entitled To A New Trial Due To The Introduction Of
          Extraneous Evidence By Juror Misconduct ................................................... 7

     B.   The Court Erred by Excluding All Unvaccinated Jurors ............................... 10

     C.   Plaintiffs' Counsel's Misconduct During Closing Arguments
          Warranted a Mistrial, and Also Warrants a New Trial ................................. 12

     D.   The Court Improperly Admitted Evidence of DEA Settlements and
          Administrative Actions ................................................................................ 16

     E.   The Court's One-Sided Hearsay Errors Warrant a New Trial ....................... 17

     F.   Plaintiffs' Counsel's References to "Facts" Not in Evidence Warrants
          a New Trial ................................................................................................. 20

     G.   Defendants Are Entitled to a New Trial Due to the Court's Delegation
          to DEA and Other Witnesses to Define the Law .......................................... 23

     H.   Permitting Catizone to Testify Regarding His Understanding of the
          CSA's Obligations and About Red Flags Was Prejudicial And
          Warrants a New Trial .................................................................................. 26

     I.   The Court Exceeded Its Authority By Forcing Walmart to Get Brad
          Nelson to Testify ........................................................................................ 29

     J.   Permitting Plaintiffs to Reference the DOJ Complaint Against
          Walmart Was Wrong and Warrants a New Trial .......................................... 34

     K.   The Court Should Order a New Trial That Excludes
          Extraterritorial Evidence ............................................................................ 37

     L.   The Court Should Order a New Trial Because the Jury Instructions It
          Gave (and Refused to Give) Tainted the Jury's Verdict ............................... 38

     M.   The Court's Many Errors Combined To Make this Trial
          Fundamentally Unfair .................................................................................. 39

CONCLUSION ............................................................................................................. 40

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adkins v. Wolever*,
    554 F.3d 650 (6th Cir. 2009) ........................................................................................36

*Barnes v. District of Columbia*,
    924 F. Supp. 2d 74 (D.D.C. 2013) ..............................................................................16

*Beck v. Haik*,
    377 F.3d 624 (6th Cir. 2004) ........................................................................................36

*Black Card LLC v. Visa USA Inc.*,
    No. 15-CV-27-SWS, 2020 WL 9812009 (D. Wyo. Dec. 2, 2020) ................................32

*Bridgeport Music, Inc. v. UMG Recordings, Inc.*,
    585 F.3d 267 (6th Cir. 2009) ........................................................................................39

*Broumand v. Joseph*,
    522 F. Supp. 3d 8 (S.D.N.Y. 2021) ..............................................................................31

*Caudle v. District of Columbia*,
    707 F.3d 354 (D.C. Cir. 2013) ......................................................................................14

*City of Cleveland v. Peter Kiewit Sons' Co.*,
    624 F.2d 749 (6th Cir. 1980) ........................................................................................15

*City of Hamilton v. Dilley*,
    165 N.E. 713 (Ohio 1920) ............................................................................................23

*Clark v. Chrysler Corp.*,
    436 F.3d 594 (6th Cir. 2006) ........................................................................................15

*Conwood Co., L.P. v. U.S. Tobacco Co.*,
    290 F.3d 768 (6th Cir. 2002) ........................................................................................28

*Cross v. Wyeth Pharma., Inc.*,
    No. 06-cv-429-T-23AEP, 2011 WL 2517211 (M.D. Fla. June 23, 2011) ....................32

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ........................................................................................27, 28, 29

*Draper v. Rosario*,
    836 F.3d 1072 (9th Cir. 2016) ......................................................................................14

*Factory Mut. Ins. Co. v. Alon USA L.P.*,
    705 F.3d 518 (5th Cir. 2013) ........................................................................................18

*Ford v. Seabold*,
    841 F.2d 677 (6th Cir. 1988) ........................................................................................11

*Fryman v. Fed. Crop Ins. Corp.*,
    936 F.2d 244 (6th Cir. 1991) ........................................................................................39

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Gilster v. Primebank*,
747 F.3d 1007 (8th Cir. 2014) ........................................................................14

*Gritton v. Disponett*,
No. 05-cv-75, 2007 WL 3407459 (E.D. Ky. Nov. 14, 2007) ...............................34

*Hodge v. Hurley*,
426 F.3d 368 (6th Cir. 2005) ......................................................................14, 15

*Holmes v. City of Massillon*,
78 F.3d 1041 (6th Cir. 1996) ............................................................................2

*In re Air Crash Disaster*,
86 F.3d 498 (6th Cir. 1996) .............................................................................23

*In re Beverly Hills Fire Litig.*,
695 F.2d 207 (6th Cir. 1982) .........................................................................7, 9

*In re Chocolate Confectionary Antitrust Litig.*,
801 F.3d 383 (3d Cir. 2015)..............................................................................38

*In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*,
No. 17-MD-2785-DDC-TJJ, 2021 WL 2822535 (D. Kan. July 7, 2021)..........31, 32

*In re Petition of Boehringer Ingelheim Pharms., Inc.*,
745 F.3d 216 (7th Cir. 2014) ............................................................................33

*In re Scrap Metal Antitrust Litig.*,
527 F.3d 517 (6th Cir. 2008) ............................................................................28

*Jones v. Federated Fin. Rsrv. Corp.*,
144 F.3d 961 (6th Cir. 1998) ............................................................................39

*Kentucky v. Long*,
837 F.2d 727 (6th Cir. 1988) ............................................................................34

*Lea v. Wyeth LLC*,
No. 03-CV-1339, 2011 WL 13195950 (E.D. Tex. Nov. 22, 2011) ................31, 32

*Leavitt v. Scott*,
338 F.2d 749 (10th Cir. 1964) ..........................................................................23

*Libbey-Owens-Ford Co. v. Ins. Co. of N. Am.*,
9 F.3d 422 (6th Cir. 1993) ...............................................................................38

*Mia. Valley Fair Hous. Ctr., Inc. v. Connor Grp.*,
725 F.3d 571 (6th Cir. 2013) ............................................................................39

*Mich. First Credit Union v. Cumis Ins. Soc'y, Inc.*,
641 F.3d 240 (6th Cir. 2011) ............................................................................39

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Montgomery Ward & Co. v. Duncan*,
   311 U.S. 243 (1940)............................................................................................1, 2, 7

*N.Y. Cent. R.R. Co. v. Johnson*,
   279 U.S. 310 (1929)................................................................................................21, 23

*Nian v. Warden, N. Cent. Corr. Inst.*,
   994 F.3d 746 (6th Cir. 2021) ...................................................................................7, 9

*Off. Comm. of Unsecured Creditors v. Calpers Corp. Partners LLC*,
   No. 18-cv-68-NT, 2021 WL 3081880 (D. Me. July 20, 2021)................................32

*Park W. Galleries, Inc. v. Hochman*,
   692 F.3d 539 (6th Cir. 2012) ...................................................................................15

*Pingatore v. Montgomery Ward & Co.*,
   419 F.2d 1138 (6th Cir. 1969) .................................................................................23

*Saint Gobain Autover USA, Inc. v. Xinyi Glass N. Am., Inc.*,
   666 F. Supp. 2d 820 (N.D. Ohio 2009)....................................................................28

*Saint-Gobain Autover USA, Inc. v. Xinyi Glass N. Am., Inc.*,
   No. 06-cv-2781, 2009 WL 10689369 (N.D. Ohio Oct. 23, 2009)...........................18

*Singh v. Vanderbilt Univ. Med. Ctr.*,
   No. 17-cv-0400, 2021 WL 3710442 (M.D. Tenn. Aug. 19, 2021).........................31

*Skogen v. Dow Chem. Co.*,
   375 F.2d 692 (8th Cir. 1967) ...................................................................................23

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
   538 U.S. 408 (2003)..................................................................................................12

*Stern v. Shouldice*,
   706 F.2d 742 (6th Cir. 1983) ...................................................................................38

*Stiles v. Lawrie*,
   211 F.2d 188 (6th Cir. 1954) ...................................................................................9

*Stockman v. Oakcrest Dental Ctr., P.C.*,
   480 F.3d 791 (6th Cir. 2007) .......................................................................16, 17, 36, 37

*Stone Tech. (HK) Co. v. GlobalGeeks, Inc.*,
   No. 20-cv-23251, 2021 WL 2940256 (S.D. Fla. July 13, 2021) .............................32

*United States v. Acosta*,
   924 F.3d 288 (6th Cir. 2019)...................................................................................14, 16

*United States v. Adams*,
   722 F.3d 788 (6th Cir. 2013) .........................................................................20, 34, 40

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*United States v. Allen*,
  160 F.3d 1096 (6th Cir. 1998) ...............................................................11

*United States v. Cook*,
  No. CR 06-2403, 2008 WL 11362043 (D.N.M. Oct. 2, 2008) .................................11

*United States v. Hill*,
  167 F.3d 1055 (6th Cir. 1999) ...............................................................23

*United States v. King*,
  378 F.2d 359 (6th Cir. 1967) ................................................................36

*United States v. Knox*,
  17 F. App'x 353 (6th Cir. 2001) .............................................................39

*United States v. Medel*,
  592 F.2d 1305 (5th Cir. 1979) ...............................................................23

*United States v. Mejia*,
  545 F.3d 179 (2d Cir. 2008)..................................................................19

*United States v. Payne*,
  2 F.3d 706 (6th Cir. 1993) ..................................................................23

*United States v. Rios*,
  830 F.3d 403 (6th Cir. 2016) ................................................................18

*United States v. Royal*,
  174 F.3d 1 (1st Cir. 1999)...................................................................11

*United States v. Scott*,
  716 F. App'x 477 (6th Cir. 2017) ............................................................19

*United States v. Smith*,
  500 F.2d 293 (6th Cir. 1974) ............................................................14, 15

*United States v. Solivan*,
  937 F.2d 1146 (6th Cir. 1991) ...........................................................13, 16

*United States v. Yarbrough*,
  352 F.2d 491 (6th Cir. 1965) ............................................................34, 36

*United States v. Young*,
  470 U.S. 1 (1985)............................................................................15

*United States v. Zipkin*,
  729 F.2d 384 (6th Cir. 1984) ................................................................27

*Valadez v. Watkins Motor Lines, Inc.*,
  758 F.3d 975 (8th Cir. 2014) ................................................................36

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Waldorf v. Shuta*,
  3 F.3d 705 (3rd Cir. 1993) ...................................................................7

*Walker v. Engle*,
  703 F.2d 959 (6th Cir. 1983) ..............................................................40

*Williams v. Illinois*,
  567 U.S. 50 (2012)...............................................................................18

**STATUTES**

21 U.S.C. § 823 ...........................................................................................25

28 U.S.C. § 1861 .........................................................................................10

Ohio Rev. Code Ann. § 4729.01 ..................................................................5

Ohio Rev. Code Ann. § 4729.39 ..................................................................5

**OTHER AUTHORITIES**

Am. Gen. Order No. 2020-08-8 (June 7, 2021) ..........................................10

21 C.F.R. § 1306.04 ....................................................................................25

Fed. R. Civ. P. 43 ..................................................................................31, 32

Fed. R. Civ. P. 45 ..................................................................................30, 32

Fed. R. Civ. P. 50 ....................................................................................1, 2

Fed. R. Civ. P. 51 .......................................................................................38

Fed. R. Civ. P. 59 .........................................................................................1

Fed. R. Evid. 401 ........................................................................................37

Fed. R. Evid. 402 ............................................................................17, 37, 40

Fed. R. Evid. 403 ............................................................................36, 37, 40

Fed. R. Evid. 404 ..................................................................................17, 37

Fed. R. Evid. 408 ........................................................................................16

Fed. R. Evid. 602 ........................................................................................17

Fed. R. Evid. 702 ..................................................................................18, 28

Fed. R. Evid. 703 ........................................................................................18

Fed. R. Evid. 802 ........................................................................................17

1 McCormick On Evid. § 7 (8th ed. Jan. 2020 update) ..............................23

N.D. Ohio, Juror Selection Plan (Apr. 8, 2021)..........................................10

29 Wright & Miller, Fed. Prac. & Proc. Evid. § 6273 (2d ed. Apr. 2021 update)........................19

## INTRODUCTION

In separate motions and briefs, also filed today, Defendants renew their motion for judgment as a matter of law.  The Court should grant those motions, making this one moot, because even under the erroneous legal framework and decisions governing this trial, Plaintiffs failed to prove that any Defendant committed acts that could support a jury finding of nuisance liability.

But if this Court denies Defendants' Rule 50(b) motions, it should grant Defendants' "alternative . . . request for a new trial under Rule 59." Fed. R. Civ. P. 50(b).  From the beginning of this trial until the jury's verdict, this Court erred in ways making it easier for Plaintiffs to prove their case and harder for Defendants to fairly defend themselves.  Before trial, it excluded jurors with characteristics making them more likely to rule in Defendants' favor, and declined to exclude certain evidence with no link to these cases.  During trial, in addition to ruling one-sidedly on numerous issues, the Court refused to grant a mistrial when both sides asked for one—and when even Plaintiffs' counsel conceded the juror misconduct at issue "affects this jury" and "affects everybody whether they recognize it or not."  Dkt. 4065 at 3769 (Oct. 22, trial tr., vol. 14).  And after trial, this Court confusingly, misleadingly, and prejudicially instructed the jury, again making it easier for jurors to find for Plaintiffs.  The result of all this was a trial plagued with errors, and a verdict against the weight of the evidence.  Before the remedy phase (if any) begins, this Court should order a new liability trial that is free of these prejudicial errors and fair to Defendants.

## ARGUMENT

Under Rule 59, the Court may "grant a new trial . . . for any reason for which a new trial has heretofore been granted," Fed. R. Civ. P. 59(a)(1)(A)—including because the "verdict is against the weight of the evidence" and because "the trial was not fair to the party moving," *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940).  A new trial is warranted here for both reasons: (1) The weight of the evidence shows that Defendants are not liable to Plaintiffs in

public nuisance, and (2) the many errors before, during, and after trial made this trial fundamentally unfair to Defendants.

## I.     DEFENDANTS ARE ENTITLED TO A NEW TRIAL BECAUSE THE VERDICT WAS AGAINST THE GREAT WEIGHT OF THE EVIDENCE.

As explained in Defendants' joint and individual Rule 50(b) briefs, no reasonable jury could find for Plaintiffs.  But if this Court disagrees, it should at least hold that a new trial is warranted because "the verdict is against the weight of the evidence." *Duncan*, 311 U.S. at 251. In ruling upon such a motion, the judge compares the opposing proofs and weighs the evidence, and it is the duty of the judge to set aside the verdict and grant a new trial, if the verdict is against the clear weight of the evidence. *See id.*  "Generally, when a district court determines that a verdict is against the weight of the evidence, that court has a duty to grant a new trial in order to prevent a miscarriage of justice." *Holmes v. City of Massillon*, 78 F.3d 1041, 1047 (6th Cir. 1996).

Plaintiffs were required to show at trial an ongoing public nuisance specifically related to prescription opioid medications dispensed by each one of the Defendants, which were then diverted to the illicit market.  Plaintiffs had to show that the criminals involved in such diversion flocked to Defendants' pharmacies, where they supposedly persuaded pharmacists to knowingly fill bogus prescriptions, as opposed to obtaining drugs for diversion from the scores of other locations that dispensed prescription opioids in the two counties but are *not* named as defendants; from the known pill mills, crooked doctors, and pill traffickers in the area; or from the medicine cabinets of friends and family.  *See, e.g.*, Dkt. 4065 at 3684–88 (Oct. 22 trial tr., vol. 14); *id.* at 3688–89; Dkt. 4090 at 4090 (Oct. 26 trial tr., vol. 16).  They did not.  Instead, the evidence at trial showed that any public nuisance that exists in the two counties was driven by the widespread availability of heroin, illicit fentanyl, and other illicit drugs—including counterfeit "pills" that look like prescription medicines but are not—trafficked by criminal drug gangs.  *Id.* at 3684–88. While

Plaintiffs' lawyers poured untold resources into an attempt to develop a theory of liability based on Defendants' activities as self-distributors of prescription opioid medications to their own pharmacies, they chose not to call their DEA expert on distribution, Jim Rafalski, and ultimately abandoned their distribution theory entirely. *See* Dkt. 4106 at 4492–96 (Oct. 28 trial tr., vol. 18); Dkt. 4109 at 5060 (Nov. 1 trial tr., vol. 20); Ex. A, 10/30/21 Email from P. Weinberger.

As to dispensing by Defendants' pharmacists, Plaintiffs attempted to prove the following theory at trial: (1) that a large percentage of prescriptions for opioid medications filled by the Defendants' pharmacists in Lake and Trumbull Counties bore "red flags of diversion"; (2) that the Defendants' pharmacists knew of, or were willfully blind to, these "red flags" and did not resolve them before dispensing; (3) that these "red flag" prescriptions were *in fact* illegitimate, sham prescriptions written by corrupt doctors and/or presented by criminals masquerading as patients; and (4) that the pharmacists employed by each of the Defendants knowingly filled enough of these bad prescriptions to support a conclusion that medications dispensed by that Defendant's pharmacies pursuant to sham prescriptions—rather than pills dispensed by the huge number of other outlets where prescription opioids can be obtained in Lake and Trumbull Counties, or even pills appropriately dispensed pursuant to valid prescriptions but then subsequently diverted—played a substantial role in a current and ongoing public nuisance of prescription opioid medications.

Plaintiffs devoted great energy to introducing evidence (in the form of expert testimony from Carmen Catizone) that was supposed to support the first of these four showings—that pharmacists employed by each of the Defendants dispensed opioid prescriptions despite "red

flags"—in the teeth of all evidence to the contrary.[1]  But they adduced no evidence sufficient to make showings (2)–(4).

Against all of Plaintiffs' failures of proof, Defendants' evidence at trial showed that their pharmacists are highly trained healthcare professionals who care deeply about their patients and about the communities where they live and work, and who are supported by some of the best resources in the business.  *See, e.g.*, Dkt. 4132 at 6778–79, 6669–73, 6750, 6758, 6540–50, 6555–56 (Nov. 8 trial tr., vol. 25); Dkt. 4057 at 3203–09 (Oct. 20 trial tr., vol. 12); Dkt. 4109 at 5112–13 (Nov. 1 trial tr., vol. 20); Dkt. 4115 at 5666–5728 (Nov. 3 trial tr., vol. 22).  Defendants showed that the real regulators on the ground in Ohio—as opposed to profit-seeking contingent fee lawyers and their hired-gun experts—never saw Defendants as a source of diverted controlled substances in Lake and Trumbull Counties.  *See, e.g.*, Dkt. 4106 at 4546–47 (Oct. 28 trial tr., vol. 18).  While Trumbull County was home to a well-known pill mill whose pharmacist-owner has been criminally prosecuted and pleaded guilty to drug trafficking offenses, Defendants showed that their own local operations have always been in compliance with all state and federal regulations regarding controlled substances.  *See, e.g.*, *id.* at 4545–47, 4571, 4580, 4586, 4588–90; Dkt. 4111 at 5365–66, 5374, 5349–50 (Nov. 2 trial tr., vol. 21).  And Defendants showed that they and their

---

[1] For example, Plaintiffs' expert's theory would flag as a potential criminal involved in illegal drug diversion (1) every patient who travels from Trumbull County to the Cleveland Clinic for specialty oncology care, simply because of the distance between the two places; (2) every resident of the two counties without prescription drug coverage who must pay cash for their prescriptions; (3) every orthopedic surgeon who routinely writes the same initial prescription for patients who need pain control following a knee replacement surgery; (4) doctors who write additional prescriptions for pain medication following an initial prescription by a partner in the same medical practice; (5) and doctors who write a prescription for pain control when seeing a patient for follow-up care after an ER doctor writes an initial, short-duration pain prescription.  As Plaintiffs and their expert told it, Defendants' pharmacists should have treated each of these patients and prescribers as a likely criminal attempting to commit a drug felony, regardless of the actual circumstances that may make a particular prescription unremarkable and regardless of how well the pharmacist already knows a patient and that patient's individual situation.

pharmacists in Lake and Trumbull Counties have always been strong allies, not adversaries, to local regulators and law enforcement in the fight against drug diversion. *See, e.g.*, Dkt. 4106 at 4534, 4549–50 (Oct. 28 trial tr., vol. 18); Dkt. 4109 at 5293–95, 5303, 5304–06, 5313–14 (Nov. 1 trial tr., vol. 20); Dkt. 4111 at 5346, 5348, 5349–50 (Nov. 2 trial tr., vol. 21) (Edwards testifying about Walgreens pharmacies being "cooperative and accommodating" and how he had a good relationship with Defendants' pharmacists); Dkt. 4136 at 6883–86 (Nov. 9 trial tr., vol. 26).

Plaintiffs could not get around any of this by caricaturing Defendants' pharmacists as unthinking pill-dispensing machines. Pharmacists are highly trained professionals who play a critical role in the delivery of healthcare to Americans. When it comes to controlled substances, pharmacists take the appropriate steps under the circumstances of each prescription to guard against filling illegitimate prescriptions, while still working to make sure that patients suffering in real pain are able to obtain the medications their doctors have prescribed. *See, e.g.*, Dkt. 4136 at 6875–77, 6878–79, 6965 (Nov. 9 trial tr., vol. 26); Dkt. 4132 at 6665, 6544 (Nov. 8 trial tr., vol. 25).

But pharmacists are not trained as doctors and do not make prescribing decisions. Except under the narrowest of circumstances that are not relevant here, Ohio law forbids pharmacists from making prescribing decisions.[2] It would be entirely inappropriate for pharmacists to refuse to fill legitimate prescriptions written by legitimate doctors simply because they disagree with the prescriber's medical judgment—a state of affairs that regulators, doctors, patients, and the public at large would rightly refuse to tolerate. Pharmacists do not examine patients; they do not have access to a patient's full medical history; they do not diagnose patients; and they do not have the long years of medical education and training and the clinical expertise that doctors use to make

---

[2] *See* Ohio Rev. Code Ann. §§ 4729.01(I), 4729.39.

prescribing decisions.  While pharmacists may always refuse to fill a prescription if they doubt its legitimacy, they may not stand between patients and their doctors by depriving patients of legitimately prescribed medicines simply because the pharmacist disagrees with a doctor's professional medical judgment about the best treatment options for an individual patient.

Finally, there was absolutely no dispute at trial that criminals have engaged in the diversion of prescription medications in Lake and Trumbull Counties, just as they do elsewhere.  But there was nothing to tie any of *that* wrongdoing to Defendants' pharmacies located in the two counties. There were over 140 pharmacies, hospitals, and clinics that dispensed opioid medications in Lake and Trumbull Counties during the key time period.  There was no evidence at trial for Plaintiffs' theory that any prescriptions filled at any Defendant's pharmacies were illegitimate prescriptions presented by criminals, which Defendants' pharmacists then knowingly filled despite "red flags" that revealed the impostors' wrongdoing.  Considering Defendants' record of working with local law enforcement to identify and apprehend drug diverters, it would be odd indeed if those in the area seeking prescription opioids for purposes of diversion preferred to go to Defendants' stores when they had ready access to so many other outlets, including a notorious pill-mill pharmacy that operated for years in Trumbull County.  *See, e.g.*, Dkt. 4106 at 4569–75, 4579–80, 4585–86 (Oct. 28 trial tr., vol. 18); Dkt. 4026 at 2086–89 (Oct. 14 trial tr., vol. 8).

The fact is that Plaintiffs' theory of liability against Defendants never made sense—it is riddled with gaps that the evidence at trial never came close to filling.  For these reasons, and the reasons set forth in Defendants' joint and individual renewed motions for judgment as a matter of law, the jury's verdict was against the great weight of the evidence and Defendants are entitled to a new trial.

## II.    THE COURT SHOULD ORDER A NEW TRIAL BECAUSE THE TRIAL WAS UNFAIR AND PREJUDICIAL TO DEFENDANTS.

Errors littered this trial. Individually, each error identified below warrants a new trial. Together, they present an overwhelming case for one. If this Court does not grant judgment as a matter of law or order a new trial based on the insufficient evidence Plaintiffs presented, it should order a new trial because the "substantial errors in admission or rejection of evidence [and] instructions to the jury," as well as the other errors described below, made this trial fundamentally unfair to Defendants. *Duncan*, 311 U.S. at 251.

### A.    Defendants Are Entitled To A New Trial Due To The Introduction Of Extraneous Evidence By Juror Misconduct.

"It is fundamental that every litigant who is entitled to trial by jury is entitled to an impartial jury, free to the furthest extent practicable from extraneous influences that may subvert the fact-finding process." *Waldorf v. Shuta*, 3 F.3d 705, 709 (3rd Cir. 1993). The Sixth Circuit "has not hesitated to declare mistrials" where misconduct by a juror "injected extraneous information into the trial" and the juror's act was "a response to the facts of the case at hand." *In re Beverly Hills Fire Litig.*, 695 F.2d 207, 213–14 (6th Cir. 1982). Indeed, "a juror introducing extraneous information into deliberations 'can rarely be viewed as harmless.'" *Nian v. Warden, N. Cent. Corr. Inst.*, 994 F.3d 746, 758 (6th Cir. 2021) (quoting *Beverly Hills*, 695 F.2d at 215).

While the full set of relevant facts is set forth in Defendants' motions for mistrial, Dkt. 4068 & Dkt. 4067, the core facts are not in dispute: A juror violated what this Court called "probably the most important instruction" by conducting outside internet research on an issue in the case, printing out the results of that independent research, handing her research out to every other juror, and discussing it in the jury room. Dkt. 4068 at 2–3; *see also* Dkt. 4067-1. The juror's research was prompted by testimony about the cost and availability of Narcan (or naloxone)—a life-saving medication that can reverse an opioid overdose—at a Defendant's stores. That

testimony, in turn, was prompted by *a question from a juror*: "Was naloxone offered to patients for free when getting 50 MMEs?  If not, how much did it cost?"  Dkt. 4057 at 3292 (Oct. 20 trial tr., vol. 12).  Counsel for Plaintiffs immediately seized on the question, tying it to Plaintiffs' central theme of the trial:  that Defendants put profit over patient safety.  *Id.* at 3292:3–24; *see also* Dkt. 4068 at 1–2 (collecting examples); Dkt. 4153 at 7095–96 (Nov. 15 trial tr., vol. 15) (Plaintiffs arguing in closing that Defendants are not "charitable foundations" but instead "are all for profit," that "[t]hey make money off every pill they sell," and that "[t]hey don't have to sell the drugs, they choose to sell the drugs").  And the research, in turn, confirmed the juror's suspicion:  It found that patients could get Narcan for free from other sources but had to pay for it at the Defendant's stores.

There is also no dispute about the unprecedented and prejudicial nature of the juror's misconduct.  This Court said that in his 22 years on the bench, he had never had a juror do something like this.  Dkt. 4065 at 3725 (Oct. 22 trial tr., vol. 14).  After *voir dire* of each juror and alternate, both Plaintiffs and Defendants *agreed* that a mistrial was warranted.  Counsel for Plaintiffs, a lawyer with 37 years of experience, stated "in candor to the tribunal" that he believed a mistrial was appropriate, observing that the juror's research involved an issue in the trial—an issue prompted by a juror question—and that in his opinion it prejudiced Defendants and affected "everybody whether they recognize it or not."  *Id.* at 3722–23, 3768–70.

While counsel for Plaintiffs later changed his mind, that was only after the Court repeatedly urged the parties to reconsider whether they really wanted a mistrial, told them to speak to their clients, and said if a mistrial was declared he did not know if the case would ever be re-tried.  *See, e.g.*, *id.* at 3769 ("Well, I want everyone to know, if there's a mistrial, I have no idea when I'm going to try this again.  It's not going to be for a while."); *id.* at 3771 ("So everyone understand that, if this – if we have to stop the trial, we have to the stop the trial, but I don't know when it will

be – we'll do it again.  It will be a long time, I can tell you that."); *id.* at 3773 ("I really have no idea as to if we have to stop this trial, when or if I'll do it again, and I may just decide, I'll let the other five judges [in the other MDL bellwethers] do it.").  The Court proceeded to deny Defendants' motions for mistrial, reasoning that the Sixth Circuit's unhesitating practice of declaring mistrials where juror misconduct injects extraneous information into a case applies only where the misconduct is discovered after the trial and there is no opportunity to conduct *voir dire* and issue a limiting instruction.  Dkt. 4078 at 3785–86 (Oct. 25 trial tr., vol. 25).  The Court also surmised that no one was going to decide the case based on Narcan.  *Id.* at 3786.

The Court was mistaken on both points.  The Sixth Circuit has never limited the principles in *Beverly Hills* or *Nian* to juror misconduct discovered after a verdict, or declined to order a mistrial because the injection of extraneous information was "cured" by a limiting instruction.  Rather, whenever juror misconduct injects extraneous information into the case, "the verdict [must] be set aside, unless entirely devoid of any proven influence or the probability of such influence upon the jury's deliberations or verdict."  *Beverly Hills*, 695 F.2d at 215 (quoting *Stiles v. Lawrie*, 211 F.2d 188, 190 (6th Cir. 1954)).  There is no basis for such a finding here, where even counsel for Plaintiffs immediately recognized that the juror's research hurt Defendants, was in response to a question from the jury itself, and would affect all of the jurors "whether they recognize it or not."  Dkt. 4065 at 3769 (Oct. 22 trial tr., vol. 14).  Even after changing his mind, counsel for Plaintiffs did not conclude that there was no prejudicial influence on the jury, just that a mistrial was not warranted.

"[A] juror introducing extraneous information into deliberations 'can rarely be viewed as harmless.'"  *Nian*, 994 F.3d at 758 (quoting *Beverly Hills*, 695 F.2d at 215).  This is not the "rare case" where the introduction of extraneous information was "harmless."  *Id.*  To the contrary, this

is the exceedingly rare case where **both sides** agreed that the introduction of extraneous information was prejudicial, would necessarily affect the jury's deliberations, and that a mistrial was appropriate. Defendants have been unable to identify a single case in which counsel for both sides agreed that a mistrial was warranted and the Court nonetheless refused to grant a mistrial. The Court should have granted a mistrial and should now order a new trial.

### B. The Court Erred by Excluding All Unvaccinated Jurors.

After *voir dire*, the Court excluded all three prospective jurors who were not vaccinated against COVID-19 solely because they were not vaccinated. Dkt 3986 at 467–68. In doing so, the Court reversed its prior ruling that it would "not automatically disqualify prospective jurors who are not vaccinated." Dkt. 3766 at 1–2. The Court also ignored orders and policies issued by this Court during the COVID-19 pandemic that did not require jurors, court employees, or court visitors to be vaccinated. N.D. Ohio, Juror Selection Plan, Parts C, D (Apr. 8, 2021); Am. Gen. Order No. 2020-08-8 at 2 (June 7, 2021). Indeed, jurors were the *only* participants in the trial who were required to be vaccinated. Everyone else, including the attorneys, the witnesses, and the spectators, were not required to be vaccinated but just had to follow the Court's normal COVID-19 protocols—have a temperature below 100.4 degrees, respond negatively to any COVID-19 screening questions, and wear a mask when not speaking.

The Jury Selection Act provides that "all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community." 28 U.S.C. § 1861. Excluding adults who have not received a COVID-19 vaccine violated the requirement that the jury be drawn from a fair cross section of the community. This requirement is violated when: (1) "a distinctive group, that is, a cognizable group, was excluded from the jury selection process"; (2) "such group was systematically excluded"; and (3) "because

of such exclusion the jury pool failed to be reasonably representative of the community." *United States v. Allen*, 160 F.3d 1096, 1102 (6th Cir. 1998) (quotation marks omitted).[3]

Adults who have not received a COVID-19 vaccine are a distinctive group. Courts generally agree that groups based on gender, race, ethnicity, and religious affiliation qualify as distinctive. *See United States v. Cook*, No. CR 06-2403, 2008 WL 11362043, at *4–5 (D.N.M. Oct. 2, 2008). As to other groups, such as those based on age, class, political affiliation, and education, courts usually require some proof of a "common thread or basic similarity in attitude, ideas or experiences." *Ford v. Seabold*, 841 F.2d 677, 683 (6th Cir. 1988). Adults who have not received a COVID-19 vaccine meet these criteria, consisting largely of conservatives, libertarians, and government skeptics, and also include a disproportionate percentage of nonprofessionals and lower-wage workers. Dkt. 3763-4; Dkt. 3763-5; & Dkt. 3763-6. Statewide data published before the trial also showed disparities in vaccination rates by age (with older residents of Ohio much more likely to be vaccinated) and by gender (with women more likely to be vaccinated than men). Dkt. 3763-2. All three of the potential jurors who were excluded based on their vaccination status had non-professional jobs, were under the age of 50, and two of the three were men. In short, the Court's juror vaccine mandate potentially altered one-third of a jury that by appearances was closely divided, deliberating the issues for days before returning a verdict.

By excluding the prospective jurors who were not vaccinated, the Court systematically excluded distinctive groups from the jury, and their exclusion resulted in a jury that was not reasonably representative of the community.

---

[3] Although the Sixth Amendment does not apply in this civil case, jury-pool challenges under the Sixth Amendment also require a showing that a "distinctive group[]" was excluded, and the Sixth Amendment cases interpreting that phrase are sometimes applied in JSSA cases. *E.g.*, *United States v. Royal*, 174 F.3d 1, 6 (1st Cir. 1999).

### C.  Plaintiffs' Counsel's Misconduct During Closing Arguments Warranted a Mistrial, and Also Warrants a New Trial.

This Court found that "some of the statements [Plaintiffs' counsel] made during his closing arguments were improper." Dkt. 4172 at 3.  The Court explained that Plaintiffs' counsel "should have known better than to make the[se] improper comments," which introduced significant prejudice into the trial, right before the jury began deliberations. *Id.* at 4.  Yet the Court denied Defendants' motion for a mistrial based on these improper comments, reasoning that the prejudice "was quickly and effectively dealt with"; that Defendants' objections came too late; and that the improper comments did not "permeate the entire trial from the beginning to the end." *See, e.g.*, *id.* at 1, 4, 6 n.5, 8.  That ruling was erroneous and should be corrected with a new trial.

Start with the improper comments themselves.  Most egregiously, Plaintiffs' counsel told jurors that a decision for Plaintiffs would "set up the standards by which these chain pharmacies and independent pharmacies must act," and that its decision would be "reported" and become a "seminal" decision with "national ramifications."  Dkt. 4153 at 7082–83 (Nov. 15 trial tr., vol. 15); *see also* Dkt. 4156 at 1–5.  These statements look eerily similar to the improper statements the Supreme Court held warranted a new trial in *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003):  "This is a very important case.  It transcends the Campbell file.  It involves a nationwide practice.  And you, here, are going to be evaluating and assessing, and hopefully requiring [Defendant] to stand accountable for what it's doing across the country." *Id.* at 420 (cleaned up).  But Plaintiffs' counsel did not stop with those improper comments.  As detailed in Defendants' motion for a mistrial, counsel also misleadingly suggested to the jury that the litigation would not carry financial consequences for Defendants; suggested without evidence that Defendants are the subject of multiple ongoing investigations in Lake and Trumbull Counties; improperly vouched for Plaintiffs' expert witness Dr. Anna Lembke; "joking[ly]" encouraged

jurors to "beat up" any juror who did not agree with Plaintiffs; and more. *See* Dkt. 4156 at 5–13. This Court found many of these comments "improper," *see generally* Dkt. 4172, but offered three justifications for refusing a mistrial based on them. None of the three rationales should save Plaintiffs from their counsel's misconduct.

*First*, the Court suggested that its two "curative instructions" blunted the prejudice from Plaintiffs' counsel's misconduct. But neither one did so.

As to Plaintiffs' counsel's "send a message" comments, the Court offered what it thought "was tantamount to a rebuke," Dkt. 4172 at 5, when it told the jury that "your job as jurors is to decide the issues presented in this case only. It is not to decide anything about any future case or any other case in the country." Dkt. 4153 at 7130 (Nov. 15 trial tr., vol. 15). But far from "rebuking" Plaintiffs' counsel for his inappropriate "send a message" theme, this meager instruction did not even *rebut* what Plaintiffs' counsel said: That the jury would be deciding only this case does not mean that its decision would not have "national ramifications" and "set up the standards by which these chain pharmacies . . . must act" moving forward. *Id.* at 7082–83. And that was counsel's main (and plainly improper) point. The Court's instruction thus did not address the real problem of counsel's comments: "The substance of the statements made by [Plaintiffs' counsel] in this case were designed, both in purpose and effect, to arouse passion and prejudice and to inflame the jurors' emotions . . . by urging them to send a message and strike a blow to the drug problem" *in this case*, because doing so would reverberate well beyond this case. *United States v. Solivan*, 937 F.2d 1146, 1153 (6th Cir. 1991). And indeed, proving the point, Plaintiffs' counsel repeated his improper theme even after this Court's supposed "rebuke"—repeating his belief that this case "has national ramifications." Dkt. 4153 at 7171, 7323 (Nov. 15 trial tr., vol. 15) (in rebuttal, arguing that "this is about something much bigger than me"). In other cases in

which "counsel made [repeated] impermissible statements" in closing, including "after the district court had sustained [Defendants'] objections," a court's curative instruction or general jury instruction did not "so easily remove[] . . . the unfair prejudice to [Defendants] caused by [Plaintiffs'] counsel." *E.g.*, *Caudle v. District of Columbia*, 707 F.3d 354, 363 (D.C. Cir. 2013). The same is true here. The Court's instruction and counsel's statements did not "un-ring" the bell Plaintiffs' closing sounded to the jury; even if it had, Plaintiffs' counsel rang the bell again in rebuttal.

This is also true of the Court's instruction about Plaintiffs' counsel's improper bolstering of Dr. Lembke. *See United States v. Acosta*, 924 F.3d 288, 299–300 (6th Cir. 2019) (granting new trial for improper vouching and bolstering). The Court simply offered a "remind[er]" of what it had said before; it did not call out the impropriety of counsel's statements. Unlike Defendants' proposed curative instruction—which would have told the jurors not to "consider [Plaintiffs' counsel's comments] in any way when rendering your verdict or making your own determination regarding a witness' credibility" (*see* Dkt. 4153 at 7181 (Nov. 15 trial tr., vol. 28))—the Court merely said counsel's comments are not "evidence." This was not enough on its own, and was certainly not enough given the rest of the improper comments Plaintiffs' counsel made during closing arguments. *See, e.g.*, *Draper v. Rosario*, 836 F.3d 1072, 1084 (9th Cir. 2016); *Gilster v. Primebank*, 747 F.3d 1007, 1013 (8th Cir. 2014); *see also, e.g.*, *United States v. Smith*, 500 F.2d 293, 296 (6th Cir. 1974) (ordering a new trial despite the trial court's curative instruction).

*Second*, the Court faulted Defendants for "not object[ing] in the moment"—that is, for not "interrupt[ing] opposing counsel during closing arguments" and objecting while counsel was speaking. Dkt. 4172 at 6 n.5, 1, 8. But "an attorney who believes that opposing counsel has made improper closing arguments" need not interrupt a closing argument to object. *Hodge v. Hurley*,

14

426 F.3d 368, 386 n.25 (6th Cir. 2005); *see United States v. Young*, 470 U.S. 1, 13 (1985).  Instead, it is perfectly proper to "request a bench conference at the conclusion of the opposing argument, where he or she can lodge an appropriate objection out [of] the hearing of the jury."  *Hodge*, 426 F.3d at 386 n.25.  Recognizing that there are sound reasons to stay silent while opposing counsel is speaking—chief among them that objecting in the moment "might more dramatically impress on the jury [the statement's] prejudicial effect"—the Sixth Circuit has reviewed arguments in favor of a mistrial or a new trial based on statements in a closing argument even though the party did not object during closing.  *See, e.g.*, *Smith*, 500 F.2d at 296 (reversing and remanding for a new trial); *see also Young*, 470 U.S. at 13 (objecting "at the close of [other party's] summation" is a "timely objection [sufficient] to preserve the issue for review").  Indeed, the Sixth Circuit has reviewed new-trial arguments based on improper closing arguments even when counsel "fail[ed] to object to plaintiff's closing arguments [at all] at trial."  *Clark v. Chrysler Corp.*, 436 F.3d 594, 609 n.19 (6th Cir. 2006); *see Park W. Galleries, Inc. v. Hochman*, 692 F.3d 539, 548 (6th Cir. 2012).  Thus, this Court cannot avoid its obligation to review these arguments.

*Third*, the Court suggested that a mistrial was unwarranted because Plaintiffs' counsel's comments did not "permeate the entire trial from the beginning to the end."  Dkt. 4172 at 8.  Under the correct standard, however, a verdict "should be set aside" if an improper statement—even a single one—creates "a reasonable probability that the verdict of a jury has been influenced" by that statement.  *City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 756 (6th Cir. 1980).  It is true that the more frequent and repeated an improper statement, the more likely that the comment has influenced the verdict.  *See id.*  But a highly improper and prejudicial statement made during closing, and only during closing, can just as much influence a verdict—especially when, as here, the jury already has concern surrounding a drug crisis that undoubtedly influences its members.

*United States v. Solivan*, 937 F.2d 1146, 1153 (6th Cir. 1991).  Courts have ordered new trials based on improper statements made only during closing arguments.  *See, e.g.*, *id.*; *see also, e.g.*, *Acosta*, 924 F.3d at 299–300 (among other improper comments during closing arguments, improper vouching and bolstering).  This Court should too.

**D.     The Court Improperly Admitted Evidence of DEA Settlements and Administrative Actions.**

The Court erred by permitting Plaintiffs to introduce evidence related to DEA settlements and administrative actions involving Defendants.  *See e.g.*, P-42147-A; P-08954; P-08955; P-10212; P-10213; P-10214; P-15; P-14750; P-15317; P-14711; P-21113.  Admitting evidence about the settlements violated Federal Rule of Evidence 408.  While the Court ruled that the settlements were admissible to show knowledge, notice, or intent, that is not how the settlements were used. *See, e.g.*, Dkt. 4153 at 7315 (Nov. 15 trial tr., vol. 15) (Plaintiffs' counsel arguing that the settlement agreements showed that Defendants' policies and procedures were ineffective).  The Court allowed Plaintiffs to introduce cumulative evidence of DEA settlements and to needlessly repeat evidence about the settlements long after any alleged knowledge, notice, or intent had been established.  *See Barnes v. District of Columbia*, 924 F. Supp. 2d 74, 90 (D.D.C. 2013) (when settlement and related evidence is admitted, "the evidence . . . [must] be presented as briefly as possible" in order to "guard against the risk of prejudice or confusion").  While the Court's jury instructions included a limiting instruction on the settlements, it was inconsistent with how the Court permitted the evidence to be used, came long after Plaintiffs had introduced (and repeated) the evidence during their case-in-chief, and was simply too late and ineffective to undo the prejudice caused to Defendants.  *Stockman v. Oakcrest Dental Ctr., P.C.*, 480 F.3d 791, 805 (6th Cir. 2007).  The Sixth Circuit has held that the erroneous admission of a settlement was an abuse of discretion and caused substantial prejudice, justifying reversal and a remand for a new trial,

even when a limiting instruction was given. *Id.* (holding that "a limiting instruction read at any time during the trial" was "[in]sufficient to cure the wrongful admission"). The same is true here.

In addition, evidence of Defendants' DEA settlements and administrative actions, all of which related to conduct that occurred outside Ohio, was not relevant under Rule 402 and was not admissible under Rule 404(b), Rule 602, and Rule 802. Moreover, any probative value the evidence had (none) was substantially outweighed by the risk of unfair prejudice to Defendants. The Court should order a new trial that does not include evidence of DEA settlements and administrative actions involving Defendants.

### E. The Court's One-Sided Hearsay Errors Warrant a New Trial.

Hearsay without a hearsay exception must be excluded, *see* Fed. R. Evid. 802—but it was not in this trial when Plaintiffs were trying to introduce it at Defendants' expense. This Court's repeated errors from both sides—admitting hearsay that helped Plaintiffs and prohibiting what was not hearsay when it helped Defendants—warrant a new trial.

Over Defendants' objections, this Court allowed Plaintiffs to introduce hearsay on issues both small and large. *See, e.g.*, Dkt. 3992 at 25–27 (Oct. 4 trial tr.); Dkt. 4017 at 1343–44, 1468, 1495 (Oct. 12 trial tr., vol. 6); Dkt. 4132 at 6498 (Nov. 8 trial tr., vol. 25); Dkt. 4093 at 4366–67, 4370–74 (Oct. 27 trial tr., vol. 17) (permitting hearsay testimony from Kim Fraser on the community-wide impacts of opioids). But the Court repeatedly sustained similar objections by Plaintiffs, indeed even when the statements were not hearsay, barring similar statements or giving special instructions on the statements. Comparing the Court's hearsay rulings on two key witnesses highlights this inequity.

Consider first the Court's rulings on hearsay objections involving *Plaintiffs'* expert witness Dr. Anna Lembke. The Court freely allowed Lembke to act as a conduit for hearsay, even though the Federal Rules, the Supreme Court, and the Sixth Circuit all prohibit exactly that. As the

Supreme Court has put it, "experts are generally precluded from disclosing inadmissible evidence to a jury," and trial courts can and should "screen out experts who would act as mere conduits for hearsay by strictly enforcing the requirement[s]" of the Federal Rules of Evidence, specifically Rules 702 and 703. *Williams v. Illinois*, 567 U.S. 50, 80–81 (2012). "If an expert simply parrots another individual's out-of-court statement, rather than conveying an independent judgment that only incidentally discloses the statement to assist the jury in evaluating the expert's opinion, then the expert is, in effect, disclosing that out-of-court statement for its substantive truth"; the expert thereby becomes little more than a backdoor conduit for an otherwise inadmissible statement. *United States v. Rios*, 830 F.3d 403, 418 (6th Cir. 2016). It "falls to the [trial] court to ensure that 'the expert witness is truly testifying as an expert and not merely serving as a conduit through which hearsay is brought before the jury.'" *Saint-Gobain Autover USA, Inc. v. Xinyi Glass N. Am., Inc.*, No. 06-cv-2781, 2009 WL 10689369, at *2 n.1 (N.D. Ohio Oct. 23, 2009).

Rather than exercising this gate-keeping function, this Court allowed Lembke to be "used as a vehicle for circumventing the rules of evidence" on prejudicial hearsay. *Factory Mut. Ins. Co. v. Alon USA L.P.*, 705 F.3d 518, 524 (5th Cir. 2013). Plaintiffs had Lembke read exactly what certain Purdue documents said—they had her read out loud the entire content of the clearly inadmissible e-mails and other documents. Dkt. 4000 at 598, 601, 604, 621 (objecting). And these documents were not just hearsay; they were also prejudicial to Defendants: They suggested that Defendants collaborated with Purdue and other manufacturers to mislead prescribers, patients, and their own pharmacists about opioids and marketed opioids in ways that prolonged their use and increased the risk of negative patient outcomes.

Defendants objected because "the law in the Sixth Circuit is that you cannot use an expert to get an inadmissible document into evidence and that's in substance what they are doing." Dkt.

4000 at 600, 477, 592, 599, 621. But the Court overruled the objections, *e.g.*, *id.* at 603, believing that, simply because the documents were "shown to Ms. Lembke in preparation of her report and [because] she reviewed and she's commented and opined on" them, she "can testify [about] whatever she was given." *Id.* at 477–78; *see also, e.g.*, *id.* at 480–81 ("[S]he can testify about anything she was shown."), 600 ("If this is a document Dr. Lembke reviewed," she can read its contents aloud.). The Court thought, in other words, that Lembke could simply read hearsay into evidence so long as the hearsay documents themselves were not admitted. *Id.* at 621. So Lembke proceeded to "merely repeat[] information [s]he had read or heard," adding nothing to the hearsay. *United States v. Mejia*, 545 F.3d 179, 197–98 (2d Cir. 2008). This is precisely what the Federal Rules prohibit. *Id.*; *see* 29 Wright & Miller, Fed. Prac. & Proc. Evid. § 6273 (2d ed. Apr. 2021 update). This Court thus erred, impermissibly allowing Lembke to be "used as a mere conduit for testimonial hearsay" and "simply to parrot" out-of-court statements that were prejudicial to Defendants. *United States v. Scott*, 716 F. App'x 477, 485 (6th Cir. 2017).

But the Court did not act likewise with *Defendants'* witnesses on the stand. Take Susanne Hiland as an example. She was, as others were too, poised to testify about how some state Boards of Pharmacies refused to permit blanket refusals to fill—a fact that undercut Plaintiffs' theory of the case. As one of Defendants' counsel then explained, "This isn't hearsay because it goes to state of mind [not the truth of the matter asserted]; or if it is hearsay, then we have to strike from the record all the [Defendants'] settlements that were admitted into evidence" by Plaintiffs, which were admitted on the purported basis that "they provide notice and provide a state of mind." Dkt. 4109 at 5138 (Nov. 1 trial tr., vol. 20). But rather than staying neutral—and permitting testimony on what the Boards of Pharmacies said on the same basis the Court permitted the evidence of settlements—the Court ruled against Defendants, holding that their witnesses "can't relate the

19

contents of it.  That's hearsay."  *Id.*  So the Court allowed Plaintiffs' experts to read hearsay documents into evidence, and even admitted hearsay settlements when they hurt Defendants, but it did not "allow [Defendants' witnesses] to testify to the details" of conversations they had with the Boards of Pharmacy to show why they acted as they did and whether those actions were motivated by willful blindness—which is not hearsay.  *Id.* at 5140.  Indeed, it did not even allow Ms. Hiland to "get out two words" on the subject, constantly interrupting the examination rather than simply overruling Plaintiffs' baseless objections, *see id.* at 5147, and eventually sustaining Plaintiffs' objection when it mattered most, *see id.* at 5151.

To make matters worse, after admitting next to nothing on what the Boards of Pharmacies said, the Court—*sua sponte*—added a pro-Plaintiffs jury instruction on this issue.  In an instruction entitled "Employee Conversations," the Court singled out this important evidence (not any of Plaintiffs' evidence) for further limitation, with a targeted instruction that the jury "may not consider any official policy of any Board of Pharmacy."  Trial Tr. at 7073.  These one-sided, substantively erroneous hearsay rulings and instructions warrant a new trial.  *See, e.g.*, *United States v. Adams*, 722 F.3d 788, 833 (6th Cir. 2013) (reversing and ordering a new trial because the district court's rulings "paint an unfair picture of defendants").

### F.  Plaintiffs' Counsel's References to "Facts" Not in Evidence Warrants a New Trial.

Throughout the trial, Plaintiffs' counsel had a clear strategy for any instance in which he lacked admissible evidence on a topic:  He would simply manufacture that "evidence" by burying extra-record information into his questions and comments.  This happened throughout the seven-week trial and led to extreme prejudice.  By the end of the trial, the jury had every reason to believe that certain fundamental facts were established, even though there was, in fact, nothing in the record about those "facts."  This should lead to a new trial, because counsel's questions were "not

fair comment on the evidence or justified by the record." *N.Y. Cent. R.R. Co. v. Johnson*, 279 U.S. 310, 317 (1929).

One could search in vain for actual evidence on various critical matters, but all one would find on those matters is counsel's unsubstantiated questions *assuming the evidence to be true*. Take first whether there were doctors or prescribers who regularly issued prescriptions for non-medical use, a key link in Plaintiffs' chain of causation.  Plaintiffs never introduced evidence of any such bad prescribers—not in Lake or Trumbull Counties, not anywhere.  But Plaintiffs' counsel, over weeks and weeks of testimony, repeatedly *asserted* that specific prescribers were somehow "bad"—in questions, in comments, and at side bars.  For example, counsel simply stated that "Ohio doctors" have "problems," and then read off a list of names (none of which the witness recognized).  Dkt. 4078 at 3917–18, 4012–4017 (Oct. 25 trial tr., vol. 15); Dkt. 4090 at 4478 (Oct. 26 trial tr., vol. 16); Dkt. 4111 at 5582, 5598 (Nov. 2 trial tr., vol. 21); Dkt. 4115 at 5800 (Nov. 3 trial tr., vol. 22); Dkt. 4124 at 6299–6300, 6311 (Nov. 5 trial tr., vol. 24); Dkt. 4078 at 3916, 3918, 3917, 3939, 3395, 3991–4006 (Oct. 25 trial tr., vol. 15); Dkt. 3991 at 163, 165 (Oct. 4 trial tr., vol. 1); Dkt. 3995 at 296–99 (Oct. 5 trial tr., vol. 2); Dkt. 4106 at 4533, 4569–72, 4572–86, 4580–81, 4587–91, 4595 (Oct. 28 trial tr., vol. 18); Dkt. 4111 at 5582 (Nov. 1 trial tr., vol. 20); Dkt. 4124 at 6311–12 (Nov. 5 trial tr., vol. 24); Dkt. 3995 at 302–27, 355–56, 372, 421 (Oct. 5 trial tr., vol. 2); Dkt. 4000 at 458–70 (Oct. 6 trial tr., vol. 3), Dkt. 4050 at 2739 (Oct. 19 trial tr., vol. 11).  By the end of trial, the jury likely took it as a given that some of these prescribers were, in fact, issuing prescriptions for non-medically-appropriate uses.  But there was no *evidence* that there was this overwhelming number of "Ohio doctors" with such "problems.

On other issues, too, big and small, Plaintiffs' counsel asserted or assumed facts not in the evidence.  *See, e.g.*, Dkt. 4109 at 5190–91 (Nov. 1 trial tr., vol. 20); Dkt. 4132 at 6722 (Nov. 8

trial tr., vol. 25).  Plaintiffs' counsel, for example, asserted that one of the Defendant's stores was "one of the top volume stores for oxy in the entire nation."  Dkt. 4132 at 6745 (Nov. 8 trial tr., vol. 25).  Nothing in the record supported that, and it is simply not true.  Same when Plaintiffs' counsel falsely asserted that the data from McCann's report came from the Ohio Automated Rx Reporting System (OARRS).  *See, e.g.*, Dkt. 4124 at 6340–43, 6348–49 (Nov. 5 trial tr., vol. 24).  In what was typical fashion for Plaintiffs' counsel, counsel spoke as if *counsel* were the ultimate authority: "[T]his is [OARRS] dispensing data.  This is how much they actually dispensed.  You got it?"  *Id.* at 6305; *see also, e.g.*, Dkt. 4111 at 5280 (Nov. 1 trial tr., vol. 20); Dkt. 4132 at 6727 (Nov. 8 trial tr., vol. 25) (falsely asserting to the witness that "Walmart was four to five years late in allowing [] access to OARRS").

But not only is counsel *not* the authority, what counsel authoritatively said was often flat-out wrong.  And even when it was not unambiguously wrong, it was misleading or at least wrong in the context of this record.  Illustrating this point is Plaintiffs' counsel's suggestion that Lori Militello personally filled 900 "trinity" prescriptions from 2013 to 2018.  Counsel told Militello that he "tried to add up how many prescriptions over a six-year period . . . that you personally filled for the trinity."  Dkt. 4132 at 6745 (Nov. 8 trial tr., vol. 25).  And then counsel asked (if you could call it "asking"), "Would you be shocked to know [you did so] over 900 times"?  *Id.*  Militello did not "know the number of times," but by "asking" the question this way, counsel got the number he wanted in front of the jury.  And the number was misleading—among other reasons, Militello did not always fill all parts of the trinity, and in any event Plaintiffs' counsel's number appears nowhere in the evidentiary record.

Through these examples and more, Plaintiffs' counsel thus acted as his own witness—and got "evidence" in that he otherwise could not have.  Counsel's assertions and questions misled by

assuming facts not in evidence—which is improper, 1 McCormick On Evid. § 7 (8th ed. Jan. 2020 update); *see, e.g.*, *United States v. Medel*, 592 F.2d 1305, 1314 (5th Cir. 1979), and, to say the least, "not fair comment on the evidence or justified by the record," *Johnson*, 279 U.S. at 317. Counsel of course has "wide latitude [in] examination," but that "does not include . . . the insertion of suggested facts that do not exist." *Leavitt v. Scott*, 338 F.2d 749, 751–52 (10th Cir. 1964); *see, e.g.*, *Skogen v. Dow Chem. Co.*, 375 F.2d 692, 704 (8th Cir. 1967). Faced with "prejudicial misconduct" in counsel's questions, the Sixth Circuit has ordered new trials—even when the district court gave an instruction that "statements, questions, etc[.] of lawyers are not evidence." *E.g.*, *United States v. Payne*, 2 F.3d 706, 714 (6th Cir. 1993); *see also, e.g.*, *Pingatore v. Montgomery Ward & Co.*, 419 F.2d 1138, 1143 (6th Cir. 1969) ("Due to the intemperate argument of counsel for plaintiffs, the case is reversed and remanded for a new trial."). This Court should do likewise in this case.

### G. Defendants Are Entitled to a New Trial Due to the Court's Delegation to DEA and Other Witnesses to Define the Law.

It is the "sole province" of the Court to define for the jury what conduct can give rise to liability for a public nuisance. *United States v. Hill*, 167 F.3d 1055, 1069 (6th Cir. 1999) ("[I]t is within the sole province of the court 'to determine the applicable law and to instruct the jury as to that law.'") (quoting *In re Air Crash Disaster*, 86 F.3d 498, 523 (6th Cir. 1996)); *City of Hamilton v. Dilley*, 165 N.E. 713, 714 (Ohio 1920) ("Under all the authorities, it is the province of the court to define a nuisance and the province of the jury to determine whether the circumstances of the particular case come within the definition of a nuisance.").

For that reason, dating back to Track 1 of the MDL, Defendants have consistently asked this Court to define the law for the jury. *See, e.g.*, Dkt. 3449 at 7–8 (objecting to plaintiffs' proposed instruction because "it delegates legal determinations to the jury—most notably, which

23

precise violations can give rise to nuisance liability and what constitutes a violation—that by law must be made by this Court"); *id.* at 32–33 ("[L]egal determinations are for the Court, not the jury."); Dkt. 3550 at 2 ("The meaning of the statutes and regulations is a question of law that must be decided by this Court, and it would be error to leave that inquiry to the jury."); Dkt. 3616 at 2 ("[I]t is not the jury's province to interpret the purported duties that any statute or regulation imposes on Pharmacy Defendants.  Instead, it is the *Court's* duty to determine the elements of a violation and instruct the jury regarding those elements.") (emphasis in original); Dkt. 3793 at 31 ("[T]he Court, not the jury, must determine what 'unlawful conduct' could support public nuisance liability."); Dkt. 4043 at 1 ("[T]he jury must be instructed on the law in order to determine whether any Defendant engaged in 'unlawful' conduct.").  While the Court eventually agreed to give an instruction on the law governing dispensing, it left key legal terms undefined.  In addition, and throughout the trial, the Court allowed expert and fact witnesses to testify about the DEA's or their personal understanding of the law.  *See, e.g.*, Dkt. 4005 at 968–69 (trial tr., Oct. 7, vol. 4) (Plaintiffs' expert Carmen Catizone testifying on the meaning of "responsible persons" under the CSA); Dkt. 4017 at 1580–83 (Oct. 12 trial tr., vol. 6) (Plaintiffs' fact witness Joseph Rannazzisi testifying on the "knowingly" standard for dispensing); *id.* at 1591 (Plaintiffs' fact witness Rannazzisi on documentation requirements).

There is no question that this delegation of the Court's role prejudiced Defendants.  For example, in their proposed jury instructions, Defendants included a definition of "diversion," one of the most critical terms in the entire case.  Based on the CSA and DEA regulations, Defendants defined "diversion" as "the transfer of a controlled substance from legitimate 'medical, scientific, research, or industrial channels' (such as prescriptions written by a licensed medical prescriber for a legitimate medical purpose and in the usual course of the prescriber's professional practice), to

an illegal channel." Dkt. 3793-2 at 17 (citing 21 U.S.C. § 823(b)(1) and 21 C.F.R. § 1306.04(a)); *see also* Dkt. 4146-1 at 2. "Diversion" was used repeatedly in the Court's instructions and, most importantly, in Question 1 of the jury verdict form. Dkt. 4176 at 2. The Court nonetheless declined to instruct the jury on the definition of diversion, and the jury heard testimony from former DEA officials, experts, and other witnesses about that term. Catizone opined at length that "controlled substances laws and regulations require each defendant to maintain effective controls for a closed system of distribution and dispensing of opioids that guards against ***diversion***." Dkt. 4005 at 954 (trial tr., Oct. 7, vol. 4) (emphasis added). Rannazzisi, while no longer employed by DEA, was invited by counsel to provide *his* definition of the word "diversion," in order to "make sure we're clearly using it the way the DEA does." Dkt. 4017 at 1530 (Oct. 12 trial tr., vol. 6); *see also id.* at 1535–36 (repeating the definition and adopting a modified version proposed by counsel).

During deliberations, the jury submitted a question—one of just two questions in more than a week of deliberating, and the only substantive question: "Can we please have the DEA definition of diversion?" Dkt. 4157 at 7340 (Nov. 16 trial tr., vol. 29). The Court informed counsel that "[m]y intent is to simply say I cannot answer this question," adding that "[c]ertainly there's no definition of diversion in the instructions" and "[i]f there was, I would refer them to that instruction." *Id.* at 7340. Defendants reminded the Court that they had proposed a definition of "diversion" in their proposed instructions, but the parties agreed that there was no official "DEA definition" to provide the jury. *Id.* at 7342. The Court instructed the jury that it could not answer their question, telling them to "rely upon your collective memory of the testimony and the documents." *Id.* at 7342.

This delegation of the Court's role to define the law for the jury was improper, prejudiced Defendants (as evidenced by the jury's question), and requires a new trial.

**H.**     **Permitting Catizone to Testify Regarding His Understanding of the CSA's Obligations and About Red Flags Was Prejudicial And Warrants a New Trial.**

During Mr. Catizone's testimony, the Court improperly allowed him to offer irrelevant testimony about the supposed customs and standards of care imposed on chain pharmacies by the CSA and about the consequences of filling "red flag" prescriptions.  Both lines of testimony were improper and prejudicial.

**1.**  Allowing Catizone to testify about what the CSA required was of a piece with the Court's errors delegating rulings on the applicable legal standards to lay witnesses, rather than determining the law itself.  *See* Section II.G, *supra*.

With Mr. Catizone on the stand, the Court at first sustained an objection and prohibited Mr. Catizone from testifying about how the CSA has been interpreted in practice.  But then Plaintiffs' counsel told Mr. Catizone not to tell the jury "what's legally right" but to nevertheless explain how the CSA operates.  *See, e.g.*, Dkt. 4005 at 976 (trial tr., Oct. 7, vol. 4) (asking whether a pharmacy is responsible for its stores' operations and pharmacist conduct).  Defendants objected again, *id.*—this was, after all, just a different way for Plaintiffs to tell the jury what they believe the CSA requires—but the Court overruled the objection.

This testimony improperly usurped the role of the Court and was irrelevant.  The legal issue in contention at trial was whether Defendants violated statutes or regulations, and Mr. Catizone's "[t]estimony about customs, standard of cares in the industry . . . is not about what would statutes provide or regulations provide."  *Id.* at 976–77.  This line of questioning, too, led Mr. Catizone to testify about his understanding of the CSA—a legal matter solely for the judge to decide.  *Id.* at 977.  Once Mr. Catizone was permitted to "say what his understanding [of the CSA] is in his practice," *id.*, the jury listened to irrelevant testimony about the purported customs and standards of care Mr. Catizone contended applied to Defendants under the CSA.  It heard about Mr.

Catizone's understanding that "the CSA does not place unilateral responsibility on the pharmacist," *id.* at 980; that it was this understanding of the CSA that influenced the National Association of Boards of Pharmacy's draft model legislation, *id.* at 981; and that this understanding is important as a policy matter because it governs how the entire system works, *id.*

That the Court instructed the jury on the law at the end of the case does not solve this problem. For one thing, those instructions were erroneous. *See generally* Dkt. 4146; Section II.L, *infra*. More to the point, the Court instructed the jury that one way to find Defendants liable was to conclude that they "engaged in unlawful conduct." Trial Tr. 7071:25. And the Court delegated the question of what unlawful conduct means to witnesses. *See* Trial Tr. 7074:6–8.

The Court's error prejudiced Defendants. By permitting Mr. Catizone to "say what his understanding [of the CSA] is in his practice," Dkt. 4005 at 977 (trial tr., Oct. 7, vol. 4), the Court permitted him to instruct the jury on a hotly contested legal interpretation of the CSA: whether pharmacies could interfere with pharmacists' corresponding responsibility under the CSA. There is only one correct answer to that legal question and only the Court could provide it. Yet through Mr. Catizone's testimony, the Court rendered its "special legal knowledge" superfluous, supplanting it with witness testimony. *Cf. United States v. Zipkin*, 729 F.2d 384, 387 (6th Cir. 1984) (explaining that expert witness testimony about the law is superfluous because courts are better suited to answer legal questions). This Court should order a new trial in which it, not the witnesses, decide the law.

**2.** The Court separately erred, violating *Daubert*, by allowing Mr. Catizone to testify about the supposed consequences of diversion of red-flag prescriptions.

Before trial, the Court rightly agreed with Defendants that Catizone was unqualified to offer just that sort of opinion. Recognizing that Catizone was not a statistician or an epidemiologist,

27

the Court barred him from offering opinions on the consequences of filling "red flag" prescriptions. *See* Dkt. No. 3947 at 11 ("Plaintiffs have not shown Catizone is qualified to offer expert opinions regarding a statistical link or causal correlation between the number of 'red-flagged' prescriptions and actual diversion of opioids, or that 'red-flagged' prescriptions, *in fact*, were diverted at a higher rate than other prescription opioids."). But then, at trial, Catizone testified over objection that the dispensing of a "red flag" prescription can *and would* lead to diversion. Dkt. 4005 at 1041–42 (trial tr., Oct. 7, vol. 4). This violated *Daubert* (as the Court earlier held it would).

Expert evidence "can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993). That is why district courts function as gatekeepers that filter out expert evidence that "is unreliable and irrelevant" under Federal Rule of Evidence 702. *Id.* at 597; *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 792–93 (6th Cir. 2002). To offer expert testimony at trial, three requirements must be met: (1) the witness must be qualified; (2) the witness' testimony must be relevant; and (3) the witness' testimony must be reliable. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008); *Saint Gobain Autover USA, Inc. v. Xinyi Glass N. Am., Inc.*, 666 F. Supp. 2d 820, 830 (N.D. Ohio 2009). Under Rule 702, the testimony must be based on "sufficient facts or data"; the testimony must be the "product of reliable principles and methods," and the expert must have "applied the principles and methods [reliably] to the facts of the case." Fed. R. Evid. 702.

The Court itself held these requirements were not met with respect to Catizone's testimony on the effects of diversion of red-flag prescriptions. Catizone lacked any requisite expertise about whether his "red flag" methodologies actually identify illegitimate or diverted prescriptions. And yet Catizone testified at trial that it was foreseeable that the dispensing of a medication with an unresolved red flag could and would lead to diversion. *See* Dkt. 4005 at 1041–42 (trial tr., Oct. 7,

vol. 4); Catizone Dep. at 167:8–11, 167:12–18.[4]  Permitting this testimony prejudiced Pharmacy

Defendants by leaving the jury with the impression that if an unresolved "red flag" prescription

was dispensed, it was in fact diverted—a fact that lied at the heart of this case.  The Court should

go back to its *Daubert* opinion, and order a new trial without this prejudicial error.

**I.  The Court Exceeded Its Authority By Forcing Walmart to Get Brad Nelson to Testify.**

The Court exceeded its authority by coercing the remote testimony from *former* Walmart

employee Brad Nelson—a witness who is outside the Court's subpoena power and who testified

only because the Court ordered him to.  *See* Dkt. 4047 (Order Regarding Testimony of Brad

Nelson).

Nelson was set to testify by video deposition when Plaintiffs sought "permission to call

[him additionally] live via video as a trial witness."  Dkt. 4047 at 1.  Walmart repeatedly opposed

this request.  *See, e.g.*, Dkt. 4038.  Plaintiffs based their request on supposedly "highly relevant

documents produced in discovery after Mr. Nelson was deposed," Dkt. 4047 at 1, but those

documents were "substantively identical to documents they had in their possession well before

they questioned Mr. Nelson the first time," Dkt. 4038 at 1.  And, even more fundamental than that,

---

[4] *See* Dkt. 4008 at 1208–09 (Oct. 8 trial tr., vol. 5) (Catizone testifying and agreeing that just because a prescription has red flags and was dispensed does not mean it was diverted); Dkt. 4017 at 1429 (Oct. 12 trial tr., vol. 6) (Catizone agreeing that one of his 16 red flags for a prescription does not mean that the prescription was written for an illegitimate purpose or that the prescription dispensed was diverted); *see also* Dkt. 4008 at 1253, 1286 (Oct. 8 trial tr., vol. 5) (Catizone testifying that his red flag analysis did not consider information available to local pharmacists about repeat patients, and that he did not take into account anything outside of the prescriptions he reviewed); Dkt. 4017 at 1401 (Oct. 12 trial tr., vol. 6) (Catizone admitting that he neither looked at what percentage of a Defendants' controlled substance dispensing was paid for with cash nor what percentage of prescriptions reflected controlled substances versus non-controlled substances); *id.* at 1361–62 (Catizone testifying that he reviewed only information provided by Plaintiffs' counsel, he was willing to draw conclusions about the 2,000 prescriptions produced by Walgreens without looking at all the data that Walgreens had produced, and that he does not know what other data exist).

the Court lacked any authority to compel Nelson to testify:  he is a "former employee who is outside of the Court's [] subpoena power to appear in court," and he could not otherwise be ordered to appear.  *Id.* at 6.  After all, a court may force a former employee to testify at trial only when the former employee lives within 100 miles of the courthouse, *see* Fed. R. Civ. P. 45(c)(1)(A), and Nelson—all agree—lives far more than 100 miles away.

The Court acknowledged this "hundred-mile limit" on securing Nelson's live testimony, but came up with a way to "get around [it]."  Tr. 2408.  At first the Court said it would simply "order" Walmart to "arrange to have him brought [to Cleveland] on Walmart's private jet.  That will get around the hundred-mile limit."  *Id.* at 2408–09.  Initially, the Court was emphatic on this point:  When Walmart strenuously objected to this *ultra vires* action, *see id.*, the Court reiterated that bringing Nelson to testify live was an "order," and that if Walmart did not comply, the Court would "have to consider draconian sanctions," *id.* at 2409.  The Court went on:  "Walmart's a big company.  They can get anyone anywhere in prompt order, so I think that's the way to do it."  Tr. 2408–09.  And if Walmart did not comply with the Court's order, the Court again threatened "something a lot more draconian."  *Id.* at 2413.  "You want to test me, test me," the Court warned, *id.*; "if I get any pushback, trust me, I'll just have him here, okay?"  *Id.* at 2523.

Eventually, rather than order Walmart to use a private jet to bring Nelson to Cleveland, the Court forced Nelson to testify live, but *remotely*.  While the Court continued to "believe [it has] the authority to make him come here [to Cleveland]," it settled on remote, live testimony "rather than having a big brouhaha about" making him come to Cleveland.  *Id.* at 2520.  Walmart objected on the record and in writing to this plan as well, *see, e.g.*, *id.* at 2524—again because the order was *ultra vires*—but the Court still "ORDERED [Nelson] to testify via live video" and "ORDERED

30

[Walmart] to ensure timely service of this order upon Mr. Nelson" and "to make the necessary arrangements for this testimony."  Dkt. 4047 at 2.

The Court had no power to enter that order.  Although the Court suggested two potential sources of authority for its order—Rule 43(a) and its inherent authority to sanction a party—neither suffices.

*First*, the Court expressly grounded its order in Civil Rule 43(a), *see* Dkt. 4047 at 1, but that Rule does not give the Court vast nationwide power over non-party witnesses.  Rule 43(a) provides that, "[a]t trial, the witnesses' testimony [generally] must be taken in open court. . . .  For good cause in compelling circumstances and with appropriate safeguards, the court may permit testimony in open court by contemporaneous transmission from a different location."  The Court read this Rule to mean that it could order remote testimony of any witness in the country, regardless of the limits on its subpoena power, whenever there "exist good cause and compelling circumstances for [a witness] to testify by video, rather than in person."  Dkt. 4047 at 1.

But the Rule means no such thing.  Most critically, "[t]here is nothing in the language of Rule 43(a) that permits [a] court to compel the testimony of an individual who is indisputably outside the reach of its subpoena power."  *Lea v. Wyeth LLC*, No. 03-CV-1339, 2011 WL 13195950, at *1 (E.D. Tex. Nov. 22, 2011).  Brad Nelson is outside the reach of this Court's subpoena power—and thus Rule 43(a) does not permit the Court to compel his testimony.  *Id.* Court after court, all around the country, have so held, limiting Rule 43(a)'s application to when the Court already has the power to subpoena someone to testify in person.  *See, e.g.*, *Singh v. Vanderbilt Univ. Med. Ctr.*, No. 17-cv-0400, 2021 WL 3710442 (M.D. Tenn. Aug. 19, 2021); *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, No. 17-MD-2785-DDC-TJJ, 2021 WL 2822535, at *4 (D. Kan. July 7, 2021); *Broumand v. Joseph*, 522 F. Supp. 3d

8, 23–24 (S.D.N.Y. 2021); *Black Card LLC v. Visa USA Inc.*, No. 15-CV-27-SWS, 2020 WL 9812009, at *3 (D. Wyo. Dec. 2, 2020) (relying in part on the Advisory Committee notes to hold that "live video testimony under Rule 43 [is] subject to the same geographic limits as a trial subpoena under Rule 45"). Indeed, courts have specifically refused to compel the remote testimony of former employees outside the courts' subpoena reach. *See, e.g.*, *EpiPen*, 2021 WL 2822535, at *4; *Lea*, 2011 WL 13195950, at *1; *Cross v. Wyeth Pharma., Inc.*, No. 06-cv-429-T-23AEP, 2011 WL 2517211 (M.D. Fla. June 23, 2011). This Court had no power to subpoena Nelson to come to Cleveland, which means it could not order his remote testimony either.

But even if the Court possessed the power to order Nelson's remote live testimony, the conditions for exercising that power were not met: There was no "good cause" or "compelling circumstances" to have Nelson testify remotely. The only such circumstance the Court offered was that Nelson "resides in Arkansas." Dkt. 4047 at 1. But if residing over 100 miles from the Court were "compelling" enough to circumvent the general rule requiring in-person testimony, the exception would swallow the rule. Rather, the "good cause" needed under Rule 43(a) must be something "unexpected," such as accident or illness. *Stone Tech. (HK) Co. v. GlobalGeeks, Inc.*, No. 20-cv-23251, 2021 WL 2940256, at *2 (S.D. Fla. July 13, 2021); *see* Rule 43(a), Advisory Committee Notes. When, instead, the party "could reasonably foresee the circumstances offered to justify transmission of testimony" remotely, courts do not permit such testimony, especially if (as here) the party has a video deposition it can play. *See, e.g.*, *Off. Comm. of Unsecured Creditors v. Calpers Corp. Partners LLC*, No. 18-cv-68-NT, 2021 WL 3081880, at *4 (D. Me. July 20, 2021). Rule 43(a), at bottom, did not give the Court the power it thought it did.

*Second*, aside from Rule 43(a), the Court hinted that it was ordering Nelson's testimony as a sanction for Walmart's supposed failure to produce certain Nelson-related documents. *See* Dkt.

32

4047 at 1; Dkt. 4041 at 2522–23 (Oct. 18 trial tr., vol. 10). But as an initial matter, there were no discovery failures by Walmart: Walmart produced all the documents relevant to Lake and Trumbull Counties before Nelson's deposition, and it produced nearly all the documents relevant to other parts of the country after this Court expanded the scope of discovery to cover nationwide documents. Only thirty Nelson documents were produced after trial began, and nearly all of those were duplicates of documents produced before Nelson's deposition. Walmart engaged in no discovery misconduct, and there was no basis for any sanction. *See* Dkt. 4038 at 2–3.

At any rate, to the extent that the Court tried to "get around the hundred-mile limit" as a sanction, that too would be impermissible. As the Seventh Circuit has held, it is inappropriate for a Court to exceed its subpoena authority as a sanction for an employer's alleged discovery violation. *See In re Petition of Boehringer Ingelheim Pharms., Inc.*, 745 F.3d 216, 218–19 (7th Cir. 2014) (granting mandamus and vacating discovery sanction requiring employees of German company to appear in New York for deposition when it lacked subpoena power to do so). The Seventh Circuit held that a discovery sanction forcing German employees (not even, as here, *former* employees) to be deposed in New York, as opposed to Amsterdam as planned, was "a judicial usurpation of power or a clear abuse of discretion," and rhetorically asked if "using an employer's leverage over his employees [is] a proper means of circumventing limitations" on the court's subpoena powers. *Id.* at 219; *see also id.* (criticizing district court for allowing employees "to be punished for the sins of their employer" as part of discovery sanction, particularly where the employees were not executives). The argument is even stronger here for at least two reasons. First, Nelson is a former, non-executive employee whom Plaintiffs have already had a chance to depose. And second, during Nelson's live testimony, Plaintiffs questioned Nelson primarily about documents produced before Nelson's deposition—12 of the 18 documents were pre-deposition

documents—which led this Court to walk back its sanction and order that half the time from Nelson's testimony be charged to Plaintiffs. *See* Dkt. 4078 at 4025–27 (Oct. 25 trial tr., vol. 25). Either way, therefore, this Court lacked the authority to order Brad Nelson to testify.

> **J.** **Permitting Plaintiffs to Reference the DOJ Complaint Against Walmart Was Wrong and Warrants a New Trial.**

This Court repeatedly and rightly recognized that allowing the DOJ Complaint against Walmart to come in would be improper and unduly prejudicial. *See, e.g.*, Dkt. 3546 at 27–29, Dkt. 3052 at 11–13, 15–16, 17–18; Dkt. 3058 at 11–13, 15–17; Dkt. 3546 at 11. After all, "it is a basic principle of law that an indictment is not evidence." *Kentucky v. Long*, 837 F.2d 727, 740 n.5 (6th Cir. 1988). Indictments and complaints are "inadmissible hearsay," *Gritton v. Disponett*, No. 05-cv-75, 2007 WL 3407459, at *10 (E.D. Ky. Nov. 14, 2007), *aff'd*, 332 F. App'x 232 (6th Cir. 2009); they have "no probative value," *United States v. Yarbrough*, 352 F.2d 491, 493 (6th Cir. 1965); and they "are unfairly prejudicial," *Adams*, 722 F.3d at 831. This Court thus correctly "exclude[d] references to criminal investigations and indictments that did not result in a conviction." Dkt. 3058 at 15–17. The Court even went further than that, holding that *settlements* in which a defendant "did not admit" any violations lack significant "probative value" and, at any rate, any "attenuated" probative value would be "substantially outweighed by the danger of unfair prejudice." Dkt. 3990 at 2 (emphasis omitted). A *mere* complaint would be that much less probative and that much more prejudicial. So the Court correctly barred Plaintiffs from raising the DOJ Complaint against Walmart at trial.

But when it mattered most, the Court let this "evidence" in, allowing Plaintiffs' counsel to reference it and question Walmart's witnesses about it. The prejudice was palpable. How could a jury hear about an investigation and formal complaint by the U.S. Department of Justice and *not* think it supports Plaintiffs' view of the case? *See Adams*, 722 F.3d at 831.

The Court justified its decision on the ground that Walmart "opened the door" to the DOJ Complaint. But Walmart did no such thing, and regardless, this would not justify the Court's actions.

A brief background is in order. Plaintiffs were not satisfied with the Court's pretrial ruling barring the DOJ Complaint, and they eventually saw an opportunity to get this "evidence" in. Walmart's corporate representative Susanne Hiland answered a benign question about Walmart's "business culture"—it is one of "service to the customer, respect for the individual, and striving for excellence; all of that based in a foundation of integrity," she said. Dkt. 4109 at 5077 (Nov. 1 trial tr., vol. 20). These are statements that, if true, any defendant being sued for massive civil liability would offer through its corporate witness. Nonetheless, at this, Plaintiffs' counsel asked for a sidebar. "[W]e believe that the door is opening to the Department of Justice complaint that was filed in Texas that you have excluded from this case," counsel told the Court, "because [the Complaint] bears directly on the issue of their corporate culture and whether or not they in fact have a foundation of integrity." *Id.* at 5078. How a mere complaint, with only unproven allegations, undermines testimony of a culture of integrity, counsel did not say. Yet this Court adopted wholesale Plaintiffs' argument: "You want to put your corporate culture and integrity in play, then I'll let the plaintiffs bring out whatever they want," the Court declared. *Id.* at 5079. When Walmart pointed out the extreme prejudice in letting Plaintiffs bring in "whatever they want," including a complaint brought by the Department of Justice, the Court retorted, "Well, you started it." *Id.* The Court at first struck Hiland's answer but eventually allowed Plaintiffs to discuss the DOJ Complaint when Hiland testified, unprompted by any question, that Walmart's "corporate culture" was "focused on patient safety and access." *Id.* at 5079, 5116.

35

As Walmart's counsel said then, the Court's decision to allow "mention of the DOJ lawsuit is clear error." *Id.* at 5118. Even assuming Walmart opened the door to rebuttal evidence of its past "bad acts," *unproven* allegations in a complaint are not that. Even if the door was open to challenging Walmart's character, "unproven[] accusations" are "simply . . . not relevant to that subject." *Beck v. Haik*, 377 F.3d 624, 642 (6th Cir. 2004), *overruled on other grounds by Adkins v. Wolever*, 554 F.3d 650 (6th Cir. 2009); *see United States v. King*, 378 F.2d 359, 360 (6th Cir. 1967); *Yarbrough*, 352 F.2d at 493. Were it otherwise, and if parties could use unproven accusations through an open door, courts would "risk subverting the doctrine of opening the door 'into a rule for injection of prejudice.'" *Valadez v. Watkins Motor Lines, Inc.*, 758 F.3d 975, 982 (8th Cir. 2014).

What is more, even if unproven allegations *were* somehow probative on this subject, the prejudice of a jury hearing that the Department of Justice has sued Walmart for the same underlying conduct at issue in this case greatly outweighs any probative value. *See* Fed. R. Evid. 403. When evidence has minimal probative value and is "inherently prejudicial because a jury could easily have misunderstood [it]," "the district court's admission of the [evidence] under Rule 403 was an abuse of discretion"—even when Defendants arguably "opened the door." *Stockman*, 480 F.3d at 798–99.

This Court's error in permitting evidence of the DOJ Complaint does not prejudice Walmart alone. Throughout the trial, Plaintiffs lumped the Defendants together, accused them of the same dispensing-related failures and repeated the same theories and themes about them. Not only that, but the use of the DOJ Complaint to improperly buttress Plaintiffs' view and theory of the case necessarily prejudices every Defendant. For all of these reasons, this error prejudiced

Defendants and warrants a new trial.  *See, e.g.*, *id.* (ordering a new trial because of "inherently prejudicial" evidence admitted through an allegedly open door).

### K.    The Court Should Order a New Trial That Excludes Extraterritorial Evidence.

The Court also prejudicially erred by admitting an extensive amount of extraterritorial evidence—an error that had its roots before the trial, when this Court denied Defendants' motion in limine on the subject.  *See* Dkt. 3546 at 32–33.  Defendants moved to bar "evidence, testimony, or argument concerning alleged conduct that occurred outside of [Plaintiff] Counties," unless Plaintiffs could establish "a foundation showing a specific nexus connecting th[e] extraterritorial conduct to harm suffered by one of the Counties and a specific Defendant's [] conduct."  Dkt. 3421 at 1.  "Without an evidentiary nexus to Plaintiffs' claims," Defendants explained, Plaintiffs' extraterritorial-conduct evidence would be "irrelevant to the facts at issue in this trial, *see* Fed. R. Evid. 401, 402, inadmissible 'other bad acts,' *see* Fed. R. Evid. 404(b), and unfairly prejudicial, *see* Fed. R. Evid. 403."  *Id.*; *see id.* at 1–5.  But the Court rejected Defendants' request, holding that extraterritorial evidence "is relevant to demonstrate the national scope of the opioid crisis" and could be relevant to national policies also in place in Northeast Ohio.  Dkt. 3546 at 32.

Among other problems with this holding, the "national scope of the opioid crisis" was not on trial.  Defendants' conduct in Lake and Trumbull Counties was.  Yet by allowing "national," extraterritorial evidence, the Court opened the door to the kind of improper comment we heard from Plaintiffs' counsel at the end of the case:  that the jury was deciding something "national."  Dkt. 4153 at 7082–83 (Nov. 15 trial tr., vol. 15).  The Track 3 trial, between two small Ohio Counties and three companies operating there, was not supposed to be *national*.

Another problem is that Plaintiffs' extraterritorial evidence admitted at trial far exceeded the Court's rationales for allowing that evidence.  Whether it was Defendants' out-of-state

settlements (*e.g.*, P-42147-A, Holiday CVS decision and order), blanket refusal decisions for out-of-state physicians (*e.g.*, P-14540, Email RE: Refusal to Fill-store 20), or suspicious controlled substance orders placed by non-County stores (*e.g.*, P-08182, High Quantity Stores 682971), the extraterritorial evidence the Court admitted was not limited to national policies also in place in Lake and Trumbull Counties. Without a nexus to the specific Counties, none of this national evidence should have come in. *See, e.g.*, *In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 402–03 (3d Cir. 2015). All it did was "inflame[] [and] confuse[] the jury," *Stern v. Shouldice*, 706 F.2d 742, 750 (6th Cir. 1983)—making the jury think it could, or even *should*, hold Defendants liable for what they did anywhere in the country (especially when Plaintiffs' counsel was permitted to suggest the jury should do just that). This Court should order a new trial that is about Defendants' conduct in or with a nexus to Plaintiffs' Counties, not one about Defendants' national conduct.

## L. The Court Should Order a New Trial Because the Jury Instructions It Gave (and Refused to Give) Tainted the Jury's Verdict.

Defendants objected to the Court's erroneous jury instructions and verdict form every chance they had, *e.g.*, Dkt. 4146. *See* Fed. R. Civ. P. 51(b)(2), (c). Defendants formally object again. *See Libbey-Owens-Ford Co. v. Ins. Co. of N. Am.*, 9 F.3d 422, 427 (6th Cir. 1993).

For the reasons detailed in Defendants' previous filings, the Court's instructions were wrong on many levels, and they caused prejudice to Defendants. The Court left out case-specific instructions it should have given, *see, e.g.*, Dkt. 4146-1; gave specific instructions it should not have given, *see, e.g.*, Dkt. 4146-2; and erred in the instructions that all agree were necessary, *see, e.g.*, *id.* at 21, 24 (unlawful dispensing and causation). For example, the Court improperly instructed the jury on core issues related to causation and intentional conduct. As a whole, the instructions failed to "provide the jury with sufficient guidance concerning the issues to be tried"

and were confusing, misleading, and prejudicial—which "constitutes grounds for a new trial." *Fryman v. Fed. Crop Ins. Corp.*, 936 F.2d 244, 248 (6th Cir. 1991); *see Bridgeport Music, Inc. v. UMG Recordings, Inc.*, 585 F.3d 267, 273–74 (6th Cir. 2009). And again here, the Court's errors tilted one way only—away from Defendants and toward Plaintiffs, making it easier for the jury to find for Plaintiffs. This made them prejudicial as well, because a jury, applying the instructions, would have little choice but to find for Plaintiffs. *See, e.g.*, *Mia. Valley Fair Hous. Ctr., Inc. v. Connor Grp.*, 725 F.3d 571, 580–81 (6th Cir. 2013).

Similarly, the verdict form asked the jury off-point questions designed to manufacture a verdict for Plaintiffs. For example, the first question on the verdict form asked only if there was a nuisance caused by "oversupply" and "diversion" of opioids in Plaintiff counties. Of course, large amounts of opioid medications prescribed for medical use and dispensed in compliance with the CSA can hardly form the basis of nuisance liability. Dkt. 4146-2 at 35. Nor did the Court separate out whether the jury found that Defendants (1) unlawfully and/or (2) intentionally and culpably caused any such nuisance. The causation question on the verdict form was similarly flawed, as was the fact that the Court allowed the jury to find Defendants liable based on intentional conduct that was lawful under the CSA. *See, e.g.*, *id.* at 36–37.

As the Sixth Circuit has often done with similarly erroneous, confusing, misleading, and prejudicial jury instructions, *see, e.g.*, *Connor Grp.*, 725 F.3d at 580–81, this Court should order a new trial, *see also, e.g.*, *Jones v. Federated Fin. Rsrv. Corp.*, 144 F.3d 961, 966–67 (6th Cir. 1998).

### M.  The Court's Many Errors Combined To Make this Trial Fundamentally Unfair.

If the prejudice from each of these many enumerated errors does not individually warrant a new trial, "the cumulative effect of the [multiple] errors" certainly does. *United States v. Knox*, 17 F. App'x 353, 356 (6th Cir. 2001); *see Mich. First Credit Union v. Cumis Ins. Soc'y, Inc.*, 641

F.3d 240, 251 (6th Cir. 2011) (same in the civil context). The Court's errors—not inconspicuously cutting *against* Defendants—include the ones outlined above. But they also include the many errors before and during the trial: the motions in limine the Court denied; the objections the Court overruled throughout trial; and the misconduct the Court let Plaintiffs' counsel get away with. These errors include, for example, the Court permitting, over objections, former DEA official Joseph Rannazzisi to give an improper and undisclosed expert opinion that Defendants were "rogue pharmacies" that was inadmissible not only in its own right, but also due to the fact that it was based solely on evidence that was irrelevant under Rule 402 and prejudicial under Rule 403 (DEA enforcement actions involving Defendants pharmacies located outside Ohio). Dkt. 4023 at 1810–11 (Oct. 13 trial tr., vol. 7).

These errors often affected all Defendants at once. But even the errors that seemingly affected only one Defendant in reality prejudiced them all. The Court and the jury saw Defendants as one, and when one was prejudiced, all were prejudiced. This prejudice, when combined across Defendants and across errors, "necessitates a new trial." *Adams*, 722 F.3d at 832 (collecting cases and holding that even when "no one of the six identified errors may warrant reversal on its own, the cumulative effect of these errors rendered defendants' trial fundamentally unfair").

In this important case, Defendants did not get a fair shake. "It is clear that the cumulative effect of the conduct of the [trial] . . . was to arouse prejudice against the defendant[s] to such an extent that [they were] denied fundamental fairness." *Walker v. Engle*, 703 F.2d 959, 968 (6th Cir. 1983). Defendants deserve a new trial, free of error and prejudice. This Court should order one.

## CONCLUSION

For these reasons, if the Court does not grant judgment as a matter of law in favor of Defendants, it should order a new trial.

Dated:  December 21, 2021              Respectfully submitted,

/s/  John M. Majoras
John M. Majoras
Benjamin C. Mizer
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Phone: (202) 879-3939
Fax: (202) 626-1700
E-mail: jmmajoras@jonesday.com
E-mail: bmizer@jonesday.com

Tina M. Tabacchi
Tara A. Fumerton
JONES DAY
77 West Wacker
Chicago, IL 60601
Phone: (312) 269-4335
Fax: (312) 782-8585
E-mail: tmtabacchi@jonesday.com
E-mail: tfumerton@jonesday.com

*Counsel for Walmart Inc.*

/s/ Eric R. Delinsky
Eric R. Delinsky
Alexandra W. Miller
Graeme W. Bush
Paul B. Hynes, Jr.
ZUCKERMAN SPAEDER LLP
1800 M Street NW, Suite 1000
Washington, DC  20036
Tel: (202) 778-1800
E-mail: edelinsky@zuckerman.com
E-mail: smiller@zuckerman.com
E-mail: gbush@zucerkman.com
E-mail: phynes@zuckerman.com

Counsel for CVS Pharmacy, Inc., Ohio
CVS Stores, L.L.C., CVS TN Distribution,
L.L.C., CVS Rx Services, Inc., and CVS
Indiana, L.L.C.

*/s/ Kaspar J. Stoffelmayr*
Kaspar J. Stoffelmayr
Brian C. Swanson
Katherine M. Swift
Sharon Desh
Sten Jernudd
Bartlit Beck LLP
54 West Hubbard Street
Chicago, IL 60654
Tel: (312) 494-4400
Fax: (312) 494-4440
kaspar.stoffelmayr@bartlitbeck.com
brian.swanson@bartlitbeck.com
kate.swift@bartlitbeck.com
sharon.desh@bartlitbeck.com
sten.jernudd@bartlitbeck.com

Alex J. Harris
BARTLIT BECK LLP
1801 Wewatta Street, 12th Floor
Denver, CO 80202
Tel: (303) 592-3100
Fax: (303) 592-3140
alex.harris@bartlitbeck.com

*Counsel for Walgreens Boots Alliance, Inc.,*
*Walgreen Co., and Walgreen Eastern Co., Inc.*

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that the foregoing document was served via the Court's

ECF system on all counsel of record on December 21, 2021.


/s/  John M. Majoras
John M. Majoras
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
Phone: (202) 879-3939
Fax: (202) 626-1700
E-mail: jmmajoras@jonesday.com

*Counsel for Walmart Inc.*