# EXHIBIT C

As of: December 22, 2021 6:14 PM Z

# N.D. ex rel. Stenehjem v. Purdue

District Court of North Dakota, Burleigh County

May 10, 2019, Decided

Case No, 08-2018-CV-01300

**Reporter**
2019 N.D. Trial Order LEXIS 3 *

State of North Dakota Ex Rel. Wayne Stenehjem, Attorney General, Plaintiff, v. Purdue Pharma L.P.; Purdue Pharma, Inc., The Purdue Frederick Company, Inc., and Does 1 through 100, inclusive, Defendants.

## Core Terms

opioids, labeling, manufacturer, nuisance, alleges, warning, preempted, preemption, deceptive, prescription, medications, consumer fraud, public nuisance, addiction, patients, state law, argues, prescribing, causation, pleadings, federal law, misrepresentation, marketing, cases, regulations, summary judgment, clear evidence, Practices, reimburse, benefits

**Judges:**  [*1] James S. Hill, District Judge.

**Opinion by:** James S. Hill

## Opinion

### ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

### INTRODUCTION

P1 This matter is before the Court on the Defendants', Purdue Pharma L.P., Purdue Pharma Inc., and The Purdue Frederick Company Inc. (collectively "Purdue"), Motion to Dismiss for failure to state a claim. The State has sued Purdue in this matter seeking to essentially hold it liable for the impact of opioid overuse and addiction in North Dakota. The State asserts claims for alleged violations of the North Dakota Unlawful Sales or Advertising Practices statute, N.D. C. C. § 51-15-01 *et seq.* (Consumer Fraud law) (Counts 1 & 2) and the nuisance statute, N.D.C.C. § 42-01-01 *et seq.* (Count 3).

P2 In its Motion, Purdue argues the present case should be dismissed on the pleadings for various reasons, including the following:

1. The State's claims fail as a matter of law because it seeks to impose liability for Purdue's lawful promotion of FDA-approved medications for an FDA-approved use, i.e. the claims are preempted by federal law.

2. The State does not plead the essential elements of causation.

3. The State's statutory public nuisance claim fails because North Dakota courts have not extended that statute to cases involving the sale of goods, and, even [*2] if it did apply, the State does not allege that Purdue unlawfully interfered with a public right in North Dakota.

P3 The Plaintiff, the State of North Dakota ex rel. Wayne Stenehjem, Attorney General ("the State"), resists the Motion arguing they have sufficiently pled their claims and Purdue's arguments mischaracterize the claims.

P4 A hearing was held on the Motion on February 26, 2019. Parrell Grossman and Elfin Alm appeared on behalf of the State. Will Sachse appeared and argued on behalf of Purdue. Robert Stock also appeared on behalf of Purdue.

P5 The Court has extensively reviewed the parties' briefing on the present Motion, on more than one occasion, and has reviewed the oral arguments presented by both parties. The Court has also extensively reviewed the State's Complaint in this matter, paying careful attention to the allegations detailed therein, following oral argument.

### FACTS

P6 The facts underlying this Action are detailed at length in the Complaint [DE 2], and in the parties' respective briefing on the present Motion to Dismiss [DE 13 & DE 34]. The Court will not restate the facts as outlined by the parties, but incorporates those facts by reference into this Order.

P7 The State [*3]  of North Dakota filed this action against drug manufacturer, Purdue Pharma, alleging the opioid epidemic and a public health crisis in North Dakota were

caused, in large part, by a fraudulent and deceptive marketing campaign intended by Purdue to increase sales of its opioid products. The State alleges it has paid and will continue to pay expenses for the medical care and law enforcement response of North Dakota's population due to overuse, addiction, injury, overdose, and death. The State seeks damages, injunctive relief, and civil penalties.

P8 The State's Complaint asserts three causes of action: (1) violations of North Dakota's Consumer Fraud Law — Deceptive Practices (N.D.C.C. 51-15-01 et seq.); (2) violation of North Dakota's Consumer Fraud Law — Unconscionable Practices (N.D.C.C. 51-15-01 et seq.); and (3) statutory public nuisance.

P9 Purdue now seeks to dismiss the State's claims as a matter of law.

### LEGAL STANDARD

P10 A motion to dismiss a complaint under N.D.R.Civ.P. 12(b)(6) test the legal sufficiency of the statement of the claim presented in the complaint. *Ziegelmann v. Daimler Chrysler Corp.*, 2002 ND 134, ¶ 5, 649 N.W.2d 556. "Because determinations on the merits are generally preferred to dismissal on the pleadings, Rule 12(b)(vi) motions are viewed with disfavor." *Id.* A complaint "should not be dismissed unless it is disclosed [*4] with certainty the impossibility of proving a claim upon which relief can be granted." *Id.* A court's scrutiny of the pleadings should be deferential to the plaintiff. *Id*

P11 The Court notes at the outset that Purdue filed the present Motion as a Motion to Dismiss under Rule 12(b)(6). However, both parties have cited to multiple documents and sources outside of the pleadings and each relies heavily on these sources in their briefing. "When a motion to dismiss for failure to state a claim upon which relief can be granted is presented before the court and 'matters outside the pleadings are presented to and not excluded by the court, the motion should be treated as one for summary judgment and disposed of as provided in Rule 56.'" *Podrygula v. Bray*, 2014 ND 226, ¶7, 856 N.W.2d 791 (quoting *Livingood v. Meece*, 477 N.W.2d 183, 187 (ND. 1991)).

P12 The Court does not intend to ignore or exclude the materials cited by the parties and incorporated in their briefing, which are technically outside the pleadings. Based on the parties framing of the issues, both in their briefing and at the hearing on the present Motion, and based upon Purdue's reliance on matters technically outside the pleadings, the Court will treat Purdue's Motion as a motion for summary judgment.

P13 Rule 56(c) of the North Dakota Rules of Civil Procedure directs a trial court to enter summary judgment [*5] "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

P14 The standard for summary judgment is well established:

> Summary judgment is a procedural device for the prompt resolution of a controversy on the merits without a trial if there are no genuine issues of material fact or inferences that can reasonably be drawn from undisputed facts, or if the only issues to be resolved are questions of law. A party moving for summary judgment has the burden of showing there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. . . . [W]e must view the evidence in the light most favorable to the party opposing the motion, and that party will be given the benefit of all favorable inferences which can reasonably *be* drawn from the record.

*Golden v. Sill Energy Co.*, 2013 ND 17, ¶ 7, 826 N. W.2d 610, 615 (quoting *Hamilton v. Woll*, 2012 ND 238, ¶ 9, 823 N.W.2d 754.

P15 "Although the party seeking summary judgment bears the initial burden of showing there is no genuine issue of material fact, the party opposing the motion may not simply rely upon the pleadings, but must present competent admissible evidence [*6] which raises an issue of material fact." *Black v. Abex Corp.*, 1999 ND 236, ¶ 23, 603 N.W.2d 182. "Summary judgment is appropriate against a party who fails to establish the existence of a factual dispute on an essential element of her claim and on which she will bear the burden of proof at trial." *Id.*

### ANALYSIS

#### A. Federal Preemption

P16 Purdue first argues the State's claims are improper because they seek to impose liability for lawful promotion of FDA-approved medications for an FDA-approved use. Specifically, Purdue argues that the FDA has approved opioid medications for long-term treatment of chronic non-cancer pain, and Purdue's promotion is consistent with the FDA-approved indications and labeling decisions. Because their promotion/marketing is consistent with FDA-approved labeling decisions and because the FDA has previously declined to alter the labeling and/or warnings, Purdue argues the State's claims are preempted.

P17 The Supremacy Clause of the United States Constitution makes federal law the supreme law of the land, and state law that conflicts with federal law is without effect. *Home of Economy v. Burlington N. Santa Fe R.R.*, 2005 ND 74, ¶ 5, 694 N.W.2d 840. Whether claims are preempted is a question of law that may be resolved at the pleading stage. *See NoDak Bancorporation v. Clarkson*, 471 N.W.2d 140, 142 (ND. 1991). The North Dakota Supreme Court has described when federal law preempts state law under the Supremacy [*7] Clause:

> First, Congress can define explicitly the extent to which its enactments pre-empt state law. Pre-emption fundamentally is a question of congressional intent, and when Congress has made its intent known through explicit statutory language, the courts' task is an easy one.
>
> Second, in the absence of explicit statutory language, state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively. Such an intent may be inferred from a "scheme of federal regulation ... so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it," or where an Act of Congress "touch[es] a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." Although this Court has not hesitated to draw an inference of field pre-emption where it is supported by the federal statutory and regulatory schemes, it has emphasized: "Where ... the field which Congress is said to have pre-empted" includes areas that have "been traditionally occupied by the States," congressional intent to supersede state laws must be 'clear [*8] and manifest.'"
>
> Finally, state law is pre-empted to the extent that it actually conflicts with federal law. Thus, the Court has found pre-emption where it is impossible for a private party to comply with both state and federal requirements, or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Home of Economy v. Burlington N. Santa Fe R.R.*, 2005 ND 74, at ¶ 5.

P18 "The United States Supreme Court's framework for analyzing preemption claims starts with the assumption that Congress does not intend to displace state law." *Id.* at ¶ 6. "The assumption that Congress did not intend to displace state law is not triggered when a state regulated in an area where there has been history of significant federal presence." *Id.* (citing *United States v. Locke*, 529 U.S. 89 (2000)).

P19 Although there are three established types of federal preemption as detailed above, the parties in this case agree that "conflict preemption" is the only potential basis for preemption in this case. Conflict preemption exists where state law has not been completely displaced but is superseded to the extent that it conflicts with federal law. *Lefaivre v. KV Pharmaceutical Co.*, 636 F.3d 935, 939 (8th Cir. 2011). There are two types of conflict preemption, impossibility preemption and obstruction preemption. *Id.* "Impossibility [*9] preemption arises when compliance with both federal and state regulations is a physical impossibility. *Id.* (internal quotations omitted). "Obstruction preemption exists when a state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.*

P20 "[T]he FDCA's treatment of prescription drugs includes neither an express preemption clause (as in the vaccine context, 42 U.S.C. § 300aa-22(b)(1)), nor an express non-preemption clause (as in the over-the-counter drug context, 21 U.S.C. §§ 379r(e), 379s(d))." *Mutual Pharmaceutical Co., Inc. v. Bartlett*, 570 U.S. 472, 493 (2013). "In the absence of that sort of 'explicit' expression of congressional intent, we are left to divine Congress' will from the duties the statute imposes." *Id.*

P21 In determining whether the State's claims against Purdue in this case are preempted in this case, the Court must review Congress' purpose and intent in enacting the Federal Food, Drug, and Cosmetic Act (FDCA). This was succinctly summarized by the 10th Circuit in *Cereveny v. Aventis, Inc.*, 855 F.3d 1091, 1096 (10th Cir. 2017):

> The Federal Food, Drug, and Cosmetic Act has long required a manufacturer to obtain approval from the FDA before the manufacturer can introduce a new drug in the market. 21 U.S.C. § 355(a). For brand-name drugs, a manufacturer must submit an application. *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 133 S.Ct. 2466, 2470-71, 186 L.Ed.2d 607 (2013). The application must include [*10] the proposed label, "full reports of investigations which have been made to show whether such drug is [safe and effective]," comprehensive information of the drug's composition and the "manufacture, processing, and packing of such drug," relevant nonclinical studies, and "any other data or information relevant to an evaluation of the safety and effectiveness of the drug product obtained or otherwise received by the applicant from any source." 21 U.S.C. § 355(b)(1); 21 C.F.R. § 314.50(c)(2)(i), (d)(1), (2), (5)(iv).
>
> If the FDA approves the application, the manufacturer

generally is restricted from changing the label without advance permission from the FDA. 21 U.S.C. §§ 331(a), (c), 352; 21 C.F.R. § 314.70(a), (b). But an exception exists, allowing a manufacturer under *certain* circumstances to change the label before obtaining FDA approval. 21 C.F.R. § 314.70(c).4 But even when this exception applies, the FDA will ultimately approve the label change only if it is based on reasonable evidence of an association between the drug and a serious hazard. 21 C.F.R. §§ 201.80(e), 314.70(c)(6)(iii).

*Cereveny v. Aventis, Inc.*, 855 F.3d 1091, 1096 (10th Cir. 2017).

P22 Purdue argues the FDCA "preempts state-law claims that seek to impose a duty to alter FDA-approved labeling or to market FDA-approved prescription medications in a way that conflicts with federal law." [DE 13 (Purdue's Brief in Support of Motion to Dismiss) at ¶ 20. [*11] Specifically, Purdue argues the State's claims are preempted because they require Purdue to include, either in the label for opioids or in its marketing of the opioids, a more extensive warning of the risks and benefits of Opioids than what has been approved by the FDA. Purdue contends federal law preempts such state law claims where they would require a pharmaceutical manufacturer to make statements about safety or efficacy that are inconsistent with what the FDA has required after it evaluated the available data.

P23 Similar issues were addressed by the United States Supreme Court in *Wyeth v. Levine*, 555 U.S. 555 (2009). At issue in *Levine* was the label warning and accompanying use instructions for Phenargen, an antihistamine approved by the FDA for the intravenous treatment of nausea. *Id.* at 559. The plaintiff argued the manufacturer violated its common law duty to warn of the risks associated with the injection of Phenargen, including the manner in which it is injected. *Id.* at 559-60. The manufacturer argued the claim was preempted because the FDA had previously approved the warning and use instructions for the drug's label. *Id.* at 560.

P24 The United States Supreme Court held that the state failure to warn claim was not preempted by FDA regulations. [*12] *Id.* at 581. The Court rejected the manufacturer's argument that, once a label is approved by the FDA, the manufacturer is not obligated to seek revision of its contents. *Id.* at 570-71. The Court outlined that FDA regulations permit a drug manufacturer, without first obtaining FDA approval, to strengthen a warning contained in a label already approved by the FDA, <u>if the manufacturer has evidence to support an altered warning</u>. *Id.*

P25 The *Levine* Court established a "clear evidence" standard of proof required to support a claim of conflict preemption based on FDA labeling regulations. *Id.* at 571-72. *Levine* <u>did not</u> hold that impossibility preemption based on FDA labeling regulations is precluded in all cases. Rather, *Levine* established that the FDA labeling regulations do not preempt state law claims <u>unless</u> the manufacturer presents "clear evidence that the FDA would not have approved a change" to the drug's label or warning, thereby making it "impossible" for the manufacturer to comply with "both federal and state requirements." *Levine*, 555 U.S. at 571.

P26 The *Levine* Court did not define "clear evidence," and it did not establish the level of proof required to constitute such evidence. The Court simply held that in the circumstances of that case, [*13] there was no evidence that the manufacturer tried to alter the label to include additional warnings, and, therefore, the state law claims were not preempted by FDA regulations.

P27 In this case, the Court concludes the marketing practices of Purdue that the State claims are improper — including claims relating to OxyContin's appropriateness for long-term treatment of chronic pain [DE 2 (Complaint) at ¶¶ 107-08], maximum dosing [Complaint at ¶¶ 95, 115-16], and the use of screening tools [Complaint at ¶¶ 85-89], were consistent with the FDA-approved product labeling. *See generally* [DE 14-16 (Exhibits 1-3 to Purdue's Brief)].

P28 The State claims it is not pursuing an inadequate labeling theory, but simultaneously argues Purdue could have, and should have, strengthened its labeling and warnings to include additional risk information without prior FDA approval. [DE 34 (State's Opposition Brief) at 26-27]. The Complaint, however, contains no allegations of newly acquired information that could provide a basis for Purdue to change its labeling without prior FDA approval. Instead, consistent with the Supreme Court's decision in *Levine*, there is "clear evidence" that the FDA <u>would not</u> have [*14] approved changes to Purdue's labels to comport with the State's claims.

P29 In 2013, the FDA addressed the same issues raised by the State, and concluded that no modification to the product labeling was necessary. [DE 14-16 (Exhibits 1-3)]. In response to a 2012 citizen's petition from PROP, the FDA studied the available scientific evidence and concluded that it supports the *use* of ER/LA opioids to treat chronic non-cancer pain. [DE 17 (Exhibit 4)]. Therefore, the FDA has communicated its disagreement with the State's specific contention that Purdue "falsely and misleadingly touted the benefits of long-term opioid use and falsely and misleadingly suggested that these benefits were supported by scientific evidence," and therefore that it was improper to promote OxyContin for chronic pain. PROP and other commentators raised these same concerns as a reason to limit the indication

for opioid medications, but the FDA rejected the request. [DE 17 (Exhibit 4) at 5]. Nor did the FDA direct Purdue to stop marketing the medications for long-term use. *Id.* at 14 ("FDA has determined that limiting the duration of use for opioid therapy to 90 days is not supportable.").

P30 As to certain risks that [*15] were already included in the labeling for Purdue's opioid medications, the FDA required Purdue to conduct additional studies and further assess those risks along with the benefits of use before any changes or additional warnings would be included. *Id.* at 11. The FDA is awaiting any new evidence to determine whether the medications' labeling should be revised to provide any different or additional information about those risks and benefits to physicians.

P31 The following allegations made by the State in its Complaint similarly conflict with statements the FDA has specifically approved:

P32 **Oxy Contin and 12-hour relief**: The State alleges "Purdue misleadingly promoted OxyContin as . . . providing 12 continuous hours of pain relief with one dose." [DE 2 (Complaint) at ¶ 115]. The FDA specifically addressed and rejected this claim. In a January 2004 citizen's petition, the Connecticut Attorney General requested labeling changes for OxyContin, asserting that OxyContin is not a true 12-hour drug and that using it on a more frequent dosing schedule increases its risk for diversion and abuse. In September 2008, the FDA denied the petition, and concluded the evidence failed to support that using [*16] OxyContin more frequently than every 12 hours created greater risk. *See* [DE 18 (FDA's September 2008 letter to Richard Blumenthal, Attorney General, State of Connecticut) at 14-17; cited by Complaint at ¶ 117). Since then, the FDA continues to approve OxyContin as a 12-hour medication. [DE 14 (Exhibit 1)].

P33 **Higher Doses**: The State alleges Purdue misrepresented the safety of increasing opioid doses. [DE 2 (Complaint) at ¶¶ 94-100]. This allegation is contrary to the FDA's labeling decision in response to the PROP Petition, which denied a request to limit the dose of opioids. The FDA concluded "the available information does not demonstrate that the relationship [between opioid dose and risk of certain adverse events] is necessary a causal one." [DE 17 (Exhibit 4)].

P34 **Pseudoaddiction**: The State claims Purdue falsely promoted the concept of "psuedoaddiction" — drug seeking behavior that mimics addiction, occurring in patients who receive adequate pain relief — to diminish addiction concerns by implying this concept is substantiated by scientific evidence. [DE 2 (Complaint) at ¶¶ 77-84]. However, the FDA has approved labeling for Purdue's medications that embody this concept, both before [*17] and after the FDA's evidentiary review in response to the PROP petition. The FDA-approved labeling for extended-release opioid medications discusses "[d]rug-seeking behavior" in "persons with substance use disorders[,]" but also recognizes that "preoccupation with achieving adequate pain relief can be appropriate behavior in a patient with poor pain control." *See* FDA REMS, FDA Blueprint for Prescriber Education for Extended-Release and Long-Acting Opioid Analgesics at 3.

P35 **Manageability of Addiction Risk**: The State alleges Purdue misrepresented that addiction risk screening tools allow prescribers to identify and safely prescribe opioids to patients predisposed to addiction. [DE 2 (Complaint) at ¶¶ 85-89]. However, again, the State ignores that the FDA-approved REMS for Purdue's medications directs doctors to use screening tools and questionnaires to help mitigate opioid abuse. [DE 14 (Exhibit 1 - Oxy Contin Labeling)]. The FDA's response to the PROP Petition also clarified this distinction between physical dependence and addiction. [DE 17 (Exhibit 4) at 16 n.64 (the DSM-V "combines the substance abuse and substance dependence categories into a single disorder measured on a continuum, [*18] to try to avoid an inappropriate linking of 'addiction' with 'physical dependence,' which are distinct issues.")].

P36 **Withdrawal**: The State alleges Purdue falsely claimed that "opioid withdrawal is not a problem." [DE 2 (Complaint) at ¶ 90]. The State contends symptoms associated with withdrawal can "decrease the likelihood that . . . patients will be able to taper or stop taking opioids." *Id.* However, the FDA approved Purdue's labeling, which informs doctors that physically dependent patients can be withdrawn safely by gradually tapering the dosage, and that addiction is "separate and distinct from physical dependence." [DE 14 (Exhibit 1 - Oxy Contin Labeling)].

P37 **Abuse-Deterrent Formulations**: The State alleges Purdue deceptively claimed that abuse-deterrent formulations of its opioid medications could "deter abuse," and "create false impressions that" abuse-deterrent formulations could "curb addiction and abuse." [DE 2 (Complaint) at ¶ 101]. The FDA-approved Oxy Contin labeling states that "OXYCONTIN is formulated with inactive ingredients intended to make the tablet more difficult to manipulate for misuse and abuse." [DE 14 (Exhibit 1 — OxyContin Labeling)]. Therefore, statements [*19] that abuse-deterrent formulations are designed to reduce the incidence of misuse, abuse, and diversion, [Compl. At ¶¶ 101-106], are consistent with the FDA-approved labeling and FDA policies. The State's allegations are also inconsistent with the FDA's 2013 "extensive review of the data regarding reformulated OxyConin" and the FDA's conclusion that reformulated Oxy Contin is "expected" to "make abuse via injection difficult,"

"reduce abuse via the intranasal route," and "deter certain types of misuse in therapeutic contexts." 78 Fed. Reg. 23273-01, 2013 WL 1650735 (Apr. 18, 2013).

P38 In other words, when presented with many of the same concerns the State alleges against Purdue in its Complaint regarding the enhanced risks of using opioids in high doses and for long durations, and with inadequate or misleading warnings, the FDA chose neither to impose those limits on opioid use nor to add warnings about those risks. The Court concludes this is "clear evidence" under *Levine* that the FDA would not have approved the changes to Purdue's labeling that the State contends were required to satisfy North Dakota law.

P39 "[T]he Court in *Levine* did not say that for evidence to be clear it must result from a formal procedure of approval or disapproval." [*20] *Rheinfrank v. Abbott Laboratories, Inc.*, 680 Fed. Appx. 369, 386 (6th Cir. 2017). The *Levine* Court concluded the claims were not preempted in that case because there was "**no** evidence in [the] record." *Wyeth*, 555 U.S. at 572. However, the Court noted that the claims in *Levine* "would have been preempted upon clear evidence that the FDA would have rejected the desired label change." *Cerveny v. Aventis, Inc.*, 855 F.3d 1091, 1098 10th Cir. 2017). "*Levine* did not characterize the proof standard as requiring a manufacturer in every case to prove that it would have been impossible to alter the drug's label." *Dobbs v. Wyeth Pharmaceuticals*, 797 F. Supp.2d 1264, 1279 (W.D. Okla. 2011). "[T]his court does not interpret *Levine* as imposing upon the drug manufacturer a duty to continually 'press' an enhanced warning which has been rejected by the FDA." *Id.*

P40 In this case, the Court concludes Purdue has met its burden under *Levine's* clear evidence standard. "[A] court cannot order a drug company to place on a label a warning if there is clear evidence that the FDA would not approve it." *Robinson v. McNeil Consumer Healthcare*, 615 F.3d 861, 873 (7th Cir. 2010). Given that the FDA does not yet believe the state of the data supports additional warnings or altered labeling when presented with the issues asserted by the State in this case, it would have been impossible for Purdue to comply with what the State alleges was required under North Dakota law while still respecting the FDA's unwillingness [*21] to change the labeling and warnings, both on its labels for opioids and in its advertising.

P41 Accordingly, federal law preempts the State's state-law claims, which are based on the marketing of Purdue's medications for their FDA-approved uses, including for treatment of chronic, non-cancer pain. Those claims necessarily "conflict[] with the FDA's jurisdiction over drug labeling, and specifically its approval of those indications. *Prohias v. Pfizer, Inc.*, 490 F.Supp.2d 1228, 1234 (S.D. Fla. 2007). Because Purdue has met its burden under *Wyeth v. Levine*, the court concludes the state law claims asserted by the State are preempted in this matter by federal law.

## B. Consumer Fraud Law Claims

P42 In addition to the preemption arguments detailed above, Purdue also argues the State's Consumer Fraud Law claims (First and Second Causes of Action) should be dismissed because the State has failed to plead the essential element of causation. The State argues it is not required to allege causation to prevail under the Consumer Fraud Law.

P43 The Unlawful Sales or Advertising Practices Act prohibits deceptive or fraudulent conduct in the sale or advertising of merchandise:

> The act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, [*22] false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is declared to be an unlawful practice. The act, use, or employment by any person of any act or practice, in connection with the sale or advertisement of any merchandise, which is unconscionable or which causes or is likely to cause substantial injury to a person which is not reasonably avoidable by the injured person and not outweighed by countervailing benefits to consumers or to competition, is declared to be an unlawful practice.

N.D.C.C. § 51-15-02.

P44 Purdue relies on *Ackre v. Chapman & Chapman, P.C.*, 2010 ND 167, 788 N.W.2d 344, for the argument that causation is an element the State must plead and prove to support its cause of action under the Consumer Fraud Law. *Ackre* involved a lawsuit brought under the private right of action in N.D.C.C. § 51-15-09. Because of this, the State argues "[w]hen the Court stated that the Plaintiff was required 'to show the putatively illegal action caused some threatened or actual injury to his or her legal rights and interests,' the Court was referring to what is required for a private plaintiff to have standing to bring [*23] a private right of action under N.D.C.C. § 51-15-09." [DE 34 (State's Response Brief) at ¶ 66]. Specifically, the State asserts "Consumer Fraud Actions brought by the Attorney General are civil law enforcement actions, not civil tort actions, and causation, and requirements applied to tort actions are, therefore, inapplicable to consumer fraud claims." [DE 34 (State's Response Brief) at ¶ 65].

P45 These arguments blatantly ignore the State's own Complaint and the types of damages it is seeking in this

lawsuit.

P46 The State specifically alleges that "Purdue's conduct <u>has resulted</u> in a financial burden on the State of North Dakota." [DE 2 (Complaint) at ¶ 15]. It goes on to allege that the State and its Departments have "spent millions of dollars on opioid prescriptions for chronic pain and addiction treatment — costs directly attributable to the opioids Purdue unleashed on the State." *Id.* "Purdue's deceptive marketing of opioids and <u>the resulting</u> opioid epidemic also has caused the State to incur additional cost for law enforcement, North Dakota Workforce Safety and Insurance, Department of Corrections, North Dakota Department of Human Services, and North Dakota Behavioral Health and other agencies." *[*24] Id.* at ¶ 16. "The State seeks injunctive relief, disgorgement and restitution for amounts the State's Medicaid program and other State agencies have paid for excessive opioid prescriptions." *Id.* at ¶ 17. The State also clearly asserts it is seeking "restitution for North Dakota consumers who, like the State, paid for excessive prescriptions of opioids for chronic pain." *Id.*

P47 The State's Complaint clearly includes requests for money damages for purported violations of the Consumer Fraud Law. For additional examples, the Complaint requests the Court to "restore any loss suffered by persons <u>as a result of</u> the deceptive acts or practices of Defendants as provided in N.D.C.C. § 51-15-07." [DE 2 (Complaint) at ¶ 186(d) (emphasis added)]. The State also alleges "Purdue is responsible for the claims submitted and the amount the State's Medicaid program and other State agencies spent on its opioids." *Id.* at ¶ 182. The Prayer for Relief also requests "[t]hat Purdue be ordered to pay restitution to the State, [and] State agencies, including the Department of Human Services." [DE 2 (Complaint — Prayer for Relief (E)].

P48 The plain language of § 51-15-07 requires proof that the money to be restored was acquired "by means [*25] of the allegedly deceptive act. Whether styled as a claim for money damages or for restitution pursuant to § 51-15-07, the requirement is the same: The State must plead and prove causation, i.e. the loss of money occurred "by means of the alleged deception. *Compare* N.D.C.C. § 51-15-09 (allowing claim "against any person who has acquired any moneys or property <u>by means of</u> any practice declared to be unlawful un this chapter") (emphasis added) *with* N.D.C.C. § 51-15-07 (allowing restitution of money "that may have been acquired <u>by means of</u> any practice in this chapter . . . declared to be unlawful") (emphasis added).

P49 When the State makes a claim under the Consumer Fraud Law for out-of-pocket losses, it is no different than a private plaintiff's claim to recover actual damages suffered "by means of the deception. *See* N.D.C.C. § 51-15-09. There is simply no basis in North Dakota law to conclude the "by means of" language in the private consumer section of the Consumer Fraud Act (51-15-09) has a different meaning than the "by means o' language in § 51-15-07.

P50 The State's Complaint fails to identify which losses occurred "by means of" — i.e., because of — any specific alleged deception or misrepresentation on the part of Purdue. The State does not allege that [*26] <u>every</u> opioid prescription in North Dakota was unlawful. In fact, the State expressly acknowledges that it does not seek an outright ban on the sale of opioids. [DE 34 (State's Response Brief) at 25]. The State acknowledges that "not every sale" of opioids "contributed" to the public health problem. *Id.* at 49. To put it succinctly, the State essentially alleges that there is an opioid problem in North Dakota that has caused the State and its citizens great "financial burden", and that the problem was the fault of Purdue and its marketing, but then completely fails to allege how Purdue's allegedly deceptive marketing actually caused the alleged great "financial burden."

P51 The State does not identify any North Dakota doctor who ever received any specific purported misrepresentation made by Purdue, or who wrote a medically unnecessary prescription because of those alleged statements. The State also does not allege any false statement caused the State to reimburse prescriptions it otherwise would not have reimbursed. Under the State's theory, it can recover for reimbursements under the Consumer Fraud Act even if the State fails to show any such reimbursements were caused by a deception, and even [*27] when the State continued to pay for reimbursements with knowledge of the alleged deception.

P52 Rather than plead the requisite specifics, the Complaint offers only conclusory allegations that Purdue had "a marketing campaign" since the 1990s, which was "designed to convince prescribers and the public that its opioids are effective for treating chronic pain" and allegedly resulted in the routine prescription of opioids for long-term use. [DE 2 (Complaint) at ¶ 4]. These allegations are unconnected to any particular North Dakota doctor or prescription. Additionally, the State fails to plead how the alleged misstatements, most of which are alleged to have occurred over a decade ago, could have caused specific prescribing decisions to this day.

P53 A generalized "fraud-on-the-market" theory does not suffice to establish causation. In cases that assert claims for fraudulent or deceptive pharmaceutical marketing, "a fraud-on-the-market theory cannot plead the necessary element of causation because the relationship between the defendants' alleged misrepresentations and the purported loss suffered by the patients is so attenuated . . . that it would effectively be

nonexistent." *In re Actimmune Mktg. Litig.*, 614 F.Sup.2d 1037, 1054 (N.D. Cal. 2009), aff'd, 464 F.App'x 651 (9th Cir. 2011).

P54 [*28] The State acknowledges that patients may not lawfully obtain Purdue's opioid medications without a valid prescription. [DE 2 (Complaint) at ¶ 11]. The State also recognizes that doctors themselves have many resources available about Purdue's products, including FDA-approved labeling that discloses the risks Purdue allegedly concealed. *Id.* at ¶¶ 69-70, 72-73, 75-76, 83-84, 88, 93, 97-100, 104, 111-12, 117.

P55 Even assuming, for purposes of argument only, that Purdue had failed to disclose these *risks, such a* failure would not be the "proximate cause of a patient's injury if the prescribing physician had independent knowledge of the risk that the adequate warning should have communicated." *Ehlis v. Shire Richwood, Inc.*, 367 F.3d 1013, 1016 (8th Cir. 2004) (internal quotations and citations omitted) (concluding North Dakota would adopt the "learned intermediary" doctrine), The State's theory in this case depends on an extremely attenuated, multi-step, and remote causal chain. The State's claims — no matter how styled — have to account for the independent actor (i.e. doctors) who stands between Purdue's alleged conduct and the alleged harm. *Id.* In the face of information available to physicians, the State has not pleaded facts showing that Purdue's alleged [*29] misrepresentations — as opposed to the undisputed multiple layers of individualized decision-making by doctors and patients or other possible intervening causes — led to any relevant prescribing or reimbursement decision.

P56 A defendant is not liable for alleged injuries that either result from a superseding, intervening cause, or "if the cause is remote" from the injury. *Mourn v. Maercklein*, 201 N.W.2d 399, 403 (N.D. 1972); *see also Price v. Purdue Pharma Co.*, 920 So.2d 479, 485-86 (Miss. 2006) (observing lack of proximate cause for claims of opioid addiction brought against Purdue, because injuries were the result of illegally obtained and improper use of opioids). "A superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about." *Leistra v. Bucyrus-Erie Co.*, 443 F.2d 157, 163 n.3 (8th Cir. 1971) (internal quotations omitted).

P57 *Ashley County, Ark. v. Pfizer, Inc.*, 552 F.3d 659 (8th Cir. 2009), which was decided under analogous facts, is instructive. In *Ashely County*, Arkansas counties brought claims against pharmaceutical companies for, *inter alia*, public nuisance and deceptive trade practices, seeking "compensation to recoup the costs expended by the counties in dealing with the societal effects of the methamphetamine epidemic in Arkansas, with liability premised [*30] on the use of the Defendants' products in the methamphetamine manufacturing process. *Id.* at 663. The Eighth Circuit affirmed the dismissal of the complaint for failure to state a claim, and determined that "[p]roximate cause seems an appropriate *avenue* for limiting liability in this context . . . particularly 'where an effect may be a proliferation of lawsuits not merely against these defendants but against other types of commercial enterprises — manufacturers, say, of liquor, anti-depressants, SUVs, or violent video games — in order to address a myriad of societal problems regardless of the distance between the 'causes' of the 'problems' and their alleged consequences.'" *Id.* at 671-72 (quoting *Dist. of Columbia v. Beretta, USA., Corp.*, 872 A.2d 633, 651 (D.C. 2005)).

P58 Similarly, in this case, the connection between the alleged misconduct and the prescription depends on multiple, independent, intervening events and actors. These intervening events and actors include: the doctor's independent medical judgment, the patient's decision whether and how to use the medication, the patient's response to the medication, and the State's own decision to reimburse the prescriptions. Additionally, it is nearly impossible to trace any of the harms the State alleges back to solely Purdue's [*31] own medications, as opposed to other manufacture's opioids and other unlawful opioids. Holding Purdue solely responsible for the entire opioid epidemic in North Dakota is difficult to comprehend, especially given Purdue's small share of the overall market for lawful opioids. It is also difficult to comprehend given the large market for unlawful opioids.

P59 The State's claims that Purdue can, should, or should have in the past, "changed the message" regarding opioids to include stronger warnings and labeling is not taken well by the Court. Even if Purdue can and does "change the message," Purdue has absolutely no control over how doctors prescribe the drug and how patients choose to use the drug. Purdue also has no control over how other manufacturers of opioids promote the drugs. Doctors can be loose with their prescribing practices, and patients do not always follow their doctor's orders. The Court does not mean to suggest this is the sole cause of the opioid crisis in North Dakota. But the State has failed to allege facts which, if true, show that Purdue, alone, caused the opioid crisis for which the State seeks compensation. The causal chain the State attempts to allege is simply [*32] too attenuated.

P60 The State seems to acknowledge its attenuated theory of causation in its Complaint by identifying a number of behaviors that contribute to the opioid crisis, such as "doctor shopping, forged prescriptions, falsified pharmacy records,

and employees who steal from their place of employment." [DE 2 (Complaint) at ¶ 151]. The State also clearly acknowledges the "high statistic of people that first get addicted after obtaining opioids free from a friend or relative." *Id.* at ¶ 145. These are not Purdue's acts or misrepresentations, yet the State seeks to hold Purdue solely liable. The State's effort to hold one company to account for this entire, complex public health issue oversimplifies the problem.

P61 The Court concludes the State's causal theory is too attenuated and requires dismissal of the State's Consumer Fraud Law Claims as a matter of law. If the State can proceed on the causation it has alleged in this lawsuit against Purdue, it begs the question of how far the causal chain can go. There are a seemingly limitless number of actors who could have "tried harder" under the State's theory and claims. Purdue is no higher up in the causal chain under the facts alleged [*33] by the State than any other actor who could be held liable. The State has not pleaded facts that Purdue's alleged misrepresentations caused North Dakota doctors to write medically unnecessary prescriptions or that Purdue's alleged misrepresentation caused the State to reimburse prescriptions.

P62 Because the State has failed to adequately plead causation, its Consumer Fraud Law claims fail as a matter of law and must be dismissed.

## C. Public Nuisance

P63 Purdue additionally argues the State's Third Cause of Action for public nuisance must be dismissed because no North Dakota court has extended the public nuisance statutes to cases involving the sale of goods. Because the State's nuisance claim in this case revolves around the effects of a product (opioids) sold and used in North Dakota, Purdue argues the State's public nuisance claim fails.

P64 The State's claim for public nuisance is brought under N.D.C.C. § 42-01-01 *et seq.* (nuisance) and 42-02-01 *et seq.* (abatement of common nuisance). A nuisance is defined by N.D.C.C. § 42-01-01, which provides:
> A nuisance consists in unlawfully doing an act or omitting to perform a duty, which act or omission:
> 1. Annoys, injures, or endangers the comfort, repose, health, or safety of others;
> 2. Offends [*34] decency;
> 3. Unlawfully interferes with, obstructs or tends to obstruct, or renders dangerous for passage, any lake, navigable river, bay, stream, canal, basin, public park, square, street, or highway; or
> 4. In any way renders other persons insecure in life or in the use of property.

N.D.C.C. § 42-01-01.

P65 "A public nuisance is one which at the same time affects an entire community or neighborhood or any considerable number of persons, although the extent of the annoyance or damage inflicted upon the individuals may be unequal." N.D.C.C. § 42-01-06. The N.D.C.C. § 42-01-01 definition of nuisance applies to public nuisance claims. *Kappenman v. Klipfel*, 2009 ND 89, ¶ 36, 765 N.W.2d 716.

P66 In response to Purdue's argument on this issue, the State attempts to characterize its claims as focusing only on Purdue's marketing conduct, and not on the actual sale of opioids. The State alleges "[t]he Complaint does not identify Purdue's sale of the opioids as the public nuisance; instead, the nuisance is Purdue's misrepresentations and deceptive promotion of their risks and benefits." [DE 34 (State's Response Brief) at ¶ 73]. This argument, again, ignores the clear allegations in the State's Complaint.

P67 The State specifically alleges a public nuisance in this case in that "Purdue's conduct unreasonably [*35] interfered with the public health, welfare, and safety of North Dakota residents by expanding the opioid market and opioid use through an aggressive and successful marketing scheme that relied on intentional deception and misrepresentation regarding the benefits, safety and efficacy of prescription opioids." [DE 34 (State's Response Brief) at ¶ 72; and DE 2 (Complaint) at ¶¶ 4, 7, & 9]. The State further alleges that Purdue's conduct "caused and maintained the overprescribing and sale of opioid for long-term treatment of chronic pain at such volumes and degrees as to create an epidemic." [DE 2 (Complaint) at ¶ 201].

P68 The State cannot escape the true nature of the nuisance claim it has pleaded. The "overprescribing and sale" of opioids manufactured by Purdue are directly at the heart of the State's nuisance claim, regardless of how it otherwise now tries to characterize its claim.

P69 Purdue is correct, as the State concedes, that North Dakota courts have not extended the nuisance statute to cases involving the sale of goods. [DE 34 (State's Response Brief) at ¶ 74; DE 13 (Purdue's Brief in Support of Motion) at ¶ 45]. Such a situation was addressed by the Eighth Circuit Court of Appeals [*36] in *Tioga Pub. Sch. Dist. No. 15 of Williams Cty. State of N. Dakota v. United States Gypsum Co.*, 984 F.2d 915, 920 (8th Cir. 1993). Although *Tioga* was a federal case, in the absence of binding North Dakota Supreme Court decisions interpreting North Dakota law, federal court decisions are given deference. *N. Dakota Fair Hous. Council, Inc. v. Peterson*, 2001 ND 81, ¶¶ 20-24, 625 N.W.2d 551, 559 (N.D. 2001).

P70 In *Tioga*, the 8th Circuit concluded that the North Dakota Supreme Court would not extend the nuisance doctrine to cases involving the sale of goods. *Tioga*, 984 F.2d at 920. The Court reasoned:

> Tioga has not presented us with any North Dakota cases <u>extending the application of the nuisance statute to situations where one party has sold to the other a product that later is alleged to constitute a nuisance</u>, nor has our research disclosed any such cases, North Dakota cases applying the state's nuisance statute all appear to arise in the classic context of a landowner or other person in control of property conducting an activity on his land in such a manner as to interfere with the property rights of a neighbor

*Id.* (emphasis added).

P71 The State urges this Court to distinguish *Tioga* "because it does not arise from a direct injury to a private individual from the use of the product purchased, and it's not a product liability or warranty type claim." [DE 34 (State's Response Brief) at ¶ 74]. However, [*37] the statutory definition of nuisance applies equally to public and private nuisances. Additionally, as the Eighth Circuit warned in *Tioga*:

> [T]o interpret the nuisance statute in the manner espoused by Tioga would in effect totally rewrite North Dakota tort law. Under Tioga's theory, any injury suffered in North Dakota would give rise to a cause of action under section 43-02-01 regardless of the defendant's degree of culpability or *of* the availability of other traditional tort law theories of recovery. Nuisance thus would become a monster that would devour in one gulp the entire law of tort, a development we cannot imagine the North Dakota legislature intended when it enacted the nuisance statute.

*Tioga*, 984 F.2d at 921.

P72 This Court agrees with the reasoning of the Eighth Circuit in *Tioga*. The State is clearly seeking to extend the application of the nuisance statute to a situation where one party has sold to another a product that <u>later</u> is alleged to constitute a nuisance. *Id.* at 920 (emphasis added). The reality is that Purdue has no control over its product after it is sold to distributors, then to pharmacies, and then prescribed to consumers, i.e. after it enters the market. Purdue cannot control how doctors prescribe [*38] its products and it certainly cannot control how individual patients use and respond to its products, regardless of any warning or instruction Purdue may give.

P73 No North Dakota court has extended the public nuisance statutes to cases involving the sale of goods. The Eighth Circuit Court of Appeals, while applying North Dakota law, expressly declined to do so, and this Court declines to do so in this case. The State does not have a cause of action for nuisance against Purdue since its nuisance claim arises from the "overprescribing and sale" of opioids manufactured by Purdue. Therefore, the State's claim for public nuisance must be, and is, dismissed.

## CONCLUSION

P74 Based upon the foregoing, the Court concludes that the State has not adequately pleaded its causes of action against Purdue. Therefore, for all the reasons stated above, Purdue's Motion to Dismiss is, in all respects, hereby **GRANTED**.

P75 Counsel for Purdue is tasked with the responsibility of drafting a judgment consistent with this memorandum.

**IT IS SO ORDERED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

Dated this 10th day of May, 2019.

BY THE COURT:

/s/ James S. Hill

James S. Hill, District Judge

South Central Judicial District

**End of Document**