Page 1

1            IN THE UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF OHIO

3                      EASTERN DIVISION

4

5    MDL NO. 2804

6    CASE NO. 17-md-2804

7    Hon. Dan A. Polster

8

9    IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION

10

11   THIS DOCUMENT RELATES TO:

12   TRACK THREE CASES

13

14

15

16              REMOTE VIDEO DEPOSITION OF

17                 CALEB ALEXANDER, M.D.

18                   May 27, 2021

19

20

21

22   REPORTED BY:     Laura H. Nichols

23                    Certified Realtime Reporter,

24                    Registered Professional

25                    Reporter and Notary Public

```
 1              A P P E A R A N C E S

 2              (All Appearing Remotely)

 3

 4   FOR THE PLAINTIFFS, COUNTIES OF LAKE AND TRUMBULL,

 5   OHIO:

 6          Mr. Andrew P. Arnold

 7          Attorney at Law

 8          Motley Rice LLC

 9          28 Bridgeside Boulevard

10          Mount Pleasant, South Carolina 294644

11          (843) 216-9000

12          aarnold@motleyrice.com

13

14   FOR THE PLAINTIFFS:

15          Mr. Frank L. Gallucci III

16          Attorney at Law

17          Plevin & Gallucci

18          55 Public Square

19          Suite 2222

20          Cleveland, Ohio 44113

21          (216) 861-0804

22          fgallucci@pglawyer.com

23

24

25
```

Page 3

1          A P P E A R A N C E S  (Continuing)

2               (All Appearing Remotely)

3

4   FOR DEFENDANTS CVS PHARMACY, INC.; CVS INDIANA,

5   LLC; CVS RX SERVICES, INC.; CVS TN DISTRIBUTION,

6   LLC and OHIO CVS STORES, LLC:

7          Mr. Adam L. Fotiades

8          Attorney at Law

9          Zuckerman Spaeder

10          1800 M Street Northwest

11          Suite 1000

12          Washington, DC 20036-5807

13          (202) 778-1800

14          afotiades@zuckerman.com

15

16   FOR THE DEFENDANT, WALMART, INC.:

17          Ms. Kristin S.M. Morrison

18          Attorney at Law

19          Jones Day

20          901 Lakeside Avenue East

21          Cleveland, Ohio 44114

22          (216) 586-7375

23          kmorrison@jonesday.com

24

25

Page 4

1          A P P E A R A N C E S  (Continuing)

2              (All Appearing Remotely)

3

4    FOR THE DEFENDANT, WALGREENS BOOTS ALLIANCE,

5    INC.; WALGREEN CO.; AND WALGREEN EASTERN CO., INC.:

6          Ms. Sharon Desh

7          Attorney at Law

8          Bartlit Beck

9          Courthouse Place

10         54 West Hubbard Street

11         Chicago, Illinois 60654

12         (312) 494-4400

13         sharon.desh@bartlitbeck.com

14

15   FOR THE DEFENDANT, RITE AID:

16         Ms. Elizabeth I. Buechner

17         Attorney at Law

18         Morgan, Lewis & Bockius LLP

19         101 Park Avenue

20         New York, New York 10178-0060

21         (212) 309-6000

22         elizabeth.buechner@morganlewis.com

23

24

25

1    A P P E A R A N C E S  (Continuing)

2          (All Appearing Remotely)

3

4   FOR THE DEFENDANTS GIANT EAGLE, INC. and HBC

5   SERVICE COMPANY:

6          Mr. Paul M. Mannix

7             and Ms. Lauren Melfa Catanzarite

8          Attorneys at Law

9          Marcus & Shapira LLP

10         One Oxford Centre

11         35th Floor

12         Pittsburgh, Pennsylvania 15219

13         (412) 471-3490

14         pmannix@marcus-shapira.com

15         catanzarite@marcus-shapira.com

16

17  OTHERS PRESENT:

18         Ms. Katherine Ozenberger

19

20         Mr. Justin Bond, Videographer

21         Veritext Legal Solutions

22

23

24

25

1              INDEX OF EXAMINATION

2

3                                        Page:

4   DEPONENT:  CALEB ALEXANDER, M.D.              10

5   EXAMINATION BY MR. MANNIX                     11

6

7

8                 INDEX OF EXHIBITS

9

10                                       Page:

11  Exhibit 1                                    28-6

12       Abatement Plan for Addressing the

13  Opioid Crisis in Lake County and Trumbull

14  County, Expert Witness Report of G. Caleb

15  Alexander, MD, MS, April 16, 2021

16  Exhibit 2                                    140-9

17       Abatement Plan for Addressing the

18  Opioid Crisis in Lake County and Trumbull

19  County, Expert Witness Report of G. Caleb

20  Alexander, MD, MS.  Appendix F.  Potential

21  Indicators of High-Risk Opioid Distribution

22  Exhibit 3                                    89-2

23       Monumental Analytics, Lake County

24  Opioid Epidemic Abatement Estimates, Last

25  updated April 14, 2021 (Confidential)

Page 7

1          INDEX OF EXHIBITS (Continuing)

2

3                                         Page:

4   Exhibit 4                                89-11

5           Monumental Analytics, Trumbull

6   County Opioid Epidemic Abatement Estimates,

7   Last updated April 14, 2021 (Confidential)

8   Exhibit 5                                29-10

9           Material Relied Upon - Report

10  Exhibit 6                                12-25

11          Abatement Plan for Addressing the

12  Opioid Crisis in Lake County and Trumbull

13  County, Expert Witness Report of G. Caleb

14  Alexander, MD, MS.  Appendix C:  Expert

15  Witness Engagements

16  Exhibit 7                                17-5

17          Expert Witness Report of G. Caleb

18  Alexander, MD, MS.  Appendix B - Curriculum

19  Vitae

20  Exhibit 8                                28-3

21          Expert Witness Report of G. Caleb

22  Alexander, MD, MS.  Appendix A - Johns

23  Hopkins Report:  "From Evidence to Impact"

24

25

Page 8

1          INDEX OF EXHIBITS (Continuing)

2

3                                              Page:

4    Exhibit 10                                67-23

5          Abatement Plan for Addressing the

6    Opioid Crisis in Cabell County and the City

7    of Huntington, Expert Witness Report of G.

8    Caleb Alexander, MD, MS, August 3, 2020

9    Exhibit 18                                99-4

10          Article:  Relationship between

11   Nonmedical Prescription-Opioid Use and

12   Heroin Use, from The New England Journal of

13   Medicine

14   Exhibit 20                                75-1

15          Review:  The Evolving Overdose

16   Epidemic:  Synthetic Opioids and Rising

17   Stimulant-Related Harm

18   Exhibit 38                                102-8

19          Article:  Associations of Nonmedical

20   Pain Reliever Use and Initiation of Heroin

21   Use in the United States (Exhibit 19),

22   SAMHSA, CBHSQ Data Review, August 2013

23

24

25

Page 9

1                    S T I P U L A T I O N

2                IT IS STIPULATED AND AGREED, by and

3    between the parties, through their respective

4    counsel, that the deposition of CALEB ALEXANDER,

5    M.D. may be taken before Laura H. Nichols,

6    Commissioner, Certified Realtime Reporter,

7    Registered Professional Reporter and Notary Public;

8                That it shall not be necessary for

9    any objections to be made by counsel to any

10   questions, except as to form or leading questions,

11   and that counsel for the parties may make

12   objections and assign grounds at the time of trial,

13   or at the time said deposition is offered in

14   evidence, or prior thereto.

15

16

17

18

19

20

21

22

23

24

25

Page 10

1              I, Laura H. Nichols, a Certified

2    Realtime Reporter and Registered Professional

3    Reporter of Birmingham, Alabama, and a Notary

4    Public for the State of Alabama at Large, acting as

5    Commissioner, certify that on this date, as

6    provided by the Federal Rules of Civil Procedure of

7    the United States District Court, and the foregoing

8    stipulation of counsel, there came before me

9    remotely via Zoom, on May 27, 2021, commencing at

10   9:33 a.m. EDT, CALEB ALEXANDER, M.D., witness in

11   the above cause, for oral examination, whereupon

12   the following proceedings were had:

13                        *      *      *

14

15              THE VIDEOGRAPHER:  Good morning.

16   Today is May 27th, 2021.  We are on the record at

17   9:33 a.m.  Today we will take the videotaped

18   deposition in Case Number 17-md-2804.  This

19   deposition is being held remotely.

20              Would you please swear the witness?

21

22              CALEB ALEXANDER, M.D.,

23   having been first duly sworn, was examined and

24   testified as follows:

25

Page 11

1    EXAMINATION BY MR. MANNIX:

2         Q.    Dr. Alexander, good morning.  My name

3    is Paul Mannix, again, and I represent Giant Eagle

4    in this matter.  We've called you here today to be

5    deposed in connection with your expert report in

6    the Track 3 litigation, opiate litigation.

7              You are in Maryland; is that right?

8         A.    Yes, that's right.

9         Q.    Okay.  I'm here in Pittsburgh and I

10   believe we're ready to begin.

11             I confirm that you did receive

12   documents that were sent to your office, and we'll

13   be referring to those as we proceed, at least a

14   large number of those.  And I'll ask you to pull

15   them out of the envelope when the time arises.

16             To begin with, can you state your

17   name for the record?

18        A.    George Caleb Alexander.

19        Q.    And your current employer is whom?

20        A.    I'm employed through Johns Hopkins

21   University.  And I also have a consultancy that's

22   separate and independent from Johns Hopkins.

23        Q.    And what is that consultancy name?

24        A.    Monument Analytics.

25        Q.    You understand you're under oath

Page 12

1   today; is that right?

2          A.      Yes, I do.

3          Q.      And any reason you cannot give

4   truthful and complete testimony here today?

5          A.      No, there's no reason why I can't

6   give truthful and complete testimony.

7          Q.      Have you testified in a deposition

8   before?

9          A.      Yes, I have.

10         Q.      And how many times have you testified

11  in a deposition?

12         A.      I believe two.  But my -- you know,

13  Mr. Arnold might correct me if I'm mistaken there.

14         Q.      Okay.  And we did receive, in your

15  report, an Appendix C, which identified two cases

16  that you were deposed in.

17                 Any other cases, besides those cases,

18  that you've been deposed in?

19         A.      Well, I'm actually second-guessing

20  myself and wondering if it's three.

21                 But may I ask Mr. Arnold to -- reply

22  or let me know the two that you have and I can note

23  if there's a third that I think may also be

24  relevant?

25                 (Exhibit 6 was marked for

Page 13

1          identification.)

2          Q.     (BY MR. MANNIX:)  Well, why don't we

3     do this.  We're going to get into that exhibit at

4     some point in time.  Why don't you open up the

5     package, Exhibit 6.

6          A.     Okay.

7          Q.     And let me know if that's Appendix C

8     to your report.

9          A.     Yes, it is.

10         Q.     And I've reviewed this, and it looks

11    like I've seen three cases on Appendix C, two in

12    the first page and one on the second page, which it

13    appears you're deposed in.  Is that accurate?

14         A.     Yes.  So I believe the first, you

15    know, CT1 entitled Orange County, and the

16    California case, and the CT2, Cabell County and

17    City of Huntington.  So it is three total.

18         Q.     Other than those cases, have you been

19    deposed at all?

20         A.     No, I don't believe so.

21         Q.     Okay.  So you have a general

22    understanding.  I'll review some ground rules with

23    you.  I'm going to ask you questions today.  If you

24    don't hear them, let me know and I'll repeat them.

25              If you don't understand the question,

1    let me know and I'll rephrase it.  And do your best

2    to let me fully ask my question before you answer

3    and I will do my best to let you fully answer

4    before I ask my next question.  Okay?

5            A.      Of course.

6            Q.      What did you do to prepare for this

7    deposition?

8            A.      Well, I mean, in some sense, my --

9    all of the work that I've done, understanding the

10   local context of Lake and Trumbull Counties and

11   reviewing all of the materials and writing my

12   report is preparation.

13                   But in addition to that, I met with

14   counsel and some team members that supported me in

15   producing my report to review -- to review my

16   report.

17           Q.      Okay.  And I understand your point.

18   I'm asking primarily, after you prepared your

19   report, you were notified you were going to be

20   deposed today.  And what did you do in order to

21   prepare specifically for the deposition today?

22                   And you said you met with team

23   members; is that right?

24           A.      Sure, correct.

25           Q.      And you met with counsel; is that

Page 15

1    correct?

2         A.      Correct, yes.

3         Q.      And did you also review documents in

4    connection with your preparation?

5         A.      Yes, I did.

6         Q.      And I assume you reviewed your

7    report; is that right?

8         A.      Yes, it is.

9         Q.      Any other specific documents that you

10   reviewed that you thought necessary to review in

11   order to prepare for your deposition?

12        A.      Well, by "report," I reviewed both my

13   narrative report as well as, for example, the

14   redress models that are included in my report.  And

15   I reviewed some background material that was

16   referenced in my report.

17        Q.      What background material do you

18   recall reviewing?

19        A.      For example, information from -- I'm

20   sorry.  I'm trying to recall.  But another expert

21   that submitted -- that submitted a report regarding

22   the use of flags to identify potentially

23   problematic or high-risk controlled substance, you

24   know, prescribing or dispensing or distribution and

25   the like.

1          Catizone, I believe it is an expert,

2     Mr. Catizone.

3          Q.     Okay.  Any other documents you recall

4     reviewing, other than your report, redress model

5     and the Catizone report?

6          A.     Well, some information from the Ohio

7     substance abuse monitoring system that provides

8     some high-level trends in terms of adverse events

9     related to opioids in the state.

10         Q.     Okay.

11         A.     I also reviewed some information

12    about Lake and Trumbull Counties that provides

13    background information, similar background

14    information at a county level.

15         Q.     Okay.  What documents were those that

16    you just referenced there?  Not the OSAM reports,

17    but the Lake and Trumbull information, what

18    specifically did you review in preparation for

19    today's deposition?

20         A.     Well, for example, the community

21    health improvement plans and Lake County's HUB

22    report.

23         Q.     Okay.  Anything else that you recall

24    digging into in order to prepare for the

25    deposition?

1          A.      Those were the -- those were the main

2    materials.  I mean, the vast majority of what time

3    I did spend was spent simply reviewing my report

4    itself.

5                      (Exhibit 7 was marked for

6                      identification.)

7          Q.      (BY MR. MANNIX:)  Okay.  If you could

8    go to package Exhibit 7.

9          A.      Okay.  I have that.

10          Q.      I am hoping Exhibit 7 is your CV.  Is

11    that your CV?

12          A.      Yes, it is.

13          Q.      And that's Appendix B to your report;

14    is that right?

15          A.      Yes, it is.

16          Q.      And I won't go over this in great

17    detail, but can you please summarize your

18    educational background, the degrees that you hold?

19          A.      Well, I grew up in Pittsburgh.  And I

20    went to Oberlin for two years for college in Ohio,

21    just north of Lake and Trumbull Counties, and went

22    to University of Pennsylvania to complete my

23    undergraduate training.

24                      At that point, I returned to Ohio and

25    went to medical school at Case Western Reserve

Page 18

1    University.

2                    Following medical school, I went back

3    to Philadelphia to complete a residency in internal

4    medicine at the University of Pennsylvania.

5                    Following my residency, I moved back

6    to the Midwest, to Chicago, to the University of

7    Chicago, to complete a Robert Wood Johnson Clinical

8    Scholars Fellowship, which provides training in the

9    nonbiologic sciences important to healthcare.

10                   And that -- you know -- and I

11   completed a master's in science while at the

12   University of Chicago, and that marked the end of

13   my formal educational training.

14        Q.    What was your masters of science,

15   what specific field?

16        A.    It was a blend of health services

17   research, biostatistics and epidemiology.

18        Q.    And you are -- are you board

19   certified as a doctor?

20        A.    Yes, I am.

21        Q.    In what field?

22        A.    Internal medicine.

23        Q.    Anything else?

24        A.    I'm only board certified in internal

25   medicine.

1          Q.     Okay.  And what licenses do you hold?

2          A.     I have a license to practice medicine

3    in the state of Maryland.  And I have the

4    appropriate state and federal controlled substance

5    prescribing licenses, so as to allow for me to

6    prescribe controlled substances.

7          Q.     Any other licenses?

8          A.     Well, I have -- I mean, I have a

9    driver's license, but I don't have other medical

10   licenses.

11         Q.     Any other professional license you

12   don't hold; is that right?

13         A.     No, not -- no.  I don't believe I do.

14         Q.     And you are presently employed with

15   Johns Hopkins.  What is your title with Johns

16   Hopkins right now?

17         A.     Professor of epidemiology and

18   medicine.

19         Q.     Okay.  Now, correct me if I'm wrong.

20   As I understand, you're not a pharmacist, correct?

21         A.     I'm not a practicing pharmacist, no,

22   that's correct.

23         Q.     You are not a toxicologist, correct?

24         A.     I'm not a practicing toxicologist,

25   but I have significant experience studying

Page 20

1   substances such as opioids and understanding their

2   epidemiology and -- and the evidence base to

3   support abatement efforts.

4           Q.    You're not a licensed toxicologist or

5   hold yourself out as an expert toxicologist,

6   practicing toxicologist; is that fair?

7           A.    Well, I was asked to develop a

8   comprehensive abatement plan for Lake and Trumbull

9   Counties, and that didn't require me to have such a

10  license, and I don't have such a license.

11          Q.    Okay.  And I'm not -- I'm just

12  asking, understanding what your credentials are.

13  I'm not asking what you think is required in order

14  to prepare your report.  So let me just make sure I

15  understand who you are and what licenses you hold

16  and what expertise you have.

17                Am I correct that you are not a

18  statistician?

19          A.    I routinely employ statistics,

20  specifically biostatistics in the work that I do.

21  So while I primarily identify myself as an

22  epidemiologist and practicing internist, virtually

23  all of my epidemiologic work incorporates

24  biostatistics.

25          Q.    Are you a pain management specialist?

Page 21

1          A.      I'm a practicing internist, and many

2    of my patients have chronic and acute pain.  But I

3    don't exclusively practice pain management, nor

4    market my services as a pain management specialist.

5          Q.      Do you hold yourself out as an expert

6    in pain management?

7          A.      As a practicing internist, I have to

8    understand how to identify and manage pain because

9    pain is so prevalent in my patient population.  So

10   there's not a day that I have clinic where a

11   patient isn't -- one of my patients that I'm seeing

12   isn't likely to have some complaint that involves

13   pain.

14         Q.      Do you hold yourself out as an

15   addiction specialist?

16         A.      I have been studying the opioid

17   epidemic for, you know, a decade or more.  And

18   understanding the nature of addiction and how it

19   manifests and how it can best be treated is

20   something integral to what I do.

21               But I don't have an addiction

22   practice, if that's what you're asking.  In other

23   words, I don't market myself as an addiction

24   specialist.

25         Q.      I'm just asking, do you hold yourself

Page 22

1    out as an addiction specialist, yes or no?

2         A.    Well, I believe I answered that.

3         Q.    Is it "yes" or "no"?

4         A.    What I would say is that addiction is

5    a fundamental feature of the opioid epidemic, and

6    much of my work is focused on understanding the

7    nature of the epidemic, as well as how harms can

8    best be mitigated.  And so I have extensive

9    experience in studying addiction.

10        Q.    Do you consider yourself an addiction

11   specialist, yes or no?

12        A.    Clinically or nonclinically?

13        Q.    Clinically.  Clinically.

14        A.    As a practicing internist, I have to

15   be comfortable and equipped to manage any patient

16   that walks in the door.  And unfortunately, all too

17   often, my patients have been impacted by addiction.

18        Q.    So what I understand you're

19   testifying to -- you're not giving me a yes-or-no

20   answer -- you hold yourself out as an addiction

21   specialist from a clinical standpoint, correct?

22             MR. ARNOLD:  Objection.  Asked and

23   answered.

24             MR. MANNIX:  It hasn't been answered

25   yes or no.  I don't know what he -- whether he's

1   saying he's an addiction specialist from a clinical

2   standpoint or not.

3          Q.     (BY MR. MANNIX:)  Yes or no?

4          A.     What I would say, as a practicing

5   internist, because of how common addiction is, I

6   have to be capable and prepared to manage

7   addiction.

8                 And so as a practicing internist, I

9   am comfortable screening for, identifying and

10  assisting patients in treating addiction.

11         Q.     Do you hold yourself out as a

12  clinical specialist in opioid disorders?

13                MR. ARNOLD:  Objection to form.

14         A.     I'm sorry.  Can you ask that again,

15  please?

16         Q.     (BY MR. MANNIX:)  Do you hold

17  yourself out as a clinical specialist in opioid

18  disorders?

19         A.     Can you say more about what you mean

20  by "hold yourself out as"?

21         Q.     Do you consider yourself a clinical

22  specialist in opioid disorders?

23         A.     Unfortunately, I have encountered

24  many patients over the past twenty years of my

25  patients that have been impacted directly by the

1    opioid epidemic, some with addiction, some who have

2    lost loved ones and so on.

3                    And so as a practicing internist, I

4    feel equipped, and I think it's important that I'm

5    equipped, to identify and address patients that

6    have opioid use disorder, or who have otherwise

7    been impacted by the opioid epidemic.

8                    So I will defer to you as to whether

9    or not that qualifies as an opioid addiction

10   specialist.

11                   But I primarily hold myself out as a

12   practicing internist who's equipped to manage, you

13   know, the day-to-day problems that come in the

14   door.  And all too often, that includes individuals

15   that have been impacted by the opioid epidemic.

16       Q.    Do you consider yourself a clinical

17   specialist in opioid disorders, yes or no?

18                   MR. ARNOLD:  Objection to form.

19       Q.    (BY MR. MANNIX:)  I want to

20   understand whether you consider yourself one,

21   Dr. Alexander, yes or no?

22                   MR. ARNOLD:  Objection, form.

23       A.    I consider myself a practicing

24   internist who's equipped to manage the next patient

25   that walks in the door.  And unfortunately, all too

Page 25

1    often, that may be someone who has been impacted

2    directly by the opioid epidemic.

3           Q.     (BY MR. MANNIX:)  If you could turn

4    to Exhibit 6.  Again, we talked about this

5    previously.  This is Appendix C to your report.

6                  Do you have that in front of you?

7           A.     Yes, I do.

8           Q.     You have listed the other cases where

9    you have been retained as an expert in Appendix C,

10   Exhibit 6.  They all appear to relate to opioid

11   issues; is that right?

12          A.     Yes.  Yes, that is --

13          Q.     And who retained you in the present

14   case?  Who do you understand retained your services

15   in the present case?

16          A.     Well, I --

17                 THE REPORTER:  Mr. Arnold --

18   Mr. Arnold, your paper is shuffling, so if you

19   could mute yourself a little bit, I'd appreciate

20   it.

21                 MR. ARNOLD:  Sorry.  My apologies.

22          A.     In the present case, I mean, I'm here

23   to serve the citizens of Lake and Trumbull County

24   and the courts and the parties involved.  My direct

25   contact through counsel has primarily been with

Page 26

1    Motley Rice.

2              So I don't know the precise answer to

3    your question, I'm sorry to say.  But, you know, my

4    primary contact is through Motley Rice.  But,

5    again, I view my role as really serving the

6    citizens of Lake and Trumbull Counties, as well as

7    the other stakeholders in this case.

8         Q.    (BY MR. MANNIX:)  Who initially

9    contacted you to get involved in this case?

10        A.    I don't remember.

11        Q.    Do you remember what law firm or what

12   employer they had, who contacted you?

13        A.    I believe it was likely Motley Rice,

14   somebody at Motley Rice, but I don't know for sure.

15        Q.    In these other cases where you

16   provide expert services listed on Appendix C, was

17   your primary contact in those cases someone from

18   Motley Rice?

19        A.    Yes.  Yes, it has been.

20        Q.    In the context of all of the cases

21   that you worked on listed in Appendix C where

22   Motley Rice was your primary contact, how much have

23   you been paid, in total, for those cases?  And when

24   I say "you," I'm talking about Monument Analytics.

25   Do you know how much they've invoiced total?

Page 27

```
1            A.      I don't know.
2            Q.      Has it been over a million dollars?
3            A.      Yes, I believe it has.
4            Q.      Has it been over two million dollars?
5            A.      I believe it has.
6            Q.      Has it been over three million
7      dollars?
8            A.      I believe it probably has.
9            Q.      Over four million dollars?
10           A.      I do not know.
11           Q.      And what is your present hourly rate?
12           A.      Nine hundred dollars an hour.
13           Q.      If you could go through the
14     process -- we've opened some of them already, but
15     why don't you go ahead and open the packages,
16     Exhibits 1 through 8, which I think they were sent
17     out as your report and your various appendices.  I
18     think that's A through F.  And we'll talk about
19     those.
20           A.      Sure.  I will just stand up for one
21     second, but I'm here.
22           Q.      Yeah, okay.
23                   (Pause.)
24           A.      Okay.  I'm all set.
25           Q.      (BY MR. MANNIX:)  All right.  Do you
```

1    have Exhibits 1 through 8 available in front of

2    you?

3                    (Exhibit 8 was marked for

4                    identification.)

5          A.      Yes.  Yes, I do.

6                    (Exhibit 1 was marked for

7                    identification.)

8          Q.      (BY MR. MANNIX:)  Okay.  The Exhibit

9    1, that is your expert report, without the

10   appendices; is that right?

11         A.      Yes, that's right.

12         Q.      And that is dated 4 -- April 16th,

13   2021, correct?

14         A.      Yes.

15         Q.      And is it fair to say that this

16   contains a description of your analysis and your

17   conclusions and the opinions you intend to offer in

18   this case; is that fair?

19         A.      Well, I haven't reviewed the document

20   that was sent to me.  But assuming that it

21   represents -- that it's actually my report and it

22   was printed correctly and so on and so forth, yes,

23   that does represent -- in addition to the

24   appendices that accompany it -- the opinions that I

25   would be prepared to provide to the courts, unless

Page 29

1    the judge and parties requested other information

2    of me, in which case I would try to provide

3    whatever I can to be of service.

4         Q.    Okay.  And I'm not going to ask you

5    to review it word for word.  But as we go through

6    this, if you see anything that indicates to you

7    that what I sent you was not your report, just go

8    ahead and let me know that.  Okay?

9         A.    Yes.

10               (Exhibit 5 was marked for

11               identification.)

12         Q.    (BY MR. MANNIX:)  So look at Exhibit

13    5, if you would.  Have that available.  I'm going

14    to quickly refer to your Exhibit 1 report.  And

15    then I want to go to Appendix 5, but would you

16    agree -- or Appendix D, which is Exhibit 5.

17               Am I right that what's in front of

18    you as Exhibit 5 is Appendix D?

19         A.    I don't see a cover sheet to it, and

20    I don't know the ordering of the Appendices.  But

21    it certainly seems plausible that it was Appendix

22    D.

23         Q.    Yeah.  I'm not sure if there was a

24    cover sheet on your Appendix D.  But in any event,

25    it says -- does it say in the upper right-hand

Page 30

1    corner, "Materials Relied Upon - Report"?

2         A.    Yes, it does.

3         Q.    If you look at your expert report,

4    Paragraph 11 -- this is Page 6 of Exhibit 1 -- and

5    the last sentence of Paragraph 11 says, "A complete

6    list of the documents I consulted in preparing this

7    report is provided as Appendix D."

8              Did I read that correctly?

9         A.    Yes.

10        Q.    All right.  And now if we turn to

11   Appendix D, Exhibit 5, with that understanding, I

12   want to talk to you about what you identify as the

13   complete list of the documents you consulted.  I --

14        A.    May I say one thing, please?

15        Q.    Well, I'm just going to ask you some

16   questions.

17        A.    Okay.  Fair enough.

18        Q.    If you want to answer the questions.

19        A.    Okay.

20        Q.    The Appendix D, I've reviewed

21   Appendix D and I've noted, at least -- I know you

22   may prove me wrong, is I did not see any reference

23   to deposition transcripts that were reviewed listed

24   in Appendix D.

25              Did you list -- are you aware of any

Page 31

1   depositions listed in Appendix D?

2         A.      I would have to review the appendix

3   carefully to identify those.  But I just want to

4   add that the sentence at the end of Paragraph 11 is

5   over and above any references that may be included

6   in my report itself.

7                  In other words, my report, I believe,

8   includes, I don't know, five hundred or six hundred

9   references.  And so Appendix D provides

10  supplemental references that were not formally

11  referenced in my report, but were nevertheless

12  consulted.

13        Q.      Okay.  I understand that.  I

14  understand that qualification.  Fair enough.

15                 Let me ask you, just -- do you know

16  if you reviewed any depositions in connection with

17  preparing this report?

18        A.      I did.  I did.

19        Q.      What depositions do you know that you

20  reviewed?

21        A.      I reviewed -- well, I'm sorry.

22  Depositions.  I'm sorry.  I thought you were asking

23  about expert reports.

24                 Did I review -- I don't believe that

25  I reviewed depositions.

1      Q.      Okay.  If you look at Page 12 of

2   Appendix D --

3      A.      You know, I would want to -- I mean,

4   I would like to look at the references in my report

5   proper in order to better answer your question as

6   to whether I reviewed depositions.  I do not recall

7   having done so, but I did have team members that

8   helped me.  Ultimately, you know, the work

9   represents my own.  But I would like to review the

10  references in my report in order to provide you

11  with a more definitive answer regarding your

12  question.

13     Q.      So if there are depositions

14  referenced in your report, it's your understanding

15  that either you or a team member reviewed those

16  depositions; is that right?

17     A.      Correct, or pieces of them.  I mean,

18  you know, for example, my discussions with April

19  Caraway and Kim Frasier were really helpful in

20  understanding the context on the ground and in

21  Trumbull and Lake Counties.  And so -- but I don't

22  recall whether or not, as part of that process, I

23  or a team member reviewed their actual depositions.

24              So, again, it would be helpful to

25  review my report in order to provide you with a,

1    you know, definitive answer regarding that.

2         Q.      Understood.  But as you sit here

3    today, you don't have a specific recollection,

4    aside from reviewing your report, of what

5    depositions, if any, you reviewed; is that fair?

6         A.      I don't recall having reviewed any

7    depositions, as I sit here today, to prepare my

8    report.

9         Q.      Okay.  If you look at Page 12 of

10   Appendix D, Exhibit 5 -- you have listed there the

11   documents that you have reviewed by Bates number.

12   Do you see that?

13        A.      Yes.

14        Q.      It says, "Production Documents."

15              You know, there's three pages of

16   listed documents that seem to have Bates numbers of

17   Lake or TRUM, T-R-U-M, meaning produced by

18   Trumbull.  Do you see that?

19        A.      Yes, I do.

20        Q.      And are you aware that Lake and

21   Trumbull County produced over a million documents

22   in this case?

23        A.      No, I'm not aware of that.

24        Q.      With that understanding, it's fair to

25   say that you did not review over a million

1    documents produced by Lake and Trumbull County in

2    this case; is that fair?

3           A.     You know, I was asked to develop a

4    comprehensive abatement plan.  And I reviewed

5    documents that my team and I identified as being

6    most crucial to that effort.  So what I was asked

7    to do didn't require for me to review a million

8    documents.

9           Q.     Okay.  And I'd ask you to just answer

10   the question that I'm asking.  And I didn't ask for

11   an explanation as to why or why you didn't review a

12   million documents.  I just asked whether you

13   reviewed them.

14           My understanding is you didn't review

15   over a million documents produced by Lake and

16   Trumbull Counties; is that fair?

17           A.     Well, again.  I was asked to develop

18   --

19           Q.     I'm not asking what you were asked to

20   do, Doctor.  I'm asking you whether or not you did.

21   And I'm asking that you answer simply the question

22   that I am asking.

23                  MR. ARNOLD:  Objection, form.

24           Q.     (BY MR. MANNIX:)  And I'll ask it

25   once again.  And I am going to request that you

Page 35

1    answer the question asked, not what you want the

2    question to be.  Okay?

3                    You've identified here -- and I don't

4    have the exact number, but it's three pages, and it

5    certainly looks like less than two hundred

6    documents in this case that were produced by Lake

7    and Trumbull Counties; is that correct?

8          A.    I'm sorry.  Can you ask that again,

9    please?

10         Q.    What you've identified here in your

11   Appendix D as produced documents are the produced

12   documents that you reviewed; is that right?

13         A.    No.  That's not correct.

14         Q.    These are not -- you reviewed

15   additional documents that were produced in this

16   litigation, other than what you have identified

17   here?

18         A.    Yes, that's true.

19         Q.    And what documents are those?

20         A.    Well, I would have to look through

21   them, but there are six hundred and fifty-one

22   references in my report, and some of those were

23   produced.  So, you know, we would need to look

24   through those together to answer your question.

25         Q.    Okay.  In combination with the

Page 36

1  documents identified here starting on Page 12, and

2  what's referenced in your report, identify the

3  produced documents that you reviewed in this case;

4  is that fair?

5          A.      I'm not sure.  I'm not sure.

6          Q.      Okay.  How were the documents that

7  you reviewed in this case collected?

8          A.      Well, I discussed that in my report,

9  so I'd like to look at my report with you in order

10  to answer that question.

11          Q.      As you sit here today, you're not

12  sure how your -- the documents that you reviewed

13  were selected; is that correct?

14          A.      No.  My recollection --

15                  MR. ARNOLD:  Objection as to form.

16          A.      I'm sorry.  Can you ask that again,

17  please?

18          Q.      (BY MR. MANNIX:)  As you sit here

19  today, you are not sure how the documents that you

20  reviewed were selected; is that correct?

21                  MR. ARNOLD:  Objection, form.  Sorry.

22          A.      That's not correct.

23          Q.      (BY MR. MANNIX:)  Okay.  How were

24  they selected?

25          A.      Again, I would -- as I discuss in my

1  report -- and it would be helpful to review my

2  report with you -- I describe a careful process

3  whereby I comprehensively evaluated both the

4  produced documents, as well as other literature,

5  white papers, reports, peer-reviewed papers.  And

6  so on.  And in a careful and systematic process,

7  used these to develop my recommendations.

8          Q.     If you can access in your report

9  quickly -- you can refer to your report.  I'm not

10  precluding you from doing that.  I don't want you

11  to waste significant time that we have today to

12  talk to you about your report in locating that.

13  But if you know where that is, then that's fine.

14          A.     Thank you.

15          So, for example, in Paragraph 15, I

16  describe the stepwise process that I used to

17  develop or review the scientific evidence.  So for

18  example, I started with the information I was aware

19  of.  I supplemented this with the review of

20  additional academic and governmental studies,

21  included in both their reference list, as well as

22  subsequent reports that have cited those studies.

23          And I'd also used information such as

24  I describe in Paragraph 11.  So this includes

25  reviewing materials, including Bates stamped

Page 38

1    documents, deposition testimony provided to me by

2    counsel, although I don't recall, as we've

3    discussed, specific deposition records, published

4    reports regarding the epidemic, information derived

5    from other local and national sources,

6    peer-reviewed literature, white papers, reports

7    from public health authorities, nonprofit

8    organizations and other publicly available sources.

9                    In addition, I, along with some of my

10   team members, spoke with local stakeholders, such

11   as those that I've mentioned.

12                   So that provides the waterfront, if

13   you will, of the -- of the sources that I used.

14                   And then, you know, there's a sort of

15   stepwise process of evaluating the quality of

16   information, and that also is included in Paragraph

17   15 where I discuss a number of factors that are

18   used to assess the scientific quality of

19   information to address describing efforts to abate

20   the opioid epidemic.

21        Q.    Let me focus on Paragraph 11.  You

22   say the sources include, "Bates-stamped documents

23   and deposition testimony in this case provided to

24   me by counsel."

25                   I want to focus on that sentence.

Page 39

1    Okay?

2           A.     Okay.

3           Q.     How were the Bates-stamped documents

4    that you reviewed provided to you by counsel

5    selected?

6           A.     I -- I don't know.  You would have to

7    ask the counsel.

8           Q.     Okay.  So your understanding, the

9    Bates-stamped documents that you reviewed were not

10   selected by you, they were selected by counsel and

11   provided to you; is that fair?

12          A.     Well, I mean, I -- no, not entirely.

13   I mean, to be fair, I discussed with counsel -- I

14   mean, my typical process is to discuss with counsel

15   my goals and objectives and the type of information

16   that I need.  And then in an iterative process,

17   review materials and discuss whether further

18   materials would be helpful for review or not.

19                 And, you know, counsel has been

20   responsive and receptive and willing to provide me

21   with the information that I've requested.  And at

22   no point did I have a concern during the process of

23   developing my report that there were crucial

24   statistics or data points or programs relevant to

25   the case that I was not privy to or that I didn't

Page 40

```
 1   have access to understanding.
 2          Q.      Okay.  So the process was, in part,
 3   you would explain to counsel, plaintiff's counsel,
 4   the type of documents that you were looking for,
 5   and they would search the produced documents and
 6   see if those could be located and provided to you.
 7   Is that generally correct?
 8          A.      Yeah.  I mean, much of the
 9   information that I use is in the public domain.
10          Q.      Well, wait a second, Doctor.  I'm not
11   talking about that.  I want to focus on what my
12   question is.  And I'm talking about this sentence
13   of Bates-stamped documents.  So don't move on to --
14              MR. ARNOLD:  Object to the form.  The
15   witness should be allowed to finish his answer.
16              I'll point out that some of the
17   produced documents are also in the public domain,
18   so his response was responsive to the question.
19          Q.      (BY MR. MANNIX:)  Okay.  I'm going to
20   ask to focus the question again.
21              On the Bates-stamped documents, those
22   were -- you had discussions with counsel, and the
23   type of documents that you were looking for, and
24   the Bates-stamped documents were provided to you by
25   counsel, correct?
```

Page 41

1              MR. ARNOLD:  Objection.  Asked and
2    answered.
3         A.    Well, I think I answered that
4    question.  But I used many different sources of
5    information.  And wherever possible, triangulated
6    information through the comparison of different
7    sources of information.
8              And the core of my abatement program
9    is not terribly controversial.  That is there's
10   widespread consensus regarding what needs to be
11   done to reduce opioid-related morbidity and
12   mortality.
13             The most important part of my report,
14   as it applies to Lake and Trumbull Counties, is
15   understanding the experience of these counties on
16   the ground.
17             And I was fortunate to have more than
18   sufficient opportunities to do so, both through my
19   review of specific reports, such as the community
20   health improvement plans, and the proceedings of
21   the ASAP Coalition, and the Lake County Opioid Task
22   Force, through my conversations with individuals
23   like Kim Frasier and April Caraway.  Through my
24   review of state -- data provided by the State
25   regarding county-level trends, and through many

Page 42

1    other sources of information.

2         Q.     (BY MR. MANNIX:)  Did you review any

3    documents that were produced by the defendants, to

4    your knowledge?

5         A.     I don't believe, for this case, that

6    I did.

7         Q.     Did you not consider documents

8    produced by defendants relevant to your analysis?

9         A.     I was asked to develop a

10   comprehensive abatement plan for Lake and Trumbull

11   Counties.  And I didn't -- and, you know, at no

12   point did I discuss or was I advised to review

13   specific documents from the defendants as part of

14   developing recommendations for how to

15   comprehensively abate the epidemic.

16        Q.     So plaintiff's counsel didn't send

17   those to you to ask you to review.  But what I want

18   to understand is, did you think to yourself, those

19   documents produced by defendant, those won't be

20   relevant for my analysis, I don't need to see them?

21        A.     What sort of documents are you

22   referring to?

23        Q.     Any documents from defendants.

24   Documents that were produced by defendants.  Did

25   you consider those relevant to your analysis and

Page 43

1    decide not to review them, despite the fact you

2    thought they were relevant?

3                    MR. ARNOLD:  Objection, form.

4          A.    I'm sorry.  Can you ask that again,

5    please?

6          Q.    (BY MR. MANNIX:)  Did you consider

7    documents produced by defendants relevant to your

8    analysis and decide not to review them in any

9    event, despite the fact they were relevant?

10          A.    I was asked to develop a

11   comprehensive and evidence-based abatement plan for

12   Lake and Trumbull Counties.  And I don't believe

13   that reviewing those documents was vital to my

14   development of such a plan.

15          Q.    Did you not consider relevant to

16   determine if any of the pharmacy defendants were

17   involved in providing some of the programs that you

18   have identified as needed for the abatement?

19          A.    I was not asked as part of -- I was

20   not asked to perform a comprehensive retrospective

21   evaluation of efforts to date, you know, defendant

22   by defendant in these counties.

23          Q.    Did you not consider existing

24   programs within the counties to be relevant to your

25   analysis and your abatement program?

1          A.     Did I not?  I'm a little bit confused

2     by the construction.  I mean, I think -- I think

3     the answer --

4          Q.     Let me ask this:  Did you -- let me

5     ask it this way:  Did you consider existing

6     programs within the communities to be relevant to

7     your analysis of the abatement program that you're

8     proposing?

9          A.     Yes, I did.  And I carefully

10    evaluated a great number of programs that have been

11    undertaken in Lake and Trumbull Counties in an

12    effort to reduce opioid-related morbidity and

13    mortality.

14         Q.     So if the pharmacy defendants had

15    existing programs which were set up to help the

16    opioid epidemic in Lake County and Trumbull County,

17    then it would have been relevant to review those;

18    is that fair?

19                MR. ARNOLD:  Objection to the form.

20         A.     Well, I wasn't asked -- I'm sorry.

21    Go ahead, Mr. Arnold.

22                MR. ARNOLD:  Objection to form.  You

23    can answer.

24         A.     I wasn't asked to perform a

25    quantitative evaluation of programs to date.  I did

1    qualitatively evaluate a large number of activities

2    undertaken in Lake and Trumbull Counties.  And I

3    also -- I'm aware of and understand the potential

4    value of interventions that can be implemented

5    throughout the supply chain, including by

6    pharmacies and pharmacists.  And I believe that I

7    discussed these in the context of my report.

8         Q.    (BY MR. MANNIX:)  You just stated

9    that you weren't asked to perform a quantitative

10   evaluation, but you did conduct a qualitative

11   evaluation; is that right?

12        A.    Correct.  I -- I qualitatively

13   evaluated a number of different interventions and

14   programs and services that have been offered by

15   Lake and Trumbull County or in Lake and Trumbull

16   County, some by the County themselves, some by the

17   State.  And I did qualitatively evaluate these

18   because these were helpful in my understanding

19   the -- you know, the contours of the opioid

20   epidemic to date.

21        Q.    Okay.  And I have to understand this

22   a little better.  If there were a hundred programs

23   in Lake County to address the opioid program [sic],

24   are you saying that it wasn't important for you to

25   analyze all one hundred of those programs; all you

1   had to do is take a sampling and analyze the

2   quality of those several programs, and not worry

3   about additional programs and analyze all of them?

4                  Is that what you say by

5   distinguishing between a qualitative analysis,

6   which you did, and a quantitative analysis, which

7   you said you didn't do?

8                  MR. ARNOLD:  Objection to form.

9          A.     No, it is not.

10         Q.     (BY MR. MANNIX:)  If there were a

11  hundred programs, it would have been important for

12  you to review all one hundred programs and do a

13  qualitative analysis of all hundred programs

14  instead of just a few that you selected, correct?

15         A.     No.  I -- when I say "qualitative,"

16  I'm -- firstly, when I say "qualitative," I'm not

17  talking about a formal evaluation of the quality of

18  a given program.

19                 I think your question -- one question

20  before the last one, sort of, you know, switched to

21  talking about the quality of a program.

22                 When I say "qualitative evaluation,"

23  I'm saying that I used this information as a basis

24  to understand the contours and the efforts that

25  have been undertaken.

Page 47

1               And, again, I believe that there are,

2    as I describe in my report, important opportunities

3    for pharmacies and pharmacists and others in the

4    pharmaceutical supply chain to implement processes

5    and procedures to improve, you know, the safe

6    distribution of controlled substances, and to

7    reduce morbidity and mortality from these products.

8               But keep in mind, my report is

9    forward looking.  So it's built upon an

10   understanding of Lake and Trumbull County, but

11   I'm -- it's forward looking.  And I didn't need to

12   net out the certain level, current level or

13   provision of services.

14               It's clear that whatever has --

15   despite the best efforts of the counties, and

16   despite their having done, I believe, the best they

17   can with the resources that they've had available,

18   I believe there's still an epidemic in these

19   counties.  And so my report focuses on looking

20   forward, not looking backwards.

21          Q.    But wouldn't it be important to

22   know -- I understand they existed previously,

23   certain programs, exist now.  But if the intent is

24   they will continue to exist, right, outside of

25   whether your abatement program is put in place,

1  isn't it important to know what those programs are

2  that are intending to proceed prospectively?

3            MR. ARNOLD:  Objection to form.

4      A.    I'm sorry.  Can you ask the question

5  again, please?

6      Q.    (BY MR. MANNIX:)  Isn't it important

7  to understand -- I gave you the example before of

8  if there's a hundred programs that exist, and if

9  all one hundred are intending to continue to exist

10  into the future, isn't it important for you to know

11  what those programs are so that you can build on

12  those instead of abandoning all of those and start

13  from scratch?

14      A.    Well, I'm not recommending abandoning

15  anything.  I mean, ultimately it's up for the

16  counties themselves to decide what the, you know,

17  composition of their abatement going forward will

18  be.

19            But, again, I do discuss the

20  important role of actors in the pharmaceutical

21  supply system in my report.

22            And I'd be happy to review that

23  section of my report with you if that would be

24  helpful for you to understand what I believe -- you

25  know, what I believe -- how I believe that actors

1   within the pharmaceutical supply system can

2   implement processes that can reduce opioid-related

3   injuries and deaths.

4         Q.    How did you confirm, one way or

5   another, whether those processes and actions by the

6   pharmacy companies that you're speaking of weren't

7   already in place?

8         A.    I was not -- my report -- I was asked

9   to develop a comprehensive and evidence-based

10  abatement plan.  I was not asked to do a

11  retrospective evaluation of the adequacy of

12  programs to date by pharmacies.

13        Q.    But if they're already -- if the ones

14  that you recommend moving forward are already in

15  place, why would you not analyze that and take that

16  into consideration to figure out whether your

17  proposal would be effective or not?  If they're

18  already in place, and you're proposing to do

19  exactly what's already in place, why would that be

20  successful?

21        A.    My --

22              MR. ARNOLD:  Objection.  Incomplete

23  hypothetical.

24        A.    I'm sorry.  Mr. Arnold, I think I

25  spoke over you.

Page 50

1              MR. ARNOLD:  Yeah.  I just had an

2    objection.  Incomplete hypothetical.  You can go

3    ahead and answer.

4          A.     My recommendations, Mr. Mannix, rest

5    on an enormous evidence-based, a vast evidence base

6    of ultimately thousands, tens of thousands of

7    scientific studies.  So, you know, the

8    recommendations that I make are not pulled out of a

9    vacuum.

10             But just to be clear, I was not asked

11   to identify what's been done and net that out and

12   only recommend what I think is needed above and

13   beyond what may already be taking place.  I mean,

14   consider treatment.  I discuss treatment.  And you

15   could have the same argument about treatment.

16             Well, if Lake Geauga Recovery Center

17   is already offering treatment, then why are you

18   recommending treatment in your report?

19             It's because I wasn't asked to

20   subtract out the services or the programs that may

21   already be offered.

22         Q.     Okay.  So you were doing what you

23   were asked to do by Motley Rice in proceeding the

24   way you did; is that right?

25         A.     Well, you would have to ask them.  I

Page 51

```
 1   mean, that seems to me like a question that has --
 2   you know, that it's not fair for me to answer
 3   alone.
 4                   But my hope is that my report is
 5   useful for the courts, and most importantly, for
 6   the citizens of Lake and -- Lake and Trumbull
 7   County that have been, you know, devastated by the
 8   opioid crisis.
 9          Q.      Okay.  That's your hope, right?
10          A.      Yeah.
11          Q.      But were you doing -- using your own
12   discretion on what the scope of your work would be,
13   based on what your hope was, or were you doing what
14   you were asked to do by Motley Rice --
15                   MR. ARNOLD:  Objection to form.
16          Q.      (BY MR. MANNIX:) -- for the work you
17   performed?
18          A.      Well, I'd like to just review.
19                   So in the very first paragraph of my
20   report, I say, "I have been asked to discuss ways
21   to abate or reduce the harms caused by the opioid
22   epidemic, which has devastated the communities.  I
23   have also been asked to estimate the size of
24   specific populations that may require abatement
25   interventions."
```

Page 52

1          And that's what I believe I have

2    done.  I have discussed ways to abate or reduce the

3    harms, and I have also estimated the size of

4    specific populations.

5          Q.    Okay.  So that's what you were asked

6    to do and that's what you did; is that right?

7          A.    I believe so.  I hope so.  Again, I

8    think you would have to ask others to judge that as

9    well.  I don't feel that I alone should be the one

10   to judge whether or not I have fulfilled what I was

11   asked to do.

12         Q.    You attempted to do what you were

13   asked to do, correct?

14         A.    I did.

15         Q.    Do you know Harvey Rosen?  Are you

16   familiar with Harvey Rosen?

17         A.    Yes, I am.

18         Q.    Have you met with Dr. Rosen

19   personally?

20         A.    No, I have not.  I don't believe -- I

21   don't believe so.  I suppose it's possible in the

22   course of other litigation work, such as CT1, that

23   we may have been in the same room.  But I don't

24   recall.

25         Q.    Okay.  You didn't fly out anywhere or

Page 53

1   drive out anywhere and meet with him, correct?

2          A.    Not -- not -- not recently.

3   Unfortunately, the pandemic has made that sort of

4   undertaking less easy than it would otherwise have

5   been.

6          Q.    Okay.  That's a good clarification.

7   Have you had personal phone calls or Zoom calls

8   directly with Dr. Rosen?

9          A.    Yes, I have.

10         Q.    And when did those take place?

11         A.    I don't recall.

12         Q.    Did they take place before the date

13  of your report and his report of April 16th, 2021?

14         A.    I believe they would have.

15         Q.    Approximately how many Zoom calls or

16  phone calls did you have with Dr. Rosen?

17         A.    I personally -- I believe I

18  personally had one or two.  And I believe members

19  of my team likely had many more.

20         Q.    Have you reviewed Dr. Rosen's report

21  dated April 16th, 2021?

22                And it's Exhibit 39, if you want to

23  review it, if you want to refer to it.

24         A.    Oh, if you have -- yeah.  So I

25  have -- I have reviewed it, yes.

1          Q.     Did you review drafts of that report?

2          A.     I don't recall, but I certainly

3     worked with Dr. Rosen to try to assist he and his

4     team in any way that my or my team was able.

5          Q.     Did you have an understanding that

6     there were times where you were assisting him in

7     helping him develop his analysis and his report?

8                    MR. ARNOLD:  Objection, form.

9          A.     I'm sorry.  Can you ask again,

10    please?

11         Q.     (BY MR. MANNIX:)  Yeah.  I'm trying

12    to understand.  You had conversations with him,

13    your team had conversations with him.  Did you

14    understand that a purpose of the conversations

15    between you and Dr. Rosen or your team and

16    Dr. Rosen was to help him develop his analysis and

17    prepare his report?

18         A.     I mean, ultimately, Dr. Rosen is

19    responsible for his report, just like I'm

20    responsible for mine.  But my effort in any call

21    with anybody, including being here today, is to try

22    to be helpful and communicate and provide the

23    information that I can.

24                    So I don't know if that answers your

25    question.  But in speaking with Dr. Rosen or his

1   team, my effort would be to try to assist him if he

2   has any questions.

3           Q.      Did you have an understanding, when

4   you had your discussions with him, that his -- one

5   of his end goals was to finalize a report that was

6   to be produced in this litigation?

7           A.      Yes, I did.

8           Q.      And did you understand, when you had

9   your conversations with him, that he was -- you

10  were expecting him to take the information, the

11  helpful information you were providing, however you

12  were helping, to assist him in developing and

13  finalizing that report?

14          A.      Well, I mean, broadly speaking, I

15  don't think I would be speaking with him about much

16  other than issues relevant to his work or my work

17  with respect to opioid litigation.

18                  So I think, broadly speaking, all of

19  the exchange was, in some sense, an effort to -- to

20  provide any -- any helpful feedback or reactions or

21  comments or thoughts regarding the opioid epidemic

22  and our work in litigation.

23          Q.      Did you or your team send to him any

24  draft reports of your report before your report was

25  finalized?

1          A.     I don't know.

2          Q.     Did you prepare draft versions of

3    your report?

4          A.     Well, anything prior to the final

5    would be a draft, so I don't know what you mean by

6    "prepare."  But I certainly had a working copy of

7    the report prior to having a final copy of the

8    report.

9          Q.     Okay.  And were those circulated to

10   anyone, Harvey Rosen or anyone else?

11         A.     I don't know.  I did not -- I don't

12   recall having provided a copy of my report to

13   Mr. Rosen.

14         Q.     Do you recall circulating a copy of

15   any draft reports to anyone else?

16         A.     Well, I think it's likely that I

17   sent -- I or my team sent a copy, a draft of our

18   report, to Mr. Arnold or one of his colleagues at

19   Motley Rice.

20              MR. ARNOLD:  Counsel, we've been

21   going for over an hour.  If now or sometime soon

22   would be a convenient time to take a break, we

23   would appreciate it.

24              MR. MANNIX:  I'm always up for just

25   stopping for breaks.  I was planning on going until

1    10:45.  I'd like to take one break and go to 12:30

2    and then take lunch.

3              We can break now and then try to

4    proceed accordingly.  If we can go till -- can I do

5    one more line of questioning?  It's not all that --

6              MR. ARNOLD:  Well, Dr. Alexander, do

7    you want to go another ten minutes --

8         A.    Yeah.  That would be fine.  Thank

9    you.  I think that sounds great.

10             MR. MANNIX:  Okay.  Thanks.  And then

11   our court reporter, videographer, speak up if you

12   disagree.  I'm just trying to keep to a workable

13   schedule that I developed.  And if anyone wants to

14   comment, please do.

15        Q.    (BY MR. MANNIX:)  Dr. Alexander, you

16   indicated -- you talked about Kim Frasier and April

17   Caraway and Lauren Thorp a little earlier.  And

18   these are what you refer to as stakeholders, local

19   stakeholders, who you did speak to; is that right?

20        A.    Yes, it is.

21        Q.    Okay.  And in your report, those are

22   the ones you identified as the individuals from

23   Lake and Trumbull County who you personally spoke

24   to.

25             Is there anyone else, as you sit here

Page 58

1  today, who you spoke to in a similar fashion as you

2  did to April Caraway, Lauren Thorp and Kim Frasier

3  from Lake and Trumbull County to gain information?

4          A.     I don't believe so.

5          Q.     Let's talk a little bit about

6  these -- I don't know if they're personal meetings

7  or Zoom calls or phone calls.

8                 Let's talk about Kim Frasier first.

9  Did you meet with her personally?  Did you have a

10  Zoom call with her?  Did you talk to her on the

11  phone?  What was the context of your discussion

12  with her?

13         A.     I believe it was a phone call, at

14  least for me.

15         Q.     Okay.  Was it one phone call or

16  several phone calls with Kim Frasier?

17         A.     I don't recall.  I believe it was one

18  call.  It may have been two different times that we

19  engaged, but it was certainly -- there was

20  certainly one.

21         Q.     Whether it was one or two combined,

22  how long did you speak with Kim Frasier?

23         A.     Well, again, I don't recall if there

24  was a second call or not.  I believe the first call

25  was about fifty -- forty-five to fifty minutes.

1          Q.      If you had a second call, was it

2    shorter than that, or do you think it could have

3    been similar?

4          A.      Probably similar duration, if there

5    was a second call.

6          Q.      All right.  So you spoke to her

7    somewhere between forty-five minutes and an hour

8    and a half; is that fair, whether it's one or two

9    calls?

10         A.      Well, if they were both fifty

11   minutes, I guess it would have been an hour and

12   forty minutes, but that's correct.

13         Q.      Okay.  Somewhere in that range.

14                 Do you know when those were held?

15         A.      I do not.  I mean, within the past,

16   you know, four months, but I don't know the precise

17   date.

18         Q.      It was in 2021, you think?

19         A.      Yes, I do believe so.

20         Q.      Who else was on that call, besides

21   you and Kim Frasier?

22         A.      Yeah.  I don't recall for sure, but

23   my guess is Katherine Ozenberger, who's a colleague

24   of mine at Monument Analytics.  Last name

25   O-Z-E-N-B-E-R-G-E-R.

1              Elena Fernandez.  First name

2     E-L-E-N-A, and last name F-E-R-N-A-N-D-E-Z.

3              Possibly Omar Mansour.  First name

4     O-M-A-R, last name M-A-N-S-O-U-R.  I believe

5     Mr. Arnold would have been there.  I believe

6     Mr. Frank Gallucci may have been on the call.  And

7     a co-counsel or colleague of Mr. Gallucci's --

8     first name is Sal, and I apologize, but I don't

9     recall the last name.

10             But those would be the main

11    colleagues of mine from Monument Analytics and the

12    main counsel that I believe may have been present.

13         Q.    Okay.  And so if I understand, it was

14    Kim Frasier, you and individuals from your team and

15    individuals from plaintiff's counsel's firm,

16    correct?

17         A.    Correct.

18         Q.    And then what was the -- what were

19    you attempting to obtain -- what information were

20    you trying to obtain from Kim Frasier?

21         A.    Well, these calls are very helpful

22    because they allow for -- you know, I spoke earlier

23    about triangulation.  And this is an example where

24    these types of calls allow for me to triangulate

25    information that I am hearing or reading about or,

Page 61

1   you know, taking in from varied sources, and to

2   get -- to get a perspective from someone that has

3   day-to-day boots on the ground.

4           And so we spoke about a large number

5   of matters relevant to, in Kim's case, the

6   activities within Lake County that are relevant to

7   this case.

8         Q.    Do you recall who suggested you meet

9   with her?  Did you identify her as someone you

10  wanted to speak to, or did someone else identified

11  her as someone you should speak to?

12        A.    I think there -- she was a natural.

13  I don't recall specifically, but she was a natural

14  because of -- because of her position as executive

15  director of the Lake County Board of Alcohol, Drug

16  Addiction and Mental Health Services.

17        Q.    Did you maintain -- take and maintain

18  any notes related to that meeting?

19        A.    I don't believe that I did.  I

20  believe one of these calls I may have.  And I

21  believe for two of them, while typically it's my

22  practice to maintain notes, I believe for two of

23  these I was driving and did not take notes

24  personally.

25        Q.    Do you know if anyone on your team

Page 62

1  took notes?

2          A.      I do not.

3          Q.      How about Lauren Thorp, how many

4  times did you meet with her?

5          A.      I believe, one.

6          Q.      Excuse me, I include telephone calls,

7  Zoom calls.

8          A.      Right.  Right.

9          Q.      Personal meetings.

10          A.      Yeah.  I believe once.

11          Q.      Was that a phone call, Zoom call,

12  personal meeting?

13          A.      Again, I believe it was either phone

14  or Zoom.  I do not recall.

15          Q.      Did that happen in 2021?

16          A.      Yes.  I believe it did.

17          Q.      And was it a similar situation where

18  there was -- Lauren Thorp, other people from your

19  team, as well as representatives from plaintiff's

20  counsel?

21          A.      Yes, I believe so.

22          Q.      What, specifically, were you

23  attempting to obtain, what information were you

24  seeking to obtain from Lauren Thorp?

25          A.      Well, as director of recovery and

1   youth programs at the Trumbull County Mental Health

2   and Recovery Board, I believe that Ms. Thorp has a

3   valuable perspective to offer regarding the

4   activities that the Mental Health and Recovery

5   Board has taken, many of which have been undertaken

6   through the ASAP Coalition, to try to reduce

7   opioid-related morbidity and mortality.

8          Q.    Did you maintain any notes from that

9   meeting?

10         A.    I don't believe that I did.

11         Q.    Was it your testimony that you

12  thought two of these -- well, I guess there might

13  have been more than one time.

14               Do you know if that call with Lauren

15  Thorp was in your car, or could have been in your

16  office, or do you recall where you were when you

17  were taking that call or Zoom?

18         A.    I don't recall.  Again, I believe

19  that one of these -- in speaking with one of these

20  three individuals, I believe that I may have taken

21  some notes.  And in speaking with the other two, at

22  least one of those conversations, I believe I was

23  in a car and not in a position to take notes.

24         Q.    And then April Caraway, how many

25  times did you meet with her, personally or Zoom or

Page 64

1    over the phone?

2              A.      I believe -- I believe once.

3              Q.      Approximately how long was that call?

4              A.      I don't recall.

5              Q.      Would it have been similar to what we

6    talked about with Kim Frasier, somewhere between

7    forty-five minutes and fifty minutes, less or more?

8              A.      Yeah.  I mean, typically, I like to

9    speak with these types of individuals for -- until,

10   you know, at least as long as I feel like allows

11   for me to get a good sense of their perspective on

12   the opioid epidemic and the abatement efforts to

13   date within their communities.  And so I don't know

14   the precise duration of the call.  But I can tell

15   you that I felt comfortable, based on the calls and

16   based on my -- the totality of evidence that I

17   reviewed, that I was able to develop what I feel is

18   a comprehensive and evidence-based and

19   fit-for-purpose abatement plan within Lake and

20   Trumbull Counties.

21             Q.      When you met with these individuals,

22   did you seek to obtain information or did you ask

23   them to talk to other individuals prior to the call

24   or Zoom call with you?

25             A.      That, I didn't -- I mean, you -- you

Page 65

1   asked if when I met with them, I asked them to

2   speak --

3            Q.     Yeah, let me back up.

4            A.     -- or if they spoke with people

5   before?  I didn't understand the question.

6            Q.     When the call was being set up with

7   them, and they were aware that a call was being

8   held in a week or however long it was, do you know

9   if there was a request made of them to obtain

10  additional insider information, from other specific

11  individuals at Lake or Trumbull County, so that

12  they could relay to you information from those

13  individuals, or was it simply a meeting with them

14  to understand what they knew based on their

15  experience and personal knowledge?

16           A.     I mean, these calls were one of

17  dozens, or I suppose, to speak literally, hundreds

18  of sources of inputs that I used in order to

19  understand the experience on the ground in these

20  communities, and including reports such as

21  community health improvement plans and the HUB

22  report in Lake County.  Reports that have been

23  generated by the counties, by the types of

24  individuals that you're speaking about.

25                  So at no point in preparing this

Page 66

1    report did I feel -- did I have concern that I

2    lacked access to the information that I needed to

3    develop a comprehensive and evidence-based

4    abatement plan.

5              Q.    Yeah, I don't think that was

6    responsive to my question at all.

7                    My question was whether you know, one

8    way or the other, whether Lauren Thorp, Kim

9    Frasier, April Caraway, in preparation for the

10   meeting or call with you, whether they were asked

11   to speak to other people so that they could convey

12   information obtained from those individuals to you

13   when the meeting was held or the phone call was

14   held with you.

15                   Do you know one way or the other

16   whether that was asked of them and whether they did

17   that?

18             A.    I'm not aware of whether -- I'm not

19   aware of the preparatory -- I'm not aware of the

20   preparation that these individuals performed in

21   advance of the call that I had with them.

22             Q.    Were they asked to -- did they bring

23   specific documents to the meeting, or provide you

24   specific documents during the meeting?

25             A.    During the -- one of the things that

Page 67

1    I like to be sure about and used these calls for is

2    to be sure that I have reviewed the most relevant

3    documents to the case.

4              And so, typically, I will discuss

5    with local experts what materials they believe are

6    most valuable in allowing for me to get as good a

7    sense as I can of the experience on the ground.

8              MR. MANNIX:  We're a little past

9    10:45, so we can take a break now, and we'll come

10   back and discuss this and some other things after

11   that.

12             What do we want to say, right at

13   11:00?

14        A.    That's fine.  That's fine.

15             MR. MANNIX:  Okay.

16             THE VIDEOGRAPHER:  Okay.  We're off

17   the record, 10:48.

18        A.    Thank you.

19             (Whereupon, a break was had from

20             10:48 a.m. until 11:03 a.m. EDT)

21             THE VIDEOGRAPHER:  We are back on the

22   record at 11:03.

23             (Exhibit 10 was marked for

24             identification.)

25        Q.    (BY MR. MANNIX:)  Dr. Alexander,

Page 68

1    we've returned from break.  Let me have you turn to

2    Exhibit 10.

3              A.     Okay.

4              Q.     Do you have that -- let me know when

5    you have that in front of you.

6              A.     Yes, I do.

7              Q.     Okay.  This is -- does this appear to

8    be a report that you prepared in another case, the

9    case brought by Cabell County and the City of

10   Huntington in West Virginia?

11             A.     Yes, it does.

12             Q.     And were you asked to provide

13   opinions in that case on abatement strategies,

14   similar to what you were in this case?

15             A.     Well, I wasn't asked to focus on any

16   specific strategies, but I was asked to develop, in

17   a similar manner, a comprehensive and

18   evidence-based abatement plan, yes.

19             Q.     Did you attempt to conduct an

20   analysis in that case similar to the analysis you

21   did in this case?

22             A.     Well, the general scientific process

23   is similar, yes.  But there are, you know, big

24   differences between these communities as well.

25             Q.     Understood.  But as you said, the

Page 69

1   scientific process that you undertook was the same,

2   right?

3          A.     Similar.  I mean, these are -- these

4   are dynamic plans.  And my information is provided

5   at a single point in time for each of these

6   communities.  But, yes, the general underlying

7   process is similar.

8          Q.     And you -- in those communities, did

9   you attempt to understand and then describe the

10  opioid problem existing in those communities as you

11  attempted to do so in this case?

12         A.     Yes, I did.

13         Q.     And you spoke to individuals there,

14  correct; is that right?

15         A.     Yes, I believe I did.

16         Q.     If you look at Page 6 of this report,

17  you've identified stakeholders in those

18  communities; is that right?

19         A.     Yes, that's correct.

20         Q.     And I've counted, there's twenty-one

21  individuals that you identify in those communities.

22                Does that look approximately correct?

23                You're free to count them.  But I'll

24  represent to you I've counted them as twenty-one.

25                And really the question I have to you

Page 70

1     is:  Recognizing there's many more people that you

2     spoke to in those communities than you have in

3     Trumbull and Lake County as stakeholders and

4     referenced in your report, is there a reason why

5     you spoke to only three in Lake and Trumbull and

6     spoke to twenty-one in West Virginia, in the West

7     Virginia case?

8                 A.      Well, these individuals are one of

9     many sources of information that I used to generate

10    my report.  And so, you know, my typical process is

11    to speak with people in order to learn as much as I

12    can and ensure that what I've learned from other

13    sources is consistent with what I'm hearing from

14    individuals.

15                Q.      Okay.  But you spoke to people in

16    many different departments in West Virginia, while

17    in this case you spoke to the three individuals you

18    identified, correct?

19                A.      That's correct.  The individuals that

20    I spoke with in this case were individuals that had

21    a broad view of the landscape and were able to

22    provide me with valuable information to supplement

23    the information that I got from other sources.

24                      Some of the individuals that I spoke

25    with in -- in Cabell County in the City of

Page 71

1   Huntington, while helpful, were able -- provide --
2   provided me with a much more narrow, you know,
3   slice of the waterfront, if you will.
4           Q.      With respect to your report,
5   obviously, there's -- I want to talk a little more
6   directly about your report, your analysis in Track
7   3.
8                   You use the word "opioid" throughout,
9   obviously.  So we're on the same page, what is your
10  meaning?  When you use the word "opioid," what is
11  your understanding?  What are you attempting to
12  convey with that word, with that term?
13          A.      It depends.
14          Q.      Okay.  What does it depend on?
15          A.      It depends on the context.
16          Q.      Okay.  What do you mean by
17  "nonprescription opioid"?
18          A.      Typically -- I'm sorry.  Go ahead.
19          Q.      No, what does that entail?  Go ahead.
20  You were speaking.
21          A.      Typically, by "nonprescription
22  opioid," I mean an opioid -- well, it depends on
23  whether -- I'm sorry, but I want to be sure not to
24  confuse matters regarding nonmedical use, which is
25  a separate term that we can discuss, and

Page 72

```
1    nonprescription opioid.  But by "nonprescription
2    opioid," typically, I mean opioids such as heroin
3    or illicit fentanyl.
4           Q.    Okay.  Well, you reference
5    "nonmedical use," what do you mean by that term?
6           A.    "Nonmedical use"?  As with the
7    standard definitions that are used, you know, in
8    national service and otherwise generally, I use
9    that to refer to use of a product for a purpose or
10   in a way other than for which it's been prescribed.
11          Q.    And when you use the term
12   "prescription opioid," what is meant by that term?
13          A.    I believe -- if -- I'd like to look
14   at my report.  I believe, in my report, I discuss
15   some of these terms and their definitions, so it
16   would be helpful to refer you -- I'd like to refer
17   you to that point in my -- that place in my report.
18          Q.    Okay.  And that -- the report is
19   right in front of you, so feel free to look at your
20   report as we go through these questions.  You can
21   do that.
22          A.    Okay.  So I think, in Footnote A on
23   Page 3 of my report, I refer to Dr. Anna Lembke's
24   report for definitions of terms such as "opioid use
25   disorder," "addiction," "nonopioid medical use and
```

 1   misuse."

 2          Q.      So you would have to refer to her

 3   report to understand what you mean by those terms?

 4   Is that --

 5          A.      No, that's -- no, that's not true.

 6          Q.      Okay.  My question was earlier, when

 7   you used the term "prescription opioid," what do

 8   you mean by that?

 9          A.      It depends on the context.

10          Q.      Okay.  What does it depend on?  What

11   do you mean "it depends on the context"?  What --

12   what are the different meanings it can have?  When

13   you use it, what are you referring to?

14          A.      Can we look at an instance where I

15   used that term in my report?

16          Q.      If you're saying, sir, every time you

17   use it, it may mean something different?  Or do you

18   have a standard meaning when you use the word

19   "prescription opioids"?  I understand that there

20   may be something refined, but is there a broad

21   category or definition that you -- it falls into

22   when you use the word "prescription opioids" in

23   your report?  Or can we give it no meaning at all?

24                  Are you saying that when you use the

25   word "prescription opioids," it varies -- the

Page 74

1    meaning of that varies throughout your report?

2          A.    Again, it would be helpful to look at

3    a specific context.  If you're asking about how I

4    intended a specific -- how -- what I intended a

5    specific word to mean.

6          Q.    No.  I'm fine with that answer.  As I

7    understand, it varies depending on what sentence,

8    what page we're referring to.  That's fine.

9                When you use the word "opioid use

10   disorder," what is meant by that term?

11         A.    I generally use that synonymously

12   with opioid addiction.  And as I describe in my

13   report, I provide a reference to the expert report

14   of Dr. Anna Lembke with respect to definitions of

15   these terms.

16         Q.    Okay.  So we should look to her

17   report if we want to understand your definition of

18   those terms?

19         A.    Well, I think -- I think -- I haven't

20   matched up every time she uses the word and every

21   time I use the word.  But I think that our reports

22   and language and use of these terms is well

23   aligned, because we both practice clinically, and

24   we both see people with addiction and treat

25   addiction.

```
                                                  Page 75
 1                    (Exhibit 20 was marked for
 2                    identification.)
 3          Q.     (BY MR. MANNIX:)  I'm going to have
 4    you turn to Exhibit 20.
 5                    Do you have that in front of you?
 6    Let me know when you have it in front of you.
 7          A.     I do.
 8          Q.     This is -- correct me if I'm wrong.
 9    This is an article that you coauthored; is that
10    right?
11          A.     Yes, it is.
12          Q.     Okay.  And it was published -- what
13    year was this published in, 2020; is that right?
14          A.     It looks to be, yes.
15          Q.     Okay.  And do you agree with the
16    statements in this article?
17          A.     Just one minute, please.
18                    At the time the article was written,
19    I believe that the article represents my views and
20    perspectives on the matters at hand, yes.
21          Q.     If you look at the -- down to the
22    introduction, first page, middle of the page says,
23    "Introduction."  Do you see that?
24          A.     Yes, I do.
25          Q.     Could you read the first sentence
```

1    into the record?

2         A.    "The overdose crisis in the United

3    States has typically been described as an opioid

4    overdose epidemic consisting of three waves, with

5    morbidity and mortality accounting for -- accounted

6    for predominantly by prescription opioids, 1999 to

7    2010; heroin 2010 to 2013; and illicit fentanyl and

8    other synthetic opioids, 2014 to present."

9         Q.    Now, that's -- that was your position

10   in 2020, correct?

11        A.    Yeah.  At the time that we submitted

12   this for publication, it was my position that

13   the -- that the overdose crisis has typically been

14   framed as having three waves, yes.

15        Q.    Has that position changed?  Do you

16   think differently now?  Or do you maintain that

17   position now?

18        A.    Well, I mean, I think it's important

19   to understand what -- what is and isn't meant by

20   this.  So I'm not suggesting that many people

21   aren't still dying from prescription opioids.  And

22   I'm not suggesting that nobody died from illicit

23   opioids in the year 2002.

24             But, yes, I still believe that the

25   opioid epidemic is typically characterized as

Page 77

1   having had three waves.

2          Q.     As described in the sentence you just

3   read, correct?

4          A.     Yes, that's correct.

5          Q.     And then can you read the next

6   sentence that begins "between" down to the words

7   "efforts" -- or the word "efforts" in the Footnote

8   4?  Could you read that into the record?

9          A.     Sure.

10                 "Between 1999 and 2010, the volume of

11  prescription opioids distributed in the United

12  States increased four fold, corresponding with an

13  approximate four fold increase in the rate of fatal

14  overdoses involving prescription opioids.

15                 "Deaths involving prescription

16  opioids plateaued in 2010 to 2013, rose modestly

17  until 2016-2017, and declined in 2018 attributable

18  to both reduced opioid prescribing and other

19  prevention, treatment and recovery efforts."

20         Q.     And is that the statement that you

21  stand by today, as describing --

22         A.     Well --

23         Q.     -- on some level, the first wave?

24         A.     I'm sorry.  I believe I interrupted

25  you.  Can you please ask your question again?

Page 78

1          Q.    Yeah.  I just want to know.  You said

2     this was your view back in 2020, suggesting that

3     some of your views may have changed.  I don't know

4     if they did or not.  I just want to know if you

5     stand by that statement as generally descriptive of

6     the first wave of the opioid epidemic?

7                    MR. ARNOLD:  Objection.  Misstates

8     testimony.

9          A.    Yeah.  I'm not speaking here only to

10    the first wave.  And if I were speaking today, as I

11    am, I would feel compelled to mention the

12    coronavirus pandemic and that deaths from overdoses

13    in many communities have never been higher than

14    they are currently.

15         Q.    Okay.  If -- is there something about

16    this statement that you think is incorrect that you

17    just read into the record?

18         A.    No.

19         Q.    Is your article incorrect as it

20    stands today, yes or no?

21         A.    My article or that statement?

22         Q.    That statement.

23         A.    No, I do not believe there's anything

24    incorrect about that statement.

25         Q.    Okay.  And then can you read the next

Page 79

1    sentence into the record?

2         A.    "Beginning in 2010, largely as a

3    result of increased geographic availability of

4    historically low cost, high purity heroin and

5    increased demand for opioids, overdose deaths from

6    heroin began to rapidly increase."

7         Q.    Is there anything incorrect about

8    that statement?

9         A.    Again, I think all of these things

10   have to be --

11        Q.    Is there anything incorrect about

12   that statement?

13             MR. ARNOLD:  Objection.  You have to

14   let him finish his answer.

15             MR. MANNIX:  This is not anything

16   other than a yes-or-no question.

17             MR. ARNOLD:  It's not a multiple

18   choice test.  I think he gets to answer the

19   question.

20        Q.    (BY MR. MANNIX:)  Is there anything

21   incorrect about that statement?

22             Go ahead.

23        A.    I think these statements have to be

24   taken into context.  And the context of these

25   statements is understanding the genesis of

1    opioid-related morbidity and mortality.

2              And in the case of this paper, also

3    understanding nonopioid morbidity and mortality.

4         Q.    Dr. Alexander, do you stand by that

5    statement you just read into the record?

6         A.    I think that -- again, I think that

7    the typical characterization of the opioid epidemic

8    in three waves is not terribly controversial.  But

9    I think it's important to understand the

10   interrelationship between the oversupply of

11   prescription opioids that -- that predominated over

12   everything else early in the opioid epidemic, and

13   the subsequent increase in heroin and illicit

14   fentanyl use that we've seen more recently.

15        Q.    You published this in 2020.  Are you

16   now backtracking and taking the position that that

17   statement you just read into the record is

18   incorrect?  Is that what you're doing?

19        A.    I think that there are serious --

20   serious challenges with heroin and illicit

21   fentanyl, there's no question.

22              And one important process or part of

23   understanding those challenges is understanding the

24   interrelationships of prescription opioid

25   oversupply on the one hand, and heroin and fentanyl

Page 81

1    morbidity and mortality on the other.

2           Q.    Are you willing to stand by that

3    statement, as you sit here today?

4               And I'll read it back for the record

5    if you need me to, but you read it.

6               Do you stand by that statement or

7    not?

8           A.    I think that the increased demand for

9    opioids, of which the oversupply of prescription

10   opioids, which was fueled by the oversupply of

11   prescription opioids, has driven increases in

12   heroin and illicit fentanyl use.

13          Q.    What's incorrect about that

14   statement?

15          A.    I mean, what I'm providing you with

16   is context for that -- for that statement.

17          Q.    I'm not asking you for context.  I'm

18   asking you what's incorrect about that statement?

19          A.    I think that statement accurately

20   reflects one element of the opioid epidemic, which

21   has been that following the vast oversupply of

22   prescription opioids and the predominant

23   prescription opioid deaths early in the opioid

24   epidemic, we've seen increases in deaths from

25   heroin and subsequently illicit fentanyl.

1          Q.     Go ahead and read the next sentence

2     into the record.

3          A.     "Then, in 2013, coincident with the

4     rapid increase of illicitly-made fentanyl and

5     fentanyl analogs, including the extremely potent

6     analog carfentanil in the U.S. drug supply, there

7     was a near exponential increase in overdose deaths

8     involving fentanyl and other synthetic opioids,

9     with the rate of overdose deaths increasing" -- I'm

10    sorry -- "with the rate of overdose deaths

11    involving these drugs increasing eight hundred and

12    ninety percent, from 1.0 per hundred thousand

13    person in 2013 to 9.9 in 2018."

14         Q.     Is that a correct statement or

15    incorrect statement, as you sit here today?

16         A.     Again, if I were discussing the waves

17    of the opioid epidemic today, I would highlight

18    these three waves.  And then I would discuss the

19    issues with respect to the pandemic and more recent

20    evidence of greater morbidity and mortality in many

21    communities than ever before.

22         Q.     Okay.  So you can't point out

23    anything in that particular statement that's

24    incorrect, you would just add additional

25    information; is that right?

Page 83

1      A.      I think that statement accurately
2    captures some of the challenges of the opioid
3    epidemic, which include significant morbidity and
4    mortality from illicit fentanyl.
5      Q.      Have you prescribed opioids in your
6    practice?
7      A.      Yes, I have.
8      Q.      When you have written a prescription
9    for any drug, do you expect a pharmacy to fill it?
10     A.      No, I do not.  Not necessarily.
11     Q.      If the pharmacy calls and you confirm
12   that the prescription was intended for the patient,
13   do you expect it to be filled?
14              MR. ARNOLD:  Objection, form.
15     A.      Not necessarily.
16     Q.      (BY MR. MANNIX:)  If pills are later
17   stolen from the patient after it's dispensed, the
18   patient -- an opioid prescription that you've
19   written and was dispensed, do you consider that to
20   be your fault?
21              MR. ARNOLD:  Objection, form.
22     A.      I mean, there are -- I would
23   certainly be interested and concerned and do
24   anything and -- I mean, do everything within my
25   power to prevent that type of occurrence from

Page 84

1    happening.

2            Q.      (BY MR. MANNIX:)  So it's possible

3    that you would consider it your fault, if you wrote

4    a prescription for somebody for opioids, believing

5    that that was the right thing to do based on their

6    medical history and their condition, it was

7    dispensed and it was stolen, that could potentially

8    be your fault as far as --

9            A.      It depends.  It depends.

10           Q.      Has that happened to you, where

11   you've looked back -- that's happened and you've

12   said, "That was my fault"?

13                   MR. ARNOLD:  Objection, form.

14           A.      Well, that -- that seems to imply

15   that it's happened.

16                   Can you ask the question again?

17           Q.      (BY MR. MANNIX:)  That's what I'm

18   asking.  Is it a situation where, you know, you

19   prescribed opioids, it was dispensed, and it was

20   stolen by somebody else, and you came to the

21   conclusion that that was your fault?  Has that

22   happened?

23           A.      No, it has not.

24           Q.      In this case, you were asked to

25   provide your expert analysis and opinions in this

Page 85

1   matter, right?

2          A.      In which matter?

3          Q.      In the matter related to Lake and

4   Trumbull.

5                  Or do you think we're still on West

6   Virginia?

7                  We're talking about Lake and Trumbull

8   Counties, the litigation in Lake and Trumbull

9   Counties.

10                 Were you asked to provide an expert

11  analysis and an opinion related to Lake and

12  Trumbull Counties?

13                 MR. ARNOLD:  Objection, form.

14         A.      I mean, I think I was responding -- I

15  think "matter" may be a legal term of art, and I

16  just am not clear on what "this matter" means.

17                 But if you're asking whether I was

18  asked to provide an opinion as to what

19  scientifically-based comprehensive and coordinated

20  actions could be taken by Lake and Trumbull

21  Counties to reduce further harms from the opioid

22  epidemic in their communities, yes, that's what I

23  was asked to do, as well as to identify the

24  specific populations eligible for specific

25  services.

1          Q.     (BY MR. MANNIX:)  So what you just

2     described there was what you were asked to do and

3     what you attempted to do, right?

4          A.     Yes.  I mean, as I'm speaking, it

5     occurs to me, I believe there's an Appendix D or E,

6     there's an additional appendix that speaks to the

7     use of indicators or flags.  And so we can come to

8     that.  But that was an additional request.  But I

9     think those govern sort of the totality of requests

10    that were made of me.

11               There were some instances where I was

12    asked to provide specific estimates of medical

13    costs.  And those are included in my redress report

14    or redress model.

15               So I think that captures the totality

16    of what I was asked to do.

17         Q.     Were you asked to provide your best

18    judgment about what actions and interventions

19    should be employed to abate the opioid epidemic in

20    Lake and Trumbull County?

21         A.     Yes, I was.

22         Q.     What is the goal of the abatement

23    plan that's included in your report, the summary in

24    your report in the redress models?

25         A.     I mean, it's to be sure there's never

Page 87

1    another child that wakes up without her mom or dad

2    the next day.  I mean, it is to reduce the pain and

3    suffering and heartache that opioids have caused

4    for so many individuals within these communities.

5              It's to, you know, help ensure that

6    individuals with chronic pain are well managed and

7    managed according to best practices.

8              You know, it's to ensure that police

9    officers and detectives have the resources that

10   they need to -- to help get people in treatment

11   that are nonviolent criminal offenders, and to

12   divert people from the criminal justice to the

13   treatment system and so on and so forth.

14             I mean, at the end of the day, it's

15   about improving the lives of the citizens of Lake

16   and Trumbull County.

17        Q.    Is your goal to completely eliminate

18   the opioid-related injuries, addictions and death

19   in Lake and Trumbull County?

20        A.    I don't have as a goal a specific,

21   you know, quantitative threshold of zero or two or

22   fourteen or something with respect to my goal.  I

23   mean, I just told you in broad form my goal, which

24   is to -- to be sure that no one ever wakes up again

25   without a parent from a fatal overdose; that

1    individuals in high school or middle school aren't

2    running into trouble with opioids that have been

3    oversupplied and that are circulating through --

4    you know, through schools and after school clubs

5    and elsewhere and so on and so forth.

6            Q.    But you don't have specific numbers

7    as to what percentage of reduction or what

8    numerical percentage you would put on that

9    reduction in Lake and Trumbull County; is that

10   right?

11           A.    I'm sorry.  You said I would "put

12   on," and I guess I don't understand the question.

13           Q.    Yeah.  That's not a great term.  Do

14   you have an understanding as to the percentage

15   reduction of opioid problems that would be achieved

16   if your abatement program would be put in place in

17   Lake and Trumbull County?

18           A.    Yes, I do.

19           Q.    And what is that specific reduction?

20   Percentage?

21           A.    I'd like to review my redress models

22   to point you to that information.

23           Q.    Okay.  Where are those found in your

24   redress models?

25           A.    Well, let's take Exhibit 3, which is

Page 89

```
 1   for Lake County.
 2               (Exhibit 3 was marked for
 3               identification.)
 4        A.     And Page 2.  And it looks as if it's
 5   cut off.  So let's see if it's different for this
 6   one.  It's not.  So both of these are cut off.
 7               So could we get a complete version of
 8   the report, please?
 9        Q.     (BY MR. MANNIX:)  This is the -- what
10   page is it on Trumbull County?
11               (Exhibit 4 was marked for
12               identification.)
13        A.     Page 2 of either Exhibit 3 or Exhibit
14   4.  But I'd like to be able to see the electronic
15   version, please.
16        Q.     (BY MR. MANNIX:)  On Page 3.  Let's
17   do this if we can:  I'll come back to that after
18   lunch and we can address that line of questioning.
19        A.     Okay.
20        Q.     Put a flag on that.  I'll be able to
21   get those electronically, knowing what pages you're
22   talking about.
23        A.     I mean, I can look it up quickly, if
24   you'd like, on my computer.  But that would require
25   me to look at a nonformal exhibit, so maybe that's
```

Page 90

 1    not permitted.

 2          Q.    Yeah.  Let's just -- we'll go through

 3    the process.  I think I can bring those up

 4    electronically --

 5          A.    Okay.

 6          Q.    -- probably after the break, lunch

 7    break.

 8                With respect to the defendants in

 9    this case, do you understand who the defendants are

10    in this matter?

11          A.    I believe I have a broad

12    understanding.

13          Q.    And what is your understanding?

14          A.    I believe they are typically

15    pharmacies or distributors that act as -- in some

16    capacity as, you know, pharmacies in the supply

17    chain.

18          Q.    Is it your understanding that the

19    defendants in this case, Track 3, are different

20    than or do not include all of the defendants that

21    were involved in the other cases where you provided

22    expert services as listed in Appendix C of your

23    report?

24          A.    I'm not -- I don't -- setting aside

25    whether Appendix C was where that information was

Page 91

1    listed, the answer to your question is yes, it's my

2    understanding that the defendants in this case may

3    overlap with, but are not comprehensive of all of

4    the defendants that have been -- had claims made

5    against them in the other opioid litigation.

6            Q.    Do you understand what types of

7    defendants or categories -- you said primary -- in

8    this case pharmacy and distributors.

9            Do you understand that the other

10   cases involved manufacturers or other types of

11   entities?

12           A.    Yes, I do.

13           Q.    And what other type of entities do

14   you understand those other cases involved included?

15           A.    Well, I believe most of the

16   litigation has focused on cases against

17   manufacturers, distributors and pharmacies.

18           Q.    With the manufacturers that were

19   involved in those other cases, did you have a

20   position of whether those entities should be held

21   responsible for paying for the abatement plans that

22   you proposed in those cases, those other cases?

23           A.    No, I did not.

24           Q.    Does your model assume that, in this

25   case, the retail chain pharmacy defendants are

1    responsible for the abatement costs in Lake and

2    Trumbull County?

3         A.    I wasn't asked to assign

4    responsibility in my case.  I was asked to develop

5    comprehensive and evidence-based abatement plans.

6    But I can tell you that, based on my ten to fifteen

7    years and dozens of analyses of these matters and

8    close read of the opioid epidemic, I believe that

9    one important driver of the epidemic has been the

10   oversupply of prescription opioids within Lake and

11   Trumbull County.

12        Q.    Were you asked to identify any

13   specific wrongdoing by any of the defendant

14   pharmacies?

15        A.    I was asked to develop an

16   evidence-based abatement plan.  And that didn't

17   require me to identify wrongdoing by a specific

18   pharmacy.

19        Q.    Are you offering opinions as to who

20   caused the opioid epidemic and the harms identified

21   in Lake and Trumbull County?

22        A.    Again, I was asked to develop a

23   comprehensive and evidence-based abatement plan.

24   And that didn't require me to identify the precise

25   cause of the opioid epidemic in Lake and Trumbull

Page 93

1    Counties.

2           Q.      And you're not offering an opinion as

3    to who should pay the costs for your proposed

4    abatement program in this case; is that correct?

5           A.      I was asked to develop an

6    evidence-based and comprehensive abatement plan,

7    which is what I did.  And that didn't require me to

8    assign costs to particular parties.

9           Q.      Would you agree that your report does

10   not identify any causal connection between the

11   defendant pharmacies' conduct and any specific harm

12   you have identified in your report?

13          A.      My recommendations for how to reduce

14   opioid-related morbidity and mortality didn't

15   require me to identify causal connections between

16   specific parties and the harms that have occurred

17   in Lake and Trumbull Counties.

18          Q.      Is your abatement program set up to

19   address the problems with the opioid epidemic in

20   Lake and Trumbull County?

21          A.      Yes.  Yes, it is.

22          Q.      Is it set up to address the problems

23   with prescription opioids that are found in Lake

24   and Trumbull County?

25          A.      Which problems are you referring to?

1         Q.        Well, let me ask it this way:  You

2    talked about the three waves of the opioid epidemic

3    earlier, correct?

4         A.        Yes.

5         Q.        And I assume the article -- and you

6    can look at it -- was that a nationally-based

7    article in your description of the three waves of

8    the opioid epidemic?  It wasn't particular to a

9    specific community or state; is that right?

10        A.        Correct.  It was a systematic review.

11   But, again, it's not as if when Wave 2 comes along,

12   Wave 1 is suddenly no longer relevant.  I mean,

13   these are -- I describe, in my report, that there

14   are still people this -- you know, this very year,

15   that are dying in Lake and Trumbull County because

16   of prescription opioids.

17                  So it's not as if -- so I think it's

18   important to emphasize that the waves refer to

19   broad classifications of morbidity over time, but

20   should not be taken to the final story, or that

21   they -- these waves are mutually exclusive, and

22   there's no continuing morbidity from -- you know,

23   that there was no morbidity from heroin before

24   2010.  That's simply not true.

25        Q.        Yeah.  I'm not sure how that, in any

Page 95

1   way, was responsive to my question.  The question

2   was:  Would you agree with me your article was

3   based on a national perspective, as opposed to a

4   community or state-specific analysis?

5           A.    Yes.  The article that you're

6   referencing, I believe, which is Exhibit 20 --

7           Q.    20, uh-huh.

8           A.    -- is a systematic review.  And so it

9   provides a broad review of the landscape.

10          Q.    All right.  Do you agree that the --

11  understanding your -- how you're qualifying the

12  description of the three waves, do you understand

13  that the three waves of the opioid epidemic that

14  you've described in your article generally evolved

15  in that fashion in Ohio?

16          A.    Well, I would like to refer to my

17  report.  If there's a -- there's a complete section

18  of my report called "indicia" that speaks

19  specifically to the morbidity and mortality for

20  prescription opioids and nonprescription opioids

21  over time in these communities.  So it would be

22  helpful to review that with you.

23          Q.    Yeah.  Well, you can refer to your

24  report.  I don't want -- I can read your report.  I

25  don't want you to just reiterate what's in your

Page 96

1    report.  I'm just asking, yes or no -- and you can

2    refer to your report -- if the opioid epidemic in

3    Ohio evolved in a three-wave fashion as you

4    describe in your article?

5              A.    I believe that it did.  For example,

6    on Paragraph 21, the first sentence I write, "As

7    observed nationally and within Ohio, there was

8    first a rise in prescription opioid-related deaths

9    in the early 2000s, followed by a rapid increase in

10   heroin overdose deaths beginning in 2010, and a

11   sharp increase in fentanyl overdose deaths in

12   2016."

13             But I go on to talk about the clear

14   link between the nonmedical use of prescription

15   opioids, and subsequent heroin or illicit fentanyl

16   use.  And I also go on to say, for example, that

17   based on Ohio data, that nearly ninety percent of

18   participants used prescription opioids prior to

19   initiating heroin.

20             And so --

21        Q.    We'll talk about those statements in

22   a second.

23             What I'm trying to confirm, and I

24   think you said you agree, that the three waves of

25   the opioid epidemic were national evolution, and it

Page 97

1   also generally applied to Ohio.

2               Did -- does that also apply to what

3   happened in Lake and Trumbull County, that there

4   generally were -- or was a three-wave evolution of

5   the opioid epidemic in Lake and Trumbull County?

6   Would you agree with that?

7               MR. ARNOLD:  Objection, form.

8        A.    Can you ask the question once more,

9   please?

10       Q.    (BY MR. MANNIX:)  Yeah.  Do you

11  generally agree that there's a three-wave evolution

12  of the opioid epidemic in Lake and Trumbull County,

13  as there was nationally and there was in Ohio, as

14  you explained?

15       A.    I believe that the broad contours of

16  the opioid epidemic nationally have played out both

17  within the state of Ohio, as well as within Lake

18  and Trumbull Counties.

19              And that includes enormous morbidity

20  and mortality from prescription opioids, heroin and

21  illicit fentanyl.

22       Q.    Okay.  If you look at -- and I know

23  you referred -- what paragraph of your report were

24  you referring to, 21?

25       A.    Correct.

1          Q.     And I think you spoke about the

2    sentence that starts, "There's a clear link between

3    nonmedical use of prescription opioids and

4    subsequent heroin or illicit fentanyl" --

5                  THE REPORTER:  I'm sorry.  I couldn't

6    hear you.  "There's a clear link" --

7          Q.     (BY MR. MANNIX:) -- "between

8    nonmedical use of prescription opioids and

9    subsequent heroin or illicit fentanyl use as heroin

10   and fentanyl are close chemical analogs to

11   prescription opioids."

12                 You stated that, correct, in your

13   report?

14         A.     Yes.  Correct.

15         Q.     Okay.  And then you have a citation.

16                 Well, then you go on further to say,

17   "Several studies estimate that seventy to eighty

18   percent of the current heroin users report

19   nonmedical prescription opioid use prior to

20   initiating heroin," correct?

21         A.     Yes, that's correct.

22         Q.     And then you cite -- your first

23   citation there, 76, is to an article written by

24   Compton, Jones, Baldwin, "The Relationship Between

25   Nonmedical Prescription-Opioid Use and Heroin Use."

Page 99

1    It's in The New England Journal of Medicine.

2                     That's your citation, correct?

3           A.      Yes.

4                     (Exhibit 18 was marked for

5                     identification.)

6           Q.      (BY MR. MANNIX:)  If you would turn

7    to Exhibit 18.  Let me know if that is the article

8    that you cite.

9           A.      Well, I believe I cite two articles

10   there, but eight --

11          Q.      Is this one of the articles you cite?

12          A.      Yes, I believe this is one of the two

13   articles that I cite.

14          Q.      Okay.  And if you go to the

15   conclusions of this article, Page 160.  It starts

16   on 154, go to Page 160 of that article where the

17   conclusions are.

18                     Are you at that section?

19          A.      Yes.

20          Q.      And under "Conclusions" it states,

21   "Available data indicate that the nonmedical use of

22   prescription opioids is a strong risk factor for

23   heroin use.  Yet, although the majority of current

24   heroin users report having used prescription

25   opioids nonmedically before they initiated heroin

Page 100

1  use, heroin use among people who used prescription

2  opioids for nonmedical reasons is rare, and the

3  transition to heroin use appears to occur at a low

4  rate."

5          Did I read that correctly?

6      A.    Yes.

7      Q.    And then it goes on further to state,

8  "The transition from nonmedical use of prescription

9  opioid to heroin use appears to be part of the

10  progression of addiction and a subgroup of

11  nonmedical users of prescription opioids, primarily

12  among persons with frequent nonmedical use and

13  those with prescription opioid abuse or dependence.

14          "Although some authors suggest that

15  there is association between policy-driven

16  reductions and the availability of prescription

17  opioids and increases in the rates of heroin use,

18  the timing of these shifts, many of which began

19  before policies were robustly implemented, makes a

20  causal link unlikely."

21          Did I read that correctly?

22      A.    Yes.

23      Q.    And then if you look at this article,

24  on Page 156 there is a -- down about -- the

25  left-hand column, about three quarters of the way

Page 101

1  down, it talks about an article written by a

2  Muhuri.

3              Are you familiar with Dr. Muhuri?

4        A.    With the doctor him or herself?  How

5  do you spell the last name?

6        Q.    M-U-H-U-R-I.  If you don't know,

7  that's fine.

8              It says, "Similarly, Muhuri, et al.,

9  found that the incidence of heroin use among people

10  who reported prior nonmedical use was nineteen

11  times as high as incidents among persons who

12  reported no previous nonmedical use."

13        A.    I'm sorry.  What page are you on?

14        Q.    Well, let me -- I am on Page 156.

15  I'm sorry.  I thought you were following along with

16  me.

17        A.    No.  I thought you said 157.  I may

18  have misunderstood you.

19        Q.    Okay.

20        A.    So where on Page 156?

21        Q.    If you look down at -- about three

22  quarters of the way down, there's a footnote,

23  Footnote 28.  Do you see that?

24        A.    Oh, I see it.  Yes.  Yes, I do.

25        Q.    And then if you look at -- back to

Page 102

1    the citations, there's a citation to an article

2    written by Muhuri --

3              A.    Uh-huh.

4              Q.    -- I can't pronounce the other, and

5    Davies, called the "Associations of Nonmedical Pain

6    Reliever Use and Initiation of Heroin Use in the

7    United States."

8                   (Exhibit 38 was marked for

9                   identification.)

10             Q.    (BY MR. MANNIX:)  If you could turn

11   to Exhibit 38.  That was in the second package that

12   came yesterday.

13                   Let me know when you have 38.

14             A.    Okay.

15             Q.    This -- in the Abstract, it states

16   that, "This study examines the recent trends in the

17   heroin initiation, including the role of nonmedical

18   prescription pain reliever use in the heroin trend

19   among persons age twelve to forty-nine."

20                   Do you see that sentence?

21             A.    Uh-huh.

22             Q.    Second sentence?

23             A.    Yes.

24             Q.    And in the second-to-last sentence,

25   it says, "However, the vast majority of nonmedical

Page 103

1   NMPR users," nonmedical prescription pain reliever

2   users, "have not progressed to heroin use.  Only

3   3.6 percent of NPR -- NMPR initiates had initiated

4   heroin use within the five-year period following

5   first NMPR use."

6                   Do you see that?  Do you see that

7   sentence?

8           A.      Yes.

9           Q.      Okay.  So we have the conclusion that

10  I read earlier from the Compton article stating

11  that, although some authors suggest, "There is an

12  association between policy-driven reductions and

13  the availability of prescription opioids and

14  increases in the rates of heroin use, the timing of

15  these shifts, many of which began before policies

16  were robustly implemented, makes a causal link

17  unlikely."

18                   And then we have this other article

19  that I just mentioned that shows that this study,

20  Exhibit 38, "The vast majority of NMPR users have

21  not progressed to heroin use.  Only 3.6 percent of

22  MPR [sic] initiates have initiated heroin within

23  the five-year period following first NMPR use."

24                   Have you conducted any published

25  studies that you believe disprove the conclusions

Page 104

1   in these two articles, The New England Medical

2   Journal and the other article I referred you to,

3   Exhibit 38?

4          A.     I mean, I'm a little bit -- I had a

5   little bit of a hard time following.  I think I

6   followed, but -- but, you know --

7                 MR. ARNOLD:  Sorry.  I was muted.  I

8   had an objection to form.

9                 Go ahead, Dr. Alexander.

10         A.     Okay.  I had a little bit of a hard

11  time following, you know, the things that you were

12  weaving together.

13                But what I can tell you, first, I

14  would point out that the Compton piece was

15  published more than five years ago, I believe.  And

16  the Muhuri piece more than seven years ago.  And a

17  lot has happened since that time.

18                The second point I would make is that

19  the Compton piece was one of two references to

20  support an assertion that I made in my report that

21  I'd be happy to discuss further.

22                Now, specifically, having said that

23  and having, again, pointed out that I didn't really

24  understand the nature of your questioning, if

25  you're asking specifically if I have conducted a

Page 105

1    study that runs against or refutes something, can

2    you please tell me the assertion that you're

3    wondering whether I have refuted through my own

4    empiric work?

5            Q.    (BY MR. MANNIX:)  Well, let's take

6    the Compton report that's stating that there's --

7    the causal link between prescription opioids and

8    the increase of heroin use is unlikely.  I'm

9    paraphrasing, but that's from the Compton report.

10                  MR. ARNOLD:  Objection.

11           A.    That's not what the Compton article

12   asserts.  They're not talking about increases in

13   prescription opioids and subsequent transitions to

14   heroin.  They're talking about the impact of, I

15   believe -- I mean, let's look at the language

16   again.  But I believe they're talking about the

17   impact of policy interventions to reduce

18   prescription opioid oversupply.

19                  And what they're speaking to is a

20   question as to whether policy interventions to

21   reduce prescription opioid oversupply effectively

22   push people to heroin.

23           Q.    (BY MR. MANNIX:)  Right.  And they

24   conclude that the causal link is unlikely.  Have

25   you --

Page 106

1          A.      In 2000 -- in 2016, so more than five

2    years ago, they wrote -- they wrote that they

3    believe that policy-driven reductions in the

4    availability of prescription opioids --

5    essentially, that they felt that the evidence to

6    date, at that point in time, did not strongly

7    support claims that policy-driven reductions in

8    prescription opioids were responsible for increases

9    in the rates of heroin use.

10         Q.      Right.  Okay.  Do you -- have you

11   done any studies to take a different position,

12   disprove that?

13         A.      I've looked at an enormous number of

14   studies.  I cite more than six hundred, I believe,

15   in my report.  And I speak directly in my report --

16   or I reference studies that my colleagues and I

17   have done that do examine this interrelationship of

18   prescription opioid and heroin morbidity and

19   mortality.

20         Q.      Okay.  And what citations, that you

21   have conducted, can you point me to exactly what

22   citations you are referring to, that you have

23   performed or been a part of?

24         A.      Yes.  Please give me one minute to

25   review my report.

1                   (Pause.)

2          A.     So Reference 27 in my report is to a

3    paper entitled "Modeling Mitigation Strategies to

4    Reduce Opioid-Related Morbidity and Mortality in

5    the U.S." that was published in the JAMA Network.

6                   And that -- that is an example of a

7    study that I have done that builds upon evidence

8    regarding the interrelationships of prescription

9    opioid and heroin morbidity and mortality.

10         Q.     (BY MR. MANNIX:)  Okay.  Anything

11   else?  Any other studies that you have performed?

12         A.     Well, again, I would have to -- I

13   don't recall -- I would have to look through the

14   papers more carefully.  While I don't believe that

15   I've directly modeled these interrelationships, I

16   believe that other work that I've published has

17   been predicated upon my understanding -- review and

18   understanding of the comprehensive literature

19   examining these important associations.

20         Q.     You recognize that Lake and Trumbull

21   Counties have taken steps to address the opioid

22   crisis, correct?

23         A.     Yes.

24         Q.     And do you think that some of the

25   things that the Lake and Trumbull Counties have

Page 108

1    been doing have been beneficial?

2            A.      Yes, I do.

3            Q.      Do you think that some of the things

4    that they've been doing that are beneficial, if

5    they had started earlier, would have had a positive

6    impact sooner than what was experienced due to the

7    fact that they started at a later date?

8                    MR. ARNOLD:  Objection, form.

9            A.      I think the counties have done the

10   best with what they've had.  And I think there's an

11   enormous amount of work still to do.  And I hope

12   that my -- my proposed abatement plan assists them

13   in this undertaking.

14           Q.      (BY MR. MANNIX:)  And you said "what

15   they had," right?  What do you mean by what they

16   had?  Are you talking finances, or are you talking

17   about individuals, or are you talking personnel?  I

18   just didn't know when you said "what they had,"

19   what you were referring to.

20           A.      Well, I believe that there's not a

21   county in the country that hasn't been impacted in

22   some way, or that hasn't faced resource constraints

23   in their efforts to address the opioid epidemic.

24                   And so I believe that Lake and

25   Trumbull County have done the best with the -- with

1   the resources that they've had and the, you know,

2   economic resources and human capital that they've

3   had to address what has been a monumental problem.

4         Q.    Have you analyzed the money spent by

5   Trumbull County -- I'll say Trumbull first --

6   Trumbull County to address the opioid crisis over

7   the last five years?

8         A.    I was asked to develop an

9   evidence-based abatement plan, and that didn't

10  require me to analyze the money spent.

11        Q.    So you haven't done that, correct?

12  You haven't looked at the money spent, correct?

13        A.    Again -- again, I was asked to

14  develop an evidence-based and comprehensive

15  abatement plan for these communities, and that

16  didn't require me to do a detailed analysis of the

17  money spent to date.

18        Q.    So do you know what the average

19  amount of money spent by Trumbull County over the

20  past five years has been to address the opioid

21  crisis?

22        A.    My plan provides a comprehensive

23  review of the scientific evidence base.  And

24  developing that plan required me to understand a

25  lot about what Lake and Trumbull County have done.

Page 110

1    And I performed a careful qualitative review of

2    those efforts.  But my report wasn't predicated

3    upon having done a financial audit of the efforts

4    to date.

5              Q.     So you don't know what the average

6    amount of money is that was spent by Trumbull

7    County over the last five years, yes or no?

8              A.     In preparing my report, I looked at a

9    large number of materials and worked hard to

10   understand the activities that Trumbull County has

11   taken to date.  But my report didn't require me to

12   do a detailed financial audit to understand the

13   amount of money that Trumbull County has spent to

14   date.

15             Q.     Does the same thing go for Lake

16   County, that you have not analyzed the money that

17   was spent by Lake County to address the opioid

18   crisis over the past five years?

19             A.     Well, in preparing my

20   recommendations, I looked carefully at the

21   activities that Lake County has conducted to date,

22   including the development of the community health

23   improvement plan, the HUB report, the activities of

24   the ADAMHS Board and the Opioid Task Force.

25                    But my abatement plan didn't require

Page 111

1   me to do a comprehensive audit of the monies that

2   Lake County has spent to date to address the opioid

3   epidemic.

4          Q.     Well, you were talking earlier about

5   you thought that Lake and Trumbull County have

6   done -- I'm paraphrasing, but you use the word have

7   done a good job based on "what they had."  And you

8   said one of the elements you meant by "what they

9   had" was their financial resources, right?  Said

10  something along those lines, correct?

11         A.     Yes, that's correct.

12         Q.     And then -- and what I'm trying to

13  understand is, do you understand what their

14  financial resources were?  Did you analyze those to

15  be able to make a statement that what they did was

16  good based on what they had?

17         A.     My review of materials made it

18  abundantly clear that there have been very serious

19  resource constraints in both Lake and Trumbull

20  Counties.  I'm not sure there was -- so I don't

21  have any ambivalence or uncertainty about that

22  assertion.

23         Q.     What is your position that there are

24  resource constraints based upon?  Explain to me

25  exactly what your conclusions that there was

1    resource constraints on Lake County, first.  What

2    is that based upon?

3            A.    It's based upon the totality of my

4    review of the materials that are in the public

5    domain, as well as that may have been produced that

6    are relevant to the case in Lake County, as well as

7    my, you know, ten to fifteen years of experience

8    studying the epidemiology of the opioid epidemic,

9    as well as the experience of communities to address

10   it.

11           Q.    What --

12           A.    So --

13           Q.    When were you hired -- when did you

14   first begin looking at the situation in Lake and

15   Trumbull Counties?

16           A.    Well, as a professor and as a student

17   of the opioid epidemic, I've been examining the

18   progress that communities have made, as well as the

19   setbacks that they've incurred, for years.

20                 And unfortunately, Ohio has the

21   dubious distinction of having had some of the

22   highest morbidity and mortality in the country.

23                 And as you may know, Trumbull County

24   is one of the leading counties in terms of

25   morbidity and mortality from opioids in the state.

Page 113

1                And so, you know, I don't have a

2    precise date for you, but I would say many, many

3    years ago.

4         Q.    What specifically -- your testimony

5    was, "Upon the totality of my review of materials

6    that are in the public domain, as well as that may

7    have been produced that are relevant to the case in

8    Lake County."

9                What specifically did you look at

10   related to Lake County, specific to Lake County,

11   that you base your position that there was

12   considerable resource constraints on Lake County

13   on?  What specific materials?

14        A.    Well, there's not -- there's more

15   than one source of information.  There's not a

16   single --

17        Q.    I didn't say a single.  I said what

18   specific, plural, material.

19        A.    Okay.  So one is the discussion that

20   I had with Kim Frasier and the conversation with

21   her.

22        Q.    Okay.

23        A.    And another is the review of

24   morbidity and mortality over time, and the presence

25   of specific programs or lack thereof in the

Page 114

1   community.

2                   Another is my review of the HUB

3   report that -- and the community health improvement

4   plan and the information within those reports.  And

5   another is the -- again, the broader context of

6   these counties, which in one of the hardest-hit

7   states in the country, have competing demands.

8                   I mean, I've spoken with many

9   individuals over time, in many different contexts,

10  that have helped me to understand the competing

11  demands in terms of county budgets.

12                  But I was not asked to do a careful

13  appraisal, line by line, of how many dollars were

14  spent here and how many dollars were spent there.

15  That wasn't what I was required to do.  I was asked

16  to develop, looking forward, a comprehensive plan

17  for how the epidemic could best be abated.

18        Q.    In looking at these counties, did you

19  analyze the state or federal funding that was

20  available and -- to address the opioid epidemic in

21  those counties?

22        A.    My plan looks forward, but I did not

23  try -- I was not asked, nor did I net out in a

24  quantitative sense the current provision of

25  services in the counties.  So I'm aware, for

Page 115

 1   example, that there are -- there may be federal or

 2   state dollars that flow through the county.  For

 3   example, naloxone distribution through Project Dawn

 4   may be an example where the county benefits from a

 5   statewide initiative.

 6              Recovery Ohio, the governor's task

 7   force, clearly has had some -- a salutorious [sic]

 8   impact or effects or activities at a county level.

 9              But I wasn't asked, nor was I

10   required -- nor did my report require me to net out

11   or identify the sources of funding -- the

12   sources -- the current sources of funding for

13   opioid-related programs.

14        Q.    You weren't asked, nor were you

15   required, nor did you do those things, correct?

16        A.    I was asked to develop an abatement

17   plan, and that didn't require me to disaggregate

18   the current sources of funding for current

19   opioid-related programs.

20        Q.    Have you analyzed to what extent

21   Medicare presently pays for opioid-related programs

22   in Lake or Trumbull Counties?

23        A.    I provide evidence-based concrete

24   steps that these counties can take to abate the

25   opioid epidemic.  This didn't require me to

Page 116

1    identify or quantify the amount of current

2    opioid-related activities that are paid for by

3    Medicare.

4         Q.    Have you analyzed which of your

5    proposed programs, looking into the future, would

6    be likely covered by Medicare funding?

7         A.    My report focuses on the science and

8    the public health and the implementation of these

9    programs, but not -- not where ultimate funding for

10   these initiatives would come from.

11        Q.    So you haven't analyzed what state or

12   federal funding presently pays for or, in the

13   future, would pay for the programs that you are

14   proposing; is that correct?

15        A.    As it pertains to this case, I've not

16   analyzed the distribution of funding for specific

17   evidence-based programs that I suggest the

18   community consider.

19        Q.    You've implemented a five -- or a

20   fifteen-year model; is that right, for your redress

21   model?

22        A.    Yes.  I've proposed an abatement

23   strategy that would extend over fifteen years.

24        Q.    Why did you use a fifteen-year span,

25   as opposed to less or more years?

Page 117

1        A.     Well, I'd like -- I would like to

2   refer to my report, because I speak to that

3   directly.

4        Q.     Are you looking at your report or

5   your redress model?

6        A.     My report itself.

7        Q.     Okay.

8        A.     So it's Footnote F in the first

9   sentence of Paragraph 33.  I write that, "This

10  medium-turn view strikes a balance - it is long

11  enough to support infrastructure development and

12  several cycles of planning and evaluation while

13  avoiding some of the uncertainty entailed in trying

14  to anticipate the magnitude of sequelae from the

15  epidemic that may last decades or even

16  generations."

17       Q.     So if they had -- if Lake or Trumbull

18  County had brought their case five years ago, would

19  you have used the same fifteen-year span, or would

20  you have increased that to twenty years to still

21  reach 2035?

22            MR. ARNOLD:  Objection to form.

23       A.     I mean, that's a hypothetical

24  question.  I don't think that I can answer that.  I

25  don't know is the answer, what I would suggest.

1              But I do believe there's some value

2      in having a proposed plan that's -- again, that

3      strikes a balance between these -- these competing

4      tensions or interests that I articulate in Footnote

5      F.

6              Q.     (BY MR. MANNIX:)  And, again, in

7      Footnote F, you're focused on the fifteen years as

8      opposed to the year 2035; is that right?

9                   MR. ARNOLD:  Objection to form.

10             Q.     (BY MR. MANNIX:)  In other words,

11     you're more focused on the reasonableness of

12     fifteen years, as opposed to drawing it out to the

13     year -- anything special about the year 2035,

14     right?

15                  MR. ARNOLD:  Objection to the form.

16             A.     Yeah.  In this footnote, I'm speaking

17     to the duration of the abatement plan and my belief

18     that an abatement plan needs to be -- needs to

19     strike a balance in terms of the duration of the

20     plan itself.  Yes, that's correct.

21             Q.     (BY MR. MANNIX:)  Has anything

22     changed related to the opioid crisis in Trumbull

23     and Lake County in the last five years that you

24     believe is of significance?

25             A.     Yes.

Page 119

1          Q.      What?

2          A.      I mean, this is a dynamic process.  I

3    mean, this is -- you know, I mean, among other

4    things, we've had a global pandemic.  And, you

5    know, deaths in many communities are higher than

6    ever before.

7                  So an enormous amount has changed,

8    but -- but the principles of abatement and a sound

9    abatement strategy remain the same.

10         Q.      You mentioned the pandemic.  And

11   generally you said that it's a dynamic process.

12                 Anything else, over the last five

13   years, with respect to the opioid crisis in

14   Trumbull or Lake County that you considered

15   significant?

16         A.      Yes, many -- many factors.  Again,

17   you know, there are a lot of different things in

18   flux that affect the fabric of the community and

19   the ultimate -- the ultimate contours of the

20   epidemic.

21                 So the principles of a sound

22   abatement strategy, I believe, are unchanged.  But

23   among other things, the -- you know, the evidence

24   base has evolved.  Different programs may have been

25   launched or extended or superseded by other

Page 120

1    programs and so on and so forth.

2         Q.     If you could turn to Page 12 and 13

3    of your report.

4         A.     Okay.

5         Q.     On Page 12, and then specifically on

6    13, you list these four categories of programs,

7    right?

8         A.     Yes.

9         Q.     And you have four categories and then

10   subcategories ranging between four and six under

11   each category, correct?

12        A.     Yes.

13        Q.     And then in the following pages --

14   you're familiar with your report.  In the following

15   pages, you -- I think it's 14 to 67 you acknowledge

16   that some of these programs that you're addressing,

17   Lake and Trumbull have implemented some measures

18   similar to what you've identified; is that right?

19   Do you recall that?

20        A.     Absolutely.  Yes.

21        Q.     Okay.  Are you aware of whether the

22   pharmacies have implemented any of the programs

23   that you mentioned in your analysis, in your

24   abatement framework?

25        A.     Which programs?  I mean, Section 3-B

Page 121

1   is criminal justice system.  So how could that

2   apply to a pharmacy?  A pharmacy isn't a criminal

3   justice system.

4            Q.     Fair enough.  I was just asking of

5   any.  You know, you have these categories.

6                   You're very familiar with your

7   report, right?

8            A.     It's -- I mean, there -- it's a long

9   report, and there are six hundred plus references

10  in it, but I understand the broad contours of the

11  report, yes.

12           Q.     But the framework of the report,

13  you're familiar with, right?

14           A.     Uh-huh.

15           Q.     Okay.  And look for sure.  But it's a

16  similar framework that you used in the West

17  Virginia case?

18           A.     Similar.  Not identical, but similar,

19  I believe.

20           Q.     You had four categories in the West

21  Virginia case, and then there's subcategories.

22  Subcategories are not identical, but similar,

23  right?

24           A.     Yes.

25           Q.     I'm just asking, with your knowledge

Page 122

1    of these programs, your knowledge or framework for
2    any -- this report and other reports of the
3    programs that you identified, are you aware of any
4    programs, that you're recommending, that the
5    pharmacies have implemented already in Lake and
6    Trumbull County?  Are you aware of any?
7            A.      Well, I think, as it applies to this
8    case, a major opportunity for the pharmacies is
9    with respect to the institution of measures to
10   reduce the oversupply, and unnecessary oversupply
11   of opioids in the supply chain.  And I believe that
12   there's an appendix to my report that discusses in
13   detail the public health rationale for these
14   measures.
15           But my development of that appendix
16   did not require me to evaluate the specific actions
17   of pharmacies to date.  And I would leave it to
18   Mr. Catizone or other experts to do so.
19           Q.      So as you sit here today, you do not
20   know -- not looking forward, but existing,
21   preexisting programs by pharmacies as to whether
22   they do anything that is outlined in your report,
23   you don't know sitting here today, correct?
24           A.      No, that's not correct.
25           Q.      Okay.  What programs do you know that

1   the pharmacies run that are outlined in your

2   framework, your abatement framework?

3          A.     Well, I reviewed the section of

4   Mr. Carmen Catizone's report that elucidated or

5   that outlined what appear to be significant missed

6   opportunities on the part of pharmacies to

7   institute safer practices to reduce the oversupply

8   of prescription opioids in the supply chain.

9          Q.     And that was based on Mr. -- or

10  Catizone's analysis, right?

11         A.     Correct.

12         Q.     Have you analyzed any existing

13  programs, personally analyzed any existing programs

14  within the pharmacies?

15         A.     I have some experience.  I have

16  published papers on pharmacy-based interventions,

17  and I have performed independent scholarship

18  looking at pharmacy-based interventions.

19                And so I do have some experience in

20  understanding of the sorts of interventions that

21  pharmacies could potentially implement in order to

22  reduce opioid oversupply.

23         Q.     I -- my statement was as to existing

24  programs existing in Lake and Trumbull County

25  operated by pharmacies, have you analyzed those?

Page 124

1         A.      My abatement report didn't require me

2    to analyze and net out existing programs that may

3    be operational in Lake and Trumbull Counties.

4         Q.      If you look at, for instance, Page 20

5    of your report.  If you look at Paragraph 57.  And

6    you're talking here about patient and public

7    education, correct?

8         A.      Yes, that's correct.

9         Q.      And you acknowledge, in Paragraph 57,

10   that Trumbull County has an outreach program

11   through the ASAP program, right?

12        A.      Yes, that's correct.

13        Q.      What information do you have on the

14   details of that outreach program?

15             MR. ARNOLD:  Objection, form.

16        Q.      (BY MR. MANNIX:)  I mean, other than

17   what's stated here, you state, "For example, the

18   Coalition disseminates education materials to

19   address stigma, provide tools that parents can use

20   to discuss substance use with their children, and

21   maintains a directory of treatment and recovery

22   support within Trumbull County."

23             Do you see that?

24        A.      Yes, I do.

25        Q.      Other than that, do you have any

Page 125

1    additional information related to the ASAP outreach
2    program related to patient and public education?
3           A.    Well, I would want to look at the
4    materials in my report.  I mean, I would start with
5    Reference 188.  But there are, you know, six
6    hundred plus references in my report.  And then we
7    identified another, I don't know, two hundred or
8    however many in the additional materials that I
9    consulted, but didn't use directly.
10          So there may well be other materials
11   that provide more context for the alliance for
12   substance abuse preventions, outreach efforts
13   within the community of Trumbull County.
14          Q.    All right.  And Citation 188 is a
15   link to the website for the TCMHRB.  Okay?
16          As you sit here today, do you have
17   any knowledge of additional information related to
18   the ASAP program that you identify in Paragraph 57
19   of your report?
20          A.    Well, as I sit here today, I mean, my
21   approach in answering your question would be
22   similar to any other day, which is to look
23   carefully at the totality of evidence that I have
24   available.
25          And so, you know, to answer your

Page 126

1    question, I'd like the opportunity to look at that

2    reference, as well as other references in my report

3    that may be relevant to your question.

4          Q.    Would you have any knowledge of the

5    amount of money that was expended by the ASAP

6    program related to the patient and public outreach

7    over the last five years?  Did you look at that

8    information?

9          A.    Again, what I would say is that I

10   think the communities have done the best they --

11   they can with the resources that they've had and

12   what they have had.

13                And my forward-looking abatement plan

14   was not predicated on or didn't require me to parse

15   out line by line the amount of dollars spent for

16   specific programs and services in the community.

17         Q.    Did you attempt, in any way, to

18   analyze the effectiveness of that ASAP program in

19   seeking the goal of patient and public education?

20         A.    Well, there's an enormous evidence

21   base to support the effectiveness, and in many

22   cases cost effectiveness, of the types of

23   interventions that I propose.

24                So I didn't do a retrospective

25   evaluation of the impact of any specific program in

Page 127

1    the community.  But I can assure you that there is

2    not a lot of disagreement in public health and

3    public policy about the effectiveness of the types

4    of interventions that I propose in my abatement

5    plan.

6              Q.    Is it your opinion that the existing

7    program, this ASAP program in Lake County -- or

8    excuse me, in Trumbull County, related to patient

9    and public education, was not sufficient to

10   accomplish the goals of your plan as it relates to

11   patient and public education?

12             A.    Well, I haven't done a line-by-line

13   retrospective on the spending or resources that

14   were committed to one particular plan, or one

15   particular program or another, because that wasn't

16   required for me to develop my abatement program,

17   which is a forward-looking program to prevent

18   further harms from accruing in these communities.

19             Q.    And I wasn't asking for spending or

20   resource retrospective.  I was talking about

21   performance or effectiveness of the program.

22                  Does your answer remain the same, or

23   did you do an analysis of the effectiveness and

24   performance of the existing program to compare to

25   what you're proposing?

1           A.      What I do is discuss a large number

2      of complimentary interventions, and I leave it

3      to -- that are evidence-based.  And I leave it to

4      the communities to ultimately determine the plan,

5      the mix of services and programs.

6                       And part of that process, at a

7      community level, will be deciding what already is

8      adequately resourced within the community and what

9      isn't.

10                      So that's something that the

11     community would decide, not me.

12                      MR. MANNIX:  I think it's 12:30

13     exactly.  I think that's when we said we'd take our

14     break, so why don't we do that.  Plan on 1:15

15     coming back?

16           A.      That's fine.  Or 1:00, if you prefer

17     and others prefer.  Either way would be fine.

18                      MR. MANNIX:  Yeah.  Let's shoot for

19     definitely 1:15.  My experience is thirty minutes

20     is always -- it's a little longer than that.  So

21     somewhere in that thirty or forty-five minutes.

22     But we'll do 1:15.

23           A.      1:15 it is.  Thank you so much.

24                      THE VIDEOGRAPHER:  Off the record,

25     12:31.

```
                                            Page 129

 1                  (Whereupon, a lunch break was had

 2                  from 12:31 p.m. until 1:17 p.m. EDT)

 3                  THE VIDEOGRAPHER:  We are back on the

 4       record at 1:17.

 5            Q.    (BY MR. MANNIX:)  Dr. Alexander, we

 6       are back from lunch.

 7                  You may presently be muted.

 8                  The -- I want to cover a few things

 9       from this morning that we -- one thing was the --

10       that you had the ability to pull up those redress

11       models.  I think you were looking at Page 2 or 3.

12       We were talking about the percentage of reduction

13       that you were anticipating.

14                  MR. MANNIX:  I think Lauren from my

15       office is here.

16                  Lauren, can you put that up on the

17       screen?

18                  I just need to check and make sure

19       Lauren is here.

20                  MS. CATANZARITE:  I am here.  I'm

21       working on getting them up on the screen for us.

22                  MR. MANNIX:  Okay.  Thank you.

23                  MS. CATANZARITE:  Paul, do you have a

24       preference as to whether it's Lake County first or

25       Trumbull County?
```

```
 1          Q.     (BY MR. MANNIX:)  Doctor, do you have
 2    preference?
 3                 MR. MANNIX:  I have Lake County up,
 4    so can we go to Lake County?
 5                 MS. CATANZARITE:  Lake County it is.
 6                 Can you see my screen?
 7                 MR. MANNIX:  I can see it.
 8          Q.     (BY MR. MANNIX:)  Doctor, can you see
 9    it?
10          A.     I can.  I can.
11                 MR. MANNIX:  And if you want to
12    reference anything -- I don't know if you can pull
13    it up --
14                 You'll have to click on it again,
15    Lauren.
16          Q.     (BY MR. MANNIX:)  Well, point us to
17    where you're --
18          A.     Yeah.  I think Line 24 may have
19    either not be displayed in full, or it may have
20    been cut off in the production process.  But Line
21    24 is cut off.  And so if you make it wider -- I
22    don't quite know what happened.  But the bottom
23    line is that -- that I believe that what I project
24    is that these interventions will reduce the number
25    of, and there's a missing -- essentially, there's a
```

Page 131

1  missing line there.

2             But I believe what it says is that
3  based -- given that I proposed more comprehensive
4  coordinated and sustained interventions, I
5  project --

6             Thank you.  There you go.

7             So the bottom line is there --

8             THE REPORTER:  I'm sorry.  He froze.
9  I can't hear anything.

10             MR. MANNIX:  I can't either so that's
11  fine.

12             THE REPORTER:  Off the record,
13  Videographer?

14             THE VIDEOGRAPHER:  We're off the
15  record.  It's 1:20.

16             (Whereupon, a break was had from 1:20
17             p.m. until 1:22 p.m. EDT)

18             THE VIDEOGRAPHER:  And we are back on
19  the record at 1:22.

20        Q.    (BY MR. MANNIX:)  Doctor, when we
21  lost you, Lauren had expanded so you could see the
22  full paragraph under "Intervention population."

23             Can you explain what your conclusions
24  were as to the percentage reduction that you would
25  expect to see or hope your plan would result in?

Page 132

1         A.      Yes.  I project that the

2    interventions that I propose will reduce the number

3    of individuals with opioid use disorder and other

4    relevant populations by fifty percent over fifteen

5    years, 15 years.  And I use this to scale the

6    intensity of the different interventions in my

7    model.

8         Q.      Okay.  So what we were discussing

9    when we were on that line of questioning is the

10   idea that your expectation is not that it would go

11   down to zero, the individuals with OUD.  There

12   would still be individuals in Lake and Trumbull

13   County who had opioid use disorders, correct?

14        A.      Yes.  I didn't design a plan that

15   will necessarily reduce these populations to zero.

16        Q.      And is there a reason why?  Is that

17   not possible to do that?  Or why does your model

18   not attempt to achieve something greater than fifty

19   percent?

20                And, ideally, we'd have no one with

21   that.  But go ahead.

22        A.      I apologize for speaking over you.

23                I think fifty percent reduction would

24   be an enormous gain.  And even one life lost from

25   the opioid epidemic is one life too many.

1          But there are a lot of countervailing

2     forces.  And if this were easy, these communities

3     might have been able to have experienced lower

4     rates of morbidity and mortality thus far.

5          So I think that fifty percent

6     reduction over fifteen years, again, strikes a good

7     balance between a bold plan, but one that is

8     achievable and will improve the quality of life

9     for, you know, for many residents in these two

10    counties.

11         Q.    We were talking earlier about, you

12    know, what you were asked to do and what you looked

13    at.  And I understood, you didn't look in full

14    detail as to the programs that were in place or

15    analyze them.  I think you said that yours was a

16    prospective program.

17         If -- the one thing I want to

18    understand, though, is if you haven't looked at a

19    program that exists in the county, and let's say

20    the county is operating a program that you are

21    proposing to the same extent and the full effect

22    that you would want it to be run and operated, and

23    it just is not having much success, wouldn't you

24    want to know that in order to determine whether it

25    makes sense to include that exact program in your

Page 134

1     prospective model?

2               MR. ARNOLD:  Objection to form.

3          A.    I was asked to make recommendations

4     about what should be done, not quantitatively, what

5     more should be done above and beyond specific

6     programs that may be in place.

7               Evaluation is a critical part of what

8     I'm recommending.  And I devote a significant

9     section of my report to discussing the evaluation

10    of programs and services.  So I'd be happy to

11    discuss those with you if helpful.

12         Q.    (BY MR. MANNIX:)  Okay.  But my point

13    being is, wouldn't you need to know, want to know

14    if -- how successful the program is?  I think you

15    indicated earlier that you didn't evaluate it in

16    great detail, the successor, the performance of

17    each and every existing program.  And wouldn't you

18    want to and have to know that in order to determine

19    whether what you're proposing, if it's identical to

20    an existing program, is going to be successful or

21    not?

22              MR. ARNOLD:  Objection to form.

23         A.    It's not as if my recommendations are

24    simply to be pasted on and sort of fill holes, you

25    know, fill potholes that may exist in the

Page 135

1    community.  Rather, what I provide is a
2    comprehensive suite of evidence-based
3    interventions.
4                And it's to -- it's for the
5    communities themselves to examine what they have in
6    place at the time that this abatement program is
7    undertaken, and to compare and contrast what I've
8    recommended with what they have in place.
9                And by all means, the sort of
10   evaluation that you're talking about will be an
11   important component of the -- you know, evaluation
12   of programs is an important component of the sort
13   of abatement activities that I recommend.
14        Q.    (BY MR. MANNIX:)  And you're saying
15   it will be an evaluation.  You're expecting the
16   communities to do that?
17        A.    Yes.  I discuss, in my report, a
18   framework for evaluating the effect of different
19   community-based interventions.
20                MR. MANNIX:  Lauren, if you could
21   pull that off the screen, what's on there now, I'd
22   appreciate it.
23                But, thank you.  I think we're done
24   with that for now.
25        Q.    (BY MR. MANNIX:)  We also talked

Page 136

1    about the fact that you prescribe opioids, you

2    prescribed opioids in your practice, and we

3    discussed your expectations as to whether that

4    would be filled.  And I think you indicated -- I

5    don't have the exact language, but the -- there may

6    be circumstances where you wouldn't expect a

7    pharmacy to fill a prescription for opioids that

8    you wrote.

9                   Under what circumstances would you

10   expect a pharmacist to refuse to fill a

11   prescription that you wrote?

12          A.      There might be, you know, any number

13   of different situations.  A patient might not come

14   in.  A lot of patients don't come in for the first

15   fill.  So patients might not come in to get the

16   prescription.

17                  The out-of-pocket costs may exceed

18   what the patient is willing to pay, and so it may

19   be cost prohibitive.  The patient's -- a patient's

20   family member may -- or a patient may come and

21   discuss with the pharmacist and in -- you know, and

22   a pharmacist should be making a reasoned judgment

23   about whether or not filling the prescription is

24   consistent with best pharmacist practices.

25          Q.      Okay.  Would you expect a pharmacist

Page 137

1  to second-guess your medical judgment as to whether

2  a prescription is appropriate for a certain

3  individual?

4          MR. ARNOLD:  Objection to form.

5          A.      Well, a pharmacist has access to

6  information that I don't have.  So I guess I don't

7  view it quite as maybe defensively as thinking that

8  it would be second-guessing me, but rather that a

9  pharmacist is part of the care team and plays an

10  important role and is privy to data and information

11  that I may not have that may suggest that the

12  dispensing of the opioid is actually quite unsafe.

13          Q.      (BY MR. MANNIX:)  So it would be

14  other information available, as opposed to trumping

15  your medical judgment; is that right?

16          A.      Again, I -- my model or framework is

17  not where one person's knowledge trumps another.  I

18  view pharmacists as an important ally in the care

19  team.  And if I was contacted by a pharmacist, I'm

20  always open ears to hear what they have to suggest.

21          Q.      And if you told that pharmacist to

22  fill the script, based on your medical judgment,

23  would you expect them to use their own medical

24  judgment to not fill the script?

25          MR. ARNOLD:  Objection to the form.

1          A.     I've never -- I've never encountered

2     that scenario in more than twenty-five years in

3     clinical practice.

4          Q.     (BY MR. MANNIX:)  We talked about

5     existing programs in Lake and Trumbull County.  And

6     I just want to make sure I understand your

7     testimony on a related matter.  And that is, there

8     are existing programs in Ohio that relate to some

9     of the programs in your abatement framework.  Are

10    you aware of such programs?

11         A.     I'm sorry.  I think I missed one

12    word, but it was an important one.  You said there

13    are existing programs in Ohio that what?

14         Q.     That relate -- I think I said that

15    relate to.

16         A.     That relate to, yes.  Yes, there are.

17         Q.     Did you analyze those from a

18    standpoint to determine if they would serve the

19    purpose that your programs are set to serve and,

20    therefore, the programs that you are proposing

21    would not be necessary, the Ohio State programs?

22              MR. ARNOLD:  Objection to form.

23         Q.     (BY MR. MANNIX:)  Doctor, you can --

24         A.     With all -- I mean, with all due

25    respect -- and I know that we have discussed

Page 139

1    this -- I was not asked, nor did I try to just

2    patch on sort of additional programs on top of what

3    was being offered in order to create a whole.

4              What I was asked to do was to develop

5    a comprehensive abatement program, soup to nuts.

6    And so all of these questions about sort of, well,

7    did I consider what was being done, the answer to

8    all of them is the same in that I did consider

9    them, and I qualitatively considered them.

10             But I wasn't ever asked to net out

11   either quantitatively, financially or otherwise,

12   specific programs or services.

13             So, like, if you take naloxone

14   distribution, the State has Project Dawn, which has

15   been a very important program at a state level.

16   But I didn't say, in my report, that naloxone is

17   less important because the State is doing it.

18   That's not -- that wasn't my goal.  I write about

19   the importance of naloxone.  I do highlight,

20   though, that Project Dawn has played an important

21   role, and I discuss that.

22             So I hope that's helpful in -- you

23   know, in sort of outlining what I tried to do

24   versus what I didn't try to do.

25             Q.    Understood.  I think you made that

                                        Page 140

1    point.  Certainly we talked in detail about county

2    programs primarily in the morning.  And I just

3    wanted to make sure that that approach that you

4    took applied also to state and federal programs.

5    And I think the answer is yes; is that right?

6            A.    Yes, that's correct.  The same

7    approach and the same -- the same strategy applied,

8    yes.

9                  (Exhibit 2 was marked for

10                 identification.)

11           Q.    (BY MR. MANNIX:)  I'm going to turn

12   now -- I know the points you've referred to, the

13   indicators that are found in the Catizone report,

14   Appendix F, is what I'm going to refer to.  I think

15   that is -- gosh, I should know this now.

16                 Is that Exhibit 2?

17                 Yeah.  Exhibit 2 of those documents I

18   provided.

19           A.    Okay.  I have that in front of me.

20           Q.    And Exhibit F -- 2, Appendix F, which

21   is Exhibit 2, is referenced in your report at

22   Paragraph 14.  I'm going to read this to you.  You

23   can certainly refer to it.

24                 Paragraph 14 of your report says, "In

25   addition to the redress model, I was asked to

Page 141

1   review the literature on certain potential

2   indicators of high-risk opioid distribution and

3   describe their evidence base.  See Appendix F."

4              And is that what led you to prepare

5   Appendix F, what you describe there in Paragraph 14

6   of your report?

7        A.    Yes.  Yes, it is.

8        Q.    Now, in Appendix F -- let's look at

9   this twelve-page document, which includes several

10  pages.  About half of that is citations.  You speak

11  of indicators that are identified in the Catizone

12  report, correct?

13       A.    Yes, that's correct.

14       Q.    And I think you say -- yeah, about

15  the fifth line down in your Appendix F, you say, "I

16  reviewed the portion of Carmen Catizone's expert

17  report in which he identifies indicators that are

18  triggered based on information about prescriptions,

19  patients and prescribers."

20             And it goes on further, but I just --

21  so you reviewed a portion of his report.

22             Do you know when you reviewed the

23  portion of his report that you reference there?

24       A.    Well, I've reviewed it recently, but

25  believe that I also reviewed it sometime ago.  And

Page 142

1   I clearly reviewed it before I submitted this

2   report, because I stated such.

3                    So I don't know the exact date,

4   though.

5           Q.      Yeah.  And that was not a well-framed

6   question, because I understand you may have

7   reviewed it before the deposition.

8                    But before preparing your report, you

9   reviewed a portion of his report, right?

10          A.      Correct.

11          Q.      And do you know if you assisted

12  him -- or do you recall assisting him in preparing

13  the portion of his report that he prepared?

14          A.      Well, again, I mean, this feels like

15  a similar line of questioning as to how I engaged

16  with Expert Rosen.  And the answer is that anytime

17  I engage with anybody around these matters, my

18  focus is on the science.  And fortunately I'm

19  encouraged to follow the true north, which is the

20  science, and I do everything I can to try to

21  communicate what I know to whoever I'm speaking

22  with and to try to be of service.

23                   So I don't know if that answered your

24  question, but that's my general approach in

25  speaking with others about these matters.

1          Q.      All right.  The Catizone report

2     includes a list of what you call "indicators,"

3     correct?

4          A.      Yes.  I believe that it does.

5          Q.      And did you -- is it your

6     understanding that Dr. -- I don't know if he's a

7     doctor -- but Carmen Catizone prepared that list of

8     indicators?

9          A.      Well, ultimately, Mr. Catizone has to

10    speak for them.  I don't know the process that was

11    used to derive that list.  I don't know the details

12    of the process that was used to derive that list.

13         Q.      Okay.  Were you involved in the

14    development of that list?

15         A.      Again, I have a hard time answering

16    that question.  What I can say is that I shared my

17    knowledge regarding the evidence base to support

18    these types of indicators.  And, you know, my

19    report includes seventy-four studies or references.

20    And -- and many of these are studies that I am --

21    have significant familiarity with.  And so I may

22    well have discussed these with Mr. Catizone in an

23    effort to try to be of service.

24         Q.      Okay.  But as to whether you had

25    discussions with him, you attempted to be of

Page 144

1    service, whether he used that to develop this list

2    or not, you don't have firsthand knowledge, as you

3    weren't involved in that particular process of the

4    development of the list; is that fair?

5            A.      That's correct.  I'm not aware of the

6    precise methods that Mr. Catizone used to derive

7    the list that he has included in his report.

8            Q.      Do you -- other than recent dealings

9    with him, were those all in 2021, you think, or did

10   you have communications with him before that?

11           A.      I think it's likely I spoke with him

12   during 2020, as well as 2021.

13           Q.      The end of 2020 you think?

14           A.      Well, I doubt it was the first half,

15   but it could have been Quarter 3.

16           Q.      Got it.

17                   Prior to having discussions with him

18   in the third quarter of 2020 and 2021, did you have

19   any dealings with Mr. Catizone before that?

20           A.      Well, just to be clear, I don't know

21   precisely when these discussions took place, so I'm

22   sorry if I misconstrued that they definitely took

23   place during the third quarter of 2020.

24                   But if you're asking whether I spoke

25   with him or interacted with him prior to this case,

                                              Page 145

1    the answer is, no, I have not, to my knowledge or

2    recollection.

3            Q.     And that's what I was asking.

4    Thanks.

5                   Your interactions with him, was that

6    done in person, via Zoom, conference calls, a

7    little bit of both?

8            A.     Well, again, unfortunately, the

9    pandemic precluded what may have otherwise been in

10   a nonpandemic world face-to-face meetings.  I do

11   not recall if we engaged by Zoom or by telephone,

12   but I do not believe I've ever met Mr. Catizone

13   face-to-face.

14           Q.     Other than what's contained in

15   Appendix F, did you use information provided by

16   Mr. Catizone to prepare any other portion of your

17   report?

18           A.     I don't know the answer to that.  My

19   report has, as we've discussed, you know, six

20   hundred plus references.  And then there were

21   another hundred or two hundred that were

22   considered, though not directly cited.

23                   And so I don't know whether

24   Mr. Catizone alerted me to or directly provided

25   materials that may have informed other portions of

Page 146

1  my report.

2          Q.     Are you aware of whether or not

3  Mr. Catizone prepared a supplemental report since

4  his April report?

5          A.     No, I am not.

6          Q.     What is your understanding of

7  Mr. Catizone's area of expertise?

8          A.     Well, I would leave that to him to

9  describe.  But I believe he has significant

10  experience in understanding the pharmaceutical

11  supply chain and the -- and methods used to promote

12  and maximize the safe flow of controlled substances

13  through the pharmaceutical supply chain.

14          Q.     In his report, he identifies himself

15  as having an expertise in the practice and

16  regulation of pharmacy.

17                 Do you have any reason to dispute

18  that?

19          A.     I wasn't asked to critique

20  Mr. Catizone, nor any other expert's qualifications

21  per se.  And that's not what I focused on in my

22  abatement program.

23          Q.     All right.  So you don't have a

24  position one way or the other whether he has an

25  expertise in the practice of regulation of

Page 147

1   pharmacy -- excuse me, the practice and regulation

2   of pharmacy?

3          A.     Again, my program is focused on

4   concrete measures that can be employed by these

5   communities, and didn't require me to closely

6   evaluate the credentials and professional

7   experience of, you know, every individual that I

8   spoke with in order to make the recommendations

9   that I've made.

10         Q.     Well, we're talking about Appendix F,

11  right, not your abatement framework, in the report

12  right now?

13         A.     Appendix F represents my own beliefs,

14  and I stand behind it.  I'm happy to review any

15  portion of that appendix with you.  But I, at the

16  time that I submitted, you know, Appendix F, it --

17  you know, and what -- what I would be happy to

18  review with you today is my own beliefs, not those

19  of Mr. Catizone's.

20         Q.     Understood.

21                But my question, I was asking about

22  your understanding of his expertise.  And you

23  indicated earlier that he had developed the list

24  that you then included in Tab 6 -- or Tab 1, Page 6

25  of your report.

Page 148

1    A.    Well, I'd like a minute to review

2  this, please.

3              (Pause.)

4    Q.    (BY MR. MANNIX:)  Well, yeah.  I

5  don't know if there's a question there, but you can

6  certainly review.  I'm not going to prevent you

7  from reviewing it.

8              Let me ask you this:  You reviewed a

9  portion of his report, though, you mention that in

10 Appendix F, right?  Appendix F, Paragraph 1, you

11 say that you reviewed, "A portion of Carmen

12 Catizone's expert report in which he identifies

13 indicators that are triggered based on information

14 about prescriptions, patients and prescribers, and

15 which have been recognized by defendants and/or law

16 enforcement.  These indicators are listed in Table

17 1 below."

18              So you say he identifies indicators.

19              You then list those indicators in

20 Table 1, right?

21    A.    Yeah.  But what I would say is that

22 there's not a lot of -- I mean, this wasn't a

23 terribly difficult process in terms of identifying

24 the types of indicators and the evidence base to

25 support them that can be used by pharmacies and

Page 149

1    other actors in the pharmaceutical supply chain.

2                   In other words, if I had -- in other

3    words, it wasn't as if, you know, I had a blank

4    slate and I said, Mr. Catizone, can you please give

5    me what you have, and I'm going to pipe it into my

6    report because I have no idea what to do.  Not at

7    all.  I mean, it would be easy.

8                   And, in fact, even prior to speaking

9    to Mr. Catizone, I believe that I had conceived of

10   and conceptualized these broad categories of

11   indicators.

12        Q.    Okay.  So is it your testimony that

13   you didn't need Mr. Catizone at all in developing

14   this list?

15        A.    No.  No, it's my testimony that I was

16   provided with a list, and that it was highly

17   consistent with what I may well have identified

18   using my own independent approach.  And there may

19   have been some slight differences around the edges

20   in how one or two of these -- I mean, how some of

21   these were operationalized or precisely defined.

22                   But the evidence base is there.  I

23   mean, there's twelve pages of evidence for you in

24   terms of the rationale for using things like

25   concomitant drugs.

Page 150

1              In other words, I didn't need

2    Mr. Catizone to tell me that when a patient fills

3    both the benzodiazepine and a prescription opioid,

4    they're at much higher risk of potential trouble.

5         Q.     Okay.  Mr. Catizone, as I said

6    before, identifies himself as having expertise in

7    the practice and regulation of pharmacy.

8              Do you hold yourself out as an expert

9    in the practice and regulation of pharmacy?

10        A.     I hold myself out as a professor of

11   epidemiology and practicing internist with

12   extensive experience in the role of pharmacies and

13   pharmacists in the pharmaceutical supply chain,

14   including how it pertains to the opioid epidemic.

15        Q.     Okay.  And I take it, from that

16   answer, you do not hold yourself out as an expert

17   in the practice of pharmacy; is that right?

18        A.     I -- as a practicing internist, I

19   prescribe medicines every day, including yesterday

20   when I prescribed five or ten different

21   prescriptions for patients.

22              So I -- you know, so I hold myself

23   out as someone that has expertise as an

24   epidemiologist, and as a practicing internist, in

25   the pharmaceutical supply chain.

Page 151

1      Q.      How many days, during your lifetime,
2  have you acted and practiced as a pharmacist?
3      A.      I -- my -- my abatement plan didn't
4  require me to act or practice as a pharmacist in
5  order to have an understanding of how to abate the
6  epidemic.
7              And in this instance, the role of
8  potential indicators were flagged to identify
9  potentially problematic pharmaceutical dispensing.
10     Q.      Are you a licensed pharmacist in
11 Ohio?
12     A.      I practice in the state of Maryland,
13 not the state of Ohio.
14     Q.      Are you a licensed pharmacist in
15 Maryland?
16     A.      I'm a practicing internist.  So I
17 prescribe medications on a regular basis, but I'm
18 not a practicing pharmacist, nor did my expert
19 report -- nor did my expert report require me to be
20 such.
21     Q.      If you were in front of the Ohio
22 Board of Pharmacy and they asked you if you are an
23 expert in the practice of pharmacy, would you
24 answer yes or no?
25     A.      I would answer just as I'm answering

Page 152

1    now, which is to thank them for the question, let

2    them know that I'm a practicing internist, and that

3    my field of study is pharmacoepidemiology, which is

4    the study of the use, safety and effectiveness of

5    prescription medicines.

6                    And as a pharmacoepidemiologist, and

7    having done this for many, many years, I have

8    extensive experience in the pharmaceutical supply

9    chain and how drugs flow through the pharmacy

10   system.

11        Q.    Do you know if holding yourself out

12   as an expert in the practice of pharmacy in Ohio,

13   whether that would violate the rules of the Ohio

14   Board of Pharmacy?

15                    MR. ARNOLD:  Objection to form.

16        A.    I think the term "holding myself out

17   as" is a little bit counter to how I think about

18   these matters.  The way I think about it is, do I

19   have experience the field of pharmacy.  And the

20   answer is, yes, I have enormous experience.

21                    I have worked closely with

22   pharmacists for many, many years, I've published

23   dozen, more than a hundred or probably two hundred

24   papers focused on prescription drugs.

25                    I've carefully studied the actors in

Page 153

1    the pharmaceutical supply chain.  I have experience

2    having worked on a national PMT committee for a

3    pharmacy benefits manager.  I've done studies of

4    systems that pharmacies have implemented in an

5    effort to improve controlled substance prescribing,

6    and so on and so forth.

7                   So that's what I would want someone

8    to know who was interested in my experience

9    regarding the practice of pharmacy.

10        Q.     All right.  Whether we say holding

11   yourself out or claiming that you were an expert in

12   the practice of pharmacy, do you believe that that

13   would be in violation of the Ohio Board of Pharmacy

14   rules --

15                   MR. ARNOLD:  Objection to form.

16        Q.     (BY MR. MANNIX:) -- an illegal

17   practice in Ohio of pharmacy?

18                   MR. ARNOLD:  Objection to form.

19        A.     I haven't reviewed the Ohio Board of

20   Pharmacy.  But what I can tell you is that my

21   experience includes -- I haven't reviewed -- I

22   mean, what I can tell you is that my experience as

23   a pharmacoepidemiologist includes years of study of

24   the use, safety and effectiveness of prescription

25   medicines.

1          And doing this type of work at the
2    level that I do and for the length of time that
3    I've done it requires a complex and nuanced
4    understanding of actors in the pharmaceutical
5    supply chain.  And that includes pharmacists and
6    pharmacies.
7          Q.    (BY MR. MANNIX:)  I'm not asking if
8    you have experience.  You know, experience is one
9    thing.  In the legal profession, in the court of
10   law, an expert is another thing.  There's
11   experience, there's expert.
12          Do you hold yourself out as an expert
13   in the practice of pharmacy in Ohio?
14          MR. ARNOLD:  Object to the form.
15   You've been over this question again and again.
16   You've got his answer.  You should move on.
17          MR. MANNIX:  I'm not.  I really very
18   rarely get direct answers to my question, so I'm
19   asking that he answers this question.
20          MR. ARNOLD:  I think he answered the
21   question.
22          A.    I think I've answered the question.
23   But as it applies to this case, I believe that I
24   have the understanding, the requisite understanding
25   of the pharmaceutical supply chain in order to make

1    the recommendations and draw the opinions that I've

2    drawn in my expert report.

3           Q.     (BY MR. MANNIX:)  Are you -- you

4    know, I see various things throughout your report.

5    With respect to pharmacists, do you believe that

6    you have the expertise -- or what -- let me ask you

7    this:  Do you provide any opinions as to the

8    standard of care related to pharmacists, in your

9    report -- standard of care of pharmacists?

10          A.     Well, I think the closest I come to

11   that is probably in Appendix F where I discuss the

12   variety of opportunities that pharmacists and

13   pharmacies have to improve the safe dispensing and

14   distribution of controlled substances.

15          Q.     Okay.  And that's what I'm focused --

16   I do want to focus our attention right now on

17   Appendix F.

18              In Appendix F, do you provide any

19   opinions on the standard of care of pharmacists?

20          A.     What I do in Appendix F is outline

21   the evidence base, the broad and substantial

22   evidence base supporting the use of a variety of

23   flags or indicators of potential high-risk

24   prescription opioid prescribing, dispensing, you

25   know, and use and so on.

1      Q.      Did you study, in relation to
2    Appendix F, and what you've placed in your -- the
3    contents of Appendix F, did you study the specific
4    actions of any of the defendant pharmacies and
5    their pharmacists related to Appendix F?
6           A.      Well, I reviewed Mr. Catizone's
7    report, and I believe he does so.  But the
8    development of my Appendix F did not require me or
9    wasn't predicated on having studied the specific
10   actions of defendants in this case.
11          Q.      Okay.  So I just want to break that
12   down.  I understand you looked at his report, and
13   his report says what it says.  And if you reviewed
14   that, you saw what was in there.
15                  But as far as you personally
16   investigating studying the actions of the defendant
17   pharmacies in this case, you know, in Lake and
18   Trumbull County, as I understand, the answer is you
19   did not do that; is that correct?
20          A.      To develop my Appendix F, my -- my
21   development -- you know, in Appendix F, I outline
22   the evidence base supporting the use of indicators
23   or flags for high-risk use.  And this didn't
24   require me, nor did I, undertake a study of the
25   specific actions of specific defendants in this

Page 157

1   case.

2           Q.      So you're not opining in Appendix F,

3   or anywhere else in your report, that the defendant

4   pharmacies failed to follow the standard of care in

5   dispensing opioids; is that fair?

6           A.      In my report, I outlined the evidence

7   base to support a number of different flags or

8   indicators of high-risk prescription drug

9   distribution or -- or use.  But I did not opine on

10  the actions of specific defendants with respect to

11  how they may have failed to adhere to standards of

12  care.

13          Q.      In Appendix F, we talked a little bit

14  about Paragraph 1.  And then Paragraphs 2 through

15  10 appear to add some more description to the

16  headings in Tab 1 generally, right?

17          A.      I'm sorry.  You said the headings in

18  Tab 1?

19          Q.      Yeah.  You know, in Paragraph 1 you

20  say -- you say what you say there.  But you say

21  also, I listed indicators in Tab 1.

22                  We look back at Tab 1.  We see what

23  the -- under the column of "Concept," what the

24  various indicators are, the first one being

25  "Frequency, dose and duration."

1            And then we go back to the other

2    Paragraphs 2 through 10 of Appendix F. You

3    describe, in Paragraph 2, "Frequency, dose and

4    duration."  And you provide various support for

5    positions under that category, correct?

6                MR. ARNOLD:  Objection to form.

7         A.    Yes, that's correct.  Table --

8    Table 1.  I was a little thrown off by the use of

9    the word "tab."  But, yes, that's correct.  The

10   sections --  the Paragraphs 2 through 10 correspond

11   at a high level with -- or 2 through 9 correspond

12   with the rows in Table 1 in Appendix F.

13        Q.    (BY MR. MANNIX:)  Okay.  And

14   there's -- as you said before, I think there's

15   seventy-four sources that you cite to throughout

16   Appendix F, right?

17        A.    Yes, that's correct.

18        Q.    And how did you go about finding the

19   articles that you cite in Appendix F?

20        A.    Well, I used a process similar to

21   my -- the process that I used in my main report,

22   which is outlined in Paragraph 11 and Paragraph 15

23   of my main report.

24        Q.    Okay.  Are these articles that you

25   and team members at Monument Analytics sought and

Page 159

1   identified and cited in your Appendix F?

2           A.      Yes, they are.  And many of them I

3   may have been familiar with prior to this

4   undertaking, but others I probably learned of only

5   through a refresher or rereview of the evidence

6   base.

7           Q.      Did the -- did anyone from any of the

8   law firms you're working with in this case, were

9   they used to help find articles that are cited in

10  Appendix F?

11          A.      I doubt it.  I don't remember -- I

12  don't remember for sure.  But, in general, the

13  firms are not, you know, feeding me articles.

14  They -- I am -- I am free to find anything that I

15  like.  And I suppose there may have been one or two

16  articles, or a few articles that were sent to me,

17  but I don't recall is the bottom line.

18          Q.      In reviewing the articles, both the

19  citations as well as what's in the text of Appendix

20  F, it appears that many of these articles are

21  national based studies; is that right?

22          A.      I would have to review them with you,

23  but I would not be surprised if that's the case.

24          Q.      And some are more state specific.

25  I've seen Massachusetts, Maine, Maryland, Arkansas,

Page 160

1    West Virginia.  There might be another one or two

2    that are referenced as state-specific articles.

3                   Do you recall that being the case?

4                   MR. ARNOLD:  Objection to form.

5         A.      I mean, again, we could look through

6    these.  But I think it's plausible that many are

7    national and some are state.

8                   But just to be clear, when something

9    is, quote/unquote, state specific, that doesn't

10   mean it's only applicable to that state.  It may

11   mean that it was a study in one state, but it may

12   be highly applicable, or what we say in the field,

13   generalizable to many other states.

14                  And so the generalizability of an

15   article is something that I routinely will evaluate

16   as I consider the use of scientific evidence to

17   support a scientific assertion that I'm making.

18        Q.      (BY MR. MANNIX:)  And it's your

19   recollection that you conducted this

20   generalizability analysis in preparing Appendix F?

21        A.      Always.  I mean, in any -- it's just

22   a part and parcel of good -- good epidemiology.

23   It's not something that I specifically looked at

24   seventy-two articles and, you know, categorized for

25   each one yea or nay.  But a routine dimension of

Page 161

1    the work that I do as a scientist is understanding

2    and thinking about issues of generalizability.

3           Q.    Based on my review, I saw no articles

4    that were Ohio specific, or certainly not Trumbull

5    or Lake County specific, that that's where the

6    studies were done, right?

7                 Do you have a different recall or --

8           A.    I don't know if that's the case, and

9    I would have to look at the articles with you.  But

10   I don't think that that undermines the potential

11   import of my conclusions or recommendations.

12                You know, the -- I mean, as the

13   citizens of these counties know, there -- you can't

14   just -- it's not like there's a one-size-fits-all

15   approach, on the one hand.

16                So clearly the abatement plan needs

17   to reflect and be of, by and for the community.

18   We've discussed that.

19                But there's also a good scientific

20   evidence to support the value of these specific

21   indicators.  And the value of them isn't going to

22   be conditional on -- you know, on whether you're in

23   Kansas or whether you're in Kalamazoo.

24                I mean, the -- if you think about

25   something like the potential risks posed by

Page 162

1  combining dangerous drugs together, that doesn't

2  change when you move from San Francisco to Seattle

3  or from Iowa to, you know, Nebraska.  That's an

4  inherent risk of combining these medicines

5  together.

6            So I hope that's helpful as you're

7  thinking about the generalizability of these

8  studies.

9       Q.    In the Paragraph 10 of Appendix F, I

10  want to talk to you about that a little bit.

11       A.    Okay.

12       Q.    In -- the first statement says,

13  "Pharmacies and pharmacists play an important role

14  in addressing the opioid epidemic, given their

15  position, within the pharmaceutical supply chain

16  and face-to-face interactions with the patient."

17            Do you see that?

18       A.    Yes, I do.

19       Q.    And then can you read the next

20  sentence, starting, "First and foremost"?

21       A.    "First and foremost, pharmacies and

22  pharmacists should follow up on indicators of

23  opioid misuse, since they have the authority to

24  refuse prescription fills or to gather further

25  information so as to allow for the dispensing of

Page 163

1  controlled substances under the safest conditions

2  possible."

3          Q.      You indicate there that pharmacists,

4  under certain circumstances, can refuse to fill

5  prescriptions; is that right?

6          A.      Sure.  Absolutely.

7          Q.      And do you maintain that you have an

8  expertise in deciding precisely what circumstances

9  a pharmacist should fill and when a pharmacist

10  should refuse a prescription?

11          A.      I wasn't asked in my report to opine

12  on specifically under what circumstances a

13  pharmacist should fill or refuse a prescription.

14          Q.      When you write a prescription for a

15  patient, is that generally done based on a clinical

16  examination of a patient?

17          A.      It depends.

18          Q.      Okay.  What circumstances or how do

19  you go about -- you said you've prescribed opioids

20  before.  Give me the scenarios in which you have

21  prescribed opioids.

22                  And let me clarify that.

23                  What are the scenarios which lead you

24  to do that, not the specifics of a certain patient,

25  but sometime -- is that sometimes done simply by

Page 164

1    looking at their medical records?

2         A.     No.

3         Q.     Okay.  Is it sometimes done by simply

4    examining them?

5         A.     No.

6         Q.     What are the events or what do you

7    do, what have you done in the past, that lead you

8    to prescribe an opioid for a patient?

9              MR. ARNOLD:  Object.

10        A.     I've got -- I've got to gather the

11   information that I need to be sure it's the best

12   choice.

13        Q.     (BY MR. MANNIX:)  Okay.  And how do

14   you gather that information?

15        A.     It depends on the case.

16        Q.     Okay.  What are some of the things

17   you do to gather the information?

18        A.     I may speak with the patient, I may

19   evaluate the patient, I may examine the medical

20   record, I may speak with patient's family members,

21   I may check the prescription drug monitoring

22   information for the state, I may speak with other

23   clinicians, I may consult the medical literature

24   and clinical decision support software.  I mean,

25   there are a potentially large number of inputs, and

Page 165

1    it really just depends upon the case.

2         Q.    Is it fair to say you don't expect a

3    pharmacist to conduct a clinical examination of a

4    patient when they come to have a script filled at

5    the pharmacy?

6         A.    Well, I think a pharmacist does have

7    an obligation to evaluate physical cues that may be

8    present when engaging with patients.  But I suppose

9    maybe that doesn't qualify as a formal physical

10   examination.  I don't expect a pharmacist to listen

11   to a patient's lungs with a stethoscope, if that's

12   what you're asking.

13        Q.    The type of examination that you do

14   prior to prescribing opioids, you don't expect the

15   pharmacist to do the same type of examination; is

16   that fair?

17        A.    Yeah.  I think a pharmacist has a

18   separate and complementary responsibilities that --

19   and in some cases, overlapping responsibilities

20   with a prescriber, such as a physician or nurse

21   practitioner.  And so that's what I believe the

22   pharmacists' responsibilities are.

23        Q.    Do you have an understanding that you

24   have access to certain records generally of

25   patients that are not available to a pharmacist?

Page 166

1      A.    Yes.  And the pharmacist has access

2  to records that are not available to me.

3      Q.    Okay.  And what are the documents or

4  records that you have access to, generally

5  speaking, that a pharmacist does not have access

6  to?

7      A.    I don't -- I mean, it depends upon

8  the pharmacist, the pharmacy and the patient and

9  the health system.  I mean, I just can't answer

10  that question.  I don't know, and my report didn't

11  require me to know specifically what fraction of

12  the information that I have is visible to the

13  pharmacist and vice versa.

14      Q.    So you don't have -- as a practicing

15  internal MD, you don't have an understanding or an

16  expectation of what information is available to the

17  pharmacists that is different from the information

18  that is available for you, or do you have an

19  understanding?

20      A.    Well, I think that -- I mean, in this

21  day and age, there's an awful lot of information

22  that gets piped around from system to system.  And

23  so that's -- that's one of the reasons why I'm more

24  cautious in -- in asserting a response here than I

25  would otherwise be.

1              For example, I believe, in many

2   systems of care, pharmacists actually do have some

3   diagnostic information about patients.  And that

4   may come as a surprise.

5              So that's why I don't feel like I can

6   speak to this in detail.  But I want to underscore

7   that the preparation of my report, including

8   Appendix F, didn't require me to know this

9   information.

10        Q.    You said something there about it

11  would come as a surprise.  I believe, in many

12  systems of care, pharmacists actually do have some

13  diagnostic information about patients.

14             Is it your understanding that

15  pharmacists have the same amount of diagnostic

16  information that is available generally to you?

17        A.    So I was asked to develop -- within

18  Appendix F, I was asked to develop discussion

19  around the evidence base to support potential

20  indicators of high-risk opioid distribution.

21             And that undertaking didn't require

22  me to understand the detailed information that

23  pharmacists may or may not have that, as a

24  practicing clinician, I may or may not have.

25        Q.    And you don't have that information,

Page 168

1    the information as to what a pharmacist may or may

2    not have, as opposed to what you, as a practicing

3    clinician, may or may not have?  You don't know

4    what that difference is?

5          A.    I've told you that I think it

6    depends, and my guess is that it varies as well.

7          Q.    And then you said earlier that that

8    might come as a surprise.

9                Are you saying that may come as a

10   surprise to you or to others?  Who are you saying

11   that may come as a surprise to?  And I can read the

12   exact quote, if you want me to go back to it.

13         A.    No.  Yeah.  I think I was speaking to

14   the fact that, in today's interconnected world,

15   there is a greater visibility of information across

16   different organizational structures than

17   historically has been the case, in the

18   pharmaceutical supply chain.

19         Q.    Okay.  And as we talked about before,

20   you haven't spent any day of your life acting as a

21   pharmacist, and you don't have an understanding, a

22   precise understanding what information is available

23   to them?

24         A.    As a pharmacoepidemiologist, I have

25   spent my career focused on the study of the use and

Page 169

1    safety and effectiveness of prescription medicines.

2    And this includes having worked very closely with

3    pharmacists for many years to understand the

4    practice of pharmacy, as well as the pharmaceutical

5    supply chain.

6           Q.    Okay.  And do you or do you not

7    understand what a pharmacist -- what information

8    they have available to them?

9           A.    I've told you I think it depends and

10   it's highly variable.

11          Q.    In the next sentence of Paragraph 10,

12   you state that, "Pharmacies, and particularly

13   pharmacists, are also ideal points for patient

14   education and outreach on the risks of overdose and

15   to implement programs for screening and referrals

16   to OUD treatment."

17                Do you see that?

18          A.    Yes, I do.

19          Q.    And then you cite, I think, one

20   article there, correct, article -- Footnote 67?

21          A.    Well, the prior assertion in the same

22   sentence cites a different reference, Reference 66.

23          Q.    Oh, you're right.  It's the same

24   sentence.

25                So you cite those two articles for

Page 170

1    that proposition; is that right?

2           A.    Yes, that's correct.

3           Q.    And then you go on further to state,

4    "Pharmacies are also well-positioned to implement

5    drug disposal or deactivation packets for

6    individuals filling prescriptions for controlled

7    substances (See also Section 1C of Expert Report),

8    as well as harm reduction initiatives such as

9    naloxone prescribing and dispensing."

10                Do you see that?

11          A.    Yes.

12          Q.    And you have -- you have four

13   articles cited there, correct?

14          A.    Well, again, if you include the first

15   part of the sentence, there are a total of five

16   articles.  But, yes, I see those.

17          Q.    Perfect.  Okay.

18                I think we've talked about before,

19   you have not assessed whether or not the pharmacy

20   defendants have implemented these -- any of these

21   types of programs in Lake and Trumbull County; is

22   that right?

23          A.    My report and what I was asked to do

24   didn't require me to evaluate whether or not the

25   defendants have implemented specific programs in

Page 171

1    Lake and Trumbull County thus far.

2         Q.    And then the last sentence here says,

3    "However, pharmacists report that time constraints

4    that result from organizational policies, such as

5    those that arise from insufficient staffing or time

6    requirements for filling a prescription, hinder

7    their review of concerning patient behavior or

8    prescribing practices."

9              Do you see that?

10        A.    Yes, I do.

11        Q.    And that's based on -- I'm going to

12   get this one correct.  I'm going to look at the

13   rest of the sentence, not just the last -- you cite

14   two articles there, right?

15        A.    Correct.

16        Q.    And -- all right.  And these are

17   not -- and these were articles that studies were

18   done, correct?

19        A.    Yes, I believe that's correct.

20   Although I would want to review them specifically

21   in more detail in order to provide a definitive

22   answer to that question.

23        Q.    And you were not involved in those

24   studies, were you?

25              And you didn't conduct the interviews

Page 172

1    or anything of that nature; is that fair?

2            A.    Yes.  I was not involved in the

3    studies referenced in Reference 73 or 74 in

4    Appendix F.

5            Q.    And I reviewed these two articles.

6    One is from, I think, five Canadians who write

7    about pharmacy practice in Canada.  And the other

8    is from an Oregon story -- Oregon study.

9                 Are you familiar with those articles,

10   as you sit here today?

11           A.    Again, I would want to review them

12   more carefully if you have specific questions about

13   them.  But I included them because I felt that they

14   supported the general assertion that I was making.

15           Q.    In my review of those articles, they

16   don't discuss any specific conduct particularly

17   related to the defendants in this case.

18                 Do you have any reason to dispute

19   that?

20           A.    Well, we've discussed the issue of

21   generalizability before.  And I would just say,

22   again, for the record, that -- that a study can be

23   conducted in one setting, and be highly

24   generalizable and relevant to another setting.  So

25   it's an important matter and one that I considered

Page 173

1    when developing my recommendations.

2                    MR. ARNOLD:  Paul, I'll just mention,

3    since there's a moment of silence --

4                    MR. MANNIX:  Yeah.  That's good.

5    It's a good time to take a break.

6                    MR. ARNOLD:  Yeah.

7         A.    May I ask what the total video time

8    is on the record thus far?

9                    THE VIDEOGRAPHER:  Yeah.  I'm going

10   to have to add that up.

11                   MR. ARNOLD:  Why don't we go off the

12   record.

13                   THE VIDEOGRAPHER:  Okay.  Let's go

14   off the record at 2:19.

15        A.    Take your time.

16                   (Whereupon, a break was had from 2:19

17                   p.m. until 2:37 p.m. EDT)

18                   THE VIDEOGRAPHER:  We are back on the

19   record at 2:37.

20        Q.    (BY MR. MANNIX:)  Dr. Alexander, we

21   were talking about Appendix F, and I have a couple

22   of final questions related to that.

23                   We were talking about the information

24   that you have and the pharmacist has.  And I think,

25   at one point, you said a pharmacist often has

Page 174

1      information you don't have.

2                      What are -- what's an example -- or

3      what -- not just an example, but what information

4      do you understand a pharmacist has access to that

5      you don't have access to for a particular patient?

6                      MR. ARNOLD:  Objection to form.

7           A.      I believe pharmacists typically will

8      have information regarding the -- a patient's fill

9      history, you know, within a given pharmacy or

10     pharmacy chain.  And these days may well have

11     information about the broader use, the broader fill

12     history for a patient beyond the pharmacy in

13     question.

14          Q.      (BY MR. MANNIX:)  Now, in preparing

15     Appendix F, we were talking about the defendants'

16     conduct.  And I think you indicated that you did

17     not -- you weren't asked to and weren't required

18     to, in order to prepare Appendix F, study the exact

19     practices of each pharmacy defendant.

20                      Did you, in any way, review the

21     written policies related to dispensing of any of

22     the pharmacies in preparing Appendix F, or any

23     other part of your report?

24          A.      I have broad familiarity with some of

25     the policies that pharmacies have put in place in

Page 175

1   an effort to try to improve the safe distribution

2   of pharmaceuticals.  But I didn't -- but the

3   preparation of my report didn't require me to look

4   at the defendants' policies in this particular

5   instance.

6          Q.    So you don't have an opinion as to

7   whether or not their policies need to change or not

8   in connection with their dispensing -- and your

9   position is Appendix F -- considering you haven't

10  reviewed their policies; is that fair?

11         A.    Well, I think Mr. Catizone's report

12  highlights many opportunities for improved, safe

13  dispensing and distribution of pharmaceuticals.

14  And so I -- and I did review those as part of my

15  preparation for -- as part of the materials that I

16  reviewed in developing my own opinions.

17              But my report focuses on the evidence

18  base to support these indicators, rather than their

19  institution, or lack thereof, by the defendants in

20  question.

21         Q.    Would you agree that it is not the

22  goal of your opinions in your report, including

23  Appendix F, to have a specific impact on the

24  dispensing patterns that exist?

25         A.    Based on the totality of evidence

Page 176

1  I've reviewed, I believe there are enormous

2  opportunities for pharmacies to improve the safe

3  distribution of controlled substances, such as

4  opioids, in the supply chain.

5        Q.    And that's a totality for pharmacies

6  in general, not -- you haven't looked at the

7  specific conduct of these defendants; is that

8  right?

9        A.    That's correct.

10       Q.    If you look at -- I want to review

11 with you some of the information in your redress

12 models.  So let's go to what I've marked as Exhibit

13 3.

14             I think we'll be able --

15             MR. MANNIX:  Lauren, are you able to

16 pull that up onto Exhibit Share?

17       A.    I'm comfortable without doing so, as

18 long as it's something that I can find.

19       Q.    (BY MR. MANNIX:)  Okay.  All right.

20 Let's see if we can go without it.  And then, if we

21 need to, we will.

22             MS. CATANZARITE:  Exhibit 3 is

23 currently on Exhibit Share.  But if you want me to,

24 I can share my screen.

25             MR. MANNIX:  Yeah.  We'll see if we

Page 177

1    need that if there's one tab that's hard to read,

2    or not all the information is included.

3                    MS. CATANZARITE:  Sure.

4            Q.    (BY MR. MANNIX:)  If you look -- and

5    we're going to discuss on Lake County as an

6    example.

7                    If you look, Doctor, at 1D of your

8    redress model for Lake County.  You indicate

9    here -- why don't you explain what this

10   generally -- this program or this topic, what this

11   is meant to achieve.  "Achieve" is the wrong word.

12   What do you see as being the services provided

13   under this category?

14           A.    Sure.  So this category -- and

15   there's a section of my report, to be clear, that

16   describes this in more detail.

17           Q.    Right.  I think for all of these,

18   right?

19           A.    That's right.  That's right.  So, you

20   know, if you'd like that detail, I think we should

21   look at my report for that information.

22                    But the broad idea here is to help

23   promote what we call primary prevention.  In other

24   words, preventing new individuals from developing

25   opioid use disorder, nonmedical opioid use and the

Page 178

1   like, through the support of -- through the support
2   of community coalitions and community-based
3   organizations.

4           Q.     Okay.  You indicate under Number 3,
5   "Total number of community spaces."  And for each
6   year of the fifteen years of the model, it's 1.0,
7   correct?

8           A.     Yes.

9           Q.     What does that represent, that number
10  and -- go ahead.

11          A.     Well, for any given input to these, I
12  describe the source or the rationale further down
13  the page.  So in this instance, I write, "I assume
14  one community physical space to host forums,
15  seminars, training sessions and community
16  meetings."

17          Q.     Now, is that your assumption that
18  that is an existing space or a new -- an existing
19  community space or a new community space?

20          A.     This is the same question that we
21  have, you know -- I mean, it's a similar question
22  to what we've discussed many times today, which is
23  that my report didn't require me to net out
24  specific services or programs quantitatively.

25                 So I didn't require me to determine

Page 179

1   whether or not there's currently a brick and mortar

2   space or whether a new brick and mortar space needs

3   to be provided.

4            Q.    Okay.  So you didn't look into that

5   issue because it didn't matter to you, correct?

6            A.    It wasn't what I was asked to do.  It

7   is not that I'm not -- it's not that I'm

8   disinterested or wouldn't be -- you know, I'm very

9   interested.  But it's not -- was not required for

10  me to make the recommendations that I made.

11           Q.    Okay.  And I'm not suggesting that

12  you don't -- are not a caring person.  But as far

13  as your analysis goes, it wasn't critical for you

14  to know that; is that right?

15           A.    Correct.

16           Q.    And then if you go to 2A, it talks

17  about "Connecting Individuals to Care."

18                 You see that?

19           A.    Yes, I do.

20           Q.    And then you have various numbers.

21  And then you have the footnotes below or the notes

22  below.

23                 Under Number 4 to the notes, it says,

24  "One voucher per week, fifty-two weeks."

25                 Do you see that?

Page 180

```
1                    Did you say "yes," Doctor?  I was
2      looking down.
3              A.    No.  I'm looking.
4              Q.    Okay.  And that relates to total
5      number of transportation vouchers needed for
6      patients receiving outpatients OUD treatment per
7      year.  You see that?
8              A.    Yes, I do.
9              Q.    In that -- for the outpatient
10     treatment, what percentage of the participants are
11     you assuming will require travel vouchers?
12             A.    I estimate here the -- well, I guess
13     I'd like to look at this.  I guess it would be
14     helpful to see a little bit -- I'm changing my mind
15     and would like to see it projected, if that's okay,
16     because this is small.
17             Q.    Yeah.
18             A.    And I'd like to be sure that I give
19     you the information that you seek.
20             Q.    Yeah, that's fine.
21                   MR. MANNIX:  Lauren, can you bring
22     that up, then?
23                   MS. CATANZARITE:  You should see my
24     screen.
25                   MR. MANNIX:  Yeah, we -- I do.
```

Page 181

1            And then we're looking at Note 4.  So
2    you might have to drag that down a little bit.
3            Or is that it?  That might be it.
4            MS. CATANZARITE:  Can everyone see --
5        A.    Yeah.  That's much better.  That's
6    helpful.  So -- although that's -- is that the
7    right -- yeah, okay.  So Tab 2A.  Yeah.
8            So you asked sort of about this --
9    you asked the number of patients that I assumed
10   would need transportation vouchers.  And I think
11   it's all patients that are receiving outpatient
12   care.
13       Q.    (BY MR. MANNIX:)  Okay.  And I think
14   my question was the percentage.  But you're saying
15   a hundred percent of the people --
16       A.    Correct.  Correct.
17       Q.    -- is your assumption?
18           What is that based upon that you
19   assume that a hundred percent of the participants
20   would need vouchers?
21       A.    Well, I provide a reference -- I
22   provide a reference for that in -- I don't know
23   what row it is, but it's -- well, one voucher per
24   week.  So it's Row 44 here, the center for
25   substance abuse treatment, substance abuse

Page 182

1    administrative issues and outpatient treatment,

2    treatment improvement protocol series is the basis

3    for that recommendation.

4         Q.    Okay.  Is that specific to Lake and

5    Trumbull County --

6         A.    I don't believe -- I don't believe

7    that it is.  But, again, as with all of the inputs

8    and sources of information, I considered issues of

9    relevance to Lake and Trumbull County as I make my

10   recommendations.

11        Q.    Okay.  But you didn't analyze

12   whether -- presently, what percentage of people in

13   outpatient treatment in Lake and Trumbull County

14   actually need this form of transportation; is that

15   fair?

16        A.    My recommendations didn't require for

17   me to do a detailed audit of the number of

18   individuals within the county that -- that

19   currently have adequate transportation or not for

20   addiction treatment.

21        Q.    Okay.  And then the -- it also

22   appears -- correct me if I am wrong -- that --

23   well, it says fifty-two weeks.  That's every week

24   of the year.

25                   So you're assuming that if each

1    person in outpatient treatment would treat for

2    fifty-two weeks out of the year, the full year; is

3    that right?

4            A.     Correct.  I mean, these may not be

5    the same precise individual, but I'm assuming that

6    the demand would be -- that there would be

7    sufficient resources to provide for transportation

8    of at least one voucher per week for each

9    individual in outpatient care.

10               So you can think of it as like a sort

11   of -- a bed being occupied, or an outpatient slot

12   being occupied.  But it may or may not be by the

13   one continuous patient for an entire year.

14           Q.     And then the next, go down two

15   columns to Note 6, which, if you go up at top,

16   relates to the total number of transportation

17   vouchers needed for patients receiving intensive

18   outpatient OUD treatment per year.

19               And then Note 6 says, "Four vouchers

20   per week for fifty-two weeks."

21               So once again, that's every week out

22   of the year.

23               What is that based on?  The same

24   rationale that you just explained with the

25   outpatient treatment?

Page 184

1          A.     Well, I would want to look carefully

2     to see whether or not the reference is the same.

3     Keep in mind that I had, you know, hundreds of

4     references that I relied on in my report.

5               But the general intuition is that

6     transportation is an important barrier to

7     treatment; that intensive outpatient treatment is,

8     by definition, more frequent and more intensive

9     than just standard outpatient treatment, and

10    that -- that for these slots that would be filled,

11    that -- that whether or not it's one person

12    continuously or not getting treatment, that they

13    would be provided with transportation assistance

14    and that those treatment slots would be filled

15    throughout the year.

16         Q.     Turn to the next page, 2B, which is

17    "Treatment for Opioid Use Disorder."

18               Do you see that?  I guess it's on the

19    screen.

20               But if you look at the proportion of

21    individuals with OUD to receive treatment, and

22    there's some numbers from 2021 to 2035.  And down

23    in the note it explains the assumptions of that

24    yearly estimate from forty percent in Year 1 to

25    sixty percent in Year 15, correct?

Page 185

1          A.      Correct.

2          Q.      And then you provide more information

3    about that, explain it was based on 2018 treatment

4    episode data, TEDS, right?

5          A.      Yes.

6          Q.      And approximately twenty to thirty

7    percent of individuals with OUD were in treatment

8    at some point in the past twelve months nationally.

9                  And then you identified the World

10   Health recommendation of -- a recommended forty

11   percent minimum target.

12                 What is that based upon that, with

13   those numbers, the twenty to thirty percent of

14   individuals from the TEDS source, and then forty

15   percent minimum from World Health Organization, you

16   make the assumption of forty percent in Year 1 to

17   sixty percent in Year 15?

18                 How did you jump to those numbers?

19                 MR. ARNOLD:  Objection to form.

20         A.      Well, I mean, listen, we -- it's -- I

21   mean, it's a bit surprising or shocking, frankly,

22   to talk about settling for anything less than

23   everybody getting treated.  I mean, imagine if I

24   told you that our target for colon cancer is that,

25   you know, rest assured, Mr. Mannix, we're going

Page 186

1    to -- we're going to guarantee that we reach forty

2    percent of people with colon cancer, and they're

3    going to get high quality care next year.

4                    So these are -- unfortunately,

5    they're -- they're -- you know, they're pragmatic,

6    they're in some sense conservative, and yet they're

7    also ambitious estimates all at the same time.

8                    In other words, I believe that we can

9    achieve forty percent.  That would be a great

10   improvement over what has taken place in many

11   communities around the country.  But it's far too

12   little.  And sixty percent is much better.

13                   But, again, if I told you, you know,

14   fear not, you know, we're going to be sure that

15   sixty percent of people with multiple sclerosis

16   have access to FDA-approved evidence-based

17   treatments, there would be global outrage.

18                   And yet -- you know, yet we're

19   swimming upstream in many cases because of the --

20   because of the, you know, historic challenges,

21   including resource constraints, in building out the

22   infrastructure that we need.

23                   So I believe that a forty percent

24   target up to a sixty percent target over fifteen

25   years is achievable.  And I estimate that, along

1    with the other recommendations that I make, we can

2    reduce morbidity and mortality by fifty percent or

3    more over fifteen years.

4           Q.    (BY MR. MANNIX:)  Understanding that

5    that's the numbers you are seeking to achieve, is

6    there any basis for those particular numbers, as

7    opposed to other numbers more or less than those

8    numbers?

9           A.    Well, what -- what numbers would you

10   be proposing?  I mean, I'm --

11          Q.    You -- I'm not proposing numbers.

12   You proposed numbers, and I want to understand the

13   basis for those numbers is all.

14          A.    Yeah.  Yeah.  Sure.  Sure.  The

15   numbers are based on my review of the totality of

16   evidence, and my review of models, modeling

17   different impacts, and my review of many different

18   abatement programs in cities and counties and

19   states around the country.

20                And so the numbers represent the --

21   my best evidence, as I sit here today, regarding

22   what we should be targeting in these communities.

23          Q.    If you look at Note 4 -- let's see if

24   that needs expanded.  You know, once again, you

25   have TEDS data, 24.5 percent, and then you have

Page 188

1  yearly estimate from thirty percent Year 1 to sixty

2  percent in Year 5.

3          And those percentages are based on --

4  that you use, are based on what?  Thirty percent

5  and sixty percent?

6      A.    Yeah.  But this is estimating

7  something different.  I mean, Row 2 is estimating

8  the proportion of individuals with opioid use

9  disorder to receive treatment.  Whereas, Row 4 is

10 estimating the proportion of individuals with OUD

11 in treatment to receive medication-assisted

12 therapies.

13     Q.    Right.

14     A.    So Rows 2 and 4 are doing different

15 things.  But you're correct that the source for Row

16 4 is based on Ohio-specific TEDS data, as well as

17 information from the Substance Abuse and Mental

18 Health Services Administration.

19     Q.    Okay.  What steps did you take to

20 confirm that the sixty percent goal that you have

21 was achievable, in other words, that sixty percent

22 of OUD treated population would accept MAT?

23     A.    Well, I just want to correct one

24 thing that I said.

25          In looking at this, I think that

Page 189

1    there was just one source.  I think my last answer

2    suggested that there were two separate sources.

3    But I think the source was one and the same, which

4    is the SAMHSA data, the Substance Abuse and Mental

5    Health Services Administration data.

6                    But you asked what reason do I have

7    to believe that sixty percent is achievable, and

8    that that many people will accept MAT.  And I think

9    your question is a great one, and it points out

10    that there has been widespread stigma and

11    misinformation about medications to treat addiction

12    that have contributed to the very tepid uptake of

13    these treatments in some settings.

14                    And so that's why one of the things

15    that I recommend are broad, multi-faceted campaigns

16    to destigmatize these FDA-approved evidence-based

17    treatments.  I think sixty percent is achievable

18    based on the totality of evidence that I have

19    reviewed.

20          Q.    Okay.  And can you provide any

21    specifics, other than the totality of evidence, as

22    to what you relied upon for that?

23          A.    I can, but it will take time.  I

24    would want to review with you the sections of my

25    report that discuss stigma, the sections of my

Page 190

1    report that discuss --

2                    I'm sorry.  I'm getting a -- some

3    Zoom alert.

4                    The sections of my report that

5    discuss a treatment uptake.  The information that's

6    contained within the SAMHSA materials that I

7    reference, and so on and so forth.

8         Q.     If you look at Exhibit 3D -- not

9    Exhibit 3D, Section 3D of your redress model.  And

10   this speaks to mental health counseling and grief

11   support; is that right?

12        A.     Yes, it does.

13        Q.     In a family with opioid-related

14   death, what percentage -- based on your redress

15   model, what percentage of the family members are

16   you assuming will want or need grief support?  Are

17   you assuming all members or a percentage less than

18   all?

19        A.     I believe all members.  I cite the

20   median household size in Lake County as being 2.4

21   individuals.  And then multiply the total number of

22   opioid deaths by that number.

23                    I mean, there are a lot of ripples of

24   the effect of -- an overdose death has.  But I

25   suppose a conservative estimate is focusing just on

Page 191

1    the nuclear family alone, although this is a

2    multigeneral -- multigenerational epidemic all too

3    often, and the loss is felt and ricochets

4    throughout different generations.

5            Q.      So it says in Note 6, input is

6    fifteen hundred.  What does that number represent

7    where it says fifteen hundred?

8            A.      Yeah.  That's focused on individuals

9    with chronic pain.  So the idea here for this

10   abatement remedy is not just to focus on those that

11   have lost loved ones, but also to improve the

12   quality of care for individuals with chronic pain.

13   Because, in many cases, opioids have been

14   oversupplied at the expense of other safer and more

15   effective alternatives.

16              And so that number, fifteen hundred,

17   is derived from estimates regarding the total

18   number of individuals to receive mental health

19   counseling, as well as the number of bereaved

20   family members to receive support.

21           Q.      Okay.  The -- at the -- your citation

22   for that number, number of unique patients per

23   counts per year, six patients per day, at the end

24   it says, "Expert opinion."  And we see that at

25   various points throughout your report.

Page 192

1              When you say "expert opinion," what

2    are you referring to?  Is that your opinion?

3         A.    Well, in many cases, expert opinion

4    is listed as one of many different inputs for a

5    given parameter.  So there may be three or four

6    alternative estimates of a number like the number

7    of lives saved for every naloxone dose distributed,

8    or something like that.

9              And so, in some cases, expert opinion

10   I've provided as an additional input because it

11   takes expert opinion in order to interpret and

12   combine and assimilate different data sources that

13   may use different methods to estimate slightly

14   different measures in slightly different

15   populations and so on and so forth.

16             In other cases, there was no such

17   literature available.  And in those instances,

18   expert opinion represents the combined expertise of

19   myself as well as other experts who I may have

20   consulted with in arriving at any particular

21   estimate.

22        Q.    Okay.  Now, when you -- the first

23   circumstance where you identify -- you said there's

24   various sources.  And you then take that and

25   compile your own -- it sounded like you then gather

Page 193

1    that information and come to some assumptions based

2    on that.  And that may not be using your exact

3    words.

4                    But I don't think, in those

5    situations -- or I haven't seen a situation where

6    there's referenced expert opinions, and then the

7    various sources you are gathering and combining are

8    cited.  Or am I incorrect on that?  Do you leave

9    those sources that you're referring to out?

10        A.    No.  In no case did I omit sources,

11   that I'm aware of, from my expert report.

12                    So if there was a setting where I was

13   looking at a number of different data sources, and

14   then interpreting the optimal value based on those,

15   using expert opinion, I would -- I would stipulate

16   such.

17        Q.    Okay.  So for this instance, then,

18   are you saying that that's the second category, the

19   instance I'm looking under 3D, where it says,

20   "Expert opinion," you didn't have these various

21   data sources, you just based that on your own

22   expert view; is that right?

23        A.    In this type of instance, "expert

24   opinion" refers to my best estimates, which, in

25   many cases, were based on further discussion with

Page 194

1   other health policy, public health, addiction and

2   pharmacy experts.

3            Q.     Turning back to 1C of your report.

4   Turning -- let's go to 3.  I'm sorry.  Let's go

5   back to 3.  3C before we go to 1C.

6                  In this situation, I note under,

7   "Suggested costs," you have some information.  And

8   then you cite the Washington Statewide Reentry

9   Council as a basis for that.

10                 Is there a reason that you didn't

11  use -- attempt to use Ohio-based figures to come to

12  that conclusion?

13                 MR. ARNOLD:  Objection to form.

14           A.     I always used local data when I felt

15  that the local data was the best data to be used.

16                 I mean, my North Star is:  What's the

17  best data source for this particular question?

18                 And as I described in my expert

19  report, I used a careful process, and a

20  conservative process, to identify those sources.

21           Q.     (BY MR. MANNIX:)  If you look at 1C.

22  Go to 1C.  When you reference --

23                 MR. MANNIX:  Are you there yet?

24           Q.     (BY MR. MANNIX:)  Do you have that in

25  front of you, Doctor, or do you want to --

Page 195

1          A.      Yes.  Yes, I do.

2          Q.      Okay.

3          A.      Although, it would be helpful to,

4     yeah, show it here too.  But, yes, I do.

5                  MR. MANNIX:  Okay.  There you go.

6     Here we go.

7          Q.      (BY MR. MANNIX:)  So, again, if you

8     go down to the bottom there where it says,

9     "Suggested costs," and you're providing potential

10    costs for these programs, you're using California

11    and Washington information.

12                  Is there a reason, in that instance,

13    why you didn't use Ohio information?

14                  Well, let me ask you this:  Did you

15    look for Ohio information that related to that?

16         A.      Yes, I did.

17         Q.      And you couldn't find it?

18         A.      Well, I may have found something, but

19    I -- if I found it, then it -- if I found it and

20    it's not referenced here -- if I found it, then

21    it's referenced somewhere in my report.

22                  And if it's not included here, it's

23    because I didn't feel that it was the best source

24    of information to use.

25                  So I may have found something

Page 196

1    locally; I don't know.  But I can tell you that --

2    that the quality of information matters a great

3    deal here, as does the potential similarity or

4    dissimilarity in what's being estimated between

5    where -- the population where it's being estimated

6    and Lake and Trumbull Counties.

7         Q.    Okay.  Now, you've provided testimony

8    and were retained in a King County, Washington

9    case, correct, previous to this case?

10        A.    I mean, I was retained in a

11   Washington case that I think has been disclosed.

12   And anything that I've been retained in that has

13   been disclosed has been disclosed in an appendix.

14        Q.    No.  And I understand that.  I

15   just -- I'm looking here in your report.  You

16   submitted a report, in January of 2021, for a State

17   of Washington versus McKesson, Washington Superior

18   Court, King County.  And I wanted to understand if

19   that information that you have included there was

20   taken from that -- the work on that case?

21        A.    I don't know the answer to that.  But

22   I can tell you that it has been very helpful to

23   have been -- had the opportunity to be engaged in

24   multiple cases because it has allowed for me to

25   develop a confident appraisal of the evidence base

1    supporting the interventions and the costs of the

2    interventions that I propose.

3            Q.      With respect to the interplay between

4    your report and the redress models you have here,

5    can you explain the relationship between the

6    discussion in your report and the selected

7    components that are included in your redress

8    models?

9            A.      There's a very close relationship

10   between the discussion in my report and the

11   interventions that are proposed in my redress

12   models.

13           Q.      Okay.  And could you explain that,

14   just in general, besides saying it's a close

15   relationship?

16           A.      Well, the redress models are my

17   effort -- represent my effort to estimate the

18   specific populations, and in select cases the costs

19   of interventions as they would be applied to Lake

20   or Trumbull Counties.

21           Q.      And how did you select which inputs

22   to include in the redress models for each category?

23           A.      Well, that's hard to discuss in the

24   abstract.  But maybe we could look at a particular

25   instance.

Page 198

1          Q.      Okay.  Why don't we take the

2     example of -- what's up on the screen now?

3          A.      Drug disposal.

4          Q.      I don't know.  Is that what's up

5     there, 1C?  Why don't we just go to 1A.

6          A.      Okay.  So you asked how did I decide

7     which inputs to use in developing this model.  I

8     thought through if academic detailing and

9     continuing healthcare provider education were to be

10    required, what would be important to know in order

11    to estimate the populations of individuals to

12    receive this.

13                 And so I felt, for example, that when

14    it comes to academic detailing, it would be

15    important for me to estimate Input 1:  The total

16    number of prescribers eligible in the County;

17                 Input 2:  The number, the proportion

18    to receive detailing;

19                 Input 3:  Not the proportion, but the

20    absolute number of providers to receive detailing;

21                 and, Input 4:  The number of academic

22    detailers required for that.

23                 So there's sort of a sequential

24    process for any of these categories that I used in

25    order to identify the components of a given

```
                                        Page 199
 1   category.
 2          Q.     We were talking earlier in instances
 3   where you identify expert opinion as the source.
 4   And you said there's two situations.  One where
 5   you -- there's not a specific data source, and you,
 6   based on your experience, come to that conclusion.
 7                 And there's others where -- I know
 8   I'm paraphrasing.  There's data sources you gather
 9   and you use those to combine or correlate and come
10   to expert opinion.
11                 Can you show me examples, in your
12   redress model, of the situation where you do have
13   data sources and you're combining them or --
14          A.     Sure.
15          Q.     I just want to see one to make sure I
16   know what you're talking about.
17          A.     Of course.  So Tab 1E, like echo, the
18   description under Input 1, if you scroll down
19   further -- right here is perfect.
20                 So if you look at Row 28, you can see
21   how this played out.  So --
22          Q.     Okay.  Are you done testifying on
23   that?
24          A.     Yes, I am.
25          Q.     When you said "played out," I thought
```

Page 200

1   you were going to explain how it played out.

2          A.     Well, I -- yeah, I said "so" --

3          Q.     So that's an example --

4          A.     Sorry.  Go ahead, please.

5          Q.     So the citations you have before the

6   word "expert opinion" are what you took and you

7   compiled and combined; is that right?

8          A.     Yeah.  I mean --

9          Q.     "Combined" is the wrong word.  Go

10  ahead.

11         A.     I would say I synthesized --

12         Q.     Good.

13         A.     -- and interpreted.

14         Q.     That's right.  So you synthesized and

15  interpreted.

16                And then if you go down a few lines

17  below that under 4, there's one saying assuming one

18  permanent site and one mobile van, expert opinion,

19  that's an example of where you did not synthesize

20  and interpret; is that right?

21         A.     Well, I mean, there's still

22  synthesis.  I think it's just a question at what

23  level.  I mean, I'm aware of the broad reach of

24  syringe service programs.  And there's a large

25  literature supporting these that I discuss in my

Page 201

1    report.

2              And so it's not as if -- and,

3    frankly, the matter that there's a mobile van is

4    very important.  And there's evidence to support

5    that as well.

6              So -- and a mobile van is going to

7    reach different populations than the permanent site

8    will.

9              So I don't want to misconstrue expert

10   opinion as anything other than what it was, which

11   was my effort to combine the totality of my

12   knowledge, and in many cases, a reading of relevant

13   literature with -- with my best judgment and, at

14   times, the judgment of others with whom I

15   consulted.

16        Q.    Okay.

17        A.    Let me -- let me try to say that more

18   succinctly for you.  There is still scientific

19   sources of information that, broadly speaking, I

20   rely upon, when I cite expert opinion alone, as the

21   basis for a parameter.

22              It's simply that those sources of

23   information are not so directly relevant that they

24   would substantiate the parameter in and of

25   themselves if I provided them.

1          Q.      But they are not cited in your

2    report, so we can't look at those and analyze

3    those?

4          A.      That's not true.

5          Q.      Well, give me the example of that one

6    right there, assuming one --

7          A.      Okay.

8          Q.      -- permanent site and one mobile van.

9                  Where can I see what you're

10   interpreting and synthesizing there?

11         A.      I will be happy to do so.  It will

12   take a little bit of time, but I will be happy to

13   do so.

14                 (Pause.)

15         A.      Okay.  So for example, Paragraph 78

16   from my report, "Mobile harm reduction programs are

17   one tool to significantly improve access for

18   hard-to-reach populations, including those that do

19   not have access to transportation or who may reside

20   in rural areas.

21                 "Mobile SSPs (syringe service

22   programs), are already in use in other Ohio

23   locations, including an SSP in Dayton, Reference

24   260:

25                 "A review of twelve HIV outreach

Page 203

1   programs, which included harm reduction services,

2   found that clients who accessed mobile units were

3   eighty-six times more likely to receive an HIV test

4   than those who accessed other sites.

5                    "Reference 261.  The authors

6   noted" -- and so on and so forth.

7                    That's just one example.  I could

8   give you many more that support this assertion that

9   there be both a mobile and a brick and mortar

10  syringe service program.

11          Q.    But for purposes of understanding and

12  reviewing and interpreting your report, your

13  expectation, for us to understand that, is that we

14  would see expert report -- you don't cite it in the

15  redress model, to then turn back to your section of

16  your report that speaks to harm reduction and see

17  if we can find it there; is that generally correct?

18          A.    Well, I don't think it is a -- I

19  mean, my report is, I think, fairly presented.  But

20  to answer your question specifically, I believe

21  both the review of the -- I believe the review of

22  my narrative report is a helpful complement to the

23  review of any specific component of my redress

24  models.

25                    That's -- I mean, that gets to your

Page 204

1   question as to what's the relationship between the

2   narrative report and the redress models.

3               And the bottom line is that they

4   support each other, and I think that they should be

5   reviewed and interpreted in conjunction with one

6   another, not in isolation.

7               MR. MANNIX:  Why don't we do this,

8   let's go off the record for -- take a quick break.

9               THE VIDEOGRAPHER:  Off the record,

10  3:21.

11              (Whereupon, a break was had from 3:21

12              p.m. until 3:33 p.m. EDT)

13              THE VIDEOGRAPHER:  We are back on the

14  record at 3:33.

15              MR. MANNIX:  Dr. Alexander, I do not

16  have any further questions.  Let me just confirm it

17  from defense counsel.  I understand -- I don't

18  think they do, but I just want to make sure I don't

19  have that incorrect.

20              Sharon, Adam --

21              MR. FOTIADES:  No questions for CVS.

22              MS. DESH:  Nothing from me, thank

23  you.

24              MS. MOORE:  No questions from

25  Walmart.  Thank you.

Page 205

1              MS. BUECHNER:  No questions for Rite

2    Aid.  Thank you.

3              MR. MANNIX:  Okay.  So that's it for

4    now.  We'll reserve our right.  I think we're a

5    little less than four and a half hours, so we'll

6    reserve our right in Phase 2 to ask additional

7    questions for the hour and a half we have not

8    spent.

9              But other than that, we're ready to

10   conclude.

11             THE VIDEOGRAPHER:  Okay.  We will --

12             MR. ARNOLD:  All right.  Sorry.

13   Plaintiffs do not have any questions.

14             I'm not sure if under the terms of

15   the litigation or any agreement, whether you can

16   save your hour and a half and use it later.  But

17   I'm sure we can discuss that later.  I don't know

18   one way or the other.

19             MR. MANNIX:  Yeah.  We don't need to

20   resolve it now.  I understand your thoughts and you

21   know ours, so we'll deal with that later.  Thanks.

22        A.     Thank you very much.

23             THE VIDEOGRAPHER:  Okay.  We're off

24   the record, 3:34.

25

Page 206

1

2

3          (Deposition concluded at 3:34 p.m. EDT)

4

5              FURTHER THE DEPONENT SAITH NOT

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 207

1                 C E R T I F I C A T E

2

3

4    STATE OF ALABAMA

5    JEFFERSON COUNTY

6

7              I hereby certify that the above and

8    foregoing deposition was taken down by me in

9    stenotypy, and the questions and answers thereto

10   were reduced to typewriting under my supervision,

11   and that the foregoing represents a true and

12   correct transcript of the deposition given by said

13   witness upon said hearing, to the best of my

14   ability.

15              I further certify that I am neither

16   of counsel nor of kin to the parties to the action,

17   nor am I in anywise interested in the result of

18   said cause.

19

20

21        LAURA H. NICHOLS

          Commissioner-Notary Public, State of AL

22        ACCR License No. 3, Exp. 9/30/2021

          GA CCR No. 2714, Exp. 4/1/2022

23        TN LCR No. 679, Exp. 6/30/2021

          Transcript Certified on 5/31/2021

24

25

```
                                                    Page 208
 1                    Veritext Legal Solutions
                          1100 Superior Ave
 2                            Suite 1820
                        Cleveland, Ohio 44114
 3                      Phone: 216-523-1313
 4
      June 1, 2021
 5
      To: Andrew P. Arnold, Esq.
 6
      Case Name: National Prescription Opiate Litigation - Track 3
 7
      Veritext Reference Number: 4611957
 8
      Witness:  Caleb Alexander, M.D.       Deposition Date:  5/27/2021
 9
10    Dear Sir/Madam:
11
      Enclosed please find a deposition transcript.  Please have the witness
12
      review the transcript and note any changes or corrections on the
13
      included errata sheet, indicating the page, line number, change, and
14
      the reason for the change.  Have the witness' signature notarized and
15
      forward the completed page(s) back to us at the Production address
16    shown
17    above, or email to production-midwest@veritext.com.
18
      If the errata is not returned within thirty days of your receipt of
19
      this letter, the reading and signing will be deemed waived.
20
21    Sincerely,
22    Production Department
23
24
25    NO NOTARY REQUIRED IN CA
```

```
1              DEPOSITION REVIEW
               CERTIFICATION OF WITNESS
2
    ASSIGNMENT REFERENCE NO: 4611957
3   CASE NAME: National Prescription Opiate Litigation - Track 3
    DATE OF DEPOSITION: 5/27/2021
4   WITNESS' NAME: Caleb Alexander, M.D.
5        In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7        I have made no changes to the testimony
    as transcribed by the court reporter.
8
    _____        _____
9   Date                   Caleb Alexander, M.D.
10       Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12
         They have read the transcript;
13       They signed the foregoing Sworn
             Statement; and
14       Their execution of this Statement is of
             their free act and deed.
15
         I have affixed my name and official seal
16
    this _____ day of_____, 20____.
17
                   _____
18                 Notary Public
19                 _____
                   Commission Expiration Date
20
21
22
23
24
25
```

Page 210

```
 1                   DEPOSITION REVIEW
                  CERTIFICATION OF WITNESS
 2

         ASSIGNMENT REFERENCE NO: 4611957
 3       CASE NAME: National Prescription Opiate Litigation - Track 3
         DATE OF DEPOSITION: 5/27/2021
 4       WITNESS' NAME: Caleb Alexander, M.D.
 5           In accordance with the Rules of Civil
         Procedure, I have read the entire transcript of
 6       my testimony or it has been read to me.
 7           I have listed my changes on the attached
         Errata Sheet, listing page and line numbers as
 8       well as the reason(s) for the change(s).
 9           I request that these changes be entered
         as part of the record of my testimony.
10

             I have executed the Errata Sheet, as well
11       as this Certificate, and request and authorize
         that both be appended to the transcript of my
12       testimony and be incorporated therein.
13       _____        _____
         Date                    Caleb Alexander, M.D.
14

             Sworn to and subscribed before me, a
15       Notary Public in and for the State and County,
         the referenced witness did personally appear
16       and acknowledge that:
17           They have read the transcript;
             They have listed all of their corrections
18               in the appended Errata Sheet;
             They signed the foregoing Sworn
19               Statement; and
             Their execution of this Statement is of
20               their free act and deed.
21           I have affixed my name and official seal
22       this _____ day of_____, 20____.
23               _____
                 Notary Public
24
                 _____
25               Commission Expiration Date
```

Page 211

1                      ERRATA SHEET
              VERITEXT LEGAL SOLUTIONS MIDWEST
2                  ASSIGNMENT NO: 4611957
3    PAGE/LINE(S) /        CHANGE        /REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19

     _____      _____
20   Date                  Caleb Alexander, M.D.
21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22   DAY OF _____, 20_____ .
23                  _____
                    Notary Public
24
                    _____
25                  Commission Expiration Date

[& - 4]                                                                                            Page 1

## &

**&**   2:17 4:18 5:9

## 1

**1**   6:11 27:16 28:1
28:6,9 29:14 30:4
94:12 147:24
148:10,17,20
157:14,16,18,19
157:21,22 158:8
158:12 184:24
185:16 188:1
198:15 199:18
208:4
**1.0**   82:12 178:6
**10**   6:4 8:4 67:23
68:2 157:15 158:2
158:10 162:9
169:11
**1000**   3:11
**101**   4:19
**10178-0060**   4:20
**102-8**   8:18
**10:45**   57:1 67:9
**10:48**   67:17,20
**11**   6:5 30:4,5 31:4
37:24 38:21
158:22
**1100**   208:1
**11:00**   67:13
**11:03**   67:20,22
**12**   32:1 33:9 36:1
120:2,5
**12-25**   7:10
**12:31**   128:25
129:2
**13**   120:2,6
**14**   6:25 7:7 120:15
140:22,24 141:5
**140-9**   6:16

**15**   37:15 38:17
132:5 158:22
184:25 185:17
**15219**   5:12
**154**   99:16
**156**   100:24 101:14
101:20
**157**   101:17
**16**   6:15
**160**   99:15,16
**16th**   28:12 53:13
53:21
**17**   1:6 10:18
**17-5**   7:16
**18**   8:9 99:4,7
**1800**   3:10
**1820**   208:2
**18409**   207:20
**188**   125:5,14
**19**   8:21
**1999**   76:6 77:10
**1:00**   128:16
**1:17**   129:2,4
**1:22**   131:17,19
**1a**   198:5
**1c**   170:7 194:3,5
194:21,22 198:5
**1d**   177:7
**1e**   199:17

## 2

**2**   6:16 89:4,13
94:11 129:11
140:9,16,17,20,21
157:14 158:2,3,10
158:11 188:7,14
198:17 205:6
**2.4**   190:20
**20**   8:14 75:1,4
95:6,7 124:4
209:16 210:22
211:22

**2000**   106:1
**2000s**   96:9
**2002**   76:23
**20036-5807**   3:12
**2010**   76:7,7 77:10
77:16 79:2 94:24
96:10
**2013**   8:22 76:7
77:16 82:3,13
**2014**   76:8
**2016**   96:12 106:1
**2016-2017**   77:17
**2018**   77:17 82:13
185:3
**202**   3:13
**2020**   8:8 75:13
76:10 78:2 80:15
144:12,13,18,23
**2021**   1:18 6:15,25
7:7 10:9,16 28:13
53:13,21 59:18
62:15 144:9,12,18
184:22 196:16
208:4
**2035**   117:21 118:8
118:13 184:22
**21**   96:6 97:24
**212**   4:21
**216**   2:21 3:22
**216-523-1313**
208:3
**216-9000**   2:11
**2222**   2:19
**24**   130:18,21
**24.5**   187:25
**260**   202:24
**261**   203:5
**27**   1:18 10:9 107:2
**2714**   207:22
**27th**   10:16

**28**   2:9 101:23
199:20
**28-3**   7:20
**28-6**   6:11
**2804**   1:5,6 10:18
**29-10**   7:8
**294644**   2:10
**2:37**   173:17,19
**2a**   179:16 181:7
**2b**   184:16

## 3

**3**   6:22 8:8 11:6
71:7 72:23 88:25
89:2,13,16 90:19
120:25 129:11
144:15 176:13,22
178:4 194:4,5
198:19 207:22
208:6 209:3 210:3
**3.6**   103:3,21
**309-6000**   4:21
**312**   4:12
**33**   117:9
**35th**   5:11
**38**   8:18 102:8,11
102:13 103:20
104:3
**39**   53:22
**3:33**   204:12,14
**3:34**   205:24 206:3
**3c**   194:5
**3d**   190:8,9,9
193:19

## 4

**4**   7:4 28:12 77:8
89:11,14 179:23
181:1 187:23
188:9,14,16
198:21 200:17

[4/1/2022 - addition]

**4/1/2022** 207:22
**412** 5:13
**44** 181:24
**44113** 2:20
**44114** 3:21 208:2
**4611957** 208:7
209:2 210:2 211:2
**471-3490** 5:13
**494-4400** 4:12

**5**

**5** 7:8 29:10,13,15
29:16,18 30:11
33:10 188:2
**5/27/2021** 208:8
209:3 210:3
**5/31/2021** 207:23
**54** 4:10
**55** 2:18
**57** 124:5,9 125:18
**586-7375** 3:22

**6**

**6** 7:10 12:25 13:5
25:4,10 30:4
69:16 147:24,24
183:15,19 191:5
**6/30/2021** 207:23
**60654** 4:11
**66** 169:22
**67** 120:15 169:20
**67-23** 8:4
**679** 207:23

**7**

**7** 7:16 17:5,8,10
**73** 172:3
**74** 172:3
**75-1** 8:14
**76** 98:23
**778-1800** 3:13
**78** 202:15

**8**

**8** 7:20 27:16 28:1
28:3
**843** 2:11
**861-0804** 2:21
**89-11** 7:4
**89-2** 6:22

**9**

**9** 158:11
**9.9** 82:13
**9/30/2021** 207:22
**901** 3:20
**99-4** 8:9
**9:33** 10:10,17

**a**

**a.m.** 10:10,17
67:20,20
**aarnold** 2:12
**abandoning** 48:12
48:14
**abate** 38:19 42:15
51:21 52:2 86:19
115:24 151:5
**abated** 114:17
**abatement** 6:12,17
6:24 7:6,11 8:5
20:3,8 34:4 41:8
42:10 43:11,18,25
44:7 47:25 48:17
49:10 51:24 64:12
64:19 66:4 68:13
68:18 86:22 88:16
91:21 92:1,5,16,23
93:4,6,18 108:12
109:9,15 110:25
115:16 116:22
118:17,18 119:8,9
119:22 120:24
123:2 124:1
126:13 127:4,16

135:6,13 138:9
139:5 146:22
147:11 151:3
161:16 187:18
191:10
**ability** 129:10
207:14
**able** 54:4 64:17
70:21 71:1 89:14
89:20 111:15
133:3 176:14,15
**absolute** 198:20
**absolutely** 120:20
163:6
**abstract** 102:15
197:24
**abundantly** 111:18
**abuse** 16:7 100:13
125:12 181:25,25
188:17 189:4
**academic** 37:20
198:8,14,21
**accept** 188:22
189:8
**access** 37:8 40:1
66:2 137:5 165:24
166:1,4,5 174:4,5
186:16 202:17,19
**accessed** 203:2,4
**accompany** 28:24
**accomplish** 127:10
**accounted** 76:5
**accounting** 76:5
**accr** 207:22
**accruing** 127:18
**accurate** 13:13
**accurately** 81:19
83:1
**achievable** 133:8
186:25 188:21

189:7,17
**achieve** 132:18
177:11,11 186:9
187:5
**achieved** 88:15
**acknowledge** 120:15 124:9
209:11 210:16
**act** 90:15 151:4
209:14 210:20
**acted** 151:2
**acting** 10:4 168:20
**action** 207:16
**actions** 49:5 85:20
86:18 122:16
156:4,10,16,25
157:10
**activities** 45:1
61:6 63:4 110:10
110:21,23 115:8
116:2 135:13
**actors** 48:20,25
149:1 152:25
154:4
**actual** 32:23
**acute** 21:2
**adam** 3:7 204:20
**adamhs** 110:24
**add** 31:4 82:24
157:15 173:10
**addiction** 21:15,18
21:21,23 22:1,4,9
22:10,17,20 23:1,5
23:7,10 24:1,9
61:16 72:25 74:12
74:24,25 100:10
182:20 189:11
194:1
**addictions** 87:18
**addition** 14:13
28:23 38:9 140:25

**additional** 35:15 37:20 46:3 65:10 82:24 86:6,8 125:1,8,17 139:2 192:10 205:6

**address** 24:5 38:19 45:23 89:18 93:19,22 107:21 108:23 109:3,6,20 110:17 111:2 112:9 114:20 124:19 208:15

**addressing** 6:12 6:17 7:11 8:5 120:16 162:14

**adequacy** 49:11

**adequate** 182:19

**adequately** 128:8

**adhere** 157:11

**administration** 188:18 189:5

**administrative** 182:1

**advance** 66:21

**adverse** 16:8

**advised** 42:12

**affect** 119:18

**affixed** 209:15 210:21

**afotiades** 3:14

**age** 102:19 166:21

**ago** 104:15,16 106:2 113:3 117:18 141:25

**agree** 29:16 75:15 93:9 95:2,10 96:24 97:6,11 175:21

**agreed** 9:2

**agreement** 205:15

**ahead** 27:15 29:8 44:21 50:3 71:18 71:19 79:22 82:1 104:9 132:21 178:10 200:4,10

**aid** 4:15 205:2

**al** 101:8 207:21

**alabama** 10:3,4 207:4

**alcohol** 61:15

**alert** 190:3

**alerted** 145:24

**alexander** 1:17 6:4 6:15,20 7:14,18,22 8:8 9:4 10:10,22 11:2,18 24:21 57:6,15 67:25 80:4 104:9 129:5 173:20 204:15 208:8 209:4,9 210:4,13 211:20

**aligned** 74:23

**alliance** 4:4 125:11

**allow** 19:5 60:22 60:24 162:25

**allowed** 40:15 196:24

**allowing** 67:6

**allows** 64:10

**ally** 137:18

**alternative** 192:6

**alternatives** 191:15

**ambitious** 186:7

**ambivalence** 111:21

**amount** 108:11 109:19 110:6,13 116:1 119:7 126:5 126:15 167:15

**analog** 82:6

**analogs** 82:5 98:10

**analyses** 92:7

**analysis** 28:16 42:8,20,25 43:8,25 44:7 46:5,6,13 54:7,16 68:20,20 71:6 84:25 85:11 95:4 109:16 120:23 123:10 127:23 160:20 179:13

**analytics** 6:23 7:5 11:24 26:24 59:24 60:11 158:25

**analyze** 45:25 46:1 46:3 49:15 109:10 111:14 114:19 124:2 126:18 133:15 138:17 182:11 202:2

**analyzed** 109:4 110:16 115:20 116:4,11,16 123:12,13,25

**andrew** 2:6 208:5

**anna** 72:23 74:14

**answer** 14:2,3 22:20 26:2 30:18 32:5,11 33:1 34:9 34:21 35:1,24 36:10 40:15 44:3 44:23 50:3 51:2 74:6 79:14,18 91:1 117:24,25 125:25 127:22 139:7 140:5 142:16 145:1,18 150:16 151:24,25 152:20 154:16 156:18 166:9

**analog** 171:22 189:1 196:21 203:20

**answered** 22:2,23 22:24 41:2,3 142:23 154:20,22

**answering** 125:21 143:15 151:25

**answers** 54:24 154:18,19 207:9

**anticipate** 117:14

**anticipating** 129:13

**anybody** 54:21 142:17

**anytime** 142:16

**anywise** 207:17

**apologies** 25:21

**apologize** 60:8 132:22

**appear** 25:10 68:7 123:5 157:15 209:11 210:15

**appearing** 2:2 3:2 4:2 5:2

**appears** 13:13 100:3,9 159:20 182:22

**appended** 210:11 210:18

**appendices** 27:17 28:10,24 29:20

**appendix** 6:20 7:14,18,22 12:15 13:7,11 17:13 25:5,9 26:16,21 29:15,16,18,21,24 30:7,11,20,21,24 31:1,2,9 32:2 33:10 35:11 86:5 86:6 90:22,25 122:12,15 140:14

140:20 141:3,5,8
141:15 145:15
147:10,13,15,16
148:10,10 155:11
155:17,18,20
156:2,3,5,8,20,21
157:2,13 158:2,12
158:16,19 159:1
159:10,19 160:20
162:9 167:8,18
172:4 173:21
174:15,18,22
175:9,23 196:13
**applicable** 160:10
160:12
**applied** 97:1 140:4
140:7 197:19
**applies** 41:14
122:7 154:23
**apply** 97:2 121:2
**appraisal** 114:13
196:25
**appreciate** 25:19
56:23 135:22
**approach** 125:21
140:3,7 142:24
149:18 161:15
**appropriate** 19:4
137:2
**approved** 186:16
189:16
**approximate**
77:13
**approximately**
53:15 64:3 69:22
185:6
**april** 6:15,25 7:7
28:12 32:18 41:23
53:13,21 57:16
58:2 63:24 66:9
146:4

**area** 146:7
**areas** 202:20
**argument** 50:15
**arises** 11:15
**arkansas** 159:25
**arnold** 2:6 12:13
12:21 22:22 23:13
24:18,22 25:17,18
25:21 34:23 36:15
36:21 40:14 41:1
43:3 44:19,21,22
46:8 48:3 49:22
49:24 50:1 51:15
54:8 56:18,20
57:6 60:5 78:7
79:13,17 83:14,21
84:13 85:13 97:7
104:7 105:10
108:8 117:22
118:9,15 124:15
134:2,22 137:4,25
138:22 152:15
153:15,18 154:14
154:20 158:6
160:4 164:9 173:2
173:6,11 174:6
185:19 194:13
205:12 208:5
**arriving** 192:20
**art** 85:15
**article** 8:10,19
75:9,16,18,19
78:19,21 94:5,7
95:2,5,14 96:4
98:23 99:7,15,16
100:23 101:1
102:1 103:10,18
104:2 105:11
160:15 169:20,20
**articles** 99:9,11,13
104:1 158:19,24

159:9,13,16,16,18
159:20 160:2,24
161:3,9 169:25
170:13,16 171:14
171:17 172:5,9,15
**articulate** 118:4
**asap** 41:21 63:6
124:11 125:1,18
126:5,18 127:7
**aside** 33:4 90:24
**asked** 20:7 22:22
34:3,6,12,17,19
35:1 41:1 42:9
43:10,19,20 44:20
44:24 45:9 49:8
49:10 50:10,19,23
51:14,20,23 52:5
52:11,13 65:1,1
66:10,16,22 68:12
68:15,16 84:24
85:10,18,23 86:2
86:12,16,17 92:3,4
92:12,15,22 93:5
109:8,13 114:12
114:15,23 115:9
115:14,16 133:12
134:3 139:1,4,10
140:25 146:19
151:22 163:11
167:17,18 170:23
174:17 179:6
181:8,9 189:6
198:6
**asking** 14:18
20:12,13 21:22,25
31:22 34:10,19,20
34:21,22 74:3
81:17,18 84:18
85:17 96:1 104:25
121:4,25 127:19
144:24 145:3

147:21 154:7,19
165:12
**asserting** 166:24
**assertion** 104:20
105:2 111:22
160:17 169:21
172:14 203:8
**asserts** 105:12
**assess** 38:18
**assessed** 170:19
**assign** 9:12 92:3
93:8
**assignment** 209:2
210:2 211:2
**assimilate** 192:12
**assist** 54:3 55:1,12
**assistance** 184:13
**assisted** 142:11
188:11
**assisting** 23:10
54:6 142:12
**assists** 108:12
**association** 100:15
103:12
**associations** 8:19
102:5 107:19
**assume** 15:6 91:24
94:5 178:13
181:19
**assumed** 181:9
**assuming** 28:20
180:11 182:25
183:5 190:16,17
200:17 202:6
**assumption**
178:17 181:17
185:16
**assumptions**
184:23 193:1
**assure** 127:1

**assured** 185:25
**attached** 210:7
**attempt** 68:19
  69:9 126:17
  132:18 194:11
**attempted** 52:12
  69:11 86:3 143:25
**attempting** 60:19
  62:23 71:11
**attention** 155:16
**attorney** 2:7,16
  3:8,18 4:7,17
**attorneys** 5:8
**attributable** 77:17
**audit** 110:3,12
  111:1 182:17
**august** 8:8,22
**authorities** 38:7
**authority** 162:23
**authorize** 210:11
**authors** 100:14
  103:11 203:5
**availability** 79:3
  100:16 103:13
  106:4
**available** 28:1
  29:13 38:8 47:17
  99:21 114:20
  125:24 137:14
  165:25 166:2,16
  166:18 167:16
  168:22 169:8
  192:17
**ave** 208:1
**avenue** 3:20 4:19
**average** 109:18
  110:5
**avoiding** 117:13
**aware** 30:25 33:20
  33:23 37:18 45:3
  65:7 66:18,19,19

114:25 120:21
122:3,6 138:10
144:5 146:2
193:11 200:23
**awful** 166:21

**b**

**b** 7:18 17:13 59:25
  120:25
**back** 18:2,5 65:3
  67:10,21 78:2
  81:4 84:11 89:17
  101:25 128:15
  129:3,6 131:18
  157:22 158:1
  168:12 173:18
  194:3,5 203:15
  204:13 208:15
**background** 15:15
  15:17 16:13,13
  17:18
**backtracking**
  80:16
**backwards** 47:20
**balance** 117:10
  118:3,19 133:7
**baldwin** 98:24
**barrier** 184:6
**bartlit** 4:8
**bartlitbeck.com**
  4:13
**base** 20:2 50:5
  109:23 113:11
  119:24 126:21
  141:3 143:17
  148:24 149:22
  155:21,22 156:22
  157:7 159:6
  167:19 175:18
  196:25
**based** 43:11 49:9
  50:5 51:13 64:15

64:16,18 65:14
66:3 68:18 84:5
85:19 92:5,6,16,23
93:6 94:6 95:3
96:17 109:9,14
111:7,16,24 112:2
112:3 115:23
116:17 123:9,16
123:18 128:3
131:3 135:2,19
137:22 141:18
148:13 159:21
161:3 163:15
171:11 175:25
178:2 181:18
183:23 185:3,12
186:16 187:15
188:3,4,16 189:16
189:18 190:14
193:1,14,21,25
194:11 199:6
**basis** 46:23 151:17
  182:2 187:6,13
  194:9 201:21
**bates** 33:11,16
  37:25 38:22 39:3
  39:9 40:13,21,24
**beck** 4:8
**bed** 183:11
**began** 79:6 100:18
  103:15
**beginning** 79:2
  96:10
**begins** 77:6
**behavior** 171:7
**belief** 118:17
**beliefs** 147:13,18
**believe** 11:10
  12:12 13:14,20
  16:1 19:13 22:2
  26:13 27:3,5,8

31:7,24 42:5
43:12 45:6 47:1
47:16,18 48:24,25
48:25 52:1,7,20,21
53:14,17,18 58:4
58:13,17,24 59:19
60:4,5,12 61:19,20
61:21,22 62:5,10
62:13,16,21 63:2
63:10,18,20,22
64:2,2 67:5 69:15
72:13,14 75:19
76:24 77:24 78:23
86:5 90:11,14
91:15 92:8 95:6
96:5 97:15 99:9
99:12 103:25
104:15 105:15,16
106:3,14 107:14
107:16 108:20,24
118:1,24 119:22
121:19 122:11
130:23 131:2
141:25 143:4
145:12 146:9
149:9 153:12
154:23 155:5
156:7 165:21
167:1,11 171:19
174:7 176:1 182:6
182:6 186:8,23
189:7 190:19
203:20,21
**believing** 84:4
**beneficial** 108:1,4
**benefits** 115:4
  153:3
**benzodiazepine**
  150:3
**bereaved** 191:19

**best** 14:1,3 21:19
22:8 47:15,16
86:17 87:7 108:10
108:25 114:17
126:10 136:24
164:11 187:21
193:24 194:15,17
195:23 201:13
207:13
**better** 32:5 45:22
181:5 186:12
**beyond** 50:13
134:5 174:12
**big** 68:23
**biostatistics** 18:17
20:20,24
**birmingham** 10:3
**bit** 25:19 44:1 58:5
104:4,5,10 145:7
152:17 157:13
162:10 180:14
181:2 185:21
202:12
**blank** 149:3
**blend** 18:16
**board** 18:18,24
61:15 63:2,5
110:24 151:22
152:14 153:13,19
**bockius** 4:18
**bold** 133:7
**bond** 5:20
**boots** 4:4 61:3
**bottom** 130:22
131:7 159:17
195:8 204:3
**boulevard** 2:9
**break** 56:22 57:1,3
67:9,19 68:1 90:6
90:7 128:14 129:1
131:16 156:11

173:5,16 204:8,11
**breaks** 56:25
**brick** 179:1,2
203:9
**bridgeside** 2:9
**bring** 66:22 90:3
180:21
**broad** 70:21 73:20
87:23 90:11 94:19
95:9 97:15 121:10
149:10 155:21
174:24 177:22
189:15 200:23
**broader** 114:5
174:11,11
**broadly** 55:14,18
201:19
**brought** 68:9
117:18
**budgets** 114:11
**buechner** 4:16
205:1
**build** 48:11
**building** 186:21
**builds** 107:7
**built** 47:9

**c**

**c** 2:1 3:1 4:1 5:1
7:14 12:15 13:7
13:11 25:5,9
26:16,21 90:22,25
207:1,1
**ca** 208:25
**cabell** 8:6 13:16
68:9 70:25
**caleb** 1:17 6:4,14
6:19 7:13,17,21
8:8 9:4 10:10,22
11:18 208:8 209:4
209:9 210:4,13
211:20

**california** 13:16
195:10
**call** 54:20 58:10,13
58:15,18,24,24
59:1,5,20 60:6
62:11,11 63:14,17
64:3,14,23,24 65:6
65:7 66:10,13,21
143:2 177:23
**called** 11:4 95:18
102:5
**calls** 53:7,7,15,16
58:7,7,16 59:9
60:21,24 61:20
62:6,7 64:15
65:16 67:1 83:11
145:6
**campaigns** 189:15
**canada** 172:7
**canadians** 172:6
**cancer** 185:24
186:2
**capable** 23:6
**capacity** 90:16
**capital** 109:2
**captures** 83:2
86:15
**car** 63:15,23
**caraway** 32:19
41:23 57:17 58:2
63:24 66:9
**care** 137:9,18
155:8,9,19 157:4
157:12 167:2,12
179:17 181:12
183:9 186:3
191:12
**career** 168:25
**careful** 37:2,6
110:1 114:12
194:19

**carefully** 31:3
44:9 107:14
110:20 125:23
152:25 172:12
184:1
**carfentanil** 82:6
**caring** 179:12
**carmen** 123:4
141:16 143:7
148:11
**carolina** 2:10
**case** 1:6 10:18
13:16 17:25 25:14
25:15,22 26:7,9
28:18 29:2 33:22
34:2 35:6 36:3,7
38:23 39:25 42:5
61:5,7 67:3 68:8,9
68:13,14,20,21
69:11 70:7,17,20
80:2 84:24 90:9
90:19 91:2,8,25
92:4 93:4 112:6
113:7 116:15
117:18 121:17,21
122:8 144:25
154:23 156:10,17
157:1 159:8,23
160:3 161:8
164:15 165:1
168:17 172:17
193:10 196:9,9,11
196:20 208:6
209:3 210:3
**cases** 1:12 12:15
12:17,17 13:11,18
25:8 26:15,17,20
26:23 90:21 91:10
91:14,16,19,22,22
126:22 165:19
186:19 191:13

192:3,9,16 193:25
196:24 197:18
201:12
catanzarite 5:7,15
129:20,23 130:5
176:22 177:3
180:23 181:4
categories 91:7
120:6,9 121:5,20
149:10 198:24
categorized
160:24
category 73:21
120:11 158:5
177:13,14 193:18
197:22 199:1
catizone 16:1,2,5
122:18 140:13
141:11 143:1,7,9
143:22 144:6,19
145:12,16,24
146:3,20 149:4,9
149:13 150:2,5
catizone's 123:4
123:10 141:16
146:7 147:19
148:12 156:6
175:11
causal 93:10,15
100:20 103:16
105:7,24
cause 10:11 92:25
207:18
caused 51:21 87:3
92:20
cautious 166:24
cbhsq 8:22
ccr 207:22
center 50:16
181:24

centre 5:10
certain 47:12,23
137:2 141:1 163:4
163:24 165:24
certainly 29:21
35:5 54:2 56:6
58:19,20 83:23
140:1,23 148:6
161:4
certificate 210:11
certification 209:1
210:1
certified 1:23 9:6
10:1 18:19,24
207:23
certify 10:5 207:7
207:15
chain 45:5 47:4
90:17 91:25
122:11 123:8
146:11,13 149:1
150:13,25 152:9
153:1 154:5,25
162:15 168:18
169:5 174:10
176:4
challenges 80:20
80:23 83:2 186:20
change 162:2
175:7 208:13,14
210:8 211:3
changed 76:15
78:3 118:22 119:7
changes 208:12
209:7 210:7,9
changing 180:14
characterization
80:7
characterized
76:25

check 129:18
164:21
chemical 98:10
chicago 4:11 18:6
18:7,12
child 87:1
children 124:20
choice 79:18
164:12
chronic 21:2 87:6
191:9,12
circulated 56:9
circulating 56:14
88:3
circumstance
192:23
circumstances
136:6,9 163:4,8,12
163:18
citation 98:15,23
99:2 102:1 125:14
191:21
citations 102:1
106:20,22 141:10
159:19 200:5
cite 98:22 99:8,9
99:11,13 106:14
158:15,19 169:19
169:25 171:13
190:19 194:8
201:20 203:14
cited 37:22 145:22
159:1,9 170:13
193:8 202:1
cites 169:22
cities 187:18
citizens 25:23 26:6
51:6 87:15 161:13
city 8:6 13:17 68:9
70:25

civil 10:6 209:5
210:5
claiming 153:11
claims 91:4 106:7
clarification 53:6
clarify 163:22
classifications
94:19
clear 47:14 50:10
85:16 96:13 98:2
98:6 111:18
144:20 160:8
177:15
clearly 115:7
142:1 161:16
cleveland 2:20
3:21 208:2
click 130:14
clients 203:2
clinic 21:10
clinical 18:7 22:21
23:1,12,17,21
24:16 138:3
163:15 164:24
165:3
clinically 22:12,13
22:13 74:23
clinician 167:24
168:3
clinicians 164:23
close 92:8 98:10
197:9,14
closely 147:5
152:21 169:2
closest 155:10
clubs 88:4
coalition 41:21
63:6 124:18
coalitions 178:2
coauthored 75:9

coincident  82:3
colleague  59:23
  60:7
colleagues  56:18
  60:11 106:16
collected  36:7
college  17:20
colon  185:24
  186:2
column  100:25
  157:23
columns  183:15
combination
  35:25
combine  192:12
  199:9 201:11
combined  58:21
  192:18 200:7,9
combining  162:1,4
  193:7 199:13
come  24:13 67:9
  86:7 89:17 116:10
  136:13,14,15,20
  155:10 165:4
  167:4,11 168:8,9
  168:11 193:1
  194:11 199:6,9
comes  94:11
  198:14
comfortable  22:15
  23:9 64:15 176:17
coming  128:15
commencing  10:9
comment  57:14
comments  55:21
commission
  209:19 210:25
  211:25
commissioner  9:6
  10:5 207:21

committed  127:14
committee  153:2
common  23:5
communicate
  54:22 142:21
communications
  144:10
communities  44:6
  51:22 64:13 65:20
  68:24 69:6,8,10,18
  69:21 70:2 78:13
  82:21 85:22 87:4
  95:21 109:15
  112:9,18 119:5
  126:10 127:18
  128:4 133:2 135:5
  135:16 147:5
  186:11 187:22
community  16:20
  41:19 65:21 94:9
  95:4 110:22 114:1
  114:3 116:18
  119:18 125:13
  126:16 127:1
  128:7,8,11 135:1
  135:19 161:17
  178:2,2,5,14,15,19
  178:19
companies  49:6
company  5:5
compare  127:24
  135:7
comparison  41:6
compelled  78:11
competing  114:7
  114:10 118:3
compile  192:25
compiled  200:7
complaint  21:12
complement
  203:22

complementary
  165:18
complete  12:4,6
  17:22 18:3,7 30:5
  30:13 89:7 95:17
completed  18:11
  208:15
completely  87:17
complex  154:3
complimentary
  128:2
component  135:11
  135:12 203:23
components  197:7
  198:25
composition  48:17
comprehensive
  20:8 34:4 42:10
  43:11,20 49:9
  64:18 66:3 68:17
  85:19 91:3 92:5
  92:23 93:6 107:18
  109:14,22 111:1
  114:16 131:3
  135:2 139:5
comprehensively
  37:3 42:15
compton  98:24
  103:10 104:14,19
  105:6,9,11
computer  89:24
conceived  149:9
concept  157:23
conceptualized
  149:10
concern  39:22
  66:1
concerned  83:23
concerning  171:7
conclude  105:24
  205:10

concluded  206:3
conclusion  84:21
  103:9 194:12
  199:6
conclusions  28:17
  99:15,17,20
  103:25 111:25
  131:23 161:11
concomitant
  149:25
concrete  115:23
  147:4
condition  84:6
conditional  161:22
conditions  163:1
conduct  45:10
  68:19 93:11 165:3
  171:25 172:16
  174:16 176:7
conducted  103:24
  104:25 106:21
  110:21 160:19
  172:23
conference  145:6
confident  196:25
confidential  6:25
  7:7
confirm  11:11
  49:4 83:11 96:23
  188:20 204:16
confuse  71:24
confused  44:1
conjunction  204:5
connecting  179:17
connection  11:5
  15:4 31:16 93:10
  175:8
connections  93:15
consensus  41:10
conservative
  186:6 190:25

194:20
consider 22:10
23:21 24:16,20,23
42:7,25 43:6,15,23
44:5 50:14 83:19
84:3 116:18 139:7
139:8 160:16
considerable
113:12
consideration
49:16
considered 119:14
139:9 145:22
172:25 182:8
considering 175:9
consistent 70:13
136:24 149:17
consisting 76:4
constraints 108:22
111:19,24 112:1
113:12 171:3
186:21
construction 44:2
consult 164:23
consultancy 11:21
11:23
consulted 30:6,13
31:12 125:9
192:20 201:15
contact 25:25 26:4
26:17,22
contacted 26:9,12
137:19
contained 145:14
190:6
contains 28:16
contents 156:3
context 14:10
26:20 32:20 45:7
58:11 71:15 73:9
73:11 74:3 79:24

79:24 81:16,17
114:5 125:11
contexts 114:9
continue 47:24
48:9
continuing 3:1 4:1
5:1 7:1 8:1 94:22
198:9
continuous 183:13
continuously
184:12
contours 45:19
46:24 97:15
119:19 121:10
contrast 135:7
contributed
189:12
controlled 15:23
19:4,6 47:6
146:12 153:5
155:14 163:1
170:6 176:3
controversial 41:9
80:8
convenient 56:22
conversation
113:20
conversations
41:22 54:12,13,14
55:9 63:22
convey 66:11
71:12
coordinated 85:19
131:4
copy 56:6,7,12,14
56:17
core 41:8
corner 30:1
coronavirus 78:12
correct 12:13
14:24 15:1,2

19:19,20,22,23
20:17 22:21 28:13
32:17 35:7,13
36:13,20,22 40:7
40:25 45:12 46:14
52:13 53:1 59:12
60:16,17 69:14,19
69:22 70:18,19
75:8 76:10 77:3,4
82:14 93:4 94:3
94:10 97:25 98:12
98:14,20,21 99:2
107:22 109:11,12
111:10,11 115:15
116:14 118:20
120:11 122:23,24
123:11 124:7,8,12
132:13 140:6
141:12,13 142:10
143:3 144:5
156:19 158:5,7,9
158:17 169:20
170:2,13 171:12
171:15,18,19
176:9 178:7 179:5
179:15 181:16,16
182:22 183:4
184:25 185:1
188:15,23 196:9
203:17 207:12
corrections 208:12
210:17
correctly 28:22
30:8 100:5,21
correlate 199:9
correspond
158:10,11
corresponding
77:12
cost 79:4 126:22
136:19

costs 86:13 92:1
93:3,8 136:17
194:7 195:9,10
197:1,18
council 194:9
counsel 9:4,9,11
10:8 14:14,25
25:25 38:2,24
39:4,7,10,13,14,19
40:3,3,22,25 42:16
56:20 60:7,12
62:20 204:17
207:16
counsel's 60:15
counseling 190:10
191:19
count 69:23
counted 69:20,24
counter 152:17
countervailing
133:1
counties 2:4 14:10
16:12 17:21 20:9
26:6 32:21 34:16
35:7 41:14,15
42:11 43:12,22,24
44:11 45:2 47:15
47:19 48:16 64:20
65:23 85:8,9,12,21
93:1,17 97:18
107:21,25 108:9
111:20 112:15,24
114:6,18,21,25
115:22,24 124:3
133:10 161:13
187:18 196:6
197:20
country 108:21
112:22 114:7
186:11 187:19

**counts**  191:23
**county**  6:13,14,18
  6:19,23 7:6,12,13
  8:6 13:15,16
  16:14 25:23 33:21
  34:1 41:21,25
  44:16,16 45:15,16
  45:16,23 47:10
  51:7 57:23 58:3
  61:6,15 63:1
  65:11,22 68:9
  70:3,25 86:20
  87:16,19 88:9,17
  89:1,10 92:2,11,21
  93:20,24 94:15
  97:3,5,12 108:21
  108:25 109:5,6,19
  109:25 110:7,10
  110:13,16,17,21
  111:2,5 112:1,6,23
  113:8,10,10,12
  114:11 115:2,4,8
  117:18 118:23
  119:14 122:6
  123:24 124:10,22
  125:13 127:7,8
  129:24,25 130:3,4
  130:5 132:13
  133:19,20 138:5
  140:1 156:18
  161:5 170:21
  171:1 177:5,8
  182:5,9,13,18
  190:20 196:8,18
  198:16 207:5
  209:10 210:15
**county's**  16:21
**couple**  173:21
**course**  14:5 52:22
  199:17

**court**  1:1 10:7
  57:11 154:9
  196:18 209:7
**courthouse**  4:9
**courts**  25:24 28:25
  51:5
**cover**  29:19,24
  129:8
**covered**  116:6
**create**  139:3
**credentials**  20:12
  147:6
**criminal**  87:11,12
  121:1,2
**crisis**  6:13,18 7:12
  8:6 51:8 76:2,13
  107:22 109:6,21
  110:18 118:22
  119:13
**critical**  134:7
  179:13
**critique**  146:19
**crucial**  34:6 39:23
**ct1**  13:15 52:22
**ct2**  13:16
**cues**  165:7
**current**  11:19
  47:12 98:18 99:23
  114:24 115:12,18
  115:18 116:1
**currently**  78:14
  176:23 179:1
  182:19
**curriculum**  7:18
**cut**  89:5,6 130:20
  130:21
**cv**  17:10,11
**cvs**  3:4,4,5,5,6
  204:21
**cycles**  117:12

**d**

**d**  29:16,18,22,24
  30:7,11,20,21,24
  31:1,9 32:2 33:10
  35:11 60:2 86:5
**dad**  87:1
**dan**  1:7
**dangerous**  162:1
**data**  8:22 39:24
  41:24 96:17 99:21
  137:10 185:4
  187:25 188:16
  189:4,5 192:12
  193:13,21 194:14
  194:15,15,17
  199:5,8,13
**date**  10:5 43:21
  44:25 45:20 49:12
  53:12 59:17 64:13
  106:6 108:7
  109:17 110:4,11
  110:14,21 111:2
  113:2 122:17
  142:3 208:8 209:3
  209:9,19 210:3,13
  210:25 211:20,25
**dated**  28:12 53:21
**davies**  102:5
**dawn**  115:3
  139:14,20
**day**  3:19 21:10
  24:13,13 61:3,3
  87:2,14 125:22
  150:19 166:21
  168:20 191:23
  209:16 210:22
  211:22
**days**  151:1 174:10
  208:18
**dayton**  202:23

**dc**  3:12
**deactivation**  170:5
**deal**  196:3 205:21
**dealings**  144:8,19
**dear**  208:10
**death**  87:18
  190:14,24
**deaths**  49:3 77:15
  78:12 79:5 81:23
  81:24 82:7,9,10
  96:8,10,11 119:5
  190:22
**decade**  21:17
**decades**  117:15
**decide**  43:1,8
  48:16 128:11
  198:6
**deciding**  128:7
  163:8
**decision**  164:24
**declined**  77:17
**deed**  209:14
  210:20
**deemed**  208:19
**defendant**  3:16
  4:4,15 42:19
  43:21,22 92:13
  93:11 156:4,16
  157:3 174:19
**defendants**  3:4 5:4
  42:3,8,13,23,24
  43:7,16 44:14
  90:8,9,19,20 91:2
  91:4,7,25 148:15
  156:10,25 157:10
  170:20,25 172:17
  174:15 175:4,19
  176:7
**defense**  204:17
**defensively**  137:7

| | | | |
|---|---|---|---|
| **defer** 24:8 | **depositions** 31:1 | **details** 124:14 | 73:12,17 89:5 |
| **defined** 149:21 | 31:16,19,22,25 | 143:11 | 90:19 106:11 |
| **definitely** 128:19 | 32:6,13,16,23 33:5 | **detectives** 87:9 | 114:9 119:17,24 |
| 144:22 | 33:7 | **determine** 43:16 | 132:6 135:18 |
| **definition** 73:21 | **derive** 143:11,12 | 128:4 133:24 | 136:13 150:20 |
| 74:17 184:8 | 144:6 | 134:18 138:18 | 157:7 161:7 |
| **definitions** 72:7,15 | **derived** 38:4 | 178:25 | 166:17 168:16 |
| 72:24 74:14 | 191:17 | **devastated** 51:7 | 169:22 187:17,17 |
| **definitive** 32:11 | **describe** 37:2,16 | 51:22 | 188:7,14 191:4 |
| 33:1 171:21 | 37:24 47:2 69:9 | **develop** 20:7 34:3 | 192:4,12,13,14,14 |
| **degrees** 17:18 | 74:12 94:13 96:4 | 34:17 37:7,17 | 193:13 201:7 |
| **demand** 79:5 81:8 | 141:3,5 146:9 | 42:9 43:10 49:9 | **differently** 76:16 |
| 183:6 | 158:3 178:12 | 54:7,16 64:17 | **difficult** 148:23 |
| **demands** 114:7,11 | **described** 76:3 | 66:3 68:16 92:4 | **digging** 16:24 |
| **department** | 77:2 86:2 95:14 | 92:15,22 93:5 | **dimension** 160:25 |
| 208:22 | 194:18 | 109:8,14 114:16 | **direct** 25:24 |
| **departments** | **describes** 177:16 | 115:16 127:16 | 154:18 |
| 70:16 | **describing** 38:19 | 139:4 144:1 | **directly** 23:25 |
| **depend** 71:14 | 77:21 | 156:20 167:17,18 | 25:2 53:8 71:6 |
| 73:10 | **description** 28:16 | 196:25 | 106:15 107:15 |
| **dependence** | 94:7 95:12 157:15 | **developed** 57:13 | 117:3 125:9 |
| 100:13 | 199:18 | 147:23 | 145:22,24 201:23 |
| **depending** 74:7 | **descriptive** 78:5 | **developing** 39:23 | **director** 61:15 |
| **depends** 71:13,15 | **desh** 4:6 204:22 | 42:14 55:12 | 62:25 |
| 71:22 73:9,11 | **design** 132:14 | 109:24 149:13 | **directory** 124:21 |
| 84:9,9 163:17 | **despite** 43:1,9 | 173:1 175:16 | **disaggregate** |
| 164:15 165:1 | 47:15,16 | 177:24 198:7 | 115:17 |
| 166:7 168:6 169:9 | **destigmatize** | **development** | **disagree** 57:12 |
| **deponent** 6:4 | 189:16 | 43:14 110:22 | **disagreement** |
| 206:5 | **detail** 17:17 | 117:11 122:15 | 127:2 |
| **deposed** 11:5 | 122:13 133:14 | 143:14 144:4 | **disclosed** 196:11 |
| 12:16,18 13:13,19 | 134:16 140:1 | 156:8,21 | 196:13,13 |
| 14:20 | 167:6 171:21 | **devote** 134:8 | **discretion** 51:12 |
| **deposition** 1:16 | 177:16,20 | **diagnostic** 167:3 | **discuss** 36:25 |
| 9:4,13 10:18,19 | **detailed** 109:16 | 167:13,15 | 38:17 39:14,17 |
| 12:7,11 14:7,21 | 110:12 167:22 | **died** 76:22 | 42:12 48:19 50:14 |
| 15:11 16:19,25 | 182:17 | **difference** 168:4 | 51:20 67:4,10 |
| 30:23 38:1,3,23 | **detailers** 198:22 | **differences** 68:24 | 71:25 72:14 82:18 |
| 142:7 206:3 207:8 | **detailing** 198:8,14 | 149:19 | 104:21 124:20 |
| 207:12 208:8,11 | 198:18,20 | **different** 41:4,6 | 128:1 134:11 |
| 209:1,3 210:1,3 | | 45:13 58:18 70:16 | 135:17 136:21 |

139:21 155:11
172:16 177:5
189:25 190:1,5
197:23 200:25
205:17
**discussed** 36:8
38:3 39:13 45:7
52:2 136:3 138:25
143:22 145:19
161:18 172:20
178:22
**discusses** 122:12
**discussing** 82:16
132:8 134:9
**discussion** 58:11
113:19 167:18
193:25 197:6,10
**discussions** 32:18
40:22 55:4 143:25
144:17,21
**disinterested**
179:8
**disorder** 24:6
72:25 74:10 132:3
177:25 184:17
188:9
**disorders** 23:12,18
23:22 24:17
132:13
**dispensed** 83:17
83:19 84:7,19
**dispensing** 15:24
137:12 151:9
155:13,24 157:5
162:25 170:9
174:21 175:8,13
175:24
**displayed** 130:19
**disposal** 170:5
198:3

**disprove** 103:25
106:12
**dispute** 146:17
172:18
**disseminates**
124:18
**dissimilarity**
196:4
**distinction** 112:21
**distinguishing**
46:5
**distributed** 77:11
192:7
**distribution** 3:5
6:21 15:24 47:6
115:3 116:16
139:14 141:2
155:14 157:9
167:20 175:1,13
176:3
**distributors** 90:15
91:8,17
**district** 1:1,2 10:7
**divert** 87:12
**division** 1:3
**doctor** 18:19
34:20 40:10 101:4
130:1,8 131:20
138:23 143:7
177:7 180:1
194:25
**document** 1:11
28:19 141:9
**documents** 11:12
15:3,9 16:3,15
30:6,13 33:11,14
33:16,21 34:1,5,8
34:12,15 35:6,11
35:12,15,19 36:1,3
36:6,12,19 37:4
38:1,22 39:3,9

40:4,5,13,17,21,23
40:24 42:3,7,13,19
42:21,23,24 43:7
43:13 66:23,24
67:3 140:17 166:3
**doing** 37:10 50:22
51:11,13 80:18
108:1,4 139:17
154:1 176:17
188:14
**dollars** 27:2,4,7,9
27:12 114:13,14
115:2 126:15
**domain** 40:9,17
112:5 113:6
**door** 22:16 24:14
24:25
**dose** 157:25 158:3
192:7
**doubt** 144:14
159:11
**dozen** 152:23
**dozens** 65:17 92:7
**dr** 11:2 24:21
52:18 53:8,16,20
54:3,15,16,18,25
57:6,15 67:25
72:23 74:14 80:4
101:3 104:9 129:5
143:6 173:20
204:15
**draft** 55:24 56:2,5
56:15,17
**drafts** 54:1
**drag** 181:2
**draw** 155:1
**drawing** 118:12
**drawn** 155:2
**drive** 53:1
**driven** 81:11
100:15 103:12

106:3,7
**driver** 92:9
**driver's** 19:9
**driving** 61:23
**drug** 61:15 82:6
83:9 157:8 164:21
170:5 198:3
**drugs** 82:11
149:25 152:9,24
162:1
**dubious** 112:21
**due** 108:6 138:24
**duly** 10:23
**duration** 59:4
64:14 118:17,19
157:25 158:4
**dying** 76:21 94:15
**dynamic** 69:4
119:2,11

e

**e** 2:1,1 3:1,1 4:1,1
5:1,1 59:25,25,25
60:2,2,2,2 86:5
207:1,1
**eagle** 5:4 11:3
**earlier** 57:17
60:22 73:6 94:3
103:10 108:5
111:4 133:11
134:15 147:23
168:7 199:2
**early** 80:12 81:23
96:9
**ears** 137:20
**east** 3:20
**eastern** 1:3 4:5
**easy** 53:4 133:2
149:7
**echo** 199:17
**economic** 109:2

**edges** 149:19
**edt** 10:10 67:20
  129:2 131:17
  173:17 204:12
  206:3
**education** 124:7
  124:18 125:2
  126:19 127:9,11
  169:14 198:9
**educational** 17:18
  18:13
**effect** 133:21
  135:18 190:24
**effective** 49:17
  191:15
**effectively** 105:21
**effectiveness**
  126:18,21,22
  127:3,21,23 152:4
  153:24 169:1
**effects** 115:8
**effort** 34:6 44:12
  54:20 55:1,19
  143:23 153:5
  175:1 197:17,17
  201:11
**efforts** 20:3 38:19
  43:21 46:24 47:15
  64:12 77:7,7,19
  108:23 110:2,3
  125:12
**eight** 82:11 99:10
**eighty** 98:17 203:3
**either** 32:15 62:13
  89:13 128:17
  130:19 131:10
  139:11
**electronic** 89:14
**electronically**
  89:21 90:4

**element** 81:20
**elements** 111:8
**elena** 60:1
**eligible** 85:24
  198:16
**eliminate** 87:17
**elizabeth** 4:16
**elizabeth.buech...**
  4:22
**elucidated** 123:4
**email** 208:17
**emphasize** 94:18
**empiric** 105:4
**employ** 20:19
**employed** 11:20
  19:14 86:19 147:4
**employer** 11:19
  26:12
**enclosed** 208:11
**encountered** 23:23
  138:1
**encouraged**
  142:19
**enforcement**
  148:16
**engage** 142:17
**engaged** 58:19
  142:15 145:11
  196:23
**engagements** 7:15
**engaging** 165:8
**england** 8:12 99:1
  104:1
**enormous** 50:5
  97:19 106:13
  108:11 119:7
  126:20 132:24
  152:20 176:1
**ensure** 70:12 87:5
  87:8

**entail** 71:19
**entailed** 117:13
**entered** 210:9
**entire** 183:13
  209:5 210:5
**entirely** 39:12
**entities** 91:11,13
  91:20
**entitled** 13:15
  107:3
**envelope** 11:15
**epidemic** 6:24 7:6
  8:16 21:17 22:5,7
  24:1,7,15 25:2
  38:4,20 42:15
  44:16 45:20 47:18
  51:22 55:21 64:12
  76:4,25 78:6 80:7
  80:12 81:20,24
  82:17 83:3 85:22
  86:19 92:8,9,20,25
  93:19 94:2,8
  95:13 96:2,25
  97:5,12,16 108:23
  111:3 112:8,17
  114:17,20 115:25
  117:15 119:20
  132:25 150:14
  151:6 162:14
  191:2
**epidemiologic**
  20:23
**epidemiologist**
  20:22 150:24
**epidemiology**
  18:17 19:17 20:2
  112:8 150:11
  160:22
**episode** 185:4
**equipped** 22:15
  24:4,5,12,24

**errata** 208:13,18
  210:7,10,18 211:1
**esq** 208:5
**essentially** 106:5
  130:25
**estimate** 51:23
  98:17 180:12
  184:24 186:25
  188:1 190:25
  192:13,21 197:17
  198:11,15
**estimated** 52:3
  196:4,5
**estimates** 6:24 7:6
  86:12 186:7
  191:17 192:6
  193:24
**estimating** 188:6,7
  188:10
**et** 101:8
**evaluate** 45:1,17
  122:16 134:15
  147:6 160:15
  164:19 165:7
  170:24
**evaluated** 37:3
  44:10 45:13
**evaluating** 38:15
  135:18
**evaluation** 43:21
  44:25 45:10,11
  46:17,22 49:11
  117:12 126:25
  134:7,9 135:10,11
  135:15
**event** 29:24 43:9
**events** 16:8 164:6
**everybody** 185:23
**evidence** 7:23 9:14
  20:2 37:17 43:11
  49:9 50:5,5 64:16

64:18 66:3 68:18
82:20 92:5,16,23
93:6 106:5 107:7
109:9,14,23
115:23 116:17
119:23 125:23
126:20 128:3
135:2 141:3
143:17 148:24
149:22,23 155:21
155:22 156:22
157:6 159:5
160:16 161:20
167:19 175:17,25
186:16 187:16,21
189:16,18,21
196:25 201:4
**evolution** 96:25
97:4,11
**evolved** 95:14 96:3
119:24
**evolving** 8:15
**exact** 35:4 133:25
136:5 142:3
168:12 174:18
193:2
**exactly** 49:19
106:21 111:25
128:13
**examination** 6:1,5
10:11 11:1 163:16
165:3,10,13,15
**examine** 106:17
135:5 164:19
**examined** 10:23
**examines** 102:16
**examining** 107:19
112:17 164:4
**example** 15:13,19
16:20 32:18 37:15
37:18 48:7 60:23

96:5,16 107:6
115:1,3,4 124:17
167:1 174:2,3
177:6 198:2,13
200:3,19 202:5,15
203:7
**examples** 199:11
**exceed** 136:17
**exchange** 55:19
**exclusive** 94:21
**exclusively** 21:3
**excuse** 62:6 127:8
147:1
**executed** 210:10
**execution** 209:14
210:19
**executive** 61:14
**exhibit** 6:11,16,22
7:4,8,10,16,20 8:4
8:9,14,18,21 12:25
13:3,5 17:5,8,10
25:4,10 28:3,6,8
29:10,12,14,16,18
30:4,11 33:10
53:22 67:23 68:2
75:1,4 88:25 89:2
89:11,13,13,25
95:6 99:4,7 102:8
102:11 103:20
104:3 140:9,16,17
140:20,21 176:12
176:16,22,23
190:8,9
**exhibits** 6:8 7:1
8:1 27:16 28:1
**exist** 47:23,24 48:8
48:9 134:25
175:24
**existed** 47:22
**existing** 43:23
44:5,15 69:10

122:20 123:12,13
123:23,24 124:2
127:6,24 134:17
134:20 138:5,8,13
178:18,18
**exists** 133:19
**exp** 207:22,22,23
**expanded** 131:21
187:24
**expect** 83:9,13
131:25 136:6,10
136:25 137:23
165:2,10,14
**expectation**
132:10 166:16
203:13
**expectations**
136:3
**expecting** 55:10
135:15
**expended** 126:5
**expense** 191:14
**experience** 19:25
22:9 41:15 65:15
65:19 67:7 112:7
112:9 123:15,19
128:19 146:10
147:7 150:12
152:8,19,20 153:1
153:8,21,22 154:8
154:8,11 199:6
**experienced** 108:6
133:3
**expert** 6:14,19
7:13,14,17,21 8:7
11:5 15:20 16:1
20:5 21:5 25:9
26:16 28:9 30:3
31:23 74:13 84:25
85:10 90:22
141:16 142:16

148:12 150:8,16
151:18,19,23
152:12 153:11
154:10,11,12
155:2 170:7
191:24 192:1,3,9
192:11,18 193:6
193:11,15,20,22
193:23 194:18
199:3,10 200:6,18
201:9,20 203:14
**expert's** 146:20
**expertise** 20:16
146:7,15,25
147:22 150:6,23
155:6 163:8
192:18
**experts** 67:5
122:18 192:19
194:2
**expiration** 209:19
210:25 211:25
**explain** 40:3
111:24 131:23
177:9 185:3 197:5
197:13 200:1
**explained** 97:14
183:24
**explains** 184:23
**explanation** 34:11
**exponential** 82:7
**extend** 116:23
**extended** 119:25
**extensive** 22:8
150:12 152:8
**extent** 115:20
133:21
**extremely** 82:5

**[f - focus]** Page 15

| f |
| --- |

**f** 6:20 27:18 60:2
117:8 118:5,7
140:14,20,20
141:3,5,8,15
145:15 147:10,13
147:16 148:10,10
155:11,17,18,20
156:2,3,5,8,20,21
157:2,13 158:2,12
158:16,19 159:1
159:10,20 160:20
162:9 167:8,18
172:4 173:21
174:15,18,22
175:9,23 207:1
**fabric** 119:18
**face** 145:10,10,13
145:13 162:16,16
**faced** 108:22
**faceted** 189:15
**fact** 43:1,9 108:7
136:1 149:8
168:14
**factor** 99:22
**factors** 38:17
119:16
**failed** 157:4,11
**fair** 20:6 28:15,18
30:17 31:14 33:5
33:24 34:2,16
36:4 39:11,13
44:18 51:2 59:8
121:4 144:4 157:5
165:2,16 172:1
175:10 182:15
**fairly** 203:19
**falls** 73:21
**familiar** 52:16
101:3 120:14
121:6,13 159:3

172:9
**familiarity** 143:21
174:24
**family** 136:20
164:20 190:13,15
191:1,20
**far** 84:8 133:4
156:15 171:1
173:8 179:12
186:11
**fashion** 58:1 95:15
96:3
**fatal** 77:13 87:25
**fault** 83:20 84:3,8
84:12,21
**fda** 186:16 189:16
**fear** 186:14
**feature** 22:5
**federal** 10:6 19:4
114:19 115:1
116:12 140:4
**feedback** 55:20
**feeding** 159:13
**feel** 24:4 52:9
64:10,17 66:1
72:19 78:11 167:5
195:23
**feels** 142:14
**fellowship** 18:8
**felt** 64:15 106:5
172:13 191:3
194:14 198:13
**fentanyl** 72:3 76:7
80:14,21,25 81:12
81:25 82:4,5,8
83:4 96:11,15
97:21 98:4,9,10
**fernandez** 60:1
**fgallucci** 2:22
**field** 18:15,21
152:3,19 160:12

**fifteen** 92:6 112:7
116:20,23,24
117:19 118:7,12
132:4 133:6 178:6
186:24 187:3
191:6,7,16
**fifth** 141:15
**fifty** 35:21 58:25
58:25 59:10 64:7
132:4,18,23 133:5
179:24 182:23
183:2,20 187:2
**figure** 49:16
**figures** 194:11
**fill** 83:9 134:24,25
136:7,10,15
137:22,24 163:4,9
163:13 174:8,11
**filled** 83:13 136:4
165:4 184:10,14
**filling** 136:23
170:6 171:6
**fills** 150:2 162:24
**final** 56:4,7 94:20
173:22
**finalize** 55:5
**finalized** 55:25
**finalizing** 55:13
**finances** 108:16
**financial** 110:3,12
111:9,14
**financially** 139:11
**find** 159:9,14
176:18 195:17
203:17 208:11
**finding** 158:18
**fine** 37:13 57:8
67:14,14 74:6,8
101:7 128:16,17
131:11 180:20

**finish** 40:15 79:14
**firm** 26:11 60:15
**firms** 159:8,13
**first** 10:23 13:12
13:14 51:19 58:8
58:24 60:1,3,8
75:22,25 77:23
78:6,10 96:6,8
98:22 103:5,23
104:13 109:5
112:1,14 117:8
129:24 136:14
144:14 157:24
162:12,20,21
170:14 192:22
**firsthand** 144:2
**firstly** 46:16
**fit** 64:19
**fits** 161:14
**five** 31:8 58:25
59:7 64:7 103:4
103:23 104:15
106:1 109:7,20
110:7,18 116:19
117:18 118:23
119:12 126:7
128:21 138:2
150:20 170:15
172:6
**flag** 89:20
**flagged** 151:8
**flags** 15:22 86:7
155:23 156:23
157:7
**floor** 5:11
**flow** 115:2 146:12
152:9
**flux** 119:18
**fly** 52:25
**focus** 38:21,25
40:11,20 68:15

142:18 155:16
191:10
**focused** 22:6 91:16
118:7,11 146:21
147:3 152:24
155:15 168:25
191:8
**focuses** 47:19
116:7 175:17
**focusing** 190:25
**fold** 77:12,13
**follow** 142:19
157:4 162:22
**followed** 96:9
104:6
**following** 10:12
18:2,5 81:21
101:15 103:4,23
104:5,11 120:13
120:14
**follows** 10:24
**footnote** 72:22
77:7 101:22,23
117:8 118:4,7,16
169:20
**footnotes** 179:21
**force** 41:22 110:24
115:7
**forces** 133:2
**foregoing** 10:7
207:8,11 209:13
210:18
**foremost** 162:20
162:21
**form** 9:10 23:13
24:18,22 34:23
36:15,21 40:14
43:3 44:19,22
46:8 48:3 51:15
54:8 83:14,21
84:13 85:13 87:23

97:7 104:8 108:8
117:22 118:9,15
124:15 134:2,22
137:4,25 138:22
152:15 153:15,18
154:14 158:6
160:4 174:6
182:14 185:19
194:13
**formal** 18:13
46:17 165:9
**formally** 31:10
**forth** 28:22 87:13
88:5 120:1 153:6
190:7 192:15
203:6
**fortunate** 41:17
**fortunately**
142:18
**forty** 58:25 59:7
59:12 64:7 102:19
128:21 184:24
185:10,14,16
186:1,9,23
**forums** 178:14
**forward** 47:9,11
47:20 48:17 49:14
114:16,22 122:20
126:13 127:17
208:15
**fotiades** 3:7
204:21
**found** 88:23 93:23
101:9 140:13
195:18,19,19,20
195:25 203:2
**four** 27:9 59:16
77:12,13 120:6,9
120:10 121:20
143:19 158:15
170:12 183:19

192:5 205:5
**fourteen** 87:22
**fraction** 166:11
**framed** 76:14
142:5
**framework**
120:24 121:12,16
122:1 123:2,2
135:18 137:16
138:9 147:11
**francisco** 162:2
**frank** 2:15 60:6
**frankly** 185:21
201:3
**frasier** 32:19
41:23 57:16 58:2
58:8,16,22 59:21
60:14,20 64:6
66:9 113:20
**free** 69:23 72:19
159:14 209:14
210:20
**frequency** 157:25
158:3
**frequent** 100:12
184:8
**front** 25:6 28:1
29:17 68:5 72:19
75:5,6 140:19
151:21 194:25
**froze** 131:8
**fueled** 81:10
**fulfilled** 52:10
**full** 130:19 131:22
133:13,21 183:2
**fully** 14:2,3
**fundamental** 22:5
**funding** 114:19
115:11,12,18
116:6,9,12,16

**further** 39:17
85:21 98:16 100:7
104:21 127:18
141:20 162:24
170:3 178:12
193:25 199:19
204:16 206:5
207:15
**future** 48:10 116:5
116:13

**g**

**g** 6:14,19 7:13,17
7:21 8:7 59:25
**ga** 207:22
**gain** 58:3 132:24
**gallucci** 2:15,17
60:6
**gallucci's** 60:7
**gather** 162:24
164:10,14,17
192:25 199:8
**gathering** 193:7
**geauga** 50:16
**general** 13:21
68:22 69:6 142:24
159:12 172:14
176:6 184:5
197:14
**generalizability**
160:14,20 161:2
162:7 172:21
**generalizable**
160:13 172:24
**generally** 40:7
72:8 74:11 78:5
95:14 97:1,4,11
119:11 157:16
163:15 165:24
166:4 167:16
177:10 203:17

generate 70:9
generated 65:23
generations
117:16 191:4
genesis 79:25
geographic 79:3
george 11:18
getting 129:21
184:12 185:23
190:2
giant 5:4 11:3
give 12:3,6 73:23
106:24 149:4
163:20 180:18
202:5 203:8
given 46:18 131:3
162:14 174:9
178:11 192:5
198:25 207:12
giving 22:19
global 119:4
186:17
go 17:8,16 27:13
27:15 29:5,7,15
44:21 50:2 57:1,4
57:7 71:18,19
72:20 79:22 82:1
90:2 96:13,16
98:16 99:14,16
104:9 110:15
130:4 131:6
132:10,21 158:1
158:18 163:19
168:12 170:3
173:11,13 176:12
176:20 178:10
179:16 183:14,15
194:4,4,5,22 195:5
195:6,8 198:5
200:4,9,16 204:8

goal 86:22 87:17
87:20,22,23
126:19 139:18
175:22 188:20
goals 39:15 55:5
127:10
goes 100:7 141:20
179:13
going 13:3,23
14:19 29:4,13
30:15 34:25 40:19
48:17 56:21,25
75:3 134:20
140:11,14,22
148:6 149:5
161:21 171:11,12
173:9 177:5
185:25 186:1,3,14
200:1 201:6
good 10:15 11:2
53:6 64:11 67:6
111:7,16 133:6
160:22,22 161:19
173:4,5 200:12
gosh 140:15
govern 86:9
governmental
37:20
governor's 115:6
great 17:16 44:10
57:9 88:13 134:16
186:9 189:9 196:2
greater 82:20
132:18 168:15
grew 17:19
grief 190:10,16
ground 13:22
32:20 41:16 61:3
65:19 67:7
grounds 9:12

guarantee 186:1
guess 59:11,23
63:12 88:12 137:1
137:6 168:6
180:12,13 184:18
guessing 12:19
137:8

h

h 1:22 9:5 10:1
101:6 207:21
half 59:8 141:10
144:14 205:5,7,16
hand 29:25 75:20
80:25 100:25
161:15
happen 62:15
happened 84:10
84:11,15,22 97:3
104:17 130:22
happening 84:1
happy 48:22
104:21 134:10
147:14,17 202:11
202:12
hard 104:5,10
110:9 143:15
177:1 197:23
202:18
hardest 114:6
harm 8:17 93:11
170:8 202:16
203:1,16
harms 22:7 51:21
52:3 85:21 92:20
93:16 127:18
harvey 52:15,16
56:10
hbc 5:4
headings 157:16
157:17

health 16:21 18:16
38:7 41:20 61:16
63:1,4 65:21
110:22 114:3
116:8 122:13
127:2 166:9
185:10,15 188:18
189:5 190:10
191:18 194:1,1
healthcare 18:9
198:9
hear 13:24 98:6
131:9 137:20
hearing 60:25
70:13 207:13
heartache 87:3
held 10:19 59:14
65:8 66:13,14
91:20
help 44:15 54:16
87:5,10 159:9
177:22
helped 32:8
114:10
helpful 32:19,24
37:1 39:18 45:18
48:24 54:22 55:11
55:20 60:21 71:1
72:16 74:2 95:22
134:11 139:22
162:6 180:14
181:6 195:3
196:22 203:22
helping 54:7 55:12
heroin 8:12,20
72:2 76:7 79:4,6
80:13,20,25 81:12
81:25 94:23 96:10
96:15,19 97:20
98:4,9,9,18,20,25
99:23,24,25 100:1

100:3,9,17 101:9
102:6,17,18 103:2
103:4,14,21,22
105:8,14,22 106:9
106:18 107:9
**high** 6:21 15:23
16:8 79:4 88:1
101:11 141:2
155:23 156:23
157:8 158:11
167:20 186:3
**higher** 78:13
119:5 150:4
**highest** 112:22
**highlight** 82:17
139:19
**highlights** 175:12
**highly** 149:16
160:12 169:10
172:23
**hinder** 171:6
**hired** 112:13
**historic** 186:20
**historically** 79:4
168:17
**history** 84:6 174:9
174:12
**hit** 114:6
**hiv** 202:25 203:3
**hold** 17:18 19:1,12
20:5,15 21:5,14,25
22:20 23:11,16,20
24:11 150:8,10,16
150:22 154:12
**holding** 152:11,16
153:10
**holes** 134:24
**hon** 1:7
**hope** 51:4,9,13
52:7 108:11
131:25 139:22

162:6
**hoping** 17:10
**hopkins** 7:23
11:20,22 19:15,16
**host** 178:14
**hour** 27:12 56:21
59:7,11 205:7,16
**hourly** 27:11
**hours** 205:5
**household** 190:20
**hub** 16:21 65:21
110:23 114:2
**hubbard** 4:10
**huh** 95:7 102:3,21
121:14
**human** 109:2
**hundred** 27:12
31:8,8 35:5,21
45:22,25 46:11,12
46:13 48:8,9
82:11,12 106:14
121:9 125:6,7
145:20,21,21
152:23,23 181:15
181:19 191:6,7,16
**hundreds** 65:17
184:3
**huntington** 8:7
13:7 68:10 71:1
**hypothetical**
49:23 50:2 117:23

**i**

**idea** 132:10 149:6
177:22 191:9
**ideal** 169:13
**ideally** 132:20
**identical** 121:18
121:22 134:19
**identification** 13:1
17:6 28:4,7 29:11
67:24 75:2 89:3

89:12 99:5 102:9
140:10
**identified** 12:15
34:5 35:3,10,16
36:1 43:18 57:22
61:10 69:17 70:18
92:20 93:12
120:18 122:3
125:7 141:11
149:17 159:1
185:9
**identifies** 141:17
146:14 148:12,18
150:6
**identify** 15:22
20:21 21:8 24:5
30:12 31:3 36:2
50:11 61:9 69:21
85:23 92:12,17,24
93:10,15 115:11
116:1 125:18
151:8 192:23
194:20 198:25
199:3
**identifying** 23:9
148:23
**iii** 2:15
**illegal** 153:16
**illicit** 72:3 76:7,22
80:13,20 81:12,25
83:4 96:15 97:21
98:4,9
**illicitly** 82:4
**illinois** 4:11
**imagine** 185:23
**impact** 7:23
105:14,17 108:6
115:8 126:25
175:23
**impacted** 22:17
23:25 24:7,15

25:1 108:21
**impacts** 187:17
**implement** 47:4
49:2 123:21
169:15 170:4
**implementation**
116:8
**implemented** 45:4
100:19 103:16
116:19 120:17,22
122:5 153:4
170:20,25
**imply** 84:14
**import** 161:11
**importance**
139:19
**important** 18:9
24:4 41:13 45:24
46:11 47:2,21
48:1,6,10,20 76:18
80:9,22 92:9
94:18 107:19
135:11,12 137:10
137:18 138:12
139:15,17,20
162:13 172:25
184:6 198:10,15
201:4
**importantly** 51:5
**improve** 47:5
133:8 153:5
155:13 175:1
176:2 191:11
202:17
**improved** 175:12
**improvement**
16:21 41:20 65:21
110:23 114:3
182:2 186:10
**improving** 87:15

**incidence** 101:9
**incidents** 101:11
**include** 38:22 62:6
  83:3 90:20 133:25
  170:14 197:22
**included** 15:14
  31:5 37:21 38:16
  86:13,23 91:14
  144:7 147:24
  172:13 177:2
  195:22 196:19
  197:7 203:1
  208:13
**includes** 24:14
  31:8 37:24 97:19
  141:9 143:2,19
  153:21,23 154:5
  169:2
**including** 37:25
  45:5 54:21 65:20
  82:5 102:17
  110:22 150:14,19
  167:7 175:22
  186:21 202:18,23
**incomplete** 49:22
  50:2
**incorporated**
  210:12
**incorporates**
  20:23
**incorrect** 78:16,19
  78:24 79:7,11,21
  80:18 81:13,18
  82:15,24 193:8
  204:19
**increase** 77:13
  79:6 80:13 82:4,7
  96:9,11 105:8
**increased** 77:12
  79:3,5 81:8
  117:20

**increases** 81:11,24
  100:17 103:14
  105:12 106:8
**increasing** 82:9,11
**incurred** 112:19
**independent** 11:22
  123:17 149:18
**index** 6:1,8 7:1 8:1
**indiana** 3:4
**indicate** 99:21
  163:3 177:8 178:4
**indicated** 57:16
  134:15 136:4
  147:23 174:16
**indicates** 29:6
**indicating** 208:13
**indicators** 6:21
  86:7 140:13 141:2
  141:11,17 143:2,8
  143:18 148:13,16
  148:18,19,24
  149:11 151:8
  155:23 156:22
  157:8,21,24
  161:21 162:22
  167:20 175:18
**indicia** 95:18
**individual** 137:3
  147:7 183:5,9
**individuals** 24:14
  41:22 57:22 60:14
  60:15 63:20 64:9
  64:21,23 65:11,13
  65:24 66:12,20
  69:13,21 70:8,14
  70:17,19,20,24
  87:4,6 88:1
  108:17 114:9
  132:3,11,12 170:6
  177:24 179:17
  182:18 184:21

  185:7,14 188:8,10
  190:21 191:8,12
  191:18 198:11
**information** 15:19
  16:6,11,13,14,17
  29:1 37:18,23
  38:4,16,19 39:15
  39:21 40:9 41:5,6
  41:7 42:1 46:23
  54:23 55:10,11
  58:3 60:19,25
  62:23 64:22 65:10
  65:12 66:2,12
  69:4 70:9,22,23
  82:25 88:22 90:25
  113:15 114:4
  124:13 125:1,17
  126:8 137:6,10,14
  141:18 145:15
  148:13 162:25
  164:11,14,17,22
  166:12,16,17,21
  167:3,9,13,16,22
  167:25 168:1,15
  168:22 169:7
  173:23 174:1,3,8
  174:11 176:11
  177:2,21 180:19
  182:8 185:2
  188:17 190:5
  193:1 194:7
  195:11,13,15,24
  196:2,19 201:19
  201:23
**informed** 145:25
**infrastructure**
  117:11 186:22
**inherent** 162:4
**initially** 26:8
**initiated** 99:25
  103:3,22

**initiates** 103:3,22
**initiating** 96:19
  98:20
**initiation** 8:20
  102:6,17
**initiative** 115:5
**initiatives** 116:10
  170:8
**injuries** 49:3
  87:18
**input** 178:11
  191:5 192:10
  198:15,17,19,21
  199:18
**inputs** 65:18
  164:25 182:7
  192:4 197:21
  198:7
**insider** 65:10
**instance** 73:14
  124:4 151:7 175:5
  178:13 193:17,19
  193:23 195:12
  197:25
**instances** 86:11
  192:17 199:2
**institute** 123:7
**institution** 122:9
  175:19
**insufficient** 171:5
**integral** 21:20
**intend** 28:17
**intended** 74:4,4
  83:12
**intending** 48:2,9
**intensity** 132:6
**intensive** 183:17
  184:7,8
**intent** 47:23
**interacted** 144:25

**interactions** 145:5
  162:16
**interconnected**
  168:14
**interested** 83:23
  153:8 179:9
  207:17
**interests** 118:4
**internal** 18:3,22
  18:24 166:15
**internist** 20:22
  21:1,7 22:14 23:5
  23:8 24:3,12,24
  150:11,18,24
  151:16 152:2
**interplay** 197:3
**interpret** 192:11
  200:20
**interpreted**
  200:13,15 204:5
**interpreting**
  193:14 202:10
  203:12
**interrelationship**
  80:10 106:17
**interrelationships**
  80:24 107:8,15
**interrupted** 77:24
**intervention**
  131:22
**interventions** 45:4
  45:13 51:25 86:18
  105:17,20 123:16
  123:18,20 126:23
  127:4 128:2
  130:24 131:4
  132:6 135:3,19
  197:1,2,11,19
**interviews** 171:25
**introduction**
  75:22,23

**intuition** 184:5
**investigating**
  156:16
**invoiced** 26:25
**involved** 25:24
  26:9 43:17 90:21
  91:10,14,19
  143:13 144:3
  171:23 172:2
**involves** 21:12
**involving** 77:14,15
  82:8,11
**iowa** 162:3
**isolation** 204:6
**issue** 172:20 179:5
**issues** 25:11 55:16
  82:19 161:2 182:1
  182:8
**iterative** 39:16

**j**

**jama** 107:5
**january** 196:16
**jefferson** 207:5
**job** 111:7
**johns** 7:22 11:20
  11:22 19:15,15
**johnson** 18:7
**jones** 3:19 98:24
**jonesday.com**
  3:23
**journal** 8:12 99:1
  104:2
**judge** 29:1 52:8,10
**judgment** 86:18
  136:22 137:1,15
  137:22,24 201:13
  201:14
**jump** 185:18
**june** 208:4
**justice** 87:12
  121:1,3

**justin** 5:20

**k**

**kalamazoo** 161:23
**kansas** 161:23
**katherine** 5:18
  59:23
**keep** 47:8 57:12
  184:3
**kim** 32:19 41:23
  57:16 58:2,8,16,22
  59:21 60:14,20
  64:6 66:8 113:20
**kim's** 61:5
**kin** 207:16
**king** 196:8,18
**kmorrison** 3:23
**knew** 65:14
**know** 12:12,22
  13:7,15,24 14:1
  15:24 18:10 21:17
  22:25 24:13 26:2
  26:3,14,25 27:1,10
  29:8,20 30:21
  31:8,15,19 32:3,8
  32:18 33:1,15
  34:3 35:23 37:13
  38:14 39:6,19
  42:11 43:21 45:19
  46:20 47:5,22
  48:1,10,16,25 50:7
  51:2,7 52:15
  54:24 56:1,5,11
  58:6 59:14,16,16
  60:22 61:1,25
  63:14 64:10,13
  65:8 66:7,15 68:4
  68:23 70:10 71:2
  72:7 75:6 78:1,3,4
  84:18 87:5,8,21
  88:4 90:16 94:14
  94:22 97:22 99:7

101:6 102:13
104:6,11 108:18
109:1,18 110:5
112:7,23 113:1
117:25 119:3,5,17
119:23 121:5
122:20,23,25
125:5,7,25 130:12
130:22 133:9,12
133:24 134:13,13
134:18,25 135:11
136:12,21 138:25
139:23 140:12,15
141:22 142:3,11
142:21,23 143:6
143:10,11,18
144:20 145:18,19
145:23 147:7,16
147:17 148:5
149:3 150:22
152:2,11 153:8
154:8 155:4,25
156:17,21 157:19
159:13 160:24
161:8,12,13,22
162:3 166:10,11
167:8 168:3 174:9
177:20 178:21
179:8,14 181:22
184:3 185:25
186:5,13,14,18,20
187:24 196:1,21
198:4,10 199:7,16
205:17,21
**knowing** 89:21
**knowledge** 42:4
  65:15 121:25
  122:1 125:17
  126:4 137:17
  143:17 144:2
  145:1 201:12

**kristin** 3:17

**l**

**l** 2:15 3:7 9:1 60:2
**lack** 113:25
  175:19
**lacked** 66:2
**lake** 2:4 6:13,18
  6:23 7:12 14:10
  16:12,17,21 17:21
  20:8 25:23 26:6
  32:21 33:17,20
  34:1,15 35:6
  41:14,21 42:10
  43:12 44:11,16
  45:2,15,15,23
  47:10 50:16 51:6
  51:6 57:23 58:3
  61:6,15 64:19
  65:11,22 70:3,5
  85:3,7,8,11,20
  86:20 87:15,19
  88:9,17 89:1 92:1
  92:10,21,25 93:17
  93:20,23 94:15
  97:3,5,12,17
  107:20,25 108:24
  109:25 110:15,17
  110:21 111:2,5,19
  112:1,6,14 113:8
  113:10,10,12
  115:22 117:17
  118:23 119:14
  120:17 122:5
  123:24 124:3
  127:7 129:24
  130:3,4,5 132:12
  138:5 156:17
  161:5 170:21
  171:1 177:5,8
  182:4,9,13 190:20
  196:6 197:19

**lakeside** 3:20
**landscape** 70:21
  95:9
**language** 74:22
  105:15 136:5
**large** 10:4 11:14
  45:1 61:4 110:9
  128:1 164:25
  200:24
**largely** 79:2
**launched** 119:25
**laura** 1:22 9:5
  10:1 207:21
**lauren** 5:7 57:17
  58:2 62:3,18,24
  63:14 66:8 129:14
  129:16,19 130:15
  131:21 135:20
  176:15 180:21
**law** 2:7,16 3:8,18
  4:7,17 5:8 26:11
  148:15 154:10
  159:8
**lcr** 207:23
**lead** 163:23 164:7
**leading** 9:10
  112:24
**learn** 70:11
**learned** 70:12
  159:4
**leave** 122:17 128:2
  128:3 146:8 193:8
**led** 141:4
**left** 100:25
**legal** 5:21 85:15
  154:9 208:1 211:1
**lembke** 74:14
**lembke's** 72:23
**length** 154:2
**letter** 208:19

**level** 16:8,14 41:25
  47:12,12 77:23
  115:8 128:7
  139:15 154:2
  158:11 200:23
**lewis** 4:18
**license** 19:2,9,11
  20:10,10 207:22
**licensed** 20:4
  151:10,14
**licenses** 19:1,5,7
  19:10 20:15
**life** 132:24,25
  133:8 168:20
**lifetime** 151:1
**line** 57:5 89:18
  114:13,13 126:15
  126:15 127:12,12
  130:18,20,23
  131:1,7 132:9
  141:15 142:15
  159:17 204:3
  208:13 210:7
  211:3
**lines** 111:10
  200:16
**link** 96:14 98:2,6
  100:20 103:16
  105:7,24 125:15
**list** 30:6,13,25
  37:21 120:6 143:2
  143:7,11,12,14
  144:1,4,7 147:23
  148:19 149:14,16
**listed** 25:8 26:16
  26:21 30:23 31:1
  33:10,16 90:22
  91:1 148:16
  157:21 192:4
  210:7,17

**listen** 165:10
  185:20
**listing** 210:7
**literally** 65:17
**literature** 37:4
  38:6 107:18 141:1
  164:23 192:17
  200:25 201:13
**litigation** 1:9 11:6
  11:6 35:16 52:22
  55:6,17,22 85:8
  91:5,16 205:15
  208:6 209:3 210:3
**little** 25:19 44:1
  45:22 57:17 58:5
  67:8 71:5 104:4,5
  104:10 128:20
  145:7 152:17
  157:13 158:8
  162:10 180:14
  181:2 186:12
  202:12 205:5
**lives** 87:15 192:7
**llc** 2:8 3:5,6,6
**llp** 4:18 5:9
**local** 14:10 38:5,10
  57:18 67:5 194:14
  194:15
**locally** 196:1
**located** 40:6
**locating** 37:12
**locations** 202:23
**long** 58:22 64:3,10
  65:8 117:10 121:8
  176:18
**longer** 94:12
  128:20
**look** 29:12 30:3
  32:1,4 33:9 35:20
  35:23 36:9 69:16
  69:22 72:13,19

73:14 74:2,16
75:21 89:23,25
94:6 97:22 100:23
101:21,25 105:15
107:13 113:9
121:15 124:4,5
125:3,22 126:1,7
133:13 141:8
157:22 160:5
161:9 171:12
175:3 176:10
177:4,7,21 179:4
180:13 184:1,20
187:23 190:8
194:21 195:15
197:24 199:20
202:2
**looked** 84:11
106:13 109:12
110:8,20 133:12
133:18 156:12
160:23 176:6
**looking** 40:4,23
47:9,11,19,20
112:14 114:16,18
116:5 117:4
122:20 123:18
126:13 127:17
129:11 164:1
180:2,3 181:1
188:25 193:13,19
196:15
**looks** 13:10 35:5
75:14 89:4 114:22
**loss** 191:3
**lost** 24:2 131:21
132:24 191:11
**lot** 104:17 109:25
119:17 127:2
133:1 136:14
148:22 166:21

190:23
**loved** 24:2 191:11
**low** 79:4 100:3
**lower** 133:3
**lunch** 57:2 89:18
90:6 129:1,6
**lungs** 165:11

**m**

**m** 3:10 5:6 33:17
60:4,4 101:6
**m.d.** 1:17 6:4 9:5
10:10,22 208:8
209:4,9 210:4,13
211:20
**madam** 208:10
**magnitude** 117:14
**main** 17:1 60:10
60:12 158:21,23
**maine** 159:25
**maintain** 61:17,17
61:22 63:8 76:16
163:7
**maintains** 124:21
**major** 122:8
**majority** 17:2
99:23 102:25
103:20
**making** 136:22
160:17 172:14
**manage** 21:8
22:15 23:6 24:12
24:24
**managed** 87:6,7
**management**
20:25 21:3,4,6
**manager** 153:3
**manifests** 21:19
**manner** 68:17
**mannix** 5:6 6:5
11:1,3 13:2 17:7
22:24 23:3,16

24:19 25:3 26:8
27:25 28:8 29:12
34:24 36:18,23
40:19 42:2 43:6
45:8 46:10 48:6
50:4 51:16 54:11
56:24 57:10,15
67:8,15,25 75:3
79:15,20 83:16
84:2,17 86:1 89:9
89:16 97:10 98:7
99:6 102:10 105:5
105:23 107:10
108:14 118:6,10
118:21 124:16
128:12,18 129:5
129:14,22 130:1,3
130:7,8,11,16
131:10,20 134:12
135:14,20,25
137:13 138:4,23
140:11 148:4
153:16 154:7,17
155:3 158:13
160:18 164:13
173:4,20 174:14
176:15,19,25
177:4 180:21,25
181:13 185:25
187:4 194:21,23
194:24 195:5,7
204:7,15 205:3,19
**mansour** 60:3
**manufacturers**
91:10,17,18
**marcus** 5:9,14,15
**marked** 12:25
17:5 18:12 28:3,6
29:10 67:23 75:1
89:2,11 99:4
102:8 140:9

176:12
**market** 21:4,23
**maryland** 11:7
19:3 151:12,15
159:25
**massachusetts**
159:25
**master's** 18:11
**masters** 18:14
**mat** 188:22 189:8
**matched** 74:20
**material** 7:9 15:15
15:17 113:18
**materials** 14:11
17:2 30:1 37:25
39:17,18 67:5
110:9 111:17
112:4 113:5,13
124:18 125:4,8,10
145:25 175:15
190:6
**matter** 11:4 85:1,2
85:3,15,16 90:10
138:7 172:25
179:5 201:3
**matters** 61:5
71:24 75:20 92:7
142:17,25 152:18
196:2
**maximize** 146:12
**mckesson** 196:17
**md** 1:6 6:15,20
7:14,18,22 8:8
10:18 166:15
**mdl** 1:5
**mean** 14:8 17:2
19:8 23:19 25:22
32:3,17 39:12,13
39:14 40:8 44:2
48:15 50:13 51:1
54:18 55:14 56:5

59:15 64:8,25
65:16 69:3 71:16
71:22 72:2,5 73:3
73:8,11,17 74:5
76:18 81:15 83:22
83:24 85:14 86:4
86:25 87:2,14,23
89:23 94:12 104:4
105:15 108:15
114:8 117:23
119:2,3,3 120:25
121:8 124:16
125:4,20 138:24
142:14 148:22
149:7,20,23
153:22 160:5,10
160:11,21 161:12
161:24 164:24
166:7,9,20 178:21
183:4 185:20,21
185:23 187:10
188:7 190:23
194:16 196:10
200:8,21,23
203:19,25
**meaning** 33:17
71:10 73:18,23
74:1
**meanings** 73:12
**means** 85:16 135:9
**meant** 72:12 74:10
76:19 111:8
177:11
**measures** 120:17
122:9,14 147:4
192:14
**median** 190:20
**medical** 17:25
18:2 19:9 72:25
84:6 86:12 104:1
137:1,15,22,23

164:1,19,23
**medicare** 115:21
116:3,6
**medication** 188:11
**medications**
151:17 189:11
**medicine** 8:13
18:4,22,25 19:2,18
99:1
**medicines** 150:19
152:5 153:25
162:4 169:1
**medium** 117:10
**meet** 53:1 58:9
61:8 62:4 63:25
**meeting** 61:18
62:12 63:9 65:13
66:10,13,23,24
**meetings** 58:6
62:9 145:10
178:16
**melfa** 5:7
**member** 32:15,23
136:20
**members** 14:14,23
32:7 38:10 53:18
158:25 164:20
190:15,17,19
191:20
**mental** 61:16 63:1
63:4 188:17 189:4
190:10 191:18
**mention** 78:11
148:9 173:2
**mentioned** 38:11
103:19 119:10
120:23
**met** 14:13,22,25
52:18 64:21 65:1
145:12

**methods** 144:6
146:11 192:13
**middle** 75:22 88:1
**midwest** 18:6
208:17 211:1
**million** 27:2,4,6,9
33:21,25 34:7,12
34:15
**mind** 47:8 180:14
184:3
**mine** 54:20 59:24
60:11
**minimum** 185:11
185:15
**minute** 75:17
106:24 148:1
**minutes** 57:7
58:25 59:7,11,12
64:7,7 128:19,21
**misconstrue** 201:9
**misconstrued**
144:22
**misinformation**
189:11
**missed** 123:5
138:11
**missing** 130:25
131:1
**misstates** 78:7
**mistaken** 12:13
**misunderstood**
101:18
**misuse** 73:1
162:23
**mitigated** 22:8
**mitigation** 107:3
**mix** 128:5
**mobile** 200:18
201:3,6 202:8,16
202:21 203:2,9

**model** 16:4 86:14
91:24 116:20,21
117:5 132:7,17
134:1 137:16
140:25 177:8
178:6 190:9,15
198:7 199:12
203:15
**modeled** 107:15
**modeling** 107:3
187:16
**models** 15:14
86:24 88:21,24
129:11 176:12
187:16 197:4,8,12
197:16,22 203:24
204:2
**modestly** 77:16
**mom** 87:1
**moment** 173:3
**money** 109:4,10
109:12,17,19
110:6,13,16 126:5
**monies** 111:1
**monitoring** 16:7
164:21
**months** 59:16
185:8
**monument** 11:24
26:24 59:24 60:11
158:25
**monumental** 6:23
7:5 109:3
**moore** 204:24
**morbidity** 41:11
44:12 47:7 63:7
76:5 80:1,3 81:1
82:20 83:3 93:14
94:19,22,23 95:19
97:19 106:18
107:4,9 112:22,25

Case: 1:17-md-02804-DAP  Doc #: 4217-1  Filed: 12/29/21  234 of 256.  PageID #: 558601

113:24 133:4
187:2
**morgan** 4:18
**morganlewis.com**
4:22
**morning** 10:15
11:2 129:9 140:2
**morrison** 3:17
**mortality** 41:12
44:13 47:7 63:7
76:5 80:1,3 81:1
82:20 83:4 93:14
95:19 97:20
106:19 107:4,9
112:22,25 113:24
133:4 187:2
**mortar** 179:1,2
203:9
**motley** 2:8 26:1,4
26:13,14,18,22
50:23 51:14 56:19
**motleyrice.com**
2:12
**mount** 2:10
**move** 40:13
154:16 162:2
**moved** 18:5
**moving** 49:14
**mpr** 103:22
**muhuri** 101:2,3,8
102:2 104:16
**multi** 189:15
**multigeneral**
191:2
**multigenerational**
191:2
**multiple** 79:17
186:15 196:24
**multiply** 190:21
**mute** 25:19

**muted** 104:7 129:7
**mutually** 94:21

**n**

**n** 2:1 3:1 4:1 5:1
9:1 59:25 60:2,2,2
60:4
**naloxone** 115:3
139:13,16,19
170:9 192:7
**name** 11:2,17,23
59:24 60:1,2,3,4,8
60:9 101:5 208:6
209:3,4,15 210:3,4
210:21
**narrative** 15:13
203:22 204:2
**narrow** 71:2
**national** 1:9 38:5
72:8 95:3 96:25
153:2 159:21
160:7 208:6 209:3
210:3
**nationally** 94:6
96:7 97:13,16
185:8
**natural** 61:12,13
**nature** 21:18 22:7
104:24 172:1
**nay** 160:25
**near** 82:7
**nearly** 96:17
**nebraska** 162:3
**necessarily** 83:10
83:15 132:15
**necessary** 9:8
15:10 138:21
**need** 35:23 39:16
42:20 47:11 81:5
87:10 129:18
134:13 149:13
150:1 164:11

175:7 176:21
177:1 181:10,20
182:14 186:22
190:16 205:19
**needed** 43:18
50:12 66:2 180:5
183:17
**needs** 41:10
118:18,18 161:16
179:2 187:24
**neither** 207:15
**net** 47:12 50:11
114:23 115:10
124:2 139:10
178:23
**network** 107:5
**never** 78:13 86:25
138:1,1
**nevertheless** 31:11
**new** 4:20,20 8:12
99:1 104:1 177:24
178:18,19 179:2
**nichols** 1:22 9:5
10:1 207:21
**nine** 27:12 102:19
**nineteen** 101:10
**ninety** 82:12 96:17
**nmpr** 103:1,3,5,20
103:23
**nonbiologic** 18:9
**nonclinically**
22:12
**nonformal** 89:25
**nonmedical** 8:11
8:19 71:24 72:5,6
96:14 98:3,8,19,25
99:21 100:2,8,11
100:12 101:10,12
102:5,17,25 103:1
177:25

**nonmedically**
99:25
**nonopioid** 72:25
80:3
**nonpandemic**
145:10
**nonprescription**
71:17,21 72:1,1
95:20
**nonprofit** 38:7
**nonviolent** 87:11
**north** 17:21
142:19 194:16
**northern** 1:2
**northwest** 3:10
**notarized** 208:14
**notary** 1:25 9:7
10:3 207:21
208:25 209:10,18
210:15,23 211:23
**note** 12:22 181:1
183:15,19 184:23
187:23 191:5
194:6 208:12
**noted** 30:21 203:6
**notes** 61:18,22,23
62:1 63:8,21,23
179:21,23
**notified** 14:19
**npr** 103:3
**nuanced** 154:3
**nuclear** 191:1
**number** 10:18
11:14 33:11 35:4
38:17 44:10 45:1
45:13 61:4 106:13
110:9 128:1
130:24 132:2
136:12 157:7
164:25 178:4,5,9
179:23 180:5

181:9 182:17
183:16 190:21,22
191:6,16,18,19,22
191:22 192:6,6
193:13 198:16,17
198:20,21 208:7
208:13
**numbers** 33:16
88:6 179:20
184:22 185:13,18
187:5,6,7,8,9,11
187:12,13,15,20
210:7
**numerical** 88:8
**nurse** 165:20
**nuts** 139:5

**o**

**o** 9:1 59:25 60:4,4
**oath** 11:25
**oberlin** 17:20
**object** 40:14
154:14 164:9
**objection** 22:22
23:13 24:18,22
34:23 36:15,21
41:1 43:3 44:19
44:22 46:8 48:3
49:22 50:2 51:15
54:8 78:7 79:13
83:14,21 84:13
85:13 97:7 104:8
105:10 108:8
117:22 118:9,15
124:15 134:2,22
137:4,25 138:22
152:15 153:15,18
158:6 160:4 174:6
185:19 194:13
**objections** 9:9,12
**objectives** 39:15

**obligation** 165:7
**observed** 96:7
**obtain** 60:19,20
62:23,24 64:22
65:9
**obtained** 66:12
**obviously** 71:5,9
**occupied** 183:11
183:12
**occur** 100:3
**occurred** 93:16
**occurrence** 83:25
**occurs** 86:5
**offenders** 87:11
**offer** 28:17 63:3
**offered** 9:13 45:14
50:21 139:3
**offering** 50:17
92:19 93:2
**office** 11:12 63:16
129:15
**officers** 87:9
**official** 209:15
210:21
**oh** 53:24 101:24
169:23
**ohio** 1:2 2:5,20 3:6
3:21 16:6 17:20
17:24 95:15 96:3
96:7,17 97:1,13,17
112:20 115:6
138:8,13,21
151:11,13,21
152:12,13 153:13
153:17,19 154:13
161:4 188:16
194:11 195:13,15
202:22 208:2
**okay** 11:9 12:14
13:6,21 14:4,17
16:3,10,15,23 17:7

17:9 19:1,19
20:11 27:22,24
28:8 29:4,8 30:17
30:19 31:13 32:1
33:9 34:9 35:2,25
36:6,23 39:1,2,8
40:2,19 45:21
50:22 51:9 52:5
52:25 53:6 56:9
57:10,21 58:15
59:13 60:13 67:15
67:16 68:3,7
70:15 71:14,16
72:4,18,22 73:6,10
74:16 75:12,15
78:15,25 82:22
88:23 89:19 90:5
97:22 98:15 99:14
101:19 102:14
103:9 104:10
106:10,20 107:10
113:19,22 117:7
120:4,21 121:15
122:25 125:15
129:22 132:8
134:12 136:25
140:19 143:13,24
149:12 150:5,15
155:15 156:11
158:13,24 162:11
163:18 164:3,13
164:16 166:3
168:19 169:6
170:17 173:13
176:19 178:4
179:4,11 180:4,15
181:7,13 182:4,11
182:21 188:19
189:20 191:21
192:22 193:17
195:2,5 196:7

197:13 198:1,6
199:22 201:16
202:7,15 205:3,11
205:23
**omar** 60:3
**omit** 193:10
**once** 34:25 62:10
64:2 97:8 183:21
187:24
**ones** 24:2 49:13
57:22 191:11
**open** 13:4 27:15
137:20
**opened** 27:14
**operated** 123:25
133:22
**operating** 133:20
**operational** 124:3
**operationalized**
149:21
**opiate** 1:9 11:6
208:6 209:3 210:3
**opine** 157:9
163:11
**opining** 157:2
**opinion** 85:11,18
93:2 127:6 175:6
191:24 192:1,2,3,9
192:11,18 193:15
193:20,24 199:3
199:10 200:6,18
201:10,20
**opinions** 28:17,24
68:13 84:25 92:19
155:1,7,19 175:16
175:22 193:6
**opioid** 6:13,18,21
6:24 7:6,12 8:6,11
21:16 22:5 23:12
23:17,22 24:1,6,7
24:9,15,17 25:2,10

38:20 41:11,21
44:12,16 45:19,23
49:2 51:8,21
55:17,21 63:7
64:12 69:10 71:8
71:10,17,22,22
72:1,2,12,24 73:7
74:9,12 76:3,25
77:18 78:6 80:1,7
80:12,24 81:20,23
81:23 82:17 83:2
83:18 85:21 86:19
87:18 88:15 91:5
92:8,20,25 93:14
93:19 94:2,8
95:13 96:2,8,25
97:5,12,16 98:19
98:25 100:9,13
105:18,21 106:18
107:4,9,21 108:23
109:6,20 110:17
110:24 111:2
112:8,17 114:20
115:13,19,21,25
116:2 118:22
119:13 123:22
132:3,13,25
137:12 141:2
150:3,14 155:24
162:14,23 164:8
167:20 177:25,25
184:17 188:8
190:13,22
**opioids** 8:16 16:9
20:1 72:2 73:19
73:22,25 76:6,8,21
76:23 77:11,14,16
79:5 80:11 81:9
81:10,11,22 82:8
83:5 84:4,19 87:3
88:2 92:10 93:23

94:16 95:20,20
96:15,18 97:20
98:3,8,11 99:22,25
100:2,11,17
103:13 105:7,13
106:4,8 112:25
122:11 123:8
136:1,2,7 157:5
163:19,21 165:14
176:4 191:13
**opportunities**
41:18 47:2 123:6
155:12 175:12
176:2
**opportunity** 122:8
126:1 196:23
**opposed** 95:3
116:25 118:8,12
137:14 168:2
187:7
**optimal** 193:14
**oral** 10:11
**orange** 13:15
**order** 14:20 15:11
16:24 20:13 32:5
32:10,25 36:9
65:18 70:11
123:21 133:24
134:18 139:3
147:8 151:5
154:25 171:21
174:18 192:11
198:10,25
**ordering** 29:20
**oregon** 172:8,8
**organization**
185:15
**organizational**
168:16 171:4
**organizations** 38:8
178:3

**osam** 16:16
**oud** 132:11 169:16
180:6 183:18
184:21 185:7
188:10,22
**outline** 155:20
156:21
**outlined** 122:22
123:1,5 157:6
158:22
**outlining** 139:23
**outpatient** 180:9
181:11 182:1,13
183:1,9,11,18,25
184:7,9
**outpatients** 180:6
**outrage** 186:17
**outreach** 124:10
124:14 125:1,12
126:6 169:14
202:25
**outside** 47:24
**overdose** 8:15
76:2,4,13 79:5
82:7,9,10 87:25
96:10,11 169:14
190:24
**overdoses** 77:14
78:12
**overlap** 91:3
**overlapping**
165:19
**oversupplied** 88:3
191:14
**oversupply** 80:10
80:25 81:9,10,21
92:10 105:18,21
122:10,10 123:7
123:22
**oxford** 5:10

**ozenberger** 5:18
59:23

**p**

**p** 2:1,1,6 3:1,1 4:1
4:1 5:1,1 9:1
208:5
**p.m.** 129:2,2
131:17,17 173:17
173:17 204:12,12
206:3
**package** 13:5 17:8
102:11
**packages** 27:15
**packets** 170:5
**page** 6:3,10 7:3
8:3 13:12,12 30:4
32:1 33:9 36:1
69:16 71:9 72:23
74:8 75:22,22
89:4,10,13,16
99:15,16 100:24
101:13,14,20
120:2,5 124:4
129:11 141:9
147:24 178:13
184:16 208:13,15
210:7 211:3
**pages** 33:15 35:4
89:21 120:13,15
141:10 149:23
**paid** 26:23 116:2
**pain** 8:20 20:25
21:2,3,4,6,8,9,13
87:2,6 102:5,18
103:1 191:9,12
**pandemic** 53:3
78:12 82:19 119:4
119:10 145:9
**paper** 25:18 80:2
107:3

papers 37:5,5 38:6
107:14 123:16
152:24
paragraph 30:4,5
31:4 37:15,24
38:16,21 51:19
96:6 97:23 117:9
124:5,9 125:18
131:22 140:22,24
141:5 148:10
157:14,19 158:3
158:22,22 162:9
169:11 202:15
paragraphs
157:14 158:2,10
parameter 192:5
201:21,24
paraphrasing
105:9 111:6 199:8
parcel 160:22
parent 87:25
parents 124:19
park 4:19
parse 126:14
part 32:22 40:2
41:13 42:13 43:19
80:22 100:9
106:23 123:6
128:6 134:7 137:9
160:22 170:15
174:23 175:14,15
210:9
participants 96:18
180:10 181:19
particular 82:23
93:8 94:8 127:14
127:15 144:3
174:5 175:4 187:6
192:20 194:17
197:24

particularly
169:12 172:16
parties 9:3,11
25:24 29:1 93:8
93:16 207:16
pasted 134:24
patch 139:2
patient 21:9,11
22:15 24:24 83:12
83:17,18 124:6
125:2 126:6,19
127:8,11 136:13
136:18,20 150:2
162:16 163:15,16
163:24 164:8,18
164:19 165:4
166:8 169:13
171:7 174:5,12
183:13
patient's 136:19
136:19 164:20
165:11 174:8
patients 21:2,11
22:17 23:10,24,25
24:5 136:14,15
141:19 148:14
150:21 165:8,25
167:3,13 180:6
181:9,11 183:17
191:22,23
patterns 175:24
paul 5:6 11:3
129:23 173:2
pause 27:23 107:1
148:3 202:14
pay 93:3 116:13
136:18
paying 91:21
pays 115:21
116:12

peer 37:5 38:6
pennsylvania 5:12
17:22 18:4
people 62:18 65:4
66:11 70:1,11,15
74:24 76:20 87:10
87:12 94:14 100:1
101:9 105:22
181:15 182:12
186:2,15 189:8
percent 82:12
96:17 98:18 103:3
103:21 132:4,19
132:23 133:5
181:15,19 184:24
184:25 185:7,11
185:13,15,16,17
186:2,9,12,15,23
186:24 187:2,25
188:1,2,4,5,20,21
189:7,17
percentage 88:7,8
88:14,20 129:12
131:24 180:10
181:14 182:12
190:14,15,17
percentages 188:3
perfect 170:17
199:19
perform 43:20
44:24 45:9
performance
127:21,24 134:16
performed 51:17
66:20 106:23
107:11 110:1
123:17
period 103:4,23
permanent 200:18
201:7 202:8

permitted 90:1
person 82:13
145:6 179:12
183:1 184:11
person's 137:17
personal 53:7 58:6
62:9,12 65:15
personally 52:19
53:17,18 57:23
58:9 61:24 63:25
123:13 156:15
209:11 210:15
personnel 108:17
persons 100:12
101:11 102:19
perspective 61:2
63:3 64:11 95:3
perspectives 75:20
pertains 116:15
150:14
pglawyer.com
2:22
pharmaceutical
47:4 48:20 49:1
146:10,13 149:1
150:13,25 151:9
152:8 153:1 154:4
154:25 162:15
168:18 169:4
pharmaceuticals
175:2,13
pharmacies 45:6
47:3 49:12 90:15
90:16 91:17 92:14
93:11 120:22
122:5,8,17,21
123:1,6,14,21,25
148:25 150:12
153:4 154:6
155:13 156:4,17
157:4 162:13,21

169:12 170:4
174:22,25 176:2,5
**pharmacist** 19:20
19:21 136:10,21
136:22,24,25
137:5,9,19,21
151:2,4,10,14,18
163:9,9,13 165:3,6
165:10,15,17,25
166:1,5,8,13 168:1
168:21 169:7
173:24,25 174:4
**pharmacists** 45:6
47:3 137:18
150:13 152:22
154:5 155:5,8,9,12
155:19 156:5
162:13,22 163:3
165:22 166:17
167:2,12,15,23
169:3,13 171:3
174:7
**pharmacoepide...**
152:6 153:23
168:24
**pharmacoepide...**
152:3
**pharmacy** 3:4
43:16 44:14 49:6
83:9,11 91:8,25
92:18 121:2,2
123:16,18 136:7
146:16 147:1,2
150:7,9,17 151:22
151:23 152:9,12
152:14,19 153:3,9
153:12,13,17,20
154:13 165:5
166:8 169:4
170:19 172:7
174:9,10,12,19

194:2
**phase** 205:6
**philadelphia** 18:3
**phone** 53:7,16
58:7,11,13,15,16
62:11,13 64:1
66:13 208:3
**physical** 165:7,9
178:14
**physician** 165:20
**piece** 104:14,16,19
**pieces** 32:17
**pills** 83:16
**pipe** 149:5
**piped** 166:22
**pittsburgh** 5:12
11:9 17:19
**place** 4:9 47:25
49:7,15,18,19
50:13 53:10,12
72:17 88:16
133:14 134:6
135:6,8 144:21,23
174:25 186:10
**placed** 156:2
**plaintiff's** 40:3
42:16 60:15 62:19
**plaintiffs** 2:4,14
205:13
**plan** 6:12,17 7:1
8:5 20:8 34:4
42:10 43:11,14
49:10 64:19 66:4
68:18 86:23 92:16
92:23 93:6 108:12
109:9,15,22,24
110:23,25 114:4
114:16,22 115:17
118:2,17,18,20
126:13 127:5,10
127:14 128:4,14

131:25 132:14
133:7 151:3
161:16
**planning** 56:25
117:12
**plans** 16:21 41:20
65:21 69:4 91:21
92:5
**plateaued** 77:16
**plausible** 29:21
160:6
**play** 162:13
**played** 97:16
139:20 199:21,25
200:1
**plays** 137:9
**pleasant** 2:10
**please** 10:20 17:17
23:15 30:14 35:9
36:17 43:5 48:5
54:10 57:14 75:17
77:25 89:8,15
97:9 105:2 106:24
148:2 149:4 200:4
208:11,11
**plevin** 2:17
**plural** 113:18
**plus** 121:9 125:6
145:20
**pmannix** 5:14
**pmt** 153:2
**pocket** 136:17
**point** 13:4 14:17
17:24 39:22 40:16
42:12 65:25 69:5
72:17 82:22 88:22
104:14,18 106:6
106:21 130:16
134:12 140:1
173:25 185:8

**pointed** 104:23
**points** 39:24
140:12 169:13
189:9 191:25
**police** 87:8
**policies** 100:19
103:15 171:4
174:21,25 175:4,7
175:10
**policy** 100:15
103:12 105:17,20
106:3,7 127:3
194:1
**polster** 1:7
**population** 21:9
131:22 188:22
196:5
**populations** 51:24
52:4 85:24 132:4
132:15 192:15
197:18 198:11
201:7 202:18
**portion** 141:16,21
141:23 142:9,13
145:16 147:15
148:9,11
**portions** 145:25
**posed** 161:25
**position** 61:14
63:23 76:9,12,15
76:17 80:16 91:20
106:11 111:23
113:11 146:24
162:15 175:9
**positioned** 170:4
**positions** 158:5
**positive** 108:5
**possible** 41:5
52:21 84:2 132:17
163:2

**possibly** 60:3
**potent** 82:5
**potential** 6:20
 45:3 141:1 150:4
 151:8 155:23
 161:10,25 167:19
 195:9 196:3
**potentially** 15:22
 84:7 123:21 151:9
 164:25
**potholes** 134:25
**power** 83:25
**practice** 19:2 21:3
 21:22 61:22 74:23
 83:6 136:2 138:3
 146:15,25 147:1
 150:7,9,17 151:4
 151:12,23 152:12
 153:9,12,17
 154:13 169:4
 172:7
**practiced** 151:2
**practices** 87:7
 123:7 136:24
 171:8 174:19
**practicing** 19:21
 19:24 20:6,22
 21:1,7 22:14 23:4
 23:8 24:3,12,23
 150:11,18,24
 151:16,18 152:2
 166:14 167:24
 168:2
**practitioner**
 165:21
**pragmatic** 186:5
**precise** 26:2 59:16
 64:14 92:24 113:2
 144:6 168:22
 183:5

**precisely** 144:21
 149:21 163:8
**precluded** 145:9
**precluding** 37:10
**predicated** 107:17
 110:2 126:14
 156:9
**predominant**
 81:22
**predominantly**
 76:6
**predominated**
 80:11
**preexisting** 122:21
**prefer** 128:16,17
**preference** 129:24
 130:2
**preparation** 14:12
 15:4 16:18 66:9
 66:20 167:7 175:3
 175:15
**preparatory** 66:19
**prepare** 14:6,21
 15:11 16:24 20:14
 33:7 54:17 56:2,6
 141:4 145:16
 174:18
**prepared** 14:18
 23:6 28:25 68:8
 142:13 143:7
 146:3
**preparing** 30:6
 31:17 65:25 110:8
 110:19 142:8,12
 160:20 174:14,22
**prescribe** 19:6
 136:1 150:19
 151:17 164:8
**prescribed** 72:10
 83:5 84:19 136:2
 150:20 163:19,21

**prescriber** 165:20
**prescribers**
 141:19 148:14
 198:16
**prescribing** 15:24
 19:5 77:18 153:5
 155:24 165:14
 170:9 171:8
**prescription** 1:9
 8:11 72:12 73:7
 73:19,22,25 76:6
 76:21 77:11,14,15
 80:11,24 81:9,11
 81:22,23 83:8,12
 83:18 84:4 92:10
 93:23 94:16 95:20
 96:8,14,18 97:20
 98:3,8,11,19,25
 99:22,24 100:1,8
 100:11,13,16
 102:18 103:1,13
 105:7,13,18,21
 106:4,8,18 107:8
 123:8 136:7,11,16
 136:23 137:2
 150:3 152:5,24
 153:24 155:24
 157:8 162:24
 163:10,13,14
 164:21 169:1
 171:6 208:6 209:3
 210:3
**prescriptions**
 141:18 148:14
 150:21 163:5
 170:6
**presence** 113:24
**present** 5:17 25:13
 25:15,22 27:11
 60:12 76:8 165:8

**presented** 203:19
**presently** 19:14
 115:21 116:12
 129:7 182:12
**prevalent** 21:9
**prevent** 83:25
 127:17 148:6
**preventing** 177:24
**prevention** 77:19
 177:23
**preventions**
 125:12
**previous** 101:12
 196:9
**previously** 25:5
 47:22
**primarily** 14:18
 20:21 24:11 25:25
 100:11 140:2
**primary** 26:4,17
 26:22 91:7 177:23
**principles** 119:8
 119:21
**printed** 28:22
**prior** 9:14 56:4,7
 64:23 96:18 98:19
 101:10 144:17,25
 149:8 159:3
 165:14 169:21
**privy** 39:25
 137:10
**probably** 27:8
 59:4 90:6 152:23
 155:11 159:4
**problem** 69:10
 109:3
**problematic** 15:23
 151:9
**problems** 24:13
 88:15 93:19,22,25

procedure 10:6
209:5 210:5
procedures 47:5
proceed 11:13
48:2 57:4
proceeding 50:23
proceedings 10:12
41:20
process 27:14
32:22 37:2,6,16
38:15 39:14,16,22
40:2 68:22 69:1,7
70:10 80:22 90:3
119:2,11 128:6
130:20 143:10,12
144:3 148:23
158:20,21 194:19
194:20 198:24
processes 47:4
49:2,5
produced 33:17
33:21 34:1,15
35:6,11,11,15,23
36:3 37:4 40:5,17
42:3,8,19,24 43:7
55:6 112:5 113:7
producing 14:15
product 72:9
production 33:14
130:20 208:15,17
208:22
products 47:7
profession 154:9
professional 1:24
9:7 10:2 19:11
147:6
professor 19:17
112:16 150:10
program 41:8
43:25 44:7 45:23
46:18,21 47:25

88:16 93:4,18
124:10,11,14
125:2,18 126:6,18
126:25 127:7,7,15
127:16,17,21,24
133:16,19,20,25
134:14,17,20
135:6 139:5,15
146:22 147:3
177:10 203:10
programs 39:24
43:17,24 44:6,10
44:15,25 45:14,22
45:25 46:2,3,11,12
46:13 47:23 48:1
48:8,11 49:12
50:20 63:1 113:25
115:13,19,21
116:5,9,13,17
119:24 120:1,6,16
120:22,25 122:1,3
122:4,21,25
123:13,13,24
124:2 126:16
128:5 133:14
134:6,10 135:12
138:5,8,9,10,13,19
138:20,21 139:2
139:12 140:2,4
169:15 170:21,25
178:24 187:18
195:10 200:24
202:16,22 203:1
progress 112:18
progressed 103:2
103:21
progression
100:10
prohibitive 136:19
project 115:3
130:23 131:5

132:1 139:14,20
projected 180:15
promote 146:11
177:23
pronounce 102:4
proper 32:5
proportion 184:20
188:8,10 198:17
198:19
proposal 49:17
propose 126:23
127:4 132:2 197:2
proposed 91:22
93:3 108:12 116:5
116:22 118:2
131:3 187:12
197:11
proposing 44:8
49:18 116:14
127:25 133:21
134:19 138:20
187:10,11
proposition 170:1
prospective
133:16 134:1
prospectively 48:2
protocol 182:2
prove 30:22
provide 26:16
28:25 29:2 32:10
32:25 39:20 54:22
55:20 66:23 68:12
70:22 71:1 74:13
84:25 85:10,18
86:12,17 115:23
124:19 125:11
135:1 155:7,18
158:4 171:21
181:21,22 183:7
185:2 189:20

provided 10:6
30:7 38:1,23 39:4
39:11 40:6,24
41:24 56:12 69:4
71:2 90:21 140:18
145:15,24 149:16
177:12 179:3
184:13 192:10
196:7 201:25
provider 198:9
providers 198:20
provides 16:7,12
18:8 31:9 38:12
95:9 109:22
providing 43:17
55:11 81:15 195:9
provision 47:13
114:24
public 1:25 2:18
9:7 10:4 38:7 40:9
40:17 112:4 113:6
116:8 122:13
124:6 125:2 126:6
126:19 127:2,3,9
127:11 194:1
207:21 209:10,18
210:15,23 211:23
publication 76:12
publicly 38:8
published 38:3
75:12,13 80:15
103:24 104:15
107:5,16 123:16
152:22
pull 11:14 129:10
130:12 135:21
176:16
pulled 50:8
purity 79:4
purpose 54:14
64:19 72:9 138:19

**purposes** 203:11
**push** 105:22
**put** 47:25 88:8,11
88:16 89:20
129:16 174:25

**q**

**qualification**
31:14
**qualifications**
146:20
**qualifies** 24:9
**qualify** 165:9
**qualifying** 95:11
**qualitative** 45:10
46:5,13,15,16,22
110:1
**qualitatively** 45:1
45:12,17 139:9
**quality** 38:15,18
46:2,17,21 133:8
186:3 191:12
196:2
**quantify** 116:1
**quantitative** 44:25
45:9 46:6 87:21
114:24
**quantitatively**
134:4 139:11
178:24
**quarter** 144:15,18
144:23
**quarters** 100:25
101:22
**question** 13:25
14:2,4 26:3 32:5
32:12 34:10,21
35:1,2,24 36:10
40:12,18,20 41:4
46:19,19 48:4
51:1 54:25 65:5
66:6,7 69:25 73:6

77:25 79:16,19
80:21 84:16 88:12
91:1 95:1,1 97:8
105:20 117:24
125:21 126:1,3
142:6,24 143:16
147:21 148:5
152:1 154:15,18
154:19,21,22
166:10 171:22
174:13 175:20
178:20,21 181:14
189:9 194:17
200:22 203:20
204:1
**questioning** 57:5
89:18 104:24
132:9 142:15
**questions** 9:10,10
13:23 30:16,18
55:2 72:20 139:6
172:12 173:22
204:16,21,24
205:1,7,13 207:9
**quick** 204:8
**quickly** 29:14 37:9
89:23
**quite** 130:22 137:7
137:12
**quote** 160:9
168:12

**r**

**r** 2:1 3:1 4:1 5:1
33:17 59:25,25
60:2,4,4 101:6
207:1
**range** 59:13
**ranging** 120:10
**rapid** 82:4 96:9
**rapidly** 79:6

**rare** 100:2
**rarely** 154:18
**rate** 27:11 77:13
82:9,10 100:4
**rates** 100:17
103:14 106:9
133:4
**rationale** 122:13
149:24 178:12
183:24
**reach** 117:21
186:1 200:23
201:7 202:18
**reactions** 55:20
**read** 30:8 75:25
77:3,5,8 78:17,25
80:5,17 81:4,5
82:1 92:8 95:24
100:5,21 103:10
140:22 162:19
168:11 177:1
209:5,6,12 210:5,6
210:17
**reading** 60:25
201:12 208:19
**ready** 11:10 205:9
**really** 26:5 32:19
69:25 104:23
154:17 165:1
**realtime** 1:23 9:6
10:2
**reason** 12:3,5 70:4
132:16 146:17
172:18 189:6
194:10 195:12
208:14 210:8
211:3
**reasonableness**
118:11
**reasoned** 136:22

**reasons** 100:2
166:23
**recall** 15:18,20
16:3,23 32:6,22
33:6 38:2 52:24
53:11 54:2 56:12
56:14 58:17,23
59:22 60:9 61:8
61:13 62:14 63:16
63:18 64:4 107:13
120:19 142:12
145:11 159:17
160:3 161:7
**receipt** 208:18
**receive** 11:11
12:14 184:21
188:9,11 191:18
191:20 198:12,18
198:20 203:3
**receiving** 180:6
181:11 183:17
**receptive** 39:20
**recognize** 107:20
**recognized** 148:15
**recognizing** 70:1
**recollection** 33:3
36:14 145:2
160:19
**recommend** 49:14
50:12 135:13
189:15
**recommendation**
182:3 185:10
**recommendations**
37:7 42:14 50:4,8
93:13 110:20
134:3,23 147:8
155:1 161:11
173:1 179:10
182:10,16 187:1

**recommended** 135:8 185:10

**recommending** 48:14 50:18 122:4 134:8

**record** 10:16 11:17 67:17,22 76:1 77:8 78:17 79:1 80:5,17 81:4 82:2 128:24 129:4 131:12,15,19 164:20 172:22 173:8,12,14,19 204:8,9,14 205:24 210:9

**records** 38:3 164:1 165:24 166:2,4

**recovery** 50:16 62:25 63:2,4 77:19 115:6 124:21

**redress** 15:14 16:4 86:13,14,24 88:21 88:24 116:20 117:5 129:10 140:25 176:11 177:8 190:9,14 197:4,7,11,16,22 199:12 203:15,23 204:2

**reduce** 41:11 44:12 47:7 49:2 51:21 52:2 63:6 85:21 87:2 93:13 105:17,21 107:4 122:10 123:7,22 130:24 132:2,15 187:2

**reduced** 77:18 207:10

**reduction** 88:7,9 88:15,19 129:12 131:24 132:23 133:6 170:8 202:16 203:1,16

**reductions** 100:16 103:12 106:3,7

**reentry** 194:8

**refer** 29:14 37:9 53:23 57:18 72:9 72:16,16,23 73:2 94:18 95:16,23 96:2 117:2 140:14 140:23

**reference** 30:22 37:21 72:4 74:13 106:16 107:2 125:5 126:2 130:12 141:23 169:22,22 172:3 181:21,22 184:2 190:7 194:22 202:23 203:5 208:7 209:2 210:2

**referenced** 15:16 16:16 31:11 32:14 36:2 70:4 140:21 160:2 172:3 193:6 195:20,21 209:11 210:15

**references** 31:5,9 31:10 32:4,10 35:22 104:19 121:9 125:6 126:2 143:19 145:20 184:4

**referencing** 95:6

**referrals** 169:15

**referred** 97:23 104:2 140:12

**referring** 11:13 42:22 73:13 74:8 93:25 97:24 106:22 108:19 192:2 193:9

**refers** 193:24

**refined** 73:20

**reflect** 161:17

**reflects** 81:20

**refresher** 159:5

**refuse** 136:10 162:24 163:4,10 163:13

**refuted** 105:3

**refutes** 105:1

**regarding** 15:21 32:11 33:1 38:4 41:10,25 55:21 63:3 71:24 107:8 143:17 153:9 174:8 187:21 191:17

**registered** 1:24 9:7 10:2

**regular** 151:17

**regulation** 146:16 146:25 147:1 150:7,9

**reiterate** 95:25

**relate** 25:10 138:8 138:14,15,16

**related** 8:17 16:9 41:11 44:12 49:2 61:18 63:7 80:1 85:3,11 87:18 93:14 96:8 107:4 113:10 115:13,19 115:21 116:2 118:22 125:1,2,17 126:6 127:8 138:7 155:8 156:5

172:17 173:22 174:21 190:13 195:15

**relates** 1:11 127:10 180:4 183:16

**relation** 156:1

**relationship** 8:10 98:24 197:5,9,15 204:1

**relay** 65:12

**relevance** 182:9

**relevant** 12:24 39:24 42:8,20,25 43:2,7,9,15,24 44:6,17 55:16 61:5,6 67:2 94:12 112:6 113:7 126:3 132:4 172:24 201:12,23

**relied** 7:9 30:1 184:4 189:22

**reliever** 8:20 102:6,18 103:1

**rely** 201:20

**remain** 119:9 127:22

**remedy** 191:10

**remember** 26:10 26:11 159:11,12

**remote** 1:16

**remotely** 2:2 3:2 4:2 5:2 10:9,19

**repeat** 13:24

**rephrase** 14:1

**reply** 12:21

**report** 6:14,19 7:9 7:13,17,21,23 8:7 11:5 12:15 13:8 14:12,15,16,19 15:7,12,13,14,16

| | | | |
|---|---|---|---|
| 15:21 16:4,5,22 | 143:19 144:7 | 192:18 207:11 | **resources** 47:17 |
| 17:3,13 20:14 | 145:17,19 146:1,3 | **request** 34:25 65:9 | 87:9 109:1,2 |
| 25:5 27:17 28:9 | 146:4,14 147:11 | 86:8 210:9,11 | 111:9,14 126:11 |
| 28:21 29:7,14 | 147:25 148:9,12 | **requested** 29:1 | 127:13 183:7 |
| 30:1,3,7 31:6,7,11 | 149:6 151:19,19 | 39:21 | **respect** 55:17 71:4 |
| 31:17 32:4,10,14 | 155:2,4,9 156:7,12 | **requests** 86:9 | 74:14 82:19 87:22 |
| 32:25 33:4,8 | 156:13 157:3,6 | **require** 20:9 34:7 | 90:8 119:13 122:9 |
| 35:22 36:2,8,9 | 158:21,23 163:11 | 51:24 89:24 92:17 | 138:25 155:5 |
| 37:1,2,8,9,12 | 166:10 167:7 | 92:24 93:7,15 | 157:10 197:3 |
| 39:23 41:13 45:7 | 170:7,23 171:3 | 109:10,16 110:11 | **respective** 9:3 |
| 47:2,8,19 48:21,23 | 174:23 175:3,11 | 110:25 115:10,17 | **responding** 85:14 |
| 49:8 50:18 51:4 | 175:17,22 177:15 | 115:25 122:16 | **response** 40:18 |
| 51:20 53:13,13,20 | 177:21 178:23 | 124:1 126:14 | 166:24 |
| 54:1,7,17,19 55:5 | 184:4 189:25 | 147:5 151:4,19 | **responsibilities** |
| 55:13,24,24 56:3,7 | 190:1,4 191:25 | 156:8,24 166:11 | 165:18,19,22 |
| 56:8,12,18 57:21 | 193:11 194:3,19 | 167:8,21 170:24 | **responsibility** |
| 65:22 66:1 68:8 | 195:21 196:15,16 | 175:3 178:23,25 | 92:4 |
| 69:16 70:4,10 | 197:4,6,10 201:1 | 180:11 182:16 | **responsible** 54:19 |
| 71:4,6 72:14,14,17 | 202:2,16 203:12 | **required** 20:13 | 54:20 91:21 92:1 |
| 72:18,20,23,24 | 203:14,16,19,22 | 109:24 114:15 | 106:8 |
| 73:3,15,23 74:1,13 | 204:2 | 115:10,15 127:16 | **responsive** 39:20 |
| 74:13,17 86:13,23 | **reported** 1:22 | 174:17 179:9 | 40:18 66:6 95:1 |
| 86:24 89:8 90:23 | 101:10,12 | 198:10,22 208:25 | **rest** 50:4 171:13 |
| 93:9,12 94:13 | **reporter** 1:23,25 | **requirements** | 185:25 |
| 95:17,18,24,24 | 9:6,7 10:2,3 25:17 | 171:6 | **result** 79:3 131:25 |
| 96:1,2 97:23 | 57:11 98:5 131:8 | **requires** 154:3 | 171:4 207:17 |
| 98:13,18 99:24 | 131:12 209:7 | **requisite** 154:24 | **retail** 91:25 |
| 104:20 105:6,9 | **reports** 16:16 | **rereview** 159:5 | **retained** 25:9,13 |
| 106:15,15,25 | 31:23 37:5,22 | **research** 18:17 | 25:14 196:8,10,12 |
| 107:2 110:2,8,11 | 38:4,6 41:19 | **reserve** 17:25 | **retrospective** |
| 110:23 114:3 | 55:24 56:15 65:20 | 205:4,6 | 43:20 49:11 |
| 115:10 116:7 | 65:22 74:21 114:4 | **reside** 202:19 | 126:24 127:13,20 |
| 117:2,4,6 120:3,14 | 122:2 | **residency** 18:3,5 | **returned** 17:24 |
| 121:7,9,11,12 | **represent** 11:3 | **residents** 133:9 | 68:1 208:18 |
| 122:2,12,22 123:4 | 28:23 69:24 178:9 | **resolve** 205:20 | **review** 8:15,22 |
| 124:1,5 125:4,6,19 | 187:20 191:6 | **resource** 108:22 | 13:22 14:15,15 |
| 126:2 134:9 | 197:17 | 111:19,24 112:1 | 15:3,10 16:18 |
| 135:17 139:16 | **representatives** | 113:12 127:20 | 29:5 31:2,24 32:9 |
| 140:13,21,24 | 62:19 | 186:21 | 32:25 33:25 34:7 |
| 141:6,12,17,21,23 | **represents** 28:21 | **resourced** 128:8 | 34:11,14 37:1,17 |
| 142:2,8,9,13 143:1 | 32:9 75:19 147:13 | | 37:19 39:17,18 |

41:19,24 42:2,12
42:17 43:1,8
44:17 46:12 48:22
51:18 53:23 54:1
88:21 94:10 95:8
95:9,22 106:25
107:17 109:23
110:1 111:17
112:4 113:5,23
114:2 141:1
147:14,18 148:1,6
159:22 161:3
171:7,20 172:11
172:15 174:20
175:14 176:10
187:15,16,17
189:24 202:25
203:21,21,23
208:12 209:1
210:1
**reviewed** 13:10
15:6,10,12,15
16:11 28:19 30:20
30:23 31:16,20,21
31:25 32:6,15,23
33:5,6,11 34:4,13
35:12,14 36:3,7,12
36:20 37:5 38:6
39:4,9 53:20,25
64:17 67:2 123:3
141:16,21,22,24
141:25 142:1,7,9
148:8,11 153:19
153:21 156:6,13
172:5 175:10,16
176:1 189:19
204:5
**reviewing** 14:11
15:18 16:4 17:3
33:4 37:25 43:13
148:7 159:18

203:12
**rice** 2:8 26:1,4,13
26:14,18,22 50:23
51:14 56:19
**ricochets** 191:3
**right** 11:7,8 12:1
14:23 15:7 17:14
19:12,16 25:11
27:25 28:10,11
29:17,25 30:10
32:16 35:12 45:11
47:24 50:24 51:9
52:6 57:19 59:6
62:8,8 67:12 69:2
69:14,18 72:19
75:10,13 82:25
84:5 85:1 86:3
88:10 94:9 95:10
105:23 106:10
108:15 111:9
116:20 118:8,14
120:7,18 121:7,13
121:23 123:10
124:11 125:14
137:15 140:5
142:9 143:1
146:23 147:11,12
148:10,20 150:17
153:10 155:16
157:16 158:16
159:21 161:6
163:5 169:23
170:1,22 171:14
171:16 176:8,19
177:17,18,19,19
179:14 181:7
183:3 185:4
188:13 190:11
193:22 199:19
200:7,14,20 202:6
205:4,6,12

**ripples** 190:23
**rise** 96:8
**rising** 8:16
**risk** 6:21 15:23
99:22 141:2 150:4
155:23 156:23
157:8 162:4
167:20
**risks** 161:25
169:14
**rite** 4:15 205:1
**robert** 18:7
**robustly** 100:19
103:16
**role** 26:5 48:20
102:17 137:10
139:21 150:12
151:7 162:13
**room** 52:23
**rose** 77:16
**rosen** 52:15,16,18
53:8,16 54:3,15,16
54:18,25 56:10,13
142:16
**rosen's** 53:20
**routine** 160:25
**routinely** 20:19
160:15
**row** 181:23,24
188:7,9,15 199:20
**rows** 158:12
188:14
**rules** 10:6 13:22
152:13 153:14
209:5 210:5
**run** 123:1 133:22
**running** 88:2
**runs** 105:1
**rural** 202:20
**rx** 3:5

**s**

**s** 2:1 3:1 4:1 5:1
9:1 60:4 208:15
210:8,8 211:3
**s.m.** 3:17
**safe** 47:5 146:12
155:13 175:1,12
176:2
**safer** 123:7 191:14
**safest** 163:1
**safety** 152:4
153:24 169:1
**saith** 206:5
**sal** 60:8
**salutorious** 115:7
**samhsa** 8:22 189:4
190:6
**sampling** 46:1
**san** 162:2
**save** 205:16
**saved** 192:7
**saw** 156:14 161:3
**saying** 23:1 45:24
46:23 73:16,24
135:14 168:9,10
181:14 193:18
197:14 200:17
**says** 29:25 30:5
33:14 75:22 101:8
102:25 131:2
140:24 156:13,13
162:12 171:2
179:23 182:23
183:19 191:5,7,24
193:19 195:8
**scale** 132:5
**scenario** 138:2
**scenarios** 163:20
163:23
**schedule** 57:13

**scholars** 18:8

**scholarship** 123:17

**school** 17:25 18:2 88:1,1,4

**schools** 88:4

**science** 18:11,14 116:7 142:18,20

**sciences** 18:9

**scientific** 37:17 38:18 50:7 68:22 69:1 109:23 160:16,17 161:19 201:18

**scientifically** 85:19

**scientist** 161:1

**sclerosis** 186:15

**scope** 51:12

**scratch** 48:13

**screen** 129:17,21 130:6 135:21 176:24 180:24 184:19 198:2

**screening** 23:9 169:15

**script** 137:22,24 165:4

**scroll** 199:18

**se** 146:21

**seal** 209:15 210:21

**search** 40:5

**seattle** 162:2

**second** 12:19 13:12 27:21 40:10 58:24 59:1,5 96:22 102:11,22 102:24 104:18 137:1,8 193:18

**section** 48:23 95:17 99:18

120:25 123:3 134:9 170:7 177:15 190:9 203:15

**sections** 158:10 189:24,25 190:4

**see** 29:6,19 30:22 33:12,18 40:6 42:20 74:24 75:23 89:5,14 101:23,24 102:20 103:6,6 124:23 130:6,7,8 131:21,25 141:3 155:4 157:22 162:17 169:17 170:7,10,16 171:9 176:20,25 177:12 179:18,25 180:7 180:14,15,23 181:4 184:2,18 187:23 191:24 199:15,20 202:9 203:14,16

**seeing** 21:11

**seek** 64:22 180:19

**seeking** 62:24 126:19 187:5

**seen** 13:11 80:14 81:24 159:25 193:5

**select** 197:18,21

**selected** 36:13,20 36:24 39:5,10,10 46:14 197:6

**seminars** 178:15

**send** 42:16 55:23

**sense** 14:8 55:19 64:11 67:7 114:24 133:25 186:6

**sent** 11:12 27:16 28:20 29:7 56:17

56:17 159:16

**sentence** 30:5 31:4 38:25 40:12 74:7 75:25 77:2,6 79:1 82:1 96:6 98:2 102:20,22,24 103:7 117:9 162:20 169:11,22 169:24 170:15 171:2,13

**separate** 11:22 71:25 165:18 189:2

**sequelae** 117:14

**sequential** 198:23

**series** 182:2

**serious** 80:19,20 111:18

**serve** 25:23 138:18 138:19

**service** 5:5 29:3 72:8 142:22 143:23 144:1 200:24 202:21 203:10

**services** 3:5 18:16 21:4 25:14 26:16 45:14 47:13 50:20 61:16 85:25 90:22 114:25 126:16 128:5 134:10 139:12 177:12 178:24 188:18 189:5 203:1

**serving** 26:5

**sessions** 178:15

**set** 27:24 44:15 65:6 93:18,22 138:19

**setbacks** 112:19

**setting** 90:24 172:23,24 193:12

**settings** 189:13

**settling** 185:22

**seven** 104:16

**seventy** 98:17 143:19 158:15 160:24

**shapira** 5:9

**shapira.com** 5:14 5:15

**share** 176:16,23 176:24

**shared** 143:16

**sharon** 4:6 204:20

**sharon.desh** 4:13

**sharp** 96:11

**sheet** 29:19,24 208:13 210:7,10 210:18 211:1

**shifts** 100:18 103:15

**shocking** 185:21

**shoot** 128:18

**shorter** 59:2

**show** 195:4 199:11

**shown** 208:16

**shows** 103:19

**shuffling** 25:18

**sic** 45:23 103:22 115:7

**signature** 207:20 208:14

**signed** 209:13 210:18

**significance** 118:24

**significant** 19:25 37:11 83:3 119:15 123:5 134:8 143:21 146:9

**significantly** 202:17
**signing** 208:19
**silence** 173:3
**similar** 16:13 58:1 59:3,4 62:17 64:5 68:14,17,20,23 69:3,7 120:18 121:16,18,18,22 125:22 142:15 158:20 178:21
**similarity** 196:3
**similarly** 101:8
**simply** 17:3 34:21 65:13 94:24 134:24 163:25 164:3 201:22
**sincerely** 208:21
**single** 69:5 113:16 113:17
**sir** 73:16 208:10
**sit** 33:2,7 36:11,18 57:25 81:3 82:15 122:19 125:16,20 172:10 187:21
**site** 200:18 201:7 202:8
**sites** 203:4
**sitting** 122:23
**situation** 62:17 84:18 112:14 193:5 194:6 199:12
**situations** 136:13 193:5 199:4
**six** 31:8 35:21 106:14 120:10 121:9 125:5 145:19 191:23 203:3

**sixty** 184:25 185:17 186:12,15 186:24 188:1,5,20 188:21 189:7,17
**size** 51:23 52:3 161:14 190:20
**slate** 149:4
**slice** 71:3
**slight** 149:19
**slightly** 192:13,14
**slot** 183:11
**slots** 184:10,14
**small** 180:16
**software** 164:24
**solutions** 5:21 208:1 211:1
**somebody** 26:14 84:4,20
**soon** 56:21
**sooner** 108:6
**sorry** 15:20 23:14 25:21 26:3 31:21 31:22 35:8 36:16 36:21 43:4 44:20 48:4 49:24 54:9 71:18,23 77:24 82:10 88:11 98:5 101:13,15 104:7 131:8 138:11 144:22 157:17 190:2 194:4 200:4 205:12
**sort** 38:14 42:21 46:20 53:3 86:9 134:24 135:9,12 139:2,6,23 181:8 183:10 198:23
**sorts** 123:20
**sought** 158:25
**sound** 119:8,21

**sounded** 192:25
**sounds** 57:9
**soup** 139:5
**source** 113:15 178:12 185:14 188:15 189:1,3 194:17 195:23 199:3,5
**sources** 38:5,8,13 38:22 41:4,7 42:1 61:1 65:18 70:9 70:13,23 115:11 115:12,12,18 158:15 182:8 189:2 192:12,24 193:7,9,10,13,21 194:20 199:8,13 201:19,22
**south** 2:10
**space** 178:14,18 178:19,19 179:2,2
**spaces** 178:5
**spaeder** 3:9
**span** 116:24 117:19
**speak** 57:11,19 58:22 61:10,11 64:9 65:2,17 66:11 70:11 106:15 117:2 141:10 143:10 164:18,20,22 167:6
**speaking** 49:6 54:25 55:14,15,18 63:19,21 65:24 71:20 78:9,10 86:4 105:19 118:16 132:22 142:21,25 149:8 166:5 168:13

**speaks** 86:6 95:18 190:10 203:16
**special** 118:13
**specialist** 20:25 21:4,15,24 22:1,11 22:21 23:1,12,17 23:22 24:10,17
**specific** 15:9 18:15 33:3 38:3 41:19 42:13 51:24 52:4 65:10 66:23,24 68:16 74:3,4,5 85:24,24 86:12 87:20 88:6,19 92:13,17 93:11,16 94:9 95:4 113:10 113:13,18,25 116:16 122:16 126:16,25 134:5 139:12 156:3,9,25 156:25 157:10 159:24 160:2,9 161:4,5,20 170:25 172:12,16 175:23 176:7 178:24 182:4 188:16 197:18 199:5 203:23
**specifically** 14:21 16:18 20:20 61:13 62:22 95:19 104:22,25 113:4,9 120:5 160:23 163:12 166:11 171:20 203:20
**specifics** 163:24 189:21
**spell** 101:5
**spend** 17:3

spending   127:13
   127:19
spent   17:3 109:4
   109:10,12,17,19
   110:6,13,17 111:2
   114:14,14 126:15
   168:20,25 205:8
spoke   38:10 49:25
   57:23 58:1 59:6
   60:22 61:4 65:4
   69:13 70:2,5,6,15
   70:17,20,24 98:1
   144:11,24 147:8
spoken   114:8
square   2:18
ssp   202:23
ssps   202:21
staffing   171:5
stakeholders   26:7
   38:10 57:18,19
   69:17 70:3
stamped   37:25
   38:22 39:3,9
   40:13,21,24
stand   27:20 77:21
   78:5 80:4 81:2,6
   147:14
standard   72:7
   73:18 155:8,9,19
   157:4 184:9
standards   157:11
standpoint   22:21
   23:2 138:18
stands   78:20
star   194:16
start   48:12 125:4
started   37:18
   108:5,7
starting   36:1
   162:20

starts   98:2 99:15
state   10:4 11:16
   16:9 19:3,4 41:24
   41:24 45:17 94:9
   95:4 97:17 100:7
   112:25 114:19
   115:2 116:11
   124:17 138:21
   139:14,15,17
   140:4 151:12,13
   159:24 160:2,7,9
   160:10,11 164:22
   169:12 170:3
   196:16 207:4,21
   209:10 210:15
stated   45:8 98:12
   124:17 142:2
statement   77:20
   78:5,16,21,22,24
   79:8,12,21 80:5,17
   81:3,6,14,16,18,19
   82:14,15,23 83:1
   111:15 123:23
   162:12 209:13,14
   210:19,19
statements   75:16
   79:23,25 96:21
states   1:1 8:21
   10:7 76:3 77:12
   99:20 102:7,15
   114:7 160:13
   187:19
statewide   115:5
   194:8
stating   103:10
   105:6
statistician   20:18
statistics   20:19
   39:24
stenotypy   207:9

steps   107:21
   115:24 188:19
stepwise   37:16
   38:15
stethoscope
   165:11
stigma   124:19
   189:10,25
stimulant   8:17
stipulate   193:15
stipulated   9:2
stipulation   10:8
stolen   83:17 84:7
   84:20
stopping   56:25
stores   3:6
story   94:20 172:8
strategies   68:13
   68:16 107:3
strategy   116:23
   119:9,22 140:7
street   3:10 4:10
strike   118:19
strikes   117:10
   118:3 133:6
strong   99:22
strongly   106:6
structures   168:16
student   112:16
studied   152:25
   156:9
studies   37:20,22
   50:7 98:17 103:25
   106:11,14,16
   107:11 143:19,20
   153:3 159:21
   161:6 162:8
   171:17,24 172:3
study   102:16
   103:19 105:1
   107:7 152:3,4

153:23 156:1,3,24
   160:11 168:25
   172:8,22 174:18
studying   19:25
   21:16 22:9 112:8
   156:16
subcategories
   120:10 121:21,22
subgroup   100:10
submitted   15:21
   15:21 76:11 142:1
   147:16 196:16
subscribed   209:10
   210:14 211:21
subsequent   37:22
   80:13 96:15 98:4
   98:9 105:13
subsequently
   81:25
substance   15:23
   16:7 19:4 124:20
   125:12 153:5
   181:25,25 188:17
   189:4
substances   19:6
   20:1 47:6 146:12
   155:14 163:1
   170:7 176:3
substantial   155:21
substantiate
   201:24
subtract   50:20
success   133:23
successful   49:20
   134:14,20
successor   134:16
succinctly   201:18
suddenly   94:12
suffering   87:3
sufficient   41:18
   127:9 183:7

[suggest - tell]

**suggest** 100:14 103:11 116:17 117:25 137:11,20
**suggested** 61:8 189:2 194:7 195:9
**suggesting** 76:20 76:22 78:2 179:11
**suite** 2:19 3:11 135:2 208:2
**summarize** 17:17
**summary** 86:23
**superior** 196:17 208:1
**superseded** 119:25
**supervision** 207:10
**supplement** 70:22
**supplemental** 31:10 146:3
**supplemented** 37:19
**supply** 45:5 47:4 48:21 49:1 82:6 90:16 122:11 123:8 146:11,13 149:1 150:13,25 152:8 153:1 154:5 154:25 162:15 168:18 169:5 176:4
**support** 20:3 104:20 106:7 117:11 124:22 126:21 143:17 148:25 157:7 158:4 160:17 161:20 164:24 167:19 175:18 178:1,1 190:11,16 191:20 201:4 203:8 204:4

**supported** 14:14 172:14
**supporting** 155:22 156:22 197:1 200:25
**suppose** 52:21 65:17 159:15 165:8 190:25
**sure** 14:24 20:14 26:14 27:20 29:23 36:5,5,12,19 59:22 67:1,2 71:23 77:9 86:25 87:24 94:25 111:20 121:15 129:18 138:6 140:3 159:12 163:6 164:11 177:3,14 180:18 186:14 187:14,14 199:14,15 204:18 205:14,17
**surprise** 167:4,11 168:8,10,11
**surprised** 159:23
**surprising** 185:21
**sustained** 131:4
**swear** 10:20
**swimming** 186:19
**switched** 46:20
**sworn** 10:23 209:10,13 210:14 210:18 211:21
**synonymously** 74:11
**synthesis** 200:22
**synthesize** 200:19
**synthesized** 200:11,14
**synthesizing** 202:10

**synthetic** 8:16 76:8 82:8
**syringe** 200:24 202:21 203:10
**system** 16:7 48:21 49:1 87:13 121:1 121:3 152:10 166:9,22,22
**systematic** 37:6 94:10 95:8
**systems** 153:4 167:2,12

**t**

**t** 9:1,1 33:17 207:1 207:1
**tab** 147:24,24 157:16,18,21,22 158:9 177:1 181:7 199:17
**table** 148:16,20 158:7,8,12
**take** 10:17 46:1 49:15 53:10,12 55:10 56:22 57:1 57:2 61:17,23 63:23 67:9 88:25 105:5 106:11 115:24 128:13 139:13 150:15 173:5,15 188:19 189:23 192:24 198:1 202:12 204:8
**taken** 9:5 63:5,20 79:24 85:20 94:20 107:21 110:11 186:10 196:20 207:8
**takes** 192:11
**talk** 27:18 30:12 37:12 58:5,8,10

64:23 71:5 96:13 96:21 162:10 185:22
**talked** 25:4 57:16 64:6 94:2 135:25 138:4 140:1 157:13 168:19 170:18
**talking** 26:24 40:11,12 46:17,21 85:7 89:22 105:12 105:14,16 108:16 108:16,17 111:4 124:6 127:20 129:12 133:11 135:10 147:10 173:21,23 174:15 199:2,16
**talks** 101:1 179:16
**target** 185:11,24 186:24,24
**targeting** 187:22
**task** 41:21 110:24 115:6
**tcmhrb** 125:15
**team** 14:14,22 32:7,15,23 34:5 38:10 53:19 54:4 54:4,13,15 55:1,23 56:17 60:14 61:25 62:19 137:9,19 158:25
**teds** 185:4,14 187:25 188:16
**telephone** 62:6 145:11
**tell** 64:14 92:6 104:13 105:2 150:2 153:20,22 196:1,22

**ten**  57:7 92:6
  112:7 150:20
**tens**  50:6
**tensions**  118:4
**tepid**  189:12
**term**  71:12,25
  72:5,11,12 73:7,15
  74:10 85:15 88:13
  152:16
**terms**  16:8 72:15
  72:24 73:3 74:15
  74:18,22 112:24
  114:11 118:19
  148:23 149:24
  205:14
**terribly**  41:9 80:8
  148:23
**test**  79:18 203:3
**testified**  10:24
  12:7,10
**testifying**  22:19
  199:22
**testimony**  12:4,6
  38:1,23 63:11
  78:8 113:4 138:7
  149:12,15 196:7
  209:6,7 210:6,9,12
**text**  159:19
**thank**  37:14 57:8
  67:18 128:23
  129:22 131:6
  135:23 152:1
  204:22,25 205:2
  205:22
**thanks**  57:10
  145:4 205:21
**therapies**  188:12
**thereof**  113:25
  175:19
**thereto**  9:14 207:9

**thing**  30:14 84:5
  110:15 129:9
  133:17 154:9,10
  188:24
**things**  66:25 67:10
  79:9 104:11
  107:25 108:3
  115:15 119:4,17
  119:23 129:8
  149:24 155:4
  164:16 188:15
  189:14
**think**  12:23 20:13
  24:4 27:16,18
  41:3 42:18 44:2,2
  46:19 49:24 50:12
  52:8 55:15,18
  56:16 57:9 59:2
  59:18 61:12 66:5
  72:22 74:19,19,21
  76:16,18 78:16
  79:9,18,23 80:6,6
  80:9,19 81:8,19
  83:1 85:5,14,15
  86:9,15 90:3
  94:17 96:24 98:1
  104:5 107:24
  108:3,9,10 117:24
  120:15 122:7
  126:10 128:12,13
  129:11,14 130:18
  132:23 133:5,15
  134:14 135:23
  136:4 138:11,14
  139:25 140:5,14
  141:14 144:9,11
  144:13 152:16,17
  152:18 154:20,22
  155:10 158:14
  160:6 161:10,24
  165:6,17 166:20

  168:5,13 169:9,19
  170:18 172:6
  173:24 174:16
  175:11 176:14
  177:17,20 181:10
  181:13 183:10
  188:25 189:1,3,8
  189:17 193:4
  196:11 200:22
  203:18,19 204:4
  204:18 205:4
**thinking**  137:7
  161:2 162:7
**third**  12:23 144:18
  144:23
**thirty**  128:19,21
  185:6,13 188:1,4
  208:18
**thorp**  57:17 58:2
  62:3,18,24 63:2,15
  66:8
**thought**  15:10
  31:22 43:2 63:12
  101:15,17 111:5
  198:8 199:25
**thoughts**  55:21
  205:20
**thousand**  82:12
**thousands**  50:6,6
**three**  1:12 12:20
  13:11,17 27:6
  33:15 35:4 63:20
  70:5,17 76:4,14
  77:1 80:8 82:18
  94:2,7 95:12,13
  96:3,24 97:4,11
  100:25 101:21
  192:5
**threshold**  87:21
**thrown**  158:8

**till**  57:4
**time**  9:12,13 11:15
  13:4 17:2 37:11
  56:22 63:13 69:5
  73:16 74:20,21
  75:18 76:11 94:19
  95:21 104:5,11,17
  106:6 113:24
  114:9 135:6
  143:15 147:16
  154:2 171:3,5
  173:5,7,15 186:7
  189:23 202:12
**times**  12:10 54:6
  58:18 62:4 63:25
  101:11 178:22
  201:14 203:3
**timing**  100:18
  103:14
**title**  19:15
**tn**  3:5 207:23
**today**  10:16,17
  11:4 12:1,4 13:23
  14:20,21 33:3,7
  36:11,19 37:11
  54:21 58:1 77:21
  78:10,20 81:3
  82:15,17 122:19
  122:23 125:16,20
  147:18 172:10
  178:22 187:21
**today's**  16:19
  168:14
**told**  87:23 137:21
  168:5 169:9
  185:24 186:13
**tool**  202:17
**tools**  124:19
**top**  139:2 183:15
**topic**  177:10

**total** 13:17 26:23
26:25 170:15
173:7 178:5 180:4
183:16 190:21
191:17 198:15
**totality** 64:16 86:9
86:15 112:3 113:5
125:23 175:25
176:5 187:15
189:18,21 201:11
**toxicologist** 19:23
19:24 20:4,5,6
**track** 1:12 11:6
71:6 90:19 208:6
209:3 210:3
**training** 17:23
18:8,13 178:15
**transcribed** 209:7
**transcript** 207:12
207:23 208:11,12
209:5,12 210:5,11
210:17
**transcripts** 30:23
**transition** 100:3,8
**transitions** 105:13
**transportation**
180:5 181:10
182:14,19 183:7
183:16 184:6,13
202:19
**travel** 180:11
**treat** 74:24 183:1
189:11
**treated** 21:19
185:23 188:22
**treating** 23:10
**treatment** 50:14
50:14,15,17,18
77:19 87:10,13
124:21 169:16
180:6,10 181:25

**treatments** 186:17
189:13,17
**trend** 102:18
**trends** 16:8 41:25
102:16
**trial** 9:12
**triangulate** 60:24
**triangulated** 41:5
**triangulation**
60:23
**tried** 139:23
**triggered** 141:18
148:13
**trouble** 88:2 150:4
**true** 35:18 73:5
94:24 142:19
202:4 207:11
**trum** 33:17
**trumbull** 2:4 6:13
6:18 7:5,12 14:10
16:12,17 17:21
20:8 25:23 26:6
32:21 33:18,21
34:1,16 35:7
41:14 42:10 43:12
44:11,16 45:2,15
45:15 47:10 51:6
57:23 58:3 63:1
64:20 65:11 70:3
70:5 85:4,7,8,12
85:20 86:20 87:16
87:19 88:9,17
89:10 92:2,11,21
92:25 93:17,20,24
94:15 97:3,5,12,18
107:20,25 108:25

109:5,5,6,19,25
110:6,10,13 111:5
111:19 112:15,23
115:22 117:17
118:22 119:14
120:17 122:6
123:24 124:3,10
124:22 125:13
127:8 129:25
132:12 138:5
156:18 161:4
170:21 171:1
182:5,9,13 196:6
197:20
**trumping** 137:14
**trumps** 137:17
**truthful** 12:4,6
**try** 29:2 54:3,21
55:1 57:3 63:6
114:23 139:1,24
142:20,22 143:23
175:1 201:17
**trying** 15:20 54:11
57:12 60:20 96:23
111:12 117:13
**turn** 25:3 30:10
68:1 75:4 99:6
102:10 117:10
120:2 140:11
184:16 203:15
**turning** 194:3,4
**twelve** 102:19
141:9 149:23
185:8 202:25
**twenty** 23:24
69:20,24 70:6
117:20 138:2
185:6,13
**two** 12:12,15,22
13:11 17:20 27:4
35:5 53:18 58:18

58:21 59:8 61:21
61:22 63:12,21
87:21 99:9,12
104:1,19 125:7
133:9 145:21
149:20 152:23
159:15 160:1,24
169:25 171:14
172:5 179:24
182:23 183:2,14
183:20 189:2
199:4
**type** 39:15 40:4,23
83:25 91:13 154:1
165:13,15 193:23
**types** 60:24 64:9
65:23 91:6,10
126:22 127:3
143:18 148:24
170:21
**typewriting**
207:10
**typical** 39:14
70:10 80:7
**typically** 61:21
64:8 67:4 71:18
71:21 72:2 76:3
76:13,25 90:14
174:7

**u**

**u** 9:1 33:17 60:4
101:6,6
**u.s.** 82:6 107:5
**uh** 95:7 102:3,21
121:14
**ultimate** 116:9
119:19,19
**ultimately** 32:8
48:15 50:6 54:18
128:4 143:9

**uncertainty**
111:21 117:13
**unchanged** 119:22
**undergraduate**
17:23
**underlying** 69:6
**undermines**
161:10
**underscore** 167:6
**understand** 11:25
13:25 14:17 19:20
20:15 21:8 22:18
24:20 25:14 31:13
31:14 42:18 45:3
45:21 46:24 47:22
48:7,24 54:12,14
55:8 60:13 65:5
65:14,19 69:9
73:3,19 74:7,17
76:19 80:9 88:12
90:9 91:6,9,14
95:12 104:24
109:24 110:10,12
111:13,13 114:10
121:10 133:18
138:6 142:6
156:12,18 167:22
169:3,7 174:4
187:12 196:14,18
203:13 204:17
205:20
**understanding**
13:22 14:9 20:1
20:12 21:18 22:6
30:11 32:14,20
33:24 34:14 39:8
40:1 41:15 45:18
47:10 54:5 55:3
71:11 79:25 80:3
80:23,23 88:14
90:12,13,18 91:2

95:11 107:17,18
123:20 143:6
146:6,10 147:22
151:5 154:4,24,24
161:1 165:23
166:15,19 167:14
168:21,22 187:4
203:11
**understood** 33:2
68:25 133:13
139:25 147:20
**undertake** 156:24
**undertaken** 44:11
45:2 46:25 63:5
135:7
**undertaking** 53:4
108:13 159:4
167:21
**undertook** 69:1
**unfortunately**
22:16 23:23 24:25
53:3 112:20 145:8
186:4
**unique** 191:22
**united** 1:1 8:21
10:7 76:2 77:11
102:7
**units** 203:2
**university** 11:21
17:22 18:1,4,6,12
**unnecessary**
122:10
**unquote** 160:9
**unsafe** 137:12
**updated** 6:25 7:7
**upper** 29:25
**upstream** 186:19
**uptake** 189:12
190:5
**use** 8:11,12,20,21
15:22 24:6 40:9

71:8,10,24 72:5,6
72:8,9,11,24,25
73:13,17,18,22,24
74:9,9,11,21,22
80:14 81:12 86:7
96:14,16 98:3,8,9
98:19,25,25 99:21
99:23 100:1,1,3,8
100:9,12,17 101:9
101:10,12 102:6,6
102:18 103:2,4,5
103:14,21,23
105:8 106:9 111:6
116:24 124:19,20
125:9 132:3,5,13
137:23 145:15
152:4 153:24
155:22,25 156:22
156:23 157:9
158:8 160:16
168:25 174:11
177:25,25 184:17
188:4,8 192:13
194:11,11 195:13
195:24 198:7
199:9 202:22
205:16
**useful** 51:5
**users** 98:18 99:24
100:11 103:1,2,20
**uses** 74:20

**v**

**vacuum** 50:9
**valuable** 63:3 67:6
70:22
**value** 45:4 118:1
161:20,21 193:14
**van** 200:18 201:3
201:6 202:8
**variable** 169:10

**varied** 61:1
**varies** 73:25 74:1
74:7 168:6
**variety** 155:12,22
**various** 27:17
155:4 157:24
158:4 179:20
191:25 192:24
193:7,20
**vast** 17:2 50:5
81:21 102:25
103:20
**veritext** 5:21
208:1,7 211:1
**veritext.com.**
208:17
**versa** 166:13
**version** 89:7,15
**versions** 56:2
**versus** 139:24
196:17
**vice** 166:13
**video** 1:16 173:7
**videographer** 5:20
10:15 57:11 67:16
67:21 128:24
129:3 131:13,14
131:18 173:9,13
173:18 204:9,13
205:11,23
**videotaped** 10:17
**view** 26:5 70:21
78:2 117:10 137:7
137:18 193:22
**views** 75:19 78:3
**violate** 152:13
**violation** 153:13
**virginia** 68:10
70:6,7,16 85:6
121:17,21 160:1

**virtually** 20:22
**visibility** 168:15
**visible** 166:12
**vitae** 7:19
**vital** 43:13
**volume** 77:10
**voucher** 179:24
  181:23 183:8
**vouchers** 180:5,11
  181:10,20 183:17
  183:19

**w**

**wait** 40:10
**waived** 208:19
**wakes** 87:1,24
**walgreen** 4:5,5
**walgreens** 4:4
**walks** 22:16 24:25
**walmart** 3:16
  204:25
**want** 24:19 29:15
  30:12,18 31:3
  32:3 35:1 37:10
  38:25 40:11 42:17
  53:22,23 57:7
  67:12 71:5,23
  74:17 78:1,4
  95:24,25 125:3
  129:8 130:11
  133:17,22,24
  134:13,18 138:6
  153:7 155:16
  156:11 162:10
  167:6 168:12
  171:20 172:11
  176:10,23 184:1
  187:12 188:23
  189:24 190:16
  194:25 199:15
  201:9 204:18

**wanted** 61:10
  140:3 196:18
**wants** 57:13
**washington** 3:12
  194:8 195:11
  196:8,11,17,17
**waste** 37:11
**waterfront** 38:12
  71:3
**wave** 77:23 78:6
  78:10 94:11,12
  96:3 97:4,11
**waves** 76:4,14
  77:1 80:8 82:16
  82:18 94:2,7,18,21
  95:12,13 96:24
**way** 44:5 49:4
  50:24 54:4 66:8
  66:15 72:10 94:1
  95:1 100:25
  101:22 108:22
  126:17 128:17
  146:24 152:18
  174:20 205:18
**ways** 51:20 52:2
**we've** 11:4 27:14
  38:2 56:20 68:1
  80:14 81:24 119:4
  145:19 161:18
  170:18 172:20
  178:22
**weaving** 104:12
**website** 125:15
**week** 65:8 179:24
  181:24 182:23
  183:8,20,21
**weeks** 179:24
  182:23 183:2,20
**went** 17:20,21,25
  18:2

**west** 4:10 68:10
  70:6,6,16 85:5
  121:16,20 160:1
**western** 17:25
**white** 37:5 38:6
**wider** 130:21
**widespread** 41:10
  189:10
**willing** 39:20 81:2
  136:18
**witness** 6:14,19
  7:13,15,17,21 8:7
  10:10,20 40:15
  207:13 208:8,11
  209:1,4,11 210:1,4
  210:15
**witness'** 208:14
**wondering** 12:20
  105:3
**wood** 18:7
**word** 29:5,5 71:8
  71:10,12 73:18,22
  73:25 74:5,9,20,21
  77:7 111:6 138:12
  158:9 177:11
  200:6,9
**words** 21:23 31:7
  77:6 118:10 149:2
  149:3 150:1
  177:24 186:8
  188:21 193:3
**work** 14:9 20:20
  20:23 22:6 32:8
  51:12,16 52:22
  55:16,16,22 105:4
  107:16 108:11
  154:1 161:1
  196:20
**workable** 57:12
**worked** 26:21 54:3
  110:9 152:21

  153:2 169:2
**working** 56:6
  129:21 159:8
**world** 145:10
  168:14 185:9,15
**worry** 46:2
**write** 96:6 117:9
  139:18 163:14
  172:6 178:13
**writing** 14:11
**written** 75:18 83:8
  83:19 98:23 101:1
  102:2 174:21
**wrong** 19:19 30:22
  75:8 177:11
  182:22 200:9
**wrongdoing** 92:13
  92:17
**wrote** 84:3 106:2,2
  136:8,11

**y**

**yea** 160:25
**yeah** 27:22 29:23
  40:8 50:1 51:10
  53:24 54:11 57:8
  59:22 62:10 64:8
  65:3 66:5 76:11
  78:1,9 88:13 90:2
  94:25 95:23 97:10
  118:16 128:18
  130:18 140:17
  141:14 142:5
  148:4,21 157:19
  165:17 168:13
  173:4,6,9 176:25
  180:17,20,25
  181:5,7,7 187:14
  187:14 188:6
  191:8 195:4 200:2
  200:8 205:19

**[year - zuckerman.com]**                                              Page 43

**year**  75:13 76:23
  94:14 103:4,23
  116:20,24 117:19
  118:8,13,13 178:6
  180:7 182:24
  183:2,2,13,18,22
  184:15,24,25
  185:16,17 186:3
  188:1,2 191:23
**yearly**  184:24
  188:1
**years**  17:20 23:24
  92:7 104:15,16
  106:2 109:7,20
  110:7,18 112:7,19
  113:3 116:23,25
  117:18,20 118:7
  118:12,23 119:13
  126:7 132:5,5
  133:6 138:2 152:7
  152:22 153:23
  169:3 178:6
  186:25 187:3
**yesterday**  102:12
  150:19
**york**  4:20,20
**youth**  63:1

|                        **z**                        |

**z**  59:25 60:2
**zero**  87:21 132:11
  132:15
**zoom**  10:9 53:7,15
  58:7,10 62:7,11,14
  63:17,25 64:24
  145:6,11 190:3
**zuckerman**  3:9
**zuckerman.com**
  3:14

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.