Page 1

1              IN THE UNITED STATES DISTRICT COURT

2               FOR THE NORTHERN DISTRICT OF OHIO

3                       EASTERN DIVISION

4

5   IN RE: NATIONAL PRESCRIPTION  )
    OPIATE LITIGATION             )

6                                 )  MDL No. 2804
    THIS DOCUMENT RELATES TO:     )  Case No. 17-md-2804

7                                 )
    Track Three Cases             )

8

9

10

11

12

13

14

15        VIDEOTAPED DEPOSITION OF DEMETRA ASHLEY

16                  Conducted via Zoom

17                   Chicago, Illinois

18              Thursday, March 11th, 2021

19

20

21

22

23

24   REPORTED BY:  GREG S. WEILAND, CSR, RMR, CRR

25   JOB NO.:      4486738

Page 2

1

2

3

4                        March 11th, 2021

5                8:11 a.m. Central Standard Time

6

7           Videotaped Deposition of DEMETRA ASHLEY,

8     conducted via Zoom, taken before GREG S. WEILAND,

9     CSR, RMR, CRR, pursuant to the Federal Rules of

10    Civil Procedure for the United States District Court

11    pertaining to the taking of depositions, in the City

12    of Chicago, Cook County, Illinois, commencing at

13    8:11 o'clock a.m. Central Standard Time, on the

14    11th day of March, 2021.

15

16

17

18

19

20

21

22

23

24

25

```
 1   PRESENT:

 2

 3   ON BEHALF OF THE MDL PLAINTIFFS:

 4        SPANGENBERG SHIBLEY AND LIBER

 5        BY: MR. PETER H. WEINBERGER (via Zoom)

 6             1001 Lakeside Avenue East, Suite 1700

 7             Cleveland, Ohio 44114

 8             (216) 696-3232

 9             Email: Pweinberger@spanglaw.com

10

11        NAPOLI SHKOLNIK PLLC

12        BY: MR. HUNTER SHKOLNIK (via Zoom)

13             270 Luiz Munoz Avenue

14             Hato Rey, Puerto Rico 00919

15             (917) 544-0009

16                      - and -

17        NAPOLI SHKOLNIK PLLC

18        BY: MR. SALVATORE BADALA (via Zoom)

19             MR. JOSEPH L. CIACCIO (via Zoom)

20             400 Broadhollow Road, Suite 305

21             Melville, New York  11747

22             (212) 397-1000

23             Email: SBadala@napolilaw.com

24                    JCiaccio@napolilaw.com

25
```

```
                                              Page 4

1    PRESENT (CONTINUED):

2

3    ON BEHALF OF THE MDL PLAINTIFFS (continued):

4         SIMMONS HANLY CONROY

5         BY: MS. LAURA S. FITZPATRICK (via Zoom)

6              112 Madison Avenue

7              New York, New York 10016

8              (212) 784-6400

9              Email: lfitzpatrick@simmonsfirm.com

10

11        THE LANIER LAW FIRM

12        BY: MS. MILDRED CONROY (via Zoom)

13             126 East 56th Street, 6th Floor

14             New York, New York 10022

15             (212) 421-2800

16             Email: Mildred.Conroy@lanierlawfirm.com

17

18        MOTLEY RICE LLC

19        BY: MR. MICHAEL ELSNER (via Zoom)

20             MR. JAMES LEDLIE (via Zoom)

21             28 Bridgeside Boulevard

22             Mount Pleasant, South Carolina 29464

23             (843) 216-9252

24             Email: melsner@motleyrice.com

25                    jledlie@motleyrice.com
```

1    PRESENT (CONTINUED):

2

3    ON BEHALF OF THE MDL PLAINTIFFS (continued):

4         FARRELL AND FULLER

5         BY: MR. MICHAEL J. FULLER (via Zoom)

6              1311 Ponce De Leon, Suite 202

7              San Juan, Puerto Rico 00907

8              (939) 293-8244

9

10        MCHUGH FULLER LAW GROUP

11        BY: MR. A.J. ELKINS (via Zoom)

12             91 Elias Whiddon Road

13             Hattiesburg, Mississippi 39402

14             (601) 261-2220

15             Email: aj@mchughfuller.com

16

17

18

19

20

21

22

23

24

25

```
                                              Page 6
 1   PRESENT (CONTINUED):

 2

 3   ON BEHALF OF DEFENDANTS CVS PHARMACY, INC.;

 4   CVS INDIANA, LLC; CVS Rx SERVICES, INC.;

 5   CVS TN DISTRIBUTION, LLC; OHIO CVS STORES, LLC:

 6        ZUCKERMAN SPAEDER LLP

 7        BY: MR. GRAEME W. BUSH (via Zoom)

 8            MR. KYLE CRAWFORD (via Zoom)

 9            1800 M Street, N.W., Suite 1000

10            Washington, D.C. 20036-5807

11            (202) 778-1825

12            Email: gbush@zuckerman.com

13                   kcrawford@zuckerman.com

14

15   ON BEHALF OF DEFENDANTS GIANT EAGLE, INC.;

16   HBC SERVICE COMPANY:

17        MARCUS & SHAPIRA, LLP

18        BY: MR. PAUL M. MANNIX (via Zoom)

19            MR. SCOTT D. LIVINGSTON (via Zoom)

20            One Oxford Centre, 35th Floor

21            Pittsburgh, Pennsylvania 15219

22            (412) 338-5212

23            Email: PMannix@marcus-shapira.com

24                   DLivingston@marcus-shapira.com

25
```

```
                                              Page 7
 1   PRESENT (CONTINUED):

 2

 3   ON BEHALF OF DEFENDANT WALMART, INC.:

 4        JONES DAY

 5        BY: MR. NEAL STEPHENS (via Zoom)

 6             MR. VINCENT DOCTOR (via Zoom)

 7             1755 Embarcadero Road

 8             Palo Alto, California 94303

 9             (650) 739-3939

10             Email: nstephens@jonesday.com

11                    vdoctor@jonesday.com

12

13   ON BEHALF OF DEFENDANTS WALGREENS BOOTS ALLIANCE,

14   INC.; WALGREEN CO.; AND WALGREEN EASTERN CO., INC.:

15        BARTLIT BECK LLP

16        BY: MS. KATHERINE M. SWIFT (via Zoom)

17             54 West Hubbard Street, Suite 300

18             Chicago, Illinois 60654

19             (312) 494-4400

20             Email: kate.swift@bartlitbeck.com

21

22

23

24

25
```

```
                                                    Page 8
 1    PRESENT (CONTINUED):

 2

 3    ON BEHALF OF MCKESSON:

 4         COVINGTON & BURLING LLP

 5         BY: MR. CHRISTOPHER EPPICH (via Zoom)

 6              1999 Avenue of the Stars

 7              Los Angeles, California 90067-4643

 8              (424) 332-4764

 9              Email: ceppich@cov.com

10                        - and -

11         MS. MEGHAN MONAGHAN (via Zoom)

12              One CityCenter

13              850 Tenth Street, NW

14              Washington, DC  20001-4956

15              (202) 662-5531

16              Email: mmonaghan@cov.com

17

18    ON BEHALF OF HENRY SCHEIN, INC.:

19         LOCKE LORD LLP

20         BY: MS. MADELEINE E. BRUNNER (via Zoom)

21              2200 Ross Avenue, Suite 2800

22              Dallas, Texas 75201

23              (214) 740-8554

24              Email: maddie.brunner@lockelord.com

25
```

```
                                              Page 9
 1    PRESENT (CONTINUED):

 2

 3    ON BEHALF OF ALLERGAN:

 4         KIRKLAND & ELLIS LLP

 5         BY: MS. ERICA B. ZOLNER (via Zoom)

 6              300 North LaSalle Street

 7              Chicago, Illinois 60654

 8              (312) 862-3247

 9              Email: Erica.zolner@kirkland.com

10

11    ON BEHALF OF AMERISOURCEBERGEN DRUG CORPORATION:

12         REED SMITH LLP

13         BY: MS. ABIGAIL PIERCE (via Zoom)

14              1717 Arch Street, Suite 3100

15              Philadelphia, Pennsylvania 19103

16              (215) 241-7909

17              Email: Abigail.pierce@reedsmith.com

18

19    ON BEHALF OF CARDINAL HEALTH:

20         WILLIAMS & CONNOLLY LLP

21         BY: MR. BRADLEY MASTERS (via Zoom)

22              725 Twelfth Street, N.W.,

23              Washington, DC 20005

24              (202) 434-5182

25              Email: bmasters@wc.com
```

```
1    PRESENT (CONTINUED):

2

3    ON BEHALF OF EXPRESS SCRIPTS:

4         BAILEY & WYANT, PLLC

5         BY: MR. JUSTIN C. TAYLOR

6              500 Virginia Street East

7              Suite 600

8              Charleston, West Virginia 25301

9              (304) 720-0714

10             Email: Jtaylor@baileywyant.com.

11

12   ON BEHALF OF THE U.S. DEPARTMENT OF JUSTICE DRUG

13   ENFORCEMENT ADMINISTRATION AND THE WITNESS:

14        U.S. DEPARTMENT OF JUSTICE

15        BY: MR. DAVID M. SOBOTKIN (via Zoom)

16             MS. ALLISON CARROLL (via Zoom)

17             MR. J. ANDREW JACO (via Zoom)

18             Three Constitution Square

19             175 N Street, NE

20             Washington, D.C. 20002

21             (202) 353-1291

22             Email: David.M.Sobotkin@usdoj.gov

23                  Allison.C.Carroll@usdoj.gov

24                  James.A.Jaco@usdoj.gov

25
```

Page 11

1   PRESENT (CONTINUED):

2

3   ON BEHALF OF THE U.S. DEPARTMENT OF JUSTICE DRUG

4   ENFORCEMENT ADMINISTRATION AND THE WITNESS

5   (continued):

6        U.S. DEPARTMENT OF JUSTICE

7        BY: MR. JAMES R. BENNETT II (via Zoom)

8             MS. RENEE A. BACCHUS (via Zoom)

9             801 West Superior Avenue, Suite 400

10            Cleveland, Ohio 44113-1852

11            (216) 622-3988

12            Email: James.Bennett4@usdoj.gov

13                        - and -

14            MS. MARIAMA C. SPEARS (via Zoom)

15            8701 Morrissette Drive

16            Springfield, Virginia 22152

17            (571) 296-8713

18            Email: Mariama.C.Spears@usdoj.gov.

19

20   ALSO PRESENT:

21        MR. KURT HENSCHELL, The Videographer (via Zoom)

22        MR. JIM HOY (via Zoom)

23        MR. WILLIAM AUBEL (via Zoom)

24        MR. JONATHAN JAFFE (via Zoom)

25

Page 12

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 13

1                              INDEX

2    March 11th, 2021

3    TESTIMONY OF DEMETRA ASHLEY

4                                                 PAGE

5    Examination by Ms. Swift .........................21

6    Examination by Mr. Weinberger ...................102

7    Further Examination by Ms. Swift ................175

8    Examination by Mr. Bush .........................222

9    Further Examination by Mr. Weinberger ...........224

10   Further Examination by Ms. Swift ................229

11

12                       DEPOSITION EXHIBITS

13   NUMBER                 DESCRIPTION               PAGE

14   Plaintiff Exhibit 1                              105

15        Title 21, Code of Federal Regulations, Part

16        1301, Registration of Manufacturers,

17        Distributors, and Dispensers of Controlled

18        Substances, Bates labeled P-GEN-00187

19   Plaintiff Exhibit 2                              120

20        Document titled 012 - Holiday CVS, L.L.C.,

21        d/b/a CVS/Pharmacy Nos. 219 and 5195;

22        Decision and Order, Bates labeled P-GEN00216

23

24

25

Page 14

1            DEPOSITION EXHIBITS (CONTINUED)

2   NUMBER                 DESCRIPTION                 PAGE

3   Plaintiff Exhibit 3                               122

4         Registrant Actions - 2010, East Main Street

5         Pharmacy; Affirmance of Suspension Order,

6         Bates labeled P-GEN-00215

7   Plaintiff Exhibit 4                               135

8         Title 21 Code of Professional Regulations,

9         Part 1306.04 - Purpose of issue of

10        prescription, Bates labeled P-GEN-00174

11  Plaintiff Exhibit 5                               136

12        Title 21, Code of Federal Regulations, Part

13        1306.06, Bates labeled P-GEN-00220

14  Plaintiff Exhibit 6                               160

15        Settlement Agreement, P-OD-WAG-00248, Bates

16        labeled CVS-MDLT1-000060796 through 000060804

17  Plaintiff Exhibit 7                               162

18        Document titled United States Reaches $22

19        Million Settlement Agreement With CVS For

20        Unlawful Distribution Of Controlled

21        Substances, Bates labeled P-GEN-00221

22

23

24

25

Page 15

1            DEPOSITION EXHIBITS (CONTINUED)

2    NUMBER                  DESCRIPTION                    PAGE

3    Plaintiff Exhibit 8                                    163

4         Document titled United States Reaches $8

5         Million Settlement Agreement with CVS for

6         Unlawful Distribution of Controlled

7         Substances, Bates labeled P-GEN-00222

8    Plaintiff Exhibit 9                                    165

9         Settlement Agreement, P-OD-WAG-00249, Bates

10        labeled CVS-MDLT1-000060805 through 000060811

11   Plaintiff Exhibit 10                                   168

12        Document titled Walgreens Agrees To Pay A

13        Record Settlement Of $80 Million For Civil

14        Penalties Under The Controlled Substances

15        Act, Bates labeled P-GEN-00224

16   Plaintiff Exhibit 11                                   170

17        Settlement and Memorandum of Agreement,

18        P-WAG-0001, not Bates labeled sequentially,

19        349 pages

20

21

22

23

24

25

Page 16

1              DEPOSITION EXHIBITS (CONTINUED)

2    NUMBER                  DESCRIPTION                PAGE

3    Defendant Exhibit 1                                 26

4          PowerPoint titled Pharmacy Track, Drug

5          Enforcement Administration Regulations

6          Update, Bates labeled US-DEA-00001329

7          [document produced natively]

8    Defendant Exhibit 2                                 28

9          PowerPoint titled Combating Pharmaceutical

10         Diversion: Targeting "Rogue Pain Clinics" &

11         "Pill Mills," Bates labeled US-DEA-00001434

12         [document produced natively]

13   Defendant Exhibit 3                                 36

14         Document titled Ten Defendants Charged with

15         Drug Trafficking Conspiracy Alleging

16         Prescription Drug Fraud, no Bates labels, 3

17         pages

18   Defendant Exhibit 4                                 38

19         Document titled Cases Against Doctors, no

20         Bates labels, 272 pages

21   Defendant Exhibit 5                                 41

22         Statement of Demetra Ashley Before the

23         Judiciary Committee, United States Senate,

24         Presented December 12, 2017, no Bates labels,

25         9 pages

Page 17

1              DEPOSITION EXHIBITS (CONTINUED)

2   NUMBER                   DESCRIPTION                  PAGE

3   Defendant Exhibit 6                                    45

4        Transcript, Hearing Before the Committee on

5        the Judiciary, House of Representatives,

6        May 8, 2018, Bates labeled DEF-19592.00001

7        through 00067

8   Defendant Exhibit 7                                    53

9        Photograph, Walgreens safe medication

10       disposal drop box, no Bates label, 1 page

11  Defendant Exhibit 8                                    55

12       Pharmacist's Manual, An Informational Outline

13       of the Controlled Substances Act, no Bates

14       labels, 129 pages

15  Defendant Exhibit 9                                    70

16       PowerPoint titled Drugs, Drugs, & More Drugs,

17       no Bates labels, 16 pages

18  Defendant Exhibit 10                                   77

19       Email, with attachment, Bates labeled

20       US-DEA-00002668 through 00002692

21  Defendant Exhibit 11                                   79

22       Email, with attachment, Bates labeled

23       US-DEA-00005955 through 00005983

24

25

Page 18

1            DEPOSITION EXHIBITS (CONTINUED)

2    NUMBER                DESCRIPTION                PAGE

3    Defendant Exhibit 12                              85

4        Emails, Bates labeled US-DEA-00008525 through

5        00008531

6    Defendant Exhibit 13                              85

7        Stakeholders' Challenges and Red Flag Warning

8        Signs Related to Prescribing and Dispensing

9        Controlled Substances, no Bates labels, 17

10       pages

11   Defendant Exhibit 14                              89

12       Letter dated July 12, 2019, Bates labeled

13       WMT_MDL_000071341 through 000071342;

14       CVS-MDLT3-000094465 through 000094472

15   Defendant Exhibit 15                              93

16       Federal Register, 21 CFR Part 1306, no Bates

17       labels, 9 pages

18   Defendant Exhibit 16                             100

19       Letter dated April 24, 2018, Bates labeled

20       DEA-T1BCC-00000117 through 00000121

21

22

23

24

25

Page 19

1              DEPOSITION EXHIBITS (CONTINUED)

2    NUMBER                    DESCRIPTION                    PAGE

3    Defendant Exhibit 17                                     189

4         Statement of Susan C. Langston Before the

5         Controlled Substance Standards Committee,

6         Florida Board of Pharmacy, Presented on

7         August 10, 2015, Bates labeled

8         US-DEA-00008287 through 0008287.0005

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 20

1           THE VIDEOGRAPHER:  Okay.  We're on the

2      record.  Today's date is March 11, 2021.  The

3      time is 8:11.

4           This is the matter of the National

5      Prescription Opiate Litigation.  Appearances

6      will be noted on the stenographic record.  The

7      witness is located in Chicago.

8           Court reporter, please swear in the

9      witness.

10           THE STENOGRAPHER:  Good morning,

11      Counselors.  My name is Greg Weiland.  I'm a

12      licensed Certified Shorthand Reporter working

13      in association with Veritext Legal Solutions.

14           Due to the severity of COVID-19 and

15      following the practice of social distancing, I

16      will not be in the same room with the witness.

17      Instead, I will swear the witness and will

18      stenographically record this deposition

19      remotely via Zoom.

20           Do all parties stipulate to the validity

21      of the remote swearing as if it had been

22      conducted following Rule 30 of the Federal

23      Rules of Civil Procedure and the state's rules

24      where this action is pending?

25           MS. SWIFT:  Yes, for defendants.

Page 21

1          MR. WEINBERGER:  On behalf of the
2     plaintiffs, yes.
3                    (Witness sworn.)
4                    DEMETRA ASHLEY
5    after being first duly sworn, testified as follows:
6                       EXAMINATION
7    BY MS. SWIFT:
8       Q.   Good morning, Ms. Ashley.  My name is Kate
9    Swift, and I represent Walgreens.
10             Thank you for being here with us today.
11             My first question for you is do you live
12    and work in Chicago?
13       A.   Yes.
14       Q.   If I understand your resumé correctly, you
15    worked at the Drug Enforcement Administration for
16    more than 30 years; is that right?
17       A.   Yes.
18       Q.   Did you work as a DEA diversion
19    investigator in both Detroit and Chicago for a
20    number of years?
21       A.   Yes.
22       Q.   Were you also head of the Chicago field
23    division for the DEA for a number of years?
24       A.   For diversion, yes.
25       Q.   In that role as head of DEA's Chicago

1    Field Division Office for Diversion, were you in

2    charge of diversion control for five states?

3          A.   Yes.

4          Q.   Is that what you were doing from around

5    2007 until 2015?

6          A.   Yes.

7          Q.   I understand you also worked at DEA

8    headquarters for a number of years in different

9    roles; is that right?

10         A.   Yes.

11         Q.   Were you the acting assistant

12   administrator of DEA's Office of Diversion Control

13   for a period of time?

14         A.   Yes.

15         Q.   Does that mean you were the second or

16   third highest-level executive in the Office of

17   Diversion Control?

18              MR. WEINBERGER:  Objection, form.

19   BY MS. SWIFT:

20         Q.   You can answer.

21         A.   Oh.  So there were -- at my level, there

22   were seven of us.  So three levels down, but there

23   were seven us at my same level, yeah.

24         Q.   That was a senior executive role?

25         A.   Senior executive, correct.

Page 23

1      Q.    When did you leave the DEA?

2      A.    March of 2018.

3      Q.    Since leaving the DEA in 2018, have you

4   had your own consulting business?

5      A.    Yes.

6      Q.    Now, I understand you gave another

7   deposition in this litigation in March of 2019; is

8   that correct?

9      A.    Yes.

10      Q.    You testified that you had done some

11   consulting work for Purdue Pharma after leaving the

12   DEA.

13          When was the last time you did any work

14   for Purdue?

15      A.    I think I need to make a correction.  I

16   didn't actually do any work.  I did sign a contract,

17   but I signed the contract in -- I don't even

18   remember -- November of 2018 and terminated in March

19   of 2019.

20      Q.    So is it fair to say you never did any

21   actual consulting work for Purdue?

22      A.    Correct.

23          MR. WEINBERGER:  Objection, form.

24   BY MS. SWIFT:

25      Q.    You can answer.

```
                                              Page 24
 1        A.    Correct.
 2        Q.    Have you ever done any consulting work for
 3   Walgreens?
 4        A.    No.
 5        Q.    Have you ever done any consulting work for
 6   CVS?
 7        A.    No.
 8        Q.    Have you ever done any consulting work for
 9   Walmart, Rite Aid, or Giant Eagle Pharmacy?
10        A.    No.
11        Q.    Have you ever done any consulting work for
12   any chain pharmacy?
13        A.    No.
14        Q.    I'd like to ask you some questions about
15   your understanding and knowledge about DEA's roles
16   and responsibilities.
17             Is it correct to say that the DEA
18   regulates medications classified as controlled
19   substances?
20        A.    Yes.
21             MR. WEINBERGER:  Objection.  I just want
22        to be clear that the witness is here testifying
23        in her personal recollection.  She's not a DEA
24        witness, so you may just want to rephrase that
25        question.
```

Page 25

1          MS. SWIFT:  Before I do, Greg, I just
2      noticed that I'm not getting the realtime.  Let
3      me refresh and see if it comes back.
4          MR. WEINBERGER:  Yeah, neither am I.
5          MS. SWIFT:  I've got it.  I just hit
6      refresh and it came back.  Maybe that will
7      help, Pete.
8          MR. WEINBERGER:  Go ahead.
9  BY MS. SWIFT:
10     Q.   Ms. Ashley, in your experience, with more
11 than 30 years at the DEA, is it your understanding
12 the DEA regulates medications that are classified as
13 controlled substances?
14     A.   Yes.
15     Q.   Does that include prescription opioid
16 medications such as oxycodone?
17     A.   Yes.
18     Q.   Does the DEA, in your experience, register
19 and oversee doctors and other prescribers who write
20 prescriptions for opioid medications?
21     A.   Yes.
22          MR. WEINBERGER:  Objection as to
23      "oversee."
24  BY MS. SWIFT:
25     Q.   Can a doctor write a prescription for an

Page 26

1    opioid medication without a DEA registration?

2        A.    No.

3        Q.    Do prescribers have to renew their DEA

4    registration on a regular basis?

5        A.    Yes.

6        Q.    Do you recall how often prescribers have

7    to renew their DEA registration?

8        A.    Every three years.

9        Q.    Can the DEA revoke a doctor's registration

10   to prescribe opioids if DEA determines that that

11   prescriber's doing so is not in the public interest?

12       A.    Yes.

13       Q.    Can the DEA investigate and recommend

14   criminal charges against doctors who write

15   illegitimate prescriptions for opioids?

16       A.    Yes.

17       Q.    All right.  I'd like you to take a look at

18   the envelope that says Exhibit Q on the front of it,

19   please.  You can go ahead and open that one.

20            MS. SWIFT:  This will be Exhibit 1 to

21       Ms. Ashley's deposition.

22                    (Defendant Exhibit 1 was marked

23                     for identification.)

24   BY MS. SWIFT:

25       Q.    Do you have that in front of you,

Page 27

1    Ms. Ashley?

2           A.    Yes.

3           Q.    This is a PowerPoint presentation that you

4    gave when you were the associate deputy assistant

5    administrator for DEA, correct?

6           A.    Yes.

7           Q.    I'll represent to you that we can tell

8    from the metadata, it was -- that the file is from

9    2016.

10          Do you recall that this is a presentation

11   you gave in 2016 when you were a senior executive at

12   the DEA?

13          A.    Do I recall it?  No, but --

14          Q.    Does that sound right to you based on --

15          A.    Yeah, it sounds right.

16          Q.    Okay.  Got it.

17          Right now I just have one question for you

18   about this document, and it's -- if you'll take a

19   look at Page 12.  There are page numbers at the

20   bottom right-hand corner of each slide.

21          A.    12, yeah.

22          Q.    You said in your presentation in 2016,

23   "Prescription drug abuse is driven by indiscriminate

24   prescribing, criminal activity."

25          Do you agree with that statement today?

Page 28

1      A.    Say that again.  It says it where?

2            Oh, what you just read, "Prescription drug

3   abuse is driven by indiscriminate prescribing" --

4   well, yeah, it's two separate things.  But, yes, I

5   do, yes.

6      Q.    Do you agree that indiscriminate

7   prescribing drove prescription drug abuse?

8            MR. WEINBERGER:  Objection.

9            THE WITNESS:  That's part of it.  I agree

10       that it's part of it.

11  BY MS. SWIFT:

12     Q.    Do you agree that criminal activity is

13  also part of what drove prescription drug abuse?

14           MR. WEINBERGER:  Objection.

15           THE WITNESS:  Yes.

16  BY MS. SWIFT:

17     Q.    You can set that one aside for now, and

18  I'll ask you to open the envelope that says

19  Exhibit S.

20           MS. SWIFT:  This will be Exhibit 2 to

21       Ms. Ashley's deposition.

22                   (Defendant Exhibit 2 was marked

23                    for identification.)

24  BY MS. SWIFT:

25     Q.    Ms. Ashley, do you recognize what I've

Page 29

1    marked as Exhibit 2 to your deposition?

2         A.    Do I recognize it?  Yes.

3         Q.    This is another PowerPoint presentation.

4    And you can see on the first slide, it says that it

5    is from a presentation in June of 2013 called

6    "Prescription Drug Awareness Conference" in Chicago,

7    Illinois.

8              Correct?

9         A.    Yes.

10        Q.    This is a presentation that you gave; is

11   it not?

12        A.    I'm not a hundred percent certain.

13        Q.    Did you give presentations like this in

14   the 2013 time frame?

15        A.    Yes, but because this says "Operations

16   Division," I don't think I gave this one.

17        Q.    You were in charge of DEA's Chicago field

18   division at the time in 2013; is that right?

19        A.    Yes.

20             MR. WEINBERGER:  Objection.

21   BY MS. SWIFT:

22        Q.    The Page 1 of this presentation that I

23   marked as Exhibit 2, the title says "Combating

24   Pharmaceutical Diversion:  Targeting 'Rogue Pain

25   Clinics' and 'Pill Mills.'"

1                What is a rogue pain clinic?

2           A.    It's a clinic where they are likely

3    operating, we used to call them, pill mills, where

4    there's, you know, lines out the door and physicians

5    are writing prescriptions, you know, for no

6    legitimate medical need, like, they're not --

7    they're not within compliance of the Controlled

8    Substances Act.

9           Q.    Is a pill mill the same thing as a rogue

10   pain clinic, in your understanding?

11          A.    Pretty much, yeah.

12          Q.    At rogue pain clinics and pill mills, is

13   it your understanding, from your experience at the

14   DEA, that doctors were both writing and dispensing

15   pain medications without a legitimate medical

16   purpose?

17          A.    Yes, on some occasions, yes.

18          Q.    On Page 2 of the slide deck that I marked

19   as Exhibit 2, it has the heading Outline.

20                Do you see that?

21          A.    Yes.

22          Q.    The second bullet point says, "Pill Mills

23   on the Move ... Everywhere."

24                Based on your experience at DEA, is it

25   true that pill mills were a problem all over the

                                                  Page 31

1    country in this time frame?

2         A.   Yeah, I think so, yes.

3         Q.   Was that true in 2011, 2012, 2013, that

4    pill mills were a problem all over the country?

5         A.   I believe so, yes.

6         Q.   You already testified that rogue pain

7    clinics are basically the same thing as pill mills.

8              Is it fair to say that rogue pain clinics

9    were also a problem all over the country in the

10   2011, 2012, 2013 time frame?

11        A.   I believe so.

12        Q.   Would you agree that rogue pain clinics

13   and pill mills were a big part of the prescription

14   opioid problem in the 2011, 2012, 2013 time frame?

15             MR. WEINBERGER:  Objection.

16             THE WITNESS:  Does that mean answer?

17   BY MS. SWIFT:

18        Q.   You can answer.

19        A.   Yes.  I believe it was part of the

20   problem, yes.

21        Q.   This -- this slide in Exhibit 2 is

22   followed by a number of pages with pictures of pill

23   mills and rogue pain clinics.

24             Would you agree with that?

25        A.   It is, yes.

1      Q.   And those pictures show what I think you

2  were describing a moment ago, people lined up

3  outside the door.

4           Is it your understanding that these are

5  pictures of people lined up to obtain prescription

6  opioids from doctors without a legitimate medical

7  purpose?

8      A.   Yes.

9      Q.   Then if you turn to Page 39 of Exhibit 2,

10  39 has a heading that says, "What Authorities are

11  Doing to Target the Problem."

12          Do you see that?

13     A.   Yes.

14     Q.   Then on Slide 40, there's a map of the

15  United States, and the heading of the slide says,

16  "Status of State Prescription Drug Monitoring

17  Programs."

18          Do you see that?

19     A.   Yes.

20     Q.   What are Prescription Drug Monitoring

21  Programs, based on your experience at DEA?

22     A.   Those are monitoring programs set up by

23  each state to monitor the prescriptions, the

24  controlled substance prescriptions, the transactions

25  from pharmacies.

1    Q.   Do pharmacies typically have to report the
2  controlled substance prescriptions that they fill to
3  their state prescription monitoring program?
4    A.   They have recently.  I mean, well, it's
5  been a number of years now, but yes.
6    Q.   How do state prescription monitoring
7  programs help prevent diversion, in your experience?
8    A.   They have -- it's a monitoring, so they
9  have state employees, investigators, and, you know,
10  different sections in state organizations that sort
11  of take a look at the prescription drug
12  transactions, and it helps them to address if they
13  see an issue bubbling up.
14    Q.   Would you agree that State Prescription
15  Drug Monitoring Programs have helped to reduce
16  illegitimate prescriptions around the country?
17    A.   Has it helped?  I think they've been
18  effective.
19    Q.   Would you agree that State Prescription
20  Drug Monitoring Programs have helped prevent
21  diversion of prescription opioids?
22    A.   Somewhat.  Not totally.
23    Q.   Would you agree that DEA and local law
24  enforcement have greater access to the data that is
25  housed in prescription monitoring program databases,

1   greater access than doctors and pharmacists have?

2            MR. WEINBERGER:  Objection.

3            THE WITNESS:  Oh, I'm sorry.

4            MR. WEINBERGER:  Withdraw the objection.

5            THE WITNESS:  No, they don't.

6   BY MS. SWIFT:

7       Q.   Do you understand that a pharmacist can

8   only look up information for a particular patient in

9   a Prescription Drug Monitoring Program in the course

10  of filling that patient's prescription?

11           MR. WEINBERGER:  Objection, form.

12           THE WITNESS:  No, that's not my

13      understanding.

14  BY MS. SWIFT:

15      Q.   Okay.  Do you know one way or the other?

16           MR. WEINBERGER:  Objection, form.

17           THE WITNESS:  I have an understanding,

18      yeah, I think, yes.

19  BY MS. SWIFT:

20      Q.   What is your understanding?

21      A.   They can also look up the physician, the

22  physicians prescribing --

23      Q.   Do you --

24      A.   -- and not just the patient.

25      Q.   Do you have an understanding that a

Page 35

1    pharmacist filling a prescription cannot look up a

2    physician independent of a particular prescription?

3         A.   Yes.

4         Q.   If you'll turn to Page 46 of Exhibit 2,

5    this is still in the section of this PowerPoint on

6    what authorities are doing to target the problem of

7    rogue pain clinics and pill mills, Slide 46 has the

8    heading "Targeting the Pill Mills:  Sources of

9    Complaints."

10             Do you see that?

11        A.   Yeah, I'm sorry.  I turned it to the wrong

12   page.

13             Okay.  I have it now, yes.

14        Q.   Do you see the heading "Targeting the Pill

15   Mills:  Sources of Complaints"?

16        A.   Yes.

17        Q.   Pharmacy employees is at the top of the

18   list and highlighted.

19             Do you see that?

20        A.   Yes.

21        Q.   Do you agree, based on your 30-plus years

22   at DEA, that pharmacy employees have been an

23   important source of cooperation and assistance in

24   investigations of pill mills over the years?

25        A.    I believe they have been an important

1   source, yes.

2        Q.   Is that true all over the country, that

3   pharmacy employees are a key source of complaints

4   about bad doctors and pill mills?

5        A.   I can say they're a valuable source.  Are

6   they a key source?  I don't know how often that is.

7   I mean, no.

8        Q.   Would you agree, based on your experience

9   at DEA, that DEA has investigated hundreds and

10  hundreds of doctors for improper prescribing of

11  prescription opioids?

12       A.   Yes.

13       Q.   And now I'd like you to open the envelope

14  that is marked KK.

15            MS. SWIFT:  It will be Exhibit 3 to

16       Ms. Ashley's deposition.

17                      (Defendant Exhibit 3 was marked

18                       for identification.)

19  BY MS. SWIFT:

20       Q.   Ms. Ashley, Exhibit 3 is a 272-page list

21  that I printed out from the DEA's website.  You can

22  see at the top of the first page it says, "Cases

23  Against Doctors."

24            Do you see that?

25       A.   Yes.

1      Q.   And beneath that it says, "This is a

2  listing of investigations of physician registrants

3  in which DEA was involved that resulted in the

4  arrest and prosecution of the registrant."

5           Do you see that?

6      A.   Yes.

7      Q.   If you flip through it, you can see that

8  the doctors listed in this Exhibit 3 are from all

9  over the country.

10          Do you see that?

11     A.   Yes.

12     Q.   And -- oh, this one isn't numbered.

13  Shoot.  I'll show it to you on the screen.  Let's

14  see.

15          Do you have access to the Exhibit Share,

16  or do I need to share this with you on the Zoom?

17     A.   I have access to it, but I -- I'll

18  probably screw it up.

19     Q.   You haven't pulled it up.  That's okay.

20          And, actually, the version on the

21  Exhibit Share is incorrect.  Oh, I marked the wrong

22  exhibit.  Hold on one moment.  I marked Exhibit K

23  instead of Exhibit KK.

24          MS. SWIFT:  So then, for the record,

25      Exhibit KK is going to be Exhibit 4.  My

```
                                                        Page 38
 1         apologies.
 2                         (Defendant Exhibit 4 was marked
 3                          for identification.)
 4    BY MS. SWIFT:
 5         Q.   Let me see if I can show this to you on
 6    the screen, Ms. Ashley.
 7              All right.  Can you see that on the
 8    screen?
 9         A.   Yes.
10         Q.   I'm going to go to, if I can, Page 24.
11              And do you see on Page 24, there's an Ohio
12    doctor referenced, Dr. Broadnax?
13         A.   Yes.
14         Q.   It says that Dr. Broadnax -- let me scroll
15    here.
16              You can see that Dr. Broadnax was
17    sentenced to five years' probation and ordered to
18    pay $145,000 in restitution.
19              Do you see that?
20         A.   Yes.
21         Q.   And in the right-hand column of this DEA
22    document, it says that he pleaded guilty to writing
23    prescription for Oxycontin and Percocet to people
24    who were not his patients and didn't need the
25    medication.
```

```
 1              And that's just one example in this
 2   272-page listing marked as Exhibit 4.
 3              Do you see that?
 4       A.    Yes.
 5              MR. WEINBERGER:  Objection.
 6   BY MS. SWIFT:
 7       Q.    Ms. Ashley, have you seen documents like
 8   the 272-page listing I've marked as Exhibit 4 in
 9   your time at DEA?
10              MR. SOBOTKIN:  Objection.
11              You can answer.
12              THE WITNESS:  Oh, I said yes.  I'm sorry.
13              MR. SOBOTKIN:  I'm sorry.  I didn't --
14   BY MS. SWIFT:
15       Q.    Do you know whether this listing of cases
16   against doctors that I marked as Exhibit 4 is
17   comprehensive?
18              MR. SOBOTKIN:  Objection.
19              MR. WEINBERGER:  Objection.
20              THE WITNESS:  I don't.
21   BY MS. SWIFT:
22       Q.    I'll represent to you that it does not
23   include anything about a Dr. Adolph Harper, another
24   Ohio doctor.
25              Have you ever heard of Dr. Harper?
```

1     A.    No.

2           MR. SOBOTKIN:   Objection.  I'm going

3       to ...

4   BY MS. SWIFT:

5     Q.    Would you agree, based on your career at

6   DEA, that DEA's crackdown on bad doctors, rogue pain

7   clinics, and pill mills helped reduce illegitimate

8   prescriptions being filled?

9     A.    Help to reduce it, yeah, I imagine so,

10  yes.

11    Q.    Would you agree with me that DEA's

12  crackdown on bad doctors, rogue pain clinics, and

13  pill mills helped prevent diversion?

14    A.    Yes.

15    Q.    You understand that DEA ultimately, in

16  around the 2016 or 2017 time frame, decreased the

17  amount of opioids that could be legally manufactured

18  for a legitimate use in the United States; is that

19  right?

20          MR. SOBOTKIN:   Objection, outside the

21      Touhy authorization.

22          MS. SWIFT:  I'm sorry, David.  I'm having

23      a hard time hearing you.

24          I'll withdraw the question and ask another

25      one.

Page 41

1    BY MS. SWIFT:

2         Q.   Ms. Ashley, can you pull out Exhibit E

3    from your set of exhibits.

4              MS. SWIFT:  This will be Exhibit 5 to the

5         deposition.

6                        (Defendant Exhibit 5 was marked

7                        for identification.)

8              THE WITNESS:  Got it.

9    BY MS. SWIFT:

10        Q.   Ms. Ashley, do you recognize what I marked

11   as Exhibit 5 as a statement that you gave to the

12   Senate Judiciary Committee in 2017?

13        A.   Okay.  Yes.

14        Q.   If you turn to Page 4, I'd like to ask you

15   about your statement in the bottom paragraph.

16             You told the Senate Judiciary Committee

17   that "Since 2014, DEA has observed a decline in

18   prescriptions written for certain Schedule II

19   opioids."

20             Is that right?

21        A.   That's right.

22        Q.   Would you agree that doctors, in general,

23   stopped writing so many opioid prescriptions in that

24   time frame, not just bad doctors who may have been

25   operating out of a pill mill or a pain clinic, a

1  rogue pain clinic?  Would you agree with that?

2          MR. SOBOTKIN:  Objection.

3          MR. WEINBERGER:  Objection.

4          THE WITNESS:  Yeah, it's likely, yes.

5      Yes.

6  BY MS. SWIFT:

7      Q.   Then in your statement to the Senate

8  Judiciary Committee, you also said that "These

9  declines directly impacted the factors DEA considers

10 when establishing the APQs for Schedule II opioids."

11          What are APQs?

12     A.   That's the aggregate production quota.

13 It's the quota.

14     Q.   Is that a reference to the amount of

15 opioids that the DEA allows to be legally

16 manufactured every year?

17          MR. SOBOTKIN:  Objection.

18          MR. WEINBERGER:  Objection as to the scope

19      of this deposition.

20          We were notified by the Department of

21      Justice as to what the scope of this deposition

22      would be.  And this is way beyond that scope

23      and was, I believe, covered in the first

24      deposition.

25          Note my continuing objection to this line

Page 43

1       of questioning.

2             MS. SWIFT:  It wasn't covered in the first

3       objection [sic], I believe because of

4       plaintiffs' objections to it.  And the Touhy

5       authorization, which I'm looking at,

6       specifically authorized testimony about the

7       role and responsibilities of DEA, and this is a

8       question directly related to that.

9             And the only question is whether APQs, or

10      aggregate production quotas, is a reference to

11      the amount of opioid medications that the DEA

12      allows to be legally manufactured each year.

13            MR. WEINBERGER:  Objection.

14            THE WITNESS:  Am I answering now?

15            MR. SOBOTKIN:  You can answer that one.

16            THE WITNESS:  Oh, okay.

17            It's -- I guess I wouldn't phrase it in

18      that way.  It's a determination of legitimate

19      need.  So I guess that's one of the factors,

20      the amount of prescriptions that are written.

21      That's only one part.

22  BY MS. SWIFT:

23      Q.   But the quota that the DEA sets each

24  year --

25      A.   Yeah.

Page 44

1      Q.    -- does that set a limit on how many

2    opioids can be legally manufactured in the

3    United States?

4              MR. WEINBERGER:  Objection.

5              THE WITNESS:  Yeah, but it's more complex

6         than that.  But, yes, ultimately, yes.

7    BY MS. SWIFT:

8      Q.    Following the decrease in doctors writing

9    prescriptions for opioids, DEA reduced the amount of

10   opioids that could be manufactured each year,

11   correct?

12     A.    Yeah.  But, again, that's part of the

13   consideration.  But, yes, that did happen.

14     Q.    In your statement to the Senate Judiciary

15   Committee that I marked as Exhibit 5, you said, "In

16   October 2016, DEA announced a 25 percent reduction

17   (or more) in the 2017 APQs," or quotas, "for many

18   prescription opioids, including oxycodone,

19   hydrocodone, fentanyl, hydromorphone, and morphine,"

20   correct?

21     A.    Correct.

22     Q.    You went on to say that "Hydrocodone was

23   reduced to 66 percent of the previous years' (2016)

24   level," correct?

25     A.    Correct.

Page 45

1        Q.    We've talked a bit about bad doctors,

2   rogue pain clinics, and pill mills that drove

3   illegitimate prescribing and dispensing in the 2010

4   to 2013 time frame.

5             I'd like to now ask you about your

6   understanding of DEA's views about other doctors,

7   the ones who were trying to do right by their

8   patients.

9             And for that, I'd like you to take out

10  envelope -- the envelope marked J, as in jolly.

11            MR. WEINBERGER:  Objection to the

12       statement of counsel.

13            MS. SWIFT:  I'm sorry, it's actually JJ.

14       My apologies.

15            MR. WEINBERGER:  Objection to the

16       introductory statement of counsel.

17            THE WITNESS:  I have it.

18                      (Defendant Exhibit 6 was marked

19                       for identification.)

20  BY MS. SWIFT:

21       Q.    Do you have that in front of you,

22  Ms. Ashley?

23       A.    Yes.

24       Q.    Do you see that what I've marked as

25  Exhibit 6 is a hearing transcript from the Committee

1    on the Judiciary of the House of Representatives and

2    Congress from May of 2018?

3            A.    Okay.

4            Q.    And if you look at Page 3, the Table of

5    Contents, you can see that the witnesses who

6    testified, the first one on the list is Robert W.

7    Patterson, acting administrator, Drug Enforcement

8    Administration.

9                  Do you see that?

10           A.    Yes.

11           Q.    Turn, if you would, please, to Page 32 of

12   this hearing transcript that I marked as Exhibit 6.

13                 Do you see close to the top of the page

14   where it says "Mr. Patterson"?

15           A.    Yes.

16           Q.    And Mr. Patterson testified -- I'm not

17   going to read that entire paragraph, but do you see

18   that at the end of that paragraph, the last sentence

19   right before Mr. Sensenbrenner starts speaking?

20                 Do you see that?

21           A.    Yes.

22           Q.    Mr. Patterson testified, "I look at the

23   vast majority of doctors: 99.99 percent are all

24   trying to do right by their patients."

25                 Do you agree with that statement, based on

Page 47

1    your experience at DEA?

2              MR. WEINBERGER:  Objection.

3              THE WITNESS:  I believe the vast majority,

4        yes, are trying to do the right thing, yes.

5    BY MS. SWIFT:

6        Q.   When those doctors write prescriptions for

7    opioid medication to take care of their patients, it

8    is appropriate for pharmacists to fill those

9    prescriptions.

10             Would you agree with that?

11             MR. WEINBERGER:  Objection.

12             THE WITNESS:  I'm sorry, could you repeat

13       that?

14   BY MS. SWIFT:

15       Q.   Sure.

16             When those vast majority of doctors who

17   are trying to do right by their patients, when they

18   write prescriptions for opioid medications, would

19   you agree that it's appropriate for pharmacists to

20   fill those legitimate prescriptions?

21             MR. WEINBERGER:  Objection.

22             MR. SOBOTKIN:  Renew my objection.

23             THE WITNESS:  Sure, if they make an

24       independent judgment, yeah.  Yes.

25

Page 48

1    BY MS. SWIFT:

2        Q.    And, in fact, would you also agree that

3    part of DEA's mission is to ensure an adequate

4    supply of controlled substance medications,

5    including opioids, to meet the legitimate medical

6    needs of patients?

7                MR. WEINBERGER:  Objection.

8                THE WITNESS:  Yes.

9    BY MS. SWIFT:

10       Q.    Would you agree, Ms. Ashley, that, even if

11   a doctor does right by her patients and writes a

12   legitimate prescription, and the pharmacist properly

13   fills that prescription in her professional judgment

14   that it is a legitimate prescription, even if those

15   things both happen, it is still possible for that

16   medication to get into the wrong hands through no

17   fault of the pharmacist or the doctor?

18               MR. SOBOTKIN:  Objection.

19               MR. WEINBERGER:  Objection.

20               THE WITNESS:  That is possible, yes.

21   BY MS. SWIFT:

22       Q.    All right.  Turn back to what was -- it

23   was in Exhibit Q, so you took it out of the

24   envelope.  I'll tell you what it is on the first

25   page.

1    A.    I tried to keep them organized.  Let's

2  see.

3    Q.    This is the one marked as Exhibit 1, and

4  it's your PowerPoint presentation that says,

5  "Pharmacy Track, Drug Enforcement Administration,

6  Regulations Update" on the first page.  It's got a

7  green and blue banner.

8    A.    This one, yes.

9    Q.    Yes, that's it.

10        MR. WEINBERGER:  What page are we on?

11        MS. SWIFT:  I was about to tell you.

12      We're going to go to Page 10 of Exhibit 1.

13        MR. SOBOTKIN:  I'm just going to object,

14      just briefly, to the characterization of this

15      as Ms. Ashley's PowerPoint.  I think there was

16      some hedging on whether she recalled giving

17      this presentation or not.

18        MS. SWIFT:  That was a different one,

19      David.  You can see on the first page of this

20      one it says, "Presenter:  Demetra Ashley."

21        MR. SOBOTKIN:  Sure.

22  BY MS. SWIFT:

23    Q.    Okay.  Ms. Ashley, are you on Page 10 of

24  Exhibit 1?

25    A.    Yes.

1      Q.   And I should ask you, do you recall giving
2  this presentation?
3      A.   I don't specifically recall giving it, but
4  I'm familiar with this.  I think -- I'm pretty
5  certain it's me, yeah, that gave this.
6      Q.   On Page 10 --
7      A.   But I --
8           (Simultaneous speaking.)
9  BY MS. SWIFT:
10      Q.   Understood.
11           On Page 10 of your presentation marked as
12  Exhibit 1, you wrote, "Most Frequent Method of
13  Obtaining Pharmaceutical Controlled Substance for
14  Nonmedical Use.  Friends and Family ... For Free."
15           Correct?
16      A.   Yes.
17           MR. SOBOTKIN:  Objection.
18  BY MS. SWIFT:
19      Q.   Would you agree with me that those
20  prescriptions that people may obtain from their
21  friends or their family, those prescriptions may
22  have been legitimately written?
23      A.   Yes.
24      Q.   Would you agree with me that those
25  prescriptions may have been legitimately filled by a

Page 51

1    pharmacist?

2          A.   Yes.

3          Q.   All right.  If you take a -- turn to

4    Page 11, the next page in Exhibit 1, the heading

5    here says, "Medicine Cabinets:  Easy Access."

6               Do you see that?

7          A.   Yes.

8          Q.   What is that reference to?

9               MR. SOBOTKIN:  Objection.

10              THE WITNESS:  Basically, in this slide,

11         giving the example that medications can be

12         taken from a medicine cabinet at someone's

13         home.

14   BY MS. SWIFT:

15         Q.   You have a number of statistics on this

16   Slide 11 of Exhibit 1.

17              The first one says, "More than half of

18   teams (73 percent) indicate that it's easy to get

19   prescription drugs from their parents's medicine

20   cabinet."

21              Is the point here to raise awareness and

22   get people to properly dispose of unused medication?

23         A.   That is the point, yes.

24         Q.   At the end of this PowerPoint, starting

25   around Slide 40, there are a number of slides about

Page 52

1   the proper collection and disposal of controlled

2   substances.

3              Do you see that?

4        A.   Yes.

5        Q.   Slide 40, the heading says, "Collection."

6   And it says, "Collection means to receive a

7   controlled substance for the purpose of destruction

8   from" a number of sources, correct?

9        A.   I'm sorry, yes, that's correct.

10       Q.   And then there's a picture at the bottom

11  of Slide 40 of a few prescription drop boxes.

12             Are those drop boxes for people to dispose

13  of medication they no longer need?

14       A.   Yes.

15       Q.   Are you aware that drop boxes like that

16  exist in Walgreens stores all over the country?

17       A.   Yes.

18       Q.   And I know that you live in Chicago.  I do

19  too.

20       A.   Oh, get out.

21       Q.   And I say that because the picture I'm

22  going to show you now, I'm marking -- if you'll take

23  a look at -- let's see.  That's the wrong one.

24             Take a look, if you will, at the envelope

25  marked MM, as in Mary Mary.

1           MS. SWIFT:  This will be Exhibit 7.

2                  (Defendant Exhibit 7 was marked

3                  for identification.)

4           THE WITNESS:  Uh-huh.  I have it.

5    BY MS. SWIFT:

6       Q.   The picture --

7           MR. WEINBERGER:  Can you hold on for just

8       a second so I can get this out, please?

9           MS. SWIFT:  Sure.

10          MR. WEINBERGER:  What exhibit is this?

11          MS. SWIFT:  This is -- it's now been

12      marked as Exhibit 7.

13          THE WITNESS:  While we're on this brief

14      pause, my contractor just said 9:20.  He will

15      be here at 9:20.

16          MS. SWIFT:  Okay.  Got it.  So we've got

17      about a half hour.

18          MR. WEINBERGER:  Okay.  Go ahead.

19   BY MS. SWIFT:

20      Q.   Ms. Ashley, do you recognize the picture

21   in Exhibit 7 as a Walgreens safe medication disposal

22   drop box?

23      A.   Yes.

24      Q.   I'll represent to you that this is a

25   Walgreens safe medication disposal drop box in

Page 54

1    Chicago.

2              Have you seen drop boxes like this --

3         A.   Yes.

4         Q.   -- in Walgreens around Chicago?

5              MR. WEINBERGER:  Objection.

6              THE WITNESS:  Yes.

7    BY MS. SWIFT:

8         Q.   Would you agree with me that it is a good

9    thing for pharmacies like Walgreens to provide

10   opportunities for safe medication disposal?

11        A.   Yes, I agree with you.

12        Q.   Would you agree, based on your experience

13   at DEA, that providing opportunities for safe

14   medication disposal helps to -- helps reduce

15   medicine cabinet diversion?

16             MR. SOBOTKIN:  Objection.

17             THE WITNESS:  Yes.  Oh, I'm sorry.  Yes.

18   BY MS. SWIFT:

19        Q.   Would you agree that providing

20   opportunities for safe medication disposal also

21   helps reduce other types of diversion?

22        A.   Yes, I agree.

23        Q.   Okay.  Now I'd like to ask you some

24   questions about your understanding of DEA's rules

25   and regulations for pharmacists.

1          Does the DEA, in your understanding,

2     register every pharmacy that dispenses controlled

3     substances to patients?

4          A.   Yes.

5          Q.   Does that include -- strike that.

6          Can a pharmacy fill a prescription for an

7     opioid medication without a DEA registration?

8               MR. SOBOTKIN:  Objection.

9               THE WITNESS:  Not legally, no.

10    BY MS. SWIFT:

11         Q.   All right.  If you would, please, take out

12    the envelope that you have that is marked with the

13    letter G, as in good.

14         A.   I have it.

15              MS. SWIFT:  This will be Exhibit 8 to

16         Ms. Ashley's deposition.

17                        (Defendant Exhibit 8 was marked

18                         for identification.)

19    BY MS. SWIFT:

20         Q.   Ms. Ashley, do you see that this is the

21    DEA's Pharmacist's Manual that I marked as

22    Exhibit 8?

23         A.   Yes.

24         Q.   Is the DEA's Pharmacist's Manual, is

25    that -- in your experience, is that published

1   guidance from DEA for pharmacists on the Controlled

2   Substances Act?

3        A.   Yes.

4        Q.   And if you'll turn to Page 15 of

5   Exhibit 8 -- well, let me just ask.

6             Do you understand that a pharmacy must

7   renew its DEA registration every three years?

8        A.   Pharmacist, I don't remember.  I thought

9   it was every year.  Is it every three?  I forgot.

10            Pharmacists, I don't know.  I forgot.  I'm

11   sorry.

12        Q.   Actually, I have the page number wrong.

13   It's Page 14.  I apologize.

14            Do you see the heading Renewal of Pharmacy

15   Registration on Page 14?

16        A.   Yes.

17        Q.   It says, "A pharmacy registration must be

18   renewed every three years."

19        A.   Three years.  Okay.  Yes.

20        Q.   Was that -- was the same true when you

21   were at the DEA?

22        A.   Yes.

23        Q.   Now, if you'll look at Page 18 of the

24   pharmacist's manual, do you see the heading "Denial

25   of Registration in the Public Interest"?

Page 57

1       A.   Yes.

2       Q.   Is it correct that DEA can deny a pharmacy

3   a registration if DEA deems that to be in the public

4   interest?

5            MR. WEINBERGER:  Objection.

6            THE WITNESS:  Yes.  Yes.

7   BY MS. SWIFT:

8       Q.   Was that also true when you were at the

9   DEA?

10      A.   Yes.

11      Q.   Then under that heading "Denial of

12  Registration in the Public Interest," there are a

13  number of factors that it says DEA considers to

14  determine, whether the public interest provides --

15  strike that.

16           There are a number of factors listed in

17  the pharmacist's manual that the DEA says it

18  considers in determining whether a pharmacist's

19  registration or a pharmacy's registration is in the

20  public interest.

21           Do you see that?

22      A.   Yes.

23      Q.   The first factor listed is "The

24  recommendation of the appropriate state licensing

25  board or professional disciplinary authority."

Page 58

1           Do you see that?

2      A.   Yes.

3      Q.   So, for example, in Ohio, is it correct to

4  say, based on your experience at DEA, that DEA would

5  consider a recommendation of the Ohio Board of

6  Pharmacy?

7      A.   It would, yes.

8      Q.   Is it your understanding that the Ohio

9  Board of Pharmacy is the responsible agency for

10  licensing and disciplining pharmacists in Ohio?

11      A.   Yes.

12      Q.   Does DEA also have the authority to

13  suspend or revoke a pharmacy's DEA registration?

14      A.   Yes.

15      Q.   Is it correct to say that DEA considers

16  several factors before doing that?

17      A.   Yes.

18      Q.   Is one of those factors whether the

19  pharmacy has had a state license or registration

20  suspended, revoked, or denied by a competent state

21  authority, for example, the Ohio Board of Pharmacy?

22      A.   Yes, that's a factor.

23      Q.   Does the DEA have the authority to inspect

24  each pharmacy that it registers in person and review

25  its records?

Page 59

1        A.    Yes, they have the authority to do that.

2        Q.    Does DEA have access to data regarding the

3   pharmacy's purchases and sales of controlled

4   substances?

5             MR. SOBOTKIN:  Objection as to the

6        personal knowledge of Ms. Ashley or not.

7             THE WITNESS:  Answer?  Yes.

8             MR. SOBOTKIN:  You may answer.

9             THE WITNESS:  Yes.

10  BY MS. SWIFT:

11       Q.    Are examples of the data that DEA has

12  access to DEA's ARCOS shipping data and state

13  prescription monitoring data maintained by state

14  boards of pharmacy and other state agencies?

15       A.    The transaction ARCOS shipping data, yes.

16  PDMP, no.

17       Q.    DEA does not have access to state PDMP

18  data?

19       A.    Not direct access, no.

20       Q.    Can DEA get access to state PDMP data from

21  a State Board of Pharmacy if necessary for an

22  investigation?

23       A.    Yes.

24       Q.    Does DEA use that data, the various types

25  of data that you just testified about, to

Page 60

1   investigate pharmacies?

2           MR. SOBOTKIN:  Objection.  Ms. Ashley's

3       testimony about what DEA can and can't do is

4       outside of the scope of the Touhy

5       authorization.

6           MS. SWIFT:  Well, the first -- the Touhy

7       authorization, the first item that is

8       authorized is the role and responsibilities of

9       DEA.  And my question was whether DEA uses the

10      types of data that we've talked about to

11      investigate pharmacies, which is squarely

12      within the role and responsibility.

13          MR. SOBOTKIN:  I understand that piece of

14      it, but the piece -- what causes my objection

15      is the framing of the question of whether DEA

16      can or knows things.

17          If Ms. Ashley knows or has an

18      understanding, that would satisfy my objection.

19          MS. SWIFT:  Understood.

20  BY MS. SWIFT:

21      Q.  Ms. Ashley, based on your experience at

22  DEA, does DEA use the types of data that you just

23  testified about, ARCOS shipping data, state

24  prescription monitoring data, to investigate

25  pharmacies?

Page 61

1        A.    Yes.

2        Q.    Does DEA use that type of data to

3    investigate doctors?

4        A.    Yes.

5        Q.    Does DEA use that type of data to

6    investigate individual patients?

7        A.    I -- well, some of it, yes.  Not ARCOS, I

8    don't think, no.  But PDMP, yes.

9        Q.    Does DEA use that type of data to help

10   ensure that pharmacies are following the law?

11       A.    Yes.

12       Q.    DEA's regulation on the filling of

13   controlled substance prescriptions by pharmacists is

14   called the Corresponding Responsibility Regulation;

15   is that right?

16       A.    Yes.

17       Q.    If you'll take a look in the pharmacist

18   manual, which is Exhibit 8, at Page 42, do you see

19   that the Corresponding Responsibility Regulation is

20   described there?

21       A.    Yes.

22       Q.    That regulation is at 21 CFR 1306.04(a),

23   correct?

24       A.    Yes.

25       Q.    The Corresponding Responsibility

Page 62

1    Regulation says that "A pharmacist has a

2    corresponding responsibility for the proper

3    dispensing of controlled substances," correct?

4         A.   Yes.

5         Q.   That was true the entire time you were at

6    the DEA as well, right?

7         A.   Right.

8         Q.   In the next paragraph of the pharmacist's

9    manual at Page 42, DEA's guidance is that "A

10   pharmacist is required to exercise sound

11   professional judgment, and to adhere to professional

12   standards, when making a determination about the

13   legitimacy of a controlled substance prescription."

14             Correct?

15        A.   Correct.

16        Q.   Do you agree with that, based on your

17   experience at DEA?

18        A.   Yes, I agree with that.

19        Q.   Do you understand that pharmacists

20   sometimes identify issues with prescriptions for

21   controlled substances before they fill them?

22        A.   Yes.

23        Q.   For example, maybe the pharmacist thinks

24   the prescription is for an unusual combination of

25   drugs and doesn't understand why it has been

Page 63

1   prescribed.

2          That would be an example when a pharmacist

3   has identified a red flag on that prescription?

4      A.   Yes, that's an example.

5      Q.   Would you agree with me that the

6   pharmacist is supposed to address those issues

7   before filling the prescription?

8      A.   Yes.

9      Q.   Would you agree with me that that's part

10  of the pharmacist's corresponding responsibility?

11     A.   Yes.

12     Q.   Would you agree that there are many ways a

13  pharmacist might satisfy herself that a prescription

14  for a controlled substance is legitimate?

15     A.   Yes.

16     Q.   For example, a pharmacist might talk to

17  the patient about a drug combination to make sure

18  the patient understands the potential side effects.

19          That's one way she might resolve the red

20  flag?

21     A.   That's one way, yes.

22     Q.   A pharmacist might also call the doctor to

23  get a better understanding of the prescription.

24          Would you agree with that?

25     A.   I agree.

1     Q.   The pharmacist might check the State

2  Prescription Drug Monitoring Program to see if the

3  patient has been filling similar prescriptions at

4  other pharmacies.

5          Would you agree with that?

6     A.   I agree.

7     Q.   Would you agree that checking the State

8  Prescription Drug Monitoring Program may be required

9  depending on state law?

10     A.   I agree.

11     Q.   Would you agree with me that the

12  pharmacist might document what she did, particularly

13  if she thinks there is a red flag on a prescription?

14     A.   I agree.

15     Q.   Would you agree with me that there is no

16  DEA requirement that the pharmacist document the

17  steps she takes to resolve a red flag before filling

18  a prescription?

19     A.   A federal requirement, no, I don't think

20  there is.  That they document it, that's what you're

21  asking me?

22     Q.   Yes, that's what I'm asking.

23     A.   Yeah.

24     Q.   There is no federal requirement to

25  document the resolution of red flags; is that what

Page 65

1   you said?

2         A.    To document the resolution, not that I can

3   recall, no.

4         Q.    The pharmacist might look at a

5   prescription for an unusual quantity or a

6   combination of drugs and determine, based on her

7   knowledge of that patient, that the prescription

8   presents no issues.

9               Would you agree with that?

10        A.    Based on her knowledge of that patient?

11        Q.    Yes.

12        A.    That they may decide to fill the

13   prescription?  Yeah, that's possible, yes.

14        Q.    The pharmacist might determine that there

15   is not a red flag on that prescription based on her

16   knowledge of the patient, the doctor, or other

17   circumstances.

18              Would you agree with that?

19        A.    I agree.

20        Q.    In the pharmacist's professional judgment,

21   she might determine that the prescription is

22   legitimate and appropriately fill it, even if it is

23   for a large quantity of opioids.

24              Would you agree with that?

25        A.    Based on other knowledge?

Page 66

1    Q.   Yes.

2    A.   Yes, I do agree with that.

3    Q.   The pharmacist might, in her professional

4    judgment, determine that a prescription is

5    legitimate and appropriately fill it even if it is

6    for an unusual combination of drugs.

7         Would you agree with that?

8    A.   Yes.

9    Q.   The pharmacist, in her professional

10   judgment, might determine that a prescription is

11   legitimate and appropriately fill it even if the

12   patient traveled a long distance to visit the doctor

13   or the pharmacy?

14   A.   Well, yeah, I guess there would be

15   additional information.  I mean, it would have to be

16   additional information.  But, sure, they may.

17   Q.   The same is true even if the patient paid

18   in cash; the pharmacist might determine in her

19   professional judgment, based on her knowledge, that

20   that prescription is legitimate and appropriately

21   fill that prescription?

22   A.   There are circumstances that would make

23   that true, yes.

24   Q.   There may be any number of good reasons to

25   fill a prescription that was paid in cash.

Page 67

1          Would you agree with that?

2     A.   Yes.

3     Q.   If a prescription bears red flags, it does

4  not necessarily mean that it lacks a legitimate

5  medical purpose.

6          Would you agree with that?

7     A.   I agree with that.

8     Q.   If a prescription bears a red flag, it

9  does not necessarily mean that a patient does not

10 need that medication to treat her condition.

11         Would you agree with that?

12    A.   I agree with that.

13    Q.   If a prescription bears red flags, it does

14 not necessarily mean that it will lead to diversion.

15         Would you agree with that?

16    A.   I agree with that.

17    Q.   Prescriptions that bear red flags may well

18 have been written for legitimate medical reasons by

19 legitimate doctors for legitimate patients, in which

20 case the pharmacist should fill those prescriptions.

21         Would you agree with that?

22    A.   No.  I mean, because the way you just

23 described it, there are no red flags.

24    Q.   I'm sorry, I don't understand your answer.

25 Let me try to ask it another way.

Page 68

1              A prescription that bears a red flag may

2      be still -- may still have been written by a

3      legitimate physician.

4              Would you agree with that?

5         A.    Well, yeah, I guess that's possible, yeah.

6         Q.    A prescription that bears a red flag can

7      still be for a legitimate medical purpose and a

8      legitimate patient.

9              Would you agree with that?

10        A.    Legitimate, yeah, I guess.  Like, kind of

11     takes away the red flags if it's legitimate medical

12     purpose and written by a legitimate physician for a

13     legitimate medical purpose, then what -- it seems to

14     me it takes away the red flag.

15        Q.    Understood.

16        A.    But I guess it's possible.

17        Q.    Would you agree with me that there's no

18     DEA requirement that a pharmacy conduct a computer

19     data analysis on its own prescription records before

20     a pharmacist at that pharmacy fills a prescription?

21              MR. WEINBERGER:  Objection.

22              MR. SOBOTKIN:  Objection.

23              THE WITNESS:  The DEA does not have a

24         requirement that a pharmacy has a data

25         platform.  Is that what you're asking me?

Page 69

1   BY MS. SWIFT:
2        Q.   The DEA does not have a requirement that a
3   pharmacy conduct a computer data analysis on its
4   prescription records before a pharmacist fills a
5   prescription?
6             MR. WEINBERGER:  Objection.
7             THE WITNESS:  No, there is no -- that I'm
8        aware of, that I can recall, no.
9   BY MS. SWIFT:
10       Q.   Do you agree that there is also no
11  published guidance by DEA suggesting that pharmacies
12  conduct a computer data analysis on their own
13  prescription records before filling a prescription?
14            MR. SOBOTKIN:  Objection.
15            MR. WEINBERGER:  Objection.
16            THE WITNESS:  Yeah, that's hard for me to
17       answer.  I don't know.  I don't the answer to
18       that question.
19  BY MS. SWIFT:
20       Q.   In your experience in more than 30 years
21  at the DEA, can you think of any published guidance
22  by DEA suggesting that pharmacies conduct computer
23  data analysis on their prescription records?
24            MR. WEINBERGER:  Objection.
25            MR. SOBOTKIN:  Objection.

1          THE WITNESS:  Published guidance, not that

2      I recall.

3  BY MS. SWIFT:

4      Q.   There's no DEA requirement that a pharmacy

5  block particular prescriptions or prescribers

6  systematically that you can think of, is there?

7          MR. SOBOTKIN:  Objection.

8          MR. WEINBERGER:  Objection.

9          THE WITNESS:  No, not that I can think of.

10  BY MS. SWIFT:

11     Q.   Would you agree with me, Ms. Ashley, that

12  even if a pharmacy has a computer system doing some

13  sort of data analysis, the pharmacist still has to

14  exercise her professional judgment before filling a

15  prescription?

16         MR. SOBOTKIN:  Objection.

17         MR. WEINBERGER:  Objection.

18         THE WITNESS:  Yes, I agree with that.

19  BY MS. SWIFT:

20     Q.   Okay.  If you would, please, take out the

21  envelope marked O.

22         MS. SWIFT:  This will be Exhibit 9.

23              (Defendant Exhibit 9 was marked

24               for identification.)

25

Page 71

1    BY MS. SWIFT:

2        Q.   Do you have that in front of you,

3    Ms. Ashley?

4        A.   I do.

5        Q.   Exhibit 9 is a -- it's a presentation that

6    was produced by DEA, though we have it printed in

7    the native form, so it doesn't reflect the Bates

8    number at the bottom right-hand corner.  That Bates

9    number on the produced version is DEA-T3CC00000128,

10   and it's a presentation by William Winsley,

11   executive director, Ohio State Board of Pharmacy

12   with the title "Drugs, Drugs, and More Drugs."

13            Ms. Ashley, have you ever seen this

14   presentation?

15       A.   I -- I don't recall.  I've seen him

16   present before, so it's likely this one.

17       Q.   Are you aware that presentations like this

18   one from Mr. Winsley from the Ohio State Board of

19   Pharmacy are available on DEA's website?

20       A.   Oh, no, I didn't know that.

21       Q.   But you've seen presentations by

22   Mr. Winsley?  Did I hear that correctly?

23       A.   Yes.

24       Q.   If you take a look at Page 3 of

25   Mr. Winsley's presentation that I marked as

Page 72

1   Exhibit 9, that's the Corresponding Responsibility

2   Regulation, correct?

3        A.   Yes.

4        Q.   And you see there, he -- Mr. Winsley cites

5   both to the DEA regulation, 1306.04 of the CFR, and

6   also to an Ohio regulation, 4729-5-21.

7             Do you see that?

8        A.   Yes.

9        Q.   And do you know whether it is true that

10  the Ohio regulation on corresponding responsibility

11  is the same as the federal corresponding

12  responsibility requirement?

13       A.   No, I don't know that.

14       Q.   Turn, if you would, please, to Page 9 of

15  Mr. Winsley's presentation.

16            Do you see that it says, in the middle of

17  the page, "Dispensing pharmacists need to remember

18  that they, not their district supervisors, have been

19  assigned the 'corresponding responsibility'"?

20       A.   Yeah, I see that.

21       Q.   Do you agree with that statement?

22       A.   Not totally, no.

23       Q.   Why don't you agree with it?

24       A.   Because the supervisor, in my opinion, is

25  also responsible for what the -- the staff that they

1    supervise.

2         Q.   Do you know whether that is true under

3    Ohio law?

4              MR. SOBOTKIN:  Objection, calls for a

5         legal conclusion.

6              MS. SWIFT:  I'm just asking for her

7         understanding.

8              THE WITNESS:  I don't, under Ohio law, I

9         don't know.

10   BY MS. SWIFT:

11        Q.   Do you agree that it's important for

12   pharmacists to exercise their individual

13   corresponding responsibility before filling a

14   prescription?

15        A.   I agree with that.

16        Q.   Do you agree that if a pharmacist doesn't

17   exercise her corresponding responsibility, it could

18   lead to inappropriate prescriptions being filled?

19        A.   I agree with that.

20        Q.   This Ohio Board of Pharmacy presentation

21   produced by DEA goes on to talk about one Ohio

22   pharmacy where the pharmacist did not exercise his

23   corresponding responsibility.

24             I'd like you to take a look at Page 10 of

25   the presentation, just -- which is an introduction

Page 74

1   into this section of the presentation.  It says, "Is

2   it all just pill mills?  How about the internet?"

3          Do you see that?

4      A.   I do.

5      Q.   Do you agree, Ms. Ashley, that internet

6   prescriptions were a significant problem, internet

7   prescriptions for opioids were a significant problem

8   for a period of time?

9              MR. WEINBERGER:  Objection.

10             THE WITNESS:  Yes.  Oh, sorry.

11             MR. SOBOTKIN:  You can answer.

12             THE WITNESS:  They were, yes.

13  BY MS. SWIFT:

14     Q.   Page 11 of this Ohio Board of Pharmacy

15  presentation produced by DEA refers to a Caringwell

16  Pharmacy and Jae Lee, the pharmacist.

17         Do you see that?

18     A.   I do, yes.

19     Q.   This page purports to show legitimate

20  prescription patients for the Caringwell Pharmacy,

21  and then it highlights -- you can see a series of

22  small pins in Central Ohio.

23         Do you see that?

24     A.   Yes.

25     Q.   Then if you turn to Page 12, Mr. Winsley's

Page 75

1   Ohio Board of Pharmacy presentation shows a map

2   reflecting the Caringwell Pharmacy's legitimate

3   prescription prescribers, also a small number of

4   pins clustered in Central Ohio.

5           Do you see that?

6       A.   Yes.

7       Q.   Page 13 of the Ohio Board of Pharmacy

8   presentation shows Caringwell Pharmacy's internet

9   prescription prescribers.  And you can see on this

10  map, the pins are all over the country scattered

11  around.

12          Do you see that?

13      A.   Yes.

14      Q.   Then Page 14 shows Caringwell Pharmacy's

15  internet prescription customers, and those are --

16  there's far, far more pins all over the country.

17          Do you see that?

18      A.   Yes.

19      Q.   Do you know, based on your experience at

20  DEA, whether Ohio Board of Pharmacy revoked the

21  license for this pharmacy?

22      A.   I don't know.

23      Q.   Would you agree with me that that is what

24  the State Board of Pharmacy is supposed to do when a

25  pharmacist isn't following his or her corresponding

Page 76

1   responsibility?

2           MR. SOBOTKIN:  Objection.  You can answer.

3           THE WITNESS:  Yes, I agree.

4   BY MS. SWIFT:

5       Q.   Would you agree that DEA, in your

6   experience, isn't involved in every investigation of

7   a rogue pharmacy?

8       A.   Yes, I agree with that.

9       Q.   Based on your experience at DEA, is it

10  true that State Boards of Pharmacy are charged with

11  investigating pharmacies that don't follow the law?

12      A.   Yes, I agree with that.

13      Q.   Is it your understanding that State Boards

14  of Pharmacy are also law enforcement agencies?

15      A.   I don't know that always.

16      Q.   Do you know that that's sometimes the

17  case, as in Ohio?

18      A.   Yes, I think it's sometimes the case, yes.

19      Q.   Do you understand that State Board of

20  Pharmacies do revoke licenses when pharmacies

21  violate the law?

22      A.   Yes.

23      Q.   Do you Agree, Ms. Ashley, that internet

24  pharmacies were a significant problem for a period

25  of time?

Page 77

1            MR. WEINBERGER:  Objection.

2            MR. SOBOTKIN:  Objection, vague.

3            THE WITNESS:  Yes, I agree with that.

4    BY MS. SWIFT:

5        Q.   Turn, if you would, please, or pull out

6    the envelope marked U, as in ukulele.

7            MS. SWIFT:  I will mark this one as

8        Exhibit 10.

9                      (Defendant Exhibit 10 was marked

10                       for identification.)

11   BY MS. SWIFT:

12       Q.   Ms. Ashley, Exhibit 10, the first page is

13   an email to a number of people, including yourself,

14   dated February 26, 2004.

15           Do you see that?

16       A.   Yes.

17       Q.   It attaches a paper by an organization at

18   Columbia University entitled "You've Got Drugs.

19   Prescription Drug Pushers on the Internet.  A CASA

20   White Paper."

21           Do you see that?

22       A.   Yes.

23       Q.   And if you'd turn with me, please, to

24   Bates number ending 672 at the bottom right-hand

25   corner.

Page 78

1      A.    I have it.

2      Q.    You can see that this is -- it's a paper

3    based on a study by the National Center on Addiction

4    and Substance Abuse, CASA, at Columbia University.

5            Do you see that?

6      A.    I do.

7      Q.    Then in the third paragraph on this page,

8    it says, the studies showed that of the 157 websites

9    selling controlled prescription drugs on the

10    internet, 90 percent did not require a prescription.

11            Do you see that?

12      A.    I do.

13      Q.    That's a violation of DEA regulations and

14    federal law, correct?

15      A.    Correct.

16      Q.    Then if you'd turn with me, please, to the

17    Bates number ending 674, so just two pages farther.

18      A.    Yes.

19      Q.    In the third paragraph, do you see that it

20    says that the findings of this study were so

21    alarming that CASA and an organization called BDA

22    considered it their obligation to release this

23    information prior to the completion of the

24    comprehensive study?

25      A.    I do.

Page 79

1        Q.   All right.  Now, hold on to that one.  I'm
2   going to mark another one that is similar.  If you
3   would, please, pull out the envelope marked V, as in
4   victory.
5            MS. SWIFT:  This will be Exhibit 11.
6                     (Defendant Exhibit 11 was marked
7                      for identification.)
8   BY MS. SWIFT:
9        Q.   Ms. Ashley, Exhibit 11, it starts with an
10  email to you dated July 9th, 2008, with the subject
11  line "CASA report."
12           Do you see that?
13       A.   Yes.
14       Q.   Do you recall receiving either of these
15  two CASA reports that I've marked as Exhibit 10 and
16  11?
17       A.   No, I do not recall.
18       Q.   The 2008 report, it's another -- if you
19  look at the second page of the exhibit, it's another
20  CASA white paper, this time from July 2008, and the
21  title is "You've Got Drugs V: Prescription Drug
22  Pushers on the Internet."
23           Do you see that?
24       A.   Yes.
25       Q.   And if you'll turn to the Bates number

Page 80

1   ending 959.

2        A.   I have it.

3        Q.   The first paragraph says that CASA, this

4   organization at Columbia University, has been

5   tracking the availability of controlled prescription

6   drugs over the internet for five years.

7             Do you see that?

8        A.   Yes.

9        Q.   Then in the third paragraph, the second

10  sentence says --

11            MR. WEINBERGER:  What page are we on?

12            MS. SWIFT:  We're on the Bates number

13       ending 959.

14            MR. WEINBERGER:  Thank you.

15  BY MS. SWIFT:

16       Q.   Ms. Ashley, do you see in the third

17  paragraph, the second sentence reads, "This year the

18  number of sites that advertise and offer controlled

19  prescription drugs for sale declined from 2007."

20            Do you see that?

21       A.   Yes.

22       Q.   It goes on to say "However," a couple of

23  sentences below that, "widespread availability

24  continues."

25            Do you see that?

Page 81

1      A.    You lost me.

2            Oh, yes, I do.

3      Q.    Then on the next page, Bates Number ending

4   960, in the second paragraph where it says "this

5   report offers," do you see that?

6      A.    Yes.

7      Q.    This CASA report from Columbia University

8   says that it "offers a range of recommendations and

9   calls on the Congress to enact legislation closing

10  this illicit channel of distribution."

11           Do you see that?

12     A.    Yes.

13     Q.    Are you aware, based on your experience at

14  DEA, that Congress did pass legislation soon after

15  this called the Ryan Haight Act?

16     A.    Yes.

17     Q.    Are you aware that the Ryan Haight Act

18  became effective in 2009?

19     A.    Sounds about right, yeah.

20     Q.    And if it's helpful, take a look at the

21  document in Envelope AA.

22     A.    I have it.

23     Q.    That document is an email to you dated

24  March of 2016, correct?

25     A.    Yes.

Page 82

1      Q.    With the subject line "Internet

2    pharmacies"?

3      A.    Yes.

4      Q.    And then if you follow through the chain

5    of emails, there's a summary of the Ryan Haight

6    Online Pharmacy Consumer Protection Act of 2008.

7          Do you see that?

8      A.    Yes.

9      Q.    At the bottom of the first page, it says

10   that the Ryan Haight Act "amends the CSA," the

11   Controlled Substances Act, "by adding a series of

12   new regulatory requirements and criminal provisions

13   designed to combat the proliferation of so-called

14   'rogue Internet sites' that unlawfully dispense

15   controlled substances by means of the Internet."

16          Is that your understanding of what the

17   Ryan Haight Act did?

18     A.    Yes.

19     Q.    Then in the next paragraph, you see that

20   the law, the Ryan Haight Act, became effective in

21   April of 2009?

22     A.    Yes.

23     Q.    Is it accurate to say that the Ryan Haight

24   Act made it illegal to operate an online pharmacy

25   without a DEA registration authorizing that pharmacy

Page 83

1   to operate online?

2        A.   Correct, yes.

3        Q.   Did the Ryan Haight Act, in your

4   understanding, subject violators to criminal

5   penalties?

6        A.   Yes.

7        Q.   Would you agree with me that the Ryan

8   Haight Act effectively curtailed illegal internet

9   pharmacies?

10            MR. SOBOTKIN:  Objection.

11            THE WITNESS:  I'm sorry.  Yes, I believe

12       it was effective.

13  BY MS. SWIFT:

14       Q.   When it comes to the corresponding

15  responsibility obligation, would you agree with me

16  based on your experience at DEA, that the law is the

17  same for every pharmacist, whether that pharmacist

18  is employed by a large chain like Walgreens or a

19  single mom-and-pop pharmacy?

20       A.   The law is the same, correct.

21       Q.   Do the Controlled Substances Act and its

22  regulations require the same thing of every

23  registered pharmacy, whether that pharmacy is part

24  of a big chain or on stands all by itself?

25       A.   Yes, the law is the same, yes.

Page 84

1      Q.    I'm about --

2            MR. BUSH:  Kate, I'm sorry to interrupt

3      you, but before you get too far away from that

4      document, you did not mark the previous

5      document as an exhibit.

6            MS. SWIFT:  I didn't.  And I'm happy to do

7      it.  I wasn't planning on it.

8            MR. BUSH:  Oh, if you weren't doing it,

9      that's fine.  I thought maybe you just

10      overlooked it.  If you don't want to mark it,

11      that's fine.

12            MS. SWIFT:  I noticed the time,

13      Ms. Ashley.

14            THE WITNESS:  Yeah, he actually is not

15      here.  I can see out the window.

16            MS. SWIFT:  All right.

17            MR. WEINBERGER:  So that last document was

18      not 12?  You didn't mark it as Exhibit 12?

19            MS. SWIFT:  I did not, but I can go ahead

20      and do it.  I'm happy to do it.

21            MR. WEINBERGER:  Okay.  Whatever you want

22      to do.

23            THE WITNESS:  Get some water.

24            MS. SWIFT:  It is now Exhibit 12.

25

Page 85

1                    (Defendant Exhibit 12 was marked

2                         for identification.)

3           THE WITNESS:  Sorry.

4    BY MS. SWIFT:

5        Q.   You're fine.  All right.  Just let me know

6    if your contractor shows up and we will stop, but

7    I'm going to switch to a new topic.

8           Ms. Ashley, in your time at the DEA, did

9    DEA work with pharmacy chains and pharmacy

10   associations like the National Association of Boards

11   of Pharmacy to develop a consensus around potential

12   red flags a pharmacist might identify on a

13   controlled substance prescription?

14       A.   Yes.

15       Q.   If you'll take a look at the envelope with

16   the letter D, for dog.

17           MS. SWIFT:  This will be Exhibit 13.

18                    (Defendant Exhibit 13 was marked

19                         for identification.)

20   BY MS. SWIFT:

21       Q.   Do you have that in front of you,

22   Ms. Ashley?

23       A.   Yes.

24       Q.   Is the document that I marked as

25   Exhibit 13, is this a consensus document that DEA

Page 86

1   worked on with the National Association of Boards of

2   Pharmacy and others on red flag warning signs

3   related to prescribing and dispensing controlled

4   substances?

5        A.   Yes.

6             MR. SOBOTKIN:  Objection.

7             THE WITNESS:  Oh, I'm sorry.

8             Yes.

9   BY MS. SWIFT:

10       Q.   You can see that there's a list of

11  stakeholders on the first page of this consensus

12  document that I marked as Exhibit 13.

13            Do you see that?

14       A.   Yes.

15       Q.   CVS, Walgreens, and Rite Aid are all

16  listed among the stakeholders on this consensus

17  document about red flags, correct?

18       A.   Yes.

19       Q.   There are also a number of other

20  organizations listed as stakeholders on this

21  consensus document including the American Medical

22  Association.

23            Do you see that?

24       A.   Yes.

25       Q.   The National Association of Boards of

Page 87

1    Pharmacy is listed.

2              Do you see that?

3        A.    Yes.

4        Q.    The National Association of Chain

5    Drugstores is listed.

6              Do you see that?

7        A.    Yes.

8        Q.    And there are a number of other

9    associations of various types of healthcare

10   providers.

11             Do you see that?

12       A.    Yes.

13       Q.    Do you agree, based on your career at DEA,

14   that putting together a document like this

15   stakeholders document on red flag warning signs was

16   a good thing for these pharmacists, pharmacies, and

17   other organizations to do?

18       A.    Yes, I agree it was a good thing.

19       Q.    And I think you just testified that DEA

20   worked with these pharmacies and other organizations

21   on this consensus document; is that right?

22       A.    That's right.

23       Q.    If you'll take a look at the bottom of

24   Page 2 of this consensus document on red flags, at

25   the very end of the last paragraph, do you see where

1   it says, "The consensus document however, is not to

2   be construed as establishing any standards of care"?

3           Are you with me?

4       A.   I'm trying to find it.  You said Page 2,

5   yeah.  I'm looking at 3.  That will do it.

6       Q.   It's the last --

7       A.   Yes, I do see it.

8       Q.   "The consensus document however, is not to

9   be construed as establishing any standards of care,

10  but considered as general guidelines and as a

11  reminder that healthcare practitioners must comply

12  with federal laws and regulations and use their

13  professional judgment when confronted with red flag

14  warnings and aberrant patient behaviors in regard to

15  controlled substance prescriptions."

16          Do you agree with that statement?

17      A.   Yes, I do.

18      Q.   It's also consistent with what DEA put in

19  its pharmacist's manual, that pharmacists must use

20  their professional judgment in determining what

21  prescriptions to fill.

22          Would you agree with that?

23      A.   Yes.

24      Q.   You understand that pharmacies have sought

25  guidance from DEA from time to time on how to

1    exercise their corresponding responsibility?

2         A.   Yes.

3         Q.   Pull out, if you would, please, the

4    envelope marked with the letter F, as in fun.

5              MS. SWIFT:  This will be Exhibit 14.

6                   (Defendant Exhibit 14 was marked

7                   for identification.)

8    BY MS. SWIFT:

9         Q.   Do you have it, Ms. Ashley?

10        A.   Yes, I do.

11        Q.   Just to orient you to what this document

12   is, because it's a couple of things, do you see that

13   the first couple of pages is a letter to DEA from

14   the National Association of Chain Drugstores?

15        A.   Yes.

16        Q.   And then pages -- starting at Page 3 and

17   the rest of the document is a response from DEA.

18             Do you see that?

19        A.   Yes.

20        Q.   All right.  Starting with the letter from

21   the National Association of Chain Drugstores, do you

22   understand that that's a national organization

23   that -- it is what it sounds like it is, it's an

24   association of large chain drugstores like Walgreens

25   and others?

Page 90

1        A.    Yes.

2        Q.    The National Association of Chain

3  Drugstores is writing to DEA in July of 2019.

4              Do you see that?

5        A.    Yes.

6        Q.    And feel free to take your time to look at

7  it if you need to, but my first question is whether

8  you agree with me that, in the second and third

9  paragraph of this letter, the chain drugstores group

10 is asking for DEA's views on whether there are

11 legitimate medical reasons to prescribe so-called

12 "trinity" prescriptions, meaning a combination of an

13 opioid, a benzodiazepine, and a muscle relaxer.

14             Do you see that?

15       A.    I'm looking for it.

16             Oh, yeah, I do.  I see it.

17       Q.    Would you agree with me that that's also

18 known as a "cocktail prescription"?

19       A.    Yes, I agree.

20       Q.    Then on the next page of the letter from

21 the chain drugstores group, the writer says, "To

22 clear any confusion, we ask that you provide

23 guidance in writing."

24             Do you see that?

25       A.    Yes.

Page 91

1      Q.    Okay.  Then DEA's response follows that
2    letter from the chain drugstores group.
3            Do you see that?
4      A.    Yes.
5      Q.    The response is from November of 2019?
6      A.    Yes.
7      Q.    The -- at the very bottom of the third
8    paragraph, and please feel free to take your time to
9    look at whatever you want to, but do you see at the
10   bottom of the third paragraph, DEA responds to the
11   chain drugstores group that "The DEA lacks the
12   authority to issue guidelines that constitute advice
13   relating to the general practice of medicine"?
14     A.    Yes.
15     Q.    Do you agree with that statement, based on
16   your experience at DEA?
17     A.    I agree with that statement.
18     Q.    The next paragraph, second sentence, DEA
19   says to the National Chain Drugstores group,
20   "Federal law and DEA regulations do not impose a
21   specific quantitative minimum or maximum limit on
22   the amount of medication that may be prescribed on a
23   single prescription or the duration of treatment
24   intended with the prescribed controlled substance."
25           Do you see that?

1          A.   Yes.

2          Q.   Do you agree with those statements?

3          A.   I do.

4          Q.   Do you agree that federal law and DEA

5    regulations do not impose a limit on the duration of

6    treatment for a prescribed controlled substance?

7          A.   I agree with that, yes.

8          Q.   And federal law and DEA regulations also

9    do not impose any maximum limit on the amount of

10   medication that may be prescribed on a single

11   prescription.

12              You agree with that as well?

13         A.   I agree with that, yes.

14         Q.   Then the DEA attaches to its letter a

15   Federal Register notice from 2006 on dispensing

16   controlled substances for the treatment of pain.

17              Do you see that?

18         A.   Yes.

19         Q.   It's very hard to read in every copy that

20   I could find attached to the letter, and so I have a

21   better copy of it, which is to be in Envelope LL of

22   your box.

23         A.   Okay.  I'm pulling the document.

24              MS. SWIFT:  This will be Exhibit 15.

25

```
                                                    Page 93

 1                      (Defendant Exhibit 15 was marked
 2                      for identification.)
 3    BY MS. SWIFT:
 4         Q.   Do you have it in front of you,
 5    Ms. Ashley?
 6         A.   Yes.
 7         Q.   Okay.  Again, it's a Federal Register
 8    notice from September 6, 2006.
 9              It says Department of Justice, DEA -- or
10    Drug Enforcement Administration, 21 CFR Part 1306,
11    dispensing controlled substances for the treatment
12    of pain.
13              Did I get all that correctly?
14         A.   Yes.
15         Q.   Okay.  Now, I'd like you to look at
16    Page 3, which has at the top of it 52717.
17              Do you see that?
18         A.   Page 3, the 52718?
19         Q.   It's 52717 is what I'm going for.
20         A.   Oh, okay.  I'm sorry.  Yes.
21         Q.   Do you see the heading at the bottom of
22    the second column, "The Meaning of Legitimate
23    Medical Purpose" of the -- strike that.
24              Do you see the heading at the bottom of
25    the second column that reads, "The Meaning of the
```

```
                                              Page 94
 1   Legitimate Medical Purpose Requirement"?
 2        A.   Yes.
 3        Q.   Then if you carry that over to the third
 4   column, do you see where DEA says, "Federal courts
 5   have long recognized that it is not possible to
 6   expand on the phrase 'legitimate medical purpose' in
 7   the usual course of professional practice in a way
 8   that will provide definitive guidelines"?
 9        A.   Yes, I see that.
10        Q.   Do you agree I with that statement, based
11   on your more than 30 years at DEA?
12        A.   I agree with that statement.
13        Q.   DEA goes on to say, "There are no specific
14   guidelines."
15             Do you see that in the next paragraph?
16        A.   I do.
17        Q.   Do you agree with that statement?
18        A.   I do.
19        Q.   Then if you'll turn to the next page, this
20   one is the page heading 52718, and there's a heading
21   "Comments Regarding the Use of Opioids."
22             Do you see that?
23        A.   Yes.
24        Q.   Under that heading, it says that "DEA
25   recognizes that physicians who specialize in the
```

Page 95

```
 1    treatment of pain believe the undertreatment of pain

 2    is of paramount concern and a serious public health

 3    problem."

 4            Do you see that?

 5       A.   I'm looking for it.  Under comments

 6    regarding the use of opioids, DEA recognizes --

 7       Q.   In the second paragraph.

 8       A.   Second paragraph.

 9       Q.   "The undertreatment of pain is recognized

10    as a serious public health problem."

11       A.   Yes, yes, yes.  I see it.

12       Q.   Okay.  Do you agree with that statement?

13       A.   Yes.

14       Q.   And still in that first column -- sorry,

15    but on Page 5, so now I believe we should be on

16    52719.  In the middle of that first column, do you

17    see the paragraph that says, "First, one cannot

18    provide"?

19       A.   Yes.

20       Q.   It says, and this is DEA's statement, "One

21    cannot provide an exhaustive and foolproof list of

22    dos and don'ts when it comes to prescribing

23    controlled substances for pain or any other medical

24    purpose."

25            Do you agree with that statement?
```

1      A.    Yes, I do.

2      Q.    It goes on to say that "Each patient's

3  medical situation is unique and must be evaluated

4  based on the entirety of the circumstances."

5            Do you agree with that as well?

6      A.    Yes, I do.

7      Q.    Then on the third column of that same

8  page, the first full paragraph on the page where it

9  says "DEA recognizes," do you see that?

10     A.    Yes.

11     Q.    It says, "DEA recognizes that the

12  overwhelming majority of American physicians who

13  prescribe controlled substances do so for legitimate

14  medical purposes.  In fact, the overwhelming

15  majority of physicians who prescribe controlled

16  substances do so in a legitimate manner and will

17  never warrant scrutiny by federal or state law

18  enforcement officials."

19            Do you agree with that statement?

20     A.    Yes, I agree with that statement.

21     Q.    In response to questions from doctors,

22  this is the DEA saying we're not going to tell

23  doctors what kinds of prescriptions they can and

24  can't write.

25            Would you agree with that?

1          A.    Yes.

2          Q.    In response to questions from

3    pharmacies --

4                MR. WEINBERGER:  Excuse me, I was on mute,

5          Kate.

6                I want to interpose an objection to that

7          prior question.  Thanks.

8    BY MS. SWIFT:

9          Q.    In response to questions from pharmacies,

10   the DEA also said we're not going to tell

11   pharmacists what prescriptions they can and can't

12   fill.

13               Would you agree with that?

14               MR. WEINBERGER:  Objection.

15               MR. SOBOTKIN:  Objection.

16               THE WITNESS:  Can you repeat that?  DEA is

17         not going to tell --

18   BY MS. SWIFT:

19         Q.    -- pharmacists what prescriptions they can

20   and can't fill.

21         A.    That's correct.

22               MR. WEINBERGER:  Objection.

23   BY MS. SWIFT:

24         Q.    Excuse me.

25         A.    I mean, I should say I agree.

1      Q.    Thank you.

2            Ms. Ashley, has the DEA ever imposed

3    limits on the amount of prescription opioids that

4    may be prescribed or dispensed for a patient in your

5    experience?

6            MR. SOBOTKIN:  Objection to form.

7            THE WITNESS:  Not that I'm aware of.

8    BY MS. SWIFT:

9      Q.    In your experience, has DEA ever imposed

10   any limit on the daily dose of a prescription opioid

11   that may be prescribed or dispensed for a patient?

12     A.    Not in my experience.

13     Q.    In your experience, has DEA ever imposed

14   any limits on the strength of a prescription opioid

15   medication that may be prescribed or dispensed for a

16   patient?

17     A.    Not in my experience.

18     Q.    In your experience, has DEA ever

19   prohibited the prescribing or dispensing of

20   prescription opioids in combination with other

21   medications?

22     A.    Not in my experience.

23     Q.    Would you agree with me, Ms. Ashley, that

24   people suffering from pain should have access to

25   prescription opioid medication if a doctor

1   determines that that's an appropriate treatment?

2          MR. WEINBERGER:  Objection.

3          THE WITNESS:  I agree with that.

4   BY MS. SWIFT:

5      Q.   If you'll pull out the envelope with the

6   letter M, as in Mary.  This may have been one that I

7   accidentally marked before.

8      A.   Would this be an okay time to break?

9          MS. SWIFT:  This would be a perfect time

10      to break.

11          THE WITNESS:  And when I come back, I'll

12      come to M.  It should be ten minutes?

13          MS. SWIFT:  That's fine.  Let's make it

14      15, just to be safe.

15          THE WITNESS:  Okay.  Okay.  Thank you.

16          THE VIDEOGRAPHER:  Off the record, 9:43.

17              (Whereupon, a recess was taken

18              from 9:43 a.m. to 10:01 a.m.)

19          THE VIDEOGRAPHER:  Okay.  We're on the

20      record at 10:01.

21   BY MS. SWIFT:

22      Q.   Ms. Ashley, before we broke, I asked you

23   to pull out the envelope with letter M, as in Mary,

24   on it.

25          Do you have that in front of you?

```
                                            Page 100
 1        A.   Yes.
 2             MS. SWIFT:  I've marked this one as
 3        Exhibit 16 to Ms. Ashley's deposition.
 4                      (Defendant Exhibit 16 was marked
 5                       for identification.)
 6             MR. WEINBERGER:  What's the number?
 7             MS. SWIFT:  16.
 8             MR. WEINBERGER:  16.  Okay.  Thank you.
 9   BY MS. SWIFT:
10        Q.   Ms. Ashley, do you recognize this letter
11   as one that you wrote in April of 2017?
12        A.   Yes.
13        Q.   You were responding to concerns from a
14   pain patient; is that correct?
15        A.   Yes.
16        Q.   In the first paragraph of your letter, you
17   wrote, "Thank you for your letter dated
18   January 23rd, 2017, to the Drug Enforcement
19   Administration.  You indicated how the rescheduling
20   of hydrocodone combination products requires you to
21   now undergo expensive random drug testing, limit you
22   to a 90-day maximum supply with no refills, and
23   requires you to see your practitioner for each new
24   prescription.  The DEA appreciates the opportunity
25   to address your concerns."
```

1          Did I read all of that correctly?

2     A.   Yes.

3     Q.   Do you understand, based on your

4  experience at DEA in this time frame, that pain

5  patients were having a harder time getting access to

6  pain medication?

7     A.   I was -- yeah, I did learn that, yes.

8     Q.   Pain patients like this one were writing

9  to DEA with their concerns about getting access to

10 necessary pain medication; is that true?

11    A.   Yes, that's true.

12    Q.   In the second paragraph of your letter,

13 you wrote that "The responsibility for the proper

14 prescribing and dispensing of controlled substances

15 is on the prescribing practitioner," correct?

16    A.   That's correct.

17    Q.   Then you go on to say something that we've

18 seen before in other DEA documents, that "Federal

19 law and DEA regulations do not impose a specific

20 quantitative minimum or maximum limit on the amount

21 of medication that can be prescribed on a single

22 prescription or the duration of treatment intended

23 with the prescribed controlled substance," correct?

24    A.   That's correct.

25    Q.   And then if you'll turn, please, to Page 2

Page 102

1    of your letter, at the top of the page, you said,

2    "Individual practitioners must determine on their

3    own, based on sound medical judgment and in

4    accordance with established medical standards,

5    whether it is appropriate to issue multiple

6    prescriptions and how often to see their patients."

7            Do you agree with that statement that you

8    made?  Do you agree with that today?

9        A.   Yes, I do.

10       Q.   Do you agree that that's true with respect

11   to any prescription a doctor writes?

12           MR. WEINBERGER:  Objection.

13           THE WITNESS:  Yes, I agree.

14           MS. SWIFT:  That is all of the questions

15       that I have at this time.  We will reserve the

16       balance of our time for redirect, any necessary

17       redirect.

18           MR. WEINBERGER:  Thank you.

19                       EXAMINATION

20   BY MR. WEINBERGER:

21       Q.   Ms. Ashley, my name is Peter Weinberger.

22   And I'm privileged to represent the plaintiffs, who

23   in this particular case are Lake County, Ohio, and

24   Trumbull County, Ohio.  And to the extent that this

25   deposition might be used beyond this case, I'm also

Page 103

1    representing the plaintiffs' executive committee on

2    behalf of several thousand political subdivisions

3    around the country who have brought cases against

4    these five pharmacies.

5              So I have an opportunity now to ask you

6    questions, and so I'm going to go right to it.

7         A.   Okay.

8         Q.   First of all, you explained to Ms. Swift

9    your extensive experience at the DEA.  And on behalf

10   of our clients, my clients, I want to thank you for

11   your service.  And I thank you for your being here

12   today to testify.

13             You have -- you are appearing today,

14   Ms. Ashley, because you were subpoenaed by the

15   defendant retail pharmacies in this case, Walgreens,

16   CVS, Walmart, Rite Aid, and Giant Eagle, correct?

17        A.   Correct.

18        Q.   And you are represented -- even though you

19   no longer work at the DEA, you're represented by

20   counsel for the Department of Justice, correct?

21        A.   Correct.

22        Q.   Each of these five --

23             MR. SOBOTKIN:  I'm sorry, Peter.  Let me

24        just note for the record, my appearance is on

25        behalf of the United States Drug Enforcement

Page 104

1      Administration in Ms. Ashley's capacity as a
2      former DEA employee.
3           MR. WEINBERGER:  Thank you for that
4      explanation, Mr. Sobotkin.  I appreciate it.
5  BY MR. WEINBERGER:
6      Q.   So each of these five defendants, you are
7  aware, are registered with the Drug Enforcement
8  agency to distribute and dispense opioid
9  prescription products, true?
10      A.   True.
11           MS. SWIFT:  Object to form.
12  BY MR. WEINBERGER:
13      Q.   Did you say correct?
14      A.   I said, yes, true.
15      Q.   Okay.  And by the way, the questions that
16  I'm going to ask you today, in accordance with the
17  parameters that have been set by the Department of
18  Justice, are about your own personal knowledge as a
19  long-time employee of the Drug Enforcement agency.
20           Based upon your knowledge and experience
21  at the DEA, is it true that these defendants,
22  Walgreens, CVS, Walmart, Rite Aid, and Giant Eagle,
23  are required to, quote, "provide effective controls
24  and procedures to guard against the theft and
25  diversion of controlled substances," end quote?

1      A.   Yes, that's correct.

2      Q.   And I know you're well familiar with it,

3   but -- so somebody has got to go on mute because I

4   just got some feedback.

5           I know you're well familiar with it, but

6   let me mark as Plaintiffs' Exhibit Number 1,

7   1301.71, which is in an envelope.  It's marked

8   P-GEN-00187.

9      A.   In the same group?

10      Q.   So it's in a separate packet.

11      A.   Oh, okay.

12      Q.   Okay.  So what you did -- what we did is

13   you've got a packet of exhibits that we sent you

14   versus those that the defendants sent you.

15      A.   I got it.

16           MR. SOBOTKIN:  What is the Bates number

17      again?

18           MR. WEINBERGER:  So this is P-GEN-00187.

19           THE WITNESS:  I have it.

20           MR. WEINBERGER:  And we're going to mark

21      this as Plaintiffs' Exhibit Number 1.

22                   (Plaintiff Exhibit 1 was marked

23                    for identification.)

24           MR. WEINBERGER:  And, Jim, if you would

25      focus in on that very first paragraph for us.

Page 106

1      Great.

2    BY MR. WEINBERGER:

3        Q.   So what I just asked you about is what's

4    contained in the federal regulations, which were

5    enacted as a result of the Controlled Substances

6    Act.

7             And it says in Section (a), "All

8    applicants and registrants shall provide effective

9    controls and procedures to guard against theft and

10   diversion of controlled substances."

11            Can you highlight that, Jim, please.

12            So this is the regulation that governs

13   this, correct, Ms. Ashley?

14       A.   Correct.

15       Q.   And this is an obligation on a number of

16   registrants, but particularly in this case, it's an

17   obligation of these five defendants, these five

18   corporate defendants, to provide effective controls

19   and procedures to guard against theft and diversion

20   of controlled substances, correct?

21       A.   Correct.

22       Q.   Just one second here, please.

23            And each of these retail pharmacies, in

24   your experience, should know that controlled

25   substances like opioid prescriptions can be

Page 107

1  addictive, true?

2       A.   Yes, I agree with that.

3            MR. WEINBERGER:  You can take down this

4       exhibit, Jim.  Thanks.

5  BY MR. WEINBERGER:

6       Q.   And each of these retail pharmacy

7  companies should know that opioid prescription drugs

8  can be and often are used for nonmedical purposes,

9  true?

10      A.   Yes.

11      Q.   They should all know that opioid

12  prescription drugs can often be diverted, true?

13      A.   True, yes.

14      Q.   And by "diverted," we mean they can be

15 stolen within the pharmacies, by pharmacy employees

16 or others, or it can be used by patients or

17 individuals in ways not consistent with a legitimate

18 medical use, true?

19      A.   Yes.

20      Q.   And if these five retail pharmacy

21 companies have been registrants for 30 years or

22 more, they should have been well aware of these

23 risks associated with opioid prescription

24 medications for that entire period of time, true?

25           MS. SWIFT:  Object to the form.

Page 108

1              THE WITNESS:  I agree with that.

2     BY MR. WEINBERGER:

3         Q.   You agree with that?

4         A.   Yes, I agree with that.

5         Q.   Okay.  And, frankly, that's why the

6     Controlled Substances Act was enacted.  It was --

7     its purpose was to set up a closed system where drug

8     companies, including the defendant pharmacies, were

9     required to follow the rules to minimize the risk of

10    misuse and diversion of drugs like opioid

11    prescriptions, correct?

12        A.   Correct.

13             MS. SWIFT:  Objection, calls for a legal

14        conclusion.

15    BY MR. WEINBERGER:

16        Q.   Addiction, misuse, and diversion of opioid

17    prescriptions pose a significant risk to the health

18    and safety of our communities across the nation.

19             Do you agree with that?

20        A.   I agree with that.

21        Q.   Diversion of opioid prescriptions is a

22    danger to the health and welfare of our cities and

23    counties across the country.

24             Do you agree with that?

25        A.   I agree with that.

1      Q.    Now, it's well-known, and I assume you

2    know, Ms. Ashley, that all five of these defendants

3    are multibillion-dollar operations, correct?

4      A.    Oh, do I know that?  Yes.

5            MS. SWIFT:  Object to the form.

6    BY MR. WEINBERGER:

7      Q.    Yes?

8      A.    Yes.

9      Q.    And, in fact, Walmart, the defendant

10   Walmart in this case is the largest company in our

11   country by any measure, Fortune 500 or otherwise.

12           Do you agree with that?

13           MS. SWIFT:  Object to form, foundation.

14           THE WITNESS:  I agree with that.

15   BY MR. WEINBERGER:

16     Q.    CVS and Walgreens are in the top ten of

17   Fortune 500 companies in total annual revenues.

18           Do you agree with that?

19     A.    I --

20           MS. SWIFT:  Object to the form,

21       foundation.

22           MR. SOBOTKIN:  It's outside the scope of

23       the Touhy.  I'm going to request that the

24       witness not answer related to the business

25       operations of these companies.

Page 110

1    BY MR. WEINBERGER:

2         Q.   Well, you are aware, based on your

3    experience, that these large corporations have or

4    should have regulatory compliance departments,

5    correct?

6              MS. SWIFT:  Object to the form, outside

7         the scope and foundation.

8    BY MR. WEINBERGER:

9         Q.   Go ahead.  You can answer.

10        A.   Oh, am I aware?  Yes.

11        Q.   They have governmental affairs

12   departments?

13             MS. SWIFT:  Same objections.

14             Sorry, I think David was trying to object

15        as well.

16             MR. SOBOTKIN:  Yeah, I'm sorry, we're

17        talking over each other.

18             It's outside the scope of the Touhy

19        authorization.  You should not answer.

20             THE WITNESS:  Don't answer.  Okay.

21   BY MR. WEINBERGER:

22        Q.   Well, as part of your role in the

23   diversion section of the DEA and in some of the

24   documents which -- including the stakeholders

25   documents, didn't you become aware of the fact that

1  each of these defendants, either individually or
2  through trade organizations, have governmental
3  affair departments that interact with governmental
4  officials?
5        MS. SWIFT:  Still outside the scope.
6     Objection.
7        MR. SOBOTKIN:  Same objection.  You should
8     not answer in the general.
9        MR. WEINBERGER:  Well, I'm just saying as
10     a matter of her own personal knowledge.
11  BY MR. WEINBERGER:
12     Q.   Isn't that true?
13        MS. SWIFT:  Same objection.  It's outside
14     the scope.
15        MR. SOBOTKIN:  Agreed.
16        MR. WEINBERGER:  Are you instructing her
17     not to answer, David?
18        MR. SOBOTKIN:  I'm not instructing her not
19     to answer.  It's outside the scope.
20  BY MR. WEINBERGER:
21     Q.   Okay.  Would you agree from your own
22  personal knowledge in all your years at the DEA,
23  that the prescription drug dispensing business is a
24  highly profitable business for these companies?
25        MS. SWIFT:  Same objection.  It's outside

1       the scope.

2              MR. SOBOTKIN:  Objection.  It's outside

3       the scope.  Direct the witness not to answer.

4    BY MR. WEINBERGER:

5       Q.   Well, would you agree that the opioid

6    distribution and dispensing business that these

7    defendants operate for profit is a highly regulated

8    business?

9              MS. SWIFT:  Outside the scope.

10             THE WITNESS:  Answer?

11             MR. SOBOTKIN:  You may answer as it

12      pertains to the DEA.

13             THE WITNESS:  Is it regulated?  Yes, I

14      agree.

15   BY MR. WEINBERGER:

16      Q.   You agree that it's a highly regulated

17   business?  That is, opioid distribution and

18   dispensing is a highly regulated business?

19             MS. SWIFT:  I'm going to object to the

20      extent the question relates to distribution as

21      opposed to dispensing.  That's outside the

22      scope of this deposition.

23             MR. SOBOTKIN:  Objection, outside the

24      scope on "distribution"; objection, asked and

25      answered, as to the balance.

Page 113

1          MR. WEINBERGER:  All right.  Well, I want
2       to make sure the record is clear, and I'll take
3       out distribution.
4    BY MR. WEINBERGER:
5       Q.   Would you agree that the opioid dispensing
6    business that these defendants operate for profits
7    is a heavily regulated business?
8          MS. SWIFT:  Object to the characterization
9       of the question about profits.
10   BY MR. WEINBERGER:
11      Q.   You can answer.
12         MS. SWIFT:  Outside the scope.
13         THE WITNESS:  Yes, I agree.
14   BY MR. WEINBERGER:
15      Q.   And would you agree that these defendants
16   have an obligation to comply with the Controlled
17   Substances Act and its regulations?
18      A.   Yes, I agree.
19      Q.   Would you agree they have an obligation to
20   comply with state laws on controlled substances?
21      A.   Yes, I agree.
22      Q.   Would you agree that these defendants have
23   an obligation to keep current on both the federal
24   and state laws and regulations associated with the
25   dispensing of controlled substances?

Page 114

1      A.   Yes, I agree.

2      Q.   They have an obligation to read and follow

3  the regulations, true?

4      A.   Yes, I agree with that.

5      Q.   These companies have an obligation to read

6  and know the developments in the laws and

7  regulations, as they may be modified or changed over

8  the years?

9      A.   I agree with that.

10      Q.   And the DEA has, for the last 30 years,

11  helped the defendants to know the law and

12  regulations by various means, true?

13          MS. SWIFT:  Objection, outside the scope,

14      foundation.

15          MR. SOBOTKIN:  Objection, outside the

16      scope, as the witness is here to testify in her

17      personal capacity, not as on behalf of the DEA.

18  BY MR. WEINBERGER:

19      Q.   So, with respect to your personal

20  knowledge over all the years that you worked at the

21  DEA, would you agree that the DEA helps the

22  defendants know the law and regulations associated

23  with dispensing opioid products?

24      A.   Yes, I agree.

25      Q.   The DEA sends out advisory letters, true?

Page 115

1      A.    Correct.

2            MS. SWIFT:   Objection.

3   BY MR. WEINBERGER:

4      Q.    Go ahead.  You can answer.

5      A.    Yes, true.

6      Q.    The DEA publishes developments in the

7   regulations on dispensing on the DEA website, true?

8      A.    Yes, they do.

9      Q.    The DEA holds meetings with these

10   defendant companies from time to time to explain

11   issues associated with regulations about dispensing,

12   true?

13      A.    Yes, that's true.

14      Q.    The DEA publishes in the Federal Register

15   the results of enforcement actions brought against

16   companies that violate the dispensing regulations of

17   the DEA, of the Controlled Substances Act?

18            MS. SWIFT:   Objection, outside the scope.

19            THE WITNESS:  Yes, that's true.

20            MR. SOBOTKIN:   Same objection.

21   BY MR. WEINBERGER:

22      Q.    That's true.

23            The DEA puts out information about final

24   adjudications associated with enforcement actions

25   brought against pharmaceutical companies like

                                           Page 116

1   Walgreens and CVS, true?

2           MS. SWIFT:  Objection, this is wildly

3       outside the scope.

4           MR. WEINBERGER:  It's not very wild,

5       Ms. Swift.

6   BY MR. WEINBERGER:

7       Q.   With respect to dispensing enforcement

8   actions that have been brought against CVS and

9   Walgreens and Walmart and Rite Aid, isn't it true

10  that the DEA publishes adjudications, information

11  about those enforcement actions?

12          MS. SWIFT:  Objection, outside the scope.

13      It was also covered in the last deposition of

14      Ms. Ashley and, therefore, is doubly outside

15      the scope.

16  BY MR. WEINBERGER:

17      Q.   Do you agree with that statement?

18          MR. SOBOTKIN:  Answer if you have an

19      understanding in your personal recollection.

20          THE WITNESS:  In my personal recollection,

21      yes.

22  BY MR. WEINBERGER:

23      Q.   And the reason for publishing this

24  information is not only to explain what happened

25  with respect to a particular defendant but also to

Page 117

1    give guidance to other of the defendants who may not

2    have been involved in that particular action,

3    correct?

4           MR. SOBOTKIN:  Objection.  You can't

5        answer on behalf of what DEA is intending to do

6        or not intending to do.

7           If you have a personal understanding, you

8        can answer the question.

9           THE WITNESS:  Okay.  So I need you to

10       repeat the question.  They publish it in order

11       to provide guidance?

12   BY MR. WEINBERGER:

13       Q.   I'll just restate it.

14           With respect to information that's

15   published about adjudications or enforcement actions

16   and their conclusion, isn't -- from your own

17   personal knowledge, doesn't the DEA put out that

18   information not only to tell people what happened

19   with respect to a particular defendant, but also to

20   give guidance to other defendants?

21       A.   Yes, I think it's to help, yes.

22       Q.   The -- from your experience, were you

23   familiar, generally speaking, with the CVS Holiday

24   enforcement case?

25           MS. SWIFT:  Objection, outside the scope.

1          THE WITNESS:  I'm aware of it, yes.

2     BY MR. WEINBERGER:

3          Q.   And you're aware that that -- that the

4     decision in 2012 was published both on the DEA

5     website and in the Federal Register?

6               MR. BUSH:  Object to this.  This is Graham

7          Bush on behalf of CVS.  This is way outside the

8          scope.  There is nothing in the Touhy

9          authorization that applies to investigations.

10    BY MR. WEINBERGER:

11         Q.   So I'm not going to get into a colloquy

12    with counsel and their speaking objections.

13              But would you agree that the CVS Holiday

14    enforcement case included or really centered around

15    dispensing issues associated with CVS's conduct?

16              MR. BUSH:  Objection, foundation, and

17         outside the scope.

18              MR. SOBOTKIN:  Objection, outside the

19         scope of the Touhy authorization, and direct

20         the witness not to answer the particulars about

21         what may have been at issue in a particular

22         enforcement action.

23              MR. WEINBERGER:  Well, Mr. Sobotkin, the

24         witness has testified that the publishing of

25         these adjudications serve as guidance to other

1            defendants with respect to -- and in this case

2            it involved dispensing issues.

3                  So since the Touhy authorization

4            specifically talks about her testimony about

5            dispensing issues and what was -- you know,

6            what advice was given, I mean, this is, with

7            all due respect, I think, clearly within the

8            scope of the Touhy letter.

9                  MR. SOBOTKIN:  The role of guidance, you

10           know, I did not object and did not direct her

11           not to answer on that generalized basis.  And

12           to the extent that there is an enforcement

13           action that's been published in the Federal

14           Register, it speaks for itself.

15                 MR. WEINBERGER:  Okay.  Well, I get that,

16           but I guess I'm wondering why I'm not allowed

17           to ask her about it.

18                 MR. SOBOTKIN:  We were very clear in the

19           negotiations that led to the issuance of the

20           Touhy letter that specific investigations,

21           specific matters, specific enforcement actions

22           would not be permitted as part of the Touhy

23           authorization.

24     BY MR. WEINBERGER:

25           Q.   Okay.  Well, do you agree based upon your

Page 120

1    experience that, Ms. Ashley, that these five

2    defendant pharmacy companies are sophisticated in

3    following the requirements of the CSA regulations

4    and that it's a part of their companies' businesses

5    to keep abreast of the government regulations?

6              MR. SOBOTKIN:  Object to the word

7         "sophisticated."

8    BY MR. WEINBERGER:

9         Q.   Go ahead.  You can answer.

10        A.   Yes, I do agree.

11        Q.   Now, let me have you pull out P-GEN-00216.

12        A.   I have it.

13        Q.   Thank you.

14             MR. WEINBERGER:  We're going to mark this

15        as Plaintiffs' Exhibit Number 2.

16                  (Plaintiff Exhibit 2 was marked

17                   for identification.)

18    BY MR. WEINBERGER:

19        Q.   And we've put the first page of Exhibit 2

20    up on the screen, Ms. Ashley.

21             Can we agree that this is the DEA's

22    website publication of the case entitled

23    Holiday CVS LLC?

24             MR. BUSH:  Objection, outside -- sorry,

25        didn't mean to interrupt you, Pete.  Are you

```
                                      Page 121

 1      done?

 2             I have an objection, outside the scope.

 3             MR. SOBOTKIN:  I'm going to just object on

 4      foundation, but you can answer, if you can.

 5             THE WITNESS:  I agree that it is.

 6  BY MR. WEINBERGER:

 7      Q.   And in the course of your work at the DEA,

 8  have you had an opportunity to refer to this case

 9  from time to time?

10      A.   I don't recall.  I'd say it's likely.

11      Q.   And do you -- is it your understanding

12  that this case lays out information regarding red

13  flags that a pharmacy should be looking for in

14  fulfilling the corresponding responsibility required

15  by the federal regulations?

16             MR. SOBOTKIN:  Objection.

17             MR. BUSH:  Objection, foundation, scope.

18      Mischaracterizes the case.

19             THE WITNESS:  Yes, I believe it does.

20  BY MR. WEINBERGER:

21      Q.   And has this case been used often in

22  discussions that you have had or been involved in

23  with pharmacies that include CVS and other

24  pharmacies regarding how pharmacies should utilize

25  red flags in fulfilling their corresponding
```

Page 122

1   responsibility?

2           MR. BUSH:  Objection.

3           THE WITNESS:  I don't recall.  But it's

4       likely.

5   BY MR. WEINBERGER:

6       Q.   Likely, thank you.

7           Would you also pull out and we will mark

8   as Exhibit 3 P-GEN-00215.

9                   (Plaintiff Exhibit 3 was marked

10                  for identification.)

11  BY MR. WEINBERGER:

12      Q.   This will be marked as Exhibit 3.  This is

13  the case of the East Main Street Pharmacy from 2010.

14          Are you aware of this case?

15      A.   I don't recall this one.

16      Q.   Okay.  This is -- actually involves an

17  Ohio pharmacy.  But can we agree that, at least from

18  what you can see on Exhibit 3, that this is another

19  case that's on the DEA website and available to be

20  reviewed by the defendants in this case?

21          MR. SOBOTKIN:  Objection, foundation.

22          THE WITNESS:  Yes, I agree with that.

23  BY MR. WEINBERGER:

24      Q.   All right.  Would you agree, in terms of

25  your own personal experience, Ms. Ashley -- you can

Page 123

1   take that down, Jim.  Thanks.

2            Would you agree that these defendant

3   pharmacies are required to develop policies to train

4   pharmacists to comply with the CSA regulations?

5        A.   Are they required to develop policies?

6        Q.   Yes, ma'am.

7        A.   I'm trying to think, is that a federal

8   regulation?

9        Q.   Well, as part of their obligation under

10  1301.71 to provide effective controls of procedures

11  to guard against theft and diversion, would you

12  agree that these defendant pharmacies corporately

13  have an obligation to develop policies to train

14  pharmacists to comply with the regulations?

15       A.   Yeah, I agree --

16            MR. BUSH:  Objection.

17            THE WITNESS:  -- as part of that process,

18       yes.

19  BY MR. WEINBERGER:

20       Q.   Would you agree that the defendants are

21  required to develop and implement systems to provide

22  the necessary tools for their pharmacists to comply

23  with the CSA regulations?

24            MS. SWIFT:  Objection.

25            MR. SOBOTKIN:  Objection.

Page 124

1           MR. BUSH:  Objection.

2           THE WITNESS:  Yes.

3  BY MR. WEINBERGER:

4      Q.   Would you agree that the defendants

5  pharmacist training and the tools that they provide

6  must be designed to provide effective controls and

7  procedures to prevent the theft and diversion of

8  opioids?

9      A.   You said they "must be designed"?

10     Q.   Yes.

11     A.   Yeah, I believe that's an obligation.

12     Q.   Because if the training and the tools used

13 by the defendant corporations are not adequate, we

14 run the risk of opioid pills getting into the wrong

15 hands and leading to diversion, correct?

16     A.   That's correct.

17     Q.   And I think you already agree with me that

18 diversion is dangerous to the health and safety of

19 our neighborhoods, correct?

20     A.   That's correct.

21     Q.   And diversion burdens our court systems,

22 our law enforcement community, and the social fabric

23 of our communities, agreed?

24          MS. SWIFT:  Objection, outside the scope.

25          MR. BUSH:  And foundation.

Page 125

1    BY MR. WEINBERGER:

2        Q.    Do you agree with that?

3        A.    Yes, I agree.

4        Q.    And if you would go back to Defendants'

5    Exhibit 5, which Ms. Swift showed you, which was

6    your testimony before the Judiciary Committee of the

7    United States Senate from December 12, 2017, it was

8    interesting to me that Ms. Swift didn't ask you to

9    read a couple of sections when she was examining

10   you.

11          So do you have Exhibit 5 in front of you,

12   Defendants' Exhibit 5?

13       A.    I was looking at it on the screen.  Hold

14   on.

15       Q.    Sure.  You can look at it on the screen if

16   you want to, but whatever is easiest for you.

17       A.    Yes, I'm looking at it on the screen.  I'm

18   sure it's around here somewhere.

19       Q.    Okay.  So we're going to go to the very

20   next page, and this is the beginning of your

21   testimony where you thank or you address

22   Chairman Grassley and Ranking Member Feinstein, but

23   I'm interested in the second sentence of your

24   testimony.

25          It says, "The overprescribing and abuse of

Page 126

```
 1   controlled prescription drugs is inextricably linked
 2   with the threat the United States faces from the
 3   trafficking of heroin, illicit fentanyl, and
 4   fentanyl analogues."
 5            That was your testimony, correct?
 6        A.   Yes.
 7        Q.   That's what we -- what's commonly known in
 8   the DEA agency as the gateway effect, from
 9   prescription opioid drugs into illegal drugs,
10   correct?
11            MR. SOBOTKIN:  Objection.
12            MS. SWIFT:  Objection.
13            MR. SOBOTKIN:  From your personal
14       recollection, you can answer.
15            MS. SWIFT:  It's outside the scope.
16            THE WITNESS:  From personal recollection,
17       yes.
18   BY MR. WEINBERGER:
19        Q.   But by "gateway," what that means is that
20   the overprescribing and abuse of controlled
21   prescription drugs is well-known to lead -- as you
22   said, inextricably linked with the threat of illicit
23   drugs in our country, correct?
24            MS. SWIFT:  Objection, outside the scope,
25       foundation.
```

1           THE WITNESS:  Correct.

2    BY MR. WEINBERGER:

3           Q.   And the second paragraph says that drug

4    overdoses suffer -- I'll tell you what.  Why don't

5    you read for us into the record what you stated in

6    the second paragraph.

7           A.   "Drug overdose" --

8           Q.   Go ahead.

9           A.   "Drug overdoses, suffered by family,

10   friends, neighbors, and colleagues, are now the

11   leading cause of injury-related death in the

12   United States, eclipsing deaths from motor-vehicle

13   crashes or firearms.  According to initial estimates

14   provided by the Center for Disease Control and

15   Prevention (CDC), there were more than 64,000

16   overdose deaths in 2016, approximately 175 per day.

17   Over 34,500 (54 percent) of these deaths were caused

18   by prescription opioids, fentanyl, or fentanyl

19   analogues.  The sharpest increase in drug overdose

20   deaths from 2015 to 2016 was fueled by a surge in

21   fentanyl and fentanyl analogue (synthetic opioids)

22   overdoses."

23          Q.   Then the -- you go to say in the next

24   paragraph, and I'll read it for you, "In 2016,

25   almost 3.4 million Americans age 12 or older

Page 128

1    reported misusing prescription pain relievers within

2    the past month.  This makes prescription opioid

3    misuse more common than use of any category of

4    illicit drug in the United States except for

5    marijuana."

6              Did I read that correctly?

7         A.   Yes.

8         Q.   Is it fair to say that this is a

9    description of an opioid epidemic?

10        A.   That's fair to say.

11        Q.   And is it fair to say that this opioid

12   epidemic, from your knowledge of the DEA, had been

13   going on since the early 2000s?

14        A.   Yes, it's --

15             MS. SWIFT:  Object to form, foundation.

16   BY MR. WEINBERGER:

17        Q.   The answer is yes, right?

18        A.   It's fair to say that, yes.

19        Q.   Yes.

20             And is it fair to say that any registrant,

21   including these five defendants, from your

22   experience, knew or should have known of the raging

23   epidemic in opioid prescription pills from the early

24   2000s on?

25             MS. SWIFT:  Object to the form,

Page 129

1      foundation.

2  BY MR. WEINBERGER:

3      Q.   Go ahead.  You can answer.

4      A.   I believe they knew or should have known.

5      Q.   And when your -- and as registrants and

6  dispensers of prescription opioid medications,

7  shouldn't the conduct of these pharmacies have

8  been -- shouldn't they have taken into effect the

9  fact that there was an ongoing epidemic of

10  prescription opioid pills in this country?

11          MS. SWIFT:  Object to the form.

12          THE WITNESS:  That would be my

13      expectation, yes.

14  BY MR. WEINBERGER:

15      Q.   And because of the danger and risk of

16  prescription opioid pills and the -- and its effect

17  on the epidemic, would you agree that these pharmacy

18  companies should have been extremely vigilant in

19  ensuring that their employees complied with the

20  Controlled Substances Act?

21          MR. SOBOTKIN:  Object to form.

22          THE WITNESS:  I believe they should have

23      been vigilant, yes.

24  BY MR. WEINBERGER:

25      Q.   Right.

Page 130

1          We have a -- we have a saying in the law

2     that as the danger of somebody's conduct increases,

3     the degree of vigilance required of the person who

4     knows of that danger and who might contribute to it

5     goes up.

6          Do you agree with that general concept?

7          MS. SWIFT:   Object to the form.

8     BY MR. WEINBERGER:

9          Q.   Do you agree?

10          A.   I agree with that general concept, yes.

11          Q.   In your testimony, if we go on to, at the

12     bottom of Page 3 -- or, I'm sorry, to Page 3 of your

13     testimony, right, Page 3, next page.  There we go.

14     There's a section in your testimony about

15     Prescription Drug Monitoring Programs.

16          A.   Yes.

17          Q.   And I'll read it for you.  You describe

18     them as "Prescription Drug Monitoring Programs

19     (PDMPs) are state-run electronic database systems

20     used by practitioners, pharmacists, medical and

21     pharmacy boards, and law enforcement, but their

22     organization and operation varies according to state

23     law, including who can access information contained

24     in the PDMP database."

25          Did I read that correctly?

Page 131

1       A.    Yes.

2       Q.    So these PDMPs -- and by the way, you're

3   familiar with the Ohio PDMP, which is the acronym

4   OARRS?  Are you familiar with OARRS?

5       A.    No.

6       Q.    Maybe not.  Okay.  Well, Ohio has one and

7   has had one since 2006, and that was implemented

8   more significantly in 2011.  That's our -- Ohio's

9   PDMP.

10           So PDMPs, in general, according to what

11   you know about them, are based upon dispensing data,

12   correct?

13           MS. SWIFT:  Object to the form.

14           THE WITNESS:  Correct.

15   BY MR. WEINBERGER:

16       Q.    And the dispensing -- and the PDMPs, the

17   way that they work is they analyze the dispensing

18   data and use software algorithms to create either

19   warning signs or signals to their user about

20   potential red flags that might be associated with

21   either a patient, a prescriber, or a pharmacist,

22   true?

23       A.    True.

24           MS. SWIFT:  Objection, mischaracterizes

25       the facts.

Page 132

1            MR. SOBOTKIN:  And object to form,
2        foundation.
3    BY MR. WEINBERGER:
4        Q.   You did say "true," correct?  That you
5    agreed?
6        A.   Yes.
7        Q.   Okay.  And the experience with these PDMPs
8    is that this dispensing data has a lot of important
9    information that can actually, if properly analyzed,
10   be utilized to assist a pharmacist in identifying
11   red flags associated with a particular prescription,
12   true?
13       A.   It helps to assist, yes.
14       Q.   Right.  And I'm assuming -- well, maybe I
15   shouldn't assume.
16            You're aware of the CSA regulation that
17   requires the defendants to store their dispensing
18   data in their own systems?
19            MS. SWIFT:  Object to the form,
20        foundation.
21            THE WITNESS:  Yes.
22   BY MR. WEINBERGER:
23       Q.   And you're aware that that dispensing
24   data, for most of these large corporations, are kept
25   in central locations and are retrievable through

                                              Page 133

1   various computerized means?

2             MS. SWIFT:  Object to the form.

3             THE WITNESS:  Yes.

4   BY MR. WEINBERGER:

5        Q.   And are you aware of the fact that these

6   corporations' dispensing data databases, if accessed

7   properly with proper software, could do many of the

8   same things that a PDMP does?  In other words,

9   identify red flags that would be associated with the

10  data?

11            MS. SWIFT:  Object to the form.

12            MR. BUSH:  Objection.

13            MR. SOBOTKIN:  Same objection, calls for

14       speculation.

15  BY MR. WEINBERGER:

16       Q.   Do you agree with that?

17       A.   I believe that could be done, yes.

18       Q.   And can we agree, generally -- and we will

19  get into the red flag systems a little bit later --

20  but can we agree, generally, that many of the red

21  flags associated with either a prescriber profile or

22  a patient profile can use data to identify potential

23  red flags?

24            MS. SWIFT:  Object to the form.

25            THE WITNESS:  Yes.

Page 134

1  BY MR. WEINBERGER:

2      Q.    And in terms of the pharmacy companies'

3  obligation to establish appropriate controls to

4  guard against diversion, it would be reasonable to

5  expect the pharmacies to access their own databases

6  to look for red flags, right?

7            MS. SWIFT:  Object to the form.

8            MR. BUSH:  Objection.

9            THE WITNESS:  That is reasonable, yes.

10 BY MR. WEINBERGER:

11     Q.    And particularly, if a pharmacy company is

12 being vigilant in the face of a raging prescription

13 opioid pill epidemic, access to that database of

14 information would be important, correct?

15           MS. SWIFT:  Object to the form.

16           THE WITNESS:  I agree it would be

17      important, yes.

18 BY MR. WEINBERGER:

19     Q.    So you testified earlier, in response to

20 Ms. Swift's questioning, that -- well, let me ask

21 you this.

22           Is it your understanding, based upon

23 your years of experience, that a pharmacy and its

24 pharmacists have a corresponding responsibility, in

25 addition to the prescribers' responsibility, to fill

Page 135

1   only opioid prescriptions that are issued for a

2   legitimate medical purpose?

3           MS. SWIFT:  Object to the form.

4           THE WITNESS:  That is my understanding.

5   BY MR. WEINBERGER:

6       Q.  Okay.  And that's contained -- that

7   requirement is contained in the regulations.  Let me

8   see if I can get them out.  I've got too many papers

9   here, Ms. Ashley.  Sorry.  Here we go.

10          130 -- sorry.

11          1306.04, which is in your packet of

12  materials P-GEN-00174.

13          MR. WEINBERGER:  And we're going to mark

14      it as Plaintiffs' Exhibit 3 [sic].

15              (Plaintiff Exhibit 4 was marked

16                  for identification.)

17          THE WITNESS:  I have it.

18          MR. WEINBERGER:  And if you could

19      highlight, Jim, that very first paragraph and

20      blow it up.  Right.

21  BY MR. WEINBERGER:

22      Q.  So this, this says, "A prescription for a

23  controlled substance to be effective must be issued

24  for a legitimate medical purpose by an individual

25  practitioner acting in the usual course of his

Page 136

1    professional practice.  The responsibility for the
2    proper prescribing and dispensing of controlled
3    substances is upon the prescribing practitioner, but
4    a corresponding responsibility rests with the
5    pharmacist who fills the prescription."
6             Have I read that correctly?
7        A.   Yes.
8        Q.   And that corresponding responsibility is
9    something that should be well-known to these
10   defendant pharmacy companies ever since they first
11   got registered, right?
12       A.   I imagine so, yes.
13       Q.   And a prescription for a controlled
14   substance may only be filled by a pharmacist acting
15   within the usual course of his professional practice
16   and either registered individually or employed by a
17   registered pharmacy.
18            Do you agree with that?
19       A.   I agree with that.
20       Q.   And that's contained in 1306.06, which
21   we're going to -- that's P-GEN-00220, which we're
22   going to mark as Exhibit 4 [sic].
23                      (Plaintiff Exhibit 5 was marked
24                       for identification.)
25            MR. WEINBERGER:  If you would bring that

```
                                              Page 137
 1        up, Jim.  And just, if you would, highlight it
 2        because I actually read most of that directly
 3        when I asked the last question.
 4   BY MR. WEINBERGER:
 5        Q.   So you agree this is 1306.06, Ms. Ashley?
 6        A.   Yes.
 7        Q.   And would you agree, as it's your own
 8   personal knowledge and understanding, that in order
 9   for a pharmacist to fulfill the obligations of
10   1306.06, that is, in the normal course of practicing
11   in dispensing opioids and other controlled
12   substances, the pharmacy must identify and resolve
13   any red flags?
14             MS. SWIFT:  Object to form.
15             THE WITNESS:  Yes, I agree with that.
16   BY MR. WEINBERGER:
17        Q.   And these defendant pharmacies, they
18   didn't need some specific regulation in the CFRs, or
19   in the Code of Federal Regulations, to tell them
20   that as a matter of course, they had an obligation,
21   or the pharmacist did, to identify red flags.
22             That is common-sense understanding
23   associated with all pharmacy education going back 30
24   or 40 years, correct?
25             MS. SWIFT:  Object to form.
```

```
                                            Page 138

 1              MR. BUSH:  Objection.
 2              MR. SOBOTKIN:  The question about pharmacy
 3         education is outside the scope of the Touhy
 4         authorization.  I'll instruct the witness not
 5         to answer.
 6   BY MR. WEINBERGER:
 7         Q.   All right.  Well, pharmacists are
 8   professionals, aren't they?
 9         A.   Yes.
10         Q.   They have college degrees, right?
11         A.   Yes, they do.
12         Q.   And you've dealt with pharmacists for your
13   entire career, haven't you?
14         A.   Yes, I have.
15         Q.   And pharmacists and the corporations that
16   they employ all know that identifying and
17   investigating red flags is an integral part of the
18   pharmacy's obligation to -- before opioids are
19   dispensed, correct?
20         A.   Correct.
21              MS. SWIFT:  Objection, foundation, outside
22         the scope.
23              THE WITNESS:  I believe they should know
24         and exercise that, yes.
25
```

Page 139

1    BY MR. WEINBERGER:

2        Q.   And identification of red flags is an

3    integral part of the pharmacy and the pharmacist's

4    fulfilling the corresponding responsibility required

5    by the CSA, correct?

6            MS. SWIFT:  Objection, form, calls for a

7        legal conclusion.

8            THE WITNESS:  I agree with that.

9    BY MR. WEINBERGER:

10       Q.   The corresponding responsibility has been

11   described by the Drug Enforcement agency, in your

12   experience, as, quote, "the last line of defense to

13   preventing opioid abuse and diversion."

14           True?

15           MS. SWIFT:  Object to form.

16           THE WITNESS:  That's true.

17   BY MR. WEINBERGER:

18       Q.   And by "last line of defense," what is

19   meant is it's the very last opportunity before the

20   opioid prescription pills gets into the hands of the

21   patient or gets onto the streets for the system to

22   ensure that the prescription is properly dispensed

23   under the laws, correct?

24           MS. SWIFT:  Object to form.

25           MR. SOBOTKIN:  The witness can answer if

1          that's her personal understanding of the

2          phrase, not the agency's.

3               THE WITNESS:  It's my personal

4          understanding that that is the last

5          decision-making before it's turned over to the

6          end user, correct.

7     BY MR. WEINBERGER:

8          Q.   Also known as the last line of defense,

9     correct?

10         A.   Last line of defense, yes.

11              MR. WEINBERGER:  Ms. Ashley, for me it's

12         about 10 to 12:00.  For you, it's about 10 to

13         11:00.

14              Do you want to take a short break?

15              THE WITNESS:  Sure, yes.

16              MR. WEINBERGER:  Shall we come back in,

17         say, five minutes?

18              THE WITNESS:  That would be great.  Yes.

19              MR. WEINBERGER:  All right.  Very good.

20              THE VIDEOGRAPHER:  Off the record, 10:50.

21                        (Whereupon, a recess was taken

22                        from 10:50 a.m. to 11:04 a.m.)

23              THE VIDEOGRAPHER:  On the record at 11:04.

24              MR. WEINBERGER:  Okay.  Thank you.

25              Just to -- I need to do just a little bit

Page 141

1          of housekeeping.  I messed up some of the

2          exhibit numbers.

3               So Exhibit 4 -- it's not 3 -- Exhibit 4 is

4          P-GEN-00174.  That's 1306.04.

5               And Exhibit 5 is P-GEN-00220, Exhibit 5.

6          Yes, Exhibit 5.  That's the 1306.06.

7     BY MR. WEINBERGER:

8          Q.   Ms. Ashley, I want to go back over some of

9     the exhibits that Ms. Swift showed you, and let's

10    start with Exhibit 1.  Defendants' Exhibit 1, if you

11    can pull that back out.

12         A.   I'm sorry, I left my glasses in the other

13    room.  Hold on for a second.

14         Q.   We will give you a minute.

15         A.   I have it.

16         Q.   Most importantly, you have your glasses.

17         A.   I had to get a different pair.  I couldn't

18    find them.

19         Q.   Hopefully, they're good for reading.

20         A.   Yeah.

21         Q.   Okay.  So Exhibit 1 is what Ms. Swift

22    showed you.  It's this PowerPoint that -- where you

23    were a presenter, apparently, in 2016.  And I want

24    to go over just a couple of pages of it.

25               If you go one, two, three, four, to the

Page 142

1    fifth page.  Like I say, they're numbered, yeah.

2            So this apparently was a presentation that

3    you made to representatives from the drug pharmacy

4    industry?

5        A.    Okay.

6        Q.    And you've entitled this "DEA and

7    Pharmacy:  Working Together to Prevent Prescription

8    Drug Abuse."

9            Can we -- can we agree, based upon your

10   experience over your many years at the DEA, that,

11   you know, part of your job was to communicate with

12   DEAs -- I'm sorry, with pharmacy corporations like

13   these defendants and to cooperate with them and

14   provide them, where appropriate, proper guidance,

15   true?

16       A.    Yes, that's true.

17       Q.    And that's something you strove to do,

18   right?

19       A.    Yes, I did.

20       Q.    And so if any of these defendants were to

21   get up in open court and say, you know, we didn't

22   get -- we didn't get the help of the DEA that we

23   needed or we didn't get proper guidance, that just

24   wouldn't be true, would it?

25            MS. SWIFT:  Objection, foundation, outside

Page 143

1           the scope to the extent it has anything to do
2           with other than Ms. Ashley's own personal
3           knowledge.
4   BY MR. WEINBERGER:
5           Q.   Okay.  It just wouldn't be true from your
6   own personal experience, correct?
7               MS. SWIFT:  Same objections.  It's outside
8           the scope.
9               THE WITNESS:  In my personal experience,
10          yeah, there were lots of questions, and I, you
11          know, did my best to respond.
12  BY MR. WEINBERGER:
13          Q.   Okay.  And to cooperate as much as
14  possible --
15          A.   To cooperate, yes.
16          Q.   -- as a governmental employee interested
17  in doing your job to prevent diversion, correct?
18              MS. SWIFT:  Same objections.
19              THE WITNESS:  That is correct.
20  BY MR. WEINBERGER:
21          Q.   So go on, then, to Page 8 of this
22  PowerPoint.  We can put that up on the screen.
23              This sort of piggy-backs on your testimony
24  before Congress in 2016.  In this PowerPoint slide,
25  you are describing the impact of the opioid

Page 144

1  prescription pill epidemic in our country from 2000

2  until 2014, correct?

3       A.   That's correct.

4       Q.   This significant increase in overdose

5  deaths, the fact that, you know, 500,000 people died

6  from drug overdoses, that's just -- and you've cited

7  statistics from the CDC for this slide, correct?

8       A.   That's correct.

9       Q.   That's the Center for Disease Control,

10  right?

11      A.   Yes.

12      Q.   Okay.  And if we go on to the next slide,

13  you're now focusing in on 2014 and the effect of

14  this epidemic on our country, right?

15      A.   Yes.

16           MR. WEINBERGER:  I'm just going to let the

17      jury read this slide.

18           MS. SWIFT:  Objection.

19  BY MR. WEINBERGER:

20      Q.   Okay.  If we go on to Page 15 and 16 --

21  let's start with Page 15 -- you're describing the

22  corresponding responsibility that rests with the

23  pharmacists, and we've already gone over that

24  earlier in your testimony, correct?

25      A.   Yes.

Page 145

1       Q.   And the next -- the next slide, I'm kind

2   of interested in the words that you highlighted on

3   this slide.  You have, "A pharmacist, by law, has a

4   corresponding responsibility to ensure that

5   prescriptions are legitimate."

6            What did you mean by that?

7       A.   Just to make great effort to the best of

8   their ability to ensure.

9       Q.   And is that part of -- part and parcel of

10   what we talked about earlier about the importance of

11   pharmacists and their -- and the companies they work

12   for to be vigilant with respect to filling

13   prescription opioids?

14       A.   Yes, it is.

15       Q.   And the next bullet point says, "When a

16   prescription is presented by a patient or demanded

17   to be filled by a patient -- for a patient by a

18   doctor's office, a pharmacist is not obligated to

19   fill the prescription."

20            What did you mean by that?

21       A.   I mean they are not -- they have in their

22   professional judgment to make a decision to fill or

23   not fill.  They are not obligated to do it.  They

24   need to make a decision.

25       Q.   And that's where we come back to this

Page 146

1   whole red flag analysis, correct?

2        A.   Correct.

3             MR. BUSH:  Objection.

4   BY MR. WEINBERGER:

5        Q.   I'm interested in the use of the

6   terminology "red flag," based upon your experience,

7   you know, as a layperson not in this field.

8             I'm just interested, from your personal

9   understanding, does "red flag" mean stop and

10  investigate?  Is that what using that terminology

11  means?

12       A.   It means stop, pay attention, warning,

13  yes.

14       Q.   Okay.  Go on to Page 28, if you would,

15  please.  This is entitled "DEA Registrant

16  Initiatives."

17            What are you intending to communicate as

18  part of this presentation, at this part of this

19  presentation?

20       A.   The initiatives that DEA may have going

21  forward in working with registrants.  I'm just

22  reading this.

23       Q.   Okay.  Including reinforcing the issues

24  associated with red flag analysis of prescriptions?

25       A.   That's correct.

Page 147

1      Q.   While we're -- while we're on this page, I
2  want to go back to Defendants' Exhibit 13, if you
3  could pull that out, please.
4      A.   Which one was it?
5      Q.   It's the one that's entitled
6  "Stakeholders' Challenges and Red Flag Warning
7  Signs."
8      A.   Okay.
9      Q.   Exhibit 13, Defendants' Exhibit 13.
10     A.   I have it.
11     Q.   Okay.  You were -- you were asked a number
12  of questions about this.
13          On this first page, I don't see the DEA
14  listed as a stakeholder.
15          Do you know of your own personal knowledge
16  whether the DEA actually signed off on this
17  document?
18     A.   I don't.  But I do know they were
19  involved.
20     Q.   Okay.  In -- in this document, there's a
21  lot of footnotes.  And if you would go to page -- in
22  the upper right-hand corner, there's a page number
23  for this document.
24          If you look at Page 9.  Okay.  Down below,
25  there's a footnote to the Holiday CVS case that we

Page 148

1    talked about earlier.  And this page, by the way,
2    talks about red flags.  There's a footnote to
3    Holiday CVS case, correct?
4         A.    Correct.
5         Q.    And then there's also -- there's a
6    footnote to the East Main Street Pharmacy case.
7              Do you remember when I showed that to you
8    earlier, and you didn't recall that?
9         A.    Yes, I do remember.
10        Q.    And then if you go on to Page 11, there's
11   Footnotes 15 through 20, which are all cases from
12   the Federal Register, right?
13        A.    Yes.
14        Q.    And some of those cases go back to 2008,
15   right?
16        A.    Yes.
17        Q.    And all of these cases, to the extent that
18   they deal with corresponding responsibility and
19   obligations under the CSA and red flags, all would
20   have been available to all these defendant
21   pharmacies had they actually looked in the Federal
22   Register and followed the developments set forth in
23   those cases, correct?
24        A.    That's correct.
25        Q.    All right.  I'm going back -- sorry to

Page 149

1   skip around a little bit, but I'm going back to

2   Exhibit 1, which we still have in front of us.  Look

3   at Page 32.

4           This is the National Take-Back Initiative.

5   It's a slide about taking unused prescription opioid

6   pills or promoting that patients who have them

7   sitting around in their medicine cabinets or

8   whatever should take them back to dispose of them,

9   right?

10      A.   Yes.

11      Q.   And you were shown, by the way, a

12  receptacle, a Walgreens receptacle, a picture of it

13  by Ms. Swift earlier.

14          Do you remember that?

15      A.   Yes.

16      Q.   So if the evidence in this case,

17  Ms. Ashley, was that, for years, the executives at

18  Walgreens, as documented in the evidence, objected

19  to putting these receptacles in their stores, would

20  that surprise you?

21          MR. SOBOTKIN:  Objection.

22          MS. SWIFT:  Objection, mischaracterizes

23      the evidence, outside the scope.

24  BY MR. WEINBERGER:

25      Q.   You can answer.

Page 150

1       A.    That would surprise me.  That they

2    objected to it?

3       Q.    Yes.

4       A.    That would surprise me, yes.

5       Q.    Now, let's go on then to Defendants'

6    Exhibit 9.  This was the PowerPoint that was

7    prepared by the executive director of the Ohio State

8    Board of Pharmacy that Ms. Swift asked you a number

9    of questions about.

10      A.    Yes.

11      Q.    The -- if you go to Page 4 of this

12   exhibit, she didn't -- she didn't show you this

13   particular slide, which is entitled "2010

14   Prescription Opioid Consumption Per Capita."

15            And it says, "Opioid doses per capita,"

16   and this is from the Ohio State Board of Pharmacy.

17      A.    Uh-huh.

18      Q.    Now, when we use the term "per capita,"

19   what we're talking about is the number of doses per

20   person in a particular -- in this particular case,

21   in a particular county.

22            Do you see that?

23      A.    Yes.

24      Q.    And, you know, one of the plaintiffs in

25   this case is Trumbull County.  And if I read that

```
 1   correctly, in 2010, there were 85.5 doses of opioids
 2   dispensed in Trumbull County per person for 2010.
 3            MS. SWIFT:  Object to the form.
 4            MR. SOBOTKIN:  Objection.
 5   BY MR. WEINBERGER:
 6       Q.   Do you see that?
 7            MS. SWIFT:  Object to the form.
 8            MR. BUSH:  Is there a question?
 9            THE WITNESS:  Oh, yeah.
10   BY MR. WEINBERGER:
11       Q.   Do you see that?
12       A.   I can see that, yes.
13       Q.   And you're aware that Walgreens and
14   Walmart and Rite Aid and CVS -- and I think
15   Giant Eagle, but I'm not going to include
16   Giant Eagle in this question -- those four all had
17   pharmacies in Trumbull County?
18            MS. SWIFT:  Object to the form,
19       foundation.
20   BY MR. WEINBERGER:
21       Q.   Are you aware of that?
22       A.   Am I aware?  I just would assume, if I
23   can.  I would just assume.
24       Q.   I'm sorry?
25       A.   I would just assume.  I don't know for
```

Page 152

1    certain.  I would assume that they have pharmacies

2    in that area.

3        Q.  And 85 doses of opioids per person, every

4    man, woman, and child in Trumbull County, is that an

5    indication to you of overprescribing and

6    overdispensing in --

7            MS. SWIFT:  Object to the form,

8        foundation.

9            MR. SOBOTKIN:  Objection.

10            MS. SWIFT:  Beyond the scope.

11            MR. WEINBERGER:  Can I finish my question,

12        please, with all due respect?  Okay?  I know I

13        hesitate sometimes.

14            MS. SWIFT:  Yeah, you do.

15            MR. WEINBERGER:  But I'd really like to

16        finish my question if I could.

17            MR. SOBOTKIN:  I thought you were done.

18            MR. WEINBERGER:  Yeah, I appreciate that.

19    BY MR. WEINBERGER:

20        Q.  So is that statistic an indication of

21    overprescribing and overdispensing, based upon your

22    own personal knowledge back in 2010?

23            MR. SOBOTKIN:  Objection, I'm going to

24        direct the witness not to answer as outside the

25        scope of the Touhy authorization, to the extent

Page 153

1          it calls for her personal or expert opinion as
2          to nonpublic facts she gained during the course
3          of her employment at DEA.
4               MR. WEINBERGER:  Is that a she can't
5          answer?
6               MR. SOBOTKIN:  She can't answer if it
7          requires her to rely on nonpublic facts that
8          she learned as a DEA employee.
9               MR. WEINBERGER:  Oh, okay.
10               MR. SOBOTKIN:  If she can answer it -- and
11          this is on her -- based on public facts or
12          post-employment at DEA facts, then she can
13          answer.
14               MS. SWIFT:  And I'm going to object as
15          well.  It's outside the scope and the witness
16          lacks foundation.
17               THE WITNESS:  My answer would rely on
18          nonpublic facts at DEA that I acquired at DEA.
19     BY MR. WEINBERGER:
20          Q.   Fair enough.
21               Let's look at -- are you familiar, as a
22     DEA employee, of "blue highway," the description of
23     the "blue highway"?
24               MS. SWIFT:  Objection, outside the scope.
25               THE WITNESS:  The term is familiar.

Page 154

1   BY MR. WEINBERGER:

2       Q.   Yeah, it's traveling -- it's the traveling

3   of pills from one location to another on the highway

4   system of Interstate 77, in general.

5            Do you remember that, in general?

6            MS. SWIFT:  I'm going to object that this

7        is outside the scope.  Where in the Touhy

8        authorization do you think that this is

9        covered, Pete?

10           MR. WEINBERGER:  Well, I'll tell you what,

11       Ms. Swift.  I'll tell you where that's coming

12       from.

13  BY MR. WEINBERGER:

14      Q.   If you look at Exhibit 2 that Ms. Swift

15  used in questioning you, this is the -- this is the

16  DEA PowerPoint about what Ms. Swift questioned you

17  about regarding rogue pain clinics and pill mills.

18           And if you look at Page 34 of this exhibit

19  that she used, that she got from the DEA, this slide

20  apparently depicts the migration of pain clinics

21  from Florida through Georgia, Tennessee, Kentucky,

22  and Ohio.

23           Do you see that?

24           MS. SWIFT:  Object to the form.

25           THE WITNESS:  I see that, yes.

Page 155

1    BY MR. WEINBERGER:

2        Q.   And from your knowledge, Ms. Ashley, at

3    the DEA, was the DEA aware of the fact that patients

4    were coming from Ohio, Kentucky, Tennessee, Georgia,

5    going down to Florida, and getting prescriptions

6    filled and then taking them back to these other

7    states?

8            MS. SWIFT:  Object to the form.

9            MR. SOBOTKIN:  I'm going to direct the

10       witness not to answer as to what DEA may have

11       known or not known.

12           But the witness can answer as to what she

13       knew.

14   BY MR. WEINBERGER:

15       Q.   Sorry, that's how I should be couching

16   these questions, Ms. Ashley.

17           Did you know about that?

18       A.   I did not know independent of DEA, of my

19   role --

20       Q.   You became --

21       A.   -- at DEA.

22       Q.   You became generally aware of that in your

23   position at DEA, correct?

24           MS. SWIFT:  Object to the form.  She was

25       just instructed not to answer the question.

Page 156

1    BY MR. WEINBERGER:

2         Q.   Well, are you -- okay.  You can answer the

3    question, Ms. Ashley.

4              MS. SWIFT:  Same objection.

5              THE WITNESS:  I became aware of it in my

6         role at DEA, yes.

7    BY MR. WEINBERGER:

8         Q.   And did you become aware, as part of your

9    personal experience at the DEA, that some of this

10   pill migration or traveling was from pills that were

11   being dispensed at the Walgreens and CVS Pharmacy

12   facilities in Florida?

13             MS. SWIFT:  Object to form, outside the

14        scope, foundation.

15             MR. BUSH:  Objection.

16             THE WITNESS:  I recall that, yes.

17   BY MR. WEINBERGER:

18        Q.   And some of the conduct at those CVS and

19   Walgreens stores were investigated, and the subject

20   of enforcement actions brought against those

21   companies by the DEA.

22             Without going into details, isn't that

23   true?

24             MS. SWIFT:  Object to the form, outside

25        the scope.

1            MR. BUSH:  Objection.

2            MS. SWIFT:  Foundation.

3            MR. SOBOTKIN:  Objection, outside the

4        scope.

5            To the extent you can answer in the

6        general, you can answer.

7            To the extent you're required to answer as

8        to specific enforcement matters or

9        investigations, you cannot answer.

10            THE WITNESS:  I am aware of that, yes.

11    BY MR. WEINBERGER:

12        Q.    In Exhibit 15, which is the 2006 --

13    Defendants' Exhibit 15, which is the 2006

14    publication the Federal Register that you were asked

15    about by Ms. Swift, if you could go to the first

16    page, the next page, I was interested that she sort

17    of skipped over this part when she asked you

18    questions.

19            This is 2006, starting the first column,

20    left column all the way at the bottom.

21            Jim, there you go, "Extent of Abuse in the

22    United States of Controlled Prescription Drugs."

23            Again, 2006, this is published.  Let me

24    read this to you.  "The abuse (nonmedical use) of

25    prescription drugs is a serious and growing health

Page 158

1    problem in this country.  As the administration has

2    announced, recent data indicate that prescription

3    drug abuse, particularly of opioid painkillers, has

4    increased at an alarming rate over the past decade."

5            Let me stop there.

6            From your understanding, personal

7    understanding, so this is a problem that started in

8    the mid 1990s, correct?

9            MS. SWIFT:  Object to the form.

10           THE WITNESS:  Correct.

11   BY MR. WEINBERGER:

12       Q.   And going on to the next paragraph, one of

13   the areas -- see it, Jim?  Right there.

14           "One of the areas of concerns is the

15   number of persons who have recently begun abusing

16   prescription controlled substances.  In the NSDUH

17   Report published in June of 2006, SAMHSA states, 'In

18   2004, among persons aged 12 or older, 2.4 million

19   initiated nonmedical use of prescription pain

20   relievers within the past year.'"

21           All of this information published in the

22   Federal Register should have been available to and

23   reviewed by the regulatory compliance offices of

24   each of these defendants; isn't that true?

25           MS. SWIFT:  Object to the form.

Page 159

1          MR. BUSH:  Objection.

2          THE WITNESS:  That's publicly available,

3     yes.

4          MR. WEINBERGER:  So you can take that

5     down, Jim.

6  BY MR. WEINBERGER:

7     Q.   I asked you earlier, in general, that when

8  the DEA files and proceeds with enforcement actions

9  against the pharmacies, including these defendants,

10  whether there is information published about those

11  enforcement -- that conclusions of those enforcement

12  actions published by the DEA in the Federal

13  Register.

14          Do you remember my question about that?

15     A.   I do.

16     Q.   If you would pull out P-OD-WAG-00248.

17          MR. SOBOTKIN:  Can I get that number

18     again, please.

19          MR. WEINBERGER:  Sure.  00248.

20     P-OD-WAG-00248.

21          THE WITNESS:  I have it.

22          MR. BUSH:  This is what exhibit?  I'm

23     sorry.

24          MR. WEINBERGER:  This is Exhibit 6,

25     Plaintiffs' Exhibit 6.

Page 160

1                    (Plaintiff Exhibit 6 was marked

2                       for identification.)

3           MR. WEINBERGER:  Thanks for reminding me.

4  BY MR. WEINBERGER:

5      Q.   This is -- this is a settlement agreement

6  between the federal government and CVS from 2015,

7  and I just want to -- first of all, are you familiar

8  with the settlement agreement, the document itself?

9           MR. BUSH:  Objection, outside the scope.

10      I object to all questions about the settlement

11      agreement and the enforcement action, so

12      starting early.

13           THE WITNESS:  I'm familiar with the

14      settlement agreement with CVS.

15  BY MR. WEINBERGER:

16      Q.   Okay.  And I'm not going to ask you about

17  details of the investigation because that's

18  off-limits for me today.

19           But if you look at Page 3 of the

20  agreement, Paragraph K, it says here, "CVS

21  acknowledges that certain CVS/pharmacy retail stores

22  did dispense certain controlled substances in a

23  manner not fully consistent with their compliance

24  obligations under the CSA and its implementing

25  regulations."

Page 161

1              Do you see that?

2         A.   I do.

3         Q.   And if you go back to Page 2, Paragraph G,

4    it says, "CVS" -- and this is the corporation CVS,

5    right?

6         A.   Yes.

7         Q.   Not some individual pharmacist, right?

8         A.   Correct.

9         Q.   It says, "CVS acknowledges that it has a

10   corresponding responsibility to dispense only those

11   prescriptions that have been issued for a legitimate

12   medical purpose by an individual practitioner acting

13   in the usual course of professional practice and

14   that knowingly filling a prescription not in the

15   usual course of professional practice [sic] or in

16   legitimate and authorized research subjects CSA --

17   CVS to penalties under the CSA."

18              Did I read that correctly?

19        A.   Yes.

20        Q.   And the Department of Justice issued a

21   press release about this settlement, and we will

22   pull that out.  It's P-GEN-00221.

23        A.   I have it.

24              MR. WEINBERGER:  Okay.  We will mark that

25        as Exhibit 7.

Page 162

1                    (Plaintiff Exhibit 7 was marked
2                     for identification.)
3    BY MR. WEINBERGER:
4        Q.    So this is from the Department of Justice
5    website.
6        A.    Yes.
7        Q.    And this is a report of the settlement we
8    just looked at.  The United States reached a
9    $22 million settlement agreement with CVS for the
10   unlawful distribution of controlled substances.
11              MR. SOBOTKIN:  Objection.  Is there a
12        question?
13   BY MR. WEINBERGER:
14       Q.    Have I read that correctly?
15       A.    Yes.
16              MS. SWIFT:  I'm going to object to the
17        foundation and to the form of the question.
18              MR. BUSH:  Me too.
19   BY MR. WEINBERGER:
20       Q.    Look at the -- on the first paragraph, the
21   last line that says, "CVS."  "CVS further
22   acknowledged"?
23       A.    Yes.
24       Q.    It says, "CVS further acknowledged that
25   certain of its retail stores dispensed certain

Page 163

1  controlled substances in a manner not fully

2  consistent with their compliance obligations under

3  the Controlled Substances Act and related

4  regulations."

5          Have I read that correctly?

6      A.   Yes.

7      Q.   Did you have knowledge of that occurring

8  when you were at the DEA?

9          MR. SOBOTKIN:  Objection, outside the

10      scope of the Touhy authorization.

11  BY MR. WEINBERGER:

12      Q.   I'm sorry, did you have knowledge of this

13  settlement at the time, not the investigation, of

14  this settlement?

15          MR. SOBOTKIN:  I'm sorry, the event of the

16      settlement itself?

17          MR. WEINBERGER:  Yes, yes.

18          THE WITNESS:  Yes, I had knowledge of it.

19          MR. WEINBERGER:  And if you look at

20      P-GEN-00222, we will mark that as Exhibit 8.

21                  (Plaintiff Exhibit 8 was marked

22                   for identification.)

23          THE WITNESS:  I have it.

24  BY MR. WEINBERGER:

25      Q.   This is a -- this is from the Department

Page 164

1    of Justice website announcing an $8 million

2    settlement with CVS for the unlawful distribution of

3    controlled substances in 2016.  And it says here --

4    there's a number of comments from the U.S. Attorney

5    who was in charge of this enforcement action, but

6    look at the last paragraph on the first page.

7              It says, "According to the settlement

8    agreement, CVS acknowledged that between 2008 and

9    2012 certain CVS pharmacy stores in Maryland

10   dispensed controlled substances, including

11   oxycodone, fentanyl, and hydrocodone, in a manner

12   not fully consistent with their compliance

13   obligations under the CSA and related regulations.

14   This included failing to comply with a pharmacist's

15   liability to ensure the controlled substance

16   prescriptions were issued for a legitimate medical

17   purpose.  Caps off an investigation that was part of

18   the DEA's crackdown on prescription drug abuse in

19   Maryland."

20             So this was CVS acknowledging their

21   obligations and responsibilities, not some

22   pharmacist for CVS, right?

23             MR. SOBOTKIN:  Objection, outside the

24       scope of the Touhy.  I'm directing the witness

25       not to answer.

Page 165

1    BY MR. WEINBERGER:

2        Q.    Well, you were familiar with this

3    settlement, right?

4        A.    Yes, I'm familiar with the settlement.

5        Q.    And the Department of Justice's

6    description of the settlement that I just read is

7    consistent with your understanding of it, correct?

8              MR. BUSH:  Objection, foundation.

9    BY MR. WEINBERGER:

10       Q.    Personal understanding.

11       A.    Yes.

12       Q.    And if you would pull out P-OD-WAG-00249,

13   which we're going to mark as Exhibit 9.

14             MS. SWIFT:  What was the number, Pete?

15             MR. WEINBERGER:  00249.

16             THE WITNESS:  I have it.

17                      (Plaintiff Exhibit 9 was marked

18                       for identification.)

19   BY MR. WEINBERGER:

20       Q.    This is the -- this is the agreement,

21   Exhibit 9, that's referenced in that -- in the DOJ

22   press release, and if you look at Page 2 of the

23   agreement, Section E, just like the other agreement,

24   it has CVS acknowledging that it has a corresponding

25   responsibility, right?

1      A.    Right.

2            MR. SOBOTKIN:  Objection.

3            THE WITNESS:  Oh, sorry.

4   BY MR. WEINBERGER:

5      Q.    And under Section G --

6            MR. SOBOTKIN:  I'm sorry, Pete.  Is the

7      question does the agreement say that?  Or is

8      the question does she agree with the substance

9      of that statement?

10           MR. WEINBERGER:  The latter.

11           MR. SOBOTKIN:  Okay.  Then, I'm going to

12     object, outside the scope, and direct the

13     witness not to answer.

14  BY MR. WEINBERGER:

15     Q.    All right.  Then, I'll ask the former.

16           Does the agreement say that, that CVS is

17  acknowledging it has a corresponding responsibility?

18     A.    Yes.

19           MR. BUSH:  And I'm going to object to the

20     whole line of questioning.  It's all outside

21     the scope.

22           MR. WEINBERGER:  It has nothing to do with

23     dispensing, right, Mr. Bush?  All right.  Go

24     ahead.  Sorry, withdraw that comment.

25

Page 167

1    BY MR. WEINBERGER:

2         Q.    Did I read that --

3         A.    Yes, you read that, yes.

4         Q.    -- correctly?

5               And then in Paragraph G, it says, CVS

6    acknowledges that these CVS/pharmacy stores

7    dispensed in a manner -- controlled substances in a

8    manner not fully consistent with their compliance

9    obligations and their corresponding responsibility.

10              Is that what the agreement says?

11        A.    That's what it says, correct.

12        Q.    Now, let's move to Walgreens for a moment,

13   Ms. Swift's client.

14              Are you familiar generally with the fact

15   that, in 2013, Walgreens agreed to pay a settlement

16   of $80 million for civil penalties under the

17   Controlled Substances Act?

18              MS. SWIFT:  Objection, outside the scope,

19        foundation.

20              THE WITNESS:  Yes, I'm familiar with that.

21              MR. WEINBERGER:  Okay.  Let's take a look

22        at P-GEN-00224.  I'm going to mark this as

23        Exhibit 10.

24                         (Plaintiff Exhibit 10 was marked

25                          for identification.)

Page 168

1    BY MR. WEINBERGER:

2        Q.    This is the press release from the

3    Department of Justice.

4              And in this press release, at Paragraph 2,

5    the second paragraph, it says, "The settlement, the

6    largest in DEA history, resolves allegations that

7    the Registrants," meaning Walgreens, "committed an

8    unprecedented number of recordkeeping and dispensing

9    violations under the Act.  According to documents

10   filed in the underlying administrative actions, the

11   Registrants negligently allowed controlled

12   substances listed as -- in Schedules II to V of the

13   Act, such as oxycodone and other prescription

14   painkillers, to be diverted for abuse and illegal

15   black market sales."

16             Did I read that correctly?

17             MS. SWIFT:  Objection.  This is well

18        outside the scope.  The witness should not

19        answer these questions.

20             MR. SOBOTKIN:  Objection.  Is the question

21        does the press release say that, contain that

22        line that you just read?

23             MR. WEINBERGER:  We'll go with that.

24   BY MR. WEINBERGER:

25        Q.    Does it?

```
 1      A.    Yes, it does.
 2      Q.    And were you generally familiar, as the --
 3  and personally knowledgeable about this $80 million
 4  settlement of this enforcement action with
 5  Walgreens?
 6           MS. SWIFT:  Objection, outside the scope.
 7           THE WITNESS:  Yes, personally
 8        knowledgeable, yes.
 9  BY MR. WEINBERGER:
10      Q.    And this press release, by the way, on the
11  third page, actually has a link to the actual
12  settlement agreement, doesn't it?
13           MR. SOBOTKIN:  Objection.
14  BY MR. WEINBERGER:
15      Q.    Walgreens MOA and addendum, doesn't it?
16           MR. SOBOTKIN:  Objection, the document
17        says Walgreens MOA and addendum.  There's no
18        way the witness could possibly know what that
19        link would lead to.
20  BY MR. WEINBERGER:
21      Q.    Well, do you know, from your own personal
22  knowledge, that the Department of Justice in this
23  press release had the ability -- or had allowed
24  people who were reading it the ability to link to
25  the Walgreens memorandum of agreement?
```

1              MR. SOBOTKIN:  Objection, outside the

2         scope.  Direct the witness not to answer.

3    BY MR. WEINBERGER:

4         Q.   Well, certainly, that's what it says on

5    the document, right?  That there's a link to it,

6    right?  And it's in a PDF form, right?

7              MS. SWIFT:  Objection, form.

8    BY MR. WEINBERGER:

9         Q.   You can answer.

10        A.   That's what it says, yes.

11        Q.   Without telling us any details, were you

12   involved either in supervising or on the ground with

13   respect to the Walgreens investigation?

14             MR. SOBOTKIN:  Objection.

15             MS. SWIFT:  Object to the form.

16             MR. SOBOTKIN:  Outside of the scope of the

17        Touhy authorization.  Direct the witness not to

18        answer.

19             MR. WEINBERGER:  All right.  Let's pull

20        out PWAG-00001, which we will mark as

21        Exhibit 11.

22                       (Plaintiff Exhibit 11 was marked

23                        for identification.)

24   BY MR. WEINBERGER:

25        Q.   It's a real thick document.  It's the

1    Walgreens memorandum of agreement from 2013.
2          A.   I have it.
3               MS. SWIFT:  Objection to the extent you're
4          mischaracterizing the document.
5               MR. WEINBERGER:  You mean that it's large?
6          Okay.
7    BY MR. WEINBERGER:
8          Q.   Exhibit 11 --
9               MS. SWIFT:  No, that's not what I meant.
10   BY MR. WEINBERGER:
11         Q.   Exhibit -- Exhibit 11, are you familiar
12   with this agreement?
13              MS. SWIFT:  Objection, outside the scope.
14              MR. SOBOTKIN:  Objection, outside the
15         scope.  Direct the witness not to answer.
16   BY MR. WEINBERGER:
17         Q.   Just the document itself, have you seen
18   this document before?
19              MS. SWIFT:  Objection, outside the scope.
20   BY MR. WEINBERGER:
21         Q.   You can answer.
22         A.   Okay.  Let me look at the year.
23              Yes.
24              MS. SWIFT:  And --
25

Page 172

1    BY MR. WEINBERGER:

2         Q.    Yes?

3               And from your own personal knowledge,

4    without getting into any details about the

5    investigation, did it include issues associated with

6    the dispensing practices of Walgreens?

7               MS. SWIFT:  I'm going to object that you

8          are -- you just did get into the details of the

9          investigation, and it's outside the scope.

10              MR. SOBOTKIN:  And I'm going to object

11         that's outside the scope and direct the witness

12         not to answer.

13   BY MR. WEINBERGER:

14        Q.    Did you -- have you recently read about

15   the DOJ's enforcement action that they've filed

16   against Walmart associated with Walmart's dispensing

17   conduct?

18              MS. SWIFT:  Objection, outside the scope.

19              MR. BUSH:  Join.

20              THE WITNESS:  Did I read it?  Yes.

21   BY MR. WEINBERGER:

22        Q.    Well, since you're not -- you weren't at

23   the DOJ at the time that it was filed, I'm not going

24   to go into that in any significant detail.

25              So, Ms. Ashley, we talked about the fact

Page 173

1    that these pharmacy defendants have a duty to

2    provide the tools to their pharmacists to prevent

3    diversion, generally speaking, under 1301.71,

4    correct?

5              MS. SWIFT:  Objection to form.

6              MR. BUSH:  Objection.

7    BY MR. WEINBERGER:

8         Q.   Do you agree with that?

9              MS. SWIFT:  Object to the form.

10             MR. BUSH:  Objection.

11             THE WITNESS:  Yes.

12   BY MR. WEINBERGER:

13        Q.   Okay.  Do you believe from your experience

14   at the DEA, that that includes pharmacies providing

15   a work environment for their pharmacists that allows

16   the pharmacists to fulfill their corresponding

17   responsibility?

18             MS. SWIFT:  Object to the form.

19             THE WITNESS:  That a pharmacy should?  Is

20        that what you're asking?

21   BY MR. WEINBERGER:

22        Q.   Yes.

23        A.   Yeah, I agree with that.

24        Q.   So that would include not imposing strict

25   and unreasonable time limits to fill prescriptions

                                            Page 174

1   so that they can't have enough time to investigate

2   red flags?

3              MS. SWIFT:  Object to the form.

4              THE WITNESS:  Yeah, that sounds

5         unreasonable.

6   BY MR. WEINBERGER:

7       Q.   Not -- and it would include not requiring

8   quotas on prescriptions filled?

9              MS. SWIFT:  Object to the form.

10  BY MR. WEINBERGER:

11      Q.   True?

12      A.   Yeah, that sounds unreasonable.

13      Q.   It would require adequate staffing of the

14  pharmacy to allow enough pharmacists at these stores

15  to fulfill their corresponding responsibility, true?

16             MS. SWIFT:  Object to the form.

17             MR. BUSH:  Objection.

18             THE WITNESS:  Yeah, I think that's

19        important.

20             MR. WEINBERGER:  Ms. Ashley, those are all

21        the questions I have.  Thank you.

22             MS. SWIFT:  It looks like it's about

23        lunchtime.  Can we take a break for lunch and

24        then come back for our redirect?

25             THE WITNESS:  Sure.

Page 175

1          MR. WEINBERGER:  It's okay with me.

2          MS. SWIFT:  Okay with you guys?

3          THE VIDEOGRAPHER:  Off the record, 11:50.

4                    (Whereupon, a lunch recess was

5                    taken from 11:50 a.m. to

6                    12:40 p.m.)

7          THE VIDEOGRAPHER:  We're on the record at

8      12:40.

9                    FURTHER EXAMINATION

10 BY MS. SWIFT:

11     Q.   Ms. Ashley, the Department of Justice has

12 allowed the plaintiffs to ask questions about CVS

13 and Walgreens Pharmacies that were investigated by

14 the DEA, some close to or more than a decade ago.

15          Do you recall those questions?

16          MR. SOBOTKIN:  Objection, mischaracterizes

17     testimony, but you can answer if you can.

18          THE WITNESS:  Do I recall the questions?

19     I'm sorry, from you guys?

20 BY MS. SWIFT:

21     Q.   From the plaintiffs' lawyer earlier today,

22 Mr. Weinberger.

23     A.   Yes, I do.

24     Q.   Okay.  Do you understand that all of those

25 investigations occurred in Florida?

Page 176

1          MR. SOBOTKIN:  Objection.  I'm going to

2      direct the witness not to answer.  It's outside

3      the scope of the Touhy authorization.

4          MS. SWIFT:  David, Mr. Weinberger was

5      allowed to ask a number of questions, not just

6      about those investigations, but about the

7      details of those investigations.  I've got to

8      be allowed to redirect on it.

9          MR. SOBOTKIN:  I disagree with your

10     premise.  I don't think he was allowed to get

11     into any of the details on the investigations.

12     Just he -- Ms. Ashley was allowed to read aloud

13     or confirm the correct reading of certain

14     documents, but nothing about the details of

15     those.

16         MS. SWIFT:  He asked her questions about

17     the details of numerous settlements, about what

18     those settlement agreements said, and what they

19     related to, which was the underlying

20     investigations.  That is what he asked her

21     about, very selectively.

22         I've got to be able to redirect on it.

23         MR. SOBOTKIN:  I -- I agree you can

24     redirect on some of that, but I don't think he

25     got into any of those kind of particular

                                                    Page 177

 1      matters.

 2              MR. WEINBERGER:  I was very careful, based

 3      upon the instructions from Mr. Sobotkin, to do

 4      exactly what he has stated.

 5              MS. SWIFT:  I disagree.  And, look, we

 6      will take it question by question, but I

 7      disagree.

 8              Mr. Weinberger was allowed to ask lots of

 9      questions about investigations and settlements

10      that we've never been able to ask a DEA witness

11      questions about, but I hear you simply saying

12      David, that you're not cutting it off entirely.

13      So let's just take it question by question.

14              MR. SOBOTKIN:  I agree with that.

15  BY MS. SWIFT:

16      Q.   Ms. Ashley, do you understand that the

17  settlement agreements that Mr. Weinberger showed you

18  today with respect to Walgreens and CVS, every one

19  of those related to investigations in Florida?

20      A.   That's not how I recall it.  I thought

21  they were national.  I mean, I could be wrong.

22      Q.   Do you have Plaintiffs' Exhibit 10 handy?

23  It's the Southern District of Florida's press

24  release about the Walgreens settlement.

25      A.   Yes.

1    Q.    Do you agree with me that it's a press

2    release from the United States Attorney's Office in

3    the Southern District of Florida?

4    A.    Yes.

5    Q.    Do you have any personal knowledge about

6    anything having to do with this settlement or the

7    underlying investigation relating to any other state

8    besides Florida?

9         MR. SOBOTKIN:  Objection.  This one is

10         outside the scope of the Touhy.

11         MS. SWIFT:  David, I'm going to have to

12         hold the deposition open if I can't ask these

13         questions.  This is -- I mean, this is absurd.

14         MR. SOBOTKIN:  Listen, I'm not going to

15         tell you or suggest how you should be doing

16         your exam, but the kind of framework that I was

17         working with was allowing Mr. Weinberger to

18         talk about the face of the document and, you

19         know, whether or not Ms. Ashley was aware of

20         the event of a settlement or of an action.

21         But further delving into the details was

22         where I drew the line, and, you know, I'm

23         trying to be consistent between the two

24         parties.

25         MS. SWIFT:  All right.

Page 179

1    BY MS. SWIFT:

2         Q.   Ms. Ashley, do you see on the face of

3    Exhibit 10, the press release from the United States

4    Attorney's Office in the Southern District of

5    Florida, it says, in the first paragraph, that the

6    settlement related to six Walgreens retail

7    pharmacies in Florida, in the first paragraph?

8         A.   Yes, that's what it says.

9         Q.   Do you understand that Walgreens

10   cooperated with the DEA in that investigation that

11   led to the settlement?

12            MR. SOBOTKIN:  Objection.  That's outside

13        the scope of the Touhy.

14   BY MS. SWIFT:

15        Q.   Do you understand that as a result of this

16   investigation, Walgreens voluntarily stopped

17   dispensing controlled substances at those six

18   Walgreens pharmacies?

19            MR. SOBOTKIN:  Objection, outside the

20        scope.

21   BY MS. SWIFT:

22        Q.   Do you understand that the investigation

23   that is described in Exhibit 10 related to

24   dispensing limited to 2010 and 2011?

25            MR. SOBOTKIN:  Objection, outside the

```
                                            Page 180

 1       scope unless there's something particular in

 2       this document that you can point to.

 3   BY MS. SWIFT:

 4       Q.   Setting aside Exhibit 10, Ms. Ashley, are

 5   you aware of any DEA investigation of any Walgreens

 6   Pharmacy in Ohio relating to the dispensing of

 7   opioids?

 8            MR. SOBOTKIN:  Objection, that's outside

 9       the scope.

10   BY MS. SWIFT:

11       Q.   Ms. Ashley, do you have any reason to

12   believe that Walgreens has not been vigilant in its

13   evaluation of prescriptions for opioids in the State

14   of Ohio?

15            MR. WEINBERGER:  Objection.

16            MR. SOBOTKIN:  Object to form, but you can

17       answer, if you can.

18            THE WITNESS:  I don't recall.

19   BY MS. SWIFT:

20       Q.   Sitting here today, you don't have any

21   reason to believe that Walgreens has not been

22   vigilant in its evaluation of prescriptions for

23   opioids in the State of Ohio?

24            MR. WEINBERGER:  Objection.

25            MR. SOBOTKIN:  I'm going to object, only
```

Page 181

1          to point out, you can answer unless it requires
2          you to rely on nonpublic facts you gained as a
3          DEA employee.
4                THE WITNESS:  It would require me to rely
5          on DEA information, not nonpublic.
6    BY MS. SWIFT:
7          Q.   Ms. Ashley, if you would, pull out
8    Exhibit 2, which is your PowerPoint from 2013.
9          A.   Let me see.  Where did I put it?  Where
10   did I put it?
11               I have it.
12         Q.   All right.  If you would, turn to Page 34
13   of your 2013 PowerPoint, which is the page that --
14   or one of the pages the plaintiffs' lawyer asked you
15   about before.
16               Do you remember that?
17         A.   Yes.
18         Q.   The plaintiffs' lawyer suggested that the
19   map on Page 34 showed a migration of patients from
20   Florida to Ohio.
21               Do you recall those questions?
22         A.   I'm sorry, I think I --
23               MR. WEINBERGER:  Mischaracterizes the
24         testimony.  It mischaracterizes the question
25         that I asked, but --

Page 182

1          THE WITNESS:  I may be looking at the
2      wrong PowerPoint.  You said my PowerPoint,
3      Page 34?
4  BY MS. SWIFT:
5      Q.   It's the one that was marked as Exhibit 2.
6          MR. WEINBERGER:  That's not hers.  That's
7      not her PowerPoint.
8  BY MS. SWIFT:
9      Q.   It's this one.
10      A.   Yeah, that's not mine.
11      Q.   Okay.  This is the one from the Chicago
12  presentation in 2013?
13      A.   That's correct, but I didn't give this
14  presentation.
15      Q.   Turn to Page 34 of this presentation.
16  It's Exhibit 2.
17      A.   Sure.  I have it.
18      Q.   And do you see that the heading of this
19  slide says "Migration of Pain Clinics"?
20      A.   Yes, I see that.
21      Q.   And it shows arrows going from Florida up
22  through Georgia, Tennessee, Kentucky, and Ohio,
23  correct?
24      A.   Correct.
25      Q.   Then if you'd turn to Page 39 -- sorry,

Page 183

1    it's not 39.

2              Oh, it's 38, I'm sorry, with the heading

3    "Georgia Pain Clinics."

4         A.    I have it.

5         Q.    Actually, just to lead up to it, let's go

6    back to 36.  I apologize, just so it will make more

7    sense if we start with 36.

8         A.    Sure.  I have it.

9         Q.    It says, "Georgia Example:  Traditional

10   Pain Management Clinics."

11             Do you see that?

12        A.    I do.

13        Q.    And it says in the years prior to 2009 and

14   2010, there were 15 to 20 legitimate clinics.

15             Do you see that?

16        A.    Yes.

17        Q.    "Almost all owned by physicians.

18             "Accept insurance, Medicaid, Medicare,

19   et cetera.

20             "Patients need appointments.

21             "Follow pain management guidelines.

22             "Patients get a complete physical work-up

23   and exam.

24             "Use physical therapy, other treatment

25   methods.

Page 184

1          "Prescribed drugs usually include

2    nonnarcotics."

3          Do you see all of that?

4    A.    Yes.

5    Q.    Then if you go back to Page 38, it says,

6    "Now in 2012 - approximately 125 rogue clinics owned

7    by nonphysicians, and the owners:

8          "Are from another state.

9          "Many are convicted felons.

10         "Usually owned or operated a pain clinic

11   in another state.

12         "Have ties to some type of ordinary

13   crime."

14         And then the last bullet says, "If from

15   Florida, left not because of the Florida PMP, but

16   due to new Pain Clinic restrictions and no

17   dispensing."

18         Did I get all that correctly?

19   A.    Yes.

20   Q.    And is that consistent with your

21   understanding from your 30-plus years at the DEA of

22   what happened with the expansion of rogue pain

23   clinics in this time frame?

24   A.    Yeah, in general, yes.

25   Q.    The fifth bullet, "If from Florida, left

Page 185

1   not because of the Florida PMP, but due to new Pain

2   Clinic restrictions and no dispensing," do you know

3   what that means?

4        A.    I'm sorry, say that again.

5        Q.    Do you know what that fifth bullet means?

6        A.    The fifth bullet, one, two, three, four,

7   five, "if from Florida."

8             It's written kind of oddly.  I'm not sure

9   what they're saying.

10       Q.    Okay.  We will come back to that.

11            Flip ahead to Page 47, please.  This slide

12  has a heading that says, "Utility of the TDSs:

13  Operation Pill Nation."

14            Do you know what the acronym "TDS" stands

15  for?

16       A.    Yes.

17       Q.    What does it stand for?

18       A.    Tactical diversion squad.

19       Q.    So this says, "Utility of the Tactical

20  Diversion Squads:  Operation Pill Nation."

21            Explain for me, please, if you could, what

22  the tactical diversion squads were or are.

23            MR. WEINBERGER:  Objection, improper

24       redirect.  Beyond the scope of

25       cross-examination.

Page 186

1    BY MS. SWIFT:

2        Q.    You can answer.

3        A.    The tactical diversion quad are groups

4    within DEA that have diversion investigators,

5    special agents, and local state law enforcement

6    officers, and they work together on diversion

7    matters.

8        Q.    What is Operation Pill Nation?

9            MR. WEINBERGER:  Objection.

10            MR. SOBOTKIN:  Objection.  Outside the

11        scope of the Touhy, as it gets into kind of

12        particular matters.

13            MS. SWIFT:  It's within the scope of the

14        Touhy as it relates to a presentation given by

15        DEA to registrants including pharmacies on

16        their obligations regarding preventing

17        diversion, and I'm just going to ask her based

18        on the face of the document.

19            MR. SOBOTKIN:  Let me rephrase my

20        objection, if I can.

21            I'll object to the Touhy as it -- object

22        to the scope as outside the Touhy, except to

23        the extent that it's information that's been

24        conveyed to third parties.

25            MR. WEINBERGER:  And I object on the basis

Page 187

1    of improper redirect.

2   BY MS. SWIFT:

3         Q.   Do you remember the question, Ms. Ashley?

4         A.   Yes, what was Operation Pill Nation?

5         Q.   Yes.

6         A.   That was the title given to the initiative

7   for the Florida investigations.

8         Q.   Is it correct that Operation Pill Nation

9   began in February of 2010 in Florida?

10        A.   I don't recall.

11             MR. WEINBERGER:  Objection.

12             THE WITNESS:  But in general.

13  BY MS. SWIFT:

14        Q.   That's what it says in the document?

15        A.   Yeah, yeah.  It says that, when it began,

16  yeah.

17        Q.   It also says that DEA was working with

18  other federal, state and local partners to start

19  identifying, targeting, and investigating rogue pain

20  clinics, correct?

21        A.   Correct.

22             MR. WEINBERGER:  Objection.

23  BY MS. SWIFT:

24        Q.   It goes on to say that "11 Tactical

25  Diversion Squads from across the United States

Page 188

1    provided assistance," and that there were 340

2    undercover buys from more than 48 clinics and 64

3    doctors, correct?

4              MR. WEINBERGER:  Objection.

5              THE WITNESS:  Correct.

6    BY MS. SWIFT:

7         Q.   Then if you look at the next slide,

8    Slide 48, still talking about Operation Pill Nation,

9    the DEA's operation in Florida, it says that there

10   were 21 search warrants executed at clinics,

11   residences, and other locations in South Florida,

12   and 25 people arrested on various federal and state

13   drug and money laundering charges, of which five

14   were medical doctors and five were pain clinic

15   owners.

16             Is that consistent with your understanding

17   of Operation Pill Nation?

18             MR. WEINBERGER:  Objection.

19             THE WITNESS:  Yes.

20   BY MS. SWIFT:

21        Q.   None of those people who were arrested

22   were Walgreens pharmacists, right, Ms. Ashley?

23             MR. SOBOTKIN:  Objection, outside the

24        scope of the Touhy.

25             MS. SWIFT:  Are you going to instruct her

```
                                              Page 189

 1      not to answer the question?

 2            MR. SOBOTKIN:  I'm going to instruct her

 3      not to answer the question.

 4  BY MS. SWIFT:

 5      Q.    Turn, if you would, please, Ms. Ashley, to

 6  your envelope in the original box you were looking

 7  through earlier today.  This time I want you to grab

 8  Envelope W.

 9            MS. SWIFT:  This will be Exhibit 12 [sic].

10                  (Defendant Exhibit 17 was marked

11                    for identification.)

12            THE WITNESS:  I have it.

13  BY MS. SWIFT:

14      Q.    Exhibit 12 is a statement from Susan

15  Langston, the diversion program manager at the DEA's

16  Miami Field Division Office, before the Controlled

17  Substance Standards Committee of the Florida Board

18  of Pharmacy and the Florida Department of Health for

19  a Public Meeting Concerning Issues with Patients

20  Filling Prescriptions for Controlled Substances in

21  August of 2015, correct?

22      A.    Yes.

23      Q.    Have you seen this document before?

24      A.    Have I seen this document?  I don't

25  recall.
```

Page 190

1      Q.    Okay.   Take a look at the first page of

2  Ms. Langston's statement from the DEA to the Florida

3  Board of Pharmacy, if you would, please.

4      A.    Yes.

5      Q.    In the fourth paragraph, Ms. Langston

6  states the DEA's goal is "to do our part to make

7  sure all legitimate pain patients receive whatever

8  medications they need."

9           Do you agree with that statement based on

10  your career at DEA?

11           MR. WEINBERGER:  Objection, improper

12      redirect, beyond the scope of cross.

13           THE WITNESS:  I'm sorry, would you repeat

14      the question, please?

15  BY MS. SWIFT:

16      Q.    Ms. Langston says in the fourth paragraph

17  the DEA's goal is "to do our part to make sure all

18  legitimate pain patients receive whatever

19  medications they need."

20           Do you agree with that statement based on

21  your career at the DEA?

22           MR. WEINBERGER:  Objection, same reasons.

23           THE WITNESS:  If -- yes.

24  BY MS. SWIFT:

25      Q.    At the bottom of that page, Ms. Langston

Page 191

1    says, at the beginning of the last paragraph, that

2    "2010 to 2011 was the peak of Florida's

3    pharmaceutical drug abuse epidemic."

4            Is that true, based on your experience at

5    DEA?

6            MR. WEINBERGER:  Objection.

7            THE WITNESS:  It was the peak of -- I'm

8        sorry, I'm trying to find where you're reading

9        from.

10   BY MS. SWIFT:

11       Q.   The very last paragraph on the first page,

12   "2010 to 2011 was the peak of Florida's

13   pharmaceutical drug abuse epidemic."

14       A.   I don't know that.

15       Q.   Okay.  In that same paragraph, she goes on

16   to say, "at that time, most of the narcotic pain

17   pills prescribed by those pain pill [sic] physicians

18   were dispensed directly from the pain clinics and

19   the involvement of a separate retail pharmacy was

20   not necessary."

21           Is that true, based on your experience at

22   DEA?

23           MR. WEINBERGER:  Objection.

24           THE WITNESS:  Yeah, yes, it is.

25

Page 192

```
 1    BY MS. SWIFT:
 2         Q.   In the next paragraph, Ms. Langston says
 3    on behalf of DEA that "In 2011, the State of Florida
 4    adopted legislation known as the Anti-Pill Mill Bill
 5    that restricted doctors from selling actual pills
 6    from these pain clinics."
 7              Is that true, based on your experience at
 8    DEA?
 9              MR. WEINBERGER:  Objection.
10              THE WITNESS:  Yeah, some of this is just
11         not a "yes" or "no" answer, but yeah.
12    BY MS. SWIFT:
13         Q.   She goes on to say, "This new law shifted
14    the dispensing of most narcotic painkillers to
15    actual pharmacies.  This shift heightened
16    pharmacists' responsibilities and they were suddenly
17    faced with circumstances many had never dealt with
18    before."
19              Is that true, based on your own experience
20    at DEA?
21              MR. WEINBERGER:  Objection.
22              THE WITNESS:  You're saying based on my
23         experience, is it true that this happened in
24         Florida?
25
```

Page 193

1   BY MS. SWIFT:

2        Q.   Yes.

3        A.   I'm just trying to understand the

4   question.

5        Q.   I'm just asking, I mean, if you understand

6   that statement to be true.

7             MR. SOBOTKIN:  I'm going to object as

8        that, I don't think, fits within one of the

9        authorized topics on the Touhy.

10            MS. SWIFT:  Well, it's a DEA statement,

11       public statement about dispensing-related

12       issues.  It's, I think, well within the scope

13       of the Touhy on those grounds, particularly

14       given the leeway that plaintiffs have been

15       given to ask about settlements and

16       investigations --

17            MR. WEINBERGER:  Objection.

18            MS. SWIFT:  -- in Florida.

19            MR. WEINBERGER:  Objection.

20            MR. SOBOTKIN:  So, I'm sorry, could you

21       repeat the question?

22            MS. SWIFT:  Sure.

23  BY MS. SWIFT:

24       Q.   Ms. Langston says to the Florida Board of

25  Pharmacy in this statement that the shift in the

Page 194

1    Florida law -- "The new law shifted the dispensing

2    of most narcotic painkillers to actual pharmacies.

3    This shift heightened pharmacists' responsibilities,

4    and they were suddenly faced with circumstances many

5    never had dealt with before."

6              And my only question is whether you know

7    that to be true.

8              MR. WEINBERGER:  Objection.

9              MR. SOBOTKIN:  You can answer.

10             THE WITNESS:  Yeah, yes, I think that the

11        legislation did change things, yes.

12   BY MS. SWIFT:

13        Q.   Okay.  Take a look at Page 3 of

14   Ms. Langston's DEA statement, please.

15             In the second paragraph, the last

16   statement, which starts "if a pharmacist

17   encounters," do you see that?

18        A.   Yes.  Oh, I'm looking at --

19        Q.   I just want to make sure you're at the

20   same spot I am.

21        A.   Page 3, which paragraph?

22        Q.   Second paragraph, last sentence.

23        A.   "If a pharmacist encounters," yes.

24        Q.   Ms. Langston says on behalf of DEA to the

25   Florida Board of Pharmacy, "If a pharmacist

Page 195

1    encounters a red flag, then asking a question of the

2    patient, calling the doctor's office, combined with

3    using common sense, will often offer a reasonable

4    explanation to clear that red flag."

5                Do you agree with that?

6                MR. WEINBERGER:  Objection.

7                THE WITNESS:  I agree with that.

8    BY MS. SWIFT:

9        Q.   It goes on to say, in the very next

10   paragraph, "We recognize that the vast majority of

11   controlled substance prescriptions are written by

12   highly trained and ethical medical professionals who

13   are treating legitimate medical conditions."

14               Do you agree with that?

15       A.   I agree with that.

16       Q.   She goes on, "We also recognize that the

17   vast majority of controlled substance prescriptions

18   written by doctors are for legitimate medical

19   purposes and are issued in the usual course of

20   professional practice.  A great deal of the time a

21   red flag at a pharmacy can easily be explained and

22   once it is resolved there should be no problem

23   filling that prescription."

24               Do you agree with that?

25               MR. WEINBERGER:  Objection.

Page 196

1           THE WITNESS:  Yeah, I agree with that.
2    BY MS. SWIFT:
3       Q.   Then towards the bottom of that same
4    page -- actually, in the next paragraph, the
5    paragraph starting "although we asked pharmacists."
6           Do you see that?
7       A.   "Although we asked pharmacists," yes, I
8    see that.
9       Q.   Ms. Langston says, on behalf of DEA,
10   "Although we asked pharmacists to be on the lookout
11   for suspicious activities that may indicate drug
12   abuse and diversion, we are not asking pharmacists
13   to be medical doctors."
14          Do you agree with that?
15          MR. WEINBERGER:  Objection.
16          THE WITNESS:  I agree with that.
17   BY MS. SWIFT:
18      Q.   It says, "We are not asking pharmacists to
19   review medical records, MRI reports, x-rays, or to
20   diagnose patients.  We simply want pharmacists to be
21   aware there is an epidemic of pharmaceutical drug
22   abuse in this country and to use their education,
23   experience, professional judgment, ethics, and
24   common sense to not knowingly participate in this
25   national health crisis."

Page 197

1              Do you agree with all of that?

2              MR. WEINBERGER:  Objection.

3              THE WITNESS:  Yes.

4    BY MS. SWIFT:

5         Q.    Ms. Ashley, do you have any personal

6    knowledge of the dispensing systems used by

7    Walgreens, CVS, Walmart, Rite Aid, or Giant Eagle

8    pharmacies?

9         A.    Do you mean their platform for

10   prescriptions?

11        Q.    Yes.

12        A.    No.

13        Q.    Do you have any personal knowledge about

14   what those pharmacies do with the dispensing data

15   that exists in those systems?

16        A.    Generally, but no.  I mean, in general,

17   for DEA purposes, I do.  The storage part of it, you

18   mean?

19        Q.    Well, what general knowledge do you have

20   about what pharmacies do with the data they have in

21   their systems?

22        A.    Oh, the only general knowledge I have is

23   that they store it and have it available for DEA

24   when we need it.

25        Q.    And they can provide records to DEA upon

Page 198

1    request?  Is that what you're getting at?

2         A.   Yes.

3         Q.   Do you have any other personal knowledge

4    about what pharmacies do with the dispensing data in

5    their systems?

6         A.   I don't.

7         Q.   You've already testified that there is no

8    federal requirement that pharmacies conduct data

9    analysis before filling a prescription for a

10   controlled substance, right?

11            MR. SOBOTKIN:  Objection.  I believe that

12        misconstrues the testimony, which I recall was

13        related to whether there was a federal

14        regulation on that issue rather than a

15        requirement.

16            MS. SWIFT:  I believe I asked it both

17        ways, but she can correct me if I'm wrong.

18            THE WITNESS:  I don't recall if you asked

19        it both ways, but I do recall that I said I'm

20        not aware of a federal regulation that requires

21        it.

22   BY MS. SWIFT:

23        Q.   Are you aware of any other federal

24   requirement?

25        A.   A federal requirement, no.  I'd call it an

1   expectation.

2        Q.   Well, is the expectation that the DEA put

3   in its published guidance, the pharmacist manual

4   that we looked at earlier today, is the expectation

5   that the pharmacist is going to exercise

6   professional judgment in determining whether to fill

7   a prescription for a controlled substance?

8        A.   Yes.

9             MR. WEINBERGER:  Objection.

10  BY MS. SWIFT:

11       Q.   Do you have any personal knowledge about

12  Walgreens' policies, procedures, or training

13  materials for pharmacists?

14       A.   Today, as I sit here, I don't recall.  I

15  may have, yeah.  Over my career, it's likely.

16       Q.   But you can't think of anything today?

17       A.   Today, no.

18       Q.   What about for the other chain pharmacies,

19  CVS, Rite Aid, Walmart, and Giant Eagle, do you have

20  any personal knowledge about their policies,

21  procedures, or training materials?

22       A.   Not today, no.

23       Q.   The plaintiff asked you a number of

24  questions about the Ohio Board of Pharmacy's

25  Prescription Drug Monitoring Program, which goes by

Page 200

1    the acronym OARRS.

2            Do you remember those questions?

3        A.    I remember those questions.

4        Q.    Before I get to OARRS, Ms. Ashley, do you

5    know what doctor shopping is?

6        A.    Yes.

7        Q.    What is doctor shopping?

8            MR. WEINBERGER:  Objection.

9            MR. SOBOTKIN:  Objection.  I think the

10        breadth of the question is outside the scope of

11        the Touhy.

12            MS. SWIFT:  I'm going to get there.

13            MR. SOBOTKIN:  It's foundational.

14            MR. WEINBERGER:  This is all -- can I have

15        a continuing objection to this line of

16        questioning, which is all way beyond my

17        cross-examination?

18            MS. SWIFT:  We're getting there, Pete.

19        We're getting there.  But sure.

20    BY MS. SWIFT:

21        Q.    What is doctor shopping, Ms. Ashley?

22        A.    When an individual doctor-shops, they're

23    going from doctor to doctor attempting to obtain

24    whatever controlled substance they're, you know,

25    seeking to obtain, yeah.

1       Q.   Is doctor shopping a form of diversion, in

2    your experience?

3       A.   Yes, it is.

4       Q.   Is doctor shopping a crime, at least in

5    some states?

6            MR. SOBOTKIN:  Objection, calls for a

7            legal conclusion.

8    BY MS. SWIFT:

9       Q.   If you know.  Let me -- I'll withdraw the

10   question and ask it a different way.

11           Is it your understanding, based on your

12   experience at DEA, that doctor shopping is a crime?

13      A.   Only if it's for the purpose of obtaining

14   a drug illegally, yes, that is a crime.

15      Q.   Should a pharmacist be on the lookout for

16   doctor shopping when they fill prescriptions for

17   opioids?

18      A.   Should pharmacists be on the lookout?

19           Sure.  In exercising judgment, yeah, sure.

20      Q.   Okay.  I'm going to introduce a document

21   that is not in your box because I didn't know I was

22   going to need it until the plaintiffs' lawyer asked

23   you questions.

24           MR. WEINBERGER:  You think that's -- you

25           think that's okay?  So, like, you have, you

1          know, 50 documents that I don't get to see

2          before your direct examination, and I have to

3          anticipate what you're going to ask and provide

4          you with documents.  And now you're saying

5          because I asked a question, you get to

6          introduce a document that I haven't seen?

7                  MS. SWIFT:  That's what the remote

8          deposition protocol says, yes.

9                  MR. WEINBERGER:  Yeah, well, I don't think

10         so.  I don't think so.

11                 So I'll object to any questions on this

12         new document.

13                 MS. SWIFT:  This is going to be

14         Exhibit 18, Ms. Ashley, and I'll show it to you

15         on the screen.  I apologize you don't have it

16         in front of you.

17                 MR. WEINBERGER:  Have you emailed it to

18         me?  Have you emailed it to me or provided me a

19         copy of it?

20                 MS. SWIFT:  I just marked it as an exhibit

21         in the Exhibit Share.

22                 MR. WEINBERGER:  No, no, no, you're not

23         answering my question.  Why is that --

24                 MS. SWIFT:  I just provided it to you via

25         the Exhibit Share.  Do you need me to --

Page 203

1              MR. WEINBERGER:  I'm not on the

2         Exhibit Share.

3              MS. SWIFT:  Well, that's the way everybody

4         has been -- you know, Pete, for you, I'll send

5         you an email.

6              MR. WEINBERGER:  So, you know, I harken

7         back to a couple of the Ohio Board of Pharmacy

8         depositions where you interposed this exact

9         objection, that we hadn't provided you with a

10        document in advance, and you objected to our

11        being able to use a document.

12             Do you remember that?

13             MS. SWIFT:  I don't, actually.  You know,

14        I'm sure you'll point it out to me.

15             MR. WEINBERGER:  Oh, I will.  I will, at

16        some point.

17             MS. SWIFT:  I don't really think it's --

18             MR. WEINBERGER:  I think we all ought to

19        play by the same rules.  And I know you think

20        is hilarious.  But, you know, you are the

21        strictest of strict enforcer of the rules,

22        and -- but only when it suits you.

23             MS. SWIFT:  Always a pleasure, Pete.  I'm

24        going to email you at your request.

25             MR. WEINBERGER:  I'm not trying to make it

Page 204

1           pleasurable, believe me.

2                MS. SWIFT:  I'm aware of that.  I'm trying

3           to be nice.

4                MR. WEINBERGER:  Well, I am too.  I'm

5           trying to be courteous, just like you -- like

6           you expect, and you're suggesting that you

7           didn't -- you didn't know that you were going

8           to need this document because of something I

9           asked.  That's ridiculous.

10                MS. SWIFT:  It's actually true.  You asked

11           her about OARRS, which is an Ohio Board of

12           Pharmacy system that she testified she didn't

13           know anything about, which is what I would have

14           expected.

15                MR. WEINBERGER:  And you used an Ohio

16           Board of Pharmacy exhibit in questioning her.

17                MS. SWIFT:  All right.  I just emailed you

18           the document.  It's Exhibit 18.

19                MR. WEINBERGER:  I don't have it.

20                MS. FITZPATRICK:  Kate, could you please

21           send that to all of the plaintiffs' counsel?

22                MS. SWIFT:  Sure, give me one second,

23           Laura.

24      BY MS. SWIFT:

25           Q.   And, Ms. Ashley, I've got it showing on

1    the screen.  Let me know if you can see it.

2            MR. WEINBERGER:  Wait for a minute, until

3        I have a chance to look through the document.

4        Do you mind?

5            MS. SWIFT:  We can go off the record if

6        you want to take the time to look at the

7        document.  That's fine.

8            MR. WEINBERGER:  No, this is -- this is a

9        delay because of what you're doing, not because

10       of anything that I'm doing, so I'm --

11           MS. SWIFT:  We're going to go off the

12       record if you're going to take time to look at

13       the document, Pete.

14           MR. WEINBERGER:  I'm printing it up.  I'm

15       going to look at the document.  You can go off

16       the record all you want.  I'm telling you, it's

17       going to go against your time.  And if we need

18       to get Special Master Cohen on the phone, we

19       will do that.

20           MS. SWIFT:  Can we go off the record,

21       please, and we're not going to count this

22       against our time.

23           THE VIDEOGRAPHER:  Going off the record at

24       1:14.

25

```
 1                    (Whereupon, a recess was taken

 2                    from 1:14 p.m. to 1:22 p.m.)

 3            THE VIDEOGRAPHER:  On the record, 1:22.

 4   BY MS. SWIFT:

 5        Q.   Ms. Ashley, can you see the OARRS

 6   PowerPoint that I marked as Exhibit 18 in front of

 7   you on the screen?

 8        A.   Yes, I do.

 9        Q.   All right.  I'm just going to ask you

10   about one page of it, which is Page 11.

11            Do you see that in front of you?  You can

12   see it's got a Board of Pharmacy Bates number at the

13   bottom right-hand corner ending 3269.

14        A.   It doesn't show the full document.  I

15   can't see that, but I can see up to the point where

16   it says "Doctor Shoppers."

17        Q.   Okay.  Let me see if I can make it so you

18   can see the whole thing.

19            Can you see the whole thing now?

20        A.   Not totally, but I can see the top of it,

21   the Bates number, but anyway --

22        Q.   You can see enough.

23        A.   -- in the border, I can see it, yes.

24        Q.   Okay.  Great.  Is it big enough for you to

25   read it?
```

1        A.    Yes, it is.

2        Q.    Okay.  Great.  I'd like to direct your

3   attention to -- there are a number of bullets on

4   this slide, and this is not -- okay.  I'm sorry.  I

5   was on the wrong slide.

6             The slide that I wanted to focus you on is

7   actually on Page 12 with the Bates

8   Number BOP_MDL543270.

9             Do you see that?

10       A.    I do.

11       Q.    Okay.  And it says -- the first bullet

12   says, "'Doctor Shopping' is criminally cited as

13   'deception to obtain a dangerous drug.'"

14            And I believe you testified earlier that

15   you know that, at least in some states, doctor

16   shopping can be a crime; is that fair?

17       A.    Yes.

18            MR. WEINBERGER:  Objection, continuing

19       line -- continuing objection to this line of

20       questioning.

21   BY MS. SWIFT:

22       Q.    The second bullet says, "A patient may be

23   guilty of 'doctor shopping' by receiving

24   prescriptions by as few as two prescribers; however,

25   a patient receiving prescriptions from many

Page 208

1   prescribers may not be guilty of 'doctor shopping,'

2   depending on the manner in which the prescriptions

3   were obtained."

4           Do you agree with that statement?

5           MR. WEINBERGER:  Objection.

6           THE WITNESS:  Patient -- yes.

7   BY MS. SWIFT:

8       Q.   The next bullet reads, "There is no way to

9   determine if a patient is guilty of 'doctor

10  shopping' using OARRS data."

11          Did you know, during your time at the DEA,

12  that State Board of Pharmacies like the one in Ohio

13  had concluded that there is no way to determine if a

14  patient is guilty of doctor shopping using their

15  State PDMP data?

16          MR. WEINBERGER:  Objection.

17          THE WITNESS:  Did I know that they

18      determined that?  No, I did not know that.

19  BY MS. SWIFT:

20      Q.   The bullet goes on to read, "However,

21  there is a growing trend nationwide to treat 'any

22  patient receiving a prescription from five

23  prescribers and five pharmacies in a one-month

24  period' as a doctor shopper for the purposes of

25  tracking trends."

Page 209

1          Was that a trend that you were aware of?

2     A.    This specific one, I don't recall.

3     Q.    Do you know whether there are other signs

4  of diversion that may be impossible to determine

5  from data like the prescription data in the OARRS

6  prescription monitoring program?

7          MR. WEINBERGER:  Objection.

8          THE WITNESS:  I know that it may be

9     impossible to determine if a patient -- I'm

10     sorry, what's the question?

11  BY MS. SWIFT:

12     Q.    Let me ask it a slightly different way.

13          This document shows the Ohio Board of

14  Pharmacy stating that it's impossible to determine

15  if a patient is guilty of doctor shopping using

16  OARRS data.

17          My question for you is if you know if

18  there are other signs of diversion that may be

19  impossible to determine from data in state

20  prescription monitoring programs.

21          MR. WEINBERGER:  Objection.

22          THE WITNESS:  I agree with that statement.

23  BY MS. SWIFT:

24     Q.    Okay.  You can set that one aside.

25          Ms. Ashley, are you a medical doctor?

1      A.   I am not.

2      Q.   Are you an epidemiologist?

3      A.   I am not.

4      Q.   Do you have any training in epidemiology?

5      A.   I do not.

6      Q.   Have you ever conducted a study to

7  determine the likelihood that somebody who takes a

8  prescription opioid will turn to heroin or other

9  illicit drugs?

10     A.   If I conducted a study for that purpose?

11  No, I have not.

12     Q.   Are you aware of whether the DEA has ever

13  conducted such a study?

14     A.   To determine, I am not aware of that.

15     Q.   Would you agree that most people who take

16  prescription opioids pursuant to a doctor's

17  prescription never use heroin?

18          MR. WEINBERGER:  Objection.

19          THE WITNESS:  Yeah, I would agree with

20      that.

21  BY MS. SWIFT:

22     Q.   All right.  Turn back to the very first

23  exhibit that I marked with you this morning,

24  Exhibit 1.  And I think this one, actually, is your

25  PowerPoint.

Page 211

1        A.    At the Summit, yes.  I have it.

2        Q.    And turn to Page 10 with me, if you would,

3   please.

4        A.    I have it.

5        Q.    Is it your view that the most frequent

6   method of obtaining pharmaceuticals for nonmedical

7   use is from family and friends out of the medicine

8   cabinet?

9        A.    I'd have to say it was my view at the

10  time.  I'm not certain it's true today.

11       Q.    Do you have a different view today, or do

12  you just not know?

13       A.    Well, I'm -- I'm thinking of all of the

14  awareness out there that their parents or whoever

15  may not be maintaining their controlled substances

16  in the medicine cabinet.  So things could have

17  changed due to the awareness as of today.

18       Q.    Got it.

19             So if I understand your testimony, it may

20  be the case that what I've referred to as "medicine

21  cabinet diversion" has decreased because of

22  awareness of the issue?

23       A.    That's what I'm saying.

24             MR. WEINBERGER:  Objection.

25

Page 212

1   BY MS. SWIFT:

2        Q.    And do you mean by that that people may be

3   locking up their medicine cabinets today or properly

4   disposing of unused medications?

5                MR. WEINBERGER:  Objection.

6                THE WITNESS:  Yes, that's what I'm saying.

7   BY MS. SWIFT:

8        Q.    Would that include disposal of medications

9   at drop boxes, at places like Walgreens and other

10  places that have medication disposal drop boxes?

11               MR. WEINBERGER:  Objection.

12               THE WITNESS:  Yes, it includes that.

13  BY MS. SWIFT:

14       Q.    Take a look with me, if you would, please,

15  at Plaintiffs' Exhibit 4, which is the corresponding

16  responsibility regulation from DEA.

17               Do you see that?

18       A.    I know I have it in one of these.

19       Q.    It's one of the DEA website printouts, if

20  that helps.

21       A.    Yes, I know it's in one of these.  Let me

22  find it in a second.

23               MR. SOBOTKIN:  Just to confirm, it bears

24       Bates number P-GEN-00174?

25               MS. SWIFT:  Yes.

Page 213

1          MR. SOBOTKIN:  Thank you.

2          THE WITNESS:  Oh, that's -- it's mixed in

3      here.  I know I have it.

4          You don't know the folder number, do you?

5  BY MS. SWIFT:

6      Q.   It's P-GEN-00174.

7      A.   I have it.

8      Q.   Great.

9          The Corresponding Responsibility

10  Regulation that's 1306.04(a), correct?

11      A.   Yes.

12      Q.   The regulation states that "The

13  responsibility for the proper prescribing and

14  dispensing of controlled substances is upon the

15  prescribing practitioner."

16          That's the first half of that sentence,

17  correct?

18      A.   Correct.

19      Q.   It goes on to say, "But a corresponding

20  responsibility rests with the pharmacist who fills

21  with prescription."

22          Correct?

23      A.   Correct.

24      Q.   It says that -- it goes on to say, "An

25  order purporting to be a prescription issued not in

Page 214

1   the usual course of professional treatment or in

2   legitimate and authorized research is not a

3   prescription within the meaning and intent of

4   Section 309 of the Act."

5            Correct?

6       A.   Correct.

7       Q.   And then it goes on to say, "The person

8   knowingly filling such a purported prescription,"

9   meaning an illegitimate prescription, "as well as

10  the person issuing it, shall be subject to the

11  penalties provided for violations of the provisions

12  of the law relating to controlled substances."

13           Correct?

14      A.   Yes, that's correct.

15      Q.   Would you agree with me that the

16  Corresponding Responsibility Regulation has an

17  explicit knowledge requirement with respect to the

18  filling of an illegitimate prescription?

19           MR. WEINBERGER:  Objection.

20  BY MS. SWIFT:

21      Q.   It says the person knowingly doing that is

22  subject to penalties.

23           Do you agree with that?

24           MR. WEINBERGER:  Objection.

25           THE WITNESS:  Yeah, there has to be

1      knowledge, yes.

2  BY MS. SWIFT:

3      Q.    Ms. Ashley, you testified -- do you want

4  to take a minute?

5      A.    I think she ran out.

6      Q.    If you need to take --

7      A.    Someone rang the doorbell, so, yeah.  Go

8  ahead.

9      Q.    I have to leave the house to deal with

10  that.

11      A.    Yeah.

12      Q.    Ms. Ashley, you testified earlier when the

13  plaintiffs' lawyer was asking questions that a

14  pharmacist is a professional.

15            Did I hear that correctly?

16      A.    Yes.

17      Q.    Do you understand that pharmacists have to

18  go to school for six years to get a Pharm.D.?

19      A.    Yes.

20      Q.    Do you understand that pharmacists have to

21  profess -- have to pass a professional licensing

22  exam before they can practice pharmacy?

23      A.    Yes.

24      Q.    Do you understand that pharmacists have to

25  be licensed in their state to practice pharmacy?

Page 216

1        A.    Yes.

2        Q.    And we've already discussed today that DEA

3    says pharmacists have to exercise their professional

4    judgment in filling prescriptions for controlled

5    substances; is that correct?

6        A.    That's correct.

7        Q.    The pharmacy that employs a pharmacist

8    can't tell that pharmacist whether or not to fill a

9    prescription; that's within the pharmacist's own

10   professional judgment.

11            Would you agree with that?

12            MR. WEINBERGER:  Objection, beyond the

13        scope.

14            THE WITNESS:  No, I don't think I do.

15        Tell me --

16   BY MS. SWIFT:

17       Q.    Let me ask it again.

18            I believe you've already testified a

19   number of times that it's up to the pharmacist in

20   her professional judgment to decide whether or not

21   to fill a prescription for controlled substances.

22            Do I have that part right?

23       A.    Yes.

24       Q.    Would you agree, then, that the pharmacy

25   that employs the pharmacist can't tell her whether

```
                                               Page 217
 1   she should fill a particular prescription or not?

 2        A.   No, sure, they can.

 3        Q.   Is it your testimony that a pharmacist can

 4   tell -- strike that.

 5             Is it your testimony that a pharmacy could

 6   tell a pharmacist "You have to fill this

 7   prescription," even if that pharmacist determined

 8   that the prescription was illegitimate in her

 9   professional judgment?

10        A.   Could the pharmacy, let's say, supervisor

11   or someone tell them to fill it?  Sure, they could.

12        Q.   Is it your testimony that it would not

13   violate the pharmacist's professional obligations to

14   fill a prescription that she believed was

15   illegitimate --

16             MR. WEINBERGER:  Objection.

17   BY MS. SWIFT:

18        Q.   -- just because her boss told her to do

19   it?

20        A.   Yes, it is a violation, but yes.

21        Q.   Okay.  So I think maybe we're speaking

22   past each other.

23        A.   Okay.

24        Q.   My question is, if the pharmacist

25   determines, in her professional judgment under her
```

Page 218

1   license to practice pharmacy, that she should or

2   shouldn't fill a prescription, that rests on her,

3   and her license is on the line if she doesn't follow

4   that professional judgment.

5           Would you agree with that?

6       A.   Her license is on the line if she does not

7   follow that professional judgment, correct.

8       Q.   So would you agree with me, it would be

9   inappropriate for the pharmacy that employs her,

10  whether a supervisor or anybody else, to infringe

11  upon that professional judgment?

12          MR. WEINBERGER:  Objection.

13          THE WITNESS:  I agree, that would be

14      inappropriate, correct.

15  BY MS. SWIFT:

16      Q.   All right.  We've talked about pharmacists

17  and the fact that they are professionals.

18          Do you agree with me that doctors are also

19  professionals?

20      A.   Yes, I agree.

21      Q.   Doctors go to medical school for a number

22  of years.  They have to do a residency and sometimes

23  an internship as well?

24      A.   Yes.

25          MR. WEINBERGER:  Continuing objection.

Page 219

```
 1        This is all way beyond the scope of
 2        cross-examination.
 3   BY MS. SWIFT:
 4        Q.   Doctors also have to be licensed before
 5   they can practice medicine and prescribe medications
 6   in their state, correct?
 7        A.   That is correct.
 8        Q.   Only a licensed prescriber is allowed to
 9   write a prescription for an opioid medication,
10   correct?
11        A.   That is correct.
12             MR. WEINBERGER:  Objection.
13             THE WITNESS:  Legally.
14   BY MS. SWIFT:
15        Q.   A pharmacist can't write a prescription
16   for an opioid, correct?
17        A.   I'm going to say, I think in some states,
18   they can.  But I'll just say I'm not sure.
19        Q.   In your experience, does the pharmacist
20   typically examine the patient?
21        A.   Pharmacist, no.
22        Q.   Pharmacists don't typically practice
23   medicine.
24             Would you agree with that?
25        A.   I agree.
```

1      Q.   All right.  One more document for you,

2   Ms. Ashley.

3           Turn back to Exhibit 13, which is the

4   stakeholders' consensus document on red flags.

5      A.   I have it.

6      Q.   We talked about this exhibit before.

7           Would you agree with me that this

8   document -- this Stakeholders' Challenges and Red

9   Flag Warning Signs, related to prescribing and

10  dispensing of controlled substances, would you agree

11  with me that this document shows pharmacies working

12  together with other organizations and the DEA and

13  others to try to find consensus on red flags that

14  potentially identify signs of diversion?

15     A.   I agree with you.

16     Q.   Would you agree with me that pharmacies

17  generally try to work with the DEA to ensure that

18  they have --

19     A.   I'm sorry, can you give me one minute?

20     Q.   I'll withdraw the question.

21          THE VIDEOGRAPHER:  Off the record.  1:38.

22                 (Whereupon, a recess was taken

23                 from 1:38 p.m. to 1:38 p.m.)

24          THE VIDEOGRAPHER:  On the record, 1:38.

25

Page 221

1    BY MS. SWIFT:

2         Q.   Would you agree with me, Ms. Ashley, that

3    pharmacies generally try to work with the DEA to

4    ensure that they have effective controls to prevent

5    diversion?

6              MR. SOBOTKIN:  Objection.

7              THE WITNESS:  I agree with that.

8    BY MS. SWIFT:

9         Q.   Would you agree with me that pharmacies

10   generally try to work with the DEA to ensure that

11   they are complying with the law?

12        A.   I agree with that.

13        Q.   In your experience, do pharmacies try

14   their best to prevent the diversion of prescription

15   opioids?

16             MR. WEINBERGER:  Objection.

17             MR. SOBOTKIN:  Objection.

18             THE WITNESS:  In general, yes.

19             MS. SWIFT:  I do not have any further

20        questions right now.

21             I would like to make a standing objection

22        to our inability to ask the questions that I

23        tried to ask about the investigations and

24        settlements that plaintiffs have been permitted

25        to ask about.  But that's it for me right now.

Page 222

1              I believe we have other defendants who may

2         want to ask Ms. Ashley some questions.

3              MR. WEINBERGER:  You mean after you did

4         redirect, you're suggesting that other defense

5         counsel can ask questions?  This is -- you

6         know, depositions are supposed to take place as

7         if they are at trial, as if we are at trial.

8         So the order is certainly not in accordance

9         with that.

10             I have additional questions to ask.

11             Who else -- who else is going to ask

12        questions?

13             MR. BUSH:  I'm going to ask a couple

14        questions.

15             MR. WEINBERGER:  All right.  Well, do you

16        want to go first, or do you want me to go

17        first?

18             MR. BUSH:  No, no, I'll go first.  Mine

19        will be real brief.

20                            EXAMINATION

21   BY MR. BUSH:

22        Q.   Ms. Ashley, are you there?  I don't see

23   you now.

24        A.   You don't?  The video is on.

25        Q.   There you are, there you are.  Okay.

1          My name is Graham Bush, and I represent
2    CVS or the CVS entities in the lawsuits that your
3    deposition is being taken in, and I have, like,
4    probably two minutes' worth of questions, if that.
5          As I understand it, you were -- this goes
6    back to your background.
7          You were in the Chicago field office
8    between 2007 and 2015; is that right?
9      A.    That's correct.
10     Q.    And in the Chicago field office, you were
11   responsible for matters that occurred in a
12   five-state area; is that right?
13     A.    That's correct.
14     Q.    And what was the five-state area?
15     A.    Illinois, Indiana, Wisconsin, Minnesota --
16   I'm missing one.  What am I missing?
17     Q.    North Dakota?
18     A.    North Dakota, yes.
19     Q.    And would it be accurate to say that you
20   didn't have any responsibility while you were in the
21   Chicago field office for matters outside of that
22   five-state area?
23     A.    That's correct.
24     Q.    And that would include for enforcement
25   matters?

Page 224

1      A.    That's correct.

2      Q.    And investigatory matters?

3      A.    That's correct.

4      Q.    And I think sometime in 2015, you moved to

5   headquarters.

6            What -- do you remember exactly when you

7   moved to headquarters in 2015?

8      A.    September 2015.

9            MR. BUSH:  All right.  Thanks.  I don't

10          have anything further.  I told you it wasn't

11          going to take long.

12                      FURTHER EXAMINATION

13   BY MR. WEINBERGER:

14     Q.    Ms. Ashley, a couple of follow-up

15   questions after Ms. Swift's redirect.

16            Exhibit 13, which is the stakeholders'

17   document which you -- which we referenced before, it

18   includes a list of entities, including CVS and

19   Walgreens and Rite Aid, and it includes a company by

20   the name of Purdue Pharma.

21            Do you know who Purdue -- do you know the

22   company Purdue Pharma?

23     A.    I know them.

24            MR. SOBOTKIN:  Objection, outside of the

25          scope of the Touhy authorization.

Page 225

1    BY MR. WEINBERGER:

2         Q.    You do know them?

3         A.    I'm aware of the company, yes.

4         Q.    And are you aware of the recent conviction

5    of Purdue for mail fraud, misrepresentation of facts

6    associated with their drug Oxycontin and bribing

7    doctors?

8              MR. SOBOTKIN:  Objection, it's outside of

9         the scope of the Touhy.  I'm directing the

10         witness not to answer.

11    BY MR. WEINBERGER:

12         Q.    But your recollection is that

13    Purdue Pharma was one of the stakeholders back

14    whenever this meeting took place, right?  Right?

15         A.    Yes.  Yes, sir.

16         Q.    Now, this OARRS document that Ms. Swift

17    asked you about, she didn't ask you to look at the

18    second page of the document.  So I don't know what

19    number she -- we assigned to it, but, okay.

20              The second page, it talks about OARRS

21    basics.  And I know you're not particularly familiar

22    with OARRS, but it talks about the authorized users

23    of OARRS as "Pharmacists - for current patients for

24    the purpose of practicing pharmacy."

25              Do you see that?

Page 226

1      A.   Yes.

2      Q.   So if this is -- if pharmacists are

3   authorized users to look at this database and use

4   the database and its algorithms, isn't it logical to

5   assume that the purpose of this PDMP is to help

6   pharmacists look for and sort out and investigate

7   red flags?

8           MR. SOBOTKIN:  Objection.

9           THE WITNESS:  I agree with that.

10  BY MR. WEINBERGER:

11     Q.   And I know you're not a pharmacist, and

12  you told us that pharmacists goes -- or you have

13  confirmed what Ms. Swift asked you, that pharmacists

14  go to school for six years.

15          Based upon your experience at the DEA, do

16  you think it's logical to assume that these

17  professional pharmacists, during their education,

18  get trained on red flags with respect to opioid

19  prescriptions?

20          MR. SOBOTKIN:  Objection.

21          MR. BUSH:  Objection.

22          UNIDENTIFIED SPEAKER:  Objection.

23          THE WITNESS:  It's logical to assume that.

24  BY MR. WEINBERGER:

25     Q.   And then, finally, you were asked by

Page 227

1    Ms. Swift to go back to the Exhibit 10, our

2    Exhibit 10, Plaintiffs' Exhibit 10, which is the

3    press release from the Department of Justice

4    regarding the Walgreens settlement.

5           And she said, well, isn't it true,

6    Ms. Ashley, that this was limited to their conduct

7    in Florida?

8           Well, you know, once again, let's take a

9    look at the entire document and see if what she

10   asked you about is actually correct.

11          The very first paragraph, the second --

12   the very last sentence in the first paragraph says,

13   "The settlement further resolves open civil

14   investigations in the District of Colorado, the

15   Eastern District of Michigan, and the Eastern

16   District of New York, as well as civil

17   investigations by DEA field offices nationwide,

18   pursuant to the Controlled Substances Act."

19          Have I read that correctly?

20   A.   Yes.

21          MS. SWIFT:  Objection to the extent it

22       mischaracterizes all of the evidence in the

23       case and also to the extent that plaintiffs

24       continue to be allowed to ask questions that I

25       was not allowed to ask.

1           MR. WEINBERGER:  Well, it would be helpful
2       if you would ask questions that have an
3       accurate factual predicate.
4           MS. SWIFT:  Objection to the colloquy of
5       plaintiffs' counsel.
6  BY MR. WEINBERGER:
7       Q.   Okay.  Well, so I've read that correctly,
8  correct?
9           MS. SWIFT:  Same objection.
10          THE WITNESS:  Yes, you read that
11      correctly.
12  BY MR. WEINBERGER:
13      Q.   Now, with respect to the Walgreens
14  settlement document -- and I'm not going to go into
15  the details -- is it relatively standard that these
16  settlement documents attach to the documents orders
17  to show cause that begin the investigation, just as
18  a matter of process?
19          MS. SWIFT:  Objection, outside the scope.
20          MR. SOBOTKIN:  Objection, it's outside the
21      scope of the Touhy authorization, and I'm going
22      to direct the witness not to answer.
23  BY MR. WEINBERGER:
24      Q.   Okay.  So of your own personal knowledge,
25  without going into any facts about the

Page 229

1    investigation, isn't it true that the investigation

2    had a geographic scope with respect to Walgreens

3    that was far beyond Florida?

4            MS. SWIFT:  Objection, mischaracterizes

5        the evidence.  Outside the scope.

6            MR. SOBOTKIN:  Objection.  It's outside

7        the scope of the Touhy authorization.  I'm

8        going to direct the witness not to answer.

9            MR. WEINBERGER:  Ms. Ashley, you've been

10       extremely patient and cooperative, and we

11       appreciate that very much.

12           And I don't have any further questions.

13           MS. SWIFT:  I apologize, Ms. Ashley, I've

14       got to ask a couple more.

15                  FURTHER EXAMINATION

16   BY MS. SWIFT:

17       Q.   Sticking with Exhibit 10, I don't think

18   this will take very long.

19           If you would turn to Page 2 of Exhibit 10,

20   which is the same press release about the Walgreens

21   settlement and investigation that I've been very

22   limited in being able to ask you questions about

23   today.

24           MR. SOBOTKIN:  Would you mind pausing just

25       for a second.  I lost my document.  Can you

Page 230

```
 1        tell me which folder that was?
 2              MS. SWIFT:  Yes, it's P-GEN-224.
 3              MR. SOBOTKIN:  224, thanks.  Just bear
 4        with me one second.
 5              And as an alternative, I could suggest if
 6        you want to just display it, I could follow
 7        along on the screen instead of you waiting for
 8        me to find it.
 9              MS. SWIFT:  It's okay.  Take your time.
10        It's not a big deal, David.  Take your time.
11        I've only got a few questions.
12              MR. SOBOTKIN:  224?
13              MS. SWIFT:  Yes.
14              MR. SOBOTKIN:  Thanks.
15              MS. SWIFT:  And I'm on Page 2.
16   BY MS. SWIFT:
17        Q.   Ms. Ashley, do you see the first full
18   paragraph on Page 2 of Exhibit 10?
19        A.   Page 2, first paragraph, yes, I do.
20        Q.   It says, "The settlement agreement covers
21   conduct that was the subject of DEA's administrative
22   actions and the U.S. Attorney's Office civil penalty
23   investigation."
24              Do you see that?
25        A.   I do.
```

Page 231

1          Q.     "More specifically, the settlement covers

2     allegations against Walgreens Jupiter Distribution

3     Center and six Walgreens retail pharmacies."

4               Correct?

5          A.     That's what it says, yes.

6          Q.     It doesn't say anything about any other

7     pharmacies or any other distribution center anywhere

8     in America, correct?

9               MR. SOBOTKIN:   Objection.   Is the question

10          as to those two sentences?

11               MS. SWIFT:   It's as to the document.

12     BY MS. SWIFT:

13          Q.     But I'll ask you to read the rest of the

14     paragraph and tell me if you agree that it doesn't

15     say anything about any other distribution center or

16     any other pharmacies anywhere in the United States.

17          A.     Do you want me to read it aloud?

18          Q.     No, that's okay.

19          A.     Okay.   It doesn't mention it -- anything

20     national in this paragraph, correct.

21          Q.     All right.   Then if you'd take a look at

22     the paragraph towards the bottom of the page that

23     starts "since 2009," do you see that?

24          A.     Yes.

25          Q.     It says, "Since 2009, the DEA, along with

Page 232

1   its federal, state, and local counterparts, have
2   partnered to combat the prescription drug abuse
3   epidemic that has plagued Florida, culminating in
4   Operation Pill Nation," that we -- and that's what
5   we spoke about earlier today, right, Ms. Ashley?
6        A.   Yes.
7        Q.   It says, "These investigations have
8   resulted in charges against more than 172
9   individuals, including 51 doctors and 24
10  clinic/pharmacy owners."
11            Do you see that?
12       A.   I do.
13       Q.   It says that "The investigations have
14  resulted in the seizure of approximately 2.5 million
15  dosage units of controlled substances, approximately
16  $16.6 million, real property and exotic cars."
17            Do you see that?
18       A.   I do.
19       Q.   It says that "Approximately 42 doctors
20  have lost their DEA registrations through the
21  issuance of immediate suspension orders."
22            Do you see that?
23       A.   I do.
24       Q.   "As well, approximately 192 doctors and 68
25  pharmacies have voluntarily surrendered their DEA

Page 233

1    registrations following an official visit from the

2    DEA."

3              Do you see that?

4         A.   I do.

5         Q.   Would you agree with me that Operation

6    Pill Mill Nation, the goal of that was to target the

7    most serious pill mill and rogue pain clinics that

8    were in existence in America at that time?

9              MR. WEINBERGER:  Objection.

10             MR. SOBOTKIN:  Objection.  I'm going to

11        direct the witness to not answer to the extent

12        it requires her to rely on nonpublic

13        information.

14             To the extent she can rely on public

15        information, she can answer.

16             THE WITNESS:  My response would rely on

17        nonpublic information.

18   BY MS. SWIFT:

19        Q.   Would you agree with me that DEA's efforts

20   through Operation Pill Mill Nation curtailed

21   diversion by many, many rogue pain clinics and pill

22   mills in Florida?

23             MR. WEINBERGER:  Objection.

24             THE WITNESS:  I agree with that.

25             MS. SWIFT:  I don't have any other

Page 234

1       questions.

2              MR. WEINBERGER:  Nothing further,

3       Ms. Ashley.  Have a great rest of the day.

4       Thank you so much.

5              THE WITNESS:  Thank you.  Bye.

6              MS. SWIFT:  Thank you, ma'am.

7              THE VIDEOGRAPHER:  Off the record, 1:52.

8                      (Whereupon, the deposition was

9                      concluded at 1:52 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 235

1                    C E R T I F I C A T E

2           The within and foregoing deposition of the

3    witness, DEMETRA ASHLEY, conducted via Zoom, was

4    taken before GREG S. WEILAND, CSR, RMR, CRR, in the

5    City of Chicago, Cook County, Illinois, commencing

6    at 8:11 o'clock a.m. Central Standard Time, on the

7    11th day of March, 2021.

8           The said witness was first duly sworn and

9    was then examined upon oral interrogatories; the

10   questions and answers were taken down in shorthand

11   by the undersigned, acting as stenographer; and the

12   within and foregoing is a true, accurate and

13   complete record of all the questions asked of and

14   answers made by the aforementioned witness at the

15   time and place hereinabove referred to.

16          The signature of the witness was not

17   waived and the deposition was submitted to the

18   deponent as per copy of the attached letter.

19          The undersigned is not interested in the

20   within case, nor of kin or counsel to any of the

21   parties.

22          Witness my signature on this 15th day of

23

24   _____

25   GREG S. WEILAND, CSR, RMR, CRR

     License No. 084-003472

```
                                                     Page 236
 1                    Veritext Legal Solutions
                          1100 Superior Ave
 2                           Suite 1820
                      Cleveland, Ohio 44114
 3                      Phone: 216-523-1313
 4
     March 16, 2021
 5
     To: MR. SOBOTKIN
 6
     Case Name: National Prescription Opiate Litigation - Track 3 v.
 7
     Veritext Reference Number: 4486738
 8
     Witness: Demetra Ashley        Deposition Date:  3/11/2021
 9
10   Dear Sir/Madam:
11
     Enclosed please find a deposition transcript.  Please have the witness
12
     review the transcript and note any changes or corrections on the
13
     included errata sheet, indicating the page, line number, change, and
14
     the reason for the change.  Have the witness' signature notarized and
15
     forward the completed page(s) back to us at the Production address
16   shown
17   above, or email to production-midwest@veritext.com.
18
     If the errata is not returned within thirty days of your receipt of
19
     this letter, the reading and signing will be deemed waived.
20
21   Sincerely,
22   Production Department
23
24
25   NO NOTARY REQUIRED IN CA
```

```
1              DEPOSITION REVIEW
              CERTIFICATION OF WITNESS
2
        ASSIGNMENT REFERENCE NO: 4486738
3       CASE NAME: National Prescription Opiate Litigation - Track 3 v.
        DATE OF DEPOSITION: 3/11/2021
4       WITNESS' NAME: Demetra Ashley
5       In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7       I have made no changes to the testimony
   as transcribed by the court reporter.
8
   _____        _____
9  Date                    Demetra Ashley
10      Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
        They have read the transcript;
13      They signed the foregoing Sworn
             Statement; and
14      Their execution of this Statement is of
             their free act and deed.
15
        I have affixed my name and official seal
16
   this _____ day of_____, 20____.
17
                  _____
18                Notary Public
19                _____
                  Commission Expiration Date
20
21
22
23
24
25
```

```
1              DEPOSITION REVIEW
            CERTIFICATION OF WITNESS
2

        ASSIGNMENT REFERENCE NO: 4486738
3       CASE NAME: National Prescription Opiate Litigation - Track 3 v.
        DATE OF DEPOSITION: 3/11/2021
4       WITNESS' NAME: Demetra Ashley
5           In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7           I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
8   well as the reason(s) for the change(s).
9           I request that these changes be entered
    as part of the record of my testimony.
10

            I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____        _____
    Date                     Demetra Ashley
14

            Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17          They have read the transcript;
            They have listed all of their corrections
18              in the appended Errata Sheet;
            They signed the foregoing Sworn
19              Statement; and
            Their execution of this Statement is of
20              their free act and deed.
21          I have affixed my name and official seal
22  this _____ day of_____, 20_____.
23               _____
                 Notary Public
24
                 _____
25               Commission Expiration Date
```

Page 239

1                           ERRATA SHEET
                 VERITEXT LEGAL SOLUTIONS MIDWEST
2                      ASSIGNMENT NO: 4486738
3     PAGE/LINE(S) /          CHANGE          /REASON
4     _____
5     _____
6     _____
7     _____
8     _____
9     _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19

      _____        _____
20    Date                     Demetra Ashley
21    SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22    DAY OF _____, 20_____ .
23                     _____
                       Notary Public
24
                       _____
25                     Commission Expiration Date

[& - 1:22]                                                                                    Page 1

**&**

**&**   6:17 8:4 9:4,20
10:4 16:10 17:16

**0**

**00000117**   18:20
**00000121**   18:20
**00001**   170:20
**00001329**   16:6
**00001434**   16:11
**00002668**   17:20
**00002692**   17:20
**00005955**   17:23
**00005983**   17:23
**000060804**   14:16
**000060811**   15:10
**000071341**   18:13
**000071342**   18:13
**00008287**   19:8
**00008525**   18:4
**00008531**   18:5
**000094472**   18:14
**0001**   15:18
**00067**   17:7
**0008287.0005**   19:8
**00174**   14:10
135:12 141:4
212:24 213:6
**00187**   13:18 105:8
105:18
**00215**   14:6 122:8
**00216**   120:11
**00220**   14:13
136:21 141:5
**00221**   14:21
161:22
**00222**   15:7 163:20
**00224**   15:15
167:22
**00248**   14:15
159:16,19,20

**00249**   15:9 165:12
165:15
**00907**   5:7
**00919**   3:14
**012**   13:20
**084-003472**
235:25

**1**

**1**   13:14 16:3 17:10
26:20,22 29:22
49:3,12,24 50:12
51:4,16 105:6,21
105:22 141:10,10
141:21 149:2
210:24
**10**   15:11 17:18
19:7 49:12,23
50:6,11 73:24
77:8,9,12 79:15
140:12,12 167:23
167:24 177:22
179:3,23 180:4
211:2 227:1,2,2
229:17,19 230:18
**100**   18:18
**1000**   6:9
**1001**   3:6
**10016**   4:7
**10022**   4:14
**102**   13:6
**105**   13:14
**10:01**   99:18,20
**10:50**   140:20,22
**11**   15:16 17:21
20:2 51:4,16
74:14 79:5,6,9,16
148:10 170:21,22
171:8,11 187:24
206:10
**1100**   236:1

**112**   4:6
**11747**   3:21
**11:00**   140:13
**11:04**   140:22,23
**11:50**   175:3,5
**11th**   1:18 2:4,14
13:2 235:7
**12**   16:24 18:3,12
27:19,21 74:25
84:18,18,24 85:1
125:7 127:25
158:18 189:9,14
207:7
**120**   13:19
**122**   14:3
**125**   184:6
**126**   4:13
**129**   17:14
**12:00**   140:12
**12:40**   175:6,8
**13**   18:6 75:7 85:17
85:18,25 86:12
147:2,9,9 220:3
224:16
**130**   135:10
**1301**   13:16
**1301.71**   105:7
123:10 173:3
**1306**   18:16 93:10
**1306.04**   14:9 61:22
72:5 135:11
213:10
**1306.04.**   141:4
**1306.06**   14:13
136:20 137:5,10
**1306.06.**   141:6
**1311**   5:6
**135**   14:7
**136**   14:11
**14**   18:11 56:13,15
75:14 89:5,6

**145,000**   38:18
**15**   18:15 56:4
92:24 93:1 99:14
144:20,21 148:11
157:12,13 183:14
**15219**   6:21
**157**   78:8
**15th**   235:22
**16**   17:17 18:18
100:3,4,7,8 144:20
236:4
**16.6**   232:16
**160**   14:14
**162**   14:17
**163**   15:3
**165**   15:8
**168**   15:11
**17**   1:6 18:9 19:3
189:10
**170**   15:16
**1700**   3:6
**1706**   235:24
**1717**   9:14
**172**   232:8
**175**   10:19 13:7
127:16
**1755**   7:7
**18**   56:23 202:14
204:18 206:6
**1800**   6:9
**1820**   236:2
**189**   19:3
**19**   20:14
**19103**   9:15
**192**   232:24
**19592.00001**   17:6
**1990s**   158:8
**1999**   8:6
**1:14**   205:24 206:2
**1:22**   206:2,3

**1:38** 220:21,23,23
220:24
**1:52** 234:7,9

**2**

**2** 13:19 16:8 28:20
28:22 29:1,23
30:18,19 31:21
32:9 35:4 87:24
88:4 101:25
120:15,16,19
154:14 161:3
165:22 168:4
181:8 182:5,16
229:19 230:15,18
230:19
**2.4** 158:18
**2.5** 232:14
**20** 148:11 183:14
237:16 238:22
239:22
**2000** 144:1
**20001-4956** 8:14
**20002** 10:20
**20005** 9:23
**2000s** 128:13,24
**20036-5807** 6:10
**2004** 77:14 158:18
**2006** 92:15 93:8
131:7 157:12,13
157:19,23 158:17
**2007** 22:5 80:19
223:8
**2008** 79:10,18,20
82:6 148:14 164:8
**2009** 81:18 82:21
183:13 231:23,25
**2010** 14:4 45:3
122:13 150:13
151:1,2 152:22
179:24 183:14
187:9 191:2,12

**2011** 31:3,10,14
131:8 179:24
191:2,12 192:3
**2012** 31:3,10,14
118:4 164:9 184:6
**2013** 29:5,14,18
31:3,10,14 45:4
167:15 171:1
181:8,13 182:12
**2014** 41:17 144:2
144:13
**2015** 19:7 22:5
127:20 160:6
189:21 223:8
224:4,7,8
**2016** 27:9,11,22
40:16 44:16,23
81:24 127:16,20
127:24 141:23
143:24 164:3
**2017** 16:24 40:16
41:12 44:17
100:11,18 125:7
**2018** 17:6 18:19
23:2,3,18 46:2
**2019** 18:12 23:7,19
90:3 91:5
**202** 5:6 6:11 8:15
9:24 10:21
**2021** 1:18 2:4,14
13:2 20:2 235:7
235:23 236:4
**21** 13:5,15 14:8,12
18:16 61:22 93:10
188:10
**212** 3:22 4:8,15
**214** 8:23
**215** 9:16
**216** 3:8 11:11
**216-523-1313**
236:3

**216-9252** 4:23
**219** 13:21
**22** 14:18 162:9
**2200** 8:21
**22152** 11:16
**222** 13:8
**224** 13:9 230:2,3
230:12
**229** 13:10
**23rd** 100:18
**24** 18:19 38:10,11
232:9
**241-7909** 9:16
**25** 44:16 188:12
**25301** 10:8
**26** 16:3 77:14
**261-2220** 5:14
**270** 3:13
**272** 16:20 36:20
39:2,8
**28** 4:21 16:8
146:14
**2800** 8:21
**2804** 1:6,6
**293-8244** 5:8
**29464** 4:22
**296-8713** 11:17

**3**

**3** 14:3 16:13,16
36:15,17,20 37:8
46:4 71:24 88:5
89:16 93:16,18
122:8,9,12,18
130:12,12,13
135:14 141:3
160:19 194:13,21
236:6 237:3 238:3
**3.4** 127:25
**3/11/2021** 236:8
237:3 238:3

**30** 20:22 21:16
25:11 35:21 69:20
94:11 107:21
114:10 137:23
184:21
**300** 7:17 9:6
**304** 10:9
**305** 3:20
**309** 214:4
**3100** 9:14
**312** 7:19 9:8
**32** 46:11 149:3
**3269** 206:13
**332-4764** 8:8
**338-5212** 6:22
**34** 154:18 181:12
181:19 182:3,15
**34,500** 127:17
**340** 188:1
**349** 15:19
**353-1291** 10:21
**35th** 6:20
**36** 16:13 183:6,7
**38** 16:18 183:2
184:5
**39** 32:9,10 182:25
183:1
**39402** 5:13
**397-1000** 3:22

**4**

**4** 14:7 16:18 37:25
38:2 39:2,8,16
41:14 135:15
136:22 141:3,3
150:11 212:15
**40** 32:14 51:25
52:5,11 137:24
**400** 3:20 11:9
**41** 16:21
**412** 6:22

**42** 61:18 62:9
  232:19
**421-2800** 4:15
**424** 8:8
**434-5182** 9:24
**44113-1852** 11:10
**44114** 3:7 236:2
**4486738** 1:25
  236:7 237:2 238:2
  239:2
**45** 17:3
**46** 35:4,7
**47** 185:11
**4729-5-21** 72:6
**48** 188:2,8
**494-4400** 7:19

**5**

**5** 14:11 16:21 41:4
  41:6,11 44:15
  95:15 125:5,11,12
  136:23 141:5,5,6
**50** 202:1
**500** 10:6 109:11,17
**500,000** 144:5
**51** 232:9
**5195** 13:21
**52717** 93:16,19
**52718** 93:18 94:20
**52719** 95:16
**53** 17:8
**54** 7:17 127:17
**544-0009** 3:15
**55** 17:11
**56th** 4:13
**571** 11:17

**6**

**6** 14:14 17:3 45:18
  45:25 46:12 93:8
  159:24,25 160:1

**600** 10:7
**601** 5:14
**60654** 7:18 9:7
**622-3988** 11:11
**64** 188:2
**64,000** 127:15
**650** 7:9
**66** 44:23
**662-5531** 8:15
**672** 77:24
**674** 78:17
**68** 232:24
**696-3232** 3:8
**6th** 4:13

**7**

**7** 14:17 17:8 53:1
  53:2,12,21 161:25
  162:1
**70** 17:15
**720-0714** 10:9
**725** 9:22
**73** 51:18
**739-3939** 7:9
**740-8554** 8:23
**75201** 8:22
**77** 17:18 154:4
**778-1825** 6:11
**784-6400** 4:8
**79** 17:21

**8**

**8** 15:3,4 17:6,11
  55:15,17,22 56:5
  61:18 143:21
  163:20,21 164:1
**80** 15:13 167:16
  169:3
**801** 11:9
**843** 4:23
**85** 18:3,6 152:3

**85.5** 151:1
**850** 8:13
**862-3247** 9:8
**8701** 11:15
**89** 18:11
**8:11** 2:5,13 20:3
  235:6

**9**

**9** 15:8 16:25 17:15
  18:17 70:22,23
  71:5 72:1,14
  147:24 150:6
  165:13,17,21
**90** 78:10 100:22
**90067-4643** 8:7
**91** 5:12
**917** 3:15
**93** 18:15
**939** 5:8
**94303** 7:8
**959** 80:1,13
**960** 81:4
**99.99** 46:23
**9:20** 53:14,15
**9:43** 99:16,18
**9th** 79:10

**a**

**a.j.** 5:11
**a.m.** 2:5,13 99:18
  99:18 140:22,22
  175:5 235:6
**aa** 81:21
**aberrant** 88:14
**abigail** 9:13
**abigail.pierce** 9:17
**ability** 145:8
  169:23,24
**able** 176:22
  177:10 203:11
  229:22

**abreast** 120:5
**absurd** 178:13
**abuse** 27:23 28:3,7
  28:13 78:4 125:25
  126:20 139:13
  142:8 157:21,24
  158:3 164:18
  168:14 191:3,13
  196:12,22 232:2
**abusing** 158:15
**accept** 183:18
**access** 33:24 34:1
  37:15,17 51:5
  59:2,12,17,19,20
  98:24 101:5,9
  130:23 134:5,13
**accessed** 133:6
**accidentally** 99:7
**accurate** 82:23
  223:19 228:3
  235:12
**acknowledge**
  237:11 238:16
**acknowledged**
  162:22,24 164:8
**acknowledges**
  160:21 161:9
  167:6
**acknowledging**
  164:20 165:24
  166:17
**acquired** 153:18
**acronym** 131:3
  185:14 200:1
**act** 15:15 17:13
  30:8 56:2 81:15
  81:17 82:6,10,11
  82:17,20,24 83:3,8
  83:21 106:6 108:6
  113:17 115:17
  129:20 163:3

167:17 168:9,13
214:4 227:18
237:14 238:20
**acting** 22:11 46:7
135:25 136:14
161:12 235:11
**action** 20:24 117:2
118:22 119:13
160:11 164:5
169:4 172:15
178:20
**actions** 14:4
115:15,24 116:8
116:11 117:15
119:21 156:20
159:8,12 168:10
230:22
**activities** 196:11
**activity** 27:24
28:12
**actual** 23:21
169:11 192:5,15
194:2
**addendum** 169:15
169:17
**addiction** 78:3
108:16
**addictive** 107:1
**adding** 82:11
**addition** 134:25
**additional** 66:15
66:16 222:10
**address** 33:12
63:6 100:25
125:21 236:15
**adequate** 48:3
124:13 174:13
**adhere** 62:11
**adjudications**
115:24 116:10
117:15 118:25

**administration**
10:13 11:4 16:5
21:15 46:8 49:5
93:10 100:19
104:1 158:1
**administrative**
168:10 230:21
**administrator**
22:12 27:5 46:7
**adolph** 39:23
**adopted** 192:4
**advance** 203:10
**advertise** 80:18
**advice** 91:12 119:6
**advisory** 114:25
**affair** 111:3
**affairs** 110:11
**affirmance** 14:5
**affixed** 237:15
238:21
**aforementioned**
235:14
**age** 127:25
**aged** 158:18
**agencies** 59:14
76:14
**agency** 58:9 104:8
104:19 126:8
139:11
**agency's** 140:2
**agents** 186:5
**aggregate** 42:12
43:10
**ago** 32:2 175:14
**agree** 27:25 28:6,9
28:12 31:12,24
33:14,19,23 35:21
36:8 40:5,11
41:22 42:1 46:25
47:10,19 48:2,10
50:19,24 54:8,11

54:12,19,22 62:16
62:18 63:5,9,12,24
63:25 64:5,6,7,10
64:11,14,15 65:9
65:18,19,24 66:2,7
67:1,6,7,11,12,15
67:16,21 68:4,9,17
69:10 70:11,18
72:21,23 73:11,15
73:16,19 74:5
75:23 76:3,5,8,12
76:23 77:3 83:7
83:15 87:13,18
88:16,22 90:8,17
90:19 91:15,17
92:2,4,7,12,13
94:10,12,17 95:12
95:25 96:5,19,20
96:25 97:13,25
98:23 99:3 102:7
102:8,10,13 107:2
108:1,3,4,19,20,24
108:25 109:12,14
109:18 111:21
112:5,14,16 113:5
113:13,15,18,19
113:21,22 114:1,4
114:9,21,24
116:17 118:13
119:25 120:10,21
121:5 122:17,22
122:24 123:2,12
123:15,20 124:4
124:17 125:2,3
129:17 130:6,9,10
133:16,18,20
134:16 136:18,19
137:5,7,15 139:8
142:9 166:8 173:8
173:23 176:23
177:14 178:1

190:9,20 195:5,7
195:14,15,24
196:1,14,16 197:1
208:4 209:22
210:15,19 214:15
214:23 216:11,24
218:5,8,13,18,20
219:24,25 220:7
220:10,15,16
221:2,7,9,12 226:9
231:14 233:5,19
233:24
**agreed** 111:15
124:23 132:5
167:15
**agreement** 14:15
14:19 15:5,9,17
160:5,8,11,14,20
162:9 164:8
165:20,23,23
166:7,16 167:10
169:12,25 171:1
171:12 230:20
**agreements**
176:18 177:17
**agrees** 15:12
**ahead** 25:8 26:19
53:18 84:19 110:9
115:4 120:9 127:8
129:3 166:24
185:11 215:8
**aid** 24:9 86:15
103:16 104:22
116:9 151:14
197:7 199:19
224:19
**aj** 5:15
**alarming** 78:21
158:4
**algorithms** 131:18
226:4

allegations 168:6
 231:2
alleging 16:15
allergan 9:3
alliance 7:13
allison 10:16
allison.c.carroll
 10:23
allow 174:14
allowed 119:16
 168:11 169:23
 175:12 176:5,8,10
 176:12 177:8
 219:8 227:24,25
allowing 178:17
allows 42:15 43:12
 173:15
aloud 176:12
 231:17
alternative 230:5
alto 7:8
amends 82:10
america 231:8
 233:8
american 86:21
 96:12
americans 127:25
amerisourceberg...
 9:11
amount 40:17
 42:14 43:11,20
 44:9 91:22 92:9
 98:3 101:20
analogue 127:21
analogues 126:4
 127:19
analysis 68:19
 69:3,12,23 70:13
 146:1,24 198:9
analyze 131:17

analyzed 132:9
andrew 10:17
angeles 8:7
announced 44:16
 158:2
announcing 164:1
annual 109:17
answer 22:20
 23:25 31:16,18
 39:11 43:15 59:7
 59:8 67:24 69:17
 69:17 74:11 76:2
 109:24 110:9,19
 110:20 111:8,17
 111:19 112:3,10
 112:11 113:11
 115:4 116:18
 117:5,8 118:20
 119:11 120:9
 121:4 126:14
 128:17 129:3
 138:5 139:25
 149:25 152:24
 153:5,6,10,13,17
 155:10,12,25
 156:2 157:5,6,7,9
 164:25 166:13
 168:19 170:2,9,18
 171:15,21 172:12
 175:17 176:2
 180:17 181:1
 186:2 189:1,3
 192:11 194:9
 225:10 228:22
 229:8 233:11,15
answered 112:25
answering 43:14
 202:23
answers 235:10,14
anti 192:4

anticipate 202:3
anybody 218:10
anyway 206:21
apologies 38:1
 45:14
apologize 56:13
 183:6 202:15
 229:13
apparently 141:23
 142:2 154:20
appear 237:11
 238:15
appearance
 103:24
appearances 20:5
appearing 103:13
appended 238:11
 238:18
applicants 106:8
applies 118:9
appointments
 183:20
appreciate 104:4
 152:18 229:11
appreciates
 100:24
appropriate 47:8
 47:19 57:24 99:1
 102:5 134:3
 142:14
appropriately
 65:22 66:5,11,20
approximately
 127:16 184:6
 232:14,15,19,24
apqs 42:10,11 43:9
 44:17
april 18:19 82:21
 100:11
arch 9:14

arcos 59:12,15
 60:23 61:7
area 152:2 223:12
 223:14,22
areas 158:13,14
arrest 37:4
arrested 188:12
 188:21
arrows 182:21
ashley 1:15 2:7
 13:3 16:22 21:4,8
 25:10 27:1 28:25
 36:20 38:6 39:7
 41:2,10 45:22
 48:10 49:20,23
 53:20 55:20 59:6
 60:17,21 70:11
 71:3,13 74:5
 76:23 77:12 79:9
 80:16 84:13 85:8
 85:22 89:9 93:5
 98:2,23 99:22
 100:10 102:21
 103:14 106:13
 109:2 116:14
 120:1,20 122:25
 135:9 137:5
 140:11 141:8
 149:17 155:2,16
 156:3 172:25
 174:20 175:11
 176:12 177:16
 178:19 179:2
 180:4,11 181:7
 187:3 188:22
 189:5 197:5 200:4
 200:21 202:14
 204:25 206:5
 209:25 215:3,12
 220:2 221:2 222:2
 222:22 224:14

227:6 229:9,13
230:17 232:5
234:3 235:3 236:8
237:4,9 238:4,13
239:20
**ashley's** 26:21
28:21 36:16 49:15
55:16 60:2 100:3
104:1 143:2
**aside** 28:17 180:4
209:24
**asked** 99:22 106:3
112:24 137:3
147:11 150:8
157:14,17 159:7
176:16,20 181:14
181:25 196:5,7,10
198:16,18 199:23
201:22 202:5
204:9,10 225:17
226:13,25 227:10
235:13
**asking** 64:21,22
68:25 73:6 90:10
173:20 193:5
195:1 196:12,18
215:13
**assigned** 72:19
225:19
**assignment** 237:2
238:2 239:2
**assist** 132:10,13
**assistance** 35:23
188:1
**assistant** 22:11
27:4
**associate** 27:4
**associated** 107:23
113:24 114:22
115:11,24 118:15
131:20 132:11

133:9,21 137:23
146:24 172:5,16
225:6
**association** 20:13
85:10 86:1,22,25
87:4 89:14,21,24
90:2
**associations** 85:10
87:9
**assume** 109:1
132:15 151:22,23
151:25 152:1
226:5,16,23
**assuming** 132:14
**attach** 228:16
**attached** 92:20
235:18 238:7
**attaches** 77:17
92:14
**attachment** 17:19
17:22
**attempting** 200:23
**attention** 146:12
207:3
**attorney** 164:4
**attorney's** 178:2
179:4 230:22
**aubel** 11:23
**august** 19:7
189:21
**authorities** 32:10
35:6
**authority** 57:25
58:12,21,23 59:1
91:12
**authorization**
40:21 43:5 60:5,7
110:19 118:9,19
119:3,23 138:4
152:25 154:8
163:10 170:17

176:3 224:25
228:21 229:7
**authorize** 238:11
**authorized** 43:6
60:8 161:16 193:9
214:2 225:22
226:3
**authorizing** 82:25
**availability** 80:5
80:23
**available** 71:19
122:19 148:20
158:22 159:2
197:23
**ave** 236:1
**avenue** 3:6,13 4:6
8:6,21 11:9
**aware** 52:15 69:8
71:17 81:13,17
98:7 104:7 107:22
110:2,10,25 118:1
118:3 122:14
132:16,23 133:5
151:13,21,22
155:3,22 156:5,8
157:10 178:19
180:5 196:21
198:20,23 204:2
209:1 210:12,14
225:3,4
**awareness** 29:6
51:21 211:14,17
211:22

**b**

**b** 9:5 13:21
**bacchus** 11:8
**back** 25:3,6 48:22
99:11 125:4
137:23 140:16
141:8,11 145:25
147:2 148:14,25

149:1,4,8 152:22
155:6 161:3
174:24 183:6
184:5 185:10
203:7 210:22
220:3 223:6
225:13 227:1
236:15
**background** 223:6
**backs** 143:23
**bad** 36:4 40:6,12
41:24 45:1
**badala** 3:18
**bailey** 10:4
**baileywyant.com.**
10:10
**balance** 102:16
112:25
**banner** 49:7
**bartlit** 7:15
**bartlitbeck.com**
7:20
**based** 27:14 30:24
32:21 35:21 36:8
40:5 46:25 54:12
58:4 60:21 62:16
65:6,10,15,25
66:19 75:19 76:9
78:3 81:13 83:16
87:13 91:15 94:10
96:4 101:3 102:3
104:20 110:2
119:25 131:11
134:22 142:9
146:6 152:21
153:11 177:2
186:17 190:9,20
191:4,21 192:7,19
192:22 201:11
226:15

**basically** 31:7
51:10
**basics** 225:21
**basis** 26:4 119:11
186:25
**bates** 13:18,22
14:6,10,13,15,21
15:7,9,15,18 16:6
16:11,16,20,24
17:6,10,13,17,19
17:22 18:4,9,12,16
18:19 19:7 71:7,8
77:24 78:17 79:25
80:12 81:3 105:16
206:12,21 207:7
212:24
**bda** 78:21
**bear** 67:17 230:3
**bears** 67:3,8,13
68:1,6 212:23
**beck** 7:15
**began** 187:9,15
**beginning** 125:20
191:1
**begun** 158:15
**behalf** 3:3 4:3 5:3
6:3,15 7:3,13 8:3
8:18 9:3,11,19
10:3,12 11:3 21:1
103:2,9,25 114:17
117:5 118:7 192:3
194:24 196:9
**behaviors** 88:14
**believe** 31:5,11,19
35:25 42:23 43:3
47:3 83:11 95:1
95:15 121:19
124:11 129:4,22
133:17 138:23
173:13 180:12,21
198:11,16 204:1

207:14 216:18
222:1
**believed** 217:14
**beneath** 37:1
**bennett** 11:7
**benzodiazepine**
90:13
**best** 143:11 145:7
221:14
**better** 63:23 92:21
**beyond** 42:22
102:25 152:10
185:24 190:12
200:16 216:12
219:1 229:3
**big** 31:13 83:24
206:24 230:10
**bill** 192:4
**bit** 45:1 133:19
140:25 149:1
**black** 168:15
**block** 70:5
**blow** 135:20
**blue** 49:7 153:22
153:23
**bmasters** 9:25
**board** 19:6 57:25
58:5,9,21 59:21
71:11,18 73:20
74:14 75:1,7,20,24
76:19 150:8,16
189:17 190:3
193:24 194:25
199:24 203:7
204:11,16 206:12
208:12 209:13
**boards** 59:14
76:10,13 85:10
86:1,25 130:21
**boots** 7:13

**bop** 207:8
**border** 206:23
**boss** 217:18
**bottom** 27:20
41:15 52:10 71:8
77:24 82:9 87:23
91:7,10 93:21,24
130:12 157:20
190:25 196:3
206:13 231:22
**boulevard** 4:21
**box** 17:10 53:22
53:25 92:22 189:6
201:21
**boxes** 52:11,12,15
54:2 212:9,10
**bradley** 9:21
**breadth** 200:10
**break** 99:8,10
140:14 174:23
**bribing** 225:6
**bridgeside** 4:21
**brief** 53:13 222:19
**briefly** 49:14
**bring** 136:25
**broadhollow** 3:20
**broadnax** 38:12
38:14,16
**broke** 99:22
**brought** 103:3
115:15,25 116:8
156:20
**brunner** 8:20
**bubbling** 33:13
**bullet** 30:22
145:15 184:14,25
185:5,6 207:11,22
208:8,20
**bullets** 207:3
**burdens** 124:21

**burling** 8:4
**bush** 6:7 13:8 84:2
84:8 118:6,7,16
120:24 121:17
122:2 123:16
124:1,25 133:12
134:8 138:1 146:3
151:8 156:15
157:1 159:1,22
160:9 162:18
165:8 166:19,23
172:19 173:6,10
174:17 222:13,18
222:21 223:1
224:9 226:21
**business** 23:4
109:24 111:23,24
112:6,8,17,18
113:6,7
**businesses** 120:4
**buys** 188:2
**bye** 234:5

**c**

**c** 10:5 11:14 19:4
235:1,1
**ca** 236:25
**cabinet** 51:12,20
54:15 211:8,16,21
**cabinets** 51:5
149:7 212:3
**california** 7:8 8:7
**call** 30:3 63:22
198:25
**called** 29:5 61:14
78:21 81:15 82:13
90:11
**calling** 195:2
**calls** 73:4 81:9
108:13 133:13
139:6 153:1 201:6

capacity 104:1
114:17
capita 150:14,15
150:18
caps 164:17
cardinal 9:19
care 47:7 88:2,9
career 40:5 87:13
138:13 190:10,21
199:15
careful 177:2
caringwell 74:15
74:20 75:2,8,14
carolina 4:22
carroll 10:16
carry 94:3
cars 232:16
casa 77:19 78:4,21
79:11,15,20 80:3
81:7
case 1:6 67:20
76:17,18 102:23
102:25 103:15
106:16 109:10
117:24 118:14
119:1 120:22
121:8,12,18,21
122:13,14,19,20
147:25 148:3,6
149:16 150:20,25
211:20 227:23
235:20 236:6
237:3 238:3
cases 1:7 16:19
36:22 39:15 103:3
148:11,14,17,23
cash 66:18,25
category 128:3
cause 127:11
228:17

caused 127:17
causes 60:14
cdc 127:15 144:7
center 78:3 127:14
144:9 231:3,7,15
centered 118:14
central 2:5,13
74:22 75:4 132:25
235:6
centre 6:20
ceppich 8:9
certain 29:12
41:18 50:5 152:1
160:21,22 162:25
162:25 164:9
176:13 211:10
certainly 170:4
222:8
certificate 238:11
certification 237:1
238:1
certified 20:12
cetera 183:19
cfr 18:16 61:22
72:5 93:10
cfrs 137:18
chain 24:12 82:4
83:18,24 87:4
89:14,21,24 90:2,9
90:21 91:2,11,19
199:18
chains 85:9
chairman 125:22
challenges 18:7
147:6 220:8
chance 205:3
change 194:11
236:13,14 238:8
239:3
changed 114:7
211:17

changes 236:12
237:7 238:7,9
channel 81:10
characterization
49:14 113:8
charge 22:2 29:17
164:5
charged 16:14
76:10
charges 26:14
188:13 232:8
charleston 10:8
check 64:1
checking 64:7
chicago 1:17 2:12
7:18 9:7 20:7
21:12,19,22,25
29:6,17 52:18
54:1,4 182:11
223:7,10,21 235:5
child 152:4
christopher 8:5
ciaccio 3:19
circumstances
65:17 66:22 96:4
192:17 194:4
cited 144:6 207:12
cites 72:4
cities 108:22
city 2:11 235:5
citycenter 8:12
civil 2:10 15:13
20:23 167:16
227:13,16 230:22
237:5 238:5
classified 24:18
25:12
clear 24:22 90:22
113:2 119:18
195:4

clearly 119:7
cleveland 3:7
11:10 236:2
client 167:13
clients 103:10,10
clinic 30:1,2,10
41:25 42:1 184:10
184:16 185:2
188:14 232:10
clinics 16:10 29:25
30:12 31:7,8,12,23
35:7 40:7,12 45:2
154:17,20 182:19
183:3,10,14 184:6
184:23 187:20
188:2,10 191:18
192:6 233:7,21
close 46:13 175:14
closed 108:7
closing 81:9
clustered 75:4
cocktail 90:18
code 13:15 14:8,12
137:19
cohen 205:18
colleagues 127:10
collection 52:1,5,6
college 138:10
colloquy 118:11
228:4
colorado 227:14
columbia 77:18
78:4 80:4 81:7
column 38:21
93:22,25 94:4
95:14,16 96:7
157:19,20
combat 82:13
232:2
combating 16:9
29:23

combination
  62:24 63:17 65:6
  66:6 90:12 98:20
  100:20
combined 195:2
come 99:11,12
  140:16 145:25
  174:24 185:10
comes 25:3 83:14
  95:22
coming 154:11
  155:4
commencing 2:12
  235:5
comment 166:24
comments 94:21
  95:5 164:4
commission
  237:19 238:25
  239:25
committed 168:7
committee 16:23
  17:4 19:5 41:12
  41:16 42:8 44:15
  45:25 103:1 125:6
  189:17
common 128:3
  137:22 195:3
  196:24
commonly 126:7
communicate
  142:11 146:17
communities
  108:18 124:23
community
  124:22
companies 107:7
  107:21 108:8
  109:17,25 111:24
  114:5 115:10,16
  115:25 120:2,4

129:18 134:2
  136:10 145:11
  156:21
company 6:16
  109:10 134:11
  224:19,22 225:3
competent 58:20
complaints 35:9
  35:15 36:3
complete 183:22
  235:13
completed 236:15
completion 78:23
complex 44:5
compliance 30:7
  110:4 158:23
  160:23 163:2
  164:12 167:8
complied 129:19
comply 88:11
  113:16,20 123:4
  123:14,22 164:14
complying 221:11
comprehensive
  39:17 78:24
computer 68:18
  69:3,12,22 70:12
computerized
  133:1
concept 130:6,10
concern 95:2
concerning 189:19
concerns 100:13
  100:25 101:9
  158:14
concluded 208:13
  234:9
conclusion 73:5
  108:14 117:16
  139:7 201:7

conclusions
  159:11
condition 67:10
conditions 195:13
conduct 68:18
  69:3,12,22 118:15
  129:7 130:2
  156:18 172:17
  198:8 227:6
  230:21
conducted 1:16
  2:8 20:22 210:6
  210:10,13 235:3
conference 29:6
confirm 176:13
  212:23
confirmed 226:13
confronted 88:13
confusion 90:22
congress 46:2 81:9
  81:14 143:24
connolly 9:20
conroy 4:4,12
consensus 85:11
  85:25 86:11,16,21
  87:21,24 88:1,8
  220:4,13
consider 58:5
consideration
  44:13
considered 78:22
  88:10
considers 42:9
  57:13,18 58:15
consistent 88:18
  107:17 160:23
  163:2 164:12
  165:7 167:8
  178:23 184:20
  188:16

conspiracy 16:15
constitute 91:12
constitution 10:18
construed 88:2,9
consulting 23:4,11
  23:21 24:2,5,8,11
consumer 82:6
consumption
  150:14
contain 168:21
contained 106:4
  130:23 135:6,7
  136:20
contents 46:5
continue 227:24
continued 4:1,3
  5:1,3 6:1 7:1 8:1
  9:1 10:1 11:1,5
  14:1 15:1 16:1
  17:1 18:1 19:1
continues 80:24
continuing 42:25
  200:15 207:18,19
  218:25
contract 23:16,17
contractor 53:14
  85:6
contribute 130:4
control 22:2,12,17
  127:14 144:9
controlled 13:17
  14:20 15:6,14
  17:13 18:9 19:5
  24:18 25:13 30:7
  32:24 33:2 48:4
  50:13 52:1,7 55:2
  56:1 59:3 61:13
  62:3,13,21 63:14
  78:9 80:5,18
  82:11,15 83:21
  85:13 86:3 88:15

91:24 92:6,16
93:11 95:23 96:13
96:15 101:14,23
104:25 106:5,10
106:20,24 108:6
113:16,20,25
115:17 126:1,20
129:20 135:23
136:2,13 137:11
157:22 158:16
160:22 162:10
163:1,3 164:3,10
164:15 167:7,17
168:11 179:17
189:16,20 195:11
195:17 198:10
199:7 200:24
211:15 213:14
214:12 216:4,21
220:10 227:18
232:15
**controls** 104:23
106:9,18 123:10
124:6 134:3 221:4
**conveyed** 186:24
**convicted** 184:9
**conviction** 225:4
**cook** 2:12 235:5
**cooperate** 142:13
143:13,15
**cooperated** 179:10
**cooperation** 35:23
**cooperative**
229:10
**copy** 92:19,21
202:19 235:18
**corner** 27:20 71:8
77:25 147:22
206:13
**corporate** 106:18

**corporately**
123:12
**corporation** 9:11
161:4
**corporations**
110:3 124:13
132:24 133:6
138:15 142:12
**correct** 22:25 23:8
23:22 24:1,17
27:5 29:8 44:11
44:20,21,24,25
50:15 52:8,9 57:2
58:3,15 61:23
62:3,14,15 72:2
78:14,15 81:24
83:2,20 86:17
97:21 100:14
101:15,16,23,24
103:16,17,20,21
104:13 105:1
106:13,14,20,21
108:11,12 109:3
110:5 115:1 117:3
124:15,16,19,20
126:5,10,23 127:1
131:12,14 132:4
134:14 137:24
138:19,20 139:5
139:23 140:6,9
143:6,17,19 144:2
144:3,7,8,24 146:1
146:2,25 148:3,4
148:23,24 155:23
158:8,10 161:8
165:7 167:11
173:4 176:13
182:13,23,24
187:8,20,21 188:3
188:5 189:21
198:17 213:10,17

213:18,22,23
214:5,6,13,14
216:5,6 218:7,14
219:6,7,10,11,16
223:9,13,23 224:1
224:3 227:10
228:8 231:4,8,20
**correction** 23:15
**corrections** 236:12
238:17
**correctly** 21:14
71:22 93:13 101:1
128:6 130:25
136:6 151:1
161:18 162:14
163:5 167:4
168:16 184:18
215:15 227:19
228:7,11
**corresponding**
61:14,19,25 62:2
63:10 72:1,10,11
72:19 73:13,17,23
75:25 83:14 89:1
121:14,25 134:24
136:4,8 139:4,10
144:22 145:4
148:18 161:10
165:24 166:17
167:9 173:16
174:15 212:15
213:9,19 214:16
**couching** 155:15
**counsel** 45:12,16
103:20 118:12
204:21 222:5
228:5 235:20
**counselors** 20:11
**count** 205:21
**counterparts**
232:1

**counties** 108:23
**country** 31:1,4,9
33:16 36:2 37:9
52:16 75:10,16
103:3 108:23
109:11 126:23
129:10 144:1,14
158:1 196:22
**county** 2:12
102:23,24 150:21
150:25 151:2,17
152:4 235:5
237:10 238:15
**couple** 80:22
89:12,13 125:9
141:24 203:7
222:13 224:14
229:14
**course** 34:9 94:7
121:7 135:25
136:15 137:10,20
153:2 161:13,15
195:19 214:1
**court** 1:1 2:10
20:8 124:21
142:21 237:7
**courteous** 204:5
**courts** 94:4
**cov.com** 8:9,16
**covered** 42:23
43:2 116:13 154:9
**covers** 230:20
231:1
**covid** 20:14
**covington** 8:4
**crackdown** 40:6
40:12 164:18
**crashes** 127:13
**crawford** 6:8
**create** 131:18

**crime** 184:13
201:4,12,14
207:16
**criminal** 26:14
27:24 28:12 82:12
83:4
**criminally** 207:12
**crisis** 196:25
**cross** 185:25
190:12 200:17
219:2
**crr** 1:24 2:9 235:4
235:25
**csa** 82:10 120:3
123:4,23 132:16
139:5 148:19
160:24 161:16,17
164:13
**csr** 1:24 2:9 235:4
235:25
**culminating** 232:3
**current** 113:23
225:23
**curtailed** 83:8
233:20
**customers** 75:15
**cutting** 177:12
**cvs** 6:3,4,4,5,5
13:20,21 14:16,19
15:5,10 18:14
24:6 86:15 103:16
104:22 109:16
116:1,8 117:23
118:7,13 120:23
121:23 147:25
148:3 151:14
156:11,18 160:6
160:14,20,21
161:4,4,9,17 162:9
162:21,21,24
164:2,8,9,20,22

165:24 166:16
167:5,6 175:12
177:18 197:7
199:19 223:2,2
224:18
**cvs's** 118:15

**d**

**d** 6:19 13:21 85:16
**d.c.** 6:10 10:20
**daily** 98:10
**dakota** 223:17,18
**dallas** 8:22
**danger** 108:22
129:15 130:2,4
**dangerous** 124:18
207:13
**data** 33:24 59:2,11
59:12,13,15,18,20
59:24,25 60:10,22
60:23,24 61:2,5,9
68:19,24 69:3,12
69:23 70:13
131:11,18 132:8
132:18,24 133:6
133:10,22 158:2
197:14,20 198:4,8
208:10,15 209:5,5
209:16,19
**database** 130:19
130:24 134:13
226:3,4
**databases** 33:25
133:6 134:5
**date** 20:2 236:8
237:3,9,19 238:3
238:13,25 239:20
239:25
**dated** 18:12,19
77:14 79:10 81:23
100:17

**david** 10:15 40:22
49:19 110:14
111:17 176:4
177:12 178:11
230:10
**david.m.sobotkin**
10:22
**day** 2:14 7:4
100:22 127:16
234:3 235:7,22
237:16 238:22
239:22
**days** 236:18
**dc** 8:14 9:23
**de** 5:6
**dea** 16:6,11 17:20
17:23 18:4,20
19:8 21:18,23
22:7 23:1,3,12
24:17,23 25:11,12
25:18 26:1,3,7,9
26:10,13 27:5,12
30:14,24 32:21
33:23 35:22 36:9
36:9 37:3 38:21
39:9 40:6,15
41:17 42:9,15
43:7,11,23 44:9,16
47:1 54:13 55:1,7
56:1,7,21 57:2,3,9
57:13,17 58:4,4,12
58:13,15,23 59:2
59:11,17,20,24
60:3,9,9,15,22,22
61:2,5,9 62:6,17
64:16 68:18,23
69:2,11,21,22 70:4
71:6,9 72:5 73:21
74:15 75:20 76:5
76:9 78:13 81:14
82:25 83:16 85:8

85:9,25 87:13,19
88:18,25 89:13,17
90:3 91:10,11,16
91:18,20 92:4,8,14
93:9 94:4,11,13,24
95:6 96:9,11,22
97:10,16 98:2,9,13
98:18 100:24
101:4,9,18,19
103:9,19 104:2,21
110:23 111:22
112:12 114:10,17
114:21,21,25
115:6,7,9,14,17,23
116:10 117:5,17
118:4 121:7
122:19 126:8
128:12 142:6,10
142:22 146:15,20
147:13,16 153:3,8
153:12,18,18,22
154:16,19 155:3,3
155:10,18,21,23
156:6,9,21 159:8
159:12 163:8
168:6 173:14
175:14 177:10
179:10 180:5
181:3,5 184:21
186:4,15 187:17
190:2,10,21 191:5
191:22 192:3,8,20
193:10 194:14,24
196:9 197:17,23
197:25 199:2
201:12 208:11
210:12 212:16,19
216:2 220:12,17
221:3,10 226:15
227:17 231:25
232:20,25 233:2

dea's 21:25 22:12
24:15 29:17 36:21
40:6,11 45:6 48:3
54:24 55:21,24
59:12 61:12 62:9
71:19 90:10 91:1
95:20 120:21
164:18 188:9
189:15 190:6,17
230:21 233:19
deal 148:18
195:20 215:9
230:10
dealt 138:12
192:17 194:5
dear 236:10
deas 142:12
death 127:11
deaths 127:12,16
127:17,20 144:5
decade 158:4
175:14
december 16:24
125:7
deception 207:13
decide 65:12
216:20
decision 13:22
118:4 140:5
145:22,24
deck 30:18
decline 41:17
declined 80:19
declines 42:9
decrease 44:8
decreased 40:16
211:21
deed 237:14
238:20
deemed 236:19

deems 57:3
def 17:6
defendant 7:3
16:3,8,13,18,21
17:3,8,11,15,18,21
18:3,6,11,15,18
19:3 26:22 28:22
36:17 38:2 41:6
45:18 53:2 55:17
70:23 77:9 79:6
85:1,18 89:6 93:1
100:4 103:15
108:8 109:9
115:10 116:25
117:19 120:2
123:2,12 124:13
136:10 137:17
148:20 189:10
defendants 6:3,15
7:13 16:14 20:25
104:6,21 105:14
106:17,18 109:2
111:1 112:7 113:6
113:15,22 114:11
114:22 117:1,20
119:1 122:20
123:20 124:4
125:4,12 128:21
132:17 141:10
142:13,20 147:2,9
150:5 157:13
158:24 159:9
173:1 222:1
defense 139:12,18
140:8,10 222:4
definitive 94:8
degree 130:3
degrees 138:10
delay 205:9
delving 178:21

demanded 145:16
demetra 1:15 2:7
13:3 16:22 21:4
49:20 235:3 236:8
237:4,9 238:4,13
239:20
denial 56:24 57:11
denied 58:20
deny 57:2
department 10:12
10:14 11:3,6
42:20 93:9 103:20
104:17 161:20
162:4 163:25
165:5 168:3
169:22 175:11
189:18 227:3
236:22
departments
110:4,12 111:3
depending 64:9
208:2
depicts 154:20
deponent 235:18
deposition 1:15
2:7 13:12 14:1
15:1 16:1 17:1
18:1 19:1 20:18
23:7 26:21 28:21
29:1 36:16 41:5
42:19,21,24 55:16
100:3 102:25
112:22 116:13
178:12 202:8
223:3 234:8 235:2
235:17 236:8,11
237:1,3 238:1,3
depositions 2:11
203:8 222:6
deputy 27:4

describe 130:17
described 61:20
67:23 139:11
179:23
describing 32:2
143:25 144:21
description 13:13
14:2 15:2 16:2
17:2 18:2 19:2
128:9 153:22
165:6
designed 82:13
124:6,9
destruction 52:7
detail 172:24
details 156:22
160:17 170:11
172:4,8 176:7,11
176:14,17 178:21
228:15
determination
43:18 62:12
determine 57:14
65:6,14,21 66:4,10
66:18 102:2 208:9
208:13 209:4,9,14
209:19 210:7,14
determined
208:18 217:7
determines 26:10
99:1 217:25
determining 57:18
88:20 199:6
detroit 21:19
develop 85:11
123:3,5,13,21
developments
114:6 115:6
148:22
diagnose 196:20

| | | | |
|---|---|---|---|
| **died** 144:5 | 72:17 86:3 92:15 | 22:17 29:24 33:7 | 47:6,16 61:3 |
| **different** 22:8 | 93:11 98:19 | 33:21 40:13 54:15 | 67:19 96:21,23 |
| 33:10 49:18 | 101:14 111:23 | 54:21 67:14 | 188:3,14 192:5 |
| 141:17 201:10 | 112:6,18,21 113:5 | 104:25 106:10,19 | 195:18 196:13 |
| 209:12 211:11 | 113:25 114:23 | 108:10,16,21 | 218:18,21 219:4 |
| **direct** 59:19 112:3 | 115:7,11,16 116:7 | 110:23 123:11 | 225:7 232:9,19,24 |
| 118:19 119:10 | 118:15 119:2,5 | 124:7,15,18,21 | **document** 1:6 |
| 152:24 155:9 | 131:11,16,17 | 134:4 139:13 | 13:20 14:18 15:4 |
| 166:12 170:2,17 | 132:8,17,23 133:6 | 143:17 173:3 | 15:12 16:7,12,14 |
| 171:15 172:11 | 136:2 137:11 | 185:18,20,22 | 16:19 27:18 38:22 |
| 176:2 202:2 207:2 | 166:23 168:8 | 186:3,4,6,17 | 64:12,16,20,25 |
| 228:22 229:8 | 172:6,16 179:17 | 187:25 189:15 | 65:2 81:21,23 |
| 233:11 | 179:24 180:6 | 196:12 201:1 | 84:4,5,17 85:24,25 |
| **directing** 164:24 | 184:17 185:2 | 209:4,18 211:21 | 86:12,17,21 87:14 |
| 225:9 | 192:14 193:11 | 220:14 221:5,14 | 87:15,21,24 88:1,8 |
| **directly** 42:9 43:8 | 194:1 197:6,14 | 233:21 | 89:11,17 92:23 |
| 137:2 191:18 | 198:4 213:14 | **diverted** 107:12 | 147:17,20,23 |
| **director** 71:11 | 220:10 | 107:14 168:14 | 160:8 169:16 |
| 150:7 | **display** 230:6 | **division** 1:3 21:23 | 170:5,25 171:4,17 |
| **disagree** 176:9 | **disposal** 17:10 | 22:1 29:16,18 | 171:18 178:18 |
| 177:5,7 | 52:1 53:21,25 | 189:16 | 180:2 186:18 |
| **disciplinary** 57:25 | 54:10,14,20 212:8 | **dlivingston** 6:24 | 187:14 189:23,24 |
| **disciplining** 58:10 | 212:10 | **doctor** 7:6 25:25 | 201:20 202:6,12 |
| **discussed** 216:2 | **dispose** 51:22 | 38:12 39:24 48:11 | 203:10,11 204:8 |
| **discussions** 121:22 | 52:12 149:8 | 48:17 63:22 65:16 | 204:18 205:3,7,13 |
| **disease** 127:14 | **disposing** 212:4 | 66:12 98:25 | 205:15 206:14 |
| 144:9 | **distance** 66:12 | 102:11 200:5,7,21 | 209:13 220:1,4,8 |
| **dispense** 82:14 | **distancing** 20:15 | 200:22,23,23 | 220:11 224:17 |
| 104:8 160:22 | **distribute** 104:8 | 201:1,4,12,16 | 225:16,18 227:9 |
| 161:10 | **distribution** 6:5 | 206:16 207:12,15 | 228:14 229:25 |
| **dispensed** 98:4,11 | 14:20 15:6 81:10 | 207:23 208:1,9,14 | 231:11 |
| 98:15 138:19 | 112:6,17,20,24 | 208:24 209:15,25 | **documented** |
| 139:22 151:2 | 113:3 162:10 | **doctor's** 26:9 | 149:18 |
| 156:11 162:25 | 164:2 231:2,7,15 | 145:18 195:2 | **documents** 39:7 |
| 164:10 167:7 | **distributors** 13:17 | 210:16 | 101:18 110:24,25 |
| 191:18 | **district** 1:1,2 2:10 | **doctors** 16:19 | 168:9 176:14 |
| **dispensers** 13:17 | 72:18 177:23 | 25:19 26:14 30:14 | 202:1,4 228:16,16 |
| 129:6 | 178:3 179:4 | 32:6 34:1 36:4,10 | **dog** 85:16 |
| **dispenses** 55:2 | 227:14,15,16 | 36:23 37:8 39:16 | **doing** 22:4 26:11 |
| **dispensing** 18:8 | **diversion** 16:10 | 40:6,12 41:22,24 | 32:11 35:6 58:16 |
| 30:14 45:3 62:3 | 21:18,24 22:1,2,12 | 44:8 45:1,6 46:23 | 70:12 84:8 143:17 |

178:15 205:9,10
214:21
**doj** 165:21 172:23
**doj's** 172:15
**dollar** 109:3
**don'ts** 95:22
**door** 30:4 32:3
**doorbell** 215:7
**dos** 95:22
**dosage** 232:15
**dose** 98:10
**doses** 150:15,19
151:1 152:3
**doubly** 116:14
**dr** 38:12,14,16
39:23,25
**drew** 178:22
**drive** 11:15
**driven** 27:23 28:3
**drop** 17:10 52:11
52:12,15 53:22,25
54:2 212:9,10
**drove** 28:7,13 45:2
**drug** 9:11 10:12
11:3 16:4,15,16
21:15 27:23 28:2
28:7,13 29:6
32:16,20 33:11,15
33:20 34:9 46:7
49:5 63:17 64:2,8
77:19 79:21 93:10
100:18,21 103:25
104:7,19 108:7
111:23 127:3,7,9
127:19 128:4
130:15,18 139:11
142:3,8 144:6
158:3 164:18
188:13 191:3,13
196:11,21 199:25
201:14 207:13

225:6 232:2
**drugs** 17:16,16,16
51:19 62:25 65:6
66:6 71:12,12,12
77:18 78:9 79:21
80:6,19 107:7,12
108:10 126:1,9,9
126:21,23 157:22
157:25 184:1
210:9
**drugstores** 87:5
89:14,21,24 90:3,9
90:21 91:2,11,19
**due** 20:14 119:7
152:12 184:16
185:1 211:17
**duly** 21:5 235:8
**duration** 91:23
92:5 101:22
**duty** 173:1

**e**

**e** 8:20 41:2 165:23
235:1,1
**eagle** 6:15 24:9
103:16 104:22
151:15,16 197:7
199:19
**earlier** 134:19
144:24 145:10
148:1,8 149:13
159:7 175:21
189:7 199:4
207:14 215:12
232:5
**early** 128:13,23
160:12
**easiest** 125:16
**easily** 195:21
**east** 3:6 4:13 10:6
14:4 122:13 148:6

**eastern** 1:3 7:14
227:15,15
**easy** 51:5,18
**eclipsing** 127:12
**education** 137:23
138:3 196:22
226:17
**effect** 126:8 129:8
129:16 144:13
**effective** 33:18
81:18 82:20 83:12
104:23 106:8,18
123:10 124:6
135:23 221:4
**effectively** 83:8
**effects** 63:18
**effort** 145:7
**efforts** 233:19
**either** 79:14 111:1
131:18,21 133:21
136:16 170:12
**electronic** 130:19
**elias** 5:12
**elkins** 5:11
**ellis** 9:4
**elsner** 4:19
**email** 3:9,23 4:9
4:16,24 5:15 6:12
6:23 7:10,20 8:9
8:16,24 9:9,17,25
10:10,22 11:12,18
17:19,22 77:13
79:10 81:23 203:5
203:24 236:17
**emailed** 202:17,18
204:17
**emails** 18:4 82:5
**embarcadero** 7:7
**employ** 138:16
**employed** 83:18
136:16

**employee** 104:2,19
143:16 153:8,22
181:3
**employees** 33:9
35:17,22 36:3
107:15 129:19
**employment** 153:3
153:12
**employs** 216:7,25
218:9
**enact** 81:9
**enacted** 106:5
108:6
**enclosed** 236:11
**encounters** 194:17
194:23 195:1
**enforcement**
10:13 11:4 16:5
21:15 33:24 46:7
49:5 76:14 93:10
96:18 100:18
103:25 104:7,19
115:15,24 116:7
116:11 117:15,24
118:14,22 119:12
119:21 124:22
130:21 139:11
156:20 157:8
159:8,11,11
160:11 164:5
169:4 172:15
186:5 223:24
**enforcer** 203:21
**ensure** 48:3 61:10
139:22 145:4,8
164:15 220:17
221:4,10
**ensuring** 129:19
**entered** 238:9
**entire** 46:17 62:5
107:24 138:13

227:9 237:5 238:5
**entirely** 177:12
**entirety** 96:4
**entities** 223:2
  224:18
**entitled** 77:18
  120:22 142:6
  146:15 147:5
  150:13
**envelope** 26:18
  28:18 36:13 45:10
  45:10 48:24 52:24
  55:12 70:21 77:6
  79:3 81:21 85:15
  89:4 92:21 99:5
  99:23 105:7 189:6
  189:8
**environment**
  173:15
**epidemic** 128:9,12
  128:23 129:9,17
  134:13 144:1,14
  191:3,13 196:21
  232:3
**epidemiologist**
  210:2
**epidemiology**
  210:4
**eppich** 8:5
**erica** 9:5
**erica.zolner** 9:9
**errata** 236:13,18
  238:7,10,18 239:1
**establish** 134:3
**established** 102:4
**establishing** 42:10
  88:2,9
**estimates** 127:13
**et** 183:19
**ethical** 195:12

**ethics** 196:23
**evaluated** 96:3
**evaluation** 180:13
  180:22
**event** 163:15
  178:20
**everybody** 203:3
**evidence** 149:16
  149:18,23 227:22
  229:5
**exact** 203:8
**exactly** 177:4
  224:6
**exam** 178:16
  183:23 215:22
**examination** 13:5
  13:6,7,8,9,10 21:6
  102:19 175:9
  185:25 200:17
  202:2 219:2
  222:20 224:12
  229:15
**examine** 219:20
**examined** 235:9
**examining** 125:9
**example** 39:1
  51:11 58:3,21
  62:23 63:2,4,16
  183:9
**examples** 59:11
**excuse** 97:4,24
**executed** 188:10
  238:10
**execution** 237:14
  238:19
**executive** 22:16,24
  22:25 27:11 71:11
  103:1 150:7
**executives** 149:17
**exercise** 62:10
  70:14 73:12,17,22

89:1 138:24 199:5
  216:3
**exercising** 201:19
**exhaustive** 95:21
**exhibit** 13:14,19
  14:3,7,11,14,17
  15:3,8,11,16 16:3
  16:8,13,18,21 17:3
  17:8,11,15,18,21
  18:3,6,11,15,18
  19:3 26:18,20,22
  28:19,20,22 29:1
  29:23 30:19 31:21
  32:9 35:4 36:15
  36:17,20 37:8,15
  37:21,22,22,23,25
  37:25 38:2 39:2,8
  39:16 41:2,4,6,11
  44:15 45:18,25
  46:12 48:23 49:3
  49:12,24 50:12
  51:4,16 53:1,2,10
  53:12,21 55:15,17
  55:22 56:5 61:18
  70:22,23 71:5
  72:1 77:8,9,12
  79:5,6,9,15,19
  84:5,18,24 85:1,17
  85:18,25 86:12
  89:5,6 92:24 93:1
  100:3,4 105:6,21
  105:22 107:4
  120:15,16,19
  122:8,9,12,18
  125:5,11,12
  135:14,15 136:22
  136:23 141:2,3,3,5
  141:5,6,10,10,21
  147:2,9,9 149:2
  150:6,12 154:14
  154:18 157:12,13

159:22,24,25
  160:1 161:25
  162:1 163:20,21
  165:13,17,21
  167:23,24 170:21
  170:22 171:8,11
  171:11 177:22
  179:3,23 180:4
  181:8 182:5,16
  189:9,10,14
  202:14,20,21,25
  203:2 204:16,18
  206:6 210:23,24
  212:15 220:3,6
  224:16 227:1,2,2
  229:17,19 230:18
**exhibits** 13:12
  14:1 15:1 16:1
  17:1 18:1 19:1
  41:3 105:13 141:9
**exist** 52:16
**existence** 233:8
**exists** 197:15
**exotic** 232:16
**expand** 94:6
**expansion** 184:22
**expect** 134:5 204:6
**expectation**
  129:13 199:1,2,4
**expected** 204:14
**expensive** 100:21
**experience** 25:10
  25:18 30:13,24
  32:21 33:7 36:8
  47:1 54:12 55:25
  58:4 60:21 62:17
  69:20 75:19 76:6
  76:9 81:13 83:16
  91:16 98:5,9,12,13
  98:17,18,22 101:4
  103:9 104:20

106:24 110:3
117:22 120:1
122:25 128:22
132:7 134:23
139:12 142:10
143:6,9 146:6
156:9 173:13
191:4,21 192:7,19
192:23 196:23
201:2,12 219:19
221:13 226:15
**expert** 153:1
**expiration** 237:19
238:25 239:25
**explain** 115:10
116:24 185:21
**explained** 103:8
195:21
**explanation** 104:4
195:4
**explicit** 214:17
**express** 10:3
**extensive** 103:9
**extent** 102:24
112:20 119:12
143:1 148:17
152:25 157:5,7,21
171:3 186:23
227:21,23 233:11
233:14
**extremely** 129:18
229:10

**f**

**f** 89:4 235:1
**fabric** 124:22
**face** 134:12 178:18
179:2 186:18
**faced** 192:17
194:4
**faces** 126:2

**facilities** 156:12
**fact** 48:2 96:14
109:9 110:25
129:9 133:5 144:5
155:3 167:14
172:25 218:17
**factor** 57:23 58:22
**factors** 42:9 43:19
57:13,16 58:16,18
**facts** 131:25 153:2
153:7,11,12,18
181:2 225:5
228:25
**factual** 228:3
**failing** 164:14
**fair** 23:20 31:8
128:8,10,11,18,20
153:20 207:16
**familiar** 50:4
105:2,5 117:23
131:3,4 153:21,25
160:7,13 165:2,4
167:14,20 169:2
171:11 225:21
**family** 50:14,21
127:9 211:7
**far** 75:16,16 84:3
229:3
**farrell** 5:4
**farther** 78:17
**fault** 48:17
**february** 77:14
187:9
**federal** 2:9 13:15
14:12 18:16 20:22
64:19,24 72:11
78:14 88:12 91:20
92:4,8,15 93:7
94:4 96:17 101:18
106:4 113:23
115:14 118:5

119:13 121:15
123:7 137:19
148:12,21 157:14
158:22 159:12
160:6 187:18
188:12 198:8,13
198:20,23,25
232:1
**feedback** 105:4
**feel** 90:6 91:8
**feinstein** 125:22
**felons** 184:9
**fentanyl** 44:19
126:3,4 127:18,18
127:21,21 164:11
**field** 21:22 22:1
29:17 146:7
189:16 223:7,10
223:21 227:17
**fifth** 142:1 184:25
185:5,6
**file** 27:8
**filed** 168:10
172:15,23
**files** 159:8
**fill** 33:2 47:8,20
55:6 62:21 65:12
65:22 66:5,11,21
66:25 67:20 88:21
97:12,20 134:25
145:19,22,23
173:25 199:6
201:16 216:8,21
217:1,6,11,14
218:2
**filled** 40:8 50:25
73:18 136:14
145:17 155:6
174:8
**filling** 34:10 35:1
61:12 63:7 64:3

64:17 69:13 70:14
73:13 145:12
161:14 189:20
195:23 198:9
214:8,18 216:4
**fills** 48:13 68:20
69:4 136:5 213:20
**final** 115:23
**finally** 226:25
**find** 88:4 92:20
141:18 191:8
212:22 220:13
230:8 236:11
**findings** 78:20
**fine** 84:9,11 85:5
99:13 205:7
**finish** 152:11,16
**firearms** 127:13
**firm** 4:11
**first** 21:5,11 29:4
36:22 42:23 43:2
46:6 48:24 49:6
49:19 51:17 57:23
60:6,7 77:12 80:3
82:9 86:11 89:13
90:7 95:14,16,17
96:8 100:16 103:8
105:25 120:19
135:19 136:10
147:13 157:15,19
160:7 162:20
164:6 179:5,7
190:1 191:11
207:11 210:22
213:16 222:16,17
222:18 227:11,12
230:17,19 235:8
**fits** 193:8
**fitzpatrick** 4:5
204:20

**five**  22:2 38:17
80:6 103:4,22
104:6 106:17,17
107:20 109:2
120:1 128:21
140:17 185:7
188:13,14 208:22
208:23 223:12,14
223:22

**flag**  18:7 63:3,20
64:13,17 65:15
67:8 68:1,6,14
86:2 87:15 88:13
133:19 146:1,6,9
146:24 147:6
195:1,4,21 220:9

**flags**  64:25 67:3,13
67:17,23 68:11
85:12 86:17 87:24
121:13,25 131:20
132:11 133:9,21
133:23 134:6
137:13,21 138:17
139:2 148:2,19
174:2 220:4,13
226:7,18

**flip**  37:7 185:11

**floor**  4:13 6:20

**florida**  19:6
154:21 155:5
156:12 175:25
177:19 178:3,8
179:5,7 181:20
182:21 184:15,15
184:25 185:1,7
187:7,9 188:9,11
189:17,18 190:2
192:3,24 193:18
193:24 194:1,25
227:7 229:3 232:3
233:22

**florida's**  177:23
191:2,12

**focus**  105:25 207:6

**focusing**  144:13

**folder**  213:4 230:1

**follow**  76:11 82:4
108:9 114:2
183:21 218:3,7
224:14 230:6

**followed**  31:22
148:22

**following**  20:15,22
44:8 61:10 75:25
120:3 233:1

**follows**  21:5 91:1

**foolproof**  95:21

**footnote**  147:25
148:2,6

**footnotes**  147:21
148:11

**foregoing**  235:2
235:12 237:13
238:18

**forgot**  56:9,10

**form**  22:18 23:23
34:11,16 71:7
98:6 104:11
107:25 109:5,13
109:20 110:6
128:15,25 129:11
129:21 130:7
131:13 132:1,19
133:2,11,24 134:7
134:15 135:3
137:14,25 139:6
139:15,24 151:3,7
151:18 152:7
154:24 155:8,24
156:13,24 158:9
158:25 162:17
170:6,7,15 173:5,9

173:18 174:3,9,16
180:16 201:1

**former**  104:2
166:15

**forth**  148:22

**fortune**  109:11,17

**forward**  146:21
236:15

**foundation**  109:13
109:21 110:7
114:14 118:16
121:4,17 122:21
124:25 126:25
128:15 129:1
132:2,20 138:21
142:25 151:19
152:8 153:16
156:14 157:2
162:17 165:8
167:19

**foundational**
200:13

**four**  141:25
151:16 185:6

**fourth**  190:5,16

**frame**  29:14 31:1
31:10,14 40:16
41:24 45:4 101:4
184:23

**framework**
178:16

**framing**  60:15

**frankly**  108:5

**fraud**  16:16 225:5

**free**  50:14 90:6
91:8 237:14
238:20

**frequent**  50:12
211:5

**friends**  50:14,21
127:10 211:7

**front**  26:18,25
45:21 71:2 85:21
93:4 99:25 125:11
149:2 202:16
206:6,11

**fueled**  127:20

**fulfill**  137:9
173:16 174:15

**fulfilling**  121:14
121:25 139:4

**full**  96:8 206:14
230:17

**fuller**  5:4,5,10

**fully**  160:23 163:1
164:12 167:8

**fun**  89:4

**further**  13:7,9,10
162:21,24 175:9
178:21 221:19
224:10,12 227:13
229:12,15 234:2

**g**

**g**  55:13 161:3
166:5 167:5

**gained**  153:2
181:2

**gateway**  126:8,19

**gbush**  6:12

**gen**  13:18 14:6,10
14:13,21 15:7,15
105:8,18 120:11
122:8 135:12
136:21 141:4,5
161:22 163:20
167:22 212:24
213:6 230:2

**gen00216**  13:22

**general**  41:22
88:10 91:13 111:8
130:6,10 131:10
154:4,5 157:6

159:7 184:24
187:12 197:16,19
197:22 221:18
**generalized**
119:11
**generally** 117:23
133:18,20 155:22
167:14 169:2
173:3 197:16
220:17 221:3,10
**geographic** 229:2
**georgia** 154:21
155:4 182:22
183:3,9
**getting** 25:2 101:5
101:9 124:14
155:5 172:4 198:1
200:18,19
**giant** 6:15 24:9
103:16 104:22
151:15,16 197:7
199:19
**give** 29:13 117:1
117:20 141:14
182:13 204:22
220:19
**given** 119:6
186:14 187:6
193:14,15
**giving** 49:16 50:1
50:3 51:11
**glasses** 141:12,16
**go** 25:8 26:19
38:10 49:12 53:18
84:19 101:17
103:16 105:3 110:9
115:4 120:9 125:4
125:19 127:8,23
129:3 130:11,13
135:9 141:8,24,25
143:21 144:12,20

146:14 147:2,21
148:10,14 150:5
150:11 157:15,21
161:3 166:23
168:23 172:24
183:5 184:5 205:5
205:11,15,17,20
215:7,18 218:21
222:16,16,18
226:14 227:1
228:14
**goal** 190:6,17
233:6
**goes** 73:21 80:22
94:13 96:2 130:5
187:24 191:15
192:13 195:9,16
199:25 208:20
213:19,24 214:7
223:5 226:12
**going** 37:25 38:10
40:2 46:17 49:12
49:13 52:22 79:2
85:7 93:19 96:22
97:10,17 103:6
104:16 105:20
109:23 112:19
118:11 120:14
121:3 125:19
128:13 135:13
136:21,22 137:23
144:16 146:20
148:25 149:1
151:15 152:23
153:14 154:6
155:5,9 156:22
158:12 160:16
162:16 165:13
166:11,19 167:22
172:7,10,23 176:1
178:11,14 180:25

182:21 186:17
188:25 189:2
193:7 199:5
200:12,23 201:20
201:22 202:3,13
203:24 204:7
205:11,12,15,17
205:21,23 206:9
219:17 222:11,13
224:11 228:14,21
228:25 229:8
233:10
**good** 20:10 21:8
54:8 55:13 66:24
87:16,18 140:19
141:19
**government** 120:5
160:6
**governmental**
110:11 111:2,3
143:16
**governs** 106:12
**grab** 189:7
**graeme** 6:7
**graham** 118:6
223:1
**grassley** 125:22
**great** 106:1 140:18
145:7 195:20
206:24 207:2
213:8 234:3
**greater** 33:24 34:1
**green** 49:7
**greg** 1:24 2:1
20:11 25:1 235:4
235:25
**ground** 170:12
**grounds** 193:13
**group** 5:10 90:9
90:21 91:2,11,19
105:9

**groups** 186:3
**growing** 157:25
208:21
**guard** 104:24
106:9,19 123:11
134:4
**guess** 43:17,19
66:14 68:5,10,16
119:16
**guidance** 56:1
62:9 69:11,21
70:1 88:25 90:23
117:1,11,20
118:25 119:9
142:14,23 199:3
**guidelines** 88:10
91:12 94:8,14
183:21
**guilty** 38:22
207:23 208:1,9,14
209:15
**guys** 175:2,19

**h**

**h** 3:5
**haight** 81:15,17
82:5,10,17,20,23
83:3,8
**half** 51:17 53:17
213:16
**hand** 27:20 38:21
71:8 77:24 147:22
206:13
**hands** 48:16
124:15 139:20
**handy** 177:22
**hanly** 4:4
**happen** 44:13
48:15
**happened** 116:24
117:18 184:22
192:23

**happy** 84:6,20
**hard** 40:23 69:16
  92:19
**harder** 101:5
**harken** 203:6
**harper** 39:23,25
**hato** 3:14
**hattiesburg** 5:13
**hbc** 6:16
**head** 21:22,25
**heading** 30:19
  32:10,15 35:8,14
  51:4 52:5 56:14
  56:24 57:11 93:21
  93:24 94:20,20,24
  182:18 183:2
  185:12
**headquarters** 22:8
  224:5,7
**health** 9:19 95:2
  95:10 108:17,22
  124:18 157:25
  189:18 196:25
**healthcare** 87:9
  88:11
**hear** 71:22 177:11
  215:15
**heard** 39:25
**hearing** 17:4
  40:23 45:25 46:12
**heavily** 113:7
**hedging** 49:16
**heightened** 192:15
  194:3
**help** 25:7 33:7
  40:9 61:9 117:21
  142:22 226:5
**helped** 33:15,17
  33:20 40:7,13
  114:11

**helpful** 81:20
  228:1
**helps** 33:12 54:14
  54:14,21 114:21
  132:13 212:20
**henry** 8:18
**henschell** 11:21
**hereinabove**
  235:15
**heroin** 126:3
  210:8,17
**hesitate** 152:13
**highest** 22:16
**highlight** 106:11
  135:19 137:1
**highlighted** 35:18
  145:2
**highlights** 74:21
**highly** 111:24
  112:7,16,18
  195:12
**highway** 153:22
  153:23 154:3
**hilarious** 203:20
**history** 168:6
**hit** 25:5
**hold** 37:22 53:7
  79:1 125:13
  141:13 178:12
**holds** 115:9
**holiday** 13:20
  117:23 118:13
  120:23 147:25
  148:3
**home** 51:13
**hopefully** 141:19
**hour** 53:17
**house** 17:5 46:1
  215:9
**housed** 33:25

**housekeeping**
  141:1
**hoy** 11:22
**hubbard** 7:17
**huh** 53:4 150:17
**hundred** 29:12
**hundreds** 36:9,10
**hunter** 3:12
**hydrocodone**
  44:19,22 100:20
  164:11
**hydromorphone**
  44:19

**i**

**identification**
  26:23 28:23 36:18
  38:3 41:7 45:19
  53:3 55:18 70:24
  77:10 79:7 85:2
  85:19 89:7 93:2
  100:5 105:23
  120:17 122:10
  135:16 136:24
  139:2 160:2 162:2
  163:22 165:18
  167:25 170:23
  189:11
**identified** 63:3
**identify** 62:20
  85:12 133:9,22
  137:12,21 220:14
**identifying** 132:10
  138:16 187:19
**ii** 11:7 41:18 42:10
  168:12
**illegal** 82:24 83:8
  126:9 168:14
**illegally** 201:14
**illegitimate** 26:15
  33:16 40:7 45:3
  214:9,18 217:8,15

**illicit** 81:10 126:3
  126:22 128:4
  210:9
**illinois** 1:17 2:12
  7:18 9:7 29:7
  223:15 235:5
**imagine** 40:9
  136:12
**immediate** 232:21
**impact** 143:25
**impacted** 42:9
**implement** 123:21
**implemented**
  131:7
**implementing**
  160:24
**importance**
  145:10
**important** 35:23
  35:25 73:11 132:8
  134:14,17 174:19
**importantly**
  141:16
**impose** 91:20 92:5
  92:9 101:19
**imposed** 98:2,9,13
**imposing** 173:24
**impossible** 209:4,9
  209:14,19
**improper** 36:10
  185:23 187:1
  190:11
**inability** 221:22
**inappropriate**
  73:18 218:9,14
**include** 25:15
  39:23 55:5 121:23
  151:15 172:5
  173:24 174:7
  184:1 212:8
  223:24

**included** 118:14
164:14 236:13
**includes** 173:14
212:12 224:18,19
**including** 44:18
48:5 77:13 86:21
108:8 110:24
128:21 130:23
146:23 159:9
164:10 186:15
224:18 232:9
**incorporated**
238:12
**incorrect** 37:21
**increase** 127:19
144:4
**increased** 158:4
**increases** 130:2
**independent** 35:2
47:24 155:18
**index** 13:1
**indiana** 6:4 223:15
**indicate** 51:18
158:2 196:11
**indicated** 100:19
**indicating** 236:13
**indication** 152:5
152:20
**indiscriminate**
27:23 28:3,6
**individual** 61:6
73:12 102:2
135:24 161:7,12
200:22
**individually** 111:1
136:16
**individuals** 107:17
232:9
**industry** 142:4
**inextricably** 126:1
126:22

**information** 34:8
66:15,16 78:23
115:23 116:10,24
117:14,18 121:12
130:23 132:9
134:14 158:21
159:10 181:5
186:23 233:13,15
233:17
**informational**
17:12
**infringe** 218:10
**initial** 127:13
**initiated** 158:19
**initiative** 149:4
187:6
**initiatives** 146:16
146:20
**injury** 127:11
**inspect** 58:23
**instruct** 138:4
188:25 189:2
**instructed** 155:25
**instructing** 111:16
111:18
**instructions** 177:3
**insurance** 183:18
**integral** 138:17
139:3
**intended** 91:24
101:22
**intending** 117:5,6
146:17
**intent** 214:3
**interact** 111:3
**interest** 26:11
56:25 57:4,12,14
57:20
**interested** 125:23
143:16 145:2
146:5,8 157:16

235:19
**interesting** 125:8
**internet** 74:2,5,6
75:8,15 76:23
77:19 78:10 79:22
80:6 82:1,14,15
83:8
**internship** 218:23
**interpose** 97:6
**interposed** 203:8
**interrogatories**
235:9
**interrupt** 84:2
120:25
**interstate** 154:4
**introduce** 201:20
202:6
**introduction**
73:25
**introductory**
45:16
**investigate** 26:13
60:1,11,24 61:3,6
146:10 174:1
226:6
**investigated** 36:9
156:19 175:13
**investigating**
76:11 138:17
187:19
**investigation**
59:22 76:6 160:17
163:13 164:17
170:13 172:5,9
178:7 179:10,16
179:22 180:5
228:17 229:1,1,21
230:23
**investigations**
35:24 37:2 118:9
119:20 157:9

175:25 176:6,7,11
176:20 177:9,19
187:7 193:16
221:23 227:14,17
232:7,13
**investigator** 21:19
**investigators** 33:9
186:4
**investigatory**
224:2
**involved** 37:3 76:6
117:2 119:2
121:22 147:19
170:12
**involvement**
191:19
**involves** 122:16
**issuance** 119:19
232:21
**issue** 14:9 33:13
91:12 102:5
118:21 198:14
211:22
**issued** 135:1,23
161:11,20 164:16
195:19 213:25
**issues** 62:20 63:6
65:8 115:11
118:15 119:2,5
146:23 172:5
189:19 193:12
**issuing** 214:10
**item** 60:7

| j |
|---|

**j** 5:5 10:17 45:10
**jaco** 10:17
**jae** 74:16
**jaffe** 11:24
**james** 4:20 11:7
**james.a.jaco** 10:24

james.bennett4
    11:12
january   100:18
jciaccio   3:24
jim   11:22 105:24
    106:11 107:4
    123:1 135:19
    137:1 157:21
    158:13 159:5
jj   45:13
jledlie   4:25
job   1:25 142:11
    143:17
join   172:19
jolly   45:10
jonathan   11:24
jones   7:4
jonesday.com
    7:10,11
joseph   3:19
jtaylor   10:10
juan   5:7
judgment   47:24
    48:13 62:11 65:20
    66:4,10,19 70:14
    88:13,20 102:3
    145:22 196:23
    199:6 201:19
    216:4,10,20 217:9
    217:25 218:4,7,11
judiciary   16:23
    17:5 41:12,16
    42:8 44:14 46:1
    125:6
july   18:12 79:10
    79:20 90:3
june   29:5 158:17
jupiter   231:2
jury   144:17
justice   10:12,14
    11:3,6 42:21 93:9

103:20 104:18
161:20 162:4
164:1 168:3
169:22 175:11
227:3
justice's   165:5
justin   10:5

**k**

k   37:22 160:20
kate   21:8 84:2
    97:5 204:20
kate.swift   7:20
katherine   7:16
kcrawford   6:13
keep   49:1 113:23
    120:5
kentucky   154:21
    155:4 182:22
kept   132:24
key   36:3,6
kin   235:20
kind   68:10 145:1
    176:25 178:16
    185:8 186:11
kinds   96:23
kirkland   9:4
kirkland.com   9:9
kk   36:14 37:23,25
knew   128:22
    129:4 155:13
know   30:4,5 33:9
    34:15 36:6 39:15
    52:18 56:10 69:17
    71:20 72:9,13
    73:2,9 75:19,22
    76:15,16 85:5
    105:2,5 106:24
    107:7,11 109:2,4
    114:6,11,22 119:5
    119:10 131:11
    138:16,23 142:11

142:21 143:11
144:5 146:7
147:15,18 150:24
151:25 152:12
155:17,18 169:18
169:21 178:19,22
185:2,5,14 191:14
194:6 200:5,24
201:9,21 202:1
203:4,6,13,19,20
204:7,13 205:1
207:15 208:11,17
208:18 209:3,8,17
211:12 212:18,21
213:3,4 222:6
224:21,21,23
225:2,18,21
226:11 227:8
knowingly   161:14
    196:24 214:8,21
knowledge   24:15
    59:6 65:7,10,16,25
    66:19 104:18,20
    111:10,22 114:20
    117:17 128:12
    137:8 143:3
    147:15 152:22
    155:2 163:7,12,18
    169:22 172:3
    178:5 197:6,13,19
    197:22 198:3
    199:11,20 214:17
    215:1 228:24
knowledgeable
    169:3,8
known   90:18
    109:1 126:7,21
    128:22 129:4
    136:9 140:8
    155:11,11 192:4

knows   60:16,17
    130:4
kurt   11:21
kyle   6:8

**l**

l   3:19
l.l.c.   13:20
label   17:10
labeled   13:18,22
    14:6,10,13,16,21
    15:7,10,15,18 16:6
    16:11 17:6,19,22
    18:4,12,19 19:7
labels   16:16,20,24
    17:14,17 18:9,17
lacks   67:4 91:11
    153:16
lake   102:23
lakeside   3:6
langston   19:4
    189:15 190:5,16
    190:25 192:2
    193:24 194:24
    196:9
langston's   190:2
    194:14
lanier   4:11
lanierlawfirm.com
    4:16
large   65:23 83:18
    89:24 110:3
    132:24 171:5
largest   109:10
    168:6
lasalle   9:6
laundering   188:13
laura   4:5 204:23
law   4:11 5:10
    33:23 61:10 64:9
    73:3,8 76:11,14,21
    78:14 82:20 83:16

83:20,25 91:20
92:4,8 96:17
101:19 114:11,22
124:22 130:1,21
130:23 145:3
186:5 192:13
194:1,1 214:12
221:11
**laws** 88:12 113:20
113:24 114:6
139:23
**lawsuits** 223:2
**lawyer** 175:21
181:14,18 201:22
215:13
**layperson** 146:7
**lays** 121:12
**lead** 67:14 73:18
126:21 169:19
183:5
**leading** 124:15
127:11
**learn** 101:7
**learned** 153:8
**leave** 23:1 215:9
**leaving** 23:3,11
**led** 119:19 179:11
**ledlie** 4:20
**lee** 74:16
**leeway** 193:14
**left** 141:12 157:20
184:15,25
**legal** 20:13 73:5
108:13 139:7
201:7 236:1 239:1
**legally** 40:17
42:15 43:12 44:2
55:9 219:13
**legislation** 81:9,14
192:4 194:11

**legitimacy** 62:13
**legitimate** 30:6,15
32:6 40:18 43:18
47:20 48:5,12,14
63:14 65:22 66:5
66:11,20 67:4,18
67:19,19 68:3,7,8
68:10,11,12,13
74:19 75:2 90:11
93:22 94:1,6
96:13,16 107:17
135:2,24 145:5
161:11,16 164:16
183:14 190:7,18
195:13,18 214:2
**legitimately** 50:22
50:25
**leon** 5:6
**letter** 18:12,19
55:13 85:16 89:4
89:13,20 90:9,20
91:2 92:14,20
99:6,23 100:10,16
100:17 101:12
102:1 119:8,20
235:18 236:19
**letters** 114:25
**level** 22:16,21,23
44:24
**levels** 22:22
**lfitzpatrick** 4:9
**liability** 164:15
**liber** 3:4
**license** 58:19
75:21 218:1,3,6
235:25
**licensed** 20:12
215:25 219:4,8
**licenses** 76:20
**licensing** 57:24
58:10 215:21

**likelihood** 210:7
**limit** 44:1 91:21
92:5,9 98:10
100:21 101:20
**limited** 179:24
227:6 229:22
**limits** 98:3,14
160:18 173:25
**line** 42:25 79:11
82:1 139:12,18
140:8,10 162:21
166:20 168:22
178:22 200:15
207:19,19 218:3,6
236:13 238:7
239:3
**lined** 32:2,5
**lines** 30:4
**link** 169:11,19,24
170:5
**linked** 126:1,22
**list** 35:18 36:20
46:6 86:10 95:21
224:18
**listed** 37:8 57:16
57:23 86:16,20
87:1,5 147:14
168:12 238:7,17
**listen** 178:14
**listing** 37:2 39:2,8
39:15 238:7
**litigation** 1:5 20:5
23:7 236:6 237:3
238:3
**little** 133:19
140:25 149:1
**live** 21:11 52:18
**livingston** 6:19
**llc** 4:18 6:4,5,5
120:23

**llp** 6:6,17 7:15 8:4
8:19 9:4,12,20
**local** 33:23 186:5
187:18 232:1
**located** 20:7
**location** 154:3
**locations** 132:25
188:11
**locke** 8:19
**lockelord.com**
8:24
**locking** 212:3
**logical** 226:4,16,23
**long** 66:12 94:5
104:19 224:11
229:18
**longer** 52:13
103:19
**look** 26:17 27:19
33:11 34:8,21
35:1 46:4,22
52:23,24 56:23
61:17 65:4 71:24
73:24 79:19 81:20
85:15 87:23 90:6
91:9 93:15 125:15
134:6 147:24
149:2 153:21
154:14,18 160:19
162:20 163:19
164:6 165:22
167:21 171:22
177:5 188:7 190:1
194:13 205:3,6,12
205:15 212:14
225:17 226:3,6
227:9 231:21
**looked** 148:21
162:8 199:4
**looking** 43:5 88:5
90:15 95:5 121:13

125:13,17 182:1
189:6 194:18
**lookout** 196:10
201:15,18
**looks** 174:22
**lord** 8:19
**los** 8:7
**lost** 81:1 229:25
232:20
**lot** 132:8 147:21
**lots** 143:10 177:8
**luiz** 3:13
**lunch** 174:23
175:4
**lunchtime** 174:23

**m**

**m** 6:9,18 7:16
10:15 99:6,12,23
**ma'am** 123:6
234:6
**madam** 236:10
**maddie.brunner**
8:24
**madeleine** 8:20
**madison** 4:6
**mail** 225:5
**main** 14:4 122:13
148:6
**maintained** 59:13
**maintaining**
211:15
**majority** 46:23
47:3,16 96:12,15
195:10,17
**making** 62:12
140:5
**man** 152:4
**management**
183:10,21
**manager** 189:15

**manner** 96:16
160:23 163:1
164:11 167:7,8
208:2
**mannix** 6:18
**manual** 17:12
55:21,24 56:24
57:17 61:18 62:9
88:19 199:3
**manufactured**
40:17 42:16 43:12
44:2,10
**manufacturers**
13:16
**map** 32:14 75:1,10
181:19
**march** 1:18 2:4,14
13:2 20:2 23:2,7
23:18 81:24 235:7
235:23 236:4
**marcus** 6:17,23,24
**mariama** 11:14
**mariama.c.spears**
11:18
**marijuana** 128:5
**mark** 77:7 79:2
84:4,10,18 105:6
105:20 120:14
122:7 135:13
136:22 161:24
163:20 165:13
167:22 170:20
**marked** 26:22
28:22 29:1,23
30:18 36:14,17
37:21,22 38:2
39:2,8,16 41:6,10
44:15 45:10,18,24
46:12 49:3 50:11
52:25 53:2,12
55:12,17,21 70:21

70:23 71:25 77:6
77:9 79:3,6,15
85:1,18,24 86:12
89:4,6 93:1 99:7
100:2,4 105:7,22
120:16 122:9,12
135:15 136:23
160:1 162:1
163:21 165:17
167:24 170:22
182:5 189:10
202:20 206:6
210:23
**market** 168:15
**marking** 52:22
**mary** 52:25,25
99:6,23
**maryland** 164:9
164:19
**master** 205:18
**masters** 9:21
**materials** 135:12
199:13,21
**matter** 20:4
111:10 137:20
228:18
**matters** 119:21
157:8 177:1 186:7
186:12 223:11,21
223:25 224:2
**maximum** 91:21
92:9 100:22
101:20
**mchugh** 5:10
**mchughfuller.com**
5:15
**mckesson** 8:3
**md** 1:6
**mdl** 1:6 3:3 4:3 5:3
18:13

**mdl543270** 207:8
**mdlt1-000060796**
14:16
**mdlt1-000060805**
15:10
**mdlt3-000094465**
18:14
**mean** 22:15 31:16
33:4 36:7 66:15
67:4,9,14,22 97:25
107:14 119:6
120:25 145:6,20
145:21 146:9
171:5 177:21
178:13 193:5
197:9,16,18 212:2
222:3
**meaning** 90:12
93:22,25 168:7
214:3,9
**means** 52:6 82:15
114:12 126:19
133:1 146:11,12
185:3,5
**meant** 139:19
171:9
**measure** 109:11
**medicaid** 183:18
**medical** 30:6,15
32:6 48:5 67:5,18
68:7,11,13 86:21
90:11 93:23 94:1
94:6 95:23 96:3
96:14 102:3,4
107:18 130:20
135:2,24 161:12
164:16 188:14
195:12,13,18
196:13,19 209:25
218:21

medicare 183:18
medication 17:9
26:1 38:25 47:7
48:16 51:22 52:13
53:21,25 54:10,14
54:20 55:7 67:10
91:22 92:10 98:15
98:25 101:6,10,21
212:10 219:9
medications 24:18
25:12,16,20 30:15
43:11 47:18 48:4
51:11 98:21
107:24 129:6
190:8,19 212:4,8
219:5
medicine 51:5,12
51:19 54:15 91:13
149:7 211:7,16,20
212:3 219:5,23
meet 48:5
meeting 189:19
225:14
meetings 115:9
meghan 8:11
melsner 4:24
melville 3:21
member 125:22
memorandum
15:17 169:25
171:1
mention 231:19
messed 141:1
metadata 27:8
method 50:12
211:6
methods 183:25
miami 189:16
michael 4:19 5:5
michigan 227:15

mid 158:8
middle 72:16
95:16
midwest 236:17
239:1
migration 154:20
156:10 181:19
182:19
mildred 4:12
mildred.conroy
4:16
mill 30:9 41:25
192:4 233:6,7,20
million 14:19 15:5
15:13 127:25
158:18 162:9
164:1 167:16
169:3 232:14,16
mills 16:11 29:25
30:3,12,22,25 31:4
31:7,13,23 35:7,8
35:15,24 36:4
40:7,13 45:2 74:2
154:17 233:22
mind 205:4 229:24
mine 182:10
222:18
minimize 108:9
minimum 91:21
101:20
minnesota 223:15
minute 141:14
205:2 215:4
220:19
minutes 99:12
140:17 223:4
mischaracterizes
121:18 131:24
149:22 175:16
181:23,24 227:22
229:4

mischaracterizing
171:4
misconstrues
198:12
misrepresentation
225:5
missing 223:16,16
mission 48:3
mississippi 5:13
misuse 108:10,16
128:3
misusing 128:1
mixed 213:2
mm 52:25
mmonaghan 8:16
moa 169:15,17
modified 114:7
mom 83:19
moment 32:2
37:22 167:12
monaghan 8:11
money 188:13
monitor 32:23
monitoring 32:16
32:20,22 33:3,6,8
33:15,20,25 34:9
59:13 60:24 64:2
64:8 130:15,18
199:25 209:6,20
month 128:2
208:23
morning 20:10
21:8 210:23
morphine 44:19
morrissette 11:15
motley 4:18
motleyrice.com
4:24,25
motor 127:12
mount 4:22

move 30:23
167:12
moved 224:4,7
mri 196:19
multibillion 109:3
multiple 102:5
munoz 3:13
muscle 90:13
mute 97:4 105:3

### n

n 10:19
n.w. 6:9 9:22
name 20:11 21:8
102:21 223:1
224:20 236:6
237:3,4,15 238:3,4
238:21
napoli 3:11,17
napolilaw.com
3:23,24
narcotic 191:16
192:14 194:2
nation 108:18
185:13,20 186:8
187:4,8 188:8,17
232:4 233:6,20
national 1:5 20:4
78:3 85:10 86:1
86:25 87:4 89:14
89:21,22 90:2
91:19 149:4
177:21 196:25
231:20 236:6
237:3 238:3
nationwide 208:21
227:17
native 71:7
natively 16:7,12
ne 10:19
neal 7:5

necessarily 67:4,9
67:14
necessary 59:21
101:10 102:16
123:22 191:20
need 23:15 30:6
37:16 38:24 43:19
52:13 67:10 72:17
90:7 117:9 137:18
140:25 145:24
183:20 190:8,19
197:24 201:22
202:25 204:8
205:17 215:6
needed 142:23
needs 48:6
negligently 168:11
negotiations
119:19
neighborhoods
124:19
neighbors 127:10
neither 25:4
never 23:20 96:17
177:10 192:17
194:5 210:17
new 3:21 4:7,7,14
4:14 82:12 85:7
100:23 184:16
185:1 192:13
194:1 202:12
227:16
nice 204:3
nonmedical 50:14
107:8 157:24
158:19 211:6
nonnarcotics
184:2
nonphysicians
184:7

nonpublic 153:2,7
153:18 181:2,5
233:12,17
normal 137:10
north 9:6 223:17
223:18
northern 1:2
nos 13:21
notarized 236:14
notary 236:25
237:10,18 238:15
238:23 239:23
note 42:25 103:24
236:12
noted 20:6
notice 92:15 93:8
noticed 25:2 84:12
notified 42:20
november 23:18
91:5
nsduh 158:16
nstephens 7:10
number 13:13
14:2 15:2 16:2
17:2 18:2 19:2
21:20,23 22:8
31:22 33:5 51:15
51:25 52:8 56:12
57:13,16 66:24
71:8,9 75:3 77:13
77:24 78:17 79:25
80:12,18 81:3
86:19 87:8 100:6
105:6,16,21
106:15 120:15
147:11,22 150:8
150:19 158:15
159:17 164:4
165:14 168:8
176:5 199:23
206:12,21 207:3,8

212:24 213:4
216:19 218:21
225:19 236:7,13
numbered 37:12
142:1
numbers 27:19
141:2 238:7
numerous 176:17
nw 8:13

**o**

o 70:21
o'clock 2:13 235:6
oarrs 131:4,4
200:1,4 204:11
206:5 208:10
209:5,16 225:16
225:20,22,23
object 49:13
104:11 107:25
109:5,13,20 110:6
110:14 112:19
113:8 118:6
119:10 120:6
121:3 128:15,25
129:11,21 130:7
131:13 132:1,19
133:2,11,24 134:7
134:15 135:3
137:14,25 139:15
139:24 151:3,7,18
152:7 153:14
154:6,24 155:8,24
156:13,24 158:9
158:25 160:10
162:16 166:12,19
170:15 172:7,10
173:9,18 174:3,9
174:16 180:16,25
186:21,21,25
193:7 202:11

objected 149:18
150:2 203:10
objection 22:18
23:23 24:21 25:22
28:8,14 29:20
31:15 34:2,4,11,16
39:5,10,18,19 40:2
40:20 42:2,3,17,18
42:25 43:3,13
44:4 45:11,15
47:2,11,21,22 48:7
48:18,19 50:17
51:9 54:5,16 55:8
57:5 59:5 60:2,14
60:18 68:21,22
69:6,14,15,24,25
70:7,8,16,17 73:4
74:9 76:2 77:1,2
83:10 86:6 97:6
97:14,15,22 98:6
99:2 102:12
108:13 111:6,7,13
111:25 112:2,23
112:24 114:13,15
115:2,18,20 116:2
116:12 117:4,25
118:16,18 120:24
121:2,16,17 122:2
122:21 123:16,24
123:25 124:1,24
126:11,12,24
131:24 133:12,13
134:8 138:1,21
139:6 142:25
144:18 146:3
149:21,22 151:4
152:9,23 153:24
156:4,15 157:1,3
159:1 160:9
162:11 163:9
164:23 165:8

166:2 167:18
168:17,20 169:6
169:13,16 170:1,7
170:14 171:3,13
171:14,19 172:18
173:5,6,10 174:17
175:16 176:1
178:9 179:12,19
179:25 180:8,15
180:24 185:23
186:9,10,20
187:11,22 188:4
188:18,23 190:11
190:22 191:6,23
192:9,21 193:17
193:19 194:8
195:6,25 196:15
197:2 198:11
199:9 200:8,9,15
201:6 203:9
207:18,19 208:5
208:16 209:7,21
210:18 211:24
212:5,11 214:19
214:24 216:12
217:16 218:12,25
219:12 221:6,16
221:17,21 224:24
225:8 226:8,20,21
226:22 227:21
228:4,9,19,20
229:4,6 231:9
233:9,10,23
**objections** 43:4
110:13 118:12
143:7,18
**obligated** 145:18
145:23
**obligation** 78:22
83:15 106:15,17
113:16,19,23

114:2,5 123:9,13
124:11 134:3
137:20 138:18
**obligations** 137:9
148:19 160:24
163:2 164:13,21
167:9 186:16
217:13
**observed** 41:17
**obtain** 32:5 50:20
200:23,25 207:13
**obtained** 208:3
**obtaining** 50:13
201:13 211:6
**occasions** 30:17
**occurred** 175:25
223:11
**occurring** 163:7
**october** 44:16
**od** 14:15 15:9
159:16,20 165:12
**oddly** 185:8
**offer** 80:18 195:3
**offers** 81:5,8
**office** 22:1,12,16
145:18 178:2
179:4 189:16
195:2 223:7,10,21
230:22
**officers** 186:6
**offices** 158:23
227:17
**official** 233:1
237:15 238:21
**officials** 96:18
111:4
**oh** 22:21 28:2 34:3
37:12,21 39:12
43:16 52:20 54:17
71:20 74:10 81:2
84:8 86:7 90:16

93:20 105:11
109:4 110:10
151:9 153:9 166:3
183:2 194:18
197:22 203:15
213:2
**ohio** 1:2 3:7 6:5
11:10 38:11 39:24
58:3,5,8,10,21
71:11,18 72:6,10
73:3,8,20,21 74:14
74:22 75:1,4,7,20
76:17 102:23,24
122:17 131:3,6
150:7,16 154:22
155:4 180:6,14,23
181:20 182:22
199:24 203:7
204:11,15 208:12
209:13 236:2
**ohio's** 131:8
**okay** 20:1 27:16
34:15 35:13 37:19
41:13 43:16 46:3
49:23 53:16,18
54:23 56:19 70:20
84:21 91:1 92:23
93:7,15,20 95:12
99:8,15,15,19
100:8 103:7
104:15 105:11,12
108:5 110:20
111:21 117:9
119:15,25 122:16
125:19 131:6
132:7 135:6
140:24 141:21
142:5 143:5,13
144:12,20 146:14
146:23 147:8,11
147:20,24 152:12

153:9 156:2
160:16 161:24
166:11 167:21
171:6,22 173:13
175:1,2,24 182:11
185:10 190:1
191:15 194:13
201:20,25 206:17
206:24 207:2,4,11
209:24 217:21,23
222:25 225:19
228:7,24 230:9
231:18,19
**older** 127:25
158:18
**once** 195:22 227:8
**ones** 45:7
**ongoing** 129:9
**online** 82:6,24
83:1
**open** 26:19 28:18
36:13 142:21
178:12 227:13
**operate** 82:24 83:1
112:7 113:6
**operated** 184:10
**operating** 30:3
41:25
**operation** 130:22
185:13,20 186:8
187:4,8 188:8,9,17
232:4 233:5,20
**operations** 29:15
109:3,25
**opiate** 1:5 20:5
236:6 237:3 238:3
**opinion** 72:24
153:1
**opioid** 25:15,20
26:1 31:14 41:23
43:11 47:7,18

55:7 90:13 98:10
98:14,25 104:8
106:25 107:7,11
107:23 108:10,16
108:21 112:5,17
113:5 114:23
124:14 126:9
128:2,9,11,23
129:6,10,16
134:13 135:1
139:13,20 143:25
149:5 150:14,15
158:3 210:8 219:9
219:16 226:18
**opioids** 26:10,15
32:6 33:21 36:11
40:17 41:19 42:10
42:15 44:2,9,10,18
48:5 65:23 74:7
94:21 95:6 98:3
98:20 124:8
127:18,21 137:11
138:18 145:13
151:1 152:3 180:7
180:13,23 201:17
210:16 221:15
**opportunities**
54:10,13,20
**opportunity**
100:24 103:5
121:8 139:19
**opposed** 112:21
**oral** 235:9
**order** 13:22 14:5
117:10 137:8
213:25 222:8
**ordered** 38:17
**orders** 228:16
232:21
**ordinary** 184:12

**organization**
77:17 78:21 80:4
89:22 130:22
**organizations**
33:10 86:20 87:17
87:20 111:2
220:12
**organized** 49:1
**orient** 89:11
**original** 189:6
**ought** 203:18
**outline** 17:12
30:19
**outside** 32:3 40:20
60:4 109:22 110:6
110:18 111:5,13
111:19,25 112:2,9
112:21,23 113:12
114:13,15 115:18
116:3,12,14
117:25 118:7,17
118:18 120:24
121:2 124:24
126:15,24 138:3
138:21 142:25
143:7 149:23
152:24 153:15,24
154:7 156:13,24
157:3 160:9 163:9
164:23 166:12,20
167:18 168:18
169:6 170:1,16
171:13,14,19
172:9,11,18 176:2
178:10 179:12,19
179:25 180:8
186:10,22 188:23
200:10 223:21
224:24 225:8
228:19,20 229:5,6

**overdispensing**
152:6,21
**overdose** 127:7,16
127:19 144:4
**overdoses** 127:4,9
127:22 144:6
**overlooked** 84:10
**overprescribing**
125:25 126:20
152:5,21
**oversee** 25:19,23
**overwhelming**
96:12,14
**owned** 183:17
184:6,10
**owners** 184:7
188:15 232:10
**oxford** 6:20
**oxycodone** 25:16
44:18 164:11
168:13
**oxycontin** 38:23
225:6

**p**

**p** 13:18,22 14:6,10
14:13,15,21 15:7,9
15:15,18 105:8,18
120:11 122:8
135:12 136:21
141:4,5 159:16,20
161:22 163:20
165:12 167:22
212:24 213:6
230:2
**p.m.** 175:6 206:2,2
220:23,23 234:9
**packet** 105:10,13
135:11
**page** 13:4,13 14:2
15:2 16:2 17:2,10
18:2 19:2 27:19

27:19 29:22 30:18
32:9 35:4,12
36:20,22 38:10,11
39:2,8 41:14 46:4
46:11,13 48:25
49:6,10,12,19,23
50:6,11 51:4,4
56:4,12,13,15,23
61:18 62:9 71:24
72:14,17 73:24
74:14,19,25 75:7
75:14 77:12 78:7
79:19 80:11 81:3
82:9 86:11 87:24
88:4 89:16 90:20
93:16,18 94:19,20
95:15 96:8,8
101:25 102:1
120:19 125:20
130:12,12,13,13
142:1 143:21
144:20,21 146:14
147:1,13,21,22,24
148:1,10 149:3
150:11 154:18
157:16,16 160:19
161:3 164:6
165:22 169:11
181:12,13,19
182:3,15,25 184:5
185:11 190:1,25
191:11 194:13,21
196:4 206:10,10
207:7 211:2
225:18,20 229:19
230:15,18,19
231:22 236:13,15
238:7 239:3
**pages** 15:19 16:17
16:20,25 17:14,17
18:10,17 31:22

78:17 89:13,16
141:24 181:14
**paid** 66:17,25
**pain** 16:10 29:24
30:1,10,12,15 31:6
31:8,12,23 35:7
40:6,12 41:25
42:1 45:2 92:16
93:12 95:1,1,9,23
98:24 100:14
101:4,6,8,10 128:1
154:17,20 158:19
182:19 183:3,10
183:21 184:10,16
184:22 185:1
187:19 188:14
190:7,18 191:16
191:17,18 192:6
233:7,21
**painkillers** 158:3
168:14 192:14
194:2
**pair** 141:17
**palo** 7:8
**paper** 77:17,20
78:2 79:20
**papers** 135:8
**paragraph** 41:15
46:17,18 62:8
78:7,19 80:3,9,17
81:4 82:19 87:25
90:9 91:8,10,18
94:15 95:7,8,17
96:8 100:16
101:12 105:25
127:3,6,24 135:19
158:12 160:20
161:3 162:20
164:6 167:5 168:4
168:5 179:5,7
190:5,16 191:1,11

191:15 192:2
194:15,21,22
195:10 196:4,5
227:11,12 230:18
230:19 231:14,20
231:22
**parameters**
104:17
**paramount** 95:2
**parcel** 145:9
**parents** 211:14
**parents's** 51:19
**part** 13:15 14:9,12
18:16 28:9,10,13
31:13,19 43:21
44:12 48:3 63:9
83:23 93:10
110:22 119:22
120:4 123:9,17
138:17 139:3
142:11 145:9,9
146:18,18 156:8
157:17 164:17
190:6,17 197:17
216:22 238:9
**participate** 196:24
**particular** 34:8
35:2 70:5 102:23
116:25 117:2,19
118:21 132:11
150:13,20,20,21
176:25 180:1
186:12 217:1
**particularly** 64:12
106:16 134:11
158:3 193:13
225:21
**particulars** 118:20
**parties** 20:20
178:24 186:24
235:21

**partnered** 232:2
**partners** 187:18
**pass** 81:14 215:21
**patient** 34:8,24
63:17,18 64:3
65:7,10,16 66:12
66:17 67:9 68:8
88:14 98:4,11,16
100:14 131:21
133:22 139:21
145:16,17,17
195:2 207:22,25
208:6,9,14,22
209:9,15 219:20
229:10
**patient's** 34:10
96:2
**patients** 38:24
45:8 46:24 47:7
47:17 48:6,11
55:3 61:6 67:19
74:20 101:5,8
102:6 107:16
149:6 155:3
181:19 183:20,22
189:19 190:7,18
196:20 225:23
**patterson** 46:7,14
46:16,22
**paul** 6:18
**pause** 53:14
**pausing** 229:24
**pay** 15:12 38:18
146:12 167:15
**pdf** 170:6
**pdmp** 59:16,17,20
61:8 130:24 131:3
131:9 133:8
208:15 226:5
**pdmps** 130:19
131:2,10,16 132:7

**peak** 191:2,7,12
**penalties** 15:14
83:5 161:17
167:16 214:11,22
**penalty** 230:22
**pending** 20:24
**pennsylvania** 6:21
9:15
**people** 32:2,5
38:23 50:20 51:22
52:12 77:13 98:24
117:18 144:5
169:24 188:12,21
210:15 212:2
**percent** 29:12
44:16,23 46:23
51:18 78:10
127:17
**percocet** 38:23
**perfect** 99:9
**period** 22:13 74:8
76:24 107:24
208:24
**permitted** 119:22
221:24
**person** 58:24
130:3 150:20
151:2 152:3 214:7
214:10,21
**personal** 24:23
59:6 104:18
111:10,22 114:17
114:19 116:19,20
117:7,17 122:25
126:13,16 137:8
140:1,3 143:2,6,9
146:8 147:15
152:22 153:1
156:9 158:6
165:10 169:21
172:3 178:5 197:5

[personal - pill]

197:13 198:3
199:11,20 228:24
**personally** 169:3,7
237:11 238:15
**persons** 158:15,18
**pertaining** 2:11
**pertains** 112:12
**pete** 25:7 120:25
154:9 165:14
166:6 200:18
203:4,23 205:13
**peter** 3:5 102:21
103:23
**pharm.d.** 215:18
**pharma** 23:11
224:20,22 225:13
**pharmaceutical**
16:9 29:24 50:13
115:25 191:3,13
196:21
**pharmaceuticals**
211:6
**pharmacies** 32:25
33:1 54:9 60:1,11
60:25 61:10 64:4
69:11,22 76:11,20
76:20,24 82:2
83:9 87:16,20
88:24 97:3,9
103:4,15 106:23
107:15 108:8
121:23,24,24
123:3,12 129:7
134:5 137:17
148:21 151:17
152:1 159:9
173:14 175:13
179:7,18 186:15
192:15 194:2
197:8,14,20 198:4
198:8 199:18

208:12,23 220:11
220:16 221:3,9,13
231:3,7,16 232:25
**pharmacist** 34:7
35:1 48:12,17
51:1 56:8 61:17
62:1,10,23 63:2,6
63:13,16,22 64:1
64:12,16 65:4,14
66:3,9,18 67:20
68:20 69:4 70:13
73:16,22 74:16
75:25 83:17,17
85:12 124:5
131:21 132:10
136:5,14 137:9,21
145:3,18 161:7
164:22 194:16,23
194:25 199:3,5
201:15 213:20
215:14 216:7,8,19
216:25 217:3,6,7
217:24 219:15,19
219:21 226:11
**pharmacist's**
17:12 55:21,24
56:24 57:17,18
62:8 63:10 65:20
88:19 139:3
164:14 216:9
217:13
**pharmacists** 34:1
47:8,19 54:25
56:1,10 58:10
61:13 62:19 72:17
73:12 87:16 88:19
97:11,19 123:4,14
123:22 130:20
134:24 138:7,12
138:15 144:23
145:11 173:2,15

173:16 174:14
188:22 192:16
194:3 196:5,7,10
196:12,18,20
199:13 201:18
215:17,20,24
216:3 218:16
219:22 225:23
226:2,6,12,13,17
**pharmacy** 6:3
13:21 14:5 16:4
19:6 24:9,12
35:17,22 36:3
49:5 55:2,6 56:6
56:14,17 57:2
58:6,9,19,21,24
59:14,21 66:13
68:18,20,24 69:3
70:4,12 71:11,19
73:20,22 74:14,16
74:20 75:1,7,20,21
75:24 76:7,10,14
82:6,24,25 83:19
83:23,23 85:9,9,11
86:2 87:1 107:6
107:15,20 120:2
121:13 122:13,17
129:17 130:21
134:2,11,23
136:10,17 137:12
137:23 138:2
139:3 142:3,7,12
148:6 150:8,16
156:11 160:21
164:9 167:6 173:1
173:19 174:14
180:6 189:18
190:3 191:19
193:25 194:25
195:21 203:7
204:12,16 206:12

209:14 215:22,25
216:7,24 217:5,10
218:1,9 225:24
232:10
**pharmacy's** 57:19
58:13 59:3 75:2,8
75:14 138:18
199:24
**philadelphia** 9:15
**phone** 205:18
236:3
**photograph** 17:9
**phrase** 43:17 94:6
140:2
**physical** 183:22,24
**physician** 34:21
35:2 37:2 68:3,12
**physicians** 30:4
34:22 94:25 96:12
96:15 183:17
191:17
**picture** 52:10,21
53:6,20 149:12
**pictures** 31:22
32:1,5
**piece** 60:13,14
**pierce** 9:13
**piggy** 143:23
**pill** 16:11 29:25
30:3,9,12,22,25
31:4,7,13,22 35:7
35:8,14,24 36:4
40:7,13 41:25
45:2 74:2 134:13
144:1 154:17
156:10 185:13,20
186:8 187:4,8
188:8,17 191:17
192:4 232:4 233:6
233:7,20,21

**pills** 124:14
128:23 129:10,16
139:20 149:6
154:3 156:10
191:17 192:5
**pins** 74:22 75:4,10
75:16
**pittsburgh** 6:21
**place** 222:6 225:14
235:15
**places** 212:9,10
**plagued** 232:3
**plaintiff** 13:14,19
14:3,7,11,14,17
15:3,8,11,16
105:22 120:16
122:9 135:15
136:23 160:1
162:1 163:21
165:17 167:24
170:22 199:23
**plaintiffs** 3:3 4:3
5:3 21:2 43:4
102:22 103:1
105:6,21 120:15
135:14 150:24
159:25 175:12,21
177:22 181:14,18
193:14 201:22
204:21 212:15
215:13 221:24
227:2,23 228:5
**planning** 84:7
**platform** 68:25
197:9
**play** 203:19
**pleaded** 38:22
**pleasant** 4:22
**please** 20:8 26:19
46:11 53:8 55:11
70:20 72:14 77:5

77:23 78:16 79:3
89:3 91:8 101:25
106:11,22 146:15
147:3 152:12
159:18 185:11,21
189:5 190:3,14
194:14 204:20
205:21 211:3
212:14 236:11,11
**pleasurable** 204:1
**pleasure** 203:23
**pllc** 3:11,17 10:4
**plus** 35:21 184:21
**pmannix** 6:23
**pmp** 184:15 185:1
**point** 30:22 51:21
51:23 145:15
180:2 181:1
203:14,16 206:15
**policies** 123:3,5,13
199:12,20
**political** 103:2
**ponce** 5:6
**pop** 83:19
**pose** 108:17
**position** 155:23
**possible** 48:15,20
65:13 68:5,16
94:5 143:14
**possibly** 169:18
**post** 153:12
**potential** 63:18
85:11 131:20
133:22
**potentially** 220:14
**powerpoint** 16:4,9
17:16 27:3 29:3
35:5 49:4,15
51:24 141:22
143:22,24 150:6
154:16 181:8,13

182:2,2,7 206:6
210:25
**practice** 20:15
91:13 94:7 136:1
136:15 161:13,15
195:20 215:22,25
218:1 219:5,22
**practices** 172:6
**practicing** 137:10
225:24
**practitioner**
100:23 101:15
135:25 136:3
161:12 213:15
**practitioners**
88:11 102:2
130:20
**predicate** 228:3
**premise** 176:10
**prepared** 150:7
**prescribe** 26:10
90:11 96:13,15
219:5
**prescribed** 63:1
91:22,24 92:6,10
98:4,11,15 101:21
101:23 184:1
191:17
**prescriber** 131:21
133:21 219:8
**prescriber's** 26:11
**prescribers** 25:19
26:3,6 70:5 75:3,9
134:25 207:24
208:1,23
**prescribing** 18:8
27:24 28:3,7
34:22 36:10 45:3
86:3 95:22 98:19
101:14,15 136:2,3
213:13,15 220:9

**prescription** 1:5
14:10 16:16 20:5
25:15,25 27:23
28:2,7,13 29:6
31:13 32:5,16,20
33:3,6,11,14,19,21
33:25 34:9,10
35:1,2 36:11
38:23 44:18 48:12
48:13,14 51:19
52:11 55:6 59:13
60:24 62:13,24
63:3,7,13,23 64:2
64:8,13,18 65:5,7
65:13,15,21 66:4
66:10,20,21,24
67:3,8,13 68:1,6
68:19,20 69:4,5,13
69:13,23 70:15
73:14 74:20 75:3
75:9,15 77:19
78:9,10 79:21
80:5,19 85:13
90:18 91:23 92:11
98:3,10,14,20,25
100:24 101:22
102:11 104:9
107:7,12,23
111:23 126:1,9,21
127:18 128:1,2,23
129:6,10,16
130:15,18 132:11
134:12 135:22
136:5,13 139:20
139:22 142:7
144:1 145:13,16
145:19 149:5
150:14 157:22,25
158:2,16,19
161:14 164:18
168:13 195:23

198:9 199:7,25
208:22 209:5,6,20
210:8,16,17
213:21,25 214:3,8
214:9,18 216:9,21
217:1,7,8,14 218:2
219:9,15 221:14
232:2 236:6 237:3
238:3
**prescriptions**
25:20 26:15 30:5
32:23,24 33:2,16
40:8 41:18,23
43:20 44:9 47:6,9
47:18,20 50:20,21
50:25 61:13 62:20
64:3 67:17,20
70:5 73:18 74:6,7
88:15,21 90:12
96:23 97:11,19
102:6 106:25
108:11,17,21
135:1 145:5
146:24 155:5
161:11 164:16
173:25 174:8
180:13,22 189:20
195:11,17 197:10
201:16 207:24,25
208:2 216:4
226:19
**present**  3:1 4:1 5:1
6:1 7:1 8:1 9:1
10:1 11:1,20
71:16
**presentation**  27:3
27:10,22 29:3,5,10
29:22 49:4,17
50:2,11 71:5,10,14
71:25 72:15 73:20
73:25 74:1,15

75:1,8 142:2
146:18,19 182:12
182:14,15 186:14
**presentations**
29:13 71:17,21
**presented**  16:24
19:6 145:16
**presenter**  49:20
141:23
**presents**  65:8
**press**  161:21
165:22 168:2,4,21
169:10,23 177:23
178:1 179:3 227:3
229:20
**pretty**  30:11 50:4
**prevent**  33:7,20
40:13 124:7 142:7
143:17 173:2
221:4,14
**preventing**  139:13
186:16
**prevention**  127:15
**previous**  44:23
84:4
**printed**  36:21 71:6
**printing**  205:14
**printouts**  212:19
**prior**  78:23 97:7
183:13
**privileged**  102:22
**probably**  37:18
223:4
**probation**  38:17
**problem**  30:25
31:4,9,14,20 32:11
35:6 74:6,7 76:24
95:3,10 158:1,7
195:22
**procedure**  2:10
20:23 237:5 238:5

**procedures**  104:24
106:9,19 123:10
124:7 199:12,21
**proceeds**  159:8
**process**  123:17
228:18
**produced**  16:7,12
71:6,9 73:21
74:15
**production**  42:12
43:10 236:15,17
236:22
**products**  100:20
104:9 114:23
**profess**  215:21
**professional**  14:8
48:13 57:25 62:11
62:11 65:20 66:3
66:9,19 70:14
88:13,20 94:7
136:1,15 145:22
161:13,15 195:20
196:23 199:6
214:1 215:14,21
216:3,10,20 217:9
217:13,25 218:4,7
218:11 226:17
**professionals**
138:8 195:12
218:17,19
**profile**  133:21,22
**profit**  112:7
**profitable**  111:24
**profits**  113:6,9
**program**  33:3,25
34:9 64:2,8
189:15 199:25
209:6
**programs**  32:17
32:21,22 33:7,15
33:20 130:15,18

209:20
**prohibited**  98:19
**proliferation**
82:13
**promoting**  149:6
**proper**  52:1 62:2
101:13 133:7
136:2 142:14,23
213:13
**properly**  48:12
51:22 132:9 133:7
139:22 212:3
**property**  232:16
**prosecution**  37:4
**protection**  82:6
**protocol**  202:8
**provide**  54:9
90:22 94:8 95:18
95:21 104:23
106:8,18 117:11
123:10,21 124:5,6
142:14 173:2
197:25 202:3
**provided**  127:14
188:1 202:18,24
203:9 214:11
**providers**  87:10
**provides**  57:14
**providing**  54:13
54:19 173:14
**provisions**  82:12
214:11
**public**  26:11 56:25
57:3,12,14,20 95:2
95:10 153:11
189:19 193:11
233:14 237:10,18
238:15,23 239:23
**publication**
120:22 157:14

**publicly** 159:2
**publish** 117:10
**published** 55:25
  69:11,21 70:1
  117:15 118:4
  119:13 157:23
  158:17,21 159:10
  159:12 199:3
**publishes** 115:6,14
  116:10
**publishing** 116:23
  118:24
**puerto** 3:14 5:7
**pull** 41:2 77:5 79:3
  89:3 99:5,23
  120:11 122:7
  141:11 147:3
  159:16 161:22
  165:12 170:19
  181:7
**pulled** 37:19
**pulling** 92:23
**purchases** 59:3
**purdue** 23:11,14
  23:21 224:20,21
  224:22 225:5,13
**purported** 214:8
**purporting** 213:25
**purports** 74:19
**purpose** 14:9
  30:16 32:7 52:7
  67:5 68:7,12,13
  93:23 94:1,6
  95:24 108:7 135:2
  135:24 161:12
  164:17 201:13
  210:10 225:24
  226:5
**purposes** 96:14
  107:8 195:19
  197:17 208:24

**pursuant** 2:9
  210:16 227:18
**pushers** 77:19
  79:22
**put** 88:18 117:17
  120:19 143:22
  181:9,10 199:2
**puts** 115:23
**putting** 87:14
  149:19
**pwag** 170:20
**pweinberger** 3:9

**q**

**quad** 186:3
**quantitative** 91:21
  101:20
**quantity** 65:5,23
**question** 21:11
  24:25 27:17 40:24
  43:8,9 60:9,15
  69:18 90:7 97:7
  112:20 113:9
  117:8,10 137:3
  138:2 151:8,16
  152:11,16 155:25
  156:3 159:14
  162:12,17 166:7,8
  168:20 177:6,6,13
  177:13 181:24
  187:3 189:1,3
  190:14 193:4,21
  194:6 195:1
  200:10 201:10
  202:5,23 209:10
  209:17 217:24
  220:20 231:9
**questioned** 154:16
**questioning** 43:1
  134:20 154:15
  166:20 200:16
  204:16 207:20

**questions** 24:14
  54:24 96:21 97:2
  97:9 102:14 103:6
  104:15 143:10
  147:12 150:9
  155:16 157:18
  160:10 168:19
  174:21 175:12,15
  175:18 176:5,16
  177:9,11 178:13
  181:21 199:24
  200:2,3 201:23
  202:11 215:13
  221:20,22 222:2,5
  222:10,12,14
  223:4 224:15
  227:24 228:2
  229:12,22 230:11
  234:1 235:10,13
**quota** 42:12,13
  43:23
**quotas** 43:10
  44:17 174:8
**quote** 104:23,25
  139:12

**r**

**r** 11:7 235:1
**raging** 128:22
  134:12
**raise** 51:21
**ran** 215:5
**random** 100:21
**rang** 215:7
**range** 81:8
**ranking** 125:22
**rate** 158:4
**rays** 196:19
**reached** 162:8
**reaches** 14:18 15:4
**read** 28:2 46:17
  92:19 101:1 114:2

  114:5 125:9 127:5
  127:24 128:6
  130:17,25 136:6
  137:2 144:17
  150:25 157:24
  161:18 162:14
  163:5 165:6 167:2
  167:3 168:16,22
  172:14,20 176:12
  206:25 208:20
  227:19 228:7,10
  231:13,17 237:5,6
  237:12 238:5,6,17
**reading** 141:19
  146:22 169:24
  176:13 191:8
  236:19
**reads** 80:17 93:25
  208:8
**real** 170:25 222:19
  232:16
**really** 118:14
  152:15 203:17
**realtime** 25:2
**reason** 116:23
  180:11,21 236:14
  238:8 239:3
**reasonable** 134:4
  134:9 195:3
**reasons** 66:24
  67:18 90:11
  190:22
**recall** 26:6 27:10
  27:13 50:1,3 65:3
  69:8 70:2 71:15
  79:14,17 121:10
  122:3,15 148:8
  156:16 175:15,18
  177:20 180:18
  181:21 187:10
  189:25 198:12,18

198:19 199:14
209:2
**recalled** 49:16
**receipt** 236:18
**receive** 52:6 190:7
190:18
**receiving** 79:14
207:23,25 208:22
**receptacle** 149:12
149:12
**receptacles** 149:19
**recess** 99:17
140:21 175:4
206:1 220:22
**recognize** 28:25
29:2 41:10 53:20
100:10 195:10,16
**recognized** 94:5
95:9
**recognizes** 94:25
95:6 96:9,11
**recollection** 24:23
116:19,20 126:14
126:16 225:12
**recommend** 26:13
**recommendation**
57:24 58:5
**recommendations**
81:8
**record** 15:13 20:2
20:6,18 37:24
99:16,20 103:24
113:2 127:5
140:20,23 175:3,7
205:5,12,16,20,23
206:3 220:21,24
234:7 235:13
238:9
**recordkeeping**
168:8

**records** 58:25
68:19 69:4,13,23
196:19 197:25
**red** 18:7 63:3,19
64:13,17,25 65:15
67:3,8,13,17,23
68:1,6,11,14 85:12
86:2,17 87:15,24
88:13 121:12,25
131:20 132:11
133:9,19,20,23
134:6 137:13,21
138:17 139:2
146:1,6,9,24 147:6
148:2,19 174:2
195:1,4,21 220:4,8
220:13 226:7,18
**redirect** 102:16,17
174:24 176:8,22
176:24 185:24
187:1 190:12
222:4 224:15
**reduce** 33:15 40:7
40:9 54:14,21
**reduced** 44:9,23
**reduction** 44:16
**reed** 9:12
**reedsmith.com**
9:17
**refer** 121:8
**reference** 42:14
43:10 51:8 236:7
237:2 238:2
**referenced** 38:12
165:21 224:17
237:11 238:15
**referred** 211:20
235:15
**refers** 74:15
**refills** 100:22

**reflect** 71:7
**reflecting** 75:2
**refresh** 25:3,6
**regard** 88:14
**regarding** 59:2
94:21 95:6 121:12
121:24 154:17
186:16 227:4
**register** 18:16
25:18 55:2 92:15
93:7 115:14 118:5
119:14 148:12,22
157:14 158:22
159:13
**registered** 83:23
104:7 136:11,16
136:17
**registers** 58:24
**registrant** 14:4
37:4 128:20
146:15
**registrants** 37:2
106:8,16 107:21
129:5 146:21
168:7,11 186:15
**registration** 13:16
26:1,4,7,9 55:7
56:7,15,17,25 57:3
57:12,19,19 58:13
58:19 82:25
**registrations**
232:20 233:1
**regular** 26:4
**regulated** 112:7
112:13,16,18
113:7
**regulates** 24:18
25:12
**regulation** 61:12
61:14,19,22 62:1
72:2,5,6,10 106:12

123:8 132:16
137:18 198:14,20
212:16 213:10,12
214:16
**regulations** 13:15
14:8,12 16:5 49:6
54:25 78:13 83:22
88:12 91:20 92:5
92:8 101:19 106:4
113:17,24 114:3,7
114:12,22 115:7
115:11,16 120:3,5
121:15 123:4,14
123:23 135:7
137:19 160:25
163:4 164:13
**regulatory** 82:12
110:4 158:23
**reinforcing** 146:23
**related** 18:8 43:8
86:3 109:24
127:11 163:3
164:13 176:19
177:19 179:6,23
193:11 198:13
220:9
**relates** 1:6 112:20
186:14
**relating** 91:13
178:7 180:6
214:12
**relatively** 228:15
**relaxer** 90:13
**release** 78:22
161:21 165:22
168:2,4,21 169:10
169:23 177:24
178:2 179:3 227:3
229:20
**relievers** 128:1
158:20

**rely** 153:7,17
181:2,4 233:12,14
233:16
**remember** 23:18
56:8 72:17 148:7
148:9 149:14
154:5 159:14
181:16 187:3
200:2,3 203:12
224:6
**reminder** 88:11
**reminding** 160:3
**remote** 20:21
202:7
**remotely** 20:19
**renee** 11:8
**renew** 26:3,7
47:22 56:7
**renewal** 56:14
**renewed** 56:18
**repeat** 47:12 97:16
117:10 190:13
193:21
**rephrase** 24:24
186:19
**report** 33:1 79:11
79:18 81:5,7
158:17 162:7
**reported** 1:24
128:1
**reporter** 20:8,12
237:7
**reports** 79:15
196:19
**represent** 21:9
27:7 39:22 53:24
102:22 223:1
**representatives**
17:5 46:1 142:3
**represented**
103:18,19

**representing**
103:1
**request** 109:23
198:1 203:24
238:9,11
**require** 78:10
83:22 174:13
181:4
**required** 62:10
64:8 104:23 108:9
121:14 123:3,5,21
130:3 139:4 157:7
236:25
**requirement**
64:16,19,24 68:18
68:24 69:2 70:4
72:12 94:1 135:7
198:8,15,24,25
214:17
**requirements**
82:12 120:3
**requires** 100:20
100:23 132:17
153:7 181:1
198:20 233:12
**requiring** 174:7
**rescheduling**
100:19
**research** 161:16
214:2
**reserve** 102:15
**residences** 188:11
**residency** 218:22
**resolution** 64:25
65:2
**resolve** 63:19
64:17 137:12
**resolved** 195:22
**resolves** 168:6
227:13

**respect** 102:10
114:19 116:7,25
117:14,19 119:1,7
145:12 152:12
170:13 177:18
214:17 226:18
228:13 229:2
**respond** 143:11
**responding** 100:13
**responds** 91:10
**response** 89:17
91:1,5 96:21 97:2
97:9 134:19
233:16
**responsibilities**
24:16 43:7 60:8
164:21 192:16
194:3
**responsibility**
60:12 61:14,19,25
62:2 63:10 72:1
72:10,12,19 73:13
73:17,23 76:1
83:15 89:1 101:13
121:14 122:1
134:24,25 136:1,4
136:8 139:4,10
144:22 145:4
148:18 161:10
165:25 166:17
167:9 173:17
174:15 212:16
213:9,13,20
214:16 223:20
**responsible** 58:9
72:25 223:11
**rest** 89:17 231:13
234:3
**restate** 117:13
**restitution** 38:18

**restricted** 192:5
**restrictions**
184:16 185:2
**rests** 136:4 144:22
213:20 218:2
**result** 106:5
179:15
**resulted** 37:3
232:8,14
**results** 115:15
**resumé** 21:14
**retail** 103:15
106:23 107:6,20
160:21 162:25
179:6 191:19
231:3
**retrievable** 132:25
**returned** 236:18
**revenues** 109:17
**review** 58:24
196:19 236:12
237:1 238:1
**reviewed** 122:20
158:23
**revoke** 26:9 58:13
76:20
**revoked** 58:20
75:20
**rey** 3:14
**rice** 4:18
**rico** 3:14 5:7
**ridiculous** 204:9
**right** 21:16 22:9
26:17 27:14,15,17
27:20 29:18 38:7
38:21 40:19 41:20
41:21 45:7 46:19
46:24 47:4,17
48:11,22 51:3
55:11 61:15 62:6
62:7 71:8 77:24

79:1 81:19 84:16
85:5 87:21,22
89:20 103:6 113:1
122:24 128:17
129:25 130:13
132:14 134:6
135:20 136:11
138:7,10 140:19
142:18 144:10,14
147:22 148:12,15
148:25 149:9
158:13 161:5,7
164:22 165:3,25
166:1,15,23,23
170:5,6,6,19
178:25 181:12
188:22 198:10
204:17 206:9,13
210:22 216:22
218:16 220:1
221:20,25 222:15
223:8,12 224:9
225:14,14 231:21
232:5
**risk**  108:9,17
124:14 129:15
**risks**  107:23
**rite**  24:9 86:15
103:16 104:22
116:9 151:14
197:7 199:19
224:19
**rmr**  1:24 2:9 235:4
235:25
**road**  3:20 5:12 7:7
**robert**  46:6
**rogue**  16:10 29:24
30:1,9,12 31:6,8
31:12,23 35:7
40:6,12 42:1 45:2
76:7 82:14 154:17

184:6,22 187:19
233:7,21
**role**  21:25 22:24
43:7 60:8,12
110:22 119:9
155:19 156:6
**roles**  22:9 24:15
**room**  20:16
141:13
**ross**  8:21
**rule**  20:22
**rules**  2:9 20:23,23
54:24 108:9
203:19,21 237:5
238:5
**run**  124:14 130:19
**rx**  6:4
**ryan**  81:15,17
82:5,10,17,20,23
83:3,7

**s**

**s**  1:24 2:8 4:5
28:19 235:4,25
236:15 238:8,8
239:3
**safe**  17:9 53:21,25
54:10,13,20 99:14
**safety**  108:18
124:18
**sale**  80:19
**sales**  59:3 168:15
**salvatore**  3:18
**samhsa**  158:17
**san**  5:7
**satisfy**  60:18 63:13
**saying**  96:22 111:9
130:1 177:11
185:9 192:22
202:4 211:23
212:6

**says**  26:18 28:1,18
29:4,15,23 30:22
32:10,15 36:22
37:1 38:14,22
46:14 49:4,20
51:5,17 52:5,6
56:17 57:13,17
62:1 72:16 74:1
78:8,20 80:3,10
81:4,8 82:9 88:1
90:21 91:19 93:9
94:4,24 95:17,20
96:9,11 106:7
125:25 127:3
135:22 145:15
150:15 160:20
161:4,9 162:21,24
164:3,7 167:5,10
167:11 168:5
169:17 170:4,10
179:5,8 182:19
183:9,13 184:5,14
185:12,19 187:14
187:15,17 188:9
190:16 191:1
192:2 193:24
194:24 196:9,18
202:8 206:16
207:11,12,22
213:24 214:21
216:3 227:12
230:20 231:5,25
232:7,13,19
**sbadala**  3:23
**scattered**  75:10
**schedule**  41:18
42:10
**schedules**  168:12
**schein**  8:18
**school**  215:18
218:21 226:14

**scope**  42:18,21,22
60:4 109:22 110:7
110:18 111:5,14
111:19 112:1,3,9
112:22,24 113:12
114:13,16 115:18
116:3,12,15
117:25 118:8,17
118:19 119:8
121:2,17 124:24
126:15,24 138:3
138:22 143:1,8
149:23 152:10,25
153:15,24 154:7
156:14,25 157:4
160:9 163:10
164:24 166:12,21
167:18 168:18
169:6 170:2,16
171:13,15,19
172:9,11,18 176:3
178:10 179:13,20
180:1,9 185:24
186:11,13,22
188:24 190:12
193:12 200:10
216:13 219:1
224:25 225:9
228:19,21 229:2,5
229:7
**scott**  6:19
**screen**  37:13 38:6
38:8 120:20
125:13,15,17
143:22 202:15
205:1 206:7 230:7
**screw**  37:18
**scripts**  10:3
**scroll**  38:14
**scrutiny**  96:17

seal 237:15 238:21
search 188:10
second 22:15
  30:22 53:8 79:19
  80:9,17 81:4 90:8
  91:18 93:22,25
  95:7,8 101:12
  106:22 125:23
  127:3,6 141:13
  168:5 194:15,22
  204:22 207:22
  212:22 225:18,20
  227:11 229:25
  230:4
section 35:5 74:1
  106:7 110:23
  130:14 165:23
  166:5 214:4
sections 33:10
  125:9
see 25:3 29:4
  30:20 32:12,18
  33:13 35:10,14,19
  36:22,24 37:5,7,10
  37:14 38:5,7,11,16
  38:19 39:3 45:24
  46:5,9,13,17,20
  49:2,19 51:6 52:3
  52:23 55:20 56:14
  56:24 57:21 58:1
  61:18 64:2 72:4,7
  72:16,20 74:3,17
  74:21,23 75:5,9,12
  75:17 77:15,21
  78:2,5,11,19 79:12
  79:23 80:7,16,20
  80:25 81:5,11
  82:7,19 84:15
  86:10,13,23 87:2,6
  87:11,25 88:7
  89:12,18 90:4,14

90:16,24 91:3,9,25
92:17 93:17,21,24
94:4,9,15,22 95:4
95:11,17 96:9
100:23 102:6
122:18 135:8
147:13 150:22
151:6,11,12
154:23,25 158:13
161:1 179:2 181:9
182:18,20 183:11
183:15 184:3
194:17 196:6,8
202:1 205:1 206:5
206:11,12,15,15
206:17,18,19,20
206:22,23 207:9
212:17 222:22
225:25 227:9
230:17,24 231:23
232:11,17,22
233:3
seeking 200:25
seen 39:7 54:2
  71:13,15,21
  101:18 171:17
  189:23,24 202:6
seizure 232:14
selectively 176:21
selling 78:9 192:5
senate 16:23 41:12
  41:16 42:7 44:14
  125:7
send 203:4 204:21
sends 114:25
senior 22:24,25
  27:11
sense 137:22 183:7
  195:3 196:24
sensenbrenner
  46:19

sent 105:13,14
sentence 46:18
  80:10,17 91:18
  125:23 194:22
  213:16 227:12
sentenced 38:17
sentences 80:23
  231:10
separate 28:4
  105:10 191:19
september 93:8
  224:8
sequentially 15:18
series 74:21 82:11
serious 95:2,10
  157:25 233:7
serve 118:25
service 6:16
  103:11
services 6:4
set 28:17 32:22
  41:3 44:1 104:17
  108:7 148:22
  209:24
sets 43:23
setting 180:4
settlement 14:15
  14:19 15:5,9,13,17
  160:5,8,10,14
  161:21 162:7,9
  163:13,14,16
  164:2,7 165:3,4,6
  167:15 168:5
  169:4,12 176:18
  177:17,24 178:6
  178:20 179:6,11
  227:4,13 228:14
  228:16 229:21
  230:20 231:1
settlements 176:17
  177:9 193:15

221:24
seven 22:22,23
severity 20:14
shapira 6:17
shapira.com 6:23
  6:24
share 37:15,16,21
  202:21,25 203:2
sharpest 127:19
sheet 236:13 238:7
  238:10,18 239:1
shibley 3:4
shift 192:15
  193:25 194:3
shifted 192:13
  194:1
shipping 59:12,15
  60:23
shkolnik 3:11,12
  3:17
shoot 37:13
shopper 208:24
shoppers 206:16
shopping 200:5,7
  200:21 201:1,4,12
  201:16 207:12,16
  207:23 208:1,10
  208:14 209:15
shops 200:22
short 140:14
shorthand 20:12
  235:10
show 32:1 37:13
  38:5 52:22 74:19
  150:12 202:14
  206:14 228:17
showed 78:8 125:5
  141:9,22 148:7
  177:17 181:19
showing 204:25

[shown - speaking]

**shown** 149:11
236:16
**shows** 75:1,8,14
85:6 182:21
209:13 220:11
**sic** 43:3 135:14
136:22 161:15
189:9 191:17
**side** 63:18
**sign** 23:16
**signals** 131:19
**signature** 235:16
235:22,24 236:14
**signed** 23:17
147:16 237:13
238:18
**significant** 74:6,7
76:24 108:17
144:4 172:24
**significantly** 131:8
**signing** 236:19
**signs** 18:8 86:2
87:15 131:19
147:7 209:3,18
220:9,14
**similar** 64:3 79:2
**simmons** 4:4
**simmonsfirm.com**
4:9
**simply** 177:11
196:20
**simultaneous** 50:8
**sincerely** 236:21
**single** 83:19 91:23
92:10 101:21
**sir** 225:15 236:10
**sit** 199:14
**sites** 80:18 82:14
**sitting** 149:7
180:20

**situation** 96:3
**six** 179:6,17
215:18 226:14
231:3
**skip** 149:1
**skipped** 157:17
**slide** 27:20 29:4
30:18 31:21 32:14
32:15 35:7 51:10
51:16,25 52:5,11
143:24 144:7,12
144:17 145:1,3
149:5 150:13
154:19 182:19
185:11 188:7,8
207:4,5,6
**slides** 51:25
**slightly** 209:12
**small** 74:22 75:3
**smith** 9:12
**sobotkin** 10:15
39:10,13,18 40:2
40:20 42:2,17
43:15 47:22 48:18
49:13,21 50:17
51:9 54:16 55:8
59:5,8 60:2,13
68:22 69:14,25
70:7,16 73:4
74:11 76:2 77:2
83:10 86:6 97:15
98:6 103:23 104:4
105:16 109:22
110:16 111:7,15
111:18 112:2,11
112:23 114:15
115:20 116:18
117:4 118:18,23
119:9,18 120:6
121:3,16 122:21
123:25 126:11,13

129:21 132:1
133:13 138:2
139:25 149:21
151:4 152:9,17,23
153:6,10 155:9
157:3 159:17
162:11 163:9,15
164:23 166:2,6,11
168:20 169:13,16
170:1,14,16
171:14 172:10
175:16 176:1,9,23
177:3,14 178:9,14
179:12,19,25
180:8,16,25
186:10,19 188:23
189:2 193:7,20
194:9 198:11
200:9,13 201:6
212:23 213:1
221:6,17 224:24
225:8 226:8,20
228:20 229:6,24
230:3,12,14 231:9
233:10 236:5
**social** 20:15
124:22
**software** 131:18
133:7
**solutions** 20:13
236:1 239:1
**somebody** 105:3
210:7
**somebody's** 130:2
**someone's** 51:12
**somewhat** 33:22
**soon** 81:14
**sophisticated**
120:2,7
**sorry** 34:3 35:11
39:12,13 40:22

45:13 47:12 52:9
54:17 56:11 67:24
74:10 83:11 84:2
85:3 86:7 93:20
95:14 103:23
110:14,16 120:24
130:12 135:9,10
141:12 142:12
148:25 151:24
155:15 159:23
163:12,15 166:3,6
166:24 175:19
181:22 182:25
183:2 185:4
190:13 191:8
193:20 207:4
209:10 220:19
**sort** 33:10 70:13
143:23 157:16
226:6
**sought** 88:24
**sound** 27:14 62:10
102:3
**sounds** 27:15
81:19 89:23 174:4
174:12
**source** 35:23 36:1
36:3,5,6
**sources** 35:8,15
52:8
**south** 4:22 188:11
**southern** 177:23
178:3 179:4
**spaeder** 6:6
**spangenberg** 3:4
**spanglaw.com** 3:9
**speaker** 226:22
**speaking** 46:19
50:8 117:23
118:12 173:3
217:21

speaks  119:14
spears  11:14
special  186:5
  205:18
specialize  94:25
specific  91:21
  94:13 101:19
  119:20,21,21
  137:18 157:8
  209:2
specifically  43:6
  50:3 119:4 231:1
speculation
  133:14
spoke  232:5
spot  194:20
springfield  11:16
squad  185:18
squads  185:20,22
  187:25
square  10:18
squarely  60:11
staff  72:25
staffing  174:13
stakeholder
  147:14
stakeholders
  86:11,16,20 87:15
  110:24 147:6
  220:4,8 224:16
  225:13
stakeholders'  18:7
stand  185:17
standard  2:5,13
  228:15 235:6
standards  19:5
  62:12 88:2,9
  102:4 189:17
standing  221:21
stands  83:24
  185:14

stars  8:6
start  141:10
  144:21 183:7
  187:18
started  158:7
starting  51:24
  89:16,20 157:19
  160:12 196:5
starts  46:19 79:9
  194:16 231:23
state  32:16,23 33:3
  33:6,9,10,14,19
  57:24 58:19,20
  59:12,13,14,17,20
  59:21 60:23 64:1
  64:7,9 71:11,18
  75:24 76:10,13,19
  96:17 113:20,24
  130:19,22 150:7
  150:16 178:7
  180:13,23 184:8
  184:11 186:5
  187:18 188:12
  192:3 208:12,15
  209:19 215:25
  219:6 223:12,14
  223:22 232:1
  237:10 238:15
state's  20:23
stated  127:5 177:4
statement  16:22
  19:4 27:25 41:11
  41:15 42:7 44:14
  45:12,16 46:25
  72:21 88:16 91:15
  91:17 94:10,12,17
  95:12,20,25 96:19
  96:20 102:7
  116:17 166:9
  189:14 190:2,9,20
  193:6,10,11,25

194:14,16 208:4
  209:22 237:13,14
  238:19,19
statements  92:2
states  1:1 2:10
  14:18 15:4 16:23
  22:2 32:15 40:18
  44:3 103:25 125:7
  126:2 127:12
  128:4 155:7
  157:22 158:17
  162:8 178:2 179:3
  187:25 190:6
  201:5 207:15
  213:12 219:17
  231:16
stating  209:14
statistic  152:20
statistics  51:15
  144:7
status  32:16
stenographer
  20:10 235:11
stenographic  20:6
stenographically
  20:18
stephens  7:5
steps  64:17
sticking  229:17
stipulate  20:20
stolen  107:15
stop  85:6 146:9,12
  158:5
stopped  41:23
  179:16
storage  197:17
store  132:17
  197:23
stores  6:5 52:16
  149:19 156:19
  160:21 162:25

164:9 167:6
  174:14
street  4:13 6:9
  7:17 8:13 9:6,14
  9:22 10:6,19 14:4
  122:13 148:6
streets  139:21
strength  98:14
strict  173:24
  203:21
strictest  203:21
strike  55:5 57:15
  93:23 217:4
strove  142:17
studies  78:8
study  78:3,20,24
  210:6,10,13
subdivisions  103:2
subject  79:10 82:1
  83:4 156:19
  214:10,22 230:21
subjects  161:16
submitted  235:17
subpoenaed
  103:14
subscribed  237:10
  238:14 239:21
substance  19:5
  32:24 33:2 48:4
  50:13 52:7 61:13
  62:13 63:14 78:4
  85:13 88:15 91:24
  92:6 101:23
  135:23 136:14
  164:15 166:8
  189:17 195:11,17
  198:10 199:7
  200:24
substances  13:18
  14:21 15:7,14
  17:13 18:9 24:19

[substances - swift]

25:13 30:8 52:2
55:3 56:2 59:4
62:3,21 82:11,15
83:21 86:4 92:16
93:11 95:23 96:13
96:16 101:14
104:25 106:5,10
106:20,25 108:6
113:17,20,25
115:17 129:20
136:3 137:12
158:16 160:22
162:10 163:1,3
164:3,10 167:7,17
168:12 179:17
189:20 211:15
213:14 214:12
216:5,21 220:10
227:18 232:15
**suddenly** 192:16
194:4
**suffer** 127:4
**suffered** 127:9
**suffering** 98:24
**suggest** 178:15
230:5
**suggested** 181:18
**suggesting** 69:11
69:22 204:6 222:4
**suite** 3:6,20 5:6
6:9 7:17 8:21 9:14
10:7 11:9 236:2
**suits** 203:22
**summary** 82:5
**summit** 211:1
**superior** 11:9
236:1
**supervise** 73:1
**supervising**
170:12

**supervisor** 72:24
217:10 218:10
**supervisors** 72:18
**supply** 48:4
100:22
**supposed** 63:6
75:24 222:6
**sure** 47:15,23
49:21 53:9 63:17
66:16 113:2
125:15,18 140:15
159:19 174:25
182:17 183:8
185:8 190:7,17
193:22 194:19
200:19 201:19,19
203:14 204:22
217:2,11 219:18
**surge** 127:20
**surprise** 149:20
150:1,4
**surrendered**
232:25
**susan** 19:4 189:14
**suspend** 58:13
**suspended** 58:20
**suspension** 14:5
232:21
**suspicious** 196:11
**swear** 20:8,17
**swearing** 20:21
**swift** 7:16 13:5,7
13:10 20:25 21:7
21:9 22:19 23:24
25:1,5,9,24 26:20
26:24 28:11,16,20
28:24 29:21 31:17
34:6,14,19 36:15
36:19 37:24 38:4
39:6,14,21 40:4,22
41:1,4,9 42:6 43:2

43:22 44:7 45:13
45:20 47:5,14
48:1,9,21 49:11,18
49:22 50:9,18
51:14 53:1,5,9,11
53:16,19 54:7,18
55:10,15,19 57:7
59:10 60:6,19,20
70:19,22 71:1
73:6,10 74:13
76:4 77:4,7,11
79:5,8 80:12,15
83:13 84:6,12,16
84:19,24 85:4,17
85:20 86:9 89:5,8
92:24 93:3 97:8
97:18,23 98:8
99:4,9,13,21 100:2
100:7,9 102:14
103:8 104:11
107:25 108:13
109:5,13,20 110:6
110:13 111:5,13
111:25 112:9,19
113:8,12 114:13
115:2,18 116:2,5
116:12 117:25
123:24 124:24
125:5,8 126:12,15
126:24 128:15,25
129:11 130:7
131:13,24 132:19
133:2,11,24 134:7
134:15 135:3
137:14,25 138:21
139:6,15,24 141:9
141:21 142:25
143:7,18 144:18
149:13,22 150:8
151:3,7,18 152:7

152:10,14 153:14
153:24 154:6,11
154:14,16,24
155:8,24 156:4,13
156:24 157:2,15
158:9,25 162:16
165:14 167:18
168:17 169:6
170:7,15 171:3,9
171:13,19,24
172:7,18 173:5,9
173:18 174:3,9,16
174:22 175:2,10
175:20 176:4,16
177:5,15 178:11
178:25 179:1,14
179:21 180:3,10
180:19 181:6
182:4,8 186:1,13
187:2,13,23 188:6
188:20,25 189:4,9
189:13 190:15,24
191:10 192:1,12
193:1,10,18,22,23
194:12 195:8
196:2,17 197:4
198:16,22 199:10
200:12,18,20
201:8 202:7,13,20
202:24 203:3,13
203:17,23 204:2
204:10,17,22,24
205:5,11,20 206:4
207:21 208:7,19
209:11,23 210:21
212:1,7,13,25
213:5 214:20
215:2 216:16
217:17 218:15
219:3,14 221:1,8
221:19 225:16

226:13 227:1,21
228:4,9,19 229:4
229:13,16 230:2,9
230:13,15,16
231:11,12 233:18
233:25 234:6
**swift's** 134:20
167:13 224:15
**switch** 85:7
**sworn** 21:3,5
235:8 237:10,13
238:14,18 239:21
**synthetic** 127:21
**system** 70:12
108:7 139:21
154:4 204:12
**systematically**
70:6
**systems** 123:21
124:21 130:19
132:18 133:19
197:6,15,21 198:5

**t**

**t** 235:1,1
**t1bcc** 18:20
**t3cc00000128** 71:9
**table** 46:4
**tactical** 185:18,19
185:22 186:3
187:24
**take** 26:17 27:18
33:11 45:9 47:7
51:3 52:22,24
55:11 61:17 70:20
71:24 73:24 81:20
85:15 87:23 90:6
91:8 107:3 113:2
123:1 140:14
149:4,8 159:4
167:21 174:23
177:6,13 190:1

194:13 205:6,12
210:15 212:14
215:4,6 222:6
224:11 227:8
229:18 230:9,10
231:21
**taken** 2:8 51:12
99:17 129:8
140:21 175:5
206:1 220:22
223:3 235:4,10
**takes** 64:17 68:11
68:14 210:7
**talk** 63:16 73:21
178:18
**talked** 45:1 60:10
145:10 148:1
172:25 218:16
220:6
**talking** 110:17
150:19 188:8
**talks** 119:4 148:2
225:20,22
**target** 32:11 35:6
233:6
**targeting** 16:10
29:24 35:8,14
187:19
**taylor** 10:5
**tds** 185:14
**tdss** 185:12
**teams** 51:18
**tell** 27:7 48:24
49:11 96:22 97:10
97:17 117:18
127:4 137:19
154:10,11 178:15
216:8,15,25 217:4
217:6,11 230:1
231:14

**telling** 170:11
205:16
**ten** 16:14 99:12
109:16
**tennessee** 154:21
155:4 182:22
**tenth** 8:13
**term** 150:18
153:25
**terminated** 23:18
**terminology** 146:6
146:10
**terms** 122:24
134:2
**testified** 21:5
23:10 31:6 46:6
46:16,22 59:25
60:23 87:19
118:24 134:19
198:7 204:12
207:14 215:3,12
216:18
**testify** 103:12
114:16
**testifying** 24:22
**testimony** 13:3
43:6 60:3 119:4
125:6,21,24 126:5
130:11,13,14
143:23 144:24
175:17 181:24
198:12 211:19
217:3,5,12 237:6,7
238:6,9,12
**testing** 100:21
**texas** 8:22
**thank** 21:10 80:14
98:1 99:15 100:8
100:17 102:18
103:10,11 104:3
120:13 122:6

125:21 140:24
174:21 213:1
234:4,5,6
**thanks** 97:7 107:4
123:1 160:3 224:9
230:3,14
**theft** 104:24 106:9
106:19 123:11
124:7
**therapy** 183:24
**thick** 170:25
**thing** 30:9 31:7
47:4 54:9 83:22
87:16,18 206:18
206:19
**things** 28:4 48:15
60:16 89:12 133:8
194:11 211:16
**think** 23:15 29:16
31:2 32:1 33:17
34:18 49:15 50:4
61:8 64:19 69:21
70:6,9 76:18
87:19 110:14
117:21 119:7
123:7 124:17
151:14 154:8
174:18 176:10,24
181:22 193:8,12
194:10 199:16
200:9 201:24,25
202:9,10 203:17
203:18,19 210:24
215:5 216:14
217:21 219:17
224:4 226:16
229:17
**thinking** 211:13
**thinks** 62:23 64:13
**third** 22:16 78:7
78:19 80:9,16

90:8 91:7,10 94:3
96:7 169:11
186:24
**thirty** 236:18
**thought** 56:8 84:9
152:17 177:20
**thousand** 103:2
**threat** 126:2,22
**three** 1:7 10:18
22:22 26:8 56:7,9
56:18,19 141:25
185:6
**thursday** 1:18
**ties** 184:12
**time** 2:5,13 20:3
22:13 23:13 29:14
29:18 31:1,10,14
39:9 40:16,23
41:24 45:4 62:5
74:8 76:25 79:20
84:12 85:8 88:25
88:25 90:6 91:8
99:8,9 101:4,5
102:15,16 104:19
107:24 115:10,10
121:9,9 163:13
172:23 173:25
174:1 184:23
189:7 191:16
195:20 205:6,12
205:17,22 208:11
211:10 230:9,10
233:8 235:6,15
**times** 216:19
**title** 13:15 14:8,12
29:23 71:12 79:21
187:6
**titled** 13:20 14:18
15:4,12 16:4,9,14
16:19 17:16

**tn** 6:5
**today** 21:10 27:25
102:8 103:12,13
104:16 160:18
175:21 177:18
180:20 189:7
199:4,14,16,17,22
211:10,11,17
212:3 216:2
229:23 232:5
**today's** 20:2
**told** 41:16 217:18
224:10 226:12
**tools** 123:22 124:5
124:12 173:2
**top** 35:17 36:22
46:13 93:16 102:1
109:16 206:20
**topic** 85:7
**topics** 193:9
**total** 109:17
**totally** 33:22 72:22
206:20
**touhy** 40:21 43:4
60:4,6 109:23
110:18 118:8,19
119:3,8,20,22
138:3 152:25
154:7 163:10
164:24 170:17
176:3 178:10
179:13 186:11,14
186:21,22 188:24
193:9,13 200:11
224:25 225:9
228:21 229:7
**track** 1:7 16:4
49:5 236:6 237:3
238:3
**tracking** 80:5
208:25

**trade** 111:2
**traditional** 183:9
**trafficking** 16:15
126:3
**train** 123:3,13
**trained** 195:12
226:18
**training** 124:5,12
199:12,21 210:4
**transaction** 59:15
**transactions** 32:24
33:12
**transcribed** 237:7
**transcript** 17:4
45:25 46:12
236:11,12 237:5
237:12 238:5,11
238:17
**traveled** 66:12
**traveling** 154:2,2
156:10
**treat** 67:10 208:21
**treating** 195:13
**treatment** 91:23
92:6,16 93:11
95:1 99:1 101:22
183:24 214:1
**trend** 208:21
209:1
**trends** 208:25
**trial** 222:7,7
**tried** 49:1 221:23
**trinity** 90:12
**true** 30:25 31:3
36:2 56:20 57:8
62:5 66:17,23
72:9 73:2 76:10
101:10,11 102:10
104:9,10,14,21
107:1,9,12,13,18
107:24 111:12

114:3,12,25 115:5
115:7,12,13,19,22
116:1,9 131:22,23
132:4,12 139:14
139:16 142:15,16
142:24 143:5
156:23 158:24
174:11,15 191:4
191:21 192:7,19
192:23 193:6
194:7 204:10
211:10 227:5
229:1 235:12
**trumbull** 102:24
150:25 151:2,17
152:4
**try** 67:25 220:13
220:17 221:3,10
221:13
**trying** 45:7 46:24
47:4,17 88:4
110:14 123:7
178:23 191:8
193:3 203:25
204:2,5
**turn** 32:9 35:4
41:14 46:11 48:22
51:3 56:4 72:14
74:25 77:5,23
78:16 79:25 94:19
101:25 181:12
182:15,25 189:5
210:8,22 211:2
220:3 229:19
**turned** 35:11
140:5
**twelfth** 9:22
**two** 28:4 78:17
79:15 141:25
178:23 185:6
207:24 223:4

231:10
**type** 61:2,5,9
184:12
**types** 54:21 59:24
60:10,22 87:9
**typically** 33:1
219:20,22

**u**

**u** 77:6
**u.s.** 10:12,14 11:3
11:6 164:4 230:22
**uh** 53:4 150:17
**ukulele** 77:6
**ultimately** 40:15
44:6
**undercover** 188:2
**undergo** 100:21
**underlying** 168:10
176:19 178:7
**undersigned**
235:11,19
**understand** 21:14
22:7 23:6 34:7
40:15 56:6 60:13
62:19,25 67:24
76:19 88:24 89:22
101:3 175:24
177:16 179:9,15
179:22 193:3,5
211:19 215:17,20
215:24 223:5
**understanding**
24:15 25:11 30:10
30:13 32:4 34:13
34:17,20,25 45:6
54:24 55:1 58:8
60:18 63:23 73:7
76:13 82:16 83:4
116:19 117:7
121:11 134:22
135:4 137:8,22

140:1,4 146:9
158:6,7 165:7,10
184:21 188:16
201:11
**understands** 63:18
**understood** 50:10
60:19 68:15
**undertreatment**
95:1,9
**unidentified**
226:22
**unique** 96:3
**united** 1:1 2:10
14:18 15:4 16:23
32:15 40:18 44:3
103:25 125:7
126:2 127:12
128:4 157:22
162:8 178:2 179:3
187:25 231:16
**units** 232:15
**university** 77:18
78:4 80:4 81:7
**unlawful** 14:20
15:6 162:10 164:2
**unlawfully** 82:14
**unprecedented**
168:8
**unreasonable**
173:25 174:5,12
**unused** 51:22
149:5 212:4
**unusual** 62:24
65:5 66:6
**update** 16:6 49:6
**upper** 147:22
**usdoj.gov** 10:22
10:23,24 11:12
**usdoj.gov.** 11:18
**use** 40:18 50:14
59:24 60:22 61:2

61:5,9 88:12,19
94:21 95:6 107:18
128:3 131:18
133:22 146:5
150:18 157:24
158:19 183:24
196:22 203:11
210:17 211:7
226:3
**user** 131:19 140:6
**users** 225:22 226:3
**uses** 60:9
**usual** 94:7 135:25
136:15 161:13,15
195:19 214:1
**usually** 184:1,10
**utility** 185:12,19
**utilize** 121:24
**utilized** 132:10

**v**

**v** 79:3,21 168:12
236:6 237:3 238:3
**vague** 77:2
**validity** 20:20
**valuable** 36:5
**varies** 130:22
**various** 59:24 87:9
114:12 133:1
188:12
**vast** 46:23 47:3,16
195:10,17
**vdoctor** 7:11
**vehicle** 127:12
**veritext** 20:13
236:1,7 239:1
**veritext.com.**
236:17
**version** 37:20 71:9
**versus** 105:14
**victory** 79:4

**video** 222:24
**videographer**
11:21 20:1 99:16
99:19 140:20,23
175:3,7 205:23
206:3 220:21,24
234:7
**videotaped** 1:15
2:7
**view** 211:5,9,11
**views** 45:6 90:10
**vigilance** 130:3
**vigilant** 129:18,23
134:12 145:12
180:12,22
**vincent** 7:6
**violate** 76:21
115:16 217:13
**violation** 78:13
217:20
**violations** 168:9
214:11
**violators** 83:4
**virginia** 10:6,8
11:16
**visit** 66:12 233:1
**voluntarily** 179:16
232:25

**w**

**w** 6:7 46:6 189:8
**wag** 14:15 15:9,18
159:16,20 165:12
**wait** 205:2
**waiting** 230:7
**waived** 235:17
236:19
**walgreen** 7:14,14
**walgreens** 7:13
15:12 17:9 21:9
24:3 52:16 53:21
53:25 54:4,9

| | | | |
|---|---|---|---|
| 83:18 86:15 89:24 | **washington** 6:10 | 74:9 77:1 80:11 | 161:24 162:3,13 |
| 103:15 104:22 | 8:14 9:23 10:20 | 80:14 84:17,21 | 162:19 163:11,17 |
| 109:16 116:1,9 | **water** 84:23 | 97:4,14,22 99:2 | 163:19,24 165:1,9 |
| 149:12,18 151:13 | **way** 34:15 42:22 | 100:6,8 102:12,18 | 165:15,19 166:4 |
| 156:11,19 167:12 | 43:18 63:19,21 | 102:20,21 104:3,5 | 166:10,14,22 |
| 167:15 168:7 | 67:22,25 94:7 | 104:12 105:18,20 | 167:1,21 168:1,23 |
| 169:5,15,17,25 | 104:15 118:7 | 105:24 106:2 | 168:24 169:9,14 |
| 170:13 171:1 | 131:2,17 148:1 | 107:3,5 108:2,15 | 169:20 170:3,8,19 |
| 172:6 175:13 | 149:11 157:20 | 109:6,15 110:1,8 | 170:24 171:5,7,10 |
| 177:18,24 179:6,9 | 169:10,18 200:16 | 110:21 111:9,11 | 171:16,20 172:1 |
| 179:16,18 180:5 | 201:10 203:3 | 111:16,20 112:4 | 172:13,21 173:7 |
| 180:12,21 188:22 | 208:8,13 209:12 | 112:15 113:1,4,10 | 173:12,21 174:6 |
| 197:7 199:12 | 219:1 | 113:14 114:18 | 174:10,20 175:1 |
| 212:9 224:19 | **ways** 63:12 107:17 | 115:3,21 116:4,6 | 175:22 176:4 |
| 227:4 228:13 | 198:17,19 | 116:16,22 117:12 | 177:2,8,17 178:17 |
| 229:2,20 231:2,3 | **wc.com** 9:25 | 118:2,10,23 | 180:15,24 181:23 |
| **walmart** 7:3 24:9 | **we've** 45:1 53:16 | 119:15,24 120:8 | 182:6 185:23 |
| 103:16 104:22 | 60:10 101:17 | 120:14,18 121:6 | 186:9,25 187:11 |
| 109:9,10 116:9 | 120:19 144:23 | 121:20 122:5,11 | 187:22 188:4,18 |
| 151:14 172:16 | 177:10 216:2 | 122:23 123:19 | 190:11,22 191:6 |
| 197:7 199:19 | 218:16 | 124:3 125:1 | 191:23 192:9,21 |
| **walmart's** 172:16 | **website** 36:21 | 126:18 127:2 | 193:17,19 194:8 |
| **want** 24:21,24 | 71:19 115:7 118:5 | 128:16 129:2,14 | 195:6,25 196:15 |
| 84:10,21 91:9 | 120:22 122:19 | 129:24 130:8 | 197:2 199:9 200:8 |
| 97:6 103:10 113:1 | 162:5 164:1 | 131:15 132:3,22 | 200:14 201:24 |
| 125:16 140:14 | 212:19 | 133:4,15 134:1,10 | 202:9,17,22 203:1 |
| 141:8,23 147:2 | **websites** 78:8 | 134:18 135:5,13 | 203:6,15,18,25 |
| 160:7 189:7 | **weiland** 1:24 2:8 | 135:18,21 136:25 | 204:4,15,19 205:2 |
| 194:19 196:20 | 20:11 235:4,25 | 137:4,16 138:6 | 205:8,14 207:18 |
| 205:6,16 215:3 | **weinberger** 3:5 | 139:1,9,17 140:7 | 208:5,16 209:7,21 |
| 222:2,16,16 230:6 | 13:6,9 21:1 22:18 | 140:11,16,19,24 | 210:18 211:24 |
| 231:17 | 23:23 24:21 25:4 | 141:7 143:4,12,20 | 212:5,11 214:19 |
| **wanted** 207:6 | 25:8,22 28:8,14 | 144:16,19 146:4 | 214:24 216:12 |
| **warning** 18:7 86:2 | 29:20 31:15 34:2 | 149:24 151:5,10 | 217:16 218:12,25 |
| 87:15 131:19 | 34:4,11,16 39:5,19 | 151:20 152:11,15 | 219:12 221:16 |
| 146:12 147:6 | 42:3,18 43:13 | 152:18,19 153:4,9 | 222:3,15 224:13 |
| 220:9 | 44:4 45:11,15 | 153:19 154:1,10 | 225:1,11 226:10 |
| **warnings** 88:14 | 47:2,11,21 48:7,19 | 154:13 155:1,14 | 226:24 228:1,6,12 |
| **warrant** 96:17 | 49:10 53:7,10,18 | 156:1,7,17 157:11 | 228:23 229:9 |
| **warrants** 188:10 | 54:5 57:5 68:21 | 158:11 159:4,6,19 | 233:9,23 234:2 |
| | 69:6,15,24 70:8,17 | 159:24 160:3,4,15 | |

welfare 108:22
went 44:22
west 7:17 10:8
 11:9
whiddon 5:12
white 77:20 79:20
widespread 80:23
wild 116:4
wildly 116:2
william 11:23
 71:10
williams 9:20
window 84:15
winsley 71:10,18
 71:22 72:4
winsley's 71:25
 72:15 74:25
wisconsin 223:15
withdraw 34:4
 40:24 166:24
 201:9 220:20
witness 10:13 11:4
 20:7,9,16,17 21:3
 24:22,24 28:9,15
 31:16 34:3,5,12,17
 39:12,20 41:8
 42:4 43:14,16
 44:5 45:17 47:3
 47:12,23 48:8,20
 51:10 53:4,13
 54:6,17 55:9 57:6
 59:7,9 68:23 69:7
 69:16 70:1,9,18
 73:8 74:10,12
 76:3 77:3 83:11
 84:14,23 85:3
 86:7 97:16 98:7
 99:3,11,15 102:13
 105:19 108:1
 109:14,24 110:20
 112:3,10,13

113:13 114:16
115:19 116:20
117:9 118:1,20,24
121:5,19 122:3,22
123:17 124:2
126:16 127:1
129:12,22 131:14
132:21 133:3,25
134:9,16 135:4,17
137:15 138:4,23
139:8,16,25 140:3
140:15,18 143:9
143:19 151:9
152:24 153:15,17
153:25 154:25
155:10,12 156:5
156:16 157:10
158:10 159:2,21
160:13 163:18,23
164:24 165:16
166:3,13 167:20
168:18 169:7,18
170:2,17 171:15
172:11,20 173:11
173:19 174:4,18
174:25 175:18
176:2 177:10
180:18 181:4
182:1 187:12
188:5,19 189:12
190:13,23 191:7
191:24 192:10,22
194:10 195:7
196:1,16 197:3
198:18 208:6,17
209:8,22 210:19
212:6,12 213:2
214:25 216:14
218:13 219:13
221:7,18 225:10
226:9,23 228:10

228:22 229:8
233:11,16,24
234:5 235:3,8,14
235:16,22 236:8
236:11 237:1,4,11
238:1,4,15
witnesses 46:5
witness' 236:14
wmt 18:13
woman 152:4
wondering 119:16
word 120:6
words 133:8 145:2
work 21:12,18
 23:11,13,16,21
 24:2,5,8,11 85:9
 103:19 121:7
 131:17 145:11
 173:15 183:22
 186:6 220:17
 221:3,10
worked 21:15 22:7
 86:1 87:20 114:20
working 20:12
 142:7 146:21
 178:17 187:17
 220:11
worth 223:4
write 25:19,25
 26:14 47:6,18
 96:24 219:9,15
writer 90:21
writes 48:11
 102:11
writing 30:5,14
 38:22 41:23 44:8
 90:3,23 101:8
written 41:18
 43:20 50:22 67:18
 68:2,12 185:8
 195:11,18

wrong 35:11 37:21
 48:16 52:23 56:12
 124:14 177:21
 182:2 198:17
 207:5
wrote 50:12
 100:11,17 101:13
wyant 10:4

**x**

x 196:19

**y**

yeah 22:23 25:4
 27:15,21 28:4
 30:11 31:2 34:18
 35:11 40:9 42:4
 43:25 44:5,12
 47:24 50:5 64:23
 65:13 66:14 68:5
 68:5,10 69:16
 72:20 81:19 84:14
 88:5 90:16 101:7
 110:16 123:15
 124:11 141:20
 142:1 143:10
 151:9 152:14,18
 154:2 173:23
 174:4,12,18
 182:10 184:24
 187:15,15,16
 191:24 192:10,11
 194:10 196:1
 199:15 200:25
 201:19 202:9
 210:19 214:25
 215:7,11
year 42:16 43:12
 43:24 44:10 56:9
 80:17 158:20
 171:22

**years** 21:16,20,23
22:8 25:11 26:8
33:5 35:21,24
38:17 44:23 56:7
56:18,19 69:20
80:6 94:11 107:21
111:22 114:8,10
114:20 134:23
137:24 142:10
149:17 183:13
184:21 215:18
218:22 226:14
**york** 3:21 4:7,7,14
4:14 227:16

**z**

**zolner** 9:5
**zoom** 1:16 2:8 3:5
3:12,18,19 4:5,12
4:19,20 5:5,11 6:7
6:8,18,19 7:5,6,16
8:5,11,20 9:5,13
9:21 10:15,16,17
11:7,8,14,21,22,23
11:24 20:19 37:16
235:3
**zuckerman** 6:6
**zuckerman.com**
6:12,13

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
## COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.