1          UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF OHIO
2                EASTERN DIVISION
3

    IN RE: NATIONAL          )
4   PRESCRIPTION             )   MDL No. 2804
    OPIATE LITIGATION        )
5   _____ )   Case No.
                             )   1:17-MD-2804
6                            )
    THIS DOCUMENT RELATES )   Hon. Dan A.
7   TO ALL CASES             )   Polster
8

9              FRIDAY, NOVEMBER 13, 2020

      HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10              CONFIDENTIALITY REVIEW
11                    - - -
12            Remote videotaped deposition of
13   Drug Enforcement Agency 30(b)(6) designee
14   Claire Brennan, held at the location of the
15   witness commencing at 10:05 a.m. Eastern
16   Time, on the above date, before Carrie A.
17   Campbell, Registered Diplomate Reporter
18    and Certified Realtime Reporter.
19

20

21

22                    - - -
23

            GOLKOW LITIGATION SERVICES
24      877.370.3377 ph | 917.591.5672 fax
                deps@golkow.com
25

```
 1      R E M O T E    A P P E A R A N C E S :

 2

 3      LEVIN PAPANTONIO THOMAS MITCHELL
        RAFFERTY PROCTOR, P.A.
 4      BY:  PETER MOUGEY
             pmougey@levinlaw.com
 5           LAURA DUNNING
             ldunning@levinlaw.com
 6           PAGE POERSCHKE
             ppoerschke@levinlaw.com
 7      316 South Baylen Street
        Pensacola, Florida 32502
 8      (850) 435-7000

 9

        and
10

11      MOTLEY RICE LLC
        BY:  DONALD A. MIGLIORI
12           dmigliori@motleyrice.com
        28 Bridgeside Boulevard
13      Mount Pleasant, South Carolina 29464
        (843) 216-9000
14

15      and

16

        SIMMONS HANLY CONROY LLC
17      BY:  LAURA FITZPATRICK
             lfitzpatrick@simmonsfirm.com
18      112 Madison Avenue, Seventh Floor
        New York, New York 10016
19      (212) 784-6400

20

        and
21

22      THE LANIER LAW FIRM, PLLC
        BY:  MILDRED CONROY
23           mildred.conroy@lanierlawfirm.com
        126 East 56th Street
24      New York, New York 10022
        (212) 421-2800

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1     and
 2
       NAPOLI SHKOLNIK, PLLC
 3     BY:  HUNTER J. SHKOLNIK
            hunter@napolilaw.com
 4     360 Lexington Avenue, 11th Floor
       New York, New York 10017
 5     (212) 397-1000
       Counsel for the Plaintiffs
 6
 7
       U.S. DEPARTMENT OF JUSTICE
 8     BY:  ANDREW JACO
            Andrew.Jaco@usdoj.gov
 9          DAVID M. SOBOTKIN
            David.M.Sobotkin@usdoj.gov
10          MARIAMA C. SPEARS
            Mariama.C.Spears@usdoj.gov
11     950 Pennsylvania Avenue NW
       Washington, DC 20530
12     (202) 514-2000
       Counsel for the DEA & Witness
13
14
       WILLIAMS & CONNOLLY LLP
15     BY:  JENNIFER G. WICHT
            jwicht@wc.com
16     725 Twelfth Street, N.W.
       Washington, DC 20005
17     (202) 434-5331
       Counsel for Cardinal Health, Inc.
18
19
       COVINGTON & BURLING LLP
20     BY:  CHRISTOPHER K. EPPICH
            ceppich@cov.com
21          MEGHAN MONAGHAN
            mmonaghan@cov.com
22     850 Tenth Street, NW
       Washington, DC 20001-4956
23     (202) 662-6000
       Counsel for McKesson Corporation
24
25
```

```
 1      REED SMITH LLP
        BY:  SHANNON MCCLURE
 2           smcclure@reedsmith.com
             ABIGAIL M. PIERCE
 3           abigail.pierce@reedsmith.com
        Three Logan Square
 4      1717 Arch Street, Suite 3100
        Philadelphia, Pennsylvania 19103
 5      (215) 851-8100
        Counsel for AmerisourceBergen
 6

 7

 8      BARTLIT BECK LLP
        BY:  KATHERINE M. SWIFT
 9           kate.swift@bartlitbeck.com
        54 West Hubbard Street, Suite 300
10      Chicago, Illinois 60654
        (312) 494-4400
11      Counsel for Walgreens

12

13      JONES DAY
        BY:  PATRICK J. BEISELL
14           pbeisell@jonesday.com
        77 West Wacker
15      Chicago, Illinois 60601-1692
        (312) 782-3939
16      Counsel for Walmart

17

18      ZUCKERMAN SPAEDER LLP
        BY:  ANTHONY RUIZ
19           aruiz@zuckerman.com
        1800 M Street NW, Suite 1000
20      Washington, DC  20036-5807
        (202) 778-1800
21      Counsel for CVS Indiana, LLC, and
        CVS RX Services, Inc.
22

23

24

25
```

```
 1      MARCUS & SHAPIRA LLP
        BY:  SCOTT D. LIVINGSTON
 2           livingston@Marcus-Shapira.com
             JOSHUA A. KOBRIN
 3           kobrin@Marcus-Shapira.com
             MATTHEW MAZGAJ
 4           mazgaj@Marcus-Shapira.com
        301 Grant Street, 35th Floor
 5      Pittsburgh, Pennsylvania 15219-6401
        (412) 338-4690
 6      Counsel for HBC
 7
 8      MORGAN, LEWIS & BOCKIUS LLP
        BY:  MATTHEW R. LADD
 9           matthew.ladd@morganlewis.com
        101 Park Avenue
10      New York, New York 10178-0060
        (212) 309-6000
11      Counsel for Rite Aid
12
13      LOCKE LORD LLP
        BY:  MADELINE E. BRUNNER
14           madeline.brunner@lockelord.com
        2200 Ross Avenue, Suite 2800
15      Dallas, Texas 75201
        (214) 740-8445
16      Counsel for Henry Schein, Inc., and
        Henry Schein Medical Systems, Inc.
17
18
    ALSO PRESENT:
19      ANNE DOYLE, legal assistant, Bartlit
        Beck
20
21
    VIDEOGRAPHER:
22        DAN LAWLOR,
          Golkow Litigation Services
23
                        - - -
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                      INDEX
 2                                        PAGE
 3    APPEARANCES................................   2
 4   EXAMINATIONS
 5     BY MS. SWIFT.............................  10
 6     BY MR. MOUGEY............................ 141
 7     BY MS. SWIFT............................. 220
 8
 9                    EXHIBITS
10      No.        Description                 Page
11    1            US Department of Justice     144
                   Report of Investigation,
12                 US-DEA-00031084 -
                   US-DEA-00031099
13
      2            US Department of Justice     120
14                 Report of Investigation,
                   US-DEA-00030921 -
15                 US-DEA-00030925
16    3            Chemical Handler's Manual,    74
                   January 2004, Appendix
17                 E-3,
                   WAGMDL00396010
18
      4            US Department of Justice     122
19                 Report of Investigation,
                   US-DEA-00032745 -
20                 US-DEA-00032760
21    5            US Department of Justice     124
                   Report of Investigation,
22                 US-DEA-00030763 -
                   US-DEA-00030786
23
      6            US DEA May 17, 2006 letter    56
24                 to Todd Polarolo,
                   WAGMDL00709510 -
25                 WAGMDL00709512
```

| | | | |
|---|---|---|---|
| 7 | US Department of Justice Report of Investigation, US-DEA-00031395 - US-DEA-00031398 | 126 |
| 8 | July 28, 2006 letter to Barbara Dobric, WAGMDL00387642 - WAGMDL00387650 | 71 |
| 9 | US Department of Justice Report of Investigation, US-DEA-00033081 - US-DEA-00033107 | 78 |

Plaintiffs

| | | | |
|---|---|---|---|
| 9 | 5/27/2006 Walgreens Memorandum from Justin Joseph to Todd Polarolo, WAGMDL00709508 - WAGMDL00709509 | 205 |
| 10 | June 28, 2009 letter to Robert Corso, WAGMDL00493688 - WAGMDL00493691 | 91 |
| 11 | US Department of Justice Report of Investigation, US-DEA-00033080 | 95 |
| 12 | US Department of Justice Report of Investigation, US-DEA-00032761 - US-DEA-00032803 | 128 |
| 13 | US Department of Justice Report of Investigation, US-DEA-00030873 - US-DEA-00030897 | 130 |
| 14 | US Department of Justice Report of Investigation, US-DEA-00030898 - US-DEA-00030920 | 135 |
| 15 | US Department of Justice Report of Investigation, US-DEA-00031425 - US-DEA-00031428 | 98 |

| 1 | 16 | US Department of Justice | 138 |
| 2 | | Report of Investigation, | |
| | | US-DEA-00031015 - | |
| 3 | | US-DEA-00031029 | |
| | 18 | US Department of Justice | 103 |
| 4 | | Report of Investigation, | |
| | | US-DEA-00031492 - | |
| 5 | | US-DEA-00031505 | |
| 6 | 19 | US Department of Justice | 114 |
| | | Report of Investigation, | |
| 7 | | US-DEA-00031514 - | |
| | | US-DEA-00031522 | |
| 8 | | | |
| | 20 | US Department of Justice | 20 |
| 9 | | November 4, 2020 letter to | |
| | | Jeff Gaddy | |
| 10 | | | |
| | 24 | DEA Memorandum dated | 40 |
| 11 | | October 27, 2009, | |
| | | US-DEA-00056902 - | |
| 12 | | US-DEA-00056915 | |
| 13 | 26 | DEA Memorandum dated | 245 |
| | | October 5, 2010, | |
| 14 | | US-DEA-00056901 | |

15

16     (Exhibits attached to the deposition.)

17     CERTIFICATE................................260
18     ACKNOWLEDGMENT OF DEPONENT..................262
19     ERRATA.....................................263
20     LAWYER'S NOTES.............................264

21

22

23

24

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1              VIDEOGRAPHER:  We are now on
 2      the record.
 3              My name is Dan Lawlor.  I'm a
 4      videographer representing Golkow
 5      Litigation Services.
 6              Today's date is November 13,
 7      2020, and the time is 10:05 a.m.
 8              This remote video deposition is
 9      being held in the matter of National
10      Prescription Opiate Litigation, MDL
11      Number 2804.
12              All parties to this deposition
13      are appearing remotely and have agreed
14      to the witness being sworn in
15      remotely.
16              Due to the nature of remote
17      reporting, please pause briefly before
18      speaking to ensure all parties are
19      heard completely.
20              The deponent is Claire Brennan.
21              Counsel will be noted on the
22      stenographic record.
23              The court reporter is Carrie
24      Campbell, who will now swear in the
25      witness.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  CLAIRE BRENNAN,

 2   of lawful age, having been first duly sworn

 3   to tell the truth, the whole truth and

 4   nothing but the truth, deposes and says on

 5   behalf of the Defendant Walgreens, as

 6   follows:

 7

 8                  DIRECT EXAMINATION

 9   QUESTIONS BY MS. SWIFT:

10        Q.     Good morning, Ms. Brennan.

11   Once again, my name is Kate Swift, and I'm a

12   lawyer for Walgreens.

13               Would you please state your

14   full name?

15        A.     Claire Marie Brennan.

16        Q.     Am I correct that you are a

17   section chief in the diversion control

18   division of the Drug Enforcement

19   Administration?

20        A.     Yes.

21        Q.     Do you work in Arlington,

22   Virginia?

23        A.     Yes.

24        Q.     Do you live in Arlington?

25        A.     No.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        Q.      Where do you live?

2                Just the city and town -- and

3   state, sorry.

4        A.      Alexandria, Virginia.

5        Q.      How long have you been working

6   at the DEA?

7        A.      This past June was 25 years.

8        Q.      And I understand you currently

9   work in the diversion control division of the

10  DEA.

11               How long have you worked in

12  diversion control?

13       A.      For 25 years.

14       Q.      What is diversion?  Can you

15  give us a simple explanation of it?

16       A.      Well, our mission is to

17  prevent, detect and investigate, to ensure

18  that there's -- while protecting -- so

19  protect form diversion.  So we're trying to

20  keep controlled -- legitimate controlled

21  substances and chemicals going into the

22  illegitimate market.

23       Q.      One of the mission statements

24  of the DEA, correct?

25       A.      Correct.
```

```
 1            Q.      Is another mission statement of

 2    the DEA is that you want to ensure that

 3    there's an adequate, uninterrupted supply of

 4    controlled substances like opioid medications

 5    to be available for legitimate medical uses?

 6            A.      Yes.

 7            Q.      Is it fair to say that you have

 8    knowledge, experience and training carrying

 9    out DEA's diversion control mission?

10            A.      Yes.

11                    MR. JACO:  Objection.  Form.

12    QUESTIONS BY MS. SWIFT:

13            Q.      Is it fair to say you have

14    decades of experience in doing that?

15                    MR. JACO:  Objection.  Form.

16                    You can answer.

17    QUESTIONS BY MS. SWIFT:

18            Q.      Well, let me try to address

19    your counsel's objection, Ms. Brennan.

20                    You testified that you've

21    worked in diversion control at the DEA for

22    25 years.

23                    Is it fair to say that you have

24    a long period of experience working to

25    prevent diversion?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         A.     Yes.

 2         Q.     Do you have training in

 3    preventing diversion?

 4         A.     Yes.

 5         Q.     Is it your job to ensure that

 6    the diversion control division's objectives

 7    are met and to act as a liaison with DEA

 8    registrants like distributors to prevent the

 9    diversion of controlled substances?

10              MR. JACO:  Objection.  Form.

11              You can answer.

12              THE WITNESS:  Yes, my job right

13         now is to liaison with registrants and

14         associations and making them aware of

15         the regulations.

16    QUESTIONS BY MS. SWIFT:

17         Q.     When you say "registrants,"

18    that's just a word to describe companies like

19    distributors who are registered with the DEA;

20    is that fair?

21         A.     Yes.

22         Q.     In your time at the DEA, have

23    you worked as a diversion investigator?

24         A.     Yes.

25         Q.     Have you overseen other
```

 1    diversion investigators while you've been at

 2    the DEA?

 3         A.     Yes.

 4         Q.     And have you had the occasion

 5    to interact with diversion investigators at

 6    the DEA?

 7         A.     Yes.

 8         Q.     What is a diversion

 9    investigator?

10         A.     A diversion investigator is

11    when -- we're considered non-law enforcement,

12    but we investigate -- and our job is to work

13    with the registrant population to ensure that

14    there is -- you know, hold them -- with the

15    regulations and try and prevent diversion.

16         Q.     You understand that diversion

17    investigators conduct regular investigations

18    of companies that are registered with the DEA

19    to distribute controlled substances such as

20    opioids, right?

21              MR. JACO:  Objection.  Form.

22              You can answer.

23              THE WITNESS:  I'm sorry, you

24         just cut out at the very end --

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MS. SWIFT:

 2         Q.     Sure.

 3         A.     -- Ms. Swift.

 4         Q.     Diversion investigators, you

 5    know, in the course of their job, they

 6    conduct investigations of companies that

 7    distribute controlled substances like

 8    opioids.

 9              That's what they do, right?

10         A.     That's one of the duties.

11              MR. JACO:  Same -- same

12         objection.

13    QUESTIONS BY MS. SWIFT:

14         Q.     When a diversion investigator

15    conducts an investigation of a distributor

16    like Walgreens, they actually go to the

17    warehouses, the distribution centers, and

18    walk around, right?  That's part of what they

19    do?

20              MR. JACO:  Objection.  Form.

21              You can answer.

22              THE WITNESS:  Yes, that would

23         be considered on-site.

24    QUESTIONS BY MS. SWIFT:

25         Q.     And the goal when you're doing
```

Highly Confidential - Subject to Further Confidentiality Review

1    an on-site investigation is to make sure --

2    well, a lot of things, but, for example, that

3    the distributors -- the controlled substances

4    that that distributor has in its warehouse or

5    its distribution center, that they're

6    being -- those controlled substances are

7    being stored correctly; is that fair?  It's

8    one of the things that they do?

9        A.    Yes.

10       Q.    The diversion investigators

11   also look to see whether alarm systems are

12   working, correct?

13       A.    Yes.

14       Q.    They look to see whether

15   controlled substances like opioids are either

16   in a vault or in a cage or, you know, they're

17   being stored the way they are required to be

18   stored under the DEA's regulations; is that

19   fair?

20            MR. JACO:  Objection.  Form.

21            THE WITNESS:  Yes.

22   QUESTIONS BY MS. SWIFT:

23       Q.    The diversion investigators

24   also make sure that records are being kept

25   properly when they conduct an on-site

1    investigation, correct?

2        A.    Yes.

3        Q.    The DEA has rules and

4    requirements on all of those aspects of how a

5    distributor stores its controlled substances,

6    keep records about them, maintains alarm

7    systems about them; is that fair?

8            MR. JACO:  Objection.  Form.

9            You can answer.

10            THE WITNESS:  Yes.

11   QUESTIONS BY MS. SWIFT:

12        Q.    Would you agree with me,

13   Ms. Brennan, that there are a lot of

14   different things that a diversion

15   investigator is supposed to check in the

16   course of an on-site investigation of a

17   controlled substance distributor?

18            MR. JACO:  Objection.  Form.

19            THE WITNESS:  Yes, we look at a

20        multitude of things.

21   QUESTIONS BY MS. SWIFT:

22        Q.    Diversion investigators at the

23   DEA conduct on-site investigations of all

24   distributors as part of DEA's regulatory

25   role, right?

```
1                   MR. JACO:  Objection.  Form.

2                   THE WITNESS:  Yes, we're

3          required to look at -- investigate

4          distributors on site.

5    QUESTIONS BY MS. SWIFT:

6          Q.     And that's not a sign that a

7    company is necessarily doing anything wrong.

8    Everybody gets investigated whether they're

9    doing anything wrong or not, fair?

10         A.     Yes.

11         Q.     Would you agree with me that

12   it's important -- strike that.

13                 Would you agree that the

14   on-site investigations that diversion

15   investigators conduct are important so that

16   the DEA can make sure distributors are

17   complying with the laws and regulations?

18                 MR. JACO:  Objection.  Form.

19                 THE WITNESS:  Yes, I would

20         agree that it's for all registrants.

21   QUESTIONS BY MS. SWIFT:

22         Q.     Would you agree with me that

23   on-site investigations of distributors are

24   also important to fulfill DEA's mission of

25   preventing diversion?
```

```
 1                    MR. JACO:  Objection.  Form.

 2                    THE WITNESS:  Yes, I'd agree

 3          that they're one of the registrants --

 4          that's part of the mission.

 5   QUESTIONS BY MS. SWIFT:

 6          Q.    Do the diversion investigators

 7   that you know take that job seriously?

 8          A.    Yes.

 9          Q.    Do you, as a diversion

10   investigator, take the job of conducting

11   on-site investigations seriously?

12          A.    Yes.

13          Q.    To your understanding, do

14   diversion investigators at the DEA do a

15   careful and thorough job when conducting

16   investigations?

17          A.    We're trained to do a thorough

18   job.  I can't say, you know -- I don't

19   speak -- at DEA, that's what we're trained to

20   do.

21          Q.    And do you believe that the

22   diversion investigators that you have worked

23   with over the years do, in fact, do a

24   careful, thorough job?

25          A.    I do believe that for the --
```

1    yes.

2         Q.      Do you believe that the

3    diversion investigators at the DEA do a

4    careful, thorough job when documenting their

5    findings during investigations?

6         A.      DEA expects that an

7    investigation would be documented.

8         Q.      When a diversion investigator

9    finds a problem at a distribution center, do

10   they document it, typically?

11             MR. JACO:  Objection.  Form.

12             THE WITNESS:  Typically the

13        problem would be documented.

14   QUESTIONS BY MS. SWIFT:

15        Q.      And if a diversion investigator

16   sees a violation of the laws and regulations,

17   is it typical for the diversion investigator

18   to document that as a part of an

19   investigation?

20             MR. JACO:  Objection.  Form.

21             THE WITNESS:  Yes, it's typical

22        that a violation would be documented.

23             (Brennan 30(b)(6) Exhibit 20

24        marked for identification.)

25

```
 1   QUESTIONS BY MS. SWIFT:

 2        Q.     Now, I'd like for you to look

 3   in your binder, if you would, please,

 4   Ms. Brennan, for Exhibit 20.

 5             Do you have that in front of

 6   you?

 7        A.     Yes.

 8        Q.     Exhibit 20 is a letter from the

 9   US Department of Justice addressed to a law

10   firm in Florida with the subject line "Touhy

11   requests re: DEA 30(b)(6)," and the in re:

12   National Prescription Opiate Litigation case,

13   correct?

14        A.     That's correct.

15        Q.     Have you seen this letter

16   before?

17        A.     Yes, I have.

18        Q.     And do you know what a Touhy

19   request is?

20             Let me ask it a different way.

21   I'll withdraw the question.

22             Do you understand that you have

23   been authorized on behalf of the DEA to

24   testify about certain topics and documents

25   today?
```

Highly Confidential - Subject to Further Confidentiality Review

1       A.      Yes.

2       Q.      Do you understand that those

3   topics are listed on page 2 of this letter?

4       A.      Yes.

5       Q.      And then the specific documents

6   that you've been authorized to testify about

7   are listed on the last page of the exhibit,

8   this Attachment A, correct?

9       A.      Yes.

10      Q.      Okay.  Turn back to page 2 of

11  the Touhy letter, if you would, please.

12              Do you see in the first full

13  paragraph that starts, "The DEA has been

14  contacted"?

15              Do you see that paragraph?

16      A.      Yes.

17      Q.      Towards the end of that

18  paragraph it says, "I am authorizing DEA

19  section chief Claire Brennan to provide

20  deposition testimony as a 30(b)(6) witness on

21  behalf of DEA regarding the following

22  topics."

23              And the first topic is "the

24  responsibilities of diversion investigators

25  when performing cyclic investigations of

1    pharmacy distribution centers."

2              Did I read that correctly?

3    A.      Yes.

4    Q.      Are you qualified to testify on

5    that topic based on your knowledge, training,

6    experience at the DEA?

7    A.      Yes.

8    Q.      What is a pharmacy distribution

9    center?

10   A.      It would be a distri -- a

11   distribution center who sells products to

12   pharmacies.

13   Q.      And what is a cyclic

14   investigation?

15   A.      That would be what we

16   considered cyclic or scheduled

17   investigations, when we go out every so many

18   years to -- to a registrant.

19   Q.      And when you say "when we go

20   out every so many years to a registrant," you

21   mean an investigation like what we were

22   discussing a few moments ago?

23   A.      Yes.

24              MR. JACO:  Objection.

25

```
 1    QUESTIONS BY MS. SWIFT:

 2         Q.     And when you say "go out every

 3    so many years to a registrant," you mean the

 4    diversion investigator's actually going to

 5    the distribution center and conducting an

 6    investigation to make sure they're following

 7    the laws, fair?

 8              MR. JACO:  Objection.  Form.

 9              You can answer.

10              THE WITNESS:  Yes.

11    QUESTIONS BY MS. SWIFT:

12         Q.     And I believe you already

13    testified that the purpose of the cyclic

14    investigations that DEA conducts is to make

15    sure that distributors are following DEA

16    regulations in distributing controlled

17    substances such as opioids; is that fair?

18         A.     Yes.

19         Q.     Is it standard operating

20    procedure at the DEA for the diversion

21    investigator to create a report of the cyclic

22    investigations they conduct?

23         A.     It's a requirement, yes.

24         Q.     Do DEA's investigation reports

25    typically follow a standard format?
```

Highly Confidential - Subject to Further Confidentiality Review

1        A.      Yes.

2        Q.      The DEA's investigation reports

3    typically address a standard set of issues to

4    make sure the DEA investigator is covering

5    each of those issues in the investigation; is

6    that fair?

7                MR. JACO:  Objection.  Form.

8                You can answer.

9                THE WITNESS:  Yes.

10   QUESTIONS BY MS. SWIFT:

11       Q.      Is it a DEA requirement that

12   DEA investigators document certain things

13   when they conduct their investigations?

14       A.      Yes, we have -- that's part of

15   the standard format.

16       Q.      Is one of the goals of the

17   DEA's investigations to try to make sure that

18   pharmacy distributors are following DEA

19   regulations to the letter?

20       A.      It would be to ensure that

21   they're following the regulations.

22       Q.      And DEA wants distributors to

23   do that -- DEA wants distributors to dot

24   every I and cross every T when it comes to

25   following those regulations, right?

```
 1              MR. JACO:  Objection.  Form.

 2              THE WITNESS:  Well, DEA -- the

 3         regulation -- DEA expects the

 4         registrants to follow the regulations

 5         that pertain to them.

 6    QUESTIONS BY MS. SWIFT:

 7         Q.     Does DEA expect distributor

 8    registrants to be in perfect compliance with

 9    DEA regulations?

10         A.     DEA expects that all

11    registrants should be in compliance with the

12    regulations.

13         Q.     Would you agree with me that no

14    distributor is perfect?

15              MR. JACO:  Objection.  Form.

16              THE WITNESS:  I wouldn't agree

17         that that's the correct saying.  I

18         think it depends on what the

19         investigation shows, if they're -- if

20         there are any violations or not.

21    QUESTIONS BY MS. SWIFT:

22         Q.     Would you agree with me that

23    when DEA conducts investigations of

24    distributors, there are often small

25    violations identified?
```

1           MR. JACO:  Objection.  Form.

2           THE WITNESS:  Without

3     knowing -- without seeing every single

4     investigation, it's hard to say.

5  QUESTIONS BY MS. SWIFT:

6     Q.     Is it fair to say that the

7  diversion investigator is going to document

8  violations discovered during an investigation

9  whether they're big or small?

10          MR. JACO:  Objection.  Form.

11          THE WITNESS:  The expectation

12    of DEA would be that.

13  QUESTIONS BY MS. SWIFT:

14    Q.     And sometimes the violations

15  that a diversion investigator identifies

16  during an investigation involves things like

17  records not being filled out exactly the

18  right way; is that fair?

19          MR. JACO:  Objection.  Form.

20          THE WITNESS:  Yes.

21  QUESTIONS BY MS. SWIFT:

22    Q.     When that happens, the

23  investigator documents it, right?

24    A.     That would be DEA's

25  expectation.

1    Q.    And certainly if an

2   investigator identifies a large violation,

3   that's going to be documented as well?

4              MR. JACO:  Objection.  Form.

5              THE WITNESS:  A violation is a

6        violation.

7   QUESTIONS BY MS. SWIFT:

8    Q.    One of the things that DEA

9   regulations require distributors to do is to

10  monitor and report suspicious orders, right?

11   A.    I'm sorry, can you just repeat

12  that?

13   Q.    Sure.

14             One of the things that the DEA

15  regulations require distributors to do is to

16  monitor and report suspicious orders.

17             Is that a true statement?

18   A.    Yes.

19   Q.    The DEA defines -- well, let me

20  ask this question:  Do you know how the DEA

21  defines suspicious order?

22   A.    Well, the DEA -- the

23  regulations say that a registrant has to come

24  up -- figure out their own system to operate

25  and -- but they define a suspicious order to

```
 1    include unusual size, frequency or deviating

 2    substantially from a normal pattern.

 3         Q.    So if a pharmacy orders an

 4    unusually large amount of oxycodone, for

 5    example, from its distributor, depending on

 6    the circumstances, that order might be deemed

 7    suspicious; is that fair?

 8              MR. JACO:  Objection.  Form.

 9         Incomplete hypothetical.

10              THE WITNESS:  It would be on

11         the distributor to decide that.

12    QUESTIONS BY MS. SWIFT:

13         Q.    If the distributor decided that

14    that order was suspicious, it would -- it

15    would at least potentially need to be

16    reported to the DEA.

17              Is that a fair statement?

18              MR. JACO:  Objection.  Form.

19              THE WITNESS:  Yes, it should be

20         reported to DEA.

21    QUESTIONS BY MS. SWIFT:

22         Q.    Many of the -- well, let me

23    take a step back to Exhibit 20, which is the

24    Touhy letter that we talked about a minute

25    ago.
```

Highly Confidential - Subject to Further Confidentiality Review

1                   The documents that are listed

2    in Attachment A, most of those are

3    investigation reports of Walgreens

4    distribution centers, correct?

5         A.     Yes.

6         Q.     Many of those investigation

7    reports -- well, strike that.

8                   Did you review each of those

9    Walgreens investigation reports in

10   preparation for your deposition?

11        A.     Yes.

12        Q.     Many of those Walgreens

13   investigation reports that DEA conducted

14   mentioned suspicious order monitoring and

15   reporting, correct?

16               MR. JACO:  Objection.  Form.

17               THE WITNESS:  Yes.

18   QUESTIONS BY MS. SWIFT:

19        Q.     The DEA looks at a

20   distributor's suspicious order monitoring and

21   reporting when it investigates that

22   distributor's facilities, right?

23               MR. JACO:  Objection.  Form.

24               THE WITNESS:  The investigator

25        would ask the facility what they had

```
 1          in place, what system.
 2   QUESTIONS BY MS. SWIFT:
 3          Q.     And for the good of the public,
 4   DEA wants to make sure that distributors are
 5   complying with the rules on suspicious order
 6   monitoring and reporting, correct?
 7                 MR. JACO:  Objection.  Form.
 8                 THE WITNESS:  It's a
 9          requirement of the federal regulations
10          that they do that.
11   QUESTIONS BY MS. SWIFT:
12          Q.     To do that, do the diversion
13   investigators do things like talk to the
14   company's managers?
15          A.     Diversion investigators would
16   talk with whoever they needed to, whomever
17   they needed to at the company, to answer
18   specific questions.
19          Q.     The diversion investigators
20   would also look at documents, whatever
21   documents they needed to, to answer their
22   questions?
23                 MR. JACO:  Objection.  Form.
24                 THE WITNESS:  Yes.
25
```

```
 1    QUESTIONS BY MS. SWIFT:

 2         Q.    Diversion investigators might

 3    also look at data to determine whether a

 4    distributor has an effective suspicious order

 5    monitoring system in place; is that fair?

 6                   MR. JACO:  Objection.  Form.

 7                   THE WITNESS:  It would

 8         really -- it would depend on the

 9         company and what they were providing,

10         what they were offering as -- as to

11         show what system they had in place.

12    QUESTIONS BY MS. SWIFT:

13         Q.    Is it fair to say that ensuring

14    a distributor has an effective suspicious

15    order monitoring in place is not something

16    that the DEA is going to overlook?

17                   MR. JACO:  Objection.  Form.

18                   THE WITNESS:  The diversion

19         investigator is trained to ensure that

20         the company had a system in place for

21         detecting suspicious orders and

22         thereby preventing diversion.

23    QUESTIONS BY MS. SWIFT:

24         Q.    If the investigator concludes

25    that a distributor is not complying with the
```

1    rules on suspicious order monitoring, the DEA

2    tells the distributor that, right?

3            MR. JACO:  Objection.  Form.

4            THE WITNESS:  If there was no

5        system in place, yes.

6    QUESTIONS BY MS. SWIFT:

7        Q.    What if there was a system in

8    place but the investigator didn't think it

9    was good enough; the investigator would tell

10   the distributor that, right?

11           MR. JACO:  Objection.  Form.

12           THE WITNESS:  No.  The

13       investigator is trained to -- to

14       ensure that there is a system in place

15       as required by the regulations.  The

16       investigator's also trained not to

17       approve nor disapprove the system.

18   QUESTIONS BY MS. SWIFT:

19       Q.    The DEA's investigators, at

20   certain points in time, have asked

21   distributors to change their suspicious order

22   monitoring systems if they didn't think they

23   were sufficient, correct?

24           MR. JACO:  Objection.  Form.

25           THE WITNESS:  Again, only -- a

1          diversion investigator is trained not

2          to comment on a system.  Only the

3          registrant knows their customers, and

4          they're the ones that are required to

5          know whether their system is

6          sufficient to detect suspicious

7          orders.

8     QUESTIONS BY MS. SWIFT:

9          Q.     If you had an issue with a

10    distributor's suspicious order monitoring

11    system, the DEA might send that distributor

12    something called a letter of admonition,

13    right?

14               MR. JACO:  Objection.  Form.

15               THE WITNESS:  If there was --

16          if there was something, clearly they

17          are not having one, yes.

18    QUESTIONS BY MS. SWIFT:

19         Q.     What is a letter of admonition?

20         A.     That is like what we would

21    consider like an administrative follow-up,

22    one of -- we have some administrative tools;

23    that's one of them.  And what it does is it

24    formalizes violations found in the cyclic

25    investigation, and then it points out the

Highly Confidential - Subject to Further Confidentiality Review

1    specific violations of the regulations.

2            And then they -- the registrant

3    has usually about 30 days to respond in

4    writing to DEA as to how they're going to

5    correct those violations.

6        Q.    Is a letter of admonition a

7    relatively standard way to ask a distributor

8    to fix a violation the DEA has identified?

9        A.    That -- that is one of the --

10   one of the tools, and it's usually --

11   probably is a little bit more common, but,

12   yes.

13       Q.    Is it fair to say that often

14   letters of admonition from the DEA lead to no

15   further action?

16            MR. JACO:  Objection.  Form.

17            THE WITNESS:  That's the goal.

18       I can't say for sure whether that's

19       what happens.

20   QUESTIONS BY MS. SWIFT:

21       Q.    You mentioned a couple of times

22   that letters of admonition, that it's one of

23   the tools the DEA has for trying to get

24   distributors to fix violations.

25            What are other tools the DEA

Highly Confidential - Subject to Further Confidentiality Review

```
 1   has to do that?

 2        A.      There's also memorandums of

 3   agreement, civil fines, hearings,

 4   administrative hearings.

 5        Q.      Are all of those things that

 6   you just mentioned, those other tools, more

 7   serious than a letter of admonition?

 8        A.      They're usually considered like

 9   a next step.

10        Q.      Is an order to show cause

11   another tool that the DEA has to try to get

12   distributors to fix violations?

13        A.      I'm sorry, can you repeat that?

14        Q.      Sure.

15                Are you familiar with the term

16   "order to show cause"?

17        A.      Yes.

18        Q.      And is an order to show cause,

19   is that another tool that the DEA has to

20   ensure that registrants are following DEA

21   regulations?

22        A.      Yes, an order to show cause

23   would also be an administrative option.

24        Q.      Is an order to show cause

25   another, like, more -- you referred to the
```

 1    other tools, the memorandums of agreement,

 2    civil fines, administrative hearings, as next

 3    steps after a letter of admonition.

 4              Would you include orders to

 5    show cause in that same category?

 6              MR. JACO:  Objection.  Form.

 7              THE WITNESS:  Yeah, I think my

 8         next step was probably a poor choice.

 9         Sorry.

10              Any of these tools could be

11         used.  It doesn't have to be -- it

12         depends on the severity of the

13         violations.  So a letter of admonition

14         isn't always necessarily first.

15              So when I meant next, you know,

16         they're all tools, so there's not

17         really any right order for them.  It

18         depends on the severity of the

19         violation.

20    QUESTIONS BY MS. SWIFT:

21         Q.    Would you agree with me that

22    the DEA typically uses letters of admonition

23    for less severe violations?

24              MR. JACO:  Objection.  Form.

25              THE WITNESS:  I don't think --

```
 1          a violation is a violation.  We don't

 2          really discuss less severe and more

 3          severe.

 4   QUESTIONS BY MS. SWIFT:

 5          Q.     Okay.  Turning back to

 6   Exhibit 20, the Touhy letter we were talking

 7   about a minute ago, Topic 2 that is listed in

 8   Exhibit 20 is -- on page 2 is the specific

 9   cyclic investigation reports and related

10   documents identified in Attachment A,

11   correct?

12          A.     Yes.

13          Q.     And we spoke about the -- that

14   list of documents a minute ago.  And I

15   believe you testified that the documents --

16   that most of these documents are Walgreens

17   investigation reports put together by the

18   DEA, right?

19          A.     Yes, those were the ones that I

20   reviewed.

21          Q.     These investigation reports

22   involve investigations of three of Walgreens

23   distribution centers, correct?

24          A.     Yes.

25          Q.     They're investigations of
```

1    distribution centers, one in Perrysburg,

2    Ohio, one in Mount Vernon, Illinois, and one

3    in Jupiter, Florida.

4                Is that consistent with your

5    recollection of the reports you reviewed?

6        A.    Yes, that's consistent with my

7    recollection.

8        Q.    Do the investigation reports

9    that you reviewed for your deposition follow

10   the standard format for DEA's cyclic

11   investigation?

12       A.    Yes.

13       Q.    Is it your understanding, based

14   on your experience as a diversion

15   investigator, that those investigation

16   reports of the Walgreens distribution centers

17   were prepared in the ordinary course of

18   business?

19       A.    It looks like they were

20   prepared after going on site for a cyclic

21   investigation.

22       Q.    Is it your understanding that

23   those reports were prepared by the

24   investigators who conducted those

25   investigations?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Yes, that would be my

 2  understanding.

 3          Q.      Okay.  Before the deposition

 4  got started, we talked about a handful of

 5  documents that your lawyer -- well, strike

 6  that.

 7                  Mr. Jaco is -- I don't want to

 8  say with you.

 9                  Is Mr. Jaco representing you

10  for your deposition today?  Is he your

11  lawyer?

12          A.      He's representing not me

13  personally, but on behalf of DEA.

14          Q.      Okay.  Got it.

15                  We talked about the exhibits

16  that Mr. Jaco sent to us on Wednesday that

17  you don't have in your binder but that you

18  have electronically.

19                  Do you recall that?

20          A.      Yes.

21                  (Brennan 30(b)(6) Exhibit 24

22          marked for identification.)

23  QUESTIONS BY MS. SWIFT:

24          Q.      I'm going to ask you about one

25  of them.  It's Exhibit 24.
```

```
 1                    Do you have it?
 2        A.    You want me to open that up
 3   now?
 4        Q.    Please.
 5              Just let me know when you've
 6   got it open.
 7        A.    Okay.  I have it open.
 8        Q.    Okay.  Just to make sure we're
 9   literally on --
10              MR. MOUGEY:  Kate, will you
11        hold on one second?  It's Peter
12        Mougey.  I just want to -- I'm
13        tracking down the docs.
14              When you say 24, Kate, would
15        you give us the Bates numbers to make
16        sure we're using the same one you're
17        using?
18              MS. SWIFT:  Sure thing, Peter.
19        It's US-DEA-00056902.
20              MR. MOUGEY:  Thank you.
21              MS. SWIFT:  Yeah.
22   QUESTIONS BY MS. SWIFT:
23        Q.    And just to make sure we're all
24   on the same page, Ms. Brennan, is your
25   Exhibit 24 a 14-page document with the date
```

```
 1   October 27, 2009, on the top of it?

 2        A.    Yes.

 3        Q.    Did you review this document in

 4   preparing for your deposition today?

 5        A.    Yes.

 6        Q.    Did Exhibit 24 help educate you

 7   on the responsibilities of diversion

 8   investigators when performing cyclic

 9   investigations?

10        A.    It reinforced the -- what we --

11   what we were taught, yes.

12        Q.    The subject line of Exhibit 24

13   is "interim policy for scheduled

14   investigations," correct?

15        A.    Yes.

16        Q.    Then if you'll look with me at

17   the first paragraph of the memo, it says,

18   "The Office of Diversion Control is in the

19   process of rewriting the diversion manual,

20   the purpose of which is to refocus efforts

21   within the program to ensure continued

22   compliance among the registrant population."

23              Correct?

24        A.    Yes.

25        Q.    What is the diversion manual?
```

1      A.      It's the manual for diversion

2    investigators, and it's used as a training

3    tool and -- with a lot of information about

4    the program and investigations and things

5    like that in there.

6      Q.      The second paragraph of this

7    October 27, 2009 memo says, "Until such time

8    as the manual is finalized, the attached

9    interim guidelines will be implemented."

10          Correct?

11     A.      Yes.

12     Q.      Is it your understanding that

13   these guidelines were implemented in October

14   of 2009?

15     A.      Well, it's my understanding

16   this is when it was documented and signed.

17     Q.      This memo that we're talking

18   about says in the first page that it's from

19   Joseph T. Rannazzisi, Deputy Assistant

20   Administrator, Office of Diversion Control,

21   correct?

22     A.      Yes.

23     Q.      Did Mr. Rannazzisi periodically

24   send out interim guidelines like this?

25     A.      Yes.

1          Q.     Did DEA issue interim

2     guidelines like this in order to spell out

3     things that may not have been clear in the

4     diversion manual?

5          A.     No, we usually just gave me

6     some new directives or added some things.

7          Q.     I'm sorry, what was the last

8     thing you said?

9          A.     It usually gave some new

10    directives.

11         Q.     Did interim guidelines like

12    this tend to give new directives that were

13    not included in the diversion manual?

14         A.     More so they just updated

15    guidelines.

16         Q.     When was the new diversion

17    manual finalized?

18                The first paragraph says that

19    they're in the process of rewriting it.

20                Do you know when it was

21    finalized?

22         A.     No, I don't.

23         Q.     Take a look at the next page of

24    Exhibit 24.  It says Attachment 1.

25                Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

1     A.     Yes.

2          Q.     And the first bullet says,

3     "Automation of reports and consolidated

4     orders system, ARCOS, analysis."

5                 Right?

6     A.     Yes.

7          Q.     It says, "A complete and

8     detailed ARCOS analysis will be conducted on

9     every registrant engaged in ARCOS-reportable

10    activity during each scheduled

11    investigation."

12                Right?

13    A.     Yes.

14         Q.     Then it says, "Prior to the

15    on-site portion of an investigation,

16    diversion investigators must access and

17    review ARCOS status and transaction activity

18    as follows."

19                Correct?

20    A.     Yes.

21         Q.     Was that a new directive in

22    October of 2009?

23    A.     No.  We were -- diversion

24    investigators were trained already to look at

25    ARCOS.

1    Q.    So what is there -- what was

2    the purpose of this first bullet if diversion

3    investigators were already trained to do

4    ARCOS reports before an on-site

5    investigation?

6    A.    It really just reinforced it.

7    Q.    Was it to make sure the

8    diversion investigators were actually doing

9    those ARCOS reports before their

10   investigations?

11   A.    I'm not sure of exactly

12   Mr. Rannazzisi's intent, but it did reinforce

13   that.

14   Q.    All right.  Take a look at --

15   well, before we look at the next page, after

16   that -- well, strike that.

17          What is ARCOS?

18   A.    So as it stands for, the

19   Automation Reports Consolidated Order

20   Systems, it's a requirement for manufacturers

21   and distributors to report all Schedule II --

22   IIs and III narcotic sales, and then

23   manufacturers, there's a couple of extra

24   requirements in there for, I think,

25   psychotropic drugs and GHB.

1        Q.      So every Schedule II or

2    Schedule III controlled substance a

3    distributor distributes, they have to report

4    that to the DEA?

5                MR. JACO:  Objection.  Form.

6                THE WITNESS:  Every Schedule II

7        and Schedule III narcotic controlled

8        substance.

9    QUESTIONS BY MS. SWIFT:

10       Q.      Every Schedule II and

11   Schedule III narcotic controlled substance

12   that a distributor sells, they have to report

13   to the DEA's ARCOS system.

14               Is that a fair statement?

15               MR. JACO:  Objection.  Form.

16               THE WITNESS:  Yes.

17   QUESTIONS BY MS. SWIFT:

18       Q.      Then after that first paragraph

19   that we just talked about, the rest of that

20   page is blacked out, correct?

21       A.      Yes.

22       Q.      Do you know whether that was

23   done by the lawyers or somebody else?

24               MR. JACO:  Objection.

25               You can answer, if you know.

Highly Confidential - Subject to Further Confidentiality Review

1            THE WITNESS:  I believe it was

2      the lawyers.

3   QUESTIONS BY MS. SWIFT:

4      Q.     On the next page of Exhibit 24,

5   we see a bullet that says, "Request for

6   validation of ARCOS data."

7            Correct?

8      A.     Yes.

9      Q.     It says, "All ARCOS data to be

10  used in the course of the investigation is

11  required to be validated by ODPT prior to the

12  on-site portion of the investigation."

13           Correct?

14     A.     Yes.

15     Q.     What does ODPT stand for?

16     A.     I'm not sure exactly.  They

17  change up the synonyms for the department,

18  but I believe that was our targeting unit in

19  the Office of Diversion Control at the time.

20     Q.     Was this a new directive in

21  October of 2009?

22     A.     To be validated, my

23  recollection, I believe it was.

24     Q.     The next bullet that we can see

25  says, "Drug theft and loss, DTL, data."

1              Correct?

2        A.      Yes.

3        Q.      What is DTL?

4        A.      That would be drug theft and

5    loss.

6        Q.      Okay.  "Investigators will

7    check drug theft and loss data, DEA forms

8    106, online via the DTL database prior to the

9    on-site visit and determine if there are

10   unexplained losses or any pattern involving

11   theft or loss."

12              Was that a new directive in

13   October of 2009?

14       A.      I don't believe so.

15       Q.      The next bullet says memoranda

16   of agreement, or MOA, and it reads, "The

17   investigator will ascertain whether the

18   subject firm's registration is currently

19   under a memorandum of agreement, either as an

20   individual registrant or as part of a larger

21   corporation that has entered into an MOA."

22              Correct?

23       A.      Yes.

24       Q.      Then it says, "If so, the

25   investigator will thoroughly review the

1    details and conditions of the MOA prior to

2    the on-site portion of the investigation."

3              Correct?

4         A.    Correct.

5         Q.    Was that a new directive in

6    October of 2009?

7         A.    No, I don't believe so.  It

8    just reiterated it, brought it up -- you

9    know, just reiterated if it was under an MOA.

10        Q.    What is an MOA, a memorandum of

11   agreement?

12        A.    That would be after violations

13   are found, that DEA enters into this

14   memorandum.  And the idea is that both

15   parties have agreed, and the registrant

16   agrees to what DEA is asking them to do after

17   the violations were found to keep them in

18   compliance.

19        Q.    What this is saying is that if

20   there -- a company has a memorandum of

21   agreement with the DEA, it's the

22   investigator's job to thoroughly review the

23   details and conditions of that agreement as

24   part of the investigation, correct?

25        A.    That's correct.

```
 1              Q.      The next bullet says

 2      "Suspicious order reporting."

 3              Correct?

 4              A.      Yes.

 5              Q.      And it says, "OD, in

 6      conjunction with CCD, has notified in writing

 7      all distributors of their responsibility to

 8      immediately report all suspicious orders."

 9              Correct?

10              A.      Yes.

11              Q.      What is OD?

12              A.      That would have been Office of

13      Diversion.

14              Q.      And what is CCD?

15              A.      That would be our chief counsel

16      for diversion.

17              Q.      It goes on to say, "A

18      suspicious order is an order which, when

19      received by a registrant and in accordance

20      with 21 CFR 1301.74, the registrant

21      determines to be suspicious."

22              Correct?

23              A.      Yes.

24              Q.      Then it says, "The registrant

25      does not fill the order but reports same to
```

1    their local DEA office.  Excessive purchase

2    reports from registrant, reports of unusual

3    sales, will no longer be accepted by the DEA.

4    Any firm still reporting excessive purchases

5    will be informed of the OD directive and

6    instructed to immediately report suspicious

7    order."

8            Correct?

9    A.      Yes.

10   Q.      Were excessive purchase reports

11   from registrants accepted prior to this

12   period in time?

13   A.      They were accepted, but they

14   were not part of the, you know, obligation to

15   detect a system of a suspicious order.

16   Q.      Was it incumbent upon diversion

17   investigators prior to this time in October

18   of 2009 to make sure that registrants were

19   complying with the suspicious order reporting

20   rules and regulations?

21   A.      That was one of the regulations

22   that DEA -- that diversion investigators are

23   trained to make sure that registrants are in

24   compliance with.

25   Q.      Did the diversion investigators

1  at the DEA follow this guidance that we see

2  here on page 2 of Exhibit 24 with respect to

3  instructing registrants on how to report

4  suspicious orders?

5           MR. JACO:  Objection.  Form.

6           THE WITNESS:  That would have

7      been the expectation.

8  QUESTIONS BY MS. SWIFT:

9      Q.     Do you know whether --

10     A.     About not accepting -- sorry.

11 I was just going to say the expectation would

12 have been to let them know to no longer

13 accept -- you know, that they would no longer

14 be sending excessive purchase reports if

15 that's what they were doing.

16     Q.     Do you know whether that

17 actually happened?

18     A.     No.

19     Q.     Then if you turn with me to

20 page 3 of Exhibit 24, the next bullet says

21 "Due Diligence," correct?

22     A.     Yes.

23     Q.     It says, "Registrant must have

24 established effective controls against

25 diversion of controlled substances in

 1   accordance with 21 USC 823.  DEA will not

 2   approve, certify or assist registrants in

 3   conducting their due diligence

 4   responsibilities, e.g., provide lists or

 5   identify customers to whom they should or

 6   should not sell."

 7            Did the DEA do that prior to

 8   October of 2009, assist registrants in

 9   conducting due diligence?

10       A.    No.

11       Q.    It goes on to say, "It is

12   solely incumbent upon the registrant to know

13   their customers and the potential abuses of

14   the controlled substance products for which

15   they are approved.  A registrant's due

16   diligence process/program should be flexible

17   to adapt to changing trends with respect to

18   diversion."

19            Did I read all of that

20   correctly so far?

21       A.    Yes.

22       Q.    Then it says, "A thorough

23   review of the registrant's due diligence

24   procedures must be documented in the

25   scheduled investigation report."

 1              Was that something that
 2    diversion investigators were supposed to do
 3    prior to 2000 -- October of 2009?
 4         A.    Yeah, we were trained to look
 5    at all that stuff and how they look at their
 6    customers, but this kind of brought it out in
 7    the forefront a little bit more.
 8         Q.    Do you know whether diversion
 9    investigators did conduct thorough reviews of
10    a registrant's due diligence procedures prior
11    to October of 2009?
12         A.    I can't say for sure.
13         Q.    You can put that one aside.
14              All right.  Now I'd like to
15    turn to some of the reports of the Walgreens
16    investigations that you reviewed for your
17    deposition.
18              Just looking at the time, we've
19    been going not quite an hour.  I'm happy to
20    keep going, or if you'd like to take a
21    break -- I should have said at the beginning,
22    if you need a break at any point, please feel
23    free to speak up.  But it's up to you and
24    your counsel.  I'm happy to keep going.
25         A.    I'm fine.

```
 1                 (Brennan 30(b)(6) Exhibit 6

 2        marked for identification.)

 3   QUESTIONS BY MS. SWIFT:

 4        Q.     Turn, if you would, please, to

 5   Exhibit 6.

 6                 Do you have that one in front

 7   of you?

 8        A.     Yes.

 9        Q.     Exhibit 6 is a letter from the

10   DEA to a Mr. Todd Polarolo at a Walgreens

11   distribution center in Perrysburg, Ohio,

12   correct?

13                 MR. JACO:  Objection.  Form.

14        Foundation.

15                 You can answer.

16                 THE WITNESS:  Yes, that's what

17        it says.

18   QUESTIONS BY MS. SWIFT:

19        Q.     And you can see from the

20   signature at the end of the letter that it's

21   from Robert Corso, special agent in charge,

22   Detroit field division?

23        A.     That appears to be so.

24                 I'd like to point out, though,

25   that this document DEA was not able to
```

1    produce from its own records.

2        Q.    It's one of the documents that

3    you reviewed in preparation for your

4    deposition today, correct?

5        A.    Yes.

6        Q.    Do you know Mr. Corso or

7    Mr. Polarolo?

8        A.    I do not.  I know them to be,

9    obviously from the letter, that, you know,

10   that this is special agent in charge at the

11   time.

12       Q.    You haven't spoken to either

13   one of them, though?

14       A.    No.

15       Q.    This May 17, 2006 letter, would

16   you agree with me that this is a letter of

17   admonition?

18            MR. JACO:  Objection.  Form.

19   QUESTIONS BY MS. SWIFT:

20       Q.    If you know.

21       A.    It appears to be.

22       Q.    This letter marked as Exhibit 6

23   from the DEA, it says in the first paragraph

24   that "DEA completed a regulatory

25   investigation of Walgreens in March of 2006,"

1    correct?

2        A.    Yes.  I'd like to point out

3    again, though, that you said from DEA.  It's

4    not a DEA exhibit.  It did not come -- be

5    produced by DEA.

6        Q.    And to be clear, when I'm

7    saying "the letter came from DEA," what I

8    mean is that it's a letter that was written

9    by a DEA agent and sent to Walgreens.

10            Do you agree with that?

11       A.    I agree that it was signed by a

12   DEA agent.

13       Q.    Okay.  Would you agree with me

14   that the first paragraph refers to a

15   March 2006 DEA investigation of Walgreens'

16   Perrysburg distribution center?

17            MR. MOUGEY:  Objection.  Form.

18            You can answer.

19            THE WITNESS:  Yes.

20   QUESTIONS BY MS. SWIFT:

21       Q.    We, Walgreens, don't have that

22   investigation report, and I under -- I will

23   represent to you that my understanding is

24   that the DOJ lawyers who helped us get ready

25   for this deposition, meaning negotiating the

Highly Confidential - Subject to Further Confidentiality Review

1   date and time and what you were going to be

2   authorized to talk about, they told us that

3   they haven't been able to find that

4   investigation report.

5            My question for you is whether,

6   in the course of your preparation, did you

7   have an opportunity to look for the

8   March 2006 investigation report of the

9   Perrysburg distribution center?

10       A.    No, I was not involved in

11  searching for any of the records.

12       Q.    Have you seen the March 2006

13  investigation report of the Perrysburg DC?

14       A.    No, I have not.

15       Q.    Okay.  This May 2006 letter, it

16  says -- I'm still in the first paragraph --

17  says that "the March 2006 investigation

18  revealed recordkeeping inadequacies and

19  security deficiencies."

20            Do you see that?

21       A.    Yes.

22       Q.    And then it says, "The

23  discrepancies noted are as follows," and it

24  lists ten things.

25            Right?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Yes.

2          Q.     The first discrepancy

3     identified relates to suspicious order

4     reporting, correct?

5          A.     Yes.

6          Q.     That paragraph number 1 on the

7     first page says, "The formulation utilized by

8     the firm for reporting suspicious ordering of

9     controlled substances was insufficient."

10               Right?

11         A.     Yes.

12         Q.     Then it goes on to explain the

13    system for suspicious order reporting that

14    Walgreens was using at that period in time,

15    and it says it involved groupings of 25

16    customers, based on the number of

17    prescriptions filled by each customer, and

18    that ultimately the firm calculated the

19    average order per item of each controlled

20    substance and multiplied that figure by 3.

21               Is that a fair summary?

22               MR. JACO:  Objection.

23    Misstates the document.

24    QUESTIONS BY MS. SWIFT:

25         Q.     If you think I misstated it,

1    please, by all means, correct me,

2    Ms. Brennan.  Not my intent.

3          A.     Yes.  Where you said that

4    they -- based on the number of prescriptions,

5    it was the number of noncontrolled and

6    controlled substance prescriptions.

7          Q.     Okay.  But in general what it's

8    saying is that what Walgreens was doing in

9    March of 2006 was grouping customers in

10   groups of 25 based on the number of both

11   noncontrolled and controlled substance

12   prescriptions, and then they calculated an

13   average order and multiplied that average

14   number by 3.

15             Is that fair?

16             MR. JACO:  Objection.  Form.

17   QUESTIONS BY MS. SWIFT:

18         Q.     I'm sorry, I didn't hear your

19   answer.

20         A.     That's -- that's what it

21   appears they're describing.

22         Q.     And then it says Walgreens

23   would use that average multiplied by 3 as a

24   base to report suspicious orders above such

25   figure, correct?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      Yes.

2      Q.      That's all the letter says

3  about Walgreens' system for reporting

4  suspicious orders as it existed in 2006,

5  correct?

6      A.      That's what this letter is

7  documenting.  I don't --

8      Q.      This 2006 DEA letter does not

9  explain what DEA thought was wrong with

10  Walgreens' suspicious order reporting system,

11  correct?

12              MR. JACO:  Objection.  Form.

13              THE WITNESS:  Based on my

14         knowledge, the fact that it's talking

15         about noncontrolled and then it says

16         that it's not disclosing suspicious

17         orders of controlled substances.

18  QUESTIONS BY MS. SWIFT:

19      Q.      Next -- well, strike that.

20              Is there anything else that you

21  believe this letter is saying, here's why DEA

22  thinks your suspicious order monitoring

23  system is not sufficient for controlled

24  substance?

25              MR. JACO:  Objection.  Form.

```
 1                   THE WITNESS:  Yeah, I think --
 2           based on my opinion, they don't have a
 3           clear system for identifying
 4           controlled substances.
 5   QUESTIONS BY MS. SWIFT:
 6           Q.     It's a fact that the system
 7   included noncontrolled and controlled
 8   substance prescriptions in the calculation of
 9   the average.
10                   Am I understanding you
11   correctly?
12           A.     Yes, that would be my
13   understanding on reading this.
14           Q.     The next paragraph says,
15   "Section 1301.74(b) of Title 21 of the Code
16   of Federal Regulations requires the
17   registrant to design and operate a system to
18   disclose to the registrant suspicious orders
19   of controlled substances and inform DEA of
20   suspicious orders."
21                   That's the regulation we
22   discussed earlier, correct?
23           A.     Yes.
24           Q.     And that is all this DEA letter
25   says about what Walgreens is supposed to do
```

Highly Confidential - Subject to Further Confidentiality Review

1  to monitor and report suspicious orders,

2  correct?

3  　　　　　MR. JACO:  Objection.  Form.

4  　　　　　THE WITNESS:  Yes.

5  QUESTIONS BY MS. SWIFT:

6  　　Q.　　None of the other listed

7  Items 2 through 10 in this letter from

8  May 2006 relate to suspicious order

9  monitoring or suspicious order reporting of

10 controlled substances, correct?

11 　　　　　MR. JACO:  Objection.  Form.

12 　　　　　THE WITNESS:  There was -- I'm

13 　　sorry, repeat the question, please.

14 QUESTIONS BY MS. SWIFT:

15 　　Q.　　Sure.

16 　　　　　None of the other listed items

17 in this letter, Items 2 through 10, none of

18 those relate to the suspicious order

19 monitoring or suspicious order reporting of

20 controlled substances, right?

21 　　A.　　That's correct.

22 　　　　　MR. JACO:  Same objection.

23 QUESTIONS BY MS. SWIFT:

24 　　Q.　　The second item relates to a

25 regulation with the number 1301.74(e),

1  correct?

2       A.    Yes.

3       Q.    And it says that Walgreens was

4  using shipping containers that indicated they

5  were carrying controlled substances, and

6  that's something that a distributor is not

7  supposed to do; is that fair?

8              MR. JACO:  Objection.  Form.

9              THE WITNESS:  You're supposed

10        to write "employee" -- where it says

11        "have precautions to guard against

12        storage or in-transit losses."

13  QUESTIONS BY MS. SWIFT:

14       Q.    That doesn't have anything to

15  do with suspicious order monitoring, right?

16       A.    No, it does not.

17              MR. JACO:  Objection.  Form.

18  QUESTIONS BY MS. SWIFT:

19       Q.    The third item in the May 2006

20  letter is about where Walgreens stored its

21  purchase records, correct?

22       A.    That's correct.

23       Q.    It says, "Such records were

24  stored at the company's headquarters in

25  Deerfield instead of at the registered

1    location," meaning the distribution center,

2    right?

3              Walgreens hadn't notified DEA

4    of its intent for central recordkeeping?

5         A.    Yes, that's what that appears

6    to be.

7         Q.    Then the fourth item says that

8    "Walgreens' biannual inventory failed to

9    indicate whether it was taken at the

10   beginning or close of business."

11             This literally relates to the

12   time of day when Walgreens took its

13   inventory; is that right?

14        A.    Yes, that's correct.

15        Q.    That has nothing to do with

16   suspicious order monitoring, right?

17             MR. JACO:  Objection.  Form.

18             THE WITNESS:  No.

19   QUESTIONS BY MS. SWIFT:

20        Q.    No, it's not right or, no, it

21   has nothing to do with suspicious order

22   monitoring?

23        A.    No, that doesn't have anything

24   to do with suspicious order monitoring.

25        Q.    The fifth item says, "Walgreens

1    inaccurately recorded a loss in transit as a

2    distribution, leading to an accountability

3    error."

4              That doesn't have anything to

5    do with suspicious order monitoring either,

6    correct?

7              MR. JACO:  Objection to form.

8              THE WITNESS:  Yes, that has to

9         deal with recordkeeping.

10   QUESTIONS BY MS. SWIFT:

11        Q.    And the sixth item says

12   "Walgreens' maintenance of purchase records

13   was inadequate and that various pieces of

14   information were missing from the records."

15             That doesn't have anything to

16   do with suspicious order monitoring, correct?

17             MR. JACO:  Objection.  Form.

18             THE WITNESS:  Yes, that's

19        correct.

20   QUESTIONS BY MS. SWIFT:

21        Q.    And then Items 7 through 10 all

22   relate to List I chemicals as opposed to

23   controlled substances, correct?

24        A.    Yes, that's correct.

25        Q.    What is a List I chemical?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      List I chemicals are basically

 2    deemed to be like essential chemicals needed

 3    to produce methamphetamine and some other

 4    illegal substances.

 5              Q.      Is Sudafed an example of a

 6    List I chemical?

 7              A.      Pseudoephedrine, yes.

 8              Q.      And I'm specifically referring

 9    to the brand name Sudafed that you can buy

10    over the counter at the store.

11              A.      That would be one of them.

12              Q.      List I chemicals are different

13    from controlled substances like opioids,

14    correct?

15              A.      Yes, it's correct.

16              Q.      None of Items 7 through 10 have

17    anything to do with suspicious order

18    monitoring of controlled substances, correct?

19              A.      This appears that they're

20    talking about List I chemicals on 7

21    through 10.

22              Q.      For each of those items, these

23    ten items in this letter, the letter

24    identifies the regulation that DEA said

25    Walgreens had deviated from, correct?
```

1      A.     Yes, it appears that way.

2      Q.     And then on page 3 of the

3   letter it says, "This letter is formal

4   notification," and it's towards -- towards

5   the bottom of page 3.

6             Are you with me?

7      A.     Yes.

8      Q.     It says, "This letter is formal

9   notification that your failure to maintain

10  adequate records and security for controlled

11  substances and List I chemicals constitutes

12  violations of the Controlled Substances Act."

13            Correct?

14     A.     Yes.

15     Q.     Then it says, "At this time you

16  are being afforded the opportunity to comply

17  with the requirements of the Controlled

18  Substances Act which were outlined by the

19  diversion investigators with the management

20  of your firm in March of 2006."

21            Correct?

22     A.     Yes.

23     Q.     Does that mean that if

24  Walgreens complies as DEA has asked it to do,

25  that the expectation is that DEA will take no

```
 1    further action?
 2                 MR. MOUGEY:  Objection.  Form.
 3                 THE WITNESS:  On this specific
 4         time, I can't think they wouldn't
 5         take, but that's the opportunity for
 6         them to comply, yes.
 7    QUESTIONS BY MS. SWIFT:
 8         Q.    When DEA takes no further
 9    action in response to a letter of admonition
10    like this one, does that mean the DEA has
11    concluded that the distributor has come into
12    compliance?
13                 MR. JACO:  Objection.  Form.
14                 THE WITNESS:  So if they
15         respond satisfactorily, then that
16         would be -- but again, this would be
17         looked at.  It's only until -- if
18         violations are found or the next, you
19         know, on-site.
20    QUESTIONS BY MS. SWIFT:
21         Q.    Then asked Walgreens to inform
22    DEA of actions planned or taken to correct
23    these violations within 30 days, correct?
24         A.    Yes.
25         Q.    Then it says, "If you have any
```

Highly Confidential - Subject to Further Confidentiality Review

 1   questions, contact acting group supervisor

 2   Barbara Dobric."

 3              Correct?

 4      A.     Yes.

 5              (Brennan 30(b)(6) Exhibit 8

 6      marked for identification.)

 7   QUESTIONS BY MS. SWIFT:

 8      Q.     All right.  Now I'd like for

 9   you to turn to Exhibit 8 in your binder,

10   please.

11              Exhibit 8 is a July 28, 2006

12   letter to Barbara K. Dobric at the DEA from

13   Walgreens.  It looks like it's a lawyer,

14   Dwayne Piñon.

15              Correct?

16      A.     Yes.

17      Q.     All right.  The first paragraph

18   of this letter to Ms. Dobric -- well, strike

19   that.

20              July 28, 2006, this is just a

21   couple of months after the May 2006 letter we

22   were just looking at, correct?

23      A.     Yes.

24      Q.     The first paragraph of the

25   letter to Ms. Dobric says, "In furtherance of

1   our recent telephone conversations, please

2   accept the following responses to the issues

3   identified during the March 2006 regulatory

4   investigation of the above-referenced

5   facility," and that facility is the Walgreens

6   distribution center in Perrysburg, Ohio.

7            Do you see that?

8       A.    Yes.  And again, I'd like to

9   point out that the DEA was not able to

10  produce this document from its files.

11      Q.    I understand that.

12            Are you taking issue with the

13  fact that Walgreens sent this letter to DEA

14  or just pointing out that you couldn't find

15  it in your files?

16      A.    Just that it appears that this

17  is a letter, but since it wasn't in our

18  files, I can't say for sure that it was a

19  response letter.

20      Q.    Okay.  This letter suggests

21  that Walgreens has already talked to

22  Ms. Dobric on the phone about these issues,

23  correct?

24      A.    Yes.  According this letter, it

25  makes reference to that.

1      Q.     You recall that the May 2006

2  DEA letter we looked at specifically said if

3  you have questions about any of this, call

4  Ms. Dobric, right?

5      A.     Yes.

6      Q.     And then Walgreens followed up

7  with this written response to Ms. Dobric,

8  correct?

9      A.     That's what it appears to be,

10  yes.

11      Q.     This is what a registrant is

12  supposed to do in response to a letter of

13  admonition, correct?  Inform the DEA of the

14  actions planned or taken to correct any

15  violations identified during an

16  investigation?

17              MR. JACO:  Objection.  Form.

18              THE WITNESS:  Yes, that's the

19         expectation, and it is also stated in

20         the previous letter that we looked at.

21  QUESTIONS BY MS. SWIFT:

22      Q.     The Walgreens letter to

23  Ms. Dobric addresses all ten discrepancies

24  that were identified in the May 2006 DEA

25  letter, correct?

1          A.     Yes, it appears that they did.

2          Q.     The first numbered paragraph of

3    Walgreens' letter to Ms. Dobric has a heading

4    "Controlled Substance Suspicious Orders,"

5    correct?

6          A.     Yes.

7          Q.     It says, "Walgreens is

8    currently pursuing the necessary programming

9    to modify this formula in accordance with the

10   voluntary formula listed in Appendix E-3 of

11   the DEA Chemical Handler's Manual.  Walgreens

12   expects that these programming changes will

13   be completed and implemented within the next

14   six months."

15                Correct?

16        A.     Yes.

17        Q.     Do you have an understanding of

18   what Appendix E-3 of the DEA Chemical

19   Handler's Manual is?

20        A.     Yes.

21                (Brennan 30(b)(6) Exhibit 3

22        marked for identification.)

23   QUESTIONS BY MS. SWIFT:

24        Q.     Turn, if you would, please,

25   Ms. Brennan, to Exhibit 3.

1                    Exhibit 3, does it appear to

2     you to be Appendix E-3 of DEA's Chemical

3     Handler's Manual dated January 2004?

4          A.    Yes.

5          Q.    And the heading says,

6     "Suspicious Order Reporting System for Use in

7     Automated Tracking System," correct?

8          A.    Yes.

9          Q.    And then the first paragraph

10    says that this is a voluntary formula for use

11    by distributors to wholesale and resale

12    levels?

13         A.    Yes.

14         Q.    The Appendix E-3 says that this

15    formula calculates the quantity which, if

16    exceeded in one month, may be considered

17    excessive or suspicious and therefore require

18    reporting to DEA, correct?

19         A.    Yes.

20         Q.    And then it walks through a

21    five-step process for applying this formula,

22    correct?

23         A.    Yes.

24         Q.    That process involves

25    calculating an average order size, would you

Highly Confidential - Subject to Further Confidentiality Review

1    agree with me?

2              MR. JACO:  Objection.  Form.

3    QUESTIONS BY MS. SWIFT:

4         Q.    That's steps 1 through 3?

5         A.    Yeah, they're definitely giving

6    a calculation.

7         Q.    And then in step 4, it talks

8    about multiplying that average by a factor to

9    give the maximum amount that a customer can

10   order per month before showing up on the

11   suspicious order report, correct?

12        A.    Yes.

13        Q.    It says the factor equals 3 for

14   C-II and C-III controlled substances

15   containing List I chemicals, and 8 for C-III,

16   IV and V controlled substances and

17   noncontrolled OTC products containing List I

18   chemical items, correct?

19        A.    Yes.

20        Q.    Then step 5 says, "At the end

21   of each month, a report will be transmitted

22   to DEA, separate reports for List I and

23   controlled substances, of all purchases of

24   these drugs by any customer whose purchase

25   quantities exceed the parameters above any

1    two consecutive months or in three of any

2    moving six-month period."

3            Correct?

4        A.    Yes.

5        Q.    Then the final thing that

6    Appendix E-3 of the Chemical Handler's Manual

7    says is that "using a computer to do all of

8    this for high-volume transaction business

9    activities is the only viable, cost-effective

10   methodology for the reporting of orders that

11   may be considered excessive or suspicious,"

12   correct?

13       A.    Yes.

14       Q.    This is the formula that

15   Walgreens told DEA it was implementing for

16   its controlled substance suspicious order

17   monitoring in the July 2006 letter to

18   Ms. Dobric, correct?

19            MR. JACO:  Objection.  Form.

20            THE WITNESS:  Yes, that's what

21       it appears they were.

22   QUESTIONS BY MS. SWIFT:

23       Q.    This is the formula, the

24   Appendix E-3 suspicious order reporting

25   formula, this is what Walgreens told DEA it

1    was doing in response to DEA's 2006 letter of

2    admonition saying that Walgreens' suspicious

3    order monitoring system was insufficient,

4    correct?

5              MR. JACO:  Objection.  Form.

6              THE WITNESS:  That appears

7         that's what they told DEA.

8              (Brennan 30(b)(6) Exhibit 9

9         marked for identification.)

10   QUESTIONS BY MS. SWIFT:

11        Q.    Okay.  Turn, if you would,

12   please, to Exhibit 9.

13        A.    Okay.

14        Q.    Is Exhibit 9 a May 18, 2009

15   investigation report of the Perrysburg

16   distribution center, Walgreens' Perrysburg,

17   Ohio, distribution center?

18        A.    Yes.

19        Q.    You see the synopsis on page 1

20   says, "On April 28, 2009, diversion

21   investigators Jackie Honoway and Paula Albert

22   initiated an in-depth regulatory

23   investigation at Walgreen Company in

24   Perrysburg, Ohio," and it gives the DEA

25   registration number.  "This investigation was

1    initiated in accordance with the Detroit

2    divisional office, fiscal year regulatory

3    work plan for 2009."

4                Did I read that basically

5    correctly?

6        A.      Yes.

7        Q.      In your review for the

8    deposition, did you conclude that this report

9    was written according to DEA's standard

10   format for site investigations?

11       A.      I would say for the most part

12   it followed.

13       Q.      I'd like you to turn to page 5

14   of the 2009 Perrysburg report, please.

15                You see the section that starts

16   "firm's history with DEA"?

17       A.      Yes.

18       Q.      And then it provides

19   essentially that, a history of earlier

20   investigations, correct?  And other

21   information?

22       A.      Yes.

23                MR. JACO:  Objection.  Form.

24   QUESTIONS BY MS. SWIFT:

25       Q.      And then turn, if you would, to

 1    page 6, still within the history with DEA

 2    section.

 3              Do you see at the top of page 6

 4    it says, "In-depth regulatory investigation

 5    completed in February 2006.  This

 6    investigation resulted in a letter of

 7    admonition, citing the following violations."

 8    And the first one listed is under "controlled

 9    substances suspicious ordering system

10    inadequate," correct?

11         A.    Yes.

12         Q.    And then it also lists the

13    other violations that were addressed in the

14    DEA's letter of admonition and Walgreens

15    response that we looked at earlier this

16    morning, correct?

17              MR. JACO:  Objection.  Form.

18              THE WITNESS:  Yes.

19    QUESTIONS BY MS. SWIFT:

20         Q.    And then further down on

21    page 6, the paragraph marked number 3 says,

22    "In May 2006, a letter of admonition was

23    issued for the aforementioned violations, and

24    in a letter dated July 28, 2006, Walgreens

25    responded to the noted violations and advised

Highly Confidential - Subject to Further Confidentiality Review

 1    that corrective measures would be taken."

 2               Correct?

 3         A.    Yes.

 4         Q.    Again, that's a reference to

 5    the May 2006 letter of admonition that we

 6    just looked at and the July 28, 2006

 7    Walgreens letter to Ms. Dobric responding to

 8    that letter of admonition, correct?

 9               MR. JACO:  Objection.  Form.

10               THE WITNESS:  Yes, it would

11         appear that that is a reference to

12         those letters that DEA was unable to

13         find.

14    QUESTIONS BY MS. SWIFT:

15         Q.    And then if you would turn,

16    please, to page 15.  There's a section

17    towards the bottom of page 15 that says

18    "List I Chemicals."

19               Do you see that?

20         A.    Yes.

21         Q.    Again, List I chemicals are

22    drugs like Sudafed.  They're not controlled

23    substances like opioids, right?

24         A.    Correct.

25         Q.    The first paragraph under that

Highly Confidential - Subject to Further Confidentiality Review

 1    heading references a Steve Kneller and says

 2    that he is the distribution center manager,

 3    correct?

 4         A.    Yes.

 5         Q.    Then if you would turn to

 6    page 16, please.

 7               The paragraph marked number 3

 8    says that Mr. Kneller, Walgreens'

 9    distribution center manager, explained to the

10    diversion investigator that Walgreens was

11    using the Chemical Handler's Manual for

12    List I suspicious order monitoring, correct?

13               MR. JACO:  Objection.  Form.

14               THE WITNESS:  Yes.

15    QUESTIONS BY MS. SWIFT:

16         Q.    In the middle of that

17    paragraph, the report notes, quote,

18    "Suspicious orders were unable to be

19    determined due to the lack of milligram

20    strength of List I chemical products not

21    being identified."

22               Correct?

23         A.    Yes.

24         Q.    That qualifies as a violation

25    of the DEA rules; is that true?

1           A.      That would be according to the

2    regulations of -- for the Chemical Handler's

3    Manual on how to -- and for chemical handlers

4    on how to help identify and stay in the

5    regulations.

6           Q.      So the diversion investigator

7    is documenting it here, right?

8           A.      Yes.

9           Q.      If you look with me, please, on

10   page 17, do you see the section that says

11   "Suspicious Orders" towards the bottom of the

12   page?

13          A.      Yes.

14          Q.      It says that "Mr. Kneller also

15   explained that Walgreens follows the Chemical

16   Handler's Manual, Appendix 3, for determining

17   suspicious orders of controlled substances."

18               Do you see that?

19               MR. JACO:  Objection.  Form.

20        Misstates the document.

21   QUESTIONS BY MS. SWIFT:

22          Q.      Do you see where it says

23   "controlled substances" in that first bullet?

24          A.      Yes, I see that in the first

25   bullet.

1        Q.      Would you agree with me that

2    Mr. Kneller is explaining here that Walgreens

3    followed the Chemical Handler's Manual,

4    Appendix 3, for determining suspicious orders

5    of controlled substances?

6                MR. JACO:  Objection.  Form.

7                THE WITNESS:  It appears that

8         that's what he's explaining.

9    QUESTIONS BY MS. SWIFT:

10       Q.      This DEA report does not note

11   any problems with Walgreens using the

12   Chemical Handler's Manual for determining

13   suspicious orders of controlled substances,

14   correct?

15               MR. JACO:  Objection.  Form.

16               THE WITNESS:  That would be in

17        line with a diversion investigator's

18        training, to neither approve nor

19        disapprove, just to see that there is

20        a system in place.

21   QUESTIONS BY MS. SWIFT:

22       Q.      On page 18, paragraph number 2,

23   it says, "Mr. Kneller doesn't know what

24   measures the corporate office takes to

25   investigate suspicious orders, and that that

 1    process is currently under review."

 2              Correct?

 3         A.      Yes.

 4         Q.      The report does not note any

 5    issues or problems with that, correct?

 6              MR. JACO:  Objection.  Form.

 7              THE WITNESS:  Yeah, they're

 8         just -- the report is stating the

 9         fact.

10    QUESTIONS BY MS. SWIFT:

11         Q.      In the next paragraph,

12    number 3, the report states, "The most

13    current suspicious order report was received

14    by the Detroit DO on April 6, 2009.  The

15    report listed all suspicious sales

16    originating from the distribution center to

17    all Walgreens stores they service."

18              The report doesn't note any

19    issues or problems with this suspicious order

20    report here, correct?

21              MR. JACO:  Objection to form.

22              THE WITNESS:  Right.  That

23         would be consistent with DI's training

24         with not to approve or disapprove.

25

1   QUESTIONS BY MS. SWIFT:

2          Q.      And then on page 19 at the

3   bottom of the page, do you see Item Number 4

4   that notes "the problem with the C-II vault,

5   the day gate not closing properly"?

6                  Sorry, it's not the vault, it's

7   the gate.  Let me strike the question and ask

8   it again.

9                  Do you see at the bottom of

10  page 19 where the DEA has noted that "the

11  large day gate is equipped with a

12  self-closing, self-locking device, and the

13  investigators found the bottom of the day

14  gate did not close completely, allowing

15  access to the vault through the lower portion

16  of the day gate"?

17         A.      Yes.

18         Q.      Okay.  Then if you turn to the

19  very bottom of page 23 of this same report,

20  you see the heading that says "Discussion

21  with Management"?

22         A.      Yes.

23         Q.      And then it carries over to 24

24  and says, "Diversion Investigators Honoway

25  and GS" --

 1                    Is that group supervisor

 2    Francis?

 3           A.     Yes, GS would stand for group

 4    supervisor.

 5           Q.     That Ms. Honoway and

 6    Ms. Francis met with Mr. Kneller and Justin

 7    Joseph and Jeremy Willis, all in Walgreens

 8    management, correct?

 9           A.     I don't know if they're all

10    with management.  It appears they're all

11    employees of Walgreens.

12           Q.     Got it.  Yes.

13                    It says that they held a

14    management -- the DI and the GS held a

15    management discussion with those three

16    employees of Walgreens, correct?

17                    MR. JACO:  Objection.

18           Misstates the document.

19    QUESTIONS BY MS. SWIFT:

20           Q.     The report says that GI Honoway

21    and GI -- sorry.

22                    The report says that DI Honoway

23    and GS Francis talked to Mr. Kneller, Justin

24    Joseph and Jeremy Willis, correct?

25           A.     Yes.

 1          Q.     And then paragraph 2 summarizes

 2    issues that were noted but that Walgreens had

 3    already corrected, so they were not cited as

 4    violations.  And it includes -- that includes

 5    providing more effective measures to thefts

 6    and losses during shipping through a common

 7    carrier, correct?

 8          A.     Yes.

 9          Q.     Then paragraph 3 notes a couple

10    of recordkeeping violations, including 222

11    forms not being completed properly, correct?

12          A.     Yes.

13          Q.     It says the date was not

14    accurately identified on the 222 forms?

15          A.     For items not received, and

16    also the dates items were shipped was not

17    accurately identified.

18          Q.     Then in paragraph 4, it notes

19    violations pertaining to List I chemicals

20    that were previously cited during the

21    in-depth regulatory investigation in 2006,

22    correct?

23          A.     I'm sorry, could you repeat?

24    You froze up there when you started the

25    question.

1        Q.      Sure.

2                I'm looking at paragraph 4 on

3        page 24, and it notes that the following

4        violations pertaining to List I chemicals

5        were previously cited during the in-depth

6        regulatory investigation in 2006, correct?

7        A.      Yes.

8        Q.      And it says, again, List I

9        chemicals.  Those are things like Sudafed.

10       They do not include opioids, right?

11       A.      They're not considered to be

12       controlled substances.

13       Q.      Okay.  One of the violations

14       listed with respect to the List I chemicals

15       is -- relates to identification of suspicious

16       orders, correct?

17       A.      One of the items does, yes.

18       Q.      Then on page 25, paragraph

19       number 5 says -- well, strike that.

20               The paragraph 4 notes that

21       these are List I chemical violations that

22       were previously cited and haven't yet been

23       corrected, according to DEA, right?

24       A.      Yes.

25       Q.      And then on page 25, on

Highly Confidential - Subject to Further Confidentiality Review

1    paragraph 5 it states that Mr. Joseph tried

2    to address the referenced List I chemical

3    violations by showing records on a large

4    computer screen but did not provide

5    printouts.

6            As of the date of the report,

7    it says that no additional records have been

8    provided to satisfy the List I chemical

9    violations, correct?

10        A.    Yes.

11        Q.    And the conclusion says that

12   the DEA is going to send another letter of

13   admonition, correct?

14        A.    Yes.

15        Q.    This 2009 DEA investigation

16   report of Walgreens' Perrysburg distribution

17   center does not note any violations relating

18   to suspicious orders of controlled substances

19   such as opioids, correct?

20        A.    Correct.

21        Q.    It does note violations

22   relating to other issues that the DI

23   discovered during the investigation and

24   documented in the report, correct?

25        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     Turn, if you would, please, to
 2    Exhibit 10.
 3               MR. JACO:  Kate, just jumping
 4          in.  We've been going for about an
 5          hour and a half.
 6               Are you close to a good
 7          breaking point?
 8               MS. SWIFT:  This would be a
 9          great breaking point if you guys want
10          to take five or ten minutes.
11               MR. JACO:  Yeah, let's take --
12          let's -- I'm fine with five minutes.
13               Claire, is that okay with you?
14               THE WITNESS:  Yes.
15               MR. MOUGEY:  If we could do
16          ten, that would be great.  This is
17          Peter.  If we could start back at 5
18          till, that would be great.
19               VIDEOGRAPHER:  Going off the
20          record.  The time is 11:44.
21           (Off the record at 11:44 a.m.)
22               VIDEOGRAPHER:  We are going
23          back on the record.  The time is
24          11:57.
25               (Brennan 30(b)(6) Exhibit 10
```

 1          marked for identification.)

 2     QUESTIONS BY MS. SWIFT:

 3          Q.     Welcome back, Ms. Brennan.

 4                 I think I had just asked you to

 5     turn to Exhibit 10 before we went off the

 6     record.

 7                 Do you have that in front of

 8     you?

 9          A.     Yes.

10          Q.     Exhibit 10 is a July 28, 2009

11     letter from Mr. Kneller at Walgreens to

12     Mr. Corso at the DEA, correct?

13          A.     Yes, it's -- sorry, that's what

14     it appears to be.

15          Q.     Mr. Kneller is the Walgreens

16     distribution center manager who was discussed

17     in the previous investigation report that we

18     looked at from May of 2009, correct?

19          A.     Yes, Mr. Kneller was mentioned

20     in that report.  This one also was not able

21     to be produced by DEA from our records.

22          Q.     And in this July 2009 letter,

23     Mr. Kneller states that he is responding to a

24     June 25th letter of admonition, correct?

25                 MR. JACO:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

1    QUESTIONS BY MS. SWIFT:

2         Q.    Let me reask it.

3              The first paragraph of

4    Mr. Kneller's letter said, "This letter is in

5    response to your June 25, 2009 correspondence

6    regarding the above-referenced facility."

7              And that facility is the

8    Perrysburg, Ohio, distribution center.

9              Do you see that?

10   A.    Yes.

11        Q.    Mr. Kneller says to the DEA in

12   this letter that Walgreens appreciates the

13   opportunity to comply with the Controlled

14   Substances Act requirements and then

15   describes remedial actions that Walgreens has

16   taken to correct certain alleged violations,

17   correct?

18   A.    Yes.

19        Q.    Then Section 1 of the letter

20   relates to controlled substances.

21              Do you see that?

22   A.    Yes.

23        Q.    Mr. Kneller notes two issues,

24   and Walgreens responds to each of those

25   issues.

Highly Confidential - Subject to Further Confidentiality Review

1              Do you see that?

2       A.     Yes.

3       Q.     One of the issues relates to

4  the proper completion of 222 forms, and the

5  other relates to the day gate and the

6  Schedule II vault not being self-closing and

7  self-locking, correct?

8       A.     Yes.

9       Q.     These are the same two issues

10 relating to controlled substances that were

11 identified in the May 2009 investigation

12 report, correct?

13             MR. JACO:  Objection.  Form.

14             THE WITNESS:  Yes, it appears

15     that way.

16 QUESTIONS BY MS. SWIFT:

17      Q.     Neither of these two issues

18 relates to identifying or reporting

19 suspicious orders of controlled substances,

20 right?

21             MR. JACO:  Objection.  Form.

22             THE WITNESS:  No.

23 QUESTIONS BY MS. SWIFT:

24      Q.     No, they don't relate to

25 suspicious orders?

1        A.      No, they don't relate to

2   suspicious orders.

3        Q.      Then the rest of Mr. Kneller's

4   letter in July of 2009 addresses issues that

5   DEA had identified with List I chemicals like

6   Sudafed, correct?

7        A.      Yes.

8        Q.      None of those issues involve

9   controlled substances like opioids, right?

10       A.      No, they pertain to List I

11  chemicals.

12               (Brennan 30(b)(6) Exhibit 11

13       marked for identification.)

14  QUESTIONS BY MS. SWIFT:

15       Q.      Turn, if you would, please, to

16  Exhibit 11, which is an August 17, 2009

17  Perrysburg case closing document.

18               Do you see that?

19       A.      Yes.

20       Q.      In the re: line it says that

21  this August 17, 2009 document relates to

22  response to LOA case closing.

23               Do you see that?

24       A.      Yes.

25       Q.      Do you think that LOA relates

Highly Confidential - Subject to Further Confidentiality Review

```
1    to letter of admonition?
2         A.     Yes, based on my experience,
3    that's what -- it would.
4         Q.     And then do you see at the
5    bottom -- well, towards the bottom under
6    Attachments, there's a reference in this DEA
7    report to an original letter dated July 28,
8    2009, from Walgreens?
9         A.     Yes.
10        Q.     Would you agree with me that
11   that's the July 28, 2009 letter from
12   Walgreens that we just looked at?
13             MR. JACO:  Objection.  Form.
14             THE WITNESS:  Again, this
15        wasn't produced by DEA from our files,
16        but it appears that it matches up with
17        the dates in this report.
18   QUESTIONS BY MS. SWIFT:
19        Q.     Exhibit 11, the August 2009
20   Perrysburg closing document, says that on
21   August 6, 2009, DI Honoway received the
22   attached letter from Steve Kneller,
23   distribution center manager of Walgreens'
24   Perrysburg facility, in response to the
25   letter of admonition dated June 20, 2009,
```

1    correct?

2         A.     Yes.

3         Q.     And I just heard you say that

4    the July 2009 letter from Mr. Kneller

5    couldn't be produced by DEA because DEA

6    couldn't find it.

7              We also don't have this

8    June 25, 2009 letter.  Do you know whether

9    that's another one that DEA was unable to

10   locate?

11        A.     I believe that is the case.

12        Q.     In this August 2009 Perrysburg

13   case closing document, DEA says that

14   Mr. Kneller has identified the correct

15   actions that were being taken to address all

16   of the violations noted during the regulatory

17   investigation, correct?

18        A.     Yes.

19        Q.     And then it goes on to say that

20   no further action is required at this time,

21   and it is recommended that this case file be

22   closed, correct?

23        A.     Yes.

24        Q.     It also says that Group

25   Supervisor Francis concurs with this

Highly Confidential - Subject to Further Confidentiality Review

1    recommendation, right?

2         A.    Yes.

3               (Brennan 30(b)(6) Exhibit 15

4         marked for identification.)

5    QUESTIONS BY MS. SWIFT:

6         Q.    Okay.  Now I'd like you to turn

7    to Exhibit 15, if you would, please.

8               Exhibit 15 is a DEA

9    investigation report dated January 7, 2013,

10   relating to an investigation of the

11   Perrysburg distribution center again,

12   correct?

13        A.    A pre-on-site investigation

14   relating to it, yes.

15        Q.    This is a four-page report, and

16   would you agree with me that it's pretty

17   heavily redacted?  It looks like a page and a

18   half of those four pages?

19        A.    Yes.

20        Q.    On page 1, under ARCOS

21   Analysis -- do you see that, where it says

22   "ARCOS Analysis"?  That heading?

23        A.    Yes.

24        Q.    In that paragraph it says, "Due

25   to the high volume of transactions reported

1    by Walgreens, an ARCOS analysis had to be

2    requested to be generated from the ARCOS

3    unit."

4              Correct?

5        A.    Yes.

6        Q.    Am I correct that the earlier

7    DEA memo we looked at instructed diversion

8    investigators to request ARCOS analyses

9    before all on-site investigations?

10             Do you recall that?

11       A.    Yes.

12       Q.    Does this statement in the

13   January 2013 report suggest to you that the

14   investigators didn't always do that?

15       A.    I can't say from this.  I don't

16   think you can suggest that.

17       Q.    Okay.  On page 2 of the 2013

18   report, do you see in the middle of the page

19   where it says "Suspicious Order Reporting"?

20       A.    Yes.

21       Q.    It says, "Walgreens reported on

22   a monthly basis to the Detroit DO; however,

23   since January 1, 2012, no reports have been

24   received at the Detroit DO."

25             Correct?

1     A.    Yes.

2     Q.    Then a little bit farther down

3  on that same page, do you see where it says

4  "Historical Background"?

5     A.    Yes.

6     Q.    It says, "Walgreens has been

7  the subject of letters of admonition in past

8  regulatory investigations.  The violations

9  have included recordkeeping violations and

10 insufficient reporting of suspicious orders."

11        Correct?

12    A.    Yes.

13    Q.    We looked at the previous

14 investigation report from 2009, and we also

15 looked at the letter of admonition from 2006.

16        Do you remember both of those

17 documents?

18    A.    Yes.

19    Q.    The letter of admonition from

20 2006 is the only document we've seen today

21 that -- where DEA concluded that Walgreens

22 had insufficient reporting of suspicious

23 orders of controlled substances, correct?

24        MR. JACO:  Objection.  Form.

25        THE WITNESS:  Could you also

1    repeat -- you froze up again at the

2    beginning.

3    QUESTIONS BY MS. SWIFT:

4         Q.    Sure.

5               You recall the letter of

6    admonition from 2006 that stated that at that

7    point in time Walgreens' system for

8    suspicious order reporting was insufficient?

9         A.    Yes.

10        Q.    That is the only document we've

11   seen today where DEA concluded that

12   Walgreens' system for reporting suspicious

13   orders of controlled substances was in

14   violation or insufficient or that there was

15   anything wrong with it.

16              Would you agree with that?

17              MR. JACO:  Objection.  Form.

18              THE WITNESS:  Yes, so it

19        appears that that -- we don't have the

20        2006 investigation, but it appears

21        that the letter of admonition did

22        point that out.

23   QUESTIONS BY MS. SWIFT:

24        Q.    And we saw in the 2009

25   Perrysburg report and the subsequent closing

Highly Confidential - Subject to Further Confidentiality Review

1   document DEA concluded that Walgreens had

2   addressed all of the issues raised, and

3   closed the Perrysburg case that it had open,

4   correct?

5           MR. JACO:  Objection.  Form.

6           THE WITNESS:  Yes, that

7       appeared to be so.

8   QUESTIONS BY MS. SWIFT:

9       Q.    Nothing that we can see in the

10  2013 Perrysburg report identifies any new

11  violations relating to the suspicious order

12  monitoring of controlled substances, correct?

13          MR. JACO:  Objection.  Form.

14          THE WITNESS:  Right now they're

15      only reporting on something in the

16      office.  They haven't been on site yet

17      to have a discussion or to ask those

18      questions.

19  QUESTIONS BY MS. SWIFT:

20      Q.    So you would agree with me that

21  there's nothing in this four-page report that

22  we can see that identifies any new violations

23  relating to suspicious orders of controlled

24  substances?

25          MR. JACO:  Same objection.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  I don't see any
 2       violations listed throughout this
 3       report.
 4              (Brennan 30(b)(6) Exhibit 18
 5       marked for identification.)
 6  QUESTIONS BY MS. SWIFT:
 7       Q.    Turn, if you would, please, to
 8  Exhibit 18.
 9              This is a June 2015 document,
10  and the subject line says, "Case closing and
11  regulatory investigation of Walgreens
12  Corporation."
13              Correct?
14       A.    Yes.
15       Q.    It's another report of a DEA
16  investigation of the Perrysburg distribution
17  center, correct?
18       A.    Yes.
19       Q.    If you turn with me, please, to
20  page 5, towards the bottom of the page,
21  paragraph number 3.
22              Do you see that?
23       A.    Yes.
24       Q.    It says, "In 2013, the Detroit
25  divisional office received information from a
```

1    source of information."

2              What does that mean, "a source

3    of information"?  Do you know?

4         A.    Yes.

5         Q.    What does it mean?

6         A.    It usually means someone who we

7    might -- we may or may not know their

8    identity when they call in.  It may be an

9    anonymous person who gives information.

10        Q.    Could it be anybody, like

11   somebody who works for the company, somebody

12   who doesn't work for the company?

13             MR. JACO:  Objection.  Form.

14             THE WITNESS:  Yes.

15   QUESTIONS BY MS. SWIFT:

16        Q.    All right.  So this is saying

17   that in 2013 the Detroit office of the DEA

18   received information from a source of

19   information, we don't know who that is, and

20   that source communicated knowledge of alleged

21   violations regarding the Walgreens

22   Corporation DC, or distribution center,

23   located in Perrysburg, Ohio, correct?

24        A.    Yes.

25        Q.    It goes on to say that

```
 1    "diversion investigators interviewed the

 2    source and were provided intelligence

 3    regarding violations in security and

 4    recordkeeping of controlled substances.  In

 5    February 2013, the Detroit divisional field

 6    office executed on-site administrative

 7    inspection warrant and issued subpoenas for

 8    various records.  The complaint

 9    investigation" -- and then it says, "DEA

10    investigative case file, redacted, disclosed

11    the following violations."

12                   Have I read all of that

13    correctly so far?

14         A.    Yes.

15         Q.    And then it lists -- there's

16    three bullet points for alleged violations.

17                   The first one says,

18    "Schedule II controlled substances were not

19    properly secured in the vault, a violation of

20    21 CFR 1301.72(a)."

21                   Correct?

22         A.    Yes.

23         Q.    That doesn't have anything to

24    do with suspicious order monitoring or

25    reporting, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

 1        A.      Correct.

 2        Q.      Then the second bullet point, I

 3   won't read the whole thing, but would you

 4   agree with me that it relates to DEA 222

 5   forms being incomplete and not recording on

 6   copies 1 and 2 the number of commercial

 7   containers furnished on each item and the

 8   date on which the containers were shipped to

 9   the purchaser?

10        A.      Yes, you read that correctly.

11        Q.      And the report says that that's

12   a violation of 21 CFR 1305.13(b), correct?

13        A.      Yes.

14        Q.      Would you agree with me that

15   this violation regarding the DEA 222 forms

16   does not have anything to do with suspicious

17   order monitoring or reporting?

18            MR. JACO:  Objection.  Form.

19            THE WITNESS:  There's nothing

20        in this paragraph that says anything

21        about suspicious ordering or

22        monitoring.

23   QUESTIONS BY MS. SWIFT:

24        Q.      And those are actually the only

25   violations identified here.

1    The next bullet, which is the

2    last one, simply states, "The Walgreens

3    Corporation investigation conducted under DEA

4    investigative case, redacted, was made part

5    of a DEA national investigation which

6    resulted in a large civil settlement

7    agreement."

8    And then it has an amount given

9    there, $80 million, right?

10    A.    Yes.

11    Q.    Would you agree with me that

12    that bullet point also doesn't say anything

13    about suspicious order monitoring or

14    reporting?

15    MR. JACO:  Objection.  Form.

16    THE WITNESS:  That bullet

17    doesn't really say much about anything

18    other than a settlement.

19    QUESTIONS BY MS. SWIFT:

20    Q.    This report from 2015 makes no

21    mention anywhere of any violation of --

22    related to suspicious order monitoring or

23    reporting, correct?

24    MR. JACO:  Objection.  Form.

25

```
 1   QUESTIONS BY MS. SWIFT:

 2        Q.     Let me actually reask that

 3   question.  I apologize.

 4               This report makes no mention of

 5   any violation relating to suspicious order

 6   monitoring or reporting coming out of the

 7   February 2013 investigation that's being

 8   described in this part of the report, right?

 9               MR. JACO:  Same objection.

10               THE WITNESS:  I'm not seeing

11        that stated as a violation.

12   QUESTIONS BY MS. SWIFT:

13        Q.     Turn, if you would, please, to

14   page 10 of the 2015 Perrysburg report.  And

15   I'll direct your attention to the section

16   that says "Suspicious Orders."

17               Do you see that?

18        A.     Yes.

19        Q.     And the first paragraph under

20   that heading says, "Walgreens Corporation DC

21   no longer handles controlled substances or

22   prescription drugs."

23               Correct?

24        A.     Yes.

25        Q.     It goes on to say that a
```

1    summary of Walgreens Corporation DC's

2    suspicious order monitoring system was

3    provided and is attached to this report.

4              Do you see that?

5         A.   Yes.

6         Q.   It says that the system, the

7    Walgreens suspicious order monitoring system,

8    sets allocation limits on all controlled

9    substances and the List I chemical products

10   ordered, correct?

11        A.   Yes, that's what it says.

12        Q.   It says, "The suspicious order

13   monitoring system is triggered when any order

14   exceeds the threshold assigned to that

15   specific store for that specific drug."

16              Correct?

17        A.   Yes.

18        Q.   And then it says, "All flagged

19   orders are investigated as orders of interest

20   by Walgreens' pharmaceutical integrity team

21   to determine if it was a suspicious order.

22   It is the store's responsibility to provide

23   an explanation as to why more product was

24   ordered than what the ordering system

25   suggested for that store.  The pharmaceutical

1    integrity team then reviews each response to

2    determine if the flagged order is suspicious

3    and reports the order to the local DEA office

4    if it is deemed suspicious."

5            Correct?

6    A.      That's what it says, yes.

7    Q.      This is a different method of

8    suspicious order monitoring than the method

9    that Walgreens previously told DEA it was

10   using following the Appendix E-3 Chemical

11   Handler's Manual, correct?

12           MR. JACO:  Objection.  Form.

13           THE WITNESS:  It's hard to say.

14       It's not described here what method

15       they're using.

16   QUESTIONS BY MS. SWIFT:

17   Q.      The report does not identify

18   any problem with Walgreens using this system

19   of monitoring suspicious orders, correct?

20   A.      That's consistent with the

21   DEA's --

22           MR. JACO:  Objection.

23           THE WITNESS:  I'm sorry.

24           That's consistent with the

25       training of the diversion

1          investigator.  They ask about a

2          system, and then they describe that

3          system that the registrant has set up.

4     QUESTIONS BY MS. SWIFT:

5          Q.     DEA certainly doesn't identify

6     any violation based on Walgreens using this

7     suspicious order monitoring system that is

8     described in the Perrysburg investigation

9     report?

10          MR. JACO:  Objection.  Form.

11          THE WITNESS:  Yeah, there's no

12          indication from this that it was

13          signed off on or, you know, it was

14          approved or disapproved.

15     QUESTIONS BY MS. SWIFT:

16          Q.     Well, take a look at page 13,

17     if you would, please.

18          You see the paragraph that says

19     "discrepancies and discussion with

20     management"?

21          A.     Yes.

22          Q.     And in the middle of that

23     paragraph, do you see where it says, "DI

24     Groves," or Diversion Investigator Groves,

25     "stated there were no violations disclosed

Highly Confidential - Subject to Further Confidentiality Review

1    during this investigation"?

2         A.    Yes.

3         Q.    Now, I'd like to ask you to go

4    back to page 2, if you would, please.  And do

5    you see the second paragraph on page 2 where

6    it says, "Investigators inspected the

7    Walgreens Corporation DC facility's security

8    and concentrated their inspection in the

9    designated areas for the controlled

10   substances, those being the Schedule II

11   cage/vault and the Schedule III through V

12   cage"?

13        A.    Yes.

14        Q.    And it goes on to say that

15   "There were no controlled substances viewed

16   in any of these areas because Walgreens

17   Corporation DC had not handled controlled

18   substances for over two years."

19              Do you see that?

20        A.    Yes.

21        Q.    Do you see where it says, "The

22   on-site was initiated on May 5, 2015, and

23   concluded on that same day"?

24        A.    Yes.

25        Q.    It says, "Security was deemed

```
 1    adequate; no violations were noted during

 2    this investigation."

 3            Correct?

 4       A.    Yes.

 5       Q.    Then it says, "No violations of

 6    the memorandum of agreement the firm remains

 7    under were found.  No further investigation

 8    is deemed warranted, and this investigation

 9    and this case will be closed with the

10    concurrence of GS Angela Francis."

11            Correct?

12       A.    Yes.

13       Q.    All right.  Then turn, if you

14    would, please, to Exhibit 19.  Exhibit 19 is

15    a June 13, 2017 investigation report of the

16    Perrysburg distribution center, correct?

17       A.    Yes.

18       Q.    Do you see in the third

19    paragraph on page 1 it says -- the last

20    sentence of that paragraph says, "In

21    addition, no violations were revealed during

22    the investigation, and security was deemed

23    adequate."

24            Do you see that?

25       A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    And then it goes on to say, "No

2  further investigation is warranted.

3  Therefore, upon concurrence of this report of

4  investigation, group supervisor John

5  Cavendish, this case will be closed."

6          Correct?

7    A.    Yes.

8          (Brennan 30(b)(6) Exhibit 19

9    marked for identification.)

10 QUESTIONS BY MS. SWIFT:

11   Q.    Okay.  Exhibit 19 is the last

12 report in time that we have.  That's from

13 June of 2017.

14          And now we're going to go all

15 the way back in time to Exhibit 1, which is a

16 May 1999 report of a different distribution

17 center in Mount Vernon, Illinois.

18          Are you with me?

19   A.    Yes.

20   Q.    Okay.  On page 1 of the Mount

21 Vernon, Illinois, report dated May 27, 1999,

22 there are two problems noted.

23          Do you see that in paragraph

24 number 3?

25   A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    The first problem noted is that

2    the self-closing cage door was restrained

3    while employees moved orders to the waiting

4    area.

5                Do you see that?

6    A.    Yes.

7    Q.    And then the second problem

8    that's noted is that a dedicated transmission

9    line to the Mount Vernon police department

10   had been changed to a digital communicator

11   answered by Alarm Communications Co. of

12   Bloomington, Minnesota.

13               Right?

14   A.    Yes.

15   Q.    And then it says, "The problem

16   with the cage door was addressed with

17   employees while the investigators were there

18   on site."

19               Right?

20   A.    Yes.

21   Q.    And then it says that with

22   respect to the alarm system, it says that the

23   alarm system will be changed within two

24   months when the controlled substances storage

25   area will be moved to the second floor and

1    additional alarm coverage added, correct?

2         A.    Yes.

3         Q.    And it concludes by saying a

4    letter of admonition will be sent to

5    Walgreens' Mount Vernon distribution center,

6    right?

7         A.    Yes.

8         Q.    Then if you turn with me,

9    please, to page 8.  Would you agree with me

10   that pages 8 through 14 of this investigation

11   report provide information about drug and

12   equipment security at the Mount Vernon

13   distribution center?

14              MR. JACO:  Objection.  Form.

15              THE WITNESS:  I would agree the

16         bottom, starting with part 6, is drug

17         and equipment security, not all of

18         page 8.

19   QUESTIONS BY MS. SWIFT:

20         Q.    Right.

21              Starting on page 8 at the

22   bottom, there's a section called Drug and

23   Equipment Security, and that section carries

24   through to the bottom of page 14, right?

25         A.    Yes.

1      Q.      On page 11, Item Number 2 under

2  Cage Construction describes the issue with

3  the self-closing cage door, right?

4      A.      Yes.

5      Q.      On page 12, Item Number 3

6  describes the issue with the alarm system,

7  right?

8      A.      Yes.

9      Q.      Then on page 13, paragraph H

10  says "Suspicious Orders."  Right?

11              There's one paragraph there on

12  suspicious orders?

13      A.      Yes.

14      Q.      It says, "A monthly report

15  entitled 'Suspicious controlled drug orders

16  for month of...' is received regularly by the

17  St. Louis DO from Cheryl D. McCray, logistics

18  and planning analyst, located in the Walgreen

19  corporate office.  Information received is

20  categorized by drug item number and product

21  description listing the store number, DEA

22  number, address, store category number,

23  average order quantity per store, DEA factor

24  and trigger quantity.  If the store surpasses

25  its trigger quantity, all orders, dates and

```
 1    quantities for that store that month are

 2    listed."

 3              Did I read that correctly?

 4    A.     Yes.

 5    Q.     There's no mention here of any

 6    problem that the DEA found with that method

 7    of reporting suspicious orders, correct?

 8              MR. JACO:  Objection.  Form.

 9              THE WITNESS:  That would be --

10        that would be consistent with the DI's

11        training, to just report that -- the

12        system that the -- that the registrant

13        reported as being in place.

14    QUESTIONS BY MS. SWIFT:

15    Q.     Okay.  So you'll agree with me,

16    there's no mention of there being any problem

17    with that method of reporting suspicious

18    orders, right?

19    A.     There's no mention that it was

20    approved nor disapproved.

21              MR. JACO:  Objection.

22              Give me a chance to object.

23              Objection.  Form.

24              Go ahead.

25              THE WITNESS:  There's no
```

1          mention that the system was neither

2          approved or disapproved.

3    QUESTIONS BY MS. SWIFT:

4          Q.     Page 15 of the report, there's

5    a section called Discrepancies and

6    Discussions with Management, correct?

7          A.     Correct.

8          Q.     Again, it mentions the issue

9    with the self-closing cage gate?

10         A.     Yes.

11         Q.     It also mentions an issue with

12   DEA 106 forms?

13         A.     Yes.

14         Q.     And again, it mentions the

15   issue with alarm transmission, correct?

16         A.     Yes.

17         Q.     And it says a letter of

18   admonition will be sent, presumably on those

19   issues, right?

20              MR. JACO:  Objection.  Form.

21              THE WITNESS:  Yeah, it says a

22         letter of admonition will be sent.

23         Unless you see the letter, you don't

24         know what specifically, but it should

25         have one.

```
 1   QUESTIONS BY MS. SWIFT:

 2       Q.    None of the issues discussed in

 3   this section, Discrepancies and Discussions

 4   with Management, relate to suspicious order

 5   monitoring or reporting, correct?

 6             MR. JACO:  Objection.  Form.

 7             THE WITNESS:  No, but again,

 8        the silence on it is consistent with

 9        diversion investigators' training.

10   QUESTIONS BY MS. SWIFT:

11       Q.    We've seen when the diversion

12   investigators have issues with suspicious

13   order monitoring reporting, we've seen that

14   documented, right, in the 2006 letter of

15   admonition that Walgreens subsequently

16   addressed?

17             MR. JACO:  Objection.  Form.

18             THE WITNESS:  That was

19        mentioned because it wasn't based

20        solely on controlled substances, which

21        the regulation states.

22             (Brennan 30(b)(6) Exhibit 2

23        marked for identification.)

24   QUESTIONS BY MS. SWIFT:

25       Q.    Okay.  Turn, if you would,
```

1    please, to Exhibit 2, which is a

2    September 13, 1999 Mount Vernon report.  And

3    this is about three months after the last

4    report we looked at, right?

5         A.    Yes.

6         Q.    If you look at the last

7    sentence in the synopsis on the first page,

8    it says, "The cage and alarm system were

9    approved on September 8, 1999."

10             Correct?

11        A.    Yes.

12        Q.    Those are the same two issues

13   that we saw noted in the May 1999 report of

14   the Mount Vernon distribution center,

15   correct?

16        A.    They notated an issue with the

17   cage and the alarm.

18        Q.    And then three months later, in

19   this report marked as Exhibit 2, DEA is

20   saying that the cage and alarm system were

21   approved, right?

22        A.    They're making reference to, in

23   the other report, that they were going to be

24   relocating their cage.

25        Q.    And it says, "The cage and

Highly Confidential - Subject to Further Confidentiality Review

```
 1    alarm system were approved."

 2              Correct?

 3        A.    Yes.

 4        Q.    There are no problems or

 5    violations identified in this report from

 6    September of 1999, correct?

 7              MR. JACO:  Objection to form.

 8              THE WITNESS:  No, there's no

 9        violations stated.

10              (Brennan 30(b)(6) Exhibit 4

11        marked for identification.)

12    QUESTIONS BY MS. SWIFT:

13        Q.    Right.

14              Turn, if you would, please, to

15    Exhibit 4.  We're going to jump ahead five

16    years and go to a different distribution

17    center.

18              Exhibit 4 is a report on the

19    Jupiter, Florida, distribution center from

20    December of 2004, correct?

21        A.    Yes.

22        Q.    On page 1, the report notes

23    that this investigation was initiated on

24    May 24, 2004, and ended on May 27, 2004,

25    correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes.

 2        Q.    It says, "The audit revealed no

 3   discrepancies."

 4              Correct?

 5        A.    Yes.

 6        Q.    Then it says, "Since no

 7   significant violations were noted, this file

 8   is closed."

 9              Correct?

10        A.    Yes.

11        Q.    Turn to page 3 of the 2004

12   Jupiter report, please.

13              And do you see the heading

14   Basis of Investigation?

15        A.    Yes.

16        Q.    It describes this investigation

17   as in-depth, correct?

18        A.    Yes.

19        Q.    Okay.  Then turn to page 4,

20   please.  You see a little bit more than

21   halfway down the page where it says, "Only

22   this Jupiter facility and the Woodland,

23   California, facility distribute Schedule II

24   controlled substances"?

25        A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1          Q.     Then turn to page 15, if you

2     would, please.

3                 You see the section that's

4     called Discrepancies and Discussion with

5     Management?

6          A.     Yes.

7          Q.     It says, "No violations were

8     uncovered."

9                 Correct?

10         A.     Yes.

11                (Brennan 30(b)(6) Exhibit 5

12         marked for identification.)

13    QUESTIONS BY MS. SWIFT:

14         Q.     All right.  Turn to Exhibit 5,

15    please.  We're jumping ahead in time again.

16    Now we're in June of 2005, and we've gone

17    back to the Mount Vernon distribution center.

18                This is a report of an

19    investigation of the Mount Vernon DC,

20    correct?

21         A.     Yes.

22         Q.     And I'd like you to turn to

23    page 19.

24                Do you see towards the top of

25    the page where it says, "Investigators gave
```

1     Mr. Prost the following items to serve as

2     official notices of laws and regulations

3     pertaining to the handling of listed

4     chemicals."

5                 Do you see that?

6          A.     Yes.

7          Q.     The first item on the list

8     says, "Suspicious order guidelines."

9                 Do you see that?

10         A.     Yes.

11         Q.     The second item on the list is

12    the DEA Chemical Handler's Manual, correct?

13         A.     Yes.

14         Q.     And then there's several other

15    things listed as well, right?

16         A.     Yes.

17         Q.     Then below that list it says,

18    "DI Hull further advised Mr. Prost that if a

19    customer asks for any of the other products

20    on the notices or special surveillance list

21    in combination with pseudoephedrine

22    purchases, this would be a suspicious order."

23                Correct?

24         A.     Yes.

25         Q.     There are no other references

1    to suspicious orders anywhere in this report;

2    would you agree with me?

3            And please take a minute to

4    confirm that, if you would.

5            MR. JACO:  Object to the form.

6            You can answer.

7            THE WITNESS:  I don't -- I

8        don't see it, and I don't recall

9        seeing that in the report.

10   QUESTIONS BY MS. SWIFT:

11       Q.    Okay.  Turn back to page 1 of

12   the June 2005 Mount Vernon report, please.

13       A.    I'm sorry, page 1?

14       Q.    Yes.

15            Page 1 of the 2005 Mount Vernon

16   investigation report concludes, "No

17   violations were discovered during this

18   scheduled investigation; therefore, this case

19   is closed."

20            Correct?

21       A.    That's what that says, yes.

22            (Brennan 30(b)(6) Exhibit 7

23        marked for identification.)

24   QUESTIONS BY MS. SWIFT:

25       Q.    Turn with me, please, to

1    Exhibit 7 in your binder.

2                We've jumped ahead again.  Now

3    we're in June of 2006, and this is another

4    report related to the Mount Vernon

5    distribution center, but it's a little bit

6    different.

7                Would you agree with me?

8        A.    Yes.

9        Q.    This report marked as Exhibit 7

10   is about the disappearance of 12,000

11   lorazepam 1 milligram tablets, correct?

12       A.    Yes.

13       Q.    Walgreens reported the loss

14   and -- this unexplained loss of lorazepam

15   tablets to the DEA, correct?

16       A.    Yes.

17       Q.    And then in response, DEA

18   initiated this investigation?

19       A.    Yes.

20       Q.    There's nothing in this

21   June 2006 Mount Vernon report about

22   suspicious orders, right?

23                MR. JACO:  Objection.  Form.

24                THE WITNESS:  No.

25

```
 1    QUESTIONS BY MS. SWIFT:

 2         Q.     "No" meaning --

 3         A.     No, there's nothing about

 4    suspicious orders.

 5         Q.     Thank you.

 6                (Brennan 30(b)(6) Exhibit 12

 7         marked for identification.)

 8    QUESTIONS BY MS. SWIFT:

 9         Q.     Turn, if you would, please, to

10    Exhibit 12.

11                Exhibit 12, we've jumped ahead

12    three years in time, and we're now in October

13    of 2009.  And this is a report of another

14    investigation of the Jupiter, Florida,

15    distribution center, correct?

16         A.     Yes.

17         Q.     On page 1 of this 2009 Jupiter,

18    Florida, investigation report says -- see if

19    I can find it for you.

20                Okay, in the first paragraph at

21    the end it says, "The investigation resulted

22    in accountability discrepancies which were

23    reconciled prior to the conclusion of the

24    audit."

25                Correct?
```

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yes.

2    Q.    Does that mean that Walgreens

3  corrected the problems the DEA identified

4  before this audit was even completed?

5    A.    That's what it appears that

6  this is saying.

7    Q.    And in the next paragraph it

8  says that "the audit discrepancies were

9  caused by miscounts and/or system input

10  errors."

11          Correct?

12    A.    Yes.

13    Q.    And then the next paragraph

14  says, "In a letter dated September 21, 2009,

15  Mr. Varno indicated the firm has implemented

16  the following corrective actions in order to

17  increase accuracy of the controlled substance

18  inventories," and then it lists those

19  actions.

20          Correct?

21    A.    Yes.

22    Q.    Then it concludes,

23  "Accordingly, all discrepancies have been

24  addressed, and this file is closed."

25          Correct?

 1          A.     Yes.

 2          Q.     Take a look at page 12 of this

 3     2009 report on the Jupiter distribution

 4     center.

 5                 There are no mentions here or

 6     anywhere in this report from 2009 of the

 7     Jupiter, Florida, distribution center of

 8     suspicious orders or any problems with

 9     Walgreens' suspicious order monitoring

10     system, correct?

11                 MR. JACO:  Objection.  Form.

12                 THE WITNESS:  This page

13          specifically is only talking about the

14          actual security.

15     QUESTIONS BY MS. SWIFT:

16          Q.     There are no mentions anywhere

17     else in the report either of any problems

18     with Walgreens' suspicious order monitoring

19     or reporting, right?

20                 MR. JACO:  Same objection.

21                 THE WITNESS:  I believe it's

22          not addressed, so that doesn't -- it's

23          just not addressed.

24                 (Brennan 30(b)(6) Exhibit 13

25          marked for identification.)

```
 1    QUESTIONS BY MS. SWIFT:

 2         Q.    Okay.  Take a look, if you

 3    would, please, at Exhibit 13.  We jumped

 4    ahead another year, and now we've gone back

 5    to the Mount Vernon distribution center.

 6               Exhibit 13 is a report of an

 7    investigation of the Mount Vernon

 8    distribution center dated September 9, 2010,

 9    correct?

10         A.    Yes.

11         Q.    Turn to page 6 this report,

12    please.

13               Page 6 notes Individuals

14    Interviewed and Personal Responsibilities.

15               Do you see that heading?

16         A.    Yes.

17         Q.    Paragraph 1 underneath that

18    heading notes that distribution center

19    manager, Bill Bush, and administration and

20    systems training manager, whose name is

21    redacted, both of those folks were

22    interviewed during this investigation,

23    correct?

24         A.    It's just saying that the

25    second person was present, even though
```

1    they're -- it's a -- whether they -- she was

2    interviewed -- or a he was interviewed, I

3    can't tell from this.

4         Q.    The second paragraph there

5    says, "Mr. Bush is the individual responsible

6    for controlled substance records.  Ms. Gill

7    was responsible for providing the majority of

8    all requested documents."

9              Correct?

10        A.    Yes.

11        Q.    Then turn, if you would,

12   please, to page 18.

13             Do you see paragraph number 20

14   on page 18?

15        A.    Yes.

16        Q.    It says, "According to

17   Ms. Gill, an identifiable suspicious or

18   excessive order sent to their facility is

19   very uncommon.  Orders from the local

20   Walgreens pharmacies are sent to Walgreen

21   Co.'s main district office located at 1084

22   Mount Prospect Plaza, Mount Prospect,

23   Illinois.  Once the orders from the local

24   Walgreens pharmacies are sent to the district

25   office, the district office will

```
 1   electronically send the distribution orders

 2   to Walgreens Co.'s facility."

 3              Did I read all of that

 4   correctly?

 5        A.    Yes.

 6        Q.    And then it goes on to say,

 7   "Due to all order requests of controlled

 8   substances being directed to their district

 9   office in Mount Prospect, Illinois, a

10   suspicious or excessive order will be

11   identified at Walgreens Co.'s main district

12   office.  Ms. Gill related that she could not

13   recall a time when an order was deemed

14   suspicious but not identified by the district

15   office.  If what seems to be an excessive

16   order is not caught by the district office,

17   Walgreen Co. will call the district office

18   and the local Walgreens pharmacy by phone to

19   verify the order."

20              Correct?

21        A.    Yes, that's what that says.

22        Q.    The diversion investigators

23   didn't identify any problem with that process

24   in this part of the report, correct?

25        A.    Again, they did what they're
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    trained to do --
2                   MR. JACO:  Objection.  Form.
3                   THE WITNESS:  Sorry.
4                   Again, they did what they were
5         trained to do, is just ask about --
6         ask about the system that's in place
7         and record what the company tells them
8         that they have one in place.
9    QUESTIONS BY MS. SWIFT:
10        Q.    {Audio interruption} -- in the
11   closing discussion with management.  Do you
12   see in the middle of paragraph 1 where it
13   says "DI Matsantonis"?
14        A.    Yes.
15        Q.    It says, "DI Matsantonis
16   informed Mr. Bush and Ms. Gill that no
17   discrepancies were discovered during their
18   audit of controlled substances.  DI
19   Matsantonis related that all reviewed
20   Walgreen Co. records and security procedures
21   were compliant under the Federal Code of
22   Regulations."
23                   Correct?
24        A.    Yes.
25        Q.    And then if you would, please,
```

1  turn back to page 1 of the September 2010

2  Mount Vernon report.

3          Do you see at the bottom of

4  page 1 it says, "No violations were

5  discovered during this scheduled

6  investigation.  This case is closed"?

7          A.    Yes.

8          (Brennan 30(b)(6) Exhibit 14

9      marked for identification.)

10  QUESTIONS BY MS. SWIFT:

11          Q.    And turn, if you would, please,

12  to Exhibit 14.

13          We jumped ahead an additional

14  two years, and Exhibit 14 is an August 2012

15  investigation report of the Mount Vernon,

16  Illinois, distribution center, correct?

17          A.    Yes.

18          Q.    Turn, if you would, please, to

19  page 10.

20          Do you see the sentence that

21  says "suspicious order reporting"?

22          A.    Yes.

23          Q.    It says, "Notification of

24  responsibility to report all suspicious or

25  excessive orders, no suspicious orders."

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Correct?

 2      A.      Yes.

 3      Q.      And then do you see immediately

 4  beneath that where it says "effective

 5  controls"?

 6      A.      Yes.

 7      Q.      It says, "All physical controls

 8  against diversion in accordance with 21 USC

 9  823 were in place and operational."

10              Correct?

11      A.      Yes.

12      Q.      Then turn to page 18.

13              Do you see where it says

14  "according to Ms. Gill"?

15      A.      Yes.

16      Q.      And it says again, "According

17  to Ms. Gill, an identifiable excessive or

18  suspicious order sent to their facility is

19  very uncommon."

20              And then it recounts what

21  Ms. Gill has told the DEA about what

22  Walgreens does when it identifies a

23  suspicious order, correct?

24              MR. JACO:  Objection.  Form.

25              THE WITNESS:  Yes.
```

 1    QUESTIONS BY MS. SWIFT:

 2         Q.     It's very similar to what we

 3    saw in the 2010 report; would you agree with

 4    me?

 5         A.     Yes.

 6         Q.     Including that if what seems to

 7    be an excessive order is not caught by the

 8    district office, Walgreen Co. will call the

 9    district office and the local Walgreens

10    pharmacy by phone to verify the order,

11    correct?

12         A.     Yes, that's what it says.

13         Q.     Turn back to page 1, please.

14              The bottom of page 1 states,

15    "No violations were discovered during this

16    scheduled investigation.  This case is

17    closed."

18              Correct?

19         A.     Yes.  But the not mentioning of

20    it would be, again, consistent with a

21    diversion investigator's training to not

22    approve nor disapprove.

23         Q.     Well, they didn't find any

24    violations, correct?

25         A.     They gave them the system -- no

1    other violations, and they said there was a

2    system in place for...

3         Q.    They didn't find any violations

4    in this report, right?

5         A.    That's what the -- that's what

6    it says there.

7              (Brennan 30(b)(6) Exhibit 16

8         marked for identification.)

9    QUESTIONS BY MS. SWIFT:

10        Q.    All right.  Turn, if you would,

11   please, to Exhibit 16.

12             Exhibit 16 is a March 12, 2015

13   report of another investigation of the Mount

14   Vernon distribution center, correct?

15        A.    Yes.

16        Q.    And it states in the synopsis

17   on page 1, "The firm has not handled

18   controlled substances since May of 2014;

19   therefore, a controlled substance

20   accountability audit was not conducted."

21        Correct?

22        A.    Yes.

23        Q.    The 2015 Mount Vernon

24   investigation report concluded that the

25   firm's security and recordkeeping were found

Highly Confidential - Subject to Further Confidentiality Review

```
 1    to be in compliance, correct?

 2         A.    That's what it says, yes.

 3         Q.    Would you agree with me,

 4    Ms. Brennan, that we have looked at more than

 5    a dozen investigation reports of Walgreens'

 6    distribution centers today?

 7         A.    Yes.

 8         Q.    The only report that we saw

 9    that identified problems with Walgreens'

10    controlled substance suspicious order

11    monitoring was the May 2006 DEA letter of

12    admonition marked as Exhibit 6.

13              Would you agree with that?

14              MR. JACO:  Objection.  Form.

15              THE WITNESS:  Yeah, I would

16         just refer to it as a letter, not a --

17         not a report.

18    QUESTIONS BY MS. SWIFT:

19         Q.    But otherwise you would agree

20    with what I said?

21              MR. JACO:  Same objection.

22              THE WITNESS:  I would agree in

23         the sense that that's -- in looking at

24         these reports, diversion investigators

25         have done as they were trained to do.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          By notating the one we talked about
 2          when it was doing noncontrolled
 3          substances that was not going by the
 4          regulations, which states for
 5          controlled substances, and all the
 6          others did reference systems for
 7          controlled substances.
 8     QUESTIONS BY MS. SWIFT:
 9          Q.     The May 2006 DEA letter marked
10     as Exhibit 6 is the only one of the more than
11     a dozen reports we've looked at today that
12     found fault with Walgreens' suspicious order
13     monitoring system for controlled substances?
14          A.     Correct, which is in line with
15     an investigator's training.
16               MR. JACO:  Objection.  Form.
17               THE WITNESS:  Sorry.
18               MS. SWIFT:  All right.  I'm
19          going to reserve the rest of my time.
20          I don't have additional questions
21          right now, but I expect to -- there
22          may be follow-up after plaintiffs'
23          questioning.
24               Can we -- can I get from Dan,
25          the videographer, how much time we
```

1      have on the record so far?

2              VIDEOGRAPHER:  Sure.  Stand by

3      just a second.

4              MS. SWIFT:  Thank you.

5              VIDEOGRAPHER:  We've been on

6      for 2 hours and 42 minutes.

7              MS. SWIFT:  Thank you.

8              CROSS-EXAMINATION

9   QUESTIONS BY MR. MOUGEY:

10         Q.    Ms. Brennan, good morning.  My

11   name is Peter Mougey.  I represent the

12   plaintiffs in this case.

13              It's one o'clock your time.

14   I'm more than happy to take a break for lunch

15   now, or if you want to do a little bit and

16   then take a break, whatever is good for you.

17         A.    I'm fine with going a little

18   bit longer before a break.

19         Q.    Great.

20              First of all, thank you for

21   your 25 years of service with the DEA and the

22   work that you've done.  We appreciate the

23   opportunity to talk with you this morning.

24              We've just spent, I don't know,

25   two or three hours going through a handful of

```
 1    documents and letters that Ms. Swift took you

 2    through.

 3                One document to me that was

 4    conspicuously absent was the memorandum of

 5    agreement with Walgreens.

 6                Are you familiar with that

 7    document?

 8                MR. JACO:  I'm going to object

 9         to questioning on the memorandum of

10         agreement.

11                Peter, I think you know that we

12         negotiated the scope of this

13         deposition with Jeff Gaddy, and

14         plaintiffs explicitly requested

15         questioning on the MOA, and that was

16         not authorized pursuant to the Touhy

17         authorization that Ms. Brennan is

18         testifying about.

19                MR. MOUGEY:  I understand.

20         Thank you.  I just simply asked if

21         Ms. Brennan was -- as a representative

22         of the DEA today was familiar with

23         that document.

24                MR. JACO:  You can answer.

25                THE WITNESS:  I know there
```

```
 1          is -- there was one.  I'm not familiar
 2          with what -- the details of it.
 3     QUESTIONS BY MR. MOUGEY:
 4          Q.     Exactly.
 5                 But just generally speaking,
 6     you are familiar with the memorandum of
 7     agreement that was reached with Walgreens in
 8     2013, correct?
 9          A.     Yes, I know there was one.
10          Q.     And at least some of the
11     details that were included in that 300-plus
12     pages was a result of the DEA's work through
13     its investigators that ultimately resulted in
14     that agreement, correct?
15                 MR. JACO:  Object again.  I'm
16          going to object to the scope.
17                 Ms. Brennan can testify in her
18          personal capacity to the extent she
19          knows, but she's not testifying on
20          behalf of DEA right now.
21                 MS. SWIFT:  I'm also going to
22          object to the extent that counsel is
23          going to get into questions that were
24          not authorized in the Touhy
25          authorization, we may need to seek
```

 1          additional time with Ms. Brennan.

 2     QUESTIONS BY MR. MOUGEY:

 3          Q.    Ms. Brennan, you can answer.

 4          A.    Usually that does come about,

 5     yes.  A memorandum of agreement would come

 6     about from an investigator's work.

 7          Q.    And you have a box of documents

 8     that we sent you, Ms. Brennan.  I think it

 9     has a series of sealed folders in them,

10     correct?

11          A.    I actually was instructed to

12     not open the box yet, so...

13          Q.    Okay.  So if you would take the

14     time to open the box, and open the very first

15     envelope marked number 1.

16               If you would, after lunch, I

17     think if you have somebody there that can

18     open up each one of those folders, that would

19     be helpful, Ms. Brennan, to make it a little

20     easier for you while we do these questions.

21     We can take a little extra time to make sure

22     that -- okay?

23          A.    Okay.

24               (Brennan 30(b)(6) Exhibit 1

25          marked for identification.)

1    QUESTIONS BY MS. SWIFT:

2        Q.    All right.  Thank you.

3              So in envelope number 1 in the

4    Exhibit 1 is a document dated September 27,

5    1988.

6              Do you see that, Ms. Brennan?

7        A.    Yes.

8        Q.    And you understand that your

9    testimony today is not in your individual

10   capacity but as on behalf of the DEA,

11   correct?

12       A.    Yes.

13       Q.    And that you are officially

14   speaking on behalf of the DEA, correct?

15       A.    Yes.

16       Q.    And in Document 1, or

17   Exhibit 1, is a letter dated December 27,

18   1988, from Ronald Buzzeo, who was at the time

19   deputy director, Office of Diversion Control.

20             Do you see that document,

21   Ms. Brennan?

22             MR. JACO:  I'm going to object

23        and instruct the witness not to answer

24        any further questions on this

25        document.

Highly Confidential - Subject to Further Confidentiality Review

1           Again, this is a document that
2       plaintiffs expressly requested
3       authorization for Ms. Brennan to
4       testify on.
5           As you just noted, she's
6       testifying as a 30(b)(6) witness on
7       behalf of DEA.  Her testimony was
8       authorized on a specific set of
9       documents, and this is a specific
10      document that plaintiffs sought.  And
11      testimony was not authorized on this
12      document, so I'm going to instruct the
13      witness not to answer any further
14      questions on this document.
15          MR. MOUGEY:  Mr. -- and I
16      apologize, I don't know how to
17      pronounce your name.  Is it Jaco or --
18          MR. JACO:  It's Jaco.
19          MR. MOUGEY:  Would you please
20      explain on the record why a letter
21      dated December 27, 1988, from the DEA
22      to Walgreens discussing the issues
23      that we covered for the last two and a
24      half hours, why Walgreens {sic} would
25      not allow Ms. Brennan, on behalf of

Highly Confidential - Subject to Further Confidentiality Review

```
 1        the DEA in the scope of audit
 2        investigations, to talk about this
 3        document?
 4             MR. JACO:  So I'm not here to
 5        re-explain the basis of the Touhy
 6        authorization.  What I can explain to
 7        you is that there are Touhy
 8        regulations that you're familiar with.
 9        There is a process in place.
10             This is a document, a specific
11        document, that plaintiffs sought to be
12        authorized for this testimony.  This
13        document was not authorized.
14             If you're simply going to go
15        through the Touhy process and then
16        still ask questions about documents or
17        topics that have not been authorized,
18        it eviscerates the Touhy regulations.
19             MR. MOUGEY:  So I would like --
20             MR. JACO:  -- that you're
21        simply going to ask questions --
22             MR. MOUGEY:  I'd like --
23             MR. JACO:  Sorry about that.
24        And the regulations, if you're going
25        to then ask questions about documents
```

```
 1          that have not been authorized.

 2               I'm not in a position to

 3          authorize her to expand her testimony.

 4          I don't even have the authority to do

 5          that.  That's several levels above me

 6          in DOJ, which is why we go through

 7          that process in advance and certain

 8          documents were authorized.

 9               And here, we're not even

10          talking about a document that wasn't

11          considered.  We're talking about a

12          document that was considered.  DEA --

13          DEA, DOJ, informed you and your

14          co-counsel that this document would

15          not be authorized, and you're asking

16          about it anyway.

17               MR. MOUGEY:  You said that

18          about --

19               MR. JACO:  I'm not --

20               MR. MOUGEY:  You said that

21          about four or five times.

22               What I'm asking you is, could

23          you please explain to the special

24          masters here on the record while we

25          have this witness here to testify
```

1        today, and this is directly within the

2        scope of what this witness is here to

3        testify about on behalf of the DEA,

4        why in the world this document

5        wouldn't be approved to discuss today?

6             MR. JACO:  Sure.  What I can

7        tell you is that this deposition was

8        negotiated over the course of a number

9        of months.  Plaintiffs were copied on

10       all of the correspondence involved in

11       the negotiation of this deposition.

12            Plaintiffs filed an incredibly

13       late cross-notice and Touhy request.

14       I'll note that that late cross-notice

15       and Touhy request did not include this

16       document as a requested document for

17       her testimony.

18            Plaintiffs were informed that

19       their request was too late and would

20       be denied outright.

21            We then engaged in good faith

22       negotiations in an attempt to allow

23       plaintiffs to get some of the

24       documents they wanted in, despite the

25       late nature of the request.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                This document, along with some
 2        others, which I suspect you're going
 3        to ask about, did not even get raised
 4        by plaintiffs until two weeks after
 5        the initial late request.  At that
 6        point I think we were past the
 7        original date of the deposition.
 8                So that's why this document was
 9        not authorized.
10                The alternative, as I informed
11        Mr. Gaddy when the request first came
12        across, was that we would just reject
13        the request -- the request outright at
14        the beginning because of the late
15        nature of it and because it would
16        force DEA and DOJ to duplicate the
17        work they had already done in
18        preparing Ms. Brennan for this
19        30(b)(6) deposition.
20                Mr. Gaddy said he was willing
21        to negotiate a narrowly expanded
22        scope, which we did in good faith.
23        This document was not included.  It
24        was made clear before we came into
25        this deposition that this document
```

1              would not be included.

2                    It was again made clear that

3              any objections to the scope of this

4              deposition should be raised with the

5              special master in advance.  Mr. Gaddy

6              accepted all of that, and yet you're

7              asking about this document.

8                    This is an issue that we've

9              been over beforehand.

10                   MR. MOUGEY:  This one page with

11             two paragraphs on it, your position is

12             that when Mr. Gaddy identified this

13             document six weeks ago that's one page

14             with two paragraphs, this was too

15             burdensome for the DEA to prep its

16             corporate witness on this morning, to

17             have a complete and accurate record of

18             what we're doing today?

19                   MR. JACO:  My position is that

20             as an initial matter -- sure, you want

21             to take one page out of context?

22             Mr. Gaddy didn't identify one page.

23             One of the other documents he

24             requested was a 300-page memorandum of

25             agreement.

1            So, first of all, it wasn't one

2       page.  There were a lot of pages that

3       were requested.  And I'll make the

4       point again, the entire request was

5       too late.  The entire request came in

6       a week before the deposition --

7            MR. MOUGEY:  I don't need you

8       to say that again.  You've said that

9       on the record.  I understand that.  I

10      appreciate, but I think you've said

11      that four or five times.

12           So you're instructing the

13      witness on this one document, one

14      page, two paragraphs, from the DEA to

15      Walgreens, directly within the scope,

16      not to answer any questions today?

17           MR. JACO:  It is not directly

18      within the scope.  I reject that

19      description.  It is not within the

20      scope at all.  The scope is narrow.

21           The two topics that are in the

22      letter, the Touhy authorization, to

23      you clearly state -- read them if you

24      want.  They've already been read into

25      the record, though.  The topics are

1        the responsibilities of diversion

2        investigators --

3                MR. MOUGEY:  I don't need you

4        to read it back.

5                MR. JACO:  -- investigations.

6                MR. MOUGEY:  I don't need you

7        to read it back.

8                MR. JACO:  Okay.

9    QUESTIONS BY MR. MOUGEY:

10       Q.    Ms. Brennan --

11               MR. JACO:  This is not within

12       the scope.  This document from 1988 is

13       not within the scope.

14               MR. MOUGEY:  Okay.  You've said

15       that five times.  I got it.

16   QUESTIONS BY MR. MOUGEY:

17       Q.    Ms. Brennan --

18               MR. JACO:  Sure.

19   QUESTIONS BY MR. MOUGEY:

20       Q.    -- today you've testified

21   repeatedly about -- on behalf of the DEA

22   about the role of DIs, diversion

23   investigators, with SOMS, correct?

24               MR. JACO:  You can answer.

25               THE WITNESS:  Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
1    QUESTIONS BY MR. MOUGEY:

2         Q.    And Ms. Swift asked you a

3    number of questions today about diversion

4    investigators approving SOMS policies at

5    Walgreens, correct?

6              MS. SWIFT:  Mischaracterizes

7         the questioning and answers.

8    QUESTIONS BY MR. MOUGEY:

9         Q.    You can answer, Ms. Brennan.

10        A.    I've discussed, yes, what

11   diversion investigators do when they're

12   looking at suspicious order monitoring

13   systems.

14        Q.    Ms. Brennan, would you agree

15   that it has always been the DEA's position

16   that the submission of a -- to the DEA, after

17   the fact, a report of suspicious orders

18   without performing due diligence prior to

19   shipment violates the law?

20             MR. JACO:  Objection.  Form.

21             You can answer.

22             THE WITNESS:  I would agree

23        that that would be, yes.  It's always

24        been DEA's position that an order is

25        prior to a sale.
```

```
 1   QUESTIONS BY MR. MOUGEY:

 2        Q.     And that due diligence has to

 3   be performed on a suspicious order prior to

 4   shipment, correct?

 5              MR. JACO:  Objection.  Form.

 6              THE WITNESS:  Yes, that has

 7        been DEA's position.

 8   QUESTIONS BY MR. MOUGEY:

 9        Q.     And that if due diligence is

10   not performed on a specific order, suspicious

11   order, prior to the shipment, that violates

12   the Controlled Substance Act, correct?

13              MR. JACO:  Objection.  Form.

14        Calls for a legal conclusion.

15   QUESTIONS BY MR. MOUGEY:

16        Q.     You can answer, Ms. Brennan.

17        A.     It would -- it would open the

18   possibility to substances being diverted.

19        Q.     Yes, ma'am.

20              And that a shipment of a

21   suspicious order, prior to performing any due

22   diligence, would violate the Controlled

23   Substance Act and the regs thereunder,

24   correct?

25              MR. JACO:  Same objection.
```

```
 1                    THE WITNESS:  Yes, that
 2          would -- it would be considered a
 3          violation.  Due diligence should be
 4          done before an order -- the registrant
 5          should be determining whether to ship
 6          that order.
 7   QUESTIONS BY MR. MOUGEY:
 8          Q.    Yes, ma'am.
 9                 And that has been the DEA's
10   position from at least the late '80s,
11   correct?
12                    MR. JACO:  Objection.  Form.
13                    THE WITNESS:  That would be
14          DEA's position for as long as I can
15          recall.
16   QUESTIONS BY MR. MOUGEY:
17          Q.    And you've been at the DEA for
18   over 25 years, correct, Ms. Brennan?
19          A.    Yes.
20          Q.    And in your preparation for
21   today to speak on behalf of the DEA, your
22   preparation has indicated that shipping a
23   suspicious order prior to performing due
24   diligence has always been a violation of the
25   law, correct?
```

```
 1                   MS. SWIFT:  Objection.  Calls

 2         for a legal conclusion.

 3                   MR. JACO:  Objection.  Form.

 4    QUESTIONS BY MR. MOUGEY:

 5         Q.     It's okay, Ms. Brennan.  You

 6    can answer.

 7         A.     Yes, that was DEA's position.

 8    That's been a violation.

 9         Q.     Ms. Brennan, you indicated

10    several times on behalf of the DEA during

11    your testimony today that the DEA does not

12    approve any suspicious form -- any specific

13    formulas for suspicious orders, correct?

14         A.     Yes.

15         Q.     And you were never, over the

16    last two or three hours, asked to explain

17    that by Walgreens.

18                 Do you have an understanding on

19    behalf of the DEA about why it does not

20    approve specific formulas to identify

21    suspicious orders?

22                 MR. JACO:  Objection.  Scope.

23                 She's here to testify on behalf

24         of the DEA regarding diversion

25         investigators' responsibilities.
```

```
 1                    To the extent you want to reask
 2         the question, you're welcome to.
 3         Otherwise, she can answer in her
 4         personal capacity.
 5                    MR. MOUGEY:  We just spent
 6         three hours talking about suspicious
 7         orders on behalf of -- or in the
 8         context of audit reports and
 9         investigations.
10                    All I'm simply asking is for
11         Ms. Brennan, on behalf of the DEA, to
12         explain why it does not approve
13         specific formulas to identify
14         suspicious orders.
15                    MS. SWIFT:  Object to form.
16                    MR. JACO:  Same objection.
17    QUESTIONS BY MR. MOUGEY:
18         Q.    Ms. Brennan, you're familiar
19    with the DEA's diversion investigator manual,
20    correct?
21         A.    Yes.
22         Q.    And the diversion
23    investigator's manual and the contents
24    therein are kind of the foundation of what
25    diversion investigators do on a day-to-day
```

1    basis, correct?

2        A.    Yes.

3        Q.    And it gives you the tools or

4    the information that an investigator needs

5    when working for the DEA to fill its role,

6    correct?

7        A.    Yes.

8        Q.    And in that manual, the DEA

9    advises its diversion investigators that it

10   does not approve specific formulas for

11   suspicious orders, correct?

12       A.    Yes.

13       Q.    Now, do you have an

14   understanding on behalf of the DEA,

15   Ms. Brennan, why it is that the DEA does not

16   approve specific formulas to identify

17   suspicious orders?

18           MR. JACO:  Same objection on

19       scope.  The witness can answer in her

20       personal capacity.

21           MR. MOUGEY:  I'm sorry, but

22       this -- we just -- we just went

23       through that the DEA advises its

24       diversion investigators in its

25       diversion manual that is the basis for

1          its audits and investigations not to

2          approve specific formulas, and I'm

3          simply asking why.

4                  I can't think of a question

5          that's more directly within the scope

6          of what we're here to talk about

7          today.

8     QUESTIONS BY MR. MOUGEY:

9          Q.     Why is it that the DEA -- why

10    is it that the DEA doesn't approve specific

11    formulas?

12                 MR. JACO:  You can answer.

13                 THE WITNESS:  The regulation

14         puts that on the registrant.  It

15         states that the registrant has to

16         devise and come up with a system to

17         identify suspicious orders.  And

18         they're the ones that know their

19         customers.

20    QUESTIONS BY MR. MOUGEY:

21         Q.     Exactly.

22                 And the customers at Walgreens

23    specifically are its own pharmacies, correct?

24         A.     Yes, according to the reports.

25         Q.     Yes, ma'am.

```
 1                    And Walgreens is in the best

 2      position to know its own customers or its own

 3      pharmacies, correct?

 4           A.    Yes.

 5           Q.    Now, does the -- when the DEA

 6      performs an audit or investigation like the

 7      documents that we just went through, is there

 8      a typical number of investigators that

 9      perform those audits?

10                    I mean, is it two or three or

11      four or five?  I mean, is it -- what's the --

12      just a range would be fine.

13           A.    Generally it's two.  It can be

14      more, but it's always got to be at least two

15      employees.

16           Q.    So it's got to be at least two,

17      but is it typically no more than three, four,

18      five?

19           A.    Yes.

20           Q.    So have you been to a Walgreens

21      distribution center?

22           A.    No.

23           Q.    Do you have any idea how many

24      Walgreens distribution centers serve or

25      distribute Schedule II opiates in the US?
```

1    A.    According to the report we

2    looked at, it was two.  I don't know if

3    that's changed.  I don't know currently.

4    Q.    So you would agree with me that

5    there is a tremendous amount of shipments

6    that come out of those distribution centers

7    to Walgreen stores across the US?

8              MS. SWIFT:  Object to form.

9              MR. JACO:  Same objection.

10             THE WITNESS:  No.

11   QUESTIONS BY MR. MOUGEY:

12   Q.    I'm sorry, go ahead,

13   Ms. Brennan.

14   A.    Without looking at the actual

15   sales, it's hard to say.

16   Q.    Yes, ma'am.

17             There's thousands of Walgreens,

18   right?

19             MR. JACO:  Objection.  Form.

20             THE WITNESS:  I know there's a

21        lot.

22   QUESTIONS BY MR. MOUGEY:

23   Q.    So when these two, three, four,

24   five investigators arrive at a distribution

25   center, what is their ability to review data

```
 1    or documents to verify what Walgreens'

 2    position is during those interviews?

 3              MR. JACO:  Objection.  Form.

 4              You can answer.

 5              THE WITNESS:  A diversion

 6         investigator would have the ability to

 7         review any documents that they're --

 8         that they're required to keep

 9         according to the regulations.

10    QUESTIONS BY MR. MOUGEY:

11         Q.    How long does a -- is there a

12    standard or a typical time period that one of

13    these audits or investigations take place?  I

14    mean, is it a few days?  A week?

15         A.    It can all be dependent upon

16    the size of the company, you know, of the

17    registrant, how many diversion investigators

18    are there and how quickly they're able to

19    provide records.

20         Q.    So let's just take Walgreens,

21    which is -- I would assume is one of the

22    larger companies that the DEA dealt with in

23    its role of performing an audit from the DIs,

24    correct?

25         A.    It would be probably among some
```

Highly Confidential - Subject to Further Confidentiality Review

1    of the bigger distributors.

2         Q.    So let's just say there's, you

3    know, within the range, two to five.  I mean,

4    typically does an audit take a week?

5         A.    I would say depending, it

6    probably wouldn't take more than five days.

7         Q.    All right.  And beforehand,

8    gathering any information, data, documents,

9    how much time is spent reviewing prior to the

10   audit?

11        A.    Probably several days.

12        Q.    And then post-audit, how much

13   time is spent reviewing documents or

14   submissions after the DIs are on site?

15        A.    Again, it could take up to

16   several days, compiling information, writing

17   the report.

18        Q.    So from pre-review of on-site

19   inspection, on-site inspection and then post,

20   a typical audit might be two to three weeks.

21             Is that fair, Ms. Brennan?

22        A.    Yeah, given -- given the size,

23   a bigger registrant that we consider, yes,

24   that's fair to say.

25        Q.    Are you familiar with the

1    phrase "self-regulation"?

2         A.     Not overly.  I mean, I can

3    imagine what it means, but...

4         Q.     And on behalf of the DEA, what

5    is your understanding of what self-regulation

6    means in the context of diversion

7    investigators performing an audit?

8         A.     I don't know that we've ever

9    really used that term, but there -- but I --

10   what I think you mean is that there's any --

11   once -- once a person becomes a DEA

12   registrant, the expectation is that they will

13   understand and abide by the regulations that

14   come with that registration.

15        Q.     And that that registrant -- the

16   DEA requires the registrant to fulfill its

17   duties and obligations under the Controlled

18   Substance Act, correct?

19             MS. SWIFT:  Objection.

20   QUESTIONS BY MR. MOUGEY:

21        Q.     Ms. Brennan?

22        A.     Sorry.  Yes.

23        Q.     Now, for example, in this

24   litigation, Walgreens has produced over --

25   it's about 379,000 documents, or over a

```
 1    million pages, in the course of this

 2    litigation.

 3              When you've mentioned during

 4    the course of today that the DIs are

 5    reviewing documents, you're not talking about

 6    that scope of documents, correct?

 7              MR. JACO:  Objection.  Form.

 8              You can answer.

 9              THE WITNESS:  Most likely not.

10         You'd be -- you'd be looking at the

11         documents that pertain to the scope of

12         your audit, and then whatever other

13         documents that pertain to that

14         registrant need to be reviewed.

15    QUESTIONS BY MR. MOUGEY:

16         Q.    Well, out of the things that we

17    covered today that Ms. Swift took you through

18    were, for example, security, correct?

19         A.    Yes.

20         Q.    Cage/vault locks, correct?

21         A.    Yes.

22         Q.    Fencing, correct?

23         A.    Yes.

24         Q.    Those were a lot of the topics

25    that Ms. Swift took you through today,
```

1    correct?

2          A.      Yes, they were some of the

3    topics.

4          Q.      And reviewing tens of thousands

5    of pages of suspicious order reports that

6    Walgreens was generating, would that be

7    something that the diversion investigators

8    would review when performing an audit?

9          A.      They would review -- they might

10   ask us to see it just to know what system is

11   in place, but then they would definitely, you

12   know, be asking if the system was in place

13   and then what -- what the registrant, what

14   that system was to disclose.

15         Q.      So if there were tens of

16   thousands of pages of suspicious orders that

17   a Walgreens distribution center had or

18   corporate had, the DEA's role would be to

19   simply confirm that it had a policy -- a SOMS

20   policy and procedure in place, correct?

21                 MR. JACO:  Objection.  Form.

22                 You can answer.

23                 THE WITNESS:  Yes, we were

24        trained to make sure that they were

25        following the regulations by having a

Highly Confidential - Subject to Further Confidentiality Review

```
 1          system in place.
 2     QUESTIONS BY MR. MOUGEY:
 3          Q.     And at no point during the
 4     audit would the DEA's DIs, diversion
 5     investigators, would they ever review these
 6     tens of thousands of pages of suspicious
 7     orders and analyze those from a statistical
 8     perspective, correct?
 9                 MR. JACO:  Objection.  Form.
10                 THE WITNESS:  No, there was no
11          requirement by DEA for DIs to do that.
12     QUESTIONS BY MR. MOUGEY:
13          Q.     And registrants like Walgreens
14     was aware that the diversion investigators,
15     the DIs, were not reviewing the results of
16     any suspicious order monitoring on an order-
17     by-order-by-order basis, correct?
18                 MS. SWIFT:  Objection.
19          Foundation.
20                 THE WITNESS:  I can't say if
21          Walgreens was aware of that or not.
22     QUESTIONS BY MR. MOUGEY:
23          Q.     Let me rephrase that.  It was
24     probably a bad question.
25                 The DEA's diversion
```

1    investigators would not analyze tens of

2    thousands of pages of orders that were

3    flagged by Walgreens and then sit with

4    Walgreens employees as part of their

5    investigation and ask questions about those

6    orders, correct?

7              MR. JACO:  Objection.  Form.

8              You can answer.

9              THE WITNESS:  No, probably not.

10        They would not -- you know, they would

11        look to see that the system is in

12        place.

13   QUESTIONS BY MR. MOUGEY:

14        Q.    Now, you --

15        A.    And may have looked at certain

16   records, but...

17        Q.    Same question.  Would your

18   diversion investigators, the DAs {sic}, would

19   they review all or any due diligence

20   associated with those orders that were

21   flagged?

22        A.    It's possible they would have

23   looked to see that due diligence was being

24   done and maybe picked -- looked at, you know,

25   during the time frame of the audit, but

1    it's -- you know, I can't say that for sure

2    without seeing reports.

3           Q.     And when you say that they

4    would have reviewed them, I think you started

5    to say that they picked -- they picked

6    examples to ensure that there was some due

7    diligence being performed?

8                  MR. JACO:  Objection.

9           Misstates the witness' testimony.

10                 You can answer.

11                 THE WITNESS:  I'm sorry, could

12          you just repeat the question again?

13   QUESTIONS BY MR. MOUGEY:

14          Q.     Sure.

15                 There was never a comparison

16   between all of the suspicious orders that

17   were flagged by Walgreens to the due

18   diligence files to ensure that due diligence

19   was being performed on each and every

20   suspicious order before it was shipped from

21   the DEA, correct?

22                 MR. JACO:  Objection.  Form.

23                 You can answer.

24                 THE WITNESS:  I would say

25          that's probably correct.

```
 1    QUESTIONS BY MR. MOUGEY:

 2         Q.    Okay.  As part of your

 3    preparation today to testify on behalf of the

 4    DEA, I think you looked at somewhere north of

 5    20 and south of 30 documents, correct?

 6         A.    Correct.

 7         Q.    And you saw the names on

 8    those -- the audits and the investigations of

 9    the folks that worked for the DEA, correct?

10         A.    Yes.

11         Q.    Do you know who those people

12    are?

13              MR. JACO:  Objection.  Form.

14              You can answer.

15              THE WITNESS:  I know them to be

16         employees of DEA at the time that

17         those investigations and reports were

18         written.

19    QUESTIONS BY MR. MOUGEY:

20         Q.    Are you familiar with their

21    backgrounds?

22         A.    No.

23         Q.    Do your diversion

24    investigators, "your" meaning the DEA, do

25    they typically have statistical or computer
```

1    science backgrounds?

2         A.    Diversion investigators have

3    all kinds of backgrounds.

4         Q.    Are you aware if any of the

5    diversion investigators involved in this

6    analysis have advanced degrees in any type of

7    statistical analysis or computer science?

8         A.    I would have no way of knowing

9    that.

10        Q.    So we started off this line of

11   questioning talking about the -- about

12   self-regulation.

13             The DEA, when performing its

14   audit, relies heavily on the information

15   given to it by the registrant, correct?

16             MR. JACO:  Objection to the

17        form.

18             You can answer.

19             THE WITNESS:  Yes.

20   QUESTIONS BY MR. MOUGEY:

21        Q.    And the investigators, given

22   the time, the couple of weeks that they're on

23   site and preparing a post-audit and the

24   volume of information, have to rely on what

25   the registrant relays, correct?

 1                    MR. JACO:  Objection.  Form.

 2                    THE WITNESS:  Yes, because it's

 3          their records that were -- their

 4          information and records that they're

 5          responsible to have that we're

 6          reviewing.

 7     QUESTIONS BY MR. MOUGEY:

 8          Q.    So, Ms. Brennan, if you would,

 9     please -- if you would go to, just to make it

10     easy, Walgreens Defendant Exhibit 6.

11                    MR. JACO:  What number was

12          that?  I missed it?

13                    MR. MOUGEY:  6.

14                    THE WITNESS:  Number 6?

15     QUESTIONS BY MR. MOUGEY:

16          Q.    Yes, ma'am.  It's dated May 17,

17     2006.

18                    Do you have that in front of

19     you, Ms. Brennan?

20          A.    Yes.

21          Q.    In paragraph number 1, the DEA

22     was communicating to Walgreens that the

23     formulation utilized by the firm for

24     reporting suspicious ordering of controlled

25     substances was insufficient, correct?

```
 1          A.     They're saying it didn't

 2   meet the require -- the regulation.

 3          Q.     Yes, ma'am.

 4                 And it was insufficient, the

 5   exact words on the page, right?

 6          A.     Yes.

 7          Q.     And that was as early as this

 8   letter as 2006, correct?

 9          A.     Correct.

10                 And again, I would point out

11   that this letter was not produced by DEA

12   through our files.

13          Q.     Yes, ma'am.

14                 Would it surprise the DEA that

15   Walgreens, as early as May of 2006, was

16   discussing internally that the suspicious

17   ordering report, based on the DEA factor, was

18   inadequate?

19                 MR. JACO:  Objection.  Form.

20                 THE WITNESS:  I'm sorry, can

21      you repeat that again?

22   QUESTIONS BY MR. MOUGEY:

23          Q.     Yes, ma'am.

24                 Would it surprise the DEA that

25   by the middle of 2006, that Walgreens knew
```

1    that its suspicious ordering report relying

2    on the DEA factor of 3 was inadequate?

3              MR. JACO:  Same objection.

4              THE WITNESS:  I'm not -- I'm

5         not sure.  They were never told to use

6         that.  They had to know, but also that

7         this -- this is -- more speaks to

8         utilizing noncontrolled substances in

9         with their system.

10   QUESTIONS BY MR. MOUGEY:

11        Q.    I'm not sure I follow you.

12   Help me out.

13             When you say "noncontrolled

14   substances" --

15        A.    So their -- what it states

16   here, that their system is that it's standard

17   of deviation from a normal ordering pattern

18   and groups, 25 customers, based on the number

19   of noncontrolled and controlled substance

20   prescriptions.

21        Q.    Yes, ma'am.

22             And I apologize if we're not --

23   if I'm -- what the question I asked you:

24   Would it surprise the DEA that by the

25   mid-2006 Walgreens was aware that using a

1    formula based on the DEA factor of 3 in

2    Appendix E was inadequate to identify

3    suspicious orders for opiates?

4                    MR. JACO:  Objection.  Form and

5            foundation.

6                    THE WITNESS:  I'm not sure if I

7            can answer DEA would be surprised by

8            that information or not.

9    QUESTIONS BY MR. MOUGEY:

10           Q.    Well, let's just stick with

11   Exhibit 6.

12                   Here the DEA is telling

13   Walgreens that the formulation utilized by

14   the firm for reporting suspicious ordering of

15   controlled substances was insufficient,

16   correct?

17           A.    Yes.

18           Q.    And the next several sentences

19   relay what that formulation was, correct?

20           A.    Yes.

21           Q.    And that formulation, at least

22   part of it, used the DEA factor of 3,

23   correct?

24           A.    Yes.

25           Q.    And just so the jury

1    understands, when you say "the DEA factor of

2    3," that means that the orders were grouped

3    and then averaged, and if a subsequent order

4    exceeded that by three times, it was flagged,

5    correct?

6                    MR. JACO:  Objection.  Form.

7         Foundation.

8                    THE WITNESS:  As described

9         here, that's what it's saying.

10   QUESTIONS BY MR. MOUGEY:

11        Q.    Yes, ma'am.

12                  And if we take this third

13   sentence from the bottom of paragraph 1, it

14   says, "Of these 25 customer groupings, the

15   firm calculated the average order per item of

16   each controlled substance.  The firm then

17   took the average and multiplied that figure

18   by 3."

19                  Correct?

20        A.    Correct.  But it also said the

21   number of noncontrolled and controlled

22   substances prescriptions.

23        Q.    Yes, ma'am.

24                  But the DEA factor of 3, the

25   DEA was telling Walgreens that that was

1   insufficient, correct?

2            MR. JACO:  Objection.

3        Misstates the document.

4   QUESTIONS BY MR. MOUGEY:

5        Q.    I'm sorry.  Ms. Brennan,

6   please?

7            MR. JACO:  You can answer.

8            THE WITNESS:  Without having

9        the report, it's difficult to say what

10       they were saying was insufficient

11       here.

12  QUESTIONS BY MR. MOUGEY:

13       Q.    The plain language of the

14  document, that the firm took the average and

15  multiplied that figure by 3, whether it was

16  controlled substances or noncontrolled

17  substances, the DEA was advising Walgreens

18  that that formula was insufficient as of

19  2006, correct?

20           MS. SWIFT:  Asked and answered

21       several times.

22           MR. JACO:  Objection.  Same

23       objection.

24           THE WITNESS:  I don't know that

25       that can be stated here.  I don't

Highly Confidential - Subject to Further Confidentiality Review

```
 1          think there's enough information.

 2                I believe DEA, when you're

 3          putting noncontrolled, that's negating

 4          your system for controlled substances.

 5          They were doing a combination here.

 6                So I don't know if they were --

 7          what they were seeing was

 8          insufficient, if they were describing

 9          their program.

10   QUESTIONS BY MR. MOUGEY:

11        Q.    All right.  So I think -- so

12   your concern about this paragraph is that it

13   included both noncontrolled and controlled

14   and then used the DEA factor of 3; is that --

15   am I stating accurately what you're

16   communicating?

17                MS. SWIFT:  Object to the form.

18                MR. JACO:  Same objection.

19                THE WITNESS:  Yes.

20   QUESTIONS BY MR. MOUGEY:

21        Q.    And that the DEA -- just -- I

22   apologize if I made this more complicated

23   than it needed to be, but the DEA was simply

24   advising Walgreens in 2006 that its formula

25   was insufficient, correct?
```

```
 1              MS. SWIFT:  Objection.
 2         Mischaracterizes the document.
 3              THE WITNESS:  Something about
 4         its formula was insufficient.
 5    QUESTIONS BY MR. MOUGEY:
 6         Q.    It's insufficient, right, as of
 7    2006.
 8              And the DEA, as part of its
 9    standard operating procedures for diversion
10    investigators, would then rely on Walgreens
11    to correct that formula to identify orders of
12    unusual size, frequency or pattern; correct,
13    Ms. Brennan?
14         A.    Based on what they said in this
15    violation, then, yes.
16              MR. MOUGEY:  I tell you what.
17         Why don't we -- it's two o'clock
18         Eastern time; it's 1 our time.  Why
19         don't we go ahead and break there and
20         we'll come back.
21              How long, Ms. Brennan, to take
22         a break and get something to eat and
23         open those other documents?  How much
24         time do you need or would you like to
25         take?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  No more than

 2         30 minutes probably, if that's good

 3         for everybody else.

 4              MR. MOUGEY:  That's fine for

 5         me.

 6              30 minutes works for everybody

 7         else?

 8              MR. JACO:  Works for me.

 9              MR. MOUGEY:  Great.  Thanks.

10              VIDEOGRAPHER:  We're going off

11         the record.  The time is 1:47.

12          (Off the record at 1:47 p.m.)

13              VIDEOGRAPHER:  We're going back

14         on record.  The time is 2:36.

15    QUESTIONS BY MR. MOUGEY:

16         Q.    Ms. Brennan, as -- the DEA

17    would expect that its registrants to follow

18    the guidance that it sends to each and every

19    member, correct?

20         A.    Yes.

21         Q.    So when the DEA provides

22    guidance to its registrants that the DEA

23    would not approve specific formulas, you

24    would expect its registrants to heed that

25    advice, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. JACO:  Objection.  Form.

 2              THE WITNESS:  I mean, I think

 3         the expectation would be that they

 4         should know DEA was not going to

 5         approve whatever system they put in

 6         place.

 7    QUESTIONS BY MR. MOUGEY:

 8         Q.    Exactly.

 9              So when the DEA advises the

10    registrants that it shouldn't rely on rigid

11    formulas when detecting suspicious orders of

12    unusual size, frequency or pattern, the DEA

13    would expect the registrants to follow that

14    advice, correct?

15              MR. JACO:  Objection.  Form.

16              THE WITNESS:  Yes, they --

17         they're putting it out there as

18         guidance so that they can know it's

19         expected, and it usually clarifies the

20         regulations.

21    QUESTIONS BY MR. MOUGEY:

22         Q.    It ensures that each of the

23    respondents follow that advice so we have the

24    closed system, with opiates, continues to be

25    one that minimizes diversion, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. JACO:  Objection.  Form.

 2                    THE WITNESS:  We do have a

 3            closed system of distribution, yes,

 4            and that's to prevent diversion, and

 5            the system to detect suspicious orders

 6            is one part of that.

 7     QUESTIONS BY MR. MOUGEY:

 8            Q.     So when the DEA tells its

 9     registrants, "only send us orders that you

10     have confirmed that are suspicious," you'd

11     expect the registrants to follow that

12     guidance, correct?

13                    MS. SWIFT:  Assumes facts not

14            in evidence.

15                    THE WITNESS:  Yes, that would

16            be the expectation.

17     QUESTIONS BY MR. MOUGEY:

18            Q.     When the DEA sends its

19     registrants guidance that suspicious orders

20     shouldn't be shipped until due diligence was

21     performed, the DEA would expect the

22     registrants to follow that advice, that

23     guidance, correct?

24                    MS. SWIFT:  Objection.  Form.

25                    MR. JACO:  Objection.  Form.
```

```
 1              THE WITNESS:  Yes, I believe
 2         that would be DEA's expectation.
 3    QUESTIONS BY MR. MOUGEY:
 4         Q.     And if we look at a complete
 5    record of information that the DEA provided
 6    to its registrants over the course of almost
 7    two decades, there is example after example
 8    after example wherein the DEA provides ample
 9    guidance to the registrants on how to conduct
10    business, correct?
11              MS. SWIFT:  Assumes facts not
12         in evidence.
13              MR. JACO:  Form.
14              THE WITNESS:  I'm aware that
15         DEA has provided some guidance out to
16         registrants.
17    QUESTIONS BY MR. MOUGEY:
18         Q.     You're aware that there's
19    guidance from the DEA going back to its
20    registrants going back to the late '80s;
21    correct, Ms. Brennan?
22              MS. SWIFT:  Vague.
23              MR. JACO:  Objection.  Form.
24              You can answer.
25              THE WITNESS:  I'm aware that as
```

1         diversion investigators, we were

2         trained -- like I'm not aware of a

3         specific reference, but I know that's

4         always been DEA's -- you know, staying

5         consistent with the regulations.

6    QUESTIONS BY MR. MOUGEY:

7         Q.     Now, when the DEA performs its

8    audits, it expects complete candor from the

9    registrants, correct?

10        A.     Yes.

11        Q.     When the DEA performs its

12   audits, it expects that its registrants

13   provide an accurate universe of information

14   to the auditors, correct?

15        A.     Yes.  It should be what we've

16   asked for, and there's a regulation for

17   accurate records.

18        Q.     And when the DEA is performing

19   its audit, it expects the registrants to

20   provide all of the material information,

21   correct?

22                MR. MOUGEY:  Objection.  Form.

23                THE WITNESS:  The expectation

24        is that the information that DEA is

25        requesting that pertains to records

Highly Confidential - Subject to Further Confidentiality Review

1       that a registrant has to keep will be

2       provided.

3   QUESTIONS BY MR. MOUGEY:

4       Q.      And not just the records.

5   Because today during Ms. Swift's questioning,

6   you-all discussed conversations between

7   auditors and management, correct?

8       A.      That's correct.

9       Q.      And in those conversations

10  between auditors and management, and I mean

11  registrants' management, the auditors would

12  expect complete candor in those

13  conversations, not just the records, correct?

14      A.      Yes.

15      Q.      And the auditors would expect

16  complete truths during those conversations

17  with the registrants' management, correct?

18              MR. JACO:  Objection.  Form.

19              THE WITNESS:  Yes.

20  QUESTIONS BY MR. MOUGEY:

21      Q.      You, in your personal capacity,

22  you've been an auditor, diversion

23  investigator, with the DEA for over 25 years,

24  correct?

25      A.      Yes.

1    Q.    In order for an auditor to do

2  his or her job, it's paramount that they have

3  complete and accurate information, correct?

4                MR. JACO:  Objection.  Form.

5                THE WITNESS:  It's required by

6        the regulations that they have

7        complete and accurate, so -- so that's

8        what we're looking for.

9  QUESTIONS BY MR. MOUGEY:

10    Q.    And not just when you're

11  looking for it.  But in order to do -- in

12  order for the DEA to do its job and to

13  generate an audit, an investigative report,

14  that is accurate, you have to have access to

15  complete information, correct?

16    A.    Yes, we'd need access to the

17  information that's required to do the audit.

18    Q.    The weight or importance of an

19  audit wherein the auditor relies on

20  half-truths or incomplete information is

21  worthless, correct?

22                MR. JACO:  Objection.  Form.

23                THE WITNESS:  I'd say it

24        doesn't help to get an accurate audit,

25        and it doesn't -- and it shows the --

Highly Confidential - Subject to Further Confidentiality Review

```
1          the registrant isn't -- is not keeping

2          complete and accurate records like

3          they're required to.

4    QUESTIONS BY MR. MOUGEY:

5          Q.     And my questions that we just

6    walked through, not only the records, but the

7    information that's verbally relayed during

8    the course of the audit, it is extremely

9    important that that be complete and accurate

10   as well, correct?

11               MR. JACO:  Objection.  Form.

12          Asked and answered.

13               THE WITNESS:  Yes, we would

14          rely on information in conversation to

15          be as accurate as possible also.

16   QUESTIONS BY MR. MOUGEY:

17          Q.     So in performing an audit, the

18   DEA would expect -- when asking for

19   information, whether it be records or

20   verbally, the DEA expects that it gets a

21   complete picture, correct?

22               MR. JACO:  Objection.  Asked

23          and answered.

24               THE WITNESS:  Yes.

25
```

Highly Confidential - Subject to Further Confidentiality Review

1    QUESTIONS BY MR. MOUGEY:

2        Q.    So, for example, today, there's

3    a series of 20 to 30 documents that you've

4    been provided to answer questions today.  You

5    would expect, as the DEA representative, that

6    you be allowed to review and see the universe

7    of information for you to provide your

8    testimony.

9            Based on all of these decades

10   of experience, you'd expect that record to be

11   complete today, correct?

12           MR. JACO:  Objection.

13       Argumentative.

14   QUESTIONS BY MR. MOUGEY:

15       Q.    You expect it to be complete,

16   what you were shown today, Ms. Brennan?

17   That's not a difficult question.

18           The DEA would -- as a

19   representative of the DEA here today, you'd

20   expect the documents that you were shown to

21   be a complete and accurate picture of what

22   transpired, correct?

23           MR. MOUGEY:  Same objection.

24           THE WITNESS:  I would expect by

25       reading the reports of investigation

Highly Confidential - Subject to Further Confidentiality Review

```
 1          that they were, you know, documented

 2          by diversion investigators as they've

 3          been trained to do.

 4    QUESTIONS BY MR. MOUGEY:

 5          Q.     Yes, ma'am.

 6                 And that's -- you're entitled

 7    to a complete and accurate picture of the

 8    information from the registrant, just as

 9    today when you're asked to be -- to review

10    all of that information and review all of the

11    material information, you would want to see

12    everything, right?

13                 MR. MOUGEY:  Objection.  Same

14          objection.

15                 THE WITNESS:  As a witness, I

16          would expect to review what I've been

17          authorized to.

18    QUESTIONS BY MR. MOUGEY:

19          Q.     You'd expect in order to do

20    your job today representing the DEA, based on

21    your 25 years of experience and as a

22    corporate rep today, that you be allowed to

23    review and opine on documents that are

24    material to this analysis today, correct?

25                 MR. JACO:  Objection.  Asked
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              and answered.  Argumentative.

2                   THE WITNESS:  Again, I would

3              expect to be answering on what I was

4              authorized to testify on.

5    QUESTIONS BY MR. MOUGEY:

6         Q.    That's not what I've --

7                   MR. MOUGEY:  And, Mr. Jaco, I'd

8              appreciate if you just stick with the

9              objection to form, the argumentative

10             and asked and answered.  If you would

11             just stick to the objection to form,

12             that'd be great.

13   QUESTIONS BY MR. MOUGEY:

14        Q.    So let's -- let me make sure I

15   understand.

16                  In your capacity today as the

17   corporate representative for the DEA and

18   asked to review a series of documents, you

19   would expect to review a complete picture of

20   those documents reflecting the DEA's audit

21   work with Walgreens, correct?

22                  MR. JACO:  Objection.  Form.

23                  MS. SWIFT:  Objection.

24                  THE WITNESS:  Again, I would

25             expect to be reviewing what I was
```

1          authorized to speak on.

2    QUESTIONS BY MR. MOUGEY:

3          Q.     And you'd expect what you were

4    authorized to speak on to be a complete and

5    accurate picture, correct?

6               MS. SWIFT:  Objection.  Asked

7          and answered.  Argumentative.

8          Foundation.

9               MR. JACO:  Same objections.

10   QUESTIONS BY MR. MOUGEY:

11         Q.     You can answer, Ms. Brennan.

12         A.     I would -- again, I did not --

13   I was told what I would be.  I was not part

14   of what would be reviewed and asked.  I was

15   just provided testimony that I could provide.

16         Q.     I'm sorry, I didn't mean to

17   interrupt you.

18               When Ms. Swift just spent three

19   hours asking you about alarms and security

20   and locks, you would expect Ms. Swift to put

21   a complete and accurate picture of documents

22   in front of you, just as your auditors would

23   expect a complete and accurate picture from

24   the registrants when performing the audit,

25   correct?

```
 1              MS. SWIFT:  Object to the
 2         mischaracterization of the process.
 3              MR. JACO:  Same objection.
 4    QUESTIONS BY MR. MOUGEY:
 5         Q.    Ms. Brennan, you would expect
 6    that Walgreens put a complete and accurate
 7    picture of the applicable documents in front
 8    of you today, not just bits and pieces;
 9    correct, Ms. Brennan?
10              MS. SWIFT:  Same objection.
11         Asked and answered.
12              MR. JACO:  Same objection.
13              THE WITNESS:  When we were
14         discussing the controlled -- the
15         scheduled investigations, the report
16         was there, so that was the -- the
17         report of investigation.
18    QUESTIONS BY MR. MOUGEY:
19         Q.    If there are documents that
20    reflect internal conversations at Walgreens
21    discussing meetings with the DEA, you would
22    want to be shown those, would you not,
23    Ms. Brennan, in your capacity as a DEA rep?
24              MR. JACO:  Objection.  Form.
25         Argumentative.
```

```
 1              THE WITNESS:  Again, my
 2         understanding is that there is very
 3         specific things that I was told I
 4         could testify on, so I have to rely on
 5         my attorneys to -- that they're going
 6         to provide the information needed.
 7    QUESTIONS BY MR. MOUGEY:
 8         Q.    I understand, and you've given
 9    me that answer about what was approved and
10    what Mr. Jaco approved and what the DOJ
11    approved.
12              What I'm asking you is:  If
13    there are documents that reflect internal
14    conversations at Walgreens memorializing
15    communications with the DEA, you'd expect to
16    be shown those, would you not?
17              MS. SWIFT:  Same objections.
18         Asked and answered several times.
19              MR. JACO:  Agreed.
20    QUESTIONS BY MR. MOUGEY:
21         Q.    We can continue down this road.
22    I'm asking you in your capacity as an
23    auditor, 25 years with the DEA, as the
24    corporate representative today, would you
25    expect to be shown a complete and accurate
```

1    picture of the information between Walgreens

2    and the DEA?

3              MS. SWIFT:  Object to the

4         mischaracterization of the Touhy.

5    QUESTIONS BY MR. MOUGEY:

6         Q.    Yes or no, Ms. Brennan.

7              MR. JACO:  Objection.  Asked

8         and answered.

9              THE WITNESS:  Again, I have to

10        go with I would expect to be shown

11        what I'm allowed to testify on.

12   QUESTIONS BY MR. MOUGEY:

13        Q.    So it's not important to you as

14   a DEA corporate rep today to have access to

15   complete information?

16             MR. JACO:  Objection.

17        Misstates the witness' testimony.

18             MR. MOUGEY:  I'm not asking

19        what Mr. Jaco's approved or hasn't

20        approved, because we all know from how

21        we started this off that you weren't

22        approved to testify on an $80 million

23        fine, you weren't approved to testify

24        on the diversion manual, the Chemical

25        Handler's Manual, there's all kinds of

Highly Confidential - Subject to Further Confidentiality Review

```
 1          documents you haven't been approved to

 2          testify on.

 3   QUESTIONS BY MR. MOUGEY:

 4          Q.      For you to give a complete and

 5   accurate testimony today as a corporate

 6   representative from Walgreens {sic}, wouldn't

 7   you expect to be given the material

 8   information from Walgreens?

 9                 I'm not asking you from the

10   DOJ.  I'm asking you from Walgreens.

11                 Would you have expected

12   Ms. Swift to put in front of you documents

13   that give you the complete story?

14                 MS. SWIFT:  Objection.

15                 MR. JACO:  Objection.  Asked

16          and answered.  Argumentative.

17                 THE WITNESS:  I'll be honest, I

18          didn't know what to expect what I was

19          going to be asked today.  I knew a

20          little bit of what I was -- but I

21          didn't know what I would be.

22   QUESTIONS BY MR. MOUGEY:

23          Q.      So, for example, if Walgreens

24   memorialized conversations with the DEA in

25   2006 that the DEA believes that the
```

1  suspicious ordering report is inadequate,

2  they specifically did not like the DEA factor

3  and would like to know how we determined it.

4  They would like a better description of the

5  formula used to determine the suspicious

6  order.

7         The explanation of the formula

8  is, all stores are put into a group of 25

9  based on the amount of daily prescribed --

10  prescriptions filled.  The average is then --

11  the orders to the DC on each group of 25.

12  The result is average order, times DEA

13  factor, equals trigger.  They said the

14  formula should be based on size, pattern and

15  frequency.

16         As the DEA corporate

17  representative, would you want to know that

18  in 2006 the DEA told Walgreens that the

19  formula should be based on size, pattern and

20  frequency?

21         MR. JACO:  Objection.  This --

22      Ms. Swift -- excuse me.  Ms. Brennan

23      is the DEA corporate representative on

24      a select set of narrow topics that

25      were authorized.  This is going far

1          afield from those topics.

2                You've asked and answered the

3          question numerous times.

4     QUESTIONS BY MR. MOUGEY:

5          Q.    Would you want to know that the

6     DEA said to Walgreens that the formula should

7     be based on size, frequency and pattern?

8                MS. SWIFT:  And lodge the same

9          objections.

10               MR. JACO:  Objection.

11               MS. SWIFT:  And to the extent

12         that this continues to go on, we're

13         going to seek more time with the

14         witness.

15    QUESTIONS BY MR. MOUGEY:

16         Q.    Would you want to know,

17    Ms. Brennan, as the DEA representative, that

18    the DEA told Walgreens that the formula

19    should be based on size, frequency and

20    pattern, and that the DEA factor was

21    inadequate; yes or no?

22               MR. JACO:  Objection.

23         Objection.  Argumentative.  Outside

24         the scope of the notice of deposition

25         as well as the Touhy authorization.

```
 1                    MR. MOUGEY:  Outside the scope.
 2          We spent three hours talking about
 3          suspicious order monitoring, Mr. Jaco.
 4   QUESTIONS BY MR. MOUGEY:
 5          Q.    Ms. Brennan, would you want to
 6   know --
 7                    MR. JACO:  It's Mr. Jaco, and
 8          it's outside the scope.
 9   QUESTIONS BY MR. MOUGEY:
10          Q.    Would you want to know,
11   Ms. Brennan -- don't worry about what some
12   lawyer in DC is telling you.
13                    Would you want to know -- as
14   the auditor with all of the decades of
15   experience, would you want to know that the
16   DEA told Walgreens that the formula should be
17   based on size, pattern and frequency and that
18   the DEA factor was inadequate?  Would you
19   want to know that; yes or no?
20                    MR. JACO:  Objection.  You
21          cannot instruct the witness to ignore
22          her attorney and her counsel.
23                    If you're going to continue
24          down this track, we'll just stop, and
25          we'll move for a protective order with
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            the special master.
2                This has all been negotiated
3            beforehand, and your attempt to use
4            this deposition to expand the scope of
5            a negotiated and authorized deposition
6            is improper.
7    QUESTIONS BY MR. MOUGEY:
8        Q.    Would you want to know,
9    Ms. Brennan, if there was material
10   information about conversations between the
11   DEA and Walgreens as part of your opinion
12   today?
13               MR. JACO:  Objection.  Asked
14           and answered.  Argumentative.
15               She's answered the question
16           numerous times.
17   QUESTIONS BY MR. MOUGEY:
18       Q.    I'm not asking what your lawyer
19   told you.
20               As the auditor, as the DEA rep,
21   was it important to you?
22               MR. JACO:  Objection.
23           Ms. Brennan is not testifying as an
24           auditor.  She is testifying on
25           specific audits that were authorized.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. MOUGEY:  Actually, if you
 2         look at the Touhy request, and we can
 3         pull it out, Ms. Brennan is here to
 4         testify today about the -- about the
 5         audit process and the scope of the
 6         audit investigation, which includes
 7         suspicious orders.
 8    QUESTIONS BY MR. MOUGEY:
 9         Q.    So I'm asking, as part of that
10    capacity here today, as a representative of
11    the DEA, would you want to know about
12    conversations between Walgreens and the DEA
13    wherein Walgreens was told that the formula
14    should be based on size, frequency and
15    pattern, and that the DEA factor of 3 was
16    inadequate?  Would you want to know that?
17              MS. SWIFT:  Objection.  Assumes
18         facts not in evidence.
19              MR. JACO:  Objection.  Asked
20         and answered.
21              MR. MOUGEY:  I'll agree that
22         it's --
23              MR. JACO:  Authorized to
24         testify --
25              MR. MOUGEY:  I agree --
```

```
 1              MR. JACO:  -- on the role

 2         diversion investigators.  You're

 3         asking about her role as a witness

 4         here today.  Those are two very

 5         different things.

 6              So the role of diversion

 7         investigators when conducting

 8         scheduled investigations is one thing,

 9         but her role as a witness and what

10         information is provided to her by

11         Walgreens is not an appropriate line

12         of questioning, especially when it's

13         been asked repeatedly.

14    QUESTIONS BY MR. MOUGEY:

15         Q.    Would you agree today,

16    Ms. Brennan, that part of the responsibility

17    of a diversion investigator when performing

18    cyclic investigations of pharmacy

19    distribution centers includes knowing whether

20    or not a SOMS policy was in place?

21         A.    You're asking if -- knowing if

22    we go out, if there's a suspicious order

23    monitoring system in place?

24         Q.    Yes, ma'am.

25              Is it your responsibility --
```

1    I'm sorry.

2                As the corporate representative

3    today, testifying or opining about the

4    responsibilities of diversion investigators

5    when performing cyclic investigations of

6    pharmacy distribution centers, would you

7    want -- was part of that audit that a SOMS

8    policy was in place?

9                MS. SWIFT:  Form.

10               THE WITNESS:  Yes, it was to

11          check that there was a system in

12          place.

13   QUESTIONS BY MR. MOUGEY:

14        Q.    And as part of your testimony

15   today about the responsibility of diversion

16   investigators, would you think it was

17   important, if there are records and

18   memorializations of conversations about SOMS

19   policies, that those be provided to you?

20               MR. JACO:  Objection.  Asked

21          and answered.

22   QUESTIONS BY MR. MOUGEY:

23        Q.    You can answer, Ms. Brennan.

24        A.    Depends on the context, I

25   guess.  I wasn't asked about that, and I

1    wasn't testifying -- I wasn't even testifying

2    on the 2006 scheduled investigation.

3         Q.    Give me one second,

4    Ms. Brennan, just...

5              Ms. Brennan, you provided

6    testimony today in response to questions by

7    Ms. Swift about the 2006 investigation,

8    correct?

9         A.    On what we -- what appeared to

10    be a letter of admonition in response to that

11    investigation.

12         Q.    Yes, ma'am.

13              Wherein Walgreens was told by

14    the DEA in 2006 that the formulas -- the

15    formulation utilized by the firm was

16    insufficient, that May 17, 2006, correct?

17         A.    Correct.

18         Q.    And what I'm asking you is, if

19    there are related documents that memorialize

20    conversations between Walgreens and DEA,

21    wouldn't you expect Walgreens to show that to

22    you?

23              MS. SWIFT:  Objection.

24         Mischaracterizes.

25              MR. JACO:  Objection.  Asked

Highly Confidential - Subject to Further Confidentiality Review

```
 1          and answered.
 2                  If we're going to continue down
 3          this track and you're going to
 4          continue abusing the witness, we'll
 5          move for a protective order.
 6                  If you have something you want
 7          to show her, show her the document,
 8          but you just keep asking her the same
 9          question over and over again.  We're
10          not getting anywhere.
11                  (Brennan 30(b)(6) Plaintiff's
12          Exhibit 9 marked for identification.)
13  QUESTIONS BY MR. MOUGEY:
14          Q.    All right.  Ms. Brennan, would
15  you please open folder number 9.
16                  The document you have in front
17  of you is dated 5/27/2006; correct,
18  Ms. Brennan?
19          A.    Yes.
20          Q.    And this is an internal
21  Walgreens memorandum.  If you look under the
22  section titled 1301.74(b), Walgreens is
23  discussing the fact that the DEA told
24  Walgreens that the DEA factor was inadequate,
25  that the formula should be based on size,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    pattern and frequency, correct?

 2                 MR. JACO:  Objection.  Scope.

 3                 The witness can answer in her

 4          personal capacity, but not on behalf

 5          of DEA.

 6    QUESTIONS BY MR. MOUGEY:

 7          Q.     You can answer, Ms. Brennan.

 8          A.     Yes.

 9          Q.     And, Ms. Brennan, you were

10    saying "yes" to the fact that it appears that

11    Walgreens was told by the DEA that its

12    formula using the DEA factor was inadequate,

13    and instead the formula should be based on

14    size, pattern and frequency, correct,

15    Ms. Brennan?

16          A.     That's what it appears this is

17    saying.

18                 MR. JACO:  Just a standing

19          objection that any answer she gives on

20          this document are in her personal

21          capacity.

22    QUESTIONS BY MR. MOUGEY:

23          Q.     And in your 25 years as an

24    auditor with Walgreens -- I'm sorry, with

25    the -- in your 25 years of experience as an
```

1  auditor with the DEA, if you were performing

2  this audit, you'd want to see what that

3  internal memorialization was, correct?

4                  MR. JACO:  Objection.  Form.

5                  THE WITNESS:  Probably -- well,

6        if you were doing an audit, you would

7        probably never see the internal

8        documents.

9  QUESTIONS BY MR. MOUGEY:

10      Q.    If you're having conversations

11  with Walgreens post-May 17, 2006 letter and

12  you were asking what Walgreens -- what their

13  interpretation of that conversation was, and

14  there's an internal memo discussing that

15  conversation, as an auditor, you'd want to

16  know what Walgreens' interpretation of that

17  conversation was, correct?

18                  MR. JACO:  Objection.  Form.

19                  You can answer.

20                  THE WITNESS:  That would pretty

21        much be outside the scope of what we'd

22        be looking at.

23  QUESTIONS BY MR. MOUGEY:

24      Q.    Well, you don't have the 2006

25  audit, and no one can find the 2006 audit,

1    correct?  The report?

2        A.    That's what I've been told.

3        Q.    Yes, ma'am.

4              And here you have a

5    memorialization of what was discussed during

6    the missing audit.

7              Wouldn't you expect as a

8    25-year auditor for Walgreens to say, ah, we

9    can't find the report, but I've got a

10   memorialization of that conversation?

11             Ms. Brennan, it's right here.

12   You'd expect them to take a consistent

13   position with this memorialization, would you

14   not?

15             MR. JACO:  Objection.  Form.

16        Argumentative.

17   QUESTIONS BY MR. MOUGEY:

18        Q.    It's part of the registrant's

19   duty of candidness, complete, accurate

20   information.

21             You'd expect Walgreens to tell

22   you about this memorialization, correct?

23             MR. JACO:  Same objection.

24             THE WITNESS:  I would expect to

25        know what they were doing to make the

1          corrections.  That would be follow-up

2          as a diversion investigator.

3     QUESTIONS BY MR. MOUGEY:

4          Q.     But in order to know what the

5     corrections were, you'd want to know what the

6     conversation -- this is an easy question.

7     Come on.

8               As an auditor, you'd definitely

9     want to know, what were the conversations.

10    If you can't find the audit report, the

11    conversation's memorialized.  How would you

12    not want to know it?

13              MR. JACO:  Objection.  Asked

14         and answered.

15    QUESTIONS BY MR. MOUGEY:

16         Q.     You can answer.

17         A.     As an auditor, I'd expect to

18    see the changes made the next time we went

19    back.

20         Q.     And in order to know what the

21    changes made because the audits were missing,

22    you'd expect someone to show you the internal

23    memorialization, correct?  Or at least be

24    consistent?

25         A.     I'd expect --

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. JACO:  Objection.  Asked

 2         and answered.

 3              Go ahead.

 4              THE WITNESS:  I would -- I

 5         would expect that whoever we were

 6         dealing with at the company would be

 7         explaining how they were now -- how --

 8         explaining their new system, or if

 9         they changed, made changes, what that

10         was.

11   QUESTIONS BY MR. MOUGEY:

12         Q.    And that those changes were

13   based off of the previous conversation,

14   correct, Ms. Brennan?

15              MR. JACO:  Objection.  Form.

16              THE WITNESS:  Well, the changes

17         would have been based off the

18         conversation that DEA had during their

19         scheduled investigation.

20   QUESTIONS BY MR. MOUGEY:

21         Q.    Ms. Brennan, in your capacity

22   today as the DEA representative on the

23   audits, you would expect to be able to rely

24   on basic documents like the Chemical

25   Handler's Manual, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. JACO:  Objection.  Form.
 2              THE WITNESS:  I mean, they were
 3         given to -- to the registrants to help
 4         them guide them with the regulations.
 5   QUESTIONS BY MR. MOUGEY:
 6         Q.    Right.
 7              But you would expect that that
 8   Chemical Handler's Manual, because it was
 9   provided to the registrants and because we
10   talked about it today, you would expect that
11   one of the approved documents would be the
12   Chemical Handler's Manual, correct?
13              MR. JACO:  Objection.
14         Argumentative.
15              She's not here to testify about
16         the approved documents.  That's not
17         part of her process or responsibility.
18              If you want to argue about the
19         approved documents, we can go argue
20         about the approved documents before
21         the special master.  This line of
22         questioning is inappropriate for the
23         witness.
24   QUESTIONS BY MR. MOUGEY:
25         Q.    You would expect -- you would
```

1  expect, Ms. Brennan, in your capacity today,

2  that -- not to be given a snippet of the

3  Chemical Handler's Manual to testify about,

4  correct?

5          MR. JACO:  Objection.

6       Mischaracterizes the preparation.

7       Mischaracterizes testimony already

8       given.

9          MR. MOUGEY:  Just object to the

10      form, please, Mr. Jaco.

11         MR. JACO:  It's Mr. Jaco, for

12      the third time today.

13         MR. MOUGEY:  Tab 3 in the --

14         MR. JACO:  The evidence

15      track --

16         MR. MOUGEY:  Exhibit 3.

17         MR. JACO:  All right.  Let's --

18  QUESTIONS BY MR. MOUGEY:

19      Q.    Exhibit 3.  You were given E-3.

20  E-3 is a small piece, one page, of the

21  Chemical Handler's Manual, correct?

22      A.    That's correct.

23      Q.    The Chemical Handler's Manual

24  covers List I chemicals, does it not?

25      A.    Yes.

```
 1          Q.      Does List I chemicals -- do the
 2  List I chemicals in the Chemical Handler's
 3  Manual include opiates?
 4          A.      No.
 5          Q.      So this formula that Ms. Swift
 6  walked you through in Defendant's Exhibits
 7  Number 3, with paragraphs numbered 1, 2, 3,
 8  4, 5 with that formula, none of that applies
 9  to opiates in the Chemical Handler's Manual;
10  correct, Ms. Brennan?
11                  MS. SWIFT:  Objection.
12                  MR. JACO:  Objection.  Form.
13                  THE WITNESS:  Yes, it's my
14          belief that whatever's in the Chemical
15          Handler's Manual pertains to listed
16          chemicals.
17  QUESTIONS BY MR. MOUGEY:
18          Q.      And the listed chemicals do not
19  include opiates, correct?
20          A.      The listed chemicals do not
21  include controlled substances.
22          Q.      So when you look at Defendant's
23  Exhibit Number 3, one page of the Chemical
24  Handler's Manual, that refers to List I
25  chemicals containing items stocked by the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    distribution center.

 2                  Do you see that?

 3                  And if you need to take a

 4    minute to get there, that's fine.

 5         A.    Yes, it's my understanding that

 6    since this is in the Chemical Handler's

 7    Manual, this is pertaining to list -- List I

 8    chemicals.

 9         Q.    And you see the paragraph 1 --

10    and I'll just read it.  "Add purchase

11    quantities for the past 12 months for all

12    customers within the same distribution center

13    and for customer type" -- it's hospital,

14    pharmacy or other -- "for any List I chemical

15    containing items stocked by the distribution

16    center."

17                  Do you see that?

18         A.    Yes.

19         Q.    So the entire formula for E-3

20    is premised upon List I chemicals that does

21    not even include opiates?

22                  MR. JACO:  Objection.  Form.

23                  THE WITNESS:  That's the

24         understanding, yes.

25                  MS. SWIFT:  How long have we
```

 1          been on the record?

 2                  VIDEOGRAPHER:  Total time or

 3          specific to plaintiffs?

 4                  MS. SWIFT:  Specific to

 5          plaintiffs.

 6                  VIDEOGRAPHER:  Plaintiffs have

 7          been on for 1:26.

 8                  MS. SWIFT:  I believe that

 9          means we've got four minutes left.

10                  MR. JACO:  No, I think they

11          have 34 minutes left.  I believe we

12          did four and two.

13                  MS. SWIFT:  Let me check.  I

14          thought it was an hour and a half.

15                  MR. MOUGEY:  I think -- I think

16          the -- I thought it was either two or

17          two and a half.  That must be --

18                  MR. JACO:  It's two.  It's four

19          and two.  We changed it to two in the

20          Touhy authorization that went out to

21          plaintiffs.

22                  MS. SWIFT:  We accepted four on

23          the understanding of an hour and a

24          half.  So we got knocked 30 minutes of

25          the hour and a half we had originally

1    negotiated.

2           MR. JACO:  I don't believe so.

3    There was a -- I'd have to go back and

4    pull up the e-mail chain, but in the

5    e-mail I offered -- came back and

6    offered four and two, and everyone

7    agreed to that.

8           MS. SWIFT:  We'll check it.

9           Thanks, Andrew.

10   QUESTIONS BY MR. MOUGEY:

11          Q.    Ms. Brennan, in your

12   preparations for today, were you made aware

13   that Walgreens created an algorithm in 2008

14   that identified orders of unusual size,

15   frequency or pattern?

16          A.    Just as was reported in --

17   under suspicious orders in some of the

18   reports.

19          Q.    Have you ever heard of a

20   gentleman from Walgreens, in preparation for

21   today, the name of Wayne Bancroft?

22          A.    No.

23          Q.    Did anyone advise you that

24   Walgreens had a formula based on size,

25   frequency or pattern that it was running

 1    internally for a period of years post-2008

 2    until 2012 in the background?

 3              MR. JACO:  Objection.  Form.

 4         Assumes facts not in the record.

 5    QUESTIONS BY MR. MOUGEY:

 6         Q.    Have you seen any evidence

 7    preparing for today that Walgreens had a

 8    formula identifying suspicious orders based

 9    on size, frequency or pattern, other than the

10    formula using the DEA factor?

11         A.    Some of the -- the reports

12    documented suspicious order monitoring

13    programs that were not using this factor.

14         Q.    And what were those reports

15    that you saw?

16         A.    They were some of the ones we

17    went over this morning.  I don't remember

18    offhand.  They were after -- after the 2006

19    report.

20         Q.    When you say "this morning,"

21    you mean in response to Ms. Swift's

22    questioning?

23         A.    Yes, those would be the reports

24    I'm referring to.

25         Q.    Okay.  So are you referencing

1    the different systems in '13 to '14 and '15,

2    2013, '14 and '15, that Ms. Swift took you

3    through?

4          A.    Yes, I believe that was them.

5          Q.    Were you aware that Walgreens

6    had a formula identifying orders of unusual

7    size, frequency or pattern that it developed

8    in 2008 and were running until at least 2012?

9                MR. JACO:  Objection.

10               You can answer.

11               THE WITNESS:  No, I was not.

12   QUESTIONS BY MR. MOUGEY:

13         Q.    So you were not aware that

14   Walgreens was identifying orders that were

15   suspicious based on size, frequency of

16   pattern, 10,000 orders on a regular basis,

17   that it did not report to the DEA?

18               MS. SWIFT:  Objection.  Assumes

19          facts not in evidence.

20               MR. JACO:  Objection.

21               MR. MOUGEY:  What is your

22          objection, Mr. Jaco?  Help me

23          understand what your objection is to

24          that question.

25               MR. JACO:  It's assuming facts

```
 1              not in record.
 2                    MR. MOUGEY:  I'm just -- I know
 3              I'm definitely assuming not facts not
 4              in the record.  I'll agree with you on
 5              that.
 6     QUESTIONS BY MR. MOUGEY:
 7         Q.      What I'm asking is did anyone
 8     tell you or show you, Ms. Brennan, that
 9     Walgreens was running an algorithm
10     identifying orders of unusual size, frequency
11     or pattern, that was identifying in some
12     instances 10,000 orders a month that it
13     didn't report to the DEA?
14                    MS. SWIFT:  Mischaracterizes
15              the record.  Assumes facts not in
16              evidence.
17     QUESTIONS BY MR. MOUGEY:
18         Q.      Anybody tell you that?
19                    MR. JACO:  Same objection.
20                    THE WITNESS:  No.
21     QUESTIONS BY MR. MOUGEY:
22         Q.      Did anybody show you the
23     formula?
24                    MR. JACO:  Objection.  Form.
25                    THE WITNESS:  No.
```

```
 1              MR. MOUGEY:  And I'll go ahead

 2         and turn it over to Ms. Swift, and

 3         I'll reserve whatever I have left.

 4              Thank you very much,

 5         Ms. Brennan.

 6              MS. SWIFT:  And how much does

 7         he have left, assuming two hours?

 8              MR. MOUGEY:  I don't know,

 9         Kate.  I left my stopwatch at home.

10              MS. SWIFT:  I wasn't asking

11         you, Peter.  Sorry, I was asking Dan.

12              VIDEOGRAPHER:  Stand by.

13              MS. SWIFT:  Sorry.

14              VIDEOGRAPHER:  Plaintiffs'

15         total time is 1:32.

16              MS. SWIFT:  Thank you.

17              REDIRECT EXAMINATION

18    QUESTIONS BY MS. SWIFT:

19         Q.    Ms. Brennan, I would like to

20    start right where plaintiffs' counsel left

21    off.

22              If you would, please, turn to

23    Exhibit 9, which is the May 2009 Perrysburg

24    report that we talked about this morning.

25         A.    Okay.
```

1    Q.    And take a look at page 18, if

2  you would, please.  And we looked at this

3  before.

4          Do you see paragraph number 2

5  on page 18 of the 2009 Perrysburg report?

6    A.    Yes.

7    Q.    It says, "Suspicious orders are

8  sent from the corporate office to DEA as well

9  as the distribution center."  And then it

10  says, "Mr. Kneller" -- that's the Walgreens

11  distribution center manager -- "was unaware

12  of what measures the corporate office takes

13  in investigating suspicious orders, stating,

14  'this process is currently under review at

15  their corporate office.'  Kneller identified

16  Dan Coughlin, DEA compliance officer, as the

17  individual who will draft final policy in

18  CM 15, the published procedures of Walgreen

19  Company."

20          Did I read that correctly?

21    A.    Yes.

22    Q.    Do you know whether the

23  diversion investigator who conducted this

24  2009 investigation contacted Mr. Coughlin and

25  talked to him about the process that was

 1    under review for monitoring suspicious orders

 2    at the corporate office?

 3         A.    No, I don't know if that

 4    conversation occurred.

 5         Q.    But if a diversion investigator

 6    had wanted to do that, that would have been

 7    something that he or she could have done?

 8         A.    Yes.

 9              MR. JACO:  Objection.  Form.

10              THE WITNESS:  Sorry.  Yes.

11    QUESTIONS BY MS. SWIFT:

12         Q.    And you see here Mr. Kneller is

13    not only reporting to the DEA that the

14    process for monitoring suspicious orders is

15    currently under review, but he's very candid.

16    He says, I don't really know what they do;

17    you'd need to talk to Mr. Coughlin.

18              Is that fair?

19         A.    Yes, it says here that he

20    stated he was unaware of what measures the

21    corporate office takes.

22         Q.    Okay.  Now I'd like to go back

23    to Exhibit 24.

24              This is the October 2009

25    memorandum from Joseph Rannazzisi, correct?

1      A.    Yes.

2      Q.    Mr. Rannazzisi sent this 2009

3   memo to all diversion program managers, among

4   others, right?

5      A.    Yes.

6      Q.    In 2009, you were a diversion

7   program manager; is that true?

8      A.    No.

9      Q.    What were you in 2009?

10      A.    October of 2009, I believe I

11   was a group supervisor.

12      Q.    This memo from October of 2009

13   also went to diversion group supervisors,

14   correct?  You see that on the first page?

15      A.    Yes.

16      Q.    Did you receive this memo from

17   Mr. Rannazzisi in October of 2009?

18      A.    Yes.

19      Q.    Do you remember receiving it?

20      A.    Yes, I remember.

21      Q.    Did Mr. Rannazzisi or the

22   Office of Diversion Control provide any

23   training to the group supervisors and the

24   others about this October 2009 memo around

25   that time?

Highly Confidential - Subject to Further Confidentiality Review

1      A.     I don't recall specifically

2  around this time.

3      Q.     Do you remember receiving

4  training about this October 2009 memo at any

5  point in time?

6      A.     I believe they started bringing

7  us in -- yeah, bringing all the DI's group

8  supervisors in to discuss -- and give us a

9  little more training.

10      Q.     After receiving this

11  October 2009 memo?

12      A.     I don't recall.

13      Q.     Do you think it was somewhere

14  in that general time frame?

15      A.     It may have been.  I believe I

16  was a group supervisor by then.

17      Q.     And just to be clear, the

18  October 2009 memo relates to interim

19  guidelines that were going to be implemented

20  until the diversion manual was rewritten,

21  right?

22             That's what it says on page 1

23  of Exhibit 24?

24      A.     Yes, that's what it says.

25      Q.     Did you discuss the

```
 1    October 2009 interim guidelines with

 2    Mr. Rannazzisi?

 3         A.    No, I don't recall doing that.

 4         Q.    Did you discuss it with anybody

 5    else in the Office of Diversion Control?

 6         A.    No, I don't recall doing that.

 7         Q.    You said you thought you

 8    recalled receiving training on these

 9    October 2009 interim guidelines.

10              What do you recall about that

11    training?

12         A.    I just recall -- sorry.

13              MR. JACO:  Just to be clear, in

14         her personal capacity here.

15              MS. SWIFT:  Well --

16              MR. JACO:  Are you asking her

17         in her personal capacity?

18              MS. SWIFT:  I mean, you gave us

19         these documents and told us they were

20         documents that she is to prep on.

21              I understand that your -- is

22         your position that her testimony on

23         these documents that you've provided

24         to us, that, you know, because she

25         prepped on them, that we can only ask
```

Highly Confidential - Subject to Further Confidentiality Review

```
1        questions about them for some

2        particular period of time?

3            I guess the answer to your

4        question, Andrew, is no.  I'm asking

5        her as the corporate representative.

6            MR. JACO:  Okay.  I just

7        didn't -- it wasn't clear to me if you

8        were asking if she personally received

9        training or if training was provided

10       by DEA.

11           Go ahead.  It sounds like the

12       latter.

13           MS. SWIFT:  I hear you.

14           MR. JACO:  Can you rephrase the

15       question?

16           MS. SWIFT:  Yep.

17  QUESTIONS BY MS. SWIFT:

18       Q.    I think I did actually ask

19  previously whether you personally received

20  training, and I think you said yes; is that

21  fair?

22       A.    Yes, that's fair.

23       Q.    Is it also true then that DEA

24  provided training to diversion program

25  managers, diversion group supervisors and
```

Highly Confidential - Subject to Further Confidentiality Review

1    others on these interim guidelines?

2         A.    I mean, it's fair to say

3    training was provided.  I don't know if it

4    was specifically, you know, on these

5    guidelines.

6         Q.    What is the nature of the

7    training that you're talking about?

8         A.    It was on -- to the best of my

9    recollection, on scheduled investigations

10   explaining ARCOS.  You know, certain sections

11   came in and just gave some updates and

12   trainings.

13        Q.    To be clear, did you talk to

14   Mr. Rannazzisi in preparation for your

15   deposition today?

16        A.    No, I did not.

17        Q.    Did you talk to anybody in

18   preparation for your deposition today about

19   this October 2009 set of interim guidelines?

20        A.    No, I did not.

21        Q.    And what was involved in DEA's

22   training about these October 2009 interim

23   guidelines?  What were folks trained on?

24        A.    I remember someone from the

25   ARCOS unit being there and discussing, like,

1    you know, the analysis, like here where it's

2    telling us prior to, so it was understanding

3    that a little bit.

4              And then I believe it was, I'll

5    have to say, discussing -- probably

6    reiterated like suspicious order -- what's in

7    here, reporting and then discussing, you

8    know, like the due diligence and stuff.

9              So I think some of the sections

10   covered some of these -- some of these and

11   probably then also brought up, you know, just

12   reminders and kind of -- it was like a

13   refresher almost from the diversion manual

14   to, excuse me, to scheduled investigations.

15       Q.    Did you review this

16   October 2009 memo in preparation for your

17   deposition today?

18       A.    I'm sorry, could you repeat

19   that?

20       Q.    Did you review the October 2009

21   interim guidelines in preparation for your

22   deposition?

23       A.    Yes.

24       Q.    Who provided the training that

25   you're talking about?

1        A.      I believe it was different

2    section chiefs at the time in DEA

3    headquarters.

4        Q.      Do you remember their names?

5        A.      I'm sorry, I don't.

6        Q.      Again, the set of interim

7    guidelines says that "these are interim

8    guidelines that will be implemented until

9    such time as the diversion manual is

10    finalized."

11              And then in the third paragraph

12    it refers to these guidelines as "changes and

13    requirements," correct?

14        A.      Sorry, it's down too many

15    pages.

16              Yes.  Sorry.

17        Q.      And then in the attachments,

18    attachment number 1 is listed as "interim

19    policy in lieu of diversion manual changes,"

20    correct?

21        A.      Yes.

22        Q.      The October 20, 2009 interim

23    guidelines are not a copy of the updated

24    version of the diversion manual that is being

25    referenced, right?  It's not the same thing?

1          MR. JACO:  Objection.  Form.

2          THE WITNESS:  That would be

3     correct.

4  QUESTIONS BY MS. SWIFT:

5     Q.    In fact, they're interim

6  guidelines to be used in lieu of the new

7  diversion investigator's manual that's to be

8  finalized at some future date after

9  October 2009, correct?

10    A.    Yes, that's what's stated on

11 the memo.

12    Q.    The October 2009 interim

13 guidelines reflect changes to requirements

14 provided in the prior version of the

15 diversion manual, right?  That's what it

16 says?

17         MR. JACO:  Objection.  Form.

18         THE WITNESS:  I'm sorry, can

19    you repeat the question again?

20 QUESTIONS BY MS. SWIFT:

21    Q.    Sure.

22         The October 2009 interim

23 guidelines reflect changes and requirements

24 that are supposed to be used until an updated

25 version of the diversion manual is released?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. JACO:  Same objection.
 2                    THE WITNESS:  Yes, that's
 3          correct.
 4     QUESTIONS BY MS. SWIFT:
 5          Q.    All right.  Turn to page 3 of
 6     the October 2009 interim guidelines.
 7                    And under the paragraph about
 8     suspicious order reporting, it says, "The
 9     registrant does not fill the order but
10     reports same to their local field office."
11                    Correct?
12          A.    Yes, that's what it says.
13          Q.    And Mr. Rannazzisi put in bold
14     and underlined the words "does not fill,"
15     because that's one of the changes in
16     requirements that the interim guidelines are
17     meant to convey, right?
18                    MR. JACO:  Objection.  Form.
19          Misstates the document.
20                    THE WITNESS:  Well, the -- "by
21          nature of an order."  As put in the
22          regulations, it says, "suspicious
23          orders by nature of an order."  That's
24          something that is not filled yet.
25                    So it's being reiterated here,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          but it was always DEA's -- it was

 2          always the understanding that DEA and

 3          diversion investigators were trained

 4          on that it related to the order.

 5   QUESTIONS BY MS. SWIFT:

 6          Q.    Who told you that?

 7                What is the basis of your

 8   testimony that you give today?  Who told you

 9   that?

10          A.    I'm sorry?

11                MR. MOUGEY:  You cannot hear

12          the attorney.

13                MS. SWIFT:  Can you hear me

14          now?

15                MR. MOUGEY:  Very muffled.

16                MR. JACO:  Muffled, yeah.

17                MS. SWIFT:  How about now?

18                MR. JACO:  That's better.

19                MR. MOUGEY:  Getting better.

20   QUESTIONS BY MS. SWIFT:

21          Q.    What is the basis of the

22   testimony you gave a moment ago, Ms. Brennan?

23          A.    The basis is based on DEA's

24   training and understanding of the

25   regulations.
```

1      Q.     My specific question is:  Who

2    told you that that was always DEA's

3    understanding?  Who told you that?

4      A.     I mean, nobody told me that was

5    DEA's -- that -- that's what we were trained

6    on, and that's what the regulations state.

7      Q.     Who trained you on that,

8    specifically on that particular point?

9      A.     I mean, we were trained in

10   Quantico.  I was trained in the field.

11     Q.     Can you point to any document

12   prior to this 2009 set of interim guidelines

13   that says the registrant does not fill the

14   order but reports same to their local field

15   office?

16           MR. JACO:  Objection.  Form.

17           THE WITNESS:  Sorry.

18           MR. JACO:  Go ahead, sorry.

19           THE WITNESS:  The regulations

20       state that an order, suspicious order,

21       when a system is in place, that has to

22       be sent, reported, to DEA.  And also

23       in our reg -- in our manual, it also

24       discusses that.

25

```
 1   QUESTIONS BY MS. SWIFT:

 2        Q.    {Audio interruption} -- whether

 3   fills an order?

 4             MR. JACO:  You're fading out

 5        again, Kate.

 6             MS. SWIFT:  Give me a minute.

 7             (Discussion off the record.)

 8             MS. SWIFT:  And actually, could

 9        we go off the record so we can fix

10        this?  Because I'm not really sure how

11        I'm going to fix it.

12             VIDEOGRAPHER:  Yes.  We are

13        going off record.  The time is

14        3:38 p.m.

15         (Off the record at 3:38 p.m.)

16             VIDEOGRAPHER:  We're going back

17        on record.  The time is 3:41.

18   QUESTIONS BY MS. SWIFT:

19        Q.    Ms. Brennan, the regulation

20   that you referred to a moment ago, were you

21   referring to the suspicious order monitoring

22   regulation, Section 1301.74(b)?

23        A.    Yes.

24        Q.    That regulation reads in full:

25   "The registrant shall design and operate a
```

1    system to disclose to the registrant

2    suspicious orders of controlled substances.

3    The registrant shall inform the field

4    division office of the administration in his

5    area of suspicious orders when discovered by

6    the registrant.  Suspicious orders include

7    orders of unusual size, orders deviating

8    substantially from a normal pattern, and

9    orders of unusual frequency."

10              It doesn't say anything about

11   whether a registrant is not supposed to fill

12   an order, correct?

13        A.     No, it doesn't specify right

14   there.

15        Q.     It also doesn't say anything

16   about whether a registrant is supposed to

17   perform due diligence, correct?

18              MR. JACO:  Objection.  Form.

19              THE WITNESS:  Due diligence

20        isn't mentioned there specifically,

21        no.

22   QUESTIONS BY MS. SWIFT:

23        Q.     Did you ever ask Mr. Rannazzisi

24   why he bolded and underlined the phrase "does

25   not fill" in these October 2009 interim

1    guidelines?

2         A.    No.

3         Q.    You don't know why that phrase,

4    "does not fill," is bolded and underlined,

5    correct?

6         A.    No, I don't know why he --

7               MR. JACO:  Objection.

8    QUESTIONS BY MS. SWIFT:

9         Q.    Then if you'll take a look at

10   the next sentence for me, it says, "Excessive

11   purchase reports from registrants, reports of

12   unusual sales, will no longer be accepted by

13   the DEA."

14               Correct?

15        A.    Yes, that's what it says.

16        Q.    Mr. Rannazzisi bolded and

17   underlined the phrase "will no longer be

18   accepted."

19               Correct?

20        A.    Yes.

21        Q.    And again, that's because this

22   is one of the changes in requirements that

23   the interim guidelines were meant to convey,

24   right?

25               MR. JACO:  Objection.  Form.

1    Mischaracterizes the document.

2    QUESTIONS BY MS. SWIFT:

3        Q.    Do you know one way or the

4    other?

5        A.    I don't know what exactly he

6    was conveying, but I know the suspicious

7    order reporting, the regulation was always

8    there.  And, you know, we were trained that

9    an order is different than a purchase.

10       Q.    Well, that's interesting that

11   you say that.  The phrase in parentheses here

12   is "reports of unusual sales," correct?

13            Do you see that?

14       A.    Yes.

15       Q.    The phrase "reports of unusual

16   sales" appears to reference reports of

17   suspicious orders that had been shipped.

18            Would you agree with that?

19            MR. JACO:  Objection.  Form.

20            THE WITNESS:  I mean, he's put

21       it there under talking about excessive

22       purchases.

23   QUESTIONS BY MS. SWIFT:

24       Q.    You were designated as a

25   30(b)(6) witness on behalf of the DEA on

Highly Confidential - Subject to Further Confidentiality Review

```
1    specific subjects, correct?

2         A.    Yes.

3         Q.    And in fact, the DEA and the

4    Department of Justice went through a

5    relatively detailed process to authorize you

6    to testify on only those subjects, correct?

7         A.    That's my understanding from

8    the attorneys.

9         Q.    And then the specific subjects

10   you were authorized to testify about by the

11   Department of Justice and the DEA are the

12   topics that are listed in the Touhy

13   authorization marked as Exhibit 20 that we

14   discussed this morning, correct?

15        A.    Yes.

16        Q.    Those topics did not include

17   the meaning or interpretation of the

18   Controlled Substances Act or its regulations,

19   correct?

20        A.    That would be correct.

21        Q.    Do you understand, Ms. Brennan,

22   that the DEA has just very recently, within

23   the past couple of weeks, proposed a new rule

24   that would require due diligence to be

25   performed on suspicious orders prior to
```

1   shipment?

2           MR. JACO:  Objection.  Scope.

3           You can answer.

4           THE WITNESS:  I understand that

5       there's regulations being proposed,

6       but I -- I haven't been part of that.

7   QUESTIONS BY MS. SWIFT:

8       Q.    And that new rule, that new

9   regulation, has not been enacted yet.  It's

10  not Code of Federal Regulations, correct?

11          MR. JACO:  Same objection.

12      Outside the scope.

13          She can testify in her personal

14      capacity.

15          You can answer.

16          THE WITNESS:  I believe it's in

17      a -- I think it's in a proposed

18      rulemaking, but, no, it hasn't been

19      finalized yet.

20  QUESTIONS BY MS. SWIFT:

21      Q.    October of 2009 interim

22  guidelines that we've been talking about, if

23  you look at the page -- let's see, it's

24  page 3 that talks about due diligence.  We

25  spoke about it a little this morning.

1           Do you remember that?

2      A.     Yes.

3      Q.     It says that the diversion

4  investigators are "required to do a thorough

5  review of the registrant's due diligence

6  procedures," correct?

7      A.     Yes.

8      Q.     And they're also required to

9  document that, right?

10     A.     Yes, that's what it says here.

11     Q.     And we've seen throughout the

12  dozen or so investigation reports that we

13  reviewed today that when the diversion

14  investigators find violations, they do

15  document them, right?

16     A.     Yes.

17          MR. JACO:  Objection.

18  QUESTIONS BY MS. SWIFT:

19     Q.     We didn't see -- in any of the

20  investigation reports we looked at today, we

21  didn't see the DEA find any fault with

22  Walgreens' due diligence procedures, correct?

23          MR. JACO:  Objection.  Form.

24          THE WITNESS:  Well, it also

25       states here that DEA will not approve,

```
 1            certify or assist them, so --
 2  QUESTIONS BY MS. SWIFT:
 3       Q.     I understand.  That wasn't my
 4  question.
 5            My question was:  In all of the
 6  investigation reports we looked at today, we
 7  did not see DEA find any violation with
 8  respect to due diligence.
 9            That's a true statement, right?
10            MR. JACO:  Same objection.
11            THE WITNESS:  Of the ones we
12       looked at today, no, we didn't see it
13       listed as a violation.
14  QUESTIONS BY MS. SWIFT:
15       Q.     And I'm glad you said "of the
16  ones we looked at today."  I wanted to ask
17  you a couple of questions about the process
18  by which we came to the documents we looked
19  at today.
20            Do you have an understanding
21  that the reason you were authorized to
22  testify on the Walgreens investigation
23  reports that appear in the Touhy
24  authorization is because those -- that --
25  that list of investigation reports
```

```
 1    constitutes every investigation report of

 2    those three distribution centers that DEA has

 3    produced to us?  It's everything we have.

 4               Do you have an understanding of

 5    that?

 6               MR. MOUGEY:  Objection.

 7               THE WITNESS:  Yes.

 8    QUESTIONS BY MS. SWIFT:

 9        Q.    And in all of those

10    investigation reports for those three

11    distribution centers, we didn't see a single

12    violation relating to due diligence on

13    suspicious orders, correct?

14               MR. JACO:  Objection.  Form.

15               THE WITNESS:  Again, that's

16          correct, but it would be how we were

17          trained.

18    QUESTIONS BY MS. SWIFT:

19        Q.    Often we didn't see anything

20    about Walgreens' due diligence procedures in

21    the reports, correct?

22               MR. JACO:  Objection.  Form.

23               THE WITNESS:  That's correct.

24    QUESTIONS BY MS. SWIFT:

25        Q.    And is that consistent with
```

1    your own practice when you were acting as a

2    diversion investigator, that sometimes you

3    would document due diligence procedures and

4    sometimes you wouldn't?

5                    MR. JACO:  Objection.  Form.

6                    THE WITNESS:  Well, this is

7           part of the due diligence as part of

8           the memo -- of this memo, so at this

9           time it would have started being

10          included.

11   QUESTIONS BY MS. SWIFT:

12          Q.     In your experience at DEA, the

13   diversion investigators follow the

14   instructions and guidance provided in the

15   diversion investigator's manual and interim

16   guidelines like what we see in the

17   October 2009 memo, right?

18          A.     Yes, that's the expectation.

19          Q.     And I believe what I asked you,

20   if you could point me to anything other than

21   this memo from October of 2009 instructing

22   the investigators to make sure that

23   registrants were performing diligence before

24   they shipped.

25                    I believe you pointed to the

```
 1   regulation; is that right?

 2              MR. MOUGEY:  Objection.

 3              Is that just within the scope

 4        of the approved documents --

 5              MR. JACO:  Objection.

 6              MR. MOUGEY:  -- or is that in

 7        total?

 8   QUESTIONS BY MS. SWIFT:

 9        Q.    Do you understand the question?

10        A.    Yes.  And -- yes.  I pointed to

11   the regulation.

12        Q.    And we read the regulation, and

13   you confirmed for me that it does not say

14   anything about due diligence, correct?

15        A.    Correct.

16        Q.    Can you point me to anything

17   else, anywhere, that instructs diversion

18   investigators, or registrants in particular,

19   to conduct due diligence on orders before

20   they are shipped?

21        A.    I'm aware in our -- in the

22   manual that it says a letter was sent to the

23   registrants back around 2006 explaining it,

24   and then that also gives us -- tells us that

25   it should not be shipped prior to
```

1    investigating it by the registrant.

2         Q.    Can you identify -- and are you

3    speaking about the current diversion

4    investigator's manual?

5         A.    I'm speaking about the one that

6    was provided as part of this testimony, the

7    sections.

8         Q.    What is the date on that

9    manual?

10        A.    I believe it's 2013.

11        Q.    And you referenced a 2006

12   letter; is that right?

13        A.    Yes.

14        Q.    Was that a letter from

15   Mr. Rannazzisi?

16        A.    I haven't seen it recently, but

17   I believe it was.

18        Q.    Okay.  Can you point me to

19   anything else?

20        A.    No.

21             (Brennan 30(b)(6) Exhibit 26

22        marked for identification.)

23   QUESTIONS BY MS. SWIFT:

24        Q.    All right.  Take a look, if you

25   would, please, at Exhibit Number 26.

1    And actually, before I ask you

2    about Exhibit Number 26, Dan, can you tell me

3    how much time I have on the record?

4    VIDEOGRAPHER:  Yeah.  Stand by.

5    Three hours, 12 minutes.

6    QUESTIONS BY MS. SWIFT:

7    Q.    Okay.  Exhibit 26 is one of the

8    other documents that your lawyers provided us

9    on Wednesday that -- it's my understanding

10    these are documents that you reviewed during

11    your prep for the deposition.

12    Is that true with respect to

13    Exhibit Number 26?

14    A.    Yes.

15    Q.    Exhibit 26 is an October 5,

16    2010, memo from Mr. Rannazzisi, again, to

17    diversion program managers and diversion

18    investigators and others about

19    modifications -- or modification of

20    controlled substance and chemical work plan,

21    correct?

22    A.    Yes.

23    Q.    This memo, in the first

24    paragraph, says, "Enhanced criteria for

25    scheduled investigation work plans were most

1    recently implemented by a memorandum dated

2    March 25, 2009."

3                Do you see that?

4        A.    Yes.

5        Q.    We do not, "we" meaning

6    Walgreens, we have not seen this March 25,

7    2009 memo that is referenced here.

8                Is that something that you

9    reviewed in your preparation?

10       A.    I'm just looking back because

11   I'm getting the other one that was March.

12   October.

13               I don't recall.  I know this

14   one -- this October 27th one.

15               MS. SWIFT:  Right.  And,

16          Andrew, I'll represent to you that we

17          have looked for this memo and cannot

18          find it.  I don't believe it's been

19          produced.

20               We'd ask that it be produced,

21          if you can find it.

22               MR. JACO:  Okay.  We can follow

23          up on that.  I can -- I can represent

24          that that is not something she

25          reviewed.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   MS. SWIFT:  Thank you.  I
 2       appreciate that.
 3  QUESTIONS BY MS. SWIFT:
 4       Q.     Ms. Brennan, do you know what
 5  the enhanced criteria are that are referenced
 6  in the first paragraph of Exhibit 26?
 7       A.     I believe -- let's see.  It
 8  changed -- I'm trying to remember the years
 9  we had.  I believe it changed some of the
10  requirements of the frequency of the cyclic
11  investigations for the registrants, of which
12  it says that's -- yeah, at the time it
13  increased overall frequency.
14       Q.     Do you know whether the
15  enhanced criteria had anything to do with
16  suspicious order monitoring or due diligence?
17       A.     No, I don't know that.
18       Q.     Do you know whether the
19  enhanced criteria that are described here are
20  connected in any way to the rewriting of the
21  diversion manual that was discussed in the
22  October 2009 interim guidelines?
23       A.     No, I'm not sure if that
24  included that or if those were other things.
25       Q.     Now, I asked you some questions
```

```
 1    this morning about what diversion

 2    investigators do when they go on site to

 3    conduct a cyclic investigation.

 4              Do you remember those

 5    questions?

 6        A.    Yes.

 7        Q.    And then plaintiffs' counsel

 8    asked you questions about, well, wouldn't you

 9    have liked to know about all these other

10    things.

11              Do you remember those

12    questions?

13        A.    Yes.

14        Q.    Is it a fair statement that a

15    diversion investigator who goes on site to

16    investigate a distribution center can ask to

17    talk to whoever they want to talk to?

18        A.    Yes.

19        Q.    Is it a fair statement that the

20    diversion investigators can request whatever

21    documents they need to conduct their

22    investigation?

23        A.    Yes.

24        Q.    Do the diversion investigators

25    have the leeway to ask as many questions as
```

1    they want in order to reach the conclusions

2    that are reflected in their investigation

3    reports?

4         A.    Yes.

5         Q.    And that's their job, right?

6               It's important that they do

7    thorough investigations to make sure they

8    have the information they need before they

9    write that report; is that fair?

10        A.    Yes.

11        Q.    That's an important part of a

12   diversion investigator's job, because if the

13   reports that they put out aren't based on

14   thorough, complete information, they're --

15   that could -- that could lead to diversion,

16   potentially?

17              MR. JACO:  Objection.  Form.

18   QUESTIONS BY MS. SWIFT:

19        Q.    Well, maybe you don't agree

20   with that.  I mean, I'm just asking.

21        A.    The report should reflect the

22   investigation, and the investigation is what

23   you hope to not have, you know, diversion.

24        Q.    In preparing for your

25   deposition today and reviewing all of the

Highly Confidential - Subject to Further Confidentiality Review

```
 1    Walgreens investigation reports that DEA
 2    produced to us, did you see any reason to
 3    think that any of the diversion investigators
 4    who wrote those reports failed to conduct
 5    thorough, complete investigations?
 6         A.    I think it's hard to
 7    blanket-statement that as to, you know,
 8    exactly what they did.  I mean, they -- the
 9    reports reflected the investigations that
10    they did.
11         Q.    If a registrant does not
12    provide complete and accurate information
13    that the diversion investigator asks for,
14    wouldn't the diversion investigator put that
15    in the report?
16              MR. JACO:  Objection.  Form.
17              THE WITNESS:  That would be the
18         expectation.
19    QUESTIONS BY MS. SWIFT:
20         Q.    And you didn't see any of that,
21    any indication of anything like that, in any
22    of these reports, correct?
23         A.    I mean, without being there on
24    site and doing it, I can't be for sure.
25         Q.    I mean, you didn't see anything
```

1    documented about that?

2         A.     Right.  What we saw documented

3    were the violations that they said they

4    found.

5         Q.     And you would have every

6    expectation that the DEA investigators would

7    document every violation they found, right?

8         A.     I mean, normally you discuss

9    it, but I can't say, you know, that's

10   something that was discussed and it didn't

11   make it in the report.

12        Q.     Now, {audio interruption } --

13   included every cyclic investigation of the

14   three Walgreens distribution centers the DEA

15   produced to us.

16               Are you aware of any other

17   Walgreens investigation reports for those

18   three distribution centers that DEA has but

19   didn't include in the set that you have?

20        A.     I'm not -- I'm not, but I

21   didn't -- I wasn't involved in looking for

22   any of these records.

23        Q.     You're certainly not aware that

24   the DEA withheld any information from you

25   about its investigations from Walgreens?

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.     Not that I'm aware of.

 2        Q.     Do you understand how the Touhy

 3   authorization process works?

 4        A.     Yes, as explained to me.

 5               MR. JACO:  Objection.  Scope.

 6               The witness can answer in her

 7        personal capacity.

 8   QUESTIONS BY MS. SWIFT:

 9        Q.     It's not up to you what you get

10   to testify about on behalf of DEA, correct?

11        A.     That's correct.

12        Q.     There's a process, and I'll

13   confess I don't understand all of it, but

14   there's a process the DEA goes through to

15   determine the specific topics that you will

16   be authorized to talk about, correct?

17               MR. JACO:  Same objection.

18               The witness can answer in her

19        personal capacity, if she knows.

20               THE WITNESS:  Yes, I understand

21        as far as the process that was

22        explained to me by the attorneys.

23   QUESTIONS BY MS. SWIFT:

24        Q.     Now, a number of the

25   investigation reports we looked at today
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    actually did reference documents that had
 2    been prepared by Walgreens, right?
 3         A.    Some of them did, yes.
 4         Q.    And those were included in your
 5    Touhy authorization.  You were allowed to
 6    talk about those, right?
 7         A.    Yes.
 8         Q.    All right.  Plaintiffs' counsel
 9    asked you some questions about a May 2006
10    internal Walgreens memo from Justin Joseph to
11    Todd Polarolo.
12              Do you have that handy?
13         A.    Yes.
14         Q.    And he asked you questions
15    about the paragraph set off by the regulation
16    1301.74(b).
17              Right?
18         A.    Yes.
19         Q.    I'd like for you --
20              MR. JACO:  Just reiterate my
21         standing objection from earlier that
22         any of her answers with respect to
23         this document are in her personal
24         capacity and not on behalf of DEA.
25              MS. SWIFT:  I understand, and
```

1    I'll agree with you that this

2    testimony is in her personal capacity.

3    QUESTIONS BY MS. SWIFT:

4        Q.    If you would, please,

5    Ms. Brennan, I'd like you to take a look at

6    Exhibit 6, the May 2006 DEA letter, and have

7    it next to the May 2006 Walgreens memo.

8        Okay?

9        A.    Yes.

10       Q.    The DEA's letter is dated

11   May 17, 2006, correct?

12       A.    Yes, the one that DEA was

13   unable to find.  But, yes, that's the one

14   we're referring to.

15       Q.    And it's a letter to

16   Mr. Polarolo, right?

17       A.    Yes.

18       Q.    And then the memo from

19   Walgreens is dated ten days later on

20   May 27th, correct?

21       A.    Yes.

22       Q.    And it's also to Mr. Polarolo,

23   and it has a subject line, "DEA audit

24   preliminary response, March 6, '06," right?

25       A.    Yes.

1        Q.      And I'd like you to compare

2    paragraph 1 from the May 2006 DEA letter to

3    that same -- the 1301.74(b) paragraph in the

4    May 2006 Walgreens memo.

5              And my question for you is:  Is

6    there anything inconsistent here?  I mean, I

7    know they're not word-for-word the same.

8        A.      Yes, it looks like -- similar,

9    consistent.

10       Q.      All right.  Plaintiffs' counsel

11   also asked you some questions about the

12   Chemical Handler's Manual.

13             Do you remember those

14   questions?

15       A.      Yes.

16       Q.      And I believe you testified

17   that the Chemical Handler's Manual was

18   drafted for List I chemicals.

19             Is that fair?

20       A.      Yes.

21       Q.      Do you recall seeing in the

22   July 28, 2006 letter that Walgreens sent to

23   Barbara Dobric at the DEA that Walgreens told

24   the DEA, we're going to use the Chemical

25   Handler's Manual, Appendix E-3, for

1    suspicious order monitoring of controlled

2    substances?

3         A.    Yes.

4         Q.    Walgreens wasn't hiding that

5    from the DEA, correct?

6         A.    Yes.

7               MR. JACO:  Objection.  Form.

8    QUESTIONS BY MS. SWIFT:

9         Q.    Do you recall that in the 2009

10   Perrysburg report marked as Exhibit 9, DEA

11   reported that Mr. Kneller, again, told DEA,

12   we're using the Chemical Handler's Manual,

13   Appendix E-3, for monitoring of suspicious

14   orders of controlled substances?

15              Do you recall that?

16        A.    Yes.

17        Q.    And do you recall after that

18   investigation report the Perrysburg closing

19   document that we looked at where DEA

20   concluded that all violations had been

21   resolved as of that point in time?

22        A.    Yes.

23        Q.    And we didn't see any other

24   documents after that point in time

25   identifying any violations with respect to

Highly Confidential - Subject to Further Confidentiality Review

```
 1   suspicious order monitoring or reporting of
 2   controlled substances, correct?
 3        A.    Correct.  We started -- we saw
 4   that it was documented.  They had one.
 5             MS. SWIFT:  All right.  I'm
 6        going to reserve the rest of my time.
 7        I don't have any other questions right
 8        now.
 9             MR. JACO:  Before we jump
10        ahead, we've been going for quite a
11        while on the record.
12             Ms. Brennan, do you need a
13        break?
14             MR. MOUGEY:  I do.
15             MR. JACO:  Yeah, I think let's
16        take a ten-minute break and come back.
17             VIDEOGRAPHER:  Okay.  We're
18        going off record.  The time is 4:10.
19         (Off the record at 4:10 p.m.)
20             VIDEOGRAPHER:  We're going back
21        on record.  The time is 4:21.
22             MR. MOUGEY:  We'll make it real
23        easy.  We don't have any more
24        questions.
25             I saw Ms. Brennan smile just a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          little bit.

 2               MS. SWIFT:  Afraid of what I'm

 3      going to say.

 4               MR. MOUGEY:  Here comes Kate.

 5               MS. SWIFT:  We don't have any

 6      other questions either.

 7               MR. MOUGEY:  All right.

 8               MS. SWIFT:  Thank you very much

 9      for your time today.

10               MR. JACO:  All right.

11               MR. MOUGEY:  Thanks, everybody.

12               VIDEOGRAPHER:  This concludes

13      today's deposition.  We're going off

14      record.  The time is 4:22.

15      (Deposition concluded at 4:22 p.m.)

16               - - - - - - -

17

18

19

20

21

22

23

24

25
```

```
 1                    CERTIFICATE
 2
 3           I, CARRIE A. CAMPBELL, Registered
      Diplomate Reporter, Certified Realtime
 4    Reporter and Certified Shorthand Reporter, do
      hereby certify that prior to the commencement
 5    of the examination, Claire Brennan, was duly
      sworn by me to testify to the truth, the
 6    whole truth and nothing but the truth.
 7           I DO FURTHER CERTIFY that the
      foregoing is a verbatim transcript of the
 8    testimony as taken stenographically by and
      before me at the time, place and on the date
 9    hereinbefore set forth, to the best of my
      ability.
10
             I DO FURTHER CERTIFY that I am
11    neither a relative nor employee nor attorney
      nor counsel of any of the parties to this
12    action, and that I am neither a relative nor
      employee of such attorney or counsel, and
13    that I am not financially interested in the
      action.
14
15
16
              Carrie A. Campbell
17    CARRIE A. CAMPBELL,
      NCRA Registered Diplomate Reporter
18    Certified Realtime Reporter
      Notary Public
19
20
21
22
23    Dated:  November 19, 2020
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  INSTRUCTIONS TO WITNESS

 2

 3          Please read your deposition over

 4   carefully and make any necessary corrections.

 5   You should state the reason in the

 6   appropriate space on the errata sheet for any

 7   corrections that are made.

 8          After doing so, please sign the

 9   errata sheet and date it.  You are signing

10   same subject to the changes you have noted on

11   the errata sheet, which will be attached to

12   your deposition.

13          It is imperative that you return

14   the original errata sheet to the deposing

15   attorney within thirty (30) days of receipt

16   of the deposition transcript by you.  If you

17   fail to do so, the deposition transcript may

18   be deemed to be accurate and may be used in

19   court.

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3

 4         I,_____, do

    hereby certify that I have read the foregoing

 5  pages and that the same is a correct

    transcription of the answers given by me to

 6  the questions therein propounded, except for

    the corrections or changes in form or

 7  substance, if any, noted in the attached

    Errata Sheet.

 8

 9

10

11

12  _____

    Claire Brennan                    Date

13

14

15  Subscribed and sworn to before me this

16  _____ day of _____, 20 _____.

17  My commission expires: _____

18

19  Notary Public

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   - - - - - - -

                         ERRATA

 2                   - - - - - - -

 3     PAGE    LINE    CHANGE/REASON

 4     _____   _____   _____

 5     _____   _____   _____

 6     _____   _____   _____

 7     _____   _____   _____

 8     _____   _____   _____

 9     _____   _____   _____

10     _____   _____   _____

11     _____   _____   _____

12     _____   _____   _____

13     _____   _____   _____

14     _____   _____   _____

15     _____   _____   _____

16     _____   _____   _____

17     _____   _____   _____

18     _____   _____   _____

19     _____   _____   _____

20     _____   _____   _____

21     _____   _____   _____

22     _____   _____   _____

23     _____   _____   _____

24     _____   _____   _____

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  - - - - - - -

                   LAWYER'S NOTES

 2                  - - - - - - -

 3    PAGE    LINE

 4    _____   _____   _____

 5    _____   _____   _____

 6    _____   _____   _____

 7    _____   _____   _____

 8    _____   _____   _____

 9    _____   _____   _____

10    _____   _____   _____

11    _____   _____   _____

12    _____   _____   _____

13    _____   _____   _____

14    _____   _____   _____

15    _____   _____   _____

16    _____   _____   _____

17    _____   _____   _____

18    _____   _____   _____

19    _____   _____   _____

20    _____   _____   _____

21    _____   _____   _____

22    _____   _____   _____

23    _____   _____   _____

24    _____   _____   _____

25
```