Page 1

1            IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF OHIO
2                       EASTERN DIVISION
3                   CAUSE NO. 17-md-2804
                       MDL NO. 2804
4
     IN RE: NATIONAL                )
5    PRESCRIPTION OPIATE            )
     LITIGATION                     )
6                                   )
     THIS DOCUMENT RELATES TO:      )
7    TRACK THREE CASES              )
8
                 REMOTE VIDEO DEPOSITION OF
9               CARMEN A. CATIZONE, MS, RPh, DPh
                          VOLUME I
10
11
12          The deposition upon oral examination of
     CARMEN A. CATIZONE, MS, RPh, DPh, a witness produced
13   and sworn before me, Amy Doman, Registered Merit
     Reporter, Certified Realtime Reporter, Certified
14   Shorthand Reporter, Notary Public in and for the County
     of Hamilton, State of Indiana, taken on behalf of the
15   Defendants, in Mount Pleasant, South Carolina,
     scheduled to begin at 8:10 A.M., on Tuesday,
16   June 15, 2021, pursuant to the Federal Rules of Civil
     Procedure.
17
18
19
20
21
22
23
24
25

```
 1                   A P P E A R A N C E S
                   (All appearing remotely)
 2
    ON BEHALF OF THE PLAINTIFFS:
 3
         MOTLEY RICE LLC
 4       BY:  Michael E. Elsner
         Courtney R. Wolf
 5       James Ledlie
         Kaitlyn Eekhoff
 6       28 Bridgeside Boulevard
         Mount Pleasant, SC 29464
 7       (843) 216-9000
         Melsner@motleyrice.com
 8       cwolf@motleyrice.com
         jledlie@motleyrice.com
 9       keekhoff@motleyrice.com
10       SPANGENBERG SHIBLEY & LIBER LLP
         Peter H. Weinberger
11       1001 Lakeside Avenue East
         Suite 1700
12       Cleveland, OH 44114
         (216) 600-0114
13       pweinberger@spanglaw.com
14  ON BEHALF OF DEFENDANTS CVS PHARMACY, INC.;
    CVS INDIANA, LLC; CVS Rx SERVICES, INC.;
15  CVS TN DISTRIBUTION, LLC; OHIO CVS STORES, LLC:
16       ZUCKERMAN SPAEDER LLP
         BY:  Graeme W. Bush
17       100 East Pratt Street
         Suite 2440
18       Baltimore, MD 21202-1031
         (410) 949-1159
19       gbush@zuckerman.com
20       ZUCKERMAN SPAEDER
         BY:  Jason B. Acton
21       1800 M Street Northwest
         Suite 1000
22       Washington, DC 20036-5807
         (202) 778-1800
23       jacton@zuckerman.com
24
25
```

```
 1    Appearances (Continued):
 2    ON BEHALF OF DEFENDANTS GIANT EAGLE, INC.;
      HBC SERVICE COMPANY:
 3
          MARCUS & SHAPIRA, LLP
 4        BY:  David Zwier
          Joshua A. Kobrin
 5        One Oxford Centre, 35th Floor
          Pittsburgh, PA 15219
 6        (412) 338-5214
          zwier@marcus-shapira.com
 7        kobrin@marcus-shapira.com
 8    ON BEHALF OF DEFENDANT WALMART, INC.:
 9        JONES DAY
          BY:  John D. Goetz
10        500 Grant Street, Suite 4500
          Pittsburgh, PA 15219-2514
11        (412) 394-7911
          jdgoetz@jonesday.com
12
      ON BEHALF OF DEFENDANT RITE-AID:
13
          MORGAN LEWIS & BOCKIUS LLP
14        BY: John Gisleson
          1701 Market Street
15        Philadelphia, PA 19103-2921
          (215) 963-5328
16        john.gisleson@morganlewis.com
17    ON BEHALF OF DEFENDANTS WALGREENS BOOTS ALLIANCE,
      INC.; WALGREEN CO.; AND WALGREEN EASTERN CO., INC.:
18
          BARTLIT BECK LLP
19        BY: Brian C. Swanson
          1801 Wewatta Street
20        Suite 1200
          Denver, CO 80202
21        (303) 592-3197
          brian.swanson@bartlitbeck.com
22
23
24
25
```

Page 4

```
 1   Appearances (Continued):
 2        LEVIN PAPANTONIO RAFFERTY
          BY:  Laura Dunning
 3        Page Poerschke
          316 South Baylen St.
 4        Pensacola, FL 32502
          (205) 396-5014
 5        ldunning@levinlaw.com
          ppoerschke@levinlaw.com
 6
     VIDEOGRAPHER:
 7        Robert Miller
 8   ALSO PRESENT:
          Jonathan Jaffe
 9
          David R. Cohen
10        Special Master
          DAVID R. COHEN CO. LPA
11        24400 Chagrin Boulevard, Suite 300
          Cleveland, OH 44122
12        (216) 831-0001
          david@specialmaster.law
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1               INDEX OF EXAM

2                                         Page

3   DIRECT EXAMINATION............................  9
      Questions by Tara Fumerton

4

    CROSS-EXAMINATION............................ 157
5     Questions by Graeme Bush

6   CROSS-EXAMINATION............................ 286
      Questions by Brian Swanson

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXHIBITS
2    Deposition Exhibits:                              Page

3    Exhibit 1      - Pharmacist Expert Opinion......  19
4    Exhibit 2      - Pharmacist Expert .............  19
                      Supplemental Opinion dated
5                    5/19/21
6    Exhibit 3      - Amended Pharmacist Expert .....  19
                      Opinion dated 5/19/21
7
     Exhibit 4      - Curriculum Vitae...............  21
8
     Exhibit 5      - Second Curriculum Vitae........  21
9
     Exhibit 6      - Appendix B Material ...........  21
10                   Considered
11   Exhibit 7      - Invoice for Expert Services ...  51
                      dated 5/31/2020 to 4/2021
12
     Exhibit 8      - Return of 2018 NABP ........... 103
13                   Organization Exempt from
                      Income Tax
14
     Exhibit 9      - Declaration of Carmen ........ 143
15                   Catizone dated 5/25/21
16   Exhibit 10     - Notice of Clarification ....... 150
                      Concerning Reply of the
17                   National Association of
                      Boards of Pharmacy in Support
18                   of Motion for Leave to File
                      Amicus Curiae Brief dated
19                   5/28/21
20   Exhibit 11     - East Main Street Pharmacy ..... 217
                      case cite, Federal Register
21                   10/27/10D
22   Exhibit 12     - McCann App. 14 Extract (D. .... 217
                      Combination Red Flagged
23                   Scripts Summary
24   Exhibit 13     - OARRS SemiAnnual Report on .... 227
                      Opioid Prescribing in Ohio
25                   (June 2015)

1     Exhibits (Continued):

2      Exhibit 14    - OARRS Annual Report 2017....... 227

3      Exhibit 15    - Combination red flag .......... 281

                       prescription summary, Lake

4                      County and Trumbull County,

                       red flag computation 1

5                      through 16

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 8

1          THE VIDEOGRAPHER:  We are on the record.  Today is

2      June 15th, 2021.  This is the video deposition of

3      Carmen Catizone being taken In Re:  National

4      Prescription Opiate Litigation.  This case is

5      pending in the United States District Court for the

6      Northern District of Ohio.  The case number is

7      17-md-2804.  I am Rob Miller, and the court

8      reporter is Amy Doman.

9          You may now swear in the witnesses.

10          THE REPORTER:  Good morning, Counselors.  My

11      name is Amy Doman.  I'm a licensed Certified

12      Shorthand Reporter working in association with

13      Veritext Legal Solutions.  I will not be in the

14      same room with the witness.  Instead, I will swear

15      the witness and will stenographically record the

16      deposition remotely via Zoom.

17          Do all parties stipulate to the validity of

18      the remote swearing as if it had been conducted

19      following Rule 30 of the Federal Rules of Civil

20      Procedure and the state's rules where this action

21      is pending?

22          MR. ELSNER:  Yes.

23

24

25

Page 9

1          CARMEN A. CATIZONE, MS, RPh, DPh,

2     having been duly sworn to tell the truth, the whole

3     truth, and nothing but the truth relating to said

4     matter, was examined and testified as follows:

5

6    DIRECT EXAMINATION

7     QUESTIONS BY TARA FUMERTON:

8    Q    Good morning, sir.  Can you please state your name

9         for the record.

10   A    Good morning.  Carmen Catizone, C-a-t-i-z-o-n-e.

11   Q    My name is Tara Fumerton, and I'm one of the

12        attorneys that represents Walmart in this

13        litigation, and I'm going to begin asking you

14        questions today.  Some of the other co-defendants

15        in this case have counsel who will be asking

16        questions to you today as well.  But I get the

17        pleasure of starting off with you.

18             Sir, what do you prefer to be called?

19   A    Call me Carmen.

20   Q    If we were going a little bit more formal -- I

21        appreciate that -- would you prefer to be called,

22        Mr. Catizone?  Dr. Catizone?

23   A    Mr. Catizone is fine.

24   Q    Okay.  Where do you live, Mr. Catizone?

25   A    I live in Arlington Heights, Illinois.

1   Q   And where are you located today for your remote

2       deposition?

3   A   I'm in Mount Pleasant, South Carolina.

4   Q   And are you in a lawyer's office?

5   A   A lawyer's conference room.

6   Q   Is anybody else present in the room with you today?

7   A   No.

8   Q   Is anybody else present at that lawyer's office

9       with you?

10  A   There are lawyers across the hall but not

11      physically in the same room or close to me.

12  Q   Is -- Plaintiffs' counsel, Mr. Elsner, is in the

13      same building; is that correct?

14  A   Correct.

15  Q   Are there other Plaintiffs' counsel that are also

16      in that building --

17  A   I'm not --

18  Q   -- that you're aware of?

19  A   I'm not familiar with the building or who is here,

20      so...

21  Q   To your knowledge, is there any other Plaintiffs'

22      counsel who you've been working with on this matter

23      at that building?

24  A   I saw one of the other attorneys here earlier, but

25      I'm not sure where he is now.

1    Q    And who is that?

2    A    James Ledlie.

3    Q    Do you understand that you're not permitted to

4         communicate with anybody via phone or text while

5         you're giving your testimony today?

6    A    Yes.

7    Q    And are you in front of a computer?

8    A    I'm in front of two screens, no computers here.  I

9         think there's just a terminal, a dummy terminal to

10        activate the Zoom.

11             Can you hear me okay?  Is that loud enough for

12        you?

13   Q    I can hear you just fine.  Can you hear me as well?

14   A    Yes, thank you.

15   Q    If at any point in time you can't or I forget to go

16        off mute, which will happen at some point, please

17        let me know, and I'll do the same.

18   A    Thank you.

19   Q    Do you understand the oath that you just took?

20   A    Yes, I do.

21   Q    And do you agree to answer each question I ask

22        today truthfully as to the best of your ability?

23   A    Yes.

24   Q    Have you been -- do you have any materials with you

25        today?

```
 1    A    All I have is my supplemental report, which is
 2         Exhibit 1, that you provided me with, a blank pad
 3         to write things down, my CV, and a glass of water
 4         and a glass -- a cup of coffee.
 5    Q    On your supplemental report, do you have any notes
 6         that you've made on that?
 7    A    No.
 8    Q    What about on your CV?
 9    A    No.
10    Q    And the CV that you have with you, is that the
11         first CV that you provided in this case or is it
12         the second?
13    A    This was the one that was provided in September of
14         2020, so I don't know if that was the first or
15         second.
16    Q    Okay.  And who did you provide that to in
17         September of 2020?
18    A    To Amanda Unterreiner.  She's one of the paralegals
19         at the firm.
20    Q    Have you been deposed in the past?
21    A    Yes, I have.
22    Q    On several occasions, correct?
23    A    Yes.
24    Q    And you've testified at trials and other legal
25         proceedings as well, correct?
```

Page 13

```
 1    A    Correct.
 2    Q    And we'll get into that in some more depth later,
 3         but just sort of as a reminder, I know that you've
 4         done this several times, our goal here is to get a
 5         clear record.  I will do my best to wait until you
 6         finish your answer before I ask another question.
 7         Please give verbal answers.  Obviously, the court
 8         reporter can't take nods.
 9             It might seem like a long time too but a
10         relatively short time for the defendants to ask you
11         questions today, so to the extent that you could
12         answer questions yes or no, I would appreciate you
13         answering questions yes or no.  If you don't
14         understand a question I ask, please ask me to
15         rephrase it.
16             Are you represented at this deposition by
17         counsel today?
18    A    No.
19    Q    Do you have other counsel that represent you in
20         connection with this matter?
21    A    No.
22    Q    What is your understanding of who Mr. Elsner
23         represents?
24    A    Municipalities located in Ohio, Lake, and Trumbull
25         County.
```

Page 14

1    Q    From time to time, Mr. Elsner might object to

2         questions that I ask, and I will ask you to go

3         ahead and answer the question if you understand it.

4         Please ask to take a break if you need to do so.

5         We will otherwise aim to take breaks periodically.

6             Any questions?

7    A    No.

8    Q    Is there anything today that would prevent you from

9         testifying fully, completely, and honestly?

10   A    No.

11   Q    Do you have any health considerations or are you

12        taking any medications that would impede your

13        ability to sit for a deposition today?

14   A    No.

15   Q    What did you do to prepare for your deposition?

16   A    I reviewed a number of materials.  I also then

17        looked at the Controlled Substances Act and other

18        regulations and requirements, and then I reviewed

19        depositions that were provided to me.

20   Q    Did you review -- let me back up.

21            In connection with your expert report in this

22        matter, you produced an Appendix B that was some

23        materials that you considered, correct?

24   A    If you're referring to the reliance list, then yes.

25   Q    Okay.  And we'll look at that in just a second.

1       But are all of the materials that you reviewed in

2       preparation for your deposition cited in that

3       document?

4    A  No.

5    Q  What materials did you review that are not cited in

6       that document?

7    A  Over the past 35 years, working as the executive

8       director of NABP and pharmacy practice regulation,

9       there's a significant amount of documents and

10      background that I've gathered.  So what was

11      included in my report were primary documents and

12      examples of that.  The inclusive list of everything

13      that I looked or everything I drew upon based upon

14      my experience would be very exhaustive and wouldn't

15      have been productive.

16   Q  I think my question was a little narrower than what

17      you just said, but we're going to get back to that

18      too.

19          In preparation for your deposition --

20   A  Oh, I'm sorry.

21   Q  -- you specifically mentioned reviewing some

22      materials.  I was trying to understand what

23      materials you reviewed in preparation for your

24      deposition.

25   A  Just the materials that were on the reliance list.

1    Q    Okay.

2    A    Sorry about that.

3    Q    And you mentioned depositions.  Are there

4         particular depositions that you reviewed in

5         preparation for this deposition?

6    A    Depositions that were taken by the plaintiffs'

7         counsel.

8    Q    And did you review all of the depositions that were

9         in your reliance list in preparation for your

10        deposition, or was it a subset of them?

11   A    All the depositions on the reliance list.

12   Q    Did you meet with Mr. Elsner or any other attorneys

13        for plaintiff in preparation for your deposition?

14   A    Yes.

15   Q    How many times?

16   A    Probably twice in person and maybe two or three

17        times via virtual or Zoom.

18   Q    Who else participated in those meetings besides

19        Mr. Elsner?

20   A    The attorney I mentioned earlier, James Ledlie and

21        then Dan Goetz.

22   Q    Anybody else?

23   A    Amanda, who I mentioned earlier, is a paralegal.

24   Q    Anybody else?

25   A    No.

1    Q    If you had to estimate of those four to five

2         meetings, approximately how long did they last in

3         totality?

4    A    Each meeting was probably, on average, two hours,

5         and so a total of four times two, maybe eight to

6         ten hours total.

7    Q    Did you meet or speak with any lawyers for the

8         Department of Justice in preparation for this

9         deposition?

10   A    No.

11   Q    Did you talk to anybody from the Department of

12        Justice about this deposition?

13   A    No.

14   Q    Did you talk to anybody else other than Mr. Elsner

15        or the individuals that you mentioned about the

16        deposition?

17   A    No.

18   Q    You mentioned that you reviewed materials that were

19        on your reliance list in preparation for the

20        deposition and that you reviewed all of the

21        depositions that were listed.

22            Did you review all of the materials on your

23        reliance list, or did you review a subset of the

24        other documents that were cited there in

25        preparation for your deposition?

1    A    All of the materials.

2    Q    And how long did that take you?

3    A    Probably a total time, two and a half to three

4         months.

5    Q    And so when I asked you what you did to prepare for

6         your deposition, you're essentially including

7         everything you've done to work on this case; is

8         that fair?

9    A    Yes, ma'am.

10   Q    What about the weeks leading up to the deposition?

11        Are there any other materials that you went back to

12        specifically to prepare?

13   A    I'm sorry.  The first part of the question cut out

14        a little bit.  I'm sorry.

15   Q    Sure.  I leaned back, which is another thing I'm

16        going to try not to do.

17             In the weeks leading up to the deposition,

18        were there any particular materials that you went

19        back to review in preparation for your deposition?

20   A    My CV, a supplemental report, and those were

21        probably the primary documents.

22   Q    Was there anything you wanted to do in order to

23        prepare for your deposition that you didn't have

24        the opportunity to do?

25   A    No.

1    Q    Okay.  Before we went on the record, I'd ask you to

2         pull out a number of documents.  We're going to

3         mark them for the record if everybody will bear

4         with us for a second.  I'll ask you to keep them

5         handy because we're going to be referencing these

6         four documents throughout your deposition.

7              So we've marked as Exhibit 1 your original

8         report that was served in this case.

9              (Exhibit 1 was marked for identification.)

10   Q    That was Tab 1 in the documents in the box.

11             We're going to mark as Exhibit 2 your

12        supplemental report.

13             (Exhibit 2 was marked for identification.)

14   Q    We're going to mark as Exhibit 3 the redline

15        showing the changes between the report.

16             (Exhibit 3 was marked for identification.)

17   Q    We'll mark as Exhibit 4 --

18   A    Excuse me.  Exhibit 3 is Appendix B.  It's not the

19        supplemental report with changes.

20   Q    So it might be a little confusing, but at the end

21        of the day, I promise it will be a clearer record.

22        The tab numbers aren't going to necessarily

23        correspond to the exhibit numbers.  So what was

24        Tab 3 is going to end up being marked as Exhibit 6.

25        So what we're marking as Exhibit 3 for purposes of

1           the deposition is the redline of your report.

2               MS. FUMETON:  And, Mike, unless you have an

3           objection, given that we're putting -- you know, he

4           doesn't see exhibit stickers, I'm okay with him

5           actually writing Exhibit 1, Exhibit 2, Exhibit 3 on

6           the documents if it's easier for him to reference

7           it.

8               MR. ELSNER:  That's fine.  You can just refer

9           to the track change version of the report you have

10          in front of you as Exhibit 3.

11     BY MS. FUMETON:

12     Q    And so Exhibit 4 will be the CV that you provided

13          with your original report, and that was Tab 4 in

14          the envelope?

15              MR. ELSNER:  Wait a second.  Now I'm confused.

16          Is Exhibit 4 the materials considered list,

17          Appendix B.

18              MS. FUMETON:  No, that's Exhibit 6.

19              THE WITNESS:  It's Exhibit 3 in the box.

20              MS. FUMETON:  Right.  So the tabs aren't the

21          exhibit numbers.  It's going to be -- we're going

22          to mark for the record what the exhibits are.

23              THE WITNESS:  Okay.

24              MS. FUMETON:  Are you following?

25              MR. ELSNER:  So Exhibit 4 is his original CV.

1              MS. FUMETON:  Is Exhibit 4.

2         (Exhibit 4 was marked for identification.)

3              MS. FUMERTON:  And these also are being

4         published to Exhibit Share.  Mike, I don't know if

5         you use that, but that's another way to easily keep

6         track of what is used in the exhibits.

7              MR. ELSNER:  No, I understand, but we want to

8         keep track with paper copies as well and make sure

9         we have them aligned.

10              MS. FUMETON:  Sure, absolutely.

11      BY MS. FUMETON:

12   Q    And then Exhibit 5 is the second CV that was

13         submitted with the supplemental report.

14         (Exhibit 5 was marked for identification.)

15              MR. ELSNER:  And, Carmen, this is the document

16         that I brought in to you that was printed for you

17         before the deposition began.  It's not in an

18         envelope.  It's the copy of your CV that does not

19         have an address under your name in the middle of

20         the document.

21         (Exhibit 6 was marked for identification.)

22      BY MS. FUMETON:

23   Q    And then Exhibit 6 is that Appendix B.  We will

24         publish them for everybody so we make sure we're on

25         the same page, but I just want to make sure you

```
 1              have them in front of you as we go through this.
 2                   Okay.  So Exhibit 1, if you can look at that,
 3              Mr. Catizone -- and we're putting it up on the
 4              screen too to make sure that we're all on the same
 5              page.  This Exhibit 1 is the first expert report
 6              that you submitted in this litigation, correct?
 7    A         Yes.
 8    Q         It is dated April 16, 2021, correct?
 9    A         Yes.
10    Q         Is that the date you completed it?
11    A         Yes.
12    Q         And if you look at page 105, is that your
13              signature?
14    A         Yes, it is.
15    Q         Keep it handy.  But you can put it aside for a
16              second.
17                   I want you to now pull out Exhibit 2, which is
18              the second expert report that you submitted in this
19              litigation.  I'll publish that as well to make sure
20              that we're all on the same page.
21                   Can you confirm that Exhibit 2 is the second
22              expert report that you submitted in this
23              litigation?
24    A         Yes.
25    Q         And it is dated May 19, 2021, correct?
```

1    A    Yes.

2    Q    Is that the date you completed it?

3    A    Yes.

4    Q    If you turn to page 105, that your signature?

5    A    Yes, it is.

6    Q    If you take out what we've marked as Exhibit 3,

7         it's a redline that is showing changes that were

8         made between the two reports.

9             Have you seen this document before,

10        Mr. Catizone?

11   A    Yes.

12   Q    Did you provide plaintiffs with the redline?

13   A    I'm sorry.  I didn't understand the question.

14   Q    Sure.  Did you create the redline documents?

15   A    Some of the data came from one of the other experts

16        in there, but I actually prepared the final

17        document and signed off on it.

18   Q    And my question is slightly different.

19            Did you prepare the redline, the comparison

20        between the two reports?

21   A    Yes.

22   Q    And you provided that, then, to Plaintiffs?

23   A    Yes.

24   Q    Could you pull out Exhibit 4.

25            Can you please confirm that Exhibit 4 is the

1      CV that you submitted with your original report?

2   A   Yes.

3   Q   Was the CV accurate at the time you submitted it?

4   A   I believe so, yes.

5   Q   So it was accurate as of April 16th, 2021?

6   A   Yes.

7   Q   Exhibit 5 is the CV that you submitted with your

8      supplemental report, correct?

9   A   Correct.

10  Q   And is that CV accurate?

11  A   Yes, it is.

12  Q   And did you provide a redline showing the changes

13     of that document to your attorney?

14  A   No, I did not.

15  Q   Exhibit 6 is the Appendix B to your original

16     report, correct?

17  A   Was that Exhibit 3 and now marked Appendix B

18     Material Considered?  Up on the screen?  Yes.

19  Q   To make sure the record's clear, it's been marked

20     as Defendants' Exhibit 6 for purposes of your

21     deposition.  Again, we'll be referring to other tab

22     numbers that won't be consecutive, and so we will

23     be marking exhibits consecutive.  You'll be pulling

24     them from other boxes as well.  So the tabs will

25     help you find the documents, but we're going to

 1           refer to this document as Exhibit 6.

 2               Do you understand?

 3    A    Yes.

 4    Q    Is this a list of all of the materials that you

 5         considered when preparing both your original and

 6         your supplemental reports in this case?

 7    A    As I mentioned earlier, this includes the primary

 8         documents, but not an exhaustive list, because over

 9         my 30 years of experience or 35 years, I've

10         accumulated a lot of background knowledge and

11         information that was also helpful in preparing the

12         reports, but not included on the list because the

13         list then would become too exhaustive.

14    Q    You obviously had have had a lengthy career and

15         have learned various about things along the way.

16         And so my question isn't does this document reflect

17         everything that you know, but does this document

18         reflect all of the materials that you received

19         specifically to give an opinion in this case?

20               MR. ELSNER:  Objection; asked and answered.

21    A    Yes.

22      BY MS. FUMETON:

23    Q    If you can pull out Exhibit 2, which is your

24         supplemental report, on page 3, Footnote 1 of that

25         report states that "Supplements to the report were

```
 1          made with the Court's May 10, 2021, order, Doc
 2          Number 3726 and to include two additional sources
 3          that only became available after my initial
 4          reported" -- I think that was a typo -- "was
 5          submitted."
 6                Is that an accurate statement?
 7     A    Yes.
 8     Q    And what are the two additional sources you
 9          reviewed?
10     A    The additional sources were a checklist of one of
11          the defendants and the other information concerned
12          the data, the analysis of data.
13     Q    So these two documents -- and I want to ask some
14          more questions about them -- would be in addition
15          to the materials that were listed on Appendix B
16          that you relied upon, correct?
17     A    Correct.
18     Q    So earlier when you testified that Appendix B
19          contained all of the materials, that wasn't quite
20          correct; is that true?
21             MR. ELSNER:  Objection.
22     A    Yes.
23       BY MS. FUMETON:
24     Q    So other than the two materials that you just
25          mentioned, if we took Appendix B plus those two
```

```
 1          materials, would that be all of the materials that

 2          you reviewed for purposes --

 3               MR. ELSNER:  Objection.

 4      BY MS. FUMETON:

 5   Q    -- of this litigation?

 6   A    Yes.

 7   Q    And so I want to make sure I know specifically what

 8          those two additional sources are.  So if you

 9          mentioned the checklist of one of the defendants,

10          if you turn to Footnote 47, which is page 34 of

11          your report, there's a CVS document that's listed

12          there that was not listed in your prior report.

13               Is that one of the documents that you're

14          referring to?

15   A    Yes.

16   Q    You also mentioned analysis of data.  Can you give

17          me more specificity as to what that additional

18          document is that you reviewed?

19   A    When the Court restricted the number of

20          prescriptions that could be included in the report,

21          then the new data analysis was something that I

22          looked at that I didn't have in the first report.

23   Q    What about the deposition of John Aidazif?  Is that

24          something that you looked at for purposes of your

25          supplemental report that you didn't for your
```

```
 1        original report?

 2   A    I'm sorry.  I didn't hear that question.

 3   Q    The deposition of John Aidazif -- I could be

 4        mispronouncing the name.  It's A-i-d-a-z-i-f -- is

 5        that something that you reviewed for purposes of

 6        your supplemental report that you did not review in

 7        your original report?

 8   A    I don't remember when I reviewed it, but I did

 9        review that document.  I don't remember the time

10        frame.

11   Q    If you look at page 104 of your report,

12        Footnote 447, you read a "State of Ohio, Board of

13        Pharmacy Pharmacist Workload Survey."

14            Do you see that?

15   A    Yes.

16   Q    Is that something you reviewed for purposes of your

17        original report?

18   A    Yes.

19            MR. ELSNER:  Objection.

20      BY MS. FUMETON:

21   Q    Footnote -- if you turn to page 51, Footnote 126 of

22        your report references a June 2020 response to

23        interrogatories.

24            Do you see that?

25   A    Yes.
```

 1    Q    Are you relying on that document for purposes of

 2         your opinions in this case?

 3              MR. ELSNER:  Objection.

 4    A    Again, I apologize, the last part of your question

 5         trailed off.  I think you put your head down.  I'm

 6         sorry.

 7              What was the last part of the question?

 8      BY MS. FUMETON:

 9    Q    I'll repeat the question.

10              Are you relying on that document for purposes

11         of your opinions in this case?

12              MR. ELSNER:  Objection.

13    A    I reviewed the document, but I didn't rely on it

14         for the report.  There was other material I relied

15         upon for the report.

16      BY MS. FUMETON:

17    Q    When did you first review it?

18    A    Probably once I actually received some information

19         from the plaintiffs' counsel and other documents,

20         maybe a month or so into the process.

21    Q    What do you mean by "the process"?

22    A    Once I was engaged by legal counsel, about a month

23         after that.

24    Q    Did you have any input in creating it?

25    A    That document, no.

1   Q    If you're not relying on it for purposes of your

2        opinions in this case, why did you review it?

3             MR. ELSNER:  Objection.

4   A    It was background material that I utilized as part

5        of the total number of documents and background

6        material that I looked at.  But it wasn't something

7        that I relied on specifically or as a primary

8        document to rely my opinion on.

9     BY MS. FUMETON:

10  Q    Are you relying on the Court's May 10th, 2021,

11       order for purposes of forming your opinions in this

12       case?

13            MR. ELSNER:  Objection.

14  A    I can't recall that document specifically.  If it

15       was some of the materials I utilized, it was part

16       of my review, but not something that I would say I

17       relied entirely on or significantly on to form my

18       opinion.

19    BY MS. FUMETON:

20  Q    Sir, just to refresh your recollection perhaps, if

21       you'd look at the screen, I'm specifically

22       referencing the order that you've actually

23       referenced a couple of times in your report and as

24       referenced here in Footnote 126.

25  A    Yes.

```
 1   Q   And so does that reflect or refresh your
 2       recollection as to what that document relates to?
 3   A   Yes, I recall what it relates to, but it didn't
 4       influence my opinion.  It was one of the documents
 5       I reviewed as part of the process.
 6   Q   When we refer to your report during your
 7       deposition, can we have an agreement that that
 8       refers to Exhibit 2, your most recent report,
 9       unless we specifically say we're referring to
10       Exhibit 1, your earlier report?
11   A   Sure.
12   Q   Does your report, so Exhibit 2, contain a complete
13       and accurate statement of all of the opinions you
14       intend to offer in connection with this matter?
15   A   Yes, unless other questions are asked of me or
16       other information is presented that would cause me
17       to opine on those questions and those -- that
18       information.
19   Q   Have you been given any indication that those
20       questions might be posed to you?
21   A   No.
22   Q   Does your report contain a complete and accurate
23       statement of all the bases for the opinions you
24       formed in connection with in this matter?
25           MR. ELSNER:  Objection.  You can answer.
```

```
 1    A    Yes.

 2      BY MS. FUMETON:

 3    Q    Does your report contain all the facts that you

 4         considered in forming your opinions?

 5    A    Yes.

 6    Q    Did you talk to anybody in forming your opinions

 7         that are set forth in your report?

 8    A    Outside of discussions that I may have had with

 9         legal counsel, no one else.

10    Q    And I just want to be sure I understand exactly who

11         you're referring to.  So when you're referring

12         to "legal counsel," are you talking about

13         Mr. Elsner and the four individuals that you

14         referenced earlier?

15    A    Yes.

16    Q    Is there any other legal counsel that you discussed

17         this report with?

18    A    No.

19    Q    Are there any other experts in this case that you

20         talked to in forming your opinions in this case?

21    A    Yes.

22    Q    Who is that?

23    A    There was a discussion with an expert witness.  I

24         believe his name is Craig McCann.

25    Q    How many times did you speak with Mr. McCann?
```

1   A   Probably twice.

2   Q   When did you speak with him?

3   A   I can't recall the dates.  The first time was

4       probably towards the end of summer 2020 and the

5       last time was probably about three or four weeks

6       ago into 2021.

7   Q   How long was the first conversation?

8   A   One half hour.

9   Q   Was it over the phone?

10  A   Yes.

11  Q   How long was the second conversation?

12  A   About the same, half hour.

13  Q   Was that also via phone?

14  A   Yes.

15  Q   What did you talk to Mr. McCann about?

16  A   The data analysis that Mr. McCann ran.

17  Q   Did you direct Mr. McCann on how to run that data

18      analysis?

19  A   When I identified the red flags for my report, I

20      asked Mr. McCann to run the data for those red

21      flags.

22  Q   Did he share with you the details of how he was

23      going to run that data?

24  A   No.

25  Q   Did you leave it up to him to decide how to

```
 1          implement the red flags --

 2    A     Yes.

 3              MR. ELSNER:  Objection.

 4      BY MS. FUMETON:

 5    Q     -- that he identified?

 6              MR. ELSNER:  Objection.

 7      BY MS. FUMETON:

 8    Q     Does Mr. McCann have a background in pharmacy?

 9    A     Not that I'm aware of.

10    Q     Did Mr. McCann have any questions for you about how

11          to run any of the particular red flags?

12    A     No.

13    Q     Did Mr. McCann represent that he had all the data

14          he needed to run the red flags?

15              MR. ELSNER:  Objection.

16    A     That question never came up.  That issue never came

17          up.

18      BY MS. FUMETON:

19    Q     You mentioned the second time you spoke to

20          Mr. McCann was three or four weeks ago.  Did that

21          conversation precede your supplemental report?

22    A     It was after the report.

23    Q     So you issued two reports in this case, Exhibit 1

24          and Exhibit 2, correct?

25    A     Correct.
```

1    Q    What I'm trying to understand is when the second

2         conversation with Mr. McCann happened.  Did it

3         happen in between your first and second report or

4         after your second report?

5    A    It would have been between the first and second

6         report.

7    Q    And what did that conversation entail?

8    A    That involved the Court's decision May 10th and the

9         fact that the data that was going to be analyzed

10        was not being restricted.

11   Q    I want to make sure that the record is clear.  I

12        believe that you just testified that you discussed

13        with him the fact of the data that was going to be

14        analyzed was not being restricted.

15            What do you mean by that?

16   A    The first conversation was for Mr. McCann to run

17        data analysis on the red flags, which I used for my

18        report.  The second conversation was an update

19        after the May 10th court ruling indicating how the

20        data was now going to be restricted and what could

21        be analyzed and presented in my report.

22   Q    Is it your understanding that the Court dictated

23        how the data was to be restricted?

24            MR. ELSNER:  Objection.

25   A    No.  It's my understanding the Court limited the

```
 1        total prescriptions that could be analyzed.
 2     BY MS. FUMETON:
 3  Q    What's your basis for that understanding?
 4        MR. ELSNER:  Objection.
 5  A    Based upon the numbers and how the numbers changed
 6        in the report -- I think if I could refer to my
 7        supplemental report, the total number of
 8        prescriptions that were actually allowed to be
 9        analyzed was reduced by the Court, and that's what
10        was the basis for my statement.
11     BY MS. FUMETON:
12  Q    And what's your basis for understanding that it was
13        the Court as opposed to plaintiff that decided to
14        reduce your numbers?
15  A    The footnote note that said pursuant to the court
16        order of May 10th.
17     BY MS. FUMETON:
18  Q    But you wrote that footnote, right?
19  A    Yes.
20  Q    So when you wrote that footnote, what did you
21        understand -- how did you come to understand that
22        the Court was dictating how the data was to be
23        restricted?
24        MR. ELSNER:  Objection.
25  A    When we had a discussion with Mr. McCann and with
```

1        legal counsel for the plaintiffs, it was explained

2        to me that the total number of prescriptions --

3            MR. ELSNER:  Excuse me, stop, please.  Carmen,

4        you cannot reveal the conversations that you had

5        with counsel.  So if you can answer the question

6        without revealing the conversations that you had

7        with counsel, you may do so.  If you can't do that,

8        then you cannot answer the question.

9            MR. SWANSON:  This is Brian Swanson.  I'm not

10       sure that is correct.  If the discussions formed

11       the basis for his opinions, he can disclose those.

12       He's required to.

13           MR. ELSNER:  His opinions relate to red flags

14       and how those prescriptions -- and what

15       prescriptions are triggered by those red flags.

16       It's not an interpretation of the Court's order

17       with respect to the procedure in the case.

18           MR. SWANSON:  I think we're entitled to know

19       why he limited the prescriptions that he did and

20       what he believed the basis for that was.

21           MR. ELSNER:  You do know.  The Court ordered

22       us to do so.

23           MR. SWANSON:  No, the Court didn't.

24           MR. ELSNER:  The Court gave us a choice as to

25       how that ordering could be done, and plaintiffs

1       made that selection.  But that's not a proper

2       inquiry to Mr. Catizone.  That relates to the

3       Court's procedures with respect to the

4       prescriptions and the red flags identified.

5            MS. FUMETON:  Well, we obviously disagree with

6       that assessment, and I think you've just given some

7       more information there.

8     BY MS. FUMETON:

9   Q    But, Mr. Catizone, did you understand that it was

10      not, in fact, the Court that dictated how the

11      analysis was to be run but, in fact, plaintiffs had

12      a choice of how they wanted to present the

13      analysis?

14           MR. ELSNER:  Objection.  You can answer if you

15      can answer that question without revealing

16      conversations with counsel.

17           THE WITNESS:  Sure.

18  A    In preparing my report, to be quite honest, I

19      didn't care who decided what.  I focused on what

20      was going to analyzed.  And whoever made that

21      decision, whether it was the Court, Plaintiffs, or

22      Defendants really didn't have any relevance to my

23      findings or my opinions.  I simply knew that the

24      data changes, and it was based upon a court order

25      on May 10th.

1          But as to what happened in those proceedings,

2      who decided what, I didn't ask and I didn't care

3      because I wasn't concerned about that.  I was just

4      concerned about the data and the red flags and how

5      the red flags represented my opinion.

6     BY MS. FUMETON:

7  Q   So look, we're going to get into this in more

8      depth, and we'll be circling back around to it.

9      But I think we need to be clear about a couple of

10      things.

11          You have in your report, you identify specific

12      red flags that result in a specific number of

13      prescriptions that, according to you, were flagged,

14      correct?

15  A   Correct.

16  Q   So what's your basis to understand that the numbers

17      that you have in your report reflect the number of

18      prescriptions that were flagged by the criteria you

19      established?

20          MR. ELSNER:  Objection.

21  A   I heard the question, but I'm not sure I understand

22      the question.

23     BY MS. FUMETON:

24  Q   Do you have any understanding of what the numbers

25      in your report reflect?

```
 1   A    Yes, actually.

 2            MR. ELSNER:  Objection.

 3      BY MS. FUMETON:

 4   Q    What do they reflect?

 5   A    They reflect actual prescriptions that were -- had

 6        red flags associated with those prescriptions.

 7   Q    And what is your understanding of what those red

 8        flags actually -- how those prescriptions were

 9        chosen?

10            MR. ELSNER:  Objection.

11   A    My understanding of how they were chosen were

12        whether or not those prescriptions involve opioids,

13        and that is how those prescriptions were selected.

14      BY MS. FUMETON:

15   Q    And then you understand that any of the

16        prescriptions that were opioids that hit on your

17        red flags are then included in your report; is that

18        accurate?

19   A    Right.  Opioids and other controlled substances

20        like benzodiazepines or methadone.

21   Q    That hit on the red flags in your report, correct?

22   A    Correct.

23   Q    In forming your opinions in this -- let me back up.

24        You mentioned that you spoke with Mr. McCann on two

25        occasions.  Did you speak with any other
```

```
 1        individuals that are giving expert opinions in this

 2        case?

 3   A    No.

 4   Q    Have you reviewed the transcript of Mr. McCann's

 5        deposition?

 6   A    No.

 7   Q    In forming your opinions in this matter, were you

 8        asked to assume any facts?

 9   A    No.

10   Q    Did you make any assumptions in forming your

11        opinions?

12   A    No.

13   Q    Did anybody assist you in writing your report?

14   A    No.

15   Q    How did you come up with the numbers in your

16        report?

17   A    Well -- I'm sorry.  Obviously, Mr. McCann provided

18        the data, but the actual writing of the report and

19        text that accompany those data was all prepared by

20        myself.

21   Q    Before you signed your report, did you review it

22        carefully?

23   A    Yes, I did.

24   Q    Do you agree with all its contents?

25   A    Yes, I do.
```

```
 1   Q    Do you take full responsibility for all the words

 2        that are contained in your report?

 3   A    Yes, I do.

 4   Q    Except where you've expressly quoted from or cited

 5        to another source, are the words in your report

 6        your own?

 7   A    Yes.

 8   Q    Do you understand all the terms used in your

 9        report?

10   A    Yes.

11   Q    On page 7 of your report, so this is Exhibit 2

12        above the heading that says "The Practice of

13        Pharmacy Standard of Care," you have a paragraph

14        the last sentence of which reads, "A complete list

15        of the materials I reviewed is attached as

16        Exhibit A."

17             Do you see that?

18             MR. ELSNER:  I'm sorry.  I don't.

19   A    I don't see it.

20   Q    Let me highlight it for you.

21             MR. ELSNER:  Oh, yes, thank you.

22     BY MS. FUMETON:

23   Q    Do you see that now?

24   A    Yes, I do.

25   Q    Did you provide an Exhibit A with your report?
```

1    A    Yes.

2    Q    Who did you provide that to?

3    A    The legal team when I was preparing my report.

4              MS. FUMETON:  So, Mike, we'll represent we did

5         not receive an Exhibit A to the report.

6              MR. ELSNER:  I'll check into that.  It was my

7         understanding that a list of materials was

8         provided --

9              MS. FUMETON:  So we think --

10             MR. ELSNER:  -- of -- it's listed as

11        Appendix B, "Materials Considered."

12             MS. FUMETON:  So that's what I want to clarify

13        to make sure that there was no misunderstanding.

14        So is there no Exhibit A to the supplemental

15        report, correct?

16             MR. ELSNER:  I think that's correct.  That's

17        correct.  We'll confirm on a break.  It's my

18        understanding there's no Exhibit A, that it's

19        referred to as Appendix B.

20             MS. FUMETON:  Can we just get the witness who

21        wrote the report to testify as to what his

22        understanding is of whether or not his report had

23        an Exhibit A or not?

24   A    Based on the information presented, I would say

25        that Exhibit A was changed, then, to Exhibit B.

```
 1      BY MS. FUMETON:

 2   Q    Changed how?

 3   A    Since the pandemic and COVID and most of this has

 4        been done virtually, once I signed off on a report

 5        electronically, I left the formatting up to the

 6        legal team as to what made the most sense and what

 7        was the proper format.  So in probably formatting

 8        it that way, Exhibit A was changed to Exhibit B.

 9        But I have no objection to that change, and it

10        doesn't change my report at all.

11   Q    So just so we're clear, the complete list of the

12        materials that you reviewed is actually Appendix B,

13        which is marked as Exhibit 6 to this deposition,

14        correct?

15   A    Correct.

16   Q    But you had provided Exhibit A to Plaintiffs; is

17        that correct?

18   A    As part of the report, it was marked Exhibit A.

19        But I didn't have any problem with it being changed

20        to Exhibit B.

21   Q    Did you know it was changed to Exhibit B?

22   A    When I saw the final report, yes.

23   Q    But just a couple minutes, I asked you if Exhibit A

24        contains the list of materials relied on, you said

25        yes.
```

1    A    That was -- my apology.

2    Q    You were wrong?

3    A    Yes.

4         MR. ELSNER:  Objection.

5      BY MS. FUMETON:

6    Q    Who asked you to be an expert in this matter?

7    A    Legal counsel.

8    Q    Specifically whom?

9    A    Linda Singer.

10   Q    When?

11   A    Sometime in July/August 2020.

12   Q    Is that the first time you had spoken to anybody

13        about this litigation?

14   A    Yes.

15        MR. ELSNER:  Objection.

16     BY MS. FUMETON:

17   Q    How were you introduced to Ms. Singer?

18   A    I was recommended to her by someone.  She didn't

19        say who.  She simply said my name had come up as an

20        expert that could be utilized and she picked up the

21        phone and gave me a call.

22   Q    What did she tell you as to what expert opinion she

23        wanted you to give in this case?

24        MR. ELSNER:  Objection.

25   A    She asked if I was -- she had seen my testimony in

```
 1          other cases and knew I was familiar with red flags
 2          and corresponding responsibility and asked if I was
 3          willing to serve as an expert witness in regard to
 4          corresponding responsibility and red flags.
 5       BY MS. FUMETON:
 6    Q    Did she tell you who she represented?
 7    A    Not at the time.
 8    Q    Did you understand that she was representing
 9          plaintiffs in that action?
10    A    Prior to signing the agreement, yes, or the
11          engagement, yes.
12    Q    During that initial conversation?
13    A    After the initial call, I took some time to think
14          about whether or not my schedule would permit it
15          and then phoned her back and said I was available
16          and then asked for more details.
17    Q    You mentioned that the plaintiffs -- you knew that
18          the plaintiffs in this particular matter are Lake
19          and Trumbull Counties.  Have you been asked or have
20          you been retained by any other entities in
21          opioid-related litigation?
22          MR. ELSNER:  Objection.  He can answer to the
23          extent that he's been designated as an expert
24          witness, but should not answer to the extent that
25          he's been served as a consulting expert for anyone
```

```
 1        else.
 2             So, Carmen, to the extent you've been
 3        disclosed as an expert, feel free to answer that
 4        question.
 5             THE WITNESS:  Sure.
 6   A    Included in my résumé -- and I'm not sure which
 7        exhibit it now is -- there's a list of those trials
 8        and cases involving opioids where I have served as
 9        an expert witness for litigation.
10      BY MS. FUMETON:
11   Q    And we'll go through those in more depth in a
12        little bit.  Those are all entities in which -- I'm
13        sorry.  All cases in which you've already given
14        testimony, correct?
15   A    Correct.  Some of the cases were testimony and some
16        just reports.
17   Q    Right.  So my question was slightly different.
18             Have you been retained by other plaintiffs in
19        opioid litigation to serve as an expert where
20        you've not yet given testimony?
21   A    No.
22   Q    Have you been retained as a consultant by anybody
23        in opioid-related litigation?  And to be clear, I'm
24        not asking who.  I'm not asking for details.  This
25        is a yes-or-no question.
```

1          MR. ELSNER:  Objection.  If he is a

2      nontestifying consultant to any plaintiff -- and I

3      don't know if he is or isn't for some -- that's not

4      an appropriate question to ask.

5          MS. FUMETON:  I think generally speaking what

6      type of consulting work he does and what type of

7      clients he has are.  And if he's been retained as a

8      consultant in connection with a litigation, again,

9      if it's a yes-or-no answer, I think we're entitled

10     to know it.

11         MR. ELSNER:  If you want to know yes or no,

12     you can ask that way.  If you're going to probe

13     into the specific cases or ask about opinions.  So

14     I think generally you can ask --

15         So Carmen, yes or no, have you served as a

16     nontestifying consulting witness in any opioid

17     litigation?

18  A    Yes.

19    BY MS. FUMETON:

20  Q    And to be clear, I'm talking about litigation

21     that's associated with the MDL in which your

22     testimony is being given today.

23  A    The answer is no.

24  Q    Okay.  What about in any related -- other state or

25     federal actions relating to opioid litigation?

1    A    Yes.

2    Q    You've been retained by the United States

3         Attorney's Office in a case brought by the United

4         States against Walmart, correct?

5              MR. ELSNER:  Objection.  If that's been

6         disclosed --

7              MS. FUMETON:  That's disclosed.

8              MR. ELSNER:  If it has been disclosed

9         publicly, then you can answer that, Carmen.  If it

10        has not been disclosed publicly, then you cannot

11        answer.

12   A    I don't know if that's been disclosed publicly.

13        If, Ms. Fumerton, you're saying it's been disclosed

14        publicly, then the answer would be yes.  If it

15        hasn't been disclosed publicly, then I can't

16        confirm that.

17     BY MS. FUMETON:

18   Q    You are being compensated in this matter at a rate

19        of $300 per hour, correct?

20   A    Correct.

21   Q    In other opioid-related litigation where you've

22        given testimony, have you also charged $300 per

23        hour?

24   A    No.

25   Q    How has it varied?

```
 1    A    Some cases I've charged $800 an hour; on other

 2         cases I've charged $200 an hour.

 3    Q    All in opioid-related litigation?

 4    A    Yes.

 5    Q    Do you know how much you've been paid for your work

 6         on this matter to date approximately?

 7    A    Maybe $30,000 total.

 8    Q    Do you know what outstanding bills you have to

 9         plaintiffs --

10    A    Yes.

11    Q    -- that have not been paid?

12    A    Yes.

13    Q    How much?

14    A    Roughly $25,000.

15              MR. ELSNER:  Objection.

16      BY MS. FUMETON:

17    Q    We are going to mark as a composite exhibit

18         invoices that have been submitted in this case.

19         And they are going to be Tab 41 through 51 in your

20         box, if you want to open them.  We will put them

21         all together and mark them as one exhibit.

22    A    What were the numbers again?

23    Q    41 through 51.

24              MS. FUMETON:  And there's also one additional

25         one that we received last night.  Mike, were you
```

1     able to print that out?

2          MR. ELSNER:  Yes, but I don't know if he has

3          that in front of him.  So we'll try to do that.

4          MS. FUMETON:  Okay.  And I think we will put

5          on the screen.  So I don't think we need to pause

6          for that.  But if you do need the hard copy, you

7          can let us know.

8      BY MS. FUMETON:

9   Q    Let me know when you've had a chance to open up

10         those documents.

11  A    I've got them here.  So go ahead.

12         MS. FUMETON:  Can we mark as Exhibit 7 --

13     BY MS. FUMETON:

14  Q    For the record, they're invoices that Plaintiffs'

15         counsel have provided to us for work that you've

16         done from May 2020 through May 2021.

17         (Exhibit 7 was marked for identification.)

18  Q    And that last one is the one I don't think -- you

19         may not have in front of you.  But we'll show it on

20         the screen.

21         MR. ELSNER:  I think we just gave him a copy

22         of that, so he should have it now.

23         MS. FUMETON:  Okay.

24         MR. ELSNER:  It looks like 40 is not --

25         MS. FUMETON:  Tab 41, I'm sorry.  Tab 41 to

1       51.

2           MR. ELSNER:  I'm sorry.  I accidentally opened

3       40.  So my apologies.

4   BY MS. FUMETON:

5   Q   So this is, what we have on the screen, as I said,

6       it's a composite exhibit of all of the invoices

7       that Plaintiffs' counsel have provided to us to

8       date, and they have represented that they are the

9       invoices that you have submitted.

10          Can you take a quick minute, Mr. Catizone, to

11      review them and to confirm that what has been

12      marked as Defendants' Exhibit 7 are, in fact, the

13      invoices that you have submitted for your work in

14      this case from May 2020 until --

15          MR. ELSNER:  Sorry.  Objection, asked --

16          MS. FUMETON:  -- May 2021.  Sorry.

17          MR. ELSNER:  Sorry.  I don't think he's had a

18      chance to open them.  I certainly haven't.

19          MS. FUMETON:  Okay, yeah.  He told me to go

20      ahead.  That's what I thought.  If you haven't had

21      time to open them, yeah, please go ahead.

22          MR. ELSNER:  If you're going to ask him about

23      all of them, maybe the tech then can flip through

24      the exhibits so he can see what you're referencing

25      if you are going to ask about them collectively.

 1            MS. FUMETON:  Sure.

 2       BY MS. FUMETON:

 3   Q    Well, Mr. Catizone, how would you prefer to do it?

 4        You have the hard copies in front of you, so we

 5        don't have to flip to the screen.  Is that easy

 6        enough for you to see on the screen?

 7   A    If you go in order, I'm opening them one at a time

 8        now.  If you want to start with the May 20, that's

 9        fine with me.

10   Q    I actually just want -- we're not going to spend

11        time on each of these.  I just want to confirm that

12        these are all of the invoices that you've submitted

13        to date.

14   A    Give me a few moments to open all of them so I can

15        check that, please.

16            Did you say packet 51, Exhibit 51?

17   Q    51, and the one that was just handed to you should

18        be the last two.

19   A    So 51 is not ours.  It's a receipt for travel

20        expenses and a meeting.

21   Q    Okay.  So I guess Exhibit -- or Tab 50 would be the

22        last one, plus the one that was delivered to you.

23   A    Okay.

24            MS. FUMETON:  Kristen, let's just confirm --

25   A    All appear to be as I have submitted them.

1      BY MS. FUMETON:

2    Q    Okay.  Can we flip to the last two pages, Kristen,

3         of this exhibit, just to we can make sure that we

4         are all -- it gets introduced properly.

5    A    Okay.

6         MS. ZINMASTER:  Tara, this is the last page?

7         The expenses are included in here as well.

8         MS. FUMETON:  So we'll just note for the

9         record that there are -- are these expenses?

10     BY MS. FUMETON:

11   Q    So this is tab 51.  Are those expenses that you

12        submitted in connection with this matter too?

13   A    Exhibit 51 has the hotel and parking receipt but

14        not the airfare.  So that's part of the expenses I

15        submitted.

16   Q    Okay.  But there were other expenses you submitted

17        as well; is that right?

18   A    Correct.

19   Q    But with the exception of those expenses, do these

20        otherwise reflect all of the invoices that you've

21        submitted in connection with this matter?

22   A    Yes.

23   Q    And earlier you testified that Linda Singer

24        contacted you about becoming an expert in this

25        matter in July or August of 2020.  But if we go to

1       the first page of Exhibit 7, it appears that you

2       submitted an invoice for work on this matter in

3       May of 2020.

4           Do you see that?

5   A   Yes.

6   Q   Do you stand by your testimony that you were first

7       contacted about testifying in this litigation in

8       July or August of 2020?

9   A   For this litigation, yes.

10  Q   So what work were you contacted about doing in

11      May of 2020?

12          MR. ELSNER:  Objection.

13  A   It involved the Washington Board of Pharmacy, which

14      was that last item down there.

15    BY MS. FUMETON:

16  Q   So does this first invoice not reflect work that

17      you did in connection with this matter?

18          MR. ELSNER:  Objection.

19  A   Not directly.  It was more for the Washington Board

20      of Pharmacy, questions that I was being asked.

21    BY MS. FUMETON:

22  Q   And who was asking you the questions?

23  A   I was working with Linda Singer at the time.

24  Q   So prior to Linda approaching you about working as

25      an expert in this case, you were working with her

1    on something else?

2         MR. ELSNER:  Objection.

3  A    Yes.  The Washington Board of Pharmacy matter.

4    BY MS. FUMETON:

5  Q    And what was the Washington Board of Pharmacy

6       matter?

7         MR. ELSNER:  Objection.  I think this is as

8       far as we can permit this line of questioning to go

9       to the extent he wasn't disclosed as a testifying

10      expert in that case.

11        MS. FUMETON:  But, Mike, earlier he just

12      testified that these are all of the invoices that

13      he submitted in connection with this matter.  Now

14      he's testifying --

15        (Simultaneous conversation.)

16        MR. ELSNER:  You can inquire as to the

17      invoices.  I've permitted you to do that, but that

18      last question appeared to seek to probe the work

19      that he was doing in the Washington opioid

20      litigation, and I'm not going to permit him to

21      answer questions related to that work.  You can ask

22      him about the invoices.  We've provided them, and

23      he's given you some general answers.

24    BY MS. FUMETON:

25  Q    Okay.  So the first document in Defendants'

```
 1          Exhibit 7 is not an invoice that you submitted in
 2          connection with this matter.  Is that now accurate?
 3     A    If I can clarify for you, I simply submitted
 4          documents to Motley Rice, and whether or not any of
 5          the information I provided there applied to the
 6          case, I left up to the attorneys.  So if I talked
 7          about the red flags and others and that became
 8          something that was used later in the case, at that
 9          point I was just having the conversation regarding
10          the Washington Board of Pharmacy and that
11          information.  But I didn't distinguish between
12          cases.  All of my invoices were submitted to Motley
13          Rice.
14     Q    When were you first introduced to Linda Singer?
15     A    It was right around this time in May when she
16          called and asked about the Washington Board of
17          Pharmacy.
18     Q    Okay.  So when you had a conversation with her in
19          July or August about this case, you already knew
20          her, correct?
21     A    Yes.
22     Q    Did you work with anybody else from Motley Rice
23          prior to the work that's reflected here in May of
24          2020?
25     A    No.
```

1  Q    And earlier when I was asking you how you were

2       introduced to Ms. Singer, was that testimony

3       referring to when you were introduced to her for

4       this work involving the Washington Board of

5       Pharmacy?

6            MR. ELSNER:  Objection.

7  A    You know what, when you asked me the question, I

8       interpreted it as when was I first introduced to

9       this case and asked to become a part of it by Linda

10      Singer, and that's how I interpreted it.  I was

11      introduced to Linda Singer because of the

12      Washington Board of Pharmacy issue, and that was

13      sometime in May.

14   BY MS. FUMETON:

15  Q    So if we go to the next invoice, so the next

16      page of Defendant Exhibit 7, this is reflecting

17      work that does done in June.  So this is also prior

18      to you being retained to provide expert testimony

19      in this case; is that accurate?

20            MR. ELSNER:  Objection.

21  A    I would have to double-check when the retainer took

22      place, but it probably was around this time, June,

23      July, or August.  My apologies for not knowing the

24      exact date.

25   BY MS. FUMETON:

1    Q    So your testimony now is that you think it was

2         June when you were first contacted by Ms. Singer

3         about providing testimony in this litigation; is

4         that right?

5              MR. ELSNER:  Objection.

6    A    Not about this case, but about a related -- about

7         questions regarding whether or not I was going to

8         be available for this case.

9      BY MS. FUMETON:

10   Q    So if you would look at that page that is on the

11        screen right now, which is the second page of

12        Exhibit 7, it references June 24th, 2020, review

13        interrogatory 0.5 hours.

14             Do you see that?

15   A    Yes.

16   Q    What interrogatory is that?

17   A    That was a document that was sent to me as part of

18        a discussion about whether or not I was qualified

19        as an expert witness to talk about red flags, and I

20        think it was one of the documents in the case, but

21        I'm not sure what exactly that interrogatory was

22        because I really didn't review the document.  It

23        was provided to me as a "Are you familiar with red

24        flags?"  And I said "Yes" and explained what my

25        familiarity was.

1    Q    Is that June 2020 interrogatory as reflected on

2         that invoice the same June 2020 interrogatory that

3         we were talking about earlier this morning?

4             MR. ELSNER:  Objection.

5    A    I'm sorry.  What interrogatory were we talking

6         about earlier.

7      BY MS. FUMETON:

8    Q    You referenced a June 2020 interrogatory in your

9         expert report, correct?

10   A    Yes, yes, that's the same.

11   Q    Is it the same --

12            So putting aside the first invoice, the rest

13        of the invoices in Exhibit 7 are all invoices you

14        submitted in connection with this matter, correct?

15   A    Correct.

16   Q    And it adds up to about 170 hours, give or take a

17        few.

18            Does that sound about right?

19   A    I haven't done the math, but I will trust you.

20   Q    Does it sound about right to you, though?

21   A    Sure.

22   Q    We've not received an invoice for June.

23            Do you know how many hours you have worked so

24        far this month, approximately?

25   A    Somewhere between 20 and 30.

1   Q    And according to the invoices, it appears that you

2        spent a little over 50 hours preparing for your

3        deposition in this matter.

4             Does that sound about right?

5   A    Yes.

6             MR. ELSNER:  Objection.

7    BY MS. FUMETON:

8   Q    How many of the hours that you have billed were

9        spent on your supplemental report?

10            MR. ELSNER:  Objection.

11  A    Every time I reviewed a document or reviewed

12       information, my supplemental report was always

13       there, and I was always making changes or adding to

14       that report.  So I couldn't calculate the amount of

15       time, but it was -- primarily what I was focused on

16       was preparing that report.

17   BY MS. FUMETON:

18  Q    Well, let me ask you this.  When did you learn that

19       you would be doing this supplemental report?

20  A    I don't remember.

21  Q    Well, your first report in this matter was on

22       April 16th, correct?

23  A    Yes.

24  Q    April 16th, 2021, right?

25  A    Yes.

                                                          Page 62

 1    Q    At that time, did you think you would be providing

 2         supplemental report?

 3    A    No.

 4    Q    So you weren't working on the supplemental report

 5         then, right?

 6    A    Correct.

 7    Q    And then your supplemental report was served on

 8         May 19th, right?

 9    A    Yes.

10    Q    So let's look at the May 2021 invoice.  And that's

11         the one that was just provided to us, so it should

12         be the last one that you received.

13           Do you have that in front of you?  It's also

14         up on the screen.

15    A    Yes.

16    Q    Is any of that time there reflected billing your --

17         for billing for the supplemental report?

18           MR. ELSNER:  Objection.

19    A    Yes.

20      BY MS. FUMETON:

21    Q    For drafting the supplemental report?

22    A    Yes.

23    Q    So of all the dep preps that are listed there,

24         which one is for drafting the supplemental report?

25           MR. ELSNER:  Objection.

```
1    A     Probably May 6th, 7th, 9th, 10th, 11th, 13th, and
2          14th.
3      BY MS. FUMETON:
4    Q     So how many hours do you think that you --
5    A     It looks like about 20 hours.
6    Q     So earlier when you said "Every time I reviewed a
7          document or reviewed information, my supplemental
8          report was there," what do you mean by that?
9    A     I considered the report really one document, the
10         first report and the supplemental report.  So every
11         time it was information that I was preparing the
12         report, I would validate that information or update
13         the report.
14             After the data was altered or changed in May,
15         then I began to look at the new data statistics and
16         again, prepared and reviewed that supplemental
17         report because it was going to be part of this
18         deposition.  And I knew it would be a primary
19         document, so that's why it was listed as dep prep.
20         And that's what I did then is review the facts and
21         go back over that document.
22   Q     So in other parts of your invoice, you write "Draft
23         Report," correct?
24   A     Correct.
25   Q     But for your supplemental report, you agree you
```

```
 1        didn't submit any invoice that said "drafting
 2        report" correct?
 3            MR. ELSNER:  Objection.
 4   A    Correct.
 5     BY MS. FUMETON:
 6   Q    If we look at the June 2020 invoice -- we'll pull
 7        it up on the screen so you can get to the right
 8        spot too.
 9            The June 26th entry says "Review P&Ps."
10            Do you see that?
11   A    Yes.
12   Q    What are P&Ps?
13   A    Policies and procedures.
14   Q    Are those referring to the policies and procedures
15        of the defendants for whom you give opinions in
16        this case?
17   A    No.
18   Q    What policies and procedures are you referring to?
19            MR. ELSNER:  Objection.
20   A    Washington Board of Pharmacy.
21     BY MS. FUMETON:
22   Q    If you go to the September and October invoice on
23        October 30th, 2020, you have an interview that says
24        "Call - Interview."
25            Do you see that?
```

Page 65

1    A    Yes.

2    Q    Who did you interview?

3             MR. ELSNER:  Objection.

4    A    The plaintiffs' legal team.

5      BY MS. FUMETON:

6    Q    Did you rely on information that they gave you in

7         forming the opinions in your case -- in this case?

8    A    For that call with the interview?

9    Q    Yes.

10   A    No.

11   Q    Well, no.  Let me ask the question.

12            When you -- did plaintiffs provide you any

13        information that you relied on for purposes of

14        forming your opinions in this case?

15   A    As mentioned earlier, the data analysis from

16        McCann.

17   Q    Was there anything else that plaintiffs asked you

18        to assume or facts that they gave you that you

19        relied on for purposes of your expert report?

20   A    No.

21            MR. ELSNER:  Objection.

22      BY MS. FUMETON:

23   Q    Why were you interviewing Plaintiffs' counsel on

24        October 30, 2020, for purposes of your report?

25            MR. ELSNER:  Objection.

1   A   They were actually interviewing me.

2     BY MS. FUMETON:

3   Q   For what purpose?

4        MR. ELSNER:  Objection.

5        You can answer that, Carmen, if you can do so

6        without revealing the content of any conversations

7        with counsel.  It's hard for me to imagine how you

8        could.  But if you can, you can answer.  But please

9        do not reveal any communications with counsel.

10  A   I think it was to introduce me to the legal team in

11       this issue.

12    BY MS. FUMETON:

13  Q   So you started drafting the report, though,

14       however, before you were introduced to the legal

15       team or the issues in the case; is that right?

16        MR. ELSNER:  Objection.

17  A   No, no.

18    BY MS. FUMETON:

19  Q   Okay.  So when you see on this particular

20       interview -- invoice that we're looking at all

21       these entries for "Draft Report, what report is

22       that referring to?

23  A   That was Report 1 and the supplemental report.

24  Q   So in October 2020, you were drafting the

25       supplemental report --

```
                                                   Page 67

 1              MR. ELSNER:  Objection.

 2       BY MS. FUMETON:

 3    Q    -- for this case?

 4    A    Since the supplemental report was not changed much

 5         from the first report, ultimately that's where

 6         everything led to.

 7    Q    You testified two minutes ago that the interview on

 8         October 30th was to introduce you to the legal team

 9         and the issues in this case, correct?

10    A    No, no, just to the legal team.  The entire legal

11         team involved in this matter.

12    Q    So you had already been told what your assignment

13         was with respect to this expert report prior to

14         October 30th, correct?

15    A    Not an assignment.

16    Q    How did you know what report to start drafting,

17         then, if you didn't know what your assignment was

18         in this case?

19              MR. ELSNER:  Objection.

20    A    I was asked to opine on corresponding

21         responsibility and red flags similar to other cases

22         in which I had provided reports and testified.  And

23         to analyze data and information that was provided

24         to me by Plaintiffs' counsel and to draft a report

25         of my findings.
```

1      BY MS. FUMETON:

2   Q    And you had started that, then -- it's referring to

3        draft report in these invoices.  That's the report

4        that you submitted in this case, correct?

5   A    I'm sorry.  I didn't hear the whole question.

6   Q    That's the report you submitted in this case,

7        correct?

8   A    Correct.

9   Q    If we go to the February/March 2021 invoice, I want

10       to ask you about a particular entry there.

11            What does "Report and PQAC" refer to?

12  A    That is actually the appropriate and proper name

13       for the Washington Board of Pharmacy.  It's the

14       Pharmacy Quality Assurance Commission.  And it

15       refers back to the Washington Board of Pharmacy.

16  Q    Are all the other references to drafting the report

17       and the invoices the report that you submitted in

18       this case?

19  A    Correct.

20            MS. FUMETON:  I'm about to switch topics, if

21       we would like to take a five-, ten-minute break.

22            THE WITNESS:  I'm good.

23            MR. ELSNER:  That's fine.  We're happy to do

24       that.

25            MS. FUMETON:  Why don't we say we'll be back

1          in ten, then.

2                THE VIDEOGRAPHER:  We're off the record.

3                (A recess was taken.)

4                THE VIDEOGRAPHER:  We're on the record.

5       BY MS. FUMETON:

6    Q    Mr. Catizone, can you pull out your Appendix B,

7         which is the materials you considered for your

8         report.  It has been marked as Exhibit 6 in this

9         litigation -- I'm sorry -- in this deposition.

10              How did you select the materials on this list

11        to be the relevant materials in forming your

12        opinion?

13   A    Some of the materials were provided to me by legal

14        counsel and then other materials, once I began my

15        review, I requested.

16   Q    Which are the materials that you requested, if you

17        can summarize general categories as opposed to

18        necessarily specific ones?

19              MR. ELSNER:  Objection.

20   A    General categories would be policies and procedures

21        of the defendants, the data that Mr. McCann's group

22        provided are probably the two main areas.

23       BY MS. FUMETON:

24   Q    And what did you understand was the universe of

25        materials that plaintiffs were providing you?

1        MR. ELSNER:  Objection.

2    A    The material would be or the universe would be what

3         was important information about the defendants and

4         red flags and corresponding responsibility.

5      BY MS. FUMETON:

6    Q    So plaintiffs selected what was important

7         information about the defendants' red flags and

8         corresponding responsibility, correct?

9        MR. ELSNER:  Objection.

10   A    My understanding is they went through documents,

11        and based upon the documents that were relevant is

12        what was provided to me.  And then I requested

13        additional documents if I didn't see something that

14        I thought I needed.

15     BY MS. FUMETON:

16   Q    So at least in the first instance, the plaintiffs

17        selected what documents you should review, correct?

18   A    Yes.

19   Q    And made the determination as to what is relevant,

20        correct?

21        MR. ELSNER:  Objection.

22   A    Yes.

23     BY MS. FUMETON:

24   Q    Did you request any materials from Plaintiffs'

25        counsel that you did not receive?

```
 1    A    No.

 2    Q    Were there any materials that you thought would be

 3         relevant that you did not have?

 4    A    Yes.

 5    Q    What were those?

 6    A    The patient notes and other documentation that the

 7         defendants have.  And I'm not sure if they've

 8         agreed to provide those to me, but those would be

 9         very relevant to my work.

10    Q    And why would they be relevant to the

11         identification of red flags?

12    A    Some primary requirements of corresponding

13         responsibility is when resolving the red flags, and

14         then two, documenting the red flags.  And based

15         upon the materials I reviewed of the defendants,

16         the documentation would help me determine whether

17         or not the defendants complied with their own

18         policies and procedures and what prescriptions

19         actually led to diversion or what prescriptions

20         where the red flags were resolved.

21    Q    And so you didn't have access to the documentation

22         that the defendants had.

23             Is that your understanding?

24             MR. ELSNER:  Objection.

25    A    Yeah, I'm sorry I didn't have access to, and then
```

1        the last part I didn't hear.

2     BY MS. FUMETON:

3  Q    You did not have access to the documentation -- I'm

4        sorry.  Let me repeat that.

5           You did not have access to the documentation

6        that the defendants had.  Is that your

7        understanding?

8           MR. ELSNER:  Objection.

9  A    My understanding is that the defendants didn't want

10       to turn that information over.

11    BY MS. FUMETON:

12 Q    Okay.  So you don't -- aren't saying that the

13       information doesn't exist.  You're saying that you

14       just didn't have an opportunity to review that; is

15       that correct?

16 A    Correct.

17          MR. ELSNER:  Objection.

18    BY MS. FUMETON:

19 Q    Do you know how many documents the pharmacy

20       defendants produced in this case?

21 A    No.

22 Q    Do you have any concept or estimate?

23 A    No.

24 Q    Do you have any sense of what percentage of the

25       documents that the pharmacy defendants produced in

1      this case that you reviewed in formulating your

2      opinion?

3    A    No.

4    Q    Could it be 1 percent?

5         MR. ELSNER:  Objection.

6    A    If I have no idea what the total was, I would have

7      no idea what the percentage was either.

8      BY MS. FUMETON:

9    Q    So it could be 1 percent?

10         MR. ELSNER:  Objection.

11      BY MS. FUMETON:

12    Q    Is that right?

13    A    I have no idea.  I've answered that.

14    Q    And it doesn't matter for purposes of your opinion

15      whether you reviewed 1 percent or 99 percent.  Is

16      that what you're saying?

17    A    Correct.

18    Q    And if you reviewed less than 1 percent of the

19      document that the defendants produced, that still

20      wouldn't make a defense to you as to how you

21      reached your opinions, correct?

22         MR. ELSNER:  Objection.

23    A    The percentage is insignificant compared to the

24      documents themselves and the data that I reviewed

25      that helped formulate my opinion.

1    BY MS. FUMETON:

2    Q    But you don't know what you didn't review, correct?

3    A    I know what I did review, and that was the basis of

4         my opinion.

5    Q    And you don't know what exists that defendants

6         produced that you didn't review, correct?

7    A    Correct.

8    Q    For the materials you listed on Exhibit 6, did you

9         review the entirety of all those documents?

10   A    Yes.

11   Q    Do you have an estimate as to how many pages of

12        documents you reviewed?

13   A    No.

14   Q    How long did you spend reviewing those documents

15        before formulating your opinions?  Do you know?

16        MR. ELSNER:  Objection.

17   A    Hours and hours and hours.

18    BY MS. FUMETON:

19   Q    Well, we know it's less than 170 hours, correct?

20   A    Correct.

21   Q    Do you know how much less than 170?

22        MR. ELSNER:  Objection.

23   A    I don't.

24    BY MS. FUMETON:

25   Q    Did you review any other expert reports submitted

```
 1          in connection with this matter?
 2     A    No.
 3     Q    Did you review the expert report of Craig McCann?
 4     A    Yes.
 5     Q    Did you review any other expert reports submitted
 6          in connection with this matter?
 7     A    No.
 8     Q    In a number of places in Exhibit 6, you listed
 9          defendants, quote, dispensing data samples, so for
10          example, the Walmart dispensing data sample.  What
11          is that referring to?
12     A    The dispensing data that McCann's group provided to
13          me in his report.
14     Q    Did you review any data that Mr. McCann provided
15          other than what he put in his report?
16              MR. ELSNER:  Objection.
17     A    No.
18       BY MS. FUMETON:
19     Q    So did you review any specific prescriptions?
20     A    No.
21     Q    So you just reviewed the result, the aggregate
22          numbers of his analysis; is that accurate?
23              MR. ELSNER:  Objection.
24     A    Yes.
25       BY MS. FUMETON:
```

1    Q    You haven't looked at any specific prescriptions in

2         connection with this matter, correct?

3    A    I have looked at a few of those prescriptions.

4    Q    In what context?

5    A    In the context of Mr. McCann's report where he

6         noted that information was inaccurate, missing, or

7         made up concerning the doctor DEA and the doctor's

8         address, and information that was there about

9         whether doctors should be arrested or not or were

10        arrested, I did review a small number of scripts

11        that validated what Mr. McCann had in his report.

12   Q    How would we identify what small number of scripts

13        you validated?

14            MR. ELSNER:  Objection.

15   A    I would say I would look up maybe 10 to 20

16        prescriptions that were part of that notation in

17        Mr. McCann's report.

18     BY MS. FUMETON:

19   Q    And those are the only specific prescriptions that

20        you reviewed in connection with this -- with your

21        report, correct?

22            MR. ELSNER:  Objection.

23            (Stenographer requested clarification.)

24   A    Correct.  Sorry.

25     BY MS. FUMETON:

1    Q    So just to make sure that I'm clear, when you say

2         that, in Exhibit 6, you reviewed you Walmart's

3         dispensing data sample, you're not referring to any

4         particular Walmart prescriptions, correct?

5              MR. ELSNER:  Objection.

6    A    Not individual prescriptions, except for the ones

7         that I just mentioned.

8      BY MS. FUMETON:

9    Q    And do you know whether any of those were Walmart

10        prescriptions?

11             MR. ELSNER:  Objection.

12   A    I don't recall.

13     BY MS. FUMETON:

14   Q    Switching gears to your CV, I'm going to ask you

15        questions both about Exhibit 4 and Exhibit 5,

16        Exhibit 4 being the first CV you submitted and then

17        Exhibit 5 being the second one you submitted, if

18        you want to have those in front of you.

19             Why did you provide an updated CV in

20        connection with this supplemental report?

21   A    Because I retired from the National Association of

22        Boards of Pharmacy as executive director.

23   Q    And when did that happen?

24   A    That was in May of 2020.

25   Q    And I think you testified earlier that the CV that

```
 1          you submitted as of April 16th, 2021, was accurate,

 2          correct?

 3               MR. ELSNER:  Objection.

 4     A    To the best of my understanding, yes.

 5       BY MS. FUMETON:

 6     Q    Okay.  So this is Exhibit 4 that you submitted in

 7          April of 2021, and on the first page it says

 8          Dr. Catizone is the executive director of the

 9          National Association of Boards of Pharmacy.

10               Do you see that?

11     A    Yes.

12     Q    That was not accurate as of April 15th, 2021,

13          correct?

14     A    That was -- that was accurate.

15               MR. ELSNER:  Objection.

16     A    Did you say April 2020 or April 2021?

17       BY MS. FUMETON:

18     Q    April 2021.

19     A    No, that was not correct.

20     Q    Okay.  But this is the CV that you submitted with

21          your expert report in this case that was provided

22          to the defendants on April 15, 2021, correct?

23     A    It was submitted much earlier than that, prior to

24          me having a chance to revise it.

25     Q    Are you aware that this is the document that was
```

1       provided with your expert report on April 15th,

2       2021?

3    A   I would assume it was.

4    Q   So it was not accurate as of April 20th, 2021,

5       correct -- I'm sorry, April 16th, 2021, correct?

6    A   It hadn't been updated, so yes.

7    Q   So it was not accurate, correct?

8    A   Correct.

9           MR. ELSNER:  Objection.

10    BY MS. FUMETON:

11    Q   So why did you update -- I'll ask again.  Why did

12       you update your CV with your supplemental report?

13    A   For one, my CV has not been something that I've

14       been concerned about, and so I don't spend a lot of

15       time writing about myself or updating it.  When I

16       finally had time to sit down and review it and

17       update it, that's when I update it.

18    Q   In your first CV in this matter, Exhibit 4, you

19       provided the dates in which you received your

20       degrees and licenses, correct?

21    A   Correct.

22    Q   Why did you remove them in your second CV,

23       Exhibit 5?

24           MR. ELSNER:  Objection.

25    A   Just a format change.  No particular reason.

1      BY MS. FUMETON:

2    Q    What else did you update in your résumé or change

3         in your résumé?

4    A    I really don't know.  I'd have to go through it to

5         see what the changes were.

6    Q    Is it not that important to you what your résumé

7         says?

8              MR. ELSNER:  Objection.

9    A    From a personal perspective, no.  I'm kind of a

10        modest person, and my CV is not something that I've

11        considered important.

12     BY MS. FUMETON:

13   Q    So your first CV, which we've shown on your screen,

14        you refer to yourself as Dr. Catizone, correct?

15   A    Correct.

16   Q    And in your second CV, which is Exhibit 5, you

17        refer to yourself as Mr. Catizone, correct?

18   A    Correct.

19   Q    Why did you make the change?

20   A    While I was executive director of NABP, the state

21        of Oklahoma through the Oklahoma board of pharmacy

22        provided me the designation of doctor of pharmacy,

23        and out of respect for a member of NABP and the

24        honor bestowed on me, I used that title of doctor.

25        But once I was no longer the executive director and

```
 1        just a consultant, then I changed it to

 2        Mr. Catizone.

 3   Q    So do you still have the honorary doctorate or was

 4        that withdrawn?

 5   A    I still have that honorary doctorate.  It's not a

 6        doctorate degree, it's a designation.

 7   Q    You do not have a doctor of pharmacy, correct?

 8   A    Correct.

 9   Q    And so you don't feel it would be appropriate to

10        refer to yourself as a doctor of pharmacy, correct?

11   A    I didn't hear that.  I'm sorry.

12   Q    You don't feel it would be appropriate to refer to

13        yourself as a doctor of pharmacy, correct?

14            MR. ELSNER:  Objection.

15   A    It's not whether it's appropriate or not.  That is

16        a title.  It's a title I choose not to use.

17     BY MS. FUMETON:

18   Q    Now, correct?

19   A    Correct.

20   Q    You did previously use it?

21   A    Yes.

22   Q    For how many years did you use it?

23   A    Let me check the résumé.  Since 2001.

24   Q    And when did you stop using it?

25   A    As soon as I retired from NABP.
```

1    Q    On your first CV in this matter, if you look at

2         Exhibit 4, in the last full paragraph on the first

3         page, you listed one of your many honors and

4         awards, the "University of Illinois, College of

5         Pharmacy, Alumni Association's Sister Margaret

6         Wright Graduate Award," correct?

7    A    Yes.

8    Q    But in your second CV in this matter, Exhibit 5,

9         you removed that award, correct?

10   A    Correct.

11   Q    Why?

12   A    Again, it was a matter of modesty.  I didn't want

13        to appear egotistical or to put things in my résumé

14        that were really just something I considered an

15        honor, but didn't feel I needed to brag about that.

16   Q    So looking at your current CV, Exhibit 5, you list

17        another award, the "University of Illinois, Alumnus

18        of the Year."

19            Do you see that?

20   A    Yes.

21   Q    And is that an award you received?

22   A    Yes.

23   Q    And to be clear, though, that award was not on

24        behalf of the entire University of Illinois,

25        correct?

1   A    No, it was.

2   Q    Well, what you actually received was the University

3        of Illinois Chicago Pharmacy Alumnus Award in 1997,

4        correct?

5   A    No.  It was the University of Illinois, College of

6        Pharmacy, which is part of the University of

7        Illinois.

8   Q    Right.  But you're aware that the University of

9        Illinois also has a prestigious alumni achievement

10       award, correct, for the entire university?

11           MR. ELSNER:  Objection.

12  A    I wasn't aware of that.

13     BY MS. FUMETON:

14  Q    You're unaware that the University of Illinois has

15       something called the University of Illinois Alumni

16       Award?

17  A    Yes.

18  Q    But to be clear, it was the University of Illinois

19       Chicago Pharmacy Alumni Award that you received,

20       correct?

21  A    Chicago College of Pharmacy which has since been

22       renamed.  The college has been renamed.

23  Q    Okay.  Is that relevant to the award?

24           MR. ELSNER:  Objection.

25     BY MS. FUMETON:

```
 1    Q    What was the name of the award when you received

 2         it?

 3    A    Chicago College of Pharmacy.

 4    Q    So let's stay with your Defendants' Exhibit 5,

 5         which is your current CV.  Although you've removed

 6         the dates from that one, so keep the other one

 7         handy if you need to look at the dates to answer my

 8         question.

 9              But you obtained a BS in pharmacy in 1983 from

10         the University of Illinois at Chicago, correct?

11    A    Correct.

12    Q    And that's a bachelor of science degree, right?

13    A    Yes.

14    Q    Did you attend college directly in the fall after

15         graduating from high school?

16    A    Yes.

17    Q    And where did you grow up?

18    A    South side of Chicago.

19    Q    You reviewed a master's in pharmacy from the

20         University of Illinois at Chicago in 1987; is that

21         right?

22    A    Yes.

23    Q    And we'll get your employment history in a minute.

24         But that was after you went to work for NABP,

25         correct?
```

1    A    Right.

2    Q    Why did you obtain your master's degree in 1987?

3    A    It was something that I wanted to achieve and I was

4         asked by the faculty at the University of Illinois

5         Chicago College of Pharmacy to pursue a graduate

6         degree.

7    Q    Did NABP pay for part of all of that degree

8         program?

9    A    I can't recall.

10   Q    You don't know one way or the other?

11   A    I think if they did, it would have been part

12        payment, but I'm not sure.

13   Q    Earlier, you just testified that you have an

14        honorary doctorate degree from the Oklahoma State

15        Board of Pharmacy, correct?

16   A    No.  It's --

17   Q    Okay.  I apologize.  I didn't mean to put words in

18        your mouth.

19   A    It's the legal designation of what a pharmacist in

20        Oklahoma is considered.  In Illinois, pharmacists

21        who are licensed are considered registered

22        pharmacists.  In Oklahoma they are considered

23        doctors of pharmacy, as the designation, the legal

24        designation.  And so the Oklahoma Board of Pharmacy

25        issued me an honorary legal designation as a doctor

```
1          of pharmacy in Oklahoma.  But not a degree.

2   Q     And so the -- do pharmacists in Oklahoma refer to

3          themselves as doctors?

4   A     Yes.

5   Q     And so this may seem an odd question, but the

6          Oklahoma State Board of Pharmacy is not an

7          accredited educational institution, correct?

8   A     Correct.

9   Q     We discussed that you graduated with a BS in

10         pharmacy in 1983, correct?

11  A     Yes.

12  Q     And I believe you began working for NABP in 1985.

13             Is that also correct?

14  A     Correct.

15  Q     So you practiced as a pharmacist from 1983 to 1985;

16         is that right?

17             MR. ELSNER:  Objection.

18  A     I'm sorry.  I heard practice of pharmacist and

19         then --

20    BY MS. FUMETON:

21  Q     Let me ask a question a different way.

22             Did you ever practice as a pharmacist?

23  A     Yes.

24  Q     What years?

25  A     1983 to 2004.
```

Page 87

1   Q   So you went to work for NABP in 1985, correct?

2   A   Correct.

3   Q   Did you continue practicing as a pharmacist from

4       1985 to 2004 while you were working at NABP?

5   A   Yes.

6   Q   And so did you do that part-time?

7   A   Yes.

8   Q   Did you ever work full-time as a pharmacist?

9   A   Yes.

10  Q   For how many years?

11  A   From 1983 through 1985.

12  Q   So two years?

13  A   Yes.

14  Q   You didn't ever work in any capacity for one of the

15      defendant pharmacies in this action, correct?

16          MR. ELSNER:  Objection.

17  A   I'm trying to think of all the mergers that have

18      occurred.  I worked for a large chain, but I

19      believe it's not one of the defendants.

20    BY MS. FUMETON:

21  Q   What was the large chain?

22  A   At the time it was Osco Drug.  I believe now it's

23      Albertsons.

24  Q   And what years was that?

25  A   That was from 1981 through 2004.

1    Q    And so you didn't graduate as a pharmacist or did

2         not get your degree in pharmacy until 1983,

3         correct?

4    A    Correct.

5    Q    So were you working as an intern from 1981 to 1983

6         part-time?

7    A    No, I was working as a technician from 1981 to

8         1982.  And then from 1982 to 1983, I was working as

9         a graduate pharmacist.  From 1983 to 1984, I was a

10        staff pharmacist, and then from 1984 to 1985, I was

11        the pharmacist in charge.

12   Q    And then did you continue to work at the same place

13        part-time after you took the position at NABP?

14   A    No.  I worked as a floater and worked at different

15        locations.

16   Q    In what geographic area?

17   A    Primarily initially the south side of Chicago and

18        then afterwards, the northwest suburbs of Illinois.

19   Q    Did you ever work as a pharmacist in Ohio?

20   A    No.

21   Q    And so just so we're clear, to the best of your

22        knowledge, you've never worked for any of the

23        pharmacy defendants in this litigation, correct?

24   A    Correct.

25   Q    Do you hold any other professional certifications

```
 1         or licenses?

 2    A    No.

 3    Q    Are you still a registered pharmacist today?

 4    A    Yes.

 5    Q    Have you ever had faced any disciplinary action --

 6    A    No.

 7    Q    -- as a pharmacist?

 8              Any revocation of licenses?

 9    A    No.

10    Q    Did you ever face any disciplinary action at NABP?

11    A    No.

12    Q    Have you ever been convicted of a crime other than

13         a misdemeanor traffic violation?

14    A    No.

15    Q    NABP is the National Association of Boards of

16         Pharmacy, correct?

17    A    Correct.

18    Q    And it's a 501(c) organization, right?

19    A    501(c)(3).

20    Q    Thank you for that clarification.

21              How is it funded?

22    A    Funding primarily comes from fees that the

23         pharmacists pay in order to take the national

24         licensure exam that's required by all the states,

25         and also for pharmacists to transfer their license
```

```
 1          from one state to the other, for which NABP
 2          maintains a disciplinary clearinghouse, and then
 3          through some of its accreditation programs.
 4     Q    And as a 501(c)(3) organization, the NABP has to
 5          submit certain tax returns that are publicly
 6          available, correct?
 7               MR. ELSNER:  Objection.
 8     A    Yes.
 9       BY MS. FUMETON:
10     Q    And NABP has a foundation, correct?
11     A    Correct.
12     Q    It's called the NABP Foundation?
13     A    Correct.
14     Q    What is its purpose?
15     A    The purpose is if there's a new concept, a new
16          innovation, a new program, it's begun in the
17          foundation, and the foundation then will test that
18          concept.  If it seems like it's a program that's
19          going to benefit the states, then NABP will move it
20          into its operational side, which is the NABP.
21     Q    And so is the foundation a not-for-profit
22          foundation?
23     A    Both NABP and the foundation are 501(c)(3)
24          charitable and educational organizations.
25     Q    And how is the NABP Foundation funded?
```

1    A    It's funded by grants that are received, as well as

2         primarily through NABP.

3    Q    You are currently a senior advisor to the NABP; is

4         that correct?

5    A    Correct.

6    Q    And what does it mean to be a senior advisor?

7    A    If people have questions about what's happened in

8         the past or they would like my advice on current

9         issues or programs, then I'm available to assist

10        with that.

11   Q    How long have you been a senior advisor?

12   A    Since May when I retired, May 2021 -- or 2020.

13        May 2020.

14   Q    About how many hours per week do you devote to

15        being a senior advisor to NABP?

16   A    Anywhere between one to five hours.

17   Q    Are you compensated in that role?

18   A    No.

19   Q    Do you have any type of in-kind benefits?

20   A    Yes.

21   Q    What are those benefits?

22   A    For the next two years until 2022, I actually

23        receive a complimentary copy of the National

24        Association of Boards of Pharmacy compilation of

25        laws and regulations called NABPLAW, and also the

```
1         domain name for my company, Pharmacy Advisors, is

2         provided the .pharmacy domain for two years at no

3         cost.

4    Q    When did you first get that domain name?

5    A    Shortly after the company was founded sometime in

6         2020.

7    Q    Was that before or after you left the NABP as the

8         executive director?

9    A    I'm not exactly sure.  I believe it was before I

10        left NABP.

11   Q    And so why is NABP providing the pharmacy domain

12        name for your consulting company?

13            MR. ELSNER:  Objection.

14   A    After 35 years of building the company from a

15        seven-person staff with a budget of less than

16        100,000 to 160-person staff with a budget of

17        40 million, they felt that I would be a good

18        representative or ambassador for NABP and the work

19        I was doing afterwards.  So they wanted to -- that

20        was an in-kind service that they appreciated and I

21        also requested.

22     BY MS. FUMETON:

23   Q    Is there any other in-kind benefit that you

24        received from NABP?

25   A    When I'm in the office, I'm entitled to the free
```

```
 1         water and coffee that's provided to the employees.

 2    Q    Anything else?

 3    A    That's it.

 4    Q    What is the name of your consulting company?

 5    A    It's called Catizone, Luce & Menighan Pharmacy

 6         Advisors.

 7    Q    And you believe that was founded in 2020; is that

 8         right?

 9    A    Yes.

10    Q    But you can't recall if it was founded before or

11         after you left NABP?

12    A    It was -- yeah, I don't recall.  I could check the

13         documents at some point, but I can't recall.

14    Q    Given that they are funding your domain name for

15         NABP -- that NABP is funding your domain name for a

16         consulting company, do you think it was before you

17         left NABP?

18            MR. ELSNER:  Objection.

19    A    The funding is $150 for the actual domain.  That's

20         what NABP provides as an in-kind service.  So

21         again, I'm not sure when it was funded.  I think it

22         was prior to.

23      BY MS. FUMETON:

24    Q    When did you know that the NABP was going to

25         support you in this regard?
```

1          MR. ELSNER:  Objection.

2   A   When I signed an agreement with -- after I left in

3       May.

4    BY MS. FUMETON:

5   Q   Was that a severance agreement --

6   A   No.

7   Q   -- or retirement?  Severance is probably the wrong

8       word.  Was it like a retirement agreement?

9          MR. ELSNER:  Objection.

10  A   I don't know what the title was.  It was -- it's

11      spelled out that NABP would provide me the domain

12      for $150 each year and free access to NABPLAW at

13      $800 per year, and in return for that, I would

14      provide advice as needed to the executive director

15      and staff for two years.

16   BY MS. FUMETON:

17  Q   And that's a two-year agreement?

18  A   Yes.

19  Q   How are you compensated as a partner at CLM --

20      well, let me first ask, is your consulting -- let

21      me back up.  Is your consulting company sometimes a

22      referred to as CLM?

23  A   The last part?

24  Q   CLM?

25  A   Yes.

1    Q    How are you compensated as a partner in CLM?

2    A    There's a formula that we utilize based upon the

3         clients that the individual partners have

4         responsibility for, and the revenue is generated

5         and an algorithm is used to determine how much each

6         person has used.

7    Q    Have you been retained in your individual capacity

8         by plaintiffs in this case or was CLM retained?

9    A    No.  I mean, I'm sorry.  I've been -- our company

10        has been retained, but I'm the primary for this

11        case.

12   Q    Plaintiffs retained CLM with you being the primary

13        person to work on it; is that correct?

14            MR. ELSNER:  Objection.

15   A    I don't know what the legalities is.  They retained

16        me as a partner.  It's my company, and that's where

17        the funding and everything goes.

18     BY MS. FUMETON:

19   Q    I guess my question is, is your agreement with CLM

20        or is your agreement with you individually?

21            MR. ELSNER:  Objection.

22   A    The contract is with me individually, but payments

23        go to CLM.

24     BY MS. FUMETON:

25   Q    Let's go back to your time with NABP.  Prior to

1        being a senior advisor, you served as the executive

2        director of that organization, correct?

3   A   Correct.

4   Q   And you held that position for 35 years?

5   A   I started in 1988, so approximately 33, 32 years.

6   Q   So if we look at the second page of your current

7        CV, which is marked as Exhibit 5, prior to your

8        executive director role, you served as the NABP's

9        test and measurement director; is that right?

10   A   Correct.

11   Q   In that role you were responsible for the

12        administration of the NAPLEX examination; is that

13        right?

14   A   Correct.  And the other exams there as well.

15   Q   And would that include the MPJE?

16   A   Yes.

17   Q   And did that exist back in 1985?

18   A   No.

19   Q   Okay.  So I just asked if when you were in that

20        role you were responsible for the MPJE, and you

21        said yes.

22   A   Sorry.  I was confused.  I thought you meant at my

23        time at NABP.

24   Q   Okay.  So thank you for that clarification.  So

25        from 1985 to 1988, you were responsible for NAPLEX,

```
 1        but when you were elevated to the executive

 2        director of that organization, you continued to

 3        have that responsibility of being responsible for

 4        NAPLEX; is that accurate?

 5   A    And the other exams, yes.

 6   Q    And so in that role, you were responsible for the

 7        MPJE, is that right?

 8   A    Correct.  I was actually responsible for developing

 9        the MPJE and its blueprint.

10           MR. ELSNER:  Carmen, I'm sorry.  Excuse me.

11        Carmen, if you could just give a second after the

12        question is asked so I can lodge an objection.  I'm

13        afraid we're talking over each other, which makes

14        it very difficult for the stenographer.

15           Go ahead, Tara.

16      BY MS. FUMETON:

17   Q    So we mentioned NAPLEX and MPJE.  Are there other

18        competence assessment programs and activities that

19        you were responsible for?

20   A    Yes.

21   Q    What would those be?

22   A    It's the pharmacy curriculum outcomes assessment

23        examination.

24   Q    And what is that?

25   A    That's an examination and an assessment tool that
```

```
 1        measures how well a doctor of pharmacy program is

 2        performing based upon its curriculum and provides

 3        feedback to the faculty as well as to students.

 4   Q    And just briefly, what is NAPLEX?

 5   A    NAPLEX is the national licensure exam required by

 6        all states that sets the minimum or entry level

 7        competence that a pharmacist must demonstrate in

 8        order to be licensed by the individual State Board

 9        of Pharmacy.

10   Q    And what is the MPJE?

11   A    That is a multistate pharmacy jurisprudence

12        examination that has a very special algorithm so

13        that questions are asked of individuals, and the

14        correct answers pertain to that individual state or

15        the state where they are seeking licensure.  So in

16        cases where a state law may be more restrictive

17        than federal law, state law takes precedence and

18        reverse, the federal law is more.  So the candidate

19        knows exactly what they have -- what the laws in

20        the state or in the jurisdiction where they are

21        practicing.

22   Q    And so the MPJE in layman's terms, it's focusing on

23        what the law and legal requirements are of the

24        pharmacist; is that right?

25             MR. ELSNER:  Objection.
```

1    A    Yes.

2      BY MS. FUMETON:

3    Q    And what are competencies?

4    A    Competencies, probably the best way to describe

5         them, are the blueprint for an examination.  It

6         details what areas are going to be tested and what

7         the domain of knowledge is required to be known for

8         that particular area.

9    Q    And did you develop the competencies for the MPJE?

10   A    I was instrumental in developing the competencies

11        for NAPLEX, and I personally developed the

12        competencies for the MPJE.

13   Q    And if I wanted to get my hands on those

14        competencies, how could I do that?

15        MR. ELSNER:  Objection.

16   A    All you'd need to do is go to www.nabp.pharmacy,

17        under programs, under examinations, and the MPJE

18        competency statements will be there as part of the

19        candidate board.

20     BY MS. FUMETON:

21   Q    So for example, the competency 1.4.1, are you

22        familiar with that under the MPJE?

23        MR. ELSNER:  Objection.

24   A    If you put it up on --

25     BY MS. FUMETON:

1    Q    I --

2    A    I'm not -- I don't remember it offhand.

3    Q    So if I said that it was responsibilities for

4         determining whether prescriptions or orders were

5         issued for a legitimate medical purpose and within

6         all applicable legal restrictions, would that ring

7         a bell?

8              MR. ELSNER:  Objection.

9    A    Sounds familiar, but I would prefer to actually see

10        it in writing so I could make sure it was what you

11        said.

12     BY MS. FUMETON:

13   Q    Okay.  And the MPJE asks pharmacists questions

14        about the competencies; is that right?

15             MR. ELSNER:  Objection.

16   A    It would ask --

17     BY MS. FUMETON:

18   Q    Maybe I'm going about it incorrectly.  I'm trying

19        to understand, sir.  I've seen the competencies

20        listed there, and then the MPJE, though, is testing

21        pharmacists with respect to those various

22        competencies; is that right?

23             MR. ELSNER:  Objection.

24   A    Yeah.  You know, I'll try and answer, but I'm not

25        following where you're going with the question.

1    The competencies are the entry-level requirements

2    that the individual states through MPJE have set,

3    and then the MPJE tests the pharmacist's knowledge

4    of those competencies.

5    BY MS. FUMETON:

6  Q    Thank you.  So if I wanted to see what the MPJE

7    tests were, how could I do that?

8         MR. ELSNER:  Objection.

9  A    You can only see the competencies because under the

10    standards for testing issued by the American

11    Psychological Association and standards that are

12    used for all high-stakes licensure exams, no

13    questions that are on the exam are actually

14    disclosed.  But there are pretest and also

15    candidate guides that provide some sample questions

16    to candidates about what may appear on the

17    examination.

18    BY MS. FUMETON:

19  Q    And in your view, it would be -- that's something

20    that I could access; is that right?

21         MR. ELSNER:  Objection.

22  A    You can access the practice exams that exist for

23    the other programs.  There's not a practice exam

24    for MPJE yet.

25    BY MS. FUMETON:

Page 102

1    Q    As the executive director of NABP, you were

2         responsible for its executive governance, the

3         day-to-day operations, and development and

4         implementation of mission, vision, and strategic

5         plans; is that right?

6    A    Yes.

7    Q    How were you compensated at NABP?

8    A    Paid a salary.

9    Q    Do you know what your salary was in 2018?

10             MR. ELSNER:  Objection.

11   A    In 2000 what?

12     BY MS. FUMETON:

13   Q    Let me back up.

14             What was your salary in 2020 when you left?

15             MR. ELSNER:  Objection.

16   A    Approximately $600,000.

17     BY MS. FUMETON:

18   Q    What was it in 2019?

19             MR. ELSNER:  Objection.

20   A    It was probably around the same, somewhere in the

21        ballpark between 500 and 700,000 over the last

22        three years I was there.

23     BY MS. FUMETON:

24   Q    Will you take out what is in envelope 16?  We're

25        going to mark that as Exhibit 8.

1        (Exhibit 8 was marked for identification.)

2   A   Is that the 990?

3   Q   Yes.

4   A   Okay.

5   Q   So for the record, it is -- appears to be a

6       2018 990 form, IRS form, for the National

7       Association of Boards of Pharmacy.  And,

8       Mr. Catizone, I'll give you a minute to review the

9       document.

10   A   I have it here.

11   Q   Are you familiar with this document, what's been

12      marked Exhibit 8?

13   A   Yes.

14   Q   What is it?

15   A   Exactly what you said.  It's the 990 form for NABP.

16   Q   And is it something that you prepare?

17   A   No.

18   Q   That's a bad question.  I'll withdraw that

19      question.

20       This is the tax return that you signed on

21      behalf of the NABP; is that correct?

22       MR. ELSNER:  Objection.

23   A   Correct.

24    BY MS. FUMETON:

25   Q   And in fact, if you'd look -- and I don't think

1       this version actually has a signature on it, but

2       you're listed down on the first page at the "Sign

3       Here" as "Carmen Catizone Secretary/Executive

4       Director," correct?

5            MS. FUMETON:  I think -- Mike, can you hear

6       me?

7            Amy, can you hear me?

8            THE REPORTER:  I believe we are frozen.

9            Do you want to go off the record for a moment?

10           MS. FUMETON:  Yes, let's go off the record.

11           THE VIDEOGRAPHER:  We're off the record.

12           (A recess was taken.)

13           THE VIDEOGRAPHER:  We're on the record.

14    BY MS. FUMETON:

15    Q    Okay.  Mr. Catizone, we just had a technical

16         difficulty, so I don't think you heard my last

17         question, which was, if you'd look at the first

18         page of Exhibit 8, you're listed down there as the

19         signatory, Carmen Catizone Secretary/Executive

20         Director, correct?

21    A    Correct.

22    Q    And not just for 2018, which is the particular

23         return that we're looking at on Exhibit 8, but in

24         your role at NABP as executive director, you had

25         the responsibility of ensuring that the information

Page 105

1      that was contained in these tax returns that the

2      NABP was filing is truthful and accurate, correct?

3          MR. ELSNER:  Objection.

4   A   Correct.

5     BY MS. FUMETON:

6   Q   Since 2010, NABP has reported in its tax returns

7      that you worked 23 hours per week; is that

8      accurate?

9   A   I'm sorry I didn't hear the question.

10  Q   Sure.  Since 2010, NABP has reported in its tax

11     returns that you worked 23 hours per week; is that

12     accurate?

13         MR. ELSNER:  Objection.

14  A   From a payroll standpoint, yes.

15    BY MS. FUMETON:

16  Q   And in fact, you can see that, if we turn to page 7

17     of this report, correct?

18  A   Okay.

19  Q   You're listed on line 13 --

20  A   Yes.

21  Q   -- as Carmen Catizone, correct?

22  A   Correct.

23  Q   And it says "Average hours per week."  You're

24     listed at 23, correct?

25  A   Correct.

1   Q     And that's been the same as it has been since 2010,

2         right?

3   A     Correct.

4   Q     And your reportable compensation for 2018 was

5         $846,873, correct?

6   A     Correct.

7   Q     So earlier you testified that your income was

8         approximately 500 to $700,000 for the last few

9         years that you were there.

10              Is it a little bit higher than that?

11              MR. ELSNER:  Objection.

12  A     I had two contracts with NABP.  So I thought the

13        question was how much was I compensated by NABP.

14        NABP compensated me between 5- and $700.  And I

15        worked for 27 hours for NABP.  And then I worked

16        12 hours per week on payroll for the Foundation.

17        And the Foundation then paid me the difference

18        between the 5- to $700 that I quoted and the

19        $845,000.  So I actually had two contracts with

20        NABP, two different payments.

21     BY MS. FUMETON:

22  Q     I think you testified earlier that the funding for

23        the Foundation is basically coming from -- a

24        significant amount of it is coming from the NABP,

25        correct?

Page 107

```
 1    A    Correct.

 2    Q    Okay.  So if you combine your work for the

 3         foundation and the NABP, you were receiving

 4         approximately 800 -- well, approximately $850,000

 5         in 2018, correct?

 6    A    Correct.

 7    Q    And was that number higher in 2019?

 8             MR. ELSNER:  Objection.

 9    A    I believe I received an increase, so yes, it was

10         higher in 2019.

11      BY MS. FUMETON:

12    Q    What was it in 2019?

13    A    It might have been 5 percent higher, but I don't

14         recall.

15    Q    No, I can't do the math in my head like that.  So

16         is that about 900,000?

17    A    To the best of my recollection, probably around

18         there.

19    Q    Okay.  And did you also get an increase for 2020?

20    A    Yes.  Approximately another 5 percent, I would say.

21    Q    So going to about 950,000?

22             MR. ELSNER:  Objection.

23    A    Yes.

24      BY MS. FUMETON:

25    Q    So from looking at this line, I just want to
```

1      understand how the structure works.  You're giving

2      approximately in 2018, 850,000 of reportable income

3      from NABP.  And then in column F, it refers to

4      "Estimated amount of other compensation from the

5      organization or related organizations" and there,

6      it's listed as 52,000.

7           Do you see that?

8   A  Yes.

9   Q  What's that referring to?

10  A  That would have been a deferred income payment.

11     Oh, I'm sorry, that's actually the benefits for

12     healthcare and for retirement and pension.

13  Q  That's the additional benefits that you received;

14     is that right?

15  A  Yes.

16  Q  When you were working for NABP as its executive

17     director, did you do consulting work on the side?

18  A  No.

19  Q  Was your only source of income from -- well, when

20     you became the executive director in 1985, did you

21     have any other -- I'm sorry.  I have got my dates

22     wrong.

23          When you became the executive director in

24     1988, did you have any other income other than

25     through NABP?

1    A    Yes.

2    Q    That was your work as a pharmacist?

3    A    Correct.

4    Q    Any other income other than that?

5    A    No.

6    Q    And then you eventually stopped working as a

7         pharmacist on the side, correct?

8    A    Correct.

9    Q    At that point, did NABP and the Foundation become

10        your only source of income?

11            MR. ELSNER:  Objection.

12   A    Yes.

13     BY MS. FUMETON:

14   Q    And so you never did any consulting work prior to

15        the formation of your current company in 2020; is

16        that right?

17            MR. ELSNER:  Objection.

18   A    Consulting work, but I was not compensated for it.

19     BY MS. FUMETON:

20   Q    Okay.  Were you compensated in any way, shape, or

21        form?

22   A    No.

23            MR. ELSNER:  Objection.

24     BY MS. FUMETON:

25   Q    Looking back at Exhibit 8, in 2018, you were NABP's

Page 110

1       highest paid employee, correct?

2    A    Correct.

3    Q    And in fact, the next highest paid employee is

4        Paul Jones, who received approximately $280,000,

5        correct?

6    A    Correct.

7    Q    So you received drastically more money that he did,

8        right?

9    A    I received more than he did.  I'm not sure if it's

10       drastically or not.

11   Q    Well, he worked more hours than you did.  He worked

12       35 hours a week, correct?

13           MR. ELSNER:  Objection.

14   A    No.

15     BY MS. FUMETON:

16   Q    Well, it's list on the tax return as 35

17       average hours per week, correct?

18   A    Everyone at NABP works 35 hours per week.  I work

19       23 for NABP and 12 for the Foundation; so we work

20       the same amount of hours.

21   Q    So your foundation money is included in this;

22       your hours are not.

23           Is that what you're saying?

24   A    Correct.

25   Q    Well, you made more than twice -- two times what he

```
 1       made, right?
 2           MR. ELSNER:  Objection.
 3   A   I would have to do the math.  That's probably what
 4       it is.
 5     BY MS. FUMETON:
 6   Q   It's more than that, right?
 7           MR. ELSNER:  Objection.
 8   A   I don't have a calculator here.  We could figure
 9       out how many more times it is, but I don't have it.
10     BY MS. FUMETON:
11   Q   You can't figure that out by just looking at those
12       two numbers?
13           MR. ELSNER:  Objection.
14   A   No.
15     BY MS. FUMETON:
16   Q   Okay.  How is your salary determined?
17   A   Via board of directors of NABP, which is the
18       executive committee who are elected volunteers from
19       all of the states, set my salary for me.
20   Q   And was that set on a yearly basis?
21   A   It was contractual for three-year periods.  And
22       then the committee had the ability to provide
23       increases as deemed appropriate.
24   Q   Did NABP -- I think we've already established they
25       provided you with some additional benefits in the
```

Page 112

1        amount of $52,000 that you think is retirement and

2        other health benefits; is that right?

3            MR. ELSNER:  Objection.

4      BY MS. FUMETON:

5    Q    Did they provide any other benefits to you?

6    A    Two other expenses.  They provided me with a cell

7        phone.  So that was about $50 a month.  And they

8        also provided me with funding to lease a vehicle,

9        and that was about $400 per month.

10   Q    And was that vehicle registered in NABP's name?

11   A    Yes.

12   Q    Do you have a Range Rover that was leased through

13       NABP?

14           MR. ELSNER:  Objection.

15   A    At one point, yes.

16     BY MS. FUMETON:

17   Q    When did you have that?

18   A    I can't recall the exact dates.  It was maybe

19       five years past or something.

20   Q    If we look on page -- I don't know what page this

21       is.  It's -- it's the one with the travel on it.

22       So if you keep going, it's part IX.  We can put it

23       up on the screen.  When we get to that page -- it's

24       page 10.  Sorry.  Yeah, it's page 10.  I don't know

25       if you have that.  It might be easier.  It's kind

1        of a small font.  You can see it in front of you

2        more easily.

3             Are you on page 10, Mr. Catizone?

4    A    Yes.

5    Q    Okay.  And so it has a line item of travel for NABP

6        of about 1.5 million.

7             Do you see that?

8    A    Yes.

9    Q    About what percentage of that was utilized by you?

10       Can you estimate that?

11            MR. ELSNER:  Objection.

12   A    Maybe 30,000.

13     BY MS. FUMETON:

14   Q    And other than the vehicle and the cell phone that

15       we discussed, was there any other benefits that the

16       NABP, other than the retirement and the health

17       insurance that we discussed, that they provided

18       you?

19   A    No, not that I can recall.

20   Q    Your bio also notes, going back to your CV, that

21       you have worked as a liaison for the federal

22       government; is that right?

23   A    Yes.

24   Q    And what does that mean?

25   A    As the spokesperson and representative for the

1      National Association of Boards of Pharmacy, I would

2      serve on various committees with the DEA, FDA, as

3      well as participate in meetings, discussions with

4      them and represent what the thoughts of the State

5      Board of Pharmacy and NABP were.

6  Q   You worked closely with the DEA; is that right?

7          MR. ELSNER:  Objection.

8  A   Yes.

9    BY MS. FUMETON:

10  Q   Do you consider the DEA as competent?

11  A   Did you say -- did you ask if I thought the DEA was

12      competent?

13         MR. ELSNER:  Objection.

14  A   Yes.

15    BY MS. FUMETON:

16  Q   Who specifically at DEA -- are there particular

17      individuals that you worked with more often than

18      not or I shouldn't say more often than not.  Let me

19      rephrase the question.

20         Are there specific individuals of the DEA that

21      you often worked with?

22         MR. ELSNER:  Objection.

23  A   Primarily the diversion team, but I have worked

24      with each of the administrators from Michelle

25      Leonard through my tenure at NABP.

1    BY MS. FUMETON:

2    Q    And what about the specific names, specific

3         individuals?  I understand the team, but are there

4         specific individuals that you worked with closely?

5             MR. ELSNER:  Objection.

6    A    Over the years, whoever has been responsible for

7         diversion is the individual that I've worked most

8         closely with.

9    BY MS. FUMETON:

10   Q    Can you give me some names?

11   A    Sure.  There was Joe Rannazzisi, there was others

12        that I can't recall right now, but they are

13        mentioned in some of the other documents that the

14        DEA released, and I worked with them as well.

15   Q    So there are no other names that you can recall

16        right now?

17   A    Correct.

18   Q    Is it fair to say you worked primarily with

19        Mr. Rannazzisi?

20            MR. ELSNER:  Objection.

21   A    While he was in charge of diversion, Mr. Rannazzisi

22        and his team I worked with.

23   BY MS. FUMETON:

24   Q    Have you stayed in contact with Mr. Rannazzisi?

25   A    Very sparingly.

Page 116

1    Q    When is the last time you spoke with him?

2    A    Probably about a year ago.

3    Q    So NABP has a product called InterConnect; is that

4         right?

5    A    Yes.

6    Q    Can you describe what that is?

7    A    Sure.  Every state in the country, based upon

8         funding and support for NABP, has a prescription

9         drug-monitoring program.  The InterConnect program

10        that was developed by NABP in about a six-month

11        time frame provides the interoperability between

12        all of those systems so that a pharmacist or

13        prescriber can query their individual PDMP and have

14        access to all the PDMPs across the country, all of

15        the states PDMP.

16   Q    And is the InterConnect functional?

17             MR. ELSNER:  Objection.

18   A    I'm sorry.  Did you say --

19     BY MS. FUMETON:

20   Q    Is it operational?  Does it work?

21   A    Yes.

22   Q    Okay.  Is that a product that's a revenue stream

23        for NABP?

24   A    Yes.

25   Q    Is that something that NABP has made available to

1         the federal government?

2    A    Did we make -- NABP was approached by the states to

3         develop InterConnect because the federal government

4         was unable to do so.  And we've offered that

5         program to the federal government several times,

6         and the federal government has decided not to use

7         that program but instead use another program called

8         RxCheck.

9    Q    Has InterConnect faced various road blocks?

10            MR. ELSNER:  Objection.

11   A    Yes.

12     BY MS. FUMETON:

13   Q    What are those road blocks?

14   A    The road blocks are political partisanship whereby

15        contractors are working and receiving grants for a

16        competing program wish to have that established,

17        and they've tried to shut down InterConnect, even

18        though InterConnect is operating at no cost to the

19        federal government, processes billions of records

20        each hour, each day, and provides operability

21        across all 50 states.

22   Q    You were told that it would be very helpful to the

23        DEA, correct?

24            MR. ELSNER:  Objection.

25   A    No.  The DEA and other law enforcement agencies

1           were advised that because of state laws and

2           requirements, the only way they could have access

3           to the PDMPs was through a subpoena or a case or a

4           court order.

5       BY MS. FUMETON:

6    Q    But putting aside those road blocks, my point is

7           that you thought that would be something that would

8           be very helpful to the DEA; is that right?

9              MR. ELSNER:  Objection.

10   A    It's helpful -- more helpful to prescribers and

11          doctors and law enforcement, including the DEA,

12          that it would be a tool that could be used by them

13          as well.

14      BY MS. FUMETON:

15   Q    Does NABP administer the VAWD program?

16   A    Yes.

17   Q    Can you briefly explain what that is?

18   A    A VAWD program focuses on the integrity of products

19          that are distributed by wholesale distributors and

20          focuses on compliance with the Food, Drug and

21          Cosmetic Act, particularly those related to

22          wholesale distribution and pedigrees and other

23          requirements.

24   Q    And VAWD actually accredited states wholesale

25          distributors of pharmaceuticals, correct?

1          MR. ELSNER:  Objection.

2    A     Correct.

3      BY MS. FUMETON:

4    Q     And in fact, NABP is accredited from the defendants

5          in this litigation, correct?

6          MR. ELSNER:  Objection.

7    A     I believe the wholesale distribution aspects of the

8          defendants, yes.

9      BY MS. FUMETON:

10   Q     And in doing so, in accrediting the defendants and

11         their wholesale distribution activities, the NABP

12         looks at their policies and procedures to ensure

13         that they comply with the Controlled Substances

14         Act, correct?

15         MR. ELSNER:  Objection.

16   A     The primary focus is the Food, Drug and Cosmetic

17         Act, and then there's a tertiary review of whether

18         or not they're compliant with their Controlled

19         Substances Act.

20     BY MS. FUMETON:

21   Q     So they do look to see whether they are in

22         compliance when doing their accreditation, correct?

23         MR. ELSNER:  Objection.

24   A     They look at their policies and procedures, and

25         then they may pull an invoice to do a random audit.

1    BY MS. FUMETON:

2   Q   Okay.  And so at least from a policies and

3       procedures standpoint, if the VAWD is giving

4       accreditation, it is concluding that their policies

5       and procedures are compliant with the CSA, correct?

6       MR. ELSNER:  Objection.

7   A   Along the distribution lines, yes.

8    BY MS. FUMETON:

9   Q   When you left the executive director position at

10      NABP in May of 2020, did you receive a type of

11      severance or retirement package?

12   A   I was an employee of the association, and so I

13      received a pension and 401(k) like the other

14      employees did, yes.

15   Q   And was that something you had already paid into?

16   A   Yes.

17   Q   Other than the compensation benefits that we've

18      already discussed, did you ever receive any other

19      remuneration from the NABP, any other benefits?

20   A   Yes.

21   Q   What are those?

22   A   Whenever there was an increase or bonus provided to

23      me, I deposited that money into a deferred income

24      account so that I would not then take that money

25      for that year, and then at the end of my time with

1       NABP, I withdrew the monies from that deferred

2       compensation fund.

3    Q   How much was that in deferred compensation when you

4       retired from the NABP?

5           MR. ELSNER:  Objection.

6    A   I believe about 2.2 million of which I received

7       1.5 million.

8     BY MS. FUMETON:

9    Q   Why did you receive 1.5 and not the rest?

10          MR. ELSNER:  Objection.

11   A   There's a thing in the United States called taxes.

12    BY MS. FUMETON:

13   Q   I see.  So you received that, but then you had to

14      pay taxes on it?

15   A   Correct.  Because it counted as compensation, so

16      technically, the answer did I receive any other

17      compensation, I answered it correctly.  This was

18      part of compensation that I chose to defer.

19   Q   On your CV, does it accurately list all of your

20      professional memberships?

21   A   To the best of my ability, but there may be some on

22      there that aren't included.  I'm not sure.

23   Q   Do you receive compensation for any of them?

24   A   No.

25   Q   And you also on your CV are listed as instructor,

1       Drug Enforcement Administration Training Academy

2       from 2008 to the present, correct?

3   A   Correct.

4   Q   What does that entail?

5   A   Up until about five years ago, I actually taught a

6       course at Quantico for DEA diversion investigators

7       explaining to them what is the practice of

8       pharmacy, what boards of pharmacy are, and then

9       what red flags were that were identified by boards

10      of pharmacy, and then also the disciplinary actions

11      that state boards of pharmacy can take or not take.

12  Q   And were you compensated for that?

13  A   No.

14  Q   And why did you stop doing that five years ago?

15  A   They just didn't ask me to present it anymore.  I'm

16      not sure why.

17  Q   You don't list any scientific or academic research

18      on your CV.

19          Is that fair to say?

20  A   There is some on there.

21  Q   And what are you referring to specifically?

22  A   If you can turn to the publications, one of my

23      publications has actually been the sentinel

24      quotation for clinical pharmacy in the United

25      States and the basis for additional research.  So

Page 123

1        I've done that type of research, that research as

2        well.

3   Q    And which one are you specifically referring to?

4            MR. ELSNER:  Objection.

5   A    It's the citation, I'm sorry, there's no

6        page numbers on the résumé, but it begins with

7        "Hatoum, HT, Catizone, C, Hutchinson, RA,

8        Bibliography:  An Eleven-Year Review of Pharmacy

9        Literature:  Documentation of the Value and

10       Acceptance of Clinical Pharmacy."  All of the

11       passing score studies that are also listed there

12       for the NAPLEX and others were actually academic

13       and research.  And so there are a number of

14       citations there.

15     BY MS. FUMETON:

16   Q    You're not an expert in the field of pain

17       management, correct?

18   A    Correct.

19   Q    Or the use of opioid pain medications for the

20       clinical treatment of pain, correct?

21           MR. ELSNER:  Objection.

22   A    Correct.

23     BY MS. FUMETON:

24   Q    And you would agree that you're not an expert on

25       opioids in particular, correct?

1          MR. ELSNER:  Objection.

2     A    Correct.

3       BY MS. FUMETON:

4     Q    I'd like to briefly turn now to your experience

5          serving as an expert witness.  And I know that you

6          have listed several different litigation matters

7          and other consulting activity in your CV.  If we

8          actually look at your report at pages 5 and 7 --

9          and you are happy to reference it if you want.  You

10         list 25 cases in which you served as an expert

11         witness; is that accurate, approximately?

12         MR. ELSNER:  I'm sorry, Tara.  What are you

13         referring to, his CV or his report?

14         MS. FUMETON:  The report, pages 5 and 7 of his

15         report.  Exhibit 2.

16    A    Those are listed on pages 5 to 7, yes.

17      BY MS. FUMETON:

18    Q    Okay.  And the cases cover about the last 15 years;

19         is that right?

20    A    Correct.

21    Q    And approximately how many times did you serve as

22         an expert witness prior to 2006 in any litigation?

23         MR. ELSNER:  Objection.

24    A    In litigation, not at all.

25         (Stenographer requested clarification.)

Page 125

1   A    Not at all.

2      BY MS. FUMETON:

3   Q    Earlier you mentioned that your fees can range from

4        $200 to $800 for expert work in opioid-related

5        litigation.  I guess my first question is, of the

6        litigation matters listed here, which, if any, do

7        you consider to be opioid related?

8          MR. ELSNER:  Objection.

9   A    On page 5, third, Trial:  Expert witness,

10       distribution of controlled substances; the next

11       one, distribution of controlled substance; Trial:

12       Expert, Northern District of California,

13       distribution of controlled substances; Trial:

14       Expert, Northern District U.S. versus Michael

15       Arnold Jeffrey; Trial:  Expert witness -- on the

16       next page -- Michigan versus Fabode, controlled

17       substances; Trial:  Expert witness, Office Southern

18       District New York, controlled substances; Northern

19       District of Ohio, controlled substances; Office

20       San Francisco Division, Napoli, controlled

21       substances; Trial:  Expert, Michael Arnold and

22       Jeffrey Herholz, controlled substances; Baldwin

23       Ihenacho, distribution of prescription drugs; then

24       Western District, Rostie, distribution of

25       controlled substances; then Trial:  Witness, the

1     last there, Eastern District of New York,

2     distribution and possession of oxycodone and

3     hydrocodone.

4          Moving to page 7, illegal distribution of

5     prescription drugs, Office District of Minnesota,

6     U.S. versus Christopher Smith; Matter of United

7     Prescription Services, illegal distribution of

8     controlled substances; Trinity Healthcare, illegal

9     distribution of controlled substances.

10    BY MS. FUMETON:

11  Q   So you're referencing all that being opioid

12     litigation because they all involved in part some

13     opioids?

14  A   Even though the focus has been maybe internet

15     pharmacy, there has been some tangential relation

16     to opioids in most of the hearings in cases.

17  Q   So when you were talking about that they involve

18     opioids, this is tangential relationship to

19     opioids; is that right?

20         MR. ELSNER:  Objection.

21  A   The cases I just cited, those were very specific to

22     opioids.  The internet cases that would have been

23     tangential to opioids.

24    BY MS. FUMETON:

25  Q   Okay.  And in fact, some of the cases that you list

```
 1         on page 5 are actually the same cases listed on
 2         page 6, though, right?  It's first just what's
 3         happening at the DEA hearings and then it's going
 4         on to proceed to other litigation?
 5    A    If so, that might be.  No, I think -- yes, they
 6         would be -- when I was the expert witness, I
 7         delineated that, and then the second, this is where
 8         I've actually provided testimony.  So in the first
 9         part --
10    Q    Okay.
11    A    -- is where I may have provided a report and may
12         not have testified.
13    Q    Which is the first part that now you're referring
14         to?
15    A    Page 5.  Page 5 would have been recognized - I'm
16         sorry.  If there's duplication, then that one would
17         have been a mistake.
18    Q    Well, is there duplication?  I mean, just asked the
19         question.  You would know.
20              Is there duplication?  I just looked at the
21         first five on page 5.  They seem to match the first
22         five on page 6 as far as the names are concerned.
23              MR. ELSNER:  Objection.
24    A    I don't think there was duplication.  I thought you
25         said that there was.  So I don't think there's
```

```
 1        duplication.

 2     BY MS. FUMETON:

 3   Q    So if you look at the first one, it talks about

 4        U.S. v. Abiodun Fabode on page 5.  And then on the

 5        second page, it talks about U.S. v. Abiodun Fabode,

 6        right?

 7   A    Yes.

 8   Q    Are those the same matters?

 9   A    Yes.  So --

10   Q    If you look at the second one on page 5, it's the

11        same as the second one on page 6, correct?

12   A    Yes.  So there was some duplication in the trials

13        and hearings.

14   Q    And which of these were you paid $800 for -- an

15        hour, do you recall?

16   A    I'm sorry?

17   Q    Which of these were you paid $800 an hour for, do

18        you recall?

19            MR. ELSNER:  Objection.

20   A    None of these cases.

21     BY MS. FUMETON:

22   Q    None of the ones that are listed here?

23   A    Correct.

24   Q    Which litigation matters have you been paid $800

25        per hour on?
```

1    A    Those were with private clients that weren't

2         actually -- they did not go to trial.  I actually

3         provided advice and served as a litigation

4         consultant for them.

5    Q    So that's in a consulting role, not as a testifying

6         expert; is that right?

7    A    Correct.

8    Q    So that was not involving opioid litigation,

9         correct?

10   A    It was involving opioids and possible opioid

11        litigation.

12   Q    Okay.  Did you provide an expert report for all of

13        these cases listed on page 5 through 7?

14   A    The expert reports that I provided, I would have to

15        double-check to see.  I can't recall.

16   Q    Would you still -- if you had provided an expert

17        report, would you have possession of it or a way to

18        access it?

19   A    Whatever expert report I have, I turned over to

20        legal counsel.

21   Q    Okay.  Is that same with deposition transcripts?

22   A    Yes.

23   Q    And trial transcripts?

24   A    I'm sorry, what was that?

25   Q    Trial transcripts?

1    A    Just, like, my deposition transcripts or trial

2         transcripts, yes.

3    Q    Has your testimony as an expert ever been excluded

4         by a Court?

5    A    No.

6    Q    Has a Court ever found you not qualified to testify

7         as an expert?

8    A    No.

9    Q    In all of the matters listed on pages 5 through 7

10        of your report, you were an expert on behalf of the

11        United States Government; is that right?

12   A    Yes.

13   Q    And the Department of Justice, in fact, on behalf

14        of the United States, hired you to serve as an

15        expert in these cases, correct?

16   A    Yes.

17   Q    You didn't testify on behalf of any defendant in

18        any of those cases, correct?

19   A    Correct.

20   Q    Have you ever served as an expert witness on

21        litigation on behalf of any party other than the

22        United States or now the plaintiffs in this

23        litigation?

24   A    No.

25   Q    So you've never provided expert testimony on behalf

1          of a retail chain pharmacy, correct?

2    A    I provided testimony before boards of pharmacy on

3          behalf of a retail pharmacy or a chain pharmacy in

4          regard to whether or not a particular law, rule,

5          regulation or decision was actually something that

6          NABP and I considered fair or not.  But never in a

7          litigated matter or a hearing.

8    Q    And none in which you were being compensated,

9          correct?

10   A    I'm sorry?

11   Q    And no matter in which you were being compensated,

12         correct?

13             MR. ELSNER:  Objection.

14   A    Correct.

15             MS. FUMETON:  Why don't we take a short break.

16         I might have just a few more questions before I

17         pass the witness on to another defendant.

18             MR. ELSNER:  Shall we say ten minutes?

19             MS. FUMETON:  Ten minutes would be great.

20             THE VIDEOGRAPHER:  Off the record.

21         (A recess was taken.)

22             THE VIDEOGRAPHER:  We're on the record.

23      BY MS. FUMETON:

24   Q    Mr. Catizone, I want to ask you about your

25         familiarity with United States v. Walmart, which is

1     the case that's currently pending in the District

2     of Delaware.

3         You're familiar with that case, correct?

4         MR. ELSNER:  Objection.

5   A   Yes.

6    BY MS. FUMETON:

7   Q   You cite it in your report, correct?

8   A   Yes.

9   Q   Has anyone asked you to review or draft any claims

10     or documents relating to that litigation?

11        MR. ELSNER:  Objection.  To the extent you're

12     asking him whether he has performed any consulting

13     services for any other defendant, including the

14     Department of Justice, that's not an appropriate

15     inquiry.

16        MS. FUMETON:  Well, the Department of Justice

17     isn't a defendant.

18        MR. ELSNER:  I said or the Department of

19     Justice or anyone else.

20        If he's performing a consulting role with

21     respect to any other entity or a defendant or

22     plaintiff in any kind of litigation, then that's

23     not an appropriate area of inquiry.

24        MS. FUMETON:  Well, first of all, I disagree,

25     and I think I can set the foundation for it because

1      he cites to the litigation and, in fact, the

2      complaint in his expert report as something he is

3      relying upon.  So if he was involved with it in any

4      way, I think I'm entitled to know that.

5          MR. ELSNER:  No, you're not entitled to know

6      what consulting work he's done with the Department

7      of Justice.  If you want to ask him about the

8      allegations against Walmart and what he's relied

9      upon in his report with respect to that, that's

10     fair game.  But whatever consulting work he's done

11     for the Department of Justice, you're not entitled

12     to ask him that question.

13         MS. FUMETON:  Well, let's see where we go, and

14     if you want to instruct him not to answer, we'll

15     see what happens.

16    BY MS. FUMETON:

17  Q   Mr. Catizone, on page 86 of your report -- if you

18      need it, you can reference it -- you rely on

19      allegations made in the United States complaint

20      against Walmart for forming your opinions in this

21      case, right?

22  A   Yes.

23  Q   Okay.  And going back to my question, you're

24      involved in that litigation, correct?

25         MR. ELSNER:  Objection.  You can answer yes or

1      no.

2  A    No.

3    BY MS. FUMETON:

4  Q    You have filed a declaration in that litigation,

5      correct?

6  A    Yes.

7  Q    Okay.  So let's walk through what your involvement

8      is, then, and I'll ask my question again.

9        Has anyone asked you to review or draft any

10     pleadings related to that litigation?

11     MR. ELSNER:  Objection.  If it was performed

12     as part of a consulting role, then you cannot

13     reveal the contents of the work that you did as a

14     consultant and nontestifying expert witness.

15     MS. FUMETON:  He can testify about anything

16     that's been made publicly available, including, if

17     he submitted, for example, declarations in

18     litigation.

19     MR. ELSNER:  If you want to show him the

20     declaration or show him something that's been

21     publicly made available that shows what work he

22     did, then you can do that.  But you cannot probe

23     into what work he did as a nontestifying consulting

24     expert with respect to any litigation, including

25     this litigation that you're referring to with

1      respect to the Department of Justice.

2    BY MS. FUMETON:

3    Q    You referenced the United States complaint and the

4         allegations made therein against Walmart in your

5         report, correct?

6    A    Yes.

7    Q    Have you ever had any conversations with the DOJ

8         about those allegations?

9         MR. ELSNER:  Objection.  You can answer to

10        the -- you can't.  If you're serving as a -- I

11        don't know the answer to this question.  So if

12        you're serving as a consulting expert to the

13        Department of Justice and -- then you cannot

14        disclose the content of those communications or

15        what they asked you to do on their behalf.  If you

16        can answer the question --

17        (Simultaneous conversation.)

18        MR. ELSNER:  Otherwise, then you're free to do

19        so.

20   A    So I think I can answer the question.  So I believe

21        in April the Department of Justice participated in

22        a phone call with the executive directors of the

23        state boards of pharmacy, and on that phone call,

24        the Department of Justice asked for an opportunity

25        to speak with the individual directors of the

```
 1        boards of pharmacy to talk with them about the

 2        litigation and what DOJ litigation involved.

 3            Beyond that, I have not had any conversations

 4        beyond that call with anyone from DOJ.

 5      BY MS. FUMETON:

 6   Q    And that was in April of 2021; is that correct?

 7   A    Correct.

 8   Q    How long did that phone call last?

 9   A    The actual part of DOJ was about 15 minutes.

10   Q    And you were not an executive director of a State

11        Board of Pharmacy, correct?

12   A    Correct.

13   Q    Why were you participating in that phone call?

14   A    In my role as senior advisor, I participant in

15        those calls, again, as I said, to provide

16        background or clarity to -- I'm sorry.  The name

17        Graeme Bush just appeared on my screen.  I don't --

18   Q    He's counsel for CVS in this litigation.

19   A    Okay.  But I've lost you.  There you are.  So I was

20        there as a senior advisor to the NABP staff.

21   Q    And what was the response from the executive

22        directors that you recall?

23   A    No one commented.  They simply listened to the

24        comments by the DOJ, and that was the extent of it.

25   Q    So going back to my first question about the
```

Page 137

1       complaint that you reference in your report, did

2       you review that complaint before it was filed in

3       any way?

4   A   No.

5   Q   Are you aware that NABP filed an amicus brief in

6       connection with that litigation?

7   A   Yes.

8   Q   Were you involved in that decision by the NABP to

9       file an amicus brief in connection with that

10      litigation?

11  A   No, I was not.

12  Q   When did you learn that they had filed an amicus

13      brief?

14  A   What I've learned was that Walmart raised an

15      objection to NABP filing an amicus brief, and I

16      don't recall when that date was.  But I don't know

17      when NABP actually filed the brief or not, if it

18      was actually allowed or not.

19  Q   If I said it was filed in May of -- May 17, 2021,

20      does that refresh your recollection?

21  A   It's not a recollection.  I didn't know when it was

22      filed at all, so...

23  Q   Okay.  When do you first recall having a discussion

24      with anybody about NABP filing an amicus brief in

25      that litigation?

```
 1              MR. ELSNER:  Objection.

 2    A     Probably in April, after NACDS filed an amicus

 3          brief in that case.

 4      BY MS. FUMETON:

 5    Q     And what were those discussions?

 6    A     I read on my own the NACDS amicus brief, and I

 7          could not believe that NACDS undermined the

 8          authority and the scope of practice for pharmacists

 9          in their amicus brief.

10              And I felt that -- I spoke with the executive

11          director of NABP and thought it would be in NABP's

12          best interest and the state's best interest to file

13          an amicus brief, like NABP did in the Walmart

14          versus Apple case to affirm that the pharmacist has

15          very specific responsibilities in regard to drug

16          utilization reviews, scope of authority, and red

17          flags and corresponding responsibility.

18    Q     So you went to the NABP and suggested that they

19          file an amicus brief; is that accurate?

20              MR. ELSNER:  Objection.

21      BY MS. FUMETON:

22    Q     Did you facilitate any discussion between the NABP

23          and anyone associated with the United States or the

24          DOJ with respect to filing that amicus brief?

25              MR. ELSNER:  Objection.
```

1  A   I set up a conversation to talk about what DOJ was

2      going to talk about with the states on phone calls,

3      and I believe the amicus brief then was also one of

4      the topics that DOJ wanted to talk with NABP about.

5    BY MS. FUMETON:

6  Q   Who did you set that conversation up with?

7  A   I worked simply through Lindsay Graham, and I don't

8      know who then set those calls up or how those calls

9      were set up, because I did not participate in the

10     subsequent calls with NABP.

11 Q   Who is Lindsay Graham?

12 A   She's an attorney for the U.S. Department of

13     Justice.  I believe that's her name.

14 Q   And so did you reach out to her or did she reach

15     out to you?

16     MR. ELSNER:  Objection.

17 A   As part of the follow-up to the call with the

18     states, I reached out to them to ask what the next

19     steps were and if they needed any other assistance,

20     and that's when a request was made to have a call

21     with NABP to talk about what they were going to

22     talk with the states about, and then I believe

23     that's when the amicus brief was also discussed,

24     but I can't say for certain.

25   BY MS. FUMETON:

1    Q    So I'm confused about your timeline, because you

2         say as a follow-up to the call with the states, you

3         reached out to them and asked them what next steps

4         were needed, and that's when a request was made to

5         have a call with the states.  That's what you just

6         testified to.

7              So what was the order that happened here?

8    A    No, it was a follow-up --

9              MR. ELSNER:  I have to lodge an objection to

10        this.  It's unclear to me whether any of this work

11        was being performed in the context of a consultancy

12        relationship with the DOJ.  And I need to -- I

13        think I need to go off the record and confirm that,

14        and then I can properly provide objections.

15             I'm concerned that we may be tiptoeing into

16        areas that are covered by consultancy agreement.

17        We may not.  I don't know the answer.  But I need

18        to know the answer to that first before we can go

19        any further.  So I'd request that we take a brief

20        two-minute break just so I can understand the

21        answer to that question so I can lodge my

22        objections.

23        BY MS. FUMETON:

24   Q    Well, before we go off the record, Mr. Catizone, do

25        you understand whether or not you had a consulting

Page 141

1    agreement with the United States?

2         MR. ELSNER:  Objection.  I need to ask him

3    this question, and I need -- look, his

4    understanding of what a consultancy role is and

5    what ours is as counsel and what's protected and

6    what's not protected by disclosure is very

7    different.  So I need to be able to understand that

8    and then have a conversation with him.  It will not

9    take long.

10        SPECIAL MASTER COHEN:  This is David Cohen.  I

11   think it is fair that Mr. Elsner and Mr. Catizone

12   have a brief conversation to make sure they are on

13   the same page, and, frankly, I think it might help

14   if I listen in.  I'm not going to ask any

15   questions, just hear what it is, because I've been

16   wondering whether and when I might be asked to rule

17   on this, and I was thinking that if I am asked to

18   rule on it, I'm going to need to know what Mike now

19   wants to ask Carmen.

20        So why don't we take a quick break, and I'm

21   going to ask the video -- whoever is running the

22   meeting to set up a room so that I can also

23   participate in that conversation.

24        MS. FUMETON:  Okay.

25        THE VIDEOGRAPHER:  We're off the record.

Page 142

1            (A recess was taken.)

2            THE VIDEOGRAPHER:  We're on the record.

3      BY MS. FUMETON:

4    Q    Okay.  Mr. Catizone, you have a contract with the

5         Department of Justice in connection with the

6         United States v. Walmart matter in which you're

7         getting paid, correct?

8    A    Yes.

9    Q    And is that relationship one of a consulting expert

10        or a testifying expert?

11   A    Consulting expert.

12   Q    So I want you to pull out what's tabbed 8 and 9 in

13        your binder.  And then, if you can hold Tab 10,

14        pull that out while you're down there.  Don't open

15        that one yet up, but please open Tab 8 and 9.  And

16        that's going to be marked collectively as

17        Exhibit 9.  And for the record, it's the

18        Declaration of Carmen Catizone dated May 25th,

19        2021, with the attached exhibits in the

20        United States v. Walmart matter pending in the

21        District of Delaware.

22   A    Okay.

23   Q    Mr. Catizone, let me know when you have that.

24        Have you been able to open both of those

25        documents?

1    A    Yes, I have.

2         (Exhibit 9 was marked for identification.)

3    Q    Mr. Catizone, you're familiar with what's been

4         marked as Defendant Exhibit 9, correct?

5    A    Yes, I am.

6    Q    And it's a declaration that you provided on

7         May 25th, 2021, in the United States v. Walmart

8         matter, correct?

9    A    Correct.

10   Q    If we look at the first page of the affidavit,

11        paragraph 34, you state?  "Following my retirement

12        as executive director, I remained an employee of

13        the Association until December 21st, 2020."

14        Do you see that?

15   A    Yes.

16   Q    You say:  "I still provide some services to NABP as

17        an independent contractor."  Correct?

18   A    Yes.

19   Q    What type of services do you provide as an

20        independent contractor?

21   A    I am the senior advisor to NABP.

22   Q    So that's just referring to your senior advisor

23        position?

24   A    Yes, ma'am.

25   Q    And that's an unpaid position; that's your

1         testimony?

2    A    It was unpaid but there was in-kind services that

3         we discussed, the domain name, access to NABPLAW.

4    Q    Okay.  And attached to your declaration, you filed

5         two contracts as Exhibit A and Exhibit B, correct?

6    A    Yes.

7    Q    I want you to look at Exhibit A first.

8    A    I'm sorry.  Is Exhibit A in the Tab 9 folder?

9    Q    So what you should have in front of you is, yes,

10        Tab 8 and Tab 9, Tab 9 being the declaration, Tab 9

11        being the exhibits, has been marked as a composite

12        exhibit of Defendant Exhibit 9 which is both your

13        declaration and the two supporting exhibits that

14        you filed in the Walmart v. DOJ litigation,

15        correct?

16           So are you looking at Exhibit A now?  We can

17        turn to that page.

18   A    Yes, I am.

19   Q    So this is a contract that's dated August 25th,

20        2020, correct?

21   A    Yes.

22   Q    And you entered into this contract on behalf of the

23        NABP, correct?

24   A    No, I entered into it personally.

25   Q    So let's look at paragraph 4 of your declaration.

Page 145

1     You say:  "On August 25th, 2020, after I retired as
2     the Association's executive director but while I
3     was still an employee of the Association, I entered
4     into a consulting contract with the United States
5     Attorney's Office for the Eastern District of North
6     Carolina.  The contract named the Association as
7     the contracting party.  A copy of the contract is
8     attached to this declaration as Exhibit A."
9         And that's what's attached in what's been
10    marked as Exhibit 9 in this case, correct?
11  A   Correct.
12  Q   And so even though you're the person who the
13    consulting agreement was with, you entered into it
14    under the name of the NABP, correct?
15        MR. ELSNER:  Objection.
16  A   Yes.
17    BY MS. FUMETON:
18  Q   And the total award for this contract was $10,000,
19    correct?
20        MR. ELSNER:  Objection.
21  A   Compensation paid to NABP was $2,000.
22    BY MS. FUMETON:
23  Q   So the total amount of this contract, though, is
24    $10,000, correct?
25  A   The amount that --

1   Q    To --

2   A    The amount that was budgeted by DOJ was $10,000,

3        not what was actually compensated.

4   Q    So this is a contract that you entered into for

5        your consulting arrangement with the DOJ.  How much

6        money did you receive for it?

7            MR. ELSNER:  Objection.

8   A    I didn't receive anything.

9      BY MS. FUMETON:

10  Q    Did you receive any money through the NABP as part

11       of this agreement?

12  A    No.

13  Q    So NABP was paid for your services by the DOJ in

14       August of 2020 after you had left?

15           MR. ELSNER:  Objection.

16  A    Yes.  So prior to this time, whenever I worked on

17       cases for the DOJ or the DEA, I received no

18       compensation whatsoever.  I did that on free time

19       or time provided by NABP.  If there was ever any

20       compensation, the compensation went to NABP.  And

21       with this contract, since I was on contract with

22       NABP through December of 2020, any contracts that

23       were begun prior to that time, the compensation

24       went directly to NABP and not to me personally.

25     BY MS. FUMETON:

1   Q   So let me be clear.  In all the different testimony

2       that you gave earlier today, where you said that

3       you would offer testimony on behalf of the DEA and

4       that you were not being paid for it, in fact, the

5       NABP was being paid for it, and you were receiving

6       a large salary from the NABP, correct?

7           MR. ELSNER:  Objection.

8   A   I was receiving a fair salary for the amount of

9       time and work I put in.

10    BY MS. FUMETON:

11  Q   And the NABP was being paid by the DOJ for your

12      testimony, correct?

13          MR. ELSNER:  Objection.

14  A   Only beginning in 2019-2020.  All my prior cases,

15      there was no compensation paid to me or NABP.

16    BY MS. FUMETON:

17  Q   So starting in 2019, you started -- NABP started

18      receiving compensation from the DOJ for you to

19      provide testimony to -- for the DOJ; is that

20      correct?

21          MR. ELSNER:  Objection.

22  A   Yes.

23    BY MS. FUMETON:

24  Q   And the NABP at the time was giving you regularly

25      significant increases in your salary, correct?

Page 148

1          MR. ELSNER:  Objection.

2     A    The increases were 5 percent.  I'm not sure if

3          that's significant or not.

4       BY MS. FUMETON:

5     Q    $50,000 a year at least, correct?

6          MR. ELSNER:  Objection.

7     A    Whatever the math would be, but 5 percent was the

8          standard increase that all employees at NABP got

9          that performed well.

10      BY MS. FUMETON:

11    Q    Well, you were making almost a million dollars for

12         the NABP while the DOJ was paying NABP for your

13         testimony in its cases, correct?

14         MR. ELSNER:  Objection.

15    A    Yes.

16      BY MS. FUMETON:

17    Q    If we go to Exhibit B, your declaration, which is

18         Exhibit -- in Exhibit 9.  So the second contract,

19         correct?

20    A    Yes.

21    Q    And this contract is specifically in your name,

22         Carmen Catizone, correct?

23    A    Yes.

24    Q    And it's for expert services in United States v.

25         Walmart case, correct?

1    A    Yes.

2    Q    And the total award amount is $19,743, correct?

3    A    That's the total budgeted amount.

4    Q    So that's the total amount that you could receive

5         in that year for your services to the DOJ, correct?

6              MR. ELSNER:  Objection.

7    A    Correct.

8      BY MS. FUMETON:

9    Q    And so both the contracts in Exhibit A and

10        Exhibit B relate to your work for the DOJ in the

11        United States v. Walmart case, correct?

12   A    My understanding is that Exhibit A was a separate

13        case based in North Carolina and Exhibit B is the

14        case that's now pending.

15   Q    So to your knowledge, you do not think that the

16        work in Exhibit A, the consulting work you're doing

17        on behalf of the DOJ related to the United States

18        v. Walmart case; is that right?

19              MR. ELSNER:  Objection.

20   A    Yes, that's my understanding.

21     BY MS. FUMETON:

22   Q    Do you know if NABP has a different understanding?

23   A    I'm sorry.  I didn't hear the question.

24   Q    Do you know if the NABP has a different

25        understanding?

Page 150

1        MR. ELSNER:  Objection.

2    A    I do not.

3     BY MS. FUMETON:

4    Q    Are you aware that the NABP has submitted a notice

5         of clarification to the Court in Delaware?

6        MR. ELSNER:  Objection.

7    A    I'm aware that they submitted something, but I've

8         not seen that clarification or that document.

9     BY MS. FUMETON:

10   Q    Let's mark that as -- that's in your Tab 10.  We're

11        going to mark it as Exhibit 10.

12        (Exhibit 10 was marked for identification.)

13   A    Okay.  I have it.

14    BY MS. FUMETON:

15   Q    Okay.  Were you aware -- can we take this down for

16        one -- well, were you aware that the NABP was going

17        to file a notice of clarification?

18   A    No.

19        MR. ELSNER:  Objection.

20    BY MS. FUMETON:

21   Q    Did you have any conversations with anybody at NABP

22        relating to the notice of clarification?

23   A    To this clarification, no.

24   Q    To any clarification?

25   A    No.

1   Q    You were the only person providing work under the

2        contract in Exhibit A, correct?

3             MR. ELSNER:  Objection.

4   A    Correct.

5     BY MS. FUMETON:

6   Q    And did you -- is it your testimony that you didn't

7        understand what your consulting work was being used

8        for?

9             MR. ELSNER:  Objection.

10  A    It's my testimony that based upon prior cases that

11       I had worked on, that I was working on a case that

12       was based in North Carolina for Walmart pharmacies

13       based in the North Carolina area.  And that was my

14       complete understanding of the work.

15    BY MS. FUMETON:

16  Q    Are you aware that the United States informed NABP

17       after the filing of the NABP reply to which your

18       declaration was attached, that in fact, that

19       consulting work you performed was being used for

20       purposes of the United States case against Walmart

21       pending in the District of Delaware?

22  A    I'm aware now as I read that in the clarification,

23       but I was not aware of that prior to this time.

24  Q    So your prior declaration that was submitted in

25       this court was false, right?

1         MR. ELSNER: Objection; misstates and

2     mischaracterizes his testimony.

3  A    No, it was not.

4   BY MS. FUMETON:

5  Q    So I'm just trying to figure out what the truth is.

6     The true is that the work that you performed under

7     the contract at Exhibit A of what's been marked as

8     Exhibit 8 in this case was, in fact, being used for

9     purposes of the litigation pending against my

10     client, Walmart, correct?

11         MR. ELSNER: Objection.

12  A    The truth is, if that's the case, I was not aware

13     of that, as I testified.

14   BY MS. FUMETON:

15  Q    Are you surprised to learn that that information

16     was being used for purposes of that litigation?

17         MR. ELSNER: Objection.

18  A    I'm not surprised because I don't make the

19     decisions for the DOJ and in many cases don't know

20     where the cases go or how the reports are utilized.

21     I simply provide the expertise and then turn it

22     over to DOJ.

23   BY MS. FUMETON:

24  Q    So how much have you been paid in total under the

25     two contracts that we've just looked at, Exhibit A

1       and Exhibit B, for consulting work against Walmart?

2            MR. ELSNER:  Objection.  You can answer to the

3       extent that that information has been made publicly

4       available.

5    A   The information has not been made publicly

6       available, but it's within the budget that has been

7       proposed for this contract.

8      BY MS. FUMETON:

9    Q   Did you receive any materials from your work with

10      the DOJ that you're relying on for purposes of your

11      expert report in this case?

12   A   No, none whatsoever.

13   Q   Earlier you testified that you were using your

14      experience and all the years of work in this

15      industry and knowledge you've gained as part of

16      your opinions in this case, correct?

17   A   Yes.

18   Q   Would that include the work that you've done with

19      the DOJ under these two agreements with respect to

20      Walmart?

21           MR. ELSNER:  Objection.

22   A   Not the specific facts of the case.  When I serve

23      as an expert witness, everything remains

24      confidential, and when I'm done with a case, all

25      those materials are destroyed, and that is not

1        anything I use in future cases.

2            The knowledge I may have gained in general

3        about the concepts and about the red flags and

4        such, that knowledge stays with me, but anything

5        particular to a client or to a defendant or to a

6        plaintiff, I do not use in future cases.

7      BY MS. FUMETON:

8    Q    But to be clear, your report in this case, in fact,

9        references that litigation which you're a

10       consulting expert on for the DOJ against Walmart,

11       correct?

12           MR. ELSNER:  Objection.

13   A    Yes.  It references information in the complaint

14       that I thought was particularly useful and helpful,

15       but it had nothing to do with North Carolina.

16     BY MS. FUMETON:

17   Q    And are you going to adhere to Special Master

18       Cohen's comments and Mr. Elsner's comments that you

19       can't testify about what your communications are

20       with the DOJ under those agreements, even though

21       you are citing that case as evidence of something

22       you're relying on in this litigation against my

23       client?

24           MR. ELSNER:  Objection.

25   A    Special Master Cohen and Mr. Elsner know a lot more

1      than I do, so my answer is, yes, I'm not going to

2      testify to that information.

3          MS. FUMETON:  Well, I'm going to issue a

4      formal objection that I think it's completely

5      inappropriate that he is working as a consulting

6      expert in litigation on behalf of the DOJ and

7      litigation against Walmart and, in fact, is

8      referencing that litigation as a basis for his

9      opinion in this case and is now hiding behind the

10     consulting agreement to tell us what information he

11     has.

12         So we can adjust this at a later time, but I'm

13     going to decide what further action we might need

14     to take with respect to this.  But I object to his

15     refusal to answer this question.

16         At this point in time, though, I'm going to --

17         MR. ELSNER:  Wait, wait.  Just so the record

18     is clear, his references in his expert report in

19     the MDL are to his -- are to the Walmart publicly

20     filed complaint.

21         And he has testified that he has not relied

22     upon any documents that he was given or any facts

23     he was provided with respect to his consultancy

24     work for the Department of Justice for use in the

25     MDL opioid litigation and, therefore, it's not

Page 156

1     appropriate for you to be able to inquire into

2     those matters.

3         MS. FUMETON:  I disagree completely,

4     especially since he is relying on that litigation,

5     allegations in that litigation that he has

6     knowledge about that my client does not have

7     knowledge about of what those discussions are, what

8     those characterizations have been for purposes of

9     his opinion in this case.

10        So I think it's completely inappropriate, and

11    so we reserve all of our rights to object and take

12    whatever action we think is necessary.  At this

13    point in time --

14        MR. ELSNER:  The record says the opposite.

15    The record indicates that he cited to the publicly

16    available complaint, which is available to your

17    client, and in fact relates to documents held and

18    produced by your client to the Department of

19    Justice.

20        So all of that information is available to

21    Walmart, and he only relied upon the publicly filed

22    complaint.

23        But I think the record is now clear if you

24    want to find some -- if you want to challenge that

25    ruling, we can take it up at a different time.

1          MS. FUMETON:  I'm going to pass the witness at

2      the time but reserve right to revisit this issue

3      and also to ask any additional Walmart-specific

4      questions after the other areas of inquiry are done

5      by our codefendants.

6          MR. BUSH:  Thank you, Tara.

7  CROSS-EXAMINATION

8    QUESTIONS BY GRAEME BUSH:

9    BY MR. BUSH:

10  Q    Mr. Catizone, my name is Graeme Bush, and I

11      represent CVS Pharmacy in the Track 3 litigation

12      that your expert report has been filed in, so I'm

13      going to ask you some questions now.

14          I'm going to focus on the portion of your

15      report that addresses red flags, and I think before

16      we get into individual red flags, I wanted to ask

17      you some general questions about how the red flags

18      were developed and what they're intended to mean.

19          I intend to go into some more detail with

20      respect to particular red flags later on in the

21      examination, but at this point, I'm just going to

22      ask you some general questions just so you have a

23      perspective where I'm coming from right now.

24          I don't know why my screen is having Tara up

25      here and nothing else.  Let me see if I can fix

1         that so I can see the witness.

2             Actually, Mr. Catizone, could you say hello or

3         something and see if you pop up?

4    A    It's a pleasure to meet you, Mr. Bush.

5    Q    Thank you.  Pleasure to meet you too.  Now it seems

6         to be working.  Sorry.

7             So your report, beginning at page 27, talks

8         about 16 red flags that are the subject of your

9         report.

10            You know what I'm referring to in your report?

11   A    Yes, sir.

12   Q    Okay.  My general question is to ask you if you

13        could explain how those red flags are supposed to

14        work insofar as a pharmacy, any of the pharmacy

15        defendants is concerned.

16            What was supposed to happen with these

17        prescriptions that flagged under any of the 16 red

18        flags?

19   A    A red flag, as the name indicates, was an indicator

20        or warning sign that there were issues with the

21        prescription that caused some concern and that

22        those issues needed to be resolved before the

23        prescription could be dispensed.

24   Q    Is that true for every single prescription that is

25        identified in your 16 red flags?

Page 159

1   A    Based on the aggregate data that I looked at, sir,

2        I would say if it had a red flag, then that red

3        flag needed to be resolved.

4   Q    So what was the pharmacist who was presented with

5        each of these prescriptions that flagged under your

6        16 red flags supposed to do?

7   A    Resolve the red flag and substantiate that the

8        prescription was a legitimate prescription and

9        whatever the issue was that the red flag was

10       pointing to, that that was resolved and if the

11       pharmacist could proceed and know that that was a

12       legitimate prescription.

13  Q    Okay.  And in particular, what was the pharmacist

14       supposed to do in order to resolve the red flag?

15  A    It would again upon the red flag.  Some red flags

16       would involve calling the prescriber directly.

17       Other red flags would involve looking at the PDMP.

18       Other red flags might be a complete review of the

19       patient information or behaviors of the patient,

20       activities of the prescriber.  So each red flag may

21       have its own set of actions that would be required.

22  Q    So is it your opinion that each of the

23       prescriptions that is identified under your 16 red

24       flags was, in fact, a red flag?  What I mean by

25       that, is it correct that your opinion is that there

1       were no other circumstances that might have been

2       known to the pharmacist to whom the prescription

3       was presented that would have meant that, even

4       though it flags under your metrics, it really

5       wasn't a red flag?

6            MR. ELSNER:  Objection.

7    A   Information that would have helped me in that

8        regard, sir, is whether or not I had access to the

9        patient notes or the documentation that the

10       pharmacist subscribed to that prescription to know

11       whether or not that was the case.

12            Absent that information, all I can assume is

13       that there was a red flag with that prescription

14       and it was not resolved and that's why it was

15       included.

16      BY MR. BUSH:

17   Q   All right.  We'll get into that a little bit more

18       in some of the specific questions about specific

19       red flags.

20            Let me ask you this.  Is it your opinion that

21       each of the prescriptions identified by each of

22       your red flags should not have been filled?

23   A   Yes, sir, it is.

24   Q   And is it your opinion that each of the

25       prescriptions identified by each of your red flags

```
 1        was diverted to a use that was not intended?
 2   A    I can't comment to say that each individual
 3        prescription, but I could say based upon the other
 4        data that I reviewed, a significant number of those
 5        prescriptions were diverted.
 6   Q    And is it the opinion that each of the
 7        prescriptions identified by each of your red flags
 8        was written by a prescriber not for a legitimate
 9        medical purpose?
10            MR. ELSNER:  Objection.
11   A    I believe that some of the red flags indicated
12        that, and other red flags may have indicated that
13        it was the patient's behavior that signaled that
14        the prescription was not for legitimate medical
15        purpose.
16      BY MR. BUSH:
17   Q    And in that situation, the second situation, is
18        that a situation in which you say that it's your
19        opinion that the prescription or the drugs
20        dispensed to fill the prescription were diverted?
21   A    Yes, sir.  Anytime the prescription was not used as
22        intended or for legitimate medical purpose, then
23        that would have been considered diverted.
24   Q    Is it your opinion that the pharmacists who filled
25        each of the prescriptions flagged by your red flag
```

1      methodology violated his or her corresponding

2      responsibility in filling the prescriptions?

3  A    Yes, sir.

4  Q    The individual pharmacist violated a corresponding

5      responsibility?

6  A    The individual pharmacist and the pharmacy, sir.

7  Q    But I'm focused on the individual pharmacist.  The

8      individual pharmacist -- it's your opinion that the

9      individual pharmacist violated his or her

10     corresponding responsibility by filling each of the

11     prescriptions that are identified in your 16 red

12     flags?

13        MR. ELSNER:  Objection.

14  A    Without the documentation, my answer is yes, sir.

15   BY MR. BUSH:

16  Q    So do you have any other opinions about these

17     prescriptions --

18        MR. ELSNER:  Objection; vague.

19   BY MR. BUSH:

20  Q    -- other than the ones that I've taken you through

21     so far?

22        MR. ELSNER:  Objection.

23  A    I don't understand your question, sir.  I don't

24     know what you mean by "other opinions."  If you

25     could clarify, I would appreciate it.

Page 163

1      BY MR. BUSH:

2   Q    Well, let me give you an example.

3         Do you have any opinions about whether these

4         prescriptions were consistent or inconsistent with

5         the standard of care that applied to prescribers?

6         MR. ELSNER:  Objection.

7   A    I would say that those prescriptions were the red

8         flags pointed to the prescriber, then I would say

9         the prescribers in those cases did not adhere to

10        the standards of care.

11     BY MR. BUSH:

12  Q    And do you have any opinions about whether or not

13        the pharmacist, in filling these prescriptions

14        identified in your 16 red flags, violated any

15        standard of care that applies to pharmacy practice?

16  A    Yes, based upon the red flag, there were standards

17        of care that were violated as well.

18  Q    Do I take it from your answer that you think the

19        standard of care is independent -- withdrawn.

20        Do I take it from your answer that you

21        consider that the standard of care is independent

22        from the obligations that a pharmacist has under

23        DEA regulations governing corresponding

24        responsibility?

25        MR. ELSNER:  Objection.

Page 164

1    A    No, sir.  They are complementary.

2      BY MR. BUSH:

3    Q    Are they at the same or -- you say "complementary."

4         That can mean that one of them is -- that they are

5         a little different.  But are they the same or are

6         they different?

7    A    In 1306.04, the requirement for documentation is

8         spelled out.  In the Hills Pharmacy case, the

9         opinion rendered, said in the absence of

10        documentation, that it was probative of a failed

11        resolution of the red flags.  In Superior

12        Pharmacies I and II, "The absence of the

13        documentation was the inference that they failed to

14        resolve the red flag and therefore violated a

15        standard of care."

16           So I think they were equal and complementary,

17        sir.

18   Q    Okay.  Are you saying that the lack of

19        documentation -- or what you're referring to here

20        is lack of documentation about resolution of red

21        flags is a violation of the standard of care?

22   A    Yes, sir.

23   Q    Are you saying it's also in violation of the

24        Regulation 1304?

25   A    1306.04, yes, sir.

1    Q    Excuse me, 1360.04.  So it's a violation of both?

2    A    Yes, sir.

3    Q    Would you agree with me that corresponding

4         responsibility is a matter of the professional

5         judgment of the pharmacist taking into account all

6         the facts and circumstances known or available to

7         the pharmacist at the time the prescription is

8         presented to be filled?

9    A    As part of the corresponding responsibility, yes,

10        sir.

11   Q    Now, I think you've also expressed some opinions

12        here that are really not going to be the subject of

13        most of my questioning, but I do want to refer to

14        them here.  And you've expressed some opinions

15        about information that in your view should have

16        been made available to the pharmacist filling a

17        prescription by the pharmacy company.

18             Do you know what I'm referring to?

19   A    If you can point to that in my report, sir, that

20        would help me.

21   Q    You don't know that you have an opinion that the

22        pharmacy companies are supposed to supply certain

23        information to the pharmacists and their failure to

24        do so is a violation of the standard of care?  You

25        don't know that that's your opinion?

1          MR. ELSNER:  Objection.

2    A    I know it's my opinion, sir.  I didn't know if you

3         were referencing a particular point within that

4         opinion.

5      BY MR. BUSH:

6    Q    No.  I'm just referencing that general point so

7         that you know the context of my question.

8    A    Yes.

9    Q    So if a pharmacist did not have information that,

10        in your opinion, the pharmacy company should have

11        been made available to the pharmacist using its

12        dispensing data, you're saying that that is what

13        caused the pharmacist to violate his or her

14        corresponding responsibility?

15   A    I'm saying that contributed to the violation, sir.

16   Q    Even if she did have information that you think the

17        pharmacy company should have made available to the

18        pharmacist filling a prescription, the pharmacist

19        would still have to exercise corresponding

20        responsibility to decide whether there was a red

21        flag, first of all.

22            Do you agree with that?

23   A    Yes, sir.

24   Q    And then second of all, would have to exercise

25        corresponding responsibility to decide whether or

Page 167

```
 1        not to fill the prescription?
 2   A    Yes, sir.
 3   Q    Would you agree with me that just because a
 4        prescription flags under one of your 16 red flags,
 5        that does not mean that it was written for an
 6        illegitimate medical purpose?
 7   A    Yes, sir.
 8   Q    And would you agree with me that it also does not
 9        mean that the drugs that were dispensed to fill
10        that prescription were diverted?
11   A    Yes, sir.
12   Q    And you have not made any effort in your -- if you
13        have, tell me.  But as I understand it, you've not
14        made any effort to determine how many of the
15        prescriptions that flagged under your flags 1
16        through 16 were actually diverted?
17           MR. ELSNER:  Objection.
18   A    Not the individual numbers, sir, no.
19     BY MR. BUSH:
20   Q    And you haven't made any effort to determine how
21        many of the prescriptions that flagged under your
22        16 red-flag methodologies were not written for a
23        legitimate medical purpose?
24   A    Not individually, sir.
25   Q    And you would agree with me, would you not, that
```

1      many of the prescriptions that flagged are likely

2      to have been written for a legitimate medical

3      purpose?

4          MR. ELSNER:  Objection.

5  A   No, sir.

6   BY MR. BUSH:

7  Q   Do you think any of them were?

8  A   Yes, sir.

9  Q   And would you agree with me that many of the

10     prescriptions that have flagged in your red flags 1

11     through 16 were most likely not diverted to a

12     purpose other than not for which the prescription

13     was written?

14  A   No, sir, I would not agree with that.

15  Q   You would agree with me that some were?

16  A   Yes, sir.

17  Q   Can you tell me what your definition of diversion

18     is?

19  A   The Controlled Substances Act was designed to

20     create a closed system of distribution for

21     controlled substances.  Now, starting with the

22     manufacturer through the distributor, through the

23     prescriber, through the pharmacy, and ultimately to

24     the patient.  Anything outside of that closed

25     system is what I would consider diversion because

```
 1        it's not used for its intended purpose and it
 2        violates the closed distribution system that was
 3        intended by the CSA.
 4    Q   When the prescription is dispensed to the patient
 5        who presented the prescription, it goes outside the
 6        closed distribution system, right?
 7    A   The closed distribution system ends with the
 8        patient, and that's where the system ends.
 9    Q   So once it's dispensed to the patient, it's outside
10        the closed distribution system?
11    A   Correct.
12    Q   Are you familiar with the term "medicine cabinet
13        diversion"?
14    A   Yes, I am, sir.
15    Q   And are you familiar with any of the studies that
16        have assessed how much medicine cabinet diversion
17        occurs?
18    A   Somewhat familiar, sir, yes.
19    Q   And are you also familiar with studies that have
20        assessed how much diversion occurs because drugs
21        that were dispensed to family or friends are given
22        to other members of the family or other friends?
23            MR. ELSNER:  Objection.
24    A   Yes.  I'm familiar with some of those studies, sir.
25      BY MR. BUSH:
```

Page 170

```
 1   Q    And you would agree -- or would you agree that
 2        that's all -- both of those kinds of diversion are
 3        diversion that occurs after the patient has
 4        received a legitimate medical prescription?
 5             MR. ELSNER:  Objection.
 6   A    No, sir.  I think it occurs both with a legitimate
 7        and a not legitimate prescription.
 8     BY MR. BUSH:
 9   Q    But it definitely occurs in a number of cases where
10        somebody has gotten a legitimate medical
11        prescription, didn't use all of them -- I'm giving
12        you an example -- but didn't use all of the opioids
13        that were prescribed, left it in their medicine
14        cabinet and then some family member, friend, maid,
15        or whomever took it from the medicine cabinet?
16             MR. ELSNER:  Objection.
17   A    That's the process that occurs, but had the
18        pharmacist properly counseled the patient on
19        disposal of that medication, that scenario could be
20        avoided.
21     BY MR. BUSH:
22   Q    And we don't know whether the pharmacist did
23        properly counsel the patient on that, right?
24             MR. ELSNER:  Objection.
25     BY MR. BUSH:
```

Page 171

1    Q    There's no way to know that?

2    A    That would be in the documentation of the patient

3         notes and the prescription.

4    Q    Do you think that the patient notes, it's the

5         standard of care that a pharmacist documents

6         everything that she told a patient about the proper

7         disposal of opioids?

8    A    Under the requirements that were enacted in

9         OBRA '90 and the state boards of pharmacy also

10        codified, one of the nine elements that the

11        pharmacist is supposed to counsel patients on is

12        proper disposal.  So if a pharmacist marked that

13        they counseled the patient, then they either

14        falsified their documentation saying that they

15        didn't or they failed to document what they talked

16        to pharmacist about.

17   Q    I understand you're referring to with OBRA.  Does

18        that requirement include the requirement that they

19        document every conversation about the proper

20        disposal of opioids?

21   A    No, sir.

22   Q    So going back to the example I gave that -- one way

23        that medicine cabinet diversion occurs, do any of

24        your red flags identify the possibility of that

25        kind of medicine cabinet diversion?  And just to be

```
 1        clear so that we're talking the same language, a

 2        legitimate prescription that the patient doesn't

 3        use all of and is ultimately taken by somebody else

 4        from that patient's medicine cabinet and used in a

 5        way that isn't in accordance with the prescription?

 6             MR. ELSNER:  Objection.

 7   A    In the context of a legitimate prescription, sir,

 8        the answer is no.

 9      BY MR. BUSH:

10   Q    Now, I also asked you earlier about diversion that

11        occurs after a prescription is dispensed because

12        the patient who received the prescription gives

13        some of it to family members or friends who were

14        not on the prescription.

15             Is your answer the same, that there's none of

16        your red flags that identifies that kind of

17        diversion?

18             MR. ELSNER:  Objection.

19   A    For a legitimate prescription, the answer is none

20        of the red flags identify that activity.

21      BY MR. BUSH:

22   Q    Are you aware of any assessments of how much --

23        withdrawn.

24             Are you aware of any studies that assess what

25        percentage of people who end up misusing opioids
```

1        got their opioids from friends and family?

2    A   No, sir, I can't recall.  I'm not aware of any.

3    Q   You're not familiar with the SAMHSA study that says

4        over 50 percent of people who were studied and were

5        engaged in opioid abuse said that they got their

6        opioids from friends and familiar?

7    A   Yes, sir, I'm aware of the SAMHSA.  I'm sorry.  I

8        didn't realize that was a study.  I'm aware of that

9        SAMHSA data.

10   Q   Do you agree with that or disagree with that?

11           MR. ELSNER:  Objection.

12   A   I would have no way or no reason to disagree with

13       it, sir.

14     BY MR. BUSH:

15   Q   And are you aware of studies that have been cited

16       that approximately 70 percent of people who report

17       nonmedical use of prescription medications,

18       including opioid pain relievers, say that they got

19       their drugs from a friend or family member?

20           MR. ELSNER:  Objection.

21   A   I've seen statistics like that, sir, yes.

22     BY MR. BUSH:

23   Q   And do you agree or disagree with those?

24           MR. ELSNER:  Objection.

25   A   I think coming from credible sources, I would agree

1       with those statistics.

2     BY MR. BUSH:

3   Q   Is it your view that one of the indications that

4       you're relying on that there was diversion in the

5       two counties that, in your view, there were just

6       too many opioid medications flooding the counties?

7   A   That was one of the reasons.

8           The other reason is that the number of people

9       who died from drug overdoses, including opiates,

10      were four per day from 2006-2009, and then

11      increased in Trumbull County from 11 in 2009 to

12      2017 to 69 people per hundred thousand, and in Lake

13      County it moved from 9 to 46 people per a hundred

14      thousand.

15          So if all those prescriptions were for

16      legitimate purposes, the data would have been

17      otherwise, so the number of prescriptions dosages

18      mentioned in my report per person in those two

19      counties and then the death rates from drug

20      overdoses are what lead me to believe a significant

21      number of those prescriptions were not for

22      legitimate purposes and were diverted.

23  Q   Now, focusing on the amount of prescription opioids

24      that were placed into the counties, just the sheer

25      number by itself doesn't identify whether any

Page 175

1      particular prescription is legitimate, right?

2    A  Not individual prescription, but clearly a

3       significant number of prescriptions would be, sir.

4    Q  And it doesn't help a pharmacist determine whether

5       a script that's being presented to be filled is

6       legitimate on a prescription-by-prescription basis,

7       right?

8    A  I'm sorry.  I didn't understand the question.

9    Q  The fact that there are a lot more opioids being

10      shipped into the county doesn't help a pharmacist

11      decide whether any particular prescription is being

12      presented to be filled is legitimate or is likely

13      to be diverted?

14         MR. ELSNER:  Objection.

15   A  I disagree.  That would be data that the

16      corporation and pharmacy has that should be made

17      available to the pharmacist so they would be able

18      to see, though, when an individual prescription

19      came in, if it was for an opioid, and they kept

20      seeing those opioid prescriptions and they had this

21      distribution data from the pharmacy and

22      corporation, they would know that that individual

23      prescription had a red flag and was problematic.

24     BY MR. BUSH:

25   Q  Just because there's a lot of prescriptions --

1       excuse me -- a lot of opioids that are being

2       shipped into the county, they would know that this

3       particular prescription is likely to be diverted?

4            Is that your testimony?

5            MR. ELSNER:  Objection.

6    A   Yes, sir.  Not just because it's a prescription,

7        it's an opioid, which is a dangerous drug that

8        kills people, and the pharmacist should know that

9        it's paying special attention to the quantities of

10       opioids.

11     BY MR. BUSH:

12   Q   So how does that distinguish any one prescription

13       that is presented, any one opioid prescription that

14       is identified -- is presented to the pharmacist to

15       be filled from any other?

16   A   Every prescription for a controlled substance,

17       particularly opioid, is an immediate pause for the

18       pharmacist because of the deadly nature of those

19       products and the problems with addiction,

20       diversion, and abuse.

21            So every individual prescription for an opioid

22       is something that the pharmacist has to carefully

23       review and then utilize all of the other

24       information available to them to make a

25       determination on an individual prescription.

1   Q    But that pharmacist still has to make that

2         determination exercising his or her professional

3         judgment and taking account of all the information

4         that's available to her concerning the prescription

5         that's being presented to her to be filled?

6           MR. ELSNER:  Objection; form.

7   A    Yes, sir.

8    BY MR. BUSH:

9   Q    Would you agree with me that it would be

10        inappropriate for a pharmacist to refuse to fill a

11        particular script just because she knows that there

12        are a lot of prescription opioids that have been

13        shipped to or dispensed in two counties?

14   A    No, sir, I would not agree with you?

15   Q    So you think that if I bring my opioid prescription

16        into a pharmacist in Lake County and that she can

17        refuse to fill it just because there's been a lot

18        of prescription opioids that have been shipped into

19        the county?

20          MR. ELSNER:  Objection.

21   A    If she's a pharmacist who is aware that there's an

22        opioid problem in that county, people are dying,

23        and she sees a prescription for an opioid and is

24        not comfortable that that prescription is for a

25        legitimate purpose based upon the number of opioids

1          she is seeing in that county, then that pharmacist

2          should refuse to dispense that prescription.

3      BY MR. BUSH:

4    Q    Would you agree with me that if a prescriber is not

5          writing opioid prescriptions for a legitimate

6          medical purpose, there are regulatory bodies that

7          can take action against the prescriber?

8    A    Yes.

9    Q    The Ohio medical board could suspend the doctor and

10         revoke his license?

11   A    Yes.

12   Q    The DEA could revoke its license to write

13         prescriptions for opioids?

14   A    I think, sir, technically what the DEA would do

15         would be revoke his registration to prescribe

16         controlled substances.  The DEA wouldn't issue a

17         license, but yes, sir.

18   Q    Right, and without that registration, the doctor

19         couldn't prescribe opioids anymore, right?

20   A    Yes, sir.

21   Q    And the DEA also could initiate criminal actions

22         against a prescriber who was not writing

23         prescriptions for opioids for a legitimate medical

24         purpose?

25   A    That's my understanding, sir, yes.

1    Q    And local law enforcement could investigate and

2         bring actions against a prescriber who was not

3         writing prescriptions for a legitimate medical

4         purpose?

5    A    The quick answer is yes.  I think that would depend

6         upon the laws of the local and what was violated,

7         but overall, yes, sir.

8    Q    I'm going to switch to a little different topic

9         here.  You have expressed some opinions about PDMP

10        programs, and you have opinions expressed on

11        page 90 of your supplemental report, which is

12        Exhibit 2, if you want to take a quick look at it.

13             The heading for that section is "Corporate

14        Policies Failed to Make PDMP Checks Mandatory."

15             Do you see that?

16   A    Yes, sir.

17   Q    And you testify -- I see in here, that you've

18        referred in the second paragraph to InterConnect,

19        and you talked about that a little bit this morning

20        when you were talking with Ms. Fumerton, right?

21   A    Yes, sir.

22   Q    Now, you don't actually mention CVS in this

23        particular part of your report.  I want to direct

24        your attention -- please feel free to look at that

25        and correct me if I'm wrong, but I think I'm right.

1              I want to direct your attention to page 64,

2        and there you do refer to PDMPs in the section in

3        which you're talking about CVS, and you say in the,

4        I guess, third paragraph -- fourth paragraph --

5        fourth paragraph down, "Despite recognition that

6        PDMPs are an invaluable tool for pharmacists to

7        prevent controlled substances from being diverted

8        or dispensed for nonmedical purposes, there was no

9        mandatory requirement to use PDMPs until 2015 to

10       resolve red flags."

11            Do you see that?

12   A    Yes, sir.

13   Q    So as I understand your report, you haven't done

14       any analysis of what the pharmacy defendants, who

15       were the subject of these PDMP opinions, would have

16       seen if they had consulted OARRS, which is -- let

17       me stop there.

18            You haven't done any analysis like that, have

19       you?

20            MR. ELSNER:  Objection.

21   A    No, I disagree, sir.

22     BY MR. BUSH:

23   Q    Where have you done that, please?  Please show me

24       in your report where you've told us what the

25       pharmacy defendants and their pharmacists would

Page 181

```
 1        have seen if they had consulted OARRS with respect

 2        to any of the prescriptions that flagged under

 3        flags 1 through 16?

 4   A    It's not in my report, but since I was involved in

 5        the establishment of PDMPs and the InterConnect, I

 6        know of all the data fields that are available and

 7        what the pharmacist would see in a report from PDMP

 8        that would be available to the CVS Pharmacies, sir.

 9   Q    But let me be clearer with my question.  What I'm

10        asking you is whether you know, with respect to any

11        particular prescription that flags under red flags

12        1 through 16 in your report, what a pharmacist

13        would have seen with respect to that prescription

14        if the pharmacist had looked into the OARRS

15        database?

16            MR. ELSNER:  Objection.

17   A    Not the specific data but the data fields that that

18        pharmacist would have seen for every one of the

19        items on that prescription.

20     BY MR. BUSH:

21   Q    Now, the data analysis that you rely on here, that

22        Mr. McCann performed, that data analysis for each

23        pharmacy defendant is limited to the dispensing

24        data produced by that pharmacy defendant; is that

25        your understanding?
```

1   A    Yes, sir.

2   Q    So neither you nor Mr. McCann have quantified or

3        identified what any pharmacy defendant would have

4        learned if it looked at OARRS data?

5        MR. ELSNER:  Objection.

6   A    Again, sir, I know per individual prescription what

7        data would have been available, but not

8        specifically, but they would know how many doctors

9        that patient had seen.  They would have known how

10       many prescriptions for controlled substances they

11       received.  They would have known how many

12       pharmacies that they went to.  They would have

13       known all that information in a simple OARRS report

14       for every single individual prescription.

15     BY MR. BUSH:

16   Q    Well, let me ask it this way.

17        Your opinion is not based in any way on what

18       the pharmacy defendants would or would not have

19       dispensed if any of them had looked at OARRS data

20       with respect to any of the prescriptions that flag

21       under your red flags 1 through 16?

22        MR. ELSNER:  Objection.

23   A    If I understand the question, sir, then I disagree.

24       I think had they looked at the OARRS data, that

25       would have helped the defendants make a

1      determination based upon the data as to whether or

2      not to fill that prescription.

3    BY MR. BUSH:

4  Q    I don't think you're answering my question, though.

5         My question is, you don't know what the result

6      would have been if they had looked at that data?

7      You don't know whether any particular prescription

8      would have been dispensed or they would have

9      refused to dispense?

10         MR. ELSNER:  Objection.

11  A    Correct, sir, yes.

12    BY MR. BUSH:

13  Q    All right.  And you also don't know how often any

14      of the pharmacists at any of the pharmacy

15      defendants consulted OARRS with respect to the

16      prescriptions that have been flagged in red flags 1

17      through 16?

18  A    I don't.  But that information would have been

19      available to the corporation through the OARRS

20      program.

21  Q    And you haven't done any investigation to find out?

22         MR. ELSNER:  Objection.

23  A    No, sir.

24    BY MR. BUSH:

25  Q    And you agree that the pharmacists for each of the

```
 1        pharmacies -- excuse me, pharmacy defendants have
 2        the ability to consult OARRS in connection with any
 3        opioid prescription that was presented to them to
 4        be filled if they determined in their professional
 5        judgment that it was appropriate and it would be
 6        helpful?
 7             MR. ELSNER:  Objection.
 8   A    I need to qualify that -- my response, sir, because
 9        at one time, firsthand information presented to me
10        by CVS pharmacists was that CVS pharmacists could
11        only use the CVS intranet, and they were prohibited
12        from using the internet which provided them access
13        to PDMP.  And so they would have to access PDMP
14        through their smartphones because they were not
15        allowed to do so with the pharmacy operating
16        system.  And that was conveyed to me while I was
17        executive director of NABP in the time period about
18        2016 to 2017, sir.
19     BY MR. BUSH:
20   Q    Right.  And if it turns out that what you think you
21        were told is wrong, then -- actually, withdrawn.
22             The CVS pharmacists could still consult OARRS
23        if they thought it was appropriate to do so and
24        would help exercise their professional judgment?
25   A    Utilizing their own phones and a great burden to
```

Page 185

1      them compared to having it as part of the CVS

2      intranet system, sir.

3   Q   Now, in the section of your report that I quoted,

4      you said there was no mandatory requirement to use

5      PDMPs until 2015 at CVS.  Independently of any

6      policies and procedures, a pharmacist has a

7      professional responsibility to abide by legal

8      requirements, right?

9         MR. ELSNER:  Objection.

10  A   Yes, sir.

11    BY MR. BUSH:

12  Q   And there were legal requirements in Ohio about

13      circumstances in which a pharmacist was supposed to

14      consult the PDMP?

15  A   Yes, sir.  And that's contained in my report.

16  Q   And you don't have any reason to believe that the

17      defendants -- any of the defendants' pharmacists

18      failed to comply with their professional

19      responsibilities and consulted OARRS when it was

20      legally mandated that they do so?

21  A   I have reason to believe they did not do so because

22      if they did, then the proliferation of red flags

23      and the dispensing of those prescriptions would not

24      have occurred to the level that I was able to

25      track.

Page 186

1   Q    You have no -- you don't know whether the

2        defendants' pharmacists failed to comply with their

3        professional and legal responsibilities, do you?

4            MR. ELSNER:  Objection.

5   A    Every red flag that wasn't resolved and a

6        prescription dispensed, my answer would be they did

7        not meet that, but I can't identify that to an

8        individual prescription, sir.

9     BY MR. BUSH:

10  Q    Have you reviewed in the data that has been

11       produced by Mr. McCann following your red flag

12       analysis how many prescribers have prescriptions

13       flagged under your methodologies?

14           MR. ELSNER:  Objection.

15  A    No, sir.

16    BY MR. BUSH:

17  Q    Have you reviewed how many unique patients had

18       prescriptions that flagged under your

19       methodologies?

20  A    No, sir.

21  Q    You're aware that the DEA has said that the

22       overwhelming majority of American physicians who

23       provide controlled substances do so for legitimate

24       medical purposes?

25  A    I wasn't aware of that statement, sir.

```
 1   Q    Okay.  Are you aware that the DEA has said that the
 2        overwhelming majority of physicians who prescribe
 3        controlled substances do so in a legitimate manner
 4        that will never warrant scrutiny?
 5   A    I'm not familiar with that opinion either, sir, or
 6        that statement.
 7   Q    Are you familiar with the DEA's statement that
 8        nearly every prescription issued by a physician in
 9        the United States is for a legitimate medical
10        purpose in the usual course of professional
11        practice?
12   A    No, sir, not familiar with that.
13   Q    Would you agree with me that prescribers from
14        well-regarded practices, clinics or hospitals are
15        not likely to be writing prescriptions that are not
16        for a legitimate medical purpose?
17             MR. ELSNER:  Objection.
18      BY MR. BUSH:
19   Q    Sorry for the double negative on that.  Maybe I
20        should ask it again.
21             Would you agree that prescribers from
22        well-regarded practices, clinics or hospitals are
23        unlikely to be writing illegitimate medical
24        prescriptions for opioids?
25             MR. ELSNER:  Objection.
```

1    A    No, sir.  The institution doesn't have a bearing on

2         whether or not the individual engages in that

3         conduct to a large extent.

4      BY MR. BUSH:

5    Q    So would you agree that the Cleveland Clinic is

6         reputable and nationally well-regarded?

7    A    Yes, sir.

8    Q    Would you agree that University Hospitals is?

9    A    I'm not familiar with University Hospitals.

10   Q    So you don't -- well, do you agree that the

11        prescribers and doctors at those facilities are

12        unlikely to be writing prescriptions that are not

13        in the doctor's judgment for a legitimate medical

14        purpose?

15            MR. ELSNER:  Objection.

16   A    I can only answer that based upon my experience,

17        and I can tell you that there have been prescribers

18        from some of the most reputable institutions and

19        hospitals that have been writing prescriptions for

20        illegitimate purposes and also have been convicted

21        of those activities.

22     BY MR. BUSH:

23   Q    And do you think that's typical?

24            MR. ELSNER:  Objection.

25   A    I don't know if it's typical or not.  I think

1       that's a question based upon each individual

2       institution and the policies they have in place to

3       enforce them.

4    BY MR. BUSH:

5  Q    And you haven't done anything to investigate how

6       often that happens?

7           MR. ELSNER:  Objection.

8  A    No, sir.

9    BY MR. BUSH:

10 Q    So I want to talk a little bit about the red flags

11      that were identified by Mr. McCann.

12          MR. ELSNER:  Objection.

13          MR. BUSH:  Why, I can't talk about that?

14          MR. ELSNER:  You can talk about it, but you're

15      mischaracterizing what was done.  So I object to

16      the way you framed the question.

17   BY MR. BUSH:

18 Q    So I think you said that you did review

19      Mr. McCann's report; is that right?

20 A    Yes, sir.

21 Q    Do you recall in his original report that he

22      describes red flags numbered 17 through 43?

23 A    I recall seeing that in the report, sir, yes.

24 Q    Did you rely on those red flags in the original

25      report for anything at all?

Page 190

1    A    No, sir.

2    Q    So let me ask you to take a look at your --

3         actually, probably the best way to do this is to

4         look at Exhibit 3, which has the redline changes.

5             Do you have that?

6    A    Yes, sir.

7    Q    And I'd like you to take a look at Footnote 126,

8         which is on page 51.

9    A    Yes, sir.

10   Q    Okay.  It says:  "The flagged prescriptions were

11        limited pursuant to the Court's May 10th, 2021

12        Order to prescriptions flagged by the universe of

13        884,166 prescriptions previously disclosed by

14        plaintiffs in their June 2020 response to

15        interrogatories referred to as the 'Combination Red

16        Flagged Prescriptions'."

17            Do you see that?

18   A    Yes, sir.

19   Q    And did you review any of the universe of 884,166

20        prescriptions previously disclosed by plaintiffs in

21        their June 2020 response to interrogatories?

22   A    In reviewing Mr. McCann's report, I was able to

23        look at some of the spreadsheets that were utilized

24        to prepare that data, that information.

25   Q    To prepare the data that was disclosed in June of

1       2020 in the response to interrogatories?  Is that

2       what you referred to?

3            MR. ELSNER:  Objection.

4   A   Spreadsheets that listed prescriptions and then

5       became the basis for the analysis provided back to

6       me.  I'm not sure if that was the June 2020 or

7       where that fell into the sequence, sir.

8     BY MR. BUSH:

9   Q   And when you say that that was used to provide the

10      data back to you, you're talking about the data

11      that was used in your supplemental report?

12  A   Yes, sir.

13  Q   Is that right?

14       Okay.  Did you do any investigation to

15      determine how those 884,166 prescriptions

16      previously disclosed had been determined?

17  A   No, sir.

18  Q   Did you ask Mr. McCann how they had been

19      determined?

20  A   No, sir.

21  Q   You said earlier that you spoke to Mr. McCann

22      twice, I think.  Did you speak more frequently to

23      any of the people who worked on the report for

24      him --

25  A   No, sir.

Page 192

1          MR. ELSNER:  Objection.

2     BY MR. BUSH:

3   Q    -- any of his staff?

4          You never talked to his staff independently of

5       talking to him?

6   A    No, sir.

7   Q    So did you do anything to make any judgment whether

8       the previously disclosed prescriptions made any

9       sense to limit the number of red flag prescriptions

10      that your opinion is based on?

11         MR. ELSNER:  Objection.

12  A    No, sir.  I simply reviewed the data provided to

13      me, came up with the red flags that I thought

14      were -- present an opinion on, and then asked

15      Mr. McCann to run data on those 16 red flags that I

16      identified.

17    BY MR. BUSH:

18  Q    I'd like you to take a look at a document that I'm

19      going to have to put up on the screen.

20         Mike, this is the sample that you and I

21      corresponded about.

22         MR. ELSNER:  Yeah, that's fine.  It's actually

23      not in the room with him.  We need to take it to

24      him to load it.

25         MR. BUSH:  Actually, I think I can just put it

1        up here.  I'm not going to --

2            MR. ELSNER:  That's fine.

3            MR. BUSH:  -- ask a lot of questions about it.

4        I just want to ask you a few questions about it.

5        If it turns out you need to, you know, look at it

6        more than you can do on the screen, we can --

7            MR. ELSNER:  I misunderstood you.  I thought

8        you needed us to load it on his computer.  If you

9        can screen share it, go for it.

10           MR. BUSH:  Jason, can you -- Jason Acton --

11       put up the sample data on the screen share.

12           Not that.

13           MR. ELSNER:  That's a good one.

14           MR. BUSH:  It's the one I sent you this

15       morning, Jason, in an attachment to the email.

16       There you go.

17           Can we get rid of all the junk on the right of

18       this screen and then blow this up?  It's going to

19       be a little hard to see it, I think, the way it is

20       now.  Even if we can't get rid of -- just click the

21       arrow I think by comments, I think that will close

22       that window.

23           MR. ACTON:  There's a double arrow on the top

24       right.

25           MR. BUSH:  There you go.

1           There we are.  Now can we blow this up so it

2        takes the whole screen?  Okay.

3           If we can't, let me just move on with it.

4     BY MR. BUSH:

5     Q    This is a document that was listed in the materials

6        you reviewed -- what happened?  I lost him?

7     A    The document is not there.

8     Q    Yeah, I know.  We lost him.  He was probably trying

9        to blow it up.

10          Well, let me ask you a question before --

11        he'll be back, and he'll get it up here, but let me

12        ask you the preliminary question.

13          In your -- I guess it's Appendix B, which is

14        marked as Exhibit 6.

15    A    Yes, sir.

16    Q    Yeah.  If you'll take a look at that, you'll see

17        that there's a list -- on the list, there's

18        something called "CVS Sample Data."

19    A    Is that on the first page of second page or --

20          MR. ELSNER:  I believe it's the second page.

21     BY MR. BUSH:

22    Q    It's on the second page.  It says "CVS dispensing

23        data sample."  It's maybe five or six lines, seven

24        lines down.

25    A    I found it.  Thank you, sir.

```
 1   Q    Okay.  And what we were trying to put up on the

 2        screen was the actual document, and I wanted to ask

 3        you some questions about it.  But while we're

 4        waiting to see if my colleague can get back on to

 5        this -- actually, you know something, can you tell

 6        me what use you made of the CVS sample data?

 7   A    I reviewed it as part of my report, looking at

 8        information in there, patient name, drug,

 9        quantities, any of the information in the table,

10        that was something I reviewed.

11           MR. BUSH:  Okay, Mike, I'm going to share

12        this, I'm going to try and share this myself, and

13        hopefully I will do a better job.  So let me pop

14        this -- maybe I don't have the right -- oh, yes, I

15        do.  Here we go.

16           MR. ELSNER:  Extra credit for any lawyer that

17        can operate the technology.

18           MR. BUSH:  Yeah, well, can you see it or not?

19           MR. ELSNER:  Yes, sir.

20           MR. BUSH:  Okay, I get extra credit.

21     BY MR. BUSH:

22   Q    So this is what was in the materials and identified

23        as the CVS sample data, and just looking at this

24        now, how much -- first of all, tell me how much

25        time you spent looking at this in the course of
```

Page 196

1        formulating your report and your opinions?

2            MR. ELSNER:  Objection.

3    A   Yeah, I can't remember.  Sorry.  I know I looked at

4        it, but I can't tell you exactly how much time I

5        spent there.  I know it was -- I couldn't quantify.

6        Sorry.

7      BY MR. BUSH:

8    Q   And there are similar data samples for each of the

9        other defendant, pharmacy defendants in the case,

10       right?

11   A   Yes, sir.

12   Q   And you looked at the same reports for them?

13   A   Yes, sir.

14   Q   And looking at this table now, can you tell me

15       anything about the table that you particularly

16       focused on?

17   A   ████████████████████████████████████████████

     ████████████████████████████████████████

     ████████████████████████████████████

     ████████████████████████████████████████

     ████████████████████████████████████

     ████████████████████████████████████████████

     ████████████████████████████████████

     ███████████████████

25           Looking at the data this way, it's very



Page 197

1    difficult for me to pick up anything, but if you

2    could manipulate the data the way I did, I would be

3    glad to comment on that.

4    Q    ████████████████████████████████████████

     ████████████████████████████████████████████████

     ███████████████████████████████████████████

     ████████████████████████████

8         Do you want to look at it and tell me what

9    you'd like me to do?  I'm happy to sort it.  I just

10   don't know what you're referring to.

11   A    ██████████████████████████████████████

     ███████████████████████████████████████████

     ████████████████████ --

14   Q    Here?

15   A    Yes.  Can you open that tab, move your cursor over

16   to show what that full column says?

17   Q    █████████████████████████████████████

     █████████████████

19   A    ████████████████████████████████████████████

     █████████████████████████

21   Q    ██████████████████████████ --

22   A    ██████████████████████████████████████

     ████████████████████████████████████████████

     ████████████████████████████████████████

     ████████████████████████████████████████████

1 ██████████████████████████████████████

2  Q   So I've done the first of that.  I don't know that

3      I know how to do the second without --

4  A   What you have to do is highlight all of the fields

5      and then go into data sort so that all of the

6      fields sort and all of the data then are

7      categorized by it.  That's how I reviewed these

8      data sheets.

9  Q   ██████████████████████████████████████

██  ████████████████████████████████████████

██  ██████████████████████████████████████

██  ████████

13 A   I don't think you did that.  So if you've

14     highlighted all the fields, if you go up to the tab

15     now that says data at the top of the screen --

16 Q   Oh, yeah, right.

17 A   -- click on that, please.

18 Q   Okay.  Done.

19 A   No, because you see -- nothing is -- is yourself

20     highlighted where it says "sort"?  They're not

21     highlighted so where it says "sort" is where you

22     need to go into to sort those data.

23 Q   I see.  For whatever reason -- maybe this -- let me

24     make this a little bit smaller.  Maybe this is

25     not -- it's not letting me do that.

```
 1    A    Okay.  That's how I reviewed the data.

 2    Q    ████████████████████████████████████████

      ████████████████████████████████████████

      ████████████████████████████████████████

      ████████████████████████

 6    A    I don't think it's sorted the other data because

 7         I'm not -- I'm not saying you're right or wrong,

 8         but if you didn't highlight all the fields, I'm not

 9         sure the other fields got sorted.

10    Q    No, I think it did.  I think it did.  The way the

11         sort work works, it sorts everything.  I'm pretty

12         sure.  I mean, let's go -- let's go backwards.

13    A    Okay.  Yeah.

14    Q    Well, anyway, I'll tell you what, I'm not sure

15         we're going to be able to do this effectively, and

16         I don't want to waste everybody's time on it.

17             But to go to what you were trying to tell me,

18         you sorted it by patient, and then you looked at

19         the other data fields to, for example, to see what

20         the fill dates were and what the prescriptions were

21         and who the prescribers were and all of that.

22             Is that what you did?

23    A    Yes, sir.

24    Q    And this appears to be a subset.  The first date

25         here is -- well, I don't know what the first date
```

Page 200

1        is because I resorted it. 

11            MR. ELSNER:  Objection.

12   A    No, sir.

13     BY MR. BUSH:

14   Q    Did you ask for this data table or did somebody

15        just provide it to you?

16   A    It was just provided to me, sir.

17   Q    All right.  Let me ask you to take a look over --

18        actually, before I -- before I ask you to take a

19        look at this, some other columns here -- so looking

20        at all of this, what -- what use did you make of it

21        in formulating your opinion?

22            You're obviously not -- you didn't give

23        opinions on any particular patient or any

24        particular prescription.  So how did this inform

25        the opinions that you did give?

Page 201



1  A    ███████████████████████████████████

      ████████████████████████████████

      ███████████████████████

4  Q    I'm just trying to find it.

5  A    I saw you flip through there.  That was one

6      patient.

7  Q    Stop me when -- I'll keep flipping, but you stop me

8      when you see what you're looking for.

9  A    Okay.  Stop there, please.

10     █████████████████████████████

      ██████████████████████████████████

      █████████████████████████████████

      ████████████████████████████████

      ██████████████████████████████████

      █████████████████████████████████

      ████████████████████████████████

      ██████████████████████████

      ███████████████████████████████████

      ████

      ███████████████████████████████

      ████████████████████████████████

      █████████████████████████████████

      ████████████████████████

      ████████████████████

      ██████████████████████

Page 202



24   Q    Right.

25   A    Because I couldn't remember the patient ID numbers.

Page 203

1    I could remember the ZIP Code for that when you

2    scrolled through.

3  Q  But all the different combinations and the

4    different prescribers and everything you said, that

5    all related not to a patient but to a ZIP Code?

6  A  ██████████████████████████████████████████

   ████████████████████████████████████████

   ████████████████████████████████████████

   ██████████████████████████████████████

10  Q  Right.  Okay.  Let me ask you to take a look over

11    at these columns here, starting with column BS.

12    And going all the way over to the end.  And I would

13    note for you, and ask you if you agree with me, it

14    starts with C1, and if you look -- if I highlight

15    this, I think I would see C1 INDIC.

16       Do you see up there?  That's the title.  If

17    you go all the way across here, we get to C27

18    INDIC, and then we go from starting here, INDIC all

19    C1 INDIC all to C27, INDIC all.  And this is in the

20    tab called red flags.

21       Do you see down here?

22       What use, if any, did you make of this data?

23  A  I didn't, sir.

24  Q  You didn't?

25       (Simultaneous conversation.)

Page 204

1    A    I thought it was binary code for a computer system.

2      BY MR. BUSH:

3    Q    Okay.  So you don't know what it is?

4    A    Correct, sir.

5    Q    Okay.

6    A    I looked at the individual patient data.

7    Q    This is what we were talking about before?

8    A    Yes, sir.

9          MR. BUSH:  Now, if I can figure out how to

10         stop sharing the screen, we will go back to what we

11         were doing.

12         MR. ELSNER:  Graeme, we've been going almost

13         two hours.  And I know that the defendants had a

14         break while we were talking with Special

15         Master Cohen, but the plaintiffs didn't.  I don't

16         want to interrupt your flow.  If you have a few

17         more questions, that's fine.  But at a good time,

18         it might helpful to take a lunch break.

19         MR. BUSH:  No.  This is actually a pretty good

20         time.  Why don't we take it now.

21         So how long do we want to take for lunch?

22         MR. ELSNER:  I think 30 minutes will be

23         plenty.  We have lunch here.

24         THE VIDEOGRAPHER:  We are off the record.

25         (A recess was taken.)

1          THE VIDEOGRAPHER:  We're on the record.

2      BY MR. BUSH:

3   Q    Good afternoon, Mr. Catizone.  I want to ask you

4        some questions about some of the individual red

5        flags this afternoon.  So the first ones are the

6        first ones in your report which are -- I guess we

7        call them the distance red flags.  And as -- am I

8        correct that you've got two distance red flags?

9        One is where an opioid was dispensed to a patient

10       who traveled more than 25 miles to visit the

11       pharmacy.

12            That's one, right?

13  A    Good afternoon, Mr. Bush.  Could we go to the

14       page you're talking about?  Are you talking about

15       page 32?  Is that what you're referencing?

16  Q    Actually on my supplemental copy, it's 33.  But --

17  A    33.  Okay.

18  Q    Well, actually it starts on 32.  You're right.  The

19       definition, I think is on 33.  It says opioid was

20       dispensed to a patient who traveled more than

21       25 miles to visit the pharmacy.

22            Do you see that?

23  A    Yes, sir.

24  Q    And the second distance one is that opioid was

25       dispensed to a patient who traveled more than

1           25 miles to visit their prescriber.

2               Do you see that?

3    A    Yes, sir.

4    Q    And I'm correct that the distance when you're

5         calculating -- or Mr. McCann was calculating

6         25 miles in each of these red flags, he was

7         measuring it from the center of the patient ZIP

8         Code to the center of the pharmacy ZIP Code for the

9         first red flag to the prescriber's ZIP Code in the

10        second, right?

11   A    That's my understanding, sir, yes.

12   Q    And did you direct him to do that it that way or

13        was that something he did on his own?

14   A    I directed what the distance would be.  How they

15        calculated that based on ZIP Code was something

16        that they came up with, sir.

17   Q    Some of the prescriptions that flag here might

18        actually be a little less than 25 miles because the

19        actual addresses of the pharmacy and the patient

20        are -- where they are located in the ZIP Code,

21        right?

22   A    Probably so, sir, yes.

23   Q    And that's also true for the doctors --  or I

24        shouldn't say the doctors -- the prescribers and

25        the patient.  Depending upon where the addresses

1      are within a ZIP Code, it could be flagging some

2      that are a little less than 25 miles?

3  A   That would seem logical, yes.

4  Q   Can you explain to me how you came up with 25 miles

5      as the distance measure?

6  A   Sure.  There were three primary sources of

7      information that I relied upon besides experience

8      that I've had in other cases.  The first was

9      information that's available that says the average

10     distance that a patient travels to their pharmacy

11     is about five miles, and that the primary choice

12     for a patient's pharmacy is the accessibility and

13     closeness to their home or work.  Included in that

14     data was information that for prescribers, patients

15     normally travel about the same distance, two to

16     three miles.

17        The other two factors were in the Holiday

18     case, the testimony of the witnesses in there

19     indicated that the red flag they looked at was less

20     than 30 miles, a little less than 30 miles.  And

21     then the in the Walmart DOJ complaint, they noted

22     several distances in there from anywhere from

23     6 miles to 60 miles to a hundred miles.  And

24     finally, the third piece of data that sort of

25     brought this all together for both the prescriber

```
 1          and pharmacy was that when NABP was working with
 2          the states to develop telepharmacy regulations, the
 3          consensus of the states was that 25 miles from a
 4          patient's home would be the approximate distance
 5          for opening a telepharmacy or allowing a
 6          telepharmacy to operate and practice.  Because
 7          within that 25-mile range, there would be ample
 8          pharmacies for the patient to utilize, but outside
 9          that 25-mile range, there would be no reason why,
10          if there wasn't access outside a 25, that a
11          telepharmacy should not exist and be able to
12          practice.
13    Q     Okay.  So let's talk about a couple of these
14          sources.
15              In Holiday, the patients who were filling
16          prescriptions at the pharmacy were coming from
17          Kentucky and from Tennessee, right?
18    A     Some of the patients, yes, sir.
19    Q     And some of the patients were coming from the
20          southern part of Florida, right?
21    A     Yes, sir.
22    Q     And the pharmacies were in the northern part of
23          Florida in Sanford, right?
24    A     Yes, sir.
25    Q     So you can agree with me that the actual fills of
```

```
 1       patients that were at issue were for patients who

 2       were well, well, well more than 25 miles from the

 3       pharmacy?

 4            MR. ELSNER:  Objection.

 5   A    Not for all the patients.  There were patients that

 6       were noted in that case that traveled less than

 7       30 miles to the pharmacy.

 8     BY MR. BUSH:

 9   Q    And you think that's the basis of the decision?

10   A    It's the --

11            MR. ELSNER:  Objection.

12   A    -- it's the basis for me using 25 miles as a

13       parameter.

14     BY MR. BUSH:

15   Q    And in East Main Street, let me ask you to take a

16       look at -- let me find it.

17            MR. BUSH:  Jason, it's actually CVS 3 in your

18       packages.

19     BY MR. BUSH:

20   Q    Mr. Catizone, if you can pull that out, and then we

21       can also put it on the screen if Jason is back in

22       action.

23            MR. BUSH:  Jason, are you with us?

24            Well, Jason appears not to be with us.

25     BY MR. BUSH:
```

Page 210

1   Q    Do you have that decision?

2        Do you have that decision, Mr. Catizone?

3   A    Yes, sir.

4   Q    And this is the East Main Street decision that is

5        one of the sources that you relied on?

6   A    Yes, sir.

7   Q    And take a look at page 2 about -- I'd say a little

8        less than halfway down the first column talking

9        about one of the patients who was filling

10       prescriptions at this pharmacy.

11       Do you see it says she traveled approximately

12       100 miles from Wheelersburg to Columbus and filled

13       the prescriptions at respondent, which is the

14       pharmacy, right?

15  A    Yes, sir.

16  Q    And a little further down, it says that one of the

17       patients who filled opioid prescriptions with the

18       pharmacy is approximately 64 miles from Columbus

19       where the pharmacy is located"?

20  A    Yes, sir.

21  Q    And then it says in Dayton and Portsmouth, Ohio,

22       they are 78 and 92 miles respectively from the

23       pharmacy, right?

24  A    Yes, sir.

25  Q    Not 25 miles?

1   A    No, sir.

2   Q    What's the -- can you explain why telepharmacy is

3        relevant at all to the distance that you would

4        establish for a distance metric for a retail

5        pharmacy?

6   A    Yes, sir.  In the deliberations with the states on

7        telepharmacy regulations, the states talked about

8        what is the approximate distance that a patient

9        would travel to a pharmacy.  And what was a cutoff

10       point, where if a patient had to travel beyond that

11       point because there weren't any pharmacies

12       available to them, that the patient should have

13       access to remote services.  And based upon

14       information from the states and looking at their

15       own pharmacies and demographics, 25 miles seemed as

16       a cutoff point that if a patient was within

17       25 miles of the pharmacy, they would utilize that

18       pharmacy.  If it was beyond 25 miles and they chose

19       not to utilize that pharmacy, then that was a

20       problem.

21  Q    So do you know how many of your red flags

22       prescriptions were filled by patients who were

23       between 25 and 30 miles from the pharmacy?

24  A    No, sir.

25  Q    Do you know how many were written by a prescriber

1       who was between 25 and 30 miles from the patient?

2   A   No, sir.

3   Q   Same answers for between 30 and 35 miles?

4   A   Yes, sir.

5   Q   And do you believe that 5 miles is a meaningful

6       difference in terms of identifying prescriptions

7       that are not written for a legitimate medical

8       purpose?

9         MR. ELSNER:  Objection.

10  A   I think you could be within 5 miles of a pharmacy

11      and still have a prescription that's not

12      legitimate.  So the mile is a -- 25 is a parameter,

13      but anything can occur within 5 miles or 10 miles

14      of the pharmacy or prescriber.

15   BY MR. BUSH:

16  Q   But by setting 25 miles, you're trying to identify

17      prescriptions that are likely to have been written

18      for an illegitimate medical purpose or to be

19      diverted, right?

20  A   No, sir.

21  Q   What are you trying to do?

22  A   25 miles presents a red flag which indicates to the

23      pharmacist that further diligence is needed on that

24      prescription because there could be diversion or

25      abuse or a problem.

Page 213

1    Q    Did you do anything to determine how far patients

2         go to fill nonopioid prescriptions?

3    A    The data I looked at didn't break it down by

4         noncontrolled or controlled.  It simply said within

5         a 2 to 3 miles or 5 miles is what patients utilize

6         their pharmacies for.

7    Q    And the same for the prescriber metric?

8    A    Yes, sir.

9    Q    You would expect, would you not, that a certain

10        share of nonopioid prescriptions are filled at a

11        pharmacy that's more than 25 miles from the

12        patient's residence, right?

13             MR. ELSNER:  Objection.

14   A    Not really, sir, unless there were extenuating

15        circumstances.

16     BY MR. BUSH:

17   Q    Well, forget what the explanation might be.  You

18        would expect that a certain number or share of

19        nonopioid prescriptions would be filled at a

20        pharmacy that's more than 25 miles from the

21        patient's residence, right?

22             MR. ELSNER:  Objection.

23   A    Yes, sir.

24     BY MR. BUSH:

25   Q    And you would also expect that a certain number of

1      nonopioid prescriptions were written by a

2      practitioner who was more than 25 miles from the

3      patient's residence, right?

4  A   Yes, sir.

5  Q   Would you also agree with me that there's,

6      therefore, a certain share of prescriptions that

7      are either filled at a pharmacy more than 25 miles

8      from the residence of the patient or written by a

9      prescriber more than 25 miles from the patient's

10     residence that are just normal patient behavior?

11 A   Yes, sir.

12 Q   Is one of the reasons that somebody might get a

13     prescription written by a doctor that's more than

14     25 miles from where he lives is that he goes to a

15     doctor that's near his place of work, right?

16 A   Yes, sir.

17 Q   And one of the reasons a patient might get a

18     prescription filled more than 25 miles from where

19     he works is because -- I'm sorry -- from where he

20     lives is because it's close to where he works,

21     right?

22 A   Yes, sir.

23 Q   And you haven't -- this red flag doesn't make any

24     effort to determine how many people were either

25     filling prescriptions at pharmacies or getting

1      prescriptions from practitioners more than 25 miles

2      from where they lived because the pharmacy or the

3      practitioner was near where they work?  You don't

4      have any way to tell that?

5           MR. ELSNER:  Objection.

6           Graeme, you may want to rephrase that.

7           MR. BUSH:  Okay.  Did I screw it up?

8           MR. ELSNER:  Well, I heard it -- maybe I

9      misheard it.

10           MR. BUSH:  I'll --

11           MR. ELSNER:  I thought you said from where

12      they lived, not from where they worked.  I think

13      that was the point you were trying to make.

14           MR. BUSH:  I may have screwed it up.  Let me

15      just do it over.

16     BY MR. BUSH:

17  Q    Your red flag -- let's do it one at a time.  Your

18      red flag for pharmacy distance doesn't make any

19      effort to determine how many people who filled a

20      prescription at a pharmacy more than 25 miles from

21      where they live did so because the pharmacy was

22      near where they work?  You don't have any way to

23      tell that, right?

24           MR. ELSNER:  Objection.

25  A    Not from the data.  That would be in patient notes

1        and other documentation that I was not provided.

2      BY MR. BUSH:

3   Q    So you don't have any way to tell that?

4   A    No, sir.

5   Q    And you also don't have any way to tell whether any

6        prescription -- withdrawn.

7           You don't have any way to determine how many

8        people who filled -- who got a prescription written

9        by a prescriber who was more than 25 miles from

10       where they lived did so because the prescriber, the

11       doctor they went to, was near where they worked.

12       You don't have any way to tell that either?

13  A    No, sir.

14          MR. BUSH:  Jason, you can take down that

15       exhibit.

16          MR. ELSNER:  Graeme, did you want to mark that

17       exhibit?

18          MR. BUSH:  Yeah, I'm sorry.  I did want to

19       mark that exhibit.

20          THE REPORTER:  The last one we marked was

21       Exhibit 10.  I didn't know if you wanted to mark

22       the spreadsheet.

23          MR. BUSH:  I guess we ought to mark the

24       spreadsheet too.  Sorry.  I should have done it at

25       the time.  I was thinking we didn't need to because

Page 217

1      it was not really in hard copy.  Let's do that.  So

2      that will be 11, and this exhibit that was just up

3      here, the East Main Street decision will be 12.

4          (Exhibit 11 was marked for identification.)

5          (Exhibit 12 was marked for identification.)

6    BY MR. BUSH:

7  Q    If you would look back at your report on page 32,

8      in the middle of the paragraph -- well, I guess

9      just after you start the paragraph under the

10      heading, it says:

11          "The exceptions can occur" -- and that's

12      exceptions to the distance metric -- "can occur

13      when an individual's drug coverage under their

14      insurance plan mandates certain pharmacies, the

15      pharmacy that they frequent is out of medication or

16      the patient is being treated by practitioners at a

17      tertiary care facility that is highly specialized

18      to provide services such as -- services such areas

19      as cardiac surgery, cancer treatment and

20      management, burn treatment, plastic surgery,

21      neurosurgery, and other complicated treatments or

22      procedures."

23          So you would agree that any of the

24      prescriptions that flag on your distance metrics

25      here that fall within those exceptions are not

```
 1          really red flags, right?

 2              MR. ELSNER:  Objection.

 3      BY MR. BUSH:

 4   Q    I'm sorry.  What was your answer?

 5   A    Yes.

 6   Q    And you also say that "these exceptions did not

 7        appear to be factors impacting the data."

 8              Do you see that in the next sentence?

 9   A    Yes.

10   Q    What's the basis for that conclusion?

11   A    I had no documentation on patient notes or anything

12        else that indicate otherwise, and so based upon the

13        data, that was the only conclusion I could reach.

14   Q    You would agree that there are going to be some

15        prescriptions that were flagged under these flags

16        that fall within these exceptions?  You're just

17        saying that you can't identify them; is that right?

18              MR. ELSNER:  Objection.

19   A    Yes, sir.

20      BY MR. BUSH:

21   Q    So let me ask you another question here.  Let's say

22        that we have a prescription that is presented by

23        somebody who lives a thousand miles away from the

24        pharmacy.  Would that flag?

25   A    Yes, sir.
```

1    Q    What if the patient is the child of somebody who

2         lives within the pharmacy's geographical area and

3         is known to the pharmacist and he's just home from

4         college where he got the prescription written.

5         That wouldn't be a red flag, would it?

6    A    All those hypotheticals are possible, but that

7         would be documented in the record because a

8         pharmacist filling that prescription afterwards

9         didn't know that would question the mileage as a

10        red flag.  So the documentation of that part would

11        be very important and critical.

12   Q    So the only thing that's wrong with that scenario

13        is that the pharmacist didn't document it?

14             MR. ELSNER:  Objection.

15   A    No.  What happened in that situation is the

16        pharmacist resolved the red flag by making a

17        determination that the individual, even though a

18        thousand miles away, was here on a visit from

19        college and, therefore, had a nexus to the pharmacy

20        and to the prescriber that took away that red flag

21        or resolved that red flag.

22      BY MR. BUSH:

23   Q    And it's your opinion that, even if the pharmacist

24        knows the child and knows the family and they've

25        been getting prescriptions filled at the pharmacy

Page 220

1         for years, knows the kid's away at school, that's a

2         red flag that has to be documented?

3    A    Yes, sir.

4    Q    Let me move to the next sets of red flags, which

5         was doctor and -- sorry.  Got that wrong.

6              No, I'm sorry.  Doctor and pharmacy shopping.

7         And those appear to be mentioned at page --

8         starting at page 35 on your report, if you want to

9         refer to that.

10   A    Yes, sir.

11   Q    So you defined red flag number -- I'm calling it

12        Number 3, the doctor shopping red flag, as a

13        patient who gets opioid prescriptions with

14        overlapping days of supply from two or more

15        prescribers.

16             Do I have that right?

17   A    Yes, sir.

18   Q    Okay.  And just so that we're clear, I think we

19        probably all have a commonsense understanding of

20        what "overlapping" means, but just so that there

21        isn't any mix-up on this, would you please tell us

22        what you mean by "overlapping days of supply"?

23   A    Yes, sir.  That would mean that there would be an

24        overlap in between the two prescriptions so that

25        the patient would be taking both medications at the

1      same time.

2  Q   Let me make sure I understand what you're saying.

3      In other words, the duration of the first

4      prescription is overlapped by the duration of the

5      second prescription?

6  A   Yes, sir.  Maybe I can give an example to better

7      explain.

8  Q   Sure.

9  A   So if a patient was on a pain medication, and let's

10      say they were on a 20-milligram medication and the

11      patient's pain was still severe.  Then the

12      physician or prescriber would discontinue the

13      20-milligram prescription and then authorize a

14      30-milligram prescription and make sure that the

15      patient did not take any more of 20 milligrams but

16      then was using and taking 30 milligrams.

17         If they prescribed a 20-milligram and a

18      30-milligram and the patient was taking both at the

19      same time, that would be the overlap.

20  Q   And in that situation, if the 20-milligram was not

21      working, the 30-milligram prescription might have

22      been written before the 20-milligram prescription

23      ran out because the patient needed additional

24      medication, right?

25  A   It could be, sir, yes.

1   Q    And it doesn't mean that the patient was taking

2        both?  It could be that the patient stopped taking

3        the 20 and started taking the 30, right?

4   A    Right.  That's why it's a red flag to make that

5        determination and to document that determination,

6        sir.

7   Q    But in that situation that you have just given us,

8        neither of the prescriptions is diverted to, you

9        know, a use other than what the prescriptions were

10       intended for, right?

11            MR. ELSNER:  Objection.

12  A    Yes, sir.

13    BY MR. BUSH:

14  Q    And in neither of those situations were the

15       prescriptions written not for a legitimate medical

16       purpose, right?

17  A    I wouldn't know exactly, sir.  I couldn't comment

18       on it.  They could have both been written for a

19       nonlegitimate purpose, if the patient wasn't being

20       truthful or something else was occurring with the

21       prescriber.

22  Q    Right.  But absent those additional pieces of

23       information, the mere fact that the person needed a

24       higher dose of medication doesn't mean that the

25       second prescription or the first prescription were

1      written for a nonlegitimate medical purpose.  They

2      were both written for legitimate medical purposes,

3      right?

4         MR. ELSNER:  Objection.

5  A   Yes, sir.  Could be.

6   BY MR. BUSH:

7  Q   Do you know whether the numbers that you have set

8      forth in your report at page 35 for the doctor

9      shopping red flags include both the -- well, all of

10     the prescriptions that overlap?

11  A   Yes, sir.

12  Q   They do?

13  A   Yes, sir.

14  Q   You also say at page 35 -- hold on a second.  Let

15     me find it.

16      And I'm reading from the first sentence under

17     "Doctor Shopping" that "Doctor shopping, as a red

18     flag, includes when a patient presents a

19     prescription for a controlled substance and may be

20     obtaining the similar or similar controlled

21     substance from a different prescriber and the

22     patient does not make the prescriber aware of the

23     other prescriber."

24      Do you see that?

25  A   Yes, sir.

1    Q    How is the pharmacist supposed to know whether the

2         patient made the second prescriber aware of the

3         first prescriber?

4    A    As a red flag, the pharmacist would check the PDMP

5         to see whether or not it was the same prescriber

6         for the first prescription, ask the patient, check

7         with the prescriber, and then use their

8         professional judgment to determine whether or not

9         that prescription was for two of them.

10   Q    So in this particular situation the numbers that

11        are flagged for each of the defendants here are

12        based solely on the dispensing data from each

13        defendant, right?

14   A    Yes, sir.

15   Q    So from each pharmacy defendants' own dispensing

16        data, they will be able to see -- the pharmacist

17        will be able to see, to use your hypothetical, that

18        the patient is presenting a 30-milligram

19        prescription and he has an overlapping supply with

20        the earlier 20-milligram prescription, right?  That

21        information is available to the pharmacist in that

22        situation?

23            MR. ELSNER:  Objection.

24   A    If it's from the same pharmacy chain, yes.  If it's

25        outside of that pharmacy chain, then that's where

1           the PDMP would be critical to review.

2      BY MR. BUSH:

3   Q    So you've chosen -- withdrawn.

4           You've chosen two or more prescribers in this

5           metric.  How did you settle on two?

6   A    So if you see later in the report, later down under

7           "Pharmacy Shopping" where patients overwhelmingly

8           use this one pharmacy, the same is true for

9           patients.  They generally use one physician.  So

10          for a patient to see two prescribers for the same

11          medication is a red flag that I've discovered in my

12          experience and also that's been talked about in

13          various cases and decisions.

14  Q    Do you have any understanding of what is

15          accepted -- an accepted definition of pharmacy

16          shopping among regulators?

17          MR. ELSNER:  Objection.

18  A    Yes, sir.  The definition in my report is well

19          accepted by regulators.

20      BY MR. BUSH:

21  Q    Do you know what the Ohio Board of Pharmacy defines

22          doctor shopping and pharmacy shopping to be?

23  A    Not at this moment, sir.

24  Q    And if the Board of Pharmacy in Ohio defines doctor

25          shopping and pharmacy shopping differently, is it

Page 226

1       your opinion that the pharmacy defendants have to

2       comply with a stricter standard that you have

3       created here?

4   A   My standard is not my standard.  It's a standard

5       that the DEA has employed.  And so if the DEA

6       standard or CSA is stricter than Ohio or the

7       pharmacy rules and regulations, the answer is yes,

8       the more stringent requirement prevails whether

9       it's federal or state.

10  Q   And where do you see that there's a DEA 14

11      requirement -- if that's the way you put it or -- a

12      stricter rule or regulation from the DEA?  What's

13      the source for that?

14  A   My response was based on your hypothetical where

15      you asked if the Ohio Board of Pharmacy had a more

16      stringent or a less stringent definition than I

17      did, whether or not they would have to follow that.

18      So in the hypothetical that you gave me, I then

19      made the assumption that if the DEA had a more

20      stringent requirement, the more stringent would

21      take place.

22  Q   Let's take a look at -- if you could get out CVS --

23      the package CVS 19 and CVS 17.  And we'll mark

24      CVS 19 as -- I think the next exhibit, is that 13?

25          THE REPORTER:  Yes, sir.

1        MR. BUSH:  And CVS 17 as the following

2        exhibit, 14.

3            (Exhibit 13 was marked for identification.)

4            (Exhibit 14 was marked for identification.)

5    A    Yes, sir, I have those open.

6    Q    Thank you.

7        MR. BUSH:  So Jason, can you put CVS 19 up on

8        the screen, please?  All right.  And I'd like

9        you -- so if you could, show Mr. Catizone -- well,

10       actually, you don't have it up on the screen yet.

11       Hold on a second.

12           While we're waiting for it to get up on the

13       screen, Mr. Catizone, let me ask you to take a look

14       at Exhibit 13.  You'll see that this is the Ohio

15       Automated Rx Reporting System Semiannual Report on

16       Opioid Prescribing in Ohio dated June 2015.

17           Do you see that?

18   A    Did you say 13 and I'm ignoring 17 and 19 now and

19       switching to 13?

20           Is that what you said?

21   Q    No, those were our folder numbers.  Those are not

22       the exhibit numbers.

23   A    So is this still folder 17 and folder 19?

24   Q    Folder 19 has Exhibit 13 in it.  So that's the --

25       sorry.  The numbers are a little confusing.

Page 228

1   A    Thank you.

2   Q    So do you have that?

3   A    Yes, sir.

4   Q    All right.  And if you turn to the second-to-last

5        page, section 3, and down at the bottom, it says

6        "OARRS usage versus doctor shopping by year."

7             Are you with me?

8   A    Yes, sir, yes, sir.

9   Q    All right.  And at the bottom it says -- the little

10       asterisk says:  "In this chart a doctor shopper is

11       defined as an individual who visits at a minimum

12       five prescribers and five pharmacies in a single

13       month."

14            MR. BUSH:  Further down, Jason.  Further down.

15       Bottom of that page.  So highlight the italics at

16       the very bottom of the page.  Yep.

17     BY MR. BUSH:

18   Q    So that -- Mr. Catizone, that's a very different

19       definition of doctor shopping than the one you

20       used, which is just two prescribers in one month,

21       right?

22            MR. ELSNER:  Objection.

23   A    Yes, it's different, sir.

24     BY MR. BUSH:

25   Q    Okay.  And do you think that pharmacists and

Page 229

1          pharmacies that are operating in Ohio, which is

2          subject to the Ohio State Board of Pharmacy should

3          have to comply with your much more restrictive

4          definition of doctor shopping than what the

5          regulator uses?

6              MR. ELSNER:  Objection.

7      A   The definition that I included in my report as a

8          red flag that would indicate that the pharmacist

9          has to do some additional diligence, again, is

10         based upon my experience and other actions that the

11         DEA has taken in these cases.  So it's up to the

12         pharmacist to decide whether they want to take

13         action and follow Ohio or DEA.  But by following

14         Ohio it, subjects them to action by the DEA or DOJ,

15         and that would be up to the individual pharmacist.

16     BY MR. BUSH:

17     Q   Have you seen -- can you cite any decision or

18         guidance from the DEA that says two doctors in one

19         month is a definition of doctor shopping?

20     A   Not offhand, sir.

21     Q   All right.  Let me ask you to take a look at

22         Exhibit 14, which is the next exhibit that you

23         marked here.  And that is the OARRS 2016 Annual

24         Report.

25     A   Excuse me, Mr. Bush.  Is that CVS folder 14 or

 1        Exhibit 14?

 2   Q    No, that's CVS folder 17.

 3   A    Okay.  That says June --

 4   Q    Maybe I have the -- maybe I have it wrong.

 5   A    It's the 2017, it's not 2016, sir.

 6            MR. BUSH:  Jason, can you please pull that up,

 7        because I'm not sure that what we're actually using

 8        here are the ones that I have here in hard copy.

 9        Nope.  It's Folder Number 17.  All right.

10        Actually, we can just pass on that.  Just leave

11        that one alone.

12      BY MR. BUSH:

13   Q    At page 36 of your report, if you take a look at

14        that.

15   A    Yes, sir.

16   Q    You cite -- maybe it's not 36.  Sorry.  It's 37.

17        You cite as support for your doctor and pharmacy

18        shopping metric of two pharmacies or two doctors

19        that the NABP stakeholder report says, and I quote,

20        "Patient presents a prescription for controlled

21        substance that a pharmacist knows or reasonably

22        believes that another pharmacy refused to fill."

23            Do you see that?

24   A    No, sir, I don't.  What page are you on?

25   Q    37, top of page 37.

Page 231

1    A    Oh, yes, I do.  Thank you.

2    Q    Okay.  That stakeholder report, I think others will

3         ask you some questions about that.  But that was a

4         document that the NABP helped put together, right?

5             MR. ELSNER:  Objection.

6    A    Yes, sir.

7      BY MR. BUSH:

8    Q    And that doesn't really say anything about two

9         pharmacies or two doctors?

10            MR. ELSNER:  Objection.

11   A    Correct, sir.

12     BY MR. BUSH:

13   Q    Let me ask you a question.

14            Do you agree or disagree with the following

15        statement:  "Multiple prescribing can indicate

16        individuals who are recklessly seeking opioids for

17        nonmedical personal use and sale or could be

18        indicative of poorly managed care"?

19            Do you agree or disagree with that?

20            MR. ELSNER:  Objection.

21   A    I can agree with that, sir.

22     BY MR. BUSH:

23   Q    I'm sorry.  You say can or cannot?

24   A    Can.  Yes.

25   Q    I'm sorry, I still didn't hear you clearly.  Cannot

Page 232

1       or can?

2    A    I can, can, c-a-n.

3    Q    Thank you, appreciate it.

4         And if it's indicative of poorly managed care,

5         then the prescription that would qualify for

6         multiple prescribing would not be a prescription

7         written for nonmedical purpose?

8    A    Correct.

9    Q    Let me ask you about your combination red flags.

10        And by my read, those are red flags 5, 6, 7, and 8,

11        and these are sometimes referred to as cocktail

12        prescriptions, right?

13   A    Yes, sir.

14   Q    And those are combinations -- and you have various

15        different combinations here -- but prescription

16        opioid, a benzodiazepine, and a muscle relaxer or

17        maybe just a prescription opioid and a

18        benzodiazepine.  I think those are the two basic

19        combinations that your red flags focus on here; is

20        that right?

21   A    Yes, sir.

22   Q    And bear with me for a second.

23        At page 37 of your report -- I think it's

24        page 37.  Let's make sure the page hasn't changed

25        here.

```
 1              So I think you're talking here about the

 2         prescription combination of an opioid, a benzo, and

 3         a muscle relaxer.  And there are two different red

 4         flags here.  The first one is for overlapping days

 5         of supply, and the second one is written by the

 6         same prescriber and filled by the pharmacy on the

 7         same day.

 8              Is that right?  Are you with me?

 9    A    Yes, sir.

10    Q    And you say up above at the top of the page, first

11         full sentence, "The red flags indicated that the

12         prescriptions were not issued for a legitimate

13         medical purpose or in the usual course of pharmacy

14         practice."

15              Do you see that?

16    A    Yes, sir.

17    Q    You are aware, are you not, that medical

18         practitioners do believe that in some circumstances

19         these combinations are legitimate and necessary to

20         treat medical conditions of patients?

21    A    I'm not aware of any medical practitioner that has

22         voiced that opinion, sir.

23    Q    Okay.  And I'm looking for something that I wanted

24         to ask you about you said in here.

25              Right.
```

Page 234

1           So at the bottom of the same paragraph, you

2       say:  "Further, there were additional red flags

3       present including but not limited to excessive

4       quantities and the duration of therapy outside of

5       recommended dosages and dosing to further concern

6       and alert the pharmacist."

7           Do you see that?

8    A   Yes, sir.

9    Q   Do all of the prescriptions that flag in red flags,

10       these combination red flags 5 through 8 involve

11       excessive quantities?

12           MR. ELSNER:  Objection.

13   A   Not for all the red flags, sir.

14     BY MR. BUSH:

15   Q   Some of them do?

16   A   Not for all of the prescriptions, sir.

17   Q   But some do?

18   A   Yes, sir.

19   Q   And have you identified which ones do?

20   A   No, sir.  I looked at the aggregate data, not the

21       individual prescriptions.

22   Q   And do all of the prescriptions that flag in red

23       flags 5 through 8 involve excessive duration of

24       therapy outside recommended dosages and dosing?

25   A   No, sir.

1   Q    So you've already said you don't agree that there

2        are any legitimate uses for these combinations, and

3        I want to go back and just make sure what you're

4        referring to here.

5             Is this for all four of -- actually, it's

6        really two combinations.  It's just measuring them

7        differently.  But for both of the combinations that

8        you're talking about, there's no legitimate use for

9        them?

10            MR. ELSNER:  Objection.

11   BY MR. BUSH:

12   Q    Did I not ask that -- ask that question very well?

13            MR. BUSH:  Mike, you are frowning at me.  Let

14       me let go back.  I'll try it again.

15            MR. ELSNER:  You kind of mixed the two

16       different combinations with the -- with how they

17       are calculated, so I think if you get it out -- we

18       will be clear.

19   BY MR. BUSH:

20   Q    All right.  So what I'm curious about here, let's

21       take the opioid, the benzo, and a muscle relaxer.

22       So you've got two red flags that focus on those.

23            I think you've already said that, in your

24       view, there's no legitimate medical use for that

25       combination; is that right?

1    A    Yes, sir.

2    Q    All right.  So why would -- why is there a standard

3         for the duration of the therapy if it's never

4         appropriate?  How would the -- any duration is too

5         much, right?

6    A    Not for that combination collectively, but for the

7         individual drugs that were included in the

8         combination, there's a duration of therapy for

9         those individual drugs.

10   Q    Okay.  So that's what you meant when you said the

11        duration of therapy was excessive?

12   A    For those or it could have been that the amount of

13        medications that were prescribed as a combination

14        was excessive as well.

15   Q    All right.  And I take it you cannot describe for

16        me -- well, I'm sorry.  Let's go to the second set.

17            The second set are an opioid and a

18        benzodiazepine.

19            Do you see that?

20   A    Yes, sir.

21   Q    Okay.  And is it also your opinion that there is no

22        legitimate medical reason to prescribe those two

23        drugs in combination?

24   A    No, sir.

25   Q    It's not your opinion?

1   A   No, sir.

2   Q   So there are situations where that's a legitimate

3       medical prescription?

4   A   Yes, sir.

5   Q   And how do we, in your red flags, identify which of

6       the combinations of prescriptions are legitimate

7       and which ones aren't?

8   A   Again, the pharmacist's due diligence to ascertain

9       that there was a legitimate need for these

10      prescriptions and documentation of that resolution.

11  Q   Does the timing of when the prescriptions were

12      filled make a difference in making that assessment?

13  A   It would be a factor that would help the pharmacist

14      decide as well, sir.

15  Q   And does the timing make a difference in

16      determining whether it's even a red flag?

17  A   No, sir.  The two combined are a red flag.

18  Q   What if the benzo prescription is filled with only

19      one day left and the opioid prescription.  That's

20      still a red flag?

21  A   Again, that would be, in that hypothetical,

22      something for the pharmacist to make sure that was

23      resolved so the patient didn't take both

24      medications at the same time.

25  Q   So let me go back and ask the question again.  Is

1            it still a red flag?

2       A    Yes, sir.

3       Q    Okay.  Doesn't matter if the overlap of the

4            prescription is one day, two days, three days, as

5            opposed to they were filled at the same time and

6            they completely overlapped to you?

7                MR. ELSNER:  Objection.

8       A    If you look at the patient's health, and if that

9            combination caused the patient to have respiratory

10           failure or die, and it could happen with just a

11           combination of two doses, then it's a red flag that

12           the pharmacist needs to resolve.

13         BY MR. BUSH:

14      Q    All right.  But in that a situation, it might be a

15           danger to the patient, but it would not be an

16           illegitimate prescription, right?

17                MR. ELSNER:  Objection.

18      A    Hypothetically, yes, it could not be.

19         BY MR. BUSH:

20      Q    Do you have any idea how many prescribers prescribe

21           this combination of drugs?  And by "this," I'm

22           referring to an opioid and a benzodiazepine in the

23           two counties, Lake and Trumbull County?

24      A    No, sir.

25      Q    Would it trouble you, if, say, 200 or 300

Page 239

```
 1       prescribers write this combination of

 2       prescriptions?

 3   A   I'm deeming by trouble -- I'm -- I'm just trying to

 4       answer best for you.

 5   Q   Well, let me ask it differently.

 6           Do you think that 2- or 300 prescribers in

 7       Lake and Trumbull County are writing prescriptions

 8       not for a legitimate medical purpose?

 9           MR. ELSNER:  Objection.

10   A   I thought that would help, but I actually have

11       become more confused, so I --

12     BY MR. BUSH:

13   Q   So the hypothetical is there there's 2- or 300

14       prescribers in Lake and Trumbull County who are

15       writing prescriptions for an opioid and the

16       benzodiazepine.  That's the hypothetical.

17   A   Okay.

18   Q   Do you believe in that hypothetical that 2- or 300

19       doctors or prescribers are writing prescriptions

20       not for a legitimate medical purpose?

21           MR. ELSNER:  Objection.

22   A   No.

23     BY MR. BUSH:

24   Q   Would your answer to that question be the same for

25       the Trinity, if you -- hypothetical is that several
```

1     hundred doctors in the two counties write

2     prescriptions for the Trinity that flag on your two

3     Trinity red flags.  And do you believe that that

4     many doctors writing those prescriptions are

5     writing them for -- not for a legitimate medical

6     purpose?

7         MR. ELSNER:  Objection.

8  A   My first answer is yes.  The second answer would be

9     perhaps the prescriber was incompetent and didn't

10    realize that that was not a legitimate medical

11    purpose, but overall the answer would be yes, those

12    are not issued for legitimate medical purposes.

13   BY MR. BUSH:

14  Q   And, to your knowledge, are there any proceedings

15     in Ohio to discipline the 2- or 300 doctors in my

16     hypothetical who were writing prescriptions that

17     trigger on your Trinity red flags?

18        MR. ELSNER:  Objection.

19  A   Not that I'm aware of, but in a hypothetical, I

20    would just suspect that there probably would be

21    some.

22   BY MR. BUSH:

23  Q   But you don't have any knowledge as you sit here

24     today whether there's even one disciplinary

25     proceeding against a doctor for writing that

Page 241

1      particular combination, do you?

2           MR. ELSNER:  Objection.

3   A   Not in a hypothetical, I don't.

4     BY MR. BUSH:

5   Q   Well, in actual life, you don't have -- forget the

6       hypothetical aspect of it.  You don't know if any

7       prescriber who is being disciplined in Ohio for

8       writing the combination -- the Trinity combination

9       that your red flag flagged?

10  A   If you could identify them, I could help you with

11      that, but I know Dr. Volkman was disciplined for

12      writing that combination in Ohio.

13  Q   We're talking about the two counties, Lake and

14      Trumbull County.

15  A   I don't have any knowledge of that, sir.

16  Q   Let me ask you about next red flag, which is two

17      short-acting -- hold on.  I've got to find it.

18          So this is the red flag that is identifying

19      two short-acting opioids on the same day, and

20      that's at page 41, I believe, of your report.

21          Are you with me?

22  A   Yes, sir.

23  Q   Okay.  I have, I think, only a couple of questions

24      on this one.

25          Do you know whether in order to identify the

```
 1        numbers of prescriptions that flag under this
 2        particular flag, it is necessary to refer to a
 3        prescription that is excluded from your
 4        computations because of the changes you made after
 5        the judge's order?
 6            MR. ELSNER:  Objection.
 7   A    No, I don't, sir.
 8     BY MR. BUSH:
 9   Q    Okay.  So you don't know how Mr. McCann actually
10        calculated these and whether he relied on both
11        prescriptions that are in the universe of
12        prescriptions that you were purporting to red flag
13        in addition to prescriptions that are outside of
14        that universe because of your reaction to the
15        judge's order?
16            MR. ELSNER:  Objection.
17   A    I know Mr. McCann is an expert witness in this
18        case, and he would be better able to answer that
19        question.  I can't answer that question, sir.
20     BY MR. BUSH:
21   Q    I take it you did not instruct him not to use any
22        prescriptions that were excluded from consideration
23        by the plaintiffs' decision about how to deal with
24        the judge's order?  You didn't instruct him in that
25        way at all?
```

Page 243

1         MR. ELSNER:  Objection.

2    A    I gave no instructions to Mr. McCann, but I'd

3         assume that he would follow the order of the Court

4         and it wouldn't be a necessary direction to give to

5         him.

6      BY MR. BUSH:

7    Q    Let's take a look at your red flags under excessive

8         dispensing, which I think begins on page 43.  And

9         as I understand this -- and I'm going to direct

10        your attention to page 45 of your report.  It says

11        you've done two different calculations here.  A

12        patient was dispensed and opioid prescription of

13        over 200 MME per day before 2018 or over 50 MME per

14        day after January 1st 2018, right?

15   A    Yes, sir.

16   Q    And then you've also done a calculation of

17        prescriptions when a patient was dispensed an

18        opioid prescription over 200 MME per day before

19        2018 and 90 MME per day after January 1st, 2018,

20        right?

21   A    Yes, sir.

22   Q    Why did you use 2000 MME as the test through 2017?

23        MR. ELSNER:  Objection.

24   A    200 MME, sir not 2000.

25     BY MR. BUSH:

Page 244

1   Q    I'm sorry, I misspoke.  Let me ask it again.

2        Why did you use 200 MME for these two red

3        flags through 2017?

4   A    That was a guideline issued by the Centers for

5        Disease Control.

6   Q    And where was that issued?  In what document does

7        that show up?

8   A    It is in the -- probably the list of documents,

9        but -- I can go through and try to find it.  But it

10       was something that the CDC released from their

11       website and on their website.

12  Q    Okay.  And why did you use 50 MME in one of these

13       red flags and 90 MME in the other?

14  A    Again, the CDC published information that indicated

15       that the dosage for opioids because of their

16       accessibility to harm needed to be lowered for the

17       200 down to the 50 and even the 20 in some cases.

18  Q    Do you agree that 200 MME per day was considered a

19       safe dosage prior to 2018, given the guidance that

20       you're referring to?

21       MR. ELSNER:  Objection.

22  A    Based upon the information, people thought that was

23       a safe dosage, yes, sir.

24     BY MR. BUSH:

25  Q    And then after 2000 -- as you say, after 2017, that

Page 245

1        guidance changed and the consensus was that safe

2        dosage was 50 MME per day?

3   A   50 or 90 MME, sir.

4   Q   Was that because there's difference guidance that

5        had different standards or was 50 applied in one

6        set of circumstances and 90 applied in another or

7        some other reason?

8   A   If I can refer you to my report on page 44, the

9        first full paragraph.  I think it's the second

10       sentence that said "Compared with dosages of 1 to

11       less than 20 MME per day, dosages of 50 to less

12       than 100 MME per day were found to increase risk

13       for opioid overdose by factors of 1.9 to 4.6 with

14       absolute risk differences approximation of

15       0.15 percent for fatal overdose and 1.4 percent for

16       any overdose.  Dosages of 100 MME or more per day

17       were found to increase risk for opioid overdose by

18       factors of 2.0 to 8.9, relative to dosages of 1 to

19       less than 20 MME per day with absolute risk

20       differences approximation of 0.25 percent for fatal

21       overdose and 4.04 percent for any overdose."

22           It continues and it's referenced there as

23       Footnote Number 94.  And that's why the

24       determination was made.  And that references the

25       CDC guideline for prescribing opioids for chronic

1      pain, United States, 2016.

2   Q  So the studies that you just read about did not

3      really set the standard that you used here, because

4      they're talking about different MME per-day dosage

5      limits.  The standard was set -- and I'm asking

6      you -- for your purposes by the CDC guidelines in

7      2016?

8   A  Based upon my experience and my involvement in

9      these issues, I used that 90 MME as a guideline for

10     red flags in my report and what pharmacists should

11     use as a guideline as well.

12  Q  Was that what you understood was in use throughout

13     the medical profession by prescribers in deciding

14     what dosage levels to prescribe?

15  A  It's what should have been in place for prescribers

16     based upon the literature and based upon

17     recommendations from the CDC.

18  Q  So it's what should have been but not what was in

19     place.

20         Is that what you're saying?

21  A  I didn't say it was not.  I don't know if it was or

22     not.  I just know what the recommended standards

23     were and should be.

24  Q  Okay.  Did you review the particular drugs that

25     were flagged by these two red flags, 10 and 11?

Page 247

1           MR. ELSNER:  Objection.

2    A    I know that if it contained -- if it was an opioid

3         and contained an opium or the measure for an MME,

4         it was a drug included, but I'm not sure whether

5         the combination was -- how that was divided up.

6      BY MR. BUSH:

7    Q    And would you agree that some forms of the drug are

8         less likely to be diverted than others?

9    A    No.

10   Q    So a patch is just as easily diverted as a pill?

11   A    If a potential for abuse for those products is the

12        same because they are in Schedule II, then any

13        product in Schedule II has the same abuse potential

14        and abuse for diversion, same if it was in a

15        Schedule III.  So if those products were comparable

16        on those schedules, they would have the same

17        comparable risk.

18   Q    So you're making no independent judgment about

19        this.  You're just saying if they are on the same

20        schedule, then they are equally likely to be

21        diverted?

22   A    That's what the schedules are for, sir.  That's how

23        they were devised and the purpose for the

24        schedules.

25   Q    Do you know whether patches are more easily or more

```
 1        difficult -- do you know whether patches are more

 2        difficult to divert?

 3            MR. ELSNER:  Objection.

 4    A   I don't know, but I know the fentanyl patches are

 5        the more deadly and have killed probably

 6        percentagewise more people than some of the other

 7        opioids.

 8      BY MR. BUSH:

 9    Q   Are you aware that the FDA has found that there's

10        no maximum dose for opioid analgesics because

11        there's no ceiling effect for the analgesia?

12    A   I was not aware of that, sir.

13    Q   So you don't agree or disagree with that?

14            MR. ELSNER:  Objection.

15    A   I'm not aware of it, sir.  I really can't say

16        whether I agree or disagree.  I would have to see

17        that whole study, see where you're taking that

18        from, and see what the other information was for me

19        to render an opinion.

20      BY MR. BUSH:

21    Q   Do you agree that there are some conditions that

22        require higher doses of opioids and higher MMEs

23        like cancer?

24    A   Yes, sir.

25    Q   Hospice care?
```

1    A    Yes, sir.

2    Q    Sickle cell anemia?

3    A    Yes, sir.

4    Q    So let me ask you a question about what you

5         characterized as a pattern prescribing.  And I

6         think your report on this begins on page 47 -- 46.

7    A    I see.

8    Q    So in particular, on these same hour prescribing,

9         which is described on page 47, it says "An opioid

10        was dispensed to at least three different patients

11        within an hour and the opioid prescriptions for the

12        same base drug, strength, and dosage form were

13        written by the same prescriber."

14            Do you see that?

15   A    Yes, sir.

16   Q    How was the time decided, the one-hour time

17        decided?

18   A    That was something that was addressed by

19        Mr. McCann.

20   Q    Do you know how he did it?

21   A    No, sir.

22   Q    Do you know what data fields he used to do it?

23   A    No, sir.

24   Q    Do you know whether he made any assumptions about

25        times because the data really wasn't in the data

```
 1        fields for him?
 2             MR. ELSNER:  Objection.
 3   A    No, sir.
 4     BY MR. BUSH:
 5   Q    And do you know what the data fields reflected in
 6        terms of the time -- what time is reflected in the
 7        data fields?
 8             MR. ELSNER:  Objection.
 9     BY MR. BUSH:
10   Q    Let me put it differently.
11             Do you know what's reflected in the data
12        fields for CVS as the time the prescription was
13        given to the pharmacist, the time the prescription
14        was picked up by the patient, or some other time?
15             MR. ELSNER:  Objection.
16   A    I don't know what the times were, sir.
17     BY MR. BUSH:
18   Q    So both of these prescription -- excuse me.  Both
19        of these red flags talk about prescribing to a
20        number of different patients, either in the case we
21        were just talking about, within an hour, or with
22        respect to the first pattern prescribing red flag,
23        four different patients on the same day.  Can you
24        think of any situations where it would be
25        appropriate for a prescriber to write the same
```

```
 1          prescription for multiple of his patients?
 2     A    Very rare circumstances, sir.
 3     Q    But you can think of some?
 4     A    Very limited.
 5     Q    What are they?  What can you think of?
 6     A    If a patient had a vitamin deficiency and the
 7          prescriber wrote for multiple patients to take the
 8          same multivitamin, that would be one instance.
 9     Q    How about for opioid prescriptions?  Can you think
10          of any reason that you'd give the same prescription
11          to multiple patients for opioid?
12     A    No, sir.
13     Q    How about if you have a surgical practice and you
14          do a kind of routine surgery?
15     A    Again, I think it's possible, but in looking at
16          opioid and how the abuse potential differs for each
17          patient, and the assessment should be done of that
18          patient's potential, it's hard for me to conceive
19          that every patient should receive the same
20          quantity, the same strength, and the same number of
21          opioids.
22     Q    So if we had a medical professional come in and say
23          there are situations in which you would have a
24          practice or a physician who prescribed fairly
25          consistently the same opioid prescription for his
```

1      patients because they are all getting the same

2      treatment, would you disagree with that?

3          MR. ELSNER:  Objection.

4  A   I would say that's probably -- that's not

5      appropriate therapy and probably one of the main

6      reasons why we have such a big problem with opioids

7      today.

8    BY MR. BUSH:

9  Q   So you think that doctor ought to be disciplined?

10         MR. ELSNER:  Objection.

11  A   If he violated the laws in that state and also what

12      the DEA notes would conclude, most certainly, yes,

13      sir.

14    BY MR. BUSH:

15  Q   So one of the -- withdrawn.

16         These red flags are based on when the

17      prescription is dispensed, right, dispensed from

18      the same day or within an hour, right?

19  A   I believe so, sir, yes.

20  Q   So this is going to capture patients who got

21      prescriptions written on different days but

22      happened to fill them on the same day, right?

23  A   Yes, sir.

24  Q   And this is another series of red flags where I

25      have to ask you whether or not you used

```
 1      prescriptions from the original red flags that

 2      you've now eliminated from your red flags analysis

 3      in order to meet the four-plus patient test or

 4      three-plus patient test in red flags -- these two

 5      red flags.

 6          MR. ELSNER:  Objection.

 7    BY MR. BUSH:

 8  Q   I take it you're going to tell me you don't know?

 9  A   I will give you the same answer.  I would assume

10      that they did, but I don't know for certain, sir.

11  Q   But you would assume that they were using in order

12      to get -- let's pick four patients on the same day

13      with the same prescription -- that they are using

14      some prescriptions that were in your original red

15      flag analysis but are no longer in your red flag

16      analysis in order to get to four?

17          MR. ELSNER:  Objection.

18  A   I would say again, I don't know, and I think that

19      that would be violative of what the court order

20      was, so I don't think they would be able to do

21      that, sir.

22    BY MR. BUSH:

23  Q   Okay.  And same answer for the three-plus patient

24      test for -- excuse me -- Red Flag 13?

25          MR. ELSNER:  Objection.
```

Page 254

1    A    Okay.

2     BY MR. BUSH:

3    Q    Have you given any thought to how CVS or any of the

4         other pharmacy defendants would actually

5         operationalize these tests to know whether four

6         patients are filling on the same day from the same

7         prescriber?

8    A    Yes, sir.

9    Q    How would they do that?

10   A    They could build alerts into their dispensing

11        system so that if a red flag manifested, they would

12        be able to then to alert the pharmacist, and the

13        pharmacist would be able to pause in that process

14        and conduct due diligence.

15   Q    And do you know whether the systems that these

16        pharmacy companies have are able to have this

17        information available in real-time in the sense

18        that the minute I fill a prescription, it's already

19        in the system and somebody else can see it

20        immediately?  Do you know whether that's possible?

21             MR. ELSNER:  Objection.

22   A    I don't know if it's possible for all the

23        defendants, sir, no.

24     BY MR. BUSH:

25   Q    And does this -- do these red flags flag all of the

1   prescriptions that are in the combination of four

2   or three, as you understand it?

3 A  As I understand it, yes, sir.

4 Q  They do.

5    But the pharmacist who fills the first three

6   prescriptions or the pharmacy company that fills

7   the first three prescriptions -- withdrawn.

8    The pharmacy company that fills the first

9   three of the prescriptions in your red flag that

10   requires four doesn't know that there's going to be

11   a fourth prescription coming in, right?

12    How can they not fill those first three

13   prescriptions?

14 A  If they don't have the information and don't fill

15   it, when the fourth prescription is filled, they

16   then know and know that they shouldn't fill any

17   more prescriptions for that patient.

18 Q  Right.  But the first three they should have

19   filled, because they haven't hit four yet, right?

20 A  Unless there were other red flags associated with

21   that prescription.

22 Q  Well, let's focus on this red flag.  On this red

23   flag, if they didn't know about the fourth, they

24   should have filled the first three, right?

25    MR. ELSNER:  Objection.

1    A    Hypothetically, yes, sir.

2       BY MR. BUSH:

3    Q    And that's also true for the three-plus within one

4         hour?  If they haven't gotten the third, they go to

5         fill the first two?

6            MR. ELSNER:  Objection.

7    A    Same logic, same reply, sir.  But once they fill

8         the fourth prescription, all four of those

9         prescriptions are not for a legitimate medical

10        purpose.  That should be noted by the pharmacy and

11        by the company.

12      BY MR. BUSH:

13   Q    What can the pharmacist do about that?

14   A    They can alert the board of pharmacy.  They could

15        provide notices and documentation of the patient

16        and prescriber's file.  They could also notify the

17        DEA.

18   Q    How do they know it's not for a legitimate medical

19        purpose?  You yourself have said that some of these

20        prescriptions in all of your red flags are probably

21        written for a legitimate medical purpose.  So just

22        because it happens to flag, that doesn't mean it is

23        not written for a legitimate medical purpose,

24        right?

25            MR. ELSNER:  Objection; mischaracterizes the

Page 257

1      testimony.

2           You can answer.

3    A   So in your hypothetical, you said that they had

4        reached the tenet of four prescriptions that would

5        verify and credential that as a red flag and

6        problematic.  So if it's credentialed by those four

7        prescriptions, then the pharmacist's due diligence

8        would occur and probably ascertain that it was not

9        for a legitimate medical purpose.

10     BY MR. BUSH:

11   Q   There's nothing they can do the get the

12       prescriptions back, the ones that they filled

13       before it hit four, before it hit three?

14   A   No, sir.

15   Q   So let's look at the red flag.  It's a 210-day

16       supply in a six-month period.  So that begins I

17       think on page 49.

18           Are you with me?

19   A   Yes, sir.

20   Q   Would you agree that this kind of a pattern is

21       likely to be for a patient who is on some kind of

22       long-term opioid therapy?

23   A   For the exceptions that you presented before, a

24       cancer patient, a hospice patient, yes.

25   Q   Could it be for a chronic pain patient?

Page 258

```
 1    A    It's not recommended for chronic pain patients.

 2         The literature says that there should be nonopioid

 3         treatment as well as nonmedication treatment for

 4         that type of chronic pain.

 5    Q    All right.  But is it -- is it your opinion that a

 6         course of opioid therapy that goes on for a

 7         six-month period is -- to treat chronic pain is not

 8         for a legitimate medical purpose?

 9    A    No.  It's something that has to be closely

10         monitored, and it's outside the recommended

11         dosages, and the pharmacist would have to resolve

12         that in order to protect the patient from harm or

13         addiction.

14    Q    Right.  But it's still written for a legitimate

15         medical purpose?

16    A    In the context, yes, sir.

17    Q    And in a situation like this, a pharmacist,

18         especially in the metrics that we're using here,

19         because this is all based on each individual's --

20         individual defendant's dispensing data, the

21         pharmacist would have filled prescriptions each

22         month during this period for the person who was

23         getting this long-term opioid therapy, right?

24    A    Yes, sir.

25    Q    And he or she would know who the prescriber was,
```

```
 1        right?

 2             MR. ELSNER:  Objection.

 3   A    If the information was entered correctly, yes, sir.

 4     BY MR. BUSH:

 5   Q    And you can see if the dosage or the drug

 6        formulation had changed during that period of time

 7        in any way that caused concern or if it had

 8        remained stable, right?

 9             MR. ELSNER:  Objection.

10   A    I'm sorry.  Could you explain it further?  I didn't

11        follow that.

12     BY MR. BUSH:

13   Q    Okay.  The pharmacist who's filling prescriptions

14        over this six-month period would see if the dosage

15        changed during the period, right?

16             MR. ELSNER:  Objection.

17   A    Correct, yes, sir.

18     BY MR. BUSH:

19   Q    And would also see if the form -- the form of the

20        drug had changed?

21   A    I'm sorry.  What do you mean by "form of the drug"?

22   Q    They took a different strength of the drug or --

23   A    Oh.

24   Q    Yeah.

25   A    Yeah.  That would be information provided to the
```

Page 260

1    pharmacist.

2    Q    And all of this information is available to the

3         pharmacist in the normal course by looking at the

4         patient profile, right?

5              MR. ELSNER:  Objection.

6    A    Depending on the system, yes, sir.

7      BY MR. BUSH:

8    Q    And in this particular red flag, somebody could be

9         on a long-term course of therapy with opioids, and

10        if they're -- the prescription, the last

11        prescription they got happened to be two days

12        before the end of the 210-day supply metric, it

13        would flag under your red flag analysis, right?

14             Not -- not following me?

15   A    I'm sorry, sir.  I -- I'm trying to --

16   Q    I'm probably not asking you a good question.  Let

17        me ask --

18   A    Prior to that time, there would be a red flag for

19        the pharmacist to look at that patient's therapy

20        because Ohio law requires when dispensing opioids

21        that a physical and psychological assessment and

22        monitoring be done throughout the process.

23             So anything that reached more than the three

24        months or four months or five months, the

25        pharmacist would -- should be monitoring and having

1    discussions with the prescriber and patient.

2  Q   Okay.  Let's leave that aside for a minute.  Now I

3    just want to focus on what triggers the red flag

4    here, and I'll try and ask a better question about

5    this.

6       So if somebody is getting a monthly

7    prescription for long-term opioid therapy, and the

8    last prescription that he gets happens to be a

9    couple of days before the 210 days' supply expires,

10   that's going to trigger this red flag, right?

11  A   I'll try to give you a better answer.

12  Q   Okay.

13  A   Yes, for purposes of the aggregate data, yes.

14  Q   Okay.  And it might be nothing more than an anomaly

15   that it was filled or presented two days before the

16   end of the 210th day period.  It's really just a

17   continuation of the long-term opioid therapy.  It's

18   not a red flag?

19      You would agree with that?

20  A   I think anything's possible.  That's a possible

21   scenario.

22  Q   Let's look at the last red flag you have here,

23   which is Red Flag 16.  It's when a patient pays for

24   an opioid prescription with cash, right?

25  A   Yes, sir.

Page 262

1    Q    Are there reasons that a patient may pay in cash?

2         Good reasons?

3    A    I'm sure there are, sir, yes.

4    Q    Can you tell me ones you can think of?

5         MR. ELSNER:  Objection.

6    A    One of the obvious would be if they don't have

7         insurance.

8      BY MR. BUSH:

9    Q    Okay.  Anything else?

10   A    That's all that immediately comes to mind.

11   Q    Okay.  One of the -- I think in your report, you

12        say that "The likelihood of diversion increases in

13        circumstances in which the patient pays for an

14        opioid prescription with cash when they otherwise

15        have insurance."

16        Do you see that?  I'm sorry.  It's on page 50

17        of your report.

18   A    Yes, sir.

19   Q    All right.  This Red Flag 16 did not identify

20        situations where the person who paid with cash did

21        have insurance, correct?

22   A    Correct.

23   Q    It's all cash payments, whether you have insurance

24        or not?

25   A    Yes, sir.

 1   Q    Do you understand that sometimes people pay in cash

 2        because -- who have insurance because the co-pay is

 3        more than the cash price?

 4             MR. ELSNER:  Objection.

 5   A    I wasn't aware of that.  My thinking was similar to

 6        CVS' on page 51 that says "Cash payments for

 7        prescription particularly if RxConnect indicates

 8        the patient has insurance," that's one of the red

 9        flags that CVS was concerned about.  So I share the

10        same thoughts as CVS did in that regard.

11     BY MR. BUSH:

12   Q    Right.  But I asked -- you've already agreed with

13        me that this red flag flags people who don't have

14        insurance, right?

15   A    That was what I said, yes, sir.

16   Q    And I'm asking a different question, which is

17        where -- do you understand that there are

18        circumstances where a person who has insurance

19        might want to pay the co-pay in cash because -- I'm

20        sorry.  Wrong.  Withdrawn.

21             There are circumstances in which the -- a

22        patient with insurance might want to pay in cash

23        because the co-pay on the insurance is greater than

24        the cash payment?

25             MR. ELSNER:  Objection.

Page 264

1    A    Yeah.  I'm not aware of that, sir.  I'm not that

2         involved in co-pays --

3      BY MR. BUSH:

4    Q    Okay.

5    A    -- to understand --

6             MR. ELSNER:  Carmen, were you finished with

7         your answer?

8             THE WITNESS:  Yes.

9      BY MR. BUSH:

10   Q    All right.  Do you know what cash discount card

11        programs are?

12   A    I'm familiar with some of them, sir.

13   Q    Do you know whether or not people who paid cash in

14        the cash discount program are included in this cash

15        red flag analysis?

16   A    I don't know for certain, sir.

17   Q    Would you agree with me that a person who has a

18        cash discount card is very likely not to have

19        insurance and so has the cash discount card in

20        order to get a discount on his cash payments for

21        prescriptions?

22             MR. ELSNER:  Objection.

23   A    No, sir.

24      BY MR. BUSH:

25   Q    You would not agree with me on that?  Why not?

Page 265

1    A    I don't have enough information to know that people

2         using a cash discount card and the purposes for

3         doing so.  I am aware of individuals that use a

4         cash discount card even though they do have

5         insurance.

6    Q    Okay.  Do you have any idea what percentage of

7         people who have cash discount cards also have

8         insurance?

9    A    No, sir.

10   Q    Do you know who provides the cash discount card?

11            MR. ELSNER:  Objection.

12   A    Not specifically, sir.

13     BY MR. BUSH:

14   Q    Do you know whether people paying with cash

15        discount cards require any adjudication of their

16        claim to be able to pay?

17   A    My understanding is that there is no adjudication,

18        and that is the reason why people pay cash for the

19        prescription or pay cash for the co-pays to avoid

20        that third-party examination that would reject the

21        prescription, but that's as far as my understanding

22        goes.

23   Q    I take it similar to the question I asked you

24        earlier, you've done no analysis to determine how

25        many people pay for nonopioid prescriptions with

```
 1        cash?

 2    A     Correct.

 3              MR. ELSNER:  Objection.

 4    A     No analysis, sir.

 5      BY MR. BUSH:

 6    Q     And you haven't -- so you haven't done -- made any

 7          effort to compare whether the percentage of people

 8          who pay for nonopioid prescriptions with cash is

 9          similar to the percentage who pay for opioid

10          prescriptions with cash?

11    A     The research that I did indicated that anywhere

12          between 87 and 90 percent of all people getting

13          prescriptions or all prescriptions are paid for

14          insurance.  So the percentage of nonopioid

15          prescriptions that are paid for in cash seems to be

16          highly unlikely or significantly less than what may

17          be paid for opioid prescriptions.

18    Q     What percentage of opioid prescriptions are paid

19          for in cash, as you understand it?

20              MR. ELSNER:  Objection.

21    A     I don't know, sir.

22      BY MR. BUSH:

23    Q     So how do you know whether the percentage for

24          nonopioids as you just answered is a lot less than

25          for opioids?
```

Page 267

1    A    It's significant enough of a number to be
2         considered a red flag and to be cited by DEA and
3         others in a number of cases.  So to me, that
4         indicates that probably the purchase of opioids by
5         cash is far more significant than the purchase of
6         nonopioids by cash.
7    Q    But you haven't done any investigation to figure
8         out whether your hunch is right?
9              MR. ELSNER:  Objection.
10   A    My hunch is more experience and observations, but I
11        have not done any analysis.
12      BY MR. BUSH:
13   Q    So on page 54, I think, on page 53 of your
14        supplemental report, Exhibit 2, at the bottom of
15        page you have the heading "Multiple Red Flags"?
16   A    Yes, sir.
17   Q    And you've spoken today a couple of times in the
18        answers to some of my questions about the
19        possibility that there would be other red flags in
20        addition to which red flag we were talking about.
21             My question here is, have you -- what kind of
22        an analysis, if any, have you done of what you're
23        calling multiple red flags here?
24   A    On page 54, the analysis by Mr. McCann indicates
25        how many prescriptions actually had two or more of

1         the 16 red flags.  And I think also contained in

2         this report, although I don't have it in front of

3         me, is a breakdown of how many of those

4         prescriptions had two or more, three, four, five,

5         and I think there was some prescriptions that

6         actually had ten or more red flags.

7    Q    And have you looked at which red flags were

8         triggered in order to get more than one?

9    A    No, sir.

10   Q    So you haven't, for example, figured out whether

11        some of the prescriptions that triggered the

12        multiple red flags -- excuse me -- some of the red

13        flags that triggered the multiple red flag analysis

14        were redundant?

15            MR. ELSNER:  Objection.

16   A    I'm not sure what you mean by "redundant" because

17        the analysis, I understand it, was that each red

18        flag would be counted separately.  So if it had

19        three or more red flags, those were three separate

20        red flags, not the same red flag counted twice.

21     BY MR. BUSH:

22   Q    For example, if you look at Red Flag 5 and 6, it's

23        a prescription opioid or benzo and a muscle relaxer

24        with overlapping day's supply and a prescription

25        opioid muscle relaxer, same day, same prescriber,

1    right?

2    A    Yes.

3    Q    So those are -- both of those red flags are going

4         to be triggered for all of the prescriptions red

5         flagged by Red Flag 6, right?

6    A    Yes, sir.

7    Q    One's a subset of the other.  Right?

8    A    I believe so, sir.

9         MR. ELSNER:  Objection.

10     BY MR. BUSH:

11   Q    And similarly, Red Flag 11, 200 MME per day before

12        2018 and 90 after, and Red Flag 10, which is the

13        same but 50 MMEs, those overlap.  Some of the

14        prescriptions that flagged for the -- all of the

15        prescriptions that flagged for the 50 MME are going

16        to also flag for the 90 MME, right?

17        MR. ELSNER:  Objection.

18   A    I can't comment.  I'm not sure.

19     BY MR. BUSH:

20   Q    But you didn't take that into account in deciding

21        whether or not multiple red flags -- or which --

22        you didn't take that into account in your multiple

23        red flag analysis?

24        MR. ELSNER:  Objection.

25   A    Red flag analysis was done by Mr. McCann.  I simply

1        identified the red flags and asked him to run the

2        data on those red flags.

3            MR. BUSH:  If we could take a break now.  I

4        don't know how long I've been going actually

5        because I haven't been paying attention to the

6        time.  But if you let me kind of collect my

7        thoughts here, I think I may be winding up.

8            MR. ELSNER:  That would be fine.

9            THE VIDEOGRAPHER:  We're off the record.

10           (A recess was taken.)

11           THE VIDEOGRAPHER:  We're on the record.

12           MR. BUSH:  Thank you.

13     BY MR. BUSH:

14  Q    Mr. Catizone, do you intend to do any further

15       analysis of multiple red flags after this

16       deposition to testify about it at trial?

17           MR. ELSNER:  Objection.

18  A    Not that I'm planning, sir.

19     BY MR. BUSH:

20  Q    And similarly to that question, we talked earlier

21       about the original red flag analysis that was done

22       and responded to in the plaintiffs' interrogatories

23       answers in 2020.  And obviously I don't mean to

24       mischaracterize what you said, but my understanding

25       of what you said was that you really had not looked

Page 271

```
 1          at that original analysis and it wasn't a part

 2          of -- or the basis for any of your opinions here

 3          today.

 4               First of all, did I characterize it generally

 5          correctly?

 6     A    Yes, sir.

 7     Q    And I believe they are the same, but just to put a

 8          bow on it, the red flag analysis in Mr. McCann's

 9          first report, I think it's Red Flags 17 through 43,

10          are essentially the same as those interrogatory red

11          flags.

12               Did you rely on the analyses in McCann's

13          report for Red Flags 17 through 43?

14     A    Just so that I can understand, the interrogatory

15          report that was mentioned referencing June of 2020,

16          that's a document I referred to that I did not pay

17          much analysis to.  But McCann's report, if it

18          included those, I looked at that report and

19          utilized the report -- or data from that report in

20          my report.

21     Q    Can you explain to us how you used the data and the

22          red flag analysis contained in McCann's report for

23          17 through 43.  Yours are 1 through 16.  So 17

24          through 43, how did you use those?

25     A    I'm sorry.  I used the data for 1 to 16 in my
```

1       report.  But I did look at the data from 17 to 43.

2   Q   And how did it inform your opinion on Red Flags 1

3       through 16?

4   A   I looked at it, but I'm not sure how -- what effect

5       it had on my opinion.

6   Q   Do you intend to do any further work on

7       Mr. McCann's red flag analyses 17 through 43 before

8       you testify in trial in this case?

9       MR. ELSNER:  Objection.

10  A   No, sir.

11   BY MR. BUSH:

12  Q   Did you make any effort when you looked at Red

13      Flags 17 through 43 to analyze how those red flags

14      related to your Red Flags 1 through 16?

15  A   No, sir, because what happened is, I approached the

16      red flags from my expertise and my background in

17      pharmacy and working with these types of

18      situations.

19      How Mr. McCann came up with his red flags and

20      the analysis he performed on those was not

21      something that I was aware of or knowledgeable of.

22      So I simply relied on my red flags and the data

23      analysis for that.

24      I looked at those data, but I did not make an

25      analysis of whether they were comparable or

Page 273

1        conflicting or had any impact whatsoever on the
2        data that I was using.
3   Q    So would it be accurate for me to say that you
4        don't sit here today and have an opinion what the
5        red flag analyses in 17 through 43 support your
6        analyses in 1 through 16?
7            MR. ELSNER:  Objection.
8   A    Yes, sir.
9     BY MR. BUSH:
10  Q    I'm correct when I say that?
11  A    Yes.
12  Q    Okay.  And you don't have any intent to go and try
13       and figure out the answer to that question between
14       now and the time you testify at trial?
15           MR. ELSNER:  Objection.
16  A    I'm just trying to still figure out what the
17       question is and yet alone get the answer, so the
18       answer is no.
19    BY MR. BUSH:
20  Q    So I want to run through hopefully quickly your Red
21       Flags Analyses 1 through 16 and ask you one or
22       probably just one question about each one.
23           So Red Flag Number 1, which is 25 miles from
24       the patient to the pharmacy, the patient address is
25       in the patient profile in -- that's on the CVS and

Page 274

```
 1        other pharmacy defendants' system, right?
 2            MR. ELSNER:  Objection.
 3   A    Yes.  From the sample data prescriptions that I
 4        looked at, that was -- that appeared to be the
 5        case, yes.
 6     BY MR. BUSH:
 7   Q    And the prescriber address is on the prescription,
 8        right?
 9   A    It's required on the prescription, sir, and --
10   Q    So for -- sorry.
11   A    Mr. McCann identified prescriptions in which there
12        was wrong addresses or made-up addresses for the
13        prescriber as well as for the patient.
14   Q    Right.  But for the vast majority of prescriptions,
15        leaving aside errors, the prescriber address is on
16        the prescription, right?
17   A    Yes, sir.
18   Q    All right.  So a pharmacist who is trying to
19        evaluate how far the patient is from a pharmacy or
20        the patient is from a prescriber has the address
21        data from which he or she could figure that out?
22            MR. ELSNER:  Objection.
23   A    They may have the data, but if they are a
24        pharmacist that's not familiar with the area and
25        they are a floater in that system, the addresses
```

Page 275

```
 1         may be meaningless to that pharmacist.
 2      BY MR. BUSH:
 3   Q    But they could figure it if they thought it was --
 4         if it looked odd and really needed to be
 5         investigated, they could figure it out, right?
 6   A    I suppose so, sir, yes.
 7   Q    And with respect to prescriptions with overlapping
 8         days -- and so this is doctor shopping and pharmacy
 9         shopping -- prescriptions with overlapping days in
10         two or more prescribers or two or more pharmacies,
11         that information is also in the patient profile and
12         on the prescription that's presented to the
13         pharmacist, right?
14   A    No, sir.
15   Q    Why not?
16   A    If those prescriptions were prescribed by
17         prescribers outside of that pharmacy chain or they
18         were filled at pharmacies outside of that pharmacy
19         chain, that information would not be available to
20         the pharmacist unless they queried the PDMP.
21   Q    And all of the prescriptions that you have flagged
22         in Red Flags 3 and 4 are based on the data from
23         each individual defendant's dispensing data.  So
24         that information would be available to the
25         pharmacist at CVS, Walgreens, Walmart, and Rite Aid
```

1       when they were looking at the prescriptions that

2       your red flags have flagged?

3          MR. ELSNER:  Objection.

4   A   Correct, for that data set.  When you asked the

5       question the first time, I thought you were

6       referring to generally.

7    BY MR. BUSH:

8   Q   And with respect to the combination red flags,

9       the -- this is, again, all based on the dispensing

10       data that comes from each individual defendant so

11       that the pharmacist for each individual defendant

12       will know whether or not a prescription -- sorry --

13       a prescription opioid, a benzo, and a muscle

14       relaxer has been prescribed to that patient?

15          MR. ELSNER:  Objection.

16    BY MR. BUSH:

17   Q   Right?

18   A   Yes, sir.

19   Q   And they'll also know whether a prescription opioid

20       or a benzodiazepine has been prescribed to that

21       patient because it's in their data?  It's in the

22       patient profile, right?

23   A   Yes, sir.

24   Q   And they'll also know when you -- for your

25       prescription -- sorry -- for your red flag for two

Page 277

1        short-acting prescription opioids on the same day,

2        that's going to be on the prescriptions that are

3        presented to the pharmacist to fill.  So she's

4        going to know that too?

5   A    Yes, sir.

6   Q    And she's also going to know that the patient is --

7        has been getting whatever MMEs per day for, you

8        know, up through -- or through 2018 and 50 MMEs per

9        day after or 90 MMEs per day after, so for Red

10       Flags 10 and 11, that information is on the

11       prescription, and it's in the patient profile,

12       right?

13            MR. ELSNER:  Objection.

14   A    It should be, and so the answer is yes, if it was

15       in there.

16     BY MR. BUSH:

17   Q    And if somebody presents a prescription that's an

18       early refill, which we didn't talk about that

19       specifically, but that information is also going to

20       be in the patient profile and on the prescription

21       that's being presented to the pharmacist.  So she's

22       going to have all that information when she's

23       deciding whether or not to fill that prescription,

24       right?

25            MR. ELSNER:  Objection.

Page 278

1    A    Yes, sir.

2      BY MR. BUSH:

3    Q    And she's also going to have the information on the

4         prescription and in the patient profile about

5         whether there's more than a 200-day supply in a

6         six-month period because that's all in her system

7         and on the prescription, right?

8    A    Yes, sir.

9    Q    And she's also for sure going to know that the

10        patient wanted to pay in cash?

11   A    Yes, sir.

12   Q    On page 60, if I can ask you to take a quick look

13        at that --

14            MR. ELSNER:  Page 60 of his report?

15            MR. BUSH:  Yeah, of your report.  Well, wait a

16        second.  Too many different versions of this

17        report.  Sorry, bear with me, almost done here.

18      BY MR. BUSH:

19   Q    Okay.  On -- yeah, it's on page -- yeah, it's on

20        page 60 of your supplemental report.  So that's

21        Exhibit 2.

22            And above the heading H, you have -- I'd like

23        you to look at that paragraph that's just above H

24        and --

25   A    Mr. Bush, there's no H on the page.

1    Q    Exhibit 2?  It's the supplemental report?

2    A    Is it a G?

3    Q    Sorry?

4         MR. ELSNER:  G.

5    A    Do you mean G instead of H?

6      BY MR. BUSH:

7    Q    On my copy, it's H.  Are you on page -- do you have

8         the supplemental report?  Make sure we're on the

9         same exhibit.

10   A    Yes, sir.  On page 60, it says G.

11   Q    What does -- what does it say?  What's the heading?

12   A    "Investigate, Resolve, and Document Resolution of

13        Red Flags."

14   Q    Huh.  That's very interesting.  I have a

15        supplemental report where that is what the heading

16        is, but it's H.  Might want to try and figure out

17        why that's true, but for the moment, let me ask you

18        the question.  Okay.

19            The paragraph above it -- and tell me if --

20        for some reason, this has gotten a little screwed

21        up in terms of the headings and everything, but on

22        my copy of your report, it says, "As a result of

23        these DEA enforcement actions -- "

24            Is that what it says about this heading on

25        your version of it?

1   A   Yes, sir.

2   Q   Okay.

3           "As a result of these DEA enforcement actions

4       related to defendants and other pharmacies for

5       failures to maintain effective controls to guard

6       against diversion and pharmacy practice as well as

7       warning from the DEA given to the defendants, one

8       would expect the number of drugs dispensed in the

9       face of red flags to have significantly declined

10      meaningfully over time."

11      You then go on to say, "However, a review of

12      annualized instances of red flags request

13      calculated by Dr. McCann did not reveal significant

14      reduction in the amount of prescriptions filled in

15      the face of red flags over time."

16      What did you review to reach that conclusion

17      in the final sentence that I just read?

18  A   When I looked at the prescriptions that were

19      dispensed at the beginning of the process and the

20      red flags, so the early days, early years, and then

21      at the end, the number of prescriptions with red

22      flags didn't diminish significantly.

23  Q   All right.  And did you look at any particular

24      exhibit or appendices or table that Dr. McCann or

25      Mr. McCann created to reach that conclusion?

1   A     It was in his report, and I don't have a copy of it

2         to give you a specific example, but it was in his

3         report as I looked at all the numbers.

4   Q     One second.

5             MR. BUSH:  Jason, can you put up -- it's in

6         our exhibit folder.  It's CVS 7.  The first page of

7         it is Appendix 14.  Yeah.

8             And, Mr. Catizone, yeah, you can open the --

9         go ahead and open the packet for that.

10            MR. ELSNER:  I'm sorry.  I missed it.  What

11        was the number, Graeme?

12            MR. BUSH:  CVS 7.

13     BY MR. BUSH:

14  Q     Let me know when you have that.  And I'm not quite

15        sure whether Jason is going to be able to pull this

16        up or not.

17            Do you have it in front of you?

18  A     Yes, sir.

19  Q     So this is -- let's mark this as whatever the next

20        exhibit is.

21            THE REPORTER:  It will be 15.

22            (Exhibit 15 was marked for identification.)

23     BY MR. BUSH:

24  Q     Just for the record, what I have done is excerpted

25        from Appendix 14 of Mr. McCann's supplemental

Page 282

1          report the three pages that are behind the cover

2          page that says Appendix 14.  And I think I'm just

3          going to focus your attention on the first page.

4               But that appears to be all defendants'

5          combination red flag prescription summary, Lake

6          County and Trumbull County, red flag computation 1

7          through 16 in number of prescriptions.

8               Did I read that accurately?

9     A    Yes, sir.

10    Q    Okay.  And I mean, we can do this one by one, but

11         let's see if we can just do this in summary

12         fashion.  It looks to me, Mr. Catizone, that the

13         high point for the number of prescriptions that's

14         flagged on most of these red flag prescriptions 1

15         through 16 was 2011.  And for Red Flag 4, it was

16         2012.  And there's an anomaly -- I don't completely

17         understand -- for Red Flag 12 where it actually

18         piqued later.  If you'd look down, 2011, through

19         all of these red flags and then look thereafter and

20         tell me if you agree that with the exceptions I

21         noted, Red Flag 4 and Red Flag 12, the high point

22         for prescriptions that flagged was in 2011.

23              MR. ELSNER:  Objection.  I think you're -- I

24         object to using this chart to reach the conclusions

25         you're trying to reach and associate with his

Page 283

1      report.  But you can continue.

2   A    Mr. Bush, if I can answer that in the context of

3        which you began the question.

4             So in my report, I noted that in 2010, there

5        was a meeting with the DEA, and after that meeting,

6        I would expect the prescriptions to decrease.  If

7        you look at the data in the column mentioned 2010

8        for all the defendants under the red flags and then

9        look at the columns for 2011 and 2012, you'll see

10       that in some cases after that meeting with the DEA,

11       those red flag numbers actually increased and

12       stayed high all the way through to about, oh, 2016,

13       2017, or so.

14            So based upon when the DEA interacted with the

15       defendants is when I would have expected a

16       precipitous drop from prescriptions in those

17       subsequent years, 2011, 2012, in case -- the

18       opposite, just as you said, 2011 was the high point

19       even after a meeting with the DEA.

20     BY MR. BUSH:

21   Q    Let's look at this --

22   A    That's what I get by my analysis from my --

23   Q    You didn't actually say anything in that paragraph

24        I read you about 2010.  You said "As a result of

25        DEA enforcement actions related to the defendants

Page 284

1    and other pharmacies" and then you go on.  And you

2    say you would have expected the number of drugs

3    dispensed in the face of red flags to have

4    significantly declined meaningfully over time.

5         So over time would include, you would agree

6    with me, would you not, all the way through to

7    2018, 2019?

8   A   Correct.  But --

9        MR. ELSNER:  Objection.

10  A   -- the paragraph did mention 2010.  I said "After

11      the DEA executed administrative inspection warrants

12      at CVS stores, interviews with CVS pharmacies, the

13      pharmacists in charge of one store asked about the

14      staggering amounts of oxycodone dispensed in CVS's

15      20 -- December 27 meeting with the DEA and the

16      pharmacist was unfamiliar with multiple red flags."

17       So my reference in that last paragraph was

18      back to all the activities that occurred between

19      CVS and the DEA in 2010.

20    BY MR. BUSH:

21  Q   You would agree with me that over the time period

22      of 2011 to 2019, the number of prescriptions that

23      flagged on your red flags -- not accepting them as

24      valid red flags, but the number of prescriptions

25      that flagged on your red flags decreased

Page 285

1      meaningfully in some cases by more than 50 percent?

2           MR. ELSNER:  Objection.  Mischaracterizes the

3           document and the chart.

4  A    I would say that the prescription volumes decreased

5           and did not decrease significantly until 2019.

6    BY MR. BUSH:

7  Q    So you would say going from -- I'm sorry -- from

8           4,000 for flag 1 to roughly 2,000 in 2016 was not

9           meaningful?

10          MR. ELSNER:  Objection.

11 A    Not over a five-year period after the DEA had

12          warned and taken action against CVS, to take

13          five years to get to one-half the number is not a

14          meaningful decrease in my opinion.

15   BY MR. BUSH:

16 Q    And for flag 5 to get to less than half by 2016,

17          almost half by 2015, not a meaningful decrease in

18          your book?

19          MR. ELSNER:  Same objection.  Misstates --

20 A    Not over the time period and based upon the

21          interactions with the DEA.

22          MR. BUSH:  Okay.  I'm going to -- let me just

23          take a quick look and see if I've forgotten

24          anything.

25          Brian, you're up.

```
 1          Mr. Catizone, thank you very much for your
 2      time.
 3          THE WITNESS:  Thank you, Mr. Bush.
 4   CROSS-EXAMINATION
 5     QUESTIONS BY MR. BRIAN SWANSON:
 6   Q    Mr. Catizone, how are you?
 7   A    I'm fine, sir, and yourself?
 8   Q    Good, thank you.  I'm not sure I introduced myself
 9        before.  I'm Brian Swanson, and I represent
10        Walgreens in this matter.
11          I want to cover with you today and into
12        tomorrow two things.  The first is I want to talk
13        about your opinions regarding what you call the
14        standard of care and corporate responsibility.  I
15        know you've touched on that in response to some of
16        Mr. Bush's questions, but I want to take a bit
17        deeper dive there.  Okay?
18   A    Yes, sir.
19   Q    And then I also will have some questions specific
20        to my client Walgreens that I'll try to touch on at
21        the end of my questioning.
22          Does that sound fair?
23   A    Yes, sir.
24   Q    Okay.  So to set up those topics, I wanted to
25        return briefly to the NABP and your time there.  I
```

```
 1        think we've established maybe a couple times that

 2        from 1988 through May of 2020, you were the

 3        executive director and the CEO of NABP, true?

 4   A    Yes, sir.

 5   Q    When you were the executive director and the CEO,

 6        were you also a member of the NABP's executive

 7        committee?

 8   A    An ex officio member.  I was the secretary of the

 9        executive committee, sir.

10   Q    And what did that mean as an ex officio member?

11        Did you vote with the committee?  What were your

12        responsibilities?

13   A    I was responsible for the minutes of the meeting,

14        and I did not have -- I did not vote in any

15        proceedings.

16   Q    Did you participate in meetings, though, in

17        advising the executive committee and giving input

18        where it was appropriate?

19            MR. ELSNER:  Objection, vague.

20   A    Yes, sir.

21     BY MR. SWANSON:

22   Q    Okay.  So talking more generally about the NABP and

23        its role.  I just wanted -- I pulled out Exhibit 4,

24        which is your CV in this matter.  If you can find

25        it, great.  I'm not planning to quiz you on it.
```

Page 288

1        But in your CV, Exhibit 4, you talk about what you

2        refer to as the purpose of NABP.  It's right there

3        on the first page, second paragraph.

4           Do you see that?

5   A    Yes, sir.

6   Q    And you set out three different areas, according to

7        you, defining the purpose or the role of the NABP,

8        right?

9   A    Yes, sir.

10  Q    The first one you have there is to "assist the

11       state boards of pharmacy in protecting the public

12       health and welfare," right?

13  A    Yes, sir.

14  Q    And at the NABP, is it true that all 50 state

15       boards of pharmacies were members or participants?

16  A    All of the 50 states, the District of Columbia, and

17       all of the U.S. territories as well as provinces in

18       Canada, Australia at one time was a member,

19       New Zealand, Virgin Islands and Bahamas were

20       members of the NABP.

21  Q    So all those entities were members of NABP when you

22       were there, true?

23  A    Yes, sir.

24  Q    The second purpose you say is "to serve as an

25       information and disciplinary clearinghouse for the

1      interstate transfer of licensing among the state

2      boards of pharmacy."

3          Did I read that right?

4  A   Yes, sir.

5  Q   And can you tell me what that means, what the

6      purpose is there?

7  A   NABP was founded on this concept.  It's the

8      agreement among the states that they would work

9      together and share information through NABP so that

10     pharmacists seeking licensure in other states, the

11     states would be provided by information that was

12     centralized and reviewed by NABP.

13 Q   Okay.  So if I'm a pharmacist in Illinois and I

14     want to move my practice to Arizona, the NABP makes

15     that transition easier for me?

16 A   We'd provide background information on you to the

17     state for the state to make the ultimate decision.

18 Q   Got it.  And then the third purpose you have there

19     is to "provide model regulations in order to assist

20     the state boards of pharmacy with the development

21     of uniform practice, educational, and competency

22     standards for the practice of pharmacy," right?

23 A   Yes, sir.

24 Q   And I want to spend a little bit more time on, I

25     think, that aspect of NABP.  Is it fair to say that

Page 290

1        the NABP has the ability to influence state law and

2        policy around the practice of pharmacy?

3            MR. ELSNER:  Objection.

4    A   If you're referring -- what NABP does is provide

5        educational information about the laws.  And then

6        leaves the decision up to the local authorities or

7        the local legislature.

8      BY MR. SWANSON:

9    Q   Right.  But when you do that, when you provide that

10        information, you provide information that you think

11        is important to state boards regarding laws and

12        policies that the NABP would recommend the states

13        follow.

14            Would you agree with that?

15            MR. ELSNER:  Objection.

16    A   Regarding protection of the public health, yes,

17        sir.

18      BY MR. SWANSON:

19    Q   Yes, sir.

20            And so if there's an important law or policy

21        that the NABP, you and your team had sort of

22        thought about and you thought it was important, you

23        could go out and try to persuade the states to

24        adopt the NABP's policies, right?

25            MR. ELSNER:  Objection.

Page 291

1    A    Just so that I'm clear, because I know there's

2         distinction in law, NABP would not get involved in

3         any persuading or lobbying because of our

4         501(c)(3).  What we would do, though, is provide

5         information about that law or our opinion as to

6         whether or not we thought the law was helpful to

7         the state boards and protection of public health.

8         But we would not try to influence or sway the

9         states one way or the other, sir.

10     BY MR. SWANSON:

11   Q    But you might provide opinions about laws or

12        regulations that the state could adopt, for

13        instance, to address the prescription opioid abuse,

14        right?

15   A    Yes, sir.

16   Q    And as I understand it, one of the ways that NABP

17        would do that is by drafting and then distributing

18        model regulations to the various state boards,

19        true?

20   A    Somewhat, sir.  What we have is a model practice

21        act and regulations, which is a guide to the

22        states.  And anytime a new issue arose that was

23        incorporated into that document, that was NABP's

24        suggestion as to what might be a model law and

25        regulation.

Page 292

1    Q    Got it.  And so you and your team at the NABP, I

2         guess, at one point sat down and put together model

3         regulations, and then as time passes and you think

4         they need updating, you would provide those updates

5         to the state; is that accurate?

6    A    Yes, sir.

7    Q    And would these model regulations get updated

8         annually or just when a new issue popped up that

9         you thought was important to address to the states?

10              MR. ELSNER:  Objection.

11   A    That would depend on several factors.  One, if a

12        state presented that issue to NABP and asked for it

13        to be revised, if NABP identified a situation where

14        it needed to be revised, or whether at the local

15        district meetings or the annual meeting the states

16        collectively asked NABP to look at this issue or

17        revise the issue.

18      BY MR. SWANSON:

19   Q    But were there other -- were there ever times when

20        the NABP on its own through, you know, looking at

21        what was happening in the practice of pharmacy

22        throughout the country, said, you know, I think we

23        should update these model regulations and

24        distribute them to the states because I think the

25        states should be modifying their laws to better

 1        address a certain issue?

 2            Does that make sense?

 3   A    Yeah.  But in order for us to do that, it would

 4        have to go through a committee process, and then

 5        the ultimate committee would be the law enforcement

 6        and legislation committee, which is comprised of

 7        volunteer members from each of the states.

 8            That committee would have the final say as to

 9        whether or not that recommendation would be made to

10        the model act.

11   Q    All right.  When was the last time that the model

12        regulations were updated?

13            MR. ELSNER:  Objection.

14   A    Last year.

15     BY MR. SWANSON:

16   Q    And do the model regulations that we've been

17        discussing, do those reflect the views of the NABP

18        as far as the laws and policies that the NABP

19        believes the state should adopt?

20   A    Adopt based upon what may already be in place,

21        either in federal law or what the states may

22        already have in place, sir.

23   Q    Okay.  But it's the NABP's view that its -- that

24        its model regulations are sort of best practices in

25        the law and should be adopted or incorporated by

1       the states, right?

2   A   Twofold purpose.  One, best practices, two, not all

3       states are at the same place in terms of resources

4       or regulation.  So states that may be new to a

5       particular area of practice or regulation and may

6       need that assistance or that information or those

7       basics is another purpose as to why they are

8       included in the model act.

9   Q   Another thing that I've seen from the NABP

10      documents, we talked a bit about the model state

11      pharmacy act and the model rules.

12          I've also seen newsletters that the NABP

13      distributes periodically; is that accurate?

14   A   There's a couple of different newsletters.  So --

15   Q   Yes, sir.

16   A   Which one are you referring to, sir, just so I can

17      answer that correctly?

18   Q   Well, I was going to try to ask about them both

19      because I want to understand the difference.

20          I've seen State Board of Pharmacies

21      newsletters that are distributed periodically.  Are

22      you are familiar with those?

23   A   Yes, sir.

24   Q   And I notice at least in Ohio, you are the national

25      news editor and the executive editor of the Ohio

1        State Board of Pharmacy news, is that right, when

2        you were at NABP?

3    A   No, sir.  I'm the editor for the NABP portion of

4        that newsletter, which this inner two pages.

5            The outer two pages are prepared by the

6        individual boards, 35 states which participate in

7        the program, and usually the executive director of

8        that board, Steve Schlerholt in Ohio, would be the

9        editor of the Ohio information, the outer two

10       pages.

11   Q   Okay.  So for the Ohio board of pharmacy news,

12       State Board of Pharmacy newsletters, you were

13       responsible for the -- you said the inner two

14       pages?

15   A   Yes, sir.

16   Q   And you were the executive editor for those pages?

17   A   Yes, sir.

18   Q   And then for the outer pages, that was the head

19       honcho at the state agency was responsible for

20       those?

21   A   Or whoever the designee was, maybe the chief

22       elected officer or maybe chief compliance officer,

23       depending on the states, sir.

24   Q   And how would you decide what you were going to put

25       into the new -- the NABP was going to put into that

1      newsletter versus the states?

2          MR. ELSNER:  Objection.

3    A   Our information was what might be a timely issue to

4        advise a state if a product was pulled off a

5        market.  If the FDA or DEA changed the requirement

6        or regulation, that's the type of information we

7        put in the middle pages, something that would be of

8        interest and applicable across all states.

9      BY MR. SWANSON:

10   Q   Was your departure from the NABP voluntary?

11   A   Yes, sir.

12   Q   Why did you decide to leave?

13   A   After 35 years of 24 hours/7, I needed to spend

14       more time for me and my family, and I thought that

15       I was leaving NABP at a high moment and wanted to

16       leave at that point and make sure the association

17       was in good financial and structural position.

18   Q   Were you involved at all in the search for your

19       replacement at NABP?

20   A   Only in organizing the process, but I was not

21       involved in any of the decision-making interviews

22       or selection.

23   Q   So you didn't -- did you provide input to the board

24       of directors or the executive board as to what sort

25       of person they should look for in finding your

Page 297

1          replacement?

2     A    No, sir.

3     Q    Did you have any discussions with the board, not

4          you're providing input, but did they tell you what

5          they were looking for in your replacement?

6     A    No, sir.

7     Q    And the NABP, as I understand it, hired a

8          Dr. Lemrey Carter to replace you; is that right?

9     A    Yes, sir.

10    Q    And did you know Dr. Carter before he was

11         appointed?

12    A    I knew him from my interactions while he was at

13         Walgreens and later at CVS and then back at

14         Walgreens, yes, sir.

15    Q    And did he interact with the NABP in his -- when he

16         was with Walgreens and CVS?

17    A    At times he did, sir, yes.

18    Q    And through that interaction, do you have -- did

19         you get to know him at all?

20    A    I knew him professionally but not so much

21         personally, sir.

22    Q    Okay.  Well, professionally, did he have expertise

23         in pharmacy practice, in your view?

24              MR. ELSNER:  Objection.

25    A    It was not an area that I interacted with him to be

Page 298

1       able to make that decision.

2     BY MR. SWANSON:

3   Q   Okay.  So you don't know anything about his

4       expertise in, say, pharmacy operations either?

5   A   No, sir.  All that I knew is that he worked at

6       Walgreens and had some sort of responsibility for

7       all the Walgreens across the country.

8   Q   Okay.  And that's all you know about him?

9   A   That was the extent of it, yes, sir.  I didn't know

10      what he did specifically or what his

11      responsibilities were.

12  Q   Understood.

13          And you haven't spoken to Dr. Carter at all

14      about this lawsuit; is that right?

15  A   Except to advise him that I'm involved with it but

16      none of the particulars or facts.

17  Q   Okay.  And you're certainly not relying on anything

18      you learned from Dr. Carter in formulating your

19      opinions in this case, true?

20  A   No, sir, Dr. Carter and I meet for about three

21      minutes a week, and that's the extent of our

22      interactions.

23  Q   Got it.

24          Before I move off your CV, I just had a couple

25      of questions.  You said in your CV at page 2, you

```
 1        mentioned that you're a registered pharmacist, and

 2        then you say that you practiced in community

 3        hospital and institutional settings as a registered

 4        pharmacist throughout your career.

 5             Do you see that?

 6   A    Yes, sir.

 7   Q    Is that accurate?

 8   A    Yes, sir.

 9   Q    You talked a bit in response to earlier questioning

10        about your time in -- in a community pharmacy.

11        When did you last work in a hospital setting?

12   A    Probably back in 1990.

13   Q    And what about in an institutional setting?

14   A    The hospital pharmacy also had an institutional

15        setting as well.

16   Q    Understood.

17             When did you last dispense an opioid

18        prescription?

19   A    Probably back in 2004, sir.

20   Q    And have you ever dispensed an opioid prescription

21        that hit on any of the red flags that you now

22        identify in this lawsuit?

23   A    Not that I'm aware of, sir.

24   Q    Do you know one way or the other?

25   A    I would say based upon the diligence that I did in
```

```
 1          filling prescriptions, the answer would be no, but
 2          I couldn't say for certain.
 3   Q      Did you ever refuse to fill an opioid prescription?
 4   A      Yes, sir.
 5   Q      You're certain?
 6   A      Very certain.
 7   Q      And if we were to look at your dispensing
 8          practices, we would see that if you dispensed an
 9          opioid prescription, you would have documented any
10          diligence you conducted on that?
11   A      Yes, sir.
12   Q      Okay.  You understand, sir, that your role in this
13          litigation is as an independent expert and not as
14          an advocate for the plaintiffs, right?
15   A      Yes, sir.
16   Q      Okay.  So you're supposed to be independent and
17          apply your expertise, whatever that is, to the
18          facts of the case as presented to you, right?
19   A      Yes, sir.
20   Q      And you agree that we, the pharmacies, are entitled
21          to Carmen Catizone's opinions and not the opinions
22          of the plaintiffs' lawyers or other lawyers, right?
23   A      Yes, sir.
24   Q      It would be inappropriate for you to simply adopt
25          the plaintiffs' allegations or arguments and claim
```

```
 1        them as your own, right?
 2   A    Yes, sir.
 3   Q    Why would that -- why would that be inappropriate?
 4   A    If I did not feel that way and put that in the
 5        opinion, then I would not be objective, and it
 6        would not represent what I thought was right and
 7        what my opinion should say.
 8   Q    What we have in your report, Exhibit 2, are your
 9        words and your opinions and not those of the
10        plaintiffs' lawyers, right?
11             MR. ELSNER:  Objection.
12   A    There may be excerpts in there in which I took
13        information from documents, but everything that --
14        the final say was my writing and approved by me.
15     BY MR. SWANSON:
16   Q    Yeah.  But you already told us that if you quoted
17        something or pulled something from a document, you
18        told us that, right, in your report?
19             MR. ELSNER:  Objection.
20   A    I put -- yes, sir, I believe so.
21     BY MR. SWANSON:
22   Q    Okay.  Now, your report has -- looks like nearly
23        450 footnotes, right?
24   A    Yes, sir, I believe so.
25   Q    And the purpose of those footnotes is to provide
```

1      evidentiary support for the statements that you've

2      made, right?

3              MR. ELSNER:  Objection.

4  A    Yes, sir.

5    BY MR. SWANSON:

6  Q    And you're telling us that you've reviewed each and

7      every footnote that you put into your report to

8      make sure that it does support the statements that

9      you say they support, right?

10  A    Yes, sir.

11  Q    Okay.  You agree with me, don't you, sir, that the

12      pharmacists who work for the retail chain

13      pharmacies in this case, they don't prescribe

14      opioid medications, right?

15  A    Right, they do not prescribe.

16  Q    Correct.  We agree with that, right?

17  A    Yes, sir.

18  Q    Okay.  And the prescriptions at issue in this

19      lawsuit that you identify in your red flag

20      analysis, those were all written by doctors or

21      other practitioners who are registered with the DEA

22      to write prescriptions for controlled substances

23      including opioids, right?

24  A    They should be.  I believe some of them were not.

25  Q    Well, you're not offering any opinions that the

```
 1        pharmacies in this lawsuit dispensed doctors
 2        without DEA registration.  You haven't given that
 3        opinion, have you?
 4             MR. ELSNER:  Objection.
 5   A    No, sir.
 6     BY MR. SWANSON:
 7   Q    And those doctors who wrote those prescriptions
 8        that you identified in your red flag analysis, they
 9        were also licensed by the State of Ohio Board of
10        Medicine to write prescriptions for controlled
11        substances, right?
12             MR. ELSNER:  Objection.
13   A    That would be an assumption that I made.  I did not
14        verify that information, but I would make that
15        assumption.
16     BY MR. SWANSON:
17   Q    Well, and you also haven't said that the pharmacy
18        defendants were wrong because they were filling
19        scripts for doctors who didn't have licenses,
20        right?  You haven't provided that opinion, right?
21             MR. ELSNER:  Objection.
22   A    Correct.
23     BY MR. SWANSON:
24   Q    Now, Mr. Bush asked you some questions about
25        whether you had seen some info from the DEA
```

1        regarding, you know, the number of doctors out

2        there who trying to do right by their patients.  I

3        want to ask you directly, do you agree with me,

4        sir, that the vast majority of doctors in Ohio are

5        trying to do right by their patients and writing

6        prescriptions based only on legitimate medical

7        need?

8   A   I don't know how to quantify that.  I would say

9        there are a fair number of doctors that do exactly

10       as you say.  But because of the significance of the

11       opioid epidemic, I would also have to say there is

12       a significant number of doctors who weren't writing

13       prescriptions for legitimate medical needs.

14  Q   And have you done any analysis of that?  Can you

15       tell me what percent of the doctors out there in

16       Ohio you're going to come in and say were not

17       writing prescriptions based on legitimate medical

18       need?

19        MR. ELSNER:  Objection.

20  A   I can only base that on, Mr. Swanson, the number of

21       people that have died from overdoses, almost a

22       million people and the number of people that have

23       died in Ohio from that.  That's the basis for me

24       saying there had to be some causal relationship and

25       how did those opioids get out of the system for

Page 305

1          these individuals to take those and actually

2          overdose and die.

3     BY MR. SWANSON:

4     Q    You've mentioned a couple times these overdose

5          figures that you rely on.  Are those overdose

6          figures specific to prescription opioid drugs?

7     A    The numbers are -- yes, they reflect the opioid

8          overdose.

9     Q    Right.  But there are -- opioid overdoses can

10         include heroin, illicit fentanyl and other illegal

11         drugs.

12              You understand that, right?

13    A    Yes, sir.

14    Q    And so when I ask you the question, the numbers you

15         keep repeating, or that you provided to me and to

16         earlier questioning, are those prescription opioid

17         overdose deaths or are they all opioid overdose

18         deaths?

19    A    The numbers I prepared presented before were

20         prescription opioid and did not include heroin and

21         other illicit drugs.

22    Q    Got it.  I just wanted to be clear on that.

23              You're familiar with what's called a pill

24         mill?

25    A    Yes, sir.

1    Q    What is that?

2    A    A pill mill is an operation run by a prescriber in

3         which the prescriber is simply writing

4         prescriptions for controlled substance and other

5         medications without a legitimate medical purpose

6         and for the purpose of profit, greed, or other

7         purposes.

8    Q    And can some of those -- and that's -- obviously,

9         that's unlawful activity, right?

10   A    I would hope so.

11   Q    And do some of those prescribers also have

12        operations where they dispense medications from

13        their shops?

14   A    I'm sorry.  I didn't understand the question.

15        Dispense medication -- that's what they're doing.

16        They're dispensing -- some of them are dispensing

17        as well if that's the question, sir.

18   Q    Yeah, that was my question.

19             So you define it as -- a pill mill as an

20        operation where a doctor writes unlawful

21        prescriptions, but some of those doctors also fill

22        those prescriptions from their shops, right?

23   A    Yes, sir.

24   Q    And, of course, that's also illegal, right?

25             MR. ELSNER:  Objection.

1    A    If they are not for legitimate medical need, yes,

2         but dispensing them is not illegal, sir.

3      BY MR. SWANSON:

4    Q    I'm sorry.  Dispensing them is not illegal?

5    A    Right.  A doctor in all states can dispense

6         medications from their practice.

7    Q    I see.  But if they are dispensing medications that

8         were not written for a legitimate medical purpose,

9         then that's unlawful?

10   A    Yes.

11   Q    And did pill mills in Ohio contribute to the opioid

12        crisis in Lake and Trumbull Counties?

13   A    That was not data I looked at, but I would say that

14        because the opioid epidemic is a complex issue, I'm

15        sure there were instances where that happened, yes.

16   Q    Okay.  But you don't know one way or the other to

17        what extent pill mills contributed to the opioid

18        crisis in Ohio?

19   A    I knew there were pill mills, but I don't know the

20        extent of that impact.

21   Q    I think I know the answer to these, but I want to

22        make sure I'm clear what your testimony is.

23            Are opioid medications important medications

24        for the treatment of certain conditions?

25   A    They are medications that are prescribed for

```
 1          certain conditions, yes.
 2    Q    Right.  And they provide -- they're important
 3          medicines for a lot of people suffering from pain,
 4          right?
 5    A    They are not really supposed to be prescribed for
 6          all pain, just certain types of pain.  So for those
 7          types of pain and patients, yes.
 8    Q    Well, let me ask you:  You're certainly not a
 9          person who believes that opioid medication should
10          be taken from the market, right?
11    A    No, sir, I don't believe that.
12    Q    And you agree that a cancer patient, for instance,
13          should have access to opioid medications if needed
14          to treat pain, right?
15    A    Again, it would depend on the patient and to make
16          sure that those opioids didn't do more harm to that
17          patient.
18    Q    But you're not -- you don't have expertise or
19          background in what a doctor should or shouldn't
20          prescribe to his or her patient?
21          MR. ELSNER:  Objection.
22      BY MR. SWANSON:
23    Q    Right?
24    A    Well, my training as a pharmacist, and education,
25          has helped me look at prescriptions doses,
```

1       diseases, and to know that whether or not that

2       would be an appropriate medication, I'm not

3       involved in the clinical diagnosis or physical

4       assessment.  But I have enough information and

5       knowledge as a pharmacist to be somewhat

6       knowledgeable in that area, sir.

7    Q  Well, you know, I'm a lawyer and I'm somewhat

8       knowledgeable about it.  I'm trying to figure out

9       where your expertise is.  You obviously didn't go

10      to medical school, right?

11   A  No, sir.

12   Q  Okay.  And you don't have any training in specific

13      disease states for, say, cancer or other illnesses,

14      right?

15          MR. ELSNER:  Objection.

16   A  I did have training in -- for disease states, but

17      not cancers.

18    BY MR. SWANSON:

19   Q  Okay.  Do you have any specialized training in

20      treatment of pain?

21   A  No, sir.

22   Q  Do you have specialized training in arthritis or

23      arthritic conditions?

24   A  No, sir.

25   Q  And do you have any specialized training in

```
 1          illnesses like sickle cell anemia or other

 2          conditions where opioid medications may be

 3          appropriate treatments?

 4   A      No, sir.

 5   Q      And I thought I heard it's your opinion that opioid

 6          medications in your view are not appropriate

 7          treatment for chronic pain, such as pain caused by

 8          arthritis?

 9               Is that your opinion?

10   A      Well, I think so.  The characterization that all

11          arthritis is chronic pain, studies have shown that

12          using a nonsteroidal anti-inflammatory with

13          acetaminophen is more effective for chronic pain,

14          and that the primary benefit of an opioid when

15          treating chronic pain is the mood elevation that

16          first occurs which gives the patient a feeling of

17          euphoria which believes them -- or helps them think

18          that their pain is being alleviated.  But new

19          studies have said that there really isn't --

20          opioids are not really the primary source for

21          chronic pain.

22   Q      In all of those opinions or articles that you just

23          read, you haven't disclosed any opinions in your

24          report in this case about whether opioids are

25          appropriate treatments for those conditions, right?
```

1    A    It wasn't something I was asked to opine on until

2         you just asked the question, sir.

3    Q    Got it.  I just want to be clear.  You're not going

4         to come into court and start proffering expert

5         testimony on whether opioid medications are

6         appropriate for a given condition.

7              You're not going to do that, right?

8              MR. ELSNER:  Objection.  Depends on whether

9         you ask the question.

10   A    If you ask the question, yes.

11     BY MR. SWANSON:

12   Q    How about if I don't ask the question?  You don't

13        have an opinion, right?

14             MR. ELSNER:  Objection.

15   A    If I don't ask the question and there's not an

16        opportunity to provide my knowledge, then the

17        answer would be no, sir.

18     BY MR. SWANSON:

19   Q    Got it.

20             Is a pharmacist licensed by the State of Ohio

21        expected to exercise independent professional

22        judgment before dispensing a medication?

23   A    Can you help me understand what you mean

24        by "independent professional judgment"?

25   Q    That's a term I've seen a bunch.  I've maybe seen

```
 1        it in your report.

 2             You don't know what independent professional

 3        judgment is?

 4   A    I know what it is in my report, and I'll explain it

 5        to you.

 6   Q    That's what I asked.

 7   A    The pharmacist is supposed to make an objective

 8        decision and not be influenced by any other

 9        factors, such as corporate metrics or corporate

10        requirements.  They are supposed to do their due

11        diligence as a pharmacist and make sure the patient

12        is treated safely.

13   Q    Okay.  All right.  If you can look at Exhibit 2, I

14        want to turn now to your opinions regarding the

15        standard of care.  Okay?

16   A    That's the folder that's marked WAG2?

17   Q    No, sir.  I'm sorry.  It's Exhibit 2.  I'm not

18        going to introduce an exhibit yet.  It might be a

19        bit.  I'm just looking at Exhibit 2 that's already

20        been marked, the supplemental report.

21   A    Okay.  The supplemental report?

22   Q    Yes, sir.

23   A    I've got that, yes, sir.

24   Q    All right.  And if you turn to page 7, you see

25        there's a section titled "The Practice of Pharmacy
```

Page 313

1           Standard of Care"?

2     A     Yes, sir.

3     Q     And earlier Mr. Bush asked you some questions about

4           whether the standard of care was different from the

5           statutory requirements of a pharmacist's practice.

6               I want to ask you a bit more about that issue

7           now.  Okay?

8     A     Yes, sir.

9     Q     Okay.  So when you used that term, "standard of

10          care," just to sort of help me out, to start things

11          out, how do you define that term, "standard of

12          care"?

13    A     It's right there in my report, sir.  It's the

14          competent level of care expected of a pharmacist

15          dispensing medication to providing direct patient

16          care.

17    Q     And would you agree with me that the standard of

18          care, whatever it is, has to be something that

19          other pharmacies and pharmacists are doing?

20              MR. ELSNER:  Objection.

21      BY MR. SWANSON:

22    Q     In other words, in order to be a standard, it has

23          to be accepted and adopted by others, right?

24              MR. ELSNER:  Objection.

25    A     No.  It just has to be recognized as a standard by

Page 314

1      some sort of authoritative body.  It doesn't

2      necessarily become a standard because more people

3      are doing it or less people are doing it.

4   BY MR. SWANSON:

5   Q   So if it's recognized as a standard by some sort of

6      authoritative body, in your view, that would

7      represent a standard of care?

8   A   Yes, sir.

9   Q   And what's the authoritative body that you cite or

10     rely on for the practice of pharmacy standard of

11     care?

12         MR. ELSNER:  Objection.

13  A   A number of different authorities.  Number one,

14     it's the boards of pharmacy.  Number two, it's the

15     professional associations that have accreditations

16     processes or develop standards like the USP, United

17     States Pharmacopeia standard or other

18     standard-setting groups that actually designate

19     what might be a standard of care.

20   BY MR. SWANSON:

21  Q   And I think you told Mr. Bush that the standard of

22     care is that embodied by or encompassed by the

23     Controlled Substances Act?

24  A   No.  I said it was complementary to, and he asked

25     me whether it was as important as the statutory

Page 315

1          requirement, and I said in some circumstances, yes.

2     Q    So I guess, in your view, somebody could violate a

3          pharmacist's standard of care without violating the

4          Controlled Substances Act?

5              MR. ELSNER:  Objection.

6     A    It's possible, sir, yes.

7       BY MR. SWANSON:

8     Q    And in your view, a person could -- a pharmacist

9          could violate the standard of care even though he

10         or she wasn't violating any state law?

11    A    Yes, sir.

12    Q    You say in the first paragraph under the standard

13         of care, "The path to becoming a pharmacist

14         involves years of specialized training, education,

15         and licensure and ongoing continuing education to

16         remain current with new drugs, devices, therapies,

17         and standards."

18             Do you see that?

19    A    Yes, sir.

20    Q    And how many years are required -- how many years

21         of schooling are required to become a practicing

22         pharmacist in Ohio?

23    A    Currently, I think it's anywhere between six and

24         eight, sir.

25    Q    And why do you equivocate?

1          MR. ELSNER:  Objection.

2    A    I'm not equivocating.  The doctor of pharmacy

3          program in Ohio, I think there are eight or ten

4          colleges of pharmacy in Ohio, and their programs

5          vary in length, and the requirements in Ohio says

6          that -- say that you must graduate from an

7          accredited program of pharmacy and then pass the

8          competency exam.

9          So if a pharmacist went to a six-year program,

10         that would meet the requirement.  If they went to

11         an eight-year program, that would also satisfy it.

12   Q    Got it.  So all of the pharmacists that you're --

13         MR. ELSNER:  Sorry, please.

14         Carmen, could I just caution you to pause a

15         little bit.  My last objection wasn't recorded, and

16         I think we were speaking over each other.

17         THE WITNESS:  Sorry, sir.

18         MR. ELSNER:  Please continue.

19    BY MR. SWANSON:

20   Q    All the pharmacists at the pharmacy defendants in

21         this case, they all went to school for six or

22         eight years, right?

23         MR. ELSNER:  Objection.

24    A    I don't know that for certain.  And if they

25         graduated prior to the doctor of pharmacy being a

1           requirement, which was in 1999, they may have gone

2           to school four or five years, and if some of the

3           defendants still have assistant pharmacists in

4           their system, then they never graduated from the

5           college of pharmacy.

6      BY MR. SWANSON:

7    Q    Does a pharmacist operating in Ohio, do they have

8           to receive training or credits regarding the

9           dispensing of controlled substances while they're

10          in pharmacy school?

11   A    It's part of the curriculum for all the programs.

12   Q    And do they have to receive training or credits

13          regarding the Controlled Substances Act and other

14          laws applicable to controlled substances?

15   A    Yes, sir.

16   Q    And so you'd agree with me, we might not have the

17          years right down, but you'd agree with me that the

18          pharmacists who worked for the retail chain

19          defendants, they all had years of specialized

20          training before they became pharmacists, right?

21          MR. ELSNER:  Objection.

22   A    Yes, sir.  The same training that qualifies me to

23          look at a prescription and make a decision as to

24          whether that's appropriate therapy or not.

25   Q    I'm sorry.  I didn't understand your answer.  You

```
 1          said the same training that qualifies me to look at

 2          a prescription and make a decision as to whether

 3          that's appropriate therapy or not?

 4     A    Yes, sir.  Earlier you asked me a question about

 5          whether or not I had specialized training or went

 6          to medical school.  That specialized training that

 7          all the defendant pharmacists have are the training

 8          that qualifies pharmacists to be able to evaluate

 9          prescriptions and conduct drug utilization review

10          in regard to the appropriateness of a medication.

11     Q    But you at least agree with me that the pharmacist

12          that's presented with a prescription has less

13          information about the patient's health and health

14          history than does the doctor who wrote that

15          prescription?  We can agree there, right?

16     A    Yes, sir.

17     Q    Okay.  Now, all of the pharmacists who practice in

18          the state of Ohio, they get their licensure from

19          the Ohio State Board of Pharmacy, right?

20     A    Yes, sir.

21     Q    And the -- well, let me withdraw that.

22               As the licensing body for pharmacists in the

23          state of Ohio, is the Ohio Board of Pharmacy

24          responsible for ensuring that pharmacists that it

25          licenses comply with the relevant laws and
```

1      regulations?

2   A   Yes, sir.

3   Q   Is the Ohio Board of Pharmacy responsible for

4       disciplining pharmacists who fail to comply with

5       the relevant laws and regulations?

6   A   Yes, sir.

7   Q   What I'm getting at, in other words, the Ohio Board

8       of Pharmacy, they don't just hand out licenses to

9       pharmacists who pass the exam when they graduate

10      pharmacy school and then pay them no more mind,

11      right?  That's not how it works?

12          MR. ELSNER:  Objection.

13  A   Correct, sir.

14    BY MR. SWANSON:

15  Q   What is the Ohio State Board of Pharmacy do to

16      ensure that the pharmacists that it licenses are

17      qualified to maintain their license?

18  A   The requirement for continuing education is

19      something that the Ohio Board of Pharmacy monitors,

20      as well as any complaints they may receive about

21      that pharmacist, and as part of their routine

22      inspections or monitoring of pharmacies, if they

23      detect a problem or suspect a problem, the Ohio

24      Board of Pharmacy uses that as another evaluation

25      tool.

```
 1   Q    Got it.  So I guess I didn't ask the relevant
 2        question first.  The license that a pharmacist gets
 3        in Ohio, that needs to be periodically renewed,
 4        right?
 5   A    Yes, sir.
 6   Q    Okay.  And what you were just describing, I guess,
 7        are kind of the steps that the State Board of
 8        Pharmacy takes to ensure that renewal of a pharmacy
 9        license is proper, right?
10   A    I think the question that you asked me is what does
11        the Ohio Board of Pharmacy do to make sure that
12        that pharmacist remains competent and current.
13            So the answer to that is yes, as well as the
14        second question you asked me.
15   Q    Understood.
16            So you mentioned that the State Board of
17        Pharmacy, they have investigators who go out and
18        visit pharmacies in their jurisdiction, right?
19   A    Yes, sir.
20   Q    And they'll conduct inspections of those pharmacies
21        to make sure they are compliant, right?
22   A    Yes, sir.
23   Q    And they can interview the pharmacist to make sure
24        the pharmacist is complying with the appropriate
25        state and federal laws and regulations, right?
```

Page 321

1   A   Yes, sir.

2   Q   They provide continuing pharmacy education programs

3       so the pharmacists can make sure they are updated

4       and kept up-to-date on important issues, legal and

5       otherwise, right?

6   A   Not exactly, sir.  The Ohio Board of Pharmacy

7       requires continuing education.  They may provide

8       some sort of CE, but the bulk of CE is provided by

9       approved continuing education providers, and they

10      are approved by the American Council on

11      Pharmaceutical Education.

12   Q   Right.  I guess what I'm saying is the State Board

13      of Pharmacy, they mandate that the pharmacists

14      comply and complete continuing education courses,

15      right?

16   A   Correct.  But you'd asked me before you if they

17      provide CEs, and that's what I was clarifying.

18   Q   Got it.  So they don't provide it, but they mandate

19      that you do it?

20   A   They may provide some classes, sir.

21   Q   And do they -- do they have other educational tools

22      that they can provide to pharmacists to make sure

23      that pharmacists are able to keep up to speed on

24      important laws and issues?

25         MR. ELSNER:  Objection.

Page 322

1   A    Yes.  A newsletter program that you referenced

2        earlier is one way, as well as any correspondence

3        or contact with a pharmacist through email or

4        mailings to alert them of changes or important

5        things in Ohio.

6     BY MR. SWANSON:

7   Q    And I noticed as I was looking at your materials

8        reviewed, I didn't -- well, let me take a step

9        back.

10            Were you aware that in this case, several

11       Ohio -- State of Ohio Board of Pharmacy

12       investigators provided depositions in this case?

13            Did you know that?

14  A    I'm sorry.  I did not.

15  Q    And I guess you did know that one of the things

16       that the State Board of Pharmacy does is they go

17       out and they conduct inspections of pharmacies in

18       their jurisdiction, right?

19  A    Yes, sir.

20  Q    And when they do those inspections, they complete

21       reports about their findings from those

22       inspections.

23            You knew that, right?

24  A    The standard operating procedure for all boards of

25       pharmacy so yes, sir.

Page 323

1    Q    And I didn't see it in your materials reviewed that

2         you'd looked at any inspection reports for any of

3         the retail chain pharmacies in this case.

4              Is that true you didn't look at any of those?

5    A    Yes, sir.  I'm not sure I would have access to

6         those if they are legally able to provide them to

7         me, but I did not review them.

8    Q    Well, it is something that you knew existed from

9         your time at the NABP.  Didn't you ask the lawyers

10        what the Ohio State Board of Pharmacy had to say

11        about the retail chain pharmacies?

12             MR. ELSNER:  Objection.

13   A    Based upon my experience, many of the states

14        prohibit or will not release the inspection

15        reports, and so I did not ask for that.  I did not

16        think it was available, sir.

17     BY MR. SWANSON:

18   Q    Got it.  Okay.

19             Returning to your report -- and bear with me.

20        I have to find what I'm quoting here.

21             On page 7, continuing on to page 8, you say

22        pharmacists -- so we're talking about the standard

23        of care.  You say "Pharmacists are not mere sellers

24        of tablets and capsules prescribed by doctors.

25        They are licensed professionals with independent

1       duties and obligations which have evolved over the

2       past century.  Those practices and their standard

3       of care are reflected in national and state laws

4       and regulations."

5            I just want to pause there, okay.

6            In your section on the standard of care, you

7       cite to the Controlled Substances Act, three

8       provisions of the Controlled Substances Act and the

9       Ohio Administrative Code.

10           Do you see that?

11  A    On the same page, sir?  I don't see a footnote.

12       Are you saying --

13  Q    Well, yeah, that was my question.  I mean, you have

14       450 footnotes in your report, but when it comes to

15       the section on the standard of care, you don't cite

16       a whole lot of documents, statutes, regulations,

17       etcetera, that you're relying on.

18           Would you agree with that?

19           MR. ELSNER:  Objection.

20  A    There are so many standards available that I could

21       not list them all, and that's why they are not

22       included.

23     BY MR. SWANSON:

24  Q    Well, I want to focus not on standards.  I want to

25       focus on federal and state laws.  If you look at

1       the last paragraph on that page, on page 8, you

2       cite to three separate provisions of the Controlled

3       Substances Act.

4           Do you see that?

5   A   Yes, sir.

6   Q   And then you cite to a single provision of the Ohio

7       Administrative Code.

8           Do you see that?

9   A   Yes, sir.

10  Q   So beginning with the Controlled Substances Act,

11      are there any other federal laws or regulations or

12      sections of the CSA that you rely on for your

13      opinions regarding your definition of the standard

14      of care?

15          MR. ELSNER:  Objection.

16  A   Yes, sir.

17    BY MR. SWANSON:

18  Q   Okay.  Can you tell me what they are?

19  A   I'd have to go through the document because in this

20      first section, I simply provide a broad overview of

21      what those documents or citations were.  And then

22      as those specific citations pertain to a topic or

23      issue of my opinion, they are further cited,

24      including DEA actions or what parts of 1306.04 or

25      1306.06 would be relevant to that particular

Page 326

 1         section, sir.

 2    Q    I understand.  But I want to know -- well, let me

 3         just ask it more broadly, then.

 4              Have you in your report identified every

 5         provision of the CSA that you believe is relevant

 6         to your opinion in this case?

 7              MR. ELSNER:  Objection.

 8    A    No, sir.

 9      BY MR. SWANSON:

10    Q    You have not?

11    A    No, sir.

12    Q    Why not?

13              MR. ELSNER:  Objection.

14    A    Based upon the reports and the narrative and the

15         explanation of how it applied, I didn't feel it was

16         necessary to cite every single paragraph, sentence,

17         or provision.  Instead, quoted the necessary ones

18         but assumed that as a total document, the CSA was

19         applicable and that it would be applicable in this

20         situation in the context of the report and what the

21         activities of the defendants in the case -- the

22         assumption was made that the CSA, the entire

23         document, the entire provision was applicable.

24              (Stenographer requested clarification.)

25    Q    At the bottom of page 8, you state -- and I'll

```
1        start reading.  Tell me if you don't see where I

2        am.  You say:  "For a controlled substance

3        prescription to be valid, a pharmacist is obligated

4        to determine whether the prescription was issued

5        for a legitimate medical purpose."

6             Do you see that?

7   A    Yes, sir.

8   Q    Okay.  And then you cite the CSA at 1306.04(a),

9        right.

10  A    Yes, sir.

11  Q    And that's a corresponding responsibility

12       provision?

13            MR. ELSNER:  Objection.

14  A    Yes, sir.

15    BY MR. SWANSON:

16  Q    Now, earlier in your testimony in response to a

17       question -- I can't recall who posed it -- you

18       testified that a primary requirement -- those were

19       your words -- primary requirement of a pharmacist's

20       corresponding responsibility is documenting red

21       flags or resolution of red flags.

22            Do you recall that testimony?

23  A    Yes, sir.

24  Q    If I wanted to find where that specific requirement

25       exists in the Controlled Substances Act, where
```

```
 1        would you point me?
 2   A    I would point you to two places, sir.  One would be
 3        the general provision of 1306.04.  And then I would
 4        point to clarification of that provision that was
 5        provided in the Hills Pharmacy case in Superior I
 6        and II, in which the ALJ, the administrative law
 7        judge or the findings in that case stated very
 8        specifically that documentation was the standard of
 9        care and something that would be required.
10   Q    Okay.  So let's start.  You said you would point me
11        to 1306.04(a).  And I believe if you turn to
12        page 25 of your report, you have -- you've quoted
13        that provision.  So why don't you turn to 25.
14             Are you there?
15   A    Yes, sir.
16   Q    Okay.  And you can see in the second paragraph
17        under the section on "Corresponding
18        Responsibility," you've quoted 1306.04?
19   A    Yes, sir.
20   Q    And can you show me where in that provision it
21        discusses what you call the requirement of
22        documenting resolution of red flags?
23   A    Sure.  Based upon my experience and knowledge in
24        this area, that first sentence:  "The
25        practitioner's responsible for the proper
```

1        prescribing and dispensing of controlled

2        substances."  My interpretation based upon my

3        experience and all of the matters I've been

4        involved with on this issue, the proper dispensing

5        of controlled substances involves documentation as

6        a standard of care and something that's been

7        spelled out or explained more clearly by the DEA in

8        other actions.

9    Q   All right.  So let's start with the Controlled

10       Substances Act.  I take it you can't identify any

11       provision in the Controlled Substances Act that

12       specifically requires a pharmacist to document the

13       resolution of red flags, true?

14            MR. ELSNER:  Objection.

15   A   No, sir.  The provision I just read is basis for me

16       to make that statement and opinion.

17     BY MR. SWANSON:

18   Q   Well, you would agree with me that there's nothing

19       on the face of that language that says anything

20       about documenting red flags or resolution of red

21       flags.

22            You would at least agree with that, right?

23   A   No, sir.  On the face, the proper dispensing says

24       to me as the pharmacist documentation included.

25   Q   All right.  Well, then let me just ask.  Is there

1          anywhere other than -- anywhere other than what

2          you've just stated where the Controlled Substances

3          Act in the Act itself clarifies or elucidates what

4          it means when it says proper prescribing, that it

5          must include documentation of red flags?

6      A   The cases that I cited are very clear and very

7          explicit in clarifying that requirement;

8          Hills Pharmacy and Superior I and II.

9      Q   And what year were those?

10     A   I believe -- I can't recall, but I'd have to look

11         those up, sir.

12     Q   Okay.  And are they cited in your report?  I was

13         just doing a search.

14     A   They are -- I think they are one of the documents

15         as well.  I would have to check as well.

16     Q   Okay.  Other than the language about proper

17         prescribing, is there anywhere else in the

18         Controlled Substances Act that you would point me

19         to that you claim makes clear that documentation of

20         the resolution of red flags is a requirement under

21         the CSA?  Anywhere else?

22     A   Sections I gave you and the citations are very

23         clear, and that's what I base it on.  I don't see

24         any need for anywhere else for it to be mentioned.

25         It's very clear and very explicit.

Page 331

1    Q    Well, I guess you'd agree with me there's nothing

2         else that stopped the DEA from saying, you know

3         what, we're having these cases pop up where

4         pharmacists aren't documenting a resolution of red

5         flags.  Maybe we should be more clear in the

6         statute about what's required.

7              That's something the DEA could have done,

8         right?

9              MR. ELSNER:  Objection.

10   A    Outside of my scope, sir.

11     BY MR. SWANSON:

12   Q    What about -- can you point me to any Ohio State

13        law that specifically requires a pharmacist to

14        document resolution of red flags?

15   A    I don't have the laws here, but I believe if you

16        want me to research that, I would be willing to do

17        so to determine if that's there or not.

18   Q    Well, I'm trying to figure out the basis for your

19        opinion.  Okay?  And what you've opined and you say

20        in your report is that documentation of the

21        resolution of red flags is required by the

22        Controlled Substances Act, right?

23   A    Yes, sir.

24   Q    Is it also required by Ohio State law?

25   A    Yes, sir.

```
 1   Q    What provision?

 2   A    The provision in Ohio law that says pharmacists

 3        must be compliant with all federal laws.

 4   Q    Got it.  Okay.

 5             So when you say it's -- that's a requirement

 6        under state law, you're just sort of -- you're

 7        directing me back to the Controlled Substances Act

 8        and Section 1306.04; is that fair?

 9             MR. ELSNER:  Objection.

10   A    As one possible avenue, I also would like to

11        research Ohio law to see if it's mentioned as well.

12     BY MR. SWANSON:

13   Q    Okay.  But you haven't done that research today, so

14        you can't tell me sitting here; is that fair?

15             MR. ELSNER:  Objection.

16   A    That's fair, sir.

17     BY MR. SWANSON:

18   Q    Now, when you were at the NABP -- we've already

19        talked about this a bit -- but the NABP put out the

20        Model State Pharmacy Act and Model Rules for

21        pharmacists, right?

22   A    It's been published since 1960, sir, yes.

23   Q    And did -- when you were at the NABP, did you ever

24        tell your board in sum or substance there seem to

25        be issues out there about pharmacists not
```

1     documenting their resolution of red flags for

2     controlled substance prescriptions.  Maybe we

3     should clarify the law and put it out to the states

4     to make sure everybody understands that we think

5     that's a requirement?

6          Is that something that ever happened when you

7     were there?

8          MR. ELSNER:  Objection.

9  A  Those discussions did take place with my board and

10    also with many of the individuals from the

11    defendants that gave depositions because the issue

12    of documentation arose many times in board

13    requirements and board of laws regarding controlled

14    substances, and the position taken by the

15    individuals who I interacted with directly that

16    represented the defendants would often say that

17    documentation is not something that they wanted to

18    do.

19         And the response from me and the NABP was that

20    the documentation was required and was a critical

21    step in the process for dispensing prescriptions.

22         MR. SWANSON:  Okay.  Can we go off the record?

23    I lost my real-time, and I really needed it for

24    that response.

25         MR. ELSNER:  That's fine.  Should we take a

1       quick five-minute break?

2            THE VIDEOGRAPHER:  We're off the record.

3            (A recess was taken.)

4     BY MR. SWANSON:

5  Q    Dr. Catizone -- excuse me -- Mr. Catizone, when I

6       asked you about the requirement that a pharmacist

7       document the resolution of red flags, you pointed

8       me to the Controlled Substances Act in Section

9       1306.04, and then you cited two or three cases that

10      you said you were relying on to support that

11      opinion of yours.

12           I don't see those cases cited anywhere in your

13      report or in the materials relied upon that you

14      provided to the lawyers in this case.

15           Do you know if that's accurate?

16           MR. ELSNER:  Objection.

17  A    I would assume what you're saying is accurate.

18      Earlier in my testimony, the question was asked

19      about whether or not everything or references and

20      background that I utilized would be included in my

21      report, my response was no, and so to new

22      questions, new areas that were not part of my

23      original report that I'm using in relying on that

24      experience to cite those cases.

25     BY MR. SWANSON:

1    Q    Well, with respect, sir, you do comment and opine

2         about what you claim is an obligation to document

3         resolution of red flags.  That is contained in your

4         report, isn't it, sir?

5    A    Yes, sir.

6    Q    Okay.  But in the cases that you're now testifying

7         about, they are not cited in your report, true?

8              MR. ELSNER:  Objection.

9    A    They are not cited based upon the materials in my

10        report but based upon your questions, which asked

11        for whether or not they were specifically required

12        rather that whether or not it was something that

13        the pharmacist should and was required to do in the

14        specific citations, and that's why the additional

15        information was provided.

16      BY MR. SWANSON:

17   Q    And could you tell me real slow so we can all write

18        it down what these cases are that you relying on?

19   A    Sure.  Hills Pharmacy in which the opinion

20        indicated that the absence --

21   Q    I don't need the opinion.  I just want to know what

22        the cite is.

23   A    And the other one is Superior I and II.

24   Q    Okay.  And then -- and those were both -- forget

25        it.  I'll find those.

 1          My last question for today, it appeared to me

 2      throughout the deposition that there have been

 3      times you're reading from documents, and I just

 4      want to be sure, have you read from any documents

 5      other than, you know, the exhibits that have been

 6      presented to you or your expert reports?  Any other

 7      documents you have in front of you?

 8   A   No, sir.  The only documents I'm reading are what

 9      you see is me trying to organize all of the

10      different exhibits, but I have no other documents

11      except my supplemental report and the exhibits,

12      sir.

13   Q   Okay.  And I wasn't accusing.  I just wanted to be

14      sure that I saw everything that you saw.  Okay.

15          MR. SWANSON:  With that, we'll convene again

16      tomorrow morning to finish up.  Thanks very much.

17          THE VIDEOGRAPHER:  We're off the record.

18      (Time noted:  5:12 p.m.)

19

20

21          FURTHER THE DEPONENT SAITH NOT

22

23

24

                         _____

25                       CARMEN A. CATIZONE, MS, RPh, DPh

Page 337

1    STATE OF INDIANA            )

                                 )  SS:

2    COUNTY OF HAMILTON          )

3

4            I, Amy Doman, Stenographic Reporter,

5        Registered Merit Reporter, Certified Realtime

6        Reporter, Certified Shorthand Reporter, Notary

7        Public in and for the County of Hamilton, State of

8        Indiana, at Large, do hereby certify that CARMEN A.

9        CATIZONE, MS, RPh, DPh, the deponent herein, was by

10       me first remotely duly sworn to tell the truth, the

11       whole truth, and nothing but the truth in the

12       aforementioned matter;

13           That the foregoing deposition was taken on

14       behalf of the Defendants, at the Mount Pleasant,

15       South Carolina, on Tuesday, June 15, 2021, pursuant

16       to the Federal Rules of Civil Procedure;

17           That said deposition was taken down in

18       stenographic notes and afterwards reduced to

19       typewriting under my direction, and that the

20       typewritten transcript is a true record of the

21       testimony given by the said deponent; and that

22       signature was requested by the deponent and all

23       parties present;

24           That the parties were represented by their

25       counsel as aforementioned.

Page 338

1      I do further certify that I am a disinterested

2   person in this cause of action, that I am not a

3   relative or attorney of either party or otherwise

4   interested in the event of this action, and that I

5   am not in the employ of the attorneys for any

6   party.

7      IN WITNESS WHEREOF, I have hereunto set my

8   hand and affixed my notarial seal this 18th day

9   of June, 2021.

10

11

12

13

14         Amy Doman, RMR, CRR, CSR

15         Stenographic Reporter

16         Notary Public

17

18

19  My Commission Expires:

20  September 30, 2025,

21  Residing in Hamilton County, Indiana

22

23

24

25

Page 339

1                              Veritext Legal Solutions
                                   1100 Superior Ave
2                                     Suite 1820
                                Cleveland, Ohio 44114
3                                Phone: 216-523-1313
4

June 18, 2021
5

To: Michael E. Elsner
6

Case Name: National Prescription Opiate Litigation - Track 3 v.
7

Veritext Reference Number: 4628755
8

Carmen A. Catizone, MS, RPh, DPh        Deposition Date:  6/15/2021
9

10   Dear Sir/Madam:

11
Enclosed please find a deposition transcript.  Please have the witness
12
review the transcript and note any changes or corrections on the
13
included errata sheet, indicating the page, line number, change, and
14
the reason for the change.  Have the witness' signature notarized and
15
forward the completed page(s) back to us at the Production address
16   shown
17   above, or email to production-midwest@veritext.com.
18
If the errata is not returned within thirty days of your receipt of
19
this letter, the reading and signing will be deemed waived.
20
21   Sincerely,
22   Production Department
23
24
25   NO NOTARY REQUIRED IN CA

```
 1                    DEPOSITION REVIEW
                   CERTIFICATION OF WITNESS
 2

     ASSIGNMENT REFERENCE NO: 4628755
 3   CASE NAME: National Prescription Opiate Litigation - Track 3
     DATE OF DEPOSITION: 6/15/2021
 4   WITNESS' NAME: Carmen A. Catizone, MS, RPh, DPh
 5        In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
 6   my testimony or it has been read to me.
 7        I have made no changes to the testimony
     as transcribed by the court reporter.
 8

     _____        _____
 9   Date              Carmen A. Catizone, MS, RPh, DPh
10        Sworn to and subscribed before me, a
     Notary Public in and for the State and County,
11   the referenced witness did personally appear
     and acknowledge that:
12
          They have read the transcript;
13        They signed the foregoing Sworn
          Statement; and
14        Their execution of this Statement is of
          their free act and deed.
15
          I have affixed my name and official seal
16
     this _____ day of_____, 20____.
17
                     _____
18                   Notary Public
19                   _____
                     Commission Expiration Date
20
21
22
23
24
25
```

Page 341

1                    DEPOSITION REVIEW
                 CERTIFICATION OF WITNESS
2

     ASSIGNMENT REFERENCE NO: 4628755
3    CASE NAME: National Prescription Opiate Litigation - Track 3
     DATE OF DEPOSITION: 6/15/2021
4    WITNESS' NAME: Carmen A. Catizone, MS, RPh, DPh
5          In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6    my testimony or it has been read to me.
7          I have listed my changes on the attached
     Errata Sheet, listing page and line numbers as
8    well as the reason(s) for the change(s).
9          I request that these changes be entered
     as part of the record of my testimony.
10

           I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
     that both be appended to the transcript of my
12   testimony and be incorporated therein.
13   _____       _____
     Date                   Carmen A. Catizone, MS, RPh, DPh
14

           Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
     the referenced witness did personally appear
16   and acknowledge that:
17         They have read the transcript;
           They have listed all of their corrections
18         in the appended Errata Sheet;
           They signed the foregoing Sworn
19         Statement; and
           Their execution of this Statement is of
20         their free act and deed.
21         I have affixed my name and official seal
22   this _____ day of_____, 20____.
23         _____
           Notary Public
24
           _____
25         Commission Expiration Date

Page 342

ERRATA SHEET

VERITEXT LEGAL SOLUTIONS MIDWEST

ASSIGNMENT NO: 4628755

PAGE/LINE(S) /        CHANGE        /REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____



_____        _____

Date                    Carmen A. Catizone, MS, RPh, DPh

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

DAY OF _____, 20_____ .

_____

Notary Public


_____

Commission Expiration Date

| & | | | |
| --- | --- | --- | --- |

**&**

**&** 2:10 3:3,13 93:5

**0**

**0.15** 245:15
**0.25** 245:20
**0.5** 59:13

**1**

**1** 6:3 7:4 12:2 19:7
19:9,10 20:5 22:2
22:5 25:24 31:10
34:23 66:23 73:4
73:9,15,18 167:15
168:10 181:3,12
182:21 183:16
196:20 245:10,18
271:23,25 272:2
272:14 273:6,21
273:23 282:6,14
285:8
**1.4** 245:15
**1.4.1** 99:21
**1.5** 113:6 121:7,9
**1.9** 245:13
**10** 6:16 26:1 76:15
112:24,24 113:3
142:13 150:10,11
150:12 212:13
216:21 246:25
269:12 277:10
**10,000** 145:18,24
146:2
**10/27/10d** 6:21
**100** 2:17 210:12
245:12,16
**100,000** 92:16
**1000** 2:21
**1001** 2:11
**103** 6:12
**104** 28:11

**105** 22:12 23:4
**10th** 30:10 35:8,19
36:16 38:25 63:1
190:11
**11** 6:20 174:11
217:2,4 246:25
269:11 277:10
**1100** 339:1
**112** 201:14
**11th** 63:1
**12** 6:22 106:16
110:19 217:3,5
282:17,21
**1200** 3:20
**12347236** 202:10
203:7
**126** 28:21 30:24
190:7
**13** 6:24 105:19
200:1 226:24
227:3,14,18,19,24
253:24
**1304** 164:24
**1306.04** 164:7,25
325:24 327:8
328:11,18 332:8
334:9
**1306.04.** 328:3
**1306.06** 325:25
**134930** 199:4
**1360.04.** 165:1
**13th** 63:1
**14** 6:22 7:2 226:10
227:2,4 229:22,25
230:1 281:7,25
282:2
**143** 6:14
**14th** 63:2
**15** 1:16 7:3 78:22
124:18 136:9
281:21,22 337:15

**150** 6:16 93:19
94:12
**15219** 3:5
**15219-2514** 3:10
**157** 5:4
**15th** 8:2 78:12
79:1
**16** 7:5 22:8 102:24
158:8,17,25 159:6
159:23 162:11
163:14 167:4,16
167:22 168:11
181:3,12 182:21
183:17 192:15
261:23 262:19
268:1 271:23,25
272:3,14 273:6,21
282:7,15
**160** 92:16
**16th** 24:5 61:22,24
78:1 79:5
**17** 1:3 8:7 137:19
189:22 226:23
227:1,18,23 230:2
230:9 271:9,13,23
271:23 272:1,7,13
273:5
**170** 60:16 74:19,21
**1700** 2:11
**1701** 3:14
**18** 339:4
**1800** 2:21
**1801** 3:19
**1820** 339:2
**18th** 338:8
**19** 6:3,4,6 22:25
226:23,24 227:7
227:18,23,24
**19,743** 149:2
**19103-2921** 3:15

**1960** 332:22
**1981** 87:25 88:5,7
**1982** 88:8,8
**1983** 84:9 86:10,15
86:25 87:11 88:2
88:5,8,9
**1984** 88:9,10
**1985** 86:12,15 87:1
87:4,11 88:10
96:17,25 108:20
**1987** 84:20 85:2
**1988** 96:5,25
108:24 287:2
**1990** 299:12
**1997** 83:3
**1999** 317:1
**19th** 62:8
**1st** 243:14,19

**2**

**2** 6:4 19:11,13
20:5 22:17,21
25:23 31:8,12
34:24 42:11
124:15 179:12
210:7 213:5 239:6
239:13,18 240:15
267:14 278:21
279:1 298:25
301:8 312:13,17
312:19
**2,000** 145:21 285:8
**2.0** 245:18
**2.2** 121:6
**20** 53:8 60:25 63:5
76:15 201:13
221:10,13,15,17
221:20,22 222:3
224:20 244:17
245:11,19 284:15
340:16 341:22
342:22

**200** 50:2 125:4
238:25 243:13,18
243:24 244:2,17
244:18 269:11
278:5
**2000** 102:11
243:22,24 244:25
**2001** 81:23
**20036-5807** 2:22
**2004** 86:25 87:4,25
299:19
**2006** 124:22
**2006-2009** 174:10
**2008** 122:2
**2009** 174:11
**2010** 105:6,10
106:1 200:4,7
283:4,7,24 284:10
284:19
**2011** 282:15,18,22
283:9,17,18
284:22
**2012** 282:16 283:9
283:17
**2015** 6:25 180:9
185:5 227:16
285:17
**2016** 184:18
229:23 230:5
246:1,7 283:12
285:8,16
**2017** 7:2 174:12
184:18 230:5
243:22 244:3,25
283:13
**2018** 6:12 102:9
103:6 104:22
106:4 107:5 108:2
109:25 243:13,14
243:19,19 244:19
269:12 277:8

284:7
**2019** 102:18 107:7
107:10,12 147:17
284:7,22 285:5
**2019-2020** 147:14
**202** 2:22
**2020** 12:14,17
28:22 33:4 45:11
51:16 52:14 54:25
55:3,8,11 57:24
59:12 60:1,2,8
64:6,23 65:24
66:24 77:24 78:16
91:12,13 92:6
93:7 102:14
107:19 109:15
120:10 143:13
144:20 145:1
146:14,22 190:14
190:21 191:1,6
270:23 271:15
287:2
**2021** 1:16 8:2 22:8
22:25 24:5 26:1
30:10 33:6 51:16
52:16 61:24 62:10
68:9 78:1,7,12,16
78:18,22 79:2,4,5
91:12 136:6
137:19 142:19
143:7 190:11
337:15 338:9
339:4
**2022** 91:22
**2025** 338:20
**205** 4:4
**20th** 79:4
**21** 6:7,8,9
**210** 257:15 260:12
261:9

**210th** 261:16
**21178** 338:13
**21202-1031** 2:18
**215** 3:15
**216** 2:12 4:12
**216-523-1313**
339:3
**216-9000** 2:7
**217** 6:20,22
**21st** 143:13
**227** 6:24 7:2
**23** 105:7,11,24
110:19
**24** 296:13
**2440** 2:17
**24400** 4:11
**24th** 59:12
**25** 124:10 205:10
205:21 206:1,6,18
207:2,4 208:3,7,9
208:10 209:2,12
210:25 211:15,17
211:18,23 212:1
212:12,16,22
213:11,20 214:2,7
214:9,14,18 215:1
215:20 216:9
273:23 328:12,13
**25,000** 50:14
**25th** 142:18 143:7
144:19 145:1
**26th** 64:9
**27** 106:15 158:7
284:15
**28** 2:6
**280,000** 110:4
**2804** 1:3,3 8:7
**281** 7:3
**286** 5:6
**29464** 2:6

**3**

**3** 6:6 19:14,16,18
19:24,25 20:5,10
20:19 23:6 24:17
25:24 89:19 90:4
90:23 157:11
190:4 209:17
213:5 220:12
228:5 275:22
291:4 339:6 340:3
341:3
**30** 8:19 25:9 60:25
65:24 201:15
204:22 207:20,20
209:7 211:23
212:1,3 221:14,16
221:18,21 222:3
224:18 338:20
**30,000** 50:7 113:12
**300** 4:11 49:19,22
238:25 239:6,13
239:18 240:15
**303** 3:21
**30th** 64:23 67:8,14
**316** 4:3
**32** 96:5 205:15,18
217:7
**32502** 4:4
**33** 96:5 205:16,17
205:19
**338-5214** 3:6
**34** 27:10 143:11
**35** 15:7 25:9 92:14
96:4 110:12,16,18
212:3 220:8 223:8
223:14 295:6
296:13
**35th** 3:5
**36** 230:13,16
**37** 230:16,25,25
232:23,24

**3726**   26:2
**394-7911**   3:11
**396-5014**   4:4

**4**

**4**   6:7 19:17 20:12
  20:13,16,25 21:1,2
  23:24,25 77:15,16
  78:6 79:18 82:2
  144:25 275:22
  282:15,21 287:23
  288:1
**4,000**   285:8
**4.04**   245:21
**4.6**   245:13
**4/2021**   6:11
**40**   51:24 52:3
  92:17
**400**   112:9
**401**   120:13
**41**   50:19,23 51:25
  51:25 241:20
**410**   2:18
**412**   3:6,11
**43**   189:22 243:8
  271:9,13,23,24
  272:1,7,13 273:5
**44**   201:2 245:8
**44007**   201:3
**44077**   201:2 202:6
  202:17
**44114**   2:12 339:2
**44122**   4:11
**447**   28:12
**45**   243:10
**450**   301:23 324:14
**4500**   3:10
**46**   174:13 249:6
**4628755**   339:7
  340:2 341:2 342:2
**47**   27:10 249:6,9

**49**   257:17

**5**

**5**   6:8 21:12,14
  24:7 77:15,17
  79:23 80:16 82:8
  82:16 84:4 96:7
  106:14,18 107:13
  107:20 124:8,14
  124:16 125:9
  127:1,15,15,21
  128:4,10 129:13
  130:9 148:2,7
  212:5,10,13 213:5
  232:10 234:10,23
  268:22 285:16
**5/19/21**   6:5,6
**5/25/21**   6:15
**5/28/21**   6:19
**5/31/2020**   6:11
**50**   53:21 61:2
  112:7 117:21
  173:4 243:13
  244:12,17 245:2,3
  245:5,11 262:16
  269:13,15 277:8
  285:1 288:14,16
**50,000**   148:5
**500**   3:10 102:21
  106:8
**501**   89:18,19 90:4
  90:23 291:4
**51**   6:11 28:21
  50:19,23 52:1
  53:16,16,17,19
  54:11,13 190:8
  263:6
**52,000**   108:6 112:1
**53**   267:13
**54**   267:13,24
**56**   201:15

**592-3197**   3:21
**5:12**   336:18

**6**

**6**   6:9 19:24 20:18
  21:21,23 24:15,20
  25:1 44:13 69:8
  74:8 75:8 77:2
  127:2,22 128:11
  194:14 207:23
  232:10 268:22
  269:5
**6/14/2010**   201:12
**6/15/2021**   339:8
  340:3 341:3
**60**   201:13 207:23
  278:12,14,20
  279:10
**600,000**   102:16
**600-0114**   2:12
**64**   180:1 210:18
**69**   174:12
**6th**   63:1

**7**

**7**   6:11 42:11 51:12
  51:17 52:12 55:1
  57:1 58:16 59:12
  60:13 105:16
  124:8,14,16 126:4
  129:13 130:9
  232:10 281:6,12
  296:13 312:24
  323:21
**70**   173:16
**700**   106:14,18
**700,000**   102:21
  106:8
**778-1800**   2:22
**78**   210:22
**7th**   63:1

**8**

**8**   6:12 102:25
  103:1,12 104:18
  104:23 109:25
  142:12,15 144:10
  152:8 232:10
  234:10,23 323:21
  325:1 326:25
**8.9**   245:18
**800**   50:1 94:13
  107:4 125:4
  128:14,17,24
**80202**   3:20
**831-0001**   4:12
**843**   2:7
**845,000**   106:19
**846,873**   106:5
**850,000**   107:4
  108:2
**86**   133:17
**87**   266:12
**884,166**   190:13,19
  191:15
**8:10**   1:15

**9**

**9**   5:3 6:14 142:12
  142:15,17 143:2,4
  144:8,10,10,10,12
  145:10 148:18
  174:13
**90**   171:9 179:11
  243:19 244:13
  245:3,6 246:9
  266:12 269:12,16
  277:9
**900,000**   107:16
**92**   210:22
**94**   245:23
**949-1159**   2:18

**950,000** 107:21
**963-5328** 3:15
**99** 73:15
**990** 103:2,6,15
**9th** 63:1

**a**

**a.m.** 1:15
**abide** 185:7
**ability** 11:22 14:13
  111:22 121:21
  184:2 290:1
**abiodun** 128:4,5
**able** 51:1 141:7
  142:24 156:1
  175:17 185:24
  190:22 199:15
  208:11 224:16,17
  242:18 253:20
  254:12,13,16
  265:16 281:15
  298:1 318:8
  321:23 323:6
**absence** 164:9,12
  335:20
**absent** 160:12
  222:22
**absolute** 245:14
  245:19
**absolutely** 21:10
**abuse** 173:5
  176:20 212:25
  247:11,13,14
  251:16 291:13
**academic** 122:17
  123:12
**academy** 122:1
**acadia** 201:14
**acceptance** 123:10
**accepted** 225:15
  225:15,19 313:23

**accepting** 284:23
**access** 71:21,25
  72:3,5 94:12
  101:20,22 116:14
  118:2 129:18
  144:3 160:8
  184:12,13 208:10
  211:13 308:13
  323:5
**accessibility**
  207:12 244:16
**accidentally** 52:2
**accompany** 41:19
**account** 120:24
  165:5 177:3
  269:20,22
**accreditation** 90:3
  119:22 120:4
**accreditations**
  314:15
**accredited** 86:7
  118:24 119:4
  316:7
**accrediting** 119:10
**accumulated**
  25:10
**accurate** 24:3,5,10
  26:6 31:13,22
  40:18 57:2 58:19
  75:22 78:1,12,14
  79:4,7 97:4 105:2
  105:8,12 124:11
  138:19 273:3
  292:5 294:13
  299:7 334:15,17
**accurately** 121:19
  282:8
**accusing** 336:13
**acetaminophen**
  201:14 310:13

**achieve** 85:3
**achievement** 83:9
**acknowledge**
  340:11 341:16
**act** 14:17 118:21
  119:14,17,19
  168:19 291:21
  293:10 294:8,11
  314:23 315:4
  317:13 324:7,8
  325:3,10 327:25
  329:10,11 330:3,3
  330:18 331:22
  332:7,20 334:8
  340:14 341:20
**acting** 241:17,19
  277:1
**action** 8:20 46:9
  87:15 89:5,10
  155:13 156:12
  178:7 209:22
  229:13,14 285:12
  338:2,4
**actions** 48:25
  122:10 159:21
  178:21 179:2
  229:10 279:23
  280:3 283:25
  325:24 329:8
**activate** 11:10
**activities** 97:18
  119:11 159:20
  188:21 284:18
  326:21
**activity** 124:7
  172:20 306:9
**acton** 2:20 193:10
  193:23
**actual** 40:5 41:18
  93:19 136:9 195:2
  206:19 208:25

**241:5
addiction** 176:19
  258:13
**adding** 61:13
**addition** 26:14
  242:13 267:20
**additional** 26:2,8
  26:10 27:8,17
  50:24 70:13
  108:13 111:25
  122:25 157:3
  221:23 222:22
  229:9 234:2
  335:14
**address** 21:19
  76:8 273:24 274:7
  274:15,20 291:13
  292:9 293:1
  339:15
**addressed** 249:18
**addresses** 157:15
  206:19,25 274:12
  274:12,25
**adds** 60:16
**adhere** 154:17
  163:9
**adjudication**
  265:15,17
**adjust** 155:12
**administer** 118:15
**administration**
  96:12 122:1
**administrative**
  284:11 324:9
  325:7 328:6
**administrators**
  114:24
**adopt** 290:24
  291:12 293:19,20
  300:24

**adopted** 293:25
313:23
**advice** 91:8 94:14
129:3
**advise** 296:4
298:15
**advised** 118:1
**advising** 287:17
**advisor** 91:3,6,11
91:15 96:1 136:14
136:20 143:21,22
**advisors** 92:1 93:6
**advocate** 300:14
**affidavit** 143:10
**affirm** 138:14
**affixed** 338:8
340:15 341:21
**aforementioned**
337:12,25
**afraid** 97:13
**afternoon** 205:3,5
205:13
**agencies** 117:25
**agency** 295:19
**aggregate** 75:21
159:1 234:20
261:13
**ago** 33:6 34:20
67:7 116:2 122:5
122:14
**agree** 11:21 41:24
63:25 123:24
165:3 166:22
167:3,8,25 168:9
168:14,15 170:1,1
173:10,23,25
177:9,14 178:4
183:25 187:13,21
188:5,8,10 202:17
203:13 208:25
214:5 217:23

218:14 231:14,19
231:21 235:1
244:18 247:7
248:13,16,21
257:20 261:19
264:17,25 282:20
284:5,21 290:14
300:20 302:11,16
304:3 308:12
313:17 317:16,17
318:11,15 324:18
329:18,22 331:1
**agreed** 71:8
263:12
**agreement** 31:7
46:10 94:2,5,8,17
95:19,20 140:16
141:1 145:13
146:11 155:10
289:8
**agreements**
153:19 154:20
**ahead** 14:3 51:11
52:20,21 97:15
281:9
**aid** 3:12 275:25
**aidazif** 27:23 28:3
**aim** 14:5
**airfare** 54:14
**albertsons** 87:23
**alert** 234:6 254:12
256:14 322:4
**alerts** 254:10
**algorithm** 95:5
98:12
**aligned** 21:9
**alj** 328:6
**allegations** 133:8
133:19 135:4,8
156:5 300:25

**alleviated** 310:18
**alliance** 3:17
**allowed** 36:8
137:18 184:15
**allowing** 208:5
**altered** 63:14
**alumni** 82:5 83:9
83:15,19
**alumnus** 82:17
83:3
**amanda** 12:18
16:23
**ambassador** 92:18
**amended** 6:6
**american** 101:10
186:22 321:10
**amicus** 6:18 137:5
137:9,12,15,24
138:2,6,9,13,19,24
139:3,23
**amount** 15:9
61:14 106:24
108:4 110:20
112:1 145:23,25
146:2 147:8 149:2
149:3,4 174:23
236:12 280:14
**amounts** 284:14
**ample** 208:7
**amy** 1:13 8:8,11
104:7 337:4
338:14
**analgesia** 248:11
**analgesics** 248:10
**analyses** 271:12
272:7 273:5,6,21
**analysis** 26:12
27:16,21 33:16,18
35:17 38:11,13
65:15 75:22
180:14,18 181:21

181:22 186:12
191:5 253:2,15,16
260:13 264:15
265:24 266:4
267:11,22,24
268:13,17 269:23
269:25 270:15,21
271:1,8,17,22
272:20,23,25
283:22 302:20
303:8 304:14
**analyze** 67:23
272:13
**analyzed** 35:9,14
35:21 36:1,9
38:20
**anemia** 249:2
310:1
**annual** 7:2 229:23
292:15
**annualized** 280:12
**annually** 292:8
**anomaly** 261:14
282:16
**answer** 11:21 13:6
13:12 14:3 31:25
37:5,8 38:14,15
46:22,24 47:3
48:9,23 49:9,11,14
56:21 66:5,8 84:7
100:24 121:16
133:14,25 135:9
135:11,16,20
140:17,18,21
153:2 155:1,15
162:14 163:18,20
172:8,15,19 179:5
186:6 188:16
218:4 226:7 239:4
239:24 240:8,8,11
242:18,19 253:9

253:23 257:2
261:11 264:7
273:13,17,18
277:14 283:2
294:17 300:1
307:21 311:17
317:25 320:13
answered  25:20
73:13 121:17
266:24
answering  13:13
183:4
answers  13:7
56:23 98:14 212:3
267:18 270:23
anti  310:12
anybody  10:6,8
11:4 16:22,24
17:11,14 32:6
41:13 45:12 47:22
57:22 137:24
150:21
anymore  122:15
178:19
anything's  261:20
anytime  161:21
291:22
anyway  199:14
apologies  52:3
58:23
apologize  29:4
85:17
apology  45:1
app  6:22
appear  53:25
82:13 101:16
218:7 220:7
340:11 341:15
appearances  3:1
4:1

appeared  56:18
136:17 274:4
336:1
appearing  2:1
appears  55:1 61:1
103:5 199:24
209:24 282:4
appended  341:11
341:18
appendices  280:24
appendix  6:9
14:22 19:18 20:17
21:23 24:15,17
26:15,18,25 43:11
43:19 44:12 69:6
194:13 281:7,25
282:2
apple  138:14
applicable  100:6
296:8 317:14
326:19,19,23
applied  57:5 163:5
245:5,6 326:15
applies  163:15
apply  300:17
appointed  297:11
appreciate  9:21
13:12 162:25
232:3
appreciated  92:20
approached  117:2
272:15
approaching
55:24
appropriate  48:4
68:12 81:9,12,15
111:23 132:14,23
156:1 184:5,23
236:4 250:25
252:5 287:18
309:2 310:3,6,25

311:6 317:24
318:3 320:24
appropriateness
318:10
approved  301:14
321:9,10
approximate
208:4 211:8
approximately
17:2 50:6 60:24
96:5 102:16 106:8
107:4,4,20 108:2
110:4 124:11,21
173:16 210:11,18
approximation
245:14,20
april  22:8 24:5
61:22,24 78:1,7,12
78:16,16,18,22
79:1,4,5 135:21
136:6 138:2
area  88:16 99:8
132:23 151:13
202:9 219:2
274:24 294:5
297:25 309:6
328:24
areas  69:22 99:6
140:16 157:4
217:18 288:6
334:22
arguments  300:25
arizona  289:14
arlington  9:25
arnold  125:15,21
arose  291:22
333:12
arrangement
146:5
arrested  76:9,10

arrow  193:21,23
arthritic  309:23
arthritis  309:22
310:8,11
articles  310:22
ascertain  237:8
257:8
aside  22:15 60:12
118:6 261:2
274:15
asked  18:5 25:20
31:15 33:20 41:8
44:23 45:6,25
46:2,16,19 52:15
55:20 57:16 58:7
58:9 65:17 67:20
85:4 96:19 97:12
98:13 127:18
132:9 134:9
135:15,24 140:3
141:16,17 172:10
192:14 226:15
263:12 265:23
270:1 276:4
284:13 292:12,16
303:24 311:1,2
312:6 313:3
314:24 318:4
320:10,14 321:16
334:6,18 335:10
asking  9:13,15
47:24,24 55:22
58:1 132:12
181:10 246:5
260:16 263:16
asks  100:13
aspect  241:6
289:25
aspects  119:7
assess  172:24

assessed 169:16,20

assessment 38:6
97:18,22,25
237:12 251:17
260:21 309:4

assessments
172:22

assignment 67:12
67:15,17 340:2
341:2 342:2

assist 41:13 91:9
288:10 289:19

assistance 139:19
294:6

assistant 317:3

associate 282:25

associated 40:6
48:21 138:23
255:20

association 6:17
8:12 77:21 78:9
89:15 91:24
101:11 103:7
114:1 120:12
143:13 145:3,6
296:16

association's 82:5
145:2

associations
314:15

assume 41:8 65:18
79:3 160:12 243:3
253:9,11 334:17

assumed 326:18

assumption
226:19 303:13,15
326:22

assumptions 41:10
249:24

assurance 68:14

asterisk 228:10

attached 42:15
142:19 144:4
145:8,9 151:18
341:7

attachment
193:15

attend 84:14

attention 176:9
179:24 180:1
243:10 270:5
282:3

attorney 16:20
24:13 139:12
338:3

attorney's 49:3
145:5

attorneys 9:12
10:24 16:12 57:6
338:5

audit 119:25

august 45:11
54:25 55:8 57:19
58:23 144:19
145:1 146:14

australia 288:18

authoritative
314:1,6,9

authorities 290:6
314:13

authority 138:8,16

authorize 221:13
341:11

automated 227:15

available 26:3
46:15 59:8 90:6
91:9 116:25
134:16,21 153:4,6
156:16,16,20
165:6,16 166:11
166:17 175:17

176:24 177:4
181:6,8 182:7
183:19 207:9
211:12 224:21
254:17 260:2
275:19,24 323:16
324:20

ave 339:1

avenue 2:11
332:10

average 17:4
105:23 110:17
207:9

avoid 265:19

avoided 170:20

award 82:6,9,17
82:21,23 83:3,10
83:16,19,23 84:1
145:18 149:2

awards 82:4

aware 10:18 34:9
78:25 83:8,12
137:5 150:4,7,15
150:16 151:16,22
151:23 152:12
172:22,24 173:2,7
173:8,15 177:21
186:21,25 187:1
223:22 224:2
233:17,21 240:19
248:9,12,15 263:5
264:1 265:3
272:21 299:23
322:10

**b**

**b** 2:20 6:9 14:22
19:18 20:17 21:23
24:15,17 26:15,18
26:25 43:11,19,25
44:8,12,20,21 69:6
144:5 148:17

149:10,13 153:1
194:13

bachelor 84:12

back 14:20 15:17
18:11,15,19 39:8
40:23 46:15 63:21
68:15,25 94:21
95:25 96:17
102:13 109:25
113:20 133:23
136:25 171:22
191:5,10 194:11
195:4 201:1
204:10 209:21
217:7 235:3,14
237:25 257:12
284:18 297:13
299:12,19 322:9
332:7 339:15

background 15:10
25:10 30:4,5 34:8
136:16 272:16
289:16 308:19
334:20

backwards 199:12

bad 103:18

bahamas 288:19

baldwin 125:22

ballpark 102:21

baltimore 2:18

bartlit 3:18

bartlitbeck.com
3:21

base 249:12
304:20 330:23

based 15:13 36:5
38:24 43:24 70:11
71:14 95:2 98:2
116:7 149:13
151:10,12,13
159:1 161:3

163:16 177:25
182:17 183:1
188:16 189:1
192:10 202:17
206:15 211:13
218:12 224:12
226:14 229:10
244:22 246:8,16
246:16 252:16
258:19 275:22
276:9 283:14
285:20 293:20
299:25 304:6,17
323:13 326:14
328:23 329:2
335:9,10
**bases** 31:23
**basic** 232:18
**basically** 106:23
**basics** 294:7
**basis** 36:3,10,12
37:11,20 39:16
74:3 111:20
122:25 155:8
175:6 191:5 209:9
209:12 218:10
271:2 304:23
329:15 331:18
**baylen** 4:3
**bear** 19:3 232:22
278:17 323:19
**bearing** 188:1
**beck** 3:18
**becoming** 54:24
315:13
**began** 21:17 63:15
69:14 86:12 283:3
**beginning** 147:14
158:7 280:19
325:10

**begins** 123:6 243:8
249:6 257:16
**begun** 90:16
146:23
**behalf** 1:14 2:2,14
3:2,8,12,17 82:24
103:21 130:10,13
130:17,21,25
131:3 135:15
144:22 147:3
149:17 155:6
337:14
**behavior** 161:13
214:10
**behaviors** 159:19
**believe** 24:4 32:24
35:12 86:12 87:19
87:22 92:9 93:7
104:8 107:9 119:7
121:6 135:20
138:7 139:3,13,22
161:11 174:20
185:16,21 194:20
201:2 212:5
233:18 239:18
240:3 241:20
252:19 269:8
271:7 301:20,24
302:24 308:11
326:5 328:11
330:10 331:15
**believed** 37:20
**believes** 230:22
293:19 308:9
310:17
**bell** 100:7
**benefit** 90:19
92:23 310:14
**benefits** 91:19,21
108:11,13 111:25
112:2,5 113:15

120:17,19
**benzo** 233:2
235:21 237:18
268:23 276:13
**benzodiazepine**
232:16,18 236:18
238:22 239:16
276:20
**benzodiazepines**
40:20
**best** 11:22 13:5
78:4 88:21 99:4
107:17 121:21
138:12,12 190:3
239:4 293:24
294:2
**bestowed** 80:24
**better** 195:13
221:6 242:18
261:4,11 292:25
**beyond** 136:3,4
211:10,18
**bibliography**
123:8
**big** 252:6
**billed** 61:8
**billing** 62:16,17
**billions** 117:19
**bills** 50:8
**binary** 204:1
**binder** 142:13
**bio** 113:20
**bit** 9:20 18:14
47:12 106:10
160:17 179:19
189:10 198:24
286:16 289:24
294:10 299:9
312:19 313:6
316:15 332:19

**blank** 12:2
**blocks** 117:9,13,14
118:6
**blow** 193:18 194:1
194:9
**blueprint** 97:9
99:5
**board** 28:12 55:13
55:19 56:3,5
57:10,16 58:4,12
64:20 68:13,15
80:21 85:15,24
86:6 98:8 99:19
111:17 114:5
136:11 178:9
225:21,24 226:15
229:2 256:14
294:20 295:1,8,11
295:12 296:23,24
297:3 303:9
318:19,23 319:3,7
319:15,19,24
320:7,11,16 321:6
321:12 322:11,16
323:10 332:24
333:9,12,13
**boards** 6:17 77:22
78:9 89:15 91:24
103:7 114:1 122:8
122:9,11 131:2
135:23 136:1
171:9 288:11,15
289:2,20 290:11
291:7,18 295:6
314:14 322:24
**bockius** 3:13
**bodies** 178:6
**body** 314:1,6,9
318:22
**bonus** 120:22

book  285:18
boots  3:17
bottom  228:5,9,15
  228:16 234:1
  267:14 326:25
boulevard  2:6
  4:11
bow  271:8
box  19:10 20:19
  50:20
boxes  24:24
brag  82:15
break  14:4 43:17
  68:21 131:15
  140:20 141:20
  204:14,18 213:3
  270:3 334:1
breakdown  268:3
breaks  14:5
brian  3:19 5:6
  37:9 285:25 286:5
  286:9
brian.swanson
  3:21
bridgeside  2:6
brief  6:18 137:5,9
  137:13,15,17,24
  138:3,6,9,13,19,24
  139:3,23 140:19
  141:12
briefly  98:4
  118:17 124:4
  286:25
bring  177:15
  179:2
broad  325:20
broadly  326:3
brought  21:16
  49:3 207:25
bs  84:9 86:9
  203:11

budget  92:15,16
  153:6
budgeted  146:2
  149:3
build  254:10
building  10:13,16
  10:19,23 92:14
bulk  321:8
bunch  311:25
burden  184:25
burn  217:20
bush  2:16 5:5
  136:17 157:6,8,9
  157:10 158:4
  160:16 161:16
  162:15,19 163:1
  163:11 164:2
  166:5 167:19
  168:6 169:25
  170:8,21,25 172:9
  172:21 173:14,22
  174:2 175:24
  176:11 177:8
  178:3 180:22
  181:20 182:15
  183:3,12,24
  184:19 185:11
  186:9,16 187:18
  188:4,22 189:4,9
  189:13,17 191:8
  192:2,17,25 193:3
  193:10,14,25
  194:4,21 195:11
  195:18,20,21
  196:7 200:13
  204:2,9,19 205:2
  205:13 209:8,14
  209:17,19,23,25
  212:15 213:16,24
  215:7,10,14,16
  216:2,14,18,23

217:6 218:3,20
  219:22 222:13
  223:6 225:2,20
  227:1,7 228:14,17
  228:24 229:16,25
  230:6,12 231:7,12
  231:22 234:14
  235:11,13,19
  238:13,19 239:12
  239:23 240:13,22
  241:4 242:8,20
  243:6,25 244:24
  247:6 248:8,20
  250:4,9,17 252:8
  252:14 253:7,22
  254:2,24 256:2,12
  257:10 259:4,12
  259:18 260:7
  262:8 263:11
  264:3,9,24 265:13
  266:5,22 267:12
  268:21 269:10,19
  270:3,12,13,19
  272:11 273:9,19
  274:6 275:2 276:7
  276:16 277:16
  278:2,15,18,25
  279:6 281:5,12,13
  281:23 283:2,20
  284:20 285:6,15
  285:22 286:3
  303:24 313:3
  314:21
bush's  286:16

**c**

c  2:1 3:19 9:10
  89:18,19 90:4,23
  123:7 197:18
  232:2 291:4
c1  203:14,15,19

c27  203:17,19
ca  339:25
cabinet  169:12,16
  170:14,15 171:23
  171:25 172:4
calculate  61:14
calculated  206:15
  235:17 242:10
  280:13
calculating  206:5
  206:5
calculation  243:16
calculations
  243:11
calculator  111:8
california  125:12
call  9:19 45:21
  46:13 64:24 65:8
  135:22,23 136:4,8
  136:13 139:17,20
  140:2,5 205:7
  286:13 328:21
called  9:18,21
  57:16 83:15 90:12
  91:25 93:5 116:3
  117:7 121:11
  194:18 203:20
  305:23
calling  159:16
  220:11 267:23
calls  136:15 139:2
  139:8,8,10
canada  288:18
cancer  217:19
  248:23 257:24
  308:12 309:13
cancers  309:17
candidate  98:18
  99:19 101:15
candidates  101:16

capacity 87:14
  95:7
capsules 323:24
capture 252:20
card 264:10,18,19
  265:2,4,10
cardiac 217:19
cards 265:7,15
care 38:19 39:2
  42:13 163:5,10,15
  163:17,19,21
  164:15,21 165:24
  171:5 217:17
  231:12 232:4
  248:25 286:14
  312:15 313:1,4,10
  313:12,14,16,18
  314:7,11,19,22
  315:3,9,13 323:23
  324:3,6,15 325:14
  328:9 329:6
career 25:14 299:4
carefully 41:22
  176:22
carmen 1:9,12
  6:14 8:3 9:1,10,19
  21:15 37:3 47:2
  48:15 49:9 66:5
  97:10,11 104:3,19
  105:21 141:19
  142:18 148:22
  264:6 300:21
  316:14 336:25
  337:8 339:8 340:4
  340:9 341:4,13
  342:20
carolina 1:15 10:3
  145:6 149:13
  151:12,13 154:15
  337:15

carter 297:8,10
  298:13,18,20
case 6:20 8:4,6
  9:15 12:11 18:7
  19:8 25:6,19 29:2
  29:11 30:2,12
  32:19,20 34:23
  37:17 41:2 45:23
  49:3 50:18 52:14
  55:25 56:10 57:6
  57:8,19 58:9,19
  65:6,8,20 64:16
  65:7,7,14 66:15
  67:3,9,18 68:4,6
  68:18 72:20 73:1
  78:21 95:8,11
  118:3 132:1,3
  133:21 138:3,14
  145:10 148:25
  149:11,13,14,18
  151:11,20 152:8
  152:12 153:11,16
  153:22,24 154:8
  154:21 155:9
  156:9 160:11
  164:8 196:9
  207:18 209:6
  242:18 250:20
  272:8 274:5
  283:17 298:19
  300:18 302:13
  310:24 316:21
  322:10,12 323:3
  326:6,21 328:5,7
  334:14 339:6
  340:3 341:3
cases 1:7 46:1 47:8
  47:13,15 48:13
  50:1,2 57:12
  67:21 98:16
  124:10,18 126:16

126:21,22,25
  127:1 128:20
  129:13 130:15,18
  146:17 147:14
  148:13 151:10
  152:19,20 154:1,6
  163:9 170:9 207:8
  225:13 229:11
  244:17 267:3
  283:10 285:1
  330:6 331:3 334:9
  334:12,24 335:6
  335:18
cash 261:24 262:1
  262:14,20,23
  263:1,3,6,19,22,24
  264:10,13,14,14
  264:18,19,20
  265:2,4,7,10,14,18
  265:19 266:1,8,10
  266:15,19 267:5,6
  278:10
categories 69:17
  69:20
categorized 198:7
catizone 1:9,12
  6:15 8:3 9:1,10,22
  9:22,23,24 22:3
  23:10 38:2,9
  52:10 53:3 69:6
  78:8 80:14,17
  81:2 93:5 103:8
  104:3,15,19
  105:21 113:3
  123:7 131:24
  133:17 140:24
  141:11 142:4,18
  142:23 143:3
  148:22 157:10
  158:2 205:3
  209:20 210:2

227:9,13 228:18
  270:14 281:8
  282:12 286:1,6
  334:5,5 336:25
  337:9 339:8 340:4
  340:9 341:4,13
  342:20
catizone's 300:21
causal 304:24
cause 1:3 31:16
  338:2
caused 158:21
  166:13 238:9
  259:7 310:7
caution 316:14
cd 197:18
cdc 244:10,14
  245:25 246:6,17
ce 321:8,8
ceiling 248:11
cell 112:6 113:14
  249:2 310:1
center 206:7,8
centers 244:4
centralized 289:12
centre 3:5
century 324:2
ceo 287:3,5
certain 90:5
  139:24 165:22
  213:9,18,25 214:6
  217:14 253:10
  264:16 293:1
  300:2,5,6 307:24
  308:1,6 316:24
certainly 52:18
  252:12 298:17
  308:8
certificate 341:11
certification 340:1
  341:1

certifications 88:25

certified 1:13,13 8:11 337:5,6

certify 337:8 338:1

ces 321:17

chagrin 4:11

chain 87:18,21 131:1,3 224:24,25 275:17,19 302:12 317:18 323:3,11

challenge 156:24

chance 51:9 52:18 78:24

change 20:9 44:9 44:10 79:25 80:2 80:19 339:13,14 341:8 342:3

changed 36:5 43:25 44:2,8,19,21 63:14 67:4 81:1 232:24 245:1 259:6,15,20 296:5

changes 19:15,19 23:7 24:12 38:24 61:13 80:5 190:4 242:4 322:4 339:12 340:7 341:7,9

characterization 310:10

characterizations 156:8

characterize 271:4

characterized 249:5

charge 88:11 115:21 284:13

charged 49:22 50:1,2

charitable 90:24

chart 228:10 282:24 285:3

check 43:6 53:15 58:21 81:23 93:12 129:15 224:4,6 330:15

checklist 26:10 27:9

checks 179:14

chicago 83:3,19,21 84:3,10,18,20 85:5 88:17

chief 295:21,22

child 219:1,24

choice 37:24 38:12 207:11

choose 81:16

chose 121:18 211:18

chosen 40:9,11 225:3,4

christopher 126:6

chronic 245:25 257:25 258:1,4,7 310:7,11,13,15,21

circling 39:8

circumstances 160:1 165:6 185:13 213:15 233:18 245:6 251:2 262:13 263:18,21 315:1

citation 123:5

citations 123:14 325:21,22 330:22 335:14

cite 6:20 132:7 229:17 230:16,17 314:9 324:7,15 325:2,6 326:16

327:8 334:24 335:22

cited 15:2,5 17:24 42:4 126:21 156:15 173:15 267:2 325:23 330:6,12 334:9,12 335:7,9

cites 133:1

citing 154:21

civil 1:16 8:19 337:16 340:5 341:5

claim 265:16 300:25 330:19 335:2

claims 132:9

clarification 6:16 76:23 89:20 96:24 124:25 150:5,8,17 150:22,23,24 151:22 326:24 328:4

clarifies 330:3

clarify 43:12 57:3 162:25 333:3

clarifying 321:17 330:7

clarity 136:16

classes 321:20

clear 13:5 24:19 35:11 39:9 44:11 47:23 48:20 77:1 82:23 83:18 88:21 147:1 154:8 155:18 156:23 172:1 220:18 235:18 291:1 305:22 307:22 311:3 330:6,19,23 330:25 331:5

clearer 19:21 181:9 196:23

clearinghouse 90:2 288:25

clearly 175:2 231:25 329:7

cleveland 2:12 4:11 188:5 339:2

click 193:20 198:17

client 152:10 154:5,23 156:6,17 156:18 286:20

clients 48:7 95:3 129:1

clinic 188:5

clinical 122:24 123:10,20 309:3

clinics 187:14,22

clm 94:19,22,24 95:1,8,12,19,23

close 10:11 193:21 214:20

closed 168:20,24 169:2,6,7,10

closely 114:6 115:4,8 258:9

closeness 207:13

cocktail 232:11

code 202:9,14,18 202:21 203:1,5 204:1 206:8,8,9,15 206:20 207:1 324:9 325:7

codefendants 157:5

codified 171:10

coffee 12:4 93:1

cohen 4:9,10 141:10,10 154:25 204:15

**cohen's** 154:18
**colleague** 195:4
**collect** 270:6
**collectively** 52:25
  142:16 236:6
  292:16
**college** 82:4 83:5
  83:21,22 84:3,14
  85:5 219:4,19
  317:5
**colleges** 316:4
**columbia** 288:16
**columbus** 210:12
  210:18
**column** 108:3
  197:13,16 203:11
  210:8 283:7
**columns** 200:19
  203:11 283:9
**combination** 6:22
  7:3 190:15 232:9
  233:2 234:10
  235:25 236:6,8,13
  236:23 238:9,11
  238:21 239:1
  241:1,8,8,12 247:5
  255:1 276:8 282:5
**combinations**
  203:3 232:14,15
  232:19 233:19
  235:2,6,7,16 237:6
**combine** 107:2
**combined** 237:17
**come** 36:21 41:15
  45:19 251:22
  304:16 311:4
**comes** 89:22
  262:10 276:10
  324:14
**comfortable**
  177:24

**coming** 106:23,24
  157:23 173:25
  208:16,19 255:11
**comment** 161:2
  197:3 222:17
  269:18 335:1
**commented**
  136:23
**comments** 136:24
  154:18,18 193:21
**commission** 68:14
  338:19 340:19
  341:25 342:25
**committee** 111:18
  111:22 287:7,9,11
  287:17 293:4,5,6,8
**committees** 114:2
**commonsense**
  220:19
**communicate** 11:4
**communications**
  66:9 135:14
  154:19
**community** 299:2
  299:10
**companies** 165:22
  254:16
**company** 3:2 92:1
  92:5,12,14 93:4,16
  94:21 95:9,16
  109:15 165:17
  166:10,17 255:6,8
  256:11
**comparable**
  247:15,17 272:25
**compare** 266:7
**compared** 73:23
  185:1 245:10
**comparison** 23:19
**compensated**
  49:18 91:17 94:19

  95:1 102:7 106:13
  106:14 109:18,20
  122:12 131:8,11
  146:3
**compensation**
  106:4 108:4
  120:17 121:2,3,15
  121:17,18,23
  145:21 146:18,20
  146:20,23 147:15
  147:18
**competence** 97:18
  98:7
**competencies** 99:3
  99:4,9,10,12,14
  100:14,19,22
  101:1,4,9
**competency** 99:18
  99:21 289:21
  316:8
**competent** 114:10
  114:12 313:14
  320:12
**competing** 117:16
**compilation** 91:24
**complaint** 133:2
  133:19 135:3
  137:1,2 154:13
  155:20 156:16,22
  207:21
**complaints** 319:20
**complementary**
  164:1,3,16 314:24
**complete** 31:12,22
  42:14 44:11
  151:14 159:18
  321:14 322:20
**completed** 22:10
  23:2 339:15
**completely** 14:9
  155:4 156:3,10

  238:6 282:16
**complex** 307:14
**compliance**
  118:20 119:22
  295:22
**compliant** 119:18
  120:5 320:21
  332:3
**complicated**
  217:21
**complied** 71:17
**complimentary**
  91:23
**comply** 119:13
  185:18 186:2
  226:2 229:3
  318:25 319:4
  321:14
**complying** 320:24
**composite** 50:17
  52:6 144:11
**comprised** 293:6
**computation** 7:4
  282:6
**computations**
  242:4
**computer** 11:7
  193:8 204:1
**computers** 11:8
**conceive** 251:18
**concept** 72:22
  90:15,18 289:7
**concepts** 154:3
**concern** 158:21
  234:5 259:7
**concerned** 26:11
  39:3,4 79:14
  127:22 140:15
  158:15 263:9
**concerning** 6:16
  76:7 177:4

**conclude** 252:12
**concluding** 120:4
**conclusion** 218:10
218:13 280:16,25
**conclusions**
282:24
**condition** 311:6
**conditions** 233:20
248:21 307:24
308:1 309:23
310:2,25
**conduct** 188:3
254:14 318:9
320:20 322:17
**conducted** 8:18
300:10
**conference** 10:5
**confidential**
153:24
**confirm** 22:21
23:25 43:17 49:16
52:11 53:11,24
140:13
**conflicting** 273:1
**confused** 20:15
96:22 140:1
239:11
**confusing** 19:20
227:25
**connection** 13:20
14:21 31:14,24
48:8 54:12,21
55:17 56:13 57:2
60:14 75:1,6 76:2
76:20 77:20 137:6
137:9 142:5 184:2
**consecutive** 24:22
24:23
**consensus** 208:3
245:1

**consider** 114:10
125:7 163:21
168:25
**consideration**
242:22
**considerations**
14:11
**considered** 6:10
14:23 20:16 24:18
25:5 32:4 43:11
63:9 69:7 80:11
82:14 85:20,21,22
131:6 161:23
244:18 267:2
**consistent** 163:4
**consistently**
251:25
**consult** 184:2,2
185:14
**consultancy**
140:11,16 141:4
155:23
**consultant** 47:22
48:2,8 81:1 129:4
134:14
**consulted** 180:16
181:1 183:15
185:19
**consulting** 46:25
48:6,16 92:12
93:4,16 94:20,21
108:17 109:14,18
124:7 129:5
132:12,20 133:6
133:10 134:12,23
135:12 140:25
142:9,11 145:4,13
146:5 149:16
151:7,19 153:1
154:10 155:5,10

**contact** 115:24
322:3
**contacted** 54:24
55:7,10 59:2
**contain** 31:12,22
32:3
**contained** 26:19
42:2 105:1 185:15
247:2,3 268:1
271:22 335:3
**contains** 44:24
**content** 66:6
135:14
**contents** 41:24
134:13
**context** 76:4,5
140:11 166:7
172:7 258:16
283:2 326:20
**continuation**
261:17
**continue** 87:3
88:12 283:1
316:18
**continued** 3:1 4:1
7:1 97:2
**continues** 245:22
**continuing** 315:15
319:18 321:2,7,9
321:14 323:21
**contract** 95:22
142:4 144:19,22
145:4,6,7,18,23
146:4,21,21
148:18,21 151:2
152:7 153:7
**contracting** 145:7
**contractor** 143:17
143:20
**contractors**
117:15

**contracts** 106:12
106:19 144:5
146:22 149:9
152:25
**contractual**
111:21
**contribute** 307:11
**contributed**
166:15 307:17
**control** 244:5
**controlled** 14:17
40:19 119:13,18
125:10,11,13,16
125:18,19,20,22
125:25 126:8,9
168:19,21 176:16
178:16 180:7
182:10 186:23
187:3 213:4
223:19,20 230:20
302:22 303:10
306:4 314:23
315:4 317:9,13,14
324:7,8 325:2,10
327:2,25 329:1,5,9
329:11 330:2,18
331:22 332:7
333:2,13 334:8
**controls** 280:5
**convene** 336:15
**conversation** 33:7
33:11 34:21 35:2
35:7,16,18 46:12
56:15 57:9,18
135:17 139:1,6
141:8,12,23
171:19 203:25
**conversations**
37:4,6 38:16 66:6
135:7 136:3
150:21

conveyed   184:16
convicted   89:12
   188:20
copies   21:8 53:4
copy   21:18 51:6
   51:21 91:23 145:7
   205:16 217:1
   230:8 279:7,22
   281:1
corporate   179:13
   286:14 312:9,9
corporation
   175:16,22 183:19
correct   10:13,14
   12:22,25 13:1
   14:23 22:6,8,25
   24:8,9,16 26:16,17
   26:20 34:24,25
   37:10 39:14,15
   40:21,22 43:15,16
   43:17 44:14,15,17
   47:14,15 49:4,19
   49:20 54:18 57:20
   60:9,14,15 61:22
   62:6 63:23,24
   64:2,4 67:9,14
   68:4,7,8,19 70:8
   70:17,20 72:15,16
   73:17,21 74:2,6,7
   74:19,20 76:2,21
   76:24 77:4 78:2
   78:13,19,22 79:5,5
   79:7,8,20,21 80:14
   80:15,17,18 81:7,8
   81:10,13,18,19
   82:6,9,10,25 83:4
   83:10,20 84:10,11
   84:25 85:15 86:7
   86:8,10,13,14 87:1
   87:2,15 88:3,4,23
   88:24 89:16,17

90:6,10,11,13 91:4
91:5 95:13 96:2,3
96:10,14 97:8
98:14 103:21,23
104:4,20,21 105:2
105:4,17,21,22,24
105:25 106:3,5,6
106:25 107:1,5,6
109:3,7,8 110:1,2
110:5,6,12,17,24
115:17 117:23
118:25 119:2,5,14
119:22 120:5
121:15 122:2,3
123:17,18,20,22
123:25 124:2,20
128:11,23 129:7,9
130:15,18,19
131:1,9,12,14
132:3,7 133:24
134:5 135:5 136:6
136:7,11,12 142:7
143:4,8,9,17 144:5
144:15,20,23
145:10,11,14,19
145:24 147:6,12
147:20,25 148:5
148:13,19,22,25
149:2,5,7,11 151:2
151:4 152:10
153:16 154:11
159:25 169:11
179:25 183:11
202:18 203:6
204:4 205:8 206:4
231:11 232:8
259:17 262:21,22
266:2 273:10
276:4 284:8
302:16 303:22
319:13 321:16

corrections   339:12
   341:17
correctly   121:17
   259:3 271:5
   294:17
correspond   19:23
corresponded
   192:21
correspondence
   322:2
corresponding
   46:2,4 67:20 70:4
   70:8 71:12 138:17
   162:1,4,10 163:23
   165:3,9 166:14,19
   166:25 327:11,20
   328:17
cosmetic   118:21
   119:16
cost   92:3 117:18
council   321:10
counsel   9:15 10:12
   10:15,22 13:17,19
   16:7 29:19,22
   32:9,12,16 37:1,5
   37:7 38:16 45:7
   51:15 52:7 65:23
   66:7,9 67:24
   69:14 70:25
   129:20 136:18
   141:5 170:23
   171:11 337:25
counseled   170:18
   171:13
counselors   8:10
counted   121:15
   268:18,20
counties   46:19
   174:5,6,19,24
   177:13 238:23
   240:1 241:13

307:12
country   116:7,14
   292:22 298:7
county   1:14 7:4,4
   13:25 174:11,13
   175:10 176:2
   177:16,19,22
   178:1 238:23
   239:7,14 241:14
   282:6,6 337:2,7
   338:21 340:10
   341:15
couple   30:23 39:9
   44:23 208:13
   241:23 261:9
   267:17 287:1
   294:14 298:24
   305:4
course   122:6
   187:10 195:25
   233:13 258:6
   260:3,9 306:24
courses   321:14
court   1:1 8:5,7
   13:7 27:19 35:19
   35:22,25 36:9,13
   36:15,22 37:21,23
   37:24 38:10,21,24
   118:4 130:4,6
   150:5 151:25
   243:3 253:19
   311:4 340:7
court's   26:1 30:10
   35:8 37:16 38:3
   190:11
courtney   2:4
cover   124:18
   282:1 286:11
coverage   217:13
covered   140:16

covid  44:3
craig  32:24 75:3
create  23:14
   168:20 196:20
created  226:3
   280:25
creating  29:24
credential  257:5
credentialed  257:6
credible  173:25
credit  195:16,20
credits  317:8,12
crime  89:12
criminal  178:21
crisis  307:12,18
criteria  39:18
critical  219:11
   225:1 333:20
cross  5:4,6 157:7
   286:4
crr  338:14
csa  120:5 169:3
   226:6 325:12
   326:5,18,22 327:8
   330:21
csr  338:14
cup  12:4
curiae  6:18
curious  235:20
current  82:16 84:5
   91:8 96:6 109:15
   315:16 320:12
currently  91:3
   132:1 315:23
curriculum  6:7,8
   97:22 98:2 317:11
cursor  197:15
cut  18:13
cutoff  211:9,16
cv  12:3,8,10,11
   18:20 20:12,25

21:12,18 24:1,3,7
24:10 77:14,16,19
77:25 78:20 79:12
79:13,18,22 80:10
80:13,16 82:1,8,16
84:5 96:7 113:20
121:19,25 122:18
124:7,13 287:24
288:1 298:24,25
cvs  2:14,14,14,15
2:15 27:11 136:18
157:11 179:22
180:3 181:8
184:10,10,11,22
185:1,5 194:18,22
195:6,23 209:17
226:22,23,23,24
227:1,7 229:25
230:2 250:12
254:3 263:6,9,10
273:25 275:25
281:6,12 284:12
284:12,19 285:12
297:13,16
cvs's  284:14
cwolf  2:8

d

d  3:9 6:22 28:4
dan  16:21
danger  238:15
dangerous  176:7
data  23:15 26:12
26:12 27:16,21
33:16,17,20,23
34:13 35:9,13,17
35:20,23 36:22
38:24 39:4 41:18
41:19 63:14,15
65:15 67:23 69:21
73:24 75:9,10,12
75:14 77:3 159:1

161:4 166:12
173:9 174:16
175:15,21 181:6
181:17,17,21,22
181:24 182:4,7,19
182:24 183:1,6
186:10 190:24,25
191:10,10 192:12
192:15 193:11
194:18,23 195:6
195:23 196:8,25
197:2 198:5,6,8,15
198:22 199:1,6,19
200:9,14 201:22
203:22 204:6
207:14,24 213:3
215:25 218:7,13
224:12,16 234:20
249:22,25,25
250:5,7,11 258:20
261:13 270:2
271:19,21,25
272:1,22,24 273:2
274:3,21,23
275:22,23 276:4
276:10,21 283:7
307:13
database  181:15
date  22:10 23:2
50:6 52:8 53:13
58:24 137:16
196:22 197:24
199:24,25 200:7
201:12,23 321:4
339:8 340:3,9,19
341:3,13,25
342:20,25
dated  6:4,6,11,15
6:18 22:8,25
142:18 144:19
227:16

dates  33:3 79:19
84:6,7 108:21
112:18 199:20
200:2
david  3:4 4:9,10
4:12 141:10
day  3:9 19:21
102:3,3 117:20
174:10 201:16
233:7 237:19
238:4 241:19
243:13,14,18,19
244:18 245:2,11
245:12,16,19
246:4 250:23
252:18,22 253:12
254:6 257:15
260:12 261:16
268:25 269:11
277:1,7,9,9 278:5
338:8 340:16
341:22 342:22
day's  268:24
days  220:14,22
233:4 238:4,4
252:21 260:11
261:9,9,15 275:8,9
280:20 339:18
dayton  210:21
dc  2:22
dea  76:7 114:2,6
114:10,11,16,20
115:14 117:23,25
118:8,11 122:6
127:3 146:17
147:3 163:23
178:12,14,16,21
186:21 187:1
226:5,5,10,12,19
229:11,13,14,18
252:12 256:17

267:2 279:23
280:3,7 283:5,10
283:14,19,25
284:11,15,19
285:11,21 296:5
302:21 303:2,25
325:24 329:7
331:2,7
dea's 187:7
deadly 176:18
248:5
deal 242:23
dear 339:10
death 174:19
deaths 305:17,18
december 143:13
146:22 284:15
decide 33:25
155:13 166:20,25
175:11 229:12
237:14 295:24
296:12
decided 36:13
38:19 39:2 117:6
249:16,17
deciding 246:13
269:20 277:23
decision 35:8
38:21 131:5 137:8
209:9 210:1,2,4
217:3 229:17
242:23 289:17
290:6 296:21
298:1 312:8
317:23 318:2
decisions 152:19
225:13
declaration 6:14
134:4,20 142:18
143:6 144:4,10,13
144:25 145:8

declarations
134:17
declined 280:9
284:4
decrease 283:6
285:5,14,17
decreased 284:25
285:4
deed 340:14
341:20
deemed 111:23
339:19
deeming 239:3
deeper 286:17
defendant 3:8,12
58:16 87:15
130:17 131:17
132:13,17,21
143:4 144:12
154:5 181:23,24
182:3 196:9
224:13 276:10,11
318:7
defendant's
258:20 275:23
defendants 1:15
2:14 3:2,17 9:14
13:10 24:20 26:11
27:9 38:22 52:12
56:25 64:15 69:21
70:3,7 71:7,15,17
71:22 72:6,9,20,25
73:19 74:5 75:9
78:22 84:4 87:19
88:23 119:4,8,10
158:15 180:14,25
182:18,25 183:15
184:1 185:17,17
186:2 196:9
204:13 224:11,15

226:1 254:4,23
274:1 280:4,7
282:4 283:8,15,25
303:18 316:20
317:3,19 326:21
333:11,16 337:14
defense 73:20
defer 121:18
deferred 108:10
120:23 121:1,3
deficiency 251:6
define 306:19
313:11
defined 220:11
228:11
defines 225:21,24
defining 288:7
definitely 170:9
definition 168:17
205:19 225:15,18
226:16 228:19
229:4,7,19 325:13
degree 81:6 84:12
85:2,6,7,14 86:1
88:2
degrees 79:20
delaware 132:2
142:21 150:5
151:21
deliberations
211:6
delineated 127:7
delivered 53:22
demographics
211:15
demonstrate 98:7
denver 3:20
dep 62:23 63:19
department 17:8
17:11 130:13
132:14,16,18

133:6,11 135:1,13
135:21,24 139:12
142:5 155:24
156:18 339:22
departure 296:10
depend 179:5
292:11 308:15
depending 206:25
260:6 295:23
depends 311:8
deponent 336:21
337:9,21,22
deposed 12:20
deposited 120:23
deposition 1:8,12
6:2 8:2,16 10:2
13:16 14:13,15
15:2,19,24 16:5,10
16:13 17:9,12,16
17:20,25 18:6,10
18:17,19,23 19:6
20:1 21:17 24:21
27:23 28:3 31:7
41:5 44:13 61:3
63:18 69:9 129:21
130:1 270:16
336:2 337:13,17
339:8,11 340:1,3
341:1,3
depositions 14:19
16:3,4,6,8,11
17:21 322:12
333:11
depth 13:2 39:8
47:11
describe 99:4
116:6 236:15
described 249:9
describes 189:22
describing 320:6

designate 314:18
designated 46:23
designation 80:22
　81:6 85:19,23,24
　85:25
designed 168:19
designee 295:21
despite 180:5
destroyed 153:25
detail 157:19
details 33:22
　46:16 47:24 99:6
detect 319:23
determination
　70:19 176:25
　177:2 183:1
　219:17 222:5,5
　245:24
determine 71:16
　95:5 167:14,20
　175:4 191:15
　213:1 214:24
　215:19 216:7
　224:8 265:24
　327:4 331:17
determined
　111:16 184:4
　191:16,19
determining 100:4
　237:16
develop 99:9
　117:3 208:2
　314:16
developed 99:11
　116:10 157:18
developing 97:8
　99:10
development
　102:3 289:20
devices 315:16

devised 247:23
devote 91:14
diagnosis 309:3
dictated 35:22
　38:10
dictating 36:22
die 238:10 305:2
died 174:9 304:21
　304:23
difference 106:17
　212:6 237:12,15
　245:4 294:19
differences 245:14
　245:20
different 23:18
　47:17 86:21 88:14
　106:20 124:6
　141:7 147:1
　149:22,24 156:25
　164:5,6 179:8
　202:14 203:3,4
　223:21 228:18,23
　232:15 233:3
　235:16 243:11
　245:5 246:4
　249:10 250:20,23
　252:21 259:22
　263:16 278:16
　288:6 294:14
　313:4 314:13
　336:10
differently 225:25
　235:7 239:5
　250:10
differs 251:16
difficult 97:14
　197:1 248:1,2
difficulty 104:16
diligence 212:23
　229:9 237:8
　254:14 257:7

299:25 300:10
　312:11
diminish 280:22
direct 5:3 9:6
　33:17 179:23
　180:1 206:12
　243:9 313:15
directed 206:14
directing 332:7
direction 243:4
　337:19
directly 55:19
　84:14 146:24
　159:16 304:3
　333:15
director 15:8
　77:22 78:8 80:20
　80:25 92:8 94:14
　96:2,8,9 97:2
　102:1 104:4,20,24
　108:17,20,23
　120:9 136:10
　138:11 143:12
　145:2 184:17
　287:3,5 295:7
directors 111:17
　135:22,25 136:22
　296:24
disagree 38:5
　132:24 156:3
　173:10,12,23
　175:15 180:21
　182:23 231:14,19
　248:13,16 252:2
disciplinary 89:5
　89:10 90:2 122:10
　240:24 288:25
discipline 240:15
disciplined 241:7
　241:11 252:9

disciplining 319:4
disclose 37:11
　135:14
disclosed 47:3
　49:6,7,8,10,12,13
　49:15 56:9 101:14
　190:13,20,25
　191:16 192:8
　310:23
disclosure 141:6
discontinue
　221:12
discount 264:10
　264:14,18,19,20
　265:2,4,7,10,15
discovered 225:11
discussed 32:16
　35:12 86:9 113:15
　113:17 120:18
　139:23 144:3
discusses 328:21
discussing 293:17
discussion 32:23
　36:25 59:18
　137:23 138:22
discussions 32:8
　37:10 114:3 138:5
　156:7 261:1 297:3
　333:9
disease 244:5
　309:13,16
diseases 309:1
disinterested
　338:1
dispense 178:2
　183:9 299:17
　306:12,15 307:5
dispensed 158:23
　161:20 167:9
　169:4,9,21 172:11
　177:13 180:8

182:19 183:8
186:6 201:12
205:9,20,25
243:12,17 249:10
252:17,17 280:8
280:19 284:3,14
299:20 300:8
303:1
**dispensing** 75:9,10
75:12 77:3 166:12
181:23 185:23
194:22 196:22
224:12,15 243:8
254:10 258:20
260:20 275:23
276:9 300:7
306:16,16 307:2,4
307:7 311:22
313:15 317:9
329:1,4,23 333:21
**disposal** 170:19
171:7,12,20
**distance** 205:7,8
205:24 206:4,14
207:5,10,15 208:4
211:3,4,8 215:18
217:12,24
**distances** 207:22
**distinction** 291:2
**distinguish** 57:11
176:12
**distribute** 292:24
**distributed** 118:19
294:21
**distributes** 294:13
**distributing**
291:17
**distribution** 2:15
118:22 119:7,11
120:7 125:10,11
125:13,23,24

126:2,4,7,9 168:20
169:2,6,7,10
175:21
**distributor** 168:22
**distributors**
118:19,25
**district** 1:1,1 8:5,6
125:12,14,18,19
125:24 126:1,5
132:1 142:21
145:5 151:21
288:16 292:15
**dive** 286:17
**diversion** 71:19
114:23 115:7,21
122:6 168:17,25
169:13,16,20
170:2,3 171:23,25
172:10,17 174:4
176:20 212:24
247:14 262:12
280:6
**divert** 248:2
**diverted** 161:1,5
161:20,23 167:10
167:16 168:11
174:22 175:13
176:3 180:7
212:19 222:8
247:8,10,21
**divided** 247:5
**division** 1:2
125:20
**doc** 26:1
**doctor** 76:7 80:22
80:24 81:7,10,13
85:25 98:1 178:9
178:18 214:13,15
216:11 220:5,6,12
223:8,17,17
225:22,24 228:6

228:10,19 229:4
229:19 230:17
240:25 252:9
275:8 306:20
307:5 308:19
316:2,25 318:14
**doctor's** 76:7
188:13
**doctorate** 81:3,5,6
85:14
**doctors** 76:9 85:23
86:3 118:11 182:8
188:11 206:23,24
229:18 230:18
231:9 239:19
240:1,4,15 302:20
303:1,7,19 304:1,4
304:9,12,15
306:21 323:24
**document** 1:6 15:3
15:6 21:15,20
23:9,17 24:13
25:1,16,17 27:11
27:18 28:9 29:1
29:10,13,25 30:8
30:14 31:2 56:25
59:17,22 61:11
63:7,9,19,21 73:19
78:25 103:9,11
150:8 171:15,19
192:18 194:5,7
195:2 197:5
219:13 222:5
231:4 244:6
271:16 279:12
285:3 291:23
301:17 325:19
326:18,23 329:12
331:14 334:7
335:2

**documentation**
71:6,16,21 72:3,5
123:9 160:9
162:14 164:7,10
164:13,19,20
171:2,14 216:1
218:11 219:10
237:10 256:15
328:8 329:5,24
330:5,19 331:20
333:12,17,20
**documented** 219:7
220:2 300:9
**documenting**
71:14 327:20
328:22 329:20
331:4 333:1
**documents** 15:9
15:11 17:24 18:21
19:2,6,10 20:6
23:14 24:25 25:8
26:13 27:13 29:19
30:5 31:4 51:10
57:4 59:20 70:10
70:11,13,17 72:19
72:25 73:24 74:9
74:12,14 93:13
115:13 132:10
142:25 155:22
156:17 171:5
244:8 294:10
301:13 324:16
325:21 330:14
336:3,4,7,8,10
**doing** 55:10 56:19
61:19 92:19
119:10,22 122:14
149:16 204:11
265:3 306:15
313:19 314:3,3
330:13

**doj** 135:7 136:2,4
136:9,24 138:24
139:1,4 140:12
144:14 146:2,5,13
146:17 147:11,18
147:19 148:12
149:5,10,17
152:19,22 153:10
153:19 154:10,20
155:6 207:21
229:14
**dollars** 148:11
**domain** 92:1,2,4
92:11 93:14,15,19
94:11 99:7 144:3
**doman** 1:13 8:8,11
337:4 338:14
**dosage** 244:15,19
244:23 245:2
246:4,14 249:12
259:5,14
**dosages** 174:17
234:5,24 245:10
245:11,16,18
258:11
**dose** 222:24
248:10
**doses** 238:11
248:22 308:25
**dosing** 234:5,24
**double** 58:21
129:15 187:19
193:23
**dph** 1:9,12 9:1
336:25 337:9
339:8 340:4,9
341:4,13 342:20
**dr** 9:22 78:8 80:14
241:11 280:13,24
297:8,10 298:13
298:18,20 334:5

**draft** 63:22 66:21
67:24 68:3 132:9
134:9
**drafting** 62:21,24
64:1 66:13,24
67:16 68:16
291:17
**drastically** 110:7
110:10
**drew** 15:13
**drop** 283:16
**drug** 87:22 116:9
118:20 119:16
122:1 138:15
174:9,19 176:7
195:8 217:13
247:4,7 249:12
259:5,20,21,22
318:9
**drugs** 125:23
126:5 161:19
167:9 169:20
173:19 236:7,9,23
238:21 246:24
280:8 284:2 305:6
305:11,21 315:16
**due** 237:8 254:14
257:7 312:10
**duly** 9:2 337:10
**dummy** 11:9
**dunning** 4:2
**duplicate** 203:8
**duplication**
127:16,18,20,24
128:1,12
**duplicative** 202:13
202:15
**duration** 221:3,4
234:4,23 236:3,4,8
236:11

**duties** 324:1
**dying** 177:22

**e**

**e** 2:1,1,4 9:10
339:5
**eagle** 3:2
**earlier** 10:24
16:20,23 25:7
26:18 31:10 32:14
54:23 56:11 58:1
60:3,6 63:6 65:15
77:25 78:23 85:13
106:7,22 125:3
147:2 153:13
172:10 191:21
224:20 265:24
270:20 299:9
305:16 313:3
318:4 322:2
327:16 334:18
**early** 277:18
280:20,20
**easier** 20:6 112:25
289:15
**easily** 21:5 113:2
247:10,25
**east** 2:11,17 6:20
209:15 210:4
217:3
**eastern** 1:2 3:17
126:1 145:5
**easy** 53:5
**editor** 294:25,25
295:3,9,16
**education** 308:24
315:14,15 319:18
321:2,7,9,11,14
**educational** 86:7
90:24 289:21
290:5 321:21

**eekhoff** 2:5
**effect** 248:11
272:4
**effective** 280:5
310:13
**effectively** 199:15
**effort** 167:12,14
167:20 214:24
215:19 266:7
272:12
**egotistical** 82:13
**eight** 17:5 315:24
316:3,11,22
**either** 73:7 171:13
187:5 202:3 214:7
214:24 216:12
250:20 293:21
298:4 338:3
**elected** 111:18
295:22
**electronically** 44:5
**elements** 171:10
**elevated** 97:1
**elevation** 310:15
**eleven** 123:8
**eliminated** 253:2
**elsner** 2:4 8:22
10:12 13:22 14:1
16:12,19 17:14
20:8,15,25 21:7,15
25:20 26:21 27:3
28:19 29:3,12
30:3,13 31:25
32:13 34:3,6,15
35:24 36:4,24
37:3,13,21,24
38:14 39:20 40:2
40:10 42:18,21
43:6,10,16 45:4,15
45:24 46:22 48:1
48:11 49:5,8

| | | | |
|---|---|---|---|
| 50:15 51:2,21,24 | 146:15 147:7,13 | 250:15 252:3,10 | employed  226:5 |
| 52:2,15,17,22 | 147:21 148:1,6,14 | 253:6,17,25 | employee  110:1,3 |
| 55:12,18 56:2,7,16 | 149:6,19 150:1,6 | 254:21 255:25 | 120:12 143:12 |
| 58:6,20 59:5 60:4 | 150:19 151:3,9 | 256:6,25 259:2,9 | 145:3 |
| 61:6,10 62:18,25 | 152:1,11,17 153:2 | 259:16 260:5 | employees  93:1 |
| 64:3,19 65:3,21,25 | 153:21 154:12,24 | 262:5 263:4,25 | 120:14 148:8 |
| 66:4,16 67:1,19 | 154:25 155:17 | 264:6,22 265:11 | employment  84:23 |
| 68:23 69:19 70:1 | 156:14 160:6 | 266:3,20 267:9 | enacted  171:8 |
| 70:9,21 71:24 | 161:10 162:13,18 | 268:15 269:9,17 | enclosed  339:11 |
| 72:8,17 73:5,10,22 | 162:22 163:6,25 | 269:24 270:8,17 | encompassed |
| 74:16,22 75:16,23 | 166:1 167:17 | 272:9 273:7,15 | 314:22 |
| 76:14,22 77:5,11 | 168:4 169:23 | 274:2,22 276:3,15 | ends  169:7,8 |
| 78:3,15 79:9,24 | 170:5,16,24 172:6 | 277:13,25 278:14 | enforce  189:3 |
| 80:8 81:14 83:11 | 172:18 173:11,20 | 279:4 281:10 | enforcement |
| 83:24 86:17 87:16 | 173:24 175:14 | 282:23 284:9 | 117:25 118:11 |
| 90:7 92:13 93:18 | 176:5 177:6,20 | 285:2,10,19 | 122:1 179:1 |
| 94:1,9 95:14,21 | 180:20 181:16 | 287:19 290:3,15 | 279:23 280:3 |
| 97:10 98:25 99:15 | 182:5,22 183:10 | 290:25 292:10 | 283:25 293:5 |
| 99:23 100:8,15,23 | 183:22 184:7 | 293:13 296:2 | engaged  29:22 |
| 101:8,21 102:10 | 185:9 186:4,14 | 297:24 301:11,19 | 173:5 |
| 102:15,19 103:22 | 187:17,25 188:15 | 302:3 303:4,12,21 | engagement  46:11 |
| 105:3,13 106:11 | 188:24 189:7,12 | 304:19 306:25 | engages  188:2 |
| 107:8,22 109:11 | 189:14 191:3 | 308:21 309:15 | ensure  119:12 |
| 109:17,23 110:13 | 192:1,11,22 193:2 | 311:8,14 313:20 | 319:16 320:8 |
| 111:2,7,13 112:3 | 193:7,13 194:20 | 313:24 314:12 | ensuring  104:25 |
| 112:14 113:11 | 195:16,19 196:2 | 315:5 316:1,13,18 | 318:24 |
| 114:7,13,22 115:5 | 200:11 204:12,22 | 316:23 317:21 | entail  35:7 122:4 |
| 115:20 116:17 | 209:4,11 212:9 | 319:12 321:25 | entered  144:22,24 |
| 117:10,24 118:9 | 213:13,22 215:5,8 | 323:12 324:19 | 145:3,13 146:4 |
| 119:1,6,15,23 | 215:11,24 216:16 | 325:15 326:7,13 | 259:3 341:9 |
| 120:6 121:5,10 | 218:2,18 219:14 | 327:13 329:14 | entire  67:10 82:24 |
| 123:4,21 124:1,12 | 222:11 223:4 | 331:9 332:9,15 | 83:10 326:22,23 |
| 124:23 125:8 | 224:23 225:17 | 333:8,25 334:16 | 340:5 341:5 |
| 126:20 127:23 | 228:22 229:6 | 335:8 339:5 | entirely  30:17 |
| 128:19 131:13,18 | 231:5,10,20 | elsner's  154:18 | entirety  74:9 |
| 132:4,11,18 133:5 | 234:12 235:10,15 | elucidates  330:3 | entities  46:20 |
| 133:25 134:11,19 | 238:7,17 239:9,21 | email  193:15 | 47:12 288:21 |
| 135:9,18 138:1,20 | 240:7,18 241:2 | 322:3 339:17 | entitled  37:18 48:9 |
| 138:25 139:16 | 242:6,16 243:1,23 | embodied  314:22 | 92:25 133:4,5,11 |
| 140:9 141:2,11 | 244:21 247:1 | employ  338:5 | 300:20 |
| 145:15,20 146:7 | 248:3,14 250:2,8 | | |

entity 132:21
entries 66:21
entry 64:9 68:10
  98:6 101:1
envelope 20:14
  21:18 102:24
epidemic 304:11
  307:14
equal 164:16
equally 247:20
equivocate 315:25
equivocating
  316:2
er 201:15
errata 339:13,18
  341:7,10,18 342:1
errors 274:15
especially 156:4
  258:18
essentially 18:6
  271:10
establish 211:4
established 39:19
  111:24 117:16
  287:1
establishment
  181:5
estimate 17:1
  72:22 74:11
  113:10
estimated 108:4
etcetera 324:17
euphoria 310:17
evaluate 274:19
  318:8
evaluation 319:24
event 338:4
eventually 109:6
everybody 19:3
  21:24 333:4

everybody's
  199:16
evidence 154:21
evidentiary 302:1
evolved 324:1
ex 287:8,10
exact 58:24 112:18
exactly 32:10
  59:21 92:9 98:19
  103:15 196:4
  222:17 304:9
  321:6
exam 5:1 89:24
  98:5 101:13,23
  316:8 319:9
examination 1:12
  5:3,4,6 9:6 96:12
  97:23,25 98:12
  99:5 101:17 157:7
  157:21 265:20
  286:4
examinations
  99:17
examined 9:4
example 75:10
  99:21 134:17
  163:2 170:12
  171:22 199:3,19
  221:6 268:10,22
  281:2
examples 15:12
exams 96:14 97:5
  101:12,22
exception 54:19
exceptions 217:11
  217:12,25 218:6
  218:16 257:23
  282:20
excerpted 281:24
excerpts 301:12

excessive 234:3,11
  234:23 236:11,14
  243:7
excluded 130:3
  242:3,22
excuse 19:18 37:3
  97:10 165:1 176:1
  184:1 229:25
  250:18 253:24
  268:12 334:5
executed 284:11
  341:10
execution 340:14
  341:19
executive 15:7
  77:22 78:8 80:20
  80:25 92:8 94:14
  96:1,8 97:1 102:1
  102:2 104:3,19,24
  108:16,20,23
  111:18 120:9
  135:22 136:10,21
  138:10 143:12
  145:2 184:17
  287:3,5,6,9,17
  294:25 295:7,16
  296:24
exempt 6:13
exercise 166:19,24
  184:24 311:21
exercising 177:2
exhaustive 15:14
  25:8,13
exhibit 6:3,4,6,7,8
  6:9,11,12,14,16,20
  6:22,24 7:2,3 12:2
  19:7,9,11,13,14,16
  19:17,18,23,24,25
  20:4,5,5,10,12
  20:16,18,19,21,25
  21:1,2,4,12,14,21

  21:23 22:2,5,17,21
  23:6,24,25 24:7,15
  24:17,20 25:1,23
  31:8,10,12 34:23
  34:24 42:11,16,25
  43:5,14,18,23,25
  43:25 44:8,8,13,16
  44:18,20,21,23
  47:7 50:17,21
  51:12,17 52:6,12
  53:16,21 54:3,13
  55:1 57:1 58:16
  59:12 60:13 69:8
  74:8 75:8 77:2,15
  77:15,16,17 78:6
  79:18,23 80:16
  82:2,8,16 84:4
  96:7 102:25 103:1
  103:12 104:18,23
  109:25 124:15
  142:17 143:2,4
  144:5,5,7,8,12,12
  144:16 145:8,10
  148:17,18,18
  149:9,10,12,13,16
  150:11,12 151:2
  152:7,8,25 153:1
  179:12 190:4
  194:14 216:15,17
  216:19,21 217:2,4
  217:5 226:24
  227:2,3,4,14,22,24
  229:22,22 230:1
  267:14 278:21
  279:1,9 280:24
  281:6,20,22
  287:23 288:1
  301:8 312:13,17
  312:18,19
exhibits 6:1,2 7:1
  20:22 21:6 24:23

52:24 142:19
144:11,13 336:5
336:10,11
**exist** 72:13 96:17
101:22 208:11
**existed** 323:8
**exists** 74:5 327:25
**expect** 213:9,18,25
280:8 283:6
**expected** 283:15
284:2 311:21
313:14
**expenses** 53:20
54:7,9,11,14,16,19
112:6
**experience** 15:14
25:9 124:4 153:14
188:16 207:7
225:12 229:10
246:8 267:10
323:13 328:23
329:3 334:24
**expert** 6:3,4,6,11
14:21 22:5,18,22
32:23 41:1 45:6
45:20,22 46:3,23
46:25 47:3,9,19
54:24 55:25 56:10
58:18 59:19 60:9
65:19 67:13 74:25
75:3,5 78:21 79:1
123:16,24 124:5
124:10,22 125:4,9
125:12,14,15,17
125:21 127:6
129:6,12,14,16,19
130:3,7,10,15,20
130:25 133:2
134:14,24 135:12
142:9,10,11
148:24 153:11,23

154:10 155:6,18
157:12 242:17
300:13 311:4
336:6
**expertise** 152:21
272:16 297:22
298:4 300:17
308:18 309:9
**experts** 23:15
32:19
**expiration** 340:19
341:25 342:25
**expires** 261:9
338:19
**explain** 118:17
158:13 207:4
211:2 221:7
259:10 271:21
312:4
**explained** 37:1
59:24 329:7
**explaining** 122:7
**explanation**
213:17 326:15
**explicit** 330:7,25
**expressed** 165:11
165:14 179:9,10
**expressly** 42:4
**extent** 13:11 46:23
46:24 47:2 56:9
132:11 136:24
153:3 188:3 298:9
298:21 307:17,20
**extenuating**
213:14
**extra** 195:16,20
**extract** 6:22

**f**

**f** 28:4 108:3
**fabode** 125:16
128:4,5

**face** 89:10 280:9
280:15 284:3
329:19,23
**faced** 89:5 117:9
**facilitate** 138:22
**facilities** 188:11
**facility** 217:17
**fact** 35:9,13 38:10
38:11 52:12
103:25 105:16
110:3 119:4
126:25 130:13
133:1 147:4
151:18 152:8
154:8 155:7
156:17 159:24
175:9 222:23
**factor** 237:13
**factors** 207:17
218:7 245:13,18
292:11 312:9
**facts** 32:3 41:8
63:20 65:18
153:22 155:22
165:6 298:16
300:18
**faculty** 85:4 98:3
**fail** 319:4
**failed** 164:10,13
171:15 179:14
185:18 186:2
**failure** 165:23
238:10
**failures** 280:5
**fair** 18:8 115:18
122:19 131:6
133:10 141:11
147:8 286:22
289:25 304:9
332:8,14,16

**fairly** 251:24
**fall** 84:14 217:25
218:16
**false** 151:25
**falsified** 171:14
**familiar** 10:19
46:1 59:23 99:22
100:9 103:11
132:3 143:3
169:12,15,18,19
169:24 173:3,6
187:5,7,12 188:9
264:12 274:24
294:22 305:23
**familiarity** 59:25
131:25
**family** 169:21,22
170:14 172:13
173:1,19 197:12
197:12,17 219:24
296:14
**far** 56:8 60:24
127:22 162:21
213:1 265:21
267:5 274:19
293:18
**fashion** 282:12
**fatal** 245:15,20
**fda** 114:2 248:9
296:5
**february** 68:9
**federal** 1:16 6:20
8:19 48:25 98:17
98:18 113:21
117:1,3,5,6,19
226:9 293:21
320:25 324:25
325:11 332:3
337:16
**feedback** 98:3

[feel - flag]                                                                    Page 23

feel 47:3 81:9,12
  82:15 179:24
  301:4 326:15
feeling 310:16
fees 89:22 125:3
fell 191:7
felt 92:17 138:10
fentanyl 248:4
  305:10
field 123:16
  196:20
fields 181:6,17
  196:19 198:4,6,14
  199:8,9,19 249:22
  250:1,5,7,12
figure 111:8,11
  152:5 204:9 267:7
  273:13,16 274:21
  275:3,5 279:16
  309:8 331:18
figured 268:10
figures 305:5,6
file 6:18 137:9
  138:12,19 150:17
  256:16
filed 134:4 137:2,5
  137:12,17,19,22
  138:2 144:4,14
  155:20 156:21
  157:12
filing 105:2 137:15
  137:24 138:24
  151:17
fill 161:20 167:1,9
  177:10,17 183:2
  197:24 199:20
  200:7 201:12
  213:2 230:22
  252:22 254:18
  255:12,14,16
  256:5,7 277:3,23

300:3 306:21
filled 160:22
  161:24 165:8
  175:5,12 176:15
  177:5 184:4
  201:24 210:12,17
  211:22 213:10,19
  214:7,18 215:19
  216:8 219:25
  233:6 237:12,18
  238:5 255:15,19
  255:24 257:12
  258:21 261:15
  275:18 280:14
filling 162:2,10
  163:13 165:16
  166:18 208:15
  210:9 214:25
  219:8 254:6
  259:13 300:1
  303:18
fills 208:25 255:5
  255:6,8
final 23:16 44:22
  280:17 293:8
  301:14
finally 79:16
  207:24
financial 296:17
find 24:25 156:24
  183:21 201:4
  209:16 223:15
  241:17 244:9
  287:24 323:20
  327:24 335:25
  339:11
finding 296:25
findings 38:23
  67:25 322:21
  328:7

fine 9:23 11:13
  20:8 53:9 68:23
  192:22 193:2
  204:17 270:8
  286:7 333:25
finish 13:6 336:16
finished 264:6
firm 12:19
first 12:11,14
  18:13 22:5 27:22
  29:17 33:3,7 35:3
  35:5,16 45:12
  55:1,6,16 56:25
  57:14 58:8 59:2
  60:12 61:21 63:10
  67:5 70:16 77:16
  78:7 79:18 80:13
  82:1,2 92:4 94:20
  104:2,17 125:5
  127:2,8,13,21,21
  128:3 132:24
  136:25 137:23
  140:18 143:10
  144:7 166:21
  194:19 195:24
  196:20,21 197:23
  198:2 199:24,25
  205:5,6 206:9
  207:8 210:8 221:3
  222:25 223:16
  224:3,6 233:4,10
  240:8 245:9
  250:22 255:5,7,8
  255:12,18,24
  256:5 271:4,9
  276:5 281:6 282:3
  286:12 288:3,10
  310:16 315:12
  320:2 325:20
  328:24 337:10

firsthand 184:9
five 17:1 68:21
  91:16 112:19
  122:5,14 127:21
  127:22 194:23
  197:18 207:11
  228:12,12 260:24
  268:4 285:11,13
  317:2 334:1
fix 157:25
fl 4:4
flag 7:3,4 158:19
  159:2,3,7,9,14,15
  159:20,24 160:5
  160:13 161:25
  163:16 164:14
  166:21 167:22
  175:23 182:20
  186:5,11 192:9
  206:9,17 207:19
  212:22 214:23
  215:17,18 217:24
  218:24 219:5,10
  219:16,20,21
  220:2,11,12 222:4
  223:18 224:4
  225:11 229:8
  234:9,22 237:16
  237:17,20 238:1
  238:11 240:2
  241:9,16,18 242:1
  242:2,12 250:22
  253:15,15,24
  254:11,25 255:9
  255:22,23 256:22
  257:5,15 260:8,13
  260:13,18 261:3
  261:10,18,22,23
  262:19 263:13
  264:15 267:2,20
  268:13,18,20,22

269:5,11,12,16,23
269:25 270:21
271:8,22 272:7
273:5,23 276:25
282:5,6,14,15,17
282:21,21 283:11
285:8,16 302:19
303:8
**flagged** 6:22 39:13
39:18 158:17
159:5 161:25
167:15,21 168:1
168:10 181:2
183:16 186:13,18
190:10,12,16
218:15 224:11
241:9 246:25
269:5,14,15
275:21 276:2
282:14,22 284:23
284:25
**flagging** 207:1
**flags** 33:19,21 34:1
34:11,14 35:17
37:13,15 38:4
39:4,5,12 40:6,8
40:17,21 46:1,4
57:7 59:19,24
67:21 70:4,7
71:11,13,14,20
122:9 138:17
154:3 157:15,16
157:17,20 158:8
158:13,18,25
159:6,15,17,18,24
160:4,19,22,25
161:7,11,12
162:12 163:8,14
164:11,21 167:4,4
167:15 168:10
171:24 172:16,20

180:10 181:3,11
181:11 182:21
183:16 185:22
189:10,22,24
192:13,15 202:1
203:20 205:5,7,8
206:6 211:21
218:1,15 220:4
223:9 232:9,10,19
233:4,11 234:2,9
234:10,13,23
235:22 237:5
240:3,17 243:7
244:3,13 246:10
246:25 250:19
252:16,24 253:1,2
253:4,5 254:25
255:20 256:20
263:9,13 267:15
267:19,23 268:1,6
268:7,12,13,19,20
269:3,21 270:1,2
270:15 271:9,11
271:13 272:2,13
272:13,14,16,19
272:22 273:21
275:22 276:2,8
277:10 279:13
280:9,12,15,20,22
282:19 283:8
284:3,16,23,24,25
299:21 327:21,21
328:22 329:13,20
329:21 330:5,20
331:5,14,21 333:1
334:7 335:3
**flip** 52:23 53:5
54:2 201:5
**flipping** 201:7
**floater** 88:14
274:25

**flooding** 174:6
**floor** 3:5
**florida** 208:20,23
**flow** 204:16
**focus** 119:16
126:14 157:14
232:19 235:22
255:22 261:3
282:3 324:24,25
**focused** 38:10
61:15 162:7
196:16 202:5
**focuses** 118:18,20
**focusing** 98:22
174:23
**folder** 144:8
227:21,23,23,24
229:25 230:2,9
281:6 312:16
**follow** 139:17
140:2,8 226:17
229:13 243:3
259:11 290:13
**following** 8:19
20:24 100:25
143:11 186:11
227:1 229:13
231:14 260:14
**follows** 9:4
**font** 113:1
**food** 118:20
119:16
**footnote** 25:24
27:10 28:12,21,21
30:24 36:15,18,20
190:7 245:23
302:7 324:11
**footnotes** 301:23
301:25 324:14
**foregoing** 337:13
340:13 341:18

**flooding** 174:6

**forget** 11:15
213:17 241:5
335:24
**forgotten** 285:23
**form** 30:17 103:6
103:6,15 109:21
177:6 249:12
259:19,19,21
**formal** 9:20 155:4
**format** 44:7 79:25
**formation** 109:15
**formatting** 44:5,7
**formed** 31:24
37:10
**forming** 30:11
32:4,6,20 40:23
41:7,10 65:7,14
69:11 133:20
**forms** 247:7
**formula** 95:2
**formulate** 73:25
**formulating** 73:1
74:15 196:1
200:21 298:18
**formulation** 259:6
**forth** 32:7 223:8
**forward** 339:15
**found** 130:6
194:25 245:12,17
248:9
**foundation** 90:10
90:12,17,17,21,22
90:23,25 106:16
106:17,23 107:3
109:9 110:19,21
132:25
**founded** 92:5 93:7
93:10 289:7
**four** 17:1,5 19:6
32:13 33:5 34:20
174:10 235:5

250:23 253:3,12
253:16 254:5
255:1,10,19 256:8
257:4,6,13 260:24
268:4 317:2
**fourth** 180:4,5
255:11,15,23
256:8
**frame** 28:10
116:11
**framed** 189:16
**francisco** 125:20
**frankly** 141:13
**free** 47:3 92:25
94:12 135:18
146:18 179:24
340:14 341:20
**frequent** 217:15
**frequently** 191:22
**friend** 170:14
173:19
**friends** 169:21,22
172:13 173:1,6
**front** 11:7,8 20:10
22:1 51:3,19 53:4
62:13 77:18 113:1
144:9 268:2
281:17 336:7
**frowning** 235:13
**frozen** 104:8
**full** 42:1 82:2 87:8
197:16 233:11
245:9
**fully** 14:9
**fumerton** 5:3 9:7
9:11 21:3 49:13
179:20
**fumeton** 20:2,11
20:18,20,24 21:1
21:10,11,22 25:22
26:23 27:4 28:20

29:8,16 30:9,19
32:2 34:4,7,18
36:2,11,17 38:5,8
39:6,23 40:3,14
42:22 43:4,9,12,20
44:1 45:5,16 46:5
47:10 48:5,19
49:7,17 50:16,24
51:4,8,12,13,23,25
52:4,16,19 53:1,2
53:24 54:1,8,10
55:15,21 56:4,11
56:24 58:14,25
59:9 60:7 61:7,17
62:20 63:3 64:5
64:21 65:5,22
66:2,12,18 67:2
68:1,20,25 69:5,23
70:5,15,23 72:2,11
72:18 73:8,11
74:1,18,24 75:18
75:25 76:18,25
77:8,13 78:5,17
79:10 80:1,12
81:17 83:13,25
86:20 87:20 90:9
92:22 93:23 94:4
94:16 95:18,24
97:16 99:2,20,25
100:12,17 101:5
101:18,25 102:12
102:17,23 103:24
104:5,10,14 105:5
105:15 106:21
107:11,24 109:13
109:19,24 110:15
111:5,10,15 112:4
112:16 113:13
114:9,15 115:1,9
115:23 116:19
117:12 118:5,14

119:3,9,20 120:1,8
121:8,12 123:15
123:23 124:3,14
124:17 125:2
126:10,24 128:2
128:21 131:15,19
131:23 132:6,16
132:24 133:13,16
134:3,15 135:2
136:5 138:4,21
139:5,25 140:23
141:24 142:3
145:17,22 146:9
146:25 147:10,16
147:23 148:4,10
148:16 149:8,21
150:3,9,14,20
151:5,15 152:4,14
152:23 153:8
154:7,16 155:3
156:3 157:1
**functional** 116:16
**fund** 121:2
**funded** 89:21
90:25 91:1 93:21
**funding** 89:22
93:14,15,19 95:17
106:22 112:8
116:8
**further** 140:19
155:13 210:16
212:23 228:14,14
234:2,5 259:10
270:14 272:6
325:23 336:21
338:1
**future** 154:1,6

**g**

**g** 279:2,4,5,10
**gained** 153:15
154:2

**game** 133:10
**gathered** 15:10
**gbush** 2:19
**gears** 77:14
**general** 56:23
69:17,20 154:2
157:17,22 158:12
166:6 328:3
**generally** 48:5,14
225:9 271:4 276:6
287:22
**generated** 95:4
**geographic** 88:16
**geographical**
219:2
**getting** 142:7
214:25 219:25
252:1 258:23
261:6 266:12
277:7 319:7
**giant** 3:2
**gisleson** 3:14
**give** 13:7 25:19
27:16 45:23 53:14
60:16 64:15 97:11
103:8 115:10
163:2 200:22,25
221:6 243:4
251:10 253:9
261:11 281:2
**given** 20:3 31:19
38:6 47:13,20
48:22 49:22 56:23
93:14 155:22
169:21 222:7
244:19 250:13
254:3 280:7 303:2
311:6 337:21
**gives** 172:12
196:22 310:16

[giving - heading]                                                    Page 26

**giving**  11:5 41:1
  108:1 120:3
  147:24 170:11
  287:17
**glad**  197:3
**glass**  12:3,4
**go**  11:15 14:2 22:1
  47:11 51:11 52:19
  52:21 53:7 54:25
  56:8 58:15 63:21
  64:22 68:9 80:4
  95:23,25 97:15
  99:16 104:9,10
  129:2 133:13
  140:13,18,24
  148:17 152:20
  157:19 193:9,16
  193:25 195:15
  198:5,14,22
  199:12,12,17
  200:5 201:1
  203:17,18 204:10
  205:13 213:2
  235:3,14 236:16
  237:25 244:9
  256:4 273:12
  280:11 281:9
  284:1 290:23
  293:4 309:9
  320:17 322:16
  325:19 333:22
**goal**  13:4
**goes**  95:17 169:5
  214:14 258:6
  265:22
**goetz**  3:9 16:21
**going**  9:13,20
  15:17 18:16 19:2
  19:5,11,14,22,24
  20:21,21 24:25
  33:23 35:9,13,20

38:20 39:7 48:12
  50:17,19 52:22,25
  53:10 56:20 59:7
  63:17 77:14 90:19
  93:24 99:6 100:18
  100:25 102:25
  107:21 112:22
  113:20 127:3
  133:23 136:25
  139:2,21 141:14
  141:18,21 142:16
  150:11,16 154:17
  155:1,3,13,16
  157:1,13,14,21
  165:12 171:22
  179:8 192:19
  193:1,18 195:11
  195:12 198:10
  199:4,15 203:12
  204:12 218:14
  243:9 252:20
  253:8 255:10
  261:10 269:3,15
  270:4 277:2,4,6,19
  277:22 278:3,9
  281:15 282:3
  285:7,22 294:18
  295:24,25 304:16
  311:3,7 312:18
**good**  8:10 9:8,10
  68:22 92:17
  193:13 204:17,19
  205:3,13 260:16
  262:2 286:8
  296:17
**gotten**  170:10
  256:4 279:20
**governance**  102:2
**governing**  163:23
**government**
  113:22 117:1,3,5,6

117:19 130:11
**graduate**  82:6
  85:5 88:1,9 316:6
  319:9
**graduated**  86:9
  316:25 317:4
**graduating**  84:15
**graeme**  2:16 5:5
  136:17 157:8,10
  204:12 215:6
  216:16 281:11
**graham**  139:7,11
**grant**  3:10
**grants**  91:1 117:15
**great**  131:19
  184:25 287:25
**greater**  263:23
**greed**  306:6
**group**  69:21 75:12
  197:25
**groups**  314:18
**grow**  84:17
**guard**  280:5
**guess**  53:21 95:19
  125:5 180:4
  194:13 205:6
  216:23 217:8
  292:2 315:2 320:1
  320:6 321:12
  322:15 331:1
**guidance**  229:18
  244:19 245:1,4
**guide**  291:21
**guideline**  244:4
  245:25 246:9,11
**guidelines**  246:6
**guides**  101:15

| h |
| --- |

**h**  2:10 278:22,23
  278:25 279:5,7,16

**half**  18:3 33:8,12
  285:13,16,17
**halfway**  210:8
**hall**  10:10
**hamilton**  1:14
  337:2,7 338:21
**hand**  319:8 338:8
**handed**  53:17
**hands**  99:13
**handy**  19:5 22:15
  84:7
**happen**  11:16 35:3
  77:23 158:16
  238:10
**happened**  35:2
  39:1 91:7 140:7
  194:6 196:23
  219:15 252:22
  260:11 272:15
  307:15 333:6
**happening**  127:3
  292:21
**happens**  133:15
  189:6 256:22
  261:8
**happy**  68:23 124:9
  197:9 198:9
**hard**  51:6 53:4
  66:7 193:19 217:1
  230:8 251:18
**harm**  244:16
  258:12 308:16
**hatoum**  123:7
**hbc**  3:2
**he'll**  194:11,11
**head**  29:5 107:15
  295:18
**heading**  42:12
  179:13 217:10
  267:15 278:22
  279:11,15,24

headings  279:21

health  14:11 112:2
  113:16 238:8
  288:12 290:16
  291:7 318:13,13

healthcare  108:12
  126:8

hear  11:11,13,13
  28:2 68:5 72:1
  81:11 104:5,7
  105:9 141:15
  149:23 231:25

heard  39:21 86:18
  104:16 215:8
  310:5

hearing  131:7

hearings  126:16
  127:3 128:13

heights  9:25

held  96:4 156:17

hello  158:2

help  24:25 71:16
  141:13 165:20
  175:4,10 184:24
  237:13 239:10
  241:10 311:23
  313:10

helped  73:25
  160:7 182:25
  202:21 231:4
  308:25

helpful  25:11
  117:22 118:8,10
  118:10 154:14
  184:6 196:17
  204:18 291:6

helps  310:17

hereunto  338:7

herholz  125:22

heroin  305:10,20

hiding  155:9

high  84:15 101:12
  282:13,21 283:12
  283:18 296:15

higher  106:10
  107:7,10,13
  222:24 248:22,22

highest  110:1,3

highlight  42:20
  198:4 199:8
  203:14 228:15

highlighted
  197:17 198:14,20
  198:21

highly  217:17
  266:16

hills  164:8 328:5
  330:8 335:19

hired  130:14
  297:7

history  84:23
  318:14

hit  40:16,21
  255:19 257:13,13
  299:21

hold  88:25 142:13
  223:14 227:11
  241:17

holiday  207:17
  208:15

home  207:13
  208:4 219:3

honcho  295:19

honest  38:18

honestly  14:9

honor  80:24 82:15

honorary  81:3,5
  85:14,25

honors  82:3

hope  306:10

hopefully  195:13
  273:20

hospice  248:25
  257:24

hospital  299:3,11
  299:14

hospitals  187:14
  187:22 188:8,9,19

hotel  54:13

hour  33:8,12
  49:19,23 50:1,2
  117:20 128:15,17
  128:25 249:8,11
  249:16 250:21
  252:18 256:4

hours  17:4,6 59:13
  60:16,23 61:2,8
  63:4,5 74:17,17,17
  74:19 91:14,16
  105:7,11,23
  106:15,16 110:11
  110:12,17,18,20
  110:22 204:13
  296:13

ht  123:7

huh  279:14

hunch  267:8,10

hundred  174:12
  174:13 207:23
  240:1

hutchinson  123:7

hydro  201:15

hydrocodone
  126:3

hypothetical
  224:17 226:14,18
  237:21 239:13,16
  239:18,25 240:16
  240:19 241:3,6
  257:3

hypothetically
  238:18 256:1

hypotheticals
  219:6

i

idea  73:6,7,13
  238:20 265:6

identification  19:9
  19:13,16 21:2,14
  21:21 51:17 71:11
  103:1 143:2
  150:12 217:4,5
  227:3,4 281:22

identified  33:19
  34:5 38:4 122:9
  158:25 159:23
  160:21,25 161:7
  162:11 163:14
  176:14 182:3
  189:11 192:16
  195:22 197:5
  202:20 234:19
  270:1 274:11
  292:13 303:8
  326:4

identifier  198:10

identifiers  202:22

identifies  172:16

identify  39:11
  76:12 171:24
  172:20 174:25
  186:7 212:16
  218:17 237:5
  241:10,25 262:19
  299:22 302:19
  329:10

identifying  212:6
  241:18

ids  202:10,14

ignoring  227:18

ihenacho  125:23
ii  164:12 247:12
    247:13 328:6
    330:8 335:23
iii  247:15
illegal  126:4,7,8
    305:10 306:24
    307:2,4
illegitimate  167:6
    187:23 188:20
    212:18 238:16
illicit  305:10,21
illinois  9:25 82:4
    82:17,24 83:3,5,7
    83:9,14,15,18
    84:10,20 85:4,20
    88:18 289:13
illnesses  309:13
    310:1
imagine  66:7
immediate  176:17
immediately
    254:20 262:10
impact  273:1
    307:20
impacting  218:7
impede  14:12
implement  34:1
implementation
    102:4
important  70:3,6
    80:6,11 219:11
    290:11,20,22
    292:9 307:23
    308:2 314:25
    321:4,24 322:4
inaccurate  76:6
inappropriate
    155:5 156:10
    177:10 300:24
    301:3

include  26:2 96:15
    153:18 171:18
    223:9 284:5
    305:10,20 330:5
included  15:11
    25:12 27:20 40:17
    47:6 54:7 110:21
    121:22 160:15
    207:13 229:7
    236:7 247:4
    264:14 271:18
    294:8 324:22
    329:24 334:20
    339:13
includes  25:7
    223:18
including  18:6
    118:11 132:13
    134:16,24 173:18
    174:9 234:3
    302:23 325:24
inclusive  15:12
income  6:13 106:7
    108:2,10,19,24
    109:4,10 120:23
incompetent  240:9
inconsistent  163:4
incorporated
    291:23 293:25
    341:12
incorrectly  100:18
increase  107:9,19
    120:22 148:8
    245:12,17
increased  174:11
    283:11
increases  111:23
    147:25 148:2
    262:12
independent
    143:17,20 163:19

163:21 247:18
    300:13,16 311:21
    311:24 312:2
    323:25
independently
    185:5 192:4
index  5:1 6:1
indiana  1:14 2:14
    337:1,8 338:21
indic  203:15,18,18
    203:19,19
indicate  218:12
    229:8 231:15
indicated  161:11
    161:12 207:19
    233:11 244:14
    266:11 335:20
indicates  156:15
    158:19 212:22
    263:7 267:4,24
indicating  35:19
    339:13
indication  31:19
indications  174:3
indicative  231:18
    232:4
indicator  158:19
individual  77:6
    95:3,7 98:8,14
    101:2 115:7
    116:13 135:25
    157:16 161:2
    162:4,6,7,8,9
    167:18 175:2,18
    175:22 176:21,25
    182:6,14 186:8
    188:2 189:1
    196:24 197:25
    199:3 202:22
    203:6 204:6 205:4
    219:17 228:11

229:15 234:21
    236:7,9 258:20
    275:23 276:10,11
    295:6
individual's
    217:13 258:19
individually  95:20
    95:22 167:24
individuals  17:15
    32:13 41:1 98:13
    114:17,20 115:3,4
    231:16 265:3
    305:1 333:10,15
industry  153:15
inference  164:13
inflammatory
    310:12
influence  31:4
    290:1 291:8
influenced  312:8
info  303:25
inform  200:24
    272:2
information  25:11
    26:11 29:18 31:16
    31:18 38:7 43:24
    57:5,11 61:12
    63:7,11,12 65:6,13
    67:23 70:3,7
    72:10,13 76:6,8
    104:25 152:15
    153:3,5 154:13
    155:2,10 156:20
    159:19 160:7,12
    165:15,23 166:9
    166:16 176:24
    177:3 182:13
    183:18 184:9
    190:24 195:8,9
    201:25 207:7,9,14
    211:14 222:23

224:21 244:14,22
248:18 254:17
255:14 259:3,25
260:2 265:1
275:11,19,24
277:10,19,22
278:3 288:25
289:9,11,16 290:5
290:10,10 291:5
294:6 295:9 296:3
296:6 301:13
303:14 309:4
318:13 335:15

**informed** 151:16

**initial** 26:3 46:12
46:13

**initially** 88:17

**initiate** 178:21

**injured** 202:3

**inner** 295:4,13

**innovation** 90:16

**input** 29:24
287:17 296:23
297:4

**inquire** 56:16
156:1

**inquiry** 38:2
132:15,23 157:4

**insignificant** 73:23

**insofar** 158:14

**inspection** 284:11
323:2,14

**inspections** 319:22
320:20 322:17,20
322:22

**instance** 70:16
251:8 291:13
308:12

**instances** 280:12
307:15

**institution** 86:7
188:1 189:2

**institutional** 299:3
299:13,14

**institutions** 188:18

**instruct** 133:14
242:21,24

**instructions** 243:2

**instructor** 121:25

**instrumental**
99:10

**insurance** 113:17
217:14 262:7,15
262:21,23 263:2,8
263:14,18,22,23
264:19 265:5,8
266:14

**integrity** 118:18

**intend** 31:14
157:19 270:14
272:6

**intended** 157:18
161:1,22 169:1,3
222:10

**intent** 273:12

**interact** 297:15

**interacted** 283:14
297:25 333:15

**interaction** 297:18

**interactions**
285:21 297:12
298:22

**interconnect**
116:3,9,16 117:3,9
117:17,18 179:18
181:5

**interest** 138:12,12
296:8

**interested** 338:4

**interesting** 279:14

**intern** 88:5

**internet** 126:14,22
184:12

**interoperability**
116:11

**interpretation**
37:16 329:2

**interpreted** 58:8
58:10

**interrogatories**
28:23 190:15,21
191:1 270:22

**interrogatory**
59:13,16,21 60:1,2
60:5,8 271:10,14

**interrupt** 204:16

**interstate** 289:1

**interview** 64:23,24
65:2,8 66:20 67:7
320:23

**interviewing**
65:23 66:1

**interviews** 284:12
296:21

**intranet** 184:11
185:2

**introduce** 66:10
67:8 312:18

**introduced** 45:17
54:4 57:14 58:2,3
58:8,11 66:14
286:8

**invaluable** 180:6

**investigate** 179:1
189:5 279:12

**investigated** 275:5

**investigation**
183:21 191:14
267:7

**investigators**
122:6 320:17

322:12

**invoice** 6:11 55:2
55:16 57:1 58:15
60:2,12,22 62:10
63:22 64:1,6,22
66:20 68:9 119:25

**invoices** 50:18
51:14 52:6,9,13
53:12 54:20 56:12
56:17,22 57:12
60:13,13 61:1
68:3,17

**involve** 40:12
126:17 159:16,17
234:10,23

**involved** 35:8
55:13 67:11
126:12 133:3,24
136:2 137:8 181:4
264:2 291:2
296:18,21 298:15
309:3 329:4

**involvement** 134:7
246:8

**involves** 315:14
329:5

**involving** 47:8
58:4 129:8,10

**irs** 103:6

**islands** 288:19

**issue** 34:16 58:12
66:11 155:3 157:2
159:9 178:16
209:1 291:22
292:8,12,16,17
293:1 296:3
302:18 307:14
313:6 325:23
329:4 333:11

**issued** 34:23 85:25
100:5 101:10

187:8 233:12
240:12 244:4,6
327:4

**issues** 66:15 67:9
91:9 158:20,22
246:9 321:4,24
332:25

**italics** 228:15

**item** 55:14 113:5

**items** 181:19

**ix** 112:22

**j**

**jacton** 2:23

**jaffe** 4:8

**james** 2:5 11:2
16:20

**january** 243:14,19

**jason** 2:20 193:10
193:10,15 209:17
209:21,23,24
216:14 227:7
228:14 230:6
281:5,15

**jdgoetz** 3:11

**jeffrey** 125:15,22

**jledlie** 2:8

**job** 195:13

**joe** 115:11

**john** 3:9,14 27:23
28:3

**john.gisleson** 3:16

**jonathan** 4:8

**jones** 3:9 110:4

**jonesday.com**
3:11

**joshua** 3:4

**judge** 328:7

**judge's** 242:5,15
242:24

**judgment** 165:5
177:3 184:5,24

188:13 192:7
224:8 247:18
311:22,24 312:3

**july** 45:11 54:25
55:8 57:19 58:23

**june** 1:16 6:25 8:2
28:22 58:17,22
59:2,12 60:1,2,8
60:22 64:6,9
190:14,21,25
191:6 200:1,6
227:16 230:3
271:15 337:15
338:9 339:4

**junk** 193:17

**jurisdiction** 98:20
320:18 322:18

**jurisprudence**
98:11

**justice** 17:8,12
130:13 132:14,16
132:19 133:7,11
135:1,13,21,24
139:13 142:5
155:24 156:19

**k**

**k** 120:13

**kaitlyn** 2:5

**keekhoff** 2:9

**keep** 19:4 21:5,8
22:15 84:6 112:22
201:7 305:15
321:23

**kentucky** 208:17

**kept** 175:19 321:4

**kid's** 220:1

**killed** 202:3 248:5

**kills** 176:8

**kind** 80:9 91:19
92:20,23 93:20
112:25 132:22

144:2 171:25
172:16 235:15
251:14 257:20,21
267:21 270:6
320:7

**kinds** 170:2

**knew** 38:23 46:1
46:17 57:19 63:18
297:12,20 298:5
307:19 322:23
323:8

**know** 11:17 12:14
13:3 20:3 21:4
25:17 27:7 37:18
37:21 44:21 48:3
48:10,11 49:12
50:5,8 51:2,7,9
58:7 60:23 67:16
67:17 72:19 74:2
74:3,5,15,19,21
77:9 80:4 85:10
93:24 94:10 95:15
100:24 102:9
112:20,24 124:5
127:19 133:4,5
135:11 137:16,21
139:8 140:17,18
141:18 142:23
149:22,24 152:19
154:25 157:24
158:10 159:11
160:10 162:24
165:18,21,25
166:2,2,7 170:22
171:1 175:22
176:2,8 181:6,10
182:6,8 183:5,7,13
186:1 188:25
193:5 194:8 195:5
196:3,5 197:10
198:2,3 199:25

200:8,9 204:3,13
211:21,25 216:21
219:9 222:9,17
223:7 224:1
225:21 241:6,11
241:25 242:9,17
246:21,22 247:2
247:25 248:1,4,4
249:20,22,24
250:5,11,16 253:8
253:10,18 254:5
254:15,20,22
255:10,16,16,23
256:18 258:25
264:10,13,16
265:1,10,14
266:21,23 270:4
276:12,19,24
277:4,6,8 278:9
281:14 286:15
291:1 292:20,22
297:10,19 298:3,8
298:9 299:24
304:1,8 307:16,19
307:21 309:1,7
312:2,4 316:24
322:13,15 326:2
331:2 334:15
335:21 336:5

**knowing** 58:23

**knowledge** 10:21
25:10 88:22 99:7
101:3 149:15
153:15 154:2,4
156:6,7 240:14,23
241:15 309:5
311:16 328:23

**knowledgeable**
272:21 309:6,8

**known** 99:7 160:2
165:6 182:9,11,13

219:3

**knows** 98:19
177:11 219:24,24
220:1 230:21

**kobrin** 3:4,7

**kristen** 53:24 54:2

**l**

**lack** 164:18,20

**lake** 7:3 13:24
46:18 174:12
177:16 238:23
239:7,14 241:13
282:5 307:12

**lakeside** 2:11

**language** 172:1
329:19 330:16

**large** 87:18,21
147:6 188:3 337:8

**laura** 4:2

**law** 98:16,17,17,18
98:23 117:25
118:11 131:4
179:1 260:20
290:1,20 291:2,5,6
291:24 293:5,21
293:25 315:10
328:6 331:13,24
332:2,6,11 333:3

**laws** 91:25 98:19
118:1 179:6
252:11 290:5,11
291:11 292:25
293:18 317:14
318:25 319:5
320:25 321:24
324:3,25 325:11
331:15 332:3
333:13

**lawsuit** 298:14
299:22 302:19
303:1

**lawyer** 195:16
309:7

**lawyer's** 10:4,5,8

**lawyers** 10:10
17:7 300:22,22
301:10 323:9
334:14

**layman's** 98:22

**ldunning** 4:5

**lead** 174:20

**leading** 18:10,17

**leaned** 18:15

**learn** 61:18 137:12
152:15

**learned** 25:15
137:14 182:4
298:18

**lease** 112:8

**leased** 112:12

**leave** 6:18 33:25
230:10 261:2
296:12,16

**leaves** 290:6

**leaving** 274:15
296:15

**led** 67:6 71:19

**ledlie** 2:5 11:2
16:20

**left** 44:5 57:6 92:7
92:10 93:11,17
94:2 102:14 120:9
146:14 170:13
237:19

**legal** 8:13 12:24
29:22 32:9,12,16
37:1 43:3 44:6
45:7 65:4 66:10
66:14 67:8,10,10
69:13 85:19,23,25
98:23 100:6
129:20 185:7,12

186:3 321:4 339:1
342:1

**legalities** 95:15

**legally** 185:20
323:6

**legislation** 293:6

**legislature** 290:7

**legitimate** 100:5
159:8,12 161:8,14
161:22 167:23
168:2 170:4,6,7,10
172:2,7,19 174:16
174:22 175:1,6,12
177:25 178:5,23
179:3 186:23
187:3,9,16 188:13
212:7,12 222:15
223:2 233:12,19
235:2,8,24 236:22
237:2,6,9 239:8,20
240:5,10,12 256:9
256:18,21,23
257:9 258:8,14
304:6,13,17 306:5
307:1,8 327:5

**lemrey** 297:8

**length** 316:5

**lengthy** 25:14

**leonard** 114:25

**letter** 339:19

**letting** 198:25

**level** 98:6 101:1
185:24 313:14

**levels** 246:14

**levin** 4:2

**levinlaw.com** 4:5
4:5

**lewis** 3:13

**liaison** 113:21

**liber** 2:10

**license** 89:25
178:10,12,17
319:17 320:2,9

**licensed** 8:11
85:21 98:8 303:9
311:20 323:25

**licenses** 79:20 89:1
89:8 303:19
318:25 319:8,16

**licensing** 289:1
318:22

**licensure** 89:24
98:5,15 101:12
289:10 315:15
318:18

**life** 241:5

**likelihood** 262:12

**limit** 192:9

**limited** 35:25
37:19 181:23
190:11 200:10
234:3 251:4

**limits** 246:5

**linda** 45:9 54:23
55:23,24 57:14
58:9,11

**lindsay** 139:7,11

**line** 56:8 105:19
107:25 113:5
339:13 341:7
342:3

**lines** 120:7 194:23
194:24

**list** 14:24 15:12,25
16:9,11 17:19,23
20:16 25:4,8,12,13
42:14 43:7 44:11
44:24 47:7 69:10
82:16 110:16
121:19 122:17
124:10 126:25

194:17,17 203:9
244:8 324:21
**listed** 17:21 26:15
27:11,12 43:10
62:23 63:19 74:8
75:8 82:3 100:20
104:2,18 105:19
105:24 108:6
121:25 123:11
124:6,16 125:6
127:1 128:22
129:13 130:9
191:4 194:5 341:7
341:17
**listen** 141:14
**listened** 136:23
**listing** 341:7
**literature** 123:9
246:16 258:2
**litigated** 131:7
**litigation** 1:5 8:4
9:13 22:6,19,23
27:5 45:13 46:21
47:9,19,23 48:8,17
48:20,25 49:21
50:3 55:7,9 56:20
59:3 69:9 88:23
119:5 124:6,22,24
125:5,6 126:12
127:4 128:24
129:3,8,11 130:21
130:23 132:10,22
133:1,24 134:4,10
134:18,24,25
136:2,2,18 137:6
137:10,25 144:14
152:9,16 154:9,22
155:6,7,8,25 156:4
156:5 157:11
300:13 339:6
340:3 341:3

**little** 9:20 15:16
18:14 19:20 47:12
61:2 106:10
160:17 164:5
179:8,19 189:10
193:19 198:24
200:5 206:18
207:2,20 210:7,16
227:25 228:9
279:20 289:24
316:15
**live** 9:24,25 215:21
**lived** 215:2,12
216:10
**lives** 214:14,20
218:23 219:2
**llc** 2:3,14,15,15
**llp** 2:10,16 3:3,13
3:18
**load** 192:24 193:8
**lobbying** 291:3
**local** 179:1,6 290:6
290:7 292:14
**located** 10:1 13:24
206:20 210:19
**locations** 88:15
**lodge** 97:12 140:9
140:21
**logic** 256:7
**logical** 207:3
**long** 13:9 17:2
18:2 33:7,11
74:14 91:11 136:8
141:9 204:21
257:22 258:23
260:9 261:7,17
270:4
**longer** 80:25
253:15
**look** 14:25 22:2,12
28:11 30:21 39:7

59:10 62:10 63:15
64:6 76:15 82:1
84:7 96:6 103:25
104:17 112:20
119:21,24 124:8
128:3,10 141:3
143:10 144:7,25
179:12,24 190:2,4
190:7,23 192:18
193:5 194:16
197:8 199:2
200:17,19 201:11
201:21 202:9
203:10,14 209:16
210:7 217:7
226:22 227:13
229:21 230:13
238:8 243:7
257:15 260:19
261:22 268:22
272:1 278:12,23
280:23 282:18,19
283:7,9,21 285:23
292:16 296:25
300:7 308:25
312:13 317:23
318:1 323:4
324:25 330:10
**looked** 14:17
15:13 27:22,24
30:6 76:1,3
127:20 152:25
159:1 181:14
182:4,19,24 183:6
196:3,12 199:18
201:10,20 204:6
207:19 213:3
234:20 268:7
270:25 271:18
272:4,12,24 274:4
275:4 280:18

281:3 307:13
323:2
**looking** 66:20
82:16 104:23
107:25 109:25
111:11 144:16
159:17 195:7,23
195:25 196:14,25
200:19 201:8,20
211:14 233:23
251:15 260:3
276:1 292:20
297:5 312:19
322:7
**looks** 51:24 63:5
119:12 282:12
301:22
**lost** 136:19 194:6,8
333:23
**lot** 25:10 79:14
154:25 175:9,25
176:1 177:12,17
193:3 266:24
308:3 324:16
**loud** 11:11
**lowered** 244:16
**lpa** 4:10
**luce** 93:5
**lunch** 204:18,21
204:23

**m**

**m** 2:21
**ma'am** 18:9
143:24
**madam** 339:10
**maid** 170:14
**mailings** 322:4
**main** 6:20 69:22
209:15 210:4
217:3 252:5

**maintain** 280:5
319:17
**maintains** 90:2
**majority** 186:22
187:2 274:14
304:4
**making** 61:13
148:11 219:16
237:12 247:18
296:21
**managed** 231:18
232:4
**management**
123:17 217:20
**mandate** 321:13
321:18
**mandated** 185:20
**mandates** 217:14
**mandatory** 179:14
180:9 185:4
**manifested** 254:11
**manipulate** 197:2
**manner** 187:3
**manufacturer**
168:22
**march** 68:9
**marcus** 3:3,6,7
**margaret** 82:5
**mark** 19:3,11,14
19:17 20:22 50:17
50:21 51:12
102:25 150:10,11
216:16,19,21,23
226:23 281:19
**marked** 19:7,9,13
19:16,24 21:2,14
21:21 23:6 24:17
24:19 44:13,18
51:17 52:12 69:8
96:7 103:1,12
142:16 143:2,4

144:11 145:10
150:12 152:7
171:12 194:14
216:20 217:4,5
227:3,4 229:23
281:22 312:16,20
**market** 3:14 296:5
308:10
**marking** 19:25
24:23
**master** 4:10
141:10 154:17,25
204:15
**master's** 84:19
85:2
**match** 127:21
**material** 6:9 24:18
29:14 30:4,6 70:2
**materials** 11:24
14:16,23 15:1,5,22
15:23,25 17:18,22
18:1,11,18 20:16
25:4,18 26:15,19
26:24 27:1,1
30:15 42:15 43:7
43:11 44:12,24
69:7,10,11,13,14
69:16,25 70:24
71:2,15 74:8
153:9,25 194:5
195:22 322:7
323:1 334:13
335:9
**math** 60:19 107:15
111:3 148:7
**matter** 9:4 10:22
13:20 14:22 31:14
31:24 41:7 45:6
46:18 49:18 50:6
54:12,21,25 55:2
55:17 56:3,6,13

57:2 60:14 61:3
61:21 67:11 73:14
75:1,6 76:2 79:18
82:1,8,12 126:6
131:7,11 142:6,20
143:8 165:4 238:3
286:10 287:24
337:12
**matters** 124:6
125:6 128:8,24
130:9 156:2 329:3
**maximum** 248:10
**mccann** 6:22
32:24,25 33:15,16
33:17,20 34:8,10
34:13,20 35:2,16
36:25 40:24 41:17
65:16 75:3,14
76:11 181:22
182:2 186:11
189:11 191:18,21
192:15 206:5
242:9,17 243:2
249:19 267:24
269:25 272:19
274:11 280:13,24
280:25
**mccann's** 41:4
69:21 75:12 76:5
76:17 189:19
190:22 271:8,12
271:17,22 272:7
281:25
**md** 1:3 2:18 8:7
**mdl** 1:3 48:21
155:19,25
**mean** 29:21 35:15
63:8 85:17 91:6
95:9 113:24
127:18 157:18
159:24 162:24

164:4 167:5,9
199:12 220:22,23
222:1,24 256:22
259:21 268:16
270:23 279:5
282:10 287:10
311:23 324:13
**meaningful** 212:5
285:9,14,17
**meaningfully**
280:10 284:4
285:1
**meaningless** 275:1
**means** 220:20
289:5 330:4
**meant** 96:22 160:3
236:10
**measure** 207:5
247:3
**measurement** 96:9
**measures** 98:1
**measuring** 206:7
235:6
**medical** 100:5
161:9,14,22 167:6
167:23 168:2
170:4,10 178:6,9
178:23 179:3
186:24 187:9,16
187:23 188:13
212:7,18 222:15
223:1,2 233:13,17
233:20,21 235:24
236:22 237:3
239:8,20 240:5,10
240:12 246:13
251:22 256:9,18
256:21,23 257:9
258:8,15 304:6,13
304:17 306:5
307:1,8 309:10

318:6 327:5
medication 170:19
  217:15 221:9,10
  221:24 222:24
  225:11 306:15
  308:9 309:2
  311:22 313:15
  318:10
medications 14:12
  123:19 173:17
  174:6 198:1 202:2
  202:4 220:25
  236:13 237:24
  302:14 306:5,12
  307:6,7,23,23,25
  308:13 310:2,6
  311:5
medicine 169:12
  169:16 170:13,15
  171:23,25 172:4
  303:10
medicines 308:3
meet 16:12 17:7
  158:4,5 186:7
  253:3 298:20
  316:10
meeting 17:4
  53:20 141:22
  283:5,5,10,19
  284:15 287:13
  292:15
meetings 16:18
  17:2 114:3 287:16
  292:15
melsner 2:7
member 80:23
  170:14 173:19
  287:6,8,10 288:18
members 169:22
  172:13 288:15,20
  288:21 293:7

memberships
  121:20
menighan 93:5
mention 179:22
  284:10
mentioned 15:21
  16:3,20,23 17:15
  17:18 25:7 26:25
  27:9,16 34:19
  40:24 46:17 65:15
  77:7 97:17 115:13
  125:3 174:18
  220:7 271:15
  283:7 299:1 305:4
  320:16 330:24
  332:11
mere 222:23
  323:23
mergers 87:17
merit 1:13 337:5
methadone 40:20
methodologies
  167:22 186:13,19
methodology
  162:1
metric 211:4
  213:7 217:12
  225:5 230:18
  260:12
metrics 160:4
  217:24 258:18
  312:9
michael 2:4
  125:14,21 339:5
michelle 114:24
michigan 125:16
middle 21:19
  217:8 296:7
midwest 339:17
  342:1

mike 20:2 21:4
  43:4 50:25 56:11
  104:5 141:18
  192:20 195:11
  235:13
mile 208:7,9
  212:12
mileage 219:9
miles 205:10,21
  206:1,6,18 207:2,4
  207:11,16,20,20
  207:23,23,23
  208:3 209:2,7,12
  210:12,18,22,25
  211:15,17,18,23
  212:1,3,5,10,13,13
  212:16,22 213:5,5
  213:11,20 214:2,7
  214:9,14,18 215:1
  215:20 216:9
  218:23 219:18
  273:23
mill 305:24 306:2
  306:19
miller 4:7 8:7
milligram 221:10
  221:13,14,17,18
  221:20,21,22
  224:18,20
milligrams 201:13
  201:15 221:15,16
million 92:17
  113:6 121:6,7
  148:11 304:22
mills 307:11,17,19
mind 262:10
  319:10
minimum 98:6
  228:11
minnesota 126:5

minute 52:10
  68:21 84:23 103:8
  140:20 254:18
  261:2 334:1
minutes 44:23
  67:7 131:18,19
  136:9 204:22
  287:13 298:21
mischaracterize
  270:24
mischaracterizes
  152:2 256:25
  285:2
mischaracterizing
  189:15
misdemeanor
  89:13
misheard 215:9
mispronouncing
  28:4
missed 281:10
missing 76:6
mission 102:4
misspoke 244:1
misstates 152:1
  285:19
mistake 127:17
misunderstanding
  43:13
misunderstood
  193:7
misusing 172:25
mix 220:21
mixed 235:15
mme 243:13,13,18
  243:19,22,24
  244:2,12,13,18
  245:2,3,11,12,16
  245:19 246:4,9
  247:3 269:11,15
  269:16

mmes 248:22
269:13 277:7,8,9
model 289:19
291:18,20,24
292:2,7,23 293:10
293:11,16,24
294:8,10,11
332:20,20
modest 80:10
modesty 82:12
modifying 292:25
moment 104:9
225:23 279:17
296:15
moments 53:14
money 110:7,21
120:23,24 146:6
146:10
monies 121:1
monitored 258:10
monitoring 116:9
260:22,25 319:22
monitors 319:19
month 29:20,22
60:24 112:7,9
116:10 200:10
228:13,20 229:19
257:16 258:7,22
259:14 278:6
monthly 261:6
months 18:4
260:24,24,24
mood 310:15
morgan 3:13
morganlewis.com
3:16
morning 8:10 9:8
9:10 60:3 179:19
193:15 336:16
morphine 201:18

motion 6:18
motley 2:3 57:4,12
57:22
motleyrice.com
2:7,8,8,9
mount 1:15 2:6
10:3 337:14
mouth 85:18
move 90:19 194:3
197:15 220:4
289:14 298:24
moved 174:13
moving 126:4
mpje 96:15,20
97:7,9,17 98:10,22
99:9,12,17,22
100:13,20 101:2,3
101:6,24
multiple 201:22
203:7 231:15
232:6 251:1,7,11
267:15,23 268:12
268:13 269:21,22
270:15 284:16
multistate 98:11
multivitamin
251:8
municipalities
13:24
muscle 232:16
233:3 235:21
268:23,25 276:13
mute 11:16

## n

n 2:1 9:10 232:2
nabp 6:12 15:8
80:20,23 81:25
84:24 85:7 86:12
87:1,4 88:13
89:10,15 90:1,4,10
90:12,19,20,23,25

91:2,3,15 92:7,10
92:11,18,24 93:11
93:15,15,17,20,24
94:11 95:25 96:23
102:1,7 103:15,21
104:24 105:2,6,10
106:12,13,14,15
106:20,24 107:3
108:3,16,25 109:9
110:18,19 111:17
111:24 112:13
113:5,16 114:5,25
116:3,8,10,23,25
117:2 118:15
119:4,11 120:10
120:19 121:1,4
131:6 136:20
137:5,8,15,17,24
138:11,13,18,22
139:4,10,21
143:16,21 144:23
145:14,21 146:10
146:13,19,20,22
146:24 147:5,6,11
147:15,17,24
148:8,12,12
149:22,24 150:4
150:16,21 151:16
151:17 184:17
208:1 230:19
231:4 286:25
287:3,22 288:2,7
288:14,20,21
289:7,9,12,14,25
290:1,4,12,21
291:2,16 292:1,12
292:13,16,20
293:17,18 294:9
294:12 295:2,3,25
296:10,15,19
297:7,15 323:9

332:18,19,23
333:19
nabp's 96:8
109:25 112:10
138:11 287:6
290:24 291:23
293:23
nabplaw 91:25
94:12 144:3
nacds 138:2,6,7
name 8:11 9:8,11
21:19 28:4 32:24
45:19 68:12 84:1
92:1,4,12 93:4,14
93:15 112:10
136:16 139:13
144:3 145:14
148:21 157:10
158:19 195:8
196:21,22 197:7
339:6 340:3,4,15
341:3,4,21
named 145:6
names 115:2,10,15
127:22
naplex 96:12,25
97:4,17 98:4,5
99:11 123:12
napoli 125:20
narrative 326:14
narrower 15:16
national 1:4 6:17
8:3 77:21 78:9
89:15,23 91:23
98:5 103:6 114:1
294:24 324:3
339:6 340:3 341:3
nationally 188:6
nature 176:18
near 214:15 215:3
215:22 216:11

**nearly** 187:8
301:22
**necessarily** 19:22
69:18 314:2
**necessary** 156:12
233:19 242:2
243:4 326:16,17
**need** 14:4 39:9
51:5,6 84:7 99:16
133:18 140:12,13
140:17 141:2,3,7
141:18 155:13
184:8 192:23
193:5 198:22
216:25 237:9
292:4 294:6 304:7
304:18 307:1
330:24 335:21
**needed** 34:14
70:14 82:15 94:14
139:19 140:4
158:22 159:3
193:8 212:23
221:23 222:23
244:16 275:4
292:14 296:13
308:13 333:23
**needs** 238:12
304:13 320:3
**negative** 187:19
**neither** 182:2
222:8,14
**neurosurgery**
217:21
**never** 34:16,16
88:22 109:14
130:25 131:6
187:4 192:4 236:3
317:4
**new** 27:21 63:15
90:15,15,16

125:18 126:1
288:19 291:22
292:8 294:4
295:25 310:18
315:16 334:21,22
**news** 294:25 295:1
295:11
**newsletter** 295:4
296:1 322:1
**newsletters**
294:12,14,21
295:12
**nexus** 219:19
**night** 50:25
**nine** 171:10
**nods** 13:8
**noncontrolled**
213:4
**nonlegitimate**
222:19 223:1
**nonmedical**
173:17 180:8
231:17 232:7
**nonmedication**
258:3
**nonopioid** 213:2
213:10,19 214:1
258:2 265:25
266:8,14
**nonopioids** 266:24
267:6
**nonsteroidal**
310:12
**nontestifying** 48:2
48:16 134:14,23
**nope** 230:9
**normal** 214:10
260:3
**normally** 207:15
**north** 145:5
149:13 151:12,13

154:15
**northern** 1:1 8:6
125:12,14,18
208:22
**northwest** 2:21
88:18
**notarial** 338:8
**notarized** 339:14
**notary** 1:14 337:6
338:16 339:25
340:10,18 341:15
341:23 342:23
**notation** 76:16
**note** 36:15 54:8
203:13 339:12
**noted** 76:6 207:21
209:6 256:10
282:21 283:4
336:18
**notes** 12:5 71:6
113:20 160:9
171:3,4 215:25
218:11 252:12
337:18
**notice** 6:16 150:4
150:17,22 294:24
**noticed** 322:7
**notices** 256:15
**notify** 256:16
**number** 8:6 14:16
19:2 26:2 27:19
30:5 36:7 37:2
39:12,17 75:8
76:10,12 107:7
123:13 161:4
170:9 174:8,17,21
174:25 175:3
177:25 192:7
196:20 202:5,6
213:18,25 220:11
220:12 230:9

245:23 250:20
251:20 267:1,3
273:23 280:8,21
281:11 282:7,13
284:2,22,24
285:13 304:1,9,12
304:20,22 314:13
314:13,14 339:7
339:13
**numbered** 189:22
**numbers** 19:22,23
20:21 24:22 36:5
36:5,14 39:16,24
41:15 50:22 75:22
111:12 123:6
167:18 202:25
223:7 224:10
227:21,22,25
242:1 281:3
283:11 305:7,14
305:19 341:7

**o**

**o** 9:10
**oarrs** 6:24 7:2
180:16 181:1,14
182:4,13,19,24
183:15,19 184:2
184:22 185:19
228:6 229:23
**oath** 11:19
**object** 14:1 155:14
156:11 189:15
282:24
**objection** 20:3
25:20 26:21 27:3
28:19 29:3,12
30:3,13 31:25
34:3,6,15 35:24
36:4,24 38:14
39:20 40:2,10
44:9 45:4,15,24

46:22 48:1 49:5
50:15 52:15 55:12
55:18 56:2,7 58:6
58:20 59:5 60:4
61:6,10 62:18,25
64:3,19 65:3,21,25
66:4,16 67:1,19
69:19 70:1,9,21
71:24 72:8,17
73:5,10,22 74:16
74:22 75:16,23
76:14,22 77:5,11
78:3,15 79:9,24
80:8 81:14 83:11
83:24 86:17 87:16
90:7 92:13 93:18
94:1,9 95:14,21
97:12 98:25 99:15
99:23 100:8,15,23
101:8,21 102:10
102:15,19 103:22
105:3,13 106:11
107:8,22 109:11
109:17,23 110:13
111:2,7,13 112:3
112:14 113:11
114:7,13,22 115:5
115:20 116:17
117:10,24 118:9
119:1,6,15,23
120:6 121:5,10
123:4,21 124:1,23
125:8 126:20
127:23 128:19
131:13 132:4,11
133:25 134:11
135:9 137:15
138:1,20,25
139:16 140:9
141:2 145:15,20
146:7,15 147:7,13

147:21 148:1,6,14
149:6,19 150:1,6
150:19 151:3,9
152:1,11,17 153:2
153:21 154:12,24
155:4 160:6
161:10 162:13,18
162:22 163:6,25
166:1 167:17
168:4 169:23
170:5,16,24 172:6
172:18 173:11,20
173:24 175:14
176:5 177:6,20
180:20 181:16
182:5,22 183:10
183:22 184:7
185:9 186:4,14
187:17,25 188:15
188:24 189:7,12
191:3 192:1,11
196:2 200:11
209:4,11 212:9
213:13,22 215:5
215:24 218:2,18
219:14 222:11
223:4 224:23
225:17 228:22
229:6 231:5,10,20
234:12 235:10
238:7,17 239:9,21
240:7,18 241:2
242:6,16 243:1,23
244:21 247:1
248:3,14 250:2,8
250:15 252:3,10
253:6,17,25
254:21 255:25
256:6,25 259:2,9
259:16 260:5
262:5 263:4,25

264:22 265:11
266:3,20 267:9
268:15 269:9,17
269:24 270:17
272:9 273:7,15
274:2,22 276:3,15
277:13,25 282:23
284:9 285:2,10,19
287:19 290:3,15
290:25 292:10
293:13 296:2
297:24 301:11,19
302:3 303:4,12,21
304:19 306:25
308:21 309:15
311:8,14 313:20
313:24 314:12
315:5 316:1,15,23
317:21 319:12
321:25 323:12
324:19 325:15
326:7,13 327:13
329:14 331:9
332:9,15 333:8
334:16 335:8
**objections**  140:14
140:22
**objective**  301:5
312:7
**obligated**  327:3
**obligation**  335:2
**obligations**  163:22
324:1
**obra**  171:9,17
**observations**
267:10
**obtain**  85:2
**obtained**  84:9
**obtaining**  223:20
**obvious**  262:6

**obviously**  13:7
25:14 38:5 41:17
200:22 270:23
306:8 309:9
**occasions**  12:22
40:25
**occur**  212:13
217:11,12 257:8
**occurred**  87:18
185:24 284:18
**occurring**  222:20
**occurs**  169:17,20
170:3,6,9,17
171:23 172:11
310:16
**october**  64:22,23
65:24 66:24 67:8
67:14
**odd**  86:5 275:4
**offer**  31:14 147:3
**offered**  117:4
**offering**  302:25
**offhand**  100:2
229:20
**office**  10:4,8 49:3
92:25 125:17,19
126:5 145:5
**officer**  295:22,22
**official**  340:15
341:21
**officio**  287:8,10
**oh**  2:12 4:11 15:20
42:21 108:11
195:14 198:16
201:3 231:1
259:23 283:12
**ohio**  1:1 2:15 6:24
8:6 13:24 28:12
88:19 125:19
178:9 185:12
210:21 225:21,24

226:6,15 227:14
227:16 229:1,2,13
229:14 240:15
241:7,12 260:20
294:24,25 295:8,9
295:11 303:9
304:4,16,23
307:11,18 311:20
315:22 316:3,4,5
317:7 318:18,19
318:23,23 319:3,7
319:15,19,23
320:3,11 321:6
322:5,11,11
323:10 324:9
325:6 331:12,24
332:2,11 339:2

**okay** 9:24 11:11
12:16 14:25 16:1
19:1 20:4,23 22:2
48:24 51:4,23
52:19 53:21,23
54:2,5,16 56:25
57:18 66:19 72:12
78:6,20 83:23
85:17 96:19,24
100:13 103:4
104:15 105:18
107:2,19 109:20
111:16 113:5
116:22 120:2
124:18 126:25
127:10 129:12,21
133:23 134:7
136:19 137:23
141:24 142:4,22
144:4 150:13,15
158:12 159:13
164:18 187:1
190:10 191:14
194:2 195:1,11,20

197:19 198:18
199:1,2,13 201:9
202:16 203:10
204:3,5 205:17
208:13 215:7
220:18 228:25
230:3 231:2
233:23 236:10,21
238:3 239:17
241:23 242:9
244:12 246:24
253:23 254:1
259:13 261:2,12
261:14 262:9,11
264:4 265:6
273:12 278:19
279:18 280:2
282:10 285:22
286:17,24 287:22
289:13 293:23
295:11 297:22
298:3,8,17 300:12
300:16 301:22
302:11,18 307:16
309:12,19 312:13
312:15,21 313:7,9
318:17 320:6
323:18 324:5
325:18 327:8
328:10,13 330:12
330:16 331:19
332:4,13 333:22
335:6,24 336:13
336:14

**oklahoma** 80:21
80:21 85:14,20,22
85:24 86:1,2,6

**once** 29:18,22 44:4
69:14 80:25 169:9
256:7

**one's** 269:7
**ones** 69:18 77:6
128:22 162:20
205:5,6 230:8
234:19 237:7
257:12 262:4
326:17
**ongoing** 315:15
**open** 50:20 51:9
52:18,21 53:14
142:14,15,24
197:15 227:5
281:8,9
**opened** 52:2
**opening** 53:7
208:5
**operability** 117:20
**operate** 195:17
208:6
**operating** 117:18
184:15 229:1
317:7 322:24
**operation** 306:2
306:20
**operational** 90:20
116:20
**operationalize**
254:5
**operations** 102:3
298:4 306:12
**opiate** 1:5 8:4
339:6 340:3 341:3
**opiates** 174:9
201:18
**opine** 31:17 67:20
331:1 335:1
**opined** 331:19
**opinion** 6:3,4,6
25:19 30:8,18
31:4 39:5 45:22
69:12 73:2,14,25

74:4 155:9 156:9
159:22,25 160:20
160:24 161:6,19
161:24 162:8
164:9 165:21,25
166:2,4,10 182:17
187:5 192:10,14
200:21 219:23
226:1 233:22
236:21,25 248:19
258:5 272:2,5
273:4 285:14
291:5 301:5,7
303:3,20 310:5,9
311:13 325:23
326:6 329:16
331:19 334:11
335:19,21
**opinions** 29:2,11
30:2,11 31:13,23
32:4,6,20 37:11,13
38:23 40:23 41:1
41:7,11 48:13
64:15 65:7,14
73:21 74:15
133:20 153:16
162:16,24 163:3
163:12 165:11,14
179:9,10 180:15
196:1 200:23,25
271:2 286:13
291:11 298:19
300:21,21 301:9
302:25 310:22,23
312:14 325:13
**opioid** 6:24 46:21
47:19,23 48:16,25
49:21 50:3 56:19
123:19 125:4,7
126:11 129:8,10
155:25 173:5,18

174:6 175:19,20
176:7,13,17,21
177:15,22,23
178:5 184:3 205:9
205:19,24 210:17
220:13 227:16
232:16,17 233:2
235:21 236:17
237:19 238:22
239:15 243:12,18
245:13,17 247:2
248:10 249:9,11
251:9,11,16,25
257:22 258:6,23
261:7,17,24
262:14 266:9,17
266:18 268:23,25
276:13,19 291:13
299:17,20 300:3,9
302:14 304:11
305:6,7,9,16,17,20
307:11,14,17,23
308:9,13 310:2,5
310:14 311:5
**opioids** 40:12,16
40:19 47:8 123:25
126:13,16,18,19
126:22,23 129:10
170:12 171:7,20
172:25 173:1,6
174:23 175:9
176:1,10 177:12
177:18,25 178:13
178:19,23 187:24
202:15 203:8
231:16 241:19
244:15 245:25
248:7,22 251:21
252:6 260:9,20
266:25 267:4
277:1 302:23

304:25 308:16
310:20,24
**opium** 247:3
**opportunity** 18:24
72:14 135:24
311:16
**opposed** 36:13
69:17 238:5
**opposite** 156:14
283:18
**oral** 1:12
**order** 18:22 26:1
30:11,22 36:16
37:16 38:24 53:7
89:23 98:8 118:4
140:7 159:14
190:12 241:25
242:5,15,24 243:3
253:3,11,16,19
258:12 264:20
268:8 289:19
293:3 313:22
**ordered** 37:21
**ordering** 37:25
**orders** 100:4
**organization** 6:13
89:18 90:4 96:2
97:2 108:5
**organizations**
90:24 108:5
**organize** 336:9
**organizing** 296:20
**original** 19:7
20:13,25 24:1,15
25:5 28:1,7,17
189:21,24 253:1
253:14 270:21
271:1 334:23
**osco** 87:22
**ought** 216:23
252:9

**outcomes** 97:22
**outer** 295:5,9,18
**outside** 32:8
168:24 169:5,9
208:8,10 224:25
234:4,24 242:13
258:10 275:17,18
331:10
**outstanding** 50:8
**overall** 179:7
240:11
**overdose** 202:4
245:13,15,16,17
245:21,21 305:2,4
305:5,8,17,17
**overdoses** 174:9
174:20 304:21
305:9
**overlap** 220:24
221:19 223:10
238:3 269:13
**overlapped** 221:4
238:6
**overlapping**
220:14,20,22
224:19 233:4
268:24 275:7,9
**overview** 325:20
**overwhelming**
186:22 187:2
**overwhelmingly**
225:7
**oxford** 3:5
**oxycodone** 126:2
201:14 284:14
**oxycontin** 201:13

**p**

**p** 2:1,1
**p&ps** 64:9,12
**p.m.** 336:18

**pa** 3:5,10,15
**package** 120:11
226:23
**packages** 209:18
**packet** 53:16
281:9
**pad** 12:2
**page** 4:3 5:2 6:2
21:25 22:5,12,20
23:4 25:24 27:10
28:11,21 42:11
54:6 55:1 58:16
59:10,11 78:7
82:3 96:6 104:2
104:18 105:16
112:20,20,23,24
112:24 113:3
123:6 125:9,16
126:4 127:1,2,15
127:15,21,22
128:4,5,10,11
129:13 133:17
141:13 143:10
144:17 158:7
179:11 180:1
190:8 194:19,19
194:20,22 205:14
205:15 210:7
217:7 220:7,8
223:8,14 228:5,15
228:16 230:13,24
230:25 232:23,24
232:24 233:10
241:20 243:8,10
245:8 249:6,9
257:17 262:16
263:6 267:13,13
267:15,24 278:12
278:14,19,20,25
279:7,10 281:6
282:2,3 288:3

298:25 312:24
323:21,21 324:11
325:1,1 326:25
328:12 339:13,15
341:7 342:3
**pages**  54:2 74:11
124:8,14,16 130:9
282:1 295:4,5,10
295:14,16,18
296:7
**paid**  50:5,11 102:8
106:17 110:1,3
120:15 128:14,17
128:24 142:7
145:21 146:13
147:4,5,11,15
152:24 262:20
264:13 266:13,15
266:17,18
**pain**  123:16,19,20
173:18 221:9,11
246:1 257:25
258:1,4,7 308:3,6
308:6,7,14 309:20
310:7,7,11,13,15
310:18,21
**pandemic**  44:3
**papantonio**  4:2
**paper**  21:8
**paragraph**  42:13
82:2 143:11
144:25 179:18
180:4,4,5 217:8,9
234:1 245:9
278:23 279:19
283:23 284:10,17
288:3 315:12
325:1 326:16
328:16
**paralegal**  16:23

**paralegals**  12:18
**parameter**  209:13
212:12
**parking**  54:13
**part**  18:13 29:4,7
30:4,15 31:5
44:18 54:14 58:9
59:17 63:17 72:1
76:16 83:6 85:7
85:11 87:6 88:6
88:13 94:23 99:18
112:22 121:18
126:12 127:9,13
134:12 136:9
139:17 146:10
153:15 165:9
179:23 185:1
195:7 208:20,22
219:10 271:1
317:11 319:21
334:22 341:9
**participant**  136:14
**participants**
288:15
**participate**  114:3
139:9 141:23
287:16 295:6
**participated**  16:18
135:21
**participating**
136:13
**particular**  16:4
18:18 34:11 46:18
66:19 68:10 77:4
79:25 99:8 104:22
114:16 123:25
131:4 154:5
157:20 159:13
166:3 175:1,11
176:3 177:11
179:23 181:11

183:7 200:23,24
224:10 241:1
242:2 246:24
249:8 260:8
280:23 294:5
325:25
**particularly**
118:21 154:14
176:17 196:15
263:7
**particulars**  298:16
**parties**  8:17
337:23,24
**partisanship**
117:14
**partner**  94:19
95:1,16
**partners**  95:3
**parts**  63:22 325:24
**party**  130:21
145:7 265:20
338:3,6
**pass**  131:17 157:1
230:10 316:7
319:9
**passes**  292:3
**passing**  123:11
**patch**  247:10
**patches**  247:25
248:1,4
**path**  315:13
**patient**  71:6
159:19,19 160:9
168:24 169:4,8,9
170:3,18,23 171:2
171:4,6,13 172:2
172:12 182:9
195:8 196:21,24
197:5,7,19,20,21
197:22,23 198:1
198:10,11 199:4,5

199:18 200:23
201:2,6,11,16,23
202:2,3,10,12,19
202:21,22,25
203:5 204:6 205:9
205:20,25 206:7
206:19,25 207:10
208:8 211:8,10,12
211:16 212:1
214:8,10,17
215:25 217:16
218:11 219:1
220:13,25 221:9
221:15,18,23
222:1,2,19 223:18
223:22 224:2,6,18
225:10 230:20
237:23 238:9,15
243:12,17 250:14
251:6,17,19 253:3
253:4,23 255:17
256:15 257:21,24
257:24,25 258:12
260:4 261:1,23
262:1,13 263:8,22
273:24,24,25
274:13,19,20
275:11 276:14,21
276:22 277:6,11
277:20 278:4,10
308:12,15,17,20
310:16 312:11
313:15
**patient's**  161:13
172:4 207:12
208:4 213:12,21
214:3,9 221:11
238:8 251:18
260:19 318:13
**patients**  171:11
186:17 197:25

199:3 202:12,13
203:6,9 207:14
208:15,18,19
209:1,1,5,5 210:9
210:17 211:22
213:1,5 225:7,9
233:20 249:10
250:20,23 251:1,7
251:11 252:1,20
253:12 254:6
258:1 304:2,5
308:7
**pattern** 249:5
250:22 257:20
**paul** 110:4
**pause** 51:5 176:17
254:13 316:14
324:5
**pay** 85:7 89:23
121:14 262:1
263:1,2,19,19,22
263:23 265:16,18
265:19,25 266:8,9
271:16 278:10
319:10
**paying** 148:12
176:9 265:14
270:5
**payment** 85:12
108:10 263:24
**payments** 95:22
106:20 262:23
263:6 264:20
**payroll** 105:14
106:16
**pays** 261:23
262:13 264:2
265:19
**pdmp** 116:13,15
159:17 179:9,14
180:15 181:7

184:13,13 185:14
224:4 225:1
275:20
**pdmps** 116:14
118:3 180:2,6,9
181:5 185:5
**pedigrees** 118:22
**pending** 8:5,21
132:1 142:20
149:14 151:21
152:9
**pensacola** 4:4
**pension** 108:12
120:13
**people** 91:7
172:25 173:4,16
174:8,12,13 176:8
177:22 191:23
214:24 215:19
216:8 244:22
248:6 263:1,13
264:13 265:1,7,14
265:18,25 266:7
266:12 304:21,22
304:22 308:3
314:2,3
**percent** 73:4,9,15
73:15,18 107:13
107:20 148:2,7
173:4,16 245:15
245:15,20,21
266:12 285:1
304:15
**percentage** 72:24
73:7,23 113:9
172:25 265:6
266:7,9,14,18,23
**percentagewise**
248:6
**performed** 132:12
134:11 140:11

148:9 151:19
152:6 181:22
272:20
**performing** 98:2
132:20
**period** 184:17
257:16 258:7,22
259:6,14,15
261:16 278:6
284:21 285:11,20
**periodically** 14:5
294:13,21 320:3
**periods** 111:21
**permit** 46:14 56:8
56:20
**permitted** 11:3
56:17
**person** 16:16
80:10 92:15,16
95:6,13 145:12
151:1 174:18
222:23 258:22
262:20 263:18
264:17 296:25
308:9 315:8 338:2
**personal** 80:9
231:17
**personally** 99:11
144:24 146:24
297:21 340:11
341:15
**perspective** 80:9
157:23
**persuade** 290:23
**persuading** 291:3
**pertain** 98:14
325:22
**peter** 2:10
**pharmaceutical**
321:11

**pharmaceuticals**
118:25
**pharmacies** 87:15
151:12 164:12
181:8 182:12
184:1 208:8,22
211:11,15 213:6
214:25 217:14
228:12 229:1
230:18 231:9
275:10,18 280:4
284:1,12 288:15
294:20 300:20
302:13 303:1
313:19 319:22
320:18,20 322:17
323:3,11
**pharmacist** 6:3,4
6:6 28:13 85:19
86:15,18,22 87:3,8
88:1,9,10,11,19
89:3,7 98:7,24
109:2,7 116:12
138:14 159:4,11
159:13 160:2,10
162:4,6,7,8,9
163:13,22 165:5,7
165:16 166:9,11
166:13,18,18
170:18,22 171:5
171:11,12,16
175:4,10,17 176:8
176:14,18,22
177:1,10,16,21
178:1 181:7,12,14
181:18 185:6,13
212:23 219:3,8,13
219:16,23 224:1,4
224:16,21 229:8
229:12,15 230:21
234:6 237:13,22

238:12 250:13
254:12,13 255:5
256:13 258:11,17
258:21 259:13
260:1,3,19,25
274:18,24 275:1
275:13,20,25
276:11 277:3,21
284:16 289:13
299:1,4 308:24
309:5 311:20
312:7,11 313:14
315:8,13,22 316:9
317:7 318:11
319:21 320:2,12
320:23,24 322:3
327:3 329:12,24
331:13 334:6
335:13

**pharmacist's**
101:3 237:8 257:7
313:5 315:3
327:19

**pharmacists** 85:20
85:22 86:2 89:23
89:25 100:13,21
138:8 161:24
165:23 180:6,25
183:14,25 184:10
184:10,22 185:17
186:2 228:25
246:10 284:13
313:19 316:12,20
317:3,18,20 318:7
318:8,17,22,24
319:4,9,16 321:3
321:13,22,23
323:22,23 331:4
332:2,21,25

**pharmacopeia**
314:17

**pharmacy** 2:14
6:17,20 15:8
28:13 34:8 42:13
55:13,20 56:3,5
57:10,17 58:5,12
64:20 68:13,14,15
72:19,25 77:22
78:9 80:21,22
81:7,10,13 82:5
83:3,6,19,21 84:3
84:9,19 85:5,15,23
85:24 86:1,6,10
88:2,23 89:16
91:24 92:1,2,11
93:5 97:22 98:1,9
98:11 103:7 114:1
114:5 122:8,8,10
122:11,24 123:8
123:10 126:15
131:1,2,3,3 135:23
136:1,11 157:11
158:14,14 162:6
163:15 164:8
165:17,22 166:10
166:17 168:23
171:9 175:16,21
180:14,25 181:23
181:24 182:3,18
183:14 184:1,15
196:9 205:11,21
206:8,19 207:10
207:12 208:1,16
209:3,7 210:10,14
210:18,19,23
211:5,9,17,18,19
211:23 212:10,14
213:11,20 214:7
215:2,18,20,21
217:15 218:24

219:19,25 220:6
224:15,24,25
225:7,8,15,21,22
225:24,25 226:1,7
226:15 229:2
230:17,22 233:6
233:13 254:4,16
255:6,8 256:10,14
272:17 273:24
274:1,19 275:8,17
275:18 280:6
288:11 289:2,20
289:22 290:2
292:21 294:11
295:1,11,12
297:23 298:4
299:10,14 303:17
312:25 314:10,14
316:2,4,7,20,25
317:5,10 318:19
318:23 319:3,8,10
319:15,19,24
320:8,8,11,17
321:2,6,13 322:11
322:16,25 323:10
328:5 330:8
332:20 335:19

**pharmacy's** 219:2
**philadelphia** 3:15
**phone** 11:4 33:9
33:13 45:21 112:7
113:14 135:22,23
136:8,13 139:2
339:3
**phoned** 46:15
**phones** 184:25
**physical** 260:21
309:3
**physically** 10:11
**physician** 187:8
221:12 225:9

251:24
**physicians** 186:22
187:2
**pick** 197:1 253:12
**picked** 45:20
250:14
**picture** 196:23
**piece** 207:24
**pieces** 222:22
**pill** 247:10 305:23
306:2,19 307:11
307:17,19
**piqued** 282:18
**pittsburgh** 3:5,10
**place** 58:22 88:12
189:2 214:15
226:21 246:15,19
293:20,22 294:3
333:9
**placed** 174:24
**places** 75:8 328:2
**plaintiff** 16:13
36:13 48:2 132:22
154:6
**plaintiffs** 2:2
10:12,15,21 16:6
23:12,22 29:19
37:1,25 38:11,21
44:16 46:9,17,18
47:18 50:9 51:14
52:7 65:4,12,17,23
67:24 69:25 70:6
70:16,24 95:8,12
130:22 190:14,20
204:15 242:23
270:22 300:14,22
300:25 301:10
**plan** 217:14
**planning** 270:18
287:25

**plans** 102:5
**plastic** 217:20
**pleadings** 134:10
**pleasant** 1:15 2:6
  10:3 337:14
**please** 9:8 11:16
  13:7,14 14:4
  23:25 37:3 52:21
  53:15 66:8 142:15
  179:24 180:23,23
  198:17 201:9
  220:21 227:8
  230:6 316:13,18
  339:11,11
**pleasure** 9:17
  158:4,5
**plenty** 204:23
**plus** 26:25 53:22
  253:3,4,23 256:3
**poerschke** 4:3
**point** 11:15,16
  57:9 93:13 109:9
  112:15 118:6
  155:16 156:13
  157:21 165:19
  166:3,6 211:10,11
  211:16 215:13
  282:13,21 283:18
  292:2 296:16
  328:1,2,4,10
  330:18 331:12
**pointed** 163:8
  334:7
**pointing** 159:10
**policies** 64:13,14
  64:18 69:20 71:18
  119:12,24 120:2,4
  179:14 185:6
  189:2 290:12,24
  293:18

**policy** 290:2,20
**political** 117:14
**poorly** 231:18
  232:4
**pop** 158:3 195:13
  331:3
**popped** 292:8
**portion** 157:14
  295:3
**portsmouth**
  210:21
**posed** 31:20
  327:17
**position** 88:13
  96:4 120:9 143:23
  143:25 296:17
  333:14
**possession** 126:2
  129:17
**possibility** 171:24
  267:19
**possible** 129:10
  219:6 251:15
  254:20,22 261:20
  261:20 315:6
  332:10
**potential** 247:11
  247:13 251:16,18
**ppoerschke** 4:5
**pqac** 68:11
**practice** 15:8
  42:12 86:18,22
  101:22,23 122:7
  138:8 163:15
  187:11 208:6,12
  233:14 251:13,24
  280:6 289:14,21
  289:22 290:2
  291:20 292:21
  294:5 297:23
  307:6 312:25

313:5 314:10
  318:17
**practiced** 86:15
  299:2
**practices** 187:14
  187:22 293:24
  294:2 300:8 324:2
**practicing** 87:3
  98:21 315:21
**practitioner** 214:2
  215:3 233:21
**practitioner's**
  328:25
**practitioners**
  215:1 217:16
  233:18 302:21
**pratt** 2:17
**precede** 34:21
**precedence** 98:17
**precipitous** 283:16
**prefer** 9:18,21
  53:3 100:9
**preliminary**
  194:12
**prep** 63:19
**preparation** 15:2
  15:19,23 16:5,9,13
  17:8,19,25 18:19
**prepare** 14:15
  18:5,12,23 23:19
  103:16 190:24,25
**prepared** 23:16
  41:19 63:16 295:5
  305:19
**preparing** 25:5,11
  38:18 43:3 61:2
  61:16 63:11
**preps** 62:23
**prescribe** 178:15
  178:19 187:2
  236:22 238:20

246:14 302:13,15
  308:20
**prescribed** 170:13
  221:17 236:13
  251:24 275:16
  276:14,20 307:25
  308:5 323:24
**prescriber** 116:13
  159:16,20 161:8
  163:8 168:23
  178:4,7,22 179:2
  206:1 207:25
  211:25 212:14
  213:7 214:9 216:9
  216:10 219:20
  221:12 222:21
  223:21,22,23
  224:2,3,5,7 233:6
  240:9 241:7
  249:13 250:25
  251:7 254:7
  258:25 261:1
  268:25 274:7,13
  274:15,20 306:2,3
**prescriber's** 206:9
  256:16
**prescribers**
  118:10 163:5,9
  186:12 187:13,21
  188:11,17 199:21
  201:21,22 203:4
  206:24 207:14
  220:15 225:4,10
  228:12,20 238:20
  239:1,6,14,19
  246:13,15 275:10
  275:17 306:11
**prescribing** 6:24
  227:16 231:15
  232:6 245:25
  249:5,8 250:19,22

329:1 330:4,17
**prescription** 1:5
7:3 8:4 116:8
125:23 126:5,7
158:21,23,24
159:8,8,12 160:2
160:10,13 161:3
161:14,19,20,21
165:7,17 166:18
167:1,4,10 168:12
169:4,5 170:4,7,11
171:3 172:2,5,7,11
172:12,14,19
173:17 174:23
175:1,2,6,6,11,18
175:23 176:3,6,12
176:13,16,21,25
177:4,12,15,18,23
177:24 178:2
181:11,13,19
182:6,14 183:2,7
184:3 186:6,8
187:8 200:24
201:20 212:11,24
214:13,18 215:20
216:6,8 218:22
219:4,8 221:4,5,13
221:14,21,22
222:25,25 223:19
224:6,9,19,20
230:20 232:5,6,15
232:17 233:2
237:3,18,19 238:4
238:16 242:3
243:12,18 250:12
250:13,18 251:1
251:10,25 252:17
253:13 254:18
255:11,15,21
256:8 260:10,11
261:7,8,24 262:14

263:7 265:19,21
268:23,24 274:7,9
274:16 275:12
276:12,13,19,25
277:1,11,17,20,23
278:4,7 282:5
285:4 291:13
299:18,20 300:3,9
305:6,16,20
317:23 318:2,12
318:15 327:3,4
339:6 340:3 341:3
**prescriptions**
27:20 36:1,8 37:2
37:14,15,19 38:4
39:13,18 40:5,6,8
40:12,13,16 71:18
71:19 75:19 76:1
76:3,16,19 77:4,6
77:10 100:4
158:17 159:5,23
160:21,25 161:5,7
161:25 162:2,11
162:17 163:4,7,13
167:15,21 168:1
168:10 174:15,17
174:21 175:3,20
175:25 178:5,13
178:23 179:3
181:2 182:10,20
183:16 185:23
186:12,18 187:15
187:24 188:12,19
190:10,12,13,16
190:20 191:4,15
192:8,9 198:11
199:5,20 200:6
201:18,24 202:1
202:15 203:7
206:17 208:16
210:10,13,17

211:22 212:6,17
213:2,10,19 214:1
214:6,25 215:1
217:24 218:15
219:25 220:13,24
222:8,9,15 223:10
232:12 233:12
234:9,16,21,22
237:6,10,11 239:2
239:7,15,19 240:2
240:4,16 242:1,11
242:12,13,22
243:17 249:11
251:9 252:21
253:1,14 255:1,6,7
255:9,13,17 256:9
256:20 257:4,7,12
258:21 259:13
264:21 265:25
266:8,10,13,13,15
266:17,18 267:25
268:4,5,11 269:4
269:14,15 274:3
274:11,14 275:7,9
275:16,21 276:1
277:2 280:14,18
280:21 282:7,13
282:14,22 283:6
283:16 284:22,24
300:1 302:18,22
303:7,10 304:6,13
304:17 306:4,21
306:22 308:25
318:9 333:2,21
**present** 4:8 10:6,8
38:12 122:2,15
192:14 234:3
337:23
**presented** 31:16
35:21 43:24 159:4
160:3 165:8 169:5

175:5,12 176:13
176:14 177:5
184:3,9 218:22
257:23 261:15
275:12 277:3,21
292:12 300:18
305:19 318:12
336:6
**presenting** 224:18
**presents** 212:22
223:18 230:20
277:17
**prestigious** 83:9
**pretest** 101:14
**pretty** 199:11
204:19
**prevails** 226:8
**prevent** 14:8
180:7
**previously** 81:20
190:13,20 191:16
192:8
**price** 263:3
**primarily** 61:15
88:17 89:22 91:2
114:23 115:18
**primary** 15:11
18:21 25:7 30:7
63:18 71:12 95:10
95:12 119:16
207:6,11 310:14
310:20 327:18,19
**print** 51:1
**printed** 21:16
**prior** 27:12 46:10
55:24 57:23 58:17
67:13 78:23 93:22
95:25 96:7 109:14
124:22 146:16,23
147:14 151:10,23
151:24 244:19

260:18 316:25
**private** 129:1
**probably** 16:16
17:4 18:3,21
29:18 33:1,4,5
44:7 58:22 63:1
69:22 94:7 99:4
102:20 107:17
111:3 116:2 138:2
190:3 194:8
206:22 220:19
240:20 244:8
248:5 252:4,5
256:20 257:8
260:16 267:4
273:22 299:12,19
**probative** 164:10
**probe** 48:12 56:18
134:22
**problem** 44:19
177:22 211:20
212:25 252:6
319:23,23
**problematic**
175:23 257:6
**problems** 176:19
**procedure** 1:16
8:20 37:17 322:24
337:16 340:5
341:5
**procedures** 38:3
64:13,14,18 69:20
71:18 119:12,24
120:3,5 185:6
217:22
**proceed** 127:4
159:11
**proceeding** 240:25
**proceedings** 12:25
39:1 240:14
287:15

**process** 29:20,21
31:5 170:17
254:13 260:22
280:19 293:4
296:20 333:21
**processes** 117:19
314:16
**produced** 1:12
14:22 72:20,25
73:19 74:6 156:18
181:24 186:11
**product** 116:3,22
247:13 296:4
**production** 339:15
339:17,22
**productive** 15:15
**products** 118:18
176:19 247:11,15
**profession** 246:13
**professional** 88:25
121:20 165:4
177:2 184:4,24
185:7,18 186:3
187:10 224:8
251:22 311:21,24
312:2 314:15
**professionally**
297:20,22
**professionals**
323:25
**proffering** 311:4
**profile** 260:4
273:25 275:11
276:22 277:11,20
278:4
**profit** 90:21 306:6
**program** 85:8
90:16,18 98:1
116:9,9 117:5,7,7
117:16 118:15,18
183:20 264:14

295:7 316:3,7,9,11
322:1
**programs** 90:3
91:9 97:18 99:17
101:23 179:10
264:11 316:4
317:11 321:2
**prohibit** 323:14
**prohibited** 184:11
**proliferation**
185:22
**promise** 19:21
**proper** 38:1 44:7
68:12 171:6,12,19
320:9 328:25
329:4,23 330:4,16
**properly** 54:4
140:14 170:18,23
**proposed** 153:7
**protect** 258:12
**protected** 141:5,6
**protecting** 288:11
**protection** 290:16
291:7
**provide** 12:16
23:12 24:12 42:25
43:2 58:18 65:12
71:8 77:19 94:11
94:14 101:15
111:22 112:5
129:12 136:15
140:14 143:16,19
147:19 152:21
186:23 191:9
200:15 217:18
256:15 289:16,19
290:4,9,10 291:4
291:11 292:4
296:23 301:25
308:2 311:16
321:2,7,17,18,20

321:22 323:6
325:20
**provided** 12:2,11
12:13 14:19 20:12
23:22 41:17 43:8
44:16 51:15 52:7
56:22 57:5 59:23
62:11 67:22,23
69:13,22 70:12
75:12,14 78:21
79:1,19 80:22
92:2 93:1 111:25
112:6,8 113:17
120:22 127:8,11
129:3,14,16
130:25 131:2
143:6 146:19
155:23 184:12
191:5 192:12
200:16 216:1
259:25 289:11
303:20 305:15
321:8 322:12
328:5 334:14
335:15
**providers** 321:9
**provides** 93:20
98:2 116:11
117:20 265:10
**providing** 59:3
62:1 69:25 92:11
151:1 297:4
313:15
**provinces** 288:17
**provision** 325:6
326:5,17,23
327:12 328:3,4,13
328:20 329:11,15
332:1,2
**provisions** 324:8
325:2

**psychological**
101:11 260:21
**public** 1:14 288:11
290:16 291:7
337:7 338:16
340:10,18 341:15
341:23 342:23
**publications**
122:22,23
**publicly** 49:9,10
49:12,14,15 90:5
134:16,21 153:3,5
155:19 156:15,21
**publish** 21:24
22:19
**published** 21:4
244:14 332:22
**pull** 19:2 22:17
23:24 25:23 64:6
69:6 119:25
142:12,14 209:20
230:6 281:15
**pulled** 287:23
296:4 301:17
**pulling** 24:23
**purchase** 267:4,5
**purporting** 242:12
**purpose** 66:3
90:14,15 100:5
161:9,15,22 167:6
167:23 168:3,12
169:1 177:25
178:6,24 179:4
187:10,16 188:14
212:8,18 222:16
222:19 223:1
232:7 233:13
239:8,20 240:6,11
247:23 256:10,19
256:21,23 257:9
258:8,15 288:2,7

288:24 289:6,18
294:2,7 301:25
306:5,6 307:8
327:5
**purposes** 19:25
24:20 27:2,24
28:5,16 29:1,10
30:1,11 65:13,19
65:24 73:14
151:20 152:9,16
153:10 156:8
174:16,22 180:8
186:24 188:20
223:2 240:12
246:6 261:13
265:2 306:7
**pursuant** 1:16
36:15 190:11
337:15
**pursue** 85:5
**put** 22:15 29:5
50:20 51:4 75:15
82:13 85:17 99:24
112:22 147:9
192:19,25 193:11
195:1 209:21
226:11 227:7
231:4 250:10
271:7 281:5 292:2
295:24,25 296:7
301:4,20 302:7
332:19 333:3
**putting** 20:3 22:3
60:12 118:6
**pweinberger** 2:13

**q**

**qualified** 59:18
130:6 319:17
**qualifies** 317:22
318:1,8

**qualify** 184:8
232:5
**quality** 68:14
**quantico** 122:6
**quantified** 182:2
**quantify** 196:5
304:8
**quantities** 176:9
195:9 234:4,11
**quantity** 251:20
**queried** 275:20
**query** 116:13
**question** 11:21
13:6,14 14:3
15:16 18:13 23:13
23:18 25:16 28:2
29:4,7,9 34:16
37:5,8 38:15
39:21,22 47:4,17
47:25 48:4 56:18
58:7 65:11 68:5
84:8 86:5,21
95:19 97:12
100:25 103:18,19
104:17 105:9
106:13 114:19
125:5 127:19
133:12,23 134:8
135:11,16,20
136:25 140:21
141:3 149:23
155:15 158:12
162:23 166:7
175:8 181:9
182:23 183:4,5
189:1,16 194:10
194:12 218:21
219:9 231:13
235:12 237:25
239:24 242:19,19
249:4 260:16

261:4 263:16
265:23 267:21
270:20 273:13,17
273:22 276:5
279:18 283:3
305:14 306:14,17
306:18 311:2,9,10
311:12,15 318:4
320:2,10,14
324:13 327:17
334:18 336:1
**questioning** 56:8
165:13 286:21
299:9 305:16
**questions** 5:3,5,6
9:7,14,16 13:11,12
13:13 14:2,6
26:14 31:15,17,20
34:10 55:20,22
56:21 59:7 77:15
91:7 98:13 100:13
101:13,15 131:16
141:15 157:4,8,13
157:17,22 160:18
193:3,4 195:3
204:17 205:4
231:3 241:23
267:18 286:5,16
286:19 298:25
303:24 313:3
334:22 335:10
**quick** 52:10
141:20 179:5,12
278:12 285:23
334:1
**quicker** 200:5
**quickly** 273:20
**quite** 26:19 38:18
281:14
**quiz** 287:25

quotation   122:24
quote   75:9 230:19
quoted   42:4
   106:18 185:3
   301:16 326:17
   328:12,18
quoting   323:20

**r**

r   2:1,4 4:9,10
ra   123:7
rafferty   4:2
raised   137:14
ran   33:16 221:23
random   119:25
range   112:12
   125:3 208:7,9
rannazzisi   115:11
   115:19,21,24
rare   251:2
rate   49:18
rates   174:19
reach   139:14,14
   218:13 280:16,25
   282:24,25
reached   73:21
   139:18 140:3
   257:4 260:23
reaction   242:14
read   28:12 138:6
   151:22 232:10
   246:2 280:17
   282:8 283:24
   289:3 310:23
   329:15 336:4
   340:5,6,12 341:5,6
   341:17
reading   223:16
   327:1 336:3,8
   339:19
reads   42:14

real   254:17 333:23
   335:17
realize   173:8
   240:10
really   38:22 59:22
   63:9 80:4 82:14
   160:4 165:12
   213:14 217:1
   218:1 231:8 235:6
   246:3 248:15
   249:25 261:16
   270:25 275:4
   308:5 310:19,20
   333:23
realtime   1:13
   337:5
rearranging
   196:18
reason   79:25
   173:12 174:8
   185:16,21 198:23
   208:9 236:22
   245:7 251:10
   265:18 279:20
   339:14 341:8
   342:3
reasonably   230:21
reasons   174:7
   214:12,17 252:6
   262:1,2
recall   30:14 31:3
   33:3 77:12 85:9
   93:10,12,13
   107:14 112:18
   113:19 115:12,15
   128:15,18 129:15
   136:22 137:16,23
   173:2 189:21,23
   327:17,22 330:10
receipt   53:19
   54:13 339:18

receive   43:5 70:25
   91:23 120:10,18
   121:9,16,23 146:6
   146:8,10 149:4
   153:9 251:19
   317:8,12 319:20
received   25:18
   29:18 50:25 60:22
   62:12 79:19 82:21
   83:2,19 84:1 91:1
   92:24 107:9
   108:13 110:4,7,9
   120:13 121:6,13
   146:17 170:4
   172:12 182:11
   198:1 201:13,16
   202:12
receiving   107:3
   117:15 147:5,8,18
   202:15
recess   69:3 104:12
   131:21 142:1
   204:25 270:10
   334:3
recklessly   231:16
recognition   180:5
recognized   127:15
   313:25 314:5
recollection   30:20
   31:2 107:17
   137:20,21
recommend
   290:12
recommendation
   293:9
recommendations
   246:17
recommended
   45:18 234:5,24
   246:22 258:1,10

record   8:1,15 9:9
   13:5 19:1,3,21
   20:22 35:11 51:14
   54:9 69:2,4 103:5
   104:9,10,11,13
   131:20,22 140:13
   140:24 141:25
   142:2,17 155:17
   156:14,15,23
   204:24 205:1
   219:7 270:9,11
   281:24 333:22
   334:2 336:17
   337:20 341:9
record's   24:19
recorded   316:15
records   117:19
red   6:22 7:3,4
   33:19,20 34:1,11
   34:14 35:17 37:13
   37:15 38:4 39:4,5
   39:12 40:6,7,17,21
   46:1,4 57:7 59:19
   59:23 67:21 70:4
   70:7 71:11,13,14
   71:20 122:9
   138:16 154:3
   157:15,16,17,20
   158:8,13,17,19,25
   159:2,2,6,7,9,14
   159:15,15,17,18
   159:20,23,24
   160:5,13,19,22,25
   161:7,11,12,25
   162:11 163:7,14
   163:16 164:11,14
   164:20 166:20
   167:4,22 168:10
   171:24 172:16,20
   175:23 180:10
   181:11 182:21

183:16 185:22
186:5,11 189:10
189:22,24 190:15
192:9,13,15 202:1
203:20 205:4,7,8
206:6,9 207:19
211:21 212:22
214:23 215:17,18
218:1 219:5,10,16
219:20,21 220:2,4
220:11,12 222:4
223:9,17 224:4
225:11 229:8
232:9,10,19 233:3
233:11 234:2,9,10
234:13,22 235:22
237:5,16,17,20
238:1,11 240:3,17
241:9,16,18
242:12 243:7
244:2,13 246:10
246:25 250:19,22
252:16,24 253:1,2
253:4,5,14,15,24
254:11,25 255:9
255:20,22,22
256:20 257:5,15
260:8,13,18 261:3
261:10,18,22,23
262:19 263:8,13
264:15 267:2,15
267:19,20,23
268:1,6,7,12,12,13
268:17,19,20,20
268:22 269:3,4,5
269:11,12,21,23
269:25 270:1,2,15
270:21 271:8,9,10
271:13,22 272:2,7
272:12,13,14,16
272:19,22 273:5

273:20,23 275:22
276:2,8,25 277:9
279:13 280:9,12
280:15,20,21
282:5,6,14,15,17
282:19,21,21
283:8,11 284:3,16
284:23,24,25
299:21 302:19
303:8 327:20,21
328:22 329:13,20
329:20 330:5,20
331:4,14,21 333:1
334:7 335:3
**redline** 19:14 20:1
23:7,12,14,19
24:12 190:4
**reduce** 36:14
**reduced** 36:9
337:18
**reduction** 280:14
**redundant** 268:14
268:16
**refer** 20:8 25:1
31:6 36:6 68:11
80:14,17 81:10,12
86:2 165:13 180:2
220:9 242:2 245:8
288:2
**reference** 20:6
124:9 133:18
137:1 284:17
339:7 340:2 341:2
**referenced** 30:23
30:24 32:14 60:8
135:3 245:22
322:1 340:11
341:15
**references** 28:22
59:12 68:16 154:9
154:13 155:18

245:24 334:19
**referencing** 19:5
30:22 52:24
126:11 155:8
166:3,6 205:15
271:15
**referred** 43:19
94:22 179:18
190:15 191:2
232:11 271:16
**referring** 14:24
24:21 27:14 31:9
32:11,11 58:3
64:14,18 66:22
68:2 75:11 77:3
108:9 122:21
123:3 124:13
127:13 134:25
143:22 158:10
164:19 165:18
171:17 197:6,10
235:4 238:22
244:20 276:6
290:4 294:16
**refers** 31:8 68:15
108:3
**refill** 277:18
**reflect** 25:16,18
31:1 39:17,25
40:4,5 54:20
55:16 293:17
305:7
**reflected** 57:23
60:1 62:16 250:5
250:6,11 324:3
**reflecting** 58:16
**refresh** 30:20 31:1
137:20
**refusal** 155:15
**refuse** 177:10,17
178:2 300:3

**refused** 183:9
230:22
**regard** 46:3 93:25
131:4 138:15
160:8 263:10
318:10
**regarded** 187:14
187:22 188:6
**regarding** 57:9
59:7 286:13
290:11,16 304:1
312:14 317:8,13
325:13 333:13
**register** 6:20
**registered** 1:13
85:21 89:3 112:10
299:1,3 302:21
337:5
**registration**
178:15,18 303:2
**regularly** 147:24
**regulation** 15:8
131:5 164:24
226:12 291:25
294:4,5 296:6
**regulations** 14:18
91:25 163:23
208:2 211:7 226:7
289:19 291:12,18
291:21 292:3,7,23
293:12,16,24
319:1,5 320:25
324:4,16 325:11
**regulator** 229:5
**regulators** 225:16
225:19
**regulatory** 178:6
**reject** 265:20
**relate** 37:13
149:10

related 46:21
47:23 48:24 49:21
50:3 56:21 59:6
108:5 118:21
125:4,7 134:10
149:17 203:5
272:14 280:4
283:25
relates 1:6 31:2,3
38:2 156:17
relating 9:3 48:25
132:10 150:22
relation 126:15
relationship
126:18 140:12
142:9 304:24
relative 245:18
338:3
relatively 13:10
relaxer 232:16
233:3 235:21
268:23,25 276:14
release 323:14
released 115:14
244:10
relevance 38:22
relevant 69:11
70:11,19 71:3,9,10
83:23 211:3
318:25 319:5
320:1 325:25
326:5
reliance 14:24
15:25 16:9,11
17:19,23
relied 26:16 29:14
30:7,17 44:24
65:13,19 133:8
155:21 156:21
207:7 210:5
242:10 272:22

334:13
relievers 173:18
rely 29:13 30:8
65:6 133:18
181:21 189:24
271:12 305:5
314:10 325:12
relying 29:1,10
30:1,10 133:3
153:10 154:22
156:4 174:4
298:17 324:17
334:10,23 335:18
remain 315:16
remained 143:12
259:8
remains 153:23
320:12
remember 28:8,9
61:20 100:2 196:3
202:25 203:1
reminder 13:3
remote 1:8 8:18
10:1 211:13
remotely 2:1 8:16
337:10
remove 79:22
removed 82:9 84:5
remuneration
120:19
renamed 83:22,22
render 248:19
rendered 164:9
renewal 320:8
renewed 320:3
repeat 29:9 72:4
repeating 305:15
rephrase 13:15
114:19 215:6
replace 297:8

replacement
296:19 297:1,5
reply 6:16 151:17
256:7
report 6:24 7:2
12:1,5 14:21
15:11 18:20 19:8
19:12,15,19 20:1,9
20:13 21:13 22:5
22:18,22 24:1,8,16
25:24,25,25 27:11
27:12,20,22,25
28:1,6,7,11,17,22
29:14,15 30:23
31:6,8,10,12,22
32:3,7,17 33:19
34:21,22 35:3,4,6
35:18,21 36:6,7
38:18 39:11,17,25
40:17,21 41:13,16
41:18,21 42:2,5,9
42:11,25 43:3,5,15
43:21,22 44:4,10
44:18,22 60:9
61:9,12,14,16,19
61:21 62:2,4,7,17
62:21,24 63:8,9,10
63:10,12,13,17,23
63:25 64:2 65:19
65:24 66:13,21,21
66:23,23,25 67:4,5
67:13,16,24 68:3,3
68:6,11,16,17 69:8
75:3,13,15 76:5,11
76:17,21 77:20
78:21 79:1,12
105:17 124:8,13
124:14,15 127:11
129:12,17,19
130:10 132:7
133:2,9,17 135:5

137:1 153:11
154:8 155:18
157:12,15 158:7,9
158:10 165:19
173:16 174:18
179:11,23 180:13
180:24 181:4,7,12
182:13 185:3,15
189:19,21,23,25
190:22 191:11,23
195:7 196:1 205:6
217:7 220:8 223:8
225:6,18 227:15
229:7,24 230:13
230:19 231:2
232:23 241:20
243:10 245:8
246:10 249:6
262:11,17 267:14
268:2 271:9,13,15
271:17,18,19,19
271:20,22 272:1
278:14,15,17,20
279:1,8,15,22
281:1,3 282:1
283:1,4 301:8,18
301:22 302:7
310:24 312:1,4,20
312:21 313:13
323:19 324:14
326:4,20 328:12
330:12 331:20
334:13,21,23
335:4,7,10 336:11
reportable 106:4
108:2
reported 26:4
105:6,10
reporter 1:13,13
1:14 8:8,10,12
13:8 104:8 216:20

226:25 281:21 337:4,5,6,6 338:15 340:7
**reporting** 227:15
**reports** 23:8,20 25:6,12 34:23 47:16 67:22 74:25 75:5 129:14 152:20 196:12 322:21 323:2,15 326:14 336:6
**represent** 13:19 34:13 43:4 114:4 157:11 286:9 301:6 314:7
**representative** 92:18 113:25
**represented** 13:16 39:5 46:6 52:8 333:16 337:24
**representing** 46:8
**represents** 9:12 13:23
**reputable** 188:6 188:18
**request** 70:24 139:20 140:4,19 280:12 341:9,11
**requested** 69:15 69:16 70:12 76:23 92:21 124:25 326:24 337:22
**require** 248:22 265:15
**required** 37:12 89:24 98:5 99:7 159:21 274:9 315:20,21 328:9 331:6,21,24 333:20 335:11,13 339:25

**requirement** 164:7 171:18,18 180:9 185:4 226:8 226:11,20 296:5 315:1 316:10 317:1 319:18 327:18,19,24 328:21 330:7,20 332:5 333:5 334:6
**requirements** 14:18 71:12 98:23 101:1 118:2,23 171:8 185:8,12 312:10 313:5 316:5 333:13
**requires** 255:10 260:20 321:7 329:12 331:13
**research** 122:17 122:25 123:1,1,13 266:11 331:16 332:11,13
**reserve** 156:11 157:2
**residence** 213:12 213:21 214:3,8,10
**residing** 338:21
**resolution** 164:11 164:20 237:10 279:12 327:21 328:22 329:13,20 330:20 331:4,14 331:21 333:1 334:7 335:3
**resolve** 159:7,14 164:14 180:10 238:12 258:11 279:12
**resolved** 71:20 158:22 159:3,10 160:14 186:5

219:16,21 237:23
**resolving** 71:13
**resorted** 200:1
**resources** 294:3
**respect** 37:17 38:3 67:13 80:23 100:21 132:21 133:9 134:24 135:1 138:24 153:19 155:14,23 157:20 181:1,10 181:13 182:20 183:15 250:22 275:7 276:8 335:1
**respectively** 210:22
**respiratory** 238:9
**responded** 270:22
**respondent** 210:13
**response** 28:22 136:21 184:8 190:14,21 191:1 226:14 286:15 299:9 327:16 333:19,24 334:21
**responsibilities** 100:3 138:15 185:19 186:3 287:12 298:11
**responsibility** 42:1 46:2,4 67:21 70:4,8 71:13 95:4 97:3 104:25 138:17 162:2,5,10 163:24 165:4,9 166:14,20,25 185:7 286:14 298:6 327:11,20 328:18
**responsible** 96:11 96:20,25 97:3,6,8

97:19 102:2 115:6 287:13 295:13,19 318:24 319:3 328:25
**rest** 60:12 121:9
**restricted** 27:19 35:10,14,20,23 36:23
**restrictions** 100:6
**restrictive** 98:16 229:3
**result** 39:12 75:21 183:5 279:22 280:3 283:24
**retail** 131:1,3 211:4 302:12 317:18 323:3,11
**retained** 46:20 47:18,22 48:7 49:2 58:18 95:7,8 95:10,12,15
**retainer** 58:21
**retired** 77:21 81:25 91:12 121:4 145:1
**retirement** 94:7,8 108:12 112:1 113:16 120:11 143:11
**return** 6:12 94:13 103:20 104:23 110:16 286:25
**returned** 339:18
**returning** 323:19
**returns** 90:5 105:1 105:6,11
**reveal** 37:4 66:9 134:13 280:13
**revealing** 37:6 38:15 66:6

**revenue** 95:4
116:22
**reverse** 98:18
**review** 14:20 15:5
16:8 17:22,23
18:19 28:6,9
29:17 30:2,16
41:21 52:11 59:12
59:22 63:20 64:9
69:15 70:17 72:14
74:2,3,6,9,25 75:3
75:5,14,19 76:10
79:16 103:8
119:17 123:8
132:9 134:9 137:2
159:18 176:23
189:18 190:19
196:17 225:1
246:24 280:11,16
318:9 323:7
339:12 340:1
341:1
**reviewed** 14:16,18
15:1,23 16:4
17:18,20 26:9
27:2,18 28:5,8,16
29:13 31:5 41:4
42:15 44:12 61:11
61:11 63:6,7,16
71:15 73:1,15,18
73:24 74:12 75:21
76:20 77:2 84:19
161:4 186:10,17
192:12 194:6
195:7,10 198:7
199:1 289:12
302:6 322:8 323:1
**reviewing** 15:21
74:14 190:22
201:10

**reviews** 138:16
**revise** 78:24
292:17
**revised** 292:13,14
**revisit** 157:2
**revocation** 89:8
**revoke** 178:10,12
178:15
**rice** 2:3 57:4,13,22
**rid** 193:17,20
**right** 20:20 36:18
40:19 47:17 54:17
57:15 59:4,11
60:18,20 61:4,24
62:5,8 64:7 66:15
73:12 83:8 84:12
84:21 85:1 86:16
89:18 93:8 96:9
96:13 97:7 98:24
100:14,22 101:20
102:5 106:2
108:14 109:16
110:8 111:1,6
112:2 113:22
114:6 115:12,16
116:4 118:8
124:19 126:19
127:2 128:6 129:6
130:11 133:21
149:18 151:25
157:2,23 160:17
169:6 170:23
175:1,7 178:18,19
179:20,25 183:13
184:20 185:8
189:19 191:13
193:17,24 195:14
196:10 198:12,16
199:7 200:17
202:8,20,24
203:10 205:12,18

206:10,21 208:17
208:20,23 210:14
210:23 212:19
213:12,21 214:3
214:15,21 215:23
218:1,17 220:16
221:24 222:3,4,10
222:16,22 223:3
224:13,20 227:8
228:4,9,21 229:21
230:9 231:4
232:12,20 233:8
233:25 235:20,25
236:2,5,15 238:14
238:16 243:14,20
252:17,18,22
255:11,18,19,24
256:24 258:5,14
258:23 259:1,8,15
260:4,13 261:10
261:24 262:19
263:12,14 264:10
267:8 269:1,5,7,16
274:1,8,14,16,18
275:5,13 276:17
276:22 277:12,24
278:7 280:23
288:2,8,12 289:3
289:22 290:9,24
291:14 293:11
294:1 295:1 297:8
298:14 300:14,18
300:22 301:1,6,10
301:18,23 302:2,9
302:14,15,16,23
303:11,20,20
304:2,5 305:9,12
306:9,22,24 307:5
308:2,4,10,14,23
309:10,14 310:25
311:7,13 312:13

312:24 313:13,23
316:22 317:17,20
318:15,19 319:11
320:4,9,18,21,25
321:5,12,15
322:18,23 327:9
329:9,22,25 331:8
331:22 332:21
**rights** 156:11
**ring** 100:6
**risk** 245:12,14,17
245:19 247:17
**rite** 3:12 275:25
**rmr** 338:14
**road** 117:9,13,14
118:6
**rob** 8:7
**robert** 4:7
**role** 91:17 96:8,11
96:20 97:6 104:24
129:5 132:20
134:12 136:14
141:4 287:23
288:7 300:12
**room** 8:14 10:5,6
10:11 141:22
192:23
**rostie** 125:24
**roughly** 50:14
285:8
**routine** 251:14
319:21
**rover** 112:12
**rph** 1:9,12 9:1
336:25 337:9
339:8 340:4,9
341:4,13 342:20
**rule** 8:19 131:4
141:16,18 226:12
**rules** 1:16 8:19,20
226:7 294:11

332:20 337:16
340:5 341:5
**ruling**  35:19
156:25
**run**  33:17,20,23
34:11,14 35:16
38:11 192:15
270:1 273:20
306:2
**running**  141:21
**rx**  2:14 227:15
**rxcheck**  117:8
**rxconnect**  263:7
**résumé**  47:6 80:2
80:3,6 81:23
82:13 123:6

**s**

**s**  2:1 339:15 341:8
341:8 342:3
**safe**  244:19,23
245:1
**safely**  312:12
**saith**  336:21
**salary**  102:8,9,14
111:16,19 147:6,8
147:25
**sale**  231:17
**samhsa**  173:3,7,9
**sample**  75:10 77:3
101:15 192:20
193:11 194:18,23
195:6,23 200:9
274:3
**samples**  75:9
196:8
**san**  125:20
**sanford**  208:23
**sat**  292:2
**satisfy**  316:11
**saw**  10:24 44:22
201:5 336:14,14

**saying**  49:13 72:12
72:13 73:16
110:23 164:18,23
166:12,15 171:14
199:7 218:17
221:2 246:20
247:19 304:24
321:12 324:12
331:2 334:17
**says**  42:12 64:9,23
78:7 80:7 105:23
156:14 173:3
190:10 194:22
197:12,16,17,20
198:15,20,21
205:19 207:9
210:11,16,21
217:10 228:5,9,10
229:18 230:3,19
243:10 249:9
258:2 263:6
279:10,22,24
282:2 316:5
329:19,23 330:4
332:2
**sc**  2:6
**scenario**  170:19
219:12 261:21
**schedule**  46:14
247:12,13,15,20
**scheduled**  1:15
**schedules**  247:16
247:22,24
**schlerholt**  295:8
**school**  84:15 220:1
309:10 316:21
317:2,10 318:6
319:10
**schooling**  315:21
**science**  84:12

**scientific**  122:17
**scope**  138:8,16
331:10
**score**  123:11
**screen**  22:4 24:18
30:21 51:5,20
52:5 53:5,6 59:11
62:14 64:7 80:13
112:23 136:17
157:24 192:19
193:6,9,11,18
194:2 195:2
198:15 204:10
209:21 227:8,10
227:13
**screens**  11:8
**screw**  215:7
**screwed**  215:14
279:20
**script**  175:5
177:11
**scripts**  6:23 76:10
76:12 303:19
**scroll**  203:8
**scrolled**  203:2
**scrolling**  200:2
201:1
**scrutiny**  187:4
**seal**  338:8 340:15
341:21
**search**  296:18
330:13
**second**  6:8 12:12
12:15 14:25 19:4
20:15 21:12 22:16
22:18,21 33:11
34:19 35:1,3,4,5
35:18 59:11 77:17
79:22 80:16 82:8
96:6 97:11 127:7
128:5,10,11

148:18 161:17
166:24 179:18
194:19,20,22
198:3 205:24
206:10 221:5
222:25 223:14
224:2 227:11
228:4 232:22
233:5 236:16,17
240:8 245:9
278:16 281:4
288:3,24 320:14
328:16
**secretary**  104:3,19
287:8
**section**  179:13
180:2 185:3 228:5
312:25 324:6,15
325:20 326:1
328:17 332:8
334:8
**sections**  325:12
330:22
**see**  20:4 28:14,24
42:17,19,23 52:24
53:6 55:4 59:14
64:10,25 66:19
70:13 78:10 80:5
82:19 100:9 101:6
101:9 105:16
108:7 113:1,7
119:21 121:13
129:15 133:13,15
143:14 157:25
158:1,3 175:18
179:15,17 180:11
181:7 190:17
193:19 194:16
195:4,18 197:12
197:19 198:19,23
199:19 201:8,17

203:7,9,15,16,21
205:22 206:2
210:11 218:8
223:24 224:5,16
224:17 225:6,10
226:10 227:14,17
230:23 233:15
234:7 236:19
248:16,17,18
249:7,14 254:19
259:5,14,19
262:16 282:11
283:9 285:23
288:4 299:5 300:8
307:7 312:24
315:18 323:1
324:10,11 325:4,8
327:1,6 328:16
330:23 332:11
334:12 336:9
**seeing** 175:20
178:1 189:23
**seek** 56:18
**seeking** 98:15
231:16 289:10
**seen** 23:9 45:25
100:19 150:8
173:21 180:16
181:1,13,18 182:9
229:17 294:9,12
294:20 303:25
311:25,25
**sees** 177:23
**select** 69:10
**selected** 40:13
70:6,17
**selection** 38:1
296:22
**sellers** 323:23
**semiannual** 6:24
227:15

**senior** 91:3,6,11
91:15 96:1 136:14
136:20 143:21,22
**sense** 44:6 72:24
192:9 254:17
293:2
**sent** 59:17 193:14
**sentence** 42:14
218:8 223:16
233:11 245:10
280:17 326:16
328:24
**sentinel** 122:23
**separate** 149:12
268:19 325:2
**separately** 268:18
**september** 12:13
12:17 64:22
338:20
**sequence** 191:7
**series** 252:24
**serve** 46:3 47:19
114:2 124:21
130:14 153:22
288:24
**served** 19:8 46:25
47:8 48:15 62:7
96:1,8 124:10
129:3 130:20
**service** 3:2 92:20
93:20
**services** 2:14 6:11
126:7 132:13
143:16,19 144:2
146:13 148:24
149:5 211:13
217:18,18
**serving** 124:5
135:10,12
**set** 32:7 101:2
111:19,20 132:25

139:1,6,8,9 141:22
159:21 223:7
236:16,17 245:6
246:3,5 276:4
286:24 288:6
338:7
**sets** 98:6 220:4
**setting** 212:16
299:11,13,15
314:18
**settings** 299:3
**settle** 225:5
**seven** 92:15
194:23 201:17
**severance** 94:5,7
120:11
**severe** 221:11
**severely** 202:3
**shape** 109:20
**shapira** 3:3
**shapira.com** 3:6,7
**share** 21:4 33:22
193:9,11 195:11
195:12 213:10,18
214:6 263:9 289:9
**sharing** 204:10
**sheer** 174:24
**sheet** 339:13 341:7
341:10,18 342:1
**sheets** 198:8
**shibley** 2:10
**shipped** 175:10
176:2 177:13,18
**shopper** 228:10
**shopping** 220:6,12
223:9,17,17 225:7
225:16,22,22,25
225:25 228:6,19
229:4,19 230:18
275:8,9

**shops** 306:13,22
**short** 13:10 131:15
241:17,19 277:1
**shorthand** 1:14
8:12 337:6
**shortly** 92:5
**show** 51:19 134:19
134:20 180:23
197:16 227:9
244:7 328:20
**showing** 19:15
23:7 24:12
**shown** 80:13
310:11 339:16
**shows** 134:21
**shut** 117:17
**sickle** 249:2 310:1
**side** 84:18 88:17
90:20 108:17
109:7
**sign** 104:2 158:20
**signaled** 161:13
**signatory** 104:19
**signature** 22:13
23:4 104:1 337:22
338:13 339:14
**signed** 23:17 41:21
44:4 94:2 103:20
340:13 341:18
**significance**
304:10
**significant** 15:9
106:24 147:25
148:3 161:4
174:20 175:3
202:1 267:1,5
280:13 304:12
**significantly** 30:17
266:16 280:9,22
284:4 285:5

signing  46:10
  339:19
similar  67:21
  196:8 223:20,20
  263:5 265:23
  266:9
similarly  269:11
  270:20
simple  182:13
simply  38:23
  45:19 57:3 136:23
  139:7 152:21
  192:12 213:4
  269:25 272:22
  300:24 306:3
  325:20
simultaneous
  56:15 135:17
  203:25
sincerely  339:21
singer  45:9,17
  54:23 55:23 57:14
  58:2,10,11 59:2
single  158:24
  182:14 228:12
  325:6 326:16
sir  9:8,18 30:20
  100:19 158:11
  159:1 160:8,23
  161:21 162:3,6,14
  162:23 164:1,17
  164:22,25 165:2
  165:10,19 166:2
  166:15,23 167:2,7
  167:11,18,24
  168:5,8,14,16
  169:14,18,24
  170:6 171:21
  172:7 173:2,7,13
  173:21 175:3
  176:6 177:7,14

178:14,17,20,25
179:7,16,21
180:12,21 181:8
182:1,6,23 183:11
183:23 184:8,18
185:2,10,15 186:8
186:15,20,25
187:5,12 188:1,7
189:8,20,23 190:1
190:6,9,18 191:7
191:12,17,20,25
192:6,12 194:15
194:25 195:19
196:11,13,17
199:23 200:12,16
203:23 204:4,8
205:23 206:3,11
206:16,22 208:18
208:21,24 210:3,6
210:15,20,24
211:1,6,24 212:2,4
212:20 213:8,14
213:23 214:4,11
214:16,22 216:4
216:13 218:19,25
220:3,10,17,23
221:6,25 222:6,12
222:17 223:5,11
223:13,25 224:14
225:18,23 226:25
227:5 228:3,8,8,23
229:20 230:5,15
230:24 231:6,11
231:21 232:13,21
233:9,16,22 234:8
234:13,16,18,20
234:25 236:1,20
236:24 237:1,4,14
237:17 238:2,24
241:15,22 242:7
242:19 243:15,21

243:24 244:23
245:3 247:22
248:12,15,24
249:1,3,15,21,23
250:3,16 251:2,12
252:13,19,23
253:10,21 254:8
254:23 255:3
256:1,7 257:14,19
258:16,24 259:3
259:17 260:6,15
261:25 262:3,18
262:25 263:15
264:1,12,16,23
265:9,12 266:4,21
267:16 268:9
269:6,8 270:18
271:6 272:10,15
273:8 274:9,17
275:6,14 276:18
276:23 277:5
278:1,8,11 279:10
280:1 281:18
282:9 286:7,18,23
287:4,9,20 288:5,9
288:13,23 289:4
289:23 290:17,19
291:9,15,20 292:6
293:22 294:15,16
294:23 295:3,15
295:17,23 296:11
297:2,6,9,14,17,21
298:5,9,20 299:6,8
299:19,23 300:4
300:11,12,15,19
300:23 301:2,20
301:24 302:4,10
302:11,17 303:5
304:4 305:13,25
306:17,23 307:2
308:11 309:6,11

309:21,24 310:4
311:2,17 312:17
312:22,23 313:2,8
313:13 314:8
315:6,11,19,24
316:17 317:15,22
318:4,16,20 319:2
319:6,13 320:5,19
320:22 321:1,6,20
322:19,25 323:5
323:16 324:11
325:5,9,16 326:1,8
326:11 327:7,10
327:14,23 328:2
328:15,19 329:15
329:23 330:11
331:10,23,25
332:16,22 335:1,4
335:5 336:8,12
339:10
sister  82:5
sit  14:13 79:16
  240:23 273:4
sitting  332:14
situation  161:17
  161:17,18 219:15
  221:20 222:7
  224:10,22 238:14
  258:17 292:13
  326:20
situations  222:14
  237:2 250:24
  251:23 262:20
  272:18
six  116:10 194:23
  201:17 257:16
  258:7 259:14
  278:6 315:23
  316:9,21
slightly  23:18
  47:17

**slow**  335:17

**small**  76:10,12
  113:1

**smaller**  198:24

**smartphones**
  184:14

**smith**  126:6

**solely**  224:12

**solutions**  8:13
  339:1 342:1

**somebody**  170:10
  172:3 200:14
  214:12 218:23
  219:1 254:19
  260:8 261:6
  277:17 315:2

**somewhat**  169:18
  291:20 309:5,7

**soon**  81:25

**sorry**  15:20 16:2
  18:13,14 23:13
  28:2 29:6 41:17
  42:18 47:13 51:25
  52:2,15,16,17 60:5
  68:5 69:9 71:25
  72:4 76:24 79:5
  81:11 86:18 95:9
  96:22 97:10 105:9
  108:11,21 112:24
  116:18 123:5
  124:12 127:16
  128:16 129:24
  131:10 136:16
  144:8 149:23
  158:6 173:7 175:8
  187:19 196:3,6
  202:7 214:19
  216:18,24 218:4
  220:5,6 227:25
  230:16 231:23,25
  236:16 244:1

259:10,21 260:15
  262:16 263:20
  271:25 274:10
  276:12,25 278:17
  279:3 281:10
  285:7 306:14
  307:4 312:17
  316:13,17 317:25
  322:14

**sort**  13:3 196:21
  197:9,11,23 198:5
  198:6,20,21,22
  199:11 207:24
  290:21 293:24
  296:24 298:6
  313:10 314:1,5
  321:8 332:6

**sorted**  196:18
  197:7,22,23
  198:10 199:6,9,18
  201:3

**sorts**  199:11

**sound**  60:18,20
  61:4 286:22

**sounds**  100:9

**source**  42:5
  108:19 109:10
  226:13 310:20

**sources**  26:2,8,10
  27:8 173:25 207:6
  208:14 210:5

**south**  1:15 4:3
  10:3 84:18 88:17
  337:15

**southern**  125:17
  208:20

**spaeder**  2:16,20

**spangenberg**  2:10

**spanglaw.com**
  2:13

**sparingly**  115:25

**speak**  17:7 32:25
  33:2 40:25 135:25
  191:22

**speaking**  48:5
  316:16

**special**  4:10 98:12
  141:10 154:17,25
  176:9 204:14

**specialized**  217:17
  309:19,22,25
  315:14 317:19
  318:5,6

**specialmaster.law**
  4:12

**specific**  39:11,12
  48:13 69:18 75:19
  76:1,19 114:20
  115:2,2,4 126:21
  138:15 153:22
  157:3 160:18,18
  181:17 281:2
  286:19 305:6
  309:12 325:22
  327:24 335:14

**specifically**  15:21
  18:12 25:19 27:7
  30:7,14,21 31:9
  45:8 114:16
  122:21 123:3
  148:21 182:8
  265:12 277:19
  298:10 328:8
  329:12 331:13
  335:11

**specificity**  27:17

**speed**  321:23

**spelled**  94:11
  164:8 329:7

**spend**  53:10 74:14
  79:14 289:24

296:13

**spent**  61:2,9
  195:25 196:5

**spoke**  34:19 40:24
  116:1 138:10
  191:21

**spoken**  45:12
  267:17 298:13

**spokesperson**
  113:25

**spot**  64:8

**spreadsheet**
  216:22,24

**spreadsheets**
  190:23 191:4

**ss**  337:1

**st**  4:3

**stable**  259:8

**staff**  88:10 92:15
  92:16 94:15
  136:20 192:3,4

**staggering**  284:14

**stakeholder**
  230:19 231:2

**stakes**  101:12

**stand**  55:6

**standard**  42:13
  148:8 163:5,15,19
  163:21 164:15,21
  165:24 171:5
  226:2,4,4,4,6
  236:2 246:3,5
  286:14 312:15
  313:1,4,9,11,17,22
  313:25 314:2,5,7
  314:10,17,18,19
  314:21 315:3,9,12
  322:24 323:22
  324:2,6,15 325:13
  328:8 329:6

standards 101:10
101:11 163:10,16
245:5 246:22
289:22 314:16
315:17 324:20,24
standpoint 105:14
120:3
start 53:8 67:16
217:9 311:4
313:10 327:1
328:10 329:9
started 66:13 68:2
96:5 147:17,17
222:3
starting 9:17
147:17 168:21
203:11,18 220:8
starts 203:14
205:18
state 1:14 9:8
28:12 48:24 80:20
85:14 86:6 90:1
98:8,14,15,16,17
98:20 114:4 116:7
118:1 122:11
135:23 136:10
143:11 171:9
226:9 229:2
252:11 288:11,14
289:1,17,17,20
290:1,11 291:7,12
291:18 292:5,12
293:19 294:10,20
295:1,12,19 296:4
303:9 311:20
315:10 318:18,19
318:23 319:15
320:7,16,25
321:12 322:11,16
323:10 324:3,25
326:25 331:12,24

332:6,20 337:1,7
340:10 341:15
state's 8:20 138:12
stated 328:7 330:2
statement 26:6
31:13,23 36:10
186:25 187:6,7
231:15 329:16
340:13,14 341:19
341:19
statements 99:18
302:1,8
states 1:1 8:5
25:25 49:2,4
89:24 90:19 98:6
101:2 111:19
116:15 117:2,21
118:24 121:11
122:25 130:11,14
130:22 131:25
133:19 135:3
138:23 139:2,18
139:22 140:2,5
141:1 142:6,20
143:7 145:4
148:24 149:11,17
151:16,20 187:9
208:2,3 211:6,7,14
246:1 288:16
289:8,10,11
290:12,23 291:9
291:22 292:9,15
292:24,25 293:7
293:21 294:1,3,4
295:6,23 296:1,8
307:5 309:13,16
314:17 323:13
333:3
statistics 63:15
173:21 174:1

statute 331:6
statutes 324:16
statutory 313:5
314:25
stay 84:4 200:3
stayed 115:24
283:12
stays 154:4
stenographer
76:23 97:14
124:25 326:24
stenographic
337:4,18 338:15
stenographically
8:15
step 322:8 333:21
steps 139:19 140:3
320:7
steve 295:8
stickers 20:4
stipulate 8:17
stop 37:3 81:24
122:14 180:17
201:7,7,9 204:10
stopped 109:6
222:2 331:2
store 284:13
stores 2:15 284:12
strategic 102:4
stream 116:22
street 2:17,21 3:10
3:14,19 6:20
209:15 210:4
217:3
strength 249:12
251:20 259:22
stricter 226:2,6,12
stringent 226:8,16
226:16,20,20
structural 296:17

structure 108:1
students 98:3
studied 173:4
studies 123:11
169:15,19,24
172:24 173:15
246:2 310:11,19
study 173:3,8
248:17
subject 158:8
165:12 180:15
229:2
subjects 229:14
submit 64:1 90:5
submitted 21:13
22:6,18,22 24:1,3
24:7 26:5 50:18
52:9,13 53:12,25
54:12,15,16,21
55:2 56:13 57:1,3
57:12 60:14 68:4
68:6,17 74:25
75:5 77:16,17
78:1,6,20,23
134:17 150:4,7
151:24
subpoena 118:3
subscribed 160:10
340:10 341:14
342:21
subsequent 139:10
283:17
subset 16:10 17:23
199:24 200:6
269:7
substance 125:11
176:16 223:19,21
230:21 306:4
327:2 332:24
333:2

| | | | |
|---|---|---|---|
| **substances** 14:17 | 66:25 67:4 77:20 | 221:2,8,14 230:7 | 332:12,17 333:22 |
| 40:19 119:13,19 | 79:12 179:11 | 232:24 235:3 | 334:4,25 335:16 |
| 125:10,13,17,18 | 191:11 205:16 | 237:22 247:4 | 336:15 |
| 125:19,21,22,25 | 267:14 278:20 | 262:3 268:16 | **sway** 291:8 |
| 126:8,9 168:19,21 | 279:1,8,15 281:25 | 269:18 272:4 | **swear** 8:9,14 |
| 178:16 180:7 | 312:20,21 336:11 | 278:9 279:8 | **swearing** 8:18 |
| 182:10 186:23 | **supplements** | 281:15 286:8 | **switch** 68:20 179:8 |
| 187:3 302:22 | 25:25 | 296:16 302:8 | **switching** 77:14 |
| 303:11 314:23 | **supply** 165:22 | 307:15,22 308:16 | 227:19 |
| 315:4 317:9,13,14 | 220:14,22 224:19 | 312:11 320:11,21 | **sworn** 1:13 9:2 |
| 324:7,8 325:3,10 | 233:5 257:16 | 320:23 321:3,22 | 337:10 340:10,13 |
| 327:25 329:2,5,10 | 260:12 261:9 | 323:5 328:23 | 341:14,18 342:21 |
| 329:11 330:2,18 | 268:24 278:5 | 333:4 335:19 | **system** 168:20,25 |
| 331:22 332:7 | **support** 6:17 | 336:4,14 | 169:2,6,7,8,10 |
| 333:14 334:8 | 93:25 116:8 | **surgery** 217:19,20 | 184:16 185:2 |
| **substantiate** 159:7 | 230:17 273:5 | 251:14 | 204:1 227:15 |
| **suburbs** 88:18 | 302:1,8,9 334:10 | **surgical** 251:13 | 254:11,19 260:6 |
| **suffering** 308:3 | **supporting** 144:13 | **surprised** 152:15 | 274:1,25 278:6 |
| **suggested** 138:18 | **suppose** 275:6 | 152:18 | 304:25 317:4 |
| **suggestion** 291:24 | **supposed** 158:13 | **survey** 28:13 | **systems** 116:12 |
| **suite** 2:11,17,21 | 158:16 159:6,14 | **suspect** 240:20 | 254:15 |
| 3:10,20 4:11 | 165:22 171:11 | 319:23 | |
| 339:2 | 185:13 224:1 | **suspend** 178:9 | **t** |
| **sulphate** 201:18 | 300:16 308:5 | **swanson** 3:19 5:6 | |
| **sum** 332:24 | 312:7,10 | 37:9,9,18,23 286:5 | **t** 9:10 |
| **summarize** 69:17 | **sure** 10:25 18:15 | 286:9 287:21 | **tab** 19:10,22,24 |
| **summary** 6:23 7:3 | 21:8,10,24,25 22:4 | 290:8,18 291:10 | 20:13 24:21 50:19 |
| 282:5,11 | 22:19 23:14 24:19 | 292:18 293:15 | 51:25,25 53:21 |
| **summer** 33:4 | 27:7 31:11 32:10 | 296:9 298:2 | 54:11 142:13,15 |
| **superior** 164:11 | 35:11 37:10 38:17 | 301:15,21 302:5 | 144:8,10,10,10,10 |
| 328:5 330:8 | 39:21 43:13 47:5 | 303:6,16,23 | 150:10 197:15 |
| 335:23 339:1 | 47:6 53:1 54:3 | 304:20 305:3 | 198:14 203:20 |
| **supplemental** 6:4 | 59:21 60:21 71:7 | 307:3 308:22 | **tabbed** 142:12 |
| 12:1,5 18:20 | 77:1 85:12 92:9 | 309:18 311:11,18 | **table** 195:9 196:14 |
| 19:12,19 21:13 | 93:21 100:10 | 313:21 314:4,20 | 196:15,18 200:14 |
| 24:8 25:6,24 | 105:10 110:9 | 315:7 316:19 | 280:24 |
| 27:25 28:6 34:21 | 115:11 116:7 | 317:6 319:14 | **tablets** 201:13,14 |
| 36:7 43:14 61:9 | 121:22 122:16 | 322:6 323:17 | 201:15 323:24 |
| 61:12,19 62:2,4,7 | 141:12 148:2 | 324:23 325:17 | **tabs** 20:20 24:24 |
| 62:17,21,24 63:7 | 191:6 197:6,11 | 326:9 327:15 | **take** 13:8 14:4,5 |
| 63:10,16,25 66:23 | 199:9,12,14 207:6 | 329:17 331:11 | 18:2 23:6 42:1 |
| | | | 52:10 60:16 68:21 |
| | | | 89:23 102:24 |

120:24 122:11,11
131:15 140:19
141:9,20 150:15
155:14 156:11,25
163:18,20 178:7
179:12 190:2,7
192:18,23 194:16
200:17,18 203:10
204:18,20,21
209:15 210:7
216:14 221:15
226:21,22 227:13
229:12,21 230:13
235:21 236:15
237:23 242:21
243:7 251:7 253:8
265:23 269:20,22
270:3 278:12
285:12,23 286:16
305:1 322:8
329:10 333:9,25
**taken** 1:14 8:3
16:6 69:3 104:12
131:21 142:1
162:20 172:3
204:25 229:11
270:10 285:12
308:10 333:14
334:3 337:13,17
**takes** 98:17 194:2
320:8
**talk** 17:11,14 32:6
33:15 59:19 136:1
139:1,2,4,21,22
189:10,13,14
208:13 250:19
277:18 286:12
288:1
**talked** 32:20 57:6
171:15 179:19
192:4 211:7

225:12 270:20
294:10 299:9
332:19
**talking** 32:12
48:20 60:3,5
97:13 126:17
172:1 179:20
180:3 191:10
192:5 204:7,14
205:14,14 210:8
233:1 235:8
241:13 246:4
250:21 267:20
287:22 323:22
**talks** 128:3,5
158:7
**tangential** 126:15
126:18,23
**tara** 5:3 9:7,11
54:6 97:15 124:12
157:6,24
**taught** 122:5
**tax** 6:13 90:5
103:20 105:1,6,10
110:16
**taxes** 121:11,14
**team** 43:3 44:6
65:4 66:10,15
67:8,10,11 114:23
115:3,22 290:21
292:1
**tech** 52:23
**technical** 104:15
**technically** 121:16
178:14
**technician** 88:7
**technology** 195:17
**telepharmacy**
208:2,5,6,11 211:2
211:7

**tell** 9:2 45:22 46:6
155:10 167:13
168:17 188:17
195:5,24 196:4,14
197:8 199:2,14,17
215:4,23 216:3,5
216:12 220:21
253:8 262:4
279:19 282:20
289:5 297:4
304:15 325:18
327:1 332:14,24
335:17 337:10
**telling** 198:9 302:6
**ten** 17:6 68:21
69:1 131:18,19
268:6 316:3
**tenet** 257:4
**tennessee** 208:17
**tenure** 114:25
**term** 169:12
257:22 258:23
260:9 261:7,17
311:25 313:9,11
**terminal** 11:9,9
**terms** 42:8 98:22
212:6 250:6
279:21 294:3
**territories** 288:17
**tertiary** 119:17
217:17
**test** 90:17 96:9
243:22 253:3,4,24
**tested** 99:6
**testified** 9:4 12:24
26:18 35:12 54:23
56:12 67:7,22
77:25 85:13 106:7
106:22 127:12
140:6 152:13
153:13 155:21

327:18
**testify** 43:21 130:6
130:17 134:15
154:19 155:2
179:17 270:16
272:8 273:14
**testifying** 14:9
55:7 56:9,14
129:5 142:10
335:6
**testimony** 11:5
45:25 47:14,15,20
48:22 49:22 55:6
58:2,18 59:1,3
127:8 130:3,25
131:2 144:1 147:1
147:3,12,19
148:13 151:6,10
152:2 176:4
202:16 207:18
257:1 307:22
311:5 327:16,22
334:18 337:21
340:6,7 341:6,9,12
**testing** 100:20
101:10
**tests** 101:3,7 254:5
**text** 11:4 41:19
**thank** 11:14,18
42:21 89:20 96:24
101:6 157:6 158:5
194:25 227:6
228:1 231:1 232:3
270:12 286:1,3,8
**thanks** 336:16
**therapies** 315:16
**therapy** 202:13
234:4,24 236:3,8
236:11 252:5
257:22 258:6,23
260:9,19 261:7,17

[therapy - tool]                                                                Page 59

317:24 318:3
**thing** 18:15 121:11
203:9 219:12
294:9
**things** 12:3 25:15
39:10 82:13
286:12 313:10
322:5,15
**think** 11:9 15:16
26:4 29:5 36:6
37:18 38:6 39:9
43:9,16 46:13
48:5,9,14 51:4,5
51:18,21 52:17
56:7 59:1,20 62:1
63:4 66:10 77:25
85:11 87:17 93:16
93:21 103:25
104:5,16 106:22
111:24 112:1
127:5,24,25
132:25 133:4
135:20 140:13
141:11,13 149:15
155:4 156:10,12
156:23 157:15
163:18 164:16
165:11 166:16
168:7 170:6 171:4
173:25 177:15
178:14 179:5,25
182:24 183:4
184:20 188:23,25
189:18 191:22
192:25 193:19,21
193:21 197:4,4,13
197:17,21 198:13
199:2,6,10,10
203:15 204:22
205:19 209:9
212:10 215:12

220:18 226:24
228:25 231:2
232:18,23 233:1
235:17,23 239:6
241:23 243:8
245:9 249:6
250:24 251:3,5,9
251:15 252:9
253:18,20 257:17
261:20 262:4,11
267:13 268:1,5
270:7 271:9 282:2
282:23 287:1
289:25 290:10
292:3,22,24
307:21 310:10,17
314:21 315:23
316:3,16 320:10
323:16 330:14
333:4
**thinking** 141:17
216:25 263:5
**third** 125:9 180:4
207:24 256:4
265:20 289:18
**thirty** 339:18
**thought** 52:20
70:14 71:2 96:22
106:12 114:11
118:7 127:24
138:11 154:14
184:23 192:13
193:7 204:1
215:11 239:10
244:22 254:3
275:3 276:5
290:22,22 291:6
292:9 296:14
301:6 310:5
**thoughts** 114:4
263:10 270:7

**thousand** 174:12
174:14 218:23
219:18
**three** 1:7 16:16
18:3 33:5 34:20
102:22 111:21
207:6,16 238:4
249:10 253:4,23
255:2,5,7,9,12,18
255:24 256:3
257:13 260:23
268:4,19,19 282:1
288:6 298:20
324:7 325:2 334:9
**time** 11:15 13:9,10
14:1,1 18:3 24:3
28:9 33:3,5 34:19
45:12 46:7,13
52:21 53:7,11
55:23 57:15 58:22
61:11,15 62:1,16
63:6,11 79:15,16
87:6,8,22 88:6,13
95:25 96:23 116:1
116:11 120:25
146:16,18,19,23
147:9,24 151:23
155:12,16 156:13
156:25 157:2
165:7 184:9,17
195:25 196:4
199:16 204:17,20
215:17 216:25
221:1,19 237:24
238:5 249:16,16
250:6,6,12,13,14
254:17 259:6
260:18 270:6
273:14 276:5
280:10,15 284:4,5
284:21 285:20

286:2,25 288:18
289:24 292:3
293:11 296:14
299:10 323:9
333:23 336:18
**timeline** 140:1
**timely** 296:3
**times** 13:4 16:15
16:17 17:5 30:23
32:25 110:25
111:9 117:5
124:21 249:25
250:16 267:17
287:1 292:19
297:17 305:4
333:12 336:3
**timing** 237:11,15
**tiptoeing** 140:15
**title** 80:24 81:16
81:16 94:10
203:16
**titled** 312:25
**tn** 2:15
**today** 8:1 9:14,16
10:1,6 11:5,22,25
13:11,17 14:8,13
48:22 89:3 147:2
240:24 252:7
267:17 271:3
273:4 286:11
332:13 336:1
**told** 52:19 67:12
117:22 171:6
180:24 184:21
201:25 301:16,18
314:21
**tomorrow** 286:12
336:16
**tool** 97:25 118:12
180:6 319:25

**tools** 321:21

**top** 193:23 198:15
  230:25 233:10

**topic** 179:8 325:22

**topics** 68:20 139:4
  286:24

**total** 17:5,6 18:3
  30:5 36:1,7 37:2
  50:7 73:6 145:18
  145:23 149:2,3,4
  152:24 326:18

**totality** 17:3

**touch** 286:20

**touched** 286:15

**track** 1:7 20:9
  21:6,8 157:11
  185:25 339:6
  340:3 341:3

**traffic** 89:13

**trailed** 29:5

**training** 122:1
  308:24 309:12,16
  309:19,22,25
  315:14 317:8,12
  317:20,22 318:1,5
  318:6,7

**transcribed** 340:7

**transcript** 41:4
  337:20 339:11,12
  340:5,12 341:5,11
  341:17

**transcripts** 129:21
  129:23,25 130:1,2

**transfer** 89:25
  289:1

**transition** 289:15

**travel** 53:19
  112:21 113:5
  207:15 211:9,10

**traveled** 205:10,20
  205:25 209:6

210:11

**travels** 207:10

**treat** 233:20 258:7
  308:14

**treated** 217:16
  312:12

**treating** 310:15

**treatment** 123:20
  217:19,20 252:2
  258:3,3 307:24
  309:20 310:7

**treatments** 217:21
  310:3,25

**trial** 125:9,11,13
  125:15,17,21,25
  129:2,23,25 130:1
  270:16 272:8
  273:14

**trials** 12:24 47:7
  128:12

**tried** 117:17

**trigger** 240:17
  261:10

**triggered** 37:15
  268:8,11,13 269:4

**triggers** 261:3

**trinity** 126:8
  239:25 240:2,3,17
  241:8

**trouble** 238:25
  239:3

**true** 26:20 152:6
  158:24 206:23
  225:8 256:3
  279:17 287:3
  288:14,22 291:19
  298:19 323:4
  329:13 335:7
  337:20

**trumbull** 7:4
  13:24 46:19

174:11 238:23
  239:7,14 241:14
  282:6 307:12

**trust** 60:19

**truth** 9:2,3,3 152:5
  152:12 337:10,11
  337:11

**truthful** 105:2
  222:20

**truthfully** 11:22

**try** 18:16 51:3
  100:24 195:12
  235:14 244:9
  261:4,11 273:12
  279:16 286:20
  290:23 291:8
  294:18

**trying** 15:22 35:1
  87:17 100:18
  152:5 194:8 195:1
  199:17 201:4
  212:16,21 215:13
  239:3 260:15
  273:16 274:18
  282:25 304:2,5
  309:8 331:18
  336:9

**tuesday** 1:15
  337:15

**turn** 23:4 27:10
  28:21 72:10
  105:16 122:22
  124:4 144:17
  152:21 228:4
  312:14,24 328:11
  328:13

**turned** 129:19

**turns** 184:20
  193:5

**twice** 16:16 33:1
  110:25 191:22

268:20

**two** 11:8 16:16
  17:4,5 18:3 23:8
  23:20 26:2,8,13,24
  26:25 27:8 34:23
  40:24 53:18 54:2
  67:7 69:22 71:14
  87:12 91:22 92:2
  94:15,17 106:12
  106:19,20 110:25
  111:12 112:6
  140:20 144:5,13
  152:25 153:19
  174:5,18 177:13
  197:24 204:13
  205:8 207:15,17
  220:14,24 224:9
  225:4,5,10 228:20
  229:18 230:18,18
  231:8,9 232:18
  233:3 235:6,15,22
  236:22 237:17
  238:4,11,23 240:1
  240:2 241:13,16
  241:19 243:11
  244:2 246:25
  253:4 256:5
  260:11 261:15
  267:25 268:4
  275:10,10 276:25
  286:12 294:2
  295:4,5,9,13
  314:14 328:2
  334:9

**twofold** 294:2

**type** 48:6,6 91:19
  120:10 123:1
  143:19 258:4
  296:6

**types** 272:17 308:6
  308:7

**typewriting**
337:19
**typewritten**
337:20
**typical** 188:23,25
**typo** 26:4

**u**

**u.s.** 125:14 126:6
128:4,5 139:12
288:17
**ultimate** 289:17
293:5
**ultimately** 67:5
168:23 172:3
**unable** 117:4
**unaware** 83:14
**unclear** 140:10
**undermined** 138:7
**understand** 11:3
11:19 13:14 14:3
15:22 21:7 23:13
25:2 32:10 35:1
36:21,21 38:9
39:16,21 40:15
42:8 46:8 69:24
100:19 108:1
115:3 140:20,25
141:7 151:7
162:23 167:13
171:17 175:8
180:13 182:23
221:2 243:9 255:2
255:3 263:1,17
264:5 266:19
268:17 271:14
282:17 291:16
294:19 297:7
300:12 305:12
306:14 311:23
317:25 326:2

**understanding**
13:22 35:22,25
36:3,12 39:24
40:7,11 43:7,18,22
70:10 71:23 72:7
72:9 78:4 141:4
149:12,20,22,25
151:14 178:25
181:25 206:11
220:19 225:14
265:17,21 270:24
**understands** 333:4
**understood**
246:12 298:12
299:16 320:15
**unfamiliar** 284:16
**uniform** 289:21
**unique** 186:17
197:22,22 202:19
**united** 1:1 8:5 49:2
49:3 121:11
122:24 126:6
130:11,14,22
131:25 133:19
135:3 138:23
141:1 142:6,20
143:7 145:4
148:24 149:11,17
151:16,20 187:9
246:1 314:16
**universe** 69:24
70:2 190:12,19
242:11,14
**university** 82:4,17
82:24 83:2,5,6,8
83:10,14,15,18
84:10,20 85:4
188:8,9
**unlawful** 306:9,20
307:9

**unpaid** 143:25
144:2
**unterreiner** 12:18
**update** 35:18
63:12 79:11,12,17
79:17 80:2 292:23
**updated** 77:19
79:6 292:7 293:12
321:3
**updates** 292:4
**updating** 79:15
292:4
**usage** 228:6
**use** 21:5 81:16,20
81:22 117:6,7
123:19 154:1,6
155:24 161:1
170:11,12 172:3
173:17 180:9
184:11 185:4
195:6 200:20
202:20 203:22
222:9 224:7,17
225:8,9 231:17
235:8,24 242:21
243:22 244:2,12
246:11,12 265:3
271:24
**useful** 154:14
**uses** 229:5 235:2
319:24
**usp** 314:16
**usual** 187:10
233:13
**usually** 295:7
**utilization** 138:16
318:9
**utilize** 95:2 176:23
208:8 211:17,19
213:5

**utilized** 30:4,15
45:20 113:9
152:20 190:23
271:19 334:20
**utilizing** 184:25

**v**

**v** 128:4,5 131:25
142:6,20 143:7
144:14 148:24
149:11,18 339:6
**vague** 162:18
287:19
**valid** 284:24 327:3
**validate** 63:12
**validated** 76:11,13
**validity** 8:17
**value** 123:9
**varied** 49:25
**various** 25:15
100:21 114:2
117:9 225:13
232:14 291:18
**vary** 316:5
**vast** 274:14 304:4
**vawd** 118:15,18
118:24 120:3
**vehicle** 112:8,10
113:14
**verbal** 13:7
**verify** 257:5
303:14
**veritext** 8:13
339:1,7 342:1
**veritext.com.**
339:17
**version** 20:9 104:1
279:25
**versions** 278:16
**versus** 125:14,16
126:6 138:14
228:6 296:1

**video** 1:8 8:2
141:21
**videographer** 4:6
8:1 69:2,4 104:11
104:13 131:20,22
141:25 142:2
204:24 205:1
270:9,11 334:2
336:17
**view** 101:19
165:15 174:3,5
235:24 293:23
297:23 310:6
314:6 315:2,8
**views** 293:17
**violate** 166:13
315:2,9
**violated** 162:1,4,9
163:14,17 164:14
179:6 252:11
**violates** 169:2
**violating** 315:3,10
**violation** 89:13
164:21,23 165:1
165:24 166:15
**violative** 253:19
**virgin** 288:19
**virtual** 16:17
**virtually** 44:4
**vision** 102:4
**visit** 205:10,21
206:1 219:18
320:18
**visits** 228:11
**vitae** 6:7,8
**vitamin** 251:6
**voiced** 233:22
**volkman** 241:11
**volume** 1:9
**volumes** 285:4

**voluntary** 296:10
**volunteer** 293:7
**volunteers** 111:18
**vote** 287:11,14

**w**

**w** 2:16
**wag2** 312:16
**wait** 13:5 20:15
155:17,17 278:15
**waiting** 195:4
227:12
**waived** 339:19
**walgreen** 3:17,17
**walgreens** 3:17
275:25 286:10,20
297:13,14,16
298:6,7
**walk** 134:7
**walmart** 3:8 9:12
49:4 75:10 77:4,9
131:25 133:8,20
135:4 137:14
138:13 142:6,20
143:7 144:14
148:25 149:11,18
151:12,20 152:10
153:1,20 154:10
155:7,19 156:21
157:3 207:21
275:25
**walmart's** 77:2
**want** 21:7,25
22:17 26:13 27:7
32:10 35:11 43:12
48:11 50:20 53:8
53:10,11 68:9
72:9 77:18 82:12
104:9 107:25
124:9 131:24
133:7,14 134:19
142:12 144:7

156:24,24 165:13
179:12,23 180:1
189:10 193:4
197:8 199:16
204:16,21 205:3
215:6 216:16,18
220:8 229:12
235:3 261:3
263:19,22 273:20
279:16 286:11,12
286:16 289:14,24
294:19 304:3
307:21 311:3
312:14 313:6
324:5,24,24 326:2
331:16 335:21
336:4
**wanted** 18:22
38:12 45:23 85:3
92:19 99:13 101:6
139:4 157:16
195:2 216:21
233:23 278:10
286:24 287:23
296:15 305:22
327:24 333:17
336:13
**wants** 141:19
**warned** 285:12
**warning** 158:20
280:7
**warrant** 187:4
**warrants** 284:11
**washington** 2:22
55:13,19 56:3,5,19
57:10,16 58:4,12
64:20 68:13,15
**waste** 199:16
**water** 12:3 93:1
**way** 21:5 25:15
44:8 48:12 85:10

86:21 99:4 109:20
118:2 129:17
133:4 137:3 171:1
171:22 172:5
173:12 182:16,17
189:16 190:3
193:19 196:25
197:2 199:10
203:12,17 206:12
215:4,22 216:3,5,7
216:12 226:11
242:25 259:7
283:12 284:6
291:9 299:24
301:4 307:16
322:2
**ways** 291:16
**we've** 19:7 23:6
56:22 60:22 80:13
111:24 117:4
120:17 152:25
204:12 287:1
293:16 332:18
**website** 244:11,11
**week** 91:14 105:7
105:11,23 106:16
110:12,17,18
298:21
**weeks** 18:10,17
33:5 34:20
**weinberger** 2:10
**welfare** 288:12
**went** 18:11,18
19:1 70:10 84:24
87:1 138:18
146:20,24 182:12
216:11 316:9,10
316:21 318:5
**western** 125:24
**wewatta** 3:19

whatsoever
  146:18 153:12
  273:1
wheelersburg
  210:12
whereof  338:7
wholesale  118:19
  118:22,24 119:7
  119:11
willing  46:3
  331:16
winding  270:7
window  193:22
wish  117:16
withdraw  103:18
  318:21
withdrawn  81:4
  163:19 172:23
  184:21 216:6
  225:3 252:15
  255:7 263:20
withdrew  121:1
witness  1:12 8:14
  8:15 20:19,23
  32:23 38:17 43:20
  46:3,24 47:5,9
  48:16 59:19 68:22
  124:5,11,22 125:9
  125:15,17,25
  127:6 130:20
  131:17 134:14
  153:23 157:1
  158:1 242:17
  264:8 286:3
  316:17 338:7
  339:11 340:1,4,11
  341:1,4,15
witnesses  8:9
  207:18
witness'  339:14

wolf  2:4
wondering  141:16
word  94:8
words  42:1,5
  85:17 221:3 301:9
  313:22 319:7
  327:19
work  18:7 48:6
  50:5 51:15 52:13
  55:2,10,16 56:18
  56:21 57:22,23
  58:4,17 71:9
  84:24 87:1,8,14
  88:12,19 92:18
  95:13 107:2
  108:17 109:2,14
  109:18 110:18,19
  116:20 125:4
  133:6,10 134:13
  134:21,23 140:10
  147:9 149:10,16
  149:16 151:1,7,14
  151:19 152:6
  153:1,9,14,18
  155:24 158:14
  199:11 207:13
  214:15 215:3,22
  272:6 289:8
  299:11 302:12
worked  60:23
  87:18 88:14,14,22
  105:7,11 106:15
  106:15 110:11,11
  113:21 114:6,17
  114:21,23 115:4,7
  115:14,18,22
  139:7 146:16
  151:11 191:23
  215:12 216:11
  298:5 317:18

working  8:12
  10:22 15:7 55:23
  55:24,25 62:4
  86:12 87:4 88:5,7
  88:8 108:16 109:6
  117:15 151:11
  155:5 158:6 208:1
  221:21 272:17
workload  28:13
works  108:1
  110:18 199:11
  214:19,20 319:11
wright  82:6
write  12:3 63:22
  178:12 239:1
  240:1 250:25
  302:22 303:10
  335:17
writes  306:20
writing  20:5 41:13
  41:18 79:15
  100:10 178:5,22
  179:3 187:15,23
  188:12,19 239:7
  239:15,19 240:4,5
  240:16,25 241:8
  241:12 301:14
  304:5,12,17 306:3
written  161:8
  167:5,22 168:2,13
  211:25 212:7,17
  214:1,8,13 216:8
  219:4 221:22
  222:15,18 223:1,2
  232:7 233:5
  249:13 252:21
  256:21,23 258:14
  302:20 307:8
wrong  45:2 94:7
  108:22 179:25
  184:21 199:7

  219:12 220:5
  230:4 263:20
  274:12 303:18
wrote  36:18,20
  43:21 251:7 303:7
  318:14
www.nabp.phar...
  99:16

| y |
| --- |

yeah  52:19,21
  71:25 93:12
  100:24 112:24
  192:22 194:8,16
  195:18 196:3
  197:21 198:16
  199:13 201:2
  202:7,11 216:18
  259:24,25 264:1
  278:15,19,19
  281:7,8 293:3
  301:16 306:18
  324:13
year  82:18 94:12
  94:13,17 111:21
  116:2 120:25
  123:8 148:5 149:5
  200:10 228:6
  285:11 293:14
  316:9,11 330:9
yearly  111:20
years  15:7 25:9,9
  81:22 86:24 87:10
  87:12,24 91:22
  92:2,14 94:15
  96:4,5 102:22
  106:9 112:19
  115:6 122:5,14
  124:18 153:14
  220:1 280:20
  283:17 285:13
  296:13 315:14,20

315:20 316:22
317:2,17,19
**yep**   228:16
**york**   125:18 126:1

**z**

**z**   9:10 28:4
**zealand**   288:19
**zinmaster**   54:6
**zip**   197:17 202:14
202:18,21 203:1,5
206:7,8,9,15,20
207:1
**zoom**   8:16 11:10
16:17
**zuckerman**   2:16
2:20
**zuckerman.com**
2:19,23
**zwier**   3:4,6

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.