Page 343

1                IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF OHIO
2                        EASTERN DIVISION
3                    CAUSE NO. 17-md-2804
                        MDL NO. 2804
4

     IN RE: NATIONAL              )
5    PRESCRIPTION OPIATE          )
     LITIGATION                   )
6                                 )
     THIS DOCUMENT RELATES TO:    )
7    TRACK THREE CASES            )
8
9               REMOTE VIDEO DEPOSITION OF
               CARMEN A. CATIZONE, MS, RPh, DPh
10                        VOLUME II
11
12
13

             The deposition upon oral examination of
14   CARMEN A. CATIZONE, MS, RPh, DPh, a witness produced
     and sworn before me, Amy Doman, Registered Merit
15   Reporter, Certified Realtime Reporter, Certified
     Shorthand Reporter, Notary Public in and for the
16   County of Hamilton, State of Indiana, taken on behalf
     of the Defendants, in Mount Pleasant, South Carolina,
17   scheduled to begin at 8:00 a.m., on Wednesday,
     June 16, 2021, pursuant to the Federal Rules of
18   Civil Procedure.
19
20
21
22
23
24
25

```
 1                    A P P E A R A N C E S
 2   ON BEHALF OF THE PLAINTIFFS:
 3        MOTLEY RICE LLC
          BY:  Michael E. Elsner
 4        Courtney R. Wolf
          James Ledlie
 5        Kaitlyn Eekhoff
          28 Bridgeside Boulevard
 6        Mount Pleasant, South Carolina 29464
          (843) 216-9000
 7        Melsner@motleyrice.com
          cwolf@motleyrice.com
 8        jledlie@motleyrice.com
          keekhoff@motleyrice.com
 9
          SPANGENBERG SHIBLEY & LIBER LLP
10        Peter H. Weinberger
          1001 Lakeside Avenue East
11        Suite 1700
          Cleveland, OH 44114
12        (216) 600-0114
          pweinberger@spanglaw.com
13
     ON BEHALF OF DEFENDANTS CVS PHARMACY, INC.;
14   CVS INDIANA, LLC; CVS Rx SERVICES, INC.;
     CVS TN DISTRIBUTION, LLC; OHIO CVS STORES, LLC:
15
          ZUCKERMAN SPAEDER LLP
16        BY:  Graeme W. Bush
          100 East Pratt Street
17        Suite 2440
          Baltimore, MD 21202-1031
18        (410) 949-1159
          gbush@zuckerman.com
19
          ZUCKERMAN SPAEDER
20        BY:  Jason B. Acton
          1800 M Street Northwest
21        Suite 1000
          Washington, DC 20036-5807
22        (202) 778-1800
          jacton@zuckerman.com
23
24
25
```

```
 1   Appearances (Continued):
 2   ON BEHALF OF DEFENDANTS GIANT EAGLE, INC.;
     HBC SERVICE COMPANY:
 3
          MARCUS & SHAPIRA, LLP
 4        BY:  David Zwier
          Joshua A. Kobrin
 5        One Oxford Centre, 35th Floor
          Pittsburgh, PA 15219
 6        (412) 338-5214
          zwier@marcus-shapira.com
 7        kobrin@marcus-shapira.com
 8   ON BEHALF OF DEFENDANT WALMART, INC.:
          JONES DAY
 9        BY:  Tara A. Fumerton
          77 West Wacker, Suite 3500
10        Chicago, IL 60601-1692
          (312) 269-4335
11        tfumerton@jonesday.com
12        JONES DAY
          BY:  John D. Goetz
13        500 Grant Street, Suite 4500
          Pittsburgh, PA 15219-2514
14        (412) 394-7911
          jdgoetz@jonesday.com
15
     ON BEHALF OF DEFENDANT RITE-AID:
16
          MORGAN LEWIS & BOCKIUS LLP
17        BY:  John Gisleson
          1701 Market Street
18        Philadelphia, PA 19103-2921
          (215) 963-5328
19        john.gisleson@morganlewis.com
20   ON BEHALF OF DEFENDANTS WALGREENS BOOTS ALLIANCE,
     INC.; WALGREEN CO.; AND WALGREEN EASTERN CO., INC.:
21
          BARTLIT BECK LLP
22        BY: Brian C. Swanson
          1801 Wewatta Street
23        Suite 1200
          Denver, CO 80202
24        (303) 592-3197
          brian.swanson@bartlitbeck.com
25
```

```
                                             Page 346
1   Appearances (Continued):
2        LEVIN PAPANTONIO RAFFERTY
         BY:  Laura Dunning
3        Page Poerschke
         316 South Baylen St.
4        Pensacola, FL 32502
         (205) 396-5014
5        ldunning@levinlaw.com
         ppoerschke@levinlaw.com
6
    VIDEOGRAPHER:
7        Robert Miller
8   ALSO PRESENT:
         Jonathan Jaffe
9
         David R. Cohen
10       Special Master
         DAVID R. COHEN CO. LPA
11       24400 Chagrin Boulevard, Suite 300
         Cleveland, Ohio 44122
12       (216) 831-0001
         david@specialmaster.law
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 347

1                    INDEX OF EXAM
2                                                Page
3    CROSS-EXAMINATION (Continued) ................ 344
       Questions by Brian C. Swanson
4
     CROSS-EXAMINATION............................ 417
5      Questions by John Gisleson
6    CROSS-EXAMINATION............................ 463
       Questions by Joshua Kobrin
7
     REDIRECT EXAMINATION......................... 509
8      Questions by Tara Fumerton
9    CROSS-EXAMINATION............................ 517
       Questions by Michael Elsner
10
     RECROSS-EXAMINATION.......................... 522
11     Questions by Joshua Kobrin
12
13                   INDEX OF EXHIBITS
14   Deposition Exhibits:                           Page
15   Exhibit 16    - August 014 Model State ........ 359
                     Pharmacy Act and Model Rules
16                   of the National Association
                     of Boards of Pharmacy
17
     Exhibit 17    - May 2011 newsletter from the .. 369
18                   Ohio state board of pharmacy
19   Exhibit 18    - Email dated 3/10/2015.......... 385
20
21
22
23
24
25

1           THE VIDEOGRAPHER:  Good morning.  We're going

2      on the record at 8:09 a.m. Eastern time on

3      June 16th, 2021.  This is Media Unit Number 1,

4      Volume 2 of the video-recorded deposition of Carmen

5      Catizone taken in the matter of In Re:  National

6      Prescription Opiate Litigation from the

7      U.S. District Court for the Northern District of

8      Ohio, Eastern Division, Case Number 17-md-2804.

9           This deposition is being held remotely.  My

10      name is Kraig Hildahl from the firm Veritext Legal

11      Solutions, and I'm the videographer.  The court

12      reporter today is Amy Doman, also with Veritext.

13           Will counsel please identify themselves for

14      the record.

15           MR. SWANSON:  We have all counsel on the

16      transcript, Amy.  Can we just proceed?  Is that

17      okay?

18           THE REPORTER:  Yes, sir.  Thank you.

19    CROSS-EXAMINATION (continued)

20     QUESTIONS BY BRIAN C. SWANSON:

21   Q    Good morning, Mr. Catizone.

22   A    Good morning, Mr. Swanson.

23   Q    How are you this morning, sir?

24   A    I'm fine, thank you.

25   Q    Terrific.  Can you pull out and put in front of you

Page 349

1         Exhibit 2, which is your supplemental report in

2         this case?

3    A    Yes, sir.

4    Q    Do you have that in front of you now?

5    A    Yes, sir.

6    Q    Great.  Other than that report, do you have any

7         other notes, documents, or aids, either paper or

8         electronic with you today?

9    A    Yes, sir.

10   Q    What else do you have?

11   A    I have all of the exhibits from yesterday on the

12        desk.  I have a blank pad of paper for notes, and I

13        have a pen and that's it, sir.

14   Q    Okay.  So you don't have any electronic media or

15        anything with notes or guides for you?

16   A    No, sir.

17   Q    Okay.  Thank you for confirming that.

18            Before we launched, you also have the box of

19        possible exhibits that my firm sent over to you?

20   A    Let me check, please.

21   Q    Sure.

22   A    Yes, sir.

23   Q    Okay.  Now I can assure you that we're not going to

24        go through all of those documents, so you don't

25        have to worry about that, but I'll try to, as we

1           go, identify the ones that we might need so you can

2           put those in front of you if you would like to.

3           Okay?

4    A      Yes, sir.

5    Q      Great.  Can you please open up your expert report,

6           Exhibit 2, to page 10.

7    A      I'm there, sir.

8    Q      Page 10, if you just flip back one page, this is

9           the section of your report regarding what you call

10          "Corporate Oversight."

11              Do you see that?

12   A      Yes, sir.

13   Q      On page 10 in the middle paragraph, the one that

14          begins "Chain Pharmacies."  Can you go to that

15          paragraph?

16   A      Yes, sir.

17   Q      About midway through, you write:  "Pharmacies must

18          maintain systems and methods to store and retain

19          prescription dispensing data and records."

20              Do you see that sentence?

21   A      Yes.

22   Q      And then the final sentence of that paragraph, it

23          continues:  "Pharmacies must utilize their

24          information to identify patterns of diversion to

25          audit the work of their pharmacists, to train its

Page 351

1    pharmacy personnel, investigate suspicious

2    prescribers, patients, and pharmacists, and to

3    prevent diversion of controlled substances."

4        Did you write that, sir?

5  A  Yes, sir.

6  Q  Is it your opinion that every licensed pharmacy in

7    Ohio is required to use its dispensing data to

8    identify patterns of diversion?

9  A  Yes, sir.

10 Q  Is it your opinion that every licensed pharmacy in

11   Ohio is required to use its dispensing data to

12   audit the dispensing of the pharmacists?

13 A  Yes, sir.

14 Q  Is it your opinion that every licensed pharmacy in

15   Ohio is required to use its dispensing data to

16   investigate suspicious prescribers, patients, and

17   pharmacists?

18 A  Yes, sir.

19 Q  If I understand your report and the content of your

20   report, to you that means that the pharmacies must

21   create systems that use dispensing data to alert

22   pharmacists at the store level of certain red flags

23   that you have created when those red flags are

24   triggered; is that accurate?

25 A  Yes, sir.

Page 352

1    Q    If you flip back to page 9, again, in the corporate

2         oversight, you write that:  "These

3         responsibilities" -- that we've just been

4         discussing -- "are reflected in the Controlled

5         Substances Act and relevant Ohio state law."

6              Is that your opinion?

7    A    Yes, sir.

8    Q    Now, when you say that those -- what you call

9         responsibilities are reflected in the Controlled

10        Substances Act and relevant in Ohio state law, you

11        don't provide any citation to what provisions of

12        the CSA or Ohio state law you are referring to; is

13        that right?

14             MR. ELSNER:  Objection.

15   A    Not in this section, sir.

16     BY MR. SWANSON:

17   Q    So can you tell me what provision of the Controlled

18        Substances Act states the pharmacy must use its

19        dispensing data to identify patterns of diversion

20        in the way that you have opined in your report?

21   A    There are two or three sections within the CSA that

22        I cannot cite specifically, but I can explain.

23             If there's a copy you could provide or if I

24        have a copy of the CSA, I could point out those

25        specific provisions.  But the sections are, one,

1           that says that a pharmacy must maintain appropriate

2           records and controls for controlled substances.

3           That is the part that says that they must have

4           dispensing records, and the dispensing data must be

5           appropriate for the distribution and control of

6           controlled substances.

7                And then the second section talks about being

8           able to identify diversion, abuse, and a fraud.  So

9           as a pharmacist and as a regulator for 35 years,

10          those sections, to me, and to pharmacists,

11          represent my opinion and the basis for my opinions.

12     Q    Can you help me by identifying by number the

13          provision that you are relying upon?

14               MR. ELSNER:  Objection.

15     A    I don't have it in front of me, but it would be

16          part of 1306.04, .06, those two sections of the

17          provisions of the Controlled Substances Act.

18       BY MR. SWANSON:

19     Q    So you are relying on 1306.04, which is the

20          "Corresponding Responsibility" section?

21     A    Correct.

22     Q    That's one of the sections you're relying on?

23     A    One of the sections, sir.

24     Q    Okay.  And if you turn to page 25, we looked at

25          that yesterday.  You've quoted that provision in

1          its entirety.  So why don't you turn to 25.

2    A     I'm there.

3    Q     Okay.  And you can see where you've quoted 1306.04.

4          Can you show me where in 1306.04 it states

5          that a pharmacy must use its dispensing data to

6          identify patterns of diversion?

7          MR. ELSNER:  Objection.

8    A     Again, sir, as I explained yesterday, the

9          application of 1306.04 and 1306.06 and the

10         interpretation based upon my experience in this

11         area and regulation, is where the basis for my

12         opinion comes from.

13     BY MR. SWANSON:

14   Q     All right.  I just want to make sure I am clear,

15         then, on your testimony.  When you say that the

16         pharmacist -- the pharmacy's obligation to use

17         dispensing data to identify patterns of diversion

18         is required by the Controlled Substances Act, the

19         provisions that you rely upon are 1306.04 and

20         1306.06; is that correct?

21         MR. ELSNER:  Objection.

22   A     In part, sir.  It's the entire CSA.

23     BY MR. SWANSON:

24   Q     Okay.  Well, I want to know -- and I'm asking if

25         you can identify anywhere in the CSA where it

Page 355

1      states that a pharmacy has an obligation to use its

2      dispensing data to identify patterns of diversion.

3      Is there anywhere in the CSA that specifically

4      requires that obligation?

5          MR. ELSNER:  Objection.

6  A   Specifically, the CSA identifies pharmacy as a

7      practitioner, as the DEA has.  And therefore, the

8      same responsibilities that a pharmacist has is on a

9      pharmacy.  And if I can, if I can point you down to

10     the next paragraph and the testimony of Demetra

11     Ashley from the DEA who said that the obligation to

12     identify any red flags relating to a

13     controlled-substance prescription to resolve them

14     before filling a prescription, and to document any

15     resolution of red flags is a well-recognized

16     responsibility of the pharmacist in the

17     professional practice of pharmacy.

18         And since the DEA has interpreted practitioner

19     to mean pharmacy, corporation, and pharmacist, that

20     also is the basis of my opinion in this report.

21   BY MR. SWANSON:

22  Q   Okay.  But right now, I want you to stick with me,

23     okay?  I'm asking you about the Controlled

24     Substances Act and any specific provisions.  I'm

25     not asking you about what another witness might

1      have said.  And I can go -- we can go there if you

2      want to.

3          But I first want to get your testimony about

4      what specific provisions you would rely on when you

5      are testifying in court and saying that the

6      defendants violated because they didn't have -- if

7      they didn't have the systems that you claim they

8      should have had.  Do you understand the question

9      I'm asking you?

10         MR. ELSNER:  Objection.

11   A    I do, sir, but I don't think you're understanding

12       my answer.  So my answer is that the Controlled

13       Substance Act in its entirety forms the basis and

14       that each individual provision within there was

15       used to substantiate my position.  I've explained

16       to you that the provision that says the appropriate

17       dispensing and recordkeeping, although it may not

18       specifically say what they're to do to the utmost

19       detail, that is the basis for my opinion and those

20       are the provisions that I've used.

21          And that's the answer I've been giving you

22       several times and the same answer I will give

23       repeatedly if you continue to ask that question.

24   BY MR. SWANSON:

25   Q    Let me see if we can at least get agreement on

1       this.  Sitting here today in response to my

2       questions to what provisions of the CSA, in your

3       view, require a pharmacy to use dispensing data to

4       identify patterns of diversion, the two provisions

5       that you've provided to me sitting here today are

6       1306.04 and 1306.06; is that true?

7   A   No, sir.

8           MR. ELSNER:  Objection, asked and answered.

9   A   You asked me that question, I've answered a couple

10      times saying that those are some of the provisions.

11      My answer is all of the CSA, all provisions, form

12      the basis for that responsibility.

13    BY MR. SWANSON:

14  Q   Okay.  So 1306.07, that's one?

15  A   I've said all of the provisions of the CSA taken in

16      total are the basis for my opinions, sir.

17  Q   Any state law that you rely on for your opinion

18      that a pharmacy is required to use its dispensing

19      data to identify patterns of diversion?

20  A   Again, the state law mimics federal law and

21      pharmacists in states are responsible to comply

22      with federal law.  So my answer would be the same.

23      The CSA in its entirety is the basis for

24      pharmacists at the state level to also comply with

25      that responsibility in my opinion.

1   Q   So it's your opinion that if a pharmacy -- and go

2        outside of Ohio.  Any pharmacy in the United States

3        that isn't using its dispensing data to provide the

4        pharmacists at the counter with information to

5        identify patterns of diversion, that pharmacy is in

6        violation of the Controlled Substances Act?  Is

7        that your testimony?

8           MR. ELSNER:  Objection.

9   A   It's my opinion that that pharmacy, then, is not

10       instituting, implementing, and enforcing

11       appropriate controls for the distribution and

12       dispensing of controlled substances.  So my answer

13       is yes.

14   BY MR. SWANSON:

15   Q   And can you identify for me a pharmacy anywhere in

16       the country that uses its dispensing data to

17       identify patterns of diversion that are provided to

18       the pharmacists prior to dispensing a medication?

19          MR. ELSNER:  Objection.

20   A   I can't specifically identify, but I can identify

21       that the defendants in this case did not do so, and

22       therefore, didn't meet the standard of care.

23   BY MR. SWANSON:

24   Q   And I understand that's your opinion.  But my

25       question was a bit broader.

1          Can you identify a pharmacy anywhere in the
2      country that uses dispensing data to identify
3      patterns of diversion that are then provided to
4      pharmacists prior to dispensing medication.  I'm
5      not limiting it.  Anywhere in the country, can you
6      point to a pharmacy?
7          MR. ELSNER:  Objection.
8   A  I can't point to one today, but I would be glad to
9      do the research and find a pharmacy for you.  I'm
10     sure they exist out there.
11    BY MR. SWANSON:
12  Q  Well, I mean, you worked for the NABP for 30 years.
13     I imagine you must have interacted with pharmacies
14     quite a lot in that position, didn't you, sir?
15  A  Yes, I did.
16  Q  And you worked at a pharmacy, you said, all the way
17     through 2004, you were working as a pharmacist,
18     right?
19  A  Yes, sir.
20  Q  And given all of that experience and all of those
21     interactions with pharmacies all over the country,
22     and boards of pharmacy all over the country,
23     sitting here today you can't identify a single
24     pharmacy anywhere in the country that uses
25     dispensing data to identify patterns of diversion

1    provided to pharmacists prior to dispensing a

2    medication, true?

3        MR. ELSNER:  Objection.

4  A    No, sir.  Thanks to you refreshing my memory, I can

5        say for certain that the pharmacy I worked at in

6        Albertsons chain pharmacy uses dispensing data and

7        provides that dispensing data prior to the

8        pharmacist dispensing prescriptions.

9    BY MR. SWANSON:

10  Q    How does their system work?

11  A    I don't know the mechanics behind it, sir.  I know

12        that they provide dispensing data to the

13        pharmacists as part of the process before

14        dispensing a prescription.

15  Q    When is the last time you saw the Albertsons'

16        dispensing data or dispensing system?

17  A    I reviewed their error reporting and dispensing

18        system about three weeks ago, sir.

19  Q    Do you do consulting for Albertsons?

20  A    No, sir, I don't.

21  Q    So what was -- why were you reviewing their error

22        reporting and dispensing system three weeks ago?

23        MR. ELSNER:  Objection.

24  A    It was for another client, sir.

25    BY MR. SWANSON:

1  Q  And what was -- what was the reason that you were

2     reviewing their reporting and dispensing system?

3  A  The client that I am working with has a system that

4     will centralize the distribution management of the

5     COVID vaccine for pharmacies and integrate that

6     into their dispensing system, as well as provide

7     alerts to patients.  As so as part of that process,

8     we reviewed their dispensing process to determine

9     what alerts the pharmacist receives, and at what

10    point the pharmacists would be able to utilize this

11    system and an error reporting system as part of the

12    dispensing process.

13  Q  And is it your testimony that this system at

14     Albertsons that you say you looked at recently,

15     will alert a pharmacist of patterns of diversion?

16        MR. ELSNER:  Objection.

17  A  No, sir, your question to me was, was I aware of

18     any pharmacy in the United States that used

19     dispensing data to alert pharmacists or to provide

20     pharmacists with information about diversion.

21        MR. ELSNER:  Objection.

22  A  And Albertsons provides that information.  I'm not

23     sure what the alert system is for that.  But I know

24     dispensing data is one of the tools and information

25     provided to pharmacists as they dispense

 1        prescriptions.

 2     BY MR. SWANSON:

 3  Q    But does this Albertsons' system that you now say

 4        provides this information, does it alert the

 5        pharmacist at the counter of a potential pattern of

 6        diversion like you say is required under the CSA?

 7            MR. ELSNER:  Objection.

 8  A    Two points, sir, if I can.  One, I did not say it

 9        was required at the counter.  I said they had to

10        have a system that uses dispensing data that

11        provides information to the pharmacists prior to

12        dispensing the prescription.

13            Second, I do not know Albertsons' system

14        enough to comment on that.  So I would have to say

15        I don't know about that.

16     BY MR. SWANSON:

17  Q    We talked a bit yesterday when you were with the

18        NABP, one of the things that the NABP did is you

19        would publish -- you would write and then publish

20        model rules and model acts that you would provide

21        to the state.

22            Do you recall that?

23  A    Yes, sir.

24  Q    If you can open up please the folder that's marked

25        WAG19-1-9.  I'm going to try to introduce this as

Page 363

1       an exhibit online too.

2    A   You mean WAG 19, not WAG 19-1-9, not 1919, just

3        WAG 19, right?

4    Q   Yes, sir, one, nine.

5            And can I ask the court reporter what exhibit

6        I should mark this as.

7            THE REPORTER:  This will be 16.

8            (Exhibit 16 was marked for identification.)

9    A   I have it open, sir.

10     BY MR. SWANSON:

11   Q   And I'm going to -- I'll publish it to or at least

12       introduce it so everybody can have it.  Okay.

13           Exhibit 16 is a document, an "August 014 Model

14       State Pharmacy Act and Model Rules of the National

15       Association of Boards of Pharmacy"?

16           Is that what you have in front of you?

17   A   Yes, sir.

18   Q   Terrific.  We're on the same page, then.

19           So I just read the title of Exhibit 16.  Are

20       these -- is this an example of the model rules and

21       regulations that the NABP would publish when you

22       were there?

23   A   Yes, sir.

24   Q   You're familiar with this document, right?

25   A   Yes, sir.

1    Q    Who drafts this document?  Is it sort of a team

2         effort at NABP?

3    A    Yes, sir.

4    Q    What's your contribution or what was your

5         contribution to the model act in 2014?

6              MR. ELSNER:  Objection.

7    A    I provide the final staff review before it's

8         presented to the board of directors for ultimate

9         approval.

10     BY MR. SWANSON:

11   Q    Okay.  So when this -- when the Model State

12        Pharmacy Act goes out and gets published, it has

13        your sign-off, right?

14   A    Yes, sir.

15   Q    I think you said yesterday that the model act

16        describes what you'd call best practices for state

17        boards to try to implement; is that right?

18   A    Yes, to some degree, sir.

19   Q    Now, if you look at the table of contents on the

20        third or fourth page, you can see there's a section

21        for "Model Rules for the Practice of Pharmacy."

22   A    Yes, sir.

23   Q    And I can -- I can publish this if that makes it

24        easier for everybody.  At least I think I can.

25              MR. SWANSON:  How did I do, is everybody

1      seeing the Exhibit 16?

2           MR. ELSNER:  Yes.

3           MR. SWANSON:  Okay.  Thank you.

4      BY MR. SWANSON:

5   Q    So Mr. Catizone, you can see if you scroll down

6        three or four pages, there's a section there Model

7        Rules for the Practice of Pharmacy.  Do you see

8        that?

9   A    Yes, sir.

10  Q    And one of the sections you can see in there is

11       automated pharmacy systems; is that right?

12  A    I can't see it on the screen, but I believe it's

13       there, sir.

14  Q    All right.  I can --

15          MR. ELSNER:  Carmen, take the time if you

16       can't see it on the screen to refer to --

17     BY MR. SWANSON:

18  Q    Or you can look at whichever one is easier for you,

19       sir.  I just have it up so everyone can see it.

20          MS. FUMERTON:  Brian, it's a little small if

21       you can make it bigger.

22          MR. SWANSON:  I sure can.  Thanks.

23          MR. ELSNER:  Mr. Catizone, it's on the

24       page that ends 9630.

25          THE WITNESS:  Okay.  Thank you.

```
 1      BY MR. SWANSON:

 2   Q    Are you there?

 3   A    Yes, sir.

 4   Q    Okay.  And again, and what are automated pharmacy

 5        systems?

 6   A    They're a variety of systems.  They can be the

 7        dispensing process, they can be the pill-counting

 8        machines, it's technology utilized within the

 9        pharmacies.

10   Q    And is it the automated pharmacy system that, in

11        your view, would be the system that should alert a

12        pharmacist to potential patterns of diversion?

13   A    It would be one of the systems, sir.

14   Q    And then if you go down -- or if you flip your copy

15        in to page 91, you'll see the section on automated

16        pharmacy systems.  And you'll get there faster than

17        I will, because there's really no good way to do

18        this on the screen.  But if you turn to page 91?

19   A    Yes, sir.

20   Q    Okay.  Page 91 you can see is Section 8 and it's on

21        "Automated Pharmacy Systems," right?

22   A    Yes, sir.

23   Q    Now, is there anywhere in the section that you and

24        your team put out on automated pharmacy systems

25        that requires a pharmacy to implement a system
```

1      where it uses its dispensing data to identify

2      patterns of diversion?  Can you point me anywhere

3      in the section that you signed off on that says

4      that that's a requirement?

5          MR. ELSNER:  Objection.

6  A    Yes, sir.

7   BY MR. SWANSON:

8  Q    Okay.  Where?

9  A    Can I explain and then point to the section at the

10      same time, sir?

11  Q    You can answer it however you feel appropriate.

12  A    Thank you.

13      So the Model State Pharmacy Practice Act is

14      reflective of what occurs at the state level.  And

15      perhaps just as an explanation, what is contained

16      in the act is very relevant and forms the basis of

17      the model rules.

18      And the model rules then reflect the

19      interpretation and implementation of the act.  In

20      the act it talks about the practice of pharmacy.

21      It talks about drug utilization review, and it

22      talks about prospective drug utilization review.

23      In this particular section on page 92 on Number 5

24      at the bottom, it says:  "Records and/or electronic

25      data kept by automated pharmacy systems shall meet

1          the following requirements.  All events involving

2          the contents of the automated pharmacy system must

3          be recorded electronically."

4              So taking the practice act, which requires the

5          pharmacist to appropriately dispense prescriptions,

6          resolve red flags and document that, this system

7          then must have some way of recording that

8          electronically, whether it's part of the alerts for

9          the pharmacist, or whether there are other tools

10         that are available to the pharmacist.

11             That's the interpretation of NABP and the

12         guidance to the states to -- in direct response to

13         your question.

14    Q    Okay.  I thought I heard you talking about

15         documentation.

16             My question was focused on this requirement

17         where you say that every pharmacy in the country is

18         required to have a -- to use its dispensing data to

19         identify patterns of diversion at the pharmacy

20         counter.  And I'm wondering if that requirement,

21         that you now say is a requirement, is included

22         anywhere in the model rules that you signed off on?

23             MR. ELSNER:  Objection, asked and answered.

24    A    And my answer was, yes, sir.  The model rules must

25         be implemented in accordance with the practice act

1        as with state law.  There are no model rules that

2        exist without an existing state law.  The practice

3        act forms the basis for that requirement of the

4        dispensing data being utilized as part of the

5        appropriate controls for dispensing controlled

6        substances.  The model rules then further identify

7        in terms of technology and operations, what those

8        events are and the rules say all events, which

9        would include utilizing dispensing data to ensure

10       the appropriate dispensing drug utilization review

11       and distribution of prescriptions.

12    BY MR. SWANSON:

13  Q    I'm not asking -- sir, I'm not asking about drug

14       utilization review.  I'm asking about the system

15       that you talk about in your report, right?  Is a

16       system where you say a pharmacy has to use

17       dispensing data to identify patterns of diversion,

18       and then notify the pharmacist at the store level

19       of a possible red flag.

20            That's the system that you claim every

21       defendant was required to implement.  Do I have

22       that right?

23            MR. ELSNER:  Objection; asked and answered.

24  A    Yes, sir.

25    BY MR. SWANSON:

1   Q    And so my question is, where in the model act that

2        you signed off on, is that express requirement, you

3        now claim is a requirement, where is it included in

4        the model act?  That's my question.

5            MR. ELSNER:  Objection.  Objection; asked and

6        answered, several times.

7   A    If I can explain again, sir, you cannot separate in

8        the practice of pharmacy, drug utilization review

9        and appropriate dispensing and the utilization of

10       dispensing data to identify patterns of diversion

11       or red flags.  They are all one end product that

12       must be used together.

13           The practice act requires DUR, the practice

14       act requires that the pharmacist must comply with

15       all federal and state laws, and the practice act

16       says there must be appropriate dispensing of those

17       products.  And that is, in its entirely, what forms

18       the basis then for any system to utilize dispensing

19       data so the pharmacist is aware of that when they

20       are conducting DUR and other checks to make sure

21       that the patient receives the right medication and

22       the prescription is for a legitimate medical

23       purpose.

24     BY MR. SWANSON:

25   Q    When you were with the NABP, did you have any

1      knowledge or awareness of the dispensing systems

2      that you were utilized by the retail chain

3      pharmacies in this case?

4          MR. ELSNER:  Objection.

5   A    From the view of a state board of pharmacy or NABP,

6          but not as a practicing pharmacy.  In those

7          systems, I had experience, again, within the

8          Osco/Albertsons system as a system as a pharmacist.

9     BY MR. SWANSON:

10  Q    Got it.  I guess my question was, though, by

11         virtual of your role at the NABP, did you ever go

12         out to different pharmacies and look at their

13         systems and comment on them or advise?

14  A    No, sir.

15  Q    Okay.  I'm going to move on to "Corresponding

16         Responsibility."  You provided opinions in this

17         case regarding pharmacists corresponding

18         responsibility and we talked a bit about --

19  A    Mr. Swanson?  Excuse me.  Are you -- am I done with

20         the model act?  Do I need this anymore?

21  Q    Yes, you can set that aside for now.

22  A    Thank you, sir.

23  Q    Thank you.

24  A    Sorry for the interruption.

25  Q    That's all right.

1         You provided opinions in this case and have

2         written in your report we talked a bit about the

3         corresponding responsibility in Section 1306.04,

4         right?

5    A    Yes, sir.

6    Q    One of the things we talked about yesterday was

7         that the state boards of pharmacy, sometimes they

8         will put out newsletters to provide guidance and

9         education to the pharmacists who practice in their

10        state, right?

11   A    Yes, sir.

12   Q    And Ohio is one of the states that did that, right?

13   A    Yes, sir.

14   Q    They would periodically write about topics that

15        were important to pharmacists who were dispensing

16        medications, including opioids, right?

17   A    Yes, sir.

18   Q    Sometimes they would write about issues like laws

19        and regulations that dictate the practice of

20        pharmacy, true?

21   A    Yes, sir.

22   Q    And we talked yesterday, while you were at the

23        NABP, you were an editor of portions of those

24        letters but not the entire letter, right?

25   A    Yes, sir.

1    Q    Your role was to act as the editor of NABP content

2         and for state-specific content that was the

3         responsibility of whoever the lead person was for

4         the state board of pharmacy, right?

5    A    Yes, sir.

6    Q    But it was important that those newsletters

7         contained accurate information regarding the

8         practice of pharmacy, right?

9    A    The responsibility for the accuracy rested with the

10        state, sir.

11   Q    Or with you, if it was your content, right?

12   A    Yes, sir.

13   Q    Or the NABP's content, I should say?

14   A    Yes, sir.

15   Q    If you can open up the envelope that's marked

16        WAG 08?

17   A    Yes, sir.

18            MR. ELSNER:  I'm going to get this out to

19        everybody else.  We're now on 17.

20            (Exhibit 17 was marked for identification.)

21            MR. ELSNER:  Just for time sake, if it's okay

22        with everybody, I'm not going to put it up on the

23        screen, but I have distributed it.

24     BY MR. SWANSON:

25   Q    Okay.  The document you have in front of you is a

1       May 2011 newsletter from the Ohio state board of

2       pharmacy, correct?

3    A  Yes, sir.

4    Q  And if you look at the second page, you can see

5       that in the bottom right, you're identified as the

6       national news editor and executive editor, right?

7    A  Yes, sir.

8    Q  Looking at the content of Exhibit 17, it's a

9       relatively short newsletter, right?

10   A  I don't know if this is the entire newsletter, sir.

11      So I can't --

12   Q  It might just be a portion?

13   A  Yeah.  The middle portion is missing and I don't

14      know if this is the first or second page of the

15      Ohio, so I can't comment if it's the short or not.

16          MR. ELSNER:  I'm going to object to the

17      completeness of the document.  But you can

18      continue.

19          MR. SWANSON:  Okay.  Thanks.

20     BY MR. SWANSON:

21   Q  If you look at the first page, there's a section

22      that reads:  "Corresponding responsibility is

23      needed more than ever."  Right?

24   A  Yes, sir.

25   Q  And this section continues to the second page of

1        the document.  So you at least have a complete

2        iteration of the section on the corresponding

3        responsibility.  Do you agree with that?

4            MR. ELSNER:  Objection.  I think it -- I think

5        what it shows is that the document was originally

6        four pages and you're showing us the first page and

7        the fourth page.

8            MR. SWANSON:  Right.  But Mr. Elsner, what I

9        just said is, it's a complete iteration of that

10       section and I asked if he agreed with that.  So I

11       appreciate the objection.  But I'm just asking --

12           (Simultaneous conversation.)

13           MR. ELSNER:  I just want the record to be

14       clear.  Go ahead.  You can answer.

15   A   Sure.  This is not the format that I've seen the

16       newsletter in.  And I don't know for sure if it's

17       complete.  It appears to be complete, but I can't

18       say for certain that it is.

19     BY MR. SWANSON:

20   Q   Okay.  It begins:  "In last May's newsletter, the

21       board mentioned that it is having a tremendous

22       problem in Ohio with so-called pain clinics that

23       are doing nothing but providing large amounts of

24       controlled substances, particularly oxycodone and

25       hydrocodone to people who have no legitimate

Page 376

1        medical need for them."

2           Do you see that?

3   A   Yes, sir.

4   Q   And do you recall that was a problem in Ohio back

5        in 2011?

6   A   I recall it was a problem, yes, sir.

7   Q   If you turn to the next page, then, it continues

8        on, that second complete sentence on page 2:

9        "Since most of the pharmacists in Ohio have taken

10       their corresponding responsibility requirements

11       seriously, the patients, quote/unquote, of these

12       operations are having more and more problems

13       finding a place to get the prescriptions filled.

14       The board has had calls from pharmacies as far away

15       as Virginia and South Carolina asking about the

16       legitimacy of these prescriptions."

17          Did I read that correctly?

18   A   Yes, sir.

19   Q   And do you recall that, at the time, that the Ohio

20       Board of Pharmacy was of the view that its

21       pharmacists were practicing their corresponding

22       responsibility and that was leading patients to

23       leave the state to try to get their prescriptions

24       filled?

25          MR. ELSNER:  Objection.

Page 377

1    A    I don't recall that, sir.

2      BY MR. SWANSON:

3    Q    But you agree that that was the view of the state

4         board of pharmacy expressed in Exhibit 17, true?

5           MR. ELSNER:  Objection.

6    A    No, sir, I would ask for your indulgence to allow

7         me to read the entire article, rather than just

8         comment on individual sections, if there's time to

9         do that, sir.

10     BY MR. SWANSON:

11   Q    Well, there's probably not time to do that so --

12          MR. ELSNER:  Objection.

13          MR. SWANSON:  I will ask you to comment.

14     BY MR. ELSNER:

15   Q    I understand your request.  I will just ask if you

16        are able to comment on some of the provisions, I'm

17        going to ask you about that.  How about that?

18   A    Can I clarify and explain that, sir?

19   Q    Sure.

20   A    Yesterday it was represented to me that the

21        definition of doctor shopping by the Ohio Board of

22        Pharmacy was five or more prescribers.  When I

23        actually researched that last night in the Ohio

24        practice act rules, it was only more than one

25        prescriber.  So I don't want to misrepresent or

1      take something as an assumption that turns out not

2      to be correct today.

3           So I will comment to the best of my ability,

4      but I cannot make assumptions or take

5      misrepresented information again to give the wrong

6      answer to you.

7           MR. SWANSON:  Okay.  Well, I'll move to strike

8      that response.  And I understand -- I understand

9      that you can only comment to the extent you are

10     able when I ask you these questions.

11   BY MR. SWANSON:

12   Q    Here's the question I --

13          MR. ELSNER:  Wait.

14   BY MR. SWANSON:

15   Q    -- want to ask you.

16          MR. ELSNER:  But Mr. Catizone, please take the

17     time that you need to put whatever sentence he asks

18     you about in the appropriate context, okay?

19          THE WITNESS:  Yes.

20          MR. SWANSON:  I agree with that.  I agree with

21     that.

22   BY MR. SWANSON:

23   Q    I want to ask you in the second column on the

24     second page.  The second complete sentence begins

25     with the word "please."

Page 379

1        Do you see that?

2    A    No, sir, I apologize.  I don't see that.

3    Q    You don't need to apologize.

4        Second column, second sentence.

5    A    Yes, sir.  I found that.

6    Q    Okay.  It says:  "Please note that the pharmacist

7        is the one held accountable for making that

8        independent judgment, not the employer, supervisor,

9        or fellow employee."

10        Do you see that?

11   A    Yes, sir.

12   Q    Do you recall that it was the Ohio state board of

13        pharmacy's view that the corresponding

14        responsibility rested with the pharmacist; the

15        pharmacist was the one that was accountable for

16        exercising that judgment, and not the employer,

17        supervisor, or fellow employee?

18        MR. ELSNER:  Objection.

19   A    I don't recall that, sir.

20     BY MR. SWANSON:

21   Q    Do you at least agree with me that the state board

22        of pharmacy is telling the pharmacists that it

23        sends out this newsletter to, that it's the

24        pharmacist who has the corresponding

25        responsibility, and not the employer, supervisor,

1       or fellow employee?

2              MR. ELSNER:  Objection.

3    A   Based on the context of the newsletter and other

4        information I know about the Ohio Board of

5        Pharmacy, the newsletter is directed to

6        pharmacists, practicing pharmacists, and that's why

7        the content may have referred to pharmacists.  But

8        I know that the Ohio Board of Pharmacy at the time

9        that I was at NABP took action forth -- against

10       pharmacies for violating or not complying with

11       their corresponding responsibility.  So I think

12       this is part of the answer or part of the position

13       of the Ohio Board of Pharmacy.

14              MR. ELSNER:  I'm just going to lodge an

15       objection.  You haven't established that

16       Mr. Catizone was involved in the writing of any of

17       this.  In fact, I think his testimony was that

18       he --

19              MR. SWANSON:  Mike, let's stop the speaking

20       objections and the coaching of the witness.  Okay.

21       Your objection is on the record and it's noted.

22              MR. ELSNER:  It's important context, not for

23       the witness.  The witness already testified that

24       his section was in pages 2 and 3.  I want the

25       record to be clear because you seem to indicate --

1      seem to suggest that he actually wrote this, and

2      it's not clear to me that he wrote it or even saw

3      it.  And I think you have to lay that foundation.

4          MR. SWANSON:  There's been zero suggestion

5      that he wrote this, Mike.

6          MR. ELSNER:  I disagree.  The implication was

7      you started with his name on the last page of the

8      document.  So please continue.  But I'm going to

9      continue to object to the use of this document if

10     you don't lay the proper foundation.  You can

11     continue.

12    BY MR. SWANSON:

13  Q    All right.  So again, my only question on this is,

14     you said this is a document that went out to

15     pharmacists, correct?

16  A    Yes, sir.

17  Q    And the intent was to educate pharmacists on laws

18     and regulations among other things, correct?

19  A    Yes, sir.

20  Q    And what the Ohio state board of pharmacy told the

21     pharmacists that it sent this letter to is that

22     both Ohio laws and rules and federal laws and

23     regulations place a corresponding responsibility on

24     the pharmacist to make a judgment and hold the

25     pharmacist accountable for that judgment, right?

Page 382

```
 1    A    I can only comment to say that's what the
 2         newsletter says.  I can't comment beyond that, sir.
 3    Q    Fair enough.  You can set that one aside.
 4              If you look at page 78 of your report, I'm
 5         going to pivot to a new topic here, briefly.
 6              Are you on page 78?
 7    A    Yes, sir.
 8    Q    Page 78 of your report, you fault Walgreens -- and
 9         I'll just read:  "Even so, as late as 2017,
10         Walgreens refused to allow 'blanketly' refusing to
11         fill prescriptions from a prescriber as long as the
12         prescriber had an active DEA number."
13              Do you see that?
14    A    Yes, sir.
15    Q    You say:  "Instead, it, Walgreens insisted
16         pharmacists evaluate each prescription on a
17         'case-by-case basis."  Right?
18    A    Yes, sir.
19    Q    And in your view, that was a fault of Walgreens.
20         Walgreens was doing wrong by refusing to implement
21         blanket refusals to fill, right?
22              MR. ELSNER:  Objection.
23    A    Yes, sir.
24      BY MR. SWANSON:
25    Q    And does that opinion apply to other pharmacies as
```

1   well, that other pharmacies also should have had

2   blanket refusal to fill policies?

3 A Based upon the information, if the physician was

4   involved in writing and prescribing prescriptions

5   for nonlegitimate purposes and the pharmacist

6   suspected diversion.  And then the diversion could

7   or could not be confirmed, the answer would be yes,

8   sir.

9 Q Now, Walgreens policy was to ask their pharmacists

10   to exercise their own independent judgment on a

11   case-by-case basis, right?

12 A Yes, sir.

13 Q But it's your opinion that a pharmacy should

14   mandate that its pharmacists refuse to fill

15   prescriptions written by some doctors, even though

16   those doctors still have an active DEA number,

17   right?

18 A Based upon information that the pharmacist would

19   have about that prescriber, yes, sir.

20 Q Do blanket refusal to fill policies like the one

21   you advocate, do they interfere with the

22   pharmacist's independent professional judgment?

23 A No, sir.

24 Q When I asked you yesterday what the independent

25   professional judgment meant, you said that:  "The

Veritext Legal Solutions

www.veritext.com                 888-391-3376

1       pharmacist is supposed to make an objective

2       decision and not be influenced by any other factors

3       such as corporate metrics or corporate

4       requirements."

5           Do you remember giving that testimony?

6    A   Yes, sir.

7    Q   Doesn't the -- doesn't a blanket refusal to fill

8       take away the pharmacist's ability to exercise

9       independent judgment because it's based on a

10      corporate requirement?

11   A   No, sir.

12          MR. ELSNER:  Objection.

13     BY MR. SWANSON:

14   Q   Why not?

15   A   The blanket refusal would be an independent

16      judgment made by the pharmacist at the store.  What

17      is occurring with these policies is that the

18      pharmacists from Walgreens in documents that I've

19      looked at have asked to have certain prescribers

20      put on a prescriber list so that prescriptions

21      would not be filled by those prescribers and that

22      was refused, and the policy back said, we must take

23      these on a case-by-case basis.

24          If the pharmacist's independent judgment has

25      determined that the prescriber is diverting

Page 385

1       medication to not writing medications for

2       legitimate medical purposes, then the pharmacist

3       should make the independent judgment that they are

4       not going to fill prescriptions for that prescriber

5       for a controlled substance.

6           And I say that also based on my experience as

7       a pharmacist, when a physician exhibited this type

8       of behavior, we reported him to the state board of

9       pharmacy, and I personally refused to fill any

10      prescriptions for that doctor for controlled

11      substances until the DEA or board of pharmacy had

12      investigated that prescriber or medical board and

13      provided back to me clearance that the pattern and

14      actions were correct.

15  Q   Have you seen evidence in this case of Walgreens'

16      refusal to fill files?

17  A   Yes, sir, I have.

18  Q   And you didn't cite those in your report.  Did you

19      actually review them?

20  A   Yes, I did cite them in my report, sir.

21  Q   Okay.  So you have seen evidence of Walgreens

22      pharmacy -- pharmacists using their independent

23      judgment to refuse to fill prescriptions that they

24      felt were suspicious or illegitimate?  You've seen

25      that, right?

1           MR. ELSNER:  Objection.

2    A    So I clarify, sir, I looked at the good faith

3         dispensing checklist that each Walgreens

4         pharmacist -- and on there I thought there was

5         refusal to dispense.  If that's not the document,

6         then I'm not sure exactly what you're referring to

7         or if I reviewed that document.

8      BY MR. SWANSON:

9    Q    Was it your view while you were at the NABP that

10        blanket refusal to fill policies improperly

11        interfered with the pharmacist's independent

12        professional judgment?

13          MR. ELSNER:  Objection.

14   A    No, sir.

15     BY MR. SWANSON:

16   Q    At the NABP, did you advocate that pharmacy stores

17        should implement blanket refusals to fill for

18        prescribers?

19          MR. ELSNER:  Objection.

20   A    I advocated that the pharmacists should use

21        independent judgment and if they determined that,

22        then they had all the writing authority to

23        blanketly refuse to fill a prescription from a

24        prescriber, yes, sir.

25     BY MR. SWANSON:

1  Q  Well, but you're talking about a pharmacist

2     blanketly refusing to fill.  I'm asking about a

3     pharmacy mandating that its pharmacists refuse to

4     fill for a prescriber.

5        Do you see the difference there?

6  A  Yes, sir.

7  Q  And certainly, a pharmacist could determine that he

8     or she doesn't trust the prescription that he's

9     seeing from a physician and be suspicious of those

10    and not fill them.

11       My question is whether, at the NABP, you

12    advocated that pharmacies should implement blanket

13    refusal to fill policies to prevent all of their

14    pharmacists from filling prescriptions from certain

15    prescribers.

16       Is that something you advocated at NABP?

17       MR. ELSNER:  Objection.

18 A  Yes, sir.  Because NABP and the DEA feel that the

19    pharmacy, as well as the pharmacist, is the

20    registrant and responsibility and also held a

21    corresponding responsibility.

22       I advocated while at NABP that the pharmacy

23    incorporation should have appropriate controls and

24    empower the pharmacist to make those independent

25    judgments and provide the tools and support for the

1        pharmacist to be able to do that in order to combat

2        diversion.  So the answer is yes.

3     BY MR. SWANSON:

4   Q    But a blanket refusal to fill policy is not

5        empowering a pharmacist to use independent

6        judgment.  It is taking away a pharmacist's

7        independent judgment, correct?

8            MR. ELSNER:  Objection.

9   A    No, sir.

10     BY MR. SWANSON:

11  Q    So if a pharmacy company tells its pharmacists, you

12       cannot fill any prescriptions written by Dr. Smith,

13       in your view, that's empowering the pharmacist to

14       use his or her independent judgment when he gets a

15       prescription from Dr. Smith?

16           MR. ELSNER:  Objection.

17  A    Yes, sir.  And it goes back to your earlier

18       question.

19     BY MR. SWANSON:

20  Q    That's fine.

21  A    They are using dispensing data by the corporation

22       to make that determination with the pharmacist so

23       the corporation that is assuming responsibility

24       providing the tools to the pharmacist needed to

25       make such a decision.

1    Q    Okay.  I'm going to introduce a new exhibit.  I'm

2         sorry that I'm rushing, but I'm -- time is tight.

3              If you can open up WAG 23.

4              (Exhibit 18 was marked for identification.)

5    A    Excuse me, Mr. Swanson?

6    Q    Yes.

7              THE WITNESS:  I think Ms. Fumerton has her

8         hand raised.  I don't know if she's trying to get

9         someone's attention, so she's blocking my screen

10        and I can't see and so...

11             MR. SWANSON:  She may well be.

12             MS. FUMERTON:  Am I on video?  Please tell me

13        I'm not.  Actually, you know what?  Brian, could

14        we -- I'm sorry, I did not mean to do that.  But

15        Brian, could we just take a quick break?  I'm

16        sorry.  I know it's not an hour.  Just about five

17        minutes?

18             THE WITNESS:  Fine with me.

19             MR. ELSNER:  We haven't gone an hour but

20        what's the reason for the break?  The witness is

21        available.

22             MS. FUMERTON:  Just a quick break.  We have

23        been going about an hour.

24             MR. ELSNER:  It hasn't been an hour.

25             MR. SWANSON:  Well, here, let me do --

1          SPECIAL MASTER COHEN:  If someone needs a

2      break, we ought to take a break.

3          MR. SWANSON:  Okay.

4          THE VIDEOGRAPHER:  We are going off the record

5      at 8:59 a.m.

6          (A recess was taken.)

7          THE VIDEOGRAPHER:  This is the Media Number 2

8      in the deposition of Carmen Catizone.  Today is

9      June 16th, 2021.  We're going to back on the record

10      at 9:07 a.m.

11    BY MR. SWANSON:

12  Q   Mr. Catizone, I have marked as Exhibit 18 a

13      document.  It has an email cover dated March 10,

14      2015, an email to the stakeholder member

15      organizations from you, and then it attaches the

16      document that I want to talk about, which is the

17      "Stakeholders Challenges and Red Flag Warning Signs

18      Related to Prescribing and Dispensing Controlled

19      Substances."

20          Is that the document that you have in front of

21      you, sir?

22  A   Yes.

23  Q   This is a document that you've cited throughout

24      your report in this case, correct?

25  A   Yes, sir.

1    Q    You've relied on this document, among others, to

2         support your analysis of red flags in this case,

3         right?

4    A    Yes, sir.

5    Q    This document was created -- Exhibit 18 was created

6         while you were the executive director at NABP,

7         right?

8    A    Yes, sir.

9    Q    You sat on a panel or a committee that met to

10        discuss the contents of this document, true?

11            MR. ELSNER:  Objection.

12   A    It was not a formal committee, sir.  It was just a

13        stakeholder group or coalition.

14     BY MR. SWANSON:

15   Q    Okay.  Call it coalition, committee panel, whatever

16        you want.  It was a group of folks that got

17        together to create the content of this document,

18        right?

19   A    Yes, sir.

20   Q    Those groups or entities are listed on the

21        beginning page of the actual stakeholder document,

22        right?  It starts with the American Academy of

23        Family Physicians?

24   A    Yes, sir.

25   Q    And the entities that are listed on that

1    page ending in 240, those were the entities that

2    participated in the creation of this red flag

3    warning signs document, right?

4  A    Yes, sir.

5  Q    Were you the principal drafter?

6  A    I was the executive editor, so to speak, sir.

7  Q    Did you sort of have responsibility for the final

8       content of the document?

9        MR. ELSNER:  Objection.

10 A    My responsibility was to coordinate all of the

11      content and pull it all together, sir.

12   BY MR. SWANSON:

13 Q    And do you stand behind the content of the

14      document, Exhibit 18?

15       MR. ELSNER:  Objection.

16 A    Yes, sir, but the individual content areas were the

17      responsibility of the various stakeholders.  I did

18      not have control over that, simply to make sure

19      that the document fit together as a cohesive

20      document, sir.

21   BY MR. SWANSON:

22 Q    Right.  But the document went out with your

23      support, right?

24 A    Yes, sir.

25 Q    Do you believe that the document, Exhibit 18, was

Page 393

```
 1        an important tool for helping pharmacists to detect

 2        possible diversion?

 3             MR. ELSNER:  Objection.

 4   A    Not exactly, sir.

 5     BY MR. SWANSON:

 6   Q    Okay.  What was the purpose of this document?

 7   A    The purpose of this document was to foster

 8        communication between the stakeholders about red

 9        flags and the challenges that each of those groups

10        faced so that the other groups would have a better

11        understanding of what their responsibilities were

12        and why pharmacists/prescribers were reacting and

13        doing the things that they did.

14   Q    One of the things that the stakeholders document

15        does is identify possible red flags of diversion,

16        right?

17   A    Yes, sir.

18   Q    Why was it necessary for the NABP to create a

19        document describing possible red flags of

20        diversion?  Why not just rely on the DEA's

21        definition of red flags?

22             MR. ELSNER:  Objection.

23   A    So back to the purpose of the meaning of the

24        document.  There were problems between prescribers

25        and pharmacists regarding red flags and
```

1       corresponding responsibility.  And so the red flags

2       were used as discussion points between the groups

3       to identify areas where there had been challenges

4       and where physicians didn't understand why

5       pharmacists and pharmacies had corresponding

6       responsibility and why pharmacists were doing the

7       things they did.

8    BY MR. SWANSON:

9   Q   What complaints did the physicians have about

10      pharmacists corresponding responsibility?

11  A   Just before the organization of the stakeholders

12      document, at the AMA annual meeting, one of the

13      regional AMAs passed a resolution and the

14      resolution said that pharmacists should simply fill

15      prescriptions from the doctors and that pharmacists

16      should provide no check or no second-guessing of

17      those prescriptions, and that the pharmacists were

18      interfering with the practice of medicine by

19      exercising their responsibilities and prospective

20      drug utilization review.

21         The particular issue was between Walgreens and

22      the AMA.  And we were approached by Walgreens and

23      the AMA to convene a meeting of the stakeholders to

24      try and resolve that communication issue, because

25      pharmacists were conducting DUR questioning

```
 1          patients and questioning prescribers in accordance
 2          with the corresponding responsibility.
 3     Q    So if I -- let me break that down a bit.  You were
 4          approached by Walgreens and the AMA to convene this
 5          group of stakeholders?
 6     A    Yes, sir.
 7     Q    And who was it from Walgreens?
 8     A    I remember the individual from the AMA was one of
 9          their attorneys.  And I think there were several
10          people at Walgreens, but I can't remember
11          specifically who it was.
12     Q    And you said the circumstances where the AMA had
13          passed a resolution asking, in essence, that the
14          pharmacists stop challenging their prescribing
15          decisions and just dispense medications that they
16          prescribed.  Is that a fair assessment?
17     A    The second part is, sir.  The physicians said that
18          pharmacists should just dispense any prescription
19          that's written.
20     Q    And the folks at Walgreens had a problem with that
21          because they had been calling the physicians to
22          check on a prescription or to confirm that the
23          prescription was appropriate, and that was
24          upsetting the doctors, right?
25               MR. ELSNER:  Objection.
```

```
 1   A     It was part of the problem.  Some of the
 2         pharmacists were calling and asking for x-rays,
 3         MRIs, and other information that the physicians
 4         felt extended way beyond what the pharmacist's
 5         responsibility was.
 6      BY MR. SWANSON:
 7   Q     Okay.  So the folks at the AMA thought that the
 8         Walgreens pharmacists were doing too much inquiry
 9         into the doctor's practice; is that fair?
10             MR. ELSNER:  Objection.
11   A     Yes, sir.
12      BY MR. SWANSON:
13   Q     And the folks at Walgreens wanted guidance on what
14         they should be doing so that they could still meet
15         their corresponding responsibility in dispensing
16         medications, right?
17   A     The purpose was that NABP would serve as an
18         objective third party and open the lines of
19         communication so that physicians and AMA would
20         understand what pharmacists needed to do.  And then
21         pharmacists then wouldn't encroach beyond what the
22         responsibilities were into the practice of medicine
23         as well.
24   Q     Does the stakeholders challenges and red flags
25         warning signs document appropriately strike the
```

```
 1        balance in your view as between a pharmacist's
 2        obligation and a doctor's obligations?
 3             MR. ELSNER:  Objection.
 4   A    To the extent that the individual red flags that
 5        were discussed, yes, sir.
 6     BY MR. SWANSON:
 7   Q    Now, in the stakeholders document at page 10, you
 8        can see there's a Section 3 that discusses red
 9        flags.  I'll give you a second to get there.
10   A    I'm there, sir.
11   Q    Okay.  So Section 3 is the red flags section of the
12        stakeholders document, correct?
13   A    Yes, sir.
14   Q    The section then breaks out, you know, what are red
15        flags to prescribers and what might be red flags to
16        pharmacists, right?
17             MR. ELSNER:  Objection.
18   A    Yes, sir.
19     BY MR. SWANSON:
20   Q    And if you want to see what the red flags are for
21        the pharmacists, you would turn to page 14 and
22        you'd see what was identified by the group as
23        pharmacy red flags, right?
24             MR. ELSNER:  Objection.
25   A    Some of the red flags, sir, yes.
```

1     BY MR. SWANSON:

2     Q    What do you mean by some of the red flags?

3     A    The document does not include all of the red flags

4          that a pharmacist may encounter.  It was again, red

5          flags that the group, the stakeholders, wanted to

6          have more discussion around.

7     Q    Are you saying that the red flags that are

8          identified on page 14 are the red flags that the

9          stakeholders wanted to have more discussion around?

10         Is that -- did I understand that correctly?

11    A    Yes, sir.

12    Q    And you're saying that there are additional red

13         flags that aren't included here?

14    A    Yes, sir.

15    Q    And I was going to ask you about that because

16         these -- the red flags that are identified in -- on

17         page 14 don't match up exactly with the red flags

18         that you've identified in your report.  Do you

19         agree with that?

20    A    Yes, sir.

21    Q    Would you agree with me that reasonable minds can

22         differ as to what constitutes a red flag to a

23         pharmacist?

24         MR. ELSNER:  Objection.

25    A    No, sir.

1      BY MR. SWANSON:

2    Q    So when you say that it's a red flag if a patient

3         travels more than 25 miles to see his or her

4         prescriber, you're saying if somebody said I

5         think it's more reasonable to be -- to set it at

6         35 miles, you'd say no, reasonable minds can't

7         disagree about this, it's 25 miles?

8              MR. ELSNER:  Objection.

9    A    The question as you've posed it, the DEA in their

10         guidance in other documents have pointed out

11         specific red flags.  So distance is a red flag.

12         25 miles is a parameter that, as I've determined,

13         is a safe parameter to utilize.  So a pharmacist

14         may, in their professional and independent

15         judgment, make a determination that 30 miles or

16         20 miles may not be a red flag.  But it's still a

17         red flag for them to conduct further due diligence.

18              The red flags the DEA have identified, those

19         are not things that are discussed or debatable.

20         They are actually standards of care in that

21         highway.

22      BY MR. SWANSON:

23    Q    But my question was a bit more basic.  Can

24         reasonable minds differ as to what constitutes a

25         red flag?

1           MR. ELSNER:  Objection.

2    A    Out of the 16 red flags I have identified in my

3          report, my answer is no, sir.

4       BY MR. SWANSON:

5    Q    That reasonable minds could not differ?  Those 16

6          red flags are required, no ifs, ands, or buts; is

7          that your testimony?

8           MR. ELSNER:  Objection.

9    A    Yes, sir.

10      BY MR. SWANSON:

11   Q    If you look -- so you have on page 14, it

12         identifies -- I don't know the number, but it

13         identifies the red flags that the panel wanted to

14         discuss, right?

15   A    Yes, sir.

16   Q    Then in section 4, there's a section that's called,

17         "Other aberrant medication-related behaviors and

18         factors potentially indicative of substance abuse

19         or diversion," right?

20   A    Yes, sir.

21   Q    And again, it breaks out between physicians and

22         pharmacists about what might constitute other

23         aberrant behavior, right?

24   A    Yes, sir.

25   Q    On page 16, if you go to the section on

```
 1        pharmacists, I want to ask you about that.  Are you
 2        there?
 3   A    Yes, sir.
 4   Q    The second sentence in that paragraph reads:
 5        "While the above factors or "red flags" are more
 6        indicative of substance abuse or diversion,
 7        oftentimes, more subtle aberrant behaviors exist
 8        that, while in and of themselves may not be
 9        problematic, may indicate a potential issue that
10        warrants further evaluation prior to dispensing."
11            Do you see that?
12            THE REPORTER:  We've lost the witness.
13            MR. ELSNER:  Sorry.  We had a power surge.
14            THE VIDEOGRAPHER:  We are going off the record
15        at 9:20 a.m.
16            (A recess was taken.)
17            THE VIDEOGRAPHER:  We're going back on the
18        record at 9:21 a.m.
19      BY MR. SWANSON:
20   Q    Mr. Catizone, I'm not sure where I cut out.  So why
21        don't I read my last question back and we'll start
22        there, okay?
23   A    Thank you.
24   Q    Okay.  I've directed you to page 16 of the
25        stakeholders document, the section regarding
```

Page 402

```
1        pharmacists, right?
2    A    Page 15 is prescribers.
3    Q    16.
4    A    Oh, 16, sorry.  Okay.
5             MR. ELSNER:  The second sentence
6         under "Pharmacists."
7      BY MR. SWANSON:
8    Q    Correct.  It reads:  "While the above factors or
9         'red flags' are more indicative of substance abuse
10        or diversion, oftentimes more subtle aberrant
11        behaviors exist that, while in and of themselves
12        may not be problematic, may indicate a potential
13        issue that warrants further evaluation prior to
14        dispensing."
15           Did I read that correctly?
16   A    Yes, sir.
17   Q    And then it goes on to describe some of these --
18        what you and the stakeholders termed aberrant
19        behaviors, right?
20   A    The pharmacist stakeholders did, sir.
21   Q    Well, so what's your responsibility for this
22        document?  I mean, is this something that you say,
23        well, there are a bunch of stakeholders but they
24        only take ownership for their specific sections?
25             MR. ELSNER:  Objection.
```

Page 403

1  A    What happened, sir, was each group was asked to

2       write their individual sections.  So prescribers

3       were asked as to what they viewed red flags, what

4       the challenges they faced with patients, same with

5       the pharmacists group.  So the American Pharmacy

6       Association, Walgreens, all the participants that

7       were pharmacies and pharmacists put together this

8       section.

9          My role was to ensure that there was nothing

10       offensive in there that criticized or aggravated

11       the other stakeholders.  But this is what the

12       pharmacy groups felt was happening in pharmacy

13       practice in their interactions with prescribers

14       that was important for prescribers to know.

15    BY MR. SWANSON:

16  Q    But it's a document that you supported, right, you

17       supported the stakeholders document in its final

18       form, right?

19  A    Yes, sir.

20  Q    Okay.  And if you objected to positions or language

21       that was included in this stakeholder document, you

22       didn't have to sign off on it, right?  You could

23       have said, I'm not going to be a party to this, you

24       had that opportunity if you needed it, right?

25  A    Yes, sir, I thought the question was whether or not

Page 404

1     I agreed with this.  And my role was not to agree

2     with it.  It was to make sure that the document met

3     its purpose, which was open the lines of

4     communication.

5  Q   Okay.  But in any event, you were -- it was

6     acceptable to you that the document went out with

7     you as a signatory, so to speak, and was published

8     with your name on it, right?

9  A   Yes, sir.

10  Q   And the section on aberrant behaviors for

11     pharmacists, it says:  "Aberrant behaviors that

12     patients may exhibit upon the presentation of the

13     prescription include traveling unexplainable and/or

14     unreasonably long distance to a physician office

15     and/or the pharmacy, or requesting to pay cash for

16     a controlled substance prescription when it has

17     been documented that he or she has insurance that

18     would normally cover the prescription."

19      Right?

20  A   Yes, sir.

21  Q   And in your view, those are -- at least your view

22     in this case, in this litigation, is that -- those

23     two behaviors, traveling long distances and paying

24     cash, they are red flags that nobody could disagree

25     with?  They're just -- they're red flags, right?

Page 405

1    A    Yes, sir.

2    Q    In the document that you signed off on, the

3         stakeholders document said no, no, no, those aren't

4         red flags, they are behaviors that might warrant

5         suspicion, but they might have easily explainable

6         answers, right?

7              MR. ELSNER:  Objection.

8    A    No, sir.

9      BY MR. SWANSON:

10   Q    Well, it says:  "Whereas, these types of behaviors

11        may be warning signs, they can also be explained by

12        today's specialty practice arena as well as

13        third-party payor reimbursement circumstances."

14        Right?

15   A    That's what it says.

16   Q    Okay.  And this wasn't something that you objected

17        to such that you refused to put your name on this

18        document, right?

19   A    What the document -- what it says, that I signed

20        off on, sir, was that these may be aberrant

21        behaviors as well as red flags.  But the document

22        also says that both types of situations result in

23        diversion.  And also if you read in there, an

24        important point that you and I have been discussing

25        all morning, it says "whereas, documented."  That

1      once again is the importance of documentation that

2      is documented if a person has insurance, the

3      documentation about that patient decides whether or

4      not the red flag that's been identified is

5      legitimate or not.

6          So documentation is critical to this entire

7      process, as the document was constructed, my

8      interpretation and my sign-off of that document,

9      sir.

10  Q    Well, sir, respectfully, what it says is, when it

11     has been documented that he or she has insurance.

12     That's the documentation it's talking about, right?

13         MR. ELSNER:  Objection.

14  A    No, the documentation included the prescription

15     process which would include that as part of the

16     process.  I was there for the document, sir, and

17     that was how it was presented and understood.

18  BY MR. SWANSON:

19  Q    Okay.  Well, what it says, all right, so the people

20     who weren't there who were just getting this out in

21     the public, it says:  "Requesting to pay cash for a

22     controlled substance prescription when it has been

23     documented that he or she has insurance, that would

24     normally cover the prescription."  That's what the

25     document reads, correct, "yes" or "no"?

 1          MR. ELSNER:  Objection.

 2    A     Yes.  Pharmacists would know what that means.

 3       BY MR. SWANSON:

 4    Q     Yes.  And you don't claim that any of the

 5          defendants in this case didn't document whether the

 6          patient who came in had insurance or not?  That's

 7          not a claim you're making, is it?

 8          MR. ELSNER:  Objection.

 9    A     I'm not understanding the question.  I'm sorry,

10          sir.

11       BY MR. SWANSON:

12    Q     You're not saying that the retail pharmacies in

13          this case didn't have documentation about whether

14          the patient had insurance, right?

15    A     I'm claiming that the defendants in this case

16          should have documented the prescription process

17          which included whether they had insurance coverage

18          or not.

19    Q     Now, I was going to ask you whether it said

20          anywhere in this document that the pharmacist was

21          required to document resolution of red flags.  And

22          I thought you were going to say no, but I guess

23          because the word document has appeared in that

24          paragraph, you're going to say that this document

25          does say that pharmacists must document resolution

1       of red flags; is that right?

2   A   Yes, sir.

3   Q   Okay.  So if I asked you the question, where in

4       this document does it tell me and tell pharmacists

5       that they're required to document the resolution of

6       red flags, you would point me to that sentence that

7       I just read?

8           MR. ELSNER:  Objection.

9   A   I would point you to that paragraph, sir, which

10      says, here is a behavior.  It is a red flag.  It

11      could also be an aberrant behavior, and here's the

12      resolution of that behavior by a pharmacist, which

13      was determining whether or not distance was a

14      probable explanation and that was documented.

15          So that paragraph in its entirety and as part

16      of the document is exactly the basis for the

17      requirement for documentation, sir.

18    BY MR. SWANSON:

19  Q   Got it.

20          Okay.  I'm about done.  I'd like you to turn

21      to page 4 of your report.

22  A   Yes, sir.

23  Q   Okay.  Page 4 is a continuation of the summary of

24      your opinions in this case, right?

25  A   Yes, sir.

Page 409

1    Q    And I want to ask you about the last bullet, the

2         last summary opinion that you provide here.

3              You say that:  "The defendants failed to

4         provide their pharmacists with data, information,

5         and the tools necessary to assist their pharmacists

6         in fulfilling their corresponding responsibility,

7         duties, including but not limited to, utilizing

8         dispensing data to identify patterns, trends, and

9         practitioners possibly involved in diversion, as

10        well, to recognize and resolve red flags."

11             Do you see that?

12   A    Yes, sir.

13   Q    Is it your opinion in this case that pharmacists

14        cannot fill their corresponding responsibility

15        without the systems that you claim the retail chain

16        pharmacy should have implemented?

17   A    Those systems are needed to assist the pharmacists,

18        sir.

19   Q    Well, my question was different.

20             Is it your opinion that pharmacists cannot

21        fulfill their corresponding responsibility without

22        the systems that you claim the retail chains should

23        have implemented?

24             MR. ELSNER:  Objection.

25   A    If pharmacists do not have the access to

```
1            information about the patient prescriber they need

2            to fill that prescription, my answer is yes.

3       BY MR. SWANSON:

4    Q    Okay.  But I want to be clear on this, because you

5            say that there were very specific systems that had

6            to be implemented by the retail chain pharmacies

7            and specific ways to use the dispensing data.

8            That's your opinion, right?

9                MR. ELSNER:  Objection.

10   A    I refer to them as tools, sir, not -- and I didn't

11           specify what they should be.  But they should be

12           tools available to the pharmacists.

13      BY MR. SWANSON:

14   Q    And in your opinion, those tools include --

15           necessarily must include using dispensing data

16           making the dispensing data available to the

17           pharmacist to detect possible patterns of

18           diversion, that's your opinion, right?

19   A    Yes, sir.

20   Q    So my question is, is it your opinion that

21           pharmacists cannot fulfill their corresponding

22           responsibility without that tool, that specific

23           tool, that you claim the retail chains should have

24           implemented?

25                MR. ELSNER:  Objection.
```

```
 1    A    Yes, sir.  As an individual pharmacist, they have

 2         the dispensing data available to them to make that

 3         decision.  In a corporation like Walgreens, that

 4         dispensing data rests with the corporation.  And if

 5         the corporation doesn't provide that data to the

 6         pharmacist, the pharmacist doesn't have the

 7         complete information to make that decision.

 8              MR. SWANSON:  Okay.  Move to strike as

 9         nonresponsive.

10              MR. ELSNER:  Objection.

11       BY MR. SWANSON:

12    Q    Is it your opinion that pharmacists cannot fulfill

13         their corresponding responsibility without the

14         specific tool that you just discussed that you

15         claim the retail chain pharmacies should have

16         implemented?

17              MR. ELSNER:  Objection; asked and answered.

18    A    Without dispensing data on controlled substances

19         and red flags, my answer is yes, sir.

20       BY MR. SWANSON:

21    Q    And you've identified of all the pharmacies in the

22         country, one pharmacy that has -- that you say has

23         such a system, right?

24    A    No, sir.

25              MR. ELSNER:  Objection.
```

Page 412

1     BY MR. SWANSON:

2   Q    What other pharmacies other than Albertsons have

3        you identified?

4          MR. ELSNER:  Objection.

5   A    You asked me to give one example.  I gave you one

6        example, and then said I could not identify other

7        individual pharmacies without being able to go

8        through and question and look at all the different

9        pharmacy systems.  So my answer is -- my answer

10       was, there were more pharmacies, but I could not

11       identify those beyond Albertsons.

12    BY MR. SWANSON:

13  Q    The second sentence, you say:  "The subsequent

14       result of the failure to provide such data,

15       information, and tools was the diversion of

16       significant quantities of controlled substances,

17       particularly opioids, outside of the closed

18       distribution and dispensing system for controlled

19       substances."

20          Right?

21  A    Yes, sir.

22  Q    Now, in your report, you've identified, and we've

23       talked a lot about 16 different red flags, right?

24  A    Yes, sir.

25  Q    And those red flags have been run by Dr. McCann

Page 413

1        across some subset of each pharmacy's dispensing

2        data, right?

3    A   Yes, sir.

4    Q   And the result is that in your report, you've

5        identified, for each red flag, a certain number of

6        prescriptions, right?

7    A   Dr. McCann identified, sir.

8    Q   Okay.  And then you put those into your report,

9        right?

10   A   Yes, sir.

11   Q   So if you turn, please, to page 33, I just want to

12       ask you about one of these and then we'll finish

13       up.

14   A   I'm there, sir.

15   Q   Okay.  On page 33, I want to look at your red flag

16       Number 2, okay?

17   A   "Prescriber Distance," sir?

18   Q   Yes.  So there, you've said it's a red flag if a

19       patient traveled more than 25 miles to visit their

20       prescriber, right?

21   A   Yes, sir.

22   Q   For Walgreens, you identified 37,066 prescriptions

23       that fit that red flag in some subset of dispensing

24       data between 2006 and 2020, right?

25   A   Again, just to clarify, Dr. McCann identified those

Page 414

1    prescriptions.  That was included in my report,

2    yes.

3  Q   And to be clear here, you did not look at any

4    individual prescription in that set, 37,066

5    prescriptions, to test your opinion as to whether

6    that was actually -- any one was actually a

7    suspicious prescription, right?

8  A   Correct, sir.

9  Q   So you can't tell me that any of the doctors who

10    wrote any one of those 37,066 prescriptions, right?

11       MR. ELSNER:  Objection.

12  A   I'm sorry, sir.  I didn't understand what the

13    question was.

14   BY MR. SWANSON:

15  Q   You can't identify any doctor who wrote any of

16    those 37,066 prescriptions, right?

17       MR. ELSNER:  Objection.

18  A   Correct, sir.

19   BY MR. SWANSON:

20  Q   But those 37,066 prescriptions, they might have

21    been written oncologists at the Cleveland Clinic.

22    You just don't know one way or the other, right?

23       MR. ELSNER:  Objection.

24  A   I did not review the individual prescriptions, just

25    aggregate data, sir.

Page 415

1    BY MR. SWANSON:

2    Q    And because you didn't look at any individual

3         prescription, you can't say if any diligence was

4         conducted on any of those prescriptions, right?

5         You just don't know?

6             MR. ELSNER:  Objection.

7    A    Partially, sir.  If the documentation was included

8         on patient notes, I would have been able to

9         determine that without seeing the individual

10        prescription, but I didn't have that information

11        available either.

12   BY MR. SWANSON:

13   Q    But you didn't look at any prescriptions?  So you

14        can't say whether a red flag was cleared or wasn't

15        cleared by the pharmacist, right?  Again, you just

16        don't know because you're relying on aggregate

17        data, right?

18            MR. ELSNER:  Objection.  Objection;

19        mischaracterizes his testimony.

20   A    We used the aggregate data.  What was missing for

21        me to substantiate that was the documentation in

22        notes that the pharmacist should have included to

23        resolve that red flag.

24   BY MR. SWANSON:

25   Q    Okay.  Whether it was missing or not, you just

```
 1          don't know one way or the other whether a

 2          pharmacist cleared and documented any of those

 3          37,066 prescriptions, right?  You just don't know?

 4               MR. ELSNER:  Objection.

 5    A     Correct.

 6      BY MR. SWANSON:

 7    Q     And you can't say -- because of that, you can't say

 8          whether any of those 37,066 prescriptions were

 9          written for an illegitimate reason, right?

10    A     No, sir.

11    Q     Well, if you didn't look at the prescription, and

12          you don't know who the doctor was writing it, and

13          you don't know the circumstances of the

14          prescription, how can you say that any one of those

15          37,066 prescriptions was written for an

16          illegitimate reason?

17               MR. ELSNER:  Objection.

18    A     Based on information I provided earlier.  Based on

19          the amount of opioids that were dispensed in those

20          two counties.  Based upon the amount of deaths per

21          hundred thousand people in those two counties.  And

22          based on the fact that still 37,000 prescriptions

23          tagged for that red flag indicates to me from an

24          aggregate data and overall view that diversion

25          occurred and diversion occurred at a significant
```

1      level; even though I can't identify which specific

2      prescriptions were diverted.

3    BY MR. SWANSON:

4    Q    Okay.  You can't tell me what individual

5         prescriptions were, in your view, illegitimate.

6         What percentage of those 37,066 prescriptions were

7         written for an illegitimate reason?

8              MR. ELSNER:  Objection.

9    A    The best way I can qualify that and give you an

10        answer, sir, is a significant number based upon the

11        total of opioids that were dispensed and based on

12        the resulting deaths in overdoses.  Beyond that, I

13        can't give you anything more than "significant" and

14        I can't qualify it beyond "significant."

15   BY MR. SWANSON:

16   Q    So you can't tell me if it's 10 percent or

17        20 percent or 30 percent, you can't tell me that,

18        can you, sir?

19   A    I can if you provide the documentation that whether

20        or not those red flags were resolved.  That would

21        allow me to give you the percentage versus the

22        aggregate totals, the deaths, and the supply of

23        opioids in those two counties.

24   Q    But I have you in front of me today for

25        questioning.  So sitting there in your chair today,

Page 418

1        you can't tell me what percentage of those 37,066

2        prescriptions you claimed were written for an

3        illegitimate reason, true?

4            MR. ELSNER:  Objection.

5    A   My answer is significant and significant would be

6        far greater than 10, 20, or 30 percent.  Probably

7        more in the range of between 70 and 80 or

8        90 percent, sir.

9      BY MR. SWANSON:

10   Q   Oh, so your opinion -- your opinion is that 70 to

11       90 percent of those 37,066 prescriptions were

12       written for an illegitimate reason?

13   A   No, sir.  You asked me to define just sitting in

14       the chair today what I thought would be a

15       significant number.  And to me, a significant

16       number is somewhere to 70, 80 percent.  Again,

17       lacking the documentation, I cannot quantify

18       whether or not those 37,000 prescriptions fell into

19       that category.  But if you ask me what's the

20       difference between significant and others, for me a

21       significant number of prescriptions would be 70,

22       80 percent if I could make that determination, sir.

23   Q   So a significant quantity of controlled substances

24       at 70 to 80 percent to you?

25           MR. ELSNER:  Objection.

Page 419

```
 1    A     A significant number versus not a significant
 2          number, sir.
 3      BY MR. SWANSON:
 4    Q     Okay.  70 to 80 percent is what you qualify as
 5          significant?
 6    A     Yes, sir.
 7             MR. ELSNER:  Objection.
 8      BY MR. SWANSON:
 9    Q     So let's turn back to page 4.  I want to read the
10          second sentence of your opinion again.
11             "The subsequent result of the failure to
12          provide such data, information, and tools was a
13          diversion of significant quantities of controlled
14          substances particularly opioids, outside of the
15          closed distribution and dispensing system for
16          controlled substances."  Right?
17    A     Yes, sir.
18    Q     So if I understand your testimony, it is your view
19          that 70 to 90 percent of the medications that were
20          dispensed by the retail chain pharmacies were
21          diverted outside of the closed distribution and
22          dispensing system for controlled substances?
23             MR. ELSNER:  Objection.
24      BY MR. SWANSON:
25    Q     Right?
```

Page 420

1    A    No, sir.

2    Q    Okay.  Where is my disconnect there?

3    A    The disconnect is, I've said that a significant

4         number of prescriptions were diverted outside of

5         the system.  But absent patient notes and other

6         documentation, I couldn't qualify or quantify what

7         significant meant.  And defining significant as a

8         general term, that term for me means between 70 and

9         90 percent.  If I had the documentation, I would be

10        able then to make a determination beyond how many

11        patients died in Lake and Trumbull County, and how

12        many opiates were distributed per person in opiate

13        [sic] county that, to me, supports "significant"

14        and would help me quantify that beyond just the

15        term "significant."

16   Q    Sitting here today, can you do anything other than

17        speculate as to what percentage of the 37,066

18        prescriptions that hit on flag 2 for Walgreens were

19        for an illegitimate medical purpose?

20        MR. ELSNER:  Objection.

21   A    Again, it's not a speculation, sir.  It's based on

22        the data, the number of opioids that were

23        distributed in those counties, the number of

24        overdoses and deaths indicate to me factually that

25        there was a significant diversion of prescriptions.

```
                                                          Page 421

 1      BY MR. SWANSON:

 2    Q    And again, significant to you is 70 to 80 percent?

 3            MR. ELSNER:  Objection.

 4    A    As a general term, sir, yes.

 5      BY MR. SWANSON:

 6    Q    I don't want to go through it all, but would your

 7         same answer apply if I asked you about any one of

 8         these numbers that you've included for any of the

 9         retail chain pharmacies in the red flag analysis?

10            MR. ELSNER:  Objection.

11    A    Significant in all of those cases, yes, sir.

12            MR. SWANSON:  I appreciate your answering my

13         questions.  I think I'm short on time so I'm going

14         to pass you off to one of my colleagues.

15            THE WITNESS:  Thank you, sir.

16            MR. SWANSON:  Thank you.

17    CROSS-EXAMINATION

18      QUESTIONS BY JOHN GISLESON:

19    Q    Good morning, Mr. Catizone.  My name is John

20         Gisleson and I represent Rite Aid.

21            Have you been to either Lake County or

22         Trumbull County?

23    A    No, sir.

24    Q    Do you know how many stores, pharmacy stores Rite

25         Aid has in Lake County?
```

Page 422

1          MR. ELSNER:  Objection.

2    A    I think approximately four or five, sir, but I'm

3          not certain.

4      BY MR. GISLESON:

5    Q    Do you know how many stores any of the other

6          pharmacy defendants have in Lake County?

7          MR. ELSNER:  Objection.

8    A    Again, I've looked at that data, and I think they

9          vary between three and five for the other

10         defendants, Giant Eagle has the smallest number of

11         pharmacies within those counties, sir.

12     BY MR. GISLESON:

13   Q    Same questions for Trumbull County.  Do you know

14         how many pharmacy stores each of the chain

15         defendants have in Trumbull County?

16         MR. ELSNER:  Objection.

17   A    I believe it's relatively the same proportion, sir,

18         somewhere between three and five for the larger

19         chains, and then maybe one or two for Giant Eagle.

20     BY MR. GISLESON:

21   Q    As part of your investigation in this case, did you

22         seek to determine what the specific geographic area

23         serviced by each store in each county was?

24   A    No, sir.

25   Q    Would you expect the geographic area serviced by

Page 423

1       each pharmacy store in Lake and Trumbull County to

2       vary?

3            MR. ELSNER:  Objection.

4    A   If you could help me understand what you mean by

5       "vary," sir.

6      BY MR. GISLESON:

7    Q   Sure.  Would you expect that some stores -- strike

8       that.

9            Would you expect that some pharmacy stores in

10       Lake and Trumbull Counties service a larger

11       geographic area, whereas others might service a

12       smaller geographic area?

13   A   Yes, sir.

14   Q   Did you do anything to investigate the specific

15       geographic area serviced by each pharmacy store in

16       Lake and Trumbull Counties?

17            MR. ELSNER:  Objection.

18   A   No, sir.

19      BY MR. GISLESON:

20   Q   Did you do anything as part of your investigation

21       in this case to determine how many patients were

22       serviced by each chain pharmacy store in Lake and

23       Trumbull County?

24            MR. ELSNER:  Objection.

25   A   No, sir.

1     BY MR. GISLESON:

2    Q    Would you expect that some chain pharmacy stores in

3         Lake and Trumbull County have more patients than

4         other stores?

5    A    Yes, sir.

6    Q    Did you do anything to evaluate the demographics of

7         the patients served by each chain pharmacy store in

8         Lake and Trumbull County?

9    A    No, sir.

10   Q    Do you agree that the patient demographics may vary

11        from store to store, depending on the local

12        community?

13   A    I would agree the demographics would vary, but the

14        opioid epidemic cuts across all demographic factors

15        and affects equal -- the populations equally.  So

16        yes and no, sir.

17   Q    As part of your analysis in this case, did you do a

18        specific investigation of the dispensing practices

19        of any particular pharmacy?

20             MR. ELSNER:  Objection.

21   A    Again, Mr. Gisleson, by dispensing practices, can

22        you just help me understand what you mean by that?

23     BY MR. GISLESON:

24   Q    Sure.

25             Did you evaluate the percentage of controlled

Page 425

 1        versus noncontrolled prescriptions dispensed by a

 2        particular pharmacy store in Lake or Trumbull

 3        County?

 4             MR. ELSNER:  Objection.

 5    A    No, sir.

 6      BY MR. GISLESON:

 7    Q    Did you evaluate the prescribing -- strike that.

 8             Did you evaluate the dispensing practices of

 9        any particular pharmacist in either Lake or

10        Trumbull County?

11    A    No, sir.

12    Q    Did you review any patient medical records for any

13        of the prescriptions that you flagged?

14    A    No, sir.

15    Q    Did you speak with any pharmacists in Ohio who

16        worked for one of the chain pharmacy defendants?

17    A    No, sir, but I read the depositions of the

18        pharmacists who practiced in Ohio and supervised

19        pharmacists in Ohio.

20    Q    Did you speak with anyone from the Ohio board of

21        pharmacy concerning dispensing practices in Lake or

22        Trumbull County as part of the work you did in this

23        case?

24    A    No, sir.

25    Q    During the time that you were preparing your report

1        in this case, did you know who ran the day-to-day

2        operations of the Ohio board of pharmacy?

3    A   Yes, sir.

4    Q   What's the name of that individual?

5    A   What division, sir?  Steve Schierholt is the

6        executive director and oversees the entire board.

7            The compliance officer, is that who you were

8        asking about, sir?

9    Q   Either.

10           Did you speak with either Mr. Schierholt or

11       the compliance officer for the Ohio Board of

12       Pharmacy as part of your work in this case?

13   A   No, sir.

14   Q   Did you request from the Ohio board of pharmacy any

15       information as to the guidance the Ohio Board of

16       Pharmacy provided to chain pharmacy stores in Ohio?

17   A   No, sir.

18   Q   Did you do any investigation as to the continuing

19       education courses that were taken by the

20       pharmacists who worked for the chain pharmacy

21       defendants?

22   A   No, sir.

23   Q   What was the continuing education requirement for

24       pharmacists in Ohio between 2006 and 2020?

25           MR. ELSNER:  Objection.

1   A    That information is contained in NABP Survey of

2        Pharmacy Law, which I did not access but I could

3        access if needed.

4      BY MR. GISLESON:

5   Q    Can you describe what the Survey of Pharmacy Law

6        is?

7             MR. ELSNER:  Objection.

8   A    Survey of Pharmacy Law is a compilation of state

9        laws that the executive directors of the state

10       boards of pharmacy put together.  Included in that

11       section is the continuing education requirements of

12       each individual states, and I do believe that Ohio

13       requires some continuing education in pharmacy law,

14       besides live and via workbook or webinar CE.

15     BY MR. GISLESON:

16  Q    When you say compilation of state laws, how are

17       those laws compiled in that survey?

18  A    There are a series of charts that specify certain

19       parts of the law or certain laws, and the state

20       board executive director fills that out.  So for

21       example, it would say, "is a license required for a

22       pharmacy in your state?"  And the executive

23       director would check yes or no.  That type of

24       compilation, sir.

25  Q    Does the Survey of Pharmacy Law address the

Page 428

1      requirements of the Controlled Substances Act?

2   A   Some of those, sir, yes.

3   Q   As part of your responsibilities as the executive

4       director for the NABP, did you review the Survey of

5       Pharmacy Law before it was issued?

6   A   Yes, sir.

7   Q   And did you approve the Survey of Pharmacy Law

8       before it was issued?

9          MR. ELSNER:  Objection.

10  A   I did not approve the individual state content

11      because that would be up to the states to determine

12      if that was correct.  I approved the format of that

13      publication when it was released.

14     BY MR. GISLESON:

15  Q   What was the frequency with which the Survey of

16      Pharmacy Law was released by the NABP?

17  A   It's updated annually, sir.

18  Q   To whom did the NABP provide that survey of law?

19  A   It's provided to all the state boards of pharmacy,

20      all of the 140 colleges of pharmacy and it's

21      provided to students as well, graduating students,

22      and then any pharmacy, pharmacist, corporation, or

23      individual that wants to purchase a copy is able to

24      do so.

25  Q   So that if any pharmacist is interested in knowing

```
 1        what Ohio law requires of a pharmacist in
 2        connection with dispensing controlled substances,
 3        it would be appropriate for that pharmacist to read
 4        the Survey of Pharmacy Law for Ohio?
 5   A    No.
 6   Q    Why not?
 7   A    What the pharmacist would have to read and be
 8        responsible for is the Ohio practice and rules.
 9        Ohio also has a requirement that pharmacists must
10        maintain a written copy of the Ohio newsletter and
11        the Ohio newsletter includes updates and
12        information on laws in Ohio.
13           The Survey of Pharmacy Law would be a nice
14        handy guide for pharmacists to better understand or
15        easily access questions they may have about the law
16        in Ohio.
17   Q    Did the Survey of Pharmacy Law at any point between
18        2006 and 2020 specifically state for Ohio that
19        pharmacy law requires a pharmacist to document the
20        resolution of red flags?
21           MR. ELSNER:  Objection.
22   A    I don't recall that specific section, sir, in the
23        Survey of Pharmacy Law.
24      BY MR. GISLESON:
25   Q    Can you identify any newsletter issued by the board
```

1        of Ohio that specifically stated that a pharmacist

2        must document the resolution of red flags?

3    A   I can't specifically, but I do remember that, as

4        the executive editor and reviewing content at the

5        states, that the Ohio Board of Pharmacy did issue

6        newsletters that talks about the responsibility of

7        the pharmacist as well as the pharmacy and did talk

8        about red flags particularly after the Volkman

9        decision in Ohio.  I know there were newsletters

10       from Ohio that talked about that.  They talked

11       about resolving and documenting red flags, sir.

12   Q   If I want to get a complete set of the newsletters

13       that were issued by the Ohio Board of Pharmacy to

14       pharmacists and pharmacies in Ohio, how can I

15       obtain that documentation?

16           MR. ELSNER:  Objection.

17   A   I think you --

18     BY MR. GISLESON:

19   Q   I'll rephrase the question.

20           Do you know whether there was anybody in Ohio

21       that compiles the newsletters that are issued by

22       the Ohio Board of Pharmacy to pharmacists?

23   A   Just as basic information?  The source of that

24       would be the Ohio Board of Pharmacy, but I'm not

25       sure what their record retention policy is in

Page 431

1        accordance with state or administrative practice

2        laws.  So they would be the primary source for you

3        to request that, sir.

4   Q    You say in your report that:  "Pharmacists have

5        been trained when determining whether to fill a

6        prescription for a controlled substance to be alert

7        for suspicious activity surrounding the

8        prescription.  Licensed or registered pharmacists

9        in every state are required to complete a formal

10        education program of didactic and practical

11        experience."

12            Did that include how to resolve red flags in

13        controlled substance prescriptions?

14   A    If I could ask you to direct me to the page you're

15        reading that from, sir, so I can make sure I

16        understand and am reading it correctly, please.

17   Q    Page 28.

18   A    Thank you.  Okay.  I'm there, sir.

19            Could you repeat the question, please?

20   Q    Sure.

21            You wrote that:  "Pharmacists have been

22        trained when determining whether to fill a

23        prescription for a controlled substance to be alert

24        for suspicious activities surrounding the

25        prescription.  Licensed or registered pharmacists

Page 432

1        in every state are required to complete a formal

2        education program of didactic and practical

3        experience."

4            That applies before they receive their

5        license; is that correct?

6    A    Yes, sir.

7    Q    And if you and the NABP is doing its job, it

8        appropriately tests pharmacists on the licensure

9        examination to make sure that those pharmacists

10       seeking to become licensed know how to

11       appropriately resolve red flags for a controlled

12       substance prescription, correct?

13           MR. ELSNER:  Objection.

14   A    That's one of the competencies in the overall state

15       Rx exams, sir, yes.

16     BY MR. GISLESON:

17   Q    And that's a serious competency that the NABP wants

18       to ensure a pharmacist knows how to perform, right?

19   A    If I can clarify, it's not NABP because the state

20       law exam is developed and the content of that exam

21       is selected by Ohio.  It's the Ohio Board of

22       Pharmacy or that board determination that that's

23       critical and that the pharmacist should know that.

24           NABP simply facilitates that process by

25       creating the exam and administering the exam for

Page 433

1          the state.

2    Q    And throughout the time that you were the executive

3          director for the NABP, you communicated with the

4          Ohio Board of Pharmacy, correct?

5    A    Yes, sir.

6    Q    And was it your understanding, based on your

7          communications with the Ohio Board of Pharmacy,

8          that the Ohio Board of Pharmacy believed it was

9          critical that pharmacists know how to perform a

10         review of a controlled substance prescription?

11             MR. ELSNER:  Objection.

12   A    Based on my conversations with executive director

13         Bill Winsley and its investigators, particularly

14         after the Volkman case, and what they found there

15         and what they found with the pharmacies and the

16         prescribers there, I could say yes, that was a

17         serious concern of Bill Winsley of the Ohio Board

18         of Pharmacy at the time, sir.

19      BY MR. GISLESON:

20   Q    And the Ohio Board of Pharmacy to your knowledge,

21         therefore, took appropriate steps to make sure that

22         pharmacists in Ohio were appropriately trained as

23         part of their licensure in the resolution of red

24         flags for controlled substances?

25             MR. ELSNER:  Objection.

Page 434

1    A    The Ohio Board of Pharmacy took all the steps they

2         could to provide that information to pharmacists

3         and indicate to them that this was a responsibility

4         they needed to meet.  Ohio Board of Pharmacy also

5         provided some educational programs, PowerPoints,

6         but the training goes -- is just -- I'm

7         interpreting training to mean something hands-on

8         and very different than what the Ohio board is

9         charged to do, sir.

10     BY MR. GISLESON:

11   Q    Pharmacists create relationships with patients,

12        true?

13            MR. ELSNER:  Objection.

14   A    Yes, sir.

15     BY MR. GISLESON:

16   Q    Do you believe that the pharmacist who worked for

17        the chain pharmacies in Lake and Trumbull County

18        sought to create relationships with their patients?

19            MR. ELSNER:  Objection.

20   A    I have no idea how to answer that question, sir,

21        because I'm not familiar with the pharmacists or

22        the patients.

23     BY MR. GISLESON:

24   Q    In evaluating whether a prescription for a

25        controlled substance was issued for a legitimate

1      medical purpose, is it appropriate for the

2      pharmacist to take into consideration whether the

3      pharmacist has a preexisting relationship with a

4      patient?

5          MR. ELSNER:  Objection.

6    A    Yes, sir.

7      BY MR. GISLESON:

8    Q    So for example, would you expect, based on your

9      experience as pharmacist as well as the executive

10     director of the National Boards of Pharmacies, that

11     a pharmacist may develop over time an understanding

12     of the health conditions that led to a particular

13     patient taking prescription opioid medications?

14         MR. ELSNER:  Objection.

15   A    Yes, sir.

16     BY MR. GISLESON:

17   Q    Did you investigate as part of the work you did in

18     this case the extent to which any of the chain

19     pharmacy pharmacists had an existing relationship

20     for any of the patients for whom you have

21     identified a flagged prescription?

22   A    No, sir.

23   Q    Do you have any understanding how many patients

24     with flagged prescriptions were existing patients

25     known to the pharmacists?

Page 436

1   A    No, sir, but that information should have been

2        documented and included in the patient record.  And

3        I didn't have access to that information, sir.

4   Q    What patient record?

5            MR. ELSNER:  Objection.

6   A    The patient profile or documentation, so that no

7        pharmacist I'm aware of works 24 hours a day, seven

8        days a week, so if there are other pharmacists in

9        the pharmacy that didn't have that relationship

10       with the patient, and didn't know that patient

11       history, documentation in that patient profile, or

12       with that prescription, would help that pharmacist

13       understand and realize those red flags had been

14       resolved, sir.

15     BY MR. GISLESON:

16   Q    Between 2006 and the present, were pharmacies

17       required to maintain a patient profile for every

18       patient that was being served by the pharmacy?

19            MR. ELSNER:  Objection.

20   A    The dispensing systems that the states required

21       required that there be patient records and whether

22       that was an actual patient profile or some other

23       documentation, the pharmacies were required to

24       document that information and maintain that

25       information.

1     BY MR. GISLESON:

2   Q    What was the information in Rite Aid's patient

3        profile by category?

4             MR. ELSNER:  Objection.

5   A    I don't know, sir.  I didn't have access to that

6        information.

7     BY MR. GISLESON:

8   Q    Did you request access to Rite Aid's patient

9        profile for the flagged prescriptions from the

10       plaintiff's lawyers?

11            MR. ELSNER:  Objection.

12  A    I didn't request the profile.  I understand there's

13       a request that's been made for the patient notes of

14       the defendants, but I am not sure what the status

15       of that is.

16    BY MR. GISLESON:

17  Q    Did you review the patient profiles for any of the

18       flagged prescriptions for any of the chain

19       pharmacies in this case?

20            MR. ELSNER:  Objection.

21  A    No, sir.

22    BY MR. GISLESON:

23  Q    Is it appropriate, in your view, for a pharmacist

24       to review a patient profile maintained by the

25       pharmacy in evaluating whether to fill a

Page 438

1       prescription for opioid medications?

2    A    Yes, sir.

3    Q    Does a patient profile contain information relating

4       to a drug utilization review?

5         MR. ELSNER:  Objection.

6    A    It should, sir.  I can't comment as to whether each

7       patient's profile contains that information, but it

8       should, sir.

9     BY MR. GISLESON:

10   Q    How many of the pharmacists who fill prescriptions

11      on your flagged prescription list, did you report

12      to the Ohio Board of Pharmacy for violating their

13      corresponding responsibility?

14        MR. ELSNER:  Objection.

15   A    I think if we go back to your earlier questions and

16      my responses, sir, I did not look at individual

17      prescriptions, so I did not have access to who the

18      individual pharmacist or prescribers were in each

19      of those cases.

20    BY MR. GISLESON:

21   Q    So none of the dispensing data you had identified

22      the pharmacist who filled a prescription?

23        MR. ELSNER:  Objection.

24   A    Not personally identifiable information, sir.

25      There may have been initials, but the information I

```
 1        looked at did not identify the pharmacist.

 2     BY MR. GISLESON:

 3  Q    Did you report to anyone with the Ohio Board of

 4        Pharmacy, that in your view, a large number of

 5        pharmacists at CVS, Rite Aid, Walgreens, Walmart,

 6        and Giant Eagle violated their corresponding

 7        responsibility based on your review of aggregate

 8        data?

 9            MR. ELSNER:  Objection.

10  A    Knowing the workings of the state boards of

11        pharmacy, sir, the answer is no, because I'm not

12        sure whether or not the Ohio Board of Pharmacy took

13        action against these pharmacists or has them under

14        investigation.  And I defer to the Ohio Board of

15        Pharmacy.

16            If I'm presented with information to that

17        extent, then it would be my responsibility to

18        report those pharmacists and those companies to the

19        Ohio Board of Pharmacy.

20     BY MR. GISLESON:

21  Q    The Ohio Board of Pharmacy does inspections of

22        pharmacies in Lake and Trumbull County, correct?

23  A    Yes, sir.

24  Q    And they have the ability as part of those

25        inspections to look at a pharmacy's dispensing
```

Page 440

1          system, correct?

2                MR. ELSNER:  Objection.

3     A    Yes, sir.

4       BY MR. GISLESON:

5     Q    In fact, isn't it true that the Ohio Board of

6          Pharmacy must approve any dispensing system used by

7          a pharmacy in Ohio?

8                MR. ELSNER:  Objection.

9     A    I believe that was a requirement at one time.  I'm

10         not sure if it still is, but yes, sir.

11      BY MR. GISLESON:

12    Q    As part of your role as executive director of the

13         NABP, did the NABP at any time ever instruct the

14         Ohio Board of Pharmacy or advise the Ohio Board of

15         Pharmacy that it should review a pharmacy's

16         dispensing system to determine whether it analyzes

17         data to identify patterns of diversion?

18               MR. ELSNER:  Objection.

19    A    We're talking about different systems here, sir.

20         So if I can clarify, in a pharmacy, there are

21         numerous systems that the pharmacist has available.

22         There's a dispensing system that may focus on

23         processing a prescription and adjudicating the

24         claim.  And then there's a DUR process, patient

25         profile process, and other patient information.

1        NABP did instruct the Ohio Board of Pharmacy

2        through the model practice act as to what those

3        requirements should be in total.  And then as we

4        went through with the prior attorney, what the

5        automated systems needed to document, but did not

6        say it had to be specific to dispensing, but it had

7        to be available, readily available to the

8        pharmacists to make a determination on each

9        individual prescription, sir.

10     BY MR. GISLESON:

11  Q    Is there an average in the pharmacy industry for

12       how long a pharmacist should take to fill a

13       controlled substance prescription?

14  A    Not that I'm aware of, sir.

15  Q    Is there an average in Ohio for how long it should

16       take a pharmacist to fill a controlled substance

17       prescription?

18          MR. ELSNER:  Objection.

19  A    Not that I'm aware of, sir.

20     BY MR. GISLESON:

21  Q    Have you ever analyzed as part of your work in this

22       case, how long a pharmacist working for one of the

23       chain pharmacies should take to evaluate a

24       prescription for a controlled substance to

25       determine whether it has a legitimate medical

Page 442

1     purpose?

2         MR. ELSNER:  Objection.

3  A    The analysis that I've done is that depending upon

4         each prescription, that time could vary, just like

5         other medications, if it's a complicated situation,

6         it could take longer than less than a situation

7         that may not be as complicated.

8     BY MR. GISLESON:

9  Q    I understand that you take issue with the chain

10        pharmacies' policies that they had.  Did you do

11        anything to investigate the knowledge that any of

12        the pharmacists for the chain pharmacies had that

13        was independent of any policies or training that

14        they received from the chain pharmacies?

15        MR. ELSNER:  Objection.

16  A    Again, Mr. Gisleson, I'm having a little trouble

17        understanding the question.

18        Can you rephrase it or help me so I can better

19        answer it?

20     BY MR. GISLESON:

21  Q    Sure.

22        Did you make any effort to determine what

23        information or knowledge the pharmacists who worked

24        for the chain pharmacies in Lake and Trumbull

25        County had about evaluating controlled substance

Page 443

1        prescriptions that was separate and apart from any

2        information they learned from the chain pharmacies?

3            MR. ELSNER:  Objection.

4    A    No, sir.

5      BY MR. GISLESON:

6    Q    Did you review Rite Aid's computer-based training

7        they provided to pharmacists?

8    A    If it was included in the policies and procedures,

9        then the answer was yes, sir.

10   Q    All of it?

11   A    Again, I reviewed all the policies and procedures

12       that were provided to me for Rite Aid.

13   Q    Can you identify any pharmacist in either Lake

14       Trumbull County who filled a prescription for an

15       opioid medication with actual knowledge that the

16       prescription lacked a legitimate medical purpose?

17   A    I can answer that any pharmacist that filled a

18       prescription that had an unresolved red flag

19       knowingly and willfully filled that prescription

20       and had knowledge that it was not for a legitimate

21       medical purpose until it was resolved, and that

22       knowingly and willingly, that has been a guidance

23       issued by the DEA and is says that ignorance or not

24       knowing does not negate the fact that the

25       pharmacist should have known that that was a red

Page 444

1        flag and should have been resolved.

2    Q   And the only basis you have for identifying whether

3        a pharmacist knowingly and willfully filled a

4        prescription with an unresolved red flag is that

5        you have not seen any documentation showing that

6        the red flag or red flags were resolved; is that

7        right?

8    A   No, sir.

9            MR. ELSNER:  Objection.

10   A   The other two data points are the significant

11       number of prescription opioids that were

12       distributed in Lake and Trumbull County and the

13       number of opioid and prescription drug overdoses in

14       those two counties that point to the fact that

15       there was significant number of prescriptions

16       written for nonlegitimate purposes.

17     BY MR. GISLESON:

18   Q   For the overdoses in Lake and Trumbull County, did

19       you do any investigation to determine whether the

20       individuals who overdosed obtained those

21       prescription medications from one of the chain

22       pharmacies in this case?

23   A   Not specifically, sir.

24   Q   Even generally?  Do you have any evidence that even

25       a single person who overdosed in Lake and Trumbull

1     County obtained the prescription opioid medication

2     from one of the chain pharmacies in this case?

3         MR. ELSNER:  Objection.

4   A   Not specific to a person, but again, the data

5     indicate that with that many prescriptions that the

6     chains were distributing and if the -- in the

7     chains, the industry numbers say dispensed 70 to

8     80 percent of all prescriptions, that would

9     indicate to me that at least one person or more

10    received a prescription from a chain pharmacy in

11    those two counties.

12   BY MR. GISLESON:

13   Q   So that's an inference that you are drawing,

14     correct?

15   A   It's an inference based on hard data that the

16     industry is well aware of and has been tested and

17     analyzed as well.

18   Q   Now, you also reference a significant number of

19     opioid medications that were dispensed in Lake and

20     Trumbull County.  Did you do any investigation as

21     part of your work in this case what an appropriate

22     and reasonable quantity of opioid medications was

23     to be dispensed and consumed in Lake and Trumbull

24     Counties?

25         MR. ELSNER:  Objection.

1   A    Yes.  Based upon the quantities of medication that

2        were identified as excessive, what would be an

3        appropriate amount of prescriptions in those two

4        counties would be what the recommended doses would

5        be for a legitimate medical condition, but I did

6        not have that information, sir, because I didn't

7        have documentation to determine how many of those

8        prescriptions actually the red flags were resolved.

9     BY MR. GISLESON:

10  Q    So you believe that the quantities of medication

11       for pain that were dispensed were excessive, but

12       you can't identify what, in your view, is not an

13       excessive amount, or is an appropriate amount for

14       Lake and Trumbull County?

15       MR. ELSNER:  Objection.

16  A    I could, sir, if I had the data that indicated to

17       me which one of those prescriptions that were

18       filled for an excessive amount of prescriptions

19       were actually legitimate.  That would allow me to

20       calculate what that appropriate amount of opioids

21       should be for those two counties for legitimate

22       pain management medications.

23    BY MR. GISLESON:

24  Q    You have not performed that work, correct?

25       MR. ELSNER:  Objection.

1  A   The data hasn't been made available to me, so I

2      have not, sir.

3    BY MR. GISLESON:

4  Q   Does the Ohio Board of Pharmacy to your knowledge

5      analyze OARRS data to identify prescribers issuing

6      prescriptions without a legitimate medical purpose?

7        MR. ELSNER:  Objection.

8  A   My understanding of the OARRS data, sir, is that

9      the Ohio Board of Pharmacy analyzing red flags

10     associated with prescribers and then sends the

11     letters to those prescribers when they've

12     identified problems or other red flags that OARRS

13     has identified for those prescribers.

14   BY MR. GISLESON:

15  Q   Did the NABP also instruct the Ohio Board of

16     Pharmacy to send copies of those letters to the

17     pharmacies who were filling prescriptions for those

18     prescribers so they know that the Ohio Board of

19     Pharmacy has a concern about specific opioid

20     prescribers?

21  A   NABP has no authority or control over the Ohio

22     Board of Pharmacy and OARRS, so that decision would

23     have been left to the Ohio board and how they

24     thought best to manage the registrants and

25     licensees in Ohio.

Page 448

```
 1   Q    To your knowledge as a former executive director

 2        for NABP, did the Ohio Board of Pharmacy, in fact,

 3        notify any pharmacies in Lake and Trumbull County

 4        of prescribers for whom the board of pharmacy had

 5        concerns?

 6   A    I'm not aware of that information, sir.

 7   Q    Did you speak with any doctors in Lake or Trumbull

 8        Counties about prescribing practices in those

 9        counties?

10   A    No, sir.

11   Q    Did you do any investigation of what the medical

12        standard of care was in those counties for

13        prescribing opioid medications?

14   A    No, sir, but I don't understand why the standard of

15        care would be different in Lake and Cook County

16        than the rest of the country, so I assume it would

17        be the same standard of care, but I did not do an

18        analysis of that, sir.

19   Q    Are you aware, then, that throughout the country,

20        including in Ohio, and specifically Lake and

21        Trumbull County, there was an increase in

22        prescribing of prescription opioids --

23             MR. ELSNER:  Objection.

24      BY MR. GISLESON:

25   Q    -- over time?
```

Page 449

1   A    Yes, sir.

2   Q    Is it your view that prescribers exercise their own

3        professional judgment in deciding whether or not to

4        prescribe an opioid medication?

5   A    It's my understanding, but it's also my

6        understanding that prescribers engage in diversion

7        as well.

8   Q    Did you report any prescribers in this case to the

9        Ohio board of medicine?

10            MR. ELSNER:  Objection.

11  A    Again, sir, I didn't have access to identifiable

12       information, but if that information becomes

13       available and it would be my responsibility to

14       report those practitioners to the medical board.

15     BY MR. GISLESON:

16  Q    Did the NABP at any point while you were executive

17       director ever provide guidance to the Ohio Board of

18       Pharmacy on when a pharmacy should entirely refuse

19       to fill a particular prescriber's prescriptions for

20       opioid medications?

21  A    The guidance we talked about earlier with the model

22       act and the ability of the pharmacist to exercise

23       their independent judgment.  And once that judgment

24       was made such as not to fill prescriptions, that

25       there be supporting data to affirm that and data

Page 450

1      available to the pharmacist to make that decision

2      the guidance was yes, in that regard.

3   Q   How many prescribers in your view should Rite Aid

4      have blocked from having their prescriptions filled

5      at Rite Aid pharmacists in Lake and Trumbull

6      Counties?

7          MR. ELSNER:  Objection.

8   A   Every prescriber that Rite Aid identified was

9      issues prescriptions for nonlegitimate purpose

10      based upon the data available to the corporation

11      and the input from the pharmacist, every one of

12      those prescribers should have been blocked by Rite

13      Aid.

14     BY MR. GISLESON:

15   Q   And it's your view -- strike that.

16          Is it your view that once a prescriber in Lake

17      or Trumbull County issued one opioid medication

18      prescription without a legitimate medical purpose,

19      then that means that all of that prescriber's

20      opioid prescriptions are invalid and illegitimate?

21   A   No, sir.

22   Q   Do you agree that a prescriber can write some

23      prescriptions without a legitimate medical purpose,

24      while at the same time writing other prescriptions

25      that do have a legitimate medical purpose?

Page 451

1          MR. ELSNER:  Objection.

2     A    I agree that that could occur, but it doesn't make

3          any sense to me, sir.  So why a physician or

4          prescriber would want to write prescriptions for a

5          nonlegitimate purpose jeopardize their license and

6          jeopardize that patient's life.  So yes, it can

7          happen.  But there's no logical speculation as to

8          why it should happen.

9        BY MR. GISLESON:

10    Q    Can you identify any prescriber in Lake or Trumbull

11         County who intentionally issued opioid

12         prescriptions knowing that they lacked a legitimate

13         medical purpose?

14          MR. ELSNER:  Objection.

15    A    Again, absent the individual data, I cannot do

16         that, sir.

17        BY MR. GISLESON:

18    Q    Did you identify any guidance that the NABP issued

19         to any state board of pharmacy identifying a

20         formula or methodology to determine how many red

21         flag prescriptions will result in diverted opioid

22         medications?

23          MR. ELSNER:  Objection.

24    A    The only guidance that we provided, sir, was

25         information from the DEA that said that the more

Page 452

1      red flags a prescription has and based upon the

2      individual red flag, then the potential or

3      possibility of diversion is related to that and it

4      could increase exponentially.

5    BY MR. GISLESON:

6  Q   Are you aware of any formula or methodology used in

7      the pharmacy industry or practice that allows a

8      determination of the number of diverted

9      prescriptions based on the number red flagged

10     prescriptions?

11  A   Yes, sir.

12  Q   What's that?

13  A   I can't remember the exact time, but there was an

14     emergency room physician in Ohio that developed a

15     program called NARxCHECK.  NAPB purchased

16     NARxCHECK, and what does NARxCHECK does, it looks

17     at the red flags of a patient and prescriber, such

18     as how many pharmacies that patient has visited,

19     how many prescribers the MMEs of controlled

20     substances, and generates a score for that patient

21     very similar to what the score would be as a credit

22     score.

23         And the higher the score, the more potential

24     for diversion that would occur, and that program is

25     available to any pharmacy and any pharmacist.  And

Page 453

1    in fact, the defendants -- some of the defendants

2    in this case actually use NARxCHECK as an algorithm

3    to help detect red flags and help detect diversion

4    as well.

5  Q    Any other formulas or methodologies you can

6    identify?

7  A    Not specifically beyond NARxCHECK, sir.

8  Q    Did you do any investigation, whether pharmacies

9    who the counties didn't sue, were filling

10    prescriptions for opioid medications without a

11    legitimate medical purpose?

12  A    The scope of the lawsuit was outside of my

13    expertise.  I was simply asked to look at

14    corresponding responsibility red flags.  How the

15    lawyers handled that and proceeded, I had no

16    information, access, or input into that, sir.

17  Q    Did you have any understanding as to how many

18    opioid pills pharmacies other than the chain

19    pharmacies in this case dispensed between 2006 and

20    2020?

21        MR. ELSNER:  Objection.

22  A    In Ohio or nationwide?  The answer --

23    BY MR. GISLESON:

24  Q    I'm sorry, Lake and Trumbull Counties.

25        MR. ELSNER:  Objection.

Page 454

1    A    No, sir.

2      BY MR. GISLESON:

3    Q    Do you know whether any opioid medications were

4         illegally being sold in Lake and Trumbull Counties?

5             MR. ELSNER:  Objection.

6    A    My scope was to look at the red flags corresponding

7         responsibility.  I did not look at that factor,

8         sir.

9      BY MR. GISLESON:

10   Q    Now, you say the dispensing data should have been

11        reviewed by each chain pharmacy to identify

12        patterns of diversion.  Did you identify patterns

13        of diversion in this case based on your review of

14        the aggregate dispensing data?

15            MR. ELSNER:  Objection.

16   A    I identified red flags that indicated the potential

17        for diversion based on the aggregate data, sir.

18   Q    Right.  But you reviewed dispensing data.  Based on

19        your review of that dispensing data, did you

20        identify any patterns of diversion?

21            MR. ELSNER:  Objection.

22   A    For the sample of dispensing data provided to me by

23        each of the defendants, yes.

24      BY MR. GISLESON:

25   Q    What was the pattern?

Page 455

1        MR. ELSNER:  Objection.

2   A    There were different patterns that existed.  They

3        were patients that were receiving duplicative

4        therapy or combinations.  There were patients

5        receiving the same medications, pattern

6        prescribing.  So in the limited sample, I was able

7        to identify those red flags and those patterns.

8     BY MR. GISLESON:

9   Q    So in your view, once a pharmacy identifies what it

10       considers to be a pattern of diversion for a

11       particular patient or a particular prescriber, the

12       pharmacist then should refuse to fill a

13       prescription presented by a patient?

14       MR. ELSNER:  Objection.

15  A    It's my opinion, sir, that once the pharmacist

16       identifies a red flag and a pattern of red flags,

17       it's the pharmacist's responsibility to resolve

18       those red flags.  If they cannot resolve those red

19       flags, and they understand that diversion is

20       occurring, then until that matter is addressed by

21       either reporting that prescriber to the medical

22       board and DEA, or alerting local authorities that

23       the patient is diverting medications and having

24       them investigate, then the pharmacist should not

25       fill prescriptions from that prescriber, nor

Page 456

1              dispense controlled substances to that patient.

2         BY MR. GISLESON:

3    Q    And exercising a pharmacist's corresponding

4         responsibility, is it your view that a pharmacist

5         should refuse to fill a prescription solely because

6         the pharmacy identified a potential pattern of

7         diversion associated with either the patient or the

8         prescriber?

9    A    Until the pharmacist has resolved what those issues

10        were for the red flags and is assured that the

11        patient is not abusing or diverting those

12        medications, which then goes outside of the system

13        and kills people, until that's resolved, the answer

14        is yes, sir.

15   Q    Okay.  So in your view, then, a pharmacist upon

16        receiving information from the pharmacy about a

17        potential pattern of diversion can include that

18        information among the mix of facts and

19        circumstances on which the pharmacist relies?

20             MR. ELSNER:  Objection.

21   A    Yes, sir.

22        BY MR. GISLESON:

23   Q    And in your view, depending on the pharmacist's

24        exercised professional judgment, it still may be

25        appropriate to fill that prescription for a

Page 457

1        particular patient, true?

2    A   In some cases, sir.

3    Q   Yes?

4    A   Yes, in some cases.

5    Q   Do you believe that the DEA could identify patterns

6        of diversion from OARRS data?

7           MR. ELSNER:  Objection.

8    A   I can't speak for the DEA, but I can tell you that

9        I've identified patterns of diversion from the

10       OARRS data and other PDMP programs.

11    BY MR. GISLESON:

12   Q   You refer in your report to Rite Aid's 2009

13       settlement with the DEA.  Did you actually read

14       that DEA settlement agreement?

15   A   Again, just so we're on the same page, is there a

16       specific page in my report?  I just want to make

17       sure I'm understanding you correctly.

18   Q   55 to 56.

19   A   Thank you, sir.  Are you referring to the bottom of

20       page 56, stepping into 2009?

21   Q   That sounds right.

22   A   Yes, sir, I did review that.

23   Q   Okay.  So that you knew and you know that that

24       settlement agreement did not involve the State of

25       Ohio, correct?

1           MR. ELSNER:  Objection.

2     A     I don't recall, but I would say until I have a

3           chance to review that, I can't say definitively.  I

4           read it, reviewed it, but I can't recall all the

5           facts, sir.

6       BY MR. GISLESON:

7     Q     Do you know who Janet Hart is?

8     A     Yes, I do, sir.

9     Q     What role does she have at Rite Aid?

10          MR. ELSNER:  Objection.

11    A     I know that she's involved in compliance or

12          operations and that she was one of the witnesses

13          deposed in this matter.

14      BY MR. GISLESON:

15    Q     Was she ever the -- did she ever -- strike that.

16          Did she ever have any -- strike that.

17          Did Janet Hart ever have a role in the

18          Pennsylvania Board of Pharmacy?

19    A     Yes, sir.

20    Q     What was her role?

21    A     As various times she served as member and at

22          certain points she was actually president of the

23          Pennsylvania board.

24    Q     Did you ever discuss with her Rite Aid's practices

25          for dispensing opioid pain medications?

Page 459

```
 1   A    Yes.

 2            MR. ELSNER:  Objection.

 3     BY MR. GISLESON:

 4   Q    Did you ever tell Janet Hart, whether in writing or

 5        orally in a conversation, that Rite Aid's

 6        pharmacists had to document the resolution of red

 7        flags for controlled substance prescriptions?

 8   A    As part of a conversation involving Rite Aid's

 9        practices, yes.

10   Q    When?

11   A    When Rite Aid was instructed by -- or taken to task

12        by the boards of pharmacy for the red, white, or

13        15-minute rules that created significant

14        controversy, and discussions with Janet Hart and

15        others from Rite Aid, the whole question of how

16        long it takes to fill a controlled substance, how

17        the pharmacists were being unduly pressured to

18        respond to those metrics, and how it was important

19        that the pharmacist document those situations and

20        have the time to document it was part of that

21        discussion, sir.

22   Q    Were those discussions in writing in any way?

23   A    They were verbal, but I believe if you go back and

24        check the minutes of the boards that took action

25        against Rite Aid or raised a complaint, that Janet
```

Page 460

```
 1        Hart and others from Rite Aid spoke to that.
 2             And I know for a fact that the boards of
 3        pharmacy raised those various issues in those
 4        public discussions and recorded meetings.
 5   Q    And the issue was the amount of time -- strike
 6        that.
 7             The issue was any time guidelines or
 8        requirements for filling a prescription?
 9             MR. ELSNER:  Objection.
10   A    There were several issues, corporate pressure on
11        pharmacists to fill those prescriptions in an
12        amount of time, not having enough time to perform
13        the due diligence, not documenting what was
14        occurring and pharmacists feeling that because of
15        that, they were dispensing prescriptions they
16        shouldn't dispense, but if they didn't dispense
17        them, that they would be fired by the corporation.
18     BY MR. GISLESON:
19   Q    Did you speak with any Rite Aid pharmacists to
20        express the view that they might be fired if they
21        didn't dispense a controlled substance?
22             MR. ELSNER:  Objection.
23   A    Yes, sir.
24     BY MR. GISLESON:
25   Q    Do you know the names?
```

Page 461

1    A    No, sir.

2    Q    So you would expect Janet Hart, then, to know what

3         guidance the NABP was providing to state boards of

4         pharmacy concerning whether it was necessary to

5         document the resolution of red flags?

6    A    I would expect that Janet Hart, because she's a

7         very knowledgeable person, would know in general

8         what NABP's recommendations were.  But she would be

9         looking at Pennsylvania and incorporating NABP, but

10        I would not expect her to have the same knowledge

11        that I do or somebody that was a staff person or

12        member of the board of directors of NABP to have,

13        sir.

14   Q    Did you at any point tell the Pennsylvania Board of

15        Pharmacy that Janet Hart should not be on the board

16        of pharmacy or its president?

17   A    NABP would never do that, sir, and I would never do

18        that personally, so the answer is no.

19   Q    Do you believe that Janet Hart gave any

20        instructions to Rite Aid pharmacists to fill

21        prescriptions for opioid pain medications even if

22        they lacked a legitimate medical purpose?

23             MR. ELSNER:  Objection.

24   A    I would have no way to answer that question, sir.

25        I don't know what Janet Hart said to pharmacists

Page 462

1            and Rite Aid, or what she would be instructed to

2            say to pharmacists in her role.

3        BY MR. GISLESON:

4    Q    Was there anyone else at Rite Aid with whom you had

5            a discussion whether Rite Aid pharmacists had to

6            document resolution of red flags?

7    A    Former employee of Rite Aid, Michael Podgurski.

8    Q    What position did he have?

9    A    I believe he was at one time, Janet Hart's boss.

10   Q    What was that discussion?

11   A    Same discussion as with Janet Hart.

12   Q    Anything different or in addition?

13   A    I think there was pretty extensive discussion and

14           pretty significant.

15   Q    When did that discussion secure?

16   A    Again, right after Rite Aid was taken to task by

17           the state boards of pharmacy for its imposition of

18           metrics to fill prescriptions in a certain amount

19           of time, sir.

20   Q    Did you do any analysis of Rite Aid's staffing at

21           its pharmacies in Lake or Trumbull Counties?

22   A    No, sir.

23   Q    Did you do an analysis of staffing at any other

24           chain pharmacy in Lake or Trumbull County to

25           determine whether that staffing was adequate?

Page 463

1   A    No, sir.

2   Q    Did you do any analysis for any chain pharmacy in

3        this case to determine whether any time limits or

4        time guarantees relating to filling opioid

5        prescription medications interfered with their

6        exercise of corresponding responsibility?

7   A    I'm sorry.  Did you say other pharmacies outside of

8        Rite Aid?

9   Q    Any pharmacies.  Any of the chain pharmacies in

10       this case.  Did you do any analysis to determine

11       whether any time limits or time guarantees relating

12       to filling opioid medications interfered with their

13       exercise of corresponding responsibility?

14  A    The analysis was information that NABP and I

15       received firsthand from pharmacists in those

16       chains, information from the American Pharmacists

17       Association, which is included in my report, and

18       then the resolution passed by the members of NABP

19       that asked NABP to look at the situation because of

20       reports state boards of pharmacy were hearing that

21       those metrics were interfering with the

22       pharmacists' ability to conduct their due

23       diligence.

24  Q    Can you identify any prescription listed among your

25       flagged prescriptions for which a pharmacist failed

Page 464

```
 1         to clear a red flag because that pharmacist was

 2         under time pressure?

 3             MR. ELSNER:  Objection.

 4   A   I can't identify individual prescriptions but,

 5         again, my report talks about the impact that had

 6         based on the aggregate data.

 7      BY MR. GISLESON:

 8   Q   Is it true that when the Ohio Board of Pharmacy

 9         does an inspection of a pharmacy in Lake or

10         Trumbull County, that one of the issues that's

11         evaluated is staffing levels?

12   A   I don't know if that's restricted to just Lake and

13         Trumbull County, sir.  I think it's a metric that

14         they look at all pharmacies.

15   Q   All pharmacies throughout Ohio?

16   A   I believe so, sir.

17   Q   Do you also understand that the Ohio Board of

18         Pharmacy, when doing an inspection, also evaluates

19         whether improper dispensing occurred?

20   A   I'm not specifically aware, but believe that would

21         be one of the tenets, again, that the board of

22         pharmacy would look at.

23   Q   Does the board of pharmacy also look at whether

24         pharmacists for a particular pharmacy have access

25         to OARRS to request reports when needed?
```

Page 465

```
 1   A    I believe in 2011 and then in 2015, when OARRS

 2        became mandatory first for certain drugs, and then

 3        for certain drugs with red flags, and then for

 4        certain drugs identified by the board of pharmacy,

 5        since that was a mandate and a requirement that the

 6        Ohio Board of Pharmacy would have looked for that,

 7        sir.

 8   Q    When was the first time that NABP advised the Ohio

 9        Board of Pharmacy that it should be mandatory for

10        pharmacists in Ohio to check OARRS with respect to

11        every single prescription for opioid medications

12        that are presented to the pharmacist?

13            MR. ELSNER:  Objection.

14   A    NABP made that recommendation to all states beyond

15        Ohio that the PDMP should be utilized for all

16        controlled substances prior to dispensing, and that

17        prescribers should also be mandated to check the

18        PDMP.  And that might have been right at the

19        beginning of PDMP's -- when they were first

20        initiated, but I can't recall the specific dates,

21        sir.

22     BY MR. GISLESON:

23   Q    So was that sometime around 2011?

24   A    Again, it was early on in the PDMPs.  I'm not sure

25        if it was 2010, 2011 or so.
```

Page 466

1   Q   Did Ohio follow the recommendation that the NABP

2       made?

3   A   I believe in 2011 they mandated it for

4       prescriptions with red flags, and then I believe in

5       2015 they mandated it for all drugs designated by

6       Ohio.

7   Q   Were the pharmacies in Lake and Trumbull County and

8       the rest of Ohio required to comply with the

9       requirements of the Ohio Board of Pharmacy and Ohio

10      law or with NABP's views as to how things should

11      be?

12          MR. ELSNER:  Objection.

13  A   Of course, only Ohio law.  NABP is not a government

14      agency and has no authority over pharmacists,

15      pharmacies, or state boards of pharmacy.

16          MR. GISLESON:  Those are the questions I have.

17      Thank you, Mr. Catizone.  Josh?

18          THE WITNESS:  Thank you, sir.

19          MR. KOBRIN:  Let's go off the record real

20      quick.

21          THE VIDEOGRAPHER:  We are off the record at

22      10:32 a.m.

23          (A recess was taken.)

24          THE VIDEOGRAPHER:  This is Media Number 3 in

25      the deposition of Carmen Catizone.  Today is

Page 467

1       June 16th, 2021.  We're going back on the record at

2       10:48 a.m.

3    CROSS-EXAMINATION

4      QUESTIONS BY JOSHUA KOBRIN:

5    Q   Hi, Mr. Catizone.  My name is Josh Kobrin, I

6        represent Giant Eagle.  We're going to primarily be

7        looking at your May 19, 2021, supplemental report.

8        I'll probably refer to that as just the report.

9        Does that sound all right to you?

10   A   Yes, sir.

11   Q   Yesterday during your deposition with Mr. Bush, he

12       asked you some questions about doctor shopping.

13          Do you remember that?

14   A   Yes, sir.

15   Q   And you talked about why you chose two or more

16       prescribers as your metric for doctor shopping.

17          Do you remember that?

18   A   Yes, sir.

19   Q   And you said that was your decision to measure

20       doctor shopping as overlapping days of supply

21       written by two or more prescribers, correct?

22   A   Yes, sir.

23   Q   And I believe part of the reason for that decision

24       was as you stated, quote/unquote, because patients

25       generally use one physician; is that correct?

Page 468

```
 1    A     The data indicated that, sir.
 2    Q     Did the data -- your reason for selecting that
 3          metric was the data indicated that patients
 4          generally use one physician?
 5              MR. ELSNER:  Objection.
 6    A     Yes.
 7      BY MR. KOBRIN:
 8    Q     And your concern here, and this is kind of also
 9          from your report, as you explained in your report,
10          is that:  "A patient presenting a prescription for
11          a controlled substance" -- and I'm reading from
12          your report now on page 35 -- "may be obtaining the
13          same or similar controlled substance from a
14          different prescriber/prescribers, and the patient
15          does not make the prescriber aware of the other
16          prescriber."
17              Did I read that correctly?
18    A     Yes, sir.
19    Q     So given this concern, does the doctor shopping
20          metric that you created for your report here, does
21          it include -- or does it, rather, does it flag
22          prescribers who work together in the same medical
23          practice?
24              MR. ELSNER:  Objection.
25    A     If there's continuity of care and that is
```

Page 469

1          documented as the red flag that that physician is

2          covering for the other prescriber, then it would

3          not be a red flag, but the documentation would

4          verify that, sir.

5       BY MR. KOBRIN:

6    Q    Yeah.  I'm just wondering, your red flags here, the

7          number of red flags here on page 35, does that

8          include doctors who are working together in the

9          same medical practice?

10          MR. ELSNER:  Objection.

11   A    That was the analysis done by Mr. McCann.  I can't

12          answer that, sir.

13       BY MR. KOBRIN:

14   Q    Was that intended to include doctors who were

15          working together in the same medical practice?

16          MR. ELSNER:  Objection.

17   A    Again, I did not run the numbers or the

18          prescriptions, so I can't answer that, sir.

19       BY MR. KOBRIN:

20   Q    You instructed Mr. McCann on how to identify these

21          prescriptions, didn't you?

22   A    I identified the red flags, sir, and asked him to

23          run the numbers based upon the red flags.

24   Q    And you wrote this, right?  "The data reveals as

25          follows regarding patient was dispensed opioid

Page 470

1        prescriptions in overlapping days prescribed and

2        were written by two or more prescribers."

3    A   Yes, sir.

4    Q   You wrote that, right?

5    A   Yes, sir.

6    Q   Is that intended to capture doctors who are working

7        together in the same medical practice?

8            MR. ELSNER:  Objection.

9    A   It was intended to identify whether or not there

10       were two different prescribers writing for that

11       that would create duplicative therapy or therapy

12       that was unknown to the other prescriber.

13           So if the best way to analyze the data was

14       simply to include that, I don't know.  That

15       decision was Mr. McCann's decision.

16     BY MR. KOBRIN:

17   Q   So you don't know one way or the other whether that

18       includes doctors who where partnered in a medical

19       practice together?

20   A   Correct.

21   Q   You don't know one way or the other whether that

22       includes a physician prescribing for one patient

23       and a physician's assistant also prescribing for

24       the same patient in collaboration with the

25       physician?

Page 471

1    A    I don't know that, but the way the red flag was set

2         up, there would be no reason for those two to

3         prescribe duplicative therapy that this would

4         identify as well.

5    Q    I think you talked about yesterday that there are

6         situations in which a doctor or practice might

7         change a therapy, you might have a therapy that's

8         overlapping because, one is short-acting and one is

9         long-acting but there are different situations

10        where there might be, correct, duplicative

11        therapies?

12   A    Not so much duplicative, but change in therapy, and

13        that change would be documented in the pharmacists

14        notes and patient record.

15   Q    Would those be flagged in this flag Number 2,

16        doctor shopping in your report?

17            MR. ELSNER:  Objection.

18   A    Again, I can't answer that.  I did not analyze the

19        data, sir.

20      BY MR. KOBRIN:

21   Q    So you just -- what did you tell Mr. McCann to do

22        for this?

23            MR. ELSNER:  Objection.

24   A    I identified the red flags based upon my pharmacy

25        knowledge and experience and asked Mr. McCann to

Page 472

1          identify the prescriptions and total those

2          prescriptions based upon the description I gave of

3          those red flags.

4      BY MR. KOBRIN:

5   Q    And for this red flag metric you just said, any two

6          prescribers?

7   A    It was the information --

8              MR. ELSNER:  Objection.

9   A    -- that's presented there in the report, sir, about

10         different prescribers.

11     BY MR. KOBRIN:

12  Q    That's what you gave him?

13  A    Yes.

14  Q    That one sentence, the data reveals as follows?

15  A    Yes, sir.

16  Q    Did you give him that in a written form?

17             MR. ELSNER:  Objection.

18  A    It was part of my draft report.

19     BY MR. KOBRIN:

20  Q    So you gave him a draft report and then he gave you

21         the numbers to fill in in the chart here?

22             MR. ELSNER:  Objection.

23  A    That was the first report.

24     BY MR. KOBRIN:

25  Q    Is that correct?

1   A    That was the first report, for that first report,

2        that was one of the exhibits.

3   Q    The document that you gave to Mr. McCann was one of

4        the exhibits to the first report?

5   A    No, no.

6             MR. ELSNER:  Objection.

7   A    The first report.

8     BY MR. KOBRIN:

9   Q    Right.  So before he gave you the numbers is what

10       I'm talking about.  Before you came out and you had

11       served any report, what did you give to Mr. McCann?

12            MR. ELSNER:  Objection.

13  A    Mr. McCann received the draft report of what my red

14       flags were and how I described those red flags,

15       sir.

16    BY MR. KOBRIN:

17  Q    Have you produced that draft report that you gave

18       to Mr. McCann, Dr. McCann?

19            MR. ELSNER:  Objection.

20            MR. KOBRIN:  Have you produced that, Mike?

21            MR. ELSNER:  That's actually not correct.  He

22       wasn't given a draft report.  He was given the

23       clauses --

24            MR. KOBRIN:  I don't want you testifying right

25       now.  We don't have time for that right now.  You

1        can clarify that later.

2      BY MR. KOBRIN:

3    Q    The testimony is that he was going to draft a

4         report.  Is that correct, Mr. Catizone?

5    A    No, I don't recall --

6    Q    What did you give Dr. McCann?

7    A    I don't recall, sir.

8            MR. ELSNER:  Objection.

9      BY MR. KOBRIN:

10   Q    You don't recall.

11          Did you give him anything in writing to

12        explain your flags?

13           MR. ELSNER:  Objection.

14   A    I don't recall.

15     BY MR. KOBRIN:

16   Q    You don't recall.

17          How did he know what to do to run these

18        algorithms to flag the proper prescriptions that

19        you aimed to identify?

20           MR. ELSNER:  Objection.

21   A    I don't recall, sir.

22     BY MR. KOBRIN:

23   Q    You don't recall what you gave him, how you

24        instructed him?

25   A    No, sir.

Page 475

1          MR. ELSNER:  Objection.

2       BY MR. KOBRIN:

3   Q    Okay.  Did you do any research on how researchers

4        or academics who study pharmacy science and health

5        administration have defined doctor shopping?

6          MR. ELSNER:  Objection.

7   A    My research would be the references included in the

8        report and then my involvement in cases and work

9        with the DEA, sir.

10      BY MR. KOBRIN:

11  Q    I think you already testified that you didn't do

12       any research on how boards of pharmacy measure

13       doctor shopping, correct?

14         MR. ELSNER:  Objection.

15  A    No, sir.  I didn't.  I didn't testify --

16      BY MR. KOBRIN:

17  Q    Yesterday when -- yesterday when Mr. Bush was

18       asking you questions, I believe you said you were

19       unaware of the Ohio board of pharmacies doctor

20       shopping metric; is that correct?

21  A    That specific metric, sir, yes.

22  Q    In writing this report, then, did you review any

23       documents that defined doctor shopping?

24  A    Yes, sir.

25  Q    And how did they define doctor shopping?

Page 476

1    A    Those documents are included in my references and

2         they defined them as I've indicated my opinion,

3         that's my interpretation and analysis of what

4         doctor shopping is, sir.

5    Q    So you stand by the -- strike that.

6              You rely on the documents stated in your

7         report for their definition of doctor shopping

8         rather than the Ohio Board of Pharmacy's definition

9         of doctor shopping that you were shown yesterday,

10        correct?

11   A    I relied on that information and my experience and

12        the fact that the actual definition of doctor

13        shopping by the Ohio Board of Pharmacy is more than

14        one practitioner, so the Ohio Board of Pharmacy's

15        definition is more stringent than my definition,

16        sir.

17   Q    I'm not sure where that's coming from but we can

18        talk about that later if there's time.  I'm

19        interested as to where you found that.

20             MR. ELSNER:  Objection.

21     BY MR. KOBRIN:

22   Q    So you said you did review some documents that

23        defined doctor shopping.  Let's flip to page 20 of

24        your report real quick.  Section B of your

25        "Controlled Substances," sorry, just before

```
 1        Section 3, the paragraph just above it, the end of
 2        that paragraph.  Do you see where it says -- I'm
 3        going to read from your report:  "As rates of PDMP
 4        participation increased, measures of doctor
 5        shopping and prescribing of certain controlled
 6        substances declined.  The data suggests that PDMP
 7        utilization helps to promote medically warranted
 8        prescribing and dispensing and assists in detecting
 9        possible controlled substance misuse and
10        diversion."
11            Did I read that right?
12   A    Yes, sir.
13   Q    And that's what you wrote in your report, correct?
14   A    Yes, sir.
15   Q    When you say, quote/unquote, measures of doctor
16        shopping, what measures of doctor shopping are you
17        referencing?
18   A    The actual incidence of doctor shopping that would
19        be recorded in the PDMP, sir.
20   Q    Well, what's the metric for doctor shopping in the
21        PDMP?
22            MR. ELSNER:  Objection.
23      BY MR. KOBRIN:
24   Q    What's the measure?
25   A    Sure.
```

Page 478

1           In the 30-some cases that I've reviewed or

2           served as an expert witness, in all those cases

3           I've accessed the PDMP data.  And when you analyze

4           the PDMP data, you look at the number of

5           prescribers and you look at where those prescribers

6           are based, whether they're in the same practice or

7           not, whether or not the patient is going to

8           different practitioners, and so you formulate a

9           metric based upon the PDMP data of how many

10          prescribers that patient is seeing for those

11          medications.  That's the metrics in the analysis,

12          sir.

13     Q    What is doctor shopping based on that analysis?

14     A    Based upon the Ohio Practice Act Rules, it's more

15          than one prescriber prescribing the same controlled

16          substances or controlled substances, and my

17          interpretation that was just written in the report

18          is what I view as the red flags.

19     Q    Okay.  So when you run the report, you didn't

20          actually cite anything -- you didn't actually cite

21          anything in the Ohio practice rules.  You cited an

22          article by the PDMP Center for Excellence article,

23          mandating PDMP participation by medical providers.

24          Do you see that in Footnote 18?

25     A    What page, sir?

Page 479

1    Q    It's the footnote that follows right after the

2         sentence I just read, footnote 18 at the bottom of

3         page 20.

4    A    Oh, okay, yes, sir.

5    Q    You didn't say cite any Ohio practice rules that

6         you allege right now, that you relied upon.  You

7         actually cite this from the article.  Do you know

8         what that article is?

9              MR. ELSNER:  Objection.

10   A    The article that's cited, sir?

11     BY MR. KOBRIN:

12   Q    Yes.

13   A    Yes, I do.

14   Q    Is that one of the articles you relied on to

15        understand how practitioners and others within the

16        industry measure doctor shopping?

17   A    The article didn't -- the article just spoke about

18        doctor shopping and the information contained in my

19        report.  The information from the Ohio medical

20        board came, because yesterday, Mr. Bush represented

21        that the standard in Ohio was five or more based on

22        OARRS reports.  And yesterday evening, I actually

23        reviewed the Ohio practice act and regulations and

24        found out that that was not the case.  That the

25        Ohio board, so therefore, would not have been a

Page 480

1       reference in my report because that information

2       was --

3            (Simultaneous conversation.)

4    A   -- yesterday.

5            MR. KOBRIN:  Move to strike.

6     BY MR. KOBRIN:

7    Q   Is this article what you're relying on for your

8        statement that:  "As rates of PDMP participation

9        increased, measures of doctor shopping and

10       controlled substances declined"?

11           MR. ELSNER:  Objection.

12     BY MR. KOBRIN:

13   Q   What did you rely on to know that fact?

14   A   Sure.

15           That was one of the sources.  The other

16       sources was information from the PDMP programs.

17       NABP operates a steering committee for all of the

18       PDMP programs.  And that steering committee meets

19       with the administrators of all the PDMP programs

20       and all the states once a year.  And at that

21       meeting, that discussion occurred.

22           And people reported that when they utilized

23       PDMP, and provided information on doctor shopping

24       to pharmacists and prescribers, or pharmacists and

25       prescribers accessed, and saw doctor shopping, that

Page 481

1          helped decrease the incidence of that.

2     Q    But you don't know how those people were measuring

3          doctor shopping or the incidence of doctor

4          shopping, do you?

5     A    They were using similar standards, looking at the

6          number of prescribers that I did in my analysis of

7          this situation.

8     Q    Did that article, Footnote 18, use a similar

9          standard as you did in your analysis of this

10         situation?

11    A    Again, it was one of the resources that I utilized

12         and provided more background information.  But my

13         actual analysis came based upon actual PDMP reports

14         that I reviewed and interactions with the PDMP

15         administrators across the country.

16    Q    I'm asking you if the article you cited in support

17         of the statement I read used similar standards as

18         you in measuring doctor shopping.

19    A    I don't recall the specifics of the article.  It

20         was one of the sources I used, sir.

21    Q    All right.  And that's the only article that you

22         cite for that statement, correct?

23             MR. ELSNER:  Objection.

24    A    It's for that statement, but there are other

25         articles cited in the document that reference how

Page 482

1        valuable PDMP is and how they have an impact on the

2        red flags.

3      BY MR. KOBRIN:

4    Q    Did you cite any other articles in your report that

5        measured doctor shopping --

6            MR. ELSNER:  Objection.

7      BY MR. KOBRIN:

8    Q    -- or that you relied on for their measure of

9        doctor shopping?

10            MR. ELSNER:  Same objection.

11    A    I would have to go through the report and check to

12        make sure.  At this point, I can't say

13        definitively, but I'm sure that there were probably

14        other references that I used besides my experience,

15        sir.

16      BY MR. KOBRIN:

17    Q    Right now that's the only one that you cited that

18        we've found, correct?

19            MR. ELSNER:  Objection.

20    A    That's the only one on that page.  I said there are

21        probably others in the report, sir.

22      BY MR. KOBRIN:

23    Q    Okay.  That's the only one that you cite here,

24        correct?

25            MR. ELSNER:  Objection.

1   A    Yes, sir.  Again, for the -- that's the only one on

2        this page, but there are probably other sources of

3        references throughout the document.

4     BY MR. KOBRIN:

5   Q    Do you remember yesterday, Mr. Bush also asked you

6        several questions about drug cocktails?

7   A    I remember some of the discussions, sir, yes.

8   Q    The measure you applied for the opioid and

9        benzodiazepine drug cocktail in Number 5, this is

10       on page 39 of your report, that flagged

11       prescriptions if they were dispensed within 30 days

12       of one another, correct?

13  A    Sorry, what page was that, sir?

14  Q    39.

15  A    Okay.  And what section?

16       MR. ELSNER:  Objection.

17    BY MR. KOBRIN:

18  Q    "Section 5, Drug Cocktail, an opioid and

19       benzodiazepine."

20       I'll just repeat my question for clarity.

21       The measure you applied for the opioid and

22       benzodiazepine drug cocktail at Number 5, that

23       measure flagged prescriptions if they were

24       dispensed within 30 days of one another, correct?

25  A    Is that reference to page 40?

Page 484

1    Q    I'm on page 39.  Are you in your supplemental

2         report?

3    A    Yes.

4    Q    May of 2021?

5    A    But the actual data and table for that appears on

6         page 40.  It says:  "An opioid and a benzodiazepine

7         were dispensed to a patient within 30 days of one

8         another."

9             Is that the reference.

10   Q    Right.  I'm referring to that section, which starts

11        on page 39, but we can look at page 40 if you want.

12   A    I was just trying to find out where you were, sir.

13   Q    That's fair.

14            So that flagged prescriptions if they were

15        dispensed within 30 days of one another, correct?

16   A    Yes, sir.

17   Q    On what basis did you pick 30 days?

18   A    Based upon, again, my review of prior prescription

19        programs, profiles, PDMPs within that time period.

20        It would create that problem noted on page 39, that

21        the combination of an opioid and a benzodiazepine

22        would create an increased risk of respiratory

23        depression because those two drugs would still have

24        the potential to interact during that time frame,

25        sir.

Page 485

1   Q    Did you use 30 days for all the defendants?

2   A    Yes, sir.

3   Q    Is that because you wanted to measure dispensing

4        consistently across all the defendants?

5   A    Yes, sir.

6   Q    Consistency is important, especially when you are

7        comparing red flags in a chart like you do on

8        page 40, correct?

9            MR. ELSNER:  Objection.

10  A    Yes, sir.

11    BY MR. KOBRIN:

12  Q    You don't want to measure dispensing within 20 days

13       for one defendant, 30 days for another, do you?

14           MR. ELSNER:  Objection.

15  A    No, sir.

16    BY MR. KOBRIN:

17  Q    You wouldn't want to do that.

18           So is it your opinion that your metric applied

19       consistently across the data sets provided by all

20       the defendants?

21  A    It would be my testimony that Mr. McCann applied

22       that across all the data sets consistently, yes,

23       sir.

24  Q    And that's your opinion, right, that this metric is

25       being applied consistently across CVS, Walgreens,

Page 486

1    Walmart, Giant Eagle, HPC, and Rite Aid, correct?

2        MR. ELSNER:  Objection.

3    A    Yes, sir.

4      BY MR. KOBRIN:

5    Q    And it's your opinion that if we picked a month

6         during the discovery period, January of 2008, the

7         metric that's being used in this test, this drug

8         cocktail test, that would apply consistently to all

9         defendants in that month, correct?

10        MR. ELSNER:  Objection.

11   A    I can respond again to the prior question.  It

12        would be my expectation and my instruction that it

13        should be applied consistently, whether it's one

14        month or whether it's the total data set, sir.

15     BY MR. KOBRIN:

16   Q    Same for the holy trinity red flag at Number 4 on

17        page 37.  That would also apply consistently across

18        all defendants?

19        MR. ELSNER:  Objection.

20   A    All of the data in the report should be applied

21        consistently, sir.

22     BY MR. KOBRIN:

23   Q    It's an apples-to-apples comparison between one

24        defendant pharmacy and another defendant pharmacy,

25        correct?

1          MR. ELSNER:  Objection.

2     A    Yes, sir.

3       BY MR. KOBRIN:

4     Q    All right.  Near the top of page 47 of your report,

5          you describe the way you measured same hour

6          prescribing.

7              Do you see that?

8     A    Yes, sir.

9     Q    According to your report you wanted this to flag a

10         prescription when:  "An opioid was dispensed to at

11         least three different patients within an hour, and

12         the opioid prescriptions were for the same base

13         drug, strength, and dosage form, and were written

14         by the same prescriber."

15             Did I read that correctly?

16    A    Yes, sir.

17    Q    So the reason you named this flag same hour

18         prescribing, is just that its defining feature,

19         right?  These scripts had to be dispensed to these

20         three patients within an hour of each other, right?

21    A    That was one of the defining factors, sir.  The

22         other was the fact that they would be the same

23         medications, dosages, strengths, and quantities.

24    Q    Did you name this or is that Dr. McCann?  Did you

25         name it "same hour prescribing"?

Page 488

```
 1          MR. ELSNER:  Objection.
 2    A    I'm sorry.  I didn't understand the question.  I
 3          apologize.
 4      BY MR. KOBRIN:
 5    Q    Did you name this, this metric, same hour
 6          prescribing there, did you name it that?
 7          MR. ELSNER:  Objection.
 8      BY MR. KOBRIN:
 9    Q    The other one is same day prescribing and this one,
10          same hour prescribing.  Did you name it same hour
11          prescribing?
12    A    When the data came back in the data run, yes, I did
13          name it that within -- because that's what the data
14          set showed when they ran the data, so I entitled
15          that as well.
16    Q    Did you instruct Dr. McCann on this data run or did
17          he do this and give you the data and tell you what
18          he found?
19          MR. ELSNER:  Objection.
20    A    Mr. McCann ran the data.
21      BY MR. KOBRIN:
22    Q    You didn't give him any instruction on this one?
23    A    I think --
24          MR. ELSNER:  Objection.
25    A    I'm sorry.
```

1    BY MR. KOBRIN:

2    Q    Your answer?

3    A    I said, no, sir.

4    Q    What expertise does Dr. McCann have to decide that

5         any dispensing within an hour is relevant at all to

6         this case?

7             MR. ELSNER:  Objection.

8    A    I think Mr. McCann's expertise is in analysis.  And

9         performing that analysis if other numbers looked

10        interesting or significant to what the original

11        question was, Dr. McCann would present those to me.

12        And I would make a determination of whether or not

13        that information was useful or not, sir.

14    BY MR. KOBRIN:

15    Q    So Dr. McCann formulated this red flag, correct?

16            MR. ELSNER:  Objection.

17    A    No.  He just simply used the red flag that I gave

18        him and did additional analysis to see if there was

19        other data points or data information that would be

20        useful to me.

21    BY MR. KOBRIN:

22    Q    What red flag did you give him that led him to do

23        this analysis?

24    A    The red flag was the pattern prescribing that

25        appears on page 46 that said, look for patients

1     that receive the same medications from the same
2     prescribers in the same quantity strengths and
3     such.  That was the instruction given to him.
4  Q  And he added this one-hour element; is that
5     correct?
6        MR. ELSNER:  Objection.
7  A  In analyzing the data, this information came up,
8     that he asked to me whether it was significant or
9     not, and it helped to clarify or it helped to
10    further explain how prevalent and how significant
11    this red flag was.
12       So I said, "Yes, that would be interesting
13    data.
14   BY MR. KOBRIN:
15  Q  How did he ask you?  Is this a phone conversation,
16    an email, a document he sent you?
17       MR. ELSNER:  Objection.
18  A  The information came to me provided through
19    counsel, so I don't know how that information was
20    provided.
21   BY MR. KOBRIN:
22  Q  But you knew that information was from Dr. McCann?
23  A  Yes.
24  Q  And was that in written form?
25  A  Again, the information was provided to me by

Page 491

1    counsel, so I don't know how it --

2  Q    In written form?  It was provided to you in written

3       form?

4         MR. ELSNER:  Objection.  Do not discuss how --

5         MR. KOBRIN:  If he's relying on this, I think

6       we're going to need to go off the record because

7       we're running out of time and I would like Special

8       Master Cohen to make a judgment on this.

9         Could we go off the record?

10        MS. FUMERTON:  I agree with that.

11        MR. KOBRIN:  We can go off the record.

12        THE VIDEOGRAPHER:  Off the record at

13      11:12 a.m.

14        (A recess was taken.)

15        THE VIDEOGRAPHER:  We're going back on the

16      record at 11:58 a.m.

17   BY MR. KOBRIN:

18  Q    Mr. Catizone, good to see you again.  I just want

19      to clarify the record from where we left off

20      before, if that's okay?

21  A    Yes, sir.

22  Q    Could you -- thank you.  Now I can see you.

23        Just to clarify, your testimony earlier

24      reflected you had some communication with

25      Dr. McCann, through attorneys or otherwise, through

Page 492

1        which you communicated a description of the red

2        flag you wanted him to run on the data, correct?

3    A   Yes, that was a verbal conversation, sir, yes.

4    Q   And Dr. McCann or his staff, through attorneys or

5        otherwise, then provided you with information and

6        data and asked you if it was significant or not,

7        and whether it helped clarify or further explain a

8        red flag, correct?

9            MR. ELSNER:  Objection.

10   A   No, sir, that's where I made a mistake.  If I can

11       explain?

12     BY MR. KOBRIN:

13   Q   Please.

14   A   So in working with legal counsel, I began drafting

15       a report which I referred to as a draft report,

16       that's noted in the invoices that we discussed

17       yesterday.  Whatever conversations, whatever data

18       analysis was conveyed to Mr. McCann was through

19       legal counsel.  I never spoke or interacted with

20       him directly beyond that first phone call.

21           Information then from Mr. McCann was inserted

22       into my draft report by counsel and I reviewed that

23       information through my draft reports, sir.

24   Q   So your understanding was that information was

25       inserted from Dr. McCann into your draft report,

1      which you then edited and integrated into your

2      draft report?

3  A   Yes, sir.

4  Q   And that information, as you previously testified,

5      you understood to be coming directly from

6      Mr. McCann through counsel to you?

7  A   I didn't know where that came from.  I worked

8      directly with counsel.  Whatever conversations

9      occurred or where it came from, I don't know,

10     except I asked for the analysis of my red flags and

11     that was provided to me back by counsel.

12  Q   You previously testified that that information came

13     from Dr. McCann.  Did you have conversations with

14     Dr. McCann about that information?

15  A   No, sir.  And in answering your question, I erred

16     by focusing on the substance in trying to answer

17     the question you were asking.  And I didn't realize

18     that the process was that important to these

19     proceedings.  And so, I misspoke or left out the

20     detail that all of my connections, all of my

21     conversations were directly with legal counsel, and

22     what happened on the other side of that, I have no

23     idea.

24  Q   Mr. McCann was never on those calls with you and

25     legal counsel?

Page 494

1    A    Just the two calls that I referenced yesterday.

2         The first call where I verbally explained what my

3         red flags were, and then a second call after the

4         supplemental data was analyzed.

5             Beyond that, I had no direct contact with

6         Dr. McCann at all, sir.

7    Q    Was one of the things that was inserted into your

8         report, these boxes, where it says "Defendant CVS,

9         Walgreens, Walmart, HBC, Rite Aid" across the top?

10   A    I'm sorry.

11   Q    Were those inserted into your report?

12   A    What --

13   Q    The boxes that you have under each red flag where

14        the first row is "Defendant CVS, Walgreens,

15        Walmart, HBC, Rite Aid," were those boxes inserted

16        into your report?

17            MR. ELSNER:  Objection.

18   A    The data was inserted there and then I made the

19        boxes as part of the format, but the data was

20        provided to me.

21     BY MR. KOBRIN:

22   Q    In what format was the data provided?

23   A    Numbers under the text.

24   Q    So when -- there were just numbers, they weren't in

25        a box, they weren't in a grid?

Page 495

```
 1    A    No, sir.

 2    Q    And those numbers you understood were communicated

 3         by Mr. McCann to counsel to you, correct?

 4              MR. ELSNER:  Objection.

 5    A    That was a direct conversation with counsel, so...

 6      BY MR. KOBRIN:

 7    Q    Well, you understood that Dr. McCann was doing the

 8         numbers crunching for you, correct?

 9    A    That was my understanding, sir.

10    Q    Counsel wasn't doing the number crunching, correct?

11    A    No.  I just replied that I understood that it was

12         Dr. McCann running the numbers, sir.

13    Q    So any numbers that were inserted into your draft

14         reports were from Dr. McCann or his staff, correct?

15    A    That would be the assumption, sir.

16    Q    Did you ever receive any emails that were forwards

17         of emails with Dr. McCann and counsel?

18    A    No, sir.

19    Q    Did you ever see any emails through any means

20         between Dr. McCann and counsel?

21    A    No, sir.

22    Q    Did you have any communications on the phone or

23         otherwise with Dr. McCann's staff?

24    A    No, sir, just the two conversations with Dr. McCann

25         that I've already testified to.
```

1    Q    You never communicated directly or indirectly to

2         your knowledge with anyone on Dr. McCann's staff?

3    A    I have not, sir.  I did not, sir.

4    Q    All right.

5             MR. KOBRIN:  Can we go off the record for a

6         moment?

7             THE VIDEOGRAPHER:  We're going off record at

8         12:03 p.m.

9             (A recess was taken.)

10            THE VIDEOGRAPHER:  We're going back on the

11        record at 12:10 p.m.

12      BY MR. KOBRIN:

13   Q    Mr. Catizone, you worked at a pharmacy, right?  I

14        believe you said you worked at Albertsons in

15        Chicago; is that correct?

16   A    Osco Drug, sir, yes.

17   Q    When you worked there, what dispensing software was

18        the pharmacy using?

19            MR. ELSNER:  Objection; asked and answered.

20   A    I don't recall, sir.

21      BY MR. KOBRIN:

22   Q    PDX?

23   A    I don't recall.

24   Q    You don't recall?

25            Do you know that not all data regarding hour

Page 497

1    and minute actions were collected in that system

2    you used?

3         MR. ELSNER:  Objection.

4  A   I don't recall the system, so I can't answer the

5    question, sir.

6   BY MR. KOBRIN:

7  Q   Do you know generally that not all hour and minute

8    actions -- strike that.

9         Do you know generally that not all actions --

10    strike that.

11         Do you know generally that there's not a

12    record made of the hour and minute that all actions

13    are taken in pharmacy dispensing systems?

14  A   I know in general that the pharmacy system records

15    the actual hour and minutes that a prescription is

16    entered into the system and then also at the point

17    of sale that the hour and minute that that's

18    actually transacted is recorded in the system, sir.

19  Q   When did the leading pharmacy dispensing systems in

20    the market begin adding the hour and minute to the

21    dispensing point of sale transaction?

22  A   That's outside of my expertise, sir.  I'm sorry, I

23    don't know.

24  Q   Do you know how pharmacy dispensing systems work?

25  A   In general, sir, yes.

1    Q    You know that at a certain point they did not

2         capture that hour and minute for the dispense; is

3         that correct, that that was a recent addition in

4         the past ten years or so to the pharmacy dispensing

5         systems?

6    A    I do know that the pharmacy dispensing systems have

7         changed over time and that they went from

8         typewriters to computer systems.  But I'm not sure

9         when those other changes occurred, sir.

10   Q    Do you know whether they collect an hour and data

11        for the time that the sale is done, where the

12        actual tech or pharmacists puts pills in a bottle?

13            MR. ELSNER:  Objection.

14     BY MR. KOBRIN:

15   Q    Do you know that hour and minute when that's

16        collected?

17            MR. ELSNER:  Objection.

18   A    Point of sale is when it's actually rang up, rung

19        up, that is collected.  When the technician puts

20        the medications in the container, that's -- there's

21        not a time that I'm aware of where that's recorded.

22     BY MR. KOBRIN:

23   Q    So there's not a time stamp to show when the fill

24        is done, pills in bottle?

25   A    I think, sir, I'm being confused the sale.  When

Page 499

1           the sale transacts that is recorded, but what the

2           actual --

3      Q    I understand that.

4               I'm talking about the transaction being the

5           fill, when the pills are actually put into the

6           bottle.  I think you understand, as you've stated,

7           that that minute and hour, that is not recorded in

8           the pharmacy dispensing system, correct?

9      A    Yes, sir.

10     Q    If certain hour and minute data was not collected

11          for defendants in this case, did you intend for the

12          same hour prescribing red flag to capture all

13          prescriptions that were from the prescriber and for

14          the same drug, but for which there was no available

15          information about when the opioid was dispensed?

16              MR. ELSNER:  Objection.

17     A    First, I'm not sure of the question.  But what I

18          expected was data analysis of that particular red

19          flag.  Beyond that, I can't comment, sir.

20       BY MR. KOBRIN:

21     Q    Well, did you expect it to pull in all situations

22          in which there was the same drug and the same

23          prescriber but there was no time stamp?

24     A    What I expected is to have data analysis across all

25          defendants for that particular red flag.

1    Q    I think you earlier said that the same hour issue

2         was one of the defining factors of the red flag,

3         correct?

4    A    The primary defining factors were the same drug,

5         same strength, and same dosage.  The time that

6         was -- the time could be another more explicit

7         determinant of that red flag.

8    Q    Well, that's what distinguished it from the same

9         day prescribing, correct, that and the lower number

10        of patients, correct?

11            MR. ELSNER:  Objection.

12   A    Again, I'm sorry, sir.  What do you mean by

13        distinguish --

14     BY MR. KOBRIN:

15   Q    Same hour prescribing was one of your flags and

16        same day of prescribing was one of your flags,

17        correct?

18   A    Yes, sir.

19            MR. ELSNER:  Objection.

20     BY MR. KOBRIN:

21   Q    And the main difference between same hour

22        prescribing and same day prescribing is that in

23        same hour prescribing, it had to be in the same

24        hour, and it only had to be three patients,

25        correct?

1    A    Correct, sir.

2    Q    So you wouldn't have expected that if there were

3         three patients who had the same base drug,

4         strength, and dosage, much like the same day

5         prescribing flag, if you have three patients, same

6         drug, strength, and dosage, but there was no time

7         stamp, did you expect that they would get flagged

8         by the same hour prescribing flag --

9              MR. ELSNER:  Objection.

10     BY MR. KOBRIN:

11   Q    -- just because there was no time stamp?

12   A    They would have gotten flagged, sir, in the prior

13        data field that was listed above that, sir.

14   Q    They shouldn't be flagged in the same hour

15        prescribing sale then, correct?

16             MR. ELSNER:  Objection.

17     BY MR. KOBRIN:

18   Q    They had no hour.

19   A    I think if they weren't part of the data set or

20        didn't have the data to enter the data set, then

21        they probably would not be recorded, sir.  But I

22        can't comment, that was Dr. McCann's analysis.

23   Q    Well, they shouldn't have been in the same hour

24        prescribing.  They should have been in the same day

25        prescribing because they would have met that

Page 502

1       requirement, right?

2            MR. ELSNER:  Objection.

3    A    That would be my assumption as well, sir.

4      BY MR. KOBRIN:

5    Q    Turn to page 51 of your report.  These bullets on

6         page 51, they list defendant and stakeholder

7         policies related to cash payments, right?

8    A    I'm sorry, sir, my 51 doesn't have any bullet

9         points.

10   Q    Sorry.  They are not actual bullets, but it's

11        Walmart, CVS, Walgreens, Rite Aid.  Do you see

12        where I'm looking?

13   A    Yes, sir.

14   Q    I want to focus on the NACDS one, if you could.

15        It's the last one on that list of stakeholder

16        policies and it says that -- it states:

17        "Enforcement actions were nearly 87 percent of a

18        physician's patients were paid case -- I think it

19        means paid -- "cash for their prescriptions and

20        acknowledges that that's a red flag."

21            Do you see that?

22   A    I see that in the document, sir, yes.

23   Q    Why is that 87 percent data point informative?

24            MR. ELSNER:  Objection.

25   A    NACDS put that in there and considered it an

Page 503

```
 1          important reason or an important red flag.  From

 2          the perspective of a pharmacy and pharmacist,

 3          whenever a patient pays something for cash, a

 4          prescription or a visit and they have insurance, is

 5          a red flag asking the question, why would they not

 6          submit this to their insurance, and why are they

 7          paying out of their pocket.

 8      BY MR. KOBRIN:

 9   Q   And 87 percent number, that told you something

10          about the pharmacy and about the prescriber,

11          correct?

12              MR. ELSNER:  Objection.

13   A   Again, sir, I apologize.  I'm not following the

14          question.

15      BY MR. KOBRIN:

16   Q   These are enforcement actions in which 87 percent

17          of a physician's patients paid cash for their

18          prescriptions.  That tells you about, in this case

19          East Main, which I think is a pharmacy, that

20          there's an enforcement action.  It tells you about

21          the physician for whom 87 percent of his patients

22          paid cash, right?

23   A   Yes, sir.

24   Q   It tells you even if the pharmacy in East Main

25          didn't do a ton of business, let's say that they
```

Page 504

```
 1          only dispensed a thousand scripts a day.  Too many
 2          of them are paid in cash, right?  Would you agree
 3          with that?
 4              MR. ELSNER:  Objection.
 5     A    No, sir.  I don't agree with -- maybe I don't
 6          understand the example you're giving.
 7       BY MR. KOBRIN:
 8     Q    87 percent, that's too high a number for someone to
 9          be dispensing for one physician's patients in cash,
10          right, or for one pharmacy to be dispensing all of
11          a product or all of their controls in cash; is that
12          right?
13     A    NACDS said that.  Holiday and East Main said that,
14          so I would say, I would agree with what that is
15          saying, sir.
16     Q    That was what I was going to ask.  Do you agree
17          with that?
18              I think it's fair to say that 87 percent of
19          opioid prescriptions being paid in cash is probably
20          indicative of diversion, correct?
21     A    I would disagree, sir, and say that one
22          prescription could be indicative of diversion.  The
23          percentage is not important when it comes to
24          diversion of a prescription and whether or not that
25          prescription harms a patient.
```

Page 505

1   Q   Well, we would expect to see some cash payments,
2       wouldn't we?
3   A   Yes, sir.  But we're talking about whether or not
4       that cash payment was for a legitimate or not a
5       legitimate prescription.  Any prescription that's
6       not legitimate is diversion and that's concerning
7       whether it's one or a thousand, sir.
8   Q   Right.  But you're using this cash fact or -- as a
9       flag, correct?
10  A   As a flag for the pharmacist to conduct due
11      diligence to ascertain whether or not it was for a
12      legitimate medical order or not.
13  Q   And if you're looking at a pharmacy and the
14      defendants here are pharmacies, what percentage of
15      cash payments for prescriptions constitutes an
16      inappropriate amount?  That's what I'm trying to
17      get at.  If you are judging a pharmacy on whether
18      its dispensed prescriptions are being diverted, I'm
19      just saying, I think it's fair to say that
20      87 percent of opioid prescriptions being paid for
21      in cash is probably indicative of diversion at that
22      pharmacy.
23          Would you agree with that?
24  A   Yes, sir.
25  Q   Would you agree that 50 percent of opioid

1          prescriptions being paid for in cash is also

2          indicative of diversion?

3              MR. ELSNER:  Objection.

4     A    I think, again, when we're looking at percentages

5          and the question that came up earlier about what is

6          significant and what is not, when we're dealing

7          with prescriptions that are not legitimate, that is

8          the concern overall; and whether a pharmacy has

9          50 percent or 87 percent, the fact that there are

10         patients paying for the prescriptions as a red flag

11         needs to be resolved.

12             And, then, how much of that pharmacy's

13         inventory or percentage is information the

14         corporation has, and that the pharmacy should

15         receive so the pharmacist could make a better

16         decision.  But as far as I'm concerned, 1 percent

17         would be significant or one patient if that's not a

18         legitimate prescription.

19       BY MR. KOBRIN:

20    Q    Right.  But we're not -- we don't know if that's a

21         legitimate prescription.  We're using this flag to

22         decide whether we think it's a legitimate

23         prescription, right?

24    A    Correct.  And we take each flag individually and

25         analyze it, and then the pharmacy corporation has

1         to provide data to conduct the larger analysis as

2         to what those percentages might be and whether or

3         not those percentages should be included in the

4         discussion or determination of the pharmacists.

5    Q    So you have no opinion either way whether there's a

6         certain number of a prescriptions at a pharmacy

7         that would be an acceptable level of cash payments

8         for opioid prescriptions?

9    A    My testimony is that cash payments is a red flag

10        and that a pharmacy has to evaluate those cash

11        prescriptions.

12   Q    But we've already established that a certain number

13        you expect would be paid for in cash, I believe you

14        yesterday you that generally only 87 to 90 percent

15        of prescriptions are covered by some form of

16        insurance, correct?

17            MR. ELSNER:  Objection.

18            (Stenographer requested clarification.)

19   A    Yes.

20     BY MR. KOBRIN:

21   Q    You have no opinion as to whether a certain

22        percentage would be an acceptable percentage of

23        cash payments in order to assess the dispensing

24        from a particular pharmacy?

25            MR. ELSNER:  Objection.

1   A    My opinion is that that is one of the factors that

2        the pharmacist looks at to determine whether it's a

3        legitimate prescription.  But the percentage

4        whether it's 10 percent, 20 percent, 80 percent,

5        90 percent, is secondary to the fact that the

6        pharmacist and the corporation make a determination

7        as to whether or not that's a legitimate

8        prescription.

9     BY MR. KOBRIN:

10  Q    What about the fact that you're looking at the

11       number of cash prescriptions in an aggregate?  Does

12       they tell you anything about the defendants in this

13       case?  Shouldn't we be looking at all of these

14       individually?  You're looking at them in aggregate,

15       correct?

16  A    Yes, sir.  What I've commented or testified before

17       is that absent that documentation that would help

18       me realize which prescriptions actually had red

19       flags that were resolved or not, the aggregate data

20       is important to identify that there was a pattern

21       occurring and something that warranted concern

22       because of the number of prescriptions and the

23       number of opioids that were being distributed, sir.

24  Q    But you could assess the whole prescription?  You

25       have all the information about the prescription.

Page 509

1        Short of some PHI, you have the dispensing -- you

2        have the dispensing pharmacist's name, you have the

3        prescriber's name, you are have the dosage amount.

4        You have all that information.  Why can't you make

5        the assessment?

6             MR. ELSNER:  Objection.

7     BY MR. KOBRIN:

8  Q   Why are you only dealing with this in aggregate?

9             MR. ELSNER:  Objection.

10 A    The only data I received in that regard were sample

11       data from the individual defendants, but I did not

12       look at the entire prescription database.

13    BY MR. KOBRIN:

14 Q    So you're saying that you can't judge the percent

15       of prescriptions for any particular opioid that

16       were paid for in cash because every prescription

17       has to be looked at individually, correct?

18             MR. ELSNER:  Objection.

19 A    Let me explain and see if I understand the question

20       correctly, sir.

21             What I'm saying is that the percentages of the

22       red flags that each of the defendants had in regard

23       to what is significant or how many of those were

24       actually red flags, I don't have that

25       information -- I don't have that information absent

Page 510

1       documentation.

2           And as far as I'm concerned in my opinion, the

3       percentage is less important and not as important

4       as the fact that the red flags existed and the red

5       flags were resolved, whether that's 1 percent or

6       99 percent.  The opinion is any red flag, any

7       prescription with red flags should not have been

8       dispensed by the defendants.

9     BY MR. KOBRIN:

10  Q   But you said you need to look at each one

11      individually, correct?  You need to look at each

12      prescription individually?

13  A   In order to substantiate some of the questions that

14      you're asking about the actual percentages and the

15      actual number of prescriptions that were legitimate

16      or not.

17  Q   Well, you listed these pharmacies and I'm saying

18      I'd like to ask for a particular brick and mortar

19      pharmacy.  What percentage of cash prescriptions

20      would be an acceptable amount to be paid in cash?

21      And you're saying you have no opinion about that

22      because things need to be analyzed individually,

23      correct?

24          MR. ELSNER:  Objection.

25  A   I think you're asking two different questions and

Page 511

1       I'll respond to both of them as I understand

2       them --

3     BY MR. KOBRIN:

4   Q   I'm only asking one, sir, if you can answer my

5       question.

6   A   Sure.

7           The industry --

8   Q   I'm saying --

9   A   -- industry data says that the average pharmacists

10      and average pharmacy, that 95 percent of the

11      prescriptions processed are covered by insurance.

12      That's what my testimony is.

13          I'm not saying what percentage that a pharmacy

14      that processes cash would be determined to be

15      diversion or not legitimate.  Because pharmacies

16      could process 10 percent of the prescriptions that

17      are cash, and those 10 percent could all be

18      diverted or not for legitimate purpose as well.

19  Q   And they could all be perfectly acceptable and for

20      legitimate purposes as well, correct?

21          MR. ELSNER:  Objection.

22  A   Correct, sir.  That's why the percentage is there

23      as a guide and that's why it's important to look at

24      all the information.

25          MS. ZINMASTER:  If I may just interject

1        quickly.  Tara lost -- Ms. Fumerton lost audio.

2        Can we go off the record for just a moment?

3            THE VIDEOGRAPHER:  We're going off the record

4        at 12:26 p.m.

5            (A recess was taken.)

6            THE VIDEOGRAPHER:  We're going back on the

7        record at 12:29 p.m.

8            MR. KOBRIN:  I am going to pass the witness

9        and if we have time remaining, I have a couple more

10       questions.  Thanks.

11           MR. ELSNER:  Dr. Catizone, I've got -- do you

12       have another --

13           MR. KOBRIN:  No, I'm sorry.  I meant pass it

14       to Ms. Fumerton.  She's the next questioner.

15           MR. ELSNER:  Oh, I'm sorry.

16           MS. FUMERTON:  Yes.  I'm going to --

17           MR. ELSNER:  That was important to get her

18       back online.

19           MR. KOBRIN:  That was why, we had to get her

20       back on.

21           MR. ELSNER:  I was right.

22           MR. KOBRIN:  I'm sorry.  I assumed that you

23       got that because you were doing it.  Right?

24

25

1   REDIRECT EXAMINATION

2     QUESTIONS BY TARA FUMERTON:

3   Q     Thank you, Josh, and thank you, Mr. Catizone.

4           I'm going to be very brief and so I'm going to

5         ask a series or yes-or-no questions, if you can

6         keep to that, we'll be even briefer.

7           Mr. Swanson, this morning, asked you questions

8         about blanket refusals to fill policies, correct?

9   A     Yes.

10  Q     You understood that Walmart pharmacists have always

11        had the ability to refuse to fill any prescription

12        that they felt was inappropriate for any reason,

13        correct?

14          MR. ELSNER:  Objection.

15  A     Yes.

16    BY MS. FUMERTON:

17  Q     And that meant that Walmart pharmacists could

18        exercise their professional judgment and not fill a

19        single prescription from a prescriber they felt was

20        problematic, correct?

21          MR. ELSNER:  Objection.

22  A     That's my understanding, yes.

23    BY MS. FUMERTON:

24  Q     And Walmart, through its evolution of policies,

25        also began permitting its pharmacists to blanket

Page 514

1      refuse to fill a prescription from certain doctors,

2      correct?

3  A   That, I'm not aware of.

4  Q   Okay.  Well, are you aware that at Walmart the

5      blanket refuse to fill a prescription is a decision

6      that is made by a single pharmacist in their

7      professional judgment to not fill any prescriptions

8      from a particular prescriber without looking at

9      that individual prescription?

10         MR. ELSNER:  Objection.

11  A   That's not my understanding, but I thought you just

12      mentioned earlier that Walmart permitted its

13      pharmacists to do that.  So it would seem that that

14      decision was made based with Walmart's approval.

15      So the corporation approved or allowed pharmacists

16      to do that rather that the pharmacists exercising

17      independent judgment.  But I'm not familiar with

18      that.

19    BY MS. FUMERTON:

20  Q   So regardless, you understood that at any given

21      time if a Walmart pharmacist didn't want to fill a

22      prescription from a particular prescriber for a

23      particular reason, they didn't have to do so,

24      right?

25  A   As long as the reason was justified, yes.

Page 515

1    Q    Are you familiar that Walmart, through its

2         evolution of policies, began centrally blocking

3         prescribers?

4              MR. ELSNER:  Objection.

5    A    No, I'm not familiar with that.

6      BY MS. FUMERTON:

7    Q    Okay.  You did not read the deposition of Walmart's

8         corporate representative Sussane Hiland in this

9         case, correct?

10   A    I can't recall specifically if I did or not.  I

11        know I did read depositions from Walmart, but I

12        can't recall that one specifically.

13   Q    Do you know Ms. Hiland?

14   A    Yes, I do.

15   Q    Do you have a favorable opinion of her?

16             MR. ELSNER:  Objection.

17   A    I don't have an opinion one way or the other.  I've

18        worked with her professionally, but don't have an

19        opinion.

20     BY MS. FUMERTON:

21   Q    And you always found her to be professional,

22        correct?

23   A    In my professional interactions and all of our

24        discussions we were always at the professional

25        level, and I found them to be professional, yes.

Page 516

1    Q    Are you aware that Ms. Hiland testified that

2         Walmart associates had conversations with various

3         boards of pharmacies where those boards took the

4         position that it would be inappropriate for a

5         retail chain pharmacy to centrally block a

6         prescriber?

7              MR. ELSNER:  Objection.

8    A    I don't recall the deposition, but I do know that

9         that were -- that issue was raised, but I'm not

10        sure because of the blanket refusal to -- for one

11        physician.  It was based upon the fact that the

12        entire practice was going to be a blanket refusal

13        and boards of pharmacy had issues with that rather

14        than dealing with an individual prescriber based on

15        information the pharmacy may have.

16      BY MS. FUMERTON:

17   Q    And so I just want to make sure the record is clear

18        and we're not talking past each other.  So in the

19        blanket refuse to fill, it's a pharmacist who is

20        making the decision not to fill any particular

21        prescriptions from a particular prescriber,

22        correct?

23              MR. ELSNER:  Objection.

24   A    That would be my understanding, but you're

25        referring to Walmart having a blanket policy and

```
1        Walmart, so you're suggesting that the corporation
2        made that decision rather than the pharmacist's
3        independent judgment.
4     BY MS. FUMERTON:
5     Q    So what I'm distinguishing between is the
6        pharmacist's decision and then also a corporate
7        block policy or sometimes referred to as the
8        "central block policy" where the corporate entity
9        at home office would make a decision that none of
10       its pharmacists nationwide could fill for a
11       particular prescriber.
12            Are you familiar with that concept?
13    A    I'm not familiar, but I don't understand how that
14       central policy that impacts the pharmacist's
15       individual judgment.
16    Q    That's not my question.
17            Are you familiar with the concept of a
18       centrally blocked prescriber?
19    A    No, I'm not.
20    Q    But you are aware that various boards of pharmacies
21       have concerns about the home office making a
22       decision for the pharmacist as to whether or not
23       the pharmacists could fill a prescription, correct?
24            MR. ELSNER:  Objection.
25    A    That's not my understanding, no.
```

Page 518

1      BY MS. FUMERTON:

2    Q    Well, earlier you just testified that you knew that

3         there were discussions at the boards of pharmacy

4         about this, correct?

5    A    Correct.

6    Q    Are you aware that the Wisconsin pharmacy board has

7         issued an administrative warning to Walmart citing

8         evidence of professional misconduct because

9         Walmart's corporate block policies were deterring

10        pharmacists from exercising their independent

11        clinic judgment?

12            MR. ELSNER:  Objection.

13   A    I'm aware of the case, but I think there was more

14        to it than that.

15     BY MS. FUMERTON:

16   Q    Are you aware that the Idaho board --

17            MR. ELSNER:  Ms. Fumerton, you're out of time.

18     BY MS. FUMERTON:

19   Q    Are you aware that the Idaho board --

20            MS. FUMERTON:  I'm sorry?

21            MR. ELSNER:  The time period has expired.

22        I've given you another minute of latitude, but the

23        time is now expired.

24            MS. FUMERTON:  Are you not going to let me ask

25        some more -- another question?

Page 519

1           MR. ELSNER:  I'll let you finish the question

2       you started, but you've already exceeded your time,

3       so you can ask about the Idaho board if you want.

4       But I'm not going to let you continue down this

5       line of inquiry unlimited.  You've already used

6       your ten hours.

7           MS. FUMERTON:  All right.

8     BY MS. FUMERTON:

9   Q   Are you aware, Mr. Catizone, that the Idaho Board

10      of Pharmacy has also stated that Walmart's

11      directive that certain doctors cannot have -- that

12      Walmart's directive that certain doctors cannot

13      have controlled substance prescriptions filled at

14      Walmart pharmacies and, thereby, not allowing

15      pharmacists to determine what constitutes a valid

16      prescription is preventing pharmacists from

17      fulfilling their legal obligations as a pharmacist

18      from exercising their obligation of corresponding

19      responsibility, which violates 21 CFR 1306.04A?

20          MR. ELSNER:  Objection.

21  A   I'm familiar with that.

22          MS. FUMERTON:  So I would --

23          (Simultaneous conversation.)

24          MS. FUMERTON:  -- counsel were prohibited

25      from -- defendants from asking any further

Page 520

1  questions at this point in time.  I'd like to lodge

2  an objection to the ten-hour limit that was imposed

3  on the pharmacists -- on the pharmacy defendants,

4  given that this is a new expert with an

5  over-100-page report, and five defendants who all

6  had questions that I know they were not able to

7  ask, so...

8   MR. KOBRIN:  Yeah.  I'd like to specifically

9  lodge an objection on behalf of Giant Eagle.  We

10  did not have enough time to ask the questions that

11  we had prepared for today.  Mr. Elsner, you won't

12  let me go back and ask the remaining questions that

13  I have?

14   MR. ELSNER:  No, I won't.  This is an order

15  from Judge Polster with respect to the time, and

16  you've had ample time to ask questions.  If you

17  didn't divide your time equally among counsel, I'm

18  sorry.  That's not my issue or Mr. Catizone's.

19   MR. KOBRIN:  You're not --

20   SPECIAL MASTER COHEN:  Your objections are all

21  noted for the record, and I've also observed, Josh,

22  that you are very good at interrupting the deponent

23  but you're even interrupting cocounsel, and I

24  really urge you to watch that.  You've been

25  stepping on Tara this whole time.

Page 521

1              If you go back and look at the transcript,

2         you'll see that you're interrupting her more than

3         once.

4              So I think that brings things to an end.

5              MR. GISLESON:  Rite Aid shares that objection

6         as well.  I would have asked more questions had the

7         parties been given more time.  The ten hours was

8         inadequate.

9              MR. ELSNER:  I'm sure every lawyer feels that

10        way about every deposition.  I would like to just

11        pause for a minute, I want to make sure there's no

12        issues that we want to clean up in redirect and

13        I'll just go off the record.  I should be able to

14        do that in one or two minutes.

15             MS. FUMERTON:  Okay.  We'll come back.

16             THE VIDEOGRAPHER:  We're going off record at

17        12:38 p.m.

18             (A recess was taken.)

19             THE VIDEOGRAPHER:  We're going back on the

20        record at 12:43 p.m.

21    CROSS-EXAMINATION

22      QUESTIONS BY MICHAEL ELSNER:

23    Q    Mr. Catizone, will you please explain to us what

24        the importance or significance is --

25             MS. FUMERTON:  So Mike --

Page 522

1           MR. ELSNER:  Excuse me?

2           MS. FUMERTON:  So Mike, you are asking

3       questions?  I thought we were going back to find

4       out if you are.  I'm trying to understand what's

5       happening.

6           MR. ELSNER:  I have maybe three questions to

7       ask.  Very brief.

8           MS. FUMERTON:  Okay.  Thank you.

9           MR. ELSNER:  Sorry about that.

10     BY MR. ELSNER:

11   Q   Mr. Catizone, I'm Michael Elsner from the law firm

12       of Motley Rice on behalf of the plaintiffs.  I'm

13       just going to ask you just a few brief questions

14       this afternoon.

15           Mr. Catizone, what is the importance or

16       significance, if any, to a single opioid

17       prescription that presents with a red flag?

18   A   The significance of that is that medication is a

19       very dangerous and harmful medication, and if that

20       red flag is not resolved, and those medications go

21       outside of the system, are diverted, or abused,

22       that patient harm could occur and does occur.

23   Q   So is it your testimony that every single red flag

24       prescription must be resolved before it is

25       dispensed?

Page 523

1   A    My opinion, and also information that's been

2        conveyed to pharmacists by the DEA and boards of

3        pharmacy as well.

4   Q    And what must be done in your opinion with respect

5        to each red flagged opioid prescription?

6   A    The red flag needs to be resolved --

7             MS. FUMERTON:  Object to form.

8   A    The red flag needs to be resolved so that the

9        pharmacist is assured that the prescription is for

10       a legitimate medical purpose and that it won't

11       create harm to the patient.

12     BY MR. ELSNER:

13  Q    And does the resolution of that red flag need to be

14       documented in any way?

15  A    Yes.

16            MR. SWANSON:  Objection.

17     BY MR. ELSNER:

18  Q    What was the answer?

19  A    Yes, it does.

20  Q    And how many of those red flag prescriptions must

21       be resolved and also documented?

22            MS. FUMERTON:  Objection; form.

23  A    Any prescription with a red flag must be resolved

24       and documented.

25     BY MR. ELSNER:

Page 524

1   Q    Okay.  So when you testified earlier that it would

2        be generally significant of 70, 80 percent of red

3        flag opioid prescriptions did not have

4        documentation, was that correct?

5   A    No.

6             MR. SWANSON:  Object to form.  Misstates his

7        testimony.

8      BY MR. ELSNER:

9   Q    What percentage of red flag opioid prescriptions in

10       your opinion must be resolved and documented under

11       the Controlled Substances Act, the Ohio Board of

12       Pharmacy rules, and general pharmacy practice?

13  A    100 percent.

14            MS. FUMERTON:  Objection; form.

15            MR. ELSNER:  I pass the witness.

16            THE WITNESS:  I'm sorry?

17            MR. ELSNER:  I don't have any further

18       questions.

19            MS. FUMERTON:  Are we off the record?

20            THE VIDEOGRAPHER:  We're going off the record

21       at 12:45 p.m.

22            (A recess was taken.)

23            THE VIDEOGRAPHER:  We're going back on the

24       record at 12:49 p.m.

25     BY MR. GISLESON:

1  Q    Mr. Catizone, it's John Gisleson again for Rite

2       Aid.

3            You just testified that a red flag needs to be

4       resolved so that the pharmacist is assured that the

5       prescription is for a legitimate medical purpose

6       and that it won't create harm to the patient.

7            Can you identify a single patient among the

8       aggregate data you identified who, in fact, was

9       harmed as a result in your view of a pharmacist for

10      one of the chain pharmacies not resolving a red

11      flag?

12           MR. ELSNER:  Objection.

13 A    Mr. Gisleson, I can't say that to a specific

14      prescription, but I could say the overall aggregate

15      data in opioid overdoses and deaths would indicate

16      that there were patients that were harmed and

17      actually died from those prescriptions dispensed.

18    BY MR. GISLESON:

19 Q    As an expert in this case, you made no effort to

20      identify a specific patient, included among the

21      aggregate data, who, in fact, was harmed, correct?

22           MR. ELSNER:  Objection.

23 A    I did not perform any analysis to that extent, sir.

24    BY MR. GISLESON:

25 Q    So that when you're asked under oath at trial,

Page 526

1       based on your review of aggregate data, if you can

2       identify a single patient in Lake or Trumbull

3       County among your flagged prescriptions, who, in

4       fact, was harmed, your answer will be no, correct?

5           MR. ELSNER:  Objection.

6   A   If that question is asked, then that would be my

7       answer.

8           MR. GISLESON:  Those are the questions I have.

9       Josh?

10  RECROSS-EXAMINATION

11    QUESTIONS BY JOSHUA KOBRIN:

12  Q   Returning to the red flags you were just testifying

13      about on redirect, why did you choose a distance of

14      25 miles as a red flag metric for the distance

15      patients traveled to visit a prescriber?

16          MR. ELSNER:  Objection; it's beyond the scope.

17          SPECIAL MASTER COHEN:  That's sustained.

18          MR. KOBRIN:  So you're not going to allow me

19      to ask that question, Special Master Cohen?

20          SPECIAL MASTER COHEN:  Right.  That's

21      something that you delved into before and was not

22      asked by Mr. Elsner during the last go-around.

23          MR. KOBRIN:  I'm sorry.  That I delved into

24      before or just that defendants did?

25          SPECIAL MASTER COHEN:  It's beyond the scope

Page 527

1       of Mr. Elsner's questioning.

2           MR. KOBRIN:  Anyone want to ask him any other

3       questions for the defense that they want to ask

4       that are within the scope?

5           We pass then.

6           MR. ELSNER:  Thank you very much.

7           MS. FUMERTON:  And I just -- I think this is

8       on the record --

9           MR. ELSNER:  Can we go off the record?  I

10      think the deposition is closed at this point.

11          THE VIDEOGRAPHER:  We are going off the record

12      at 12:52 p.m.

13

14          FURTHER THE DEPONENT SAITH NOT

15

16

17

                        _____

18                      CARMEN A. CATIZONE, MS, RPh, DPh

19

20

21

22

23

24

25

Page 528

1    STATE OF INDIANA              )

                                   )  SS:

2    COUNTY OF HAMILTON            )

3

4           I, Amy Doman, Stenographic Reporter,

5        Registered Merit Reporter, Certified Realtime

6        Reporter, Certified Shorthand Reporter, Notary

7        Public in and for the County of Hamilton, State

8        of Indiana, at Large, do hereby certify that

9        CARMEN A. CATIZONE, MS, RPh, DPh, the deponent

10       herein, was by me first remotely duly sworn to

11       tell the truth, the whole truth, and nothing but

12       the truth in the aforementioned matter;

13          That the foregoing deposition was taken on

14       behalf of the Defendants, in Mount Pleasant, South

15       Carolina, on Wednesday, June 16, 2021, pursuant to

16       the Federal Rules of Civil Procedure;

17          That said deposition was taken down in

18       stenographic notes and afterwards reduced to

19       typewriting under my direction, and that the

20       typewritten transcript is a true record of the

21       testimony given by the said deponent; and that

22       signature was requested by the deponent and all

23       parties present;

24          That the parties were represented by their

25       counsel as aforementioned.

Page 529

1          I do further certify that I am a disinterested

2      person in this cause of action, that I am not a

3      relative or attorney of either party or otherwise

4      interested in the event of this action, and that I

5      am not in the employ of the attorneys for any

6      party.

7          IN WITNESS WHEREOF, I have hereunto set my

8      hand and affixed my notarial seal this 21st day

9      of June, 2021.

10

11

12

13

14          Amy Doman, RMR, CRR, CSR

15          Stenographic Reporter

16          Notary Public

17

18

19  My Commission Expires:

20  September 30, 2025,

21  Residing in Hamilton County, Indiana

22

23

24

25

```
                                                          Page 530
                              Veritext Legal Solutions
 1                              1100 Superior Ave
                                   Suite 1820
 2                             Cleveland, Ohio 44114
                               Phone: 216-523-1313
 3
 4
     June 21, 2021
 5
     To: Michael E. Elsner
 6
     Case Name: National Prescription Opiate Litigation - Track 3 v.
 7
     Veritext Reference Number: 4628785
 8
     Carmen A. Catizone, MS, RPh, DPh   Deposition Date:  6/16/2021
 9
10   Dear Sir/Madam:
11
     Enclosed please find a deposition transcript.  Please have the witness
12
     review the transcript and note any changes or corrections on the
13
     included errata sheet, indicating the page, line number, change, and
14
     the reason for the change.  Have the witness' signature notarized and
15
     forward the completed page(s) back to us at the Production address
16   shown
17   above, or email to production-midwest@veritext.com.
18
     If the errata is not returned within thirty days of your receipt of
19
     this letter, the reading and signing will be deemed waived.
20
21   Sincerely,
22   Production Department
23
24
25   NO NOTARY REQUIRED IN CA
```

Page 531

```
1              DEPOSITION REVIEW
             CERTIFICATION OF WITNESS
2
   ASSIGNMENT REFERENCE NO: 4628785
3  CASE NAME: National Prescription Opiate Litigation - Track 3
   DATE OF DEPOSITION: 6/16/2021
4  WITNESS' NAME: Carmen A. Catizone, MS, RPh, DPh
5       In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7       I have made no changes to the testimony
   as transcribed by the court reporter.
8

   _____        _____
9  Date              Carmen A. Catizone, MS, RPh, DPh
10      Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
        They have read the transcript;
13      They signed the foregoing Sworn
        Statement; and
14      Their execution of this Statement is of
        their free act and deed.
15
        I have affixed my name and official seal
16
   this _____ day of_____, 20____.
17
                    _____
18                  Notary Public
19                  _____
                    Commission Expiration Date
20
21
22
23
24
25
```

Page 532

```
 1                    DEPOSITION REVIEW
                   CERTIFICATION OF WITNESS
 2
      ASSIGNMENT REFERENCE NO: 4628785
 3    CASE NAME: National Prescription Opiate Litigation - Track 3
      DATE OF DEPOSITION: 6/16/2021
 4    WITNESS' NAME: Carmen A. Catizone, MS, RPh, DPh
 5         In accordance with the Rules of Civil
      Procedure, I have read the entire transcript of
 6    my testimony or it has been read to me.
 7         I have listed my changes on the attached
      Errata Sheet, listing page and line numbers as
 8    well as the reason(s) for the change(s).
 9         I request that these changes be entered
      as part of the record of my testimony.
10
           I have executed the Errata Sheet, as well
11    as this Certificate, and request and authorize
      that both be appended to the transcript of my
12    testimony and be incorporated therein.
13    _____       _____
      Date                   Carmen A. Catizone, MS, RPh, DPh
14
           Sworn to and subscribed before me, a
15    Notary Public in and for the State and County,
      the referenced witness did personally appear
16    and acknowledge that:
17         They have read the transcript;
           They have listed all of their corrections
18         in the appended Errata Sheet;
           They signed the foregoing Sworn
19         Statement; and
           Their execution of this Statement is of
20         their free act and deed.
21         I have affixed my name and official seal
22    this _____ day of_____, 20____.
23         _____
                   Notary Public
24
           _____
25                 Commission Expiration Date
```

Page 533

1                          ERRATA SHEET
              VERITEXT LEGAL SOLUTIONS MIDWEST
2                      ASSIGNMENT NO: 4628785
3     PAGE/LINE(S) /        CHANGE        /REASON
4     _____
5     _____
6     _____
7     _____
8     _____
9     _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19

      _____      _____
20    Date                   Carmen A. Catizone, MS, RPh, DPh
21    SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22    DAY OF _____, 20_____ .
23                  _____
                    Notary Public
24
                    _____
25                  Commission Expiration Date

[& - 37,066]

| & | |
|---|---|
| **&** | 344:9 345:3,16 |

| 0 | |
|---|---|
| **014** | 347:15 363:13 |
| **06** | 353:16 |
| **08** | 373:16 |

| 1 | |
|---|---|
| **1** | 348:3 506:16 510:5 |
| **10** | 350:6,8,13 390:13 397:7 417:16 418:6 508:4 511:16,17 524:13 |
| **100** | 344:16 520:5 524:13 |
| **1000** | 344:21 |
| **1001** | 344:10 |
| **10:32** | 466:22 |
| **10:48** | 467:2 |
| **1100** | 530:1 |
| **11:12** | 491:13 |
| **11:58** | 491:16 |
| **1200** | 345:23 |
| **12:03** | 496:8 |
| **12:10** | 496:11 |
| **12:26** | 512:4 |
| **12:29** | 512:7 |
| **12:38** | 521:17 |
| **12:43** | 521:20 |
| **12:45** | 524:21 |
| **12:49** | 524:24 |
| **12:52** | 527:12 |
| **1306.04** | 353:16,19 354:4,9,19 357:6 372:3 |
| **1306.04.** | 354:3 |
| **1306.04a** | 519:19 |
| **1306.06** | 354:9,20 357:6 |

| **1306.07** | 357:14 |
|---|---|
| **14** | 397:21 398:8,17 400:11 |
| **140** | 428:20 |
| **15** | 402:2 459:13 |
| **15219** | 345:5 |
| **15219-2514** | 345:13 |
| **16** | 343:17 347:15 363:7,8,13,19 365:1 400:2,5,25 401:24 402:3,4 412:23 528:15 |
| **16th** | 348:3 390:9 467:1 |
| **17** | 343:3 347:17 348:8 373:19,20 374:8 377:4 |
| **1700** | 344:11 |
| **1701** | 345:17 |
| **18** | 347:19 389:4 390:12 391:5 392:14,25 478:24 479:2 481:8 |
| **1800** | 344:20 |
| **1801** | 345:22 |
| **1820** | 530:2 |
| **19** | 363:2,3 467:7 |
| **19-1-9** | 363:2 |
| **19103-2921** | 345:18 |
| **1919** | 363:2 |

| 2 | |
|---|---|
| **2** | 348:4 349:1 350:6 376:8 380:24 390:7 413:16 420:18 471:15 |
| **20** | 399:16 417:17 418:6 476:23 479:3 485:12 |

| **508:4** | 531:16 |
|---|---|
| **532:22** | 533:22 |
| **20036-5807** | 344:21 |
| **2004** | 359:17 |
| **2006** | 413:24 426:24 429:18 436:16 453:19 |
| **2008** | 486:6 |
| **2009** | 457:12,20 |
| **2010** | 465:25 |
| **2011** | 347:17 374:1 376:5 465:1,23,25 466:3 |
| **2014** | 364:5 |
| **2015** | 390:14 465:1 466:5 |
| **2017** | 382:9 |
| **202** | 344:22 |
| **2020** | 413:24 426:24 429:18 453:20 |
| **2021** | 343:17 348:3 390:9 467:1,7 484:4 528:15 529:9 530:4 |
| **2025** | 529:20 |
| **205** | 346:4 |
| **21** | 519:19 530:4 |
| **21178** | 529:13 |
| **21202-1031** | 344:17 |
| **215** | 345:18 |
| **216** | 344:12 346:12 |
| **216-523-1313** | 530:3 |
| **216-9000** | 344:6 |
| **21st** | 529:8 |
| **23** | 389:3 |
| **24** | 436:7 |

| **240** | 392:1 |
|---|---|
| **2440** | 344:17 |
| **24400** | 346:11 |
| **25** | 353:24 354:1 399:3,7,12 413:19 526:14 |
| **269-4335** | 345:10 |
| **28** | 344:5 431:17 |
| **2804** | 343:3,3 348:8 |
| **29464** | 344:6 |

| 3 | |
|---|---|
| **3** | 380:24 397:8,11 466:24 477:1 530:6 531:3 532:3 |
| **3/10/2015** | 347:19 |
| **30** | 359:12 399:15 417:17 418:6 478:1 483:11,24 484:7,15,17 485:1 485:13 529:20 |
| **300** | 346:11 |
| **303** | 345:24 |
| **312** | 345:10 |
| **316** | 346:3 |
| **32502** | 346:4 |
| **33** | 413:11,15 |
| **338-5214** | 345:6 |
| **344** | 347:3 |
| **35** | 353:9 399:6 468:12 469:7 |
| **3500** | 345:9 |
| **359** | 347:15 |
| **35th** | 345:5 |
| **369** | 347:17 |
| **37** | 486:17 |
| **37,000** | 416:22 418:18 |
| **37,066** | 413:22 414:4,10,16,20 416:3,8,15 417:6 418:1,11 420:17 |

**385**  347:19
**39**  483:10,14 484:1
  484:11,20
**394-7911**  345:14
**396-5014**  346:4

**4**

**4**  400:16 408:21,23
  419:9 486:16
**40**  483:25 484:6,11
  485:8
**410**  344:18
**412**  345:6,14
**417**  347:4
**44114**  344:11
  530:2
**44122**  346:11
**4500**  345:13
**46**  489:25
**4628785**  530:7
  531:2 532:2 533:2
**463**  347:6
**47**  487:4

**5**

**5**  367:23 483:9,18
  483:22
**50**  505:25 506:9
**500**  345:13
**509**  347:7
**51**  502:5,6,8
**517**  347:9
**522**  347:10
**55**  457:18
**56**  457:18,20
**592-3197**  345:24

**6**

**6/16/2021**  530:8
  531:3 532:3
**600-0114**  344:12
**60601-1692**
  345:10

**7**

**70**  418:7,10,16,21
  418:24 419:4,19
  420:8 421:2 445:7
  524:2
**77**  345:9
**778-1800**  344:22
**78**  382:4,6,8

**8**

**8**  366:20
**80**  418:7,16,22,24
  419:4 421:2 445:8
  508:4 524:2
**80202**  345:23
**831-0001**  346:12
**843**  344:6
**87**  502:17,23 503:9
  503:16,21 504:8
  504:18 505:20
  506:9 507:14
**8:00**  343:17
**8:09**  348:2
**8:59**  390:5

**9**

**9**  352:1
**90**  418:8,11 419:19
  420:9 507:14
  508:5
**91**  366:15,18,20
**92**  367:23
**949-1159**  344:18
**95**  511:10
**963-5328**  345:18
**9630**  365:24
**99**  510:6
**9:07**  390:10
**9:20**  401:15
**9:21**  401:18

**a**

**a.m.**  343:17 348:2
  390:5,10 401:15
  401:18 466:22
  467:2 491:13,16
**aberrant**  400:17
  400:23 401:7
  402:10,18 404:10
  404:11 405:20
  408:11
**ability**  378:3 384:8
  439:24 449:22
  463:22 513:11
**able**  353:8 361:10
  377:16 378:10
  388:1 412:7 415:8
  420:10 428:23
  455:6 520:6
  521:13
**absent**  420:5
  451:15 508:17
  509:25
**abuse**  353:8
  400:18 401:6
  402:9
**abused**  522:21
**abusing**  456:11
**academics**  475:4
**academy**  391:22
**acceptable**  404:6
  507:7,22 510:20
  511:19
**access**  409:25
  427:2,3 429:15
  436:3 437:5,8
  438:17 449:11
  453:16 464:24
**accessed**  478:3
  480:25
**accountable**  379:7
  379:15 381:25

**accuracy**  373:9
**accurate**  351:24
  373:7
**acknowledge**
  531:11 532:16
**acknowledges**
  502:20
**act**  347:15 352:5
  352:10,18 353:17
  354:18 355:24
  356:13 358:6
  363:14 364:5,12
  364:15 367:13,16
  367:19,20 368:4
  368:25 369:3
  370:1,4,13,14,15
  371:20 373:1
  377:24 428:1
  441:2 449:22
  478:14 479:23
  524:11 531:14
  532:20
**acting**  471:8,9
**action**  380:9
  439:13 459:24
  503:20 529:2,4
**actions**  385:14
  497:1,8,9,12
  502:17 503:16
**active**  382:12
  383:16
**activities**  431:24
**activity**  431:7
**acton**  344:20
**acts**  362:20
**actual**  391:21
  436:22 443:15
  476:12 477:18
  481:13,13 484:5
  497:15 498:12
  499:2 502:10

510:14,15
added 490:4
adding 497:20
addition 462:12
  498:3
additional 398:12
  489:18
address 427:25
  530:15
addressed 455:20
adequate 462:25
adjudicating
  440:23
administering
  432:25
administration
  475:5
administrative
  431:1 518:7
administrators
  480:19 481:15
advise 371:13
  440:14
advised 465:8
advocate 383:21
  386:16
advocated 386:20
  387:12,16,22
affirm 449:25
affixed 529:8
  531:15 532:21
aforementioned
  528:12,25
afternoon 522:14
agency 466:14
aggravated 403:10
aggregate 414:25
  415:16,20 416:24
  417:22 439:7
  454:14,17 464:6
  508:11,14,19

509:8 525:8,14,21
  526:1
ago 360:18,22
agree 375:3 377:3
  378:20,20 379:21
  398:19,21 404:1
  424:10,13 450:22
  451:2 491:10
  504:2,5,14,16
  505:23,25
agreed 375:10
  404:1
agreement 356:25
  457:14,24
ahead 375:14
aid 345:15 421:20
  421:25 439:5
  443:12 450:3,5,8
  450:13 458:9
  459:11,15,25
  460:1,19 461:20
  462:1,4,5,7,16
  463:8 486:1 494:9
  494:15 502:11
  521:5 525:2
aid's 437:2,8 443:6
  457:12 458:24
  459:5,8 462:20
aids 349:7
aimed 474:19
albertsons 360:6
  360:15,19 361:14
  361:22 362:3,13
  371:8 412:2,11
  496:14
alert 351:21
  361:15,19,23
  362:4 366:11
  431:6,23
alerting 455:22

alerts 361:7,9
  368:8
algorithm 453:2
algorithms 474:18
allege 479:6
alliance 345:20
allow 377:6
  382:10 417:21
  446:19 526:18
allowed 514:15
allowing 519:14
allows 452:7
ama 394:12,22,23
  395:4,8,12 396:7
  396:19
amas 394:13
american 391:22
  403:5 463:16
amount 416:19,20
  446:3,13,13,18,20
  460:5,12 462:18
  505:16 509:3
  510:20
amounts 375:23
ample 520:16
amy 343:14
  348:12,16 528:4
  529:14
analysis 391:2
  421:9 424:17
  442:3 448:18
  462:20,23 463:2
  463:10,14 469:11
  476:3 478:11,13
  481:6,9,13 489:8,9
  489:18,23 492:18
  493:10 499:18,24
  501:22 507:1
  525:23
analyze 447:5
  470:13 471:18

478:3 506:25
analyzed 441:21
  445:17 494:4
  510:22
analyzes 440:16
analyzing 447:9
  490:7
ands 400:6
annual 394:12
annually 428:17
answer 356:12,12
  356:21,22 357:11
  357:22 358:12
  367:11 368:24
  375:14 378:6
  380:12 383:7
  388:2 400:3 410:2
  411:19 412:9,9
  417:10 418:5
  421:7 434:20
  439:11 442:19
  443:9,17 453:22
  456:13 461:18,24
  469:12,18 471:18
  489:2 493:16
  497:4 511:4
  523:18 526:4,7
answered 357:8,9
  368:23 369:23
  370:6 411:17
  496:19
answering 421:12
  493:15
answers 405:6
anybody 430:20
anymore 371:20
apart 443:1
apologize 379:2,3
  488:3 503:13
appear 531:11
  532:15

**appearances**
345:1 346:1
**appeared** 407:23
**appears** 375:17
484:5 489:25
**appended** 532:11
532:18
**apples** 486:23,23
**application** 354:9
**applied** 483:8,21
485:18,21,25
486:13,20
**applies** 432:4
**apply** 382:25
421:7 486:8,17
**appreciate** 375:11
421:12
**approached**
394:22 395:4
**appropriate** 353:1
353:5 356:16
358:11 367:11
369:5,10 370:9,16
378:18 387:23
395:23 429:3
433:21 435:1
437:23 445:21
446:3,13,20
456:25
**appropriately**
368:5 396:25
432:8,11 433:22
**approval** 364:9
514:14
**approve** 428:7,10
440:6
**approved** 428:12
514:15
**approximately**
422:2

**area** 354:11
422:22,25 423:11
423:12,15
**areas** 392:16
394:3
**arena** 405:12
**article** 377:7
478:22,22 479:7,8
479:10,17,17
480:7 481:8,16,19
481:21
**articles** 479:14
481:25 482:4
**ascertain** 505:11
**ashley** 355:11
**aside** 371:21 382:3
**asked** 357:8,9
368:23 369:23
370:5 375:10
383:24 384:19
403:1,3 408:3
411:17 412:5
418:13 421:7
453:13 463:19
467:12 469:22
471:25 483:5
490:8 492:6
493:10 496:19
513:7 521:6
525:25 526:6,22
**asking** 354:24
355:23,25 356:9
369:13,13,14
375:11 376:15
387:2 395:13
396:2 426:8
475:18 481:16
493:17 503:5
510:14,25 511:4
519:25 522:2

**asks** 378:17
**assess** 507:23
508:24
**assessment** 395:16
509:5
**assignment** 531:2
532:2 533:2
**assist** 409:5,17
**assistant** 470:23
**assists** 477:8
**associated** 447:10
456:7
**associates** 516:2
**association** 347:16
363:15 403:6
463:17
**assume** 448:16
**assumed** 512:22
**assuming** 388:23
**assumption** 378:1
495:15 502:3
**assumptions** 378:4
**assure** 349:23
**assured** 456:10
523:9 525:4
**attached** 532:7
**attaches** 390:15
**attention** 389:9
**attorney** 441:4
529:3
**attorneys** 395:9
491:25 492:4
529:5
**audio** 512:1
**audit** 350:25
351:12
**august** 347:15
363:13
**authorities** 455:22
**authority** 386:22
447:21 466:14

**authorize** 532:11
**automated** 365:11
366:4,10,15,21,24
367:25 368:2
441:5
**available** 368:10
389:21 410:12,16
411:2 415:11
440:21 441:7,7
447:1 449:13
450:1,10 452:25
499:14
**ave** 530:1
**avenue** 344:10
**average** 441:11,15
511:9,10
**aware** 361:17
370:19 436:7
441:14,19 445:16
448:6,19 452:6
464:20 468:15
498:21 514:3,4
516:1 517:20
518:6,13,16,19
519:9
**awareness** 371:1

**b**

**b** 344:20 476:24
**back** 350:8 352:1
376:4 384:22
385:13 388:17
390:9 393:23
401:17,21 419:9
438:15 459:23
467:1 488:12
491:15 493:11
496:10 512:6,18
512:20 520:12
521:1,15,19 522:3
524:23 530:15

**background**
481:12
**balance** 397:1
**baltimore** 344:17
**bartlit** 345:21
**bartlitbeck.com**
345:24
**base** 487:12 501:3
**based** 354:10
380:3 383:3,18
384:9 385:6
416:18,18,20,22
417:10,11 420:21
433:6,12 435:8
439:7 443:6
445:15 446:1
450:10 452:1,9
454:13,17,18
464:6 469:23
471:24 472:2
478:6,9,13,14
479:21 481:13
484:18 514:14
516:11,14 526:1
**basic** 399:23
430:23
**basis** 353:11
354:11 355:20
356:13,19 357:12
357:16,23 367:16
369:3 370:18
382:17 383:11
384:23 408:16
444:2 484:17
**baylen** 346:3
**beck** 345:21
**began** 492:14
513:25 515:2
**beginning** 391:21
465:19

**begins** 350:14
375:20 378:24
**behalf** 343:16
344:2,13 345:2,8
345:15,20 520:9
522:12 528:14
**behavior** 385:8
400:23 408:10,11
408:12
**behaviors** 400:17
401:7 402:11,19
404:10,11,23
405:4,10,21
**believe** 365:12
392:25 422:17
427:12 434:16
440:9 446:10
457:5 459:23
461:19 462:9
464:16,20 465:1
466:3,4 467:23
475:18 496:14
507:13
**believed** 433:8
**benzodiazepine**
483:9,19,22 484:6
484:21
**best** 364:16 378:3
417:9 447:24
470:13
**better** 393:10
429:14 442:18
506:15
**beyond** 382:2
396:4,21 412:11
417:12,14 420:10
420:14 453:7
465:14 492:20
494:5 499:19
526:16,25

**bigger** 365:21
**bill** 433:13,17
**bit** 358:25 362:17
371:18 372:2
395:3 399:23
**blank** 349:12
**blanket** 382:21
383:2,20 384:7,15
386:10,17 387:12
388:4 513:8,25
514:5 516:10,12
516:19,25
**blanketly** 382:10
386:23 387:2
**block** 516:5 517:7
517:8 518:9
**blocked** 450:4,12
517:18
**blocking** 389:9
515:2
**board** 347:18
364:8 371:5 373:4
374:1 375:21
376:14,20 377:4
377:21 379:12,21
380:4,8,13 381:20
385:8,11,12
425:20 426:2,6,11
426:14,15 427:20
429:25 430:5,13
430:22,24 432:21
432:22 433:4,7,8
433:17,20 434:1,4
434:8 438:12
439:3,12,14,19,21
440:5,14,14 441:1
447:4,9,15,18,22
447:23 448:2,4
449:9,14,17
451:19 455:22
458:18,23 461:12

461:14,15 464:8
464:17,21,23
465:4,6,9 466:9
475:19 476:8,13
476:14 479:20,25
518:6,16,19 519:3
519:9 524:11
**boards** 347:16
359:22 363:15
364:17 372:7
427:10 428:19
435:10 439:10
459:12,24 460:2
461:3 462:17
463:20 466:15
475:12 516:3,3,13
517:20 518:3
523:2
**bockius** 345:16
**boots** 345:20
**boss** 462:9
**bottle** 498:12,24
499:6
**bottom** 367:24
374:5 457:19
479:2
**boulevard** 344:5
346:11
**box** 349:18 494:25
**boxes** 494:8,13,15
494:19
**break** 389:15,20
389:22 390:2,2
395:3
**breaks** 397:14
400:21
**brian** 345:22
347:3 348:20
365:20 389:13,15
**brian.swanson**
345:24

brick 510:18
bridgeside 344:5
brief 513:4 522:7
  522:13
briefer 513:6
briefly 382:5
brings 521:4
broader 358:25
bullet 409:1 502:8
bullets 502:5,10
bunch 402:23
bush 344:16
  467:11 475:17
  479:20 483:5
business 503:25
buts 400:6

**c**

c 344:1 345:22
  347:3 348:20
ca 530:25
calculate 446:20
call 350:9 352:8
  364:16 391:15
  492:20 494:2,3
called 375:22
  400:16 452:15
calling 395:21
  396:2
calls 376:14
  493:24 494:1
capture 470:6
  498:2 499:12
care 358:22
  399:20 448:12,15
  448:17 468:25
carmen 343:9,14
  348:4 365:15
  390:8 466:25
  527:18 528:9
  530:8 531:4,9
  532:4,13 533:20

carolina 343:16
  344:6 376:15
  528:15
case 348:8 349:2
  358:21 371:3,17
  372:1 382:17,17
  383:11,11 384:23
  384:23 385:15
  390:24 391:2
  404:22 407:5,13
  407:15 408:24
  409:13 422:21
  423:21 424:17
  425:23 426:1,12
  433:14 435:18
  437:19 441:22
  444:22 445:2,21
  449:8 453:2,19
  454:13 463:3,10
  479:24 489:6
  499:11 502:18
  503:18 508:13
  515:9 518:13
  525:19 530:6
  531:3 532:3
cases 343:7 421:11
  438:19 457:2,4
  475:8 478:1,2
cash 404:15,24
  406:21 502:7,19
  503:3,17,22 504:2
  504:9,11,19 505:1
  505:4,8,15,21
  506:1 507:7,9,10
  507:13,23 508:11
  509:16 510:19,20
  511:14,17
category 418:19
  437:3
catizone 343:9,14
  348:5,21 365:5,23

378:16 380:16
  390:8,12 401:20
  421:19 466:17,25
  467:5 474:4
  491:18 496:13
  512:11 513:3
  519:9 521:23
  522:11,15 525:1
  527:18 528:9
  530:8 531:4,9
  532:4,13 533:20
catizone's 520:18
cause 343:3 529:2
ce 427:14
center 478:22
central 517:8,14
centralize 361:4
centrally 515:2
  516:5 517:18
centre 345:5
certain 351:22
  360:5 375:18
  384:19 387:14
  413:5 422:3
  427:18,19 458:22
  462:18 465:2,3,4
  477:5 498:1
  499:10 507:6,12
  507:21 514:1
  519:11,12
certainly 387:7
certificate 532:11
certification 531:1
  532:1
certified 343:15
  343:15 528:5,6
certify 528:8
  529:1
cfr 519:19
chagrin 346:11

chain 350:14
  360:6 371:2
  409:15 410:6
  411:15 419:20
  421:9 422:14
  423:22 424:2,7
  425:16 426:16,20
  434:17 435:18
  437:18 441:23
  442:9,12,14,24
  443:2 444:21
  445:2,10 453:18
  454:11 462:24
  463:2,9 516:5
  525:10
chains 409:22
  410:23 422:19
  445:6,7 463:16
chair 417:25
  418:14
challenges 390:17
  393:9 394:3
  396:24 403:4
challenging
  395:14
chance 458:3
change 471:7,12
  471:13 530:13,14
  532:8 533:3
changed 498:7
changes 498:9
  530:12 531:7
  532:7,9
charged 434:9
chart 472:21
  485:7
charts 427:18
check 349:20
  394:16 395:22
  427:23 459:24
  465:10,17 482:11

[checklist - conducting] Page 7

checklist  386:3
checks  370:20
chicago  345:10
   496:15
choose  526:13
chose  467:15
circumstances
   395:12 405:13
   416:13 456:19
citation  352:11
cite  352:22 385:18
   385:20 478:20,20
   479:5,7 481:22
   482:4,23
cited  390:23
   478:21 479:10
   481:16,25 482:17
citing  518:7
civil  343:18
   528:16 531:5
   532:5
claim  356:7
   369:20 370:3
   407:4,7 409:15,22
   410:23 411:15
   440:24
claimed  418:2
claiming  407:15
clarification
   507:18
clarify  377:18
   386:2 413:25
   432:19 440:20
   474:1 490:9
   491:19,23 492:7
clarity  483:20
clauses  473:23
clean  521:12
clear  354:14
   375:14 380:25
   381:2 410:4 414:3

464:1 516:17
clearance  385:13
cleared  415:14,15
   416:2
cleveland  344:11
   346:11 414:21
   530:2
client  360:24
   361:3
clinic  414:21
   518:11
clinics  375:22
closed  412:17
   419:15,21 527:10
coaching  380:20
coalition  391:13
   391:15
cocktail  483:9,18
   483:22 486:8
cocktails  483:6
cocounsel  520:23
cohen  346:9,10
   390:1 491:8
   520:20 526:17,19
   526:20,25
cohesive  392:19
collaboration
   470:24
colleagues  421:14
collect  498:10
collected  497:1
   498:16,19 499:10
colleges  428:20
column  378:23
   379:4
combat  388:1
combination
   484:21
combinations
   455:4

come  521:15
comes  354:12
   504:23
coming  476:17
   493:5
comment  362:14
   371:13 374:15
   377:8,13,16 378:3
   378:9 382:1,2
   438:6 499:19
   501:22
commented
   508:16
commission
   529:19 531:19
   532:25 533:25
committee  391:9
   391:12,15 480:17
   480:18
communicated
   433:3 492:1 495:2
   496:1
communication
   393:8 394:24
   396:19 404:4
   491:24
communications
   433:7 495:22
community
   424:12
companies  439:18
company  345:2
   388:11
comparing  485:7
comparison
   486:23
competencies
   432:14
competency
   432:17

compilation  427:8
   427:16,24
compiled  427:17
compiles  430:21
complaint  459:25
complaints  394:9
complete  375:1,9
   375:17,17 376:8
   378:24 411:7
   430:12 431:9
   432:1
completed  530:15
completeness
   374:17
compliance  426:7
   426:11 458:11
complicated  442:5
   442:7
comply  357:21,24
   370:14 466:8
complying  380:10
computer  443:6
   498:8
concept  517:12,17
concern  433:17
   447:19 468:8,19
   506:8 508:21
concerned  506:16
   510:2
concerning  425:21
   461:4 505:6
concerns  448:5
   517:21
condition  446:5
conditions  435:12
conduct  399:17
   463:22 505:10
   507:1
conducted  415:4
conducting  370:20
   394:25

confirm 395:22
confirmed 383:7
confirming 349:17
confused 498:25
connection 429:2
connections
　493:20
consideration
　435:2
considered 502:25
considers 455:10
consistency 485:6
consistently 485:4
　485:19,22,25
　486:8,13,17,21
constitute 400:22
constitutes 398:22
　399:24 505:15
　519:15
constructed 406:7
consulting 360:19
consumed 445:23
contact 494:5
contain 438:3
contained 367:15
　373:7 427:1
　479:18
container 498:20
contains 438:7
content 351:19
　373:1,2,11,13
　374:8 380:7
　391:17 392:8,11
　392:13,16 428:10
　430:4 432:20
contents 364:19
　368:2 391:10
context 378:18
　380:3,22
continuation
　408:23

continue 356:23
　374:18 381:8,9,11
　519:4
continued 345:1
　346:1 347:3
　348:19
continues 350:23
　374:25 376:7
continuing 426:18
　426:23 427:11,13
continuity 468:25
contribution
　364:4,5
control 353:5
　392:18 447:21
controlled 351:3
　352:4,9,17 353:2,6
　353:17 354:18
　355:13,23 356:12
　358:6,12 369:5
　375:24 385:5,10
　390:18 404:16
　406:22 411:18
　412:16,18 418:23
　419:13,16,22
　424:25 428:1
　429:2 431:6,13,23
　432:11 433:10,24
　434:25 441:13,16
　441:24 442:25
　452:19 456:1
　459:7,16 460:21
　465:16 468:11,13
　476:25 477:5,9
　478:15,16 480:10
　519:13 524:11
controls 353:2
　358:11 369:5
　387:23 504:11
controversy
　459:14

convene 394:23
　395:4
conversation
　375:12 459:5,8
　480:3 490:15
　492:3 495:5
　519:23
conversations
　433:12 492:17
　493:8,13,21
　495:24 516:2
conveyed 492:18
　523:2
cook 448:15
coordinate 392:10
copies 447:16
copy 352:23,24
　366:14 428:23
　429:10
corporate 350:10
　352:1 384:3,3,10
　460:10 515:8
　517:6,8 518:9
corporation
　355:19 388:21,23
　411:3,4,5 428:22
　450:10 460:17
　506:14,25 508:6
　514:15 517:1
correct 353:21
　354:20 374:2
　378:2 381:15,18
　385:14 388:7
　390:24 397:12
　402:8 406:25
　414:8,18 416:5
　428:12 432:5,12
　433:4 439:22
　440:1 445:14
　446:24 457:25
　467:21,25 470:20

471:10 472:25
　473:21 474:4
　475:13,20 476:10
　477:13 481:22
　482:18,24 483:12
　483:24 484:15
　485:8 486:1,9,25
　489:15 490:5
　492:2,8 495:3,8,10
　495:14 496:15
　498:3 499:8 500:3
　500:9,10,17,25
　501:1,15 503:11
　504:20 505:9
　506:24 507:16
　508:15 509:17
　510:11,23 511:20
　511:22 513:8,13
　513:20 514:2
　515:9,22 516:22
　517:23 518:4,5
　524:4 525:21
　526:4
corrections 530:12
　532:17
correctly 376:17
　398:10 402:15
　431:16 457:17
　468:17 487:15
　509:20
corresponding
　353:20 371:15,17
　372:3 374:22
　375:2 376:10,21
　379:13,24 380:11
　381:23 387:21
　394:1,5,10 395:2
　396:15 409:6,14
　409:21 410:21
　411:13 438:13
　439:6 453:14

[corresponding - dealing]                                                                      Page 9

454:6 456:3 463:6
463:13 519:18
**counsel** 348:13,15
490:19 491:1
492:14,19,22
493:6,8,11,21,25
495:3,5,10,17,20
519:24 520:17
528:25
**counter** 358:4
362:5,9 368:20
**counties** 416:20,21
417:23 420:23
422:11 423:10,16
444:14 445:11,24
446:4,21 448:8,9
448:12 450:6
453:9,24 454:4
462:21
**counting** 366:7
**country** 358:16
359:2,5,21,22,24
368:17 411:22
448:16,19 481:15
**county** 343:16
420:11,13 421:21
421:22,25 422:6
422:13,15,23
423:1,23 424:3,8
425:3,10,22
434:17 439:22
442:25 443:14
444:12,18 445:1
445:20 446:14
448:3,15,21
450:17 451:11
462:24 464:10,13
466:7 526:3 528:2
528:7 529:21
531:10 532:15

**couple** 357:9
512:9
**course** 466:13
**courses** 426:19
**court** 343:1 348:7
348:11 356:5
363:5 531:7
**courtney** 344:4
**cover** 390:13
404:18 406:24
**coverage** 407:17
**covered** 507:15
511:11
**covering** 469:2
**covid** 361:5
**create** 351:21
391:17 393:18
434:11,18 470:11
484:20,22 523:11
525:6
**created** 351:23
391:5,5 459:13
468:20
**creating** 432:25
**creation** 392:2
**credit** 452:21
**critical** 406:6
432:23 433:9
**criticized** 403:10
**cross** 347:3,4,6,9
348:19 421:17
467:3 521:21
**crr** 529:14
**crunching** 495:8
495:10
**csa** 352:12,21,24
354:22,25 355:3,6
357:2,11,15,23
362:6
**csr** 529:14

**cut** 401:20
**cuts** 424:14
**cvs** 344:13,14,14
344:14,14 439:5
485:25 494:8,14
502:11
**cwolf** 344:7

**d**

**d** 345:12
**dangerous** 522:19
**data** 350:19 351:7
351:11,15,21
352:19 353:4
354:5,17 355:2
357:3,19 358:3,16
359:2,25 360:6,7
360:12,16 361:19
361:24 362:10
367:1,25 368:18
369:4,9,17 370:10
370:19 388:21
409:4,8 410:7,15
410:16 411:2,4,5
411:18 412:14
413:2,24 414:25
415:17,20 416:24
419:12 420:22
422:8 438:21
439:8 440:17
444:10 445:4,15
446:16 447:1,5,8
449:25,25 450:10
451:15 454:10,14
454:17,18,19,22
457:6,10 464:6
468:1,2,3 469:24
470:13 471:19
472:14 477:6
478:3,4,9 484:5
485:19,22 486:14
486:20 488:12,12

**488**:13,14,16,17
488:20 489:19,19
490:7,13 492:2,6
492:17 494:4,18
494:19,22 496:25
498:10 499:10,18
499:24 501:13,19
501:20,20 502:23
507:1 508:19
509:10,11 511:9
525:8,15,21 526:1
**database** 509:12
**date** 530:8 531:3,9
531:19 532:3,13
532:25 533:20,25
**dated** 347:19
390:13
**dates** 465:20
**david** 345:4 346:9
346:10,12
**day** 345:8,12
426:1,1 436:7
488:9 500:9,16,22
501:4,24 504:1
529:8 531:16
532:22 533:22
**days** 436:8 467:20
470:1 483:11,24
484:7,15,17 485:1
485:12,13 530:18
**dc** 344:21
**dea** 355:7,11,18
382:12 383:16
385:11 387:18
399:9,18 443:23
451:25 455:22
457:5,8,13,14
475:9 523:2
**dea's** 393:20
**dealing** 506:6
509:8 516:14

dear 530:10
deaths 416:20
  417:12,22 420:24
  525:15
debatable 399:19
decide 489:4
  506:22
decides 406:3
deciding 449:3
decision 384:2
  388:25 411:3,7
  430:9 447:22
  450:1 467:19,23
  470:15,15 506:16
  514:5,14 516:20
  517:2,6,9,22
decisions 395:15
declined 477:6
  480:10
decrease 481:1
deed 531:14
  532:20
deemed 530:19
defendant 345:8
  345:15 369:21
  485:13 486:24,24
  494:8,14 502:6
defendants 343:16
  344:13 345:2,20
  356:6 358:21
  407:5,15 409:3
  422:6,10,15
  425:16 426:21
  437:14 453:1,1
  454:23 485:1,4,20
  486:9,18 499:11
  499:25 505:14
  508:12 509:11,22
  510:8 519:25
  520:3,5 526:24
  528:14

defense 527:3
defer 439:14
define 418:13
  475:25
defined 475:5,23
  476:2,23
defining 420:7
  487:18,21 500:2,4
definition 377:21
  393:21 476:7,8,12
  476:15,15
definitively 458:3
  482:13
degree 364:18
delved 526:21,23
demetra 355:10
demographic
  424:14
demographics
  424:6,10,13
denver 345:23
department
  530:22
depending 424:11
  442:3 456:23
deponent 520:22
  527:14 528:9,21
  528:22
deposed 458:13
deposition 343:9
  343:13 347:14
  348:4,9 390:8
  466:25 467:11
  515:7 516:8
  521:10 527:10
  528:13,17 530:8
  530:11 531:1,3
  532:1,3
depositions 425:17
  515:11

depression 484:23
describe 402:17
  427:5 487:5
described 473:14
describes 364:16
describing 393:19
description 472:2
  492:1
designated 466:5
desk 349:12
detail 356:19
  493:20
detect 393:1
  410:17 453:3,3
detecting 477:8
determinant 500:7
determination
  388:22 399:15
  418:22 420:10
  432:22 441:8
  452:8 489:12
  507:4 508:6
determine 361:8
  387:7 415:9
  422:22 423:21
  428:11 440:16
  441:25 442:22
  444:19 446:7
  451:20 462:25
  463:3,10 508:2
  519:15
determined
  384:25 386:21
  399:12 511:14
determining
  408:13 431:5,22
deterring 518:9
develop 435:11
developed 432:20
  452:14

dictate 372:19
didactic 431:10
  432:2
died 420:11
  525:17
differ 398:22
  399:24 400:5
difference 387:5
  418:20 500:21
different 371:12
  409:19 412:8,23
  434:8 440:19
  448:15 455:2
  462:12 468:14
  470:10 471:9
  472:10 478:8
  487:11 510:25
diligence 399:17
  415:3 460:13
  463:23 505:11
direct 368:12
  431:14 494:5
  495:5
directed 380:5
  401:24
direction 528:19
directive 519:11
  519:12
directly 492:20
  493:5,8,21 496:1
director 391:6
  426:6 427:20,23
  428:4 433:3,12
  435:10 440:12
  448:1 449:17
directors 364:8
  427:9 461:12
disagree 381:6
  399:7 404:24
  504:21

**disconnect** 420:2,3
**discovery** 486:6
**discuss** 391:10
　400:14 458:24
　491:4
**discussed** 397:5
　399:19 411:14
　492:16
**discusses** 397:8
**discussing** 352:4
　405:24
**discussion** 394:2
　398:6,9 459:21
　462:5,10,11,13,15
　480:21 507:4
**discussions** 459:14
　459:22 460:4
　483:7 515:24
　518:3
**disinterested**
　529:1
**dispense** 361:25
　368:5 386:5
　395:15,18 456:1
　460:16,16,21
　498:2
**dispensed** 416:19
　417:11 419:20
　425:1 445:7,19,23
　446:11 453:19
　469:25 483:11,24
　484:7,15 487:10
　487:19 499:15
　504:1 505:18
　510:8 522:25
　525:17
**dispensing** 350:19
　351:7,11,12,15,21
　352:19 353:4,4
　354:5,17 355:2
　356:17 357:3,18

358:3,12,16,18
359:2,4,25 360:1,6
360:7,8,12,14,16
360:16,17,22
361:2,6,8,12,19,24
362:10,12 366:7
367:1 368:18
369:4,5,9,10,17
370:9,10,16,18
371:1 372:15
386:3 388:21
390:18 396:15
401:10 402:14
409:8 410:7,15,16
411:2,4,18 412:18
413:1,23 419:15
419:22 424:18,21
425:8,21 429:2
436:20 438:21
439:25 440:6,16
440:22 441:6
454:10,14,18,19
454:22 458:25
460:15 464:19
465:16 477:8
485:3,12 489:5
496:17 497:13,19
497:21,24 498:4,6
499:8 504:9,10
507:23 509:1,2
**distance** 399:11
404:14 408:13
413:17 526:13,14
**distances** 404:23
**distinguish** 500:13
**distinguished**
500:8
**distinguishing**
517:5
**distributed** 373:23
420:12,23 444:12

508:23
**distributing** 445:6
**distribution**
　344:14 353:5
　358:11 361:4
　369:11 412:18
　419:15,21
**district** 343:1,1
　348:7,7
**diversion** 350:24
　351:3,8 352:19
　353:8 354:6,17
　355:2 357:4,19
　358:5,17 359:3,25
　361:15,20 362:6
　366:12 367:2
　368:19 369:17
　370:10 383:6,6
　388:2 393:2,15,20
　400:19 401:6
　402:10 405:23
　409:9 410:18
　412:15 416:24,25
　419:13 420:25
　440:17 449:6
　452:3,24 453:3
　454:12,13,17,20
　455:10,19 456:7
　456:17 457:6,9
　477:10 504:20,22
　504:24 505:6,21
　506:2 511:15
**diverted** 417:2
　419:21 420:4
　451:21 452:8
　505:18 511:18
　522:21
**diverting** 384:25
　455:23 456:11
**divide** 520:17

**division** 343:2
　348:8 426:5
**doctor** 377:21
　385:10 414:15
　416:12 467:12,16
　467:20 468:19
　471:6,16 475:5,13
　475:19,23,25
　476:4,7,9,12,23
　477:4,15,16,18,20
　478:13 479:16,18
　480:9,23,25 481:3
　481:3,18 482:5,9
**doctor's** 396:9
　397:2
**doctors** 383:15,16
　394:15 395:24
　414:9 448:7 469:8
　469:14 470:6,18
　514:1 519:11,12
**document** 343:6
　355:14 363:13,24
　364:1 368:6
　373:25 374:17
　375:1,5 381:8,9,14
　386:5,7 390:13,16
　390:20,23 391:1,5
　391:10,17,21
　392:3,8,14,19,20
　392:22,25 393:6,7
　393:14,19,24
　394:12 396:25
　397:7,12 398:3
　401:25 402:22
　403:16,17,21
　404:2,6 405:2,3,18
　405:19,21 406:7,8
　406:16,25 407:5
　407:20,21,23,24
　407:25 408:4,5,16
　429:19 430:2

436:24 441:5
459:6,19,20 461:5
462:6 473:3
481:25 483:3
490:16 502:22
**documentation**
368:15 406:1,3,6
406:12,14 407:13
408:17 415:7,21
417:19 418:17
420:6,9 430:15
436:6,11,23 444:5
446:7 469:3
508:17 510:1
524:4
**documented**
404:17 405:25
406:2,11,23
407:16 408:14
416:2 436:2 469:1
471:13 523:14,21
523:24 524:10
**documenting**
430:11 460:13
**documents** 349:7
349:24 384:18
399:10 475:23
476:1,6,22
**doing** 375:23
382:20 393:13
394:6 396:8,14
432:7 464:18
495:7,10 512:23
**doman** 343:14
348:12 528:4
529:14
**dosage** 487:13
500:5 501:4,6
509:3
**dosages** 487:23

**doses** 446:4
**dph** 343:9,14
527:18 528:9
530:8 531:4,9
532:4,13 533:20
**dr** 388:12,15
412:25 413:7,25
473:18 474:6
487:24 488:16
489:4,11,15
490:22 491:25
492:4,25 493:13
493:14 494:6
495:7,12,14,17,20
495:23,24 496:2
501:22 512:11
**draft** 472:18,20
473:13,17,22
474:3 492:15,22
492:23,25 493:2
495:13
**drafter** 392:5
**drafting** 492:14
**drafts** 364:1
**drawing** 445:13
**drug** 367:21,22
369:10,13 370:8
394:20 438:4
444:13 483:6,9,18
483:22 486:7
487:13 496:16
499:14,22 500:4
501:3,6
**drugs** 465:2,3,4
466:5 484:23
**due** 399:17 460:13
463:22 505:10
**duly** 528:10
**dunning** 346:2
**duplicative** 455:3
470:11 471:3,10

471:12
**dur** 370:13,20
394:25 440:24
**duties** 409:7

**e**

**e** 344:1,1,3 530:5
**eagle** 345:2 422:10
422:19 439:6
467:6 486:1 520:9
**earlier** 388:17
416:18 438:15
449:21 491:23
500:1 506:5
514:12 518:2
524:1
**early** 465:24
**easier** 364:24
365:18
**easily** 405:5
429:15
**east** 344:10,16
503:19,24 504:13
**eastern** 343:2
345:20 348:2,8
**edited** 493:1
**editor** 372:23
373:1 374:6,6
392:6 430:4
**educate** 381:17
**education** 372:9
426:19,23 427:11
427:13 431:10
432:2
**educational** 434:5
**eekhoff** 344:5
**effort** 364:2
442:22 525:19
**either** 349:7
415:11 421:21
425:9 426:9,10
443:13 455:21

456:7 507:5 529:3
**electronic** 349:8
349:14 367:24
**electronically**
368:3,8
**element** 490:4
**elsner** 344:3 347:9
352:14 353:14
354:7,21 355:5
356:10 357:8
358:8,19 359:7
360:3,23 361:16
361:21 362:7
364:6 365:2,15,23
367:5 368:23
369:23 370:5
371:4 373:18,21
374:16 375:4,8,13
376:25 377:5,12
377:14 378:13,16
379:18 380:2,14
380:22 381:6
382:22 384:12
386:1,13,19
387:17 388:8,16
389:19,24 391:11
392:9,15 393:3,22
395:25 396:10
397:3,17,24
398:24 399:8
400:1,8 401:13
402:5,25 405:7
406:13 407:1,8
408:8 409:24
410:9,25 411:10
411:17,25 412:4
414:11,17,23
415:6,18 416:4,17
417:8 418:4,25
419:7,23 420:20
421:3,10 422:1,7

[elsner - execution]

422:16 423:3,17
423:24 424:20
425:4 426:25
427:7 428:9
429:21 430:16
432:13 433:11,25
434:13,19 435:5
435:14 436:5,19
437:4,11,20 438:5
438:14,23 439:9
440:2,8,18 441:18
442:2,15 443:3
444:9 445:3,25
446:15,25 447:7
448:23 449:10
450:7 451:1,14,23
453:21,25 454:5
454:15,21 455:1
455:14 456:20
457:7 458:1,10
459:2 460:9,22
461:23 464:3
465:13 466:12
468:5,24 469:10
469:16 470:8
471:17,23 472:8
472:17,22 473:6
473:12,19,21
474:8,13,20 475:1
475:6,14 476:20
477:22 479:9
480:11 481:23
482:6,10,19,25
483:16 485:9,14
486:2,10,19 487:1
488:1,7,19,24
489:7,16 490:6,17
491:4 492:9
494:17 495:4
496:19 497:3
498:13,17 499:16

500:11,19 501:9
501:16 502:2,24
503:12 504:4
506:3 507:17,25
509:6,9,18 510:24
511:21 512:11,15
512:17,21 513:14
513:21 514:10
515:4,16 516:7,23
517:24 518:12,17
518:21 519:1,20
520:11,14 521:9
521:22 522:1,6,9
522:10,11 523:12
523:17,25 524:8
524:15,17 525:12
525:22 526:5,16
526:22 527:6,9
530:5
elsner's  527:1
email  347:19
390:13,14 490:16
530:17
emails  495:16,17
495:19
emergency  452:14
employ  529:5
employee  379:9,17
380:1 462:7
employer  379:8,16
379:25
empower  387:24
empowering
388:5,13
enclosed  530:11
encounter  398:4
encroach  396:21
ends  365:24
enforcement
502:17 503:16,20

enforcing  358:10
engage  449:6
ensure  369:9
403:9 432:18
enter  501:20
entered  497:16
532:9
entire  354:22
372:24 374:10
377:7 406:6 426:6
509:12 516:12
531:5 532:5
entirely  370:17
449:18
entirety  354:1
356:13 357:23
408:15
entities  391:20,25
392:1
entitled  488:14
entity  517:8
envelope  373:15
epidemic  424:14
equal  424:15
equally  424:15
520:17
errata  530:13,18
532:7,10,18 533:1
erred  493:15
error  360:17,21
361:11
especially  485:6
essence  395:13
established  380:15
507:12
evaluate  382:16
424:6,25 425:7,8
441:23 507:10
evaluated  464:11
evaluates  464:18

evaluating  434:24
437:25 442:25
evaluation  401:10
402:13
evening  479:22
event  404:5 529:4
events  368:1 369:8
369:8
everybody  363:12
364:24,25 373:19
373:22
evidence  385:15
385:21 444:24
518:8
evolution  513:24
515:2
exact  452:13
exactly  386:6
393:4 398:17
408:16
exam  347:1
432:20,20,25,25
examination
343:13 347:3,4,6,7
347:9,10 348:19
421:17 432:9
467:3 513:1
521:21 526:10
example  363:20
412:5,6 427:21
435:8 504:6
exams  432:15
exceeded  519:2
excellence  478:22
excessive  446:2,11
446:13,18
excuse  371:19
389:5 522:1
executed  532:10
execution  531:14
532:19

**executive** 374:6
  391:6 392:6 426:6
  427:9,20,22 428:3
  430:4 433:2,12
  435:9 440:12
  448:1 449:16
**exercise** 383:10
  384:8 449:2,22
  463:6,13 513:18
**exercised** 456:24
**exercising** 379:16
  394:19 456:3
  514:16 518:10
  519:18
**exhibit** 347:15,17
  347:19 349:1
  350:6 363:1,5,8,13
  363:19 365:1
  373:20 374:8
  377:4 389:1,4
  390:12 391:5
  392:14,25 404:12
**exhibited** 385:7
**exhibits** 347:13,14
  349:11,19 473:2,4
**exist** 359:10 369:2
  401:7 402:11
**existed** 455:2
  510:4
**existing** 369:2
  435:19,24
**expect** 422:25
  423:7,9 424:2
  435:8 461:2,6,10
  499:21 501:7
  505:1 507:13
**expectation**
  486:12
**expected** 499:18
  499:24 501:2

**experience** 354:10
  359:20 371:7
  385:6 431:11
  432:3 435:9
  471:25 476:11
  482:14
**expert** 350:5 478:2
  520:4 525:19
**expertise** 453:13
  489:4,8 497:22
**expiration** 531:19
  532:25 533:25
**expired** 518:21,23
**expires** 529:19
**explain** 352:22
  367:9 370:7
  377:18 474:12
  490:10 492:7,11
  509:19 521:23
**explainable** 405:5
**explained** 354:8
  356:15 405:11
  468:9 494:2
**explanation**
  367:15 408:14
**explicit** 500:6
**exponentially**
  452:4
**express** 370:2
  460:20
**expressed** 377:4
**extended** 396:4
**extensive** 462:13
**extent** 378:9 397:4
  435:18 439:17
  525:23

**f**

**faced** 393:10
  403:4
**facilitates** 432:24

**fact** 380:17 416:22
  440:5 443:24
  444:14 448:2
  453:1 460:2
  476:12 480:13
  487:22 505:8
  506:9 508:5,10
  510:4 516:11
  525:8,21 526:4
**factor** 454:7
**factors** 384:2
  400:18 401:5
  402:8 424:14
  487:21 500:2,4
  508:1
**facts** 456:18 458:5
**factually** 420:24
**failed** 409:3
  463:25
**failure** 412:14
  419:11
**fair** 382:3 395:16
  396:9 484:13
  504:18 505:19
**faith** 386:2
**familiar** 363:24
  434:21 514:17
  515:1,5 517:12,13
  517:17 519:21
**family** 391:23
**far** 376:14 418:6
  506:16 510:2
**faster** 366:16
**fault** 382:8,19
**favorable** 515:15
**feature** 487:18
**federal** 343:17
  357:20,22 370:15
  381:22 528:16
**feel** 367:11 387:18

**feeling** 460:14
**feels** 521:9
**fell** 418:18
**fellow** 379:9,17
  380:1
**felt** 385:24 396:4
  403:12 513:12,19
**field** 501:3
**files** 385:16
**fill** 382:11,21
  383:2,14,20 384:7
  385:4,9,16,23
  386:10,17,23
  387:2,4,10,13
  388:4,12 394:14
  409:14 410:2
  431:5,22 437:25
  438:10 441:12,16
  449:19,24 455:12
  455:25 456:5,25
  459:16 460:11
  461:20 462:18
  472:21 498:23
  499:5 513:8,11,18
  514:1,5,7,21
  516:19,20 517:10
  517:23
**filled** 376:13,24
  384:21 438:22
  443:14,17,19
  444:3 446:18
  450:4 519:13
**filling** 355:14
  387:14 447:17
  453:9 460:8 463:4
  463:12
**fills** 427:20
**final** 350:22 364:7
  392:7 403:17
**find** 359:9 484:12
  522:3 530:11

finding 376:13
fine 348:24 388:20
  389:18
finish 413:12
  519:1
fired 460:17,20
firm 348:10
  349:19 522:11
first 356:3 374:14
  374:21 375:6
  465:2,8,19 472:23
  473:1,1,4,7 492:20
  494:2,14 499:17
  528:10
firsthand 463:15
fit 392:19 413:23
five 377:22 389:16
  422:2,9,18 479:21
  520:5
fl 346:4
flag 369:19 390:17
  392:2 398:22
  399:2,11,16,17,25
  406:4 408:10
  413:5,15,18,23
  415:14,23 416:23
  420:18 421:9
  443:18 444:1,4,6
  451:21 452:2
  455:16 464:1
  468:21 469:1,3
  471:1,15 472:5
  474:18 486:16
  487:9,17 489:15
  489:17,22,24
  490:11 492:2,8
  494:13 499:12,19
  499:25 500:2,7
  501:5,8 502:20
  503:1,5 505:9,10
  506:10,21,24

507:9 510:6
522:17,20,23
523:6,8,13,20,23
524:3,9 525:3,11
526:14
flagged 425:13
  435:21,24 437:9
  437:18 438:11
  452:9 463:25
  471:15 483:10,23
  484:14 501:7,12
  501:14 523:5
  526:3
flags 351:22,23
  355:12,15 368:6
  370:11 391:2
  393:9,15,19,21,25
  394:1 396:24
  397:4,9,11,15,15
  397:20,23,25
  398:2,3,5,7,8,13
  398:16,17 399:11
  399:18 400:2,6,13
  401:5 402:9 403:3
  404:24,25 405:4
  405:21 407:21
  408:1,6 409:10
  411:19 412:23,25
  417:20 429:20
  430:2,8,11 431:12
  432:11 433:24
  436:13 444:6
  446:8 447:9,12
  452:1,17 453:3,14
  454:6,16 455:7,16
  455:18,19 456:10
  459:7 461:5 462:6
  465:3 466:4 469:6
  469:7,22,23
  471:24 472:3
  473:14,14 474:12

478:18 482:2
485:7 493:10
494:3 500:15,16
508:19 509:22,24
510:4,5,7 526:12
flip 350:8 352:1
  366:14 476:23
floor 345:5
focus 440:22
  502:14
focused 368:16
focusing 493:16
folder 362:24
folks 391:16
  395:20 396:7,13
follow 466:1
following 368:1
  503:13
follows 469:25
  472:14 479:1
footnote 478:24
  479:1,2 481:8
foregoing 528:13
  531:13 532:18
form 357:11
  403:18 472:16
  487:13 490:24
  491:2,3 507:15
  523:7,22 524:6,14
formal 391:12
  431:9 432:1
format 375:15
  428:12 494:19,22
former 448:1
  462:7
forms 356:13
  367:16 369:3
  370:17
formula 451:20
  452:6

formulas 453:5
formulate 478:8
formulated 489:15
forth 380:9
forward 530:15
forwards 495:16
foster 393:7
found 379:5
  433:14,15 476:19
  479:24 482:18
  488:18 515:21,25
foundation 381:3
  381:10
four 365:6 375:6
  422:2
fourth 364:20
  375:7
frame 484:24
fraud 353:8
free 531:14 532:20
frequency 428:15
front 348:25 349:4
  350:2 353:15
  363:16 373:25
  390:20 417:24
fulfill 409:21
  410:21 411:12
fulfilling 409:6
  519:17
fumerton 345:9
  347:8 365:20
  389:7,12,22
  491:10 512:1,14
  512:16 513:2,16
  513:23 514:19
  515:6,20 516:16
  517:4 518:1,15,17
  518:18,20,24
  519:7,8,22,24
  521:15,25 522:2,8
  523:7,22 524:14

[fumerton - health]

524:19 527:7
**further** 369:6
399:17 401:10
402:13 490:10
492:7 519:25
524:17 527:14
529:1

**g**

**gbush** 344:18
**general** 420:8
421:4 461:7
497:14,25 524:12
**generally** 444:24
467:25 468:4
497:7,9,11 507:14
524:2
**generates** 452:20
**geographic** 422:22
422:25 423:11,12
423:15
**getting** 406:20
**giant** 345:2 422:10
422:19 439:6
467:6 486:1 520:9
**gisleson** 345:17
347:5 421:18,20
422:4,12,20 423:6
423:19 424:1,21
424:23 425:6
427:4,15 428:14
429:24 430:18
432:16 433:19
434:10,15,23
435:7,16 436:15
437:1,7,16,22
438:9,20 439:2,20
440:4,11 441:10
441:20 442:8,16
442:20 443:5
444:17 445:12
446:9,23 447:3,14

448:24 449:15
450:14 451:9,17
452:5 453:23
454:2,9,24 455:8
456:2,22 457:11
458:6,14 459:3
460:18,24 462:3
464:7 465:22
466:16 521:5
524:25 525:1,13
525:18,24 526:8
**give** 356:22 378:5
397:9 412:5 417:9
417:13,21 472:16
473:11 474:6,11
488:17,22 489:22
**given** 359:20
468:19 473:22,22
490:3 514:20
518:22 520:4
521:7 528:21
**giving** 356:21
384:5 504:6
**glad** 359:8
**go** 349:24 350:1,14
356:1,1 358:1
366:14 371:11
375:14 400:25
412:7 421:6
438:15 459:23
466:19 482:11
491:6,9,11 496:5
512:2 520:12
521:1,13 522:20
526:22 527:9
**goes** 364:12
388:17 402:17
434:6 456:12
**goetz** 345:12
**going** 348:1
349:23 362:25

363:11 371:15
373:18,22 374:16
377:17 380:14
381:8 382:5 385:4
389:1,23 390:4,9
398:15 401:14,17
403:23 407:19,22
407:24 421:13
467:1,6 474:3
477:3 478:7 491:6
491:15 496:7,10
504:16 512:3,6,8
512:16 513:4,4
516:12 518:24
519:4 521:16,19
522:3,13 524:20
524:23 526:18
527:11
**good** 348:1,21,22
366:17 386:2
421:19 491:18
520:22
**gotten** 501:12
**government**
466:13
**graduating** 428:21
**graeme** 344:16
**grant** 345:13
**great** 349:6 350:5
**greater** 418:6
**grid** 494:25
**group** 391:13,16
395:5 397:22
398:5 403:1,5
**groups** 391:20
393:9,10 394:2
403:12
**guarantees** 463:4
463:11
**guess** 371:10
407:22

**guessing** 394:16
**guidance** 368:12
372:8 396:13
399:10 426:15
443:22 449:17,21
450:2 451:18,24
461:3
**guide** 429:14
511:23
**guidelines** 460:7
**guides** 349:15

**h**

**h** 344:10
**hamilton** 343:16
528:2,7 529:21
**hand** 389:8 529:8
**handled** 453:15
**hands** 434:7
**handy** 429:14
**happen** 451:7,8
**happened** 403:1
493:22
**happening** 403:12
522:5
**hard** 445:15
**harm** 522:22
523:11 525:6
**harmed** 525:9,16
525:21 526:4
**harmful** 522:19
**harms** 504:25
**hart** 458:7,17
459:4,14 460:1
461:2,6,15,19,25
462:11
**hart's** 462:9
**hbc** 345:2 494:9
494:15
**health** 435:12
475:4

heard  368:14
hearing  463:20
held  348:9 379:7
  387:20
help  353:12
  420:14 423:4
  424:22 436:12
  442:18 453:3,3
  508:17
helped  481:1
  490:9,9 492:7
helping  393:1
helps  477:7
hereunto  529:7
hi  467:5
high  504:8
higher  452:23
highway  399:21
hiland  515:8,13
  516:1
hildahl  348:10
history  436:11
hit  420:18
hold  381:24
holiday  504:13
holy  486:16
home  517:9,21
hour  389:16,19,23
  389:24 487:5,11
  487:17,20,25
  488:5,10,10 489:5
  490:4 496:25
  497:7,12,15,17,20
  498:2,10,15 499:7
  499:10,12 500:1
  500:15,21,23,24
  501:8,14,18,23
  520:2
hours  436:7 519:6
  521:7

hpc  486:1
hundred  416:21
hydrocodone
  375:25

i

idaho  518:16,19
  519:3,9
idea  434:20
  493:23
identifiable
  438:24 449:11
identification
  363:8 373:20
  389:4
identified  374:5
  397:22 398:8,16
  398:18 399:18
  400:2 406:4
  411:21 412:3,22
  413:5,7,22,25
  435:21 438:21
  446:2 447:12,13
  450:8 454:16
  456:6 457:9 465:4
  469:22 471:24
  525:8
identifies  355:6
  400:12,13 455:9
  455:16
identify  348:13
  350:1,24 351:8
  352:19 353:8
  354:6,17,25 355:2
  355:12 357:4,19
  358:5,15,17,20,20
  359:1,2,23,25
  367:1 368:19
  369:6,17 370:10
  393:15 394:3
  409:8 412:6,11
  414:15 417:1

429:25 439:1
  440:17 443:13
  446:12 447:5
  451:10,18 453:6
  454:11,12,20
  455:7 457:5
  463:24 464:4
  469:20 470:9
  471:4 472:1
  474:19 508:20
  525:7,20 526:2
identifying  353:12
  444:2 451:19
ifs  400:6
ignorance  443:23
ii  343:10
il  345:10
illegally  454:4
illegitimate  385:24
  416:9,16 417:5,7
  418:3,12 420:19
  450:20
imagine  359:13
impact  464:5
  482:1
impacts  517:14
implement  364:17
  366:25 369:21
  382:20 386:17
  387:12
implementation
  367:19
implemented
  368:25 409:16,23
  410:6,24 411:16
implementing
  358:10
implication  381:6
importance  406:1
  521:24 522:15

important  372:15
  373:6 380:22
  393:1 403:14
  405:24 459:18
  485:6 493:18
  503:1,1 504:23
  508:20 510:3,3
  511:23 512:17
imposed  520:2
imposition  462:17
improper  464:19
improperly
  386:10
inadequate  521:8
inappropriate
  505:16 513:12
  516:4
incidence  477:18
  481:1,3
include  369:9
  398:3 404:13
  406:15 410:14,15
  431:12 456:17
  468:21 469:8,14
  470:14
included  368:21
  370:3 398:13
  403:21 406:14
  407:17 414:1
  415:7,22 421:8
  427:10 436:2
  443:8 463:17
  475:7 476:1 507:3
  525:20 530:13
includes  429:11
  470:18,22
including  372:16
  409:7 448:20
incorporated
  532:12

incorporating
  461:9
incorporation
  387:23
increase  448:21
  452:4
increased  477:4
  480:9 484:22
independent  379:8
  383:10,22,24
  384:9,15,24 385:3
  385:22 386:11,21
  387:24 388:5,7,14
  399:14 442:13
  449:23 514:17
  517:3 518:10
index  347:1,13
indiana  343:16
  344:14 528:1,8
  529:21
indicate  380:25
  401:9 402:12
  420:24 434:3
  445:5,9 525:15
indicated  446:16
  454:16 468:1,3
  476:2
indicates  416:23
indicating  530:13
indicative  400:18
  401:6 402:9
  504:20,22 505:21
  506:2
indirectly  496:1
individual  356:14
  377:8 392:16
  395:8 397:4 403:2
  411:1 412:7 414:4
  414:24 415:2,9
  417:4 426:4
  427:12 428:10,23

438:16,18 441:9
451:15 452:2
464:4 509:11
514:9 516:14
517:15
individually
  506:24 508:14
  509:17 510:11,12
  510:22
individuals  444:20
indulgence  377:6
industry  441:11
  445:7,16 452:7
  479:16 511:7,9
inference  445:13
  445:15
influenced  384:2
information
  350:24 358:4
  361:20,22,24
  362:4,11 373:7
  378:5 380:4 383:3
  383:18 396:3
  409:4 410:1 411:7
  412:15 415:10
  416:18 419:12
  426:15 427:1
  429:12 430:23
  434:2 436:1,3,24
  436:25 437:2,6
  438:3,7,24,25
  439:16 440:25
  442:23 443:2
  446:6 448:6
  449:12,12 451:25
  453:16 456:16,18
  463:14,16 472:7
  476:11 479:18,19
  480:1,16,23
  481:12 489:13,19
  490:7,18,19,22,25

492:5,21,23,24
493:4,12,14
499:15 506:13
508:25 509:4,25
509:25 511:24
516:15 523:1
informative
  502:23
initials  438:25
initiated  465:20
input  450:11
  453:16
inquiry  396:8
  519:5
inserted  492:21,25
  494:7,11,15,18
  495:13
insisted  382:15
inspection  464:9
  464:18
inspections  439:21
  439:25
instituting  358:10
instruct  440:13
  441:1 447:15
  488:16
instructed  459:11
  462:1 469:20
  474:24
instruction  486:12
  488:22 490:3
instructions
  461:20
insurance  404:17
  406:2,11,23 407:6
  407:14,17 503:4,6
  507:16 511:11
integrate  361:5
integrated  493:1
intend  499:11

intended  469:14
  470:6,9
intent  381:17
intentionally
  451:11
interact  484:24
interacted  359:13
  492:19
interactions
  359:21 403:13
  481:14 515:23
interested  428:25
  476:19 529:4
interesting  489:10
  490:12
interfere  383:21
interfered  386:11
  463:5,12
interfering  394:18
  463:21
interject  511:25
interpretation
  354:10 367:19
  368:11 406:8
  476:3 478:17
interpreted
  355:18
interpreting  434:7
interrupting
  520:22,23 521:2
interruption
  371:24
introduce  362:25
  363:12 389:1
invalid  450:20
inventory  506:13
investigate  351:1
  351:16 423:14
  435:17 442:11
  455:24

investigated
385:12
investigation
422:21 423:20
424:18 426:18
439:14 444:19
445:20 448:11
453:8
investigators
433:13
invoices 492:16
involve 457:24
involved 380:16
383:4 409:9
458:11
involvement 475:8
involving 368:1
459:8
issue 394:21,24
401:9 402:13
430:5 442:9 460:5
460:7 500:1 516:9
520:18
issued 428:5,8
429:25 430:13,21
434:25 443:23
450:17 451:11,18
518:7
issues 372:18
450:9 456:9 460:3
460:10 464:10
516:13 521:12
issuing 447:5
iteration 375:2,9

**j**

jacton 344:22
jaffe 346:8
james 344:4
janet 458:7,17
459:4,14,25 461:2
461:6,15,19,25

462:9,11
january 486:6
jason 344:20
jdgoetz 345:14
jeopardize 451:5,6
jledlie 344:8
job 432:7
john 345:12,17
347:5 421:18,19
525:1
john.gisleson
345:19
jonathan 346:8
jones 345:8,12
jonesday.com
345:11,14
josh 466:17 467:5
513:3 520:21
526:9
joshua 345:4
347:6,11 467:4
526:11
judge 509:14
520:15
judging 505:17
judgment 379:8
379:16 381:24,25
383:10,22,25
384:9,16,24 385:3
385:23 386:12,21
388:6,7,14 399:15
449:3,23,23
456:24 491:8
513:18 514:7,17
517:3,15 518:11
judgments 387:25
june 343:17 348:3
390:9 467:1
528:15 529:9
530:4

justified 514:25

**k**

kaitlyn 344:5
keekhoff 344:8
keep 513:6
kept 367:25
kills 456:13
kind 468:8
knew 457:23
490:22 518:2
know 354:24
360:11,11 361:23
362:13,15 374:10
374:14 375:16
380:4,8 389:8,13
389:16 397:14
400:12 403:14
407:2 414:22
415:5,16 416:1,3
416:12,13 421:24
422:5,13 426:1
430:9,20 432:10
432:23 433:9
436:10 437:5
447:18 454:3
457:23 458:7,11
460:2,25 461:2,7
461:25 464:12
470:14,17,21
471:1 474:17
479:7 480:13
481:2 490:19
491:1 493:7,9
496:25 497:7,9,11
497:14,23,24
498:1,6,10,15
506:20 515:11,13
516:8 520:6
knowing 428:25
439:10 443:24
451:12

knowingly 443:19
443:22 444:3
knowledge 371:1
433:20 442:11,23
443:15,20 447:4
448:1 461:10
471:25 496:2
knowledgeable
461:7
known 435:25
443:25
knows 432:18
kobrin 345:4,7
347:6,11 466:19
467:4,5 468:7
469:5,13,19
470:16 471:20
472:4,11,19,24
473:8,16,20,24
474:2,9,15,22
475:2,10,16
476:21 477:23
479:11 480:5,6,12
482:3,7,16,22
483:4,17 485:11
485:16 486:4,15
486:22 487:3
488:4,8,21 489:1
489:14,21 490:14
490:21 491:5,11
491:17 492:12
494:21 495:6
496:5,12,21 497:6
498:14,22 499:20
500:14,20 501:10
501:17 502:4
503:8,15 504:7
506:19 507:20
508:9 509:7,13
510:9 511:3 512:8
512:13,19,22

520:8,19 526:11
526:18,23 527:2
**kraig** 348:10

**l**

**lacked** 443:16
451:12 461:22
**lacking** 418:17
**lake** 420:11
421:21,25 422:6
423:1,10,16,22
424:3,8 425:2,9,21
434:17 439:22
442:24 443:13
444:12,18,25
445:19,23 446:14
448:3,7,15,20
450:5,16 451:10
453:24 454:4
462:21,24 464:9
464:12 466:7
526:2
**lakeside** 344:10
**language** 403:20
**large** 375:23 439:4
528:8
**larger** 422:18
423:10 507:1
**late** 382:9
**latitude** 518:22
**launched** 349:18
**laura** 346:2
**law** 352:5,10,12
357:17,20,20,22
369:1,2 427:2,5,8
427:13,19,25
428:5,7,16,18
429:1,4,13,15,17
429:19,23 432:20
466:10,13 522:11
**laws** 370:15
372:18 381:17,22

381:22 427:9,16
427:17,19 429:12
431:2
**lawsuit** 453:12
**lawyer** 521:9
**lawyers** 437:10
453:15
**lay** 381:3,10
**ldunning** 346:5
**lead** 373:3
**leading** 376:22
497:19
**learned** 443:2
**leave** 376:23
**led** 435:12 489:22
**ledlie** 344:4
**left** 447:23 491:19
493:19
**legal** 348:10
492:14,19 493:21
493:25 519:17
530:1 533:1
**legitimacy** 376:16
**legitimate** 370:22
375:25 385:2
406:5 434:25
441:25 443:16,20
446:5,19,21 447:6
450:18,23,25
451:12 453:11
461:22 505:4,5,6
505:12 506:7,18
506:21,22 508:3,7
510:15 511:15,18
511:20 523:10
525:5
**letter** 372:24
381:21 530:19
**letters** 372:24
447:11,16

**level** 351:22
357:24 367:14
369:18 417:1
507:7 515:25
**levels** 464:11
**levin** 346:2
**levinlaw.com**
346:5,5
**lewis** 345:16
**liber** 344:9
**license** 427:21
432:5 451:5
**licensed** 351:6,10
351:14 431:8,25
432:10
**licensees** 447:25
**licensure** 432:8
433:23
**life** 451:6
**limit** 520:2
**limited** 409:7
455:6
**limiting** 359:5
**limits** 463:3,11
**line** 519:5 530:13
532:7 533:3
**lines** 396:18 404:3
**list** 384:20 438:11
502:6,15
**listed** 391:20,25
463:24 501:13
510:17 532:7,17
**listing** 532:7
**litigation** 343:5
348:6 404:22
530:6 531:3 532:3
**little** 365:20
442:16
**live** 427:14
**llc** 344:3,14,14,14

**llp** 344:9,15 345:3
345:16,21
**local** 424:11
455:22
**lodge** 380:14
520:1,9
**logical** 451:7
**long** 382:11
404:14,23 441:12
441:15,22 459:16
471:9 514:25
**longer** 442:6
**look** 364:19
365:18 371:12
374:4,21 382:4
400:11 412:8
413:15 414:3
415:2,13 416:11
438:16 439:25
453:13 454:6,7
463:19 464:14,22
464:23 478:4,5
484:11 489:25
509:12 510:10,11
511:23 521:1
**looked** 353:24
361:14 384:19
386:2 422:8 439:1
465:6 489:9
509:17
**looking** 374:8
461:9 467:7 481:5
502:12 505:13
506:4 508:10,13
508:14 514:8
**looks** 452:16 508:2
**lost** 401:12 512:1,1
**lot** 359:14 412:23
**lower** 500:9
**lpa** 346:10

| m | | | |
|---|---|---|---|
| **m** 344:20 | **may's** 375:20 | **measures** 477:4,15 | 463:5,12 465:11 |
| **machines** 366:8 | **mccann** 412:25 | 477:16 480:9 | 478:11 487:23 |
| **madam** 530:10 | 413:7,25 469:11 | **measuring** 481:2 | 490:1 498:20 |
| **main** 500:21 | 469:20 471:21,25 | 481:18 | 522:20 |
| 503:19,24 504:13 | 473:3,11,13,18,18 | **mechanics** 360:11 | **medicine** 394:18 |
| **maintain** 350:18 | 474:6 485:21 | **media** 348:3 | 396:22 449:9 |
| 353:1 429:10 | 487:24 488:16,20 | 349:14 390:7 | **meet** 358:22 |
| 436:17,24 | 489:4,11,15 | 466:24 | 367:25 396:14 |
| **maintained** | 490:22 491:25 | **medical** 370:22 | 434:4 |
| 437:24 | 492:4,18,21,25 | 376:1 385:2,12 | **meeting** 394:12,23 |
| **making** 379:7 | 493:6,13,14,24 | 420:19 425:12 | 480:21 |
| 407:7 410:16 | 494:6 495:3,7,12 | 435:1 441:25 | **meetings** 460:4 |
| 516:20 517:21 | 495:14,17,20,24 | 443:16,21 446:5 | **meets** 480:18 |
| **manage** 447:24 | **mccann's** 470:15 | 447:6 448:11 | **melsner** 344:7 |
| **management** | 489:8 495:23 | 449:14 450:18,23 | **member** 390:14 |
| 361:4 446:22 | 496:2 501:22 | 450:25 451:13 | 458:21 461:12 |
| **mandate** 383:14 | **md** 343:3 344:17 | 453:11 455:21 | **members** 463:18 |
| 465:5 | 348:8 | 461:22 468:22 | **memory** 360:4 |
| **mandated** 465:17 | **mdl** 343:3 | 469:9,15 470:7,18 | **mentioned** 375:21 |
| 466:3,5 | **mean** 355:19 | 478:23 479:19 | 514:12 |
| **mandating** 387:3 | 359:12 363:2 | 505:12 523:10 | **merit** 343:14 |
| 478:23 | 389:14 398:2 | 525:5 | 528:5 |
| **mandatory** 465:2 | 402:22 423:4 | **medically** 477:7 | **met** 391:9 404:2 |
| 465:9 | 424:22 434:7 | **medication** 358:18 | 501:25 |
| **march** 390:13 | 500:12 | 359:4 360:2 | **methodologies** |
| **marcus** 345:3,6,7 | **meaning** 393:23 | 370:21 385:1 | 453:5 |
| **mark** 363:6 | **means** 351:20 | 400:17 443:15 | **methodology** |
| **marked** 362:24 | 407:2 420:8 | 445:1 446:1,10 | 451:20 452:6 |
| 363:8 373:15,20 | 450:19 495:19 | 449:4 450:17 | **methods** 350:18 |
| 389:4 390:12 | 502:19 | 522:18,19 | **metric** 464:13 |
| **market** 345:17 | **meant** 383:25 | **medications** | 467:16 468:3,20 |
| 497:20 | 420:7 512:13 | 372:16 385:1 | 472:5 475:20,21 |
| **master** 346:10 | 513:17 | 395:15 396:16 | 477:20 478:9 |
| 390:1 491:8 | **measure** 467:19 | 419:19 435:13 | 485:18,24 486:7 |
| 520:20 526:17,19 | 475:12 477:24 | 438:1 442:5 | 488:5 526:14 |
| 526:20,25 | 479:16 482:8 | 444:21 445:19,22 | **metrics** 384:3 |
| **match** 398:17 | 483:8,21,23 485:3 | 446:22 448:13 | 459:18 462:18 |
| **matter** 348:5 | 485:12 | 449:20 451:22 | 463:21 478:11 |
| 455:20 458:13 | **measured** 482:5 | 453:10 454:3 | **michael** 344:3 |
| 528:12 | 487:5 | 455:5,23 456:12 | 347:9 462:7 |
| | | 458:25 461:21 | 521:22 522:11 |

530:5
**middle** 350:13
  374:13
**midway** 350:17
**midwest** 530:17
  533:1
**mike** 380:19 381:5
  473:20 521:25
  522:2
**miles** 399:3,6,7,12
  399:15,16 413:19
  526:14
**miller** 346:7
**mimics** 357:20
**minds** 398:21
  399:6,24 400:5
**minute** 459:13
  497:1,7,12,17,20
  498:2,15 499:7,10
  518:22 521:11
**minutes** 389:17
  459:24 497:15
  521:14
**mischaracterizes**
  415:19
**misconduct** 518:8
**misrepresent**
  377:25
**misrepresented**
  378:5
**missing** 374:13
  415:20,25
**misspoke** 493:19
**misstates** 524:6
**mistake** 492:10
**misuse** 477:9
**mix** 456:18
**mmes** 452:19
**model** 347:15,15
  362:20,20 363:13
  363:14,20 364:5

364:11,15,21
365:6 367:13,17
367:18 368:22,24
369:1,6 370:1,4
371:20 441:2
449:21
**moment** 496:6
  512:2
**month** 486:5,9,14
**morgan** 345:16
**morganlewis.com**
  345:19
**morning** 348:1,21
  348:22,23 405:25
  421:19 513:7
**mortar** 510:18
**motley** 344:3
  522:12
**motleyrice.com**
  344:7,7,8,8
**mount** 343:16
  344:6 528:14
**move** 371:15
  378:7 411:8 480:5
**mris** 396:3

**n**

**n** 344:1
**nabp** 359:12
  362:18,18 363:21
  364:2 368:11
  370:25 371:5,11
  372:23 373:1
  380:9 386:9,16
  387:11,16,18,22
  391:6 393:18
  396:17 427:1
  428:4,16,18 432:7
  432:17,19,24
  433:3 440:13,13
  441:1 447:15,21
  448:2 449:16

451:18 461:3,9,12
461:17 463:14,18
463:19 465:8,14
466:1,13 480:17
**nabp's** 373:13
  461:8 466:10
**nacds** 502:14,25
  504:13
**name** 348:10
  381:7 404:8
  405:17 421:19
  426:4 467:5
  487:24,25 488:5,6
  488:10,13 509:2,3
  530:6 531:3,4,15
  532:3,4,21
**named** 487:17
**names** 460:25
**napb** 452:15
**narxcheck** 452:15
  452:16,16 453:2,7
**national** 343:4
  347:16 348:5
  363:14 374:6
  435:10 530:6
  531:3 532:3
**nationwide** 453:22
  517:10
**near** 487:4
**nearly** 502:17
**necessarily** 410:15
**necessary** 393:18
  409:5 461:4
**need** 350:1 371:20
  376:1 378:17
  379:3 410:1 491:6
  510:10,11,22
  523:13
**needed** 374:23
  388:24 396:20
  403:24 409:17

427:3 434:4 441:5
464:25
**needs** 390:1
  506:11 523:6,8
  525:3
**negate** 443:24
**never** 461:17,17
  492:19 493:24
  496:1
**new** 382:5 389:1
  520:4
**news** 374:6
**newsletter** 347:17
  374:1,9,10 375:16
  375:20 379:23
  380:3,5 382:2
  429:10,11,25
**newsletters** 372:8
  373:6 430:6,9,12
  430:21
**nice** 429:13
**night** 377:23
**nine** 363:4
**noncontrolled**
  425:1
**nonlegitimate**
  383:5 444:16
  450:9 451:5
**nonresponsive**
  411:9
**normally** 404:18
  406:24
**northern** 343:1
  348:7
**northwest** 344:20
**notarial** 529:8
**notarized** 530:14
**notary** 343:15
  528:6 529:16
  530:25 531:10,18
  532:15,23 533:23

**note** 379:6 530:12
**noted** 380:21
  484:20 492:16
  520:21
**notes** 349:7,12,15
  415:8,22 420:5
  437:13 471:14
  528:18
**notify** 369:18
  448:3
**number** 348:3,8
  353:12 367:23
  382:12 383:16
  390:7 400:12
  413:5,16 417:10
  418:15,16,21
  419:1,2 420:4,22
  420:23 422:10
  439:4 444:11,13
  444:15 445:18
  452:8,9 466:24
  469:7 471:15
  478:4 481:6 483:9
  483:22 486:16
  495:10 500:9
  503:9 504:8 507:6
  507:12 508:11,22
  508:23 510:15
  530:7,13
**numbers** 421:8
  445:7 469:17,23
  472:21 473:9
  489:9 494:23,24
  495:2,8,12,13
  532:7
**numerous** 440:21

**o**

**oarrs** 447:5,8,12
  447:22 457:6,10
  464:25 465:1,10
  479:22

**oath** 525:25
**object** 374:16
  381:9 523:7 524:6
**objected** 403:20
  405:16
**objection** 352:14
  353:14 354:7,21
  355:5 356:10
  357:8 358:8,19
  359:7 360:3,23
  361:16,21 362:7
  364:6 367:5
  368:23 369:23
  370:5,5 371:4
  375:4,11 376:25
  377:5,12 379:18
  380:2,15,21
  382:22 384:12
  386:1,13,19
  387:17 388:8,16
  391:11 392:9,15
  393:3,22 395:25
  396:10 397:3,17
  397:24 398:24
  399:8 400:1,8
  402:25 405:7
  406:13 407:1,8
  408:8 409:24
  410:9,25 411:10
  411:17,25 412:4
  414:11,17,23
  415:6,18,18 416:4
  416:17 417:8
  418:4,25 419:7,23
  420:20 421:3,10
  422:1,7,16 423:3
  423:17,24 424:20
  425:4 426:25
  427:7 428:9
  429:21 430:16
  432:13 433:11,25

434:13,19 435:5
435:14 436:5,19
437:4,11,20 438:5
438:14,23 439:9
440:2,8,18 441:18
442:2,15 443:3
444:9 445:3,25
446:15,25 447:7
448:23 449:10
450:7 451:1,14,23
453:21,25 454:5
454:15,21 455:1
455:14 456:20
457:7 458:1,10
459:2 460:9,22
461:23 464:3
465:13 466:12
468:5,24 469:10
469:16 470:8
471:17,23 472:8
472:17,22 473:6
473:12,19 474:8
474:13,20 475:1,6
475:14 476:20
477:22 479:9
480:11 481:23
482:6,10,19,25
483:16 485:9,14
486:2,10,19 487:1
488:1,7,19,24
489:7,16 490:6,17
491:4 492:9
494:17 495:4
496:19 497:3
498:13,17 499:16
500:11,19 501:9
501:16 502:2,24
503:12 504:4
506:3 507:17,25
509:6,9,18 510:24
511:21 513:14,21

514:10 515:4,16
516:7,23 517:24
518:12 519:20
520:2,9 521:5
523:16,22 524:14
525:12,22 526:5
526:16
**objections** 380:20
  520:20
**objective** 384:1
  396:18
**obligation** 354:16
  355:1,4,11 397:2
  519:18
**obligations** 397:2
  519:17
**observed** 520:21
**obtain** 430:15
**obtained** 444:20
  445:1
**obtaining** 468:12
**occur** 451:2
  452:24 522:22,22
**occurred** 416:25
  416:25 464:19
  480:21 493:9
  498:9
**occurring** 384:17
  455:20 460:14
  508:21
**occurs** 367:14
**offensive** 403:10
**office** 404:14
  517:9,21
**officer** 426:7,11
**official** 531:15
  532:21
**oftentimes** 401:7
  402:10
**oh** 344:11 402:4
  418:10 479:4

512:15
**ohio** 343:1 344:14
  346:11 347:18
  348:8 351:7,11,15
  352:5,10,12 358:2
  372:12 374:1,15
  375:22 376:4,9,19
  377:21,23 379:12
  380:4,8,13 381:20
  381:22 425:15,18
  425:19,20 426:2
  426:11,14,15,16
  426:24 427:12
  429:1,4,8,9,10,11
  429:12,16,18
  430:1,5,9,10,13,14
  430:20,22,24
  432:21,21 433:4,7
  433:8,17,20,22
  434:1,4,8 438:12
  439:3,12,14,19,21
  440:5,7,14,14
  441:1,15 447:4,9
  447:15,18,21,23
  447:25 448:2,20
  449:9,17 452:14
  453:22 457:25
  464:8,15,17 465:6
  465:8,10,15 466:1
  466:6,8,9,9,13
  475:19 476:8,13
  476:14 478:14,21
  479:5,19,21,23,25
  524:11 530:2
**okay** 348:17
  349:14,17,23
  350:3 353:24
  354:3,24 355:22
  355:23 357:14
  363:12 364:11
  365:3,25 366:4,20

367:8 368:14
371:15 373:21,25
374:19 375:20
378:7,18 379:6
380:20 385:21
389:1 390:3
391:15 393:6
396:7 397:11
401:22,24 402:4
403:20 404:5
405:16 406:19
408:3,20,23 410:4
411:8 413:8,15,16
415:25 417:4
419:4 420:2
431:18 456:15
457:23 475:3
478:19 479:4
482:23 483:15
491:20 514:4
515:7 521:15
522:8 524:1
**once** 406:1 449:23
  450:16 455:9,15
  480:20 521:3
**oncologists** 414:21
**ones** 350:1
**online** 363:1
  512:18
**open** 350:5 362:24
  363:9 373:15
  389:3 396:18
  404:3
**operates** 480:17
**operations** 369:7
  376:12 426:2
  458:12
**opiate** 343:5 348:6
  420:12 530:6
  531:3 532:3

**opiates** 420:12
**opined** 352:20
**opinion** 351:6,10
  351:14 352:6
  353:11 354:12
  355:20 356:19
  357:17,25 358:1,9
  358:24 382:25
  383:13 409:2,13
  409:20 410:8,14
  410:18,20 411:12
  414:5 418:10,10
  419:10 455:15
  476:2 485:18,24
  486:5 507:5,21
  508:1 510:2,6,21
  515:15,17,19
  523:1,4 524:10
**opinions** 353:11
  357:16 371:16
  372:1 408:24
**opioid** 424:14
  435:13 438:1
  443:15 444:13
  445:1,19,22
  447:19 448:13
  449:4,20 450:17
  450:20 451:11,21
  453:10,18 454:3
  458:25 461:21
  463:4,12 465:11
  469:25 483:8,18
  483:21 484:6,21
  487:10,12 499:15
  504:19 505:20,25
  507:8 509:15
  522:16 523:5
  524:3,9 525:15
**opioids** 372:16
  412:17 416:19
  417:11,23 419:14

420:22 444:11
446:20 448:22
508:23
**opportunity**
  403:24
**oral** 343:13
**orally** 459:5
**order** 388:1
  505:12 507:23
  510:13 520:14
**organization**
  394:11
**organizations**
  390:15
**original** 489:10
**originally** 375:5
**osco** 371:8 496:16
**ought** 390:2
**outside** 358:2
  412:17 419:14,21
  420:4 453:12
  456:12 463:7
  497:22 522:21
**overall** 416:24
  432:14 506:8
  525:14
**overdosed** 444:20
  444:25
**overdoses** 417:12
  420:24 444:13,18
  525:15
**overlapping**
  467:20 470:1
  471:8
**oversees** 426:6
**oversight** 350:10
  352:2
**ownership** 402:24
**oxford** 345:5
**oxycodone** 375:24

| p | | | |
|---|---|---|---|

**p**

**p** 344:1,1
**p.m.** 496:8,11
　512:4,7 521:17,20
　524:21,24 527:12
**pa** 345:5,13,18
**pad** 349:12
**page** 346:3 347:2
　347:14 350:6,8,8
　350:13 352:1
　353:24 363:18
　364:20 365:24
　366:15,18,20
　367:23 374:4,14
　374:21,25 375:6,7
　376:7,8 378:24
　381:7 382:4,6,8
　391:21 392:1
　397:7,21 398:8,17
　400:11,25 401:24
　402:2 408:21,23
　413:11,15 419:9
　431:14,17 457:15
　457:16,20 468:12
　469:7 476:23
　478:25 479:3
　482:20 483:2,10
　483:13,25 484:1,6
　484:11,11,20
　485:8 486:17
　487:4 489:25
　502:5,6 520:5
　530:13,15 532:7
　533:3
**pages** 365:6 375:6
　380:24
**paid** 502:18,19
　503:17,22 504:2
　504:19 505:20
　506:1 507:13
　509:16 510:20

**pain** 375:22
　446:11,22 458:25
　461:21
**panel** 391:9,15
　400:13
**papantonio** 346:2
**paper** 349:7,12
**paragraph** 350:13
　350:15,22 355:10
　401:4 407:24
　408:9,15 477:1,2
**parameter** 399:12
　399:13
**part** 353:3,16
　354:22 360:13
　361:7,11 368:8
　369:4 380:12,12
　395:17 396:1
　406:15 408:15
　422:21 423:20
　424:17 425:22
　426:12 428:3
　433:23 435:17
　439:24 440:12
　441:21 445:21
　459:8,20 467:23
　472:18 494:19
　501:19 532:9
**partially** 415:7
**participants** 403:6
**participated** 392:2
**participation**
　477:4 478:23
　480:8
**particular** 367:23
　394:21 424:19
　425:2,9 435:12
　449:19 455:11,11
　457:1 464:24
　499:18,25 507:24
　509:15 510:18

　514:8,22,23
　516:20,21 517:11
**particularly**
　375:24 412:17
　419:14 430:8
　433:13
**parties** 521:7
　528:23,24
**partnered** 470:18
**parts** 427:19
**party** 396:18
　403:23 405:13
　529:3,6
**pass** 421:14 512:8
　512:13 524:15
　527:5
**passed** 394:13
　395:13 463:18
**patient** 370:21
　399:2 406:3 407:6
　407:14 410:1
　413:19 415:8
　420:5 424:10
　425:12 435:4,13
　436:2,4,6,10,10,11
　436:17,18,21,22
　437:2,8,13,17,24
　438:3 440:24,25
　452:17,18,20
　455:11,13,23
　456:1,7,11 457:1
　468:10,14 469:25
　470:22,24 471:14
　478:7,10 484:7
　503:3 504:25
　506:17 522:22
　523:11 525:6,7,20
　526:2
**patient's** 438:7
　451:6

**patients** 351:2,16
　361:7 376:11,22
　395:1 403:4
　404:12 420:11
　423:21 424:3,7
　434:11,18,22
　435:20,23,24
　455:3,4 467:24
　468:3 487:11,20
　489:25 500:10,24
　501:3,5 502:18
　503:17,21 504:9
　506:10 525:16
　526:15
**pattern** 362:5
　385:13 454:25
　455:5,10,16 456:6
　456:17 489:24
　508:20
**patterns** 350:24
　351:8 352:19
　354:6,17 355:2
　357:4,19 358:5,17
　359:3,25 361:15
　366:12 367:2
　368:19 369:17
　370:10 409:8
　410:17 440:17
　454:12,12,20
　455:2,7 457:5,9
**pause** 521:11
**pay** 404:15 406:21
**paying** 404:23
　503:7 506:10
**payment** 505:4
**payments** 502:7
　505:1,15 507:7,9
　507:23
**payor** 405:13
**pays** 503:3

pdmp  457:10
  465:15,18 477:3,6
  477:19,21 478:3,4
  478:9,22,23 480:8
  480:16,18,19,23
  481:13,14 482:1
pdmp's  465:19
pdmps  465:24
  484:19
pdx  496:22
pen  349:13
pennsylvania
  458:18,23 461:9
  461:14
pensacola  346:4
people  375:25
  395:10 406:19
  416:21 456:13
  480:22 481:2
percent  417:16,17
  417:17 418:6,8,11
  418:16,22,24
  419:4,19 420:9
  421:2 445:8
  502:17,23 503:9
  503:16,21 504:8
  504:18 505:20,25
  506:9,9,16 507:14
  508:4,4,4,5 509:14
  510:5,6 511:10,16
  511:17 524:2,13
percentage  417:6
  417:21 418:1
  420:17 424:25
  504:23 505:14
  506:13 507:22,22
  508:3 510:3,19
  511:13,22 524:9
percentages  506:4
  507:2,3 509:21
  510:14

perfectly  511:19
perform  432:18
  433:9 460:12
  525:23
performed  446:24
performing  489:9
period  484:19
  486:6 518:21
periodically
  372:14
permitted  514:12
permitting  513:25
person  373:3
  406:2 420:12
  444:25 445:4,9
  461:7,11 529:2
personally  385:9
  438:24 461:18
  531:11 532:15
personnel  351:1
perspective  503:2
peter  344:10
pharmacies
  350:14,17,23
  351:20 359:13,21
  361:5 366:9 371:3
  371:12 376:14
  380:10 382:25
  383:1 387:12
  394:5 403:7
  407:12 410:6
  411:15,21 412:2,7
  412:10 419:20
  421:9 422:11
  430:14 433:15
  434:17 435:10
  436:16,23 437:19
  439:22 441:23
  442:10,12,14,24
  443:2 444:22
  445:2 447:17

448:3 452:18
  453:8,18,19
  462:21 463:7,9,9
  464:14,15 466:7
  466:15 475:19
  505:14 510:17
  511:15 516:3
  517:20 519:14
  525:10
pharmacist  353:9
  354:16 355:8,16
  355:19 359:17
  360:8 361:9,15
  362:5 366:12
  368:5,9,10 369:18
  370:14,19 371:8
  379:6,14,15,24
  381:24,25 383:5
  383:18 384:1,16
  385:2,7 386:4
  387:1,7,19,24
  388:1,5,13,22,24
  398:4,23 399:13
  402:20 407:20
  408:12 410:17
  411:1,6,6 415:15
  415:22 416:2
  425:9 428:22,25
  429:1,3,7,19 430:1
  430:7 432:18,23
  434:16 435:2,3,9
  435:11 436:7,12
  437:23 438:18,22
  439:1 440:21
  441:12,16,22
  443:13,17,25
  444:3 449:22
  450:1,11 452:25
  455:12,15,24
  456:4,9,15,19
  459:19 463:25

464:1 465:12
  503:2 505:10
  506:15 508:2,6
  514:6,21 516:19
  517:22 519:17
  523:9 525:4,9
pharmacist's
  383:22 384:8,24
  386:11 388:6
  396:4 397:1
  455:17 456:3,23
  509:2 517:2,6,14
pharmacists
  350:25 351:2,12
  351:17,22 353:10
  357:21,24 358:4
  358:18 359:4
  360:1,13 361:10
  361:19,20,25
  362:11 371:17
  372:9,15 376:9,21
  379:22 380:6,6,7
  381:15,17,21
  382:16 383:9,14
  384:18 385:22
  386:20 387:3,14
  388:11 393:1,12
  393:25 394:5,6,10
  394:14,15,17,25
  395:14,18 396:2,8
  396:20,21 397:16
  397:21 400:22
  401:1 402:1,6
  403:5,7 404:11
  407:2,25 408:4
  409:4,5,13,17,20
  409:25 410:12,21
  411:12 425:15,18
  425:19 426:20,24
  429:9,14 430:14
  430:22 431:4,8,21

431:25 432:8,9
433:9,22 434:2,11
434:21 435:19,25
436:8 438:10
439:5,13,18 441:8
442:12,23 443:7
450:5 459:6,17
460:11,14,19
461:20,25 462:2,5
463:15,16,22
464:24 465:10
466:14 471:13
480:24,24 498:12
507:4 511:9
513:10,17,25
514:13,15,16
517:10,23 518:10
519:15,16 520:3
523:2

**pharmacy** 344:13
347:15,16,18
351:1,6,10,14
352:18 353:1
354:5 355:1,6,9,17
355:19 357:3,18
358:1,2,5,9,15
359:1,6,9,16,22,24
360:5,6 361:18
363:14,15 364:12
364:21 365:7,11
366:4,10,16,21,24
366:25 367:13,20
367:25 368:2,17
368:19 369:16
370:8 371:5,6
372:7,20 373:4,8
374:2 376:20
377:4,22 379:22
380:5,8,13 381:20
383:13 385:9,11
385:22 386:16

387:3,19,22
388:11 397:23
403:5,12,12
404:15 409:16
411:22 412:9
421:24 422:6,14
423:1,9,15,22
424:2,7,19 425:2
425:16,21 426:2
426:12,14,16,16
426:20 427:2,5,8
427:10,13,22,25
428:5,7,16,19,20
428:22 429:4,13
429:17,19,23
430:5,7,13,22,24
432:22 433:4,7,8
433:18,20 434:1,4
435:19 436:9,18
437:25 438:12
439:4,11,12,15,19
439:21 440:6,7,14
440:15,20 441:1
441:11 445:10
447:4,9,16,19,22
448:2,4 449:18,18
451:19 452:7,25
454:11 455:9
456:6,16 458:18
459:12 460:3
461:4,15,16
462:17,24 463:2
463:20 464:8,9,18
464:22,23,24
465:4,6,9 466:9,15
471:24 475:4,12
476:13 486:24,24
496:13,18 497:13
497:14,19,24
498:4,6 499:8
503:2,10,19,24

504:10 505:13,17
505:22 506:8,14
506:25 507:6,10
507:24 510:19
511:10,13 516:5
516:13,15 518:3,6
519:10 520:3
523:3 524:12,12

**pharmacy's**
354:16 379:13
413:1 439:25
440:15 476:8,14
506:12

**phi** 509:1

**philadelphia**
345:18

**phone** 490:15
492:20 495:22
530:3

**physician** 383:3
385:7 387:9
404:14 451:3
452:14 467:25
468:4 469:1
470:22,25 503:21
516:11

**physician's** 470:23
502:18 503:17
504:9

**physicians** 391:23
394:4,9 395:17,21
396:3,19 400:21

**pick** 484:17

**picked** 486:5

**pill** 366:7

**pills** 453:18
498:12,24 499:5

**pittsburgh** 345:5
345:13

**pivot** 382:5

**place** 376:13
381:23

**plaintiff's** 437:10

**plaintiffs** 344:2
522:12

**pleasant** 343:16
344:6 528:14

**please** 348:13
349:20 350:5
362:24 378:16,25
379:6 381:8
389:12 413:11
431:16,19 492:13
521:23 530:11,11

**pocket** 503:7

**podgurski** 462:7

**poerschke** 346:3

**point** 352:24 355:9
359:6,8 361:10
367:2,9 405:24
408:6,9 429:17
444:14 449:16
461:14 482:12
497:16,21 498:1
498:18 502:23
520:1 527:10

**pointed** 399:10

**points** 362:8 394:2
444:10 458:22
489:19 502:9

**policies** 383:2,20
384:17 386:10
387:13 442:10,13
443:8,11 502:7,16
513:8,24 515:2
518:9

**policy** 383:9
384:22 388:4
430:25 516:25
517:7,8,14

polster 520:15
populations 424:15
portion 374:12,13
portions 372:23
posed 399:9
position 356:15
359:14 380:12
462:8 516:4
positions 403:20
possibility 452:3
possible 349:19
369:19 393:2,15
393:19 410:17
477:9
possibly 409:9
potential 362:5
366:12 401:9
402:12 452:2,23
454:16 456:6,17
484:24
potentially 400:18
power 401:13
powerpoints 434:5
ppoerschke 346:5
practical 431:10
432:2
practice 355:17
364:21 365:7
367:13,20 368:4
368:25 369:2
370:8,13,13,15
372:9,19 373:8
377:24 394:18
396:9,22 403:13
405:12 429:8
431:1 441:2 452:7
468:23 469:9,15
470:7,19 471:6
478:6,14,21 479:5

479:23 516:12
524:12
practiced 425:18
practices 364:16
424:18,21 425:8
425:21 448:8
458:24 459:9
practicing 371:6
376:21 380:6
practitioner 355:7
355:18 476:14
practitioners
409:9 449:14
478:8 479:15
pratt 344:16
preexisting 435:3
prepared 520:11
preparing 425:25
prescribe 449:4
471:3
prescribed 395:16
470:1
prescriber 377:25
382:11,12 383:19
384:20,25 385:4
385:12 386:24
387:4 399:4 410:1
413:17,20 450:8
450:16,22 451:4
451:10 452:17
455:11,21,25
456:8 468:14,15
468:16 469:2
470:12 478:15
487:14 499:13,23
503:10 513:19
514:8,22 516:6,14
516:21 517:11,18
526:15
prescriber's
449:19 450:19

509:3
prescribers 351:2
351:16 377:22
384:19,21 386:18
387:15 393:12,24
395:1 397:15
402:2 403:2,13,14
433:16 438:18
447:5,10,11,13,18
447:20 448:4
449:2,6,8 450:3,12
452:19 465:17
467:16,21 468:14
468:22 470:2,10
472:6,10 478:5,5
478:10 480:24,25
481:6 490:2 515:3
prescribing 383:4
390:18 395:14
425:7 448:8,13,22
455:6 470:22,23
477:5,8 478:15
487:6,18,25 488:6
488:9,10,11
489:24 499:12
500:9,15,16,22,22
500:23 501:5,8,15
501:24,25
prescription 343:5
348:6 350:19
355:13,14 360:14
362:12 370:22
382:16 386:23
387:8 388:15
395:18,22,23
404:13,16,18
406:14,22,24
407:16 410:2
414:4,7 415:3,10
416:11,14 431:6,8
431:23,25 432:12

433:10 434:24
435:13,21 436:12
438:1,11,22
440:23 441:9,13
441:17,24 442:4
443:14,16,18,19
444:4,11,13,21
445:1,10 448:22
450:18 452:1
455:13 456:5,25
460:8 463:5,24
465:11 468:10
484:18 487:10
497:15 503:4
504:22,24,25
505:5,5 506:18,21
506:23 508:3,8,24
508:25 509:12,16
510:7,12 513:11
513:19 514:1,5,9
514:22 517:23
519:16 522:17,24
523:5,9,23 525:5
525:14 530:6
531:3 532:3
prescriptions
360:8 362:1 368:5
369:11 376:13,16
376:23 382:11
383:4,15 384:20
385:4,10,23
387:14 388:12
394:15,17 413:6
413:22 414:1,5,10
414:16,20,24
415:4,13 416:3,8
416:15,22 417:2,5
417:6 418:2,11,18
418:21 420:4,18
420:25 425:1,13
431:13 435:24

437:9,18 438:10
438:17 443:1
444:15 445:5,8
446:3,8,17,18
447:6,17 449:19
449:24 450:4,9,20
450:23,24 451:4
451:12,21 452:9
452:10 453:10
455:25 459:7
460:11,15 461:21
462:18 463:25
464:4 466:4
469:18,21 470:1
472:1,2 474:18
483:11,23 484:14
487:12 499:13
502:19 503:18
504:19 505:15,18
505:20 506:1,7,10
507:6,8,11,15
508:11,18,22
509:15 510:15,19
511:11,16 514:7
516:21 519:13
523:20 524:3,9
525:17 526:3
**present**  346:8
436:16 489:11
528:23
**presentation**
404:12
**presented**  364:8
406:17 439:16
455:13 465:12
472:9
**presenting**  468:10
**presents**  522:17
**president**  458:22
461:16

**pressure**  460:10
464:2
**pressured**  459:17
**pretty**  462:13,14
**prevalent**  490:10
**prevent**  351:3
387:13
**preventing**  519:16
**previously**  493:4
493:12
**primarily**  467:6
**primary**  431:2
500:4
**principal**  392:5
**prior**  358:18 359:4
360:1,7 362:11
401:10 402:13
441:4 465:16
484:18 486:11
501:12
**probable**  408:14
**probably**  377:11
418:6 467:8
482:13,21 483:2
501:21 504:19
505:21
**problem**  375:22
376:4,6 395:20
396:1 484:20
**problematic**  401:9
402:12 513:20
**problems**  376:12
393:24 447:12
**procedure**  343:18
528:16 531:5
532:5
**procedures**  443:8
443:11
**proceed**  348:16
**proceeded**  453:15

**proceedings**
493:19
**process**  360:13
361:7,8,12 366:7
406:7,15,16
407:16 432:24
440:24,25 493:18
511:16
**processed**  511:11
**processes**  511:14
**processing**  440:23
**produced**  343:14
473:17,20
**product**  370:11
504:11
**production**  530:15
530:17,22
**products**  370:17
**professional**
355:17 383:22,25
386:12 399:14
449:3 456:24
513:18 514:7
515:21,23,24,25
518:8
**professionally**
515:18
**profile**  436:6,11
436:17,22 437:3,9
437:12,24 438:3,7
440:25
**profiles**  437:17
484:19
**program**  431:10
432:2 452:15,24
**programs**  434:5
457:10 480:16,18
480:19 484:19
**prohibited**  519:24
**promote**  477:7

**proper**  381:10
474:18
**proportion**  422:17
**prospective**
367:22 394:19
**provide**  352:11,23
358:3 360:12
361:6,19 362:20
364:7 372:8
387:25 394:16
409:2,4 411:5
412:14 417:19
419:12 428:18
434:2 449:17
507:1
**provided**  357:5
358:17 359:3
360:1 361:25
371:16 372:1
385:13 416:18
426:16 428:19,21
434:5 443:7,12
451:24 454:22
480:23 481:12
485:19 490:18,20
490:25 491:2
492:5 493:11
494:20,22
**providers**  478:23
**provides**  360:7
361:22 362:4,11
**providing**  375:23
388:24 461:3
**provision**  352:17
353:13,25 356:14
356:16
**provisions**  352:11
352:25 353:17
354:19 355:24
356:4,20 357:2,4
357:10,11,15

[provisions - received]

377:16
**public** 343:15
406:21 460:4
528:7 529:16
531:10,18 532:15
532:23 533:23
**publication**
428:13
**publish** 362:19,19
363:11,21 364:23
**published** 364:12
404:7
**pull** 348:25 392:11
499:21
**purchase** 428:23
**purchased** 452:15
**purpose** 370:23
393:6,7,23 396:17
404:3 420:19
435:1 442:1
443:16,21 447:6
450:9,18,23,25
451:5,13 453:11
461:22 511:18
523:10 525:5
**purposes** 383:5
385:2 444:16
511:20
**pursuant** 343:17
528:15
**put** 348:25 350:2
366:24 372:8
373:22 378:17
384:20 403:7
405:17 413:8
427:10 499:5
502:25
**puts** 498:12,19
**pweinberger**
344:12

**q**

**qualify** 417:9,14
419:4 420:6
**quantify** 418:17
420:6,14
**quantities** 412:16
419:13 446:1,10
487:23
**quantity** 418:23
445:22 490:2
**question** 356:8,23
357:9 358:25
361:17 368:13,16
370:1,4 371:10
378:12 381:13
387:11 388:18
399:9,23 401:21
403:25 407:9
408:3 409:19
410:20 412:8
414:13 430:19
431:19 434:20
442:17 459:15
461:24 483:20
486:11 488:2
489:11 493:15,17
497:5 499:17
503:5,14 506:5
509:19 511:5
517:16 518:25
519:1 526:6,19
**questioner** 512:14
**questioning**
394:25 395:1
417:25 527:1
**questions** 347:3,5
347:6,8,9,11
348:20 357:2
378:10 421:13,18
422:13 429:15
438:15 466:16

467:4,12 475:18
483:6 510:13,25
512:10 513:2,5,7
520:1,6,10,12,16
521:6,22 522:3,6
522:13 524:18
526:8,11 527:3
**quick** 389:15,22
466:20 476:24
**quickly** 512:1
**quite** 359:14
**quote** 376:11
467:24 477:15
**quoted** 353:25
354:3

**r**

**r** 344:1,4 346:9,10
**rafferty** 346:2
**raised** 389:8
459:25 460:3
516:9
**ran** 426:1 488:14
488:20
**rang** 498:18
**range** 418:7
**rates** 477:3 480:8
**rays** 396:2
**reacting** 393:12
**read** 363:19
376:17 377:7
382:9 401:21
402:15 405:23
408:7 419:9
425:17 429:3,7
457:13 458:4
468:17 477:3,11
479:2 481:17
487:15 515:7,11
531:5,6,12 532:5,6
532:17

**readily** 441:7
**reading** 431:15,16
468:11 530:19
**reads** 374:22
401:4 402:8
406:25
**real** 466:19 476:24
**realize** 436:13
493:17 508:18
**really** 366:17
520:24
**realtime** 343:15
528:5
**reason** 361:1
389:20 416:9,16
417:7 418:3,12
467:23 468:2
471:2 487:17
503:1 513:12
514:23,25 530:14
532:8 533:3
**reasonable** 398:21
399:5,6,24 400:5
445:22
**recall** 362:22
376:4,6,19 377:1
379:12,19 429:22
458:2,4 465:20
474:5,7,10,14,16
474:21,23 481:19
496:20,23,24
497:4 515:10,12
516:8
**receipt** 530:18
**receive** 432:4
490:1 495:16
506:15
**received** 442:14
445:10 463:15
473:13 509:10

receives 361:9
370:21
receiving 455:3,5
456:16
recess 390:6
401:16 466:23
491:14 496:9
512:5 521:18
524:22
recognize 409:10
recognized 355:15
recommendation
465:14 466:1
recommendations
461:8
recommended
446:4
record 348:2,14
375:13 380:21,25
390:4,9 401:14,18
430:25 436:2,4
466:19,21 467:1
471:14 491:6,9,11
491:12,16,19
496:5,7,11 497:12
512:2,3,7 516:17
520:21 521:13,16
521:20 524:19,20
524:24 527:8,9,11
528:20 532:9
recorded 348:4
368:3 460:4
477:19 497:18
498:21 499:1,7
501:21
recording 368:7
recordkeeping
356:17
records 350:19
353:2,4 367:24
425:12 436:21

497:14
recross 347:10
526:10
red 351:22,23
355:12,15 368:6
369:19 370:11
390:17 391:2
392:2 393:8,15,19
393:21,25 394:1
396:24 397:4,8,11
397:14,15,20,23
397:25 398:2,3,4,7
398:8,12,16,17,22
399:2,11,11,16,17
399:18,25 400:2,6
400:13 401:5
402:9 403:3
404:24,25 405:4
405:21 406:4
407:21 408:1,6,10
409:10 411:19
412:23,25 413:5
413:15,18,23
415:14,23 416:23
417:20 421:9
429:20 430:2,8,11
431:12 432:11
433:23 436:13
443:18,25 444:4,6
444:6 446:8 447:9
447:12 451:20
452:1,2,9,17 453:3
453:14 454:6,16
455:7,16,16,18,18
456:10 459:6,12
461:5 462:6 464:1
465:3 466:4 469:1
469:3,6,7,22,23
471:1,24 472:3,5
473:13,14 478:18
482:2 485:7

486:16 489:15,17
489:22,24 490:11
492:1,8 493:10
494:3,13 499:12
499:18,25 500:2,7
502:20 503:1,5
506:10 507:9
508:18 509:22,24
510:4,4,6,7 522:17
522:20,23 523:5,6
523:8,13,20,23
524:2,9 525:3,10
526:12,14
redirect 347:7
513:1 521:12
526:13
reduced 528:18
refer 365:16
410:10 457:12
467:8
reference 445:18
480:1 481:25
483:25 484:9
530:7 531:2 532:2
referenced 494:1
531:11 532:15
references 475:7
476:1 482:14
483:3
referencing
477:17
referred 380:7
492:15 517:7
referring 352:12
386:6 457:19
484:10 516:25
reflect 367:18
reflected 352:4,9
491:24
reflective 367:14

refreshing 360:4
refusal 383:2,20
384:7,15 385:16
386:5,10 387:13
388:4 516:10,12
refusals 382:21
386:17 513:8
refuse 383:14
385:23 386:23
387:3 449:18
455:12 456:5
513:11 514:1,5
516:19
refused 382:10
384:22 385:9
405:17
refusing 382:10,20
387:2
regard 450:2
509:10,22
regarding 350:9
371:17 373:7
393:25 401:25
469:25 496:25
regardless 514:20
regional 394:13
registered 343:14
431:8,25 528:5
registrant 387:20
registrants 447:24
regulation 354:11
regulations 363:21
372:19 381:18,23
479:23
regulator 353:9
reimbursement
405:13
related 390:18
400:17 452:3
502:7

relates 343:6
relating 355:12
  438:3 463:4,11
relationship 435:13
  435:19 436:9
relationships
  434:11,18
relative 529:3
relatively 374:9
  422:17
released 428:13,16
relevant 352:5,10
  367:16 489:5
relied 391:1
  476:11 479:6,14
  482:8
relies 456:19
rely 354:19 356:4
  357:17 393:20
  476:6 480:13
relying 353:13,19
  353:22 415:16
  480:7 491:5
remaining 512:9
  520:12
remember 384:5
  395:8,10 430:3
  452:13 467:13,17
  483:5,7
remote 343:9
remotely 348:9
  528:10
repeat 431:19
  483:20
repeatedly 356:23
rephrase 430:19
  442:18
replied 495:11
report 349:1,6
  350:5,9 351:19,20
  352:20 355:20

369:15 372:2
382:4,8 385:18,20
390:24 398:18
400:3 408:21
412:22 413:4,8
414:1 425:25
431:4 438:11
439:3,18 449:8,14
457:12,16 463:17
464:5 467:7,8
468:9,9,12,20
471:16 472:9,18
472:20,23 473:1,1
473:4,7,11,13,17
473:22 474:4
475:8,22 476:7,24
477:3,13 478:17
478:19 479:19
480:1 482:4,11,21
483:10 484:2
486:20 487:4,9
492:15,15,22,25
493:2 494:8,11,16
502:5 520:5
reported 385:8
  480:22
reporter 343:15
  343:15,15 348:12
  348:18 363:5,7
  401:12 528:4,5,6,6
  529:15 531:7
reporting 360:17
  360:22 361:2,11
  455:21
reports 463:20
  464:25 479:22
  481:13 492:23
  495:14
represent 353:11
  421:20 467:6

representative
  515:8
represented
  377:20 479:20
  528:24
request 377:15
  426:14 431:3
  437:8,12,13
  464:25 532:9,11
requested 507:18
  528:22
requesting 404:15
  406:21
require 357:3
required 351:7,11
  351:15 354:18
  357:18 362:6,9
  368:18 369:21
  400:6 407:21
  408:5 427:21
  431:9 432:1
  436:17,20,21,23
  466:8 530:25
requirement
  367:4 368:16,20
  368:21 369:3
  370:2,3 384:10
  408:17 426:23
  429:9 440:9 465:5
  502:1
requirements
  368:1 376:10
  384:4 427:11
  428:1 441:3 460:8
  466:9
requires 355:4
  366:25 368:4
  370:13,14 427:13
  429:1,19
research 359:9
  475:3,7,12

researched 377:23
researchers 475:3
residing 529:21
resolution 355:15
  394:13,14 395:13
  407:21,25 408:5
  408:12 429:20
  430:2 433:23
  459:6 461:5 462:6
  463:18 523:13
resolve 355:13
  368:6 394:24
  409:10 415:23
  431:12 432:11
  455:17,18
resolved 417:20
  436:14 443:21
  444:1,6 446:8
  456:9,13 506:11
  508:19 510:5
  522:20,24 523:6,8
  523:21,23 524:10
  525:4
resolving 430:11
  525:10
resources 481:11
respect 465:10
  520:15 523:4
respectfully
  406:10
respiratory
  484:22
respond 459:18
  486:11 511:1
response 357:1
  368:12 378:8
responses 438:16
responsibilities
  352:3,9 355:8
  393:11 394:19
  396:22 428:3

**responsibility**
353:20 355:16
357:12,25 371:16
371:18 372:3
373:3,9 374:22
375:3 376:10,22
379:14,25 380:11
381:23 387:20,21
388:23 392:7,10
392:17 394:1,6,10
395:2 396:5,15
402:21 409:6,14
409:21 410:22
411:13 430:6
434:3 438:13
439:7,17 449:13
453:14 454:7
455:17 456:4
463:6,13 519:19
**responsible**
357:21 429:8
**rest** 448:16 466:8
**rested** 373:9
379:14
**restricted** 464:12
**rests** 411:4
**result** 405:22
412:14 413:4
419:11 451:21
525:9
**resulting** 417:12
**retail** 371:2
407:12 409:15,22
410:6,23 411:15
419:20 421:9
516:5
**retain** 350:18
**retention** 430:25
**returned** 530:18
**returning** 526:12

**reveals** 469:24
472:14
**review** 364:7
367:21,22 369:10
369:14 370:8
385:19 394:20
414:24 425:12
428:4 433:10
437:17,24 438:4
439:7 440:15
443:6 454:13,19
457:22 458:3
475:22 476:22
484:18 526:1
530:12 531:1
532:1
**reviewed** 360:17
361:8 386:7
443:11 454:11,18
458:4 478:1
479:23 481:14
492:22
**reviewing** 360:21
361:2 430:4
**rice** 344:3 522:12
**right** 352:13
354:14 355:22
359:18 363:3,24
364:13,17 365:11
365:14 366:21
369:15,22 370:21
371:25 372:4,10
372:12,16,24
373:4,8,11 374:5,6
374:9,23 375:8
381:13,25 382:17
382:21 383:11,17
385:25 391:3,7,18
391:22 392:3,22
392:23 393:16
395:24 396:16

397:16,23 400:14
400:19,23 402:1
402:19 403:16,18
403:22,24 404:8
404:19,25 405:6
405:14,18 406:12
406:19 407:14
408:1,24 410:8,18
411:23 412:20,23
413:2,6,9,20,24
414:7,10,16,22
415:4,15,17 416:3
416:9 419:16,25
432:18 444:7
454:18 457:21
462:16 465:18
467:9 469:24
470:4 473:9,24,25
477:11 479:1,6
481:21 482:17
484:10 485:24
487:4,19,20 496:4
496:13 502:1,7
503:22 504:2,10
504:12 505:8
506:20,23 512:21
512:23 514:24
519:7 526:20
**risk** 484:22
**rite** 345:15 421:20
421:24 437:2,8
439:5 443:6,12
450:3,5,8,12
457:12 458:9,24
459:5,8,11,15,25
460:1,19 461:20
462:1,4,5,7,16,20
463:8 486:1 494:9
494:15 502:11
521:5 525:1

**rmr** 529:14
**robert** 346:7
**role** 371:11 373:1
403:9 404:1
440:12 458:9,17
458:20 462:2
**room** 452:14
**row** 494:14
**rph** 343:9,14
527:18 528:9
530:8 531:4,9
532:4,13 533:20
**rules** 343:17
347:15 362:20
363:14,20 364:21
365:7 367:17,18
368:22,24 369:1,6
369:8 377:24
381:22 429:8
459:13 478:14,21
479:5 524:12
528:16 531:5
532:5
**run** 412:25 469:17
469:23 474:17
478:19 488:12,16
492:2
**rung** 498:18
**running** 491:7
495:12
**rushing** 389:2
**rx** 344:14 432:15

**s**

**s** 344:1 530:15
532:8,8 533:3
**safe** 399:13
**saith** 527:14
**sake** 373:21
**sale** 497:17,21
498:11,18,25
499:1 501:15

[sample - signatory]

sample 454:22
455:6 509:10
sat 391:9
saw 360:15 381:2
480:25
saying 356:5
357:10 398:7,12
399:4 407:12
504:15 505:19
509:14,21 510:17
510:21 511:8,13
says 353:1,3
356:16 367:3,24
370:16 379:6
382:2 404:11
405:10,15,19,22
405:25 406:10,19
406:21 408:10
443:23 477:2
484:6 494:8
502:16 511:9
scheduled 343:17
schierholt 426:5
426:10
science 475:4
scope 453:12
454:6 526:16,25
527:4
score 452:20,21,22
452:23
screen 365:12,16
366:18 373:23
389:9
scripts 487:19
504:1
scroll 365:5
seal 529:8 531:15
532:21
second 353:7
362:13 374:4,14
374:25 376:8

378:23,24,24
379:4,4 394:16
395:17 397:9
401:4 402:5
412:13 419:10
494:3
secondary 508:5
section 350:9
352:15 353:7,20
364:20 365:6
366:15,20,23
367:3,9,23 372:3
374:21,25 375:2
375:10 380:24
397:8,11,11,14
400:16,16,25
401:25 403:8
404:10 427:11
429:22 476:24
477:1 483:15,18
484:10
sections 352:21,25
353:10,16,22,23
365:10 377:8
402:24 403:2
secure 462:15
see 350:11,20
354:3 356:25
364:20 365:5,7,10
365:12,16,19
366:15,20 374:4
376:2 379:1,2,10
382:13 387:5
389:10 397:8,20
397:22 399:3
401:11 409:11
477:2 478:24
487:7 489:18
491:18,22 495:19
502:11,21,22
505:1 509:19

521:2
seeing 365:1 387:9
415:9 478:10
seek 422:22
seeking 432:10
seen 375:15
385:15,21,24
444:5
selected 432:21
selecting 468:2
send 447:16
sends 379:23
447:10
sense 451:3
sent 349:19 381:21
490:16
sentence 350:20
350:22 376:8
378:17,24 379:4
401:4 402:5 408:6
412:13 419:10
472:14 479:2
separate 370:7
443:1
september 529:20
series 427:18
513:5
serious 432:17
433:17
seriously 376:11
serve 396:17
served 424:7
436:18 458:21
473:11 478:2
service 345:2
423:10,11
serviced 422:23,25
423:15,22
services 344:14
set 371:21 382:3
399:5 414:4

430:12 471:1
486:14 488:14
501:19,20 529:7
sets 485:19,22
settlement 457:13
457:14,24
seven 436:7
shapira 345:3
shapira.com 345:6
345:7
shares 521:5
sheet 530:13 532:7
532:10,18 533:1
shibley 344:9
shopping 377:21
467:12,16,20
468:19 471:16
475:5,13,20,23,25
476:4,7,9,13,23
477:5,16,16,18,20
478:13 479:16,18
480:9,23,25 481:3
481:4,18 482:5,9
short 374:9,15
421:13 471:8
509:1
shorthand 343:15
528:6
show 354:4 498:23
showed 488:14
showing 375:6
444:5
shown 476:9
530:16
shows 375:5
sic 420:13
side 493:22
sign 364:13 403:22
406:8
signatory 404:7

| | | | |
|---|---|---|---|
| signature 528:22 | 351:4,5,9,13,18,25 | 408:22,25 409:12 | 465:21 466:18 |
| 529:13 530:14 | 352:7,15 353:23 | 409:18 410:10,19 | 467:10,14,18,22 |
| signed 367:3 | 354:8,22 356:11 | 411:1,19,24 | 468:1,18 469:4,12 |
| 368:22 370:2 | 357:7,16 359:14 | 412:21,24 413:3,7 | 469:18,22 470:3,5 |
| 405:2,19 531:13 | 359:19 360:4,11 | 413:10,14,17,21 | 471:19 472:9,15 |
| 532:18 | 360:18,20,24 | 414:8,12,18,25 | 473:15 474:7,21 |
| significance | 361:17 362:8,23 | 415:7 416:10 | 474:25 475:9,15 |
| 521:24 522:16,18 | 363:4,9,17,23,25 | 417:10,18 418:8 | 475:21,24 476:4 |
| significant 412:16 | 364:3,14,18,22 | 418:13,22 419:2,6 | 476:16 477:12,14 |
| 416:25 417:10,13 | 365:9,13,19 366:3 | 419:17 420:1,21 | 477:19 478:12,25 |
| 417:14 418:5,5,15 | 366:13,19,22 | 421:4,11,15,23 | 479:4,10 481:20 |
| 418:15,20,21,23 | 367:6,10 368:24 | 422:2,11,17,24 | 482:15,21 483:1,7 |
| 419:1,1,5,13 420:3 | 369:13,24 370:7 | 423:5,13,18,25 | 483:13 484:12,16 |
| 420:7,7,13,15,25 | 371:14,22 372:5 | 424:5,9,16 425:5 | 484:25 485:2,5,10 |
| 421:2,11 444:10 | 372:11,13,17,21 | 425:11,14,17,24 | 485:15,23 486:3 |
| 444:15 445:18 | 372:25 373:5,10 | 426:3,5,8,13,17,22 | 486:14,21 487:2,8 |
| 459:13 462:14 | 373:12,14,17 | 427:24 428:2,6,17 | 487:16,21 489:3 |
| 489:10 490:8,10 | 374:3,7,10,24 | 429:22 430:11 | 489:13 491:21 |
| 492:6 506:6,17 | 376:3,6,18 377:1,6 | 431:3,15,18 432:6 | 492:3,10,23 493:3 |
| 509:23 524:2 | 377:9,18 379:2,5 | 432:15 433:5,18 | 493:15 494:6 |
| signing 530:19 | 379:11,19 381:16 | 434:9,14,20 435:6 | 495:1,9,12,15,18 |
| signs 390:17 392:3 | 381:19 382:2,7,14 | 435:15,22 436:1,3 | 495:21,24 496:3,3 |
| 396:25 405:11 | 382:18,23 383:8 | 436:14 437:5,21 | 496:16,20 497:5 |
| similar 452:21 | 383:12,19,23 | 438:2,6,8,16,24 | 497:18,22,25 |
| 468:13 481:5,8,17 | 384:6,11 385:17 | 439:11,23 440:3 | 498:9,25 499:9,19 |
| simply 392:18 | 385:20 386:2,14 | 440:10,19 441:9 | 500:12,18 501:1 |
| 394:14 432:24 | 386:24 387:6,18 | 441:14,19 443:4,9 | 501:12,13,21 |
| 453:13 470:14 | 388:9,17 390:21 | 444:8,23 446:6,16 | 502:3,8,13,22 |
| 489:17 | 390:25 391:4,8,12 | 447:2,8 448:6,10 | 503:13,23 504:5 |
| simultaneous | 391:19,24 392:4,6 | 448:14,18 449:1 | 504:15,21 505:3,7 |
| 375:12 480:3 | 392:11,16,20,24 | 449:11 450:21 | 505:24 508:16,23 |
| 519:23 | 393:4,17 395:6,17 | 451:3,16,24 | 509:20 511:4,22 |
| sincerely 530:21 | 396:11 397:5,10 | 452:11 453:7,16 | 525:23 530:10 |
| single 359:23 | 397:13,18,25 | 454:1,8,17 455:15 | sitting 357:1,5 |
| 444:25 465:11 | 398:11,14,20,25 | 456:14,21 457:2 | 359:23 417:25 |
| 513:19 514:6 | 400:3,9,15,20,24 | 457:19,22 458:5,8 | 418:13 420:16 |
| 522:16,23 525:7 | 401:3 402:16,20 | 458:19 459:21 | situation 442:5,6 |
| 526:2 | 403:1,19,25 404:9 | 460:23 461:1,13 | 463:19 481:7,10 |
| sir 348:18,23 | 404:20 405:1,8,20 | 461:17,24 462:19 | situations 405:22 |
| 349:3,5,9,13,16,22 | 406:9,10,16 | 462:22 463:1 | 459:19 471:6,9 |
| 350:4,7,12,16 | 407:10 408:2,9,17 | 464:13,16 465:7 | 499:21 |

small 365:20
smaller 423:12
smallest 422:10
smith 388:12,15
software 496:17
sold 454:4
solely 456:5
solutions 348:11
  530:1 533:1
somebody 399:4
  461:11
someone's 389:9
sorry 371:24
  389:2,14,16
  401:13 402:4
  407:9 414:12
  453:24 463:7
  476:25 483:13
  488:2,25 494:10
  497:22 500:12
  502:8,10 512:13
  512:15,22 518:20
  520:18 522:9
  524:16 526:23
sort 364:1 392:7
sought 434:18
sound 467:9
sounds 457:21
source 430:23
  431:2
sources 480:15,16
  481:20 483:2
south 343:16
  344:6 346:3
  376:15 528:14
spaeder 344:15,19
spangenberg
  344:9
spanglaw.com
  344:12

speak 392:6 404:7
  425:15,20 426:10
  448:7 457:8
  460:19
speaking 380:19
special 346:10
  390:1 491:7
  520:20 526:17,19
  526:20,25
specialmaster.law
  346:12
specialty 405:12
specific 352:25
  355:24 356:4
  373:2 399:11
  402:24 410:5,7,22
  411:14 417:1
  422:22 423:14
  424:18 429:22
  441:6 445:4
  447:19 457:16
  465:20 475:21
  525:13,20
specifically 352:22
  355:3,6 356:18
  358:20 395:11
  429:18 430:1,3
  444:23 448:20
  453:7 464:20
  515:10,12 520:8
specifics 481:19
specify 410:11
  427:18
speculate 420:17
speculation
  420:21 451:7
spoke 460:1
  479:17 492:19
ss 528:1
st 346:3

staff 364:7 461:11
  492:4 495:14,23
  496:2
staffing 462:20,23
  462:25 464:11
stakeholder
  390:14 391:13,21
  403:21 502:6,15
stakeholders
  390:17 392:17
  393:8,14 394:11
  394:23 395:5
  396:24 397:7,12
  398:5,9 401:25
  402:18,20,23
  403:11,17 405:3
stamp 498:23
  499:23 501:7,11
stand 392:13
  476:5
standard 358:22
  448:12,14,17
  479:21 481:9
standards 399:20
  481:5,17
start 401:21
started 381:7
  519:2
starts 391:22
  484:10
state 343:16
  347:15,18 352:5
  352:10,12 357:17
  357:20,24 362:21
  363:14 364:11,16
  367:13,14 369:1,2
  370:15 371:5
  372:7,10 373:2,4
  373:10 374:1
  376:23 377:3
  379:12,21 381:20

385:8 427:8,9,16
  427:19,22 428:10
  428:19 429:18
  431:1,9 432:1,14
  432:19 433:1
  439:10 451:19
  457:24 461:3
  462:17 463:20
  466:15 528:1,7
  531:10 532:15
stated 430:1
  467:24 476:6
  499:6 519:10
statement 480:8
  481:17,22,24
  531:13,14 532:19
  532:19
states 343:1
  352:18 354:4
  355:1 357:21
  358:2 361:18
  368:12 372:12
  427:12 428:11
  430:5 436:20
  465:14 480:20
  502:16
status 437:14
steering 480:17,18
stenographer
  507:18
stenographic
  528:4,18 529:15
stepping 457:20
  520:25
steps 433:21 434:1
steve 426:5
stick 355:22
stop 380:19
  395:14
store 350:18
  351:22 369:18

384:16 422:23
423:1,15,22 424:7
424:11,11 425:2
**stores** 344:14
386:16 421:24,24
422:5,14 423:7,9
424:2,4 426:16
**street** 344:16,20
345:13,17,22
**strength** 487:13
500:5 501:4,6
**strengths** 487:23
490:2
**strike** 378:7
396:25 411:8
423:7 425:7
450:15 458:15,16
460:5 476:5 480:5
497:8,10
**stringent** 476:15
**students** 428:21
428:21
**study** 475:4
**submit** 503:6
**subscribed** 531:10
532:14 533:21
**subsequent** 412:13
419:11
**subset** 413:1,23
**substance** 355:13
356:13 385:5
400:18 401:6
402:9 404:16
406:22 431:6,13
431:23 432:12
433:10 434:25
441:13,16,24
442:25 459:7,16
460:21 468:11,13
477:9 493:16
519:13

**substances** 351:3
352:5,10,18 353:2
353:6,17 354:18
355:24 358:6,12
369:6 375:24
385:11 390:19
411:18 412:16,19
418:23 419:14,16
419:22 428:1
429:2 433:24
452:20 456:1
465:16 476:25
477:6 478:16,16
480:10 524:11
**substantiate**
356:15 415:21
510:13
**subtle** 401:7
402:10
**sue** 453:9
**suggest** 381:1
**suggesting** 517:1
**suggestion** 381:4
**suggests** 477:6
**suite** 344:11,17,21
345:9,13,23
346:11 530:2
**summary** 408:23
409:2
**superior** 530:1
**supervised** 425:18
**supervisor** 379:8
379:17,25
**supplemental**
349:1 467:7 484:1
494:4
**supply** 417:22
467:20
**support** 387:25
391:2 392:23
481:16

**supported** 403:16
403:17
**supporting** 449:25
**supports** 420:13
**supposed** 384:1
**sure** 349:21
354:14 359:10
361:23 365:22
370:20 375:15,16
377:19 386:6
392:18 401:20
404:2 423:7
424:24 430:25
431:15,20 432:9
433:21 437:14
439:12 440:10
442:21 457:17
465:24 476:17
477:25 480:14
482:12,13 498:8
499:17 511:6
516:10,17 521:9
521:11
**surge** 401:13
**surrounding**
431:7,24
**survey** 427:1,5,8
427:17,25 428:4,7
428:15,18 429:4
429:13,17,23
**suspected** 383:6
**suspicion** 405:5
**suspicious** 351:1
351:16 385:24
387:9 414:7 431:7
431:24
**sussane** 515:8
**sustained** 526:17
**swanson** 345:22
347:3 348:15,20
348:22 352:16

353:18 354:13,23
355:21 356:24
357:13 358:14,23
359:11 360:9,25
362:2,16 363:10
364:10,25 365:3,4
365:17,22 366:1
367:7 369:12,25
370:24 371:9,19
373:24 374:19,20
375:8,19 377:2,10
377:13 378:7,11
378:14,20,22
379:20 380:19
381:4,12 382:24
384:13 386:8,15
386:25 388:3,10
388:19 389:5,11
389:25 390:3,11
391:14 392:12,21
393:5 394:8 396:6
396:12 397:6,19
398:1 399:1,22
400:4,10 401:19
402:7 403:15
405:9 406:18
407:3,11 408:18
410:3,13 411:8,11
411:20 412:1,12
414:14,19 415:1
415:12,24 416:6
417:3,15 418:9
419:3,8,24 421:1,5
421:12,16 513:7
523:16 524:6
**sworn** 343:14
528:10 531:10,13
532:14,18 533:21
**system** 360:10,16
360:18,22 361:2,3
361:6,11,11,13,23

362:3,10,13
366:10,11,25
368:2,6 369:14,16
369:20 370:18
371:8,8 411:23
412:18 419:15,22
420:5 447:2,11
440:22 456:12
497:1,4,14,16,18
499:8 522:21
systems   350:18
351:21 356:7
365:11 366:5,6,13
366:16,21,24
367:25 371:1,7,13
409:15,17,22
410:5 412:9
436:20 440:19,21
441:5 497:13,19
497:24 498:5,6,8

t

table   364:19 484:5
tagged   416:23
take   365:15 378:1
378:4,16 384:8,22
389:15 390:2
402:24 435:2
441:12,16,23
442:6,9 506:24
taken   343:16
348:5 357:15
376:9 390:6
401:16 426:19
459:11 462:16
466:23 491:14
496:9 497:13
512:5 521:18
524:22 528:13,17
takes   459:16
talk   369:15 390:16
430:7 476:18

talked   362:17
371:18 372:2,6,22
412:23 430:10,10
449:21 467:15
471:5
talking   368:14
387:1 406:12
440:19 473:10
499:4 505:3
516:18
talks   353:7 367:20
367:21,22 430:6
464:5
tara   345:9 347:8
512:1 513:2
520:25
task   459:11
462:16
team   364:1 366:24
tech   498:12
technician   498:19
technology   366:8
369:7
tell   352:17 389:12
408:4,4 414:9
417:4,16,17 418:1
457:8 459:4
461:14 471:21
488:17 508:12
528:11
telling   379:22
tells   388:11 503:18
503:20,24
ten   498:4 519:6
520:2 521:7
tenets   464:21
term   420:8,8,15
421:4
termed   402:18
terms   369:7

terrific   348:25
363:18
test   414:5 486:7,8
tested   445:16
testified   380:23
475:11 493:4,12
495:25 508:16
516:1 518:2 524:1
525:3
testify   475:15
testifying   356:5
473:24 526:12
testimony   354:15
355:10 356:3
358:7 361:13
380:17 384:5
400:7 415:19
419:18 474:3
485:21 491:23
507:9 511:12
522:23 524:7
528:21 531:6,7
532:6,9,12
tests   432:8
text   494:23
tfumerton   345:11
thank   348:18,24
349:17 365:3,25
367:12 371:22,23
401:23 421:15,16
431:18 457:19
466:17,18 491:22
513:3,3 522:8
527:6
thanks   360:4
365:22 374:19
512:10
therapies   471:11
therapy   455:4
470:11,11 471:3,7
471:7,12

things   362:18
372:6 381:18
393:13,14 394:7
399:19 466:10
494:7 510:22
521:4
think   356:11
364:15,24 375:4,4
380:11,17 381:3
389:7 395:9 399:5
421:13 422:2,8
430:17 438:15
462:13 464:13
471:5 475:11
488:23 489:8
491:5 498:25
499:6 500:1
501:19 502:18
503:19 504:18
505:19 506:4,22
510:25 518:13
521:4 527:7,10
third   364:20
396:18 405:13
thirty   530:18
thought   368:14
386:4 396:7
403:25 407:22
418:14 447:24
514:11 522:3
thousand   416:21
504:1 505:7
three   343:7 352:21
360:18,22 365:6
422:9,18 487:11
487:20 500:24
501:3,5 522:6
tight   389:2
time   348:2 360:15
365:15 367:10
373:21 376:19

377:8,11 378:17
380:8 389:2
421:13 425:25
433:2,18 435:11
440:9,13 442:4
448:25 450:24
452:13 459:20
460:5,7,12,12
462:9,19 463:3,4
463:11,11 464:2
465:8 473:25
476:18 484:19,24
491:7 498:7,11,21
498:23 499:23
500:5,6 501:6,11
512:9 514:21
518:17,21,23
519:2 520:1,10,15
520:16,17,25
521:7
**times**  356:22
357:10 370:6
458:21
**title**  363:19
**tn**  344:14
**today**  348:12
349:8 357:1,5
359:8,23 378:2
390:8 417:24,25
418:14 420:16
466:25 520:11
**today's**  405:12
**told**  381:20 503:9
**ton**  503:25
**tool**  393:1 410:22
410:23 411:14
**tools**  361:24 368:9
387:25 388:24
409:5 410:10,12
410:14 412:15
419:12

**top**  487:4 494:9
**topic**  382:5
**topics**  372:14
**total**  357:16
417:11 441:3
472:1 486:14
**totals**  417:22
**track**  343:7 530:6
531:3 532:3
**train**  350:25
**trained**  431:5,22
433:22
**training**  434:6,7
442:13 443:6
**transacted**  497:18
**transaction**
497:21 499:4
**transacts**  499:1
**transcribed**  531:7
**transcript**  348:16
521:1 528:20
530:11,12 531:5
531:12 532:5,11
532:17
**traveled**  413:19
526:15
**traveling**  404:13
404:23
**travels**  399:3
**tremendous**
375:21
**trends**  409:8
**trial**  525:25
**triggered**  351:24
**trinity**  486:16
**trouble**  442:16
**true**  357:6 360:2
372:20 377:4
391:10 418:3
434:12 440:5
457:1 464:8

528:20
**trumbull**  420:11
421:22 422:13,15
423:1,10,16,23
424:3,8 425:2,10
425:22 434:17
439:22 442:24
443:14 444:12,18
444:25 445:20,23
446:14 448:3,7,21
450:5,17 451:10
453:24 454:4
462:21,24 464:10
464:13 466:7
526:2
**trust**  387:8
**truth**  528:11,11,12
**try**  349:25 362:25
364:17 376:23
394:24
**trying**  389:8
484:12 493:16
505:16 522:4
**turn**  353:24 354:1
366:18 376:7
397:21 408:20
413:11 419:9
502:5
**turns**  378:1
**two**  352:21 353:16
357:4 362:8
404:23 416:20,21
417:23 422:19
444:10,14 445:11
446:3,21 467:15
467:21 470:2,10
471:2 472:5
484:23 494:1
495:24 510:25
521:14

**type**  385:7 427:23
**types**  405:10,22
**typewriters**  498:8
**typewriting**
528:19
**typewritten**
528:20

|  u  |
|---|

**u.s.**  348:7
**ultimate**  364:8
**unaware**  475:19
**understand**
351:19 356:8
358:24 377:15
378:8,8 394:4
396:20 398:10
414:12 419:18
423:4 424:22
429:14 431:16
436:13 437:12
442:9 448:14
455:19 464:17
479:15 488:2
499:3,6 504:6
509:19 511:1
517:13 522:4
**understanding**
356:11 393:11
407:9 433:6
435:11,23 442:17
447:8 449:5,6
453:17 457:17
492:24 495:9
513:22 514:11
516:24 517:25
**understood**
406:17 493:5
495:2,7,11 513:10
514:20
**unduly**  459:17

**unexplainable**
404:13
**unit** 348:3
**united** 343:1 358:2
361:18
**unknown** 470:12
**unlimited** 519:5
**unquote** 376:11
467:24 477:15
**unreasonably**
404:14
**unresolved** 443:18
444:4
**updated** 428:17
**updates** 429:11
**upsetting** 395:24
**urge** 520:24
**use** 351:7,11,15,21
352:18 354:5,16
355:1 357:3,18
368:18 369:16
381:9 386:20
388:5,14 410:7
453:2 467:25
468:4 481:8 485:1
**useful** 489:13,20
**uses** 358:16 359:2
359:24 360:6
362:10 367:1
**utilization** 367:21
367:22 369:10,14
370:8,9 394:20
438:4 477:7
**utilize** 350:23
361:10 370:18
399:13
**utilized** 366:8
369:4 371:2
465:15 480:22
481:11

**utilizing** 369:9
409:7
**utmost** 356:18

**v**

**v** 530:6
**vaccine** 361:5
**valid** 519:15
**valuable** 482:1
**variety** 366:6
**various** 392:17
458:21 460:3
516:2 517:20
**vary** 422:9 423:2,5
424:10,13 442:4
**verbal** 459:23
492:3
**verbally** 494:2
**verify** 469:4
**veritext** 348:10,12
530:1,7 533:1
**veritext.com.**
530:17
**versus** 417:21
419:1 425:1
**video** 343:9 348:4
389:12
**videographer**
346:6 348:1,11
390:4,7 401:14,17
466:21,24 491:12
491:15 496:7,10
512:3,6 521:16,19
524:20,23 527:11
**view** 357:3 366:11
371:5 376:20
377:3 379:13
382:19 386:9
388:13 397:1
404:21,21 416:24
417:5 419:18
437:23 439:4

446:12 449:2
450:3,15,16 455:9
456:4,15,23
460:20 478:18
525:9
**viewed** 403:3
**views** 466:10
**violated** 356:6
439:6
**violates** 519:19
**violating** 380:10
438:12
**violation** 358:6
**virginia** 376:15
**virtual** 371:11
**visit** 413:19 503:4
526:15
**visited** 452:18
**volkman** 430:8
433:14
**volume** 343:10
348:4

**w**

**w** 344:16
**wacker** 345:9
**wag** 363:2,2,3
373:16 389:3
**wag19-1-9** 362:25
**wait** 378:13
**waived** 530:19
**walgreen** 345:20
345:20
**walgreens** 345:20
382:8,10,15,19,20
383:9 384:18
385:15,21 386:3
394:21,22 395:4,7
395:10,20 396:8
396:13 403:6
411:3 413:22
420:18 439:5

485:25 494:9,14
502:11
**walmart** 345:8
439:5 486:1 494:9
494:15 502:11
513:10,17,24
514:4,12,21 515:1
515:11 516:2,25
517:1 518:7
519:14
**walmart's** 514:14
515:7 518:9
519:10,12
**want** 354:14,24
355:22 356:2,3
375:13 377:25
378:15,23 380:24
390:16 391:16
397:20 401:1
409:1 410:4
413:11,15 419:9
421:6 430:12
451:4 457:16
473:24 484:11
485:12,17 491:18
502:14 514:21
516:17 519:3
521:11,12 527:2,3
**wanted** 396:13
398:5,9 400:13
485:3 487:9 492:2
**wants** 428:23
432:17
**warning** 390:17
392:3 396:25
405:11 518:7
**warrant** 405:4
**warranted** 477:7
508:21
**warrants** 401:10
402:13

washington
  344:21
watch  520:24
way  352:20 359:16
  366:17 368:7
  396:4 414:22
  416:1 417:9
  459:22 461:24
  470:13,17,21
  471:1 487:5 507:5
  515:17 521:10
  523:14
ways  410:7
we've  352:3
  401:12 412:22
  482:18 507:12
webinar  427:14
wednesday  343:17
  528:15
week  436:8
weeks  360:18,22
weinberger
  344:10
went  381:14
  392:22 404:6
  441:4 498:7
west  345:9
wewatta  345:22
whereof  529:7
whichever  365:18
white  459:12
willfully  443:19
  444:3
willingly  443:22
winsley  433:13,17
wisconsin  518:6
witness  343:14
  355:25 365:25
  378:19 380:20,23
  380:23 389:7,18
  389:20 401:12

421:15 466:18
478:2 512:8
524:15,16 529:7
530:11 531:1,4,11
532:1,4,15
witnesses  458:12
witness'  530:14
wolf  344:4
wondering  368:20
  469:6
word  378:25
  407:23
work  350:25
  360:10 425:22
  426:12 435:17
  441:21 445:21
  446:24 468:22
  475:8 497:24
workbook  427:14
worked  359:12,16
  360:5 425:16
  426:20 434:16
  442:23 493:7
  496:13,14,17
  515:18
working  359:17
  361:3 441:22
  469:8,15 470:6
  492:14
workings  439:10
works  436:7
worry  349:25
write  350:17 351:4
  352:2 362:19
  372:14,18 403:2
  450:22 451:4
writing  380:16
  383:4 385:1
  386:22 416:12
  450:24 459:4,22
  470:10 474:11

475:22
written  372:2
  383:15 388:12
  395:19 414:21
  416:9,15 417:7
  418:2,12 429:10
  444:16 467:21
  470:2 472:16
  478:17 487:13
  490:24 491:2,2
wrong  378:5
  382:20
wrote  381:1,2,5
  414:10,15 431:21
  469:24 470:4
  477:13

| x |
|---|

x  396:2

| y |
|---|

yeah  374:13 469:6
  520:8
year  480:20
years  353:9
  359:12 498:4
yesterday  349:11
  353:25 354:8
  362:17 364:15
  372:6,22 377:20
  383:24 467:11
  471:5 475:17,17
  476:9 479:20,22
  480:4 483:5
  492:17 494:1
  507:14

| z |
|---|

zero  381:4
zinmaster  511:25
zuckerman  344:15
  344:19

zuckerman.com
  344:18,22
zwier  345:4,6

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.