```
 1              UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF OHIO
 2                   EASTERN DIVISION
 3
      IN RE: NATIONAL          )
 4    PRESCRIPTION             )   MDL No. 2804
      OPIATE LITIGATION        )
 5    _____ )   Case No.
      THIS DOCUMENT RELATES TO: )  1:17-MD-2804
 6                             )
      The County of Lake, Ohio )   Hon. Dan A.
 7    v. Purdue Pharma, LP, et )   Polster
      al.,                     )
 8    Case No. 18-op-45032     )
                              )
 9    The County of Trumbull,  )
      Ohio v. Purdue Pharma,   )
10    LP, et al.,              )
      Case No. 1:18-op-45079   )
11    Track 3 Cases            )
12
              MONDAY, MARCH 8, 2021
13
       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
14              CONFIDENTIALITY REVIEW
15                    - - -
16           Remote videotaped deposition of
      George Chunderlik and personal deposition,
17    held at the location of the witness in
      Cranberry Township, Pennsylvania, commencing
18    at 9:08 a.m. Eastern Time, on the above date,
      before Carrie A. Campbell, Registered
19    Diplomate Reporter and Certified Realtime
      Reporter.
20
21
                      - - -
22
            GOLKOW LITIGATION SERVICES
23      877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1      R E M O T E   A P P E A R A N C E S :
 2
 3      LEVIN PAPANTONIO RAFFERTY PROCTOR,
        BUCHANAN O'BRIEN BARR MOUGEY, P.A.
 4      BY:  JEFF GADDY
             jgaddy@levinlaw.com
 5           JULIA METTS
             jmetts@levinlaw.com
 6      316 South Baylen Street
        Pensacola, Florida 32502
 7      (850) 435-7000
        Counsel for Plaintiffs
 8
 9
        JONES DAY
10      BY:  NIA M. MACK
             nmack@jonesday.com
11      77 West Wacker
        Chicago, Illinois 60601-1692
12      (312) 782-3939
        Counsel for Walmart
13
14
        MARCUS & SHAPIRA LLP
15      BY:  JOSHUA A. KOBRIN
             kobrin@Marcus-Shapira.com
16      301 Grant Street, 35th Floor
        Pittsburgh, Pennsylvania 15219-6401
17      (412) 338-4690
        Counsel for HBC
18
19
   VIDEOGRAPHER:
20      VINCE ROSICA,
        Golkow Litigation Services
21
22
   TRIAL TECHNICIAN:
23      GINA VELDMAN,
        Precision Trial Solutions
24
                     - - -
25
```

```
 1                        INDEX
 2                                              PAGE
 3   APPEARANCES..................................   2
 4   EXAMINATIONS
 5     BY MR. GADDY...............................   6
 6     BY MR. KOBRIN............................. 197
 7     BY MR. GADDY............................. 222
 8
 9                     EXHIBITS
10    No.   Description                         Page
11    1     E-mail(s),                            13
            HBC_MDL00030274  HBC_MDL00030279
12
      2     Giant Eagle Pharmacy Pharmacy         45
13          Compliance, Pharmacy Board Review
            2013,
14          HBC_MDL00190998
15    3     Annual Performance Review - FY13      59
            for Chunderlik, George M,
16          GE_TL00014983 - GE_TL00015131
17    4     Controlled Substance Dispensing       73
            Guideline,
18          HBC_MDL00191292 - HBC_MDL00191295
19    5     E-mail(s),                            81
            HBC_MDL00056686 - HBC_MDL00056687
20
      6     E-mail(s),                           107
21          HBC_MDL00061011
22    7     E-mail(s),                           146
            HBC_MDL00078158 - HBC_MDL00078164
23
      8     Giant Eagle Pharmacy                 156
24          Policy/Procedure, Drug Utilization
            Review (DUR) Policy,
25          HBC_MDL00191824
```

Highly Confidential - Subject to Further Confidentiality Review

1   9      E-mail(s),                                      159
           GE_TL00004829 - GE_TL00004831
2
    10     E-mail(s),                                       172
3          HBC_MDL00158840 - HBC_MDL00158848
4   11     E-mail(s),                                       183
           HBC_MDL00059191 - HBC_MDL000591269
5
    12     E-mail(s),                                       190
6          GE_TL00001227 - GE_TL00001306
7
8      (Exhibits attached to the deposition.)
9   CERTIFICATE.................................236
10  ACKNOWLEDGMENT OF DEPONENT..................238
11  ERRATA......................................239
12  LAWYER'S NOTES..............................240
13
14
15
16
17
18
19
20
21
22
23
24
25

Highly Confidential - Subject to Further Confidentiality Review

```
 1              VIDEOGRAPHER:  We are now on
 2      the record.
 3              My name is Vince Rosica.  I'm a
 4      videographer for Golkow Litigation
 5      Services.
 6              Today's date is March 8, 2021,
 7      and the time is 9:08 a.m.
 8              This remote video deposition is
 9      being held in the matter Of Opioid
10      Litigation Track 3, Counties of Lake
11      and Trumbull, Ohio versus Purdue, for
12      the United States District Court,
13      Northern District of Ohio, Eastern
14      Division.
15              The deponent is George
16      Chunderlik.
17              All parties to this deposition
18      are appearing remotely and have agreed
19      to the witness being sworn in
20      remotely.
21              Due to the nature of remote
22      reporting, please pause briefly before
23      speaking to ensure all parties are
24      heard completely.
25              Counsel will be noted on the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          stenographic record.

 2               The court reporter is Carrie

 3          Campbell and will now swear in the

 4          witness.

 5

 6               GEORGE CHUNDERLIK,

 7   of lawful age, having been first duly sworn

 8   to tell the truth, the whole truth and

 9   nothing but the truth, deposes and says on

10   behalf of the Plaintiffs, as follows:

11

12               DIRECT EXAMINATION

13   QUESTIONS BY MR. GADDY:

14        Q.    Good morning, Mr. Chunderlik.

15               Could you please state your

16   name?

17        A.    Yes.  My name is George

18   Chunderlik.

19        Q.    And I understand that you are

20   now retired from Giant Eagle?

21        A.    Yes.

22        Q.    Okay.  When did you retire?

23        A.    In July of 2019.

24        Q.    What led you to leave --

25        A.    I'm sorry, Jeff, July of 2020.
```

Highly Confidential - Subject to Further Confidentiality Review

1       Q.      Thank you.

2               What led you to leave Giant

3       Eagle?

4       A.      I had an opportunity.  The

5       company had offered a corporate buyout to all

6       corporate employees, and I decided to take

7       advantage of the buyout that was presented.

8       Q.      Tell me a little bit more about

9       that.  What do you mean by "a corporate

10      buyout"?

11      A.      The company was offering

12      severance to people who decided to take what

13      I would consider early retirement.

14      Q.      Okay.  And you opted into that

15      opportunity?

16      A.      I did, yes.

17      Q.      Okay.  What did that -- what

18      did that agreement entail?

19      A.      I had a -- for my years of

20      service, I had weeks of severance for the

21      weeks of -- for the years of service that I

22      had with Giant Eagle, and I also had some

23      health care benefits to go along with that as

24      well.

25      Q.      Okay.  And I understand -- I

Highly Confidential - Subject to Further Confidentiality Review

1    had an opportunity to look at the severance

2    agreement.  It looks like you received

3    severance pay for approximately 24 weeks?

4         A.     That's correct.

5         Q.     Okay.  And most of that was at

6    your full salary?

7         A.     Yes, it was.

8         Q.     Okay.  You also --

9         A.     Excuse me, I'm sorry, excuse

10   me.  It was -- the first 16 -- it was an

11   incremental, I'll call it, decrease.  The

12   first 16 weeks were at my full salary, and

13   then from week 17 through the end, which

14   would be week 24, it was 75 percent of my

15   salary.

16        Q.     Okay.  You also continued to

17   receive a bonus for the year?

18        A.     I did receive my bonus for the

19   fiscal year, yes.

20        Q.     Okay.  And you received your

21   full bonus, even though you accepted the

22   package and retired?

23        A.     Yes.

24        Q.     Was this an opportunity that

25   was offered across the board to everybody, or

Highly Confidential - Subject to Further Confidentiality Review

1    were you part of a subset of employees that

2    this was offered to?

3         A.     No, I was not part of a subset.

4    This was offered to all corporate-level

5    employees.

6         Q.     Did you feel that you were

7    encouraged in any way by Giant Eagle to

8    accept the severance and leave the company?

9         A.     No, not at all.

10        Q.     Now, you were previously

11   deposed in this case, correct?

12        A.     Yes.

13             MR. KOBRIN:  I just want to

14        make sure there's -- kind of make it

15        on the record and that I'm not too

16        quiet or there's not any sound

17        inference.

18             Did you guys -- were you able

19        to hear that?  No?

20             THE WITNESS:  I did not hear

21        anything.

22             MR. KOBRIN:  Let's try it

23        again.  It was about being encouraged

24        in any way by Giant Eagle to leave the

25        company that I objected to form on.

1              But I'll try and -- I'll try

2        and be louder.

3              George, make sure that you kind

4        of give me a moment to object.  {Audio

5        interruption} -- get your answer.

6    QUESTIONS BY MR. GADDY:

7        Q.    Mr. Chunderlik, you were

8    previously deposed in this case, correct?

9        A.    Correct.

10       Q.    Have you had any discussions

11   with anyone at Giant Eagle regarding that

12   deposition?

13       A.    Not that I'm aware of.

14       Q.    Do you know whether or not

15   anybody at Giant Eagle read that deposition?

16       A.    I'm not aware of that.

17       Q.    Do you recall getting any

18   feedback from anybody at Giant Eagle

19   regarding that deposition?

20             MR. KOBRIN:  Objection to form.

21             Again, I just want to make

22        sure, George, that any conversations

23        or feedback you may have gotten from

24        counsel at Giant Eagle or outside

25        counsel is not up for discussion.

```
 1
 2    QUESTIONS BY MR. GADDY:
 3         Q.    Mr. Chunderlik, I think you
 4    said, no, you've not received any feedback
 5    from anyone at Giant Eagle?
 6         A.    No, I have not.
 7         Q.    Are you -- have you stayed
 8    retired or are you working again?
 9         A.    I am working again, yes.
10         Q.    Okay.  And where are you
11    working now?
12         A.    I work for a company -- it was
13    Panther Specialty Pharmacy, and Panther had
14    just recently been bought by a company called
15    Centene.
16         Q.    And what did you do for them?
17         A.    I am a pharmacy audit
18    specialist.  I audit third-party prescription
19    claims that are paid by third-party insurance
20    and respond to audit requests made by any
21    insurance that requests information from us
22    in regards to prescriptions, copies of
23    prescriptions and those types of things.
24         Q.    I want to ask you a couple more
25    questions about the severance agreement that
```

1   you entered into with Giant Eagle.

2               Did you have any conversations

3   with anybody at Giant Eagle surrounding that

4   severance agreement regarding this case and

5   the fact that you may have to continue to be

6   involved in this case?

7       A.      I didn't have any discussions

8   with anyone, but in the severance agreement

9   itself it talked about, you know, if Giant

10  Eagle was involved in any type of litigation,

11  that I might be called to cooperate.

12      Q.      And did you have an

13  understanding at the time that you signed

14  that agreement that that may involve

15  requiring you to continue to cooperate in

16  this case?

17      A.      That was my understanding, yes.

18      Q.      Okay.  I also saw that there

19  was a clause in that agreement regarding --

20  kind of maybe framed as like an

21  anti-defamation-type clause that had some

22  language in there that prohibited you from

23  saying anything of a defamatory nature about

24  Giant Eagle.

25              Do you know what I'm talking

1   about?

2        A.    Yes, I do.

3        Q.    Okay.  Tell me how you

4   understood that clause of the contract.

5        A.    I understand that to mean if I

6   said anything negative, you know, it could be

7   social media-wise, anything like that -- you

8   know, I think -- when I think of defamation,

9   I think of things to discredit the

10  organization in any way.

11       Q.    Do you understand that clause

12  to have any impact on your ability to give

13  truthful testimony here today?

14       A.    No, I don't.

15       Q.    If at any time you think that

16  an answer to a question would cause you to be

17  in violation of that clause or cause you

18  or -- or anytime you think an answer would

19  give you pause because of that clause, will

20  you let me know today?

21       A.    Yes, I will.

22            (Chunderlik Exhibit 1 marked

23       for identification.)

24  QUESTIONS BY MR. GADDY:

25       Q.    Mr. Chunderlik, I'm going to

Highly Confidential - Subject to Further Confidentiality Review

```
 1   show you what we've marked as P-HBC-30, which

 2   is going to be your Tab 12.

 3              Let me know when you've got

 4   that out and ready.

 5        A.    Okay.  Just -- I lost some

 6   video.

 7        Q.    You should be seeing --

 8        A.    Oh, I see.

 9        Q.    We're going to pull the

10   document up on the screen for you.

11        A.    I see, yes.

12        Q.    You have a hardcopy there in

13   front of you, but you can always look on the

14   screen as well.

15        A.    Yes.

16              MR. KOBRIN:  Hey, I -- you said

17        Tab 12, Jeff?

18              MR. GADDY:  Correct.

19              MR. KOBRIN:  I'm unsealing

20        these, but I -- okay.  Here they are.

21        They're up front.  All right.

22   QUESTIONS BY MR. GADDY:

23        Q.    You with me, Mr. Chunderlik?

24        A.    Yes.

25        Q.    Okay.  And you see this looks
```

1    like an e-mail from April 2016.  It looks

2    like you e-mailed something to yourself.

3              Do you see that?  Just looking

4    at the top of the first page.

5         A.    Okay.  Yes.

6         Q.    Okay.

7         A.    Yes.

8         Q.    And just flip the page one time

9    and we're going to see -- it looks like a

10   résumé that you prepared or at least had in

11   your possession back in April of 2016.

12             Do you see that?

13        A.    Yes.

14        Q.    And I don't want to go over

15   this in too terribly much detail, but I just

16   want to make sure we're on the same page

17   about what you were doing at Giant Eagle over

18   certain time periods.

19             But it looks like you have a

20   pharmacy degree, and you were a practicing

21   pharmacist from 1980 to 1990, correct?

22        A.    That's correct, yes.

23        Q.    If you flip to the second page

24   of your résumé, there's an entry that says

25   "pharmacy trainer" about halfway through that

1   block of text?

2        A.     Yes.

3        Q.     It indicates you held that

4   position from January of 1990 to June

5   of 1996.

6               Do you see that?

7        A.     Yes.

8        Q.     It says you were responsible to

9   "implement and oversee training for all

10  pharmacy team members on the PDX pharmacy

11  computer system."

12              Correct?

13       A.     Yes.

14       Q.     And tell us what PDX is.

15       A.     PDX is the pharmacy software

16  that we use to process prescriptions.

17       Q.     Okay.  And obviously that's a

18  software you were using back between '90 and

19  '96.

20              Is that the software that Giant

21  Eagle continued to use when you left the

22  company last year?

23       A.     It was still owned by PDX, but

24  it was -- it had gone through several

25  iterations since the implementation back in

Highly Confidential - Subject to Further Confidentiality Review

```
 1   January of 1990.

 2        Q.      Sure, sure, of course.

 3                So help me understand what your

 4   specific role was as it related to training

 5   all the pharmacy team members -- well, let me

 6   back up a little bit.

 7                When you say "all pharmacy team

 8   members," who's encompassed under that?

 9        A.      That would be pharmacists and

10   pharmacy technicians --

11        Q.      Okay.

12        A.      -- in our stores.

13        Q.      And what was your job as far as

14   helping the pharmacists and the pharmacist

15   technicians as it came to the PDX system?

16        A.      When we were implementing this

17   particular piece of software, it was -- at

18   that point in time it was our -- new for

19   everybody, and I would show them and work

20   with them to show them how this new software

21   would work in processing prescriptions.

22        Q.      Was this an IT position, or did

23   you need any type of IT background to do this

24   job?

25        A.      No, I didn't need any IT
```

1 background to do this job.

2     Q.    Okay.  Do you have any IT

3 background?

4     A.    I do not.

5     Q.    Well, did you have any

6 involvement in designing the PDX system?

7     A.    No, I did not.

8     Q.    Did you have any input into the

9 type of data that would be captured by the

10 system or the type of data that should be

11 entered into the system?

12     A.    No, I did not.

13     MR. KOBRIN:  Form.

14 QUESTIONS BY MR. GADDY:

15     Q.    Your involvement was to take

16 the system and roll it out to the pharmacy

17 team members and make sure they understood

18 what it was and knew how to use it; is that

19 fair?

20     A.    Yes.

21     Q.    And looks like you left the

22 company for a bit; is that right?

23     A.    Yes, I did.

24     Q.    And then came back in 2008, if

25 we go to the first page of your résumé and

```
 1    look down at the bottom, correct?
 2         A.    Yes.
 3         Q.    And it says when you came back
 4    in 2008, you were the manager of pharmacy
 5    training?
 6         A.    Yes, that was my title.
 7         Q.    Okay.  And the entry there says
 8    that you were "responsible to implement and
 9    oversee the training for all pharmacy team
10    members, new and existing, including
11    computer-based classroom and self-study
12    programs as it relates to the pharmacy."
13              Correct?
14         A.    Yes.
15         Q.    And again, all pharmacy team
16    members, that includes pharmacists and
17    technicians?
18         A.    Yes.
19         Q.    Now, when we see computer-based
20    programs -- I've seen the acronyms CBTs in
21    other places.
22         A.    Yes.
23         Q.    CBTs means computer-based
24    training?
25         A.    That's correct, yes.
```

1    Q.    Did you have any involvement in

2  this position in designing training programs,

3  or were you just administering programs that

4  were already created?

5    A.    The majority of the programs, I

6  would just be administering programs that

7  were already -- that were already designed.

8    Q.    Okay.  And I saw, you know,

9  examples of programs related to HIPAA

10  regulations?

11    A.    That was one of the -- that was

12  one of the programs that would be in those

13  CBTs, yes.

14    Q.    Okay.  I saw maybe another one

15  related to some type of OSHA regulations?

16    A.    That's correct.

17    Q.    Okay.  You said the majority of

18  them you administered.  Can you think of any

19  of these training programs that you

20  developed?  Any that would be the exceptions

21  to the rule?

22    A.    There was one where it was also

23  a HIPAA computer-based training program for

24  the HITECH Act when it was implemented.

25         We had designed a training that

1    I was involved in designing, and I also took

2    part in -- a part in the video itself.

3         Q.    Okay.  And that was a

4    HIPAA-related training program, correct?

5         A.    Yes.

6         Q.    Okay.  Any other training

7    programs that you recall developing as

8    opposed to just administering?

9         A.    No.

10        Q.    Now, when you came back to

11   Giant Eagle in 2008, and during this period

12   of 2008 to 2012 when you were in charge of

13   providing training for pharmacists and

14   pharmacy techs, were you aware that the

15   country was in the midst of an opioid

16   epidemic?

17        A.    I had -- yes, I did.

18        Q.    How were you aware of that?

19        A.    Through news articles and

20   publicity and things like that.

21        Q.    During that time period while

22   you were the manager of pharmacy training and

23   had this awareness of the opioid epidemic,

24   had you received any training or education by

25   Giant Eagle, by the company, in this time

Highly Confidential - Subject to Further Confidentiality Review

1  period, '08 to 2012, that kind of

2  reemphasized the fact that the country was in

3  the midst of an opioid epidemic?

4           MR. KOBRIN:  Object to form.

5           THE WITNESS:  No formal

6      training.  I -- you know, part of my

7      job was to stay attuned to things that

8      were happening within the industry,

9      and I availed myself of everything

10     that I could to educate myself about

11     the opioid epidemic.

12 QUESTIONS BY MR. GADDY:

13     Q.    But no training by the company

14 that you can recall?

15           MR. KOBRIN:  Object to form.

16           THE WITNESS:  No formal

17     training.

18 QUESTIONS BY MR. GADDY:

19     Q.    Going up to the next entry on

20 your résumé, in 2012 you became the manager

21 of pharmacy compliance, correct?

22     A.    Yes.

23     Q.    Okay.  And you served in a

24 compliance role from July of 2012 until you

25 left the company last summer, correct?

1          A.     There's not -- this only goes

2     up to 2016.  I was in the compliance role

3     between 2012 up through early 2019.

4          Q.     What happened then?

5          A.     I became the senior manager of

6     pharmacy quality and training.

7          Q.     If you look at the third bullet

8     point, or dash mark, under your

9     responsibilities for pharmacy compliance

10    manager, it indicates that one of your duties

11    was to "monitor and evaluate the development,

12    implementation, communication and

13    administration of pharmacy policies and

14    procedures to ensure compliance with

15    regulatory statutes, rules and regulations,

16    in addition to compliance with internal

17    pharmacy and compliance policies."

18               Correct?

19          A.     Yes.

20          Q.     Does that bullet point

21    encompass -- and when you're talking about

22    some of the rules and regulations and

23    statutes, does that encompass rules and

24    regulations under the Controlled Substance

25    Act?

1    A.    Yes.

2    Q.    Does that encompass rules and

3  regulations regarding the dispensing of

4  controlled substances like opioids?

5    A.    Yes.

6    Q.    And certainly if you already

7  had a general understanding while you were

8  the manager of pharmacy training, you would

9  agree that when you take over as the manager

10 of pharmacy compliance in 2012, you already

11 had an understanding that the country was in

12 the midst of an opioid epidemic, correct?

13        MR. KOBRIN:  Object to form.

14        THE WITNESS:  I had a -- I had

15   an understanding of it.

16 QUESTIONS BY MR. GADDY:

17   Q.    And as a person with a pharmacy

18 degree and a person who had been a practicing

19 pharmacist for over a decade, would it be

20 fair to say that you have an understanding of

21 some of the dangers associated with opioid

22 drugs like oxycodone or hydrocodone?

23        MR. KOBRIN:  Object to form.

24        THE WITNESS:  If used

25   improperly.

1    QUESTIONS BY MR. GADDY:

2         Q.    What are some of the dangers

3    associated with drugs like oxycodone and

4    hydrocodone?

5         A.    If used improperly, you know, a

6    person has the potential to be addicted to

7    those substances.

8         Q.    And what can that lead to?

9              MR. KOBRIN:  Object to form.

10        Seeks an improper expert testimony.

11             THE WITNESS:  You know, if

12        somebody becomes addicted, I don't

13        know what could happen to that person.

14        I can't speculate on, you know, what

15        happens once somebody does become

16        addicted.

17             You know, there's potential for

18        other things to occur, but other than

19        that, I can't speculate.

20   QUESTIONS BY MR. GADDY:

21        Q.    Well, Mr. Chunderlik, by the

22   time you take on this role as manager of

23   pharmacy compliance, you've had an

24   understanding that the opioid epidemic has

25   been going on for several years, including

1   while you were the manager of pharmacy

2   training, right?

3           MR. KOBRIN:  Object to form.

4           THE WITNESS:  I had an

5       understanding.

6   QUESTIONS BY MR. GADDY:

7       Q.    And you say that opioids can be

8   addictive if used improperly and that you

9   don't know what can happen if somebody

10  becomes addicted.

11          But you knew there was an

12  opioid epidemic, you knew that folks were

13  getting addicted to these drugs, that they

14  were being use improperly, and there was harm

15  being caused; is that fair?

16          MR. KOBRIN:  Object to form.

17      Facts not in evidence.

18          You're seeking expert testimony

19      from a fact witness, Jeff.  It's

20      improper.

21  QUESTIONS BY MR. GADDY:

22      Q.    Go ahead, Mr. Chunderlik.

23      A.    You're going to have to restate

24  the question again.

25      Q.    Sure.

```
 1                    What I asked you was that you
 2     told us that opioids can be addictive if used
 3     improperly.  And then you said you can't
 4     speculate as to what happens if somebody
 5     becomes addicted.
 6                    But you've known, going back to
 7     2008, that we're in the middle of an opioid
 8     epidemic and that that's happening because
 9     people are getting addicted and suffering
10     harms from these drugs.
11                    That's what you knew in your
12     mind, correct?
13                    MR. KOBRIN:  Object to form.
14          Facts not in evidence.  Seeking expert
15          testimony.
16                    You can answer these questions,
17          if you can, Mr. Chunderlik.
18                    THE WITNESS:  I don't
19          necessarily think that I can answer to
20          what happens after that.  I mean,
21          there could be a potential, but
22          whether these things happen or not, I
23          can't speculate.
24                    I can only see what I saw in,
25          you know, media reports and the
```

1    information that was coming out in

2    relation to the opioid epidemic.

3  QUESTIONS BY MR. GADDY:

4       Q.     And I appreciate that,

5  Mr. Chunderlik, and I want to make sure that

6  you understand the question I'm asking and

7  why I'm asking it.

8             You spent four or five years as

9  the manager of -- or, excuse me, the manager

10  of pharmacy training for pharmacists and

11  pharmacy techs, correct?

12      A.     Yes.

13      Q.     And you told us that while you

14  were in that position, you knew there was an

15  opioid epidemic throughout the country,

16  correct?

17            MR. KOBRIN:  Object to form.

18       Misstates his testimony.  I'm not sure

19       he said anything about throughout the

20       country.

21            MR. GADDY:  Josh, Josh, just

22       object to form.  I don't need you

23       testifying.

24            Go ahead, Mr. Chunderlik.

25            MR. KOBRIN:  Jeff, I'm going to

```
 1              put my objection on the record if

 2              you're going to keep asking the same

 3              questions to the witness that are

 4              totally improper.

 5                     MR. GADDY:  Josh, stop talking.

 6                     MR. KOBRIN:  Don't respond to

 7              my objections if you don't want me to

 8              talk, Jeff.

 9      QUESTIONS BY MR. GADDY:

10          Q.      Mr. Chunderlik, you can answer

11      the question.

12          A.      Would you mind just restating

13      it again?

14          Q.      Absolutely.

15              You were the manager of

16      pharmacy training for about four or five

17      years, from '08 to 2012, and you already told

18      us that you understood during that time

19      period that there was an opioid epidemic

20      throughout the country, correct?

21          A.      Yes.

22                     MR. KOBRIN:  Object to form.

23          Same objection.

24      QUESTIONS BY MR. GADDY:

25          Q.      From there you went on to --
```

 1    from there you went on to --

 2              MR. KOBRIN:  Jeff --

 3    QUESTIONS BY MR. GADDY:

 4        Q.      -- be the manager of pharmacy

 5    compliance.

 6              MR. KOBRIN:  Jeff, please stop.

 7              George, please give me a moment

 8        to get an objection in.  Thank you.

 9    QUESTIONS BY MR. GADDY:

10        Q.      Mr. Chunderlik, after that you

11    went on to be the manager of pharmacy

12    compliance from 2012 through 2019, correct?

13        A.      Not through the mid --

14    mid-2019.

15        Q.      Right.

16              And again, during that time

17    period, you've already told us, you had an

18    understanding that there was an opioid

19    epidemic, correct?

20        A.      Yes.

21        Q.      Okay.  And what I'm trying to

22    understand here is your personal opinion and

23    your personal understanding as the person who

24    held that -- those two roles at Giant Eagle,

25    the person that was in charge of training the

1    pharmacists and the pharmacy techs and the

2    person that was in charge of pharmacy

3    compliance.

4                 Did you have an understanding

5    that in the communities in which Giant Eagle

6    pharmacies existed that there were people

7    that were using opioids improperly and

8    becoming addicted and that there was harm

9    occurring from that?

10                Did you have that personal

11   understanding?

12                MR. KOBRIN:  Object to form.

13                THE WITNESS:  There's a --

14       there could be a potential for that.

15   QUESTIONS BY MR. GADDY:

16       Q.    I understand there could be a

17   potential for that.

18                But further than that, it was

19   happening in the communities where there were

20   Giant Eagle pharmacies, correct?

21                MR. KOBRIN:  Object to form.

22                THE WITNESS:  I don't

23       necessarily know that for sure.

24   QUESTIONS BY MR. GADDY:

25       Q.    You don't know whether or not

1    there were people suffering from opioid

2    abuse, opioid addiction and opioid overdose

3    deaths in communities in Ohio?

4              MR. KOBRIN:  Object to form.

5              THE WITNESS:  I could only

6         presume so based upon the news reports

7         and everything that I had seen in the

8         media.

9    QUESTIONS BY MR. GADDY:

10        Q.    Did you use that knowledge

11   about the opioid epidemic and the fact that

12   there were people in the communities,

13   including in Ohio, where these Giant Eagle

14   were located that were addicted and were

15   suffering, and some people were overdosing

16   and dying, did you use that knowledge in your

17   day-to-day job when you were training

18   pharmacists and when you were the manager of

19   pharmacy compliance?

20             MR. KOBRIN:  Object to form.

21        Facts not in evidence.  Lack of

22        foundation.

23             Go ahead, George.

24             THE WITNESS:  I can't say that

25        I used the opioid epidemic

1     specifically to -- in training to talk

2     about that specifically in relation to

3     any training in regards to controlled

4     substance dispensing.

5   QUESTIONS BY MR. GADDY:

6     Q.     Okay.  So the answer is no, you

7   did not use that understanding on a daily

8   basis of your job, correct?

9          MR. KOBRIN:  Object to form.

10    Presumes facts not in evidence.

11         THE WITNESS:  If I felt it was

12    necessary to bring it as part of --

13    and discuss it, we would do that, but

14    I can't point to any specific times

15    that I did that.

16  QUESTIONS BY MR. GADDY:

17    Q.     Okay.  Let's turn the page,

18  Mr. Chunderlik, and look at some of the notes

19  that you included in this presentation that

20  you e-mailed to yourself back in April

21  of 2016.  And I'm going to go down to the

22  note on slide 3, towards the bottom of the

23  page.

24         You with me?

25    A.     Yes.

1      Q.      I'm going to start with the
2    second sentence in the first paragraph.  It
3    says, "Over the last five years, the number
4    of deaths due to accidental opioid poisoning
5    has increased at an alarming rate, and the
6    issue has reached epidemic proportions."
7             Did I read that correctly?
8      A.      Jeff, I want to make sure I'm
9    on the same page.
10             Which tab is this?  Are we
11   still on Tab 12?
12     Q.      We are, Mr. Chunderlik.  If you
13   look down at the bottom of the page, it
14   should have a Bates number that ends 277.
15   This is the page right behind your résumé.
16     A.      Okay.
17             MR. KOBRIN:  George, to the
18        extent you feel you need to, please
19        feel free to read the document and --
20        to the extent you need to get
21        background as to what it is.
22   QUESTIONS BY MR. GADDY:
23     Q.      Let me read that again for you.
24   I'm under slide 3.
25             Do you see that?

1     A.     Yes.

2     Q.     And I'm going to go to the

3   second sentence.  It says, "Over the last

4   five years, the number of deaths due to

5   accidental opioid poisoning has increased at

6   an alarming rate, and the issue has reached

7   epidemic proportions."

8          Did I read that correctly?

9     A.     Yes.

10     Q.     And it goes to say, "Which is

11   why the DEA has stepped up enforcement

12   actions."

13          Correct?

14     A.     Yes.

15          MR. KOBRIN:  Object to form.

16   Misstates the document.

17   QUESTIONS BY MR. GADDY:

18     Q.     And this was an understanding

19   and something that you were putting in

20   presentations that you were giving at Giant

21   Eagle back in this 2014 time period, correct?

22     A.     This particular presentation

23   was for something that I had to do for a --

24   for an opportunity to move into a promotional

25   position.

1       Q.    Okay.  So who was the audience

2  for this presentation?

3       A.    This would have been people who

4  were interviewing me for the position that I

5  was seeking.

6       Q.    People at Giant Eagle?

7       A.    At Giant Eagle, yes.

8       Q.    Okay.  Is this like board of

9  directors-type folks?

10      A.    No, this was not board of

11  directors.

12      Q.    Can you give me some titles of

13  the type of people you would have been

14  presenting to here?

15      A.    Colleagues within the pharmacy,

16  operations department.

17      Q.    Would these have been people at

18  corporate level --

19      A.    Yes.

20      Q.    -- as opposed to people at

21  store level?

22      A.    Yes, this was corporate.

23      Q.    Okay.  So this was a

24  presentation to corporate that coincided with

25  a -- essentially a job interview process?

```
 1        A.     Yes.

 2        Q.     Okay.  It goes on in the second

 3   paragraph and says, "Pharmacists are

 4   constantly reminded of their corresponding

 5   responsibility to ensure that a prescription

 6   is issued for a legitimate medical purpose by

 7   an individual practitioner acting in the

 8   usual course of his professional practice."

 9              Correct?

10        A.     Yes.

11        Q.     When it says that pharmacists

12   have a "corresponding responsibility," you

13   put that phrase in quotations, correct?

14        A.     Yes.

15        Q.     What is -- to whom does the

16   pharmacist have a corresponding

17   responsibility?

18              MR. KOBRIN:  Object to form.

19              THE WITNESS:  I don't know if

20        they have a corresponding

21        responsibility to an individual, but

22        they have a responsibility to ensure

23        that the prescription is issued for a

24        legitimate medical purpose by the

25        practitioner and that it's a valid
```

```
 1          prescription.
 2   QUESTIONS BY MR. GADDY:
 3          Q.     And it's both a legal and an
 4   ethical obligation, correct?
 5               MR. KOBRIN:  Object to form.
 6          Facts not in evidence.  Seeks a legal
 7          interpretation.
 8               THE WITNESS:  That's my
 9          understanding.
10   QUESTIONS BY MR. GADDY:
11          Q.     Is that it's both a legal and
12   ethical obligation, right?
13          A.     Yes.
14               MR. KOBRIN:  Object to form.
15   QUESTIONS BY MR. GADDY:
16          Q.     And, Mr. Chunderlik, is it fair
17   to say that the practical, kind of the
18   everyday implication of the corresponding
19   responsibility that sits with the pharmacist
20   is that they are not permitted to just
21   blindly rely on a prescription that's
22   presented to them by a doctor -- or excuse
23   me, by a patient who had that prescription
24   written by a doctor?  Is that fair?
25               MR. KOBRIN:  Object to form.
```

```
 1                THE WITNESS:  If you would

 2         just -- could you just restate that

 3         one more time?

 4    QUESTIONS BY MR. GADDY:

 5         Q.     Absolutely.

 6                Is it fair to say that the

 7    practical kind of everyday implication of the

 8    corresponding responsibility that rests with

 9    the pharmacist is that they are not permitted

10    to just blindly accept a prescription and

11    fill it but that they had their own

12    responsibilities to do due diligence into

13    those prescriptions?

14                MR. KOBRIN:  Object to form.

15                THE WITNESS:  Due diligence to

16         make sure that it's a valid

17         prescription for a legitimate medical

18         use.

19    QUESTIONS BY MR. GADDY:

20         Q.     So, yes, they're not permitted

21    to just blindly rely on a doctor, true?

22                MR. KOBRIN:  Object to form.

23         Asked and answered.

24                THE WITNESS:  Yes.

25
```

1  QUESTIONS BY MR. GADDY:

2      Q.    And as it relates to

3  prescriptions for opioids, you would agree

4  that it's important that a pharmacist carry

5  out their corresponding responsibility and do

6  appropriate due diligence on both the legal

7  and ethical components of that corresponding

8  responsibility because opioids have dangers

9  associated with them, correct?

10         MR. KOBRIN:  Object to form.

11         THE WITNESS:  Pharmacists had a

12      responsibility for any prescription to

13      make sure that it was, you know, a

14      valid prescription and issued for a

15      legitimate medical purpose.

16 QUESTIONS BY MR. GADDY:

17      Q.    I understand that,

18 Mr. Chunderlik, but I'm not asking about any

19 prescription.  I'm asking about opioid

20 prescriptions.

21         Okay?

22      A.    Including opioid prescriptions.

23      Q.    Okay.  Well, I'm pulling opioid

24 prescriptions out, okay, and putting them

25 into a different subset here, and I'm only

Highly Confidential - Subject to Further Confidentiality Review

1    asking about opioid prescriptions.

2              Do you understand that?

3        A.    Yes.

4              MR. KOBRIN:  Object to form.

5    QUESTIONS BY MR. GADDY:

6        Q.    So as it relates to opioid

7    prescriptions, do you agree that it's

8    important that a pharmacist carries out their

9    corresponding obligation, both components,

10   the legal and ethical arms of that, and that

11   they perform adequate due diligence to ensure

12   that the prescription has been written for a

13   legitimate medical purpose because there are

14   dangers associated with opioids?

15             MR. KOBRIN:  Object to form,

16        and asked and answered.  And

17        completely asked and answered.

18        There's nothing about the prior

19        answer --

20             MR. GADDY:  That's not an

21        objection, Josh.  Please stop.

22             MR. KOBRIN:  Do you want to

23        engage, Jeff?  Is that what you want

24        to do?  Do you want to talk about my

25        objection?

```
 1    QUESTIONS BY MR. GADDY:

 2         Q.    Mr. Chunderlik, please answer

 3    the question.

 4         A.    Could you just restate it

 5    again?

 6         Q.    Sure.  I'll ask it for the

 7    third time.

 8               I'm asking just about opioid

 9    prescriptions, Mr. Chunderlik, and I'm asking

10    you whether or not you agree that it's

11    important that a pharmacist carries out their

12    corresponding responsibility, both the legal

13    and ethical components of that

14    responsibility, and performs adequate due

15    diligence to ensure that opioid prescriptions

16    are written for a legitimate medical purpose

17    because of the dangers associated with

18    opioids.

19               MR. KOBRIN:  Object to form.

20               THE WITNESS:  Yes.

21               MR. KOBRIN:  Same objection.

22    QUESTIONS BY MR. GADDY:

23         Q.    And some of those dangers

24    include that those pills are addictive,

25    correct?
```

```
 1            A.      They have the potential --
 2                    MR. KOBRIN:  Object to form.
 3    QUESTIONS BY MR. GADDY:
 4            Q.      That those pills can be abused,
 5    correct?
 6                    MR. KOBRIN:  Object to form.
 7                    THE WITNESS:  They have a
 8         potential.
 9    QUESTIONS BY MR. GADDY:
10            Q.      People can overdose and die
11    from taking opioids, correct, Mr. Chunderlik?
12                    MR. KOBRIN:  Object to form.
13                    THE WITNESS:  If they're taken
14         improperly, they may have the
15         potential to cause that.
16    QUESTIONS BY MR. GADDY:
17            Q.      And, Mr. Chunderlik, this
18    obligation that pharmacists have to carry out
19    a corresponding responsibility that's in this
20    PowerPoint, I know the PowerPoint is from
21    2014, I think we saw, but that's not a new
22    concept then, right?  Or excuse me, 2016.
23    That's not a new concept then, right?
24    Corresponding responsibility has been around
25    for a while, right?
```

1     A.     Yes.

2     Q.     Okay.  And Giant Eagle has been

3   dispensing opioids going back at least to

4   when you were a pharmacist in the 1980s; is

5   that fair?

6     A.     Yes.

7     Q.     And corresponding

8   responsibility was in place while you were a

9   pharmacist, or at least a practicing

10   pharmacist, I should say, right?

11     A.     Yes.

12     Q.     Down here in the very last

13   paragraph, you write, "The companies that do

14   not have tight policies and procedures to

15   follow and monitor these activities may find

16   themselves facing huge fines and closure of

17   facilities for extreme violations."

18            Is that correct?

19     A.     Yes.

20     Q.     Now, Mr. Chunderlik, I can

21   understand that huge fines are something that

22   a company wants to avoid, but if a pharmacist

23   does not properly carry out their

24   corresponding responsibility, you agree that

25   there could be serious public health

```
 1   consequences, right?
 2              MR. KOBRIN:  Object to form.
 3              THE WITNESS:  There is a
 4         possibility of that.
 5              MR. KOBRIN:  George, you've got
 6         to wait for me to make my objection,
 7         okay?  Please try and wait and give me
 8         the time to make an objection.
 9              Object to form.  Facts not in
10         evidence.  Seeks an expert.
11   QUESTIONS BY MR. GADDY:
12         Q.    You'll agree, Mr. Chunderlik,
13   that while on one hand companies like Giant
14   Eagle may want to avoid paying fines, that if
15   a pharmacist does not properly carry out
16   their corresponding responsibility when it
17   comes to prescriptions for drugs like
18   opioids, that people can get addicted and
19   people can die, right?
20              MR. KOBRIN:  Object to form.
21         Asked and answered.
22              THE WITNESS:  I've answered
23         that question previously.
24              (Chunderlik Exhibit 2 marked
25         for identification.)
```

1    QUESTIONS BY MR. GADDY:

2        Q.    And the answer is yes, right?

3        A.    I believe so.

4        Q.    Mr. Chunderlik, we're going to

5    go to a different document now.  I'm going to

6    show you P-HBC-26, which is going to be your

7    Tab Number 8.

8              And let me know when you're

9    there.

10       A.    Okay.  Yes.

11       Q.    And it looks like this is a

12   presentation given by you in 2013, correct?

13       A.    Yes.

14       Q.    Do you know who the audience

15   would have been for this presentation?

16       A.    This would have been our

17   pharmacy compliance committee.

18       Q.    And flip, if you would for me,

19   please, to the Bates on the bottom right-hand

20   corner, to the Bates ending 998.

21       A.    Yes.

22       Q.    Never mind.  It says that on

23   every page.

24             Go with me, please -- I'm about

25   15 pages in -- to a slide that says at the

```
 1   top, "Prescription drug abuse epidemic."

 2              Go back one, please Gina.

 3              (Discussion off the record.)

 4   QUESTIONS BY MR. GADDY:

 5        Q.    Do you see what we've got on

 6   the screen, Mr. Chunderlik?

 7        A.    Yes.

 8        Q.    That's the page I'm trying to

 9   go to.

10              You with me?

11        A.    Okay.  Yes, I am.

12        Q.    You see the title of this slide

13   is, "Prescription Drug Abuse Epidemic"?

14        A.    Yes.

15        Q.    And in the graph there it

16   says -- or excuse me.  Just above the graph

17   in the gray -- on my version it's a

18   grayed-out block.  It says, "100 people die

19   from drug overdoses every day in the United

20   States."

21              Do you see that?

22        A.    Yes.

23        Q.    And at the top of the graph

24   there it says, "Drug overdose death rates in

25   the US have more than tripled since 1990."
```

```
 1                Correct?

 2        A.     Yes.

 3        Q.     And I think it's -- I think

 4    it's kind of coincidental, but it looks like

 5    the timing on this graph starts in 1990 when

 6    you left as a practicing pharmacist and then

 7    picks back -- and then the graph ends at 2008

 8    when you came back to the company, right?

 9        A.     Yes.

10        Q.     And you see that during that

11    time period there was a pretty drastic rise

12    in the rate of overdose deaths across the

13    country from opioids, correct?

14        A.     Yes.

15        Q.     And again, as you told us, this

16    is information that you were aware of when

17    you were in your pharmacy training role and

18    your manager of pharmacy compliance role,

19    correct?

20        A.     Yes.

21        Q.     And if you turn the page with

22    me, please, you see this continues, and the

23    first bullet point says, "In 2009, the deaths

24    from prescription drug overdoses exceed the

25    deaths from auto accidents for the first time
```

1    ever."

2              Did I read that correctly?

3    A.      Yes.

4    Q.      And then in the next bullet

5    point it says, "Over 20 percent of Americans

6    admit to abusing prescription drugs."

7              Correct?

8    A.      Yes.

9    Q.      Now, why was this information

10   that you thought was necessary to include in

11   this PowerPoint to the pharmacy team -- or

12   excuse me, to the compliance team?

13   A.      To make sure that everyone on

14   the compliance team was aware of this.

15   Q.      Okay.  And you agree that it

16   was important for everybody in the compliance

17   team to see that there were real

18   life-and-death implications to the opioid

19   epidemic, and it's not just about the huge

20   fines that could be instituted on a company

21   like Giant Eagle, correct?

22   A.      Yes.

23   Q.      You go on to say in the next

24   bullet point that "Prescription drugs are now

25   the recognized gateway drugs to heroin and

1    other illegal drugs."

2              Correct?

3    A.       Yes.

4    Q.       What did you mean by that when

5    you included that within this presentation?

6    A.       It was another bullet point to

7    show the potential for how the opioid

8    epidemic has a potential to possibly cause

9    harm.

10   Q.       And did you have an

11   understanding and an awareness that this was

12   happening within communities where there are

13   Giant Eagle pharmacies, in Ohio and in

14   Pennsylvania, that these prescription drugs

15   were acting as a gateway drug to things like

16   heroin?

17             MR. KOBRIN:  Object to form.

18             THE WITNESS:  I knew that there

19        was a possibility that that could be

20        part of it as well.

21   QUESTIONS BY MR. GADDY:

22   Q.       And, Mr. Chunderlik, I

23   appreciate that, but I'm asking for more than

24   a possibility.

25             Did you have an awareness that

```
 1    that was actually happening in the
 2    communities where there were Giant Eagle
 3    stores?
 4                 MR. KOBRIN:  Object to form.
 5                 THE WITNESS:  I --
 6                 MR. KOBRIN:  Asked and
 7           answered.
 8                 THE WITNESS:  I mean, I could
 9           surmise that, but I don't know it
10           necessarily 100 percent to be true.  I
11           could surmise from the statistics that
12           that might be a possibility.
13                 MR. KOBRIN:  I don't want you
14           to speculate, George.
15                 THE WITNESS:  Pardon me?
16                 MR. KOBRIN:  I don't want you
17           to speculate, George.  You're here to
18           testify about facts that you know.
19                 Okay?
20                 THE WITNESS:  Yes.
21    QUESTIONS BY MR. GADDY:
22           Q.    Mr. Chunderlik, did you have to
23    apply for the position of manager of pharmacy
24    compliance?
25           A.    No, I don't recall having to
```

1    apply for that position.

2         Q.    When you took over that

3    position, were you replacing somebody?  Was

4    there somebody else in that role before you?

5         A.    No, I was -- we had actually a

6    senior manager that held that position as

7    well, so I was just a -- you know, I was the

8    manager, and there was a senior manager of

9    pharmacy compliance.

10        Q.    Okay.  So were you the first

11   person at Giant Eagle to hold that as a

12   standalone position?

13        A.    No.

14        Q.    Okay.  Well, maybe I

15   misunderstood your answer then.

16              So who did that job before you

17   did?

18        A.    There was a gentleman by the

19   name of Joe Millward.  He was the senior

20   manager of pharmacy compliance at that point

21   in time.

22        Q.    Okay.  And while you were the

23   manager of pharmacy compliance, you reported

24   to Joe?

25        A.    I did, yes.

```
 1          Q.      Okay.  Prior to you going into

 2    the role, was it just Joe, or was he

 3    reporting to somebody?

 4          A.      Joe would have reported up

 5    through upper manager -- upper management to

 6    the director of pharmacy at that period of

 7    time.

 8          Q.      Okay.  But before you went into

 9    that role, there was just one pharmacy

10    compliance person.  It was Joe.  You went

11    into the role and became the manager of

12    pharmacy compliance, and Joe maintained a

13    senior manager of pharmacy compliance title.

14               Do I have that right?

15          A.      Yes.

16          Q.      Now, I had the opportunity to

17    look through some of your performance

18    evaluations over the years.

19          A.      Yes, sir.

20          Q.      And what they did was give me a

21    decent sense of some of the different types

22    of matters and tasks that you worked on in

23    the pharmacy compliance position.

24               Can you, kind of in your own

25    words from a high-level perspective, explain
```

1    to us what you saw your job as in the manager

2    of pharmacy compliance?

3              MR. KOBRIN:  Object to form.

4              THE WITNESS:  Well, I was

5         responsible for, you know, the things

6         that we already talked about in my

7         résumé, that we reviewed previously.

8    QUESTIONS BY MR. GADDY:

9         Q.    Can you give me a little more

10   detail?  I think we only covered one of the

11   four bullet points in your résumé.  So I'm

12   looking for you to just give me kind of an

13   overview.

14             If you were -- if you had been

15   out at a cocktail party, somebody had asked

16   you what you do and wanted a 60-second

17   answer, what would you have told them?

18             MR. KOBRIN:  Object to form.

19             THE WITNESS:  That I was

20        responsible for communicating pharmacy

21        regulatory requirements to our stores,

22        and I had some responsibility in

23        training and those types of issues.

24             And I was also responsible for

25        staying up to date with regulatory

```
 1              issues so they could be communicated

 2              and explained to our pharmacists and

 3              pharmacy team members.

 4                   MR. KOBRIN:  Can I make a quick

 5              request?  If we're not going to have a

 6              document, I have a 90 percent black

 7              screen right now -- thank you.

 8              Exactly what I was asking.

 9    QUESTIONS BY MR. GADDY:

10         Q.     And, Mr. Chunderlik, we're

11    focusing today on controlled substance

12    dispensing and controlled substance

13    regulations.  But fair to say that that was

14    just a component of the different types of

15    regulations that -- that were under your

16    purview while you were in this role?

17         A.     Yes, that would be just a

18    component.

19         Q.     Okay.  If you were to kind of

20    give us a breakdown of the percentage of your

21    time or attention that would have been spent

22    on controlled substance pharmacy-related

23    regulations as opposed to the other things

24    that fell under your purview, whether it was

25    HIPAA, OSHA, you know, pseudoephedrine-type
```

1   issues, List I issues, can you give us your

2   best estimate as to where controlled

3   substance policy regulations were compared to

4   the others?

5           MR. KOBRIN:  Object to form.

6           THE WITNESS:  I would say

7       probably about 15 to 20 percent of my

8       job duties.

9   QUESTIONS BY MR. GADDY:

10      Q.      And one of the first things

11  that you were asked to do when you became a

12  manager of pharmacy compliance was to draft a

13  controlled substance dispensing policy; is

14  that correct?

15          MR. KOBRIN:  Object to form.

16      Foundation.  Assumes facts not in

17      evidence.

18          THE WITNESS:  One of my first

19      duties?  I wouldn't say that was one

20      of my first duties when I became

21      involved in compliance.

22          I was more involved, when I

23      first became involved in compliance,

24      in helping our store -- in helping our

25      company be accredited for durable

Highly Confidential - Subject to Further Confidentiality Review

1        medical equipment with Medicare Part B

2        and CMS.  That was my -- one of my

3        initial duties, and that took up a

4        great deal of my time at that period

5        of time.

6   QUESTIONS BY MR. GADDY:

7        Q.    Okay.  And about what time

8   period was that in; do you remember?

9        A.    That would have been when I

10  first became manager of pharmacy compliance

11  in the 2012 time frame.

12       Q.    Okay.  Mr. Chunderlik, I'm

13  going to look -- I don't know if you --

14             Josh, I don't know how you got

15  this to Mr. Chunderlik, but I want to look at

16  one of the entries on his performance review.

17             So, Mr. Chunderlik, I don't

18  have if you have that in hard copy.  If not,

19  we can just put it up on the screen for you.

20       A.    Okay.

21             MR. KOBRIN:  I have it.  I'd

22       actually prefer -- can you tell me

23       what you're going to send him, and I

24       will try and get it to him?  I'd

25       rather he have it in hard copy.

```
1              I mean, we can take a quick
2         break if you want.  You can just send
3         me the page.
4              MR. GADDY:  It's what you sent
5         me yesterday, so --
6              MR. KOBRIN:  Yeah, I -- you
7         sent me an article last night.  You
8         didn't tell me that you were going to
9         present any of these documents --
10        {audio interruption}.
11             MR. GADDY:  Okay.  Well, we can
12        go off the record.  We can go off the
13        record.
14             MR. KOBRIN:  I don't know if
15        he's seen them or not.  I mean, I
16        expect he has probably considering
17        they're his performance reviews,
18        but --
19             MR. GADDY:  We can go off the
20        record.
21             VIDEOGRAPHER:  The time is
22        10:00 a.m.  We are off the record.
23         (Off the record at 10:00 a.m.)
24             VIDEOGRAPHER:  The time is
25        10:29 a.m.  We are back on the record.
```

1          (Chunderlik Exhibit 3 marked

2      for identification.)

3  QUESTIONS BY MR. GADDY:

4      Q.     Mr. Chunderlik, we're going to

5  look at P-HBC-38, which is going to be your

6  performance reviews.  And I understand you've

7  had an opportunity to print at least the

8  first ten or so pages of those out, correct?

9      A.     Yes.

10     Q.     Okay.  And we can just look at

11  the first page, and by "the first page" I

12  mean the Bates number 14983 at the bottom

13  right-hand corner.

14          Do you have page in front of

15  you?

16     A.     Yes.

17     Q.     Okay.  And it looks like this

18  is the performance review for you for fiscal

19  year 2013, which runs from July of '12

20  through June of '13.

21          Right?

22     A.     Yes.

23     Q.     And at the left-hand side of

24  the page we see your name and your position

25  as the manager of pharmacy compliance,

1    correct?

2         A.    Yes.

3         Q.    Okay.  And I think you'd

4    already told us that you reported to Joseph

5    Millward, who was there listed below you,

6    correct?

7         A.    Yes.

8         Q.    Okay.  So what I was asking you

9    about before we took a break was whether or

10   not you had involvement, or the timing of

11   your involvement, in drafting a controlled

12   substance dispensing policy.  So what I want

13   to do now is look at that in just a little

14   bit more detail as far as when that happened.

15              So if you would turn with me,

16   please, to Bates number 14985, so it should

17   be the third page of this.  And down in the

18   bottom third of the page, you'll see an entry

19   related to the Giant Eagle controlled

20   substance dispensing policy.

21              Let me know when you're there.

22              MR. KOBRIN:  Object to form.

23              It's going to be dispensing

24        guideline, I think is what you want to

25        look for.

```
 1              THE WITNESS:  Dispensing
 2       guideline.
 3   QUESTIONS BY MR. GADDY:
 4       Q.     Okay.  You with me,
 5   Mr. Chunderlik?
 6       A.     Yes.
 7       Q.     All right.
 8       A.     It says, "Develop a GE
 9   controlled substance dispensing guideline."
10       Q.     Okay.  Perfect.  Thanks.  I
11   think I might have said policy, but guideline
12   is what -- the terminology used, correct?
13       A.     Yes.
14       Q.     And looking in the middle line,
15   the middle kind of section about halfway
16   across, it has a start date of July 1, 2012,
17   and the date that it was due was the end of
18   the fiscal year, June 30, 2013, correct?
19       A.     Yes.
20       Q.     Okay.  And what you were being
21   asked to do here was to draft a dispensing
22   guideline related specifically to controlled
23   substances, correct?
24              MR. KOBRIN:  Object to form.
25       Assumes facts not in evidence.
```

```
 1              THE WITNESS:  It is a

 2      controlled substance dispensing

 3      guideline.

 4  QUESTIONS BY MR. GADDY:

 5      Q.     Okay.  And was that your idea

 6  to do or did somebody ask you to do that?

 7      A.     That was, you know, brought by

 8  the upper management of Giant Eagle.

 9      Q.     And policies or guidelines such

10  as the one that you drafted here, or were

11  asked to draft here, could be important for a

12  company like Giant Eagle, correct?

13              MR. KOBRIN:  Object to form.

14              THE WITNESS:  They are

15      important so that we can educate team

16      members.

17  QUESTIONS BY MR. GADDY:

18      Q.     And when you say "team

19  members," you're referring to pharmacists and

20  pharmacy techs, correct?

21      A.     Yes.

22      Q.     And fair to say that at any

23  particular time there are hundreds of

24  pharmacists and pharmacy techs that work for

25  Giant Eagle in the different stores across
```

1    the country?

2         A.    Yes.

3         Q.    Okay.  And guidelines or

4    policies like this one here can be a good way

5    for the company to communicate the way that

6    they want things done when it relates to a

7    certain topic, correct?

8              MR. KOBRIN:  Object to form.

9              THE WITNESS:  It's a way for --

10        it's a way to communicate out to the

11        stores of what is to be expected.

12   QUESTIONS BY MR. GADDY:

13        Q.    Okay.  And it's a good way for

14   the company to tell the team members, as you

15   call them, the pharmacists and the pharmacist

16   technicians, how the company wants different

17   tasks to be performed, correct?

18        A.    It's a tool for the -- it's a

19   tool to be used to help the team members do

20   their job.

21        Q.    And when you were asked to

22   author the controlled substance dispensing

23   guidelines between 2012 and 2013, you weren't

24   updating a prior policy or a prior guideline;

25   you were writing a new guideline, correct?

```
 1              MR. KOBRIN:  Object to form.
 2        Assumes facts not in evidence.
 3              THE WITNESS:  It was a
 4        guideline of information that had been
 5        communicated to stores through various
 6        communication avenues that we had.  We
 7        put it in formalized -- in a
 8        formalized manner.
 9   QUESTIONS BY MR. GADDY:
10        Q.    Mr. Chunderlik, this was the
11   first controlled substance dispensing
12   guideline, correct?
13              MR. KOBRIN:  Object to form.
14        Assumes facts not in evidence.
15              THE WITNESS:  I don't
16        necessarily know what you mean by it's
17        the first dispensing guideline.
18              We -- we -- you know, we
19        communicated to our stores in various
20        means about controlled substances.
21        This was just a way to put it in a
22        more formalized manner.
23   QUESTIONS BY MR. GADDY:
24        Q.    Mr. Chunderlik, this was the
25   first written controlled substance dispensing
```

1    guideline prepared by Giant Eagle, correct?

2                   MR. KOBRIN:  Same objection.

3         Object to form.  Same objection.

4                   THE WITNESS:  In this manner.

5    QUESTIONS BY MR. GADDY:

6         Q.     In this manner, yes?  Is that

7    what you're saying?

8         A.     In this formalized manner.

9         Q.     Okay.  This was the first

10   written, formalized controlled substance

11   dispensing guideline issued by Giant Eagle,

12   correct?

13                  MR. KOBRIN:  Object to form.

14                  THE WITNESS:  It was -- it was

15        a guideline that we had put out there,

16        but we had communication about

17        guidelines in various forms before

18        this as well.

19   QUESTIONS BY MR. GADDY:

20        Q.     I understand that that's your

21   position, Mr. Chunderlik, but my question is

22   a little bit different.

23                  I'm asking you whether or not

24   this was the first written, formalized

25   controlled substance dispensing guideline

1    issued by Giant Eagle.

2                    MR. KOBRIN:  Object to form.  I

3          object to form.  Asked and answered.

4                    THE WITNESS:  Yes, I -- you

5          know, my answer is still the same.

6    QUESTIONS BY MR. GADDY:

7          Q.      That, yes, this is the first

8    written, formalized controlled substance

9    dispensing guideline, true?

10                   MR. KOBRIN:  Object to form.

11                   THE WITNESS:  No, we had

12         other -- we had other communications,

13         written communications, that were sent

14         to the -- that went out to the stores

15         in various forms prior to this as

16         well.

17   QUESTIONS BY MR. GADDY:

18         Q.      Is there any -- anything prior

19   to that that you can point me to?

20         A.      We -- we had, you know, team

21   leader calls that may have been -- had

22   agendas, but I don't recall specifically, no.

23         Q.      Okay.  So this is the first

24   written, formalized controlled substance

25   dispensing guideline that was prepared by

```
 1    Giant Eagle and issued out to the team
 2    members, correct?
 3                 MR. KOBRIN:  Object to form.
 4         Asked and answered.
 5                 THE WITNESS:  My answer is the
 6         same as it was before.
 7    QUESTIONS BY MR. GADDY:
 8         Q.    Which is, yes, this is the
 9    first written, formalized controlled
10    substance dispensing guideline, correct?
11                 MR. KOBRIN:  Object to form.
12         Asked and answered.
13                 THE WITNESS:  We had
14         communications out to our stores prior
15         to this particular formalized -- the
16         way it was formalized in this manner.
17    QUESTIONS BY MR. GADDY:
18         Q.    I understand that,
19    Mr. Chunderlik, but that's not at all what
20    I'm asking about.  Okay?
21                 I'm not asking about other
22    communications and other forms.  I'm asking a
23    very, very specific question here, okay?
24                 I want to know whether or not
25    this was the first written, formalized
```

1  controlled substance dispensing guideline

2  issued by Giant Eagle; yes or no?

3            MR. KOBRIN:  Object to form.

4       Asked and answered.  Also vague.

5            I think the term "guideline" is

6       causing the problem here.  He's saying

7       there have been guidelines and

8       communications --

9            MR. GADDY:  Josh, Josh, I don't

10      need your testimony.

11           MR. KOBRIN:  {Audio

12      interruption} -- or something.

13           MR. GADDY:  Josh, stop talking.

14           MR. KOBRIN:  I don't need you

15      harassing the witness.  I suggest you

16      move on, Jeff.

17 QUESTIONS BY MR. GADDY:

18      Q.    Mr. Chunderlik, can you please

19 just answer the question?

20      A.    No, because we had other types

21 of communications out to our stores, you

22 know, whether it was -- you know, this was

23 just a formalized document in a certain form

24 that we sent it out to our stores and wanted

25 to have it out to our stores.

```
 1          Q.     There you go.
 2                 This is the first written,
 3    formalized controlled substance --
 4          A.     No, formal --
 5          Q.     I'm not asking about team
 6    member phone calls.  I'm not asking about --
 7          A.     No, in this particular manner.
 8          Q.     -- individual pharmacists.  I'm
 9    asking whether or not this is the first
10    written, formalized controlled substance
11    guideline that was issued by Giant Eagle; yes
12    or no.
13                 MR. KOBRIN:  Object to form.
14          Asked and answered.  Badgering the
15          witness.
16                 THE WITNESS:  You know, I felt
17          that I answered that question
18          previously.
19    QUESTIONS BY MR. GADDY:
20          Q.     Are you not going to answer it
21    now?
22          A.     Well, it's -- my answer is
23    going to be the same as it was before.
24                 We had other types of
25    communication and -- that we communicated out
```

1    to our stores.  This was a formal document

2    that we put together in this manner.

3         Q.    So, yes, this was the first

4    formal document on controlled substance

5    dispensing that Giant Eagle put together,

6    correct?

7              MR. KOBRIN:  Object -- whoa,

8         whoa, whoa.  Object to form.  That's a

9         very different question.

10             You're causing some confusion

11        here.  I think you should look at the

12        way you phrased that and look at the

13        prior question.

14             And I do suggest that you look

15        at the way you're phrasing the

16        questions and why the witness is

17        having trouble answering the way you

18        want him to, Jeff.

19   QUESTIONS BY MR. GADDY:

20        Q.    Mr. Chunderlik, can you answer

21   the question?

22        A.    This was a formalized document

23   that was, you know, put together, but we had

24   previous types of communications with our

25   stores in -- you know, I can't put a finger

1    on it or I can't point to specific documents

2    or anything like that, but this is -- you

3    know, in a formalized manner, that's how we

4    sent it out to the store at that period of

5    time.

6         Q.    Well, what does your

7    performance evaluation issue the goal name

8    was for this product?  What was it that you

9    were supposed to do?

10        A.    To put -- to develop a

11   formalized controlled substance dispensing

12   guideline in this manner.

13        Q.    Well, what does "develop" mean

14   to you, Mr. Chunderlik?

15        A.    To develop it in this manner,

16   in this written, formalized document.

17        Q.    Okay.  And if you move over two

18   blocks to the right, it asked what actually

19   happened.

20              Do you see that?

21        A.    Yes.

22        Q.    And it says, "The controlled

23   substance manual and the dispensing

24   guidelines have been written and are in draft

25   form."

1              Do you see that?

2         A.      Yes.

3              MR. KOBRIN:  Object to form.

4    QUESTIONS BY MR. GADDY:

5         Q.      And if you go down to the

6    bottom of the page under Team Member

7    Comments, it looks like you write, "The

8    original June 30th deadline for rollout to

9    the stores was not achieved.  However, the

10   plan has been revised to present to the PDLs

11   by July 2013 and to introduce to the pharmacy

12   managers at the annual meetings which are

13   tentatively scheduled for September."

14              Correct?

15        A.      Yes.

16        Q.      So from July of 2012 through

17   June of 2013, one of the tasks that you were

18   working on was developing the controlled

19   substance dispensing guidelines, correct?

20              MR. KOBRIN:  Object to form.

21              THE WITNESS:  This document,

22        yes.

23   QUESTIONS BY MR. GADDY:

24        Q.      Okay.  And this was going to be

25   the first time that this material had been

1    put in writing into a formalized guideline

2    that would be presented to the PDLs and the

3    pharmacy managers, correct?

4              MR. KOBRIN:  Object to form.

5              THE WITNESS:  In this

6         formalized manner.

7    QUESTIONS BY MR. GADDY:

8         Q.    Did you present this policy to

9    the PDLs in July of '13 and the pharmacy

10   managers in September?

11        A.    Yes.

12             (Chunderlik Exhibit 4 marked

13        for identification.)

14   QUESTIONS BY MR. GADDY:

15        Q.    Let's look at P-HBC-28, which

16   is going to be your Tab Number 10,

17   Mr. Chunderlik.

18        A.    Yes.

19        Q.    And is this the controlled

20   substance dispensing guideline that you

21   developed in 2013?

22        A.    Yes.

23             MR. KOBRIN:  Take the time to

24        look at it and make sure it is what

25        you think it is and you're comfortable

1       with it.  If you need to.

2   QUESTIONS BY MR. GADDY:

3       Q.    This is the guideline you

4   developed in 2013, Mr. Chunderlik?

5             It looks like it's got the date

6   on the bottom left-hand side of the page,

7   7/12/13?

8       A.    7/22/2013.

9       Q.    Yes, thank you.

10      A.    Yes.

11      Q.    We're looking at it?  We're at

12  the right document?

13      A.    Yes.

14      Q.    Okay.  Let's go up to the top

15  of the page and look at the purpose.

16            It indicates that the purpose

17  is "to provide guidelines for the proper

18  dispensing of controlled substances that

19  support the corresponding responsibility

20  mandate placed upon pharmacists to exercise

21  due diligence in the decision to fill or not

22  to fill a controlled substance prescription."

23            Did I read that correctly?

24      A.    Yes.

25      Q.    And again, despite the fact

1    that this guideline is just coming out in

2    2013, pharmacists have always had that

3    obligation, correct?

4              MR. KOBRIN:  Object to form.

5        Assumes facts not in evidence.

6              He's told you that -- {audio

7        interruption}.

8    QUESTIONS BY MR. GADDY:

9        Q.    Did you say --

10             MR. KOBRIN:  -- Jeff.

11   QUESTIONS BY MR. GADDY:

12       Q.    Did you say yes,

13   Mr. Chunderlik?  I couldn't hear you.

14       A.    Could you just repeat that

15   again?

16       Q.    Sure.

17             I said, despite the fact that

18   this policy or this guideline is coming out

19   in 2013 talking about one of the purposes of

20   the policy being to support the corresponding

21   responsibility mandate on pharmacists, that's

22   a responsibility and a mandate that's been

23   there for many, many years, correct?

24             MR. KOBRIN:  Object to form.

25             THE WITNESS:  To my knowledge,

1      yes.

2    QUESTIONS BY MR. GADDY:

3          Q.      And then in the middle of the

4    page there you have a substance where you

5    talk about the corresponding responsibility

6    that applies to the pharmacists, correct?

7          A.      Yes.

8          Q.      Okay.  And we've already talked

9    about that a little bit, so I'm going to keep

10   going.  And about halfway down the page

11   there's a section that says, "Ensure the

12   validity of the controlled substance

13   prescription."

14                Correct?

15         A.      Yes.

16         Q.      And is it fair to say that some

17   of these requirements deal with the legal

18   aspect of the corresponding responsibility as

19   far as making sure that the doctor is

20   licensed, the doctor is registered with the

21   DEA to write prescriptions for certain drugs

22   and those types of things?

23                MR. KOBRIN:  Object to form.

24                George, take the time to read

25        over whatever you think you need to

1          check before you answer a question

2          related to what these are about.

3                    THE WITNESS:  And could you

4          restate your question?

5     QUESTIONS BY MR. GADDY:

6          Q.     Sure.

7                    Fair to say that some of these

8     requirements dealing with the validity of the

9     controlled substance relate to the legal

10    aspect of corresponding responsibility as far

11    as ensuring that the doctor is properly

12    licensed, properly registered with the DEA

13    and things of that nature?

14         A.     Yes, several -- yes, several of

15    the bullet points, bullets -- specifically

16    bullet point 5.

17         Q.     And do you agree,

18    Mr. Chunderlik, that it's important for a

19    Giant Eagle pharmacist, but frankly for any

20    pharmacist, to have an understanding and an

21    appreciation that the prescriber whose

22    prescription they are looking to fill is

23    legitimate?

24                    MR. KOBRIN:  Object to form.

25                    THE WITNESS:  Yeah, I would

```
 1         agree with that.
 2    QUESTIONS BY MR. GADDY:
 3         Q.    And you would agree that it's
 4    pretty essential that the pharmacist have an
 5    understanding that the doctor for whom
 6    they're filling a prescription is somebody
 7    who's acting in good faith and acting
 8    pursuant to their medical license and those
 9    types of things?
10              MR. KOBRIN:  Object to form.
11              THE WITNESS:  Yes, they would
12         have a responsibility to do that.
13    QUESTIONS BY MR. GADDY:
14         Q.    Okay.  And but -- and I
15    appreciate that, but it's not necessarily
16    that it's their responsibility.
17              But would you agree with me
18    that one factor that could lead to either
19    drugs being diverted or pills like opioids
20    ending up in the wrong hands would be if you
21    had a doctor who was not prescribing opioids
22    the way that they should be?  Is that fair?
23              MR. KOBRIN:  Object to form.
24         Vague.
25              THE WITNESS:  That's different
```

1         from what you asked me before.

2    QUESTIONS BY MR. GADDY:

3         Q.    And it was intended to be.

4               Do I need to ask it again or...

5         A.    Yes.

6         Q.    Would you agree with me that

7    one thing that pharmacists should be aware of

8    and be cognizant of is the fact that the

9    prescriber for whom they're filling an opioid

10   prescription is operating in good faith,

11   doing things the right way, issuing

12   prescriptions for causes and conditions that

13   they should be issuing those prescriptions

14   for?

15              MR. KOBRIN:  Object to form.

16        Confusing, vague and misrepresents

17        facts and the law, who they're filling

18        the prescription for.

19              THE WITNESS:  Can you repeat

20        that question one more time?

21   QUESTIONS BY MR. GADDY:

22        Q.    Mr. Chunderlik, maybe I'm

23   overcomplicating this.

24              Do you agree that it's pretty

25   important that the pharmacist have an

1    understanding that the doctor is operating

2    within the law when it comes to issuing

3    prescriptions?

4         A.    They have a responsibility to

5    ensure that the prescription is a valid

6    prescription for a -- for a legitimate

7    medical purpose, if that's what you're asking

8    me.

9         Q.    Somewhat, and I appreciate

10   that.

11              And you agree that it could be

12   a pretty big problem if a pharmacist is

13   dealing with a doctor who's running a pill

14   mill or filling prescriptions they shouldn't

15   be filling or things of that nature, correct?

16              MR. KOBRIN:  Object to form.

17              THE WITNESS:  I think that's

18        different from what you were asking me

19        before.

20   QUESTIONS BY MR. GADDY:

21        Q.    I understand, Mr. Chunderlik,

22   and not every question is going to be the

23   same.  So it was intended to be a different

24   question.

25              So do you agree it would be a

```
 1    pretty big problem if a pharmacist is dealing
 2    with a doctor who is running a pill mill,
 3    issuing prescriptions for people they
 4    shouldn't be issuing them for, that they
 5    don't have a legitimate medical need for the
 6    prescription?  You agree that would be a big
 7    problem?
 8              MR. KOBRIN:  Object to form.
 9              THE WITNESS:  It may be a
10         potential for a big problem.  I don't
11         know how a pharmacist would know that
12         a doctor is running a pill mill or
13         anything like that.
14    QUESTIONS BY MR. GADDY:
15         Q.    Okay.  But if they did, if they
16    had reason to believe or reason to be
17    cognizant, that's something you would want
18    your pharmacists to take note of, correct?
19              MR. KOBRIN:  Object to form.
20              THE WITNESS:  Yes, we would.
21              (Chunderlik Exhibit 5 marked
22         for identification.)
23    QUESTIONS BY MR. GADDY:
24         Q.    We're not going to completely
25    leave this document, so keep it handy.  But
```

1    we're going to look real quick at P-HBC-23,

2    which is Tab Number 5.

3              And, Mr. Chunderlik, this is an

4    e-mail, and there is a link embedded in this

5    e-mail.  And last night I sent to your

6    counsel, and he tells me he sent to you, an

7    article that was included in that link.

8              Do you know what I'm talking

9    about here?

10        A.     Yes.

11        Q.     Okay.  So we're going to look

12   at the e-mail first, and then we'll go to the

13   article.

14        A.     Okay.

15        Q.     And if you would, tell me

16   when -- you got the e-mail in front of you?

17        A.     I do, yes.

18        Q.     Okay.  Let's go to the bottom

19   of the first page and read this

20   chronologically.

21              Okay?

22        A.     Okay.

23        Q.     And it looks like this is an

24   e-mail that's sent on February 23, 2016, and

25   the e-mail is from a pharmacy team leader,

```
 1    correct?

 2         A.     Yes.

 3         Q.     Does that mean that's a

 4    pharmacist at the -- at a particular pharmacy

 5    store?

 6         A.     Yes.

 7         Q.     Okay.

 8         A.     Yes.

 9         Q.     And the subject is to -- it

10    says Dr. Letizio, and the e-mail is written

11    to Chris Miller, right?

12         A.     Yes.

13         Q.     And what's your understanding

14    of Chris Miller's role at this point in time?

15         A.     At this point in time, I

16    believe Chris was the pharmacy district

17    leader for this store.

18         Q.     Okay.  And this particular

19    pharmacist, it looks like her name is

20    Michelle.  She writes to Chris and says,

21    "Dr. Letizio, a local pain management doctor,

22    is being investigated by the DEA.  Is it okay

23    to fill scripts from him still, assuming

24    everything else looks legit?"

25                Do you see that?
```

```
 1        A.    Yes.  Yes.

 2        Q.    Okay.  And then if you go to

 3   the next page, do you see that she's also

 4   included within her e-mail a link?

 5        A.    Yes, I see that.

 6        Q.    Okay.  And so what I did there

 7   was I pulled up the story of that link.

 8              So you have the article that

 9   would be -- that we sent you last night?

10        A.    Yes.

11        Q.    Okay.

12        A.    Yes.

13        Q.    And you see at the very bottom

14   of the page, we see the same link there for

15   the article?

16        A.    Yes.

17              MR. KOBRIN:  Objection.

18   QUESTIONS BY MR. GADDY:

19        Q.    And you see the title of this

20   article is, "Attorney General's Office

21   investigating Erie doctor"?

22              Correct?

23        A.    Yes.

24        Q.    And this e-mail was sent to

25   Chris Miller, and this article, the link to
```

1    this article, was included in that e-mail,

2    right?

3                    MR. KOBRIN:  Object to form.

4                    To the extent you can confirm

5           that, George, you're free to answer.

6                    THE WITNESS:  It looks like it

7           is.

8    QUESTIONS BY MR. GADDY:

9         Q.    Okay.  And let's look at a

10   little bit of the article.  We'll look at the

11   first paragraph.  It says, "The Attorney

12   General's Office is investigating a local

13   doctor.  The physician is under investigation

14   for allegedly having workers forge

15   prescriptions, falsifying patient records and

16   having inappropriate relations with a

17   patient."

18                    Did I read that correctly?

19        A.    Yes.

20        Q.    And skip down and read the

21   third, fourth and fifth paragraphs.

22        A.    Okay.

23        Q.    It says, "Dr." --

24                    MR. KOBRIN:  Well, if you're

25           going to skip paragraphs, I just want

1    to make sure that George is

2    comfortable that he's read what he

3    needs to read in the skipped-over

4    paragraphs.

5              MR. GADDY:  Thanks, Josh.

6    QUESTIONS BY MR. GADDY:

7        Q.    You see here, Mr. Chunderlik,

8    it says, "Dr. Anthony Letizio is a doctor of

9    internal medicine specializing in pain

10   management."

11             Do you see that?

12       A.    Yes.

13       Q.    It says, "The AG's office

14   served a search warrant at his office at 24th

15   and State Street on February 11th.  They had

16   several leads, listing 54 circumstances in

17   their request for a search warrant, one of

18   them from a local Rite Aid pharmacy after

19   Dr. Letizio prescribed Schedule II narcotics

20   for himself, along with his 12 and

21   16-year-old children."

22             Do you see that?

23       A.    Yes.

24       Q.    Does that activity raise any

25   flags for you, Mr. Chunderlik?

1           MR. KOBRIN:  Object to form.

2      Vague.

3           THE WITNESS:  It's surprising

4      to me that a doctor would act in this

5      manner.

6  QUESTIONS BY MR. GADDY:

7      Q.    Okay.  Would you agree it's not

8  appropriate behavior for a doctor when it

9  comes to Schedule II prescriptions?

10      A.    It's not appropriate behavior

11  with any prescription.

12      Q.    The very bottom of -- skip one

13  more line.  It says, "Police are being led to

14  believe that he also prescribed a patient

15  unnecessary powerful painkillers."

16           Do you see that?

17      A.    Yes.

18      Q.    Schedule II opioids are

19  powerful painkillers, right, Mr. Chunderlik?

20           MR. KOBRIN:  Object to form.

21      Seeks expert testimony.  Vague.

22           THE WITNESS:  They're

23      painkillers.  They're controlled

24      substances.

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. GADDY:

 2         Q.     Well, they're powerful

 3    painkillers, right?

 4              MR. KOBRIN:  Object to form.

 5         Vague.

 6              THE WITNESS:  Powerful, how --

 7         what do you mean by powerful?

 8    QUESTIONS BY MR. GADDY:

 9         Q.     Are there more painful power --

10    excuse me.  Are there more powerful

11    painkillers than Schedule II opioids?

12              MR. KOBRIN:  Object to form.

13         Seeks expert testimony.

14              THE WITNESS:  Yes, I'm not an

15         expert, and I can't assume that to be

16         true.

17    QUESTIONS BY MR. GADDY:

18         Q.     As a pharmacist, do you agree

19    with me that opioids, Schedule II opioids,

20    are powerful painkillers?

21              MR. KOBRIN:  Object to form.

22         Vague.

23              THE WITNESS:  Again, they --

24         you know, powerful means different

25         things to different people.  They
```

1          are -- they are -- Schedule II

2          painkillers are used for -- to

3          regulate or to treat pain for patient.

4               I guess the word "powerful" can

5          mean different things to different

6          people.

7     QUESTIONS BY MR. GADDY:

8          Q.     And I appreciate that,

9     Mr. Chunderlik, and that's why I'm asking

10    you, because I want to know your perspective

11    as a person who has been a pharmacist with

12    Giant Eagle for over a decade, a person who's

13    been the manager of pharmacy training for

14    Giant Eagle pharmacists and techs, and the

15    person who's been a manager of pharmacy

16    compliance for Giant Eagle.

17              Do you or do you not agree that

18    Schedule II opioids are powerful painkillers?

19              MR. KOBRIN:  Object to form.

20         Asked and answered, and vague and

21         confusing.

22              THE WITNESS:  They're more

23         powerful than other painkillers or

24         other drugs that are used to treat

25         pain.  They are more power -- they can

```
 1        be more powerful.

 2   QUESTIONS BY MR. GADDY:

 3        Q.    I'm going to go down below the

 4   ad to the line that starts, "Police believe."

 5             It's on the second page.

 6        A.    Oh, okay.

 7        Q.    Sorry.

 8             MR. KOBRIN:  If you need to

 9        read the intervening paragraphs,

10        George, take the time to do that.

11   QUESTIONS BY MR. GADDY:

12        Q.    You with me, Mr. Chunderlik?

13        A.    I want to read the two

14   paragraphs before, before I go on.

15        Q.    You with me now?

16        A.    Yes.

17        Q.    It says, "Police believe

18   Dr. Letizio had his office manager write

19   patients prescriptions and forge his

20   signature on those scripts.  She does not

21   have medical clearances to see patients or

22   write prescriptions."

23             Do you see that?

24        A.    Yes.

25        Q.    Do you agree those are pretty
```

1    shocking allegations against this doctor?

2              MR. KOBRIN:  Object to form.

3              THE WITNESS:  I don't know why

4         a doctor would let somebody do that.

5    QUESTIONS BY MR. GADDY:

6         Q.    You would agree that's totally

7    inappropriate for a doctor to do, correct?

8         A.    I don't think it's appropriate.

9         Q.    You agree that any

10   prescriptions that were forged by his office

11   manager are inappropriate, illegitimate

12   prescriptions?

13             MR. KOBRIN:  Object to form.

14             THE WITNESS:  Any prescription

15        forged by somebody other than the

16        physician are inappropriate.

17   QUESTIONS BY MR. GADDY:

18        Q.    Because I'm saying the police

19   also think Dr. Letizio had his girlfriend,

20   who was a physician's assistant, forge his

21   name on patient prescriptions, right?

22        A.    Yes.

23        Q.    Again, same answer there:

24   That's also inappropriate, true?

25        A.    Yes.

```
 1          Q.     If you skip down a couple
 2    paragraphs, there's some allegations about
 3    inappropriate behavior with patients, which I
 4    don't know that we need to get into here, but
 5    then there's a paragraph that starts out,
 6    "Texts."
 7               Do you see that?  "Texts in
 8    which that manager"?
 9          A.     Yes.
10          Q.     It says, "Texts in which that
11    manager on several different dates asks the
12    doctor medical advice for patients while he
13    was out of the office.  According to police
14    findings in the search warrant, he responded
15    with directions on what and how to prescribe
16    patients."
17               Do you see that?
18          A.     Yes.
19          Q.     Do you understand that the
20    police had in the warrant and this pub --
21    this publication included within the e-mail
22    specific allegations that there were text
23    messages between the doctor and a
24    nonphysician where the doctor was telling the
25    nonphysician how to prescribe pills for
```

1  patients?

2          MR. KOBRIN:  Object to form.

3      I'm not sure he can testify to whether

4      this is an accurate representation in

5      an article, what was in a search

6      warrant, which he has no firsthand

7      knowledge of.

8          MR. GADDY:  Thanks, Josh.

9  QUESTIONS BY MR. GADDY:

10     Q.    You see that's what it says in

11 this article, Mr. Chunderlik?

12         MR. KOBRIN:  You can testify to

13     what it says in the article, George.

14         THE WITNESS:  Yes, I do see

15     what it says in the article.

16 QUESTIONS BY MR. GADDY:

17     Q.    And this is the article that

18 Michelle, the pharmacist at this particular

19 store, said to Chris Miller, correct?

20     A.    Yes.

21     Q.    Let's go back to the e-mail.

22         And you see in the middle of

23 the page, it looks like Chris responds to

24 Michelle, and he also copies you and your

25 supervisor, Joe Millward, right?

```
 1          A.      Yes.
 2          Q.      And he says, "Hi, Michelle, I
 3    would strongly encourage completing due
 4    diligence on each prescription from his
 5    office."
 6                  Correct?
 7          A.      Yes.
 8          Q.      Okay.  He doesn't tell her to
 9    stop filling prescriptions from that doctor,
10    does he?
11          A.      No.
12          Q.      He just says to encourage
13    completing due diligence on those
14    prescriptions, right?
15                  MR. KOBRIN:  Object to form.
16                  THE WITNESS:  Yes.
17    QUESTIONS BY MR. GADDY:
18          Q.      And, I mean, tell me if I'm
19    wrong, Mr. Chunderlik, but I think under your
20    controlled substance dispensing guidelines
21    Giant Eagle pharmacists are supposed to
22    complete due diligence on any Schedule II
23    prescription that's presented to them, right?
24          A.      Yes.
25          Q.      All right.  So completing due
```

```
 1   diligence on a prescription is the same thing

 2   that should be done with every controlled

 3   substance prescription that's presented at a

 4   Giant Eagle pharmacy, right?

 5               MR. KOBRIN:  Object to form.

 6        Asked and answered.

 7               THE WITNESS:  I stand by my

 8        previous answer.

 9   QUESTIONS BY MR. GADDY:

10        Q.    Because I understand that

11   only -- Chris tells Michelle, "only fill

12   those prescriptions that meet diligence."

13               Do you see that?

14        A.    Yes.

15        Q.    Is there ever a time that Giant

16   Eagle pharmacists are supposed to fill

17   prescriptions that don't meet diligence?

18               MR. KOBRIN:  Object to form.

19               THE WITNESS:  I don't believe

20        that's what Chris was implying there.

21   QUESTIONS BY MR. GADDY:

22        Q.    I'm not saying that he is.  I'm

23   just asking a question.

24               Is there ever a time that Giant

25   Eagle pharmacists are supposed to fill
```

1    prescriptions that do not meet diligence?

2              MR. KOBRIN:  Object to form.

3         Vague as to "meet diligence."

4              THE WITNESS:  What do you mean

5         by -- what do you mean by "meet

6         diligence"?

7    QUESTIONS BY MR. GADDY:

8         Q.    Mr. Chunderlik, I'm asking you

9    about an e-mail that you were included on.

10        A.    Uh-huh.

11        Q.    What Mr. Miller is saying here

12   is, only fill those prescriptions that meet

13   diligence.

14             Tell me if I'm wrong, but from

15   my perspective, that should be the case every

16   single time a controlled substance

17   prescription is issued or presented at a

18   Giant Eagle pharmacist -- pharmacy.

19             Is that true?

20             MR. KOBRIN:  Object to form.

21             THE WITNESS:  They should only

22        be filled if the pharmacist has

23        confidence that the prescription is

24        being issued by a licensed prescriber

25        in the -- in his prescriber -- within

 1            his prescribing authority and for a

 2            legitimate medical purpose, if that's

 3            what you're asking me.

 4    QUESTIONS BY MR. GADDY:

 5            Q.     It is.

 6                   That's always the rule, right?

 7            A.     Yes.

 8            Q.     So when leadership, the PDL,

 9    Mr. Miller, is presented with a question from

10    a pharmacist that includes a link to an

11    article stating that the doctor is having

12    inappropriate activities with his patient,

13    that he's writing Schedule II prescriptions

14    for himself and his children, and when he's

15    allowing his office manager and his

16    girlfriend to write and forge prescriptions,

17    the direction given to this pharmacist by

18    Mr. Miller was to continue filling

19    prescriptions from his office as long as they

20    met due diligence, correct?

21                   MR. KOBRIN:  Object to form.

22                   You want him to tell you what

23            the e-mail says?  He didn't write

24            this, Jeff.

25                   THE WITNESS:  As Josh said, I

```
 1           didn't write this e-mail, so I'm not
 2           sure what Chris Miller -- what was
 3           going through Chris Miller's mind when
 4           he wrote this e-mail.
 5   QUESTIONS BY MR. GADDY:
 6           Q.    Well, Mr. Chunderlik, I
 7   appreciate that your lawyer's suggesting how
 8   you answer the questions.
 9                 MR. KOBRIN:  Objection.
10   QUESTIONS BY MR. GADDY:
11           Q.    I suggest that you just listen
12   to me and answer the questions that I ask.
13                 Okay.  Mr. Chunderlik?
14                 My question to you is:  When
15   this pharmacist presents to her superior,
16   Chris Miller, and says, should we keep
17   filling prescriptions for this doctor, he's
18   having inappropriate relationships with
19   patients, he's writing scripts for himself
20   and his minor children, he's allowing his
21   office manager and his girlfriend to write
22   prescriptions and forge his name, the
23   direction given to that pharmacist was not,
24   cut this doctor off, not refuse those
25   prescriptions.
```

```
 1              The direction that was given to
 2    that pharmacist was, you can keep filling his
 3    prescriptions as long as they meet diligence.
 4              Correct?
 5              MR. KOBRIN:  Object to form.
 6         Misrepresents the document.
 7         Misrepresents prior testimony.
 8         Completely misrepresents all portions
 9         of the document.
10    QUESTIONS BY MR. GADDY:
11         Q.    Go ahead, Mr. Chunderlik.
12         A.    I don't think that's what Chris
13    Miller was implying here, to only -- to keep
14    on filling prescriptions.
15              There could have been
16    prescriptions, legitimate prescriptions,
17    coming from this physician's office.  And
18    Chris was -- in my mind, as I read this, felt
19    that, you know, if Michelle could verify that
20    these prescriptions were for a legitimate
21    medical purpose for patients, that it would
22    be appropriate for her to fill those types of
23    prescriptions if she knew that those
24    prescriptions were for a legitimate medical
25    purpose, written by a doctor who was only
```

Case: 1:17-md-02804-DAP Doc #: 4217-6 Filed: 12/29/21 100 of 240. PageID #: 559915

1    under investigation.

2        Q.      The fact that a doctor is under

3    investigation by DEA for allowing his office

4    manager to forge prescriptions, his

5    girlfriend to forge prescriptions, and the

6    other things we saw in that article, is not,

7    under Giant Eagle policy, a reason to refuse

8    prescriptions from a doctor, true?

9            MR. KOBRIN:  Object to form.

10        Vague and confusing.

11            THE WITNESS:  No.  If they --

12        if they were legitimate prescriptions

13        written by that doctor, there's no

14        reason why -- if they were legitimate

15        prescriptions written for a valid

16        medical purpose by that doctor,

17        there's no reason why -- why -- he's

18        under investigation.  His license

19        hasn't been sanctioned or -- at that

20        point in time or anything like that.

21            Because a pharmacist who's

22        doing their due diligence to show that

23        the prescription was written -- with

24        everything within their power to make

25        sure that that prescription was

Highly Confidential -- Subject to Further Confidentiality Review

1          written by the physician, that that

2          would -- they could still fill that

3          prescription.

4     QUESTIONS BY MR. GADDY:

5          Q.     Keep filling the prescriptions,

6     keep taking money from patients as long as --

7          A.     Not keep filling -- not keep

8     filling prescriptions.  Understanding that

9     they had to be valid prescriptions written by

10    the physician for a legitimate medical

11    purpose for legitimate patients.

12              There's no way of knowing

13    within here whether -- who was bringing those

14    prescriptions in without checking on them.

15              If we were checking on them and

16    Michelle had a comfort level that it was for

17    a legitimate medical purpose for a patient

18    who needed that prescription written by a

19    doctor who still had a medical license and it

20    wasn't suspended, this is -- this was -- this

21    just came out in a news article.  He hadn't

22    been suspended at that point in time.

23              If he still had prescription --

24    there may have still been patients,

25    legitimate patients, that he was prescribing

Highly Confidential - Subject to Further Confidentiality Review

1    for.

2         Q.     So no problem to continue

3    filling his prescriptions, even though he's

4    under investigation by the DEA --

5         A.     There --

6                MR. KOBRIN:  Stop.  Object to

7         the form.  Inappropriate.

8         Misrepresenting his testimony.  Asked

9         and answered.

10   QUESTIONS BY MR. GADDY:

11        Q.     That's right, Mr. Chunderlik?

12        A.     I gave you my answer.  If they

13   were legitimate prescriptions and the

14   pharmacist had done their diligence to ensure

15   that it was a legitimate prescription,

16   written by this doctor for a legitimate

17   medical purpose, and he still had a license

18   to prescribe, you know, we wouldn't -- there

19   was no reason to -- in my mind to shut that

20   doctor off completely until all the facts

21   came out.

22        Q.     The fact that he was under

23   investigation by DEA for the different items

24   that you've told us five, six, seven minutes

25   ago were completely inappropriate, that was

Highly Confidential - Subject to Further Confidentiality Review

```
 1    just one factor for the pharmacist to

 2    consider, right?

 3                   MR. KOBRIN:  Object to form.

 4            Asked and answered.

 5                   You're referencing a newspaper

 6            article, Jeff.

 7                   THE WITNESS:  Alls I -- you

 8            know, from what I see on -- in this

 9            article, he was being investigated for

10            certain situations for specific

11            patients.  They mentioned his two

12            daughters.  You know, that's as far as

13            they go in there.

14                   And I don't know -- you know,

15            it's hard to tell from this article

16            exactly how often this had occurred

17            and if there -- if there were

18            legitimate prescriptions being written

19            for legitimate patients for a

20            legitimate medical need from a doctor

21            who still had a license, this -- this

22            would just cause us to really take a

23            closer -- you know, a look at every

24            single -- this is just pointing out to

25            take a closer look at every single
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          prescription this doctor wrote.

 2               But to completely shut him off

 3          at this point in time?  There may be

 4          patients that, you know, were -- that

 5          he was treating that needed those --

 6          needed prescriptions.

 7               But the article only talks

 8          about two specific situations where he

 9          wrote prescriptions by people that

10          presumably were his offspring.

11  QUESTIONS BY MR. GADDY:

12          Q.     Well, to be fair,

13  Mr. Chunderlik, it talks about him allowing

14  his office manager to write prescriptions

15  when she's not licensed.  It talks about his

16  girlfriend writing prescriptions on -- under

17  his name, forging his name when she's not

18  licensed.  It references text messages when

19  the doctor was out of the office where he's

20  giving guidance to his office manager on how

21  to write prescriptions and what meds to write

22  for.

23               So it's a little bit more than

24  just writing prescriptions for his two

25  children.  Would you agree with me?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. KOBRIN:  There's no

 2        question there.  But also, you didn't

 3        read any of those text messages.

 4              If you want to talk about them,

 5        at least give Mr. Chunderlik an

 6        opportunity to read the messages as

 7        well as the remainder of the article.

 8              THE WITNESS:  The fact still

 9        remains that he may have had

10        legitimate patients that he himself

11        was writing prescriptions for.

12   QUESTIONS BY MR. GADDY:

13        Q.    I totally understand.  I

14   totally understand, Mr. Chunderlik.

15              So I'm ready to move on here,

16   but I'm just trying to make clear --

17        A.    The article does not say every

18   single prescription that he wrote were --

19   every single prescription that had his name

20   on it was not written by him.  It does not

21   say that.  It says --

22              MR. KOBRIN:  Let Jeff ask you a

23        question.

24              THE WITNESS:  Sorry.

25
```

Highly Confidential - Subject to Further Confidentiality Review

1    QUESTIONS BY MR. GADDY:

2         Q.     No, you're fine,

3    Mr. Chunderlik.

4                The fact that there were these

5    allegations included in this article that

6    were sent to Chris, that were included in the

7    e-mail that you and Mr. Miller were on, that

8    fact alone was not enough for Giant Eagle to

9    say, don't fill any prescriptions for this.

10               You were concerned that there

11   may still be legitimate prescriptions, and so

12   the guidance given to your pharmacists, or

13   Giant Eagle pharmacists, was to continue

14   filling prescriptions if they met due

15   diligence.   True?

16               MR. KOBRIN:  Object to form.

17               THE WITNESS:  As long as they

18        were, under due diligence, valid legal

19        prescriptions written for a valid

20        medical purpose by a doctor who still

21        had a license to prescribe.

22   QUESTIONS BY MR. GADDY:

23        Q.     Even though that doctor was

24   being investigated by the DEA?

25               MR. KOBRIN:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

1          Asked and answered.  Badgering the

2          witness.

3                  THE WITNESS:  He still had a

4          license to -- at this point in time

5          his license was still active.  It was

6          under investigation, but it was not

7          suspended.

8                  (Chunderlik Exhibit 6 marked

9          for identification.)

10    QUESTIONS BY MR. GADDY:

11          Q.     Mr. Chunderlik, we're going to

12    look at P-HBC-24.  It should be your Tab

13    Number 6.

14                 Let me know when you're there.

15          A.     Yes, I have it.

16          Q.     And it looks like -- we're

17    going to start in the middle of the page.  It

18    looks like this is another e-mail from a

19    pharmacist.

20                 It says, "Pharmacy team

21    leader," and it's sent on September 6, 2016,

22    correct?

23          A.     Yes.

24          Q.     And this e-mail is sent

25    directly to you with some other folks copied,

Highly Confidential - Subject to Further Confidentiality Review

1   right?

2        A.      Yes.

3        Q.      The subject is "Lighthouse

4   Medical."

5                True?

6        A.      Yes.

7        Q.      It says, "I have a

8   question/concern regarding prescriptions

9   ordered with the Lighthouse Medical practice.

10  They are a pain clinic, and all they

11  prescribe are narcotics."

12               Do you see that?

13       A.      Yes.

14       Q.      That would include opioids,

15  right?

16               MR. KOBRIN:  Object to form.

17               THE WITNESS:  I don't

18       necessarily know.  All narcotics are

19       not necessarily opioids.

20  QUESTIONS BY MR. GADDY:

21       Q.      Well, Mr. Chunderlik, we're

22  talking about a pain clinic where the

23  pharmacist is saying all they do is prescribe

24  narcotics.

25               You agree they're going to be

Highly Confidential - Subject to Further Confidentiality Review

1    talking about opioids in there?

2          MR. KOBRIN:  Object to form.

3      Asked and answered.

4          THE WITNESS:  My answer is

5      still the same.

6    QUESTIONS BY MR. GADDY:

7      Q.    Okay.  It says, "Last night on

8    our local news, there was a story about one

9    of their physicians, Dr. Johnson, being

10   charged with fraudulent billing.  They

11   referenced him as being one of 15 involved."

12         Do you see that?

13    A.    Yes.

14    Q.    It says, "They didn't specify

15   if the other physicians are from that

16   practice, but last week we had an insurance

17   issue with a different doctor, Dr. Ranieri,

18   in their practice being shut off from Gateway

19   as a provider."

20         Do you see that?

21    A.    Yes.

22    Q.    She goes on to say, "I realize

23   these aren't issues with controlled substance

24   prescribing, but my question is, if they're

25   shady in one way, should we be comfortable

Highly Confidential - Subject to Further Confidentiality Review

1  filling prescriptions from them at all?

2  Especially given the nature of drugs they

3  prescribe."

4             Do you see that?

5     A.     Yes.

6     Q.     Is that a concern for Giant

7  Eagle, if they had a pain clinic where 15 of

8  the individuals at the pain clinic are being

9  investigated for fraudulent billing related

10  to narcotic prescriptions?

11            MR. KOBRIN:  Object to form.

12        Misrepresents the evidence.  There's

13        nothing about the 15 being --

14            MR. GADDY:  Josh, stop talking,

15        man.  Make your objection.  Quit

16        coaching the witness.  Quit coaching

17        the witness.

18            You can state the basis for

19        your objection and that's it.  You're

20        coaching him.  All day long you've

21        been coaching him.  All day long I'm

22        hearing back from him exactly what

23        you're saying.

24            State "objection," state the

25        one-word basis, and then be quiet,

Highly Confidential - Subject to Further Confidentiality Review

```
 1              please.
 2                   MR. KOBRIN:  In this exact
 3              circumstance, Special Master Cohen has
 4              said that it's appropriate to explain
 5              the 106 objection.
 6                   You're misrepresenting the
 7              document.  If you're going to
 8              misrepresent the evidence to my
 9              client, I am going to clarify the
10              record and I am going to clarify the
11              evidence.
12                   There's a specific order in
13              this case from Special Master Cohen
14              regarding plaintiffs' lawyers
15              misrepresenting exhibits and our right
16              to explain the objection.
17                   I think I've been more than
18              fair.  I think I have not coached the
19              witness at all.
20                   But that's my reason, and
21              that's why I'm going to state that in
22              this particular circumstance.
23                   You can proceed.  If you're
24              going to challenge my objection in
25              that confrontational manner, I want to
```

Highly Confidential - Subject to Further Confidentiality Review

1          explain why I'm doing it in this

2          particular instance.

3                    You can go ahead, George.

4                    THE WITNESS:  Could we just

5          review what -- the question that was

6          asked?

7     QUESTIONS BY MR. GADDY:

8          Q.     Mr. Chunderlik, is it an issue

9     for Giant Eagle if they are told by one of

10    their pharmacists that a pain clinic has over

11    15 individuals being investigated for

12    fraudulent billing?

13                   MR. KOBRIN:  Object to form.

14         Misrepresents the evidence.

15                   THE WITNESS:  I don't

16         necessarily know in what I'm reading

17         is what is being meant by being

18         charged with fraudulent billing.

19                   Fraudulent billing, I'm not

20         necessarily sure, has anything to do

21         with prescribing.

22    QUESTIONS BY MR. GADDY:

23         Q.     And, Mr. Chunderlik, I'm not

24    suggesting it does.

25                   I'm asking you essentially the

Highly Confidential - Subject to Further Confidentiality Review

```
 1   same question that the pharmacist is asking
 2   you.
 3              If you have this pain clinic
 4   with over 15 individuals who, according to
 5   your pharmacist, are shady in one way, from
 6   Giant Eagle's perspective, are they
 7   comfortable filling opioid prescriptions for
 8   those doctors.
 9              Does it cause any issues for
10   Giant Eagle?  That's my question to you.
11              MR. KOBRIN:  Object to form.
12              THE WITNESS:  I don't know that
13        they --
14              MR. KOBRIN:  Object to form.
15              Hold on, George, please.
16              Object to form.  Still
17        misrepresenting the evidence with
18        regard to the 15 being involved.
19   QUESTIONS BY MR. GADDY:
20        Q.    Go ahead, Mr. Chunderlik.
21        A.    I don't know if this -- this
22   was a concern for Giant Eagle because of
23   fraudulent billing, having nothing to do with
24   prescribing.
25        Q.    I appreciate the two are
```

Highly Confidential - Subject to Further Confidentiality Review

1    distinct.

2              My question is the same

3    question the pharmacist had.  If you have a

4    pain -- a pain clinic who, according to your

5    pharmacist, all they prescribe are narcotics,

6    and you have this group, and they're shady in

7    one way, is Giant Eagle comfortable filling

8    prescriptions for them given the nature of

9    the drugs they prescribe?

10             MR. KOBRIN:  Object to form.

11             THE WITNESS:  I don't know if I

12        could go that far to say if they're

13        shady in one way, they -- they have

14        licenses to prescribe.  I don't

15        necessarily think being shady in one

16        way means that they're shady in all

17        ways.

18   QUESTIONS BY MR. GADDY:

19        Q.    Let's go back to the policy,

20   Mr. Chunderlik, that was your Tab Number 10,

21   if you've flipped from it.

22        A.    Okay.  I have it up.

23        Q.    Okay.  What I want to do is go

24   to page 2 of that policy.  About two-thirds

25   of the way down the page there's a heading

Highly Confidential - Subject to Further Confidentiality Review

1    that says, "Appropriateness of Controlled

2    Substance Prescriptions, Red Flags."

3              Do you see that?

4        A.    Yes.

5        Q.    And under here it looks -- you

6    can flip the page.  It looks like there's ten

7    items listed under the Red Flags section, and

8    then there's another, I guess, what I'd call

9    a sister section that says "Other Red Flags."

10             Do you see that?

11       A.    Yes, I do.

12       Q.    Okay.  So I want to go through

13   a couple of these and ask you some questions

14   about them.

15             The first one on page 2 says,

16   "Prescriptions written together for

17   oxycodone/hydrocodone, plus a benzodiazepine,

18   plus a muscle relaxer."

19             Do you see that?

20       A.    Yes.

21       Q.    Do you recognize that to be a

22   cocktail?

23             Have you heard that phrase

24   before?

25       A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.     Okay.  And what is a cocktail
 2     to you?
 3            A.     It's a drink.
 4            Q.     Let me ask the question a
 5     little bit better, Mr. Chunderlik.
 6                   In the context of a pharmacy
 7     setting, and specifically talking about
 8     controlled substances, what does a cocktail
 9     mean to you?
10            A.     A combination of drugs.
11            Q.     And would you agree with me
12     that a pharmacist being presented with a
13     prescription for a cocktail -- and when you
14     say "a combination of drugs," you agree with
15     this definition in the policy that you wrote,
16     I assume, an opioid, a benzo and a muscle
17     relaxer?
18            A.     Yes.
19                   MR. KOBRIN:  Object to form.
20     QUESTIONS BY MR. GADDY:
21            Q.     Would you agree with me that if
22     a pharmacist at Giant Eagle is presented with
23     a prescription for a cocktail, that that
24     should be a major red flag?
25            A.     It's a red flag.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Do you agree with me that it's

2  a major red flag?

3              MR. KOBRIN:  Object to form.

4              THE WITNESS:  It's a red flag.

5        I don't necessarily know that I would

6        call it a major red flag.  I don't

7        think that would be my terminology,

8        but it's a -- it's a red flag.

9  QUESTIONS BY MR. GADDY:

10       Q.    Okay.  Do you agree, based on

11  your experience as a practicing pharmacist

12  and your former position of manager of

13  pharmacy training and pharmacy compliance,

14  that there's no legitimate medical use for a

15  patient to have a simultaneous --

16  prescriptions for an opiate, a benzo and a

17  muscle relaxer?

18              MR. KOBRIN:  Object to form.

19        Seeks inappropriate expert testimony.

20              Go ahead, George.  If you

21        understand, you can answer.

22              THE WITNESS:  Well, they have

23        three different -- they have three

24        different uses.

25

Highly Confidential - Subject to Further Confidentiality Review

1   QUESTIONS BY MR. GADDY:

2        Q.    Well, my question is a little

3   bit different as opposed to whether or not

4   they have independent uses.

5             But what I'm asking you is

6   whether or not you'll agree that there's no

7   legitimate medical use for a patient to have

8   simultaneous prescriptions for an opiate, a

9   benzo and a muscle relaxer; yes or no?

10            MR. KOBRIN:  Same objection.

11            THE WITNESS:  Well, a patient

12       could be in pain, they could have

13       anxiety, and they could have a pulled

14       muscle that requires a muscle

15       relaxant.

16   QUESTIONS BY MR. GADDY:

17        Q.    So your answer is that there

18   are --

19        A.    You know, it --

20            MR. KOBRIN:  Object to form.

21       Again --

22            THE WITNESS:  I'm not a -- I'm

23       not a medical doctor.  These -- you

24       know, they're for three specific

25       reasons.

1  QUESTIONS BY MR. GADDY:

2      Q.    Okay.  So I just want to make

3  sure I understand your position,

4  Mr. Chunderlik.

5          Based on your history as a

6  practicing pharmacist with Giant Eagle and

7  the manager of compliance for a period of

8  years at Giant Eagle, your position is is

9  there may be circumstances in which it is

10  appropriate for a patient to have

11  prescriptions for these three drugs, opiate,

12  benzo, muscle relaxer, all at the same time,

13  correct?

14          MR. KOBRIN:  Object to form.

15          THE WITNESS:  They're used for

16      three specific -- three specific

17      reasons.  One's pain, one's anxiety,

18      and one is used as a muscle relaxant.

19  QUESTIONS BY MR. GADDY:

20      Q.    I understand that,

21  Mr. Chunderlik, but that does not at all

22  address the question I asked.

23          My question is whether or not

24  you'll agree or disagree that it's

25  appropriate for a patient to be taking all

Highly Confidential - Subjected to Further Confidentiality Review

1    three of these drugs at the same time.

2              MR. KOBRIN:  Object to form.

3         Asked and answered.  You've already

4         asked him if it's a red flag.

5              THE WITNESS:  Yeah, I don't

6         know if it's -- I don't know if this

7         combination -- it's hard for me to

8         predict that this -- this combination

9         would cause harm.

10   QUESTIONS BY MR. GADDY:

11        Q.    Okay.  Let's move on to the

12   next one.

13             Number 2 says, "Lack of

14   individualization of dosing."

15             Did I read that correctly?

16        A.    Yes.

17        Q.    Can you kind of in your own

18   words explain to me what that red flag means?

19        A.    Well, I point to the part

20   that's in brackets, you know, "individualized

21   according to the patient need using the --

22   starting or using the lowest possible dose to

23   treat the patient."

24        Q.    Okay.  I've seen this one

25   explained before as -- along the lines of it

Highly Confidential - Subject to Further Confidentiality Review

1  would be a problem or it would be a red flag

2  if you had a prescriber that wrote the exact

3  same medication for the exact same dosage for

4  every patient.

5             Is what I just described how

6  you see this one, or are we talking about

7  different flags?

8             MR. KOBRIN:  Object to form.

9             THE WITNESS:  No, that might be

10        a better way to -- lack of individual

11        dosing, I don't necessarily know if it

12        means seeing the same prescription the

13        exact same way.  It may be.  I'm not

14        really sure.

15  QUESTIONS BY MR. GADDY:

16        Q.    Okay.  But you wrote the

17  policy, right, Mr. Chunderlik, the guideline?

18             MR. KOBRIN:  Object to form.

19             You're asking him about your

20        interpretation of other policies.

21             THE WITNESS:  It was used --

22        part of these red flags were used from

23        various sources.

24  QUESTIONS BY MR. GADDY:

25        Q.    You put the guidelines

Highly Confidential - Subject to Further Confidentiality Review

1   together, right, Mr. Chunderlik?

2        A.    Not individually.  There were

3   other folks involved to help in the writing

4   of this document.

5        Q.    Okay.  But it was assigned to

6   you, correct?

7        A.    It was one of the things that I

8   would have led, but there were a group of

9   people that helped to put this document

10  together.

11       Q.    And you were the one who rolled

12  it out and presented it to the team, correct?

13       A.    Yes.

14       Q.    Do you know as you sit here

15  today what pharmacists were supposed to be

16  looking for under this second flag that you

17  put into the controlled substance dispensing

18  guidelines that you were responsible for?

19       A.    I wrote this a while ago.  I

20  don't have a firm recollection of that.

21       Q.    Okay.  Let me ask this

22  question, Mr. Chunderlik.  If we're not

23  exactly -- I'm going to go back to the

24  example that I gave you.  Okay?

25            Do you recall that?  A doctor

Highly Confidential - Subject to Further Confidentiality Review

1    writing the same script for the same patient

2    and not differentiating based on patient

3    need, do you remember that generally?

4         A.    Yes.

5         Q.    Okay.  Can you help me

6    understand what tool the pharmacist has as

7    they are inputting a prescription into the

8    PDX system to help them determine the

9    prescribing habit for a particular doctor so

10    that they can make a decision about the

11    example that I gave, whether or not this

12    doctor is writing the same script and dosage

13    level for each patient?

14              MR. KOBRIN:  Object to form.

15              THE WITNESS:  I don't know --

16              MR. KOBRIN:  Foundation.  Facts

17         not in evidence.

18              Go ahead, George.

19              THE WITNESS:  I don't know that

20         software has the ability to do that, a

21         tool within the software.

22    QUESTIONS BY MR. GADDY:

23         Q.    Okay.  Outside of the software,

24    what would be the tool that Giant Eagle has

25    armed their pharmacists with to do some type

Highly Confidential - Subject to Further Confidentiality Review

1    of investigation or make a determination

2    about the prescribing practices of a

3    particular doctor to make sure that they're

4    not just writing the same script and same

5    dosage level for every patient?

6        A.     I don't know that there's a

7    tool out there that would do what you're

8    describing.

9        Q.     Okay.  Let's look at the next

10   red flag that you included in the controlled

11   substance dispensing guideline.

12             It says, "Multiple

13   prescriptions for the strongest formulations

14   of hydrocodone and alprazolam."

15             Do you see that?

16       A.     Yes.

17       Q.     Why did you include those two

18   drugs in this guideline?

19       A.     This -- this -- these

20   particular guidelines may have been pulled

21   from articles that I had seen written and

22   things like that.  I don't necessarily have a

23   reason for that, but they may have been --

24   because these -- these red flags would show

25   up in various publications and in research

1   that we did as a group.

2        Q.    Any reason you didn't include

3   oxycodone as a red flag?  Multiple

4   prescriptions for strong formulations of

5   oxycodone?

6        A.    I don't have any recollection

7   why I would or would not have done that.

8        Q.    Okay.  But regardless, you did

9   not include it, correct?

10        A.    No, it's not there.

11        Q.    When it says "multiple" here,

12   does that mean two or is there some other

13   number that is intended to kind of signify

14   the flag for Giant Eagle pharmacists?

15        A.    I don't know if there's -- I

16   don't -- it's more than one.  I don't know

17   if -- if the -- I can't recall if the intent

18   was to have a number, but multiple, more than

19   one.

20        Q.    Was this policy, this

21   guideline, ever updated during your time as

22   the pharmacy manager, or this one from July

23   '13 stay in place without changes during your

24   tenure?

25        A.    We did not update this during

Highly Confidential - Subject to Further Confidentiality Review

1   my tenure.

2          Q.     Flipping to the next page,

3   let's look at some of the red flags there.

4          A.     Yes.

5          Q.     Number 4 talks about early

6   refills.

7                 Do you see that?

8          A.     Yes.

9          Q.     Is there any type of mechanism

10  within the software or the dispensing system

11  at Walgreens -- or excuse me, at HBC or Giant

12  Eagle, that would give a notification to the

13  a pharmacist if there was a prescription

14  presented early for a refill for a controlled

15  substance?

16                MR. KOBRIN:  Object to form.

17                THE WITNESS:  The software did

18       display alerts for early refill

19       warnings.

20  QUESTIONS BY MR. GADDY:

21         Q.     Okay.  And would that work if

22  it was one day early, or did it have to be

23  three days or a week or do you know?

24         A.     I don't know the exact time

25  frame, but it was more than -- it was -- it

```
 1   gave -- at least gave the patient some leeway
 2   so that patients weren't running out of
 3   medication completely before they could get
 4   it refilled.  I don't remember the exact --
 5   the exact percentage or days early that --
 6   when it would fire.
 7        Q.    Okay.  And there was also an
 8   issue, I think, with insurance.  You might
 9   get an insurance flag or insurance doesn't
10   want to pay for the prescription if it's
11   presented too early, correct?
12        A.    Yes.
13        Q.    Okay.  Kind of from a -- I've
14   never -- obviously never stood behind a
15   computer in a Giant Eagle pharmacy, so help
16   me understand what happens if -- let's say
17   somebody has a 30-day prescription for some
18   type of Schedule III opioid, and they come
19   in, to make it easy, three weeks early to get
20   it refilled.
21             I imagine that three weeks is
22   enough time to trigger some type of
23   notification, right?
24             MR. KOBRIN:  Object to form.
25             THE WITNESS:  It possibly could
```

```
 1        be.
 2   QUESTIONS BY MR. GADDY:
 3        Q.    Okay.  So help me understand.
 4   What happens on the screen in front of the
 5   pharmacist when that person presents that
 6   script three weeks early and they type it in?
 7   I mean, does the screen go red?  Is there a
 8   pop-up box?  What happens?
 9             MR. KOBRIN:  Object to form.
10             I just want to make a quick
11        note on the record.  We had a 30(b)(6)
12        deponent who testified extensively
13        about the databases and how the data
14        works.
15             I'm not sure Mr. Chunderlik,
16        who has not dispensed at a Giant Eagle
17        pharmacy in several years and no
18        longer works for Giant Eagle, is the
19        appropriate witness for these
20        questions.
21             Go ahead to the extent you can
22        answer, George.
23             THE WITNESS:  My recollection
24        is that there's not a red box, but
25        there would be a warning displayed to
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          the pharmacist or -- to the pharmacist

 2          who was dispensing.

 3   QUESTIONS BY MR. GADDY:

 4          Q.     Okay.  And how does the

 5   pharmacist -- is the pharmacist then

 6   prevented from filling the prescription, or

 7   is there a way that the pharmacist can kind

 8   of, you know, acknowledge the warning and

 9   then continue to fill the prescription?

10               MR. KOBRIN:  Same objection.

11               THE WITNESS:  My recollection

12          is that the pharmacist could

13          acknowledge the warning and move

14          forward.

15   QUESTIONS BY MR. GADDY:

16          Q.     So the patient could say, I

17   lost my pills, I was on vacation, I left them

18   in the hotel room, I need another script, and

19   if the pharmacist determined that everything

20   seem appropriate, legitimate, they could

21   acknowledge the warning but then fill the

22   prescription, true?

23               MR. KOBRIN:  Object to form.

24          Vague.  Misstates his testimony and

25          misstates the facts regarding a refill
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          versus a new prescription.

 2               THE WITNESS:  It could -- it

 3          could -- just say that -- repeat that

 4          one more time, please.

 5   QUESTIONS BY MR. GADDY:

 6          Q.     Sure.

 7               It's really not intended to be

 8   a trick question, regardless of Josh's

 9   objection.

10          A.     I just want to make sure I have

11   it correct in my mind.

12          Q.     Yeah, I totally understand.

13               MR. KOBRIN:  I'm not accusing

14          you of being inappropriate, but it

15          does kind of change -- it shifts

16          gears, and I don't want the record to

17          reflect that he's saying somehow that

18          they can refill a new script.

19               MR. GADDY:  Yeah, the record's

20          got a lot of your thoughts on it,

21          Josh.

22   QUESTIONS BY MR. GADDY:

23          Q.     Mr. Chunderlik, if a patient

24   comes in three weeks early with an opioid

25   prescription, presents it, you're tell --
```

Highly Confidential - Subject to Further Confidentiality Review

 1    what you told us is the pharmacist is going

 2    to get some type of pop-up or alert telling

 3    them that it's coming in early.

 4              But what I understand you to be

 5    telling me is that if the pharmacist makes a

 6    determination that there's a legitimate

 7    reason for the early refill, the pharmacist

 8    has the ability to acknowledge the

 9    notification or the pop-up and then fill the

10    prescription, true?

11         A.    Yes.

12         Q.    Next one I want to look at

13    here, number 5, is, "Further than expected

14    distances of the patient and/or medical

15    provider from the pharmacy."

16              Do you see that?

17         A.    Yes.

18         Q.    Did Giant Eagle have any

19    guidance that they gave to their pharmacists

20    on what distance was appropriate?

21         A.    Not that I can recall.

22         Q.    Okay.  Well, was there any tool

23    within the software or any other -- or any

24    other tool that was made available to the

25    pharmacists that when they entered the

```
 1   information for the doctor and the

 2   information for the patient -- and obviously

 3   they knew the information for the pharmacist

 4   since they're working in it, was there any

 5   tool that Giant Eagle gave the pharmacists

 6   that would -- that would tell the pharmacist

 7   how far away the distances were or anything

 8   like that?

 9            MR. KOBRIN:  Object to form.

10            THE WITNESS:  No, there was not

11       any tool within the software to do

12       that.

13   QUESTIONS BY MR. GADDY:

14       Q.    Okay.  And it talks about

15   distances between the patient or the doctor

16   from the pharmacy.

17            Did you ever consider a red

18   flag about the distance between the patient

19   and the doctor, or was that never a red flag

20   that was included in these guidelines?

21            MR. KOBRIN:  Hang on a second.

22            You can answer, George.

23            THE WITNESS:  Not that I can

24       recall.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   QUESTIONS BY MR. GADDY:
 2        Q.     The next one, number 6, says,
 3   "Overwhelming percentage of pharmacy business
 4   devoted to controlled substances."
 5             Do you see that?
 6        A.     Yes.
 7        Q.     And this one was honestly a
 8   little confusing to me, Mr. Chunderlik.
 9             Is it Giant Eagle's intention
10   that before a pharmacist fills a
11   prescription, that they're supposed to run or
12   calculate the percentage of controlled
13   substances that their particular pharmacy has
14   run?  Or has dispensed?
15             MR. KOBRIN:  Object to form.
16             THE WITNESS:  No, I believe
17        they were just general -- general
18        guidelines to be aware of.
19   QUESTIONS BY MR. GADDY:
20        Q.     Okay.  So you'll agree with me,
21   number 6 wasn't a particular red flag that
22   you expected Giant Eagle pharmacists to
23   consider when presented with an individual
24   prescription?
25             MR. KOBRIN:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

1           THE WITNESS:  No, it could be a

2      possible red flag.

3   QUESTIONS BY MR. GADDY:

4      Q.      Can you walk me through a

5   scenario in which number 6 would cause a

6   pharmacist, and number 6 alone, would cause a

7   pharmacist to not fill a prescription?

8      A.      Not just number 6 alone, no.

9      Q.      Okay.  But -- okay.  So explain

10  to me, how does number 6 factor in?

11          And let me see if I can ask it

12  differently.

13          What information does the

14  pharmacist have available to them to look and

15  see their volume of dispensing of controlled

16  substances versus noncontrolled substances?

17  Do they have that information available on a

18  dashboard or in realtime while they're

19  filling prescriptions?

20          MR. KOBRIN:  Object to form.

21          THE WITNESS:  To my knowledge,

22      not -- not realtime as they're filling

23      prescriptions.

24  QUESTIONS BY MR. GADDY:

25      Q.      Is there -- I mean, is there

1   like a daily report that the pharmacists are

2   supposed to pull to tell them how many

3   controls they're filling versus noncontrols?

4       A.    They do have -- they did have a

5   report that they would run at night listing

6   their prescriptions, showing, you know, what

7   schedules they fell into.

8       Q.    Was there any guidance or

9   instruction from corporate to the pharmacists

10  that they were supposed to be hitting some

11  split or some ratio of filling controls

12  versus noncontrols?

13              MR. KOBRIN:  Object to form.

14              THE WITNESS:  No.

15  QUESTIONS BY MR. GADDY:

16      Q.    Okay.  Was there any direction

17  or guidance from corporate that they were

18  supposed to be analyzing on a nightly basis

19  the ratio of controls to noncontrolled

20  scripts that they filled?

21              MR. KOBRIN:  Object to form.

22              THE WITNESS:  No.

23  QUESTIONS BY MR. GADDY:

24      Q.    Okay.  So how did number 6

25  factor into a pharmacist's decision to fill

Highly Confidential - Subject to Further Confidentiality Review

1   an individual opioid prescription?

2        A.    It's hard for me to recall at

3   this point, other than the fact that it was

4   one of the possible red flags that, again,

5   you know, would be taking from different

6   sources and things to possibly be aware of.

7        Q.    Okay.  Let's look at another --

8        A.    If they could -- if they could

9   make a determination as they were filling

10  prescriptions, they could look at somebody's

11  profile, schedule profile, to see, you know,

12  what their prescription profile and their mix

13  of their -- the types of prescriptions that

14  they were taking.

15       Q.    And I appreciate you mentioned

16  the pharmacy profile, and we'll get to that

17  in a minute.

18            But this is talking about the

19  pharmacy business, right?  Not an individual

20  patient?

21            MR. KOBRIN:  Object to form.

22        Misrepresents testimony.

23            THE WITNESS:  Individual

24        prescriptions are part of the pharmacy

25        business.  Individual patients are

1        part of the pharmacy business.

2   QUESTIONS BY MR. GADDY:

3        Q.    Okay.  The next one,

4   Mr. Chunderlik, is, "Failure to contact

5   and/or follow up with other pharmacists who

6   are not filling prescriptions from the

7   provider in question."

8             Do you see that?

9        A.    Yes.

10       Q.    When a pharmacist enters a

11  prescription -- and included in that, I

12  presume, they enter -- they input, or the

13  prescription, when it's scanned, inputs the

14  doctor who wrote the prescription, right?

15       A.    I'm sorry, say that again?

16  Just --

17       Q.    Sure.

18             When a pharmacist enters a

19  prescription, one of the -- one of the items

20  that they enter is the doctor that issued the

21  prescription.

22       A.    Yes.

23       Q.    Correct?

24       A.    Yes.

25       Q.    Okay.  So my question for you

Highly Confidential - Subject to Further Confidentiality Review

1    is, when that happens, is there any type of

2    alert, kind of like what you told us about

3    with the early refills, an alert or a pop-up

4    or a message that tells that pharmacist about

5    other pharmacists who have not filled

6    prescriptions for that particular doctor?

7                    Was that something that happens

8    within the Giant Eagle system?

9                    MR. KOBRIN:  Object to form.

10                   THE WITNESS:  As I recall, not

11        necessarily.

12   QUESTIONS BY MR. GADDY:

13       Q.    Well, it's not -- really not

14   necessarily.  It's, no, that that does not

15   happen, correct?

16                   MR. KOBRIN:  Object to form.

17   QUESTIONS BY MR. GADDY:

18       Q.    There's no pop-up, there's no

19   notification, there's no -- anything like

20   that within the Giant Eagle system, right?

21                   MR. KOBRIN:  Object to form.

22                   Again, we had a 30(b)(6)

23        deponent who testified extensively on

24        these issues.  Mr. Chunderlik no

25        longer works in compliance and no

Highly Confidential - Subject to Further Confidentiality Review

```
 1              longer works for Giant Eagle.
 2                   THE WITNESS:  Not that I can
 3              recall.
 4    QUESTIONS BY MR. GADDY:
 5         Q.     The other one I want to ask
 6    about is number 10.  It says, "Verification
 7    that a prescription is legitimate is not
 8    satisfied simply because the provider
 9    performed blood tests and MRIs on the
10    patient."
11                   Do you see that?
12                   Help me understand how that's a
13    red flag for Giant Eagle pharmacists.
14                   MR. KOBRIN:  Object to form.
15                   THE WITNESS:  Again, these were
16              red flags that were in publication,
17              various publications, that I had seen
18              that we included in our guideline.
19    QUESTIONS BY MR. GADDY:
20         Q.     Okay.  So this was something
21    that you thought was important enough to
22    include in the Giant Eagle controlled
23    substance dispensing guidelines, right?
24         A.     Possibly, yes.
25         Q.     Let's go down to the bottom of
```

Highly Confidential - Subject to Further Confidentiality Review

1    that page, Mr. Chunderlik, and there's a

2    section called Documentation.

3                  Do you see that?

4        A.      Yes.

5        Q.      And it says here, "A pharmacist

6    must document the steps they have taken to

7    verify questionable prescriptions, including

8    any calls to the prescriber, conversations

9    with the patient, medical history review and

10   notate" -- excuse me.  So let me stop right

11   there.

12                They must document the steps

13   they've taken to verify the prescription,

14   right?

15       A.      That's what it says, yes.

16       Q.      Why is that so important?

17                MR. KOBRIN:  Form.

18                THE WITNESS:  One way to maybe

19         alert others that they had checked on

20         the prescription, their fellow

21         pharmacists.  If it had refills, to

22         make sure that -- you know, basically

23         to let the fellow pharmacists, you

24         know, if there was a refill on a

25         prescription, that, you know, somebody

Highly Confidential - Subject to Further Confidentiality Review

1      had already checked on it so that

2      everybody knew that this had already

3      been done.

4  QUESTIONS BY MR. GADDY:

5      Q.    Or in the inverse, if one

6  pharmacist had looked into it and decided the

7  prescription shouldn't be filled, notes and

8  documentation about that decision could also

9  be helpful to the other pharmacists, correct?

10          MR. KOBRIN:  Object to form.

11          THE WITNESS:  It's a

12      possibility, yes.

13  QUESTIONS BY MR. GADDY:

14      Q.    Okay.  He goes on to say that

15  the notes should be notated on the

16  prescription itself or in the computer

17  system, utilizing the appropriate note

18  fields.

19          Correct?

20      A.    Yes, that's what it says.

21      Q.    Okay.  And I understand that --

22  and so the pharmacists were given an option.

23  They could either use the hardcopy

24  prescription or they could use the notes

25  field, right?

Highly Confidential - Subjected to Further Confidentiality Review

1      A.      Yes.

2      Q.      Okay.  And there's multiple

3   different note fields within the dispensing

4   software, right?

5      A.      As I recall, yes.

6      Q.      Okay.  And the hardcopy

7   prescription are filed within each individual

8   store, correct?

9      A.      Correct.

10     Q.      And my memory is that there's a

11  folder; they keep about 100 prescriptions in

12  them; keep them in order.  And if you go back

13  and look at notes made on any of those

14  hardcopy prescriptions, you'd have to go into

15  the store, into the folder and find the

16  script, right?

17          MR. KOBRIN:  Object to form.

18      Misrepresents the record.

19          THE WITNESS:  That would be --

20      that -- I would agree.

21  QUESTIONS BY MR. GADDY:

22     Q.      Now that we have these

23  controlled substance dispensing guidelines,

24  and once you -- they were documented and

25  formalized in July of 2013, what was done to

Highly Confidential - Subject to Further Confidentiality Review

1    implement these or roll these out to the

2    pharmacists and the pharmacy techs?

3              MR. KOBRIN:  Object to form.

4         Misstates the document and

5         misrepresents the prior testimony.

6              THE WITNESS:  My recollection

7         is that this was presented to our

8         pharmacy team leaders initially, and

9         they had -- they had yearly sign-offs.

10        And whenever we had quarterly CQI

11        meetings, that they had to sign off on

12        these particular guidelines, that they

13        read and understood them.

14   QUESTIONS BY MR. GADDY:

15        Q.    Was there any training done on

16   these guidelines that you implemented?

17        A.     Initial training in our

18   pharmacy conferences that we held in -- when

19   this was initially rolled out to the stores.

20        Q.     Anything other than in 2013?

21   Any training that you had implemented that

22   was rolled out other than that that you

23   recall?

24             MR. KOBRIN:  Object to form.

25        Asked and answered.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  My recollection
 2        is that these guidelines were
 3        presented multiple times through
 4        various -- there was instances when we
 5        had it on our computer-based training
 6        program for sign-off, and we also
 7        included it in our quarterly CQI
 8        meetings that we required all stores
 9        to hold.
10   QUESTIONS BY MR. GADDY:
11        Q.    I've seen some references in
12   some of the Giant Eagle documents where they
13   had a secret shopper-type program where they
14   would send someone into the store, and then
15   they would grade the team members on things
16   like friendliness and speed and ease of
17   checkout and those types of things.
18              Do you know what I'm talking
19   about?
20        A.    I do.
21              MR. KOBRIN:  Object to form.
22   QUESTIONS BY MR. GADDY:
23        Q.    Did you implement or ask to
24   implement or ask to have done any type of
25   secret shopper-type programs as it relates to
```

Highly Confidential - Subject to Further Confidentiality Review

1    these guidelines?  Say, have folks go in and

2    present, you know, prescriptions to the

3    pharmacist and grade or judge the pharmacist

4    on how they -- they handled these guidelines

5    as far as red flags?

6          A.    Not that I recall.

7                MR. GADDY:  Okay.

8          Mr. Chunderlik, if it's okay with you,

9          I'm going to take about a ten-minute

10         break and try to get organized for the

11         homestretch here.  Okay?

12               THE WITNESS:  Okay.

13               MR. KOBRIN:  How much time do

14         you think you have left, Jeff?

15               MR. GADDY:  What's that?

16               MR. KOBRIN:  How much time do

17         you think you have left?

18               MR. GADDY:  I'm not sure.

19               MR. KOBRIN:  We're still on the

20         record, right?

21               How long a break are we taking?

22               MR. GADDY:  Ten minutes is

23         fine.

24               MR. KOBRIN:  Okay.

25               VIDEOGRAPHER:  The time is

Highly Confidential - Subject to Further Confidentiality Review

1    11:53 a.m.  We are off the record.

2    (Off the record at 11:53 a.m.)

3    VIDEOGRAPHER:  The time is

4    12:16 p.m.  We are back on the record.

5    (Chunderlik Exhibit 7 marked

6    for identification.)

7    QUESTIONS BY MR. GADDY:

8    Q.    Mr. Chunderlik, we're going to

9    P-HBC-46, which would be Tab Number 20.

10    Let me know when you've gotten

11    there.

12    A.    Yes, I have it.

13    Q.    I'm going to ask you a couple

14    of questions about DURs.

15    Do you know what that means?

16    A.    Yes.

17    Q.    Tell us, please.

18    A.    A DUR is an acronym that stands

19    for drug utilization review.

20    Q.    And practically, what does that

21    mean?

22    A.    To review the prescription and

23    all the other prescriptions that the patient

24    may have on file to show if there's any

25    interactions, any type of alerts that may --

Highly Confidential - Subject to Further Confidentiality Review

1    that may come up in regards to that

2    prescription.

3           Q.     And I understand that currently

4    there's some aspect of that that is

5    incorporated into Giant Eagle's dispensing

6    system?

7           A.     Yes.

8           Q.     Okay.  Has that always been the

9    case?

10          A.     Yes.

11          Q.     Okay.  Okay.  Let's look at

12   this e-mail here.  It looks like it's from

13   October of 2011.  And if we go down to the

14   bottom, it looks like this is maybe a

15   communication to all Ohio pharmacists, and it

16   looks like it's from Joseph Millward.

17                 Do you see that?

18          A.     Yes.

19          Q.     And it says, "The purpose is to

20   update all Ohio pharmacists on the new Ohio

21   BOP rule on prospective drug utilization

22   review, DUR, through the OARRS system."

23                 Do you see that?

24          A.     Yes.

25          Q.     And you understand that OARRS

Highly Confidential - Subject to Further Confidentiality Review

1   is the Ohio's version -- excuse me, is Ohio's

2   version of the Prescription Drug Monitoring

3   Program, right?

4        A.     Yes.

5        Q.     And it goes on to say in the

6   first bullet point under Actions, "All Ohio

7   licensed pharmacists are to review and

8   incorporate into daily practice the attached

9   Ohio BOP," and it gives a regulation number,

10  "on prospective DUR."

11            Do you see that?

12       A.     Yes.

13       Q.     Did any aspect of your manager

14  of pharmacy compliance position deal with

15  this particular regulation in Ohio in

16  implementing these types of procedures?

17       A.     I'm sorry, would you repeat

18  that again, please?

19       Q.     Sure.

20            Did any aspect of your duties

21  while you were the manager of pharmacy

22  compliance, when you took on that position

23  the year after this communication in 2012,

24  deal with DURs?

25       A.     I'm not sure in what respect

Highly Confidential - Subject to Further Confidentiality Review

1  you mean "deal with DURs."  I guess I'm not

2  quite understanding what your question is.

3        Q.    Sure.

4              Did any part of your job duties

5  deal with training pharmacists on how to --

6  how to appropriately go through the DUR

7  process or practice tips on how to handle

8  DURs they're presented with, providing input

9  to the software that would flag different

10  items for DURs or things like that?  Any of

11  those?

12        A.    Not under -- not -- I didn't

13  have any -- any responsibility or any input

14  into how DURs or what DURs would present

15  themselves to the -- to the pharmacist.

16              The -- it -- at that point in

17  time I didn't have any -- anything to do

18  with, you know, how these DURs were presented

19  or anything like that, if that's what you're

20  asking.

21        Q.    Okay.  Flip a couple pages for

22  me, please, and you're going to see an Ohio

23  board -- excuse me, Ohio State Board of

24  Pharmacy newsletter, Bates ending 160.

25        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.      Up in the top left-hand corner,
 2   you see that this particular issue was May
 3   of 2011?
 4            A.      Yes.
 5            Q.      Okay.  And I want to take you
 6   down to the portion in the bottom right-hand
 7   column of that page.
 8                    You with me?
 9            A.      Yes.  Yes.
10            Q.      And it says, "Corresponding
11   responsibility is needed more than ever."
12                    Correct?
13            A.      Yes.
14            Q.      It says, "In last year's May
15   newsletter..."
16                    Do you see that?
17            A.      Okay.
18            Q.      So that would be May of -- I
19   guess the last year would have been May
20   of 2010, right?
21            A.      Yes.
22            Q.      It says, "In last year's May
23   newsletter, the board mentioned that it is
24   having a tremendous problem in Ohio with
25   so-called pain clinics that are doing nothing
```

Highly Confidential - Subject to Further Confidentiality Review

1    but providing large amounts of controlled

2    substances, particularly oxycodone and

3    hydrocodone, to people who have no legitimate

4    medical need for them."

5              Do you see that?

6        A.   Yes.

7        Q.   It goes on to say, "That

8    problem has, if anything, increased over the

9    last year."

10             Right?

11       A.   Yes.

12       Q.   So it looks like this was first

13   sent around to Ohio pharmacists back in May

14   of 2010, and then they're reiterating that

15   message here in May of 2011, correct?

16             MR. KOBRIN:  Object to form.

17        He can see what's here.  I don't think

18        he can confirm whether they published

19        it previously or are reiterating it

20        now.

21             THE WITNESS:  Say that again?

22   QUESTIONS BY MR. GADDY:

23       Q.   Sure.

24             MR. KOBRIN:  Josh -- excuse me.

25        Mr. Gaddy?

Highly Confidential - Subject to Further Confidentiality Review

1   QUESTIONS BY MR. GADDY:

2        Q.     Sure, Mr. Chunderlik.

3               You see how it's indicating

4   here that a year ago, in May of 2010, they

5   notified -- the board mentioned that there

6   was a tremendous problem in Ohio with pain

7   clinics, with oxycodone and hydrocodone, and

8   then they reiterate here that the problem has

9   continued to increase.

10              Do you see that?

11       A.     Yes.

12       Q.     And this is in May of 2011 that

13  the reiteration is sent, which is about two

14  years before Giant Eagle publishes their

15  first written, formalized version of the

16  controlled substances dispensing policies,

17  correct?

18              MR. KOBRIN:  Object to form.

19              THE WITNESS:  This -- this

20        article -- this newsletter was written

21        prior to that.

22  QUESTIONS BY MR. GADDY:

23       Q.     Two-plus years prior to that,

24  right?

25              MR. KOBRIN:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                THE WITNESS:  Yes.
 2   QUESTIONS BY MR. GADDY:
 3        Q.     Okay.  Let's go to the next
 4   page, and go down to the bottom of the
 5   left-hand column for me, please.
 6                And I'm going to be -- I'm
 7   going to start three lines from the bottom
 8   where it starts -- the sentence starts, "The
 9   pharmacist is often."
10        A.     Yes.
11        Q.     It says, "The pharmacist is
12   often the last person who has the opportunity
13   to make an independent judgment as to the
14   legitimacy of the prescription and the
15   patient."
16                Do you see that?
17        A.     Yes.
18        Q.     Do you agree with what's being
19   written here by the Ohio Board of Pharmacy
20   that the pharmacist is the last person, the
21   last line of defense, in making sure that a
22   prescription gets into the hand of a person
23   who should have it?
24        A.     That's what it says.  You know,
25   I don't know if it's -- it's the last person
```

1    who has the opportunity to make an

2    independent judgment.  They are the last

3    person -- they are the person who's filling

4    the prescription.  If they need to, they may,

5    you know, call the physician, you know, if

6    they have any question.

7              So at that point in time, if

8    they have questions on a prescription, you

9    know, they are not the last person to

10   necessarily make that independent judgment.

11   They may make it in combination with a

12   prescriber at the same time.

13       Q.    So I hear you, Mr. Chunderlik.

14             But even if they happen to have

15   an occasion to call a doctor or some other

16   practitioner or refer to some other source or

17   person, they still then have to make the

18   decision to issue the prescription and

19   actually hand the drugs to the patient,

20   right?

21       A.    That would be the only way the

22   patient could get the drug.

23       Q.    Okay.  So, again, it's not

24   intended to be a trick question, but you

25   agree the pharmacist is the last line of

1    defense in making sure that the drugs goes

2    into the hands of a person who should

3    actually get them?

4              MR. KOBRIN:  Object to form.

5              THE WITNESS:  Yes.

6    QUESTIONS BY MR. GADDY:

7         Q.    Okay.  It goes on to say that

8    "Both Ohio laws and rules and federal laws

9    and regulations place a corresponding

10   responsibility on the pharmacist to make that

11   judgment and hold the pharmacist accountable

12   for that judgment."

13             Correct?

14        A.    Yes.

15        Q.    Now, I'll look at -- excuse me.

16   If you turn one more page, you see the Ohio

17   regulation 4729-5-20 with respect to drug

18   utilization review.

19             Do you see that?

20        A.    Yes.

21        Q.    Okay.  And this was the policy

22   that was being rolled out in Ohio that would

23   relate to the pharmacists as far as DURs go,

24   correct?

25        A.    Yes.

Highly Confidential - Subject to Further Confidentiality Review

1           (Chunderlik Exhibit 8 marked

2     for identification.)

3   QUESTIONS BY MR. GADDY:

4       Q.     Let's go now, please, to

5   P-HBC-1349, which is going to be your Tab 22.

6   And let me know when you're there,

7   Mr. Chunderlik.

8       A.     I do have it.

9       Q.     Okay.  You see this is a policy

10  entitled "Drug Utilization Review," and the

11  purpose indicates to "Ensure all drug

12  utilization reviews are reviewed and

13  authorized by the final verification

14  pharmacist."

15           Do you see that?

16      A.     Yes.

17      Q.     And then there's a couple of

18  points listed, and the first one is, "The

19  pharmacist must screen for potential

20  therapeutic problems before the prescription

21  is dispensed to the patient."

22           Right?

23      A.     Yes.

24      Q.     And the last bullet point

25  indicates that "The course of action taken by

Highly Confidential - Subject to Further Confidentiality Review

1    the pharmacist to resolve a DUR must be

2    documented."

3              Correct?

4         A.    Yes.

5         Q.    And would the instruction on

6    how to document, acknowledging and moving

7    past the DUR, be consistent with what we

8    looked at earlier as far as that

9    documentation can occur on the hardcopy

10   prescription or it could occur within some

11   type of notes field in the dispensing

12   software?  Is that fair?

13             MR. KOBRIN:  Object to form.

14             THE WITNESS:  It could -- it

15        could appear on the hardcopy

16        prescription -- a note could appear on

17        the hardcopy prescription as well as

18        within the computer system.

19   QUESTIONS BY MR. GADDY:

20        Q.    Okay.  From your perspective or

21   your memory from your time as the manager of

22   pharmacy compliance, was it more likely for

23   those things to happen on the hardcopy

24   prescription or more likely to happen within

25   the system?

Highly Confidential - Subject to Further Confidentiality Review

1    A.    I do not know that.

2    Q.    Okay.  If we go down to the

3 procedure, there's a couple of steps listed

4 there.

5          Do you see that?

6    A.    Yes.

7    Q.    First thing it says is, "When a

8 DUR screen is displayed that contains one or

9 more critical DUR records," and then it has

10 some bullet points.

11          Do you see that?

12    A.    I'm sorry, on which page are we

13 on?  The first page --

14    Q.    Same page.  Same page under --

15 under -- procedure under steps.

16    A.    Okay.  Yes.  Okay.  I'm sorry,

17 I have it.  Yeah.

18    Q.    As it relates to opioids, just

19 thinking about opioid prescriptions, can you

20 give me examples of critical DURs that may be

21 displayed for opioid prescriptions?

22          MR. KOBRIN:  Object to form.

23          THE WITNESS:  I don't recall

24     how those would have displayed, and

25     specifically to opioid prescriptions.

Highly Confidential - Subject to Further Confidentiality Review

1    QUESTIONS BY MR. GADDY:

2         Q.    Do you know whether or not

3    there were any critical DURs that would have

4    specifically related to opioid prescriptions?

5              MR. KOBRIN:  Object to form.

6              THE WITNESS:  I can't recall.

7              (Chunderlik Exhibit 9 marked

8         for identification.)

9    QUESTIONS BY MR. GADDY:

10        Q.    Let's look at P-HBC-1376, which

11   is going to be your Tab Number 31, and let me

12   know when you're there, please.

13             MR. KOBRIN:  What tab did you

14        say again, Jeff?

15             MR. GADDY:  It is tab -- it

16        says 31.

17             MR. KOBRIN:  31?

18             How much time do we have on the

19        record?

20             MR. GADDY:  Gina, I'm looking

21        at Bates number 4831.  Is that

22        included in what you have up on the

23        screen?  In that same document?

24             MR. KOBRIN:  It is.

25             GINA VELDMAN:  Yeah.

Highly Confidential - Subject to Further Confidentiality Review

```
1              MR. GADDY:  Okay.  Great.
2        Thank you.
3              MR. KOBRIN:  How much time have
4        we got on the record right now?
5              VIDEOGRAPHER:  We have 2:31 on
6        the record.
7              MR. KOBRIN:  Thank you.
8    QUESTIONS BY MR. GADDY:
9        Q.    You with me, Mr. Chunderlik?
10       A.    Yes.
11       Q.    Okay.  And you see this is
12   the -- it looks like a drug utilization
13   review policy.
14             Do you see that?
15       A.    Yes.
16       Q.    And it's a Giant Eagle policy?
17       A.    Yes, it is.
18       Q.    And it indicates this is the
19   first version of this policy and that it was
20   entered in April of 2017.
21             Do you see that?
22       A.    Yes.
23       Q.    And did you have any
24   involvement with this policy?
25       A.    Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    What was your involvement with
2  this policy?
3    A.    I was involved with our
4  pharmacy quality committee in writing safety
5  and quality policies.  I was a member of the
6  committee that would have put the policy
7  together.
8    Q.    Okay.  I'm hoping you can help
9  me understand this policy a little bit.
10    I want to go under the policy
11  section, about the middle of the page.
12    Do you see that?
13    A.    Yes.  Yes.
14    Q.    It says, "The data verification
15  pharmacist must review all medications and
16  all drug management issues highlighted by the
17  pharmacy software before dispensing to the
18  patient."
19    Correct?
20    A.    Yes.
21    Q.    And obviously we're talking a
22  lot about opioids today, but fair to say that
23  DURs apply to all prescriptions?  Or can
24  apply to all prescriptions?
25    A.    Yes.

```
 1          Q.      It's not just controlled

 2    substance prescriptions that they apply to,

 3    right?

 4          A.      Yes, that's correct.

 5          Q.      You can have a medication for

 6    blood pressure that may have an adverse

 7    interaction with another medication, and

 8    that's the type of thing that would be

 9    notified -- or the pharmacist may be notified

10    about by way of a DUR, correct?

11          A.      That's correct, yes.

12          Q.      Okay.  So fair to say that this

13    policy is not written specifically for

14    opioids?

15          A.      No.

16          Q.      Okay.  Sorry, that might have

17    been a bad question.

18                  You agree it's not specifically

19    for opioids?

20          A.      It's not specifically for

21    opioids.

22          Q.      Thank you.

23                  The next bullet point says,

24    "The system flags are displayed as red or

25    yellow to identify clinical significance and
```

Highly Confidential - Subject to Further Confidentiality Review

1    include, but are not limited to, the

2    following."

3              So before we get into the

4    individual flags listed, can you help me

5    understand, when it says "displayed as red or

6    yellow," what happened on the screen for the

7    pharmacist, if you know, when there was a

8    flag or a DUR?  Did the screen turn yellow or

9    red or something along those linings?

10             MR. KOBRIN:  Object to form.

11        Same objection regarding our 30(b)(6)

12        deponent on these particular topics.

13             You can answer, if you can,

14        George.

15             THE WITNESS:  As I recall, they

16        would -- they would be highlighted in

17        red or yellow, depending on the

18        clinical significance.

19   QUESTIONS BY MR. GADDY:

20        Q.    And is it some type of pop-up

21   that prevents the pharmacist from doing

22   anything else until they acknowledge that

23   DUR?

24        A.    In certain situations, yes.

25        Q.    Okay.  And as you look at this

Highly Confidential - Subject to Further Confidentiality Review

1   list here, particularly let's look at the

2   last bullet point, abuse or misuse.

3                Looking at that, does that jog

4   your recollection as to whether or not there

5   were any DURs that were specific to opioids?

6   And if so, I want you to help me understand

7   what would have popped up on the screen that

8   may have related to opioids, if you remember.

9                MR. KOBRIN:  Object to form.

10               THE WITNESS:  In regards to any

11        drug, including opioids, if there was

12        situations where there was maybe

13        overutilization or multiple

14        prescriptions on file for the same

15        time frame.

16   QUESTIONS BY MR. GADDY:

17        Q.    Okay.  Can you give me a

18   specific example that would relate to an

19   opioid prescription, or a subset of opioid

20   prescriptions, that would cause some type of

21   an alert to the pharmacist?

22               And if you can't give me a

23   specific example, that's fine.  I'm just

24   trying to wrap my head around it, and if you

25   can give me one, that might be helpful.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                MR. KOBRIN:  Object to form.
 2                THE WITNESS:  I can't put -- I
 3         can't -- I don't have a recollection
 4         of how this would -- or an example of
 5         how that would fire.
 6   QUESTIONS BY MR. GADDY:
 7         Q.    Okay.  Let me shift gears for a
 8   few minutes, Mr. Chunderlik, and ask you
 9   about the term "metrics" in the context of
10   the pharmacy.
11                What does that mean to you?
12                MR. KOBRIN:  Object to form.
13                THE WITNESS:  I'm not -- I'm
14         not -- I'm not sure.
15   QUESTIONS BY MR. GADDY:
16         Q.    Okay.  Do you have an
17   understanding and a memory that Giant Eagle
18   tracks different metrics related to its
19   different stores within the chain?
20                MR. KOBRIN:  Object to form.
21                THE WITNESS:  Can you give me
22         an example?
23   QUESTIONS BY MR. GADDY:
24         Q.    Sure.
25                I'm -- one of the things that
```

Highly Confidential - Subject to Further Confidentiality Review

1  Giant Eagle tracks as far as metrics is the

2  sales at their stores, the number of

3  prescriptions filled at different stores.

4  They get somewhat granular and track things

5  like the number of customers signed up for

6  automatic refills.  They track things like

7  the number of customers signed up to receive

8  text message alerts and things like that.

9          Does that ring a bell?

10     A.     Yes.

11     Q.     Okay.  And you agree that those

12  are different types of metrics that Giant

13  Eagle tracked for all of its stores?

14     A.     Yes.

15     Q.     Okay.  Another thing that Giant

16  Eagle would track about all of its stores

17  might be the number of immunizations that the

18  pharmacists are dispensing, correct?

19     A.     Yes.

20     Q.     They track things like customer

21  feedback.  I think Giant Eagle called it VOC,

22  or voice of customer?

23     A.     Yes.

24     Q.     And within the voice of

25  customer platform, Giant Eagle tracks

Highly Confidential - Subject to Further Confidentiality Review

1   different mechanisms about how satisfied

2   their customers are with their experience

3   within the Giant Eagle stores, correct?

4       A.    Yes.

5       Q.    Why is it, if you know, that

6   Giant Eagle's tracking these types of metrics

7   on the pharmacies and their pharmacists?

8       A.    Some of those metrics help

9   improve -- could help improve certain aspects

10   of the business.  We wanted to make sure --

11   I'll use customer service as an example.  I

12   wanted to make sure that our customers felt

13   that our pharmacists provided them with the

14   services and the care that they would expect

15   going into a pharmacy to help us to determine

16   if our -- if our customers were satisfied

17   that -- they were satisfied with our service.

18       Q.    And some of these metrics, you

19   said, could help improve aspects of the

20   business.  Some of these metrics could also

21   help improve the bottom line of the business,

22   correct?  As far as profits?

23          MR. KOBRIN:  Object to form.

24          THE WITNESS:  I don't

25      necessarily know that to be true.

Highly Confidential - Subject to Further Confidentiality Review

1  QUESTIONS BY MR. GADDY:

2       Q.     Well, for example, we mentioned

3  and you agreed that one of the things that

4  Giant Eagle tracked was the number of

5  patients that would be set up for automatic

6  refills.

7             Do you remember that?

8       A.     Yes.

9       Q.     And if a patient is continuing

10 to get their refills at Giant Eagle

11 pharmacies and that that's signed up in an

12 automatic fashion, those are going to be

13 prescriptions that are filled at Giant Eagle

14 pharmacies, and that's money to Giant Eagle,

15 true?

16             MR. KOBRIN:  Object to form.

17             THE WITNESS:  That's not the

18      only aspect of an automatic refill.

19 QUESTIONS BY MR. GADDY:

20      Q.     I didn't ask about the only

21 aspect, Mr. Chunderlik.  I asked if that was

22 an aspect of it.

23      A.     I don't know if, when we

24 started measuring that, if that was a reason

25 for having that metric.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.      And again, that wasn't my

2    question, Mr. Chunderlik.

3                  I just asked that that metric,

4    one aspect of improving that metric, would

5    improve money flowing into Giant Eagle,

6    correct?

7                  MR. KOBRIN:  Object to form.

8          Vague.

9                  THE WITNESS:  That's not the

10         reason why the metric was put in

11         place.

12   QUESTIONS BY MR. GADDY:

13         Q.      I'm not asking you the reason

14   why it was put in place, Mr. Chunderlik.

15                 I'm just asking, if you have

16   more customers enrolled in automatic refills,

17   that means more prescriptions are getting

18   filled at Giant Eagle, and Giant Eagle is

19   making more money.

20                 Is that fair?

21                 MR. KOBRIN:  Object to form.

22         Facts not in evidence.  You're asking

23         to him to make a correlation that you

24         don't have any information about.

25                 THE WITNESS:  I mean, Giant

Highly Confidential - Subject to Further Confidentiality Review

1          Eagle -- I don't know if they were

2          making more money off those

3          prescriptions.  They were filling

4          prescriptions so that people would

5          stay and not have to necessarily

6          remember when they went into a

7          refill -- in for a refill.

8                  Not every prescription Giant

9          Eagle made money off of.

10    QUESTIONS BY MR. GADDY:

11          Q.     Okay.  There were --

12                 MR. KOBRIN:  Continue,

13          Mr. Chunderlik.

14                 THE WITNESS:  Go ahead.

15    QUESTIONS BY MR. GADDY:

16          Q.     And, Mr. Chunderlik, another

17    one that Giant Eagle tracked was they -- they

18    didn't just track, but Giant Eagle even had

19    contests for their pharmacists about giving

20    out immunizations and who could give out the

21    most immunizations and things like that,

22    correct?

23                 MR. KOBRIN:  Object to form.

24                 THE WITNESS:  That was to make

25          sure people were getting

Highly Confidential - Subject to Further Confidentiality Review

```
 1          immunizations.
 2   QUESTIONS BY MR. GADDY:
 3          Q.    Okay.  Well, the immunizations
 4   that Giant Eagle was giving out for flu shots
 5   or shingles or those types of things, you
 6   weren't giving them out for free, were you?
 7               MR. KOBRIN:  Object to form.
 8               THE WITNESS:  No, we weren't
 9          giving those out for free.
10   QUESTIONS BY MR. GADDY:
11          Q.    Okay.  People were paying for
12   those, right?
13          A.    People were paying for those.
14               MR. KOBRIN:  I'd like a
15          standing objection as to the relevance
16          of immunization programs as to opioid
17          dispensing or anything in this
18          litigation.
19               MR. GADDY:  Thanks, Josh.  If
20          it prevents you from interjecting, you
21          can have an objection to whatever you
22          like.
23               MR. KOBRIN:  That's what I do
24          it for, to prevent myself from having
25          to object.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                 (Chunderlik Exhibit 10 marked
2          for identification.)
3   QUESTIONS BY MR. GADDY:
4          Q.     All right.  Let's look at
5   P-HBC-1379, which is going to be your Tab
6   Number 47.
7          A.     Okay.  I'm going to grab the
8   other binder.
9          Q.     You got it, Mr. Chunderlik?
10         A.     I'm working my way towards it.
11         Q.     I don't want us to go all day
12  without getting into the second binder.
13         A.     Sorry.  That was Tab 47?
14         Q.     Yes, sir.
15         A.     Okay.
16         Q.     And you see this is a June 2016
17  e-mail from a Christina McAndrew, and there's
18  some attachments listed here, some of which
19  are some agendas that we'll flip to in a
20  moment.
21                 Do you see that?
22         A.     Mr. Gaddy, I lost -- for some
23  reason I lost my visual.  If you have
24  something up on the screen, I lost visual to
25  the meeting.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. GADDY:  Okay.  Let's go off
 2         the record and see if you can get it
 3         back.
 4                    VIDEOGRAPHER:  The time is
 5         12:43 p.m.  We are off the record.
 6          (Off the record at 12:43 p.m.)
 7                    VIDEOGRAPHER:  The time is
 8         12:43 p.m.  We are back on the record.
 9   QUESTIONS BY MR. GADDY:
10         Q.    You see, Mr. Chunderlik, it
11   says, "Greg, attached is the agenda and
12   PowerPoint presentation for the team leader
13   calls next week"?
14                    Do you see that?
15         A.    Yes.
16         Q.    And if you flip about two
17   pages, you'll see the start of the
18   presentation.  It says, "Giant Eagle
19   quarterly team leader meeting."
20         A.    Yes.
21         Q.    Do you see that?
22         A.    Yes.
23         Q.    You flip one more page and you
24   see the agenda, which includes a couple
25   different presentations.
```

Highly Confidential - Subject to Further Confidentiality Review

1               You see that?

2     A.      Yes.

3     Q.      And you're listed there in

4  number 4?

5     A.      Yes.

6     Q.      Okay.  I'm actually going to

7  flip to the presentation just before yours.

8  There's -- it looks like there's page numbers

9  on the slides.  If you'd go to page number 7,

10  which should say, "Q4 service focus, Cheryl

11  Rinovato."

12               Do you see that?

13     A.      I do.  I see that.

14     Q.      Okay.  And who was Cheryl?

15     A.      Cheryl was a team member.  She

16  was the senior manager of -- at one point she

17  had customer service that fell under her

18  umbrella, and she also had other

19  responsibilities in the area of work flow

20  design.

21     Q.      And one of the aspects of

22  customer service that we talked about a few

23  minutes ago that Giant Eagle utilized was

24  these voice of customers to get feedback from

25  store customers, correct?

1    A.    Yes.

2    Q.    Okay.  Let's flip the page, and

3  you'll see the title of the next slide is

4  "Service Focus"?

5    A.    Yes.

6    Q.    In there is listed several

7  different aspects that were included in some

8  of these surveys or voice of customer-type

9  type items that would be put out to the

10  customers.

11         Do you see that?  Things like

12  friendliness, team member knowledge, team

13  member professionalism, those types of

14  things?

15    A.    Yes.

16    Q.    And one of the items that Giant

17  Eagle gathered information about from its

18  customers was in the middle there, "time to

19  fill order."

20         Do you see that?

21    A.    Yes.

22    Q.    And the time to fill order just

23  happens to be one of the lowest, I guess,

24  positive result here in this chart.

25         Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

```
 1         A.     Yes.

 2         Q.     Okay.  And let's turn the

 3    page one more time.

 4         A.     Okay.

 5         Q.     And the slide here says,

 6    "Coach/work/design to reach our service

 7    goals, our two focus attributes have the

 8    lowest scores."

 9                Do you see that?

10         A.     Yes.

11         Q.     Do you recall that the time it

12    took to fill an order was one of the focus

13    attributes at Giant Eagle during this time

14    period?

15         A.     Yes.

16         Q.     Okay.  And one of the things

17    that they're talking about there are filling

18    orders that have been placed for

19    prescriptions within the pharmacy, correct?

20         A.     Yes.

21         Q.     And it's focusing on this one.

22    And there's only two here on this page, and

23    the first one is "time to fill" an order.

24                And one of the things that it

25    tells folks to do is -- it says, use the
```

1    dashboard to determine, are you ahead or

2    behind, where are you behind, and then

3    respond timely.

4              Do you see that?

5        A.    Yes.

6        Q.    What dashboard is being

7    referred to here?

8              Is there something within the

9    store that the pharmacist is able to see to

10   know where they are with filling an order?

11             MR. KOBRIN:  Object to form.

12             THE WITNESS:  I don't -- I have

13        a vague recollection of how we looked

14        at a dashboard to determine whether we

15        were ahead or behind.

16             I don't recall if it was in

17        software or a board that we used to

18        keep up in the pharmacy.

19   QUESTIONS BY MR. GADDY:

20        Q.    But the pharmacist could see

21   it, right?

22             MR. KOBRIN:  Object to form.

23             THE WITNESS:  I believe so.

24   QUESTIONS BY MR. GADDY:

25        Q.    The pharmacist knew how long a

Highly Confidential - Subject to Further Confidentiality Review

```
 1  script was outstanding while they were

 2  filling that script, correct?

 3       A.    I believe so, yes.

 4       Q.    The pharmacists at Giant Eagle

 5  knew that one of the focus attributes that

 6  the company was focusing on was time to fill

 7  an order and improving that metric, correct?

 8            MR. KOBRIN:  Object to form.

 9       It misstates facts not in evidence.

10       Assumes facts not in evidence.

11            THE WITNESS:  Restate your

12       question again?

13  QUESTIONS BY MR. GADDY:

14       Q.    Sure.

15            You told us that you recall the

16  time to fill an order was a metric that the

17  company was focused on during this time

18  period.

19            That wasn't a secret.  The

20  pharmacists knew that as well, correct?

21       A.    Right.

22            MR. KOBRIN:  Object to form.

23            THE WITNESS:  Yes.

24  QUESTIONS BY MR. GADDY:

25       Q.    The way to improve that
```

Highly Confidential - Subject to Further Confidentiality Review

1   68 percent rating would be to fill

2   prescriptions more quickly, correct?

3                    MR. KOBRIN:  Object to form.

4                    THE WITNESS:  Not necessarily.

5                    One way to improve that metric

6           is to fill the -- is to fill

7           prescriptions in the correct order to

8           get prescriptions out more timely.

9   QUESTIONS BY MR. GADDY:

10          Q.    Okay.  The end goal, whether

11  it's to do an individual prescription more

12  quickly or do them in a different order, the

13  end goal is to get prescriptions filled and

14  out the door more quickly.

15                   That's how you would improve

16  that rating, correct?

17                   MR. KOBRIN:  Object to form.

18          Assumes facts not in evidence.

19          Contradicts the witness' testimony.

20                   THE WITNESS:  Not necessarily.

21                   A way to get prescriptions out

22          the door is to fill the correct

23          prescriptions in an -- in the proper

24          order to make sure that you are

25          getting prescriptions out in a timely

Highly Confidential – Subject to Further Confidentiality Review

1       manner.

2   QUESTIONS BY MR. GADDY:

3       Q.    Mr. Chunderlik, you agree that

4   in the context of a pharmacist filling an

5   opioid prescription that the more quickly

6   they fill that prescription, the less time

7   there is for a pharmacist to perform due

8   diligence on that prescription, correct?

9           MR. KOBRIN:  Object to form.

10          THE WITNESS:  I don't -- I

11      don't agree with that.

12  QUESTIONS BY MR. GADDY:

13      Q.    Mr. Chunderlik, do you agree

14  that the more quickly a pharmacist fills an

15  opioid prescription, the less time there is

16  to check for red flags on that prescription?

17          MR. KOBRIN:  Object to form.

18          What do you mean by "fills,"

19      Jeff?

20  QUESTIONS BY MR. GADDY:

21      Q.    Go ahead, Mr. Chunderlik.

22          MR. KOBRIN:  Are you including

23      the DUR and the corresponding

24      responsibility assessment in your --

25          MR. GADDY:  Josh, stop

```
 1          speaking, man.  Stop.
 2                MR. KOBRIN:  I don't know that
 3     I'm --
 4     QUESTIONS BY MR. GADDY:
 5          Q.    Mr. Chunderlik, answer the
 6     question, please.
 7          A.    I don't -- I don't necessarily
 8     agree with your conclusion.
 9          Q.    Okay.  Well, my -- I think my
10     question is pretty simple.  If a prescription
11     is generally filled in 20 minutes,
12     hypothetically filled in 20 minutes, and you
13     have this result, 68 percent approval of time
14     to fill an order, and as a result of that, to
15     try to improve the metric, you're now filling
16     prescriptions in 15 minutes, you've just
17     reduced the amount of time available to the
18     pharmacist to do things like check for and
19     clear red flags, correct?
20                MR. KOBRIN:  Object to form.
21     QUESTIONS BY MR. GADDY:
22          Q.    It's a pretty basic concept,
23     right?
24                MR. KOBRIN:  Object to form.
25          Misstates his testimony.  Assumes
```

Highly Confidential – Subject to Further Confidentiality Review

```
 1              facts not in evidence and contradicts

 2              the evidence.

 3                   THE WITNESS:  When you fill

 4              a -- to get prescriptions, you have to

 5              do the -- the prescriptions in the

 6              correct order to be able to increase

 7              this metric.

 8    QUESTIONS BY MR. GADDY:

 9         Q.      You've said that a couple

10    times, Mr. Chunderlik.

11              But my question is, if you're

12    telling people to fill prescriptions more

13    quickly, if that's one --

14         A.      We're not telling -- we are not

15    telling people to fill prescriptions more

16    quickly.  We are -- this -- this particular

17    metric, or this particular focus, was to --

18    to fill the prescriptions in the correct

19    order.

20              Not necessarily -- this metric

21    has nothing to do with filling prescriptions

22    faster.

23         Q.      Okay.  Can I --

24                   MR. KOBRIN:  Let him ask you a

25              question.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   QUESTIONS BY MR. GADDY:
 2        Q.    Yeah, let me get a question
 3   out, Mr. Chunderlik.  I don't think there was
 4   a question pending here, so I'm going to move
 5   to strike.
 6             My question is whether or not
 7   the metric that's being tracked here is time
 8   to fill an order.  Is that correct?
 9        A.    That's what it says on the
10   screen.
11        Q.    Okay.  Let's look at
12   P-HBC-5017.  It's going to be your Tab
13   Number 34.
14             MR. KOBRIN:  Sorry.  34, Jeff?
15             MR. GADDY:  Yes.
16             (Chunderlik Exhibit 11 marked
17        for identification.)
18   QUESTIONS BY MR. GADDY:
19        Q.    You with me, Mr. Chunderlik?
20        A.    Yes.
21        Q.    You see this e-mail,
22   December 4, 2016?
23             Do you see that?
24        A.    Yes.
25        Q.    Weekly notes is what it's
```

Highly Confidential - Subject to Further Confidentiality Review

1    called, right?

2         A.     Yes.

3         Q.     These were reports that went

4    out every week at Giant Eagle, correct?

5         A.     I'm not -- I don't necessarily

6    know.

7         Q.     Okay.  And the subject of the

8    e-mail is weekly notes, right?

9         A.     Yes.

10        Q.     And do you recall that there

11   would be metrics and VOC responses sent

12   around on a regular basis?

13             MR. KOBRIN:  Object to form.

14        Assumes facts not in evidence.  No

15        foundation.

16             THE WITNESS:  Ask your question

17        again?

18   QUESTIONS BY MR. GADDY:

19        Q.     Do you recall that there would

20   be these metrics, VOC responses, sent around

21   on a regular basis?

22             MR. KOBRIN:  Same objection.

23             THE WITNESS:  Sent around

24        chain-wide?

25

Case: 1:17-md-02804-DAP Doc #: 4217-6 Filed: 12/29/21 185 of 240. PageID #: 560000

```
 1   QUESTIONS BY MR. GADDY:
 2        Q.    Sent around to leadership.
 3              MR. KOBRIN:  Same objection.
 4              THE WITNESS:  This -- what I'm
 5        looking at right now shows from Chris
 6        Miller to groups within Chris Miller's
 7        grouping of e-mail.  I don't know who
 8        would be part of this e-mail from
 9        this -- from this -- I'm not sure.
10   QUESTIONS BY MR. GADDY:
11        Q.    Turn with me, if you would,
12   please, to Bates ending 59210.
13        A.    I see that.
14        Q.    Do you see that,
15   Mr. Chunderlik?
16        A.    Yes.
17        Q.    And you see a customer
18   satisfaction scorecard here?
19        A.    Yes.
20        Q.    And it has different data
21   points for -- it has the store at the very
22   top of the page, and then it has different
23   data points and results for that particular
24   store?
25        A.    Yes.
```

Case: 1:17-md-02804-DAP Doc #: 4217-6 Filed: 12/20/21 186 of 240. PageID #: 560001

```
 1            Q.      And in the middle of the page
 2    there it says, "Where should I focus."
 3                    Do you see that?
 4            A.      Yes.
 5            Q.      And the stores here are told to
 6    focus on "speed and ease of checkout."
 7                    And what's the other thing
 8    they're told to focus on, Mr. Chunderlik?
 9                    MR. KOBRIN:  Objection.
10                    THE WITNESS:  It says, "Time to
11            fill order."
12    QUESTIONS BY MR. GADDY:
13            Q.      Flip the page for me, please,
14    and let's look at the next one.
15                    MR. KOBRIN:  "From order."
16    QUESTIONS BY MR. GADDY:
17            Q.      Time to fill order there?
18                    MR. KOBRIN:  Object to form.
19            Misstates the evidence.  It says "time
20            to fill from order."
21                    MR. GADDY:  Thanks, Josh.
22                    MR. KOBRIN:  No problem.
23    QUESTIONS BY MR. GADDY:
24            Q.      Do you see that,
25    Mr. Chunderlik?
```

```
 1        A.      Yes.

 2        Q.      Turn the page again.

 3                Time to fill from order there

 4   again there?

 5        A.      Yes.

 6        Q.      Turn the page again.

 7        A.      Yes.

 8        Q.      Time to fill from order there

 9   again?

10        A.      Yes.

11                MR. KOBRIN:  Any of these

12        stores in the Track 3 jurisdiction?

13   QUESTIONS BY MR. GADDY:

14        Q.      Do you see, Mr. Chunderlik, as

15   we turn to page after page, time to fill from

16   order is constantly listed as what the stores

17   are being told to focus on?

18                MR. KOBRIN:  Object to form.

19        States facts not in evidence.  No

20        foundation.

21   QUESTIONS BY MR. GADDY:

22        Q.      Do you see that,

23   Mr. Chunderlik?

24        A.      Okay.

25                MR. KOBRIN:  He can say that it
```

1          says it, Jeff.  He can't testify to

2          what they're asking.  He's not on this

3          e-mail.  You have no testimony he's

4          ever seen this document or knows what

5          it is.

6     QUESTIONS BY MR. GADDY:

7          Q.     Did I miss any that say

8     something different, Mr. Chunderlik?

9          A.     Just the first time you

10    mentioned it, when Josh corrected you.

11         Q.     You mean when I got the phrase

12    wrong?

13         A.     Yes.

14         Q.     Okay.  Turn with me, please, to

15    59239, Bates number 59239.

16                GINA VELDMAN:  I'm sorry, Jeff,

17         are we on the same document?

18                MR. GADDY:  Yes, ma'am.

19                GINA VELDMAN:  Okay.

20                MR. KOBRIN:  How much time have

21         we got left?  How many minutes?

22                VIDEOGRAPHER:  2:57 on record.

23                MR. KOBRIN:  Thank you.

24    QUESTIONS BY MR. GADDY:

25         Q.     You with me, Mr. Chunderlik?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Yes.
 2          Q.      Okay.  Another voice of
 3   customer, customer satisfaction scorecard.
 4                  Do you see that?
 5          A.      Yes.
 6          Q.      Top left, areas for focus, once
 7   again, time to fill from order.
 8                  We see that there?
 9                  MR. KOBRIN:  Where do you see
10       that?
11                  THE WITNESS:  Yes.
12   QUESTIONS BY MR. GADDY:
13          Q.      And then a little bit down,
14   just under the graph, now we're actually
15   giving the pharmacy their ranking amongst the
16   other stores.
17                  Do you see that?
18                  MR. KOBRIN:  Object to form.
19   QUESTIONS BY MR. GADDY:
20          Q.      See that?
21                  MR. KOBRIN:  I don't see a
22       ranking.
23                  THE WITNESS:  On the left-hand
24       side?
25
```

1    QUESTIONS BY MR. GADDY:

2         Q.    Yeah.

3               Do you see that,

4    Mr. Chunderlik?

5         A.    Yes.

6               (Chunderlik Exhibit 12 marked

7         for identification.)

8    QUESTIONS BY MR. GADDY:

9         Q.    Okay.  Last document we're

10   going to look at today is P-HBC-34.  Should

11   be your tab -- or excuse me.  Sorry, wrong

12   one.  P-HBC-35.  Should be your Tab

13   Number 43.

14               Do you see that?

15        A.    I'm working my way towards it.

16               I have it.

17        Q.    You see this is a February 12,

18   2018 e-mail?

19               MR. KOBRIN:  Where are you?

20         Tab what?

21               MR. GADDY:  I think 43.

22               THE WITNESS:  43.

23               MR. KOBRIN:  Sorry, I got it.

24   QUESTIONS BY MR. GADDY:

25        Q.    You with me, Mr. Chunderlik?

1       A.      Yes.

2       Q.      And you see the subject again,

3    we got the weekly -- I think this time it

4    says "weekly summary."

5               Do you see that?  "Forward, hot

6    topics, weekly summary"?

7       A.      Yes.

8       Q.      And it looks like you're

9    actually included on this e-mail, right, at

10   the top?  At the end of the cc line?

11      A.      Yes.

12      Q.      Okay.  And these, I guess, were

13   the type of e-mails I was talking about when

14   I was -- when I was mentioning communications

15   going around to the leadership, correct?

16              MR. KOBRIN:  Object to form.

17              THE WITNESS:  I believe so.

18   QUESTIONS BY MR. GADDY:

19      Q.      Okay.  Flip with me, if you

20   would, please -- we're going to go towards

21   the back of the document, Bates number 1304.

22              You with me, Mr. Chunderlik?

23      A.      I'm -- 1304?

24      Q.      Yes, sir.

25      A.      Okay.  I have it.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     Okay.  And you see here

 2   additional metrics that are being tracked at

 3   the pharmacy level listed within this

 4   spreadsheet.

 5                 Do you see that?

 6          A.     Yes.

 7          Q.     Okay.  And you might have to

 8   turn your head sideways to read some of

 9   these, but do you see -- it's kind of under

10   the Y in the YTD.  There's one for promise

11   time.

12                 Do you see that?

13          A.     Yes.

14          Q.     Okay.  And what was that

15   tracking?

16                 MR. KOBRIN:  Object to form.

17          No foundation.  And out of time.

18                 THE WITNESS:  That would have

19          been if we were able to deliver to the

20          prescription -- to have the

21          prescription ready for the patient

22          when they arrived at the store or when

23          they requested to have it completed.

24   QUESTIONS BY MR. GADDY:

25          Q.     Okay.  And that was one of the
```

Highly Confidential - Subject to Further Confidentiality Review

1    things that the pharmacist knew that was

2    being looked at from corporate, correct?

3                    MR. KOBRIN:  Object to form.

4        No foundation.  Out of time.

5                    THE WITNESS:  I think so.

6    QUESTIONS BY MR. GADDY:

7        Q.    If you go over a couple -- it

8    looks like four or five, there's one more

9    wait time RX.

10                   Do you see that?

11       A.    Yes.

12       Q.    And again, something else that

13   corporate was monitoring was how long people

14   had to wait to have their prescriptions

15   filled, correct?

16                   MR. KOBRIN:  Object to form.

17       No foundation.  Out of time.

18                   THE WITNESS:  Yes.

19   QUESTIONS BY MR. GADDY:

20       Q.    And again, that's something the

21   pharmacist knew was being collected and

22   looked at by corporate, correct?

23                   MR. KOBRIN:  Object to form.

24       No foundation.  Out of time.

25                   THE WITNESS:  Yes.

Highly Confidential - Subject to Further Confidentiality Review

1   QUESTIONS BY MR. GADDY:

2        Q.    And let's go and look at the

3   last two on the right side of the page.

4        A.    My copy is a little small and

5   the pictures are on the -- how can I get

6   those pictures of everybody on the other

7   side?  Is there a way for me to do that?  Can

8   I drag it?

9             MR. KOBRIN:  Yeah, you can drag

10       the block of photos --

11            THE WITNESS:  Okay.

12            MR. KOBRIN:  -- at the top.

13            THE WITNESS:  Okay.  I did.

14   QUESTIONS BY MR. GADDY:

15       Q.    Okay.  So it should be work

16   flow, average minute prepared to promised,

17   six-week average.

18            Do you see that?

19       A.    Yes.

20       Q.    Okay.  And again, that's

21   another metric that was being tracked at

22   Giant Eagle.  And it looks like if you look

23   down, it looked like it was being tracked

24   down to the -- to the tenth of a minute.

25            Do you see that?

```
1              MR. KOBRIN:  Object to form.
2         No foundation.  Out of time.
3              THE WITNESS:  Yes.
4    QUESTIONS BY MR. GADDY:
5         Q.    Okay.  And the last one is
6    walk-up waiter, percent complete within a 15
7    to 20-minute time period.
8              Do you see that?
9         A.    Yes.
10             MR. KOBRIN:  Objection.
11   QUESTIONS BY MR. GADDY:
12        Q.    And that was also being tracked
13   by corporate, and the pharmacists were aware
14   of that, correct?
15             MR. KOBRIN:  Same objection.
16        No foundation.  Out of time.
17             THE WITNESS:  My understanding
18        is we're out of time.
19             MR. KOBRIN:  You can answer it,
20        if you know, George.
21             THE WITNESS:  Yes.
22             MR. GADDY:  That's all the
23        questions I have for you this morning.
24        I appreciate your time and being
25        willing to come back and participate.
```

Highly Confidential - Subject to Further Confidentiality Review

1           THE WITNESS:  Thank you.

2           MR. KOBRIN:  I got a couple

3      questions.  I'll be very quick.  I

4      know you want to get out of here,

5      Mr. Chunderlik.

6           Do you want to take a quick

7      break?

8           THE WITNESS:  Could we take --

9      could we take a quick break?  Maybe

10     ten minutes?

11          MR. KOBRIN:  I'm okay with

12     that.  Are you okay -- if you're okay

13     with that Mr. Chunderlik.  I know you

14     want to get back to your other job.

15          Are you guys okay with that,

16     Jeff?

17          MR. GADDY:  Yeah, whatever you

18     want.

19          MR. KOBRIN:  It's 1:04.

20          THE WITNESS:  I'll be back by

21     1:15?  Yes.

22          VIDEOGRAPHER:  The time is

23     1:04 p.m.  We are off the record.

24      (Off the record at 1:04 p.m.)

25          VIDEOGRAPHER:  The time is

Case: 1:17-md-02804-DAP Doc #: 4217-6 Filed: 12/20/21 197 of 240. PageID #: 560012
Highly Confidential - Subject to Further Confidentiality Review

1           1:17 p.m.  We are back on the record.

2                  CROSS-EXAMINATION

3    QUESTIONS BY MR. KOBRIN:

4           Q.     Mr. Chunderlik, thank you for

5    taking the time today to talk to us.  I will

6    try to be brief in my redirect.

7                  If you could turn to Tab 47?  I

8    think it's in the second binder.  It's the

9    PowerPoint presentation that Mr. Gaddy was

10   talking to you about with regard to time to

11   fill an order.

12          A.     Okay.  Which specific page in

13   that slide?

14          Q.     It's page 8 and 9, was I think

15   where you looked at with Mr. Gaddy.

16          A.     Yes.

17          Q.     Do you recall Mr. Gaddy asking

18   you questions about time to fill an order

19   attribute?

20          A.     Yes.

21          Q.     And that's part of the service

22   focus attributes on slide 8.

23                 Do you recall that?

24          A.     Yes.

25          Q.     And he had you look at slide 9,

1 which talked about a few focus attributes

2 that have the lowest scores.

3           Do you see that?

4      A.     Yes.

5      Q.     Is there anything on this slide

6 regarding focusing on the time to fill an

7 order attribute about speeding up the filling

8 of prescriptions?

9      A.     No.

10      Q.     Is there anything on this slide

11 of the time to fill an attribute, time to

12 fill an order attribute, about filling

13 prescriptions more quickly?

14      A.     No.

15      Q.     Is there anything on this slide

16 about speeding up the drug utilization or DUR

17 review?

18      A.     No.

19      Q.     Is there anything on this slide

20 about speeding up the corresponding

21 responsibility analysis or any other due

22 diligence on a prescription?

23      A.     No.

24      Q.     If you read with me, under time

25 to fill an order it says, "Use the dashboard

Highly Confidential - Subject to Further Confidentiality Review

1    to determine ahead or behind and where you

2    are behind."

3              Do you see that?

4         A.    Yes.

5         Q.    And "where" is in all caps.

6              Do you see that?

7         A.    Yes.

8         Q.    Do you have an understanding of

9    why "where" is all in all caps and what is

10   meant by "where are you behind"?

11              MR. GADDY:  Object to form.

12              THE WITNESS:  My understanding

13         would be that we are behind -- if

14         you're filling -- if you're not

15         filling the correct prescriptions at

16         the right time and you're filling

17         prescriptions out of order, it may get

18         you into a situation where you are

19         behind and you're not filling

20         prescriptions that are due earlier --

21         you're filling prescriptions that are

22         due later, possibly later, in the day

23         versus the ones that you should be

24         working on that came in and have

25         earlier times for patients to get.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. KOBRIN:

 2         Q.     Is the focus of this -- strike

 3    that.

 4               Is this slide and its focus on

 5    the attribute time to fill an order, is that

 6    encouraging pharmacists to speed up

 7    prescriptions?

 8               MR. GADDY:  Object to form.

 9               THE WITNESS:  No.  No, this is

10        not -- this is not intended to have

11        pharmacists -- this attribute is not

12        intended to have pharmacists speed up.

13               It is intended so that they can

14        fill prescriptions in the proper

15        order, more efficiently, so that they

16        can leave time to do the proper DUR,

17        the proper checks on a prescription,

18        to make sure that those prescriptions

19        are filled correctly, within the

20        guidelines, and that they can get

21        those prescriptions out to a patient

22        when it is expected that they get that

23        prescription out.

24               It has nothing to do with a

25        time component.  It has to do with
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            filling prescriptions in the correct
 2            order for efficiency and making
 3            sure -- giving pharmacists enough time
 4            to do those things, DUR, checking
 5            OARRS, and some of the other things
 6            that they must do, or have to do, in
 7            order to fill that prescription
 8            correctly for the patient, and in the
 9            most safe, efficient manner.
10     QUESTIONS BY MR. KOBRIN:
11            Q.      Can you give the jury an
12     example of why this order thing matters?
13            A.      I'll give you an example
14     that -- let's say a patient calls in --
15     patients call in refills, and they say, I'm
16     not going to be into the pharmacy until six
17     o'clock this evening to pick up this
18     prescription.
19                    And we have prescriptions that
20     are ahead of those prescriptions being
21     filled.  You know, pharmacists have a
22     tendency to, you know, fill prescriptions as
23     they come in, with no regards to when the
24     patient was picking that prescription up.
25                    So if they're working on
```

Highly Confidential - Subject to Further Confidentiality Review

1   prescriptions that patients are due at six

2   o'clock in the evening and they're not

3   working on prescriptions that come into the

4   pharmacy -- you know, maybe a patient is

5   waiting, or maybe a patient is coming in

6   sooner than six o'clock, you know, and

7   they're working on things out of order.

8   That's going to create -- that's going to

9   complicate this working ahead or behind in

10  the time to fill an order.

11          Q.      Thank you, Mr. Chunderlik.

12                  And if you'll bear with me, I

13  have some big binders.  Sorry.

14                  I'm going to switch binders to

15  the first binder that Mr. Gaddy sent you.

16                  You got the first binder in

17  front of you, Mr. Chunderlik?

18          A.      Yes.

19          Q.      All right.  Go to tab -- do

20  these in order.  Go to Tab 6.

21          A.      Yes.

22          Q.      There is -- do you recall

23  Mr. Gaddy asking you about this e-mail

24  regarding pharmacy team leader noting that

25  one of the medical practices in her region

Highly Confidential - Subject to Further Confidentiality Review

1    had been accused of fraudulent billing?

2        A.    Yes.

3        Q.    And Mr. Gaddy asked you why you

4    wouldn't cut that practice off entirely so

5    you weren't filling prescriptions for any

6    patients coming from that practice.

7               Do you recall those questions?

8               MR. GADDY:  Objection.

9        Objection to form.

10              THE WITNESS:  Yes.

11   QUESTIONS BY MR. KOBRIN:

12       Q.    Would you take notice of the

13   fact that this medical practice was engaged

14   in fraudulent billing when you filled the

15   prescription?

16       A.    I'm sorry, could you repeat

17   that?

18       Q.    When you're filling a

19   prescription, if you knew that this practice

20   had been accused -- or there's allegations of

21   fraudulent billing, would that factor into

22   your consideration when you were doing due

23   diligence on the prescription?

24              Might that be a factor you

25   would consider, among other factors, while

1  you were filling the prescription -- or when

2  you were analyzing -- strike that.

3          When you were -- if you knew,

4  would you have -- strike that.

5          If a pharmacy were filling a

6  prescription from this practice, would you

7  agree that they should consider, among other

8  things, the fact that the practice had been

9  accused of fraudulent billing?

10     A.     That might -- that might be one

11 of many things that they would consider, but

12 the fact that -- you know, fraudulent billing

13 has nothing to do with filling a

14 prescription.

15          You know, a patient -- there's

16 no reason to penalize patients for errors

17 that an office might be making in billing

18 their -- their services to a patient.

19          Fraudulent -- fraudulent

20 billing here, I don't know -- the fraudulent

21 billing on behalf of a physician has nothing

22 to do with filling a prescription written by

23 that physician.

24     Q.     So while it would be a factor,

25 you might not presume that a patient is shady

```
 1    just because the practice is, quote/unquote,

 2    shady in one way?

 3              MR. GADDY:  Objection to form.

 4              THE WITNESS:  No.

 5    QUESTIONS BY MR. KOBRIN:

 6         Q.    No what, Mr. Chunderlik?

 7         A.    Just because -- if a practice

 8    is shady in billing, I would not assume that

 9    they are shady in other areas of practice.

10         Q.    Would you assume that their

11    patients are all shady?

12         A.    Absolutely not.  A patient has

13    nothing to do -- you know, patients, when

14    they get bills from the physician, maybe they

15    read over them.  But just because a physician

16    is having issues billing and providing --

17    billing for the provision of their services

18    has nothing to do with treating the patient.

19         Q.    Thank you.

20               Go to Tab 8.

21         A.    I'm sorry?

22         Q.    Flip to Tab 8 in the same

23    binder.

24         A.    Yes.

25         Q.    This is the presentation
```

Highly Confidential - Subject to Further Confidentiality Review

1    that -- there's no page numbers on it, but

2    Mr. Gaddy had you look at the first slide

3    that said "prescription drug abuse epidemic."

4    It has a chart about drug overdose and

5    overdose death rates.

6                    Do you see that?

7         A.      Yes.

8         Q.      And he had you look at this

9    chart where it says, "Drug overdose death

10   rates in the US have more than tripled since

11   1990."

12                   Do you see that?

13        A.      Yes.

14        Q.      There's a footnote after 1990.

15                   Do you see that?

16        A.      Yes, I do.

17        Q.      He didn't have you read what it

18   says in that footnote.

19                   Could you read what it says in

20   that footnote to complete the record?

21        A.      I'm going to remove this so

22   that I can bring it just a little bit closer.

23        Q.      It is very small.

24        A.      All right.  It's a little bit

25   fuzzy, but it says, "Deaths are those for

Highly Confidential - Subject to Further Confidentiality Review

1    which poisoning by drugs, illicit

2    prescription and over-the-counter" -- I can't

3    read the next word -- "the underlying -- was

4    the underlying cause."  Excuse me.

5         Q.      I think that's right.

6                 Now, does that include overdose

7    deaths by cocaine?

8         A.      Possibly.  It could, yes.

9         Q.      If there were overdose deaths

10   from cocaine, would they be included in that

11   number?

12        A.      I believe they would, according

13   to the way this is -- this footnote is

14   listed.

15        Q.      Would that include deaths by

16   heroin?

17        A.      As the way this footnote is

18   listed, I would believe so.

19        Q.      Would that include overdose

20   deaths caused by use of methamphetamines?

21        A.      Yes.

22        Q.      If you would turn with me to

23   Tab 10.

24        A.      And also, before we do that, I

25   just want to mention that it lists "and"

Highly Confidential - Subject to Further Confidentiality Review

```
 1    other" -- "and over-the-counter drugs" is

 2    included in that as well.  Included in that

 3    would be, you know, things like

 4    pseudoephedrine.  Could be overdose of

 5    ibuprofen because it -- it lists

 6    over-the-counter drugs.

 7         Q.      Thank you.

 8                 If you'd turn to Tab 12 for me,

 9    and then we'll go back to Tab 10.

10         A.      Okay.  Yes.

11         Q.      At the page marked 30277, it's

12    got the notes for the slides here.  There are

13    notes for slide 1, slide 2 and slide 3?

14         A.      Yes.

15         Q.      Do you recall that Mr. Gaddy

16    asked you questions about the notes for

17    slide 3 and he had you read a lot of that

18    into the record, or you read a lot of that

19    into the record?

20         A.      Yes.

21         Q.      And this is about controlled

22    substance compliance and corresponding

23    responsibility, correct?

24         A.      Yes.

25         Q.      At the bottom, one of the
```

Highly Confidential - Subject to Further Confidentiality Review

1   things that Mr. Gaddy asked you about was

2   that last sentence about the policies and

3   procedures to follow and monitor activities.

4           And you had said that the

5   companies that do not have tight policies and

6   procedures might find themselves facing huge

7   fines and closure of facilities for extreme

8   violations.

9           Do you see that?

10  A.    Yes, I do.

11  Q.    Did Giant Eagle ever commit any

12  extreme violations?

13          MR. GADDY:  Objection to form.

14          THE WITNESS:  No.

15          MR. KOBRIN:  What's the form

16      objection, Jeff?

17          MR. GADDY:  I don't know what

18      you mean by "extreme," Josh.

19          MR. KOBRIN:  Well, you asked

20      him about it.

21  QUESTIONS BY MR. KOBRIN:

22  Q.    So within the same definitions

23  that Mr. Gaddy asked you about regarding

24  this, would you characterize Giant Eagle as

25  having committed any extreme violations?

1   A.   No.

2        MR. GADDY:  Object to form.

3   QUESTIONS BY MR. KOBRIN:

4        Q.   Would you characterize Giant

5   Eagle as ever having received any huge fines?

6        MR. GADDY:  Objection to form.

7        THE WITNESS:  No.

8   QUESTIONS BY MR. KOBRIN:

9        Q.   To your knowledge, did Giant

10  Eagle ever commit any extreme violations?

11       MR. GADDY:  Objection to form.

12       THE WITNESS:  No.

13  QUESTIONS BY MR. KOBRIN:

14       Q.   To your knowledge, did any

15  entity, government, law enforcement, impose

16  any huge fines on Giant Eagle?

17       MR. GADDY:  Objection to form.

18       THE WITNESS:  No.

19  QUESTIONS BY MR. KOBRIN:

20       Q.   Flip back to Tab 10.  We're

21  looking at the second page.  You spent a lot

22  of time on the second page of this

23  corresponding -- excuse me.  Strike that.

24            When Mr. Gaddy was asking you

25  questions, you looked at this controlled

1    substance dispensing guideline, and you spent

2    time going through the red flags at the

3    bottom of the second page.

4              Do you see that?

5         A.    Yes.

6         Q.    All right.  One of the things

7    he asked you about was flag number 3 at the

8    bottom of the second page, why you included

9    the formulations of hydrocodone and

10   alprazolam but you didn't include oxycodone

11   or other opioids.

12             Do you recall that?

13        A.    Yes.

14        Q.    If you look up at number 1,

15   that red flag, prescriptions written together

16   for oxycodone, hydrocodone, alprazolam and

17   carisoprodol, that includes oxycodone and

18   hydrocodone being mixed with alprazolam in

19   that red flag, doesn't it?

20        A.    Yes.  Yes, it does.

21        Q.    Mr. Gaddy also asked you about

22   number 5 on the top of the third page, the

23   red flag for further than expected distances

24   of the patient and/or medical provider from

25   the pharmacy.

Highly Confidential - Subject to Further Confidentiality Review

1          Do you see that?

2     A.     Yes, I do.

3     Q.     And he asked you whether there

4  was kind of a distance that Giant Eagle

5  recommended beyond which a pharmacist should

6  be aware or should check or something like

7  that.

8          Do you recall that?

9     A.     Yes.

10     Q.     Does Giant Eagle -- strike

11  that.

12          Is there a reason that Giant

13  Eagle might not be able to give a standard

14  distance beyond which there would be a

15  problem if the patient and/or medical

16  provider was that distance from the pharmacy?

17          MR. GADDY:  Objection to form.

18          THE WITNESS:  Our stores have

19      different geographical locations.

20      Some are inner city, some are rural.

21      And if we -- if we tried to apply a

22      blanket distance or geographical

23      distance, it's not going to apply to

24      all stores.

25          We have to take into

Case: 1:17-md-02804-DAP Doc #: 4217-6 Filed: 12/20/21 213 of 240. PageID #: 560028

1    consideration geographical location of

2    the stores in relationship to things

3    like rural, inner city, suburb and

4    those types of things.  So it's

5    impossible to just apply a standard or

6    a blanket distance that we would try

7    to adhere to.

8  QUESTIONS BY MR. KOBRIN:

9        Q.    Is the pharmacist in a good

10 position to assess the distance because

11 they're in the community already?

12            MR. GADDY:  Object to form.

13            THE WITNESS:  I'm sorry, I

14      didn't quite hear that.

15 QUESTIONS BY MR. KOBRIN:

16       Q.    Would the pharmacist working at

17 any particular pharmacy be in a better

18 position to assess what distances are

19 expected and what are not?

20            MR. GADDY:  Same objection.

21 QUESTIONS BY MR. KOBRIN:

22       Q.    Would a pharmacist --

23       A.    The pharmacist would have a

24 better idea than just trying to apply a

25 blanket number to the geographical distance

1  to apply it to this red flag.

2       Q.     For number 6, Mr. Gaddy asked a

3  lot of questions about the percentage of

4  pharmacy business devoted to filling

5  controlled substances, and there seemed to be

6  a lot of confusion as to what that number 6

7  red flag meant.

8            Is that red flag about the

9  percentage of the pharmacy's business overall

10  or the pharmacy's business as applied to a

11  particular customer?

12       A.     I would -- this really applies

13  to the business as it applies to a particular

14  customer versus the business as a whole.

15       Q.     Go down to the bottom under the

16  documentation part on page 3.

17            Do you recall that Mr. Gaddy

18  asked you where -- strike that.

19            Do you recall Mr. Gaddy asking

20  you about the locations where pharmacists

21  should document that they have taken steps to

22  verify any questions that they had about

23  prescriptions?

24       A.     Yes.

25       Q.     And Mr. Gaddy asked you about

1    essentially putting in the notes fields in

2    the dispensing software or writing it on the

3    face of the script, correct?

4         A.    Yes.

5         Q.    If a pharmacist chose to write

6    a note on the face of the script -- strike

7    that.

8              Mr. Gaddy asked you also about

9    how anyone would ever see the note on the

10   face of the script and whether they would

11   have to go into the paper files in order to

12   review that prescription.

13        A.    Yes.

14        Q.    Do you recall that?

15        A.    Yes, I do.

16        Q.    In order to see a note on the

17   face of a prescription, would somebody have

18   to go into the paper files or would there be

19   another way for someone to follow up and see

20   the note on the face of the prescription?

21        A.    There is another way of -- all

22   of our prescriptions are scanned into the

23   system, so they wouldn't necessarily have to

24   go to -- as I recall, we talked about how the

25   prescriptions are filed in the yellow manila

1  folders that we use.

2          So a pharmacist, if they wanted

3  to review a note, wouldn't have to -- and if

4  it was written on the face of the

5  prescription, wouldn't have to necessarily go

6  to that folder.  They can -- they can view

7  the prescription, the scanned prescription,

8  on their screen, and if the prescription --

9  if the note was written on the back of the

10  prescription, they also have the ability to

11  view the back of that prescription as well

12  from that scanned prescription.

13      Q.     And that can be viewed across

14  the chain or only in the particular pharmacy

15  where the note was taken?

16      A.     It would only be visible in

17  where the pharmacist -- in the specific

18  pharmacy.

19      Q.     It wouldn't be part of the

20  RX.com patient profile?

21      A.     It would if that prescription

22  was being transferred to another pharmacy.

23      Q.     Do all the pharmacists have

24  access to the RX.com system?

25      A.     Yes, they do.

1    Q.    And they can all see the

2  prescriptions in that system, correct?

3              MR. GADDY:  Objection to form.

4        That's not what he said, Josh.

5  QUESTIONS BY MR. KOBRIN:

6    Q.    Can they see the prescriptions

7  in the system through RX.com?

8              MR. GADDY:  That's not what he

9        said again.

10              THE WITNESS:  Yes.

11  QUESTIONS BY MR. KOBRIN:

12    Q.    I'm not -- it doesn't matter

13  what he said.

14    A.    As I recall, I believe that

15  they can.

16    Q.    Just to make sure that's clean,

17  can all pharmacists see prescriptions from

18  other -- from pharmacies across the chain in

19  RX.com?

20              MR. GADDY:  Objection to form.

21        He said only if they're being

22        transferred.

23              THE WITNESS:  I believe so.

24  QUESTIONS BY MR. KOBRIN:

25    Q.    If we could take that

Highly Confidential - Subject to Further Confidentiality Review

1    information we just learned and flip to

2    page -- to Tab 22 of the binder.

3         A.    Yes, I have it.

4         Q.    Mr. Gaddy asked you here as

5    well about note-taking on the face of a

6    prescription.

7              Do you recall that?

8         A.    Yes.

9         Q.    So these notes, if they were on

10   the face of a prescription, could also be

11   viewed within the Giant Eagle dispensing

12   system, correct?

13             MR. GADDY:  Objection to form.

14        Mischaracterizes.

15             THE WITNESS:  Yes.

16   QUESTIONS BY MR. KOBRIN:

17        Q.    So based on your prior

18   testimony, could any notes that were entered

19   on the face of a prescription that is then

20   scanned into the dispensing system be viewed

21   within the dispensing system at Giant Eagle

22   pharmacies?

23             MR. GADDY:  Are you asking

24        about the testimony where he said it

25        couldn't be or the testimony where he

1          said it could be?  I think you need to

2          be a little more clear.

3     QUESTIONS BY MR. KOBRIN:

4          Q.    Mr. Chunderlik, can the scanned

5     notes on the face of a prescription be viewed

6     within the dispensing system at Giant Eagle

7     pharmacies?

8               There's been a little bit of

9     convoluted testimony on that.  I'd like you

10    to just let us know.

11              Can the scanned notes on the

12    face of a prescription or on the back of a

13    prescription be viewed within the dispensing

14    system at Giant Eagle pharmacies?

15              MR. GADDY:  Objection to form.

16              THE WITNESS:  I believe so.

17    QUESTIONS BY MR. KOBRIN:

18         Q.    Great.

19              So if notes were taken

20    regarding a DUR review on the face of a

21    prescription or on the back of a

22    prescription, just to clarify the record

23    because there has been a little confusion,

24    those notes could be viewed within the

25    dispensing system at Giant Eagle pharmacies,

Highly Confidential - Subject to Further Confidentiality Review

1    correct?

2              MR. GADDY:  Objection to form.

3        Asked and answered.

4    QUESTIONS BY MR. KOBRIN:

5        Q.    Could those notes -- let's

6    clarify it again then.

7              If notes were taken regarding a

8    review, a DUR review, on the face of a

9    prescription or on the back of a

10   prescription, could those notes be viewed

11   within the dispensing system at Giant Eagle

12   pharmacies?

13             MR. GADDY:  Objection to form.

14       Asked and answered.

15             THE WITNESS:  I believe so.

16   QUESTIONS BY MR. KOBRIN:

17       Q.    If a DUR note is put on the

18   face of a prescription or the back of a

19   prescription, that DUR note could be viewed

20   within the Giant Eagle dispensing system.

21             Is that accurate?

22             MR. GADDY:  Objection.  Asked

23        and answered.

24             THE WITNESS:  Yes.

25

Highly Confidential -- Subject to Further Confidentiality Review

1    QUESTIONS BY MR. KOBRIN:

2        Q.      More to the point, Mr. Gaddy

3    asked you about drug utilization review

4    notes, correct?

5        A.      Yes.

6        Q.      Okay.  If there were a critical

7    DUR flag that popped up or -- for clarity,

8    let's not call it a flag.

9            If there were a critical DUR

10   notice --

11       A.      Yes.

12       Q.      -- during the review of a

13   prescription, a pharmacist could choose to

14   put a note regarding that DUR notice and how

15   they resolved it on the face of a

16   prescription?

17       A.      Yes.

18       Q.      Okay.  Would they have to also

19   put a note regarding how they resolved that

20   DUR notice in the Giant Eagle dispensing

21   system?

22       A.      Yes, they would have to do

23   that.

24       Q.      And what would happen if they

25   didn't do that?

```
 1        A.      It would not let them move
 2  forward in the work flow.  That prescription
 3  would not work forward in work flow.
 4        Q.      So in that case there would
 5  have to be a note in the Giant Eagle
 6  dispensing entered directly rather than
 7  through the scan of a physical prescription?
 8        A.      Yes.
 9        Q.      Thank you, Mr. Chunderlik.
10           MR. GADDY:  Are you done, Josh,
11        or were you just thinking over that
12        answer?
13           MR. KOBRIN:  Sorry?
14           No, we're done.  Thank you,
15        Jeff.
16           MR. GADDY:  Okay.
17             REDIRECT EXAMINATION
18  QUESTIONS BY MR. GADDY:
19        Q.      Mr. Chunderlik, just a couple
20  follow-up.
21           When you were looking at the
22  graph showing the increase in deaths from
23  drug overdoses --
24           You remember that?
25        A.      Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     -- were you attempting to

2    minimize in any way the opioid epidemic and

3    the abuse and the death from that that's

4    happened that you've already told us about?

5              MR. KOBRIN:  Faded out a little

6         on me there, Jeff.

7              I don't know if it's the system

8         overall.

9    QUESTIONS BY MR. GADDY:

10     Q.     Did you hear me,

11   Mr. Chunderlik, or do you need me to ask it

12   again?

13     A.     Please ask me again.

14     Q.     Sure.

15              When you were looking at that

16   graph with Mr. Kobrin a few minutes ago and

17   you were talking about the types of deaths

18   that were illustrated within that graph, the

19   CDC graph --

20              Do you remember that?

21     A.     Yes.

22     Q.     -- was it your intention to

23   minimize the number of deaths that have come

24   from the opioid epidemic that you've already

25   told us that you are aware of and cognizant

```
1    of when you came back to Giant Eagle in 2008?
2         A.    No, that was not my intention,
3    to minimize.
4         Q.    You --
5         A.    That was not my intention.
6         Q.    You agree this is a serious,
7    serious problem, right?
8              MR. KOBRIN:  Object to form.
9              THE WITNESS:  Yes.
10             MR. KOBRIN:  You can answer.
11   QUESTIONS BY MR. GADDY:
12        Q.    Okay.  I mean, people --
13   according to this, 100 people are dying every
14   day from overdoses.  And you know that that
15   continued throughout your tenure at Giant
16   Eagle, correct?
17             MR. KOBRIN:  Object to form.
18        Assumes facts not in evidence, and no
19        foundation.
20             THE WITNESS:  I don't -- I
21        don't necessarily know that to be
22        true.
23   QUESTIONS BY MR. GADDY:
24        Q.    You don't know that the opioid
25   epidemic continued during the time while you
```

Highly Confidential - Subject to Further Confidentiality Review

1   were at Giant Eagle and that it continues

2   today?

3        A.     No, I'm referring to 100 people

4   die from drug overdoses every day in the

5   United States.

6        Q.     Are you comfortable saying that

7   there are people dying every day in the

8   United States from opioid overdoses?

9             MR. KOBRIN:  Object to form.

10            THE WITNESS:  From what I have

11      seen, that could be a possibility.

12  QUESTIONS BY MR. GADDY:

13       Q.     And that's a serious problem

14  that we should face seriously as a country,

15  correct, Mr. Chunderlik?

16       A.     Yes, we should.  Absolutely.

17       Q.     You were asked a couple of

18  questions about the geographical distance red

19  flag.

20            Do you recall that?

21       A.     Yes.

22       Q.     And you provided some testimony

23  about how there are stores within different

24  communities and different -- probably sort of

25  different customer bases, different

Highly Confidential - Subject to Further Confidentiality Review

1   demographics, things like that.

2              Is that fair?

3   A.    Yes.

4   Q.    Okay.  What I'm interested in

5   understanding is what tools Giant Eagle

6   provided to their pharmacists.

7              What I know is that I can hop

8   on Google and I can type in two addresses and

9   instantaneously see the difference in

10  distance, the distance between two locations.

11             Are there any tools within the

12  Giant Eagle dispensing system that provided

13  any type of information like that to the

14  pharmacists that would allow them to take

15  that information and apply it to the

16  situation that presents to them in their

17  pharmacy?

18             MR. KOBRIN:  Object to form.

19        Beyond the scope of direct -- of

20        redirect.

21             THE WITNESS:  Not within the

22        Giant Eagle filling software.  But all

23        of our stores had access to Google,

24        just like you described.  They could

25        have taken the time to do that.

Highly Confidential - Subject to Further Confidentiality Review

1    QUESTIONS BY MR. GADDY:

2        Q.    Okay.  Well, did I miss that in

3    the controlled substance dispensing guideline

4    where it encouraged pharmacists to hop on

5    Google and see -- look into things like the

6    distance?  Is that something that was

7    included in the material provided to the

8    pharmacist or not?

9        A.    No, that was not included in

10   there.

11       Q.    Okay.  I think the last thing

12   that I want to ask you about, just because I

13   wasn't entirely clear about what your answer

14   was, but your attorney asked you questions

15   about whether or not you would consider as a

16   factor in filling a prescription from a pain

17   clinic whose doctors were being investigated

18   for fraudulent billing practices, and he

19   asked you about them being shady in one way,

20   how would that impact your pharmacists -- or

21   I guess how should that impact your

22   pharmacists' decision on whether or not to

23   fill an opioid prescription.

24             I couldn't -- I'm not quite

25   sure that I understood your final position on

Highly Confidential - Subject to Further Confidentiality Review

1    that.

2              Was it that it's not a factor

3    to be considered, that they're shady in one

4    way and may not be shady in another, or is it

5    a factor to consider?

6         A.    It's a factor, but I don't

7    consider it, you know -- you know, if I was

8    looking at the different factors, red flags,

9    that would not be something that would

10   necessarily preclude me from making a

11   judgment about the other red flags or other

12   aspects of that prescription.

13             I don't believe billing has

14   anything to do -- billing of a prescriber for

15   the services they provide has nothing to do

16   with filling a prescription.  For a

17   pharmacist to fill a prescription.

18             And it has nothing to do -- it

19   has no bearing on the types of patients that

20   this -- that these physicians are seeing.

21   None whatsoever.  That's my position.

22        Q.    Okay.  So the fact that a

23   pharmacist is alerting Giant Eagle management

24   that they believe that this pain clinic, with

25   doctors who I think they said prescribe only

```
1   narcotics, are shady in some way, from your
2   perspective, that doesn't bleed over into the
3   analysis of whether or not you should fill an
4   opioid prescription presented and written by
5   one of those doctors?
6           MR. KOBRIN:  Object to form.
7       Misrepresents testimony.  He said it
8       was a factor.
9           THE WITNESS:  Also, the first
10      part of your question -- and restate
11      the first part of that question again?
12      Because there was something that I
13      misunderstood.
14  QUESTIONS BY MR. GADDY:
15      Q.    Okay.  So we had a pharmacist
16  alerting Giant Eagle management about a pain
17  clinic --
18      A.    Okay.
19      Q.    -- that had doctors that it
20  said were being investigated for fraudulent
21  billing.
22          And the pharmacist is raising
23  the issue that if we have this pain clinic
24  who prescribe only narcotics, are shady in
25  this way, how should we factor in our
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    decision about whether or not to fill their
 2    controlled substance prescriptions?
 3                 And what I hear you telling me
 4    is it has nothing -- one has nothing to do
 5    with the other.  The one does not bleed over
 6    into whether or not to fill an opioid
 7    prescription.
 8                 MR. KOBRIN:  Object to form.
 9    QUESTIONS BY MR. GADDY:
10         Q.    Did I understand you correctly?
11                 MR. KOBRIN:  Object to form.
12            Misrepresents his testimony.  It
13            misrepresents the evidence.
14                 Why don't we look at the
15            document itself and see what they
16            said.
17                 THE WITNESS:  I'd like to
18            see -- I would like to see the
19            document again to review.
20                 Do you know the tab number?
21    QUESTIONS BY MR. GADDY:
22         Q.    I can find it if you really
23    want to look at it.
24         A.    I do.
25         Q.    Okay.  It's going to be Tab 6,
```

1    P-HBC-24.

2         A.    Okay.  I'm sorry, Mr. Gaddy,

3    did you say behind Tab 24?

4         Q.    No, it's Tab 6.  24 is my

5    internal number.

6         A.    My fault.  Okay.

7                This is a pharmacist raising

8    this concern.

9         Q.    Tell me when you're there,

10   Mr. Chunderlik, and I'll ask a question.

11        A.    I'm there.  I'm there.

12        Q.    Okay.  You know from a

13   pharmacist, right?

14        A.    Yes.

15        Q.    Sent to you, who is the manager

16   of pharmacy compliance at this time, correct?

17        A.    Yes.

18        Q.    And they're raising the issue.

19   I think -- they say they have a concern,

20   right?  That's one of the things they have, a

21   question/concern?

22        A.    Yes.

23        Q.    And they're talking about a

24   pain clinic that prescribes -- that all they

25   prescribe is narcotics, right?

```
 1          A.      I see that.
 2          Q.      All right.  And it goes on to
 3    say they've become aware that one of the
 4    doctors at the clinic has been charged with
 5    fraudulent billing; there's 15 others
 6    involved; may or may not be at this practice.
 7    I guess we can't tell from this
 8    communication.
 9                  They say they had another issue
10    with a different doctor in their practice
11    being shut off from Gateway as provider.
12                  He goes on to say, "I realize
13    these aren't issues with the controlled
14    substance prescribing, but my question is, if
15    they are shady in one way, should we be
16    comfortable filling prescriptions from them
17    at all, especially given the nature of drugs
18    they prescribe."
19                  Do you see that?
20          A.      Yes.
21                  MR. KOBRIN:  Object to form.
22             He's the only one at the practice who
23             was charged or accused of fraudulent
24             billing, and it does not suggest that
25             the 15 had anything to do with the
```

Highly Confidential - Subject to Further Confidentiality Review

```
1            practice.

2                 It's one of --

3    QUESTIONS BY MR. GADDY:

4         Q.    You with me, Mr. Chunderlik?

5         A.    I see it.  I see this.

6         Q.    Okay.  My question to you,

7    because I was not clear based on the question

8    that you went through with your attorney

9    earlier, is:  This set of facts that this

10   pharmacist is presenting, is that a factor at

11   all to be considered when filling controlled

12   substance prescriptions, opioid

13   prescriptions, coming from this particular

14   practice that, according to this pharmacist,

15   has determined that they're shady in one way.

16                Is that a factor at all to be

17   considered?

18                MR. KOBRIN:  Object to form.

19                THE WITNESS:  It may be a

20        factor, but it's not a blanket reason

21        not to fill a prescription.  It's --

22        it's pretty low on the -- it's pretty

23        low on the red flag scale.  And that's

24        my term.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    QUESTIONS BY MR. GADDY:

2         Q.      Okay.

3         A.      Because patients -- this --

4    billing by a provider has nothing to do with

5    filling a prescription, with writing a

6    prescription or the types of patients that

7    they see.  It has nothing to do with -- maybe

8    the -- maybe the clinic has problems, they

9    don't have -- maybe they don't have trained

10   people to do their billing for them.  It has

11   nothing to do with prescribing or writing

12   prescriptions.

13        Q.      How does this factor come into

14   play?  How does the pharmacist use this -- I

15   think you said pretty low on the red flag

16   scale.

17              How do they use this low red

18   flag in evaluating prescriptions from doctors

19   that this pharmacist has determined are shady

20   in one way?

21              MR. KOBRIN:  Object to form.

22              THE WITNESS:  To be honest, I

23        really -- I really don't know.  I

24        can't speak for how pharmacists would

25        view this.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. GADDY:

 2         Q.     So from your perspective as the

 3    former training manager at Giant Eagle for

 4    the pharmacy team members, as well as the

 5    compliance -- the pharmacy compliance

 6    manager, you don't know how this information

 7    would be used by pharmacists to determine

 8    whether or not to fill opioid prescriptions

 9    from doctors at this practice, correct?

10         A.     I can't speculate on how they

11    would use this information to make a

12    determination whether they would fill or not

13    fill a prescription from this practice.

14              MR. GADDY:  Thank you,

15         Mr. Chunderlik.  That's all I have.

16              MR. KOBRIN:  Okay.

17              VIDEOGRAPHER:  The time is

18         1:57 p.m.  We are off the record.

19         (Deposition concluded at 1:57 p.m.)

20                 - - - - - - -

21

22

23

24

25
```

```
 1                         CERTIFICATE
 2
 3               I, CARRIE A. CAMPBELL, Registered
        Diplomate Reporter, Certified Realtime
 4      Reporter and Certified Shorthand Reporter, do
        hereby certify that prior to the commencement
 5      of the examination, George Chunderlik, was
        duly sworn by me to testify to the truth, the
 6      whole truth and nothing but the truth.
 7               I DO FURTHER CERTIFY that the
        foregoing is a verbatim transcript of the
 8      testimony as taken stenographically by and
        before me at the time, place and on the date
 9      hereinbefore set forth, to the best of my
        ability.
10
                 I DO FURTHER CERTIFY that I am
11      neither a relative nor employee nor attorney
        nor counsel of any of the parties to this
12      action, and that I am neither a relative nor
        employee of such attorney or counsel, and
13      that I am not financially interested in the
        action.
14
15
16
                 _____
17      CARRIE A. CAMPBELL,
        NCRA Registered Diplomate Reporter
18      Certified Realtime Reporter
        Notary Public
19
20
21
22
23      Dated:  March 12, 2021
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition over

 4      carefully and make any necessary corrections.

 5      You should state the reason in the

 6      appropriate space on the errata sheet for any

 7      corrections that are made.

 8              After doing so, please sign the

 9      errata sheet and date it.  You are signing

10      same subject to the changes you have noted on

11      the errata sheet, which will be attached to

12      your deposition.

13              It is imperative that you return

14      the original errata sheet to the deposing

15      attorney within thirty (30) days of receipt

16      of the deposition transcript by you.  If you

17      fail to do so, the deposition transcript may

18      be deemed to be accurate and may be used in

19      court.

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              ACKNOWLEDGMENT OF DEPONENT

 2

 3

 4          I,_____, do
    hereby certify that I have read the foregoing
 5  pages and that the same is a correct
    transcription of the answers given by me to
 6  the questions therein propounded, except for
    the corrections or changes in form or
 7  substance, if any, noted in the attached
    Errata Sheet.

 8

 9

10

11

12  _____
    George Chunderlik                    Date

13

14

15  Subscribed and sworn to before me this

16  _____ day of _____, 20 _____.

17  My commission expires: _____

18

19  Notary Public

20

21

22

23

24

25
```

```
 1                  - - - - - - -

                        ERRATA

 2                  - - - - - - -

 3      PAGE    LINE    CHANGE/REASON

 4      _____   _____   _____

 5      _____   _____   _____

 6      _____   _____   _____

 7      _____   _____   _____

 8      _____   _____   _____

 9      _____   _____   _____

10      _____   _____   _____

11      _____   _____   _____

12      _____   _____   _____

13      _____   _____   _____

14      _____   _____   _____

15      _____   _____   _____

16      _____   _____   _____

17      _____   _____   _____

18      _____   _____   _____

19      _____   _____   _____

20      _____   _____   _____

21      _____   _____   _____

22      _____   _____   _____

23      _____   _____   _____

24      _____   _____   _____

25
```

```
 1                    - - - - - - -

                   LAWYER'S NOTES

 2                    - - - - - - -

 3      PAGE    LINE

 4      _____   _____   _____

 5      _____   _____   _____

 6      _____   _____   _____

 7      _____   _____   _____

 8      _____   _____   _____

 9      _____   _____   _____

10      _____   _____   _____

11      _____   _____   _____

12      _____   _____   _____

13      _____   _____   _____

14      _____   _____   _____

15      _____   _____   _____

16      _____   _____   _____

17      _____   _____   _____

18      _____   _____   _____

19      _____   _____   _____

20      _____   _____   _____

21      _____   _____   _____

22      _____   _____   _____

23      _____   _____   _____

24      _____   _____   _____

25
```