1          IN THE UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF OHIO

3                 EASTERN DIVISION

4

                ~~~~~~~~~~~~~~~~~~~~

5

6      IN RE:  NATIONAL PRESCRIPTION   MDL No. 2804
       OPIATE LITIGATION

7                                     Case No. 17-md-2804

8                                     Judge Dan Aaron
       This Document Relates To:      Polster

9

10     The County of Lake, Ohio v.
       Purdue Pharma L.P., et al.

11     Case No. 18-op-45032

12
       The County of Trumbull, Ohio v.

13     Purdue Pharma L.P., et al.,
       Case No. 18-op-45079

14

15     Track 3 Cases

16
                ~~~~~~~~~~~~~~~~~~~~

17

18          Remote videotaped deposition of
                  LEWIS COLOSIMO

19

20

21               March 15, 2021
                  9:31 a.m.

22

23

24        Renee L. Pellegrino, RPR, CLR
             (Appearing Remotely)

25

```
 1    REMOTE APPEARANCES:
 2    On behalf of the Plaintiffs:
          Levin Papantonio Rafferty
 3        PETER MOUGEY, ESQ.
          LAURA DUNNING, ESQ.
 4        316 South Baylin Street
          Pensacola, Florida  32502
 5        (850) 435-7068
          pmougey@levinlaw.com
 6        ldunning@levinlaw.com
              - and -
 7        Simmons Hanly Conroy
          LAURA S. FITZPATRICK, ESQ.
 8        112 Madison Avenue, 7th Floor
          New York, New York  10016-7416
 9        (212) 257-8482
          lfitzpatrick@simmonsfirm.com
10           - and -
          The Lanier Law Firm
11        MILDRED CONROY, ESQ.
          6810 Cypress Creek Parkway
12        New York, New York  10022
          (800) 723-3216
13        mildred.conroy@lanierlawfirm.com
14    On behalf of Giant Eagle:
          Marcus & Shapira LLP
15        MATTHEW MAZGAJ, ESQ.
          SCOTT LIVINGSTON, ESQ.
16        One Oxford Centre, 35th Floor
          Pittsburgh, Pennsylvania  15219
17        (412) 338-3344
          mmazgaj@marcus-shapira.com
18        slivingston@marcus-shapira.com
19    On behalf of Walmart:
          Jones Day
20        PATRICK J. BEISELL, ESQ.
          77 West Wacker
21        Suite 3500
          Chicago, Illinois  60601-1692
22        (312) 269-4097
          pbeisell@jonesday.com
23
24                        ~ ~ ~ ~ ~
25
```

```
                                            Page  3
 1   REMOTE APPEARANCES, CONT'D:
 2   On behalf of Allergan:
         Kirkland & Ellis LLP
 3       ERICA B. ZOLNER, ESQ.
         300 North LaSalle
 4       Chicago, Illinois  60654
         (312) 862-2000
 5       erica.zolner@kirkland.com
 6   On behalf of Walgreens:
         Bartlit Beck
 7       STEN JERNUDD, ESQ.
         54 West Hubbard Street
 8       Chicago, Illinois  60654
         (312) 494-4410
 9       sten.jernudd@bartlitbeck.com
10   On behalf of the U.S. Drug Enforcement Agency:
         Department of Justice Civil Division
11       ALLISON C. CARROLL, ESQ.
         175 N. Street, NE
12       Washington, D.C.  20004
         (202) 598-0828
13       allison.c.carroll@usdoj.gov
14   ALSO PRESENT:
         David Sobotkin, Esq., U.S. Department of Justice
15       James Bennett, Esq., U.S. Department of Justice
         Renee Bacchus, Esq., U.S. Department of Justice
16       Andrew Jaco, Esq., U.S. Department of Justice
         Cameron Wolfe, Esq.
17       Mariama Spears, Esq.
         John Minges, Esq.
18       Gina Thiesfeldt, Concierge Tech
         Rob Miller, Videographer
19
20                      ~ ~ ~ ~ ~
21
22
23
24
25
```

Page 4

1                    TRANSCRIPT INDEX

2

3   APPEARANCES .................................2

4   INDEX OF EXHIBITS ...........................5

5   INDEX OF OBJECTIONS .........................7

6

7   EXAMINATION OF LEWIS COLOSIMO:

8   BY MR. LIVINGSTON ..........................11

9   BY MR. MOUGEY .............................135

10  BY MR. LIVINGSTON .........................170

11  BY MR. MOUGEY .............................189

12  BY MR. LIVINGSTON .........................190

13

14  REPORTER'S CERTIFICATE ....................194

15

16  EXHIBIT CUSTODY - RETAINED BY COURT REPORTER

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXHIBITS
 2
 3      Number           Description              Marked
 4
 5    Plaintiffs'
      Exhibit 1     Memorandum from Joseph T.        135
 6                  Rannazzisi to Special Agents in
                    Charge, Etc., dated October 27,
 7                  2009, with Attachments,
                    Beginning Bates Stamp
 8                  US-DEA-00056902
      Defendants'
 9    Exhibit 2     Memorandum to Diversion Program   37
                    Managers from the Diversion and
10                  Regulatory Litigation Section,
                    dated March 1, 2007, with
11                  Attached Documents, Beginning
                    Bates Stamp
12                  CAH_MDL_PRIORPROD_DEA12_00000609
      Plaintiffs'
13    Exhibit 2     Letter from Joseph T. Rannazzisi 138
                    to Dear Registrant, dated June
14                  12, 2012, with Attachments,
                    Beginning Bates Stamp
15                  ABDCMDL00269683
      Defendants'
16    Exhibit 3     Reports of Investigation         116
                    Beginning Bates Stamp
17                  US-DEA-00033016
      Plaintiffs'
18    Exhibit 3     Report of Investigation dated    140
                    October 26, 2009, Beginning
19                  Bates Stamp DEA-T1BCC-00001833
      Plaintiffs'
20    Exhibit 4     List of Citations Bates Stamped  143
                    DEA-T1BCC-00001825
21    Plaintiffs'
      Exhibit 5     Letters from Joseph T.           152
22                  Rannazzisi to Several
                    Recipients, Beginning Bates
23                  Stamp US-DEA-00026067
      Defendants'
24    Exhibit 6     2013 Diversion Manual Excerpt,    44
                    Beginning Bates Stamp
25                  CAH_MDL2804_02145395
```

1                INDEX OF EXHIBITS, CONT'D
2
3   Plaintiffs'
     Exhibit 6       Report of Investigation dated     156
4                    August 13, 2013, Beginning Bates
                     Stamp US-DEA-00030485
5   Plaintiffs'
     Exhibit 7       Report of Investigation dated     159
6                    December 3, 2014, Beginning
                     Bates Stamp US-DEA-00030618
7   Plaintiffs'
     Exhibit 8       Report of Investigation dated     162
8                    January 11, 2016, Beginning
                     Bates Stamp DEA-T1BCC-00001846
9   Defendants'
     Exhibit 10      E-Mail from Victor Vercammen to   176
10                   Lewis Colosimo and Nancy Jackson
                     dated June 3, 2019
11  Defendants'
     Exhibit 12      E-Mail String, Beginning Bates    128
12                   Stamp HBC_MDL00132815
    Defendants'
13   Exhibit 15      Thomas Prevoznik Deposition       186
                     Excerpt
14  Defendants'
     Exhibit 16      E-Mail String Beginning Bates     126
15                   Stamp HBC_MDL00136952
    Defendants'
16   Exhibit 19      Report of Investigation dated      67
                     October 26, 2009, Beginning
17                   Bates Stamp DEA-T1BCC-00001833
    Defendants'
18   Exhibit 20      Report of Investigation dated      87
                     January 11, 2016, Beginning
19                   Bates Stamp DEA-T1BCC-00001846
20
21
22
23
24
25

1                   INDEX OF OBJECTIONS

2

3     Objection ....................................20

      Objection ....................................23

4     Objection ....................................25

      Objection ....................................25

5     Objection ....................................26

      Objection ....................................30

6     Objection ....................................30

      Objection ....................................31

7     Objection ....................................31

      Objection....................................32

8     Objection ....................................32

      Objection ....................................37

9     Objection ....................................39

      Objection ....................................40

10    Objection ....................................41

      Objection ....................................42

11    Objection ....................................43

      Objection ....................................44

12    Objection ....................................44

      Objection ....................................45

13    Objection ....................................47

      Objection ....................................48

14    Objection ....................................51

      Objection ....................................52

15    Objection ....................................53

      Objection ....................................55

16    Objection ....................................55

      Objection ....................................55

17    Objection ....................................57

      Objection ....................................59

18    Objection ....................................60

      Objection ....................................61

19    Objection ....................................62

      Objection ....................................63

20    Objection ....................................66

      Objection ....................................70

21    Objection ....................................73

      Objection ....................................74

22    Objection ....................................78

      Objection ....................................80

23    Objection ....................................80

      Objection ....................................81

24    Objection ....................................81

25

1              INDEX OF OBJECTIONS, CONT'D

2

3   Objection ....................................84
    Objection ....................................87
4   Objection ....................................89
    Objection ....................................93
5   Objection ....................................93
    Objection ....................................95
6   Objection ...................................100
    Objection ...................................102
7   Objection ...................................103
    Objection ...................................104
8   Objection ...................................105
    Objection ...................................105
9   Objection ...................................107
    Objection ...................................109
10  Objection ...................................110
    Objection ...................................111
11  Objection ...................................111
    Objection ...................................112
12  Objection ...................................112
    Objection ...................................113
13  Objection ...................................113
    Objection ...................................113
14  Objection ...................................114
    Objection ...................................114
15  Objection ...................................115
    Objection ...................................116
16  Objection ...................................117
    Objection ...................................118
17  Objection ...................................119
    Objection ...................................119
18  Objection ...................................120
    Objection ...................................121
19  Objection ...................................121
    Objection ...................................121
20  Objection ...................................122
    Objection ...................................123
21  Objection ...................................124
    Objection ...................................124
22  Objection ...................................124
    Objection ...................................125
23  Objection ...................................125
    Objection ...................................127
24  Objection ...................................127
    Objection ...................................128

25

1                INDEX OF OBJECTIONS, CONT'D

2

3    Objection ...................................128
     Objection ...................................129
4    Objection ...................................129
     Objection ...................................130
5    Objection ...................................130
     Objection ...................................131
6    Objection ...................................131
     Objection ...................................133
7    Objection ...................................133
     Objection ...................................134
8    Objection ...................................153
     Objection ...................................154
9    Objection ...................................154
     Objection ...................................155
10   Objection ...................................161
     Objection ...................................163
11   Objection ...................................164
     Objection ...................................164
12   Objection ...................................164
     Objection ...................................164
13   Objection ...................................166
     Objection ...................................166
14   Objection ...................................168
     Objection ...................................168
15   Objection ...................................169
     Objection ...................................169
16   Objection ...................................171
     Objection ...................................171
17   Objection ...................................172
     Objection ...................................172
18   Objection ...................................173
     Objection ...................................174
19   Objection ...................................177
     Objection ...................................178
20   Objection ...................................179
     Objection ...................................180
21   Objection ...................................181
     Objection ...................................187
22   Objection ...................................187
     Objection ...................................188
23   Objection ...................................188
     Objection ...................................189
24   Objection ...................................190
     Objection ...................................191

25

1              INDEX OF OBJECTIONS, CONT'D

2

3    Objection ....................................191

     Objection ....................................191

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              THE VIDEOGRAPHER:  We're on the

2    record.

3         LEWIS COLOSIMO, of lawful age, called for

4    examination, as provided by the Federal Rules

5    of Civil Procedure, being by me first duly

6    sworn, as hereinafter certified, deposed and

7    said as follows:

8              EXAMINATION OF LEWIS COLOSIMO

9    BY MR. LIVINGSTON:

10        Q.    Good morning, Mr. Colosimo.  As you

11   know, my name is Scott Livingston and I

12   represent Giant Eagle in this litigation.

13   Before we begin, I just wanted to go over maybe

14   just a couple quick ground rules, if it's okay

15   with you, especially since we're doing this

16   remotely.

17             If for any reason you don't hear a

18   question that I ask you, will you promise to

19   let me know and I can repeat it for you?

20        A.    Sure.

21        Q.    And if for any reason you don't

22   fully understand a question that I ask you, will

23   you please let me know and I can try to rephrase

24   the question for you?  Will you do that?

25        A.    Yes.

1       Q.      Thank you.  Would you introduce

2   yourself to the jury, please?

3       A.      Yes.  My name is Lewis Colosimo.

4       Q.      Where do you reside, sir?

5       A.      I reside in Canonsburg,

6   Pennsylvania.

7       Q.      Is that more than 100 miles from

8   downtown Cleveland, to your knowledge?

9       A.      I believe so.

10      Q.      So this might be used as your trial

11  testimony just to kind of forewarn you of that,

12  and that's one reason why we're recording it, if

13  that's all right with you.

14      A.      Okay.

15      Q.      Could you please briefly describe

16  your educational background?

17      A.      I graduated in 1989 from Geneva

18  College with a Bachelor of Arts.

19      Q.      What was your major?

20      A.      Major was sociology.

21      Q.      And what did you do, sir,

22  employment-wise after you graduated?

23      A.      I worked as a counselor for

24  juvenile delinquents at Adelphoi Village.

25      Q.      When did you graduate -- you said

1  you graduated in 1989; is that correct?

2       A.    Yes.

3       Q.    And how long were you a counselor at

4  Adelphoi?

5       A.    I believe it was approximately one

6  year.

7       Q.    And what did you do after that

8  employment-wise?

9       A.    I accepted employment with the Drug

10  Enforcement Administration.

11       Q.    And so that would have been maybe

12  1990?

13       A.    Correct.

14       Q.    And are you still with the DEA?

15       A.    Yes.

16       Q.    Thank you for your long service

17  there, sir.

18             Could you please just run through

19  your positions, if they've changed at all over

20  time while you've been with the DEA?

21       A.    Yes.

22             In May of 1990 I was hired as a

23  diversion investigator with the Drug

24  Enforcement Administration, and since that time

25  I have been employed in the Pittsburgh district

1  office as a diversion investigator, and most

2  recently, approximately two weeks ago, I have

3  been the group supervisor, group supervisor for

4  the diversion group in the Pittsburgh district

5  office.

6       Q.    And as a group supervisor, do you --

7  I assume you supervise other diversion

8  investigators for the DEA?

9       A.    Correct.

10      Q.    And would it be fair to say that one

11  of the DEA's missions is to try to prevent the

12  use and sale of illegal drugs?

13      A.    I can explain as a diversion

14  investigator one of our duties involves the

15  prevention of the diversion of pharmaceutical

16  controlled substances.

17      Q.    Okay.  And I mean prescription drugs

18  essentially.  Is that what you're talking about

19  with respect --

20      A.    Prescription drugs as well as

21  scheduled listed chemicals, such as

22  pseudoephedrine and ephedrine.

23      Q.    But does the DEA also try to prevent

24  the use and sale of illegal drugs, like, for

25  example, heroin and cocaine?

1      A.     That would be a role of DEA,

2  correct.

3      Q.     And then your focus, sir, it sounds

4  like has been as a DEA agent on trying to limit

5  and prevent the diversion of legally prescribed

6  type drugs?

7      A.     Yes.

8      Q.     Just because I know we're going to

9  be talking a lot about diversion today, can you

10  just define that, what diversion means, for the

11  jury?

12      A.     I would define diversion as any

13  unlawful or handling of controlled substances

14  that would be outside of DEA regulations.

15      Q.     Okay.  Would that essentially be

16  like any kind of criminal act involving, you

17  know, prescription drugs?

18      A.     Controlled substance prescription

19  drugs.

20      Q.     And what is a controlled substance

21  as opposed to a regular prescription drug?

22      A.     Controlled substances are drugs

23  that are classified by DEA as well as the Food

24  and Drug Administration in one of five

25  schedules depending upon their use as

1  legitimate -- for a legitimate medical purpose.

2  These are drugs that have a potential for

3  abuse, potential for addiction and harm.

4      Q.    I see.  And does the DEA have a

5  schedule of like one through five for these

6  types of drugs?

7      A.    Yes.

8      Q.    And Schedule 1 are drugs that have

9  really no lawful purpose at all; is that fair to

10  say?

11     A.    That's correct, yes.

12     Q.    And then Schedule 2 are drugs that

13  have a potentially useful medical purpose but

14  also have a high risk of abuse and are

15  dangerous; is that correct essentially?

16     A.    Correct.

17     Q.    And then you go down the list, you

18  know, Schedule 3, with lesser severity and

19  lesser risk of abuse; would that be fair to say?

20     A.    That is one of the criteria for

21  classifying those drugs.

22     Q.    Does diversion include the theft of

23  prescription drugs?

24     A.    Yes.

25     Q.    And would it include using any kind

1   of deception to obtain a prescription drug?

2          A.    That would include that, yes.

3          Q.    Forging of a script, for example,

4   that would be a form of diversion?

5          A.    Yes.

6          Q.    What about, you know, if someone in

7   your family gets a script for, let's say, some

8   sort of opioid as a result of an operation and

9   they don't use all of their drugs, they leave

10  them in their medicine cabinet and their teenage

11  son takes those?  Would that still be considered

12  diversion, that sort of use of a prescribed

13  drug?

14         A.    Any time the drug is used by

15  someone to whom it's not prescribed would be a

16  form of diversion.

17         Q.    So that would include taking

18  grandma's prescription drugs, you know, out of

19  her medicine cabinet?

20         A.    That would be an example, yes.

21         Q.    Thank you very much.

22               Now, has the DEA enacted a number

23  of regulations to help prevent the diversion of

24  legally prescribed drugs?

25         A.    My understanding is that these

1   regulations are in the Code of Federal

2   Regulations.

3        Q.    Right.  And I was just saying are

4   those DEA regulations essentially -- DEA drafted

5   them, promulgated them, and enforces them?

6        A.    I'm not certain how much and what

7   involvement DEA has in the regulations.  I

8   can't speak to that.

9        Q.    Fair enough.  Let me ask a slightly

10  different question.

11            With respect to the regulations

12  that do apply to controlled substances, does

13  the DEA -- one of DEA's jobs is to enforce

14  those regulations?

15       A.    I think that would be a -- fair to

16  say, one of our responsibilities.

17       Q.    And does the DEA -- well, in order

18  for a doctor to prescribe controlled substances,

19  do they have to have a DEA license to do that?

20       A.    Yes.  Generally, there would be

21  limited circumstances where a physician that is

22  employed at a hospital may not have their own

23  DEA registration number, but it may, under

24  certain conditions, use the hospital's DEA

25  number for in-hospital practice.

1      Q.    But generally a doctor needs to

2    obtain -- in order to prescribe medication as

3    part of their practice, they need to obtain a

4    DEA license to do that?

5           A.    Generally, yes.

6           Q.    And the same would be true with

7    respect to a pharmacy; that if a pharmacy is

8    going to be dispensing controlled substances,

9    they would need to obtain a DEA license to do

10    that?

11           A.    Correct.

12           Q.    And I think you mentioned hospitals.

13    Hospitals would likewise have to have a license

14    to prescribe controlled substances?

15           A.    Yes, or administer or dispense to a

16    patient.

17           Q.    And with respect to distributors who

18    distribute drugs to doctors and pharmacies for

19    ultimate dispensing to the public, do they have

20    to have a DEA license if they're distributing

21    controlled substances?

22           A.    They do.

23           Q.    Now, in order to or as part of DEA's

24    efforts to enforce these controlled substance

25    regulations, does the DEA require someone who's

1    applying for a license essentially, like a

2    distributor -- let's take a distributor, for

3    example.  If a distributor is applying for a

4    license, do you do a -- sort of a

5    pre-authorization inspection of their facilities

6    and everything to make sure that they're in

7    compliance or going to be in compliance with all

8    the applicable regulations?

9        A.   Yes, we do an investigation to

10   determine that they're eligible to engage in

11   that activity.

12       Q.   What do you call that?  Is that a

13   pre-registration inspection or pre-authorization

14   inspection?  I'm not sure.  What terminology do

15   you use?

16       A.   I personally and others that I work

17   with refer to that as a pre-registrant

18   investigation.

19       Q.   And are those inspections important

20   in terms of trying to make sure that anybody who

21   has -- any distributor who has a DEA license is

22   going to be able to comply with all of the

23   controlled substance regulations?

24          MS. CARROLL:  Objection.  Form.

25          The witness may answer.

Page 21

1      A.    Could you repeat the question?  I'm

2  sorry.

3      Q.    Yes.

4            Well, is that pre-registrant

5  inspection an important tool that the DEA uses

6  to make sure that somebody who is going to be

7  distributing controlled substances with a DEA

8  license is going to be able to comply with the

9  applicable DEA controlled substances

10  regulations?

11      A.    That investigation is certainly

12  part of what I'm tasked or a diversion

13  investigator might be tasked to do, certainly.

14      Q.    Now, we didn't talk about this

15  earlier when you were mentioning that, you know,

16  you've been with the DEA for many years.  Have

17  you always been geographically in western

18  Pennsylvania as a DEA agent?

19      A.    A DEA investigator would be the

20  proper -- a diversion investigator.  I have

21  worked I indicated exclusively in the

22  Pittsburgh district office, covering western

23  Pennsylvania is our area of responsibility.

24      Q.    How many pre-registrant inspections

25  have you either performed or at least been

                                              Page 22

1    involved with since you've been with the DEA,

2    just roughly, just a general idea?

3          A.    That would be a difficult question

4    to answer.  These are investigations that I've

5    done throughout the course of my career, but it

6    would be difficult to even give a rough

7    estimate of how many of these I've done.

8          Q.    Well, maybe how about in the last

9    year how many have you done, if you can recall?

10         A.    You know what, I don't know.  Part

11   of this -- part of these investigations involve

12   a gamut of different types of activities.  I

13   think any of those probably would have been for

14   a researcher that was using controlled

15   substances for research purposes.

16         Q.    Do you have a sense of how many

17   distributors of controlled substances are in

18   your geographical area, the western Pennsylvania

19   area?

20         A.    I don't know the exact number.  I'm

21   not sure how many that would be.  I can't

22   answer that accurately.

23         Q.    You're familiar with Giant Eagle?

24         A.    Yes.

25         Q.    And Giant Eagle is a distributor of

Page 23

1   controlled substances?

2        A.    Yes.

3        Q.    And they distribute the controlled

4   substances to their own pharmacies in their

5   grocery stores?

6             MR. MOUGEY:  Objection.

7        A.    That's my understanding.

8        Q.    Meaning that they don't distribute

9   to like other company -- pharmacies owned by

10  other companies, correct?

11       A.    To my knowledge, that's correct.

12  I -- I can't say definitively if they don't,

13  but my understanding is that they sell

14  exclusively to Giant Eagle pharmacies.

15       Q.    Are you familiar with McKesson as a

16  drug distributor?

17       A.    McKesson drug, yes.

18       Q.    Okay.  And they have a distribution

19  facility in New Castle; is that correct?

20       A.    Correct.

21       Q.    Have you inspected their facility in

22  New Castle?

23       A.    I have.

24            MS. CARROLL:  Objection.  This is

25  an objection as to the scope of the testimony.

1      Q.    Mr. Colosimo, has the DEA trained

2   you in terms of trying to make sure you

3   understand all the controlled substances

4   regulations and what they require?  Have you

5   received any training from the DEA with respect

6   to that?

7          A.    I have received training, yes.

8          Q.    And what has that training involved?

9          A.    Well, initially upon hire by DEA, I

10  received training at DEA's academy.  It was

11  considered a basic diversion investigator

12  class, and periodically, throughout the course

13  of my career, I received training from DEA.

14         Q.    Now, after a registrant obtains a

15  DEA license with respect to controlled

16  substances, does that licensing or registrant

17  have to undergo periodic inspections to make

18  sure that they have remained in compliance with

19  the applicable DEA controlled substance

20  regulations?

21         A.    Yes.  These registrants, such as a

22  distributor, would be subject to inspections.

23         Q.    Are they called cyclic

24  investigations, or inspections?  I'm sorry.

25         A.    That's -- that's one phrase that

Page 25

1    has been used.

2         Q.    When you do a pre-registrant

3    inspection, what -- can you tell us what that

4    entails, what that involves, what you look at,

5    and how you conduct the inspection?

6              MS. CARROLL:  Objection.  Form.

7              The witness may answer.

8         A.    Pardon me?

9         Q.    Yes.  I'm just asking you, can you

10   tell the jury what a pre-registrant inspection

11   involves, what do you do as part of that

12   inspection?

13             MS. CARROLL:  Objection.  Form.

14             The witness may answer.

15        A.    Part of that pre-registrant

16   investigation would involve a review of the

17   applicant's security procedures they have in

18   place, any history they may have with the

19   handling of controlled substances or listed

20   chemicals, any proposed recordkeeping that they

21   have in place.  It would require an on-site

22   inspection of the facility and a meeting with

23   certain personnel, you know, that would be

24   employed by the applicant that would be able to

25   address questions regarding security,

Page 26

1   recordkeeping, personnel issues.  That would be

2   a general criteria that we consider.

3        Q.    And how many diversion investigators

4   typically are involved in a pre-registrant

5   inspection?

6        A.    I mean, I could only speak to

7   myself.  I don't know how many typically are

8   involved, but from one to several.

9        Q.    And does -- is a group supervisor

10  typically involved or does a group supervisor

11  have to approve the inspection?

12             MS. CARROLL:  Objection.  Form.

13             The witness may answer.

14       A.    A group supervisor may or may not

15  be involved.  That would be at their

16  discretion.

17       Q.    And if you find that there's

18  anything that is not in compliance with the DEA

19  regulations during a pre-registrant inspection,

20  what do you do about that?

21       A.    What I have done would be to bring

22  that to the attention of the group supervisor

23  for discussion.

24       Q.    Okay.  And then what -- with respect

25  to the registrant or proposed registrant, do you

1   bring that to the registrant's attention, that

2   there's an issue regarding compliance?

3            A.    Well, that would be something that

4   would need to be addressed with the applicant.

5            Q.    And do you withhold the grant of the

6   license until the proposed registrant has, you

7   know, remedied the non-compliance?

8            A.    The decision for that would be the

9   group supervisor's decision whether to approve

10  or to deny the application.

11           Q.    Just if you recall -- I know you've

12  been with the DEA for many years, but has that

13  situation ever arisen where a registrant's

14  application was denied that you were involved

15  with?

16           A.    That has happened on occasion.

17           Q.    Can you identify the -- what you

18  view as sort of the principal sources of

19  diversion that you're on the watch for when

20  you're inspecting registrants?

21           A.    Could you be more specific with

22  that question, please?

23           Q.    Well, maybe I'll just ask it

24  slightly differently.  What, in your view as a

25  DEA inspector, diversion inspector, do you

1   believe are the principal sources of diversion

2   of prescription drugs in your locale?

3          A.    I don't know that I could speak to

4   the principal.  I know the various forms of

5   diversion that occur, which could happen with

6   any registrant, any type of registrant, but I

7   can't quantify the -- what the principal --

8   that would be speculation.

9          Q.    Now, as a DEA diversion inspector,

10  do you also work with other state and federal

11  agencies to try to prevent diversion?

12         A.    Yes.

13         Q.    Do you work with the FBI sometimes?

14         A.    Yes.

15         Q.    Do you work with the Pennsylvania

16  Attorney General's Office sometimes?

17         A.    Yes.

18         Q.    Do you work with the state boards of

19  pharmacy, like the Pennsylvania board?

20         A.    We would coordinate investigations

21  occasionally with the various boards within

22  Pennsylvania.

23         Q.    And do you work with local law

24  enforcement as well?

25         A.    Yes.

1          Q.     Do you know a Rick Shaheen?

2          A.     Yes.

3          Q.     How do you know Mr. Shaheen?

4          A.     I know of Mr. Shaheen through his

5     employment with the Pennsylvania Office of

6     Attorney General as well as his position with

7     Giant Eagle.

8          Q.     How did you come to know him when he

9     was with the Pennsylvania Attorney General's

10    Office?  Did you work on some investigations

11    together?

12         A.     Yes.  My understanding is that

13    Mr. Shaheen was an agent with the Medicaid

14    fraud unit with the Office of Attorney General,

15    and then later was employed there as a

16    supervisor, supervising other agents within

17    that unit.

18         Q.     Okay.  And did you actually work on

19    any drug investigation, you know, drug

20    investigations with Mr. Shaheen when he was with

21    the Office of Attorney General?

22         A.     Yes.

23         Q.     And then you mentioned his position

24    with Giant Eagle.  Did he obtain that position

25    around 2013?  Does that sound right?

Page 30

```
 1              MS. CARROLL:  Objection.  Form.
 2              The witness may answer.
 3       A.    I don't know when he accepted that
 4  position.  I would be guessing.
 5       Q.    Well, when do you first recall
 6  working with him when he was in his new position
 7  with Giant Eagle?
 8       A.    It's been -- I know he's been
 9  employed there for several years.  I can't
10  recall the first time that I worked with him.
11       Q.    And do you know what his position is
12  with Giant Eagle?
13       A.    My understanding, pharmacy
14  investigator.
15       Q.    Would you agree that one of
16  Mr. Shaheen's jobs is to help prevent drug
17  diversion?
18       A.    That's my understanding of part of
19  what his role is with Giant Eagle.
20       Q.    So part of his job is to try to make
21  sure that no drug diversion occurs with respect
22  to Giant Eagle's distribution or pharmacy
23  facilities, right?
24              MS. CARROLL:  Objection.  Form.
25              The witness may answer.
```

Page 31

1          A.    I don't know all of his

2     responsibilities of -- what Giant Eagle has

3     tasked him to do.

4          Q.    In your dealings with Mr. Shaheen

5     have you found him to be a conscientious and

6     competent with respect to trying to prevent drug

7     diversion?

8          A.    I can't -- could you be more

9     specific with that question, please?

10         Q.    Well, let me -- have you worked with

11    Mr. Shaheen in trying to catch any bad guys with

12    respect to drug diversion?

13              MS. CARROLL:  Objection.  Form.

14         Q.    You know, any investigations where

15    maybe, you know, Mr. Shaheen has called you up

16    and said, I think we have a bad script here or

17    something like that, you know, has given you

18    information about a potential issue?

19              MS. CARROLL:  Objection.

20         A.    Yes.  I've worked many times with

21    Mr. Shaheen on those types of scenarios,

22    correct.

23         Q.    And with respect to your dealings

24    with Mr. Shaheen when you guys are both working

25    together to try to prevent diversion, have you

1   found him to be, you know, conscientious, hard

2   working and devoted toward preventing diversion?

3           MS. CARROLL:  Objection.  Form.

4           The witness may answer.

5       A.    From my perspective, Mr. Shaheen

6   has provided cooperation with -- with DEA, with

7   myself personally on the types of diversion

8   investigations that I have -- that I have

9   worked on.  He has offered cooperation.

10      Q.    Would it be fair to say that he's

11  always cooperated with you?

12      A.    I can't recall of any specific

13  cases where he did not cooperate with me at

14  least outwardly, if that's -- that could be a

15  way to put it.  I don't know of any cases where

16  he was not cooperative with me.

17      Q.    And would it be fair to say that

18  sometimes he calls you with sort of some

19  information or a tip with respect to an issue

20  and sometimes you call him asking him for some

21  help with respect to an investigation, the

22  relationship goes both ways?

23          MS. CARROLL:  Objection to form.

24          The witness may answer.

25      A.    I have asked for his cooperation

1   specifically with regard to activity that has

2   occurred at Giant Eagle pharmacies and

3   Mr. Shaheen has provided information, concerns

4   or suspicions regarding diversion to me.

5            Q.    Has he sometimes just called you out

6   of the blue with some information about a

7   potential problem or issue relating to drug

8   diversion?

9            A.    I don't know that I would say out

10  of the blue, but he has called me with

11  information.

12           Q.    And information that you did not

13  previously have?

14           A.    I would say that on occasion that's

15  correct.

16           Q.    Has Mr. Shaheen always been

17  responsive to any requests you've made of him?

18           A.    My understanding is he has been

19  responsive to requests for information for --

20  yes, for information, correct.

21           Q.    Now, does the DEA have a diversion

22  investigator's manual?

23           A.    Yes.

24           Q.    Are you familiar with that manual?

25           A.    I'm somewhat familiar with that.

1      Q.    And does that manual sort of set

2   forth what is supposed to be done with respect

3   to a pre-registrant inspection and a cyclic

4   inspection?

5      A.    My understanding is part of that

6   manual would address some of those issues, yes.

7      Q.    Mr. Colosimo, we're going to be now

8   starting to go through some exhibits, and we

9   sent you -- you should have -- it's actually a

10  binder, which we thought might be easier for us,

11  in terms of going through the exhibits, to put

12  them in a binder.  If you could pull that binder

13  out, I'd appreciate it.  Do you have it handy?

14     A.    I have not opened the boxes yet.  I

15  would probably need a minute or two to open

16  those.

17            MR. LIVINGSTON:  Sure.  We can go

18  off the record for a couple minutes.  How about

19  a five-minute break?  Is that sufficient?

20            THE WITNESS:  Would it be both

21  boxes that I received?

22            MR. LIVINGSTON:  Well, yeah, so the

23  Plaintiffs sent you a box and Giant Eagle sent

24  you a box.  Obviously I'm just going to be

25  asking about my exhibits.  But yeah, you could

Page 35

```
 1   open both boxes, but it's the binder is what
 2   we're going to be going through right now.
 3               THE WITNESS:  Would that be in the
 4   banker's box?
 5               MR. LIVINGSTON:  I think they both
 6   would have been in banker's boxes.  I'm not
 7   sure.
 8               THE WITNESS:  I'll take a few
 9   minutes to open those, if you don't mind.
10               THE VIDEOGRAPHER:  We're off the
11   record.
12                    (Recess had.)
13               THE VIDEOGRAPHER:  We're on the
14   record.
15   BY MR. LIVINGSTON:
16        Q.    Mr. Colosimo, periodically do you
17   get directives from your superiors at DEA about
18   particular things that they want you to focus on
19   when you do an investigation?
20        A.    Yes, periodically.
21        Q.    And just generally, would it be fair
22   to say that there's a number of so-called
23   security regulations that apply to controlled
24   substances that the DEA enforces?
25        A.    Yes.
```

1      Q.    And is one of those security

2   regulations the so-called suspicious order

3   monitoring regulation?

4      A.    Yes.

5      Q.    And just, you know, for ease of

6   reference in the deposition, I may sometimes

7   just refer to that regulation as the SOM

8   regulation.  Is that okay with you?

9      A.    You're talking about the specific

10  CFR cite for that?

11     Q.    Well, yeah.  Isn't it 1374?

12     A.    1301.74(b).

13     Q.    So is it okay if I refer to that as

14  the SOM regulation?

15     A.    Okay.

16              -   -   -   -   -

17              (Thereupon, Defendants' Deposition

18              Exhibit 2, Memorandum to Diversion

19              Program Managers from the Diversion

20              and Regulatory Litigation Section,

21              dated March 1, 2007, with Attached

22              Documents, Beginning Bates Stamp

23              CAH_MDL_PRIORPROD_DEA12_00000609,

24              was marked for purposes of

25              identification.)

Page 37

```
 1                   -   -   -   -   -
 2        Q.    If you go to Exhibit 2 in your
 3   binder, and the page 9 -- and the pages are at
 4   the top.
 5        A.    Okay.
 6        Q.    So you see that I pulled this right
 7   from the DEA website.  This is regulations
 8   beginning on 1301.71 called the Security
 9   Requirements Generally.
10             Do you see that?
11        A.    Yes.
12        Q.    Okay.  And you're familiar with
13   these security requirements, correct?
14        A.    Generally, yes.
15        Q.    And one of the -- these security
16   requirements are one of the things that you
17   check when you do a -- both a pre-registrant
18   inspection and a cyclic investigation?
19             MS. CARROLL:  Object to form.
20        A.    Yes.
21        Q.    In 1301.71(a) it says, "All
22   applicants and registrants shall provide
23   effective controls and procedures to guard
24   against theft and diversion of controlled
25   substances."
```

1          Do you see that?

2     A.    Yes.

3     Q.    So, again, that's really one of the

4  things that your -- one of the overarching goals

5  is to make sure that a pre-registrant is going

6  to be able to -- is going to have effective

7  controls against diversion, correct?

8     A.    That's something that we consider

9  in doing that pre-registrant investigation.

10     Q.    And then it goes on to say, "In

11  order to determine whether a registrant has

12  provided effective controls against diversion,

13  the administrator shall use the security

14  requirements set forth in Sections

15  1301.72-1301.76 as the standards for the

16  physical security controls and operating

17  procedures necessary to prevent diversion."

18          So those are the key security

19  regulations that every proposed registrant must

20  be able to comply with, correct?

21     A.    Yes.

22     Q.    It then goes on to say that there's

23  a number of factors that have to be taken into

24  consideration regarding whether a registrant is

25  meeting or can meet the security requirements,

```
 1   correct?
 2        A.    Yes.
 3        Q.    And it also says that strict
 4   compliance is not required but rather
 5   substantial compliance is what is required with
 6   these security regulations, correct?
 7        A.    That's what it says.
 8        Q.    And that's what you look for,
 9   correct, you look for substantial compliance
10   with these regulations when you do an
11   inspection, correct?
12             MS. CARROLL:  Objection.  Form.
13             The witness may answer.
14        A.    That is what we consider when we do
15   our inspection.
16        Q.    The first factor -- we're not going
17   to go through all these, thankfully, but the
18   first one is the type of activity conducted in
19   processing of bulk chemicals, preparing dosage
20   forms, packaging, labeling, cooperative buying,
21   et cetera.  Would this also take into
22   consideration whether you're a self-distributor
23   like Giant Eagle, where you only distribute to
24   your own stores, or whether you distribute to
25   third-party strangers as well?
```

1              MS. CARROLL:  Objection.  Form.

2              The witness may answer.

3        A.    I don't know if that addresses

4   specifically what you asked.  I look at that

5   and it seems to be the type of activity,

6   whether it's a distributor, manufacturer,

7   repackager, relabeler.

8        Q.    Well, let me ask you this:  Do you

9   take that into consideration when you inspect a

10  distributor, whether they're a self-distributor,

11  like Giant Eagle, or whether they are a

12  distributor, like McKesson, where they

13  distribute to a third party?

14       A.    In my experience, that is something

15  that I consider, yes.

16       Q.    And would you agree that there is --

17  you know, just as a general matter, there would

18  be less risk of diversion if a distributor is

19  only distributing to its own stores as opposed

20  to a situation where they're distributing to

21  anybody who places an order with them?

22       A.    I can't answer that, whether it's

23  less -- less potential for diversion, but that

24  is something that -- that I do personally on an

25  inspection.  That is what I do consider.

1      Q.    Let me ask you this then:  Why do

2  you consider it?  What is the relevance of that

3  fact?

4            MS. CARROLL:  Objection.  Form.

5            The witness may answer.

6      A.    And, again, this is based upon my

7  experience, but we look at as far as a

8  distributor goes, they are to know who their

9  customers are and, as best as they can, the

10  customer of their customers, so that would be

11  something that I would consider.

12      Q.    Right.  And would you agree that if

13  you're only distributing to your own pharmacies,

14  then you obviously know your customers very well

15  because they're your own customers, correct?

16      A.    That would depend upon what -- what

17  that applicant has in place.  I don't know

18  necessarily how well they know their -- their

19  customer.

20      Q.    Well, they would have hired the

21  pharmacist, who is placing the order, correct?

22      A.    I'm not sure that I could speak to

23  who actually hired that -- that pharmacist.

24      Q.    Well, not who individually -- let's

25  talk about Giant Eagle.  Not who individually at

Page 42

1   Giant Eagle hired, you know, the pharmacist at

2   store X, but that Giant Eagle hired its own

3   pharmacist.

4                MS. CARROLL:  Objection.  Form.

5                The witness may answer.

6        A.     In this case, my understanding is

7   that these pharmacies that Giant Eagle would

8   have distributed to are owned or operated by

9   Giant Eagle, so -- and, again, I don't know who

10  actually hired them, but they're -- they're

11  Giant Eagle pharmacies, pharmacists.

12       Q.     So another thing that you look at --

13  number 2, it says, "The type and form of

14  controlled substance handled," so would that

15  include whether they're handling Schedule 2s or

16  Schedule 3s or some other schedule?

17       A.     That particular cite, yeah, that

18  could be the schedule.

19       Q.     And wouldn't -- would you have

20  even -- in terms of like Schedule 2, obviously,

21  would you have more concern about security for

22  Schedule 2 drugs than you would about Schedule 3

23  drugs?

24       A.     Well, in my experience, and my

25  understanding is that the handling of Schedule

1   2 drugs requires a greater amount of actual

2   physical electronic security at that facility.

3        Q.    Because those drugs are more

4   dangerous, correct, there's more of a concern

5   about those drugs, you know, being diverted?

6             MS. CARROLL:  Objection.  Form.

7             The witness may answer.

8        A.    And, again, going back to how DEA

9   has classified a schedule 2 as a drug that has

10  more of the potential for abuse, but any -- all

11  controlled substances by being controlled there

12  is a -- there is a concern that those drugs

13  could be diverted, so we would -- we want to

14  see adequate security, physical security, for

15  any controlled substance.

16       Q.    Just as a general matter, would you

17  agree that the security requirements are less

18  stringent for Schedule 3 through 5 drugs than

19  they are for Schedule 2 drugs?

20       A.    The physical security for that

21  would be more strict for Schedule 2 than it

22  would be for the Schedules 3s, 4s and 5s.

23                  -   -   -   -   -

24             (Thereupon, Defendants' Deposition

25             Exhibit 6, 2013 Diversion Manual

                                                    Page 44

 1                Excerpt, Beginning Bates Stamp

 2                CAH_MDL2804_02145395, was marked

 3                for purposes of identification.)

 4                    -   -   -   -   -

 5       Q.    Would you turn to Exhibit 6, please?

 6   Do you see that this is a -- it's not the whole

 7   manual because I didn't want to kill trees, but

 8   it's at least a portion of the diversion manual

 9   for -- this one is dated 2013.

10                Do you see that?

11       A.    Yes.

12       Q.    Does a new manual come out every

13   year or is it only updated every once in a

14   while?  Is this the most current version?  Can

15   you help us out there?

16                MS. CARROLL:  Objection.  Form.

17                The witness may answer.

18       A.    I don't know.

19       Q.    Do you know which version you are

20   working with today?  If we went to your office

21   and we pulled out a copy of the manual, which

22   one would we see?

23                MS. CARROLL:  Objection.  Form.

24                The witness may answer.

25       A.    I don't know -- I don't know what

Page 45

1    year the current one I'm working with would be,

2    so I can't answer that.

3         Q.    Would you go to page 13 at the top

4    of this manual?  You see the heading here is

5    Cyclic Investigations of Nonpractitioner CSA

6    Registrants?  Do you see that?

7         A.    Yes.

8         Q.    A nonpractitioner would include a

9    distributor of controlled substances?

10        A.    That's my understanding.

11        Q.    And then if you skip down, there's a

12   paragraph beginning, "Full in-depth

13   investigations shall be conducted at least once

14   every three years for nonpractitioners."

15              Is that your understanding, that

16   every -- at least every three years you try to

17   perform a cyclic investigation on all

18   distributors in your area?

19              MS. CARROLL:  Objection.  Form.

20              Witness may answer.

21        A.    I don't know what the current

22   policy is.  In my experience, this -- this rate

23   of inspection has changed over the course of

24   time, so I don't know what the current --

25   current schedule is, whether it's once every

1    three years or longer.

2         Q.    Well, generally, how often did you

3    do cyclic investigations of distributors since

4    you've been with the DEA?  How often do you

5    generally try to do that; once every five years,

6    once every two years, you know, once every

7    three, whatever it might be?

8         A.    I can't recall specifically.  I

9    know it's -- from my memory, it would be once

10   every -- once every few years.  So I can't

11   recall specifically that.  It may depend upon,

12   you know, certain factors.  So I don't know

13   what -- I don't know exactly.

14        Q.    It says, "Emphasis shall be given to

15   inventory/recordkeeping, follow-up verification

16   of customers and orders, security, intelligence

17   collection and case support."

18             Does security include the SOM

19   system that the distributor has?  Is that

20   something that you look at when you do a cyclic

21   investigation?

22        A.    I believe that that SOM that you

23   referred to is in the security part of the

24   investigation.

25        Q.    So that is something that you

1    yourself, when you do a cyclic inspection, look

2    at?

3           A.    Yes.

4           Q.    Could you go to page 130?  Do you

5    see this is the section of the manual that

6    applies to pre-registration investigations?

7           A.    I see that.

8           Q.    And in the middle of that first

9    introductory paragraph it says, "The purpose of

10   the pre-registration investigation is to

11   determine the fitness and suitability of

12   registration investigation" -- I'm sorry, "of

13   the applicant to engage in the activities for

14   which registration is requested."

15              Would you agree with that statement

16   of purpose?  Is that your understanding as well

17   for pre-registration inspections?

18              MS. CARROLL:  Objection.  Form.

19              The witness may answer.

20         A.    That's what it states in the

21   manual.

22         Q.    And that's your understanding as

23   well?

24              MS. CARROLL:  Objection.  Form.

25              Witness may answer.

1          A.     That's my understanding, yes.

2          Q.     At the bottom of that page under the

3    heading Pre-Registration Investigations, it

4    says, "An on-site investigation is required for

5    each applicant."

6                 Do you see that statement?

7          A.     Yes.

8          Q.     Is that true that, in fact, whenever

9    you do a pre-registration inspection, it always

10   includes -- at least a portion of it is on-site?

11         A.     For a distributor pre-registration

12   investigation, it would be in my experience.

13         Q.     And do you try to be -- when you go

14   on-site and you do your inspection, do you try

15   to be as thorough as possible when you do that

16   inspection?

17         A.     Personally, I make sure that I'm

18   thorough, yes.

19         Q.     If you go to the next page, page

20   131, paragraph number 1, it indicates, "All

21   pre-registration investigative reports will

22   include information concerning the specific

23   controlled substances to be handled," and, you

24   know, it goes on to list a number of things.

25   And then it says, "The investigative report

1   should include a description of the security

2   maintained by the applicant, a description of

3   the recordkeeping and any other special

4   requirements planned by the applicant, and a

5   summary of an interview conducted with the

6   researcher's supervisor, verifying the

7   researcher's approval to conduct research."

8   Again, the security -- the reference to a

9   description of the security to be maintained,

10  does that include the suspicious order

11  monitoring system that the registrant plans to

12  use?

13          A.    This particular site here, it looks

14  like it's just addressing researchers to me.

15          Q.    As opposed to a distributor?

16          A.    Yes.

17          Q.    Well, let me just ask you this:

18  When you do a pre-registration inspection, you

19  do always look at the distributor's proposed SOM

20  system to make sure that it complies or will

21  comply with the SOM regulation?

22          A.    We would look at the -- I would

23  want to know if they have a -- if they have a

24  system that they're going to be using to detect

25  suspicious orders.

1      Q.    Do you conduct any kind of inventory

2   check of the proposed registrant's drugs?

3      A.    Well, because it's a pre-registrant

4   investigation, they should not have any

5   controlled substances on hand, so there would

6   not be an inventory check.

7      Q.    Do you explain to the applicant what

8   the inventory requirements are under the

9   Controlled Substances Act?

10      A.    That is what I do on a

11   pre-registrant investigation, yes.

12      Q.    Can we go back to Exhibit 2 for a

13   minute, page 16?  Sorry for moving around so

14   much.  Do you see that this is the specific SOM

15   regulation, Section 1301.74?

16      A.    Yes.

17      Q.    It says, number one, "Before

18   distributing a controlled substance to any

19   person who the registrant does not know to be

20   registered to possess the controlled substance,

21   the registrant shall make a good faith inquiry

22   either with the administration or with the

23   appropriate state controlled substances

24   registration agency, if any, to determine that

25   the person is registered to possess the

1   controlled substance."

2              So getting back to the Giant Eagle

3   situation, Giant Eagle would already have this

4   information readily available as to whether or

5   not its pharmacists and pharmacies have a

6   current DEA controlled substance license,

7   correct?

8        A.    Well, as part of my pre-registrant

9   investigation, I would inform them that it's

10  their obligation to determine if their customer

11  has a valid DEA registration that's not expired

12  and it's a current, valid registration.  So

13  they're -- I tell them that it's their

14  obligation to determine that.

15       Q.    Right.  But that information would

16  be just something that Giant Eagle would already

17  have in its possession; it wouldn't have to make

18  a phone call to somebody because it already has

19  that in its own records, correct?

20              MS. CARROLL:  Objection.  Form.

21  Asked and answered.

22              The witness may answer.

23       A.    I don't know exactly what

24  information they would have in their system to

25  determine that.

1       Q.    Well, you would hope that they would

2  have -- as part of any good recordkeeping, a

3  corporation should keep track of all of its

4  active DEA licenses, correct?

5       A.    That's what their responsibility

6  is, is to not sell to any customer that does

7  not have a valid DEA registration.

8       Q.    So subparagraph B in the SOM

9  regulation says, "The registrant shall design

10 and operate a system to disclose to the

11 registrant suspicious orders of controlled

12 substances.  The registrant shall inform the

13 field division office of the administration in

14 his area of suspicious orders when discovered by

15 the registrant.  Suspicious orders include

16 orders of unusual size, orders deviating

17 substantially from a normal pattern, and orders

18 of unusual frequency."

19            That's the SOM regulation, correct,

20 or at least a key part of the SOM regulation,

21 correct?

22      A.    Yes.

23            MS. CARROLL:  Objection to form.

24      Q.    And would it be fair to say that the

25 DEA does not further define what they mean by

Page 53

1    unusual size or orders deviating substantially

2    from a normal pattern and orders of unusual

3    frequency?

4         A.    My understanding is that that's the

5    obligation of the -- of the registrant to

6    define those factors.

7         Q.    Right.  In other words, you don't --

8    the DEA doesn't endeavor to try to define those

9    terms?

10        A.    I don't know if DEA has defined

11   those terms.  My understanding, again, as I

12   mentioned, is that the obligation is on that

13   registrant to determine -- determine those.

14        Q.    Now, in paragraph C it says, "The

15   registrant must notify the field division office

16   of the administration in his or her area in

17   writing of any theft or significant loss of any

18   controlled substances within one business day of

19   discovery of the theft or loss."

20             When it says "field division office

21   of the administration," would that be like

22   somebody like yourself?  Would you receive

23   these sorts of reports if there's been a theft?

24             MS. CARROLL:  Objection.  Form.

25             The witness may answer.

Page 54

1          A.     Well, my understanding, and this is

2     what I've, in my experience, tried to

3     communicate to the registrants, is that they're

4     obligated to notify the Pittsburgh district

5     office.  Now, the field division office, our

6     field division office is in Philadelphia,

7     Pittsburgh is a division of that, but

8     personally I've instructed registrants to

9     notify the Pittsburgh district office, so we

10    are aware of that, there's no time lag from the

11    time that the theft occurs to when we're

12    notified.

13         Q.     And is there some sort of like

14    standard for, you know, how much theft, you

15    know, raises alarm bells versus a theft that's

16    considered pretty minor and doesn't raise any

17    alarm bells?

18         A.     My understanding is -- of that

19    particular regulation is it's any theft.

20    Whether you think it's minor or insignificant,

21    it's any theft, but it's up to the registrant

22    to determine what they think is a significant

23    loss, but it's any -- any theft.

24         Q.     And would it be fair to say, though,

25    that almost any registrant eventually may have

1  some minor theft that they end up reporting?

2           MS. CARROLL:  Objection.  Form.

3       Q.   Or unaccounted for, you know, loss

4  of inventory?

5       A.   I'm sorry.  I --

6           MS. CARROLL:  Same objection.

7       Q.   Would it be fair to say that almost

8  every registrant eventually over time ends up

9  reporting occasionally unaccounted for loss of

10  inventory?

11           MS. CARROLL:  Objection to form.

12           The witness may answer.

13       A.   I don't know the answer to that.  I

14  can't quantify whether it's every registrant or

15  a certain percentage that you're expected to

16  have thefts or losses.

17       Q.   Do you inspect Giant Eagle's

18  pharmacies or do you only inspect Giant Eagle's

19  distribution facilities?

20       A.   I have personally -- I'm not sure

21  if the proper term would be inspect, but I've

22  gotten the consent through a notice of

23  inspection to review records at Giant Eagle

24  pharmacies.  I have done that throughout the

25  course of my career.

Page 56

1          Q.    I'm sorry.  Can you repeat?  I

2    didn't follow that.  You said you've gotten

3    requests to review records at Giant Eagle

4    pharmacies?

5          A.    If I could give an example --

6          Q.    Yes, please.

7          A.    -- that would clarify.  If -- for

8    example, if we have information that a certain

9    pharmacy has filled prescriptions that we want

10   to look at the actual prescription, I would go

11   to the pharmacy, receive written consent of

12   that pharmacist to review records.  Now, I

13   don't necessarily characterize that as an

14   inspection of everything that's going on there,

15   but it would be an inspection of what I'm

16   focusing on for that particular visit.  So

17   it's -- it's a DEA notice of inspection that

18   I'm reviewing with that pharmacist in charge,

19   but that -- it wouldn't necessarily be a

20   full-scale inspection.  It could just be a

21   review of a limited part of what -- what I need

22   to know.

23         Q.    Right.  So if you're investigating

24   somebody maybe who's like getting forged scripts

25   filled, you might, you know, want to inspect

Page 57

1  those scripts and that's when you would make

2  this request of a pharmacy?

3      A.    Yes.

4      Q.    Have you ever been in a situation

5  where a -- as part of an investigation, cyclic

6  investigation, you found that the registrant was

7  not complying with the security regulations and

8  you ended up pursuing some sort of enforcement

9  action or anything along those lines?

10              MS. CARROLL:  Objection.  Form.

11              The witness may answer.

12      A.    What specific type of registrant

13  are you asking about?

14      Q.    Let's talk about -- we're focusing

15  on distributors right now.

16      A.    I can't recall specifically.  I

17  would be speculating about what type of

18  enforcement action.  And I wouldn't

19  characterize it as an enforcement action.  It

20  could be an administrative action.  But I can't

21  recall specifically that that happened in a

22  scheduled investigation or cyclic investigation

23  that I was part of with a distributor.  I may

24  have, but I can't recall specifically.

25      Q.    Why don't we go to Exhibit 6, page

Page 58

1   137.  Do you see under paragraph D it says,

2   "Denial of DEA Form 225 Application"?  What is a

3   DEA Form 225 Application?

4        A.    That's an application that would be

5   used by a number of different types of

6   registrants, including -- or applicants,

7   including a -- someone seeking registration as

8   a distributor.

9        Q.    Okay.  And it says, "The denial of

10  any application for registration must be

11  pursuant to an order to show cause proceeding."

12        Have you ever been involved in that

13  where there's been a denial of an application,

14  of a Form 225 application?

15        A.    I don't know.  I don't know.  I may

16  have been party to that investigation, but I

17  don't recall being the lead investigator on

18  such an application.

19        Q.    And under that same paragraph, if

20  you go to the next page, page 138, under number

21  3, it says, "Revocation, denial, or surrender of

22  registration where there was suspected reason to

23  cause a registration to be revoked or

24  surrendered or to cause denial of registration,

25  an investigation is required to document the

1   circumstances."

2            Have you ever been involved in any

3   situation like that, where there's a

4   revocation, denial or surrender of registration

5   and, as a result, you've done an investigation,

6   a further investigation?

7            MS. CARROLL:  Objection.  Form.

8            Witness may answer.

9       A.    Again, this would be what --

10  similar to what I answered just a moment ago,

11  was that I may have been party to such an

12  investigation, but I don't recall being the

13  primary investigator on -- specifically with

14  regard to a distributor, revocation, denial or

15  surrender for controlled substances.

16      Q.    Number 4, it says, "Failure to

17  maintain adequate controls against theft and

18  diversion."  And is it your understanding that

19  can be one of the reasons for the DEA seeking to

20  revoke, deny or cause the surrender of a

21  registrant's license?

22      A.    My understanding is that is

23  something that we would consider, yes.

24      Q.    If you do uncover any shortcomings

25  in a security system used by a distributor when

Page 60

1    you're inspecting them, do you have a discussion

2    with management about that?  Is that something

3    that you would discuss with them?

4              MS. CARROLL:  Objection.  Form.

5              Witness may answer.

6         A.    Whether it's a pre-registrant or a

7    scheduled investigation, that is something that

8    we would -- that I would want to discuss with

9    management.

10         Q.    Would you go to page 162 of Exhibit

11   6?  There's a heading there, Discussion with

12   Management.  "At the discretion of the group

13   supervisor, the investigators should discuss

14   their findings with him/her prior to discussing

15   the alleged violations with the firm's

16   management.  Significant recordkeeping

17   discrepancies should be supported with

18   documentation."

19              And then number 2, it says, "The

20   firm should be informed of what courses of

21   action against it are possible but not the

22   specific action the investigators intend to

23   recommend."

24              Do you see that?

25         A.    Yes.

1        Q.    So that's the kind of management

2   discussion that you were referring to?

3        A.     Discussion with DEA management,

4   then continuing with management of the -- of

5   the applicant or the registrant.  And, again, I

6   don't know -- you're referring to this manual.

7   I don't know -- I'm not sure what version or if

8   this is in the current DEA manual.  I don't

9   know.  I'm not certain what version this is

10  that's on the screen.

11       Q.    All right.  So number 3 says, "The

12  investigators should suggest changes that could

13  be made in the firm's operation for the purpose

14  of achieving compliance."

15            Is that something that you've done,

16  you know, over the years, from time to time

17  you've made recommendations to registrants?

18            MS. CARROLL:  Objection.  Form.

19            The witness may answer.

20       A.    I have made those suggestions, yes.

21       Q.    And number 6, it says, "The

22  discussion with management should either

23  reinforce the investigators' findings by the

24  firm's acceptance of the cited violations and

25  willingness to correct them or challenge the

Page 62

1   investigators' findings by non-acceptance of the
2   violations pointed out."
3              Is that your understanding as well,
4   that you have -- when you have that discussion,
5   either the management will accept those
6   findings or they may sometimes challenge those
7   findings and you have to deal with that
8   situation if they challenge them?
9              MS. CARROLL:  Objection.  Form.
10             The witness may answer.
11        A.   That has happened from time to time
12   on investigations.
13        Q.   Then it says -- if they're going to
14   challenge it, then it says, "The investigators
15   should attempt to understand the firm's opinions
16   and reasons for them.  If the firm's position is
17   reasonable, the investigators should verify the
18   information and take appropriate action.
19   Investigators must control the direction and
20   tone of this discussion.  At no time should it
21   be allowed to degenerate into an uncontrollable
22   argument."
23             Is that how you've tried to -- you
24   know, to do your -- or have your discussions,
25   which is you try to hear out the registrant and

Page 63

1   then -- but, you know, keep it civil and

2   professional at all times?

3            MS. CARROLL:  Objection.  Form.

4            Witness may answer.

5       A.   I attempt to be professional in any

6   part of my investigations with registrants or

7   even non-registrants.

8       Q.   I'd like to now just focus on Giant

9   Eagle inspections.  Can you just summarize what

10  inspections you've been involved with with

11  respect to Giant Eagle?

12      A.   My recall is I was involved with at

13  least one inspection of HBC in Washington with

14  regard to their handling of scheduled listed

15  chemicals.  That would be their sale of

16  over-the-counter products containing

17  pseudoephedrine or ephedrine.

18           I was involved with a

19  pre-registrant investigation of HBC several

20  years ago when they requested authorization to

21  handle Schedules 3, 4 and 5 controlled

22  substances at their facility in Washington,

23  Pennsylvania.

24           I was involved with a

25  pre-registrant investigation of Giant Eagle Rx

1  Distribution Center in Freedom, Pennsylvania --
2  this was four or five years ago -- when they
3  sought to handle or distribute Schedules 2
4  through 5 controlled substances.
5       Q.    Any other investigations or
6  inspections of Giant Eagle?
7       A.    I think I mentioned earlier that my
8  inspections -- my visits, discussions with
9  pharmacists at the various Giant Eagle
10  pharmacies, if that's --
11      Q.    I was just referring to the
12  distribution facilities.
13      A.    Yeah, that would be on-site
14  inspection, and there may have been -- I don't
15  know that it entailed an on-site inspection,
16  but there was discussion with Giant Eagle
17  regarding certain reporting of the sale of
18  Schedule 2 controlled substances through ARCOS,
19  but I don't -- I don't recall if that entailed
20  an on-site visit.
21      Q.    When was that?
22      A.    I don't recall specifically when
23  that was.
24      Q.    So I think you mentioned you did at
25  least one inspection with respect to listed one

Page 65

1   chemicals when Giant Eagle -- with respect --

2   when Giant Eagle was -- well, why don't you

3   explain to the jury what a Schedule 1 chemical

4   is and why Giant Eagle needed to be inspected

5   for those chemicals.

6        A.    My understanding is Giant Eagle

7   operated HBC, which was a facility, a warehouse

8   in Washington, Pennsylvania.  They were selling

9   what could be described as scheduled, listed

10  chemicals.  That would be the drugs

11  pseudoephedrine and ephedrine in

12  over-the-counter form, for example, Sudafed.

13  In order to sell that product to a customer,

14  HBC had to have a registration with DEA to

15  distribute that -- those particular products to

16  their stores.

17       Q.    And was it just one inspection that

18  you did or was it more than one with respect to

19  Schedule 1 chemicals?

20       A.    You're describing Schedule 1

21  chemicals, that -- it may -- it may be a List 1

22  chemical, but it's an over-the-counter product

23  containing those drugs.  I don't know -- I know

24  I was involved with one.  There may have been

25  more, but I can't recall specifically more than

1    one.

2         Q.    And do the same regulations that

3    we've been talking about, the security

4    regulations, including the SOM regulation, apply

5    to somebody who has a -- a distributor who has a

6    DEA license for List 1 chemicals?

7         A.    I don't think -- my understanding

8    is that the security is different for someone

9    who's handling Schedules 2 through 5 controlled

10   substances as opposed to List 1 chemicals.

11        Q.    Was the inspection that you did of

12   Giant Eagle's HBC facility with respect --

13   relating to listed -- list 1 chemicals, did you

14   find any violations or did you find that they

15   were in compliance?

16             MS. CARROLL:  Objection.  Form.

17             Witness may answer.

18        A.    My recollection is that there were

19   no administrative sanctions, which would

20   include something like a -- along the lines of

21   a letter of admonition.  I don't recall that

22   that ever happened on my inspection.

23        Q.    Does it mean that Giant Eagle was in

24   compliance with all of the regulations that

25   apply to somebody who distributes list 1

Page 67

1   chemicals?

2          A.     For that specific investigation, I

3   know there was no formal administrative

4   sanction, but I don't recall specifically if

5   there were any -- any concerns or issues with

6   their compliance that may have been addressed

7   short of a formal administrative section.

8                    -   -   -   -   -

9                  (Thereupon, Defendants' Deposition

10                 Exhibit 19, Report of Investigation

11                 dated October 26, 2009, Beginning

12                 Bates Stamp DEA-T1BCC-00001833, was

13                 marked for purposes of

14                 identification.)

15                   -   -   -   -   -

16         Q.     Can you please turn to Exhibit 19,

17  page 1?  You see this is a report of

18  investigation and it says it's by yourself?  Do

19  you recognize this exhibit?

20         A.     I do, yes.

21         Q.     Is this a report that you prepared?

22         A.     It appears to be, yes.

23         Q.     At the bottom it says signature of

24  agent and your name is indicated there dated

25  11-4-2009.  Is that your signature?

Page 68

1     A.    Yeah, it looks like it was
2  electronically signed.
3     Q.    And then it says approved by Kurt G.
4  Dittmer, group supervisor.  Was Mr. Dittmer your
5  group supervisor at the time?
6     A.    Yes.
7     Q.    And he did, in fact, approve this
8  report?
9     A.    Yes.
10     Q.    And this report is with respect to
11  Giant Eagle's request for a DEA license to
12  distribute Schedule 3 through 5 controlled
13  substances, correct?
14     A.    Yes.
15     Q.    Your understanding was HBC was Giant
16  Eagle's warehouse where they were going to --
17  out of which they were going to distribute drugs
18  to their own pharmacies, and it was located in
19  Washington, Pennsylvania?
20     A.    Yes.
21     Q.    And then at the very bottom of the
22  first page, it says, "Carlson informed DI
23  Colosimo that HBC Service Company will
24  distribute Schedule 3-5 controlled substances to
25  over 200 Giant Eagle pharmacies in Pennsylvania,

1   West Virginia, Maryland and Ohio."

2              That's always been your

3   understanding ever since you've dealt with

4   Giant Eagle, that they've always distributed

5   controlled substances only to their own

6   pharmacies, correct?

7       A.    Whether they did or not, I can't

8   say, but that -- you're correct, that's my

9   understanding, that they were only selling to

10  Giant Eagle pharmacies.

11      Q.    Yeah, I wasn't suggesting that you

12  were, you know, literally, you know, at the

13  facility 24/7 making sure that every order went

14  to a Giant Eagle pharmacy, but just that your

15  understanding from Giant Eagle officials who are

16  certainly under obligation to be truthful with

17  you at all times was that they only distributed

18  controlled substances to their own pharmacies?

19      A.    Yes.

20      Q.    And why did you note that

21  information here on this report?

22      A.    Personally, that would be part of

23  my pre-registrant investigation, to identify

24  the potential customers of the applicant.

25      Q.    At the very bottom of the page it

1    says, "He," referring to Carlson, "indicated

2    these pharmacies will continue to receive

3    Schedule 2 controlled substances from their

4    current supplier, McKesson Corporation."

5              Was that your understanding when

6    you did this investigation, that all controlled

7    2 substances dispensed by Giant Eagle

8    pharmacies were going to be supplied by the

9    McKesson company?

10        A.    That's what I wrote in the report

11   and that's my recollection, yes.

12        Q.    And to the extent that McKesson --

13   and McKesson would have been supplying Giant

14   Eagle's facilities out of its New Castle

15   distribution center, correct?

16        A.    Yeah.  And, again, my understanding

17   is that McKesson has a number of warehouses

18   throughout the country, but New Castle -- my

19   understanding is that they would have been one

20   of those warehouses.

21        Q.    And you would have also inspected or

22   somebody from your office would have inspected

23   McKesson's New Castle facility?

24              MS. CARROLL:  Objection.  Scope.

25              The witness is directed not to

Page 71

1   answer.

2          MR. LIVINGSTON:  Well, I think that

3   this is related to the -- to Giant Eagle's --

4   whether Giant Eagle was complying with the

5   security regulations because they were being

6   supplied by McKesson, and it's noted in his

7   report.

8          MS. CARROLL:  I'm looking at item 3

9   on the Touhy letter.  It specifies the

10  inspections of Giant Eagle distribution

11  facilities.

12         MR. LIVINGSTON:  Right, and that's

13  what we're looking at, and there's a reference

14  to McKesson, so I think I can try to explore

15  why the word "McKesson" appears in this report.

16         MS. CARROLL:  I think you've

17  explained that, but your question goes to

18  additional inspections not done by Mr. Colosimo

19  and not summarized in this report of a

20  non-Giant Eagle facility.

21      Q.    Would you skip down to the middle of

22  the page?  It says, "Subject Firm's Background."

23  And in the middle paragraph it says, "HBC

24  Service Company, hereinafter referred to as HBC,

25  was approved as a distributor of List 1

Page 72

1   chemicals on August 27, 1997, and was assigned

2   DEA registration number" -- I won't read the

3   number.  "The subject firm was the subject of

4   in-depth cyclic investigations 2002, 2004 and

5   2008."

6            Which one of those investigations

7   did you perform?

8        A.    I don't know.

9        Q.    And then it says, "No violations

10  were uncovered during these investigations --

11  "during these in-depth investigations."  Do you

12  stand by that statement?  Is that a true

13  statement?

14       A.    My understanding, no formal

15  violations where there would have been any

16  administrative action was taken.

17       Q.    Well, it doesn't say no -- it just

18  says, "No violations were uncovered."  Are you

19  suggesting that there were violations that were

20  found but nobody did anything about them?

21       A.    I don't want to -- I'm not

22  suggesting that.  I'm just saying that there

23  may have been issues that were discussed but

24  there's no -- they were not cited for violating

25  any -- any regulations.

Page 73

1       Q.    I mean, when you wrote this report,

2    it was your understanding that the prior

3    investigations of Giant Eagle had revealed that

4    they were in compliance with all applicable DEA

5    security regulations?

6                MS. CARROLL:  Objection.

7                The witness may answer.

8       A.    As far as those investigations

9    would go, that there were no violations that

10   were uncovered during those investigations.

11      Q.    Okay.  Now, under Recordkeeping it

12   says that you provided Mr. Carlson with a

13   current copy of 21 CFR 1300 to end and then you

14   said -- it goes on to say that you also provided

15   Carlson and Zelaski with a one-page document,

16   see attachment, which listed CFR references for

17   the following topics particularly relevant to

18   drug distributors, and one of the things that's

19   listed there is reporting suspicious orders.

20   That's the SOM regulation, correct?

21      A.    Yes.

22      Q.    And so one of the things that you

23   were looking closely at during this

24   investigation was whether Giant Eagle was going

25   to be able to comply with the SOM regulation

Page 74

 1   when they opened for business?

 2              MS. CARROLL:  Objection.  Form.

 3              Witness may answer.

 4        A.    Ask the question again.  I'm sorry.

 5        Q.    Yes.  So one of the things that you

 6   were looking closely at was whether Giant Eagle

 7   was going to be able to comply with the SOM

 8   regulation when it opened for business?

 9        A.    Well, since they had not handled

10   controlled substances at that point, I don't

11   know that they were able to comply, but I was

12   notifying them of the specific CFR requirement

13   to design and operate the suspicious order

14   system.

15        Q.    If you go to the next page, at the

16   very top, page 3, it says, "DI Colosimo reviewed

17   each of these items with Carlson, Zelaski,

18   Fleming, and Beiter" from Giant Eagle.  So you,

19   in fact, had a discussion with them about, among

20   other things, the SOM regulation, correct?

21        A.    Yes.

22        Q.    And then if you go down to the

23   middle of the page, there's a paragraph that

24   says, "According to Carlson, HBC will store all

25   original purchase and sales information at their

Page 75

1   corporate headquarters."

2           Was that your understanding, that

3   there would be some oversight of the HBC

4   operation from the corporate headquarters for

5   Giant Eagle in Pittsburgh?

6       A.    That particular statement there I

7   think was specifically regarding central

8   recordkeeping, that any -- you know, the hard

9   copy files, which could be voluminous, were

10  going to be stored at their corporate

11  headquarters.

12      Q.    Right.  But these records would give

13  officials at the corporate office information

14  regarding what HBC was buying and what HBC was

15  selling and distributing to Giant Eagle stores,

16  correct?

17      A.    Those records would be at those

18  headquarters, corporate headquarters, but I

19  don't recall what specific oversight corporate

20  headquarters had.

21      Q.    Was it your understanding that HBC

22  was only -- with respect to opioids, opioid-type

23  drugs, that HBC was only going to be

24  distributing to its own -- to Giant Eagle's own

25  pharmacies hydrocodone combination products?

Page 76

1          A.     Well, at the time that that was --
2    the application was submitted, hydrocodone
3    would have been, in my understanding, in
4    Schedule 3, so any -- any controlled substances
5    in Schedules 3, 4 and 5, they had the potential
6    or the authorization to distribute, including
7    hydrocodone.
8          Q.     Which is an opioid, correct?
9          A.     Yes.
10         Q.     Could you go to page 4?  The third
11   paragraph from the bottom, towards the end of
12   that paragraph, says, "According to Zelaski, the
13   firm has not had any break-ins since they were
14   registered by DEA in 1997 to handle List 1
15   chemicals."
16              Why did you decide to include that
17   information?  Was that because it sort of gave
18   you some comfort that they did not have a lot
19   of theft issues?
20         A.     Personally, that's something that I
21   would consider, looking at the adequacy of
22   their physical security, their history of, in
23   this case, handling List 1 chemicals.  I would
24   want to know -- that's part of the criteria
25   that's used to review physical security.

Page 77

1          Q.    At the very bottom, the last

2     sentence on this page, it says -- it's referring

3     to Zelaski.  "He stated that the firm has a

4     'zero tolerance' policy with respect to employee

5     pilferage, which means that an employee caught

6     stealing merchandise is immediately terminated

7     from employment."

8               Did you consider this policy to be

9     a good policy in terms of helping prevent

10    and/or minimize diversion?

11         A.    And, again, that's something that

12    personally, in my experience, that I consider,

13    you know, with employees that have access to

14    controlled substances, that if they're dealing

15    with those employees that are caught, that

16    that's -- that's something that would be --

17    that I would consider with -- as part of their

18    physical security, personnel security.

19         Q.    Right.  But you would rather see

20    this kind of policy, which is zero tolerance, as

21    opposed to a policy that said that, you know,

22    with respect to pilferage, we give, you know, an

23    employee three strikes before they're out,

24    right?  I mean, isn't this a more serious

25    repercussion for any employee who might be

Page 78

1  tempted to steal controlled substances from the

2  HBC warehouse?

3          MS. CARROLL:  Objection.  Form.

4          The witness may answer.

5      A.    That would be a more serious

6  policy.

7      Q.    If you go to the next page, 5, at

8  the top, at the very end of that paragraph it

9  says, "All elements of this cage meet the

10  requirements specified in 21 CFR 1301.72(b)(4)."

11  Is that correct that, in fact, Giant Eagle's

12  proposed steel cage for the storing of Schedule

13  3 through 5 drugs met all of the applicable

14  controlled substance regulations?

15      A.    That was my understanding.

16      Q.    And then if you skip down to the

17  second paragraph on the bottom, "All HBC team

18  members with access to the cage or those

19  involved in handling the controlled substances

20  will undergo the required background checks

21  associated to the following DEA regulations in

22  21 CFR part 1300."

23          So is that a requirement that if

24  anyone is going to have access to controlled

25  substances, that they have to have a background

1   check that meets the DEA requirements?

2          A.    I can't recall specifically those

3   CFR cites there, but my understanding is that

4   there are certain requirements with respect to

5   felony arrests, convictions, which I think are

6   addressed in those, at least one of those --

7   those CFR citations.

8          Q.    Would you go to page 7 of Exhibit

9   19?  And then there's a heading for Selection.

10  "All selection will be performed using Vocollect

11  directed activity.  The Vocollect system will

12  direct users via headset to the location and

13  quantity of each item to select."

14             Do you recall learning about Giant

15  Eagle's Vocollect system when you went out to

16  inspect the HBC facility in 2009?

17         A.    I recall some discussion of that.

18  I can't recall the specifics on that Vocollect

19  system.

20         Q.    Doesn't the Vocollect system

21  essentially give Giant Eagle a constant

22  real-time understanding of its inventory, so as

23  soon as an item is selected, that's

24  automatically electronically picked up and so

25  Giant Eagle knows at all times what it has in

```
 1   inventory with respect to all products,

 2   including its controlled substances?

 3              MS. CARROLL:  Objection.  Form.

 4              The witness may answer.

 5        A.    That was a long question.  My

 6   understanding is that it had some interface

 7   with their computer, but I can't recall

 8   specifically the -- how that all worked, but

 9   that there was a connection with their --

10   whatever computer the Giant Eagle would have to

11   record their activity.

12        Q.    So it says that the -- "As the

13   selector is picking, they will scan the NDC bar

14   code of the item to ensure that the exact item

15   is being selected.  This will be repeated for

16   all items until all total units are selected.

17   (These tasks are completed one customer at a

18   time.)"  So that for each pharmacy, using the --

19   when the picker is using the Vocollect system,

20   Giant Eagle is getting a constant readout of

21   what has been selected and what has been put in

22   the tote for delivery, correct?

23              MS. CARROLL:  Objection.  Form.

24              The witness may answer.

25        A.    And, again, it looks -- yeah, there
```

Page 81

1    appears to be some monitoring of the Vocollect

2    activity by the computer.

3         Q.    Wasn't the Vocollect system back in

4    2009 sort of a state-of-the-art inventory

5    control system?

6              MS. CARROLL:  Objection.  Form.

7              Witness may answer.

8         A.    I can't recall specifically.

9         Q.    Well, can you recall anybody else

10   who you inspected who had a Vocollect system?

11             MS. CARROLL:  Objection.  Scope.

12             The witness is directed not to

13   answer.

14             MR. LIVINGSTON:  Well, counsel, he

15   specifically mentions the Vocollect system.  I

16   can explore why mentioning the Vocollect system

17   might be of some importance.

18             MS. CARROLL:  I agree.  Just don't

19   ask him about other inspections that he's done.

20             MR. LIVINGSTON:  I'm not asking

21   about specific other inspections, just whether,

22   you know, based on -- you know, just as a

23   general matter whether he's aware of anyone

24   else who had the Vocollect system.

25             MS. CARROLL:  Your question

1    previously went to inspections.  If the

2    question is now is he aware of other

3    registrants who use such a system, then I think

4    that's within the scope.  He may answer that

5    question if you want to ask that question.

6         Q.    Are you aware of any other

7    registrant who either at the time or since has

8    installed a Vocollect system for inventory

9    control with respect to controlled substances?

10        A.    I can't recall if any other

11   registrants have that system.  I don't know.

12        Q.    Would you go to the next page, 8, of

13   Exhibit 19?  And there's a heading for Inventory

14   Controls.  It says, "In addition to the

15   self-scan audit during selection," which I

16   presume was referring to the Vocollect system,

17   "HBC will perform random audits of at least 10

18   percent of the total tasks being completed.

19   After all selection is completed, HBC will cycle

20   count all controlled substances daily as the

21   business is run."

22              What does the DEA require with

23   respect to how often controlled substances must

24   be counted?

25        A.    My understanding is that DEA

Page 83

1    requires an initial inventory be taken that

2    would be upon the registrant's first handling

3    of controlled substances, then thereafter every

4    two years a physical inventory is required to

5    be completed.  That's what I -- that's what

6    DEA, my understanding, refers to as a biennial

7    inventory.

8         Q.    Okay.  So once a registrant is up

9    and running, every two years they have to

10   count -- here it says that HBC is going to count

11   controlled substances daily.  You would agree

12   that that's -- more than meets the minimal DEA

13   requirement for inventory?

14        A.    Yes, with respect to the physical

15   inventory.

16        Q.    And then if you go to the very

17   bottom, it talks about if there's any

18   discrepancies -- and after they do an

19   investigation -- "if discrepancies remain, the

20   HBC pharmacy merchandising team will be notified

21   and cycle count adjustments will be made.  The

22   pharmacy merchandising group will notify all

23   customers to search for any discrepancy with

24   their inbound order."

25                And you understood that the

Page 84

1   pharmacy merchandising group, that was at

2   corporate headquarters, correct?

3        A.    I believe that was my

4   understanding.

5        Q.    And so this is -- so this is telling

6   the reader that Giant Eagle's corporate office

7   was going to be watching the inventory of

8   controlled substances at HBC's facility?

9             MS. CARROLL:  Objection.  Form.

10            The witness may answer.

11       A.    Yeah.  My understanding is that

12  there would be oversight from their corporate,

13  which would include the pharmacy merchandising

14  team.

15       Q.    Would you go to page 9 of this

16  report?  It says, second paragraph, "As per 21

17  CFR 1301.74, the firm is responsible for

18  selecting a common or contract carrier which

19  provides adequate security to guard against in

20  transit losses."  And then at the very bottom of

21  that paragraph it says, "As noted below, the

22  firm appears to comply with this cite."

23            So this -- again, you also found

24  that they -- that HBC was going to be

25  complying, based on what you were being told,

Page 85

1   with 21 CFR 1301.74, correct?

2          A.    Based upon my investigation, I

3   stand by that the firm appears to comply with

4   that cite.

5          Q.    And the common carrier that was

6   selected is Prestige Delivery Systems, and you

7   actually went out to their -- visited their

8   facility to ensure that they would -- that they

9   complied with the regulation, correct?

10         A.    Yes.

11         Q.    And then if you go to page 11, at

12  the bottom it says, "On October 26, 2009, DI

13  Colosimo tested all aspects of the firm's

14  electronic security.  The security was

15  operational and deemed adequate."  So, you know,

16  with respect to electronic security, you gave

17  HBC a passing grade, correct?

18         A.    Yeah, it was operational and

19  adequate.

20         Q.    Now, when you do these

21  pre-registrant inspections, you know that a

22  number of folks are going to be relying on your

23  findings, correct?

24         A.    What do you mean by that?

25         Q.    Well, for example, I assume that you

1    have to report your findings to your group

2    supervisor, correct?

3         A.    Yes.

4         Q.    And he or she is going to rely on

5    the findings that you provide him or her,

6    correct?

7         A.    That's my understanding.

8         Q.    And, in addition, you're going to

9    report those findings to the registrant

10   applicant, correct?

11        A.    What do you mean by that?

12        Q.    Again, if you thought that there was

13   an issue or there was a problem with compliance,

14   you would want to let the registrant know so

15   that hopefully they can correct the problem,

16   correct?

17        A.    Yes, that would be part of it.

18        Q.    So -- and wouldn't it be -- wouldn't

19   you agree that it would be reasonable for the --

20   if you do your investigation and you have a

21   meeting with management and you say from

22   everything I've seen, you meet all of the

23   requirements, you're good to go, they should be

24   able to rely on what you're telling them, right,

25   that their systems, their security systems that

Page 87

1   they have in place are at least adequate, if not

2   more than adequate, under the DEA regulations?

3               MS. CARROLL:   Objection.   Form.

4               The witness may answer.

5       A.     I mean, insofar as what I'm able to

6   determine on that pre-registrant investigation,

7   I would agree with that.

8                     -   -   -   -   -

9               (Thereupon, Defendants' Deposition

10              Exhibit 20, Report of Investigation

11              dated January 11, 2016, Beginning

12              Bates Stamp DEA-T1BCC-00001846, was

13              marked for purposes of

14              identification.)

15                    -   -   -   -   -

16      Q.     Would you turn to Exhibit 20, page

17   1?  You see this is another report of

18   investigation by yourself, and it says, "Other

19   officers:  Kurt Dittmer, RPS Patricia Robison,"

20   and "Kayla" -- I'm probably going to butcher the

21   name -- "Solonichne."  Can you tell us what this

22   investigation -- which investigation this was

23   that you were involved in?

24      A.     This was a pre-registrant

25   investigation of the Giant Eagle Rx

Page 88

1   Distribution Center that proposed -- that

2   applied to open a distributor of Schedules 2

3   through 5 controlled substances in Freedom,

4   Pennsylvania.

5         Q.    Was it your understanding that this

6   was a -- going to be a new warehouse for Giant

7   Eagle that was going to also distribute Schedule

8   2 controlled substances to Giant Eagle's own

9   pharmacies?

10        A.    Yes, Schedules 2 through 5.

11        Q.    Were you involved in any cyclic

12  investigations that the DEA performed on HBC

13  between 2009, when you did the pre-registrant

14  inspection, and the time of this investigation

15  of the proposed GERx facility in 2015?

16        A.    I don't recall being involved with

17  any of those scheduled or cyclic

18  investigations.

19        Q.    When you do a -- an investigation

20  like -- where there's a pre-registrant

21  investigation or a cyclic investigation, do you

22  talk to any of your colleagues who may have been

23  involved in other earlier investigations of the

24  registrant?

25        A.    Sometimes I do that.

Page 89

1        Q.    And don't you usually try to note in

2    your report what the outcome of prior

3    investigations of that registrant have been, you

4    know, whether they passed or whether they had

5    issues or anything like that?

6                MS. CARROLL:  Objection.  Form.

7                The witness may answer.

8        A.    We would include -- I would

9    personally include the results of any prior

10   inspections that took place.

11               MR. LIVINGSTON:  I'd like to just

12   take a short restroom break, if that's okay

13   with everyone.

14               THE WITNESS:  That's fine with me.

15               THE VIDEOGRAPHER:  We're off the

16   record.

17                    (Recess had.)

18               THE VIDEOGRAPHER:  We're on the

19   record.

20   BY MR. LIVINGSTON:

21       Q.    Mr. Colosimo, from time to time did

22   Giant Eagle ever ask you for any advice

23   regarding any of the security requirements

24   relating to controlled substances?

25               A.    I believe after the -- after the

Page 90

1   second Giant Eagle Rx Distribution Center

2   application was approved, I believe I did

3   contact them with -- or they -- one of the

4   Giant Eagle representatives contacted me

5   regarding some physical security aspect.  I

6   can't recall specifically what that was, but I

7   think there was discussion about a physical

8   security issue.

9        Q.    Okay.  And did you provide any

10  guidance?

11       A.    I can't recall specifically.  Yeah,

12  I don't recall specifically, but I do remember

13  the request, but I can't remember what the

14  request was about.

15       Q.    Okay.  Well, let's turn back to

16  Exhibit 20, page 1, which was your investigation

17  report for the GERx facility before it opened.

18            Under the heading Subject Firm's

19  Background, you refer to the fact that HBC

20  currently -- you know, that currently, since

21  October of 2009, Giant Eagle's HBC facility was

22  a distributor of Schedule 3 through 5.

23            Do you see that?

24       A.    Yes.

25       Q.    And then below that you indicate

Page 91

1   that "HBC has been the subject of three in-depth
2   cyclic investigations by the Pittsburgh D.O.,"
3   and then there's some redactions, but it says,
4   "None of which resulted in any administrative
5   actions."
6           So did you look back on those prior
7   in-depth cyclic investigations to see what the
8   outcome of those investigations was?
9       A.    Yes.
10      Q.    Do you remember which years those
11  cyclic investigations took place?
12      A.    I believe the first one would have
13  been within a few years of the -- of their
14  approval.  The others, I can't recall
15  specifically when those would have been.
16      Q.    And did you just look at written
17  records of those prior investigations or did you
18  talk to the DEA folks who were involved in those
19  investigations or both?
20      A.    I would have reviewed the written
21  file.  I can't recall if I spoke with -- with
22  the investigators.  I can't recall
23  specifically.
24      Q.    Would you go to the next page?  At
25  the very top it's talking about HBC.  It says,

Page 92

1    "The subject firm was the subject of in-depth

2    chemical regulatory cyclic investigations in

3    2002, 2004, 2008 and 2014.  No violations were

4    uncovered during these investigations."

5              Now, you're referring here to the

6    List 1 chemical inspections; is that correct?

7         A.    Yes.

8         Q.    And, again, I mean, so -- when you

9    went out to the GERx facility to inspect it

10   before it opened, at that time you knew that

11   Giant Eagle's HBC facility had not had any

12   issues with respect to compliance with DEA

13   regulations during any of these audits going

14   back all the way to 2002, correct?

15        A.    Could you ask that question again?

16        Q.    Yes.

17              I mean, your report refers to every

18   single DEA inspection of HBC's facility, some

19   of which go back to 2002.  You knew at the time

20   you went out to the GERx facility to check that

21   facility out before it opened that Giant

22   Eagle's HBC facility had essentially passed

23   every single inspection that the DEA had

24   conducted going all the way back to 2002?

25              MS. CARROLL:  Objection.  Form.

Page 93

1    Mischaracterizes his statement.

2                    Witness may answer.

3         A.    I believe on page 1 of that report

4    I indicated that the three inspections of the

5    HBC facility did not result in any

6    administrative action, such as a letter of

7    admonition.

8         Q.    Well, again, not to quibble, but you

9    reviewed those reports and one of those reports

10   was -- or a couple of those reports were

11   actually ones you authored, and all of those

12   reports indicated that there were no violations

13   discovered during those inspections going all

14   the way back to 2002, correct?

15                   MS. CARROLL:  Objection.  Form.

16                   The witness may answer.

17        A.    You're distinguishing between the

18   controlled substance investigations that's

19   scheduled in the List 1 chemicals --

20        Q.    I'm including both.

21        A.     -- and as I indicated earlier, the

22   investigation of the controlled substance

23   facility, HBC, did not result in any

24   administrative action.  I did not say that

25   there was not -- there were not issues that --

1    issues of concern that were not discussed

2    during -- during those scheduled

3    investigations, that there were no

4    administrative actions that were taken.

5          Q.    I want to focus on compliance with

6    the regulations.  You did not -- I mean, from

7    2002 until the time that you went out to the

8    GERx facility in 2015, the DEA had not found and

9    reported in any of its investigation reports

10   that Giant Eagle was in violation of any DEA

11   regulation?

12         A.    There was no -- and, again, there

13   was no administrative action that was cited, a

14   formal administrative action in any of these

15   facilities.

16         Q.    I understand that, but we're both

17   reading the same report, aren't we?  It says,

18   "No violations were uncovered during these

19   investigations," and we know from the prior

20   investigation report, before HBC opened, that

21   you yourself performed or wrote that you noted

22   that there had been no prior violations before

23   and you found none in your investigation,

24   correct?

25         A.    And, again, I want to make -- the

1  report I think is clear that when I say "No

2  violations were uncovered during these

3  investigations," I'm addressing the List 1

4  chemicals, the Schedule -- the -- the

5  controlled -- the HBC with the controlled

6  substances, I'm saying there's no

7  administrative actions -- formal administrative

8  actions were taken.

9       Q.    Let me ask you this:  You

10  recommended in 2009 that the DEA approve Giant

11  Eagle's/HBC's request for a Schedule 3 license,

12  correct?

13       A.    They were approved.  I authored the

14  report approving that application with the

15  approval of my supervisor.

16       Q.    You would never recommend that an

17  applicant's request for a DEA controlled

18  substance license be approved if you thought

19  they were going to be violating any of DEA's

20  security requirements?

21            MS. CARROLL:  Objection.  Form.

22            The witness may answer.

23       A.    I would not approve it if I believe

24  that they were not going to be compliant or

25  assured us that they were not going to be

Page 96

1    compliant with DEA regulations.

2         Q.    For example, if they showed you the

3    plans for their cage and the cage didn't meet

4    DEA's requirements, you're not going to

5    recommend approving that application unless they

6    fix that problem, correct?

7         A.    Correct.

8         Q.    So can't we conclude that your

9    understanding was that everything that Giant

10   Eagle proposed to do at its HBC facility was

11   going to be in compliance with the security

12   requirements?

13        A.    What they proposed to do, what they

14   assured me, assured DEA that they were going to

15   do would be in compliance, and based upon that,

16   the application was approved.

17        Q.    All right.  Let's go back to Exhibit

18   20, which was your report relating to the GERx

19   facility from 2015.  Let me just ask a question

20   a little bit differently.  Again, you referred

21   to these past reports on HBC's facilities that

22   you reviewed.  You did not see in any of those

23   reports any indication that Giant Eagle was in

24   violation of any of the security requirements

25   under the Controlled Substance Act, correct?

1      A.    Again, as I mentioned earlier,

2  there were no administrative actions taken.  I

3  put that in my report.  But there were issues

4  that -- that I wanted to address in my -- in my

5  review of the application for the facility in

6  Freedom, Pennsylvania.

7      Q.    I'm sorry.  I'm not sure I followed

8  what you said.  What issues are you referring

9  to?

10     A.    That issue would be with the

11  suspicious orders program, suspicious orders

12  and monitoring system.

13     Q.    And you're talking about when you

14  went out to GERx in 2015?

15     A.    Yes.

16     Q.    And you said you had concerns after

17  your -- when you were preparing your report in

18  2015 with respect to the suspicious order

19  monitoring system?

20     A.    I said the concerns were expressed

21  in the reports of the HBC facility.

22     Q.    Oh, I see.  The prior reports?

23     A.    Yes.

24     Q.    Okay.  Okay.  I gotcha.  So let's

25  turn to the next page, or page 2 of Exhibit 20.

1    In the middle of the page you say that "Over the

2    past several years, McKesson Drug, a distributor

3    in New Castle, has been the primary supplier of

4    Schedule 2 controlled substances to the Giant

5    Eagle pharmacies."  I don't want to ask you any

6    questions about your inspections of McKesson,

7    but just that as a distributor of Schedule 2

8    controlled substances, the McKesson facility in

9    New Castle, like Giant Eagle, would have had to,

10   in order to maintain its license, be subject to

11   cyclic investigations that were checking to make

12   sure it had an adequate SOM system, correct?

13        A.    Yes.

14        Q.    And then we see a reference to Mr.

15   Shaheen, so at least by 2015 Mr. Shaheen was on

16   board at Giant Eagle, correct?

17        A.    Correct.

18        Q.    It says that Mr. Shaheen notified

19   Mr. Dittmer and also John Conlon that Giant

20   Eagle was considering adding a cage and a vault

21   to an existing warehouse owned by the company in

22   Freedom, PA, where they would be able to

23   distribute 2 through 5 controlled substances,

24   and that was in the summer of 2015.  Was

25   Mr. Conlon involved in any prior inspections of

1  Giant Eagle's facilities?

2       A.    Yes.

3       Q.    If you go to the next paragraph, it

4  says that, "On October 1, 2015, GERx was granted

5  a license with the Pennsylvania Department of

6  Health as a distributor."

7            Do you see that?

8       A.    Yes.

9       Q.    Why is that information noted?

10      A.    Because the DEA registration for

11  the distributor application could not be

12  granted until there was proper state licensure

13  by that facility.

14      Q.    And you did an on-site inspection,

15  correct?

16      A.    Yes.

17      Q.    Go to page 3.  And you see in the

18  middle of the page it talks about how you

19  provided Giant Eagle with the relevant

20  regulations that apply to the distribution of

21  controlled substances, which included the

22  suspicious order regulation; is that correct?

23      A.    Yes.

24      Q.    If you go to the next page, 4, under

25  the heading Record Keeping, second paragraph, it

Page 100

1    says, "As noted above, prior cyclic

2    investigations conducted at HBC have not

3    resulted in any administrative actions.  HBC was

4    the subject of its first regulatory

5    inspection/cyclic investigation in May 2011, and

6    documented under DEA file number," which is left

7    blank.  "The result of this investigation

8    revealed minor recordkeeping violations (an

9    overage due to computer software malfunction)."

10   And "This issue was resolved on-site."

11              Do you see that?

12        A.    Yes.

13        Q.    The reference to "This issue was

14   resolved on-site," meaning that there was -- it

15   was not considered to be a real violation, that

16   it was just a software malfunction and it was

17   resolved at the time?

18              MS. CARROLL:  Objection.  Form.

19              Witness may answer.

20        A.    That did not result in a formal

21   administrative action.  That issue was resolved

22   on-site and I included that in my report.

23        Q.    And you reviewed this May -- did you

24   review this May 2011 investigation report?

25        A.    Yes.

Page 101

1          Q.     And then under the heading ARCOS --
2     and just for the jury's benefit, ARCOS is a
3     system whereby all distributors have to report
4     every sale of a controlled substance to the DEA,
5     correct?
6          A.     Yes, that would be part of their
7     responsibilities under that regulation.
8          Q.     And at the very bottom it says, "A
9     review of HBC's ARCOS history revealed all
10    required reports were filed in a timely manner
11    with no delinquencies," correct?
12         A.     Yes.
13         Q.     If you go to page 5, and under
14    Theft/Loss, it indicates that you notified Giant
15    Eagle personnel of the requirement to notify the
16    DEA upon discovery of any theft or significant
17    loss of a controlled substance, and then it
18    looks like you reviewed the file and you found
19    that HBC had filed four DEA Form 106s.  And 106,
20    is that the official DEA form for reporting a
21    loss?
22         A.     Yes.
23         Q.     And there was only four that were
24    filed.  Did that -- is that considered average,
25    above average, below average in terms of theft?

Page 102

1      A.    Yeah, I don't know if -- how that

2   compares to other distributors during that --

3   during a similar period of time.

4      Q.    So then you specifically go through

5   each one and you say, "One loss was attributed

6   to employee pilferage.  His employment was

7   terminated.  Three were described as in-transit

8   losses."  If it's an in-transit loss, then it's

9   not -- it's not the fault of HBC, if it arrives

10  at the facility and it's already been stolen,

11  right?

12              MS. CARROLL:  Objection.  Form.

13              The witness may answer.

14      A.    My understanding is that the

15  obligation is upon the distributor if it's lost

16  in transit from the distributor to the

17  customer, in which case it would be the

18  pharmacy.

19      Q.    And it says, "HBC appropriately

20  documented on each of the forms security

21  measures they took to prevent or limit future

22  thefts/losses."  So you were comfortable that

23  Giant Eagle was doing what it needed to do to

24  prevent theft and loss, correct?

25              MS. CARROLL:  Object to form.

Page 103

1          Witness may answer.

2      A.     In my report I indicated that they

3  appeared to handle those thefts in the

4  appropriate -- appropriate manner, with the

5  proper recordkeeping.

6      Q.     Would you go to page 7 of this

7  report?  We're not going to bore the jury with

8  all the various specifications that the DEA has

9  for cages, but just I wanted to focus your

10  attention on the fact that Giant Eagle's

11  proposed GERx cage met, in your view, all of the

12  requirements in 21 CFR 1301.72(b)(4), correct?

13      A.     Yes.

14      Q.     And then you also closely examined

15  the vault specifications, and the vault door

16  alone was going to weigh over 4,000 pounds,

17  right?  That's indicated at the next page at the

18  top.

19      A.     Yes.

20      Q.     And then you said in the next

21  paragraph, "Almost all elements of the vault and

22  vault door appeared to meet the requirements

23  specified in 21 CFR 1301.72."  And then you say,

24  "However, while the vault's day gate was

25  equipped with a contact switch, the vault door

Page 104

1    was not equipped as such as required by the

2    regulation."

3              Rick Shaheen followed up on this

4    concern right away and that issue was fixed

5    promptly, wasn't it?

6         A.    I believe so, yes.

7         Q.    In fact, you seem to note that in

8    the next paragraph.  You say, "After the on-site

9    visit, the Pittsburgh D.O. received confirmation

10   that a contact switch was installed on the front

11   door on December 17, 2015."

12             Do you see that?

13        A.    Yes.

14        Q.    So that was -- so Giant Eagle very

15   quickly responded to your concern, correct?

16        A.    Yes.

17             MS. CARROLL:  Objection.  Form.

18             Withdrawn.

19        Q.    If you go to page 9 of your report,

20   at the very top it talks about, "All controlled

21   substances will be stored in a secure cage or

22   vault fully described elsewhere in this report.

23   As outlined in the attached 'Inventory Control -

24   Suspected Loss Policy' - all generic controlled

25   substances are cycle counted two times per week,

Page 105

1   while name brand controlled substances are

2   counted nightly after selection is completed."

3   And, again, this is a much more frequent

4   counting of controlled substances inventory than

5   is required by the DEA regulations, correct?

6           MS. CARROLL:  Objection.  Form.

7           The witness may answer.

8       A.    As I testified earlier, DEA

9   requires the initial inventory, you know, upon

10  registration or first handling, and then

11  thereafter two years of physical count is

12  required.  It's the biennial inventory.

13      Q.    Right.  That's the minimum

14  requirement, correct, but Giant Eagle counts

15  much more frequently than that?

16      A.    As represented in their policy.

17      Q.    Right.  I mean, as somebody who has

18  devoted his life to helping stop diversion, you

19  would rather see Giant Eagle and other

20  distributors counting their inventory nightly

21  than once every two years, right?

22          MS. CARROLL:  Objection.  Form.

23          The witness may answer.

24      A.    The biennial inventory is the

25  minimal once every two years.  Personally, in

Page 106

1   my experience, I recommend more frequent, more

2   routine physical counting to eliminate or to

3   mitigate against diversion.

4        Q.   Would you go to page 10 of your

5   report under the heading Due Diligence?  It

6   says, "Because the supplier (GERxDC) and

7   customers (Giant Eagle pharmacies) are owned by

8   Giant Eagle Inc., GERxDC will have access to

9   customer information that will assist them in

10   enacting the following 'due diligence' actions."

11            Again, so it was your understanding

12   that Giant Eagle, because it was only

13   distributing to its own customers, would have

14   very in-depth information relating to its

15   customers?

16        A.   Well, that they would have -- that

17   they would have dispensing ordering information

18   for their -- for their customers, prescription

19   information.

20        Q.   Well, let's just take some for

21   examples.  They would know if, for example, a

22   competitor pharmacy across the street either

23   just opened or just closed, right, which might

24   affect how much prescriptions they would end up

25   needing to fill?

Page 107

1          MS. CARROLL:  Objection.  Form.

2          Witness may answer.

3      A.   I don't know.  You would have -- I

4  would have to ask that pharmacy, that, you

5  know, representative in their headquarters if

6  they knew about that specifically.  I don't

7  know.  I'd be speculating as to what they would

8  know.

9      Q.   But you do think it's important to

10  note this information in your reports, correct?

11      A.   Which information is that?

12      Q.   The fact that Giant Eagle's only

13  customers for its GERx facility were its

14  pharmacies.

15      A.   Yes.  It's important to put in

16  there.

17      Q.   If you go down to under Customer

18  Authentication, the paragraph in the middle, it

19  says, "The GERxDC only services Giant Eagle

20  pharmacies which are owned by Giant Eagle, Inc.

21  If, for any reason, a Giant Eagle pharmacy is

22  not licensed to receive Legend drug products or

23  controlled substances, the GERxDC will no longer

24  service the pharmacy."

25          Now, you understood from this that

Page 108

1   Giant Eagle, again, was going to be monitoring

2   its own pharmacies to make sure that they were

3   at all times -- that they at all times had a

4   current DEA license, and if for some reason

5   they didn't, GERx would immediately stop

6   shipping controlled substances to that

7   pharmacy, correct?

8        A.    That's what I stated in my report.

9   That's my understanding.

10       Q.    Then on the next page, 11, there's a

11  section called -- a whole section on Suspicious

12  Orders, correct?

13       A.    Yes.

14       Q.    Okay.  And we're not going -- for

15  time reasons, we're not going to go through this

16  whole thing -- it goes on for a few pages -- but

17  you ultimately concluded that the proposed

18  suspicious order system was -- that it would be

19  compliant with DEA regulations?

20       A.    In my report I described the system

21  as represented to me by Giant Eagle.  I did not

22  evaluate its effectiveness.  I just -- I

23  completely described it as they represented to

24  me in -- with the handout that they gave me.

25       Q.    I'm just -- I mean, at the end --

Page 109

1   well, would you have approved or recommended

2   approval of this application if you thought that

3   the SOM system that -- as described to you by

4   Giant Eagle, would not comply with DEA

5   regulations?

6               MS. CARROLL:   Objection.

7       A.      With regard to their suspicious

8   order policy, I provided them with the CFR cite

9   and the emphasis is on their responsibility to

10  design and operate a system.  I did not

11  evaluate the system.  I described the system.

12  They were representing that this is what they

13  would have in place for their suspicious order

14  system specifically with regard to assuring me

15  that that system would detect the -- by size,

16  frequency of report, frequency of orders or

17  anything suspicious, unusual frequency of those

18  orders.

19      Q.      At the time that you went out to the

20  GERx facility in late 2015, at that time HBC

21  still had an active Schedule 3 license and was

22  still distributing Schedule 3 drugs to its

23  own -- to Giant Eagle's own pharmacies, correct?

24      A.      I believe they were, yes.

25      Q.      And that HBC's suspicious -- that

Page 110

1   DEA had not found anything wrong with HBC's then

2   existing SOM system; is that correct?

3          A.    As I indicated earlier, there was

4   no administrative action to indicate that the

5   system was delinquent or deficient.

6          Q.    Well, if the DEA knew that Giant

7   Eagle's HBC suspicious order monitoring system

8   was deficient, that the system as described to

9   the DEA did not meet DEA regulations, it would

10  have taken administrative action or done

11  something about it, correct?

12              MS. CARROLL:  Objection to form.

13              The witness may answer.

14         A.    Repeat the question.

15         Q.    Yes.  I think it's important for the

16  jury to understand what it means when the DEA

17  inspects a facility and says that your

18  suspicious order monitoring system is fine.  So

19  we know from the inspection reports that you've

20  looked at that the DEA regularly inspected HBC's

21  facilities, including its suspicious order

22  monitoring system, and that the DEA, as you like

23  to say, never took any administrative action

24  with respect to that system, correct?

25              MR. MOUGEY:  Objection.

Page 111

1      A.    Administrative action was not taken
2  during any of those three scheduled
3  investigations of HBC.
4      Q.    Right.  And now for the jury's
5  benefit, and I think they need to understand
6  what that means, if, in fact, the DEA found
7  anything wrong with Giant Eagle's/HBC's
8  suspicious order monitoring system on any of its
9  inspections, it would either require Giant Eagle
10  to get into compliance or it would take
11  administrative action, wouldn't it?
12           MS. CARROLL:  Objection.  Form.
13           The witness may answer.
14      A.    I'm talking -- I could answer
15  personally.  I was not involved with those
16  three inspections of the HBC facility.
17      Q.    I know you weren't, but you looked
18  at them.  You looked at the reports.
19      A.    Yes.
20      Q.    Okay.  And we already know that no
21  administrative action was taken because you
22  specifically noted it in your GERx report,
23  correct?
24      A.    Yes.
25      Q.    So my only question here is, isn't

Page 112

1   it true that whether it's you or one of your

2   colleagues, when you inspect a distributor's

3   facility, if their SOM system is non-compliant,

4   that you're not just going to let it go, you're

5   either going to require the registrant to

6   comply, or if they don't comply, you're going to

7   take administrative or some other action against

8   the facility, correct?

9                   MS. CARROLL:  Objection.  Form.

10                  The witness may answer.

11          A.    There's a difference between -- and

12   this is my experience.  There's a difference

13   between saying that this monitoring system does

14   not comply and suggestions to have a more

15   formal system in place.

16          Q.    Right.  And I'm talking about in the

17   situation where the system does not comply.

18   Then you're going to do something about that,

19   right?  You're going to try to get the

20   registrant to comply, or I suppose if they're

21   really, you know, difficult and they don't

22   comply, that you're going to take some sort of

23   action against them?

24                  MS. CARROLL:  Objection.  Form.

25          Q.    It just seems like it's common

                                                    Page 113

1   sense.

2              MR. MOUGEY:  Objection.

3        Q.    I mean, if I'm wrong about that,

4   please let me know.

5              MS. CARROLL:  Objection.

6              Witness may answer.

7        A.    There was a series of questions

8   that you asked there.

9        Q.    I was trying to just explain the one

10  question that I asked, but maybe I'll try it

11  again.  Isn't it true that if an applicant has a

12  SOM system that the DEA knows does not comply

13  with the regulations, that either they're going

14  to require the applicant to comply, or if the

15  applicant is adamant and won't comply, the DEA

16  will take some sort of administrative or other

17  action against the applicant or registrant?

18             MS. CARROLL:  Objection to form.

19             The witness may answer.

20       A.    In my experience, I would take

21  administrative action and ensure that there was

22  compliance.  That would be corrected on-site.

23       Q.    So can't we rest assured that at the

24  time you went out to GERxDC in 2015, that HBC's

25  SOM system was viewed by the DEA at that time as

Page 114

1    being in compliance with the security

2    requirements?

3              MR. MOUGEY:  Objection.

4              THE COURT REPORTER:  Excuse me.  I

5    need to know the male voice that's objecting.

6              MR. MOUGEY:  Pete Mougey.

7              MS. CARROLL:  Mr. Colosimo, would

8    you like Mr. Livingston to repeat the question?

9              THE WITNESS:  Please.

10        Q.    Yes.  I mean, can we all rest

11   assured that from the DEA's perspective, Giant

12   Eagle's HBC facility was in compliance with the

13   SOM regulation when you went out to GERxDC in

14   2015?

15             MR. MOUGEY:  Objection.

16        A.    When I visited the Giant Eagle

17   facility in Freedom, I reviewed the -- they

18   presented me with their ordering monitoring

19   system that they were going to be enacting for

20   the Giant Eagle facility in Freedom.  I did not

21   review the HBC facility SOM.

22        Q.    If you look at page 12, at the very

23   bottom it says, "Richard Shaheen, pharmacy

24   investigator, described a few other steps Giant

25   Eagle has taken to limit the potential for

Page 115

1   diversion occurring within their pharmacies:

2   All Giant Eagle pharmacists have received

3   training on procedures for checking in

4   controlled substance orders; these procedures

5   will assist in the prevention and detection of

6   in-transit losses.  While all Giant Eagle

7   pharmacies are required to conduct monthly

8   accountability audits, the pharmacist assigned

9   to complete these audits vary from month to

10  month."

11              So isn't it true that Giant Eagle

12  had some controls also at the pharmacy level

13  and not just at the HBC level to try to prevent

14  diversion?

15              MS. CARROLL:  Objection to form.

16              The witness may answer.

17       A.    That's my understanding, that they

18  did have procedures in place to limit diversion

19  at the pharmacy level.

20       Q.    And then we've already talked about

21  at the corporate level they also oversaw all of

22  the sales and the inventory relating to both the

23  pharmacies and HBC as another control against

24  diversion, correct?

25              MS. CARROLL:  Objection to form.

Page 116

1            The witness can answer.

2       A.    My understanding is that there was

3   oversight of the warehouse by -- at the

4   corporate level by Giant Eagle.

5                  -   -   -   -   -

6            (Thereupon, Defendants' Deposition

7            Exhibit 3, Reports of Investigation

8            Beginning Bates Stamp

9            US-DEA-00033016, was marked for

10           purposes of identification.)

11                 -   -   -   -   -

12      Q.    Would you turn to Exhibit 3, page 9?

13  Do you see that this is a report of

14  investigation by Michael Kupchick from your

15  office and it was prepared on May 20, 2011?  Is

16  this one of the investigation reports of HBC's

17  facility that you reviewed?

18      A.    Yes.

19      Q.    And it says -- this was a cyclic

20  investigation, correct?

21      A.    Yes.

22      Q.    And it says that Mr. Kupchick had

23  some assistance from Vincent Tomei from your

24  office as well?

25      A.    Yes.

Page 117

1          Q.    You would agree that both of those

2     individuals are very competent and highly

3     dedicated DEA inspectors, correct?

4          A.    I work with both Investigator

5     Kupchick and Investigator Tomei.

6          Q.    And they're both competent and

7     conscientious, correct?

8               MS. CARROLL:  Objection to form.

9               The witness may answer.

10          A.    I'm not the supervisor of either of

11     those investigators.

12          Q.    Well, do you trust their work?  I

13     mean, do you trust their work?

14          A.    What do you mean by that?

15          Q.    Well, you reviewed this work product

16     that they produced, this report, and you seem to

17     rely on it at least to some extent.  Did you

18     trust the accuracy of the report when you

19     reviewed it?

20          A.    The accuracy of the report?

21          Q.    Yes.

22          A.    I don't recall that there was

23     anything in there that I disagreed with that

24     was not accurate.

25          Q.    A little further down it says, "This

1  investigation revealed no discrepancies with

2  respect to security."  The security regulations

3  include the SOM regulation, correct?

4          MS. CARROLL:  Objection.

5      A.    This is not my report.  This is

6  Investigator Kupchick's report.

7      Q.    Right, I know, but you read the

8  report.  And what did you understand this

9  reference to be referring -- to mean, "This

10 investigation revealed no discrepancies with

11 respect to security"?

12     A.    After reading the report, and this

13 is my perspective, no discrepancies with regard

14 to physical security at the facility, at the

15 warehouse.

16     Q.    Was it your understanding that at

17 this time HBC was still using the Vocollect scan

18 system for inventory control?

19     A.    I don't know if that was mentioned

20 in this report.

21     Q.    Why don't you go to page 19.  At the

22 top it says, "All selections are performed using

23 Vocollect directed activity."  Does that refresh

24 your recollection that in 2011 HBC was still

25 using the Vocollect system?

1          A.    Yes.

2          Q.    What does the report mean when it

3    says "no discrepancies"?  Is that the same as no

4    violations?  What does that mean?

5                MS. CARROLL:  Objection.  Form.

6                Witness may answer.

7          A.    I don't -- I'm not sure of the

8    distinction.  In my opinion, the violation

9    would be something that would rise to the

10   issuance of a formal administrative letter or

11   administrative action.  The discrepancy could

12   be -- and, again, this is my perspective,

13   discrepancy could be some issue that was

14   resolved on-site where it did not rise to the

15   level of an administrative action.

16         Q.    In your mind, the violation is more

17   serious than just a discrepancy, which is a very

18   minor issue, correct?

19                MS. CARROLL:  Objection.  Form.

20                The witness may answer.

21         A.    They would be both issues that need

22   to be resolved in my perspective.

23         Q.    Could you go to page 40, please?

24   This is a report of investigation by John Conlon

25   from your office prepared August 13, 2013

Page 120

1   relating to the HBC facility.  Did you review

2   this report?

3        A.    Yes.

4        Q.    And then at the very bottom of the

5   synopsis on the first page, it says, "This

6   investigation revealed no discrepancies with

7   respect to recordkeeping or security."

8              Do you see that?

9        A.    Yes.

10       Q.    So this -- again, we have another

11  indication here that HBC essentially has a clean

12  inspection report, correct?

13             MS. CARROLL:  Objection.  Form.

14             The witness may answer.

15       A.    That's what Investigator Conlon

16  indicated, no discrepancies with respect to

17  recordkeeping or security.

18       Q.    And this report would have also, as

19  part of this -- of the inspection, would have

20  looked at HBC's SOM system at the time, correct?

21       A.    I believe this did.

22       Q.    Would you go to page 42?  The

23  heading is "Subject Firm's Background.  At the

24  very bottom of that first paragraph it says,

25  "HBC Service Company had 157 million dollars in

Page 121

1    sales during 2012, of which controlled
2    substances accounted for less than one percent."
3              Why is that fact noted here or why
4    would that fact be noted here?
5              MS. CARROLL:  Objection.  Form.
6              The witness may answer.
7        A.    That is part of the subject firm's
8    background and that's what Investigator Conlon
9    put in his report as -- to provide additional
10   details about the firm's background.
11       Q.    Is one percent of sales involving
12   controlled substances, is that low or high or
13   average for a distributor in your experience?
14             MS. CARROLL:  Objection.  Form.
15             The witness may answer.
16       A.    I don't know if that's low or high.
17       Q.    So it's important to note it, but
18   nobody knows what the significance of it is,
19   whether that really means anything, one percent?
20             MS. CARROLL:  Objection.  Form.
21             The witness may answer.
22       Q.    You see on the next page, 47, under
23   Sales/Distribution Records, at the bottom it
24   says, "These records were maintained in
25   accordance with requirements set forth in Title

Page 122

1   21 CFR 1304.22(b)."

2              Do you see that?

3        A.    What page are you looking at?

4        Q.    Page 47 under the heading

5   Sales/Distribution Records.  If you look in the

6   screen, you can see --

7        A.    That's what's in the report,

8   correct.

9        Q.    And there was no discrepancies noted

10  on the next page with respect to ARCOS and/or on

11  page 49 with respect to the cage requirements,

12  everything was in compliance with respect to

13  these issues, correct?

14             MS. CARROLL:  Objection.  Form.

15             The witness may answer.

16       A.    I see for the section on ARCOS it

17  said no discrepancies were noted.

18       Q.    All right.  So would you go -- skip

19  ahead to page 52 under the heading Due

20  Diligence.  And do you see that Mr. Rogos from

21  HBC advised the DEA that, unlike other drug

22  distributorships, HBC has only one customer,

23  Giant Eagle.  And that's consistent with your

24  understanding as well, right, that Giant

25  Eagle's -- the only customer for its

Page 123

1   distribution facilities are its own pharmacies,

2   correct?

3               MS. CARROLL:  Objection.  Form.

4               The witness may answer.

5        A.    That's my understanding, yes.

6        Q.    And then the report notes a

7   conversation that Mr. Conlon had with Mr. Rogos

8   about referring Mr. Rogos to the suspicious

9   order monitoring regulation, correct?

10       A.    Yes.

11       Q.    And then Mr. Rogos told Mr. Conlon

12  at this time HBC and/or Giant Eagle, Inc. and

13  its parent company has no computerized software

14  system to indicate that an order may be

15  suspicious.  Rogos advised that if Giant Eagle

16  pharmacy were to receive unusually high orders

17  of controlled substances from HBC deviating from

18  other stores, it would be noticed at the Giant

19  Eagle, Inc. headquarters level.  Rogos stated

20  that he will bring this issue to the attention

21  of Greg Carlson and Kim Remas of Giant Eagle's

22  headquarters controlled substance purchasing

23  unit.

24               Do you see that?

25       A.    Yes.

Page 124

1        Q.    Okay.  So is it your understanding
2   that essentially the DEA is saying, hey, you
3   know, you've been in compliance with the reg but
4   we think you can improve it possibly by going to
5   an automated system, right?  Was that your
6   understanding of what was being suggested to
7   Giant Eagle at this time?
8              MS. CARROLL:  Objection.  Form.
9              The witness may answer.
10             MR. MOUGEY:  Objection.
11       A.    That's -- my understanding is that
12   the DI Investigator Conlon made suggestions,
13   noted that there was no computerized system to
14   detect that and made a suggestion to Mr. Rogos
15   to have that implemented.
16       Q.    If you go to the next page, 53,
17   under Meeting with Management, it says, "During
18   this meeting, investigators advised Rogos that
19   both recordkeeping and security are in full
20   compliance with the requirement set forth in
21   Title 21 Code of Federal Regulations."
22             That includes the SOM regulation,
23   correct?
24             MS. CARROLL:  Objection.  Form.
25             Witness may answer.

1      A.    The SOM regulation, I mean, insofar

2   as that is under security, that's accurate.

3      Q.    So he says that, Giant Eagle, you're

4   in full compliance, tells Giant Eagle you're in

5   full compliance with all the security regs,

6   including the SOM regs, but then he says, but,

7   you know, I advised Mr. Rogos to develop a

8   better system of due diligence, correct?  So

9   he's saying we think you can improve your

10  system, here's our advice, and then Mr. Rogos

11  said he would follow up, correct?

12             MS. CARROLL:  Objection.  Form.

13             The witness may answer.

14      A.    Those are your words.  I'll read

15  it.  "Investigator Conlon advised Rogos to

16  develop a better system of due diligence,"

17  period.

18      Q.    Right after he told Mr. Rogos, and I

19  assume he was being a hundred percent honest,

20  that Giant Eagle, with all of the security

21  requirements, which, of course, includes the SOM

22  requirement, correct?

23             MS. CARROLL:  Objection.  Form.

24             The witness may answer.

25      A.    And, again, my understanding is

Page 126

1   that the suspicious orders would fall under

2   security.

3        Q.    Let's take a look at to see if Giant

4   Eagle tried to follow up with what Mr. Conlon

5   had recommended.

6                  -    -    -    -    -

7              (Thereupon, Defendants' Deposition

8              Exhibit 16, E-Mail String Beginning

9              Bates Stamp HBC_MDL00136952, was

10             marked for purposes of

11             identification.)

12                 -    -    -    -    -

13       Q.    Would you go to Exhibit 16?  Just

14   for reference, we were just looking at the

15   report from August of 2013.  You see Exhibit 16

16   is an e-mail from Joseph Millward at Giant Eagle

17   to some other folks at Giant Eagle dated

18   November 14, 2013 regarding daily HBC suspicious

19   purchasing report.

20             Do you see that?

21       A.    Yes.

22       Q.    If you skip down to the bottom, this

23   is an e-mail response to another e-mail from

24   Kayla Voelker at Giant Eagle, and she says, "We

25   had two pharmacies exceed the purchasing

Page 127

1    thresholds of certain controlled products so far
2    this month."  So do you see that Giant Eagle a
3    few months later already had the automated
4    threshold system in place for suspicious order
5    monitoring?
6              MS. CARROLL:  Objection.  Form.
7              The witness may answer.
8         A.    I don't know what they had in
9    place.  This is an e-mail that you're referring
10   to that addresses thresholds.
11        Q.    Right.  Which is what an automated
12   threshold system does, right?  It has --
13   automatically when you hit a certain threshold
14   at a store for purchasing a certain item, it's
15   flagged, right?
16             MS. CARROLL:  Objection.  Form.
17             The witness may answer.
18        A.    I'm familiar with the term
19   "threshold," but I don't know what Giant Eagle
20   had in place at this time to detect that.
21        Q.    Hasn't Giant Eagle -- didn't Giant
22   Eagle report some suspicious orders to you
23   telephonically or by e-mail?
24             MS. CARROLL:  Objection.  Form.
25   Vague.

Page 128

1            The witness may answer.

2       A.    I guess I don't know.  Is it to me

3  personally or to DEA, the Pittsburgh district

4  office or DEA in general?

5       Q.    Well, to you.  Do you remember ever

6  getting any report from Giant Eagle, hey, we

7  flagged this suspicious order of a particular

8  controlled substance?

9            MS. CARROLL:  Objection.  Form.

10            Witness may answer.

11       A.    I don't know.

12                -   -   -   -   -

13            (Thereupon, Defendants' Deposition

14            Exhibit 12, E-Mail String,

15            Beginning Bates Stamp

16            HBC_MDL00132815, was marked for

17            purposes of identification.)

18                -   -   -   -   -

19       Q.    Why don't we go to Exhibit 12.  This

20  is an e-mail from Mr. Millward to some other

21  folks at Giant Eagle, including Mr. Shaheen, and

22  it's dated December 5, 2013, and it says, "Team,

23  to update the group, Mike e-mailed and called

24  HBC to inform them that 2401 flagged on the

25  order monitoring report.  The follow-up

Page 129

1    uncovered an unusual pattern of prescriptions

2    for buprenorphine that requires deeper

3    investigation."

4              Doesn't this confirm for you that

5    Giant Eagle had an automated threshold system

6    in place for its SOM system by the end of 2013?

7              MS. CARROLL:  Objection.  Form.

8              The witness may answer.

9         A.   I don't know what they had in

10   place.  This is an e-mail where they're

11   referencing an unusual pattern of prescriptions

12   for buprenorphine.

13        Q.   Well, there's a number of bulleted

14   items in the middle of this e-mail, and at the

15   very bottom he says, "I called and left a voice

16   mail with DEA Diversion Investigator Lou

17   Colosimo to report the suspicious order."

18             Does that refresh your recollection

19   that at the end of 2013 Giant Eagle had begun

20   reporting suspicious orders flagged by its

21   threshold system to you?

22             MS. CARROLL:  Objection.  Form.

23             Misstates the document.

24             You may answer.

25        A.   That's what's represented in the

Page 130

1    e-mail.  I don't recall that voice mail.  I

2    don't recall -- I don't know what particular

3    pharmacy they're referencing there.  I don't

4    recall that voice mail.

5          Q.    At the very bottom he says, "We will

6    continue to discuss this in detail tomorrow.

7    The HBC orders will be held until I approve them

8    to resume."

9                From what you're seeing in this

10   report, you would agree that Giant Eagle is

11   doing the appropriate thing when there's an

12   unusual pattern of orders relating to a

13   controlled substance, they're stopping the

14   order and they're investigating it and not

15   letting it go through without investigation,

16   correct?

17                MR. MOUGEY:  Objection.

18                MS. CARROLL:  Objection.  Form.

19                The witness may answer.

20         A.    I don't know everything that

21   they're doing here.  I don't know that I was

22   notified.  This is in an e-mail that's -- from

23   my perspective, it's addressed to other Giant

24   Eagle personnel, so I don't know if this is

25   sufficient or not.

Page 131

1      Q.    Go to the next page.  At the very

2   end he says, "We will be taking a two pronged

3   approach for this order:  Stopping the shipment

4   of the order and reporting it to the DEA as well

5   as having a corporate staff member investigate

6   the usage and determine the causation of the

7   suspicious order."

8              I mean, somebody with -- you know,

9   given your background with enforcing DEA

10  regulations, is there anything else that Giant

11  Eagle should have been doing in light of the

12  situation that's presented in this exhibit;

13  they're stopping the order, they're

14  investigating it, they're reporting it to the

15  DEA, and they're having someone from corporate

16  do the investigation?  Is there anything that

17  you can think of else that Giant Eagle should

18  have been doing in this situation?

19              MR. MOUGEY:  Objection.

20              MS. CARROLL:  Objection.  Form.

21              The witness may answer.

22      A.    This is a general e-mail about a

23  specific store.  It does not specifically

24  mention quantities.  I don't know what -- what

25  else -- what other information Giant Eagle had

Page 132

1   access to that would affect what decision that

2   they were making -- should be making on that

3   particular order.  I know that they are

4   required to report once they determine it's

5   suspicious, to notify DEA.

6        Q.    Do you keep a record of -- like if

7   Giant Eagle had left you a voice mail reporting

8   an order, do you make a record of that anywhere?

9        A.    I don't recall receiving any voice

10  mails or oral notifications from any

11  distributor about a suspicious order.  I don't

12  recall this incident.

13       Q.    So you ultimately approved Giant

14  Eagle's application or recommended -- I'm

15  sorry -- approval of Giant Eagle's application

16  for GERxDC to get a Schedule 2 license, correct?

17       A.    In working with our supervisor,

18  Kurt Dittmer, it was approved.

19       Q.    Were you involved in the 2017 cyclic

20  investigation of the GERxDC facility?

21       A.    No, not the on-site inspection.

22       Q.    You have no knowledge about that

23  on-site investigation?

24       A.    No, I was not involved with the

25  on-site.  I was not on-site for that

Page 133

1    investigation.

2          Q.    But you were involved in that

3    investigation, the 2017 cyclic investigation of

4    GERxDC?

5          A.    I reviewed --

6                MS. CARROLL:  Objection.  Form.

7          A.    I reviewed a report that

8    Investigator Kupchick completed for that

9    inspection.

10          Q.    And he found no discrepancies or

11    violations, correct?

12                MS. CARROLL:  Objection.  Form.

13                The witness may answer.

14          A.    I know there was no -- nothing

15    administrative -- I'd have to look at the

16    report.

17          Q.    Why don't you do that now.  It's on

18    Exhibit 3, page 79.  It's dated May 26, 2017.

19    You approved this report, correct?  You signed

20    it, signed off as --

21          A.    Yeah.  On that date I was the

22    acting diversion supervisor.  We were without a

23    permanent or full-time supervisor.

24          Q.    Okay.  And you were -- reviewed this

25    report before you approved it, correct?

Page 134

1       A.    I reviewed this report among others

2  before it was approved.

3       Q.    And the report concludes that --

4  says, "This investigation revealed no

5  discrepancies with respect to recordkeeping or

6  security," correct?

7       A.    Yes.

8       Q.    And that would have included no

9  discrepancies with respect to Giant Eagle's SOM

10 system at its GERx facility?

11            MS. CARROLL:  Objection.  Form.

12            The witness may answer.

13      A.    Again, the SOM system would be

14 under -- my understanding, it would be under

15 the security portion.

16            MR. LIVINGSTON:  I'll pass the

17 witness and reserve any time I may still have

18 left.

19            MS. CARROLL:  Is this a good time

20 to take a short break?

21            MR. LIVINGSTON:  Sure.

22            THE VIDEOGRAPHER:  We're off the

23 record.

24                 (Recess had.)

25            THE VIDEOGRAPHER:  We're on the

Page 135

1  record.

2                  EXAMINATION OF LEWIS COLOSIMO

3  BY MR. MOUGEY:

4       Q.   Good morning, Mr. Colosimo, or good

5  afternoon.  My name is Peter Mougey.  I

6  represent the Plaintiffs in this case, sir.

7                  I have a series of folders in front

8  of you.  If you would please open the first one

9  that's marked 24, Tush 24, and we're going to

10  mark that for purposes today as number 1,

11  Exhibit 1.

12                  -   -   -   -   -

13                  (Thereupon, Plaintiffs' Deposition

14                  Exhibit 1, Memorandum from Joseph

15                  T. Rannazzisi to Special Agents in

16                  Charge, Etc., dated October 27,

17                  2009, with Attachments, Beginning

18                  Bates Stamp US-DEA-00056902, was

19                  marked for purposes of

20                  identification.)

21                  -   -   -   -   -

22       Q.   And, if you would, sir, in the

23  bottom right-hand side are what we refer to as

24  Bates numbers.  If you turn to 905 in your

25  document.  All right.  Sir, do you have that

Page 136

1   open?

2          A.    Yes.

3          Q.    All right.  And you and I should

4   have the same document up on the screen in front

5   of you.  It's the interim policy for scheduled

6   investigations dated on the right-hand side

7   October 27, 2009, correct, sir?

8          A.    Yes.

9          Q.    And this is during the course of

10  your employment with the DEA?  You were there

11  obviously in 2009, correct?

12         A.    Yes.

13         Q.    You can see under Attachments at the

14  bottom of this page the interim policy in lieu

15  of the diversion manual changes, sir.  Do you

16  see that in the bottom under Attachments?

17         A.    Yes.

18         Q.    And, sir, this references the manual

19  that pertains to investigators such as yourself,

20  correct, sir?

21         A.    Yes.

22         Q.    And, sir, if you would please turn

23  to Bates number 05 under the section entitled

24  Due Diligence.

25         A.    Okay.

Page 137

1          Q.    And, sir, let me just read these

2    first couple sentences to you.  "Registrants

3    must have established effective controls against

4    diversion of controlled substances in accordance

5    with 21 USC 823.  DEA will not approve, certify,

6    or assist registrants in conducting their due

7    diligence responsibilities, e.g. provide lists

8    or identify customers to whom they should or

9    should not sell."

10              Did I read that correctly, sir?

11         A.    Yes.

12         Q.    And, sir, is that consistent with

13   your understanding and your training with the

14   DEA that certain SOM policies, procedures,

15   including due diligence, were not sanctioned or

16   approved by the DEA?

17         A.    That's my understanding, yes.

18         Q.    And as this sentence goes on, it

19   says, "It is solely incumbent upon the

20   registrants to know their customers and the

21   potential abuses of the controlled substance

22   products for which they are approved."

23              Did I read that correctly, sir?

24         A.    Yes.

25         Q.    And, sir, is the fact that the

                                        Page 138

1   registrants, like HBC, that is solely incumbent

2   upon it to know its customers, is that

3   consistent with your training at the DEA?

4         A.    Yes.

5         Q.    Sir, if you would please open the

6   file that's marked P-GEN 3, which we're going to

7   mark as Exhibit 2.

8                    -   -   -   -   -

9                (Thereupon, Plaintiffs' Deposition

10               Exhibit 2, Letter from Joseph T.

11               Rannazzisi to Dear Registrant,

12               dated June 12, 2012, with

13               Attachments,  Beginning Bates Stamp

14               ABDCMDL00269683, was marked for

15               purposes of identification.)

16                   -   -   -   -   -

17        Q.    Sir, are you familiar with the fact

18  that the DEA sent registrants letters to help

19  educate them regarding the responsibilities

20  under the Controlled Substance Act?

21        A.    My recollection is that DEA did

22  notify certain registrants of that.

23        Q.    This is an example, I'll represent

24  to you, as one of the letters that was sent out

25  to the registrants.  I would like to direct your

Page 139

1  attention on this June 12, 2012 letter to the

2  last sentence of the third paragraph.

3          Now, sir, you're familiar with 21

4  CFR 1301.74(b), correct, sir?

5          A.    Yes.

6          Q.    And I think we were just referring

7  to that over the course of your testimony this

8  morning as the SOM policy, SOM requirement,

9  correct, sir?

10         A.    Yes.

11         Q.    And in this third paragraph the DEA

12 is reminding the registrants that they shall

13 design and operate a system to disclose to the

14 registrants suspicious orders of controlled

15 substances, correct?

16         A.    Yes.

17         Q.    And as the DEA is explaining to

18 registrants, like HBC, in the next sentence, the

19 regulation clearly places the responsibility on

20 the registrants to design and operate such a

21 system, correct, sir?

22         A.    Yes.

23         Q.    And in this last sentence of the

24 third paragraph, "Accordingly, DEA does not

25 approve or otherwise endorse any specific system

Page 140

1   for reporting suspicious orders" -- is that last

2   sentence of the third paragraph that the DEA

3   does not approve or endorse consistent with your

4   training at the DEA?

5          A.    Yes.

6          Q.    And, sir, the fact that the DEA

7   didn't approve or endorse specific systems, that

8   was, in fact, communicated to registrants like

9   HBC, correct, sir?

10         A.    That is my understanding, yes.

11         Q.    I'm going to have you hold this

12  document because I'm going to come back to it.

13              I'd like to start with your first

14  report of investigation, which is in the folder

15  marked P-DEA-0052.  We're going to mark this,

16  Mr. Colosimo, as Exhibit 3.

17                   -    -    -    -    -

18              (Thereupon, Plaintiffs' Deposition

19              Exhibit 3, Report of Investigation

20              dated October 26, 2009, Beginning

21              Bates Stamp DEA-T1BCC-00001833, was

22              marked for purposes of

23              identification.)

24                   -    -    -    -    -

25         Q.    And this is a copy of the report of

```
 1    investigation with your name on it dated

 2    10-26-2009, correct, sir?

 3          A.    Yes.

 4          Q.    And this is one of the documents you

 5    just went through with HBC's counsel, correct,

 6    sir?

 7          A.    Yes.

 8          Q.    And, in fact, sir, you signed the

 9    bottom of this report of investigation and dated

10    it November 4th, 2009, correct, sir?

11          A.    Yes.

12          Q.    And if you turn, Mr. Colosimo, to

13    the next page, Bates number 34, under

14    Recordkeeping, as part of your investigation,

15    you provided Mr. Carlson -- and he's an HBC

16    employee, correct, sir?

17          A.    Yes.

18          Q.    -- with a copy of 21 CFR part 1300

19    to the end, correct?

20          A.    Yes.

21          Q.    So in several of these reports of

22    investigation that you participated in, you

23    included the notation that you provided HBC a

24    copy of that reg, correct, all of the regs in

25    1300, correct?
```

Page 142

1          A.     Yes.

2          Q.     Was that your practice, to provide

3     the registrants, like HBC, a copy of the

4     entirety of Regulation 1300 under the Controlled

5     Substance Act?

6          A.     I don't know if that was my

7     practice with all pre-registrant

8     investigations.  It would depend upon the

9     complexity of the business activity.  I don't

10    know if I've approved other registrants, but

11    since distributors, a lot of the CFR pertains

12    to them, I thought it would be prudent to

13    provide the entire copy instead of printing

14    pages after -- page after page of the

15    regulations.

16         Q.     And part of the copy that you

17    provided HBC included the reporting of

18    suspicious orders, correct, sir?

19         A.     Yes.

20         Q.     And, sir, it's -- was -- part of the

21    reason for including Chapter 1300 was to alert

22    or notify HBC that it was obligated to create

23    and design a system to identify orders of an

24    unusual size, frequency or pattern?

25         A.     That's correct.

Page 143

1       Q.     Sir, if you would please open 46.

2   Mr. Colosimo, we're going to mark this as

3   Exhibit 4.

4                       -    -    -    -    -

5                  (Thereupon, Plaintiffs' Deposition

6                  Exhibit 4, List of Citations Bates

7                  Stamped DEA-T1BCC-00001825, was

8                  marked for purposes of

9                  identification.)

10                      -    -    -    -    -

11      Q.     Do you recognize this document, sir?

12      A.     Yes.

13      Q.     And, sir, this is -- the report that

14  we just left, Exhibit 3, included a reference to

15  a -- you providing a list of applicable

16  citations, correct?

17      A.     Yes.

18      Q.     And one of those citations is

19  Suspicious Orders, 1301.74(b), correct?

20      A.     Yes.

21      Q.     And another resource for HBC to use

22  to educate itself on its responsibility to

23  design and operate a system to identify

24  suspicious orders, you also included the DEA's

25  website specifically dedicated to diversion,

1  correct, sir?

2        A.    Yes.

3        Q.    And so what was the purpose of

4  providing registrants like HBC -- directing them

5  to the DEA's website?

6        A.    My practice in doing that, in

7  preparing the -- that would be to give the

8  applicant all the available resources that I

9  have that I believe that they should have to --

10  to know what is required of them.

11        Q.    So by including the DEA's website

12  with -- for registrants like HBC, there was a --

13  was there a significant amount of material on

14  that website related to registrants, like

15  distributors' obligations under the Controlled

16  Substance Act?

17        A.    Yes.

18        Q.    You would agree with me, sir, that

19  the DEA assists registrants, like the HBC,

20  understand the law and the regulations

21  associated with opiates under the Controlled

22  Substance Act, correct?

23        A.    It's my -- as an employee of DEA, I

24  attempt to educate the applicant or the

25  registrant, and I point them to, as noted on

Page 145

1    this, the DEA website, which has many different

2    forms of information, Q&As to letters to -- the

3    CFR -- I believe the CFR is even available on

4    that site.

5         Q.    And in addition to the DEA's website

6    with information that's available to HBC and

7    other registrants, the DEA sends out advisory

8    letters with educational material, correct?

9         A.    That's my understanding.

10        Q.    And you understand as well that the

11   DEA conducted educational meetings around the

12   country to explain the registrant's duties and

13   obligations under the Controlled Substance Act,

14   correct?

15        A.    That's my understanding, yes.

16        Q.    And is it your understanding that on

17   the DEA's website that the DEA publishes the

18   results of its enforcement actions to help

19   educate registrants like HBC?

20        A.    Excuse me.  Did you say enforcement

21   actions?

22        Q.    Yes, sir.

23        A.    Yes, it would -- yes, that is on

24   the website, I believe.

25        Q.    And all these are tools for the

Page 146

1    registrant to design and operate a system to

2    identify suspicious orders that were of an

3    unusual size, frequency or patterns, correct,

4    sir?

5         A.    I mean, that information is on

6    there, that information is available to the

7    registrant population.  It's my understanding

8    that that information does give guidance and it

9    would be helpful.

10        Q.    The very first exhibit we started

11   out with just a few minutes ago in Exhibit 1,

12   under the manual you were trained that it was

13   solely incumbent upon the registrant to know

14   their customers and the potential abuses of the

15   controlled substance products, correct?

16        A.    Yes.

17        Q.    And part of the material that's

18   published, whether it be through correspondence,

19   educational meetings conducted around the

20   country or the DEA's website, all of that

21   material provided by the DEA to registrants like

22   HBC was designed to help it fulfill its

23   obligations under the Controlled Substance Act,

24   correct?

25        A.    That's my understanding.  That's

Page 147

1   what my experience is.

2       Q.    Let's go through one of those

3   letters.  We've marked it as Exhibit 3.  We'll

4   put it up on the screen for you here.

5               You know who Mr. Rannazzisi is,

6   correct, sir?

7       A.    Yes.

8       Q.    And who do you understand, at this

9   point in June of 2012, Mr. Rannazzisi to be?

10  What was his role at the DEA?

11      A.    I'm not certain of his exact title,

12  but he was essentially the head of DEA

13  diversion control.  That's my understanding.

14      Q.    If we can flip to the second page of

15  this document with his signature block, Joseph

16  Rannazzisi, Deputy Assistant Administrator,

17  Office of Diversion Control.  Does that sound

18  about right?

19      A.    Yes.

20      Q.    And the first sentence of this

21  letter -- this letter is being sent to every

22  entity in the United States who is registered

23  with the Drug Enforcement Administration, DEA,

24  to manufacture or distribute controlled

25  substances.  Did I read that right?

Page 148

1          A.     Yes.

2          Q.     In 2012 HBC was registered with the

3    DEA as a distributor, correct?

4          A.     Yes.

5          Q.     And the DEA, in the second

6    paragraph, is informing registrants like HBC

7    that it was expressing its concerns regarding

8    drug abuse in the United States and highlighted

9    the responsibility of distributors to be

10   vigilant in the distribution of controlled

11   substances, correct, sir?

12         A.     Yes.

13         Q.     And through the course of the next

14   few sentences, do you see that Mr. Rannazzisi is

15   alerting registrants like HBC that it had sent

16   out prior letters, the example here in 2007, and

17   -- two of them in 2007, and 2006, that included

18   a list of factors that might indicate diversion;

19   correct, sir?

20         A.     Yeah, that's what it indicates in

21   this letter.

22         Q.     The next sentence, the last sentence

23   of the second paragraph, "The DEA encourages

24   registrants to take an integrated approach.

25   This point was emphasized in the December 2007

Page 149

1   letter and DEA is once again bringing it to your

2   attention."  Correct?

3        A.    Yes.

4        Q.    And the DEA is telling registrants

5   like HBC that the factors in the letters that

6   they had sent out in correspondence, two of them

7   in September '07 and one in September '06, that

8   these weren't comprehensive lists of all

9   possible indications of diversion, correct?

10       A.    That's what it says, yes.

11       Q.    And the last paragraph of this June

12  12, 2012 letter on the first page, "Registrants

13  who rely on rigid formulas to identify whether

14  an order is suspicious may fail to detect

15  suspicious orders."  So this is all part of the

16  DEA's program to educate registrants so that

17  they can fulfill their obligations under the

18  Controlled Substance Act, correct, sir?

19       A.    My understanding is this would be

20  part of that, yes.

21       Q.    And the next few sentences in the

22  last paragraph on Bates number 83 gives several

23  reasons why rigid formulas may fail to detect

24  suspicious orders, correct?

25       A.    Yes.

Page 150

1          Q.    If you turn to the next paragraph of

2     this same letter, Mr. Rannazzisi tells

3     registrants like HBC that the failure to

4     maintain effective controls against diversion is

5     inconsistent with the public interest as that

6     term is used in 21 USC Section 823 and 824,

7     correct, sir?

8          A.    Yes.

9          Q.    The next paragraph again points

10    registrants like HBC to the DEA's website that

11    has additional information, correct?

12         A.    Yes.

13         Q.    And the second to last paragraph

14    directing registrants like HBC to its website

15    even cites to a particular case from 2007

16    regarding the final order issued by the DEA

17    deputy administrator, correct?  It's the

18    Southwood case.

19         A.    Yes.

20         Q.    In the closing paragraph of this

21    paragraph the DEA seeks to educate its

22    registrants on their responsibilities and

23    obligations under federal laws and regulations

24    to ensure that controlled substances are used

25    for legitimate purposes and to prevent

1  diversion, correct?

2         A.    Yes.

3         Q.    So similar to the packet that you

4  handed HBC with the entire Chapter 1300 and the

5  website, this one letter is another example of

6  the DEA educating registrants like HBC regarding

7  its obligations under the Controlled Substance

8  Act, correct?

9         A.    I would agree with that.

10        Q.    And the last sentence here, sir,

11  says your -- Mr. Rannazzisi is telling

12  registrants like HBC that its role in the proper

13  handling of controlled substances is critical

14  for public safety as it helps to protect society

15  against drug abuse and diversion.  Did I read

16  that correctly, sir?

17        A.    Yes.

18        Q.    And the examples that we've just

19  reviewed in Exhibit 3 are consistent with the

20  messaging that went to registrants over a number

21  of years, correct, sir?

22        A.    That's my understanding.

23        Q.    If you would please open P-DEA 62,

24  which we're going to mark as Exhibit 5.

25                    -   -   -   -   -

```
                                                  Page 152

 1                    (Thereupon, Plaintiffs' Deposition

 2                    Exhibit 5, Letters from Joseph T.

 3                    Rannazzisi to Several Recipients,

 4                    Beginning Bates Stamp

 5                    US-DEA-00026067, was marked for

 6                    purposes of identification.)

 7                           -    -    -    -    -

 8         Q.    I'd like you, sir, to turn to Bates

 9    number 83, several pages in.  Do you see,

10    Mr. Colosimo, this is another piece of

11    correspondence to the Giant Eagle CEO?  Do you

12    see that, sir?

13         A.    Yes.

14         Q.    And it's, again, signed by

15    Mr. Rannazzisi.  Do you see that, sir?

16         A.    Yes, it has his name on there.

17         Q.    And, sir, this piece of

18    correspondence isn't dated, but do you see the

19    October 31, 2012 in the third paragraph?

20         A.    Yes.

21         Q.    Let's go back to the first sentence.

22    In October of '12 the DEA is alerting Giant

23    Eagle through its CEO that the diversion of

24    pharmaceutical controlled substances through the

25    United States is a growing national problem.
```

Page 153

1            Do you see that, sir?

2            MS. CARROLL:  Objection.  Form.

3     Misstates the document.

4            The witness may answer.

5       A.    That's -- the first sentence is as

6     you read it.

7       Q.    Yes, sir.

8            And, sir, the DEA's education of

9     registrants like HBC to the fact that the

10    pharmaceutical controlled substances and

11    diversion of same, that that was a growing

12    national problem, is that consistent with your

13    understanding of the DEA's education of

14    registrants like HBC?

15      A.    I would say that in my opinion that

16    sentence is consistent with my understanding.

17      Q.    And the second sentence, "This

18    diversion stems from various sources," and

19    Mr. Rannazzisi lists pharmacy robberies and

20    thefts, pharmaceutical controlled substances,

21    but it also lists forged prescriptions, doctor

22    shoppers, or illegitimate prescriptions from

23    rogue practitioners; did I read that right, sir?

24      A.    Yes.

25      Q.    And, again, is this consistent with

Page 154

1  your experience at the DEA, that Mr. Rannazzisi

2  is alerting registrants like HBC of different

3  avenues or possibilities of diversion?

4          MS. CARROLL:  Objection.

5      A.    I would agree that these are --

6  these are different forms of diversion that are

7  mentioned in that third sentence.

8      Q.    And the second paragraph of this

9  letter from Mr. Rannazzisi is alerting the CEO

10  of Giant Eagle that the DEA is going to conduct

11  a meeting in Illinois to help with information

12  regarding identifying and responding to

13  potential diversion activity and to promote

14  compliance with the Controlled Substance Act,

15  correct, sir?

16      A.    That's what it says.

17      Q.    And, sir, is this consistent with

18  your understanding at the DEA that registrants

19  like HBC were invited to meetings with the DEA

20  to help educate them on potential areas of

21  diversion?

22          MR. LIVINGSTON:  Objection.

23      A.    It's my understanding that DEA was

24  holding meetings, seminars.  I'm not -- I can't

25  recall this specific meeting that they're

Page 155

1   referring to that -- in Illinois.

2        Q.    But generally speaking, sir, you're

3   confident that the -- you understand that the

4   DEA was notifying registrants about conducting

5   meetings regarding their obligations under the

6   Controlled Substance Act and, more specifically,

7   diversion, correct, sir?

8        A.    That's my understanding, yes.

9        Q.    So the interactions between the DEA

10  and registrants like HBC regarding their

11  obligations to design and operate a system to

12  identify suspicious orders of unusual size,

13  frequency or patterns were not just during the

14  investigations or audits that you performed, but

15  a wide number of opportunities for HBC to

16  educate itself regarding its responsibilities?

17            MR. LIVINGSTON:  Objection.

18       A.    This letter is an example of an

19  opportunity for the registrant to be educated.

20       Q.    I'm sorry.  That was probably my

21  best question of the day and I just read it into

22  the mute.  Let me read that again.

23            Mr. Colosimo, it's consistent with

24  your understanding that HBC's opportunities to

25  educate itself on its obligations under the

Page 156

1   Controlled Substance Act extended beyond the

2   interactions with you and other investigators

3   during audits, correct?

4         A.    I believe so, yes.

5         Q.    Sir, if you would, please, open the

6   file I have marked as P-DEA 65.  I'm going to

7   mark this as Exhibit 6.

8                     -   -   -   -   -

9               (Thereupon, Plaintiff's Deposition

10              Exhibit 6, Report of Investigation

11              dated August 13, 2013, Beginning

12              Bates Stamp US-DEA-00030485, was

13              marked for purposes of

14              identification.)

15                    -   -   -   -   -

16        Q.    And I apologize for not following

17  along.  Sir, was this -- did you take part with

18  this report of investigation?

19        A.    You said this is under -- I'm

20  sorry -- DEA 65?

21        Q.    Yes.

22        A.    No, I was not -- I was not part of

23  this investigation.

24        Q.    Was it your practice, sir -- you

25  were part of investigations after this August

Page 157

1   13, 2013 report, correct?

2        A.    I was a part of the pre-registrant

3   investigation for this facility and I was part

4   of the on-site pre-registrant investigation of

5   the -- Giant Eagle's facility in Freedom,

6   Pennsylvania.  I was not part of the scheduled

7   or cyclic investigation of either warehouse or

8   facility that distributed controlled

9   substances.

10       Q.    When conducting a -- I'm going to

11  call it a post-investigation or to go back and

12  look at or review prior reports of

13  investigation?

14       A.    That would be part of my

15  experience, my procedures when I do my

16  investigation.

17       Q.    Do you recall reviewing -- let's put

18  it up on the screen here -- the August 13, 2013

19  report of investigation?  And, sir, if you could

20  turn to Bates number 97 under the Due Diligence

21  section.

22       A.    Yes.

23       Q.    Sir, you see I have it marked here

24  in the middle of the page that HBC was alerted

25  that it did not have a computerized software

Page 158

1   system to identify suspicious orders?

2       A.    I don't know that the report says

3   they were alerted, but the representative

4   advised that they had no computerized software

5   system and they informed the DEA investigators

6   on-site of that fact.

7       Q.    And, sir, do you have an

8   understanding who Rogos is, R-o-g-o-s?

9       A.    Earlier in that section he's

10  identified as the operations manager for

11  HBC/Giant Eagle.

12      Q.    And in the section at the bottom of

13  Bates number 97, Rogos advised that if a Giant

14  Eagle pharmacy were to receive unusually high

15  orders of controlled substances from HBC

16  deviating from other stores, he relayed that it

17  would be noticed at the Giant Eagle, Inc.

18  headquarters, right, sir?

19      A.    Yes.

20      Q.    And he advised the DEA on the next

21  page, Bates number 98 -- I apologize.  It's on

22  Bates number 97 -- he would bring the issue to

23  the attention of Greg Carlson and Kim Remas at

24  Giant Eagle's headquarters.  Do you see that at

25  the bottom, sir?

Page 159

1          A.     Yes.

2          Q.     On the next page, Bates number 98,

3    Investigator Conlon advised Rogos to develop a

4    better system of due diligence.

5                 Do you see that, sir?

6                 MS. CARROLL:  Excuse me, counsel.

7    We're not getting a good focus on this.

8                 Much better.  Thank you.

9          A.     Yeah, the report indicates that

10   Rogos was advised to develop a better system of

11   due diligence.

12         Q.     Sir, if you would please open the

13   file that's labeled P-DEA 69.

14                      -    -    -    -    -

15                 (Thereupon, Plaintiffs' Deposition

16                 Exhibit 7, Report of Investigation

17                 dated December 3, 2014, Beginning

18                 Bates Stamp US-DEA-00030618, was

19                 marked for purposes of

20                 identification.)

21                      -    -    -    -    -

22         Q.     This is a copy of another DEA report

23   of investigation dated 12-3-2014 that was part

24   of its file, correct, sir?

25         A.     Yes.

Page 160

1          Q.    And it's dated 12-3-2014, correct,

2     sir?

3          A.    Yes.

4          Q.    And on Bates number 30 of this

5     document there's another section similar to the

6     last report of investigation titled Due

7     Diligence, correct, sir?

8          A.    Yes.

9          Q.    Wherein HBC advised the DEA that its

10    parent company has no computerized software

11    system to indicate that an order may be

12    suspicious, correct, sir?

13         A.    Yes.

14         Q.    And HBC, through Mr. Rogos, advised

15    that if a Giant Eagle pharmacy were to receive

16    unusually high orders of controlled substances

17    from HBC, deviating from other stores, it would

18    be noticed at the Giant Eagle, Inc. headquarter

19    level, correct, sir?

20         A.    Yes, that's what it says there.

21         Q.    And, sir, I think that's the second

22    entry that we've seen in the DEA's report of

23    investigation that headquarters was monitoring

24    orders from HBC's pharmacies, correct?

25         A.    That was cited in here as well as

Page 161

1    the prior investigation that you mentioned.

2         Q.    So you would expect at this point in

3    time, based on Mr. Rogos' representation to the

4    DEA, that HBC or Giant Eagle would have a --

5    would have designed a system to identify

6    suspicious orders at headquarters, correct, sir?

7                   MR. LIVINGSTON:  Object to the

8    form.

9         A.    This is the second report that

10   indicates that there's no computerized software

11   system and that Giant Eagle assured the

12   investigators that they would be notifying

13   Giant Eagle headquarters of that fact.

14        Q.    And Mr. Rogos again relays at the

15   bottom of this report, consistent with the last

16   report that we looked at, that he will bring

17   this issue to the -- if you turn the page to

18   Bates number 81 -- attention of Greg Carlson and

19   Kim Remas at Giant Eagle's headquarters

20   controlled substance purchasing unit, correct?

21        A.    That's what it says, yes.

22        Q.    Mr. Colosimo, if you would please

23   open the file marked DEA 53, which we're going

24   to mark as Exhibit 8.

25                   -   -   -   -   -

```
                                              Page 162

 1                  (Thereupon, Plaintiffs' Deposition

 2                  Exhibit 8, Report of Investigation

 3                  dated January 11, 2016, Beginning

 4                  Bates Stamp DEA-T1BCC-00001846, was

 5                  marked for purposes of

 6                  identification.)

 7                       -    -    -    -    -

 8        Q.    This is dated 1-11-2016 and this was

 9    a report of investigation conducted by you,

10    correct, sir?

11        A.    Yes.

12        Q.    And you also signed this report on

13    1-11-2016, correct, sir?

14        A.    Yes.

15        Q.    And, sir, you made a notation in

16    this report, Bates number 48, that HBC or Giant

17    Eagle, that it now had written policies and

18    standard operating procedures regarding its

19    obligations under the Controlled Substance Act

20    to identify suspicious orders, correct, sir?

21        A.    Yes.

22        Q.    Now, sir, let me -- so the jury has

23    a little bit of context, Giant Eagle has more

24    than 200 pharmacies that were serviced through

25    this distribution center, correct?
```

Page 163

1          A.     That's what I recall.

2          Q.     And do you recall, sir, that -- I

3    think during your testimony earlier today --

4    that this one distribution center serviced all

5    200 plus pharmacies?

6          A.     I mean, that's what my

7    understanding was and is, that I don't know if

8    Giant Eagle had multiple distributors at the

9    time or since our office approved the

10   facilities, but my understanding was that this

11   facility was distributing to multiple states

12   that had Giant Eagle pharmacies.

13         Q.     And that Giant Eagle had relayed to

14   either you and/or your colleagues in those prior

15   reports of investigation that headquarters was

16   keeping an eye or would pick up on orders that

17   were of unusual sizes or frequency or pattern,

18   correct?

19              MS. CARROLL:  Objection.  Form.

20              The witness may answer.

21         A.     Yeah.  My recollection is that I

22   was informed that -- by Giant Eagle personnel

23   that headquarters was monitoring customer

24   pharmacy orders.

25         Q.     Sir, would it surprise you in years

Page 164

1   like 2010, '11, '12, '13, '14 that this -- the

2   HBC pharmacies were dispensing more than 20

3   million dosage units of oxycodone and

4   hydrocodone a year?

5              MR. LIVINGSTON:  Objection to form.

6              MS. CARROLL:  Excuse me, counsel.

7   I'm going to object to the scope.  I think

8   we're getting away from distribution facility

9   inspections and we're talking about pharmacies.

10  Would you care to rephrase?

11             MR. MOUGEY:  No, I don't.

12       Q.    Mr. Colosimo, would it surprise you

13  that HBC was dispensing more than 20 million

14  dosage units a year in '11, '12, '13, '14 of

15  oxycodone and hydrocodone?

16             MR. LIVINGSTON:  Objection again.

17  It's also beyond the Touhy scope.

18             MS. CARROLL:  I'll reiterate my

19  objection and direct the witness not to answer.

20             MR. MOUGEY:  I'm sorry.  You're

21  going to direct the witness not to answer?

22             MS. CARROLL:  If the question is

23  about dispensing from pharmacies -- is that the

24  question?

25             MR. MOUGEY:  Ms. Carroll, maybe you

Page 165

1  missed it, but in response to the -- HBC's and

2  Giant Eagle's responsibilities under the

3  Controlled Substance Act, the last two reports

4  of investigation have referenced the DEA to

5  HBC's corporate monitoring of orders from its

6  pharmacies.  My suggestion is to let him answer

7  and we can -- after reading the record, if you

8  want to object to it later, I think you've

9  preserved it.

10          MR. LIVINGSTON:  I was not

11  permitted to ask those kinds of questions

12  because of the limitations imposed by the Touhy

13  letter.

14          MR. MOUGEY:  HBC is the party that

15  directed the DEA to its corporate monitoring of

16  orders from its pharmacies and I'm simply

17  asking a follow-up question that's in the

18  report.

19          MR. LIVINGSTON:  No.  You're asking

20  a different question about dispensing.

21          MR. MOUGEY:  Well, the only orders

22  that the pharmacies put in were in relation to

23  its own dispensing, correct, Mr. Colosimo?

24          MS. CARROLL:  The Touhy authorizes

25  Mr. Colosimo to speak to his investigations of

Page 166

1    Giant Eagle distribution facilities.  To the

2    extent that you're discussing a report as to

3    those investigations, I think it's within the

4    scope.  Beyond that, activities at pharmacies,

5    et cetera, I believe it's beyond the scope.

6              MR. MOUGEY:  I'm not asking about

7    activities at pharmacies.  I'm just simply

8    asking if --

9         Q.    Let's do it this way.  Do you have a

10   feel, Mr. Colosimo, or an understanding of how

11   many dosage units HBC was running through its

12   distribution center?

13             MR. LIVINGSTON:  Objection.

14        A.    I can't recall those amounts for

15   those particular drugs.

16        Q.    Would it surprise you, sir, that the

17   numbers were in the tens of millions on an

18   annual basis that were coming through HBC or

19   Giant Eagle's distribution center of just

20   oxycodone and hydrocodone?

21             MR. LIVINGSTON:  Objection to form.

22        A.    Again, I don't know what the amount

23   was or -- and I can't recall what would be an

24   acceptable or an excessive amount.

25        Q.    Yes, sir, I understand that.  For

Page 167

1    context, what I'm looking for is volume, and I'm

2    going to represent to you, sir, that there were

3    tens of millions of dosage units of oxycodone

4    and hydrocodone coming through HBC or Giant

5    Eagle's distribution center.  Okay, sir?  During

6    the scope of your investigative reports, you and

7    your colleagues at the DEA were not reviewing

8    order by order from HBC or Giant Eagle

9    pharmacies, correct, sir?

10         A.    I'm sorry.  What do you mean,

11   "order by order"?

12         Q.    From orders from the pharmacies

13   to -- HBC/Giant Eagle pharmacies to -- for oxy

14   and hydro.  You were not reviewing those orders

15   one by one, correct, sir?

16         A.    One by one, we did not do that, I

17   did not do that.

18         Q.    Yes, sir.  And part of your

19   investigations -- you weren't reviewing these

20   millions of pills and the orders during your

21   investigations, correct, sir?

22         A.    My investigation was the

23   pre-registrant investigation of HBC, then later

24   the Giant Eagle facility.

25         Q.    In the course of those

Page 168

1    investigations or your reviews, it was not the

2    DEA's practice to review order by order,

3    correct, sir?

4         A.    It was -- that was not my practice,

5    and I don't -- I can't speak to the other

6    investigators, but my experience is that we

7    would not have been reviewing order by order.

8         Q.    And, sir, it would almost be --

9    based on your practice and experience, it would

10   be impossible to review the hundreds of

11   thousands or millions of orders that came in

12   through HBC's pharmacies during the scope of

13   your investigation, correct?

14              MS. CARROLL:  Object to the form.

15              The witness may answer if he feels

16   it's within the scope of the authorization.

17        A.    You had mentioned or asked a few

18   times order by order.  That's not something

19   that -- that I would have been doing for my

20   investigations, order by order.

21        Q.    Or that you observed any other DEA

22   investigators reviewing orders, correct, sir?

23              MR. LIVINGSTON:  Object to the

24   form.

25        A.    Correct.  I did not observe other

                                        Page 169

1    investigators reviewing order by order.

2         Q.    Sir, did it remain consistent with

3    your practice at the DEA on this Exhibit 8 2016

4    investigation that the DEA was not reviewing and

5    approving HBC or Giant Eagle's SOM policy or

6    system that was in place when you approved their

7    application or its application in 2016, correct?

8              MR. LIVINGSTON:  Object to the

9    form.

10             MS. CARROLL:  I'm sorry, counsel.

11   Could you repeat the question?

12             MR. MOUGEY:  I think that was a bad

13   question.  Let me restate it.  I apologize.

14        Q.    Sir, did it remain consistent with

15   your practice at the DEA and Exhibit 8, this

16   report of investigation, that the DEA was not

17   approving HBC/Giant Eagle's SOM policies and/or

18   systems that were in place, correct?

19             MR. LIVINGSTON:  Object to the

20   form.

21        A.    We reviewed the policy to the

22   extent that it was summarized in the

23   description of what they were doing, but we did

24   not sanction -- me personally and my

25   supervisor, Mr. Dittmer, did not sanction or

Page 170

1   approve of that suspicious order system in

2   place.

3            MR. MOUGEY:  I don't think I have

4   any more questions.  If you guys give me less

5   than a five-minute break, I'll confirm with my

6   colleagues and I don't think I have anything

7   else.  If you could give me just a few minutes

8   off the record.

9            THE VIDEOGRAPHER:  We're off the

10  record.

11                (Recess had.)

12            MR. MOUGEY:  On behalf of

13  Plaintiffs, we don't have any further

14  questions.

15       FURTHER EXAMINATION OF LEWIS COLOSIMO

16  BY MR. LIVINGSTON:

17       Q.    Can you look at our Exhibit, which

18  is the binder, 3, at page 70?  So this is the

19  report of investigation of the HBC facility from

20  December of 2014.  You were just asked some

21  questions about this exhibit, which was

22  Plaintiffs' Exhibit 7, by Mr. Mougey.  Do you

23  see under 10, Meeting with Management, it says,

24  "During this meeting the investigators advised

25  Giant Eagle's management that both recordkeeping

Page 171

1    and security are in full compliance with the

2    requirements in Title 21 CFR"?  That tells you,

3    sir, that Giant Eagle was told at this time that

4    it was meeting all of the security requirements,

5    including the SOM regulation, correct?

6              MS. CARROLL:  Object to the form.

7              The witness may answer.

8         A.    Yeah.  According to that sentence,

9    it does indicate that Investigators Conlon and

10   Sousa advised Rogos and Kuchta that

11   recordkeeping and security are in full

12   compliance.  That's what it says.

13        Q.    Okay.  And, sir, if you go back to

14   the previous page -- I guess it's actually page

15   69 of this exhibit -- this is that discussion

16   that -- between Mr. Rogos and the DEA

17   investigators about Giant Eagle's SOM system at

18   the time, correct?  You were just asked some

19   questions about this from Mr. Mougey.

20        A.    Yes.

21             MS. CARROLL:  Objection.  Form.

22             The witness may answer.

23        Q.    Sir, isn't this literally word for

24   word identical to what was in the previous

25   report from August of 2013 that we looked at

Page 172

1  earlier?

2        A.    My understanding is that this is

3  very similar.  I don't know how word for word

4  it would be, I would have to look at it closer,

5  but it's similar to what was addressed in the

6  prior investigation.

7        Q.    And don't you find it odd that

8  there's no reference to the prior discussion in

9  this section of the report?  Wouldn't that be

10  normal if in 2013 there had been a discussion

11  where the DEA had made a recommendation to Giant

12  Eagle and that the same discussion would be

13  reproduced without any reference back to the old

14  discussion?

15              MS. CARROLL:  Object to the form.

16              The witness may answer.

17        A.    I didn't author this.

18        Q.    No.  I'm just saying if you were

19  drafting this report, wouldn't you reference the

20  prior discussion?

21              MS. CARROLL:  Object to the form.

22              The witness may answer.

23        A.    If I'm to testify, speak about my

24  own experience, my own practices, I would -- I

25  would make reference that this was -- it was

1   brought up to the Giant Eagle personnel in the

2   prior visit.

3        Q.   So isn't it possible that this is

4   just, you know, a cut and pasting of the prior

5   report, of this section from the prior report?

6             MS. CARROLL:  Object to the form.

7             The witness may answer.

8        A.   That's -- that would be speculation

9   on my part.

10       Q.   Right.  Just that it's a

11  possibility?

12       A.   Is it possible?  Is it not

13  possible?  It's possible, but I don't know what

14  was done on this.  I'm just reading this at --

15  as it states, what was said, what was

16  discussed.

17       Q.   And earlier today I asked you some

18  questions about some internal Giant Eagle

19  documents referring to a threshold system that

20  was in place after the 2013 inspection.  Do you

21  remember I asked you some questions about that?

22       A.   I recall threshold came up, but I

23  can't recall specifically the context that

24  you --

25       Q.   Remember, one of the e-mails

Page 174

1   referred to reporting the flagged order to you

2   and you just didn't recall whether you were

3   notified or not?  Do you remember that?

4        A.    Yes.

5        Q.    And so what you don't know, sir, is

6   whether or not Giant Eagle, in fact, in response

7   to the recommendation from the DEA as to how to

8   improve its SOM system, whether or not it, in

9   fact, went with an automated system by the end

10  of 2013?  You have no knowledge of that sitting

11  here today; is that correct?

12            MS. CARROLL:  Object to the form.

13            The witness may answer.

14       A.    Yeah, I don't know for certain

15  whether they had that system in place as of

16  that date.

17       Q.    Would you agree that based on your

18  interactions with Giant Eagle, you understood

19  Giant Eagle to always be trying to improve its

20  security systems, including its SOM system?

21       A.    I don't know what -- I don't know

22  that I can answer that question.  I don't know

23  what deliberations Giant Eagle employees had,

24  whether they were doing all that they could do

25  to ensure their system was -- was sufficient,

Page 175

1  was effective.

2       Q.    Let me rephrase it and maybe you'll

3  be more comfortable answering this one.  Would

4  it be fair to say that as Giant Eagle's SOM

5  system was described by Giant Eagle to you over

6  the years, that Giant Eagle's SOM system

7  improved as described?

8       A.    In reviewing this from the 2009

9  pre-registrant inspection through the

10 inspections that were done at HBC to my

11 pre-registrant investigation in '15, '16, that

12 are -- that system was -- it was better

13 described, it seemed -- it was a formal system.

14 In effect, I don't know if it was more

15 effective than an earlier system, but it was

16 definitely -- it was -- by the time of the

17 pre-registrant investigation in '15 and '16,

18 there was a -- it appeared to be a more

19 formalized detailed monitoring system in place.

20                  -   -   -   -   -

21             (Thereupon, Defendants' Deposition

22             Exhibit 10, E-Mail from Victor

23             Vercammen to Lewis Colosimo and

24             Nancy Jackson dated June 3, 2019,

25             was marked for purposes of

```
 1            identification.)

 2                  -    -    -    -    -

 3        Q.    Look at Exhibit 10, page 1, in our

 4   binder.  Do you see this is an e-mail from

 5   Victor Vercammen dated June 3, 2019 to yourself

 6   and Nancy Jackson.  Is she a colleague of yours

 7   at the DEA?

 8        A.    Yes.  At the time she was my

 9   supervisor.

10        Q.    Do you recall meeting with

11   Mr. Vercammen around this time?

12        A.    I recall somewhere around that

13   time.  It was not a meeting.  It was a

14   conference call.

15        Q.    It refers to a -- I guess a

16   conference call you had on May 15th of 2019 to

17   discuss recent changes in Ohio law related to

18   suspicious order reporting by distributors and

19   the potential impact of those changes on federal

20   suspicious order reporting.  Do you recall that

21   being the subject of your discussion with

22   Mr. Vercammen?

23        A.    This is -- this is the e-mail that

24   summarizes that.  Part of what we did discuss

25   was whether DEA's or the CFR cite or DEA
```

Page 177

1    reporting requirements had changed based upon

2    the change in Ohio, Ohio -- the State of Ohio's

3    reporting requirements.

4         Q.    Right.  And was it your

5    understanding that essentially Ohio law was

6    requiring every potentially -- potential

7    suspicious order that was flagged by a SOM

8    system to be reported and Giant Eagle was

9    wondering whether the DEA wanted to receive a

10   report of everything that's flagged for just

11   those after investigation that were determined

12   to be, in fact, suspicious orders?

13                MS. CARROLL:  Object to the form.

14                The witness may answer.

15        A.    Yeah.  Could you repeat that again?

16        Q.    Why don't we just go through the

17   letter.  Maybe it will be easier.

18                The next paragraph says, "As we

19   described our current system, Giant Eagle has a

20   multi-layered system of controls to prevent

21   theft and diversion which also prevents and

22   detects suspicious orders if they ever occur."

23   And then again it says, "Corporate, warehouse

24   and pharmacy control."  So was it your

25   understanding that Giant Eagle explained to you

Page 178

1    at this point in time that their suspicious

2    order monitoring system had controls at all

3    three levels of the company?

4         A.    I don't recall the specifics,

5    whether those three items, corporate, warehouse

6    and pharmacy, were -- if those were discussed,

7    if they were discussed in any detail.  I don't

8    recall specifically those three, but I just --

9    I recall a general discussion of whether that

10   CFR cite or DEA's requirement had changed with

11   a change in Ohio reporting requirements.

12        Q.    If we go down a little further, it

13   says, "GERx is closely monitored by Giant Eagle

14   corporate headquarters, including controls over

15   controlled substance inventories."

16             Is that your understanding that --

17   how Giant Eagle's controls -- I mean,

18   suspicious order monitoring system works, that

19   there's corporate oversight of controlled

20   substance inventories?

21             MS. CARROLL:  Object to the form.

22             Witness may answer.

23        A.    I mean, it's my understanding that

24   Giant Eagle headquarters corporate office would

25   monitor those items closely.  I don't know how

1  close it is.  This is what the e-mail says.

2  But my understanding is that there is

3  monitoring that they do.

4       Q.    All right.  Then it goes on to say

5  that there are controls at the warehouse level

6  and also at the pharmacy level.  Is that your

7  understanding today, that Giant Eagle suspicious

8  order monitoring system has controls at all

9  three levels?

10      A.    I don't recall that these specific

11 items were discussed, if this is statements of

12 what Giant Eagle is doing or -- I don't recall

13 specifically the detail that he, you know,

14 lists in this e-mail.

15      Q.    Well, whether you discuss it or not,

16 it's set forth in this letter, and so did this

17 letter educate you then that Giant Eagle now has

18 controls at all three levels?

19           MS. CARROLL:  Objection.  Form.

20           The witness may answer.

21      A.    I mean, that's what is represented

22 in this -- this e-mail.

23      Q.    Skip down to the next paragraph.  It

24 says, "An additional corporate level control is

25 a software program that monitors all pharmacy

Page 180

1   orders placed with GERx based upon past ordering

2   trends and other information in order to detect

3   orders of interest."

4              Do you see that?

5      A.    Yes.

6      Q.    So you would agree that this is sort

7   of a form of an automated suspicious order

8   monitoring system, correct, as described?

9              MS. CARROLL:  Object to the form.

10             The witness may answer.

11     A.    As described there, that appears to

12   be a computerized software program.

13     Q.    And then it says, "When orders of

14   interest are identified by this program, Giant

15   Eagle investigates and documents the reasons for

16   the orders.  In nearly all cases the orders of

17   interest are resolved as human error, including

18   accidental, duplicate or large orders, episodic

19   increases in legitimate prescriptions presented

20   to the pharmacies or similar reasons," and he

21   calls them i.e. cleared orders.  "As we

22   discussed, Giant Eagle has not been reporting

23   the cleared orders to DEA, Ohio, Pennsylvania or

24   any other authority since there is no known risk

25   of diversion.  However, due to the recent

Page 181

1    changes in Ohio law, we understand that the

2    cleared orders must now be reported to Ohio and

3    we considered whether DEA and other authorities

4    similarly want us to report all cleared orders

5    in addition to actually suspicious orders."

6              So does that refresh your

7    recollection that Giant Eagle was asking the

8    DEA whether it wanted all orders of interest to

9    be -- to be notified of all orders of interest

10   or just orders that are determined to be

11   suspicious after investigation?

12             MS. CARROLL:  Object to the form.

13             The witness may answer.

14        A.   It was -- specifically we did not

15   delve into the Ohio requirements.  We

16   emphasized -- I'm speaking we, myself and the

17   group supervisor, Nancy Jackson, that the CFR

18   regulation did not change, that they were --

19   this has not changed their obligation since the

20   inception of that CFR order, that they were

21   required to design and operate that system and

22   to report suspicious orders.  We directed

23   Mr. Vercammen as well as Mr. Chunderlik to

24   consult with the Ohio board for clarification

25   with what they required.  We indicated there's

Page 182

1   no change in what DEA -- DEA required.

2       Q.    But if you go to the next paragraph,

3   it says, "It was further suggested that DEA does

4   not want to receive reports regarding cleared

5   orders and instead Giant Eagle should only

6   report those orders that have not been cleared

7   and not filled because it deems them

8   suspicious."

9             Is that, in fact, the directive

10  that you and Ms. Jackson gave Giant Eagle at

11  the time?

12      A.    I don't -- I don't recall the

13  discussion of cleared orders.  Orders came up.

14  I can't recall specifically, but we told them

15  that you are to report to DEA what you deem to

16  be a suspicious order.  That did not change

17  from -- regardless of any change in Ohio state

18  law.

19      Q.    And by suspicious order, you mean an

20  order that, after investigation, has been

21  determined to be suspicious, correct?

22      A.    What's your question again?

23      Q.    When you say "suspicious order,"

24  you're referring to an order that, after

25  investigation, has been determined to, in fact,

Page 183

1  be a suspicious order?

2        A.    They did not -- my understanding is

3  that they did not use the word "suspicious

4  order."  Suspicious order was only what they

5  deemed to be suspicious.  We did not delve into

6  the criteria that they -- they explained to us

7  some of the things -- some of the steps that

8  they would do, but our view was that you report

9  to us suspicious order and that that did not

10  change with the change in Ohio law.

11        Q.    The last paragraph says, "In

12  summary, we agreed that Giant Eagle will

13  continue to report to DEA only those orders that

14  have not been cleared and where such order was

15  refused due to our determination that the order

16  is actually suspicious, and will not,"

17  underscore, "report cleared orders that are

18  being reported to Ohio under the new law."

19              Is that what the agreement was?  Is

20  that accurate?

21        A.    We explained to them that whatever

22  you were doing before the Ohio law changed, you

23  were to continue to do that with regard to

24  reporting to us suspicious orders.

25        Q.    At the very end Mr. Vercammen says,

Page 184

1    "If I have misunderstood any of our discussions,

2    please let me know as soon as possible."

3              Did you ever respond to his e-mail?

4         A.    That e-mail -- actually, I don't

5    know if that -- that e-mail was directed to

6    Supervisor Jackson.  They may have had an -- if

7    I could look at the top of that.  That's not

8    how I spell my first name.

9         Q.    So you don't think -- did you

10   receive this?

11        A.    I don't know if it was sent to me

12   directly.  I did -- I did review this.  I don't

13   know -- I don't recall responding to it.  I

14   don't know if Supervisor Jackson responded to

15   that.

16        Q.    I think you testified a few minutes

17   ago about how the DEA's view is that

18   distributors like Giant Eagle should be vigilant

19   with respect to trying to prevent diversion in

20   complying with the DEA's regulations, correct?

21        A.    That they should be vigilant?

22        Q.    Yes.

23        A.    Yes.

24        Q.    And, sir, based on all your

25   interactions with Giant Eagle, you saw no

Page 185

1    evidence that Giant Eagle was acting in any way

2    other than vigilant with respect to complying

3    with the DEA's regulations?

4            A.    I don't know all that they've done

5    to comply with DEA regulations.

6            Q.    That's why I'm limiting my question

7    to your interactions.

8            A.    And that's a broad -- my

9    interaction with Giant Eagle is -- has been

10   under many different formats or scenarios, from

11   pharmacy inspections to pre-inspections,

12   security suggestions.  Which in particular are

13   you referring to?

14           Q.    I'm not aware of all your

15   interactions.  I just know you've had many, and

16   that's why I'm asking the question the way I am.

17               Are you aware of any -- is there

18   any evidence that you can point to us that

19   suggests that Giant Eagle was anything other

20   than vigilant with respect to complying with

21   the DEA's regulations?

22           A.    I don't have direct information

23   that they were not compliant.

24           Q.    To your knowledge, there was never

25   an administrative action of any kind taken

Page 186

1   against Giant Eagle's distribution facilities

2   for not complying with the DEA's regulation?

3       A.    My recollection is there was not

4   administrative action taken.

5       Q.    We talked a little bit about SOM

6   systems, automated versus sort of a manual

7   system.  From the DEA's perspective, the DEA

8   doesn't care whether it's automated or manual,

9   right?

10      A.    DEA, from my perspective, that is

11  not dictated.  In that specific CFR cite it

12  does not indicate whether it's automated or

13  computer -- or manual.  Sorry.

14      Q.    Why don't you go to Exhibit 15.

15              -   -   -   -   -

16              (Thereupon, Defendants' Deposition

17              Exhibit 15, Thomas Prevoznik

18              Deposition Excerpt, was marked for

19              purposes of identification.)

20              -   -   -   -   -

21      Q.    This is testimony that Thomas

22  Prevoznik gave -- He's from DEA headquarters --

23  earlier in this litigation.  Do you know him?

24      A.    I do know Mr. Prevoznik, yes.

25      Q.    If you go to page 5 of this exhibit,

Page 187

1   on page 180 of the transcript, line 12, he was

2   asked, "Does it matter to the DEA whether a

3   registrant reviews orders manually or uses an

4   automated system?"  And his answer was:  "No, it

5   doesn't matter."

6            Do you agree with his testimony?

7            MR. MOUGEY:  Objection.

8       A.   I don't know that I could say that

9   it does not matter.  I don't know if I would

10  necessarily agree with that or disagree, but it

11  would depend on the distributor.  It would

12  depend on several factors, I believe.  I

13  can't -- I wouldn't agree that it's a blanket

14  statement that it does not matter.

15      Q.   Well, with respect to Giant Eagle,

16  the DEA found that its SOM system, both when it

17  was described as a manual system and when it was

18  later described as an automated system, were

19  both in compliance with the DEA's security

20  regulations, correct?

21           MS. CARROLL:  Object to the form.

22           The witness may answer.

23      A.   I didn't -- did not go beyond the

24  scope of the CFR cite that -- the system -- the

25  registrant has to design and operate that

Page 188

1    system.  I don't know how effective Giant

2    Eagle's system was.

3         Q.    Well, we know there were subsequent

4    cyclic investigations of Giant Eagle's HBC

5    facility, we just went over those investigation

6    reports, where the SOM system that Giant Eagle

7    had was specifically discussed with the DEA and

8    a recommendation was made to improve the system

9    but a finding was made that the system was in

10   full compliance, correct?

11              MR. MOUGEY:  Objection.

12              MS. CARROLL:  Object to the form.

13              The witness may answer.

14        A.    Yes.  Based upon the statements in

15   those reports that -- the investigators did

16   indicate that recordkeeping and security were

17   in compliance.

18              MS. CARROLL:  Excuse me.  Could we

19   get a time check real quick?

20              THE VIDEOGRAPHER:  Sure.  One

21   moment.  We went on the record at 2:15 this

22   last segment.  It's now 2:42.

23              MR. LIVINGSTON:  I have a total of

24   three and a half hours, so how much time have I

25   used?

Page 189

1                THE VIDEOGRAPHER:  Three hours and

2     one minute during your first segment, and

3     you're just about 30 more minutes -- about 28

4     minutes.

5                MR. LIVINGSTON:  Well, I'm done.  I

6     have no more questions.  Thank you,

7     Mr. Colosimo.

8                THE WITNESS:  You're welcome.

9         FURTHER EXAMINATION OF LEWIS COLOSIMO

10    BY MR. MOUGEY:

11         Q.    Mr. Colosimo, I have just a couple

12    of quick questions.  Bear with me here.

13                I'm going to go back to what we

14    marked as Exhibit 2, a June 12, 2012 letter

15    from the DEA to registrants, including HBC and

16    Giant Eagle.  Mr. Colosimo, you would agree

17    that under no state, form or fashion did the

18    DEA approve or otherwise endorse any specific

19    system for reporting suspicious orders,

20    correct, sir?

21                MR. LIVINGSTON:  Object to the

22    form.

23         A.    That is what is indicated in the

24    letter from Rannazzisi and, from my experience,

25    I did not approve or endorse the suspicious

Page 190

1    order system.

2          Q.    And that is also consistent with

3    your training at the DEA, that investigators did

4    not approve suspicious order systems, correct,

5    sir?

6          A.    Yes.

7                MR. MOUGEY:  No further questions.

8        FURTHER EXAMINATION OF LEWIS COLOSIMO

9    BY MR. LIVINGSTON:

10         Q.    I just have a couple follow-ups.  I

11   want to make sure I understand this.

12               If you're looking at a vault for a

13   distributor to make sure it complies with the

14   security requirements, you don't approve the

15   vault, what you decide is whether the vault

16   meets the security requirements for a vault,

17   correct?  That's what you do?

18               MS. CARROLL:  Object to the form.

19               The witness may answer.

20         A.    You look at the vault and you

21   compare it with the specific CFR criteria to

22   ensure that it does comply.  There's specific

23   criteria that are outlined in the CFR.

24         Q.    Right.  The DEA doesn't have one

25   company -- one manufacturer of vaults and one

1   type of vault that everybody has to use that has

2   the DEA stamp of approval, you just go

3   through -- you look at the vault, you make sure

4   that it complies with the requirements under the

5   security regulations, correct?

6        A.    I would say that's a fair way to

7   characterize that.

8        Q.    And the same thing is true with

9   respect to the SOM system; there's no particular

10  SOM system that the DEA has approved that has

11  the DEA stamp of approval, that's up to the --

12  to each individual registrant to come up with

13  their own system; what you do is you make sure

14  that that system as described to you meets the

15  requirements for a SOM system?

16            MR. MOUGEY:  Objection.

17       Q.    In other words, it complies with the

18  SOM system regulation?

19            MR. MOUGEY:  Objection.

20            MS. CARROLL:  Objection to form.

21            The witness may answer.

22       A.    What I do is to ensure that they

23  have a system.  I don't go beyond what is in

24  that CFR cite, that it has to be -- they have

25  to design and operate the system to report

Page 192

1    suspicious orders, and it gives those three

2    types of suspicious orders.  So whatever system

3    they have in place, it needs to do that, it

4    needs to detect those and report to DEA the

5    suspicious order.

6              MR. LIVINGSTON:  Thank you.  I have

7    no more questions at this time.

8              MR. MOUGEY:  Plaintiffs don't have

9    any further questions.

10             THE VIDEOGRAPHER:  We're off the

11   record.

12

13        (Deposition concluded at 2:47 p.m.)

14                       - - - - -

15

16

17

18

19

20

21

22

23

24

25

Page 193

1   Whereupon, counsel was requested to give

2   instruction regarding the witness' review of

3   the transcript pursuant to the Civil Rules.

4

5                   SIGNATURE:

6   Transcript review was requested pursuant to

7   the applicable Rules of Civil Procedure.

8

9                 TRANSCRIPT DELIVERY:

10  Counsel was requested to give instruction

11  regarding delivery date of transcript.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 194

1                    REPORTER'S CERTIFICATE

2      The State of Ohio,    )

3                             ) SS:

4      County of Cuyahoga.   )

5

6             I, Renee L. Pellegrino, a Notary Public

7      within and for the State of Ohio, duly

8      commissioned and qualified, do hereby certify

9      that the within named witness, LEWIS COLOSIMO, was

10     by me first duly sworn to testify the truth, the

11     whole truth and nothing but the truth in the cause

12     aforesaid; that the testimony then given by the

13     above referenced witness was by me reduced to

14     stenotypy in the presence of said witness;

15     afterwards transcribed, and that the foregoing is a

16     true and correct transcription of the testimony so

17     given by the above referenced witness.

18             I do further certify that this

19     deposition was taken at the time and place in the

20     foregoing caption specified and was completed

21     without adjournment.

22

23

24

25

Page 195

1          I do further certify that I am not a

2     relative, counsel or attorney for either party,

3     or otherwise interested in the event of this

4     action.

5          IN WITNESS WHEREOF, I have hereunto set

6     my hand and affixed my seal of office at

7     Cleveland, Ohio, on this 19th day of March, 2021.

8

9

10

11

12

13     Renee L. Pellegrino, Notary Public

14     within and for the State of Ohio

15

16     My commission expires October 12, 2025.

17

18

19

20

21

22

23

24

25

```
                                                    Page 196
 1                    Veritext Legal Solutions
                        1100 Superior Ave
 2                         Suite 1820
                      Cleveland, Ohio 44114
 3                    Phone: 216-523-1313
 4
     March 19, 2021
 5
     To: ALLISON C. CARROLL
 6
     Case Name: National Prescription Opiate Litigation - Track 3 v.
 7
     Veritext Reference Number: 4486207
 8
     Witness: Lewis Colosimo        Deposition Date:  3/15/2021
 9
10   Dear Sir/Madam:
11
     Enclosed please find a deposition transcript.  Please have the witness
12
     review the transcript and note any changes or corrections on the
13
     included errata sheet, indicating the page, line number, change, and
14
     the reason for the change.  Have the witness' signature notarized and
15
     forward the completed page(s) back to us at the Production address
16   shown
17   above, or email to production-midwest@veritext.com.
18
     If the errata is not returned within thirty days of your receipt of
19
     this letter, the reading and signing will be deemed waived.
20
21   Sincerely,
22   Production Department
23
24
25   NO NOTARY REQUIRED IN CA
```

```
 1                    DEPOSITION REVIEW
                    CERTIFICATION OF WITNESS
 2
      ASSIGNMENT REFERENCE NO: 4486207
 3    CASE NAME: National Prescription Opiate Litigation - Track 3
      DATE OF DEPOSITION: 3/15/2021
 4    WITNESS' NAME: Lewis Colosimo
 5          In accordance with the Rules of Civil
      Procedure, I have read the entire transcript of
 6    my testimony or it has been read to me.
 7          I have made no changes to the testimony
      as transcribed by the court reporter.
 8

      _____           _____
 9    Date                        Lewis Colosimo
10          Sworn to and subscribed before me, a
      Notary Public in and for the State and County,
11    the referenced witness did personally appear
      and acknowledge that:
12
            They have read the transcript;
13          They signed the foregoing Sworn
            Statement; and
14          Their execution of this Statement is of
            their free act and deed.
15
            I have affixed my name and official seal
16
      this _____ day of_____, 20____.
17
                      _____
18                    Notary Public
19                    _____
                      Commission Expiration Date
20
21
22
23
24
25
```

```
1                    DEPOSITION REVIEW
                  CERTIFICATION OF WITNESS
2
     ASSIGNMENT REFERENCE NO: 4486207
3    CASE NAME: National Prescription Opiate Litigation - Track 3
     DATE OF DEPOSITION: 3/15/2021
4    WITNESS' NAME: Lewis Colosimo
5         In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6    my testimony or it has been read to me.
7         I have listed my changes on the attached
     Errata Sheet, listing page and line numbers as
8    well as the reason(s) for the change(s).
9         I request that these changes be entered
     as part of the record of my testimony.
10
          I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
     that both be appended to the transcript of my
12   testimony and be incorporated therein.
13   _____        _____
     Date                    Lewis Colosimo
14
          Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
     the referenced witness did personally appear
16   and acknowledge that:
17        They have read the transcript;
          They have listed all of their corrections
18        in the appended Errata Sheet;
          They signed the foregoing Sworn
19        Statement; and
          Their execution of this Statement is of
20        their free act and deed.
21        I have affixed my name and official seal
22   this _____ day of_____, 20____.
23        _____
                    Notary Public
24
          _____
25        Commission Expiration Date
```

1              ERRATA SHEET

        VERITEXT LEGAL SOLUTIONS MIDWEST

2            ASSIGNMENT NO: 4486207

3    PAGE/LINE(S) /        CHANGE        /REASON

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19

     _____      _____

20   Date                   Lewis Colosimo

21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

22   DAY OF _____, 20_____ .

23                  _____

                    Notary Public

24

                    _____

25                  Commission Expiration Date

**&**

**&**   2:14 3:2

**0**

**00000609**   5:12
  36:23
**00001825**   5:20
  143:7
**00001833**   5:19
  6:17 67:12 140:21
**00001846**   6:8,19
  87:12 162:4
**00026067**   5:23
  152:5
**00030485**   6:4
  156:12
**00030618**   6:6
  159:18
**00033016**   5:17
  116:9
**00056902**   5:8
  135:18
**0052**   140:15
**02145395**   5:25
  44:2
**05**   136:23
**06**   149:7
**07**   149:7

**1**

**1**   5:5,10 16:8
  36:21 48:20 65:3
  65:19,20,21 66:6
  66:10,13,25 67:17
  71:25 76:14,23
  87:17 90:16 92:6
  93:3,19 95:3 99:4
  135:10,11,14
  146:11 176:3
**1-11-2016**   162:8
  162:13

**10**   6:9 82:17 106:4
  170:23 175:22
  176:3
**10-26-2009**   141:2
**100**   8:6 12:7
**10016-7416**   2:8
**10022**   2:12
**102**   8:6
**103**   8:7
**104**   8:7
**105**   8:8,8
**106**   101:19
**106s**   101:19
**107**   8:9
**109**   8:9
**11**   4:8 6:8,18
  85:11 87:11
  108:10 162:3
  164:1,14
**11-4-2009**   67:25
**110**   8:10
**1100**   196:1
**111**   8:10,11
**112**   2:8 8:11,12
**113**   8:12,13,13
**114**   8:14,14
**115**   8:15
**116**   5:16 8:15
**117**   8:16
**118**   8:16
**119**   8:17,17
**12**   5:14 6:11
  114:22 128:14,19
  138:12 139:1
  149:12 152:22
  164:1,14 187:1
  189:14 195:16
**12-3-2014**   159:23
  160:1
**120**   8:18

**121**   8:18,19,19
**122**   8:20
**123**   8:20
**124**   8:21,21,22
**125**   8:22,23
**126**   6:14
**127**   8:23,24
**128**   6:11 8:24 9:3
**129**   9:3,4
**13**   6:4 45:3 119:25
  156:11 157:1,18
  164:1,14
**130**   9:4,5 47:4
**1300**   73:13 78:22
  141:18,25 142:4
  142:21 151:4
**1301.71**   37:8,21
**1301.72**   78:10
  103:12
**1301.72-1301.76**
  38:15
**1301.72.**   103:23
**1301.74**   36:12
  50:15 84:17 85:1
  139:4 143:19
**1304.22**   122:1
**131**   9:5,6 48:20
**133**   9:6,7
**134**   9:7
**135**   4:9 5:5
**137**   58:1
**138**   5:13 58:20
**14**   126:18 164:1,14
**140**   5:18
**143**   5:20
**15**   1:21 6:13
  175:11,17 186:14
  186:17
**152**   5:21

**15219**   2:16
**153**   9:8
**154**   9:8,9
**155**   9:9
**156**   6:3
**157**   120:25
**159**   6:5
**15th**   176:16
**16**   6:14 50:13
  126:8,13,15
  175:11,17
**161**   9:10
**162**   6:7 60:10
**163**   9:10
**164**   9:11,11,12,12
**166**   9:13,13
**168**   9:14,14
**169**   9:15,15
**17**   1:7 104:11
**170**   4:10
**171**   9:16,16
**172**   9:17,17
**173**   9:18
**174**   9:18
**175**   3:11
**176**   6:9
**177**   9:19
**178**   9:19
**179**   9:20
**18**   1:11,13
**180**   9:20 187:1
**181**   9:21
**1820**   196:2
**186**   6:13
**187**   9:21,22
**188**   9:22,23
**189**   4:11 9:23
**19**   6:16 67:10,16
  79:9 82:13 118:21
  196:4

**[190 - 4th]**

**190**   4:12 9:24
**191**   9:24 10:3,3
**194**   4:14
**1989**   12:17 13:1
**1990**   13:12,22
**1997**   72:1 76:14
**19th**   195:7

**2**

**2**   4:3 5:9,13 16:12
   36:18 37:2 42:13
   42:20,22 43:1,9,19
   43:21 50:12 60:19
   64:3,18 66:9 70:3
   70:7 88:2,8,10
   97:25 98:4,7,23
   132:16 138:7,10
   189:14
**20**   6:18 7:3 87:10
   87:16 90:16 96:18
   97:25 116:15
   164:2,13 197:16
   198:22 199:22
**200**   68:25 162:24
   163:5
**20004**   3:12
**2002**   72:4 92:3,14
   92:19,24 93:14
   94:7
**2004**   72:4 92:3
**2006**   148:17
**2007**   5:10 36:21
   148:16,17,25
   150:15
**2008**   72:5 92:3
**2009**   5:7,18 6:16
   67:11 79:16 81:4
   85:12 88:13 90:21
   95:10 135:17
   136:7,11 140:20
   141:10 175:8

**2010**   164:1
**2011**   100:5,24
   116:15 118:24
**2012**   5:14 121:1
   138:12 139:1
   147:9 148:2
   149:12 152:19
   189:14
**2013**   5:24 6:4
   29:25 43:25 44:9
   119:25 126:15,18
   128:22 129:6,19
   156:11 157:1,18
   171:25 172:10
   173:20 174:10
**2014**   6:6 92:3
   159:17 170:20
**2015**   88:15 94:8
   96:19 97:14,18
   98:15,24 99:4
   104:11 109:20
   113:24 114:14
**2016**   6:8,18 87:11
   162:3 169:3,7
**2017**   132:19 133:3
   133:18
**2019**   6:10 175:24
   176:5,16
**202**   3:12
**2021**   1:21 195:7
   196:4
**2025**   195:16
**21**   73:13 78:10,22
   84:16 85:1 103:12
   103:23 122:1
   124:21 137:5
   139:3 141:18
   150:6 171:2
**212**   2:9
**216-523-1313**
   196:3

**2227**   195:12
**225**   58:2,3,14
**23**   7:3
**24**   135:9,9
**24/7**   69:13
**2401**   128:24
**25**   7:4,4
**257-8482**   2:9
**26**   5:18 6:16 7:5
   67:11 85:12
   133:18 140:20
**269-4097**   2:22
**27**   5:6 72:1 135:16
   136:7
**28**   189:3
**2804**   1:6,7
**2:15**   188:21
**2:42**   188:22
**2:47**   192:13
**2s**   42:15

**3**

**3**   1:15 5:16,18 6:6
   6:10 16:18 42:22
   43:18 58:21 61:11
   63:21 68:12 71:8
   74:16 76:4,5
   78:13 90:22 95:11
   99:17 109:21,22
   116:7,12 133:18
   138:6 140:16,19
   143:14 147:3
   151:19 159:17
   170:18 175:24
   176:5 196:6 197:3
   198:3
**3-5**   68:24
**3/15/2021**   196:8
   197:3 198:3
**30**   7:5,6 160:4
   189:3

**300**   3:3
**31**   7:6,7 152:19
**312**   2:22 3:4,8
**316**   2:4
**32**   7:7,8
**32502**   2:4
**338-3344**   2:17
**34**   141:13
**3500**   2:21
**35th**   2:16
**37**   5:9 7:8
**39**   7:9
**3s**   42:16 43:22

**4**

**4**   5:20 59:16 63:21
   76:5,10 78:10
   99:24 103:12
   143:3,6
**4,000**   103:16
**40**   7:9 119:23
**41**   7:10
**412**   2:17
**42**   7:10 120:22
**43**   7:11
**435-7068**   2:5
**44**   5:24 7:11,12
**44114**   196:2
**4486207**   196:7
   197:2 198:2 199:2
**45**   7:12
**45032**   1:11
**45079**   1:13
**46**   143:1
**47**   7:13 121:22
   122:4
**48**   7:13 162:16
**49**   122:11
**494-4410**   3:8
**4s**   43:22
**4th**   141:10

[5 - adequate]                                                                 Page 3

**5**

**5**  4:4 5:21 43:18
63:21 64:4 66:9
68:12 76:5 78:7
78:13 88:3,10
90:22 98:23
101:13 128:22
151:24 152:2
186:25
**51**  7:14
**52**  7:14 122:19
**53**  7:15 124:16
161:23
**54**  3:7
**55**  7:15,16,16
**57**  7:17
**59**  7:17
**598-0828**  3:12
**5s**  43:22

**6**

**6**  5:24 6:3 43:25
44:5 57:25 60:11
61:21 156:7,10
**60**  7:18
**60601-1692**  2:21
**60654**  3:4,8
**61**  7:18
**62**  7:19 151:23
**63**  7:19
**65**  156:6,20
**66**  7:20
**67**  6:16
**6810**  2:11
**69**  159:13 171:15

**7**

**7**  4:5 6:5 79:8
103:16 159:16
170:22
**70**  7:20 170:18

**723-3216**  2:12
**73**  7:21
**74**  7:21
**77**  2:20
**78**  7:22
**79**  133:18
**7th**  2:8

**8**

**8**  6:7 82:12 161:24
162:2 169:3,15
**80**  7:22,23
**800**  2:12
**81**  7:23,24 161:18
**823**  137:5 150:6
**824**  150:6
**83**  149:22 152:9
**84**  8:3
**850**  2:5
**862-2000**  3:4
**87**  6:18 8:3
**89**  8:4

**9**

**9**  37:3 84:15
104:19 116:12
**905**  135:24
**93**  8:4,5
**95**  8:5
**97**  157:20 158:13
158:22
**98**  158:21 159:2
**9:31**  1:21

**a**

**a.m.**  1:21
**aaron**  1:8
**abdcmdl00269683**
5:15 138:14
**able**  20:22 21:8
25:24 38:6,20
73:25 74:7,11
86:24 87:5 98:22

**abuse**  16:3,14,19
43:10 148:8
151:15
**abuses**  137:21
146:14
**academy**  24:10
**accept**  62:5
**acceptable**  166:24
**acceptance**  61:24
62:1
**accepted**  13:9 30:3
**access**  77:13 78:18
78:24 106:8 132:1
**accidental**  180:18
**accountability**
115:8
**accounted**  121:2
**accuracy**  117:18
117:20
**accurate**  117:24
125:2 183:20
**accurately**  22:22
**achieving**  61:14
**acknowledge**
197:11 198:16
**act**  15:16 50:9
96:25 138:20
142:5 144:16,22
145:13 146:23
149:18 151:8
154:14 155:6
156:1 162:19
165:3 197:14
198:20
**acting**  133:22
185:1
**action**  57:9,18,19
57:20 60:21,22
62:18 72:16 93:6
93:24 94:13,14
100:21 110:4,10

**110**:23 111:1,11
111:21 112:7,23
113:17,21 119:11
119:15 185:25
186:4 195:4
**actions**  91:5 94:4
95:7,8 97:2 100:3
106:10 145:18,21
**active**  52:4 109:21
**activities**  22:12
47:13 166:4,7
**activity**  20:11 33:1
39:18 40:5 79:11
80:11 81:2 118:23
142:9 154:13
**actual**  43:1 56:10
**adamant**  113:15
**addiction**  16:3
**adding**  98:20
**addition**  82:14
86:8 145:5 181:5
**additional**  71:18
121:9 150:11
179:24
**address**  25:25
34:6 97:4 196:15
**addressed**  27:4
67:6 79:6 130:23
172:5
**addresses**  40:3
127:10
**addressing**  49:14
95:3
**adelphoi**  12:24
13:4
**adequacy**  76:21
**adequate**  43:14
59:17 84:19 85:15
85:19 87:1,2
98:12

**adjournment** 194:21

**adjustments** 83:21

**administer** 19:15

**administration** 13:10,24 15:24 50:22 52:13 53:16 53:21 147:23

**administrative** 57:20 66:19 67:3 67:7 72:16 91:4 93:6,24 94:4,13,14 95:7,7 97:2 100:3 100:21 110:4,10 110:23 111:1,11 111:21 112:7 113:16,21 119:10 119:11,15 133:15 185:25 186:4

**administrator** 38:13 147:16 150:17

**admonition** 66:21 93:7

**advice** 89:22 125:10

**advised** 122:21 123:15 124:18 125:7,15 158:4,13 158:20 159:3,10 160:9,14 170:24 171:10

**advisory** 145:7

**affect** 106:24 132:1

**affixed** 195:6 197:15 198:21

**aforesaid** 194:12

**afternoon** 135:5

**age** 11:3

**agencies** 28:11

**agency** 3:10 50:24

**agent** 15:4 21:18 29:13 67:24

**agents** 5:6 29:16 135:15

**ago** 14:2 59:10 63:20 64:2 146:11 184:17

**agree** 30:15 40:16 41:12 43:17 47:15 81:18 83:11 86:19 87:7 117:1 130:10 144:18 151:9 154:5 174:17 180:6 187:6,10,13 189:16

**agreed** 183:12

**agreement** 183:19

**ahead** 122:19

**al** 1:10,13

**alarm** 54:15,17

**alert** 142:21

**alerted** 157:24 158:3

**alerting** 148:15 152:22 154:2,9

**alleged** 60:15

**allergan** 3:2

**allison** 3:11 196:5

**allison.c.carroll** 3:13

**allowed** 62:21

**amount** 43:1 144:13 166:22,24

**amounts** 166:14

**andrew** 3:16

**annual** 166:18

**answer** 20:25 22:4 22:22 25:7,14 26:13 30:2,25

32:4,24 39:13 40:2,22 41:5 42:5 43:7 44:17,24 45:2,20 47:19,25 51:22 53:25 55:12 55:13 57:11 59:8 60:5 61:19 62:10 63:4 66:17 71:1 73:7 74:3 78:4 80:4,24 81:7,13 82:4 84:10 87:4 89:7 93:2,16 95:22 100:19 102:13 103:1 105:7,23 107:2 110:13 111:13,14 112:10 113:6,19 115:16 116:1 117:9 119:6,20 120:14 121:6,15 121:21 122:15 123:4 124:9,25 125:13,24 127:7 127:17 128:1,10 129:8,24 130:19 131:21 133:13 134:12 153:4 163:20 164:19,21 165:6 168:15 171:7,22 172:16 172:22 173:7 174:13,22 177:14 178:22 179:20 180:10 181:13 187:4,22 188:13 190:19 191:21

**answered** 51:21 59:10

**answering** 175:3

**anybody** 20:20 40:21 81:9

**apologize** 156:16 158:21 169:13

**appear** 197:11 198:15

**appearances** 2:1 3:1 4:3

**appeared** 103:3,22 175:18

**appearing** 1:25

**appears** 67:22 71:15 81:1 84:22 85:3 180:11

**appended** 198:11 198:18

**applicable** 20:8 21:9 24:19 73:4 78:13 143:15 193:7

**applicant** 25:24 27:4 41:17 47:13 48:5 49:2,4 50:7 61:5 69:24 86:10 113:11,14,15,17 144:8,24

**applicant's** 25:17 95:17

**applicants** 37:22 58:6

**application** 27:10 27:14 58:2,3,4,10 58:13,14,18 76:2 90:2 95:14 96:5 96:16 97:5 99:11 109:2 132:14,15 169:7,7

**applied** 88:2

**applies** 47:6

**apply** 18:12 35:23 66:4,25 99:20

**applying** 20:1,3

**appreciate** 34:13

**approach** 131:3
148:24

**appropriate** 50:23
62:18 103:4,4
130:11

**appropriately**
102:19

**approval** 49:7
91:14 95:15 109:2
132:15 191:2,11

**approve** 26:11
27:9 68:7 95:10
95:23 130:7 137:5
139:25 140:3,7
170:1 189:18,25
190:4,14

**approved** 68:3
71:25 90:2 95:13
95:18 96:16 109:1
132:13,18 133:19
133:25 134:2
137:16,22 142:10
163:9 169:6
191:10

**approving** 95:14
96:5 169:5,17

**approximately**
13:5 14:2

**arcos** 64:18 101:1
101:2,9 122:10,16

**area** 21:23 22:18
22:19 45:18 52:14
53:16

**areas** 154:20

**argument** 62:22

**arisen** 27:13

**arrests** 79:5

**arrives** 102:9

**art** 81:4

**arts** 12:18

**asked** 32:25 40:4
51:21 113:8,10
168:17 170:20
171:18 173:17,21
187:2

**asking** 25:9 32:20
34:25 57:13 81:20
165:17,19 166:6,8
181:7 185:16

**aspect** 90:5

**aspects** 85:13

**assigned** 72:1
115:8

**assignment** 197:2
198:2 199:2

**assist** 106:9 115:5
137:6

**assistance** 116:23

**assistant** 147:16

**assists** 144:19

**associated** 78:21
144:21

**assume** 14:7 85:25
125:19

**assured** 95:25
96:14,14 113:23
114:11 161:11

**assuring** 109:14

**attached** 5:11
36:21 104:23
198:7

**attachment** 73:16

**attachments** 5:7
5:14 135:17
136:13,16 138:13

**attempt** 62:15
63:5 144:24

**attention** 26:22
27:1 103:10
123:20 139:1

149:2 158:23
161:18

**attorney** 28:16
29:6,9,14,21 195:2

**attributed** 102:5

**audit** 82:15

**audits** 82:17 92:13
115:8,9 155:14
156:3

**august** 6:4 72:1
119:25 126:15
156:11,25 157:18
171:25

**authentication**
107:18

**author** 172:17

**authored** 93:11
95:13

**authorities** 181:3

**authority** 180:24

**authorization** 20:5
20:13 63:20 76:6
168:16

**authorize** 198:11

**authorizes** 165:24

**automated** 124:5
127:3,11 129:5
174:9 180:7 186:6
186:8,12 187:4,18

**automatically**
79:24 127:13

**available** 51:4
144:8 145:3,6
146:6

**ave** 196:1

**avenue** 2:8

**avenues** 154:3

**average** 101:24,25
101:25 121:13

**aware** 54:10 81:23
82:2,6 185:14,17

**b**

**b** 3:3 36:12 52:8
78:10 103:12
122:1 139:4
143:19

**bacchus** 3:15

**bachelor** 12:18

**back** 43:8 50:12
51:2 81:3 90:15
91:6 92:14,19,24
93:14 96:17
140:12 152:21
157:11 171:13
172:13 189:13
196:15

**background** 12:16
71:22 78:20,25
90:19 120:23
121:8,10 131:9

**bad** 31:11,16
169:12

**banker's** 35:4,6

**bar** 80:13

**bartlit** 3:6

**bartlitbeck.com**
3:9

**based** 41:6 81:22
84:25 85:2 96:15
161:3 168:9
174:17 177:1
180:1 184:24
188:14

**basic** 24:11

**basis** 166:18

**bates** 5:7,11,14,16
5:19,20,22,24 6:4
6:6,8,11,14,17,19
36:22 44:1 67:12
87:12 116:8 126:9
128:15 135:18,24
136:23 138:13

140:21 141:13
143:6 149:22
152:4,8 156:12
157:20 158:13,21
158:22 159:2,18
160:4 161:18
162:4,16
**baylin** 2:4
**bear** 189:12
**beck** 3:6
**beginning** 5:7,11
5:14,16,18,22,24
6:4,6,8,11,14,16
6:18 36:22 37:8
44:1 45:12 67:11
87:11 116:8 126:8
128:15 135:17
138:13 140:20
152:4 156:11
159:17 162:3
**begun** 129:19
**behalf** 2:2,14,19
3:2,6,10 170:12
**beisell** 2:20
**beiter** 74:18
**believe** 12:9 13:5
28:1 46:22 84:3
89:25 90:2 91:12
93:3 95:23 104:6
109:24 120:21
144:9 145:3,24
156:4 166:5
187:12
**bells** 54:15,17
**benefit** 101:2
111:5
**bennett** 3:15
**best** 41:9 155:21
**better** 125:8,16
159:4,8,10 175:12

**beyond** 156:1
164:17 166:4,5
187:23 191:23
**biennial** 83:6
105:12,24
**binder** 34:10,12
34:12 35:1 37:3
170:18 176:4
**bit** 96:20 162:23
186:5
**blank** 100:7
**blanket** 187:13
**block** 147:15
**blue** 33:6,10
**board** 28:19 98:16
181:24
**boards** 28:18,21
**bore** 103:7
**bottom** 48:2 67:23
68:21 69:25 76:11
77:1 78:17 83:17
84:20 85:12 101:8
114:23 120:4,24
121:23 126:22
129:15 130:5
135:23 136:14,16
141:9 158:12,25
161:15
**box** 34:23,24 35:4
**boxes** 34:14,21
35:1,6
**brand** 105:1
**break** 34:19 76:13
89:12 134:20
170:5
**briefly** 12:15
**bring** 26:21 27:1
123:20 158:22
161:16
**bringing** 149:1

**broad** 185:8
**brought** 173:1
**bulk** 39:19
**bulleted** 129:13
**buprenorphine**
129:2,12
**business** 53:18
74:1,8 82:21
142:9
**butcher** 87:20
**buying** 39:20
75:14

**c**

**c** 3:11 53:14 196:5
**ca** 196:25
**cabinet** 17:10,19
**cage** 78:9,12,18
96:3,3 98:20
103:11 104:21
122:11
**cages** 103:9
**cah** 5:12,25 36:23
44:2
**call** 20:12 32:20
51:18 157:11
176:14,16
**called** 11:3 24:23
31:15 33:5,10
35:22 36:2 37:8
108:11 128:23
129:15
**calls** 32:18 180:21
**cameron** 3:16
**canonsburg** 12:5
**caption** 194:20
**care** 164:10 186:8
**career** 22:5 24:13
55:25
**carlson** 68:22 70:1
73:12,15 74:17,24
123:21 141:15

158:23 161:18
**carrier** 84:18 85:5
**carroll** 3:11 20:24
23:24 25:6,13
26:12 30:1,24
31:13,19 32:3,23
37:19 39:12 40:1
41:4 42:4 43:6
44:16,23 45:19
47:18,24 51:20
52:23 53:24 55:2
55:6,11 57:10
59:7 60:4 61:18
62:9 63:3 66:16
70:24 71:8,16
73:6 74:2 78:3
80:3,23 81:6,11,18
81:25 84:9 87:3
89:6 92:25 93:15
95:21 100:18
102:12,25 104:17
105:6,22 107:1
109:6 110:12
111:12 112:9,24
113:5,18 114:7
115:15,25 117:8
118:4 119:5,19
120:13 121:5,14
121:20 122:14
123:3 124:8,24
125:12,23 127:6
127:16,24 128:9
129:7,22 130:18
131:20 133:6,12
134:11,19 153:2
154:4 159:6
163:19 164:6,18
164:22,25 165:24
168:14 169:10
171:6,21 172:15
172:21 173:6

174:12 177:13
178:21 179:19
180:9 181:12
187:21 188:12,18
190:18 191:20
196:5
**case** 1:7,11,13
42:6 46:17 76:23
102:17 135:6
150:15,18 196:6
197:3 198:3
**cases** 1:15 32:13
32:15 180:16
**castle** 23:19,22
70:14,18,23 98:3,9
**catch** 31:11
**caught** 77:5,15
**causation** 131:6
**cause** 58:11,23,24
59:20 194:11
**center** 64:1 70:15
88:1 90:1 162:25
163:4 166:12,19
167:5
**central** 75:7
**centre** 2:16
**ceo** 152:11,23
154:9
**certain** 18:6,24
25:23 46:12 55:15
56:8 61:9 64:17
79:4 127:1,13,14
137:14 138:22
147:11 174:14
**certainly** 21:11,13
69:16
**certificate** 4:14
194:1 198:11
**certification** 197:1
198:1

**certified** 11:6
**certify** 137:5
194:8,18 195:1
**cetera** 39:21 166:5
**cfr** 36:10 73:13,16
74:12 78:10,22
79:3,7 84:17 85:1
103:12,23 109:8
122:1 139:4
141:18 142:11
145:3,3 171:2
176:25 178:10
181:17,20 186:11
187:24 190:21,23
191:24
**challenge** 61:25
62:6,8,14
**change** 177:2
178:11 181:18
182:1,16,17
183:10,10 196:13
196:14 198:8
199:3
**changed** 13:19
45:23 177:1
178:10 181:19
183:22
**changes** 61:12
136:15 176:17,19
181:1 196:12
197:7 198:7,9
**chapter** 142:21
151:4
**characterize** 56:13
57:19 191:7
**charge** 5:6 56:18
135:16
**check** 37:17 50:2,6
79:1 92:20 188:19
**checking** 98:11
115:3

**checks** 78:20
**chemical** 65:3,22
92:2,6
**chemicals** 14:21
25:20 39:19 63:15
65:1,5,10,19,21
66:6,10,13 67:1
72:1 76:15,23
93:19 95:4
**chicago** 2:21 3:4,8
**chunderlik** 181:23
**circumstances**
18:21 59:1
**citations** 5:20 79:7
143:6,16,18
**cite** 36:10 42:17
84:22 85:4 109:8
176:25 178:10
186:11 187:24
191:24
**cited** 61:24 72:24
94:13 160:25
**cites** 79:3 150:15
**civil** 3:10 11:5
63:1 193:3,7
197:5 198:5
**clarification**
181:24
**clarify** 56:7
**class** 24:12
**classified** 15:23
43:9
**classifying** 16:21
**clean** 120:11
**clear** 95:1
**cleared** 180:21,23
181:2,4 182:4,6,13
183:14,17
**clearly** 139:19
**cleveland** 12:8
195:7 196:2

**close** 179:1
**closed** 106:23
**closely** 73:23 74:6
103:14 178:13,25
**closer** 172:4
**closing** 150:20
**clr** 1:24
**cocaine** 14:25
**code** 18:1 80:14
124:21
**colleague** 176:6
**colleagues** 88:22
112:2 163:14
167:7 170:6
**collection** 46:17
**college** 12:18
**colosimo** 1:18 4:7
6:10 11:3,8,10
12:3 24:1 34:7
35:16 68:23 71:18
74:16 85:13 89:21
114:7 129:17
135:2,4 140:16
141:12 143:2
152:10 155:23
161:22 164:12
165:23,25 166:10
170:15 175:23
189:7,9,11,16
190:8 194:9 196:8
197:4,9 198:4,13
199:20
**combination**
75:25
**come** 29:8 44:12
140:12 191:12
**comfort** 76:18
**comfortable**
102:22 175:3
**coming** 166:18
167:4

[commission - controlled]

commission
195:16 197:19
198:25 199:25
commissioned
194:8
common 84:18
85:5 112:25
communicate 54:3
communicated
140:8
companies 23:10
company 23:9
68:23 70:9 71:24
98:21 120:25
123:13 160:10
178:3 190:25
compare 190:21
compares 102:2
competent 31:6
117:2,6
competitor 106:22
complete 115:9
completed 80:17
82:18,19 83:5
105:2 133:8
194:20 196:15
completely 108:23
complexity 142:9
compliance 20:7,7
24:18 26:18 27:2
27:7 39:4,5,9
61:14 66:15,24
67:6 73:4 86:13
92:12 94:5 96:11
96:15 111:10
113:22 114:1,12
122:12 124:3,20
125:4,5 154:14
171:1,12 187:19
188:10,17

compliant 95:24
96:1 108:19 112:3
185:23
complied 85:9
complies 49:20
190:13 191:4,17
comply 20:22 21:8
38:20 49:21 73:25
74:7,11 84:22
85:3 109:4 112:6
112:6,14,17,20,22
113:12,14,15
185:5 190:22
complying 57:7
71:4 84:25 184:20
185:2,20 186:2
comprehensive
149:8
computer 80:7,10
81:2 100:9 186:13
computerized
123:13 124:13
157:25 158:4
160:10 161:10
180:12
concern 42:21
43:4,12 94:1
104:4,15
concerning 48:22
concerns 33:3
67:5 97:16,20
148:7
concierge 3:18
conclude 96:8
concluded 108:17
192:13
concludes 134:3
conditions 18:24
conduct 25:5 49:7
50:1 115:7 154:10

conducted 39:18
45:13 49:5 92:24
100:2 145:11
146:19 162:9
conducting 137:6
155:4 157:10
conference 176:14
176:16
confident 155:3
confirm 129:4
170:5
confirmation
104:9
conlon 98:19,25
119:24 120:15
121:8 123:7,11
124:12 125:15
126:4 159:3 171:9
connection 80:9
conroy 2:7,11
conscientious 31:5
32:1 117:7
consent 55:22
56:11
consider 26:2 38:8
39:14 40:15,25
41:2,11 59:23
76:21 77:8,12,17
consideration
38:24 39:22 40:9
considered 17:11
24:11 54:16
100:15 101:24
181:3
considering 98:20
consistent 122:23
137:12 138:3
140:3 151:19
153:12,16,25
154:17 155:23
161:15 169:2,14

190:2
constant 79:21
80:20
consult 181:24
cont'd 3:1 6:1 8:1
9:1 10:1
contact 90:3
103:25 104:10
contacted 90:4
containing 63:16
65:23
context 162:23
167:1 173:23
continue 70:2
130:6 183:13,23
continuing 61:4
contract 84:18
control 62:19 81:5
82:9 104:23
115:23 118:18
147:13,17 177:24
179:24
controlled 14:16
15:13,18,20,22
18:12,18 19:8,14
19:21,24 20:23
21:7,9 22:14,17
23:1,3 24:3,15,19
25:19 35:23 37:24
42:14 43:11,11,15
45:9 48:23 50:5,9
50:18,20,23 51:1,6
52:11 53:18 59:15
63:21 64:4,18
66:9 68:12,24
69:5,18 70:3,6
74:10 76:4 77:14
78:1,14,19,24 80:2
82:9,20,23 83:3,11
84:8 88:3,8 89:24
93:18,22 95:5,5,17

96:25 98:4,8,23
99:21 101:4,17
104:20,24 105:1,4
107:23 108:6
115:4 121:1,12
123:17,22 127:1
128:8 130:13
137:4,21 138:20
139:14 142:4
144:15,21 145:13
146:15,23 147:24
148:10 149:18
150:24 151:7,13
152:24 153:10,20
154:14 155:6
156:1 157:8
158:15 160:16
161:20 162:19
165:3 178:15,19
**controls** 37:23
38:7,12,16 59:17
82:14 115:12
137:3 150:4
177:20 178:2,14
178:17 179:5,8,18
**conversation**
123:7
**convictions** 79:5
**cooperate** 32:13
**cooperated** 32:11
**cooperation** 32:6
32:9,25
**cooperative** 32:16
39:20
**coordinate** 28:20
**copy** 44:21 73:13
75:9 140:25
141:18,24 142:3
142:13,16 159:22
**corporate** 75:1,4
75:10,13,18,19

84:2,6,12 115:21
116:4 131:5,15
165:5,15 177:23
178:5,14,19,24
179:24
**corporation** 52:3
70:4
**correct** 13:1,13
14:9 15:2 16:11
16:15,16 19:11
23:10,11,19,20
31:22 33:15,20
37:13 38:7,20
39:1,6,9,11 41:15
41:21 43:4 51:7
51:19 52:4,19,21
61:25 68:13 69:6
69:8 70:15 73:20
74:20 75:16 76:8
78:11 80:22 84:2
85:1,9,17,23 86:2
86:6,10,15,16 92:6
92:14 93:14 94:24
95:12 96:6,7,25
98:12,16,17 99:15
99:22 101:5,11
102:24 103:12
104:15 105:5,14
107:10 108:7,12
109:23 110:2,11
110:24 111:23
112:8 115:24
116:20 117:3,7
118:3 119:18
120:12,20 122:8
122:13 123:2,9
124:23 125:8,11
125:22 130:16
132:16 133:11,19
133:25 134:6
136:7,11,20 139:4

139:9,15,21 140:9
141:2,5,10,16,19
141:24,25 142:18
142:25 143:16,19
144:1,22 145:8,14
146:3,15,24 147:6
148:3,11,19 149:2
149:9,18,24 150:7
150:11,17 151:1,8
151:21 154:15
155:7 156:3 157:1
159:24 160:1,7,12
160:19,24 161:6
161:20 162:10,13
162:20,25 163:18
165:23 167:9,15
167:21 168:3,13
168:22,25 169:7
169:18 171:5,18
174:11 180:8
182:21 184:20
187:20 188:10
189:20 190:4,17
191:5 194:16
**corrected** 113:22
**corrections** 196:12
198:17
**correctly** 137:10
137:23 151:16
**correspondence**
146:18 149:6
152:11,18
**counsel** 81:14
141:5 159:6 164:6
169:10 193:1,10
195:2
**counselor** 12:23
13:3
**count** 82:20 83:10
83:10,21 105:11

**counted** 82:24
104:25 105:2
**counter** 63:16
65:12,22
**counting** 105:4,20
106:2
**country** 70:18
145:12 146:20
**counts** 105:14
**county** 1:10,12
194:4 197:10
198:15
**couple** 11:14
34:18 93:10 137:2
189:11 190:10
**course** 22:5 24:12
45:23 55:25
125:21 136:9
139:7 148:13
167:25
**courses** 60:20
**court** 1:1 4:16
114:4 197:7
**covering** 21:22
**create** 142:22
**creek** 2:11
**criminal** 15:16
**criteria** 16:20 26:2
76:24 183:6
190:21,23
**critical** 151:13
**csa** 45:5
**current** 44:14 45:1
45:21,24,25 51:6
51:12 61:8 70:4
73:13 108:4
177:19
**currently** 90:20,20
**custody** 4:16
**customer** 41:10,19
51:10 52:6 65:13

80:17 102:17
106:9 107:17
122:22,25 163:23
**customers**  41:9,10
41:14,15 46:16
69:24 83:23 106:7
106:13,15,18
107:13 137:8,20
138:2 146:14
**cut**  173:4
**cuyahoga**  194:4
**cycle**  82:19 83:21
104:25
**cyclic**  24:23 34:3
37:18 45:5,17
46:3,20 47:1 57:5
57:22 72:4 88:11
88:17,21 91:2,7,11
92:2 98:11 100:1
100:5 116:19
132:19 133:3
157:7 188:4
**cypress**  2:11

**d**

**d**  58:1
**d.c.**  3:12
**d.o.**  91:2 104:9
**daily**  82:20 83:11
126:18
**dan**  1:8
**dangerous**  16:15
43:4
**date**  133:21
174:16 193:11
196:8 197:3,9,19
198:3,13,25
199:20,25
**dated**  5:6,10,13,18
6:3,5,7,10,16,18
36:21 44:9 67:11
67:24 87:11

126:17 128:22
133:18 135:16
136:6 138:12
140:20 141:1,9
152:18 156:11
159:17,23 160:1
162:3,8 175:24
176:5
**david**  3:14
**day**  2:19 53:18
103:24 155:21
195:7 197:16
198:22 199:22
**days**  196:18
**dea**  5:8,17,19,20
5:23 6:4,6,8,17,19
13:14,20 14:8,23
15:1,4,14,23 16:4
17:22 18:4,4,7,13
18:17,19,23,24
19:4,9,20,25 20:21
21:5,7,9,16,18,19
22:1 24:1,5,9,13
24:15,19 26:18
27:12,25 28:9
32:6 33:21 35:17
35:24 37:7 43:8
46:4 51:6,11 52:4
52:7,25 53:8,10
56:17 58:2,3
59:19 61:3,8
65:14 66:6 67:12
68:11 72:2 73:4
76:14 78:21 79:1
82:22,25 83:6,12
87:2,12 88:12
91:18 92:12,18,23
94:8,10 95:10,17
96:1,14 99:10
100:6 101:4,16,19
101:20 103:8

105:5,8 108:4,19
109:4 110:1,6,9,9
110:16,20,22
111:6 113:12,15
113:25 116:9
117:3 122:21
124:2 128:3,4
129:16 131:4,9,15
132:5 135:18
136:10 137:5,14
137:16 138:3,18
138:21 139:11,17
139:24 140:2,4,6
140:15,21 143:7
144:19,23 145:1,7
145:11,17 146:21
147:10,12,23
148:3,5,23 149:1,4
150:16,21 151:6
151:23 152:5,22
154:1,10,18,19,23
155:4,9 156:6,12
156:20 158:5,20
159:13,18,22
160:9 161:4,23
162:4 165:4,15
167:7 168:21
169:3,4,15,16
171:16 172:11
174:7 176:7,25
177:9 180:23
181:3,8 182:1,1,3
182:15 183:13
185:5 186:7,10,22
187:2,16 188:7
189:15,18 190:3
190:24 191:2,10
191:11 192:4
**dea's**  14:11 18:13
19:23 24:10 95:19
96:4 114:11

143:24 144:5,11
145:5,17 146:20
149:16 150:10
153:8,13 160:22
168:2 176:25
178:10 184:17,20
185:3,21 186:2,7
187:19
**dea12**  5:12 36:23
**deal**  62:7
**dealing**  77:14
**dealings**  31:4,23
**dealt**  69:3
**dear**  5:13 138:11
196:10
**december**  6:6
104:11 128:22
148:25 159:17
170:20
**deception**  17:1
**decide**  76:16
190:15
**decision**  27:8,9
132:1
**dedicated**  117:3
143:25
**deed**  197:14
198:20
**deem**  182:15
**deemed**  85:15
183:5 196:19
**deems**  182:7
**deeper**  129:2
**defendants**  5:8,15
5:23 6:9,11,12,14
6:15,17 36:17
43:24 67:9 87:9
116:6 126:7
128:13 175:21
186:16

**deficient** 110:5,8
**define** 15:10,12
  52:25 53:6,8
**defined** 53:10
**definitely** 175:16
**definitively** 23:12
**degenerate** 62:21
**deliberations**
  174:23
**delinquencies**
  101:11
**delinquent** 110:5
**delinquents** 12:24
**delivery** 80:22
  85:6 193:9,11
**delve** 181:15 183:5
**denial** 58:2,9,13
  58:21,24 59:4,14
**denied** 27:14
**deny** 27:10 59:20
**department** 3:10
  3:14,15,15,16 99:5
  196:22
**depend** 41:16
  46:11 142:8
  187:11,12
**depending** 15:25
**deposed** 11:6
**deposition** 1:18
  6:13 36:6,17
  43:24 67:9 87:9
  116:6 126:7
  128:13 135:13
  138:9 140:18
  143:5 152:1 156:9
  159:15 162:1
  175:21 186:16,18
  192:13 194:19
  196:8,11 197:1,3
  198:1,3

**depth** 45:12 72:4
  72:11 91:1,7 92:1
  106:14
**deputy** 147:16
  150:17
**describe** 12:15
**described** 65:9
  102:7 104:22
  108:20,23 109:3
  109:11 110:8
  114:24 175:5,7,13
  177:19 180:8,11
  187:17,18 191:14
**describing** 65:20
**description** 5:3
  49:1,2,9 169:23
**design** 52:9 74:13
  109:10 139:13,20
  142:23 143:23
  146:1 155:11
  181:21 187:25
  191:25
**designed** 146:22
  161:5
**detail** 130:6 178:7
  179:13
**detailed** 175:19
**details** 121:10
**detect** 49:24
  109:15 124:14
  127:20 149:14,23
  180:2 192:4
**detection** 115:5
**detects** 177:22
**determination**
  183:15
**determine** 20:10
  38:11 47:11 50:24
  51:10,14,25 53:13
  53:13 54:22 87:6
  131:6 132:4

**determined** 177:11 181:10
  182:21,25
**develop** 125:7,16
  159:3,10
**deviating** 52:16
  53:1 123:17
  158:16 160:17
**devoted** 32:2
  105:18
**di** 68:22 74:16
  85:12 124:12
**dictated** 186:11
**difference** 112:11
  112:12
**different** 18:10
  22:12 58:5 66:8
  145:1 154:2,6
  165:20 185:10
**differently** 27:24
  96:20
**difficult** 22:3,6
  112:21
**diligence** 106:5,10
  122:20 125:8,16
  136:24 137:7,15
  157:20 159:4,11
  160:7
**direct** 79:12
  138:25 164:19,21
  185:22
**directed** 70:25
  79:11 81:12
  118:23 165:15
  181:22 184:5
**directing** 144:4
  150:14
**direction** 62:19
**directive** 182:9
**directives** 35:17

**directly** 184:12
**disagree** 187:10
**disagreed** 117:23
**disclose** 52:10
  139:13
**discovered** 52:14
  93:13
**discovery** 53:19
  101:16
**discrepancies**
  60:17 83:18,19
  118:1,10,13 119:3
  120:6,16 122:9,17
  133:10 134:5,9
**discrepancy** 83:23
  119:11,13,17
**discretion** 26:16
  60:12
**discuss** 60:3,8,13
  130:6 176:17,24
  179:15
**discussed** 72:23
  94:1 173:16 178:6
  178:7 179:11
  180:22 188:7
**discussing** 60:14
  166:2
**discussion** 26:23
  60:1,11 61:2,3,22
  62:4,20 64:16
  74:19 79:17 90:7
  171:15 172:8,10
  172:12,14,20
  176:21 178:9
  182:13
**discussions** 62:24
  64:8 184:1
**dispense** 19:15
**dispensed** 70:7
**dispensing** 19:8,19
  106:17 164:2,13

164:23 165:20,23
**distinction** 119:8
**distinguishing**
93:17
**distribute** 19:18
23:3,8 39:23,24
40:13 64:3 65:15
68:12,17,24 76:6
88:7 98:23 147:24
**distributed** 42:8
69:4,17 157:8
**distributes** 66:25
**distributing** 19:20
21:7 40:19,20
41:13 50:18 75:15
75:24 106:13
109:22 163:11
**distribution** 23:18
30:22 55:19 64:1
64:12 70:15 71:10
88:1 90:1 99:20
121:23 122:5
123:1 148:10
162:25 163:4
164:8 166:1,12,19
167:5 186:1
**distributor** 20:2,2
20:3,21 22:25
23:16 24:22 39:22
40:6,10,10,12,18
41:8 45:9 46:19
48:11 49:15 57:23
58:8 59:14,25
66:5 71:25 88:2
90:22 98:2,7 99:6
99:11 102:15,16
121:13 132:11
148:3 187:11
190:13
**distributor's**
49:19 112:2

**distributors** 19:17
22:17 45:18 46:3
57:15 73:18 101:3
102:2 105:20
142:11 144:15
148:9 163:8
176:18 184:18
**distributorships**
122:22
**district** 1:1,2
13:25 14:4 21:22
54:4,9 128:3
**dittmer** 68:4,4
87:19 98:19
132:18 169:25
**diversion** 5:9,9,24
13:23 14:1,4,7,13
14:15 15:5,9,10,12
16:22 17:4,12,16
17:23 21:12,20
24:11 26:3 27:19
27:25 28:1,5,9,11
30:17,21 31:7,12
31:25 32:2,7 33:4
33:8,21 36:18,19
37:24 38:7,12,17
40:18,23 43:25
44:8 59:18 77:10
105:18 106:3
115:1,14,18,24
129:16 133:22
136:15 137:4
143:25 147:13,17
148:18 149:9
150:4 151:1,15
152:23 153:11,18
154:3,6,13,21
155:7 177:21
180:25 184:19
**diverted** 43:5,13

**division** 1:3 3:10
52:13 53:15,20
54:5,6,7
**doctor** 18:18 19:1
153:21
**doctors** 19:18
**document** 1:8
58:25 73:15
129:23 135:25
136:4 140:12
143:11 147:15
153:3 160:5
**documentation**
60:18
**documented** 100:6
102:20
**documents** 5:11
36:22 141:4
173:19 180:15
**doing** 11:15 38:9
102:23 130:11,21
131:11,18 144:6
168:19 169:23
174:24 179:12
183:22
**dollars** 120:25
**door** 103:15,22,25
104:11
**dosage** 39:19
164:3,14 166:11
167:3
**downtown** 12:8
**drafted** 18:4
**drafting** 172:19
**drug** 3:10 13:9,23
15:21,24 17:1,13
17:14 23:16,17
29:19,19 30:16,21
31:6,12 33:7 43:9
73:18 98:2 107:22
122:21 147:23

148:8 151:15
**drugs** 14:12,17,20
14:24 15:6,17,19
15:22 16:2,6,8,12
16:21,23 17:9,18
17:24 19:18 28:2
42:22,23 43:1,3,5
43:12,18,19 50:2
65:10,23 68:17
75:23 78:13
109:22 166:15
**due** 100:9 106:5
106:10 122:19
125:8,16 136:24
137:6,15 157:20
159:4,11 160:6
180:25 183:15
**duly** 11:5 194:7,10
**dunning** 2:3
**duplicate** 180:18
**duties** 14:14
145:12

| e |

**e** 6:9,11,14 126:8
126:16,23,23
127:9,23 128:14
128:20,23 129:10
129:14 130:1,22
131:22 173:25
175:22 176:4,23
179:1,14,22 184:3
184:4,5
**e.g.** 137:7
**eagle** 2:14 11:12
22:23,25 23:14
29:7,24 30:7,12,19
31:2 33:2 34:23
39:23 40:11 41:25
42:1,2,7,9,11 51:2
51:3,16 55:23
56:3 63:9,11,25

64:6,9,16 65:1,2,4
65:6 66:23 68:25
69:4,10,14,15 70:7
71:4,10,20 73:3,24
74:6,18 75:5,15
79:21,25 80:10,20
87:25 88:7 89:22
90:1,4 94:10
96:10,23 98:5,9,16
98:20 99:19
101:15 102:23
104:14 105:14,19
106:7,8,12 107:19
107:20,21 108:1
108:21 109:4
111:9 114:16,20
114:25 115:2,6,11
116:4 122:23
123:12,15,19
124:7 125:3,4,20
126:4,16,17,24
127:2,19,21,22
128:6,21 129:5,19
130:10,24 131:11
131:17,25 132:7
152:11,23 154:10
158:11,14,17
160:15,18 161:4
161:11,13 162:17
162:23 163:8,12
163:13,22 166:1
167:8,13,24 171:3
172:12 173:1,18
174:6,18,19,23
175:5 177:8,19,25
178:13,24 179:7
179:12,17 180:15
180:22 181:7
182:5,10 183:12
184:18,25 185:1,9
185:19 187:15

188:6 189:16
**eagle's** 30:22
55:17,18 66:12
68:11,16 70:14
71:3 75:24 78:11
79:15 84:6 88:8
90:21 92:11,22
95:11 99:1 103:10
107:12 109:23
110:7 111:7
114:12 122:25
123:21 132:14,15
134:9 157:5
158:24 161:19
165:2 166:19
167:5 169:5,17
170:25 171:17
175:4,6 178:17
186:1 188:2,4
**earlier** 21:15 64:7
88:23 93:21 97:1
105:8 110:3 158:9
163:3 172:1
173:17 175:15
186:23
**ease** 36:5
**easier** 34:10
177:17
**eastern** 1:3
**educate** 138:19
143:22 144:24
145:19 149:16
150:21 154:20
155:16,25 179:17
**educated** 155:19
**educating** 151:6
**education** 153:8
153:13
**educational** 12:16
145:8,11 146:19

**effect** 175:14
**effective** 37:23
38:6,12 137:3
150:4 175:1,15
188:1
**effectiveness**
108:22
**efforts** 19:24
**either** 21:25 50:22
61:22 62:5 82:7
106:22 111:9
112:5 113:13
117:10 157:7
163:14 195:2
**electronic** 43:2
85:14,16
**electronically** 68:2
79:24
**elements** 78:9
103:21
**eligible** 20:10
**eliminate** 106:2
**ellis** 3:2
**email** 196:17
**emphasis** 46:14
109:9
**emphasized**
148:25 181:16
**employed** 13:25
18:22 25:24 29:15
30:9
**employee** 77:4,5
77:23,25 102:6
141:16 144:23
**employees** 77:13
77:15 174:23
**employment** 12:22
13:8,9 29:5 77:7
102:6 136:10
**enacted** 17:22

**enacting** 106:10
114:19
**enclosed** 196:11
**encourages** 148:23
**endeavor** 53:8
**ended** 57:8
**endorse** 139:25
140:3,7 189:18,25
**ends** 55:8
**enforce** 18:13
19:24
**enforcement** 3:10
13:10,24 28:24
57:8,18,19 145:18
145:20 147:23
**enforces** 18:5
35:24
**enforcing** 131:9
**engage** 20:10
47:13
**ensure** 80:14 85:8
113:21 150:24
174:25 190:22
191:22
**entailed** 64:15,19
**entails** 25:4
**entered** 198:9
**entire** 142:13
151:4 197:5 198:5
**entirety** 142:4
**entitled** 136:23
**entity** 147:22
**entry** 160:22
**ephedrine** 14:22
63:17 65:11
**episodic** 180:18
**equipped** 103:25
104:1
**erica** 3:3
**erica.zolner** 3:5

errata 196:13,18
198:7,10,18 199:1
error 180:17
especially 11:15
esq 2:3,3,7,11,15
2:15,20 3:3,7,11
3:14,15,15,16,16
3:17,17
essentially 14:18
15:15 16:15 18:4
20:1 79:21 92:22
120:11 124:2
147:12 177:5
established 137:3
estimate 22:7
et 1:10,13 39:21
166:5
evaluate 108:22
109:11
event 195:3
eventually 54:25
55:8
everybody 191:1
evidence 185:1,18
exact 22:20 80:14
147:11
exactly 46:13
51:23
examination 4:7
11:4,8 135:2
170:15 189:9
190:8
examined 103:14
example 14:25
17:3,20 20:3 56:5
56:8 65:12 85:25
96:2 106:21
138:23 148:16
151:5 155:18
examples 106:21
151:18

exceed 126:25
excerpt 5:24 6:13
44:1 186:18
excessive 166:24
exclusively 21:21
23:14
excuse 114:4
145:20 159:6
164:6 188:18
executed 198:10
execution 197:14
198:19
exhibit 4:16 5:5,9
5:13,16,18,20,21
5:24 6:3,5,7,9,11
6:13,14,16,18
36:18 37:2 43:25
44:5 50:12 57:25
60:10 67:10,16,19
79:8 82:13 87:10
87:16 90:16 96:17
97:25 116:7,12
126:8,13,15
128:14,19 131:12
133:18 135:11,14
138:7,10 140:16
140:19 143:3,6,14
146:10,11 147:3
151:19,24 152:2
156:7,10 159:16
161:24 162:2
169:3,15 170:17
170:21,22 171:15
175:22 176:3
186:14,17,25
189:14
exhibits 4:4 5:1
6:1 34:8,11,25
existing 98:21
110:2

expect 161:2
expected 55:15
experience 40:14
41:7 42:24 45:22
48:12 54:2 77:12
106:1 112:12
113:20 121:13
147:1 154:1
157:15 168:6,9
172:24 189:24
expiration 197:19
198:25 199:25
expired 51:11
expires 195:16
explain 14:13 50:7
65:3 113:9 145:12
explained 71:17
177:25 183:6,21
explaining 139:17
explore 71:14
81:16
expressed 97:20
expressing 148:7
extended 156:1
extent 70:12
117:17 166:2
169:22
eye 163:16

**f**

facilities 20:5
30:23 55:19 64:12
70:14 71:11 94:15
96:21 99:1 110:21
123:1 163:10
166:1 186:1
facility 23:19,21
25:22 43:2 63:22
65:7 66:12 69:13
70:23 71:20 79:16
84:8 85:8 88:15
90:17,21 92:9,11

92:18,20,21,22
93:5,23 94:8
96:10,19 97:5,21
98:8 99:13 102:10
107:13 109:20
110:17 111:16
112:3,8 114:12,17
114:20,21 116:17
118:14 120:1
132:20 134:10
157:3,5,8 163:11
164:8 167:24
170:19 188:5
fact 41:3 48:8 68:7
74:19 78:11 90:19
103:10 104:7
107:12 111:6
121:3,4 137:25
138:17 140:6,8
141:8 153:9 158:6
161:13 174:6,9
177:12 182:9,25
factor 39:16
factors 38:23
46:12 53:6 148:18
149:5 187:12
fail 149:14,23
failure 59:16
150:3
fair 14:10 16:9,19
18:9,15 32:10,17
35:21 52:24 54:24
55:7 175:4 191:6
faith 50:21
fall 126:1
familiar 22:23
23:15 33:24,25
37:12 127:18
138:17 139:3
family 17:7

**far** 41:7 73:8
  127:1
**fashion** 189:17
**fault** 102:9
**fbi** 28:13
**federal** 11:4 18:1
  28:10 124:21
  150:23 176:19
**feel** 166:10
**feels** 168:15
**felony** 79:5
**field** 52:13 53:15
  53:20 54:5,6
**file** 91:21 100:6
  101:18 138:6
  156:6 159:13,24
  161:23
**filed** 101:10,19,24
**files** 75:9
**fill** 106:25
**filled** 56:9,25
  182:7
**final** 150:16
**find** 26:17 66:14
  66:14 172:7
  196:11
**finding** 188:9
**findings** 60:14
  61:23 62:1,6,7
  85:23 86:1,5,9
**fine** 89:14 110:18
**firm** 2:10 60:20
  72:3 76:13 77:3
  84:17,22 85:3
  92:1
**firm's** 60:15 61:13
  61:24 62:15,16
  71:22 85:13 90:18
  120:23 121:7,10
**first** 11:5 30:5,10
  39:16,18 47:8

68:22 83:2 91:12
  100:4 105:10
  120:5,24 135:8
  137:2 140:13
  146:10 147:20
  149:12 152:21
  153:5 184:8 189:2
  194:10
**fitness** 47:11
**fitzpatrick** 2:7
**five** 15:24 16:5
  34:19 46:5 64:2
  170:5
**fix** 96:6
**fixed** 104:4
**flagged** 127:15
  128:7,24 129:20
  174:1 177:7,10
**fleming** 74:18
**flip** 147:14
**floor** 2:8,16
**florida** 2:4
**focus** 15:3 35:18
  63:8 94:5 103:9
  159:7
**focusing** 56:16
  57:14
**folder** 140:14
**folders** 135:7
**folks** 85:22 91:18
  126:17 128:21
**follow** 46:15 56:2
  125:11 126:4
  128:25 165:17
  190:10
**followed** 97:7
  104:3
**following** 73:17
  78:21 106:10
  156:16

**follows** 11:7
**food** 15:23
**foregoing** 194:15
  194:20 197:13
  198:18
**forewarn** 12:11
**forged** 56:24
  153:21
**forging** 17:3
**form** 17:4,16
  20:24 25:6,13
  26:12 30:1,24
  31:13 32:3,23
  37:19 39:12 40:1
  41:4 42:4,13 43:6
  44:16,23 45:19
  47:18,24 51:20
  52:23 53:24 55:2
  55:11 57:10 58:2
  58:3,14 59:7 60:4
  61:18 62:9 63:3
  65:12 66:16 74:2
  78:3 80:3,23 81:6
  84:9 87:3 89:6
  92:25 93:15 95:21
  100:18 101:19,20
  102:12,25 104:17
  105:6,22 107:1
  110:12 111:12
  112:9,24 113:18
  115:15,25 117:8
  119:5,19 120:13
  121:5,14,20
  122:14 123:3
  124:8,24 125:12
  125:23 127:6,16
  127:24 128:9
  129:7,22 130:18
  131:20 133:6,12
  134:11 153:2
  161:8 163:19

164:5 166:21
  168:14,24 169:9
  169:20 171:6,21
  172:15,21 173:6
  174:12 177:13
  178:21 179:19
  180:7,9 181:12
  187:21 188:12
  189:17,22 190:18
  191:20
**formal** 67:3,7
  72:14 94:14 95:7
  100:20 112:15
  119:10 175:13
**formalized** 175:19
**formats** 185:10
**forms** 28:4 39:20
  102:20 145:2
  154:6
**formulas** 149:13
  149:23
**forth** 34:2 38:14
  121:25 124:20
  179:16
**forward** 196:15
**found** 31:5 32:1
  57:6 72:20 84:23
  94:8,23 101:18
  110:1 111:6
  133:10 187:25
**four** 64:2 101:19
  101:23
**fraud** 29:14
**free** 197:14 198:20
**freedom** 64:1 88:3
  97:6 98:22 114:17
  114:20 157:5
**frequency** 52:18
  53:3 109:16,16,17
  142:24 146:3
  155:13 163:17

**frequent** 105:3
106:1
**frequently** 105:15
**front** 104:10 135:7
136:4
**fulfill** 146:22
149:17
**full** 45:12 56:20
124:19 125:4,5
133:23 171:1,11
188:10
**fully** 11:22 104:22
**further** 52:25 59:6
117:25 170:13,15
178:12 182:3
189:9 190:7,8
192:9 194:18
195:1
**future** 102:21

**g**

**g** 68:3 158:8
**gamut** 22:12
**gate** 103:24
**gen** 138:6
**general** 22:2 26:2
29:6,14,21 40:17
43:16 81:23 128:4
131:22 178:9
**general's** 28:16
29:9
**generally** 18:20
19:1,5 35:21 37:9
37:14 46:2,5
155:2
**generic** 104:24
**geneva** 12:17
**geographical**
22:18
**geographically**
21:17

**gerx** 88:15 90:17
92:9,20 94:8
96:18 97:14 99:4
103:11 107:13
108:5 109:20
111:22 134:10
178:13 180:1
**gerxdc** 106:6,8
107:19,23 113:24
114:13 132:16,20
133:4
**getting** 51:2 56:24
80:20 128:6 159:7
164:8
**giant** 2:14 11:12
22:23,25 23:14
29:7,24 30:7,12,19
30:22 31:2 33:2
34:23 39:23 40:11
41:25 42:1,2,7,9
42:11 51:2,3,16
55:17,18,23 56:3
63:8,11,25 64:6,9
64:16 65:1,2,4,6
66:12,23 68:11,15
68:25 69:4,10,14
69:15 70:7,13
71:3,4,10,20 73:3
73:24 74:6,18
75:5,15,24 78:11
79:14,21,25 80:10
80:20 84:6 87:25
88:6,8 89:22 90:1
90:4,21 92:11,21
94:10 95:10 96:9
96:23 98:4,9,16,19
99:1,19 101:14
102:23 103:10
104:14 105:14,19
106:7,8,12 107:12
107:19,20,21

108:1,21 109:4,23
110:6 111:7,9
114:11,16,20,24
115:2,6,11 116:4
122:23,24 123:12
123:15,18,21
124:7 125:3,4,20
126:3,16,17,24
127:2,19,21,21
128:6,21 129:5,19
130:10,23 131:10
131:17,25 132:7
132:13,15 134:9
152:11,22 154:10
157:5 158:11,13
158:17,24 160:15
160:18 161:4,11
161:13,19 162:16
162:23 163:8,12
163:13,22 165:2
166:1,19 167:4,8
167:13,24 169:5
169:17 170:25
171:3,17 172:11
173:1,18 174:6,18
174:19,23 175:4,5
175:6 177:8,19,25
178:13,17,24
179:7,12,17
180:14,22 181:7
182:5,10 183:12
184:18,25 185:1,9
185:19 186:1
187:15 188:1,4,6
189:16
**gina** 3:18
**give** 22:6 56:5
75:12 77:22 79:21
144:7 146:8 170:4
170:7 193:1,10

**given** 31:17 46:14
131:9 194:12,17
**gives** 149:22 192:1
**go** 11:13 16:17
34:8,17 37:2
39:17 45:3 47:4
48:13,19 50:12
56:10 57:25 58:20
60:10 73:9 74:15
74:22 76:10 78:7
79:8 82:12 83:16
84:15 85:11 86:23
91:24 92:19 96:17
99:3,17,24 101:13
102:4 103:6
104:19 106:4
107:17 108:15
112:4 118:21
119:23 120:22
122:18 124:16
126:13 128:19
130:15 131:1
147:2 152:21
157:11 171:13
177:16 178:12
182:2 186:14,25
187:23 189:13
191:2,23
**goals** 38:4
**goes** 32:22 38:10
38:22 41:8 48:24
71:17 73:14
108:16 137:18
179:4
**going** 15:8 19:8
20:7,22 21:6,8
34:7,11,24 35:2,2
38:5,6 39:16 43:8
49:24 56:14 62:13
68:16,17 70:8
73:24 74:7 75:10

75:23 78:24 83:10
84:7,24 85:22
86:4,8 87:20 88:6
88:7 92:13,24
93:13 95:19,24,25
96:4,11,14 103:7
103:16 108:1,14
108:15 112:4,5,6
112:18,19,22
113:13 114:19
124:4 135:9 138:6
140:11,12,15
143:2 151:24
154:10 156:6
157:10 161:23
164:7,21 167:2
189:13
**good**  11:10 50:21
52:2 77:9 86:23
134:19 135:4,4
159:7
**gotcha**  97:24
**gotten**  55:22 56:2
**grade**  85:17
**graduate**  12:25
**graduated**  12:17
12:22 13:1
**grandma's**  17:18
**grant**  27:5
**granted**  99:4,12
**greater**  43:1
**greg**  123:21
158:23 161:18
**grocery**  23:5
**ground**  11:14
**group**  14:3,3,4,6
26:9,10,14,22 27:9
60:12 68:4,5
83:22 84:1 86:1
128:23 181:17

**growing**  152:25
153:11
**guard**  37:23 84:19
**guess**  128:2
171:14 176:15
**guessing**  30:4
**guidance**  90:10
146:8
**guys**  31:11,24
170:4

**h**

**half**  188:24
**hand**  50:5 135:23
136:6 195:6
**handed**  151:4
**handle**  63:21 64:3
76:14 103:3
**handled**  42:14
48:23 74:9
**handling**  15:13
25:19 42:15,25
63:14 66:9 76:23
78:19 83:2 105:10
151:13
**handout**  108:24
**handy**  34:13
**hanly**  2:7
**happen**  28:5
**happened**  27:16
57:21 62:11 66:22
**hard**  32:1 75:8
**harm**  16:3
**hbc**  6:12,15 63:13
63:19 65:7,14
66:12 68:15,23
71:23,24 74:24
75:3,14,14,21,23
78:2,17 79:16
82:17,19 83:10,20
84:24 85:17 88:12
90:19,21 91:1,25

92:11,22 93:5,23
94:20 95:5 96:10
97:21 100:2,3
101:19 102:9,19
109:20 110:7
111:3,16 114:12
114:21 115:13,23
118:17,24 120:1
120:11,25 122:21
122:22 123:12,17
126:9,18 128:16
128:24 130:7
138:1 139:18
140:9 141:15,23
142:3,17,22
143:21 144:4,12
144:19 145:6,19
146:22 148:2,6,15
149:5 150:3,10,14
151:4,6,12 153:9
153:14 154:2,19
155:10,15 157:24
158:11,15 160:9
160:14,17 161:4
162:16 164:2,13
165:14 166:11,18
167:4,8,13,23
169:5,17 170:19
175:10 188:4
189:15
**hbc's**  84:8 92:18
95:11 96:21 101:9
109:25 110:1,20
111:7 113:24
116:16 120:20
141:5 155:24
160:24 165:1,5
168:12
**head**  147:12
**heading**  45:4 48:3
60:11 79:9 82:13

90:18 99:25 101:1
106:5 120:23
122:4,19
**headquarter**
160:18
**headquarters**  75:1
75:4,11,18,18,20
84:2 107:5 123:19
123:22 158:18,24
160:23 161:6,13
161:19 163:15,23
178:14,24 186:22
**headset**  79:12
**health**  99:6
**hear**  11:17 62:25
**held**  130:7
**help**  17:23 30:16
32:21 44:15
138:18 145:18
146:22 154:11,20
**helpful**  146:9
**helping**  77:9
105:18
**helps**  151:14
**hereinafter**  11:6
71:24
**hereunto**  195:5
**heroin**  14:25
**hey**  124:2 128:6
**high**  16:14 121:12
121:16 123:16
158:14 160:16
**highlighted**  148:8
**highly**  117:2
**hire**  24:9
**hired**  13:22 41:20
41:23 42:1,2,10
**history**  25:18
76:22 101:9
**hit**  127:13

hold 140:11
holding 154:24
honest 125:19
hope 52:1
hopefully 86:15
hospital 18:22,25
hospital's 18:24
hospitals 19:12,13
hours 188:24
189:1
hubbard 3:7
human 180:17
hundred 125:19
hundreds 168:10
hydro 167:14
hydrocodone
75:25 76:2,7
164:4,15 166:20
167:4

**i**

i.e. 180:21
idea 22:2
identical 171:24
identification
36:25 44:3 67:14
87:14 116:10
126:11 128:17
135:20 138:15
140:23 143:9
152:6 156:14
159:20 162:6
176:1 186:19
identified 158:10
180:14
identify 27:17
69:23 137:8
142:23 143:23
146:2 149:13
155:12 158:1
161:5 162:20

identifying 154:12
illegal 14:12,24
illegitimate 153:22
illinois 2:21 3:4,8
154:11 155:1
immediately 77:6
108:5
impact 176:19
implemented
124:15
importance 81:17
important 20:19
21:5 107:9,15
110:15 121:17
imposed 165:12
impossible 168:10
improve 124:4
125:9 174:8,19
188:8
improved 175:7
inbound 83:24
inception 181:20
incident 132:12
include 16:22,25
17:2,17 42:15
45:8 46:18 48:22
49:1,10 52:15
66:20 76:16 84:13
89:8,9 118:3
included 99:21
100:22 134:8
141:23 142:17
143:14,24 148:17
196:13
includes 48:10
124:22 125:21
including 58:6,7
66:4 76:6 80:2
93:20 110:21
125:6 128:21
137:15 142:21

144:11 171:5
174:20 178:14
180:17 189:15
inconsistent 150:5
incorporated
198:12
increases 180:19
incumbent 137:19
138:1 146:13
index 4:1,4,5 5:1
6:1 7:1 8:1 9:1
10:1
indicate 90:25
110:4 123:14
148:18 160:11
171:9 186:12
188:16
indicated 21:21
67:24 70:1 93:4
93:12,21 103:2,17
110:3 120:16
181:25 189:23
indicates 48:20
101:14 148:20
159:9 161:10
indicating 196:13
indication 96:23
120:11
indications 149:9
individual 191:12
individually 41:24
41:25
individuals 117:2
inform 51:9 52:12
128:24
information 31:18
32:19 33:3,6,11,12
33:19,20 48:22
51:4,15,24 56:8
62:18 69:21 74:25
75:13 76:17 99:9

106:9,14,17,19
107:10,11 131:25
145:2,6 146:5,6,8
150:11 154:11
180:2 185:22
informed 60:20
68:22 158:5
163:22
informing 148:6
initial 83:1 105:9
initially 24:9
inquiry 50:21
ins 76:13
insignificant 54:20
insofar 87:5 125:1
inspect 40:9 55:17
55:18,21 56:25
79:16 92:9 112:2
inspected 23:21
65:4 70:21,22
81:10 110:20
inspecting 27:20
60:1
inspection 20:5,13
20:14 21:5 25:3,5
25:10,12,22 26:5
26:11,19 34:3,4
37:18 39:11,15
40:25 45:23 47:1
48:9,14,16 49:18
55:23 56:14,15,17
56:20 63:13 64:14
64:15,25 65:17
66:11,22 88:14
92:18,23 99:14
100:5 110:19
120:12,19 132:21
133:9 173:20
175:9
inspections 20:19
21:24 24:17,22,24

[inspections - items]                                                                 Page 19

47:17 63:9,10
64:6,8 71:10,18
81:19,21 82:1
85:21 89:10 92:6
93:4,13 98:6,25
111:9,16 164:9
175:10 185:11,11
**inspector**  27:25,25
28:9
**inspectors**  117:3
**inspects**  110:17
**installed**  82:8
104:10
**instructed**  54:8
**instruction**  193:2
193:10
**integrated**  148:24
**intelligence**  46:16
**intend**  60:22
**interaction**  185:9
**interactions**  155:9
156:2 174:18
184:25 185:7,15
**interest**  150:5
180:3,14,17 181:8
181:9
**interested**  195:3
**interface**  80:6
**interim**  136:5,14
**internal**  173:18
**interview**  49:5
**introduce**  12:1
**introductory**  47:9
**inventories**  178:15
178:20
**inventory**  46:15
50:1,6,8 55:4,10
79:22 80:1 81:4
82:8,13 83:1,4,7
83:13,15 84:7
104:23 105:4,9,12

105:20,24 115:22
118:18
**investigate**  131:5
**investigates**
180:15
**investigating**
56:23 130:14
131:14
**investigation**  5:16
5:18 6:3,5,7,16,18
20:9,18 21:11
25:16 29:19 32:21
35:19 37:18 38:9
45:17 46:21,24
47:10,12 48:4,12
50:4,11 51:9 57:5
57:6,22,22 58:16
58:25 59:5,6,12
60:7 63:19,25
67:2,10,18 69:23
70:6 73:24 83:19
85:2 86:20 87:6
87:10,18,22,22,25
88:14,19,21,21
90:16 93:22 94:9
94:20,23 100:5,7
100:24 116:7,14
116:16,20 118:1
118:10 119:24
120:6 129:3
130:15 131:16
132:20,23 133:1,3
133:3 134:4
140:14,19 141:1,9
141:14,22 156:10
156:18,23 157:3,4
157:7,11,13,16,19
159:16,23 160:6
160:23 161:1
162:2,9 163:15
165:4 167:22,23

168:13 169:4,16
170:19 172:6
175:11,17 177:11
181:11 182:20,25
188:5
**investigations**
22:4,11 24:24
28:20 29:10,20
31:14 32:8 45:5
45:13 46:3 47:6
48:3 62:12 63:6
64:5 72:4,6,10,11
73:3,8,10 88:12,18
88:23 89:3 91:2,7
91:8,11,17,19 92:2
92:4 93:18 94:3
94:19 95:3 98:11
100:2 111:3 136:6
142:8 155:14
156:25 165:25
166:3 167:19,21
168:1,20 188:4
**investigative**
48:21,25 167:6
**investigator**  13:23
14:1,14 21:13,19
21:20 24:11 30:14
58:17 59:13
114:24 117:4,5
118:6 120:15
121:8 124:12
125:15 129:16
133:8 159:3
**investigator's**
33:22
**investigators**  14:8
26:3 60:13,22
61:12,23 62:1,14
62:17,19 91:22
117:11 124:18
136:19 156:2

158:5 161:12
168:6,22 169:1
170:24 171:9,17
188:15 190:3
**invited**  154:19
**involve**  22:11
25:16
**involved**  22:1 24:8
26:4,8,10,15 27:14
58:12 59:2 63:10
63:12,18,24 65:24
78:19 87:23 88:11
88:16,23 91:18
98:25 111:15
132:19,24 133:2
**involvement**  18:7
**involves**  14:14
25:4,11
**involving**  15:16
121:11
**issuance**  119:10
**issue**  27:2 31:18
32:19 33:7 86:13
90:8 97:10 100:10
100:13,21 104:4
119:13,18 123:20
158:22 161:17
**issued**  150:16
**issues**  26:1 34:6
67:5 72:23 76:19
89:5 92:12 93:25
94:1 97:3,8
119:21 122:13
**item**  71:8 79:13,23
80:14,14 127:14
**items**  74:17 80:16
129:14 178:5,25
179:11

**j**

**j**  2:20
**jackson**  6:10
  175:24 176:6
  181:17 182:10
  184:6,14
**jaco**  3:16
**james**  3:15
**january**  6:8,18
  87:11 162:3
**jernudd**  3:7
**job**  30:20
**jobs**  18:13 30:16
**john**  3:17 98:19
  119:24
**jones**  2:19
**jonesday.com**
  2:22
**joseph**  5:5,13,21
  126:16 135:14
  138:10 147:15
  152:2
**judge**  1:8
**june**  5:13 6:10
  138:12 139:1
  147:9 149:11
  175:24 176:5
  189:14
**jury**  12:2 15:11
  25:10 65:3 103:7
  110:16 162:22
**jury's**  101:2 111:4
**justice**  3:10,14,15
  3:15,16
**juvenile**  12:24

**k**

**kayla**  87:20
  126:24
**keep**  52:3 63:1
  132:6

**keeping**  99:25
  163:16
**key**  38:18 52:20
**kill**  44:7
**kim**  123:21 158:23
  161:19
**kind**  12:11 15:16
  16:25 50:1 61:1
  77:20 185:25
**kinds**  165:11
**kirkland**  3:2
**kirkland.com**  3:5
**knew**  92:10,19
  107:6 110:6
**know**  11:11,19,23
  15:8,17 16:18
  17:6,18 21:15
  22:10,10,20 25:23
  26:7 27:7,11 28:3
  28:4 29:1,3,4,8,19
  30:3,8,11 31:1,14
  31:15,17 32:1,15
  33:9 36:5 40:3,17
  41:8,14,17,18 42:1
  42:9 43:5 44:18
  44:19,25,25 45:21
  45:24 46:6,9,12,12
  46:13 48:24 49:23
  50:19 51:23 53:10
  54:14,15 55:3,13
  56:22,25 58:15,15
  61:6,7,9,16 62:24
  63:1 64:15 65:23
  65:23 67:3 69:12
  69:12 72:8 74:11
  75:8 76:24 77:13
  77:21,22 81:22,22
  82:11 85:15,21
  86:14 89:4 90:20
  94:19 102:1 105:9
  106:21 107:3,5,7,8

  110:19 111:17,20
  112:21 113:4
  114:5 118:7,19
  121:16 124:3
  125:7 127:8,19
  128:2,11 129:9
  130:2,20,21,24
  131:8,24 132:3
  133:14 137:20
  138:2 142:6,10
  144:10 146:13
  147:5 158:2 163:7
  166:22 172:3
  173:4,13 174:5,14
  174:21,21,22
  175:14 178:25
  179:13 184:2,5,11
  184:13,14 185:4
  185:15 186:23,24
  187:8,9 188:1,3
**knowledge**  12:8
  23:11 132:22
  174:10 185:24
**known**  180:24
**knows**  79:25
  113:12 121:18
**kuchta**  171:10
**kupchick**  116:14
  116:22 117:5
  133:8
**kupchick's**  118:6
**kurt**  68:3 87:19
  132:18

**l**

**l**  1:24 194:6
  195:13
**l.p.**  1:10,13
**labeled**  159:13
**labeling**  39:20
**lag**  54:10

**lake**  1:10
**lanier**  2:10
**lanierlawfirm.com**
  2:13
**large**  180:18
**lasalle**  3:3
**late**  109:20
**laura**  2:3,7
**law**  2:10 28:23
  144:20 176:17
  177:5 181:1
  182:18 183:10,18
  183:22
**lawful**  11:3 16:9
**laws**  150:23
**layered**  177:20
**ldunning**  2:6
**lead**  58:17
**learning**  79:14
**leave**  17:9
**left**  100:6 129:15
  132:7 134:18
  143:14
**legal**  196:1 199:1
**legally**  15:5 17:24
**legend**  107:22
**legitimate**  16:1,1
  150:25 180:19
**lesser**  16:18,19
**letter**  5:13 66:21
  71:9 93:6 119:10
  138:10 139:1
  147:21,21 148:21
  149:1,12 150:2
  151:5 154:9
  155:18 165:13
  177:17 179:16,17
  189:14,24 196:19
**letters**  5:21 138:18
  138:24 145:2,8
  147:3 148:16

149:5 152:2
**letting** 130:15
**level** 115:12,13,19
151:21 116:4
119:15 123:19
160:19 179:5,6,24
**levels** 178:3 179:9
179:18
**levin** 2:2
**levinlaw.com** 2:5
2:6
**lewis** 1:18 4:7 6:10
11:3,8 12:3 135:2
170:15 175:23
189:9 190:8 194:9
196:8 197:4,9
198:4,13 199:20
**lfitzpatrick** 2:9
**license** 18:19 19:4
19:9,13,20 20:1,4
20:21 21:8 24:15
27:6 51:6 59:21
66:6 68:11 95:11
95:18 98:10 99:5
108:4 109:21
132:16
**licensed** 107:22
**licenses** 52:4
**licensing** 24:16
**licensure** 99:12
**lieu** 136:14
**life** 105:18
**light** 131:11
**likewise** 19:13
**limit** 15:4 102:21
114:25 115:18
**limitations** 165:12
**limited** 18:21
56:21
**limiting** 185:6

**line** 187:1 196:13
198:7 199:3
**lines** 57:9 66:20
**list** 5:20 16:17
48:24 65:21 66:6
66:10,13,25 71:25
76:14,23 92:6
93:19 95:3 143:6
143:15 148:18
**listed** 14:21 25:19
63:14 64:25 65:9
66:13 73:16,19
198:7,17
**listing** 198:7
**lists** 137:7 149:8
153:19,21 179:14
**literally** 69:12
171:23
**litigation** 1:6 5:10
11:12 36:20
186:23 196:6
197:3 198:3
**little** 96:20 117:25
162:23 178:12
186:5
**livingston** 2:15 4:8
4:10,12 11:9,11
34:17,22 35:5,15
71:2,12 81:14,20
89:11,20 114:8
134:16,21 154:22
155:17 161:7
164:5,16 165:10
165:19 166:13,21
168:23 169:8,19
170:16 188:23
189:5,21 190:9
192:6
**llp** 2:14 3:2
**local** 28:23

**locale** 28:2
**located** 68:18
**location** 79:12
**long** 13:3,16 80:5
**longer** 46:1 107:23
**look** 25:4 39:8,9
40:4 41:7 42:12
46:20 47:1 49:19
49:22 56:10 91:6
91:16 114:22
122:5 126:3
133:15 157:12
170:17 172:4
176:3 184:7
190:20 191:3
**looked** 110:20
111:17,18 120:20
161:16 171:25
**looking** 71:8,13
73:23 74:6 76:21
122:3 126:14
167:1 190:12
**looks** 49:13 68:1
80:25 101:18
**loss** 53:17,19
54:23 55:3,9
101:14,17,21
102:5,8,24 104:24
**losses** 55:16 84:20
102:8,22 115:6
**lost** 102:15
**lot** 15:9 76:18
142:11
**lou** 129:16
**low** 121:12,16

**m**

**madam** 196:10
**madison** 2:8
**mail** 6:9,11,14
126:8,16,23,23
127:9,23 128:14

128:20 129:10,14
129:16 130:1,1,4
130:22 131:22
132:7 175:22
176:4,23 179:1,14
179:22 184:3,4,5
**mailed** 128:23
**mails** 132:10
173:25
**maintain** 59:17
98:10 150:4
**maintained** 49:2,9
121:24
**major** 12:19,20
**making** 69:13
132:2,2
**male** 114:5
**malfunction** 100:9
100:16
**management** 60:2
60:9,12,16 61:1,3
61:4,22 62:5
86:21 124:17
170:23,25
**manager** 158:10
**managers** 5:9
36:19
**manner** 101:10
103:4
**manual** 5:24 33:22
33:24 34:1,6
43:25 44:7,8,12,21
45:4 47:5,21 61:6
61:8 136:15,18
146:12 186:6,8,13
187:17
**manually** 187:3
**manufacture**
147:24
**manufacturer**
40:6 190:25

**march** 1:21 5:10 36:21 195:7 196:4
**marcus** 2:14,17,18
**mariama** 3:17
**mark** 135:10 138:7 140:15 143:2 151:24 156:7 161:24
**marked** 5:3 36:24 44:2 67:13 87:13 116:9 126:10 128:16 135:9,19 138:6,14 140:15 140:22 143:8 147:3 152:5 156:6 156:13 157:23 159:19 161:23 162:5 175:25 186:18 189:14
**maryland** 69:1
**material** 144:13 145:8 146:17,21
**matter** 40:17 43:16 81:23 187:2 187:5,9,14
**matthew** 2:15
**mazgaj** 2:15
**mckesson** 23:15 23:17 40:12 70:4 70:9,12,13,17 71:6 71:14,15 98:2,6,8
**mckesson's** 70:23
**md** 1:7
**mdl** 1:6 5:12 36:23 128:16
**mdl00132815** 6:12 128:16
**mdl00136952** 6:15 126:9
**mdl2804** 5:25 44:2
**mean** 14:17 26:6 52:25 66:23 73:1

77:24 85:24 86:11 87:5 92:8,17 94:6 105:17 108:25 113:3 114:10 117:13,14 118:9 119:2,4 125:1 131:8 146:5 163:6 167:10 178:17,23 179:21 182:19
**meaning** 23:8 100:14
**means** 15:10 77:5 110:16 111:6 121:19
**measures** 102:21
**medicaid** 29:13
**medical** 16:1,13
**medication** 19:2
**medicine** 17:10,19
**meet** 38:25 78:9 86:22 96:3 103:22 110:9
**meeting** 25:22 38:25 86:21 124:17,18 154:11 154:25 170:23,24 171:4 176:10,13
**meetings** 145:11 146:19 154:19,24 155:5
**meets** 79:1 83:12 190:16 191:14
**member** 131:5
**members** 78:18
**memorandum** 5:5 5:9 36:18 135:14
**memory** 46:9
**mention** 131:24
**mentioned** 19:12 29:23 53:12 64:7 64:24 97:1 118:19

154:7 161:1 168:17
**mentioning** 21:15 81:16
**mentions** 81:15
**merchandise** 77:6
**merchandising** 83:20,22 84:1,13
**messaging** 151:20
**met** 78:13 103:11
**michael** 116:14
**middle** 47:8 71:21 71:23 74:23 98:1 99:18 107:18 129:14 157:24
**midwest** 196:17 199:1
**mike** 128:23
**mildred** 2:11
**mildred.conroy** 2:13
**miles** 12:7
**miller** 3:18
**million** 120:25 164:3,13
**millions** 166:17 167:3,20 168:11
**millward** 126:16 128:20
**mind** 35:9 119:16
**minges** 3:17
**minimal** 83:12 105:25
**minimize** 77:10
**minimum** 105:13
**minor** 54:16,20 55:1 100:8 119:18
**minute** 34:15,19 50:13 170:5 189:2
**minutes** 34:18 35:9 146:11 170:7

184:16 189:3,4
**mischaracterizes** 93:1
**missed** 165:1
**missions** 14:11
**misstates** 129:23 153:3
**misunderstood** 184:1
**mitigate** 106:3
**mmazgaj** 2:17
**moment** 59:10 188:21
**monitor** 178:25
**monitored** 178:13
**monitoring** 36:3 49:11 81:1 97:12 97:19 108:1 110:7 110:18,22 111:8 112:13 114:18 123:9 127:5 128:25 160:23 163:23 165:5,15 175:19 178:2,18 179:3,8 180:8
**monitors** 179:25
**month** 115:9,10 127:2
**monthly** 115:7
**months** 127:3
**morning** 11:10 135:4 139:8
**mougey** 2:3 4:9,11 23:6 110:25 113:2 114:3,6,6,15 124:10 130:17 131:19 135:3,5 164:11,20,25 165:14,21 166:6 169:12 170:3,12 170:22 171:19

187:7 188:11
189:10 190:7
191:16,19 192:8
**moving** 50:13
**multi** 177:20
**multiple** 163:8,11
**mute** 155:22

**n**

**n** 3:11
**name** 11:11 12:3
67:24 87:21 105:1
135:5 141:1
152:16 184:8
196:6 197:3,4,15
198:3,4,21
**named** 194:9
**nancy** 6:10 175:24
176:6 181:17
**national** 1:6
152:25 153:12
196:6 197:3 198:3
**ndc** 80:13
**ne** 3:11
**nearly** 180:16
**necessarily** 41:18
56:13,19 187:10
**necessary** 38:17
**need** 19:3,9 27:4
34:15 56:21 111:5
114:5 119:21
**needed** 65:4
102:23
**needing** 106:25
**needs** 19:1 192:3,4
**never** 95:16
110:23 185:24
**new** 2:8,8,12,12
23:19,22 30:6
44:12 70:14,18,23
88:6 98:3,9
183:18

**nightly** 105:2,20
**non** 27:7 62:1 63:7
71:20 112:3
**nonpractitioner**
45:5,8
**nonpractitioners**
45:14
**normal** 52:17 53:2
172:10
**north** 3:3
**northern** 1:2
**notarized** 196:14
**notary** 194:6
195:13 196:25
197:10,18 198:15
198:23 199:23
**notation** 141:23
162:15
**note** 69:20 89:1
104:7 107:10
121:17 196:12
**noted** 71:6 84:21
94:21 99:9 100:1
111:22 121:3,4
122:9,17 124:13
144:25
**notes** 123:6
**notice** 55:22 56:17
**noticed** 123:18
158:17 160:18
**notifications**
132:10
**notified** 54:12
83:20 98:18
101:14 130:22
174:3 181:9
**notify** 53:15 54:4
54:9 83:22 101:15
132:5 138:22
142:22

**notifying** 74:12
155:4 161:12
**november** 126:18
141:10
**number** 5:3 17:22
18:23,25 22:20
35:22 38:23 42:13
48:20,24 50:17
58:5,20 59:16
60:19 61:11,21
70:17 72:2,3
85:22 100:6
129:13 135:10
136:23 141:13
149:22 151:20
152:9 155:15
157:20 158:13,21
158:22 159:2
160:4 161:18
162:16 196:7,13
**numbers** 135:24
166:17 198:7

**o**

**o** 158:8,8
**object** 37:19
102:25 161:7
164:7 165:8
168:14,23 169:8
169:19 171:6
172:15,21 173:6
174:12 177:13
178:21 180:9
181:12 187:21
188:12 189:21
190:18
**objecting** 114:5
**objection** 7:3,3,4,4
7:5,5,6,6,7,7,8,8,9
7:9,10,10,11,11,12
7:12,13,13,14,14
7:15,15,16,16,17

7:17,18,18,19,19
7:20,20,21,21,22
7:22,23,23,24 8:3
8:3,4,4,5,5,6,6,7,7
8:8,8,9,9,10,10,11
8:11,12,12,13,13
8:14,14,15,15,16
8:16,17,17,18,18
8:19,19,20,20,21
8:21,22,22,23,23
8:24,24 9:3,3,4,4,5
9:5,6,6,7,7,8,8,9,9
9:10,10,11,11,12
9:12,13,13,14,14
9:15,15,16,16,17
9:17,18,18,19,19
9:20,20,21,21,22
9:22,23,23,24,24
10:3,3 20:24 23:6
23:24,25 25:6,13
26:12 30:1,24
31:13,19 32:3,23
39:12 40:1 41:4
42:4 43:6 44:16
44:23 45:19 47:18
47:24 51:20 52:23
53:24 55:2,6,11
57:10 59:7 60:4
61:18 62:9 63:3
66:16 70:24 73:6
74:2 78:3 80:3,23
81:6,11 84:9 87:3
89:6 92:25 93:15
95:21 100:18
102:12 104:17
105:6,22 107:1
109:6 110:12,25
111:12 112:9,24
113:2,5,18 114:3
114:15 115:15,25
117:8 118:4 119:5

119:19 120:13
121:5,14,20
122:14 123:3
124:8,10,24
125:12,23 127:6
127:16,24 128:9
129:7,22 130:17
130:18 131:19,20
133:6,12 134:11
153:2 154:4,22
155:17 163:19
164:5,16,19
166:13,21 171:21
179:19 187:7
188:11 191:16,19
191:20
**objections** 4:5 7:1
8:1 9:1 10:1
**obligated** 54:4
142:22
**obligation** 51:10
51:14 53:5,12
69:16 102:15
181:19
**obligations** 144:15
145:13 146:23
149:17 150:23
151:7 155:5,11,25
162:19
**observe** 168:25
**observed** 168:21
**obtain** 17:1 19:2,3
19:9 29:24
**obtains** 24:14
**obviously** 34:24
41:14 42:20
136:11
**occasion** 27:16
33:14
**occasionally** 28:21
55:9

**occur** 28:5 177:22
**occurred** 33:2
**occurring** 115:1
**occurs** 30:21
54:11
**october** 5:6,18
6:16 67:11 85:12
90:21 99:4 135:16
136:7 140:20
152:19,22 195:16
**odd** 172:7
**offered** 32:9
**office** 14:1,5 21:22
28:16 29:5,10,14
29:21 44:20 52:13
53:15,20 54:5,5,6
54:9 70:22 75:13
84:6 116:15,24
119:25 128:4
147:17 163:9
178:24 195:6
**officers** 87:19
**official** 101:20
197:15 198:21
**officials** 69:15
75:13
**oh** 97:22
**ohio** 1:2,10,12
69:1 176:17 177:2
177:2,5 178:11
180:23 181:1,2,15
181:24 182:17
183:10,18,22
194:2,7 195:7,14
196:2
**ohio's** 177:2
**okay** 11:14 12:14
14:17 15:15 23:18
26:24 29:18 36:8
36:13,15 37:5,12
58:9 73:11 83:8

89:12 90:9,15
97:24,24 108:14
111:20 124:1
133:24 136:25
167:5 171:13
**old** 172:13
**once** 44:13 45:13
45:25 46:5,6,6,9
46:10 83:8 105:21
105:25 132:4
149:1
**ones** 93:11
**op** 1:11,13
**open** 34:15 35:1,9
88:2 135:8 136:1
138:5 143:1
151:23 156:5
159:12 161:23
**opened** 34:14 74:1
74:8 90:17 92:10
92:21 94:20
106:23
**operate** 52:10
74:13 109:10
139:13,20 143:23
146:1 155:11
181:21 187:25
191:25
**operated** 42:8
65:7
**operating** 38:16
162:18
**operation** 17:8
61:13 75:4
**operational** 85:15
85:18
**operations** 158:10
**opiate** 1:6 196:6
197:3 198:3
**opiates** 144:21

**opinion** 119:8
153:15
**opinions** 62:15
**opioid** 17:8 75:22
76:8
**opioids** 75:22
**opportunities**
155:15,24
**opportunity**
155:19
**opposed** 15:21
40:19 49:15 66:10
77:21
**oral** 132:10
**order** 18:17 19:2
19:23 36:2 38:11
40:21 41:21 49:10
58:11 65:13 69:13
74:13 83:24 97:18
98:10 99:22
108:18 109:8,13
110:7,18,21 111:8
123:9,14 127:4
128:7,25 129:17
130:14 131:3,4,7
131:13 132:3,8,11
149:14 150:16
160:11 167:8,8,11
167:11 168:2,2,7,7
168:18,18,20,20
169:1,1 170:1
174:1 176:18,20
177:7 178:2,18
179:8 180:2,7
181:20 182:16,19
182:20,23,24
183:1,4,4,9,14,15
190:1,4 192:5
**ordering** 106:17
114:18 180:1

**orders** 46:16
49:25 52:11,14,15
52:16,16,17 53:1,2
73:19 97:11,11
108:12 109:16,18
115:4 123:16
126:1 127:22
129:20 130:7,12
139:14 140:1
142:18,23 143:19
143:24 146:2
149:15,24 155:12
158:1,15 160:16
160:24 161:6
162:20 163:16,24
165:5,16,21
167:12,14,20
168:11,22 177:12
177:22 180:1,3,13
180:16,16,18,21
180:23 181:2,4,5,8
181:9,10,22 182:5
182:6,13,13
183:13,17,24
187:3 189:19
192:1,2
**original** 74:25
**outcome** 89:2 91:8
**outlined** 104:23
190:23
**outside** 15:14
**outwardly** 32:14
**overage** 100:9
**overarching** 38:4
**oversaw** 115:21
**oversight** 75:3,19
84:12 116:3
178:19
**owned** 23:9 42:8
98:21 106:7
107:20

**oxford** 2:16
**oxy** 167:13
**oxycodone** 164:3
164:15 166:20
167:3

**p**

**p** 138:6 140:15
151:23 156:6
159:13
**p.m.** 192:13
**pa** 98:22
**packaging** 39:20
**packet** 151:3
**page** 37:3 45:3
47:4 48:2,19,19
50:13 57:25 58:20
58:20 60:10 67:17
68:22 69:25 71:22
73:15 74:15,16,23
76:10 77:2 78:7
79:8 82:12 84:15
85:11 87:16 90:16
91:24 93:3 97:25
97:25 98:1 99:17
99:18,24 101:13
103:6,17 104:19
106:4 108:10
114:22 116:12
118:21 119:23
120:5,22 121:22
122:3,4,10,11,19
124:16 131:1
133:18 136:14
141:13 142:14,14
147:14 149:12
157:24 158:21
159:2 161:17
170:18 171:14,14
176:3 186:25
187:1 196:13,15
198:7 199:3

**pages** 37:3 108:16
142:14 152:9
**papantonio** 2:2
**paragraph** 45:12
47:9 48:20 53:14
58:1,19 71:23
74:23 76:11,12
78:8,17 84:16,21
99:3,25 103:21
104:8 107:18
120:24 139:2,11
139:24 140:2
148:6,23 149:11
149:22 150:1,9,13
150:20,21 152:19
154:8 177:18
179:23 182:2
183:11
**pardon** 25:8
**parent** 123:13
160:10
**parkway** 2:11
**part** 19:3,23 21:12
22:10,11 25:11,15
30:18,20 34:5
46:23 51:8 52:2
52:20 56:21 57:5
57:23 63:6 69:22
76:24 77:17 78:22
86:17 101:6
120:19 121:7
141:14,18 142:16
142:20 146:17
149:15,20 156:17
156:22,25 157:2,3
157:6,14 159:23
167:18 173:9
176:24 198:9
**participated**
141:22

**particular** 35:18
42:17 49:13 54:19
56:16 65:15 75:6
128:7 130:2 132:3
150:15 166:15
185:12 191:9
**particularly** 73:17
**party** 39:25 40:13
58:16 59:11
165:14 195:2
**pass** 134:16
**passed** 89:4 92:22
**passing** 85:17
**pasting** 173:4
**patient** 19:16
**patricia** 87:19
**patrick** 2:20
**pattern** 52:17 53:2
129:1,11 130:12
142:24 163:17
**patterns** 146:3
155:13
**pbeisell** 2:22
**pellegrino** 1:24
194:6 195:13
**pennsylvania** 2:16
12:6 21:18,23
22:18 28:15,19,22
29:5,9 63:23 64:1
65:8 68:19,25
88:4 97:6 99:5
157:6 180:23
**pensacola** 2:4
**percent** 82:18
121:2,11,19
125:19
**percentage** 55:15
**perform** 45:17
72:7 82:17
**performed** 21:25
79:10 88:12 94:21

118:22 155:14
**period** 102:3
125:17
**periodic** 24:17
**periodically** 24:12
35:16,20
**permanent** 133:23
**permitted** 165:11
**person** 50:19,25
**personally** 20:16
32:7 40:24 48:17
54:8 55:20 69:22
76:20 77:12 89:9
105:25 111:15
128:3 169:24
197:11 198:15
**personnel** 25:23
26:1 77:18 101:15
130:24 163:22
173:1
**perspective** 32:5
114:11 118:13
119:12,22 130:23
186:7,10
**pertains** 136:19
142:11
**pete** 114:6
**peter** 2:3 135:5
**pharma** 1:10,13
**pharmaceutical**
14:15 152:24
153:10,20
**pharmacies** 19:18
23:4,9,14 33:2
41:13 42:7,11
51:5 55:18,24
56:4 64:10 68:18
68:25 69:6,10,18
70:2,8 75:25 88:9
98:5 106:7 107:14
107:20 108:2

109:23 115:1,7,23
123:1 126:25
160:24 162:24
163:5,12 164:2,9
164:23 165:6,16
165:22 166:4,7
167:9,12,13
168:12 180:20
**pharmacist** 41:21
41:23 42:1,3
56:12,18 115:8
**pharmacists** 42:11
51:5 64:9 115:2
**pharmacy** 19:7,7
28:19 30:13,22
56:9,11 57:2
69:14 80:18 83:20
83:22 84:1,13
102:18 106:22
107:4,21,24 108:7
114:23 115:12,19
123:16 130:3
153:19 158:14
160:15 163:24
177:24 178:6
179:6,25 185:11
**philadelphia** 54:6
**phone** 51:18 196:3
**phrase** 24:25
**physical** 38:16
43:2,14,20 76:22
76:25 77:18 83:4
83:14 90:5,7
105:11 106:2
118:14
**physician** 18:21
**pick** 163:16
**picked** 79:24
**picker** 80:19
**picking** 80:13

**piece** 152:10,17
**pilferage** 77:5,22
102:6
**pills** 167:20
**pittsburgh** 2:16
13:25 14:4 21:22
54:4,7,9 75:5 91:2
104:9 128:3
**place** 25:18,21
41:17 87:1 89:10
91:11 109:13
112:15 115:18
127:4,9,20 129:6
129:10 169:6,18
170:2 173:20
174:15 175:19
192:3 194:19
**placed** 180:1
**places** 40:21
139:19
**placing** 41:21
**plaintiff's** 156:9
**plaintiffs** 2:2 5:5
5:12,17,19,21 6:3
6:5,7 34:23 135:6
135:13 138:9
140:18 143:5
152:1 159:15
162:1 170:13,22
192:8
**planned** 49:4
**plans** 49:11 96:3
**please** 11:23 12:2
12:15 13:18 27:22
31:9 44:5 56:6
67:16 113:4 114:9
119:23 135:8
136:22 138:5
143:1 151:23
156:5 159:12
161:22 184:2

196:11,11
**plus** 163:5
**pmougey** 2:5
**point** 74:10 144:25
147:9 148:25
161:2 178:1
185:18
**pointed** 62:2
**points** 150:9
**policies** 137:14
162:17 169:17
**policy** 45:22 77:4
77:8,9,20,21 78:6
104:24 105:16
109:8 136:5,14
139:8 169:5,21
**polster** 1:8
**population** 146:7
**portion** 44:8 48:10
134:15
**position** 29:6,23
29:24 30:4,6,11
62:16
**positions** 13:19
**possess** 50:20,25
**possession** 51:17
**possibilities** 154:3
**possibility** 173:11
**possible** 48:15
60:21 149:9 173:3
173:12,13,13
184:2
**possibly** 124:4
**post** 157:11
**potential** 16:2,3
31:18 33:7 40:23
43:10 69:24 76:5
114:25 137:21
146:14 154:13,20
176:19 177:6

**potentially** 16:13
177:6
**pounds** 103:16
**practice** 18:25
19:3 142:2,7
144:6 156:24
168:2,4,9 169:3,15
**practices** 172:24
**practitioners**
153:23
**pre** 20:5,13,13,17
21:4,24 25:2,10,15
26:4,19 34:3
37:17 38:5,9 47:6
47:10,17 48:3,9,11
48:21 49:18 50:3
50:11 51:8 60:6
63:19,25 69:23
85:21 87:6,24
88:13,20 142:7
157:2,4 167:23
175:9,11,17
185:11
**prepared** 67:21
116:15 119:25
**preparing** 39:19
97:17 144:7
**prescribe** 18:18
19:2,14
**prescribed** 15:5
17:12,15,24
**prescription** 1:6
14:17,20 15:17,18
15:21 16:23 17:1
17:18 28:2 56:10
106:18 196:6
197:3 198:3
**prescriptions** 56:9
106:24 129:1,11
153:21,22 180:19

**presence** 194:14
**present** 3:14
**presented** 114:18
131:12 180:19
**preserved** 165:9
**prestige** 85:6
**presume** 82:16
**pretty** 54:16
**prevent** 14:11,23
15:5 17:23 28:11
30:16 31:6,25
38:17 77:9 102:21
102:24 115:13
150:25 177:20
184:19
**preventing** 32:2
**prevention** 14:15
115:5
**prevents** 177:21
**previous** 171:14
171:24
**previously** 33:13
82:1
**prevoznik** 6:13
186:17,22,24
**primary** 59:13
98:3
**principal** 27:18
28:1,4,7
**printing** 142:13
**prior** 60:14 73:2
89:2,9 91:6,17
94:19,22 97:22
98:25 100:1
148:16 157:12
161:1 163:14
172:6,8,20 173:2,4
173:5
**priorprod** 5:12
36:23

**probably** 22:13
34:15 87:20
155:20
**problem** 33:7
86:13,15 96:6
152:25 153:12
**procedure** 11:5
193:7 197:5 198:5
**procedures** 25:17
37:23 38:17 115:3
115:4,18 137:14
157:15 162:18
**proceeding** 58:11
**processing** 39:19
**produced** 117:16
**product** 65:13,22
117:15
**production** 196:15
196:17,22
**products** 63:16
65:15 75:25 80:1
107:22 127:1
137:22 146:15
**professional** 63:2
63:5
**program** 5:9
36:19 97:11
149:16 179:25
180:12,14
**promise** 11:18
**promote** 154:13
**promptly** 104:5
**promulgated** 18:5
**pronged** 131:2
**proper** 21:20
55:21 99:12 103:5
151:12
**proposed** 25:20
26:25 27:6 38:19
49:19 50:2 78:12
88:1,15 96:10,13

103:11 108:17
**protect** 151:14
**provide** 37:22
86:5 90:9 121:9
137:7 142:2,13
**provided** 11:4
32:6 33:3 38:12
73:12,14 99:19
109:8 141:15,23
142:17 146:21
**provides** 84:19
**providing** 143:15
144:4
**prudent** 142:12
**pseudoephedrine**
14:22 63:17 65:11
**public** 19:19 150:5
151:14 194:6
195:13 197:10,18
198:15,23 199:23
**published** 146:18
**publishes** 145:17
**pull** 34:12
**pulled** 37:6 44:21
**purchase** 74:25
**purchasing** 123:22
126:19,25 127:14
161:20
**purdue** 1:10,13
**purpose** 16:1,9,13
47:9,16 61:13
144:3
**purposes** 22:15
36:24 44:3 67:13
87:13 116:10
126:10 128:17
135:10,19 138:1
140:22 143:8
150:25 152:6
156:13 159:19
162:5 175:25

[purposes - referenced]                                                                    Page 28

186:19
**pursuant**  58:11
  193:3,6
**pursuing**  57:8
**put**  32:15 34:11
  80:21 97:3 107:15
  121:9 147:4
  157:17 165:22

**q**

**q&as**  145:2
**qualified**  194:8
**quantify**  28:7
  55:14
**quantities**  131:24
**quantity**  79:13
**question**  11:18,22
  11:24 18:10 21:1
  22:3 27:22 31:9
  71:17 74:4 80:5
  81:25 82:2,5,5
  92:15 96:19
  110:14 111:25
  113:10 114:8
  155:21 164:22,24
  165:17,20 169:11
  169:13 174:22
  182:22 185:6,16
**questions**  25:25
  98:6 113:7 165:11
  170:4,14,21
  171:19 173:18,21
  189:6,12 190:7
  192:7,9
**quibble**  93:8
**quick**  11:14
  188:19 189:12
**quickly**  104:15

**r**

**r**  158:8

**rafferty**  2:2
**raise**  54:16
**raises**  54:15
**random**  82:17
**rannazzisi**  5:6,13
  5:22 135:15
  138:11 147:5,9,16
  148:14 150:2
  151:11 152:3,15
  153:19 154:1,9
  189:24
**rate**  45:22
**read**  72:2 118:7
  125:14 137:1,10
  137:23 147:25
  151:15 153:6,23
  155:21,22 197:5,6
  197:12 198:5,6,17
**reader**  84:6
**readily**  51:4
**reading**  94:17
  118:12 165:7
  173:14 196:19
**readout**  80:20
**real**  79:22 100:15
  188:19
**really**  16:9 38:3
  112:21 121:19
**reason**  11:17,21
  12:12 58:22
  107:21 108:4
  142:21 196:14
  198:8 199:3
**reasonable**  62:17
  86:19
**reasons**  59:19
  62:16 108:15
  149:23 180:15,20
**recall**  22:9 27:11
  30:5,10 32:12
  46:8,11 57:16,21

57:24 58:17 59:12
  63:12 64:19,22
  65:25 66:21 67:4
  75:19 79:2,14,17
  79:18 80:7 81:8,9
  82:10 88:16 90:6
  90:11,12 91:14,21
  91:22 117:22
  130:1,2,4 132:9,12
  154:25 157:17
  163:1,2 166:14,23
  173:22,23 174:2
  176:10,12,20
  178:4,8,9 179:10
  179:12 182:12,14
  184:13
**receipt**  196:18
**receive**  53:22
  56:11 70:2 107:22
  123:16 158:14
  160:15 177:9
  182:4 184:10
**received**  24:5,7,10
  24:13 34:21 104:9
  115:2
**receiving**  132:9
**recess**  35:12 89:17
  134:24 170:11
**recipients**  5:22
  152:3
**recognize**  67:19
  143:11
**recollection**  66:18
  70:11 118:24
  129:18 138:21
  163:21 181:7
  186:3
**recommend**  60:23
  95:16 96:5 106:1
**recommendation**
  172:11 174:7

188:8
**recommendations**
  61:17
**recommended**
  95:10 109:1 126:5
  132:14
**record**  11:2 34:18
  35:11,14 80:11
  89:16,19 99:25
  132:6,8 134:23
  135:1 165:7 170:8
  170:10 188:21
  192:11 198:9
**recording**  12:12
**recordkeeping**
  25:20 26:1 46:15
  49:3 52:2 60:16
  73:11 75:8 100:8
  103:5 120:7,17
  124:19 134:5
  141:14 170:25
  171:11 188:16
**records**  51:19
  55:23 56:3,12
  75:12,17 91:17
  121:23,24 122:5
**redactions**  91:3
**reduced**  194:13
**refer**  20:17 36:7
  36:13 90:19
  135:23
**reference**  36:6
  49:8 71:13 98:14
  100:13 118:9
  126:14 143:14
  172:8,13,19,25
  196:7 197:2 198:2
**referenced**  165:4
  194:13,17 197:11
  198:15

references  73:16
   136:18
referencing
   129:11 130:3
referred  46:23
   71:24 96:20 174:1
referring  61:2,6
   64:11 70:1 77:2
   82:16 92:5 97:8
   118:9 123:8 127:9
   139:6 155:1
   173:19 182:24
   185:13
refers  83:6 92:17
   176:15
refresh  118:23
   129:18 181:6
refused  183:15
reg  124:3 141:24
regard  33:1 59:14
   63:14 109:7,14
   118:13 183:23
regarding  25:25
   27:2 33:4 38:24
   64:17 75:7,14
   89:23 90:5 126:18
   138:19 148:7
   150:16 151:6
   154:12 155:5,10
   155:16 162:18
   182:4 193:2,11
regardless  182:17
registered  50:20
   50:25 76:14
   147:22 148:2
registrant  5:13
   20:17 21:4,24
   24:14,16 25:2,10
   25:15 26:4,19,25
   26:25 27:6 28:6,6
   34:3 37:17 38:5,9

38:11,19,24 49:11
   50:3,11,19,21 51:8
   52:9,11,12,15 53:5
   53:13,15 54:21,25
   55:8,14 57:6,12
   60:6 61:5 62:25
   63:19,25 69:23
   82:7 83:8 85:21
   86:9,14 87:6,24
   88:13,20,24 89:3
   112:5,20 113:17
   138:11 142:7
   144:25 146:1,7,13
   155:19 157:2,4
   167:23 175:9,11
   175:17 187:3,25
   191:12
registrant's  27:1
   27:13 50:2 59:21
   83:2 145:12
registrants  24:21
   27:20 37:22 45:6
   54:3,8 58:6 61:17
   63:6,7 82:3,11
   137:2,6,20 138:1
   138:18,22,25
   139:12,14,18,20
   140:8 142:3,10
   144:4,12,14,19
   145:7,19 146:21
   148:6,15,24 149:4
   149:12,16 150:3
   150:10,14,22
   151:6,12,20 153:9
   153:14 154:2,18
   155:4,10 189:15
registration  18:23
   20:13 47:6,10,12
   47:14,17 48:3,9,11
   48:21 49:18 50:24
   51:11,12 52:7

58:7,10,22,23,24
   59:4 65:14 72:2
   99:10 105:10
regs  125:5,6
   141:24
regular  15:21
regularly  110:20
regulation  36:3,7
   36:8,14 49:21
   50:15 52:9,19,20
   54:19 66:4 73:20
   73:25 74:8,20
   85:9 94:11 99:22
   101:7 104:2
   114:13 118:3
   123:9 124:22
   125:1 139:19
   142:4 171:5
   181:18 186:2
   191:18
regulations  15:14
   17:23 18:1,2,4,7
   18:11,14 19:25
   20:8,23 21:10
   24:4,20 26:19
   35:23 36:2 37:7
   38:19 39:6,10
   57:7 66:2,4,24
   71:5 72:25 73:5
   78:14,21 87:2
   92:13 94:6 96:1
   99:20 105:5
   108:19 109:5
   110:9 113:13
   118:2 124:21
   131:10 142:15
   144:20 150:23
   184:20 185:3,5,21
   187:20 191:5
regulatory  5:10
   36:20 92:2 100:4

reinforce  61:23
reiterate  164:18
relabeler  40:7
related  71:3
   144:14 176:17
relates  1:8
relating  33:7
   66:13 89:24 96:18
   106:14 115:22
   120:1 130:12
relation  165:22
relationship  32:22
relative  195:2
relayed  158:16
   163:13
relays  161:14
relevance  41:2
relevant  73:17
   99:19
rely  86:4,24
   117:17 149:13
relying  85:22
remain  83:19
   169:2,14
remained  24:18
remas  123:21
   158:23 161:19
remedied  27:7
remember  90:12
   90:13 91:10 128:5
   173:21,25 174:3
reminding  139:12
remote  1:18 2:1
   3:1
remotely  1:25
   11:16
renee  1:24 3:15
   194:6 195:13
repackager  40:7
repeat  11:19 21:1
   56:1 110:14 114:8

169:11 177:15
**repeated** 80:15
**repercussion**
77:25
**rephrase** 11:23
164:10 175:2
**report** 5:18 6:3,5,7
6:16,18 48:25
67:10,17,21 68:8
68:10 69:21 70:10
71:7,15,19 73:1
84:16 86:1,9
87:10,17 89:2
90:17 92:17 93:3
94:17,20 95:1,14
96:18 97:3,17
100:22,24 101:3
103:2,7 104:19,22
106:5 108:8,20
109:16 111:22
116:13 117:16,18
117:20 118:5,6,8
118:12,20 119:2
119:24 120:2,12
120:18 121:9
122:7 123:6
126:15,19 127:22
128:6,25 129:17
130:10 132:4
133:7,16,19,25
134:1,3 140:14,19
140:25 141:9
143:13 156:10,18
157:1,19 158:2
159:9,16,22 160:6
160:22 161:9,15
161:16 162:2,9,12
162:16 165:18
166:2 169:16
170:19 171:25
172:9,19 173:5,5

177:10 181:4,22
182:6,15 183:8,13
183:17 191:25
192:4
**reported** 94:9
177:8 181:2
183:18
**reporter** 4:16
114:4 197:7
**reporter's** 4:14
194:1
**reporting** 55:1,9
64:17 73:19
101:20 129:20
131:4,14 132:7
140:1 142:17
174:1 176:18,20
177:1,3 178:11
180:22 183:24
189:19
**reports** 5:16 48:21
53:23 93:9,9,10,12
94:9 96:21,23
97:21,22 101:10
107:10 110:19
111:18 116:7,16
141:21 157:12
163:15 165:3
167:6 182:4 188:6
188:15
**represent** 11:12
135:6 138:23
167:2
**representation**
161:3
**representative**
107:5 158:3
**representatives**
90:4
**represented**
105:16 108:21,23

129:25 179:21
**representing**
109:12
**reproduced**
172:13
**request** 57:2 68:11
90:13,14 95:11,17
198:9,11
**requested** 47:14
63:20 193:1,6,10
**requests** 33:17,19
56:3
**require** 19:25 24:4
25:21 82:22 111:9
112:5 113:14
**required** 39:4,5
48:4 58:25 78:20
83:4 101:10 104:1
105:5,12 115:7
132:4 144:10
181:21,25 182:1
196:25
**requirement**
74:12 78:23 83:13
101:15 105:14
124:20 125:22
139:8 178:10
**requirements** 37:9
37:13,16 38:14,25
43:17 49:4 50:8
78:10 79:1,4
86:23 89:23 95:20
96:4,12,24 103:12
103:22 114:2
121:25 122:11
125:21 171:2,4
177:1,3 178:11
181:15 190:14,16
191:4,15
**requires** 43:1 83:1
105:9 129:2

**requiring** 177:6
**research** 22:15
49:7
**researcher** 22:14
**researcher's** 49:6
49:7
**researchers** 49:14
**reserve** 134:17
**reside** 12:4,5
**resolved** 100:10
100:14,17,21
119:14,22 180:17
**resource** 143:21
**resources** 144:8
**respect** 14:19
18:11 19:7,17
24:5,15 26:24
30:21 31:6,12,23
32:19,21 34:2
63:11 64:25 65:1
65:18 66:12 68:10
75:22 77:4,22
79:4 80:1 82:9,23
83:14 85:16 92:12
97:18 110:24
118:2,11 120:7,16
122:10,11,12
134:5,9 184:19
185:2,20 187:15
191:9
**respond** 184:3
**responded** 104:15
184:14
**responding** 154:12
184:13
**response** 126:23
165:1 174:6
**responsibilities**
18:16 31:2 101:7
137:7 138:19
150:22 155:16

165:2
**responsibility**
21:23 52:5 109:9
139:19 143:22
148:9
**responsible** 84:17
**responsive** 33:17
33:19
**rest** 113:23 114:10
**restate** 169:13
**restroom** 89:12
**result** 17:8 59:5
93:5,23 100:7,20
**resulted** 91:4
100:3
**results** 89:9
145:18
**resume** 130:8
**retained** 4:16
**returned** 196:18
**revealed** 73:3
100:8 101:9 118:1
118:10 120:6
134:4
**review** 25:16
55:23 56:3,12,21
76:25 97:5 100:24
101:9 114:21
120:1 157:12
168:2,10 184:12
193:2,6 196:12
197:1 198:1
**reviewed** 74:16
91:20 93:9 96:22
100:23 101:18
114:17 116:17
117:15,19 133:5,7
133:24 134:1
151:19 169:21
**reviewing** 56:18
157:17 167:7,14

167:19 168:7,22
169:1,4 175:8
**reviews** 168:1
187:3
**revocation** 58:21
59:4,14
**revoke** 59:20
**revoked** 58:23
**richard** 114:23
**rick** 29:1 104:3
**right** 12:13 18:3
29:25 30:23 35:2
37:6 41:12 51:15
53:7 56:23 57:15
61:11 71:12 75:12
77:19,24 86:24
96:17 102:11
103:17 104:4
105:13,17,21
106:23 111:4
112:16,19 118:7
122:18,24 124:5
125:18 127:11,12
127:15 135:23,25
136:3,6 147:18,25
153:23 158:18
173:10 177:4
179:4 186:9
190:24
**rigid** 149:13,23
**rise** 119:9,14
**risk** 16:14,19
40:18 180:24
**rob** 3:18
**robberies** 153:19
**robison** 87:19
**rogos** 122:20
123:7,8,11,15,19
124:14,18 125:7
125:10,15,18
158:8,13 159:3,10

160:14 161:3,14
171:10,16
**rogue** 153:23
**role** 15:1 30:19
147:10 151:12
**rough** 22:6
**roughly** 22:2
**routine** 106:2
**rpr** 1:24
**rps** 87:19
**rules** 11:4,14
193:3,7 197:5
198:5
**run** 13:18 82:21
**running** 83:9
166:11
**rx** 63:25 87:25
90:1

**s**

**s** 2:7 158:8 196:15
198:8,8 199:3
**safety** 151:14
**sale** 14:12,24
63:15 64:17 101:4
**sales** 74:25 115:22
121:1,11,23 122:5
**sanction** 67:4
169:24,25
**sanctioned** 137:15
**sanctions** 66:19
**saw** 184:25
**saying** 18:3 72:22
95:6 112:13 124:2
125:9 172:18
**says** 37:21 39:3,7
42:13 46:14 47:9
48:4,25 50:17
52:9 53:14,20
58:1,9,21 59:16
60:19 61:11,21
62:13,14 67:18,23

68:3,22 70:1
71:22,23 72:9,18
73:12 74:16,24
76:12 77:2 78:9
80:12 82:14 83:10
84:16,21 85:12
87:18 91:3,25
94:17 98:18 99:4
100:1 101:8
102:19 106:6
107:19 110:17
114:23 116:19,22
117:25 118:22
119:3 120:5,24
121:24 124:17
125:3,6 126:24
128:22 129:15
130:5 131:2 134:4
137:19 149:10
151:11 154:16
158:2 160:20
161:21 170:23
171:12 177:18,23
178:13 179:1,24
180:13 182:3
183:11,25
**scale** 56:20
**scan** 80:13 82:15
118:17
**scenarios** 31:21
185:10
**schedule** 16:5,8,12
16:18 42:15,16,16
42:18,20,22,22,25
43:9,18,19,21
45:25 64:18 65:3
65:19,20 68:12,24
70:3 76:4 78:12
88:7 90:22 95:4
95:11 98:4,7
109:21,22 132:16

scheduled 14:21
57:22 60:7 63:14
65:9 88:17 93:19
94:2 111:2 136:5
157:6
schedules 15:25
43:22 63:21 64:3
66:9 76:5 88:2,10
scope 23:25 70:24
81:11 82:4 164:7
164:17 166:4,5
167:6 168:12,16
187:24
scott 2:15 11:11
screen 61:10 122:6
136:4 147:4
157:18
script 17:3,7 31:16
scripts 56:24 57:1
seal 195:6 197:15
198:21
search 83:23
second 78:17
84:16 90:1 99:25
147:14 148:5,23
150:13 153:17
154:8 160:21
161:9
section 5:10 36:20
47:5 50:15 67:7
108:11,11 122:16
136:23 150:6
157:21 158:9,12
160:5 172:9 173:5
sections 38:14
secure 104:21
security 25:17,25
35:23 36:1 37:8
37:13,15 38:13,16
38:18,25 39:6
42:21 43:2,14,14

43:17,20 46:16,18
46:23 49:1,8,9
57:7 59:25 66:3,8
71:5 73:5 76:22
76:25 77:18,18
84:19 85:14,14,16
86:25 89:23 90:5
90:8 95:20 96:11
96:24 102:20
114:1 118:2,2,11
118:14 120:7,17
124:19 125:2,5,20
126:2 134:6,15
171:1,4,11 174:20
185:12 187:19
188:16 190:14,16
191:5
see 16:4 37:6,10
38:1 43:14 44:6
44:10,22 45:4,6
47:5,7 48:6 50:14
58:1 60:24 67:17
73:16 77:19 87:17
90:23 91:7 96:22
97:22 98:14 99:7
99:17 100:11
104:12 105:19
116:13 120:8
121:22 122:2,6,16
122:20 123:24
126:3,15,20 127:2
136:13,16 148:14
152:9,12,15,18
153:1 157:23
158:24 159:5
170:23 176:4
180:4
seeing 130:9
seeking 58:7 59:19
seeks 150:21

seen 86:22 160:22
segment 188:22
189:2
select 79:13
selected 79:23
80:15,16,21 85:6
selecting 84:18
selection 79:9,10
82:15,19 105:2
selections 118:22
selector 80:13
self 39:22 40:10
82:15
sell 23:13 52:6
65:13 137:9
selling 65:8 69:9
75:15
seminars 154:24
sends 145:7
sense 22:16 113:1
sent 34:9,23,23
138:18,24 147:21
148:15 149:6
184:11
sentence 77:2
137:18 139:2,18
139:23 140:2
147:20 148:22,22
151:10 152:21
153:5,16,17 154:7
171:8
sentences 137:2
148:14 149:21
september 149:7,7
series 113:7 135:7
serious 77:24 78:5
119:17
service 13:16
68:23 71:24
107:24 120:25

serviced 162:24
163:4
services 107:19
set 34:1 38:14
121:25 124:20
179:16 195:5
severity 16:18
shaheen 29:1,3,4
29:13,20 31:4,11
31:15,21,24 32:5
33:3,16 98:15,15
98:18 104:3
114:23 128:21
shaheen's 30:16
shapira 2:14
shapira.com 2:17
2:18
sheet 196:13 198:7
198:10,18 199:1
shipment 131:3
shipping 108:6
shoppers 153:22
short 67:7 89:12
134:20
shortcomings
59:24
show 58:11
showed 96:2
shown 196:16
side 135:23 136:6
signature 67:23,25
147:15 193:5
195:12 196:14
signed 68:2 133:19
133:20 141:8
152:14 162:12
197:13 198:18
significance
121:18
significant 53:17
54:22 60:16

101:16 144:13
**signing** 196:19
**similar** 59:10
102:3 151:3 160:5
172:3,5 180:20
**similarly** 181:4
**simmons** 2:7
**simmonsfirm.com**
2:9
**simply** 165:16
166:7
**sincerely** 196:21
**single** 92:18,23
**sir** 12:4,21 13:17
15:3 135:6,22,25
136:7,15,18,20,22
137:1,10,12,23,25
138:5,17 139:3,4,9
139:21 140:6,9
141:2,6,8,10,16
142:18,20 143:1
143:11,13 144:1
144:18 145:22
146:4 147:6
148:11,19 149:18
150:7 151:10,16
151:21 152:8,12
152:15,17 153:1,7
153:8,23 154:15
154:17 155:2,7
156:5,17,24
157:19,23 158:7
158:18,25 159:5
159:12,24 160:2,7
160:12,19,21
161:6 162:10,13
162:15,20,22
163:2,25 166:16
166:25 167:2,5,9
167:15,18,21
168:3,8,22 169:2

169:14 171:3,13
171:23 174:5
184:24 189:20
190:5 196:10
**site** 25:21 48:4,10
48:14 49:13 64:13
64:15,20 99:14
100:10,14,22
104:8 113:22
119:14 132:21,23
132:25,25 145:4
157:4 158:6
**sitting** 174:10
**situation** 27:13
40:20 51:3 57:4
59:3 62:8 112:17
131:12,18
**size** 52:16 53:1
109:15 142:24
146:3 155:12
**sizes** 163:17
**skip** 45:11 71:21
78:16 122:18
126:22 179:23
**slightly** 18:9 27:24
**slivingston** 2:18
**sobotkin** 3:14
**society** 151:14
**sociology** 12:20
**software** 100:9,16
123:13 157:25
158:4 160:10
161:10 179:25
180:12
**solely** 137:19
138:1 146:13
**solonichne** 87:21
**solutions** 196:1
199:1
**som** 36:7,14 46:18
46:22 49:19,21

50:14 52:8,19,20
66:4 73:20,25
74:7,20 98:12
109:3 110:2 112:3
113:12,25 114:13
114:21 118:3
120:20 124:22
125:1,6,21 129:6
134:9,13 137:14
139:8,8 169:5,17
171:5,17 174:8,20
175:4,6 177:7
186:5 187:16
188:6 191:9,10,15
191:18
**somebody** 21:6
51:18 53:22 56:24
66:5,25 70:22
105:17 131:8
**somewhat** 33:25
**son** 17:11
**soon** 79:23 184:2
**sorry** 21:2 24:24
47:12 50:13 55:5
56:1 74:4 97:7
132:15 155:20
156:20 164:20
167:10 169:10
186:13
**sort** 17:8,12 20:4
27:18 32:18 34:1
54:13 57:8 76:17
81:4 112:22
113:16 180:6
186:6
**sorts** 53:23
**sought** 64:3
**sound** 29:25
147:17
**sounds** 15:3

**sources** 27:18 28:1
153:18
**sousa** 171:10
**south** 2:4
**southwood** 150:18
**speak** 18:8 26:6
28:3 41:22 165:25
168:5 172:23
**speaking** 155:2
181:16
**spears** 3:17
**special** 5:6 49:3
135:15
**specific** 27:21 31:9
32:12 36:9 48:22
50:14 57:12 60:22
67:2 74:12 75:19
81:21 131:23
139:25 140:7
154:25 179:10
186:11 189:18
190:21,22
**specifically** 33:1
40:4 46:8,11
57:16,21,24 59:13
64:22 65:25 67:4
75:7 79:2 80:8
81:8,15 90:6,11,12
91:15,23 102:4
107:6 109:14
111:22 131:23
143:25 155:6
173:23 178:8
179:13 181:14
182:14 188:7
**specifications**
103:8,15
**specifics** 79:18
178:4
**specified** 78:10
103:23 194:20

specifies  71:9
speculating  57:17
  107:7
speculation  28:8
  173:8
spell  184:8
spoke  91:21
ss  194:3
staff  131:5
stamp  5:7,11,14
  5:16,19,23,24 6:4
  6:6,8,12,15,17,19
  36:22 44:1 67:12
  87:12 116:8 126:9
  128:15 135:18
  138:13 140:21
  152:4 156:12
  159:18 162:4
  191:2,11
stamped  5:20
  143:7
stand  72:12 85:3
standard  54:14
  162:18
standards  38:15
start  140:13
started  146:10
starting  34:8
state  28:10,18
  50:23 81:4 99:12
  177:2 182:17
  189:17 194:2,7
  195:14 197:10
  198:15
stated  77:3 108:8
  123:19
statement  47:15
  48:6 72:12,13
  75:6 93:1 187:14
  197:13,14 198:19
  198:19

statements  179:11
  188:14
states  1:1 47:20
  147:22 148:8
  152:25 163:11
  173:15
steal  78:1
stealing  77:6
steel  78:12
stems  153:18
sten  3:7
sten.jernudd  3:9
stenotypy  194:14
steps  114:24 183:7
stolen  102:10
stop  105:18 108:5
stopping  130:13
  131:3,13
store  42:2 74:24
  127:14 131:23
stored  75:10
  104:21
stores  23:5 39:24
  40:19 65:16 75:15
  123:18 158:16
  160:17
storing  78:12
strangers  39:25
street  2:4 3:7,11
  106:22
strict  39:3 43:21
strikes  77:23
string  6:11,14
  126:8 128:14
stringent  43:18
subject  24:22
  71:22 72:3,3
  90:18 91:1 92:1,1
  98:10 100:4
  120:23 121:7
  176:21

submitted  76:2
subparagraph
  52:8
subscribed  197:10
  198:14 199:21
subsequent  188:3
substance  15:18
  15:20 19:24 20:23
  24:19 42:14 43:15
  50:18,20 51:1,6
  78:14 93:18,22
  95:18 96:25 101:4
  101:17 115:4
  123:22 128:8
  130:13 137:21
  138:20 142:5
  144:16,22 145:13
  146:15,23 149:18
  151:7 154:14
  155:6 156:1
  161:20 162:19
  165:3 178:15,20
substances  14:16
  15:13,22 18:12,18
  19:8,14,21 21:7,9
  22:15,17 23:1,4
  24:3,16 25:19
  35:24 37:25 43:11
  45:9 48:23 50:5,9
  50:23 52:12 53:18
  59:15 63:22 64:4
  64:18 66:10 68:13
  68:24 69:5,18
  70:3,7 74:10 76:4
  77:14 78:1,19,25
  80:2 82:9,20,23
  83:3,11 84:8 88:3
  88:8 89:24 95:6
  98:4,8,23 99:21
  104:21,25 105:1,4
  107:23 108:6

121:2,12 123:17
  137:4 139:15
  147:25 148:11
  150:24 151:13
  152:24 153:10,20
  157:9 158:15
  160:16
substantial  39:5,9
substantially
  52:17 53:1
sudafed  65:12
sufficient  34:19
  130:25 174:25
suggest  61:12
suggested  124:6
  182:3
suggesting  69:11
  72:19,22
suggestion  124:14
  165:6
suggestions  61:20
  112:14 124:12
  185:12
suggests  185:19
suitability  47:11
suite  2:21 196:2
summarize  63:9
summarized  71:19
  169:22
summarizes
  176:24
summary  49:5
  183:12
summer  98:24
superior  196:1
superiors  35:17
supervise  14:7
supervising  29:16
supervisor  14:3,3
  14:6 26:9,10,14,22
  29:16 49:6 60:13

68:4,5 86:2 95:15
117:10 132:17
133:22,23 169:25
176:9 181:17
184:6,14
**supervisor's** 27:9
**supplied** 70:8 71:6
**supplier** 70:4 98:3
106:6
**supplying** 70:13
**support** 46:17
**supported** 60:17
**suppose** 112:20
**supposed** 34:2
**sure** 11:20 20:6,14
20:20 21:6 22:21
24:2,18 30:21
34:17 35:7 38:5
41:22 48:17 49:20
55:20 61:7 69:13
97:7 98:12 108:2
119:7 134:21
188:20 190:11,13
191:3,13
**surprise** 163:25
164:12 166:16
**surrender** 58:21
59:4,15,20
**surrendered** 58:24
**suspected** 58:22
104:24
**suspicions** 33:4
**suspicious** 36:2
49:10,25 52:11,14
52:15 73:19 74:13
97:11,11,18 99:22
108:11,18 109:7
109:13,17,25
110:7,18,21 111:8
123:8,15 126:1,18
127:4,22 128:7

129:17,20 131:7
132:5,11 139:14
140:1 142:18
143:19,24 146:2
149:14,15,24
155:12 158:1
160:12 161:6
162:20 170:1
176:18,20 177:7
177:12,22 178:1
178:18 179:7
180:7 181:5,11,22
182:8,16,19,21,23
183:1,3,4,5,9,16
183:24 189:19,25
190:4 192:1,2,5
**switch** 103:25
104:10
**sworn** 11:6 194:10
197:10,13 198:14
198:18 199:21
**synopsis** 120:5
**system** 46:19
49:11,20,24 51:24
52:10 59:25 74:14
79:11,15,19,20
80:19 81:3,5,10,15
81:16,24 82:3,8,11
82:16 97:12,19
98:12 101:3
108:18,20 109:3
109:10,11,11,14
109:15 110:2,5,7,8
110:18,22,24
111:8 112:3,13,15
112:17 113:12,15
114:19 118:18,25
120:20 123:14
124:5,13 125:8,10
125:16 127:4,12
129:5,6,21 134:10

134:13 139:13,21
139:25 142:23
143:23 146:1
155:11 158:1,5
159:4,10 160:11
161:5,11 169:6
170:1 171:17
173:19 174:8,9,15
174:20,25 175:5,6
175:12,13,15,19
177:8,19,20 178:2
178:18 179:8
180:8 181:21
186:7 187:4,16,17
187:18,24 188:1,2
188:6,8,9 189:19
190:1 191:9,10,13
191:14,15,18,23
191:25 192:2
**systems** 85:6
86:25,25 140:7
169:18 174:20
186:6 190:4

**t**

**t** 5:5,13,21 135:15
138:10 152:2
**t1bcc** 5:19,20 6:8
6:17,19 67:12
87:12 140:21
143:7 162:4
**take** 20:2 35:8
39:21 40:9 62:18
89:12 106:20
111:10 112:7,22
113:16,20 126:3
134:20 148:24
156:17
**taken** 38:23 72:16
83:1 94:4 95:8
97:2 110:10 111:1
111:21 114:25

185:25 186:4
194:19
**takes** 17:11
**talk** 21:14 41:25
57:14 88:22 91:18
**talked** 115:20
186:5
**talking** 14:18 15:9
36:9 66:3 91:25
97:13 111:14
112:16 164:9
**talks** 83:17 99:18
104:20
**tasked** 21:12,13
31:3
**tasks** 80:17 82:18
**team** 78:17 83:20
84:14 128:22
**tech** 3:18
**teenage** 17:10
**telephonically**
127:23
**tell** 25:3,10 51:13
87:21
**telling** 84:5 86:24
149:4 151:11
**tells** 125:4 150:2
171:2
**tempted** 78:1
**tens** 166:17 167:3
**term** 55:21 127:18
150:6
**terminated** 77:6
102:7
**terminology** 20:14
**terms** 20:20 24:2
34:11 42:20 53:9
53:11 77:9 101:25
**tested** 85:13
**testified** 105:8
184:16

**testify** 172:23
194:10
**testimony** 12:11
23:25 139:7 163:3
186:21 187:6
194:12,16 197:6,7
198:6,9,12
**thank** 12:1 13:16
17:21 159:8 189:6
192:6
**thankfully** 39:17
**theft** 16:22 37:24
53:17,19,23 54:11
54:14,15,19,21,23
55:1 59:17 76:19
101:14,16,25
102:24 177:21
**thefts** 55:16
102:22 103:3
153:20
**thiesfeldt** 3:18
**thing** 42:12 108:16
130:11 191:8
**things** 35:18 37:16
38:4 48:24 73:18
73:22 74:5,20
183:7
**think** 18:15 19:12
22:13 31:16 35:5
54:20,22 64:7,24
66:7 71:2,14,16
75:7 79:5 82:3
90:7 95:1 107:9
110:15 111:5
124:4 125:9
131:17 139:6
160:21 163:3
164:7 165:8 166:3
169:12 170:3,6
184:9,16

**third** 39:25 40:13
76:10 139:2,11,24
140:2 152:19
154:7
**thirty** 196:18
**thomas** 6:13
186:17,21
**thorough** 48:15,18
**thought** 34:10
86:12 95:18 109:2
142:12
**thousands** 168:11
**three** 45:14,16
46:1,7 77:23 91:1
93:4 102:7 111:2
111:16 178:3,5,8
179:9,18 188:24
189:1 192:1
**threshold** 127:4
127:12,13,19
129:5,21 173:19
173:22
**thresholds** 127:1
127:10
**time** 13:20,24
17:14 30:10 45:24
54:10,11 55:8
61:16,16 62:11,11
62:20 68:5 76:1
79:22 80:18 82:7
88:14 89:21,21
92:10,19 94:7
100:17 102:3
108:15 109:19,20
113:24,25 118:17
120:20 123:12
124:7 127:20
133:23 134:17,19
161:3 163:9 171:3
171:18 175:16
176:8,11,13 178:1

182:11 188:19,24
192:7 194:19
**timely** 101:10
**times** 31:20 63:2
69:17 79:25
104:25 108:3,3
168:18
**tip** 32:19
**title** 121:25 124:21
147:11 171:2
**titled** 160:6
**today** 15:9 44:20
135:10 163:3
173:17 174:11
179:7
**told** 84:25 123:11
125:18 171:3
182:14
**tolerance** 77:4,20
**tomei** 116:23
117:5
**tomorrow** 130:6
**tone** 62:20
**tool** 21:5
**tools** 145:25
**top** 37:4 45:3
74:16 78:8 91:25
103:18 104:20
118:22 184:7
**topics** 73:17
**total** 80:16 82:18
188:23
**tote** 80:22
**touhy** 71:9 164:17
165:12,24
**track** 1:15 52:3
196:6 197:3 198:3
**trained** 24:1
146:12
**training** 24:5,7,8
24:10,13 115:3

137:13 138:3
140:4 190:3
**transcribed**
194:15 197:7
**transcript** 4:1
187:1 193:3,6,9,11
196:11,12 197:5
197:12 198:5,11
198:17
**transcription**
194:16
**transit** 84:20
102:7,8,16 115:6
**trees** 44:7
**trends** 180:2
**trial** 12:10
**tried** 54:2 62:23
126:4
**true** 19:6 48:8
72:12 112:1
113:11 115:11
191:8 194:16
**trumbull** 1:12
**trust** 117:12,13,18
**truth** 194:10,11,11
**truthful** 69:16
**try** 11:23 14:11,23
28:11 30:20 31:25
45:16 46:5 48:13
48:14 53:8 62:25
71:14 89:1 112:19
113:10 115:13
**trying** 15:4 20:20
24:2 31:6,11
113:9 174:19
184:19
**turn** 44:5 67:16
87:16 90:15 97:25
116:12 135:24
136:22 141:12
150:1 152:8

157:20 161:17
**tush**  135:9
**two**  14:2 34:15
46:6 83:4,9
104:25 105:11,21
105:25 126:25
131:2 148:17
149:6 165:3
**type**  15:6 28:6
39:18 40:5 42:13
57:12,17 75:22
191:1
**types**  16:6 22:12
31:21 32:7 58:5
192:2
**typically**  26:4,7,10

**u**

**u.s.**  3:10,14,15,15
3:16
**ultimate**  19:19
**ultimately**  108:17
132:13
**unaccounted**  55:3
55:9
**uncontrollable**
62:21
**uncover**  59:24
**uncovered**  72:10
72:18 73:10 92:4
94:18 95:2 129:1
**undergo**  24:17
78:20
**underscore**  183:17
**understand**  11:22
24:3 62:15 94:16
110:16 111:5
118:8 144:20
145:10 147:8
155:3 166:25
181:1 190:11

**understanding**
17:25 23:7,13
29:12 30:13,18
33:18 34:5 42:6
42:25 45:10,15
47:16,22 48:1
53:4,11 54:1,18
59:18,22 62:3
65:6 66:7 68:15
69:3,9,15 70:5,16
70:19 72:14 73:2
75:2,21 76:3
78:15 79:3,22
80:6 82:25 83:6
84:4,11 86:7 88:5
96:9 102:14
106:11 108:9
115:17 116:2
118:16 122:24
123:5 124:1,6,11
125:25 134:14
137:13,17 140:10
145:9,15,16 146:7
146:25 147:13
149:19 151:22
153:13,16 154:18
154:23 155:8,24
158:8 163:7,10
166:10 172:2
177:5,25 178:16
178:23 179:2,7
183:2
**understood**  83:25
107:25 174:18
**unit**  29:14,17
123:23 161:20
**united**  1:1 147:22
148:8 152:25
**units**  80:16 164:3
164:14 166:11
167:3

**unlawful**  15:13
**unusual**  52:16,18
53:1,2 109:17
129:1,11 130:12
142:24 146:3
155:12 163:17
**unusually**  123:16
158:14 160:16
**update**  128:23
**updated**  44:13
**ups**  190:10
**usage**  131:6
**usc**  137:5 150:6
**usdoj.gov**  3:13
**use**  14:12,24 15:25
17:9,12 18:24
20:15 38:13 49:12
82:3 143:21 183:3
191:1
**useful**  16:13
**users**  79:12
**uses**  21:5 187:3
**usually**  89:1

**v**

**v**  1:10,12 196:6
**vague**  127:25
**valid**  51:11,12
52:7
**various**  28:4,21
64:9 103:8 153:18
**vary**  115:9
**vault**  98:20 103:15
103:15,21,22,25
104:22 190:12,15
190:15,16,20
191:1,3
**vault's**  103:24
**vaults**  190:25
**vercammen**  6:9
175:23 176:5,11
176:22 181:23

183:25
**verification**  46:15
**verify**  62:17
**verifying**  49:6
**veritext**  196:1,7
199:1
**veritext.com.**
196:17
**version**  44:14,19
61:7,9
**versus**  54:15 186:6
**victor**  6:9 175:22
176:5
**videographer**  3:18
11:1 35:10,13
89:15,18 134:22
134:25 170:9
188:20 189:1
192:10
**videotaped**  1:18
**view**  27:18,24
103:11 183:8
184:17
**viewed**  113:25
**vigilant**  148:10
184:18,21 185:2
185:20
**village**  12:24
**vincent**  116:23
**violating**  72:24
95:19
**violation**  94:10
96:24 100:15
119:8,16
**violations**  60:15
61:24 62:2 66:14
72:9,15,18,19 73:9
92:3 93:12 94:18
94:22 95:2 100:8
119:4 133:11

virginia 69:1
visit 56:16 64:20
  104:9 173:2
visited 85:7
  114:16
visits 64:8
vocollect 79:10,11
  79:15,18,20 80:19
  81:1,3,10,15,16,24
  82:8,16 118:17,23
  118:25
voelker 126:24
voice 114:5 129:15
  130:1,4 132:7,9
volume 167:1
voluminous 75:9

**w**

wacker 2:20
waived 196:19
walgreens 3:6
walmart 2:19
want 35:18 43:13
  44:7 49:23 56:9
  56:25 60:8 72:21
  76:24 82:5 86:14
  94:5,25 98:5
  165:8 181:4 182:4
  190:11
wanted 11:13 97:4
  103:9 177:9 181:8
warehouse 65:7
  68:16 78:2 88:6
  98:21 116:3
  118:15 157:7
  177:23 178:5
  179:5
warehouses 70:17
  70:20
washington 3:12
  63:13,22 65:8
  68:19

watch 27:19
watching 84:7
way 32:15 92:14
  92:24 93:14 166:9
  185:1,16 191:6
ways 32:22
we've 66:3 115:20
  147:3 151:18
  160:22
website 37:7
  143:25 144:5,11
  144:14 145:1,5,17
  145:24 146:20
  150:10,14 151:5
week 104:25
weeks 14:2
weigh 103:16
welcome 189:8
went 44:20 69:13
  79:15 82:1 85:7
  92:9,20 94:7
  97:14 109:19
  113:24 114:13
  141:5 151:20
  174:9 188:5,21
west 2:20 3:7 69:1
western 21:17,22
  22:18
whereof 195:5
wide 155:15
willingness 61:25
wise 12:22 13:8
withdrawn 104:18
withhold 27:5
witness 20:25 25:7
  25:14 26:13 30:2
  30:25 32:4,24
  34:20 35:3,8
  39:13 40:2 41:5
  42:5 43:7 44:17
  44:24 45:20 47:19

47:25 51:22 53:25
  55:12 57:11 59:8
  60:5 61:19 62:10
  63:4 66:17 70:25
  73:7 74:3 78:4
  80:4,24 81:7,12
  84:10 87:4 89:7
  89:14 93:2,16
  95:22 100:19
  102:13 103:1
  105:7,23 107:2
  110:13 111:13
  112:10 113:6,19
  114:9 115:16
  116:1 117:9 119:6
  119:20 120:14
  121:6,15,21
  122:15 123:4
  124:9,25 125:13
  125:24 127:7,17
  128:1,10 129:8
  130:19 131:21
  133:13 134:12,17
  153:4 163:20
  164:19,21 168:15
  171:7,22 172:16
  172:22 173:7
  174:13 177:14
  178:22 179:20
  180:10 181:13
  187:22 188:13
  189:8 190:19
  191:21 193:2
  194:9,13,14,17
  195:5 196:8,11
  197:1,4,11 198:1,4
  198:15
witness' 196:14
wolfe 3:16
wondering 177:9

word 71:15 171:23
  171:24 172:3,3
  183:3
words 53:7 125:14
  191:17
work 20:16 28:10
  28:13,15,18,23
  29:10,18 117:4,12
  117:13,15
worked 12:23
  21:21 30:10 31:10
  31:20 32:9 80:8
working 30:6
  31:24 32:2 44:20
  45:1 132:17
works 178:18
writing 53:17
written 56:11
  91:16,20 162:17
wrong 110:1 111:7
  113:3
wrote 70:10 73:1
  94:21

**x**

x 42:2

**y**

yeah 34:22,25
  36:11 42:17 64:13
  68:1 69:11 70:16
  80:25 84:11 85:18
  90:11 102:1
  133:21 148:20
  159:9 163:21
  171:8 174:14
  177:15
year 13:6 22:9
  44:13 45:1 164:4
  164:14
years 21:16 27:12
  30:9 45:14,16

46:1,5,6,10 61:16
63:20 64:2 83:4,9
91:10,13 98:2
105:11,21,25
151:21 163:25
175:6

**york** 2:8,8,12,12

**z**

**zelaski** 73:15
74:17 76:12 77:3
**zero** 77:4,20
**zolner** 3:3

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.