Page 1

1             IN THE UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF OHIO

3                    EASTERN DIVISION

4

                  ~~~~~~~~~~~~~~~~~~~~

5

6      IN RE:  NATIONAL PRESCRIPTION    MDL No. 2804
       OPIATE LITIGATION

7                                    Case No. 17-md-2804

8                                    Judge Dan Aaron
       This Document Relates To:      Polster

9

10     The County of Lake, Ohio v.
       Purdue Pharma L.P., et al.

11     Case No. 18-op-45032

12

       The County of Trumbull, Ohio v.

13     Purdue Pharma L.P., et al.,
       Case No. 18-op-45079

14

15     Track 3 Cases

16

                  ~~~~~~~~~~~~~~~~~~~~

17

18           Remote videotaped deposition of
                  WILLIAM DiFRANGIA

19

20

21                  January 14, 2021
                     9:03 a.m.

22

23

24        Renee L. Pellegrino, RPR, CLR

25            (Appearing Remotely)

```
 1   REMOTE APPEARANCES:
 2   On behalf of the Plaintiffs:
         Spangenberg Shibley & Liber
 3       PETER H. WEINBERGER, ESQ.
         1001 Lakeside Avenue E
 4       Suite 1700
         Cleveland, Ohio  44114
 5       (216) 600-0114
         pweinberger@spanglaw.com
 6          - and -
         The Lanier Law Firm
 7       MILDRED CONROY, ESQ.
         6810 Cypress Creek Parkway
 8       New York, New York  10022
         (800) 723-3216
 9       mildred.conroy@lanierlawfirm.com
10   On behalf of the Ohio Board of Pharmacy and the
     Witness:
11       Ohio Attorney General's Office
         HENRY APPEL, ESQ.
12       30 East Broad Street
         16th Floor
13       Columbus, Ohio  43215
         (614) 466-8600
14       henry.appel@ohioattorneygeneral.com
15   On behalf of Walmart:
         Jones Day
16       PATRICK J. BEISELL, ESQ.
         77 West Wacker
17       Suite 3500
         Chicago, Illinois  60601-1692
18       (312) 269-4097
         pbeisell@jonesday.com
19
     On behalf of Giant Eagle:
20       Marcus & Shapira LLP
         ROBERT M. BARNES, ESQ.
21       DAVID ZWIER, ESQ.
         One Oxford Centre, 35th Floor
22       Pittsburgh, Pennsylvania  15219
         (412) 338-3344
23       rbarnes@marcus-shapira.com
         dzwier@marcus-shapira.com
24
                    ~ ~ ~ ~ ~
25
```

Page 3

```
 1   REMOTE APPEARANCES, CONT'D:
 2   On behalf of CVS:
         Zuckerman Spaeder LLP
 3       DANIEL MOYLAN, ESQ.
         100 East Pratt Street
 4       Suite 1000
         Baltimore, Maryland  21202-1031
 5       (410) 949-1159
         dmoylan@zuckerman.com
 6
     On behalf of Walgreens:
 7       Bartlit Beck
         KATHERINE SWIFT, ESQ.
 8       54 West Hubbard Street
         Chicago, Illinois  60654
 9       (312) 494-4410
         kate.swift@bartlitbeck.com
10
11   ALSO PRESENT:
12       Clint Thomas, Technical Support
         James Hoy, Technical Support
13       Joseph A. Koltak, Esq., Ohio Board of Pharmacy
         Steven Troncone, Videographer
14
15                    ~ ~ ~ ~ ~
16
17
18
19
20
21
22
23
24
25
```

Page 4

1                    TRANSCRIPT INDEX

2

3     APPEARANCES ................................2

4     INDEX OF EXHIBITS .........................5

5     INDEX OF OBJECTIONS .......................6

6

7     EXAMINATION OF WILLIAM DiFRANGIA:

8     BY MR. BARNES .............................10

9     BY MR. WEINBERGER .........................172

10    BY MR. BARNES .............................225

11    BY MR. BEISELL ............................247

12

13    AFTERNOON SESSION .........................121

14

15    REPORTER'S CERTIFICATE ....................252

16

17    EXHIBIT CUSTODY - RETAINED BY COURT REPORTER

18

19

20

21

22

23

24

25

Page 5

1                    INDEX OF EXHIBITS
2
3      Number           Description              Marked
4
5    Exhibit 1    Notice of Videotaped Deposition   13
                  of William DiFrangia
6
     Exhibit 2    E-Mail String, Beginning Bates    77
7                 Stamp TRUM001765557
8    Exhibit 3    E-Mail String, Beginning Bates    69
                  Stamp LAKE000068980
9
     Exhibit 4    Consent Agreement Between James   76
10                J. Skiffey, DDS and the Ohio
                  State Dental Board
11
     Exhibit 5    Multi-Page Document Entitled      32
12                "State of Ohio Board of Pharmacy
                  July Board Meeting
13                Presentation," Beginning Bates
                  Stamp BOP_MDL035385
14
     Exhibit 6    State of Ohio Board of Pharmacy   75
15                Property Receipt, dated
                  September 18, 2019, Beginning
16                Bates Stamp BOP_MDL2796412
17   Exhibit 7    Barricade Inspection              78
18   Exhibit 8    State of Ohio Board of Pharmacy   76
                  Property Receipt, dated
19                September 18, 2019, Beginning
                  Bates Stamp BOP_MDL2796570
20
     Exhibit 9    One-Page Document Entitled        86
21                "Prescription Drug
                  Investigations - Techniques and
22                Workflow"
23   Exhibit 10   James E. Prommersberger, DPM      80
                  Search Warrant, with
24                Attachments, Beginning Bates
                  Stamp BOP_-MDL1191777
25

INDEX OF OBJECTIONS

1

2

3  Objection ......................................66

Objection ......................................69

4  Objection ......................................69

Objection ......................................73

5  Objection ......................................73

Objection ......................................73

6  Objection .....................................102

Objection .....................................106

7  Objection .....................................106

Objection .....................................106

8  Objection .....................................107

Objection .....................................108

9  Objection .....................................110

Objection .....................................110

10  Objection .....................................111

Objection .....................................112

11  Objection .....................................119

Objection .....................................129

12  Objection .....................................132

Objection .....................................136

13  Objection .....................................164

Objection .....................................165

14  Objection .....................................166

Objection .....................................167

15  Objection .....................................167

Objection .....................................168

16  Objection .....................................168

Objection .....................................168

17  Objection .....................................168

Objection .....................................169

18  Objection .....................................169

Objection .....................................169

19  Objection .....................................170

Objection .....................................171

20  Objection .....................................178

Objection .....................................180

21  Objection .....................................184

Objection .....................................186

22  Objection .....................................186

Objection .....................................188

23  Objection .....................................188

Objection .....................................188

24  Objection .....................................189

Objection .....................................190

25  Objection .....................................190

1           INDEX OF OBJECTIONS, CONT'D

2

3   Objection ....................................191
    Objection ....................................192
4   Objection ....................................192
    Objection ....................................193
5   Objection ....................................194
    Objection ....................................196
6   Objection ....................................196
    Objection ....................................197
7   Objection ....................................197
    Objection ....................................197
8   Objection ....................................197
    Objection ....................................198
9   Objection ....................................201
    Objection ....................................202
10  Objection ....................................202
    Objection ....................................205
11  Objection ....................................215
    Objection ....................................217
12  Objection ....................................218
    Objection ....................................219
13  Objection ....................................222
    Objection ....................................224
14  Objection ....................................224
    Objection ....................................227
15  Objection ....................................228
    Objection ....................................229
16  Objection ....................................229
    Objection ....................................230
17  Objection ....................................230
    Objection ....................................230
18  Objection ....................................231
    Objection ....................................232
19  Objection ....................................233
    Objection ....................................236
20  Objection ....................................237
    Objection ....................................240
21  Objection ....................................241
    Objection ....................................242
22  Objection ....................................242
    Objection ....................................242
23  Objection ....................................243
    Objection ....................................243
24  Objection ....................................243
    Objection ....................................244
25  Objection ....................................244

Page  8

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE VIDEOGRAPHER:  We are now on

2    the video record.  Today is January 14th, 2021.

3    The time is approximately 9:03 a.m. eastern

4    standard time.  We are here in the matter of

5    the National Prescription Opiate Litigation,

6    Track 3, to take the deposition of William

7    DiFrangia.

8          Will counsel please identify

9    themselves for the video record?

10         MR. BARNES:  I'll start.  On behalf

11   of Giant Eagle, Robert Barnes.  I'll be taking

12   the deposition.

13         Other Defendants?  CVS, can you

14   identify yourself?

15         MR. MOYLAN:  Daniel Moylan,

16   Zuckerman Spaeder, for CVS.

17         MS. SWIFT:  Kate Swift for

18   Walgreens.

19         MR. BEISELL:  Patrick Beisell, on

20   behalf of Walmart.

21         MS. CONROY:  Mildred Conroy, on

22   behalf of the Plaintiffs.

23         THE VIDEOGRAPHER:  If there are no

24   other counsel, the court reporter may proceed.

25         THE COURT REPORTER:  Due to the

Page 10

1  need for this deposition to take place

2  remotely, will the parties stipulate that the

3  court reporter may swear in the witness over

4  virtual video conference?

5              MR. BARNES:  Yes.

6              MR. WEINBERGER:  Yes.

7              MR. APPEL:  Very briefly, this is

8  Henry Appel.  I am representing the Board of

9  Pharmacy and the witness in this case.  I just

10 didn't verbalize quick enough.

11     WILLIAM DiFRANGIA, of lawful age, called

12 for examination, as provided by the Federal Rules

13 of Civil Procedure, being by me first duly sworn,

14 as hereinafter certified, deposed and said as

15 follows:

16         EXAMINATION OF WILLIAM DIFRANGIA

17 BY MR. BARNES:

18     Q.    Okay.  Good morning, Mr. DiFrangia.

19     A.    Good morning.

20     Q.    My name is Robert Barnes.  I

21 represent Giant Eagle.  Giant Eagle is in a

22 group of Defendants which I'll call the pharmacy

23 Defendants.  They include Giant Eagle, CVS,

24 Walgreens, Rite-Aid and Walmart.  And from time

25 to time here in the deposition when I refer to

Page 11

1    "the pharmacy Defendants," I'll be referring to

2    that group of five Defendants.

3              Is that okay with you?

4         A.    Yes.

5         Q.    Okay.  Just a matter of

6    housekeeping.  Your counsel has asked us to take

7    a break at 11:30 to take care of some personal

8    matters, so we'll break for lunch at 11:30 so he

9    can do that and we'll simultaneously have our

10   lunch.  We'll break for an hour from 11:30 to

11   12:30.

12             Mr. DiFrangia, I sent to you via

13   overnight mail a couple of exhibit binders,

14   volume 1 and volume 2.  Did you receive those?

15        A.    Yes.

16        Q.    Just for everybody's understanding,

17   these exhibit binders were previously used in

18   the depositions of Trey Edwards and George

19   Pavlich, who are also Ohio Board current or

20   former agents and inspectors.  I will maintain

21   the designation of the exhibits.  So, for

22   example, if I ask you to please look at Edwards

23   Deposition Exhibit 3, it will be in the first

24   binder.  The first binder contains the first 17

25   exhibits from Mr. Edwards' deposition and the

Page 12

1    second binder contains further Trey Edwards

2    deposition exhibits, plus some Pavlich exhibits,

3    and then at the very end, the last 11, are

4    exhibits that we've solely designated in your

5    name.  So we have Edwards plus Pavlich plus

6    DiFrangia exhibits and all of your exhibits are

7    at the end of the second binder.

8              Mr. DiFrangia, could you state your

9    full name for us?

10        A.    William DiFrangia.

11        Q.    And what's your date of birth?

12        A.    May 23rd, 1982.

13        Q.    And what is your current city of

14    residence, without giving me your specific

15    address?

16        A.    Boardman Township.

17        Q.    Ohio?

18        A.    Yes.

19        Q.    Now, you were -- you understand you

20    were noticed to be deposed in this case pursuant

21    to deposition notice and subpoena.  Have you

22    seen that?

23        A.    The subpoena I don't think I have

24    seen.  I've obviously been notified that --

25        Q.    Okay.  If you look at the second

Page 13

1    exhibit binder at the back, the Exhibits 1

2    through 11 have your exhibit sticker names on

3    them, and Exhibit 1 is your notice of videotaped

4    deposition.

5              A.    Okay.

6              Q.    If you just take a look at that, I

7    just want to make sure that you understand that

8    you're appearing today pursuant to such notice

9    and are ready to testify pursuant to that

10   notice.

11                   THE TECHNICAL ASSISTANT:  Mr.

12   Barnes, do you want me to go and drop that in

13   the marked exhibits folder?

14                   MR. BARNES:  Sure.

15                   -   -   -   -   -

16                   (Thereupon, Deposition Exhibit 1,

17                   Notice of Videotaped Deposition of

18                   William DiFrangia, was marked for

19                   purposes of identification.)

20                   -   -   -   -   -

21             A.    So yes, Exhibit -- Exhibit 1 for

22   myself, yes.

23             Q.    Okay.  Have you ever been deposed

24   before, Mr. DiFrangia?

25             A.    No, I have not.

1        Q.    Have you ever testified in a hearing

2    or a court proceeding?

3        A.    Yes.

4        Q.    How many times?

5        A.    Hearings, maybe ten.  Court

6    proceedings, probably at least a hundred.

7        Q.    A hundred times?

8        A.    Yeah.

9        Q.    Now, is that in connection -- are

10   all of those in connection with your current

11   duties at the Board of Pharmacy?

12        A.    Some are with the current duties.

13   A lot of them have occurred with my prior

14   employment.

15        Q.    Okay.  Since you've never been

16   deposed in civil litigation, I'll just tell you,

17   generally, I'll ask the questions.  Please wait

18   for me to finish asking my question.  If you

19   don't understand it or need it explained or

20   didn't hear it quite right, please tell me and

21   I'll attempt to restate it for you.  But if you

22   don't ask me, is it fair that I can assume that

23   you understood it and have no problems

24   understanding the full nature of the question?

25        A.    Yes.

Page 15

```
1        Q.    Okay.  The court reporter will be
2   taking down all of your responses, so be careful
3   not to respond by nodding your head or shaking
4   your head because she may not see that, so try
5   to verbalize as many -- all of your responses if
6   you can.
7              And then, finally, if at any time
8   you need a break to talk with your counsel,
9   Mr. Appel, let me know and we'll take a break
10  so that you can do that.  Okay?
11       A.    Okay.
12       Q.    This is a remote deposition due to
13  the pandemic.  If at any time you experience any
14  technical difficulties, let us know and we'll
15  try to correct them, but during the deposition
16  you're not to receive any texts or e-mails or
17  other types of communications that relate to
18  your testimony.  Okay?
19       A.    Okay.
20       Q.    Are you alone at your present
21  location with respect to being deposed today?
22       A.    Yeah.  I'm in my office by myself.
23       Q.    Okay.  What did you do to prepare
24  for your deposition today, Mr. DiFrangia?
25       A.    I had reviewed the exhibits that
```

1  were sent to me and we had a few prior

2  preparation events with, you know, our in-house

3  counsel, reviewed my work history and my

4  resume.

5       Q.    Okay.  Which counsel -- when you say

6  "in-house counsel," are you talking about

7  counsel for the Board of Pharmacy?

8       A.    Yes.

9       Q.    Would that be Mr. Appel and other

10  lawyers for the Board of Pharmacy?

11       A.    Yes.

12       Q.    Have you had any communications in

13  connection with your deposition with any counsel

14  in the litigation, either the Defendants, the

15  pharmacy Defendants' counsel, or the Plaintiffs'

16  counsel, which are counsel for Lake and Trumbull

17  Counties?

18       A.    No.

19       Q.    Have you ever had any communications

20  with any lawyers in this litigation representing

21  the counties, Lake and Trumbull County, or any

22  of the pharmacy Defendants?

23       A.    No.

24       Q.    Could you give us a brief summary of

25  your educational background, starting with

Page 17

1  college?

2        A.    Sure.

3              I have a Bachelor's degree in

4  criminal justice from Youngstown State

5  University and I obtained that in December of

6  2005.

7        Q.    Okay.

8              MR. BARNES:  My screen just turned

9  into a green icon.

10             THE TECHNICAL ASSISTANT:  I muted

11 the phone.  If you two continue to speak, it

12 will go away.

13             MR. BARNES:  Okay.

14       Q.    Mr. DiFrangia, you got your

15 Bachelor's degree in December of '05.  Have you

16 done any graduate work after your undergraduate

17 degree?

18       A.    No, not through any type of

19 university; however, I did go through the Peace

20 Officers -- Peace Officers training through

21 Youngstown State University.  So sometimes that

22 is considered graduate coursework.

23       Q.    Did that result in a certificate or

24 any other certification or license or things of

25 that nature?

1          A.     Yes.  I obtained a certificate

2     from -- from the training academy at Youngstown

3     State and then I also obtained a certificate

4     from OPOTA for certification.

5          Q.     I'm sorry.  You said for -- for what

6     certification?

7          A.     It's through OPOTA, the Ohio Police

8     Officers Training Association, and that's for

9     just certification of being a police officer.

10         Q.     I see.

11                And did you become a police officer

12    after going through this training?

13         A.     Yes.

14         Q.     And when did you become a police

15    officer?

16         A.     June of 2006.

17         Q.     And for whom did you become a police

18    officer?

19         A.     The city of Canfield.

20         Q.     All right.  And how long were you a

21    police officer with the city of Canfield, Ohio?

22         A.     Through November of 2016.

23         Q.     Oh, so ten years?

24         A.     Yes.

25         Q.     And what generally were your duties

1  in that ten-year time period?  Were you always a

2  police officer or were you promoted to detective

3  or things of that nature?

4       A.   Yes.  I worked as a patrol officer,

5  I worked as a school resource officer for one

6  year, I was assigned to a multi-jurisdictional

7  drug unit for about five and a half years, and

8  ultimately I was promoted to a detective.

9       Q.   Okay.  How long were you a patrol

10  officer and where were you a patrol officer?

11       A.   I was a patrol officer for Canfield

12  Police Department in the city of Canfield, and

13  that designation pretty much lasted from when I

14  was sworn in in 2006 up until February of '16,

15  and then I was promoted to detective in

16  February of '16.

17       Q.   Okay.  And where is Canfield?  What

18  county is that in?

19       A.   It's in Mahoning County.

20       Q.   Mahoning.

21       And what is the county seat of

22  Mahoning County?

23       A.   I think it's Canfield.  I'm not --

24  I'm entirely not sure.  Sorry.

25       Q.   Is Mahoning geographically -- is it

1  on the border of Pennsylvania?

2        A.     Yes.

3        Q.     And is it above Trumbull?

4        A.     No.  It's below Trumbull.

5        Q.     Right below Trumbull?

6        A.     Yes.

7        Q.     Did your work cause you to do

8  anything with respect to activities that were

9  going on in Trumbull County?

10        A.     Yes.  Not very often, but it did.

11        Q.     Okay.  Did you do any drug work as a

12  patrol officer in that time period, that

13  ten-year time period?

14        A.     Yes.

15        Q.     As a patrol officer I'm focusing on.

16  Did you do street drugs, that kind of thing?

17        A.     Yeah.  When I was a patrol officer,

18  assigned -- I was assigned to a

19  multi-jurisdictional drug unit, but, you know,

20  other than that, proactive drug enforcement,

21  you know, just for proactive traffic stops and

22  that sort of thing.

23        Q.     I see.

24               While you were working as a

25  Canfield police officer, were you able to

Page 21

1    observe illegal drug activity in Mahoning -- in

2    or around Mahoning County?

3         A.    Yes.

4         Q.    What, in your experience, were the

5    types of drug problems you observed as a police

6    officer in that time period?

7         A.    It was predominantly heroin and

8    prescription medication, opiates specifically,

9    and cocaine and marijuana.

10        Q.    Were you able to -- did you

11   investigate those types of crimes involving

12   heroin, prescription drugs, cocaine and

13   marijuana?

14        A.    Yes.

15        Q.    Were you able to determine the

16   sources of those types of drugs?  Were they

17   coming into the county from outside the county?

18        A.    Yes.  For the illicit street drugs,

19   they generally did.  Your prescription

20   medications, it was typically an individual

21   that was prescribed the medication.

22        Q.    Okay.  But with respect to heroin,

23   was that coming in from -- were you able to

24   observe as a police officer it coming in from

25   specific sources, like Detroit, Mexico, New

Page 22

1   Jersey, things like that?

2        A.    Yeah.  Through our investigations,

3   generally Columbus seemed like a -- a frequent

4   destination that heroin was coming in through,

5   Akron, sometimes New York.

6        Q.    Did you ever observe foreign

7   sources, like Chinese fentanyl, Mexican

8   fentanyl, Mexican heroin, things like that?

9        A.    Nothing that I could definitively

10  say came from a foreign source.

11       Q.    By that you mean a foreign country?

12       A.    Yes.

13       Q.    And then you said you were a school

14  resource officer for approximately one year?

15       A.    Yes.

16       Q.    What did that involve and what

17  school were you at?

18       A.    I was assigned to Canfield High

19  School, and really it was to, you know, have a

20  presence of the police department within the

21  school, ensure safety of the students and

22  staff, enforce any -- any criminal violations,

23  and assist the school with discipline when

24  needed.

25       Q.    Okay.  And then after that you were

Page 23

1   assigned to this multi-jurisdictional drug unit

2   for about five and a half years you said?

3          A.    Yes.

4          Q.    And what was the name of that drug

5   unit?

6          A.    The Mahoning Valley Drug Task

7   Force.

8          Q.    And what types of law enforcement

9   personnel were assigned to that task force?

10  Where did they come from?

11         A.    They came from different agencies

12  within the county, different police

13  departments.  There was also individuals from

14  the FBI, from the ATF, and sometimes different

15  state agencies.

16         Q.    What about DEA?

17         A.    They never had a person that was

18  assigned to that.  We worked with them on

19  occasion, but they didn't have anyone that was

20  assigned to that unit.

21         Q.    What was the purpose of putting that

22  unit together?

23         A.    To proactively investigate drug

24  trafficking.

25         Q.    And what areas did you cover on this

Page 24

1   Mahoning Valley Drug Task Force?

2        A.    Well, predominantly Mahoning

3   County; however, if there was an investigation

4   that would carry over into another county, you

5   know, we would follow it there and assist other

6   counties and other agencies with it.

7        Q.    Did any of your investigations ever

8   include Trumbull or Lake Counties?

9        A.    Trumbull County, yes.  And they

10  were more investigations that I was assisting

11  on, but we -- we would go into Trumbull County

12  for investigations from time to time.

13       Q.    And on this drug task force, how big

14  was it in terms of membership?  Was it like a

15  dozen, two dozen law enforcement personnel?

16       A.    Yeah.  I think it was about --

17  about a dozen members.

18       Q.    And were there other police officers

19  like yourself on that drug task force?

20       A.    Yes.

21       Q.    And on that drug task force did you

22  become -- as you did in your prior experience as

23  a police officer, did you become familiar with

24  illegal drugs, illegal drug activity in those

25  jurisdictions?

Page 25

1    A.    Yes.  So let me clarify that the

2    experience -- the vast majority of my

3    experience with investigating drugs was from

4    when I was assigned to the drug task force, so,

5    you know, any of the things that I just

6    testified was generally from my experience

7    being assigned to the task force.  And I was

8    still a Canfield police officer.  That was just

9    my assignment was reporting to the task force

10   several days a week.

11        Q.    So those observations you gave us

12   earlier based upon your experience concerning

13   heroin and prescription drugs and cocaine and

14   marijuana, that included your work on the drug

15   task force?

16        A.    Correct.

17        Q.    While working on the drug task

18   force, did you work with partners on

19   investigations?  Were you assigned, for example,

20   a group of two or three of you to certain types

21   of investigations concerning illegal drug

22   activity?

23        A.    Yes.

24        Q.    Okay.  And were you able to

25   successfully prosecute individuals for illegal

Page 26

1   drug activity while on that task force?

2          A.    Yes.

3          Q.    Did any of your work on the drug

4   task force involve prescription drugs?

5          A.    Yes.

6          Q.    And in connection with those types

7   of investigations, did you seek and obtain the

8   assistance of pharmacies and pharmacists to

9   assist in those investigations?

10         A.    Yes, when needed.

11         Q.    Do you recall the pharmacies that

12  assisted the drug task force as needed?

13         A.    Yeah.  You know, depending on the

14  circumstance, if we were investigating some

15  sort of deception to obtain or an illegal

16  processing investigation or someone obtaining a

17  large amount of pseudoephedrine, pharmacies

18  were -- you know, all pharmacies in the area

19  were willing to assist us when needed.

20         Q.    Would that include the pharmacy

21  Defendants in this case?

22         A.    Yes.

23         Q.    Giant Eagle, CVS, Rite-Aid,

24  Walgreens, Walmart?

25         A.    Yes.

Page 27

1      Q.    All right.  Did you ever encounter

2   any resistance by any of the pharmacy

3   Defendants; in other words, saying we're not

4   going to help the drug task force, go away?

5      A.    No.

6      Q.    Okay.  And the type of assistance

7   that they provided, would that include -- would

8   they call you or other members of the drug task

9   force from time to time to provide leads on --

10  on potential illegal drug activity?

11     A.    Yes.

12     Q.    Do you recall -- I represent Giant

13  Eagle so I'm going to ask first about Giant

14  Eagle.  Do you recall Giant Eagle pharmacists

15  providing leads to you or other members of the

16  drug task force?

17     A.    Yes.

18     Q.    And what about the other pharmacy

19  Defendants; did they, similarly, provide leads

20  to you and other members of the drug task force?

21     A.    Yes.  I know Rite-Aid did.  I can

22  remember some times with Rite-Aid.  Walmart.

23  You know, specifically can I recall CVS and

24  Walgreens calling me personally, not that I

25  recall, but I can't say that that didn't happen

1   at some point.

2        Q.    And typically what type of leads

3   would they provide?  Would it relate to

4   diversion attempts generally related to

5   prescription drugs?

6        A.    Yes.  The leads varied.  They would

7   contact us when they would have a patient come

8   in and present what was deemed to be a

9   fraudulent prescription.  They would contact us

10  when they had a prescriber that was prescribing

11  in a manner that may not be -- may not be

12  consistent with other prescribers in the area.

13       Q.    I see.  So it could relate to either

14  illegal -- potential illegal activity by the

15  patient trying to get the drugs and/or the

16  prescribers who prescribe the drugs?

17       A.    Yes.

18       Q.    And did these leads result in

19  successful prosecutions of patients or

20  prescribers who were behaving illegally?

21       A.    Yes.

22       Q.    Now, you said you rose to the level

23  of detective in February of '16.  Did you remain

24  on the drug task force now that -- after you

25  became a detective?

1      A.    No.   My -- my full-time assignment

2   with the task force ended around March of 2016.

3   I was still there on a very limited part-time

4   basis, but from -- around March of 2016 I was

5   promoted to a detective, however, I was working

6   primarily patrol shifts.

7      Q.    Were you doing any drug

8   investigation work as a detective?

9      A.    Yes.  When -- you know, when --

10   when I had an opportunity, and, again, I had a

11   very limited presence at the drug task force,

12   so, you know, I was able to do it on those

13   days, but it was -- it was very limited.

14      Q.    Okay.  And at some point you became

15   employed by the Ohio Board of Pharmacy, correct?

16      A.    Yes.

17      Q.    And when was that?

18      A.    That was November of 2016.

19      Q.    Okay.  Why did you go to the Ohio

20   Board of Pharmacy?  Opportunity?

21      A.    Yeah, just really a better career

22   opportunity.

23      Q.    And what position did you take at

24   the board?  What was your first position?

25      A.    An agent.

Page 30

1       Q.     And are you currently still an

2    agent?

3       A.     Yes.

4       Q.     So for about four and a half -- not

5    quite four and a half years you've been an agent

6    at the Ohio Board of Pharmacy?

7       A.     Yes.

8       Q.     Did you go through training to

9    become an agent at the Board of Pharmacy?  Did

10   they train you in some way when you got there?

11      A.     Yeah.  My -- my initial three to

12   four months consisted of a field training

13   program within the board.

14      Q.     And who did you field train with?

15      A.     Oh, just about -- several --

16   several agents within the board, several of our

17   specialists, and several of the office staff.

18      Q.     Did any of your field training

19   include Trey Edwards?

20      A.     Yes.

21      Q.     All right.  By the time you went to

22   work for the board, had you become familiar with

23   the Ohio drug laws involving how they're

24   regulated and drug offenses, things of that

25   nature?

Page 31

1          A.     Yes.

2          Q.     And you used the term "agent."  Is

3     that a term of art within the Board of Pharmacy

4     or does it differentiate you from other

5     positions like inspectors?  And you used the

6     term "specialist."  Can you explain for us

7     generally what those different categories mean?

8          A.     Sure.

9               So our agents generally come from a

10    law enforcement background, our inspectors

11    are -- they come from a pharmacy technician

12    background, and then our specialists are

13    licensed pharmacists with the background of

14    being a pharmacist.

15         Q.     I see.  So when you use the term

16    "specialist," you're talking about a board

17    employee who's a licensed pharmacist?

18         A.     Yes.

19         Q.     And how or why were specialists used

20    in investigations?  Why would you need a

21    pharmacist?

22         A.     Well, they can provide a lot more

23    clinical knowledge that we, frankly, don't

24    possess as field agents or even specialists.

25         Q.     And have you worked with specialists

Page 32

1  since you arrived at the board?

2      A.    Yes.

3      Q.    How many specialists does the board

4  have presently?

5      A.    I believe seven.

6      Q.    And how many inspectors does the

7  board have?

8      A.    Well, there's one in Northeast

9  Ohio.  I could tell you that definitively.  The

10  rest of the state -- I think maybe six, but

11  again, I don't know for sure the rest of the

12  state.

13              -   -   -   -   -

14              (Thereupon, Deposition Exhibit 5,

15              Multi-Page Document Entitled "State

16              of Ohio Board of Pharmacy July

17              Board Meeting Presentation,"

18              Beginning Bates Stamp

19              BOP_MDL035385, was marked for

20              purposes of identification.)

21              -   -   -   -   -

22      Q.    Okay.  I'm going to show you a

23  document.  It's Exhibit 5 in your second binder.

24      A.    Okay.

25      Q.    It's marked DiFrangia Exhibit 5.

Page 33

1          A.     Yes.

2          Q.     It states on the front "July Board

3     Meeting Presentation."

4          A.     Okay.

5          Q.     The metadata for this document

6     indicates it's dated sometime in 2017.  The

7     reason I mention that is because we can't find a

8     date on it otherwise.  But did you attend board

9     meetings for the Board of Pharmacy?

10          A.     Yes.

11          Q.     And why would you attend board

12     meetings?

13          A.     Well, for the most part, they were

14     pretty much mandatory unless you had an illness

15     or some sort of prior scheduled vacation.

16          Q.     Okay.  And the board is comprised of

17     approximately eight individuals; is that

18     correct?

19          A.     Yes.

20          Q.     And most of them are -- all of them

21     are pharmacists; am I correct?

22          A.     One is a general public individual.

23          Q.     Okay.  And did you make

24     presentations at the board meetings for the

25     Board of Pharmacy from time to time?

1      A.    I don't think I ever have made a

2   presentation for the board meetings.

3      Q.    Okay.  Go to the second page of

4   Exhibit 5.  There's a slide showing compliance

5   and enforcement department overview.  Do you see

6   there's kind of an organizational chart starting

7   with the director of compliance and enforcement?

8      A.    Yes.

9      Q.    You have chief pharmacist, then

10  chief of investigations, administrative

11  assistant, supervisors; then below the chief of

12  investigations you have regional supervisors,

13  four, and then beneath those regional

14  supervisors, you have compliance specialists,

15  six; agents, 18, and inspectors, four.

16          Do you see that?

17     A.    Yes, I do.

18     Q.    Is that -- is that consistent with

19  your general recollection of how the board is

20  structured in the compliance and enforcement

21  division?

22     A.    Yes, that's the correct structure.

23     Q.    Okay.  And does that refresh your

24  recollection about the approximate number of

25  compliance specialists, which are pharmacists,

Page 35

1   six, statewide?  Do you see that?

2          A.    Yeah, at that time in 2017.

3          Q.    Okay.  And that -- you think it

4   might have changed by adding an additional

5   specialist since then?

6          A.    I believe it has, and I think we

7   even had a retirement, so --

8          Q.    Okay.  I'm just interested in the

9   ballpark.  So you have about six to seven

10  pharmacy specialists, about 18 agents as of

11  2017?  Does that sound about right?

12         A.    Yeah, as of 2017, but again, that

13  number is changing.

14         Q.    In what way, up or down?

15         A.    Up.

16         Q.    How many agents do you think you

17  have now?

18         A.    I think we're -- if this was 18 in

19  2017, we're probably in the low 30s now.

20         Q.    Oh, wow.  That's a significant

21  increase.

22         A.    Yes.  Since I've started, I kind of

23  was at the beginning cusp of -- of a lot of

24  hiring that has happened.

25         Q.    All right.  So you're up to about 30

Page 36

1    agents?

2         A.    Give or take, yes.

3         Q.    And inspectors, it says four.  Is

4    that about right for 2017, and if so, has that

5    increased or decreased since then?

6         A.    For 2017, yes, that is accurate,

7    and I think it's gone up since then.

8    I'd say it probably has increased by two.

9         Q.    Okay.  If you go to the fourth page

10   of this exhibit, two pages after the chart that

11   we just saw, there is a compliance and

12   enforcement map, field staff territory map.  Is

13   that accurate?  Does that accurately show that

14   the board breaks its staff down into four

15   geographic quadrants in the state of Ohio?

16        A.    Yes.

17        Q.    Northwest, northeast, southwest and

18   southeast?

19        A.    Yes.

20        Q.    And personnel are designated to each

21   of those four geographical quadrants?

22        A.    Yes.

23        Q.    And you're listed on the right as

24   being in the northeast quadrant; is that

25   correct?

Page 37

```
 1          A.     Correct.
 2          Q.     And that quadrant includes Mahoning,
 3    Trumbull and Lake Counties; is that correct?
 4          A.     Yes.
 5          Q.     Okay.  And the other is -- you have
 6    a couple specialists in there, Joann Predina,
 7    Katie Stable (phonetic)?
 8          A.     Katie Stabi.
 9          Q.     Stabi.  These are two pharmacist
10    specialists that assist in your investigations;
11    is that right?
12          A.     Yes; however, Joann Predina has
13    retired.
14          Q.     And has she been replaced?
15          A.     No.
16          Q.     Okay.  But the agents assigned to
17    this northeast quadrant include you, John
18    Bonish, Trey Edwards, Thomas Williams, Greg
19    Whitney, and an additional agent is Michael
20    Reese but also an inspector, Ginger Redway; is
21    that right?
22          A.     As of that time in 2017; however,
23    Michael Reese is no longer with the agency;
24    Ginger Redway, no longer with the agency; Greg
25    Whitney, he has also since retired.
```

1      Q.    Have they been replaced by others?

2      A.    Yes.  Two -- there's been a few

3  agent positions that have been replaced, but

4  the inspector has not.

5      Q.    Okay.  If you flip about five pages

6  later, there's a page that has a Bates stamp BOP

7  on the bottom right with the ending digits 393.

8      A.    Okay.

9      Q.    It says, "Roles and Responsibilities

10  of Specialists, Agents & Inspectors."

11          Do you see that?

12      A.    Yes.

13      Q.    All right.  So again, to reorient,

14  this is a presentation to the Board of Pharmacy.

15  Was the purpose of this presentation, to your

16  understanding, to let the board know what roles

17  each of these types of employees was serving

18  with the board, specialists, agents and

19  inspectors?

20      A.    Yes.

21      Q.    Okay.  If you flip the page, we

22  have -- the next several pages have compliance

23  specialists and then, after that, agents, and

24  then inspectors.  I just want to make sure I

25  understand what this information means.

Page 39

1              For compliance specialists, is this

2      showing the types of investigations and the

3      types of inspections that compliance

4      specialists, the primary duties relate to?

5              A.    Yes.

6              Q.    Okay.  And then the same for agents.

7      As agents your responsibilities included, on the

8      investigation side, criminal investigations,

9      theft of drugs, illegal processing, drug

10     trafficking, deception to obtain dangerous

11     drugs, overdose, suspicious deaths, minimum

12     qualifications of a terminal distributor.  I

13     think that's a warehouse distributor.  Is that

14     right?

15             A.    Yes.

16             Q.    All right.  Illegal sales and

17     purchases, drug security, impaired pharmacists,

18     interns and technicians, unprofessional conduct,

19     violation of board orders, OARRS complaints, and

20     operating or practicing without a license.  Is

21     that -- that's a pretty wide scope of

22     responsibilities in terms of investigations.  Is

23     that accurate?

24             A.    Yes, that's accurate.

25             Q.    Okay.  And then the types of

1    inspections you did were pain management

2    facilities, wholesalers, Suboxone clinics

3    (outpatient), virtual wholesalers and

4    manufacturers, third-party logistics companies,

5    dog trainers and retail pharmacies.  Those are

6    the types of inspections that came within your

7    field of -- your scope of duties as an agent?

8          A.    Correct.

9          Q.    What's a pain management facility?

10         A.    It would be a prescriber's office

11   that prescribes controlled substances to over

12   50 percent of their patient population.

13         Q.    So in the state of Ohio prescribers

14   are allowed to distribute prescriptions right

15   out of their offices?

16         A.    Well, typically they're issued by

17   way -- yeah, they'll issue a prescription to a

18   patient and then the patient goes and gets the

19   medication filled from a pharmacy.

20         Q.    I see.  And do you have actual

21   experience inspecting pain management

22   facilities?

23         A.    Yes.

24         Q.    Can you identify any of the pain

25   management facilities that you inspected or you

Page 41

1   have inspected?

2        A.    As far as the doctors' offices or

3   the doctors?

4        Q.    Well, I guess that would be -- I'm

5   not thinking about it correctly.  You describe

6   these as essentially prescriber offices, pain

7   management facilities.  I was thinking of pain

8   management clinic, but that's probably why we're

9   not on the same page.

10            Are you familiar with the term

11  "pain management clinic"?

12       A.    Well, we classify pain management

13  clinic as a -- as a doctor's office, pain

14  management facility -- kind of classify it all

15  together.

16       Q.    Okay.  And you -- you've actually

17  done those inspections of those -- these pain

18  management facilities and clinics?  I'll just

19  add "and clinics" on there.

20       A.    Yes, I have.

21       Q.    In your experience with the board or

22  with your prior experience as a detective and

23  police officer, do you recall any pain

24  management facilities or clinics being

25  investigated and prosecuted?

1          A.     Yes.

2          Q.     Which ones do you recall?

3          A.     There was a doctor -- Dr. Paloski,

4     he was licensed as a pain management facility.

5     He was in Mahoning County.

6          Q.     Okay.  Any others that you remember?

7          A.     Yes.  There was a Dr. Escobar.  He

8     was also in Mahoning County.  He was a pain

9     management clinic.

10         Q.     Any others?

11         A.     There was an investigation.  My end

12    is closed, however, I'm not sure of other

13    investigating partners that I had regarding

14    this physician, but he was in Trumbull County.

15    His name was Dr. Veres.

16         Q.     How do you spell that name?

17         A.     V-E-R-E-S.

18         Q.     Veres.  And he was in Trumbull

19    County?

20         A.     Yes.

21         Q.     And was he also a pain management

22    clinic?

23         A.     He was.

24         Q.     And your investigation closed on

25    him?

Page 43

1        A.    Correct.

2        Q.    And how did it close?  Was he

3   prosecuted?

4        A.    He -- he had surrendered his DEA

5   certificate.

6        Q.    Which meant what, he could no longer

7   prescribe medicine?

8        A.    Well, he could no longer prescribe

9   controlled substances.  He still has an active

10  medical license from the medical board, he

11  could still practice as a physician, but he

12  cannot prescribe any controlled substances

13  without a DEA certificate.

14       Q.    And why did he lose his right to

15  prescribe controlled substances?  What was he

16  doing?

17       A.    Well, he voluntarily gave it up.

18  You know, there was a -- there was an

19  investigation into his prescribing by the

20  pharmacy board and also other agencies, state

21  and federal agencies, and a subpoena was issued

22  for some patient files by the DEA, and then

23  through negotiations with his -- with the

24  United States Attorney, that was -- that was

25  the outcome of the case.

1      Q.    I see.  So he surrendered his

2  license, but how would you describe the conduct

3  that he was -- that led to his having to

4  surrender his license?  What was he doing?  Was

5  he issuing prescriptions that he shouldn't have

6  or bad quantities or to fake patients?

7      A.    High quantities of opiate

8  prescriptions, a large volume of patients,

9  things of that nature, some combinations of

10  medications that were -- that were suspicious.

11      Q.    Was that investigation the result of

12  a lead from one of the pharmacy Defendants?

13      A.    I don't know.  I don't know if we

14  ever got a lead from any of the pharmacy

15  Defendants on it.

16      Q.    Okay.  Any other pain management

17  facilities or clinics that you recall being

18  involved with inspecting and/or investigating?

19      A.    As far as investigations go, those

20  are the -- those are the three primary ones

21  that -- that I can think of.  Inspections, I

22  would inspect each facility routinely.

23      Q.    And did that sometimes lead to

24  prosecutions?

25      A.    No.  The inspection was just -- the

Page 45

1    inspection was just an administrative process.
2    You know, I would go in.  There was several
3    areas of the facility that I would check.  I
4    would meet with the prescriber and/or the
5    office manager, but it was clearly an
6    administrative action, and it's just to ensure
7    that all the rules and regulations are being
8    followed as far as we can tell.
9         Q.    Okay.  Getting back to this
10   presentation to the board, you also inspected
11   wholesalers; is that right?
12        A.    Yes.
13        Q.    And what would that involve?  Would
14   that include a warehouse where drugs were
15   stored?  Did you inspect those types of
16   facilities?
17        A.    Oftentimes it would be a warehouse,
18   yes.
19        Q.    And Suboxone clinics, outpatient,
20   you inspected those from time to time?
21        A.    Yes.
22        Q.    And also virtual wholesalers and
23   manufacturers.  What is that?  What is a virtual
24   wholesaler and manufacturer?
25        A.    Well, a drug manufacturer is just a

1   facility that's, you know, manufacturing any

2   type of dangerous drugs.  But I've never

3   inspected a drug manufacturer facility.  I

4   don't have any that really lie in my area,

5   so --

6          Q.    Okay.  What is a virtual wholesaler,

7   though?

8          A.    A virtual wholesaler is -- you

9   know, I'm not exactly one hundred percent sure

10  of the definition of it, but it has something

11  to do with a third-party wholesaler, but I

12  can't -- I don't have the one hundred percent

13  definition for you of it.

14         Q.    Okay.  And then after -- we'll skip

15  dog trainers, although that's kind of

16  interesting.  Retail pharmacies, you inspected a

17  lot of those?

18         A.    Yes.

19         Q.    And did you inspect and have you

20  inspected many of the stores, retail pharmacy

21  stores owned by the pharmacy Defendants in this

22  case?

23         A.    Yes.

24         Q.    A couple pages -- the next page

25  lists the duties of an inspector, the types of

Page 47

1    investigations that they do and the types of

2    inspection -- and the types of inspections that

3    they do; is that right?

4         A.    Yes.

5         Q.    So inspectors also inspect retail

6    pharmacy locations besides nursing homes and

7    clinics and doctors' offices, et cetera; is that

8    right?

9         A.    Yes.

10         Q.    So there was a little bit of overlap

11   between what you as an agent did and what

12   inspectors did; is that right?

13         A.    Yes.

14         Q.    All right.  And then the next page

15   of this presentation shows -- it's captioned

16   "Inspections."  The next page is the inspection

17   standards.  So in this presentation to the

18   board, there's a statement of the purpose of

19   inspection standards, and I'll just read it

20   because I want to ask you if you agree with it.

21   "The purpose of inspection standards is to

22   ensure that all licensed distributors of

23   dangerous drugs (DDD) are inspected on a routine

24   and consistent basis.  The timing for conducting

25   these DDD inspections will be based on the known

Page 48

1   safety concerns associated with the individual

2   license types and business classes.  The board

3   also expects that the inspection process will be

4   sufficient to ensure all major areas of a DDD

5   location are evaluated over a clearly defined

6   period of time."

7           Is that how you understood the

8   purpose of inspections by the board, including

9   the types of inspections we just went over?

10          A.    Yes.

11          Q.    In the middle there, there's a

12  reference to the timing for conducting these

13  inspections being based upon the known safety

14  concerns associated with the individual license

15  types and business classes.  What does that mean

16  to you as an agent?

17          A.    Well, there's certain facilities

18  that we try to inspect, and we put like a, you

19  know, every 12 months, every year you want to

20  get in there and conduct an inspection.

21          Q.    Okay.  Are there certain facilities

22  that get inspected more and others that get

23  inspected less from the board's perspective?

24          A.    Yes.  As far as, you know, our

25  general concern is -- the places that we're in

1   the most, such as like a Suboxone clinic, a

2   pain management clinic, a retail pharmacy,

3   those are typically you want to try and inspect

4   them every 12 months.

5        Q.   Okay.  And is the reason for that --

6   well, let me just ask you, what are the reasons

7   for that?  Why inspect them more than other

8   places?

9        A.   Well, probably because, you know,

10  obviously, to start with a pharmacy, it's a --

11  you know, they're dispensing dangerous drugs.

12  There's, you know, a lot of public safety

13  interest that go along with that.  You know,

14  for a pain management clinic, these are

15  doctors' offices that are prescribing a large

16  amount of controlled substances, typically

17  opiates.  So, again, I think there's a --

18  there's a communal interest in ensuring that

19  those are inspected and, you know, all the

20  rules are being followed.  And the same thing

21  with really Suboxone clinics, because they're

22  prescribing a controlled substance to assist in

23  -- assist in with individuals that are addicted

24  to opiates.  So I think there's -- there's a

25  heightened priority on those because there's a

1   public safety interest and a community interest

2   in those facilities to be inspected regularly.

3          Q.    I see.  And so you try to inspect

4   those facilities, including retail pharmacies,

5   about once a year?

6          A.    Try to, depending on caseload,

7   casework, and, well, most recently, a pandemic.

8          Q.    And are these inspections

9   unannounced; in other words, you just show up

10  and you don't give these locations advanced

11  warning, like get ready, we're coming next week?

12         A.    Most -- most often they are

13  unannounced.

14         Q.    And is there an investigative reason

15  for that?

16         A.    I think it's you want to capture a

17  true sense of how they're conducting their

18  daily business.

19         Q.    Okay.  And indeed on this next page

20  of this Exhibit 5 there's a reference to

21  inspections; down at the bottom, "Pain

22  management facilities, every 12 months."  That's

23  pretty much what you just told us; is that

24  right?

25         A.    Yes.

Page 51

1          Q.    Okay.  And then the next -- two

2    pages after that, Bates number ending in 35401,

3    there's -- it looks to be the different types of

4    results of inspections.  You could either get a

5    verbal warning or you would require a written

6    response or a citation would be issued plus a

7    written response, or you could get suspended.

8    Those are the four types of outcomes of an

9    inspection; is that right?

10         A.    Yes.

11         Q.    All right.  Then down into the

12   ensuing pages of these -- of this presentation,

13   there's a section called "Audit Process,"

14   beginning on 35407.  Now, is an audit different

15   from an inspection?

16         A.    Yes.

17         Q.    How so?  What's the difference

18   between an audit and an inspection?

19         A.    So what we generally do with an

20   audit is we -- we basically use our independent

21   personnel and we will conduct counts of their

22   medications, when needed, to determine if there

23   is a greater loss or a small loss or just to

24   determine the amount of medication that they

25   are or are not accountable for.

Page 52

1      Q.    Now, on page 35408, "Audit Process
2   Discussion," it says, "A mandatory audit is
3   conducted in the event that a pharmacist or
4   intern is responsible for the loss of controlled
5   substances or it is determined that there was a
6   large or significant loss."
7            Is my understanding correct that an
8   audit would be triggered in those
9   circumstances; that's typically when you do an
10  audit, when you have a major loss or a large
11  loss or a pharmacist or an intern is actively
12  involved with diversion?
13     A.    Yeah, generally that's the guiding
14  principle for the audit.
15     Q.    Okay.  And so are a lot more
16  inspections done than audits because of that?
17     A.    Yes.
18     Q.    Okay.  On page 35410 there's a
19  listing of investigations conducted.  It says,
20  "SOBOP in the news."  What does SOBOP stand for?
21     A.    State of Ohio Board of Pharmacy.
22     Q.    Okay.  Is this a listing as of 2017
23  of some successful prosecutions of doctors and
24  pharmacists in the state or by the board as of
25  that point in time?

1          A.      Yes.

2          Q.      Were you involved in any of these

3     investigations and prosecutions?

4          A.      Yes.  The Dr. Paloski

5     investigation.

6          Q.      That's the one you referred to

7     earlier?

8          A.      Yes.

9          Q.      What about Jacklyn Cropper, a

10    pharmacist in Trumbull County; were you involved

11    in that?

12         A.      No.

13         Q.      Do you have any knowledge about that

14    investigation and prosecution other than what's

15    listed here?

16         A.      I think I'm familiar with it.  It

17    was before I was with the board, but I had no

18    involvement with it.

19         Q.      Okay.  The last section of this

20    presentation deals with Rx alerts -- Rx eAlerts

21    actually.  What is an Rx eAlert?

22         A.      I think it was a system that was

23    set up to -- to alert pharmacies or pharmacists

24    of fraudulent prescriptions, but it's -- it's

25    not implemented.  I don't think it's ever been

Page 54

1   implemented.

2        Q.    Okay.  In your experience -- and

3   you've outlined it well for us -- what are the

4   types of diversion that you've seen of

5   prescription drugs?  What form of -- forms of

6   diversion have you seen as a police officer and

7   as a board agent?

8        A.    I think I've seen -- seen instances

9   where people will illegally process a

10  prescription to obtain medication, where they

11  will deceive prescribers to obtain medication,

12  where an individual will, maybe if they have

13  prescriptive authority, prescribe medication to

14  themselves, a pharmacy -- a pharmacist or

15  pharmacy technician will steal medication from

16  the pharmacy, and ultimately when a prescriber

17  is prescribing medication that's outside the

18  normal scope of their practice.

19       Q.    Have the forms of diversion changed

20  over time in your law enforcement experience?  I

21  mean, do criminals respond and evolve as

22  investigations respond and evolve?

23       A.    Yeah, I think they do.  You know,

24  back in the early 2000s deception to obtain a

25  dangerous drug happened much more than it does

Page 55

1    now.

2        Q.    So that type of diversion has

3    decreased.  What, in your experience, is the

4    cause of the decrease?

5        A.    My opinion is that it's due to

6    pharmacists and prescribers utilizing OARRS.

7        Q.    And so the criminal activity or the

8    deceptive activity has moved from that type of

9    deception to new forms of deception; is that

10   right?

11       A.    I don't know that there's really

12   any new forms, but deception to obtain, seeing

13   multiple prescribers, has been on the decrease

14   ever since the early 2000s.

15       Q.    And you attribute that to OARRS, the

16   OARRS --

17       A.    Yes.  Yes.

18       Q.    What about other types of diversion?

19   Have you seen trends increase or decrease over

20   time or change over time?

21       A.    Yeah.  I think -- I personally

22   think that prescribing of opiates has decreased

23   quite a bit probably in the past ten years.

24       Q.    And is it the same reason?  Is it

25   the prevalence of the OARRS database?

1      A.    Yes.  I think it's that and it's

2  also, you know, prescribers see other

3  prescribers get in trouble for doing something

4  that they do similar and, frankly, they don't

5  want it to happen to them.

6      Q.    Okay.  And so what are the current

7  primary forms of diversion?  If those types of

8  diversions and prescribing of opiates have

9  decreased, what are you seeing now as an agent?

10  What are the problem areas?

11      A.    The thing that I deal with the most

12  is theft of drugs, and that can be -- again, it

13  could be a pharmacist, pharmacy technician, a

14  nurse, it could be a doctor, it could be really

15  anyone that has access to any type of drug

16  stock.

17      Q.    Okay.  And in your current position

18  do you get into investigations of, you know,

19  major drug trafficking, like, you know, fentanyl

20  coming in from out of state, things of that

21  nature, or are you more in the pharmacy

22  regulatory area now?

23      A.    Yes, primarily pharmacy regulatory.

24  As far as fentanyl, there's -- there's still a

25  pharmaceutical grade fentanyl patch, which

Page 57

1    would fall into the regulatory issue with the

2    pharmacies, but there's also the, you know,

3    illicit fentanyl that's coming from some sort

4    of, you know, out-of-country clandestine lab,

5    so with that type of fentanyl we don't get

6    involved in those types of -- those types of

7    investigations.

8         Q.    I see.  In your investigations of

9    these doctors like Dr. Paloski -- Paloski I

10   should say -- do they take a long time, years,

11   for example?

12        A.    Generally, yes.

13        Q.    And in those investigations do you

14   typically need to pull in a specialist, a

15   pharmacist specialist at your agency in order to

16   assist from the clinical aspects of the

17   investigation?

18        A.    We do from time to time.

19        Q.    Approximately how many inspections

20   of retail pharmacy locations have you conducted,

21   Agent DiFrangia, in your experience, four and a

22   half years of experience at the board?

23        A.    Total, I would say over a hundred.

24        Q.    And have any of those resulted in

25   criminal investigations of the pharmacy or the

Page 58

1   pharmacists resulting in successful

2   prosecutions?

3         A.    No.  The inspections are generally

4   just an administrative review.  You'd have to

5   really kind of see something really egregious

6   that an inspection would transmit into a

7   criminal proceeding.

8         Q.    I see.  Before you go in to do an

9   inspection of a pharmacy, do you look at the

10  past inspection history of the pharmacy or maybe

11  the last couple of inspections?

12        A.    Yes.

13        Q.    And why do you do that?

14        A.    I want to see who was there last.

15  I don't want to go to a pharmacy that, you

16  know, someone conducted an inspection last

17  month on, and then I also want to see if there

18  was any -- any corrective action given last

19  time, because those are areas that I will make

20  sure that I review to ensure that, you know,

21  they have responded adequately to the

22  corrective action.

23        Q.    In terms of the two counties that

24  are the Plaintiffs in this case, Lake and

25  Trumbull County, have you done any inspections

Page 59

1  in Lake County?

2          A.    I don't think so, not that I -- not

3  that I recall.

4          Q.    But you have performed inspections

5  in Trumbull County?

6          A.    Yes.

7          Q.    Have you performed a lot of

8  inspections in Trumbull County?  For example, I

9  know that you've inspected four Giant Eagle

10  pharmacies in Trumbull County.  Is that about

11  right?

12          A.    Well, from what I saw in the

13  packet, there's four reports; however, some of

14  those aren't inspections.  Those are merely

15  property receipts.

16          Q.    Okay.  And what is a property

17  receipt?  Is that something where you go in and

18  you take records from the pharmacy for your

19  investigations?

20          A.    Yes.

21          Q.    All right.  So back to my question.

22  You've done inspections in Trumbull County you

23  told us.  I'm just trying to get a sense of --

24  did you inspect all of the pharmacy defendant

25  stores, Giant Eagle, Rite-Aid, Walmart,

Page 60

1   Walgreens and CVS?

2        A.    In Trumbull County?

3        Q.    Yes.

4        A.    No, I did not inspect every single

5   one of those in Trumbull County or even some of

6   those pharmacies, like a Walmart in Trumbull

7   County I've never conducted an inspection at.

8        Q.    That would be another agent in the

9   northeast region that would do that?

10       A.    No.  It would be me -- it would be

11  my responsibility; however, I just have never

12  gone into a Walmart in Trumbull County to

13  conduct an inspection.

14       Q.    Have you ever gone into a Walmart to

15  inspect?

16       A.    Yes.  I have when I was training,

17  when I was still doing training.

18       Q.    Okay.  Before -- besides looking at

19  the past inspection reports, do you take a look

20  at OARRS, the OARRS database, for the pharmacy

21  to get a sense of volume, types of drugs being

22  dispensed, things of that nature?

23       A.    Typically with just a random

24  inspection, no, I do not inspect -- I do not

25  review OARRS.

1          Q.     All right.  But the board -- you

2     know that the pharmacies are reporting on a

3     daily basis into the OARRS database?

4          A.     Yes.

5          Q.     So the board -- any time an

6     inspection occurs, the board has the ability to

7     check that pharmacy location's dispensing

8     activities for all drugs before going in for an

9     inspection; is that right?

10          A.     Yes.  We have the ability to.

11          Q.     Okay.  Are you familiar with the

12     Ohio Administrative Code, the regulations

13     governing pharmacies and pharmacists?

14          A.     Yes.  Which code -- which code

15     specifically are we discussing?

16          Q.     I'm talking about the Administrative

17     Code Sections 4729 related to pharmacies and

18     pharmacists.

19          A.     Yes.

20          Q.     Okay.  Is that part of your role as

21     an agent, to be familiar with those regulations?

22          A.     Yes.

23          Q.     Okay.  And you know that those

24     regulations have certain requirements.  One is

25     called the security requirement, to have

Page 62

1    effective and approved controls and procedures

2    to deter and detect theft and diversion of

3    dangerous drugs?

4           A.    Yes.

5           Q.    All right.  And that's a regulatory

6    requirement in the Ohio Administrative Code,

7    correct?

8           A.    Yes.

9           Q.    And according to those provisions,

10   pharmacies must be in substantial compliance

11   with those provisions based upon a multitude of

12   factors, including the type of activity being

13   conducted, the nature of the location, and other

14   factors; is that right?

15          A.    Yes.

16          Q.    And so when you did your

17   inspections, was one of the purposes of your

18   inspections to make sure that the pharmacists --

19   pharmacies were complying with that security

20   requirement?

21          A.    Yes.

22          Q.    Okay.  Did you work from time to

23   time with pharmacy loss prevention departments

24   for any of the pharmacy Defendants?

25          A.    Yes.

Page 63

1          Q.    And first I'll ask about Giant

2     Eagle.  Did you work with Giant Eagle's loss

3     prevention department, and specifically a

4     gentleman by the name of Rick Shaheen, who is in

5     charge of Giant Eagle's loss prevention --

6     pharmacy loss prevention department?

7          A.    Yes, I've worked with Mr. Shaheen.

8          Q.    And with respect to the other

9     pharmacy Defendants, did you work with their

10    loss prevention departments?

11         A.    I have -- yes, I have.  Walmart,

12    there was -- he was a district pharmacy manager

13    that I have worked with, but as far as a loss

14    prevention person, that would just be like the

15    store-level person that I've worked with on

16    occasion.

17         Q.    Okay.  Any of the other pharmacy

18    Defendants that you can recall?

19         A.    Yes.  Each of the other pharmacy

20    Defendants I have worked with their loss

21    prevention, their pharmacy loss prevention

22    personnel.

23         Q.    Did you view it as a good internal

24    control for the pharmacy Defendants to even have

25    a loss prevention department?

1          A.    Yes.

2          Q.    How so?  Why was that a good

3     internal control?

4          A.    Well, they're adhering to our rules

5     and, you know, you've got a pharmacy that's

6     full of several different drugs, and not even

7     just controlled drugs and opiates, but, you

8     know, you have expensive medication, and I'm

9     sure everyone has a vested interest to make

10    sure that there's accountability for all that,

11    not -- you know, let alone not to mention the

12    issues of some of these drugs are extremely

13    addictive and we want to ensure that they're

14    being dispensed to an individual pursuant to a

15    prescription.

16         Q.    I see.  And do the pharmacy

17    Defendants' loss prevention departments provide

18    leads to you from time to time of diversion

19    activities or things to investigate?

20         A.    Yes.

21         Q.    Specifically -- I'll talk about

22    Giant Eagle first.  Do you recall Mr. Shaheen

23    calling you from time to time and telling you

24    about specific issues that had arisen in certain

25    pharmacies in terms of potential diversion

Page 65

1    activities?

2          A.    Yes.

3          Q.    And were those good leads in the

4    sense that he was, you know, being cooperative

5    with you and initiating law enforcement

6    involvement by saying we've got X problem at Y

7    pharmacy, we want you to be involved?

8          A.    Yes.

9          Q.    Okay.  And was that the same for the

10   other pharmacy Defendants, their loss prevention

11   heads or members would, similarly, provide leads

12   to you and the other board members related to

13   diversion activities?

14         A.    All except for Walmart.  I don't

15   think I've ever had an instance of any type of

16   diversion regarding a Walmart employee or -- I

17   take that back.  I have been notified in my

18   prior career of improper prescribing by a

19   Walmart pharmacist and pharmacy tech.  So I

20   stand corrected.  I would say everyone has

21   contacted me at some point within my entire

22   career.

23         Q.    Did that -- did you view that type

24   of activity, being contacted by the pharmacy

25   Defendants, to be a positive indication to you

1    of pharmacies attempting to comply with the

2    rules by engaging with agents at the board and

3    providing leads and notice of potential

4    diversion?

5              MR. WEINBERGER:  Objection.

6         A.    Yes.

7         Q.    With respect to the interactions

8    with the Giant Eagle loss prevention department,

9    do you recall any specific examples of Rick

10   Shaheen providing leads to you concerning

11   activities at Giant Eagle pharmacies?

12        A.    Yes.  We've -- him and I have

13   investigated a few individuals that were

14   stealing drugs from pharmacies.  I've requested

15   his assistance on several other investigations

16   regarding, you know, a video for suspects of

17   illegal processing or anything of that nature,

18   or even sometimes I've asked for information

19   of, you know, Giant Eagle Advantage cards that

20   was used to purchase a fraudulent prescription.

21        Q.    Okay.  And did Mr. Shaheen -- did

22   you find him to be competent and -- as an

23   investigator himself?

24        A.    Yes.

25        Q.    Did he assist you from time to time

Page 67

1  in setting up video surveillance to detect

2  illegal activities?

3          A.     Yes.

4          Q.     And did that result in successful

5  investigations and prosecutions of individuals?

6          A.     Yes.

7          Q.     And did he provide, when requested,

8  Giant Eagle Advantage Card information to assist

9  in your investigations?

10          A.     Yes.

11          Q.     Do you recall any notable incidents

12  that you worked with Mr. Shaheen involving

13  illegal activities?  Does anything come to mind?

14          A.     We've had several cases and he's

15  helped me out.  I had -- had a doctor that was

16  writing prescriptions to his wife for

17  controlled substances.  I believe he provided

18  the video for that.  And, you know, recently I

19  had a physician that was doing something

20  similar, and he provided the Advantage Card

21  information.  He's contacted me countless

22  amounts of times when his pharmacists have --

23  have found an illegal prescription or a

24  fraudulent prescription.  Generally, depending

25  on the instance, I direct them to -- I direct

Page 68

1   them to local law enforcement, but we've also

2   investigated pharmacy technicians that have

3   been diverting drugs, and, you know, him and I

4   have successfully interviewed them and

5   successfully obtained, you know,

6   acknowledgments of individuals doing that

7   activity.

8          Q.    I see.

9              In your engagements with Rick

10  Shaheen and the loss -- Giant Eagle loss

11  prevention department, did you find them to be

12  cooperative and proactive in attempting to

13  avoid diversion and investigate and prosecute

14  diversion?

15         A.    Yes.

16         Q.    Would the same be true of the other

17  pharmacy Defendants?

18         A.    Yes.

19         Q.    Do you recall at any time ever

20  believing that any of the pharmacy Defendants

21  were causing diversion themselves?

22         A.    Could you rephrase that?

23         Q.    Sure, and I'll break it down.

24              You gave us a nice description of

25  your work with Rick Shaheen and the Giant Eagle

Page 69

1    loss prevention department.  My follow-up

2    question is, did you at any time believe that

3    Giant Eagle was itself violating any of the

4    pharmacy rules and regulations itself and

5    causing diversion itself?

6              MR. WEINBERGER:  Objection.

7         Q.    You can answer.

8         A.    Okay.  No.  There was nothing that

9    I -- that I could think of that led me to

10   believe that.

11        Q.    What about with respect to the other

12   pharmacy Defendants?

13             MR. WEINBERGER:  Objection.

14        A.    And, again, I -- I -- you know,

15   there's, again, nothing that comes to mind for

16   them.

17                  -   -   -   -   -

18             (Thereupon, Deposition Exhibit 3,

19             E-Mail String, Beginning Bates

20             Stamp LAKE000068980, was marked for

21             purposes of identification.)

22                  -   -   -   -   -

23        Q.    I'm going to direct your attention

24   to DiFrangia Exhibit 3, which is at the end of

25   your second binder.  It's an e-mail marked

Page 70

1   LAKE-68980. Have you had a chance to look at

2   that, sir?

3        A.    Yes.

4        Q.    There's a reference there to a

5   Dr. Thomas Detesco, D-E-T-E-S-C-O.

6        A.    Yes.

7        Q.    Were you involved in investigation

8   of Dr. Detesco?

9        A.    No, not in the investigation.

10       Q.    All right. But you were e-mailing

11  about him and you state that "He is retired from

12  practicing in the Youngstown area, however his

13  DEA credentials are still active and have been

14  compromised." What did you mean by that in this

15  e-mail?

16       A.    That someone had obtained his DEA

17  credentials and basically were issuing

18  prescriptions without his -- without his

19  knowledge or without his authorization.

20       Q.    So that's a type of diversion

21  itself, correct?

22       A.    Yes. Yes.

23       Q.    At the end of that e-mail you say

24  that -- there's a reference to coming from

25  Detroit.

Page 71

1            Do you see that?

2        A.    Yes.

3        Q.    What did you mean there?  What does

4    that mean?

5        A.    So what this -- this instance, from

6    what I recall, there was a state trooper I

7    spoke with that had stopped a vehicle and the

8    vehicle had several of these blank

9    prescriptions utilizing this prescriber's name

10   and prescribing credentials, and the vehicle

11   was supposedly coming from Detroit, vehicle and

12   its occupants.

13       Q.    I see.

14            In your experience at the board or

15   prior as a detective and patrolman, do you have

16   any experience with illegal drugs coming in

17   from Detroit?

18       A.    Yes.

19       Q.    Was that a problem in Trumbull or

20   Lake Counties?

21       A.    I think for Trumbull it was, but

22   most of our investigations did not -- did not

23   have a Trumbull County nexus when I was a

24   policeman or when I was with the drug task

25   force, and, you know, these were kind of like

Page 72

1    fractions that -- from what I recall at the

2    time, there was a Warren to -- Warren, which is

3    in Trumbull County, a Warren to Detroit nexus

4    for -- for drug trafficking, but mostly within

5    Mahoning County it was typically Akron,

6    Columbus, New York, Atlanta even, it was those

7    types of major hubs that seemed to be supplying

8    most of the individuals we were investigating.

9         Q.    Okay.  Let me ask you this:  When

10   you would begin an investigation of a doctor for

11   whatever reason, would you advise the pharmacies

12   in the area to stop filling his prescriptions,

13   his or her prescriptions?

14        A.    No.

15        Q.    Why not?

16        A.    Well, a pharmacist has their --

17   they have to exercise their own -- their own

18   professional judgment in dispensing

19   prescriptions, which I don't have any of their

20   education, their clinical background or, you

21   know, really the ability to provide them any of

22   that professional judgment.  So I leave the

23   judgment on to them, but I -- you know, that's

24   primarily the driving force for why I don't

25   advise them to or not to fill prescriptions.

1      Q.    Does it have anything to do with not

2   wanting to tip off the doctor that he's under

3   investigation?

4             MR. WEINBERGER:  Objection.

5      Q.    You can answer.

6      A.    That -- that's -- that is a typical

7   outcome that could happen; however, again, I

8   leave it up to them.  I tell them utilize your

9   professional judgment.  If they have concerns

10  with the amount of opiates and they decide

11  that, you know, there's -- they don't want to

12  dispense the medication, it's completely on

13  their -- their professional judgment to do so.

14     Q.    Okay.  And, in your experience, that

15  involves a multitude of factors, is that

16  correct, not only just data but also other

17  things that the pharmacists will consider?

18            MR. WEINBERGER:  Objection.

19     Q.    Is that right?

20            MR. WEINBERGER:  Objection.

21     A.    Yes, that's correct.

22     Q.    Okay.  Do you recall an

23  investigation of a doctor I believe by the name

24  of Skiffey, S-K-I-F-F-E-Y?

25     A.    Yes.

1       Q.      Were you involved in that

2    investigation?

3       A.      Yes.

4       Q.      What -- let me ask this:  Where is

5    Dr. Skiffey located, his practice?

6       A.      It's in Niles, Ohio, which is in

7    Trumbull County.

8       Q.      And when did you become involved

9    with the Dr. Skiffey investigation?

10      A.      That was April of 2019.

11      Q.      And is that an ongoing investigation

12   or is that concluded?

13      A.      It's concluded.

14      Q.      How did it conclude?

15      A.      Well, the suggested criminal

16   portion is still with the Trumbull County

17   Prosecutor's Office.  As of this date, he

18   hasn't been prosecuted criminally, but I have

19   handed my investigation over to them.

20      Q.      I see.

21              And what did your investigation

22   reveal about Dr. Skiffey?

23      A.      He had a live-in girlfriend that he

24   was prescribing a regular amount of Valium and

25   some occasional opiates to, and after

Page 75

1    interviewing him, he failed to document the

2    vast majority of those prescriptions within her

3    patient file.

4          Q.    I see.

5                Was that investigation open as a

6    result of a tip or a lead from any of the

7    pharmacy Defendants?

8          A.    No.  That was actually a complaint

9    from his girlfriend's family members.

10          Q.    And did you obtain property from a

11    couple of Giant Eagle pharmacies in connection

12    with that investigation?

13          A.    Yes.

14                    -    -    -    -    -

15                (Thereupon, Deposition Exhibit 6,

16                State of Ohio Board of Pharmacy

17                Property Receipt, dated September

18                18, 2019, Beginning Bates Stamp

19                BOP_MDL2796412, was marked for

20                purposes of identification.)

21                    -    -    -    -    -

22                (Thereupon, Deposition Exhibit 8,

23                State of Ohio Board of Pharmacy

24                Property Receipt, dated September

25                18, 2019, Beginning Bates Stamp

Page 76

1           BOP_MDL2796570, was marked for

2           purposes of identification.)

3               -   -   -   -   -

4      Q.    Is that shown on Exhibits 6 and 8?

5  DiFrangia Exhibit 6 and DiFrangia Exhibit 8, are

6  these receipts showing you going to Giant Eagle

7  pharmacies and obtaining pharmacy records,

8  things of that nature?

9      A.    Yes.   These are -- this is

10 documentation of me seizing those original

11 prescriptions.

12     Q.    I see.

13           And you wanted those prescriptions

14 in order to prosecute him?

15     A.    Yes.

16     Q.    Dr. Skiffey?

17     A.    Yes.

18               -   -   -   -   -

19           (Thereupon, Deposition Exhibit 4,

20           Consent Agreement Between James J.

21           Skiffey, DDS and the Ohio State

22           Dental Board, was marked for

23           purposes of identification.)

24               -   -   -   -   -

25     Q.    Okay.   And is Exhibit 4 in the

Page 77

1   binder, DiFrangia Exhibit 4, one of the results

2   of your investigation of Dr. Skiffey?

3        A.    Yes, that is.

4        Q.    And did Dr. Skiffey surrender his

5   DEA registration as part of this agreement?

6        A.    Yes, he did.  He surrendered his

7   DEA certificate.

8        Q.    Did he do anything else besides

9   surrender his certificate, to your recollection?

10       A.    No.  He might have had some

11   additional penalties through the dental board,

12   but as far as I can recall, he surrendered his

13   DEA certificate.

14                   -   -   -   -   -

15                (Thereupon, Deposition Exhibit 2,

16                E-Mail String, Beginning Bates

17                Stamp TRUM001765557, was marked for

18                purposes of identification.)

19                   -   -   -   -   -

20       Q.    Okay.  Look at Exhibit 2, DiFrangia

21   Exhibit 2 in your binder.  It appears to be some

22   e-mail communications between you and I think

23   it's a prosecutor; is that right?

24       A.    Yes.

25       Q.    And includes Dr. Skiffey and two

1   others, Donna George and a pharmacist by the

2   name of Alan Mike?

3          A.    Yes.

4          Q.    And so these are pending criminal

5   prosecutions as of May and June of 2020?

6          A.    Correct, and they're still pending.

7                      -   -   -   -   -

8                (Thereupon, Deposition Exhibit 7,

9                Barricade Inspection, was marked

10               for purposes of identification.)

11                     -   -   -   -   -

12         Q.    Now, Exhibit 7 in your binder

13  references a so-called barricade inspection of a

14  Giant Eagle pharmacy on Elm Road in Warren,

15  Ohio; is that right?

16         A.    Yes.

17         Q.    What is a barricade inspection?

18         A.    So it's generally to just check

19  the -- check the barricade, which consists of

20  the storage of the records outside of the

21  pharmacy, and then the actual outside

22  barricade, which, as you may have seen before,

23  it's a cage sometimes that comes down,

24  depending on the pharmacy.  But, you know, we

25  check the external locks, check the surrounding

Page 79

1   area, ensure only the people that have access

2   are the people by law that can have access to

3   the pharmacy.

4          Q.    I see in this inspection on page 3

5   of 4 you mention in this report that Giant Eagle

6   store 1419 was the victim of a possible breaking

7   and entering during May of 2017 through a roof

8   of an adjoining business.

9                Do you recall that?

10         A.    Yes.

11         Q.    So is that something that happens

12  from time to time, that type of breaking and

13  entering, going through roofs of businesses?

14         A.    Yes.

15         Q.    Did Giant Eagle cooperate with

16  investigation -- or, I'm sorry, this inspection

17  and anything related to the -- any loss related

18  to the breaking and enterings?

19         A.    Yes.  From what I recall, they

20  contacted me and asked me to come out and take

21  a look.

22         Q.    Do you recall investigating a doctor

23  by the name of Prommersberger?

24         A.    Yes.

25         Q.    He was a podiatrist; is that right?

Page 80

1          A.     Yes.  He still is a podiatrist.

2          Q.     Okay.  How was that investigation

3     started?  Were you provided a lead from

4     somebody?

5          A.     Yes, I was provided -- we were

6     provided leads and -- leads, various types of

7     leads.

8                      -    -    -    -    -

9                 (Thereupon, Deposition Exhibit 10,

10                James E. Prommersberger, DPM Search

11                Warrant, with Attachments,

12                Beginning Bates Stamp

13                BOP_-MDL1191777, was marked for

14                purposes of identification.)

15                     -    -    -    -    -

16         Q.     All right.  Did -- if you look at

17    page 6 of Exhibit 10, DiFrangia Exhibit 10, this

18    is an affidavit and search warrant for James E.

19    Prommersberger, DPM for his facility at Advanced

20    Arthroscopic Foot & Ankle Associates, Inc. in

21    Boardman, Ohio; is that right?

22         A.     Yes.

23         Q.     Is this your search warrant

24    affidavit?

25         A.     Yes, it was mine, and there was

Page 81

1   another agent, him and I worked on this

2   investigation together, and then we had someone

3   that was actually -- we had a law enforcement

4   officer that was the affiant.

5        Q.    I see.  And this is dated -- I'm

6   looking at the back.  Why don't you tell me.

7   When approximately was this search warrant

8   affidavit prepared?

9        A.    This was the end of August 2017.

10        Q.    If you look at page 6 at the bottom,

11   under the section Criminal Activity Detailed,

12   beginning with paragraph 2 there appears to be a

13   listing of all of the contacts and complaints

14   from various sources.

15           Do you see that?

16        A.    Yes.

17        Q.    And would you look at the paragraph

18   2(a)?  On September 29th, 2014 it references you

19   and Agent Bonish of the Board of Pharmacy

20   received information concerning the questionable

21   prescribing habits of Dr. James E.

22   Prommersberger from multiple registered

23   pharmacists practicing at Giant Eagle's number

24   4075 located just over 1,000 feet from the

25   office of Dr. James Prommersberger.  Does this

Page 82

1    refresh your recollection, sir, that this

2    investigation and prosecution of

3    Dr. Prommersberger began with Giant Eagle

4    pharmacists?

5         A.    Yes.

6         Q.    And from there your search warrant

7    continues to list multiple subsequent contacts

8    regarding his activities; am I right?  You seem

9    to go in chronological order detailing each and

10   every activity and complaint that you received

11   about this doctor.

12        A.    Yes.

13        Q.    I'm going to refer you to paragraph

14   C.  There's a reference to a Kroger Pharmacy

15   making a complaint.

16              Do you see that?

17        A.    Yes.

18        Q.    Paragraph D, a Walmart pharmacist

19   complaining -- I'm sorry, a pharmacy technician

20   employed at Walmart?

21        A.    Yes.

22        Q.    That was another source of

23   complaints.  Paragraph F, an employee of Walmart

24   pharmacy 2211, do you see that?

25        A.    Yes.

Page 83

1      Q.    And then paragraph G, Fred's Family

2   Pharmacy, yet another source of complaint for

3   this doctor.

4           Does that refresh your recollection

5   that you were getting multiple complaints from

6   multiple pharmacists and pharmacy employees,

7   including Giant Eagle, Kroger, Walmart,

8   complaining about this doctor?

9      A.    Yes.

10     Q.    Okay.  And what was the nature of

11  these complaints?  What was Dr. Prommersberger

12  doing according to these complaints?

13     A.    Well, it seemed that these were

14  typically patients that did not live within the

15  geographical area and they were coming to Dr.

16  Prommersberger's office, they were being issued

17  prescriptions for opiates, and a lot of these

18  patients had several -- they were -- similar

19  prescriptions were being issued to all of them,

20  so a lot of their drug therapies were

21  identical, which typically is a red flag.

22     Q.    Okay.  And did your investigation

23  prove that to be true, that this doctor was

24  inappropriately prescribing opioids?

25     A.    Yes.

1      Q.    What is the status of the

2   prosecution of this doctor?

3      A.    He's been indicted through Mahoning

4   County and we're currently awaiting a trial.

5      Q.    And do you expect to use Giant Eagle

6   pharmacists or Walmart pharmacists in this

7   prosecution and trial in any way?

8      A.    If the prosecutor deems it

9   necessary.

10     Q.    Okay.  Besides providing the initial

11  leads, did these pharmacies and pharmacists,

12  Giant Eagle and Walmart and these others listed,

13  did they cooperate with your investigation and

14  provide whatever records or assistance you

15  needed?

16     A.    Yes.

17     Q.    I understand that you have an open

18  investigation of another pharmacy, and because

19  it's open, I'm only going to refer to the name

20  once.  Brown's Pharmacy?

21     A.    Yes.

22     Q.    And is that an independent pharmacy

23  in Trumbull County?

24     A.    It's an independent pharmacy in

25  Mahoning County.

Page 85

1          Q.     That's a pending investigation, it's

2     open; is that right?

3          A.     It's open and active.

4          Q.     Okay.  I'm going to not ask any

5     further questions because I've been advised that

6     it's open and active.

7          A.     Thank you.

8          Q.     Sure.

9                 Have you received leads from

10    Rite-Aid from time to time concerning potential

11    diversion activities?

12         A.     Yes.

13         Q.     Have you worked with Rite-Aid's loss

14    prevention department to investigate and

15    prosecute diversion activities?

16         A.     Yes.

17         Q.     Would that include things like

18    deception and stealing of drugs?

19         A.     Yes.

20         Q.     Did Rite-Aid appear to have a

21    proactive and competent loss prevention

22    department that worked with you?

23         A.     Yes.

24                    -    -    -    -    -

25                 (Thereupon, Deposition Exhibit 9,

Page 86

1                One-Page Document Entitled

2                "Prescription Drug Investigations -

3                Techniques and Workflow," was

4                marked for purposes of

5                identification.)

6                    -    -    -    -    -

7        Q.    If you look at DiFrangia Exhibit 9,

8    this is a document captioned "Prescription Drug

9    Investigations - Techniques and Workflow."

10                Do you see that?

11        A.    Yes.

12        Q.    What is this exactly?  I was trying

13    to -- and the only reason I put it in here is

14    because I couldn't get a full grasp on what

15    this -- what this is.

16        A.    This looks like an internal

17    document.  It's just giving some guidance on

18    how to approach determining whether you have a

19    prescribing issue with a prescriber.

20        Q.    Is this kind of like a general

21    checklist of things to do for agents when they

22    receive a tip, how to go about it?

23        A.    Yes.

24        Q.    Does the Ohio Board of Pharmacy have

25    subpoena powers and the right to go into the

Page 87

1   OARRS database as part of its investigations?

2        A.    Yes.  So we have administrative

3   subpoena powers through the Ohio Board of

4   Pharmacy and then we are able to access OARRS

5   data for investigations.

6        Q.    And when you access OARRS data as

7   part of investigations, you're entitled to look

8   at all of the OARRS data, correct, not just

9   limited pieces of the data; is that right?

10       A.    Correct.

11       Q.    Indeed that's one of the reasons

12  OARRS was created was to assist law enforcement

13  to get all of the prescription data from all of

14  the pharmacies so that there would be a database

15  that law enforcement could look at to see

16  activity across pharmacies throughout the entire

17  state, right?

18       A.    Yes.  Part of it is assisting law

19  enforcement, but it's also assisting

20  prescribers and pharmacies and pharmacists.

21       Q.    Right.  So when a doctor writes a

22  prescription, part of his duties is to check

23  OARRS for certain types of prescriptions; is

24  that right?

25       A.    Yes.

1      Q.    So even before the prescription is

2  filled out, the doctor is supposed to check

3  OARRS for prescribing to the specific patient in

4  front of him; is that right?

5      A.    Yes.

6      Q.    So when the doctor checks OARRS

7  before writing the prescription, is he able to

8  see other prescriptions that this same patient

9  has obtained, for example, another doctor across

10 town or another doctor in the practice, things

11 of that nature?

12     A.    Yes.  They can see other

13 prescriptions for controlled substances only.

14     Q.    Okay.  No matter who issued them?

15 For example, it's not just me, the doctor, if I

16 check on this patient, I'm not just going in and

17 seeing what I prescribed to him, I'm seeing what

18 other doctors have prescribed to him in terms of

19 controlled substances?

20     A.    Correct.

21     Q.    But can the doctor look at other

22 doctors prescribing other than that patient?

23 For example, if a doctor saw that Dr. -- that

24 his patient in front of him was -- had seen

25 Dr. Smith a week earlier and got the same

1    prescription, am I right that the doctor would

2    only see that this patient got the same

3    prescription from some other doctor?

4         A.    Yes, that's correct.

5         Q.    But if he wanted to -- if that

6    doctor wanted to look at Dr. Smith's general

7    prescribing habits, he wouldn't be able to do

8    that, right?

9         A.    Correct.

10        Q.    But the board agents could do that?

11        A.    Yes.

12        Q.    That's the way that's set up?

13        A.    Yes.

14        Q.    So the doctor is limited to the

15   patient's controlled substance prescription

16   history only when he writes the prescription?

17        A.    Yes.  Now, a doctor can also review

18   their own prescribing through OARRS, but that's

19   it.

20        Q.    Okay.  So once the doctor reviews

21   OARRS and writes the prescription and the

22   patient goes to -- picks a pharmacy to get it

23   filled, what can the pharmacist see when he

24   accesses OARRS?

25        A.    They can -- they can see the same

1   thing, just the patient's history of controlled

2   substances that have been dispensed to them.

3        Q.    So the pharmacist doesn't have the

4   ability to say I want to see Dr. -- both

5   doctors' complete histories of what they're

6   doing?

7        A.    Correct.  Through OARRS they

8   cannot.

9        Q.    Okay.  And nor do the pharmacies

10  have subpoena powers, like the agents of the

11  board have; is that right?

12       A.    As far as I know, they do not have

13  subpoena powers.

14       Q.    Okay.  And, in your experience, do

15  you understand that it's the board's

16  responsibility to investigate diversion using

17  the OARRS database, that that's their primary

18  responsibility?

19       A.    Yes.

20            MR. BARNES:  We've been at it an

21  hour and 45 minutes.  Why don't we take a

22  ten-minute break.

23            THE VIDEOGRAPHER:  Going off the

24  record at 10:43.

25                 (Recess had.)

Page 91

1              THE VIDEOGRAPHER:  We are back on

2      the video record at 10:54.

3      BY MR. BARNES:

4          Q.    Mr. or Agent DiFrangia, we're back

5      on the record after a short break.  I want to

6      switch now to the licensing requirements set

7      forth in the Ohio regulations related to

8      pharmacies.  Are you familiar with those

9      regulations?

10         A.    Yes.

11         Q.    Am I correct, sir, that Ohio

12     regulations call a pharmacy a terminal

13     distributor?  Is that the regulatory language, a

14     TDDD?

15         A.    Yes.  Go ahead.

16         Q.    It's a TDDD, terminal distributor of

17     dangerous drugs?

18         A.    Yes.

19         Q.    Known to laymen as a pharmacy?

20         A.    Yes.

21         Q.    Okay.  Now, pharmacies have to be

22     licensed in Ohio; is that correct?

23         A.    Correct.

24         Q.    And in order to get that license,

25     they have to apply to and be approved by the

Page 92

1    Ohio Board of Pharmacy?

2          A.     Yes.

3          Q.     And in order to go through that

4    process, they have to be inspected and reviewed

5    by board employees?

6          A.     Yes.

7          Q.     Can you describe for us what those

8    inspections and reviews entail?  I guess what

9    I'm getting at is, how easy is it to get a board

10   license?  Is it send in a $25 check and give

11   them your name and you can open up shop or is it

12   more rigorous than that?

13         A.     No.  It's more rigorous.  There's

14   an application process.  There's a background

15   check that has to be conducted on ownership,

16   and then, you know, if the background check is

17   consistent, FBI BCI records check, and then

18   also internal background check.  So if this is

19   a person that maybe we have dealt with in some

20   capacity, there's going to be a record of it,

21   and then the license -- the application is

22   processed by our licensing department.  If

23   everything is okay, it's sent out to an agent

24   or an inspector, generally an inspector at this

25   point, and they will go conduct a -- you know,

Page 93

1   an initial barricade inspection.  If this is a

2   pharmacy that is just -- you know, just getting

3   up and going, maybe they occupied new space or

4   they built a new building, at that point we go

5   in and ensure that they have the bare bones

6   basic things to run a pharmacy, such as

7   adequate locks, you know, an alarm system of

8   some sort, access is limited to just

9   pharmacists, and, you know, they have some

10  systems in place to start obtaining drug orders

11  from different wholesalers.  So it's -- it's a

12  rigorous process.  And then, you know,

13  there's -- there's a fee that has to be paid.

14  And, you know, at that point, once you're up

15  and running, then you basically agree to future

16  inspections by us.  You agree to, you know,

17  ensure that all the rules and regulations are

18  followed.

19       Q.    Okay.  And you have to maintain that

20  license, right?  It's not once you're licensed,

21  you're forever licensed, you have to renew your

22  license from time to time; is that right?

23       A.    Correct.  It needs renewed -- I

24  think it's either every year or two years.

25       Q.    And in connection with those

1    renewals, are you -- is the licensee subject to

2    further reviews and inspections by the board?

3         A.    Yes.   They -- each time they have

4    to answer an application, they have to attest

5    to the truthfulness of the application, and

6    it's resubmitted to the board.   And then, you

7    know, inspections, they're not based on

8    whenever they reapply.   The inspections can

9    come at various amounts of times.   Sometimes

10   it's based on you haven't been inspected in a

11   while and a proactive inspection occurs, or

12   maybe there's an investigation, which could be

13   several different things, consumer complaints,

14   you know, maybe an error in dispensing or

15   something of that nature, but generally, at the

16   end of an investigation, we'll go in and

17   conduct an inspection at the pharmacy.

18        Q.    I see.   So the inspections aren't

19   triggered by renewal of licenses but inspections

20   are considered as part of the renewal process?

21        A.    Yes.

22        Q.    So can a bad inspection result in

23   loss of license?

24        A.    It would have to be really

25   egregious.

Page 95

1        Q.    But that's a potential outcome,

2    correct?

3        A.    Yes.

4        Q.    I think in your Exhibit 5 we had

5    those four levels of potential results of

6    inspections, verbal warnings, written responses

7    required, citations or summaries, suspensions.

8    Do you remember that?

9        A.    Yes.

10       Q.    So if the inspection is bad, you

11   could get suspended, correct?

12       A.    Yes.

13       Q.    Okay.  So there's a range of

14   outcomes.  So the inspections themselves, would

15   you agree, are they an important part of the

16   licensing process and the renewal of the

17   licensing process?

18       A.    I think it's an important part, but

19   again, it's -- it's just not solely based on

20   that renewal.  You know, if there's an

21   ownership change in the renewal or they change

22   their name or they change their business

23   structure, that could prompt an inspection, but

24   it's just -- very rarely is it based on the

25   fact that they did their annual or biannual

Page 96

1    renewal.

2         Q.    Okay.  All right.  So the pharmacy

3    itself has to be licensed and go through that

4    rigorous process and then go through renewal

5    processes, but there's further licensing

6    involved at a pharmacy location, correct?

7         A.    Yes.

8         Q.    The pharmacist has to be licensed?

9         A.    Yes.

10        Q.    Is that right?

11        A.    Yes.

12        Q.    Who else has to be licensed in a

13   pharmacy according to the State of Ohio?

14        A.    Pharmacy technicians also.

15        Q.    Is that something you look for when

16   you go for your inspections, make sure that

17   those licenses are displayed and current?

18        A.    I ensure that the -- all parties

19   are properly licensed.  They actually don't

20   have to have their licenses displayed anymore,

21   but we do check to make sure that they are

22   properly licensed.

23        Q.    And does the board license the

24   pharmacists themselves?

25        A.    Yes.

Page 97

1          Q.     And in order to become a -- to get a

2     license as a pharmacist from the board, what are

3     the requirements to your understanding?

4          A.     It requires -- it requires,

5     obviously, the education needed.  There's --

6     there's different education requirements for

7     it, and then they have to apply, they have to

8     submit a records check, and they have to answer

9     honestly on their application.  And our

10    licensing department does the same -- does the

11    same review of those applications, checks to

12    ensure that this is an individual that we have

13    somehow investigated in the past or something

14    of that nature, and then -- then their license

15    is issued, and it is renewed every two years,

16    and they, similarly, have to attest that, you

17    know, they haven't committed any crimes and

18    they're not -- you know, they're practicing in

19    the best methods and they've kept up on all

20    their required education items.

21         Q.     Okay.  So the renewal department --

22    I guess your licensing department takes care of

23    that, the original licensing of pharmacists and

24    the renewal of pharmacists' licenses?

25         A.     Yes.

1      Q.    And techs have to be -- pharmacy

2   techs have to be licensed.  Is that a more

3   recent development?  Is that like 2016 or '17?

4   Am I recalling correctly?

5      A.    Yeah.  I think it was -- I think it

6   was 2017 at some point.

7      Q.    Why did the board decide to license

8   techs?

9      A.    I think there are -- there are

10   several different reasons.  One that I can

11   imagine is that, you know, if you have someone

12   that potentially diverts medication, there's --

13   there's an extra oversight over them.  This way

14   they just can't go to another pharmacy and

15   start working as a technician.  We control

16   that.  We dictate their license status, and,

17   again, it's just really an extra -- extra --

18   extra arm that's ensuring that someone, you

19   know, is practicing in their best faith.  And I

20   think it brings a little bit more

21   professionalism to the career of a pharmacy

22   technician.

23      Q.    Since that licensing for techs

24   requirement went into effect, have you seen it

25   have any beneficial effect on diversion?

Page 99

1          A.     Yes.

2          Q.     How so?

3          A.     Well, as I mentioned, what it does

4     is if we -- if we determine that there's a

5     pharmacy technician that's diverting drugs or

6     if they have an addiction or for whatever

7     reason that they're a threat to public safety,

8     we're able to revoke or suspend their pharmacy

9     technician license.  This way if -- let's say

10    they're working at Giant Eagle, they get

11    terminated.  They can't go to an independent

12    pharmacy that's maybe in another county and

13    then work as a pharmacy technician there

14    because their license is suspended.

15         Q.     I see.  Okay.  So it has had a good

16    effect on decreasing diversion by requiring

17    techs to be licensed?

18         A.     Yes.

19         Q.     Okay.  Have I covered everybody or

20    anybody and everybody that needs to be licensed

21    at these retail pharmacy locations?  We have the

22    pharmacy itself and we have the pharmacists and

23    we have the pharmacy technicians.  Is there

24    anybody else that needs to be licensed?

25         A.     If there's a pharmacy intern,

1   they're also licensed.

2        Q.    When did they have to become

3   licensed?  When did that start?

4        A.    As far as -- as long as I've been

5   here.

6        Q.    Okay.  And do they go through the

7   same application and review process and renewal

8   process similar to techs?

9        A.    Yes.

10       Q.    And when you do your inspections, do

11  you check on the current status of the pharmacy

12  interns and pharmacy techs and pharmacist

13  licenses?

14       A.    Yes.

15       Q.    And is it important to the board,

16  when you do your inspections, to make sure that

17  everybody and anybody is properly licensed?

18       A.    Yes, that's very important.

19       Q.    Are you familiar with the Ohio

20  regulations concerning the so-called manner of

21  processing prescriptions regulations?

22       A.    Yes.

23       Q.    And do those regulations set forth

24  the steps that the board wanted the pharmacists

25  to follow when filling prescriptions?

1      A.    Yeah.  I think it's -- I mean, I

2  don't know exactly, you know, why it was

3  implemented, but to me, my interpretation is

4  that it's for pharmacists and prescribers.

5      Q.    I see.  Okay.  And are you familiar

6  with the term "patient profiles," pharmacies

7  having patient profile systems under the

8  regulations, that was a requirement?

9      A.    Yes.

10      Q.    And is that something you look for

11  in your inspections, to make sure that the

12  pharmacy had an ability -- had a patient profile

13  system so that when a prescription was being

14  filled, the pharmacist could access that patient

15  profile and take a look at the prescribing

16  history for that patient at that store?

17      A.    Yes.

18      Q.    Was that an important part of the

19  regulations in your mind?

20      A.    Very important.

21      Q.    Why was it so important?

22      A.    For various different reasons.

23  It's going to ensure that there aren't any type

24  of medical interactions or drug interactions,

25  not just controlled substances but all

Page 102

1   medication that's being dispensed to a patient.

2   A pharmacist uses their clinical knowledge and

3   all their additional resources to ensure that

4   the patient is not getting anything that is

5   unsafe for them or is going to have any other

6   interactions with any of the other medications

7   that they are taking.  And it also is used to

8   review any potential early -- early fills of

9   controlled substance medication.  It could be

10  indicative of any potential addiction issues or

11  suspicious issues that could come up from

12  reviewing that patient profile.

13          Q.    Okay.  But that patient profile

14  system was not an OARRS system, it was a -- it's

15  a store system; is that right?

16          A.    Yes.

17          Q.    And did the Board of Pharmacy ever

18  require a pharmacy location to have any

19  different type of system other than the patient

20  profile system which showed that patient's

21  prescribing history for that store?

22          MR. WEINBERGER:  Objection.

23          A.    No.  As far as I -- as far as I'm

24  aware, they have to have a patient profile

25  system that could speak to any other pharmacies

Page 103

1    that are in there.  If it's a chain, they have

2    to be able to review all those prescriptions.

3    If it's just an independent pharmacy, then, you

4    know, it's strictly -- strictly limited to just

5    those prescriptions.

6            Q.    If you would look at Exhibit 10 in

7    the first binder.

8            A.    Are we talking the volume 1 binder?

9            Q.    Yes.  Are you with me?

10           A.    I'm still searching for it.  Okay.

11           Q.    You see that's Ohio Regulation

12   4729-5-18.  It's called "Patient Profiles."

13           A.    Nope.  I'm sorry.  I'm at Manner of

14   Processing a Prescription.

15           Q.    Go to the third page of that

16   exhibit.

17           A.    Okay.

18           Q.    Are you with me now?  It's at 5-18,

19   "Patient profiles."

20           A.    Yes.

21           Q.    And do you recognize this as the

22   patient profile regulation for pharmacies?

23           A.    Yes.

24           Q.    And does that list the requirements

25   under the Ohio regulations for what a pharmacy's

Page 104

1    patient profile system must contain?

2         A.    Yes.

3         Q.    And you see under A there's a

4    listing from A-1 through 1 and 2.  The number 1

5    is the patient's data record containing the full

6    name of the patient, address, telephone number,

7    date of birth, gender, patient specific data

8    consisting of drug-related allergies, previous

9    drug reactions, history of or chronic conditions

10   or disease states, other drugs and nutritional

11   supplements.  So is that your understanding that

12   that's what the regulations require to be in the

13   patient's data record?

14        A.    Yes.

15        Q.    All right.  And part (f) of A(1)(f),

16   "Pharmacist's comments relevant to the

17   individual patient's drug therapy, including any

18   other necessary information unique to the

19   specific patient or drug," that was also a

20   requirement for the patient profile system?

21        A.    Yes.

22        Q.    Part 2 of this regulation says, "The

23   patient's drug therapy record, which shall

24   contain at least the following information for

25   all of the prescriptions that were filled at the

Page 105

1    pharmacy within the last 12 months, showing name

2    and strength of the drug or device, prescription

3    number, quantity dispensed, date dispensed, name

4    of the prescriber," and there's directions for

5    use.  Does that indicate to you that that's --

6    that that was the regulatory requirement for the

7    patient profile system?

8         A.    Yes.

9         Q.    And then, just to complete this

10   regulation, under part B, "Any information that

11   is given to the pharmacist by the patient or

12   caregiver to complete the patient data record

13   shall be presumed to be accurate unless there is

14   reasonable cause to believe the information is

15   inaccurate," that was also part of the patient

16   profile system, correct?

17        A.    Yes.

18        Q.    And then finally, part C, "The

19   patient profile shall be maintained for a period

20   of not less than one year from the date of the

21   last entry in the profile record.  This record

22   may be a hard copy or a computerized form."  So

23   is it your understanding that the patient

24   profile had to go back for one year from the

25   date of the last entry?

Page 106

1              MR. WEINBERGER:  Objection.

2        Q.    Go ahead.

3        A.    That's my understanding.

4        Q.    And is that the regulation you were

5   enforcing when you went in and did your

6   investigations?

7              MR. WEINBERGER:  Objection.

8        A.    Generally they have much longer.

9   The patient profiles are -- they go well beyond

10  one year.

11       Q.    Okay.  Going back to Subsection

12  A(2) --

13             MR. WEINBERGER:  I withdraw the

14  objection to the last question.

15       Q.    -- "for all of the prescriptions

16  that were filled at the pharmacy," is that a

17  reference to the pharmacy that filled the

18  prescription, the specific store?

19             MR. WEINBERGER:  Objection.

20       A.    Yes, I believe that's for the

21  specific store; however, like I had indicated

22  earlier, if you have a chain, they can

23  generally see medications that were dispensed

24  from other pharmacies within the chain.

25       Q.    Okay.  But what I'm getting at is to

Page 107

1   try to understand the regulation.  The actual

2   regulation requires a patient profile for the

3   specific store that fills the prescription?

4           MR. WEINBERGER:  Objection.

5       A.   Yes.

6       Q.   Okay.  Are you familiar with the

7   term "drug utilization review"?

8       A.   Yes.

9       Q.   What is that in your mind?

10      A.    In my mind, it's a pharmacist

11  using -- using multiple items to make a

12  determination prior to dispensing the

13  medication, make sure that it's safe and, you

14  know, they're going to use things like review

15  the patient profile, review OARRS, review some

16  of their clinical knowledge and even some of

17  their clinical resources to really ensure that

18  the medication is issued for a legitimate

19  manner and that it's safe for the patient to

20  consume.

21      Q.   When you did your inspections, were

22  you -- were part of your inspections to ensure

23  compliance by the pharmacy with the drug

24  utilization review regulation?

25      A.   Yes.

1    Q.    Okay.  If you go back to Exhibit 10,

2    this Edwards Exhibit 10, right after the page we

3    just went over for patient profiles, there's

4    Prospective Drug Utilization Review Regulation

5    4975-5-20.

6        A.    Yes.

7        Q.    Do you recognize this regulation as

8    the regulation that you were ensuring compliance

9    with when you went into your inspections?

10       A.    Yes.

11             MR. WEINBERGER:  Objection.

12       A.    Yes, I do.

13       Q.    Now, this drug utilization review

14   regulation requires -- at the very beginning

15   requires, prior to dispensing any prescription,

16   a pharmacist shall review the patient profile,

17   which is what we just went over.  Was that your

18   understanding?

19       A.    Yes.

20       Q.    And there's a list here of things

21   that -- it's for the purposes of identifying

22   things like over-utilization or

23   under-utilization, therapeutic duplication, drug

24   disease state contraindications, drug-drug

25   interactions, incorrect drug dosage, drug

Page 109

1  allergy interactions, abuse, misuse,
2  inappropriate duration of drug treatment, and
3  food-nutritional supplement drug interactions.
4  Is that your understanding of the regulatory
5  requirement for drug utilization reviews?
6          A.    Yes, to my understanding.
7          Q.    Okay.  Now, part B of this
8  regulation states that upon identifying any
9  issue listed in that list we just went over, a
10  pharmacist, using professional judgment, shall
11  take appropriate steps to avoid or resolve the
12  potential problems.  These steps may include
13  requesting and reviewing an OARRS report or
14  another state's report pursuant to paragraph D
15  of this rule and/or consulting with the
16  prescriber and/or counseling the patient.
17              Did you -- were you aware of this
18  regulation as part of the drug utilization
19  review process?
20          A.    Yes.
21          Q.    And what did you understand the
22  reference to a pharmacist using professional
23  judgment to mean?
24          A.    And this is my interpretation of
25  it, but they -- they rely on all their

Page 110

1    resources, all their clinical knowledge, all

2    their education, and, you know, using their

3    professional judgment to potentially not fill

4    the prescription, if that's need be, or contact

5    the physician, maybe, you know, have some sort

6    of different strength or something of that

7    nature, but that's kind of -- to me that's how

8    I interpret a pharmacist using their

9    professional judgment.

10            MR. WEINBERGER:  Objection.  Move

11   to strike.

12        Q.    Now, did the board ever require

13   pharmacists to do anything specific in terms of

14   exercising their professional judgment in that

15   regard?  In other words, to your knowledge, is

16   there any regulation or requirement by the board

17   that a pharmacist follow specific steps in every

18   instance in filling a prescription?

19            MR. WEINBERGER:  Objection.

20        A.    Could you -- could you ask that

21   question again?  I'm sorry.

22        Q.    Sure.

23            We just read this Subsection B of

24   the drug utilization review regulation and it

25   references professional judgment, and it says,

Page 111

1   "These steps may include requesting and

2   reviewing an OARRS report or another state's

3   report and/or consulting with the prescriber

4   and/or counseling the patient."  My question

5   is, do you review these -- or do you view these

6   regulatory requirements as a mandatory

7   requirement that in every instance a pharmacist

8   is required to request an OARRS report or

9   consult with the prescriber or counsel the

10  patient or, instead, is that a matter of

11  professional judgment?

12          MR. WEINBERGER:  Objection.

13      A.    My interpretation is it's a matter

14  of professional judgment.

15      Q.    Okay.  Now, Subsection D of this

16  regulation references the OARRS -- the

17  conditions under which OARRS has to be

18  consulted.  Are you familiar with this section

19  of the regulation?

20      A.    Yes.

21      Q.    And when you did your inspections,

22  did you take a look at, from time to time,

23  compliance with this regulation, making sure

24  that pharmacists were consulting OARRS when

25  required to from time to time?

Page 112

1              MR.  WEINBERGER:   Objection.

2         A.    Yes.

3         Q.    And what is your understanding of

4    when a pharmacist, under this regulation, was

5    required to consult OARRS as opposed to do it

6    discretionary under the professional judgment

7    standard?

8         A.    Well, at the very bare minimum, as

9    long as nothing has changed with the patient's

10   prescriptions, OARRS should be reviewed every

11   12 months.  Anytime a new controlled substance

12   is introduced into their drug therapy, a new

13   physician prescribes a controlled substances --

14   a controlled substance, then they should review

15   OARRS.  If there's any red flags, such as the

16   patient comes in with a prescription from a

17   prescriber outside of the geographical area or

18   the patient is outside of the geographical

19   area, they should be reviewing OARRS.  And, in

20   general, if they have any type of suspicion of

21   addiction or impairment or overusage of their

22   medication, then the pharmacist should be

23   accessing OARRS.

24        Q.    All right.  Well, let's look at the

25   regulation, part D(1), and the precursor of part

Page 113

1    D says in any of the following circumstances,

2    review the OARRS report.  The first one says, "A

3    patient adds a different or new reported drug to

4    their therapy that was not previously included."

5    So you mentioned that a second ago, but if it's

6    a new drug, check OARRS?

7         A.    Yes.

8         Q.    Number 2 says, "An OARRS report has

9    not been reviewed for that patient during the

10   preceding 12 months, as indicated in the patient

11   profile," so, in that instance, which you also

12   mentioned, check OARRS?

13        A.    Yes.

14        Q.    Number 3 says, "A prescriber is

15   located outside the usual pharmacy geographic

16   area," and, in that instance, check OARRS,

17   right?

18        A.    Yes.

19        Q.    What do you understand the term to

20   be "outside the usual pharmacy geographic area"?

21   Is that a specific mileage requirement or does

22   it depend on the facts and circumstances of the

23   pharmacy?

24        A.    It depends on the specific facts

25   and circumstances of the pharmacy.

1      Q.    To your knowledge, did the board at

2  any time ever tell the pharmacies that you

3  better check OARRS if it's X number of miles, if

4  the prescriber is X number of miles away from

5  the pharmacy?

6      A.    No.  That's never been

7  communicated.

8      Q.    So who makes this determination of

9  whether they need to check OARRS because of

10 being outside the usual pharmacy geographic

11 area?

12     A.    The pharmacist does.

13     Q.    It's up to the pharmacist?

14     A.    Yes.

15     Q.    What about number 4, "A patient is

16 from outside the pharmacy geographic area"?  Is

17 that, similarly, a matter of the pharmacist's

18 professional judgment?

19     A.    Yes.

20     Q.    And, similarly, did the board ever

21 advise the pharmacies that if a patient is X

22 number of miles away from the pharmacy, you have

23 to check OARRS?

24     A.    No.  That's -- as far as I'm aware,

25 that's never been communicated.

Page 115

1       Q.    Okay.  Number 5 says, "A pharmacist

2  has reason to believe the patient has received

3  prescriptions for reported drugs from more than

4  one prescriber in the preceding three months

5  unless the prescriptions are from prescribers

6  who practice at the same physical location."

7            So how would a pharmacist have

8  reason to believe this, that a prescription has

9  been received from more than one prescriber in

10 the preceding 3 months?

11      A.    Probably from reviewing the patient

12 profile, and then also they would confirm it or

13 deny it through OARRS.

14      Q.    Well, this is a checklist of when to

15 check OARRS, so this would be the trigger for

16 checking OARRS, and so what I'm getting at is,

17 before they check OARRS, this is saying check

18 OARRS if the pharmacist has reason to believe

19 the patient has received prescriptions for

20 reported drugs from more than one prescriber in

21 the preceding 3 months.  So when, in your

22 experience, would that trigger the need to go

23 check OARRS?  I'm not talking about what he

24 would see when he got into OARRS.  I'm saying

25 how does that work, how does that trigger?

1       A.    So my -- my guess would be that's

2  coming from reviewing the patient profile.

3       Q.    Okay.  And then, finally, the

4  regulation has a section 6 under this list of

5  when to check OARRS, "Patient is exhibiting

6  signs of potential abuse or diversion."  What

7  does that mean?

8       A.    That could be a multiple --

9  multitude of things.  It could be a patient

10  that comes into the pharmacy impaired.  It

11  could be a patient that, you know, repeatedly

12  asks for early refills of their medication.

13  They may -- a pharmacy may have been notified

14  by someone that this person is abusing their

15  medication or selling their medication or

16  something of that nature.

17       Q.    Is this a subjective thing that the

18  pharmacy looks for in its professional judgment?

19       A.    Yes.

20       Q.    And it says, "This includes, but is

21  not limited to, overutilization, early refills,"

22  which you just mentioned, "appears overly

23  sedated or intoxicated upon presenting a

24  prescription for a reported drug, or an

25  unfamiliar patient requesting reported drug by

Page 117

1    specific names, street name, color or

2    identifying marks."

3                Again, this is something that would

4    come up in the patient profile or on this

5    objective observation of the pharmacist?

6         A.    This would be a -- I think some of

7    it could come up in a patient profile, such as

8    those early refills.  I think generally

9    pharmacists -- if this is a once in a --

10   something that's never been requested and

11   there's a legitimate explanation, they may

12   dispense an early refill a few days; however,

13   some of these other things, such as exhibiting

14   signs, those are purely -- those are purely

15   observations that would be made by the

16   pharmacist.

17        Q.    Okay.  Now, Agent DiFrangia, you

18   mentioned a couple minutes ago a concept of red

19   flags.  By that term did you mean these items we

20   just went over in the drug utilization review,

21   Subsection D?

22        A.    Yes.

23                MR. APPEL:  Bob, this is Henry

24   Appel.  I'm just letting you know that it's

25   approaching 11:30.

Page 118

1          MR. BARNES:  Okay.  What time do we

2    have, 11:28?  Let me see if we can finish this

3    regulation.

4          Q.    The last portion of this regulation,

5    Subsection G, do you see that?

6          A.    Yes.

7          Q.    "A prescription, to be valid, must

8    be issued for a legitimate medical purpose by an

9    individual prescriber acting in the usual course

10   of his or her professional judgment."  Did you

11   look to see compliance with this portion of the

12   regulation when you did your inspections?

13         A.    I mean, we would generally ask

14   pharmacists, but, you know, this is something

15   that you can't -- you can't visually see as an

16   inspector.

17         Q.    But you did look at dispensing

18   records from time to time to ensure compliance

19   with the regulations?

20         A.    Yeah.  We would look at dispensing

21   records, we would ensure that they're running

22   OAARS, we would ensure that they're conducting

23   a drug utilization review and that they're not

24   relying solely on the dispensing software.  So,

25   yeah, I mean, I guess -- I guess if you take

Page 119

1   all those things combined, then we are checking

2   to ensure, you know, that prescriptions are

3   being issued for a legitimate medical purpose

4   based on those things; however, you know, are

5   there specific things that we just don't

6   know -- I mean, we ask the pharmacists

7   sometimes about prescribers, if there's any

8   suspicion of questionable prescribing with

9   anyone.  You know, unless they tell us, we

10  generally don't know that sometimes.

11       Q.    All right.  One last question before

12  we break.

13            Going back to Subsection D of the

14  regulations and this concept of the red flags,

15  other than these red flags in subsection D of

16  this regulation, are you familiar -- are you

17  aware of the Board of Pharmacy ever advising

18  pharmacies or pharmacists that there were any

19  other red flags that they needed to look out

20  for in terms of regulations?

21            MR. WEINBERGER:  Objection.

22       A.    I'm sure there's other red flags

23  that we have, you know, advised them of through

24  guidance documents, but, you know, nothing --

25  nothing exactly comes to mind, but it's not

Page 120

1    limited just to these items in here.

2         Q.    Okay.  What other red flags are you

3    aware of besides what's listed here?

4         A.    Well, like I said, you know, if

5    they get any information of someone that is,

6    you know, potentially abusing their medication

7    or diverting it or selling it, you know --

8         Q.    Okay.  So if they have specific

9    information that somebody may be a bad actor,

10   they should consider that?

11        A.    Yeah, or, you know, sometimes

12   you'll get a carload of individuals where four

13   of them are presenting similar prescriptions

14   from a prescriber.  You know, again, that's --

15   that's a pretty suspicious scenario that I

16   think most reasonable pharmacists would

17   exercise their professional judgment and not

18   dispense that medication.

19             MR. BARNES:  Okay.  We agreed to

20   break at 11:30 so Henry could take care of some

21   matters.  We'll take a lunch break and be back

22   at 12:30.

23             THE VIDEOGRAPHER:  We are going off

24   at 11:32.

25                  (Luncheon recess had.)

Page 121

1             THE VIDEOGRAPHER:  We are back on

2    the video record at 12:33.

3                    - - - - -

4             AFTERNOON SESSION

5     CONTINUED EXAMINATION OF WILLIAM DiFRANGIA

6    BY MR. BARNES:

7         Q.    Good afternoon, Agent DiFrangia.

8    We're back on the record after a lunch break.

9             We were looking at Edwards Exhibit

10   10 and I want to pick up there, just a few

11   questions.  These are the regulations related

12   to how prescriptions are to be filled,

13   including 4729-5-20, 21, 18, 16, 22 and 09.  We

14   were talking about the drug utilization review

15   regulation, 5-20.

16        A.    Okay.

17        Q.    Do you remember that?  We walked

18   through that.

19        A.    Yes.

20        Q.    And we were talking about Subsection

21   G, which begins, "A prescription, to be valid,

22   must be issued for a legitimate medical purpose

23   by an individual prescriber acting in the usual

24   course of his or her professional practice."

25             Do you see that?

Page 122

1          A.     Yes.

2          Q.     Now, the reference to "a legitimate

3    medical purpose," in your experience, can you

4    determine if a prescription is valid without

5    talking to or looking at the records of the

6    doctors?

7          A.     You know, I don't -- I don't know

8    that I can answer that because I don't -- I'm

9    not a pharmacist and I don't have the -- you

10   know, I don't have the background or education

11   or practice of a pharmacist.

12         Q.     But when you were doing your

13   investigations of doctors -- and we've covered a

14   few of those -- would you look at the doctor's

15   records if you were -- if you suspected bad

16   prescriptions?

17         A.     Yes.  Ultimately we would generally

18   get patient records and review them or we would

19   have an expert physician review them.

20         Q.     Okay.  Because you weren't medically

21   trained but you needed the input of a medical --

22   medically trained professional?

23         A.     Correct.

24         Q.     Now, the second sentence of this

25   regulation says -- begins, "The responsibility

Page 123

1   for the proper prescribing is upon the

2   prescriber."  How did you understand that

3   portion of the regulation?

4        A.   Well, my interpretation -- and I'm

5   not a lawyer or an attorney.  My interpretation

6   is just that, you know, it rests -- it's

7   upon -- the responsibility is upon the

8   prescriber that's issuing the prescription, but

9   that's just my interpretation of it.

10       Q.   Okay.  Does -- was that the

11  understanding you had and have had while you

12  have been functioning as an agent for the board?

13       A.   Yes.

14            MR. WEINBERGER:  Excuse me for just

15  a second.  I was on mute.  With respect to the

16  prior answer, would you please note an

17  objection and motion to strike?  Thank you.

18            MR. BARNES:  Pete, are you asking

19  her to read something back?

20            MR. WEINBERGER:  No.  No.  I just

21  wanted her to note on the record an objection

22  and that I was moving to strike the answer to

23  the question prior to that question and answer

24  because I was on mute.

25            THE COURT REPORTER:  Yes, I will

Page 124

1    note that.

2              MR. WEINBERGER:  Thank you.

3         Q.    Continuing in that regulation, Agent

4    DiFrangia, it says -- after the responsibility

5    for proper prescribing being on the prescriber,

6    it continues that a corresponding responsibility

7    rests with the pharmacist who dispenses the

8    prescription.

9              Do you see that?

10        A.    Yes.

11        Q.    And you've referenced this

12   corresponding responsibility in the past, in

13   your past testimony, but continuing with this

14   regulation, it says, "Based upon information

15   obtained during a prospective drug utilization

16   review, a pharmacist shall use professional

17   judgment when making a determination about the

18   legitimacy of a prescription."

19              Is that how you understood it, that

20   the corresponding responsibility after the

21   prescriber's responsibility for the

22   prescription at the beginning, the

23   corresponding responsibility is based upon the

24   drug utilization review?

25        A.    Yes, that's my understanding.

Page 125

1          Q.     And the professional judgment

2     aspect, how did you understand that to operate?

3          A.     Well, it would be within a

4     pharmacist's professional judgment to dispense

5     medication or not or potentially adjust the

6     medication through contacting the physician.

7     That's the way I would interpret that.

8          Q.     Okay.  And this regulation finishes

9     by saying, "A pharmacist is not required to

10    dispense a prescription of doubtful,

11    questionable or suspicious origin."

12              How did you understand that portion

13    of the regulation?

14         A.     Just frankly pretty much as it

15    says, that they don't have to dispense

16    medications if they feel, you know, for any

17    different reason that it's not warranted.

18         Q.     All right.  Did you understand that

19    the professional judgment of a pharmacist, when

20    dispensing, could include things like prior

21    relationships with the patients, knowledge of

22    the doctors, things of that nature?

23         A.     I'm sure that can all come into

24    their decision-making.

25         Q.     Okay.  Now, when we get back to this

Page 126

1    5-21, Manner of Processing a Prescription

2    Regulation, which is in Edwards Exhibit 10,

3    you'll see in part B -- it's the first page of

4    Exhibit 10 -- part B says, "A pharmacist when

5    dispensing a prescription must," and then it

6    lists five steps, ensure that patient

7    information is profiled pursuant to 5-18 of the

8    code.  We went over that, right?

9         A.    Right.

10        Q.    Step 2 is perform prospective drug

11   utilization review pursuant to 4729-5-20, and we

12   went over that; is that right?

13        A.    Yes.

14        Q.    And then the third step is ensure

15   that the drug is labeled pursuant to 4729-5-16.

16   Are you familiar with that labeling requirement,

17   and if so, what was your understanding of it?

18        A.    Yes, I am familiar with it.  My

19   understanding is that it -- there's specific

20   items that are required to be on a prescription

21   label, such as the patient's name, address,

22   medication, strength, quantity of the

23   medication, direction for use, the prescriber

24   of the medication, and instructions for when to

25   take that medication.

1      Q.    That regulation, 5-16, is several

2  pages into Edwards Exhibit 10.  Does that help

3  you refresh your recollection as to what the

4  labeling requirement was?  Do you see that,

5  4729-5-16?

6      A.    Yes.

7      Q.    Are those listed there under A(1)

8  through (10)?

9      A.    Yes.

10     Q.    And when you did your inspections,

11 were you in part making sure that the pharmacies

12 complied with this regulation?

13     A.    Yes.

14     Q.    So going back to the 5-21, Manner of

15 Processing regulation, the fourth step is

16 "Ensure that the patient is given an offer to

17 consult pursuant to Rule 4729-5-22."  Were you

18 familiar with that regulation, and if so, what

19 was your understanding?

20     A.    Yes, I am familiar with it, and

21 again, my interpretation just coming from me --

22 I'm not a lawyer -- the interpretation is that

23 each prescription that is dispensed and offered

24 to provide consultation is required by the

25 pharmacist to the patient.

1      Q.    And is that something that you've

2   checked on when doing your inspections,

3   compliance with this patient counseling

4   regulation?

5      A.    Yes.

6      Q.    And would that include looking for

7   things like counseling logbooks, where patients

8   would sign off that they did or didn't want

9   counseling?

10      A.    Yes.  There would be a counseling

11  log where the pharmacist would document who --

12  which pharmacist provided the counseling, and

13  then there's also usually documentation where

14  the patient declines it if they do not want any

15  counseling.

16      Q.    Okay.  And do you recognize this

17  regulation in Edwards Exhibit 10, 4729-5-22?

18      A.    Yes.

19      Q.    And then going back to the 5-21,

20  Manner of Processing, after the labeling and

21  counseling, the last step, number 5, is "Ensure

22  that a prescription is filed pursuant to

23  4729-5-09."  And that's also in Exhibit 10.

24  It's the last page.  But how did you understand

25  that regulation and were you aware of it?

Page 129

1          A.     Yes, I was aware of it.  My

2     understanding of it, just my interpretation --

3     this is not -- again, I'm not a lawyer -- my

4     interpretation is that hard copy prescriptions

5     have to be maintained in a prescription file

6     and they have to be separated by way of

7     schedule, Schedule II and then III through V,

8     and then all non-controlled prescriptions.

9          Q.     Okay.  Again, when you did your

10    inspections, were you looking for compliance

11    with that regulation?

12         A.     Yes.

13         Q.     So going back to the 5-21, Manner of

14    Processing a Prescription, under B(1) through

15    (5), are those the five steps that Ohio law

16    required pharmacists to follow when filling a

17    prescription?

18         A.     Yes, that's the way I interpret

19    that.

20                MR. WEINBERGER:  Objection.  Move

21    to strike.

22         Q.     I want to focus your attention,

23    Agent DiFrangia, on inspections.  We talked at

24    length already about inspections, but there are

25    regulations, Ohio regulations, governing

1    inspections, correct?

2            A.    Yes.

3            Q.    And if you look at Edwards Exhibit

4    11 --

5            A.    I have it.

6            Q.    -- do you recognize these as the

7    Ohio regulations governing inspections of

8    pharmacies?

9            A.    Yes.

10           Q.    And do these regulations provide the

11   Board of Pharmacy and its agents and inspectors

12   the right to inspect a pharmacy upon application

13   for a license and at any time thereafter?

14           A.    Yes.

15           Q.    Do you recognize Edwards Exhibit 12?

16           A.    Yes, I do.

17           Q.    What is it?

18           A.    So this is an inspection guide that

19   this -- this is put on our website and it's

20   available for -- for review.  Pharmacists,

21   pharmacies, they can review it and kind of get

22   an idea of what our expectations are during

23   inspections.

24           Q.    And it's relatively new.  It looks

25   like it was dated December 1 of 2020.  Is that

Page 131

1  right, it just came out very recently?

2      A.    Yes.

3      Q.    Is this the first inspection guide

4  that you're aware of that's been used by agents

5  or inspectors of the board?

6      A.    No.  We've had some informal things

7  that we would use as guidance while conducting

8  inspections, but this is the first to be put on

9  our website.

10      Q.    I see.  And so is it -- my

11  understanding correct that this isn't

12  necessarily new things that are new standards

13  for inspections, but instead, this is the first

14  time they've been compiled and put on the

15  website?

16      A.    Well, these -- a lot of these are

17  new rules, and I think because of so many

18  changes, my guess is that maybe that's why it

19  was put on the website.

20      Q.    And have you used this guide in your

21  inspections?

22      A.    You know, I -- I don't think I

23  have, primarily because since the pandemic has

24  taken place, we really have been limited to our

25  exposure in pharmacies.

1      Q.    There are sections of this

2  inspection manual -- for example, on page 33

3  there's a reference to dispensing records and

4  patient profiles.

5              Do you see that?

6      A.    Yes.

7      Q.    And the question appears to be,

8  "Does the pharmacy maintain dispensing records

9  containing the required information?"  And it

10  lists a lot of -- a lot of requirements.  My

11  question to you is, regardless of whether or not

12  this manual came out recently, but are these the

13  types of things that you covered in your

14  inspections before this manual came out to make

15  sure that pharmacies that you inspected were

16  maintaining adequate dispensing records?

17              MR. WEINBERGER:  Objection.

18      A.    Yeah, for the most part.  These --

19  these are pretty much the items that we have

20  reviewed even prior to the issuance of this

21  during inspections.

22      Q.    All right.  So part of your

23  inspections included review of the pharmacy's

24  dispensing records?

25      A.    Yes.

1     Q.    Okay.  And then part of your

2  inspection, did it also include making sure that

3  the pharmacies were keeping the records for the

4  required regulatory time frame?

5     A.    Yes.

6     Q.    And in that regard, if you look at

7  page 39 of this inspection manual, this is

8  geared towards general recordkeeping

9  requirements.  What did you understand to be

10  pharmacies' recordkeeping requirements in terms

11  of time frame?  How long did they have to have

12  records; one year, two year, three years?

13  That's what I'm getting at.

14     A.    They're required to keep three

15  years' worth of records.

16     Q.    Okay.  And is that something you

17  looked for in your inspections, to make sure

18  they were complying with that three-year

19  recordkeeping requirement?

20     A.    Yes.

21     Q.    Page 43 of this inspection manual

22  governs security, control and storage of

23  dangerous drugs.  Was that part of your

24  inspections before this manual came out, to

25  review security controls and storage of

Page 134

1    dangerous drugs?

2          A.    Yes.

3          Q.    Page 56 of this manual deals with

4    prescription formatting and manner of issuance.

5    We just went over the manner of issuance

6    requirements, but before this manual came out,

7    did you, in your inspections, follow

8    substantially the same or similar procedures as

9    indicated under this section, and that begins

10   with do outpatient prescriptions comply with the

11   manner of issuance rule that we just went over,

12   4729-5-15?

13         A.    Yes.

14         Q.    Do you see that?

15         A.    Yes.

16         Q.    Now, you are familiar with the

17   inventory requirements for pharmacies, correct?

18         A.    Yes.

19         Q.    And is that something that you

20   looked for compliance with in your inspections,

21   to make sure that they were taking an adequate

22   number of controlled substance inventories?

23         A.    Yes.

24         Q.    And is Edwards Exhibit 13 the

25   regulation that you were enforcing during those

Page 135

1    inspections?

2         A.    Okay.

3         Q.    Are you familiar with this

4    regulation, 4729:5-3-07?

5         A.    Yes.

6         Q.    All right.  And what did this

7    regulation require for pharmacies in terms of

8    conducting inventories of their controlled

9    substances?

10         A.    Well, again, my interpretation only

11    is that, you know, they were required annually

12    to take an inventory of all their controlled

13    substances, and they also had to do so when

14    they change responsible persons within the

15    pharmacy.

16              MR. WEINBERGER:  Move to strike.

17         Q.    So that was an annual inventory

18    requirement.  In your inspections did you see

19    from time to time pharmacies doing those

20    inventories more frequently than the regulatory

21    once-a-year requirement?

22         A.    Yeah, from time to time.

23         Q.    Okay.  Do you recall specifically,

24    for example, Giant Eagle conducting these

25    inventories more frequently than annually?

Page 136

1         A.    No, I don't, not for the controlled

2     substance inventory.

3         Q.    You don't recall that?

4         A.    Not off -- no, not off the top of

5     my head.

6         Q.    Okay.  Fair enough.  I probably

7     wouldn't remember either.  But if they did --

8              MR. WEINBERGER:  Objection.  Move

9     to strike the comment.

10        Q.    Do you view having more frequent

11    controlled substance inventory as a good

12    internal control?

13        A.    Yes.

14        Q.    Now, Agent DiFrangia, we've

15    compiled -- the board was kind enough to produce

16    inspection reports for the pharmacy Defendants,

17    and Exhibit -- Edwards Exhibit 16 were the ones

18    conducted by Trey Edwards -- I'm sorry, Exhibit

19    15 for Trey Edwards, Exhibit 16 were those

20    conducted by George Pavlich, and Exhibit 17 were

21    all other inspections in these two counties,

22    Lake and Trumbull, conducted by other

23    inspectors, including yourself.  So if you can

24    look at Edwards Exhibit 17.

25        A.    Okay.

Page 137

1      Q.    Do you recognize these documents as

2   inspection reports prepared by Board of Pharmacy

3   agents?

4      A.    Yes.

5      Q.    Do you recognize any of the names,

6   Mr. Bodi, for example, on the first page?

7      A.    Yes.

8      Q.    Did the agents at the board,

9   including yourself, work together with respect

10  to the inspections that they were doing?  In

11  other words, would you cross-check against the

12  other agents to see -- you know, if you were

13  going out to inspect, for example, a Giant Eagle

14  pharmacy, you told me earlier you would check

15  prior inspection reports.  Would you also talk

16  with agents who had done those inspections to

17  see if there was anything notable about their

18  inspections?

19     A.    Yes.

20     Q.    Okay.  Do you recall talking with

21  any of your fellow agents about Giant Eagle

22  pharmacies?

23     A.    I mean, I'm sure I've had

24  conversations with fellow agents about Giant

25  Eagle pharmacies, but nothing, you know,

Page 138

1    specific that I can really think of.

2         Q.    Okay.  In this Exhibit 17 I was able

3    to locate approximately four or five inspection

4    reports, and if you look at -- I don't know how

5    many pages it is, but it's probably 30 or so

6    pages -- there's an inspection beginning on

7    BOP_MDL-2799241.

8              Do you see that?

9         A.    2799241?

10        Q.    Yes.

11             And this is an inspection that you

12   prepared.  Is that your signature?

13        A.    No, that is not mine.

14        Q.    Oh, it's not yours?

15        A.    No.

16        Q.    Do you recognize it?  Whose is it?

17        A.    No, I -- I don't recognize that

18   signature, and I'm looking at a date that's

19   next to it of July 23, 2012.

20        Q.    Good catch.  Okay.  I was misreading

21   signatures.  I thought maybe you had done that

22   one.  I'm not going to ask any questions about

23   that since you didn't prepare it.

24             Continue on back in that exhibit --

25   go to MDL2796514.  Are you with me?

Page 139

1           MR. APPEL:  I'm sorry.  Which

2   exhibit are we looking at?

3           MR. BARNES:  We're looking at

4   BOP_MDL2796514.  It's an inspection dated May

5   23rd of 2017, Giant Eagle pharmacy in Warren,

6   Ohio.

7           MR. APPEL:  I'm sorry.  But which

8   exhibit packet is it in?

9           MR. BARNES:  It's 17, Edwards 17.

10      Q.    Probably from about 15 pages from

11   the back, Agent DiFrangia.

12      A.    Yeah, I'm still searching.

13      Q.    Unfortunately, these aren't in

14   sequential numbers.

15      A.    Okay, I have it.

16      Q.    This is an inspection that you

17   performed.  Your name is on the second page, 2

18   of 4, Agent William DiFrangia.

19      A.    Yes.

20      Q.    Did you prepare this document?

21      A.    Yes.

22      Q.    All right.  And you prepared this

23   document to record the results of your

24   inspection of Giant Eagle pharmacy 1419 on 2061

25   Elm Road, Warren, Ohio?

Page 140

1       A.      Yes.

2       Q.      It says this is a category 3

3  barricade inspection.  I think you told me

4  already what a barricade inspection was.

5       A.      Yes.

6       Q.      The second page of this exhibit

7  references the personnel Barbara Susan Carlson,

8  pharmacist, and Kellie Cleland, pharmacist?

9       A.      Yes.

10      Q.      Did you interact with either of

11 those pharmacists during this inspection?

12      A.      I believe I interacted with Barbara

13 Carlson.  I'm not sure about Kellie Cleland.

14      Q.      Okay.  And does this -- does this

15 barricade inspection document the results of

16 your inspection?

17      A.      Yes.

18      Q.      Was Pharmacist Carlson cooperative

19 with you?

20      A.      Yeah.  As far as I can remember, if

21 she was there, she was.

22      Q.      Okay.  Do you have any other

23 recollections about either of these pharmacists

24 in terms of having worked with them for any

25 reason in the past?

1       A.    Yeah.  I think I had requested
2  records from both of them in the past.
3       Q.    And did they provide those records
4  and cooperate with you?
5       A.    Yes.
6       Q.    And the results of this inspection
7  at the end are no issues found; is that right?
8       A.    Correct.
9       Q.    So when you did an inspection and
10  wrote it up in these reports, if there was an
11  issue found, you would document it, correct?
12       A.    Yes.
13       Q.    I like the new inspection reports,
14  by the way.  You don't have to decipher
15  handwriting.
16       A.    Right.
17       Q.    If you go about six pages later --
18  I'm looking for the next inspection report that
19  you did.  It begins on -- six or eight pages
20  later -- BOP_MDL2796530.
21       A.    What date are you looking at?
22  Sometimes that will be easier to spot it.
23       Q.    Sure.  December 18th of 2018, first
24  page.
25       A.    Okay.  Yes, December 18th, 2018.

Page 142

1          Q.    And is this another inspection

2    report showing the results of an inspection of

3    Giant Eagle pharmacy 1419, 2061 Elm Road,

4    Warren, Ohio, Trumbull County?

5          A.    Yes.

6          Q.    Now, this says, "Retail Pharmacy

7    Inspection" whereas the last one called it a

8    barricade inspection.  So is this a more normal

9    type inspection being conducted here?

10         A.    Yes.  This is more of a -- more

11   inclusive inspection.  The other one was just

12   specifically geared around the barricade

13   because I think we had mentioned that they had

14   an attempted break-in to the pharmacy.

15         Q.    Got it.  So on page 2 of this

16   inspection it shows, again, Pharmacist Carlson

17   and now another pharmacist, Nicole Deluco, as

18   well as several technicians.  When you list

19   these individuals, are these individuals that

20   were there during your inspection?

21         A.    For the most part.  The way the

22   inspection guide is -- whoever the responsible

23   person is or pharmacy manager, their name is

24   always on there, whether they're present or

25   not, so I -- out of the pharmacists, one of two

Page 143

1    was definitely present, maybe both of them, but

2    it like auto populates within the inspector,

3    the inspection software.

4         Q.    Okay.  And this now seems to be a

5    more in-depth listing of multiple things that

6    you looked for in this inspection, beginning

7    with the licensing requirement, number 1, which

8    we've talked about.

9              Do you see that?

10        A.    Yes.

11        Q.    And then you continued -- you look

12   at the responsible person issue.  In fact, here

13   you noted that there was a change in responsible

14   person reporting to the board and you noted it

15   in your inspection report, correct?

16        A.    Yes.

17        Q.    And then you looked at the DEA

18   certificate again, looking to make sure that

19   they were all currently licensed; is that right?

20        A.    Yes.

21        Q.    In 2.1 you looked at record

22   availability.  "Can the pharmacy produce a

23   detailed patient profile for the last 12 months

24   immediately upon request?"  And you said "Yes"

25   and then you made an observation.  Am I correct

1  that this is one indication of what you told me

2  earlier, that you were enforcing the patient

3  profile regulation that we went over?

4       A.    Well, yes and no.  The observations

5  that I put in there is something kind of

6  different.  It was related to something

7  different, but that's in a way how we -- I was

8  able to ensure that that's being complied with.

9       Q.    Okay.  The next section, 2.3.1, is

10  relating to dispensing software, and you made an

11  observation of EPS.  Why did you care about

12  dispensing software?

13       A.    Well, we want to know who makes the

14  software, who -- you know, is it a Giant Eagle

15  system that they own or is it a third-party

16  vendor.  There are times when maybe if a

17  pharmacist or someone with access is diverting

18  medication, they may have different levels of

19  access than other people, and, you know, these

20  things can be -- it could be helpful in further

21  investigations to know what the software is

22  that they're using.

23       Q.    And was -- your observation was that

24  Giant Eagle was using EPS.  Was that an

25  acceptable and satisfactory software --

1  dispensing software system as far as the board

2  was concerned?

3       A.    Yes.

4       Q.    On the next page, 2.3.4, "Shared

5  Dispensing Software:  Is there a real time

6  online system and used for the review and

7  transfer of dispensing data?  Yes.  Observation?

8  Yes."  Why did the board care whether it was a

9  real time online system?

10       A.    Well, I think for the purposes of,

11  you know, we want to be able to ensure proper

12  drug utilization review is being conducted, and

13  if someone goes to one Giant Eagle, you want to

14  know that, you know, if they went to another

15  one, this way the same pharmacy at a different

16  location isn't dispensing the same medication

17  to someone.

18       Q.    So having a real time online system,

19  as indicated here, is a good internal control

20  from the board's perspective?

21       A.    Yes.

22       Q.    Okay.  In fact, it says here, "Does

23  the pharmacy's real time online system prevent a

24  patient from receiving more dispensings than

25  authorized by the original prescription?"  And

1  you said, "Yes."  So that's actually a control

2  built into the system that prevents diversion?

3      A.    I can't say for sure if it's built

4  into the system or exactly how the system

5  works, but, you know, they -- it would be

6  something that -- how it would alert them, I'm

7  not exactly sure, but it does -- you know, they

8  are able to see that information.

9      Q.    Okay.  And then you continue, 2.3.6,

10  "Dispensing Record Accuracy.  Are required

11  records of accountability being kept complete

12  and accurate in the dispensing software?"  And

13  you said "Yes" here.  Is that something the

14  board wanted to make sure pharmacies were doing,

15  keeping accurate dispensing records that could

16  be reviewed when necessary?

17      A.    Yes.

18      Q.    Now, 2.5 deals with ePositive

19  identification, and it references a paperless

20  positive ID system being used and whether it was

21  approved by the board.  What is an ePositive

22  identification system?

23      A.    Well, pharmacists are required to

24  provide a positive identification for

25  essentially every step of the dispensing

1   process, and generally the way that's captured

2   is with a -- with a wet ink signature or

3   initials, just a pharmacist writing her

4   initials, dating a prescription.  So some --

5   some pharmacy chains -- Giant Eagle is one of

6   them -- they have adopted an ePositive ID

7   system, where they do not use a wet ink

8   signature on the prescription, it's done --

9   it's captured electronically, the positive ID

10   is.  So that was approved, that had prior board

11   approval and that was -- that was done on

12   February 20th of 2015 at this Giant Eagle in

13   Elyria, and that shows as approval statewide

14   for their system.

15        Q.    I see.  And is that a good control

16   from the board's perspective, to have this

17   ePositive identification system?

18        A.    Yes.

19        Q.    And then your report continues

20   through various other areas dealing with the

21   physical and electronic barricades.  Part 4

22   deals with the minimum standards on page 6 of

23   10.  If you look at 4, number 7, "Is there

24   evidence to indicate a problem with staffing

25   levels?"  And you had indicated in this

Page 148

1    inspection "No."  What was the board's concern

2    in this area as part of its inspections?  What

3    was it looking at?

4         A.    Well, I think if there is -- my

5    interpretation is that if there's -- if there's

6    some sort of staffing issue that is going to

7    affect patient safety.

8         Q.    I see.  So during your inspections

9    you would check into that, as indicated here?

10        A.    Yeah, just based on my own

11   observations at the pharmacy.

12        Q.    Okay.  Section 5 of your inspection

13   indicates "Security."  Number 1, "Is the

14   security of the pharmacy drug stock adequate to

15   detect and deter drug theft and diversion?"  And

16   you indicated, "Yes."  Can you describe for us

17   what this is all about?

18        A.    Yeah.  It's to ensure that they

19   have some processes in place; that if someone

20   does happen to divert medication or divert

21   records, that they can -- they can deter it,

22   and then if it does happen, that they can

23   detect it.  So, you know, some of their systems

24   that they have in place, you know, maybe they

25   do some additional counts of medication or

Page 149

1   something of that nature.  Those are things

2   that -- you know, are going to deter and detect

3   the theft of medication and records also.

4        Q.    We talked earlier in your deposition

5   about the security requirement regulation.  Is

6   this part of your inspection a part of that,

7   determining compliance with the overall security

8   regulation?

9        A.    Yes.

10       Q.    Your reports -- this report

11  continues with a review of the library,

12  cleanliness, refrigeration, drug ordering

13  procedures.  Are you following me?

14       A.    Yes.

15       Q.    And then 9.3 references "Electronic

16  Control II drug order receipt.  When using an

17  electronic drug ordering system, is the pharmacy

18  creating a receipt that is electronically linked

19  to the original order?"  And you said "yes" for

20  this inspection.  What is this all about?  What

21  are you -- what is this part of the inspection

22  geared towards?

23       A.    Well, my interpretation is that

24  there is a receipt for any -- they order their

25  drugs, their Schedule II drugs, electronically.

Page 150

1   They have to have a receipt of that and it has

2   to, you know, be electronically linked with the

3   order and -- the receipt of those drugs have to

4   be electronically linked.

5        Q.    Is that an internal control that the

6   board wanted to make sure that the pharmacy was

7   complying with?

8        A.    Yes.

9        Q.    Now, you list in 9.4 wholesale

10  information, who was the wholesale drug

11  distributor utilized by this pharmacy, and it

12  says here "Cardinal."  Why was that part of your

13  inspection?  Why did the board care about who

14  the distributor is?

15       A.    Again, this is my -- this is my own

16  interpretation, is that, you know, at some

17  point other investigations are going to come up

18  with Giant Eagle and, you know, we want to know

19  who's supplying them.  Maybe there's an issue

20  with the wholesaler.  Maybe in the event we

21  have to do an audit, like we had discussed

22  earlier, you have to know who the wholesale --

23  who the wholesaler is to conduct that audit.

24  Really it's just my guess, my interpretation is

25  that it could be needed for something in the

1  future and the information to have is good.

2      Q.   Are you familiar with the drug

3  distributor Cardinal at the time -- at the time

4  you wrote this report did you know who Cardinal

5  was?

6      A.   Yes.

7      Q.   Paragraph 10 of your report

8  references improper dispensing -- dispensings.

9  "Is there evidence to indicate that a

10  prescription has been dispensed improperly?"

11  And the answer here was "No."  What does this

12  mean with respect to your inspection?  Why were

13  you looking at improper -- potential improper

14  dispensing and whether or not the pharmacy was

15  dispensing properly or improperly?

16      A.   Well, I think, you know, really you

17  want to ensure that if a prescription has two

18  refills on it, two refills are given.  Just an

19  example, you know, two refills are given, not

20  more, not less.  If a prescription calls for 20

21  tablets of some sort of medication, you want to

22  ensure that all that is being done, all the

23  medicine is being done accurately pursuant to

24  the way the prescription is presented.

25      Q.   I see.  So when you did your

Page 152

1    inspections, you actually looked at this area of

2    potential improper dispensing and would indicate

3    whether the pharmacy was complying or not

4    complying; is that correct?

5         A.    Yes.

6         Q.    And here there was no evidence that

7    this pharmacy had been dispensing improperly; is

8    that correct?  Am I reading your inspection

9    report correct?

10        A.    Correct.

11        Q.    Part 11 of your report deals with

12   insufficient supervision.  There's two

13   sub-parts.  "Is there pharmacist supervision of

14   the dangerous drugs and other pharmacy employees

15   at all times while the pharmacy is open and

16   operating?"  You had indicated here "No."  What

17   does that mean?  Am I reading this as a negative

18   or what did you mean here?

19        A.    Well, from reading it, it seems --

20   it was probably answered incorrectly by myself

21   because I'm just guessing that if there was an

22   issue with pharmacist supervision of the

23   dangerous drugs, you know, we wouldn't have

24   just -- I wouldn't have just told them -- you

25   know, wouldn't have just indicated no on the

Page 153

1    inspection guide.  There would be some sort of
2    corrective action.
3         Q.    When you fill out these reports, are
4    these inspection reports -- are they online and
5    you go through a checklist and fill it out
6    electronically?
7         A.    Yes.
8         Q.    Okay.  But why even inquire about
9    this area, insufficient supervision?  Why does
10   the board care about pharmacist supervision and
11   whether or not only pharmacists are performing
12   tasks requiring professional judgment?
13        A.    Well, you know, again, my
14   interpretation is that, you know, legally you
15   cannot have a non-pharmacist practicing as a
16   pharmacist, so, you know, we can't allow a
17   pharmacy technician to review a patient profile
18   and do a drug utilization review because they
19   don't have any of the -- any of the education
20   and the background to do so.  So I think that's
21   probably -- that's probably the importance of
22   that.  And same thing with supervision similar
23   to one of the earlier points of the inspection
24   that we discussed where, you know, proper
25   supervision is going to address things like an

Page 154

1    employee that may be potentially diverting

2    drugs or ensuring that, you know, prescriptions

3    are dispensed accurately and all those things

4    are being completed, such as like the drug

5    utilization review.

6         Q.    Okay.  So for this inspection,

7    setting aside the -- what you believe to be an

8    incorrect answer to 1, is my understanding that

9    in this inspection you found that this Giant

10   Eagle pharmacy was properly supervising as

11   required?

12        A.    Yes.

13        Q.    Okay.  You also look in Section 12

14   at inventory records.  During your inspections

15   do you ask the pharmacist for their inventory

16   records to make sure they're complying with the

17   inventory requirements that we went over?

18        A.    Yes.

19        Q.    And here it was okay because you

20   answered "Yes"?

21        A.    Yes.

22        Q.    14 and 15 deal with illegal sales

23   and illegal purchases.  As part of your

24   inspections were you making sure that the

25   pharmacy was only purchasing from licensed

Page 155

1    distributors and wholesalers and that they were

2    handling returned stock correctly?

3         A.    Yes.

4         Q.    And here there was no problem; is

5    that correct?

6         A.    That's correct.

7         Q.    In 17.1 you actually look at their

8    drug utilization review software.  Is that

9    right?  Is that the purpose of this part of the

10   inspections?

11        A.    Yes.

12        Q.    And as part of that, you review

13   whether the pharmacists rely solely on the

14   dispensing software to perform the DUR for

15   prescription dispensing.  Here you said "No."

16   What is the nature of this inquiry?  What is the

17   board concerned about?

18        A.    This is you -- what you don't want,

19   you don't want a pharmacist that is merely

20   relying on only the software to conduct a drug

21   utilization review.  It's part of it.  It's an

22   aspect of it.  However, you want them to also

23   include their -- their clinical knowledge, some

24   of their clinical resources and their training

25   and their experience in conducting a drug

Page 156

1   utilization review.

2        Q.    So here am I reading this right you

3   were satisfied that the pharmacists weren't only

4   relying upon the dispensing software, and, in

5   fact, you observed pharmacists use clinical

6   knowledge in addition to software?

7        A.    Yes, that's correct.

8        Q.    Your inspection report continues,

9   Section 19, Improper Prescriptions:  "Are the

10  prescriptions on file written in compliance with

11  4729-5-30?"  You indicated "Yes" here.  You were

12  enforcing that portion of the regulations; am I

13  reading that correctly?

14       A.    Yes, that's correct.

15       Q.    And that portion -- those

16  regulations deal with, what, are the

17  prescriptions being issued correctly?

18       A.    Yes.  That is part -- well, issued

19  as far as everything required is being put on

20  the physical prescription.  Obviously, you

21  know, I don't know what is happening inside a

22  prescriber's office; however, what I do look at

23  is, you know, is the required information on

24  the prescription to be dispensed.

25       Q.    Okay.  And then there's -- after

1    that there's various other portions of your

2    inspections, including DEA numbers, outdated

3    drugs, prescription files.  I'm going to go to

4    number 28, "Annual drug inventory.  Has an

5    annual drug inventory been completed within the

6    specified time periods?"  Here you indicate

7    "Yes" and you provide some observation of when

8    they were completed; is that right?

9         A.    Yes.

10        Q.    And am I reading this correctly that

11   in this inspection the Giant Eagle pharmacy

12   complied with the annual drug inventory

13   requirement?

14        A.    Yes.

15        Q.    And then the second to last page of

16   this inspection deals with oral prescriptions

17   being reduced to writing, a positive

18   identification system, qualified pharmacy techs

19   being employed.  Are these just general areas of

20   your inspection that you checked to make sure

21   this pharmacy was complying with the

22   regulations?

23        A.    Yes.

24        Q.    38 references counseling.  You

25   checked here whether the pharmacy was complying

```
                                          Page 158
 1    with the counseling regulation; is that right?
 2    Go ahead.
 3          A.    I'm sorry.  Did you say 38 or --
 4          Q.    I'm sorry.  36.  Sorry.
 5          A.    Okay.
 6          Q.    We talked about the counseling
 7    regulation before.  Is this -- is this part of
 8    your inspection documenting compliance with the
 9    counseling regulation?
10          A.    Yes.
11          Q.    And here there was no problem?
12          A.    Correct.
13          Q.    38 deals with OARRS, including
14    access and whether they're requesting an OARRS
15    report when appropriate and whether they were
16    using delegates to request.  And here you say
17    yes, the pharmacists have access, yes, that they
18    are requesting OARRS reports when appropriate,
19    and no, they're not using delegates.  Is that
20    your enforcement of the regulations related to
21    drug utilization review that we went over?
22          A.    No.  Well, that -- that portion is
23    specific to just OARRS, but, you know, as we
24    kind of talked about, OARRS is part of the drug
25    utilization review.
```

Page 159

1        Q.    All right.  And then the remaining

2    portion of your report deals with

3    confidentiality, are there adequate safeguards

4    to protect confidentiality.  Here you had no

5    problems with this pharmacy complying with the

6    confidentiality rules?

7        A.    That's correct.

8        Q.    And then you have Points of Emphasis

9    and then Inspection Affirmations.

10            Do you see that?

11       A.    Yes.

12       Q.    Now, in the summary you indicate

13   that there's a warning of some sort and I was

14   curious about the warning.  Going through the

15   report, I didn't see anything that would --

16   called a warning.  What's this -- what does that

17   mean there?

18       A.    So it's -- it's probably difficult

19   to see just with the printed version, but if

20   you go to page 6 of 10, there was a -- I

21   believe this was a verbal warning, and, page 6

22   of 10 under Security, Section 5, and then

23   number 3.

24       Q.    All right.  And this relates to

25   where the records of accountability were being

Page 160

1  stored outside the pharmacy barricade but within

2  the same physical location.  Here's the

3  reference to the warning.  I missed that.  So

4  your observation was you inspected the cage in

5  the basement of the grocery store which houses

6  records.  "The cage is secure however two U

7  bolts on the right side of the door and a bolt

8  mechanism on the left side of the door are

9  accessible from the outside of the cage; could

10  be removed and replaced without detection.

11  Corrective action.  Ensure entire cage is both

12  secure and tamper evident."  Was that the

13  purpose of the warning that's referred to at the

14  end?

15        A.    Yes.

16        Q.    All right.  So am I reading this

17  right that this wasn't an actual break-in of the

18  records area, you just saw a potential risk that

19  somebody could break the bolts on the left side

20  of the door and you wanted them to be more

21  secure?

22        A.    Yes.  So in reading this, it would

23  have been not that they would break the bolts,

24  but they could remove the bolts, remove records

25  from within that cage, and then reattach the

Page 161

1  bolts.

2       Q.    Okay.  But that, actually, to your

3  knowledge, hadn't happened, you just said make

4  it so that nobody could even remove the bolts?

5       A.    Correct.

6       Q.    All right.  And did this pharmacy

7  comply with that request that they make those

8  bolts more secure?

9       A.    I can't answer that because I don't

10  believe I have looked at that cage since this

11  inspection.  They were not given a written

12  warning.  It was just a verbal warning.

13       Q.    Okay.  All right.  But otherwise

14  this inspection was good, am I correct, in terms

15  of all the areas we went over?

16       A.    Yes.

17       Q.    Did you consider it a good

18  inspection despite the -- they could have had

19  better bolts in the basement cage?

20       A.    Yes, I did.

21       Q.    If you go two pages after that, I

22  think I've found your name on another document

23  dated September 18, 2019, BOP_MDL2796412.

24       A.    Yes.

25       Q.    This says, "Property receipt," and I

Page 162

1    think you told me earlier this isn't necessarily

2    an inspection, it's just going to the pharmacy,

3    telling the pharmacist you want records here of

4    Dr. Skiffey, it looks like, and they give you

5    the records and you document it with a receipt,

6    correct?

7         A.    That's correct.

8         Q.    All right.  And at the end you say,

9    "No issues found."  Am I reading that right that

10   you got the records you wanted, the pharmacy

11   cooperated and gave you anything that you

12   needed?

13        A.    That's correct.

14        Q.    The last inspection report is

15   actually a property receipt with your name --

16   it's the next page -- September 18th of 2019.

17   It looks like the same date.  It looks like you

18   went to another Giant Eagle pharmacy in Warren

19   and got records with respect to Dr. Skiffey

20   again.  So same type of thing going on here;

21   it's not an inspection, it's picking up of

22   records?

23        A.    Yes, that's correct.

24        Q.    And, again, Giant Eagle pharmacists

25   provided you with the records and cooperated

Page 163

1   with you?

2          A.     Yes.

3          Q.     Have you inspected Giant Eagle

4   pharmacies outside of Trumbull County?

5          A.     Yes.

6          Q.     And am I correct that those

7   inspections were generally good inspections with

8   cooperative pharmacists, complying with whatever

9   you wanted and cooperating with you?

10         A.     Yeah.  As far as I can recall, the

11  pharmacists are always compliant and helpful.

12  You know, there probably was a written warning

13  issued or a verbal warning to the best that I

14  can recall.

15         Q.     Agent DiFrangia, as far as you're

16  concerned, did Giant Eagle meet the requirements

17  for the licenses for its store and the renewal

18  of its licenses at all times with no license

19  ever being suspended or revoked?

20         A.     Yeah.  As far as I'm concerned,

21  they have.

22         Q.     Did Giant Eagle pharmacies, from

23  your perspective, meet the security requirements

24  of the regulations at all times?

25         A.     Yes.  And if -- if there was a

1    minor portion where they didn't, corrective

2    action was given and they would address that.

3            Q.    In your experience, did you observe

4    Giant Eagle pharmacies having even better

5    controls than those required by the regulations?

6                MR. WEINBERGER:  Objection.

7            A.    Yeah, as -- as far as I can recall,

8    you know, they were conducting their controlled

9    substance inventories when required.  I can't

10   recall if they were doing it more.

11           Q.    All right.  Do you recall, in your

12   experience with Giant Eagle pharmacies, ever

13   being sanctioned or suspended or cited for

14   failure to meet the Ohio regulatory

15   requirements?

16           A.    As far as I'm aware, no.

17           Q.    Were Giant Eagle pharmacies

18   adequately staffed based upon your involvement

19   with them?

20           A.    Yes.  From what I recall, they

21   were.

22           Q.    Did they have licensed pharmacists

23   who -- who were experienced and qualified to

24   work as pharmacists in the Giant Eagle

25   pharmacies?

Page 165

1          A.     Yes.

2          Q.     Did they have trained and supervised

3     pharmacy technicians in the pharmacies based

4     upon your inspections?

5          A.     Yes.

6          Q.     Did the Giant Eagle pharmacies

7     comply with the manner of processing

8     prescription regulatory requirements, including

9     performing drug utilization reviews, as far as

10    you know?

11         A.     As far as I'm aware, they have.

12         Q.     Based upon your experience, do you

13    have any evidence that Giant Eagle pharmacies

14    ever filled illegitimate prescriptions?

15              MR. WEINBERGER:  Objection.

16         Q.     You can answer.

17         A.     Well, I guess -- yeah, they would

18    have because I'm sure -- I believe I've seized

19    prescriptions from a Giant Eagle that -- now

20    specifically, Dr. Prommersberger prescriptions,

21    that after reviewed by a medical expert and

22    deemed issued for no legitimate medical reason,

23    you know, we seized those because they were

24    dispensed at a Giant Eagle pharmacy or, you,

25    know, instances of that.

Page 166

1      Q.    I see, but those types of

2   investigations, I think you told me earlier,

3   were also prompted by Giant Eagle and other

4   pharmacists, correct?  They --

5              MR. WEINBERGER:  Objection.

6              MR. BARNES:  Can I finish my

7   question, Pete?

8              MR. WEINBERGER:  I thought you were

9   finished.  Sorry.

10     Q.    Going back to your prior testimony,

11  pharmacists, including at Giant Eagle, would

12  initiate leads and investigations for doctors

13  that they thought were behaving inappropriately?

14     A.    Yes.

15     Q.    And that from time to time would

16  lead to investigations and you would go back to

17  the pharmacies to get the prescription records,

18  correct?

19     A.    That's correct.

20     Q.    And then using pharmacy specialists

21  and medical professionals in your

22  investigations, you were able to determine that

23  some of the prescriptions were illegitimate; is

24  that correct?

25     A.    Correct.

1          Q.    So is that what you mean, that in

2     some instances you were able to later determine

3     that some prescriptions were illegitimate

4     because your investigation showed that that

5     doctor was behaving inappropriately?

6          A.    Yes.

7          Q.    Agent DiFrangia, based upon your

8     experience with the Giant Eagle pharmacies and

9     pharmacists, were the Giant Eagle pharmacies

10    operating lawfully as far as you know?

11              MR. WEINBERGER:  Objection.

12         A.    Yes.  As far as I know, they were.

13         Q.    And were Giant Eagle and its

14    pharmacists actively assisting law enforcement

15    and the board with anti-diversion efforts?

16              MR. WEINBERGER:  Objection.

17         A.    Yes.  As far as I've been involved

18    with, they have.

19         Q.    I have similar questions for the

20    other pharmacy Defendants, CVS, Walgreens,

21    Walmart and Rite-Aid.  Were those pharmacies and

22    pharmacists at those pharmacies actively

23    assisting law enforcement with anti-diversion

24    efforts?

25              MR. WEINBERGER:  Objection.

Page 168

1          A.    Yes.

2          Q.    And similar to the question I just

3     asked you about Giant Eagle, were those other

4     chain pharmacies operating lawfully as far as

5     you know?

6               MR. WEINBERGER:  Objection.

7          A.    Yes.  As far as I'm aware, they

8     were.

9          Q.    And were they, those other

10    pharmacies, the other pharmacy Defendants, they

11    were complying with the manner of processing

12    prescription regulations and the other

13    regulations that we just went over?

14              MR. WEINBERGER:  Objection.

15         Q.    I'm sorry?

16         A.    As far as I'm concerned, yes, they

17    were.

18         Q.    And were those other pharmacies also

19    adequately staffed with trained and licensed

20    pharmacists and pharmacy techs?

21              MR. WEINBERGER:  Objection.

22         A.    To my knowledge, they were.

23         Q.    And did these other pharmacies meet

24    the security requirements in the Ohio

25    regulations at all times as far as you're

Page 169

1   concerned?

2            MR. WEINBERGER:  Objection.

3       A.    Yes.

4       Q.    And did these other pharmacies also

5   meet the requirements, the licensing

6   requirements for its stores and for renewal of

7   its licensing for these stores at all times?

8            MR. WEINBERGER:  Objection.

9       A.    Yes.  As far as I'm aware, they

10  have.

11      Q.    Did you, in your experience, Agent

12  DiFrangia, including all your investigations --

13  were you able to see a difference between chain

14  pharmacies, on the one hand, and how they

15  operated, and independent pharmacies, on the

16  other hand, and how they operated?  Did you see

17  any difference between the nature of controls at

18  one versus the other?  Do you have any general

19  observations based upon your experience?

20           MR. WEINBERGER:  Objection.

21      A.    Yes.  Based on my experience, I

22  would say that, you know, I think if you're

23  looking at a retail pharmacy, you may see a

24  situation where a pharmacist is the owner and

25  maybe they may not be inclined to turn away a

Page 170

1    prescription due to potential monetary reasons

2    or, you know, they don't want to lose the

3    business, whereas, you know, I think that's a

4    little bit -- it happens more with chain

5    pharmacies because it's not the pharmacist's

6    business, they're not the owner of the

7    pharmacy, but they're, you know, protecting

8    their license and their reputation.  So I

9    guess, based on that, you know, I think there

10   is a little bit of a difference, the way they

11   operate.

12        Q.    In your experience did you observe

13   in your investigations diversion occurring at

14   independent pharmacies?

15        A.    Yes.

16        Q.    More so than chain pharmacies?

17             MR. WEINBERGER:  Objection.

18        A.    Well, it depends what type of

19   diversion.  I happen to think -- this is just

20   my own opinion.  It's not based on data or

21   anything of that nature.  But sometimes I think

22   that independent pharmacies are targeted by

23   someone with fraudulent prescriptions.  They

24   may think that they're able to get something

25   filled there.  Some of them, they do fill it.

                                        Page 171

1   Some of them don't, you know, as far as stuff
2   of that nature.  But I think the chain
3   pharmacies, they definitely report to me more
4   internal theft than any of the independent
5   pharmacies.
6                  MR. WEINBERGER:  Objection.  Move
7   to strike.
8        Q.    Have you ever investigated an
9   internet pharmacy?
10       A.    No.  No, not that I -- not that I
11  recall.
12                 MR. BARNES:  I have nothing
13  further, Agent DiFrangia.  I'd like to take a
14  five-minute restroom break.  And I don't know
15  if my co-counsel for the other pharmacy
16  Defendants are going to have any questions.
17  Maybe they want to say so now or if they want
18  to think about it over the break.
19                 MR. BEISELL:  I'll have a few
20  questions, Bob.
21                 MR. WEINBERGER:  Well, I think I'm
22  entitled to cross this witness now before
23  anybody else asks further questions.
24                 MR. BARNES:  What do you base that
25  on, Pete?  I thought we would finish the

Page 172

1  Defendants and then the Plaintiffs could go.

2              MR. WEINBERGER:  I disagree.

3              MR. BARNES:  Kate, do you have any

4  questions?

5              MS. SWIFT:  I'm happy to let Pete

6  go first.  That's fine.  I don't know if I'm

7  going to have questions or not.

8              MR. BARNES:  All right.  Is

9  everybody else happy to have Pete go first?

10              MR. BEISELL:  Fine by me.

11              THE VIDEOGRAPHER:  We're going to

12  go off the record at 1:39.

13                  (Recess had.)

14              THE VIDEOGRAPHER:  We are back on

15  the video record at 1:49.

16          EXAMINATION OF WILLIAM DiFRANGIA

17  BY MR. WEINBERGER:

18      Q.    Agent DiFrangia, my name is Peter

19  Weinberger and I'm privileged to represent Lake

20  and Trumbull Counties in this case, and so I

21  have a few questions to ask you on

22  cross-examination, okay?

23      A.    Okay.

24      Q.    We have never met before, have we?

25      A.    No.

1          Q.    As I understand your work history,

2    you have been an employee of the Board of --

3    Ohio Board of Pharmacy since November of 2016,

4    correct?

5          A.    Yes.

6          Q.    So in terms of your observations

7    relating to inspections and interactions with

8    the pharmacy Defendants or their employees, as

9    an agent for the Ohio Board of Pharmacy, that

10   has occurred since November of 2016 to the

11   present time, correct?

12         A.    Yes.

13         Q.    And as I understand your -- let me

14   ask you this:  Since COVID, since the COVID

15   pandemic, have the number of inspections, full

16   inspections of pharmacies, been reduced in

17   Trumbull County?

18         A.    Yes, by me, definitely for myself.

19         Q.    And why is that?

20         A.    Well, just with the pandemic, you

21   know, we're trying to limit our exposure and,

22   you know, limit everyone else's exposure to

23   anything.

24         Q.    Okay.  So in terms of your testimony

25   that was elicited from you over the last ten

Page 174

1    minutes or so of questioning regarding your

2    views of the conduct of retail pharmacy

3    Defendants in this case, they're limited to your

4    experience since November of 2016, correct?

5           A.    Yes; however, I've had interactions

6    with pharmacists and pharmacies prior to that.

7           Q.    Right.  But in terms of the kind of

8    inspection that you did, that you testified to

9    in 2018 at this Giant Eagle, that full

10   inspection, reviewing all these various systems,

11   pretty much your experience with respect to that

12   broad range of things that you looked at in your

13   inspections would be limited to your experience

14   since November of 2016, right?

15          A.    That's correct.

16          Q.    And when you do an inspection once a

17   year, that's really a snapshot of a couple of

18   hours of experience with a pharmacy at that

19   particular time, correct?

20          A.    That's correct.

21                And, sir, I can't see you.  I don't

22   know if it --

23          Q.    Oh, I'm sorry.  My video went off.

24   Sorry.  Is that better?

25          A.    There we go.  Yes.

Page 175

1          Q.    So when you do a full inspection,
2    like you did in 2018, that's just really a
3    couple-hour snapshot in time, correct?
4          A.    Yes.
5          Q.    And from what I can see from the
6    records, at least -- from what I can see in the
7    records, the only time that you did a full
8    inspection of a pharmacy in Trumbull County was
9    in 2018, correct?
10         A.    Well, that's just for a Giant Eagle
11   pharmacy.
12         Q.    I meant a Giant Eagle pharmacy.
13   Sorry.
14         A.    Yes.  Yes, that's correct.
15         Q.    Now, do you have any information or
16   recollection at this point as to how many full
17   inspections you did since 2016 with respect to
18   the other pharmacy Defendants in Trumbull
19   County?  Would it be a handful?
20         A.    Yes.  It's probably a handful for
21   the other Defendants.
22         Q.    And, likewise, with respect to those
23   inspections, it would be a snapshot moment in
24   time, assuming that the inspection took a couple
25   of hours on one particular day in a year,

Page 176

1   correct?

2          A.    Yes, that's correct.

3          Q.    Now, it appears from your testimony,

4   and appropriately so, that you are very familiar

5   with the regulations of the -- that the Board of

6   Pharmacy operates under with respect to

7   dangerous drugs or controlled substances,

8   correct?

9          A.    Yes.

10          Q.    And controlled substances are

11   considered in the state of Ohio to be dangerous

12   drugs, right?

13          A.    Yes.

14          Q.    And they are dangerous drugs because

15   they can be addictive, correct?

16          A.    I think they're dangerous drugs --

17   controlled substances are dangerous drugs

18   because they're issued by a prescriber and

19   they're dispensed from a pharmacy, different

20   from something that you could purchase over the

21   counter.

22          Q.    But particularly with respect to

23   opioid prescriptions or opioid prescription

24   drugs, they are dangerous because they can be

25   addictive, correct?

1        A.      Yes.

2        Q.      And because these drugs are

3    dangerous and can be addictive, they have a

4    propensity or carry a risk of being diverted,

5    correct?

6        A.      Yes.

7        Q.      And if you have addiction and

8    diversion, that leads -- that can lead to

9    problems with the safety associated with those

10   drugs, right?

11       A.      Sure.

12       Q.      In fact, the regulations that you

13   enforce for the Board of Pharmacy with respect

14   to opioid prescriptions are intended, if

15   complied with, to save lives, correct?

16       A.      I would assume that's what the

17   intention is.

18       Q.      These regulations are intended to

19   save lives and attempt to reduce the risk of

20   misuse or abuse of opioid prescription drugs,

21   correct?

22       A.      That's how I interpret many of

23   them.

24       Q.      And so any -- would you agree that

25   any retail pharmacy chain who has a license to

1    dispense opioid prescription drugs should

2    realize that compliance with the laws is

3    important in order to save lives and reduce the

4    risk of opioid misuse or abuse, correct?

5              MR. BEISELL:  Objection.

6         A.    Yes.

7         Q.    Now, are you familiar with the

8    Controlled Substances Act, the federal

9    Controlled Substances Act and its regulations?

10        A.    Yes.

11        Q.    And is it your job to enforce the

12   Controlled Substances Act and its regulations as

13   an agent of the Board of Pharmacy?

14        A.    I think it -- parts of it fall

15   within our duties.  I mean, we are tasked with

16   enforcing United States Federal Code, so I

17   would think that kind of falls within it.

18        Q.    But would you agree with me that

19   primarily your role as an agent for the Board of

20   Pharmacy is to carry out the obligations or, I

21   should say, enforce the laws of the State of

22   Ohio and its regulations?

23        A.    Yeah, I would say that's our

24   primary goal, is to enforce the rules of the

25   State of Ohio.

Page 179

1          Q.    Earlier Mr. Barnes asked you about

2     Defendants' DiFrangia Exhibit 9.

3               MR. WEINBERGER:  James, can you

4     bring that exhibit up on the screen?

5          Q.    And if you want to pull that out of

6     your notebook or you can look at the screen

7     together with me.  However you want to do it,

8     Agent DiFrangia, is okay with me.

9          A.    I'll just use the screen.

10         Q.    All right.  This DiFrangia

11    Defendants' Exhibit 9 apparently is a document

12    that the pharmacy Defendants received from the

13    Board of Pharmacy pursuant to a subpoena that

14    they issued on the board.

15              Do you got that so far?

16         A.    Yes.

17         Q.    All right.  And when you were asked

18    about this document by Mr. Barnes, you told him

19    that this appears to be how one might approach

20    investigating a prescribing issue with a

21    prescriber.  That wasn't your exact testimony

22    but did I basically get your testimony correct?

23         A.    Yes.

24         Q.    All right.  I want to go through

25    this with you -- well, let me ask you this:

Page 180

1    Looking through this document -- and, James, if

2    you would go back to the full document,

3    please -- it has two sections.  One is Data

4    Anomalies and the other is a General Workflow.

5    First of all, can you see that on your scene?

6         A.    Yes.

7         Q.    And looking at the 21 items of data

8    anomalies, do these appear to be red flags

9    regarding opioids prescribed by doctors that are

10   within the definition of red flags, as you

11   understand it?

12            MR. BARNES:  Object to form.

13        A.    I would say that they are --

14   they're anomalies.  I don't know that they're

15   necessarily red flags, but when you start to

16   put some of them together, then you could be

17   looking at a potential red flag prescribing

18   incident.

19        Q.    Right.  And so when you're -- when

20   you're looking at a red flag prescribing

21   incident, what you're looking for are signals

22   that a particular prescription might not be

23   being prescribed for a legitimate medical

24   purpose, correct?

25        A.    That's correct.

Page 181

1      Q.    And this list appears to be an

2   analysis or things that one might analyze in

3   looking at a prescriber's prescribing habits,

4   correct?

5      A.    Correct.

6      Q.    So if a prescriber has a large total

7   number of patients for which they're prescribing

8   opioids, that's a potential anomaly or red flag,

9   correct?

10     A.    Yes.

11     Q.    And if -- the analysis of the daily

12  patient breakdown, do you know what that refers

13  to?

14     A.    Yeah.  My guess is that's probably

15  relating to, you know, if you could break it

16  down to how many patients are being seen in a

17  day for controlled substances.

18     Q.    Right.  And the large overall volume

19  of prescriptions, what does that refer to?

20     A.    That's just a -- that's just your

21  lump sum of controlled substance prescriptions

22  issued by a prescriber over a period of time.

23     Q.    And number 4 seems pretty obvious,

24  "Patients with drug related criminal histories."

25  It is what it says, right?

Page 182

1          A.     Exactly.

2          Q.     Now, I'm interested in number 5,

3     "Prescribing of similar drugs in groups," and

4     there's a subsection, "Cocktails."  What does

5     that refer to?

6          A.     My guess, the way I'm interpreting

7     this, is let's say a prescriber is prescribing

8     a short-acting, pain-relieving medication in

9     addition to a long active -- long-acting,

10    pain-relieving medication.

11         Q.     Now, why is that a potential anomaly

12    or red flag?

13         A.     Well, you know, it could be

14    warranted if needed, but I guess if it's

15    something that happens over time, over multiple

16    patients, then it could be concerning that

17    instead of maybe a segment of patients getting

18    one large amount of prescription medication,

19    they're getting a prescription for two

20    medications, you know, potential opiates or

21    something of that nature.

22         Q.     Number 6 -- and the cocktails,

23    there's actually a Section 9 that deals with

24    drug cocktails.  We'll get to that in a second.

25    Number 6 is "Prescriber at unusual distance from

Page 183

1   pharmacy."  Why is that or what is it about that

2   that makes it an anomaly or potential red flag?

3          A.    Really just based on maybe the

4   patient lives near the pharmacy but they go --

5   they travel an hour to see a prescriber when in

6   theory they probably pass several prescribers'

7   offices in doing so.  So what is -- what is --

8   why is that patient driving an hour, passing

9   several different prescribers' offices, to see

10  that one prescriber, and then maybe coming back

11  to a pharmacy near their residence to get the

12  medication dispensed?

13         Q.    Meaning that there's a -- that might

14  raise the suspicion that the subscriber is

15  either a pill mill doctor or someone who is

16  overprescribing to certain patients, true?

17         A.    Yes, true.

18         Q.    Number 7, "Purchasing drugs with

19  cash (when some form of insurance, Medicare or

20  Medicaid, was previously used)."  Why is that an

21  anomaly or red flag?

22         A.    Well, if you have commercial

23  insurance or, you know, some sort of public

24  insurance, you would use that instead of paying

25  money out of your pocket.  So, you know, why --

1   it leaves one to ask why are they paying cash

2   when they have insurance for prescription

3   medications.

4        Q.    Is it fairly well-known in the law

5   enforcement sector of our country that payment

6   of prescription drugs in cash is often related

7   to potential illegal use of opioids?

8             MR. BEISELL:  Objection.

9        A.    Yeah.  My opinion is that it is.

10       Q.    When drugs are -- when opioid

11  prescription drugs are diverted and the

12  diversion is that the patient who's picked up or

13  had the prescription filled is then taking all

14  or part of that prescription and selling it on

15  the streets, is it well-known among law

16  enforcement that those transactions take place

17  utilizing cash?

18       A.    Yes.

19       Q.    And the people that are filling

20  those prescriptions and obtaining cash payments

21  when they divert those prescription pills on the

22  streets are often also people that have an

23  abundance of cash that can then be used to pay

24  for the prescriptions, correct?

25       A.    Yes.  That's possible.

Page 185

1          Q.     Now, number 8, "Multiple

2     prescriptions for similar substances (oxycodone

3     or oxycodone APAP)," what does that stand for?

4          A.     Oxycodone APAP is an abbreviation

5     for oxycodone acetaminophen.

6          Q.     So that's a combination oxycodone

7     drug, right?

8          A.     Yes.

9          Q.     Now, why is it that multiple

10     prescriptions for similar substances is an

11     anomaly or potential red flag?

12          A.     I think to me I interpret number 8

13     as being similar to number 5, where, you know,

14     you may have a prescriber that is prescribing

15     one patient oxycodone and then also giving a

16     prescription for oxycodone acetaminophen.

17          Q.     Now, number 9 is "Prescribing drug

18     cocktails (aka Trinity or Holy Trinity),

19     combinations of benzodiazepines with opiate

20     based drugs."  And then there's a list of other

21     drugs, hydrocodone, oxycodone, a pain reliever,

22     then drugs like benzodiazepine, which are

23     anti -- those are anti-anxiety drugs, right?

24          A.     Yes.

25          Q.     And a muscle relaxant.  That's the

Page 186

1    generic name for Soma, correct?

2         A.    Yes.

3         Q.    And why is this a potential red

4    flag?

5         A.    Well, you know, again, based on my

6    opinion, my conversations with pharmacists and

7    prescribers, these are just -- these are --

8    it's a combination that's kind of, I guess you

9    could say, frowned upon in the medical

10   community.  I'm not a doctor.  However, that's

11   just the information that's been told to me by,

12   again, prescribers and pharmacists.  You know,

13   there's some potential negative interactions

14   that could happen with this combination, but

15   that's just information that's been relayed to

16   me as an agent.

17        Q.    Right.  And that's because it's

18   well-known in the medical community, in the law

19   enforcement community, that the combination of

20   these three drugs are an indication of abuse and

21   potential diversion, correct?

22             MS. SWIFT:  Objection.  Foundation.

23             MR. BARNES:  Object to the form of

24   the question.

25        Q.    Go ahead.  You can answer.

Page 187

1          A.     Yes, that's correct.

2          Q.     Number 10, "Prescriber does not fit

3    the scope of practice for drugs prescribed,"

4    what does that mean?

5          A.     You know, that's a prescriber

6    that's maybe prescribing a large amount of

7    medication that's just not in their scope.  So

8    I guess as an example, like a dentist that's

9    prescribing a large amount of amphetamine

10   salts.  You know, they're scheduled

11   medications, they're stimulants.  They really

12   don't fit their -- fit into their scope of

13   practice.

14         Q.     Can you give me any other examples

15   of that?

16         A.     Yeah.  You know, maybe a -- you

17   know, it could be -- it could be that a family

18   doctor or family physician prescribing a very

19   large amount of opiates.  They're permitted to

20   prescribe those; however, you know, it could be

21   so many that, you know, potentially out of

22   their scope of practice.

23         Q.     So these other -- I'm going to group

24   these together and just ask you, from 11 to 21,

25   are these all well recognized by law enforcement

Page 188

1   and pharmacists as red flags that might indicate

2   a suspicious subscription?

3                 MR. BARNES:  Object to form.

4        A.    Yes, I believe they are.

5        Q.    And from your experience in law

6   enforcement, going back many years before you

7   were with the Board of Pharmacy, was it your

8   experience and knowledge that these 21 described

9   anomalies were fairly well known in law

10  enforcement as potential red flags for

11  suspicious prescription or a problematic

12  prescription?

13                MR. BARNES:  Object to form.

14       A.    Yes.

15       Q.    Now, from your knowledge and

16  experience, how many years has it been known

17  that these are -- these are all potential red

18  flags or anomalies associated with opioid

19  prescriptions?

20                MR. BEISELL:  Objection.

21       A.    Well, you know, I can really only

22  -- I can really only account for my own -- my

23  own knowledge and my own experience, and

24  that's -- that's probably going back to about

25  2013, 2014.

Page 189

1        Q.    All right.  Fair enough.

2              Now, looking at these -- at these

3    21 items of potential red flags, would it be

4    fair to say, Agent DiFrangia, that the retail

5    pharmacy chains have information regarding all

6    of these potential anomalies within their own

7    dispensing data?

8              MR. BARNES:  Object to form.  Lack

9    of foundation.

10             MR. WEINBERGER:  I'll withdraw that

11   question.

12       Q.    You have indicated that during the

13   course of your full inspections of pharmacies,

14   you have a chance to look at the pharmacy's own

15   dispensing data, correct?

16       A.    Yes.

17       Q.    And I'm assuming that what that

18   means is that you can look into their computer

19   systems, look at their screens and look into

20   their computer systems and see what dispensing

21   data is available, correct?

22       A.    Yes.

23       Q.    Including some of the fields of data

24   that's available through the computer, right?

25       A.    Some of the fields.

Page 190

1          Q.    So do you know, Agent DiFrangia,

2    that for -- well, let's just say for the last 20

3    years whether or not the retail pharmacy

4    Defendants in this case have been storing

5    dispensing data in their systems?

6                MR. BARNES:  Object to form.

7          A.    I'm sorry.  Do I know that?

8          Q.    Right.

9          A.    No, I don't know that.

10         Q.    Since 2013 have you known that the

11   retail pharmacy chains store their dispensing

12   data in their systems?

13               MR. BARNES:  Same objection.

14         Q.    Go ahead.  You can answer.

15         A.    Yes, I'm aware they store their

16   dispensing data in their -- in their dispensing

17   systems.

18         Q.    In the course of your interaction

19   with any of the retail pharmacies during your

20   annual inspections, have you ever inquired of

21   any of the pharmacists whether they are provided

22   with corporate analysis of dispensing data?

23         A.    No, I don't know that I've ever

24   asked that during an inspection.

25         Q.    Have you ever asked them whether

1    they receive reports from their corporate

2    offices on how to use -- or policies on how to

3    use dispensing data to analyze the data

4    anomalies and red flags that are listed on

5    Exhibit 9?

6         A.    I have never asked that of them.

7         Q.    If there was dispensing data that

8    could be analyzed to look at these various

9    anomalies, that would be helpful to the

10   pharmacist in carrying out their duties to only

11   dispense prescription opioids that are for

12   legitimate medical practice, correct?

13             MR. BARNES:  Objection.  Lack of

14   foundation.

15        A.    You know, I don't know if that

16   would be helpful because I'm not a pharmacist.

17        Q.    All right.  Fair enough.

18             But at least -- if the dispensing

19   data provided a window into the ability to

20   analyze any one of these 21 red flags or

21   anomalies and that could be provided to the

22   pharmacist, that would potentially be helpful

23   to the pharmacist in carrying out their job,

24   correct?

25             MR. BARNES:  Same objection.  Asked

Page 192

1   and answered already.

2        A.    It could be, but again, I'm not a

3   pharmacist and I don't know that I could answer

4   that.

5        Q.    Well, you're familiar with the

6   obligation -- what's called the corresponding

7   obligation or responsibility on the part of the

8   pharmacist, correct?

9        A.    Yes.

10       Q.    I mean, the pharmacist, in the chain

11  of dispensing the drugs, is the last line of

12  defense, correct?

13            MR. BARNES:  Object to form.

14       A.    Yes.

15       Q.    The answer is yes?

16       A.    Yes.

17       Q.    The pharmacist receives a

18  prescription that's presumably written or

19  ordered by a physician and then has to undertake

20  his or her own corresponding responsibilities to

21  ensure that that prescription is filled in

22  accordance with the law, correct?

23       A.    Yes.

24       Q.    And that is particularly true with

25  respect to dangerous drugs, such as opioid

Page 193

1   prescriptions, correct?

2       A.    Yes.

3       Q.    Because as the last line of

4   defense -- the pharmacies and the pharmacists is

5   the last step in providing prescription opioids

6   to the public, correct?

7               MR. BEISELL:  Objection.  Form.

8       A.    Yes.

9       Q.    Now, with respect to these data

10  anomaly and red flags on DiFrangia Defendants'

11  Exhibit 9, does OARRS -- does the data in OARRS

12  have the potential for providing the information

13  to analyze these data anomalies?

14      A.    Yes, it does.

15      Q.    And earlier you testified that there

16  are limits in OARRS in terms of what a

17  pharmacist can obtain versus what you can obtain

18  by way of either a subpoena or by utilizing

19  OARRS as an agent for the Board of Pharmacy,

20  correct?

21      A.    Correct.

22      Q.    And have you, Agent DiFrangia, ever

23  analyzed a retail pharmacy chain's data,

24  dispensing data, to see how much information

25  that data has that might identify some of these

Page 194

1    data anomalies?

2         A.    I mean, I have reviewed data for

3    retail pharmacies, but I don't know that I've

4    necessarily reviewed it for data anomalies.

5    You know, I've reviewed it for trying to find a

6    certain prescription or something of that

7    nature, but as far as I recall, I don't know

8    that I've ever reviewed a retail chain

9    pharmacy.  I've done retail independent

10   pharmacies but not a retail chain pharmacy.

11        Q.    So when you testified earlier that

12   with respect to your 2018 full inspection of the

13   Giant Eagle pharmacy, that you looked at and

14   approved their dispensing data system, that was

15   done on a very limited basis, correct?

16            MR. BARNES:  Object to form.

17        A.    Yes.  It is a -- it's a limited

18   basis.

19        Q.    Well, when you say "limited," what

20   does it mean?  I mean, let's assume that that

21   inspection, and I think the records reflect, was

22   about three and a half hours to answer all of

23   those 40 or so questions that are in that form.

24   How much time did you actually spend actually

25   looking and reviewing dispensing data of the

Page 195

1    pharmacy, of that particular Giant Eagle

2    pharmacy?

3          A.    I can't recall.

4          Q.    A matter of a minute or two?

5          A.    I can't recall.  You know, we

6    looked at the dispensing software.  I think in

7    that inspection I reviewed a patient's profile,

8    but, you know --

9          Q.    Well, with respect to the latter

10   part of that answer, that's -- I'm glad we got

11   to that.  You said -- you made the comment that

12   you believed that the Giant Eagle, based upon

13   that inspection, complied with the requirements

14   of the patient profile in terms of the data

15   that's retrievable for that, correct?

16         A.    Yes.

17         Q.    That's what you testified to, right?

18         A.    Yes.

19         Q.    But what you actually did is you

20   looked at one patient, one patient's profile,

21   correct?

22         A.    Yes.

23         Q.    You didn't look at or review 20

24   patients, 50 patients, a hundred patients, and

25   look to see whether or not the drug utilization

Page 196

1    profile was accurate or proper, correct?

2              MS. SWIFT:  Object to the form.

3    Leading.

4              MR. WEINBERGER:  Of course I'm

5    leading.  I'm cross-examining him.

6              MS. SWIFT:  Okay.  Well, if your

7    position is that this is a hostile witness to

8    Plaintiffs -- is that what you're saying, Pete,

9    the Board of Pharmacy is a hostile witness?

10             MR. WEINBERGER:  No, I'm not saying

11   he's a hostile witness, Kate.  What I'm saying

12   is that you've called him on -- you've called

13   him for deposition as if under direct and I'm

14   entitled to cross-examine the witness.

15             MS. SWIFT:  My objection stands.

16   Leading.

17             MR. WEINBERGER:  Okay.  Very good.

18        Q.   So you looked at one drug

19   utilization patient profile, correct?

20             MS. SWIFT:  Objection.

21        A.   From what I recall, yes.

22        Q.   And then you made a judgment based

23   upon that one review -- and I'm not criticizing

24   you for that, but I just want to be clear.  You

25   made a judgment based upon the review of one

Page 197

1   patient profile drug utilization review that

2   that particular Giant Eagle store was in

3   compliance, right?

4            MR. BEISELL:  Objection.

5            MR. BARNES:  Object to form.

6       A.    Typically I follow up with

7   questions, such as can you provide this

8   information, how long, how far back does it go,

9   are you able to provide it, and, you know, I

10  take all that into account.

11       Q.    Fair enough.

12            But in terms of actually looking at

13  what a particular pharmacist working for Giant

14  Eagle pharmacy actually did or does, you were

15  looking at, first of all, one snapshot in time,

16  and in terms of the patient profile, one

17  patient profile, correct?

18            MR. BARNES:  Objection.  Asked and

19  answered.

20            MS. SWIFT:  Object to form.

21       Q.    You can answer.

22       A.    Yes, it's a snapshot in time.

23       Q.    Now, do you believe that a retail

24  chain pharmacy's dispensing data could develop a

25  prescriber profile based upon that data?

Page 198

1              MR. BARNES:  Objection.  Lack of

2     foundation.

3          A.    I believe that it could.

4              MR. APPEL:  Pete, this is Henry

5     Appel.  Do you mind if we take a few minutes

6     just so I can touch base with my client

7     briefly, take five minutes, ten minutes?

8              MR. WEINBERGER:  Sure.

9              MR. APPEL:  Thank you.

10             THE VIDEOGRAPHER:  We're going off

11    the record at 2:27.

12                   (Recess had.)

13             THE VIDEOGRAPHER:  We are back on

14    the record at 2:37.

15    BY MR. WEINBERGER:

16         Q.    Agent DiFrangia, I would like you to

17    take a look at Edwards Exhibit 10.

18             MR. WEINBERGER:  And, James, these

19    aren't Bates stamped, but what we're going to

20    do is we're going to look at 4729-5-20.  So

21    it's a couple pages in.  There we go.

22         Q.    Agent DiFrangia, do you have

23    4729-5-20 in front of you from Exhibit 10?

24         A.    I -- yes.

25         Q.    Thank you.

1              So you were asked a whole lot of

2    questions by Mr. Barnes about this particular

3    section of the Ohio regulations entitled

4    "Prospective Drug Utilization Review."

5              With respect to Sections A --

6    Section A, do you know whether or not this

7    particular section has been in effect for about

8    20 years?

9         A.    I don't know.

10         Q.    I'm particularly interested in

11    Section A(4), which is drug-drug interactions,

12    and let me ask you, does that include what you

13    testified to regarding in Exhibit -- DiFrangia

14    Exhibit 9, when we looked at drug cocktails?

15         A.    No.  I don't know.

16         Q.    Well, isn't it true that the trilogy

17    drugs that are described in Exhibit 9, which is

18    a combination of an opioid, an anti-anxiety drug

19    and a muscle relaxant, are red flags because of

20    the way in which they interact together?

21         A.    Yeah.  From what I've been told by,

22    you know, prescribers and pharmacists.

23         Q.    So knowing that, would it be fair to

24    say that drug-drug interactions under Section

25    A(4) refers to that -- to cocktail drugs, as an

Page 200

1    example?

2         A.    I don't know if that refers to

3    cocktail drugs.

4         Q.    If it does, that should be part of a

5    pharmacy's drug utilization review when filling

6    an opioid, correct?

7         A.    I don't know if it has any

8    reference to that trilogy cocktail that we

9    discussed.

10        Q.    I want to go to the second page of

11   this and that's Section G of 4729-5-20.  This is

12   the section that you testified earlier in my

13   cross-examination of you that relates to the

14   corresponding responsibility of the pharmacist,

15   correct?

16        A.    Yes.

17        Q.    And it specifically says in the

18   second sentence, "The responsibility for the

19   proper prescribing is upon the prescriber, but a

20   corresponding responsibility rests with the

21   pharmacist who dispenses the prescription,"

22   correct?

23        A.    It does say that.

24        Q.    "Based upon information obtained

25   during a prospective drug utilization review, a

Page 201

1   pharmacist shall use professional judgment when

2   making a determination about the legitimacy of a

3   prescription," correct?  I've read that

4   correctly?

5           A.   Yes.

6           Q.   And it goes on to say that if

7   there's any -- if there's any concern about

8   whether or not a prescription is questionable,

9   doubtful, or suspicious, the pharmacist is not

10  required to fill the prescription, correct?

11          A.   It does say that, yes.

12          Q.   That's what we're talking about when

13  I earlier asked you about the pharmacy and the

14  pharmacist being the last line of defense with

15  respect to opioid prescriptions, correct?

16          A.   I mean, in my opinion I think

17  that's accurate.

18          Q.   All right.  Now, can we agree that

19  when the pharmacist is exercising his judgment

20  in fulfilling this corresponding responsibility,

21  the pharmacy that he works for has the

22  obligation of giving the pharmacist adequate

23  tools to be able to do his job, correct?

24               MR. BEISELL:  Objection.

25               MS. SWIFT:  Objection.  Calls for a

Page 202

1    legal conclusion.

2         Q.    You can answer.

3         A.    I don't know.

4         Q.    Well, with respect to information

5    coming from dispensing data that the pharmacist

6    might want to utilize to exercise his

7    corresponding responsibility, the information is

8    only as good as that which is provided to the

9    pharmacist by his employer, the pharmacy,

10   correct?

11             MS. SWIFT:  Object to the form.

12        A.    I don't -- I don't know what a

13   pharmacist would want or need because I am not

14   a pharmacist.

15        Q.    Well, you do know that OARRS --

16   access to the OARRS data for as long as it's

17   been accessible, which doesn't go back 20 years

18   but I think goes back something less than that,

19   is -- has the potential for providing important

20   information to the pharmacist in fulfilling his

21   corresponding responsibility, right?

22        A.    Yes.

23        Q.    And if the pharmacy that employs him

24   has information that's similar to what is

25   contained in OARRS and has had that information

Page 203

1   for years long before OARRS was in existence,

2   that information could potentially be helpful to

3   the pharmacist in carrying out his corresponding

4   responsibility, true?

5        A.    You know, again, I don't -- I don't

6   know if that would be helpful because, you

7   know, I think that would be a question geared

8   for a pharmacist.

9        Q.    Well, certainly your inspection and

10  that of the other agents doesn't look at that

11  question, does it?

12       A.    Which question?

13       Q.    The question of whether or not the

14  retail pharmacy chain that employs these

15  pharmacists is giving the pharmacist adequate

16  information from their dispensing data to help

17  that pharmacist carry out his corresponding

18  responsibility.

19       A.    I mean, that specific question is

20  not asked during an inspection.

21       Q.    Okay.  And --

22             MR. BARNES:  Excuse me.  I was

23  muted.  I didn't realize I was muted.  I did

24  have objections to the form of the last two

25  questions.

1          MR. WEINBERGER:  That's fine.  I'm

2    sure they'll note it in the record and I'll

3    recognize it.

4          Q.    You mentioned with respect to the

5    December 18, 2018 report from your inspection of

6    the Trumbull County Giant Eagle that this

7    format, this computerized or computer-generated

8    format, is a new format that is very helpful in

9    helping you document inspections, correct?

10          A.    Yes.

11          Q.    And from looking at prior inspection

12    reports that were not using this system, you

13    have generally an idea of what those reports

14    look like, right?

15          A.    Yes.

16          Q.    And those were handwritten reports

17    that had a column of items that I guess the

18    inspector might be considering in doing the

19    inspection, correct?

20          A.    Yes.

21          Q.    Looking at drug utilization review

22    reports or dispensing data is not a part of any

23    of the 40 sections or description of 40 items

24    that they might inspect in those old reports;

25    are you aware of that?

Page 205

1                MR.  BARNES:   Object  to  form.

2         A.    No,  I'm  not  aware  of  that  because

3    I've  never  used  those  old  handwritten  reports.

4         Q.    So  of  your  own  personal  knowledge,

5    Agent  DiFrangia,  would  it  be  fair  to  say  that

6    you  have  no  idea  prior  to  2016  whether  any  of

7    the  inspectors  were  looking  at  dispensing  data

8    or  drug  utilization  reports  as  they  might  be

9    accessed  by  a  pharmacist  during  their

10   inspection?

11        A.    I  mean,  I'd  have  to  guess  that  they

12   were.

13        Q.    We  don't  want  you  to  guess.

14        A.    But  I  don't  know  for  sure  because

15   I've  never  conducted  an  inspection  prior  to

16   2016.

17        Q.    All  right.   Now,  I  want  to  talk  with

18   you  a  little  bit  about  this  December  18,  2018

19   inspection  report,  so  that's  in  Exhibit  30  --

20   Exhibit  17  towards  the  back.   Can  you  pull  that

21   out  and  put  it  in  front  of  you?

22        A.    Sure.

23        Q.    Let  me  know  when  you're  there.   We

24   also  have  it  up  on  the  screen.   Do  you  got  it?

25        A.    I'm  still  going  through  the  pages

Page 206

 1   here.

 2              Yes, I have it up.  I'm sorry.

 3   December --

 4        Q.    18th, 2018.

 5        A.    Okay.

 6        Q.    I want to go through the process of

 7   this kind of inspection.  And we can agree that

 8   this is the only full inspection that you did of

 9   a Giant Eagle store in Trumbull County since you

10   were a Board of Pharmacy agent, correct?

11        A.    Yes.  As far as I can recall it is.

12        Q.    So do you -- is there -- do you have

13   a laptop with you when you're doing this?

14        A.    Yes.

15        Q.    All right.  And then it has a number

16   of questions or drop-down items that you can

17   utilize on the computer software?

18        A.    Yes.

19        Q.    And according to the second page of

20   the report, this -- well, let me ask you this:

21   When it says "start" and "end, December 18,

22   2018, 12:45 p.m. - 3:36 p.m.," what does that

23   mean?

24        A.    That is pretty much the time that

25   you initiate the inspection, the software on

Page 207

1   the computer, and then the end time is, at the

2   end when you hit "finalize," it sends an e-mail

3   to myself and then it also sends an e-mail

4   to -- to the staff pharmacist which is there.

5   It signifies the minute you hit that finalize

6   button.

7          Q.     So do you have any idea what time

8   you got to the -- to this particular pharmacy,

9   what time you arrived?

10         A.     No, I don't.

11         Q.     Do you have any idea what time you

12  left?

13         A.     No.

14         Q.     Do you have any idea how long the

15  inspection took place?

16         A.     Well, the inspection took place

17  from about that time.

18         Q.     So this was an inspection for how

19  long?

20         A.     From about 12:45 to 3:36.

21         Q.     So about four hours approximately?

22         A.     I mean, give or take, but no.  It's

23  -- I mean, we're looking at not quite three

24  hours that you could say the inspection was

25  actually occurring, but, I mean, was there time

1    that I spoke with the pharmacist before or

2    spoke with him after, I really don't recall,

3    but that's generally what happens during

4    inspections.

5          Q.    In these retail pharmacy chain

6    stores like Giant Eagle, is there -- do you know

7    whether or not they have a video system where

8    they are taking videos of what's happening

9    within the pharmacy?

10         A.    Yeah.  This pharmacy, I believe

11   they do have a video system.

12         Q.    Have you ever looked at any of the

13   video system tapes?

14         A.    For this pharmacy?

15         Q.    Yes.

16         A.    Not that I recall.

17         Q.    The time frame between 12:45 and

18   3:36 p.m., from your knowledge, in terms of

19   inspecting these retail pharmacy chain stores,

20   is that a particularly busy time or a slow time?

21         A.    I think that's probably more of a

22   busier time.

23         Q.    Why is that?

24         A.    Well, you've got people that maybe

25   on their lunch break they're trying to get

1   their prescriptions filled, and then towards

2   the end of their shift they're coming in to get

3   their prescriptions filled.

4        Q.   Setting aside the Giant Eagle

5   pharmacy, which is a part of a large grocery

6   store, with respect to CVS and Walgreens and

7   Rite-Aid, you've been in all their stores?

8        A.   Yes.

9        Q.   Do they have, generally speaking, a

10  busier time than that from your experience?

11       A.   No.  I think it's -- I think

12  they're pretty steady for the most part.  I

13  mean, the evenings are less busy.  The mornings

14  I think are busier.  They're getting, you know,

15  prescriptions that came in overnight or things

16  from late in the day the prior day.  But, I

17  mean, generally it -- it really depends.

18  They're pretty steady throughout the day.

19       Q.   Well, have you ever looked and

20  studied any of the videos of -- by the way, does

21  CVS and Walgreens also have video systems

22  that -- particularly with respect to their

23  pharmacies?

24       A.   Yeah.  I'm sure they have in some

25  pharmacies.  I don't know if they have them in

Page 210

```
 1    all.

 2         Q.    Have you ever looked at any of the

 3    CVS or Walgreens or Rite-Aid videos?

 4         A.    During inspections?

 5         Q.    Yes.

 6         A.    No, not during inspections

 7    generally.

 8         Q.    Okay.  So when you, for example,

 9    made the conclusion that there was adequate

10    staffing, that was based upon your observations

11    during this time frame at the Giant Eagle store,

12    right?

13         A.    Yes.

14         Q.    You never looked at the video for

15    the whole day of this store to determine whether

16    or not there was adequate staffing, right?

17         A.    No, I did not.

18         Q.    Nor have you ever done that with

19    respect to any of the other retail chain

20    pharmacies that you inspected, correct?

21         A.    That's correct, I haven't.

22         Q.    Now, in the course of investigating

23    a potential -- let me ask you this:  You were

24    involved in an investigation that resulted in

25    testimony in the case of Carrie Allen, who was a
```

1   Rite-Aid technician who was stealing from the

2   pharmacy.

3              Do you recall that case?

4        A.    Yes.

5        Q.    And you -- to perform that

6   investigation and to work up the case, you had

7   installed an Ohio Board of Pharmacy surveillance

8   camera, correct?

9        A.    Yes.

10       Q.    And you were able to use that camera

11  in order to catch the pharmacist, Carrie Allen,

12  or the technician, stealing hydrocodone pills,

13  right?

14       A.    I think it was -- I think it was

15  alprazolam pills, if I'm thinking of the

16  correct person.

17       Q.    From the information I have, it was

18  both alprazolam and hydrocodone.  Does that

19  refresh your memory?

20       A.    I mean, we're talking about a

21  Rite-Aid pharmacy in Newton Falls?

22       Q.    Yes.

23       A.    Okay.

24       Q.    Did that Rite-Aid pharmacy have

25  video cameras of its own?

Page 212

1        A.     I think they did, yes.

2        Q.     Why did you have to install your own

3   cameras?

4        A.     Well, their cameras were not --

5   from what I recall, they were limited and they

6   only covered a limited portion of the pharmacy,

7   and, you know, we realized that there was an

8   issue with the hydrocodone and then the

9   alprazolam, so my camera was focused

10  specifically on those areas.

11       Q.     So let's go back -- let's go back to

12  this part of Exhibit 17, your December 18, 2018

13  inspection report.  Going to page 3 of 10,

14  before when I asked you how many detailed

15  patient profiles you looked at in order for you

16  to determine whether this particular store

17  complied with the regulations regarding detailed

18  patient profile, you said you looked at one

19  patient's profile, correct?

20       A.     Yes.

21       Q.     And the patient profile that you

22  looked at was a patient who you were

23  investigating, right?

24       A.     I don't know that I was

25  investigating the patient, but he was -- the

Page 213

1    investigation was surrounding him.  I don't

2    think it was against him.

3         Q.    A complaint about a HIPAA violation?

4         A.    Yes.

5         Q.    And so you asked the pharmacist --

6    did you ask the pharmacist to pull up the

7    patient profile or did you do it yourself?

8         A.    I would have asked them.

9         Q.    And the second question under Record

10   Availability says, "Can the pharmacy produce

11   three years of dispensing records within three

12   days?"  And the answer was "Yes."  How did you

13   get that information?

14        A.    From what I recall, I probably just

15   asked it.

16        Q.    Okay.  So you didn't -- you didn't

17   ask anybody to go into the records or into the

18   data on the computer system to confirm that they

19   could do that, correct?

20        A.    No.  I just asked them if they were

21   able to produce records within three days.

22        Q.    Now, was that -- were those -- for

23   example, were those very questions questions

24   that would have been asked by an inspector prior

25   to 2017, when this new system of inspection and

1    computerized system went into effect?

2         A.    I don't know for sure.

3         Q.    Let's go to the next page.  You

4    testified about the shared dispensing software,

5    2.3.4, and you -- I think you testified and --

6    that the shared dispensing software -- "Is there

7    a real time online system used for review and

8    transfer of dispensing data?"  The answer is

9    "Yes."  And then there's an observation that

10   says "Yes."  What does that mean?

11        A.    Well, again, that -- that relates

12   to, you know, is it real time for the other

13   vacancy, real time what this patient has been

14   dispensed and, you know, if they can see for

15   pharmacies within their -- within their chain.

16        Q.    And did you actually see the data

17   yourself?

18        A.    No.  Again, this is something that

19   I would ask the pharmacist.

20        Q.    So you didn't -- you didn't confirm

21   it yourself by looking at the computer screen,

22   you were just relying on the pharmacist's

23   answer?

24        A.    Correct.

25        Q.    And going to page 7, number 10,

Page 215

1    Improper Dispensing.  "Is there evidence to

2    indicate that a prescription has been dispensed

3    improperly?  And your answer was "No."  What was

4    that based -- what was that answer based on?

5            A.    That's generally based on what I

6    typically will do is review some of the hard

7    copy prescriptions.

8            Q.    How many did you review that day?

9            A.    I don't know.

10           Q.    You didn't look at any of the

11   dispensing data to determine whether or not any

12   prescription was dispensed improperly?

13               MR. BARNES:  Objection.  Asked and

14   answered.

15           Q.    What's your answer?

16           A.    I don't know.  I don't recall.  You

17   know, I -- I was thinking about the

18   investigation that I was reviewing and, you

19   know, I just don't know.  I don't know what I

20   looked at exactly.

21           Q.    The next question, which asks about

22   insufficient supervision is based upon -- was it

23   based upon your observations during that couple

24   hours that you were there or something else?

25           A.    That's based on my own

Page 216

1   observations.

2         Q.    Well, did you -- did you ask for the

3   data on the number of opioid prescriptions that

4   were filled during any particular time frame at

5   that store?

6         A.    No.

7         Q.    And did you ask for information as

8   to how many pharmacists or pharmacy techs were

9   working at the store at any particular point in

10  time during the day?

11        A.    Well, yeah, that I would have

12  documented on the first page, everyone that was

13  there.

14        Q.    So did you ever compare the number

15  of prescriptions filled to the number of

16  pharmacists employed at the store?

17        A.    No.

18        Q.    So the way to really determine

19  whether or not there was adequate supervision

20  and sufficient employees to fill -- to properly

21  and safely fill prescriptions would be to look

22  at the number of prescriptions filled and

23  compare that with the number of pharmacists or

24  pharmacy techs employed at the store, right?

25              MR. BARNES:  Objection.  Lack of

Page 217

1   foundation.

2          A.    I don't know if that's -- that's

3   the way that has to be reviewed.

4          Q.    Well, does the Board of Pharmacy

5   ever look at those sorts of metrics, meaning

6   number of prescriptions filled versus number of

7   pharmacists or pharmacy techs employed, in order

8   to determine whether there's adequate personnel

9   or supervision?

10         A.    For different types -- for

11  different investigations, such as an error in

12  dispensing, we record the amount of

13  prescriptions dispensed for a particular day in

14  which a suspected error may have occurred.

15         Q.    You know, you were asked a question

16  to compare the conduct of independently owned

17  pharmacies versus these retail chain pharmacies,

18  and your answer was something along the lines of

19  that the independent chain pharmacy that's

20  family owned or individually owned might be more

21  incentivized to fill more prescriptions.  Did I

22  summarize your testimony correctly?

23         A.    Yes, in my opinion.

24         Q.    Have you ever inquired of the retail

25  chain pharmacies whether or not they have a

Page 218

1  bonus system or ever had a bonus system for

2  their pharmacist that was driven by the number

3  of prescriptions that they filled either per

4  hour or per day?

5       A.    No, I have not.

6       Q.    If you -- if you learned

7  hypothetically that for a significant period of

8  time, these retail chain pharmacies paid out

9  bonuses to their pharmacists based upon the

10  number of prescriptions that they filled, would

11  that change your testimony about that

12  comparison?

13            MR. BARNES:  Object to form.  I

14  don't think it's appropriate to ask a fact

15  witness a hypothetical question.

16            MR. WEINBERGER:  Well, you asked

17  him a very broad hypothetical question and I'm

18  entitled to do the same.

19            MR. BARNES:  For the record, I did

20  not ask a hypothetical question.

21       Q.    If you knew there wasn't such a

22  bonus system, would that change your position as

23  to what incentives might exist within the retail

24  chain pharmacies to fill prescriptions?

25            MR. BARNES:  Same objection.

Page 219

1        A.    Potentially, but I really don't --
2    I don't know.
3        Q.    In Exhibit 17, further into the
4    exhibit I want you to pull out a Giant Eagle
5    inspection -- full inspection report for August
6    31, 2020.  It starts Bates stamp 2796421.  Let
7    me know when you're there.
8        A.    Yes, I'm here.
9            MR. BARNES:  I'm not there yet.
10   Can you tell me how many pages into the exhibit
11   it is?
12           MR. WEINBERGER:  It's -- I think
13   it's the last inspection report, Bob --
14           MR. BARNES:  Hold on.
15           MR. WEINBERGER:  -- under Exhibit
16   17.
17           THE WITNESS:  Is this the one
18   prepared by --
19           MR. WEINBERGER:  August 31, 2020
20   prepared by Kimberly Hollingshead.
21           MR. BARNES:  I'm there.
22       Q.    Agent DiFrangia, you've got it in
23   front of you?
24       A.    Yes.
25       Q.    Do you know Agent Hollingshead?

Page 220

```
 1        A.    Yes.  She's an inspector with the
 2   Board of Pharmacy.
 3        Q.    So she has specific duties to
 4   inspect pharmacies, as you've previously
 5   described, which is different from being an
 6   agent, correct?
 7        A.    Yes.
 8        Q.    And apparently she was using the
 9   same software --
10             MR. APPEL:  I'm sorry.  Can we take
11   a very brief break?  I have to get my child off
12   the bus.
13             MR. WEINBERGER:  Oh, sure.
14             THE VIDEOGRAPHER:  Off the record
15   at 3:09.
16                  (Recess had.)
17             THE VIDEOGRAPHER:  Back on the
18   video record at 3:11.
19   BY MR. WEINBERGER:
20        Q.    We're looking at an inspection
21   report in Exhibit 17, Defendants' Exhibit 17.
22   Again, just by way of background, this is --
23   these are -- this is a report obtained by the
24   Defendants per a subpoena that was issued on the
25   Board of Pharmacy.  This report was -- this
```

Page 221

1   inspection was apparently completed by Inspector

2   Hollingshead, correct?

3          A.    Yes.

4          Q.    Using the same format as you used in

5   your 2018 inspection report that we previously

6   had discussed, right?

7          A.    Yes.

8          Q.    I want you to go to page 9 of this

9   report.  If you go to page 8, this is a section

10  under Section 38 regarding OARRS.

11         A.    Okay.

12         Q.    And it has a number of questions

13  about OARRS.  And under Section 5 there's a

14  question, "When should a pharmacist request an

15  OARRS report?"  And there is an observation, and

16  it appears that this inspector has taken a lot

17  of the language directly from the regulation

18  that we previously looked at, correct?

19         A.    Well, actually, that language I

20  believe is like -- it's pretty formatted within

21  the inspections, so, you know, the inspection

22  software does change over time.  So this one,

23  it's got that pre-formatted information in

24  there.

25         Q.    So it populates from the software,

Page 222

1    correct?

2         A.    Yes.

3         Q.    So Section 7, under number 5, on

4    when should a pharmacist request an OARRS

5    report, says, "If in doubt, run the OARRS

6    report.  You don't know what you don't know.

7    It's okay to say no.  You might save a life."

8               Did I read that correctly?

9         A.    Yes.

10        Q.    And so that's a message in this

11   inspector's report to this Giant Eagle that if

12   there's any doubt or any suspicion about a

13   prescription, you need to run an OARRS report

14   and look at the profile and data to determine

15   whether or not to, in fulfilling the

16   corresponding responsibility, to fill or not

17   fill the prescription, correct?

18               MR. BEISELL:  Objection to form.

19        A.    Yes.  The data regarding the OARRS

20   report.

21        Q.    Right.  Because if you don't, in

22   fulfilling your corresponding responsibility as

23   a pharmacist, it might be dangerous, it might

24   create a danger to the patient or a risk of

25   diversion, correct?

Page 223

1          A.     Yes.

2          Q.     And that's what's meant by it's okay

3     to say no, it's okay to not fill the

4     prescription, right?  That's what that means,

5     right?

6          A.     Yes.

7          Q.     And it says you might save a life if

8     you don't fill the prescription, correct?

9          A.     Yes, it says that.

10         Q.     Now, is this part of the software

11    that self-populates now, in --

12         A.     I -- I'm not sure.

13         Q.     Or it might have just been a

14    statement typed into this report by this

15    inspector?

16         A.     No.  This was a self-populating

17    portion that was in -- it was in there at the

18    time because at the time I was conducting more

19    inspections and, you know, we put our points of

20    emphasis in these so that the pharmacist can

21    have them as a reference.

22         Q.     So this goes back, Agent DiFrangia,

23    to what we started out with during my

24    cross-examination, and that is that with

25    dangerous drugs, like opioid prescription drugs,

Page 224

1   it's extremely important that the pharmacist

2   perform their corresponding responsibility using

3   the tools that they have or are given to analyze

4   these prescriptions carefully before dispensing

5   them, correct?

6           MR. BARNES:  Object to form.

7       A.   I think that's correct in terms of

8   OARRS.

9       Q.   And if these Defendant retail

10  pharmacy chains had dispensing data that

11  contained significant amounts of information

12  that could identify the red flags that we've

13  talked about earlier and could provide that to

14  the pharmacist, at the pharmacist's computer

15  station in the pharmacy store, as they are

16  looking and potentially dispensing opioid

17  prescriptions, that would certainly assist the

18  pharmacist in fulfilling their corresponding

19  responsibility, true?

20          MR. BARNES:  Object to form.  Lack

21  of foundation as to what a pharmacist might do.

22      Q.   You can answer.

23      A.   I'm not sure what the answer is.  I

24  don't know.  I'm not a pharmacist.  It might be

25  best geared toward a pharmacist.

Page 225

1          MR. WEINBERGER:  Agent DiFrangia,

2   that's all the questions I have at this time.

3   Thank you, sir.

4          MR. BARNES:  I have some follow-up

5   questions, unless any of the other Defendants

6   want to go first.

7     FURTHER EXAMINATION OF WILLIAM DiFRANGIA

8   BY MR. BARNES:

9      Q.    Agent DiFrangia, you were asked some

10  questions about the August 31st, 2020 inspection

11  in Exhibit 17 prepared by Inspector Kim

12  Hollingshead.  That was just a couple minutes

13  ago.

14     A.    Yes.

15     Q.    Okay.  You didn't perform that

16  inspection, you weren't there, and you don't

17  have any personal knowledge of that inspection;

18  is that correct?

19     A.    That's correct.

20     Q.    But this inspection does result, on

21  the last page, "No issues found by this

22  inspector"; is that correct?

23     A.    Yes, that's correct.

24     Q.    You were asked some questions in

25  this report about paragraph 5, which is related

Page 226

1  to when to check OARRS.  And you and I earlier

2  today went through all of that, right, what the

3  regulation actually says?  Do you recall that?

4      A.   Yes.

5      Q.   And, in fact, this number 38, items

6  1 through 6, appear to be taken right from that

7  regulation; is that right?

8      A.   In the Observation portion?

9      Q.   Yes.

10     A.   Yes.

11     Q.   In fact, that appears to be right

12  out of Exhibit 10, regulation 4729-5-21,

13  Subsection D, items 1 through 6.  You can take a

14  look back at it, but I think it's a direct cut

15  and paste out of that regulation, correct?

16     A.   Yeah, it -- it certainly seems that

17  it is.

18     Q.   Okay.  And the regulation is the

19  actual -- sets forth the actual times when the

20  Ohio Board of Pharmacy tells a pharmacist these

21  are the times when we want -- when you have to

22  check OARRS, and it lays out those parameters

23  that we went over, correct, items 1 through 6 of

24  Subsection D of the regulation?

25     A.   Yes.

1      Q.    Okay.  Did the Board of Pharmacy at

2  any time ever impose a regulation that said it

3  required the pharmacist to check OARRS each and

4  every time it filled a prescription?

5      A.    To my knowledge, they have not.

6      Q.    Okay.  You told me earlier that

7  filling prescriptions involves a lot of

8  professional judgment on behalf of the

9  pharmacist; is that right?

10      A.    Yes.

11      Q.    So if, in the professional judgment

12  of a pharmacist, he or she felt that he or she

13  wasn't required under the regulation to check

14  OARRS but in their professional judgment wanted

15  to check OARRS, they could do that; is that

16  right?

17          MR. WEINBERGER:  Objection.

18      A.    Yes.

19      Q.    Okay.  You were asked some questions

20  about that inspection of the Giant Eagle

21  pharmacy that you and I went over.  You had told

22  me earlier -- you had said that this was the

23  only full-blown inspection that you had

24  conducted of a Giant Eagle store in Trumbull

25  County; is that right?  You testified to that?

Page 228

1          A.     Yes.

2          Q.     And you had told me earlier that you

3    also inspected other Giant Eagle stores in other

4    counties, correct?

5          A.     Yes.

6          Q.     And did you find in those

7    inspections across multiple counties that the

8    Giant Eagle stores had a corporate-wide system

9    of software and policies and procedures that you

10   saw repetitively doing the same thing that the

11   other stores were doing?

12              MR. WEINBERGER:  Objection.

13   Improper redirect.

14        Q.     I'm sorry.  What was your answer?

15        A.     Yes.

16        Q.     Okay.  There was a reference -- you

17   made a reference to Giant Eagle's pharmacies are

18   inside the grocery stores.  Do you recall that?

19        A.     I -- yeah, I think I do remember

20   making that reference.

21        Q.     Okay.  Did that mean anything to you

22   as an agent, that the pharmacies were not

23   stand-alone pharmacies on a corner but actually

24   embedded inside grocery stores, with respect to

25   your inspections?  Was that a neutral item, a

Page 229

1    positive item or a negative item?

2         A.    It had no influence on my

3    inspections.

4         Q.    Okay.  Now, when you go in for your

5    inspections, the Giant Eagle pharmacist doesn't

6    tell you what you're going to look at; is that

7    correct?

8              MR. WEINBERGER:  Objection.

9         A.    That's correct.

10        Q.    In fact, under the regulations that

11   we went over, it's you as the agent are the one

12   telling the pharmacist what you're going to look

13   at and what they're going to provide if they

14   want their license to continue; is that right?

15             MR. WEINBERGER:  Objection.

16        A.    That's correct.

17        Q.    All right.  So when you look at

18   patient profiles, for example -- you were asked

19   some questions on cross about patient

20   profiles -- do you find that the software

21   systems used across these chain pharmacy stores

22   tend to or almost always have the same type of

23   system, so if you see a patient profile in a

24   software system at one Giant Eagle store, you

25   are going to tend to see the patient profile

Page 230

1    system at another Giant Eagle store?

2              MR. WEINBERGER:  Objection.

3         A.    Yeah.  Pretty much from what I've

4    seen, they're all similar.

5         Q.    Okay.  So the fact that you would

6    look at one patient profile in this December 18,

7    2018 inspection, that number of profiles that

8    you wanted to look at, was that based in part

9    upon what you had seen before and your

10   familiarity with the software and how the

11   patient profiles worked in that software?

12             MR. WEINBERGER:  Objection.

13        A.    Yes.  It was similar to documents

14   and records that I've seen before from Giant

15   Eagle.

16        Q.    Okay.  And if you had wanted to look

17   at any additional patient profiles, you

18   certainly had that right; is that right?

19             MR. WEINBERGER:  Objection.

20        A.    Yes.

21        Q.    Okay.  And if you wanted to check

22   how far back dispensing records went, you could

23   have done anything you wanted, checked the

24   software, talked to technicians, looked at the

25   records?  There was no boundary on what you

1   could do when you were in there in the

2   inspection; is that right?

3        A.    That's correct.

4        Q.    Okay.  The same with the software

5   systems; you had seen software systems in your

6   other inspections of chain pharmacy stores, so

7   when you went in to do another inspection, if

8   you saw the same system, oftentimes, am I

9   correct, that it's software you had already seen

10  in other stores?

11            MR. WEINBERGER:  Objection.

12       A.    Yes, in regards to retail chain

13  pharmacies.

14       Q.    Okay.  It was a little bit different

15  with independents.  Did they have different

16  software systems or no software systems?

17       A.    Yeah, they have, you know,

18  different software vendors from independent

19  chain -- or independent pharmacy to independent

20  pharmacy.

21       Q.    All right.  You were asked some

22  questions on cross about insufficient

23  supervision, Section 11 of these reports, and I

24  believe you testified that in the several hours

25  that you spend in these pharmacies, including

Page 232

1   during busy times, you're able to observe

2   whether or not they appear to be sufficiently

3   staffed; is that right?

4          MR. WEINBERGER:  Objection.

5       A.    Yes, that's correct.

6       Q.    All right.  And I think you told me

7   earlier that before you even go in for these

8   inspections, as an agent for the Board of

9   Pharmacy, you have full knowledge of every

10  prescription and the volume of prescriptions

11  written by these stores or filled by these

12  stores before you even go in for your

13  inspections, right?  I mean, if you wanted to

14  get that information, it was available?

15      A.    Yeah.  If I wanted to, I could get

16  all the controlled substance dispensings from a

17  pharmacy prior to an inspection, and if it was

18  relevant, if there was a relevant investigation

19  to do so.

20      Q.    All right.  And with respect to

21  looking at dispensing records themselves, those

22  were fully available to you as an agent of the

23  board when you went in for your inspections or

24  otherwise?  If you wanted to see the entire

25  dispensing data in addition to the OARRS data

Page 233

1    you already had, you could demand that and get

2    it during your inspections, correct?

3                 MR. WEINBERGER:  Objection.

4         A.    Yes, that's correct.

5         Q.    In your inspections you were asked

6    some questions about incentives and there was a

7    reference back to your earlier testimony of

8    independent, family-owned pharmacies having

9    higher incentives, profit incentives to fill

10   prescriptions.  My follow-up question is, with

11   respect to the retail pharmacy Defendants, bonus

12   information was available to you at any time,

13   compensation of pharmacists or pharmacy techs;

14   is that correct?  If you wanted to see it, you

15   could demand it and you would get it; is that

16   right?

17        A.    I don't know.  I don't know that

18   I've ever asked for it and I don't know if

19   there would be pushback.

20        Q.    Okay.  But it wasn't something that

21   you as a board agent generally looked at as part

22   of your inspections; is that right?

23        A.    That's correct.

24        Q.    And sitting here today, Agent

25   DiFrangia, are you aware of any Ohio regulation

1   that regulates how pharmacists are compensated

2   one way or the other?

3        A.    No, I'm not aware of anything like

4   that.

5        Q.    You were asked a lot of questions

6   early in the cross-examination about whether or

7   not your testimony was based upon your

8   experience only as a board agent, and I believe

9   you at one point indicated that you also had

10  prior experience that we went over in law

11  enforcement.  So am I understanding that the

12  testimony that you've provided today is a

13  combination not only of your board experience

14  but also your prior law enforcement experience?

15       A.    It is.

16       Q.    And you've certainly had

17  interactions with the pharmacy Defendants'

18  stores and pharmacists for many years prior to

19  becoming a board agent; is that right?

20       A.    Yes, that's correct.

21       Q.    I want to pull up DiFrangia Exhibit

22  9.  You were asked a lot of questions about

23  that.  Are you with me?

24       A.    Yes.  Which --

25       Q.    At binder 2 near the end, DiFrangia

Page 235

1   Exhibit 9.

2          A.     Okay.  Yes, Exhibit 9.

3          Q.     I had asked you some overview

4   questions.  I want to follow up due to the

5   questioning on cross.

6               This document is captioned

7   "Prescription Drug Investigation Techniques and

8   Workflow."  Is this an indication to you that

9   this is a board internal document related to

10  how the board agents and inspectors -- the

11  suggested way to perform their functions?

12         A.     Yes, but this is more or less

13  tailored for agents, not so much inspectors.

14         Q.     Okay.  And so do you know if this --

15  when or how this was prepared and by whom?

16         A.     I do not know.

17         Q.     Okay.  The first big section, items

18  1 through 21, Data Anomalies, is this a

19  reference to the OARRS data that is available to

20  the board and its agents when conducting

21  investigations?

22         A.     Yes.

23         Q.     So, for example, data anomaly number

24  1 and 2, large total number of patients and

25  daily patient breakdown, that's something that a

Page 236

1   board agent can go into the OARRS data and look

2   at prescribers generally and determine the

3   number of patients and the daily patient

4   breakdown; is that right?

5          A.    Yes, just for controlled

6   substances.

7          Q.    For controlled substances.

8              But this is not something that a

9   pharmacist could do, correct?  They couldn't go

10  into the OARRS data and take a look at how

11  many -- the number of patients that a

12  prescriber has or the daily patient breakdown

13  for controlled substances, correct?

14             MR. WEINBERGER:  Objection.

15         Q.    We covered that earlier?

16         A.    Correct.

17         Q.    So when you were asked on cross

18  about whether these were red flags, correct me

19  if I'm wrong but these are internal -- you call

20  them data anomalies that board agents would look

21  at based upon their special access to the OARRS

22  data, correct?

23         A.    Correct.

24         Q.    And would that include number 3,

25  large overall volume of prescriptions?  Is that

Page 237

1    special board agent access only; as part of

2    doing an investigation of a prescriber, you

3    would be able to go in and look at the total

4    volume of prescriptions issued by a prescriber?

5         A.    Yes.  Law enforcement also has --

6    would have access to that.

7         Q.    Okay.  And number 4, patients with

8    drug-related criminal histories, that's

9    something that is unique to the -- to the board

10   agent, right?  I mean, how would a pharmacist,

11   for example, know about a criminal history?

12   That's a law enforcement data point, isn't it?

13        A.    Yes.

14        Q.    Okay.  So so far, 1 through 4, these

15   are internal board agent specific only; am I

16   right?

17             MR. WEINBERGER:  Objection.

18        A.    Yes, this is an internal document

19   just for Board of Pharmacy members.

20        Q.    Okay.  This isn't -- this document

21   isn't something that was issued to pharmacists

22   and said, you know, look for these things;

23   instead, this is something that is internal to

24   the board only, that its agents should consider

25   looking at, correct?

Page 238

1          A.     Correct.

2          Q.     And would that include number 5,

3     prescribing similar drugs in groups, including

4     cocktails?  That's a board agent inquiry, not a

5     pharmacist inquiry, correct?

6          A.     Yes.  It's -- like I said, it is

7     issued to board agents and other board staff.

8          Q.     Okay.  So if I went through each one

9     of these items, the remainder, 6 through 21,

10    would you give me the same answer, that each one

11    of these things is internal -- is an internal

12    board agent data point to consider in

13    investigations and not a pharmacist's

14    requirement?

15         A.     Yes.

16         Q.     Okay.  And then down below on the

17    General Workflow, is this section of this

18    internal -- board only internal report a general

19    description of how to do your investigation once

20    you consider the data anomalies?

21         A.     Yeah.  This is generally, you know,

22    a work flow of how to -- how to interpret some

23    of the data and come to a conclusion after

24    reviewing it.

25         Q.     Are you familiar with the algorithms

Page 239

1   and formulas used by the board, the OARRS

2   department, to analyze the prescription data

3   that's coming into the board on a daily basis?

4        A.    No.

5        Q.    Do you know that they do run

6   algorithms and the formulas to analyze the data,

7   the prescription data, to provide investigative

8   leads to the agents?

9        A.    I know OARRS provides leads but I

10  don't know how they -- how they get to them.

11       Q.    Okay.  And so DiFrangia Exhibit 9

12  is, you told me, an internal document.  This is

13  not something that's in the regulations that we

14  went over; is that correct?

15       A.    Correct.

16       Q.    So when Mr. Weinberger was asking

17  you questions about red flags, did you -- were

18  your answers to him in the context of these are

19  red flags for the board agents internally?

20       A.    Yes.

21       Q.    Do you know, in your four and a half

22  years and prior experience actually in law

23  enforcement, to your knowledge, were pharmacies

24  or pharmacists ever required to analyze data

25  anomalies as reflected on this Exhibit 9 or was

Page 240

1    that a board responsibility?

2         A.    I don't know if any pharmacist was

3    ever asked to review this.  Again, this is all

4    internal board documents.

5         Q.    Okay.  You were asked some questions

6    about the pharmacist's corresponding obligation

7    and it being a so-called last line of defense.

8    Do you recall that questioning?

9         A.    Yes.

10        Q.    But, in your experience, Agent

11   DiFrangia, the first line of defense is the

12   doctor, correct?

13             MR. WEINBERGER:  Objection.

14   Leading.

15        A.    Yeah, in my opinion and my

16   experience.

17             MR. WEINBERGER:  Move to strike.

18             Bob, we can't hear you.

19             THE VIDEOGRAPHER:  Off the record

20   at 3:40.

21                  (Recess had.)

22             THE VIDEOGRAPHER:  We are back on

23   the record at 3:43.

24   BY MR. BARNES:

25        Q.    Agent DiFrangia, sorry about that

                                              Page 241

1    technology break.  I don't know if you heard my

2    last two questions.  I didn't realize my

3    microphone had died.  But we were talking about

4    the doctors being the first line of defense in

5    prescribing.  Do you recall that?

6          A.    Yes.

7          Q.    And my follow-up question was, in

8    your experience, it's the doctor that examines

9    the patient and diagnoses the patient and treats

10   the patient, correct?

11         A.    Yes.

12         Q.    Before issuing the prescription,

13   correct?

14         A.    Yes.

15         Q.    And when the patient shows up at the

16   pharmacy and presents that prescription, it's --

17   in your understanding, it's not the role of the

18   pharmacist to exercise medical judgment or

19   interfere with the medical judgment of the

20   doctors; is that correct?

21               MR. WEINBERGER:  Objection.

22         A.    That, I'm not sure.

23         Q.    All right.  Well, we went over the

24   regulations as to what a pharmacist is supposed

25   to do when filling a prescription and I didn't

```
                                    Page 242
 1   recall seeing anything like examine the patient
 2   or diagnose the patient or come up with a
 3   treatment plan for the patient.  Do you agree
 4   with me on that?
 5              MR. WEINBERGER:  Objection.
 6        A.   Yes.
 7        Q.   Okay.  Are your inspections
 8   influenced by past inspections of the same
 9   pharmacy chain?  For example, if you have
10   repetitively good inspections at a pharmacy
11   chain, does that influence the nature and scope
12   of your ensuing inspections?
13              MR. WEINBERGER:  Objection.
14        A.   No.  It's just based on the
15   pharmacy that I'm in at that point in time.
16        Q.   Okay.  Beyond the regulations that
17   we went through, the manner of dispensing
18   prescriptions regulations that we went through
19   this morning, are you aware of any other
20   regulations that required the pharmacies to do
21   anything more beyond those regulations?
22              MR. WEINBERGER:  Objection.
23        A.   As far as just for manner of
24   issuance of prescriptions?
25        Q.   Correct.
```

Page 243

1          A.    I mean, I think there's some more

2     that -- but I don't -- I can't think of them

3     off the top of my head.

4          Q.    All right.  And certainly if the

5     board wanted the pharmacies or pharmacists to

6     issue prescriptions in a certain way by

7     considering certain data, they would have put it

8     in a regulation; is that correct?

9                MR. WEINBERGER:  Objection.

10         A.    That, I don't know.

11         Q.    Are there a lot of reasons why a

12    doctor might have a lot of patients that, in

13    your mind, don't raise any suspicion at all?

14               MR. WEINBERGER:  Objection.

15         A.    I'm sorry.  Can you -- could you

16    repeat that?

17         Q.    Yeah.  I'm referencing back to that

18    Exhibit 9 that we went over and the number one

19    item was large total number of patients, and I'm

20    just curious, could a doctor have a large number

21    of patients and be totally legit in terms of the

22    way they're practicing?

23               MR. WEINBERGER:  Objection.

24         A.    Yeah.  I mean, I think in my

25    opinion I believe they can.  If the vast

Page 244

1    majority of their patients aren't receiving any

2    type of controlled substances, then we could --

3    you know, we could potentially assume that it's

4    not any type of pill mill or anything of that

5    nature.

6         Q.    And so is that something that you

7    ever looked at, I'll call it the ratio of

8    controlled substance prescriptions versus

9    overall prescriptions for a pharmacy?  Is that a

10   relevant piece of information if you were trying

11   to consider, you know, whether the pharmacy was

12   doing anything inappropriately?

13             MR. WEINBERGER:  Objection.

14        Q.    Does that make sense to you?

15        A.    It does.  I've never looked at it.

16   It could be -- always could be useful to look

17   at, but I've never looked at that.

18        Q.    Okay.  Can you determine whether a

19   doctor is prescribing inappropriately based upon

20   the volume of prescriptions alone or do you need

21   to do a lot more work before you come to that

22   conclusion?

23             MR. WEINBERGER:   Objection.

24        A.    I would like to do more.  I would

25   like to see more things -- me personally, I

1   would like to see additional things that are

2   leading in that direction, not just a large

3   amount of prescriptions.

4       Q.    All right.  But it's an internal

5   board agent anomaly that is listed here that is

6   something to consider, correct?

7       A.    Yes.

8       Q.    But it's merely the starting point,

9   not the ending point, right?

10      A.    Yes.

11      Q.    There's a listing here of age of

12  patient, 18 to 40.  Why would the board

13  internally have its agents consider that?  What

14  does that have to do with anything?

15      A.    My guess, the way I interpret this

16  is that, you know, there may be concern if you

17  have a large amount of 20-year-olds obtaining

18  maybe some opiates, for example.

19      Q.    So that's something internally the

20  board is saying agents should look at?

21      A.    It's something to be considered

22  with everything else in this.

23      Q.    But the mere age of a patient

24  doesn't necessarily indicate anything wrong is

25  going on, there's legitimate reasons why

Page 246

1    patients in that age group might need an opiate

2    prescription; do you agree with that?

3          A.    Yes.

4          Q.    And, generally, Agent DiFrangia, do

5    you agree with me that there are many legitimate

6    medical reasons for prescribing opioids and

7    opioids in combination with other drugs based

8    upon the needs of patients?

9          A.    You know, again, I don't --

10   obviously I'm not a doctor and I don't know

11   what -- you know, I don't know that I can

12   answer that.

13         Q.    Okay.  And you do know that opioids

14   dispensed through pharmacies are drugs that have

15   been approved and gone through appropriate

16   review channels, for example, by the FDA,

17   they've been approved for distribution and are

18   legal drugs that the federal authorities have

19   said deserve to be manufactured and dispensed?

20   You know that, correct?

21         A.    Yes.

22               MR. BARNES:  I've got nothing

23   further.  Thank you, Agent DiFrangia.

24               Anybody else?

25               Okay.  Thank you, sir.

Page 247

1            MR. BEISELL:  I'm sorry, Bob.  I

2    have a few questions.

3            MR. BARNES:  Sorry.  Go ahead.

4            MS. CONROY:  This is Mildred Conroy

5    for the Plaintiffs.  I just want to make sure

6    Pete Weinberger can hear us.

7            MR. WEINBERGER:  I got kicked off

8    for the last three minutes.  So, Laura, what

9    were you about to say?

10            MS. CONROY:  It's Mildred.  I was

11    just -- they were about to stop questioning and

12    I just wanted to make sure you were there.

13            MR. WEINBERGER:  I got kicked off

14    but go ahead and proceed.

15            MR. BARNES:  Any follow-up

16    questions by Plaintiffs?

17            MR. WEINBERGER:  I have no further

18    questions.

19            MR. BARNES:  All right.  Because

20    you got kicked off, Pete, I wanted to make sure

21    that no other Plaintiffs' counsel has follow-up

22    questions.

23        EXAMINATION OF WILLIAM DiFRANGIA

24    BY MR. BEISELL:

25        Q.    Agent DiFrangia, can you hear me all

Page 248

1    right?

2         A.    Yes.

3         Q.    Great.  I just have a couple of

4    really small questions to clean up some

5    testimony from earlier this morning.

6               So you've been an agent with the

7    Ohio Board of Pharmacy since November 2016,

8    right?

9         A.    Yes.

10        Q.    And your area of responsibility from

11   that time period to the present has included

12   Trumbull County but not Lake County.  Am I

13   understanding that correctly?

14        A.    That's correct.

15        Q.    Earlier this morning, and correct me

16   if I'm wrong, you testified that you never

17   personally conducted an inspection of a Walmart

18   pharmacy in Trumbull County; is that correct?

19        A.    That's correct.

20        Q.    Why is that?

21        A.    Where I inspect pharmacies,

22   sometimes I try to be judicious about it.  If

23   it's involving an investigation, you know, I'll

24   do it in conjunction with that just to really

25   manage my time.

Page 249

1          Q.     So is it -- would it be fair to say

2     that you didn't feel the need to inspect and

3     conduct a full inspection of the Walmart

4     pharmacies in Trumbull County?

5          A.     I'm sure there was a time where I

6     felt that -- there just was nothing that was

7     directing my attention there.

8          Q.     Understood.  And you also mentioned

9     collaborating with a Walmart district pharmacy

10    manager relating to diversion.  Do you remember

11    that testimony?

12         A.     Yes.

13         Q.     Do you remember that person's name,

14    by chance?

15         A.     I don't.

16         Q.     Okay.  I know it's a bit of a test

17    all day long.

18               Do you recall the specifics of that

19    particular collaboration with the district

20    manager?

21         A.     Yes.  He called me regarding -- it

22    was a pharmacy technician that -- she was not

23    diverting drugs.  She was stealing merchandise

24    from -- from the Walmart store.

25         Q.     But not pharmacy related?

1        A.    Correct.

2        Q.    Understood.

3              MR. BEISELL:  Thank you, Agent

4   DiFrangia.  I don't have any further questions,

5   unless anyone else does.

6              MR. BARNES:  Okay.  That wraps it

7   up.

8              Henry, you going to review the

9   transcript I suppose?

10             MR. APPEL:  Yes, Mr. DiFrangia will

11  review the transcript and sign.

12             THE VIDEOGRAPHER:  Going off the

13  record at 3:55.

14

15       (Deposition concluded at 3:55 p.m.)

16                  - - - - -

17

18

19

20

21

22

23

24

25

Page 251

1    Whereupon, counsel was requested to give

2    instruction regarding the witness' review of

3    the transcript pursuant to the Civil Rules.

4

5                    SIGNATURE:

6    Transcript review was requested pursuant to

7    the applicable Rules of Civil Procedure.

8

9                TRANSCRIPT DELIVERY:

10   Counsel was requested to give instruction

11   regarding delivery date of transcript.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 252

1                    REPORTER'S CERTIFICATE

2    The State of Ohio,    )

3                          ) SS:

4    County of Cuyahoga.   )

5

6           I, Renee L. Pellegrino, a Notary Public

7    within and for the State of Ohio, duly

8    commissioned and qualified, do hereby certify

9    that the within named witness, WILLIAM DiFRANGIA,

10   was by me first duly sworn to testify the truth, the

11   whole truth and nothing but the truth in the cause

12   aforesaid; that the testimony then given by the

13   above referenced witness was by me reduced to

14   stenotypy in the presence of said witness;

15   afterwards transcribed, and that the foregoing is a

16   true and correct transcription of the testimony so

17   given by the above referenced witness.

18           I do further certify that this

19   deposition was taken at the time and place in the

20   foregoing caption specified and was completed

21   without adjournment.

22

23

24

25

Page 253

1          I do further certify that I am not a

2    relative, counsel or attorney for either party,

3    or otherwise interested in the event of this

4    action.

5          IN WITNESS WHEREOF, I have hereunto set

6    my hand and affixed my seal of office at

7    Cleveland, Ohio, on this 19th day of January, 2021.

8

9

10

11    *Renee L. Pellegrino*

12

13    Renee L. Pellegrino, Notary Public

14    within and for the State of Ohio

15

16    My commission expires October 12, 2025.

17

18

19

20

21

22

23

24

25

```
                                                          Page 254
 1                        Veritext Legal Solutions
                            1100 Superior Ave
 2                             Suite 1820
                          Cleveland, Ohio 44114
 3                        Phone: 216-523-1313
 4
      January 19, 2021
 5
      To: MR. APPEL
 6
      Case Name: National Prescription Opiate Litigation - Track 3 v.
 7
      Veritext Reference Number: 4399733
 8
      Witness:  William DiFrangia        Deposition Date:  1/14/2021
 9
10    Dear Sir/Madam:
11
      Enclosed please find a deposition transcript.  Please have the witness
12
      review the transcript and note any changes or corrections on the
13
      included errata sheet, indicating the page, line number, change, and
14
      the reason for the change.  Have the witness' signature notarized and
15
      forward the completed page(s) back to us at the Production address
16    shown
17    above, or email to production-midwest@veritext.com.
18
      If the errata is not returned within thirty days of your receipt of
19
      this letter, the reading and signing will be deemed waived.
20
21    Sincerely,
22    Production Department
23
24
25    NO NOTARY REQUIRED IN CA
```

```
1                      DEPOSITION REVIEW
                     CERTIFICATION OF WITNESS
2

       ASSIGNMENT REFERENCE NO: 4399733
3      CASE NAME: National Prescription Opiate Litigation - Track 3
       DATE OF DEPOSITION: 1/14/2021
4      WITNESS' NAME: William DiFrangia
5           In accordance with the Rules of Civil
       Procedure, I have read the entire transcript of
6      my testimony or it has been read to me.
7           I have made no changes to the testimony
       as transcribed by the court reporter.
8

       _____         _____
9      Date                         William DiFrangia
10          Sworn to and subscribed before me, a
       Notary Public in and for the State and County,
11     the referenced witness did personally appear
       and acknowledge that:
12

            They have read the transcript;
13          They signed the foregoing Sworn
            Statement; and
14          Their execution of this Statement is of
            their free act and deed.
15

            I have affixed my name and official seal
16
       this _____ day of_____, 20____.
17

                       _____
18                     Notary Public
19                     _____
                       Commission Expiration Date
20
21
22
23
24
25
```

```
 1              DEPOSITION REVIEW
            CERTIFICATION OF WITNESS
 2
     ASSIGNMENT REFERENCE NO: 4399733
 3   CASE NAME: National Prescription Opiate Litigation - Track 3
     DATE OF DEPOSITION: 1/14/2021
 4   WITNESS' NAME: William DiFrangia
 5        In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
 6   my testimony or it has been read to me.
 7        I have listed my changes on the attached
     Errata Sheet, listing page and line numbers as
 8   well as the reason(s) for the change(s).
 9        I request that these changes be entered
     as part of the record of my testimony.
10
          I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
     that both be appended to the transcript of my
12   testimony and be incorporated therein.
13   _____        _____
     Date                        William DiFrangia
14
          Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
     the referenced witness did personally appear
16   and acknowledge that:
17        They have read the transcript;
          They have listed all of their corrections
18        in the appended Errata Sheet;
          They signed the foregoing Sworn
19        Statement; and
          Their execution of this Statement is of
20        their free act and deed.
21        I have affixed my name and official seal
22   this _____ day of_____, 20____.
23                   _____
                     Notary Public
24
                     _____
25                   Commission Expiration Date
```

Page 257

1               ERRATA SHEET
         VERITEXT LEGAL SOLUTIONS MIDWEST
2             ASSIGNMENT NO: 4399733
3    PAGE/LINE(S) /        CHANGE        /REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19

     _____      _____
20   Date                      William DiFrangia
21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22   DAY OF _____, 20_____ .
23                 _____
               Notary Public
24
                      _____
25             Commission Expiration Date

| & |
| --- |
| **&**   2:2,20 38:10 |
| 80:20 |

| 0 |
| --- |
| **05**   17:15 |
| **09**   121:13 |

| 1 |
| --- |
| **1**   5:5 11:14 13:1,3 |
| 13:16,21 103:8 |
| 104:4,4,4,15 |
| 112:25 127:7 |
| 129:14 130:25 |
| 143:7 148:13 |
| 154:8 226:6,13,23 |
| 235:18,24 237:14 |

**1,000**   81:24
**1/14/2021**   254:8
255:3 256:3
**10**   4:8 5:23 80:9
80:17,17 103:6
108:1,2 121:10
126:2,4 127:2,8
128:17,23 147:23
151:7 159:20,22
187:2 198:17,23
212:13 214:25
226:12
**100**   3:3
**1000**   3:4
**1001**   2:3
**10022**   2:8
**102**   6:6
**106**   6:6,7,7
**107**   6:8
**108**   6:8
**10:43**   90:24
**10:54**   91:2
**11**   12:3 13:2 130:4
152:11 187:24
231:23

**110**   6:9,9
**1100**   254:1
**111**   6:10
**112**   6:10
**119**   6:11
**11:28**   118:2
**11:30**   11:7,8,10
117:25 120:20
**11:32**   120:24
**12**   48:19 49:4
50:22 105:1
112:11 113:10
130:15 143:23
154:13 253:16
**121**   4:13
**129**   6:11
**12:30**   11:11
120:22
**12:33**   121:2
**12:45**   206:22
207:20 208:17
**13**   5:5 134:24
**132**   6:12
**136**   6:12
**14**   1:21 154:22
**1419**   79:6 139:24
142:3
**14th**   9:2
**15**   136:19 139:10
154:22
**15219**   2:22
**16**   19:14,16 28:23
121:13 136:17,19
**164**   6:13
**165**   6:13
**166**   6:14
**167**   6:14,15
**168**   6:15,16,16,17
**169**   6:17,18,18
**16th**   2:12

**17**   1:7 11:24 98:3
136:20,24 138:2
139:9,9 205:20
212:12 219:3,16
220:21,21 225:11
**17.1**   155:7
**170**   6:19
**1700**   2:4
**171**   6:19
**172**   4:9
**178**   6:20
**18**   1:11,13 5:15,19
34:15 35:10,18
75:18,25 121:13
161:23 204:5
205:18 206:21
212:12 230:6
245:12
**180**   6:20
**1820**   254:2
**184**   6:21
**186**   6:21,22
**188**   6:22,23,23
**189**   6:24
**18th**   141:23,25
162:16 206:4
**19**   156:9 254:4
**190**   6:24,25
**191**   7:3
**192**   7:3,4
**193**   7:4
**194**   7:5
**196**   7:5,6
**197**   7:6,7,7,8
**198**   7:8
**1982**   12:12
**19th**   253:7
**1:39**   172:12
**1:49**   172:15

| 2 |
| --- |
| **2**   4:3 5:6 11:14 |
| 77:15,20,21 81:12 |
| 81:18 104:4,22 |
| 106:12 113:8 |
| 126:10 139:17 |
| 142:15 234:25 |
| 235:24 |

**2.1**   143:21
**2.3.1**   144:9
**2.3.4**   145:4 214:5
**2.3.6**   146:9
**2.5**   146:18
**20**   151:20 190:2
195:23 199:8
202:17 245:17
255:16 256:22
257:22
**2000s**   54:24 55:14
**2005**   17:6
**2006**   18:16 19:14
**201**   7:9
**2012**   138:19
**2013**   188:25
190:10
**2014**   81:18 188:25
**2015**   147:12
**2016**   18:22 29:2,4
29:18 98:3 173:3
173:10 174:4,14
175:17 205:6,16
248:7
**2017**   33:6 35:2,11
35:12,19 36:4,6
37:22 52:22 79:7
81:9 98:6 139:5
213:25
**2018**   141:23,25
174:9 175:2,9
194:12 204:5
205:18 206:4,22

212:12 221:5
230:7
**2019** 5:15,19 74:10
75:18,25 161:23
162:16
**202** 7:9,10
**2020** 78:5 130:25
219:6,19 225:10
**2021** 1:21 9:2
253:7 254:4
**2025** 253:16
**205** 7:10
**2061** 139:24 142:3
**20th** 147:12
**21** 121:13 180:7
187:24 188:8
189:3 191:20
235:18 238:9
**21202-1031** 3:4
**215** 7:11
**216** 2:5
**216-523-1313**
254:3
**217** 7:11
**218** 7:12
**219** 7:12
**22** 121:13
**2211** 82:24
**222** 7:13
**2227** 253:12
**224** 7:13,14
**225** 4:10
**227** 7:14
**228** 7:15
**229** 7:15,16
**23** 138:19
**230** 7:16,17,17
**231** 7:18
**232** 7:18
**233** 7:19

**236** 7:19
**237** 7:20
**23rd** 12:12 139:5
**240** 7:20
**241** 7:21
**242** 7:21,22,22
**243** 7:23,23,24
**244** 7:24,25
**247** 4:11
**25** 92:10
**252** 4:15
**269-4097** 2:18
**2796421** 219:6
**2799241** 138:7,9
**28** 157:4
**2804** 1:6,7
**29th** 81:18
**2:27** 198:11
**2:37** 198:14

**3**

**3** 1:15 5:8 9:6
11:23 69:18,24
79:4 113:14
115:10,21 140:2
159:23 212:13
236:24 254:6
255:3 256:3
**30** 2:12 35:25
138:5 205:19
**30s** 35:19
**31** 219:6,19
**312** 2:18 3:9
**31st** 225:10
**32** 5:11
**33** 132:2
**338-3344** 2:22
**3500** 2:17
**35401** 51:2
**35407** 51:14
**35408** 52:1

**35410** 52:18
**35th** 2:21
**36** 158:4
**38** 157:24 158:3,13
221:10 226:5
**39** 133:7
**393** 38:7
**3:09** 220:15
**3:11** 220:18
**3:36** 206:22
207:20 208:18
**3:40** 240:20
**3:43** 240:23
**3:55** 250:13,15

**4**

**4** 5:9 76:19,25
77:1 79:5 114:15
139:18 147:21,23
181:23 199:11,25
237:7,14
**40** 194:23 204:23
204:23 245:12
**4075** 81:24
**410** 3:5
**412** 2:22
**43** 133:21
**43215** 2:13
**4399733** 254:7
255:2 256:2 257:2
**44114** 2:4 254:2
**45** 90:21
**45032** 1:11
**45079** 1:13
**466-8600** 2:13
**4729** 61:17
**4729-5-09** 128:23
**4729-5-15** 134:12
**4729-5-16** 126:15
127:5
**4729-5-18** 103:12

**4729-5-20** 121:13
126:11 198:20,23
200:11
**4729-5-21** 226:12
**4729-5-22** 127:17
128:17
**4729-5-30** 156:11
**4729:5-3-07** 135:4
**494-4410** 3:9
**4975-5-20** 108:5

**5**

**5** 4:4 5:11 32:14
32:23,25 34:4
50:20 95:4 115:1
128:21 129:15
148:12 159:22
182:2 185:13
221:13 222:3
225:25 238:2
**5-16** 127:1
**5-18** 103:18 126:7
**5-20** 121:15
**5-21** 126:1 127:14
128:19 129:13
**50** 40:12 195:24
**54** 3:8
**56** 134:3

**6**

**6** 4:5 5:14 75:15
76:4,5 80:17
81:10 116:4
147:22 159:20,21
182:22,25 226:6
226:13,23 238:9
**600-0114** 2:5
**60601-1692** 2:17
**60654** 3:8
**614** 2:13
**66** 6:3

**6810** 2:7
**68980** 70:1
**69** 5:8 6:3,4

**7**

**7** 5:17 78:8,12
147:23 183:18
214:25 222:3
**723-3216** 2:8
**73** 6:4,5,5
**75** 5:14
**76** 5:9,18
**77** 2:16 5:6
**78** 5:17

**8**

**8** 5:18 75:22 76:4
76:5 185:1,12
221:9
**80** 5:23
**800** 2:8
**86** 5:20

**9**

**9** 5:20 85:25 86:7
179:2,11 182:23
185:17 191:5
193:11 199:14,17
221:8 234:22
235:1,2 239:11,25
243:18
**9.3** 149:15
**9.4** 150:9
**949-1159** 3:5
**9:03** 1:21 9:3

**a**

**a.m.** 1:21 9:3
**aaron** 1:8
**abbreviation**
185:4
**ability** 61:6,10
72:21 90:4 101:12

191:19
**able** 20:25 21:10
21:15,23 25:24
29:12 87:4 88:7
89:7 99:8 103:2
138:2 144:8
145:11 146:8
166:22 167:2
169:13 170:24
197:9 201:23
211:10 213:21
232:1 237:3
**abundance** 184:23
**abuse** 109:1 116:6
177:20 178:4
186:20
**abusing** 116:14
120:6
**academy** 18:2
**acceptable** 144:25
**access** 56:15 79:1
79:2 87:4,6 93:8
101:14 144:17,19
158:14,17 202:16
236:21 237:1,6
**accessed** 205:9
**accesses** 89:24
**accessible** 160:9
202:17
**accessing** 112:23
**account** 188:22
197:10
**accountability**
64:10 146:11
159:25
**accountable** 51:25
**accuracy** 146:10
**accurate** 36:6,13
39:23,24 105:13
146:12,15 196:1
201:17

**accurately** 36:13
151:23 154:3
**acetaminophen**
185:5,16
**acknowledge**
255:11 256:16
**acknowledgments**
68:6
**act** 178:8,9,12
255:14 256:20
**acting** 118:9
121:23 182:8,9
**action** 45:6 58:18
58:22 153:2
160:11 164:2
253:4
**active** 43:9 70:13
85:3,6 182:9
**actively** 52:11
167:14,22
**activities** 20:8
61:8 64:19 65:1
65:13 66:11 67:2
67:13 82:8 85:11
85:15
**activity** 21:1 24:24
25:22 26:1 27:10
28:14 55:7,8
62:12 65:24 68:7
81:11 82:10 87:16
**actor** 120:9
**actual** 40:20 78:21
107:1 160:17
226:19,19
**add** 41:19
**addicted** 49:23
**addiction** 99:6
102:10 112:21
177:7
**addictive** 64:13
176:15,25 177:3

**adding** 35:4
**addition** 156:6
182:9 232:25
**additional** 35:4
37:19 77:11 102:3
148:25 230:17
245:1
**address** 12:15
104:6 126:21
153:25 164:2
254:15
**adds** 113:3
**adequate** 93:7
132:16 134:21
148:14 159:3
201:22 203:15
210:9,16 216:19
217:8
**adequately** 58:21
164:18 168:19
**adhering** 64:4
**adjoining** 79:8
**adjournment**
252:21
**adjust** 125:5
**administrative**
34:10 45:1,6 58:4
61:12,16 62:6
87:2
**adopted** 147:6
**advanced** 50:10
80:19
**advantage** 66:19
67:8,20
**advise** 72:11,25
114:21
**advised** 85:5
119:23
**advising** 119:17
**affect** 148:7

**affiant** 81:4
**affidavit** 80:18,24
  81:8
**affirmations** 159:9
**affixed** 253:6
  255:15 256:21
**aforesaid** 252:12
**afternoon** 4:13
  121:4,7
**age** 10:11 245:11
  245:23 246:1
**agencies** 23:11,15
  24:6 43:20,21
**agency** 37:23,24
  57:15
**agent** 29:25 30:2,5
  30:9 31:2 37:19
  38:3 40:7 47:11
  48:16 54:7 56:9
  57:21 60:8 61:21
  81:1,19 91:4
  92:23 117:17
  121:7 123:12
  124:3 129:23
  136:14 139:11,18
  163:15 167:7
  169:11 171:13
  172:18 173:9
  178:13,19 179:8
  186:16 189:4
  190:1 193:19,22
  198:16,22 205:5
  206:10 219:22,25
  220:6 223:22
  225:1,9 228:22
  229:11 232:8,22
  233:21,24 234:8
  234:19 236:1
  237:1,10,15 238:4
  238:12 240:10,25
  245:5 246:4,23

  247:25 248:6
  250:3
**agents** 11:20 30:16
  31:9,24 34:15
  35:10,16 36:1
  37:16 38:10,18,23
  39:6,7 66:2 86:21
  89:10 90:10
  130:11 131:4
  137:3,8,12,16,21
  137:24 203:10
  235:10,13,20
  236:20 237:24
  238:7 239:8,19
  245:13,20
**ago** 113:5 117:18
  225:13
**agree** 47:20 93:15
  93:16 95:15
  177:24 178:18
  201:18 206:7
  242:3 246:2,5
**agreed** 120:19
**agreement** 5:9
  76:20 77:5
**ahead** 91:15 106:2
  158:2 186:25
  190:14 247:3,14
**aid** 10:24 26:23
  27:21,22 59:25
  85:10,20 167:21
  209:7 210:3 211:1
  211:21,24
**aid's** 85:13
**aka** 185:18
**akron** 22:5 72:5
**al** 1:10,13
**alan** 78:2
**alarm** 93:7
**alert** 53:23 146:6

**alerts** 53:20
**algorithms** 238:25
  239:6
**allen** 210:25
  211:11
**allergies** 104:8
**allergy** 109:1
**allow** 153:16
**allowed** 40:14
**alprazolam**
  211:15,18 212:9
**amount** 26:17
  49:16 51:24 73:10
  74:24 182:18
  187:6,9,19 217:12
  245:3,17
**amounts** 67:22
  94:9 224:11
**amphetamine**
  187:9
**analysis** 181:2,11
  190:22
**analyze** 181:2
  191:3,20 193:13
  224:3 239:2,6,24
**analyzed** 191:8
  193:23
**ankle** 80:20
**annual** 95:25
  135:17 157:4,5,12
  190:20
**annually** 135:11
  135:25
**anomalies** 180:4,8
  180:14 188:9,18
  189:6 191:4,9,21
  193:13 194:1,4
  235:18 236:20
  238:20 239:25
**anomaly** 181:8
  182:11 183:2,21

  185:11 193:10
  235:23 245:5
**answer** 69:7 73:5
  94:4 97:8 122:8
  123:16,22,23
  151:11 154:8
  161:9 165:16
  186:25 190:14
  192:3,15 194:22
  195:10 197:21
  202:2 213:12
  214:8,23 215:3,4
  215:15 217:18
  224:22,23 228:14
  238:10 246:12
**answered** 152:20
  154:20 192:1
  197:19 215:14
**answers** 239:18
**anti** 167:15,23
  185:23,23 199:18
**anxiety** 185:23
  199:18
**anybody** 99:20,24
  100:17 171:23
  213:17 246:24
**anymore** 96:20
**anytime** 112:11
**apap** 185:3,4
**apparently** 179:11
  220:8 221:1
**appear** 85:20
  180:8 226:6 232:2
  255:11 256:15
**appearances** 2:1
  3:1 4:3
**appearing** 1:25
  13:8
**appears** 77:21
  81:12 116:22
  132:7 176:3

179:19 181:1 221:16 226:11
**appel** 2:11 10:7,8 15:9 16:9 117:23 117:24 139:1,7 198:4,5,9 220:10 250:10 254:5
**appended** 256:11 256:18
**applicable** 251:7
**application** 92:14 92:21 94:4,5 97:9 100:7 130:12
**applications** 97:11
**apply** 91:25 97:7
**approach** 86:18 179:19
**approaching** 117:25
**appropriate** 109:11 158:15,18 218:14 246:15
**appropriately** 176:4
**approval** 147:11 147:13
**approved** 62:1 91:25 146:21 147:10 194:14 246:15,17
**approximate** 34:24
**approximately** 9:3 22:14 33:17 57:19 81:7 138:3 207:21
**april** 74:10
**area** 26:18 28:12 46:4 56:22 70:12 72:12 79:1 83:15 112:17,19 113:16 113:20 114:11,16

148:2 152:1 153:9 160:18 248:10
**areas** 23:25 45:3 48:4 56:10 58:19 147:20 157:19 161:15 212:10
**arisen** 64:24
**arm** 98:18
**arrived** 32:1 207:9
**art** 31:3
**arthroscopic** 80:20
**aside** 154:7 209:4
**asked** 11:6 66:18 79:20 168:3 179:1 179:17 190:24,25 191:6,25 197:18 199:1 201:13 203:20 212:14 213:5,8,15,20,24 215:13 217:15 218:16 225:9,24 227:19 229:18 231:21 233:5,18 234:5,22 235:3 236:17 240:3,5
**asking** 14:18 123:18 239:16
**asks** 116:12 171:23 215:21
**aspect** 125:2 155:22
**aspects** 57:16
**assigned** 19:6 20:18,18 22:18 23:1,9,18,20 25:4 25:7,19 37:16
**assignment** 25:9 29:1 255:2 256:2 257:2

**assist** 22:23 24:5 26:9,19 37:10 49:22,23 57:16 66:25 67:8 87:12 224:17
**assistance** 26:8 27:6 66:15 84:14
**assistant** 13:11 17:10 34:11
**assisted** 26:12
**assisting** 24:10 87:18,19 167:14 167:23
**associated** 48:1,14 177:9 188:18
**associates** 80:20
**association** 18:8
**assume** 14:22 177:16 194:20 244:3
**assuming** 175:24 189:17
**atf** 23:14
**atlanta** 72:6
**attached** 256:7
**attachments** 5:24 80:11
**attempt** 14:21 177:19
**attempted** 142:14
**attempting** 66:1 68:12
**attempts** 28:4
**attend** 33:8,11
**attention** 69:23 129:22 249:7
**attest** 94:4 97:16
**attorney** 2:11 43:24 123:5 253:2
**attribute** 55:15

**audit** 51:13,14,18 51:20 52:1,2,8,10 52:14 150:21,23
**audits** 52:16
**august** 81:9 219:5 219:19 225:10
**authorities** 246:18
**authority** 54:13
**authorization** 70:19
**authorize** 256:11
**authorized** 145:25
**auto** 143:2
**availability** 143:22 213:10
**available** 130:20 189:21,24 232:14 232:22 233:12 235:19
**ave** 254:1
**avenue** 2:3
**avoid** 68:13 109:11
**awaiting** 84:4
**aware** 102:24 109:17 114:24 119:17 120:3 128:25 129:1 131:4 164:16 165:11 168:7 169:9 190:15 204:25 205:2 233:25 234:3 242:19

**b**

**b** 105:10 109:7 110:23 126:3,4 129:14
**bachelor's** 17:3,15
**back** 13:1 45:9 54:24 59:21 65:17

81:6 91:1,4
105:24 106:11
108:1 119:13
120:21 121:1,8
123:19 125:25
127:14 128:19
129:13 138:24
139:11 166:10,16
172:14 180:2
183:10 188:6,24
197:8 198:13
202:17,18 205:20
212:11,11 220:17
223:22 226:14
230:22 233:7
240:22 243:17
254:15
**background** 16:25
31:10,12,13 72:20
92:14,16,18
122:10 153:20
220:22
**bad** 44:6 94:22
95:10 120:9
122:15
**ballpark** 35:9
**baltimore** 3:4
**barbara** 140:7,12
**bare** 93:5 112:8
**barnes** 2:20 4:8,10
9:10,11 10:5,17,20
13:12,14 17:8,13
90:20 91:3 118:1
120:19 121:6
123:18 139:3,9
166:6 171:12,24
172:3,8 179:1,18
180:12 186:23
188:3,13 189:8
190:6,13 191:13
191:25 192:13

194:16 197:5,18
198:1 199:2
203:22 205:1
215:13 216:25
218:13,19,25
219:9,14,21 224:6
224:20 225:4,8
240:24 246:22
247:3,15,19 250:6
**barricade** 5:17
78:9,13,17,19,22
93:1 140:3,4,15
142:8,12 160:1
**barricades** 147:21
**bartlit** 3:7
**bartlitbeck.com**
3:9
**base** 171:24 198:6
**based** 25:12 47:25
48:13 62:11 94:7
94:10 95:19,24
119:4 124:14,23
148:10 164:18
165:3,12 167:7
169:19,21 170:9
170:20 183:3
185:20 186:5
195:12 196:22,25
197:25 200:24
210:10 215:4,4,5
215:22,23,25
218:9 230:8 234:7
236:21 242:14
244:19 246:7
**basement** 160:5
161:19
**basic** 93:6
**basically** 51:20
70:17 93:15
179:22

**basis** 29:4 47:24
61:3 194:15,18
239:3
**bates** 5:6,8,13,16
5:19,24 32:18
38:6 51:2 69:19
75:18,25 77:16
80:12 198:19
219:6
**bci** 92:17
**beck** 3:7
**becoming** 234:19
**began** 82:3
**beginning** 5:6,8,13
5:15,19,24 32:18
35:23 51:14 69:19
75:18,25 77:16
80:12 81:12
108:14 124:22
138:6 143:6
**begins** 121:21
122:25 134:9
141:19
**behalf** 2:2,10,15
2:19 3:2,6 9:10,20
9:22 227:8
**behaving** 28:20
166:13 167:5
**beisell** 2:16 4:11
9:19,19 171:19
172:10 178:5
184:8 188:20
193:7 197:4
201:24 222:18
247:1,24 250:3
**believe** 32:5 35:6
67:17 69:2,10
73:23 105:14
106:20 115:2,8,18
140:12 154:7
159:21 161:10

165:18 188:4
197:23 198:3
208:10 221:20
231:24 234:8
243:25
**believed** 195:12
**believing** 68:20
**beneath** 34:13
**beneficial** 98:25
**benzodiazepine**
185:22
**benzodiazepines**
185:19
**best** 97:19 98:19
163:13 224:25
**better** 29:21 114:3
161:19 164:4
174:24
**beyond** 106:9
242:16,21
**biannual** 95:25
**big** 24:13 235:17
**binder** 11:24,24
12:1,7 13:1 32:23
69:25 77:1,21
78:12 103:7,8
234:25
**binders** 11:13,17
**birth** 12:11 104:7
**bit** 47:10 55:23
98:20 170:4,10
205:18 231:14
249:16
**blank** 71:8
**blown** 227:23
**board** 2:10 3:13
5:10,12,12,14,18
10:8 11:19 14:11
16:7,10 29:15,20
29:24 30:6,9,13,16
30:22 31:3,16

32:1,3,7,16,17
33:2,8,9,11,16,24
33:25 34:2,19
36:14 38:14,16,18
39:19 41:21 43:10
43:20 45:10 47:18
48:2,8 52:21,24
53:17 54:7 57:22
61:1,5,6 65:12
66:2 71:14 75:16
75:23 76:22 77:11
81:19 86:24 87:3
89:10 90:11 92:1
92:5,9 94:2,6
96:23 97:2 98:7
100:15,24 102:17
110:12,16 114:1
114:20 119:17
123:12 130:11
131:5 136:15
137:2,8 143:14
145:1,8 146:14,21
147:10 150:6,13
153:10 155:17
167:15 173:2,3,9
176:5 177:13
178:13,19 179:13
179:14 188:7
193:19 196:9
206:10 211:7
217:4 220:2,25
226:20 227:1
232:8,23 233:21
234:8,13,19 235:9
235:10,20 236:1
236:20 237:1,9,15
237:19,24 238:4,7
238:7,12,18 239:1
239:3,19 240:1,4
243:5 245:5,12,20
248:7

board's 48:23
90:15 145:20
147:16 148:1
boardman 12:16
80:21
bob 117:23 171:20
219:13 240:18
247:1
bodi 137:6
bolt 160:7
bolts 160:7,19,23
160:24 161:1,4,8
161:19
bones 93:5
bonish 37:18
81:19
bonus 218:1,1,22
233:11
bonuses 218:9
bop 5:13,16,19,24
32:19 38:6 75:19
76:1 80:13 138:7
139:4 141:20
161:23
border 20:1
bottom 38:7 50:21
81:10
boundary 230:25
break 11:7,8,10
15:8,9 68:23
90:22 91:5 119:12
120:20,21 121:8
142:14 160:17,19
160:23 171:14,18
181:15 208:25
220:11 241:1
breakdown
181:12 235:25
236:4,12
breaking 79:6,12
79:18

breaks 36:14
brief 16:24 220:11
briefly 10:7 198:7
bring 179:4
brings 98:20
broad 2:12 174:12
218:17
brown's 84:20
building 93:4
built 93:4 146:2,3
bus 220:12
busier 208:22
209:10,14
business 48:2,15
50:18 79:8 95:22
170:3,6
businesses 79:13
busy 208:20
209:13 232:1
button 207:6

c

c 70:5 82:14
105:18
ca 254:25
cage 78:23 160:4,6
160:9,11,25
161:10,19
call 10:22 27:8
91:12 236:19
244:7
called 10:11 51:13
61:25 78:13
100:20 103:12
142:7 159:16
192:6 196:12,12
240:7 249:21
calling 27:24
64:23
calls 151:20
201:25

camera 211:8,10
212:9
cameras 211:25
212:3,4
canfield 18:19,21
19:11,12,17,23
20:25 22:18 25:8
capacity 92:20
caption 252:20
captioned 47:15
86:8 235:6
capture 50:16
captured 147:1,9
card 67:8,20
cardinal 150:12
151:3,4
cards 66:19
care 11:7 97:22
120:20 144:11
145:8 150:13
153:10
career 29:21 65:18
65:22 98:21
careful 15:2
carefully 224:4
caregiver 105:12
carload 120:12
carlson 140:7,13
140:18 142:16
carrie 210:25
211:11
carry 24:4 177:4
178:20 203:17
carrying 191:10
191:23 203:3
case 1:7,11,13
10:9 12:20 26:21
43:25 46:22 58:24
172:20 174:3
190:4 210:25
211:3,6 254:6

255:3 256:3
**caseload** 50:6
**cases** 1:15 67:14
**casework** 50:7
**cash** 183:19 184:1
   184:6,17,20,23
**catch** 138:20
   211:11
**categories** 31:7
**category** 140:2
**cause** 20:7 55:4
   105:14 252:11
**causing** 68:21 69:5
**centre** 2:21
**certain** 25:20
   48:17,21 61:24
   64:24 87:23
   183:16 194:6
   243:6,7
**certainly** 203:9
   224:17 226:16
   230:18 234:16
   243:4
**certificate** 4:15
   17:23 18:1,3 43:5
   43:13 77:7,9,13
   143:18 252:1
   256:11
**certification** 17:24
   18:4,6,9 255:1
   256:1
**certified** 10:14
**certify** 252:8,18
   253:1
**cetera** 47:7
**chain** 103:1
   106:22,24 168:4
   169:13 170:4,16
   171:2 177:25
   192:10 194:8,10
   197:24 203:14

208:5,19 210:19
   214:15 217:17,19
   217:25 218:8,24
   229:21 231:6,12
   231:19 242:9,11
**chain's** 193:23
**chains** 147:5 189:5
   190:11 224:10
**chance** 70:1
   189:14 249:14
**change** 55:20
   95:21,21,22
   135:14 143:13
   218:11,22 221:22
   254:13,14 256:8
   257:3
**changed** 35:4
   54:19 112:9
**changes** 131:18
   254:12 255:7
   256:7,9
**changing** 35:13
**channels** 246:16
**charge** 63:5
**chart** 34:6 36:10
**check** 45:3 61:7
   78:18,19,25,25
   87:22 88:2,16
   92:10,15,16,17,18
   96:21 97:8 100:11
   113:6,12,16 114:3
   114:9,23 115:15
   115:17,17,23
   116:5 137:11,14
   148:9 226:1,22
   227:3,13,15
   230:21
**checked** 128:2
   157:20,25 230:23
**checking** 115:16
   119:1

**checklist** 86:21
   115:14 153:5
**checks** 88:6 97:11
**chicago** 2:17 3:8
**chief** 34:9,10,11
**child** 220:11
**chinese** 22:7
**chronic** 104:9
**chronological** 82:9
**circumstance**
   26:14
**circumstances**
   52:9 113:1,22,25
**citation** 51:6
**citations** 95:7
**cited** 164:13
**city** 12:13 18:19
   18:21 19:12
**civil** 10:13 14:16
   251:3,7 255:5
   256:5
**clandestine** 57:4
**clarify** 25:1
**classes** 48:2,15
**classify** 41:12,14
**clean** 248:4
**cleanliness** 149:12
**clear** 196:24
**clearly** 45:5 48:5
**cleland** 140:8,13
**cleveland** 2:4
   253:7 254:2
**client** 198:6
**clinic** 41:8,11,13
   42:9,22 49:1,2,14
**clinical** 31:23
   57:16 72:20 102:2
   107:16,17 110:1
   155:23,24 156:5
**clinics** 40:2 41:18
   41:19,24 44:17

45:19 47:7 49:21
**clint** 3:12
**close** 43:2
**closed** 42:12,24
**clr** 1:24
**cocaine** 21:9,12
   25:13
**cocktail** 199:25
   200:3,8
**cocktails** 182:4,22
   182:24 185:18
   199:14 238:4
**code** 61:12,14,14
   61:17 62:6 126:8
   178:16
**collaborating**
   249:9
**collaboration**
   249:19
**college** 17:1
**color** 117:1
**columbus** 2:13
   22:3 72:6
**column** 204:17
**combination**
   185:6 186:8,14,19
   199:18 234:13
   246:7
**combinations** 44:9
   185:19
**combined** 119:1
**come** 23:10 28:7
   31:9,11 67:13
   79:20 94:9 102:11
   117:4,7 125:23
   150:17 238:23
   242:2 244:21
**comes** 69:15 78:23
   112:16 116:10
   119:25

coming 21:17,23
21:24 22:4 50:11
56:20 57:3 70:24
71:11,16 83:15
116:2 127:21
183:10 202:5
209:2 239:3
comment 136:9
195:11
comments 104:16
commercial
183:22
commission
253:16 255:19
256:25 257:25
commissioned
252:8
committed 97:17
communal 49:18
communicated
114:7,25
communications
15:17 16:12,19
77:22
community 50:1
186:10,18,19
companies 40:4
compare 216:14
216:23 217:16
comparison
218:12
compensated
234:1
compensation
233:13
competent 66:22
85:21
compiled 131:14
136:15
complaining 82:19
83:8

complaint 75:8
82:10,15 83:2
213:3
complaints 39:19
81:13 82:23 83:5
83:11,12 94:13
complete 90:5
105:9,12 146:11
completed 154:4
157:5,8 221:1
252:20 254:15
completely 73:12
compliance 34:4,7
34:14,20,25 36:11
38:22 39:1,3
62:10 107:23
108:8 111:23
118:11,18 128:3
129:10 134:20
149:7 156:10
158:8 178:2 197:3
compliant 163:11
complied 127:12
144:8 157:12
177:15 195:13
212:17
comply 66:1
134:10 161:7
165:7
complying 62:19
133:18 150:7
152:3,4 154:16
157:21,25 159:5
163:8 168:11
comprised 33:16
compromised
70:14
computer 189:18
189:20,24 204:7
206:17 207:1
213:18 214:21

224:14
computerized
105:22 204:7
214:1
concept 117:18
119:14
concern 48:25
148:1 201:7
245:16
concerned 145:2
155:17 163:16,20
168:16 169:1
concerning 25:12
25:21 66:10 81:20
85:10 100:20
182:16
concerns 48:1,14
73:9
conclude 74:14
concluded 74:12
74:13 250:15
conclusion 202:1
210:9 238:23
244:22
conditions 104:9
111:17
conduct 39:18
44:2 48:20 51:21
60:13 92:25 94:17
150:23 155:20
174:2 217:16
249:3
conducted 52:3,19
57:20 58:16 60:7
62:13 92:15
136:18,20,22
142:9 145:12
205:15 227:24
248:17
conducting 47:24
48:12 50:17

118:22 131:7
135:8,24 155:25
164:8 223:18
235:20
conference 10:4
confidentiality
159:3,4,6
confirm 115:12
213:18 214:20
conjunction
248:24
connection 14:9
14:10 16:13 26:6
75:11 93:25
conroy 2:7 9:21,21
247:4,4,10
consent 5:9 76:20
consider 73:17
120:10 161:17
237:24 238:12,20
244:11 245:6,13
considered 17:22
94:20 176:11
245:21
considering
204:18 243:7
consisted 30:12
consistent 28:12
34:18 47:24 92:17
consisting 104:8
consists 78:19
consult 111:9
112:5 127:17
consultation
127:24
consulted 111:18
consulting 109:15
111:3,24
consume 107:20
consumer 94:13

cont'd 3:1 7:1
contact 28:7,9
  110:4
contacted 65:21
  65:24 67:21 79:20
contacting 125:6
contacts 81:13
  82:7
contain 104:1,24
contained 202:25
  224:11
containing 104:5
  132:9
contains 11:24
  12:1
context 239:18
continue 17:11
  138:24 146:9
  229:14
continued 121:5
  143:11
continues 82:7
  124:6 147:19
  149:11 156:8
continuing 124:3
  124:13
contraindications
  108:24
control 63:24 64:3
  98:15 133:22
  136:12 145:19
  146:1 147:15
  149:16 150:5
controlled 40:11
  43:9,12,15 49:16
  49:22 52:4 64:7
  67:17 88:13,19
  89:15 90:1 101:25
  102:9 112:11,13
  112:14 129:8
  134:22 135:8,12

136:1,11 164:8
  176:7,10,17 178:8
  178:9,12 181:17
  181:21 232:16
  236:5,7,13 244:2,8
controls 62:1
  133:25 164:5
  169:17
conversations
  137:24 186:6
cooperate 79:15
  84:13 141:4
cooperated 162:11
  162:25
cooperating 163:9
cooperative 65:4
  68:12 140:18
  163:8
copy 105:22 129:4
  215:7
corner 228:23
corporate 190:22
  191:1 228:8
correct 15:15
  25:16 29:15 33:18
  33:21 34:22 36:25
  37:1,3 40:8 43:1
  52:7 62:7 70:21
  73:16,21 78:6
  87:8,10 88:20
  89:4,9 90:7 91:11
  91:22,23 93:23
  95:2,11 96:6
  105:16 122:23
  130:1 131:11
  134:17 141:8,11
  143:15,25 152:4,8
  152:9,10 155:5,6
  156:7,14 158:12
  159:7 161:5,14
  162:6,7,13,23

163:6 166:4,18,19
  166:24,25 173:4
  173:11 174:4,15
  174:19,20 175:3,9
  175:14 176:1,2,8
  176:15,25 177:5
  177:15,21 178:4
  179:22 180:24,25
  181:4,5,9 184:24
  186:1,21 187:1
  189:15,21 191:12
  191:24 192:8,12
  192:22 193:1,6,20
  193:21 194:15
  195:15,21 196:1
  196:19 197:17
  200:6,15,22 201:3
  201:10,15,23
  202:10 204:9,19
  206:10 210:20,21
  211:8,16 212:19
  213:19 214:24
  220:6 221:2,18
  222:1,17,25 223:8
  224:5,7 225:18,19
  225:22,23 226:15
  226:23 228:4
  229:7,9,16 231:3,9
  232:5 233:2,4,14
  233:23 234:20
  236:9,13,16,18,22
  236:23 237:25
  238:1,5 239:14,15
  240:12 241:10,13
  241:20 242:25
  243:8 245:6
  246:20 248:14,15
  248:18,19 250:1
  252:16
corrected 65:20

corrections 254:12
  256:17
corrective 58:18
  58:22 153:2
  160:11 164:1
correctly 41:5
  98:4 155:2 156:13
  156:17 157:10
  201:4 217:22
  222:8 248:13
corresponding
  124:6,12,20,23
  192:6,20 200:14
  200:20 201:20
  202:7,21 203:3,17
  222:16,22 224:2
  224:18 240:6
counsel 9:8,24
  11:6 15:8 16:3,5,6
  16:7,13,15,16,16
  111:9 171:15
  247:21 251:1,10
  253:2
counseling 109:16
  111:4 128:3,7,9,10
  128:12,15,21
  157:24 158:1,6,9
counter 176:21
counties 16:17,21
  24:6,8 37:3 58:23
  71:20 136:21
  172:20 228:4,7
countless 67:21
country 22:11
  57:4 184:5
counts 51:21
  148:25
county 1:10,12
  16:21 19:18,19,21
  19:22 20:9 21:2
  21:17,17 23:12

24:3,4,9,11 42:5,8
42:14,19 53:10
58:25 59:1,5,8,10
59:22 60:2,5,7,12
71:23 72:3,5 74:7
74:16 84:4,23,25
99:12 142:4 163:4
173:17 175:8,19
204:6 206:9
227:25 248:12,12
248:18 249:4
252:4 255:10
256:15
**couple** 11:13 37:6
46:24 58:11 75:11
117:18 174:17
175:3,24 198:21
215:23 225:12
248:3
**course** 118:9
121:24 189:13
190:18 196:4
210:22
**coursework** 17:22
**court** 1:1 4:17
9:24,25 10:3 14:2
14:5 15:1 123:25
255:7
**cover** 23:25
**covered** 99:19
122:13 132:13
212:6 236:15
**covid** 173:14,14
**create** 222:24
**created** 87:12
**creating** 149:18
**credentials** 70:13
70:17 71:10
**creek** 2:7
**crimes** 21:11
97:17

**criminal** 17:4
22:22 39:8 55:7
57:25 58:7 74:15
78:4 81:11 181:24
237:8,11
**criminally** 74:18
**criminals** 54:21
**criticizing** 196:23
**cropper** 53:9
**cross** 137:11
171:22 172:22
196:5,14 200:13
223:24 229:19
231:22 234:6
235:5 236:17
**curious** 159:14
243:20
**current** 11:19
12:13 14:10,12
56:6,17 96:17
100:11
**currently** 30:1
84:4 143:19
**cusp** 35:23
**custody** 4:17
**cut** 226:14
**cuyahoga** 252:4
**cvs** 3:2 9:13,16
10:23 26:23 27:23
60:1 167:20 209:6
209:21 210:3
**cypress** 2:7

**d**

**d** 70:5 82:18
109:14 111:15
112:25 113:1
117:21 119:13,15
226:13,24
**daily** 50:18 61:3
181:11 235:25
236:3,12 239:3

**dan** 1:8
**danger** 222:24
**dangerous** 39:10
46:2 47:23 49:11
54:25 62:3 91:17
133:23 134:1
152:14,23 176:7
176:11,14,16,17
176:24 177:3
192:25 222:23
223:25
**daniel** 3:3 9:15
**data** 73:16 87:5,6
87:8,9,13 104:5,7
104:13 105:12
145:7 170:20
180:3,7 189:7,15
189:21,23 190:5
190:12,16,22
191:3,3,7,19 193:9
193:11,13,23,24
193:25 194:1,2,4
194:14,25 195:14
197:24,25 202:5
202:16 203:16
204:22 205:7
213:18 214:8,16
215:11 216:3
222:14,19 224:10
232:25,25 235:18
235:19,23 236:1
236:10,20,22
237:12 238:12,20
238:23 239:2,6,7
239:24 243:7
**database** 55:25
60:20 61:3 87:1
87:14 90:17
**date** 12:11 33:8
74:17 104:7 105:3
105:20,25 138:18

141:21 162:17
251:11 254:8
255:3,9,19 256:3
256:13,25 257:20
257:25
**dated** 5:15,18 33:6
75:17,24 81:5
130:25 139:4
161:23
**dating** 147:4
**david** 2:21
**day** 2:15 175:25
181:17 209:16,16
209:18 210:15
215:8 216:10
217:13 218:4
249:17 253:7
255:16 256:22
257:22
**days** 25:10 29:13
117:12 213:12,21
254:18
**ddd** 47:23,25 48:4
**dds** 5:10 76:21
**dea** 23:16 43:4,13
43:22 70:13,16
77:5,7,13 143:17
157:2
**deal** 56:11 154:22
156:16
**dealing** 147:20
**deals** 53:20 134:3
146:18 147:22
152:11 157:16
158:13 159:2
182:23
**dealt** 92:19
**dear** 254:10
**deaths** 39:11
**deceive** 54:11

**december** 17:5,15
  130:25 141:23,25
  204:5 205:18
  206:3,21 212:12
  230:6
**deception** 26:15
  39:10 54:24 55:9
  55:9,12 85:18
**deceptive** 55:8
**decide** 73:10 98:7
**decipher** 141:14
**decision** 125:24
**declines** 128:14
**decrease** 55:4,13
  55:19
**decreased** 36:5
  55:3,22 56:9
**decreasing** 99:16
**deed** 255:14
  256:20
**deemed** 28:8
  165:22 254:19
**deems** 84:8
**defendant** 59:24
  224:9
**defendants** 9:13
  10:22,23 11:1,2
  16:14,15,22 26:21
  27:3,19 44:12,15
  46:21 62:24 63:9
  63:18,20,24 64:17
  65:10,25 68:17,20
  69:12 75:7 136:16
  167:20 168:10
  171:16 172:1
  173:8 174:3
  175:18,21 179:2
  179:11,12 190:4
  193:10 220:21,24
  225:5 233:11
  234:17

**defense** 192:12
  193:4 201:14
  240:7,11 241:4
**defined** 48:5
**definitely** 143:1
  171:3 173:18
**definition** 46:10
  46:13 180:10
**definitively** 22:9
  32:9
**degree** 17:3,15,17
**delegates** 158:16
  158:19
**delivery** 251:9,11
**deluco** 142:17
**demand** 233:1,15
**dental** 5:10 76:22
  77:11
**dentist** 187:8
**deny** 115:13
**department** 19:12
  22:20 34:5 63:3,6
  63:25 66:8 68:11
  69:1 85:14,22
  92:22 97:10,21,22
  239:2 254:22
**departments**
  23:13 62:23 63:10
  64:17
**depend** 113:22
**depending** 26:13
  50:6 67:24 78:24
**depends** 113:24
  170:18 209:17
**deposed** 10:14
  12:20 13:23 14:16
  15:21
**deposition** 1:18
  5:5 9:6,12 10:1,25
  11:23,25 12:2,21
  13:4,16,17 15:12

15:15,24 16:13
  32:14 69:18 75:15
  75:22 76:19 77:15
  78:8 80:9 85:25
  149:4 196:13
  250:15 252:19
  254:8,11 255:1,3
  256:1,3
**depositions** 11:18
**depth** 143:5
**describe** 41:5 44:2
  92:7 148:16
**described** 188:8
  199:17 220:5
**description** 5:3
  68:24 204:23
  238:19
**deserve** 246:19
**designated** 12:4
  36:20
**designation** 11:21
  19:13
**despite** 161:18
**destination** 22:4
**detailed** 81:11
  143:23 212:14,17
**detailing** 82:9
**detect** 62:2 67:1
  148:15,23 149:2
**detection** 160:10
**detective** 19:2,8,15
  28:23,25 29:5,8
  41:22 71:15
**deter** 62:2 148:15
  148:21 149:2
**determination**
  107:12 114:8
  124:17 201:2
**determine** 21:15
  51:22,24 99:4
  122:4 166:22

167:2 210:15
  212:16 215:11
  216:18 217:8
  222:14 236:2
  244:18
**determined** 52:5
**determining** 86:18
  149:7
**detesco** 70:5,8
**detroit** 21:25
  70:25 71:11,17
  72:3
**develop** 197:24
**development** 98:3
**device** 105:2
**diagnose** 242:2
**diagnoses** 241:9
**dictate** 98:16
**died** 241:3
**difference** 51:17
  169:13,17 170:10
**different** 23:11,12
  23:14 31:7 51:3
  51:14 64:6 93:11
  94:13 97:6 98:10
  101:22 102:19
  110:6 113:3
  125:17 144:6,7,18
  145:15 176:19
  183:9 217:10,11
  220:5 231:14,15
  231:18
**differentiate** 31:4
**difficult** 159:18
**difficulties** 15:14
**difrangia** 1:18 4:7
  5:5 9:7 10:11,16
  10:18 11:12 12:6
  12:8,10 13:18,24
  15:24 17:14 32:25
  57:21 69:24 76:5

76:5 77:1,20
80:17 86:7 91:4
117:17 121:5,7
124:4 129:23
136:14 139:11,18
163:15 167:7
169:12 171:13
172:16,18 179:2,8
179:10 189:4
190:1 193:10,22
198:16,22 199:13
205:5 219:22
223:22 225:1,7,9
233:25 234:21,25
239:11 240:11,25
246:4,23 247:23
247:25 250:4,10
252:9 254:8 255:4
255:9 256:4,13
257:20

**digits** 38:7

**direct** 67:25,25
69:23 196:13
226:14

**directing** 249:7

**direction** 126:23
245:2

**directions** 105:4

**directly** 221:17

**director** 34:7

**disagree** 172:2

**discipline** 22:23

**discretionary**
112:6

**discussed** 150:21
153:24 200:9
221:6

**discussing** 61:15

**discussion** 52:2

**disease** 104:10
108:24

**dispense** 73:12
117:12 120:18
125:4,10,15 178:1
191:11

**dispensed** 60:22
64:14 90:2 102:1
105:3,3 106:23
127:23 151:10
154:3 156:24
165:24 176:19
183:12 214:14
215:2,12 217:13
246:14,19

**dispenses** 124:7
200:21

**dispensing** 49:11
61:7 72:18 94:14
107:12 108:15
118:17,20,24
125:20 126:5
132:3,8,16,24
144:10,12 145:1,5
145:7,16 146:10
146:12,15,25
151:8,14,15 152:2
152:7 155:14,15
156:4 189:7,15,20
190:5,11,16,16,22
191:3,7,18 192:11
193:24 194:14,25
195:6 197:24
202:5 203:16
204:22 205:7
213:11 214:4,6,8
215:1,11 217:12
224:4,10,16
230:22 232:21,25
242:17

**dispensings**
145:24 151:8
232:16

**displayed** 96:17
96:20

**distance** 182:25

**distribute** 40:14

**distribution**
246:17

**distributor** 39:12
39:13 91:13,16
150:11,14 151:3

**distributors** 47:22
155:1

**district** 1:1,2
63:12 249:9,19

**diversion** 28:4
52:12 54:4,6,19
55:2,18 56:7 62:2
64:18,25 65:13,16
66:4 68:13,14,21
69:5 70:20 85:11
85:15 90:16 98:25
99:16 116:6 146:2
148:15 167:15,23
170:13,19 177:8
184:12 186:21
222:25 249:10

**diversions** 56:8

**divert** 148:20,20
184:21

**diverted** 177:4
184:11

**diverting** 68:3
99:5 120:7 144:17
154:1 249:23

**diverts** 98:12

**division** 1:3 34:21

**dmoylan** 3:5

**doctor** 42:3 56:14
67:15 72:10 73:2
73:23 79:22 82:11
83:3,8,23 84:2
87:21 88:2,6,9,10

88:15,21,23 89:1,3
89:6,14,17,20
167:5 183:15
186:10 187:18
240:12 241:8
243:12,20 244:19
246:10

**doctor's** 41:13
122:14

**doctors** 41:2,3
47:7 49:15 52:23
57:9 88:18,22
90:5 122:6,13
125:22 166:12
180:9 241:4,20

**document** 1:8 5:11
5:20 32:15,23
33:5 75:1 86:1,8
86:17 128:11
139:20,23 140:15
141:11 161:22
162:5 179:11,18
180:1,2 204:9
235:6,9 237:18,20
239:12

**documentation**
76:10 128:13

**documented**
216:12

**documenting**
158:8

**documents** 119:24
137:1 230:13
240:4

**dog** 40:5 46:15

**doing** 29:7 43:16
44:4 56:3 60:17
67:19 68:6 83:12
90:6 122:12 128:2
135:19 137:10
146:14 164:10

183:7 204:18
206:13 228:10,11
237:2 244:12
**donna** 78:1
**door** 160:7,8,20
**dosage** 108:25
**doubt** 222:5,12
**doubtful** 125:10
201:9
**dozen** 24:15,15,17
**dpm** 5:23 80:10,19
**dr** 42:3,7,15 53:4
57:9 70:5,8 74:5,9
74:22 76:16 77:2
77:4,25 81:21,25
82:3 83:11,15
88:23,25 89:6
90:4 162:4,19
165:20
**driven** 218:2
**driving** 72:24
183:8
**drop** 13:12 206:16
**drug** 5:21 19:7
20:11,19,20 21:1,5
23:1,4,6,23 24:1
24:13,19,21,24
25:4,14,17,21 26:1
26:3,12 27:4,8,10
27:16,20 28:24
29:7,11 30:23,24
39:9,17 45:25
46:3 54:25 56:15
56:19 71:24 72:4
83:20 86:2,8
93:10 101:24
104:8,9,17,19,23
105:2 107:7,23
108:4,13,23,24,24
108:25,25 109:2,3
109:5,18 110:24

112:12 113:3,6
116:24,25 117:20
118:23 121:14
124:15,24 126:10
126:15 145:12
148:14,15 149:12
149:16,17 150:10
151:2 153:18
154:4 155:8,20,25
157:4,5,12 158:21
158:24 165:9
181:24 182:24
185:7,17 195:25
196:18 197:1
199:4,11,11,14,18
199:24,24 200:5
200:25 204:21
205:8 235:7 237:8
**drugs** 20:16 21:12
21:16,18 24:24
25:3,13 26:4 28:5
28:15,16 39:9,11
45:14 46:2 47:23
49:11 54:5 56:12
60:21 61:8 62:3
64:6,7,12 66:14
68:3 71:16 85:18
91:17 99:5 104:10
115:3,20 133:23
134:1 149:25,25
150:3 152:14,23
154:2 157:3 176:7
176:12,14,16,17
176:24 177:2,10
177:20 178:1
182:3 183:18
184:6,10,11
185:20,21,22,23
186:20 187:3
192:11,25 199:17
199:25 200:3

223:25,25 238:3
246:7,14,18
249:23
**due** 9:25 15:12
55:5 170:1 235:4
**duly** 10:13 252:7
252:10
**duplication**
108:23
**dur** 155:14
**duration** 109:2
**duties** 14:11,12
18:25 39:4 40:7
46:25 87:22
178:15 191:10
220:3
**dzwier** 2:23

**e**

**e** 2:3 5:6,8,23
15:16 42:17,17
69:19,25 70:5,5,10
70:15,23 73:24
77:16,22 80:10,18
81:21 207:2,3
**eagle** 2:19 9:11
10:21,21,23 26:23
27:13,14,14 59:9
59:25 63:2 64:22
66:8,11,19 67:8
68:10,25 69:3
75:11 76:6 78:14
79:5,15 82:3 83:7
84:5,12 99:10
135:24 137:13,21
137:25 139:5,24
142:3 144:14,24
145:13 147:5,12
150:18 154:10
157:11 162:18,24
163:3,16,22 164:4
164:12,17,24

165:6,13,19,24
166:3,11 167:8,9
167:13 168:3
174:9 175:10,12
194:13 195:1,12
197:2,14 204:6
206:9 208:6 209:4
210:11 219:4
222:11 227:20,24
228:3,8 229:5,24
230:1,15
**eagle's** 63:2,5
81:23 228:17
**ealert** 53:21
**ealerts** 53:20
**earlier** 25:12 53:7
88:25 106:22
137:14 144:2
149:4 150:22
153:23 162:1
166:2 179:1
193:15 194:11
200:12 201:13
224:13 226:1
227:6,22 228:2
232:7 233:7
236:15 248:5,15
**early** 54:24 55:14
102:8,8 116:12,21
117:8,12 234:6
**easier** 141:22
**east** 2:12 3:3
**eastern** 1:3 9:3
**easy** 92:9
**education** 72:20
97:5,6,20 110:2
122:10 153:19
**educational** 16:25
**edwards** 11:18,22
11:25 12:1,5
30:19 37:18 108:2

[edwards - exhibit]

121:9 126:2 127:2
128:17 130:3,15
134:24 136:17,18
136:19,24 139:9
198:17
**effect** 98:24,25
99:16 199:7 214:1
**effective** 62:1
**efforts** 167:15,24
**egregious** 58:5
94:25
**eight** 33:17 141:19
**either** 16:14 28:13
51:4 93:24 136:7
140:10,23 183:15
193:18 218:3
253:2
**electronic** 147:21
149:15,17
**electronically**
147:9 149:18,25
150:2,4 153:6
**elicited** 173:25
**elm** 78:14 139:25
142:3
**else's** 173:22
**elyria** 147:13
**email** 254:17
**embedded** 228:24
**emphasis** 159:8
223:20
**employed** 29:15
82:20 157:19
216:16,24 217:7
**employee** 31:17
65:16 82:23 154:1
173:2
**employees** 38:17
83:6 92:5 152:14
173:8 216:20

**employer** 202:9
**employment** 14:14
**employs** 202:23
203:14
**enclosed** 254:11
**encounter** 27:1
**ended** 29:2
**enforce** 22:22
177:13 178:11,21
178:24
**enforcement**
20:20 23:8 24:15
31:10 34:5,7,20
36:12 54:20 65:5
68:1 81:3 87:12
87:15,19 158:20
167:14,23 184:5
184:16 186:19
187:25 188:6,10
234:11,14 237:5
237:12 239:23
**enforcing** 106:5
134:25 144:2
156:12 178:16
**engagements** 68:9
**engaging** 66:2
**ensuing** 51:12
242:12
**ensure** 22:21 45:6
47:22 48:4 58:20
64:13 79:1 93:5
93:17 96:18 97:12
101:23 102:3
107:17,22 118:18
118:21,22 119:2
126:6,14 127:16
128:21 144:8
145:11 148:18
151:17,22 160:11
192:21

**ensuring** 49:18
98:18 108:8 154:2
**entail** 92:8
**entered** 256:9
**entering** 79:7,13
**enterings** 79:18
**entire** 65:21 87:16
160:11 232:24
255:5 256:5
**entirely** 19:24
**entitled** 5:11,20
32:15 86:1 87:7
171:22 196:14
199:3 218:18
**entry** 105:21,25
**epositive** 146:18
146:21 147:6,17
**eps** 144:11,24
**errata** 254:13,18
256:7,10,18 257:1
**error** 94:14
217:11,14
**escobar** 42:7
**esq** 2:3,7,11,16,20
2:21 3:3,7,13
**essentially** 41:6
146:25
**et** 1:10,13 47:7
**evaluated** 48:5
**evenings** 209:13
**event** 52:3 150:20
253:3
**events** 16:2
**everybody** 99:19
99:20 100:17
172:9
**everybody's** 11:16
**evidence** 147:24
151:9 152:6
165:13 215:1

**evident** 160:12
**evolve** 54:21,22
**exact** 179:21
**exactly** 46:9 86:12
101:2 119:25
146:4,7 182:1
215:20
**examination** 4:7
10:12,16 121:5
172:16,22 200:13
223:24 225:7
234:6 247:23
**examine** 196:14
242:1
**examines** 241:8
**examining** 196:5
**example** 11:22
25:19 57:11 59:8
88:9,15,23 132:2
135:24 137:6,13
151:19 187:8
200:1 210:8
213:23 229:18
235:23 237:11
242:9 245:18
246:16
**examples** 66:9
187:14
**excuse** 123:14
203:22
**executed** 256:10
**execution** 255:14
256:19
**exercise** 72:17
120:17 202:6
241:18
**exercising** 110:14
201:19
**exhibit** 4:17 5:5,6
5:8,9,11,14,17,18
5:20,23 11:13,17

11:23 13:1,2,3,16
13:21,21 32:14,23
32:25 34:4 36:10
50:20 69:18,24
75:15,22 76:5,5,19
76:25 77:1,15,20
77:21 78:8,12
80:9,17,17 85:25
86:7 95:4 103:6
103:16 108:1,2
121:9 126:2,4
127:2 128:17,23
130:3,15 134:24
136:17,17,18,19
136:20,24 138:2
138:24 139:2,8
140:6 179:2,4,11
191:5 193:11
198:17,23 199:13
199:14,17 205:19
205:20 212:12
219:3,4,10,15
220:21,21 225:11
226:12 234:21
235:1,2 239:11,25
243:18
**exhibiting** 116:5
117:13
**exhibits** 4:4 5:1
11:21,25 12:2,2,4
12:6,6 13:1,13
15:25 76:4
**exist** 218:23
**existence** 203:1
**expect** 84:5
**expectations**
130:22
**expects** 48:3
**expensive** 64:8
**experience** 15:13
21:4 24:22 25:2,3

25:6,12 40:21
41:21,22 54:2,20
55:3 57:21,22
71:14,16 73:14
90:14 115:22
122:3 155:25
164:3,12 165:12
167:8 169:11,19
169:21 170:12
174:4,11,13,18
188:5,8,16,23
209:10 234:8,10
234:13,14 239:22
240:10,16 241:8
**experienced**
164:23
**expert** 122:19
165:21
**expiration** 255:19
256:25 257:25
**expires** 253:16
**explain** 31:6
**explained** 14:19
**explanation**
117:11
**exposure** 131:25
173:21,22
**external** 78:25
**extra** 98:13,17,17
98:18
**extremely** 64:12
224:1

**f**

**f** 73:24,24 82:23
104:15,15
**facilities** 40:2,22
40:25 41:7,18,24
44:17 45:16 48:17
48:21 50:2,4,22
**facility** 40:9 41:14
42:4 44:22 45:3

46:1,3 80:19
**fact** 95:25 143:12
145:22 156:5
177:12 218:14
226:5,11 229:10
230:5
**factors** 62:12,14
73:15
**facts** 113:22,24
**failed** 75:1
**failure** 164:14
**fair** 14:22 136:6
189:1,4 191:17
197:11 199:23
205:5 249:1
**fairly** 184:4 188:9
**faith** 98:19
**fake** 44:6
**fall** 57:1 178:14
**falls** 178:17
211:21
**familiar** 24:23
30:22 41:10 53:16
61:11,21 91:8
100:19 101:5
107:6 111:18
119:16 126:16,18
127:18,20 134:16
135:3 151:2 176:4
178:7 192:5
238:25
**familiarity** 230:10
**family** 75:9 83:1
187:17,18 217:20
233:8
**far** 41:2 44:19
45:8 48:24 56:24
63:13 77:12 90:12
100:4 102:23,23
114:24 140:20
145:1 156:19

163:10,15,20
164:7,16 165:9,11
167:10,12,17
168:4,7,16,25
169:9 171:1
179:15 194:7
197:8 206:11
230:22 237:14
242:23
**fbi** 23:14 92:17
**fda** 246:16
**february** 19:14,16
28:23 147:12
**federal** 10:12
43:21 178:8,16
246:18
**fee** 93:13
**feel** 125:16 249:2
**feet** 81:24
**fellow** 137:21,24
**felt** 227:12 249:6
**fentanyl** 22:7,8
56:19,24,25 57:3,5
**field** 30:12,14,18
31:24 36:12 40:7
**fields** 189:23,25
**file** 75:3 129:5
156:10
**filed** 128:22
**files** 43:22 157:3
**fill** 72:25 110:3
153:3,5 170:25
201:10 216:20,21
217:21 218:24
222:16,17 223:3,8
233:9
**filled** 40:19 88:2
89:23 101:14
104:25 106:16,17
121:12 165:14
170:25 184:13

192:21 209:1,3
216:4,15,22 217:6
218:3,10 227:4
232:11
**filling**  72:12
100:25 110:18
129:16 184:19
200:5 227:7
241:25
**fills**  102:8 107:3
**finalize**  207:2,5
**finally**  15:7 105:18
116:3
**find**  33:7 66:22
68:11 194:5 228:6
229:20 254:11
**fine**  172:6,10
204:1
**finish**  14:18 118:2
166:6 171:25
**finished**  166:9
**finishes**  125:8
**firm**  2:6
**first**  10:13 11:23
11:24,24 27:13
29:24 63:1 64:22
103:7 113:2 126:3
131:3,8,13 137:6
141:23 172:6,9
180:5 197:15
216:12 225:6
235:17 240:11
241:4 252:10
**fit**  187:2,12,12
**five**  11:2 19:7 23:2
38:5 126:6 129:15
138:3 171:14
198:7
**flag**  83:21 180:17
180:20 181:8
182:12 183:2,21

185:11 186:4
**flags**  112:15
117:19 119:14,15
119:19,22 120:2
180:8,10,15 188:1
188:10,18 189:3
191:4,20 193:10
199:19 224:12
236:18 239:17,19
**flip**  38:5,21
**floor**  2:12,21
**flow**  238:22
**focus**  129:22
**focused**  212:9
**focusing**  20:15
**folder**  13:13
**follow**  24:5 69:1
100:25 110:17
129:16 134:7
197:6 225:4
233:10 235:4
241:7 247:15,21
**followed**  45:8
49:20 93:18
**following**  104:24
113:1 149:13
**follows**  10:15
**food**  109:3
**foot**  80:20
**force**  23:7,9 24:1
24:13,19,21 25:4,7
25:9,15,18 26:1,4
26:12 27:4,9,16,20
28:24 29:2,11
71:25 72:24
**foregoing**  252:15
252:20 255:13
256:18
**foreign**  22:6,10,11
**forever**  93:21

**form**  54:5 105:22
180:12 183:19
186:23 188:3,13
189:8 190:6
192:13 193:7
194:16,23 196:2
197:5,20 202:11
203:24 205:1
218:13 222:18
224:6,20
**format**  204:7,8,8
221:4
**formatted**  221:20
221:23
**formatting**  134:4
**former**  11:20
**forms**  54:5,19 55:9
55:12 56:7
**formulas**  239:1,6
**forth**  91:7 100:23
226:19
**forward**  254:15
**found**  67:23 141:7
141:11 154:9
161:22 162:9
225:21
**foundation**  186:22
189:9 191:14
198:2 217:1
224:21
**four**  30:4,5,12
34:13,15 36:3,14
36:21 51:8 57:21
59:9,13 95:5
120:12 138:3
207:21 239:21
**fourth**  36:9 127:15
**fractions**  72:1
**frame**  133:4,11
208:17 210:11
216:4

**frankly**  31:23 56:4
125:14
**fraudulent**  28:9
53:24 66:20 67:24
170:23
**fred's**  83:1
**free**  255:14 256:20
**frequent**  22:3
136:10
**frequently**  135:20
135:25
**front**  33:2 88:4,24
198:23 205:21
219:23
**frowned**  186:9
**fulfilling**  201:20
202:20 222:15,22
224:18
**full**  12:9 14:24
29:1 64:6 86:14
104:5 173:15
174:9 175:1,7,16
180:2 189:13
194:12 206:8
219:5 227:23
232:9 249:3
**fully**  232:22
**functioning**
123:12
**functions**  235:11
**further**  12:1 85:5
94:2 96:5 144:20
171:13,23 219:3
225:7 246:23
247:17 250:4
252:18 253:1
**future**  93:15 151:1

---

**g**

---

**g**  83:1 118:5
121:21 200:11

**geared**  133:8
142:12 149:22
203:7 224:25
**gender**  104:7
**general**  33:22
34:19 48:25 86:20
89:6 112:20 133:8
157:19 169:18
180:4 238:17,18
**general's**  2:11
**generally**  14:17
18:25 21:19 22:3
25:6 28:4 31:7,9
51:19 52:13 57:12
58:3 67:24 78:18
92:24 94:15 106:8
106:23 117:8
118:13 119:10
122:17 147:1
163:7 204:13
208:3 209:9,17
210:7 215:5
233:21 236:2
238:21 246:4
**generated**  204:7
**generic**  186:1
**gentleman**  63:4
**geographic**  36:15
113:15,20 114:10
114:16
**geographical**
36:21 83:15
112:17,18
**geographically**
19:25
**george**  11:18 78:1
136:20
**getting**  45:9 83:5
92:9 93:2 102:4
106:25 115:16
133:13 182:17,19

209:14
**giant**  2:19 9:11
10:21,21,23 26:23
27:12,13,14 59:9
59:25 63:1,2,5
64:22 66:8,11,19
67:8 68:10,25
69:3 75:11 76:6
78:14 79:5,15
81:23 82:3 83:7
84:5,12 99:10
135:24 137:13,21
137:24 139:5,24
142:3 144:14,24
145:13 147:5,12
150:18 154:9
157:11 162:18,24
163:3,16,22 164:4
164:12,17,24
165:6,13,19,24
166:3,11 167:8,9
167:13 168:3
174:9 175:10,12
194:13 195:1,12
197:2,13 204:6
206:9 208:6 209:4
210:11 219:4
222:11 227:20,24
228:3,8,17 229:5
229:24 230:1,14
**ginger**  37:20,24
**girlfriend**  74:23
**girlfriend's**  75:9
**give**  16:24 36:2
50:10 92:10 162:4
187:14 207:22
238:10 251:1,10
**given**  58:18
105:11 127:16
151:18,19 161:11
164:2 224:3

252:12,17
**giving**  12:14 86:17
185:15 201:22
203:15
**glad**  195:10
**go**  13:12 17:12,19
24:11 27:4 29:19
30:8 34:3 36:9
44:19 45:2 49:13
58:8,15 59:17
82:9 86:22,25
91:15 92:3,25
93:4 94:16 96:3,4
96:16 98:14 99:11
100:6 103:15
105:24 106:2,9
108:1 115:22
138:25 141:17
153:5 157:3 158:2
159:20 161:21
166:16 172:1,6,9
172:12 174:25
179:24 180:2
183:4 186:25
190:14 197:8
198:21 200:10
202:17 206:6
212:11,11 213:17
214:3 221:8,9
225:6 229:4 232:7
232:12 236:1,9
237:3 247:3,14
**goal**  178:24
**goes**  40:18 89:22
145:13 201:6
202:18 223:22
**going**  18:12 20:9
27:4,13 32:22
61:8 69:23 76:6
79:13 82:13 84:19
85:4 88:16 90:23

92:20 93:3 101:23
102:5 106:11
107:14 119:13
120:23 127:14
128:19 129:13
137:13 138:22
148:6 149:2
150:17 153:25
157:3 159:14
162:2,20 166:10
171:16 172:7,11
187:23 188:6,24
198:10,19,20
205:25 212:13
214:25 229:6,12
229:13,25 245:25
250:8,12
**good**  10:18,19
63:23 64:2 65:3
99:15 121:7
136:11 138:20
145:19 147:15
151:1 161:14,17
163:7 196:17
202:8 242:10
**governing**  61:13
129:25 130:7
**governs**  133:22
**grade**  56:25
**graduate**  17:16,22
**grasp**  86:14
**great**  248:3
**greater**  51:23
**green**  17:9
**greg**  37:18,24
**grocery**  160:5
209:5 228:18,24
**group**  10:22 11:2
25:20 187:23
246:1

**groups** 182:3 238:3
**guess** 41:4 92:8 97:22 116:1 118:25,25 131:18 150:24 165:17 170:9 181:14 182:6,14 186:8 187:8 204:17 205:11,13 245:15
**guessing** 152:21
**guidance** 86:17 119:24 131:7
**guide** 130:18 131:3,20 142:22 153:1
**guiding** 52:13

**h**

**h** 2:3
**habits** 81:21 89:7 181:3
**half** 19:7 23:2 30:4 30:5 57:22 194:22 239:21
**hand** 169:14,16 253:6
**handed** 74:19
**handful** 175:19,20
**handling** 155:2
**handwriting** 141:15
**handwritten** 204:16 205:3
**happen** 27:25 56:5 73:7 148:20,22 170:19 186:14
**happened** 35:24 54:25 161:3
**happening** 156:21 208:8

**happens** 79:11 170:4 182:15 208:3
**happy** 172:5,9
**hard** 105:22 129:4 215:6
**head** 15:3,4 136:5 243:3
**heads** 65:11
**hear** 14:20 240:18 247:6,25
**heard** 241:1
**hearing** 14:1
**hearings** 14:5
**heightened** 49:25
**help** 27:4 127:2 203:16
**helped** 67:15
**helpful** 144:20 163:11 191:9,16 191:22 203:2,6 204:8
**helping** 204:9
**henry** 2:11 10:8 117:23 120:20 198:4 250:8
**henry.appel** 2:14
**hereinafter** 10:14
**hereunto** 253:5
**heroin** 21:7,12,22 22:4,8 25:13
**high** 22:18 44:7
**higher** 233:9
**hipaa** 213:3
**hiring** 35:24
**histories** 90:5 181:24 237:8
**history** 16:3 58:10 89:16 90:1 101:16 102:21 104:9 173:1 237:11

**hit** 207:2,5
**hold** 219:14
**hollingshead** 219:20,25 221:2 225:12
**holy** 185:18
**homes** 47:6
**honestly** 97:9
**hostile** 196:7,9,11
**hour** 11:10 90:21 175:3 183:5,8 218:4
**hours** 174:18 175:25 194:22 207:21,24 215:24 231:24
**house** 16:2,6
**housekeeping** 11:6
**houses** 160:5
**hoy** 3:12
**hubbard** 3:8
**hubs** 72:7
**hundred** 14:6,7 46:9,12 57:23 195:24
**hydrocodone** 185:21 211:12,18 212:8
**hypothetical** 218:15,17,20
**hypothetically** 218:7

**i**

**icon** 17:9
**idea** 130:22 204:13 205:6 207:7,11,14
**identical** 83:21
**identification** 13:19 32:20 69:21 75:20 76:2,23

77:18 78:10 80:14 86:5 146:19,22,24 147:17 157:18
**identify** 9:8,14 40:24 193:25 224:12
**identifying** 108:21 109:8 117:2
**ii** 129:7 149:16,25
**iii** 129:7
**illegal** 21:1 24:24 24:24 25:21,25 26:15 27:10 28:14 28:14 39:9,16 66:17 67:2,13,23 71:16 154:22,23 184:7
**illegally** 28:20 54:9
**illegitimate** 165:14 166:23 167:3
**illicit** 21:18 57:3
**illinois** 2:17 3:8
**illness** 33:14
**imagine** 98:11
**immediately** 143:24
**impaired** 39:17 116:10
**impairment** 112:21
**implemented** 53:25 54:1 101:3
**importance** 153:21
**important** 95:15 95:18 100:15,18 101:18,20,21 178:3 202:19 224:1

**impose** 227:2
**improper** 65:18
151:8,13,13 152:2
156:9 215:1
228:13
**improperly**
151:10,15 152:7
215:3,12
**inaccurate** 105:15
**inappropriate**
109:2
**inappropriately**
83:24 166:13
167:5 244:12,19
**incentives** 218:23
233:6,9,9
**incentivized**
217:21
**incident** 180:18,21
**incidents** 67:11
**inclined** 169:25
**include** 10:23 24:8
26:20 27:7 30:19
37:17 45:14 85:17
109:12 111:1
125:20 128:6
133:2 155:23
199:12 236:24
238:2
**included** 25:14
39:7 113:4 132:23
248:11 254:13
**includes** 37:2
77:25 116:20
**including** 48:8
50:4 62:12 83:7
104:17 121:13
136:23 137:9
157:2 158:13
165:8 166:11
169:12 189:23

231:25 238:3
**inclusive** 142:11
**incorporated**
256:12
**incorrect** 108:25
154:8
**incorrectly** 152:20
**increase** 35:21
55:19
**increased** 36:5,8
**independent** 51:20
84:22,24 99:11
103:3 169:15
170:14,22 171:4
194:9 217:19
231:18,19,19
233:8
**independently**
217:16
**independents**
231:15
**index** 4:1,4,5 5:1
6:1 7:1
**indicate** 105:5
147:24 151:9
152:2 157:6
159:12 188:1
215:2 245:24
**indicated** 106:21
113:10 134:9
145:19 147:25
148:9,16 152:16
152:25 156:11
189:12 234:9
**indicates** 33:6
148:13
**indicating** 254:13
**indication** 65:25
144:1 186:20
235:8

**indicative** 102:10
**indicted** 84:3
**individual** 21:20
33:22 48:1,14
54:12 64:14 97:12
104:17 118:9
121:23
**individually**
217:20
**individuals** 23:13
25:25 33:17 49:23
66:13 67:5 68:6
72:8 120:12
142:19,19
**influence** 229:2
242:11
**influenced** 242:8
**informal** 131:6
**information** 38:25
66:18 67:8,21
81:20 104:18,24
105:10,14 120:5,9
124:14 126:7
132:9 146:8
150:10 151:1
156:23 175:15
186:11,15 189:5
193:12,24 197:8
200:24 202:4,7,20
202:24,25 203:2
203:16 211:17
213:13 216:7
221:23 224:11
232:14 233:12
244:10
**initial** 30:11 84:10
93:1
**initials** 147:3,4
**initiate** 166:12
206:25

**initiating** 65:5
**ink** 147:2,7
**input** 122:21
**inquire** 153:8
**inquired** 190:20
217:24
**inquiry** 155:16
238:4,5
**inside** 156:21
228:18,24
**inspect** 44:22
45:15 46:19 47:5
48:18 49:3,7 50:3
59:24 60:4,15,24
130:12 137:13
204:24 220:4
248:21 249:2
**inspected** 40:25
41:1 45:10,20
46:3,16,20 47:23
48:22,23 49:19
50:2 59:9 92:4
94:10 132:15
160:4 163:3
210:20 228:3
**inspecting** 40:21
44:18 208:19
**inspection** 5:17
44:25 45:1 47:2
47:16,19,21 48:3
48:20 51:9,15,18
58:6,9,10,16 60:7
60:13,19,24 61:6,9
78:9,13,17 79:4,16
93:1 94:11,17,22
95:10,23 130:18
131:3 132:2 133:2
133:7,21 136:16
137:2,15 138:3,6
138:11 139:4,16
139:24 140:3,4,11

140:15,16 141:6,9
141:13,18 142:1,2
142:7,8,9,11,16,20
142:22 143:3,6,15
148:1,12 149:6,20
149:21 150:13
151:12 152:8
153:1,4,23 154:6,9
156:8 157:11,16
157:20 158:8
159:9 161:11,14
161:18 162:2,14
162:21 174:8,10
174:16 175:1,8,24
190:24 194:12,21
195:7,13 203:9,20
204:5,11,19
205:10,15,19
206:7,8,25 207:15
207:16,18,24
212:13 213:25
219:5,5,13 220:20
221:1,5,21 225:10
225:16,17,20
227:20,23 230:7
231:2,7 232:17
248:17 249:3

**inspections**  39:3
40:1,6 41:17
44:21 47:2,16,25
48:8,9,13 50:8,21
51:4 52:16 57:19
58:3,11,25 59:4,8
59:14,22 62:17,18
92:8 93:16 94:2,7
94:8,18,19 95:6,14
96:16 100:10,16
101:11 107:21,22
108:9 111:21
118:12 127:10
128:2 129:10,23

129:24 130:1,7,23
131:8,13,21
132:14,21,23
133:17,24 134:7
134:20 135:1,18
136:21 137:10,16
137:18 148:2,8
152:1 154:14,24
155:10 157:2
163:7,7 165:4
173:7,15,16
174:13 175:17,23
189:13 190:20
204:9 208:4 210:4
210:6 221:21
223:19 228:7,25
229:3,5 231:6
232:8,13,23 233:2
233:5,22 242:7,8
242:10,12

**inspector**  37:20
38:4 46:25 92:24
92:24 118:16
143:2 204:18
213:24 220:1
221:1,16 223:15
225:11,22

**inspector's**  222:11

**inspectors**  11:20
31:5,10 32:6
34:15 36:3 38:10
38:19,24 47:5,12
130:11 131:5
136:23 205:7
235:10,13

**install**  212:2

**installed**  211:7

**instance**  65:15
67:25 71:5 110:18
111:7 113:11,16

**instances**  54:8
165:25 167:2

**instruction**  251:2
251:10

**instructions**
126:24

**insufficient**  152:12
153:9 215:22
231:22

**insurance**  183:19
183:23,24 184:2

**intended**  177:14
177:18

**intention**  177:17

**interact**  140:10
199:20

**interacted**  140:12

**interaction**  190:18

**interactions**  66:7
101:24,24 102:6
108:25 109:1,3
173:7 174:5
186:13 199:11,24
234:17

**interest**  49:13,18
50:1,1 64:9

**interested**  35:8
182:2 199:10
253:3

**interesting**  46:16

**interfere**  241:19

**intern**  52:4,11
99:25

**internal**  63:23
64:3 86:16 92:18
136:12 145:19
150:5 171:4 235:9
236:19 237:15,18
237:23 238:11,11
238:18,18 239:12
240:4 245:4

**internally**  239:19
245:13,19

**internet**  171:9

**interns**  39:18
100:12

**interpret**  110:8
125:7 129:18
177:22 185:12
238:22 245:15

**interpretation**
101:3 109:24
111:13 123:4,5,9
127:21,22 129:2,4
135:10 148:5
149:23 150:16,24
153:14

**interpreting**  182:6

**interviewed**  68:4

**interviewing**  75:1

**intoxicated**  116:23

**introduced**  112:12

**inventories**  134:22
135:8,20,25 164:9

**inventory**  134:17
135:12,17 136:2
136:11 154:14,15
154:17 157:4,5,12

**investigate**  21:11
23:23 64:19 68:13
85:14 90:16

**investigated**  41:25
66:13 68:2 97:13
171:8

**investigating**  25:3
26:14 42:13 44:18
72:8 79:22 179:20
210:22 212:23,25

**investigation**  24:3
26:16 29:8 39:8
42:11,24 43:19
44:11 53:5,14

57:17 70:7,9
72:10 73:3,23
74:2,9,11,19,21
75:5,12 77:2
79:16 80:2 81:2
82:2 83:22 84:13
84:18 85:1 94:12
94:16 167:4
210:24 211:6
213:1 215:18
232:18 235:7
237:2 238:19
248:23
**investigations**
5:21 22:2 24:7,10
24:12 25:19,21
26:7,9 31:20
34:10,12 37:10
39:2,8,22 44:19
47:1 52:19 53:3
54:22 56:18 57:7
57:8,13,25 59:19
66:15 67:5,9
71:22 86:2,9 87:1
87:5,7 106:6
122:13 144:21
150:17 166:2,12
166:16,22 169:12
170:13 217:11
235:21 238:13
**investigative**
50:14 239:7
**investigator** 66:23
**involve** 22:16 26:4
45:13
**involved** 44:18
52:12 53:2,10
57:6 65:7 70:7
74:1,8 96:6
167:17 210:24

**involvement** 53:18
65:6 164:18
**involves** 73:15
227:7
**involving** 21:11
30:23 67:12
248:23
**issuance** 132:20
134:4,5,11 242:24
**issue** 40:17 57:1
86:19 109:9
141:11 143:12
148:6 150:19
152:22 179:20
212:8 243:6
**issued** 40:16 43:21
51:6 83:16,19
88:14 97:15
107:18 118:8
119:3 121:22
156:17,18 163:13
165:22 176:18
179:14 181:22
220:24 237:4,21
238:7
**issues** 64:12,24
102:10,11 141:7
162:9 225:21
**issuing** 44:5 70:17
123:8 241:12
**item** 228:25 229:1
229:1 243:19
**items** 97:20
107:11 117:19
120:1 126:20
132:19 180:7
189:3 204:17,23
206:16 226:5,13
226:23 235:17
238:9

**j**

**j** 2:16 5:10 76:20
**jacklyn** 53:9
**james** 3:12 5:9,23
76:20 80:10,18
81:21,25 179:3
180:1 198:18
**january** 1:21 9:2
253:7 254:4
**jersey** 22:1
**joann** 37:6,12
**job** 178:11 191:23
201:23
**john** 37:17
**jones** 2:15
**jonesday.com**
2:18
**joseph** 3:13
**judge** 1:8
**judgment** 72:18
72:22,23 73:9,13
109:10,23 110:3,9
110:14,25 111:11
111:14 112:6
114:18 116:18
118:10 120:17
124:17 125:1,4,19
153:12 196:22,25
201:1,19 227:8,11
227:14 241:18,19
**judicious** 248:22
**july** 5:12 32:16
33:2 138:19
**june** 18:16 78:5
**jurisdictional** 19:6
20:19 23:1
**jurisdictions**
24:25
**justice** 17:4

**k**

**k** 73:24
**kate** 9:17 172:3
196:11
**kate.swift** 3:9
**katherine** 3:7
**katie** 37:7,8
**keep** 133:14
**keeping** 133:3
146:15
**kellie** 140:8,13
**kept** 97:19 146:11
**kicked** 247:7,13
247:20
**kim** 225:11
**kimberly** 219:20
**kind** 20:16 34:6
35:22 41:14 46:15
58:5 71:25 86:20
110:7 130:21
136:15 144:5
158:24 174:7
178:17 186:8
206:7
**knew** 218:21
**know** 15:9,14 16:2
20:19,21 22:19
24:5 25:5 26:13
26:18 27:21,23
29:9,12 32:11
38:16 43:18 44:13
44:13 45:2 46:1,9
48:19,24 49:9,11
49:12,13,19 54:23
55:11 56:2,18,19
57:2,4 58:16,20
59:9 61:2,23 64:5
64:8,11 65:4
66:16,19 67:18
68:3,5 69:14
71:25 72:21,23

73:11 78:24 90:12
92:16,25 93:2,7,9
93:12,14,16 94:7
94:14 95:20 97:17
97:18 98:11,19
101:2,2 103:4
107:14 110:2,5
116:11 117:24
118:14 119:2,4,6,9
119:10,23,24
120:4,6,7,11,14
122:7,7,10 123:6
125:16 131:22
135:11 137:12,25
138:4 144:13,14
144:19,21 145:11
145:14,14 146:5,7
148:23,24 149:2
150:2,16,18,18,22
151:4,16,19
152:23,25 153:13
153:14,16,24
154:2 156:21,21
156:23 158:23
163:12 164:8
165:10,23,25
167:10,12 168:5
169:22 170:2,3,7,9
171:1,14 172:6
173:21,22 174:22
180:14 181:12,15
182:13,20 183:23
183:25 185:13
186:5,12 187:5,10
187:16,17,20,21
188:21 190:1,7,9
190:23 191:15,15
192:3 194:3,5,7
195:5,8 197:9
199:6,9,15,22
200:2,7 202:3,12

202:15 203:5,6,7
205:14,23 208:6
209:14,25 212:7
212:24 214:2,12
214:14 215:9,16
215:17,19,19,19
217:2,15 219:2,7
219:25 221:21
222:6,6 223:19
224:24 231:17
233:17,17,18
235:14,16 237:11
237:22 238:21
239:5,9,10,21
240:2 241:1
243:10 244:3,11
245:16 246:9,10
246:11,11,13,20
248:23 249:16
**knowing** 199:23
**knowledge** 31:23
53:13 70:19 102:2
107:16 110:1,15
114:1 125:21
155:23 156:6
161:3 168:22
188:8,15,23 205:4
208:18 225:17
227:5 232:9
239:23
**known** 47:25
48:13 91:19 184:4
184:15 186:18
188:9,16 190:10
**koltak** 3:13
**kroger** 82:14 83:7

**l**

**l** 1:24 252:6
253:13
**l.p.** 1:10,13

**lab** 57:4
**label** 126:21
**labeled** 126:15
**labeling** 126:16
127:4 128:20
**lack** 189:8 191:13
198:1 216:25
224:20
**lake** 1:10 16:16,21
24:8 37:3 58:24
59:1 70:1 71:20
136:22 172:19
248:12
**lake000068980** 5:8
69:20
**lakeside** 2:3
**language** 91:13
221:17,19
**lanier** 2:6
**lanierlawfirm.com**
2:9
**laptop** 206:13
**large** 26:17 44:8
49:15 52:6,10
181:6,18 182:18
187:6,9,19 209:5
235:24 236:25
243:19,20 245:2
245:17
**lasted** 19:13
**late** 209:16
**laura** 247:8
**law** 2:6 23:8 24:15
31:10 54:20 65:5
68:1 79:2 81:3
87:12,15,18
129:15 167:14,23
184:4,15 186:18
187:25 188:5,9
192:22 234:10,14
237:5,12 239:22

**lawful** 10:11
**lawfully** 167:10
168:4
**laws** 30:23 178:2
178:21
**lawyer** 123:5
127:22 129:3
**lawyers** 16:10,20
**laymen** 91:19
**lays** 226:22
**lead** 44:12,14,23
75:6 80:3 166:16
177:8
**leading** 196:3,5,16
240:14 245:2
**leads** 27:9,15,19
28:2,6,18 64:18
65:3,11 66:3,10
80:6,6,7 84:11
85:9 166:12 177:8
239:8,9
**learned** 218:6
**leave** 72:22 73:8
**leaves** 184:1
**led** 44:3 69:9
**left** 160:8,19
207:12
**legal** 202:1 246:18
254:1 257:1
**legally** 153:14
**legit** 243:21
**legitimacy** 124:18
201:2
**legitimate** 107:18
117:11 118:8
119:3 121:22
122:2 165:22
180:23 191:12
245:25 246:5
**length** 129:24

**letter** 254:19
**letting** 117:24
**level** 28:22 63:15
**levels** 95:5 144:18
  147:25
**liber** 2:2
**library** 149:11
**license** 17:24
  39:20 43:10 44:2
  44:4 48:2,14
  91:24 92:10,21
  93:20,22 94:23
  96:23 97:2,14
  98:7,16 99:9,14
  130:13 163:18
  170:8 177:25
  229:14
**licensed** 31:13,17
  42:4 47:22 91:22
  93:20,21 96:3,8,12
  96:19,22 98:2
  99:17,20,24 100:1
  100:3,17 143:19
  154:25 164:22
  168:19
**licensee** 94:1
**licenses** 94:19
  96:17,20 97:24
  100:13 163:17,18
**licensing** 91:6
  92:22 95:16,17
  96:5 97:10,22,23
  98:23 143:7 169:5
  169:7
**lie** 46:4
**life** 222:7 223:7
**likewise** 175:22
**limit** 173:21,22
**limited** 29:3,11,13
  87:9 89:14 93:8
  103:4 116:21

120:1 131:24
174:3,13 194:15
194:17,19 212:5,6
**limits** 193:16
**line** 192:11 193:3
  201:14 240:7,11
  241:4 254:13
  256:7 257:3
**lines** 217:18
**linked** 149:18
  150:2,4
**list** 82:7 103:24
  108:20 109:9
  116:4 142:18
  150:9 181:1
  185:20
**listed** 36:23 53:15
  84:12 109:9 120:3
  127:7 191:4 245:5
  256:7,17
**listing** 52:19,22
  81:13 104:4 143:5
  245:11 256:7
**lists** 46:25 126:6
  132:10
**litigation** 1:6 9:5
  14:16 16:14,20
  254:6 255:3 256:3
**little** 47:10 98:20
  170:4,10 205:18
  231:14
**live** 74:23 83:14
**lives** 177:15,19
  178:3 183:4
**llp** 2:20 3:2
**local** 68:1
**locate** 138:3
**located** 74:5 81:24
  113:15
**location** 15:21
  48:5 62:13 96:6

102:18 115:6
145:16 160:2
**location's** 61:7
**locations** 47:6
  50:10 57:20 99:21
**locks** 78:25 93:7
**log** 128:11
**logbooks** 128:7
**logistics** 40:4
**long** 18:20 19:9
  57:10 100:4 112:9
  133:11 182:9,9
  197:8 202:16
  203:1 207:14,19
  249:17
**longer** 37:23,24
  43:6,8 106:8
**look** 11:22 12:25
  13:6 58:9 60:19
  70:1 77:20 79:21
  80:16 81:10,17
  86:7 87:7,15
  88:21 89:6 96:15
  101:10,15 103:6
  111:22 112:24
  118:11,17,20
  119:19 122:14
  130:3 133:6
  136:24 138:4
  143:11 147:23
  154:13 155:7
  156:22 179:6
  189:14,18,19,19
  191:8 195:23,25
  198:17,20 203:10
  204:14 215:10
  216:21 217:5
  222:14 226:14
  229:6,12,17 230:6
  230:8,16 236:1,10
  236:20 237:3,22

244:16 245:20
**looked** 133:17
  134:20 143:6,17
  143:21 152:1
  161:10 174:12
  194:13 195:6,20
  196:18 199:14
  208:12 209:19
  210:2,14 212:15
  212:18,22 215:20
  221:18 230:24
  233:21 244:7,15
  244:17
**looking** 60:18 81:6
  121:9 122:5 128:6
  129:10 138:18
  139:2,3 141:18,21
  143:18 148:3
  151:13 169:23
  180:1,7,17,20,21
  181:3 189:2
  194:25 197:12,15
  204:11,21 205:7
  207:23 214:21
  220:20 224:16
  232:21 237:25
**looks** 51:3 86:16
  116:18 130:24
  162:4,17,17
**lose** 43:14 170:2
**loss** 51:23,23 52:4
  52:6,10,11 62:23
  63:2,5,6,10,13,20
  63:21,25 64:17
  65:10 66:8 68:10
  68:10 69:1 79:17
  85:13,21 94:23
**lot** 14:13 31:22
  35:23 46:17 49:12
  52:15 59:7 83:17
  83:20 131:16

132:10,10 199:1
221:16 227:7
234:5,22 243:11
243:12 244:21
**low** 35:19
**lump** 181:21
**lunch** 11:8,10
120:21 121:8
208:25
**luncheon** 120:25

**m**

**m** 2:20
**madam** 254:10
**mahoning** 19:19
19:20,22,25 21:1,2
23:6 24:1,2 37:2
42:5,8 72:5 84:3
84:25
**mail** 5:6,8 11:13
69:19,25 70:15,23
77:16,22 207:2,3
**mailing** 70:10
**mails** 15:16
**maintain** 11:20
93:19 132:8
**maintained**
105:19 129:5
**maintaining**
132:16
**major** 48:4 52:10
56:19 72:7
**majority** 25:2 75:2
244:1
**making** 82:15
111:23 124:17
125:24 127:11
133:2 154:24
201:2 228:20
**manage** 248:25
**management** 40:1
40:9,21,25 41:7,8

41:11,12,14,18,24
42:4,9,21 44:16
49:2,14 50:22
**manager** 45:5
63:12 142:23
249:10,20
**mandatory** 33:14
52:2 111:6
**manner** 28:11
100:20 103:13
107:19 126:1
127:14 128:20
129:13 134:4,5,11
165:7 168:11
242:17,23
**manual** 132:2,12
132:14 133:7,21
133:24 134:3,6
**manufactured**
246:19
**manufacturer**
45:24,25 46:3
**manufacturers**
40:4 45:23
**manufacturing**
46:1
**map** 36:12,12
**march** 29:2,4
**marcus** 2:20,23,23
**marijuana** 21:9,13
25:14
**marked** 5:3 13:13
13:18 32:19,25
69:20,25 75:19
76:1,22 77:17
78:9 80:13 86:4
**marks** 117:2
**maryland** 3:4
**matter** 9:4 11:5
88:14 111:10,13
114:17 195:4

**matters** 11:8
120:21
**md** 1:7
**mdl** 1:6 138:7
**mdl035385** 5:13
32:19
**mdl1191777** 5:24
80:13
**mdl2796412** 5:16
75:19 161:23
**mdl2796514**
138:25 139:4
**mdl2796530**
141:20
**mdl2796570** 5:19
76:1
**mean** 22:11 31:7
48:15 54:21 70:14
71:3,4 101:1
109:23 116:7
117:19 118:13,25
119:6 137:23
151:12 152:17,18
159:17 167:1
178:15 187:4
192:10 194:2,20
194:20 201:16
203:19 205:11
206:23 207:22,23
207:25 209:13,17
211:20 214:10
228:21 232:13
237:10 243:1,24
**meaning** 183:13
217:5
**means** 38:25
189:18 223:4
**meant** 43:6 175:12
223:2
**mechanism** 160:8

**medicaid** 183:20
**medical** 43:10,10
101:24 118:8
119:3 121:22
122:3,21 165:21
165:22 166:21
180:23 186:9,18
191:12 241:18,19
246:6
**medically** 122:20
122:22
**medicare** 183:19
**medication** 21:8
21:21 40:19 51:24
54:10,11,13,15,17
64:8 73:12 98:12
102:1,9 107:13,18
112:22 116:12,15
116:15 120:6,18
125:5,6 126:22,23
126:24,25 144:18
145:16 148:20,25
149:3 151:21
182:8,10,18
183:12 187:7
**medications** 21:20
44:10 51:22 102:6
106:23 125:16
182:20 184:3
187:11
**medicine** 43:7
151:23
**meet** 45:4 163:16
163:23 164:14
168:23 169:5
**meeting** 5:12
32:17 33:3
**meetings** 33:9,12
33:24 34:2
**members** 24:17
27:8,15,20 65:11

65:12 75:9 237:19
**membership**
24:14
**memory** 211:19
**mention** 33:7
64:11 79:5
**mentioned** 99:3
113:5,12 116:22
117:18 142:13
204:4 249:8
**merchandise**
249:23
**mere** 245:23
**merely** 59:14
155:19 245:8
**message** 222:10
**met** 172:24
**metadata** 33:5
**methods** 97:19
**metrics** 217:5
**mexican** 22:7,8
**mexico** 21:25
**michael** 37:19,23
**microphone** 241:3
**middle** 48:11
**midwest** 254:17
257:1
**mike** 78:2
**mildred** 2:7 9:21
247:4,10
**mildred.conroy**
2:9
**mileage** 113:21
**miles** 114:3,4,22
**mill** 183:15 244:4
**mind** 67:13 69:15
101:19 107:9,10
119:25 198:5
243:13
**mine** 80:25 138:13

**minimum** 39:11
112:8 147:22
**minor** 164:1
**minute** 90:22
171:14 195:4
207:5
**minutes** 90:21
117:18 174:1
198:5,7,7 225:12
247:8
**misreading** 138:20
**missed** 160:3
**misuse** 109:1
177:20 178:4
**moment** 175:23
**monetary** 170:1
**money** 183:25
**month** 58:17
**months** 30:12
48:19 49:4 50:22
105:1 112:11
113:10 115:4,10
115:21 143:23
**morning** 10:18,19
242:19 248:5,15
**mornings** 209:13
**motion** 123:17
**move** 110:10
129:20 135:16
136:8 171:6
240:17
**moved** 55:8
**moving** 123:22
**moylan** 3:3 9:15
9:15
**multi** 5:11 19:6
20:19 23:1 32:15
**multiple** 55:13
81:22 82:7 83:5,6
107:11 116:8
143:5 182:15

185:1,9 228:7
**multitude** 62:11
73:15 116:9
**muscle** 185:25
199:19
**mute** 123:15,24
**muted** 17:10
203:23,23

## n

**name** 10:20 12:5,9
23:4 42:15,16
63:4 71:9 73:23
78:2 79:23 84:19
92:11 95:22 104:6
105:1,3 117:1
126:21 139:17
142:23 161:22
162:15 172:18
186:1 249:13
254:6 255:3,4,15
256:3,4,21
**named** 252:9
**names** 13:2 117:1
137:5
**national** 1:6 9:5
254:6 255:3 256:3
**nature** 14:24
17:25 19:3 30:25
44:9 56:21 60:22
62:13 66:17 76:8
83:10 88:11 94:15
97:14 110:7
116:16 125:22
149:1 155:16
169:17 170:21
171:2 182:21
194:7 242:11
244:5
**near** 183:4,11
234:25

**necessarily** 131:12
162:1 180:15
194:4 245:24
**necessary** 84:9
104:18 146:16
**need** 10:1 14:19
15:8 31:20 57:14
110:4 114:9
115:22 202:13
222:13 244:20
246:1 249:2
**needed** 22:24
26:10,12,19 51:22
84:15 97:5 119:19
122:21 150:25
162:12 182:14
**needs** 93:23 99:20
99:24 246:8
**negative** 152:17
186:13 229:1
**negotiations** 43:23
**neutral** 228:25
**never** 14:15 23:17
46:2 60:7,11
114:6,25 117:10
172:24 191:6
205:3,15 210:14
244:15,17 248:16
**new** 2:8,8 21:25
22:5 55:9,12 72:6
93:3,4 112:11,12
113:3,6 130:24
131:12,12,17
141:13 204:8
213:25
**news** 52:20
**newton** 211:21
**nexus** 71:23 72:3
**nice** 68:24
**nicole** 142:17

niles 74:6
nodding 15:3
non 129:8 153:15
nope 103:13
normal 54:18
142:8
northeast 32:8
36:17,24 37:17
60:9
northern 1:2
northwest 36:17
notable 67:11
137:17
notarized 254:14
notary 252:6
253:13 254:25
255:10,18 256:15
256:23 257:23
note 123:16,21
124:1 204:2
254:12
notebook 179:6
noted 143:13,14
notice 5:5 12:21
13:3,8,10,17 66:3
noticed 12:20
notified 12:24
65:17 116:13
november 18:22
29:18 173:3,10
174:4,14 248:7
number 5:3 34:24
35:13 51:2 81:23
104:4,6 105:3
113:8,14 114:3,4
114:15,22 115:1
128:21 134:22
143:7 147:23
148:13 157:4
159:23 173:15
181:7,23 182:2,22

182:25 183:18
185:1,12,13,17
187:2 206:15
214:25 216:3,14
216:15,22,23
217:6,6 218:2,10
221:12 222:3
226:5 230:7
235:23,24 236:3
236:11,24 237:7
238:2 243:18,19
243:20 254:7,13
numbers 139:14
157:2 256:7
nurse 56:14
nursing 47:6
nutritional 104:10
109:3

o

o 70:5
oaars 118:22
oarrs 39:19 55:6
55:15,16,25 60:20
60:20,25 61:3
87:1,4,6,8,12,23
88:3,6 89:18,21,24
90:7,17 102:14
107:15 109:13
111:2,8,16,17,24
112:5,10,15,19,23
113:2,6,8,12,16
114:3,9,23 115:13
115:15,16,17,18
115:23,24 116:5
158:13,14,18,23
158:24 193:11,11
193:16,19 202:15
202:16,25 203:1
221:10,13,15
222:4,5,13,19
224:8 226:1,22

227:3,14,15
232:25 235:19
236:1,10,21 239:1
239:9
object 180:12
186:23 188:3,13
189:8 190:6
192:13 194:16
196:2 197:5,20
202:11 205:1
218:13 224:6,20
objection 6:3,3,4,4
6:5,5,6,6,7,7,8,8,9
6:9,10,10,11,11,12
6:12,13,13,14,14
6:15,15,16,16,17
6:17,18,18,19,19
6:20,20,21,21,22
6:22,23,23,24,24
6:25 7:3,3,4,4,5,5
7:6,6,7,7,8,8,9,9
7:10,10,11,11,12
7:12,13,13,14,14
7:15,15,16,16,17
7:17,18,18,19,19
7:20,20,21,21,22
7:22,23,23,24,24
7:25 66:5 69:6,13
73:4,18,20 102:22
106:1,7,14,19
107:4 108:11
110:10,19 111:12
112:1 119:21
123:17,21 129:20
132:17 136:8
164:6 165:15
166:5 167:11,16
167:25 168:6,14
168:21 169:2,8,20
170:17 171:6
178:5 184:8

186:22 188:20
190:13 191:13,25
193:7 196:15,20
197:4,18 198:1
201:24,25 215:13
216:25 218:25
222:18 227:17
228:12 229:8,15
230:2,12,19
231:11 232:4
233:3 236:14
237:17 240:13
241:21 242:5,13
242:22 243:9,14
243:23 244:13,23
objections 4:5 6:1
7:1 203:24
objective 117:5
obligation 192:6,7
201:22 240:6
obligations 178:20
observation 117:5
143:25 144:11,23
145:7 157:7 160:4
214:9 221:15
226:8
observations
25:11 117:15
144:4 148:11
169:19 173:6
210:10 215:23
216:1
observe 21:1,24
22:6 164:3 170:12
232:1
observed 21:5
156:5
obtain 26:7,15
39:10 54:10,11,24
55:12 75:10
193:17,17

**obtained** 17:5 18:1
18:3 68:5 70:16
88:9 124:15
200:24 220:23
**obtaining** 26:16
76:7 93:10 184:20
245:17
**obvious** 181:23
**obviously** 12:24
49:10 97:5 156:20
246:10
**occasion** 23:19
63:16
**occasional** 74:25
**occupants** 71:12
**occupied** 93:3
**occurred** 14:13
173:10 217:14
**occurring** 170:13
207:25
**occurs** 61:6 94:11
**october** 253:16
**offenses** 30:24
**offer** 127:16
**offered** 127:23
**office** 2:11 15:22
30:17 40:10 41:13
45:5 74:17 81:25
83:16 156:22
253:6
**officer** 18:9,11,15
18:18,21 19:2,4,5
19:10,10,11 20:12
20:15,17,25 21:6
21:24 22:14 24:23
25:8 41:23 54:6
81:4
**officers** 17:20,20
18:8 24:18
**offices** 40:15 41:2
41:6 47:7 49:15

183:7,9 191:2
**official** 255:15
256:21
**oftentimes** 45:17
231:8
**oh** 18:23 30:15
35:20 138:14
174:23 220:13
**ohio** 1:2,10,12 2:4
2:10,11,13 3:13
5:10,12,14,18
11:19 12:17 18:7
18:21 29:15,19
30:6,23 32:9,16
36:15 40:13 52:21
61:12 62:6 74:6
75:16,23 76:21
78:15 80:21 86:24
87:3 91:7,11,22
92:1 96:13 100:19
103:11,25 129:15
129:25 130:7
139:6,25 142:4
164:14 168:24
173:3,9 176:11
178:22,25 199:3
211:7 226:20
233:25 248:7
252:2,7 253:7,14
254:2
**ohioattorneygen...**
2:14
**okay** 10:18 11:3,5
12:25 13:5,23
14:15 15:1,10,11
15:18,19,23 16:5
17:7,13 19:9,17
20:11 21:22 22:25
25:24 27:6 29:14
29:19 32:22,24
33:4,16,23 34:3,23

35:3,8 36:9 37:5
37:16 38:5,8,21
39:6,25 41:16
42:6 44:16 45:9
46:6,14 48:21
49:5 50:19 51:1
52:15,18,22 53:19
54:2 56:6,17
59:16 60:18 61:11
61:20,23 62:22
63:17 65:9 66:21
69:8 72:9 73:14
73:22 76:25 77:20
80:2 83:10,22
84:10 85:4 88:14
89:20 90:9,14
91:21 92:23 93:19
95:13 96:2 97:21
99:15,19 100:6
101:5 102:13
103:10,17 106:11
106:25 107:6
108:1 109:7
111:15 115:1
116:3 117:17
118:1 120:2,8,19
121:16 122:20
123:10 125:8,25
128:16 129:9
133:1,16 135:2,23
136:6,25 137:20
138:2,20 139:15
140:14,22 141:25
143:4 144:9
145:22 146:9
148:12 153:8
154:6,13,19
156:25 158:5
161:2,13 172:22
172:23 173:24
179:8 196:6,17

203:21 206:5
210:8 211:23
213:16 221:11
222:7 223:2,3
225:15 226:18
227:1,6,19 228:16
228:21 229:4
230:5,16,21 231:4
231:14 233:20
235:2,14,17 237:7
237:14,20 238:8
238:16 239:11
240:5 242:7,16
244:18 246:13,25
249:16 250:6
**old** 204:24 205:3
**olds** 245:17
**once** 50:5 84:20
89:20 93:14,20
117:9 135:21
174:16 238:19
**ones** 42:2 44:20
136:17
**ongoing** 74:11
**online** 145:6,9,18
145:23 153:4
214:7
**op** 1:11,13
**open** 75:5 84:17
84:19 85:2,3,6
92:11 152:15
**operate** 125:2
170:11
**operated** 169:15
169:16
**operates** 176:6
**operating** 39:20
152:16 167:10
168:4
**opiate** 1:6 9:5 44:7
185:19 246:1

254:6 255:3 256:3
**opiates** 21:8 49:17
49:24 55:22 56:8
64:7 73:10 74:25
83:17 182:20
187:19 245:18
**opinion** 55:5
170:20 184:9
186:6 201:16
217:23 240:15
243:25
**opioid** 176:23,23
177:14,20 178:1,4
184:10 188:18
192:25 199:18
200:6 201:15
216:3 223:25
224:16
**opioids** 83:24
180:9 181:8 184:7
191:11 193:5
246:6,7,13
**opota** 18:4,7
**opportunity** 29:10
29:20,22
**opposed** 112:5
**oral** 157:16
**order** 57:15 76:14
82:9 91:24 92:3
97:1 149:16,19,24
150:3 178:3
211:11 212:15
217:7
**ordered** 192:19
**ordering** 149:12
149:17
**orders** 39:19
93:10
**organizational**
34:6

**origin** 125:11
**original** 76:10
97:23 145:25
149:19
**outcome** 43:25
73:7 95:1
**outcomes** 51:8
95:14
**outdated** 157:2
**outlined** 54:3
**outpatient** 40:3
45:19 134:10
**outside** 21:17
54:17 78:20,21
112:17,18 113:15
113:20 114:10,16
160:1,9 163:4
**overall** 149:7
181:18 236:25
244:9
**overdose** 39:11
**overlap** 47:10
**overly** 116:22
**overnight** 11:13
209:15
**overprescribing**
183:16
**oversight** 98:13
**overusage** 112:21
**overutilization**
116:21
**overview** 34:5
235:3
**owned** 46:21
217:16,20,20
233:8
**owner** 169:24
170:6
**ownership** 92:15
95:21

**oxford** 2:21
**oxycodone** 185:2,3
185:4,5,6,15,16,21

**p**

**p.m.** 206:22,22
208:18 250:15
**packet** 59:13
139:8
**page** 5:11,20 32:15
34:3 36:9 38:6,21
41:9 46:24 47:14
47:16 50:19 52:1
52:18 79:4 80:17
81:10 86:1 103:15
108:2 126:3
128:24 132:2
133:7,21 134:3
137:6 139:17
140:6 141:24
142:15 145:4
147:22 157:15
159:20,21 162:16
200:10 206:19
212:13 214:3,25
216:12 221:8,9
225:21 254:13,15
256:7 257:3
**pages** 36:10 38:5
38:22 46:24 51:2
51:12 127:2 138:5
138:6 139:10
141:17,19 161:21
198:21 205:25
219:10
**paid** 93:13 218:8
**pain** 40:1,9,21,24
41:6,7,11,12,13,17
41:23 42:4,8,21
44:16 49:2,14
50:21 182:8,10
185:21

**paloski** 42:3 53:4
57:9,9
**pandemic** 15:13
50:7 131:23
173:15,20
**paperless** 146:19
**paragraph** 81:12
81:17 82:13,18,23
83:1 109:14 151:7
225:25
**parameters**
226:22
**parkway** 2:7
**part** 29:3 33:13
61:20 77:5 87:1,7
87:18,22 94:20
95:15,18 101:18
104:15,22 105:10
105:15,18 107:22
109:7,18 112:25
112:25 126:3,4
127:11 132:18,22
133:1,23 142:21
147:21 148:2
149:6,6,21 150:12
152:11 154:23
155:9,12,21
156:18 158:7,24
184:14 192:7
195:10 200:4
204:22 209:5,12
212:12 223:10
230:8 233:21
237:1 256:9
**particular** 174:19
175:25 180:22
195:1 197:2,13
199:2,7 207:8
212:16 216:4,9
217:13 249:19

**particularly**
176:22 192:24
199:10 208:20
209:22
**parties** 10:2 96:18
**partners** 25:18
42:13
**parts** 152:13
178:14
**party** 40:4 46:11
144:15 253:2
**pass** 183:6
**passing** 183:8
**paste** 226:15
**patch** 56:25
**patient** 28:7,15
40:12,18,18 43:22
75:3 88:3,8,16,22
88:24 89:2,22
101:6,7,12,14,16
102:1,4,12,13,19
102:24 103:12,19
103:22 104:1,6,7
104:19,20 105:7
105:11,12,15,19
105:23 106:9
107:2,15,19 108:3
108:16 109:16
111:4,10 112:16
112:18 113:3,9,10
114:15,21 115:2
115:11,19 116:2,5
116:9,11,25 117:4
117:7 122:18
126:6 127:16,25
128:3,14 132:4
143:23 144:2
145:24 148:7
153:17 181:12
183:4,8 184:12
185:15 195:14,20

196:19 197:1,16
197:17 212:15,18
212:21,22,25
213:7 214:13
222:24 229:18,19
229:23,25 230:6
230:11,17 235:25
236:3,12 241:9,9
241:10,15 242:1,2
242:3 245:12,23
**patient's** 89:15
90:1 102:20 104:5
104:13,17,23
112:9 126:21
195:7,20 212:19
**patients** 28:19
44:6,8 83:14,18
125:21 128:7
181:7,16,24
182:16,17 183:16
195:24,24,24
235:24 236:3,11
237:7 243:12,19
243:21 244:1
246:1,8
**patrick** 2:16 9:19
**patrol** 19:4,9,10
19:11 20:12,15,17
29:6
**patrolman** 71:15
**pavlich** 11:19 12:2
12:5 136:20
**pay** 184:23
**paying** 183:24
184:1
**payment** 184:5
**payments** 184:20
**pbeisell** 2:18
**peace** 17:19,20
**pellegrino** 1:24
252:6 253:13

**penalties** 77:11
**pending** 78:4,6
85:1
**pennsylvania** 2:22
20:1
**people** 54:9 79:1,2
144:19 184:19,22
208:24
**percent** 40:12 46:9
46:12
**perform** 126:10
155:14 211:5
224:2 225:15
235:11
**performed** 59:4,7
139:17
**performing**
153:11 165:9
**period** 19:1 20:12
20:13 21:6 48:6
105:19 181:22
218:7 248:11
**periods** 157:6
**permitted** 187:19
**person** 23:17
63:14,15 92:19
116:14 142:23
143:12,14 211:16
**person's** 249:13
**personal** 11:7
205:4 225:17
**personally** 27:24
55:21 244:25
248:17 255:11
256:15
**personnel** 23:9
24:15 36:20 51:21
63:22 140:7 217:8
**persons** 135:14
**perspective** 48:23
145:20 147:16

163:23
**pete** 123:18 166:7
171:25 172:5,9
196:8 198:4 247:6
247:20
**peter** 2:3 172:18
**pharma** 1:10,13
**pharmaceutical**
56:25
**pharmacies** 26:8
26:11,17,18 40:5
46:16 50:4 53:23
57:2 59:10 60:6
61:2,13,17 62:10
62:19 64:25 66:1
66:11,14 72:11
75:11 76:7 84:11
87:14,16,20 90:9
91:8,21 101:6
102:25 103:22
106:24 114:2,21
119:18 127:11
130:8,21 131:25
132:15 133:3,10
134:17 135:7,19
137:22,25 146:14
163:4,22 164:4,12
164:17,25 165:3,6
165:13 166:17
167:8,9,21,22
168:4,10,18,23
169:4,14,15 170:5
170:14,16,22
171:3,5 173:16
174:6 189:13
190:19 193:4
194:3,10 209:23
209:25 210:20
214:15 217:17,17
217:25 218:8,24
220:4 228:17,22

228:23 231:13,25
233:8 239:23
242:20 243:5
246:14 248:21
249:4
**pharmacist** 31:14
31:17,21 34:9
37:9 52:3,11
53:10 54:14 56:13
57:15 65:19 72:16
78:1 82:18 89:23
90:3 96:8 97:2
100:12 101:14
102:2 105:11
107:10 108:16
109:10,22 110:8
110:17 111:7
112:4,22 114:12
114:13 115:1,7,18
117:5,16 122:9,11
124:7,16 125:9,19
126:4 127:25
128:11,12 140:8,8
140:18 142:16,17
144:17 147:3
152:13,22 153:10
153:15,16 154:15
155:19 162:3
169:24 191:10,16
191:22,23 192:3,8
192:10,17 193:17
197:13 200:14,21
201:1,9,14,19,22
202:5,9,13,14,20
203:3,8,15,17
205:9 207:4 208:1
211:11 213:5,6
214:19 218:2
221:14 222:4,23
223:20 224:1,14
224:18,21,24,25

226:20 227:3,9,12
229:5,12 236:9
237:10 238:5
240:2 241:18,24
**pharmacist's**
104:16 114:17
125:4 170:5
214:22 224:14
238:13 240:6
**pharmacists** 26:8
27:14 31:13 33:21
34:25 39:17 52:24
53:23 55:6 58:1
61:13,18 62:18
67:22 73:17 81:23
82:4 83:6 84:6,6
84:11 87:20 93:9
96:24 97:23,24
99:22 100:24
101:4 110:13
111:24 117:9
118:14 119:6,18
120:16 129:16
130:20 140:11,23
142:25 146:23
153:11 155:13
156:3,5 158:17
162:24 163:8,11
164:22,24 166:4
166:11 167:9,14
167:22 168:20
174:6 186:6,12
188:1 190:21
193:4 199:22
203:15 216:8,16
216:23 217:7
218:9 233:13
234:1,18 237:21
239:24 243:5
**pharmacy** 2:10
3:13 5:12,14,18

10:9,22 11:1
14:11 16:7,10,15
16:22 26:20 27:2
27:18 29:15,20
30:6,9 31:3,11
32:16 33:9,25
35:10 38:14 40:19
43:20 44:12,14
46:20,21 47:6
49:2,10 52:21
54:14,15,16 56:13
56:21,23 57:20,25
58:9,10,15 59:18
59:24 60:20 61:7
62:23,24 63:6,9,12
63:17,19,21,24
64:5,16 65:7,10,19
65:24 68:2,17,20
69:4,12 75:7,16,23
76:7 78:14,21,24
79:3 81:19 82:14
82:19,24 83:2,6
84:18,20,22,24
86:24 87:4 89:22
91:12,19 92:1
93:2,6 94:17 96:2
96:6,13,14 98:1,14
98:21 99:5,8,12,13
99:21,22,23,25
100:11,12 101:12
102:17,18 103:3
105:1 106:16,17
107:23 113:15,20
113:23,25 114:5
114:10,16,22
116:10,13,18
119:17 130:11,12
132:8 135:15
136:16 137:2,14
139:5,24 142:3,6
142:14,23 143:22

145:15 147:5
148:11,14 149:17
150:6,11 151:14
152:3,7,14,15
153:17 154:10,25
157:11,18,21,25
159:5 160:1 161:6
162:2,10,18 165:3
165:24 166:20
167:20 168:10,20
169:23 170:7
171:9,15 173:3,8,9
174:2,18 175:8,11
175:12,18 176:6
176:19 177:13,25
178:13,20 179:12
179:13 183:1,4,11
188:7 189:5 190:3
190:11 193:19,23
194:9,10,13 195:1
195:2 196:9
197:14 201:13,21
202:9,23 203:14
206:10 207:8
208:5,9,10,14,19
209:5 211:2,7,21
211:24 212:6
213:10 216:8,24
217:4,7,19 220:2
220:25 224:10,15
226:20 227:1,21
229:21 231:6,19
231:20 232:9,17
233:11,13 234:17
237:19 241:16
242:9,10,15 244:9
244:11 248:7,18
249:9,22,25
**pharmacy's**
103:25 132:23
145:23 189:14

197:24 200:5

**phone** 17:11 254:3

**phonetic** 37:7

**physical** 115:6
147:21 156:20
160:2

**physician** 42:14
43:11 67:19 110:5
112:13 122:19
125:6 187:18
192:19

**pick** 121:10

**picked** 184:12

**picking** 162:21

**picks** 89:22

**piece** 244:10

**pieces** 87:9

**pill** 183:15 244:4

**pills** 184:21
211:12,15

**pittsburgh** 2:22

**place** 10:1 93:10
131:24 148:19,24
184:16 207:15,16
252:19

**places** 48:25 49:8

**plaintiffs** 2:2 9:22
16:15 58:24 172:1
196:8 247:5,16,21

**plan** 242:3

**please** 9:8 11:22
14:17,20 123:16
180:3 254:11,11

**plus** 12:2,5,5 51:6

**pocket** 183:25

**podiatrist** 79:25
80:1

**point** 28:1 29:14
52:25 65:21 92:25
93:4,14 98:6
150:17 175:16

216:9 234:9
237:12 238:12
242:15 245:8,9

**points** 153:23
159:8 223:19

**police** 18:7,9,11,14
18:17,21 19:2,12
20:25 21:5,24
22:20 23:12 24:18
24:23 25:8 41:23
54:6

**policeman** 71:24

**policies** 191:2
228:9

**polster** 1:8

**populates** 143:2
221:25 223:11

**populating** 223:16

**population** 40:12

**portion** 74:16
118:4,11 123:3
125:12 156:12,15
158:22 159:2
164:1 212:6
223:17 226:8

**portions** 157:1

**position** 29:23,24
56:17 196:7
218:22

**positions** 31:5
38:3

**positive** 65:25
146:20,24 147:9
157:17 229:1

**possess** 31:24

**possible** 79:6
184:25

**potential** 27:10
28:14 64:25 66:3
85:10 95:1,5
102:8,10 109:12

116:6 151:13
152:2 160:18
170:1 180:17
181:8 182:11,20
183:2 184:7
185:11 186:3,13
186:21 188:10,17
189:3,6 193:12
202:19 210:23

**potentially** 98:12
110:3 120:6 125:5
154:1 187:21
191:22 203:2
219:1 224:16
244:3

**powers** 86:25 87:3
90:10,13

**practice** 43:11
54:18 74:5 88:10
115:6 121:24
122:11 187:3,13
187:22 191:12

**practicing** 39:20
70:12 81:23 97:18
98:19 153:15
243:22

**pratt** 3:3

**pre** 221:23

**preceding** 113:10
115:4,10,21

**precursor** 112:25

**predina** 37:6,12

**predominantly**
21:7 24:2

**preparation** 16:2

**prepare** 15:23
138:23 139:20

**prepared** 81:8
137:2 138:12
139:22 219:18,20
225:11 235:15

**prescribe** 28:16
43:7,8,12,15 54:13
187:20

**prescribed** 21:21
88:17,18 180:9,23
187:3

**prescriber** 28:10
41:6 45:4 54:16
86:19 105:4
109:16 111:3,9
112:17 113:14
114:4 115:4,9,20
118:9 120:14
121:23 123:2,8
124:5 126:23
176:18 179:21
181:6,22 182:7,25
183:5,10 185:14
187:2,5 197:25
200:19 236:12
237:2,4

**prescriber's** 40:10
71:9 124:21
156:22 181:3

**prescribers** 28:12
28:16,20 40:13
54:11 55:6,13
56:2,3 87:20
101:4 115:5 119:7
183:6,9 186:7,12
199:22 236:2

**prescribes** 40:11
112:13

**prescribing** 28:10
43:19 49:15,22
54:17 55:22 56:8
65:18 71:10 74:24
81:21 83:24 86:19
88:3,22 89:7,18
101:15 102:21
119:8 123:1 124:5

179:20 180:17,20
181:3,7 182:3,7
185:14,17 187:6,9
187:18 200:19
238:3 241:5
244:19 246:6
**prescription** 1:6
5:21 9:5 21:8,12
21:19 25:13 26:4
28:5,9 40:17 54:5
54:10 64:15 66:20
67:23,24 86:2,8
87:13,22 88:1,7
89:1,3,15,16,21
101:13 103:14
105:2 106:18
107:3 108:15
110:4,18 112:16
115:8 116:24
118:7 121:21
122:4 123:8 124:8
124:18,22 125:10
126:1,5,20 127:23
128:22 129:5,14
129:17 134:4
145:25 147:4,8
151:10,17,20,24
155:15 156:20,24
157:3 165:8
166:17 168:12
170:1 176:23
177:20 178:1
180:22 182:18,19
184:2,6,11,13,14
184:21 185:16
188:11,12 191:11
192:18,21 193:5
194:6 200:21
201:3,8,10 215:2
215:12 222:13,17
223:4,8,25 227:4

232:10 235:7
239:2,7 241:12,16
241:25 246:2
254:6 255:3 256:3
**prescriptions**
40:14 44:5,8
53:24 67:16 70:18
71:9 72:12,13,19
72:25 75:2 76:11
76:13 83:17,19
87:23 88:8,13
100:21,25 103:2,5
104:25 106:15
112:10 115:3,5,19
119:2 120:13
121:12 122:16
129:4,8 134:10
154:2 156:9,10,17
157:16 165:14,19
165:20 166:23
167:3 170:23
176:23 177:14
181:19,21 184:20
184:24 185:2,10
188:19 193:1
201:15 209:1,3,15
215:7 216:3,15,21
216:22 217:6,13
217:21 218:3,10
218:24 224:4,17
227:7 232:10
233:10 236:25
237:4 242:18,24
243:6 244:8,9,20
245:3
**prescriptive** 54:13
**presence** 22:20
29:11 252:14
**present** 3:11 15:20
28:8 142:24 143:1
173:11 248:11

**presentation** 5:13
32:17 33:3 34:2
38:14,15 45:10
47:15,17 51:12
53:20
**presentations**
33:24
**presented** 151:24
**presenting** 116:23
120:13
**presently** 32:4
**presents** 241:16
**presumably**
192:18
**presumed** 105:13
**pretty** 19:13 33:14
39:21 50:23
120:15 125:14
132:19 174:11
181:23 206:24
209:12,18 221:20
230:3
**prevalence** 55:25
**prevent** 145:23
**prevention** 62:23
63:3,5,6,10,14,21
63:21,25 64:17
65:10 66:8 68:11
69:1 85:14,21
**prevents** 146:2
**previous** 104:8
**previously** 11:17
113:4 183:20
220:4 221:5,18
**primarily** 29:6
56:23 72:24
131:23 178:19
**primary** 39:4
44:20 56:7 90:17
178:24

**principle** 52:14
**printed** 159:19
**prior** 14:13 16:1
24:22 33:15 41:22
65:18 71:15
107:12 108:15
123:16,23 125:20
132:20 137:15
147:10 166:10
174:6 204:11
205:6,15 209:16
213:24 232:17
234:10,14,18
239:22
**priority** 49:25
**privileged** 172:19
**proactive** 20:20,21
68:12 85:21 94:11
**proactively** 23:23
**probably** 14:6
35:19 36:8 41:8
49:9 55:23 115:11
136:6 138:5
139:10 152:20
153:21,21 159:18
163:12 175:20
181:14 183:6
188:24 208:21
213:14
**problem** 56:10
65:6 71:19 147:24
155:4 158:11
**problematic**
188:11
**problems** 14:23
21:5 109:12 159:5
177:9
**procedure** 10:13
251:7 255:5 256:5
**procedures** 62:1
134:8 149:13

228:9
**proceed** 9:24
247:14
**proceeding** 14:2
58:7
**proceedings** 14:6
**process** 45:1 48:3
51:13 52:1 54:9
92:4,14 93:12
94:20 95:16,17
96:4 100:7,8
109:19 147:1
206:6
**processed** 92:22
**processes** 96:5
148:19
**processing** 26:16
39:9 66:17 100:21
103:14 126:1
127:15 128:20
129:14 165:7
168:11
**produce** 136:15
143:22 213:10,21
**production** 254:15
254:17,22
**professional** 72:18
72:22 73:9,13
109:10,22 110:3,9
110:14,25 111:11
111:14 112:6
114:18 116:18
118:10 120:17
121:24 122:22
124:16 125:1,4,19
153:12 201:1
227:8,11,14
**professionalism**
98:21
**professionals**
166:21

**profile** 101:7,12
101:15 102:12,13
102:20,24 103:22
104:1,20 105:7,16
105:19,21,24
107:2,15 108:16
113:11 115:12
116:2 117:4,7
143:23 144:3
153:17 195:7,14
195:20 196:1,19
197:1,16,17,25
212:18,19,21
213:7 222:14
229:23,25 230:6
**profiled** 126:7
**profiles** 101:6
103:12,19 106:9
108:3 132:4
212:15 229:18,20
230:7,11,17
**profit** 233:9
**program** 30:13
**prommersberger**
5:23 79:23 80:10
80:19 81:22,25
82:3 83:11 165:20
**prommersberger's**
83:16
**promoted** 19:2,8
19:15 29:5
**prompt** 95:23
**prompted** 166:3
**propensity** 177:4
**proper** 123:1
124:5 145:11
153:24 196:1
200:19
**properly** 96:19,22
100:17 151:15
154:10 216:20

**property** 5:15,18
59:15,16 75:10,17
75:24 161:25
162:15
**prosecute** 25:25
68:13 76:14 85:15
**prosecuted** 41:25
43:3 74:18
**prosecution** 53:14
82:2 84:2,7
**prosecutions**
28:19 44:24 52:23
53:3 58:2 67:5
78:5
**prosecutor** 77:23
84:8
**prosecutor's** 74:17
**prospective** 108:4
124:15 126:10
199:4 200:25
**protect** 159:4
**protecting** 170:7
**prove** 83:23
**provide** 27:9,19
28:3 31:22 64:17
65:11 67:7 72:21
84:14 127:24
130:10 141:3
146:24 157:7
197:7,9 224:13
229:13 239:7
**provided** 10:12
27:7 67:17,20
80:3,5,6 128:12
162:25 190:21
191:19,21 202:8
234:12
**provides** 239:9
**providing** 27:15
66:3,10 84:10
193:5,12 202:19

**provisions** 62:9,11
**pseudoephedrine**
26:17
**public** 33:22 49:12
50:1 99:7 183:23
193:6 252:6
253:13 255:10,18
256:15,23 257:23
**pull** 57:14 179:5
205:20 213:6
219:4 234:21
**purchase** 66:20
176:20
**purchases** 39:17
154:23
**purchasing** 154:25
183:18
**purdue** 1:10,13
**purely** 117:14,14
**purpose** 23:21
38:15 47:18,21
48:8 118:8 119:3
121:22 122:3
155:9 160:13
180:24
**purposes** 13:19
32:20 62:17 69:21
75:20 76:2,23
77:18 78:10 80:14
86:4 108:21
145:10
**pursuant** 12:20
13:8,9 64:14
109:14 126:7,11
126:15 127:17
128:22 151:23
179:13 251:3,6
**pushback** 233:19
**put** 48:18 86:13
130:19 131:8,14
131:19 144:5

156:19 180:16
205:21 223:19
243:7
**putting**  23:21
**pweinberger**  2:5

**q**

**quadrant**  36:24
37:2,17
**quadrants**  36:15
36:21
**qualifications**
39:12
**qualified**  157:18
164:23 252:8
**quantities**  44:6,7
**quantity**  105:3
126:22
**question**  14:18,24
59:21 69:2 106:14
110:21 111:4
119:11 123:23,23
132:7,11 166:7
168:2 186:24
189:11 203:7,11
203:12,13,19
213:9 215:21
217:15 218:15,17
218:20 221:14
233:10 241:7
**questionable**
81:20 119:8
125:11 201:8
**questioning**  174:1
235:5 240:8
247:11
**questions**  14:17
85:5 121:11
138:22 167:19
171:16,20,23
172:4,7,21 194:23
197:7 199:2

203:25 206:16
213:23,23 221:12
225:2,5,10,24
227:19 229:19
231:22 233:6
234:5,22 235:4
239:17 240:5
241:2 247:2,16,18
247:22 248:4
250:4
**quick**  10:10
**quite**  14:20 30:5
55:23 207:23

**r**

**r**  42:17
**raise**  183:14
243:13
**random**  60:23
**range**  95:13
174:12
**rarely**  95:24
**ratio**  244:7
**rbarnes**  2:23
**reactions**  104:9
**read**  47:19 110:23
123:19 201:3
222:8 255:5,6,12
256:5,6,17
**reading**  152:8,17
152:19 156:2,13
157:10 160:16,22
162:9 254:19
**ready**  13:9 50:11
**real**  145:5,9,18,23
214:7,12,13
**realize**  178:2
203:23 241:2
**realized**  212:7
**really**  22:19 29:21
46:4 49:21 55:11
56:14 58:5,5

72:21 94:24 98:17
107:17 131:24
138:1 150:24
151:16 174:17
175:2 183:3
187:11 188:21,22
208:2 209:17
216:18 219:1
248:4,24
**reapply**  94:8
**reason**  33:7 49:5
50:14 55:24 72:11
86:13 99:7 115:2
115:8,18 125:17
140:25 165:22
254:14 256:8
257:3
**reasonable**  105:14
120:16
**reasons**  49:6 87:11
98:10 101:22
170:1 243:11
245:25 246:6
**reattach**  160:25
**recall**  26:11 27:12
27:14,23,25 41:23
42:2 44:17 59:3
63:18 64:22 66:9
67:11 68:19 71:6
72:1 73:22 77:12
79:9,19,22 135:23
136:3 137:20
163:10,14 164:7
164:10,11,20
171:11 194:7
195:3,5 196:21
206:11 208:2,16
211:3 212:5
213:14 215:16
226:3 228:18
240:8 241:5 242:1

249:18
**recalling**  98:4
**receipt**  5:15,18
59:17 75:17,24
149:16,18,24
150:1,3 161:25
162:5,15 254:18
**receipts**  59:15
76:6
**receive**  11:14
15:16 86:22 191:1
**received**  81:20
82:10 85:9 115:2
115:9,19 179:12
**receives**  192:17
**receiving**  145:24
244:1
**recess**  90:25
120:25 172:13
198:12 220:16
240:21
**recognize**  103:21
108:7 128:16
130:6,15 137:1,5
138:16,17 204:3
**recognized**  187:25
**recollection**  34:19
34:24 77:9 82:1
83:4 127:3 175:16
**recollections**
140:23
**record**  9:2,9 90:24
91:2,5 92:20
104:5,13,23
105:12,21,21
121:2,8 123:21
139:23 143:21
146:10 172:12,15
198:11,14 204:2
213:9 217:12
218:19 220:14,18

240:19,23 250:13
256:9
**recordkeeping**
133:8,10,19
**records** 59:18 76:7
78:20 84:14 92:17
97:8 118:18,21
122:5,15,18 132:3
132:8,16,24 133:3
133:12,15 141:2,3
146:11,15 148:21
149:3 154:14,16
159:25 160:6,18
160:24 162:3,5,10
162:19,22,25
166:17 175:6,7
194:21 213:11,17
213:21 230:14,22
230:25 232:21
**red** 83:21 112:15
117:18 119:14,15
119:19,22 120:2
180:8,10,15,17,20
181:8 182:12
183:2,21 185:11
186:3 188:1,10,17
189:3 191:4,20
193:10 199:19
224:12 236:18
239:17,19
**redirect** 228:13
**reduce** 177:19
178:3
**reduced** 157:17
173:16 252:13
**redway** 37:20,24
**reese** 37:20,23
**refer** 10:25 82:13
84:19 181:19
182:5

**reference** 48:12
50:20 70:4,24
82:14 106:17
109:22 122:2
132:3 160:3 200:8
223:21 228:16,17
228:20 233:7
235:19 254:7
255:2 256:2
**referenced** 124:11
252:13,17 255:11
256:15
**references** 78:13
81:18 110:25
111:16 140:7
146:19 149:15
151:8 157:24
**referencing**
243:17
**referred** 53:6
160:13
**referring** 11:1
**refers** 181:12
199:25 200:2
**refill** 117:12
**refills** 116:12,21
117:8 151:18,18
151:19
**reflect** 194:21
**reflected** 239:25
**refresh** 34:23 82:1
83:4 127:3 211:19
**refrigeration**
149:12
**regard** 110:15
133:6
**regarding** 42:13
65:16 66:16 82:8
174:1 180:9 189:5
199:13 212:17
221:10 222:19

249:21 251:2,11
**regardless** 132:11
**regards** 231:12
**region** 60:9
**regional** 34:12,13
**registered** 81:22
**registration** 77:5
**regular** 74:24
**regularly** 50:2
**regulated** 30:24
**regulates** 234:1
**regulation** 103:11
103:22 104:22
105:10 106:4
107:1,2,24 108:4,7
108:8,14 109:8,18
110:16,24 111:16
111:19,23 112:4
112:25 116:4
118:3,4,12 119:16
121:15 122:25
123:3 124:3,14
125:8,13 126:2
127:1,12,15,18
128:4,17,25
129:11 134:25
135:4,7 144:3
149:5,8 158:1,7,9
221:17 226:3,7,12
226:15,18,24
227:2,13 233:25
243:8
**regulations** 45:7
61:12,21,24 69:4
91:7,9,12 93:17
100:20,21,23
101:8,19 103:25
104:12 118:19
119:14,20 121:11
129:25,25 130:7
130:10 156:12,16

157:22 158:20
163:24 164:5
168:12,13,25
176:5 177:12,18
178:9,12,22 199:3
212:17 229:10
239:13 241:24
242:16,18,20,21
**regulatory** 56:22
56:23 57:1 62:5
91:13 105:6 109:4
111:6 133:4
135:20 164:14
165:8
**relate** 15:17 28:3
28:13 39:4
**related** 28:4 61:17
65:12 79:17,17
91:7 104:8 121:11
144:6 158:20
181:24 184:6
225:25 235:9
237:8 249:25
**relates** 1:8 159:24
200:13 214:11
**relating** 144:10
173:7 181:15
249:10
**relationships**
125:21
**relative** 253:2
**relatively** 130:24
**relaxant** 185:25
199:19
**relayed** 186:15
**relevant** 104:16
232:18,18 244:10
**reliever** 185:21
**relieving** 182:8,10
**rely** 109:25 155:13

**relying** 118:24
155:20 156:4
214:22
**remain** 28:23
**remainder** 238:9
**remaining** 159:1
**remember** 27:22
42:6 95:8 121:17
136:7 140:20
228:19 249:10,13
**remote** 1:18 2:1
3:1 15:12
**remotely** 1:25
10:2
**remove** 160:24,24
161:4
**removed** 160:10
**renee** 1:24 252:6
253:13
**renew** 93:21
**renewal** 94:19,20
95:16,20,21 96:1,4
97:21,24 100:7
163:17 169:6
**renewals** 94:1
**renewed** 93:23
97:15
**reorient** 38:13
**repeat** 243:16
**repeatedly** 116:11
**repetitively**
228:10 242:10
**rephrase** 68:22
**replaced** 37:14
38:1,3 160:10
**report** 79:5 109:13
109:14 111:2,3,8
113:2,8 141:18
142:2 143:15
147:19 149:10
151:4,7 152:9,11

156:8 158:15
159:2,15 162:14
171:3 204:5
205:19 206:20
212:13 219:5,13
220:21,23,25
221:5,9,15 222:5,6
222:11,13,20
223:14 225:25
238:18
**reported** 113:3
115:3,20 116:24
116:25
**reporter** 4:17 9:24
9:25 10:3 15:1
123:25 255:7
**reporter's** 4:15
252:1
**reporting** 25:9
61:2 143:14
**reports** 59:13
60:19 136:16
137:2,15 138:4
141:10,13 149:10
153:3,4 158:18
191:1 204:12,13
204:16,22,24
205:3,8 231:23
**represent** 10:21
27:12 172:19
**representing** 10:8
16:20
**reputation** 170:8
**request** 111:8
143:24 158:16
161:7 221:14
222:4 256:9,11
**requested** 66:14
67:7 117:10 141:1
251:1,6,10

**requesting** 109:13
111:1 116:25
158:14,18
**require** 51:5
102:18 104:12
110:12 135:7
**required** 95:7
97:20 111:8,25
112:5 125:9
126:20 127:24
129:16 132:9
133:4,14 135:11
146:10,23 154:11
156:19,23 164:5,9
201:10 227:3,13
239:24 242:20
254:25
**requirement**
61:25 62:6,20
98:24 101:8
104:20 105:6
109:5 110:16
111:7 113:21
126:16 127:4
133:19 135:18,21
143:7 149:5
157:13 238:14
**requirements**
61:24 91:6 97:3,6
103:24 111:6
132:10 133:9,10
134:6,17 154:17
163:16,23 164:15
165:8 168:24
169:5,6 195:13
**requires** 97:4,4
107:2 108:14,15
**requiring** 99:16
153:12
**residence** 12:14
183:11

**resistance** 27:2
**resolve** 109:11
**resource** 19:5
22:14
**resources** 102:3
107:17 110:1
155:24
**respect** 15:21 20:8
21:22 63:8 66:7
69:11 123:15
137:9 151:12
162:19 174:11
175:17,22 176:6
176:22 177:13
192:25 193:9
194:12 195:9
199:5 201:15
202:4 204:4 209:6
209:22 210:19
228:24 232:20
233:11
**respond** 15:3
54:21,22
**responded** 58:21
**response** 51:6,7
**responses** 15:2,5
95:6
**responsibilities**
38:9 39:7,22
192:20
**responsibility**
60:11 90:16,18
122:25 123:7
124:4,6,12,20,21
124:23 192:7
200:14,18,20
201:20 202:7,21
203:4,18 222:16
222:22 224:2,19
240:1 248:10

**responsible** 52:4
135:14 142:22
143:12,13
**rest** 32:10,11
**restate** 14:21
**restroom** 171:14
**rests** 123:6 124:7
200:20
**resubmitted** 94:6
**result** 17:23 28:18
44:11 67:4 75:6
94:22 225:20
**resulted** 57:24
210:24
**resulting** 58:1
**results** 51:4 77:1
95:5 139:23
140:15 141:6
142:2
**resume** 16:4
**retail** 40:5 46:16
46:20 47:5 49:2
50:4 57:20 99:21
142:6 169:23
174:2 177:25
189:4 190:3,11,19
193:23 194:3,8,9
194:10 197:23
203:14 208:5,19
210:19 217:17,24
218:8,23 224:9
231:12 233:11
**retained** 4:17
**retired** 37:13,25
70:11
**retirement** 35:7
**retrievable** 195:15
**returned** 155:2
254:18
**reveal** 74:22

**review** 58:4,20
60:25 89:17 97:11
100:7 102:8 103:2
107:7,14,15,15,24
108:4,13,16
109:19 110:24
111:5 112:14
113:2 117:20
118:23 121:14
122:18,19 124:16
124:24 126:11
130:20,21 132:23
133:25 145:6,12
149:11 153:17,18
154:5 155:8,12,21
156:1 158:21,25
195:23 196:23,25
197:1 199:4 200:5
200:25 204:21
214:7 215:6,8
240:3 246:16
250:8,11 251:2,6
254:12 255:1
256:1
**reviewed** 15:25
16:3 92:4 112:10
113:9 132:20
146:16 165:21
194:2,4,5,8 195:7
217:3
**reviewing** 102:12
109:13 111:2
112:19 115:11
116:2 174:10
194:25 215:18
238:24
**reviews** 89:20 92:8
94:2 109:5 165:9
**revoke** 99:8
**revoked** 163:19

**rick** 63:4 66:9 68:9
68:25
**right** 14:20 18:20
20:5 27:1 30:21
35:11,25 36:4,23
37:11,21 38:7,13
39:14,16 40:14
43:14 45:11 47:3
47:8,12,14 50:24
51:9,11 55:10
59:11,21 61:1,9
62:5,14 70:10
73:19 77:23 78:15
79:25 80:16,21
82:8 85:2 86:25
87:9,17,21,24 88:4
89:1,8 90:11
93:20,22 96:2,10
102:15 104:15
108:2 112:24
113:17 119:11
125:18 126:8,9,12
130:12 131:1
132:22 135:6
139:22 141:7,16
143:19 155:9
156:2 157:8 158:1
159:1,24 160:7,16
160:17 161:6,13
162:8,9 164:11
172:8 174:7,14
176:12 177:10
179:10,17,24
180:19 181:18,25
185:7,23 186:17
189:1,24 190:8
191:17 195:17
197:3 201:18
202:21 204:14
205:17 206:15
210:12,16 211:13

212:23 216:24
221:6 222:21
223:4,5 226:2,6,7
226:11 227:9,16
227:25 229:14,17
230:18,18 231:2
231:21 232:3,6,13
232:20 233:16,22
234:19 236:4
237:10,16 241:23
243:4 245:4,9
247:19 248:1,8
**rigorous** 92:12,13
93:12 96:4
**risk** 160:18 177:4
177:19 178:4
222:24
**rite** 10:24 26:23
27:21,22 59:25
85:10,13,20
167:21 209:7
210:3 211:1,21,24
**road** 78:14 139:25
142:3
**robert** 2:20 9:11
10:20
**role** 61:20 178:19
241:17
**roles** 38:9,16
**roof** 79:7
**roofs** 79:13
**rose** 28:22
**routine** 47:23
**routinely** 44:22
**rpr** 1:24
**rule** 109:15 127:17
134:11
**rules** 10:12 45:7
49:20 64:4 66:2
69:4 93:17 131:17
159:6 178:24

251:3,7 255:5
256:5
**run** 93:6 222:5,13
239:5
**running** 93:15
118:21
**rx** 53:20,20,21

**s**

**s** 42:17 70:5 73:24
254:15 256:8,8
257:3
**safe** 107:13,19
**safeguards** 159:3
**safely** 216:21
**safety** 22:21 48:1
48:13 49:12 50:1
99:7 148:7 177:9
**sales** 39:16 154:22
**salts** 187:10
**sanctioned** 164:13
**satisfactory**
144:25
**satisfied** 156:3
**save** 177:15,19
178:3 222:7 223:7
**saw** 36:11 59:12
88:23 160:18
228:10 231:8
**saying** 27:3 65:6
115:17,24 125:9
196:8,10,11
245:20
**says** 36:3 38:9
52:2,19 104:22
110:25 113:1,2,8
113:14 115:1
116:20 122:25
124:4,14 125:15
126:4 140:2 142:6
145:22 150:12
161:25 181:25

200:17 206:21
213:10 214:10
222:5 223:7,9
226:3
**scenario** 120:15
**scene** 180:5
**schedule** 129:7,7
149:25
**scheduled** 33:15
187:10
**school** 19:5 22:13
22:17,19,21,23
**scope** 39:21 40:7
54:18 187:3,7,12
187:22 242:11
**screen** 17:8 179:4
179:6,9 205:24
214:21
**screens** 189:19
**seal** 253:6 255:15
256:21
**search** 5:23 80:10
80:18,23 81:7
82:6
**searching** 103:10
139:12
**seat** 19:21
**second** 12:1,7,25
32:23 34:3 69:25
113:5 122:24
123:15 139:17
140:6 157:15
182:24 200:10,18
206:19 213:9
**section** 51:13
53:19 81:11
111:18 116:4
134:9 144:9
148:12 154:13
156:9 159:22
182:23 199:3,6,7

199:11,24 200:11
200:12 221:9,10
221:13 222:3
231:23 235:17
238:17
**sections** 61:17
132:1 180:3 199:5
204:23
**sector** 184:5
**secure** 160:6,12,21
161:8
**security** 39:17
61:25 62:19
133:22,25 148:13
148:14 149:5,7
159:22 163:23
168:24
**sedated** 116:23
**see** 15:4 18:10
20:23 28:13 31:15
34:5,16 35:1
38:11 40:20 44:1
50:3 56:2 57:8
58:5,8,14,17 64:16
68:8 71:1,13
74:20 75:4 76:12
79:4 81:5,15
82:16,24 86:10
87:15 88:8,12
89:2,23,25 90:4
94:18 99:15 101:5
103:11 104:3
106:23 115:24
118:2,5,11,15
121:25 124:9
126:3 127:4
131:10 132:5
134:14 135:18
137:12,17 138:8
143:9 146:8
147:15 148:8

151:25 159:10,15
159:19 166:1
169:13,16,23
174:21 175:5,6
180:5 183:5,9
189:20 193:24
195:25 214:14,16
229:23,25 232:24
233:14 244:25
245:1
**seeing** 55:12 56:9
88:17,17 242:1
**seek** 26:7
**seen** 12:22,24 54:4
54:6,8,8 55:19
78:22 88:24 98:24
181:16 230:4,9,14
231:5,9
**segment** 182:17
**seized** 165:18,23
**seizing** 76:10
**self** 223:11,16
**selling** 116:15
120:7 184:14
**send** 92:10
**sends** 207:2,3
**sense** 50:17 59:23
60:21 65:4 244:14
**sent** 11:12 16:1
92:23
**sentence** 122:24
200:18
**separated** 129:6
**september** 5:15,19
75:17,24 81:18
161:23 162:16
**sequential** 139:14
**serving** 38:17
**session** 4:13 121:4
**set** 53:23 89:12
91:6 100:23 253:5

**sets** 226:19

**setting** 67:1 154:7
209:4

**seven** 32:5 35:9

**shaheen** 63:4,7
64:22 66:10,21
67:12 68:10,25

**shaking** 15:3

**shapira** 2:20

**shapira.com** 2:23
2:23

**shared** 145:4
214:4,6

**sheet** 254:13 256:7
256:10,18 257:1

**shibley** 2:2

**shift** 209:2

**shifts** 29:6

**shop** 92:11

**short** 91:5 182:8

**show** 32:22 36:13
50:9

**showed** 102:20
167:4

**showing** 34:4 39:2
76:6 105:1 142:2

**shown** 76:4 254:16

**shows** 47:15
142:16 147:13
241:15

**side** 39:8 160:7,8
160:19

**sign** 128:8 250:11

**signals** 180:21

**signature** 138:12
138:18 147:2,8
251:5 253:12
254:14

**signatures** 138:21

**signed** 255:13
256:18

**significant** 35:20
52:6 218:7 224:11

**signifies** 207:5

**signing** 254:19

**signs** 116:6 117:14

**similar** 56:4 67:20
83:18 100:8
120:13 134:8
153:22 167:19
168:2 182:3 185:2
185:10,13 202:24
230:4,13 238:3

**similarly** 27:19
65:11 97:16
114:17,20

**simultaneously**
11:9

**sincerely** 254:21

**single** 60:4

**sir** 70:2 82:1 91:11
174:21 225:3
246:25 254:10

**sitting** 233:24

**situation** 169:24

**six** 32:10 34:15
35:1,9 141:17,19

**skiffey** 5:10 73:24
74:5,9,22 76:16,21
77:2,4,25 162:4,19

**skip** 46:14

**slide** 34:4

**slow** 208:20

**small** 51:23 248:4

**smith** 88:25

**smith's** 89:6

**snapshot** 174:17
175:3,23 197:15
197:22

**sobop** 52:20,20

**software** 118:24
143:3 144:10,12

144:14,21,25
145:1,5 146:12
155:8,14,20 156:4
156:6 195:6
206:17,25 214:4,6
220:9 221:22,25
223:10 228:9
229:20,24 230:10
230:11,24 231:4,5
231:9,16,16,18

**solely** 12:4 95:19
118:24 155:13

**solutions** 254:1
257:1

**soma** 186:1

**somebody** 80:4
120:9 160:19

**sorry** 18:5 19:24
79:16 82:19
103:13 110:21
136:18 139:1,7
158:3,4,4 166:9
168:15 174:23,24
175:13 190:7
206:2 220:10
228:14 240:25
243:15 247:1,3

**sort** 20:22 26:15
33:15 57:3 93:8
110:5 148:6
151:21 153:1
159:13 183:23

**sorts** 217:5

**sound** 35:11

**source** 22:10
82:22 83:2

**sources** 21:16,25
22:7 81:14

**southeast** 36:18

**southwest** 36:17

**space** 93:3

**spaeder** 3:2 9:16

**spangenberg** 2:2

**spanglaw.com** 2:5

**speak** 17:11
102:25

**speaking** 209:9

**special** 236:21
237:1

**specialist** 31:6,16
35:5 57:14,15

**specialists** 30:17
31:12,19,24,25
32:3 34:14,25
35:10 37:6,10
38:10,18,23 39:1,4
166:20

**specific** 12:14
21:25 64:24 66:9
88:3 104:7,19
106:18,21 107:3
110:13,17 113:21
113:24 117:1
119:5 120:8
126:19 138:1
158:23 203:19
220:3 237:15

**specifically** 21:8
27:23 61:15 63:3
64:21 135:23
142:12 165:20
200:17 212:10

**specifics** 249:18

**specified** 157:6
252:20

**spell** 42:16

**spend** 194:24
231:25

**spoke** 71:7 208:1,2

**spot** 141:22

ss  252:3
stabi  37:8,9
stable  37:7
staff  22:22 30:17
    36:12,14 207:4
    238:7
staffed  164:18
    168:19 232:3
staffing  147:24
    148:6 210:10,16
stamp  5:7,8,13,16
    5:19,24 32:18
    38:6 69:20 75:18
    75:25 77:17 80:12
    219:6
stamped  198:19
stand  52:20 65:20
    185:3 228:23
standard  9:4
    112:7
standards  47:17
    47:19,21 131:12
    147:22
stands  196:15
start  9:10 49:10
    93:10 98:15 100:3
    180:15 206:21
started  35:22 80:3
    223:23
starting  16:25
    34:6 245:8
starts  219:6
state  5:10,12,14,18
    12:8 17:4,21 18:3
    23:15 32:10,12,15
    36:15 40:13 43:20
    52:21,24 56:20
    70:11 71:6 75:16
    75:23 76:21 87:17
    96:13 108:24
    176:11 178:21,25

252:2,7 253:14
    255:10 256:15
state's  109:14
    111:2
statement  47:18
    223:14 255:13,14
    256:19,19
states  1:1 33:2
    43:24 104:10
    109:8 178:16
statewide  35:1
    147:13
station  224:15
status  84:1 98:16
    100:11
steady  209:12,18
steal  54:15
stealing  66:14
    85:18 211:1,12
    249:23
stenotypy  252:14
step  126:10,14
    127:15 128:21
    146:25 193:5
steps  100:24
    109:11,12 110:17
    111:1 126:6
    129:15
steven  3:13
sticker  13:2
stimulants  187:11
stipulate  10:2
stock  56:16 148:14
    155:2
stop  72:12 247:11
stopped  71:7
stops  20:21
storage  78:20
    133:22,25
store  63:15 79:6
    101:16 102:15,21

106:18,21 107:3
    160:5 163:17
    190:11,15 197:2
    206:9 209:6
    210:11,15 212:16
    216:5,9,16,24
    224:15 227:24
    229:24 230:1
    249:24
stored  45:15 160:1
stores  46:20,21
    59:25 169:6,7
    208:6,19 209:7
    228:3,8,11,18,24
    229:21 231:6,10
    232:11,12 234:18
storing  190:4
street  2:12 3:3,8
    20:16 21:18 117:1
streets  184:15,22
strength  105:2
    110:6 126:22
strictly  103:4,4
strike  110:11
    123:17,22 129:21
    135:16 136:9
    171:7 240:17
string  5:6,8 69:19
    77:16
structure  34:22
    95:23
structured  34:20
students  22:21
studied  209:20
stuff  171:1
sub  152:13
subject  94:1
subjective  116:17
submit  97:8
suboxone  40:2
    45:19 49:1,21

subpoena  12:21
    12:23 43:21 86:25
    87:3 90:10,13
    179:13 193:18
    220:24
subscribed  255:10
    256:14 257:21
subscriber  183:14
subscription  188:2
subsection  106:11
    110:23 111:15
    117:21 118:5
    119:13,15 121:20
    182:4 226:13,24
subsequent  82:7
substance  49:22
    89:15 102:9
    112:11,14 134:22
    136:2,11 164:9
    181:21 232:16
    244:8
substances  40:11
    43:9,12,15 49:16
    52:5 67:17 88:13
    88:19 90:2 101:25
    112:13 135:9,13
    176:7,10,17 178:8
    178:9,12 181:17
    185:2,10 236:6,7
    236:13 244:2
substantial  62:10
substantially
    134:8
successful  28:19
    52:23 58:1 67:4
successfully  25:25
    68:4,5
sufficient  48:4
    216:20
sufficiently  232:2

**suggested**  74:15
235:11
**suite**  2:4,17 3:4
254:2
**sum**  181:21
**summaries**  95:7
**summarize**  217:22
**summary**  16:24
159:12
**superior**  254:1
**supervised**  165:2
**supervising**
154:10
**supervision**
152:12,13,22
153:9,10,22,25
215:22 216:19
217:9 231:23
**supervisors**  34:11
34:12,14
**supplement**  109:3
**supplements**
104:11
**supplying**  72:7
150:19
**support**  3:12,12
**suppose**  250:9
**supposed**  88:2
241:24
**supposedly**  71:11
**sure**  13:7,14 17:2
19:24 31:8 32:11
38:24 42:12 46:9
58:20 62:18 64:9
64:10 68:23 85:8
96:16,21 100:16
101:11 107:13
110:22 111:23
119:22 125:23
127:11 132:15
133:2,17 134:21

137:23 140:13
141:23 143:18
146:3,7,14 150:6
154:16,24 157:20
165:18 177:11
198:8 204:2
205:14,22 209:24
214:2 220:13
223:12 224:23
241:22 247:5,12
247:20 249:5
**surrender**  44:4
77:4,9
**surrendered**  43:4
44:1 77:6,12
**surrounding**
78:25 213:1
**surveillance**  67:1
211:7
**susan**  140:7
**suspected**  122:15
217:14
**suspects**  66:16
**suspend**  99:8
**suspended**  51:7
95:11 99:14
163:19 164:13
**suspensions**  95:7
**suspicion**  112:20
119:8 183:14
222:12 243:13
**suspicious**  39:11
44:10 102:11
120:15 125:11
188:2,11 201:9
**swear**  10:3
**swift**  3:7 9:17,17
172:5 186:22
196:2,6,15,20
197:20 201:25
202:11

**switch**  91:6
**sworn**  10:13 19:14
252:10 255:10,13
256:14,18 257:21
**system**  53:22 93:7
101:13 102:14,14
102:15,19,20,25
104:1,20 105:7,16
144:15 145:1,6,9
145:18,23 146:2,4
146:4,20,22 147:7
147:14,17 149:17
157:18 194:14
204:12 208:7,11
208:13 213:18,25
214:1,7 218:1,1,22
228:8 229:23,24
230:1 231:8
**systems**  93:10
101:7 148:23
174:10 189:19,20
190:5,12,17
209:21 229:21
231:5,5,16,16

---

**t**

**t**  70:5
**tablets**  151:21
**tailored**  235:13
**take**  9:6 10:1 11:6
11:7 13:6 15:9
29:23 36:2 57:10
59:18 60:19 65:17
79:20 90:21
101:15 109:11
111:22 118:25
120:20,21 126:25
135:12 171:13
184:16 197:10
198:5,7,17 207:22
220:10 226:13
236:10

**taken**  131:24
221:16 226:6
252:19
**takes**  97:22
**talk**  15:8 64:21
137:15 205:17
**talked**  129:23
143:8 149:4 158:6
158:24 224:13
230:24
**talking**  16:6 31:16
61:16 103:8
115:23 121:14,20
122:5 137:20
201:12 211:20
241:3
**tamper**  160:12
**tapes**  208:13
**targeted**  170:22
**task**  23:6,9 24:1
24:13,19,21 25:4,7
25:9,15,17 26:1,4
26:12 27:4,8,16,20
28:24 29:2,11
71:24
**tasked**  178:15
**tasks**  153:12
**tddd**  91:14,16
**tech**  65:19
**technical**  3:12,12
13:11 15:14 17:10
**technician**  31:11
54:15 56:13 82:19
98:15,22 99:5,9,13
153:17 211:1,12
249:22
**technicians**  39:18
68:2 96:14 99:23
142:18 165:3
230:24

**techniques** 5:21
86:3,9 235:7
**technology** 241:1
**techs** 98:1,2,8,23
99:17 100:8,12
157:18 168:20
216:8,24 217:7
233:13
**telephone** 104:6
**tell** 14:16,20 32:9
45:8 73:8 81:6
114:2 119:9
219:10 229:6
**telling** 64:23 162:3
229:12
**tells** 226:20
**ten** 14:5 18:23
19:1 20:13 55:23
90:22 173:25
198:7
**tend** 229:22,25
**term** 31:2,3,6,15
41:10 101:6 107:7
113:19 117:19
**terminal** 39:12
91:12,16
**terminated** 99:11
**terms** 24:14 39:22
58:23 64:25 88:18
110:13 119:20
133:10 135:7
140:24 161:14
173:6,24 174:7
193:16 195:14
197:12,16 208:18
224:7 243:21
**territory** 36:12
**test** 249:16
**testified** 14:1 25:6
174:8 193:15
194:11 195:17

199:13 200:12
214:4,5 227:25
231:24 248:16
**testify** 13:9 252:10
**testimony** 15:18
124:13 166:10
173:24 176:3
179:21,22 210:25
217:22 218:11
233:7 234:7,12
248:5 249:11
252:12,16 255:6,7
256:6,9,12
**texts** 15:16
**thank** 85:7 123:17
124:2 198:9,25
225:3 246:23,25
250:3
**theft** 39:9 56:12
62:2 148:15 149:3
171:4
**theory** 183:6
**therapeutic**
108:23
**therapies** 83:20
**therapy** 104:17,23
112:12 113:4
**thing** 20:16,22
49:20 56:11 90:1
116:17 153:22
162:20 228:10
**things** 17:24 19:3
22:1,8 25:5 30:24
44:9 56:20 60:22
64:19 73:17 76:8
85:17 86:21 88:10
93:6 94:13 107:14
108:20,22 116:9
117:13 119:1,4,5
125:20,22 128:7
131:6,12 132:13

143:5 144:20
149:1 153:25
154:3 174:12
181:2 209:15
237:22 238:11
244:25 245:1
**think** 12:23 19:23
24:16 32:10 34:1
35:3,6,16,18 36:7
39:13 44:21 49:17
49:24 50:16 53:16
53:22,25 54:8,23
55:21,22 56:1
59:2 65:15 69:9
71:21 77:22 93:24
95:4,18 98:5,5,9
98:20 101:1 117:6
117:8 120:16
131:17,22 138:1
140:3 141:1
142:13 145:10
148:4 151:16
153:20 161:22
162:1 166:2
169:22 170:3,9,19
170:21,24 171:2
171:18,21 176:16
178:14,17 185:12
194:21 195:6
201:16 202:18
203:7 208:21
209:11,11,14
211:14,14 212:1
213:2 214:5
218:14 219:12
224:7 226:14
228:19 232:6
243:1,2,24
**thinking** 41:5,7
211:15 215:17

**third** 40:4 46:11
103:15 126:14
144:15
**thirty** 254:18
**thomas** 3:12 37:18
70:5
**thought** 138:21
166:8,13 171:25
**threat** 99:7
**three** 25:20 30:11
44:20 115:4
133:12,14,18
186:20 194:22
207:23 213:11,11
213:21 247:8
**time** 9:3,4 10:24
10:25 15:7,13
19:1 20:12,13
21:6 24:12,12
27:9,9 29:1,3
30:21 33:25,25
35:2 37:22 45:20
45:20 48:6 52:25
54:20 55:20,20
57:10,18,18 58:19
61:5 62:22,23
64:18,18,23,23
66:25,25 68:19
69:2 72:2 79:12
79:12 85:10,10
93:22,22 94:3
111:22,22,25,25
114:2 118:1,18,18
130:13 131:14
133:4,11 135:19
135:19,22,22
145:5,9,18,23
151:3,3 157:6
166:15,15 173:11
174:19 175:3,7,24
181:22 182:15

194:24 197:15,22
206:24 207:1,7,9
207:11,17,25
208:17,20,20,22
209:10 210:11
214:7,12,13 216:4
216:10 218:8
221:22 223:18,18
225:2 227:2,4
233:12 242:15
248:11,25 249:5
252:19
**times** 14:4,7 27:22
67:22 94:9 144:16
152:15 163:18,24
168:25 169:7
226:19,21 232:1
**timing** 47:24
48:12
**tip** 73:2 75:6 86:22
**today** 9:2 13:8
15:21,24 226:2
233:24 234:12
**told** 50:23 59:23
137:14 140:3
144:1 152:24
162:1 166:2
179:18 186:11
199:21 227:6,21
228:2 232:6
239:12
**tools** 201:23 224:3
**top** 136:4 243:3
**total** 57:23 181:6
235:24 237:3
243:19
**totally** 243:21
**touch** 198:6
**town** 88:10
**township** 12:16

**track** 1:15 9:6
254:6 255:3 256:3
**traffic** 20:21
**trafficking** 23:24
39:10 56:19 72:4
**train** 30:10,14
**trained** 122:21,22
165:2 168:19
**trainers** 40:5
46:15
**training** 17:20
18:2,8,12 30:8,12
30:18 60:16,17
155:24
**transactions**
184:16
**transcribed**
252:15 255:7
**transcript** 4:1
250:9,11 251:3,6,9
251:11 254:11,12
255:5,12 256:5,11
256:17
**transcription**
252:16
**transfer** 145:7
214:8
**transmit** 58:6
**travel** 183:5
**treatment** 109:2
242:3
**treats** 241:9
**trends** 55:19
**trey** 11:18 12:1
30:19 37:18
136:18,19
**trial** 84:4,7
**trigger** 115:15,22
115:25
**triggered** 52:8
94:19

**trilogy** 199:16
200:8
**trinity** 185:18,18
**troncone** 3:13
**trooper** 71:6
**trouble** 56:3
**true** 50:17 68:16
83:23 183:16,17
192:24 199:16
203:4 224:19
252:16
**trum001765557**
5:7 77:17
**trumbull** 1:12
16:16,21 20:3,4,5
20:9 24:8,9,11
37:3 42:14,18
53:10 58:25 59:5
59:8,10,22 60:2,5
60:6,12 71:19,21
71:23 72:3 74:7
74:16 84:23
136:22 142:4
163:4 172:20
173:17 175:8,18
204:6 206:9
227:24 248:12,18
249:4
**truth** 252:10,11,11
**truthfulness** 94:5
**try** 15:4,15 48:18
49:3 50:3,6 107:1
248:22
**trying** 28:15 59:23
86:12 173:21
194:5 208:25
244:10
**turn** 169:25
**turned** 17:8
**two** 17:11 24:15
25:20 36:8,10

37:9 38:2 51:1
58:23 77:25 93:24
97:15 133:12
136:21 142:25
151:17,18,19
152:12 160:6
161:21 180:3
182:19 195:4
203:24 241:2
**type** 17:18 27:6
28:2 46:2 55:2,8
56:15 57:5 62:12
65:15,23 70:20
79:12 101:23
102:19 112:20
142:9 162:20
170:18 229:22
244:2,4
**typed** 223:14
**types** 15:17 21:5
21:11,16 23:18
25:20 26:6 38:17
39:2,3,25 40:6
45:15 46:25 47:1
47:2 48:2,9,15
51:3,8 54:4 55:18
56:7 57:6,6 60:21
72:7 80:6 87:23
132:13 166:1
217:10
**typical** 73:6
**typically** 21:20
28:2 40:16 49:3
49:16 52:9 57:14
60:23 72:5 83:14
83:21 197:6 215:6

**u**

**u** 160:6
**ultimately** 19:8
54:16 122:17

**unannounced** 50:9
  50:13
**undergraduate**
  17:16
**understand** 12:19
  13:7 14:19 38:25
  84:17 90:15 107:1
  109:21 113:19
  123:2 125:2,12,18
  128:24 133:9
  173:1,13 180:11
**understanding**
  11:16 14:24 38:16
  52:7 97:3 104:11
  105:23 106:3
  108:18 109:4,6
  112:3 123:11
  124:25 126:17,19
  127:19 129:2
  131:11 154:8
  234:11 241:17
  248:13
**understood** 14:23
  48:7 124:19 249:8
  250:2
**undertake** 192:19
**unfamiliar** 116:25
**unfortunately**
  139:13
**unique** 104:18
  237:9
**unit** 19:7 20:19
  23:1,5,20,22
**united** 1:1 43:24
  178:16
**university** 17:5,19
  17:21
**unprofessional**
  39:18
**unsafe** 102:5

**unusual** 182:25
**use** 31:15 51:20
  84:5 105:5 107:14
  124:16 126:23
  131:7 147:7 156:5
  179:9 183:24
  184:7 191:2,3
  201:1 211:10
**useful** 244:16
**uses** 102:2
**usual** 113:15,20
  114:10 118:9
  121:23
**usually** 128:13
**utilization** 107:7
  107:24 108:4,13
  108:22,23 109:5
  109:18 110:24
  117:20 118:23
  121:14 124:15,24
  126:11 145:12
  153:18 154:5
  155:8,21 156:1
  158:21,25 165:9
  195:25 196:19
  197:1 199:4 200:5
  200:25 204:21
  205:8
**utilize** 73:8 202:6
  206:17
**utilized** 150:11
**utilizing** 55:6 71:9
  184:17 193:18

---
**v**
---

**v** 1:10,12 42:17
  129:7 254:6
**vacancy** 214:13
**vacation** 33:15
**valid** 118:7 121:21
  122:4

**valium** 74:24
**valley** 23:6 24:1
**varied** 28:6
**various** 80:6 81:14
  94:9 101:22
  147:20 157:1
  174:10 191:8
**vast** 25:2 75:2
  243:25
**vehicle** 71:7,8,10
  71:11
**vendor** 144:16
**vendors** 231:18
**verbal** 51:5 95:6
  159:21 161:12
  163:13
**verbalize** 10:10
  15:5
**veres** 42:15,18
**veritext** 254:1,7
  257:1
**veritext.com.**
  254:17
**version** 159:19
**versus** 169:18
  193:17 217:6,17
  244:8
**vested** 64:9
**victim** 79:6
**video** 9:2,9 10:4
  66:16 67:1,18
  91:2 121:2 172:15
  174:23 208:7,11
  208:13 209:21
  210:14 211:25
  220:18
**videographer** 3:13
  9:1,23 90:23 91:1
  120:23 121:1
  172:11,14 198:10
  198:13 220:14,17

  240:19,22 250:12
**videos** 208:8
  209:20 210:3
**videotaped** 1:18
  5:5 13:3,17
**view** 63:23 65:23
  111:5 136:10
**views** 174:2
**violating** 69:3
**violation** 39:19
  213:3
**violations** 22:22
**virtual** 10:4 40:3
  45:22,23 46:6,8
**visually** 118:15
**volume** 11:14,14
  44:8 60:21 103:8
  181:18 232:10
  236:25 237:4
  244:20
**voluntarily** 43:17

---
**w**
---

**wacker** 2:16
**wait** 14:17
**waived** 254:19
**walgreens** 3:6
  9:18 10:24 26:24
  27:24 60:1 167:20
  209:6,21 210:3
**walked** 121:17
**walmart** 2:15 9:20
  10:24 26:24 27:22
  59:25 60:6,12,14
  63:11 65:14,16,19
  82:18,20,23 83:7
  84:6,12 167:21
  248:17 249:3,9,24
**want** 13:7,12
  38:24 47:20 48:19
  49:3 50:16 56:5
  58:14,15,17 64:13

65:7 73:11 90:4
91:5 121:10 128:8
128:14 129:22
144:13 145:11,13
150:18 151:17,21
155:18,19,22
162:3 170:2
171:17,17 179:5,7
179:24 196:24
200:10 202:6,13
205:13,17 206:6
219:4 221:8 225:6
226:21 229:14
234:21 235:4
247:5
**wanted**  76:13 89:5
89:6 100:24
123:21 146:14
150:6 160:20
162:10 163:9
227:14 230:8,16
230:21,23 232:13
232:15,24 233:14
243:5 247:12,20
**wanting**  73:2
**warehouse**  39:13
45:14,17
**warning**  50:11
51:5 159:13,14,16
159:21 160:3,13
161:12,12 163:12
163:13
**warnings**  95:6
**warrant**  5:23
80:11,18,23 81:7
82:6
**warranted**  125:17
182:14
**warren**  72:2,2,3
78:14 139:5,25
142:4 162:18

**way**  30:10 35:14
40:17 84:7 89:12
98:13 99:9 125:7
129:6,18 141:14
142:21 144:7
145:15 147:1
151:24 170:10
182:6 193:18
199:20 209:20
216:18 217:3
220:22 234:2
235:11 243:6,22
245:15
**we've**  12:4 65:6
66:12 67:14 68:1
90:20 122:13
131:6 136:14
143:8 224:12
**website**  130:19
131:9,15,19
**week**  25:10 50:11
88:25
**weinberger**  2:3
4:9 10:6 66:5 69:6
69:13 73:4,18,20
102:22 106:1,7,13
106:19 107:4
108:11 110:10,19
111:12 112:1
119:21 123:14,20
124:2 129:20
132:17 135:16
136:8 164:6
165:15 166:5,8
167:11,16,25
168:6,14,21 169:2
169:8,20 170:17
171:6,21 172:2,17
172:19 179:3
189:10 196:4,10
196:17 198:8,15

198:18 204:1
218:16 219:12,15
219:19 220:13,19
225:1 227:17
228:12 229:8,15
230:2,12,19
231:11 232:4
233:3 236:14
237:17 239:16
240:13,17 241:21
242:5,13,22 243:9
243:14,23 244:13
244:23 247:6,7,13
247:17
**went**  30:21 48:9
98:24 106:5 108:3
108:9,17 109:9
117:20 126:8,12
134:5,11 144:3
145:14 154:17
158:21 161:15
162:18 168:13
174:23 214:1
226:2,23 227:21
229:11 230:22
231:7 232:23
234:10 238:8
239:14 241:23
242:17,18 243:18
**west**  2:16 3:8
**wet**  147:2,7
**whereof**  253:5
**whitney**  37:19,25
**wholesale**  150:9
150:10,22
**wholesaler**  45:24
46:6,8,11 150:20
150:23
**wholesalers**  40:2,3
45:11,22 93:11
155:1

**wide**  39:21 228:8
**wife**  67:16
**william**  1:18 4:7
5:5 9:6 10:11,16
12:10 13:18 121:5
139:18 172:16
225:7 247:23
252:9 254:8 255:4
255:9 256:4,13
257:20
**williams**  37:18
**willing**  26:19
**window**  191:19
**withdraw**  106:13
189:10
**witness**  2:10 10:3
10:9 171:22 196:7
196:9,11,14
218:15 219:17
251:2 252:9,13,14
252:17 253:5
254:8,11 255:1,4
255:11 256:1,4,15
**witness'**  254:14
**words**  27:3 50:9
110:15 137:11
**work**  16:3 17:16
20:7,11 25:14,18
26:3 29:8 30:22
62:22 63:2,9
68:25 99:13
115:25 137:9
164:24 173:1
211:6 238:22
244:21
**worked**  19:4,5
23:18 31:25 63:7
63:13,15,20 67:12
81:1 85:13,22
140:24 230:11

**workflow**  5:22
86:3,9 180:4
235:8 238:17
**working**  20:24
25:17 29:5 98:15
99:10 197:13
216:9
**works**  146:5
201:21
**worth**  133:15
**wow**  35:20
**wraps**  250:6
**writes**  87:21 89:16
89:21
**writing**  67:16 88:7
147:3 157:17
**written**  51:5,7
95:6 156:10
161:11 163:12
192:18 232:11
**wrong**  236:19
245:24 248:16
**wrote**  141:10
151:4

**x**

**x**  65:6 114:3,4,21

**y**

**y**  65:6 73:24
**yeah**  14:8 15:22
20:17 22:2 24:16
26:13 29:21 30:11
35:2,12 40:17
52:13 54:23 55:21
98:5 101:1 118:20
118:25 120:11
132:18 135:22
139:12 140:20
141:1 148:10,18
163:10,20 164:7
165:17 178:23

181:14 184:9
187:16 199:21
208:10 209:24
216:11 226:16
228:19 230:3
231:17 232:15
238:21 240:15
243:17,24
**year**  19:1,6 20:13
22:14 48:19 50:5
93:24 105:20,24
106:10 133:12,12
133:18 135:21
174:17 175:25
245:17
**years**  18:23 19:7
23:2 30:5 55:23
57:10,22 93:24
97:15 133:12,15
188:6,16 190:3
199:8 202:17
203:1 213:11
234:18 239:22
**york**  2:8,8 22:5
72:6
**youngstown**  17:4
17:21 18:2 70:12

**z**

**zuckerman**  3:2
9:16
**zuckerman.com**
3:5
**zwier**  2:21

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.