Page 1

1                UNITED STATES DISTRICT COURT
2                 NORTHERN DISTRICT OF OHIO
3                     EASTERN DIVISION
4                          * * *
5
6    IN RE:  NATIONAL PRESCRIPTION
             OPIATE LITIGATION
7
     This document relates to:
8
     THE COUNTY OF LAKE, OHIO,
9    et al. V. PURDUE PHARMA L.P.,   MDL No. 2804
     et al., Case No. 18-op-45032
10
     THE COUNTY OF TRUMBULL, OHIO,   CASE No. 17-md-2804
11   et al., v. Purdue Pharma L.P.,
     et al., Case No. 18-op-45079
12
     Case Track 3
13
14
                           * * *
15
16               Remote Videotaped Deposition of
17   TREY EDWARDS, a witness herein, called by the
18   defendants for examination pursuant to the
19   Rules of Civil Procedure, taken before me,
20   Patti Stachler, RMR, CRR, a Notary Public
21   within and for the State of Ohio, at Mentor,
22   Ohio, on December 11, 2020, at 9:01 a.m.
23                         * * *
24
25

Page 2

1                         I N D E X
2
3    TREY EDWARDS                                      PAGE
4        Examination by Mr. Barnes                       9
         Examination by Ms. Desh                       239
5        Examination by Mr. Herman                     275
6
7

                    INDEX OF EXHIBITS
8
     EXHIBIT    DESCRIPTION                           PAGE
9
     Exhibit 1  Notice of Deposition                    11
10
     Exhibit 2  Role of the Ohio State Board           45
11              of Pharmacy/OARRS
12   Exhibit 3  HB 49 Testimony Steven W.              59
                Schierholt, Executive Director
13
     Exhibit 4  A Guide for Law Enforcement            74
14
     Exhibit 5  Ohio Administrative Code               85
15              security requirement
16   Exhibit 6  Ohio Revised Code 4729.54,            104
                Terminal Distributor Licenses
17
     Exhibit 8  ORC-4729.01                           111
18
     Exhibit 10 ORC-47-29-5-21                        115
19
     Exhibit 11 4729:5-3-03                           136
20
     Exhibit 12 Ohio Board of Pharmacy               143
21              Inspection Guide
22   Exhibit 13 4729:5-3-07                           145
23   Exhibit 14 spreadsheet                           132
24   Exhibit 15 Inspection Reports for Giant         135
                Eagle Lake County and Trumbull
25              County

Page 3

1                    INDEX OF EXHIBITS
2    EXHIBIT      DESCRIPTION                      PAGE
3    Exhibit 18  record of Edwards initial         207
                 involvement with the Franklin
4                Overholt investigation
5    Exhibit 19  Search Warrant                    208
6    Exhibit 20  Inspection Report of Overholt     218
                 Pharmacy 11/17/09
7
     Exhibit 21  11/4/11 email chain               221
8
     Exhibit 22  6/18/13 email chain               222
9
     Exhibit 23  8/20/12 email chain               223
10
     Exhibit 24  1/8/13 email chain                223
11
     Exhibit 25  12/7/18 Medical Examiner's        225
12               Office report
13   Exhibit 26  9/27/11 email chain               225
14   Exhibit 27  4/11/12 email chain               226
15   Exhibit 28  4/26/13 email chain               227
16   Exhibit 29  3/5/11 Tribune Chronicle          227
                 article
17
     Exhibit 30  Presentence Report (Harrington)   220
18
     Exhibit 33  3/29/17 email chain               227
19
     Exhibit 34  Search Warrant for John Mullins   229
20
     Exhibit 35  3/11/04 news release              229
21
     Exhibit 36  1/23/09 email chain               229
22
     Exhibit 37  7/30/03 LCNA letter               229
23
     Exhibit 38  2019 Ohio Drug Overdose Data      230
24
     Exhibit 39  2/1/13 email chain                232
25

1                    INDEX OF EXHIBITS
2     EXHIBIT     DESCRIPTION                    PAGE
3     Exhibit 40  6/17/13 email chain             233
4     Exhibit 41  6/21/13 email chain             233
5     Exhibit 42  1/7/14 Chris Begley email       234
6     Exhibit 43  Presentence Report for Joseph   234
                  Sosenko
7
      Exhibit 44  Report of Investigation of      235
8                 Dorothy Rinehart
9     Exhibit 45  Report of Investigation of      235
                  Roxanne Figoli
10
      Exhibit 46  Report of Investigation of      236
11                Marlea Ciarlillo
12    Exhibit 48  TAG Law Enforcement Task Force  237
13    Exhibit 49  TAG Law Enforcement Task Force  237
                  Prescription Receipt
14                (Daniel Bayus)
15    Exhibit 50  11/5/13 email chain             238
16    Exhibit 51  Inspection Report for Walgreens 252
                  #04294
17
      Exhibit 52  Inspection Report for Walgreens 267
18                #10569
19    Exhibit 53  Inspection Report of Overholt   219
                  Pharmacy 4/22/08
20
      Exhibit 54  Inspection Report MEDSmart      238
21                Pharmacy
22    Exhibit 55  Inspection Report for           263
                  Walgreens #5821
23
      Exhibit 56  2/16/16 Walgreens #5821 letter  265
24
25                       * * *

```
                                            Page 5
 1    APPEARANCES:  (All via Zoom)
 2           On behalf of the MDL Plaintiffs
             PEC Lake and Trumbull Counties:
 3
                Napoli Shkolnik, PLLC
 4
          By:  Joseph L. Ciaccio, Esq.
 5                and
                Salvatore C. Badala, Esq.
 6                400 Broadhollow Road
                Suite 305
 7                Melville, New York  11747
                212.397.1000
 8                jciaccio@napolilaw.com
                sbadala@nsprlaw.com
 9
                and
10
                Hunter J. Shkolnik, Esq.
11                and
                James R. Auffant, Esq.
12                270 Munoz Rivera Avenue
                Suite 201
13                Hato Rey, Puerto Rico  00918
                844.860.0949
14                hshkolnik@napolilaw.com
                jauffant@napolilaw.com
15
                and
16
                Simmons Hanly Conroy
17
          By:  Laura S. Fitzpatrick, Esq.
18                112 Madison Avenue
                New York, New York  10016
19                212.784.6400
                lfitzpatrick@simmonsfirm.com
20
                and
21
                Weisman, Kennedy & Berris Co., LPA
22
          By:  Daniel P. Goetz, Esq.
23                101 West Prospect Avenue
                Midland Building, Suite 1600
24                Cleveland, Ohio  44115
                216.781.1111
25
```

```
                                                      Page 6

 1   APPEARANCES:    (All via Zoom)
 2
             On behalf of the witness and Ohio
 3           Board of Pharmacy:
 4                 Ohio Attorney General Health &
                   Human Services
 5
             By:  Henry G. Appel, Esq.
 6                30 E. Broad Street, 26th Floor
                  Columbus, Ohio  43215
 7                614.466.8600
                  henry.appel@ohioattorneygeneral.gov
 8
 9           On behalf of the witness and Ohio
             Board of Pharmacy:
10
                   Plevin & Gallucci Co., LPA
11
             By:  Frank L. Gallucci, III, Esq.
12                55 Public Square, #2222
                  Cleveland, Ohio  44113
13                216.861.0804
14
             On behalf of Walgreens:
15
                   BartlitBeck LLP
16
             By:  Sharon Desh, Esq.
17                54 West Hubbard Street
                  Suite 300
18                Chicago, Illinois  60654
                  312.494.4445
19                sharon.desh@bartlitbeck.com
20
             On behalf of Walmart:
21
                   Jones Day
22
             By:  Jason Z. Zhou, Esq.
23                77 West Wacker
                  Suite 3500
24                Chicago, Illinois  60601
                  312.269.4097
25                jzhou@jonesday.com
```

Page 7

```
 1   APPEARANCES:   (All via Zoom)
 2
 3          On behalf of Giant Eagle:
 4              Marcus & Shapira, LLP
 5          By:  Robert M. Barnes, Esq.
                 and
 6               Scott D. Livingston, Esq.
                 One Oxford Centre, 35th Floor
 7               Pittsburgh, Pennsylvania  15219
                 412.338.3344
 8               rbarnes@marcus-shapira.com
                 slivingston@marcus-shapira.com
 9
10
            On behalf of CVS Pharmacy, Inc.; CVS
11          Indiana, LLC; CVS Rx Services, LLC; CVS
            Tennessee Distribution, LLC; and Ohio CVS
12          Stores, LLC:
13               Zuckerman Spaeder, LLP
14          By:  Steven Herman, Esq.
                 1800 M Street, NW
15               Suite 1000
                 Washington, DC  20036
16               202.778.1893
                 sherman@zuckerman.com
17
18
            On behalf of Rite-Aid:
19
                 Morgan, Lewis & Bockius, LLP
20
            By:  James Nortey, Esq.
21               1000 Louisiana Street
                 Houston, Texas  77002
22               713.890.5000
                 james.nortey@morganlewis.com
23
24
25
```

```
                                            Page 8
1    APPEARANCES:    (All via Zoom)
2
3           Also present:
4                  Michelle Siba, Esq.
                   State of Ohio Board of Pharmacy
5
                   Amanda Aunterreiner, Paralegal
6                  Motley Rice
7                  Kurt Henschel, Videographer
8                  Clint Thomas, Concierge
9
                           *   *   *
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 9

1           THE  VIDEOGRAPHER:  Today's date
2    is December 11, 2020.  We're on the record at
3    9:01.  This is the National Prescription Opiate
4    Litigation.  The witness today is located in
5    Mentor, Ohio.
6           The court reporter may now swear
7    in the witnesses -- witness.  All appearances
8    will be noted on the stenographic record.
9                    TREY EDWARDS
10   a witness herein, having been first remotely duly
11   sworn as hereinafter certified, was examined and
12   deposed as follows:
13                  EXAMINATION
14   BY MR. BARNES:
15           Q.   Good morning, Mr. Edwards.
16           A.   Good morning.  How are you?
17           Q.   I'm good.  How are you?
18           A.   Good.
19           Q.   I can't see you, but I assume
20   that's a video issue.  Mr. Edwards, would you
21   please state your full name and your address
22   listing city only, no street address?
23           A.   Sure.  My name is William John
24   Edwards.  I go by Trey.  I work for the State
25   of Ohio Board of Pharmacy in Columbus, Ohio.

1          Q.   Mr. Edwards, do you go -- you said
2     you go by Trey.  Is it okay if I call you Trey
3     during this?
4          A.   Yes, absolutely.
5          Q.   And you said you work for the Ohio
6     Board of Pharmacy, as in you're an agent; is
7     that your official title?
8          A.   Correct.
9          Q.   All right.  So if I call you Agent
10    Trey, that's an accurate appellation?
11         A.   Sure, yep.  Just Trey is fine,
12    too.
13         Q.   Trey, do you understand you're
14    appearing here pursuant to a notice of
15    deposition and a subpoena issued, and
16    acceptance of service was accepted by the Ohio
17    Board of Pharmacy on your behalf?
18         A.   Yes.
19         Q.   Did you receive this large binder
20    of exhibits at your home yesterday?
21         A.   Yes.  I have it right next to me.
22         Q.   Okay.  Were you able to take a
23    look at those exhibits to familiarize yourself
24    in any way with them, or are you looking at
25    them fresh?  And, by the way, I was hoping that

Page 11

1   you would take some time to look at them

2   because there are a lot of exhibits.

3           A.   Yeah, I did look at them

4   yesterday.

5           Q.   Okay.  Would you take a look at

6   Exhibit 1?  Is that the notice of deposition,

7   which you've seen before and for which you're

8   appearing today?

9           A.   Yes.

10          Q.   Okay.  Have you ever been deposed

11  before, Mr. Edwards?

12          A.   I have not.

13          Q.   Have you ever testified before?  I

14  assume, as an agent, you've testified probably

15  dozens of times?

16          A.   Yes, many times.

17          Q.   Okay.  But in a civil deposition,

18  just to familiarize yourself with the process,

19  this is a remote deposition, and so we're all

20  experiencing something new.  But what will

21  happen is, I will ask the questions, give me

22  time to ask the question.  You'll get a full

23  opportunity to answer.  Make sure you hear and

24  understand my questions or ask to have it

25  repeated.  Otherwise, if you don't ask any

Page 12

1   questions, I'll -- about my question, I'll

2   assume you fully understood it and are giving

3   your most truthful responses.  Is that agreed

4   to?

5          A.   Yes.

6          Q.   And I'll just remind you that

7   because there's a court reporter, you need to

8   give verbal responses.  She may not pick up

9   shakes of the head or any other physical cues

10  because of the video process.  So be sure to

11  make verbal responses.  And if you need a break

12  at any time, just let me know, and we'll take a

13  break.

14         A.   Okay.

15         Q.   Let me know at any time if you

16  have any technical difficulties, if it cuts

17  out, or if you can't hear us or you need to

18  reconnect, anything like that.

19              Under the protocol entered in this

20  case, other than communications with your counsel,

21  there's to be no texting or emailing or anything

22  related to your testimony during the course of the

23  deposition.  Do you understand that?

24         A.   Yes.

25         Q.   Okay.  Are you physically alone

Page 13

1   for this deposition today?

2           A.    Yes.

3           Q.    Okay.  Have you had an opportunity

4   to prepare for your deposition by talking with

5   your counsel, Mr. Appel, or any other lawyers

6   at the Ohio Board of Pharmacy?

7           A.    Yes.

8           Q.    All right.  Were you able to

9   review documents and discuss the issues that

10  you might testify about?

11          A.    Yes.

12          Q.    Approximately how long did you

13  prepare for your deposition in that regard?

14          A.    Oh, a couple days.  I would say

15  ten, 12 hours, something like that.

16          Q.    Okay.  Were you able to refresh

17  your recollection as to your involvement with

18  the inspections of Giant Eagle Pharmacies and

19  other pharmacies that are involved in this

20  case?

21          A.    Yes.

22          Q.    Have you had any contact at all

23  with lawyers other than the Ohio Board of

24  Pharmacy related to your testimony today?

25          A.    Yes, I have.

1          Q.   Who have you had contact with?

2          A.   Frank Gallucci and the

3    gentlemen -- the two gentlemen that he's

4    working with who represent Lake County.

5               THE  VIDEOGRAPHER:  Sorry.  Can we go

6    off the record for one second, please?

7               (Off the record.)

8               THE  VIDEOGRAPHER:  We're on the

9    record, 9:07.

10   BY MR. BARNES:

11         Q.   All right.  Mr. Edwards, we're

12   back on the record.  When we broke for a

13   minute, you were telling me that you have had

14   contact with Frank Gallucci and two other

15   gentlemen representing Lake County?

16         A.   Correct.

17         Q.   Do you remember the two other

18   gentlemen's names?

19         A.   I do not.  They were told to me.

20   I was told one would be on the call today.

21   They represent -- they represent Lake County,

22   and I used to work for Lake County, so that's

23   their involvement, but I don't recall the other

24   two gentlemen's names.

25         Q.   Okay.  And when did you meet with

1    them and for how long?

2            A.    I talked on the phone with Frank,

3    oh, probably about an hour -- 45 minutes to an

4    hour with the three of them the other day, and

5    then previously I have talked to

6    Mr. Gallucci -- we did like a Zoom call for

7    probably another hour.

8            Q.    And were your conversations in

9    connection with your prior employment at Lake

10   County?

11           A.    Yes.

12           Q.    Did the conversations involve

13   anything related to your current employment at

14   the Ohio Board of Pharmacy?

15           A.    No.

16           Q.    Can you give us a little summary

17   of your educational background?  I've seen it

18   in some documents, but starting with college.

19   What was your degree, from where, and what

20   year?

21           A.    Sure.  Criminal -- I majored in

22   criminal justice at Ohio State.  I graduated in

23   1998.  After that, I went to the police academy

24   in Cleveland Heights, and that was a class of

25   '99, and then started to work for Lake County

Page 16

1    in 2000.

2         Q.    Okay.  Do you have any other

3    formal education other than your BA in criminal

4    justice?

5         A.    No.

6         Q.    Master's degree, course work,

7    anything like that?

8         A.    No.

9         Q.    Do you have any professional

10   certifications or testing that is -- I'll just

11   leave it at that.

12        A.    I'm a certified peace officer with

13   the State of Ohio.

14        Q.    What do you have to do to become a

15   certified peace officer?

16        A.    Go through the police academy and

17   just maintain the continuing education

18   requirements that they set.

19        Q.    All right.  What was your first

20   job?  You said you went to the police academy,

21   you came out in '99, and your first job was

22   with Lake County, 2000?

23        A.    Yes.  Lake County Narcotics

24   Agency.  I began there in 2000.

25        Q.    And what was your position there?

1          A.    The title was special agent; more
2     specifically, I was a pharmaceutical diversion
3     investigator.
4          Q.    Did you go through training to
5     become a pharmaceutical diversion investigator
6     for Lake County?
7          A.    Prior to getting hired, no, just
8     the police academy.
9          Q.    But how about after getting hired?
10         A.    Afterward, I did various classes,
11    DEA-sponsored drug investigation classes and
12    the National Association of Drug Diversion
13    Investigators, I've been to a number of their
14    trainings.
15         Q.    Okay.
16         A.    Mostly on-the-job training.
17         Q.    And in this training, including
18    on-the-job training, did you become familiar
19    with Ohio law and federal law related to
20    pharmaceutical diversion?
21         A.    Yes.
22         Q.    Okay.  And were you -- how long
23    were you a special agent for the Lake County
24    Narcotics Agency?
25         A.    So till 2008.  I began with the

1    State of Ohio in November of 2008.

2         Q.   You mean you started with the Ohio

3    Board of Pharmacy in November of '08?

4         A.   Correct.

5         Q.   And for the 2000 through 2008 time

6    period, were you always a special agent with

7    the pharmacy diversion investigative unit of

8    the Lake County Narcotics Agency?

9         A.   Yes.

10        Q.   What were your duties as a special

11   agent?

12        A.   To investigate drug laws.  We were

13   a unique agency.  We were a law enforcement

14   agency; however, our arrest powers only had to

15   do with drug laws of the State of Ohio.  So I

16   enforced the drug laws, particularly Ohio

17   Revised Code 2925.22 and 2925.23.  Those are

18   the main two sections of law that we focused

19   on, but there were others as well.

20        Q.   Did you actually use those powers

21   from time to time to arrest for violation of

22   the drug laws?

23        A.   Yes.

24        Q.   Those are references to the Ohio

25   Revised Code; is that correct?

1          A.    Correct.

2          Q.    Okay.  When working in law

3    enforcement as a special agent with -- I'll

4    call it LCNA for short.

5          A.    Sure.

6          Q.    -- with LCNA, did you have a

7    partner or did you work on a team --

8          A.    Yes.

9          Q.    -- or did you do primarily

10   individual investigations?

11         A.    When I started, I had two

12   partners, and they -- throughout my time there,

13   they both then retired and hired in somebody

14   else, then I had one partner.

15         Q.    Who were your two partners and

16   then the one partner?

17         A.    The initial partners were Jim

18   Snyder and Judy Pugh.  P-u-g-h is her last

19   name.  And they were there till, I want to say,

20   around 2003 or so.  And then Chris Begley was

21   hired in -- I believe in 2003, and he was my

22   partner from 2003 until 2008.

23         Q.    And you would investigate pharmacy

24   diversion matters as a team?

25         A.    Yes.

Page 20

1        Q.    Did you do primarily criminal, or
2    did you do both criminal and civil?
3        A.    All criminal.  Exclusively
4    criminal.
5        Q.    All criminal.  Okay.
6        A.    Yeah.
7        Q.    Did you have any -- do you recall
8    any notable criminal prosecutions that you had
9    while an LCNA agent?
10       A.    I mean, not any that stand out,
11   but, yeah, many.  I mean, we would probably
12   have 50 to 60 cases a year between myself and
13   my partners.
14       Q.    And were they -- you said you were
15   in the pharmacy diversion investigative unit.
16   Who were you primarily prosecuting in that time
17   period?
18       A.    Primarily the general public.  The
19   vast majority of cases we had were around the
20   general public.
21       Q.    And what types of crimes were they
22   committing while you were an agent?
23       A.    The two ORC codes that I
24   mentioned, basically in laymen's terms, doctor
25   shopping and illegal processing were the two

Page 21

1    crimes, people writing bad prescriptions,

2    forging prescriptions, and then doctor

3    shopping, seeing multiple doctors to obtain

4    overlapping prescriptions.

5            Q.    And did you --

6            MR. APPEL:  Can I interrupt for a

7    moment?  This is Henry Appel.  May we go off

8    the record for about one or two minutes for me

9    to take care of a quick personal matter that I

10   mentioned to you before the hearing began?

11           MR. BARNES:  Yes, that's fine.

12           THE  VIDEOGRAPHER:  Off the record

13   9:15.

14           (Off the record.)

15           THE  VIDEOGRAPHER:  We're on the

16   record at 9:17.

17   BY MR. BARNES:

18           Q.    Okay.  Mr. Edwards, we're back on

19   the record.  We were talking about doctor

20   shopping, and I think the term you used was

21   illegal prescriptions?

22           A.    Illegal processing.

23           Q.    Illegal processing.  What do you

24   mean by that?

25           A.    When somebody forges a

Page 22

1  prescription either by altering what a doctor
2  already wrote or by creating their own false
3  prescription.
4            Q.    I see.  While you were an agent
5  with LCNA, did you work with the local
6  pharmacies as part of your investigations?
7            A.    Yes, routinely.
8            Q.    And can you describe that for us?
9  How would you work with the local pharmacies?
10           A.    Well, the vast majority of our
11 complaints came in through the pharmacies.  We
12 would do -- we would do visits.  We called them
13 inspections but they weren't really
14 inspections.  They were more or less, you know,
15 PR visits that -- just talk to the pharmacists,
16 get to know them and, you know, let them know
17 what kind of things we were seeing in the area
18 and what to look out for.
19           We would have -- we would host
20 continuing education forums with them so that
21 they could get law CEs where we would tell
22 them, again, what we were seeing, what trends
23 we were seeing, what to look for.  It was
24 pretty much a daily basis where we would have
25 dealings with the local pharmacists.

Page 23

1          Q.    I forgot to mention to you that I
2    represent Giant Eagle.
3          A.    Okay.
4          Q.    And the other defendants in this
5    case are CVS, Walgreens, Rite-Aid, and Walmart.
6    So along with those four, along with Giant
7    Eagle, I'll sometimes call them the pharmacy
8    defendants --
9          A.    Okay.
10         Q.    -- just for ease of reference.
11               Do you recall working with
12   pharmacists employed by the pharmacy defendants
13   when you were at LCNA?
14         A.    Yes.
15         Q.    And specifically, do you remember
16   working with Giant Eagle pharmacists in
17   diversion investigations?
18         A.    Yes.
19         Q.    As well as CVS, Walgreens,
20   Rite-Aid, and Walmart pharmacists?
21         A.    Yes.
22         Q.    These pharmacists, in your
23   recollection, who work for the pharmacy
24   defendants, were they helpful in your
25   investigations and cooperative and assist you

Page 24

1    in any way they could to prevent diversion?

2            A.   Yes.

3            Q.   In what ways would they assist

4    specifically?  What would you need from the

5    pharmacists?  You said that the majority of

6    complaints came from the pharmacists.  What

7    were the nature of those complaints and how

8    would they assist after making the complaint?

9            A.   Well, we --

10           MR. CIACCIO:  Objection to form.

11           A.   So your question was, how did the

12   pharmacists assist us?

13   BY MR. BARNES:

14           Q.   Yeah.  I was referring back to

15   your testimony a couple minutes ago.  You said

16   that the majority of the complaints when you

17   were an agent at LCNA came from the

18   pharmacists?

19           A.   Correct.  Yeah, so essentially, if

20   someone came into their pharmacy with a bad

21   prescription or raised any sort of red flags

22   like from out of the area or, you know, a high

23   dose or just something that raised their

24   suspicion, they would call.

25                If we -- essentially the way we

Page 25

1    operated, it was somewhat routine in that we

2    would develop a list of suspects who we had

3    received calls about and we would send that out

4    to the pharmacies.  We didn't have OARRS -- the

5    Ohio Automated Rx Reporting System back then,

6    so the description history of individuals was

7    not at our fingertips like it is today, so we

8    would have to compile a list, send it out to

9    the pharmacies, and ask them, you know, if they

10   had seen those people, if they had had dealings

11   with them, and then they would report back to

12   us.

13          So there were many -- many reasons

14   that they would call us just to ask a question

15   or to report what they thought might be a crime

16   or to just maybe ask -- you know, ask about an

17   individual or a prescriber or, you know, a

18   general question.

19          Q.   I see.  So you would be getting

20   information from pharmacists, they would see

21   suspicious behavior in the pharmacies for any

22   number of reasons.  And from that information,

23   is that where you would create the list?

24          A.   For the most part, yeah.

25          Q.   Okay.  And then you would

1  disseminate that list to all of the other

2  pharmacies in Lake County?

3         A.   Correct, we would either mail it

4  or fax it out and basically ask them, has this

5  person been in your store, is there anything,

6  you know, that happened that you could tell us

7  that, you know, would be beneficial for our

8  investigation.  And, you know, sometimes there

9  was nothing, sometimes there was a good case

10  and they were going to several pharmacies in

11  the area.

12         Q.   I see.  So this was pre OARRS?

13         A.   Correct.

14         Q.   Did the pharmacies respond to

15  those lists from time to time and tell you

16  things that would assist?

17         A.   For the most part.  The way -- the

18  way we worded it, I believe, was if this person

19  has been in your pharmacy, please let us know.

20  So we wouldn't hear from every pharmacy every

21  month because if they didn't have any of those

22  people in their store, they wouldn't call.  But

23  if they ran their -- you know, checked the

24  names in their profile and they were there and

25  there was something that they thought they

Page 27

1    should share with us, they would call.

2          Q.   I see.  And from time to time

3    would you ask for further information from the

4    pharmacies, things like, give us copies of all

5    your prescriptions for this individual, things

6    of that nature?

7          A.   Yes.  Most commonly we would ask

8    for what was called the prescription profile,

9    and that was essentially the year's worth of

10   prescriptions that they filled.

11         Q.   Did you do pharmacy inspections

12   while you were an agent with LCNA?

13         A.   We called them inspections, but

14   they -- like I said, they weren't really

15   inspections, they were more or less PR visits

16   where we'd go in and we'd, you know, ask them

17   how many prescriptions they were filling and,

18   you know, just general -- general questions.

19              We called them inspections back

20   then.  And had you asked me back then, I would

21   say, yeah, we do inspections.  But now, having

22   worked for the Board of Pharmacy, I realize

23   what we did at Lake County Narcotics was

24   nothing even close to an inspection.

25         Q.   I see.  And we'll get to that and

1    have a good point to compare.

2           A.    Sure.

3           Q.    Who did you report to at LCNA

4    while an agent?

5           A.    My direct supervisor initially was

6    Ed Ebert.  He was lieutenant.  And my -- the

7    executive director was Chris Collins initially

8    and then John Germ.  So there were two

9    executive directors in my time there.

10          Q.    While you were an agent for LCNA,

11   were you -- and doing your investigations and

12   prosecutions, were you able to learn about the

13   nature of pharmaceutical diversion in Lake

14   County in that time period, 2000 through 2008?

15          A.    Yes.

16          Q.    Did you come to understand at any

17   time as an agent that Lake County was

18   experiencing pharmaceutical diversion coming

19   into the county from outside the county?

20          A.    Well, I didn't specifically notice

21   that trend standing out.  I mean, we had cases

22   all the time where people would be from

23   Cuyahoga County or people would be from another

24   area and come into our county.  We always said,

25   you know, criminals don't know county

Page 29

1    boundaries.  So often there were cases that

2    extended into other areas or came into our

3    area.

4            Q.   When you use the term diversion,

5    are you using it in the context of

6    pharmaceutical diversion, or are you --

7            A.   Pharmaceutical diversion.  When

8    prescription drugs go out of the legitimate

9    channels.

10           Q.   And the legitimate channel would

11   be, I guess, manufacturer to distributor to

12   pharmacy to patient; is that correct?

13           A.   Yes.

14           Q.   Are there different forms of

15   pharmaceutical diversion, in your experience?

16           A.   Sure.

17           Q.   Can you tell us what that is?

18           A.   Well, it can take many forms.  It

19   can be theft.  It can be forging prescriptions.

20   It can be trafficking.  It can be misuse or

21   abuse.  It can be tampering.  It can be -- I

22   mean, there's -- any way you can take a

23   pharmaceutical drug and take it out of that

24   legitimate channel is -- would be diversion.

25           Q.   I see.  Okay.  Well, that's

Page 30

1    helpful to get that explanation.  Did you

2    investigate thefts of pharmaceuticals while an

3    agent with LCNA?

4           A.    I don't recall any specific theft

5    case.  I believe I probably did, but I don't

6    recall any off the top of my head.  I remember

7    getting calls about patients saying someone

8    stole my prescriptions and stuff like that, but

9    I don't recall if they developed into a case

10   or, you know, someone was prosecuted.  That

11   type of investigation I handled much more

12   frequently in my current job than I did at Lake

13   County.

14          Q.    Okay.  When you say theft, are you

15   including things like a pharmacy tech stealing

16   pills or are you more --

17          A.    Yes.  Well, both.  I mean, now

18   that we're sitting here, I am recalling a case

19   of an individual stealing drugs from the

20   patient who had the prescription.  And I can

21   recall another case where I worked it with the

22   state pharmacy board of a technician who was

23   stealing drugs --

24          Q.    Okay.

25          A.    -- in Lake County.

1          Q.    All right.  And as an agent with

2     LCNA, did you investigate forged prescriptions?

3     And that would be criminals forging doctors'

4     prescriptions and trying to get them filled at

5     pharmacies.

6          A.    Yes.  That was a very common crime

7     that we investigated.

8          Q.    And trafficking, what do you mean

9     by trafficking?

10         A.    Selling.  Selling drugs.

11         Q.    And that would be outside the

12    closed system we talked about?

13         A.    Correct.  Yes.

14         Q.    And did you prosecute those kinds

15    of cases -- investigate and prosecute those

16    kinds of cases in Lake County?

17         A.    Occasionally.  Not as commonly as

18    the forging prescriptions or the doctor

19    shopping, but occasionally we would have

20    trafficking cases.  A lot of times those

21    cases -- the way Lake County operated, we had

22    the pharmaceutical diversion agents and then we

23    had another group, an enforcement group, who

24    basically worked at night.  When I was there,

25    it was like a 4:00-to-midnight shift, and they

Page 32

1    did the street drugs.  So when the

2    pharmaceutical cases would go to the street

3    side and involve trafficking and stuff like

4    that, a lot of times that group would handle

5    those cases.

6           Q.    I see.  You also mentioned

7    tampering and there was another category.  I

8    scribbled it so fast, I can't read my own

9    handwriting.  Is it misuse and abuse?  Is that

10   what you said?

11          A.    Yes.

12          Q.    Okay.  And what is -- what types

13   of prosecutions are those?

14          A.    Tampering would be like a nurse at

15   a nursing home stealing the patient's Percocet

16   and replacing it with Tylenol or diluting an

17   injectable medication so it's not the same

18   strength as what the doctor prescribed.

19          Q.    I see.  And what is misuse and

20   abuse?  What does that mean?

21          A.    That's -- that would be somebody

22   overusing their medications; maybe they have a

23   legitimate prescription, they're supposed to

24   take two or three and they take six or eight or

25   they -- it leads -- often leads into doctor

Page 33

1    shopping because --

2            Q.    I see.

3            A.    -- what their current doctor's

4    giving them isn't enough, so then they need

5    more.

6            Q.    I see.  And did you do those types

7    of investigations and prosecutions while an

8    agent with LCNA?

9            A.    We did the doctor shopping

10   investigations.  I mean, misuse of a prescribed

11   drug is not in and of itself a crime.

12           Q.    Okay.  Are the methods -- in your

13   experience, are the methods that individuals

14   use to divert prescription drugs, do they

15   change over time, particularly in response to

16   law enforcement efforts?

17           A.    Of course, yes.

18           Q.    Can you give me an example of

19   that?

20           A.    Well, doctor shopping would be an

21   example.  Back before we had OARRS, it was much

22   easier for someone to go to multiple pain

23   management doctors and get overlapping

24   prescriptions, whereas now it's much more

25   difficult because the information that was not

Page 34

1   available back then is at their fingertips

2   right now.

3           Q.   I see.  In your experience as an

4   agent and also as an agent with the Board of

5   Pharmacy, do your investigations sometimes

6   involve criminal organizations that are

7   expressly working with prescription drugs and

8   diverting prescription drugs?

9           A.   Occasionally.

10          Q.   Okay.

11          A.   Define organization.

12          Q.   Yeah, I understand.  I'm a former

13  prosecutor myself, so --

14          A.   You mean the group?

15          Q.   Yeah.

16          A.   If you mean a group of people

17  acting together for the same goal, then, yes.

18  If you mean a formal organization with a

19  president and vice president, something like

20  that, then no.

21          Q.   No, no.  That's not what I meant.

22  I meant, you know, people engaged in

23  conspiracies to divert.

24          A.   Yes.  Yes.  People working

25  together and -- yes.

1          Q.   Is that something that you saw in

2    Lake County when you were with LCNA?

3          A.   Yes.  Yes.  Like multiple

4    people -- for instance, if someone stole a

5    prescription pad and had friends or associates

6    that then would go fill the prescriptions and,

7    you know, sell them back or share or whatever,

8    like that type of thing.  Or more recently --

9    are you just referring to my time in LCNA or --

10         Q.   Yes.  But I would naturally expand

11   it if you feel like you have some relevant

12   information.

13         A.   Well, recently there's issues with

14   promethazine with codeine, cough syrup, and

15   there's groups -- there's organizations that

16   travel throughout the country breaking into

17   pharmacies and either stealing it or forging

18   prescriptions to get it.  So, yes, there are

19   groups out there who commit diversion together.

20         Q.   Okay.  The people that you've

21   investigated, including doctor shoppers and

22   criminals, are they individuals who engage in

23   deceptive activity with doctors and

24   pharmacists?

25         A.   Sure.  Yes.

1          Q.    Do your investigations -- or did

2     your investigations involve multiple agencies

3     like local police, FBI, DEA, and other law

4     enforcement agencies?

5          A.    Occasionally.

6          Q.    Have you ever worked on a task

7     force where you have multiple agencies coming

8     together to investigate pharmaceutical

9     diversion?

10         A.    I've never been assigned to a task

11    force.  I've worked with task forces.

12         Q.    Which task forces have you worked

13    with?

14         A.    I've -- well, when I say worked

15    with, I'm referring to working a case with and

16    I'm also referring to collaborating with to get

17    information.

18         Q.    Okay.

19         A.    So I've worked with the West Shore

20    Enforcement Bureau, the SEAL Task Force, the

21    TAG -- I don't believe it's called TAG anymore,

22    but Trumbull Ashtabula Group, Mahoning Valley

23    Drug Task Force.  There may be others.  That's

24    all I can think of for the moment.

25         Q.    What was the first one you

1   mentioned?  I didn't catch that name.

2          A.    The West Shore Enforcement Bureau.

3          Q.    West Shore.  Okay.

4          A.    Yeah, they're in Cuyahoga County.

5          Q.    And are all these task forces

6   essentially in the northeastern corridor of

7   Ohio?

8          A.    Essentially, yes.

9          Q.    Okay.  The investigations -- some

10  of your investigations, did they take long

11  periods of time; years, for example, from start

12  to finish?

13         A.    With the Pharmacy Board, yes.

14  With Lake County, I don't recall any taking

15  years.  They may have.  From start -- from

16  initial complaint to criminal resolution,

17  probably.

18         Q.    In your work as an agent with LCNA

19  and now as an agent for the Board of Pharmacy,

20  have either of those agencies been able to

21  totally stamp out pharmaceutical diversion by

22  criminals and others?

23         A.    No.

24         Q.    You mentioned the National

25  Association of Drug Diversion Investigators.

Page 38

1    Are you a member of that organization?

2           A.    Yeah, I am.  I'm the state vice

3    president.

4           Q.    What does that organization do

5    primarily?

6           A.    Primarily training and networking

7    of individuals who work in the field of

8    pharmaceutical diversion.

9           Q.    All right.  I want to shift focus

10   now and talk about the State Board of Pharmacy.

11   You said you went to work for the State Board

12   of Pharmacy in November of 2008?

13          A.    Correct.

14          Q.    And your first position there was

15   as an agent?

16          A.    Correct.

17          Q.    And were you an agent in a

18   specific division of the Board of Pharmacy?

19          A.    No.  I was just a general

20   compliance agent.

21          Q.    What does that mean to be a

22   general compliance agent?

23          A.    Just a -- we have different --

24   well, at the time I was hired, we had two

25   different types of enforcement employees.  It

1    would be the agents like myself who primarily

2    came from law enforcement backgrounds, and then

3    we had specialists who were pharmacists.  They

4    didn't have law enforcement backgrounds.  They

5    were clinical or, you know, or retail

6    pharmacists in their background.

7            Q.    So you had -- they were called

8    agents and specialists?

9            A.    Correct.

10           Q.    Did the agents and specialists

11   work together on the pharmaceutical diversion

12   investigations?

13           A.    Yes.

14           Q.    And have you always been an agent

15   since November of '08 through today?

16           A.    Yes.

17           Q.    And have you always reported to

18   the same individual in that 12-year time

19   period?

20           A.    No.  My supervisors have changed

21   quite a bit.

22           Q.    Who's your current supervisor?

23           A.    Kevin Flaharty.

24           Q.    Do you remember any prior

25   supervisors?

Page 40

1          A.    Prior to Kevin, it was Tom Pyles.

2    Prior to Tom, it was Lisa Dietsche.  Prior to

3    Lisa Dietsche, it was Jim Reye.  And he was --

4    he was my first supervisor when I started.

5          Q.    Were you when you first went to

6    work for the Board, were you assigned to a

7    particular geographic area of Ohio?

8          A.    Yes.  The northeast.

9          Q.    What does the northeast area

10   encompass?

11         A.    Well, it's changed over the years.

12   When I was hired, it encompassed Lake, Geauga,

13   Portage, Ashtabula, and at different times I

14   had parts of Cuyahoga, parts of Summit, parts

15   of Medina.  So it's basically the northeast

16   corner of the state, but those initial counties

17   that I mentioned were where I primarily worked.

18         Q.    I see.  And you didn't mention

19   Trumbull.  Has Trumbull been in your area of --

20         A.    I've worked in Trumbull.  I've

21   never -- I don't believe I was ever assigned

22   Trumbull, to my recollection.  But I have

23   worked occasionally in Trumbull County.

24         Q.    Are there other agents assigned to

25   Trumbull County?

Page 41

1          A.    Yes.

2          Q.    Who are they?

3          A.    Currently, I believe Bill

4     DiFrangia is the agent for that area.

5          Q.    What about George Pavlich, do you

6     recognize that name?

7          A.    Yes, he was with the agency when I

8     was hired, but he retired I believe in 2012.

9          Q.    Did he do Trumbull County?

10         A.    Yes.  He had the Youngstown area,

11    so Trumbull, Mahoning, Columbiana, those

12    counties.

13         Q.    So how would you describe the

14    responsibilities as an agent with the Ohio

15    Board of Pharmacy?

16         A.    My responsibilities are to

17    investigate criminal allegations that are

18    violations of the Ohio Revised Code, Ohio

19    Administrative Code, and the Code of Federal

20    Regulations, as well as an administrative

21    component where we do inspections of facilities

22    that manufacture, store, sell, distribute

23    dangerous drugs.

24         Q.    That's a general description for

25    all 12 years of your experience as an agent at

Page 42

1    Ohio Board?

2           A.   Generally.  Most recently, for the

3    past three years, I've been working on an early

4    intervention grant.  So I've -- for the past

5    three years, I have not -- I still do those

6    things, but not as much as the intervention

7    component.

8           Q.   Okay.  And were you trained when

9    you arrived at the Board of Pharmacy?  Were you

10   given specific training either before or after

11   you arrived with respect to the Ohio Revised

12   Code and the Administrative Code?

13          A.   Yes.  I was -- I went through some

14   training with the local agents in the northeast

15   and basically shadowed them for a period of

16   time.  I don't remember how many weeks.

17          Q.   Were you at any time given copies

18   of the Ohio Revised Code or Administrative Code

19   to review --

20          A.   Yes.

21          Q.   -- the provisions, become familiar

22   with them?

23          A.   Yes.  We were given the book.  You

24   know, back then, it was like a phone book in

25   size; kind of like this book of exhibits here.

1          Q.    Okay.  So you've seen them before?

2          A.    Yes.

3          Q.    And you've provided training, or

4    have you provided training as I guess a more

5    senior agent now at the board, do you train

6    younger agents?

7          A.    I have; not recently, but I did

8    spend a number of years training other agents.

9          Q.    Did you specifically provide

10   training with respect to the OARRS program?

11         A.    No.  Well, I take that back.  I

12   provided training to law enforcement about the

13   OARRS program, but I did not provide training

14   to our agents about the OARRS program.

15         Q.    How long -- in what time period

16   did you provide training -- OARRS training to

17   law enforcement?

18         A.    Oh, probably five or six years

19   ago.  It was a short-lived program.  It was --

20   law enforcement was -- my recollection is law

21   enforcement was having issues with OARRS and we

22   were trying to increase the amount of use by

23   law enforcement.  So we developed this

24   PowerPoint program to present to law

25   enforcement and the response was not very good.

Page 44

1   So we ended up -- not me, but we meaning our

2   agency, created an online training program for

3   OARRS to replace the in-person training.

4            Q.    So how long did that OARRS

5   training last?  It sounds like it was just a

6   short time period?

7            A.    It was short.  I want to say less

8   than a year, and I think we only did a handful

9   of those trainings.

10           Q.    Okay.  I'll get to -- you may have

11  seen in the binder I sent you --

12           A.    Yes.

13           Q.    -- there was one of your training

14  sessions.  We'll get to that.

15           A.    Okay.

16           Q.    The Board of Pharmacy, what is its

17  role in Ohio with respect to regulating the

18  pharmacy industry and investigating civil and

19  criminal violations?

20           A.    Well, it has a component where

21  there's licensing.  We administer licenses to

22  the entities that manufacture, store,

23  distribute, sell drugs.  So we have the

24  licensing aspect, the administrative aspect

25  where we enforce the rules of the Ohio

Page 45

1    Administrative Code, and then the law
2    enforcement aspect where we enforce the
3    criminal rules or the criminal laws of the Ohio
4    Revised Code and CFR.
5         Q.    Would you take a look at Exhibit 2
6    in the binder that I sent you?
7         A.    Yes.
8              MR. BARNES:  And, Clint, if you
9    could pull up the exhibit, Exhibit 2, Edwards
10   Exhibit 2.
11             MR. THOMAS:  Yes, working on it now.
12   BY MR. BARNES:
13        Q.    Mr. Edwards, have you seen this
14   document before called the Role of the Ohio
15   State Board of Pharmacy/OARRS?
16        A.    I see it here in the book.  I
17   don't -- I don't recall whether or not I was at
18   that particular NADDI training where this
19   presentation was given, but I may have been.
20        Q.    Flip to page 4, please.  There's a
21   page number in the bottom right.  Page 4.
22   There's a description, it's called the Role of
23   the Board.  If the Board is charged with
24   enforcing key chapters of the Ohio Revised
25   Code, including drug offenses, pure food and

Page 46

1   drug laws, controlled substances and

2   pharmacists, dangerous drugs.

3              Does that seem correct to you that

4   that's the role of the Board of Pharmacy to

5   enforcing these Ohio laws?

6         A.   Yes.

7         Q.   Okay.  Is it missing anything that

8   you can think of?

9         A.   Not that I can think of.

10        Q.   On the next page it breaks the

11  Board down into administrative, communication

12  and education, and law enforcement.  You seem

13  to have kind of done that on your own.

14  Licensing and regulating pharmacists, pharmacy

15  interns, and locations that store dangerous

16  drugs, pharmacies, EMS, physician's offices,

17  and wholesalers.  That's the administrative

18  side?

19        A.   Yes, correct.

20        Q.   And then there's communication and

21  education, legislative affairs, stakeholder

22  outreach, training, and operation OARRS, Ohio's

23  prescription drug database.  That's the

24  communication and educational side?

25        A.   Yes.

Page 47

1          Q.   Is that right?  And, finally, law

2    enforcement enforcing the drug laws.

3               Now, just to finish, there's an

4    agency structure on page 6 breaking the agency

5    down into multiple sections, licensing, legal

6    affairs, policy and communication, compliance and

7    legal, the OARRS department.  Does that comport

8    with your understanding of how the Board is

9    structured?

10         A.   Yes.

11         Q.   And then on the seventh -- pages 7

12   through 9 seems like you anticipated some of

13   the questions I would have.  This appears to

14   break down the staff between agents and

15   specialists.  You already told us about that?

16         A.   I didn't anticipate it.  I just am

17   used to being asked that in court, so --

18         Q.   Okay.  There's a -- with respect

19   to specialists, you told us these are licensed

20   pharmacists who assist in investigations; is

21   that right?

22         A.   Correct.

23         Q.   And do they tend to do the more

24   complex investigations?

25         A.   They tend to do the investigations

1    that involve practice-related issues or, like

2    you said, more complex drug issues such as

3    compounding.

4          Q.   Okay.  Page 10 of this exhibit

5    lists the criminal investigations, drug

6    diversion.  You also have already covered some

7    of this:  theft, tampering, deception to obtain

8    the dangerous drugs, illegal processing of drug

9    documents.

10              Is that a general description of what

11   the criminal agents do at the Board, including

12   yourself?

13         A.   Yes.

14         Q.   Now, the pages 11 through 24 of

15   this exhibit give a description of OARRS.  Now,

16   that's the PDMP program started by Ohio in

17   about 2006; am I correct?

18         A.   Correct, yes.

19         Q.   And what do you recall was the

20   main reason behind OARRS and its main purpose?

21         A.   To give pharmacists, prescribers,

22   and law enforcement quicker access to

23   information related to prescriptions being

24   written to help to stem the drug abuse or the

25   drug opiate epidemic.

Page 49

1          Q.   Was it specifically designed for

2     the opiate epidemic?

3          A.   I don't recall its specific reason

4     for being designed.  I just know that that's

5     what it helped.

6          Q.   Okay.  Prior to the creation of

7     OARRS, you had told us in your investigations

8     as an agent with LCNA that you really didn't

9     have a database to go to so you created lists

10    by talking to pharmacists and getting input

11    from pharmacists.  Is that -- did OARRS

12    basically replace that --

13         A.   Yes.

14         Q.   -- that system?

15         A.   Yes.  It made a month-long

16    investigative inquiry into a few-minute-long

17    inquiry.

18         Q.   Okay.  So am I correct that once

19    OARRS was formed, pharmacies were required to

20    report to the Board of Pharmacy through the

21    OARRS system each and every prescription filled

22    at the pharmacy on a day-to-day basis?

23         A.   Not every prescription; just

24    controlled substances.

25         Q.   Controlled?

1          A.   Mainly controlled substances.  At

2    one time or another, there were a few other

3    drugs that were not controls but were reported

4    such as tramadol and gabapentin.

5          Q.   And from day one, was that on a

6    daily basis, or did it start on a different

7    periodic reporting format, you know --

8          A.   I don't believe it was daily to

9    start.  I believe it was -- I don't believe --

10   I don't remember what the requirement was, but

11   I believe it was a few days.  And then it

12   became 24 hours, they had to report within 24

13   hours.  And --

14         Q.   Okay.  And what about doctors who

15   filled prescriptions in their offices, did they

16   have to similarly report to OARRS drugs they

17   were giving out in their office?

18         A.   I don't recall if that was an

19   initial requirement, but it is now.

20         Q.   Okay.

21         A.   I believe it was, but I don't

22   recall.

23         Q.   On pages 14 and 15 of this

24   Exhibit 2, there's a discussion of when a

25   pharmacist must query OARRS.  Now, this

Page 51

1   document I believe is approximately

2   September 25th of 2017.  So as of September of

3   2017, does this refresh your recollection as to

4   when a pharmacist must query OARRS?

5          A.   Yes.

6          Q.   On page 14?  When a patient adds a

7   different or new controlled substance to their

8   therapy that was not previously included or an

9   OARRS report has not been reviewed for that

10  patient during the preceding 12 months, as

11  indicated in the patient profile, or if a

12  prescriber is located outside the usual

13  pharmacy geographic area.

14             Was that in OARRS from day one, or

15  was there a period of time when OARRS was a

16  discretionary access and then it became

17  mandatory under certain conditions?

18         A.   Yeah, that's correct.

19         Q.   Do you recall when it became

20  mandatory when these types of conditions

21  occurred?  Was that in or around -- well, I'll

22  ask you.  I'm not going to suggest a day.

23         A.   Going by this presentation, it

24  says effective February 1st, 2016.  So I --

25         Q.   Oh, okay.

1          A.    I'll go by that.  I don't recall.

2          Q.    Okay.  So for about ten years, I

3   guess, January 1st of '06 until about

4   February 1 of '16, it was up to the pharmacist

5   to determine whether it was going to -- he or

6   she was going to access OARRS, and then as of

7   about February 1 of 2016, it became mandatory

8   if one or more of these conditions occurred?

9          A.    I don't recall if February '16 was

10  when these conditions were put in place or if

11  there were other conditions put in place and

12  then these were added and that's why it says

13  February 2016.  So I'm not sure about that.

14         Q.    Okay.  Well, we may see more

15  documents that will refresh your recollection.

16         A.    Okay.

17         Q.    On page 15 there's additional

18  things listed.  A patient is from outside the

19  usual pharmacy geographic area.  What, in your

20  experience, does it mean to be inside or

21  outside the usual pharmacy geographic area?

22         A.    Well, that's very subjective.  I

23  would say in Lake County, someone coming from

24  the Youngstown area or coming from the Akron

25  area would be outside the geographic area.

Page 53

```
 1              That being said, somebody could
 2   think that Cleveland was outside of the
 3   geographic area.  It's a very subjective --
 4   subjective statement.  Depending on what part
 5   of the state you're in, I guess, geographic
 6   area could be a much larger or much smaller
 7   area.
 8         Q.   So as a subjective matter, was
 9   this left up to the professional judgment of
10   the pharmacist?
11         A.   Yes.
12         Q.   Do you recall if the Ohio Board of
13   Pharmacy ever came out and said, you know, we
14   deem X miles to be outside the normal
15   geographic area, or the usual geographic area?
16   Did they ever do that?
17         A.   I don't recall the Board ever
18   doing that.
19         Q.   Okay.  Another reason why a
20   pharmacist as of February of '16, according to
21   this document, would query OARRS would be if he
22   had reason to believe a patient had received
23   prescriptions for controlled substances from
24   more than one prescriber in the preceding three
25   months unless the prescribers were at the same
```

1    location.

2                    Do you see that?

3           A.    Yes.

4           Q.    And is that one of the reasons

5    that you know as an agent, the pharmacist is

6    supposed to check OARRS?

7           A.    Yes.

8           Q.    Okay.  Or -- and, lastly, a

9    patient is exhibiting signs of potential abuse

10   or diversion, and then it gives a list:

11   overutilization, early refills, appears overly

12   sedated or intoxicated upon presenting a

13   prescription, unfamiliar patient requesting a

14   drug by specific name.

15                  Again, is that one of the factors

16   that you know as an agent pharmacists should check

17   OARRS?

18          A.    Yes.

19          Q.    Are some of these things

20   subjective and up to the pharmacist?  I'm

21   looking at things, for example, appears overly

22   sedated.  Is that --

23          A.    Yes.

24          Q.    How do you exactly do that?

25   That's a --

Page 55

1          A.    Right, that's subjective.

2          Q.    That's subjective.  Okay.

3                Now, when a pharmacist checks

4    OARRS -- and break down the time period if you

5    need to -- can a pharmacist go in and check the

6    prescription history for a doctor, for example;

7    Dr. Smith sends in a patient, the pharmacist

8    has reason for suspicion, can the pharmacist go

9    in and say, I want to see everything

10   Dr. Smith's been up to in the last year?

11         A.    I don't believe they have that

12   ability.

13         Q.    Okay.  Is there a reason why OARRS

14   doesn't allow pharmacists to check on the

15   history -- the prescription history for

16   prescribers, or is that just something that

17   exists as a limitation in the database?

18         A.    Well, yeah, OARRS is -- you know,

19   it's written in -- it's codified, so I don't

20   know if that's something that's written in the

21   code or -- I don't know.  That's --

22         Q.    Okay.

23         A.    I don't make the OARRS access

24   decisions.

25         Q.    Okay.  Has that always been the

Page 56

1    case, that -- as far as you know, that

2    pharmacists couldn't check on prescribers'

3    prescription history in OARRS?

4              A.    As far as I know.

5              Q.    Okay.  What about prescribers,

6    can -- on pages 16 and 17 of this Exhibit 2,

7    there's an indication that prescribers must

8    also query OARRS under certain circumstances.

9              Do you see that?

10             A.    Yes.

11             Q.    Some of those circumstances

12   include before initially prescribing or

13   personally furnishing an opioid analgesic or a

14   benzodiazepine to a patient, they must request

15   patient information from OARRS for at least the

16   last 12 months?

17             A.    Correct.

18             Q.    Do you see that?

19             A.    Yes.

20             Q.    And so these are at the point of

21   actually prescribing, the doctor is supposed to

22   go into OARRS under these circumstances and

23   check the prescription history?

24             A.    Correct.

25             Q.    Okay.  Is that a diversionary

1  tool?  Is that the reason why it's in OARRS so
2  that doctors, before they write the
3  prescription, they check OARRS and have, you
4  know, at least OARRS' body of knowledge for the
5  patient's history?
6          A.   It's not only diversionary, it's
7  to protect the patient, it's to keep the
8  patient safe.
9          Q.   Okay.  And then prescribers should
10 check OARRS, including a border state's
11 information, when they're in a county bordering
12 another state?
13              Trumbull County borders
14 Pennsylvania; is that correct?
15         A.   Yes.
16         Q.   But Lake County does not?
17         A.   Correct.
18         Q.   So according to OARRS, doctors in
19 Trumbull County should check the Pennsylvania
20 PDM program; is that right?
21         A.   According to this, yes.
22         Q.   Does the OARRS system integrate
23 with the Pennsylvania PDM system or any other
24 state systems?
25         A.   You know, I'm not sure about the

1    inner workings of OARRS.  I know there's been

2    talk of a national integration, but I don't

3    know where that stands.

4           Q.    And you don't know if they -- any

5    border states that connect to OARRS?

6           A.    Not to my knowledge.

7           Q.    Okay.

8           A.    I know we've changed -- APRS

9    (phonetic) now administers -- we went from an

10   in-house administration of OARRS to a

11   third-party administration who also administers

12   other states, but I don't know who's connected

13   or who's, you know, interlocked or what.

14          Q.    All right.  Then just to finish,

15   when the doctor or prescriber must query OARRS,

16   they should also query OARRS if they're

17   treating with an opioid or a benzodiazepine for

18   more than 90 days.  That's another reason why

19   they should check OARRS before issuing the

20   prescription?

21          A.    Correct.

22          Q.    And then to check OARRS at least

23   90-day intervals thereafter, correct?

24          A.    Correct, yes.

25          Q.    And then other reasons include

1   that the patient was selling prescription

2   drugs, forging or altering prescriptions,

3   stealing or borrowing drugs, overdose, things

4   of that nature.  Is that information that's in

5   OARRS when a prescriber accesses OARRS before

6   writing a prescription?  Will he see things

7   like that if somebody has been convicted for

8   selling drugs --

9           A.   No.

10          Q.   -- or altering prescriptions?

11          A.   No.

12          Q.   Okay.  How's the doctor going to

13  know that, through news reports or --

14          A.   Sure.  Through news reports or,

15  you know, other sources, family members, you

16  know, acquaintances who may report that and,

17  you know, maybe they'll check the court

18  website.

19          Q.   Okay.  But I just wanted to know

20  if it was in OARRS or not.

21          A.   No.

22          Q.   Take a look at Exhibit 3, please,

23  Edwards Exhibit 3.  Have you ever seen this

24  document?  It's called HB 49 Testimony

25  Steven W. Schierholt, Executive Director.

Page 60

1           A.    I don't recall seeing it until I
2    saw it in this book of exhibits.
3           Q.    Do you recognize that name,
4    Mr. Schierholt, as the executive director of
5    OARRS?
6           A.    Yes.
7           Q.    The reason I included this exhibit
8    was looking for information about the size of
9    the Board and things of that nature.  And this
10   exhibit is approximately as of 2018.  It says
11   that the Board had 68 employees.  Is that about
12   right, in your recollection, or would you have
13   no reason to know?
14          A.    In my recollection at that time,
15   that sounds about right.
16          Q.    How many of those are agents or
17   specialists?
18          A.    I don't know an exact number.
19          Q.    Can you ballpark it?  Is it a
20   dozen, couple dozen?
21          A.    I would say -- well, when I got
22   hired, I think there were like about 15 or 20,
23   and I think -- I think we've more than doubled,
24   so I would say -- I would say more than a
25   couple dozen.

Page 61

1          Q.    Okay.  And is it the agents and

2     specialists that do the pharmacy inspections?

3     In other words, I'm not missing another

4     category of like inspector?

5          A.    Well, at this time in 2016, I

6     don't believe we had inspectors yet, but

7     currently we have a class of employee that is

8     called inspector.

9          Q.    And when were the inspector

10    employees added?

11         A.    It may have been around -- I don't

12    know -- five years -- four or five years ago.

13         Q.    Okay.  And why were inspectors

14    added on top of agents and specialists?

15         A.    I believe due to the -- just the

16    caseload and responsibilities of the agents.

17    Inspectors were added to alleviate some of

18    that -- some of that work.

19         Q.    How many inspectors are there now

20    with the Board?

21         A.    I believe there are -- I think

22    we're authorized to have two per area of the

23    state, so a total of eight.  But I don't know

24    that we currently have eight employed.  I think

25    there's a couple -- one or two vacancies.

Page 62

1          Q.   You said there are areas.  Does
2      the Board break down the state between
3      northeast, northwest?
4          A.   Yes.
5               (Reporter interrupted.)
6               THE WITNESS:  Sorry, Patti.
7          A.   It's the northeast, northwest,
8      southeast, and southwest are the four
9      quadrants.
10     BY MR. BARNES:
11         Q.   Okay.  And you've always been
12     assigned to the northeast quadrant, correct?
13         A.   Correct.  That being said, our
14     agents are told we are employees of the State.
15     We may be assigned to a certain area of the
16     state, but that doesn't mean we can't get
17     assigned to a case in another area.
18         Q.   Okay.  Still focusing on
19     Exhibit 3, there's a reference on page 1 to the
20     Board's duties are to enforce the drug laws.
21     We've seen this before, but what's added here
22     is the medical marijuana control program.  I
23     guess that's newer law that you guys enforce?
24         A.   Yes.
25         Q.   And right below that there's a

Page 63

1   reference to the Board regulating more than

2   45,000 pharmacists, pharmacy interns, and sites

3   where dangerous drugs are purchased and stored.

4   Does that include pharmacies and warehouse

5   distribution centers?

6           A.   Yes.

7           Q.   Have you yourself ever inspected a

8   warehouse distribution center?

9           A.   I believe I have inspected one or

10  two warehouses, entities licensed as a

11  warehouse, but not -- I don't believe I was

12  ever in a warehouse that stored drugs.  I

13  believe they were licensed as a warehouse, but

14  they had mainly devices and other products like

15  that.  I may have -- I don't recall.

16          Q.   Okay.  Is most of your experience

17  in terms of inspections the inspection of

18  pharmacies?

19          A.   Yes.

20          Q.   Okay.  This paragraph also

21  references that these site licenses include

22  retail pharmacies, wholesalers, hospitals,

23  prescriber offices, veterinary clinics, nursing

24  homes, prisons and jails, emergency medical

25  service organizations, medical gas distributors

Page 64

1    and pain management clinics.

2                    Are these sites where controlled

3    substances are stored and dispersed or

4    distributed?

5            A.    Some of them.

6            Q.    Okay.  For example, prescriber

7    offices, some prescriber offices have licenses

8    to dispense controlled substances?

9            A.    Correct.

10           Q.    And hospitals certainly, I would

11   expect, would have licenses to do the same?

12           A.    Yes.

13           Q.    Okay.  Nursing homes and prisons,

14   I guess they would have some type of license to

15   dispense?

16           A.    Correct.

17           Q.    Okay.  There's a reference here to

18   the Board, beginning in 2018, licensing 42,000

19   pharmacy technicians, as well as prescriber

20   offices that provide treatment of opioid

21   addiction using buprenorphine.  That's why I

22   didn't become a doctor.  I can't say these

23   words.

24                    So you began regulating techs --

25   pharmacy techs in 2018.  Was there an

Page 65

1    initiative that you recall to get these techs

2    under license?

3           A.   I don't recall a specific

4    initiative, but it was put into code and we did

5    license -- or register them.

6           Q.   Page 2, there's a nice history

7    here of the duties of the Board right at the

8    top.  The Board of Pharmacy is charged with

9    preventing, detecting, and investigating the

10   diversion of dangerous drugs, including

11   controlled substances.  The Board investigates

12   and presents evidence of violations of federal,

13   state drug laws by any person and refers them

14   for criminal prosecution and/or administrative

15   action.

16           Does that seem accurate to you?

17           A.   Yes.

18           Q.   Are there any other entities or

19   agencies that you can think of that have these

20   similar duties in Ohio?

21           A.   Similar, but not exact.  I would

22   say the other -- the other regulatory boards

23   that I've worked with, the medical board, the

24   dental board, the nursing board, Bureau of

25   Workers' Compensation, there are other agencies

Page 66

1    and boards who investigate these type of

2    things.  That's primarily our responsibility,

3    but sometimes other agencies get involved as

4    well.

5            Q.   I see.  Now, does the Board have

6    full law enforcement powers and other powers

7    such as the right to issue subpoenas, the right

8    to refer for criminal prosecution, things of

9    that nature?

10           A.   We have those two authorities that

11   you mentioned, but I wouldn't say we have full

12   law enforcement authority.  We don't have

13   arrest powers.

14           Q.   Okay.

15           A.   So I would consider that full law

16   enforcement authority.

17           Q.   I see.  There's a reference here

18   that the Board investigates physicians, nurses,

19   dentists, and other individuals that may not be

20   licensed by the agency.  So you actually do --

21   the Board actually does investigate these

22   individuals, physicians, nurses, and dentists?

23           A.   We do because there are instances

24   where they are employed by one of our licensed

25   sites.

Page 67

1          Q.    I see.

2          A.    So they're an employee of an

3    office, a doctor's office or, you know, other

4    entity that's licensed by us, we would

5    investigate that.

6          Q.    Down below, just to hopefully wrap

7    up our -- a little bit of our OARRS overview,

8    there's a reference to OARRS being established

9    in 2006.  It collects information on all

10   prescriptions for controlled substances that

11   are dispensed by pharmacies and personally

12   furnished by licensed prescribers in Ohio.

13   Drug wholesalers are also required to submit

14   information on all controlled substances sold

15   in the state.  The data is reported every 24

16   hours and is maintained in a secure database.

17               Is that an accurate description of

18   how OARRS functions?

19         A.    I'm not familiar with how OARRS

20   stores or requires or maintains the data.

21         Q.    I see.  But do you know that OARRS

22   does collect all prescription data, not only

23   from pharmacies, but also from prescribers?

24         A.    Yes.

25         Q.    And it also collects information

1   from drug wholesalers?

2          A.    Yes.

3          Q.    So the Board has a comprehensive

4   view of all pharmaceuticals, including

5   controlled substances, coming into the state

6   being distributed by wholesalers and being

7   dispensed by pharmacies?

8          A.    Currently.  I don't know how -- I

9   know that throughout the history of OARRS there

10  were new requirements that were placed on folks

11  like wholesalers and doctors and pharmacies,

12  but I don't recall -- I don't believe at the

13  start of OARRS we had access to all this

14  information.

15         Q.    I see.  But -- all right.  So over

16  time OARRS developed and evolved and ultimately

17  was able to get all this information into the

18  database?

19         A.    Correct.

20         Q.    Okay.  Down below it says, OARRS

21  serves multiple functions, including a patient

22  care tool.

23              How is it a patient care tool?

24         A.    I believe that means it enables a

25  doctor to do more -- get a bigger picture of

Page 69

1   the patient's history and the drugs that they

2   may have been taking.  So it enables them to

3   better care for the patient.

4           Q.   Okay.  It further references drug

5   epidemic early warning system.  How does it

6   fulfill that function?

7           A.   I can only speculate, but I think

8   what that means is that it notifies people of

9   trends or something that's happening that maybe

10  some action may need to be taken on.

11          Q.   Okay.  And then it says it's a

12  drug diversion and insurance fraud

13  investigative tool.  Is that how you view

14  OARRS, one of its functions, is to assist in

15  drug diversion and fraud investigation?

16          A.   It -- primarily drug diversion,

17  but also, yes, it tracks how medications are

18  paid for so we can assist with fraud

19  investigations as well.

20          Q.   Okay.  On page 3 of this exhibit,

21  down below at the bottom where it says,

22  Currently Board agents and specialists are

23  charged with conducting inspections as well as

24  investigations of individuals and entities in

25  violation of Ohio laws and rules, is that -- is

Page 70

1    that accurate?

2              A.    Yes.

3                    MR.  BARNES:  I'm sorry.  Clint,

4    we're in Exhibit 3, page 4.

5                    THE WITNESS:  Page 3, I believe.

6                    MR.  BARNES:  Yeah.  Page 3.

7    Sorry.

8    BY MR. BARNES:

9              Q.    Then on page 4 in the first

10   paragraph it says, Routine inspections allow

11   Board staff to review facilities to ensure they

12   comply with security, recordkeeping, and other

13   rules designed to deter and detect the

14   diversion of prescription drugs including

15   opioids.

16                   Is that an accurate description,

17   Mr. Edwards, of the purpose of routine

18   inspections conducted by the Board of Pharmacy?

19             A.    Yeah, along with the -- yeah.  I

20   mean, that's one of our functions, one of the

21   reasons we complete inspections.

22             Q.    Okay.  The paragraph immediately

23   below that references an increase in the number

24   of high-risk licensees due to the passage of SB

25   319.  These entities include 1,035 prescriber

Page 71

1    offices that purchased more than 3 million

2    doses of opioids in 2015 and clinics that

3    provide addiction treatment using controlled

4    substances.

5              What is your understanding of a

6    high-risk licensee?

7         A.   I don't know.  That's never been

8    explained to me.

9         Q.   You never heard that term as an

10   agent?

11        A.   No.

12        Q.   Is it true that prescriber

13   offices, in your experience, purchase a lot of

14   dosages of opioids on a year-to-year basis?

15        A.   No.

16             MR. CIACCIO:  Objection to form.

17   Sorry.  This is Joe Ciaccio.  Objection to form.

18   BY MR. BARNES:

19        Q.   Go ahead, Mr. Edwards.

20        A.   No.  That's not my experience.

21        Q.   Not your -- what is your

22   experience?

23        A.   Well, primarily the medications

24   are being purchased by pharmacies, not

25   prescribers.  I -- very few prescribers store

Page 72

1    controlled substances in their facilities.

2              Now, maybe -- this paragraph may

3    be referring to medication-assisted treatment

4    or, you know, opioid abuse clinics such as

5    Suboxone clinics.  If that's what it's

6    referring to, then they would be ordering more

7    medications than, say, your standard

8    prescribers.  But my experience has been that

9    prescribers don't always order controlled --

10   don't commonly order controlled substances or

11   store controlled substances in their offices.

12        Q.    Okay.  And you've never heard the

13   term high-risk licensee before seeing it here?

14        A.    No.

15        Q.    Okay.  Down below there's a

16   reference to criminal cases investigated by the

17   Board.  They're often time consuming and

18   complex.  They involve undercover visits,

19   search warrants, interviews, experts,

20   prosecutor consultations, criminal

21   adjudication, et cetera.

22              Is that your experience as an

23   agent, that these criminal cases are often

24   complex and take a long time to prosecute?

25        A.    Yes, occasionally.

Page 73

1          Q.   Down at the end of this paragraph
2     there's a reference to stopping those engaged
3     in criminal behavior who are contributing to
4     Ohio's drug overdose epidemic.
5               Is that -- does that comport with
6     your experience as an agent, that criminal
7     behavior is contributing -- or has been and is
8     contributing to the opioid overdose epidemic?
9          A.   Well, certainly any time that
10    medication is taken out of legitimate channels
11    and diverted, that would be criminal behavior.
12    So in that sense, yes, diversion is
13    contributing to the epidemic.
14         Q.   And then the next page at the
15    bottom there's a reference to expanding access
16    to OARRS.  It's a reference to physician and
17    pharmacist access to OARRS has helped to curb
18    the number of opioids prescribed by providing
19    critical information about a patient's
20    prescription history.
21              Has that been your experience as
22    an agent, that as OARRS access was expanded
23    that the number of opioid prescriptions has
24    gone down?
25         A.   Yes.

Page 74

1              Q.    How significant of a trend is

2    that?

3              A.    I don't know the specific numbers,

4    but it's -- I feel like it's fairly

5    significant.  I've seen charts and graphs on it

6    in the past, but I don't know the exact

7    numbers.

8              Q.    Okay.  At the end of that

9    paragraph there's a reference to the record

10   retention for OARRS will be extended from three

11   to five years to provide more information on

12   prescribing history.

13                   Is that what you recall that the

14   record retention time period is for OARRS now?

15             A.    I know now that it's five years,

16   yes.  I don't know when it became five years.

17             Q.    Now, Exhibit 4 we referenced

18   earlier.  This is your August 26, 2014 training

19   guide, A Guide for Law Enforcement.

20                   Do you see that?

21             A.    Yes.

22             Q.    Is this the approximate one-year

23   or more or less time period in which the Board

24   was sending out experienced agents like

25   yourself to train law enforcement people on how

Page 75

1   to use OARRS?

2           A.    I believe so.

3           Q.    Is this something that you

4   prepared personally, or did somebody prepare it

5   for you and you reviewed it and approved it?

6           A.    I worked on it with Jesse

7   Wimberly, who's one of our supervisors.  He and

8   I were tasked with conducting these trainings.

9           Q.    Okay.  So this is as of August 26

10  of '14.  If you would go to the Bates stamped

11  page ending in 26994.

12          A.    994?

13          Q.    Yes.  Actually.  I misspoke.  966.

14  Sorry about that.

15          A.    I'm excited you're skipping all

16  those.

17          Q.    Yeah.  Yeah.

18          A.    Okay.

19          Q.    Yeah.  There's a description here

20  in this training manual describing the

21  reporting requirements for OARRS.  All

22  pharmacies, prescribers who personally furnish

23  medication and wholesalers must submit

24  controlled substance dispensing data to OARRS.

25  And pharmacies and prescribers must report at

Page 76

1    least daily; wholesalers must report monthly.
2                Does that refresh your
3    recollection that as of this -- as of 2014,
4    that was the status of the requirements for
5    submitting to OARRS?
6           A.   Yes.
7           Q.   A couple pages after that, there's
8    a reference to information sharing.  OARRS may
9    provide patient dispensing data to prescribers,
10   pharmacists, law enforcement, individuals,
11   their own Rx history, and certain regulatory
12   agencies.
13               Is that how you understood OARRS
14   to work in 2014?
15          A.   Yes.
16          Q.   Overall, Mr. Edwards, is there any
17   other agency or entity in Ohio that has the
18   comprehensive information that OARRS has in
19   terms of controlled substances, i.e., every
20   prescription dispensed by pharmacists, all
21   drugs distributed by wholesalers?
22          A.   You mean data separate from OARRS?
23          Q.   Yeah.  I mean, is there a
24   competing -- does anybody else have a competing
25   or better database than OARRS does concerning

Page 77

1   the flow of controlled substances in Ohio?

2           A.   Not accessible to folks like me

3   or law enforcement that I'm aware of.  I

4   believe -- well, I don't know if this is still

5   the case, but I can recall there being some

6   sort of database that drug sales folks had

7   access to and that's how they used to decide

8   which doctors they would call on, but that was

9   not anything that I ever had access to.

10          Q.   Okay.  We've covered when doctors

11  and pharmacists must access OARRS.  Do you

12  remember that testimony a few minutes ago?

13          A.   Yes.

14          Q.   To your knowledge, has the Board

15  ever required pharmacists to access any other

16  database besides OARRS before filling a

17  prescription?

18          A.   I mean, their own database, their

19  own -- you know, part of the drug utilization

20  review is to review their own database and

21  prescription history.  Because OARRS obviously

22  is just controlled substances and gabapentin.

23  So their -- prior to issuing a prescription,

24  they should be reviewing their own history.

25          Q.   I see.  Okay.  Understood.  Does

1   the year 2011 ring a bell to you as to when

2   OARRS became mandatory as opposed to

3   discretionary?

4          A.   Possibly.  I don't -- I remember

5   2011 was when we started licensing pain

6   management clinics, but I don't recall if that

7   was the year for OARRS as well.

8          Q.   Were pain management clinics a

9   source of a lot of opioid prescriptions?

10         A.   Yes.

11         Q.   How significant --

12              MR. CIACCIO:   This is Joe Ciaccio.

13  I'm sorry.  Can I just get an objection to form to

14  the last question?  Thanks.

15  BY MR. BARNES:

16         Q.   How significant of a source were

17  the pain management clinics for opioid

18  prescriptions?

19         A.   I would say that they were the

20  primary source.

21         Q.   Okay.  And what is a pain

22  management clinic in your experience as an

23  agent?

24         A.   Currently, it's a licensed clinic

25  that provides pain management to their

Page 79

1   patients -- to over 50 percent of their

2   patients.  So if they're prescribing opiates

3   for pain management to over 50 percent of their

4   patients, they're required to be licensed by

5   the Board of Pharmacy as a pain management

6   clinic.

7          Q.   That's since about 2011, you said?

8          A.   Yes.

9          Q.   Do these opioids, in your

10  experience, do they have legitimate medical

11  usages, including, for example, pain management

12  for patients in pain?

13         A.   Yes.

14         Q.   Now, what -- in your experience,

15  what do pharmacists have access to?  And I know

16  this changed over time, but I'm trying to get

17  an understanding of when a pharmacist accesses

18  OARRS, they do that on a patient basis,

19  correct, on a specific patient basis?

20         A.   Correct.

21         Q.   And they get a patient history of

22  prescription or controlled substances for that

23  patient --

24         A.   Correct.

25         Q.   -- over I guess three to five

Page 80

1    years?

2         A.   It's -- I believe the default is

3    one year, but they can go back longer than

4    that.

5         Q.   I see.

6         A.   Two years.  I'm sorry.

7         Q.   Can a pharmacist say, I want to

8    take a look at, you know, what another pharmacy

9    is doing, the history of dispensing of the

10   pharmacy down the street?  Is that accessible

11   by the pharmacist?

12        A.   Not through OARRS.  They can call

13   the pharmacy down the street and ask them about

14   a patient.

15        Q.   Okay.  But they can't -- they

16   can't take a look at what other pharmacists or

17   pharmacies are doing in terms of dispensing

18   controlled substances?

19        A.   Not unless it's related to a

20   specific patient.

21        Q.   I see.  Okay.  So the entree for

22   pharmacists is this patient, go in and get the

23   information for this patient?

24        A.   Correct.  Give them pharmacy

25   information on that patient.  Like, for

Page 81

1   instance, tell them that that patient had gone

2   to another pharmacy, but it would not give them

3   any additional information on that pharmacy.

4        Q.   Okay.  Do pharmacies have the

5   subpoena or other law enforcement powers that

6   the Board has?

7        A.   Not to my knowledge.

8        Q.   Do pharmacies, other than

9   accessing OARRS under the conditions we

10  covered, have the duties that the Board has to

11  analyze the OARRS data for investigative leads?

12       A.   No.

13       Q.   Have you ever heard of the doctor

14  shopper reports or the 640 reports issued by

15  the Board based upon the OARRS data?

16       A.   Yes.

17       Q.   And what is the doctor shopper

18  report and what is the 640 report?

19       A.   The 640 report is a list of

20  prescribers who have, I believe, 640 unique

21  patients in a month.  And then the doctor

22  shopper report is a list of patients who have

23  seen five prescribers and been to five

24  pharmacies within three months.

25       Q.   Is this something that the Board

1  can pull out of the OARRS data for

2  investigative leads?

3          A.    Yes.

4          Q.    Are these doctor shopper reports

5  or 640 reports shared with the pharmacies?

6          A.    No.

7          Q.    Does OARRS evaluate patient data

8  and set up red flags within the OARRS system so

9  that pharmacists can see that OARRS considers

10  this patient a potential problem?

11          A.    Like you mean like a blinking

12  light or a flashing something that tells you

13  it's a red flag?  No.

14          Q.    Can -- does OARRS actually

15  evaluate any of the data and say, you know,

16  based on this data, you shouldn't fill this

17  prescription?

18          A.    No.  That's a professional

19  judgment call made by the pharmacist after

20  reviewing OARRS.

21          Q.    I see.  So OARRS provides

22  information.  It doesn't tell you what to do?

23          A.    Correct.  And OARRS is -- it's

24  just a guide.  So that information has to be

25  verified.

Page 83

1          Q.    OARRS can identify top

2     prescribers, though; is that correct?

3          A.    It's -- the information in OARRS

4     can be used by our agency and those in the

5     OARRS department to -- yes, to identify top

6     prescribers based on number of prescriptions

7     and volume of medication being prescribed.

8          Q.    As well as patients and their

9     activities, et cetera?

10         A.    Patients and the prescriptions

11    filled, yes.

12         Q.    Can it identify top areas where

13    opioids are being dispensed and the types of

14    drugs that are being dispensed?

15         A.    You mean like by ZIP Code?

16         Q.    Yeah, any other factor like that.

17         A.    Yeah, I believe so.

18         Q.    Do you know anything about the

19    statistical models used by the Board of

20    Pharmacy on the OARRS data?  And I'll -- do you

21    know Chad Garner?

22         A.    I do know Chad Garner.  Yeah, and

23    he is the one who comes up with the algorithms

24    or, as you said, statistical models, I think

25    you said.  I don't know what goes into those

1  models.

2         Q.   Okay.  I was hoping you did

3  because he testified to between 100 and 500

4  statistical models that OARRS uses for tips for

5  investigators.  But you don't know what those

6  algorithms are or --

7         A.   No.

8         Q.   -- how he figures them out; is

9  that right?

10        A.   That's correct.  I do not.

11        Q.   Okay.  Now, you mentioned earlier

12 that you got training on the Ohio Revised Code,

13 Administrative Code, and the CFR?

14        A.   Correct.

15        Q.   And are you familiar with the

16 so-called security requirement of the Ohio

17 Administrative Code that pharmacies need to

18 meet?

19        A.   I mean, I can't recite it to you,

20 but I'm aware it exists.

21        Q.   Is that the primary requirement

22 that pharmacies need to meet as far as the

23 Board is concerned in terms of having effective

24 controls against theft and diversion of

25 dangerous drugs?

Page 85

1          A.    I believe so.

2          Q.    And I don't want to make this a

3    memory game, so let's look at this Exhibit 5.

4    Do you recognize this as the Ohio

5    Administrative Code security requirement?

6          A.    Yes.

7          Q.    And is that the main requirement

8    that you know as an agent pharmacies needed to

9    meet at all times?

10         A.    Yes.

11         Q.    Is one of the purposes of your

12   inspections of pharmacies, excuse me, to make

13   sure the pharmacies were adhering to this, I'll

14   call it OAC, Ohio Administrative Code, this OAC

15   requirement?

16         A.    Yes.

17         Q.    It says -- this is OAC 4729-9-05.

18   You have to have effective and approved

19   controls and procedures to deter and detect

20   theft and diversion of dangerous drugs.

21               I just want to stop there for a

22   moment.  What does it mean to have effective

23   controls, in your experience?

24         A.    Policies in place to ensure

25   effective security control.

Page 86

```
 1          Q.   Now, did that --
 2               MR. APPEL:  This is Henry Appel.
 3    Can we take a short break?
 4               MR. BARNES:  Yeah.  Let me just
 5    finish up this line of questioning on this
 6    paragraph and then that will be a nice breaking
 7    point.  Is that okay?
 8               MR. APPEL:  Okay.  That would be
 9    fine.
10               MR. BARNES:  All right.  Thank you.
11    BY MR. BARNES:
12          Q.   Having policies and procedures,
13    was that on a case-by-case basis?  In other
14    words, it depended on the facts and
15    circumstances of each location, it wasn't a
16    one-size-fits-all, you better have this policy
17    or else you're not in compliance?
18          A.   Well, I mean, everybody is
19    expected to follow this.  The manner in which
20    they follow it would vary, I suppose, depending
21    on the type of building they're in, the type of
22    employees, and those type of things.
23          Q.   Okay.  And then it says, effective
24    and approved controls.  What are approved
25    controls?
```

Page 87

1         A.    Well, prior to being licensed,

2    there are inspections conducted of terminal

3    distributors prior to issuing a license.

4         Q.    I see.  And you have to be

5    approved based upon an inspection review of

6    your controls and procedures?

7         A.    Well, the security of the

8    building.  I'm not saying -- you don't have to

9    be approved by an inspection of the procedures

10   in place to, you know -- for all this stuff,

11   like ordering and, you know, drugs and stuff,

12   but the physical security of the facility is

13   inspected prior to issuing license.

14        Q.    I see.  Okay.  So you have to

15   undergo an inspection even before you can open

16   up?

17        A.    Correct.

18        Q.    I see.  Has the Board ever

19   provided specific guidance about what effective

20   controls are, to your knowledge?

21        A.    Not to my knowledge.  I mean, I

22   don't recall that.

23        Q.    Do you know if this Ohio security

24   requirement tracks the federal requirement in

25   the CFR?

Page 88

1          A.   I don't -- I'm not sure about

2     that.

3          Q.   Does the Board evaluate compliance

4     with the security requirement using multiple

5     factors in order to determine whether

6     substantial compliance has been met?

7          A.   What do you mean by that?

8          Q.   Well, I'm specifically referring

9     to this same security requirement code section

10    (B), substantial compliance with the standards

11    set forth in Rule 4729-9-11 of the

12    Administrative Code may be deemed sufficient by

13    the State Board of Pharmacy after evaluation of

14    the overall security system and needs of the

15    applicant, licensee, or registrant.  In

16    evaluating the overall security system of a

17    licensee, registrant, or applicant, the State

18    Board of Pharmacy may consider any of the

19    following factors as deemed relevant for

20    compliance with security requirements.  And

21    then there's a list of 14 factors.

22               Do you see that?

23          A.   Yes.

24          Q.   Is that your understanding as an

25    agent, that in terms of determining substantial

Page 89

1   compliance with the security requirement, the
2   Board will consider any number of 14 factors,
3   including the type of activity conducted, type
4   and form of dangerous drugs handled, quantity
5   of dangerous drugs handled, location of the
6   premises, type of building construction,
7   vaults, safes, adequacy of key control systems,
8   adequacy of electronic detection and alarm
9   systems, extent of unsupervised public access,
10  adequacy of supervision over authorized
11  employees having access to any areas containing
12  dangerous drugs --
13          A.   Yes.
14          Q.   -- et cetera, procedures for
15  handling business guests and visitors,
16  availability of local police, and then,
17  finally, adequacy of the licensee's,
18  registrant's, or applicant's system for
19  monitoring the receipt, manufacture,
20  distribution, and disposition of dangerous
21  drugs and its operations.
22              Does that refresh your
23  recollection that these are the factors the
24  Board takes into account for each individual
25  pharmacy when determining substantial

Page 90

1    compliance with the security requirement?

2            A.    This is the general list of

3    factors that are taken into account when we go

4    in and license.  I believe this is saying you

5    have to provide all this in order to be

6    licensed.  So this is -- this stuff is

7    evaluated prior to issuing a license.

8            Q.    And it's not about what --

9            MR. APPEL:  Bob, you said you were

10   going to wait to the end of the paragraph.  You

11   moved from (A) to (B).  Do you want to take a

12   break at this moment?

13           MR. BARNES:  I did say that, Henry,

14   and I'm sorry.  Just give me one minute.  I just

15   want to wrap up 9-05.

16           MR. APPEL:  Well, I mean, that rule

17   goes on for another two pages and you've been

18   reading it.  If I could just -- I'd like to talk

19   to my client for a minute before you go on, if

20   that's not a problem.

21           MR. BARNES:  All right.  Why don't we

22   take a ten-minute break then?

23           MR. APPEL:  Thank you.

24           THE  VIDEOGRAPHER:  Off the record

25   10:38.

1              (Off the record.)

2              THE  VIDEOGRAPHER:  We're on the

3    record at 10:49.

4    BY MR. BARNES:

5         Q.   All right.  Mr. Edwards, we're

6    back after a short break.  We were in the

7    middle of talking about the Ohio security

8    requirement in OAC 4729-9-05, and I had

9    actually read through a list of the substantial

10   compliance factors in 05 subsection (B).

11             Do you see that?

12        A.   Yes.

13        Q.   And you were explaining to me that

14   at the time to get your license, you had to

15   show the Ohio Board of Pharmacy in order to get

16   your license that you complied with the

17   security requirement; is that correct?

18        A.   Correct.

19        Q.   And this regulation allows for

20   substantial compliance based upon multiple

21   factors, correct?

22        A.   Correct.

23        Q.   A lot of these factors appear to

24   be physical, you know, in terms of location of

25   the premises and keys and vaults and alarm

Page 92

1   systems and things of that nature.  Do you

2   agree with that?

3            A.   Yes.

4            Q.   But some of them are, I would say,

5   evaluative factors like the type of activity

6   conducted.  How do you understand that term?

7   What type of activity?  If you're dealing with

8   so-called dangerous drugs --

9            A.   Well, that's --

10           Q.   -- are there levels of dangerous

11  drugs?

12           A.   I would say type of activity would

13  mean, are you -- is it a doctor's office, is it

14  a pharmacy, is it -- you know, what type of --

15  is it a veterinary clinic; like the type of

16  activity would mean what they are doing at that

17  particular site.

18           Q.   I see.  I see.  It says, type and

19  form of dangerous drugs handled is the -- I

20  guess there are schedules for dangerous drugs,

21  Schedules I through V, is that what that refers

22  to?

23           A.   Dangerous drugs are nonscheduled

24  drugs.  Those would be legend drugs.  So

25  scheduled drugs are controlled substances

Page 93

```
 1    I through V.  And then dangerous drugs are any
 2    other --
 3            Q.    Oh, okay.
 4            A.    -- drug that requires a
 5    prescription.  So the type and form -- so
 6    dangerous drugs would cover all prescription
 7    drugs including controlled substances.
 8            Q.    Oh, okay.  All right.  Yeah, I was
 9    struggling there for a minute.  I was trying to
10    remember the definition that I thought
11    dangerous drugs -- so dangerous drugs includes
12    controlled substances?
13            A.    Correct.
14            Q.    And so if a facility or an entity
15    was only distributing, say, Schedule III, IV, V
16    controlled drugs and no controlled II drugs,
17    would that be a factor taken into account by
18    the Board --
19            A.    Sure.
20                  THE REPORTER:  I didn't hear that
21    last part.  You trailed off.
22                  THE WITNESS:  Me or Mr. Barnes?
23                  THE REPORTER:  Mr. Barnes.
24                  THE WITNESS:  I said sure.
25                  THE REPORTER:  I know.
```

Page 94

1   Mr. Barnes.

2              MR. BARNES:  Oh, you didn't hear

3   that?  I'm sorry.  I'll repeat the question.

4              THE REPORTER:  You just trailed

5   off at the end.  That's all.

6              MR. BARNES:  Yeah.  I was looking

7   down.  Sorry.

8   BY MR. BARNES:

9         Q.   The question is, the type and form

10  of dangerous drugs handled, and specifically if

11  you're only handling certain lower level of

12  controlled substances, is that a factor that

13  the Board takes into account?

14        A.   Yes.  Or if it's -- if they maybe

15  are not even handling any controlled

16  substances.  It may just be, you know, a

17  specific type of drug that's being handled at

18  that location that's not a controlled

19  substance.

20        Q.   Okay.  And what about an entity

21  that's only distributing to itself as opposed

22  to distributing to third parties, is that a

23  factor that the Board takes into account?

24        A.   Like what type of entity are you

25  talking about?

1          Q.   Well, say a pharmacy that has a

2   warehouse that has controlled substances and

3   only distributes to its own affiliated

4   pharmacies.

5          A.   Sure, that would be taken into

6   account.

7          Q.   Okay.  Now, you mentioned that

8   this is something that a pharmacy has to meet

9   at the time of license, but do they have to

10  continue to meet these requirements at renewals

11  of the license?  I mean, it's not a one-time

12  thing, I met it and I can forget it?

13         A.   Correct.

14         Q.   So when the Board renews a

15  license, does it evaluate these factors again

16  and say, has anything changed, are you doing

17  what we thought you were doing, have there been

18  significant changes in your operations, things

19  of that nature?

20         A.   I don't know exactly what the

21  renewal forms state.

22         Q.   These other factors that are taken

23  into account under the regulation, one of the

24  factors, number 14, adequacy of the licensee's,

25  registrant's, or applicant's system for

Page 96

1   monitoring the receipt, manufacture,

2   distribution, and disposition of dangerous

3   drugs in its operations, is that a reference to

4   the internal controls and other systems that

5   the licensee has to handle these drugs and to

6   take them in and store them and dispense them?

7          A.    I believe so.

8          Q.    Okay.  I just want to make sure

9   I'm reading it the same way you are.  You have

10   more experience in this area than I do.  Do you

11   read it in any other way?

12          A.    No.

13          Q.    Now, this regulation references

14   specifically -- it says, The Board of Pharmacy

15   shall use the security requirements set forth

16   in Rule 4729-9-11.  And right behind these

17   pages should have been -- yeah, there it is.

18   The third page of this exhibit is 4729-9-11.

19   Have you seen this regulation, and are you

20   familiar with it?

21          A.    Yes.

22          Q.    And so the security regulation

23   refers to this other regulation.  And this

24   regulation, if you read -- if you look at

25   subsection (A), it's for a pharmacy.  There are

1    various provisions under there, but the first

2    one talks about pharmacist personal

3    supervision.  Is that something that you're

4    familiar with, that the Board takes into

5    account and requires pharmacists to personally

6    supervise the operations at a pharmacy?

7              A.   Yes.

8              Q.   And when the pharmacist can't

9    provide such personal supervision, there has to

10   be a certain level of controls -- we'll see

11   these in your inspection reports -- like

12   barricades and locks and vaults and safes and

13   things of that nature?

14             A.   Yes.

15             Q.   Is that something that you looked

16   at when you did your pharmacy inspections?

17   Were you looking at things like personal

18   supervision and adequate safeguards for when

19   the pharmacy or pharmacist could not personally

20   supervise?

21             A.   Yes.

22             Q.   Okay.  There's a provision of this

23   code on the third page -- I mean, of this

24   regulation, subsection (C).

25                  Are you with me?

Page 98

1          A.   Yes.

2          Q.   It says, a pharmacist, prescriber,

3     or responsible person for a terminal

4     distributor of dangerous drugs licensed

5     pursuant to 4729-5-11 of the Administrative

6     Code who has signed as being responsible for a

7     terminal distributor dangerous drug license is

8     responsible to monitor for suspicious orders,

9     unusual usage, or questionable disposition of

10    dangerous drugs.

11          What, in your experience, does

12    that mean?

13          A.   Mean exactly what it says.  They

14    should monitor for those things, suspicious

15    orders, unusual usage, questionable disposition

16    of dangerous drugs.  I mean, it means what it

17    says.  That's how I take it.

18          Q.   Okay.  Is that how you had it in

19    mind when you did your pharmacy inspections?

20          A.   Yes.

21          Q.   And is some or all of this part of

22    the DUR, the drug utilization review process?

23          A.   Sure, it can be.

24          Q.   Are there any other processes that

25    would encompass this section of the regulation

Page 99

1   at a pharmacy, in your experience?

2          A.   Can you expand on that?  I

3   don't --

4          Q.   Yeah.  I'm just, you know, we've

5   gone over the security requirement and this --

6   it refers to this regulation.  And this

7   subsection of the regulation speaks of

8   monitoring for suspicious orders or unusual

9   usage or questionable disposition.

10              In terms of when you went in to do

11  your pharmacy inspections, having this

12  regulation in mind, did you look for compliance

13  with this regulatory section in things like the

14  DUR, accessing OARRS, reviewing their systems,

15  and things of that nature?

16         A.   Yes.

17         Q.   Okay.  There's a new security

18  requirement that went into effect recently, 3/1

19  of '20.  I threw it in here just for reference.

20  It's 4729:5-3-14.  Are you aware of there being

21  any significant change in the security

22  requirement effective 3/1 of 2020?

23         A.   I don't know.  I have not reviewed

24  the new code.

25         Q.   Okay.  Now, the other -- the last

Page 100

 1    code section in here is 4729-9-02, Minimum
 2    Standards for a Pharmacy, and it's broken down
 3    by library, equipment, stock of drugs,
 4    prescription containers, space and fixtures,
 5    pharmacy hours and personnel, and additional
 6    minimum standards at the end.
 7               I -- we'll see later in your
 8    inspection reports there's reference to this
 9    section.  Is that something that you look for
10    as part of your inspections, compliance with
11    this code provision and, in particular, those
12    specific items that are listed here?
13         A.    Yes.
14         Q.    All right.  Have you worked with
15    any of the pharmacy defendants' loss prevention
16    departments over the years?
17         A.    I believe I've worked with all of
18    them.
19         Q.    Have you worked with Giant Eagle's
20    loss prevention department, pharmacy --
21               THE WITNESS:  I'm sorry.  There's
22    some background noise.  I don't know -- it
23    sounds like somebody's got a radio in the
24    background or something.
25               MR. BARNES:  Yeah, can everybody

Page 101

1   put on mute who's not talking, please?

2                THE REPORTER:  It just got louder.

3                MR. THOMAS:  I muted the person in

4   question.

5                MR. BARNES:  Thank you.  Can you send

6   them a scolding warning?

7   BY MR. BARNES:

8        Q.   You said you've worked with all of

9   the pharmacy defendants' loss prevention

10  departments?

11       A.   I believe so.  CVS, Walgreens,

12  Walmart, Rite-Aid, and Giant Eagle; is that

13  the --

14       Q.   Yes, yes.  And have these loss

15  prevention departments assisted you in your

16  investigations and the Board's investigations

17  from time to time?

18       A.   Yes.

19       Q.   Have they provided information to

20  you concerning any -- the person under

21  investigation such as doctors and patients and

22  whoever you might be investigating?

23       A.   Yes.

24       Q.   Do you know Rick Shaheen at Giant

25  Eagle?

Page 102

1              A.    I do.

2              Q.    Have you worked personally with

3    Mr. Shaheen over the years in investigations

4    involving pharmaceutical diversion?

5              A.    Yes.

6              Q.    Did you find Mr. Shaheen to be a

7    competent and diligent pharmacy loss prevention

8    person?

9              A.    Yes.

10              Q.    Was there ever a time that

11   Mr. Shaheen refused to cooperate with you or

12   the Board with respect to any investigation?

13              A.    No.

14              Q.    What about the other pharmacy

15   defendants, do you have similar views of their

16   pharmacy loss prevention departments?

17              A.    Yes.

18              Q.    Is it a good control to have a

19   pharmacy loss prevention department?

20              A.    I think so.

21              Q.    Do all pharmacies, in your

22   experience, have pharmacy loss prevention

23   personnel?

24              A.    No.

25              Q.    For example, independent

Page 103

1   pharmacies, have you ever seen an independent
2   pharmacy have specific personnel assigned to
3   diversion, anti-diversion efforts?
4           A.   No.
5           Q.   Did Mr. Shaheen over the years
6   refer matters to you or call you from time to
7   time to report matters going on at Giant Eagle
8   Pharmacies?
9           A.   Yes.
10          Q.   And did you find him to be
11  informative and wanting to work with the Board
12  to stop diversion?
13          A.   Yes.
14          Q.   Did you ever advise Mr. Shaheen
15  with Giant Eagle generally -- you or the Board,
16  did you ever advise either of them that Giant
17  Eagle's loss prevention department needed to do
18  more or wasn't doing what it was supposed to be
19  doing?
20          A.   I don't recall that.
21          Q.   How about the other pharmacy
22  defendants, same question?
23          A.   Not -- personally, no, I did not
24  do that.  I don't know -- I can't speak for
25  other agents from our agency.

1          Q.    Now, you referenced earlier the

2    licensing requirements of the Board, and I was

3    interested in that topic myself getting ready

4    for your deposition, so I took a look at the

5    different types of licenses that the Board

6    issues.  One type of license is a terminal

7    distributor license.  That's basically a

8    pharmacy license?

9          A.    It's -- can be a pharmacy.  It's

10   also a doctor's office.  There's a number of

11   different entities that can be terminal

12   distributors.

13         Q.    Okay.  Okay.  And do they have to

14   go through an application process and do they

15   have to be vetted, do they have to show their

16   qualifications, things of that nature, in order

17   to get a license?

18         A.    Yes.

19         Q.    And Exhibit 6 in your book shows

20   Ohio Revised Code 4729.54, Terminal Distributor

21   Licenses.  Are you familiar with this code

22   provision and the requirements to get such a

23   license?

24         A.    Yes.  I mean, generally.

25         Q.    Okay.  So you can't operate as a

1   pharmacy or even a doctor's office distributing

2   controlled substances without going through the

3   Board licensing process, correct?

4           A.    Correct.

5           Q.    And you have to get that license

6   renewed from time to time and show continued

7   adherence to the Board's requirements; is that

8   right?

9           A.    Yes.

10          Q.    What -- Mr. Edwards, what are some

11  of the requirements that you can think of that

12  you, as an agent, saw and enforced when

13  individuals or entities were applying for a

14  pharmacy license?  What are the main

15  requirements in your mind?

16          A.    Well, the main requirements

17  initially prior to issuing the license, as an

18  agent, I would go out and conduct what we

19  called a barricade inspection.

20          Q.    Okay.

21          A.    Ensure that there was physical

22  security of the location and that it couldn't

23  be accessed by nonpharmacy employees at times

24  when the pharmacy staff was not there.

25          Q.    Okay.  So the barricade.  Did you

Page 106

1   look for anything else before the Board issued

2   the license?  Was it just the barricade, or

3   were you looking at anything else?

4           A.   There were other things like the

5   physical structure, you know, location, that

6   type of thing.

7           Q.   Okay.  Did you make sure that the

8   pharmacists to be employed were adequately

9   trained and licensed?

10          A.   We did not do that as agents.

11  Like prior to issuing a license, we were just

12  making sure that the -- if you're talking about

13  licenses for pharmacies -- is that what you're

14  talking about?

15          Q.   Yes.  Yes.

16          A.   Okay.  So, no, we wouldn't --

17  oftentimes, when they were opening a new store,

18  for instance, they didn't know who the staff

19  was going to be, so that was not something that

20  we would necessarily do.

21          Q.   Somebody else managed that in

22  terms of licensing the pharmacists; that, I

23  guess, would be the pharmacy licensing

24  personnel?

25          A.   Well, yeah.  They ensure that the

                                        Page 107

1    pharmacists are properly licensed.

2              Q.    Okay.   That's another part of the

3    Board, though, not necessarily inspection

4    agents?

5              A.    Yes.   Licensing is a whole

6    separate department.

7              Q.    I see.   Okay.   And these -- in

8    Exhibit 6, besides Ohio Revised Code 4729.54,

9    there seem to be other provisions.   .55 has the

10   licensing requirements.   Are you familiar with

11   that code provision requiring, you know, proper

12   land, buildings, and equipment, licensed

13   pharmacists, adequate safeguards to prevent the

14   sale or other distribution of dangerous drugs

15   by any person other than a pharmacist or

16   licensed healthcare professional, adequate

17   safeguards that allows the pharmacist and

18   interns to practice in a safe and effective

19   manner?   This is all part of the licensing

20   division's responsibilities and not you, as an

21   agent?

22             A.    No.   It's -- for instance, I mean,

23   I would have to review it and say it's a shared

24   responsibility to ensure that these

25   requirements are met.

Page 108

1          Q.   I see.  So when you went out on an

2    inspection, did you have these requirements in

3    mind to make sure that the pharmacy was

4    complying with its license requirements?

5          A.   Generally, yes.

6          Q.   Okay.  And the other code

7    provisions I attached here, 4729.551

8    essentially requiring the licensing of all

9    retail sellers, and then 4729.57, disciplinary

10   actions, did the Board retain the authority to

11   discipline pharmacies for violating any of its

12   rules or regulations?

13         A.   Yes.

14         Q.   And when you went out on your

15   inspections, were you specifically looking for

16   violations that might require disciplinary

17   action against the pharmacies?

18         A.   We weren't specifically looking

19   for it, but if we found it, we would take

20   action.

21         Q.   And --

22              MR. THOMAS:  Mr. Barnes, I'm

23   sorry.  What page is this on?

24              MR. BARNES:  This would have been --

25   it's near the end of Exhibit 6.  Page 11.

1              MR. THOMAS:  Okay.  Thank you.

2              MR. BARNES:  It says 4729.57 at

3    the top.

4    BY MR. BARNES:

5         Q.   And in your experience after doing

6    inspections, did you take action against

7    pharmacies for failing to comply with its

8    license requirements?

9         A.   Occasionally.

10        Q.   Okay.  And 4729, the next two

11   pages later, is renewals.  Did you understand

12   that pharmacies had to go through a renewal

13   process and prove that they were still in

14   compliance with all Board regulations?

15        A.   I mean, they had to go through a

16   renewal process.  I don't know that they

17   necessarily had to prove anything at that time

18   other than filling out their required

19   paperwork.

20        Q.   I see.  But between the time that

21   they get their original license and renew, they

22   are normally inspected by Board agents; is that

23   correct?

24        A.   Yes.  I mean, it varies from store

25   to store, but inspections occur on a routine

Page 110

1    and also nonroutine basis.

2         Q.    Does it mean anything in Ohio to

3    be licensed as a pharmacist?  Is it a

4    significant thing to go through the licensing

5    process and get your license?

6         A.    Sure.

7         Q.    Now, we know that the pharmacists

8    who work in the pharmacy have to go through

9    certain licensing requirements and I gather

10   various Revised Code and OAC sections governing

11   the licensing of pharmacies.  Do you recognize

12   these code sections, including the pharmacist

13   examination and qualifications requirements and

14   all the rules and renewal -- license renewal

15   things that they have to meet?

16        A.    I recognize them.  I wouldn't say

17   I'm familiar with all the substance, but I do

18   recognize them.

19        Q.    I know from looking at your

20   inspection reports that the very first item

21   that is listed is something -- you know, are

22   all licenses properly displayed?  Do you recall

23   that as part of your inspections?

24        A.    Yes.

25        Q.    You -- the Board wants every

Page 111

1   pharmacy to show its license as well as the

2   pharmacists' licenses?

3          A.   Yes.  I don't believe that's still

4   a requirement, but it had been.

5          Q.   Okay.  Now, did you understand as

6   an agent that the practice of pharmacy is a

7   profession?

8          A.   Yes.

9          Q.   And are you familiar with the code

10  sections that specifically define what the

11  practice of pharmacy is and what pharmacist

12  care is?  Are you familiar, for example, with

13  Exhibit 8, the code sections 4729.01?

14         A.   Yes.

15         Q.   There's a definition of the

16  practice of pharmacy.  It means providing

17  pharmacist care requiring specialized

18  knowledge, judgment, and skill derived from the

19  principles of biological, chemical, behavioral,

20  social, pharmaceutical, and clinical sciences.

21  As used in this section, pharmacist care

22  includes the following:  interpreting

23  prescriptions, dispensing drugs and drug

24  therapy-related devices, compounding drugs,

25  counseling individuals, performing drug regimen

1    reviews, performing drug utilization reviews,

2    et cetera.

3                Is that how you understood, when you

4    were inspecting pharmacies, that that's what is

5    meant to practice pharmacy?

6          A.    Yes.

7          Q.    Did your inspections involve

8    looking into how pharmacists were exercising

9    their professional judgment in any way?

10         A.    Occasionally.

11         Q.    How so?  Can you describe that?

12         A.    I mean, they -- we always

13   instructed them to use their professional

14   judgment when deciding whether or not to fill a

15   prescription or not fill a prescription.

16         Q.    Okay.  So that was something that

17   came up in the inspections from time to time?

18         A.    Not -- maybe from time to time or

19   just, generally speaking, when we receive a

20   question or, you know, get a phone call from a

21   pharmacist.

22         Q.    Okay.  And part of this definition

23   of practice of pharmacy includes interpreting

24   prescriptions.  What did you understand that to

25   mean when you were doing your pharmacy

Page 113

1    inspections?

2              A.    Reading the prescription,

3    interpreting what it means and what it says.

4              Q.    There's actually a definition of

5    that term.  It's right behind this first code

6    section 4729-5-01(D).  It says -- it's about

7    four pages behind.

8                    Are you with me?

9              A.    Yep.

10             Q.    It says, Interpret prescriptions

11   means the professional judgment of a pharmacist

12   when reviewing a prescription order of a

13   prescriber for a patient.

14                  Is that how you understood the

15   term to mean, when they were interpreting

16   prescriptions, that there was a component of

17   professional judgment in there?

18             A.    Yes.

19             Q.    Now, pharmacists are not licensed

20   to prescribe drugs, correct?

21             A.    Well, they are -- generally

22   speaking, no; however, there is a provision in

23   place now where they can prescribe with a

24   collaborating physician.

25             Q.    When did that go into place?

1          A.    Recently.  I believe within the

2     last two years.

3          Q.    And can they prescribe -- they

4     have to prescribe with a collaborating

5     physician, you said?

6          A.    Correct.

7          Q.    Do pharmacists have continuing

8     education requirements?

9          A.    Yes.

10         Q.    Does the Board licensing division

11    make sure that they comply with those

12    continuing education requirements?

13         A.    Yes.

14         Q.    Are the pharmacists authorized by

15    the Board or any other body, to your knowledge,

16    to practice medicine?

17         A.    No, unless they're under that

18    collaborating physician.

19         Q.    Can you tell me, is there a code

20    section for that collaborating physician?

21         A.    I don't -- I don't know it off the

22    top of my head.

23         Q.    Okay.  Now, Mr. Edwards, you're

24    familiar with the code sections that deal with

25    how, from the Board's perspective, pharmacists

Page 115

1   are to process a prescription; there are

2   specific code sections for that?

3          A.   Yes.

4          Q.   And I'll refer you to Exhibit 10.

5   Is this the OAC provision that governs how

6   pharmacists are supposed to process

7   prescriptions?

8          A.   Yes.

9          Q.   And are you familiar with this and

10  were you familiar with this provision when

11  doing your inspections?

12         A.   Yes.

13         Q.   Now, there are specific steps here

14  under section (B).  A pharmacist when

15  dispensing a prescription must, and then

16  there's five items.  Number 1, Ensure that the

17  patient information is profiled pursuant to

18  4729.5-18.  Number 2, Perform prospective drug

19  utilization review pursuant to Rule 4729-5-20.

20  Number 3, Ensure that the drug is labeled

21  pursuant to Rule 4729-5-16.  Number 4, Ensure

22  that a patient is given an offer to counsel

23  pursuant to 4729-5-22.  And then, finally, the

24  fifth step is, Ensure that a prescription is

25  filed pursuant to Rule 4729-5-09.

1           Are those the steps that, in your

2    understanding, Ohio Board of Pharmacy lays out for

3    the pharmacist when dispensing a prescription?

4    These are the five specific steps?

5           A.   Yes.

6           Q.   Are you aware of any other

7    requirements that a pharmacist must follow

8    according to the Board other than these five

9    steps?

10          A.   Not off the top of my head.

11          Q.   What is a -- I'll take it a step

12   at a time.  What does it mean for the patient

13   to be profiled?  Patient information is

14   profiled?

15          A.   They create a record of the

16   patient and the prescription.

17          Q.   Each pharmacy does for each

18   patient?

19          A.   Yes, for each prescription, each

20   patient.

21          Q.   So step one is access that

22   information?

23          A.   Correct.

24          Q.   And step two is perform

25   prospective drug utilization review.  Let's

Page 117

1   shorthand that DUR so we don't have to keep

2   saying it.

3           A.    Right.

4           Q.    Perform a DUR.  What does it mean

5   to perform a DUR?

6           A.    That's to ensure that, you know,

7   there's not duplicate therapy or

8   overutilization or -- it's basically steps they

9   take to check to make sure the patient should

10  get that prescription and it's okay to fill it.

11          Q.    Okay.  And is that, in your

12  experience, normally part of the pharmacy's

13  software system when filling a prescription?

14          A.    Yes.  If there's a DUR warning, it

15  will pop up on their screen typically.

16          Q.    All right.  And the Board expects

17  pharmacists to check the DUR warning if it

18  comes up?

19          A.    Correct.

20          Q.    Okay.  Number -- the step three

21  is, ensure the drug is labeled.  And what does

22  that mean?

23          A.    That there's a label on the

24  medication vial stating what it is, what's in

25  it, expiration date, those types of things.

1          Q.    And that's something you look at

2     in your inspections, correct?  You check to see

3     if prescriptions were getting properly labeled

4     before dispensing?

5          A.    Sure.

6          Q.    And the DUR review, did you also

7     check for DUR reviews in your inspections?

8          A.    Occasionally, yes.

9          Q.    Okay.  And patient profiling, is

10    that also something you checked for in your

11    inspections?

12         A.    Yes.

13         Q.    All right.  The fourth step is the

14    offer to counsel.  I saw reference in some of

15    your inspection reports to checking the

16    counseling logs.

17         A.    Yes.

18         Q.    Is that seeking to determine

19    compliance with this provision?

20         A.    Yes, it is.  Yes.

21         Q.    All right.  And then the fifth

22    step is ensuring the prescription is filed.

23    Does that -- is that a recordkeeping function

24    to make sure that you can go back to the

25    prescription and take a look at it --

```
1            A.   Yes.

2            Q.   -- for whatever reason?

3            A.   Correct.

4            Q.   Is that something you checked for

5   in your inspections?

6            A.   Yes.

7            Q.   Now, each of these five steps

8   refers to another provision.  And I attached

9   them right behind code section 5-21.  The first

10  one is 5-18.  That's the patient profile.  And

11  the Board requires, according to this

12  regulation, that the pharmacy have patient --

13  certain amount of patient information in its

14  profiles, correct?

15           A.   Correct.

16           Q.   And in your inspections, would you

17  check to make sure that the pharmacy's patient

18  profile met this requirement?

19           A.   Yes.

20           Q.   And then the next code section is

21  5-20.  This is the prospective DUR.  We talked

22  about that before.  You gave me some of this

23  information.  Overutilization,

24  underutilization, therapeutic duplication, et

25  cetera.  Is that an important part of what the
```

1   Board wanted the pharmacies -- or pharmacists

2   to do before dispensing?

3          A.   Yes.

4          Q.   And then the next provision, 5-16,

5   is the labeling.  This appears to impose

6   specific labeling requirements on each

7   prescription, including name and address of the

8   pharmacy, full name of the patient, full name

9   of the prescriber, directions for use.  Is that

10  something that you checked for in your

11  inspections?

12         A.   Yes.

13         Q.   And then, finally, 5-22 is the

14  patient counseling.  We talked about that

15  already.  You told me you checked for that.

16              And then 5-09 appears to be a -- the

17  prescription filing requirement setting forth

18  specific ways in which prescriptions for certain

19  controlled substances had to be filed, including

20  control IIs had to be in a separate file,

21  correct?

22         A.   Correct.

23         Q.   When you went in for your

24  inspections, would you ask for the control II

25  file to make sure they were complying with this

Page 121

1  type of thing?

2          A.    Yes.

3          Q.    Now, we know from having discussed

4  OARRS already that there's also a check OARRS

5  requirement that evolved over time, right?

6          A.    Correct.

7          Q.    So in addition to these five

8  steps, there's also a separate provision saying

9  check OARRS when certain conditions are met,

10 correct?

11         A.    Correct.

12         Q.    Now, is there anything else from

13 the Board's perspective that a pharmacist was

14 required to do besides these five steps and

15 checking OARRS that you can think of based on

16 your experience as an agent?

17         A.    Not off the top of my head.

18         Q.    Okay.  Did the Board ever provide

19 any specific instructions to pharmacies beyond

20 this regulatory section that said, we want you

21 to do more than what's in this regulation for

22 whatever reason?  Can you think of anything

23 that the Board ever said or issued the

24 pharmacists saying, do more than what's in 5-21

25 and checking OARRS?  Can you think of anything?

Page 122

1          A.   Maybe like a newsletter or

2     guidance document or something like that,

3     maybe.

4          Q.   Okay.  Go back to 5-20, the

5     prospective DUR.  This section, we touched on

6     it, but I forgot to go over (B) and (C) and

7     (D).  I think -- this is the DUR stuff.  But

8     subparagraph (B) talks about pharmacists using

9     professional judgment shall take appropriate

10    steps to avoid or resolve a potential -- the

11    potential problem.  And then the preface to

12    that is upon identifying any issue listed in

13    paragraph (A).  These steps may include

14    requesting and reviewing an OARRS report or

15    other state's report pursuant to subparagraph

16    (D) and/or consulting with the prescriber

17    and/or counseling the patient.

18               Is that how you understood the

19    DUR, to not only be -- consider the factors in

20    (A), but if you spot an issue, use your

21    professional judgment, which may involve

22    checking OARRS and talking to the doctor?

23         A.   Yes.

24         Q.   Okay.  Is there any requirement in

25    (A) or (B), specifically (B), that requires the

1  pharmacist to record everything he or she does

2  if he follows up -- he or she follows up on any

3  of the information in (A)?  In other words, is

4  there anything here that says, and if you do

5  call the doctor, it must be in writing and it

6  must be kept, you know, for a certain period of

7  time?

8           A.   I don't see that in here.

9           Q.   Are you aware of any requirement

10  by the Board that required pharmacists to

11  document or retain things that the pharmacist

12  was doing in the exercise of their professional

13  judgment as part of their DUR?

14           A.   Well, I mean, it's part of the

15  recordkeeping, I guess.  I always tell people,

16  if you don't write it down, it didn't happen.

17  So it's -- I don't know if there's a specific

18  rule or law that says it has to be done, but I

19  take it to mean, if they do something, if they

20  take an action, that it should be memorialized

21  either in the patient chart or, you know, the

22  patient profile or somehow in the record or on

23  the prescription even.

24           Q.   But you seem to be referring to

25  something that's outside the regulation?

Page 124

1          A.   I don't see it -- I don't see it

2     here.  I don't know if it's in another

3     regulation or not.

4          Q.   Okay.  Subsection (D) -- I'm

5     sorry -- (C) refers to using -- as part of your

6     DUR, you use predetermined standards consistent

7     with but not limited to any of the following:

8     peer-reviewed medical literature, American

9     hospital formulary, service drug information,

10    and United States pharmacopeia drug

11    information.

12             What do you understand this provision

13    of the DUR regulation to mean?

14         A.   That they should check their

15    resources, for instance, regarding drug

16    therapies.  I mean, that's what these -- that's

17    what these publications are for.

18         Q.   All right.  So the regulation

19    actually directs the pharmacist to go to these

20    sources when doing a DUR if necessary?

21         A.   These or others.

22         Q.   Okay.  And then (D) of this

23    regulation --

24         A.   Yes.

25         Q.   -- section (D) says, Prior to

Page 125

1    dispensing an outpatient prescription for a

2    reported drug, pharmacist shall request and

3    review an OARRS report covering a one-year time

4    limit in the following circumstances, which I

5    think we've already covered.

6              Do you see that there's the same

7    steps we previously talked about, it's a new

8    drug, no report in the last 12 months,

9    prescriber located outside usual pharmacy

10   geographic area, patient is outside the -- the

11   patient is from outside the usual geographic

12   area, et cetera; we've covered these before?

13        A.   Yes.

14        Q.   So this is the actual regulation

15   that imposes those requirements?

16        A.   Correct.

17        Q.   Now, this regulation, as I think

18   we've talked about before, the actual

19   regulation doesn't talk about any specific

20   geographic area, correct?  It doesn't limit it,

21   it doesn't say use X number of miles, and

22   that's because it's a subjective fact-specific

23   situation for each pharmacy, correct?

24        A.   Correct.

25        Q.   All right.  And then, similarly,

1    when it says check OARRS when you have reason

2    to believe that the patient has received

3    prescriptions for reported drugs for more than

4    one prescriber in the preceding three months

5    unless the prescriptions are from prescribers

6    who practice in the same location -- physical

7    location, that's -- that's a requirement that

8    the Board imposes, but that's a subjective

9    thing, also, correct?

10          A.    Well, I don't think it's

11   subjective because it's saying if they have

12   reason to believe that they obtained

13   prescriptions from someone else.  So if -- I

14   take that to mean, if they come upon this

15   knowledge, that they will check it.

16          Q.    I see.  Because I guess I'm

17   thinking about that type of information is in

18   OARRS, but this is a listing of when you should

19   go check OARRS.  So is it your understanding

20   that if they -- if from outside OARRS they

21   obtain this kind of information, they should

22   check OARRS?

23          A.    Correct.  Like if the patient

24   says, I used to see Dr. So-and-so and get

25   whatever drug, but now I'm getting this, then

Page 127

1    that would fall under that category.

2         Q.    Okay.   And then the last one -- I

3    think it's the last one -- we've seen this

4    before.   Patient is exhibiting signs of

5    potential abuse or diversion.   And we've talked

6    about that, that's the subjective one, kind of

7    depends upon professional judgment at the time

8    of dispensing?

9         A.    Yes.   Some of those factors could

10   be subjective, professional judgment, and then

11   some could be overt observations.

12        Q.    Has the Board ever issued to

13   pharmacies or pharmacists formulas or

14   algorithms that say, you know, do not dispense

15   if this formula's met or cut a patient off

16   under these circumstances?   Has that ever

17   happened, in your experience?

18        A.    Not to my knowledge.

19        Q.    And why is that?   What's your

20   understanding of why that would be?

21        A.    Well, each incident is unique and

22   there are different factors involved in each

23   patient and each prescription and each

24   interaction at the pharmacy, and different

25   factors should be taken into account.   So I

Page 128

1    don't think one in and of itself would be, you

2    know, reason to issue an edict like that.

3              Q.    In order to determine whether or

4    not a prescription was legitimate, would you

5    need to know what the prescriber's purpose and

6    intent was behind the prescription?

7                    MR. CIACCIO:  Objection to form.

8              A.    Can you rephrase that?

9    BY MR. BARNES:

10             Q.    Sure.  In order to determine

11   whether a prescription is legitimate at the

12   point of dispensing, would you need to know

13   more than what is shown on the prescription

14   itself as well as what's in OARRS or the DUR

15   process; in other words, is there missing

16   information?  If somebody says is this a

17   legitimate prescription, the information you

18   critically need would be from the doctor, what

19   did the doctor -- why did they issue the

20   prescription, for what purpose after performing

21   what examinations, et cetera?  That's my

22   question.

23                   MR. CIACCIO:  Same objection to form.

24             A.    Well, I think -- can you define

25   legitimate prescription for me?

Page 129

1   BY MR. BARNES:

2          Q.   Sure.   Whether or not a

3   prescription is valid, i.e., was properly

4   prescribed by a physician for a medical purpose

5   based upon a medical diagnosis.

6          A.   I guess --

7          Q.   In order --

8          A.   I guess the best way for me to

9   answer that is to say, there are times after a

10  prescription is filled that it can be

11  determined, you know, there's more -- I guess

12  I'm not -- I'm not really sure how to answer

13  that because, I mean, when a prescription is

14  presented and a pharmacist goes through all

15  these, you know, DUR requirements, are you --

16  are you asking what if there's other

17  information they're missing?  I mean --

18         Q.   Well, let me break it down for

19  you.  What I have in mind is the testimony of

20  Chad Garner when he was talking about OARRS.

21         A.   Okay.

22         Q.   He told us that OARRS does not

23  evaluate patient data and red flag certain

24  patients because, even today, we would not have

25  all of the history that a healthcare

Page 130

1    professional would have about their case to

2    know, you know, what other diagnosis the

3    patients may have, what other circumstances

4    there may be.  We are really dealing just with

5    a list of prescriptions, which is not the

6    entire picture.

7              So my first question is, do you agree

8    with that position with respect to the data that's

9    in the OARRS database, that you can't -- you can't

10   tell whether or not --

11         A.    Right.

12         Q.    It's just data, right?

13         A.    It's -- right.  It's a piece of

14   the puzzle.  It's not -- just like the

15   prescription is a piece of the puzzle and the

16   patient's chart is a piece of the puzzle.  And

17   nobody has access to all those -- all of that

18   data at any, you know, one time.

19              So like a pharmacist filling a

20   prescription that they believe -- they do their

21   professional judgment and they believe it meets

22   all these parameters set forth still would not

23   have access to the patient chart or to the

24   patient's medical history.  They may have

25   access to the prescription history, but they

Page 131

1  don't have access to their medical chart and
2  that sort of history.
3        Q.   So -- okay.  I didn't mean to cut
4  you off.
5        A.   No, that's okay.  So I guess it's
6  a very complex question.  So that's why I guess
7  I'm not really sure how to answer it.  For
8  instance, if the patient brings in a
9  prescription that interacts with some medical
10  condition they have and that doctor didn't know
11  it because the patient didn't tell them and the
12  pharmacy didn't know it, well, that
13  prescription is still legitimate even though,
14  with all the information, it would be
15  contraindicated and should not have been
16  prescribed.
17        Q.   Right.  So my follow-up question
18  is, if it later -- if later there's an inquiry
19  made as to legitimacy of a prescription, in
20  order to get the complete picture, you can't
21  just go back to the pharmacy and say, show me
22  this prescription, you would need to backtrack
23  and go back to the medical provider, the
24  prescriber, and say, why did you issue this,
25  for what purpose, what condition, et cetera?

Page 132

1              MR. CIACCIO:  Objection.

2        A.    Correct.

3  BY MR. BARNES:

4        Q.    Okay.  Mr. Edwards, you performed

5  a lot of inspections over your career so far

6  with the Board of Pharmacy; am I correct?

7        A.    Yes.

8        Q.    Approximately how many inspections

9  would you say that you've performed?

10       A.    Well, hundreds, if not thousands;

11  much less in the last three years since I've

12  been working on the intervention program, but

13  prior to that, from 2008 till 2018, so for ten

14  years I was doing probably 50 or so inspections

15  a year.

16       Q.    50 a year for about nine or ten

17  years?

18       A.    Correct.  Approximately.  And

19  maybe more.

20       Q.    Let's just call it hundreds.  How

21  about that?  Hundreds?

22       A.    Okay.

23       Q.    Well, we know that you've

24  inspected Giant Eagle Pharmacies.  If you look

25  at Exhibit 14.  The Board produced to us

Page 133

1    inspection reports for all pharmacies in Lake

2    and Trumbull County.

3            A.    Uh-huh.

4            Q.    And this is a spreadsheet that

5    I've had prepared.  I wanted to know who did

6    what inspections in which counties, and you're

7    listed the number one -- on that line one, row

8    one as having performed 23 inspections of Giant

9    Eagle Pharmacies in Lake County and three in

10   Trumbull County.

11           Does that seem accurate to you?

12           A.    Sure.

13           Q.    And then Mr. Pavlich is listed as

14   performing none in Lake County and 21 in

15   Trumbull County.  And I think you told me

16   earlier, because he was assigned more to that

17   geographic region than you?

18           A.    Correct.  Correct.

19           Q.    All right.  And you can see that

20   the Board produced 93 inspections -- this is

21   just of Giant Eagle Pharmacies -- in the time

22   period, which is 2006 to 2019.  So almost 100

23   times Giant Eagle Pharmacies were inspected by

24   the Board, 26 of which were you, 21 of which

25   were Mr. Pavlich, and then others.  Is that, in

                                        Page 134

1    your experience, the approximate amount of

2    frequency that a chain pharmacy in these areas

3    was inspected in this time period?

4            A.    I couldn't say.  There's -- each

5    chain has a different number of pharmacies, you

6    know, some more than others.  So I couldn't

7    answer that.

8            Q.    Okay.  Were pharmacies -- how were

9    they selected for inspection and for what time

10   periods?  Were these like cyclical inspections,

11   you try to get out there every year, every 18

12   months, every two years?

13           A.    Yes.  I would say initially, when

14   I was first hired, I was doing inspections at

15   all my sites every year.  And then additional

16   ones if there were issues, you know, if there

17   was an error at the pharmacy or if there was a

18   criminal investigation at the pharmacy, an

19   additional inspection may also take place.

20           Q.    Okay.  And so they began

21   approximately every year.  Did they -- for the

22   routine inspections, did they get longer over

23   time, like 18 months, two years?

24           A.    It just varied.  I mean, it varied

25   based on caseload and, you know, the agent's

Page 135

1    geographic area.  Some agents had bigger areas

2    and couldn't get to as many sites as -- you

3    know, as other agents.

4           Q.    Now, I saw from your inspection

5    reports -- and if it helps you, you can flip to

6    Exhibit 15.  Exhibit 15 is a compilation of all

7    of the inspection reports prepared by you for

8    Giant Eagle Pharmacies in Lake and Trumbull

9    Counties.

10          A.    Okay.

11          Q.    And off to the left of these

12   inspection reports down at the bottom, when I

13   first read those, the Fs and the Ps, I was

14   reading those as --

15          A.    Pass or fail.

16          Q.    -- pass or fail.  And then that

17   was clarified for me later that that actually

18   means full inspection versus partial

19   inspection?

20          A.    Correct.

21          Q.    Okay.  I was glad to learn that.

22                So what determined a full inspection

23   versus partial?

24          A.    That was kind of a subjective

25   measure.  A full inspection would mean we would

Page 136

1    go over the majority of items on that left side

2    that are listed there.  A partial -- generally

3    speaking, a partial would be where you go in

4    and you're just doing a barricade inspection or

5    you're just --

6         Q.    I see.

7         A.    -- you know, getting a

8    prescription and, therefore, you know, you're

9    only looking at a few of the items on that

10   list.

11        Q.    All right.  Before we dive in, I

12   wanted to look at the regulatory background of

13   these inspections beginning with Exhibit 11.

14   Why don't you take a look at 11?  Do you

15   recognize this as the OAC section authorizing

16   the Board to conduct onsite inspections --

17   unannounced onsite inspections of all

18   licensees?

19        A.    Yes.

20        Q.    And so that was a right that the

21   Board had as a condition of getting and

22   renewing your license?

23        A.    Correct.

24        Q.    And were the majority of your

25   inspections, were they unannounced; in other

```
                                    Page 137
 1   words, you didn't call the pharmacy and say,
 2   I'm going to be there a week from Tuesday, get
 3   ready?
 4           A.    Correct.
 5           Q.    And is there --
 6                 MR. THOMAS:  Mr. Barnes, I'm
 7   sorry.  What's the Bates number on this page?
 8                 MR. BARNES:  It's Exhibit 11.
 9                 MR. THOMAS:  That's why I don't
10   see it.
11                 MR. BARNES:  Yeah.  Sorry.
12   BY MR. BARNES:
13           Q.    This code section says, Pursuant
14   to section 3719.13 of the Revised Code, an
15   entity licensed by the State Board of Pharmacy
16   as a terminal distributor of dangerous drugs is
17   subject to an onsite inspection by the Board.
18   An authorized Board agent may, without notice,
19   carry out an onsite inspection or investigation
20   of an entity licensed by the Board.  Upon
21   verification of the Board agent's credentials,
22   the agent shall be permitted to enter the
23   licensed entity.
24                 Now, that's your regulatory
25   authority, correct, to show up unannounced at
```

1   pharmacies and say, I'm doing an inspection,

2   correct?

3           A.   Yes.

4           Q.   And do you recall doing

5   inspections of pharmacy defendants' stores?

6           A.   Yes.

7           Q.   And do you recall presenting your

8   credentials to the pharmacists and saying, I'm

9   here to do an inspection?

10          A.   Yes.

11          Q.   And with respect to the pharmacy

12  defendants, were they cooperative and allowed

13  you to do your inspections?

14          A.   Yes.

15          Q.   When you did an inspection, were

16  you allowed access by the pharmacy defendants

17  to any and all records that you wished to see

18  in the pharmacies?

19          A.   Yes.  Any and all that they had in

20  the pharmacies, and if there were records

21  outside the pharmacy, I could request that.

22          Q.   And when you performed your

23  inspections, at least after OARRS was created,

24  the Board had within its body of knowledge all

25  of the prescriptions filled by that pharmacy

Page 139

1   for any period of time leading up to the

2   inspection; is that correct?

3          A.    No.   Are you talking about OARRS

4   prescriptions?   Or like --

5          Q.    Yeah.   I may have misstated my

6   question.   Let me strike that.   I'll rephrase

7   the question.

8              After OARRS was created and all

9   pharmacies had to provide their daily

10  prescription dispensing records to the Board,

11  my question is, when you -- after that OARRS

12  was created and you had that information, when

13  you showed up for those inspections, that was

14  part of the information that the Board had with

15  respect to the pharmacy to be inspected,

16  correct?

17         A.    Correct.   That was in our OARRS

18  database, yes.

19         Q.    Okay.   And the general purpose of

20  your inspections was to make sure that the

21  pharmacy continued to meet the licensing

22  requirements set by the Board, correct?

23         A.    Correct.

24         Q.    This code section in Exhibit 11,

25  5-3-03, part (B) says, Submission of an

1    application for a license as a terminal

2    distributor of dangerous drugs with the State

3    Board of Pharmacy constitutes permission for

4    entry and onsite inspection by an authorized

5    Board agent.

6              So by merely applying for a

7    license, you had to consent to allow agents to

8    come in at any time?

9         A.   Correct.

10        Q.   All right.  And then subsection

11   (C) of this regulation says if you find a

12   violation during the inspection, the agent may

13   provide written notice of the violations to the

14   pharmacy, correct?

15        A.   Correct.

16        Q.   And the process was -- was it your

17   practice to -- if you found a violation, to

18   write it up on the inspection report and tell

19   the pharmacy, give us a written response within

20   a certain period of time?

21        A.   Correct.

22        Q.   Okay.  And if you found

23   violations -- the violations, according to this

24   regulation, may include -- and this is part

25   (D) -- any of the following:  violating any

Page 141

1   rule of the Board, violating any provision of

2   Chapter 4729 of the Revised Code, violating any

3   provision of the Federal Food Drug and Cosmetic

4   Act, violating any provision of the Federal

5   Drug Abuse Control laws or regulations.  That's

6   the type of violations you could write up a

7   pharmacy for if you saw it during your

8   inspection, correct?

9           A.   Yes.

10          Q.   And did you actually in your

11  career write up pharmacies for violating any or

12  all of these laws?

13          A.   Yes.

14          Q.   And then, finally, this regulation

15  requires in subsection (E), The licensee or

16  applicant shall submit to the Board within 30

17  days of a written notice provided in accordance

18  with paragraph (C) in a manner determined by

19  the Board either of the following:  the actions

20  the licensee or applicant has taken to correct

21  the violations and the date of implementation

22  of the corrective actions or an explanation

23  disputing the violations.

24               Is that how you did your

25  inspections in connection with this regulation?

Page 142

1        A.    Yes.

2        Q.    Now, did you -- did the Board have

3   a so-called -- I'll just call it an inspection

4   guide for pharmacies?

5        A.    Not --

6        Q.    Did you follow -- was there a

7   guide that you guys had, the agents had when

8   you went out to do your inspections?

9        A.    For the vast majority of my

10  inspections, no.  That's a fairly new creation.

11  We went digital.  When inspections became

12  digital, there was an inspection guide

13  installed in our inspection software.  But when

14  we did the paper inspections like the first one

15  in Exhibit 15 here, there was no -- there was

16  no published guide.

17       Q.    I see.  And there was no internal

18  unpublished guide either?

19       A.    No.  I mean, different people had

20  spreadsheets of different rules and stuff to

21  look at, but there was no -- I mean, there

22  was -- there were different documents floating

23  around.  I don't recall if any of them were

24  specifically Board issued, but in terms of a

25  guide, a published guide, that all came when we

Page 143

1    went online, when inspections were starting to

2    be completed electronically.

3            Q.    When was that, approximately?

4            A.    Probably four or five years ago, I

5    guess.  I don't recall the exact date.

6            Q.    So maybe 2015 or so?

7            A.    Maybe.  Maybe '14, '15, somewhere

8    like that.

9            Q.    Okay.  Have you had an opportunity

10   to look at this inspection guide?  And I'll

11   tell you, I got it from the Board website.

12           A.    Yeah.

13           Q.    And I kept digging for something

14   prior to 9/23 of '20, but you've now explained

15   why it's not available; it's because there

16   wasn't one?

17           A.    Right.

18           Q.    Correct.

19           A.    Like a lot of things at the

20   agency, it has evolved to the point where it's

21   at now.

22           Q.    All right.  In looking through

23   this guide, it has a nice summary of all the

24   code and administrative regulations.  And then

25   it has a page 11 of Exhibit 12.  It has a table

Page 144

1   of contents which refers to sections of the
2   code -- sections of the manual dealing with
3   each specific part of an inspection.  Do you
4   see that?  Paragraph -- page 11 of Exhibit 12.
5         A.   Yes.
6         Q.   Okay.
7         A.   I see that.
8         Q.   Are these, this listing, which
9   continues onto 12, are these the areas
10  inspected when you did a full inspection?
11        A.   This is some of the areas.  We
12  didn't necessarily inspect every single item.
13  However, these are -- this is a listing of
14  them.
15        Q.   All right.  So the fact that this
16  is a 2020 inspection manual, what I'm getting
17  at is, it doesn't mean it's entirely irrelevant
18  to what we're doing?
19        A.   Correct.
20        Q.   These are areas that you actually
21  did inspect in your discretion, correct?
22        A.   Correct.
23        Q.   All right.  Have you had an
24  opportunity to flip through this manual and get
25  an understanding of whether or not it's

Page 145

1    anything new that you weren't familiar with?

2          A.    Well, this -- this is new.  In

3    fact, this is just -- the outpatient inspection

4    guide is something that was newly created.

5    So --

6          Q.   Okay.

7          A.    -- I'm familiar with items within

8    it, yes.  Am I familiar with the specific

9    guide?  I would say not entirely.

10         Q.   Okay.  All right.  We may refer

11   back to it if necessary, but you've already

12   answered my question concerning this was a part

13   of your inspections.

14              The regulations issued by the

15   Board include specific requirements for

16   controlled substance inventories, correct?

17   And, if so, is that shown in Exhibit 13?

18         A.   Yes.

19         Q.    And am I correct in my summary of

20   these requirements that pharmacists -- or

21   pharmacies were supposed to have an annual

22   inventory of controlled substances at a

23   minimum?

24         A.    That's -- that's a recent change.

25   It used to be biannual.  It changed to annual

Page 146

1    within the last couple years, I believe.

2         Q.   All right.  So prior to a couple

3    years ago, it was every two years?

4         A.   Yes.

5         Q.   And now it's every year?

6         A.   Correct.

7         Q.   And have you experienced during

8    your inspections pharmacies doing it more

9    frequently as a better internal control?

10        A.   When it was required to be done

11   every two years, there were pharmacies who did

12   it every year.  So yes.

13        Q.   And did you consider that a good

14   control?

15        A.   Yes.

16        Q.   Do you recall specifically any of

17   the pharmacy defendants inventorying -- how

18   often they inventoried controlled substances,

19   or would you need to see the inspection reports

20   to know that?

21        A.   I'd have to read them.  I don't

22   recall the time frames.

23        Q.   All right.  With respect to

24   Exhibit 15, this is the compilation of your

25   inspection reports for Giant Eagle.  I want to

Page 147

1    understand these reports a little bit.

2                When you went out to do

3    inspections of pharmacies, did you refresh your

4    memory regarding the prior inspection of that

5    pharmacy, whether you did it or somebody else

6    did it?

7            A.    I oftentimes -- I don't know if I

8    did it every time, but often I would.

9            Q.    Okay.  Do you recall specifically

10   inspecting Giant Eagle Pharmacies in Lake and

11   Trumbull County?

12           A.    I recall, yes.

13           Q.    On a general basis, do you recall

14   the inspections generally being favorable in

15   terms of Giant Eagle's pharmacies were doing

16   what they were supposed to be doing under the

17   Board rules?

18           A.    Yes, generally.

19           Q.    Is that true of the other pharmacy

20   defendants, did they -- did their inspections,

21   to your knowledge, generally -- were they

22   generally favorable from the Board's

23   perspective?

24           A.    Yes.

25           Q.    When you did the inspections and,

1  again, Giant Eagle specific, in Lake and

2  Trumbull County, beginning with this first

3  inspection -- we'll take that as an example --

4  this was of 2/4 of '09, store number 6377, in

5  Painesville Township, Ohio.  You inspected

6  that store five times.  Do you remember

7  working with the pharmacist at that store,

8  Mr. Robert Hytree?

9       A.   Yes, I remember Mr. Hytree.

10       Q.   And was Mr. Hytree generally

11  cooperative with you and provide you access to

12  any and all information you wanted as part of

13  your inspection?

14       A.   As far as I recall.

15       Q.   Now, this form that this

16  inspection is on, there's a list of items 1

17  through 40 and some of them are circled?

18       A.   Yes.

19       Q.   And I was trying to track what

20  those circlings meant, et cetera.  What did you

21  intend them to mean when you circled these

22  items?

23       A.   That was the items that I looked

24  at.  The small circle -- circling the numbers,

25  that was an item that I looked at.  The larger

Page 149

1   circles were -- you know, where I circled the

2   entire phrase was an item that had an issue

3   that required response.

4          Q.   Okay.  And whenever you had an

5   item at issue for Giant Eagle Pharmacies that

6   required a response, did you get that response?

7          A.   I recall -- generally, I recall

8   that I did.  I don't recall any instances where

9   I did not.

10          Q.   And -- now, here you've circled

11  licensing, outdated drugs, RX information, and

12  refills-INT/date.  Were these the items you

13  wanted Mr. Hytree to follow up because you

14  found some areas that required follow-up?

15          A.   Yes.

16          Q.   All right.  Now, was it in your

17  discretion to not look at certain items like

18  15, 16, and 17; there's nothing there?  Is that

19  just something that the agent can say I'm going

20  to look at it or I'm not going to look at it?

21          A.   Correct.

22          Q.   But would you over time want to

23  make sure that you looked at all of these items

24  after multiple inspections?

25          A.   I can't answer that.

Page 150

1          Q.   Okay.  But you certainly had the
2    right, going into an inspection, to look at any
3    of these items 1 through 40, correct?
4          A.   Correct.
5          Q.   And it wasn't up to the pharmacist
6    to say to you, no, you're not looking at these
7    items, you're only going to look at these other
8    items?
9          A.   Right.
10         Q.   Correct?
11         A.   That never happened.
12         Q.   And what was your thinking when
13   you selected what to look at?  What were you --
14   how did you make that selection, I'm going to
15   go to this pharmacy on this day, do an
16   unannounced inspection, and I'm going to look
17   at the following factors?  How was that
18   determined?  Was it based upon your knowledge
19   of the pharmacist or the pharmacy or things of
20   that nature?
21         A.   Yes, a bunch of factors.  I mean,
22   I don't think there was any -- there was not
23   any one thing that made me decide to look at
24   certain things or not look at certain things.
25         Q.   Okay.  We know from this

Page 151

1    inspection 2/4/09 that, for example, number 3

2    is the records system, and then you list in

3    handwriting off to the right, PDX software

4    version 4.6.07, pharmacy uses a realtime

5    dispensing system which is connected to all

6    Giant Eagle stores.

7              So one of the things you looked at

8    during your inspection was the type of dispensing

9    system that they used?

10         A.   Yes.

11         Q.   And was it an indication to you of

12   a good internal control that the pharmacy was

13   using the certain software system with certain

14   number of terminals and they were

15   interconnected with each other?

16         A.   Yes.  Because some are approved --

17   different software systems had to be approved

18   for use by our agency.

19         Q.   All right.  And at this

20   inspection, Giant Eagle was using an approved

21   software system?

22         A.   Yes.

23         Q.   And that system had a 7-point

24   check verification system which the pharmacists

25   used and the techs used to prevent errors.  You

1   wrote that in your report?

2            A.    Correct.

3            Q.    And they actually used -- you

4   reference, patient profile recall available for

5   at least two years at store.

6                  That's what the Board wanted,

7   right?

8            A.    The two-year recall of the patient

9   data.  We wanted 12 months.  I believe 12

10  months is what was required.

11           Q.    So Giant Eagle was doing more than

12  what the Board required?

13           A.    Two years, correct.

14           Q.    And then on page 2, it says,

15  pharmacists use a barcode verification system

16  followed by a password for final verification

17  at two of the five work stations.

18                 Is that a good internal control,

19  barcode verification systems and passwords as

20  part of the dispensing process?

21           A.    Sure.

22           Q.    All right.  So with respect to

23  this inspection, you found the recordkeeping

24  system to be not only adequate, but in some

25  ways more than adequate; is that right?

1             A.    You mean more than adequate

2       because they kept two years' worth of --

3             Q.    Yeah, that's what I was referring

4       to.

5             A.    Yes.

6             Q.    Okay.  And another factor you

7       looked at, I forgot to go over.  The number one

8       item at the top, you say, Board and DEA license

9       are current and posted, TDDD license is posted,

10      however, pharmacist license wall certificates

11      are not posted.

12              So you found that to be an issue

13      that required follow-up?

14            A.    Correct.

15            Q.    You wanted that -- those things on

16      the wall.  And Giant Eagle followed up as you

17      requested, correct?

18              (Technical interruption.)

19            A.    The answer was, he asked if they

20      responded to those, so I was flipping to the

21      page where, yes, they responded.

22      BY MR. BARNES:

23            Q.    Yeah, go to 2327.  That's where

24      the response is.

25            A.    Yes.

                                            Page 154

1              MR. BARNES:  Who's ever tapping,

2    please turn your microphone off, mute yourself,

3    please.  Thanks.

4    BY MR. BARNES:

5         Q.   So continuing, some of the other

6    things you looked at were barricade, which you

7    described for us.  And that's not listed as a

8    follow-up item, so that means it was

9    satisfactory, correct?  You say, fully enclosed

10   barricade, see barricade inspection report?

11        A.   Yes, that was the last page of the

12   report.

13        Q.   Okay.  And I'm starting to

14   understand these a little bit better.  Number 6

15   is security.  What did you look at in terms of

16   security in these inspections?

17        A.   The physical alarm system to see

18   if they had an alarm system with motion sensors

19   or not or if they just had a key lock system

20   that only the pharmacist possessed the keys.

21        Q.   Okay.  So in this inspection,

22   security met the requirements, you didn't

23   require any follow-up, correct?

24        A.   Correct.

25        Q.   And these other items, library,

Page 155

1   you mentioned that, that doesn't have any

2   follow-up, so I assume that was met.  Same with

3   cleanliness, refrigeration, and accountability?

4           A.   Correct.

5           Q.   All satisfactory from the Board's

6   perspective?

7           A.   Correct.

8           Q.   Accountability refers -- you write

9   up DEA 222 forms in proper order, forms are

10  properly filled out and signed when control II

11  order received.  No wholesale sales being made.

12          So the accountability issue is --

13  sounds like it's whether they have proper records

14  for how they're handling controlled substances?

15          A.   Right.

16          Q.   Okay.  It looks like here you

17  found an outdated drug on the shelf; is that

18  right?  You checked the prescription, a certain

19  prescription, and you found that it had an

20  expiration date the month prior to dispensing,

21  correct?

22          A.   Yes.

23          Q.   And you asked for follow-up on

24  that.  And the pharmacist did follow up on page

25  2327.  Am I right?

Page 156

1          A.   Yes.

2          Q.   Now, for number 32, that was

3    something you asked for follow-up.  You had a

4    refill issue and on page 2319 you say that the

5    pharmacy generates an end-of-day report that

6    lists all Rx's dispensed that day by pharmacist

7    initials.  Each dispensing pharmacist who

8    worked that day must take accountability for

9    the prescriptions they dispensed by signing a

10   daily log that lists all refills.  Currently

11   pharmacists sign a cognitive services report

12   that does not list all refill prescriptions.

13   And then you go on to say that that's not quite

14   how you want it done.  Am I right?

15         A.   Correct.

16         Q.   And you asked Giant Eagle to

17   change their practices, and in their response

18   they would?

19         A.   Yes.

20         Q.   Correct.  All right.  So that

21   issue was resolved.  And then your

22   inspection -- is there any indication on your

23   inspection something simple like pass/fail

24   or --

25         A.   No.

                                                    Page 157

1            Q.    -- is it you just got to read it

2      and --

3            A.    No, it's either corrective action

4      required or not.

5            Q.    All right.  So after you

6      identified four issues and Giant Eagle

7      responded, were you satisfied your inspection

8      issues had been addressed and, therefore, the

9      inspection was a successful one as resolved?

10           A.    I believe so, yes.

11           Q.    Okay.  Did that happen often with

12     the Giant Eagle Pharmacies, that you would find

13     items that you wanted follow-up on, they would

14     follow up on, and the inspection would be fine?

15           A.    Yes.  I can't say it happened

16     often or not often, I don't recall how often it

17     happened.  But my recollection is that I don't

18     recall any instances where an issue was not

19     resolved.

20           Q.    All right.  Go to the next

21     inspection report at store 1225 on 5/19 of '09.

22     And I see compared to the prior inspection

23     report you got different items circled.  So on

24     this inspection of this Giant Eagle store, you

25     decided to inspect in certain areas that were

Page 158

1    different than the one we just looked at,

2    right?

3           A.    I'll have to rely on your exhibit

4    because my copy is not legible.

5                 MR. THOMAS:  Mr. Barnes, can you

6    please give me the Bates number again for this?

7                 MR. BARNES:  Sure.  2373.

8                 MR. THOMAS:  2373.

9                 MR. BARNES:  2802373.

10                MR. THOMAS:  One moment while I

11   scroll to it.

12          A.    I'm sorry.  I am able to read that

13   one.  It was the one prior to that that I can't

14   read.

15   BY MR. BARNES:

16          Q.    Oh, yeah, that was a duplicate of

17   the prior one.  It just found its way in there.

18          A.    Okay.

19          Q.    The next inspection begins on

20   2802373.  Do you see that one?

21          A.    Yes.

22          Q.    And so what I'm just observing is,

23   is that you circle a bunch of items on the left

24   that are slightly different from the prior

25   inspection.  Am I correct that's you, as the

1  agent, using your discretion and judgment to

2  say, I'm going to look at these items today,

3  I'm not going to just match what I did the last

4  time, right?

5          A.   Correct.

6          Q.   All right.  And so in this

7  inspection we don't see anything for follow-up.

8  It's called a so-called pink sheet, is that the

9  follow-up sheet?

10          A.   Yes.  There was no pink sheet

11  issued for this inspection.

12          Q.   A pink sheet means follow up on

13  these items within 30 days?

14          A.   Correct.

15          Q.   All right.  Now, in this one you

16  looked at things like accountability, number

17  10, again.  And on page 2 of this inspection

18  report you advised Giant Eagle that they're

19  supposed to keep these records for three years.

20              Do you see that?  Is that the

21  recordkeeping requirement that you recall for

22  these types of records?

23          A.   It must have been at that point.

24          Q.   You mentioned -- now here you look

25  at number 13.  You didn't look at 13 on the

Page 160

1    other inspection we looked at, but here you

2    mention perpetual control II inventory

3    maintained in logbook for number 13.

4                    Is that a good control, as far as

5    you're concerned, from the Board's perspective

6    to have a perpetual control II inventory?

7            A.    Yes.

8            Q.    And did you consider this to

9    exceed the Board's requirements for --

10           A.    It was not required by us, so

11   someone performing that would be exceeding,

12   yes.

13           Q.    Okay.  And then you also looked at

14   something new -- well, not new, but you looked

15   at the prescription information.  You checked

16   whether Giant Eagle was complying with that

17   requirement and you say, Patient name and

18   address properly documented, phone-in

19   prescriptions properly documented, et cetera.

20                   So that's something that you

21   looked at in this inspection, actually how they

22   were issuing their prescriptions and had the

23   proper information, correct?

24           A.    Correct.

25           Q.    You also looked at their filing

Page 161

1   system, number 26, and found them to be in

2   compliance, correct?

3          A.   Correct.

4          Q.   You checked their last biennial

5   inventory and found it to be in compliance in

6   terms of having it available, right?

7          A.   Correct.

8          Q.   Number 32 you say that daily

9   dispensing authentication log documented all

10  prescriptions that had been verified, new and

11  refill.  Log is signed by each daily dispensing

12  pharmacist.

13             Is that in excess of the Board's

14  requirements to do -- to have these kinds of

15  logs?

16         A.   No, I believe those were required

17  to be signed.  The log and the refill log were

18  required to be maintained and signed.

19         Q.   Okay.  And then for 37 you looked

20  at the counseling, counseling logbook.  You

21  found that to be in compliance?

22         A.   Yes.

23         Q.   And then 39, you signed them up

24  for OARRS.  And is that something that you

25  tried to do in the early days of OARRS, to get

Page 162

1    people to sign up?

2              A.    Yes.

3              Q.    They weren't required to sign up,

4    but you recommended it?

5              A.    Correct, initially.

6              Q.    Okay.  Now, these inspection

7    reports, the next one beginning at 1905, you'll

8    see that these are all -- the first three are

9    all full inspections, and this -- yeah,

10   including this one.  And you mark in this

11   inspection of our store 216 various items.  I

12   see nothing for follow-up on a pink sheet,

13   meaning that this inspection went fine?

14             A.    Yes.

15             Q.    And you note various things in

16   this inspection, including patient profiles and

17   meeting minimum standards and barricades are

18   fine, using the right software system,

19   accountability, perpetual logs.

20             So, again, a clean inspection by

21   you of this Giant Eagle store in May of '09?

22             A.    Yes.

23             Q.    Correct?

24             A.    Correct.

25             Q.    And we can hop, skip, and jump

                                        Page 163

1    through these.  The next one begins on 2599,

2    another full inspection, this time of Giant

3    Eagle Pharmacy 1217 on 7/13 of '09.  Was this a

4    good inspection, you have nothing for

5    follow-up?

6            A.   Yes.

7            Q.   And, again, you used your judgment

8    as to what things you were going to look at on

9    this inspection, correct?

10           A.   Correct.

11           Q.   And so I don't see anything

12   remarkable in this inspection.  They seem to

13   start getting repetitive.

14               Did you find that across the Giant

15   Eagle chain, that they tended to have the same

16   types of software systems and controls?

17           A.   Yes.

18           Q.   And did those controls generally

19   meet the Board's requirements?

20           A.   Yes.

21           Q.   In your inspections, did you from

22   time to time review the DUR process?

23           A.   From time to time, yes.

24           Q.   If you look at the next inspection

25   of Giant Eagle store 0196 beginning on 2801763,

1  is this another clean inspection of a Giant
2  Eagle store by you?
3         A.    Yes.   There was no written warning
4  there.
5         Q.    Again, this is a full inspection
6  where you had discretion to look at anything
7  you wanted?
8         A.    Yes.
9         Q.    Go to the next inspection
10 beginning on 2331.  This is another full
11 inspection prepared by you of Giant Eagle store
12 6377 on September 16th of 2010.  Is this
13 another clean inspection of a Giant Eagle
14 store?
15        A.    Yes.
16        Q.    No follow-up needed.
17             The next inspection is a part of
18 Giant Eagle store 1217 of 11/15 of '10,
19 beginning on page 280573 (sic).  Now, here we
20 have two follow-up items, 9 and 11, as written
21 up by you, correct?
22        A.    Correct.
23        Q.    And so one of the items is
24 improper dispensing.  So is this an example of
25 where you actually did look at dispensing

Page 165

1    practices to see if they complied with Board

2    requirements?

3            A.   Yes.

4            Q.   All right.  And the problem that

5    you found with number 11 on page 2575, you

6    found a specific prescription was dispensed

7    improperly on 10/7 of '10.  It was written for

8    Rynatan suspension but was dispensed for

9    Nystatin oral suspension?

10           A.   Yes.

11           Q.   And you reviewed that incident

12   with Pharmacist Smith.  He indicates

13   prescription was entered incorrectly.  Although

14   he checked prescription, the error was not

15   identified.  Since the error occurred, store

16   has implemented a new workflow system which has

17   imposed -- improved efficiency.

18               Was that something that when you

19   were looking at the dispensing practices of

20   this store, you found this prescription and

21   noted that it was improperly dispensed,

22   correct?

23           A.   Either that or we received a

24   complaint from a consumer on that prescription

25   and then went in to check it.  So sometimes --

Page 166

1    sometimes our inspections resulted from a
2    complaint, for instance, an error, and then we
3    would go in and check -- you know, check what
4    the person was telling us and see what
5    happened.  So I'm not sure in this case if I
6    identified that during the inspection or if
7    that was something that came into us as a
8    complaint which then prompted the inspection.
9              Q.   All right.  And on page 2587
10   there's -- the Giant Eagle pharmacist responds,
11   right, explaining what happened with the
12   improper dispensing?
13             Do you see that?
14             A.   Yes.
15             Q.   2587?
16             A.   Yes.
17             Q.   It says, The error occurred at
18   data entry but was missed at data verification.
19   And then it explains the new workflow system
20   including a 7-point check.
21             Was that an adequate resolution of
22   this issue in this inspection?
23             A.   I don't -- I don't recall that
24   there was any other follow-up data.
25             Q.   Okay.  And so that's number 11.

Page 167

1   You also found an issue with, I guess,

2   refrigeration, number 9?

3          A.   Yes.

4          Q.   Was that fixed to your

5   satisfaction?

6          A.   Yes, I believe so.

7          Q.   Go to page 2378, please.  This is

8   an inspection of a Giant Eagle store 1225 on

9   2/16 of '11 performed by you; am I correct?

10         A.   Yes.

11              MR. APPEL:  One quick question,

12  since you're at a natural breaking point, when

13  do you want to take lunch?

14              MR. BARNES:  12:30.  Is that okay?

15              MR. APPEL:  That will work.

16              MR. BARNES:  Okay.  How about you,

17  Mr. Edwards, can you go to 12:30?

18              THE WITNESS:  Yep.

19              MR. BARNES:  All right.  Thank

20  you.

21  BY MR. BARNES:

22         Q.   Is this a clean inspection of a

23  Giant Eagle Pharmacy 1225 in February of 2011?

24         A.   I believe, yes, it appears so.

25  There was no written warning.

Page 168

1          Q.   There's a reference on page 1 to
2    the DUR verification.  The DUR verification
3    patient profile searches --
4                MR. THOMAS:  Hold on, Mr. Barnes.
5    I don't seem to have 2378.  It might be -- the
6    Bates number might be out of order with the
7    rest of the document.
8                MR. BARNES:  Okay.  Can you --
9                THE WITNESS:  Yes, it comes after
10   2588.
11               MR. BARNES:  It's probably about 16
12   or 18 pages into the exhibit.  Did you find it?
13               MR. THOMAS:  I'm looking.
14               MR. BARNES:  2378.
15               MR. THOMAS:  It's a big exhibit.
16   One sec.
17               MR. BARNES:  While you're looking,
18   we have hard copies.
19   BY MR. BARNES:
20          Q.   I just have a few questions about
21   this inspection, Mr. Edwards.
22          A.   Yes.
23          Q.   There's a reference to the DUR
24   verification system on page 1.  Does that
25   reflect that part of this inspection, you

Page 169

1    reviewed the adequacy of the record system,

2    including DUR verification?

3             A.    That tells me that their system

4    was capable of doing those things.  I don't

5    know that I specifically went in and checked

6    prescriptions to make sure there was DUR done,

7    but it's telling me that that software is

8    capable of doing those things.

9             Q.    Okay.  But if you wanted to check,

10   you had free access to check that, correct?

11            A.    Correct.

12            Q.    All right.  The next inspection is

13   on 4/1 of '11 on page 2339.  This appears to be

14   a unremarkable partial inspection; is that

15   right?

16            A.    Yes.  That was, yeah, for a

17   remodel.

18            Q.    And you checked the barricade

19   system and everything was fine?

20            A.    Yes.

21            Q.    The next inspection is on page

22   1915.  This is store number 216.  And you had

23   an issue with item 29, which is DEA inventory.

24   And that's referenced on page 1919.  You

25   couldn't find it, you asked for it, and you

Page 170

1  issued a pink copy saying you better find it,

2  essentially, correct?

3          A.    Correct.

4          Q.    And was that resolved to your

5  satisfaction?

6          A.    It looks like --

7          Q.    If you look at page 1913.

8          A.    Yeah, it looks like I had to come

9  back for another issue maybe or --

10          Q.    Okay.  And did you get your

11  inventory that you noted that you couldn't find

12  the prior time you were there on 4/14?

13          A.    I don't know.  I don't see -- is

14  there an exhibit that's the response?  I don't

15  see it.

16          Q.    You say on 1913, a completed

17  control -- a complete controlled substance

18  inventory must be completed as soon as

19  possible.

20          A.    Yes.  So I don't think it was

21  located.  I think I went back in and told them

22  that they had to complete a new one.

23          Q.    Okay.  Do you believe that that

24  was done?

25          A.    I don't recall because I don't see

Page 171

1    the document here.  I'm not sure.

2            Q.    Okay.  Other than not being able

3    to find a copy of the last inventory, was this

4    otherwise a good inspection?

5            A.    Yes.  That was the only item

6    noted.

7            Q.    The next inspection that you did

8    on page 2343 was Giant Eagle store 6377.  This

9    looks like a partial barricade inspection,

10   barricade approved?

11           A.    Yes.

12           Q.    Unremarkable inspection.  I mean,

13   other than that issue.

14                 The next inspection is on 8177,

15   store number 196.  This looks like a copy of

16   what we just saw.  Or no, it's not a copy.

17           A.    It's a different one.

18           Q.    A different one.  Here again,

19   clean inspection other than you couldn't find

20   the DEA inventory?

21           A.    No.  It says it was a partial.

22   They did accounting for the schedule II meds

23   but III through V medications were not included

24   in the inventory, so I instructed them to

25   complete an inventory with all controls.

Page 172

1          Q.   Did they do -- did they do so, as
2    far as you remember?
3          A.   I don't recall.  I don't see the
4    response in here, so I can't answer that.
5          Q.   Well, if they didn't comply with
6    the pink sheet, there would have been
7    repercussions, correct?
8          A.   There should have been, yes.
9          Q.   Okay.  I don't know it's in the
10   records.
11         A.   Like with the previous inspection,
12   I would -- if they didn't comply, I would have
13   gone back in and ensured compliance.
14         Q.   All right.  The next inspection
15   begins on 2347?
16         A.   Yes.
17         Q.   Store 196 in Painesville, Ohio.
18   And you have two follow-up items:  improper
19   dispensing and prescription files.  Now, for
20   that item, number 10, actually -- you don't
21   have number 10 as a follow-up, but on page 2
22   you reference that in the records that you
23   requested and were given, you saw some McKesson
24   invoices that said monthly regulatory maximum
25   purchases exceeded.  You didn't see any -- you

Page 173

1    hadn't seen such a report before?

2              A.    Correct.

3              Q.    Did you ask for any follow-up on

4    that?

5              A.    I don't recall.

6              Q.    Okay.  For improper dispensing on

7    page 3 you note that a certain prescription was

8    filled for furosemide?

9              A.    Furosemide.

10             Q.    Furosemide.  And then it was

11   refilled three days later, filled too early.

12   You say, unacceptable for a technician to

13   bypass DUR warning without informing the

14   pharmacist.

15             So there you found an instance

16   where a tech had overridden the DUR and you're

17   telling the Giant Eagle store, don't allow that

18   to happen?

19             A.    Right.

20             Q.    And there's a response on page

21   2357.  Was that a satisfactory response as far

22   as you were concerned?

23             A.    I believe so.

24             Q.    Okay.  And then apparently, item

25   number 26, you wanted follow-up because you

1  couldn't find a hard copy of the prescription,

2  and Giant Eagle's response was it was found

3  after the prescription and misfiled and they

4  enclosed a copy of it.  So was that a

5  satisfactory response?

6          A.   Yes.

7          Q.   Page 9864 is another inspection,

8  this time in Trumbull County.  It looks like --

9  I can't tell if it's full or partial.  Can you

10  tell us what the nature and purpose of this

11  inspection was?

12         A.   Looks like I was conducting an

13  investigation and I was requesting hard copy

14  prescriptions and signature logs to aid in the

15  investigation.

16         Q.   So you went to the store and you

17  recorded the fact that you were taking these

18  records out of the store?

19         A.   Correct.

20         Q.   All right.  This was an

21  investigation that had something to do with

22  some other individuals or entities?

23         A.   Right.

24         Q.   Okay.  And then the last one we'll

25  cover before lunch is the next one, 2589.  This

Page 175

1    is an inspection on 2/5 of '13, a store number

2    1217.  This was a clean inspection, correct?

3              A.   Yes.  It looks so.

4              Q.   You again mention the DUR

5    verification process on the first page.  It

6    says, DUR verification daily dispensing

7    authentication log printout signed by

8    dispensing pharmacist.  Daily cognitive

9    services report lists all prescriptions with

10   DUR issues and pharmacist who resolved the

11   issue.

12             Was that satisfactory from the

13   Board's perspective, that system that Giant

14   Eagle had?

15             A.   Right.  It was me documenting that

16   the pharmacy had that system, which was capable

17   of doing those things.

18             Q.   And then you mention on page 3,

19   controlled substance II files checked,

20   prescriptions properly contain prescriber, DEA,

21   quantity, et cetera.  So Giant Eagle was

22   meeting the prescription information

23   requirement; is that right?

24             A.   On the prescriptions I checked,

25   yes.

1          Q.   Okay.  And you spot checked, you
2    randomly selected these prescriptions?
3          A.   Correct.
4          Q.   You didn't tell Giant Eagle in
5    advance, I'm going to come in and check these
6    prescriptions?
7          A.   No.
8          Q.   You just somehow select them
9    randomly and said, I want to see this one, this
10   one, this one, and this one?
11         A.   Correct, I'll like go in their
12   files and just pick out an envelope or a
13   California folder and look in the scripts in
14   their folder.
15         Q.   And then the next page, 2595,
16   number 32, you reference the daily
17   authentication log signed by the dispensing
18   pharmacist.  Log lists all new and refill
19   prescriptions.
20              So is that a good control and did
21   it meet the Board's requirements to have a
22   daily authentication log signed by each
23   dispensing pharmacist?
24         A.   Yes.
25              MR. BARNES:  All right.  We'll take,

Page 177

```
 1    I guess, an hour-long lunch break.  We'll
 2    reconvene at approximately 1:30.
 3                    THE WITNESS:  Okay.
 4                    MR. BARNES:  All right.  Thank you.
 5                    THE  VIDEOGRAPHER:  Off the record at
 6    12:31.
 7                    (Off the record.)
 8                    THE  VIDEOGRAPHER:  On the record
 9    1:30.
10    BY MR. BARNES:
11           Q.   All right.  Good afternoon,
12    Mr. Edwards.  We're resuming your deposition
13    after a lunch break.  We were going through
14    your inspection reports, and I want to finish
15    that process beginning on page 2383 of
16    Exhibit -- I believe it's 13.  I'm sorry.  15.
17                    It's an -- they're in chronological
18    order.  This is an inspection dated October 30th
19    of 2013 of Giant Eagle store number 1225.
20           A.   I see it.
21           Q.   And I see there's no follow-up
22    items.  So is this another example of a clean
23    inspection --
24           A.   Yes.
25           Q.   -- of a Giant Eagle Pharmacy?  On
```

1   page 1 of -- on page 1 of this inspection,

2   there's a reference to that this pharmacy began

3   using a new dispensing system, a McKesson PDX

4   enterprise dispensing system in July of '13.

5   DUR issues may only be resolved by pharmacists.

6   New system has biometric fingerprint scanner

7   used in final act of verification.  System

8   gives a warning tone when techs or pharmacists

9   scan incorrectly or when too much time has

10  lapsed during the fill process.  Data is backed

11  up at corporate.  Giant Eagle stores are all

12  connected for patient profiling.

13          Did you view that as a good system

14  indicative of good internal controls at this

15  Giant Eagle Pharmacy?

16          A.   Yes.

17          Q.   The reference to DUR, were you

18  happy that only the pharmacists under this

19  system could resolve DUR issues?

20          A.   Yes.  That was an improvement.

21          Q.   Okay.  And did you find that type

22  of system in the other Giant Eagle stores after

23  this time period, in other --

24          A.   I believe it was a gradual

25  rollout.  It wasn't all the stores all at once.

Page 179

1    It was a year, maybe year-plus rollout.

2            Q.    Okay.  Go to the next inspection

3    document, 2271.

4            A.    Yes.

5            Q.    Store number 6377.  Now, this

6    is -- has a lot of writing and it actually

7    required a follow-up, which is on page 2283.

8    So this inspection shows that you wanted

9    follow-ups on 27, 28, and 11.  And according to

10   the Giant Eagle response on 2283, apparently

11   there was an issue that you spotted in your

12   inspection with a certain prescription being

13   filled on 11/26 of '13.  It was written for 90

14   capsules, however, complainant states that the

15   prescription was dispensed for 130.  Pharmacist

16   believes the quantity may have been

17   back-counted from a 150-count bottle.

18               That was something that you tested

19   at least one of the prescriptions and you

20   wanted follow-up because apparently you had

21   received a complaint of a differential between

22   90 and 130?

23           A.    Yes, that's what it looks like.  I

24   think the majority of this inspection was

25   completed by Lisa Dietsche at this level, and

Page 180

1    then I documented the item 11.

2            Q.    Okay.  And was that satisfied by

3    Giant Eagle to your satisfaction?

4            A.    I believe so.  I see the response

5    here.

6            Q.    Okay.  And then you also wanted a

7    response to 27 and 28.  27 was a transfer

8    prescription, and then for 28 there was a

9    problem with samples of controlled IIs do not

10   have INT date on hard copy originals.  You

11   wanted that to be on the hard copy originals?

12           A.    Yeah, looks like it.

13           Q.    Okay.  And did Giant Eagle

14   satisfactorily fix that for you?

15           A.    I believe so.

16           Q.    Okay.  And then the next

17   inspection is 5/7 of '14 on Bates 1923.  This

18   looks like a clean inspection, nothing to

19   follow up, everything was fine at store 216 on

20   this date, according to this full inspection

21   that you conducted?

22           A.    Right.

23           Q.    I don't see anything remarkable in

24   there.

25                 Next inspection was on 7/7 of '14,

Page 181

1   store number 4097.  Nothing to follow up, clean

2   inspection.  Is that accurate?

3           A.   Yes.

4           Q.   Then the next inspection was on

5   1/7 of '15 store number 196, another clean

6   inspection by you of that store, no problems

7   noted.  You list certain controls, perpetual

8   inventory logs, things of that nature.  This

9   store satisfied your inspection at that point

10  in time?

11          A.   Yes.

12          Q.   Now we have -- the next document

13  beginning at 2639, we have an inspection of

14  store 1217 on August 10, 2015.  Does this kind

15  of refresh your recollection of when you went

16  digital?

17          A.   Yes.  Sometime around that time.

18          Q.   All right.  And so there's now a

19  new format for this inspection and it looks

20  like things aren't circled, you just provide

21  answers to all the questions now; is that

22  right?

23          A.   Correct.  There's like drop-down

24  boxes for answering most of the questions.

25  There are some areas to enter in text, but

Page 182

1   there's a lot of drop-down.

2          Q.   This inspection, if you go to page

3   5 of 11 on Bates 2643, you appear at the top of

4   page 5 to be evaluating Giant Eagle's software

5   system dispensing terminals, and this part of

6   the inspection looked at DUR and verification

7   when it was done.  Does the pharmacy's realtime

8   ARKS prevent the patient from receiving more

9   dispensing than authorized by the original

10  prescription?  And you answered yes.

11          Is that something that you covered

12  in the inspection and were satisfied that Giant

13  Eagle's systems prevented more dispensing than

14  what was authorized?

15          A.   Yes.

16          Q.   What is the ARKS system?

17          A.   Alternate recordkeeping system.

18          Q.   Okay.  And then the rest of page 5

19  list what appear to be attributes of this

20  system.  Is it -- are the required records of

21  accountability being kept, are there audit

22  trails, is there proper security, and you

23  answered all of those in the affirmative, that

24  all of this met your requirements?

25          A.   Correct.

1          Q.    On the next page under number 5,

2    minimum standards, number 7 under number 5, Is

3    there evidence to indicate a problem with

4    staffing levels?  And you said no.

5               Is that something that you

6    evaluated at the stores when you did your

7    inspections, were they adequately staffed with

8    respect to pharmacists and techs and employees?

9          A.    That's generally a question that

10   we would ask the pharmacist or --

11         Q.    Okay.

12         A.    -- or if we observe, you know,

13   something like the place is totally chaotic and

14   things are out of control, then, I mean, it

15   would be based on a firsthand observation.

16         Q.    I see.  In your experience as an

17   agent, did you from time to time observe things

18   going on in, you know, some pharmacies, you

19   know, that would be indicative to you that

20   there might be a problem of maybe diversion,

21   like maybe long lines out the door, people

22   waiting for it to be opened, you know, things

23   of that nature?

24         A.    Not in the pharmacies that I was

25   inspecting, that I recall.

Page 184

1          Q.    Okay.  On page 7 of 11 on document

2     2645, number 11, Improper Dispensing.  Are the

3     pharmacists performing a prospective drug

4     utilization review?  Answer:  Yes.  Is the

5     pharmacy using the correct NDC number when

6     dispensing drugs?  No.

7               Let's look at the first one.  In

8     this inspection you checked to see whether the

9     pharmacists were doing a prospective DUR?

10         A.    Yes.

11         Q.    And what does the no answer mean

12    under below, Is the pharmacy using the correct

13    NDC number when dispensing drugs?  Is that a

14    follow-up item that you wanted?

15         A.    I don't see that it was marked --

16    well, it says written response required.  But

17    that was -- that was for number 19, not number

18    11.  I don't know if that was a typo or if

19    that -- I'm not sure.

20         Q.    Okay.  Where are you looking for

21    the written response required, what page?

22         A.    Well, I was just flipping through,

23    and I don't see one.

24         Q.    Okay.  Number 12 is Insufficient

25    Supervision.  You answered yes to both

Page 185

1   questions.  Is there a pharmacist supervision

2   of the dangerous drugs and other pharmacy

3   employees at all times while the pharmacy's

4   open and operating?  Yes.  Are only pharmacists

5   performing tasks requiring professional

6   judgment?  Answer:  Yes.

7              That was something that you

8   covered in this inspection and were satisfied

9   with the evidence that that was being met?

10             A.   Yes.

11             Q.   And number 13 is Inventory

12   Records, and you answer yes to both.  You

13   mention the perpetual C-II log.  So Giant

14   Eagle's inventory controls in this inspection

15   were fine?

16             A.   Yes.

17             Q.   On the next page under 18.1, DUR

18   Software.  Does the pharmacist rely solely on

19   the dispensing software to perform the DUR for

20   prescription dispensing?  And you answered no.

21             So as part of this inspection, you

22   looked into whether or not the pharmacists were

23   simply following the software or doing

24   something more that was required?

25             A.   Yeah, I don't know if I physically

Page 186

1    observed them completing DUR on a prescription

2    or simply asked them if they only rely on the

3    software.  I'm not sure how I approached that

4    question.  But I see that now.

5          Q.    All right.  And number 19, there

6    was an error in dispensing.  And you wanted a

7    response in writing?

8          A.    Correct.

9          Q.    It looks like you got a response

10   in writing to your satisfaction?

11         A.    I believe so.  Right.  Well, I

12   don't know.  I don't see the response here.  So

13   I guess I can't really answer that because I

14   don't see the response included in here.

15         Q.    Well, this says under 19,

16   Corrective Action, Action plan began on 7/30/15

17   with intervention of pharmacy district manager.

18   So --

19         A.    Maybe that was already in the

20   works prior to my inspection, maybe.  I don't

21   know.

22         Q.    Okay.

23         A.    I don't recall.

24         Q.    All right.  And then the rest of

25   the inspection deals with drug labels and

Page 187

1    signatures and refills and things of that

2    nature.  This inspection following the one

3    follow-up you asked for, was this a clean

4    inspection of this store at this time?

5              A.    It appears so.

6              Q.    We have a similar looking

7    inspection report next at 6695.  This is store

8    number 196 on 10/15 of '15.  And we see similar

9    format as the last one.  But this time you

10   asked for some follow-up.  On the second page,

11   you wanted follow-up concerning an improper

12   dispensing, DUR software, OARRS, and records.

13             Giant Eagle provided a response

14   on -- it's after page 6704.

15             A.    Yes, I see that.

16             Q.    So is this an example where you

17   looked at the details of pharmacists following

18   the DUR and you wanted follow-up information

19   regarding that?

20             A.    Yes.  I don't recall if it's

21   something I observed in the pharmacy or if it

22   was based on a complaint that we received that

23   I followed up on.

24             Q.    If you look on page 8 of 11, Bates

25   stamped 6702, it looks like the matter related

Page 188

1    to a prescription being filled for a total

2    quantity of 21 tablets using two different

3    NDCs.  Pharmacist received a DUR warning for

4    therapeutic duplication and completed a DUR

5    override without taking any documented steps to

6    resolve the issue.  Neither the prescribers

7    were called, an OARRS report was not run.

8              But then in the response on

9    number 11, he provides a response.  Said, The

10   patient in question had been receiving

11   prescriptions at this location for over a year.

12   This was a short-term increase.  Based on the

13   patient's past dispensing history for multiple

14   medical conditions, I did not suspect a pattern

15   of abuse.  Was paid for by a third-party

16   carrier which wasn't rejected.  Going forward,

17   I will make a more concerted effort to more

18   thoroughly investigate.

19             Were you satisfied with that

20   response?

21        A.   Well, I'm now remembering this

22   incident, and that -- I believe that pharmacist

23   was either not even signed up for OARRS or

24   never ran OARRS reports.  So that was -- that

25   was kind of a big deal.  I don't know -- I

Page 189

1   don't know that I was satisfied.  I seem to

2   recall possibly there was maybe a hearing

3   involving this pharmacist or -- I don't recall

4   specifically, but I think there might have been

5   additional action taken against this

6   pharmacist.

7           Q.   You don't recall that specifically

8   one way or the other?

9           A.    In my mind, I remember him not

10  ever running OARRS reports, and I feel like it

11  was escalated beyond the inspection, but I

12  can't say for sure.

13          Q.   Okay.  But -- all right.  You

14  don't know one way or the other.  You would

15  have to look at more documents?

16          A.    Correct.

17          Q.   But in any event, did this

18  inspection -- were all of the issues resolved

19  to your satisfaction?

20          A.   Yes, the issues unrelated to

21  Mr. Heppner, the other issues of the pharmacy

22  were resolved.

23          Q.   Okay.  Now, the report beginning

24  on 6739 appears to just be a short report.  You

25  requested records from this pharmacy, and they

Page 190

1   provided them to you?

2          A.    What page number are you on?

3          Q.    I am on 6705.  This appears to be

4   a follow-up report to the prior inspection.

5   It's dated the same date.

6          A.    Okay.  Yeah.

7          Q.    Same pharmacy.

8          A.    Yes.

9          Q.    So this appears to be a follow-up.

10  And requested records.  You wanted dispensing

11  data for all controlled substances filled at

12  this pharmacy between 8/1 of '15 and 10/14 of

13  '15.  Were those records provided to you?

14         A.    I believe so, yes.

15         Q.    And the next page says, Written

16  Response Required Details.  Does the pharmacist

17  have access to OARRS to request reports when

18  needed?

19              And you made an observation,

20  Corrective Action, Giant Eagle must correct

21  their software to ensure that individual

22  prescriptions filled with multiple NDC numbers

23  are properly reported to the OARRS database,

24  and you cite the statutes.  So that was the

25  resolution of that inspection?

Page 191

1              A.    I believe so.

2              Q.    And the last item is just a

3    property receipt on document 6578 for a store

4    in Trumbull County, Warren, Ohio.  You took

5    original prescriptions probably in connection

6    with an investigation; is that right?

7              A.    Yes.  That's correct.

8              Q.    All right.  Mr. Edwards, we've now

9    did a march through all of your inspections.  I

10   think there were approximately 26 inspections.

11   And we saw from time to time that in certain

12   inspections you required follow-up, you wanted

13   Giant Eagle to improve their procedures, you

14   know, you had various recommendations.

15              In general, though, did Giant

16   Eagle always cooperate with you and follow your

17   recommendations?

18              A.    I believe so, for the most part,

19   yes.

20              Q.    Is it a fair statement that at all

21   times in which you were involved inspecting the

22   Giant Eagle stores in Lake and Trumbull County

23   that Giant Eagle met the requirements for the

24   licenses for their stores and for the renewal

25   of their licenses at all times?

Page 192

1          A.   I believe so.  I don't recall an

2    instance where that wasn't the case.

3          Q.   No license was ever suspended or

4    revoked by the Board for any Giant Eagle

5    pharmacy, as far as you know?

6          A.   As far as I know, no.

7          Q.   Did the Giant Eagle Pharmacies

8    comply with the Ohio security requirements at

9    all times?

10         A.   As far as I know.

11         Q.   Did Giant Eagle stores, in fact,

12   have in some instances more or better controls

13   than were required by the Board?

14         A.   Yes.

15         Q.   Is it true that Giant Eagle was

16   never cited or disciplined by the Board for

17   failing to meet any of their requirements?

18         A.   You're speaking specifically to

19   Lake and Trumbull?

20         Q.   Yes.

21         A.   To my knowledge, no, they were

22   not.

23         Q.   We talked about staffing before.

24   From your involvement with the inspections,

25   were the Giant Eagle pharmacists educated,

1   hard-working pharmacists who were attempting to
2   do the best job they could?
3           A.   As far as I could tell.
4           Q.   Did they adequately train and
5   supervise pharmacy techs and others working in
6   the pharmacy?
7           A.   If I could back up saying with the
8   exception of Mr. Heppner, the fact that --
9               THE REPORTER:  You're trailing
10  off.  I can't hear you.  Please repeat.
11              THE WITNESS:  Sorry.
12          A.   I said, with the exception of
13  Mr. Heppner, that's the only pharmacist I could
14  recall who didn't meet -- didn't meet our
15  standards and was --
16  BY MR. BARNES:
17          Q.   Was disciplinary action taken
18  against him?
19          A.   I don't recall if -- again, I
20  would need to see more documents to see if
21  there was a citation issued or requested.
22          Q.   Okay.  Is it a fair statement that
23  Giant Eagle Pharmacies complied with the manner
24  of processing prescription requirements
25  including performing drug utilization reviews

Page 194

1    at all times?

2            A.    At all times that I'm aware.

3            Q.    Okay.  In any of your inspections,

4    the 26 that you did, did you ever see any

5    evidence that Giant Eagle Pharmacies were

6    filling illegitimate opioid prescriptions?

7            A.    No --

8            MR. CIACCIO:  Objection to form.

9            A.    -- not that I --

10           THE REPORTER:  Is that Joe?  I'm

11   sorry.  Is that Joe?

12           MR. CIACCIO:  Yes.  I'm sorry.

13   Joe Ciaccio.

14           THE REPORTER:  Thank you.

15           MR. BARNES:  Did you get his

16   answer, Patti?

17           THE REPORTER:  Yes.

18           MR. BARNES:  Thank you.

19   BY MR. BARNES:

20           Q.    At any time when you were at the

21   Lake County Narcotics Agency or at the Ohio

22   Board since 2008, to your knowledge, were Giant

23   Eagle Pharmacies ever the subject of criminal

24   investigations or investigations related to

25   diversionary behavior in the pharmacies?

Page 195

1          A.    You're talking about the pharmacy

2     itself, or are you talking about the employees

3     of the pharmacy?

4          Q.    Let's start with the pharmacy

5     itself.  Pharmacies.

6          A.    No, not to my knowledge.  The

7     actual pharmacy itself, we did not take

8     disciplinary action against the terminal

9     distributor, to my knowledge.

10          Q.    Yeah.  Okay.  My question was a

11     little different.  In your years with the LCNA

12     and now with the Board, was Giant Eagle ever

13     the subject of criminal or civil investigation

14     because of alleged diversion of controlled

15     substances?

16          A.    You're referring to Giant Eagle,

17     the corporation itself?

18          Q.    Yes.

19          A.    No.

20          Q.    Okay.  As far as you're concerned,

21     Mr. Edwards, were the Giant Eagle Pharmacies

22     that you inspected over the years 2009 to 2019

23     in Lake and Trumbull Counties, were those

24     pharmacies operating lawfully at all times?

25          A.    As far as I knew.

1          Q.   As far as you knew, Mr. Edwards,

2    from 2009 through 2000 (sic), your time with

3    the Board, were the Giant Eagle Pharmacies

4    operating in a manner that was contributing in

5    any way to the diversion of prescription

6    opioids in Lake or Trumbull Counties?

7          A.   Not as far as I knew.

8          Q.   Did you ever see any evidence that

9    Giant Eagle or its pharmacists were knowingly

10   filling prescriptions that were invalid or not

11   for a legitimate medical purpose?

12         A.   Not that I recall.

13         Q.   Were Giant Eagle and its

14   pharmacists actively assisting law enforcement

15   with anti-diversion efforts from the time you

16   started at LCNA until now?

17         A.   Yes.  With me, yes.

18         Q.   With respect to the other pharmacy

19   defendants, CVS, Rite-Aid, Walmart, and

20   Walgreens, would your answers be the same with

21   respect to those defendants, their stores

22   meeting the security requirement imposed by the

23   Board of Pharmacy?

24              MR. CIACCIO:  Objection.  Form.  Joe.

25         A.   I don't recall any instances where

                                             Page 197

1    pharmacies were disciplined for not meeting
2    those standards.
3    BY MR. BARNES:
4           Q.   Okay.  And by the other pharmacy
5    defendants, I mean CVS, Rite-Aid, Walmart, and
6    Walgreens.  Were those entities adequately
7    staffed as far as you could tell from your
8    inspections?
9           A.   As far as I could tell through my
10   inspections.
11          Q.   And were those pharmacies also
12   complying with the manner of processing
13   prescription requirements imposed by the Ohio
14   regulations, as far as you knew?
15          A.   As far as I knew.  I mean, it's
16   difficult to answer a blanket yes without
17   seeing examples of past inspections and, you
18   know, doing a more thorough search like we did
19   with the Giant Eagle stuff, but nothing comes
20   to mind that --
21          Q.   And were these other pharmacies
22   operating lawfully, as far as you knew?
23          A.   As far as I knew.
24          Q.   And were these other pharmacies
25   operating in any manner that was contributing

Page 198

1   to the diversion of prescription opioids into

2   Lake and Trumbull Counties?

3                  MR. CIACCIO:  Objection.  Form.

4   BY MR. BARNES:

5          Q.   I'm sorry, sir.  What was your

6   answer?

7          A.   Not that I recall.

8          Q.   Were pharmacists at any of these

9   other pharmacies knowingly filling

10  prescriptions that were invalid or not for a

11  legitimate medical purpose, as far as you knew?

12         A.   Not that I know of.

13         Q.   Were these other pharmacies

14  assisting you in law enforcement with

15  anti-diversion efforts in Lake and Trumbull

16  Counties?

17         A.   Yes, I believe so.

18         Q.   I want to turn your attention,

19  Mr. Edwards, to diversion in general.  Are you

20  familiar with Internet pharmacies?

21         A.   Yes.

22         Q.   Was there a period of time in

23  which Internet pharmacies were operating in or

24  around Lake and Trumbull County dispensing into

25  or out of the counties?

1        A.    I believe they were dispensing

2   everywhere, but I don't -- I didn't -- I don't

3   have any specific recollection of cases that I

4   worked on involving an Internet pharmacy.

5        Q.    Do you know them -- the Internet

6   pharmacies to have been a significant source of

7   diversion of controlled substances?

8        A.    When you say Internet pharmacy,

9   are you referring to a properly licensed entity

10  or -- because when I think of Internet

11  pharmacy, I think of, you know -- I mean, that

12  could mean anything.  It could mean something

13  legitimate or it could mean, you know, getting

14  prescription drugs from another country over

15  the Internet.  So when you say Internet

16  pharmacy, what do you mean?

17       Q.    What I mean is a pharmacy that

18  advertised on the Internet and filled

19  prescriptions over the Internet.

20       A.    Licensed or unlicensed?

21       Q.    Yes.

22       A.    I recall instances of those, but

23  not -- what was your specific question?

24       Q.    My specific question was, in

25  your -- both of your jobs at LCNA or at the

```
                                        Page 200
 1   Board, was there a period of time in which you
 2   were aware that Internet pharmacies were
 3   operating and filling controlled substances,
 4   prescriptions that were finding their way into
 5   Lake and Trumbull Counties?
 6           A.   Generally speaking, yes, I
 7   remember being aware of them, but I don't have
 8   specific recollections of specific pharmacies
 9   or patients or any detail.
10           Q.   Okay.  Independent pharmacies
11   operating in Lake and Trumbull County, are you
12   familiar with certain independent pharmacies in
13   both of those counties?
14           A.   Mainly Trumbull.  There were very
15   few in Lake County, if any.  They're all closed
16   now.
17           Q.   Okay.  Were some of the
18   independent pharmacies major sources of
19   diversion of controlled substances, in your
20   experience?
21           A.   I remember there being issues with
22   Overholt's Pharmacy in Trumbull County.
23           Q.   Okay.  In your experience, the
24   independent pharmacies, did they tend to have
25   weaker or lesser controls than the chain
```

Veritext Legal Solutions
www.veritext.com                                      888-391-3376

Page 201

1   pharmacies?

2              MR. CIACCIO:  Objection.  Form.

3         A.   Generally speaking, I would say

4   yes.

5   BY MR. BARNES:

6         Q.   Okay.  What about pain clinics,

7   are you familiar with pain clinics operating in

8   Lake and Trumbull Counties?

9         A.   Yes.

10        Q.   And do you recall any specifically

11  by name?

12        A.   Yes.

13        Q.   Can you tell us those names?

14        A.   Great Lakes Pain Management is

15  one.

16        Q.   Where was that located?

17        A.   Willoughby Hills.

18        Q.   All right.  Any others?

19        A.   I don't -- I mean, I can recall

20  doctor names, not so much -- not so much their

21  business names.

22        Q.   Which doctor names do you

23  remember?

24        A.   I recall David Demangone was in

25  Willoughby.  I recall Larry Gray; I think it

Page 202

1    was Pain and Functional Medicine was the name

2    of his business in -- also in Willoughby.  I'm

3    trying to think.  There were -- well, there

4    were a couple affiliated with Lake Hospital

5    system that I don't recall the names of

6    exactly.

7            Q.   Okay.  Were these pain clinics,

8    did they tend to prescribe large amounts of

9    controlled substances, including opioids?

10           A.   Yes, by the nature of their

11   business.

12           Q.   For that reason, were they ever a

13   subject of concern by LCNA or the Ohio Board of

14   Pharmacy?

15           A.   For that reason alone?

16           Q.   Yes.

17           A.   No.  I mean --

18           Q.   All right.  For what other

19   reasons, if any, did they become --

20           A.   If you meant -- had you said like

21   a specific incident like a case or a diversion

22   incident, then maybe that would have triggered

23   something, but just the fact that they were

24   pain management clinics did not, you know,

25   automatically make them suspect.

Page 203

1          Q.    Did you inspect pain management

2     clinics ever?

3          A.    I did.

4          Q.    Did you find them to have weaker

5     or lesser controls than chain pharmacies?

6          A.    I wouldn't say weaker or lesser.

7     I wouldn't -- I wouldn't say weaker or lesser.

8          Q.    Okay.  What about pill mills?  Are

9     you familiar with the term pill mill?

10         A.    I'm sorry.  I said weaker or

11    lesser.  I meant weaker or better.

12         Q.    Okay.  What about -- go ahead.

13              (Reporter interrupted.)

14         A.    He said pill mills, I said yes,

15    I'm familiar with the term.

16    BY MR. BARNES:

17         Q.    What do you understand a pill mill

18    to be?

19         A.    A pill mill is a -- usually a

20    doctor's office that it is not following the

21    standards in terms of prescribing and tends to

22    give out much more medication than what is

23    needed and to people who really shouldn't be

24    getting that medication, quantities that are in

25    excess of normal standards, maybe not good

Page 204

1    recordkeeping.  There's a number of factors.

2              Q.    Did you ever inspect any pill

3    mills in Lake or Trumbull Counties?

4              A.    I don't believe I ever inspected

5    any.

6              Q.    Did you investigate any pill mills

7    in those two counties?

8              A.    I did some -- I assisted in some

9    investigations in the Youngstown area.  I don't

10   recall if they were Trumbull or Mahoning or

11   where, but I don't -- I don't recall any pill

12   mill doctor investigations in Lake County.

13             Q.    Okay.  What I'm getting at is,

14   using your definition of pill mills from 2006

15   to 2019, were there pill mills operating in

16   Lake and/or Trumbull Counties?

17             A.    Not that I -- not that I recall

18   specifically, not that I personally

19   investigated.

20             Q.    Okay.  Were you -- as an agent

21   with LCNA and then now with the Board of

22   Pharmacy, were you able to determine whether or

23   not controlled substances were coming into Lake

24   and Trumbull County from other sources like

25   Detroit or Pittsburgh or anywhere outside the

Page 205

1   state or these two counties?

2           A.    I recall a case I had

3   prescriptions were being filled in Florida and

4   being brought back here, but I don't recall the

5   county.  I don't recall what county that was

6   in.  May have been several.

7           Q.    Did you -- in your experience in

8   law enforcement, is it -- looking at a

9   pharmacist -- or a pharmacy's amount of

10  controlled substance dispensing versus their

11  overall dispensing, is that something that you

12  looked or cared about; in other words, if a

13  pharmacy was -- you know, 90 percent of

14  everything they filled was OxyContin versus a

15  normally operating pharmacy, is that a criteria

16  that you considered ever?

17              MR. CIACCIO:  Objection.  Form.

18          A.    It could be.  But then there -- I

19  mean, it could be something to look into

20  further because there could be a reasonable

21  explanation, such as it's right next door to a

22  hospital or, you know, it's in the same

23  building as a pain management doctor and it's a

24  small town.  I mean, there could be -- it could

25  be a red flag or it could be a legitimate --

Page 206

1   you know, a legitimate reason.

2         Q.   But are you familiar with or did

3   you have any expectations with what a regular

4   pharmacy operating in the normal course of

5   business, what your expectations were with

6   respect to what percentage of their

7   prescriptions were controlled substances?

8         A.   No.

9         Q.   And have you ever heard of whether

10  the DEA had certain measurements or, you know,

11  yardsticks to say, you know, if you're beyond a

12  certain percentage, there's a cause for

13  concern?

14        A.   No, I don't know of any of those

15  figures.

16        Q.   I want to direct your attention to

17  Dr. Franklin and the Overholt Pharmacy.

18        A.   Yes.

19        Q.   That was a rather notorious

20  investigation in Trumbull County, wasn't it,

21  both of those, Dr. Franklin and Overholt

22  Pharmacy?

23        A.   I believe that was Geauga County.

24  His office was in Middlefield, I believe.  And

25  then Trumbull was where the pharmacy was.

Page 207

1          Q.   Oh, I see.  And what was your
2     involvement in the Franklin/Overholt
3     investigation?
4          A.   I -- that was right at the time
5     that I switched from LCNA to the Board of
6     Pharmacy.  So I started working on it when I
7     was at the Board of Pharmacy, I believe --
8     either I had an informant or some patients in
9     Lake County who were going to Dr. Franklin, and
10    I was working on the case with George Pavlich,
11    who was the Pharmacy Board agent.
12         Q.   Is Exhibit 18 a record of your
13    initial involvement with the Franklin Overholt
14    investigation?
15         A.   Yes.
16         Q.   So this would indicate that in
17    about June of 2008, at the time you were with
18    LCNA still, Pharmacy Diversion Unit?
19         A.   Right.
20         Q.   You were called in to assist the
21    Board of Pharmacy in their investigation of
22    Dr. Peter S. Franklin?
23         A.   Yes.
24         Q.   Is that right?  And according to
25    this record, one of the first things you did

1   was send in an undercover agent, or a CI, a

2   confidential informant?

3          A.    Correct.

4          Q.    And what happened?  Can you

5   generally tell us how your investigation

6   proceeded from here?  You sent in the CI, and

7   then how did things roll out from there?

8          A.    Honestly, I do not recall the

9   specifics of the case.  It was a very complex

10  case with a lot -- there were multiple

11  informants, I believe.

12         Q.    What do you recall the general

13  nature of what was discovered in this

14  investigation?  What was -- what were they

15  doing?

16         A.    Sure.  The general nature was that

17  he was, as you said, a pill mill, and he was

18  prescribing to people outside the legitimate

19  course of medical practice.  And an

20  investigation was started, and basically he

21  was -- a search warrant was conducted and he

22  was charged criminally with providing

23  prescriptions to a lot of people who shouldn't

24  otherwise have been receiving those

25  prescriptions.

1          Q.   Is Exhibit 19 the search warrant
2     that you just referred to?
3          A.   Yes.
4          Q.   You're listed on the first
5     paragraph special agent Trey Edwards, Lake
6     County Narcotics Agency.
7          A.   Correct.
8          Q.   Did you assist in the preparation
9     of the search warrant, including providing
10    information that's listed in the search
11    warrant?
12         A.   I'm sure I worked with George
13    Pavlich on preparing this and providing him
14    information, but I don't recall exactly what I
15    gave him or what, if anything, I typed up or he
16    typed up.  I don't -- I don't recall writing it
17    myself.  I think -- I think this was written by
18    someone else.
19         Q.   You're mentioned on page 5736 and
20    there's a synopsis underneath your name of
21    information.  Does that refresh your
22    recollection that you were involved with --
23         A.   Well, I mean, that's my -- that's
24    just my summary of my --
25         Q.   All right.  I want to go -- just

Page 210

1  see if this jars your memory.  The
2  second-to-last paragraph on that page, that
3  same page --
4          A.   Uh-huh.
5          Q.   -- near the end of that
6  second-to-last paragraph it says, The review
7  confirmed that Dr. Franklin authorized 15,298
8  controlled substance prescriptions during the
9  period of 4/10/06 through 6/4 of '08.
10 Overholt's Pharmacy alone dispensed 50 percent,
11 or 7,660 prescriptions.
12               Were those of Dr. Franklin's
13 prescriptions?
14         A.   I believe so.  I think this was
15 written by George Pavlich.
16         Q.   Okay.  And does that jog your
17 memory of the extent of prescribing of
18 controlled substances that Dr. Franklin was
19 involved with and why this was such a complex
20 investigation?
21         A.   Yes.
22         Q.   Do you know from your involvement,
23 Agent Edwards, that this investigation was
24 actually instigated by complaints from
25 pharmacists?

Page 211

1          A.    I don't recall where it came from.

2     I would believe that there were numerous

3     complaints.

4          Q.    This is noted as a joint

5     investigation of both Dr. Franklin and the

6     Overholt Pharmacy.  Was that unusual, in your

7     experience, to do a joint investigation of both

8     the pharmacy and the doctor at the same time?

9          A.    That was the first investigation I

10    was involved in of this type.

11         Q.    Page 5737 in the middle references

12    Dr. Franklin not accepting insurance.  Do you

13    recall that, that that was one of the things

14    that was a concerning nature --

15         A.    Yes.

16         Q.    -- in the investigation, that he

17    was requiring patients to pay with cash?

18         A.    Yes, I recall that.

19         Q.    Okay.

20         A.    I recall envelopes of cash.

21         Q.    Down -- the next paragraph below,

22    paragraph 1, 2, 3 -- it says, Dr. Piszel stated

23    that the most often used pharmacy, Overholt's

24    Pharmacy, is also a cause for concern since no

25    pharmacy he has ever dealt with would fill the

Page 212

1    number of different simultaneously prescribed

2    sustained release opioid preparations, doses,

3    and quantities.

4              Was Dr. Piszel the expert retained in

5    this investigation to assist in reviewing?

6         A.   Yes.

7         Q.   And did you need an expert -- he

8    was an expert pharmacist, he or she?

9         A.   He was a -- he was a medical

10   doctor.  I don't know -- I want to say he might

11   have also been a pharmacist.  I can't recall.

12        Q.   Okay.  But is that something the

13   investigators felt that they needed in order to

14   complete this investigation of Dr. Franklin and

15   Overholt, you actually needed a medical doctor

16   to help with analyzing the prescription?

17        A.   In this case, yes.

18        Q.   Page 5739 of the search warrant,

19   sir.  In the middle paragraph, 5, it says, This

20   is a known diversion tactic used by drug

21   seekers to prevent multiple prescriptions from

22   being questioned and confiscated at one

23   pharmacy by splitting them between multiple

24   pharmacies.

25              What can you tell us about this

Page 213

1   diversion tactic used by drug seekers?  What

2   does that mean?  How do they avoid detection?

3   Is that a way to avoid detection?

4           A.   By going to multiple pharmacies?

5           Q.   Well, splitting the prescription,

6   I guess.

7           A.   Right.  Like, in other words, he

8   got multiple prescriptions and filled some at

9   one pharmacy and some at another.

10          Q.   Okay.  And that's a diversion

11  tactic because --

12          A.   Because --

13               (Reporter interrupted.)

14          A.   Had they all been taken to one

15  pharmacy, that would have been a red flag.

16  BY MR. BARNES:

17          Q.   Okay.  Have you seen that in your

18  experience as an agent, that people interested

19  in diversion will split their prescriptions in

20  order to avoid detection at single pharmacies?

21          A.   Yes.

22          Q.   Now, do you recall, Agent Edwards,

23  during this investigation, before Dr. Franklin

24  was fully prosecuted -- I guess you couldn't

25  fully prosecute him because his wife murdered

Page 214

1    him; is that right?

2           A.    Yes.

3           Q.    But while the investigation was

4    going on, did you at any time advise pharmacies

5    in the area to not fill Dr. Franklin's

6    prescriptions because of this substantial

7    evidence of diversion as a pill mill?

8           A.    Not that I recall.

9           Q.    Why would --

10          (Technical interruption.)

11          MR. BARNES:  Who's ever speaking,

12   please turn yourself on mute.  Thank you.

13   BY MR. BARNES:

14          Q.    Agent Edwards, would investigators

15   normally tell pharmacists in the area to stop

16   dispensing for a doctor under investigation or,

17   you know, pharmacy under investigation?

18          A.    No.

19          Q.    Why not?

20          A.    Well, because you don't want the

21   doctor to know that they're under

22   investigation.  If we're investigating a doctor

23   who we suspect is doing something, we want to

24   perform our investigation without being tipped

25   off.  So if we were to tell a pharmacist that

1    we're investigating a certain doctor, and then

2    they stop filling prescriptions, inevitably

3    somebody's going to tell the doctor we're not

4    filling scripts because the Board of Pharmacy's

5    looking at you.  So that's why.  That's why.

6         Q.   Okay.  So as far as if any

7    pharmacists in the area are concerned, you

8    don't tell them that somebody's under

9    investigation so they may or may not fill

10   prescriptions from that doctor under

11   investigation?

12        A.   Correct.  It's up to them to use

13   their professional judgment.

14        Q.   I see.  When is it that they

15   should stop filling for that doctor?  Is it

16   when they're actually criminally convicted and

17   their license is revoked?

18        A.   Well, certainly they should stop

19   at that point --

20        Q.   Right.

21        A.   -- when their license is revoked.

22   Prior to that, they should use their

23   professional judgment to evaluate each

24   prescription.  I mean, there's been instances

25   where a doctor is under investigation for a

Page 216

1   small portion of the practice and there's a

2   larger portion of the practice that's

3   legitimate.  So to say don't ever fill a

4   doctor's prescription would not be prudent in

5   that situation.

6            So just going back on what I said,

7   you don't ever tell a pharmacy that a doctor's

8   under investigation because it could compromise

9   the investigation.

10           Q.   Okay.  It sounds like there's also

11  patient concerns, there might be legitimate

12  patients sprinkled in there amongst --

13           A.   Correct.

14           Q.   -- doctor shoppers?

15           A.   Correct.

16           Q.   On the top of page 5741, there's

17  an indication that the agent in charge, I

18  think, was George Pavlich, met with pharmacists

19  from Rite-Aid, Giant Eagle, and Walmart in

20  Middlefield, Ohio.

21           Do you see that?

22           A.   Yes.

23           Q.   It says, These same pharmacists

24  stated they filed many complaints with the

25  local police and former Agent Bodi since 2006

Page 217

1    regarding excessive quantities and combinations

2    of controlled drugs prescribed by Dr. Franklin

3    to his patients.  These various pharmacists in

4    Middlefield, Ohio confirmed that they refused

5    to dispense medication for the majority of

6    patients issued prescriptions by Dr. Franklin.

7    The pharmacists all stated that the patients

8    they've turned away were now having their

9    prescriptions dispensed at Overholt's Pharmacy.

10                   Were you aware of that as part of

11   this investigation, that pharmacists from Giant

12   Eagle, Rite-Aid, and Walmart had met with this

13   agent and given him this information that they

14   had been complaining since 2006?

15           A.   I'm sure I was aware at some

16   point, but I didn't recall that until reading

17   this.

18           Q.   Did you deal with any of the

19   pharmacists at Giant Eagle, Rite-Aid, or

20   Walmart as part of the Franklin/Overholt

21   investigation?

22           A.   I don't recall.

23           Q.   That was a pretty long

24   investigation, pretty thorough investigation;

25   is that correct?

1          A.    Yes.

2          Q.    The individuals that were targeted

3     for prosecution in that investigation were

4     Dr. Franklin and Overholt; is that right?

5          A.    I believe so.

6          Q.    Were any other individuals or

7     entities targeted for prosecution in that

8     matter?

9          A.    I don't recall.

10          Q.    We know Dr. Franklin couldn't be

11     prosecuted because of his untimely death, but

12     the Overholt Pharmacy was charged, was it not,

13     with criminal behavior?

14          A.    I did not handle that portion of

15     the investigation.  I don't recall what

16     happened with that.

17          Q.    Okay.  The next exhibit,

18     Exhibit 20, can you identify this exhibit for

19     us?  Do you recognize it?  Have you ever seen

20     it before?

21          A.    It looks like an inspection report

22     completed by George Pavlich.

23          Q.    Of the Overholt Pharmacy in

24     Warren, Ohio?

25          A.    Yes.

1          Q.    Were you part of this inspection

2     or did you review it in connection with your

3     investigative work on the Franklin/Overholt

4     investigation?

5          A.    I don't recall.

6          Q.    Can you tell me by looking at it

7     whether this is indicative of a bad inspection

8     of a pharmacy; in other words, this is not the

9     kind of inspection you ever want to receive if

10    you're a pharmacist?

11         A.    I would have to read it word for

12    word.

13         Q.    I'll have Mr. Pavlich do that.

14         A.    Okay.

15         Q.    There's a similar report at

16    Exhibit 20, if you flip backwards.

17         A.    This is Exhibit 20.

18         Q.    Oh, I'm sorry.  I meant 53.

19              MR. THOMAS:  I'm sorry.  Do you mean

20    Exhibit 53 then?

21              MR. BARNES:  Exhibit Edwards 53, yes.

22              MR. THOMAS:  Okay.

23         A.    Okay.  I see that.

24    BY MR. BARNES:

25         Q.    Can you identify it as an

1   inspection report prepared by Mr. Pavlich?

2          A.    Yes.

3          Q.    Would you have to read it to

4   testify about it?

5          A.    Yes.

6          Q.    And recall?  All right.

7          A.    Yes.  I don't see my signature on

8   there, so I don't believe I was present.  This

9   was -- this was before I was hired by the

10  Board, so I would not have been present at this

11  inspection.

12         Q.    Okay.  If you look at Exhibit 29,

13  there's a reference to two pharmacists

14  associated with the Overholt pharmacist --

15  Pharmacy, Andrea Luchette and Robert Graves

16  being criminally prosecuted.  Did you play any

17  part in their criminal prosecutions of those

18  two Overholt pharmacists?

19         A.    Not that I recall.  That would

20  have been Agent Pavlich.

21         Q.    If you look at Exhibit 30, there's

22  a presentence report for a Joseph Michael

23  Harrington.  Do you recognize that name?

24         A.    I do.

25         Q.    Who is he?

Page 221

1          A.   He is a -- well, I don't know if
2   he still is.  He was a resident of Lake County.
3   He is someone who I had a case on when I worked
4   for LCNA and then again when I worked for the
5   Board of Pharmacy.  He was -- he was a doctor
6   shopper as well as a patient of Dr. Franklin;
7   just a frequent flier, I guess you could say.
8   He was a name that popped up regularly.
9          Q.   He was involved with diversion of
10  pharmaceuticals in Lake County --
11         A.   Correct.
12         Q.   -- in this time period?
13         A.   Yes.
14         Q.   I think we touched on this
15  earlier, Mr. Edwards, Agent Edwards, that from
16  time to time pharmacists -- well, actually,
17  many of your leads came from pharmacists in
18  terms of your investigations; is that right?
19         A.   Yes.
20         Q.   If you look at Exhibit 21, there's
21  an example -- there's an email.  Why don't you
22  take a look at it?
23         A.   Yes.
24         Q.   It's an email.  Do you recognize
25  it as an email you sent to Board of Pharmacy

1    agents on or about November 3rd of 2011?

2         A.   Yes.

3         Q.   And in it you're reporting that a

4    Walmart pharmacist called you and reported a

5    forgery of a prescription that he or she had

6    discovered?

7         A.   Correct.

8         Q.   Is this a good example of the type

9    of leads that the pharmacists in Lake and

10   Trumbull County would provide to you as an

11   agent of LCNA or the Board?

12        A.   Yes.  This was actually in

13   Ravenna, Portage County, but this -- we did

14   receive things like that from pharmacists in

15   Lake and Trumbull as well, to my knowledge.

16        Q.   Do you recall working with a

17   pharmacist at Walmart who would advise you or

18   call you and tell you about problems like this

19   in the pharmacy?

20        A.   I don't recall specific examples.

21        Q.   All right.  If you look at

22   Exhibit 22, this appears to be another one of

23   your email chains?

24        A.   Uh-huh.

25        Q.   Do you recognize it as such?

Page 223

1           A.    Yes.

2           Q.    And it appears to be referencing

3     the Goertler --

4           A.    Yes.

5           Q.    -- Goertler brothers.  Do you

6     recall them?

7           A.    I do.

8           Q.    What were they involved with, and

9     what did you investigate them for?

10          A.    They were doctor shopping.  They

11    were -- at one point they -- I think they were

12    manufacturing fraudulent prescriptions on a

13    computer and then passing them around to other

14    people.  They were names well known to law

15    enforcement in Lake County.

16          Q.    Were you able finally to

17    successfully prosecute them?

18          A.    I believe at least one of them.  I

19    can't remember if we got them both or just one.

20          Q.    Do you know how that investigation

21    started?  Did somebody provide a lead?

22          A.    I do not recall.

23          Q.    Go to Exhibit 23 and 24.  They're

24    kind of related.  Can you identify these as

25    your emails --

                                        Page 224

1            A.    Yes.

2            Q.    -- related to certain

3   investigations?

4            A.    Yes.

5            Q.    Can you tell us what

6   investigations they related to and what you

7   recall generally about these investigations?

8            A.    Yes.  They -- that involved -- at

9   first I didn't know this, but ultimately it

10  ended up that Dr. Tony Carman was befriended by

11  Mohammad Saedi and she was writing fraudulent

12  prescriptions for Mr. Saedi and all these other

13  names of people who didn't exist.  And he was

14  passing the prescriptions at pharmacies around

15  northeast Ohio.  So the case was made against

16  Mr. Saedi and Dr. Carman, and they both went to

17  prison.

18           Q.    Exhibit 24 seems to indicate that

19  these prescriptions were being filled at the

20  Hillcrest Atrium Pharmacy and the Mantua

21  Pharmacy.

22                 Do you see that?

23           A.    You said Exhibit 24?

24           Q.    Yes.

25           A.    Okay.  I see that.

Page 225

1           Q.    Are those independent pharmacies?

2           A.    Yes.

3           Q.    Go to Exhibit 25, please.

4           A.    Okay.

5           Q.    This is a news report of a medical

6    examiner issuing warning about fake oxycodone

7    pills laced with Fentanyl in about December of

8    '18?

9           A.    Yes.

10          Q.    Do you have any knowledge about

11   this matter; if not the press report itself,

12   but generally?

13          A.    Generally, I am aware that

14   fraudulent counterfeit oxycodone prescriptions

15   have been circulated in the past several years.

16          Q.    In Lake and Trumbull Counties?

17          A.    I'm aware of Lake.  I don't know

18   about Trumbull.

19          Q.    Okay.  Go to Exhibit 26, please.

20          A.    I'm sorry.  I don't have specific

21   knowledge of these being in Lake County, but I

22   do know they were in Cuyahoga County.

23          Q.    Okay.  Did you from time to time

24   do investigations that indicated that scripts

25   were coming in from outside the counties?

Page 226

1        A.    From time to time, yes.

2        Q.    Is Exhibit 26 an example of one of

3   your investigations in that regard?

4        A.    Yes, it appears that way.

5        Q.    Go to Exhibit 27, please.  You're

6   listed there as the sender of an email on

7   April 11 of 2012.

8              Do you see that?

9        A.    Yes.

10        Q.    And this involved a search warrant

11   for Dr. Harper --

12        A.    Correct.

13        Q.    -- responding to Chris Begley

14   below --

15        A.    Yes.

16        Q.    -- saying he faxed out a notice to

17   our pharmacies on Dr. Fedoroko?

18        A.    Yes.

19        Q.    Do you recall that?  What do you

20   recall about this incident?

21        A.    I don't recall that name Fedoroko,

22   but this is just -- this is just sharing

23   information with my former partner about

24   something that was going on in the area.

25   Dr. Harper was down in Summit County, I

Page 227

1    believe.

2         Q.    It says the Summit area pharmacies

3    have stopped filling his scripts.  It appeared

4    that they were -- because of that, they were

5    moving east, I guess, towards Lake and Trumbull

6    Counties.  Is that the purpose of this notice?

7         A.    I believe so.

8         Q.    On Exhibit 28, another one of your

9    emails dated April 26 of 2013, referencing a

10   Dr. Lalli?

11        A.    Yes.

12        Q.    There's a reference in there

13   saying, For obvious reasons, we cannot share

14   the information with the pharmacies.

15             Do you see that in the middle?

16        A.    Yes.

17        Q.    Why couldn't you share the

18   information?  Is that for what you told me --

19   the reason you told me earlier, which is, you

20   don't want to tip the doctor off?

21        A.    Correct, we don't want to

22   compromise the investigation.

23        Q.    Okay.  Exhibit 33.  Well, go to

24   29.  I'm sorry.  Oh, we've already covered

25   this.  This is the prosecution of the Overholt

Page 228

1   pharmacists, Luchette and Graves.  We covered

2   30.  31.  32.

3                Go to 33.

4        A.   Okay.

5        Q.   Is this your email to -- why don't

6   you tell me what it is?  It's an email from you

7   to whom?

8        A.   To Angela Garofalo, who is a

9   district manager for Giant Eagle.

10       Q.   And why were you sending her this

11  email?

12       A.   To make her aware of this case

13  that I was working on and to see if they had

14  any fraudulent prescriptions that this woman

15  was passing.

16       Q.   Did they, do you recall?

17       A.   I don't believe so.

18       Q.   Do you know Angela Garofalo?

19       A.   I do, yes.

20       Q.   And she's a district leader for

21  Giant Eagle?

22       A.   Correct.

23       Q.   Do you find her to be competent

24  and cooperative and professional in dealing

25  with the Board?

1          A.    Yes.

2          Q.    Go to Exhibit 34.  It's a search

3    warrant for John Mullins.  Did you have

4    anything to do with that investigation?

5          A.    I did not.

6          Q.    Then go to 35.  This is a news

7    release related to Dr. Masters, Dr. Sherman,

8    and Dr. Theisler in Trumbull County?

9          A.    I have no knowledge of this.

10         Q.    Okay.  Go to 36.

11         A.    Okay.

12         Q.    There's a reference to you doing

13   your first solo inspection.  I guess you were

14   pretty new at the Board at the time?

15         A.    Yes.  That would have been -- I

16   got hired in November, so two months after I

17   got hired.

18         Q.    37, can you identify 37 for us?

19         A.    That's a letter from my former

20   director at Lake County Narcotics to Aaron

21   Graham, the vice president for corporate

22   security for Purdue.

23         Q.    Was the LCNA seeking grant funding

24   from Purdue Pharmaceuticals in connection with

25   law enforcement efforts in Lake County?

Page 230

1          A.   Yes.

2          Q.   Did you get the grant?

3          A.   I believe we did.

4          Q.   And did you use it for law

5    enforcement?

6          A.   Yes.  If I recall, we did it,

7    that's what it was used for.

8          Q.   Go to Exhibit 39, please.  I'm

9    sorry.  38.  Do you recognize this as a

10   publication of the Department of Public

11   Health --

12         A.   Yes.

13         Q.   -- for Ohio?

14         A.   Yes.

15         Q.   Do you use or refer to these in

16   your job as Ohio Board of Pharmacy agent?

17         A.   Yes.

18         Q.   There's an indication on the first

19   page of this exhibit that as of -- in 2019,

20   illicit fentanyl or fentanyl analogs were

21   involved in 76.2 percent of 2019 overdose

22   deaths, often in combination with other drugs.

23              Is that consistent with your

24   experience as an agent, this is what was going

25   on in Ohio in 2019?

Page 231

1           A.    Yes.
2           Q.    And is illicit Fentanyl a problem
3    in Lake and Trumbull Counties at the present
4    time?
5           A.    At the present time, I don't know.
6    That's not -- I don't investigate the illicit
7    substances.
8           Q.    Okay.  Go to page 7 of this
9    report.  At the top it says, Illicit Fentanyl
10   or Fentanyl analogs were involved in 76.2
11   percent of 2019 unintentional overdose deaths
12   often in combination with other drugs.
13          Did that information have any
14   pertinence to you as an agent with the Board?
15          A.    In what way?
16          Q.    Well, did it affect your
17   investigations or did it make you want to
18   change the way you were investigating things or
19   anything?
20          A.    I don't think it changed any
21   investigative techniques.  Now, personally, I
22   was involved in the early intervention side of
23   things from 2018 till now.  So, I mean, it made
24   me want to get people help, but it didn't
25   change the way I did my investigations.

1          Q.   All right.  Do you know if that's

2     accurate or not, that it was illicit Fentanyl

3     or Fentanyl analogs that were involved with

4     76.2 percent of 2019 unintentional overdose

5     deaths?

6          A.   I don't have a reason to doubt the

7     Department of Health's data.

8          Q.   Would you look at Exhibit 39,

9     please?

10         A.   Okay.

11         Q.   Are you familiar with this

12    Walgreens pharmacist by the name -- I believe

13    his name is Stossel?

14         A.   Yes.

15         Q.   What can you tell us about your

16    relationship with Mr. Stossel or your dealings

17    with him?

18         A.   Well, I had -- I had known him

19    since -- pretty much since I started at Lake

20    County Narcotics Agency and continued to know

21    him in my role as a Pharmacy Board agent.

22         Q.   And he was at all times a

23    Walgreens pharmacist?

24         A.   Yes, I believe so.

25         Q.   Did Mr. Stossel provide

1    investigative leads to you when he encountered

2    problems in the pharmacy as evidenced by

3    Exhibit 39?

4            A.   Yes.

5            Q.   Did anything come of this lead

6    that he provided to you in Exhibit 39 about

7    altered prescriptions?

8            A.   I don't recall whatever became of

9    it.

10           Q.   Exhibits 40 and 41, they are more

11   Walgreen pharmacists emailing you, one about a

12   Dr. Christopher James and a alprazolam

13   prescription, and the other informing you -- on

14   Exhibit 41 informing you of another problem

15   prescription.

16                Do you see those emails?

17           A.   Yes.

18           Q.   Again, are these just simply

19   examples of Walgreens pharmacists giving notice

20   to you of people trying to pass bad scripts or

21   forging prescriptions?

22           A.   Yes.

23           Q.   Were the Walgreens pharmacists

24   generally cooperative with you in providing

25   leads for problem prescriptions?

234 of 340

1          A.    Yes.

2          Q.    Exhibit 42, this is an arrest of a

3     Marlene T. in the Walgreens drive-up window in

4     the, I guess, Painesville Walgreens involving a

5     Vicodin prescription?

6          A.    Yes.

7          Q.    Do you recall this incident?

8          A.    Only after reading the email.  I

9     just know the name because she's someone who we

10    arrested multiple times.

11         Q.    And in this instance, did the

12    Walgreens pharmacist call you so that you could

13    be there when she came through the drive-up

14    window and you could arrest her?

15         A.    I don't know if that's how it went

16    down or if they knew she was going to pick it

17    up.  I don't know how they knew she was going

18    there.

19         Q.    Exhibit 43 is a presentence report

20    for an individual by the name of Joseph

21    Sosenko.  Do you recognize that name?

22         A.    Vaguely.

23         Q.    Page 2 of his report references a

24    registered pharmacist, Diane Morris, from the

25    Walgreens pharmacy in Eastlake.  Does that

1  refresh your recollection that it was a

2  Walgreens pharmacist that instigated this

3  investigation which led to the successful

4  criminal prosecution of Mr. Sosenko?

5          A.   Yes.

6          Q.   Exhibit 44, report of

7  investigation of Dorothy Rinehart.  Do you

8  recognize that name and were you involved in

9  this prosecution?

10          A.   Yes.  I believe that was one of my

11  very first cases of my career.

12          Q.   And did you work with a Walgreens

13  pharmacist in this investigation, Melanie

14  Burlinghaus on page 2?

15          A.   Yes.

16          Q.   And did the Walgreens pharmacist

17  provide information that led to the successful

18  prosecution of Ms. Rinehart?

19          A.   Yes, it looks like it.

20          Q.   If you go to 45, this is a report

21  of investigation of Roxanne Figoli?

22          A.   Okay.

23          Q.   Were you involved with that

24  investigation?

25          A.   Yes.

Page 236

1          Q.    And was that as indicated on

2    page 2 instigated by a Walgreens pharmacist --

3    let me see -- Todd Biedenham at Walgreens?

4          A.    It was initiated by a pharmacist

5    from Medic Drug, and then additional

6    information was provided by a Walgreens

7    pharmacist, yes.

8          Q.    Okay.  And that led to the

9    successful prosecution of Ms. Figoli for crimes

10   related to pharmaceutical diversion?

11         A.    Yeah, I don't recall the outcome

12   of the case, but that's what she was

13   investigated for.

14         Q.    Exhibit 46, December 2000 report

15   of investigation of Marlea Ciarlillo?

16         A.    Yes.

17         Q.    Were you involved in that

18   investigation?

19         A.    Yes.

20         Q.    And was that also received from a

21   Walgreens pharmacist --

22         A.    Yes.

23         Q.    -- the lead on that?

24         A.    Yes.

25         Q.    And that was -- what was the name

Page 237

1    of the pharmacist?

2              A.    Teresa Zienka.

3              Q.    And she called about a phony

4    prescription being passed by Ms. Ciarillo at a

5    Walgreens pharmacy?

6              A.    Yes.

7              Q.    Do you know if that led to a

8    successful prosecution?

9              A.    Yes, it did.

10              Q.    Exhibit 47, sir.  It's actually a

11    duplicate, so we can skip it.

12                    Exhibit 48 is a TAG Law

13    Enforcement Task Force.  Can you identify this

14    exhibit for us involving a Leslie Bas, B-a-s?

15              A.    I don't know that I was -- I don't

16    believe I was involved in that.  That doesn't

17    ring a bell.

18              Q.    Doesn't ring a bell?

19              A.    No.

20              Q.    The reference on page 2 to Erica

21    Kremer at the Rite-Aid Pharmacy, does that ring

22    a bell to you that a Rite-Aid pharmacist

23    instigated this investigation?

24              A.    No, I don't recall this case.

25              Q.    You don't recall this matter?

Page 238

1   Okay.

2              A.    No.

3              Q.    Exhibit 49, did you have anything

4    to do with this investigation, doctor shopping

5    investigation of a guy named Daniel Bayus?

6              A.    I don't recall.

7              Q.    Hometown Pharmacy, page 3646, for

8    this investigation, it's a reference to a

9    Walgreens pharmacist providing information to

10   assist in this investigation.  Does that ring a

11   bell to you at all?

12             A.    It does not.

13             Q.    Exhibit 50, is this your email --

14             A.    Yes.

15             Q.    -- announcing that Dr. Lalli had

16   been successfully prosecuted --

17             A.    Yes.

18             Q.    -- and surrendered his license?

19             A.    Yes.

20             Q.    Exhibit 53, I think we've seen

21   this before.  This is the Overholt Pharmacy.

22   Skip that.

23                   Finally, Exhibit 54, this is a

24   Pavlich -- I take it you don't recognize

25   Exhibit 54?

Page 239

1              A.    No.   That was before my

2     employment.

3                   MR.  BARNES:   All right.   I don't

4     have any further questions, Agent Edwards.

5     Counsel for Walgreens and/or Rite-Aid and/or

6     CVS have reserved some time to ask you some

7     questions.   So why don't we take -- is

8     everybody good with a ten-minute break and we

9     can resume with -- Sharon, are you on the line?

10    Do you want to ask questions?

11                  MS. DESH:   Yes, let's take a

12    break, and I can start in ten minutes.

13                  MR.  BARNES:   Okay.   Thank you.

14                  Thank you, Agent Edwards.

15                  THE  WITNESS:   You're welcome.

16                  THE  VIDEOGRAPHER:   Off the record,

17    2:47.

18                  (Off the record.)

19                  THE  VIDEOGRAPHER:   We're going on

20    the record at 12:58 -- I'm sorry.   2:58.

21                        EXAMINATION

22    BY MS. DESH:

23          Q.   Good afternoon, Mr. Edwards.

24    Thanks for being with us today.   My name is

25    Sharon Desh, and I'm going to be asking you

                                                    Page 240

1    some questions on behalf of Walgreens.  I will

2    try not to cover anything that we've covered

3    this morning, but just turn back to a couple of

4    topics as it relates to my client.

5              A.    Okay.

6              Q.    Can you turn -- do you have

7    Exhibit 19 in front of you?

8              A.    Yes.

9              Q.    Okay.  And can you turn to the

10   bottom of the page ending in 5760?  It's about

11   three-quarters of the way through.

12             A.    Okay.

13             Q.    And just to orient you, Exhibit 19

14   deals with the investigation of Dr. Franklin.

15   The bottom of page 5760 it says, On July 27th,

16   2008, this agent spoke with Walgreens pharmacy

17   manager Doug Stossel.

18                   I believe you stated that you have

19   been familiar with Mr. Stossel for a long

20   period of time; is that correct?

21             A.    Yes.

22             Q.    What's the nature of your

23   relationship with him?

24             A.    Well, I knew him as a pharmacist

25   first and then we became Facebook friends, and

1  he just passed away on Sunday.  So that's

2  pretty much the extent of it.  It was a

3  professional relationship and I would run into

4  him occasionally in -- you know, in the area.

5  He lived near me.

6        Q.   And I'm aware that Mr. Stossel had

7  some health issues that caused him to retire

8  from the practice of pharmacy.  Can you

9  describe a little bit about your relationship

10 with him while he was a pharmacist, what types

11 of things he would bring to you, and generally

12 what you thought of him and his practice?

13       A.   I thought he was a great

14 pharmacist.  He was very diligent.  He would

15 give me calls whenever he had a question about

16 a patient or, you know, had something that he

17 was unsure about.  I mean, he -- I think he

18 used me as a resource, and I used him as a

19 resource, and it was a good working

20 relationship.

21       Q.   And I think that we saw both of

22 Mr. Stossel and a number of other Walgreens

23 pharmacies -- pharmacists that oftentimes those

24 tips can aid in your investigation and lead to

25 convictions of people engaged in criminal

Page 242

1    activity; is that correct?

2            A.    Yes.

3            Q.    Okay.  Would you say that the --

4    speaking of the time that you worked for Lake

5    County, do you think that the majority of the

6    investigations that you conducted of

7    pharmaceutical diversion began with a tip from

8    a pharmacist?

9            A.    Yes, I would say that's accurate.

10           Q.    Returning to Exhibit 19, it looks

11   like Mr. Stossel alerted the Board that he had,

12   it says, concerns with numerous Dr. Franklin

13   patients.  Then the agent, is this -- was this

14   you, or is this Agent Pavlich, do you recall?

15           A.    Yes.  When it refers to this

16   agent, that refers to George Pavlich.

17           Q.    Okay.  It says, This agent

18   contacted Pharmacist Stossel and advised him

19   that he should dispense the prescriptions for

20   Dr. Franklin even though an investigation was

21   ongoing unless he has a problem because of the

22   medications in combinations.

23                 Do you see that?

24           A.    Yes.

25           Q.    And is that consistent with your

Page 243

1    testimony earlier that, in general, the Board
2    did not want to tip off individuals or doctors
3    who were under investigations by telling
4    pharmacists to stop filling for them?
5            A.   I don't know what his intent was.
6    You'd have to ask Agent Pavlich.
7            Q.   Okay.  But you do see that the
8    instruction was to continue to dispense for
9    Dr. Franklin even while he was under
10   investigation?
11           A.   Correct.
12           Q.   Okay.  And then just to finish on
13   Exhibit 19, Mr. Stossel, in response to this
14   advice, did state that he would no longer
15   dispense for Dr. Franklin.
16           Do you see that?
17           A.   Correct.  Yes.
18           Q.   And that was his prerogative as a
19   pharmacist using his professional judgment,
20   correct?
21           A.   Correct.
22           Q.   Okay.  We talked a little bit
23   earlier about some of the, I think, things you
24   would investigate in your work for Lake County.
25   And you talked a little bit about illegal

Page 244

1    processing.  Can you remind us what illegal
2    processing is?
3           A.    Sure.  That's essentially writing
4    a fake prescription or altering a legitimate
5    prescription, like changing the quantity or
6    date or name or anything like that.  So it's
7    forging a prescription.
8           Q.    And is illegal processing or
9    forging of a prescription, is that a crime?
10          A.    Yes.
11          Q.    Okay.  And we also spoke about
12   doctor shopping.  Can you provide your
13   definition, sitting here today, of doctor
14   shopping?
15          A.    Sure.  That's when someone goes to
16   multiple physicians for either legitimate or
17   nonlegitimate reasons to -- with the intent to
18   overlap prescriptions and get additional
19   medication, more than -- basically they deceive
20   doctors.  They go to one doctor, get a
21   prescription, go to another doctor who doesn't
22   know that they just went to the first doctor
23   and they get another prescription, that type of
24   thing.
25          Q.    And is the act of doctor shopping

Page 245

```
 1    and that deception, is that also a crime?
 2            A.    Yes.
 3            Q.    Okay.  We spoke a little bit about
 4    pill mills and the difference between a pill
 5    mill and a pain management clinic.  I think
 6    that -- would you agree that there are --
 7    speaking specifically of pain management
 8    clinics, there can be many reasons why a
 9    particular doctor might write more
10    prescriptions for opioids, for example -- maybe
11    legitimate reasons that he would do that than
12    another doctor?
13            A.    Yes.
14            Q.    Okay.  For example, I think you
15    said if they're near a hospice center, maybe if
16    they're an oncologist; are those examples of
17    doctors who might write more prescriptions for
18    opioids than other doctors?
19            A.    Yes.
20            Q.    Okay.  Would you also agree that
21    it's possible that certain pharmacies might
22    fill more prescriptions legitimately for
23    opioids than other pharmacies, depending on
24    where they're located and the type of pharmacy
25    that they might be?
```

1           A.   Yes.

2           Q.   For example, if they're also near

3    a hospital or a hospice center or if they're

4    24 hours a day?

5           A.   Correct, yes.

6           Q.   And I think you also mentioned

7    that even for the doctors that were under

8    investigation or some portion of their practice

9    was illegitimate, those doctors may still have

10   legitimate patients who truly do need opioid

11   prescriptions; is that correct?

12          A.   Correct.

13          Q.   And that's why you would not

14   instruct a pharmacist to refuse to fill for a

15   doctor as a blanket rule, but to exercise their

16   professional judgment with respect to each

17   individual prescription; is that correct?

18          A.   That's one of the reasons, yes.

19          Q.   I want to talk a little bit --

20   well, before we end that, would you agree that

21   most doctors who prescribe opioids are just

22   good people trying to do the right thing?

23          A.   Well, I wouldn't say good people.

24   I would say good doctors.  I don't know who

25   they are as people, but I would say the vast

1    majority of prescribers are legitimate, and

2    it's a small fraction of prescribers who are

3    doing things illegal or illegitimate.

4           Q.   And would you say the same for

5    pharmacies and pharmacists, that the vast

6    majority of pharmacies and pharmacists are good

7    and executing their responsibilities

8    faithfully?

9           A.   Yes.

10          Q.   Okay.  I want to turn for a moment

11   to a discussion of diversion that we engaged in

12   a little bit earlier just to understand -- I

13   believe you said that your definition of

14   diversion is when a legitimate drug exits the

15   legitimate supply chain.  Am I paraphrasing

16   that correctly?

17          A.   Yes.

18          Q.   Okay.  Have you had a situation

19   where -- I believe you said where you've

20   prosecuted somebody for stealing drugs from a

21   patient who had a legitimate prescription?

22          A.   Yes.

23          Q.   Okay.  So sometimes we think about

24   that as somebody who's taking drugs out of a

25   medicine cabinet that belong to somebody else,

1   correct?

2          A.    Right.

3          Q.    In that instance where drugs are

4   taken out of the medicine cabinet, would you

5   agree with me that the doctor who wrote the

6   prescription and the pharmacist who filled it

7   and the patient who received it, those are not

8   the individuals engaging in diversion, it's the

9   person who has stolen the pills; is that

10  correct?

11         A.    Correct.

12         Q.    Okay.  So we spoke a little bit in

13  particular about Mr. Stossel.  Are you familiar

14  with any other Walgreens pharmacists?  I think

15  we mentioned -- we looked at Teresa Zienka and

16  also Julie Demay.

17         A.    Sure.

18         Q.    What is your relationship with

19  those two individuals?

20         A.    Well, I know them professionally.

21  One went to college with my wife, and another

22  is a neighbor.

23         Q.    Okay.  And with respect to

24  Ms. Zienka and Ms. Demay, do you also -- well,

25  I'll back up.  Do you also know Amy Stossel?

Page 249

1           A.    Yes.

2           Q.    Doug's wife.  And she's a current

3    Walgreens pharmacist; is that your

4    understanding?

5           A.    Correct.

6           Q.    And do you understand that

7    Ms. Zienka and Ms. Demay and Ms. Stossel have

8    also reported fraudulent behavior and

9    suspicious behavior to you, and that's assisted

10   you in combatting diversion?

11          A.    Yes.

12          Q.    I think we saw some examples

13   earlier where Walgreens pharmacists would even

14   time their calls to the police such that the

15   police could be waiting for a suspect when that

16   suspect showed up at Walgreens.  Do you

17   remember that?

18          A.    I don't remember a specific

19   incident, but that has happened at several

20   pharmacies in my career.

21          Q.    So is it your experience that the

22   Walgreens pharmacists generally do take the

23   time to, you know, look closely at

24   prescriptions and to reach out to law

25   enforcement when necessary?

Page 250

1              A.    Yes.

2              Q.    All right.  I want to turn to now

3      some of the Walgreens inspection reports.   I

4      promise we'll try to hit them more quickly than

5      the Giant Eagle ones since we know the general

6      parameters.  But you were -- were you involved

7      in inspecting Walgreens pharmacies?

8              A.    Yes.

9              Q.    What was the general sort of time

10     period and geographic scope of your inspection

11     of Walgreens pharmacies?

12             A.    The time period was 2008 through

13     present.  And, generally speaking, it was

14     pharmacies in the northeast part of the state,

15     but I have done some others in other areas of

16     the state.

17             Q.    Did your inspections cover both

18     Lake and Trumbull Counties?

19             A.    At various times, yes.

20             Q.    Okay.  And I think, as we

21     discussed earlier and saw in prior examples, if

22     you found something in the course of your

23     inspection that needed to be corrected, you

24     would document it in the inspection report; is

25     that correct?

1               A.   Yes.

2               Q.   And is that -- is that important

3     to you to sort of do a thorough job and to let

4     the pharmacy know when something needs to be

5     corrected?

6               A.   Yes.

7               Q.   To the best of your knowledge,

8     were the inspections of the Walgreens

9     pharmacies generally favorable and positive?

10              A.   Yes, generally.

11              Q.   Okay.  Can you turn to -- and how

12    long, actually, before we turn -- go ahead --

13    how long does an inspection usually take?

14              A.   Well, it varies.  I mean, a full

15    inspection can take an hour or more.  Just --

16    it depends.  It depends what you find.  It

17    depends, you know, how long you're talking to

18    the pharmacist about different issues.  It

19    varies, and it varies depending on the agent as

20    well.

21              Q.   Okay.  But is that a pretty

22    thorough process of going through and

23    inspecting the pharmacy?

24              A.   Yes.

25              Q.   And you could take any amount of

Page 252

1   time that you needed to feel that you had

2   completed the inspection adequately; is that

3   correct?

4           A.    Correct.

5           Q.    Okay.  Can you turn to Exhibit 51?

6   So this should be a document with Bates stamp

7   BOP_MDL2797626.

8               Do you see that?

9           A.    Yes.

10          Q.    And Exhibit 51 is an inspection

11  report of Walgreens store 4294 in Willoughby,

12  Ohio, and it looks like that's in Lake County,

13  correct?

14          A.    Yes.

15          Q.    Okay.  If you turn to the first

16  page, it looks like the responsible person was

17  Teresa Zienka, who we've already talked about

18  as somebody who you have experience with at

19  Walgreens, correct?

20          A.    Correct.

21          Q.    Okay.  I just want to go through a

22  couple of the items here.  So one of the items

23  that you documented was in section 2.2, ID

24  cards.  And it looks like a pharmacy intern at

25  Walgreens did not have her ID on her, but that

1   you were able to verify that her license was

2   currently active; is that correct?

3          A.   Yes.

4          Q.   Okay.  So even for -- even for

5   small things, do you find it important to

6   document them for -- so you have a record and

7   so that the pharmacy can make sure that it

8   complies in the future?

9          A.   Yes.

10          Q.   Can you turn to 6.1?

11          A.   Okay.

12          Q.   Okay.  And, actually, before we go

13   there, on 5.7, it looks like the answer to

14   every single -- or in section 5, Minimum

15   Standards, it looks like the answer to every

16   single one of these questions was yes.  And I

17   see no follow-up documented.  But 5.7 says, Is

18   there evidence to indicate a problem with

19   staffing levels?  And it says yes.

20               Do you know if that was an error

21   or why there's no documentation there?

22          A.   I believe that was probably an

23   error.  It's -- the manner in conducting these

24   inspections digitally, there's like a drop-down

25   menu, and the cursor must have been off because

Page 254

1    I don't recall there being an issue at this
2    pharmacy.
3            Q.    Okay.  And we'll go through a few
4    other reports, but to your knowledge, do you
5    ever recall any issues with staffing levels at
6    Walgreens pharmacies?
7            A.    No.
8            Q.    In 6.1 for Security it says, Is
9    the security of the pharmacy drugstore adequate
10   to detect and deter drug theft and diversion?
11   And the answer is yes.
12           Can you tell us what you're
13   looking for -- a little bit more about what
14   you're looking for here when you're looking for
15   controls to detect and deter drug theft and
16   diversion?
17           A.    Well, are the C-IIs locked up, is
18   there recordkeeping that's accurate, and if
19   something were to go missing, would the
20   recordkeeping find that?  Like, for instance,
21   the next time they performed a count of the
22   medication, you know, is it accurate in the
23   sense that they would catch it the next time
24   they counted.
25           Q.    And I think you mentioned earlier

Page 255

1   that you also work sometimes with the -- with

2   Walgreens and other chain pharmacies' loss

3   prevention departments; is that correct?

4           A.   Yes.

5           Q.   Is the type of activity that the

6   loss prevention department would engage in

7   doing counts of pills and making sure no pills

8   went missing or were unaccounted for?

9           A.   Generally the pharmacy employees

10  will do the counting, and then if there were

11  discrepancies, they would report it to loss

12  prevention, who would then come in and do

13  additional checks.

14          Q.   Okay.  Great.  And is that -- is

15  that general process what you're referring to

16  in 6.1 when you're talking about whether the

17  controls of the pharmacy are adequate to detect

18  and deter drug theft and diversion?

19          A.   Yes.

20          Q.   Do you know Laurie Zaccaro from

21  Walgreens?

22          A.   Yes.

23          Q.   What's your relationship with her?

24          A.   She's a loss prevention employee

25  for Walgreens.

1          Q.    And has she also reached out to
2     you about potential, you know, suspicious
3     activity at Walgreens?  Has she also helped you
4     in the course of your job?
5          A.    Yes.
6          Q.    In -- can you move down to 6.5?
7     It also says, Has the pharmacy experienced any
8     drug thefts or loss in the last three years?
9     And the answer is no.
10               Do you see that?
11         A.    Yes.
12         Q.    Okay.  And at a high level, in
13    your opinion, why -- or in your experience, why
14    are these types of questions important, talking
15    about detecting and deterring drug theft and
16    diversion and making sure there are no losses
17    at a pharmacy?
18         A.    To ensure that drugs are not being
19    diverted.
20         Q.    Okay.  And to ensure that the
21    chain pharmacies have controls in place to make
22    sure that -- to prevent diversion; is that
23    correct?
24         A.    Yes.
25         Q.    Okay.  Can you turn to -- there's

Page 257

1   a couple items on here about drug utilization

2   review that we won't touch on because they were

3   addressed earlier, but I'll bring them to your

4   attention quickly.  11.1, do you see that it

5   says, The pharmacists are performing a

6   prospective drug utilization review?

7           A.   Yes.

8           Q.   And just for the purpose of this

9   question, can you remind us, you know, what

10  that is and why it's important?

11          A.   It's part of the dispensing

12  process to fill a prescription and it's

13  ensuring that they're taking all the steps of a

14  DUR to ensure that the prescription should be

15  dispensed.

16          Q.   If you go to 18.1, also speaking

17  about DUR in Exhibit 19, Does the pharmacist

18  rely solely on the dispensing software to

19  perform the DUR for prescription dispensing?

20  And it says no.

21               And I take that to be the correct

22  answer that the pharmacist should be doing more

23  than just relying on the software; is that

24  correct?

25          A.   Correct.

Page 258

1              Q.    And what other things do
2     pharmacists usually do in addition to relying
3     on the software?
4              A.    Personal observations and
5     knowledge that they gain from other sources.
6     It's not just the checkmarks on the -- you
7     know, in the computer, it's other things that
8     they may become aware of related to the patient
9     or that particular prescription that may give
10    them pause.
11             Q.    Okay.  Great.  And so just so I
12    understand, I think you said your testimony is
13    that the practice of pharmacy and the exercise
14    of the pharmacist's judgment, they're not just,
15    I think as you said, checkmarks on a computer,
16    but things that they know and experience in
17    their everyday life and in their interaction
18    with a patient; is that correct?
19             A.    Correct.
20             Q.    Can you turn to item 19?  Item
21    19.2 says, Have the frequency of errors caused
22    a standard of practice issue for the
23    pharmacy -- with the pharmacist or a pharmacy
24    as a whole?
25                   Can you explain that a little bit

Page 259

1   more what you mean by the frequency of errors
2   as related to the standard of practice?
3           A.   Generally speaking, that -- I
4   believe that question is asked for instances
5   where there are multiple errors occurring at a
6   pharmacy, and basically it's asked to then
7   further investigate that, like why are all
8   these errors occurring, is it an impaired
9   pharmacist, is it a -- you know, a staffing
10  issue, is it -- like what is causing the errors
11  to take place.
12          Q.   Okay.  So if you see some
13  threshold of errors, it might give you reason
14  to believe that more investigation is needed?
15          A.   Correct.
16          Q.   I take it from the way that this
17  is phrased that the threshold is not one, but
18  it might be something more than one.  Can you
19  put any context around that?
20          A.   I mean, yeah.  It could be
21  multiple issues.  It could be an elderly
22  pharmacist who, you know, isn't quite there as
23  mentally as they were years ago that's making
24  many errors.  So it could be any number of
25  reasons that are causing errors to take place

Page 260

1  which are -- which are making things unsafe at
2  the pharmacy.
3          Q.  Do you have a baseline or a set
4  number of errors that would trigger a standard
5  of practice issue, or does it depend on the
6  context?
7          A.  It depends entirely on the
8  context.
9          Q.  Okay.  But we do see in
10  Exhibit 19, item 19.4, Has a dispensing error
11  occurred in the pharmacy?  And the answer there
12  is no.
13              Do you see that?
14          A.  Yes.
15          Q.  Okay.  So we've gone through that.
16  I want to go through a couple other examples.
17  Do you have an extra envelope with you that has
18  exhibits -- a separate envelope with exhibits
19  in it?
20          A.  I have a box that says do not open
21  until instructed to do so.  Is that --
22          Q.  We might be there.
23              MR. BARNES:  Should have said do not
24  open till Christmas.
25              MS. DESH:  Yeah.

1                THE WITNESS:  Yeah, send me this

2      in December.  How nice.  I've been waiting all

3      day for somebody to tell me to open this.

4                MR. CIACCIO:  Sharon, do we have

5      these exhibits either electronically or somehow?

6                MS. DESH:  Yes.  You know what,

7      they were -- they were delivered by courier to

8      counsel for Mr. Edwards.  I'm having a little

9      bit of an issue with my Exhibit Share, but I

10     can probably share my screen if you'd like to

11     see them.

12               MR. CIACCIO:  Yes.  So no one on the

13     plaintiffs' side got any exhibits.  Then, yeah,

14     I'd like to see them.

15               MS. DESH:  Okay.  I will share my

16     screen, and I'll get them to the court reporter

17     afterwards.  I did not see the folder in

18     Exhibit Share to put them.

19               THE WITNESS:  Should I go ahead

20     and open --

21               MS. DESH:  Yes.

22               THE WITNESS:  -- envelope A?

23               MR. CIACCIO:  Just for the record,

24     we're going to have an objection to not receiving

25     copies of exhibits, but for the deposition's sake,

1  whatever you can do to share them with me, I'd
2  appreciate it.  But we're going to have a standing
3  objection.
4              MS. DESH:  Sure.  And I did intend
5  to introduce them electronically and there was
6  an issue with the folder, but --
7              MR. CIACCIO:  Right.  I just thought
8  that the protocol required it to be shared with
9  the parties ahead of time just so people had
10  copies.  But --
11              MS. DESH:  I don't know if that's
12  true for a third party, but we can -- we'll
13  make sure that we do that.
14              MR. CIACCIO:  Yeah, I mean, I'm not
15  sure what to cite to tell you it is or isn't, but,
16  I mean, if you don't think we have to send you
17  exhibits and you don't have to send us exhibits,
18  that's not my understanding.  But I'll --
19              MR. APPEL:  This is Henry Appel.
20  This is Henry Appel, counsel for Mr. Edwards
21  and for the Board did receive a copy -- I did
22  receive a copy of them, and my understanding is
23  for the MDL standing order is that all parties
24  to the deposition were to receive a copy of the
25  exhibits before the deposition, but that's at

Page 263

1    least my reading of it.

2              MR. CIACCIO:  Yeah, I mean, that's

3    our reading of it, too.  So, you know, obviously

4    if there's any depositions that are going to be

5    used -- any exhibits that are going to be used on

6    Monday that we don't have yet -- I know counsel

7    for Giant Eagle gave us all of his exhibits, but

8    if any other -- if there are going to be any other

9    additional exhibits, I would ask they get sent

10   over right away so we have them in advance of the

11   deposition.

12             MS. DESH:  Sure.  We'll make sure

13   we do that.

14   BY MS. DESH:

15        Q.   Okay.  So the exhibit that I'm

16   showing you here, I think we'll mark it as

17   maybe Exhibit 55.  I'll coordinate with the

18   court reporter on that.  This is a -- this is

19   an inspection report from Walgreens store 5822

20   in Painesville, Ohio, in Lake County, from

21   February 18, 2016.

22             Do you see that?

23        A.   Yeah.  I believe it says 5821,

24   though.

25        Q.   5821.  Thank you.  And for this

Page 264

1   inspection report it actually indicates that a

2   written response is required.

3                 Do you see that?

4          A.    Yes.

5          Q.    And just to confirm for Exhibit 51

6   that we were just reviewing, no written

7   response was required, at least not on the

8   cover of the inspection report; is that

9   correct?

10         A.    No.  It does say written response

11  required.

12         Q.    Correct.  For the one that we're

13  looking at here?

14         A.    Yes.

15         Q.    Can you turn back to Exhibit 51

16  that we were looking at previously?  And that

17  is the inspection report for Walgreens --

18         A.    Yes.

19         Q.    -- 4294.

20         A.    Yes.

21         Q.    And for Exhibit 51, if I'm

22  correct, it does not indicate that any written

23  response is required; is that correct?

24         A.    Correct.

25         Q.    Okay.  And does that mean there

Page 265

1   were no follow-up issues that you needed to

2   address with the pharmacy after the inspection?

3          A.    Correct.

4          Q.    Turning back to the inspection

5   report for 5821, and it looks like this might

6   be an excerpt, although I will represent to you

7   that this is how it was produced to us.  If you

8   go to item 4, it says -- item 36.4 says, Have

9   appropriate background checks been performed on

10  all employees intending to work in the

11  pharmacy?  And then there's an observation

12  that a certain pharmacist or employee did not

13  have -- a pharmacist technician, I should say,

14  did not have a background check performed on

15  her.

16              Do you see that?

17         A.    Yes.

18         Q.    Okay.  And now I'd like to draw

19  your attention to -- stop my share for a

20  minute.  This will be the last one.  Well --

21  but -- to what we'll mark as Exhibit 56.  And

22  this is a document with the Bates stamp

23  BOP_MDL2797836, which is a letter from

24  Walgreens to the Board of Pharmacy stating,

25  This letter and enclosed document are in

Page 266

1    response to the inspection completed in

2    February 2016.  It was stated that we did not

3    have a background check completed on this

4    technician, but enclosed is a copy of that

5    background check, which was located in her file

6    on the day of the inspection.

7                    Do you see that?

8            A.    Yes.

9            Q.    Okay.  And is this an example of

10   where there might be a citation or a written

11   response required, but it's later determined

12   that the pharmacy was in compliance and they

13   just needed to find the requisite

14   documentation?

15           A.    Yes.

16           Q.    Okay.

17           A.    So just to clarify, not a

18   citation.  Citation is different from a written

19   warning.

20           Q.    Thank you.  Thank you.  That's a

21   good clarification.  And maybe just for the

22   record I'll say the letter that we just

23   reviewed is an example where there might be a

24   written response required, but it's later

25   determined that the pharmacy was in compliance

Page 267

1   and they just needed to find the requisite

2   documentation?

3           A.    Correct.  Right.

4           Q.    Sitting here today, can you --

5   well, backing up for a moment.  I think we

6   talked about the fact that when there is a

7   deficiency that you observe, you will document

8   it as part of the inspection report, correct?

9           A.    Correct.

10          Q.    And sitting here today, can you

11  recall any instance in which an issue that you

12  observed was not resolved to your satisfaction

13  by a Walgreens pharmacy in response to that

14  request?

15          A.    Not that I recall.

16          Q.    Can you turn to Exhibit 52, which

17  should be in your binder?

18          A.    I stop at 51.  Oh, no, I'm sorry.

19  Yes.

20          Q.    Okay.  Exhibit 52 is a document

21  with the Bates stamp BOP_MDL2797783.

22                Do you see that?

23          A.    Yes.

24          Q.    And this is for store 10569 in

25  Niles, Ohio in Trumbull County, Walgreens?

1          A.    Correct.

2          Q.    Okay.  From March 21st, 2017.

3          A.    Yes.

4          Q.    Okay.  We won't repeat the items

5     that we looked at before.  I'll just turn your

6     attention to a couple of items.  The first is

7     on 5.7, Minimum Standards, this asks, Is there

8     evidence to indicate a problem with staffing

9     levels?  And the answer is no.

10               And I think that's consistent with

11    your prior testimony, that your recollection

12    was that you can't recall an issue with

13    Walgreens staffing levels; is that correct?

14         A.    Correct.

15         Q.    Okay.  Can you turn to item 11.1?

16         A.    Yes.

17         Q.    Okay.  Before we get there, we've

18    looked at some inspection reports for -- from

19    2016, and Exhibit 52 is an inspection report

20    from 2017.  And it looks like the format has

21    changed a little bit; not fully, but some of

22    the questions have changed.  Can you explain a

23    little bit about why that is, why some of the

24    questions change between reports?

25         A.    They just continually update the

1  inspection form.  It's --
2          Q.   Okay.
3          A.   It's a moving document that, as
4   rules change, as things are found that, you
5   know, may be problematic, they add different
6   questions and maybe change the way certain
7   questions are asked.
8          Q.   In 11.1 it says, Is there evidence
9   to indicate that a prescription has been
10  dispensed improperly?
11               Do you see that?
12         A.   Yes.
13         Q.   Okay.  And do you see that the
14  answer is no?
15         A.   Yes.
16         Q.   Sitting here today, do you have
17  any recollection of a Walgreens pharmacy
18  dispensing a prescription improperly?
19         A.   I don't have recollection, no.
20         Q.   Okay.  And sitting here today, do
21  you have any recollection of a Walgreens
22  pharmacy having any dispensing errors that we
23  discussed earlier?
24         A.   I know I've investigated some, but
25  I don't have specific recollections.

Page 270

1          Q.    Okay.  What is your recollection
2    of what you have investigated with respect to
3    dispensing errors?
4          A.    I know I've investigated some at
5    probably all of the different stores, but I
6    don't have specific recollections of the
7    incidents.
8          Q.    Okay.  And if you had identified a
9    dispensing error, that's something that you
10    would have noted in the inspection report; is
11    that correct?
12          A.    Correct.  Now, typically we
13    don't -- it's rare to identify a dispensing
14    error while conducting an inspection.
15    Typically we're made aware of a dispensing
16    error and then you go in and conduct the
17    inspection and document the error in the
18    inspection report.
19                So as was seen with the Giant
20    Eagle documents that I reviewed, the vast
21    majority of errors that I investigated came in
22    as a complaint that resulted in an inspection
23    as opposed to the other way around.
24          Q.    Okay.  But one way or another,
25    those items, if they existed, complaints about

Page 271

1    dispensing errors, those would be documented by

2    the Board?

3            A.    Correct.

4            Q.    Okay.  I think we talked about

5    this at a high level with respect to Giant

6    Eagle and the other pharmacies.  But would you

7    agree that the Walgreens controls in particular

8    generally met the Board's requirements?

9            A.    Yes.

10           Q.    Would you agree that the Walgreens

11   pharmacies generally complied with Ohio

12   security requirements in particular?

13           A.    Yes.

14           Q.    And your -- you agree that no

15   Walgreens pharmacy had their license revoked by

16   the Board, to your knowledge?

17           A.    To my knowledge, no.

18           Q.    To your knowledge, correct, that

19   no Walgreens pharmacy had their license revoked

20   by the Board?

21           A.    Correct.

22           Q.    Okay.  And to your knowledge,

23   that -- agree that no Walgreens pharmacy was

24   cited or disciplined by the Board?

25           A.    No pharmacy was disciplined by the

```
                                        Page 272

 1    Board; is that what you're saying?

 2            Q.    Yeah.

 3            A.    Correct.

 4            Q.    Are you aware of a pharmacist?  Is

 5    there a reason why you wanted to make that

 6    distinction?

 7            A.    Yes.  I mean, I've had cases on

 8    Walgreens pharmacists in the past, but not on

 9    the particular company or store.

10            Q.    Okay.  And where there's a case on

11    an individual pharmacist, does the company

12    Walgreens usually cooperate in that case and

13    provide you the information that you need in

14    order to reach resolution?

15            A.    Yes.

16            Q.    Okay.  So as far as you know,

17    picking up on our discussion earlier, the

18    Walgreens pharmacies that you inspected were

19    operating lawfully at all times?

20            A.    As far as I know.

21            Q.    Okay.  And sitting here today,

22    you're not aware of any instance in which a

23    Walgreens pharmacy dispensed a prescription

24    improperly?

25            A.    I have no specific memory of that,
```

Page 273

1  no.

2          Q.   Okay.  And you're not aware of any

3  Walgreens pharmacy, sitting here today, that

4  was knowingly filling illegitimate opioid

5  prescriptions, correct?

6          A.   Not to my recollection.

7          Q.   Okay.  And you don't have any

8  evidence that a Walgreens pharmacy was

9  contributing in particular to the diversion of

10  prescription opioids, correct?

11         A.   Correct.

12         Q.   And I think we talked about your

13  relationship generally with a number of

14  Walgreens pharmacists.  Would you agree that

15  Walgreens and the Walgreens pharmacists

16  cooperated with you and would follow your

17  recommendations?

18         A.   Yes.

19         Q.   And would you agree that Walgreens

20  and the Walgreens pharmacists actively assisted

21  law enforcement with anti-diversion efforts?

22         A.   Yes.

23         Q.   And to your knowledge, Walgreens

24  was never the subject of any similar --

25  criminal or civil investigation due to alleged

Page 274

1    diversion of controlled substances, correct?

2            A.   Correct.

3            Q.   And you never investigated

4    Walgreens pharmacy for violations of the Ohio

5    Code or the Controlled Substances Act or any

6    other form of diversion, correct?

7            A.   Correct.

8                 MS. DESH:  Okay.  I think that's

9    all the questions that I have for you.  Maybe

10   it would be a good time to take a short break,

11   and then if we have any other questioning, we

12   can follow up.  Do you want to take ten

13   minutes?

14                THE WITNESS:  Are these -- the

15   rest of these exhibits in the envelopes, are

16   those yours or --

17                MS. DESH:  They are mine.  I am

18   finished with them.

19                THE WITNESS:  You're finished with

20   them?

21                MR. CIACCIO:  Do any other defendants

22   know if they're -- is anybody definitely asking

23   more questions, CVS or Rite-Aid or anybody?

24                MR. NORTEY:  Let's go off the

25   record.

Page 275

1                THE  VIDEOGRAPHER:  Off the record,

2       3:37.

3                (Off the record.)

4                THE  VIDEOGRAPHER:  We're on the

5       record at 3:49.

6                        EXAMINATION

7       BY MR. HERMAN:

8            Q.   Agent Edwards, I'm Steve Herman.

9       I represent CVS, and I just have a few

10      questions for you; try to go through them

11      fairly quickly.

12               I take it from your testimony earlier

13      today that you've inspected CVS Pharmacies; is

14      that correct?

15           A.   That's correct.

16           Q.   And like with everyone else, when

17      you tried to do that, you tried to be thorough?

18           A.   Yes.

19           Q.   And if there was an issue, you

20      would document it in the inspection report?

21           A.   Yes.

22           Q.   Okay.  Earlier today I think you

23      mentioned that Giant Eagle had an approved

24      software system.  Do you recall that testimony?

25           A.   Yes.

Page 276

1          Q.   Do you recall if CVS also had an
2    approved software system?
3          A.   Yes.
4          Q.   Okay.  And when you say approved,
5    do you mean that it was approved by the Ohio
6    Board of Pharmacy?
7          A.   Correct.
8          Q.   And to your knowledge, has the
9    Ohio Board of Pharmacy ever denied a license
10   application for a CVS Pharmacy?
11         A.   Not to my knowledge.
12         Q.   Okay.  To your knowledge, has Ohio
13   Board of Pharmacy ever denied the renewal of a
14   license for a CVS Pharmacy?
15         A.   Not to my knowledge.
16         Q.   To your knowledge, and based on
17   your inspections, did the CVS Pharmacies in
18   Lake and Trumbull County meet the requirement
19   for licenses?
20         A.   Yes.
21         Q.   To your knowledge, were
22   inspections at CVS Pharmacies generally
23   favorable and positive?
24         A.   Generally, yes.
25         Q.   To your knowledge, has the CVS

```
                                          Page 277
 1   Pharmacy in Trumbull or Lake County ever had
 2   its license revoked?
 3          A.    Not to my knowledge.
 4          Q.    To your knowledge, has the CVS
 5   Pharmacy in Lake or Trumbull County ever had
 6   its license suspended?
 7          A.    Not to my knowledge.
 8          Q.    Earlier today you mentioned that
 9   you had told people occasionally something
10   along the lines of, if you don't write it down,
11   it didn't happen.  Do you recall that
12   testimony?
13          A.    I remember saying that, yes.
14          Q.    Okay.  Even if a pharmacist
15   doesn't document an action, would you agree
16   that the pharmacist could have actually
17   completed that action?
18          A.    Yes.
19          Q.    Okay.  And is it fair to say that
20   you meant that documentation is a best
21   practice, because without documentation the
22   pharmacist may not be able to show he or she
23   took an action after the fact if someone
24   inquires?
25          A.    That's correct.
```

1      Q.   A couple times today you mentioned
2   how things have evolved over time.  I just
3   wanted to talk with you about that briefly.  I
4   think you testified that OARRS was created in
5   2006; is that correct?
6           A.   Yes.
7           Q.   And then later it became required
8   to check OARRS by pharmacists and prescribers
9   in certain circumstances?
10          A.   Correct.
11          Q.   And I think you mentioned that
12  over time the Board of Pharmacy had developed
13  some proactive reports.  I believe you
14  mentioned 640 report; is that correct?
15          A.   Correct.
16          Q.   And do you recall that in 2011
17  Ohio passed a law that regulates pain
18  management clinics?
19          A.   Yes.
20          Q.   Are you familiar with the fact
21  that Ohio has put out prescribing guidelines,
22  various -- I believe they put one out in 2012.
23  Do you recall that?
24          A.   Vaguely I recall that, yes.
25          Q.   And then since that time, they've

1  put out additional prescribing guidelines for

2  prescription opioids.  Do you recall that?

3          A.    That sounds familiar.

4          Q.    Is it fair to say that the way

5  that Ohio and the Ohio Board of Pharmacy have

6  addressed opioid abuse issues has evolved over

7  time?

8          A.    Yes.

9              MR. HERMAN:  Thank you.  That's

10  all the questions I have for right now.

11              MR. CIACCIO:  Plaintiffs aren't going

12  to have any questions.  I think we're done.

13              THE REPORTER:  Will the witness read

14  and sign?

15              MR. CIACCIO:  The witness will read

16  and sign.

17              THE  VIDEOGRAPHER:  Off the record,

18  3:53.

19          (Deposition concluded at 3:53 p.m.)

20                      *  *  *

21

22

23

24

25

Page 280

1   STATE OF OHIO )

2   COUNTY OF MONTGOMERY )        SS:   CERTIFICATE

3

4              I, Patti Stachler, RMR, CRR, a

5   Notary Public within and for the State of Ohio,

6   duly commissioned and qualified,

7              DO HEREBY CERTIFY that the

8   above-named TREY EDWARDS was by me first

9   remotely duly sworn to testify the truth, the

10  whole truth, and nothing but the truth.

11             Said testimony was reduced to

12  writing by me stenographically in the presence

13  of the witness and thereafter reduced to

14  typewriting.

15             I FURTHER CERTIFY that I am not a

16  relative or attorney of either party, in any

17  manner interested in the event of this action,

18  nor am I, or the court reporting firm with

19  which I am affiliated, under a contract as

20  defined in Civil Rule 28(D).

21

22

23

24

25

Page 281

1              IN WITNESS WHEREOF, I have

2    hereunto set my hand and seal of office at

3    Dayton, Ohio, on this 15th day of December

4    2020.

5

6

7

8

     PATTI STACHLER, RMR, CRR

9    NOTARY PUBLIC, STATE OF OHIO

     My commission expires 10-5-2023

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 282

1              Veritext Legal Solutions
                 1100 Superior Ave
2                    Suite 1820
               Cleveland, Ohio 44114
3               Phone: 216-523-1313
4

   December 16, 2020
5

   To: Joseph L. Ciaccio, Esq.
6

   Case Name: National Prescription Opiate Litigation - Track 3
7

   Veritext Reference Number: 4366427
8

   Witness:  Trey Edwards        Deposition Date:  12/11/2020
9

10  Dear Sir/Madam:

11
   Enclosed please find a deposition transcript.  Please have the witness
12
   review the transcript and note any changes or corrections on the
13
   included errata sheet, indicating the page, line number, change, and
14
   the reason for the change.  Have the witness' signature notarized and
15
   forward the completed page(s) back to us at the Production address
16  shown
17  above, or email to production-midwest@veritext.com.
18
   If the errata is not returned within thirty days of your receipt of
19
   this letter, the reading and signing will be deemed waived.
20
21  Sincerely,
22  Production Department
23
24
25   NO NOTARY REQUIRED IN CA

1                   DEPOSITION REVIEW
                 CERTIFICATION OF WITNESS

2

        ASSIGNMENT REFERENCE NO: 4366427
3       CASE NAME: National Prescription Opiate Litigation - Track 3
        DATE OF DEPOSITION: 12/11/2020
4       WITNESS' NAME: Trey Edwards
5            In accordance with the Rules of Civil
        Procedure, I have read the entire transcript of
6       my testimony or it has been read to me.
7            I have made no changes to the testimony
        as transcribed by the court reporter.

8

        _____        _____
9       Date                    Trey Edwards
10           Sworn to and subscribed before me, a
        Notary Public in and for the State and County,
11      the referenced witness did personally appear
        and acknowledge that:

12

            They have read the transcript;
13          They signed the foregoing Sworn
                 Statement; and
14          Their execution of this Statement is of
                 their free act and deed.

15

            I have affixed my name and official seal

16

        this _____ day of_____, 20_____.

17

                 _____
18               Notary Public
19               _____
        Commission Expiration Date

20

21

22

23

24

25

```
                                                Page 284

 1                    DEPOSITION REVIEW
                   CERTIFICATION OF WITNESS
 2

     ASSIGNMENT REFERENCE NO: 4366427
 3   CASE NAME: National Prescription Opiate Litigation - Track 3
     DATE OF DEPOSITION: 12/11/2020
 4   WITNESS' NAME: Trey Edwards
 5        In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
 6   my testimony or it has been read to me.
 7        I have listed my changes on the attached
     Errata Sheet, listing page and line numbers as
 8   well as the reason(s) for the change(s).
 9        I request that these changes be entered
     as part of the record of my testimony.
10
          I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
     that both be appended to the transcript of my
12   testimony and be incorporated therein.
13   _____        _____
     Date                    Trey Edwards
14
          Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
     the referenced witness did personally appear
16   and acknowledge that:
17        They have read the transcript;
          They have listed all of their corrections
18            in the appended Errata Sheet;
          They signed the foregoing Sworn
19            Statement; and
          Their execution of this Statement is of
20            their free act and deed.
21        I have affixed my name and official seal
22   this _____ day of_____, 20_____.
23            _____
              Notary Public
24
              _____
25            Commission Expiration Date
```

1                    ERRATA SHEET
            VERITEXT LEGAL SOLUTIONS MIDWEST
2               ASSIGNMENT NO: 4366427
3    PAGE/LINE(S) /        CHANGE        /REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19

     _____      _____
20   Date                   Trey Edwards
21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22   DAY OF _____, 20_____ .
23                   _____
                     Notary Public
24
                     _____
25                   Commission Expiration Date

**&**

**&**  5:21 6:4,10 7:4
  7:19

**0**

**00918**  5:13
**0196**  163:25
**04294**  4:16
**05**  91:10
**06**  52:3
**08**  18:3 39:15
  210:9
**09**  148:4 157:21
  162:21 163:3

**1**

**1**  2:9 11:6 52:4,7
  62:19 115:16
  148:16 150:3
  168:1,24 178:1,1
  211:22
**1,035**  70:25
**1/23/09**  3:21
**1/7**  181:5
**1/7/14**  4:5
**1/8/13**  3:10
**10**  2:18 48:4 115:4
  159:17 164:18
  165:7 172:20,21
  181:14
**10-5-2023**  281:9
**10/14**  190:12
**10/15**  187:8
**10/7**  165:7
**100**  84:3 133:22
**1000**  7:15,21
**10016**  5:18
**101**  5:23
**104**  2:16
**10569**  4:18 267:24
**10:38**  90:25

**10:49**  91:3
**11**  1:22 2:9,19 9:2
  48:14 108:25
  136:13,14 137:8
  139:24 143:25
  144:4 164:20
  165:5 166:25
  167:9 169:13
  179:9 180:1 182:3
  184:1,2,18 187:24
  188:9 226:7
**11.1**  257:4 268:15
  269:8
**11/15**  164:18
**11/17/09**  3:6
**11/26**  179:13
**11/4/11**  3:7
**11/5/13**  4:15
**1100**  282:1
**111**  2:17
**112**  5:18
**115**  2:18
**11747**  5:7
**12**  2:20 13:15
  39:18 41:25 51:10
  56:16 125:8
  143:25 144:4,9
  152:9,9 184:24
**12/11/2020**  282:8
  283:3 284:3
**12/7/18**  3:11
**1217**  163:3 164:18
  175:2 181:14
**1225**  157:21 167:8
  167:23 177:19
**12:30**  167:14,17
**12:31**  177:6
**12:58**  239:20
**13**  2:22 145:17
  159:25,25 160:3
  175:1 177:16

**178:4 179:13**
  185:11
**130**  179:15,22
**132**  2:23
**135**  2:24
**136**  2:19
**14**  2:23 50:23 51:6
  75:10 88:21 89:2
  95:24 132:25
  143:7 180:17,25
**143**  2:20
**145**  2:22
**15**  2:24 50:23
  52:17 60:22 135:6
  135:6 142:15
  143:7 146:24
  149:18 177:16
  181:5 187:8
  190:12,13
**15,298**  210:7
**150**  179:17
**15219**  7:7
**15th**  281:3
**16**  52:4,9 53:20
  56:6 149:18
  168:11 282:4
**1600**  5:23
**16th**  164:12
**17**  1:10 56:6
  149:18
**18**  1:9,11 3:3
  134:11,23 168:12
  207:12 225:8
  263:21
**18.1**  185:17 257:16
**1800**  7:14
**1820**  282:2
**19**  3:5 184:17
  186:5,15 209:1
  240:7,13 242:10
  243:13 257:17

**258:20 260:10**
**19.2**  258:21
**19.4**  260:10
**1905**  162:7
**1913**  170:7,16
**1915**  169:22
**1919**  169:24
**1923**  180:17
**196**  171:15 172:17
  181:5 187:8
**1998**  15:23
**1:30**  177:2,9
**1st**  51:24 52:3

**2**

**2**  2:10 45:5,9,10
  50:24 56:6 65:6
  115:18 152:14
  159:17 172:21
  211:22 234:23
  235:14 236:2
  237:20
**2.2**  252:23
**2/1/13**  3:24
**2/16**  167:9
**2/16/16**  4:23
**2/4**  148:4
**2/4/09**  151:1
**2/5**  175:1
**20**  3:6 60:22 99:19
  143:14 218:18
  219:16,17 283:16
  284:22 285:22
**2000**  16:1,22,24
  18:5 28:14 196:2
  236:14
**2003**  19:20,21,22
**20036**  7:15
**2006**  48:17 67:9
  133:22 204:14
  216:25 217:14
  278:5

**2008**   17:25 18:1,5 19:22 28:14 38:12 132:13 194:22 207:17 240:16 250:12
**2009**   195:22 196:2
**201**   5:12
**2010**   164:12
**2011**   78:1,5 79:7 167:23 222:1 278:16
**2012**   41:8 226:7 278:22
**2013**   177:19 227:9
**2014**   74:18 76:3,14
**2015**   71:2 143:6 181:14
**2016**   51:24 52:7,13 61:5 263:21 266:2 268:19
**2017**   51:2,3 268:2 268:20
**2018**   60:10 64:18 64:25 132:13 231:23
**2019**   3:23 133:22 195:22 204:15 230:19,21,25 231:11 232:4
**202.778.1893**   7:16
**2020**   1:22 9:2 99:22 144:16 281:4 282:4
**207**   3:3
**208**   3:5
**21**   3:7 133:14,24 188:2 221:20
**212.397.1000**   5:7
**212.784.6400**   5:19
**216**   162:11 169:22 180:19

**216-523-1313**   282:3
**216.781.1111**   5:24
**216.861.0804**   6:13
**218**   3:6
**219**   4:19
**21st**   268:2
**22**   3:8 222:22
**220**   3:17
**221**   3:7
**222**   3:8 155:9
**2222**   6:12
**22259**   281:8
**223**   3:9,10
**225**   3:11,13
**226**   3:14
**227**   3:15,16,18
**2271**   179:3
**2283**   179:7,10
**229**   3:19,20,21,22
**23**   3:9 133:8 223:23
**230**   3:23
**2319**   156:4
**232**   3:24
**2327**   153:23 155:25
**233**   4:3,4
**2331**   164:10
**2339**   169:13
**234**   4:5,6
**2343**   171:8
**2347**   172:15
**235**   4:7,9
**2357**   173:21
**236**   4:10
**237**   4:12,13
**2373**   158:7,8
**2378**   167:7 168:5 168:14

**238**   4:15,20
**2383**   177:15
**239**   2:4
**24**   3:10 48:14 50:12,12 67:15 223:23 224:18,23 246:4
**25**   3:11 225:3
**252**   4:16
**2575**   165:5
**2587**   166:9,15
**2588**   168:10
**2589**   174:25
**2595**   176:15
**2599**   163:1
**25th**   51:2
**26**   3:13 74:18 75:9 133:24 161:1 173:25 191:10 194:4 225:19 226:2 227:9
**263**   4:22
**2639**   181:13
**2643**   182:3
**2645**   184:2
**265**   4:23
**267**   4:17
**26994**   75:11
**26th**   6:6
**27**   3:14 179:9 180:7,7 226:5
**270**   5:12
**275**   2:5
**27th**   240:15
**28**   3:15 179:9 180:7,8 227:8 280:20
**2801763**   163:25
**2802373**   158:9,20
**2804**   1:9,10

**280573**   164:19
**29**   3:16 169:23 220:12 227:24
**2925.22**   18:17
**2925.23.**   18:17
**2:47**   239:17
**2:58**   239:20

**3**

**3**   1:12 2:12 59:22 59:23 62:19 69:20 70:4,5,6 71:1 115:20 151:1 173:7 175:18 211:22 282:6 283:3 284:3
**3/1**   99:18,22
**3/11/04**   3:20
**3/29/17**   3:18
**3/5/11**   3:16
**30**   3:17 6:6 141:16 159:13 220:21 228:2
**300**   6:17
**305**   5:6
**30th**   177:18
**31**   228:2
**312.269.4097**   6:24
**312.494.4445**   6:18
**319**   70:25
**32**   156:2 161:8 176:16 228:2
**33**   3:18 227:23 228:3
**34**   3:19 229:2
**35**   3:20 229:6
**3500**   6:23
**35th**   7:6
**36**   3:21 229:10
**36.4**   265:8
**3646**   238:7

**37**   3:22 161:19
    229:18,18
**3719.13**   137:14
**38**   3:23 230:9
**39**   3:24 161:23
    230:8 232:8 233:3
    233:6
**3:37**   275:2
**3:49**   275:5
**3:53**   279:18,19
**3rd**   222:1

**4**

**4**   2:13 45:20,21
    70:4,9 74:17
    115:21 265:8
**4.6.07**   151:4
**4/1**   169:13
**4/10/06**   210:9
**4/11/12**   3:14
**4/14**   170:12
**4/22/08**   4:19
**4/26/13**   3:15
**40**   4:3 148:17
    150:3 233:10
**400**   5:6
**4097**   181:1
**41**   4:4 233:10,14
**412.338.3344**   7:7
**42**   4:5 234:2
**42,000**   64:18
**4294**   252:11
    264:19
**43**   4:6 234:19
**43215**   6:6
**4366427**   282:7
    283:2 284:2 285:2
**44**   4:7 235:6
**44113**   6:12
**44114**   282:2
**44115**   5:24

**45**   2:10 4:9 15:3
    235:20
**45,000**   63:2
**45032**   1:9
**45079**   1:11
**46**   4:10 236:14
**47**   237:10
**47-29-5-21**   2:18
**4729**   109:10 141:2
**4729-5-01**   113:6
**4729-5-09**   115:25
**4729-5-11**   98:5
**4729-5-16**   115:21
**4729-5-20**   115:19
**4729-5-22**   115:23
**4729-9-02**   100:1
**4729-9-05**   85:17
    91:8
**4729-9-11**   88:11
    96:16,18
**4729.01**   2:17
    111:13
**4729.5-18.**   115:18
**4729.54**   2:16
    104:20 107:8
**4729.551**   108:7
**4729.57**   108:9
    109:2
**4729:5-3-03**   2:19
**4729:5-3-07**   2:22
**4729:5-3-14**   99:20
**48**   4:12 237:12
**49**   2:12 4:13 59:24
    238:3
**4:00**   31:25

**5**

**5**   2:14 85:3 182:3
    182:4,18 183:1,2
    212:19 253:14
**5-09**   120:16

**5-16**   120:4
**5-18**   119:10
**5-20**   119:21 122:4
**5-21**   119:9 121:24
**5-22**   120:13
**5-3-03**   139:25
**5.7**   253:13,17
    268:7
**5/19**   157:21
**5/7**   180:17
**50**   4:15 20:12 79:1
    79:3 132:14,16
    210:10 238:13
**500**   84:3
**51**   4:16 252:5,10
    264:5,15,21
    267:18
**52**   4:17 267:16,20
    268:19
**53**   4:19 219:18,20
    219:21 238:20
**54**   4:20 6:17
    238:23,25
**55**   4:22 6:12 107:9
    263:17
**56**   4:23 265:21
**5736**   209:19
**5737**   211:11
**5739**   212:18
**5741**   216:16
**5760**   240:10,15
**5821**   4:22,23
    263:23,25 265:5
**5822**   263:19
**59**   2:12

**6**

**6**   2:16 47:4 104:19
    107:8 108:25
    154:14
**6.1**   253:10 254:8
    255:16

**6.5**   256:6
**6/17/13**   4:3
**6/18/13**   3:8
**6/21/13**   4:4
**6/4**   210:9
**60**   20:12
**60601**   6:24
**60654**   6:18
**614.466.8600**   6:7
**6377**   148:4 164:12
    171:8 179:5
**640**   81:14,18,19,20
    82:5 278:14
**6578**   191:3
**6695**   187:7
**6702**   187:25
**6704**   187:14
**6705**   190:3
**6739**   189:24
**68**   60:11

**7**

**7**   47:11 151:23
    166:20 183:2
    184:1 231:8
**7,660**   210:11
**7/13**   163:3
**7/30/03**   3:22
**7/30/15**   186:16
**7/7**   180:25
**713.890.5000**   7:22
**74**   2:13
**76.2**   230:21 231:10
    232:4
**77**   6:23
**77002**   7:21

**8**

**8**   2:17 111:13
    187:24
**8/1**   190:12

**8/20/12** 3:9
**8177** 171:14
**844.860.0949** 5:13
**85** 2:14

**9**

**9** 2:4 47:12 164:20
167:2
**9-05** 90:15
**9/23** 143:14
**9/27/11** 3:13
**90** 58:18,23 179:13
179:22 205:13
**93** 133:20
**966** 75:13
**9864** 174:7
**99** 15:25 16:21
**994** 75:12
**9:01** 1:22 9:3
**9:07** 14:9
**9:15** 21:13
**9:17** 21:16

**a**

**a.m.** 1:22
**aaron** 229:20
**ability** 55:12
**able** 10:22 13:8,16
28:12 37:20 68:17
158:12 171:2
204:22 223:16
253:1 277:22
**absolutely** 10:4
**abuse** 29:21 32:9
32:20 48:24 54:9
72:4 127:5 141:5
188:15 279:6
**academy** 15:23
16:16,20 17:8
**acceptance** 10:16
**accepted** 10:16

**accepting** 211:12
**access** 48:22 51:16
52:6 55:23 68:13
73:15,17,22 77:7,9
77:11,15 79:15
89:9,11 116:21
130:17,23,25
131:1 138:16
148:11 169:10
190:17
**accessed** 105:23
**accesses** 59:5
79:17
**accessible** 77:2
80:10
**accessing** 81:9
99:14
**account** 89:24
90:3 93:17 94:13
94:23 95:6,23
97:5 127:25
**accountability**
155:3,8,12 156:8
159:16 162:19
182:21
**accounting** 171:22
**accurate** 10:10
65:16 67:17 70:1
70:16 133:11
181:2 232:2 242:9
254:18,22
**acknowledge**
283:11 284:16
**acquaintances**
59:16
**act** 141:4 178:7
244:25 274:5
283:14 284:20
**acting** 34:17
**action** 65:15 69:10
108:17,20 109:6

123:20 157:3
186:16,16 189:5
190:20 193:17
195:8 277:15,17
277:23 280:17
**actions** 108:10
141:19,22
**active** 253:2
**actively** 196:14
273:20
**activities** 83:9
**activity** 35:23 89:3
92:5,7,12,16 242:1
255:5 256:3
**actual** 125:14,18
195:7
**add** 269:5
**added** 52:12 61:10
61:14,17 62:21
**addiction** 64:21
71:3
**addition** 121:7
258:2
**additional** 52:17
81:3 100:5 134:15
134:19 189:5
236:5 244:18
255:13 263:9
279:1
**address** 9:21,22
120:7 160:18
265:2 282:15
**addressed** 157:8
257:3 279:6
**adds** 51:6
**adequacy** 89:7,8
89:10,17 95:24
169:1
**adequate** 97:18
107:13,16 152:24
152:25 153:1

166:21 254:9
255:17
**adequately** 106:8
183:7 193:4 197:6
252:2
**adherence** 105:7
**adhering** 85:13
**adjudication**
72:21
**administer** 44:21
**administers** 58:9
58:11
**administration**
58:10,11
**administrative**
2:14 41:19,20
42:12,18 44:24
45:1 46:11,17
65:14 84:13,17
85:5,14 88:12
98:5 143:24
**advance** 176:5
263:10
**advertised** 199:18
**advice** 243:14
**advise** 103:14,16
214:4 222:17
**advised** 159:18
242:18
**affairs** 46:21 47:6
**affect** 231:16
**affiliated** 95:3
202:4 280:19
**affirmative** 182:23
**affixed** 283:15
284:21
**afternoon** 177:11
239:23
**afterward** 17:10
**agencies** 36:2,4,7
37:20 65:19,25

66:3 76:12
**agency**  16:24
  17:24 18:8,13,14
  41:7 44:2 47:4,4
  66:20 76:17 83:4
  103:25 143:20
  151:18 194:21
  209:6 232:20
**agent**  10:6,9 11:14
  17:1,23 18:6,11
  19:3 20:9,22 22:4
  24:17 27:12 28:4
  28:10,17 30:3
  31:1 33:8 34:4,4
  37:18,19 38:15,17
  38:20,22 39:14
  41:4,14,25 43:5
  49:8 54:5,16
  71:10 72:23 73:6
  73:22 78:23 85:8
  88:25 105:12,18
  107:21 111:6
  121:16 137:18,22
  140:5,12 149:19
  159:1 183:17
  204:20 207:11
  208:1 209:5
  210:23 213:18,22
  214:14 216:17,25
  217:13 220:20
  221:15 222:11
  230:16,24 231:14
  232:21 239:4,14
  240:16 242:13,14
  242:16,17 243:6
  251:19 275:8
**agent's**  134:25
  137:21
**agents**  31:22 39:1
  39:8,10 40:24
  42:14 43:6,8,14

47:14 48:11 60:16
  61:1,14,16 62:14
  69:22 74:24
  103:25 106:10
  107:4 109:22
  135:1,3 140:7
  142:7 222:1
**ago**  24:15 43:19
  61:12 77:12 143:4
  146:3 259:23
**agree**  92:2 130:7
  245:6,20 246:20
  248:5 271:7,10,14
  271:23 273:14,19
  277:15
**agreed**  12:3
**ahead**  71:19
  203:12 251:12
  261:19 262:9
**aid**  7:18 23:5,20
  101:12 174:14
  196:19 197:5
  216:19 217:12,19
  237:21,22 239:5
  241:24 274:23
**akron**  52:24
**al**  1:9,9,11,11
**alarm**  89:8 91:25
  154:17,18
**alerted**  242:11
**algorithms**  83:23
  84:6 127:14
**allegations**  41:17
**alleged**  195:14
  273:25
**alleviate**  61:17
**allow**  55:14 70:10
  140:7 173:17
**allowed**  138:12,16
**allows**  91:19
  107:17

**alprazolam**
  233:12
**altered**  233:7
**altering**  22:1 59:2
  59:10 244:4
**alternate**  182:17
**amanda**  8:5
**american**  124:8
**amount**  43:22
  119:13 134:1
  205:9 251:25
**amounts**  202:8
**amy**  248:25
**analgesic**  56:13
**analogs**  230:20
  231:10 232:3
**analyze**  81:11
**analyzing**  212:16
**andrea**  220:15
**angela**  228:8,18
**announcing**
  238:15
**annual**  145:21,25
**answer**  11:23
  129:9,12 131:7
  134:7 149:25
  153:19 172:4
  184:4,11 185:6,12
  186:13 194:16
  197:16 198:6
  253:13,15 254:11
  256:9 257:22
  260:11 268:9
  269:14
**answered**  145:12
  182:10,23 184:25
  185:20
**answering**  181:24
**answers**  181:21
  196:20

**anti**  103:3 196:15
  198:15 273:21
**anticipate**  47:16
**anticipated**  47:12
**anybody**  76:24
  274:22,23
**anymore**  36:21
**apparently**  173:24
  179:10,20
**appear**  91:23
  182:3,19 283:11
  284:15
**appearances**  5:1
  6:1 7:1 8:1 9:7
**appeared**  227:3
**appearing**  10:14
  11:8
**appears**  47:13
  54:11,21 120:5,16
  167:24 169:13
  187:5 189:24
  190:3,9 222:22
  223:2 226:4
**appel**  6:5 13:5
  21:6,7 86:2,2,8
  90:9,16,23 167:11
  167:15 262:19,19
  262:20
**appellation**  10:10
**appended**  284:11
  284:18
**applicant**  88:15,17
  141:16,20
**applicant's**  89:18
  95:25
**application**  104:14
  140:1 276:10
**applying**  105:13
  140:6
**appreciate**  262:2

| | | | |
|---|---|---|---|
| approached  186:3 | ashtabula  36:22 | attorney  6:4 | **b** |
| appropriate  122:9 | 40:13 | 280:16 | **b**  88:10 90:11 |
| 265:9 | asked  27:20 47:17 | attributes  182:19 | 91:10 115:14 |
| approved  75:5 | 153:19 155:23 | audit  182:21 | 122:6,8,25,25 |
| 85:18 86:24,24 | 156:3,16 169:25 | auffant  5:11 | 139:25 237:14 |
| 87:5,9 151:16,17 | 186:2 187:3,10 | august  74:18 75:9 | ba  16:3 |
| 151:20 171:10 | 259:4,6 269:7 | 181:14 | back  14:12 21:18 |
| 275:23 276:2,4,5 | asking  129:16 | aunterreiner  8:5 | 24:14 25:5,11 |
| approximate | 239:25 274:22 | authentication | 27:19,20 33:21 |
| 74:22 134:1 | asks  268:7 | 161:9 175:7 | 34:1 35:7 42:24 |
| approximately | aspect  44:24,24 | 176:17,22 | 43:11 80:3 91:6 |
| 13:12 51:1 60:10 | 45:2 | authorities  66:10 | 118:24 122:4 |
| 132:8,18 134:21 | assigned  36:10 | authority  66:12,16 | 131:21,23 145:11 |
| 143:3 177:2 | 40:6,21,24 62:12 | 108:10 137:25 | 170:9,21 172:13 |
| 191:10 | 62:15,17 103:2 | authorize  284:11 | 179:17 193:7 |
| april  226:7 227:9 | 133:16 | authorized  61:22 | 205:4 216:6 240:3 |
| aprs  58:8 | assignment  283:2 | 89:10 114:14 | 248:25 264:15 |
| area  22:17 24:22 | 284:2 285:2 | 137:18 140:4 | 265:4 282:15 |
| 26:11 28:24 29:3 | assist  23:25 24:3,8 | 182:9,14 210:7 | backed  178:10 |
| 40:7,9,19 41:4,10 | 24:12 26:16 47:20 | authorizing | background  15:17 |
| 51:13 52:19,21,24 | 69:14,18 207:20 | 136:15 | 39:6 100:22,24 |
| 52:25,25 53:3,6,7 | 209:8 212:5 | automated  25:5 | 136:12 265:9,14 |
| 53:15,15 61:22 | 238:10 | automatically | 266:3,5 |
| 62:15,17 96:10 | assisted  72:3 | 202:25 | backgrounds  39:2 |
| 125:10,12,20 | 101:15 204:8 | availability  89:16 | 39:4 |
| 135:1 204:9 214:5 | 249:9 273:20 | available  34:1 | backing  267:5 |
| 214:15 215:7 | assisting  196:14 | 143:15 152:4 | backtrack  131:22 |
| 226:24 227:2 | 198:14 | 161:6 | backwards  219:16 |
| 241:4 | associated  220:14 | ave  282:1 | bad  21:1 24:20 |
| areas  29:2 62:1 | associates  35:5 | avenue  5:12,18,23 | 219:7 233:20 |
| 83:12 89:11 134:2 | association  17:12 | avoid  122:10 | badala  5:5 |
| 135:1 144:9,11,20 | 37:25 | 213:2,3,20 | ballpark  60:19 |
| 149:14 157:25 | assume  9:19 11:14 | aware  77:3 84:20 | barcode  152:15,19 |
| 181:25 250:15 | 12:2 155:2 | 99:20 116:6 123:9 | barnes  2:4 7:5 |
| arks  182:8,16 | atrium  224:20 | 194:2 200:2,7 | 9:14 14:10 21:11 |
| arrest  18:14,21 | attached  108:7 | 217:10,15 225:13 | 21:17 24:13 45:8 |
| 66:13 234:2,14 | 119:8 284:7 | 225:17 228:12 | 45:12 62:10 70:3 |
| arrested  234:10 | attempting  193:1 | 241:6 258:8 | 70:6,8 71:18 |
| arrived  42:9,11 | attention  198:18 | 270:15 272:4,22 | 78:15 86:4,10,11 |
| article  3:16 | 206:16 257:4 | 273:2 | 90:13,21 91:4 |
| | 265:19 268:6 | | 93:22,23 94:1,2,6 |

94:8 100:25 101:5
101:7 108:22,24
109:2,4 128:9
129:1 132:3 137:6
137:8,11,12
153:22 154:1,4
158:5,7,9,15
167:14,16,19,21
168:4,8,11,14,17
168:19 176:25
177:4,10 193:16
194:15,18,19
197:3 198:4 201:5
203:16 213:16
214:11,13 219:21
219:24 239:3,13
260:23
**barricade** 105:19
105:25 106:2
136:4 154:6,10,10
169:18 171:9,10
**barricades** 97:12
162:17
**bartlitbeck** 6:15
**bartlitbeck.com**
6:19
**bas** 237:14
**based** 81:15 82:16
83:6 87:5 91:20
121:15 129:5
134:25 150:18
183:15 187:22
188:12 276:16
**baseline** 260:3
**basically** 20:24
26:4 31:24 40:15
42:15 49:12 104:7
117:8 208:20
244:19 259:6
**basis** 22:24 49:22
50:6 71:14 79:18

79:19 86:13 110:1
147:13
**bates** 75:10 137:7
158:6 168:6
180:17 182:3
187:24 252:6
265:22 267:21
**bayus** 4:14 238:5
**befriended** 224:10
**began** 16:24 17:25
21:10 64:24
134:20 178:2
186:16 242:7
**beginning** 64:18
136:13 148:2
162:7 163:25
164:10,19 177:15
181:13 189:23
**begins** 158:19
163:1 172:15
**begley** 4:5 19:20
226:13
**behalf** 5:2 6:2,9,14
6:20 7:3,10,18
10:17 240:1
**behavior** 25:21
73:3,7,11 194:25
218:13 249:8,9
**behavioral** 111:19
**believe** 19:21
26:18 30:5 36:21
40:21 41:3,8 50:8
50:9,9,11,21 51:1
53:22 55:11 61:6
61:15,21 63:9,11
63:13 68:12,24
70:5 75:2 77:4
80:2 81:20 83:17
85:1 90:4 96:7
100:17 101:11
111:3 114:1 126:2

126:12 130:20,21
146:1 152:9
157:10 161:16
167:6,24 170:23
173:23 177:16
178:24 180:4,15
186:11 188:22
190:14 191:1,18
192:1 198:17
199:1 204:4
206:23,24 207:7
208:11 210:14
211:2 218:5 220:8
223:18 227:1,7
228:17 230:3
232:12,24 235:10
237:16 240:18
247:13,19 253:22
259:4,14 263:23
278:13,22
**believes** 179:16
**bell** 78:1 237:17
237:18,22 238:11
**belong** 247:25
**beneficial** 26:7
**benzodiazepine**
56:14 58:17
**berris** 5:21
**best** 129:8 193:2
251:7 277:20
**better** 69:3 76:25
86:16 146:9
154:14 170:1
192:12 203:11
**beyond** 121:19
189:11 206:11
**biannual** 145:25
**biedenham** 236:3
**biennial** 161:4
**big** 168:15 188:25

**bigger** 68:25 135:1
**bill** 41:3
**binder** 10:19
44:11 45:6 267:17
**biological** 111:19
**biometric** 178:6
**bit** 39:21 67:7
147:1 154:14
241:9 243:22,25
245:3 246:19
247:12 248:12
254:13 258:25
261:9 268:21,23
**blanket** 197:16
246:15
**blinking** 82:11
**board** 2:10,20 6:3
6:9 8:4 9:25 10:6
10:17 13:6,23
15:14 18:3 27:22
30:22 34:4 37:13
37:19 38:10,11,18
40:6 41:15 42:1,9
43:5 44:16 45:15
45:23,23 46:4,11
47:8 48:11 49:20
53:12,17 60:9,11
61:20 62:2 63:1
64:18 65:7,8,11,23
65:24,24 66:5,18
66:21 68:3 69:22
70:11,18 72:17
74:23 77:14 79:5
81:6,10,15,25
83:19 84:23 87:18
88:3,13,18 89:2,24
91:15 93:18 94:13
94:23 95:14 96:14
97:4 102:12
103:11,15 104:2,5
105:3 106:1 107:3

108:10 109:14,22
110:25 114:10,15
116:2,8 117:16
119:11 120:1
121:18,23 123:10
126:8 127:12
132:6,25 133:20
133:24 136:16,21
137:15,17,18,20
137:21 138:24
139:10,14,22
140:3,5 141:1,16
141:19 142:2,24
143:11 145:15
147:17 152:6,12
153:8 165:1 192:4
192:13,16 194:22
195:12 196:3,23
200:1 202:13
204:21 207:5,7,11
207:21 215:4
220:10 221:5,25
222:11 228:25
229:14 230:16
231:14 232:21
242:11 243:1
262:21 265:24
271:2,16,20,24
272:1 276:6,9,13
278:12 279:5
**board's** 62:20
101:16 105:7
114:25 121:13
147:22 155:5
160:5,9 161:13
163:19 175:13
176:21 271:8
**boards** 65:22 66:1
**bob** 90:9
**bockius** 7:19

**bodi** 216:25
**body** 57:4 114:15
138:24
**book** 42:23,24,25
45:16 60:2 104:19
**bop** 252:7 265:23
267:21
**border** 57:10 58:5
**bordering** 57:11
**borders** 57:13
**borrowing** 59:3
**bottle** 179:17
**bottom** 45:21
69:21 73:15
135:12 240:10,15
**boundaries** 29:1
**box** 260:20
**boxes** 181:24
**break** 12:11,13
47:14 55:4 62:2
86:3 90:12,22
91:6 129:18 177:1
177:13 239:8,12
274:10
**breaking** 35:16
47:4 86:6 167:12
**breaks** 46:10
**briefly** 278:3
**bring** 241:11
257:3
**brings** 131:8
**broad** 6:6
**broadhollow** 5:6
**broke** 14:12
**broken** 100:2
**brothers** 223:5
**brought** 205:4
**building** 5:23
86:21 87:8 89:6
205:23

**buildings** 107:12
**bunch** 150:21
158:23
**buprenorphine**
64:21
**bureau** 36:20 37:2
65:24
**burlinghaus**
235:14
**business** 89:15
201:21 202:2,11
206:5
**bypass** 173:13

**c**

**c** 5:5 97:24 122:6
124:5 140:11
141:18 185:13
254:17
**ca** 282:25
**cabinet** 247:25
248:4
**california** 176:13
**call** 10:2,9 14:20
15:6 19:4 23:7
24:24 25:14 26:22
27:1 77:8 80:12
82:19 85:14 103:6
112:20 123:5
132:20 137:1
142:3 222:18
234:12
**called** 1:17 22:12
27:8,13,19 36:21
39:7 45:14,22
59:24 61:8 84:16
92:8 105:19 142:3
159:8,8 188:7
207:20 222:4
237:3
**calls** 25:3 30:7
241:15 249:14

**capable** 169:4,8
175:16
**capsules** 179:14
**cards** 252:24
**care** 21:9 68:22,23
69:3 111:12,17,21
**cared** 205:12
**career** 132:5
141:11 235:11
249:20
**carman** 224:10,16
**carrier** 188:16
**carry** 137:19
**case** 1:9,10,11,12
12:20 13:20 23:5
26:9 30:5,9,18,21
36:15 56:1 62:17
77:5 86:13,13
130:1 166:5 192:2
202:21 205:2
207:10 208:9,10
212:17 221:3
224:15 228:12
236:12 237:24
272:10,12 282:6
283:3 284:3
**caseload** 61:16
134:25
**cases** 20:12,19
28:21 29:1 31:15
31:16,20,21 32:2,5
72:16,23 199:3
235:11 272:7
**cash** 211:17,20
**catch** 37:1 254:23
**category** 32:7 61:4
127:1
**cause** 206:12
211:24
**caused** 241:7
258:21

causing  259:10,25
center  63:8 245:15
    246:3
centers  63:5
centre  7:6
certain  51:17 56:8
    62:15 76:11 94:11
    97:10 110:9
    119:13 120:18
    121:9 123:6
    129:23 140:20
    149:17 150:24,24
    151:13,13 155:18
    157:25 173:7
    179:12 181:7
    191:11 200:12
    206:10,12 215:1
    224:2 245:21
    265:12 269:6
    278:9
certainly  64:10
    73:9 150:1 215:18
certificate  280:2
    284:11
certificates  153:10
certification  283:1
    284:1
certifications
    16:10
certified  9:11
    16:12,15
certify  280:7,15
ces  22:21
cetera  72:21 83:9
    89:14 112:2
    119:25 125:12
    128:21 131:25
    148:20 160:19
    175:21
cfr  45:4 84:13
    87:25

chad  83:21,22
    129:20
chain  3:7,8,9,10
    3:13,14,15,18,21
    3:24 4:3,4,15
    134:2,5 163:15
    200:25 203:5
    247:15 255:2
    256:21
chains  222:23
change  33:15
    99:21 145:24
    156:17 231:18,25
    268:24 269:4,6
    282:13,14 284:8
    285:3
changed  39:20
    40:11 58:8 79:16
    95:16 145:25
    231:20 268:21,22
changes  95:18
    282:12 283:7
    284:7,9
changing  244:5
channel  29:10,24
channels  29:9
    73:10
chaotic  183:13
chapter  141:2
chapters  45:24
charge  216:17
charged  45:23
    65:8 69:23 208:22
    218:12
chart  123:21
    130:16,23 131:1
charts  74:5
check  54:6,16 55:5
    55:14 56:2,23
    57:3,10,19 58:19
    58:22 59:17 117:9

117:17 118:2,7
    119:17 121:4,9
    124:14 126:1,15
    126:19,22 151:24
    165:25 166:3,3,20
    169:9,10 176:5
    265:14 266:3,5
    278:8
checked  26:23
    118:10 119:4
    120:10,15 155:18
    160:15 161:4
    165:14 169:5,18
    175:19,24 176:1
    184:8
checking  118:15
    121:15,25 122:22
checkmarks  258:6
    258:15
checks  55:3
    255:13 265:9
chemical  111:19
chicago  6:18,24
chris  4:5 19:20
    28:7 226:13
christmas  260:24
christopher
    233:12
chronicle  3:16
chronological
    177:17
ci  208:1,6
ciaccio  5:4 24:10
    71:16,17 78:12,12
    128:7,23 132:1
    194:8,12,13
    196:24 198:3
    201:2 205:17
    261:4,12,23 262:7
    262:14 263:2
    274:21 279:11,15

282:5
ciarlillo  4:11
    236:15 237:4
circle  148:24
    158:23
circled  148:17,21
    149:1,10 157:23
    181:20
circles  149:1
circling  148:24
circlings  148:20
circulated  225:15
circumstances
    56:8,11,22 86:15
    125:4 127:16
    130:3 278:9
citation  193:21
    266:10,18,18
cite  190:24 262:15
cited  192:16
    271:24
city  9:22
civil  1:19 11:17
    20:2 44:18 195:13
    273:25 280:20
    283:5 284:5
clarification
    266:21
clarified  135:17
clarify  266:17
class  15:24 61:7
classes  17:10,11
clean  162:20 164:1
    164:13 167:22
    171:19 175:2
    177:22 180:18
    181:1,5 187:3
cleanliness  155:3
cleveland  5:24
    6:12 15:24 53:2
    282:2

client 90:19 240:4
clinic 78:22,24
  79:6 92:15 245:5
clinical 39:5
  111:20
clinics 63:23 64:1
  71:2 72:4,5 78:6,8
  78:17 201:6,7
  202:7,24 203:2
  245:8 278:18
clint 8:8 45:8 70:3
close 27:24
closed 31:12
  200:15
closely 249:23
code 2:14,16 18:17
  18:25 41:18,19,19
  42:12,12,18,18
  45:1,4,25 55:21
  65:4 83:15 84:12
  84:13,17 85:5,14
  88:9,12 97:23
  98:6 99:24 100:1
  100:11 104:20,21
  107:8,11 108:6
  110:10,12 111:9
  111:13 113:5
  114:19,24 115:2
  119:9,20 137:13
  137:14 139:24
  141:2 143:24
  144:2 274:5
codeine 35:14
codes 20:23
codified 55:19
cognitive 156:11
  175:8
collaborating
  36:16 113:24
  114:4,18,20

collect 67:22
collects 67:9,25
college 15:18
  248:21
collins 28:7
columbiana 41:11
columbus 6:6 9:25
combatting
  249:10
combination
  230:22 231:12
combinations
  217:1 242:22
come 28:16,24
  126:14 140:8
  170:8 176:5 233:5
  255:12
comes 83:23
  117:18 168:9
  197:19
coming 28:18 36:7
  52:23,24 68:5
  204:23 225:25
commission 281:9
  283:19 284:25
  285:25
commissioned
  280:6
commit 35:19
committing 20:22
common 31:6
commonly 27:7
  31:17 72:10
communication
  46:11,20,24 47:6
communications
  12:20
company 272:9,11
compare 28:1
compared 157:22

compensation
  65:25
competent 102:7
  228:23
competing 76:24
  76:24
compilation 135:6
  146:24
compile 25:8
complainant
  179:14
complaining
  217:14
complaint 24:8
  37:16 165:24
  166:2,8 179:21
  187:22 270:22
complaints 22:11
  24:6,7,16 210:24
  211:3 216:24
  270:25
complete 70:21
  131:20 170:17,22
  171:25 212:14
completed 143:2
  170:16,18 179:25
  188:4 218:22
  252:2 266:1,3
  277:17 282:15
completing 186:1
complex 47:24
  48:2 72:18,24
  131:6 208:9
  210:19
compliance 38:20
  38:22 47:6 86:17
  88:3,6,10,20 89:1
  90:1 91:10,20
  99:12 100:10
  109:14 118:19
  161:2,5,21 172:13

266:12,25
complied 91:16
  165:1 193:23
  271:11
complies 253:8
comply 70:12
  109:7 114:11
  172:5,12 192:8
complying 108:4
  120:25 160:16
  197:12
component 41:21
  42:7 44:20 113:16
comport 47:7 73:5
compounding
  48:3 111:24
comprehensive
  68:3 76:18
compromise 216:8
  227:22
computer 223:13
  258:7,15
concern 202:13
  206:13 211:24
concerned 84:23
  160:5 173:22
  195:20 215:7
concerning 76:25
  101:20 145:12
  187:11 211:14
concerns 216:11
  242:12
concerted 188:17
concierge 8:8
concluded 279:19
condition 131:10
  131:25 136:21
conditions 51:17
  51:20 52:8,10,11
  81:9 121:9 188:14

conduct  105:18
136:16 270:16
conducted  70:18
87:2 89:3 92:6
180:21 208:21
242:6
conducting  69:23
75:8 174:12
253:23 270:14
confidential  208:2
confirm  264:5
confirmed  210:7
217:4
confiscated  212:22
connect  58:5
connected  58:12
151:5 178:12
connection  15:9
141:25 191:5
219:2 229:24
conroy  5:16
consent  140:7
consider  66:15
88:18 89:2 122:19
146:13 160:8
considered  205:16
considers  82:9
consistent  124:6
230:23 242:25
268:10
conspiracies  34:23
constitutes  140:3
construction  89:6
consultations
72:20
consulting  122:16
consumer  165:24
consuming  72:17
contact  13:22 14:1
14:14

contacted  242:18
contain  175:20
containers  100:4
containing  89:11
contents  144:1
context  29:5
259:19 260:6,8
continually
268:25
continue  95:10
243:8
continued  105:6
139:21 232:20
continues  144:9
continuing  16:17
22:20 114:7,12
154:5
contract  280:19
contraindicated
131:15
contributing  73:3
73:7,8,13 196:4
197:25 273:9
control  62:22
85:25 89:7 102:18
120:20,24 141:5
146:9,14 151:12
152:18 155:10
160:2,4,6 170:17
176:20 183:14
controlled  46:1
49:24,25 50:1
51:7 53:23 64:2,8
65:11 67:10,14
68:5 71:3 72:1,9
72:10,11 75:24
76:19 77:1,22
79:22 80:18 92:25
93:7,12,16,16
94:12,15,18 95:2
105:2 120:19

145:16,22 146:18
155:14 170:17
175:19 180:9
190:11 195:14
199:7 200:3,19
202:9 204:23
205:10 206:7
210:8,18 217:2
274:1,5
controls  50:3
84:24 85:19,23
86:24,25 87:6,20
96:4 97:10 163:16
163:18 171:25
178:14 181:7
185:14 192:12
200:25 203:5
254:15 255:17
256:21 271:7
conversations
15:8,12
convicted  59:7
215:16
convictions  241:25
cooperate  102:11
191:16 272:12
cooperated  273:16
cooperative  23:25
138:12 148:11
228:24 233:24
coordinate  263:17
copies  27:4 42:17
168:18 261:25
262:10
copy  158:4 170:1
171:3,15,16 174:1
174:4,13 180:10
180:11 262:21,22
262:24 266:4
corner  40:16

corporate  178:11
229:21
corporation
195:17
correct  10:8 14:16
18:4,25 19:1
24:19 26:3,13
29:12 31:13 38:13
38:16 39:9 46:3
46:19 47:22 48:17
48:18 49:18 51:18
56:17,24 57:14,17
58:21,23,24 62:12
62:13 64:9,16
68:19 79:19,20,24
80:24 82:23 83:2
84:10,14 87:17
91:17,18,21,22
93:13 95:13 105:3
105:4 109:23
113:20 114:6
116:23 117:19
118:2 119:3,14,15
120:21,22 121:6
121:10,11 125:16
125:20,23,24
126:9,23 132:2,6
132:18 133:18,18
135:20 136:23
137:4,25 138:2
139:2,16,17,22,23
140:9,14,15,21
141:8,20 143:18
144:19,21,22
145:16,19 146:6
149:21 150:3,4,10
152:2,13 153:14
153:17 154:9,23
154:24 155:4,7,21
156:15,20 158:25
159:5,14 160:23

160:24 161:2,3,7
162:5,23,24 163:9
163:10 164:21,22
165:22 167:9
169:10,11 170:2,3
172:7 173:2
174:19 175:2
176:3,11 181:23
182:25 184:5,12
186:8 189:16
190:20 191:7
208:3 209:7
215:12 216:13,15
217:25 221:11
222:7 226:12
227:21 228:22
240:20 242:1
243:11,17,20,21
246:5,11,12,17
248:1,10,11 249:5
250:25 252:3,4,13
252:19,20 253:2
255:3 256:23
257:21,24,25
258:18,19 259:15
264:9,12,22,23,24
265:3 267:3,8,9
268:1,13,14
270:11,12 271:3
271:18,21 272:3
273:5,10,11 274:1
274:2,6,7 275:14
275:15 276:7
277:25 278:5,10
278:14,15
**corrected** 250:23
251:5
**corrections** 282:12
284:17
**corrective** 141:22
157:3 186:16

190:20
**correctly** 247:16
**corridor** 37:6
**cosmetic** 141:3
**cough** 35:14
**counsel** 12:20 13:5
115:22 118:14
239:5 261:8
262:20 263:6
**counseling** 111:25
118:16 120:14
122:17 161:20,20
**count** 179:17
254:21
**counted** 179:17
254:24
**counterfeit** 225:14
**counties** 5:2 40:16
41:12 133:6 135:9
195:23 196:6
198:2,16,25 200:5
200:13 201:8
204:3,7,16 205:1
225:16,25 227:6
231:3 250:18
**counting** 255:10
**country** 35:16
199:14
**counts** 255:7
**county** 1:8,10 2:24
2:25 14:4,15,21,22
15:10,25 16:22,23
17:6,23 18:8 26:2
27:23 28:14,17,19
28:19,23,24,25
30:13,25 31:16,21
35:2 37:4,14
40:23,25 41:9
52:23 57:11,13,16
57:19 133:2,9,10
133:14,15 147:11

148:2 174:8 191:4
191:22 194:21
198:24 200:11,15
200:22 204:12,24
205:5,5 206:20,23
207:9 209:6 221:2
221:10 222:10,13
223:15 225:21,22
226:25 229:8,20
229:25 232:20
242:5 243:24
252:12 263:20
267:25 276:18
277:1,5 280:2
283:10 284:15
**couple** 13:14
24:15 60:20,25
61:25 76:7 146:1
146:2 202:4 240:3
252:22 257:1
260:16 268:6
278:1
**courier** 261:7
**course** 12:22 16:6
33:17 206:4
208:19 250:22
256:4
**court** 1:1 9:6 12:7
47:17 59:17
261:16 263:18
280:18 283:7
**cover** 93:6 174:25
240:2 250:17
264:8
**covered** 48:6
77:10 81:10 125:5
125:12 182:11
185:8 227:24
228:1 240:2
**covering** 125:3

**create** 25:23
116:15
**created** 44:2 49:9
138:23 139:8,12
145:4 278:4
**creating** 22:2
**creation** 49:6
142:10
**credentials** 137:21
138:8
**crime** 25:15 31:6
33:11 244:9 245:1
**crimes** 20:21 21:1
236:9
**criminal** 15:21,22
16:3 20:1,2,3,4,5,8
34:6 37:16 41:17
44:19 45:3,3 48:5
48:11 65:14 66:8
72:16,20,23 73:3,6
73:11 134:18
194:23 195:13
218:13 220:17
235:4 241:25
273:25
**criminally** 208:22
215:16 220:16
**criminals** 28:25
31:3 35:22 37:22
**criteria** 205:15
**critical** 73:19
**critically** 128:18
**crr** 1:20 280:4
281:8
**cues** 12:9
**curb** 73:17
**current** 15:13
30:12 33:3 39:22
153:9 249:2
**currently** 41:3
61:7,24 68:8

69:22 78:24
156:10 253:2
**cursor**  253:25
**cut**  127:15 131:3
**cuts**  12:16
**cuyahoga**  28:23
37:4 40:14 225:22
**cvs**  7:10,10,11,11
7:11 23:5,19
101:11 196:19
197:5 239:6
274:23 275:9,13
276:1,10,14,17,22
276:25 277:4
**cyclical**  134:10

**d**

**d**  2:1 7:6 113:6
122:7,16 124:4,22
124:25 140:25
280:20
**daily**  22:24 50:6,8
76:1 139:9 156:10
161:8,11 175:6,8
176:16,22
**dangerous**  41:23
46:2,15 48:8 63:3
65:10 84:25 85:20
89:4,5,12,20 92:8
92:10,19,20,23
93:1,6,11,11 94:10
96:2 98:4,7,10,16
107:14 137:16
140:2 185:2
**daniel**  4:14 5:22
238:5
**data**  3:23 67:15,20
67:22 75:24 76:9
76:22 81:11,15
82:1,7,15,16 83:20
129:23 130:8,12
130:18 152:9

166:18,18,24
178:10 190:11
232:7
**database**  46:23
49:9 55:17 67:16
68:18 76:25 77:6
77:16,18,20 130:9
139:18 190:23
**date**  9:1 117:25
141:21 143:5
149:12 155:20
180:10,20 190:5
244:6 282:8 283:3
283:9,19 284:3,13
284:25 285:20,25
**dated**  177:18
190:5 227:9
**david**  201:24
**day**  6:21 15:4
49:22,22 50:5
51:14,22 58:23
150:15 156:5,6,8
246:4 261:3 266:6
281:3 283:16
284:22 285:22
**days**  13:14 50:11
58:18 141:17
159:13 161:25
173:11 282:18
**dayton**  281:3
**dc**  7:15
**dea**  17:11 36:3
153:8 155:9
169:23 171:20
175:20 206:10
**deal**  114:24
188:25 217:18
**dealing**  92:7 130:4
144:2 228:24
**dealings**  22:25
25:10 232:16

**deals**  186:25
240:14
**dealt**  211:25
**dear**  282:10
**death**  218:11
**deaths**  230:22
231:11 232:5
**deceive**  244:19
**december**  1:22 9:2
225:7 236:14
261:2 281:3 282:4
**deception**  48:7
245:1
**deceptive**  35:23
**decide**  77:7 150:23
**decided**  157:25
**deciding**  112:14
**decisions**  55:24
**deed**  283:14
284:20
**deem**  53:14
**deemed**  88:12,19
282:19
**default**  80:2
**defendants**  1:18
23:4,8,12,24
100:15 101:9
102:15 103:22
138:5,12,16
146:17 147:20
196:19,21 197:5
274:21
**deficiency**  267:7
**define**  34:11
111:10 128:24
**defined**  280:20
**definitely**  274:22
**definition**  93:10
111:15 112:22
113:4 204:14
244:13 247:13

**degree**  15:19 16:6
**delivered**  261:7
**demangone**
201:24
**demay**  248:16,24
249:7
**denied**  276:9,13
**dental**  65:24
**dentists**  66:19,22
**department**  47:7
83:5 100:20
102:19 103:17
107:6 230:10
232:7 255:6
282:22
**departments**
100:16 101:10,15
102:16 255:3
**depend**  260:5
**depended**  86:14
**depending**  53:4
86:20 245:23
251:19
**depends**  127:7
251:16,16,17
260:7
**deposed**  9:12
11:10
**deposition**  1:16
2:9 10:15 11:6,17
11:19 12:23 13:1
13:4,13 104:4
177:12 262:24,25
263:11 279:19
282:8,11 283:1,3
284:1,3
**deposition's**
261:25
**depositions**  263:4
**derived**  111:18

**describe** 22:8
41:13 112:11
241:9
**described** 154:7
**describing** 75:20
**description** 2:8
3:2 4:2 25:6 41:24
45:22 48:10,15
67:17 70:16 75:19
**desh** 2:4 6:16
239:11,22,25
260:25 261:6,15
261:21 262:4,11
263:12,14 274:8
274:17
**designed** 49:1,4
70:13
**detail** 200:9
**details** 187:17
190:16
**detect** 70:13 85:19
254:10,15 255:17
**detecting** 65:9
256:15
**detection** 89:8
213:2,3,20
**deter** 70:13 85:19
254:10,15 255:18
**determine** 52:5
88:5 118:18 128:3
128:10 204:22
**determined**
129:11 135:22
141:18 150:18
266:11,25
**determining** 88:25
89:25
**deterring** 256:15
**detroit** 204:25
**develop** 25:2

**developed** 30:9
43:23 68:16
278:12
**devices** 63:14
111:24
**diagnosis** 129:5
130:2
**diane** 234:24
**dietsche** 40:2,3
179:25
**difference** 245:4
**different** 29:14
38:23,25 40:13
50:6 51:7 104:5
104:11 127:22,24
134:5 142:19,20
142:22 151:17
157:23 158:1,24
171:17,18 188:2
195:11 212:1
251:18 266:18
269:5 270:5
**differential** 179:21
**difficult** 33:25
197:16
**difficulties** 12:16
**difrangia** 41:4
**digging** 143:13
**digital** 142:11,12
181:16
**digitally** 253:24
**diligent** 102:7
241:14
**diluting** 32:16
**direct** 28:5 206:16
**directions** 120:9
**director** 2:12 28:7
59:25 60:4 229:20
**directors** 28:9
**directs** 124:19

**disciplinary** 108:9
108:16 193:17
195:8
**discipline** 108:11
**disciplined** 192:16
197:1 271:24,25
**discovered** 208:13
222:6
**discrepancies**
255:11
**discretion** 144:21
149:17 159:1
164:6
**discretionary**
51:16 78:3
**discuss** 13:9
**discussed** 121:3
250:21 269:23
**discussion** 50:24
247:11 272:17
**dispense** 64:8,15
96:6 127:14 217:5
242:19 243:8,15
**dispensed** 67:11
68:7 76:20 83:13
83:14 156:6,9
165:6,8,21 179:15
210:10 217:9
257:15 269:10
272:23
**dispensing** 75:24
76:9 80:9,17
111:23 115:15
116:3 118:4 120:2
125:1 127:8
128:12 139:10
151:5,8 152:20
155:20 156:7
161:9,11 164:24
164:25 165:19
166:12 172:19

173:6 175:6,8
176:17,23 178:3,4
182:5,9,13 184:2,6
184:13 185:19,20
186:6 187:12
188:13 190:10
198:24 199:1
205:10,11 214:16
257:11,18,19
260:10 269:18,22
270:3,9,13,15
271:1
**dispersed** 64:3
**displayed** 110:22
**disposition** 89:20
96:2 98:9,15 99:9
**disputing** 141:23
**disseminate** 26:1
**distinction** 272:6
**distribute** 41:22
44:23
**distributed** 64:4
68:6 76:21
**distributes** 95:3
**distributing** 93:15
94:21,22 105:1
**distribution** 7:11
63:5,8 89:20 96:2
107:14
**distributor** 2:16
29:11 98:4,7
104:7,20 137:16
140:2 195:9
**distributors** 63:25
87:3 104:12
**district** 1:1,2
186:17 228:9,20
**dive** 136:11
**diversion** 17:2,5
17:12,20 18:7
19:24 20:15 23:17

24:1 28:13,18 29:4,6,7,15,24 31:22 35:19 36:9 37:21,25 38:8 39:11 48:6 54:10 65:10 69:12,15,16 70:14 73:12 84:24 85:20 102:4 103:3 103:3,12 127:5 183:20 195:14 196:5,15 198:1,15 198:19 199:7 200:19 202:21 207:18 212:20 213:1,10,19 214:7 221:9 236:10 242:7 247:11,14 248:8 249:10 254:10,16 255:18 256:16,22 273:9 273:21 274:1,6

**diversionary** 56:25 57:6 194:25

**divert** 33:14 34:23

**diverted** 73:11 256:19

**diverting** 34:8

**division** 1:3 38:18 114:10

**division's** 107:20

**doctor** 20:24 21:2 21:19 22:1 31:18 32:18,25 33:9,20 35:21 55:6 56:21 58:15 59:12 64:22 68:25 81:13,17,21 82:4 122:22 123:5 128:18,19 131:10 201:20,22 204:12 205:23 211:8 212:10,15 214:16

214:21,22 215:1,3 215:10,15,25 216:14 221:5 223:10 227:20 238:4 244:12,13 244:20,21,22,25 245:9,12 246:15 248:5

**doctor's** 33:3 67:3 92:13 104:10 105:1 203:20 216:4,7

**doctors** 21:3 31:3 33:23 35:23 50:14 57:2,18 68:11 77:8,10 101:21 243:2 244:20 245:17,18 246:7,9 246:21,24

**document** 1:7 45:14 51:1 53:21 59:24 122:2 123:11 168:7 171:1 179:3 181:12 184:1 191:3 250:24 252:6 253:6 265:22,25 267:7 267:20 269:3 270:17 275:20 277:15

**documentation** 253:21 266:14 267:2 277:20,21

**documented** 160:18,19 161:9 180:1 188:5 252:23 253:17 271:1

**documenting** 175:15

**documents** 13:9 15:18 48:9 52:15 142:22 189:15 193:20 270:20

**doing** 28:11 53:18 80:9,17 92:16 95:16,17 103:18 103:19 109:5 112:25 115:11 123:12 124:20 132:14 134:14 136:4 138:1,4 144:18 146:8 147:15,16 152:11 169:4,8 175:17 184:9 185:23 197:18 208:15 214:23 229:12 247:3 255:7 257:22

**door** 183:21 205:21

**dorothy** 4:8 235:7

**dosages** 71:14

**dose** 24:23

**doses** 71:2 212:2

**doubled** 60:23

**doubt** 232:6

**doug** 240:17

**doug's** 249:2

**dozen** 60:20,20,25

**dozens** 11:15

**dr** 55:7,10 126:24 206:17,21 207:9 207:22 210:7,12 210:18 211:5,12 211:22 212:4,14 213:23 214:5 217:2,6 218:4,10 221:6 224:10,16 226:11,17,25

227:10 229:7,7,8 233:12 238:15 240:14 242:12,20 243:9,15

**draw** 265:18

**drive** 234:3,13

**drop** 181:23 182:1 253:24

**drug** 3:23 17:11 17:12 18:12,15,16 18:22 29:23 33:11 36:23 37:25 45:25 46:1,23 47:2 48:2 48:5,8,24,25 54:14 62:20 65:13 67:13 68:1 69:4,12,15,16 73:4 77:6,19 93:4 94:17 98:7,22 111:23,25 112:1 115:18,20 116:25 117:21 124:9,10 124:15 125:2,8 126:25 141:3,5 155:17 184:3 186:25 193:25 212:20 213:1 236:5 247:14 254:10,15 255:18 256:8,15 257:1,6

**drugs** 29:8 30:19 30:23 31:10 32:1 33:14 34:7,8 41:23 44:23 46:2 46:16 48:8 50:3 50:16 59:2,3,8 63:3,12 65:10 69:1 70:14 76:21 83:14 84:25 85:20 87:11 89:4,5,12,21 92:8,11,19,20,23 92:24,24,25 93:1,6

93:7,11,11,16,16
94:10 96:3,5 98:4
98:10,16 100:3
107:14 111:23,24
113:20 126:3
137:16 140:2
149:11 184:6,13
185:2 199:14
217:2 230:22
231:12 247:20,24
248:3 256:18
**drugstore** 254:9
**due** 61:15 70:24
273:25
**duly** 9:10 280:6,9
**duplicate** 117:7
158:16 237:11
**duplication**
119:24 188:4
**dur** 98:22 99:14
117:1,4,5,14,17
118:6,7 119:21
122:5,7,19 123:13
124:6,13,20
128:14 129:15
163:22 168:2,2,23
169:2,6 173:13,16
175:4,6,10 178:5
178:17,19 182:6
184:9 185:17,19
186:1 187:12,18
188:3,4 257:14,17
257:19
**duties** 18:10 62:20
65:7,20 81:10

**e**

**e** 2:1 6:6 141:15
**eagle** 2:24 7:3
13:18 23:2,7,16
101:12,25 103:7
103:15 132:24

133:9,21,23 135:8
146:25 147:10
148:1 149:5 151:6
151:20 152:11
153:16 156:16
157:6,12,24
159:18 160:16
162:21 163:3,15
163:25 164:2,11
164:13,18 166:10
167:8,23 171:8
173:17 175:14,21
176:4 177:19,25
178:11,15,22
179:10 180:3,13
187:13 190:20
191:13,16,22,23
192:4,7,11,15,25
193:23 194:5,23
195:12,16,21
196:3,9,13 197:19
216:19 217:12,19
228:9,21 250:5
263:7 270:20
271:6 275:23
**eagle's** 100:19
103:17 147:15
174:2 182:4,13
185:14
**earlier** 74:18
84:11 104:1
133:16 221:15
227:19 243:1,23
247:12 249:13
250:21 254:25
257:3 269:23
272:17 275:12,22
277:8
**early** 42:3 54:11
69:5 161:25
173:11 231:22

**ease** 23:10
**easier** 33:22
**east** 227:5
**eastern** 1:3
**eastlake** 234:25
**ebert** 28:6
**ed** 28:6
**edict** 128:2
**educated** 192:25
**education** 16:3,17
22:20 46:12,21
114:8,12
**educational** 15:17
46:24
**edwards** 1:17 2:3
3:3 9:9,15,20,24
10:1 11:11 14:11
21:18 45:9,13
59:23 70:17 71:19
76:16 91:5 105:10
114:23 132:4
167:17 168:21
177:12 191:8
195:21 196:1
198:19 209:5
210:23 213:22
214:14 219:21
221:15,15 239:4
239:14,23 261:8
262:20 275:8
280:8 282:8 283:4
283:9 284:4,13
285:20
**effect** 99:18
**effective** 51:24
84:23 85:18,22,25
86:23 87:19 99:22
107:18
**efficiency** 165:17
**effort** 188:17

**efforts** 33:16
103:3 196:15
198:15 229:25
273:21
**eight** 32:24 61:23
61:24
**either** 22:1 26:3
35:17 37:20 42:10
103:16 123:21
141:19 142:18
157:3 165:23
188:23 207:8
244:16 261:5
280:16
**elderly** 259:21
**electronic** 89:8
**electronically**
143:2 261:5 262:5
**email** 3:7,8,9,10
3:13,14,15,18,21
3:24 4:3,4,5,15
221:21,24,25
222:23 226:6
228:5,6,11 234:8
238:13 282:17
**emailing** 12:21
233:11
**emails** 223:25
227:9 233:16
**emergency** 63:24
**employed** 23:12
61:24 66:24 106:8
**employee** 61:7
67:2 255:24
265:12
**employees** 38:25
60:11 61:10 62:14
86:22 89:11
105:23 183:8
185:3 195:2 255:9
265:10

**employment** 15:9 15:13 239:2
**ems** 46:16
**enables** 68:24 69:2
**enclosed** 154:9 174:4 265:25 266:4 282:11
**encompass** 40:10 98:25
**encompassed** 40:12
**encountered** 233:1
**ended** 44:1 224:10
**enforce** 44:25 45:2 62:20,23
**enforced** 18:16 105:12
**enforcement** 2:13 4:12,13 18:13 19:3 31:23 33:16 36:4,20 37:2 38:25 39:2,4 43:12,17,20,21,23 43:25 45:2 46:12 47:2 48:22 66:6 66:12,16 74:19,25 76:10 77:3 81:5 196:14 198:14 205:8 223:15 229:25 230:5 237:13 249:25 273:21
**enforcing** 45:24 46:5 47:2
**engage** 35:22 255:6
**engaged** 34:22 73:2 241:25 247:11
**engaging** 248:8

**ensure** 70:11 85:24 105:21 106:25 107:24 115:16,20,21,24 117:6,21 190:21 256:18,20 257:14
**ensured** 172:13
**ensuring** 118:22 257:13
**enter** 137:22 181:25
**entered** 12:19 165:13 284:9
**enterprise** 178:4
**entire** 130:6 149:2 283:5 284:5
**entirely** 144:17 145:9 260:7
**entities** 44:22 63:10 65:18 69:24 70:25 104:11 105:13 174:22 197:6 218:7
**entity** 67:4 76:17 93:14 94:20,24 137:15,20,23 199:9
**entree** 80:21
**entry** 140:4 166:18
**envelope** 176:12 260:17,18 261:22
**envelopes** 211:20 274:15
**epidemic** 48:25 49:2 69:5 73:4,8 73:13
**equipment** 100:3 107:12
**erica** 237:20

**errata** 282:13,18 284:7,10,18 285:1
**error** 134:17 165:14,15 166:2 166:17 186:6 253:20,23 260:10 270:9,14,16,17
**errors** 151:25 258:21 259:1,5,8 259:10,13,24,25 260:4 269:22 270:3,21 271:1
**escalated** 189:11
**esq** 5:4,5,10,11,17 5:22 6:5,11,16,22 7:5,6,14,20 8:4 282:5
**essentially** 24:19 24:25 27:9 37:6,8 108:8 170:2 244:3
**established** 67:8
**et** 1:9,9,11,11 72:21 83:9 89:14 112:2 119:24 125:12 128:21 131:25 148:20 160:19 175:21
**evaluate** 82:7,15 88:3 95:15 129:23 215:23
**evaluated** 90:7 183:6
**evaluating** 88:16 182:4
**evaluation** 88:13
**evaluative** 92:5
**event** 189:17 280:17
**everybody** 86:18 100:25 239:8

**everyday** 258:17
**evidence** 65:12 183:3 185:9 194:5 196:8 214:7 253:18 268:8 269:8 273:8
**evidenced** 233:2
**evolved** 68:16 121:5 143:20 278:2 279:6
**exact** 60:18 65:21 74:6 143:5
**exactly** 54:24 95:20 98:13 202:6 209:14
**examination** 1:18 2:4,4,5 9:13 110:13 239:21 275:6
**examinations** 128:21
**examined** 9:11
**examiner** 225:6
**examiner's** 3:11
**example** 33:18,21 37:11 54:21 55:6 64:6 79:11 102:25 111:12 148:3 151:1 164:24 177:22 187:16 221:21 222:8 226:2 245:10,14 246:2 266:9,23
**examples** 197:17 222:20 233:19 245:16 249:12 250:21 260:16
**exceed** 160:9
**exceeded** 172:25
**exceeding** 160:11

**exception** 193:8 193:12
**excerpt** 265:6
**excess** 161:13 203:25
**excessive** 217:1
**excited** 75:15
**exclusively** 20:3
**excuse** 85:12
**executed** 284:10
**executing** 247:7
**execution** 283:14 284:19
**executive** 2:12 28:7,9 59:25 60:4
**exercise** 123:12 246:15 258:13
**exercising** 112:8
**exhibit** 2:8,9,10,12 2:13,14,16,17,18 2:19,20,22,23,24 3:2,3,5,6,7,8,9,10 3:11,13,14,15,16 3:17,18,19,20,21 3:22,23,24 4:2,3,4 4:5,6,7,9,10,12,13 4:15,16,17,19,20 4:22,23 11:6 45:5 45:9,9,10 48:4,15 50:24 56:6 59:22 59:23 60:7,10 62:19 69:20 70:4 74:17 85:3 96:18 104:19 107:8 108:25 111:13 115:4 132:25 135:6,6 136:13 137:8 139:24 142:15 143:25 144:4 145:17 146:24 158:3

168:12,15 170:14 177:16 207:12 209:1 218:17,18 218:18 219:16,17 219:20,21 220:12 220:21 221:20 222:22 223:23 224:18,23 225:3 225:19 226:2,5 227:8,23 229:2 230:8,19 232:8 233:3,6,14 234:2 234:19 235:6 236:14 237:10,12 237:14 238:3,13 238:20,23,25 240:7,13 242:10 243:13 252:5,10 257:17 260:10 261:9,18 263:15 263:17 264:5,15 264:21 265:21 267:16,20 268:19
**exhibiting** 54:9 127:4
**exhibits** 2:7 3:1 4:1 10:20,23 11:2 42:25 60:2 233:10 260:18,18 261:5 261:13,25 262:17 262:17,25 263:5,7 263:9 274:15
**exist** 224:13
**existed** 270:25
**exists** 55:17 84:20
**exits** 247:14
**expand** 35:10 99:2
**expanded** 73:22
**expanding** 73:15
**expect** 64:11

**expectations** 206:3,5
**expected** 86:19
**expects** 117:16
**experience** 29:15 33:13 34:3 41:25 52:20 63:16 71:13 71:20,22 72:8,22 73:6,21 78:22 79:10,14 85:23 96:10 98:11 99:1 102:22 109:5 117:12 121:16 127:17 134:1 183:16 200:20,23 205:7 211:7 213:18 230:24 249:21 252:18 256:13 258:16
**experienced** 74:24 146:7 256:7
**experiencing** 11:20 28:18
**expert** 212:4,7,8
**experts** 72:19
**expiration** 117:25 155:20 283:19 284:25 285:25
**expires** 281:9
**explain** 258:25 268:22
**explained** 71:8 143:14
**explaining** 91:13 166:11
**explains** 166:19
**explanation** 30:1 141:22 205:21
**expressly** 34:7
**extended** 29:2 74:10

**extent** 89:9 210:17 241:2
**extra** 260:17

**f**

**facebook** 240:25
**facilities** 41:21 70:11 72:1
**facility** 87:12 93:14
**fact** 125:22 144:15 145:3 174:17 192:11 193:8 202:23 267:6 277:23 278:20
**factor** 83:16 93:17 94:12,23 153:6
**factors** 54:15 88:5 88:19,21 89:2,23 90:3 91:10,21,23 92:5 95:15,22,24 122:19 127:9,22 127:25 150:17,21 204:1
**facts** 86:14
**fail** 135:15,16 156:23
**failing** 109:7 192:17
**fair** 191:20 193:22 277:19 279:4
**fairly** 74:4 142:10 275:11
**faithfully** 247:8
**fake** 225:6 244:4
**fall** 127:1
**false** 22:2
**familiar** 17:18 42:21 67:19 84:15 96:20 97:4 104:21 107:10 110:17 111:9,12 114:24

115:9,10 145:1,7,8
198:20 200:12
201:7 203:9,15
206:2 232:11
240:19 248:13
278:20 279:3
**familiarize**   10:23
11:18
**family**   59:15
**far**   56:1,4 84:22
132:5 148:14
160:4 172:2
173:21 192:5,6,10
193:3 195:20,25
196:1,7 197:7,9,14
197:15,22,23
198:11 215:6
272:16,20
**fast**   32:8
**favorable**   147:14
147:22 251:9
276:23
**fax**   26:4
**faxed**   226:16
**fbi**   36:3
**february**   51:24
52:4,7,9,13 53:20
167:23 263:21
266:2
**federal**   17:19
41:19 65:12 87:24
141:3,4
**fedoroko**   226:17
226:21
**feel**   35:11 74:4
189:10 252:1
**felt**   212:13
**fentanyl**   225:7
230:20,20 231:2,9
231:10 232:2,3

**field**   38:7
**fifth**   115:24
118:21
**figoli**   4:9 235:21
236:9
**figures**   84:8
206:15
**file**   120:20,25
266:5
**filed**   115:25
118:22 120:19
216:24
**files**   172:19 175:19
176:12
**filing**   120:17
160:25
**fill**   35:6 82:16
112:14,15 117:10
178:10 211:25
214:5 215:9 216:3
245:22 246:14
257:12
**filled**   27:10 31:4
49:21 50:15 83:11
129:10 138:25
155:10 173:8,11
179:13 188:1
190:11,22 199:18
205:3,14 213:8
224:19 248:6
**filling**   27:17 77:16
109:18 117:13
130:19 194:6
196:10 198:9
200:3 215:2,4,15
227:3 243:4 273:4
**final**   152:16 178:7
**finally**   47:1 89:17
115:23 120:13
141:14 223:16
238:23

**find**   102:6 103:10
140:11 157:12
163:14 168:12
169:25 170:1,11
171:3,19 174:1
178:21 203:4
228:23 251:16
253:5 254:20
266:13 267:1
282:11
**finding**   200:4
**fine**   10:11 21:11
86:9 157:14
162:13,18 169:19
180:19 185:15
**fingerprint**   178:6
**fingertips**   25:7
34:1
**finish**   37:12 47:3
58:14 86:5 177:14
243:12
**finished**   274:18,19
**firm**   280:18
**first**   9:10 16:19,21
36:25 38:14 40:4
40:5 70:9 97:1
110:20 113:5
119:9 130:7
134:14 135:13
142:14 148:2
162:8 175:5 184:7
207:25 209:4
211:9 224:9
229:13 230:18
235:11 240:25
244:22 252:15
268:6 280:8
**firsthand**   183:15
**fits**   86:16
**fitzpatrick**   5:17

**five**   43:18 61:12
61:12 74:11,15,16
79:25 81:23,23
115:16 116:4,8
119:7 121:7,14
143:4 148:6
152:17
**fix**   180:14
**fixed**   167:4
**fixtures**   100:4
**flag**   82:13 129:23
205:25 213:15
**flags**   24:21 82:8
**flaharty**   39:23
**flashing**   82:12
**flier**   221:7
**flip**   45:20 135:5
144:24 219:16
**flipping**   153:20
184:22
**floating**   142:22
**floor**   6:6 7:6
**florida**   205:3
**flow**   77:1
**focus**   38:9
**focused**   18:18
**focusing**   62:18
**folder**   176:13,14
261:17 262:6
**folks**   68:10 77:2,6
**follow**   86:19,20
116:7 131:17
142:6 149:13,14
153:13 154:8,23
155:2,23,24 156:3
157:13,14 159:7,9
159:12 162:12
163:5 164:16,20
166:24 172:18,21
173:3,25 177:21
179:7,9,20 180:19

181:1 184:14
187:3,10,11,18
190:4,9 191:12,16
253:17 265:1
273:16 274:12
followed 152:16
153:16 187:23
following 88:19
111:22 124:7
125:4 140:25
141:19 150:17
185:23 187:2,17
203:20
follows 9:12 123:2
123:2
food 45:25 141:3
force 4:12,13 36:7
36:11,20,23
237:13
forces 36:11,12
37:5
foregoing 283:13
284:18
forged 31:2
forgery 222:5
forges 21:25
forget 95:12
forging 21:2 29:19
31:3,18 35:17
59:2 233:21 244:7
244:9
forgot 23:1 122:6
153:7
form 24:10 71:16
71:17 78:13 89:4
92:19 93:5 94:9
128:7,23 148:15
194:8 196:24
198:3 201:2
205:17 269:1
274:6

formal 16:3 34:18
format 50:7
181:19 187:9
268:20
formed 49:19
former 34:12
216:25 226:23
229:19
forms 29:14,18
95:21 155:9,9
formula's 127:15
formulary 124:9
formulas 127:13
forth 88:11 96:15
120:17 130:22
forums 22:20
forward 188:16
282:15
found 108:19
140:17,22 149:14
152:23 153:12
155:17,19 158:17
161:1,5,21 165:5,6
165:20 167:1
173:15 174:2
250:22 269:4
four 23:6 61:12
62:8 113:7 143:4
157:6
fourth 118:13
fraction 247:2
frames 146:22
frank 6:11 14:2,14
15:2
franklin 3:3
206:17,21 207:2,9
207:13,22 210:7
210:18 211:5,12
212:14 213:23
217:2,6,20 218:4
218:10 219:3

221:6 240:14
242:12,20 243:9
243:15
franklin's 210:12
214:5
fraud 69:12,15,18
fraudulent 223:12
224:11 225:14
228:14 249:8
free 169:10 283:14
284:20
frequency 134:2
258:21 259:1
frequent 221:7
frequently 30:12
146:9
fresh 10:25
friends 35:5
240:25
front 240:7
fs 135:13
fulfill 69:6
full 9:21 11:22
66:6,11,15 120:8,8
135:18,22,25
144:10 162:9
163:2 164:5,10
174:9 180:20
251:14
fully 12:2 154:9
213:24,25 268:21
function 69:6
118:23
functional 202:1
functions 67:18
68:21 69:14 70:20
funding 229:23
furnish 75:22
furnished 67:12
furnishing 56:13

furosemide 173:8
173:9,10
further 27:3 69:4
205:20 239:4
259:7 280:15
future 253:8

g

g 6:5 19:18
gabapentin 50:4
77:22
gain 258:5
gallucci 6:10,11
14:2,14 15:6
game 85:3
garner 83:21,22
129:20
garofalo 228:8,18
gas 63:25
gather 110:9
geauga 40:12
206:23
general 6:4 20:18
20:20 25:18 27:18
27:18 38:19,22
41:24 48:10 90:2
139:19 147:13
191:15 198:19
208:12,16 243:1
250:5,9 255:15
generally 42:2
103:15 104:24
108:5 112:19
113:21 136:2
147:14,18,21,22
148:10 149:7
163:18 183:9
200:6 201:3 208:5
224:7 225:12,13
233:24 241:11
249:22 250:13
251:9,10 255:9

259:3 271:8,11
273:13 276:22,24
**generates** 156:5
**gentlemen** 14:3,3
14:15
**gentlemen's** 14:18
14:24
**geographic** 40:7
51:13 52:19,21,25
53:3,5,15,15
125:10,11,20
133:17 135:1
250:10
**george** 41:5
207:10 209:12
210:15 216:18
218:22 242:16
**germ** 28:8
**getting** 17:7,9
25:19 30:7 49:10
104:3 118:3
126:25 136:7,21
144:16 163:13
199:13 203:24
204:13
**giant** 2:24 7:3
13:18 23:2,6,16
100:19 101:12,24
103:7,15,16
132:24 133:8,21
133:23 135:8
146:25 147:10,15
148:1 149:5 151:6
151:20 152:11
153:16 156:16
157:6,12,24
159:18 160:16
162:21 163:2,14
163:25 164:1,11
164:13,18 166:10
167:8,23 171:8

173:17 174:2
175:13,21 176:4
177:19,25 178:11
178:15,22 179:10
180:3,13 182:4,12
185:13 187:13
190:20 191:13,15
191:22,23 192:4,7
192:11,15,25
193:23 194:5,22
195:12,16,21
196:3,9,13 197:19
216:19 217:11,19
228:9,21 250:5
263:7 270:19
271:5 275:23
**give** 11:21 12:8
15:16 27:4 33:18
48:15,21 80:24
81:2 90:14 140:19
158:6 203:22
241:15 258:9
259:13
**given** 42:10,17,23
45:19 115:22
172:23 217:13
**gives** 54:10 178:8
**giving** 12:2 33:4
50:17 233:19
**glad** 135:21
**go** 9:24 10:1,2
14:5 16:16 17:4
21:7 27:16 29:8
32:2 33:22 35:6
49:9 52:1 55:5,8
56:22 71:19 75:10
80:3,22 90:3,19
104:14 105:18
109:12,15 110:4,8
113:25 118:24
122:4,6 124:19

126:19 131:21,23
136:1,3 150:15
153:7,23 156:13
157:20 164:9
166:3 167:7,17
176:11 179:2
182:2 203:12
209:25 223:23
225:3,19 226:5
227:23 228:3
229:2,6,10 230:8
231:8 235:20
244:20,21 251:12
252:21 253:12
254:3,19 257:16
260:16 261:19
265:8 270:16
274:24 275:10
**goal** 34:17
**goertler** 223:3,5
**goes** 83:25 90:17
129:14 244:15
**goetz** 5:22
**going** 26:10 51:22
51:23 52:5,6
59:12 90:10 103:7
105:2 106:19
137:2 149:19,20
150:2,7,14,16
159:2,3 163:8
176:5 177:13
183:18 188:16
207:9 213:4 214:4
215:3 216:6
226:24 230:24
234:16,17 239:19
239:25 251:22
261:24 262:2
263:4,5,8 279:11
**good** 9:15,16,17
9:18 26:9 28:1

43:25 102:18
146:13 151:12
152:18 160:4
163:4 171:4
176:20 177:11
178:13,14 203:25
222:8 239:8,23
241:19 246:22,23
246:24 247:6
266:21 274:10
**governing** 110:10
**governs** 115:5
**gradual** 178:24
**graduated** 15:22
**graham** 229:21
**grant** 42:4 229:23
230:2
**graphs** 74:5
**graves** 220:15
228:1
**gray** 201:25
**great** 201:14
241:13 255:14
258:11
**group** 31:23,23
32:4 34:14,16
36:22
**groups** 35:15,19
**guess** 29:11 43:4
52:3 53:5 62:23
64:14 79:25 92:20
106:23 123:15
126:16 129:6,8,11
131:5,6 143:5
167:1 177:1
186:13 213:6,24
221:7 227:5
229:13 234:4
**guests** 89:15
**guidance** 87:19
122:2

**guide** 2:13,21
74:19,19 82:24
142:4,7,12,16,18
142:25,25 143:10
143:23 145:4,9
**guidelines** 278:21
279:1
**guy** 238:5
**guys** 62:23 142:7

**h**

**h** 19:18
**hand** 281:2
**handful** 44:8
**handle** 32:4 96:5
218:14
**handled** 30:11
89:4,5 92:19
94:10,17
**handling** 89:15
94:11,15 155:14
**handwriting** 32:9
151:3
**hanly** 5:16
**happen** 11:21
123:16 157:11
173:18 277:11
**happened** 26:6
127:17 150:11
157:15,17 166:5
166:11 208:4
218:16 249:19
**happening** 69:9
**happy** 178:18
**hard** 168:18 174:1
174:13 180:10,11
193:1
**harper** 226:11,25
**harrington** 3:17
220:23
**hato** 5:13

**hb** 2:12 59:24
**head** 12:9 30:6
114:22 116:10
121:17
**health** 6:4 230:11
241:7
**health's** 232:7
**healthcare** 107:16
129:25
**hear** 11:23 12:17
26:20 93:20 94:2
193:10
**heard** 71:9 72:12
81:13 206:9
**hearing** 21:10
189:2
**heights** 15:24
**help** 48:24 212:16
231:24
**helped** 49:5 73:17
256:3
**helpful** 23:24 30:1
**helps** 135:5
**henry** 6:5 21:7
86:2 90:13 262:19
262:20
**henry.appel** 6:7
**henschel** 8:7
**heppner** 189:21
193:8,13
**hereinafter** 9:11
**hereunto** 281:2
**herman** 2:5 7:14
275:7,8 279:9
**high** 24:22 70:24
71:6 72:13 256:12
271:5
**hillcrest** 224:20
**hills** 201:17
**hired** 17:7,9 19:13
19:21 38:24 40:12

41:8 60:22 134:14
220:9 229:16,17
**history** 25:6 55:6
55:15,15 56:3,23
57:5 65:6 68:9
69:1 73:20 74:12
76:1 77:21,24
79:21 80:9 129:25
130:24,25 131:2
188:13
**hit** 250:4
**hold** 168:4
**home** 10:20 32:15
**homes** 63:24 64:13
**hometown** 238:7
**honestly** 208:8
**hop** 162:25
**hopefully** 67:6
**hoping** 10:25 84:2
**hospice** 245:15
246:3
**hospital** 124:9
202:4 205:22
246:3
**hospitals** 63:22
64:10
**host** 22:19
**hour** 15:3,4,7
177:1 251:15
**hours** 13:15 50:12
50:13 67:16 100:5
246:4
**house** 58:10
**houston** 7:21
**how's** 59:12
**hshkolnik** 5:14
**hubbard** 6:17
**huh** 133:3 210:4
222:24
**human** 6:4

**hundreds** 132:10
132:20,21
**hunter** 5:10
**hytree** 148:8,9,10
149:13

**i**

**i.e.** 76:19 129:3
**identified** 157:6
165:15 166:6
270:8
**identify** 83:1,5,12
218:18 219:25
223:24 229:18
237:13 270:13
**identifying** 122:12
**ii** 93:16 120:24
155:10 160:2,6
171:22 175:19
185:13
**iii** 6:11 93:15
171:23
**iis** 120:20 180:9
254:17
**illegal** 20:25 21:21
21:22,23 48:8
243:25 244:1,8
247:3
**illegitimate** 194:6
246:9 247:3 273:4
**illicit** 230:20 231:2
231:6,9 232:2
**illinois** 6:18,24
**immediately** 70:22
**impaired** 259:8
**implementation**
141:21
**implemented**
165:16
**important** 119:25
251:2 253:5
256:14 257:10

**impose** 120:5

**imposed** 165:17
196:22 197:13

**imposes** 125:15
126:8

**improper** 164:24
166:12 172:18
173:6 184:2
187:11

**improperly** 165:7
165:21 269:10,18
272:24

**improve** 191:13

**improved** 165:17

**improvement**
178:20

**incident** 127:21
165:11 188:22
202:21,22 226:20
234:7 249:19

**incidents** 270:7

**include** 56:12
58:25 63:4,21
70:25 122:13
140:24 145:15

**included** 51:8 60:7
171:23 186:14
282:13

**includes** 93:11
111:22 112:23

**including** 17:17
30:15 35:21 45:25
48:11 57:10 65:10
68:4,21 70:14
79:11 89:3 93:7
110:12 120:7,19
162:10,16 166:20
169:2 193:25
202:9 209:9

**incorporated**
284:12

**incorrectly** 165:13
178:9

**increase** 43:22
70:23 188:12

**independent**
102:25 103:1
200:10,12,18,24
225:1

**index** 2:7 3:1 4:1

**indiana** 7:11

**indicate** 183:3
207:16 224:18
253:18 264:22
268:8 269:9

**indicated** 51:11
225:24 236:1

**indicates** 165:12
264:1

**indicating** 282:13

**indication** 56:7
151:11 156:22
216:17 230:18

**indicative** 178:14
183:19 219:7

**individual** 19:10
25:17 27:5 30:19
39:18 89:24
190:21 234:20
246:17 272:11

**individuals** 25:6
33:13 35:22 38:7
66:19,22 69:24
76:10 105:13
111:25 174:22
218:2,6 243:2
248:8,19

**industry** 44:18

**inevitably** 215:2

**informant** 207:8
208:2

**informants** 208:11

**information** 25:20
25:22 27:3 33:25
35:12 36:17 48:23
56:15 57:11 59:4
60:8 67:9,14,25
68:14,17 73:19
74:11 76:8,18
80:23,25 81:3
82:22,24 83:3
101:19 115:17
116:13,22 119:13
119:23 123:3
124:9,11 126:17
126:21 128:16,17
129:17 131:14
139:12,14 148:12
149:11 160:15,23
175:22 187:18
209:10,14,21
217:13 226:23
227:14,18 231:13
235:17 236:6
238:9 272:13

**informative**
103:11

**informing** 173:13
233:13,14

**initial** 3:3 19:17
37:16 40:16 50:19
207:13

**initially** 28:5,7
56:12 105:17
134:13 162:5

**initials** 156:7

**initiated** 236:4

**initiative** 65:1,4

**injectable** 32:17

**inner** 58:1

**input** 49:10

**inquires** 277:24

**inquiry** 49:16,17
131:18

**inside** 52:20

**inspect** 144:12,21
157:25 203:1
204:2

**inspected** 63:7,9
87:13 109:22
132:24 133:23
134:3 139:15
144:10 148:5
195:22 204:4
272:18 275:13

**inspecting** 112:4
147:10 183:25
191:21 250:7
251:23

**inspection** 2:21,24
3:6 4:16,17,19,20
4:22 27:24 63:17
87:5,9,15 97:11
100:8 105:19
107:3 108:2
110:20 118:15
133:1 134:9,19
135:4,7,12,18,19
135:22,25 136:4
137:17,19 138:1,9
138:15 139:2
140:4,12,18 141:8
142:3,12,13
143:10 144:3,10
144:16 145:3
146:19,25 147:4
148:3,13,16 150:2
150:16 151:1,8,20
152:23 154:10,21
156:22,23 157:7,9
157:14,21,22,24
158:19,25 159:7

159:11,17 160:1
160:21 162:6,11
162:13,16,20
163:2,4,9,12,24
164:1,5,9,11,13,17
166:6,8,22 167:8
167:22 168:21,25
169:12,14,21
171:4,7,9,12,14,19
172:11,14 174:7
174:11 175:1,2
177:14,18,23
178:1 179:2,8,12
179:24 180:17,18
180:20,25 181:2,4
181:6,9,13,19
182:2,6,12 184:8
185:8,14,21
186:20,25 187:2,4
187:7 189:11,18
190:4,25 218:21
219:1,7,9 220:1,11
229:13 250:3,10
250:23,24 251:13
251:15 252:2,10
263:19 264:1,8,17
265:2,4 266:1,6
267:8 268:18,19
269:1 270:10,14
270:17,18,22
275:20
**inspections** 13:18
22:13,14 27:11,13
27:15,19,21 41:21
61:2 63:17 69:23
70:10,18,21 85:12
87:2 97:16 98:19
99:11 100:10
108:15 109:6,25
110:23 112:7,17
113:1 115:11

118:2,7,11 119:5
119:16 120:11,24
132:5,8,14 133:6,8
133:20 134:10,14
134:22 136:13,16
136:17,25 138:5
138:13,23 139:13
139:20 141:25
142:8,10,11,14
143:1 145:13
146:8 147:3,14,20
147:25 149:24
154:16 162:9
163:21 166:1
183:7 191:9,10,12
192:24 194:3
197:8,10,17
250:17 251:8
253:24 276:17,22
**inspector** 61:4,8,9
**inspectors** 61:6,13
61:17,19
**installed** 142:13
**instance** 35:4 81:1
106:18 107:22
124:15 131:8
166:2 173:15
192:2 234:11
248:3 254:20
267:11 272:22
**instances** 66:23
149:8 157:18
192:12 196:25
199:22 215:24
259:4
**instigated** 210:24
235:2 236:2
237:23
**instruct** 246:14
**instructed** 112:13
171:24 260:21

**instruction** 243:8
**instructions**
121:19
**insufficient** 184:24
**insurance** 69:12
211:12
**int** 149:12 180:10
**integrate** 57:22
**integration** 58:2
**intend** 148:21
262:4
**intending** 265:10
**intent** 128:6 243:5
244:17
**interaction** 127:24
258:17
**interacts** 131:9
**interconnected**
151:15
**interested** 104:3
213:18 280:17
**interlocked** 58:13
**intern** 252:24
**internal** 96:4
142:17 146:9
151:12 152:18
178:14
**internet** 198:20,23
199:4,5,8,10,15,15
199:18,19 200:2
**interns** 46:15 63:2
107:18
**interpret** 113:10
**interpreting**
111:22 112:23
113:3,15
**interrupt** 21:6
**interrupted** 62:5
203:13 213:13
**interruption**
153:18 214:10

**intervals** 58:23
**intervention** 42:4
42:6 132:12
186:17 231:22
**interviews** 72:19
**intoxicated** 54:12
**introduce** 262:5
**invalid** 196:10
198:10
**inventoried**
146:18
**inventories** 145:16
**inventory** 145:22
160:2,6 161:5
169:23 170:11,18
171:3,20,24,25
181:8 185:11,14
**inventorying**
146:17
**investigate** 18:12
19:23 30:2 31:2
31:15 36:8 41:17
66:1,21 67:5
188:18 204:6
223:9 231:6
243:24 259:7
**investigated** 31:7
35:21 72:16
204:19 236:13
269:24 270:2,4,21
274:3
**investigates** 65:11
66:18
**investigating**
44:18 65:9 101:22
214:22 215:1
231:18
**investigation** 3:4
4:7,9,10 17:11
26:8 30:11 69:15
101:21 102:12

134:18 137:19
174:13,15,21
191:6 195:13
206:20 207:3,14
207:21 208:5,14
208:20 210:20,23
211:5,7,9,16 212:5
212:14 213:23
214:3,16,17,22,24
215:9,11,25 216:8
216:9 217:11,21
217:24,24 218:3
218:15 219:4
223:20 227:22
229:4 235:3,7,13
235:21,24 236:15
236:18 237:23
238:4,5,8,10
240:14 241:24
242:20 243:10
246:8 259:14
273:25

**investigations**
19:10 22:6 23:17
23:25 28:11 33:7
33:10 34:5 36:1,2
37:9,10 39:12
47:20,24,25 48:5
49:7 69:19,24
101:16,16 102:3
194:24,24 204:9
204:12 221:18
224:3,6,7 225:24
226:3 231:17,25
242:6 243:3

**investigative** 18:7
20:15 49:16 69:13
81:11 82:2 219:3
231:21 233:1

**investigator** 17:3
17:5

**investigators**
17:13 37:25 84:5
212:13 214:14

**invoices** 172:24

**involve** 15:12 32:3
34:6 36:2 48:1
72:18 112:7
122:21

**involved** 13:19
66:3 127:22
191:21 209:22
210:19 211:10
221:9 223:8 224:8
226:10 230:21
231:10,22 232:3
235:8,23 236:17
237:16 250:6

**involvement** 3:3
13:17 14:23
192:24 207:2,13
210:22

**involving** 102:4
189:3 199:4 234:4
237:14

**irrelevant** 144:17

**issue** 9:20 66:7
122:12,20 128:2
128:19 131:24
149:2,5 153:12
155:12 156:4,21
157:18 166:22
167:1 169:23
170:9 171:13
175:11 179:11
188:6 254:1
258:22 259:10
260:5 261:9 262:6
267:11 268:12
275:19

**issued** 10:15 81:14
106:1 121:23

127:12 142:24
145:14 159:11
170:1 193:21
217:6

**issues** 13:9 35:13
43:21 48:1,2
104:6 134:16
157:6,8 175:10
178:5,19 189:18
189:20,21 200:21
241:7 251:18
254:5 259:21
265:1 279:6

**issuing** 58:19
77:23 87:3,13
90:7 105:17
106:11 160:22
225:6

**item** 110:20
144:12 148:25
149:2,5 153:8
154:8 169:23
171:5 172:20
173:24 180:1
184:14 191:2
258:20,20 260:10
265:8,8 268:15

**items** 100:12
115:16 136:1,9
145:7 148:16,22
148:23 149:12,17
149:23 150:3,7,8
154:25 157:13,23
158:23 159:2,13
162:11 164:20,23
172:18 177:22
252:22,22 257:1
268:4,6 270:25

**iv** 93:15

## j

**j** 5:10

**jails** 63:24

**james** 5:11 7:20
233:12

**james.nortey** 7:22

**january** 52:3

**jars** 210:1

**jason** 6:22

**jauffant** 5:14

**jciaccio** 5:8

**jesse** 75:6

**jim** 19:17 40:3

**job** 16:20,21 17:16
17:18 30:12 193:2
230:16 251:3
256:4

**jobs** 199:25

**joe** 71:17 78:12
194:10,11,13
196:24

**jog** 210:16

**john** 3:19 9:23
28:8 229:3

**joint** 211:4,7

**jones** 6:21

**jonesday.com**
6:25

**joseph** 4:6 5:4
220:22 234:20
282:5

**judgment** 53:9
82:19 111:18
112:9,14 113:11
113:17 122:9,21
123:13 127:7,10
130:21 159:1
163:7 185:6
215:13,23 243:19
246:16 258:14

**judy** 19:18
**julie** 248:16
**july** 178:4 240:15
**jump** 162:25
**june** 207:17
**justice** 15:22 16:4
**jzhou** 6:25

**k**

**keep** 57:7 117:1
  159:19
**kennedy** 5:21
**kept** 123:6 143:13
  153:2 182:21
**kevin** 39:23 40:1
**key** 45:24 89:7
  154:19
**keys** 91:25 154:20
**kind** 22:17 42:25
  46:13 126:21
  127:6 135:24
  181:14 188:25
  219:9 223:24
**kinds** 31:14,16
  161:14
**knew** 195:25
  196:1,7 197:14,15
  197:22,23 198:11
  234:16,17 240:24
**know** 12:12,15
  22:14,16,16,16
  24:22 25:9,16,17
  26:6,7,8,19,23
  27:16,18 28:25,25
  30:10 34:22 35:7
  39:5 42:24 49:4
  50:7 53:13 54:5
  54:16 55:18,20,21
  56:1,4 57:4,25
  58:1,3,4,8,12,13
  59:13,15,16,17,19
  60:13,18 61:12,23

67:3,21 68:8,9
71:7 72:4 74:3,6
74:15,16 77:4,19
79:15 80:8 82:15
83:18,21,22,25
84:5 85:8 87:10
87:11,23 91:24
92:14 93:25 94:16
95:20 99:4,23
100:22 101:24
103:24 106:5,18
107:11 109:16
110:7,19,21
112:20 114:21
117:6 121:3 123:6
123:17,21 124:2
127:14 128:2,5,12
129:11,15 130:2,2
130:18 131:10,12
132:23 133:5
134:6,16,25 135:3
136:7,8 146:20
147:7 149:1
150:25 166:3
169:5 170:13
172:9 183:12,18
183:19,22 184:18
185:25 186:12,21
188:25 189:1,14
191:14 192:5,6,10
197:18 198:12
199:5,11,13
202:24 205:13,22
206:1,10,11,14
210:22 212:10
214:17,21 218:10
221:1 223:20
224:9 225:17,22
228:18 231:5
232:1,20 234:9,15
234:17 237:7,15

241:4,16 243:5
244:22 246:24
248:20,25 249:23
250:5 251:4,17
253:20 254:22
255:20 256:2
257:9 258:7,16
259:9,22 261:6
262:11 263:3,6
269:5,24 270:4
272:16,20 274:22
**knowingly** 196:9
  198:9 273:4
**knowledge** 57:4
  58:6 77:14 81:7
  87:20,21 111:18
  114:15 126:15
  127:18 138:24
  147:21 150:18
  192:21 194:22
  195:6,9 222:15
  225:10,21 229:9
  251:7 254:4 258:5
  271:16,17,18,22
  273:23 276:8,11
  276:12,15,16,21
  276:25 277:3,4,7
**known** 212:20
  223:14 232:18
**kremer** 237:21
**kurt** 8:7

**l**

**l** 5:4 6:11 282:5
**l.p.** 1:9,11
**label** 117:23
**labeled** 115:20
  117:21 118:3
**labeling** 120:5,6
**labels** 186:25
**laced** 225:7

**lake** 1:8 2:24 5:2
  14:4,15,21,22 15:9
  15:25 16:22,23
  17:6,23 18:8 26:2
  27:23 28:13,17
  30:12,25 31:16,21
  35:2 37:14 40:12
  52:23 57:16 133:1
  133:9,14 135:8
  147:10 148:1
  191:22 192:19
  194:21 195:23
  196:6 198:2,15,24
  200:5,11,15 201:8
  202:4 204:3,12,16
  204:23 207:9
  209:5 221:2,10
  222:9,15 223:15
  225:16,17,21
  227:5 229:20,25
  231:3 232:19
  242:4 243:24
  250:18 252:12
  263:20 276:18
  277:1,5
**lakes** 201:14
**lalli** 227:10 238:15
**land** 107:12
**lapsed** 178:10
**large** 10:19 202:8
**larger** 53:6 148:25
  216:2
**larry** 201:25
**lastly** 54:8
**laura** 5:17
**laurie** 255:20
**law** 2:13 4:12,13
  17:19,19 18:13,18
  19:2 22:21 33:16
  36:3 39:2,4 43:12
  43:17,20,20,23,24

45:1 46:12 47:1
48:22 62:23 66:6
66:12,15 74:19,25
76:10 77:3 81:5
123:18 196:14
198:14 205:8
223:14 229:25
230:4 237:12
249:24 273:21
278:17
**lawfully** 195:24
197:22 272:19
**laws** 18:12,15,16
18:22 45:3 46:1,5
47:2 62:20 65:13
69:25 141:5,12
**lawyers** 13:5,23
**laymen's** 20:24
**lays** 116:2
**lcna** 3:22 19:4,6
20:9 22:5 23:13
24:17 27:12 28:3
28:10 30:3 31:2
33:8 35:2,9 37:18
49:8 195:11
196:16 199:25
202:13 204:21
207:5,18 221:4
222:11 229:23
**lead** 223:21 233:5
236:23 241:24
**leader** 228:20
**leading** 139:1
**leads** 32:25,25
81:11 82:2 221:17
222:9 233:1,25
**learn** 28:12 135:21
**leave** 16:11
**led** 235:3,17 236:8
237:7

**left** 53:9 135:11
136:1 158:23
**legal** 47:5,7 282:1
285:1
**legend** 92:24
**legible** 158:4
**legislative** 46:21
**legitimacy** 131:19
**legitimate** 29:8,10
29:24 32:23 73:10
79:10 128:4,11,17
128:25 131:13
196:11 198:11
199:13 205:25
206:1 208:18
216:3,11 244:4,16
245:11 246:10
247:1,14,15,21
**legitimately**
245:22
**leslie** 237:14
**lesser** 200:25
203:5,6,7,11
**letter** 3:22 4:23
229:19 265:23,25
266:22 282:19
**level** 94:11 97:10
179:25 256:12
271:5
**levels** 92:10 183:4
253:19 254:5
268:9,13
**lewis** 7:19
**lfitzpatrick** 5:19
**library** 100:3
154:25
**license** 64:14 65:2
65:5 87:3,13 90:4
90:7 91:14,16
95:9,11,15 98:7
104:6,7,8,17,23

105:5,14,17 106:2
106:11 108:4
109:8,21 110:5,14
111:1 136:22
140:1,7 153:8,9,10
192:3 215:17,21
238:18 253:1
271:15,19 276:9
276:14 277:2,6
**licensed** 47:19
63:10,13 66:20,24
67:4,12 78:24
79:4 87:1 90:6
98:4 106:9 107:1
107:12,16 110:3
113:19 137:15,20
137:23 199:9,20
**licensee** 71:6
72:13 88:15,17
96:5 141:15,20
**licensee's** 89:17
95:24
**licensees** 70:24
136:18
**licenses** 2:16 44:21
63:21 64:7,11
104:5,21 106:13
110:22 111:2
191:24,25 276:19
**licensing** 44:21,24
46:14 47:5 64:18
78:5 104:2 105:3
106:22,23 107:5
107:10,19 108:8
110:4,9,11 114:10
139:21 149:11
**lieutenant** 28:6
**life** 258:17
**light** 82:12
**limit** 125:4,20

**limitation** 55:17
**limited** 124:7
**line** 86:5 133:7
239:9 282:13
284:7 285:3
**lines** 183:21
277:10
**lisa** 40:2,3 179:25
**list** 25:2,8,23 26:1
54:10 81:19,22
88:21 90:2 91:9
130:5 136:10
148:16 151:2
156:12 181:7
182:19
**listed** 52:18
100:12 110:21
122:12 133:7,13
136:2 154:7 209:4
209:10 226:6
284:7,17
**listing** 9:22 126:18
144:8,13 284:7
**lists** 26:15 48:5
49:9 156:6,10
175:9 176:18
**literature** 124:8
**litigation** 1:6 9:4
282:6 283:3 284:3
**little** 15:16 67:7
147:1 154:14
195:11 241:9
243:22,25 245:3
246:19 247:12
248:12 254:13
258:25 261:8
268:21,23
**lived** 43:19 241:5
**livingston** 7:6
**llc** 7:11,11,11,12

**llp** 6:15 7:4,13,19
**local** 22:5,9,25
  36:3 42:14 89:16
  216:25
**located** 9:4 51:12
  125:9 170:21
  201:14 245:24
  266:5
**location** 54:1
  86:15 89:5 91:24
  94:18 105:22
  106:5 126:6,7
  188:11
**locations** 46:15
**lock** 154:19
**locked** 254:17
**locks** 97:12
**log** 156:10 161:9
  161:11,17,17
  175:7 176:17,18
  176:22 185:13
**logbook** 160:3
  161:20
**logs** 118:16 161:15
  162:19 174:14
  181:8
**long** 13:12 15:1
  17:22 37:10 43:15
  44:4 49:15,16
  72:24 177:1
  183:21 217:23
  240:19 251:12,13
  251:17
**longer** 80:3 134:22
  243:14
**look** 10:23 11:1,3
  11:5 22:18,23
  45:5 59:22 80:8
  80:16 85:3 96:24
  99:12 100:9 104:4
  106:1 118:1,25

132:24 136:12,14
  142:21 143:10
  149:17,20,20
  150:2,7,13,16,23
  150:24 154:15
  159:2,24,25 163:8
  163:24 164:6,25
  170:7 176:13
  184:7 187:24
  189:15 205:19
  220:12,21 221:20
  221:22 222:21
  232:8 249:23
**looked** 97:15
  148:23,25 149:23
  151:7 153:7 154:6
  158:1 159:16
  160:1,13,14,21,25
  161:19 182:6
  185:22 187:17
  205:12 248:15
  268:5,18
**looking** 10:24
  54:21 60:8 94:6
  97:17 106:3
  108:15,18 110:19
  112:8 136:9
  143:22 150:6
  165:19 168:13,17
  184:20 187:6
  205:8 215:5 219:6
  254:13,14,14
  264:13,16
**looks** 155:16 170:6
  170:8 171:9,15
  174:8,12 175:3
  179:23 180:12,18
  181:19 186:9
  187:25 218:21
  235:19 242:10
  252:12,16,24

253:13,15 265:5
  268:20
**loss** 100:15,20
  101:9,14 102:7,16
  102:19,22 103:17
  255:2,6,11,24
  256:8
**losses** 256:16
**lot** 11:2 31:20 32:4
  71:13 78:9 91:23
  132:5 143:19
  179:6 182:1
  208:10,23
**louder** 101:2
**louisiana** 7:21
**lower** 94:11
**lpa** 5:21 6:10
**luchette** 220:15
  228:1
**lunch** 167:13
  174:25 177:1,13

**m**

**m** 7:5,14
**madam** 282:10
**madison** 5:18
**mahoning** 36:22
  41:11 204:10
**mail** 26:3
**main** 18:18 48:20
  48:20 85:7 105:14
  105:16
**maintain** 16:17
**maintained** 67:16
  160:3 161:18
**maintains** 67:20
**major** 200:18
**majored** 15:21
**majority** 20:19
  22:10 24:5,16
  136:1,24 142:9
  179:24 217:5

242:5 247:1,6
  270:21
**making** 24:8
  106:12 255:7
  256:16 259:23
  260:1
**managed** 106:21
**management**
  33:23 64:1 78:6,8
  78:17,22,25 79:3,5
  79:11 201:14
  202:24 203:1
  205:23 245:5,7
  278:18
**manager** 186:17
  228:9 240:17
**mandatory** 51:17
  51:20 52:7 78:2
**manner** 86:19
  107:19 141:18
  193:23 196:4
  197:12,25 253:23
  280:17
**mantua** 224:20
**manual** 75:20
  144:2,16,24
**manufacture**
  41:22 44:22 89:19
  96:1
**manufacturer**
  29:11
**manufacturing**
  223:12
**march** 191:9
  268:2
**marcus** 7:4,8,8
**marijuana** 62:22
**mark** 162:10
  263:16 265:21
**marked** 184:15

marlea 4:11
    236:15
marlene 234:3
master's 16:6
masters 229:7
match 159:3
matter 21:9 53:8
    187:25 218:8
    225:11 237:25
matters 19:24
    103:6,7
maximum 172:24
mckesson 172:23
    178:3
md 1:10
mdl 1:9 5:2 262:23
mdl2797626 252:7
mdl2797783
    267:21
mdl2797836
    265:23
mean 18:2 20:10
    20:11 21:24 28:21
    29:22 30:17 31:8
    32:20 33:10 34:14
    34:16,18 38:21
    52:20 62:16 70:20
    76:22,23 77:18
    82:11 83:15 84:19
    85:22 86:18 87:21
    88:7 90:16 92:13
    92:16 95:11 97:23
    98:12,13,16
    104:24 107:22
    109:15,24 110:2
    112:12,25 113:15
    116:12 117:4,22
    123:14,19 124:13
    124:16 126:14
    129:13,17 131:3
    134:24 135:25

142:19,21 144:17
148:21 150:21
153:1 171:12
183:14 184:11
197:5,15 199:11
199:12,12,13,16
199:17 201:19
202:17 205:19,24
209:23 213:2
215:24 219:19
231:23 241:17
251:14 259:1,20
262:14,16 263:2
264:25 272:7
276:5
meaning 44:1
    162:13
means 68:24 69:8
    98:16 111:16
    113:3,11 135:18
    154:8 159:12
meant 34:21,22
    112:5 148:20
    202:20 203:11
    219:18 277:20
measure 135:25
measurements
    206:10
medic 236:5
medical 3:11
    62:22 63:24,25
    65:23 79:10 124:8
    129:4,5 130:24
    131:1,9,23 188:14
    196:11 198:11
    208:19 212:9,15
    225:5
medication 32:17
    72:3 73:10 75:23
    83:7 117:24
    203:22,24 217:5

244:19 254:22
medications 32:22
    69:17 71:23 72:7
    171:23 242:22
medicine 114:16
    202:1 247:25
    248:4
medina 40:15
meds 171:22
medsmart 4:20
meet 14:25 84:18
    84:22 85:9 95:8
    95:10 110:15
    139:21 163:19
    176:21 192:17
    193:14,14 276:18
meeting 162:17
    175:22 196:22
    197:1
meets 130:21
melanie 235:13
melville 5:7
member 38:1
members 59:15
memorialized
    123:20
memory 85:3
    147:4 210:1,17
    272:25
mentally 259:23
mention 23:1
    40:18 160:2 175:4
    175:18 185:13
mentioned 20:24
    21:10 32:6 37:1
    37:24 40:17 66:11
    84:11 95:7 155:1
    159:24 209:19
    246:6 248:15
    254:25 275:23
    277:8 278:1,11,14

mentor 1:21 9:5
menu 253:25
merely 140:6
met 88:6 95:12
    107:25 119:18
    121:9 127:15
    154:22 155:2
    182:24 185:9
    191:23 216:18
    217:12 271:8
methods 33:12,13
michael 220:22
michelle 8:4
microphone 154:2
middle 91:7
    211:11 212:19
    227:15
middlefield
    206:24 216:20
    217:4
midland 5:23
midnight 31:25
midwest 282:17
    285:1
miles 53:14 125:21
mill 203:9,17,19
    204:12 208:17
    214:7 245:5
million 71:1
mills 203:8,14
    204:3,6,14,15
    245:4
mind 98:19 99:12
    105:15 108:3
    129:19 189:9
    197:20
mine 274:17
minimum 100:1,6
    145:23 162:17
    183:2 253:14
    268:7

minute 14:13 49:16 90:14,19,22 93:9 239:8 265:20

minutes 15:3 21:8 24:15 77:12 239:12 274:13

misfiled 174:3

missed 166:18

missing 46:7 61:3 128:15 129:17 254:19 255:8

misspoke 75:13

misstated 139:5

misuse 29:20 32:9 32:19 33:10

models 83:19,24 84:1,4

mohammad 224:11

moment 21:7 36:24 85:22 90:12 158:10 247:10 267:5

monday 263:6

monitor 98:8,14

monitoring 89:19 96:1 99:8

montgomery 280:2

month 26:21 49:15 81:21 155:20

monthly 76:1 172:24

months 51:10 53:25 56:16 81:24 125:8 126:4 134:12,23 152:9 152:10 229:16

morgan 7:19

morganlewis.com 7:22

morning 9:15,16 240:3

morris 234:24

motion 154:18

motley 8:6

move 256:6

moved 90:11

moving 227:5 269:3

mullins 3:19 229:3

multiple 21:3 33:22 35:3 36:2,7 47:5 68:21 88:4 91:20 149:24 188:13 190:22 208:10 212:21,23 213:4,8 234:10 244:16 259:5,21

munoz 5:12

murdered 213:25

mute 101:1 154:2 214:12

muted 101:3

**n**

n 2:1

naddi 45:18

name 9:21,23 19:19 37:1 41:6 54:14 60:3 120:7 120:8,8 160:17 201:11 202:1 209:20 220:23 221:8 226:21 232:12,13 234:9 234:20,21 235:8 236:25 239:24 244:6 282:6 283:3 283:4,15 284:3,4 284:21

named 238:5 280:8

names 14:18,24 26:24 201:13,20 201:21,22 202:5 223:14 224:13

napoli 5:3

napolilaw.com 5:8 5:14,14

narcotics 16:23 17:24 18:8 27:23 194:21 209:6 229:20 232:20

national 1:6 9:3 17:12 37:24 58:2 282:6 283:3 284:3

natural 167:12

naturally 35:10

nature 24:7 27:6 28:13 59:4 60:9 66:9 92:1 95:19 97:13 99:15 104:16 150:20 174:10 181:8 183:23 187:2 202:10 208:13,16 211:14 240:22

ndc 184:5,13 190:22

ndcs 188:3

near 108:25 210:5 241:5 245:15 246:2

necessarily 106:20 107:3 109:17 144:12

necessary 124:20 145:11 249:25

need 12:7,11,17 24:4 33:4 55:5 69:10 84:17,22

128:5,12,18 131:22 146:19 193:20 212:7 246:10 272:13

needed 85:8 103:17 164:16 190:18 203:23 212:13,15 250:23 252:1 259:14 265:1 266:13 267:1

needs 88:14 251:4

neighbor 248:22

neither 188:6

networking 38:6

never 36:10 40:21 71:7,9 72:12 150:11 188:24 192:16 273:24 274:3

new 5:7,18,18 11:20 51:7 68:10 99:17,24 106:17 125:7 142:10 145:1,2 160:14,14 161:10 165:16 166:19 170:22 176:18 178:3,6 181:19 229:14

newer 62:23

newly 145:4

news 3:20 59:13 59:14 225:5 229:6

newsletter 122:1

nice 65:6 86:6 143:23 261:2

night 31:24

niles 267:25

nine 132:16

noise 100:22

nonlegitimate 244:17
nonpharmacy 105:23
nonroutine 110:1
nonscheduled 92:4
normal 53:14 203:25 206:4
normally 109:22 117:12 205:15 214:15
nortey 7:20 274:24
northeast 40:8,9 40:15 42:14 62:3 62:7,12 224:15 250:14
northeastern 37:6
northern 1:2
northwest 62:3,7
notable 20:8
notarized 282:14
notary 1:20 280:5 281:9 282:25 283:10,18 284:15 284:23 285:23
note 162:15 173:7 282:12
noted 9:8 165:21 170:11 171:6 181:7 211:4 270:10
notice 2:9 10:14 11:6 28:20 137:18 140:13 141:17 226:16 227:6 233:19
notifies 69:8
notorious 206:19

november 18:1,3 38:12 39:15 222:1 229:16
nsprlaw.com 5:8
number 17:13 25:22 43:8 45:21 60:18 70:23 73:18 73:23 83:6 89:2 95:24 104:10 115:16,18,20,21 117:20 125:21 133:7 134:5 137:7 148:4 151:1,14 153:7 154:14 156:2 158:6 159:16,25 160:3 161:1,8 165:5 166:25 167:2 168:6 169:22 171:15 172:20,21 173:25 175:1 176:16 177:19 179:5 181:1,5 183:1,2,2 184:2,5 184:13,17,17,24 185:11 186:5 187:8 188:9 190:2 204:1 212:1 241:22 259:24 260:4 273:13 282:7,13
numbers 74:3,7 148:24 190:22 284:7
numerous 211:2 242:12
nurse 32:14
nurses 66:18,22
nursing 32:15 63:23 64:13 65:24

nw 7:14
nystatin 165:9

**o**

oac 85:14,14,17 91:8 110:10 115:5 136:15
oarrs 2:11 25:4 26:12 33:21 43:10 43:13,14,16,21 44:3,4 45:15 46:22 47:7 48:15 48:20 49:7,11,19 49:21 50:16,25 51:4,9,14,15 52:6 53:21 54:6,17 55:4,13,18,23 56:3 56:8,15,22 57:1,3 57:4,10,18,22 58:1 58:5,10,15,16,19 58:22 59:5,5,20 60:5 67:7,8,18,19 67:21 68:9,13,16 68:20 69:14 73:16 73:17,22 74:10,14 75:1,21,24 76:5,8 76:13,18,22,25 77:11,16,21 78:2,7 79:18 80:12 81:9 81:11,15 82:1,7,8 82:9,14,20,21,23 83:1,3,5,20 84:4 99:14 121:4,4,9,15 121:25 122:14,22 125:3 126:1,18,19 126:20,22 128:14 129:20,22 130:9 138:23 139:3,8,11 139:17 161:24,25 187:12 188:7,23 188:24 189:10 190:17,23 278:4,8

objection 24:10 71:16,17 78:13 128:7,23 132:1 194:8 196:24 198:3 201:2 205:17 261:24 262:3
observation 183:15 190:19 265:11
observations 127:11 258:4
observe 183:12,17 267:7
observed 186:1 187:21 267:12
observing 158:22
obtain 21:3 48:7 126:21
obtained 126:12
obvious 227:13
obviously 77:21 263:3
occasionally 31:17 31:19 34:9 36:5 40:23 72:25 109:9 112:10 118:8 241:4 277:9
occur 109:25
occurred 51:21 52:8 165:15 166:17 260:11
occurring 259:5,8
october 177:18
offenses 45:25
offer 115:22 118:14
office 3:12 50:17 67:3,3 92:13 104:10 105:1 203:20 206:24

281:2

**officer** 16:12,15

**offices** 46:16 50:15
63:23 64:7,7,20
71:1,13 72:11

**official** 10:7
283:15 284:21

**oftentimes** 106:17
147:7 241:23

**oh** 13:14 15:3
43:18 51:25 93:3
93:8 94:2 158:16
207:1 219:18
227:24 267:18

**ohio** 1:2,8,10,21
1:22 2:10,14,16,20
3:23 5:24 6:2,4,6
6:9,12 7:11 8:4
9:5,25,25 10:5,16
13:6,23 15:14,22
16:13 17:19 18:1
18:2,15,16,24 25:5
37:7 40:7 41:14
41:18,18 42:1,11
42:18 44:17,25
45:3,14,24 46:5
48:16 53:12 65:20
67:12 69:25 76:17
77:1 84:12,16
85:4,14 87:23
91:7,15 104:20
107:8 110:2 116:2
148:5 172:17
191:4 192:8
194:21 197:13
202:13 216:20
217:4 218:24
224:15 230:13,16
230:25 252:12
263:20 267:25
271:11 274:4

276:5,9,12 278:17
278:21 279:5,5
280:1,5 281:3,9
282:2

**ohio's** 46:22 73:4

**ohioattorneygen...**
6:7

**okay** 10:2,22 11:5
11:10,17 12:14,25
13:3,16 14:25
16:2 17:15,22
19:2 20:5 21:18
23:3,9 25:25
29:25 30:14,24
32:12 33:12 34:10
35:20 36:18 37:3
37:9 42:8 43:1
44:10,15 46:7
47:18 48:4 49:6
49:18 50:14,20
51:25 52:2,14,16
53:19 54:8 55:2
55:13,22,25 56:5
56:25 57:9 58:7
59:12,19 61:1,13
62:11,18 63:16,20
64:6,13,17 66:14
68:20 69:4,11,20
70:22 72:12,15
74:8 75:9,18
77:10,25 78:21
80:15,21 81:4
84:2,11 86:7,8,23
87:14 93:3,8
94:20 95:7 96:8
97:22 98:18 99:17
99:25 104:13,13
104:25 105:20,25
106:7,16 107:2,7
108:6 109:1,10
111:5 112:16,22

114:23 117:10,11
117:20 118:9
121:18 122:4,24
124:4,22 127:2
129:21 131:3,5
132:4,22 134:8,20
135:10,21 139:19
140:22 143:9
144:6 145:6,10
147:9 149:4 150:1
150:25 153:6
154:13,21 155:16
157:11 158:18
160:13 161:19
162:6 166:25
167:14,16 168:8
169:9 170:10,23
171:2 172:9 173:6
173:24 174:24
176:1 177:3
178:21 179:2
180:2,6,13,16
182:18 183:11
184:1,20,24
186:22 189:13,23
190:6 193:22
194:3 195:10,20
197:4 200:10,17
200:23 201:6
202:7 203:8,12
204:13,20 210:16
211:19 212:12
213:10,17 215:6
216:10 218:17
219:14,22,23
220:12 224:25
225:4,19,23
227:23 228:4
229:10,11 231:8
232:10 235:22
236:8 238:1

239:13 240:5,9,12
242:3,17 243:7,12
243:22 244:11
245:3,14,20
247:10,18,23
248:12,23 250:20
251:11,21 252:5
252:15,21 253:4
253:11,12 254:3
255:14 256:12,20
256:25 258:11
259:12 260:9,15
261:15 263:15
264:25 265:18
266:9,16 267:20
268:2,4,15,17
269:2,13,20 270:1
270:8,24 271:4,22
272:10,16,21
273:2,7 274:8
275:22 276:4,12
277:14,19

**once** 49:18 178:25

**oncologist** 245:16

**ones** 134:16 250:5

**ongoing** 242:21

**online** 44:2 143:1

**onsite** 136:16,17
137:17,19 140:4

**op** 1:9,11

**open** 87:15 185:4
260:20,24 261:3
261:20

**opened** 183:22

**opening** 106:17

**operate** 104:25

**operated** 25:1
31:21

**operating** 185:4
195:24 196:4
197:22,25 198:23

200:3,11 201:7
204:15 205:15
206:4 272:19
**operation**  46:22
**operations**  89:21
95:18 96:3 97:6
**opiate**  1:6 9:3
48:25 49:2 282:6
283:3 284:3
**opiates**  79:2
**opinion**  256:13
**opioid**  56:13 58:17
64:20 72:4 73:8
73:23 78:9,17
194:6 212:2
246:10 273:4
279:6
**opioids**  70:15 71:2
71:14 73:18 79:9
83:13 196:6 198:1
202:9 245:10,18
245:23 246:21
273:10 279:2
**opportunity**  11:23
13:3 143:9 144:24
**opposed**  78:2
94:21 270:23
**oral**  165:9
**orc**  2:17,18 20:23
**order**  72:9,10 88:5
90:5 91:15 104:16
113:12 128:3,10
129:7 131:20
155:9,11 168:6
177:18 212:13
213:20 262:23
272:14
**ordering**  72:6
87:11
**orders**  98:8,15
99:8

**organization**
34:11,18 38:1,4
**organizations**  34:6
35:15 63:25
**orient**  240:13
**original**  109:21
182:9 191:5
**originals**  180:10
180:11
**outcome**  236:11
**outdated**  149:11
155:17
**outpatient**  125:1
145:3
**outreach**  46:22
**outside**  28:19
31:11 51:12 52:18
52:21,25 53:2,14
123:25 125:9,10
125:11 126:20
138:21 204:25
208:18 225:25
**overall**  76:16
88:14,16 205:11
**overdose**  3:23
59:3 73:4,8
230:21 231:11
232:4
**overholt**  3:4,6
4:19 206:17,21
207:2,13 211:6
212:15 217:20
218:4,12,23 219:3
220:14,18 227:25
238:21
**overholt's**  200:22
210:10 211:23
217:9
**overlap**  244:18
**overlapping**  21:4
33:23

**overly**  54:11,21
**overridden**  173:16
**override**  188:5
**overt**  127:11
**overusing**  32:22
**overutilization**
54:11 117:8
119:23
**overview**  67:7
**oxford**  7:6
**oxycodone**  225:6
225:14
**oxycontin**  205:14

**p**

**p**  5:22 19:18
**p.m.**  279:19
**pad**  35:5
**page**  2:3,8 3:2 4:2
45:20,21,21 46:10
47:4 48:4 51:6
52:17 62:19 65:6
69:20 70:4,5,6,9
73:14 75:11 96:18
97:23 108:23,25
137:7 143:25
144:4 152:14
153:21 154:11
155:24 156:4
159:17 164:19
165:5 166:9 167:7
168:1,24 169:13
169:21,24 170:7
171:8 172:21
173:7,20 174:7
175:5,18 176:15
177:15 178:1,1
179:7 182:2,4,18
183:1 184:1,21
185:17 187:10,14
187:24 190:2,15
209:19 210:2,3

211:11 212:18
216:16 230:19
231:8 234:23
235:14 236:2
237:20 238:7
240:10,15 252:16
282:13,15 284:7
285:3
**pages**  47:11 48:14
50:23 56:6 76:7
90:17 96:17
109:11 113:7
168:12
**paid**  69:18 188:15
**pain**  33:22 64:1
78:5,8,17,21,25
79:3,5,11,12 201:6
201:7,14 202:1,7
202:24 203:1
205:23 245:5,7
278:17
**painesville**  148:5
172:17 234:4
263:20
**paper**  142:14
**paperwork**  109:19
**paragraph**  63:20
70:10,22 72:2
73:1 74:9 86:6
90:10 122:13
141:18 144:4
209:5 210:2,6
211:21,22 212:19
**paralegal**  8:5
**parameters**
130:22 250:6
**paraphrasing**
247:15
**part**  22:6 25:24
26:17 53:4 77:19
93:21 98:21

[part - personally]

100:10 107:2,19
110:23 112:22
117:12 119:25
123:13,14 124:5
139:14,25 140:24
144:3 145:12
148:12 152:20
164:17 168:25
182:5 185:21
191:18 217:10,20
219:1 220:17
250:14 257:11
267:8 284:9
**partial** 135:18,23
136:2,3 169:14
171:9,21 174:9
**particular** 40:7
45:18 92:17
100:11 245:9
248:13 258:9
271:7,12 272:9
273:9
**particularly** 18:16
33:15
**parties** 94:22
262:9,23
**partner** 19:7,14,16
19:22 226:23
**partners** 19:12,15
19:17 20:13
**parts** 40:14,14,14
**party** 58:11
188:15 262:12
280:16
**pass** 135:15,16
156:23 233:20
**passage** 70:24
**passed** 237:4
241:1 278:17
**passing** 223:13
224:14 228:15

**password** 152:16
**passwords** 152:19
**patient** 29:12
30:20 51:6,10,11
52:18 53:22 54:9
54:13 55:7,8 56:14
56:15 57:7,8 59:1
68:21,23 69:3
76:9 79:18,19,21
79:23 80:14,20,22
80:23,25 81:1
82:7,10 113:13
115:17,22 116:12
116:13,16,18,20
117:9 118:9
119:10,12,13,17
120:8,14 122:17
123:21,22 125:10
125:11 126:2,23
127:4,15,23
129:23 130:23
131:8,11 152:4,8
160:17 162:16
168:3 178:12
182:8 188:10
216:11 221:6
241:16 247:21
248:7 258:8,18
**patient's** 32:15
57:5 69:1 73:19
130:16,24 188:13
**patients** 30:7 79:1
79:2,4,12 81:21,22
83:8,10 101:21
129:24 130:3
200:9 207:8
211:17 216:12
217:3,6,7 242:13
246:10
**pattern** 188:14

**patti** 1:20 62:6
194:16 280:4
281:8
**pause** 258:10
**pavlich** 41:5
133:13,25 207:10
209:13 210:15
216:18 218:22
219:13 220:1,20
238:24 242:14,16
243:6
**pay** 211:17
**pdm** 57:20,23
**pdmp** 48:16
**pdx** 151:3 178:3
**peace** 16:12,15
**pec** 5:2
**peer** 124:8
**pennsylvania** 7:7
57:14,19,23
**people** 21:1 25:10
26:22 28:22,23
34:16,22,24 35:4
35:20 69:8 74:25
123:15 142:19
162:1 183:21
203:23 208:18,23
213:18 223:14
224:13 231:24
233:20 241:25
246:22,23,25
262:9 277:9
**percent** 79:1,3
205:13 210:10
230:21 231:11
232:4
**percentage** 206:6
206:12
**percocet** 32:15
**perform** 115:18
116:24 117:4,5

185:19 214:24
257:19
**performed** 132:4
132:9 133:8
138:22 167:9
254:21 265:9,14
**performing**
111:25 112:2
128:20 133:14
160:11 184:3
185:5 193:25
257:5
**period** 18:6 20:17
28:14 39:19 42:15
43:15 44:6 51:15
55:4 74:14,23
123:6 133:22
134:3 139:1
140:20 178:23
198:22 200:1
210:9 221:12
240:20 250:10,12
**periodic** 50:7
**periods** 37:11
134:10
**permission** 140:3
**permitted** 137:22
**perpetual** 160:2,6
162:19 181:7
185:13
**person** 26:5,18
44:3 65:13 98:3
101:3,20 102:8
107:15 166:4
248:9 252:16
**personal** 21:9 97:2
97:9,17 258:4
**personally** 56:13
67:11 75:4,22
97:5,19 102:2
103:23 204:18

231:21 283:11
284:15
**personnel** 100:5
102:23 103:2
106:24
**perspective**
114:25 121:13
147:23 155:6
160:5 175:13
**pertinence** 231:14
**peter** 207:22
**pharma** 1:9,11
**pharmaceutical**
17:2,5,20 28:13,18
29:6,7,15,23 31:22
32:2 36:8 37:21
38:8 39:11 102:4
111:20 236:10
242:7
**pharmaceuticals**
30:2 68:4 221:10
229:24
**pharmacies** 13:18
13:19 22:6,9,11
25:4,9,21 26:2,10
26:14 27:4 31:5
35:17 46:16 49:19
63:4,18,22 67:11
67:23 68:7,11
71:24 75:22,25
80:17 81:4,8,24
82:5 84:17,22
85:8,12,13 95:4
102:21 103:1,8
106:13 108:11,17
109:7,12 110:11
112:4 120:1
121:19 127:13
132:24 133:1,9,21
133:23 134:5,8
135:8 138:1,18,20

139:9 141:11
142:4 145:21
146:8,11 147:3,10
147:15 149:5
157:12 183:18,24
192:7 193:23
194:5,23,25 195:5
195:21,24 196:3
197:1,11,21,24
198:9,13,20,23
199:6 200:2,8,10
200:12,18,24
201:1 203:5
212:24 213:4,20
214:4 224:14
225:1 226:17
227:2,14 241:23
245:21,23 247:5,6
249:20 250:7,11
250:14 251:9
254:6 255:2
256:21 271:6,11
272:18 275:13
276:17,22
**pharmacist** 50:25
51:4 52:4 53:10
53:20 54:5,20
55:3,5,7,8 73:17
79:17 80:7,11
82:19 97:2,8,19
98:2 107:15,17
110:3,12 111:11
111:17,21 112:21
113:11 115:14
116:3,7 121:13
123:1,11 124:19
125:2 129:14
130:19 148:7
150:5,19 153:10
154:20 155:24
156:6,7 161:12

165:12 166:10
173:14 175:8,10
176:18,23 179:15
183:10 185:1,18
188:3,22 189:3,6
190:16 193:13
205:9 212:8,11
214:25 219:10
220:14 222:4,17
232:12,23 234:12
234:24 235:2,13
235:16 236:2,4,7
236:21 237:1,22
238:9 240:24
241:10,14 242:8
242:18 243:19
246:14 248:6
249:3 251:18
257:17,22 258:23
259:9,22 265:12
265:13 272:4,11
277:14,16,22
**pharmacist's**
258:14
**pharmacists** 22:15
22:25 23:12,16,20
23:22 24:5,6,12,18
25:20 35:24 39:3
39:6 46:2,14
47:20 48:21 49:10
49:11 54:16 55:14
56:2 63:2 76:10
76:20 77:11,15
79:15 80:16,22
82:9 97:5 106:8
106:22 107:1,13
110:7 111:2 112:8
113:19 114:7,14
114:25 115:6
117:17 120:1
121:24 122:8

123:10 127:13
138:8 145:20
151:24 152:15
156:11 178:5,8,18
183:8 184:3,9
185:4,22 187:17
192:25 193:1
196:9,14 198:8
210:25 214:15
215:7 216:18,23
217:3,7,11,19
220:13,18 221:16
221:17 222:9,14
228:1 233:11,19
233:23 241:23
243:4 247:5,6
248:14 249:13,22
257:5 258:2 272:8
273:14,15,20
278:8
**pharmacopeia**
124:10
**pharmacy** 2:11,20
3:6 4:19,21 6:3,9
7:10 8:4 9:25 10:6
10:17 13:6,24
15:14 18:3,7
19:23 20:15 23:7
23:12,23 24:20
26:19,20 27:11,22
29:12 30:15,22
34:5 37:13,19
38:10,12,18 41:15
42:9 44:16,18
45:15 46:4,14
49:20,22 51:13
52:19,21 53:13
61:2 63:2 64:19
64:25 65:8 70:18
79:5 80:8,10,13,24
81:2,3 83:20

88:13,18 89:25
91:15 92:14 95:1
95:8 96:14,25
97:6,16,19 98:19
99:1,11 100:2,5,15
100:20 101:9
102:7,14,16,19,22
103:2,21 104:8,9
105:1,14,24
106:23 108:3
110:8 111:1,6,11
111:16 112:5,23
112:25 116:2,17
119:12 120:8
125:9,23 127:24
131:12,21 132:6
134:2,17,18 137:1
137:15 138:5,11
138:16,21,25
139:15,21 140:3
140:14,19 141:7
146:17 147:5,19
150:15,19 151:4
151:12 156:5
163:3 167:23
175:16 177:25
178:2,15 184:5,12
185:2 186:17
187:21 189:21,25
190:7,12 192:5
193:5,6 195:1,3,4
195:7 196:18,23
197:4 199:4,8,11
199:16,17 200:22
202:14 204:22
205:13,15 206:4
206:17,22,25
207:6,7,11,18,21
210:10 211:6,8,23
211:24,25 212:23
213:9,15 214:17

216:7 217:9
218:12,23 219:8
220:15 221:5,25
222:19 224:20,21
230:16 232:21
233:2 234:25
237:5,21 238:7,21
240:16 241:8
245:24 251:4,23
252:24 253:7
254:2,9 255:9,17
256:7,17 258:13
258:23,23 259:6
260:2,11 265:2,11
265:24 266:12,25
267:13 269:17,22
271:15,19,23,25
272:23 273:3,8
274:4 276:6,9,10
276:13,14 277:1,5
278:12 279:5
**pharmacy's**
  117:12 119:17
  182:7 185:3 205:9
  215:4
**phone** 15:2 42:24
  112:20 160:18
  282:3
**phonetic** 58:9
**phony** 237:3
**phrase** 149:2
**phrased** 259:17
**physical** 12:9
  87:12 91:24
  105:21 106:5
  126:6 154:17
**physically** 12:25
  185:25
**physician** 73:16
  113:24 114:5,18
  114:20 129:4

**physician's** 46:16
**physicians** 66:18
  66:22 244:16
**pick** 12:8 176:12
  234:16
**picking** 272:17
**picture** 68:25
  130:6 131:20
**piece** 130:13,15,16
**pill** 203:8,9,14,17
  203:19 204:2,6,11
  204:14,15 208:17
  214:7 245:4,4
**pills** 30:16 225:7
  248:9 255:7,7
**pink** 159:8,10,12
  162:12 170:1
  172:6
**piszel** 211:22
  212:4
**pittsburgh** 7:7
  204:25
**place** 52:10,11
  85:24 87:10
  113:23,25 134:19
  183:13 256:21
  259:11,25
**placed** 68:10
**plaintiffs** 5:2
  261:13 279:11
**plan** 186:16
**play** 220:16
**please** 9:21 14:6
  26:19 45:20 59:22
  101:1 154:2,3
  158:6 167:7
  193:10 214:12
  225:3,19 226:5
  230:8 232:9
  282:11,11

**plevin** 6:10
**pllc** 5:3
**plus** 179:1
**point** 28:1 56:20
  86:7 128:12
  143:20 151:23
  159:23 166:20
  167:12 181:9
  215:19 217:16
  223:11
**police** 15:23 16:16
  16:20 17:8 36:3
  89:16 216:25
  249:14,15
**policies** 85:24
  86:12
**policy** 47:6 86:16
**pop** 117:15
**popped** 221:8
**portage** 40:13
  222:13
**portion** 216:1,2
  218:14 246:8
**position** 16:25
  38:14 130:8
**positive** 251:9
  276:23
**possessed** 154:20
**possible** 170:19
  245:21
**possibly** 78:4
  189:2
**posted** 153:9,9,11
**potential** 54:9
  82:10 122:10,11
  127:5 256:2
**powerpoint** 43:24
**powers** 18:14,20
  66:6,6,13 81:5
**pr** 22:15 27:15

**practice** 48:1
  107:18 111:6,11
  111:16 112:5,23
  114:16 126:6
  140:17 208:19
  216:1,2 241:8,12
  246:8 258:13,22
  259:2 260:5
  277:21
**practices** 156:17
  165:1,19
**pre** 26:12
**preceding** 51:10
  53:24 126:4
**predetermined**
  124:6
**preface** 122:11
**premises** 89:6
  91:25
**preparation** 209:8
**preparations**
  212:2
**prepare** 13:4,13
  75:4
**prepared** 75:4
  133:5 135:7
  164:11 220:1
**preparing** 209:13
**prerogative**
  243:18
**prescribe** 113:20
  113:23 114:3,4
  202:8 246:21
**prescribed** 32:18
  33:10 73:18 83:7
  129:4 131:16
  212:1 217:2
**prescriber** 25:17
  51:12 53:24 58:15
  59:5 63:23 64:6,7
  64:19 70:25 71:12

98:2 113:13 120:9
  122:16 125:9
  126:4 131:24
  175:20
**prescriber's** 128:5
**prescribers** 48:21
  53:25 55:16 56:2
  56:5,7 57:9 67:12
  67:23 71:25,25
  72:8,9 75:22,25
  76:9 81:20,23
  83:2,6 126:5
  188:6 247:1,2
  278:8
**prescribing** 56:12
  56:21 74:12 79:2
  203:21 208:18
  210:17 278:21
  279:1
**prescription** 1:6
  4:13 9:3 22:1,3
  24:21 27:8 29:8
  30:20 32:23 33:14
  34:7,8 35:5 46:23
  49:21,23 54:13
  55:6,15 56:3,23
  57:3 58:20 59:1,6
  67:22 70:14 73:20
  76:20 77:17,21,23
  79:22 82:17 93:5
  93:6 100:4 112:15
  112:15 113:2,12
  115:1,15,24 116:3
  116:16,19 117:10
  117:13 118:22,25
  120:7,17 123:23
  125:1 127:23
  128:4,6,11,13,17
  128:20,25 129:3
  129:10,13 130:15
  130:20,25 131:9

131:13,19,22
  136:8 139:10
  155:18,19 160:15
  165:6,13,14,20,24
  172:19 173:7
  174:1,3 175:22
  179:12,15 180:8
  182:10 185:20
  186:1 188:1
  193:24 196:5
  197:13 198:1
  199:14 212:16
  213:5 215:24
  216:4 222:5
  233:13,15 234:5
  237:4 244:4,5,7,9
  244:21,23 246:17
  247:21 248:6
  257:12,14,19
  258:9 269:9,18
  272:23 273:10
  279:2 282:6 283:3
  284:3
**prescriptions** 21:1
  21:2,4,21 27:5,10
  27:17 29:19 30:8
  31:2,4,18 33:24
  35:6,18 48:23
  50:15 53:23 59:2
  59:10 67:10 73:23
  78:9,18 83:6,10
  111:23 112:24
  113:10,16 115:7
  118:3 120:18
  126:3,5,13 130:5
  138:25 139:4
  156:9,12 160:19
  160:22 161:10
  169:6 174:14
  175:9,20,24 176:2
  176:6,19 179:19

188:11 190:22
  191:5 194:6
  196:10 198:10
  199:19 200:4
  205:3 206:7
  208:23,25 210:8
  210:11,13 212:21
  213:8,19 214:6
  215:2,10 217:6,9
  223:12 224:12,14
  224:19 225:14
  228:14 233:7,21
  233:25 242:19
  244:18 245:10,17
  245:22 246:11
  249:24 273:5
**presence** 280:12
**present** 8:3 43:24
  220:8,10 231:3,5
  250:13
**presentation**
  45:19 51:23
**presented** 129:14
**presentence** 3:17
  4:6 220:22 234:19
**presenting** 54:12
  138:7
**presents** 65:12
**president** 34:19,19
  38:3 229:21
**press** 225:11
**pretty** 22:24
  217:23,24 229:14
  232:19 241:2
  251:21
**prevent** 24:1
  107:13 151:25
  182:8 212:21
  256:22
**prevented** 182:13

preventing 65:9
prevention 100:15
  100:20 101:9,15
  102:7,16,19,22
  103:17 255:3,6,12
  255:24
previous 172:11
previously 15:5
  51:8 125:7 264:16
primarily 19:9
  20:1,16,18 38:5,6
  39:1 40:17 66:2
  69:16 71:23
primary 78:20
  84:21
principles 111:19
printout 175:7
prior 15:9 17:7
  39:24 40:1,2,2
  49:6 77:23 87:1,3
  87:13 90:7 105:17
  106:11 124:25
  132:13 143:14
  146:2 147:4
  155:20 157:22
  158:13,17,24
  170:12 186:20
  190:4 215:22
  250:21 268:11
prison 224:17
prisons 63:24
  64:13
proactive 278:13
probably 11:14
  15:3,7 20:11 30:5
  37:17 43:18
  132:14 143:4
  168:11 191:5
  253:22 261:10
  270:5

problem 82:10
  90:20 122:11
  165:4 180:9 183:3
  183:20 231:2
  233:14,25 242:21
  253:18 268:8
problematic 269:5
problems 181:6
  222:18 233:2
procedure 1:19
  283:5 284:5
procedures 85:19
  86:12 87:6,9
  89:14 191:13
proceeded 208:6
process 11:18
  12:10 98:22
  104:14 105:3
  109:13,16 110:5
  115:1,6 128:15
  140:16 152:20
  163:22 175:5
  177:15 178:10
  251:22 255:15
  257:12
processes 98:24
processing 20:25
  21:22,23 48:8
  193:24 197:12
  244:1,2,8
produced 132:25
  133:20 265:7
production 282:15
  282:17,22
products 63:14
profession 111:7
professional 16:9
  53:9 82:18 107:16
  112:9,13 113:11
  113:17 122:9,21
  123:12 127:7,10

130:1,21 185:5
  215:13,23 228:24
  241:3 243:19
  246:16
professionally
  248:20
profile 26:24 27:8
  51:11 119:10,18
  123:22 152:4
  168:3
profiled 115:17
  116:13,14
profiles 119:14
  162:16
profiling 118:9
  178:12
program 43:10,13
  43:14,19,24 44:2
  48:16 57:20 62:22
  132:12
promethazine
  35:14
promise 250:4
prompted 166:8
proper 107:11
  155:9,13 160:23
  182:22
properly 107:1
  110:22 118:3
  129:3 155:10
  160:18,19 175:20
  190:23 199:9
property 191:3
prosecute 31:14
  31:15 72:24
  213:25 223:17
prosecuted 30:10
  213:24 218:11
  220:16 238:16
  247:20

prosecuting 20:16
prosecution 65:14
  66:8 218:3,7
  227:25 235:4,9,18
  236:9 237:8
prosecutions 20:8
  28:12 32:13 33:7
  220:17
prosecutor 34:13
  72:20
prospect 5:23
prospective
  115:18 116:25
  119:21 122:5
  184:3,9 257:6
protect 57:7
protocol 12:19
  262:8
prove 109:13,17
provide 43:9,13,16
  64:20 71:3 74:11
  76:9 90:5 97:9
  121:18 139:9
  140:13 148:11
  181:20 222:10
  223:21 232:25
  235:17 244:12
  272:13
provided 43:3,4
  43:12 87:19
  101:19 141:17
  187:13 190:1,13
  233:6 236:6
provider 131:23
provides 78:25
  82:21 188:9
providing 73:18
  111:16 208:22
  209:9,13 233:24
  238:9

provision 97:22
100:11 104:22
107:11 113:22
115:5,10 118:19
119:8 120:4 121:8
124:12 141:1,3,4
provisions 42:21
97:1 107:9 108:7
prudent 216:4
ps 135:13
public 1:20 6:12
20:18,20 89:9
230:10 280:5
281:9 283:10,18
284:15,23 285:23
publication
230:10
publications
124:17
published 142:16
142:25
puerto 5:13
pugh 19:18
pull 45:9 82:1
purchase 71:13
purchased 63:3
71:1,24
purchases 172:25
purdue 1:9,11
229:22,24
pure 45:25
purpose 48:20
70:17 128:5,20
129:4 131:25
139:19 174:10
196:11 198:11
227:6 257:8
purposes 85:11
pursuant 1:18
10:14 98:5 115:17
115:19,21,23,25

122:15 137:13
put 52:10,11 65:4
101:1 259:19
261:18 278:21,22
279:1
puzzle 130:14,15
130:16
pyles 40:1

q

quadrant 62:12
quadrants 62:9
qualifications
104:16 110:13
qualified 280:6
quantities 203:24
212:3 217:1
quantity 89:4
175:21 179:16
188:2 244:5
quarters 240:11
query 50:25 51:4
53:21 56:8 58:15
58:16
question 11:22
12:1 24:11 25:14
25:18 78:14 94:3
94:9 101:4 103:22
112:20 128:22
130:7 131:6,17
139:6,7,11 145:12
167:11 183:9
186:4 188:10
195:10 199:23,24
241:15 257:9
259:4
questionable 98:9
98:15 99:9
questioned 212:22
questioning 86:5
274:11

questions 11:21,24
12:1 27:18 47:13
168:20 181:21,24
185:1 239:4,7,10
240:1 253:16
256:14 268:22,24
269:6,7 274:9,23
275:10 279:10,12
quick 21:9 167:11
quicker 48:22
quickly 250:4
257:4 275:11
quite 39:21 156:13
259:22

r

r 5:11
radio 100:23
raised 24:21,23
ran 26:23 188:24
randomly 176:2,9
rare 270:13
ravenna 222:13
rbarnes 7:8
reach 249:24
272:14
reached 256:1
read 32:8 91:9
96:11,24 135:13
146:21 157:1
158:12,14 219:11
220:3 279:13,15
283:5,6,12 284:5,6
284:17
reading 90:18
96:9 113:2 135:14
217:16 234:8
263:1,3 282:19
ready 104:3 137:3
realize 27:22
really 22:13 27:14
49:8 129:12 130:4

131:7 186:13
203:23
realtime 151:4
182:7
reason 48:20 49:3
53:19,22 55:8,13
57:1 58:18 60:7
60:13 119:2
121:22 126:1,12
128:2 202:12,15
206:1 227:19
232:6 259:13
272:5 282:14
284:8 285:3
reasonable 205:20
reasons 25:13,22
54:4 58:25 70:21
202:19 227:13
244:17 245:8,11
246:18 259:25
recall 14:23 20:7
23:11 30:4,6,9,21
37:14 45:17 48:19
49:3 50:18,22
51:19 52:1,9
53:12,17 60:1
63:15 65:1,3
68:12 74:13 77:5
78:6 87:22 103:20
110:22 138:4,7
142:23 143:5
146:16,22 147:9
147:12,13 148:14
149:7,7,8 152:4,8
157:16,18 159:21
166:23 170:25
172:3 173:5
183:25 186:23
187:20 189:2,3,7
192:1 193:14,19
196:12,25 198:7

199:22 201:10,19
201:24,25 202:5
204:10,11,17
205:2,4,5 208:8,12
209:14,16 211:1
211:13,18,20
212:11 213:22
214:8 217:16,22
218:9,15 219:5
220:6,19 222:16
222:20 223:6,22
224:7 226:19,20
226:21 228:16
230:6 233:8 234:7
236:11 237:24,25
238:6 242:14
254:1,5 267:11,15
268:12 275:24
276:1 277:11
278:16,23,24
279:2
**recalling** 30:18
**receipt** 4:13 89:19
96:1 191:3 282:18
**receive** 10:19
112:19 219:9
222:14 262:21,22
262:24
**received** 25:3
53:22 126:2
155:11 165:23
179:21 187:22
188:3 236:20
248:7
**receiving** 182:8
188:10 208:24
261:24
**recite** 84:19
**recognize** 41:6
60:3 85:4 110:11
110:16,18 136:15

218:19 220:23
221:24 222:25
230:9 234:21
235:8 238:24
**recollection** 13:17
23:23 40:22 43:20
51:3 52:15 60:12
60:14 76:3 89:23
157:17 181:15
199:3 209:22
235:1 268:11
269:17,19,21
270:1 273:6
**recollections**
200:8 269:25
270:6
**recommendations**
191:14,17 273:17
**recommended**
162:4
**reconnect** 12:18
**reconvene** 177:2
**record** 3:3 9:2,8
14:6,7,9,12 21:8
21:12,14,16,19
74:9,14 90:24
91:1,3 116:15
123:1,22 169:1
177:5,7,8 207:12
207:25 239:16,18
239:20 253:6
261:23 266:22
274:25 275:1,3,5
279:17 284:9
**recorded** 174:17
**recordkeeping**
70:12 118:23
123:15 152:23
159:21 182:17
204:1 254:18,20

**records** 138:17,20
139:10 151:2
155:13 159:19,22
172:10,22 174:18
182:20 185:12
187:12 189:25
190:10,13
**red** 24:21 82:8,13
129:23 205:25
213:15
**reduced** 280:11,13
**refer** 66:8 103:6
115:4 145:10
230:15
**reference** 23:10
62:19 63:1 64:17
66:17 67:8 72:16
73:2,15,16 74:9
76:8 96:3 99:19
100:8 118:14
152:4 168:1,23
172:22 176:16
178:2,17 220:13
227:12 229:12
237:20 238:8
282:7 283:2 284:2
**referenced** 74:17
104:1 169:24
283:11 284:15
**references** 18:24
63:21 69:4 70:23
96:13 211:11
234:23
**referencing** 223:2
227:9
**referred** 209:2
**referring** 24:14
35:9 36:15,16
72:3,6 88:8
123:24 153:3
195:16 199:9

255:15
**refers** 65:13 92:21
96:23 99:6 119:8
124:5 144:1 155:8
242:15,16
**refill** 156:4,12
161:11,17 176:18
**refilled** 173:11
**refills** 54:11
149:12 156:10
187:1
**reflect** 168:25
**refresh** 13:16 51:3
52:15 76:2 89:22
147:3 181:15
209:21 235:1
**refrigeration**
155:3 167:2
**refuse** 246:14
**refused** 102:11
217:4
**regard** 13:13
226:3
**regarding** 124:15
147:4 187:19
217:1
**regimen** 111:25
**region** 133:17
**register** 65:5
**registered** 234:24
**registrant** 88:15
88:17
**registrant's** 89:18
95:25
**regular** 206:3
**regularly** 221:8
**regulates** 278:17
**regulating** 44:17
46:14 63:1 64:24
**regulation** 91:19
95:23 96:13,19,22

96:23,24 97:24
98:25 99:6,7,12
119:12 121:21
123:25 124:3,13
124:18,23 125:14
125:17,19 140:11
140:24 141:14,25
**regulations** 41:20
108:12 109:14
141:5 143:24
145:14 197:14
**regulatory** 65:22
76:11 99:13
121:21 136:12
137:24 172:24
**rejected** 188:16
**related** 12:22
13:24 15:13 17:19
48:1,23 80:19
111:24 187:25
194:24 223:24
224:2,6 229:7
236:10 258:8
259:2
**relates** 1:7 240:4
**relationship**
232:16 240:23
241:3,9,20 248:18
255:23 273:13
**relative** 280:16
**release** 3:20 212:2
229:7
**relevant** 35:11
88:19
**rely** 158:3 185:18
186:2 257:18
**relying** 257:23
258:2
**remarkable**
163:12 180:23

**remember** 14:17
23:15 30:6 39:24
42:16 50:10 77:12
78:4 93:10 148:6
148:9 172:2 189:9
200:7,21 201:23
223:19 249:17,18
277:13
**remembering**
188:21
**remind** 12:6 244:1
257:9
**remodel** 169:17
**remote** 1:16 11:19
**remotely** 9:10
280:9
**renew** 109:21
**renewal** 95:21
109:12,16 110:14
110:14 191:24
276:13
**renewals** 95:10
109:11
**renewed** 105:6
**renewing** 136:22
**renews** 95:14
**repeat** 94:3 193:10
268:4
**repeated** 11:25
**repercussions**
172:7
**repetitive** 163:13
**rephrase** 128:8
139:6
**replace** 44:3 49:12
**replacing** 32:16
**report** 3:6,12,17
4:6,7,9,10,16,17
4:19,20,22 25:11
25:15 28:3 49:20
50:12,16 51:9

59:16 75:25 76:1
81:18,18,19,22
103:7 122:14,15
125:3,8 140:18
152:1 154:10,12
156:5,11 157:21
157:23 159:18
173:1 175:9 187:7
188:7 189:23,24
190:4 218:21
219:15 220:1,22
225:5,11 231:9
234:19,23 235:6
235:20 236:14
250:24 252:11
255:11 263:19
264:1,8,17 265:5
267:8 268:19
270:10,18 275:20
278:14
**reported** 39:17
50:3 67:15 125:2
126:3 190:23
222:4 249:8
**reporter** 9:6 12:7
62:5 93:20,23,25
94:4 101:2 193:9
194:10,14,17
203:13 213:13
261:16 263:18
279:13 283:7
**reporting** 25:5
50:7 75:21 222:3
280:18
**reports** 2:24 59:13
59:14 81:14,14
82:4,5 97:11
100:8 110:20
118:15 133:1
135:5,7,12 146:19
146:25 147:1

162:7 177:14
188:24 189:10
190:17 250:3
254:4 268:18,24
278:13
**represent** 14:4,21
14:21 23:2 265:6
275:9
**representing**
14:15
**request** 56:14
125:2 138:21
190:17 267:14
284:9,11
**requested** 153:17
172:23 189:25
190:10 193:21
**requesting** 54:13
122:14 174:13
**require** 108:16
154:23
**required** 49:19
67:13 77:15 79:4
109:18 121:14
123:10 146:10
149:3,6,14 152:10
152:12 153:13
157:4 160:10
161:16,18 162:3
179:7 182:20
184:16,21 185:24
190:16 191:12
192:13 262:8
264:2,7,11,23
266:11,24 278:7
282:25
**requirement** 2:15
50:10,19 84:16,21
85:5,7,15 87:24,24
88:4,9 89:1 90:1
91:8,17 99:5,18,22

111:4 119:18 120:17 121:5 122:24 123:9 126:7 159:21 160:17 175:23 196:22 276:18
**requirements** 16:18 68:10 75:21 76:4 88:20 95:10 96:15 104:2,22 105:7,11,15,16 107:10,25 108:2,4 109:8 110:9,13 114:8,12 116:7 120:6 125:15 129:15 139:22 145:15,20 154:22 160:9 161:14 163:19 165:2 176:21 182:24 191:23 192:8,17 193:24 197:13 271:8,12
**requires** 67:20 93:4 97:5 119:11 122:25 141:15
**requiring** 107:11 108:8 111:17 185:5 211:17
**requisite** 266:13 267:1
**reserved** 239:6
**resident** 221:2
**resolution** 37:16 166:21 190:25 272:14
**resolve** 122:10 178:19 188:6
**resolved** 156:21 157:9,19 170:4 175:10 178:5
189:18,22 267:12
**resource** 241:18 241:19
**resources** 124:15
**respect** 42:11 43:10 44:17 47:18 102:12 130:8 138:11 139:15 146:23 152:22 183:8 196:18,21 206:6 246:16 248:23 270:2 271:5
**respond** 26:14
**responded** 153:20 153:21 157:7
**responding** 226:13
**responds** 166:10
**response** 33:15 43:25 140:19 149:3,6,6 153:24 156:17 170:14 172:4 173:20,21 174:2,5 179:10 180:4,7 184:16,21 186:7,9,12,14 187:13 188:8,9,20 190:16 243:13 264:2,7,10,23 266:1,11,24 267:13
**responses** 12:3,8 12:11
**responsibilities** 41:14,16 61:16 107:20 247:7
**responsibility** 66:2 107:24
**responsible** 98:3,6 98:8 252:16
**rest** 168:7 182:18 186:24 274:15
**resulted** 166:1 270:22
**resume** 239:9
**resuming** 177:12
**retail** 39:5 63:22 108:9
**retain** 108:10 123:11
**retained** 212:4
**retention** 74:10,14
**retire** 241:7
**retired** 19:13 41:8
**returned** 282:18
**returning** 242:10
**review** 13:9 42:19 70:11 77:20,20 87:5 98:22 107:23 115:19 116:25 118:6 125:3 163:22 184:4 210:6 219:2 257:2 257:6 282:12 283:1 284:1
**reviewed** 51:9 75:5 99:23 124:8 165:11 169:1 266:23 270:20
**reviewing** 77:24 82:20 99:14 113:12 122:14 212:5 264:6
**reviews** 112:1,1 118:7 193:25
**revised** 2:16 18:17 18:25 41:18 42:11 42:18 45:4,24 84:12 104:20 107:8 110:10 137:14 141:2
**revoked** 192:4 215:17,21 271:15 271:19 277:2
**rey** 5:13
**reye** 40:3
**rice** 8:6
**rick** 101:24
**rico** 5:13
**right** 10:9,21 13:8 14:11 16:19 31:1 34:2 38:9 45:21 47:1,21 55:1 57:20 58:14 60:12 60:15 62:25 65:7 66:7,7 68:15 84:9 86:10 90:21 91:5 93:8 96:16 100:14 105:8 113:5 117:3 117:16 118:13,21 119:9 121:5 124:18 125:25 130:11,12,13 131:17 133:19 136:11,20 140:10 143:17,22 144:15 144:23 145:10 146:2,23 149:16 150:2,9 151:3,19 152:7,22,25 155:15,18,25 156:14,20 157:5 157:20 158:2 159:4,6,15 161:6 162:18 165:4 166:9,11 167:19 169:12,15 172:14 173:19 174:20,23 175:15,23 176:25 177:4,11 180:22 181:18,22 186:5 186:11,24 189:13

**[right - section]**

191:6,8 201:18
202:18 205:21
207:4,19,24
209:25 213:7
214:1 215:20
218:4 220:6
221:18 222:21
232:1 239:3
246:22 248:2
250:2 262:7
263:10 267:3
279:10
**rinehart**   4:8 235:7
235:18
**ring**   78:1 237:17
237:18,21 238:10
**risk**   70:24 71:6
72:13
**rite**   7:18 23:5,20
101:12 196:19
197:5 216:19
217:12,19 237:21
237:22 239:5
274:23
**rivera**   5:12
**rmr**   1:20 280:4
281:8
**road**   5:6
**robert**   7:5 148:8
220:15
**role**   2:10 44:17
45:14,22 46:4
232:21
**roll**   208:7
**rollout**   178:25
179:1
**routine**   25:1 70:10
70:17 109:25
134:22
**routinely**   22:7

**row**   133:7
**roxanne**   4:9
235:21
**rule**   88:11 90:16
96:16 115:19,21
115:25 123:18
141:1 246:15
280:20
**rules**   1:19 44:25
45:3 69:25 70:13
108:12 110:14
142:20 147:17
269:4 283:5 284:5
**run**   188:7 241:3
**running**   189:10
**rx**   7:11 25:5 76:11
149:11
**rx's**   156:6
**rynatan**   165:8

**s**

**s**   5:17 207:22
237:14 282:15
284:8,8 285:3
**saedi**   224:11,12,16
**safe**   57:8 107:18
**safeguards**   97:18
107:13,17
**safes**   89:7 97:12
**sake**   261:25
**sale**   107:14
**sales**   77:6 155:11
**salvatore**   5:5
**samples**   180:9
**satisfaction**   167:5
170:5 180:3
186:10 189:19
267:12
**satisfactorily**
180:14
**satisfactory**   154:9
155:5 173:21

174:5 175:12
**satisfied**   157:7
180:2 181:9
182:12 185:8
188:19 189:1
**saw**   35:1 60:2
105:12 118:14
135:4 141:7
171:16 172:23
191:11 241:21
249:12 250:21
**saying**   30:7 87:8
90:4 117:2 121:8
121:24 126:11
138:8 170:1 193:7
226:16 227:13
272:1 277:13
**says**   51:24 52:12
60:10 68:20 69:11
69:21 70:10 85:17
86:23 92:18 96:14
98:2,13,17 109:2
113:3,6,10 123:4
123:18 124:25
126:1,24 128:16
137:13 139:25
140:11 152:14
166:17 171:21
175:6 184:16
186:15 190:15
210:6 211:22
212:19 216:23
227:2 231:9
240:15 242:12,17
253:17,19 254:8
256:7 257:5,20
258:21 260:20
263:23 265:8,8
269:8
**sb**   70:24

**sbadala**   5:8
**scan**   178:9
**scanner**   178:6
**schedule**   93:15
171:22
**scheduled**   92:25
**schedules**   92:20
92:21
**schierholt**   2:12
59:25 60:4
**sciences**   111:20
**scolding**   101:6
**scope**   250:10
**scott**   7:6
**screen**   117:15
261:10,16
**scribbled**   32:8
**scripts**   176:13
215:4 225:24
227:3 233:20
**scroll**   158:11
**seal**   36:20 281:2
283:15 284:21
**search**   3:5,19
72:19 197:18
208:21 209:1,9,10
212:18 226:10
229:2
**searches**   168:3
**sec**   168:16
**second**   14:6
187:10 210:2,6
**section**   88:9 98:25
99:13 100:1,9
111:21 113:6
114:20 115:14
119:9,20 121:20
122:5 124:25
136:15 137:13,14
139:24 252:23
253:14

| | | | |
|---|---|---|---|
| **sections** 18:18 | 170:13,15,25 | **sell** 35:7 41:22 | **shapira** 7:4 |
| 47:5 110:10,12 | 172:3,25 176:9 | 44:23 | **shapira.com** 7:8,8 |
| 111:10,13 114:24 | 177:20,21 180:4 | **sellers** 108:9 | **share** 27:1 35:7 |
| 115:2 144:1,2 | 180:23 183:16 | **selling** 31:10,10 | 227:13,17 261:9 |
| **secure** 67:16 | 184:8,15,23 186:4 | 59:1,8 | 261:10,15,18 |
| **security** 2:15 | 186:12,14 187:8 | **send** 25:3,8 101:5 | 262:1 265:19 |
| 70:12 84:16 85:5 | 187:15 193:20,20 | 208:1 261:1 | **shared** 82:5 |
| 85:25 87:7,12,23 | 194:4 196:8 207:1 | 262:16,17 | 107:23 262:8 |
| 88:4,9,14,16,20 | 210:1 215:14 | **sender** 226:6 | **sharing** 76:8 |
| 89:1 90:1 91:7,17 | 216:21 219:23 | **sending** 74:24 | 226:22 |
| 96:15,22 99:5,17 | 220:7 224:22,25 | 228:10 | **sharon** 6:16 239:9 |
| 99:21 105:22 | 226:8 227:15 | **sends** 55:7 | 239:25 261:4 |
| 154:15,16,22 | 228:13 233:16 | **senior** 43:5 | **sharon.desh** 6:19 |
| 182:22 192:8 | 236:3 242:23 | **sense** 73:12 254:23 | **sheet** 159:8,9,10 |
| 196:22 229:22 | 243:7,16 252:8 | **sensors** 154:18 | 159:12 162:12 |
| 254:8,9 271:12 | 253:17 256:10 | **sent** 44:11 45:6 | 172:6 282:13 |
| **sedated** 54:12,22 | 257:4 259:12 | 208:6 221:25 | 284:7,10,18 285:1 |
| **see** 9:19 22:4 | 260:9,13 261:11 | 263:9 | **shelf** 155:17 |
| 25:19,20 26:12 | 261:14,17 263:22 | **separate** 76:22 | **sherman** 7:16 |
| 27:2,25 29:25 | 264:3 265:16 | 107:6 120:20 | 229:7 |
| 32:6,19 33:2,6 | 266:7 267:22 | 121:8 260:18 | **shift** 31:25 38:9 |
| 34:3 40:18 45:16 | 269:11,13 | **september** 51:2,2 | **shkolnik** 5:3,10 |
| 52:14 54:2 55:9 | **seeing** 21:3 22:17 | 164:12 | **shopper** 81:14,17 |
| 56:9,18 59:6 66:5 | 22:22,23 60:1 | **serves** 68:21 | 81:22 82:4 221:6 |
| 66:17 67:1,21 | 72:13 197:17 | **service** 10:16 | **shoppers** 35:21 |
| 68:15 74:20 77:25 | **seekers** 212:21 | 63:25 124:9 | 216:14 |
| 80:5,21 82:9,21 | 213:1 | **services** 6:4 7:11 | **shopping** 20:25 |
| 87:4,14,18 88:22 | **seeking** 118:18 | 156:11 175:9 | 21:3,20 31:19 |
| 91:11 92:18,18 | 229:23 | **sessions** 44:14 | 33:1,9,20 223:10 |
| 97:10 100:7 107:7 | **seen** 11:7 15:17 | **set** 16:18 82:8 | 238:4 244:12,14 |
| 108:1 109:20 | 25:10 43:1 44:11 | 88:11 96:15 | 244:25 |
| 118:2 123:8 124:1 | 45:13 59:23 62:21 | 130:22 139:22 | **shore** 36:19 37:2,3 |
| 124:1 125:6 | 74:5 81:23 96:19 | 260:3 281:2 | **short** 19:4 43:19 |
| 126:16,24 133:19 | 103:1 127:3 173:1 | **setting** 120:17 | 44:6,7 86:3 91:6 |
| 136:6 137:10 | 213:17 218:19 | **seventh** 47:11 | 188:12 189:24 |
| 138:17 142:17 | 238:20 270:19 | **shadowed** 42:15 | 274:10 |
| 144:4,7 146:19 | **select** 176:8 | **shaheen** 101:24 | **shorthand** 117:1 |
| 154:10,17 157:22 | **selected** 134:9 | 102:3,6,11 103:5 | **show** 91:15 104:15 |
| 158:20 159:7,20 | 150:13 176:2 | 103:14 | 105:6 111:1 |
| 162:8,12 163:11 | **selection** 150:14 | **shakes** 12:9 | 131:21 137:25 |
| 165:1 166:4,13 | | | 277:22 |

**showed** 139:13
249:16
**showing** 263:16
**shown** 128:13
145:17 282:16
**shows** 104:19
179:8
**siba** 8:4
**sic** 164:19 196:2
**side** 32:3 46:18,24
136:1 231:22
261:13
**sign** 156:11 162:1
162:3 279:14,16
**signature** 174:14
220:7 281:8
282:14
**signatures** 187:1
**signed** 98:6 155:10
161:11,17,18,23
175:7 176:17,22
188:23 283:13
284:18
**significant** 74:1,5
78:11,16 95:18
99:21 110:4 199:6
**signing** 156:9
282:19
**signs** 54:9 127:4
**similar** 65:20,21
102:15 187:6,8
219:15 273:24
**similarly** 50:16
125:25
**simmons** 5:16
**simmonsfirm.com**
5:19
**simple** 156:23
**simply** 185:23
186:2 233:18

**simultaneously**
212:1
**sincerely** 282:21
**single** 144:12
213:20 253:14,16
**sir** 198:5 212:19
237:10 282:10
**site** 63:21 92:17
**sites** 63:2 64:2
66:25 134:15
135:2
**sitting** 30:18
244:13 267:4,10
269:16,20 272:21
273:3
**situation** 125:23
216:5 247:18
**six** 32:24 43:18
**size** 42:25 60:8
86:16
**skill** 111:18
**skip** 162:25
237:11 238:22
**skipping** 75:15
**slightly** 158:24
**slivingston** 7:8
**small** 148:24
205:24 216:1
247:2 253:5
**smaller** 53:6
**smith** 55:7 165:12
**smith's** 55:10
**snyder** 19:18
**social** 111:20
**software** 117:13
142:13 151:3,13
151:17,21 162:18
163:16 169:7
182:4 185:18,19
185:23 186:3
187:12 190:21

257:18,23 258:3
275:24 276:2
**sold** 67:14
**solely** 185:18
257:18
**solo** 229:13
**solutions** 282:1
285:1
**somebody** 19:13
21:25 32:21 53:1
59:7 75:4 106:21
128:16 147:5
223:21 247:20,24
247:25 252:18
261:3
**somebody's**
100:23 215:3,8
**somewhat** 25:1
**soon** 170:18
**sorry** 14:5 62:6
70:3,7 71:17
75:14 78:13 80:6
90:14 94:3,7
100:21 108:23
124:5 137:7,11
158:12 177:16
193:11 194:11,12
198:5 203:10
219:18,19 225:20
227:24 230:9
239:20 267:18
**sort** 24:21 77:6
131:2 250:9 251:3
**sosenko** 4:6
234:21 235:4
**sounds** 44:5 60:15
100:23 155:13
216:10 279:3
**source** 78:9,16,20
199:6

**sources** 59:15
124:20 200:18
204:24 258:5
**southeast** 62:8
**southwest** 62:8
**space** 100:4
**spaeder** 7:13
**speak** 103:24
**speaking** 112:19
113:22 136:3
192:18 200:6
201:3 214:11
242:4 245:7
250:13 257:16
259:3
**speaks** 99:7
**special** 17:1,23
18:6,10 19:3
209:5
**specialists** 39:3,8
39:10 47:15,19
60:17 61:2,14
69:22
**specialized** 111:17
**specific** 30:4 38:18
42:10 49:3 54:14
65:3 74:3 79:19
80:20 87:19 94:17
100:12 103:2
115:2,13 116:4
120:6,18 121:19
123:17 125:19,22
144:3 145:8,15
148:1 165:6 199:3
199:23,24 200:8,8
202:21 222:20
225:20 249:18
269:25 270:6
272:25
**specifically** 17:2
23:15 24:4 28:20

43:9 49:1 88:8
94:10 96:14
108:15,18 111:10
122:25 142:24
146:16 147:9
169:5 189:4,7
192:18 201:10
204:18 245:7
**specifics**  208:9
**speculate**  69:7
**spend**  43:8
**split**  213:19
**splitting**  212:23
213:5
**spoke**  240:16
244:11 245:3
248:12
**sponsored**  17:11
**spot**  122:20 176:1
**spotted**  179:11
**spreadsheet**  2:23
133:4
**spreadsheets**
142:20
**sprinkled**  216:12
**square**  6:12
**ss**  280:2
**stachler**  1:20
280:4 281:8
**staff**  47:14 70:11
105:24 106:18
**staffed**  183:7
197:7
**staffing**  183:4
192:23 253:19
254:5 259:9 268:8
268:13
**stakeholder**  46:21
**stamp**  37:21 252:6
265:22 267:21

**stamped**  75:10
187:25
**stand**  20:10
**standard**  72:7
258:22 259:2
260:4
**standards**  88:10
100:2,6 124:6
162:17 183:2
193:15 197:2
203:21,25 253:15
268:7
**standing**  28:21
262:2,23
**stands**  58:3
**start**  37:11,15 50:6
50:9 68:13 163:13
195:4 239:12
**started**  15:25 18:2
19:11 40:4 48:16
78:5 196:16 207:6
208:20 223:21
232:19
**starting**  15:18
143:1 154:13
**state**  1:21 2:10 8:4
9:21,24 15:22
16:13 18:1,15
30:22 38:2,10,11
40:16 45:15 53:5
57:12,24 61:23
62:2,14,16 65:13
67:15 68:5 88:13
88:17 95:21
137:15 140:2
205:1 243:14
250:14,16 280:1,5
281:9 283:10
284:15
**state's**  57:10
122:15

**stated**  211:22
216:24 217:7
240:18 266:2
**statement**  53:4
191:20 193:22
283:13,14 284:19
284:19
**states**  1:1 58:5,12
124:10 179:14
**stating**  117:24
265:24
**stations**  152:17
**statistical**  83:19
83:24 84:4
**status**  76:4
**statutes**  190:24
**stealing**  30:15,19
30:23 32:15 35:17
59:3 247:20
**stem**  48:24
**stenographic**  9:8
**stenographically**
280:12
**step**  115:24 116:11
116:21,24 117:20
118:13,22
**steps**  115:13 116:1
116:4,9 117:8
119:7 121:8,14
122:10,13 125:7
188:5 257:13
**steve**  275:8
**steven**  2:12 7:14
59:25
**stock**  100:3
**stole**  30:8 35:4
**stolen**  248:9
**stop**  85:21 103:12
214:15 215:2,15
215:18 243:4
265:19 267:18

**stopped**  227:3
**stopping**  73:2
**store**  26:5,22
41:22 44:22 46:15
71:25 72:11 96:6
106:17 109:24,25
148:4,6,7 152:5
157:21,24 162:11
162:21 163:25
164:2,11,14,18
165:15,20 167:8
169:22 171:8,15
172:17 173:17
174:16,18 175:1
177:19 179:5
180:19 181:1,5,6,9
181:14 187:4,7
191:3 252:11
263:19 267:24
272:9
**stored**  63:3,12
64:3
**stores**  7:12 67:20
138:5 151:6
178:11,22,25
183:6 191:22,24
192:11 196:21
270:5
**stossel**  232:13,16
232:25 240:17,19
241:6,22 242:11
242:18 243:13
248:13,25 249:7
**street**  6:6,17 7:14
7:21 9:22 32:1,2
80:10,13
**strength**  32:18
**strike**  139:6
**structure**  47:4
106:5

**structured** 47:9
**struggling** 93:9
**stuff** 30:8 32:3
  87:10,11 90:6
  122:7 142:20
  197:19
**subject** 137:17
  194:23 195:13
  202:13 273:24
**subjective** 52:22
  53:3,4,8 54:20
  55:1,2 125:22
  126:8,11 127:6,10
  135:24
**submission** 139:25
**submit** 67:13
  75:23 141:16
**submitting** 76:5
**suboxone** 72:5
**subparagraph**
  122:8,15
**subpoena** 10:15
  81:5
**subpoenas** 66:7
**subscribed** 283:10
  284:14 285:21
**subsection** 91:10
  96:25 97:24 99:7
  124:4 140:10
  141:15
**substance** 51:7
  75:24 94:19
  110:17 145:16
  170:17 175:19
  205:10 210:8
**substances** 46:1
  49:24 50:1 53:23
  64:3,8 65:11
  67:10,14 68:5
  71:4 72:1,10,11
  76:19 77:1,22

79:22 80:18 92:25
  93:7,12 94:12,16
  95:2 105:2 120:19
  145:22 146:18
  155:14 190:11
  195:15 199:7
  200:3,19 202:9
  204:23 206:7
  210:18 231:7
  274:1,5
**substantial** 88:6
  88:10,25 89:25
  91:9,20 214:6
**successful** 157:9
  235:3,17 236:9
  237:8
**successfully**
  223:17 238:16
**sufficient** 88:12
**suggest** 51:22
**suite** 5:6,12,23
  6:17,23 7:15
  282:2
**summary** 15:16
  143:23 145:19
  209:24
**summit** 40:14
  226:25 227:2
**sunday** 241:1
**superior** 282:1
**supervise** 97:6,20
  193:5
**supervision** 89:10
  97:3,9,18 184:25
  185:1
**supervisor** 28:5
  39:22 40:4
**supervisors** 39:20
  39:25 75:7
**supply** 247:15

**suppose** 86:20
**supposed** 32:23
  54:6 56:21 103:18
  115:6 145:21
  147:16 159:19
**sure** 9:23 10:11
  11:23 12:10 15:21
  19:5 28:2 29:16
  35:25 52:13 57:25
  59:14 85:13 88:1
  93:19,24 95:5
  96:8 98:23 106:7
  106:12 108:3
  110:6 114:11
  117:9 118:5,24
  119:17 120:25
  128:10 129:2,12
  131:7 133:12
  139:20 149:23
  152:21 158:7
  166:5 169:6 171:1
  184:19 186:3
  189:12 208:16
  209:12 217:15
  244:3,15 248:17
  253:7 255:7
  256:16,22 262:4
  262:13,15 263:12
  263:12
**surrendered**
  238:18
**suspect** 188:14
  202:25 214:23
  249:15,16
**suspects** 25:2
**suspended** 192:3
  277:6
**suspension** 165:8
  165:9
**suspicion** 24:24
  55:8

**suspicious** 25:21
  98:8,14 99:8
  249:9 256:2
**sustained** 212:2
**swear** 9:6
**switched** 207:5
**sworn** 9:11 280:9
  283:10,13 284:14
  284:18 285:21
**synopsis** 209:20
**syrup** 35:14
**system** 25:5 31:12
  49:14,21 57:22,23
  69:5 82:8 88:14
  88:16 89:18 95:25
  117:13 151:2,5,9
  151:13,21,23,24
  152:15,24 154:17
  154:18,19 161:1
  162:18 165:16
  166:19 168:24
  169:1,3,19 175:13
  175:16 178:3,4,6,7
  178:13,19,22
  182:5,16,17,20
  202:5 275:24
  276:2
**systems** 57:24
  89:7,9 92:1 96:4
  99:14 151:17
  152:19 163:16
  182:13

**t**

**t** 234:3
**table** 143:25
**tablets** 188:2
**tactic** 212:20
  213:1,11
**tag** 4:12,13 36:21
  36:21 237:12

**take** 10:22 11:1,5
12:12 21:9 29:18
29:22,23 32:24,24
37:10 43:11 45:5
59:22 72:24 80:8
80:16 86:3 90:11
90:22 96:6 98:17
108:19 109:6
116:11 117:9
118:25 122:9
123:19,20 126:14
134:19 136:14
148:3 156:8
167:13 176:25
195:7 221:22
238:24 239:7,11
249:22 251:13,15
251:25 257:21
259:11,16,25
274:10,12 275:12
**taken** 1:19 69:10
73:10 90:3 93:17
95:5,22 127:25
141:20 189:5
193:17 213:14
248:4
**takes** 89:24 94:13
94:23 97:4
**talk** 22:15 38:10
58:2 90:18 125:19
246:19 278:3
**talked** 15:2,5
31:12 119:21
120:14 125:7,18
127:5 192:23
243:22,25 252:17
267:6 271:4
273:12
**talking** 13:4 21:19
49:10 91:7 94:25
101:1 106:12,14

122:22 129:20
139:3 195:1,2
251:17 255:16
256:14
**talks** 97:2 122:8
**tampering** 29:21
32:7,14 48:7
**tapping** 154:1
**targeted** 218:2,7
**task** 4:12,13 36:6
36:10,11,12,20,23
37:5 237:13
**tasked** 75:8
**tasks** 185:5
**tddd** 153:9
**team** 19:7,24
**tech** 30:15 173:16
**technical** 12:16
153:18 214:10
**technician** 30:22
173:12 265:13
266:4
**technicians** 64:19
**techniques** 231:21
**techs** 64:24,25
65:1 151:25 178:8
183:8 193:5
**tell** 22:21 26:6,15
29:17 81:1 82:22
114:19 123:15
130:10 131:11
140:18 143:11
174:9,10 176:4
193:3 197:7,9
201:13 208:5
212:25 214:15,25
215:3,8 216:7
219:6 222:18
224:5 228:6
232:15 254:12
261:3 262:15

**telling** 14:13 166:4
169:7 173:17
243:3
**tells** 82:12 169:3
**ten** 13:15 52:2
90:22 132:13,16
239:8,12 274:12
**tend** 47:23,25
200:24 202:8
**tended** 163:15
**tends** 203:21
**tennessee** 7:11
**teresa** 237:2
248:15 252:17
**term** 21:20 29:4
71:9 72:13 92:6
113:5,15 188:12
203:9,15
**terminal** 2:16 87:2
98:3,7 104:6,11,20
137:16 140:1
195:8
**terminals** 151:14
182:5
**terms** 20:24 63:17
76:19 80:17 84:23
88:25 91:24 99:10
106:22 142:24
147:15 154:15
161:6 203:21
221:18
**tested** 179:18
**testified** 11:13,14
84:3 278:4
**testify** 13:10 220:4
280:9
**testimony** 2:12
12:22 13:24 24:15
59:24 77:12
129:19 243:1
258:12 268:11

275:12,24 277:12
280:11 283:6,7
284:6,9,12
**testing** 16:10
**texas** 7:21
**text** 181:25
**texting** 12:21
**thank** 86:10 90:23
101:5 109:1
167:19 177:4
194:14,18 214:12
239:13,14 263:25
266:20,20 279:9
**thanks** 78:14
154:3 239:24
**theft** 29:19 30:4,14
48:7 84:24 85:20
254:10,15 255:18
256:15
**thefts** 30:2 256:8
**theisler** 229:8
**therapeutic**
119:24 188:4
**therapies** 124:16
**therapy** 51:8
111:24 117:7
**thing** 35:8 95:12
106:6 110:4 121:1
126:9 150:23
244:24 246:22
**things** 22:17 26:16
27:4,5 30:15 42:6
52:18 54:19,21
59:3,6 60:9 66:2,8
86:22 92:1 95:18
97:13,17 98:14
99:13,15 104:16
106:4 110:15
117:25 123:11
143:19 150:19,24
150:24 151:7

153:15 154:6
159:16 162:15
163:8 169:4,8
175:17 181:8,20
183:14,17,22
187:1 207:25
208:7 211:13
222:14 231:18,23
241:11 243:23
247:3 253:5 258:1
258:7,16 260:1
269:4 278:2
**think** 21:20 36:24
44:8 46:8,9 53:2
60:22,23,23 61:21
61:24 65:19 69:7
83:24 102:20
105:11 121:15,22
121:25 122:7
125:5,17 126:10
127:3 128:1,24
133:15 150:22
170:20,21 179:24
189:4 191:10
199:10,11 201:25
202:3 209:17,17
210:14 216:18
221:14 223:11
231:20 238:20
241:17,21 242:5
243:23 245:5,14
246:6 247:23
248:14 249:12
250:20 254:25
258:12,15 262:16
263:16 267:5
268:10 271:4
273:12 274:8
275:22 278:4,11
279:12

**thinking** 126:17
150:12
**third** 58:11 94:22
96:18 97:23
188:15 262:12
**thirty** 282:18
**thomas** 8:8 45:11
101:3 108:22
109:1 137:6,9
158:5,8,10 168:4
168:13,15 219:19
219:22
**thorough** 197:18
217:24 251:3,22
275:17
**thoroughly** 188:18
**thought** 25:15
26:25 93:10 95:17
241:12,13 262:7
**thousands** 132:10
**three** 15:4 32:24
42:3,5 53:24
74:10 79:25 81:24
117:20 126:4
132:11 133:9
159:19 162:8
173:11 240:11
256:8
**threshold** 259:13
259:17
**threw** 99:19
**till** 17:25 19:19
132:13 231:23
260:24
**time** 11:1,22 12:12
12:15 18:5,21,21
19:12 20:16 26:15
26:15 27:2,2 28:9
28:14,17,22 33:15
35:9 37:11 38:24
39:18 42:16,17

43:15 44:6 50:2
51:15 55:4 60:14
61:5 68:16 72:17
72:24 73:9 74:14
74:23 79:16 91:14
95:9,11 101:17,17
102:10 103:6,7
105:6,6 109:17,20
112:17,17,18,18
116:12 121:5
123:7 125:3 127:7
130:18 133:21
134:3,9,23 139:1
140:8,20 146:22
147:8 149:22
159:4 163:2,22,22
163:23,23 170:12
174:8 178:9,23
181:10,17 183:17
183:17 187:4,9
191:11,11 194:20
196:2,15 198:22
200:1 207:4,17
211:8 214:4
221:12,16,16
225:23,23 226:1,1
229:14 231:4,5
239:6 240:20
242:4 249:14,23
250:9,12 252:1
254:21,23 262:9
274:10 278:2,12
278:25 279:7
**times** 11:15,16
31:20 32:4 40:13
85:9 105:23 129:9
133:23 148:6
185:3 191:21,25
192:9 194:1,2
195:24 232:22
234:10 250:19

272:19 278:1
**tip** 227:20 242:7
243:2
**tipped** 214:24
**tips** 84:4 241:24
**title** 10:7 17:1
**today** 9:4 11:8
13:1,24 14:20
25:7 39:15 129:24
159:2 239:24
244:13 267:4,10
269:16,20 272:21
273:3 275:13,22
277:8 278:1
**today's** 9:1
**todd** 236:3
**told** 14:19,20
47:15,19 49:7
62:14 120:15
129:22 133:15
170:21 227:18,19
277:9
**tom** 40:1,2
**tone** 178:8
**tony** 224:10
**tool** 57:1 68:22,23
69:13
**top** 30:6 61:14
65:8 83:1,5,12
109:3 114:22
116:10 121:17
153:8 182:3
216:16 231:9
**topic** 104:3
**topics** 240:4
**total** 61:23 188:1
**totally** 37:21
183:13
**touch** 257:2
**touched** 122:5
221:14

| | | | |
|---|---|---|---|
| **town** 205:24 | **tried** 161:25 | 268:5,15 | **typo** 184:18 |
| **township** 148:5 | 275:17,17 | **turned** 217:8 | **u** |
| **track** 1:12 148:19 | **trigger** 260:4 | **turning** 265:4 | **u** 19:18 |
| 282:6 283:3 284:3 | **triggered** 202:22 | **two** 14:3,14,17,24 | **uh** 133:3 210:4 |
| **tracks** 69:17 87:24 | **true** 71:12 147:19 | 18:18 19:11,15 | 222:24 |
| **trafficking** 29:20 | 192:15 262:12 | 20:23,25 21:8 | **ultimately** 68:16 |
| 31:8,9,20 32:3 | **truly** 246:10 | 28:8 32:24 38:24 | 224:9 |
| **trailed** 93:21 94:4 | **trumbull** 1:10 | 61:22,25 63:10 | **unacceptable** |
| **trailing** 193:9 | 2:24 5:2 36:22 | 66:10 80:6 90:17 | 173:12 |
| **trails** 182:22 | 40:19,19,20,22,23 | 109:10 114:2 | **unaccounted** |
| **train** 43:5 74:25 | 40:25 41:9,11 | 116:24 134:12,23 | 255:8 |
| 193:4 | 57:13,19 133:2,10 | 146:3,11 152:5,8 | **unannounced** |
| **trained** 42:8 106:9 | 133:15 135:8 | 152:13,17 153:2 | 136:17,25 137:25 |
| **training** 17:4,16 | 147:11 148:2 | 164:20 172:18 | 150:16 |
| 17:17,18 38:6 | 174:8 191:4,22 | 188:2 204:7 205:1 | **undercover** 72:18 |
| 42:10,14 43:3,4,8 | 192:19 195:23 | 220:13,18 229:16 | 208:1 |
| 43:10,12,13,16,16 | 196:6 198:2,15,24 | 248:19 | **undergo** 87:15 |
| 44:2,3,5,13 45:18 | 200:5,11,14,22 | **tylenol** 32:16 | **underneath** |
| 46:22 74:18 75:20 | 201:8 204:3,10,16 | **type** 30:11 35:8 | 209:20 |
| 84:12 | 204:24 206:20,25 | 64:14 66:1 86:21 | **understand** 10:13 |
| **trainings** 17:14 | 222:10,15 225:16 | 86:21,22 89:3,3,6 | 11:24 12:23 28:16 |
| 44:9 75:8 | 225:18 227:5 | 92:5,7,12,14,15,18 | 34:12 92:6 109:11 |
| **tramadol** 50:4 | 229:8 231:3 | 93:5 94:9,17,24 | 111:5 112:24 |
| **transcribed** 283:7 | 250:18 267:25 | 104:6 106:6 121:1 | 124:12 147:1 |
| **transcript** 282:11 | 276:18 277:1,5 | 126:17 141:6 | 154:14 203:17 |
| 282:12 283:5,12 | **truth** 280:9,10,10 | 151:8 178:21 | 247:12 249:6 |
| 284:5,11,17 | **truthful** 12:3 | 211:10 222:8 | 258:12 |
| **transfer** 180:7 | **try** 134:11 240:2 | 244:23 245:24 | **understanding** |
| **travel** 35:16 | 250:4 275:10 | 255:5 | 47:8 71:5 79:17 |
| **treating** 58:17 | **trying** 31:4 43:22 | **typed** 209:15,16 | 88:24 116:2 |
| **treatment** 64:20 | 79:16 93:9 148:19 | **types** 20:21 32:12 | 126:19 127:20 |
| 71:3 72:3 | 202:3 233:20 | 33:6 38:25 51:20 | 144:25 249:4 |
| **trend** 28:21 74:1 | 246:22 | 83:13 104:5 | 262:18,22 |
| **trends** 22:22 69:9 | **tuesday** 137:2 | 117:25 159:22 | **understood** 12:2 |
| **trey** 1:17 2:3 9:9 | **turn** 154:2 198:18 | 163:16 241:10 | 76:13 77:25 112:3 |
| 9:24 10:2,2,10,11 | 214:12 240:3,6,9 | 256:14 | 113:14 122:18 |
| 10:13 209:5 280:8 | 247:10 250:2 | **typewriting** | **underutilization** |
| 282:8 283:4,9 | 251:11,12 252:5 | 280:14 | 119:24 |
| 284:4,13 285:20 | 252:15 253:10 | **typically** 117:15 | **unfamiliar** 54:13 |
| **tribune** 3:16 | 256:25 258:20 | 270:12,15 | **unintentional** |
| | 264:15 267:16 | | 231:11 232:4 |

**unique** 18:13
81:20 127:21
**unit** 18:7 20:15
207:18
**united** 1:1 124:10
**unlicensed** 199:20
**unpublished**
142:18
**unrelated** 189:20
**unremarkable**
169:14 171:12
**unsafe** 260:1
**unsupervised** 89:9
**unsure** 241:17
**untimely** 218:11
**unusual** 98:9,15
99:8 211:6
**update** 268:25
**ups** 179:9
**usage** 98:9,15 99:9
**usages** 79:11
**use** 18:20 29:4
33:14 43:22 75:1
96:15 112:13
120:9 122:20
124:6 125:21
151:18 152:15
215:12,22 230:4
230:15
**uses** 84:4 151:4
**usual** 51:12 52:19
52:21 53:15 125:9
125:11
**usually** 203:19
251:13 258:2
272:12
**utilization** 77:19
98:22 112:1
115:19 116:25
184:4 193:25
257:1,6

**v**

**v** 1:9,11 92:21
93:1,15 171:23
**vacancies** 61:25
**vaguely** 234:22
278:24
**valid** 129:3
**valley** 36:22
**varied** 134:24,24
**varies** 109:24
251:14,19,19
**various** 17:10 97:1
110:10 162:11,15
191:14 217:3
250:19 278:22
**vary** 86:20
**vast** 20:19 22:10
142:9 246:25
247:5 270:20
**vaults** 89:7 91:25
97:12
**verbal** 12:8,11
**verification**
137:21 151:24
152:15,16,19
166:18 168:2,2,24
169:2 175:5,6
178:7 182:6
**verified** 82:25
161:10
**verify** 253:1
**veritext** 282:1,7
285:1
**veritext.com.**
282:17
**version** 151:4
**versus** 135:18,23
205:10,14
**veterinary** 63:23
92:15

**vetted** 104:15
**vial** 117:24
**vice** 34:19 38:2
229:21
**vicodin** 234:5
**video** 9:20 12:10
**videographer** 8:7
9:1 14:5,8 21:12
21:15 90:24 91:2
177:5,8 239:16,19
275:1,4 279:17
**videotaped** 1:16
**view** 68:4 69:13
178:13
**views** 102:15
**violating** 108:11
140:25 141:1,2,4
141:11
**violation** 18:21
69:25 140:12,17
**violations** 41:18
44:19 65:12
108:16 140:13,23
140:23 141:6,21
141:23 274:4
**visitors** 89:15
**visits** 22:12,15
27:15 72:18
**volume** 83:7

**w**

**w** 2:12 59:25
**wacker** 6:23
**wait** 90:10
**waiting** 183:22
249:15 261:2
**waived** 282:19
**walgreen** 233:11
**walgreens** 4:16,17
4:22,23 6:14 23:5
23:19 101:11
196:20 197:6

232:12,23 233:19
233:23 234:3,4,12
234:25 235:2,12
235:16 236:2,3,6
236:21 237:5
238:9 239:5 240:1
240:16 241:22
248:14 249:3,13
249:16,22 250:3,7
250:11 251:8
252:11,19,25
254:6 255:2,21,25
256:3 263:19
264:17 265:24
267:13,25 268:13
269:17,21 271:7
271:10,15,19,23
272:8,12,18,23
273:3,8,14,15,15
273:19,20,23
274:4
**wall** 153:10,16
**walmart** 6:20 23:5
23:20 101:12
196:19 197:5
216:19 217:12,20
222:4,17
**want** 19:19 38:9
44:7 55:9 80:7
85:2,21 90:11,15
96:8 121:20
146:25 149:22
156:14 167:13
176:9 177:14
198:18 206:16
209:25 212:10
214:20,23 219:9
227:20,21 231:17
231:24 239:10
243:2 246:19
247:10 250:2

252:21 260:16
274:12
**wanted** 59:19
120:1 133:5
136:12 148:12
149:13 152:6,9
153:15 157:13
164:7 169:9
173:25 179:8,20
180:6,11 184:14
186:6 187:11,18
190:10 191:12
272:5 278:3
**wanting** 103:11
**wants** 110:25
**warehouse** 63:4,8
63:11,12,13 95:2
**warehouses** 63:10
**warning** 69:5
101:6 117:14,17
164:3 167:25
173:13 178:8
188:3 225:6
266:19
**warrant** 3:5,19
208:21 209:1,9,11
212:18 226:10
229:3
**warrants** 72:19
**warren** 191:4
218:24
**washington** 7:15
**way** 10:24,25 24:1
24:25 26:17,18
29:22 31:21 96:9
96:11 112:9 129:8
158:17 189:8,14
196:5 200:4 213:3
226:4 231:15,18
231:25 240:11
259:16 269:6

**ways** 24:3 120:18
152:25
**we've** 58:8 60:23
62:21 77:10 99:4
125:5,12,18 127:3
127:5 191:8
227:24 238:20
240:2 252:17
260:15 268:17
**weaker** 200:25
203:4,6,7,10,11
**website** 59:18
143:11
**week** 137:2
**weeks** 42:16
**weisman** 5:21
**welcome** 239:15
**went** 15:23 16:20
38:11 40:5 42:13
58:9 99:10,18
108:1,14 120:23
142:8,11 143:1
147:2 162:13
165:25 169:5
170:21 174:16
181:15 224:16
234:15 244:22
248:21 255:8
**west** 5:23 6:17,23
36:19 37:2,3
**whereof** 281:1
**wholesale** 155:11
**wholesalers** 46:17
63:22 67:13 68:1
68:6,11 75:23
76:1,21
**wife** 213:25
248:21 249:2
**william** 9:23

**willoughby** 201:17
201:25 202:2
252:11
**wimberly** 75:7
**window** 234:3,14
**wished** 138:17
**witness** 1:17 6:2,9
9:4,7,10 62:6 70:5
93:22,24 100:21
167:18 168:9
177:3 193:11
239:15 261:1,19
261:22 274:14,19
279:13,15 280:13
281:1 282:8,11
283:1,4,11 284:1,4
284:15
**witnesses** 9:7
**witness'** 282:14
**woman** 228:14
**word** 219:11,12
**worded** 26:18
**words** 61:3 64:23
86:14 123:3
128:15 137:1
205:12 213:7
219:8
**work** 9:24 10:5
14:22 15:25 16:6
19:7 22:5,9 23:23
37:18 38:7,11
39:11 40:6 61:18
76:14 103:11
110:8 152:17
167:15 219:3
235:12 243:24
255:1 265:10
**worked** 27:22
30:21 31:24 36:6
36:11,12,14,19
40:17,20,23 65:23

75:6 100:14,17,19
101:8 102:2 156:8
199:4 209:12
221:3,4 242:4
**workers** 65:25
**workflow** 165:16
166:19
**working** 14:4 19:2
23:11,16 34:7,24
36:15 42:3 45:11
132:12 148:7
193:1,5 207:6,10
222:16 228:13
241:19
**workings** 58:1
**works** 186:20
**worth** 27:9 153:2
**wrap** 67:6 90:15
**write** 57:2 123:16
140:18 141:6,11
155:8 245:9,17
277:10
**writing** 21:1 59:6
123:5 179:6 186:7
186:10 209:16
224:11 244:3
280:12
**written** 48:24
55:19,20 140:13
140:19 141:17
164:3,20 165:7
167:25 179:13
184:16,21 190:15
209:17 210:15
264:2,6,10,22
266:10,18,24
**wrote** 22:2 152:1
248:5

**[x - zuckerman.com]**

| x |
|---|
| **x**  2:1 53:14 125:21 |

| y |
|---|
| **yardsticks**  206:11 |
| **yeah**  11:3 20:6,11 |
| 24:14,19 25:24 |
| 27:21 34:12,15 |
| 37:4 38:2 51:18 |
| 55:18 70:6,19,19 |
| 75:17,17,19 76:23 |
| 83:16,17,22 86:4 |
| 93:8 94:6 96:17 |
| 99:4 100:25 |
| 106:25 137:11 |
| 139:5 143:12 |
| 153:3,23 158:16 |
| 162:9 169:16 |
| 170:8 180:12 |
| 185:25 190:6 |
| 195:10 236:11 |
| 259:20 260:25 |
| 261:1,13 262:14 |
| 263:2,23 272:2 |
| **year**  15:20 20:12 |
| 39:18 44:8 55:10 |
| 71:14,14 74:22 |
| 78:1,7 80:3 125:3 |
| 132:15,16 134:11 |
| 134:15,21 146:5 |
| 146:12 152:8 |
| 179:1,1 188:11 |
| **year's**  27:9 |
| **years**  37:11,15 |
| 40:11 41:25 42:3 |
| 42:5 43:8,18 52:2 |
| 61:12,12 74:11,15 |
| 74:16 80:1,6 |
| 100:16 102:3 |
| 103:5 114:2 |
| 132:11,14,17 |

134:12,23 143:4
146:1,3,3,11 152:5
152:13 153:2
159:19 195:11,22
225:15 256:8
259:23
**yep**  10:11 113:9
167:18
**yesterday**  10:20
11:4
**york**  5:7,18,18
**younger**  43:6
**youngstown**  41:10
52:24 204:9

| z |
|---|
| **z**  6:22 |
| **zaccaro**  255:20 |
| **zhou**  6:22 |
| **zienka**  237:2 |
| 248:15,24 249:7 |
| 252:17 |
| **zip**  83:15 |
| **zoom**  5:1 6:1 7:1 |
| 8:1 15:6 |
| **zuckerman**  7:13 |
| **zuckerman.com** |
| 7:16 |

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.