Page 1

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF OHIO

3                   EASTERN DIVISION

4

5   MDL NO. 2804

6   CASE NO. 17-md-2804

7   Hon. Dan A. Polster

8

9   IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION

10

11  THIS DOCUMENT RELATES TO:

12  TRACK THREE CASES

13

14

15

16    REMOTE VIDEO DEPOSITION OF KATHERINE KEYES, PH.D.

17

18                    June 3, 2021

19

20

21  REPORTED BY:    Laura H. Nichols

22                  Certified Realtime Reporter,

23                  Registered Professional

24                  Reporter and Notary Public

25

```
                                                    Page 2

 1                   A P P E A R A N C E S

 2                  (All Appearing Remotely)

 3

 4   FOR THE PLAINTIFFS:

 5           Messrs. Donald C. Arbitblit

 6               Ian Bensberg, Britt Cibulka

 7               and Matias Bustamante

 8           Attorneys at Law

 9           Lieff Cabraser Heimann & Bernstein, LLP

10           275 Battery Street, 29th Floor

11           San Francisco, California 94111-3339

12           (415) 956-1000

13           darbitblit@lchb.com

14           ibensberg@lchb.com

15           mbustamante@lchb.com

16           bcibulka@lchb.com

17   -and-

18           Ms. Paulina do Amaral

19           Attorney at Law

20           Lieff Cabraser Heimann & Bernstein, LLP

21           250 Hudson Street

22           Eighth Floor

23           New York, New York 10013

24           (212) 355.9500

25           pdoamaral@lchb.com
```

Page 3

1            A P P E A R A N C E S (Continuing)

2                 (All Appearing Remotely)

3

4   ALSO FOR THE PLAINTIFFS:

5           Mr. Peter H. Weinberger

6           Attorney at Law

7           Spangenberg Shibley & Liber LLP

8           1001 Lakeside Avenue East

9           Suite 1700

10          Cleveland, Ohio 44114

11          (216) 600-0114

12          pweinberger@spanglaw.com

13

14  ALSO FOR THE PLAINTIFFS:

15          Ms. Jo Anna Pollock

16          Attorney at Law

17          Simmons Hanly Conroy

18          One Court Street

19          Alton, Illinois 62002

20          jpollock@simmonsfirm.com

21          (618) 693-3104

22

23

24

25

```
                                                Page 4
 1          A P P E A R A N C E S (Continuing)
 2               (All Appearing Remotely)
 3
 4   FOR THE DEFENDANT, RITE AID:
 5          Ms. Elizabeth I. Buechner
 6          Attorney at Law
 7          Morgan, Lewis & Bockius LLP
 8          101 Park Avenue
 9          New York, New York 10178-0060
10          (212) 309-6000
11          elizabeth.buechner@morganlewis.com
12
13   FOR THE DEFENDANT, WALGREENS BOOTS ALLIANCE, INC.;
14   WALGREEN CO.; AND WALGREEN EASTERN CO., INC.:
15          Mr. Kaspar Stoffelmayr
16          Attorney at Law
17          Bartlit Beck
18          Courthouse Place
19          54 West Hubbard Street
20          Chicago, Illinois 60654
21          (312) 494-4400
22          kaspar.stoffelmayr@bartlitbeck.com
23
24
25
```

Page 5

```
 1          A P P E A R A N C E S (Continuing)
 2               (All Appearing Remotely)
 3
 4   FOR THE DEFENDANT, WALMART, INC.:
 5          Mr. Edward M. Carter
 6          Attorney at Law
 7          Jones Day
 8          325 John H. McConnell Boulevard
 9          Suite 600
10          Columbus, Ohio
11          (614) 281-3838
12          emcarter@jonesday.com
13
14   FOR DEFENDANTS CVS PHARMACY, INC.; CVS INDIANA,
15   LLC; CVS RX SERVICES, INC.; CVS TN DISTRIBUTION,
16   LLC and OHIO CVS STORES, LLC:
17          Messrs. Steven N. Herman and Jason B. Acton
18          Attorneys at Law
19          Zuckerman Spaeder
20          1800 M Street Northwest
21          Suite 1000
22          Washington, DC 20036-5807
23          (202) 778-1800
24          sherman@zuckerman.com
25          jacton@zuckerman.com
```

```
                                              Page 6

 1            A P P E A R A N C E S (Continuing)

 2               (All Appearing Remotely)

 3

 4   FOR THE DEFENDANTS GIANT EAGLE, INC. and HBC

 5   SERVICE COMPANY:

 6           Ms. Erin Gibson Allen

 7           Attorney at Law

 8           Marcus & Shapira LLP

 9           One Oxford Centre

10           35th Floor

11           Pittsburgh, Pennsylvania 15219

12           (412) 471-3490

13           allen@marcus-shapira.com

14

15   OTHERS PRESENT:

16           Mr. David R. Cohen

17           Special Master

18           David R. Cohen Co. LPA

19           24400 Chagrin Boulevard, Suite 300

20           Cleveland, Ohio 44122

21           (216) 831-0001

22           david@specialmaster.law

23

24           Mr. Stephen Kent, Videographer

25           Veritext Legal Solutions
```

1                    INDEX OF EXAMINATION

2

3                                              Page:

4    DEPONENT:  KATHERINE KEYES, PH.D.               14

5    EXAMINATION BY MR. HERMAN                       15

6

7                      INDEX OF EXHIBITS

8

9                                              Page:

10   Exhibit 1           Expert Report of         17-25

11   Katherine Keyes, Ph.D., April 16, 2021

12   Exhibit 2           Katherine Keyes, Ph.D.    18-8

13   Expert Report, MDL Case Track 3, Exhibit A,

14   Curriculum Vitae

15   Exhibit 3           CT3 Supplemental          18-14

16   Materials Considered List

17   Exhibit 4           Article:  Development      31-7

18   & Approval Process - Drugs, FDA

19   Exhibit 5           CDC Guideline for          42-21

20   Prescribing Opioids for Chronic Pain, U.S.

21   2016, MNWR, Recommendations and Reports,

22   March 18, 2016

23

24

25

1         INDEX OF EXHIBITS (Continuing)

2

3                                     Page:

4  Exhibit 6         Article:  Annual      63-3

5  Review of Public Health, A Critical Review

6  of the Social and Behavioral Contributions

7  to the Overdose Epidemic; Annual Reviews

8  Exhibit 7         Article:         67-15

9  Understanding the Rural-Urban Differences

10  in Nonmedical Prescription Opioid Use and

11  Abuse in the United States; Framing Health

12  Matters

13  Exhibit 8         Article:  Association   77-5

14  of Industry Payments to Physicians With

15  The Prescribing of Brand-name Statins in

16  Massachusetts; JAMA

17  Exhibit 9         Article:  Association   80-10

18  of Pharmaceutical Industry Marketing of

19  Opioid Products to Physicians with

20  Subsequent Opioid Prescribing; JAMA

21  Exhibit 10        Article:  High and    93-6

22  Rising Mortality Rates Among Working-Age

23  Adults; The National Academies Press

24

25

1                INDEX OF EXHIBITS (Continuing)

2

3                                                  Page:

4    Exhibit 11           Article:  The              95-5

5    Prescription Opioid and Heroin Crisis:  A

6    Public Health Approach to an Epidemic of

7    Addiction; Annual Reviews

8    Exhibit 12           Article:  Patterns of   107-11

9    Major Depression and Nonmedical Use of

10   Prescription Opioids in the United States;

11   Drug Alcohol Dependence, August 2015

12   Exhibit 13           Article:  Psychoactive 109-25

13   Substance Use Prior to the Development of

14   Iatrogenic Opioid Abuse:  A descriptive

15   Analysis of Treatment-Seeking Opioid

16   Abusers; Addictive Behaviors 2017

17   Exhibit  Article:  Associations of            130-10

18   Nonmedical Pain Reliever Use and Initiation

19   of Heroin Use in the United States; SAMHSA,

20   CBHSQ Data Review, August 2013

21   Exhibit 15           Article:  Initiation     145-1

22   into Prescription Opioid Misuse Among Young

23   Injection Drug Users; NIH Public Access,

24   January 2012

25

1           INDEX OF EXHIBITS (Continuing)

2

3                                          Page:

4    Exhibit 16            Article:  Injection      149-6

5    and Sexual HIV/HCV Risk Behaviors

6    Associated with Nonmedical Use of

7    Prescription Opioids among Young Adults in

8    New York City; NIH Public Access, January

9    2015

10   Exhibit 17            Article:  The Role of    167-12

11   Opioid Prescription in Incident Opioid

12   Abuse and Dependence Among Individuals with

13   Chronic Non-Cancer Pain:

14   The Role of Opioid Prescription, NIH Public

15   Access, July 2014

16   Exhibit 18            Deposition Transcript    181-10

17   of Katherine Keyes, Ph.D., April 29, 2019

18   (Highly Confidential)

19   Exhibit 19            Excel:  Ohio Expert      209-20

20   Report Track 3 Input Calculations

21   Exhibit 19-A          Keyes Expert Report:     210-1

22   Figures 7 and 14

23   Exhibit 19-B          Keyes Expert Report:     210-3

24   Figure 9 and Table 1

25

1      INDEX OF EXHIBITS (Continuing)

2

3                                    Page:

4   Exhibit 19-C          Keyes Expert Report:   210-5

5   Figure 12 and Table 2

6   Exhibit 19-D          Keyes Expert Report:   210-7

7   Figure 13

8   Exhibit 20            Article:  Unused       221-23

9   Opioid Analgesics and Drug Disposal

10  Following Outpatient Dental Surgery:  A

11  Randomized Controlled Trial; Drug and

12  Alcohol Dependence 2016

13  Exhibit 21            Article:  Wide         229-16

14  Variation and Excessive Dosage of Opioid

15  Prescriptions for Common General Surgical

16  Procedures; Special Series, Annals of

17  Surgery, Volume 265, Number 4, April 2017

18

19

20

21

22

23

24

25

Page 12

1                   S T I P U L A T I O N

2              IT IS STIPULATED AND AGREED, by and

3   between the parties, through their respective

4   counsel, that the deposition of KATHERINE KEYES,

5   PH.D. may be taken before Laura H. Nichols,

6   Commissioner, Certified Realtime Reporter,

7   Registered Professional Reporter and Notary Public;

8              That it shall not be necessary for

9   any objections to be made by counsel to any

10  questions, except as to form or leading questions,

11  and that counsel for the parties may make

12  objections and assign grounds at the time of trial,

13  or at the time said deposition is offered in

14  evidence, or prior thereto.

15

16

17

18

19

20

21

22

23

24

25

1                 I, Laura H. Nichols, a Certified

2     Realtime Reporter and Registered Professional

3     Reporter of Birmingham, Alabama, and a Notary

4     Public for the State of Alabama at Large, acting as

5     Commissioner, certify that on this date, as

6     provided by the Federal Rules of Civil Procedure of

7     the United States District Court, and the foregoing

8     stipulation of counsel, there came before me

9     remotely via Zoom, on June 3, 2021, commencing at

10    11:09 a.m. EDT, KATHERINE KEYES, PH.D., witness in

11    the above cause, for oral examination, whereupon

12    the following proceedings were had:

13

14                    *      *      *

15                 THE VIDEOGRAPHER:  Good morning.  We

16    are going on the record at 11:09 a.m., EST, on June

17    3rd, 2021.

18                 When you are not speaking, please

19    mute your audio input as your microphone is

20    sensitive and can pick up whispering and background

21    noise.  Please turn off all cell phones or place

22    them away from your computer as they can interfere

23    with the deposition audio.  Audio and video

24    recording will continue to take place unless all

25    parties agree to go off the record.

Page 14

1              This is Media Unit 1 of the

2    video-recorded deposition of Dr. Katherine Keyes,

3    taken by counsel for defendant in the matter of In

4    Re:  National Prescription Opiate Litigation Track

5    3 Cases, filed in the United States District Court

6    for the Northern District of Ohio, Eastern

7    Division.  Case Number 17-MD-804.

8              This deposition is being held via

9    videoconference with the witness located in New

10   York.  My name is Stephen Kent from the firm

11   Veritext Legal Solutions, and I am the

12   videographer.  The court reporter is Laura Nichols,

13   also from Veritext Legal Solutions.

14             I am not authorized to administer an

15   oath.  I am not related to any party in this

16   action, nor am I financially interested in the

17   outcome.  All appearances will be noted on the

18   stenographic record.

19             Will the court reporter please swear

20   in the witness.

21

22             KATHERINE KEYES, PH.D.,

23   having been first duly sworn, was examined and

24   testified as follows:

25

Page 15

1    EXAMINATION BY MR. HERMAN:

2         Q.    Dr. Keyes, we have met before.  I am

3    Steve Herman.  I represent CVS.  It is nice to see

4    you again.

5               Before we went on the record, we

6    talked a little bit.  You received two boxes of

7    exhibits from us, correct?

8         A.    Correct.

9         Q.    And the one that has a sealed

10   envelope is -- my understanding, is right next to

11   you; is that correct?

12        A.    Yes.

13        Q.    Okay.  Great.  And have those

14   envelopes remained sealed?

15        A.    Yes.

16        Q.    Okay.  Thank you.  And you understand

17   that CVS is a chain pharmacy, correct?

18        A.    Yes.

19        Q.    And do you understand that Walmart,

20   Walgreens, Rite Aid and Giant Eagle are also chain

21   pharmacies?

22        A.    Yes.

23        Q.    If I refer to a group, the chain

24   pharmacies today, will you understand that to mean

25   that I am referring to CVS, Walmart, Walgreens,

```
                                        Page 16
 1   Rite Aid and Giant Eagle?
 2           A.      Yes.
 3           Q.      Thank you very much.  The way we have
 4   met before is at a prior deposition.  You have
 5   testified before, correct, under oath?
 6           A.      That's correct.
 7           Q.      And would you state your full name
 8   for the record?  Just --
 9           A.      Katherine Keyes.
10           Q.      And you understand that you are under
11   oath today, Professor Keyes?
12           A.      I do.
13           Q.      And if you don't understand one of my
14   questions, please just let me know and I will do my
15   best to ask it in a way that you can understand it,
16   okay?
17           A.      Yes.
18           Q.      And if I ask a question and you give
19   an answer, I will take that as an indication that
20   you understood my question; is that fair?
21           A.      That is fair.
22           Q.      Any reason you can think of that you
23   won't be able to answer my questions fully and
24   accurately today?
25           A.      No.
```

Page 17

1          Q.      If you need to take a break at any
2     time, please just let me know and we can take a
3     break as long as there's not a question pending,
4     okay?
5          A.      Yes.
6          Q.      Did you do anything to prepare for
7     your deposition today?
8          A.      I had meetings with plaintiffs'
9     counsel.
10          Q.      About how many meetings did you have
11     with plaintiffs' counsel?
12          A.      Two.
13          Q.      And how long did those meetings last?
14          A.      Approximately two hours each.
15          Q.      Have you done the work that you feel
16     you need to do in order to testify here today?
17          A.      I believe so.
18          Q.      Have you done the work you need to do
19     in order to be able to testify before the jury at
20     trial?
21          A.      I believe so.
22          Q.      Is there any data that you wanted
23     that you did not have in writing your report?
24          A.      No.
25                  (Exhibit 1 was marked for

Page 18

1                   identification.)

2          Q.     (BY MR. HERMAN:)  Let's go ahead and

3   mark Exhibit 1, which will be a copy of your

4   report, dated April 16th, 2021.

5                   Exhibit 2, which is the exhibits to

6   your report.  And those should be in the sealed

7   envelopes marked CVS 1 and CVS 2.

8                   (Exhibit 2 was marked for

9                   identification.)

10          Q.     (BY MR. HERMAN:)  If you want to go

11   ahead.

12          A.     Go ahead --

13          Q.     Yeah, thank you.

14                   (Exhibit 3 was marked for

15                   identification.)

16                   MR. HERMAN:  And we are also going to

17   mark as Exhibit 3 -- and I am not sure -- it won't

18   be there in paper copy, but it is a supplemental

19   materials considered list that was sent to us last

20   night.

21          Q.     (BY MR. HERMAN:)  Dr. Keyes, have you

22   opened --

23          A.     I am opening Exhibit 2.

24          Q.     Just let me know when you have them.

25   It is not as easy as when I can hand it across the

Page 19

1    table.

2              A.      The tape is really tight.

3              Q.      I did not tape it, but I apologize.

4              A.      I have the exhibit.

5              Q.      Okay.  And is Exhibit 1 a copy of

6    your expert report that you submitted on April

7    16th, 2021?

8              A.      Yes.

9              Q.      And that is a report you wrote for

10   this case?

11             A.      Yes.

12             Q.      Do you understand that when you wrote

13   the report, dated it and signed it that it was to

14   include all the opinions that you intend to offer

15   at trial?

16             A.      Yes.

17             Q.      Does your report contain all the

18   opinions you intend to offer in this case?

19             A.      Yes.

20             Q.      Do you have any corrections to make

21   to your report at this time?

22             A.      I don't at this time.

23             Q.      In your report, you cite with end

24   notes a number of materials.  And my understanding

25   is those citations are to the materials that

Page 20

1    support the statements and opinions in your report;

2    is that correct?

3            A.      Yes.

4            Q.      And those cited references are on

5    Pages 62 to 76 of your report?

6            A.      Yes, the full references from the

7    footnotes are on Page 62 to 76.

8            Q.      Okay.  And besides the materials that

9    you cited as footnotes and your background and

10   experience, are you relying on anything else to

11   support the opinions in your report?

12           A.      In addition to the materials

13   considered list.

14           Q.      Okay.  When we were last together, I

15   guess, your materials considered list is, I

16   believe, seventeen hundred items long.

17                   When we were last together, I think

18   you told me that those were materials that you had

19   reviewed, but the ones that were germane to your

20   opinions are the ones that you cited in the end

21   notes to your report.  Is that still the case?

22           A.      I would say that the citations that

23   are listed in the report form the basis of many of

24   my opinions, although I also considered the

25   additional sources that are on the materials

Page 21

1  considered list as well.

2            So I would -- I would say both were

3  important in informing my opinions.

4       Q.    And I mean you recognize that your

5  materials to consider list contains -- and that is

6  Exhibit -- well, let's go and do this this way:  So

7  Exhibit 2 is your exhibits to your report in this

8  case, correct?

9       A.    Yes, it is my CV --

10       Q.    That is Exhibit A?

11       A.    And Exhibit B is the materials

12  considered list, yes.

13       Q.    And the materials considered list

14  contains, I believe, seven -- one thousand seven

15  hundred and seventy-eight numbered items?

16       A.    Yes, it does.

17       Q.    And on that list it appeared to me

18  that there were materials that you had considered

19  not just in connection with this case but materials

20  that you considered in connection, for example,

21  with the Cabell County, West Virginia case,

22  correct?

23       A.    Yes.  And other counties as well.

24       Q.    Okay.  And so, for example, Number 86

25  is related to hospital standard charges in Cabell

Page 22

1    County, West Virginia, right?

2          A.     Number 86, Cabell-Huntington Hospital

3    standard charges.

4          Q.     And does that relate to your opinions

5    in this case?  That relates to -- well, this case

6    is -- let me ask you this:  You understand this

7    case relates to Lake and Trumbull County, Ohio?

8          A.     I do.

9          Q.     So does that material considered

10   Number 86 relate in any way to the opinions you are

11   giving in this case?

12         A.     I would say that, you know, as I have

13   developed expertise across these counties, really

14   considering and comparing, it helps me to form a

15   general opinion about, you know, the extent and

16   burden of opiate use disorder and other related

17   overdose problems across counties.

18              So I didn't use Cabell data to inform

19   my estimates about Lake and Trumbull but generally

20   considering material from across counties is

21   actually very helpful in developing my opinions

22   more generally.

23         Q.     And I think the last time we were

24   together, when I asked you about some of the

25   depositions, and there are a number of depositions

Page 23

1    listed on your chart, you said you had looked at

2    some of them to some degree, but you hadn't read

3    them in full -- all of them in full.  Is that still

4    the case today?

5              MR. ARBITBLIT:  Objection, vague.

6         A.    Yeah, I have looked at a number of

7    depositions.  And the extent to which I reviewed

8    them depends on the specific deposition and how I

9    was using it to inform my opinions.

10         Q.    (BY MR. HERMAN:)  Okay.  All right.

11   Well, you do recognize that the materials listed on

12   your materials considered list is probably

13   thousands of pages of material?

14         A.    Yes.

15         Q.    And is it your testimony that you

16   reviewed all that material carefully?

17         A.    It really depends on the specific

18   material.  Some material requires a more careful

19   review than other material.  Some material I could

20   review and know rather quickly the extent to which

21   it was helpful in forming my opinion.  So it really

22   depended on the source.

23         Q.    But as a general matter, if I want to

24   understand what you are relying on to support the

25   statements in your report, I should look at the

Page 24

1   materials that you cited as end notes in the

2   report, correct?

3              MR. ARBITBLIT:  Objection, vague.

4        A.    I would say both the end notes and

5   the materials considered list would be potential

6   sources that informed my opinions.

7        Q.    (BY MR. HERMAN:)  Okay.  Exhibit D is

8   a list of the cases where you -- Exhibit D to

9   Exhibit 2 of this deposition is a list of the cases

10  where you provided testimony.  Is that correct?

11       A.    Is that in a separate -- I only have

12  through Exhibit C as part of Exhibit 2.

13       Q.    Okay.  Well, let me just try it this

14  way, then.  I don't know why that last two pages is

15  not attached to yours, but -- you testified in a

16  case involving Cuyahoga and Summit County, correct?

17       A.    Correct.

18       Q.    Okay.  And you testified there under

19  oath?

20       A.    Yes.

21       Q.    And did you have an opportunity to

22  review that transcript after your deposition?

23       A.    I did.

24       Q.    And you also testified in a case that

25  involved Suffolk County, Nassau County and the

Page 25

```
 1   State of New York?
 2           A.      Yes.
 3           Q.      And you gave a deposition in that
 4   case?
 5           A.      I did.
 6           Q.      And you also testified at a hearing
 7   before Judge Garguilo?
 8           A.      I did.
 9           Q.      And your testimony in that case, both
10   at your deposition and at the hearing, were under
11   oath?
12           A.      Yes.
13           Q.      Did you review your transcripts?
14           A.      Yes.
15           Q.      And you have also testified at a case
16   involving Cabell County and the City of Huntington,
17   West Virginia; is that correct?
18           A.      Yes.
19           Q.      And in that case you gave two
20   depositions?
21           A.      Yes.
22           Q.      And both of those depositions were
23   under oath?
24           A.      Yes.
25           Q.      And did you have a chance to review
```

Page 26

1    your transcript for both those depositions?

2            A.      Yes.

3            Q.      Going back to your report in this

4    case, your report in this case doesn't mention CVS,

5    Rite Aid, Walgreens, Walmart or Giant Eagle,

6    correct?

7            A.      That's correct.

8            Q.      You didn't consider any document

9    produced by CVS in this case or any other, correct?

10           A.      As far as I know, no document

11   produced by the -- the defendants.

12           Q.      Okay.  And when you say "the

13   defendants," you are including in that CVS,

14   Walgreens, Walmart, Rite Aid and Giant Eagle?

15           A.      Yes.

16           Q.      You didn't review any -- the

17   deposition of any CVS employee, correct?

18           A.      That's correct.

19           Q.      You didn't review the deposition of

20   any Walgreens, Walmart, Rite Aid or Giant Eagle

21   employee, correct?

22           A.      That's correct.

23           Q.      I searched your report for the words

24   "CVS," "Rite Aid," "Walgreens," "Walmart" and

25   "Giant Eagle," and they don't appear anywhere in

Page 27

1   your report, correct?

2          A.     I include various data sources that

3   provide aggregate information on retail pharmacies

4   across the United States.

5          Q.     Any pharmacy, correct, any retail

6   pharmacy?

7          A.     On a wide variety of pharmacies.

8          Q.     That is true, the word "pharmacy"

9   does appear six times in your report.  Does that

10  sound about right?

11             MR. ARBITBLIT:  Objection, vague.

12         A.     I have not done -- right.  I have not

13  done a check on the word "pharmacy," but there is

14  considerable information about pharmacies in the

15  report.

16         Q.     (BY MR. HERMAN:)  But you don't

17  specifically mention CVS, Rite Aid, Walgreens,

18  Walmart or Giant Eagle in your report, correct?

19         A.     That is correct.

20         Q.     You don't intend to offer any

21  opinions specific to CVS, correct?

22         A.     To the extent that I offer opinions

23  about pharmacies, I would include CVS as one of

24  them.  But I don't have any specific opinions about

25  CVS uniquely.

Page 28

1          Q.      Well, I think we are saying the same

2     thing.  You are not going to offer opinions

3     specific to CVS in this case, correct?

4                   MR. ARBITBLIT:  Objection.  Asked and

5     answered.

6          A.      I offer opinions about the pharmacies

7     overall.  There is nothing that is specific to any

8     particular pharmacy chain.

9          Q.      (BY MR. HERMAN:)  And just so the

10    record is clear, when you say "specific to any

11    pharmacy chain," you are including in that

12    Walgreens, Walmart, Rite Aid and Giant Eagle?

13         A.      That's correct.

14         Q.      Professor Keyes, this may be a

15    somewhat silly question, but have you ever worked

16    in a pharmacy?

17         A.      I have never worked in a pharmacy.

18         Q.      You don't hold yourself out as an

19    expert in the practice of pharmacy?

20         A.      I have expertise in the epidemiology

21    of pharmacological distribution and harms

22    associated with medications that are dispensed from

23    pharmacies.

24         Q.      Okay.  But you yourself have never

25    practiced pharmacy?

Page 29

1          A.      I am not a pharmacist.

2          Q.      And are you an expert in the laws and

3     regulations that apply to pharmacies?

4          A.      I have expertise and knowledge based

5     on my epidemiological background on laws and

6     regulations as they apply to pharmacies.

7          Q.      So do you hold yourself out as an

8     expert in the Controlled Substances Act?

9          A.      I hold myself out as an expert in

10     policies and laws as they relate to pharmacies,

11     which would include the Controlled Substances Act.

12          Q.      And -- okay.  You are not evaluating

13     whether any specific prescription was written by a

14     prescriber for a legitimate medical purpose in this

15     case, are you?

16          A.      No.  Oh, yes.  I'm sorry.  I was -- I

17     am not providing any opinions about specific

18     prescriptions, right.

19          Q.      So just so the record is clear,

20     because I think -- okay.  I think that is clear.

21              Are you aware of any prescription

22     opioid improperly dispensed by a CVS pharmacy in

23     Lake or Trumbull County?

24          A.      I have not evaluated information

25     related to specific prescription opioids dispensed

Page 30

1    in Lake or Trumbull County.

2         Q.     Okay.  And you didn't look at what

3    happened to any specific patient who filled a

4    prescription at any pharmacy in Lake or Trumbull

5    County, correct?

6         A.     That is correct.

7         Q.     You are not opining that a specific

8    prescription dispensed in Lake County led to harm?

9         A.     I have not evaluated specific

10   prescription information, so I am not opining

11   that -- about any specific prescription in a

12   singular.  I am opining about the aggregate.

13        Q.     And you are not opining about any

14   specific patient who filled a prescription either,

15   correct?

16        A.     That is correct.

17        Q.     Okay.  Prescription opioids are

18   medications approved for medical use by the United

19   States Food and Drug Administration, correct?

20        A.     Yes.

21        Q.     And to this day, prescription opioids

22   are approved by the FDA for medical use in the

23   United States, correct?

24        A.     Yes.

25        Q.     Have you heard of the Center For Drug

Page 31

1    Evaluation and Research?

2           A.    Yes.

3           Q.    And is that part of the FDA?

4           A.    Yes.

5           Q.    Can I ask you to go ahead and open up

6    CVS 3?  And I think we will mark that as Exhibit 4.

7                 (Exhibit 4 was marked for

8                 identification.)

9           Q.    (BY MR. HERMAN:)  Do you have that

10   open now?

11          A.    I do.

12          Q.    Okay.  And Exhibit 4 is a printout

13   from the FDA's website on the Development and

14   Approval Process.  Do you see that?

15          A.    I see the document that has been

16   given to me.  I haven't verified.

17          Q.    But if you look down at the bottom of

18   the page, do you see a website that says

19   https://www.fda.gov/drugs/development-approval-

20   process-drugs?  Do you see that?

21          A.    I do, yeah.

22          Q.    Does that indicate to you that this

23   was printed out off the FDA's government website?

24          A.    Yes.

25          Q.    And if you look at the top, second

Page 32

1   paragraph in, it says, "The center's best-known job

2   is to evaluate new drugs before they can be sold.

3   CDER's evaluation not only prevents quackery but

4   also provides doctors and patients information they

5   need to use medicines wisely.  The center ensures

6   that drugs, both brand name and generic, work

7   correctly and that their health benefits outweigh

8   their known risks."  Did I read that correctly?

9           A.     That is what is written.

10          Q.     And do you understand that CDER to be

11   an abbreviation for the Center -- I'm sorry, for

12   the Center for Drug Evaluation and Research?

13          A.     Yes.

14          Q.     Okay.  And so the FDA says on its

15   website that one of its roles is to provide doctors

16   and patients information needed to use medicines

17   wisely?

18          A.     That is what the FDA says on their

19   website.

20          Q.     And the FDA says that CDER ensures

21   that drugs work correctly and that their health

22   benefits outweigh their known risks?

23              MR. ARBITBLIT:  Objection.  The

24   document speaks for itself.  There's no point just

25   reading the document with the witness.

Page 33

1          Q.     (BY MR. HERMAN:)  You can answer my

2     question.

3          A.     I see that written on this page.

4          Q.     On the FDA's website?

5          A.     Yes.

6          Q.     Okay.  And if you go down under the

7     heading "FDA Approval:  What it Means," it says,

8     "FDA approval of a drug means that data on the

9     drugs' effect have been reviewed by CDER and the

10    drug is determined to provide benefits that

11    outweigh its known and potential risks for the

12    intended population."

13                MR. ARBITBLIT:  Same objection.

14         Q.     (BY MR. HERMAN:)  Did I read that

15    correctly?

16         A.     Yes, it was read correctly.

17         Q.     So the FDA states on its website that

18    its approval of a prescription opioid medication

19    means that it has determined that the benefit of

20    prescription opioids outweigh the potential risks

21    for the treatment of moderate to severe pain?

22                MR. ARBITBLIT:  Same objection.

23         A.     That is not what is written here.

24         Q.     (BY MR. HERMAN:)  Well, I apologize.

25    Why don't we go to Page 5 of your report.  And just

Page 34

1   directing your attention to the definition of

2   prescription opioids.  In your report you define

3   prescription opioids as "Drugs approved for medical

4   use in the United States for control of moderate to

5   severe pain that are either natural opiate

6   analgesics derived from opium (morphine and

7   codeine), semisynthetic opioid analgesics

8   (oxycodone, hydrocodone, hydromorphone and

9   oxymorphone), synthetic opioids (methadone) or

10  synthetic opioid analgesics (e.g., tramadol and

11  fentanyl)."  Is that how you define prescription

12  opioids?

13          A.     Yes.

14          Q.     So your definition of prescription

15  opioids recognizes that they have been approved by

16  the FDA for medical use in the United States for

17  the control of moderate to severe pain, correct?

18          A.     Yes.

19          Q.     And I said "they" there.  Just to be

20  clear, I was referring to prescription opioids; you

21  understood that, right?

22          A.     Yes.

23          Q.     And so if you would -- if you take

24  your definition and what the FDA says approval

25  means, would you agree with me that the FDA

Page 35

1  approval means that prescription opioid

2  medications -- that the FDA has determined that the

3  benefits of prescription opioids outweigh their

4  potential risk for the treatment of moderate to

5  severe pain?

6          A.     I have not evaluated the specific FDA

7  determination on specific opioid products.  I do

8  agree that the FDA has approved prescription

9  opioids and that what is written on this page

10 describes very generally the approval process in a

11 very high level way.  But I wouldn't concede

12 that -- without having reviewed the FDA's actual

13 material on opioids, I would not offer an opinion

14 about the FDA's approval process of opioids.

15         Q.     But your definition at least

16 recognizes that they have been approved for

17 treatment of moderate to severe pain, correct?

18         A.     Yes.

19         Q.     And the FDA states on its website

20 that its "evaluation of each prescription opioid

21 medication provides the doctors and patients with

22 information needed to use the medication wisely."

23              MR. ARBITBLIT:  Objection.  The

24 document speaks for itself.

25         A.     Yes, that is stated on the website.

1          Q.     (BY MR. HERMAN:)  Okay.  And can I

2    ask you to go to the next page, 2 of 4, to the

3    section "Strategies for Managing Risks."  And the

4    first sentence -- the first and second sentence

5    there say, "All drugs have risks.  Risk management

6    strategies include an FDA-approved drug label which

7    clearly describes the drug's benefits and risks and

8    how the risk can be detected and managed."  Did I

9    read that correctly?

10                  MR. ARBITBLIT:  The document speaks

11   for itself.

12         A.     Yes, it was read correctly.

13         Q.     (BY MR. HERMAN:)  Are you aware that

14   the FDA approved a warning label for each

15   prescription opioid medication?

16         A.     I have not evaluated and don't offer

17   opinions on specific FDA warning labels for opioid

18   medications.

19         Q.     Well, I am asking, I think, a

20   slightly different question.  You do have an

21   understanding that each prescription opioid

22   medication has a warning label approved by the FDA?

23         A.     Yes.

24         Q.     Is it your understanding that the

25   expectation is that prescribers will review the

Page 37

1   warning labels and utilize the information when

2   deciding whether to prescribe prescription opioids?

3                MR. ARBITBLIT:  Objection, vague.

4   Speculative.

5        A.    Yes.  I am not offering an opinion

6   about what prescribers review vis-à-vis warning

7   labels.

8        Q.    (BY MR. HERMAN:)  Well, is it your

9   understanding that one of the purposes of the FDA

10  warning label for any medication is that

11  prescribers will review that warning label to

12  better understand the risks and benefits of the

13  medication?

14               MR. ARBITBLIT:  Objection, vague.

15  Overbroad.

16       A.    I have not evaluated documents

17  regarding the purpose of the FDA warning label, so

18  I would not offer an opinion on that.

19       Q.    (BY MR. HERMAN:)  Okay.  You don't

20  have any understanding of the purpose of an FDA

21  warning label?

22               MR. ARBITBLIT:  Objection.

23  Argumentative.

24       A.    I have not evaluated any specific

25  material on the purpose of FDA warning labels, so I

Page 38

1    would not -- I would not offer an opinion about

2    what prescribers do vis-à-vis specific warning

3    labels regarding opioids.

4              Q.    (BY MR. HERMAN:)  What is your

5    understanding of the purpose of an FDA-approved

6    warning label?

7              A.    I believe that it is -- you know, the

8    document here states very clearly that the purpose

9    of the warning label is to provide information

10   about potential risks and side effects.

11             Q.    Okay.  And like its name suggests, it

12   is intended to be a warning that doctors will

13   review before prescribing medication, right?

14                   MR. ARBITBLIT:  Objection,

15   speculative.

16             A.    I think there are numerous reasons to

17   have a warning label, and I would not offer an

18   opinion about the -- what specific doctors and

19   prescribers do with those warning labels.

20             Q.    (BY MR. HERMAN:)  Do you agree that

21   approval by the FDA of prescription opioid

22   medications was a necessary condition for there to

23   be a supply of prescription opioids?

24             A.    Not in an absolute sense.

25             Q.    Well, without approval of

Page 39

1   prescription opioids by the FDA, no doctor would

2   prescribe opioids to patients, correct?

3           A.      That is correct.

4           Q.      And CVS, Rite Aid, Walmart,

5   Walgreen's and Giant Eagle's pharmacies would not

6   have prescription opioids in their pharmacies if

7   they were not approved by the FDA as medications,

8   correct?

9           A.      That's correct.

10          Q.      Professor Keyes, do you fault the FDA

11  for approving prescription opioids for medical use?

12          A.      I think, in general, when you look at

13  the drivers of the opioid crisis and the overdose

14  crisis, that certainly the role of the FDA in

15  evaluating the risks and benefits of opioid

16  medications is part of the larger constellation of

17  factors that contributed to the opioid crisis.

18          Q.      And so am I understanding you

19  correctly that with information you have today, you

20  do not believe that the FDA evaluated the risks and

21  benefits of the opioid medications appropriately?

22          A.      That is a very general statement.  I

23  would -- I would certainly -- I think that one

24  could reevaluate the information that the FDA

25  received, but I would need to look at each specific

Page 40

1  drug in determining the appropriateness of FDA

2  conclusions.

3          Q.      And you would have to look at each

4  different drug because there are different types of

5  prescription opioids, correct?

6                  MR. ARBITBLIT:  Objection, vague,

7  overbroad.

8          A.      There are different types of

9  prescription opioids.

10          Q.      (BY MR. HERMAN:)  And different types

11  of prescription opioid medications have different

12  risks and benefits?

13                  MR. ARBITBLIT:  Objection.  Vague and

14  overbroad.

15          A.      There are different types of opioid

16  medications -- each one would need to be evaluated

17  in terms of their risks and benefits separately.

18          Q.      (BY MR. HERMAN:)  If you were in

19  charge of the FDA, would you have approved

20  prescription opioids for medical use?

21                  MR. ARBITBLIT:  Objection, vague,

22  speculative, overly broad.

23          A.      That is a hypothetical that I can't

24  answer.  I am not in charge of the FDA, so I can't

25  answer what I would have done had I been in charge

1   of the FDA.

2          Q.     (BY MR. HERMAN:)  I am asking you to

3   answer that hypothetical.

4                 MR. ARBITBLIT:   Incomplete

5   hypothetical.  Same objection plus incomplete

6   hypothetical.

7          Q.     (BY MR. HERMAN:)  Dr. Keyes, if you

8   were in charge of the FDA, would you have approved

9   prescription opioids for medical use?

10                 MR. ARBITBLIT:  Same objection.

11         A.     I would need to look at each -- I

12  would need to review the documents for each

13  specific product to answer that question, which I

14  have not done.

15         Q.     (BY MR. HERMAN:)  Okay.  Sitting here

16  today, you don't know whether you would have

17  approved or banned prescription opioids for medical

18  use?

19                 MR. ARBITBLIT:  Objection, vague,

20  overbroad, hypothetical.

21         A.     I would need to review the specific

22  documents in order to engage in that hypothetical,

23  which I have not done.

24         Q.     (BY MR. HERMAN:)  So is the answer to

25  my question no, that sitting here today you cannot

Page 42

1   state whether you would ban or approve prescription

2   opioids if you were in charge of the FDA today?

3                   MR. ARBITBLIT:  Same objection and

4   asked and answered.

5           A.      I would say that the broad

6   hypothetical of all prescription opioids and the

7   inconclusive language of ban or approve is not

8   something that anyone, including, you know, people

9   in charge of the FDA, could answer in an absolute

10  way.

11          Q.      (BY MR. HERMAN:)  It is a complicated

12  question?

13                  MR. ARBITBLIT:  Object to the form.

14          A.      I don't think it is a complicated

15  question.  I think it is a hypothetical that is too

16  broad.

17          Q.      (BY MR. HERMAN:)  Can I ask you to

18  take out what has been marked as Exhibit 7-1 in the

19  envelope, and it will be Exhibit 5 to this

20  deposition.

21                  (Exhibit 5 was marked for

22                  identification.)

23          Q.      (BY MR. HERMAN:)  Do you have that or

24  do you have that exhibit?

25          A.      I do.

Page 43

1          Q.      And is Exhibit 5 the CDC guidelines

2     that were issued in 2016?

3          A.      They are a set of guidelines that

4     were published in 2016 by the CDC.

5          Q.      And they are a set of guidelines on

6     prescribing opioid medications that were published

7     in 2016?

8          A.      They are recommendations for primary

9     care clinicians who are prescribing opiates for

10    chronic pain outside of active cancer treatment,

11    palliative care and end of life care.  So just to

12    be more specific, that is the scope of the

13    guidelines.

14         Q.      Okay.  And you cite these in your

15    expert report as it is referenced, 152?

16         A.      Let me just check.

17                 (Pause.)

18         A.      Yes.

19         Q.      (BY MR. HERMAN:)  And were the 2016

20    guidelines the first guidelines put out by the CDC

21    on prescribing opioid medications?

22         A.      I'm not sure.  I would need to look

23    at that.

24         Q.      Do you know if the 2016 CDC

25    guidelines were the first federal guidelines on

Page 44

1    prescribing opioids?

2          A.     I don't know.

3          Q.     Dr. Keyes, I think in your report you

4    recognize that prescribing of opioids has been

5    decreasing for approximately ten years.  Is that

6    correct?  Since 2012?

7          A.     Is there a place in the report that I

8    can --

9          Q.     Well, let me ask in the abstract.  Do

10   you know when the prescribing -- when generally the

11   prescribing of opioids began to decrease in the

12   United States?

13         A.     I would want to look at my report to

14   make sure I am testifying correctly.  Is there a

15   place in the report that I can -- I just want to

16   make sure I am giving the most accurate

17   information.

18         Q.     We can come back to that.  You don't

19   know off the top of your head?

20         A.     I just want to make sure because this

21   is important that I am accurately citing the right

22   reference and conveying the right information for

23   the record.  And so I would prefer, and be more

24   comfortable, if you could point to where in the

25   report that is stated so I can appropriately

Page 45

1    testify.

2          Q.      Okay.  So if you look at Page 45, at

3    the top, and there's a sentence there that

4    recognizes that prescribing began to decrease in

5    2012.  Do you see that sentence?

6          A.      The sentence is "Prescribing then

7    began decreasing, although remains extraordinarily

8    high."

9          Q.      Okay.  But you recognize that

10   prescribing began to decrease in 2012, correct?

11         A.      Right.  From the height of 2012.

12         Q.      And has prescribing of prescription

13   opioids continued to decrease since 2012?

14         A.      Nationally or in Lake and Trumbull

15   County?

16         Q.      Well, let's start with nationally.

17         A.      Nationally, prescription opioid use

18   has declined, although it remains much higher than

19   preopioid epidemic levels.  So, yes, there have

20   been declines since 2012, but the level of

21   prescribing remains much higher than it was prior

22   to the opioid crisis.

23         Q.      And when higher -- when you say

24   "higher than," can you give me a year when you are

25   comparing it to?

1      A.      The sources that I cite in this

2  report began in about the mid 1990s.

3      Q.      Do you know if opioid prescribing had

4  begun to increase before the mid 1990s?

5      A.      In the sources that I have evaluated,

6  most of the -- the sources that I have evaluated

7  began in the early to mid 1990s.  So I am not -- I

8  have not evaluated carefully sources prior to the

9  early to mid 1990s.

10      Q.      Okay.  And can I ask you -- I think I

11  know the answer to this based on your past

12  testimony.  But if you look at Exhibit 5, first

13  sentence of Background, it says opioids are

14  commonly prescribed for pain.  Do you agree that

15  opioids are a commonly prescribed medication for

16  pain?

17      A.      I agree that opioids are commonly

18  prescribed for pain.

19      Q.      And you have been talking a little

20  bit about the rate of prescribing.  Do you

21  understand that to mean that licensed prescribers

22  often prescribe opioids for their patients' pain?

23             MR. ARBITBLIT:  Objection.

24  Speculative.

25      A.      I understand that -- that opioids are

Page 47

1   prescribed often for pain by licensed prescribers,

2   yes.

3          Q.     (BY MR. HERMAN:)  And can I direct

4   your attention to the second paragraph of Exhibit

5   5.

6                 MR. HERMAN:  Is there any way we can

7   put that up?

8          Q.     (BY MR. HERMAN:)  Do you see where it

9   says, "Prevention, assessment and treatment of

10  chronic pain are challenges for health providers

11  and systems.  Pain might go unrecognized and

12  patients, particularly members of racial and ethnic

13  minority groups, women, the elderly, persons with

14  cognitive impairment and those with cancer and at

15  the end of life, can be at risk for inadequate pain

16  treatment."  Do you see where I am reading?

17         A.     I do.

18         Q.     Did I read that correctly?

19         A.     Yes.

20                MR. ARBITBLIT:  Objection.  The

21  document speaks for itself.

22         Q.     (BY MR. HERMAN:)  And is it your

23  understanding that the CDC is expressing a concern

24  that pain might go unrecognized and untreated in

25  2016?

Page 48

1               MR. ARBITBLIT:  Objection.  The

2      document speaks for itself, and it is speculative

3      as to what the CDC is thinking.

4          A.    I can read what is on the page.  This

5      document, coauthored by three people through the

6      CDC, states that there can be persons who are at

7      risk for inadequate pain treatment.

8          Q.    (BY MR. HERMAN:)  I found it

9      interesting that pain going unrecognized was a

10     particular concern to women.  Do you know why that

11     would be the case, Professor Keyes?

12              MR. ARBITBLIT:  Object to the form.

13         A.    I guess I don't understand the

14     question.  Is the question, is it interesting that

15     pain goes unrecognized?

16         Q.    (BY MR. HERMAN:)  Oh, no, I'm sorry.

17     Let's get rid of my discussion of that point.

18              I just want to know, do you know why

19     it would be the case that pain would be of

20     particular concern for going unrecognized for

21     women?

22         A.    I'm not sure what specifically the

23     CDC authors are referring to when they highlight

24     women as a risk group there.

25         Q.    Would your answer be the same for

Page 49

1   ethnic and racial minority groups?

2        A.    I believe what the purpose of the

3   sentence is is that the sentence is saying pain may

4   go unrecognized and that that might be different by

5   these different demographic groups, and that would

6   include racial and ethnic minorities and women and

7   the other groups highlighted in that sentence.

8        Q.    Yeah, I understood it to be saying

9   that these groups can be particularly at risk for

10  inadequate pain treatment.  Is that how you

11  understand it or --

12             MR. ARBITBLIT:  Object to the form.

13       A.    That is not exactly what the sentence

14  says.  It says that those groups can be at risk for

15  inadequate pain treatment, based on the CDC --

16  these authors' assessment.

17       Q.    (BY MR. HERMAN:)  Okay.  And these

18  authors' assessment published by the CDC?

19       A.    Yes.

20             MR. ARBITBLIT:  Object to the form.

21       Q.    (BY MR. HERMAN:)  And if you look at

22  the next sentence, it says, "Patients can

23  experience persistent pain that is not

24  well-controlled.  There are clinical, psychological

25  and social consequences associated with chronic

Page 50

1    pain, including limitations in complex activities,

2    lost work productivity, reduced quality of life and

3    stigma, emphasizing the importance of appropriate

4    and compassionate patient care."

5              Do you see where I just read?

6         A.    I do.

7         Q.    Did I read that correctly?

8         A.    Yes.

9         Q.    Do you agree with the CDC that there

10   are clinical, psychological and social consequences

11   associated with chronic pain?

12        A.    There certainly can be consequences

13   of chronic pain, including clinical, psychological

14   and social.

15        Q.    And do you understand the CDC to be

16   saying here because of clinical -- sorry --

17   sociological and social consequences associated

18   with chronic pain, that emphasis should be placed

19   on the importance of appropriate and compassionate

20   care?

21        A.    I think -- do -- you are asking what

22   I understand the CDC to be saying?  I don't want to

23   speculate about what the CDC meant in that

24   statement.  I am not the authors.

25        Q.    Would you agree with the sentiment

Page 51

1    that because there are clinical, psychological and

2    social consequences associated with chronic pain,

3    that emphasis should be placed on the importance of

4    appropriate and compassionate patient care?

5           A.    All patients, regardless of their

6    condition, should be treated with appropriate and

7    compassionate care.  And there's a lot of

8    discussion about the level -- what constitutes

9    appropriate care in the context of chronic pain.

10          Q.    And I think the -- and can I ask you

11   to go to Page 2?  And if you look just above

12   "Rationale," do you see where it says, "Clinical

13   decision-making should be based on a relationship

14   between the clinician and patient and understanding

15   of the patient's clinical situation, functioning

16   and life context.  The recommendations in the" --

17   well, let's stop.

18                "The recommendations in the guideline

19   are voluntary rather than prescriptive standards.

20   They are based on emerging evidence, including

21   observational studies or randomized clinical trials

22   with notable limitations.  Clinicians should

23   consider the circumstances and unique needs of each

24   patient when providing care."

25                MR. ARBITBLIT:  Objection.  The

1  document speaks for itself.  No question pending.

2         Q.     (BY MR. HERMAN:)  Do you see where I

3  just read?

4              MR. ARBITBLIT:  Same objection.

5         A.     I see that that is what is written.

6         Q.     (BY MR. HERMAN:)  And did I read that

7  correctly?

8         A.     You read that correctly.

9         Q.     Clinical decisions are decisions made

10 by prescribers, correct?

11             MR. ARBITBLIT:  Objection.

12        A.     Clinical decisions can be made by

13 prescribers.

14        Q.     (BY MR. HERMAN:)  Do you agree that

15 the clinical decisions being referenced here are

16 clinical decisions made by prescribers?

17             MR. ARBITBLIT:  Objection,

18 speculative.  The document speaks for itself.

19        A.     I wouldn't speculate on specifically

20 who the CDC was referring to in that sentence.

21 They just say "clinical decision-making."  Clinical

22 decisions are made by a variety of care providers.

23        Q.     (BY MR. HERMAN:)  Well, these are

24 prescribing guidelines, are they not?

25        A.     These are prescribing guidelines.

1          Q.      And so you don't think that the

2     reference to clinical decisions is a reference to

3     the prescriber, decisions made by prescribers?

4                     MR. ARBITBLIT:  Objection,

5     speculative.  Asked and answered.  Argumentative.

6          A.      I am not speculating on who --

7     they -- I am reading the text, as you are.  They

8     discuss the dose response relationship between

9     opioid use and overdose and then say that clinical

10    decision-making should be based on a relationship

11    between a clinician and a patient.  They do not

12    specify provider.

13         Q.      (BY MR. HERMAN:)  Okay.  Right in the

14    next sentence it says -- let me ask you this:

15    Dr. Keyes, you understand that a doctor is only

16    supposed to write a prescription for a legitimate

17    medical purpose, correct?

18                     MR. ARBITBLIT:  Object to form.

19    Speculative.

20         A.      I don't want to speculate about what

21    every doctor writes prescriptions for.

22         Q.      (BY MR. HERMAN:)  Well, I am not

23    asking you about why the doctor does it.  But I am

24    asking you -- well, let me ask you this:  You said

25    earlier that you had familiar -- familiarity and

Page 54

1  expertise with the CSA and related laws and

2  regulations, correct?

3          A.      Yes.

4          Q.      Okay.  So do you understand that a

5  doctor is only supposed to write a prescription for

6  a legitimate medical purpose?

7                  MR. ARBITBLIT:  Object to form.

8          A.      I would ask what you mean by a

9  legitimate medical purpose.  There's -- doctors

10  write prescriptions based on information that they

11  have.

12          Q.      (BY MR. HERMAN:)  You understand that

13  that is the language used in the CDC, that a

14  practitioner is only supposed to write a

15  prescription for a legitimate medical purpose in

16  the usual course of practice?

17          A.      Is this a specific CDC document?

18          Q.      Well, it is a specific law and

19  regulation.  I thought earlier you said you had

20  expertise in the CSA and laws and regulations.

21                  MR. ARBITBLIT:  Objection.

22          A.      From the CDC?

23          Q.      (BY MR. HERMAN:)  No, from the

24  federal government.

25                  MR. ARBITBLIT:  Objection.

Page 55

1    Misstates.

2              A.     So your previous question was about

3    language used by the CDC.  So my question is --

4              Q.     (BY MR. HERMAN:)  No.  My --

5              A.     -- if there's a specific --

6              Q.     (BY MR. HERMAN:)  I'm sorry.  I

7    didn't mean to interrupt.  My previous question was

8    you understand that a doctor is only supposed to

9    write a prescription for a legitimate medical

10   purpose, correct?

11             MR. ARBITBLIT:  Objection, vague.

12             A.     My understanding is that physicians

13   write prescriptions based on the information that

14   they have about the patient and that -- and that

15   they use that information in writing prescriptions.

16             Q.     (BY MR. HERMAN:)  Well, let's see if

17   we can agree.  Would you agree that the doctor,

18   based on information the doctor has, is supposed to

19   write a prescription in good faith for a legitimate

20   medical purpose?

21             A.     I think that there is a wide variety

22   of opinions about the medical purposes for which

23   opioids would be an effective therapy.  And so two

24   doctors could have differences of opinion about the

25   specific medical purpose for which an opioid would

Page 56

1   be indicated.  Therefore, my opinion is that

2   physicians write prescriptions based on the

3   information that has been provided to them.

4          Q.    So I understood you to be saying --

5   you said different physicians might evaluate a

6   prescription differently, correct?

7                MR. ARBITBLIT:  Objection.  Misstates

8   the testimony.

9          Q.    (BY MR. HERMAN:)  Well, you said two

10  doctors could have differences of opinions about

11  the specific medical purpose for which an opioid

12  would be indicated, correct?

13         A.    I said that two doctors could have

14  differences, yes, about the specific medical

15  purpose for which an opioid would be indicated.

16         Q.    That is because doctors might

17  evaluate the risks and benefits of a prescription

18  opioid differently?

19                MR. ARBITBLIT:  Object to form.

20         A.    That is not what I testified.

21         Q.    (BY MR. HERMAN:)  Okay.  Well, what

22  do you mean when you say two doctors could have

23  differences of opinions about the specific medical

24  purpose for which an opioid would be indicated?

25         A.    I was referring in that statement to

1    the statement that doctors write prescriptions for

2    legitimate medical needs.  My opinion is that the

3    word "legitimate" is fairly vague.

4         Q.    Okay.  So you think the term

5    "legitimate medical purpose" is too vague to

6    evaluate?

7              MR. ARBITBLIT:  Object to form.

8         A.    It is broad.

9         Q.    (BY MR. HERMAN:)  Different people

10   could evaluate it differently?

11        A.    I think what we have seen from the

12   evidence, and I would just go back to my report, is

13   that -- is that the opioids that were dispensed

14   often went to the wrong people.  And, therefore,

15   because you have this vast oversupply, it certainly

16   is indicative of a wide variety of dispensing and

17   prescribing practices and that legitimate medical

18   needs were not always the -- that opioids were not

19   prescribed always for legitimate medical needs

20   because there was such an oversupply and diversion.

21        Q.    But do you have a reason to

22   believe -- well, let me -- let me ask you this:  I

23   mean, do you believe that -- you talked earlier

24   about how doctors were prescribing based on the

25   information available to them.  Do you believe that

Page 58

1    the doctors who were prescribing based on the

2    information available to them intended that the

3    prescriptions would be used for a legitimate

4    medical purpose?

5                    MR. ARBITBLIT:  Objection, vague,

6    overbroad, speculative.  Misstates the record.

7         A.    I wouldn't offer an opinion about all

8    doctors and their intentions for prescribing.

9         Q.    (BY MR. HERMAN:)  I want to go back

10   to my question, because you have been sort of

11   focusing on the -- understanding the intention of

12   the doctor.  But do you understand that a doctor is

13   only supposed to write a prescription for a

14   legitimate medical purpose?

15                   MR. ARBITBLIT:  Objection, vague.

16   Object to the prelude.

17        A.    When -- I guess I am not

18   understanding what you mean by a doctor is supposed

19   to write a prescription.  I think, as it says in

20   the CDC guidelines, clinicians and patients are in

21   conversation about various conditions.  And so what

22   the intention of doctors are, what they are

23   supposed to do and what is actually done in a

24   clinical setting -- you know, I'm not sure what you

25   are asking.

Page 59

1          Q.     (BY MR. HERMAN:)  Well, do you

2    understand that the federal regulations on

3    prescribing controlled substances state that a

4    practitioner should only prescribe controlled

5    substances for a legitimate medical purpose?

6          A.     I do understand the federal

7    regulations on that -- on that issue.

8          Q.     Okay.  So you do have an

9    understanding that a doctor is only supposed to

10   prescribe a prescription opioid for a legitimate

11   medical purpose?

12                 MR. ARBITBLIT:  Objection, form.

13         A.     My understanding of the federal

14   regulations is that controlled substances should be

15   prescribed for approved uses.

16         Q.     (BY MR. HERMAN:)  Okay.  Do you

17   understand that it actually uses the term

18   "legitimate medical purpose"?

19                 THE REPORTER:  You need to speak up a

20   little bit, Mr. Herman.

21                 MR. HERMAN:  I apologize.  I leaned

22   back.

23         Q.     (BY MR. HERMAN:)  Let me ask my

24   question again.  Do you understand that the federal

25   regulation actually uses the term "legitimate

Page 60

1    medical purpose"?

2         A.    I would need to review the specific

3    document to understand it in context.

4         Q.    Okay.  Going back to the guidelines,

5    when it says that the guidelines are voluntary

6    rather than prescriptive standards, do you

7    understand that to mean they are not absolute

8    rules?

9              MR. ARBITBLIT:  Object to form.

10        A.    I would just refer to the document

11   itself.  It says that they are voluntary rather

12   than prescriptive standards.  And I wouldn't offer

13   an opinion about how those are interpreted -- how

14   those words are interpreted.

15        Q.    (BY MR. HERMAN:)  Okay.  All right.

16   Well, do you understand that part of the reason

17   they are guidelines and not prescriptive standards

18   is explained in the next sentence, that "They are

19   based on emerging evidence, including observational

20   studies or randomized clinical trials" --

21              THE REPORTER:  I can't understand you

22   well.  Would you slow down when you are reading and

23   speak up?

24              MR. HERMAN:  I apologize.

25        Q.    (BY MR. HERMAN:)  Do you understand

1    the next sentence, "They are based on emerging

2    evidence, including observational studies or

3    randomized clinical trials with notable

4    limitations," to be part of the explanation for why

5    the guidelines are not prescriptive standards?

6                    MR. ARBITBLIT:  Objection,

7    speculative.

8            A.    Yeah, I don't -- I can't speak to

9    whether that sentence is being offered as part of

10   the previous sentence.

11           Q.    (BY MR. HERMAN:)  Okay.  Well, the

12   CDC in that sentence recognizes that evidence

13   related to prescription opioids has changed over

14   time, correct?

15           A.    I'm sorry.  You are cutting out a

16   little bit.

17                  SPECIAL MASTER COHEN:  Mr. Herman,

18   I'm sorry.  This is David Cohen.  I just note that

19   your appearance on my screen is actually much

20   smaller than everyone else.  And so I wonder if you

21   are a distance from the microphone and that is what

22   is causing the issue.

23                  MR. HERMAN:  I am a little bit of a

24   distance, but I haven't moved since the start.  Can

25   people hear me now?

1              SPECIAL MASTER COHEN:  Yeah.  It has

2    actually been hard to hear from the start.  So I am

3    just suggesting that if you get closer to the

4    microphone, it might be helpful.

5              MR. HERMAN:  Okay.  Do people want

6    to -- do people want to break for -- maybe just

7    take a break and maybe break for lunch now and I

8    could try to get this straightened out?

9              THE VIDEOGRAPHER:  Sure.  Stand by.

10   We are now off the record.  The time on the video

11   monitor is 12:14.

12              (Whereupon, a lunch break was had

13              from 12:14 p.m. until 12:48 p.m. EDT)

14              THE VIDEOGRAPHER:  We are now on the

15   record.  The time on the video monitor is 12:48.

16              MR. HERMAN:  Can we go off the record

17   for a second?  I really apologize.  I lost my

18   realtime because of whatever they changed.  And so

19   I didn't realize that until just now.  So --

20              THE VIDEOGRAPHER:  Stand by.

21              MR. HERMAN:  I apologize.

22              THE VIDEOGRAPHER:  We are now off the

23   record.  The time on the video monitor is 12:49.

24              (Whereupon, a break was had from

25              12:49 p.m. until 12:52 p.m. EDT)

Page 63

1                    THE VIDEOGRAPHER:  We are now on the

2      record.  The time on the video monitor is 12:52.

3                    (Exhibit 6 was marked for

4                    identification.)

5                    Q.     (BY MR. HERMAN:)  Dr. Keyes, can I

6      ask you to open CVS 5?  And Exhibit 5 is an article

7      on which you were an author, titled "A Critical

8      Review of the Social and Behavioral Contributions

9      to the Overdose Epidemic" that was published in --

10     on November 30th, 2020.  Is that correct?

11                   A.     Yes.

12                   Q.     And can I ask you to turn to Page 97?

13     And under "Supply Drivers of the Overdose

14     Epidemic," this article states, "Supply drivers

15     include the proliferation of opioids prescribing to

16     treat chronic pain, as well as changes in the

17     heroin and the illegally manufactured opioid

18     synthetics market."  Is that correct?

19                   A.     That's correct.

20                   Q.     And so this article says there were

21     two -- the two supply drivers discussed are, one,

22     more prescribing and, two, changes in heroin and

23     illegally manufactured synthetics market?

24                   A.     Yes.

25                   Q.     And if you go down, the next

Page 64

1     paragraph, it says, "The supply side routes of the

2     overdose epidemic in the United States lie at the

3     intersection of two social and behavioral forces

4     that together led to the proliferation of opioid

5     prescribing in the 1990s, especially for noncancer,

6     acute and chronic pain conditions."

7                    Did I read that correctly?

8          A.     You did.

9          Q.     Okay.  And so your article is saying

10    there are two forces that combine to lead to an

11    increase in opioid prescribing by physicians,

12    correct?

13         A.     The article does not mention by

14    physicians, just prescribing, including dispensing.

15         Q.     Well, is it your understanding that

16    CVS -- well, any pharmacy is only supposed to

17    dispense a prescription if they receive a -- well,

18    only supposed to dispense a prescription to a

19    patient if they receive a prescription from a --

20    written by a licensed prescriber?

21         A.     That's correct.

22         Q.     Okay.  So the first step is, there

23    has to be a prescription written by a doctor,

24    correct?

25         A.     A first step of what?

Page 65

1          Q.      In order for there to be a

2     proliferation of prescriptions, doctors had to

3     write more prescriptions, correct?

4          A.      There were more prescriptions written

5     by doctors in the 1990s.

6          Q.      Okay.  And the article goes on to

7     say, "The first force was a shift in treatment

8     approaches for chronic noncancer pain, including a

9     campaign by professional societies and the U.S.

10    Joint Commission, the nation's largest accrediting

11    body for healthcare organizations, to consider pain

12    as a fifth vital sign and to improve the quality of

13    care for chronic pain."  Did I read that correctly?

14         A.      Yes.

15         Q.      And then it goes on to say, "In 1997,

16    the American Pain Society and the American Academy

17    of Pain Medicine released a consensus statement

18    endorsing the use of opioids to treat chronic

19    noncancer pain, arguing that the risk of addiction

20    from opioids was low.  At the time, the risk of

21    addiction associated with opioid use was not well

22    understood."  Did I read that correctly?

23         A.      You read that correctly.

24         Q.      And so this article that you authored

25    says that the first force that led to increased

1    prescribing was that people began to approach

2    treating pain differently than they had previously,

3    correct?

4            A.    Correct.

5            Q.    Okay.  The medical standard of care

6    for treating pain changed, correct?

7                  MR. ARBITBLIT:  Objection,

8    speculative.  Outside the scope.

9            A.    That is not what the article states.

10           Q.    (BY MR. HERMAN:)  Well, have you

11   yourself said that it became standard practice to

12   use prescription opioids to treat pain?

13           A.    Yes.

14           Q.    And when you used the term "standard

15   practice," you were talking about standard practice

16   by prescribers to treat pain, correct?

17           A.    Are you referring to a specific

18   section of this article or a different article?  I

19   just want to make sure I contextualize it

20   appropriately.

21           Q.    Well, I am referring -- well, why

22   don't we try to answer it without an article.  When

23   you used the term that it became "standard

24   practice" to use prescription opioids to treat

25   pain, would you be referring to standard practice

Page 67

1    by physicians?

2                    MR. ARBITBLIT:  Objection.  The

3    witness has the right to look at the context.

4         A.     I would prefer -- just to make sure I

5    am testifying correctly, I just want to give you

6    the right information.  So there are various

7    articles I have written about pain medicine.  And

8    so if there's a specific article you would like me

9    to discuss, I would prefer to see it.

10                   MR. HERMAN:  Can you pull up --

11        Q.     (BY MR. HERMAN:)  Professor Keyes,

12   can you open Exhibit 12?  And Professor Keyes,

13   Exhibit -- well, for this deposition, it is going

14   to be Exhibit 7, I believe.

15                   (Exhibit 7 was marked for

16                   identification.)

17        Q.     (BY MR. HERMAN:)  Exhibit 7 is an

18   article that you authored called "Understanding the

19   Rural-Urban Differences in Nonmedical Prescription

20   Opioid Use and Abuse in the United States."

21        A.     Sorry.  I don't mean to interrupt

22   you.  I accidentally opened up the wrong -- this

23   was 7-12, and I accidentally opened it.

24        Q.     That is okay.  Just set that aside

25   for now.

1          A.     Okay.  I need to find CVS 12.

2          Q.     Okay.  Appreciate that.

3          A.     I apologize.

4                 MS. POLLOCK:  Steven, will you be

5     uploading that to Exhibit Share?

6                 MR. HERMAN:  It is uploading now.

7                 MS. POLLOCK:  Thank you.

8                 THE REPORTER:  I don't believe you

9     had an Exhibit 6.

10                MR. HERMAN:  I thought --

11                THE REPORTER:  Let me refresh and

12    make sure.

13                MR. HERMAN:  We may have to get this

14    straightened out, but I thought the last one, what

15    we were talking about, "A Critical Review of the

16    Social and Behavioral Contributions to the Opioid

17    Epidemic," is Exhibit 6.

18                THE REPORTER:  Okay.  I see that.  It

19    is up on Exhibit Share now.  Thank you.

20          Q.     (BY MR. HERMAN:)  Professor Keyes, do

21    you have CVS 12, what is going to be marked as

22    Exhibit 7 for this deposition now?

23          A.     I do.

24          Q.     Okay.  And that is an article titled

25    "Understanding the Rural-Urban Differences in

1  Nonmedical Prescription Opioid Use and Abuse in the

2  United States" that you are an author on that was

3  published in February 2014?

4          A.    Yes.

5          Q.    And if I could ask you to turn to

6  Page 2 [sic], under the heading, "Self-Medicating

7  for Pain."  And do you see where you wrote, "When

8  used as prescribed under medical supervision,

9  opioid analgesics are effective and used as

10  standard practice in managing acute and chronic

11  pain"?  Do you see where I am reading?

12          A.    I do.

13          Q.    Okay.  And when you use the term

14  "standard practice in managing acute and chronic

15  pain," were you referring to standard medical

16  practice by physicians?

17          A.    Yes.

18          Q.    Okay.  Do you believe the opioid

19  epidemic would have occurred if prescribing opioids

20  for medical care for treating pain did not become

21  standard practice?

22                MR. ARBITBLIT:  Objection.

23  Speculative.

24          A.    I think what I have outlined in my

25  report is that there is a constellation of factors

Page 70

1    that contributed to the opioid epidemic, and one of

2    those factors was the vast increase in the supply

3    of opioids, including through physician

4    prescription.

5              Q.    (BY MR. HERMAN:)  Well, I am asking

6    you, though, a different question, and I would like

7    you to listen.

8              Do you -- do you believe that the

9    opioid epidemic would have occurred if prescribing

10   opioids did not become standard practice in

11   managing acute and chronic pain?

12             MR. ARBITBLIT:  Objection.  Asked and

13   answered.

14        A.    I do not believe it would have

15   occurred, because it is part of that large

16   constellation of factors that led to oversupply.

17        Q.    (BY MR. HERMAN:)  You do not believe

18   that the increase in prescribing as standard

19   practice led to the opioid epidemic?

20             MR. ARBITBLIT:  Objection.  Asked and

21   answered.  Misstates the testimony.

22        A.    The question was:  Do you believe

23   that the opioid epidemic would have occurred if

24   prescribing opioids had not become standard

25   practice?  And I believe I answered the question

Page 71

1   that I do not believe it would have occurred if

2   opioids did not become standard practice, because

3   it led to this oversupply.

4           Q.      (BY MR. HERMAN:)  But do you believe

5   that the prescribing of opioids for the treatment

6   of pain as standard practice led to the oversupply

7   of prescription opioids?

8                   MR. ARBITBLIT:  Object to form.

9           A.      It was one of the factors that led to

10  oversupply.

11          Q.      (BY MR. HERMAN:)  Okay.  And going

12  back to Exhibit 6, CVS 5 for you, the article says,

13  "The second, related force involved the

14  pharmaceutical industry's concerted effort to

15  advocate for long-term use of opioids as a safe,

16  nonaddictive, effective, and humane alternative to

17  treat noncancer pain.  These marketing efforts

18  accelerated the shift in treatment approaches for

19  chronic noncancer pain."

20                  Did I read that correctly?

21          A.      Yes.

22          Q.      Okay.  And the example you go on to

23  give in the next few sentences is about Purdue,

24  right?

25          A.      Yes.

Page 72

1          Q.      Purdue is a manufacturer, correct?

2          A.      That's correct.

3          Q.      When you refer to the pharmaceutical

4     industry in this sentence, were you referring to

5     Purdue and other manufacturers?

6          A.      I believe several sentences later I

7     define the pharmaceutical industry as including the

8     production, distribution and prescription of

9     opioids proliferated due to the removal of

10    physician sanctions.  So the pharmaceutical

11    industry is broadly conceived.

12         Q.      Okay.  What is your basis for saying

13    that the marketing efforts that accelerated the

14    shift in treatment approaches for chronic noncancer

15    pain was caused by entities other than

16    manufacturers?

17         A.      Can you point me to where you are

18    looking?

19         Q.      The second force -- so it's at the

20    top of the paragraph, the second force --

21         A.      Uh-huh.

22         Q.      -- "involved the pharmaceutical

23    industry's concerted efforts to advocate for the

24    long-term use of opioids as safe, nonaddictive,

25    effective, and humane alternative to treat

Page 73

1   noncancer pain.  These marketing efforts

2   accelerated the shift in treatment approaches for

3   chronic noncancer pain."

4          A.     Yes, that is what it says.

5          Q.     Okay.  And -- well -- okay.  Well,

6   the only example you give is Purdue, a

7   manufacturer.  So I am wondering, what basis do you

8   have to say that other -- any part of the

9   pharmaceutical industry other than manufacturers

10  engaged in marketing efforts that accelerated the

11  shift in treatment approaches for chronic noncancer

12  pain?

13         MR. ARBITBLIT:  Object to form.

14  Misstates.

15         A.     I guess I am still not understanding

16  the question.  The --

17         Q.     (BY MR. HERMAN:)  Well --

18         A.     I say in here that there were

19  "concerted efforts to advocate for the long-term

20  use of opioids as" -- and that those concerted

21  efforts involved the pharmaceutical industry.

22  Several sentences later, I provide context for that

23  statement, saying that -- that the Intractable Pain

24  Act "removed physician sanctions for the use of

25  opioids" and that "the production, distribution,

1    prescription, and use of opioids proliferated."

2                    So all entities that would be

3    involved in the production, distribution,

4    prescription and use of opioids would be implicated

5    in that statement.

6          Q.    Okay.  Well, your report discusses --

7    and going back to Exhibit 1, your report discusses

8    how direct marketing to physicians increased

9    prescribing, correct?

10                   MR. ARBITBLIT:  Objection.  Vague.

11         A.    So that section in the report

12   describes three papers that have used data on

13   payments to physicians and associations with

14   various outcomes.

15         Q.    (BY MR. HERMAN:)  Okay.  And on Page

16   14, I think that is where you are talking about,

17   you are discussing how direct marketing to

18   physicians increased prescribing, right, and you

19   cite -- I think you just said three papers for that

20   proposition?

21         A.    I am -- I am on Page 14 of the

22   report, but I think it is actually later in the

23   report, just so it is accurate in the record.

24         Q.    So you talk about it at Page 14 and

25   then again at Page 33?

Page 75

1          A.     Oh, I see.  The marketing -- I state
2     in the -- in the report that the "marketing of
3     opioid drugs led to increased sales of the marketed
4     drugs."
5          Q.     Well, you say on Page 14,
6     "Evidence" -- "The increase in opioid prescribing
7     was driven by a multitude of factors, including
8     direct marketing to physicians using data that
9     underestimated opioid use disorder risks in
10    patients, which I detail in Section B.  Evidence
11    shows that pharmaceutical marketing of prescription
12    drugs increases prescribers' likelihood of
13    prescribing the marketed drug in the future,"
14    right?
15         A.     That is a general statement about
16    prescription drugs and marketing.  The next
17    sentence is about opioids.
18         Q.     Yeah.  "That is also true for
19    prescription opioids; as a result, increased
20    marketing of opioids led to increased sales of the
21    marketed drugs," right?  And you cite a couple of
22    studies?
23         A.     Correct.
24         Q.     The literature that you cite about
25    marketing discusses marketing activities by

Page 76

1   pharmaceutical manufacturers to physicians,

2   correct?

3           A.      Is there a specific study that you

4   are referring to?

5           Q.      I am asking about all of them at the

6   moment.  The literature that you cite in your

7   report about marketing activities to physicians

8   discusses marketing activities by manufacturers to

9   physicians, correct?

10          A.      Are the articles in the exhibits,

11  because I would just like to confirm that that is

12  what the articles state?

13          Q.      You don't know off the top of your

14  head whether the articles are discussing marketing

15  activities that pharmaceutical manufacturers engage

16  in?

17          A.      There -- the articles refer to a

18  database called the Sunshine Open Payments

19  database, I believe, and I would like to -- I would

20  feel more comfortable giving correct testimony if I

21  could look at the article and make sure that I am

22  describing what is included in the contents of the

23  Open Payments database accurately.

24          Q.      Okay.  Well, why don't we look at --

25  why don't we try 7 -- did you tell me you already

Page 77

1  opened 7-12?

2          A.      I did open 7-12, yes.

3                  MR. HERMAN:  Why don't we mark it --

4  mark that as Exhibit 8.

5                  (Exhibit 8 was marked for

6                  identification.)

7                  MR. HERMAN:  And --

8                  THE VIDEOGRAPHER:  Counsel, your

9  screen sharing is in the video.

10                  MR. HERMAN:  When -- I am sorry.  The

11  screen sharing is in the video.  Can you see me?

12                  THE VIDEOGRAPHER:  No, the screen --

13  the screen being shared is in the video.  I was

14  just letting him know, whoever was sharing.

15                  MR. HERMAN:  Oh.

16          Q.      (BY MR. HERMAN:)  Exhibit 8 is an

17  article titled, "Association of Industry Payments

18  to Physicians with the Prescribing of Brand-name

19  Statins in Massachusetts."

20          A.      Yes, that is correct.

21          Q.      Okay.  And do you see on Page 763 --

22  well, let me ask you this:  This is one of the

23  articles you cite in your report, correct?

24          A.      Yes, but I don't think it is on -- I

25  don't cite this on Page 14.  I believe I cite this

Page 78

1    in the other section that discusses the Hadland

2    article.  So if I could just pull up that section

3    to make sure I am -- is that correct?  To make

4    sure -- do you know which number --

5              Q.    It -- I believe this is Reference

6    141, so maybe it is --

7              A.    Yeah.

8              Q.    You cite some of them in both places,

9    but I think this is one cite on Page --

10             A.    This is only -- I just wanted to pull

11   up the correct section.  Okay.

12             Q.    Okay.  Do you see on Page 763, it

13   says, "Payment by pharmaceutical manufacturers to

14   physicians outside the research context may be

15   problematic, because they can be perceived as

16   conflicts of interest that could interfere with

17   physicians' responsibilities to their patients"?

18             A.    This is on Page 763?

19             Q.    Yep, first paragraph.

20             A.    Oh, I see.  Yes.  I see that.

21             Q.    You see above it says, "In the United

22   States" -- the paragraph begins, "In the United

23   States, many physicians have financial

24   relationships with pharmaceutical manufacturers."

25             A.    I see that.

Page 79

1          Q.     Okay.  Did I read that correctly?

2          A.     You did.

3          Q.     Is it your understanding that this

4    article about payments to physicians relates to

5    manufacturers?

6          A.     That this particular article about

7    statins?  You are asking -- you are asking

8    whether --

9          Q.     Well, I am asking -- this is -- you

10   said you would like to see an article.  I am --

11   I -- well, I am asking you, does this article deal

12   with payment by manufacturers?

13         A.     This article does -- the methods

14   section of this paper says that they used two data

15   sources.  This -- the data source that was used on

16   payments was the Massachusetts physician Open

17   Payments database, which is derived from

18   pharmaceutical manufacturer reports.  But the

19   article does not include opioids, as far as I can

20   tell.

21         Q.     Okay.  I -- well, we are short on

22   time.  I'm not sure I am going to be able to go

23   through every article.

24                But sitting here today, do you

25   believe that the literature you cite in your report

Page 80

1    about marketing to physicians discusses marketing

2    activities by pharmaceutical manufacturers?

3                    MR. ARBITBLIT:  Object to form.

4         A.     I cite a variety of studies.  If

5    there's a specific study that you are asking about,

6    I can look at the study and see what was included.

7         Q.     (BY MR. HERMAN:)  All right.  Let's

8    look at 72-26.  Oh, I'm sorry.  This is 7-2.  we

9    will mark that as Exhibit 9.

10                   (Exhibit 9 was marked for

11                   identification.)

12        A.     So it is 7-26?

13        Q.     (BY MR. HERMAN:)  Well, 7-2, I'm

14   sorry, and it is Reference 26 in your --

15        A.     Okay.  7- --

16        Q.     -- report.  And this is an article

17   entitled, "Association of Pharmaceutical Industry

18   Marketing of Opioid Products to Physicians With

19   Subsequent Opioid Prescribing."  Is that correct?

20        A.     That is correct.

21        Q.     And this is one of the papers you

22   cite in your report at both Page 14 and Page 33?

23        A.     Yes.

24        Q.     Okay.  And this looked at the Open

25   Payments database that you were asking about?

Page 81

1          A.      Yes.

2          Q.      And the authors obtained information

3   from the Open Payments database on all transfer of

4   value from pharmaceutical companies to physicians

5   during 2014, right?

6          A.      That's correct.

7          Q.      Okay.  And if you would look at Page

8   862, the "Results" column, do you see where it

9   says, "The three companies with the highest payment

10  totals were INSYS Therapeutics (which manufactures

11  Subsys, the fentanyl sublingual spray), Teva

12  Pharmaceuticals USA, and Janssen Pharmaceuticals"?

13         A.      I see that.

14         Q.      Okay.  And do you understand that

15  INSYS, Teva and Janssen are all manufacturers?

16         A.      I do understand that.

17         Q.      And if you turn to Page 863, do you

18  see the first full paragraph, where it says, "Our

19  findings add to prior studies of industry marketing

20  to physicians by examining" -- oh, sorry.  Strike

21  that.

22              Do you see the last paragraph?  After

23  the introductory clause, it says, "our findings

24  suggest that manufacturers should consider a

25  voluntary decrease or complete cessation of

Page 82

1   marketing to physicians"?

2                   MR. ARBITBLIT:  Object to reading a

3   partial sentence.

4                   MR. HERMAN:  Okay.  I will read the

5   full sentence.

6           Q.    (BY MR. HERMAN:)  "Amidst national

7   efforts to curb the overprescribing of opioids, our

8   findings suggest that manufacturers should consider

9   a voluntary decrease or complete cessation of

10  marketing to physicians."  Did I read that

11  correctly?

12          A.     You did.

13          Q.     Okay.  And is it your understanding

14  that this article relates to marketing by

15  manufacturers?

16          A.     My understanding is that the data

17  source as described in the Methods section says

18  "pharmaceutical companies."

19          Q.     Well, do you have an understanding --

20          A.     The three top companies that you

21  cited were three opioid manufacturers, but I have

22  not looked into the Open Payments database in

23  enough detail to know that every company included

24  in the Open -- Open Payments database is a

25  manufacturer.

Page 83

```
1          Q.     Sorry.  So you don't know -- I mean,
2    the recommendation certainly is about
3    manufacturers, correct?
4          A.     In -- in the Discussion section, it
5    says there's a national effort to curb
6    overprescribing and that one way to do that would
7    be to suggest manufacturers cease marketing to
8    physicians.
9          Q.     Okay.
10         A.     It does not preclude other efforts.
11         Q.     Tell me everything you know about
12   marketing by pharmacies.
13                MR. ARBITBLIT:  Object to form.
14   Vague.  Overbroad.
15         A.     Everything I know about -- if there's
16   a specific document that you would like me to
17   review, I can -- I can do that.  Otherwise, I would
18   prefer to stick to what is in my report.
19         Q.     (BY MR. HERMAN:)  Okay.
20         A.     In terms of my general knowledge
21   about marketing by pharmacies, pharmacies market
22   all kinds of products.
23         Q.     Do you know if any of these studies
24   apply to pharmacies?
25                MR. ARBITBLIT:  Objection.  Vague.
```

1          A.     I believe what I have testified is

2     that what is written in the Methods section of this

3     Hadland article is that the Open Payments database

4     includes information from pharmaceutical companies.

5     And I have not looked at every company that is in

6     the Open Payments database.  And that's as much

7     information as I can -- I can give.

8          Q.     (BY MR. HERMAN:)  Sitting here today,

9     do you know if any of the opinions you are giving

10    about marketing are applicable to pharmacies?

11               MR. ARBITBLIT:  Objection.  Vague.

12    Overbroad.

13         A.     I think all of the opinions that I

14    have given are applicable to all -- they are --

15    they are -- they are -- the opinions are what they

16    are.  And they are applicable -- for example, I say

17    that there is overprescribing and oversupply.  I

18    think that certainly applies to pharmacies.

19         Q.     (BY MR. HERMAN:)  Okay.  Sticking to

20    marketing, I asked specifically about whether your

21    opinions -- whether any of these studies about

22    marketing relate to pharmacies.

23               MR. ARBITBLIT:  Objection.  Vague,

24    interrupted the witness and misstates the prior

25    question.

Page 85

```
1          A.     I think what I have written here is
2     the amount of information that I have, which is
3     that these articles apply to pharmaceutical company
4     marketing.  And I would have to look at the extent
5     to which -- I don't know what companies are -- the
6     totality of companies that are included in the Open
7     Payments database.
8          Q.     (BY MR. HERMAN:)  So in the course of
9     your work, you haven't analyzed the materials in
10    your report to determine who is marketing?  That is
11    your testimony?
12                 MR. ARBITBLIT:  Object to the form.
13    Argumentative.
14         A.     Determine who is marketing?  I don't
15    know what you mean by "who is marketing."
16         Q.     (BY MR. HERMAN:)  Well, in the course
17    of your work, you are offering opinions about
18    marketing.  In this report, you haven't analyzed
19    the materials that you cite in your report to
20    determine who is engaged in marketing?
21                 MR. ARBITBLIT:  Object to form.
22    Vague.  Overbroad.
23         Q.     (BY MR. HERMAN:)  True or false?
24         A.     I have reviewed the epidemiological
25    evidence and reported it in this report to the best
```

Page 86

1    of my ability.  And what I reported is that

2    pharmaceutical companies are in the Open Payments

3    database.

4          Q.    But you don't know what

5    "pharmaceutical companies" actually refers to, and

6    you would agree with me that this article only

7    discusses manufacturers, correct?

8                MR. ARBITBLIT:  Objection.  Compound.

9          A.    What I can testify is that, in the

10   Results section of this paper, three companies are

11   mentioned, and those three companies are

12   manufacturers.

13         Q.    (BY MR. HERMAN:)  And in the

14   recommendation that the study makes at the end, it

15   only mentions manufacturers, correct?

16               MR. ARBITBLIT:  Objection.  Misstates

17   the record.

18         A.    No, that is not correct.  The

19   sentence says that there are national efforts to

20   curb overprescribing, which is not specific to

21   manufacturers.  And the second part of the sentence

22   suggests that manufacturers curb marketing to

23   physicians.

24         Q.    (BY MR. HERMAN:)  In an article about

25   marketing to physicians, their "findings suggest

Page 87

1   that manufacturers should consider a voluntary

2   decrease or complete cessation of marketing to

3   physicians."  You don't agree that is only about

4   manufacturers?

5                  MR. ARBITBLIT:  Object to form.

6   Argumentative.  Misstates the record.

7            A.    I think I would consider the whole

8   sentence together, which starts, "Amid national

9   efforts to curb the overprescribing of opioids."

10  And I think that that is a more general statement.

11           Q.    (BY MR. HERMAN:)  Okay.  You don't --

12  you don't agree with me that this article that

13  cites manufacturers, three manufacturers as the

14  largest payors and then makes a recommendation only

15  as to manufacturers is about manufacturers?

16                 MR. ARBITBLIT:  Objection.  Asked and

17  answered.  Compound.  Argumentative.

18           A.    I think that is a narrow

19  interpretation of the data.

20           Q.    (BY MR. HERMAN:)  Okay.  You actually

21  don't know, as you previously testified, what the

22  data in the Open Source Payment reflects, correct?

23                 MR. ARBITBLIT:  Objection.  Asked and

24  answered.

25           A.    I have -- sorry.  I have not reviewed

Page 88

1  every company that is in the Open Payments

2  database.

3        Q.    (BY MR. HERMAN:)  Have you reviewed

4  any companies?

5        A.    I have reviewed the epidemiological

6  literature, of which this article is one of

7  several, and reported its results faithfully.

8        Q.    Okay.  So you made no effort to

9  identify who was responsible for the marketing of

10  opioids?

11           MR. ARBITBLIT:  Object to form.

12  Misstates the record.  Argumentative.

13        A.    The effort that I made was to review

14  the evidence and report it, and that is what I have

15  done in my report.

16        Q.    (BY MR. HERMAN:)  Well, tell me

17  everything you know about pharmacies' marketing of

18  prescription opioids.

19           MR. ARBITBLIT:  Objection.

20  Previously asked.  Argumentative.  Overbroad.

21  Vague.

22        A.    In my report, I discuss various

23  marketing efforts, as they have been reported in

24  the epidemiological literature.  I'm not offering

25  opinions about specific companies' marketing, as I

Page 89

1   note in the report.

2        Q.    (BY MR. HERMAN:)  You don't know --

3   you don't know which companies engaged in which

4   activities, if any at all, correct?

5                MR. ARBITBLIT:  Objection.  Vague.

6        A.    I am not offering -- I -- in terms of

7   what is reported in these articles, there are

8   specific companies mentioned.  And so to the extent

9   that specific companies are mentioned in the

10  epidemiological literature, that is what I feel

11  like I have the expertise to report on.

12               But I am not offering opinions about

13  specific pharmacy marketing.

14       Q.    (BY MR. HERMAN:)  All those companies

15  that are specifically mentioned are manufacturers,

16  correct?

17       A.    The three companies mentioned in

18  Hadland's 2018 are manufacturers.

19       Q.    I meant -- I am -- I am talking in

20  any article.  Like we just looked at one where you

21  discussed Purdue, correct?  That is a manufacturer.

22               MR. ARBITBLIT:  Object to form.

23  Compound.  Vague.

24       A.    I would not offer testimony about

25  every article.  I can speak to each article at the

Page 90

```
 1   time.
 2          Q.     (BY MR. HERMAN:)  Did you review
 3   those articles carefully before using them in your
 4   report?
 5          A.     I did.
 6          Q.     Do you recall any mention of
 7   marketing by pharmacies?
 8                 MR. ARBITBLIT:  Object to form.
 9          A.     I would need to review each article
10   again.
11          Q.     (BY MR. HERMAN:)  Okay.  So sitting
12   here today, you don't know what companies engaged
13   in marketing activity?
14                 MR. ARBITBLIT:  Object to form.
15          A.     Sitting here today, I can report on
16   the companies that are specifically mentioned in
17   these articles.
18          Q.     (BY MR. HERMAN:)  And those are all
19   manufacturers?
20                 MR. ARBITBLIT:  Object to form.
21   Asked and answered.  Overbroad.
22          A.     The company -- the three companies
23   that I mentioned in Hadland 2018 are manufacturers.
24   And we can look at the other Hadland articles to go
25   through the companies that are mentioned in those
```

Page 91

1    as well.

2          Q.    (BY MR. HERMAN:)  And the marketing

3    activities that -- the studies you are looking at

4    are marketing to prescribers, correct?

5          A.    They are marketing to physicians.

6          Q.    Okay.  And when you are talking about

7    factors that led to increased prescribing, you are

8    speaking about the general population of

9    prescribers, not specific prescribers, correct?

10         A.    There is information on specific

11   types of prescribers in various articles, but there

12   was an overall increase in opioid prescriptions

13   across many different types of prescribers, I

14   guess.  If that -- if I am -- I might be

15   misunderstanding the question, so I am sorry if I

16   am.

17         Q.    I will try to do it a little

18   differently.

19               You don't know what caused a

20   particular prescriber to write a particular

21   prescription, correct?

22               MR. ARBITBLIT:  Object to form.

23         A.    I have not evaluated particular

24   prescribers.

25         Q.    (BY MR. HERMAN:)  Okay.  You don't

1    know a particular prescriber's knowledge about the

2    potential risks of prescription opioids, correct?

3              MR. ARBITBLIT:  Object to form.

4         A.    I can -- I can speak in generalities

5    about what the epidemiological literature says

6    about prescribers, but I have not evaluated any

7    singular prescriber.

8         Q.    (BY MR. HERMAN:)  You don't know

9    whether a particular prescriber saw marketing

10   materials, correct?

11        A.    I don't have any -- I don't have any

12   expertise on particular prescriber, so I do not

13   know whether they saw marketing materials.

14        Q.    Okay.  And I think you have already

15   answered this, but you don't know what, if any,

16   marketing materials doctors who prescribed opioids

17   in Trumbull and Lake Counties saw, correct?

18        A.    That's correct.

19        Q.    Okay.  Can I ask you to turn to Page

20   40 of your report?  And can you see at the end of

21   the first full paragraph where there's a reference

22   to "'aggressive and highly'" -- it is a quote,

23   "'aggressive and highly effective marketing tactics

24   on the part of the pharmaceutical industry

25   (manufacturers, distributors and pharmacies)'"?

Page 93

1          A.     Yes, I see that.

2          Q.     And you cite to Reference 190 and

3    specifically Section 719 for that proposition.

4          A.     Yes.

5          Q.     Okay.

6                 (Exhibit 10 was marked for

7                 identification.)

8                 MR. HERMAN:  Can -- Jason, can we

9    pull up -- what exhibit are we on, 9?

10                MR. ACTON:  Yeah.

11         Q.     (BY MR. HERMAN:)  Can I ask you to

12   open Exhibit -- CVS Exhibit 6, Professor Keyes?

13   And Exhibit 9 [sic] is a document called "High and

14   Rising Mortality Rates Among Working-Aged Adults."

15   And is that what you referenced as Reference 190 in

16   your report?

17         A.     It is.

18         Q.     Okay.  And if I could ask you to turn

19   to 7-19.  And do you see where you pulled that

20   quote from, there's a citation in support of it to

21   an article by Kolodny, et al., 2015?

22         A.     Page 7-19.

23         Q.     Do you see at the top it says --

24         A.     Oh, I was looking in the wrong

25   section.

Page 94

1          Q.     Quoted at the top, "Aggressive and

2     highly effective marketing tactics on the part of

3     pharmaceutical industry (manufacturers,

4     distributors, pharmacies)."  And there's a citation

5     to Kolodny et al. --

6          A.     Yes.

7          Q.     -- in support of that.  Okay.

8                 MR. HERMAN:  Can I ask you, Jason, to

9     pull up Exhibit 10 -- well, it's going to be

10    Exhibit 10 --

11                MR. ACTON:  11.

12         Q.     (BY MR. HERMAN:)  Oh, Exhibit 11.

13    And, Professor Keyes, can I ask you to open

14    Exhibit -- CVS Exhibit 8?

15         A.     I'm sorry.  I -- the Kolodny article

16    is citing actions of the legal and illegal drug

17    suppliers and regulatory failures of government

18    agencies.

19         Q.     Well, I believe, though, it is also

20    the only citation in support of "aggressive and

21    highly effective marketing tactics on the part of

22    the pharmaceutical industry (manufacturers,

23    distributors, and pharmacies)"?

24         A.     Oh, I see.  In the second paragraph.

25         Q.     Yeah.  Okay.

Page 95

1          A.      Okay.

2                  MR. HERMAN:  Can we pull up that

3    Kolodny article, if you could open CVS 8?  And that

4    is going to be Exhibit 11.

5                  (Exhibit 11 was marked for

6                  identification.)

7          A.      CVS 7-8 or CVS 8?

8          Q.      (BY MR. HERMAN:)  CVS 8.

9          A.      Okay.

10          Q.      Okay.  And CVS 8 is an article

11    entitled "The Prescription Opioid and Heroin

12    Crisis:  A Public Health Approach to an Epidemic of

13    Addiction," and the authors are Andrew Kolodny,

14    David T. Courtwright, Katherine Hwang, Peter

15    Kreiner, John L. Eadie, Thomas W. Clark, and G.

16    Caleb Alexander, and this was an article published

17    January 12th, 2015; is that correct?

18          A.      Yes.

19          Q.      Okay.  Are you aware that Professor

20    Alexander has been retained by and identified as an

21    expert witness by plaintiffs in this opioid

22    litigation?

23                  MR. ARBITBLIT:  Object to form.

24    Vague as to time.

25          A.      Could you specify what you mean by

Page 96

```
 1    "this opioid litigation"?
 2            Q.     (BY MR. HERMAN:)  Well, in the case
 3    that you are here testifying in today, the Trumbull
 4    and Lake County case.
 5                   MR. ARBITBLIT:  Same objection.
 6            A.     I have -- I have been vaguely aware
 7    that Dr. Alexander has been -- I think I have
 8    supplied him with some estimates.  And that is my
 9    knowledge of his involvement.
10            Q.     (BY MR. HERMAN:)  Okay.  So as part
11    of your work with the plaintiffs, you have provided
12    Dr. Alexander estimates?
13            A.     Yes.
14            Q.     Okay.  Are you aware that Professors
15    Courtwright and Kolodny have been retained by and
16    identified as expert witnesses by plaintiffs in
17    other opioid litigation cases?
18                   MR. ARBITBLIT:  Same objection.
19    Vague as to time.  Misleading.
20            A.     I have seen Dr. Kolodny's name in
21    other litigation, and I don't recall seeing
22    Dr. Courtwright.
23            Q.     (BY MR. HERMAN:)  Okay.  Okay.  And
24    if I direct your attention to, "In addition to
25    minimizing risks of OPRs, the campaign" -- well, I
```

Page 97

1    direct your attention to 562, the bottom of the

2    page.  Do you see where it says, "In addition to

3    minimizing the risks of OPRs, the campaign advanced

4    by opioid manufacturers and pain organizations

5    exaggerated the benefits of long-term opioid use"?

6    Do you see that?

7             A.     "In" -- yeah, "the campaign advanced

8    by opioid manufacturers and pain organizations" --

9    yes, I see it.

10            Q.     Okay.  And that only discusses opioid

11   manufacturers, correct?

12                   MR. ARBITBLIT:  Object to form.

13   Misstates.

14            A.     That sentence refers to "opioid

15   manufacturers and pain organizations."

16            Q.     (BY MR. HERMAN:)  Well, okay.  Does

17   it discuss pharmacies?

18            A.     That particular sentence or the

19   article?

20            Q.     Well, before quoting "High and Rising

21   Mortality Rates Among Working-Age Adults" about

22   aggressive and effective -- or marketing by

23   manufacturers, distributors and pharmacies, did you

24   look to see whether it or the article it cited

25   provided any support for the idea that pharmacies

```
1   engaged in, quote/unquote, aggressive and effective
2   marketing of prescription opioids?
3              MR. ARBITBLIT:  Object to form.
4   Argumentative.
5          A.    Yes.
6          Q.    (BY MR. HERMAN:)  Okay.  Tell me what
7   in either of those discusses marketing by
8   pharmacies.
9              MR. ARBITBLIT:  Object to form.
10         A.    In that sentence or the whole
11  article?
12         Q.    (BY MR. HERMAN:)  Well, you said you
13  checked.  So if you could point me to where there's
14  discussion of marketing by pharmacies, I would ask
15  that you do so.
16             MR. ARBITBLIT:  Object to form.
17  Argumentative.
18         A.    I'm not sure where -- I can read the
19  article again.
20         Q.    (BY MR. HERMAN:)  Well, tell me
21  everything -- I have asked you a couple of times
22  now.  I have asked you to tell me everything you
23  know about marketing by pharmacies from this
24  article or otherwise, and I haven't gotten a
25  response.
```

1              MR. ARBITBLIT:  Object to form.

2    Argumentative.  Misstates.

3         A.     Yeah, I mean, just glancing over this

4    article, it mentions opioid companies a number of

5    times.

6         Q.     (BY MR. HERMAN:)  Do you know if

7    those companies are pharmacies?

8              MR. ARBITBLIT:  Object to form.

9    Interrupting the witness.

10        A.     I don't see specific pharmacies

11   mentioned in this article.  But there is discussion

12   of a range of opioid companies, or companies that

13   are involved in the distribution of opioids.  And

14   this article, as well as many others, have

15   discussed the distribution of opioids as part of an

16   oversupply problem.

17        Q.     (BY MR. HERMAN:)  Okay.  Where does

18   it discuss marketing -- I mean, you're -- it seems

19   to me that you are changing the question.  But

20   where does it discuss marketing by pharmacies to

21   support the idea that pharmacies engaged in

22   aggressive and effective marketing?

23              MR. ARBITBLIT:  Object to the form.

24   Argumentative.

25        A.     I -- so the sentence that is cited

1   with regard to the National Academies report is

2   broader than just marketing activities.  It

3   includes flooding the market with highly addictive,

4   yet deadly substances.  And I think that the

5   Kolodny article provides pretty solid evidence of

6   the flooding of the market --

7           Q.     (BY MR. HERMAN:)  Well, that -- go

8   ahead.

9           A.     -- so it is an appropriate citation

10  for that sentence.

11          Q.     Well, if you're talking --

12          A.     With regard to specific marketing

13  activities, no specific marketing activities are

14  discussed in this article, but a broad range of

15  activities by these companies is discussed in the

16  article.  And there's discussion of marketing by

17  various companies.

18          Q.     But you would agree with me, I mean

19  the sentence that you quote in your report is, "On

20  the supply side, weak government regulations and

21  aggressive and highly effective marketing tactics

22  on the part of the pharmaceutical industry

23  (manufacturers, distributors, pharmacies)," that

24  neither of these sources provide support for the

25  ideas that pharmacies engaged in aggressive and

1    highly effective marketing?

2              MR. ARBITBLIT:  Object to form.

3         A.    That -- the citation of the Kolodny

4    article is a -- is a larger sentence.  It is -- it

5    is not just the --

6         Q.    (BY MR. HERMAN:)  Well, but I am

7    asking you about the portion of the sentence that

8    says "aggressive and highly effective marketing."

9    You would agree with me that the Kolodny article

10   does not provide support for the idea that the

11   pharmacies engaged in highly effective and

12   aggressive marketing, correct?

13        A.    I would not agree with that broad of

14   a statement.

15        Q.    Well, what is your basis that the

16   pharmacies engaged in aggressive and highly

17   effective marketing?

18        A.    My testimony is that the Kolodny

19   article describes overall industry marketing and

20   distribution practices that were deceptive and that

21   the pharmacies would be included in that.

22        Q.    Well, let's limit it to marketing.

23   We will put aside your editorializing about

24   distribution.  But what -- I mean, the marketing

25   example discussed, again, is Purdue.  The only

Page 102

1   campaign advance discussed is by opioid

2   manufacturers and pain organizations.  What are you

3   basing your assertion that pharmacies engaged in --

4   that the Kolodny article discusses the fact that

5   pharmacies engaged in any marketing, let alone

6   aggressive and highly effective marketing?

7                  MR. ARBITBLIT:  Objection.  Vague.

8   Argumentative.

9          A.     My testimony is the same as the

10  previous question.  I think, in citing the Kolodny

11  article, there is discussion of a broad range of

12  activities by companies.

13         Q.     (BY MR. HERMAN:)  Well, what --

14         A.     And that is my -- that is the

15  expertise that I am offering.

16         Q.     Okay.  But I want to zero in on the

17  marketing aspect.  I am only asking you about the

18  activity of marketing.

19         A.     Can you define what you mean by

20  "marketing"?

21         Q.     Well, what did you mean by it when

22  you used it in your report and you cited this

23  sentence in your report?

24         A.     I -- what I meant by "marketing" is

25  activities that increased the oversupply and

1    overprescription of opioids.

2        Q.      Okay.  And, I mean, when you are

3    talking about marketing to physicians, what

4    marketing activities were you aware of, if any,

5    engaged in by pharmacies?

6            MR. ARBITBLIT:  Object to form.

7        A.      Neither the report, the National

8    Academies article, or the Kolodny article specifies

9    marketing to physicians when talking about

10   marketing.

11       Q.      (BY MR. HERMAN:)  But your report --

12       A.      That is a separate issue.

13       Q.      I mean -- okay.  Well, let's just

14   talk about marketing generally.  Are you redefining

15   "marketing" to mean distribution, dispensing?  Are

16   you including those in marketing now?

17            I mean, I think "marketing" has a

18   pretty -- I mean, what do you mean by "marketing"?

19            MR. ARBITBLIT:  Object to form.

20   Compound.  Confusing.  Vague.

21       A.      Yeah, I am not -- what is the

22   specific question?

23       Q.      (BY MR. HERMAN:)  Let's start on Page

24   14, "direct marketing to physicians."  Are you

25   aware of any activities by pharmacies that entail

Page 104

1   direct marketing to physicians?

2               MR. ARBITBLIT:  Object to the form.

3         A.     Page 14 of my report?

4         Q.     (BY MR. HERMAN:)  Yes.

5               MR. ARBITBLIT:  Object to form.

6         A.     That goes back to the Hadland article

7   and the testimony I have already provided about the

8   Open Payments database.

9         Q.     (BY MR. HERMAN:)  Okay.  So -- and

10  your testimony was you don't know one way or

11  another whether that relates to pharmacies?

12              MR. ARBITBLIT:  Object to form.

13        A.     We can go back and read the

14  testimony.  I mean, I didn't say I don't know one

15  way or the other.  What I said was that the Hadland

16  article is based on the Open Payments databases,

17  and that what is reported in the Methods section is

18  that pharmaceutical companies are in the Open

19  Payments database.  I have not analyzed the Open

20  Payments database to derive what industry each

21  company that is in the Open Payments database is

22  from.

23        Q.     (BY MR. HERMAN:)  Okay.  And then on

24  Page 33 it says, "exposure to pharmaceutical

25  marketing" -- Page 33 of your report, "exposure to

```
 1   pharmaceutical marketing and sales efforts" --
 2   or -- it says, "association between exposure to
 3   pharmaceutical marketing and sales efforts with
 4   changes in prescribing."  And do you know --
 5           A.     I mean, pharmacies are involved in
 6   opioid sales, are they not?
 7                  MR. ARBITBLIT:  Wait for a question.
 8           A.     Sorry.
 9           Q.     (BY MR. HERMAN:)  Well, I think it is
10   talking about sales efforts with changing in
11   prescriber behaviors, and that is what the studies
12   you cite are about.  So are you aware of
13   pharmaceutical marketing efforts and sales efforts
14   that change prescriber behavior that pharmacies
15   engaged in?
16                  MR. ARBITBLIT:  Object to form.
17           A.     Again, this -- I think the articles
18   that are cited there refer to the Open Payments
19   database.  So my testimony would be the same, that
20   the Open Payments database, from my understanding,
21   includes pharmaceutical companies, and I am not --
22   I don't know all of the companies that are included
23   in the database.
24           Q.     (BY MR. HERMAN:)  Okay.  So sitting
25   here today, you couldn't give an opinion one way or
```

Page 106

1  another whether this relates to your opinions about

2  marketing on Page 14 and Page 33 of your report

3  relate to pharmacies?

4          A.     I am not offering opinions about

5  specific marketing activities of specific

6  pharmacies or pharmacy chains.  I am offering

7  opinions about these articles in generality, in

8  aggregate.

9          Q.     Do you know if CVS engaged in any

10  direct marketing activities to prescribers?

11                MR. ARBITBLIT:  Objection.  Vague.

12          A.     Again, I am not offering opinions

13  about CVS's marketing activities in --

14  specifically.

15          Q.     (BY MR. HERMAN:)  Okay.  So that same

16  answer would apply to Walmart, Walgreens, Rite Aid

17  and Giant Eagle?

18          A.     Yes.

19                MR. HERMAN:  Okay.  We have been

20  going about an hour.  Do people want to take a

21  break?

22          A.     Sure.

23                MR. ARBITBLIT:  All right.  We will

24  break for like five minutes.

25                THE VIDEOGRAPHER:  Stand by.  We are

Page 107

1    now off the record.  The time on the video monitor

2    is 1:52.

3                    (Whereupon, a break was had from 1:52

4                    p.m. until 2:01 p.m. EDT)

5                    THE VIDEOGRAPHER:  Stand by.  We are

6    now on the record.  The time on the video monitor

7    is 2:01.

8            Q.      (BY MR. HERMAN:)  Dr. Keyes, can I

9    ask you to open 7-27, which will be Exhibit 12 for

10   purposes of this deposition?

11                   (Exhibit 12 was marked for

12                   identification.)

13           Q.      (BY MR. HERMAN:)  And do you have

14   that, Doctor, please?

15           A.      I am just opening it.  The tape is --

16           Q.      I saw you struggling a little bit.

17   That is when I realized you didn't have it open.

18                   Okay.  Do you have it now?

19           A.      I do.

20           Q.      Okay.  And so Exhibit 12 is an

21   article entitled "Patterns of major depression and

22   nonmedical use of prescription opioids in the

23   United States."  And you are one of the authors on

24   this article, correct?

25           A.      Yes.

1          Q.     This was an article published in

2     August 2015?

3          A.     Yes.

4          Q.     And can I direct your attention to

5     Page 6, the last paragraph?  And this article found

6     that "Past-year drug use other than NMUPO and

7     alcohol use disorder were the strongest factors

8     associated with NMUPO alone, MDE alone and NMUPO

9     plus MDE."  That is what is read in here, correct?

10         A.     Yes.

11         Q.     And NMUPO means nonmedical

12    prescription opioid use?

13         A.     Nonmedical use of prescription

14    opioids.

15         Q.     And MDE means major depressive

16    episode?

17         A.     Yes.

18         Q.     And can I direct your attention to

19    Table 12 -- or Table 2?  I apologize.  And

20    directing your attention to the section on

21    adolescents, this table shows that adolescents who

22    had any drug use other than nonmedical use of

23    prescription opioids were 7.9 times more likely to

24    have nonmedical use of prescription opioids alone,

25    correct?

Page 109

1          A.     Let me just familiarize myself.  Yes.

2   Past any drug use other than nonmedical use of

3   prescription opioids was associated with eight

4   times higher odds of using prescription opioids

5   nonmedically.

6          Q.     Okay.

7          A.     Without MDE.

8          Q.     Okay.  And adolescents who had any

9   drug use other than nonmedical use of prescription

10  opioids were 12.4 times more likely to have

11  nonmedical use of prescription opioids and MDE?

12         A.     That's correct.

13         Q.     And adults who had any drug use other

14  than nonmedical use of prescription opioids were

15  6.6 times more likely to have nonmedical use of

16  prescription opioids alone, correct?

17         A.     That's right.

18         Q.     And adults who had any drug use other

19  than nonmedical use of prescription opioids were

20  15.9 times more likely to have nonmedical use of

21  prescription opioids and major depressive episodes?

22         A.     Yes.

23         Q.     You can set that aside.  Can I ask

24  you to open CVS 9?  And this will be Exhibit 13.

25                    (Exhibit 13 was marked for

                                        Page 110

1                    identification.)

2            Q.      (BY MR. HERMAN:)  Sorry.  I lost --

3       let me know when you have that open.

4            A.      I do.

5            Q.      And this is an article entitled

6       "Psychoactive substance use prior to the

7       development of iatrogenic opioid abuse:  A

8       descriptive analysis of treatment seeking opioid

9       abusers," correct?

10           A.      Yes.

11           Q.      It is an article by Thomas Cicero and

12      some other authors?

13           A.      Theodore, but yes.

14           Q.      Oh, that is.  Thank you.  Theodore

15      Cicero.  And if you look at the abstract, it says,

16      "Physicians are frequently thought to be major --

17      be a major source of opioids diverted for

18      nontherapeutic purposes, largely because it is so

19      difficult for them to discern when patients --

20      which patients might abuse them.

21                   "In this study, we sought to

22      determine whether those who were first exposed to

23      opioids through a physician's prescription and

24      subsequently developed a substance use disorder had

25      a history of using psychoactive drugs prior to

Page 111

1    abusing opioids."  Correct?

2         A.    Yes.

3         Q.    And if you look at the introduction,

4    it says, "Healthcare professionals who write opioid

5    prescriptions for acute and, particularly, chronic

6    pain have to consistently balance two often nagging

7    considerations.  First, since there is no tool to

8    precisely gauge the presence or severity of the

9    highly subjective experience of pain, physicians

10   must exercise their professional judgment as to

11   whether opioids are warranted or appropriate.

12              "And, second, the more troubling

13   point is it is very difficult for physicians to

14   determine which patients are currently abusing

15   opioids or are at risk for abuse."

16              Did I read that correctly?

17        A.    You did.

18        Q.    And do you agree with the statements

19   in this introduction that physicians have to

20   consistently balance the two often nagging

21   considerations that are discussed here?

22              MR. ARBITBLIT:  Object to form,

23   vague.

24        A.    I would agree that these are two

25   among many considerations that healthcare

Page 112

1    professionals need to make.

2         Q.    (BY MR. HERMAN:)  And do you agree

3    that the presence or severity -- the determination

4    of the presence or severity of pain is a highly

5    subjective determination?

6         A.    Yes, I agree.

7         Q.    And do you agree that it is difficult

8    for physicians to determine which patients are

9    currently abusing opioids or are at risk for abuse?

10        A.    I wouldn't say that as a blanket

11   statement.  Sometimes it can be difficult, and

12   sometimes it is not difficult.

13        Q.    And can I ask you to turn to Page 2,

14   "Discussions and Conclusions"?  And do you see

15   where it says, "The results of this study indicate

16   that only four percent of those who experienced

17   their first opioid via physician's prescription

18   were truly drug naïve.

19              "Rather, more than ninety-five

20   percent had significant psychoactive drug

21   experience prior to being prescribed their first

22   opioid, a drug with well established mood altering

23   effects.

24              "Two aspects of the data seem

25   noteworthy.  First, while nearly our entire sample

Page 113

1    had used alcohol, nicotine and marijuana before

2    their initial opioid prescription, seventy percent

3    had experience with other types of drugs.  And

4    second, on average, four to five different types of

5    drugs were used prior to initial opioid exposure

6    from a prescription"?

7                   Do you see that?

8         A.       I see that.

9         Q.       Did I read that correctly?

10        A.       You read it correctly.

11        Q.       Any reason you would not expect these

12   figures to apply to individuals prescribed

13   prescription opioids in Lake and Trumbull County?

14                  MR. ARBITBLIT:  Object to form.

15   Vague.  Overbroad.

16        A.       Yes.  This is not a general

17   population sample.  These are people in treatment

18   for prescription opioid use disorders.  So these

19   results would not apply to the general population

20   of Lake and Trumbull County.

21        Q.       (BY MR. HERMAN:)  Would you believe

22   they would apply to the people in need of treatment

23   for opioids in Lake and Trumbull County?

24                  MR. ARBITBLIT:  Object to form.

25        A.       That is not what this sample is.

Page 114

1   This sample is individuals who are in treatment.

2       Q.    (BY MR. HERMAN:)  Patients entering

3   one of one hundred and twenty-five drug treatment

4   programs across the country for opioid abuse were

5   asked to provide detailed history, is that what you

6   were referring to, was people entering into

7   treatment?

8       A.    Right.

9       Q.    Okay.  And so that is a population of

10  people who are in need of treatment, correct?

11              MR. ARBITBLIT:  Object to form.

12      A.    They are people who are in treatment.

13  There are people who are in need of treatment or

14  not in treatment.  So it wouldn't comprise the

15  entire population of people who need treatment.

16      Q.    (BY MR. HERMAN:)  But you would agree

17  with me that it would comprise a subset of the

18  population in need of treatment that is seeking

19  treatment at that time, correct?

20      A.    I don't understand the question.

21      Q.    Well, let me ask it this way:  People

22  in treatment are a subset of the total population

23  of people who need treatment, correct?

24      A.    Yes.

25      Q.    And so do you have any reason to

Page 115

1  believe that these statistics for a population in

2  treatment would not generalize to the population in

3  need of treatment?

4              MR. ARBITBLIT:  Object to form.

5        A.    I have not analyzed that data.  I

6  don't know whether these results generalized all

7  those who are in need of treatment.

8        Q.    (BY MR. HERMAN:)  Well, do you

9  believe that a very small percentage of people who

10  experience their first opioid via physician

11  prescription are truly drug naïve?

12              MR. ARBITBLIT:  Object to form.

13  Misstates the record.

14              MR. HERMAN:  Well, let me strike

15  that.

16        Q.    (BY MR. HERMAN:)  This study found

17  the results of this study indicate that only four

18  percent of those who experienced their first opioid

19  via physician's prescription were truly drug naïve,

20  correct?

21              MR. ARBITBLIT:  Object to form.

22        A.    Those are the results of the study.

23        Q.    (BY MR. HERMAN:)  And so do you

24  believe that those people who experienced their

25  first opioid via physician prescription who end up

Page 116

```
 1   needing treatment are truly drug naïve?
 2                   MR. ARBITBLIT:  Object to form.
 3   Misstates the record.
 4         A.     That question is not what this study
 5   analyzed.
 6         Q.     (BY MR. HERMAN:)  That is what this
 7   study found, correct?
 8                   MR. ARBITBLIT:  Object to form.
 9   Misstates the record.
10         A.     No, it is not what the study found.
11   The study found that among this population of
12   people in treatment in -- from 2010 to 2015, four
13   percent of those who experienced their first opioid
14   via physician's prescription had not used one of
15   the drugs that were assessed in this study.
16                   THE REPORTER:  That were what in this
17   study?
18         A.     Had not used one of the drugs that
19   were assessed in this study.
20         Q.     (BY MR. HERMAN:)  Do you have any
21   reason to believe that the patient population that
22   ends up needing treatment who experienced their
23   first opioid via physician's prescription were
24   truly drug naïve?
25                   MR. ARBITBLIT:  Objection, vague.
```

1          A.     Yes.

2          Q.     (BY MR. HERMAN:)  What is your basis

3    for saying that the patient population that ends up

4    needing treatment who experience their first

5    prescription opioid through a physician

6    prescription was truly drug naïve?

7          A.     This study concludes that four

8    percent who experience their first opioid via a

9    physician's prescription had not used one of the

10   drugs that were assessed in this study.  Given the

11   millions of people who have their first opioid,

12   among those who end up going to treatment, four

13   percent is a lot of people.

14         Q.     Well, are you agreeing, though, that

15   the four percent would generalize to the population

16   of people who need treatment for --

17         A.     I would need to evaluate --

18              THE REPORTER:  I'm sorry.  Y'all

19   spoke over each other.  I couldn't --

20         A.     I apologize.  I interrupted.

21         Q.     (BY MR. HERMAN:)  Putting aside

22   whether four percent of the population is a lot of

23   people, do you believe that the four percent figure

24   in this study would be generalizable to the

25   population that ends up needing treatment?

1              MR.  ARBITBLIT:  Object to form.

2      Speculative.

3          A.     I would prefer more study.  I mean,

4      generalizing from one study is not typically what

5      we do in epidemiology.

6          Q.     (BY MR. HERMAN:)  Okay.

7          A.     So to evaluate the generalizability

8      of this number, I would need to know what

9      population we are generalizing to, what information

10     we have about their demographic characteristics,

11     that you would just need to consider all of those

12     factors.

13         Q.     And you don't know one way or another

14     whether the people in Lake and Trumbull County who

15     might need treatment who experienced their first

16     opioid via a physician's prescription were truly

17     drug naïve?

18              MR.  ARBITBLIT:  Object to form.

19         A.     The people in this study were in

20     treatment, not might need treatment.  And the

21     extent to which the four percent would generalize

22     to Lake and Trumbull County, I would need -- I

23     would need further information to evaluate the

24     generalizability.

25         Q.     (BY MR. HERMAN:)  You can't --

Page 119

1   whether this study numbers would apply to Lake and

2   Trumbull County, you would need to know -- am I

3   understanding it correctly you would need to know

4   more about the population and characteristics of

5   the people in Lake and Trumbull County?

6                   MR. ARBITBLIT:  Objection.

7            A.     Those who are in treatment.

8            Q.     (BY MR. HERMAN:)  And the issue is,

9   this study was done on a population, and you don't

10  know if that population is reflective of the Lake

11  and Trumbull County population?  Am I understanding

12  you correctly?

13                  MR. ARBITBLIT:  Object to form.

14  Misstates the record.

15           A.     That is not my testimony.

16           Q.     (BY MR. HERMAN:)  Well, what am I --

17           A.     My testimony is that in order to

18  engage in generalizability -- it is not that I

19  don't know.  It is that I haven't evaluated the

20  extent to which the treatment utilization

21  population of this particular sample is similar or

22  different than the treatment-using population of

23  Lake and Trumbull County.

24           Q.     Okay.  And that is in part because

25  you haven't evaluated the treatment-needing

Page 120

1    population of Lake or Trumbull County, correct?

2                    MR. ARBITBLIT:  Object to form.

3           A.    I have not evaluated the

4    generalizability of this study to that population.

5           Q.    (BY MR. HERMAN:)  Well, I am asking a

6    slightly different question.  I mean, have you

7    evaluated the specific treatment-needing population

8    of Lake and Trumbull County?

9           A.    I believe that is included in my

10   report.  I have provided a number of estimates

11   about that population.

12          Q.    But you don't know the

13   characteristics of that population, for example,

14   whether they are truly drug naïve, correct?

15                   MR. ARBITBLIT:  Object to form.

16          A.    If the population is in treatment,

17   then they certainly are not drug naïve.

18          Q.    (BY MR. HERMAN:)  Well, drug naïve

19   before they encounter prescription opioids.

20                   MR. ARBITBLIT:  Object to form.  No

21   question pending.  There's no question pending.

22   Wait for a question.  It is a statement.

23          Q.    (BY MR. HERMAN:)  Professor Keyes,

24   have you evaluated the characteristics of the

25   population in Lake and Trumbull County that is in

Page 121

1   need of treatment specifically -- well, I will ask
2   that question first.
3              MR. ARBITBLIT:  Object to form.
4        A.    Wait.  I'm sorry.  Is there a
5   question?
6        Q.    (BY MR. HERMAN:)  Have you evaluated
7   the characteristics of the population in Lake and
8   Trumbull County in need of treatment?
9        A.    Yes.  I have evaluated some
10  characteristics that are included in my report.
11       Q.    Well, all those are estimates,
12  correct?
13             MR. ARBITBLIT:  Object to form.
14       A.    I mean, statistics are an estimate.
15       Q.    (BY MR. HERMAN:)  Okay.  And you
16  don't know anything about -- for example, let's
17  take your estimate of NAS, potential NAS births.
18  You estimate that there are six NAS births in Lake
19  County, I believe, in Lake County in -- well, one
20  of the years.  So I am going to ask you to assume
21  that you provide an estimate of six NAS births in
22  one of the years.  Okay.  Are you with me?
23             MR. ARBITBLIT:  Object to form.
24       A.    I am finding the page of the report.
25  I believe you are on Page 51.

Page 122

1          Q.    (BY MR. HERMAN:)  I am just asking

2    you to assume that I have your numbers correct,

3    that in one of the years in one of the counties you

4    estimate there were six NAS births.  Okay.  Are you

5    following what I am asking you to assume?

6                    MR. ARBITBLIT:  Object to form.

7          A.    Yes.

8          Q.    (BY MR. HERMAN:)  Okay.  As to those

9    six mothers who gave birth, do you have any

10   information about what drugs those six mothers

11   used?

12         A.    I don't have any information about

13   those six mothers.

14         Q.    All right.  So you don't know whether

15   the NAS birth, for example, was the result of

16   legitimately prescribed opioids versus illicit

17   opioids?

18                    MR. ARBITBLIT:  Object to form.

19         A.    I do provide estimates of that in

20   various drug-using populations for which there is a

21   broader range of studies that we can use to

22   generalize to inform that question.  So the extent

23   to which medical versus nonmedical opioids are used

24   in opioid-using populations, there is a sufficient

25   number of studies that we can provide more

Page 123

1    generalizable estimates.

2           Q.    (BY MR. HERMAN:)  Okay.  But as to

3    those estimated six mothers, you don't actually --

4    it is an estimate.  You don't know anything about

5    those individuals, their drug use trajectory,

6    whether they used a prescribed or illicit opioid,

7    correct?

8                 MR. ARBITBLIT:  Object to form.

9    Vague.  Compound.

10          A.    For the six individual -- well,

11   there's not -- the babies are what is reported in

12   the table.

13          Q.    (BY MR. HERMAN:)  Sure.  But it would

14   be the mother's drug use that would result in an

15   NAS birth, correct?

16          A.    Right.  I have not evaluated the

17   particular drug use history of any mother in Lake

18   and Trumbull County.

19          Q.    Do you know how many pharmacies

20   existed in Lake or Trumbull County that dispensed

21   prescription opioids?

22          A.    No.

23          Q.    So do you have any way of knowing

24   whether any of the estimated births in Lake or

25   Trumbull County in your chart were caused by

Page 124

1    prescription opioids dispensed by a pharmacy that

2    is a defendant in this litigation?

3                    MR. ARBITBLIT:  Object to form.

4        A.     I can provide expertise on the

5    estimated use of prescription opioids among

6    pregnant women in that area.

7              Q.    (BY MR. HERMAN:)  Okay.  Is the

8    answer to my question no, you have no way of

9    knowing whether any of the estimated NAS births in

10   Lake and Trumbull County were caused by

11   prescription opioids dispensed by a defendant in

12   this case?

13                   MR. ARBITBLIT:  Object to form.

14       A.     That is not my testimony.  I think

15   what is in the report provides information that can

16   be used to infer causation with regard to

17   prescription opioid use that would be dispensed by

18   a pharmacy.

19             Q.    (BY MR. HERMAN:)  But you don't know

20   if it was dispensed -- how would you figure out if

21   one of those births, one of your estimated births

22   was caused by a prescription opioid dispensed by

23   CVS?

24                   MR. ARBITBLIT:  Object to form.

25       A.     One could estimate that, given the

Page 125

1   distribution of CVS pharmacies in the area.

2          Q.    (BY MR. HERMAN:)  But to actually

3   know whether a birth was caused -- an NAS birth was

4   caused by a prescription opioid dispensed by CVS,

5   one of six births, you would have to actually show,

6   wouldn't you, that that mother came in contact with

7   an opioid dispensed by CVS, correct?

8                 MR. ARBITBLIT:  Object to form.

9   Calls for a legal conclusion.

10         A.    I would perform epidemiology using

11  the methods that I outlined in the beginning of my

12  report to estimate causation.

13         Q.    (BY MR. HERMAN:)  Can you -- can you

14  point to -- well, can you explain to me how you

15  would go about figuring out if one of those six NAS

16  births was caused by a particular pharmacy in Lake

17  or Trumbull County?

18         A.    So I would do a risk factor analysis,

19  as I have outlined in the beginning of the report,

20  which is how we analyze data in epidemiology.  So

21  you would estimate associations using regressions,

22  controlling for confounding factors.  You know, in

23  recent years, the number of NAS births in Lake and

24  Trumbull County is quadruple the six that you cite

25  in 2008.  So you certainly would have more

1  statistical power if you used more recent years.

2      Q.    Okay.  And is it likely that a

3  prescription opioid dispensed in 2010 led to an NAS

4  birth in 2018?

5      A.    Yes.

6      Q.    How would you go about figuring out

7  if a prescription opioid dispensed in 2010 led to

8  an NAS birth in 2018?

9      A.    We know very well that the dose and

10  duration of prescription opioid use is associated

11  with the development of opioid use disorder and

12  prolonged opioid use disorder.  And so you would

13  examine the onset and duration of prescription

14  opioid use.

15      Q.    By that specific individual?

16          MR. ARBITBLIT:  Object to form.

17      A.    I guess I am not understanding the

18  question.

19      Q.    (BY MR. HERMAN:)  Well, you would

20  need to know something about the dosage taken by

21  the individual, correct?

22      A.    The hypothetical here is about a

23  hypothetical what, single person?  I would do a

24  risk factor analysis of, you know, a population,

25  which is what we do in epidemiology.

Page 127

1          Q.      Well, you are estimating that six
2   people had an NAS birth.  And so I am saying okay,
3   I want to know whether a prescription opioid
4   dispensed in years before that led to that birth.
5   And you said well, you would need to know something
6   about the dose and duration.
7                    And so I am asking you, you would
8   need to know about that specific individual's drug
9   use trajectory, correct?
10                   MR. ARBITBLIT:  Objection.  Vague.
11  Compound.  Misstates the record.
12         A.      There are a wide variety of sources
13  that one could use to provide a causal analysis,
14  including individual history as well as group
15  history that could be inferred to the individual.
16         Q.      (BY MR. HERMAN:)  Can drugs other
17  than prescription opioids cause NAS?
18         A.      Can drugs other than prescription
19  opioids?
20         Q.      Yes.
21         A.      Yes.
22         Q.      Can drugs other than opioids
23  generally cause NAS?
24         A.      NAS is certainly the predominant --
25  opioids are certainly the predominant cause of NAS

1   birth outcomes.  And there's some discussion about

2   whether symptoms that occur in neonates that are

3   caused by other drugs are the same syndrome as NAS.

4   So it is a little bit more of a complicated

5   question than a yes or no, but it is possible, I

6   guess I would say.

7          Q.     Okay.  Can an NAS birth be caused by

8   use of an illegal opioid, like heroin?

9          A.     Yes.

10         Q.     Fentanyl?

11         A.     Yes.

12         Q.     Would the use of heroin make it more

13  likely that someone would have an NAS birth?

14                MR. ARBITBLIT:  Objection.  Vague.

15         A.     More likely than what?

16         Q.     (BY MR. HERMAN:)  Well, more likely

17  than the use of acute dosage of a prescription

18  opioid.

19                MR. ARBITBLIT:  Objection.  Vague.

20  Incomplete hypothetical.

21         A.     It would -- it would depend on the

22  dose and duration of use.  So it is a dose response

23  relationship for both.

24         Q.     (BY MR. HERMAN:)  Okay.  All things

25  being equal in terms of dosage, would someone who

1  used heroin be more likely to have an NAS birth or

2  someone who used a prescription opioid?

3              MR. ARBITBLIT:  Objection, vague.

4  Incomplete hypothetical.

5          A.    If the same amount of opioid is

6  consumed, I would say that they are approximately

7  equal.

8          Q.    (BY MR. HERMAN:)  Okay.  And would

9  your answer be the same for illicit fentanyl?

10          A.    The potency of fentanyl is much

11  higher than that of heroin.  So in a hypothetical

12  world where the potencies were the same, then the

13  risk would be similar.

14          Q.    But so because the potency of

15  fentanyl is higher, if someone was using illicit

16  fentanyl, would they be more likely to have an NAS

17  birth?

18              MR. ARBITBLIT:  Object to form.

19  Incomplete hypothetical.

20          A.    It depends on the potency of what you

21  are comparing it to.

22          Q.    (BY MR. HERMAN:)  Can an NAS birth

23  occur as a result of an individual taking

24  prescribed opioid medications?

25          A.    Yes.

1        Q.      Can an NAS birth occur as a result of

2   an individual taking medically-assisted treatment

3   medications?

4        A.      Yes.

5                MR. HERMAN:  What exhibit are we on?

6        Q.      (BY MR. HERMAN:)  Can I ask you,

7   Professor Keyes, while we are figuring out the

8   exhibit number, to take out what is CVS 7-23.  And

9   this is going to be Exhibit 14.

10                (Exhibit 14 was marked for

11                identification.)

12        Q.      (BY MR. HERMAN:)  Do you have it,

13   Professor Keyes?

14        A.      I do.

15        Q.      Okay.  This is an article entitled

16   "Associations of Nonmedical Pain Reliever Use and

17   Initiation of Heroin Use in the United States."

18   And it is authored by Pradip Muhuri; is that

19   correct?

20        A.      Uh-huh, yes.

21        Q.      Okay.  And this is -- this study by

22   Muhuri -- am I pronouncing that right?

23        A.      I believe so.

24        Q.      This study by Muhuri is one you rely

25   on in your report?

Page 131

1          A.     It is.

2               MR. ARBITBLIT:  Counsel, I don't mean

3    to interrupt, but can we have a representation that

4    whatever you are going to ask about Muhuri has not

5    been covered in previous depositions?  This article

6    has appeared so many times in so many depositions

7    that it is hard to imagine there's anything new to

8    say about it.

9               MR. HERMAN:  Well, I think I am going

10   to ask some new questions, but I may touch on some

11   things that were done before.  But I will try to

12   keep that to a minimum.

13         Q.     (BY MR. HERMAN:)  I'm not sure I got

14   an answer to my question.  It is a high-quality

15   research study?

16               MR. ARBITBLIT:  Object to form.

17         A.     I believe it is a reliable study.

18         Q.     (BY MR. HERMAN:)  And the lead

19   authors are at SAMHSA?

20         A.     The affiliation of the authors is not

21   on the title page, so I actually don't know.

22         Q.     Well, up at the top do you see where

23   it says at least the study was put out by SAMHSA?

24   You would agree with that?

25         A.     Yes.

1          Q.     And that is a substance abuse and

2    mental health administration?

3          A.     Yes.

4          Q.     That is a leading federal agency for

5    research on substance abuse?

6                 MR. ARBITBLIT:  Objection.

7          A.     I don't -- I don't have any

8    information to know whether it is the leading

9    federal agency.  NIDA is also a fairly prominent

10   federal agency so --

11         Q.     (BY MR. HERMAN:)  Can we agree that

12   it is one of the leading federal agencies for

13   research on substance abuse?

14         A.     I think I would be comfortable

15   testifying that it is a federal agency for research

16   on substance abuse.

17         Q.     Okay.  And they are relying on data

18   from the National Survey on Drug Use and Health?

19         A.     Yes.

20         Q.     And that is data that is collected by

21   the federal government?

22         A.     Yes.

23                MR. ARBITBLIT:  I'm going to object

24   that none of this seems new to me, Counsel.  It is

25   all repetitive.

```
                                        Page 133
 1              MR. HERMAN:  Well, I am just laying a

 2    little background.  I think I would ask for a

 3    little time.

 4

 5         Q.    (BY MR. HERMAN:)  All right.  And if

 6    you look at Page 3 under "Data and Methods," they

 7    have been collecting data since 1971.  Do you see

 8    that?

 9         A.    Yes.

10         Q.    And for this study, the total sample

11    size, if you look a couple of sentences in, was six

12    hundred and nine thousand -- six hundred and nine

13    thousand people considered at risk for heroin

14    initiation; is that correct?

15         A.    Yes.

16         Q.    Then it says in the parenthetical

17    "representing an annual average of approximately a

18    hundred and fifty-five million individuals."

19         A.    Yes.

20         Q.    And that is a large sample, you would

21    agree?

22         A.    Yes, it is a large sample.

23         Q.    In epidemiology, large samples

24    generally give you better data?

25              MR. ARBITBLIT:  Object to form,
```

Page 134

1    vague.

2            A.    I would not make that conclusion

3    across the board.

4            Q.    (BY MR. HERMAN:)  Well, other things

5    being equal, a larger sample gives you better data

6    than a smaller one, correct?

7                  MR. ARBITBLIT:  Object to form,

8    vague.

9            A.    A larger sample provides more

10   statistical precision, but the data are not

11   necessarily better.

12           Q.    (BY MR. HERMAN:)  And then it says

13   there was a total sample size of five hundred and

14   twenty-four thousand people at risk for initiating

15   NMPR use.  Do you see that?

16           A.    I do.

17           Q.    And NMPR stands for nonmedical pain

18   reliever, correct?

19           A.    Correct.

20           Q.    And in the parenthetical there, it

21   says that represented an annual average of

22   approximately a hundred thirty-two million persons?

23           A.    Yes.

24           Q.    And that is also a large sample?

25                 MR. ARBITBLIT:  Object to form.

Page 135

1          A.      That is a large sample.

2          Q.      (BY MR. HERMAN:)  And this study

3    found that 79.5 percent of people that started

4    using heroin had prior nonmedical pain reliever

5    use, correct?

6          A.      Is that Table 5?

7          Q.      Well, if you look at, for example,

8    the abstract and if you look a couple sentences up

9    from the bottom, it says four out of five recent

10   heroin initiates, 79.5 percent previously used

11   NMPR.

12         A.      So your question was?

13         Q.      The study found that 79.5 percent of

14   people who started using heroin had prior

15   nonmedical prescription opioid use?

16         A.      So those were recent heroin

17   initiates.  So it is not all, all individuals who

18   use heroin.  But among recent heroin initiates,

19   79.5 previously used pain relievers nonmedically.

20         Q.      Okay.  And NMPR means using opioids

21   that weren't prescribed to you or only for

22   experience or feeling you got from using the drug

23   in this study?  Do you recall that?

24                 MR. ARBITBLIT:  Object to form.

25         A.      Yes.

1          Q.     (BY MR. HERMAN:)  And if I could
2    direct you to Table 3.

3          A.     Table 3, yes.

4          Q.     And that has got four -- well,
5    Table 3 shows data in that Muhuri reported about
6    people in the study who started using heroin,
7    correct?

8          A.     Yes.

9          Q.     And there are four columns.  In the
10   fourth column at right shows data for the full time
11   period the authors looked at, 2002 to 2011?

12         A.     Yes.

13         Q.     And if you go down to the bottom, you
14   see that 79.5 percent of the people who started
15   heroin had prior NMPR use.  Do you see that?

16         A.     I see that.

17         Q.     And right above that you see that
18   20.5 percent of people who started using heroin had
19   no prior NMPR use?

20         A.     I see that.

21         Q.     In the same box, you see that 1.1
22   percent of people who started using heroin not only
23   had no prior NMPR use, they had no prior illicit
24   drug use?

25         A.     Yes.

1          Q.      And right below that you see that

2    19.4 percent of the people who started using heroin

3    did not have prior NMPR use before they started

4    using heroin but they did have prior use of other

5    illicit drugs?

6          A.      Yes.

7          Q.      And going down to the next box, that

8    is the box for people who had NMPR use before they

9    started heroin, right?

10          A.      Can you say that question again?

11          Q.      Going down to the next box, we see

12    the people who had NMPR use before they started

13    heroin.

14          A.      Yes.

15          Q.      And you see that zero percent of the

16    people who started using heroin had only prior NMPR

17    use but no other illicit drugs?

18          A.      Yes.

19          Q.      And 79.5 percent of people who

20    started using heroin had both prior NMPR use and

21    prior use of other illicit drugs?

22          A.      That is what the table says, yes.

23          Q.      Everyone in the study who used heroin

24    after misusing prescription opioids also had a

25    history of using other illicit drugs, correct?

Page 138

1              A.      That is correct.

2              Q.      And if we look at the people who

3     started using heroin and want to know how many had

4     prior use of illicit drugs other than prescription

5     opioids, we could add up the two numbers Muhuri

6     gives, 19.4 percent and 79.5 percent, correct?

7                      MR. ARBITBLIT:  Object to form.

8              A.      This is -- just to qualify, these are

9     recent heroin initiators and prior use of the

10    illicit drugs that were assessed in the survey.

11    But with those two qualifications, yes, you would

12    add up those two percentages.

13             Q.      (BY MR. HERMAN:)  Okay.  Those are

14    the statistics, though, for the data they looked at

15    for 2002 to 2011, correct?

16             A.      Yes.

17             Q.      And.  So Muhuri's data shows that of

18    people that started using heroin, 98.9 percent have

19    prior illicit drug use other than prescription

20    opioids.

21                     MR. ARBITBLIT:  Object to form.

22             A.      In these data for these individuals

23    with recent heroin initiation, 98.9 percent had a

24    prior illicit drug use as well.

25             Q.      (BY MR. HERMAN:)  And can I ask you

Page 139

1   to turn to Figure 6?  It is on Page 11.

2          A.     Yes.

3          Q.     Okay.  This figure breaks up people

4   who started using heroin into three groups,

5   correct?

6          A.     Yes.

7          Q.     The first bar is for a group who

8   started using heroin after misusing prescription

9   opioids, and they also showed dependence or abuse

10  of prescription opioids in the year before they

11  started using heroin, correct?

12         A.     Correct.

13         Q.     And dependence and abuse is based on

14  definitions in DSM4?

15         A.     That is right.

16         Q.     Okay.  And that is a standard

17  reference work for diagnosing substance abuse

18  conditions?

19                MR. ARBITBLIT:  Objection.  Time.

20  Vague.

21         Q.     (BY MR. HERMAN:)  I think you nodded,

22  Professor Keyes, but I think we need a verbal --

23         A.     The DSM4 is commonly used in research

24  for diagnosis.

25         Q.     For diagnosing substance abuse

Page 140

1    conditions?

2            A.      Yes.

3            Q.      And this data shows that people who

4    started heroin, 31.3 percent of them had misused

5    prescription opioids and in the year before

6    starting heroin were abusing or dependent on

7    prescription opioids under the DSM4 definition,

8    correct?

9            A.      Among -- yes, among those who started

10   heroin, 31.3 percent had prior use in the past year

11   abuse/dependence of pain relievers.

12           Q.      Okay.  And the second bar is people

13   who started using heroin after misusing

14   prescription opioids but in the year before

15   starting heroin weren't showing dependence or abuse

16   of prescription opioids, correct?

17           A.      Yes.

18           Q.      And this shows that 48.2 percent of

19   people who started heroin had misused prescription

20   opioids but in the year before starting heroin

21   weren't abusing or dependent on prescription

22   opioids under the DSM4 definition, correct?

23           A.      Yes.

24           Q.      And the third bar shows that 21.5

25   percent of people who started heroin had no prior

1   misuse of prescription opioids, right?

2          A.     Yes.

3          Q.     Okay.  In your report, you recognize

4   the people who transition from misuse of

5   prescription opioids to heroin is relatively small,

6   correct?

7                 MR. ARBITBLIT:  Object to form.

8          A.     The transition probability is small.

9   Not the number of people.  The number of people is

10  quite large.

11         Q.     (BY MR. HERMAN:)  Okay.  But the

12  percentage of people who transition from

13  prescription opioids to heroin is relatively small,

14  right?

15                MR. ARBITBLIT:  Object to form.

16  Vague.

17         A.     Among people who use prescription

18  opioids, either prescribed or nonmedically, the

19  proportion that transition to heroin is relatively

20  small.  But it translates to a large number because

21  of the commonality of the exposure.

22         Q.     (BY MR. HERMAN:)  Okay.  Muhuri found

23  that in five years after people started misusing

24  prescription opioids, 3.6 percent of them started

25  using heroin, correct?

Page 142

1              A.      Yes.

2              Q.      And so after five years, 96.4 percent

3    of people misusing prescription opioids had not

4    tried heroin?

5              A.      In this sample, yes.

6              Q.      And those figures are for people who

7    use prescription opioids nonmedically, correct?

8              A.      Not exactly.  The national household

9    survey in these years did not ask about medical

10   use.  So there's a large overlap between medical

11   and nonmedical users of prescription opioids.  And

12   so a large portion of these nonmedical users had

13   also likely used medically or from a doctor's

14   prescription --

15             Q.      Okay.  But the 3.6 is of nonmedical

16   prescription, non-medical pain reliever initiates,

17   correct?

18                     MR. ARBITBLIT:  Object to form.

19   Vague.  Misstates.

20             Q.      (BY MR. HERMAN:)  Well, I will direct

21   your attention to the abstract.  And do you have

22   that in front of you?

23             A.      I do.

24             Q.      Only 3.6 percent of NMPR initiates

25   had initiated heroin use within the five-year

Page 143

1    period following first nonmedical prescription,

2    nonmedical pain reliever use.  Right?

3            A.    Yes.  That is what the abstract

4    states.  I just want to make clear for the record

5    that they didn't -- it is not nonmedical use only.

6    It is this population of people, there's a large

7    overlap with medical use as well, which was not

8    assessed in the survey.

9            Q.    Do you know what percentage of people

10   prescribed opioids use nonmedically?

11           A.    I believe there's a citation to that.

12   I can pull it up.  Most people who use nonmedically

13   have also used medically.  And in the reverse --

14           Q.    Okay.

15           A.    -- the -- I have a citation of that.

16   I will pull it up.  I don't think I have the exact

17   figure, but if you would like to pull up the paper,

18   I am sure we can pull up the paper that would give

19   you that information.

20           Q.    Well, why don't you just tell me what

21   paper you think provides that information.

22           A.    McCabe, "Medical Use and Misuse of

23   Prescription Opioids in U.S. 12th Grade Youth"

24   would provide some of that information.  And then

25   also by McCabe, "Trends in Medical and Nonmedical

Page 144

1    Use of Prescription Opioids Among U.S. Adolescents:
2    1976 to 2015."
3          Q.    Okay.  Let's maybe keep this simple.
4    You would agree with me that the number of people
5    who use prescription opioids medically is larger
6    than the number of people who use prescription
7    opioids nonmedically, correct?
8          A.    Yes.
9              MR. HERMAN:  We have been going about
10   an hour.  Do people want to take another quick
11   break?
12                THE VIDEOGRAPHER:  Stand by.
13                THE REPORTER:  Yes.
14                THE VIDEOGRAPHER:  We are now off the
15   record.  The time on the video monitor is 2:52.
16                (Whereupon, a break was had from 2:52
17                p.m. until 3:02 p.m. EDT)
18                THE VIDEOGRAPHER:  We are now on the
19   record.  The time on the video monitor is 3:02.
20          Q.    (BY MR. HERMAN:)  Dr. Keyes, can I
21   ask you to open up what is CVS 7-22.
22                MR. ARBITBLIT:  What exhibit is this
23   again?
24                MR. HERMAN:  This is going to be
25   Exhibit 15.

```
                                                    Page 145

 1                    (Exhibit 15 was marked for

 2                    identification.)

 3                    THE REPORTER:  Hey, Steve, when you

 4       are saying 722, is it 7-22 or, all together, 722?

 5                    MR. HERMAN:  7-22.

 6            Q.      (BY MR. HERMAN:)  Dr. Keyes, do you

 7       have that?

 8            A.      I do.

 9            Q.      And is Exhibit 15 an article entitled

10       "Initiation Into Prescription Opioid Misuse Among

11       Young Injection Drug Users"; is that correct?

12            A.      It is.

13            Q.      And this is an article that you cite

14       in your report at Reference 176?

15            A.      Yes.

16            Q.      Can I ask you to turn to Page 4 of

17       the section Initiation Into Prescription Opioid

18       Misuse.

19            A.      Yes.

20            Q.      Okay.  And do you see where it says,

21       "Initiation of opioid misuse typically followed

22       first use of alcohol, marijuana and prescription

23       stimulants and preceded initiation of harder drugs,

24       such as cocaine, methamphetamine and heroin?"

25            A.      I see that, yes.
```

Page 146

1          Q.      And did I read that correctly?

2          A.      You did.

3          Q.      And if you go to the first page,

4    Methods, for this study, they recruited fifty

5    individuals ages sixteen to twenty-five who were

6    injection drug users who had misused prescription

7    opioids at least three times in the past three

8    months, correct?

9          A.      Yes.

10         Q.      And so those characteristics mean

11   that a hundred percent will misuse prescription

12   opioids?

13              MR. ARBITBLIT:  Object to form.

14         A.      There were three eligibility

15   criteria:  Eighteen to twenty-five years old,

16   misused a prescription drug -- it doesn't say

17   opioids in particular -- and injected a drug within

18   the past three months.

19         Q.      (BY MR. HERMAN:)  Okay.  So a hundred

20   percent will have misused a prescription drug?

21         A.      Yes.  It says opioids, tranquilizers

22   or stimulants.

23         Q.      And a hundred percent will be

24   injection drug users?

25         A.      Yes.

Page 147

1          Q.      And can I ask you to go to Table 2?

2     Well, actually, let me ask you this first:  On Page

3     4, right back where we were before, do you see

4     where it says, "over four-fifths (N=43) initiated

5     opioid misuse prior to heroin, which occurred two

6     years earlier on average"?

7          A.      I do.

8          Q.      Okay.  And what that is saying is

9     that eighty-six percent had misused prescription

10    opioids before they used heroin, just sequentially,

11    correct?

12                 MR. ARBITBLIT:  Object to the form.

13         A.      That's right.

14         Q.      (BY MR. HERMAN:)  And on average,

15    that misuse occurred two years earlier than the

16    person -- before when the person began using

17    heroin?

18         A.      Yes.

19         Q.      If you go to Table 2, Table 2 lists a

20    number of substances, and it has got three columns,

21    and the last column shows the total percentage of

22    the population in the study that had used the

23    substance listed, correct?

24         A.      Yes.

25         Q.      So for the first one, it shows that a

Page 148

1    hundred percent of the population in the study had

2    misused marijuana, right?

3              A.     That is right.

4              Q.     And a hundred percent had misused

5    alcohol?

6              A.     Yes.  Used alcohol.

7              Q.     And eighty-two percent had used

8    stimulants?

9              A.     Yes.

10             Q.     Okay.  And then a hundred percent had

11   used opioids, presumably prescription opioids and

12   heroin, correct?

13             A.     That's right.

14             Q.     And then ninety-eight percent had

15   used cocaine?

16             A.     Yes.

17             Q.     Ninety-four percent had used

18   mushrooms?

19             A.     Yes.

20             Q.     Ninety-two percent had used

21   tranquilizers?

22             A.     Yes.

23             Q.     Ninety-six percent had used ecstasy?

24             A.     Yes.

25             Q.     Eighty-six percent had used crack?

Page 149

1          A.      Yes.

2          Q.      Okay.  You can set that aside.  And

3    can I ask you to open up 7-21.  This will be

4    Exhibit 16.

5                  Do you have it, Professor Keyes?

6                  (Exhibit 16 was marked for

7                  identification.)

8          A.      I do.

9          Q.      (BY MR. HERMAN:)  So Exhibit 16 is an

10   article titled "Injection and Sexual Activity [sic]

11   HIV/HCV Risk Behaviors Associated With Non-Medical

12   Use of Prescription Opioids Among Young Adults in

13   New York City"; is that correct?

14         A.      That's correct.

15         Q.      And this is another article you cite

16   in your report?

17         A.      I do.  Do you know the citation

18   number?

19         Q.      It is 164.

20         A.      Yeah.

21         Q.      And if you go to Page 3 and look at

22   the Methods section, this was a study that involved

23   forty-six New York City young adults ages eighteen

24   to thirty-two who engaged in non-medical

25   prescription opioid use who were recruited for

Page 150

1  individual interviews.  "Twenty-three participants

2  were referred by service providers (drug treatment

3  programs, an outreach programs for young injectors,

4  key informants, other research projects).  And the

5  remaining twenty-three were recruited via chain

6  referral from other participants."  Is that right?

7          A.     That's right.

8          Q.     And if you look at Page 15 and the

9  last paragraph, do you see the sentence -- it is

10  the second sentence that begins "Because this is a

11  qualitative study based on interviews conducted

12  with a relatively small number of participants who

13  were sampled via non-probabilistic methods, the

14  results are not intended to be generalizable to all

15  young adult non-medical PO users."  Do you see

16  that?

17          A.     I do.

18          Q.     And that is some of what I think you

19  were talking about earlier that you have to look at

20  the population and what was being looked at to know

21  whether the results would generalize to a larger

22  population, correct?

23              MR. ARBITBLIT:  Object to form.

24          A.     There were a number of considerations

25  with respect to generalizability.  And population

Page 151

1   comparability is one part of what we would

2   evaluate.  The other part would be the strength and

3   variety of the evidence that is being offered to

4   generalize.

5           Q.      (BY MR. HERMAN:)  Okay.  And then if

6   you go a little further down, they say, "We used

7   quantitative data to precisely characterize our

8   data, not to make statistical inferences about a

9   larger population."  Do you see that?

10          A.      I do.

11          Q.      And do you see on the next page, the

12  study says, "Similarly, since the majority of study

13  participants engaged in regular daily or nearly

14  daily PO use, the behaviors and experiences of more

15  casual, sporadic PO misusers may be

16  underrepresented"?

17          A.      I see that.

18          Q.      And I read that correctly?

19          A.      Yes.

20          Q.      Can I ask you to turn to Page 5?  And

21  after the first block quote, do you see where it

22  says, "Early PO use [sic]" --  and PO means

23  prescription opioid, correct?

24          A.      Prescription opioid.

25          Q.      "Early PO misuse was typically

1   described as taking place within a normative peer

2   context in which poly-drug and poly-pharmaceutical

3   use was widely accepted.  Some participants spoke

4   of attending pill parties."  Do you read that?

5          A.      Yes.  The rest of the sentence says,

6   "where prescription opioids were used concurrently

7   with benzodiazapines, prescription stimulants and

8   marijuana."

9          Q.      What is your understanding of

10  normative peer context?

11                 MR. ARBITBLIT:  Object to form.

12         A.      In terms of how the authors are using

13  it in this sentence?  Or a broader --

14         Q.      (BY MR. HERMAN:)  Sure.  How they are

15  using it in this sentence.

16         A.      I would -- I would point to how the

17  youth uses it in their quotation.  That it was a

18  gathering of four to fifteen people.

19         Q.      Okay.  And the context was one in

20  which, among this population, poly-drug use and

21  poly-pharmaceutical use was widely accepted,

22  correct?

23         A.      In this sample, the authors report

24  that poly-drug and poly-pharmaceutical use was

25  widely accepted.

1          Q.      And if you look at the block quote

2    above that, it is describing, from one of these

3    interviews, someone said, "I first used opiate

4    painkillers when I was seventeen.  It was very

5    simple.  Basically somebody (stepfather) in my

6    household had a massive back surgery.  He didn't

7    really like the way they made them feel, so they

8    were just sitting, you know, sort of around the

9    house.  He would get them filled and never take

10   them and never seemed to notice they were missing."

11   Did I read that correctly?

12          A.      Yes.

13          Q.      And do you believe that it is

14   appropriate for a doctor to prescribe prescription

15   opioids for a massive back surgery?

16                  MR. ARBITBLIT:  Object to form.

17          A.      It would depend on the context.

18          Q.      (BY MR. HERMAN:)  Okay.  And -- well,

19   in this scenario, what this person is describing,

20   right, is that the stepfather got a prescription

21   from a doctor for massive back surgery, correct?

22          A.      Presumably, I am inferring -- I mean

23   I only have the same information that is available

24   to me, and it says that the stepfather had a

25   massive back surgery.  It doesn't say where he got

1   the opioid painkillers from, so I wouldn't --

2          Q.     You can't infer that from "he would

3   get it filled" --

4          A.     Right.  The information on the page

5   does not describe where it is from.

6          Q.     Okay.  But do you think it is a fair

7   inference that he was getting the prescription

8   filled that was prescribed by a doctor for a

9   massive back surgery?

10                 MR. ARBITBLIT:  Object to form.

11         A.     I think that -- that could be a fair

12  assumption.  I just don't have any more information

13  than you with regard to what is on this page.

14         Q.     (BY MR. HERMAN:)  Well, I am going to

15  ask you to assume that his doctor prescribed the

16  prescription opioids for his massive back surgery,

17  intending that they would be used for a legitimate

18  medical purpose of relieving his pain.

19                 Okay.  Do you understand what I am

20  asking you to assume?

21         A.     There are a lot of assumptions

22  embedded in that question.

23         Q.     Well -- I am asking -- I am asking

24  you to assume.  So, yes, there is an assumption

25  that this person had a massive back surgery, and

1   his doctor prescribed him opioids, intending that

2   they would be used for the legitimate medical

3   purpose of relieving post-operative pain.  Okay.

4   You understand what I am asking you to assume?

5                   MR. ARBITBLIT:  Object to form.

6   Incomplete hypothetical.

7          A.     I generally understand the scenario.

8   It is just -- it is not clear what opioids, how

9   much -- I mean clearly there was such a surplus

10  supply left over that -- I mean within the confines

11  of this example.

12         Q.    (BY MR. HERMAN:)  That can happen,

13  right?  You have a number of studies that you cite

14  in your report where doctors are prescribing things

15  for things like C-sections, mastectomies, thoracic

16  surgery, where the study is looking at how their

17  prescription opioid pills are left over after

18  surgery, correct?

19                  MR. ARBITBLIT:  Object to form.

20         A.     There are studies that describe

21  unused medication after -- that people received,

22  that people don't use of their opioid medication.

23         Q.    (BY MR. HERMAN:)  Yeah, including --

24  you cite one that estimates there would be a

25  hundred million prescription opioid pills left over

Page 156

1    after dental surgeries per year, correct?

2            A.    Which study is that?

3            Q.    Well, do you not recall that study?

4                  MR. ARBITBLIT:  Object to form.

5            A.    I just would -- I would prefer to see

6    the study before testifying what it says.

7            Q.    (BY MR. HERMAN:)  Okay.  We can come

8    back to that.  But going to my hypothetical here

9    with -- assuming that the doctor wrote that

10   prescription intending that it would be used by the

11   patient to relieve pain for post-operative --

12   post-operative pain for a massive back surgery, do

13   you think there would be anything wrong with a

14   pharmacy filling that prescription?

15                 MR. ARBITBLIT:  Object to form.

16   Incomplete hypothetical.  Asked and answered.

17           A.    My general understanding is that

18   pharmacies have responsibilities in terms of

19   dispensing medication that has been prescribed.

20   And there's no information in this hypothetical

21   scenario to know whether the pharmacy that

22   dispensed this prescription that was then used by a

23   twenty-five year old was dispensed responsibly.

24           Q.    (BY MR. HERMAN:)  Well, I am asking

25   you to assume that it was dispensed pursuant to a

1    prescription for postoperative pain following a

2    massive back surgery.  Do you take issue with the

3    pharmacy filling such a prescription written by an

4    FDA -- by a licensed prescriber for an FDA-approved

5    medication?

6                    MR. ARBITBLIT:  Object to form.

7    Asked and answered.  Incomplete hypothetical.

8            A.      I have no information on whether the

9    pharmacy fulfilled their responsibilities with

10   regard to this particular prescription.

11           Q.      (BY MR. HERMAN:)  Okay.  Let's

12   assume -- let's assume that the prescription was

13   written for a legitimate medical purpose for

14   post-operative pain following a massive back

15   surgery.  Okay.  I am asking you to assume that

16   now.

17                   MR. ARBITBLIT:  There's no question

18   pending.

19           Q.      (BY MR. HERMAN:)  And the pharmacy

20   appropriately filled that prescription as a

21   prescription written by a licensed medical provider

22   for an FDA-approved medication for a legitimate --

23   prescribed for a legitimate medical purpose.  So I

24   am asking you to assume that the prescription was

25   written appropriately and filled appropriately,

1    okay?

2           A.      There's no information on whether

3    there was a co-prescription with benzodiazepines.

4    There's no information whether there were multiple

5    prescriptions written and this person was getting

6    it from multiple pharmacies, which also should be a

7    responsibility of the pharmacist to check.  So I

8    can't answer that hypothetical without information

9    on what other potential --

10          Q.      I understand you don't want to answer

11   the hypothetical that I am asking.  But I'm asking

12   a very specific hypothetical.  It is a prescription

13   written by a doctor for a legitimate medical

14   purpose.  You agree with me that a pharmacy can

15   legally fill a prescription written by a licensed

16   prescriber for an FDA-approved medication for a

17   legitimate medical purpose, correct?

18                  MR. ARBITBLIT:  Object to form.

19   Argumentative, badgering, incomplete hypothetical.

20          A.      Is there a co-prescription with

21   benzodiazepines in your hypothetical scenario?

22          Q.      (BY MR. HERMAN:)  Professor Keyes,

23   I'm not trying to fight with you here.  I am

24   limiting it to a prescription opioid written for a

25   legitimate medical purpose, appropriately filled by

Page 159

1    the pharmacy.  That is the hypothetical.  Do you

2    understand?

3                    MR. ARBITBLIT:  Object to form.

4         A.      I understand the hypothetical, and it

5    cannot be answered yes or no without additional

6    information.

7              Q.    (BY MR. HERMAN:)  I haven't even

8    asked my question.  I am just asking you to assume

9    appropriately written, appropriately filled.  Got

10   it?

11                   MR. ARBITBLIT:  Object to form.

12             Q.    (BY MR. HERMAN:)  Okay.

13                   MR. ARBITBLIT:  Assumes facts not in

14   evidence.  Incomplete hypothetical.

15             Q.    (BY MR. HERMAN:)  Now, what this

16   person describes here is that the patient who

17   received an appropriate medication did not properly

18   store or dispose of the medication, correct?

19                   MR. ARBITBLIT:  Object to form.

20   Assumes facts not in evidence.  Incomplete

21   hypothetical.  Misstates the record.

22             Q.    (BY MR. HERMAN:)  Well, this

23   description says the stepfather didn't really like

24   the way they made him feel so they were just

25   sitting, you know, sort of around the house.  Do

Page 160

1   you think that describes a scenario where

2   prescription opioids were not appropriately

3   disposed of or stored?

4                    MR. ARBITBLIT:  Objection.

5   Incomplete hypothetical.

6           A.    I don't know how they were stored in

7   this hypothetical scenario.  I only know what you

8   know, that they were sitting around the house.

9           Q.    (BY MR. HERMAN:)  And that -- a

10  pharmacy can't control whether a patient

11  appropriately prescribed prescription opioids that

12  are appropriately dispensed are just sitting around

13  a house?

14                   MR. ARBITBLIT:  Objection.

15  Incomplete hypothetical.

16          A.    I would say a pharmacy can control

17  whether the person received the opioid prescription

18  in the first place.  Certainly they are a part of

19  that chain of receipt.

20          Q.    (BY MR. HERMAN:)  Sure.  And here I

21  have asked you to assume, following a massive back

22  surgery, that these prescriptions were

23  appropriately prescribed and appropriately filled.

24  Everything is appropriate when they leave the

25  pharmacy.  Can the pharmacy control how the patient

Page 161

1  stores prescription opioids?

2           MR. ARBITBLIT:  Objection.

3  Incomplete hypothetical.

4       A.     Again, I -- the hypothetical scenario

5  is asking -- has not established that the pharmacy

6  did the appropriate responsibilities to ensure that

7  this medication was being prescribed safely.

8       Q.     (BY MR. HERMAN:)  You are unwilling

9  to accept what I am asking you to assume, that

10  everything was appropriate with the prescription

11  when it left the pharmacy.  You are unwilling to

12  accept what I am asking you to assume?

13       A.     I -- I can engage in the -- in the

14  hypothetical.  I just --

15       Q.     Well, I have been asking you to do

16  that for a while.

17           MR. ARBITBLIT:  Counsel, you have

18  asked so many different hypotheticals, and now you

19  are badgering.  Some are based on the article and

20  some are not.  I will object.  It is confusing and

21  argumentative and badgering.

22       Q.     (BY MR. HERMAN:)  Well, do you agree

23  with me that a pharmacist and a pharmacy cannot

24  control how appropriately dispensed prescriptions

25  are stored?

Page 162

1          A.      I would agree that once a

2    prescription leaves the pharmacy, the pharmacy

3    cannot monitor how it is stored.

4          Q.      And can't control how it is disposed

5    of?

6          A.      That is right.

7          Q.      Can't control whether the patient

8    takes more than the doctor instructed the patient

9    to take at one time?

10               MR. ARBITBLIT:  Object to form.

11         A.      Again, I do think the pharmacy has

12   some responsibility in terms of ensuring that the

13   prescriptions that are dispensed by the pharmacy

14   are appropriately dispensed.

15               So -- I would not agree with that

16   statement.

17         Q.      (BY MR. HERMAN:)  Yeah, again, I

18   think -- I understand that you don't -- but I am

19   asking you, prescriptions appropriately dispensed,

20   you agree that after that point, a pharmacy and a

21   pharmacist cannot control whether the patient takes

22   the medication as prescribed?

23               THE REPORTER:  Someone needs to mute

24   themselves or I hear something in the background.

25         A.      I don't think I would agree with that

```
                                              Page 163
 1   as a blanket statement, given that the pharmacy has
 2   control over the number of pills that are
 3   dispensed.
 4           Q.    (BY MR. HERMAN:)  Well, it is a
 5   doctor that decides on the amount and dosage in a
 6   prescription, correct?
 7                 MR. ARBITBLIT:  Object to form.
 8   Misstates the evidence.
 9           A.    The -- the prescription is written
10   for a specific amount and dosage.
11           Q.    (BY MR. HERMAN:)  Can I ask you to go
12   to -- can I ask you to go to Page 19 of your
13   report.  And on Page 19, towards the bottom, you
14   are discussing one of the studies.  And you say,
15   "Most problematically, the article reports on an
16   overall association between any opioid use and
17   opioid use disorder, but this association is
18   uninformative and essentially pointless.  It is
19   well documented that risk of opioid use" -- opioid,
20   sorry -- "well documented that risk of
21   opioid-related adverse outcomes are heterogenous by
22   dose and duration of use."
23                 Do you see that?
24           A.    I do.
25           Q.    And I read that correctly?
```

Page 164

1          A.     Yes.

2          Q.     And when you say that risk of

3    opioid -- when you say, "risks of opioid adverse

4    outcomes are heterogenous by dose and duration,"

5    you mean that the risk differs depending on the

6    dose and duration that a patient takes, correct?

7          A.     Yes.

8          Q.     And then on Page 20, near the top of

9    the page, you say, "This same issue underlines

10   Cepeda, et al., which was also included in the

11   Higgins review; the study includes data for almost

12   forty thousand patients from insurance claims

13   databases and reports an overall association

14   between opioid prescriptions and claims-recorded

15   opioid use disorder, without disaggregating the

16   dose and duration.  Such information is

17   uninformative for assessment of opioid use disorder

18   risk with prescription opioid use, given the known

19   heterogeneity," correct?  Did I read that

20   correctly?

21         A.     Yes.

22         Q.     And what I understand you to be

23   saying there, and correct me if I am wrong, is your

24   view is that it is essentially pointless to give an

25   association between opioid use and opioid use

Page 165

1   disorder that doesn't recognize there will be

2   differences in risk, depending on how one uses

3   prescription opioids, correct?

4        A.     That is not exactly what the report

5   says.  I think overall assessment of the

6   relationship between opioid use and opioid use

7   disorder do provide some information, but we know

8   there's a dose response relationship between dose

9   and duration and opioid use disorder and overdose.

10  So it is, you know, important to evaluate that in

11  an overall body of literature, to provide that

12  information.

13       Q.     Right.  You have got to separate --

14  if you were to apply the risk from, for example,

15  all acute users, you couldn't extrapolate that risk

16  to all users, right?  It is informative to -- by

17  dose and duration, right?  I'm sorry.  I asked

18  about four questions in there.  But let me strike

19  that and ask a different one.

20            But what you are saying is, when you

21  are evaluating risk, there are different risks,

22  depending on whether someone takes an acute dose or

23  a high dose, correct?

24            MR. ARBITBLIT:  Objection, vague.

25       A.     It really depends on what the

Page 166

1   research question is and what you are looking at.

2   There are a number of ways to evaluate risk of

3   opioid use disorder after opioid use.  One way to

4   evaluate it that is very informative is to see how

5   different the risk is based on dose and duration.

6   And the risk of opioid use disorder is much higher

7   when you have high dose and high duration.

8           Q.    (BY MR. HERMAN:)  Yeah, but you

9   couldn't -- it would be uninformative, to borrow

10  your language, to use the risk percentage for acute

11  users and apply that to long-term users, correct?

12          A.    It would depend on the specific

13  context in which someone was trying to make those

14  extrapolations.  I wouldn't want to make a blanket

15  statement.

16          Q.    But so do you -- let's say I took a

17  population of all acute users and presumably came

18  up with a relatively low percentage who developed

19  OUD.  It would be wrong for me to take that

20  percentage and apply it to long-term users,

21  correct?

22              MR. ARBITBLIT:  Objection to the

23  form.

24          A.    I would need more information about

25  the studies that you were trying to extrapolate

Page 167

1  between.

2          Q.     (BY MR. HERMAN:)  Okay.  Well, let's

3  look at -- can I ask you to take out 7 -- CVS 7-18,

4  which will be Exhibit --

5                  MR. HERMAN:  What are we up to now?

6  7-18 --

7                  MR. ACTON:  7-18?  7-18?

8                  MR. HERMAN:  Yes.

9                  MR. ACTON:  17.

10                 MR. HERMAN:  This is Exhibit 17,

11  Professor Keyes.  Do you have it?

12                 (Exhibit 17 was marked for

13                 identification.)

14         A.     I do.

15         Q.     (BY MR. HERMAN:)  And this is a study

16  that discusses -- or that is titled "The Role of

17  Opioid Prescriptions in Incident Opioid Abuse and

18  Dependence Among Individuals with Chronic

19  Non-Cancer Pain:  The Role of Opioid Prescription";

20  is that correct?

21         A.     Yes.

22         Q.     And this is an article you cite in

23  your report?

24         A.     I do.

25         Q.     And if you look at Page 3 under

Page 168

1    Measures, Independent Variables.  So this report

2    looked at days of use.  And so acute was defined --

3    or none would be zero.  Acute was one to ninety

4    days, or chronic was ninety-one plus days.  Is that

5    correct?

6              A.    Yes.

7              Q.    And then if you look at the next

8    page, it also looked at dosage.  And the average

9    daily dose was measured in morphine equivalents and

10   grouped as none (zero milligrams), low dose (one to

11   36 milligrams), medium dose (36 to 120 milligrams),

12   and high dose (120 plus milligrams).  Is that

13   correct?

14             A.    Yes.

15             Q.    Okay.  And if you look at Page 5

16   under Results, there were five hundred and

17   sixty-eight thousand six hundred and forty

18   individuals in this analytical sample; is that --

19   is that correct?

20             A.    Yes.

21             Q.    Okay.  And is that a fairly large

22   sample?

23                   MR. ARBITBLIT:  Object to form.

24             A.    That is a large sample, yes.

25             Q.    (BY MR. HERMAN:)  And the majority of

1  the sample had no prescribed opioid use in the

2  twelve months following the index date, correct?

3          A.      65.3 percent had no opioid use.

4          Q.      A --

5          A.      No prescribed opioid use.

6          Q.      And thirty-five -- the flip side of

7  that is approximately thirty-five percent of the

8  sample received opioids?

9          A.      Yes.

10          Q.      And low dose acute and medium dose

11  acute were the most common type of the opioid use?

12          A.      Yes.

13          Q.      15.9 percent for low dose acute?

14          A.      Yes.

15          Q.      14.7 percent for medium dose acute?

16          A.      Yes.

17          Q.      Okay.  And high dose chronic use was

18  the least common, 0.1 percent of the sample?

19          A.      Yes.

20          Q.      And then among the entire sample

21  prescribed opioids, 94.5 percent were acute users?

22                  MR. ARBITBLIT:  Objection.

23          A.      That is right.

24          Q.      (BY MR. HERMAN:)  And if you go down

25  to the second paragraph, it says, "Among the total

1  sample, four hundred and ninety-seven (0.1 percent)

2  had a new diagnosis of OUD in the post-index

3  period."  Did I read that correctly?

4         A.    You read that correctly.

5         Q.    And because such a large percentage

6  of the sample is acute users, you wouldn't apply

7  that 0.1 percent to chronic users, correct?

8              MR. ARBITBLIT:  Object to form.

9  Misstates the evidence.

10             MR. HERMAN:  Well, I am asking.

11       Q.    (BY MR. HERMAN:)  Could I take that

12  0.1 --

13             MR. ARBITBLIT:  Your .1 is to the

14  whole sample.  You are asking -- never mind.

15  Sorry.  Object to form.  Misstates the evidence.

16       Q.    (BY MR. HERMAN:)  Could you take that

17  0.1 percent of new diagnosis of OUD and apply that

18  to a population that included only chronic users

19  and expect to get the same results?

20             MR. ARBITBLIT:  Object to form.

21  Misstates the evidence.

22       A.    I don't -- what is the goal of the

23  analysis in the hypothetical?

24       Q.    (BY MR. HERMAN:)  Well, I think I am

25  trying to follow what you are saying in your

Page 171

1  report, that something that just looks at a patient

2  population and doesn't account for heterogeneity of

3  dosage and duration wouldn't extrapolate to --

4  would be uninformative.

5                    MR. ARBITBLIT:  Object to form.

6  Vague.

7          Q.    (BY MR. HERMAN:)  All right.  Let's

8  keep going.

9          A.    I mean .1 percent is the total

10  percentage of new OUD diagnosis in the total

11  sample.

12          Q.    (BY MR. HERMAN:)  Okay.  Let's just

13  keep going.

14                    Next down it says, "The unadjusted

15  rates of post-index OUD diagnosis for the various

16  opioid dose/days categories were 0.12 percent (111

17  out of 90,415) per low dose acute; 0.72 percent (50

18  out of 6,902) for low dose chronic; 0.12 percent

19  (111 out of 83,542) for medium dose acute; 1.28

20  percent (47 out of 3,654) for medium dose chronic;

21  0.12 percent (15 out of 12,378) for high dose

22  acute; and 6.1 percent (23 out of 378) for high

23  dose chronic."

24                    Was that the results of the

25  unadjusted rates of post-index OUD diagnosis for

1   the various opioid dose/days categories that they

2   found?

3           A.      Yes.

4           Q.      Do you know how many prescription

5   opioid patients in Lake and Trumbull County fit

6   into the category of acute patients?

7           A.      No.

8           Q.      Do you know how many prescription

9   opioid users in Lake and Trumbull County were low

10  dosage patients?

11          A.      I am not aware.

12          Q.      Do you know how many patients who

13  fill prescriptions at CVS fit into each of the

14  categories discussed in this report?

15          A.      I don't.

16          Q.      Would your answer be the same for

17  Rite Aid, Giant Eagle, Walgreens and Walmart?

18          A.      Yes.

19          Q.      Besides dose and duration, there are

20  other individual risk factors that matter -- that

21  matter in terms of assessing risk to a particular

22  patient, correct?

23          A.      You mean risk for development of OUD?

24          Q.      Yes.  Yes.

25          A.      So the question is whether there are

1    risk factors for OUD over and above dose and

2    duration.  That is the question?

3              Q.     That is the question.

4              A.     OUD -- dose and duration are the

5    strongest risk factors for OUD development, but

6    other risk factors include things like, you know,

7    sex and previous history of psychiatric disorders

8    and drug use and other -- kind of individual

9    vulnerabilities.

10             Q.     Okay.  Sticking with your counsel's

11   admonition, you have discussed different individual

12   level risk factors in your previous testimony at

13   deposition and the testimony you gave in New York,

14   correct?

15             A.     I believe so.

16             Q.     And you have also discussed

17   individual risk factors in articles that you have

18   authored?

19             A.     I have.

20             Q.     Is there any reason that individual

21   risk factors discussed in your previous testimony

22   and articles would not apply to people in Lake

23   County and Trumbull County?

24                    MR. ARBITBLIT:  Object to form.

25             A.     The -- I would look at each risk

1  factor specifically, but in general the risk

2  factors that have been identified in the

3  literature, I would -- I would make the assumption

4  that they would generally generalize to Lake and

5  Trumbull County.

6          Q.     (BY MR. HERMAN:)  Sure.  Like if

7  something was a differentiation on urban versus

8  rural and one of the counties wasn't rural or

9  urban, it wouldn't apply.  But generally they would

10  apply, correct?

11          A.    I would look at each one

12  specifically, so I wouldn't want to make a blanket

13  statement.  But, you know, depending on which

14  specific risk factors we are talking about, I could

15  make a determination of generalizability.

16          Q.     Okay.  But the ones you mentioned,

17  sex, mental health history, previous drug use, no

18  reason to think that those wouldn't be risk factors

19  for individuals in Lake and Trumbull County?

20          A.    I don't have reason to think that

21  they wouldn't be.

22          Q.     Okay.  And can I ask you to look at

23  Page 11 of your report?  And the last sentence

24  where you say, "This framework does not preclude or

25  ignore that addiction and related harms are

Page 175

1    multi-factorial in their etiology."  What is

2    "multifactorial in their etiology"?

3            A.      I'm not seeing on Page 11 --

4            Q.      It is right above "Methodology For

5    Review of the Evidence."

6            A.      Okay.  So the full sentence is "This

7    framework does not preclude or ignore that

8    addiction and related harms" --

9                THE REPORTER:  I'm sorry.  Slow down,

10   please.

11           A.      I'm sorry.  Do you want to read the

12   whole sentence?

13           Q.      (BY MR. HERMAN:)  Well, I am really

14   just asking you a question in that sentence.  But

15   what is "multi-factorial in their etiology"?

16           A.      That means that there can be multiple

17   causal risk factors for an outcome.

18           Q.      Okay.  When you say a disease is

19   multi-factorial, you mean that a single cause does

20   not produce a disease but the combination of many

21   causes produce a disease, correct?

22                MR. ARBITBLIT:  Object to form.

23           A.      Not necessarily.

24           Q.      (BY MR. HERMAN:)  That is not how you

25   described multi-factorial in your textbook,

Page 176

1   Epidemiology Matters?

2          A.     It means that there can be multiple

3   causal risk factors that simultaneously produce an

4   outcome.  Sometimes that can be multiple risk

5   factors -- multiple causes interacting with each

6   other.  Cigarette smoking is a good example.

7   Smoking is a cause of lung cancer, but not all

8   smokers get lung cancer.  So there have to be other

9   factors too.

10         Q.     Just sticking with dosage and

11  duration abuse for a moment.  In your report you

12  cite the Jamison study as having the highest rates

13  of addiction, correct?  Do you recall that?

14                MR. ARBITBLIT:  Object to form.

15  Misstates.

16         A.     I just want to find the -- I believe

17  I am referring to a review article.  I say the

18  highest rate of addiction in the review article

19  documented --

20         Q.     (BY MR. HERMAN:)  Fair enough.  In

21  bold, it is the highest in bold -- Jamison has the

22  highest rates of addiction of study discussed in

23  the Vowles article, correct?

24         A.     Yes, the study where all patients

25  were on long-term prescribed opioids for noncancer

Page 177

1   pain.

2           Q.      And as you say on Page 16,

3   "Individuals in the study had been using opioids

4   for an average of five to six years.  34.1 percent

5   of the sample had evidence of opioid use disorder,

6   including thirty-one percent of men and 36.7 of

7   women, indicating a high level of opioid use

8   disorder when patients are assessed with validated

9   instruments as well as objective measures of the

10  presence of opioids, such as urine toxicology,"

11  correct?  That is the full sentence?

12          A.      That is the full sentence.

13          Q.      And so after using prescription

14  opioids for an average of five to six years,

15  approximately two-thirds of the patients did not

16  exhibit an opioid use disorder?

17          A.      A little less than that, thirty-four

18  percent.  So I guess that would be one hundred

19  minus thirty-four percent.

20          Q.      So approximately sixty-six percent,

21  making --

22          A.      Approximately.

23          Q.      65.9 percent?

24          A.      Correct.

25          Q.      Okay.  So would you agree with me

1    that characteristics of opioid use, like dose and

2    duration, can only tell you someone might be at

3    risk for opioid use disorder?

4                    MR. ARBITBLIT:  Object to form.

5            A.     No.  I would not agree with that.

6            Q.     (BY MR. HERMAN:)  Well, if I told you

7    that someone used opioids for five to six years,

8    would you be able to tell me if that person was in

9    the 65.9 percent who didn't develop a disorder or

10   the 34.1 percent who did develop an opioid use

11   disorder?

12                   MR. ARBITBLIT:  Object to form.

13   Incomplete hypothetical.

14           A.     So in this study, the 34.1 percent of

15   people who had opioid use disorder were not at risk

16   for opioid use disorder.  They had opioid use

17   disorder.

18           Q.     (BY MR. HERMAN:)  I'm asking --

19           A.     So --

20           Q.     Sorry.  I didn't mean to cut you off.

21   Please --

22           A.     I don't understand the hypothetical.

23           Q.     Well, I am asking you, in this study

24   people who used opioids for five to six years, 34.1

25   percent developed an opioid use disorder, correct?

Page 179

1          A.     Yes.

2          Q.     And so what you say with that is

3     duration of use increases your risk for developing

4     an opioid use disorder, right?

5          A.     That is not a conclusion that I draw

6     from this study.  But from the body of evidence,

7     yes, duration is a risk factor for opioid use

8     disorder.

9          Q.     Okay.  But if a person -- if I told

10    you a person had used opioids for five to six

11    years, would you only be able to tell me that

12    person had an increased use of developing an opioid

13    use disorder as opposed to being able to tell me

14    whether that person did, in fact, develop an opioid

15    use disorder?

16                 MR. ARBITBLIT:  Objection, vague.

17         A.     If I was given no additional

18    information other than the duration of use, you

19    could say what the probability is that they

20    developed opioid use disorder, but no definitive,

21    much like any risk factor.

22         Q.     (BY MR. HERMAN:)  And what additional

23    information -- well, let me ask it this way:  Well,

24    what additional information would you need to be

25    able to tell me if that person did, in fact,

Page 180

1    develop an opioid use disorder?

2            A.      In epidemiology we quantify things in

3    terms of probabilities and risk factors.  And so

4    with additional information we could refine the

5    probability and risk factor assessment.

6            Q.      Okay.  But to actually know whether

7    the person developed an opioid use disorder, you

8    would have to have a diagnosis code?  What would

9    you need?

10                   MR. ARBITBLIT:  Object to form,

11   vague.

12           A.      To know whether a person develops

13   opioid use disorder, one would assess for opioid

14   use disorder.

15           Q.      (BY MR. HERMAN:)  And you haven't

16   looked at patient files for individuals in Lake or

17   Trumbull County to see if any particular patient

18   has an opioid use disorder diagnosis, correct?

19           A.      No.

20           Q.      Earlier today, I believe you

21   testified that doctors -- you were troubled with

22   the term "legitimate medical purpose" because you

23   felt doctors did not have the right information

24   about the risks and benefits of opioids at the time

25   they made the prescription, correct?

Page 181

1          A.     I don't -- that is not a complete
2    characterization of my testimony.
3          Q.     Okay.  Well, why don't we -- if I
4    could ask you to open up Exhibit 4.
5                 MR. HERMAN:  But what is CVS 4 --
6    what exhibit are we on?
7                 (Off-the-record discussion.)
8          Q.     (BY MR. HERMAN:)  This is going to be
9    Exhibit 18.
10                (Exhibit 18 was marked for
11                identification.)
12         Q.     (BY MR. HERMAN:)  This is a copy of
13   the transcript of your testimony from your April
14   29th, 2019, deposition in the Cuyahoga and Summit
15   County case?
16         A.     Yes.
17         Q.     And can I ask you to turn to Page 82?
18   And if you look at Line 16, I asked you, "You would
19   agree that a prescriber is only supposed to write
20   prescriptions for legitimate medical reasons,
21   correct?"
22                And you answered, "I think that
23   prescribers are prescribing based on a set of
24   information that they are given and that oftentimes
25   the risk of opioids were" -- you said overstated

Page 182

1    but you correct it later to understated, "the risk

2    of prescription opioids were understated."  So I

3    think --

4           A.     I'm sorry.  I don't mean to interrupt

5    you, but I just want to find the page.

6           Q.     Oh, I'm sorry.  I thought you were

7    there.

8           A.     No, I'm sorry.  I was looking at the

9    page at the bottom, not the page --

10          Q.     Okay.  I apologize.

11          A.     I apologize.

12          Q.     It is Page 22 of the overall.

13          A.     I see.  Okay.  Sorry.

14          Q.     So I asked you, "You would agree that

15   a prescriber is only supposed to write

16   prescriptions for legitimate medical reasons,

17   correct?"

18                 And you answered, "I think that

19   prescribers are prescribing based on a set of

20   information that they are given, and oftentimes

21   that the risk of opioids were" -- and you corrected

22   it later to understated, "the risk of prescription

23   opioids were understated, and so I think that

24   physicians are in a difficult position when they

25   are trying to write prescriptions for legitimate

```
                                              Page 183
 1    medical reasons."
 2              Is that what I asked you and the
 3    answer you gave?
 4         A.    Yes.
 5         Q.    Okay.  And one of the opinions, if
 6    you look at your report on Page 4, Opinion Number
 7    4, the first sentence is, "Medical use of opioids
 8    is associated with the development of opioid use
 9    disorder at higher rates than were reported by drug
10    manufacturers."  Did I read that opinion correctly?
11         A.    Yes.
12         Q.    And is that what you were referring
13    to in your testimony that we just looked at when
14    you said the risks were understated?
15              MR. ARBITBLIT:  Object to form.
16         A.    Opioid use disorder is one of many
17    risks of using an opioid.  So I said the risks were
18    understated, and one risk that was understated is
19    the development of opioid use disorder.
20         Q.    (BY MR. HERMAN:)  Okay.  What -- what
21    other risks were understated?
22         A.    Overdose is, you know, a pretty clear
23    one.  And I believe I cite another paper that goes
24    through quite a few other medical conditions that
25    are consequential to prescribed opioid use.
```

Page 184

1       Q.      Who understated the risk of overdose?

2               MR. ARBITBLIT:  Object to form.

3       A.      Who understated the risks of

4   overdose?

5       Q.      (BY MR. HERMAN:)  Yes.

6       A.      I'm not sure I --

7       Q.      Well, you said the risks of overdose

8   were understated, that that was one of the risks

9   that was understated.  So I was just asking who,

10  who understated, if you know?

11      A.      I think there certainly is evidence

12  from drug manufacturers, and there may be other

13  companies that also produce material that included

14  information on the supposed safety of these

15  medications that may not have been accurate.

16      Q.      Sitting here today, the only one you

17  are aware of, though, is drug manufacturers?

18      A.      I am not offering opinions about

19  specific companies' materials.  I think there's

20  sufficient evidence that, overall, various

21  companies that sold and distributed opioids

22  understated risks.

23      Q.      Well, I -- Professor Keyes, I am sure

24  in your professional life, you want to be pretty

25  precise when you say things like that, that

Page 185

1   companies, generally -- I'm just asking:  Sitting

2   here today, I'm not asking you for a specific.  I

3   asked you about a category, manufacturers.

4               Is that the only category you are

5   aware of that understated the risks that you are

6   speaking about?

7               MR. ARBITBLIT:  Object to form.

8       A.    I am not offering opinions about any

9   specific companies at this time because I haven't

10  evaluated those specific materials.

11              But I believe throughout the material

12  that I have cited in this report, including the IOM

13  report, including several other sources of

14  material, there's sufficient evidence that a broad

15  range of companies that sold opioids understated

16  the risks.

17      Q.    (BY MR. HERMAN:)  Are you aware of

18  any statement by pharmacists or pharmacies that

19  understated the risks of prescription opioids,

20  sitting here today?

21              MR. ARBITBLIT:  Object to form.

22      A.    I have not evaluated that specific

23  material, and I am not offering an opinion on that.

24      Q.    (BY MR. HERMAN:)  And the concern you

25  are expressing in the testimony we have looked at

Page 186

1   was that doctors relied on what you -- what you

2   believe to be an understatement of the risks of

3   opioids, correct?

4           A.    In this specific testimony?

5           Q.    That is right.

6           A.    I was referring to physicians, yes.

7           Q.    And do you have any reason to believe

8   that pharmacists had better information than

9   doctors about the risks and benefits of

10  prescription opioids?

11              MR. ARBITBLIT:  Object to form.

12          A.    I don't have any -- I haven't

13  evaluated any material that would indicate that

14  pharmacists had different information.

15          Q.    (BY MR. HERMAN:)  Do you fault

16  pharmacists for filling prescriptions written by

17  licensed doctors for FDA-approved medications that

18  the prescriber intended would be used for

19  legitimate medical purposes?

20              MR. ARBITBLIT:  Object to form.

21  Incomplete hypothetical.

22          A.    My testimony would be that pharmacies

23  have a responsibility to do -- to do what is

24  required of them in order to dispense safely.  And

25  so in terms of what caused the opioid crisis, I

Page 187

1    would certainly look at all of those distribution

2    channels, including pharmacies.

3            Q.      (BY MR. HERMAN:)  What's the basis

4    for your statement that pharmacies have a

5    responsibility?  Where did you gain that

6    understanding?

7            A.      I think it is well-known in terms of

8    kind of opioid policy and epidemiology.

9            Q.      What specifically are you pointing to

10   for your assertion that pharmacies have -- as

11   opposed to pharmacists, have an obligation when

12   dispensing prescription medications?

13                  MR. ARBITBLIT:  Object to form.

14           A.      I am pointing to my knowledge of

15   epidemiology and opioid policy.

16           Q.      (BY MR. HERMAN:)  Well, what

17   specifically are you pointing to other than

18   something that -- like how did you gain that

19   understanding?

20                  MR. ARBITBLIT:  Objective --

21   objection, vague.  Asked and answered.

22           A.      I gained understanding of

23   epidemiology and opioid policy through my research

24   and my expertise.

25           Q.      (BY MR. HERMAN:)  What specific

Page 188

1   policy are you pointing to?

2              MR. ARBITBLIT:  Objection, vague.

3        Q.    (BY MR. HERMAN:)  Sitting here today,

4   can you point me to any document or law or

5   regulation, any source that you are relying on for

6   that statement that pharmacies, as opposed to

7   pharmacists, have an obligation with regard to

8   dispensing prescription opioids?

9              MR. ARBITBLIT:  Objection, vague.

10       A.    My general -- this comes from my

11  general knowledge about opioid law, which varies

12  across time and across states.  And my general

13  knowledge is that pharmacies and the people who

14  work there have a responsibility to dispense

15  responsibly.

16       Q.    (BY MR. HERMAN:)  What law

17  specifically?

18             MR. ARBITBLIT:  Object to form.

19       A.    I think there are various regulations

20  in various states that inform what pharmacies have

21  a responsibility to do in order to dispense

22  appropriately.

23       Q.    (BY MR. HERMAN:)  Have you ever

24  written anything on the laws or regulations

25  surrounding the practice of pharmacy?

1          A.     I am certainly involved in a number

2    of different opioid policy projects that include

3    regulations that would include pharmacies in them.

4          Q.     Have you ever written anything

5    about --

6               THE REPORTER:  I'm sorry.  You

7    garbled.  "Have you ever written anything" --

8          Q.     (BY MR. HERMAN:)  Have you ever

9    written anything evaluating the laws and

10   regulations of a pharmacy in connection with

11   dispensing of prescription opioids?

12         A.     I have certainly written a lot about

13   opioid policies, some of which covers pharmacies

14   and some which do not, including information on

15   prescription drug monitoring programs.  I have

16   written a number of articles about various

17   prescription drug monitoring programs and how they

18   differ by state.  And so I would point to those

19   articles as providing a basis for my expertise.

20         Q.     Well, I mean I have read all your

21   articles on opioids, and I don't recall any of them

22   discussing the obligations of a pharmacy or

23   pharmacist when dispensing prescription opioids.

24               MR. ARBITBLIT:  Objection.  There's

25   no question pending.

1          Q.     (BY MR. HERMAN:)  Can you point me to

2     a specific article?

3          A.     There are two systematic reviews on

4     prescription drug monitoring programs that cover

5     basically all fifty states across the last fifteen

6     years.  And so those would be articles that I would

7     point to that would include information and laws

8     that would regulate pharmacies.

9          Q.     Do you know if there's any law in

10    Ohio that says a pharmacy, as opposed to the

11    pharmacist, has to check the OARRS system?

12               MR. ARBITBLIT:  Object to form.

13    Calls for a legal conclusion.

14         A.     Yeah.  I don't have expertise on the

15    particulars of the OARRS system and how it -- and I

16    am not offering an opinion how that regulates

17    pharmacies versus pharmacists.

18         Q.     (BY MR. HERMAN:)  Okay.  Are you

19    offering -- the only -- so far, the only obligation

20    I have heard you talk about are prescription drug

21    monitoring programs.  Can you think of any others

22    that you have written about?

23               MR. ARBITBLIT:  Object to form.

24         A.     Yes -- sorry, Don.  I cut you off.

25               MR. ARBITBLIT:  I said object to

1  form.  Misstates the testimony.

2          A.    I have written about a number of

3  different opioid laws and policies and more

4  broadly, drug laws and drug policies.  That is one

5  of my areas of expertise.  So I have written about

6  an extensive array of drug policies.

7          Q.    (BY MR. HERMAN:)  Okay.  Well, going

8  back to PDMPs, do you have an understanding of

9  whether in Ohio, a pharmacist is required to check

10  the OARRS system in all circumstances or every time

11  a prescription opioid is dispensed?

12              MR. ARBITBLIT:  Object to form.

13  Calls for a legal conclusion.

14          A.    I have a general understanding of the

15  Ohio law, and my understanding is that there's some

16  controversy around the circumstances in which the

17  PDMP is required to be checked, which is why there

18  is a lot of overprescribing.

19          Q.    (BY MR. HERMAN:)  Do you have an

20  understanding of whether the obligations of when a

21  pharmacist is supposed to check the PDMP have

22  changed over time?

23          A.    In Ohio?

24          Q.    Yes.

25          A.    Yes.  My understanding is that there

Page 192

1  have been some changes to those regulations.

2        Q.      Do you have -- are you claiming

3  expertise in the obligations of pharmacists with

4  regard to the OARRS system and their obligations in

5  connection with it?

6        A.      My expertise is generally on opioid

7  policy, although I am not offering a specific

8  opinion about pharmacists and the OARRS system.

9        Q.      Okay.  Are you offering an opinion

10  about pharmacies and the OARRS system?

11              MR. ARBITBLIT:  Object to form.

12        A.      I'm not offering -- sorry.

13              MR. ARBITBLIT:  Objection, vague.

14        Q.      (BY MR. HERMAN:)  Go ahead.

15        A.      I am offering opinions about PDMPs in

16  general, but not on the OARRS system in particular.

17        Q.      Are you offering opinions about a

18  pharmacy's connection or obligations in connection

19  with use of the OARRS system?

20        A.      I'm not offering an opinion about

21  that.

22        Q.      Do you know if pharmacies, as opposed

23  to pharmacists, have the ability to access the

24  OARRS system?

25        A.      I guess I don't know what you mean by

1  pharmacies, because they are comprised by people.

2  I mean, pharmacies are buildings.

3         Q.    Well, you testified -- excuse me if I

4  am wrong, but I believe you testified earlier you

5  were drawing a distinction and saying that both

6  pharmacies and pharmacists had obligations in

7  connection with dispensing opioids.  Did I

8  understand you correctly?

9         A.    My testimony was that yes, pharmacies

10 have obligations in terms of their

11 responsibilities.

12        Q.    Okay.

13        A.    But --

14        Q.    Go ahead.  I'm sorry.  Well, the only

15 one I have heard you mention so far, and we will

16 keep going, but is in connection with PDMP usage.

17 So I am asking you, do pharmacies have obligations

18 to check the OARRS system in Ohio in connection

19 with dispensing prescription opioids?

20              MR. ARBITBLIT:  Objection.  Calls for

21 a legal conclusion.

22        A.    My general understanding of the

23 regulation would indicate that they do.  But that

24 is based on my reading of it as an epidemiologist.

25        Q.    (BY MR. HERMAN:)  And you are

Page 194

1   qualifying your reading as an epidemiologist

2   because you don't have expertise in interpreting

3   the laws surrounding the practice of pharmacy,

4   correct?

5                   MR. ARBITBLIT:  Object to form.

6           A.      I have expertise in analyzing data

7   and in -- and included in that analysis of data has

8   been developing a pretty strong understanding of

9   opioid policies and how they differ.

10                  That being said, I'm not a lawyer.

11  And so I -- you know, my reading of it as an

12  epidemiologist would seem to indicate that

13  pharmacies do have a responsibility.

14          Q.      (BY MR. HERMAN:)  Okay.  Do you

15  know -- again, do you know if pharmacies, as

16  opposed to pharmacists, can access the OARRS

17  system?

18          A.      The pharmacists that are in

19  pharmacies can is my understanding.

20          Q.      Okay.  And do you know whether,

21  again, whether a pharmacist, in connection with

22  every prescription opioid dispensed, is obligated

23  to check the OARRS system?

24                  MR. ARBITBLIT:  Objection.  Asked and

25  answered.  Calls for a legal conclusion.

Page 195

1          A.     My understanding is that there is

2     some -- that the regulations in Ohio are -- there's

3     some -- that they are not always obligated to

4     check.

5          Q.     (BY MR. HERMAN:)  And so we have

6     talked about OARRS.  What other specific

7     obligations do you understand a pharmacy to have in

8     connection with the dispensing of prescription

9     opioids?

10              MR. ARBITBLIT:  Objection, vague,

11     compound.

12          A.     I would say that my understanding is

13     generally about, you know, understanding the

14     warning label and the risks and benefits in order

15     to properly instruct patients on the usage of the

16     medication.

17          Q.     (BY MR. HERMAN:)  And is that an

18     obligation that belongs to the pharmacy or the

19     pharmacist?

20          A.     Given that the pharmacist works in

21     the pharmacy, I would say that both have a

22     responsibility to provide adequate care to patients

23     who attend -- who get their medications at the

24     store.

25          Q.     Okay.  So the pharmacist, if I am

Page 196

1   understanding you correctly, has an obligation, as

2   you interpret it, to counsel the patient on the

3   warning label, correct?

4               MR. ARBITBLIT:  Objection.  Misstates

5   the record.

6        A.    Yeah.  I would just go back to my

7   testimony is that my understanding generally is

8   that pharmacies have a responsibility to instruct

9   the patient about the proper usage and risks and

10  benefits of the medication.

11       Q.    (BY MR. HERMAN:)  Okay.  And the

12  reason you are saying pharmacies -- I mean I am

13  just trying to get this straight.  You are saying

14  that the pharmacists, because they work in the

15  pharmacy and they should do that, you believe that

16  the pharmacy has on obligation?

17              MR. ARBITBLIT:  Object to form.

18       A.    Yes.

19       Q.    (BY MR. HERMAN:)  And so the

20  obligation that you are talking about that is for

21  the pharmacy is sort of if the pharmacist doesn't

22  fulfill his obligation, his or her obligation, you

23  think that the pharmacy is responsible?

24              MR. ARBITBLIT:  Object to form.

25  Calls for a conclusion.

1          A.      I don't -- this is not an opinion

2     that I am offering in terms of the responsibility.

3     I mean, hundreds of thousands of people are dead

4     from an opioid crisis.  And I think that, you know,

5     the responsibility of that is enormous in terms of

6     the toll that this epidemic has taken on the

7     population.

8                  And so looking at the various ways

9     that this could have been prevented includes a very

10    close look on pharmacies.

11         Q.      (BY MR. HERMAN:)  Okay.  But you

12    don't actually -- I mean -- okay.  Have you -- but

13    you have not taken a close look at -- well, let me

14    strike that.

15                 I think you just said that you are

16    not offering opinion on the obligations of

17    pharmacies and pharmacists; is that correct?

18                 MR. ARBITBLIT:  Object to form.

19         A.      That is right.

20         Q.      (BY MR. HERMAN:)  And you don't

21    actually -- well, I will leave it.  All right.

22    Strike that.

23                 MR. HERMAN:  Should we -- I think we

24    have been going about maybe a little over an hour.

25    Should we take a little bit of a break?

1            MR. ARBITBLIT:  I think there's about

2    fifty minutes left.

3        A.    Sounds good.

4            MR. HERMAN:  Okay.  Well, why don't

5    we just take a break.  I will try to organize

6    myself a little bit.

7                THE VIDEOGRAPHER:  Stand by.  We are

8    now off the record.  The time on the video monitor

9    is 4:15.

10               (Whereupon, a break was had from 4:15

11               p.m. until 4:27 p.m. EDT)

12               THE VIDEOGRAPHER:  Stand by.  We are

13   now on the record.  The time on the video monitor

14   is 4:27.

15       Q.    (BY MR. HERMAN:)  Professor Keyes, do

16   you know what percentage of current heroin users

17   were misusing opioids, prescription or illicit, ten

18   years ago?

19       A.    Of the current heroin users now, what

20   proportion ten years ago were misusing or using

21   prescription opioids, that is the question?

22       Q.    Misusing.

23       A.    I don't know of an analysis that has

24   been performed on current heroin users.

25       Q.    I ask you to turn to Page 54 of your

Page 199

1    report.

2                    (Pause.)

3          Q.    (BY MR. HERMAN:)  And what I

4    understand, if you look at the bottom of the

5    page -- well, I'm sorry.  Let's start with 53.  I

6    apologize.  And one of the things you do here is

7    you are estimating the number of people with opioid

8    use disorder in Lake and Trumbull County, correct?

9          A.    Yes.

10         Q.    And at the bottom of Page 53, you

11   acknowledge that estimating the number of people

12   with opioid use disorder is a challenge, given that

13   there's no systematic way to count this population,

14   correct?

15         A.    Yes.

16         Q.    And so what you did was you took the

17   calculated overdose rate of 0.52 per one hundred

18   persons from the Larney systematic review and then

19   divided that overdose rate into the number of

20   overdoses, correct?

21                Well, that may be -- that may be too

22   simplistic because you made an adjustment for

23   fentanyl.  As to prescription, the proportion that

24   you estimate to be prescription opioids, you use

25   the 0.52 per one hundred person-years from the

Page 200

1    Larney study?

2           A.      No.   The total number of opioid

3    users, I don't think I include the number of

4    prescription opioid users specifically in this

5    calculation.  So I took the total drug overdose

6    deaths and divide it by several different estimates

7    of death rates, one of them being 0.52 per hundred

8    thousand.

9           Q.      And the other one being 1.56, which

10   is your adjustment for -- based on multiplying that

11   0.52 by three; is that correct?

12          A.      That's correct.

13          Q.      And on -- and the Larney study was

14   examining the risk for all overdose deaths,

15   regardless of the drug that caused the overdose,

16   correct?

17          A.      All drug poisoning deaths, yes.

18          Q.      And so it wasn't limited to deaths

19   caused by prescription opioids or opioids

20   generally?

21          A.      That's correct.

22          Q.      And on Page 54 at the bottom, you

23   write, "However, the application of the 0.52 per

24   one hundred person-years estimate needs to be

25   adjusted for the increase in death rate that

1  occurred after fentanyl adulteration."  Correct?

2          A.     Yes.

3          Q.     Okay.  And the reason for that is

4  because fentanyl is more lethal.  If you use the

5  same rate, 0.52, you would overestimate the number

6  of opioid use disorder cases in Lake and Trumbull

7  County, correct?

8          A.     That is right.

9          Q.     And what you are trying to do is to

10 account for the, as you write here, the increase

11 that occurred after fentanyl adulteration, correct?

12         A.     Yes.

13                MR. ARBITBLIT:  Object to form.

14         Q.     (BY MR. HERMAN:)  And you placed the

15 time period when fentanyl adulteration began to

16 occur as 2013, correct?

17         A.     Not exactly.

18         Q.     You don't say in several places in

19 your report that the adulteration of the heroin

20 supply with illicit fentanyl began to occur in

21 2013?

22         A.     I used 2013 as an interruption in the

23 time series from 2011 to 2015 for the change in

24 overdose death rates.

25         Q.     Well, other places you used 2013,

Page 202

1    right, like when you are calculating the role of

2    fentanyl illicit versus illicit played in overdose

3    deaths in your estimate, right?  You used an

4    average of all deaths before 2013, and you

5    attribute that to prescription opioids, correct?

6                    MR. ARBITBLIT:  Object to form.

7    Vague.

8           A.     That is a different analysis.

9           Q.     (BY MR. HERMAN:)  Okay.  But I stated

10   your analysis correctly, right?  You assume for

11   purposes of calculating overdoses that all

12   fentanyl, all 40.4 T-codes before 2013 were

13   prescription opioids?

14          A.     I took an average of the years prior

15   to 2013 to estimate a constant number of fentanyl

16   overdoses that were due to prescriptions.  So it is

17   not all.  It is the average across those years.

18          Q.     Well, average after 2013.  But to

19   create that average, you assumed that every death

20   that was coded 40.4 before 2013 was a prescription

21   opioid death, correct?

22          A.     The average of those years is an

23   estimate of the number of prescription opioid

24   deaths.

25          Q.     Okay.

1          A.     I don't ever assume that --

2          Q.     You don't think --

3          A.     I don't --

4          Q.     You don't think your overdose death

5     calculations before 2013 treat all deaths coded as

6     40.4 as prescription opioid related?

7                    MR. ARBITBLIT:  Object to form.

8          A.     I believe I have answered the

9     question.  The method is to take an average of

10    those overdose deaths prior to 2013 as an estimate

11    of the number of fentanyl cases per year that are

12    due to prescription opioids.  It makes no

13    assumption about the total number of T40.4 deaths.

14         Q.     (BY MR. HERMAN:)  Well, what about --

15    and we can look at some of these later, but I

16    understand that you apply that average going

17    forward for 2013, '14, '15, you know, all the years

18    that follow 2013.  But -- 2013 or later.  But for

19    2012, if a death is coded T40, you attribute that

20    death to prescription opioids.  You don't do that?

21                    MR. ARBITBLIT:  Object to form.

22         Q.     (BY MR. HERMAN:)  I see you shaking

23    your head.

24         A.     I think I have explained the

25    methodology, but I will explain it again.  You take

Page 204

1   an average of the deaths per year divided by the

2   number of years, and you use that average as your

3   estimate of the number of cases of prescription

4   opioid deaths.  I don't make assumption about all

5   T40.4 cases.

6           Q.    Well, in 2009, there was a death that

7   was coded T with a T-code 40.4.  Did you attribute

8   that death to prescription opioids, or did you

9   treat it some other way?

10                  MR. ARBITBLIT:  Object to form.

11          A.    Are you looking at the specific

12  spreadsheet?  I can walk through the specific

13  spreadsheet.  Because I have used those numbers for

14  various calculations.  I think there might be some

15  confusion.

16          Q.    (BY MR. HERMAN:)  We will look at it

17  in a second.  I think I understand it, but

18  hopefully we can get on the same page.

19                  But with the multiplier, if I could

20  ask you to -- you came up with your multiplier

21  three by looking at the increased overdose deaths

22  from 2011 to 2015, correct?

23                  MR. ARBITBLIT:  Object to form.

24          Q.    (BY MR. HERMAN:)  And that --

25                  THE REPORTER:  I didn't hear an

Page 205

1    answer.

2                    MR. HERMAN:  Oh.

3            Q.    (BY MR. HERMAN:)  Professor --

4            A.    Yes.

5            Q.    And you would agree with me, or maybe

6    not -- do you agree with me that the rise in

7    fentanyl deaths really began 2013 and later?

8                    MR. ARBITBLIT:  Object to form.

9            A.    There was an increase in 2013

10   nationally.

11           Q.    (BY MR. HERMAN:)  Okay.

12           A.    That is a statement I would agree

13   with.

14           Q.    If you use a time period from 2011 to

15   2015 and fentanyl began to play an increasing role

16   in overdoses in 2013, 2014, '15, '16 and it kept

17   going up, the role fentanyl was playing in

18   overdoses, wouldn't your multiplier, by using a

19   period that predates the introduction of fentanyl,

20   underestimate the opioid use disorder cases?

21                   MR. ARBITBLIT:  Object to form.

22           A.    No.  And I can explain why.

23                   What we did was we weighted the

24   denominator of the multiplier correction for the

25   proportion of deaths for which synthetic opioids or

Page 206

1   T40.4 was involved.  So as the years went on in

2   which there was an increasing number of T40.4

3   deaths contributing to the overall drug poisoning

4   deaths, that is accounted for.

5              That is precisely why we used the

6   methods that we did, was because those T40.4 deaths

7   kept increasing.  So that by 2018, 2019 when an

8   increasing portion of the overdose deaths are T40.4

9   deaths, we are using that higher death rate

10  weighted to all of those deaths.

11            Q.    (BY MR. HERMAN:)  But if your 1.56

12  rate, you multiplied -- you came up with your

13  multiplier three by looking -- you multiplied the

14  Larney number, 0.52, by three.  And you came up

15  with that three times multiplier by looking at the

16  increase in deaths from 2011 to 2015, correct?

17            A.    Yes.

18            Q.    And if you looked at -- did you look

19  at whether if you used a time period from, say,

20  2014 to 2019, that the multiplier should have been

21  higher than three?

22            A.    That would have been an inaccurate

23  and flawed method.  The reliability of my method is

24  that it relies on a standard and time-tested

25  epidemiological practice of using an interruption

1    in a time series.  So to describe more simply,

2    what the interruption is intended to estimate is

3    the amount of change in the probability that you

4    die of a drug overdose, given that fentanyl is

5    involved, not the number of people who are using

6    fentanyl.  Right.

7                  So if you use 2015 to 2019, you would

8    very well capture the number of people using

9    fentanyl, but that would be the wrong number to

10   use.  The right number to use is the interruption

11   in the time series immediately prior and

12   immediately after the change in the contamination

13   of the drug supply.

14                  So we use that three times number

15   because it was the interruption in the time series

16   and then weight it, each of the denominators for

17   every single year by the total number of drug

18   overdoses that involved T40.4 in order to exactly

19   not fall into the methodological flaw that you are

20   describing of conflating the number of people who

21   use fentanyl with the probability that you die

22   given that you use.

23        Q.    Well, I think if you are using a

24   period to account for the increased lethality of

25   fentanyl that predates fentanyl becoming, you know,

Page 208

1   becoming being adulterated into the drug supply,

2   you don't agree with me that you would

3   underestimate the lethality and the role fentanyl

4   played in overdose deaths?

5                 MR. ARBITBLIT:  Object to form.

6   Asked and answered.

7         A.    Yeah, I can explain it again.  I mean

8   you really do need that pre-fentanyl period so you

9   have a baseline, right.  You need to know the

10  probability -- the change in the probability of

11  deaths given that you used fentanyl versus that you

12  didn't use fentanyl.  So you need a time period in

13  which the majority of people using drugs weren't

14  using fentanyl, right.

15                And so that -- if you have seen other

16  kinds of interrupted time series models, which,

17  again, are very standard in epidemiology, exactly

18  to estimate these types of parameters, I need to

19  know a single point of change.  And so when you

20  have this like sharp interruption in a time series,

21  you wouldn't use the later dates to estimate the

22  change in the risk, because that would, again,

23  conflate the number of users with the lethality of

24  deaths.

25                So the interruption of the time

1 series exactly gets at the quantity that we want to

2 get at, which is not how many people are using

3 fentanyl, but is what is the change in the

4 probability of death, given that you use fentanyl

5 compared that you don't use fentanyl, not how

6 widespread is fentanyl use.

7 　　　　　Q.　　(BY MR. HERMAN:)  Well, can I ask you

8 to look at Table 2?  Actually, let's go to --

9 　　　　　　　　MR. HERMAN:  Jason, can I ask you to

10 pull up Exhibit 13?

11 　　　　　　　　MR. ACTON:  Yes.

12 　　　　　Q.　　(BY MR. HERMAN:)  This is CVS for

13 you, Professor Keyes, 13.  One is -- I believe all

14 the tabs are going to be in there.  The way this

15 material, your chart was sent to us was as an Excel

16 spreadsheet, which we will put up on the screen,

17 and then PDFs that followed each tab.

18 　　　　　　　　MR. HERMAN:  Why don't we mark that

19 as Exhibit -- what are we up to? -- Exhibit 19.

20 　　　　　　　　　　(Exhibit 19 was marked for

21 　　　　　　　　　　 identification.)

22 　　　　　　　　MR. HERMAN:  And if we could mark --

23 are all the tabs part of one exhibit?  Okay.  Well,

24 why don't we mark the PDFs as 19-A, B, C, D, E

25 [sic].

Page 210

1              (Exhibit 19-A was marked for

2              identification.)

3              (Exhibit 19-B was marked for

4              identification.)

5              (Exhibit 19-C was marked for

6              identification.)

7              (Exhibit 19-D was marked for

8              identification.)

9         Q.    (BY MR. HERMAN:)  And Dr. Keyes, I

10   don't think -- we sent you the PDFs, but we didn't

11   have a good way to send you the Excel spreadsheet

12   with its separate tabs.  So I think -- we will put

13   that on the screen, but I think we can hopefully

14   walk through it together.

15        A.    Sure.

16        Q.    And -- oh, I have it here.  Okay.

17   And the tabs that you and I were discussing earlier

18   is Figure 7 and 14 where we were talking about the

19   averaging of T40.

20        A.    Yes.

21        Q.    Okay.  And just so the record may be

22   a little clearer, T40.1 is heroin, correct?

23        A.    Yes.

24        Q.    And T40.2 refers to natural or

25   semisynthetic opioids such as oxycodone or

Page 211

1    hydrocodone?

2           A.     Yes.

3           Q.     Okay.  And T40.3 refers to methadone?

4           A.     Yes.  Yes, I think it is -- I think

5    the category is something that is a little bit

6    broader than that in terms of what it is called.

7           Q.     I thought I took it from your report.

8    But we will -- whatever T40.3 is, it includes

9    methadone?

10          A.     It includes methadone.

11          Q.     And T40.4 refers to synthetic opioids

12   such as fentanyl, correct?

13          A.     Correct.

14          Q.     And the issue that you and I, maybe

15   not clearly for the record, we are sort of

16   discussing is that T40 doesn't distinguish between

17   prescription fentanyl and illegal fentanyl, right?

18          A.     T40.4.

19          Q.     T40.4, yeah.

20          A.     That's correct.

21          Q.     And it also can include fentanyl

22   analogs like carfentanil, for example, right?

23          A.     Yes.

24          Q.     Okay.  And so what you were trying to

25   do in the overdoses is come up with a calculation

Page 212

1   of when fentanyl became a problem.  More of a

2   problem by your estimation post 2013 was what

3   number that T40.4 dash should be attributed to

4   prescription versus illicit fentanyl, correct?

5          A.    That's correct.

6          Q.    And the way you came up with that

7   number was, if I understand it correctly, is you

8   took -- I want to get my column right, but

9   Column H, and for every year before 2012 -- and we

10  will just use Trumbull County as an example --

11  where there was a number in Column H, you added

12  those up and you divided it by the number of years

13  for which there was a number, correct?

14         A.    My -- do you -- I guess one

15  procedural question.  Am I allowed to write on

16  this?  Just because I -- it is hard to see and I

17  kind of want to circle things.  I am happy to turn

18  it in --

19         Q.    I think unlike when we did it last

20  time, this isn't -- the exhibit with you I think is

21  not the official exhibit.  Someone should correct

22  me if I am wrong, but if it would be helpful to

23  you, I think you can write on it.

24         A.    Yeah.  It's just I don't have the

25  column number, so I want to figure out -- when you

Page 213

1  say Column H, it doesn't say Column H on mine.

2  That is okay.  I think I can figure it out.  And

3  just based on -- I just wanted to make sure it is

4  okay if I write on this.

5          Q.      Yeah.  Can you see the one that says

6  T40.2 minus T40.4 minus T40.2 -- and then it says

7  "Deaths that only" --

8          A.      Yeah.

9          Q.      I think that is what I am referring

10  to as Column H.  And that is meant to capture

11  overdose deaths that were only T40.4, correct?

12          A.      Correct.

13          Q.      And so my understanding is that you

14  before 2012 or before 2013, so 2012 or earlier,

15  when you estimated the number of RX deaths, you

16  added the column that is RX opioids not including

17  synthetics, so the one that was T40.2, T40.3, and

18  you added that to Column H.  So everything before

19  2012, you treated everything in -- that was a T40.4

20  death as attributable to an RX opioid death.  Is

21  that correct?

22          A.      Not exactly -- everything that was a

23  T40.4 death that didn't have an additional

24  contributing cause of an additional T-code.  So if

25  it had, for example, T40.4 and T40.1 -- that is

```
1   heroin and fentanyl, for example -- that was not
2   treated as a prescription fentanyl death.
3           Q.    Okay.  And that is what you did for
4   the time period before 2012, or 2012 or earlier?
5   And then for 2013 --
6                THE REPORTER:  I didn't hear an
7   answer.
8                MR. HERMAN:  Oh, I'm sorry.
9                THE REPORTER:  Question:  And that is
10  what you did the time period before 2012, or 2012
11  or earlier?
12          A.    And I said that is right.
13          Q.    (BY MR. HERMAN:)  And after 2012, or
14  2013 and later, my understanding is what you did
15  was -- let's just use Lake County, I think, because
16  it will be easier.  Lake County has NA for 1999 to
17  2005, right?  Do you see that?
18          A.    That is right.  Yes.
19          Q.    And so you didn't have a number to
20  use.  So my understanding is you took the number in
21  Column H for 2006 to 2012.  You added those all up
22  and you divided by the number of years for which
23  you had data to come up with an average, right?
24          A.    Yep.  Yes.
25          Q.    And then you rounded that up.
```

Page 215

1   Because I think the number for each of these is 2.,

2   I think, five something and one is 2.7 something.

3   So you rounded that up to three, right?

4          A.     Yes.

5          Q.     And then carrying that forward, you

6   treated for each year three of the T40.4 overdoses

7   as directly attributable to prescription opioids,

8   correct?

9          A.     That is right.

10         Q.     And I think there was one year --

11  there was one year where I believe that -- and it

12  is in Lake County where it says, 2013, if you see

13  Column H has zero in it --

14         A.     Yes, I see that.

15         Q.     And when you go over to Column J,

16  which I understand to be directly attributable to

17  prescription opioids, it looks like you still added

18  three to the nineteen.  Was it -- I'm just

19  wondering whether that was an oversight or whether

20  there is a reason why that would occur.

21         A.     I would have to go back and look

22  through my calculations to see what I actually did

23  there, because I don't have the calculations on

24  this spreadsheet and I can't see the column

25  headings either.

Page 216

1          Q.       Yeah.  Well, if there's zero T40.4

2     deaths in the data, would you agree with me that

3     you shouldn't add three T40.4 deaths to that?

4          A.       Not exactly.  There's not zero T40.4

5     deaths in the data.  That is the estimate of the

6     number of T40.4 deaths that don't have an alternate

7     contributing cause.  So there are T40.4 deaths in

8     the data.  So to derive an estimate of the number

9     of total T40.4 deaths that are attributable to

10    prescription opioids doesn't necessarily preclude a

11    year in which there are zero T40.4-only deaths from

12    having deaths that were due to prescription

13    fentanyl.

14               So I generally try in my

15    epidemiological practice to keep my rationale and

16    my methods really consistent so that I don't fall

17    into kind of methodological errors like assuming

18    that a year in which there was zero T40.4 deaths

19    only to be no deaths attributable to prescription

20    opioids.

21               But I would have to go back and look

22    at the calculations to know for sure.

23          Q.       Okay.  So am I understanding you

24    correctly that if, for example, anything listed in

25    Column H was only coded for T40.4, it didn't have

Page 217

1    potentially a T40.1 code as well?

2            A.     Well, it is an estimate of that,

3    because we can't directly estimate the number of

4    T40.4-only deaths from the CDC WONDER.  All we can

5    do is estimate the total number of T40.2 plus T40.3

6    plus T40.4 and we subtract out the T40.2 and T40.3

7    to try to get an estimate of how many of those are

8    T40.4 only.  But that doesn't preclude all of the

9    T40.4 deaths in that group.

10           Q.     But did you exclude T40.1 from those,

11   or is it possible that someone that had -- is it

12   possible that -- let's just stick with 2013 -- that

13   your column that has 19 in it, which is -- includes

14   T40.2, T40.3 and T40.4, could that also include

15   T40.1, or no, you excluded those?

16                  MR. ARBITBLIT:  Object to form.

17           A.     It absolutely does.  Because, as I am

18   sure you know, there are -- there's no -- people

19   can be prescribed fentanyl and be using heroin.  So

20   you would not want to subtract out heroin users

21   from that group.

22           Q.     (BY MR. HERMAN:)  Okay.  And the only

23   thing you looked at are T-codes related to opioids,

24   correct?

25                  MR. ARBITBLIT:  Object to form.

Page 218

1          A.      For which --

2          Q.      (BY MR. HERMAN:)  Well, for all this,

3    this entire chart, right.  It is only looking at

4    T40.1, T40.2, T40.3 and T40.4, right?

5          A.      This chart only includes those

6    T-codes, yes.

7          Q.      And it is possible that these

8    individuals had T-codes for other substances like

9    cocaine?

10         A.      I didn't look at that.

11         Q.      It is possible they had T-codes

12   for -- well, you didn't look at whether they

13   included T-codes for any nonopioid drugs?

14         A.      Yes.  I did not look at that, as it

15   was not the purpose of this chart.

16         Q.      Okay.  And I just had a question

17   about your Figure 13 as well.  Where -- I apologize

18   if I missed it in your report, but my understanding

19   is you are applying the Ohio numbers to the Ohio

20   HUD rate and Ohio POUD rate to Lake and Trumbull

21   County to come up with your estimate; is that

22   correct?

23         A.      Just so I can get on the same page,

24   we are looking at Figure 13, which is the number of

25   individuals with opioid use disorder that are

Page 219

1   directly attributable to prescription opioids.  And

2   you are looking at the spreadsheet over here.  I

3   guess it is not -- 13. -- 13-D is where I derive

4   the numbers that go into Figure 13.

5               And part of that calculation includes

6   the Ohio heroin use disorder and Ohio prescription

7   opioid use disorder rate and their overlap, their

8   estimated overlap.

9        Q.    Okay.  And so you used the Ohio

10  numbers that you -- and where did you get those

11  rates from?

12       A.    Those were from the National Survey

13  on Drug Use and Health.

14       Q.    Well, and so are we talking about --

15  let's be clear.  Are we talking about the 53.4

16  percent number, or is that the number you are

17  discussing when you are talking about the rate that

18  you got?  Or are you talking about --

19       A.    That is different.

20       Q.    Okay.  Which rate -- can you give me

21  a number, just to orient me?  Because I think --

22       A.    So in Exhibit CVS 13-D --

23       Q.    Uh-huh.

24       A.    -- on the top box, we have the total

25  number -- so let's just take 2015 as an example.

1          Q.      Yep.

2          A.      There's the total number of OUD

3    cases, which is estimated using that multiplier

4    method that we went through.

5          Q.      Yep.

6          A.      And we have the total population

7    size.

8          Q.      Uh-huh.

9          A.      The methodology used to estimate what

10   proportion of those OUD cases are directly

11   attributable to prescription opioids involves

12   looking at the percentage of heroin use disorder

13   and prescription opioid use disorder and their

14   overlap, and using those percentages to derive the

15   number that are directly attributable to

16   prescription opioids.

17         Q.      Okay.  And you are using the Ohio

18   rate, which I think you told me you got from the

19   National Drug Use Survey?

20         A.      National Survey on Drug Use and

21   Health.

22         Q.      Okay.  All right.

23                 MR. HERMAN:  Well, if you give me

24   five minutes, I may be done.

25                 THE VIDEOGRAPHER:  Stand by.  We are

Page 221

1   now off the record.  The time on the video monitor

2   is 5:01.

3                   (Off-the-record discussion.)

4                   (Whereupon, a break was had from 5:01

5                   p.m. until 5:11 p.m. EDT)

6                   THE VIDEOGRAPHER:  We are now on the

7   record.  The time on the video monitor is 5:11.

8           Q.      (BY MR. HERMAN:)  Dr. Keyes, can I

9   ask you to go to Page 24 of your report.  I just

10  want to touch on something we touched on earlier,

11  but I didn't have the articles handy.

12                  On Page 24 of your report, under the

13  first bold heading, do you see where you say,

14  "Available estimates indicate that ninety percent

15  of patients prescribed opioids after surgery have

16  unused medications, most of which are not disposed

17  of or stored properly -- or stored safely"?

18          A.      Stored safely.

19          Q.      Okay.  And if I could ask you to take

20  out -- this was a study I mentioned earlier -- what

21  is CVS 7-17 for -- in your folder.  And this is

22  going to be Exhibit 20 for the deposition.

23                  (Exhibit 20 was marked for

24                  identification.)

25          Q.      (BY MR. HERMAN:)  Do you have that,

Page 222

1  Professor Keyes?

2          A.      I do.  I do.

3          Q.      And this is an article that I

4  referenced earlier titled "Unused Opioid Analgesics

5  and Drug Disposal Following Outpatient Dental

6  Surgery:  A Randomized Controlled Study [sic]."  Do

7  you see that?

8          A.      I do.

9          Q.      And this is one of the articles you

10  cite in support of your statement that available

11  estimates indicate that ninety percent of patients

12  prescribed opioids after surgery have unused

13  medication, correct?

14          A.      Yes.

15          Q.      Page 79, the reference is 79 in your

16  report.

17          A.      Yes.

18          Q.      And if I could ask you to go to Page

19  2 and the first column, the fourth paragraph down.

20  And do you see where it says, "The primary aim of

21  this study was to describe patterns of opioid

22  prescribing and consumption after dental surgery

23  with a specific focus on measuring the quantity of

24  opioids left unused"?

25          A.      Yes, I see that.

1          Q.      Okay.  And if you go to the next page

2     under the heading 3.1, do you see that in this

3     study, they found that most patients, ninety-four

4     percent, received a prescription for an opioid

5     containing analgesic after tooth extraction?

6          A.      I do.

7          Q.      So at least in this study,

8     ninety-four percent of patients got a prescription

9     opioid -- prescription written for them after a

10    tooth extraction, correct?

11         A.      Yes.

12         Q.      And if you go to Page 5, Section 4.1,

13    and do you see where it says, "We found that

14    fifty-four percent of opioid pills prescribed to a

15    patient in this study (excluding those with dry

16    socket) were left unused after surgery.  Based on

17    the national volume of surgical tooth extractions

18    and literature on dental practitioners' prescribing

19    practices, our results suggest that more than a

20    hundred million opioid analgesic pills are left

21    unused following surgical tooth extraction in the

22    United States every year."

23         A.      Yes.  I see that.

24         Q.      Okay.  So earlier I asked if there

25    was an article that suggested that there were more

1    than a hundred million opioid analgesic pills that

2    are left unused following surgical tooth

3    extractions in the United States each year.  Is

4    that what this article says?

5         A.    Well, they don't calculate that -- I

6    mean they haven't done a primary data analysis on

7    that one hundred million opioid analgesic pills.

8    They are extrapolating about a hundred million

9    opioid analgesic pills if you assume that

10   fifty-four percent of opioid pills in this sample

11   that were unused can be mapped accurately onto the

12   national volume of tooth extractions.

13        Q.    Do you take issue with their analysis

14   not involving a primary data review?

15        A.    I think that their analysis is fine.

16   What I would be cautious about is interpreting this

17   study as showing that there's a hundred million

18   opioid analgesic pills unused, because that is not

19   what they are purporting to do.

20        Q.    Okay.  Well, they do say that their

21   results suggest that there are a hundred million

22   unused opioid pills following tooth extractions in

23   the United States per year, right?

24             MR. ARBITBLIT:  Object to form.

25        A.    The study states, "Our result

1  suggests that more than one hundred million opioid

2  analgesic pills are left unused following tooth

3  extractions in the United States."  That is what

4  the text says.

5          Q.    (BY MR. HERMAN:)  And I guess I am

6  not understanding.  What issue are you taking with

7  that extrapolation?

8          A.    I don't take an issue with their

9  extrapolation.  I would not conclude from this that

10  this conclusively demonstrates that there are one

11  hundred million unused pills.  That is an estimate

12  from this study.

13          Q.    Okay.

14          A.    So if you say studies have shown that

15  there's a hundred million unused pills, that is not

16  what the study shows nor is it -- it is not

17  claiming to show that.

18          Q.    I think I understand.  They are

19  making an estimate that is extrapolation.  But to

20  actually know whether there were really a hundred

21  million pills left over, you would have to do

22  additional primary data analysis; is that right?

23               MR. ARBITBLIT:  Object to form.

24          A.    Additional analyses would need to be

25  done in order to conclude that this -- you would

Page 226

1    have to do a study to -- that would provide

2    rigorous analysis to conclude that there are a

3    hundred million unused pills.  That is not what

4    this study was trying to show.

5              Q.    (BY MR. HERMAN:)  Okay.  But -- all

6    right.  And if you go down, though, the next

7    paragraph, it is, "these results are consistent

8    with prior research regarding opioid use among

9    post-surgical patients.  Bates surveyed patients

10   following urological surgery and found that

11   forty-two percent of prescribed opioids remained

12   unused two to four weeks after the procedure.

13   Harris found that fifty-nine percent of opioids

14   prescribed following outpatient dermatological

15   surgery were left unused, and Rogers identified

16   that sixty-six percent of opioids were unused among

17   patients following outpatient orthopedic surgery."

18              And so it is discussing a number of

19   studies that have found that prescription opioids

20   are left over from prescriptions doctors write to

21   their patients, correct?

22              MR. ARBITBLIT:  Object to form.

23        A.    These studies show that there's a

24   large proportion of opioids that are unused.

25        Q.    (BY MR. HERMAN:)  And if you go to

Page 227

1   the conclusion -- and this is, I believe, a study

2   that was written in 2016, correct?

3          A.      The data are from a randomized

4   control trial that was conducted in 2015.

5          Q.      And this study was published in 2016?

6          A.      It was published in 2016.

7          Q.      And dentists -- and if you go to the

8   Conclusion, it says, "Dentists and oral surgeons

9   could substantially reduce the amount of

10  prescription opioids available for diversion by

11  reducing the quantity of opioids prescribed

12  following these procedures.  Recently-published

13  recommendations in the dental literature highlight

14  this opportunity," right?

15         A.      Yes, that is what that says.

16         Q.      And would you agree with me that the

17  studies that you cite on unused prescription

18  opioids -- there are, I believe, three of them

19  here -- that they are directed to trying to change

20  prescriber behavior and the amount of opioids that

21  they prescribe to patients following various

22  surgical procedures?

23         A.      No.  The next sentence of this paper

24  says, "The availability of a pharmacy-based drug

25  disposal program with a financial incentive to

Page 228

1    return unused opioid analgesics is associated with

2    a lower rate of patients indicating that they

3    planned to keep their leftover opioid pills."

4              So I think, at least with this paper,

5    they are suggesting multiple points of intervention

6    to reduce opioid -- unused opioid pills, some at

7    the pharmacy level and some at the provider level.

8         Q.    So they are suggesting, one, that

9    prescribers reduce the number of prescription

10   opioids that they prescribe for dental surgery,

11   correct?

12        A.    That is one intervention that is

13   recommended.

14        Q.    And two, they are suggesting that

15   there are potentially pharmacy-based drug disposal

16   programs with a financial incentive to get the

17   patients to bring back unused prescription opioids,

18   correct?

19        A.    That is another intervention that is

20   recommended in this paper.

21        Q.    And do you agree that the other two

22   studies that you cite about unused prescription

23   opioids following surgical procedures are directed

24   at changing prescriber behavior in the

25   prescriptions that they write?

Page 229

1                    MR. ARBITBLIT:  Object to form.

2          A.     I would not agree with that without

3    reviewing the articles.

4          Q.     (BY MR. HERMAN:)  Well, do you recall

5    that one of them discusses finding the ideal

6    number, and it estimates a number that would

7    satisfy eighty percent of the patient's pain needs?

8                    MR. ARBITBLIT:  Object to form.

9          A.     I would need to look at the article.

10         Q.     (BY MR. HERMAN:)  Why don't we do

11   that.

12                   MR. HERMAN:  If I could ask you,

13   Jason, to pull up seven --

14         Q.     (BY MR. HERMAN:)  Professor Keyes, if

15   you could get out 7-16, 7-16.

16                   (Exhibit 21 was marked for

17                   identification.)

18                   MR. HERMAN:  And this will be Exhibit

19   21.

20         Q.     (BY MR. HERMAN:)  Dr. Keyes, do you

21   have that?

22         A.     I do.

23         Q.     And this is called -- this article is

24   titled "Wide Variation in Excessive Dosage of

25   Opiate Prescriptions for Common General Surgical

Page 230

1    Procedures," correct?

2         A.    Yes.

3         Q.    Okay.  And this is an article that

4    was published in 2017, correct?

5         A.    Yes.

6         Q.    Okay.  It is one you cite in your

7    report?

8         A.    I do.

9         Q.    Okay.  And can I get you to look at

10   the first page, 709, second column, the last

11   paragraph.  Do you see where it says, "Providers

12   both have societal imperative to avoid

13   overprescribing and an obligation to ensure their

14   patient's post-operative pain is addressed"?  Do

15   you see that text?

16        A.    I do.

17        Q.    And does that refresh your

18   recollection that this paper, and we can go through

19   more of it, is trying to address overprescribing by

20   doctors balanced against the need to address

21   post-operative pain?

22        A.    That is not my read of the purpose of

23   the paper.  In the background section of the

24   abstract, they talk about diversion as a major

25   contributor to mortality.  And while the

Page 231

1    introduction focuses -- one paragraph of the

2    introduction focuses on providers, other paragraphs

3    focus on other --

4           Q.    And what they are trying to do is to

5    get prescribers to write less opioid prescriptions

6    so there's less opportunity for pills left over

7    after surgery to be diverted, correct?

8           A.    That is not what their conclusion is

9    or their objective as stated.

10          Q.    That is not your understanding?  All

11   right.  Well, let's keep going.

12                So under Methods, they "evaluated the

13   five most common outpatient general surgery

14   procedures performed at our academic medical

15   facility in 2019.  These were partial mastectomies,

16   partial mastectomies sentinel lymph node biopsy,

17   laparoscopic" -- I can't pronounce that word, but

18   "cholecystectomy, laparoscopic inguinal hernia

19   repair and open inguinal hernia repair," right?

20          A.    Yes.

21          Q.    And if you look at the next column

22   over up at the very top, they found that in 2015

23   for those five procedures, 581 (90.5 percent)

24   patients were prescribed an opioid, right?

25          A.    Correct.

1      Q.      And if you go down to the last

2    paragraph, they obtained phone survey data on

3    prescription opioid pills actually taken for a

4    hundred and twenty-seven of those patients.  Is

5    that right?

6           A.      That's right.

7           Q.      And what they found was that a total

8    of three thousand five hundred and forty-five pills

9    were prescribed to those one hundred twenty-seven

10   patients and that two thousand five hundred and

11   twenty-seven, 71.3 percent, excess pills were

12   prescribed, right?

13          A.      Uh --

14          Q.      If you look at the last sentence on

15   Page 7 tab.

16          A.      I see.  I see.  Two thousand five

17   hundred and twenty-seven excess pills.

18          Q.      And then if you go to Page 711, do

19   you see in the second paragraph it says, "We

20   calculate an ideal number of pills to prescribe for

21   each operation by determining the number of pills

22   that would satisfy approximately eighty percent of

23   patients' post-operative opioid use"?

24                 Do you see that?

25          A.      I do.

                                                        Page 233

 1                    MR. ARBITBLIT:  I think we are out of

 2    time.

 3                    MR. HERMAN:  Are we out of time?

 4                    MR. ARBITBLIT:  Five hours, we are

 5    done.

 6                    MR. HERMAN:  Okay.

 7                    THE VIDEOGRAPHER:  Off the record?

 8                    MR. HERMAN:  Thank you.

 9                    THE VIDEOGRAPHER:  Stand by.  You are

10    now off the record.  The time on the video monitor

11    is 5:28.

12

13

14         (Deposition concluded at 5:28 p.m. EDT)

15

16                  FURTHER THE DEPONENT SAITH NOT

17

18

19

20

21

22

23

24

25

Page 234

1                    C E R T I F I C A T E
2
3
4     STATE OF ALABAMA
5     JEFFERSON COUNTY
6
7              I hereby certify that the above and
8     foregoing deposition was taken down by me in
9     stenotypy, and the questions and answers thereto
10    were reduced to typewriting under my supervision,
11    and that the foregoing represents a true and
12    correct transcript of the deposition given by said
13    witness upon said hearing, to the best of my
14    ability.
15              I further certify that I am neither
16    of counsel nor of kin to the parties to the action,
17    nor am I in anywise interested in the result of
18    said cause.
19
20
21          /s/  LAURA H. NICHOLS
            Commissioner-Notary Public, State of AL
22          ACCR License No. 3, Exp. 9/30/2021
            GA CCR No. 2714, Exp. 4/1/2022
23          TN LCR No. 679, Exp. 6/30/2021
            Transcript Certified on 6/3/2021
24
25

```
                                                              Page 235
 1                          Veritext Legal Solutions
                                1100 Superior Ave
 2                                 Suite 1820
                             Cleveland, Ohio 44114
 3                            Phone: 216-523-1313
 4
       June 4, 2021
 5
       To: MR. ARBITBLIT
 6
       Case Name: National Prescription Opiate Litigation - Track 3 v.
 7
       Veritext Reference Number: 4621640
 8
       Witness:  Katherine Keyes , Ph.D.        Deposition Date:  6/3/2021
 9
10     Dear Sir/Madam:
11
       Enclosed please find a deposition transcript.  Please have the witness
12
       review the transcript and note any changes or corrections on the
13
       included errata sheet, indicating the page, line number, change, and
14
       the reason for the change.  Have the witness' signature notarized and
15
       forward the completed page(s) back to us at the Production address
16     shown
17     above, or email to production-midwest@veritext.com.
18
       If the errata is not returned within thirty days of your receipt of
19
       this letter, the reading and signing will be deemed waived.
20
21     Sincerely,
22     Production Department
23
24
25     NO NOTARY REQUIRED IN CA
```

```
1                    DEPOSITION REVIEW
                   CERTIFICATION OF WITNESS
2

        ASSIGNMENT REFERENCE NO: 4621640
3       CASE NAME: National Prescription Opiate Litigation - Track 3 v.
        DATE OF DEPOSITION: 6/3/2021
4       WITNESS' NAME: Katherine Keyes , Ph.D.
5           In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7           I have made no changes to the testimony
    as transcribed by the court reporter.
8

    _____          _____
9   Date                      Katherine Keyes , Ph.D.
10          Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12

        They have read the transcript;
13      They signed the foregoing Sworn
            Statement; and
14      Their execution of this Statement is of
            their free act and deed.
15

        I have affixed my name and official seal
16
    this _____ day of_____, 20_____.
17

                   _____
18                 Notary Public
19                 _____
                   Commission Expiration Date
20
21
22
23
24
25
```

Page 237

1              DEPOSITION REVIEW
              CERTIFICATION OF WITNESS
2

        ASSIGNMENT REFERENCE NO: 4621640
3       CASE NAME: National Prescription Opiate Litigation - Track 3 v.
        DATE OF DEPOSITION: 6/3/2021
4       WITNESS' NAME: Katherine Keyes , Ph.D.
5       In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7       I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as
8  well as the reason(s) for the change(s).
9       I request that these changes be entered
   as part of the record of my testimony.
10

        I have executed the Errata Sheet, as well
11 as this Certificate, and request and authorize
   that both be appended to the transcript of my
12 testimony and be incorporated therein.
13 _____       _____
   Date                   Katherine Keyes , Ph.D.
14

        Sworn to and subscribed before me, a
15 Notary Public in and for the State and County,
   the referenced witness did personally appear
16 and acknowledge that:
17      They have read the transcript;
        They have listed all of their corrections
18          in the appended Errata Sheet;
        They signed the foregoing Sworn
19          Statement; and
        Their execution of this Statement is of
20          their free act and deed.
21      I have affixed my name and official seal
22 this _____ day of_____, 20_____.
23          _____
            Notary Public
24

            _____
25          Commission Expiration Date

Page 238

1              ERRATA SHEET

     VERITEXT LEGAL SOLUTIONS MIDWEST

2          ASSIGNMENT NO: 4621640

3    PAGE/LINE(S) /        CHANGE        /REASON

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19

     _____       _____

20   Date                   Katherine Keyes , Ph.D.

21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

22   DAY OF _____, 20_____ .

23                  _____

                    Notary Public

24

                    _____

25                  Commission Expiration Date

**&**

**&** 2:9,20 3:7 4:7
6:8 7:18

**0**

**0.1** 169:18 170:1,7
170:12,17
**0.12** 171:16,18,21
**0.52** 199:17,25
200:7,11,23 201:5
206:14
**0.72** 171:17

**1**

**1** 7:10 10:24 14:1
17:25 18:3,7 19:5
74:7 170:13 171:9
**1.1** 136:21
**1.28** 171:19
**1.56** 200:9 206:11
**10** 8:21 93:6 94:9
94:10
**1000** 5:21
**1001** 3:8
**10013** 2:23
**101** 4:8
**10178-0060** 4:9
**107-11** 9:8
**109-25** 9:12
**11** 9:4 94:11,12
95:4,5 139:1
174:23 175:3
**1100** 235:1
**111** 171:16,19
**11:09** 13:10,16
**12** 9:8 11:5 67:12
68:1,21 107:9,11
107:20 108:19
**12,378** 171:21
**12.4** 109:10
**120** 168:11,12

**12:14** 62:11,13
**12:48** 62:13,15
**12:49** 62:23,25
**12:52** 62:25 63:2
**12th** 95:17 143:23
**13** 9:12 11:7
109:24,25 209:10
209:13 218:17,24
219:3,3,4,22
**130-10** 9:17
**14** 7:4 10:22 74:16
74:21,24 75:5
77:25 80:22
103:24 104:3
106:2 130:9,10
203:17 210:18
**14.7** 169:15
**141** 78:6
**145-1** 9:21
**149-6** 10:4
**15** 7:5 9:21 144:25
145:1,9 150:8
171:21 203:17
205:16
**15.9** 109:20 169:13
**152** 43:15
**15219** 6:11
**16** 7:11 10:4 149:4
149:6,9 177:2
181:18 205:16
**164** 149:19
**167-12** 10:10
**16th** 18:4 19:7
**17** 1:6 10:10 14:7
167:9,10,12
**17-25** 7:10
**1700** 3:9
**176** 145:14
**18** 7:22 10:16
181:9,10

**18-14** 7:15
**18-8** 7:12
**1800** 5:20
**181-10** 10:16
**1820** 235:2
**18409** 234:19
**19** 10:19,21,23
11:4,6 163:12,13
209:19,20,24
210:1,3,5,7 217:13
**19.4** 137:2 138:6
**190** 93:2,15
**1971** 133:7
**1976** 144:2
**1990s** 46:2,4,7,9
64:5 65:5
**1997** 65:15
**1999** 214:16

**2**

**2** 7:12 11:5 18:5,7
18:8,23 21:7 24:9
24:12 36:2 51:11
69:6 108:19
112:13 147:1,19
147:19 209:8
215:1 222:19
**2.7** 215:2
**20** 11:8 164:8
221:22,23 236:16
237:22 238:22
**20.5** 136:18
**2002** 136:11
138:15
**20036-5807** 5:22
**2005** 214:17
**2006** 214:21
**2008** 125:25
**2009** 204:6
**2010** 116:12 126:3
126:7

**2011** 136:11
138:15 201:23
204:22 205:14
206:16
**2012** 9:24 44:6
45:5,10,11,13,20
203:19 212:9
213:14,14,19
214:4,4,10,10,13
214:21
**2013** 9:20 201:16
201:21,22,25
202:4,12,15,18,20
203:5,10,17,18,18
205:7,9,16 212:2
213:14 214:5,14
215:12 217:12
**2014** 10:15 69:3
81:5 205:16
206:20
**2015** 9:11 10:9
93:21 95:17 108:2
116:12 144:2
201:23 204:22
205:15 206:16
207:7 219:25
227:4 231:22
**2016** 7:21,22 11:12
43:2,4,7,19,24
47:25 227:2,5,6
**2017** 9:16 11:17
230:4
**2018** 89:18 90:23
126:4,8 206:7
**2019** 10:17 181:14
206:7,20 207:7
231:15
**202** 5:23
**2020** 63:10
**2021** 1:18 7:11
13:9,17 18:4 19:7

235:4

**209-20**  10:19

**21**  11:13 229:16,19

**21.5**  140:24

**210-1**  10:21

**210-3**  10:23

**210-5**  11:4

**210-7**  11:6

**212**  2:24 4:10

**216**  3:11 6:21

**216-523-1313**
235:3

**22**  182:12

**221-23**  11:8

**229-16**  11:13

**23**  171:22

**24**  221:9,12

**24400**  6:19

**250**  2:21

**26**  80:14

**265**  11:17

**2714**  234:22

**275**  2:10

**2804**  1:5,6

**281-3838**  5:11

**29**  10:17

**29th**  2:10 181:14

**2:01**  107:4,7

**3**

**3**  1:18 7:13,15
10:20 13:9 14:5
18:14,17 31:6
133:6 136:2,3,5
149:21 167:25
234:22 235:6
236:3 237:3

**3,654**  171:20

**3.1**  223:2

**3.6**  141:24 142:15
142:24

**300**  6:19

**309-6000**  4:10

**30th**  63:10

**31-7**  7:17

**31.3**  140:4,10

**312**  4:21

**325**  5:8

**33**  74:25 80:22
104:24,25 106:2

**34.1**  177:4 178:10
178:14,24

**355.9500**  2:24

**35th**  6:10

**36**  168:11,11

**36.7**  177:6

**378**  171:22

**3:02**  144:17,19

**3rd**  13:17

**4**

**4**  7:17 11:17 31:6
31:7,12 36:2
145:16 147:3
181:4,5 183:6,7
235:4

**4.1**  223:12

**4/1/2022**  234:22

**40**  92:20

**40.4**  202:12,20
203:6

**40.4.**  204:7

**412**  6:12

**415**  2:12

**42-21**  7:19

**43**  147:4

**44114**  3:10 235:2

**44122**  6:20

**45**  45:2

**4621640**  235:7
236:2 237:2 238:2

**47**  171:20

**471-3490**  6:12

**48.2**  140:18

**494-4400**  4:21

**4:27**  198:11,14

**5**

**5**  7:19 33:25 42:19
42:21 43:1 46:12
47:5 63:6,6 71:12
135:6 151:20
168:15 223:12

**50**  171:17

**51**  121:25

**53**  199:5,10

**53.4**  219:15

**54**  4:19 198:25
200:22

**562**  97:1

**581**  231:23

**5:11**  221:5,7

**5:28**  233:11,14

**6**

**6**  8:4 63:3 68:9,17
71:12 93:12 108:5
139:1

**6,902**  171:18

**6.1**  171:22

**6.6**  109:15

**6/3/2021**  234:23
235:8 236:3 237:3

**6/30/2021**  234:23

**600**  5:9

**600-0114**  3:11

**60654**  4:20

**614**  5:11

**618**  3:21

**62**  20:5,7

**62002**  3:19

**63-3**  8:4

**65.3**  169:3

**65.9**  177:23 178:9

**67-15**  8:8

**679**  234:23

**693-3104**  3:21

**7**

**7**  8:8 10:22 67:14
67:15,17 68:22
76:25 80:15 167:3
210:18 232:15

**7-1**  42:18

**7-12**  67:23 77:1,2

**7-16**  229:15,15

**7-17**  221:21

**7-18**  167:3,6,7,7

**7-19**  93:19,22

**7-2**  80:8,13

**7-21**  149:3

**7-22**  144:21 145:4
145:5

**7-23**  130:8

**7-26**  80:12

**7-27**  107:9

**7-8**  95:7

**7.9**  108:23

**709**  230:10

**71.3**  232:11

**711**  232:18

**719**  93:3

**72-26**  80:8

**722**  145:4,4

**76**  20:5,7

**763**  77:21 78:12,18

**77-5**  8:13

**778-1800**  5:23

**79**  222:15,15

**79.5**  135:3,10,13
135:19 136:14
137:19 138:6

**8**

**8** 8:13 77:4,5,16
94:14 95:3,7,8,10
**80-10** 8:17
**804** 14:7
**82** 181:17
**83,542** 171:19
**831-0001** 6:21
**86** 21:24 22:2,10
**862** 81:8
**863** 81:17

**9**

**9** 8:17 10:24 80:9
80:10 93:9,13
109:24
**9/30/2021** 234:22
**90,415** 171:17
**90.5** 231:23
**93-6** 8:21
**94.5** 169:21
**94111-3339** 2:11
**95-5** 9:4
**956-1000** 2:12
**96.4** 142:2
**97** 63:12
**98.9** 138:18,23

**a**

**a.m.** 13:10,16
**abbreviation**
32:11
**ability** 86:1 192:23
234:14
**able** 16:23 17:19
79:22 178:8
179:11,13,25
**absolute** 38:24
42:9 60:7
**absolutely** 217:17
**abstract** 44:9
110:15 135:8

142:21 143:3
230:24
**abuse** 8:11 9:14
10:12 67:20 69:1
110:7,20 111:15
112:9 114:4 132:1
132:5,13,16 139:9
139:13,17,25
140:11,15 167:17
176:11
**abusers** 9:16
110:9
**abusing** 111:1,14
112:9 140:6,21
**academic** 231:14
**academies** 8:23
100:1 103:8
**academy** 65:16
**accelerated** 71:18
72:13 73:2,10
**accept** 161:9,12
**accepted** 152:3,21
152:25
**access** 9:23 10:8
10:15 192:23
194:16
**accidentally** 67:22
67:23
**account** 171:2
201:10 207:24
**accounted** 206:4
**accr** 234:22
**accrediting** 65:10
**accurate** 44:16
74:23 184:15
**accurately** 16:24
44:21 76:23
224:11
**acknowledge**
199:11 236:11
237:16

**act** 29:8,11 73:24
236:14 237:20
**acting** 13:4
**action** 14:16
234:16
**actions** 94:16
**active** 43:10
**activities** 50:1
75:25 76:7,8,15
80:2 89:4 91:3
100:2,13,13,15
102:12,25 103:4
103:25 106:5,10
106:13
**activity** 90:13
102:18 149:10
**acton** 5:17 93:10
94:11 167:7,9
209:11
**actual** 35:12
**acute** 64:6 69:10
69:14 70:11 111:5
128:17 165:15,22
166:10,17 168:2,3
169:10,11,13,15
169:21 170:6
171:17,19,22
172:6
**add** 81:19 138:5
138:12 216:3
**added** 212:11
213:16,18 214:21
215:17
**addiction** 9:7
65:19,21 95:13
174:25 175:8
176:13,18,22
**addictive** 9:16
100:3
**addition** 20:12
96:24 97:2

**additional** 20:25
159:5 179:17,22
179:24 180:4
213:23,24 225:22
225:24
**address** 230:19,20
235:15
**addressed** 230:14
**adequate** 195:22
**adjusted** 200:25
**adjustment**
199:22 200:10
**administer** 14:14
**administration**
30:19 132:2
**admonition**
173:11
**adolescents**
108:21,21 109:8
144:1
**adult** 150:15
**adulterated** 208:1
**adulteration** 201:1
201:11,15,19
**adults** 8:23 10:7
93:14 97:21
109:13,18 149:12
149:23
**advance** 102:1
**advanced** 97:3,7
**adverse** 163:21
164:3
**advocate** 71:15
72:23 73:19
**affiliation** 131:20
**affixed** 236:15
237:21
**age** 8:22 97:21
**aged** 93:14
**agencies** 94:18
132:12

**agency** 132:4,9,10
  132:15
**ages** 146:5 149:23
**aggregate** 27:3
  30:12 106:8
**aggressive** 92:22
  92:23 94:1,20
  97:22 98:1 99:22
  100:21,25 101:8
  101:12,16 102:6
**ago** 198:18,20
**agree** 13:25 34:25
  35:8 38:20 46:14
  46:17 50:9,25
  52:14 55:17,17
  86:6 87:3,12
  100:18 101:9,13
  111:18,24 112:2,6
  112:7 114:16
  131:24 132:11
  133:21 144:4
  158:14 161:22
  162:1,15,20,25
  177:25 178:5
  181:19 182:14
  205:5,6,12 208:2
  216:2 227:16
  228:21 229:2
**agreed** 12:2
**agreeing** 117:14
**ahead** 18:2,11,12
  31:5 100:8 192:14
  193:14
**aid** 4:4 15:20 16:1
  26:5,14,20,24
  27:17 28:12 39:4
  106:16 172:17
**aim** 222:20
**al** 93:21 94:5
  164:10 234:21

**alabama** 13:3,4
  234:4
**alcohol** 9:11 11:12
  108:7 113:1
  145:22 148:5,6
**alexander** 95:16
  95:20 96:7,12
**allen** 6:6,13
**alliance** 4:13
**allowed** 212:15
**altering** 112:22
**alternate** 216:6
**alternative** 71:16
  72:25
**alton** 3:19
**amaral** 2:18
**american** 65:16,16
**amid** 87:8
**amidst** 82:6
**amount** 85:2
  129:5 163:5,10
  207:3 227:9,20
**analgesic** 223:5,20
  224:1,7,9,18 225:2
**analgesics** 11:9
  34:6,7,10 69:9
  222:4 228:1
**analogs** 211:22
**analyses** 225:24
**analysis** 9:15
  110:8 125:18
  126:24 127:13
  170:23 194:7
  198:23 202:8,10
  224:6,13,15
  225:22 226:2
**analytical** 168:18
**analyze** 125:20
**analyzed** 85:9,18
  104:19 115:5
  116:5

**analyzing** 194:6
**andrew** 95:13
**anna** 3:15
**annals** 11:16
**annual** 8:4,7 9:7
  133:17 134:21
**answer** 16:19,23
  33:1 40:24,25
  41:3,13,24 42:9
  46:11 48:25 66:22
  106:16 124:8
  129:9 131:14
  158:8,10 172:16
  183:3 205:1 214:7
**answered** 28:5
  42:4 53:5 70:13
  70:21,25 87:17,24
  90:21 92:15
  156:16 157:7
  159:5 181:22
  182:18 187:21
  194:25 203:8
  208:6
**answers** 234:9
**anywise** 234:17
**apologize** 19:3
  33:24 59:21 60:24
  62:17,21 68:3
  108:19 117:20
  182:10,11 199:6
  218:17
**appear** 26:25 27:9
  236:11 237:15
**appearance** 61:19
**appearances**
  14:17
**appeared** 21:17
  131:6
**appearing** 2:2 3:2
  4:2 5:2 6:2

**appended** 237:11
  237:18
**applicable** 84:10
  84:14,16
**application** 200:23
**applies** 84:18
**apply** 29:3,6 83:24
  85:3 106:16
  113:12,19,22
  119:1 165:14
  166:11,20 170:6
  170:17 173:22
  174:9,10 203:16
**applying** 218:19
**appreciate** 68:2
**approach** 9:6 66:1
  95:12
**approaches** 65:8
  71:18 72:14 73:2
  73:11
**appropriate** 50:3
  50:19 51:4,6,9
  100:9 111:11
  153:14 159:17
  160:24 161:6,10
**appropriately**
  39:21 44:25 66:20
  157:20,25,25
  158:25 159:9,9
  160:2,11,12,23,23
  161:24 162:14,19
  188:22
**appropriateness**
  40:1
**approval** 7:18
  31:14,19 33:7,8,18
  34:24 35:1,10,14
  38:21,25
**approve** 42:1,7
**approved** 30:18
  30:22 34:3,15

35:8,16 36:6,14,22
38:5 39:7 40:19
41:8,17 59:15
157:4,22 158:16
186:17
**approving** 39:11
**approximately**
17:14 44:5 129:6
133:17 134:22
169:7 177:15,20
177:22 232:22
**april** 7:11 10:17
11:17 18:4 19:6
181:13
**arbitblit** 2:5 23:5
24:3 27:11 28:4
32:23 33:13,22
35:23 36:10 37:3
37:14,22 38:14
40:6,13,21 41:4,10
41:19 42:3,13
46:23 47:20 48:1
48:12 49:12,20
51:25 52:4,11,17
53:4,18 54:7,21,25
55:11 56:7,19
57:7 58:5,15
59:12 60:9 61:6
66:7 67:2 69:22
70:12,20 71:8
73:13 74:10 80:3
82:2 83:13,25
84:11,23 85:12,21
86:8,16 87:5,16,23
88:11,19 89:5,22
90:8,14,20 91:22
92:3 95:23 96:5
96:18 97:12 98:3
98:9,16 99:1,8,23
101:2 102:7 103:6
103:19 104:2,5,12

105:7,16 106:11
106:23 111:22
113:14,24 114:11
115:4,12,21 116:2
116:8,25 118:1,18
119:6,13 120:2,15
120:20 121:3,13
121:23 122:6,18
123:8 124:3,13,24
125:8 126:16
127:10 128:14,19
129:3,18 131:2,16
132:6,23 133:25
134:7,25 135:24
138:7,21 139:19
141:7,15 142:18
144:22 146:13
147:12 150:23
152:11 153:16
154:10 155:5,19
156:4,15 157:6,17
158:18 159:3,11
159:13,19 160:4
160:14 161:2,17
162:10 163:7
165:24 166:22
168:23 169:22
170:8,13,20 171:5
173:24 175:22
176:14 178:4,12
179:16 180:10
183:15 184:2
185:7,21 186:11
186:20 187:13,20
188:2,9,18 189:24
190:12,23,25
191:12 192:11,13
193:20 194:5,24
195:10 196:4,17
196:24 197:18
198:1 201:13

202:6 203:7,21
204:10,23 205:8
205:21 208:5
217:16,25 224:24
225:23 226:22
229:1,8 233:1,4
235:5
**area** 124:6 125:1
**areas** 191:5
**arguing** 65:19
**argumentative**
37:23 53:5 85:13
87:6,17 88:12,20
98:4,17 99:2,24
102:8 158:19
161:21
**array** 191:6
**article** 7:17 8:4,8
8:13,17,21 9:4,8
9:12,17,21 10:4,10
11:8,13 63:6,14,20
64:9,13 65:6,24
66:9,18,18,22 67:8
67:18 68:24 71:12
76:21 77:17 78:2
79:4,6,10,11,13,19
79:23 80:16 82:14
84:3 86:6,24
87:12 88:6 89:20
89:25,25 90:9
93:21 94:15 95:3
95:10,16 97:19,24
98:11,19,24 99:4
99:11,14 100:5,14
100:16 101:4,9,19
102:4,11 103:8,8
104:6,16 107:21
107:24 108:1,5
110:5,11 130:15
131:5 145:9,13
149:10,15 161:19

163:15 167:22
176:17,18,23
190:2 222:3
223:25 224:4
229:9,23 230:3
**articles** 67:7 76:10
76:12,14,17 77:23
85:3 89:7 90:3,17
90:24 91:11
105:17 106:7
173:17,22 189:16
189:19,21 190:6
221:11 222:9
229:3
**aside** 67:24 101:23
109:23 117:21
149:2
**asked** 22:24 28:4
42:4 53:5 70:12
70:20 84:20 87:16
87:23 88:20 90:21
98:21,22 114:5
156:16 157:7
159:8 160:21
161:18 165:17
181:18 182:14
183:2 185:3
187:21 194:24
208:6 223:24
**asking** 36:19 41:2
50:21 53:23,24
58:25 70:5 76:5
79:7,7,9,11 80:5
80:25 101:7
102:17 120:5
122:1,5 127:7
154:20,23,23
155:4 156:24
157:15,24 158:11
158:11 159:8
161:5,9,12,15

162:19 170:10,14
175:14 178:18,23
184:9 185:1,2
193:17
**aspect** 102:17
**aspects** 112:24
**assertion** 102:3
187:10
**assess** 180:13
**assessed** 116:15,19
117:10 138:10
143:8 177:8
**assessing** 172:21
**assessment** 47:9
49:16,18 164:17
165:5 180:5
**assign** 12:12
**assignment** 236:2
237:2 238:2
**assisted** 130:2
**associated** 10:6
28:22 49:25 50:11
50:17 51:2 65:21
108:8 109:3
126:10 149:11
183:8 228:1
**association** 8:13
8:17 77:17 80:17
105:2 163:16,17
164:13,25
**associations** 9:17
74:13 125:21
130:16
**assume** 121:20
122:2,5 154:15,20
154:24 155:4
156:25 157:12,12
157:15,24 159:8
160:21 161:9,12
202:10 203:1
224:9

**assumed** 202:19
**assumes** 159:13,20
**assuming** 156:9
216:17
**assumption**
154:12,24 174:3
203:13 204:4
**assumptions**
154:21
**attached** 24:15
237:7
**attend** 195:23
**attending** 152:4
**attention** 34:1
47:4 96:24 97:1
108:4,18,20
142:21
**attorney** 2:19 3:6
3:16 4:6,16 5:6
6:7
**attorneys** 2:8 5:18
**attributable**
213:20 215:7,16
216:9,19 219:1
220:11,15
**attribute** 202:5
203:19 204:7
**attributed** 212:3
**audio** 13:19,23,23
**august** 9:11,20
108:2
**author** 63:7 69:2
**authored** 65:24
67:18 130:18
173:18
**authorize** 237:11
**authorized** 14:14
**authors** 48:23
49:16,18 50:24
81:2 95:13 107:23
110:12 131:19,20

136:11 152:12,23
**availability**
227:24
**available** 57:25
58:2 153:23
221:14 222:10
227:10
**ave** 235:1
**avenue** 3:8 4:8
**average** 113:4
133:17 134:21
147:6,14 168:8
177:4,14 202:4,14
202:17,18,19,22
203:9,16 204:1,2
214:23
**averaging** 210:19
**avoid** 230:12
**aware** 29:21 36:13
95:19 96:6,14
103:4,25 105:12
172:11 184:17
185:5,17

**b**

**b** 5:17 10:23 21:11
75:10 209:24
210:3
**babies** 123:11
**back** 26:3 44:18
57:12 58:9 59:22
60:4 71:12 74:7
104:6,13 147:3
153:6,15,21,25
154:9,16,25 156:8
156:12 157:2,14
160:21 191:8
196:6 215:21
216:21 228:17
235:15
**background** 13:20
20:9 29:5 46:13

133:2 162:24
230:23
**badgering** 158:19
161:19,21
**balance** 111:6,20
**balanced** 230:20
**ban** 42:1,7
**banned** 41:17
**bar** 139:7 140:12
140:24
**bartlit** 4:17
**bartlitbeck.com**
4:22
**based** 29:4 46:11
49:15 51:13,20
53:10 54:10 55:13
55:18 56:2 57:24
58:1 60:19 61:1
104:16 139:13
150:11 161:19
166:5 181:23
182:19 193:24
200:10 213:3
223:16 227:24
228:15
**baseline** 208:9
**basically** 153:5
190:5
**basing** 102:3
**basis** 20:23 72:12
73:7 101:15 117:2
187:3 189:19
**bates** 226:9
**battery** 2:10
**bcibulka** 2:16
**beck** 4:17
**becoming** 207:25
208:1
**began** 44:11 45:4
45:7,10 46:2,7
66:1 147:16

201:15,20 205:7
205:15
**beginning** 125:11
125:19
**begins** 78:22
150:10
**begun** 46:4
**behavior** 105:14
227:20 228:24
**behavioral** 8:6
63:8 64:3 68:16
**behaviors** 9:16
10:5 105:11
149:11 151:14
**believe** 17:17,21
20:16 21:14 38:7
39:20 49:2 57:22
57:23,25 67:14
68:8 69:18 70:8
70:14,17,22,25
71:1,4 72:6 76:19
77:25 78:5 79:25
84:1 94:19 113:21
115:1,9,24 116:21
117:23 120:9
121:19,25 130:23
131:17 143:11
153:13 173:15
176:16 180:20
183:23 185:11
186:2,7 193:4
196:15 203:8
209:13 215:11
227:1,18
**belongs** 195:18
**benefit** 33:19
**benefits** 32:7,22
33:10 35:3 36:7
37:12 39:15,21
40:12,17 56:17
97:5 180:24 186:9

195:14 196:10
**bensberg** 2:6
**benzodiazapines**
152:7
**benzodiazepines**
158:3,21
**bernstein** 2:9,20
**best** 16:15 32:1
85:25 234:13
**better** 37:12
133:24 134:5,11
186:8
**biopsy** 231:16
**birmingham** 13:3
**birth** 122:9,15
123:15 125:3,3
126:4,8 127:2,4
128:1,7,13 129:1
129:17,22 130:1
**births** 121:17,18
121:21 122:4
123:24 124:9,21
124:21 125:5,16
125:23
**bit** 15:6 46:20
59:20 61:16,23
107:16 128:4
197:25 198:6
211:5
**blanket** 112:10
163:1 166:14
174:12
**block** 151:21
153:1
**board** 134:3
**bockius** 4:7
**body** 65:11 165:11
179:6
**bold** 176:21,21
221:13

**boots** 4:13
**borrow** 166:9
**bottom** 31:17 97:1
135:9 136:13
163:13 182:9
199:4,10 200:22
**boulevard** 5:8
6:19
**box** 136:21 137:7
137:8,11 219:24
**boxes** 15:6
**brand** 8:15 32:6
77:18
**break** 17:1,3 62:6
62:7,7,12,24
106:21,24 107:3
144:11,16 197:25
198:5,10 221:4
**breaks** 139:3
**bring** 228:17
**britt** 2:6
**broad** 40:22 42:5
42:16 57:8 100:14
101:13 102:11
185:14
**broader** 100:2
122:21 152:13
211:6
**broadly** 72:11
191:4
**buechner** 4:5
**buildings** 193:2
**burden** 22:16
**bustamante** 2:7

**c**

**c** 2:1,5 3:1 4:1 5:1
6:1 11:4 24:12
155:15 209:24
210:5 234:1,1
**ca** 235:25

**cabell** 21:21,25
22:2,18 25:16
**cabraser** 2:9,20
**calculate** 224:5
232:20
**calculated** 199:17
**calculating** 202:1
202:11
**calculation** 200:5
211:25 219:5
**calculations** 10:20
203:5 204:14
215:22,23 216:22
**caleb** 95:16
**california** 2:11
**called** 67:18 76:18
93:13 211:6
229:23
**calls** 125:9 190:13
191:13 193:20
194:25 196:25
**campaign** 65:9
96:25 97:3,7
102:1
**cancer** 10:13
43:10 47:14
167:19 176:7,8
**capture** 207:8
213:10
**care** 43:9,11,11
50:4,20 51:4,7,9
51:24 52:22 65:13
66:5 69:20 195:22
**careful** 23:18
**carefully** 23:16
46:8 90:3
**carfentanil** 211:22
**carrying** 215:5
**carter** 5:5
**case** 1:6 7:13 14:7
19:10,18 20:21

21:8,19,21 22:5,5
22:7,11 23:4
24:16,24 25:4,9,15
25:19 26:4,4,9
28:3 29:15 48:11
48:19 96:2,4
124:12 181:15
235:6 236:3 237:3
**cases** 1:12 14:5
24:8,9 96:17
201:6 203:11
204:3,5 205:20
220:3,10
**casual** 151:15
**categories** 171:16
172:1,14
**category** 172:6
185:3,4 211:5
**causal** 127:13
175:17 176:3
**causation** 124:16
125:12
**cause** 13:11
127:17,23,25
175:19 176:7
213:24 216:7
234:18
**caused** 72:15
91:19 123:25
124:10,22 125:3,4
125:16 128:3,7
186:25 200:15,19
**causes** 175:21
176:5
**causing** 61:22
**cautious** 224:16
**cbhsq** 9:20
**ccr** 234:22
**cdc** 7:19 43:1,4,20
43:24 47:23 48:3
48:6,23 49:15,18

50:9,15,22,23
52:20 54:13,17,22
55:3 58:20 61:12
217:4
**cder** 32:10,20 33:9
**cder's** 32:3
**cease** 83:7
**cell** 13:21
**center** 30:25 32:5
32:11,12
**center's** 32:1
**centre** 6:9
**cepeda** 164:10
**certainly** 39:14,23
50:12 57:15 83:2
84:18 120:17
125:25 127:24,25
160:18 184:11
187:1 189:1,12
**certificate** 237:11
**certification** 236:1
237:1
**certified** 1:22 12:6
13:1 234:23
**certify** 13:5 234:7
234:15
**cessation** 81:25
82:9 87:2
**chagrin** 6:19
**chain** 15:17,20,23
28:8,11 150:5
160:19
**chains** 106:6
**challenge** 199:12
**challenges** 47:10
**chance** 25:25
**change** 105:14
201:23 207:3,12
208:10,19,22
209:3 227:19
235:13,14 237:8

238:3
**changed** 61:13
62:18 66:6 191:22
**changes** 63:16,22
105:4 192:1
235:12 236:7
237:7,9
**changing** 99:19
105:10 228:24
**channels** 187:2
**characteristics**
118:10 119:4
120:13,24 121:7
121:10 146:10
178:1
**characterization**
181:2
**characterize** 151:7
**charge** 40:19,24
40:25 41:8 42:2,9
**charges** 21:25
22:3
**chart** 23:1 123:25
209:15 218:3,5,15
**check** 27:13 43:16
158:7 190:11
191:9,21 193:18
194:23 195:4
**checked** 98:13
191:17
**chicago** 4:20
**cholecystectomy**
231:18
**chronic** 7:20 10:13
43:10 47:10 49:25
50:11,13,18 51:2,9
63:16 64:6 65:8
65:13,18 69:10,14
70:11 71:19 72:14
73:3,11 111:5
167:18 168:4

169:17 170:7,18
171:18,20,23
**cibulka** 2:6
**cicero** 110:11,15
**cigarette** 176:6
**circle** 212:17
**circumstances**
51:23 191:10,16
**citation** 93:20 94:4
94:20 100:9 101:3
143:11,15 149:17
**citations** 19:25
20:22
**cite** 19:23 43:14
46:1 74:19 75:21
75:24 76:6 77:23
77:25,25 78:8,9
79:25 80:4,22
85:19 93:2 105:12
125:24 145:13
149:15 155:13,24
167:22 176:12
183:23 222:10
227:17 228:22
230:6
**cited** 20:4,9,20
24:1 82:21 97:24
99:25 102:22
105:18 185:12
**cites** 87:13
**citing** 44:21 94:16
102:10
**city** 10:8 25:16
149:13,23
**civil** 13:6 236:5
237:5
**claiming** 192:2
225:17
**claims** 164:12,14
**clark** 95:15

clause 81:23
clear 28:10 29:19
    29:20 34:20 143:4
    155:8 183:22
    219:15
clearer 210:22
clearly 36:7 38:8
    155:9 211:15
cleveland 3:10
    6:20 235:2
clinical 49:24
    50:10,13,16 51:1
    51:12,15,21 52:9
    52:12,15,16,21,21
    53:2,9 58:24
    60:20 61:3
clinician 51:14
    53:11
clinicians 43:9
    51:22 58:20
close 197:10,13
closer 62:3
coauthored 48:5
cocaine 145:24
    148:15 218:9
code 180:8 204:7
    213:24 217:1
coded 202:20
    203:5,19 204:7
    216:25
codeine 34:7
codes 202:12
    217:23 218:6,8,11
    218:13
cognitive 47:14
cohen 6:16,18
    61:17,18 62:1
collected 132:20
collecting 133:7
columbus 5:10

column 81:8
    136:10 147:21
    212:8,9,11,25
    213:1,1,10,16,18
    214:21 215:13,15
    215:24 216:25
    217:13 222:19
    230:10 231:21
columns 136:9
    147:20
combination
    175:20
combine 64:10
come 44:18 156:7
    211:25 214:23
    218:21
comes 188:10
comfortable 44:24
    76:20 132:14
commencing 13:9
commission 65:10
    236:19 237:25
    238:25
commissioner
    12:6 13:5 234:21
common 11:15
    169:11,18 229:25
    231:13
commonality
    141:21
commonly 46:14
    46:15,17 139:23
companies 81:4,9
    82:18,20 84:4
    85:5,6 86:2,5,10
    86:11 88:4,25
    89:3,8,9,14,17
    90:12,16,22,25
    99:4,7,12,12
    100:15,17 102:12
    104:18 105:21,22

184:13,19,21
    185:1,9,15
company 6:5
    82:23 84:5 85:3
    88:1 90:22 104:21
comparability
    151:1
compared 209:5
comparing 22:14
    45:25 129:21
compassionate
    50:4,19 51:4,7
complete 81:25
    82:9 87:2 181:1
completed 235:15
complex 50:1
complicated 42:11
    42:14 128:4
compound 86:8
    87:17 89:23
    103:20 123:9
    127:11 195:11
comprise 114:14
    114:17
comprised 193:1
computer 13:22
concede 35:11
conceived 72:11
concern 47:23
    48:10,20 185:24
concerted 71:14
    72:23 73:19,20
conclude 225:9,25
    226:2
concluded 233:14
concludes 117:7
conclusion 125:9
    134:2 179:5
    190:13 191:13
    193:21 194:25
    196:25 227:1,8

231:8
conclusions 40:2
    112:14
conclusively
    225:10
concurrently
    152:6
condition 38:22
    51:6
conditions 58:21
    64:6 139:18 140:1
    183:24
conducted 150:11
    227:4
confidential 10:18
confines 155:10
confirm 76:11
conflate 208:23
conflating 207:20
conflicts 78:16
confounding
    125:22
confusing 103:20
    161:20
confusion 204:15
connection 21:19
    21:20 189:10
    192:5,18,18 193:7
    193:16,18 194:21
    195:8
conroy 3:17
consensus 65:17
consequences
    49:25 50:10,12,17
    51:2
consequential
    183:25
consider 21:5 26:8
    51:23 65:11 81:24
    82:8 87:1,7
    118:11

**considerable**
27:14
**considerations**
111:7,21,25
150:24
**considered** 7:16
18:19 20:13,15,24
21:1,12,13,18,20
22:9 23:12 24:5
133:13
**considering** 22:14
22:20
**consistent** 216:16
226:7
**consistently** 111:6
111:20
**constant** 202:15
**constellation**
39:16 69:25 70:16
**constitutes** 51:8
**consumed** 129:6
**consumption**
222:22
**contact** 125:6
**contain** 19:17
**containing** 223:5
**contains** 21:5,14
**contamination**
207:12
**contents** 76:22
**context** 51:9,16
60:3 67:3 73:22
78:14 152:2,10,19
153:17 166:13
**contextualize**
66:19
**continue** 13:24
**continued** 45:13
**continuing** 3:1 4:1
5:1 6:1 8:1 9:1
10:1 11:1

**contributed** 39:17
70:1
**contributing**
206:3 213:24
216:7
**contributions** 8:6
63:8 68:16
**contributor**
230:25
**control** 34:4,17
160:10,16,25
161:24 162:4,7,21
163:2 227:4
**controlled** 11:11
29:8,11 49:24
59:3,4,14 222:6
**controlling** 125:22
**controversy**
191:16
**conversation**
58:21
**conveying** 44:22
**copy** 18:3,18 19:5
181:12
**correct** 15:7,8,11
15:17 16:5,6 20:2
21:8,22 24:2,10,16
24:17 25:17 26:6
26:7,9,17,18,21,22
27:1,5,18,19,21
28:3,13 30:5,6,15
30:16,19,23 34:17
35:17 39:2,3,8,9
40:5 44:6 45:10
52:10 53:17 54:2
55:10 56:6,12
61:14 63:10,18,19
64:12,21,24 65:3
66:3,4,6,16 72:1,2
74:9 75:23 76:2,9
76:20 77:20,23

78:3,11 80:19,20
81:6 83:3 86:7,15
86:18 87:22 89:4
89:16,21 91:4,9,21
92:2,10,17,18
95:17 97:11
101:12 107:24
108:9,25 109:12
109:16 110:9
111:1 114:10,19
114:23 115:20
116:7 120:1,14
121:12 122:2
123:7,15 125:7
126:21 127:9
130:19 133:14
134:6,18,19 135:5
136:7 137:25
138:1,6,15 139:5
139:11,12 140:8
140:16,22 141:6
141:25 142:7,17
144:7 145:11
146:8 147:11,23
148:12 149:13,14
150:22 151:23
152:22 153:21
155:18 156:1
158:17 159:18
163:6 164:6,19,23
165:3,23 166:11
166:21 167:20
168:5,13,19 169:2
170:7 172:22
173:14 174:10
175:21 176:13,23
177:11,24 178:25
180:18,25 181:21
182:1,17 186:3
194:4 196:3
197:17 199:8,14

199:20 200:11,12
200:16,21 201:1,7
201:11,16 202:5
202:21 204:22
206:16 210:22
211:12,13,20
212:4,5,13,21
213:11,12,21
215:8 217:24
218:22 222:13
223:10 226:21
227:2 228:11,18
230:1,4 231:7,25
234:12
**corrected** 182:21
**correction** 205:24
**corrections** 19:20
235:12 237:17
**correctly** 32:7,8
32:21 33:15,16
36:9,12 39:19
44:14 47:18 50:7
52:7,8 64:7 65:13
65:22,23 67:5
71:20 79:1 82:11
111:16 113:9,10
119:3,12 146:1
151:18 153:11
163:25 164:20
170:3,4 183:10
193:8 196:1
202:10 212:7
216:24
**counsel** 12:4,9,11
13:8 14:3 17:9,11
77:8 131:2 132:24
161:17 196:2
234:16
**counsel's** 173:10
**count** 199:13

counties 21:23
22:13,17,20 92:17
122:3 174:8
country 114:4
county 21:21 22:1
22:7 24:16,25,25
25:16 29:23 30:1
30:5,8 45:15 96:4
113:13,20,23
118:14,22 119:2,5
119:11,23 120:1,8
120:25 121:8,19
121:19 123:18,20
123:25 124:10
125:17,24 172:5,9
173:23,23 174:5
174:19 180:17
181:15 199:8
201:7 212:10
214:15,16 215:12
218:21 234:5
236:10 237:15
couple 75:21
98:21 133:11
135:8
course 54:16 85:8
85:16
court 1:1 3:18
13:7 14:5,12,19
236:7
courthouse 4:18
courtwright 95:14
96:15,22
cover 190:4
covered 131:5
covers 189:13
crack 148:25
create 202:19
crisis 9:5 39:13,14
39:17 45:22 95:12
186:25 197:4

criteria 146:15
critical 8:5 63:7
68:15
csa 54:1,20
ct3 7:15
curb 82:7 83:5
86:20,22 87:9
current 198:16,19
198:24
currently 111:14
112:9
curriculum 7:14
cut 178:20 190:24
cutting 61:15
cuyahoga 24:16
181:14
cv 21:9
cvs 5:14,14,15,15
5:16 15:3,17,25
18:7,7 26:4,9,13
26:17,24 27:17,21
27:23,25 28:3
29:22 31:6 39:4
63:6 64:16 68:1
68:21 71:12 93:12
94:14 95:3,7,7,8
95:10 106:9
109:24 124:23
125:1,4,7 130:8
144:21 167:3
172:13 181:5
209:12 219:22
221:21
cvs's 106:13

**d**

d 11:6 24:7,8
209:24 210:7
219:3,22
daily 151:13,14
168:9

dan 1:7
darbitblit 2:13
dash 212:3
data 9:20 17:22
22:18 27:2 33:8
74:12 75:8 79:14
79:15 82:16 87:19
87:22 112:24
115:5 125:20
132:17,20 133:6,7
133:24 134:5,10
136:5,10 138:14
138:17,22 140:3
151:7,8 164:11
194:6,7 214:23
216:2,5,8 224:6,14
225:22 227:3
232:2
database 76:18,19
76:23 79:17 80:25
81:3 82:22,24
84:3,6 85:7 86:3
88:2 104:8,19,20
104:21 105:19,20
105:23
databases 104:16
164:13
date 13:5 169:2
235:8 236:3,9,19
237:3,13,25
238:20,25
dated 18:4 19:13
dates 208:21
david 6:16,18,22
61:18 95:14
day 5:7 30:21
236:16 237:22
238:22
days 168:2,4,4
171:16 172:1
235:18

dc 5:22
dead 197:3
deadly 100:4
deal 79:11
dear 235:10
death 200:7,25
201:24 202:19,21
203:4,19,20 204:6
204:8 206:9 209:4
213:20,20,23
214:2
deaths 200:6,14,17
200:18 202:3,4,24
203:5,10,13 204:1
204:4,21 205:7,25
206:3,4,6,8,9,10
206:16 208:4,11
208:24 213:7,11
213:15 216:2,3,5,6
216:7,9,11,12,18
216:19 217:4,9
deceptive 101:20
decides 163:5
deciding 37:2
decision 51:13
52:21 53:10
decisions 52:9,9
52:12,15,16,22
53:2,3
declined 45:18
declines 45:20
decrease 44:11
45:4,10,13 81:25
82:9 87:2
decreasing 44:5
45:7
deed 236:14
237:20
deemed 235:19
defendant 4:4,13
5:4 14:3 124:2,11

defendants 5:14
6:4 26:11,13
define 34:2,11
72:7 102:19
defined 168:2
definition 34:1,14
34:24 35:15 140:7
140:22
definitions 139:14
definitive 179:20
degree 23:2
demographic 49:5
118:10
demonstrates
225:10
denominator
205:24
denominators
207:16
dental 11:10 156:1
222:5,22 223:18
227:13 228:10
dentists 227:7,8
department
235:22
depend 128:21
153:17 166:12
depended 23:22
dependence 9:11
10:12 11:12 139:9
139:13 140:11,15
167:18
dependent 140:6
140:21
depending 164:5
165:2,22 174:13
depends 23:8,17
129:20 165:25
deponent 7:4
233:16

deposition 1:16
10:16 12:4,13
13:23 14:2,8 16:4
17:7 23:8 24:9,22
25:3,10 26:17,19
42:20 67:13 68:22
107:10 173:13
181:14 221:22
233:14 234:8,12
235:8,11 236:1,3
237:1,3
depositions 22:25
22:25 23:7 25:20
25:22 26:1 131:5
131:6
depression 9:9
107:21
depressive 108:15
109:21
derive 104:20
216:8 219:3
220:14
derived 34:6 79:17
dermatological
226:14
describe 154:5
155:20 207:1
222:21
described 82:17
152:1 175:25
describes 35:10
36:7 74:12 101:19
159:16 160:1
describing 76:22
153:2,19 207:20
description 159:23
descriptive 9:14
110:8
detail 75:10 82:23
detailed 114:5

detected 36:8
determination
35:7 112:3,5
174:15
determine 85:10
85:14,20 110:22
111:14 112:8
determined 33:10
33:19 35:2
determining 40:1
232:21
develop 178:9,10
179:14 180:1
developed 22:13
110:24 166:18
178:25 179:20
180:7
developing 22:21
179:3,12 194:8
development 7:17
9:13 31:13,19
110:7 126:11
172:23 173:5
183:8,19
develops 180:12
diagnosing 139:17
139:25
diagnosis 139:24
170:2,17 171:10
171:15,25 180:8
180:18
die 207:4,21
differ 189:18
194:9
differences 8:9
55:24 56:10,14,23
67:19 68:25 165:2
different 36:20
40:4,4,8,10,11,15
49:4,5 56:5 57:9
66:18 70:6 91:13

113:4 119:22
120:6 161:18
165:19,21 166:5
173:11 186:14
189:2 191:3 200:6
202:8 219:19
differentiation
174:7
differently 56:6,18
57:10 66:2 91:18
differs 164:5
difficult 110:19
111:13 112:7,11
112:12 182:24
direct 47:3 74:8,17
75:8 96:24 97:1
103:24 104:1
106:10 108:4,18
136:2 142:20
directed 227:19
228:23
directing 34:1
108:20
directly 215:7,16
217:3 219:1
220:10,15
disaggregating
164:15
discern 110:19
discuss 53:8 67:9
88:22 97:17 99:18
99:20
discussed 63:21
89:21 99:15
100:14,15 101:25
102:1 111:21
172:14 173:11,16
173:21 176:22
discusses 74:6,7
75:25 76:8 78:1
80:1 86:7 97:10

98:7 102:4 167:16
229:5
**discussing** 74:17
76:14 163:14
189:22 210:17
211:16 219:17
226:18
**discussion** 48:17
51:8 83:4 98:14
99:11 100:16
102:11 128:1
181:7 221:3
**discussions** 112:14
**disease** 175:18,20
175:21
**disorder** 22:16
75:9 108:7 110:24
126:11,12 163:17
164:15,17 165:1,7
165:9 166:3,6
177:5,8,16 178:3,9
178:11,15,16,17
178:25 179:4,8,13
179:15,20 180:1,7
180:13,14,18
183:9,16,19 199:8
199:12 201:6
205:20 218:25
219:6,7 220:12,13
**disorders** 113:18
173:7
**dispense** 64:17,18
186:24 188:14,21
**dispensed** 28:22
29:22,25 30:8
57:13 123:20
124:1,11,17,20,22
125:4,7 126:3,7
127:4 156:22,23
156:25 160:12
161:24 162:13,14

162:19 163:3
191:11 194:22
**dispensing** 57:16
64:14 103:15
156:19 187:12
188:8 189:11,23
193:7,19 195:8
**disposal** 11:9
222:5 227:25
228:15
**dispose** 159:18
**disposed** 160:3
162:4 221:16
**distance** 61:21,24
**distinction** 193:5
**distinguish** 211:16
**distributed** 184:21
**distribution** 5:15
28:21 72:8 73:25
74:3 99:13,15
101:20,24 103:15
125:1 187:1
**distributors** 92:25
94:4,23 97:23
100:23
**district** 1:1,2 13:7
14:5,6
**diversion** 57:20
227:10 230:24
**diverted** 110:17
231:7
**divide** 200:6
**divided** 199:19
204:1 212:12
214:22
**division** 1:3 14:7
**doctor** 39:1 53:15
53:21,23 54:5
55:8,17,18 58:12
58:12,18 59:9
64:23 107:14

153:14,21 154:8
154:15 155:1
156:9 158:13
162:8 163:5
**doctor's** 142:13
**doctors** 32:4,15
35:21 38:12,18
54:9 55:24 56:10
56:13,16,22 57:1
57:24 58:1,8,22
65:2,5 92:16
155:14 180:21,23
186:1,9,17 226:20
230:20
**document** 1:11
26:8,10 31:15
32:24,25 35:24
36:10 38:8 47:21
48:2,5 52:1,18
54:17 60:3,10
83:16 93:13 188:4
**documented**
163:19,20 176:19
**documents** 37:16
41:12,22
**don** 190:24
**donald** 2:5
**dosage** 11:14
126:20 128:17,25
163:5,10 168:8
171:3 172:10
176:10 229:24
**dose** 53:8 126:9
127:6 128:22,22
163:22 164:4,6,16
165:8,8,17,22,23
166:5,7 168:9,10
168:11,12 169:10
169:10,13,15,17
171:16,17,18,19
171:20,21,23

172:1,19 173:1,4
178:1
**dr** 14:2 15:2 18:21
41:7 44:3 53:15
63:5 96:7,12,20,22
107:8 144:20
145:6 210:9 221:8
229:20
**draw** 179:5
**drawing** 193:5
**driven** 75:7
**drivers** 39:13
63:13,14,21
**drug** 9:11,23 11:9
11:11 30:19,25
32:12 33:8,10
36:6 40:1,4 75:13
94:16 108:6,22
109:2,9,13,18
112:18,20,22
114:3 115:11,19
116:1,24 117:6
118:17 120:14,17
120:18 122:20
123:5,14,17 127:8
132:18 135:22
136:24 138:19,24
145:11 146:6,16
146:17,20,24
150:2 152:2,20,24
173:8 174:17
183:9 184:12,17
189:15,17 190:4
190:20 191:4,4,6
200:5,15,17 206:3
207:4,13,17 208:1
219:13 220:19,20
222:5 227:24
228:15
**drug's** 36:7

**drugs** 7:18 31:19
31:20 32:2,6,21
33:9 34:3 36:5
75:3,4,12,16,21
110:25 113:3,5
116:15,18 117:10
122:10 127:16,18
127:22 128:3
137:5,17,21,25
138:4,10 145:23
208:13 218:13
**dry** 223:15
**dsm4** 139:14,23
140:7,22
**due** 72:9 202:16
203:12 216:12
**duly** 14:23
**duration** 126:10
126:13 127:6
128:22 163:22
164:4,6,16 165:9
165:17 166:5,7
171:3 172:19
173:2,4 176:11
178:2 179:3,7,18

**e**

**e** 2:1,1 3:1,1 4:1,1
5:1,1 6:1,1 209:24
234:1,1
**e.g.** 34:10
**eadie** 95:15
**eagle** 6:4 15:20
16:1 26:5,14,20,25
27:18 28:12
106:17 172:17
**eagle's** 39:5
**earlier** 53:25
54:19 57:23 147:6
147:15 150:19
180:20 193:4
210:17 213:14

**214:4,11 221:10**
221:20 222:4
223:24
**early** 46:7,9
151:22,25
**easier** 214:16
**east** 3:8
**eastern** 1:3 4:14
14:6
**easy** 18:25
**ecstasy** 148:23
**editorializing**
101:23
**edt** 13:10 62:13,25
107:4 144:17
198:11 221:5
233:14
**edward** 5:5
**effect** 33:9
**effective** 55:23
69:9 71:16 72:25
92:23 94:2,21
97:22 98:1 99:22
100:21 101:1,8,11
101:17 102:6
**effects** 38:10
112:23
**effort** 71:14 83:5
88:8,13
**efforts** 71:17
72:13,23 73:1,10
73:19,21 82:7
83:10 86:19 87:9
88:23 105:1,3,10
105:13,13
**eight** 21:15 109:3
148:14 168:17
**eighteen** 146:15
149:23
**eighth** 2:22

**eighty** 147:9 148:7
148:25 229:7
232:22
**either** 30:14 34:5
98:7 141:18
215:25
**elderly** 47:13
**eligibility** 146:14
**elizabeth** 4:5
**elizabeth.buech...**
4:11
**email** 235:17
**embedded** 154:22
**emcarter** 5:12
**emerging** 51:20
60:19 61:1
**emphasis** 50:18
51:3
**emphasizing** 50:3
**employee** 26:17,21
**enclosed** 235:11
**encounter** 120:19
**endorsing** 65:18
**ends** 116:22 117:3
117:25
**engage** 41:22
76:15 119:18
161:13
**engaged** 73:10
85:20 89:3 90:12
98:1 99:21 100:25
101:11,16 102:3,5
103:5 105:15
106:9 149:24
151:13
**enormous** 197:5
**ensure** 161:6
230:13
**ensures** 32:5,20
**ensuring** 162:12

**entail** 103:25
**entered** 237:9
**entering** 114:2,6
**entire** 112:25
114:15 169:20
218:3 236:5 237:5
**entities** 72:15 74:2
**entitled** 80:17
95:11 107:21
110:5 130:15
145:9
**envelope** 15:10
42:19
**envelopes** 15:14
18:7
**epidemic** 8:7 9:6
45:19 63:9,14
64:2 68:17 69:19
70:1,9,19,23 95:12
197:6
**epidemiological**
29:5 85:24 88:5
88:24 89:10 92:5
206:25 216:15
**epidemiologist**
193:24 194:1,12
**epidemiology**
28:20 118:5
125:10,20 126:25
133:23 176:1
180:2 187:8,15,23
208:17
**episode** 108:16
**episodes** 109:21
**equal** 128:25
129:7 134:5
**equivalents** 168:9
**erin** 6:6
**errata** 235:13,18
237:7,10,18 238:1

**errors** 216:17
**especially** 64:5
**essentially** 163:18
  164:24
**est** 13:16
**established** 112:22
  161:5
**estimate** 121:14
  121:17,18,21
  122:4 123:4
  124:25 125:12,21
  199:24 200:24
  202:3,15,23
  203:10 204:3
  207:2 208:18,21
  216:5,8 217:2,3,5
  217:7 218:21
  220:9 225:11,19
**estimated** 123:3
  123:24 124:5,9,21
  213:15 219:8
  220:3
**estimates** 22:19
  96:8,12 120:10
  121:11 122:19
  123:1 155:24
  200:6 221:14
  222:11 229:6
**estimating** 127:1
  199:7,11
**estimation** 212:2
**et** 93:21 94:5
  164:10
**ethnic** 47:12 49:1
  49:6
**etiology** 175:1,2
  175:15
**evaluate** 32:2 56:5
  56:17 57:6,10
  117:17 118:7,23
  151:2 165:10

166:2,4
**evaluated** 29:24
  30:9 35:6 36:16
  37:16,24 39:20
  40:16 46:5,6,8
  91:23 92:6 119:19
  119:25 120:3,7,24
  121:6,9 123:16
  185:10,22 186:13
  231:12
**evaluating** 29:12
  39:15 165:21
  189:9
**evaluation** 31:1
  32:3,12 35:20
**evidence** 12:14
  51:20 57:12 60:19
  61:2,12 75:6,10
  85:25 88:14 100:5
  151:3 159:14,20
  163:8 170:9,15,21
  175:5 177:5 179:6
  184:11,20 185:14
**exact** 143:16
**exactly** 49:13
  142:8 165:4
  201:17 207:18
  208:17 209:1
  213:22 216:4
**exaggerated** 97:5
**examination** 7:1,5
  13:11 15:1
**examine** 126:13
**examined** 14:23
**examining** 81:20
  200:14
**example** 21:20,24
  71:22 73:6 84:16
  101:25 120:13
  121:16 122:15
  135:7 155:11

165:14 176:6
  211:22 212:10
  213:25 214:1
  216:24 219:25
**excel** 10:19 209:15
  210:11
**excess** 232:11,17
**excessive** 11:14
  229:24
**exclude** 217:10
**excluded** 217:15
**excluding** 223:15
**excuse** 193:3
**executed** 237:10
**execution** 236:14
  237:19
**exercise** 111:10
**exhibit** 7:10,12,13
  7:15,17,19 8:4,8
  8:13,17,21 9:4,8
  9:12,17,21 10:4,10
  10:16,19,21,23
  11:4,6,8,13 17:25
  18:3,5,8,14,17,23
  19:4,5 21:6,7,10
  21:11 24:7,8,9,12
  24:12 31:6,7,12
  42:18,19,21,24
  43:1 46:12 47:4
  63:3,6 67:12,13,14
  67:15,17 68:5,9,17
  68:19,22 71:12
  74:7 77:4,5,16
  80:9,10 93:6,9,12
  93:12,13 94:9,10
  94:12,14,14 95:4,5
  107:9,11,20
  109:24,25 130:5,8
  130:9,10 144:22
  144:25 145:1,9
  149:4,6,9 167:4,10

167:12 177:16
  181:4,6,9,10
  209:10,19,19,20
  209:23 210:1,3,5,7
  212:20,21 219:22
  221:22,23 229:16
  229:18
**exhibits** 7:7 8:1
  9:1 10:1 11:1 15:7
  18:5 21:7 76:10
**existed** 123:20
**exp** 234:22,22,23
**expect** 113:11
  170:19
**expectation** 36:25
**experience** 20:10
  49:23 111:9
  112:21 113:3
  115:10 117:4,8
  135:22
**experienced**
  112:16 115:18,24
  116:13,22 118:15
**experiences**
  151:14
**expert** 7:10,13
  10:19,21,23 11:4,6
  19:6 28:19 29:2,8
  29:9 43:15 95:21
  96:16
**expertise** 22:13
  28:20 29:4 54:1
  54:20 89:11 92:12
  102:15 124:4
  187:24 189:19
  190:14 191:5
  192:3,6 194:2,6
**expiration** 236:19
  237:25 238:25
**explain** 125:14
  203:25 205:22

208:7
**explained** 60:18
203:24
**explanation** 61:4
**exposed** 110:22
**exposure** 104:24
104:25 105:2
113:5 141:21
**expressing** 47:23
185:25
**extensive** 191:6
**extent** 22:15 23:7
23:20 27:22 85:4
89:8 118:21
119:20 122:22
**extraction** 223:5
223:10,21
**extractions** 223:17
224:3,12,22 225:3
**extraordinarily**
45:7
**extrapolate**
165:15 166:25
171:3
**extrapolating**
224:8
**extrapolation**
225:7,9,19
**extrapolations**
166:14

**f**

**f** 234:1
**facility** 231:15
**fact** 102:4 179:14
179:25
**factor** 125:18
126:24 174:1
179:7,21 180:5
**factorial** 175:1,15
175:19,25

**factors** 39:17
69:25 70:2,16
71:9 75:7 91:7
108:7 118:12
125:22 172:20
173:1,5,6,12,17,21
174:2,14,18
175:17 176:3,5,9
180:3
**facts** 159:13,20
**failures** 94:17
**fair** 16:20,21
154:6,11 176:20
**fairly** 57:3 132:9
168:21
**faith** 55:19
**faithfully** 88:7
**fall** 207:19 216:16
**false** 85:23
**familiar** 53:25
**familiarity** 53:25
**familiarize** 109:1
**far** 26:10 79:19
190:19 193:15
**fault** 39:10 186:15
**fda** 7:18 30:22
31:3 32:14,18,20
33:7,8,17 34:16,24
34:25 35:2,6,8,19
36:6,14,17,22 37:9
37:17,20,25 38:5
38:21 39:1,7,10,14
39:20,24 40:1,19
40:24 41:1,8 42:2
42:9 157:4,4,22
158:16 186:17
**fda's** 31:13,23
33:4 35:12,14
**february** 69:3
**federal** 13:6 43:25
54:24 59:2,6,13,24

132:4,9,10,12,15
132:21
**feel** 17:15 76:20
89:10 153:7
159:24
**feeling** 135:22
**felt** 180:23
**fentanyl** 34:11
81:11 128:10
129:9,10,15,16
199:23 201:1,4,11
201:15,20 202:2
202:12,15 203:11
205:7,15,17,19
207:4,6,9,21,25,25
208:3,8,11,12,14
209:3,4,5,6 211:12
211:17,17,21
212:1,4 214:1,2
216:13 217:19
**fifteen** 152:18
190:5
**fifth** 65:12
**fifths** 147:4
**fifty** 133:18 146:4
190:5 198:2
223:14 224:10
226:13
**fight** 158:23
**figure** 10:24 11:5
11:7 117:23
124:20 139:1,3
143:17 210:18
212:25 213:2
218:17,24 219:4
**figures** 10:22
113:12 142:6
**figuring** 125:15
126:6 130:7
**filed** 14:5

**files** 180:16
**fill** 158:15 172:13
**filled** 30:3,14
153:9 154:3,8
157:20,25 158:25
159:9 160:23
**filling** 156:14
157:3 186:16
**financial** 78:23
227:25 228:16
**financially** 14:16
**find** 68:1 176:16
182:5 235:11
**finding** 121:24
229:5
**findings** 81:19,23
82:8 86:25
**fine** 224:15
**firm** 14:10
**first** 14:23 36:4,4
43:20,25 46:12
64:22,25 65:7,25
78:19 81:18 92:21
110:22 111:7
112:17,21,25
115:10,18,25
116:13,23 117:4,8
117:11 118:15
121:2 139:7 143:1
145:22 146:3
147:2,25 151:21
153:3 160:18
183:7 221:13
222:19 230:10
**fit** 172:5,13
**five** 106:24 112:19
113:4 114:3
133:18 134:13
135:9 141:23
142:2,25 146:5,15
156:23 168:16

169:6,7 177:4,14
178:7,24 179:10
215:2 220:24
231:13,23 232:8,8
232:10,16 233:4
**flaw** 207:19
**flawed** 206:23
**flip** 169:6
**flooding** 100:3,6
**floor** 2:10,22 6:10
**focus** 222:23 231:3
**focuses** 231:1,2
**focusing** 58:11
**folder** 221:21
**follow** 170:25
  203:18
**followed** 145:21
  209:17
**following** 11:10
  13:12 122:5 143:1
  157:1,14 160:21
  169:2 222:5
  223:21 224:2,22
  225:2 226:10,14
  226:17 227:12,21
  228:23
**follows** 14:24
**food** 30:19
**footnotes** 20:7,9
**force** 65:7,25
  71:13 72:19,20
**forces** 64:3,10
**foregoing** 13:7
  234:8,11 236:13
  237:18
**form** 12:10 20:23
  22:14 42:13 48:12
  49:12,20 53:18
  54:7 56:19 57:7
  59:12 60:9 71:8
  73:13 80:3 83:13

85:12,21 87:5
88:11 89:22 90:8
90:14,20 91:22
92:3 95:23 97:12
98:3,9,16 99:1,8
99:23 101:2 103:6
103:19 104:2,5,12
105:16 111:22
113:14,24 114:11
115:4,12,21 116:2
116:8 118:1,18
119:13 120:2,15
120:20 121:3,13
121:23 122:6,18
123:8 124:3,13,24
125:8 126:16
129:18 131:16
133:25 134:7,25
135:24 138:7,21
141:7,15 142:18
146:13 147:12
150:23 152:11
153:16 154:10
155:5,19 156:4,15
157:6 158:18
159:3,11,19
162:10 163:7
166:23 168:23
170:8,15,20 171:5
173:24 175:22
176:14 178:4,12
180:10 183:15
184:2 185:7,21
186:11,20 187:13
188:18 190:12,23
191:1,12 192:11
194:5 196:17,24
197:18 201:13
202:6 203:7,21
204:10,23 205:8
205:21 208:5

217:16,25 224:24
225:23 226:22
229:1,8
**forming** 23:21
**forty** 149:23
  164:12 168:17
  226:11 232:8
**forward** 203:17
  215:5 235:15
**found** 48:8 108:5
  115:16 116:7,10
  116:11 135:3,13
  141:22 172:2
  223:3,13 226:10
  226:13,19 231:22
  232:7
**four** 112:16 113:4
  115:17 116:12
  117:7,12,15,22,23
  118:21 134:14
  135:9 136:4,9
  147:4 148:17
  152:18 165:18
  170:1 177:17,19
  223:3,8,14 224:10
  226:12
**fourth** 136:10
  222:19
**framework**
  174:24 175:7
**framing** 8:11
**francisco** 2:11
**free** 236:14 237:20
**frequently** 110:16
**front** 142:22
**fulfill** 196:22
**fulfilled** 157:9
**full** 16:7 20:6 23:3
  23:3 81:18 82:5
  92:21 136:10
  175:6 177:11,12

**fully** 16:23
**functioning** 51:15
**further** 118:23
  151:6 233:16
  234:15
**future** 75:13

**g**

**g** 95:15
**ga** 234:22
**gain** 187:5,18
**gained** 187:22
**garbled** 189:7
**garguilo** 25:7
**gathering** 152:18
**gauge** 111:8
**general** 11:15
  22:15 23:23 39:12
  39:22 75:15 83:20
  87:10 91:8 113:16
  113:19 156:17
  174:1 188:10,11
  188:12 191:14
  192:16 193:22
  229:25 231:13
**generalities** 92:4
**generality** 106:7
**generalizability**
  118:7,24 119:18
  120:4 150:25
  174:15
**generalizable**
  117:24 123:1
  150:14
**generalize** 115:2
  117:15 118:21
  122:22 150:21
  151:4 174:4
**generalized** 115:6
**generalizing** 118:4
  118:9

**generally** 22:19,22
35:10 44:10
103:14 127:23
133:24 155:7
174:4,9 185:1
192:6 195:13
196:7 200:20
216:14
**generic** 32:6
**germane** 20:19
**getting** 154:7
158:5
**giant** 6:4 15:20
16:1 26:5,14,20,25
27:18 28:12 39:5
106:17 172:17
**gibson** 6:6
**give** 16:18 45:24
67:5 71:23 73:6
84:7 105:25
133:24 143:18
164:24 219:20
220:23
**given** 31:16 84:14
117:10 124:25
163:1 164:18
179:17 181:24
182:20 195:20
199:12 207:4,22
208:11 209:4
234:12
**gives** 134:5 138:6
**giving** 22:11 44:16
76:20 84:9
**glancing** 99:3
**go** 13:25 18:2,10
18:12 21:6 31:5
33:6,25 36:2
47:11,24 49:4
51:11 57:12 58:9
62:16 63:25 71:22

79:22 90:24 100:7
104:13 125:15
126:6 136:13
146:3 147:1,19
149:21 151:6
163:11,12 169:24
192:14 193:14
196:6 209:8
215:15,21 216:21
219:4 221:9
222:18 223:1,12
226:6,25 227:7
230:18 232:1,18
**goal** 170:22
**goes** 48:15 65:6,15
104:6 183:23
**going** 13:16 18:16
26:3 28:2 48:9,20
60:4 67:13 68:21
71:11 74:7 79:22
94:9 95:4 106:20
117:12 121:20
130:9 131:4,9
132:23 137:7,11
144:9,24 154:14
156:8 171:8,13
181:8 191:7
193:16 197:24
203:16 205:17
209:14 221:22
231:11
**good** 13:15 55:19
176:6 198:3
210:11
**gotten** 98:24
**government** 31:23
54:24 94:17
100:20 132:21
**grade** 143:23
**great** 15:13

**grounds** 12:12
**group** 15:23 48:24
127:14 139:7
217:9,21
**grouped** 168:10
**groups** 47:13 49:1
49:5,7,9,14 139:4
**guess** 20:15 48:13
58:17 73:15 91:14
126:17 128:6
177:18 192:25
212:14 219:3
225:5
**guideline** 7:19
51:18
**guidelines** 43:1,3,5
43:13,20,20,25,25
52:24,25 58:20
60:4,5,17 61:5

**h**

**h** 1:21 3:5 5:8 12:5
13:1 212:9,11
213:1,1,10,18
214:21 215:13
216:25 234:21
**hadland** 78:1 84:3
90:23,24 104:6,15
**hadland's** 89:18
**hand** 18:25
**handy** 221:11
**hanly** 3:17
**happen** 155:12
**happened** 30:3
**happy** 212:17
**hard** 62:2 131:7
212:16
**harder** 145:23
**harm** 30:8
**harms** 28:21
174:25 175:8

**harris** 226:13
**hbc** 6:4
**hcv** 10:5 149:11
**head** 44:19 76:14
203:23
**heading** 33:7 69:6
221:13 223:2
**headings** 215:25
**health** 8:5,11 9:6
32:7,21 47:10
95:12 132:2,18
174:17 219:13
220:21
**healthcare** 65:11
111:4,25
**hear** 61:25 62:2
162:24 204:25
214:6
**heard** 30:25
190:20 193:15
**hearing** 25:6,10
234:13
**height** 45:11
**heimann** 2:9,20
**held** 14:8
**helpful** 22:21
23:21 62:4 212:22
**helps** 22:14
**herman** 5:17 7:5
15:1,3 18:2,10,16
18:21 23:10 24:7
27:16 28:9 31:9
33:1,14,24 36:1,13
37:8,19 38:4,20
40:10,18 41:2,7,15
41:24 42:11,17,23
43:19 47:3,6,8,22
48:8,16 49:17,21
52:2,6,14,23 53:13
53:22 54:12,23
55:4,6,16 56:9,21

57:9 58:9 59:1,16
59:20,21,23 60:15
60:24,25 61:11,17
61:23 62:5,16,21
63:5 66:10 67:10
67:11,17 68:6,10
68:13,20 70:5,17
71:4,11 73:17
74:15 77:3,7,10,15
77:16 80:7,13
82:4,6 83:19 84:8
84:19 85:8,16,23
86:13,24 87:11,20
88:3,16 89:2,14
90:2,11,18 91:2,25
92:8 93:8,11 94:8
94:12 95:2,8 96:2
96:10,23 97:16
98:6,12,20 99:6,17
100:7 101:6
102:13 103:11,23
104:4,9,23 105:9
105:24 106:15,19
107:8,13 110:2
112:2 113:21
114:2,16 115:8,14
115:16,23 116:6
116:20 117:2,21
118:6,25 119:8,16
120:5,18,23 121:6
121:15 122:1,8
123:2,13 124:7,19
125:2,13 126:19
127:16 128:16,24
129:8,22 130:5,6
130:12 131:9,13
131:18 132:11
133:1,5 134:4,12
135:2 136:1
138:13,25 139:21
141:11,22 142:20

144:9,20,24 145:5
145:6 146:19
147:14 149:9
151:5 152:14
153:18 154:14
155:12,23 156:7
156:24 157:11,19
158:22 159:7,12
159:15,22 160:9
160:20 161:8,22
162:17 163:4,11
166:8 167:2,5,8,10
167:15 168:25
169:24 170:10,11
170:16,24 171:7
171:12 174:6
175:13,24 176:20
178:6,18 179:22
180:15 181:5,8,12
183:20 184:5
185:17,24 186:15
187:3,16,25 188:3
188:16,23 189:8
190:1,18 191:7,19
192:14 193:25
194:14 195:5,17
196:11,19 197:11
197:20,23 198:4
198:15 199:3
201:14 202:9
203:14,22 204:16
204:24 205:2,3,11
206:11 209:7,9,12
209:18,22 210:9
214:8,13 217:22
218:2 220:23
221:8,25 225:5
226:5,25 229:4,10
229:12,14,18,20
233:3,6,8

**hernia** 231:18,19
**heroin** 9:5,19
   63:17,22 95:11
   128:8,12 129:1,11
   130:17 133:13
   135:4,10,14,16,18
   135:18 136:6,15
   136:18,22 137:2,4
   137:9,13,16,20,23
   138:3,9,18,23
   139:4,8,11 140:4,6
   140:10,13,15,19
   140:20,25 141:5
   141:13,19,25
   142:4,25 145:24
   147:5,10,17
   148:12 198:16,19
   198:24 201:19
   210:22 214:1
   217:19,20 219:6
   220:12
**heterogeneity**
   164:19 171:2
**heterogenous**
   163:21 164:4
**hey** 145:3
**higgins** 164:11
**high** 8:21 35:11
   45:8 93:13 97:20
   131:14 165:23
   166:7,7 168:12
   169:17 171:21,22
   177:7
**higher** 45:18,21,23
   45:24 109:4
   129:11,15 166:6
   183:9 206:9,21
**highest** 81:9
   176:12,18,21,22
**highlight** 48:23
   227:13

**highlighted** 49:7
**highly** 10:18 92:22
   92:23 94:2,21
   100:3,21 101:1,8
   101:11,16 102:6
   111:9 112:4
**history** 110:25
   114:5 123:17
   127:14,15 137:25
   173:7 174:17
**hiv** 10:5 149:11
**hold** 28:18 29:7,9
**hon** 1:7
**hopefully** 204:18
   210:13
**hospital** 21:25
   22:2
**hour** 106:20
   144:10 197:24
**hours** 17:14 233:4
**house** 153:9
   159:25 160:8,13
**household** 142:8
   153:6
**https** 31:19
**hubbard** 4:19
**hud** 218:20
**hudson** 2:21
**huh** 72:21 130:20
   219:23 220:8
**humane** 71:16
   72:25
**hundred** 20:16
   21:15 114:3
   133:12,12,18
   134:13,22 146:11
   146:19,23 148:1,4
   148:10 155:25
   168:16,17 170:1
   177:18 199:17,25
   200:7,24 223:20

224:1,7,8,17,21
225:1,11,15,20
226:3 232:4,8,9,10
232:17
**hundreds** 197:3
**huntington** 22:2
25:16
**hwang** 95:14
**hydrocodone** 34:8
211:1
**hydromorphone**
34:8
**hypothetical**
40:23 41:3,5,6,20
41:22 42:6,15
126:22,23 128:20
129:4,11,19 155:6
156:8,16,20 157:7
158:8,11,12,19,21
159:1,4,14,21
160:5,7,15 161:3,4
161:14 170:23
178:13,22 186:21
**hypotheticals**
161:18

**i**

**ian** 2:6
**iatrogenic** 9:14
110:7
**ibensberg** 2:14
**idea** 97:25 99:21
101:10
**ideal** 229:5 232:20
**ideas** 100:25
**identification** 18:1
18:9,15 31:8
42:22 63:4 67:16
77:6 80:11 93:7
95:6 107:12 110:1
130:11 145:2
149:7 167:13

181:11 209:21
210:2,4,6,8 221:24
229:17
**identified** 95:20
96:16 174:2
226:15
**identify** 88:9
**ignore** 174:25
175:7
**illegal** 94:16 128:8
211:17
**illegally** 63:17,23
**illicit** 122:16 123:6
129:9,15 136:23
137:5,17,21,25
138:4,10,19,24
198:17 201:20
202:2,2 212:4
**illinois** 3:19 4:20
**imagine** 131:7
**immediately**
207:11,12
**impairment** 47:14
**imperative** 230:12
**implicated** 74:4
**importance** 50:3
50:19 51:3
**important** 21:3
44:21 165:10
**improperly** 29:22
**improve** 65:12
**inaccurate** 206:22
**inadequate** 47:15
48:7 49:10,15
**incentive** 227:25
228:16
**incident** 10:11
167:17
**include** 19:14 27:2
27:23 29:11 36:6
49:6 63:15 79:19

173:6 189:2,3
190:7 200:3
211:21 217:14
**included** 76:22
80:6 82:23 85:6
101:21 105:22
120:9 121:10
164:10 170:18
184:13 194:7
218:13 235:13
**includes** 84:4
100:3 105:21
164:11 197:9
211:8,10 217:13
218:5 219:5
**including** 26:13
28:11 42:8 50:1
50:13 51:20 60:19
61:2 64:14 65:8
70:3 72:7 75:7
103:16 127:14
155:23 177:6
185:12,13 187:2
189:14 213:16
**incomplete** 41:4,5
128:20 129:4,19
155:6 156:16
157:7 158:19
159:14,20 160:5
160:15 161:3
178:13 186:21
**inconclusive** 42:7
**incorporated**
237:12
**increase** 46:4
64:11 70:2,18
75:6 91:12 200:25
201:10 205:9
206:16
**increased** 65:25
74:8,18 75:3,19,20

91:7 102:25
179:12 204:21
207:24
**increases** 75:12
179:3
**increasing** 205:15
206:2,7,8
**independent** 168:1
**index** 7:1,7 8:1 9:1
10:1 11:1 169:2
170:2 171:15,25
**indiana** 5:14
**indicate** 31:22
112:15 115:17
186:13 193:23
194:12 221:14
222:11
**indicated** 56:1,12
56:15,24
**indicating** 177:7
228:2 235:13
**indication** 16:19
**indicative** 57:16
**individual** 123:10
126:15,21 127:14
127:15 129:23
130:2 150:1
172:20 173:8,11
173:17,20
**individual's** 127:8
**individuals** 10:12
113:12 114:1
123:5 133:18
135:17 138:22
146:5 167:18
168:18 174:19
177:3 180:16
218:8,25
**industry** 8:14,18
72:4,7,11 73:9,21
77:17 80:17 81:19

92:24 94:3,22
100:22 101:19
104:20
**industry's** 71:14
72:23
**infer** 124:16 154:2
**inference** 154:7
**inferences** 151:8
**inferred** 127:15
**inferring** 153:22
**inform** 22:18 23:9
122:22 188:20
**informants** 150:4
**information** 27:3
27:14 29:24 30:10
32:4,16 35:22
37:1 38:9 39:19
39:24 44:17,22
54:10 55:13,15,18
56:3 57:25 58:2
67:6 81:2 84:4,7
85:2 91:10 118:9
118:23 122:10,12
124:15 132:8
143:19,21,24
153:23 154:4,12
156:20 157:8
158:2,4,8 159:6
164:16 165:7,12
166:24 179:18,23
179:24 180:4,23
181:24 182:20
184:14 186:8,14
189:14 190:7
**informative**
165:16 166:4
**informed** 24:6
**informing** 21:3
**inguinal** 231:18,19
**initial** 113:2,5

**initiated** 142:25
147:4
**initiates** 135:10,17
135:18 142:16,24
**initiating** 9:18,21
**initiation** 9:18,21
130:17 133:14
138:23 145:10,11
145:21,23
**initiators** 138:9
**injected** 146:17
**injection** 9:23 10:4
145:11 146:6,24
149:10
**injectors** 150:3
**input** 10:20 13:19
**instruct** 195:15
196:8
**instructed** 162:8
**instruments** 177:9
**insurance** 164:12
**insys** 81:10,15
**intend** 19:14,18
27:20
**intended** 33:12
38:12 58:2 150:14
186:18 207:2
**intending** 154:17
155:1 156:10
**intention** 58:11,22
**intentions** 58:8
**interacting** 176:5
**interest** 78:16
**interested** 14:16
234:17
**interesting** 48:9
48:14
**interfere** 13:22
78:16
**interpret** 196:2

**interpretation**
87:19
**interpreted** 60:13
60:14
**interpreting** 194:2
224:16
**interrupt** 55:7
67:21 131:3 182:4
**interrupted** 84:24
117:20 208:16
**interrupting** 99:9
**interruption**
201:22 206:25
207:2,10,15
208:20,25
**intersection** 64:3
**intervention** 228:5
228:12,19
**interviews** 150:1
150:11 153:3
**intractable** 73:23
**introduction**
111:3,19 205:19
231:1,2
**introductory**
81:23
**involved** 24:25
71:13 72:22 73:21
74:3 99:13 105:5
149:22 189:1
206:1 207:5,18
**involvement** 96:9
**involves** 220:11
**involving** 24:16
25:16 224:14
**iom** 185:12
**issue** 59:7 61:22
103:12 119:8
157:2 164:9
211:14 224:13
225:6,8

**issued** 43:2
**items** 20:16 21:15

**j**

**j** 215:15
**jacton** 5:25
**jama** 8:16,20
**jamison** 176:12,21
**janssen** 81:12,15
**january** 9:24 10:8
95:17
**jason** 5:17 93:8
94:8 209:9 229:13
**jefferson** 234:5
**jo** 3:15
**job** 32:1
**john** 5:8 95:15
**joint** 65:10
**jones** 5:7
**jonesday.com**
5:12
**jpollock** 3:20
**judge** 25:7
**judgment** 111:10
**july** 10:15
**june** 1:18 13:9,16
235:4
**jury** 17:19

**k**

**kaspar** 4:15
**kaspar.stoffelma...**
4:22
**katherine** 1:16 7:4
7:11,12 10:17
12:4 13:10 14:2
14:22 16:9 95:14
235:8 236:4,9
237:4,13 238:20
**keep** 131:12 144:3
171:8,13 193:16
216:15 228:3

231:11
**kent** 6:24 14:10
**kept** 205:16 206:7
**key** 150:4
**keyes** 1:16 7:4,11
7:12 10:17,21,23
11:4,6 12:4 13:10
14:2,22 15:2 16:9
16:11 18:21 28:14
39:10 41:7 44:3
48:11 53:15 63:5
67:11,12 68:20
93:12 94:13 107:8
120:23 130:7,13
139:22 144:20
145:6 149:5
158:22 167:11
184:23 198:15
209:13 210:9
221:8 222:1
229:14,20 235:8
236:4,9 237:4,13
238:20
**kin** 234:16
**kind** 173:8 187:8
212:17 216:17
**kinds** 83:22
208:16
**know** 16:14 17:2
18:24 22:12,15
23:20 24:14 26:10
38:7 41:16 42:8
43:24 44:2,10,19
46:3,11 48:10,18
48:18 58:24 76:13
77:14 78:4 82:23
83:1,11,15,23 84:9
85:5,15 86:4
87:21 88:17 89:2
89:3 90:12 91:19
92:1,8,13,15 98:23

99:6 104:10,14
105:4,22 106:9
110:3 115:6 118:8
118:13 119:2,3,10
119:19 120:12
121:16 122:14
123:4,19 124:19
125:3,22 126:9,20
126:24 127:3,5,8
131:21 132:8
138:3 143:9
149:17 150:20
153:8 156:21
159:25 160:6,7,8
165:7,10 172:4,8
172:12 173:6
174:13 180:6,12
183:22 184:10
190:9 192:22,25
194:11,15,15,20
195:13 197:4
198:16,23 203:17
207:25 208:9,19
216:22 217:18
225:20
**knowing** 123:23
124:9
**knowledge** 29:4
83:20 92:1 96:9
187:14 188:11,13
**known** 32:1,8,22
33:11 164:18
187:7
**kolodny** 93:21
94:5,15 95:3,13
96:15 100:5 101:3
101:9,18 102:4,10
103:8
**kolodny's** 96:20
**kreiner** 95:15

**l**

**l** 12:1 95:15
**label** 36:6,14,22
37:10,11,17,21
38:6,9,17 195:14
196:3
**labels** 36:17 37:1,7
37:25 38:3,19
**lake** 22:7,19 29:23
30:1,4,8 45:14
92:17 96:4 113:13
113:20,23 118:14
118:22 119:1,5,10
119:23 120:1,8,25
121:7,18,19
123:17,20,24
124:10 125:16,23
172:5,9 173:22
174:4,19 180:16
199:8 201:6
214:15,16 215:12
218:20
**lakeside** 3:8
**language** 42:7
54:13 55:3 166:10
**laparoscopic**
231:17,18
**large** 13:4 70:15
133:20,22,23
134:24 135:1
141:10,20 142:10
142:12 143:6
168:21,24 170:5
226:24
**largely** 110:18
**larger** 39:16 101:4
134:5,9 144:5
150:21 151:9
**largest** 65:10
87:14

**larney** 199:18
200:1,13 206:14
**laura** 1:21 12:5
13:1 14:12 234:21
**law** 2:8,19 3:6,16
4:6,16 5:6,18 6:7
54:18 188:4,11,16
190:9 191:15
**laws** 29:2,5,10
54:1,20 188:24
189:9 190:7 191:3
191:4 194:3
**lawyer** 194:10
**laying** 133:1
**lchb.com** 2:13,14
2:15,16,25
**lcr** 234:23
**lead** 64:10 131:18
**leading** 12:10
132:4,8,12
**leaned** 59:21
**leave** 160:24
197:21
**leaves** 162:2
**led** 30:8 64:4
65:25 70:16,19
71:3,6,9 75:3,20
91:7 126:3,7
127:4
**left** 155:10,17,25
161:11 198:2
222:24 223:16,20
224:2 225:2,21
226:15,20 231:6
**leftover** 228:3
**legal** 6:25 14:11,13
94:16 125:9
190:13 191:13
193:21 194:25
235:1 238:1

[legally - march]                                                                Page 23

**legally** 158:15
**legitimate** 29:14
  53:16 54:6,9,15
  55:9,19 57:2,3,5
  57:17,19 58:3,14
  59:5,10,18,25
  154:17 155:2
  157:13,22,23
  158:13,17,25
  180:22 181:20
  182:16,25 186:19
**legitimately**
  122:16
**lethal** 201:4
**lethality** 207:24
  208:3,23
**letter** 235:19
**letting** 77:14
**level** 35:11 45:20
  51:8 173:12 177:7
  228:7,7
**levels** 45:19
**lewis** 4:7
**liber** 3:7
**license** 234:22
**licensed** 46:21
  47:1 64:20 157:4
  157:21 158:15
  186:17
**lie** 64:2
**lieff** 2:9,20
**life** 43:11 47:15
  50:2 51:16 184:24
**likelihood** 75:12
**limit** 101:22
**limitations** 50:1
  51:22 61:4
**limited** 200:18
**limiting** 158:24
**line** 181:18 235:13
  237:7 238:3

**list** 7:16 18:19
  20:13,15 21:1,5,12
  21:13,17 23:12
  24:5,8,9
**listed** 20:23 23:1
  23:11 147:23
  216:24 237:7,17
**listen** 70:7
**listing** 237:7
**lists** 147:19
**literature** 75:24
  76:6 79:25 88:6
  88:24 89:10 92:5
  165:11 174:3
  223:18 227:13
**litigation** 1:9 14:4
  95:22 96:1,17,21
  124:2 235:6 236:3
  237:3
**little** 15:6 46:19
  59:20 61:16,23
  91:17 107:16
  128:4 133:2,3
  151:6 177:17
  197:24,25 198:6
  210:22 211:5
**llc** 5:15,16,16
**llp** 2:9,20 3:7 4:7
  6:8
**located** 14:9
**long** 17:3,13 20:16
  71:15 72:24 73:19
  97:5 166:11,20
  176:25
**look** 23:25 30:2
  31:17,25 39:12,25
  40:3 41:11 43:22
  44:13 45:2 46:12
  49:21 51:11 67:3
  76:21,24 80:6,8
  81:7 85:4 90:24

  97:24 110:15
  111:3 133:6,11
  135:7,8 138:2
  149:21 150:8,19
  153:1 167:3,25
  168:7,15 173:25
  174:11,22 181:18
  183:6 187:1
  197:10,13 199:4
  203:15 204:16
  206:18 209:8
  215:21 216:21
  218:10,12,14
  229:9 230:9
  231:21 232:14
**looked** 23:1,6
  80:24 82:22 84:5
  89:20 136:11
  138:14 150:20
  168:2,8 180:16
  183:13 185:25
  206:18 217:23
**looking** 72:18 91:3
  93:24 155:16
  166:1 182:8 197:8
  204:11,21 206:13
  206:15 218:3,24
  219:2 220:12
**looks** 171:1 215:17
**lost** 50:2 62:17
  110:2
**lot** 51:7 117:13,22
  154:21 189:12
  191:18
**low** 65:20 166:18
  168:10 169:10,13
  171:17,18 172:9
**lower** 228:2
**lpa** 6:18
**lunch** 62:7,12

**lung** 176:7,8
**lymph** 231:16

**m**

**m** 5:5,20
**madam** 235:10
**major** 9:9 107:21
  108:15 109:21
  110:16,17 230:24
**majority** 151:12
  168:25 208:13
**making** 51:13
  52:21 53:10
  177:21 225:19
**managed** 36:8
**management** 36:5
**managing** 36:3
  69:10,14 70:11
**manufactured**
  63:17,23
**manufacturer**
  72:1 73:7 79:18
  82:25 89:21
**manufacturers**
  72:5,16 73:9 76:1
  76:8,15 78:13,24
  79:5,12 80:2
  81:15,24 82:8,15
  82:21 83:3,7 86:7
  86:12,15,21,22
  87:1,4,13,13,15,15
  89:15,18 90:19,23
  92:25 94:3,22
  97:4,8,11,15,23
  100:23 102:2
  183:10 184:12,17
  185:3
**manufactures**
  81:10
**mapped** 224:11
**march** 7:22

**marcus** 6:8,13
**marijuana** 113:1
145:22 148:2
152:8
**mark** 18:3,17 31:6
77:3,4 80:9
209:18,22,24
**marked** 17:25
18:7,8,14 31:7
42:18,21 63:3
67:15 68:21 77:5
80:10 93:6 95:5
107:11 109:25
130:10 145:1
149:6 167:12
181:10 209:20
210:1,3,5,7 221:23
229:16
**market** 63:18,23
83:21 100:3,6
**marketed** 75:3,13
75:21
**marketing** 8:18
71:17 72:13 73:1
73:10 74:8,17
75:1,2,8,11,16,20
75:25,25 76:7,8,14
80:1,1,18 81:19
82:1,10,14 83:7,12
83:21 84:10,20,22
85:4,10,14,15,18
85:20 86:22,25
87:2 88:9,17,23,25
89:13 90:7,13
91:2,4,5 92:9,13
92:16,23 94:2,21
97:22 98:2,7,14,23
99:18,20,22 100:2
100:12,13,16,21
101:1,8,12,17,19
101:22,24 102:5,6

102:17,18,20,24
103:3,4,9,10,14,15
103:16,17,18,24
104:1,25 105:1,3
105:13 106:2,5,10
106:13
**massachusetts**
8:16 77:19 79:16
**massive** 153:6,15
153:21,25 154:9
154:16,25 156:12
157:2,14 160:21
**mastectomies**
155:15 231:15,16
**master** 6:17 61:17
62:1
**material** 22:9,20
23:13,16,18,18,19
23:19 35:13 37:25
184:13 185:11,14
185:23 186:13
209:15
**materials** 7:16
18:19 19:24,25
20:8,12,15,18,25
21:5,11,13,18,19
23:11,12 24:1,5
85:9,19 92:10,13
92:16 184:19
185:10
**matias** 2:7
**matter** 14:3 23:23
172:20,21
**matters** 8:12
176:1
**mbustamante**
2:15
**mccabe** 143:22,25
**mcconnell** 5:8
**md** 1:6 14:7

**mde** 108:8,9,15
109:7,11
**mdl** 1:5 7:13
**mean** 15:24 21:4
46:21 54:8 55:7
56:22 57:23 58:18
60:7 67:21 83:1
85:15 95:25 99:3
99:18 100:18
101:24 102:19,21
103:2,13,15,17,18
103:18 104:14
105:5 118:3 120:6
121:14 131:2
146:10 153:22
155:9,10 164:5
171:9 172:23
175:19 178:20
182:4 189:20
192:25 193:2
196:12 197:3,12
208:7 224:6
**means** 33:7,8,19
34:25 35:1 108:11
108:15 135:20
151:22 175:16
176:2
**meant** 50:23 89:19
102:24 213:10
**measured** 168:9
**measures** 168:1
177:9
**measuring** 222:23
**media** 14:1
**medical** 29:14
30:18,22 34:3,16
39:11 40:20 41:9
41:17 53:17 54:6
54:9,15 55:9,20,22
55:25 56:11,14,23
57:2,5,17,19 58:4

58:14 59:5,11,18
60:1 66:5 69:8,15
69:20 122:23
142:9,10,16 143:7
143:22,25 149:11
149:24 150:15
154:18 155:2
157:13,21,23
158:13,17,25
180:22 181:20
182:16 183:1,7,24
186:19 231:14
**medically** 130:2
142:13 143:13
144:5
**medicating** 69:6
**medication** 33:18
35:21,22 36:15,22
37:10,13 38:13
46:15 155:21,22
156:19 157:5,22
158:16 159:17,18
161:7 162:22
195:16 196:10
222:13
**medications** 28:22
30:18 35:2 36:18
38:22 39:7,16,21
40:11,16 43:6,21
129:24 130:3
184:15 186:17
187:12 195:23
221:16
**medicine** 65:17
67:7
**medicines** 32:5,16
**medium** 168:11
169:10,15 171:19
171:20
**meetings** 17:8,10
17:13

**members** 47:12
**men** 177:6
**mental** 132:2
174:17
**mention** 26:4
27:17 64:13 90:6
193:15
**mentioned** 86:11
89:8,9,15,17 90:16
90:23,25 99:11
174:16 221:20
**mentions** 86:15
99:4
**messrs** 2:5 5:17
**met** 15:2 16:4
**methadone** 34:9
211:3,9,10
**methamphetamine**
145:24
**method** 203:9
206:23,23 220:4
**methodological**
207:19 216:17
**methodology**
175:4 203:25
220:9
**methods** 79:13
82:17 84:2 104:17
125:11 133:6
146:4 149:22
150:13 206:6
216:16 231:12
**microphone** 13:19
61:21 62:4
**mid** 46:2,4,7,9
**midwest** 235:17
238:1
**milligrams** 168:10
168:11,11,12
**million** 133:18
134:22 155:25

223:20 224:1,7,8
224:17,21 225:1
225:11,15,21
226:3
**millions** 117:11
**mind** 170:14
**mine** 213:1
**minimizing** 96:25
97:3
**minimum** 131:12
**minorities** 49:6
**minority** 47:13
49:1
**minus** 177:19
213:6,6
**minutes** 106:24
198:2 220:24
**misleading** 96:19
**missed** 218:18
**missing** 153:10
**misstates** 55:1
56:7 58:6 70:21
73:14 84:24 86:16
87:6 88:12 97:13
99:2 115:13 116:3
116:9 119:14
127:11 142:19
159:21 163:8
170:9,15,21
176:15 191:1
196:4
**misunderstanding**
91:15
**misuse** 9:22 141:1
141:4 143:22
145:10,18,21
146:11 147:5,15
151:25
**misused** 140:4,19
146:6,16,20 147:9
148:2,4

**misusers** 151:15
**misusing** 137:24
139:8 140:13
141:23 142:3
198:17,20,22
**mnwr** 7:21
**models** 208:16
**moderate** 33:21
34:4,17 35:4,17
**moment** 76:6
176:11
**monitor** 62:11,15
62:23 63:2 107:1
107:6 144:15,19
162:3 198:8,13
221:1,7 233:10
**monitoring** 189:15
189:17 190:4,21
**months** 146:8,18
169:2
**mood** 112:22
**morgan** 4:7
**morganlewis.com**
4:11
**morning** 13:15
**morphine** 34:6
168:9
**mortality** 8:22
93:14 97:21
230:25
**mother** 123:17
125:6
**mother's** 123:14
**mothers** 122:9,10
122:13 123:3
**moved** 61:24
**muhuri** 130:18,22
130:24 131:4
136:5 138:5
141:22

**muhuri's** 138:17
**multi** 175:1,15,19
175:25
**multifactorial**
175:2
**multiple** 158:4,6
175:16 176:2,4,5
228:5
**multiplied** 206:12
206:13
**multiplier** 204:19
204:20 205:18,24
206:13,15,20
220:3
**multiplying**
200:10
**multitude** 75:7
**mushrooms**
148:18
**mute** 13:19 162:23

**n**

**n** 2:1 3:1 4:1 5:1
5:17 6:1 12:1
147:4
**nagging** 111:6,20
**name** 8:15 14:10
16:7 32:6 38:11
77:18 96:20 235:6
236:3,4,15 237:3,4
237:21
**narrow** 87:18
**nas** 121:17,17,18
121:21 122:4,15
123:15 124:9
125:3,15,23 126:3
126:8 127:2,17,23
127:24,25 128:3,7
128:13 129:1,16
129:22 130:1
**nassau** 24:25

| | | | |
|---|---|---|---|
| **nation's** 65:10 | **needed** 32:16 | **nodded** 139:21 | **noted** 14:17 |
| **national** 1:9 8:23 | 35:22 | **node** 231:16 | **notes** 19:24 20:21 |
| 14:4 82:6 83:5 | **needing** 116:1,22 | **noise** 13:21 | 24:1,4 |
| 86:19 87:8 100:1 | 117:4,25 119:25 | **non** 10:13 142:16 | **noteworthy** |
| 103:7 132:18 | 120:7 | 149:11,24 150:13 | 112:25 |
| 142:8 219:12 | **needs** 51:23 57:2 | 150:15 167:19 | **notice** 153:10 |
| 220:19,20 223:17 | 57:18,19 162:23 | **nonaddictive** | **november** 63:10 |
| 224:12 235:6 | 200:24 229:7 | 71:16 72:24 | **number** 11:17 |
| 236:3 237:3 | **neither** 100:24 | **noncancer** 64:5 | 14:7 19:24 21:24 |
| **nationally** 45:14 | 103:7 234:15 | 65:8,19 71:17,19 | 22:2,10,25 23:6 |
| 45:16,17 205:10 | **neonates** 128:2 | 72:14 73:1,3,11 | 78:4 99:4 118:8 |
| **natural** 34:5 | **never** 28:17,24 | 176:25 | 120:10 122:25 |
| 210:24 | 153:9,10 170:14 | **nonmedical** 8:10 | 125:23 130:8 |
| **naïve** 112:18 | **new** 2:23,23 4:9,9 | 9:9,18 10:6 67:19 | 141:9,9,20 144:4,6 |
| 115:11,19 116:1 | 10:8 14:9 25:1 | 69:1 107:22 | 147:20 149:18 |
| 116:24 117:6 | 32:2 131:7,10 | 108:11,13,22,24 | 150:12,24 155:13 |
| 118:17 120:14,17 | 132:24 149:13,23 | 109:2,9,11,14,15 | 163:2 166:2 183:6 |
| 120:18 | 170:2,17 171:10 | 109:19,20 122:23 | 189:1,16 191:2 |
| **near** 164:8 | 173:13 | 130:16 134:17 | 199:7,11,19 200:2 |
| **nearly** 112:25 | **nice** 15:3 | 135:4,15 142:11 | 200:3 201:5 |
| 151:13 | **nichols** 1:21 12:5 | 142:12,15 143:1,2 | 202:15,23 203:11 |
| **necessarily** 134:11 | 13:1 14:12 234:21 | 143:5,25 | 203:13 204:2,3 |
| 175:23 216:10 | **nicotine** 113:1 | **nonmedically** | 206:2,14 207:5,8,9 |
| **necessary** 12:8 | **nida** 132:9 | 109:5 135:19 | 207:10,14,17,20 |
| 38:22 | **night** 18:20 | 141:18 142:7 | 208:23 212:3,7,11 |
| **need** 17:1,16,18 | **nih** 9:23 10:8,14 | 143:10,12 144:7 | 212:12,13,25 |
| 32:5 39:25 40:16 | **nine** 133:12,12 | **nonopioid** 218:13 | 213:15 214:19,20 |
| 41:11,12,21 43:22 | 226:13 | **nontherapeutic** | 214:22 215:1 |
| 59:19 60:2 68:1 | **nineteen** 215:18 | 110:18 | 216:6,8 217:3,5 |
| 90:9 112:1 113:22 | **ninety** 112:19 | **normative** 152:1 | 218:24 219:16,16 |
| 114:10,13,15,18 | 148:14,17,20,23 | 152:10 | 219:21,25 220:2 |
| 114:23 115:3,7 | 168:3,4 170:1 | **northern** 1:2 14:6 | 220:15 226:18 |
| 117:16,17 118:8 | 221:14 222:11 | **northwest** 5:20 | 228:9 229:6,6 |
| 118:11,15,20,22 | 223:3,8 | **notable** 51:22 61:3 | 232:20,21 235:7 |
| 118:23 119:2,3 | **nmpr** 134:15,17 | **notarized** 235:14 | 235:13 |
| 121:1,8 126:20 | 135:11,20 136:15 | **notary** 1:24 12:7 | **numbered** 21:15 |
| 127:5,8 139:22 | 136:19,23 137:3,8 | 13:3 234:21 | **numbers** 119:1 |
| 166:24 179:24 | 137:12,16,20 | 235:25 236:10,18 | 122:2 138:5 |
| 180:9 208:8,9,12 | 142:24 | 237:15,23 238:23 | 204:13 218:19 |
| 208:18 225:24 | **nmupo** 108:6,8,8 | **note** 61:18 89:1 | 219:4,10 237:7 |
| 229:9 230:20 | 108:11 | 235:12 | |

**[numerous - okay]**

**numerous** 38:16

**o**

**o** 12:1
**oarrs** 190:11,15
  191:10 192:4,8,10
  192:16,19,24
  193:18 194:16,23
  195:6
**oath** 14:15 16:5,11
  24:19 25:11,23
**object** 42:13 48:12
  49:12,20 53:18
  54:7 56:19 57:7
  58:16 60:9 71:8
  73:13 80:3 82:2
  83:13 85:12,21
  87:5 88:11 89:22
  90:8,14,20 91:22
  92:3 95:23 97:12
  98:3,9,16 99:1,8
  99:23 101:2 103:6
  103:19 104:2,5,12
  105:16 111:22
  113:14,24 114:11
  115:4,12,21 116:2
  116:8 118:1,18
  119:13 120:2,15
  120:20 121:3,13
  121:23 122:6,18
  123:8 124:3,13,24
  125:8 126:16
  129:18 131:16
  132:23 133:25
  134:7,25 135:24
  138:7,21 141:7,15
  142:18 146:13
  147:12 150:23
  152:11 153:16
  154:10 155:5,19
  156:4,15 157:6
  158:18 159:3,11

159:19 161:20
162:10 163:7
168:23 170:8,15
170:20 171:5
173:24 175:22
176:14 178:4,12
180:10 183:15
184:2 185:7,21
186:11,20 187:13
188:18 190:12,23
190:25 191:12
192:11 194:5
196:17,24 197:18
201:13 202:6
203:7,21 204:10
204:23 205:8,21
208:5 217:16,25
224:24 225:23
226:22 229:1,8
**objection** 23:5
  24:3 27:11 28:4
  32:23 33:13,22
  35:23 37:3,14,22
  38:14 40:6,13,21
  41:5,10,19 42:3
  46:23 47:20 48:1
  51:25 52:4,11,17
  53:4 54:21,25
  55:11 56:7 58:5
  58:15 59:12 61:6
  66:7 67:2 69:22
  70:12,20 74:10
  83:25 84:11,23
  86:8,16 87:16,23
  88:19 89:5 96:5
  96:18 102:7
  106:11 116:25
  119:6 127:10
  128:14,19 129:3
  132:6 139:19
  160:4,14 161:2

165:24 166:22
169:22 179:16
187:21 188:2,9
189:24 192:13
193:20 194:24
195:10 196:4
**objections** 12:9,12
**objective** 177:9
  187:20 231:9
**obligated** 194:22
  195:3
**obligation** 187:11
  188:7 190:19
  195:18 196:1,16
  196:20,22,22
  230:13
**obligations** 189:22
  191:20 192:3,4,18
  193:6,10,17 195:7
  197:16
**observational**
  51:21 60:19 61:2
**obtained** 81:2
  232:2
**occur** 128:2
  129:23 130:1
  201:16,20 215:20
**occurred** 69:19
  70:9,15,23 71:1
  147:5,15 201:1,11
**odds** 109:4
**offer** 19:14,18
  27:20,22 28:2,6
  35:13 36:16 37:18
  38:1,17 58:7
  60:12 89:24
**offered** 12:13 61:9
  151:3
**offering** 37:5
  85:17 88:24 89:6
  89:12 102:15

106:4,6,12 184:18
185:8,23 190:16
190:19 192:7,9,12
192:15,17,20
197:2,16
**official** 212:21
  236:15 237:21
**oftentimes** 181:24
  182:20
**oh** 29:16 48:16
  75:1 77:15 78:20
  80:8 81:20 93:24
  94:12,24 110:14
  182:6 205:2
  210:16 214:8
**ohio** 1:2 3:10 5:10
  5:16 6:20 10:19
  14:6 22:7 190:10
  191:9,15,23
  193:18 195:2
  218:19,19,20
  219:6,6,9 220:17
  235:2
**okay** 15:13,16
  16:16 17:4 19:5
  20:8,14 21:24
  23:10 24:7,13,18
  26:12 28:24 29:12
  29:20 30:2,17
  31:12 32:14 33:6
  36:1 37:19 38:11
  41:15 43:14 45:2
  45:9 46:10 49:17
  53:13 54:4 56:21
  57:4 59:8,16 60:4
  60:15 61:11 62:5
  64:9,22 65:6 66:5
  67:24 68:1,2,18,24
  69:13,18 71:11,22
  72:12 73:5,5 74:6
  74:15 76:24 77:21

[okay - opioid]

78:11,12 79:1,21
80:15,24 81:7,14
82:4,13 83:9,19
84:19 87:11,20
88:8 90:11 91:6
91:25 92:14,19
93:5,18 94:7,25
95:1,9,10,19 96:10
96:14,23,23 97:10
97:16 98:6 99:17
102:16 103:2,13
104:9,23 105:24
106:15,19 107:18
107:20 109:6,8
114:9 118:6
119:24 121:15,22
122:4,8 123:2
124:7 126:2 127:2
128:7,24 129:8
130:15,21 132:17
135:20 138:13
139:3,16 140:12
141:3,11,22
142:15 143:14
144:3 145:20
146:19 147:8
148:10 149:2
151:5 152:19
153:18 154:6,19
155:3 156:7
157:11,15 158:1
159:12 167:2
168:15,21 169:17
171:12 173:10
174:16,22 175:6
175:18 177:25
179:9 180:6 181:3
182:10,13 183:5
183:20 190:18
191:7 192:9
193:12 194:14,20

195:25 196:11
197:11,12 198:4
201:3 202:9,25
205:11 209:23
210:16,21 211:3
211:24 213:2,4
214:3 216:23
217:22 218:16
219:9,20 220:17
220:22 221:19
223:1,24 224:20
225:13 226:5
230:3,6,9 233:6
**old** 146:15 156:23
**once** 162:1
**ones** 20:19,20
174:16
**onset** 126:13
**open** 31:5,10 63:6
67:12 76:18,23
77:2 79:16 80:24
81:3 82:22,24,24
84:3,6 85:6 86:2
87:22 88:1 93:12
94:13 95:3 104:8
104:16,18,19,21
105:18,20 107:9
107:17 109:24
110:3 144:21
149:3 181:4
231:19
**opened** 18:22
67:22,23 77:1
**opening** 18:23
107:15
**operation** 232:21
**operative** 155:3
156:11,12 157:14
230:14,21 232:23
**opiate** 1:9 14:4
22:16 34:5 153:3

229:25 235:6
236:3 237:3
**opiates** 43:9
**opining** 30:7,10,12
30:13
**opinion** 22:15
23:21 35:13 37:5
37:18 38:1,18
55:24 56:1 57:2
58:7 60:13 105:25
183:6,10 185:23
190:16 192:8,9,20
197:1,16
**opinions** 19:14,18
20:1,11,20,24 21:3
22:4,10,21 23:9
24:6 27:21,22,24
28:2,6 29:17
36:17 55:22 56:10
56:23 84:9,13,15
84:21 85:17 88:25
89:12 106:1,4,7,12
183:5 184:18
185:8 192:15,17
**opioid** 8:10,19,20
9:5,14,15,22 10:11
10:11,14 11:9,14
29:22 33:18 34:7
34:10 35:1,7,20
36:15,17,21 38:21
39:13,15,17,21
40:11,15 43:6,21
45:17,22 46:3
53:9 55:25 56:11
56:15,18,24 59:10
63:17 64:4,11
65:21 67:20 68:16
69:1,9,18 70:1,9
70:19,23 75:3,6,9
80:18,19 82:21
91:12 95:11,21

96:1,17 97:4,5,8
97:10,14 99:4,12
102:1 105:6
108:12 110:7,8
111:4 112:17,22
113:2,5,18 114:4
115:10,18,25
116:13,23 117:5,8
117:11 118:16
122:24 123:6
124:17,22 125:4,7
126:3,7,10,11,12
126:14 127:3
128:8,18 129:2,5
129:24 135:15
145:10,17,21
147:5 149:25
151:23,24 154:1
155:17,22,25
158:24 160:17
163:16,17,19,19
163:21 164:3,3,14
164:15,17,18,25
164:25 165:6,6,9
166:3,3,6 167:17
167:17,19 169:1,3
169:5,11 171:16
172:1,5,9 177:5,7
177:16 178:1,3,10
178:15,16,16,25
179:4,7,12,14,20
180:1,7,13,13,18
183:8,16,17,19,25
186:25 187:8,15
187:23 188:11
189:2,13 191:3,11
192:6 194:9,22
197:4 199:7,12
200:2,4 201:6
202:21,23 203:6
204:4 205:20

213:20 218:25
219:7 220:13
222:4,21 223:4,9
223:14,20 224:1,7
224:9,10,18,22
225:1 226:8 228:1
228:3,6,6 231:5,24
232:3,23
**opioids** 7:20 9:10
10:7 29:25 30:17
30:21 33:20 34:2
34:3,9,12,15,20
35:3,9,13,14 37:2
38:3,23 39:1,2,6
39:11 40:5,9,20
41:9,17 42:2,6
44:1,4,11 45:13
46:13,15,17,22,25
55:23 57:13,18
61:13 63:15 65:18
65:20 66:12,24
69:19 70:3,10,24
71:2,5,7,15 72:9
72:24 73:20,25
74:1,4 75:17,19,20
79:19 82:7 87:9
88:10,18 92:2,16
98:2 99:13,15
103:1 107:22
108:14,23,24
109:3,4,10,11,14
109:16,19,21
110:17,23 111:1
111:11,15 112:9
113:13,23 120:19
122:16,17,23
123:21 124:1,5,11
127:17,19,22,25
135:20 137:24
138:5,20 139:9,10
140:5,7,14,16,20

140:22 141:1,5,13
141:18,24 142:3,7
142:11 143:10,23
144:1,5,7 146:7,12
146:17,21 147:10
148:11,11 149:12
152:6 153:15
154:16 155:1,8
160:2,11 161:1
165:3 169:8,21
176:25 177:3,10
177:14 178:7,24
179:10 180:24
181:25 182:2,21
182:23 183:7
184:21 185:15,19
186:3,10 188:8
189:11,21,23
193:7,19 195:9
198:17,21 199:24
200:19,19 202:5
202:13 203:12,20
204:8 205:25
210:25 211:11
213:16 215:7,17
216:10,20 217:23
219:1 220:11,16
221:15 222:12,24
226:11,13,16,19
226:24 227:10,11
227:18,20 228:10
228:17,23
**opium** 34:6
**opportunity** 24:21
227:14 231:6
**opposed** 179:13
187:11 188:6
190:10 192:22
194:16
**oprs** 96:25 97:3

**oral** 13:11 227:8
**order** 17:16,19
41:22 65:1 119:17
186:24 188:21
195:14 207:18
225:25
**organizations**
65:11 97:4,8,15
102:2
**organize** 198:5
**orient** 219:21
**orthopedic** 226:17
**oud** 166:19 170:2
170:17 171:10,15
171:25 172:23
173:1,4,5 220:2,10
**outcome** 14:17
175:17 176:4
**outcomes** 74:14
128:1 163:21
164:4
**outlined** 69:24
125:11,19
**outpatient** 11:10
222:5 226:14,17
231:13
**outreach** 150:3
**outside** 43:10 66:8
78:14
**outweigh** 32:7,22
33:11,20 35:3
**overall** 28:7 91:12
101:19 163:16
164:13 165:5,11
182:12 184:20
206:3
**overbroad** 37:15
40:7,14 41:20
58:6 83:14 84:12
85:22 88:20 90:21
113:15

**overdose** 8:7
22:17 39:13 53:9
63:9,13 64:2
165:9 183:22
184:1,4,7 199:17
199:19 200:5,14
200:15 201:24
202:2 203:4,10
204:21 206:8
207:4 208:4
213:11
**overdoses** 199:20
202:11,16 205:16
205:18 207:18
211:25 215:6
**overestimate**
201:5
**overlap** 142:10
143:7 219:7,8
220:14
**overly** 40:22
**overprescribing**
82:7 83:6 84:17
86:20 87:9 191:18
230:13,19
**overprescription**
103:1
**oversight** 215:19
**overstated** 181:25
**oversupply** 57:15
57:20 70:16 71:3
71:6,10 84:17
99:16 102:25
**oxford** 6:9
**oxycodone** 34:8
210:25
**oxymorphone**
34:9

[p - payors]

**p**

**p** 2:1,1 3:1,1 4:1,1
5:1,1 6:1,1 12:1
**p.m.** 62:13,13,25
62:25 107:4,4
144:17,17 198:11
198:11 221:5,5
233:14
**page** 7:3,9 8:3 9:3
10:3 11:3 20:7
31:18 33:3,25
35:9 36:2 45:2
48:4 51:11 63:12
69:6 74:15,21,24
74:25 75:5 77:21
77:25 78:9,12,18
80:22,22 81:7,17
92:19 93:22 97:2
103:23 104:3,24
104:25 106:2,2
108:5 112:13
121:24,25 131:21
133:6 139:1
145:16 146:3
147:2 149:21
150:8 151:11,20
154:4,13 163:12
163:13 164:8,9
167:25 168:8,15
174:23 175:3
177:2 181:17
182:5,9,9,12 183:6
198:25 199:5,10
200:22 204:18
218:23 221:9,12
222:15,18 223:1
223:12 230:10
232:15,18 235:13
235:15 237:7
238:3

**pages** 20:5 23:13
24:14
**pain** 7:20 9:18
10:13 33:21 34:5
34:17 35:5,17
43:10 46:14,16,18
46:22 47:1,10,11
47:15,24 48:7,9,15
48:19 49:3,10,15
49:23 50:1,11,13
50:18 51:2,9
63:16 64:6 65:8
65:11,13,16,17,19
66:2,6,12,16,25
67:7 69:7,11,15,20
70:11 71:6,17,19
72:15 73:1,3,12,23
97:4,8,15 102:2
111:6,9 112:4
130:16 134:17
135:4,19 140:11
142:16 143:2
154:18 155:3
156:11,12 157:1
157:14 167:19
177:1 229:7
230:14,21
**painkillers** 153:4
154:1
**palliative** 43:11
**paper** 18:18 79:14
86:10 143:17,18
143:21 183:23
227:23 228:4,20
230:18,23
**papers** 74:12,19
80:21
**paragraph** 32:1
47:4 64:1 72:20
78:19,22 81:18,22
92:21 94:24 108:5

**pages** (cont.) 150:9 169:25
222:19 226:7
230:11 231:1
232:2,19
**paragraphs** 231:2
**parameters**
208:18
**parenthetical**
133:16 134:20
**park** 4:8
**part** 24:12 31:3
39:16 60:16 61:4
61:9 70:15 73:8
86:21 92:24 94:2
94:21 96:10 99:15
100:22 119:24
151:1,2 160:18
209:23 219:5
237:9
**partial** 82:3
231:15,16
**participants** 150:1
150:6,12 151:13
152:3
**particular** 28:8
48:10,20 79:6
91:20,20,23 92:1,9
92:12 97:18
119:21 123:17
125:16 146:17
157:10 172:21
180:17 192:16
**particularly** 47:12
49:9 111:5
**particulars** 190:15
**parties** 12:3,11
13:25 152:4
234:16
**party** 14:15
**patient** 30:3,14
50:4 51:4,14,24

53:11 55:14 64:19
116:21 117:3
156:11 159:16
160:10,25 162:7,8
162:21 164:6
171:1 172:22
180:16,17 196:2,9
223:15
**patient's** 51:15
229:7 230:14
**patients** 32:4,16
35:21 39:2 46:22
47:12 49:22 51:5
58:20 75:10 78:17
110:19,20 111:14
112:8 114:2
164:12 172:5,6,10
172:12 176:24
177:8,15 195:15
195:22 221:15
222:11 223:3,8
226:9,9,17,21
227:21 228:2,17
231:24 232:4,10
232:23
**patterns** 9:8
107:21 222:21
**paulina** 2:18
**pause** 43:17 199:2
**payment** 78:13
79:12 81:9 87:22
**payments** 8:14
74:13 76:18,23
77:17 79:4,16,17
80:25 81:3 82:22
82:24 84:3,6 85:7
86:2 88:1 104:8
104:16,19,20,21
105:18,20
**payors** 87:14

**pdfs** 209:17,24
 210:10
**pdmp** 191:17,21
 193:16
**pdmps** 191:8
 192:15
**pdoamaral** 2:25
**peer** 152:1,10
**pending** 17:3 52:1
 120:21,21 157:18
 189:25
**pennsylvania** 6:11
**people** 42:8 48:5
 57:9,14 61:25
 62:5,6 66:1
 106:20 113:17,22
 114:6,10,12,13,15
 114:21,23 115:9
 115:24 116:12
 117:11,13,16,23
 118:14,19 119:5
 127:2 133:13
 134:14 135:3,14
 136:6,14,18,22
 137:2,8,12,16,19
 138:2,18 139:3
 140:3,12,19,25
 141:4,9,9,12,17,23
 142:3,6 143:6,9,12
 144:4,6,10 152:18
 155:21,22 173:22
 178:15,24 188:13
 193:1 197:3 199:7
 199:11 207:5,8,20
 208:13 209:2
 217:18
**perceived** 78:15
**percent** 112:16,20
 113:2 115:18
 116:13 117:8,13
 117:15,22,23

118:21 135:3,10
 135:13 136:14,18
 136:22 137:2,15
 137:19 138:6,6,18
 138:23 140:4,10
 140:18,25 141:24
 142:2,24 146:11
 146:20,23 147:9
 148:1,4,7,10,14,17
 148:20,23,25
 169:3,7,13,15,18
 169:21 170:1,7,17
 171:9,16,17,18,20
 171:21,22 177:4,6
 177:18,19,20,23
 178:9,10,14,25
 219:16 221:14
 222:11 223:4,8,14
 224:10 226:11,13
 226:16 229:7
 231:23 232:11,22
**percentage** 115:9
 141:12 143:9
 147:21 166:10,18
 166:20 170:5
 171:10 198:16
 220:12
**percentages**
 138:12 220:14
**perform** 125:10
**performed** 198:24
 231:14
**period** 136:11
 143:1 170:3
 201:15 205:14,19
 206:19 207:24
 208:8,12 214:4,10
**persistent** 49:23
**person** 126:23
 147:16,16 153:19
 154:25 158:5

159:16 160:17
 178:8 179:9,10,12
 179:14,25 180:7
 180:12 199:25
 200:24
**personally** 236:11
 237:15
**persons** 47:13
 48:6 134:22
 199:18
**peter** 3:5 95:14
**ph.d.** 1:16 7:4,11
 7:12 10:17 12:5
 13:10 14:22 235:8
 236:4,9 237:4,13
 238:20
**pharmaceutical**
 8:18 71:14 72:3,7
 72:10,22 73:9,21
 75:11 76:1,15
 78:13,24 79:18
 80:2,17 81:4
 82:18 84:4 85:3
 86:2,5 92:24 94:3
 94:22 100:22
 104:18,24 105:1,3
 105:13,21 152:2
 152:21,24
**pharmaceuticals**
 81:12,12
**pharmacies** 15:21
 15:24 27:3,7,14,23
 28:6,23 29:3,6,10
 39:5,6 83:12,21,21
 83:24 84:10,18,22
 88:17 90:7 92:25
 94:4,23 97:17,23
 97:25 98:8,14,23
 99:7,10,20,21
 100:23,25 101:11
 101:16,21 102:3,5

103:5,25 104:11
 105:5,14 106:3,6
 123:19 125:1
 156:18 158:6
 185:18 186:22
 187:2,4,10 188:6
 188:13,20 189:3
 189:13 190:8,17
 192:10,22 193:1,2
 193:6,9,17 194:13
 194:15,19 196:8
 196:12 197:10,17
**pharmacist** 29:1
 158:7 161:23
 162:21 189:23
 190:11 191:9,21
 194:21 195:19,20
 195:25 196:21
**pharmacists**
 185:18 186:8,14
 186:16 187:11
 188:7 190:17
 192:3,8,23 193:6
 194:16,18 196:14
 197:17
**pharmacological**
 28:21
**pharmacy** 5:14
 15:17 27:5,6,8,13
 28:8,11,16,17,19
 28:25 29:22 30:4
 64:16 89:13 106:6
 124:1,18 125:16
 156:14,21 157:3,9
 157:19 158:14
 159:1 160:10,16
 160:25,25 161:5
 161:11,23 162:2,2
 162:11,13,20
 163:1 188:25
 189:10,22 190:10

194:3 195:7,18,21
196:15,16,21,23
227:24 228:7,15
**pharmacy's**
192:18
**phone** 232:2 235:3
**phones** 13:21
**physician** 70:3
72:10 73:24 79:16
115:10,25 117:5
**physician's** 110:23
112:17 115:19
116:14,23 117:9
118:16
**physicians** 8:14,19
55:12 56:2,5
64:11,14 67:1
69:16 74:8,13,18
75:8 76:1,7,9
77:18 78:14,17,23
79:4 80:1,18 81:4
81:20 82:1,10
83:8 86:23,25
87:3 91:5 103:3,9
103:24 104:1
110:16 111:9,13
111:19 112:8
182:24 186:6
**pick** 13:20
**pill** 152:4
**pills** 155:17,25
163:2 223:14,20
224:1,7,9,10,18,22
225:2,11,15,21
226:3 228:3,6
231:6 232:3,8,11
232:17,20,21
**pittsburgh** 6:11
**place** 4:18 13:21
13:24 44:7,15
152:1 160:18

**placed** 50:18 51:3
201:14
**places** 78:8 201:18
201:25
**plaintiffs** 2:4 3:4
3:14 17:8,11
95:21 96:11,16
**planned** 228:3
**play** 205:15
**played** 202:2
208:4
**playing** 205:17
**please** 13:18,21
14:19 16:14 17:2
107:14 175:10
178:21 235:11,11
**plus** 41:5 108:9
168:4,12 217:5,6
**po** 150:15 151:14
151:15,22,22,25
**point** 32:24 44:24
48:17 72:17 98:13
111:13 125:14
152:16 162:20
188:4 189:18
190:1,7 208:19
**pointing** 187:9,14
187:17 188:1
**pointless** 163:18
164:24
**points** 228:5
**poisoning** 200:17
206:3
**policies** 29:10
189:13 191:3,4,6
194:9
**policy** 187:8,15,23
188:1 189:2 192:7
**pollock** 3:15 68:4
68:7

**polster** 1:7
**poly** 152:2,2,20,21
152:24,24
**population** 33:12
91:8 113:17,19
114:9,15,18,22
115:1,2 116:11,21
117:3,15,22,25
118:9 119:4,9,10
119:11,21,22
120:1,4,7,11,13,16
120:25 121:7
126:24 143:6
147:22 148:1
150:20,22,25
151:9 152:20
166:17 170:18
171:2 197:7
199:13 220:6
**populations**
122:20,24
**portion** 101:7
142:12 206:8
**position** 182:24
**possible** 128:5
217:11,12 218:7
218:11
**post** 155:3 156:11
156:12 157:14
170:2 171:15,25
212:2 226:9
230:14,21 232:23
**postoperative**
157:1
**potencies** 129:12
**potency** 129:10,14
129:20
**potential** 24:5
33:11,20 35:4
38:10 92:2 121:17
158:9

**potentially** 217:1
228:15
**poud** 218:20
**power** 126:1
**practice** 28:19
54:16 66:11,15,15
66:24,25 69:10,14
69:16,21 70:10,19
70:25 71:2,6
188:25 194:3
206:25 216:15
**practiced** 28:25
**practices** 57:17
101:20 223:19
**practitioner** 54:14
59:4
**practitioners**
223:18
**pradip** 130:18
**pre** 208:8
**preceded** 145:23
**precise** 184:25
**precisely** 111:8
151:7 206:5
**precision** 134:10
**preclude** 83:10
174:24 175:7
216:10 217:8
**predates** 205:19
207:25
**predominant**
127:24,25
**prefer** 44:23 67:4
67:9 83:18 118:3
156:5
**pregnant** 124:6
**prelude** 58:16
**preopioid** 45:19
**prepare** 17:6
**prescribe** 37:2
39:2 46:22 59:4

59:10 153:14
227:21 228:10
232:20
**prescribed** 46:14
46:15,18 47:1
57:19 59:15 69:8
92:16 112:21
113:12 122:16
123:6 129:24
135:21 141:18
143:10 154:8,15
155:1 156:19
157:23 160:11,23
161:7 162:22
169:1,5,21 176:25
183:25 217:19
221:15 222:12
223:14 226:11,14
227:11 231:24
232:9,12
**prescriber** 29:14
53:3 64:20 91:20
92:7,9,12 105:11
105:14 157:4
158:16 181:19
182:15 186:18
227:20 228:24
**prescriber's** 92:1
**prescribers** 36:25
37:6,11 38:2,19
46:21 47:1 52:10
52:13,16 53:3
66:16 75:12 91:4
91:9,9,11,13,24
92:6 106:10
181:23 182:19
228:9 231:5
**prescribing** 7:20
8:15,20 38:13
43:6,9,21 44:1,4
44:10,11 45:4,6,10

45:12,21 46:3,20
52:24,25 57:17,24
58:1,8 59:3 63:15
63:22 64:5,11,14
66:1 69:19 70:9
70:18,24 71:5
74:9,18 75:6,13
77:18 80:19 91:7
105:4 155:14
181:23 182:19
222:22 223:18
**prescription** 1:9
8:10 9:5,10,22
10:7,11,14 14:4
29:13,21,25 30:4,8
30:10,11,14,17,21
33:18,20 34:2,3,11
34:14,20 35:1,3,8
35:20 36:15,21
37:2 38:21,23
39:1,6,11 40:5,9
40:11,20 41:9,17
42:1,6 45:12,17
53:16 54:5,15
55:9,19 56:6,17
58:13,19 59:10
61:13 64:17,18,19
64:23 66:12,24
67:19 69:1 70:4
71:7 72:8 74:1,4
75:11,16,19 88:18
91:21 92:2 95:11
98:2 107:22
108:12,13,23,24
109:3,4,9,11,14,16
109:19,21 110:23
112:17 113:2,6,13
113:18 115:11,19
115:25 116:14,23
117:5,6,9 118:16
120:19 123:21

124:1,5,11,17,22
125:4 126:3,7,10
126:13 127:3,17
127:18 128:17
129:2 135:15
137:24 138:4,19
139:8,10 140:5,7
140:14,16,19,21
141:1,5,13,17,24
142:3,7,11,14,16
143:1,23 144:1,5,6
145:10,17,22
146:6,11,16,20
147:9 148:11
149:12,25 151:23
151:24 152:6,7
153:14,20 154:7
154:16 155:17,25
156:10,14,22
157:1,3,10,12,20
157:21,24 158:3
158:12,15,20,24
160:2,11,17 161:1
161:10 162:2
163:6,9 164:18
165:3 167:19
172:4,8 177:13
180:25 182:2,22
185:19 186:10
187:12 188:8
189:11,15,17,23
190:4,20 191:11
193:19 194:22
195:8 198:17,21
199:23,24 200:4
200:19 202:5,13
202:20,23 203:6
203:12,20 204:3,8
211:17 212:4
214:2 215:7,17
216:10,12,19

219:1,6 220:11,13
220:16 223:4,8,9
226:19 227:10,17
228:9,17,22 232:3
235:6 236:3 237:3
**prescriptions**
11:15 29:18 53:21
54:10 55:13,15
56:2 57:1 58:3
65:2,3,4 91:12
111:5 158:5
160:22 161:24
162:13,19 164:14
167:17 172:13
181:20 182:16,25
186:16 202:16
226:20 228:25
229:25 231:5
**prescriptive** 51:19
60:6,12,17 61:5
**presence** 111:8
112:3,4 177:10
**present** 6:15
**press** 8:23
**presumably**
148:11 153:22
166:17
**pretty** 100:5
103:18 183:22
184:24 194:8
**prevented** 197:9
**prevention** 47:9
**prevents** 32:3
**previous** 55:2,7
61:10 102:10
131:5 173:7,12,21
174:17
**previously** 66:2
87:21 88:20
135:10,19

**primary** 43:8
222:20 224:6,14
225:22
**printed** 31:23
**printout** 31:12
**prior** 9:13 12:14
16:4 45:21 46:8
81:19 84:24 110:6
110:25 112:21
113:5 135:4,14
136:15,19,23,23
137:3,4,16,20,21
138:4,9,19,24
140:10,25 147:5
202:14 203:10
207:11 226:8
**probabilistic**
150:13
**probabilities**
180:3
**probability** 141:8
179:19 180:5
207:3,21 208:10
208:10 209:4
**probably** 23:12
**problem** 99:16
212:1,2
**problematic** 78:15
**problematically**
163:15
**problems** 22:17
**procedural** 212:15
**procedure** 13:6
226:12 236:5
237:5
**procedures** 11:16
227:12,22 228:23
230:1 231:14,23
**proceedings** 13:12
**process** 7:18 31:14
31:20 35:10,14

**produce** 175:20,21
176:3 184:13
**produced** 26:9,11
**product** 41:13
**production** 72:8
73:25 74:3 235:15
235:17,22
**productivity** 50:2
**products** 8:19
35:7 80:18 83:22
**professional** 1:23
12:7 13:2 65:9
111:10 184:24
**professionals**
111:4 112:1
**professor** 16:11
28:14 39:10 48:11
67:11,12 68:20
93:12 94:13 95:19
120:23 130:7,13
139:22 149:5
158:22 167:11
184:23 198:15
205:3 209:13
222:1 229:14
**professors** 96:14
**program** 227:25
**programs** 114:4
150:3,3 189:15,17
190:4,21 228:16
**projects** 150:4
189:2
**proliferated** 72:9
74:1
**proliferation**
63:15 64:4 65:2
**prolonged** 126:12
**prominent** 132:9
**pronounce** 231:17
**pronouncing**
130:22

**proper** 196:9
**properly** 159:17
195:15 221:17
**proportion** 141:19
198:20 199:23
205:25 220:10
226:24
**proposition** 74:20
93:3
**provide** 27:3
32:15 33:10 38:9
73:22 100:24
101:10 114:5
121:21 122:19,25
124:4 127:13
143:24 165:7,11
195:22 226:1
**provided** 13:6
24:10 56:3 96:11
97:25 104:7
120:10
**provider** 53:12
157:21 228:7
**providers** 47:10
52:22 150:2
230:11 231:2
**provides** 32:4
35:21 100:5
124:15 134:9
143:21
**providing** 29:17
51:24 189:19
**psychiatric** 173:7
**psychoactive** 9:12
110:6,25 112:20
**psychological**
49:24 50:10,13
51:1
**public** 1:24 8:5 9:6
9:23 10:8,14 12:7
13:4 95:12 234:21

236:10,18 237:15
237:23 238:23
**published** 43:4,6
49:18 63:9 69:3
95:16 108:1 227:5
227:6,12 230:4
**pull** 67:10 78:2,10
93:9 94:9 95:2
143:12,16,17,18
209:10 229:13
**pulled** 93:19
**purdue** 71:23 72:1
72:5 73:6 89:21
101:25
**purporting** 224:19
**purpose** 29:14
37:17,20,25 38:5,8
49:2 53:17 54:6,9
54:15 55:10,20,25
56:11,15,24 57:5
58:4,14 59:5,11,18
60:1 154:18 155:3
157:13,23 158:14
158:17,25 180:22
218:15 230:22
**purposes** 37:9
55:22 107:10
110:18 186:19
202:11
**pursuant** 156:25
**put** 43:20 47:7
101:23 131:23
209:16 210:12
**putting** 117:21
**pweinberger** 3:12

---

**q**

**quackery** 32:3
**quadruple** 125:24
**qualifications**
138:11

**qualify** 138:8
**qualifying** 194:1
**qualitative** 150:11
**quality** 50:2 65:12
  131:14
**quantify** 180:2
**quantitative** 151:7
**quantity** 209:1
  222:23 227:11
**question** 16:18,20
  17:3 28:15 33:2
  36:20 41:13,25
  42:12,15 48:14,14
  52:1 55:2,3,7
  58:10 59:24 70:6
  70:22,25 73:16
  84:25 91:15 99:19
  102:10 103:22
  105:7 114:20
  116:4 120:6,21,21
  120:22 121:2,5
  122:22 124:8
  126:18 128:5
  131:14 135:12
  137:10 154:22
  157:17 159:8
  166:1 172:25
  173:2,3 175:14
  189:25 198:21
  203:9 212:15
  214:9 218:16
**questions** 12:10,10
  16:14,23 131:10
  165:18 234:9
**quick** 144:10
**quickly** 23:20
**quite** 141:10
  183:24
**quotation** 152:17
**quote** 92:22 93:20
  98:1 100:19

151:21 153:1
**quoted** 94:1
**quoting** 97:20

**r**

**r** 2:1 3:1 4:1 5:1
  6:1,16,18 234:1
**racial** 47:12 49:1,6
**randomized** 11:11
  51:21 60:20 61:3
  222:6 227:3
**range** 99:12
  100:14 102:11
  122:21 185:15
**rate** 46:20 176:18
  199:17,19 200:25
  201:5 206:9,12
  218:20,20 219:7
  219:17,20 220:18
  228:2
**rates** 8:22 93:14
  97:21 171:15,25
  176:12,22 183:9
  200:7 201:24
  219:11
**rationale** 51:12
  216:15
**read** 23:2 32:8
  33:14,16 36:9,12
  47:18 48:4 50:5,7
  52:3,6,8 64:7
  65:13,22,23 71:20
  79:1 82:4,10
  98:18 104:13
  108:9 111:16
  113:9,10 146:1
  151:18 152:4
  153:11 163:25
  164:19 170:3,4
  175:11 183:10
  189:20 230:22
  236:5,6,12 237:5,6

237:17
**reading** 32:25
  47:16 53:7 60:22
  69:11 82:2 193:24
  194:1,11 235:19
**realize** 62:19
**realized** 107:17
**really** 19:2 22:13
  23:17,21 62:17
  153:7 159:23
  165:25 175:13
  205:7 208:8
  216:16 225:20
**realtime** 1:22 12:6
  13:2 62:18
**reason** 16:22
  57:21 60:16
  113:11 114:25
  116:21 173:20
  174:18,20 186:7
  196:12 201:3
  215:20 235:14
  237:8 238:3
**reasons** 38:16
  181:20 182:16
  183:1
**recall** 90:6 96:21
  135:23 156:3
  176:13 189:21
  229:4
**receipt** 160:19
  235:18
**receive** 64:17,19
**received** 15:6
  39:25 155:21
  159:17 160:17
  169:8 223:4
**recognize** 21:4
  23:11 44:4 45:9
  141:3 165:1

**recognizes** 34:15
  35:16 45:4 61:12
**recollection**
  230:18
**recommendation**
  83:2 86:14 87:14
**recommendations**
  7:21 43:8 51:16
  51:18 227:13
**recommended**
  228:13,20
**record** 13:16,25
  14:18 15:5 16:8
  28:10 29:19 44:23
  58:6 62:10,15,16
  62:23 63:2 74:23
  86:17 87:6 88:12
  107:1,6 115:13
  116:3,9 119:14
  127:11 143:4
  144:15,19 159:21
  181:7 196:5 198:8
  198:13 210:21
  211:15 221:1,3,7
  233:7,10 237:9
**recorded** 14:2
  164:14
**recording** 13:24
**recruited** 146:4
  149:25 150:5
**redefining** 103:14
**reduce** 227:9
  228:6,9
**reduced** 50:2
  234:10
**reducing** 227:11
**reevaluate** 39:24
**refer** 15:23 60:10
  72:3 76:17 105:18
**reference** 44:22
  53:2,2 78:5 80:14

92:21 93:2,15
139:17 145:14
222:15 235:7
236:2 237:2
**referenced** 43:15
52:15 93:15 222:4
236:11 237:15
**references** 20:4,6
**referral** 150:6
**referred** 150:2
**referring** 15:25
34:20 48:23 52:20
56:25 66:17,21,25
69:15 72:4 76:4
114:6 176:17
183:12 186:6
213:9
**refers** 86:5 97:14
210:24 211:3,11
**refine** 180:4
**reflective** 119:10
**reflects** 87:22
**refresh** 68:11
230:17
**regard** 100:1,12
124:16 154:13
157:10 188:7
192:4
**regarding** 37:17
38:3 226:8
**regardless** 51:5
200:15
**registered** 1:23
12:7 13:2
**regressions** 125:21
**regular** 151:13
**regulate** 190:8
**regulates** 190:16
**regulation** 54:19
59:25 188:5
193:23

**regulations** 29:3,6
54:2,20 59:2,7,14
100:20 188:19,24
189:3,10 192:1
195:2
**regulatory** 94:17
**relate** 22:4,10
29:10 84:22 106:3
217:23
**related** 14:15
21:25 22:16 29:25
54:1 61:13 71:13
163:21 174:25
175:8 203:6
217:23
**relates** 1:11 22:5,7
79:4 82:14 104:11
106:1
**relationship** 51:13
53:8,10 128:23
165:6,8
**relationships**
78:24
**relatively** 141:5,13
141:19 150:12
166:18
**released** 65:17
**reliability** 206:23
**reliable** 131:17
**relied** 186:1
**relies** 206:24
**relieve** 156:11
**reliever** 9:18
130:16 134:18
135:4 142:16
143:2
**relievers** 135:19
140:11
**relieving** 154:18
155:3
**rely** 130:24

**relying** 20:10
23:24 132:17
188:5
**remained** 15:14
226:11
**remaining** 150:5
**remains** 45:7,18
45:21
**remote** 1:16
**remotely** 2:2 3:2
4:2 5:2 6:2 13:9
**removal** 72:9
**removed** 73:24
**repair** 231:19,19
**repetitive** 132:25
**report** 7:10,13
10:20,21,23 11:4,6
17:23 18:4,6 19:6
19:9,13,17,21,23
20:1,5,11,21,23
21:7 23:25 24:2
26:3,4,23 27:1,9
27:15,18 33:25
34:2 43:15 44:3,7
44:13,15,25 46:2
57:12 69:25 74:6
74:7,11,22,23 75:2
76:7 77:23 79:25
80:16,22 83:18
85:10,18,19,25
88:14,15,22 89:1
89:11 90:4,15
92:20 93:16 100:1
100:19 102:22,23
103:7,11 104:3,25
106:2 120:10
121:10,24 124:15
125:12,19 130:25
141:3 145:14
149:16 152:23
155:14 163:13

165:4 167:23
168:1 171:1
172:14 174:23
176:11 183:6
185:12,13 199:1
201:19 211:7
218:18 221:9,12
222:16 230:7
**reported** 1:21
85:25 86:1 88:7
88:23 89:7 104:17
123:11 136:5
183:9
**reporter** 1:22,24
12:6,7 13:2,3
14:12,19 59:19
60:21 68:8,11,18
116:16 117:18
144:13 145:3
162:23 175:9
189:6 204:25
214:6,9 236:7
**reports** 7:21 79:18
163:15 164:13
**represent** 15:3
**representation**
131:3
**represented**
134:21
**representing**
133:17
**represents** 234:11
**request** 237:9,11
**required** 186:24
191:9,17 235:25
**requires** 23:18
**research** 31:1
32:12 78:14
131:15 132:5,13
132:15 139:23
150:4 166:1

187:23 226:8

**respect**  150:25

**respective**  12:3

**response**  53:8
98:25 128:22
165:8

**responsibilities**
78:17 156:18
157:9 161:6
193:11

**responsibility**
158:7 162:12
186:23 187:5
188:14,21 194:13
195:22 196:8
197:2,5

**responsible**  88:9
196:23

**responsibly**
156:23 188:15

**rest**  152:5

**result**  75:19
122:15 123:14
129:23 130:1
224:25 234:17

**results**  81:8 86:10
88:7 112:15
113:19 115:6,17
115:22 150:14,21
168:16 170:19
171:24 223:19
224:21 226:7

**retail**  27:3,5

**retained**  95:20
96:15

**return**  228:1

**returned**  235:18

**reverse**  143:13

**review**  8:5,5 9:20
23:19,20 24:22
25:13,25 26:16,19

36:25 37:6,11
38:13 41:12,21
60:2 63:8 68:15
83:17 88:13 90:2
90:9 164:11 175:5
176:17,18 199:18
224:14 235:12
236:1 237:1

**reviewed**  20:19
23:7,16 33:9
35:12 85:24 87:25
88:3,5

**reviewing**  229:3

**reviews**  8:7 9:7
190:3

**rid**  48:17

**right**  15:10 22:1
23:10 27:10,12
29:18 34:21 38:13
44:21,22 45:11
53:13 60:15 67:3
67:6 71:24 74:18
75:14,21 80:7
81:5 106:23
109:17 114:8
122:14 123:16
130:22 133:5
136:10,17 137:1,9
139:15 141:1,14
143:2 147:3,13
148:2,3,13 150:6,7
153:20 154:4
155:13 162:6
165:13,16,17
169:23 171:7
175:4 179:4
180:23 186:5
197:19,21 201:8
202:1,3,10 207:6
207:10 208:9,14
211:17,22 212:8

214:12,17,18,23
215:3,9 218:3,4
220:22 224:23
225:22 226:6
227:14 231:11,19
231:24 232:5,6,12

**rigorous**  226:2

**rise**  205:6

**rising**  8:22 93:14
97:20

**risk**  10:5 35:4 36:5
36:8 47:15 48:7
48:24 49:9,14
65:19,20 111:15
112:9 125:18
126:24 129:13
133:13 134:14
149:11 163:19,20
164:2,5,18 165:2
165:14,15,21
166:2,5,6,10
172:20,21,23
173:1,5,6,12,17,21
173:25 174:1,14
174:18 175:17
176:3,4 178:3,15
179:3,7,21 180:3,5
181:25 182:1,21
182:22 183:18
184:1 200:14
208:22

**risks**  32:8,22
33:11,20 36:3,5,7
37:12 38:10 39:15
39:20 40:12,17
56:17 75:9 92:2
96:25 97:3 164:3
165:21 180:24
183:14,17,17,21
184:3,7,8,22 185:5
185:16,19 186:2,9

195:14 196:9

**rite**  4:4 15:20 16:1
26:5,14,20,24
27:17 28:12 39:4
106:16 172:17

**rogers**  226:15

**role**  10:10,14
39:14 167:16,19
202:1 205:15,17
208:3

**roles**  32:15

**rounded**  214:25
215:3

**routes**  64:1

**rules**  13:6 60:8
236:5 237:5

**rural**  8:9 67:19
68:25 174:8,8

**rx**  5:15 213:15,16
213:20

**s**

**s**  2:1 3:1 4:1 5:1
6:1 12:1 234:21
235:15 237:8,8
238:3

**safe**  71:15 72:24

**safely**  161:7
186:24 221:17,18

**safety**  184:14

**saith**  233:16

**sales**  75:3,20 105:1
105:3,6,10,13

**samhsa**  9:19
131:19,23

**sample**  112:25
113:17,25 114:1
119:21 133:10,20
133:22 134:5,9,13
134:24 135:1
142:5 152:23
168:18,22,24

169:1,8,18,20
170:1,6,14 171:11
177:5 224:10
**sampled** 150:13
**samples** 133:23
**san** 2:11
**sanctions** 72:10
73:24
**satisfy** 229:7
232:22
**saw** 92:9,13,17
107:16
**saying** 28:1 49:3,8
50:16,22 56:4
64:9 72:12 73:23
117:3 127:2 145:4
147:8 164:23
165:20 170:25
193:5 196:12,13
**says** 31:18 32:1,14
32:18,20 33:7
34:24 46:13 47:9
49:14,14,22 51:12
53:14 58:19 60:5
60:11 63:20 64:1
65:25 71:12 73:4
78:13,21 79:14
81:9,18,23 82:17
83:5 86:19 92:5
93:23 97:2 101:8
104:24 105:2
110:15 111:4
112:15 131:23
133:16 134:12,21
135:9 137:22
145:20 146:21
147:4 151:12,22
152:5 153:24
156:6 159:23
165:5 169:25
171:14 190:10

213:5,6 215:12
222:20 223:13
224:4 225:4 227:8
227:15,24 230:11
232:19
**scenario** 153:19
155:7 156:21
158:21 160:1,7
161:4
**scope** 43:12 66:8
**screen** 61:19 77:9
77:11,12,13
209:16 210:13
**seal** 236:15 237:21
**sealed** 15:9,14
18:6
**searched** 26:23
**second** 31:25 36:4
47:4 62:17 71:13
72:19,20 86:21
94:24 111:12
113:4 140:12
150:10 169:25
204:17 230:10
232:19
**section** 36:3 66:18
74:11 75:10 78:1
78:2,11 79:14
82:17 83:4 84:2
86:10 93:3,25
104:17 108:20
145:17 149:22
223:12 230:23
**sections** 155:15
**see** 15:3 31:14,15
31:18,20 33:3
45:5 47:8,16 50:5
51:12 52:2,5
55:16 67:9 68:18
69:7,11 75:1
77:11,21 78:12,20

78:20,21,25 79:10
80:6 81:8,13,18,22
92:20 93:1,19,23
94:24 97:2,6,9,24
99:10 112:14
113:7,8 131:22
133:7 134:15
136:14,15,16,17
136:20,21 137:1
137:11,15 145:20
145:25 147:3
150:9,15 151:9,11
151:17,21 156:5
163:23 166:4
180:17 182:13
203:22 212:16
213:5 214:17
215:12,14,22,24
221:13 222:7,20
222:25 223:2,13
223:23 230:11,15
232:16,16,19,24
**seeing** 96:21 175:3
**seeking** 9:15 110:8
114:18
**seen** 57:11 96:20
208:15
**self** 69:6
**semisynthetic** 34:7
210:25
**send** 210:11
**sense** 38:24
**sensitive** 13:20
**sent** 18:19 209:15
210:10
**sentence** 36:4,4
45:3,5,6 46:13
49:3,3,7,13,22
52:20 53:14 60:18
61:1,9,10,12 72:4
75:17 82:3,5

86:19,21 87:8
97:14,18 98:10
99:25 100:10,19
101:4,7 102:23
150:9,10 152:5,13
152:15 174:23
175:6,12,14
177:11,12 183:7
227:23 232:14
**sentences** 71:23
72:6 73:22 133:11
135:8
**sentiment** 50:25
**sentinel** 231:16
**separate** 24:11
103:12 165:13
210:12
**separately** 40:17
**sequentially**
147:10
**series** 11:16
201:23 207:1,11
207:15 208:16,20
209:1
**service** 6:5 150:2
**services** 5:15
**set** 43:3,5 67:24
109:23 149:2
181:23 182:19
**setting** 58:24
**seven** 21:14,14
170:1 229:13
232:4,9,11,17
**seventeen** 20:16
153:4
**seventy** 21:15
113:2
**severe** 33:21 34:5
34:17 35:5,17
**severity** 111:8
112:3,4

**[sex - specific]**

| | | | |
|---|---|---|---|
| **sex** 173:7 174:17 | **silly** 28:15 | **slightly** 36:20 | **sort** 58:10 153:8 |
| **sexual** 10:5 149:10 | **similar** 119:21 | 120:6 | 159:25 196:21 |
| **shaking** 203:22 | 129:13 | **slow** 60:22 175:9 | 211:15 |
| **shapira** 6:8 | **similarly** 151:12 | **small** 115:9 141:5 | **sought** 110:21 |
| **shapira.com** 6:13 | **simmons** 3:17 | 141:8,13,20 | **sound** 27:10 |
| **share** 68:5,19 | **simmonsfirm.com** | 150:12 | **sounds** 198:3 |
| **shared** 77:13 | 3:20 | **smaller** 61:20 | **source** 23:22 |
| **sharing** 77:9,11,14 | **simple** 144:3 | 134:6 | 79:15 82:17 87:22 |
| **sharp** 208:20 | 153:5 | **smokers** 176:8 | 110:17 188:5 |
| **sheet** 235:13 237:7 | **simplistic** 199:22 | **smoking** 176:6,7 | **sources** 20:25 24:6 |
| 237:10,18 238:1 | **simply** 207:1 | **social** 8:6 49:25 | 27:2 46:1,5,6,8 |
| **sherman** 5:24 | **simultaneously** | 50:10,14,17 51:2 | 79:15 100:24 |
| **shibley** 3:7 | 176:3 | 63:8 64:3 68:16 | 127:12 185:13 |
| **shift** 65:7 71:18 | **sincerely** 235:21 | **societal** 230:12 | **spaeder** 5:19 |
| 72:14 73:2,11 | **single** 126:23 | **societies** 65:9 | **spangenberg** 3:7 |
| **short** 79:21 | 175:19 207:17 | **society** 65:16 | **spanglaw.com** |
| **show** 125:5 225:17 | 208:19 | **sociological** 50:17 | 3:12 |
| 226:4,23 | **singular** 30:12 | **socket** 223:16 | **speak** 59:19 60:23 |
| **showed** 139:9 | 92:7 | **sold** 32:2 184:21 | 61:8 89:25 92:4 |
| **showing** 140:15 | **sir** 235:10 | 185:15 | **speaking** 13:18 |
| 224:17 | **sitting** 41:15,25 | **solid** 100:5 | 91:8 185:6 |
| **shown** 225:14 | 79:24 84:8 90:11 | **solutions** 6:25 | **speaks** 32:24 |
| 235:16 | 90:15 105:24 | 14:11,13 235:1 | 35:24 36:10 47:21 |
| **shows** 75:11 | 153:8 159:25 | 238:1 | 48:2 52:1,18 |
| 108:21 136:5,10 | 160:8,12 184:16 | **somebody** 153:5 | **special** 6:17 11:16 |
| 138:17 140:3,18 | 185:1,20 188:3 | **somewhat** 28:15 | 61:17 62:1 |
| 140:24 147:21,25 | **situation** 51:15 | **sorry** 29:16 32:11 | **specialmaster.law** |
| 225:16 | **six** 27:9 121:18,21 | 48:16 50:16 55:6 | 6:22 |
| **sic** 69:6 93:13 | 122:4,9,10,13 | 61:15,18 67:21 | **specific** 23:8,17 |
| 149:10 151:22 | 123:3,10 125:5,15 | 77:10 80:8,14 | 27:21,24 28:3,7,10 |
| 209:25 222:6 | 125:24 127:1 | 81:20 83:1 87:25 | 29:13,17,25 30:3,7 |
| **side** 38:10 64:1 | 133:11,12 147:9 | 91:15 94:15 105:8 | 30:9,11,14 35:6,7 |
| 100:20 169:6 | 148:23,25 149:23 | 110:2 117:18 | 36:17 37:24 38:2 |
| **sign** 65:12 | 168:17 177:4,14 | 121:4 163:20 | 38:18 39:25 41:13 |
| **signature** 234:19 | 177:20 178:7,24 | 165:17 170:15 | 41:21 43:12 54:17 |
| 235:14 | 179:10 226:16 | 175:9,11 178:20 | 54:18 55:5,25 |
| **signed** 19:13 | **sixteen** 146:5 | 182:4,6,8,13 189:6 | 56:11,14,23 60:2 |
| 236:13 237:18 | **sixty** 168:17 | 190:24 192:12 | 66:17 67:8 76:3 |
| **significant** 112:20 | 177:20 226:16 | 193:14 199:5 | 80:5 83:16 86:20 |
| **signing** 235:19 | **size** 133:11 134:13 | 214:8 | 88:25 89:8,9,13 |
| | 220:7 | | 91:9,10 99:10 |

100:12,13 103:22
106:5,5 120:7
126:15 127:8
158:12 163:10
166:12 174:14
184:19 185:2,9,10
185:22 186:4
187:25 190:2
192:7 195:6
204:11,12 222:23
**specifically** 27:17
48:22 52:19 84:20
89:15 90:16 93:3
106:14 121:1
174:1,12 187:9,17
188:17 200:4
**specifies** 103:8
**specify** 53:12
95:25
**speculate** 50:23
52:19 53:20
**speculating** 53:6
**speculative** 37:4
38:15 40:22 46:24
48:2 52:18 53:5
53:19 58:6 61:7
66:8 69:23 118:2
**spoke** 117:19
152:3
**sporadic** 151:15
**spray** 81:11
**spreadsheet**
204:12,13 209:16
210:11 215:24
219:2
**stand** 62:9,20
106:25 107:5
144:12 198:7,12
220:25 233:9
**standard** 21:25
22:3 66:5,11,14,15

66:23,25 69:10,14
69:15,21 70:10,18
70:24 71:2,6
139:16 206:24
208:17
**standards** 51:19
60:6,12,17 61:5
**stands** 134:17
**start** 45:16 61:24
62:2 103:23 199:5
**started** 135:3,14
136:6,14,18,22
137:2,3,9,12,16,20
138:3,18 139:4,8
139:11 140:4,9,13
140:19,25 141:23
141:24
**starting** 140:6,15
140:20
**starts** 87:8
**state** 13:4 16:7
25:1 42:1 59:3
75:1 76:12 189:18
234:4,21 236:10
237:15
**stated** 35:25 44:25
202:9 231:9
**statement** 39:22
50:24 56:25 57:1
65:17 73:23 74:5
75:15 87:10
101:14 112:11
120:22 162:16
163:1 166:15
174:13 185:18
187:4 188:6
205:12 222:10
236:13,14 237:19
237:19
**statements** 20:1
23:25 111:18

**states** 1:1 8:11
9:10,19 13:7 14:5
27:4 30:19,23
33:17 34:4,16
35:19 38:8 44:12
48:6 63:14 64:2
66:9 67:20 69:2
78:22,23 107:23
130:17 143:4
188:12,20 190:5
223:22 224:3,23
224:25 225:3
**statins** 8:15 77:19
79:7
**statistical** 126:1
134:10 151:8
**statistics** 115:1
121:14 138:14
**stenographic**
14:18
**stenotypy** 234:9
**step** 64:22,25
**stepfather** 153:5
153:20,24 159:23
**stephen** 6:24
14:10
**steve** 15:3 145:3
**steven** 5:17 68:4
**stick** 83:18 217:12
**sticking** 84:19
173:10 176:10
**stigma** 50:3
**stimulants** 145:23
146:22 148:8
152:7
**stipulated** 12:2
**stipulation** 13:8
**stoffelmayr** 4:15
**stop** 51:17
**store** 159:18
195:24

**stored** 160:3,6
161:25 162:3
221:17,17,18
**stores** 5:16 161:1
**straight** 196:13
**straightened** 62:8
68:14
**strategies** 36:3,6
**street** 2:10,21 3:18
4:19 5:20
**strength** 151:2
**strike** 81:20
115:14 165:18
197:14,22
**strong** 194:8
**strongest** 108:7
173:5
**struggling** 107:16
**studies** 51:21
60:20 61:2 75:22
80:4 81:19 83:23
84:21 91:3 105:11
122:21,25 155:13
155:20 163:14
166:25 225:14
226:19,23 227:17
228:22
**study** 76:3 80:5,6
86:14 110:21
112:15 115:16,17
115:22 116:4,7,10
116:11,15,17,19
117:7,10,24 118:3
118:4,19 119:1,9
120:4 130:21,24
131:15,17,23
133:10 135:2,13
135:23 136:6
137:23 146:4
147:22 148:1
149:22 150:11

151:12,12 155:16
156:2,3,6 164:11
167:15 176:12,22
176:24 177:3
178:14,23 179:6
200:1,13 221:20
222:6,21 223:3,7
223:15 224:17,25
225:12,16 226:1,4
227:1,5
**subjective** 111:9
112:5
**sublingual** 81:11
**submitted** 19:6
**subscribed** 236:10
237:14 238:21
**subsequent** 8:20
80:19
**subsequently**
110:24
**subset** 114:17,22
**substance** 9:13
110:6,24 132:1,5
132:13,16 139:17
139:25 147:23
**substances** 29:8
29:11 59:3,5,14
100:4 147:20
218:8
**substantially**
227:9
**subsys** 81:11
**subtract** 217:6,20
**sufficient** 122:24
184:20 185:14
**suffolk** 24:25
**suggest** 81:24 82:8
83:7 86:25 223:19
224:21
**suggested** 223:25

**suggesting** 62:3
228:5,8,14
**suggests** 38:11
86:22 225:1
**suite** 3:9 5:9,21
6:19 235:2
**summit** 24:16
181:14
**sunshine** 76:18
**superior** 235:1
**supervision** 69:8
234:10
**supplemental** 7:15
18:18
**supplied** 96:8
**suppliers** 94:17
**supply** 38:23
63:13,14,21 64:1
70:2 100:20
155:10 201:20
207:13 208:1
**support** 20:1,11
23:24 93:20 94:7
94:20 97:25 99:21
100:24 101:10
222:10
**supposed** 53:16
54:5,14 55:8,18
58:13,18,23 59:9
64:16,18 181:19
182:15 184:14
191:21
**sure** 18:17 43:22
44:14,16,20 48:22
58:24 62:9 66:19
67:4 68:12 76:21
78:3,4 79:22
98:18 106:22
123:13 131:13
143:18 152:14
160:20 174:6

184:6,23 210:15
213:3 216:22
217:18
**surgeons** 227:8
**surgeries** 156:1
**surgery** 11:10,17
153:6,15,21,25
154:9,16,25
155:16,18 156:12
157:2,15 160:22
221:15 222:6,12
222:22 223:16
226:10,15,17
228:10 231:7,13
**surgical** 11:15
223:17,21 224:2
226:9 227:22
228:23 229:25
**surplus** 155:9
**surrounding**
188:25 194:3
**survey** 132:18
138:10 142:9
143:8 219:12
220:19,20 232:2
**surveyed** 226:9
**swear** 14:19
**sworn** 14:23
236:10,13 237:14
237:18 238:21
**symptoms** 128:2
**syndrome** 128:3
**synthetic** 34:9,10
205:25 211:11
**synthetics** 63:18
63:23 213:17
**system** 190:11,15
191:10 192:4,8,10
192:16,19,24
193:18 194:17,23

**systematic** 190:3
199:13,18
**systems** 47:11

**t**

**t** 12:1,1 95:14
202:12 204:7,7
213:24 217:23
218:6,8,11,13
234:1,1
**t40** 203:19 210:19
211:16
**t40.1** 210:22
213:25 217:1,10
217:15 218:4
**t40.2** 210:24 213:6
213:6,17 217:5,6
217:14 218:4
**t40.3** 211:3,8
213:17 217:5,6,14
218:4
**t40.4** 203:13 204:5
206:1,2,6,8 207:18
211:11,19 212:3
213:6,11,19,23,25
215:6 216:1,3,4,6
216:7,9,11,18,25
217:4,6,8,9,14
218:4
**t40.4.** 211:18
**tab** 209:17 232:15
**table** 10:24 11:5
19:1 108:19,19,21
123:12 135:6
136:2,3,5 137:22
147:1,19,19 209:8
**tabs** 209:14,23
210:12,17
**tactics** 92:23 94:2
94:21 100:21
**take** 13:24 16:19
17:1,2 34:23

42:18 62:7 106:20
121:17 130:8
144:10 153:9
157:2 162:9
166:19 167:3
170:11,16 197:25
198:5 203:9,25
219:25 221:19
224:13 225:8
**taken** 12:5 14:3
126:20 197:6,13
232:3 234:8
**takes** 162:8,21
164:6 165:22
**talk** 74:24 103:14
190:20 230:24
**talked** 15:6 57:23
195:6
**talking** 46:19
66:15 68:15 74:16
89:19 91:6 100:11
103:3,9 105:10
150:19 174:14
196:20 210:18
219:14,15,17,18
**tape** 19:2,3 107:15
**tell** 76:25 79:20
83:11 88:16 98:6
98:20,22 143:20
178:2,8 179:11,13
179:25
**ten** 44:5 198:17,20
**term** 57:4 59:17
59:25 66:14,23
69:13 71:15 72:24
73:19 97:5 166:11
166:20 176:25
180:22
**terms** 40:17 83:20
89:6 128:25
152:12 156:18

162:12 172:21
180:3 186:25
187:7 193:10
197:2,5 211:6
**tested** 206:24
**testified** 14:24
16:5 24:15,18,24
25:6,15 56:20
84:1 87:21 180:21
193:3,4
**testify** 17:16,19
45:1 86:9
**testifying** 44:14
67:5 96:3 132:15
156:6
**testimony** 23:15
24:10 25:9 46:12
56:8 70:21 76:20
85:11 89:24
101:18 102:9
104:7,10,14
105:19 119:15,17
124:14 173:12,13
173:21 181:2,13
183:13 185:25
186:4,22 191:1
193:9 196:7 236:6
236:7 237:6,9,12
**teva** 81:11,15
**text** 53:7 225:4
230:15
**textbook** 175:25
**thank** 15:16 16:3
18:13 68:7,19
110:14 233:8
**theodore** 110:13
110:14
**therapeutics** 81:10
**therapy** 55:23
**thereto** 12:14
234:9

**thing** 28:2 217:23
**things** 128:24
131:11 134:4
155:14,15 173:6
180:2 184:25
199:6 212:17
**think** 16:22 20:17
22:23 28:1 29:20
29:20 31:6 36:19
38:16 39:12,23
42:14,15 44:3
46:10 50:21 51:10
53:1 55:21 57:4
57:11 58:19 69:24
74:16,19,22 77:24
78:9 84:13,18
85:1 87:7,10,18
92:14 96:7 100:4
102:10 103:17
105:9,17 124:14
131:9 132:14
133:2 139:21,22
143:16,21 150:18
154:6,11 156:13
160:1 162:11,18
162:25 165:5
170:24 174:18,20
181:22 182:3,18
182:23 184:11,19
187:7 188:19
190:21 196:23
197:4,15,23 198:1
200:3 203:2,4,24
204:14,17 207:23
210:10,12,13
211:4,4 212:19,20
212:23 213:2,9
214:15 215:1,2,10
219:21 220:18
224:15 225:18
228:4 233:1

**thinking** 48:3
**third** 140:24
**thirds** 177:15
**thirty** 134:22
149:24 169:6,7
177:6,17,19
235:18
**thomas** 95:15
110:11
**thoracic** 155:15
**thought** 54:19
68:10,14 110:16
182:6 211:7
**thousand** 21:14
133:12,13 134:14
164:12 168:17
200:8 232:8,10,16
**thousands** 23:13
197:3
**three** 1:12 48:5
74:12,19 81:9
82:20,21 86:10,11
87:13 89:17 90:22
139:4 146:7,7,14
146:18 147:20
150:1,5 200:11
204:21 206:13,14
206:15,21 207:14
215:3,6,18 216:3
227:18 232:8
**tight** 19:2
**time** 12:12,13 17:2
19:21,22 22:23
61:14 62:10,15,23
63:2 65:20 79:22
90:1 95:24 96:19
107:1,6 114:19
133:3 136:10
139:19 144:15,19
162:9 180:24
185:9 188:12

191:10,22 198:8
198:13 201:15,23
205:14 206:19,24
207:1,11,15
208:12,16,20,25
212:20 214:4,10
221:1,7 233:2,3,10
**times** 27:9 98:21
99:5 108:23 109:4
109:10,15,20
131:6 146:7
206:15 207:14
**title** 131:21
**titled** 63:7 68:24
77:17 149:10
167:16 222:4
229:24
**tn** 5:15 234:23
**today** 15:24 16:11
16:24 17:7,16
23:4 39:19 41:16
41:25 42:2 79:24
84:8 90:12,15
96:3 105:25
180:20 184:16
185:2,20 188:3
**told** 20:18 178:6
179:9 220:18
**toll** 197:6
**tool** 111:7
**tooth** 223:5,10,17
223:21 224:2,12
224:22 225:2
**top** 31:25 44:19
45:3 72:20 76:13
82:20 93:23 94:1
131:22 164:8
219:24 231:22
**total** 114:22
133:10 134:13
147:21 169:25

171:9,10 200:2,5
203:13 207:17
216:9 217:5
219:24 220:2,6
232:7
**totality** 85:6
**totals** 81:10
**touch** 131:10
221:10
**touched** 221:10
**toxicology** 177:10
**track** 1:12 7:13
10:20 14:4 235:6
236:3 237:3
**trajectory** 123:5
127:9
**tramadol** 34:10
**tranquilizers**
146:21 148:21
**transcribed** 236:7
**transcript** 10:16
24:22 26:1 181:13
234:12,23 235:11
235:12 236:5,12
237:5,11,17
**transcripts** 25:13
**transfer** 81:3
**transition** 141:4,8
141:12,19
**translates** 141:20
**treat** 63:16 65:18
66:12,16,24 71:17
72:25 203:5 204:9
**treated** 51:6
213:19 214:2
215:6
**treating** 66:2,6
69:20
**treatment** 9:15
33:21 35:4,17
43:10 47:9,16

48:7 49:10,15
65:7 71:5,18
72:14 73:2,11
110:8 113:17,22
114:1,3,7,10,12,13
114:14,15,18,19
114:22,23 115:2,3
115:7 116:1,12,22
117:4,12,16,25
118:15,20,20
119:7,20,22,25
120:7,16 121:1,8
130:2 150:2
**trends** 143:25
**trial** 11:11 12:12
17:20 19:15 227:4
**trials** 51:21 60:20
61:3
**tried** 142:4
**troubled** 180:21
**troubling** 111:12
**true** 27:8 75:18
85:23 234:11
**truly** 112:18
115:11,19 116:1
116:24 117:6
118:16 120:14
**trumbull** 22:7,19
29:23 30:1,4
45:14 92:17 96:3
113:13,20,23
118:14,22 119:2,5
119:11,23 120:1,8
120:25 121:8
123:18,20,25
124:10 125:17,24
172:5,9 173:23
174:5,19 180:17
199:8 201:6
212:10 218:20

**try** 24:13 62:8
66:22 76:25 91:17
131:11 198:5
216:14 217:7
**trying** 158:23
166:13,25 170:25
182:25 196:13
201:9 211:24
226:4 227:19
230:19 231:4
**turn** 13:21 63:12
69:5 81:17 92:19
93:18 112:13
139:1 145:16
151:20 181:17
198:25 212:17
**twelve** 169:2
**twenty** 114:3
134:14 146:5,15
150:1,5 156:23
232:4,9,11,17
**two** 15:6 17:12,14
24:14 25:19 55:23
56:9,13,22 63:21
63:21,22 64:3,10
79:14 111:6,20,24
112:24 134:22
138:5,11,12 147:5
147:15 148:7,20
149:24 177:15
190:3 226:11,12
228:14,21 232:10
232:16
**type** 169:11
**types** 40:4,8,10,15
91:11,13 113:3,4
208:18
**typewriting**
234:10
**typically** 118:4
145:21 151:25

## u

**u** 12:1

**u.s.** 7:20 65:9
143:23 144:1

**uh** 72:21 130:20
219:23 220:8
232:13

**unadjusted** 171:14
171:25

**underestimate**
205:20 208:3

**underestimated**
75:9

**underlines** 164:9

**underrepresented**
151:16

**understand** 15:16
15:19,24 16:10,13
16:15 19:12 22:6
23:24 32:10 37:12
46:21,25 48:13
49:11 50:15,22
53:15 54:4,12
55:8 58:12 59:2,6
59:17,24 60:3,7,16
60:21,25 81:14,16
114:20 154:19
155:4,7 158:10
159:2,4 162:18
164:22 178:22
193:8 195:7 199:4
203:16 204:17
212:7 215:16
225:18

**understanding** 8:9
15:10 19:24 36:21
36:24 37:9,20
38:5 39:18 47:23
51:14 55:12 58:11
58:18 59:9,13
64:15 67:18 68:25

73:15 79:3 82:13
82:16,19 105:20
119:3,11 126:17
152:9 156:17
187:6,19,22 191:8
191:14,15,20,25
193:22 194:8,19
195:1,12,13 196:1
196:7 213:13
214:14,20 216:23
218:18 225:6
231:10

**understated** 182:1
182:2,22,23
183:14,18,18,21
184:1,3,8,9,10,22
185:5,15,19

**understatement**
186:2

**understood** 16:20
34:21 49:8 56:4
65:22

**uninformative**
163:18 164:17
166:9 171:4

**unique** 51:23

**uniquely** 27:25

**unit** 14:1

**united** 1:1 8:11
9:10,19 13:7 14:5
27:4 30:18,23
34:4,16 44:12
64:2 67:20 69:2
78:21,22 107:23
130:17 223:22
224:3,23 225:3

**unquote** 98:1

**unrecognized**
47:11,24 48:9,15
48:20 49:4

**untreated** 47:24

**unused** 11:8
155:21 221:16
222:4,12,24
223:16,21 224:2
224:11,18,22
225:2,11,15 226:3
226:12,15,16,24
227:17 228:1,6,17
228:22

**unwilling** 161:8,11

**uploading** 68:5,6

**urban** 8:9 67:19
68:25 174:7,9

**urine** 177:10

**urological** 226:10

**usa** 81:12

**usage** 193:16
195:15 196:9

**use** 8:10 9:9,13,18
9:19 10:6 22:16
22:18 30:18,22
32:5,16 34:4,16
35:22 39:11 40:20
41:9,18 45:17
53:9 55:15 65:18
65:21 66:12,24
67:20 69:1,13
71:15 72:24 73:20
73:24 74:1,4 75:9
97:5 107:22 108:6
108:7,12,13,22,22
108:24 109:2,2,9,9
109:11,13,14,15
109:18,19,20
110:6,24 113:18
122:21 123:5,14
123:17 124:5,17
126:10,11,12,14
127:9,13 128:8,12
128:17,22 130:16

130:17 132:18
134:15 135:5,15
135:18 136:15,19
136:23,24 137:3,4
137:8,12,17,20,21
138:4,9,19,24
140:10 141:17
142:7,10,25 143:2
143:5,7,10,12,22
144:1,5,6 145:22
149:12,25 151:14
151:22 152:3,20
152:21,24 155:22
163:16,17,19,22
164:15,17,18,25
164:25 165:6,6,9
166:3,3,6,10 168:2
169:1,3,5,11,17
173:8 174:17
177:5,7,16 178:1,3
178:10,15,16,16
178:25 179:3,4,7
179:12,13,15,18
179:20 180:1,7,13
180:14,18 183:7,8
183:16,19,25
192:19 199:8,12
199:24 201:4,6
204:2 205:14,20
207:7,10,10,14,21
207:22 208:12,21
209:4,5,6 212:10
214:15,20 218:25
219:6,7,13 220:12
220:13,19,20
226:8 232:23

**users** 9:23 142:11
142:12 145:11
146:6,24 150:15
165:15,16 166:11
166:11,17,20

169:21 170:6,7,18
172:9 198:16,19
198:24 200:3,4
208:23 217:20
**uses** 59:15,17,25
152:17 165:2
**usual** 54:16
**utilization** 119:20
**utilize** 37:1

**v**

**v** 235:6 236:3
237:3
**vague** 23:5 24:3
27:11 37:3,14
40:6,13,21 41:19
55:11 57:3,5 58:5
58:15 74:10 83:14
83:25 84:11,23
85:22 88:21 89:5
89:23 95:24 96:19
102:7 103:20
106:11 111:23
113:15 116:25
123:9 127:10
128:14,19 129:3
134:1,8 139:20
141:16 142:19
165:24 171:6
179:16 180:11
187:21 188:2,9
192:13 195:10
202:7
**vaguely** 96:6
**validated** 177:8
**value** 81:4
**variables** 168:1
**variation** 11:14
229:24
**varies** 188:11
**variety** 27:7 52:22
55:21 57:16 80:4

127:12 151:3
**various** 27:2 58:21
67:6 74:14 88:22
91:11 100:17
122:20 171:15
172:1 184:20
188:19,20 189:16
197:8 204:14
227:21
**vast** 57:15 70:2
**verbal** 139:22
**verified** 31:16
**veritext** 6:25
14:11,13 235:1,7
238:1
**veritext.com.**
235:17
**versus** 122:16,23
174:7 190:17
202:2 208:11
212:4
**video** 1:16 13:23
14:2 62:10,15,23
63:2 77:9,11,13
107:1,6 144:15,19
198:8,13 221:1,7
233:10
**videoconference**
14:9
**videographer** 6:24
13:15 14:12 62:9
62:14,20,22 63:1
77:8,12 106:25
107:5 144:12,14
144:18 198:7,12
220:25 221:6
233:7,9
**view** 164:24
**virginia** 21:21
22:1 25:17

**vis** 37:6,6 38:2,2
**vitae** 7:14
**vital** 65:12
**volume** 11:17
223:17 224:12
**voluntary** 51:19
60:5,11 81:25
82:9 87:1
**vowles** 176:23
**vulnerabilities**
173:9

**w**

**w** 95:15
**wait** 105:7 120:22
121:4
**waived** 235:19
**walgreen** 4:14,14
**walgreen's** 39:5
**walgreens** 4:13
15:20,25 26:5,14
26:20,24 27:17
28:12 106:16
172:17
**walk** 204:12
210:14
**walmart** 5:4 15:19
15:25 26:5,14,20
26:24 27:18 28:12
39:4 106:16
172:17
**want** 18:10 23:23
44:13,15,20 48:18
50:22 53:20 58:9
62:5,6 66:19 67:5
102:16 106:20
127:3 138:3 143:4
144:10 158:10
166:14 174:12
175:11 176:16
182:5 184:24
209:1 212:8,17,25

217:20 221:10
**wanted** 17:22
78:10 213:3
**warning** 36:14,17
36:22 37:1,6,10,11
37:17,21,25 38:2,6
38:9,12,17,19
195:14 196:3
**warranted** 111:11
**washington** 5:22
**way** 16:3,15 21:6
22:10 24:14 35:11
42:10 47:6 83:6
104:10,15 105:25
114:21 118:13
123:23 124:8
153:7 159:24
166:3 179:23
199:13 204:9
209:14 210:11
212:6
**ways** 166:2 197:8
**weak** 100:20
**website** 31:13,18
31:23 32:15,19
33:4,17 35:19,25
**weeks** 226:12
**weight** 207:16
**weighted** 205:23
206:10
**weinberger** 3:5
**went** 15:5 57:14
206:1 220:4
**west** 4:19 21:21
22:1 25:17
**whispering** 13:20
**wide** 11:13 27:7
55:21 57:16
127:12 229:24
**widely** 152:3,21
152:25

**widespread** 209:6

**wisely** 32:5,17
35:22

**witness** 13:10 14:9
14:20 32:25 67:3
84:24 95:21 99:9
234:13 235:8,11
236:1,4,11 237:1,4
237:15

**witnesses** 96:16

**witness'** 235:14

**women** 47:13
48:10,21,24 49:6
124:6 177:7

**wonder** 61:20
217:4

**wondering** 73:7
215:19

**word** 27:8,13 57:3
231:17

**words** 26:23 60:14

**work** 17:15,18
32:6,21 50:2 85:9
85:17 96:11
139:17 188:14
196:14

**worked** 28:15,17

**working** 8:22
93:14 97:21

**works** 195:20

**world** 129:12

**write** 53:16 54:5
54:10,14 55:9,13
55:19 56:2 57:1
58:13,19 65:3
91:20 111:4
181:19 182:15,25
200:23 201:10
212:15,23 213:4
226:20 228:25
231:5

**writes** 53:21

**writing** 17:23
55:15

**written** 29:13 32:9
33:3,23 35:9 52:5
64:20,23 65:4
67:7 84:2 85:1
157:3,13,21,25
158:5,13,15,24
159:9 163:9
186:16 188:24
189:4,7,9,12,16
190:22 191:2,5
223:9 227:2

**wrong** 57:14 67:22
93:24 156:13
164:23 166:19
193:4 207:9
212:22

**wrote** 19:9,12 69:7
156:9

**www.fda.gov**
31:19

**y**

**y'all** 117:18

**yeah** 18:13 23:6
31:21 49:8 61:8
62:1 75:18 78:7
93:10 94:25 97:7
99:3 103:21
149:20 155:23
162:17 166:8
190:14 196:6
208:7 211:19
212:24 213:5,8
216:1

**year** 45:24 108:6
139:10 140:5,10
140:14,20 142:25
156:1,23 203:11
204:1 207:17

212:9 215:6,10,11
216:11,18 223:22
224:3,23

**years** 44:5 121:20
121:22 122:3
125:23 126:1
127:4 141:23
142:2,9 146:15
147:6,15 177:4,14
178:7,24 179:11
190:6 198:18,20
199:25 200:24
202:14,17,22
203:17 204:2
206:1 212:12
214:22

**yep** 78:19 214:24
220:1,5

**york** 2:23,23 4:9,9
10:8 14:10 25:1
149:13,23 173:13

**young** 9:22 10:7
145:11 149:12,23
150:3,15

**youth** 143:23
152:17

**z**

**zero** 102:16
137:15 168:3,10
215:13 216:1,4,11
216:18

**zoom** 13:9

**zuckerman** 5:19

**zuckerman.com**
5:24,25

**à**

**à** 37:6 38:2

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.