HIGHLY CONFIDENTIAL

Page 1

1          SUPREME COURT OF THE STATE OF NEW YORK

2                    COUNTY OF SUFFOLK

3

4

5

6   IN RE OPIOID LITIGATION

    _____/  No. 400000/2017

7

8

9               -- HIGHLY CONFIDENTIAL --

10

11

12

13

14       VIDEOTAPED DEPOSITION OF ANNA LEMBKE, M.D.

15               San Francisco, California

16              Thursday, January 16, 2020

17

18

19

20

21

22

23   REPORTED BY:

24   LESLIE ROCKWOOD ROSAS, RPR, CSR 3462

25

HIGHLY CONFIDENTIAL

### Page 2

```
 1    SUPREME COURT OF THE STATE OF NEW YORK
 2        COUNTY OF SUFFOLK
 3
 4
 5
 6    IN RE OPIOID LITIGATION
      _____/ No. 400000/2017
 7
 8
         -- HIGHLY CONFIDENTIAL --
 9
10
11
12        Videotaped deposition of ANNA LEMBKE, M.D.,
13    taken on behalf of Defendants, at the law offices of
14    Lieff Cabraser Heimann & Bernstein, LLP, 275 Battery
15    Street, Suite 2900, San Francisco, California, beginning
16    at 8:06 A.M. and ending at 5:27 P.M., on Thursday,
17    January 16, 2020, before Leslie Rockwood Rosas, RPR,
18    Certified Shorthand Reporter No. 3462.
19
20
21
22
23
24
25
```

### Page 3

```
 1    APPEARANCES:
 2
 3    FOR THE PLAINTIFF:
 4        LIEFF CABRASER HIEMANN & BERNSTEIN, LLP
 5        BY: DONALD C. ARBITBLIT, ESQ.
 6            ABBY WOLF, ESQ.
 7            BRITT CIBULKA, ESQ. (via speakerphone)
 8        275 Battery Street, Suite 2900
 9        San Francisco, California 94111-3339
10        415.956.1000
11        darbitblit@lchb.com
12        awolf@lchb.com
13        bcibulka@lchb.com
14
15        STATE OF NEW YORK, OFFICE OF THE ATTORNEY GENERAL
16        BY:  LEO O'TOOLE, ESQ. (via speakerphone)
17        200 Old Country Road, Suite 240
18        Mineola, New York 11501
19        516.248.3302
20
21
22
23
24
25
```

### Page 4

```
 1    APPEARANCES (Continued):
 2
 3    FOR THE PLAINTIFF COUNTY OF NASSAU:
 4        NAPOLI SHKOLNIK PLLC
 5        BY: SALVATORE C. BADALA, ESQ. (via speakerphone)
 6        400 Broadhollow Road, Suite 305
 7        Melville, New York 11747
 8        212.397.1000
 9        sbadala@napolilaw.com
10
11
12    FOR THE DEFENDANT JOHNSON & JOHNSON AND JANSSEN:
13        O'MELVENY & MYERS LLP
14        BY: HOUMAN EHSAN, M.D.
15        400 South Hope Street, 18th Floor
16        Los Angeles, California 90071-2899
17        213.430.6326
18        hehsan@omm.com
19
20
21
22
23
24
25
```

### Page 5

```
 1    APPEARANCES (Continued):
 2
 3    FOR THE DEFENDANT CARDINALHEALTH:
 4        WILLIAMS & CONNOLLY LLP
 5        BY: MATTHEW P. MOONEY, ESQ.
 6            STEVEN M. PYSER, ESQ.
 7        725 Twelfth Street NW
 8        Washington, DC 20005
 9        202.434.5421
10        mmooney@wc.com
11        spyser@wc.com
12
13
14    FOR THE DEFENDANT WALMART:
15        JONES DAY
16        BY: EDWARD M. CARTER, ESQ.
17        325 John H. McConnell Boulevard, Suite 600
18        Columbus, Ohio 43215-2673
19        614.281.3906
20        emcarter@jonesday.com
21
22
23
24
25
```

2 (Pages 2 - 5)

HIGHLY CONFIDENTIAL

Page 6

1 APPEARANCES (Continued):
2
3 FOR THE DEFENDANT WALGREENS:
4    BARTLIT BECK LLP
5    BY: KATHERINE M. SWIFT, ESQ.
6    54 West Hubbard Street
7    Chicago, Illinois 60654
8    312.494.4405
9    Katherine.Swift@BartlitBeck.com
10
11
12
13 FOR THE DEFENDANT AMERISOURCEBERGEN:
14    REED SMITH
15    BY: LUKE PORTER, ESQ.
16    101 Second Street, Suite 1800
17    San Francisco, California 94105
18    415.659.5987
19    lporter@reedsmith.com
20
21
22
23
24
25

Page 8

1 APPEARANCES (Continued):
2
3 FOR THE DEFENDANT ALLERGAN FINANCE:
4    KIRKLAND & ELLIS LLP
5    BY: MARIA PELLEGRINO RIVERA, ESQ.
6    300 North LaSalle
7    Chicago, Illinois 60654
8    312.8622740
9    mrivera@kirkland.com
10
11
12 FOR THE DEFENDANT MCKESSON:
13    COVINGTON & BURLING LLP
14    BY: MEGAN L. RODGERS, ESQ.
15    3000 El Camino Real
16    5 Palo Alto Square
17    Palo Alto, California 94306-2112
18    650.632.4734
19    mrodgers@cov.com
20
21
22
23
24
25

Page 7

1 APPEARANCES (Continued):
2
3 FOR THE DEFENDANT ENDO PHARMACEUTICALS, INC., ENDO HEALTH
4 SOLUTIONS, INC., PAR PHARMACEUTICAL, INC., AND PAR
5 PHARMACEUTICAL COMPANIES:
6    ARNOLD & PORTER KAY SCHOLER LLP
7    BY: ANGELA R. VICARI, ESQ.
8    250 West 55th Street
9    New York, New York 10019-9710
10    212.836.7408
11    angela.vicari@arnoldporter.com
12
13
14 FOR THE DEFENDANT MALLINCKRODT:
15    ROPES & GRAY LLP
16    BY: ROCKY C. TSAI, ESQ.
17    Three Embarcadero Center
18    San Francisco, California 94111-4006
19    415.315.6358
20    Rocky.Tsai@ropesgray.com
21
22
23
24
25

Page 9

1 APPEARANCES (Continued):
2
3 FOR THE DEFENDANT TEVA AND ACTAVIS AND GENERIC ENTITIES:
4    MORGAN & LEWIS
5    BY: MARTHA A. LEIBELL, ESQ.
6    200 South Biscayne Boulevard, Suite 5300
7    Miami, Florida 33131-2339
8    305.415.3387
9    martha.leibell@morganlewis.com
10
11
12 FOR THE DEFENDANT ROCHESTER DRUG COOPERATIVE, INC.:
13    ALLEGAERT BERGER & VOGEL
14    BY: LAUREN J. PINCUS, ESQ. (via speakerphone)
15    111 Broadway, 20th Floor
16    New York, New York 10006
17    212.616.7057
18    lpincus@abv.com
19
20
21 Also Present:  Sean Grant, Videographer
22
23
24
25

HIGHLY CONFIDENTIAL

Page 10

```
1              I N D E X
2
3
4  THURSDAY, JANUARY 16, 2020
5
6  WITNESS                    EXAMINATION
7  ANNA LEMBKE, M.D.
8    BY MR. MOONEY              16
9    BY MR. CARTER            127
10   BY MR. TSAI              167
11   BY MR. EHSAN             251
12   BY MS. VICARI            272
13   BY MS. RIVERA            286
14   BY MS. LEIBELL           301
15   BY MS. RODGERS           310
16
17
18
19   QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:
20         PAGE   LINE
             21     18
21           50     25
             52     21
22           55     18
23
24
25
```

Page 11

```
1        DEPOSITION EXHIBITS
2         ANNA LEMBKE, M.D.
3
4  NUMBER      DESCRIPTION           IDENTIFIED
5  Exhibit 1    Court Order, Hon. Jerry        13
6      Garguilo, 1/14/20
7  Exhibit 2    Expert Report, Anna Lembke,    13
8      M.D., 12/19/19
9  Exhibit 3    Supplemental Materials         67
10     Considered List, Dr. Anna
11     Lembke
12 Exhibit 4    CBHSQ Date Review, SAMHSA,    119
13     August 2013
14 Exhibit 5    Dr. Lembke binder, notes and  126
15     notations
16 Exhibit 6    Opioid Use Disorder, DSM-5,   154
17     page 543
18 Exhibit 7    Pre-roll: Mischa intro        236
19 Exhibit 8    Handwritten notes, 1/16/14    238
20 Exhibit 9    JAN-MS-00362490               250
21 Exhibit 10   Highlights of Prescribing     250
22     Information
23 Exhibit 11   JAN-MS-00362490               250
24 Exhibit 12   Highlights of Prescribing     250
25     Information
```

Page 12

```
1  Exhibit 13   ALLERGAN_MDL_01361692 - 1850   285
2  Exhibit 14   WIS_PPSG_003892               286
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 13

```
1   San Francisco, California; Thursday, January 16, 2020
2          8:06 A.M.
3          PROCEEDINGS
4          --oOo--
5     (Exhibit 1, Court Order, Hon. Jerry Garguilo,
6     1/14/20, marked for identification.)
7     (Exhibit 2, Expert Report, Anna Lembke, M.D.,
8     12/19/19, marked for identification.)
9     THE VIDEOGRAPHER:  Good morning.  We're on the
10  record.  The time is 8:06 a.m.  The date is January 16,
11  2020.
12    This begins the videotaped deposition of
13  Dr. Anna Lembke, M.D.  This deposition is being taken on
14  behalf of counsel for defendants, In Re Opioid
15  Litigation.
16    This case is filed in the Superior Court of the
17  State of New York, County of Suffolk, Index Number
18  400000/2017.
19    This deposition is being held at Lieff Cabraser
20  Hiemann & Bernstein in San Francisco, California.
21    My name is Sean Grant from the firm Veritext.
22  I'm the videographer, and the court reporter is Leslie
23  Rockwood, also from Veritext.
24    Please note that audio and video recording will
25  take place unless all parties have agreed to go off the
```

HIGHLY CONFIDENTIAL

Page 14

1 record. Microphones are sensitive and may pick up
2 whispers, private conversations or cell interference.
3      (Telephonic interruption.)
4      THE VIDEOGRAPHER: Would all present in the room
5 please identify themselves and state whom they represent.
6      Counsel.
7      MR. MOONEY: Matthew Mooney, Williams &
8 Connolly, for CardinalHealth. And next to me is Steve
9 Pyser, also of Williams & Connolly.
10      MR. EHSAN: Houman Ehsan, O'Melveny & Myers, on
11 behalf of Johnson & Johnson and Janssen.
12      MR. CARTER: Ed Carter for Walmart.
13      MS. SMITH: Kate Swift for Walgreens.
14      MR. PORTER: Luke Porter, Reed Smith, on behalf
15 of AmerisourceBergen.
16      MS. VICARI: Angela Vicari from Arnold & Porter
17 for ENDO Pharmaceuticals, Inc., ENDO Health Solutions,
18 Inc., Par Pharmaceutical, Inc., and Par Pharmaceutical
19 Companies.
20      MR. TSAI: Rocky Tsai, Ropes & Gray, for
21 Mallinckrodt.
22      MS. RIVERA: Maria Rivera from Kirkland & Ellis
23 on behalf of Allergan Finance.
24      MS. RODGERS: Megan Rodgers, with Covington &
25 Burling, on behalf of McKesson.

Page 15

1      MS. LEIBELL: Martha Leibell of Morgan & Lewis
2 for the Teva and Actavis generic entities.
3      MS. WOLF: Abby Wolf on behalf of plaintiffs.
4      MR. ARBITBLIT: Don Arbitblit, Lieff Cabraser
5 Hiemann & Bernstein, for plaintiffs.
6      THE VIDEOGRAPHER: Is there anybody appearing
7 telephonically?
8      MR. O'TOOLE: Yes. Leo O'Toole, from the Office
9 of the New York State Attorney General on behalf of
10 plaintiff.
11      THE VIDEOGRAPHER: Okay, Leo O'Toole? One more
12 time, Leo.
13      MR. O'TOOLE: Leo O'Toole, from the Office of
14 the New York State Attorney General, on behalf of
15 plaintiff.
16      THE VIDEOGRAPHER: Thank you.
17      Next? Anyone else?
18      MR. BADALA: Sal Badala -- Sal Badala from
19 Napoli Shkolnik on behalf of Nassau County.
20      THE VIDEOGRAPHER: Is that it? Thank you.
21      MS. PINCUS: Lauren Pincus -- oh -- Lauren
22 Pincus, from Allegaert Berger & Vogel, on behalf of
23 defendant Rochester Drug Cooperative, Inc.
24      THE VIDEOGRAPHER: Anyone else?
25      MS. CIBULKA: Britt Cibulka, from Lieff Cabraser

Page 16

1 Hiemann & Bernstein, on behalf of plaintiffs.
2      THE VIDEOGRAPHER: Anyone else? Thank you.
3      Would the Certified Court Reporter please swear
4 in the witness.
5      THE REPORTER: Would you raise your right hand,
6 please.
7      You do solemnly state that the evidence you
8 shall give in this matter shall be the truth, the whole
9 truth and nothing but the truth, so help you God?
10      THE WITNESS: Yes, I do.
11      THE REPORTER: Thank you.
12      THE VIDEOGRAPHER: Counsel.
13           EXAMINATION
14 Q. BY MR. MOONEY: Good morning, Dr. Lembke.
15 A. Good morning.
16 Q. Before we get started, I just want to put on the
17 record that on January 14th of this month, the Court
18 entered a short form order that concerns the conduct of
19 expert depositions, and I've spoken to your counsel here
20 and he assured me that he's aware of the order.
21      And so we've been instructed to place the order
22 from Justice Garguilo on the record, and so I'm going to
23 offer that as Exhibit 1 to your deposition.
24      Would you please state your name for the record?
25 A. Anna Lembke.

Page 17

1 Q. And you are a professor at Stanford University
2 School of Medicine; is that right?
3 A. Yes.
4 Q. What is your current title at Stanford?
5 A. I'm an associate professor. I'm medical
6 director of addiction medicine. I'm program director of
7 our addiction medicine fellowship, and I'm chief of our
8 addiction medicine dual diagnosis clinic. I also have a
9 courtesy appointment in the Department of Anesthesia
10 Pain.
11 Q. And how long have you taught at Stanford?
12 A. I've been teaching at Stanford for over
13 20 years.
14 Q. And would you please briefly walk through your
15 educational background.
16 A. I did my undergraduate at Yale University,
17 graduating summa cum laude, Bachelor's in humanities. I
18 then attended Stanford Medical School, where I graduated
19 with an M.D. in 1995.
20      I then completed a residency in psychiatry in
21 2000 and did a fellowship in mood disorders in the early
22 aughts at the same time that I joined as junior faculty
23 at Stanford, and I've been there on faculty at the
24 university and the School of Medicine since that time.
25 Q. And you were retained by the plaintiffs to

5 (Pages 14 - 17)

HIGHLY CONFIDENTIAL

Page 18

1  provide an expert report in this litigation; is that
2  correct?
3      A.  That is correct.
4      Q.  And did you create such a report?
5      A.  Yes, I did.
6      Q.  I'm going to show you what's been marked as
7  Exhibit 2 to your deposition.  Would you please take a
8  moment to look at it.
9      A.  (Witness complies.)
10     Q.  Would you please identify what's been handed to
11 you as Exhibit 2?
12     A.  This is my expert report, which I submitted on
13 December 19, 2019, in this litigation.
14     Q.  And does the report that's been identified as
15 Exhibit 2 contain the opinions you intend to offer in
16 this litigation?
17     A.  It's a long report so it's hard for me to assess
18 whether it's exactly what I submitted, but I assume that
19 it is, and yes, it appears to contain my opinions.
20     Q.  I will represent to you that this is -- I
21 printed the PDF that we received from plaintiffs.  So
22 assuming that's true, does it contain the opinions you
23 intend to offer in this litigation?
24     A.  Yes.
25     Q.  And does this report contain a comprehensive

Page 19

1  explanation of the opinions you intend to offer in this
2  litigation?
3      A.  It does contain my opinions, yes.
4      Q.  And is it a comprehensive set of your opinions?
5      A.  What do you mean by "comprehensive"?
6      Q.  Well, are there other opinions that you didn't
7  offer in your report that you intend to offer in this
8  litigation?
9      A.  No.
10     Q.  When did the plaintiffs in this case retain you
11 as an expert?
12     MR. ARBITBLIT:  Objection.  Just to clarify --
13 and I won't do speaking objections, but we're going back
14 to the MDL or do you mean New York?
15     MR. MOONEY:  In New York.  I'll clarify.  Just
16 for everyone, I'll clarify when I'm talking about the
17 Federal litigation.
18     THE WITNESS:  I was first approached in November
19 of 2019 to be an expert witness in this litigation.
20     Q.  BY MR. MOONEY:  Are you paid by the hour?
21     A.  Yes, I am.
22     Q.  What is your hourly rate?
23     A.  $500 per hour.
24     Q.  And how about for your time testifying?
25     A.  $800 per hour.

Page 20

1      Q.  You've been paid more than $20,000 by the
2  plaintiffs in the New York litigation so far; is that
3  correct?
4      A.  I'm not sure.
5      Q.  How much do you think you have been paid by the
6  plaintiffs in the New York litigation so far?
7      A.  I think it is more than $20,000 so far.
8      Q.  Now, you also submitted a report in the Federal
9  multi-district litigation; is that correct?
10     A.  Yes, I did.
11     Q.  Did the plaintiffs in the Federal opioid
12 litigation also pay you for your time?
13     A.  Yes, they did.
14     Q.  The plaintiffs in the Federal opioid litigation
15 paid you more than $200,000 for your opinions; is that
16 correct?
17     MR. ARBITBLIT:  Objection to form.
18     And just to clarify, is this a reciprocal --
19 have there been any agreements you're aware of as far as
20 providing evidence on both sides as to what experts have
21 been paid?  Because if not, I'll object and instruct not
22 to answer until there's -- there is an agreement.
23     MR. MOONEY:  We received the expert -- or the
24 invoices from Dr. Lembke's Federal District case -- or
25 Federal litigation.  I'm just confirming that the numbers

Page 21

1  that are on that invoice are what she was paid.
2      MR. ARBITBLIT:  I'll still object to the form of
3  the question, but you can answer.
4      THE WITNESS:  I must admit I have not added it
5  up so I don't know the exact amount.
6      Q.  BY MR. MOONEY:  Can you provide an estimate of
7  how much the plaintiffs paid you in the Federal
8  litigation for your opinion?
9      MR. ARBITBLIT:  Object to form.
10     THE WITNESS:  I really don't know.
11     Q.  BY MR. MOONEY:  Have you received any other
12 payments from plaintiffs in other opioid-related
13 litigation?
14     A.  Yes, I have.
15     Q.  Who -- who has paid you in other opioid
16 litigation?
17     A.  The State of Washington.
18     Q.  And how much has the State of Washington paid
19 you?
20     MR. ARBITBLIT:  Object to form.
21     And again, if there's reciprocal agreement that
22 all payments to defense experts are fair game and will be
23 answered, then I'll allow the witness to answer.  If not,
24 I'll instruct her not to.
25     And that goes for everyone around the table.  If

6 (Pages 18 - 21)

Page 22

1 there's an agreement, she can answer; if there isn't, she
2 won't.
3     MR. PYSER: I'll jump in. This is Steven Pyser.
4     The question pending, we can talk off-line --
5 there's a lot of defendants -- about whether there's
6 agreements across all of the cases. To my knowledge,
7 there's not. But there is no sound basis for an
8 objection here.
9     The question's pending. It's a simple question.
10 There's no basis not to -- to instruct not to answer.
11     MR. ARBITBLIT: I disagree. We don't -- we
12 don't agree with that.
13     Don't answer.
14     Q. BY MR. MOONEY: Turn to page 5 and 6 of your
15 report.
16     Dr. Lembke, are you going to follow your
17 counsel's advice not to answer the question?
18     A. Yes, I am.
19     Q. On pages 5 and 6, you'll see a series of nine
20 opinions.
21     Do you see that?
22     A. Yes, I do.
23     Q. On page 6, paragraph 9: "Today's opioid crisis
24 would not have occurred without the paradigm shift that
25 contributed in overprescribing an excessive supply of

Page 23

1 opioids, which together contributed to the scourge of
2 addiction and death."
3     Did I read that correctly?
4     A. No.
5     Q. Would you read paragraph 9.
6     A. "Today's opioid crisis would not have occurred
7 without the paradigm shift that resulted in
8 overprescribing an excessive supply of opioids, which
9 together contributed to the scourge of addiction and
10 death."
11     Q. And is it your opinion that today's opioid
12 crisis would not have occurred without a paradigm shift
13 that resulted in overprescribing an excessive supply of
14 opioids?
15     A. Yes, that is my opinion.
16     Q. When you say "the paradigm shift" in paragraph
17 9, what are you referring to?
18     A. I'm referring to a change in our society leading
19 to massive oversupply of opioids, putting the population
20 at risk.
21     Q. And is that paradigm shift a paradigm shift in
22 the treatment of pain?
23     A. That paradigm shift included both a shift in the
24 treatment of pain as well as an efficient distributor
25 supply chain that enabled those pills to be distributed

Page 24

1 to every region in the country and readily dispensed.
2     Q. What is the paradigm shift in the distributor
3 supply chain?
4     A. The paradigm shift in the distributor supply
5 chain is the collaboration between distributors and
6 pharmacies and opioid manufacturers that led to a massive
7 increase in the number of pills, putting the population
8 at risk.
9     Q. Do you have any expertise in supply chain
10 management?
11     MR. ARBITBLIT: Object to form.
12     THE WITNESS: I am familiar with the path of
13 opioid pills from manufacturers to distributors to
14 pharmacies to patients. I've spent the last 20 years as
15 a practicing physician. I've also researched the opioid
16 epidemic.
17     And so based on that, I do have expertise in
18 understanding how that supply chain has contributed to
19 the oversupply of opioids.
20     Q. BY MR. MOONEY: Have you ever worked in a
21 pharmaceutical wholesale distributor?
22     A. No I have not.
23     Q. Have you ever worked in a pharmacy?
24     A. No, I have not.
25     Q. Have you ever worked for a pharmaceutical

Page 25

1 manufacturer?
2     A. No, I have not.
3     Q. Have you ever taken coursework in supply chain
4 management?
5     A. No.
6     Q. Have you taken -- are you -- have you taken any
7 coursework relating to pharmaceutical distributors'
8 regulatory responsibilities?
9     A. No, I have not.
10     Q. Do you have any -- have you taken any coursework
11 regarding the wholesale distribution of controlled
12 substances?
13     A. No.
14     Q. Do you have any expertise concerning the
15 regulatory responsibilities rela- -- excuse me. Strike
16 that.
17     Do you have any expertise concerning the
18 monitoring of suspicious orders by pharmacies?
19     A. I do have expertise in the sense that I am aware
20 that the failure to scrutinize the distribution of opioid
21 pills in large volumes has contributed to the current
22 opioid epidemic.
23     Q. And what is that awareness based on?
24     A. That's based on reports of billions of pills
25 being disseminated across this country, including to

7 (Pages 22 - 25)

HIGHLY CONFIDENTIAL

Page 26

1 small towns consisting of no more than 10,000 citizens,
2 amounts of pills that could never possibly be justified
3 by the need for analgesia in that community.
4 Q. Anything else?
5 A. It's also based on my clinical experience over
6 20 years observing the increased supply leading to ready
7 access, an endangerment of individuals due to that
8 increased supply, increasing their vulnerability to
9 addiction and accidental overdose death.
10 Q. Anything else?
11 A. Could you repeat the question?
12 Q. Anything else?
13 A. Could you repeat the root question?
14 Q. What is the -- what is your awareness of the
15 failure to scrutinize the distribution of opioid pills in
16 large volumes that has contributed to the opioid
17 epidemic?
18 A. My awareness also comes from reports that have
19 been issued on ARCOS data and DEA supply-chain data.
20 Q. Anything else?
21 A. My awareness is also based on knowledge of pill
22 mills.
23 Q. Can you identify any pill mills in the state of
24 New York?
25 A. I'm not aware of any pill mills in the state of

Page 27

1 New York.
2 Q. Have you conducted any independent analysis
3 relating to the failure to scrutinize the distribution of
4 opioid pills in large volumes?
5 MR. ARBITBLIT: Object to form.
6 THE WITNESS: What do you mean by "independent
7 analysis"?
8 Q. BY MR. MOONEY: Well, you said that you're aware
9 of reports from ARCOS data or reports on the number of
10 pills that have been shipped.
11 My question is: Have you done any of your own
12 analysis to reach a conclusion about the distribution of
13 opioids?
14 A. I have not done my own numeric analysis of those
15 data.
16 Q. You were relying on what you have read in
17 newspaper reports?
18 A. Newspaper reports and other reports as well.
19 Q. Okay. What other reports?
20 A. I'd like to refer to my report.
21 Q. Are you not familiar, sitting here today, with
22 the contents of your report?
23 A. I'm very familiar, but this is a very serious
24 proceeding and I want to be as accurate as I possibly
25 can.

Page 28

1 So the NASEM report, which I refer to on page 12
2 of my report, found that diversion is a key contributor
3 to increased exposure to prescription opioids, and I'm
4 quoting here from the NASEM report, quote: "DEA reports
5 that in recent years distributors in the United States
6 dispersed 12 to 15 billion dosage units of opioid
7 narcotics to retail-level purchasers, suggesting that
8 total diversion is on the order of 2.5 to 4 billion
9 dosage units," unquote.
10 Also a Washington Post analysis of Federal ARCOS
11 data shows that from 2006 to 2012, approximately
12 76 billion oxycodone and hydrocodone pills were delivered
13 in the United States.
14 And if we were to assume the same rate of
15 diversion as from the NASEM report, that would represent
16 diversion on the order of 12 to 19 billion pills during
17 the six-year period from 2006 to 2012.
18 There was also a more recent Washington Post
19 report adding the years 2013 and 2014, bringing that
20 total number of disbursed pills up to 100 billion pills.
21 And that's based on ARCOS data.
22 Q. How many --
23 A. Oh, sorry. I was just going to say, I also base
24 my opinion on the impact of distribution on the opioid
25 epidemic on studies showing that in regions in the

Page 29

1 United States where more pills were disbursed were also
2 regions that saw increased rates of harm due to opioid,
3 including opioid addiction overdose deaths.
4 And I do refer to that in my report, and I'd
5 like to find that reference and also include it in my
6 response.
7 So on page 85 of my report, I talk about how
8 based on an article by Ghertner, et al., that: "ARCOS
9 data on opioid prescribing shows a 9-percent increase in
10 opioid hospitalizations for each 1 morphine kilogram
11 equivalent increase in opioid sales at the county level.
12 These data demonstrate a clear and convincing geographic
13 specific link between opioid dispensing and
14 opioid-related harm."
15 Q. Opioid prescribed -- this paragraph E references
16 opioid prescribing; is that right?
17 MR. ARBITBLIT: Object to form.
18 THE WITNESS: It references opioid sales at the
19 county level.
20 Q. BY MR. MOONEY: In paragraph E of page 85:
21 "ARCOS data on opioid prescribing showing 9-percent
22 increase in opioid-related hospitalizations for each
23 1 morphine kilogram equivalent increase in opioid sales
24 at the county level."
25 Is that right?

8 (Pages 26 - 29)

HIGHLY CONFIDENTIAL

Page 30

1    A. Yes, that's right.
2    Q. And do you agree that opioid sales from a
3  pharmacy would not -- do not happen without a
4  prescription?
5    A. Pharmacies also have a responsibility in the
6  opioid supply chain to make sure that patient consumers
7  are not being harmed by the opioids that are dispensed.
8  So although I would agree that pharmacies cannot dispense
9  opioids without a prescription, I would qualify that to
10  say that they also have a responsibility to patient
11  consumers to ensure that it's an appropriate prescription
12  and that it's a true prescription, it's not a
13  prescription that will harm the patient.
14      Pharmacists do have a responsibility, for
15  example, to check drug interactions to check relative
16  contraindications.
17      Pharmacists play an important role in educating
18  their patients about the risks and benefits of the
19  medications they're dispensing.  So pharmacists are not
20  merely in a passive role of turning over opioids or other
21  medications when they get a prescription.  They have also
22  a health-safety relationship to their patients.
23      MR. CARTER:  This is Ed Carter.
24      I move to strike everything in that response
25  other than "I would agree pharmacies cannot dispense

Page 31

1  opioids without a prescription."
2      MR. MOONEY:  And I will just repeat the
3  question, understanding you have a caveat.
4    Q. My question was -- was simpler:  Do you agree
5  that opioid sales from a pharmacy do not happen without a
6  prescription?
7      MR. ARBITBLIT:  Object to form.
8      THE WITNESS:  I agree, with the caveat stated
9  previously.
10    Q. BY MR. MOONEY:  If you could turn to page 13 of
11  your report.  Paragraph 2:  "Opioid prescribing began --
12  began to increase in the 1980s, became prolific in the
13  1990s and the early part of the 21st century,
14  representing a radical paradigm shift in the treatment of
15  pain and creating more access to opioids across the
16  United States."
17      Did I read that correctly?
18    A. Yes, you did.
19    Q. Is that the opinion that you have in this case?
20    A. That is one of nine opinions that I have in this
21  case.
22    Q. And so prior to 1980, doctors used opioid pain
23  relievers sparingly; is that right?
24    A. Yes.
25    Q. And then there was a change in how doctors

Page 32

1  prescribed opioids?
2    A. Yes.
3    Q. And you say that that change was radical?
4    A. Yes.
5    Q. What do you mean by there was a radical change
6  in the way that doctors treated pain?
7    A. Prior to 1980, doctors used opioids sparingly
8  for acute pain for people in extreme agony and at the end
9  of life.  Starting in the 1980s, particularly in the
10  1990s, that paradigm changed such that opioids became
11  first-line treatment for even minor and chronic pain
12  conditions.
13    Q. Does that mean that a responsible physician
14  trying to act in good faith in treating his or her
15  patients would have prescribed opioids more often than in
16  the past?
17      MR. ARBITBLIT:  Object to form.
18      THE WITNESS:  What it means is that several
19  generations of physicians were misled in terms of what
20  the science showed regarding safety and efficacy of
21  opioids, and in believing that they were prescribing
22  according to good science, they began to prescribe
23  opioids for minor and chronic pain conditions in a
24  departure from past practice.
25    Q. BY MR. MOONEY:  And that departure was that

Page 33

1  opioids would be prescribed more frequently than in the
2  past; is that correct?
3    A. That's correct.
4    Q. Is it your opinion that the change in medical
5  practice toward liberal opioid prescribing has been a
6  major factor contributing to the increased supply which
7  has fueled the opioid epidemic?
8    A. It's my opinion that the change in opioid
9  prescribing has been a major factor, but not the only
10  factor.  Another major factor has been an efficient
11  distributor supply chain as well as the problem of
12  diversion of opioids through various means.
13    Q. Is it your understanding that pharmaceutical
14  distributors ship prescription drugs to pharmacies when a
15  pharmacy places an order for those drugs?
16    A. Yes, that is my understanding.
17    Q. Is it your understanding that pharmacies order
18  prescription drugs from distributors based on the
19  pharmacy's expected demand?
20    A. Yes, that's my understanding.
21    Q. And in the case of prescription drugs, a
22  pharmacy's expected demand will depend on how many
23  customers come to the pharmacy with a doctor's
24  prescription for those drugs, doesn't it?
25      MR. ARBITBLIT:  Object to form.

9 (Pages 30 - 33)

HIGHLY CONFIDENTIAL

Page 34

1    THE WITNESS:  I'm actually not that familiar
2  with what the pharmacies base their orders on.
3    Q.  BY MR. MOONEY:  Do you have any understanding of
4  pharmacy inventory management practices?
5    A.  That's not my area, no.
6    Q.  You keep referencing an efficient supply chain,
7  but no matter how efficient the supply chain is, without
8  a prescription, those pills are just going to sit on the
9  shelf, aren't they?
10    MR. ARBITBLIT:  Object to form.
11    THE WITNESS:  The efficient distributor supply
12  chain has played a major role in this epidemic.  Without
13  the massive distribution of opioid pain pills to every
14  geographic region in the United States, this epidemic
15  would have been much less likely to occur and perhaps may
16  not have occurred at all.
17    So what your question assumes is that the
18  distributors are just innocently fulfilling orders, that
19  they're just the trucks, and that's not really an
20  accurate representation.  Because they, too, have a
21  responsibility in scrutinizing suspicious orders and
22  being vigilant stewards of highly lethal drugs that
23  they're distributing and dispensing across the country.
24    Q.  BY MR. MOONEY:  These highly lethal drugs, these
25  are the opioids you're talking about?

Page 35

1    A.  That's right.
2    Q.  And those are FDA-approved drugs?
3    A.  Yes, they are.
4    Q.  And the FDA, even today in 2020, allows opioids
5  to be prescribed to patients; is that right?
6    A.  Yes, it does.
7    Q.  And is there anything about the efficient supply
8  chain that is unique to opioids as opposed to any of the
9  other numerous drugs that distributors distribute to
10  pharmacies?
11    MR. ARBITBLIT:  Object to form.
12    THE WITNESS:  Yes, I think so.
13    Q.  BY MR. MOONEY:  What is unique about the opioid
14  supply chain that makes it efficient?
15    A.  One thing that is unique to the opioid supply
16  chain is the way that all of the actors from
17  manufacturers to distributors to pharmacies, benefitted
18  from the actions of the others in terms of increasing
19  demand and increasing supply.
20    Q.  How is that unique to opioids as opposed to any
21  other pharmaceutical product?
22    A.  Because in the case of opioids, there was
23  collusion around the fact that people were becoming
24  addicted and dying from these opioids, and yet the opioid
25  pharmaceutical industry turned the other cheek or turned

Page 36

1  a blind eye to that problem and sought to hide behind the
2  other and say it was somebody else's responsibility, when
3  in fact they all had a responsibility.  But the money
4  was, you know, so appealing, that these various agencies
5  in the opioid distributor supply chain failed to meet
6  their stewardship responsibility vis-à-vis the American
7  public.
8    Q.  What's the basis for your statement that there
9  was collusion among the members of the supply chain?
10    A.  One small example is I believe that some of the
11  distributors, for example, created coupons for free
12  samples of opioids that patients could get.
13    Q.  Where is that in your report?
14    A.  That is not in my report.
15    Q.  Okay.  What documents are you relying on to
16  support the belief that distributors created coupons for
17  free samples of opioids?
18    A.  I've seen documents showing that McKesson
19  created coupons for free samples of Nucynta.
20    Q.  Anything else?
21    A.  No.  But the practice of kind of promotional
22  efforts and free coupons and a general collusion between
23  these individuals is something that I feel I have seen in
24  my more than 20 years of medical practice.
25    I would also add that opioids are unique from

Page 37

1  other medications because of their highly addictive
2  potential and their lethality and the fact that they
3  create a serious dependent syndrome that drives ongoing
4  use, even beyond utility or safety or efficacy.
5    So I do think that the pharmaceutical industry
6  that is involved in opioids has a responsibility above
7  and beyond what might be there even for other types of
8  medications that are not as addictive and not as lethal.
9    Q.  You say the money was so appealing.  What's the
10  profit margin for opioids for a pharmaceutical
11  distributor?
12    MR. ARBITBLIT:  Object to form.
13    THE WITNESS:  I can't give you specific numbers,
14  but my sense is that it's a billion-dollar industry.
15    Q.  BY MR. MOONEY:  And what is that based on?
16    THE WITNESS:  That's based on my reading in the
17  public domain.
18    Q.  BY MR. MOONEY:  And what are distributors'
19  profits from this so-called billion-dollar industry?
20    MR. ARBITBLIT:  Object to form.
21    THE WITNESS:  I'm not familiar with specific
22  numbers regarding profits.
23    Q.  BY MR. MOONEY:  So how do you know that the
24  money was so appealing that it caused the distributors to
25  look the other way?

10 (Pages 34 - 37)

HIGHLY CONFIDENTIAL

Page 38

1    A.  Because I am aware that this is a
2  billion-dollar -- a multi-billion-dollar industry.
3    Q.  You also say that you said you think the
4  pharmaceutical industry that is involved in opioids has a
5  responsibility above and beyond what there might be even
6  for other types of medications.  What do you mean by "a
7  responsibility above and beyond"?
8    A.  Opioids, in a sense, sell themselves because of
9  their addictive potential.  So I believe that when it
10  comes to the opioid pharmaceutical industry, they need to
11  be especially vigilant about the problem of opioid
12  addiction overdose death beyond what they would need to
13  be for a non-addictive medication or even an addictive
14  medication that is not an opioid.  I think opioids are
15  unique in this way.
16    Q.  And what would that especially vigilant, what
17  would that look like?
18    A.  That would look like being very, very vigilant
19  regarding regions of the country that -- and pharmacies
20  that are ordering especially high volumes of opioids and
21  very closely scrutinizing those pharmacies in those
22  regions to determine whether or not diversion is
23  occurring or whether or not the citizens in that
24  community are being harmed by the opioids that they are
25  ingesting.

Page 39

1    It would involve an additional degree of
2  scrutiny and vigilance and also caution such that if
3  there is a spike or an increase in a specific region in
4  terms of orders for opioid medication, then the opioid
5  pharmaceutical industry has a responsibility to have a
6  very high suspicion for a problem in that community along
7  the lines of addiction, either through a legitimate
8  prescription or addiction through diversion.
9    Q.  How is a distributor supposed to know if a
10  community is experiencing addiction through legitimate
11  prescriptions?
12    MR. ARBITBLIT:  Object to form.
13    THE WITNESS:  The job of a distributor is to
14  assess suspicious orders.  Suspicious orders are
15  determined in part by the volume of pills shipped to a
16  given region, a concern for pill mill doctors in that
17  region, a concern for diversion in that region.
18    So geographic spikes or increases in opioid
19  orders should be a concern for that community being
20  harmed by those opioids.
21    It's not enough to say that, well, that's what
22  the doctor ordered.  That's not sufficient.  That reneges
23  on their responsibility.
24    Sorry, I said "reneges on their responsibility,"
25  not "renders."

Page 40

1    Q.  When there was a change in the way in which
2  doctors prescribed opioids, was that change limited to a
3  specific type of doctor?
4    A.  No, that was a paradigm shift across all medical
5  specialties.
6    Q.  And by volume, did the family medicine doctors
7  and internal medicine doctors account for most of the
8  opioids that were prescribed?
9    A.  Yes.
10    Q.  And so as you analyzed it in your 2016 article,
11  was the problem of overprescribing the result of a small
12  number of especially big prescribers?
13    A.  The point of that 2016 article was to highlight
14  that the paradigm shift in treatment of pain in medicine
15  over the last three decades has led to all different
16  types of prescribers prescribing more opioids.
17    Q.  And then --
18    A.  None -- nonetheless -- nonetheless, pill mill
19  doctors, or small subsets of prolific prescribers, have
20  also contributed to the problem.  They're not the only
21  explanation, but they are a part of the problem.
22    So it's both pill mill doctors and the broad
23  shift in prescribing that has led to the oversupply of
24  opioids in our communities.
25    Q.  And that shift in prescribing, was that because

Page 41

1  there was a wholesale shift in the generally accepted
2  medical practice as it relates to the treatment of pain?
3    A.  Yes.
4    Q.  You also submitted a report in the Federal
5  multidistrict opioid litigation; is that correct?
6    A.  Yes, that's correct.
7    Q.  Is it fair to say that if you said something in
8  your earlier report but do not include it in your New
9  York report, then you do not intend to offer the earlier
10  opinion in this litigation?
11    MR. ARBITBLIT:  Object to form.
12    THE WITNESS:  Can you rephrase the question?
13    Q.  BY MR. MOONEY:  Sure.
14    So the opinion or the report that you submitted
15  in the New York litigation is not exactly the same as the
16  report that you offered in the Federal litigation; is
17  that right?
18    A.  That's right.
19    Q.  And so my question is:  If there are
20  differences, and you said something in the New York
21  report -- or excuse me.  Strike that.
22    If there are differences and you said something
23  in the Federal report and that is not included in your
24  New York report, can we assume that you do not intend to
25  offer the information -- the opinion that was only in the

11 (Pages 38 - 41)

HIGHLY CONFIDENTIAL

Page 42

1 Federal litigation report?
2     A.  I would not assume that.  I have a very large
3 body of work that predates my involvement in any opioid
4 litigation, and my opinions are based on that body of
5 work, on my clinical experience, as well as my reports.
6 It's -- it's all of a piece.
7     Q.  What opinions in your Federal report that are
8 not in your New York report do you intend to offer in
9 this case?
10     MR. ARBITBLIT:  Object to form.
11     THE WITNESS:  If you could refer to some
12 specific difference between the reports, it would be
13 easier for me to comment.
14     Q.  BY MR. MOONEY:  So sitting here today, you can't
15 identify opinions that were in your Federal report that
16 are not in your New York report that you intend to offer
17 in the New York litigation; is that correct?
18     MR. ARBITBLIT:  Object to form.
19     THE WITNESS:  The differences in the two reports
20 are largely structural.  The opinions are the same.
21     Q.  BY MR. MOONEY:  You also gave a deposition in
22 the Federal litigation?
23     A.  That's right.
24     Q.  And you were under oath?
25     A.  Yes, I was.

Page 43

1     Q.  Did you have a chance to review the transcript
2 after the deposition ended?
3     A.  Yes, I did.
4     Q.  Did you have a chance to make changes to your
5 testimony on an errata?
6     A.  Yes, I did.
7     Q.  Is there any statement in the Federal litigation
8 deposition that you now believe to be false?
9     A.  No.
10     Q.  So you stand by what you said in that sworn
11 testimony?
12     A.  Yes.
13     Q.  Do you treat patients with chronic pain?
14     A.  Yes.
15     Q.  Do you prescribe opioids to your patients?
16     A.  Yes.
17     Q.  Have you prescribed opioids to your patients
18 with chronic pain?
19     A.  Yes.
20     Q.  How long have you been prescribing opioids?
21     A.  I've been prescribing opioids since I began my
22 medical training and my medical career in the mid-1990s.
23 I would qualify my positive response to say that the only
24 opioid that I prescribe now are opioids to treat opioid
25 addiction.  I treat chronic pain, but I don't prescribe

Page 44

1 opioids currently for the treatment of chronic pain.
2     Q.  When you say that you only prescribe -- you
3 prescribe opioids now only to treat opioid addiction; is
4 that right?
5     A.  That's correct.
6     Q.  Is the reason you qualify it because that's a
7 change from your past practices with respect to
8 prescribing opioids?
9     A.  My opioid prescribing for pain occurred mainly
10 when I was a medical intern and not in my psychiatric
11 practice.  It's not within the scope of psychiatric
12 practice typically to prescribe Schedule II opioids for
13 pain.
14     The kind of treatment that I as a psychiatrist
15 administer for pain has to do with psychological and
16 mind-body interventions.  I can certainly make
17 recommendations, and I am actively involved in helping
18 patients who have become dependent on or addicted to
19 opioids, but I do that in collaboration with their opioid
20 prescriber.
21     That is a big part of my practice now, and my
22 medical expertise is counseling primary care doctors and
23 pain specialists, for example, on how to safely and
24 compassionately taper their patients down to a lower dose
25 of a Schedule II opioid or off of an opioid.

Page 45

1     Q.  When did you stop prescribing opioids for
2 chronic pain?
3     A.  In the early aughts, when I transitioned to a
4 primary psychiatric practice.
5     Q.  When is the last time you prescribed an opioid
6 for pain?
7     A.  I can't give you a specific date.
8     Q.  Last year?
9     A.  No, I have not prescribed opioids for chronic
10 pain for the last 15 to 20 years of my practice.
11     Q.  When did you last recommend that a doctor
12 prescribe an opioid for a patient?
13     MR. ARBITBLIT:  Object to form.
14     THE WITNESS:  I have lots of conversations with
15 other healthcare providers around opioids and opioid
16 prescribing.  Those are careful and nuanced conversations
17 that are based on the evidence, that are based on my
18 clinical experience, and on the unique situation of that
19 patient.
20     Sometimes that involves recommending continuing
21 an opioid for chronic pain at a given dose.  Sometimes it
22 involves recommending tapering to a lower dose or
23 tapering off.  It really depends on a specific patient
24 situation.
25     Although I will add that much of my work has to

12 (Pages 42 - 45)

HIGHLY CONFIDENTIAL

1 do with helping healthcare providers safely and
2 compassionately taper their patients down to safer doses
3 or off entirely because of the harm done by taking
4 opioids chronologically and because of the lack of
5 evidence that opioids work for chronic pain and can even
6 make pain worse through a process called opioid-induced
7 hyperalgesia.
8      MR. MOONEY:  Move to strike that answer.
9      Q.  Dr. Lembke, my question was when did you last
10 recommend that a doctor prescribe an opioid for a
11 patient?
12      MR. ARBITBLIT:  Object to form.
13      THE WITNESS:  That is a very general question.
14 So if you could be more specific about what opioid and
15 what kind of clinical scenario, I would be better able to
16 answer your question.
17      Q.  BY MR. MOONEY:  Sitting here today, you can't
18 tell me when last you recommended that a doctor prescribe
19 an opioid for one of your patients under any
20 circumstances?
21      MR. ARBITBLIT:  Object to form.
22      THE WITNESS:  No, that's not true.  That's work
23 that I do in every clinic, and I see patients every week
24 in clinic.  So the discussion around opioids, when to
25 prescribe, how much, whether to taper, how to taper,

1 opioids and opioids in the use of chronic pain, opioids
2 in the use of acute pain, opioids in the use of opioid
3 use disorder is a conversation I have on a regular basis
4 in my professional work.
5      Q.  BY MR. MOONEY:  So is it fair to say on a
6 regular basis, you make recommendations that doctors
7 continue to prescribe opioids for your patients?
8      MR. ARBITBLIT:  Object to form.
9      THE WITNESS:  As I said, I regularly have
10 discussions about whether opioids are indicated, how to
11 do a risk-benefit assessment, and what to do with the
12 opioid prescription.
13      The -- your question implies -- I guess I would
14 just, again, like clarification on your question because
15 I want to make sure that I answer it accurately.
16      Q.  You said that in your -- in your work as an
17 addiction doctor --
18      A.  And --
19      Q.  As a psychiatrist.
20      A.  And somebody who treats chronic pain and has a
21 courtesy appointment in the Department of Pain and
22 Anesthesia at Stanford School of Medicine.
23      Q.  Right.  You said that in the last 15 years, you
24 personally haven't prescribed opioids for chronic pain;
25 is that right?

1      A.  That's right.
2      Q.  You said you have had conversations with other
3 doctors on -- and provide recommendations as to whether
4 their patients should continue to be treated with
5 opioids?
6      A.  Yes.
7      Q.  When was the last time you made a recommendation
8 that a doctor continue to prescribe patients opioids?
9      MR. ARBITBLIT:  Object to form.
10      THE WITNESS:  Tuesday.
11 Q. BY MR. MOONEY:  So two days ago?
12      A.  Yes.
13      Q.  What pharmacy were the pills that you prescribed
14 filled at?
15      A.  I have these conversations around opioid
16 prescribing and doing a risk-benefit assessment and
17 whether the patient's developed opioid dependence or
18 opioid addiction so often in my clinical practice and on
19 such a regular basis that I could not tell you.  It's not
20 an isolated event in my work.  So, therefore, a specific
21 pharmacy doesn't stand out to me.
22      I can -- if it's helpful, I could list some of
23 the common pharmacies in my area, but I'm not sure.
24      Q.  Which distributors fill the prescriptions that
25 you write?

1      A.  I don't know.
2      Q.  If one of your patients told you that a pharmacy
3 couldn't fill a prescription for opioids because the
4 distributor wouldn't ship to that pharmacy, what would
5 you tell your patient to do?
6      MR. ARBITBLIT:  Object to form.
7      THE WITNESS:  It would really depend on the
8 specifics of that patient's circumstance.
9      Q.  BY MR. MOONEY:  If -- so what -- what would --
10 what would depend on the patient's circumstances?
11      MR. ARBITBLIT:  Object to form.
12      THE WITNESS:  The specific patient and where
13 they got their prescription and what it was for and
14 whether or not it was truly indicated and whether or not
15 their report was, in fact, accurate regarding whether or
16 not they were able to obtain that prescription for that
17 opioid.
18      Q.  BY MR. MOONEY:  And so if one of your patients
19 said that they couldn't fill a prescription for opioids
20 because the distributor wouldn't ship to that pharmacy,
21 and you went through all the circumstances of the patient
22 and you determined that this -- this patient needed
23 those -- those opioids, what would you tell the patient
24 to do?
25      MR. ARBITBLIT:  Object to form.

13 (Pages 46 - 49)

HIGHLY CONFIDENTIAL

Page 50

1      THE WITNESS: Probably the first thing that I
2  would do would be to contact the pharmacy directly and
3  try to figure out what the circumstances were of their
4  not having that particular medication.
5      Q. BY MR. MOONEY: Have you ever contacted a
6  pharmacy to ask why they don't have a particular
7  medication that you prescribe?
8      A. Frequently.
9      Q. And what did they -- what -- what answers have
10 you received from pharmacies when you've made such calls?
11     A. Sometimes it has to do with a prior
12 authorization. Sometimes it has to do with the fact that
13 they don't have it in stock. Sometimes it has to do with
14 the fact that it's at another pharmacy in their same
15 chain and they have to have it shipped over and that will
16 take a few days.
17     Sometimes it has to do with the fact that
18 they're concerned about a pattern of behavior that
19 they've seen in that particular patient, which makes them
20 reluctant to dispense.
21     Q. Have you ever consulted with a distributor about
22 any of the prescriptions that you've written in your
23 practice?
24     A. No.
25     Q. Will you tell me the last pain patient you wrote

Page 51

1  a prescription for?
2      MR. ARBITBLIT: Object to form.
3      She's not going to give you specifics of her
4  patients. That's an invasion of confidentiality.
5      Don't answer it.
6      Q. BY MR. MOONEY: Will you accept your counsel's
7  advice?
8      A. That would be a violation of HIPAA for me to
9  refer to a specific patient. I would never do that.
10     Q. What if I told you that I represent a
11 distributor and I want to investigate your patients and
12 how they're using opioids; would you then give me the
13 name and medical records of your patient?
14     MR. ARBITBLIT: Object to form.
15     THE WITNESS: I would consult Stanford's legal
16 and determine whether or not I was in a position to have
17 to offer that, legally offer that information. I'm not a
18 lawyer so I would consult a lawyer. And I would have
19 first and foremost in my mind the care and
20 confidentiality of my patient, which is my primary
21 responsibility.
22     Q. BY MR. MOONEY: From the opioids that you've
23 prescribed, have any been diverted?
24     MR. ARBITBLIT: Object to form. Assumes facts
25 not in evidence.

Page 52

1      THE WITNESS: Opioids that I have prescribed
2  have been diverted, yes.
3      Q. BY MR. MOONEY: And the opioids that you have
4  prescribed that were diverted, how were they diverted?
5      A. They were diverted by patients to whom I gave a
6  prescription who then either sold or gave away the
7  medications that I prescribed to them.
8      Q. Did you report the diverted pills to the police?
9      A. No.
10     Q. Did you believe -- or excuse me, did you report
11 the person who diverted the pills to the police?
12     A. Most of my patients suffer from addiction, and
13 so their behavior is part of their disease of addiction,
14 and I don't see myself in a law enforcement role. My
15 primary obligation to my patients is to care for them
16 while also recognizing that I have a responsibility to
17 the public.
18     So when that happens, I change my prescribing to
19 make sure that they don't have access to pills in the way
20 that they had access before.
21     Q. So diversion is not a crime when it's one of
22 your patients; is that right?
23     MR. ARBITBLIT: Object to form. Argumentative.
24     Don't answer that question.
25     Come up with a new one.

Page 53

1      Q. BY MR. MOONEY: Are you going to listen to your
2  counsel and not answer?
3      A. I feel like I've answered that question.
4      Q. The question is pending. Can you answer the
5  question or do you follow your counsel's advice not to
6  answer it?
7      A. I'm going to follow my counsel's advice not to
8  answer.
9      Q. Should doctors who know that medications they've
10 prescribed have been diverted lose their license?
11     MR. ARBITBLIT: Object to form.
12     THE WITNESS: It really depends on the specific
13 circumstance.
14     Q. BY MR. MOONEY: Do you agree that for a couple
15 of days to a couple of weeks, opioids are magical for the
16 treatment of pain?
17     MR. ARBITBLIT: Object to form.
18     THE WITNESS: I'm not sure I would use the term
19 "magical." Opioids can have benefit short-term. They
20 are a useful tool. I would never suggest that there's no
21 role for opioids in medical treatment, but every case is
22 unique. Opioids are very high risk, and even when
23 prescribed short-term, it's necessary to weigh the risks
24 against the benefits.
25     Q. BY MR. MOONEY: In your professional medical

14 (Pages 50 - 53)

1 experience, if a doctor prescribes prescription opioids
2 for short-term therapy of three weeks, how many opioid
3 pills does the doctor prescribe?
4      MR. ARBITBLIT:  Object to form.
5      THE WITNESS:  It all depends on the specific
6 circumstance on what the medical indication is.
7      Q.  BY MR. MOONEY:  Can you provide a range of the
8 number of pills that would be prescribed in a three-week
9 prescription?
10      MR. ARBITBLIT:  Object to form.
11      THE WITNESS:  I really wouldn't want to
12 prescribe a range of pills.  I don't think that's useful.
13 I wouldn't -- every case is unique.  There is such a
14 range of medical conditions, of patient circumstances.
15      Q.  BY MR. MOONEY:  Has the number of pills in a
16 prescription for three weeks of opioids remained the same
17 over the past decade?
18      A.  There is huge variation opioid prescribing
19 across the country.  In some geographic regions, opioid
20 prescribing has decreased rapidly; in others, it has not.
21 It really depends on which doctor.
22      Q.  So it depends on the doctors, then?
23      A.  It continues to depend largely on the doctor,
24 yeah.
25      Q.  Have you ever been to Suffolk County, New York?

1      A.  I have not.
2      Q.  Have you ever practiced medicine in Suffolk
3 County?
4      A.  No.
5      Q.  Have you ever been to Nassau County, New York?
6      A.  No.
7      Q.  Have you ever practiced -- have you ever been
8 licensed to practice medicine in the State of New York?
9      A.  No.
10      MR. MOONEY:  We've been going about an hour.  Do
11 you want to take a break?
12      MR. ARBITBLIT:  Sure.
13      THE VIDEOGRAPHER:  Going off the record, the
14 time is 9:03 a.m.
15      (Recess.)
16      THE VIDEOGRAPHER:  Back on the record.  The time
17 is 9:26 a.m.
18      Q.  BY MR. MOONEY:  Dr. Lembke, all in, how much
19 have you been paid by plaintiffs in any opioid litigation
20 in this country?
21      MR. ARBITBLIT:  I'll object and instruct not to
22 answer unless we get an agreement that this is
23 reciprocal.
24      Q.  BY MR. MOONEY:  Will you follow your counsel's
25 instruction?

1      A.  Yes, I will.
2      Q.  Last year, what percentage of your total
3 compensation came from serving as an expert in opioid
4 litigation in the United States?
5      A.  I don't know.  I haven't made that calculation.
6      Q.  Have any of the plaintiffs in an opioid
7 litigation allowed you to fly on their private plane to
8 attend any hearing?
9      A.  No.
10      Q.  You said you've been paid approximately $20,000
11 so far for the New York litigation; is that right?
12      MR. ARBITBLIT:  Object to form.
13      THE WITNESS:  Again, I haven't added it up so I
14 don't know.
15      Q.  BY MR. MOONEY:  How many hours have you spent
16 working on the New York litigation?
17      A.  I haven't added it up.  I don't know.
18      Q.  We were talking a little bit earlier about a
19 efficient supply chain.  Strike that.
20      Can you approximate how long you've spent
21 working on the New York litigation?
22      A.  I'm reluctant to approximate because I really
23 don't know.  I would really -- I have a record.  I could
24 add it up, but I -- I don't want to approximate and then
25 be far afield from what it actually was.

1      Q.  So sitting here today, you can't provide an
2 approximation of how much time you've spent; correct?
3      A.  I can easily provide the exact number if you'd
4 like me to access those records.  I kept very careful
5 documentation of the time that I spent.
6      Q.  Did you bring that time with you today?
7      A.  I did not.
8      Q.  So sitting here today, you cannot approximate
9 how much time you've spent on the New York litigation?
10      A.  That's correct.
11      Q.  We talked about an efficient supply chain
12 earlier.  Do you recall that conversation?
13      A.  Yes.
14      Q.  Is Amazon an efficient distribution supply
15 chain?
16      MR. ARBITBLIT:  Object to form.
17      THE WITNESS:  I'd like to know how that question
18 is relevant.
19      Q.  BY MR. MOONEY:  That's not -- that's not a
20 question that you get to ask.  I asked a question.  Do
21 you have an answer?
22      MR. ARBITBLIT:  Object to form.
23      Q.  BY MR. MOONEY:  Do you consider Amazon to be an
24 efficient distribution supply chain?
25      MR. ARBITBLIT:  Object to form.

HIGHLY CONFIDENTIAL

Page 58

1      THE WITNESS:  It does seem efficient.

2      Q.  BY MR. MOONEY:  Can you identify any public

3  statement that you made before April 2015 in which you

4  claimed prescription opioids were overprescribed?

5      A.  Yes.

6      Q.  When did you make that statement?

7      A.  I published a New England Journal of Medicine

8  perspective on the opioid crisis.

9      Q.  And when did you publish that perspective?

10      A.  That was in 2012.

11      Q.  And in that perspective, you said that

12  prescription opioids were overprescribed?

13      A.  Yes, I did.

14      Q.  Can you identify any earlier statements than the

15  2012 Journal of -- New England Journal of Medicine

16  perspective?

17      A.  Prior to 2015, I was actively writing my book

18  Drug Dealer M.D., How Doctors Were Duped, Patients Got

19  Hooked, and Why It's So Hard to Stop, and I was also

20  teaching on the topic of the opioid problem and giving

21  lectures.  So I was frequently making statements

22  regarding the oversupply and overprescribing of opioids.

23      Q.  Can you identify any statements earlier than

24  2012 in which you said that prescription opioids were

25  overprescribed?

Page 59

1      A.  Do you mean written statements, published

2  statements, or just statements in general?

3      Q.  Let's start with published statements and then

4  we can turn to written statements or journal articles,

5  rather than any talks or lectures.  Not for your

6  students, but public facing.

7      MR. ARBITBLIT:  Object to form.

8      THE WITNESS:  Let me take a look at my CV which

9  is in my report.

10      It's possible that I referred to the oversupply

11  of opioids in the chapter that I wrote for the Stanford

12  School of Medicine Handbook of Developmental Psychiatry

13  On Adolescents and Young Adult Substance Use Problems.

14  I'd have to refer to that document to verify that.

15      Q.  My question was about overprescribing, not

16  oversupply.

17      A.  It's possible that I referred to it in that

18  document.  I'd have to go back and reference that.

19      It's possible that I made a reference to

20  overprescribing of opioids in a publication for addiction

21  in 2013, From Self-Medication to Intoxication, Time For a

22  Paradigm Shift.

23      As I said, in 2012 in the New England Journal of

24  Medicine piece, Why Doctors Prescribe Opioids to Known

25  Opioid Abusers.

Page 60

1      So, you know, I've been working and studying

2  this problem since the early aughts so it's probable that

3  I made statements to the overprescribing of opioids prior

4  to 2012.  But 2012 was a kind of a landmark paper that I

5  published in the New England Journal of Medicine on this

6  topic followed by many publications since then regarding

7  the overprescribing and the oversupply of opioids.

8      Q.  You reference on page 13 of your report in

9  romanette II a 1954 study.  And you quote the study as

10  saying:  "Morphine is not the answer to chronic pain."

11      Do you recall that study?

12      A.  Yes, I do.

13      Q.  Can you identify any article that you wrote

14  between 1996 and the present in which you cited that 1954

15  study?

16      A.  No.

17      Q.  In your report you write about a 2001 continuing

18  medication -- or continuing medical education course on

19  the treatment of pain that every licensed physician in

20  California was required to attend.

21      Do you recall that continuing medical education

22  course?

23      A.  Yes, I do.

24      Q.  So first off, what is a continuing medical

25  education course?

Page 61

1      A.  Continuing medical education is courses that are

2  required for physicians to take after they finish medical

3  school and after they finish residency, once they're in

4  practice, in order to ensure that they have the latest

5  evidence to inform their care of patients.  Attending a

6  certain number of continuing medical education courses

7  per year is mandatory in order to maintain licensure.

8      Q.  And continuing medical education courses, are

9  they sometimes called CMEs?

10      A.  Yes, they are.

11      Q.  Did you attend the 2001 CME on the treatment of

12  pain that every licensed physician in California was

13  required to attend?

14      A.  Yes, I did.

15      Q.  Where was that CME held?

16      A.  That was held in Palo Alto, California.

17      Q.  And how many people attended that event?

18      A.  I don't know the exact number.  It looks to be

19  in the thousands.

20      Q.  And who presented at that 2001 CME?

21      A.  I don't recall specific presenters except for

22  some of my Stanford colleagues who presented at that CME.

23      Q.  Were there any representatives from a

24  pharmaceutical distributor that presented at the 2001

25  CME?

16 (Pages 58 - 61)

HIGHLY CONFIDENTIAL

1   A.  There probably were, but I don't recall any
2  specifics.
3   Q.  Why do you say there probably were?
4   A.  Because it is very common for the pharmaceutical
5  industry to financially support CME and also to have
6  booths or tables at these events to promote their
7  products.  That's been the standard, unfortunately.
8   Q.  My question was different.  Were there any
9  representatives of a pharmaceutical distributor, not the
10  pharmaceutical industry, the pharmaceutical distributor,
11  that presented at the 2001 CME?
12   A.  Not that I recall.
13   Q.  You write in your report, page 23, paragraph
14  romanette V:  "I recall that there was no accurate
15  presentation of the risks of opioids, and the messages
16  that were provided tracks the misconceptions described
17  above regarding overstatement of the benefits of
18  opioids."
19   Did I read that correctly?
20   A.  Yes, you did.
21   Q.  At the time you attended the CME in 2001, did
22  you do anything to alert the attendees of the event that
23  the information that was being provided that day was
24  inaccurate?
25   A.  I was extremely early in my career.  I was very

1  junior in my institution, and I did not alert anybody
2  because at that time, I myself was buying into those
3  misrepresentations.  I was the convinced or let's say
4  partially convinced recipient of those misleading
5  messages.
6   Q.  Any time in the year after the 2001 CME, did you
7  do anything to alert doctors that you believed the
8  information that was provided about prescription opioids
9  was inaccurate?
10   A.  The evolution in my thinking occurred over that
11  decade, from approximately the year 2000 or, let's say,
12  the late -- mid-to-late '90s.  I was trained in -- I went
13  to medical school, as you know, in the 1990s, my
14  residency in the late 1990s, and the evolution in my
15  thinking occurred over that decade since my medical
16  training.
17   So I did not alert anybody because I was
18  experiencing an evolution in my own thinking, and a
19  growing concern and skepticism regarding the messaging
20  that I had been the recipient of in medical school, in
21  residency, and at continuing medical education courses.
22   And as I read more in the literature and saw
23  patients, I began to realize that what I had been taught
24  was false.
25   Q.  Coming back to the question.  At any time in the

1  year after 2001, did you do anything to alert doctors
2  that you believed the information that was provided at
3  the 2001 CME about prescription opioids was inaccurate?
4   A.  Yes, I did.
5   Q.  What did you do?
6   A.  I began in my lectures to medical students and
7  residents and colleagues to talk about the problem of
8  opioids, the fact that they were being overprescribed,
9  that we, as a healthcare community, had been sold a bill
10  of goods regarding their safety and efficacy, and that we
11  had a responsibility to our patients to do something
12  about that problem.
13   I -- and I also, as you know, then published an
14  article in 2012 in The New England Journal of Medicine
15  which directly addressed this problem, and some of the
16  origins, though not all of the origins, specifically in
17  order to alert my colleagues in the healthcare profession
18  about the problem of opioid overprescribing and the
19  inherent risks associated with it.
20   And then I also began work on my book that was
21  ultimately published by Johns Hopkins University Press in
22  2016 that specifically addresses this opioid crisis.
23   My intention in writing the book was to educate
24  my colleagues and patient-consumers about this problem.
25   Q.  Let's try this one more time.

1   In the year after the 2001 CME, 2001 to 2002,
2  did you do anything to alert doctors that you believed
3  the information that was provided about prescription
4  opioids was inaccurate?
5   A.  I probably did.  Informally talking about with
6  colleagues, expressing my skepticism and concern, but
7  again, that was my beginning of my awareness of a problem
8  as I began seeing more and more patients who were
9  misusing, dependent on, and addicted to prescription
10  opioids.
11   So to answer your question, it wasn't something
12  that happened suddenly overnight.  It was an evolution in
13  my thinking beginning in the late 1990s, early aughts.
14  So there's not a specific point, but as I became
15  concerned, yes, I regularly talked with colleagues.  I
16  began to think about the problem and address the problem.
17   Q.  Was the CME presented again in 2002 with similar
18  misinformation?
19   A.  I don't know.
20   Q.  What about in 2003?
21   A.  I didn't track that exact CME and whether it was
22  presented, but I know that it was a requirement in 2001
23  to complete a CME on pain, which was a very unusual
24  circumstance.  There were very few mandatory CMEs across
25  all specialties.

17 (Pages 62 - 65)

HIGHLY CONFIDENTIAL

1    And so it was significant to me, even at the
2  time that I took the 2001 CME, that I was being mandated
3  as a psychiatrist to take a course on pain.
4    What I learned, through my work and my research
5  over the ensuing decade, is that even that requirement
6  was probably the result of the opioid pharmaceutical
7  industry and their lobbying efforts to create this
8  paradigm shift in the treatment of pain and to
9  disseminate their misleading messages to every kind of
10  medical specialist.
11    Q.  Who required -- where did the -- where did the
12  requirement come from that doctors had to attend this
13  2001 CME?
14    A.  It came from the California State Medical Board.
15    Q.  Exhibit B to your report lists the materials you
16  considered in reaching your opinions in this litigation;
17  is that right?
18    A.  Yes.
19    Q.  And you tried to make sure that that list was
20  complete?
21    A.  Yes, I did.
22    Q.  It was missing a few documents; right?
23    A.  Which documents are you referring to?
24    Q.  Well, last night your counsel provided us with a
25  supplemental list of materials you considered.

1    Are you aware of that?
2    A.  Yes.
3    MR. MOONEY:  Okay.  Handing you Exhibit 3 to
4  your report.
5    (Exhibit 3, Supplemental Materials Considered
6    List, Dr. Anna Lembke, marked for
7    identification.)
8    Q.  BY MR. MOONEY:  Which is the list of
9  supplemental materials considered that we received from
10  counsel last evening.
11    Have you identified any other documents between
12  last night and this morning that should be on a list
13  of -- or a list of materials you considered in forming
14  your opinion?
15    A.  No.
16    Q.  And so if you considered a document in forming
17  your opinions that you offer in this case, you listed the
18  document on Exhibit B or the supplemental list that was
19  provided last night; correct?
20    MR. ARBITBLIT:  Object to form.
21    THE WITNESS:  My opinion has been informed by
22  the documents that I've reviewed as well as 20 years of
23  clinical experience and training.
24    Q.  BY MR. MOONEY:  Right.  If there are materials,
25  though -- setting aside your clinical training and your

1  clinical experience -- if there are materials that you
2  considered in forming the opinions that are in your
3  report, you listed them in Exhibit B or in the
4  supplemental materials considered list; is that correct?
5    A.  To the best of my knowledge, that is correct.
6    Q.  Did you consider any documents that were
7  produced by a distributor in this case?
8    A.  I don't believe so.  Except for the McKesson
9  Nucynta coupons, which I believe were created by
10  McKesson.  Or at least by McKesson in collaboration with
11  Janssen.
12    Q.  When you use the term "pharmaceutical opioid
13  industry" in your report, are you using it to mean the
14  same thing you meant in the Federal litigation report?
15    A.  I'm using it to mean opioid manufacturers,
16  distributors and pharmacies.
17    Q.  And so are you meaning -- are you using it to
18  mean the same thing that you meant in your Federal
19  litigation report?
20    A.  Yes.
21    Q.  On page 6 of your report, at Opinion 3 you
22  write:  "The pharmaceutical opioid industry contributed
23  to the paradigm shift in opioid prescribing through
24  promotional materials and its use and manipulation of key
25  opinion leaders, continuing medical education courses,

1  professional medical societies, a Federation of State
2  Medical Boards to the Joint Commission to convey
3  misleading messages about the safety and efficacy of
4  prescription opioids."
5    Did I read that correctly?
6    A.  Yes, you did.
7    Q.  What is a "key opinion leader"?
8    A.  A key opinion leader is an individual with
9  influence in the medical community, often an academic of
10  prestigious standing, for example, a professor or a
11  clinic chief at a major university or medical center who
12  is then working as a paid consultant for a pharmaceutical
13  company to promote their messaging.
14    Q.  Can you identify any payments to a key opinion
15  leader by CardinalHealth?
16    A.  No.
17    Q.  How about for McKesson?
18    A.  No.
19    Q.  Same question for AmerisourceBergen Drug
20  Corporation and Rochester Drug Co-op.
21    A.  No.
22    Q.  When you say "the pharmaceutical opioid industry
23  used and manipulated key opinion leaders," are you
24  talking about distributors?
25    A.  I'm talking about opioid manufacturers.

18 (Pages 66 - 69)

HIGHLY CONFIDENTIAL

Page 70

1    Q.  When you say "the pharmaceutical opioid industry
2  used and manipulated continuing medical education
3  courses," are you talking about distributors?
4    A.  No.
5    Q.  When you say "the pharmaceutical opioid industry
6  used and manipulated professional medical societies," are
7  you talking about distributors?
8    A.  No.
9    Q.  When you say "the pharmaceutical opioid industry
10  used and manipulated the Federation of State Medical
11  Boards and the Joint Commission," are you talking about
12  distributors?
13    A.  No.
14    Q.  Can you identify any false or misleading claim
15  about opioids that was made by a pharmaceutical
16  distributor that has been named as a defendant in this
17  case?
18    A.  No.
19    Q.  Of the oxycodone and hydrocodone pills dispensed
20  in the United States, what percentage were prescribed by
21  a doctor and filled by a patient?
22    MR. ARBITBLIT:  Object to form.
23    THE WITNESS:  I refer to my report, page 12, the
24  NASEM report, based on DEA reports noting 76 billion
25  oxycodone and hydrocodone pills delivered in the

Page 71

1  United States, with 12 to 19 billion pills diverted.
2  Diversion can occur at multiple levels prior to a doctor
3  prescribing it or a pharmacy receiving it, at the time of
4  prescription and also after the prescription.  So it's
5  extremely hard to estimate.
6    MR. MOONEY:  Move to strike.
7    Q.  But what percentage of -- of the oxycodone and
8  hydrocodone pills dispensed in the United States, what
9  percentage were prescribed by a doctor and filled by a
10  patient?
11    MR. ARBITBLIT:  Object to form.
12    THE WITNESS:  The majority, but I don't know the
13  exact percent.
14    Q.  BY MR. MOONEY:  And of the percentage of opioids
15  that are prescribed by a doctor and filled by a patient,
16  what percentage of those pills were pursuant to illegal
17  prescriptions?
18    MR. ARBITBLIT:  Object to form.
19    THE WITNESS:  Very hard to quantify that.  It
20  would really depend on what you mean by an illegal
21  prescription.
22    Q.  BY MR. MOONEY:  What percentage of doctors'
23  prescriptions for opioids are not for legitimate medical
24  purposes?
25    A.  Again, I think that the question doesn't really

Page 72

1  appreciate the complexity of the problem.  Patients who
2  receive a prescription for a legitimate medical purpose
3  can go on themselves to be addicted to that opioid.  They
4  can also divert a portion of their legitimate
5  prescription to others who are then harmed.
6    That diversion may occur intentionally or
7  unintentionally, for example, a teenager getting pills
8  from a grandparent's medicine cabinet without the
9  awareness of that individual who has the legitimate
10  prescription.
11    Then there are individuals who intentionally
12  seek out a doctor for the purpose of obtaining pills for
13  non-legitimate medical purposes.
14    So it's very difficult to answer that question
15  simply.  It's a complicated question.  It's a complicated
16  situation, and I don't think we even now fully know
17  accurately of the rates of diversion.  We have estimates,
18  but...
19    Q.  I understand that diversion can occur after the
20  prescription is filled and it can occur in other places,
21  too.
22    My question is:  What percentage of doctors'
23  prescription of opioids are not for legitimate medical
24  purposes?
25    MR. ARBITBLIT:  Object to form.

Page 73

1    THE WITNESS:  How would you define "legitimate
2  medical purposes"?
3    Q.  BY MR. MOONEY:  As a doctor, do you have
4  responsibilities to ensure that your patients -- or that
5  you prescribe medications for patients that are for
6  legitimate medical purposes?
7    A.  Yes, we do.  But if we've been misinformed about
8  what a legitimate medical purpose is, then we may
9  prescribe believing that we're engaging in a legitimate
10  prescription, when in fact, that prescription may not be
11  what is helpful to that patient.
12    Q.  What percentage of doctors' prescriptions for
13  prescription opioids are for a legitimate medical
14  purpose, assuming that it is done with the belief that
15  they are engaging in appropriate medical care?
16    MR. ARBITBLIT:  Object to form.
17    THE WITNESS:  The majority of opioid
18  prescriptions are for a legitimate medical purpose, but I
19  couldn't quantify it.  I just believe that the majority
20  of doctors are well-intended and trying to help their
21  patients.
22    There are doctors who have lost their moral
23  compass and are prescribing opioids knowing that their
24  patient shouldn't get those opioids, and that subset is a
25  part of this problem, but another large part of this

19 (Pages 70 - 73)

HIGHLY CONFIDENTIAL

Page 74

1 problem is well-intended doctors who believe they are
2 prescribing opioids for legitimate purposes but have been
3 misinformed and miseducated due to defendants' actions.
4     Q. What percentage of opioid medication prescribed
5 by a doctor and dispensed by a pharmacy sits unused in a
6 patient's medicine cabinet?
7         MR. ARBITBLIT: Object to form.
8         THE WITNESS: There are data coming out now
9 showing that a large percentage of opioids that are
10 prescribed by a doctor are not, in fact, used by the
11 patient, especially in the postoperative setting. These
12 are data that are now being used to inform how opioids
13 should be prescribed postoperatively.
14         What the studies are showing -- and I do cite
15 them in my report, and I can go to that place, if you'd
16 like -- are that as healthcare providers are cutting back
17 on opioid prescriptions, they're finding that their
18 patients are reporting no increases in pain, no increases
19 in calls for refills, and that they have fewer opioids
20 left sitting around in medicine cabinets for teenagers or
21 neighbors or whoever it is to come and take those
22 opioids. So --
23     Q. BY MR. MOONEY: Do you -- sorry. Go ahead.
24     A. So my point being that with the growing
25 awareness of the opioid epidemic and research that is

Page 75

1 studying the extent of the harm, we are finding out that
2 a lot of patients are using some of their prescription
3 and leaving the rest to either be stolen, or in some
4 cases, they themselves may be diverting part of their
5 prescription or selling part of their prescription.
6     Q. And when did that growing awareness begin?
7         MR. ARBITBLIT: Object to form.
8         THE WITNESS: That growing awareness on my part?
9     Q. BY MR. MOONEY: Sorry. Go ahead.
10     A. That began for me in the early 2000s, as I
11 started seeing more and more patients coming into my
12 office reporting that they were misusing or addicted to
13 opioids. When I asked them where they got those opioids,
14 many of them reported that they got the opioids from a
15 doctor.
16         Many of them actually believed that they were
17 taking the opioids in part for a legitimate pain
18 condition but also expressed concern that they were
19 becoming addicted through that legitimate prescription.
20         I also began seeing more and more patients in
21 the early aughts and beyond reporting that they had
22 increased easy access to prescription opioids from
23 friends and family members, left over opioids in medicine
24 cabinets.
25         I had teenagers coming in saying they were

Page 76

1 getting opioid pills from their friends at school,
2 leftover prescriptions or from somebody at school who had
3 pills who sold or gave it to them.
4         So what I saw over the first several decades of
5 this century was a growing number of patients who were
6 telling me that opioids were everywhere, that they were
7 easy to get, that you could ask a friend or you could
8 find a dealer, you know, one text message away, or you
9 could go see a doctor and easily obtain them.
10         Again, some of these were individuals who were
11 intentionally seeking out opioids for recreational use
12 and other of them were pain patients who themselves were
13 becoming addicted through their legitimate prescription.
14         I've also spent much of the last five years
15 traveling around the country, all over the country,
16 talking to doctors, trying to educate them about this
17 problem, urging them to prescribe opioids more
18 judiciously. And in that process, I've had many
19 conversations with doctors who have expressed that they
20 were duped by the pharmaceutical industry, that they
21 engaged in a very liberal prescription pad in terms of
22 prescribing opioids, and that they were looking back on
23 that practice with regret.
24         Interestingly, I was in Buffalo last year to
25 give a conference, to give a talk on the opioid epidemic

Page 77

1 to doctors, and one of the doctors came up to me
2 afterward and said that in her clinic, which was a clinic
3 for gynecologic cancer -- she had been in practice more
4 than 15 years -- they had instituted a new policy of
5 getting urine drug screens in their long-time opioid
6 chronic pain patients.
7         And to her shock and dismay, they discovered
8 that a large percentage of those patients had a urine
9 drug screen that was negative for opioids, the
10 implication being that individuals to whom they had been
11 giving what they thought were legitimate prescriptions
12 for many years, that those individuals were not, in fact,
13 taking the opioids that they were prescribing.
14         So through these many types of conversations, my
15 own clinical experience, and my reading in the
16 literature, I have seen what I have called in my report
17 the tsunami effect, the rising tide, the increased
18 supply.
19         And as an addiction medicine specialist, I know
20 that one of the biggest risk factors for developing
21 addiction is access to the drug. If you live in a
22 neighborhood where drugs are sold on the street corner,
23 you're more likely to try that drug and you're more
24 likely to get addicted to that drug.
25         We've been living in a society for the past

20 (Pages 74 - 77)

HIGHLY CONFIDENTIAL

Page 78

1 30 years where opioids are readily available to anybody
2 who wants them.  And as a direct result of that increased
3 supply and exposure, we now have an opioid epidemic of
4 addiction and death on our hands.
5    Q. Dr. Lembke, do you have Exhibit 1 in front of
6 you?
7    A. Exhibit 1.
8    Q. It might be under your report.  The copy that I
9 used --
10    A. This?
11    Q. No, the Court's order.
12    A. Yes, I do.
13    Q. Okay.  Now, were you made aware of this Court
14 order before your deposition today?
15    A. Yes, I was.
16    Q. And so you know that Justice Garguilo entered an
17 order that said in paragraph 1:  "Your role as an expert
18 is not one of advocacy.  Your role is to listen to the
19 question and answer the question.  You are not to comment
20 on anything beyond the information sought within the
21 question."
22    Did I read that correctly?
23    A. Yes, you did.
24    Q. Now, before you started answering my question --
25 the question that was pending before your monologue:

Page 79

1 "When did that growing awareness begin?"  That's a time
2 question, is it not?
3    A. (Nods head.)
4    MR. ARBITBLIT:  Object to form.
5    THE WITNESS:  Because my growing awareness as
6 implied by the word "growing," growing is something that
7 happens gradually over time.  Things don't grow in a
8 second or a day, I felt that in order to accurately
9 answer your question, I needed to explain the growth of
10 my awareness over the time period during which it
11 occurred.
12    Q. BY MR. MOONEY:  The information sought within
13 the question, "When did it begin," you said, "It began
14 for me in the early 2000s."  That's an answer to when;
15 correct?
16    A. It is a partial answer to when.  If one's
17 growing awareness -- and those were your words, "growing
18 awareness," a growing awareness occurs over a longer
19 period of time, or at least my growing awareness occurred
20 over a longer period of time.  And my response was my
21 best effort to thoroughly and accurately answer your
22 question.
23    MR. MOONEY:  All right.  We have a limited
24 amount of time with you so I'm not going to argue with
25 you on this any more, but I move to strike everything

Page 80

1 after "in the early 2000s."
2    Q. For the medical community at large, when did the
3 growing awareness of the opioid epidemic begin?
4    MR. ARBITBLIT:  Object to form.
5    THE WITNESS:  In 2011, the CDC issued a warning
6 that we were in the midst of a prescription drug
7 epidemic, and they, in their warning, clearly stated that
8 the case was increased prescribing of opioids and other
9 psychotropic medication.
10    I think that that was a very important missive
11 and an important year that contributed to a growing
12 public awareness around the opioid epidemic.
13    Following that, there were increasing numbers of
14 reports in the media and in the lay press that I think
15 also helped the growing awareness, the public awareness.
16    I can say that approximately two years ago, for
17 the first time in my professional career, I started
18 seeing chronic pain patients coming in asking for help to
19 get off of their opioids, that they had heard that
20 opioids were dangerous, that they had been on them for a
21 long time, and that they wanted to get off.
22    That, to me, was evidence of the slow shift and
23 a growing awareness, when patients themselves were coming
24 in saying, I read this article in the newspaper, or I
25 heard this on the radio that opioids are dangerous and I

Page 81

1 didn't know that, and I'd like to get off.
2    Q. BY MR. MOONEY:  Do you have an opinion on the
3 steps distributors could take to prevent unused medicine
4 from doctors' prescriptions from sitting unused in
5 people's medicine cabinets?
6    MR. ARBITBLIT:  Object to form.
7    THE WITNESS:  I think that anything the opioid
8 pharmaceutical industry can do to limit the supply of
9 opioids to just what is evidence-based use of those
10 opioids would help reduce the number of pills sitting in
11 people's medicine cabinets.
12    Q. BY MR. MOONEY:  If distributors provided
13 20 percent less opioids across the board to all
14 pharmacies and hospitals, would that help with the
15 epidemic?
16    MR. ARBITBLIT:  Object to form.
17    THE WITNESS:  I'm not in a position to opine on
18 exact percentages or numbers.  There are other experts
19 who will be weighing in on the -- on the role of
20 distributors who possibly could answer that, but that's
21 not a question that -- that I'm in a position to answer.
22    Q. BY MR. MOONEY:  How would a pharm- -- if
23 distributors provided 20 percent less medication across
24 the board to pharmacies and hospitals, how would those
25 pharmacies and hospitals decide which patients'

21 (Pages 78 - 81)

HIGHLY CONFIDENTIAL

Page 82

1 prescriptions to fill and which ones should not be
2 filled?
3       MR. ARBITBLIT:  Object to form.
4       THE WITNESS:  The question is a hypothetical.  I
5 am uncomfortable with a specific number of 20 percent.
6 But I would say that the bottom line is that pharmacies
7 and hospitals should fill prescriptions that are based on
8 evidence-based medicine, with careful scrutiny as to
9 whether or not the individual and the community is being
10 harmed by the way in which those prescriptions are being
11 filled.  So everybody has responsibility.
12      Q.  BY MR. MOONEY:  Including doctors?
13      A.  Including doctors, yes.
14      Q.  What would you -- what would a pharmacist need
15 to know to determine which prescriptions to fill and
16 which ones should not be filled?
17      MR. ARBITBLIT:  Object to form.
18      THE WITNESS:  Even now, pharmacists are checking
19 the prescription drug monitoring database to see if the
20 patient is engaged in so-called doctor shopping or
21 whether or not there's dangerous co-prescribing, such as
22 combing opioids and benzodiazepines or opioids and other
23 sedatives.
24      A pharmacist should also have some familiarity
25 with that doctor and their general practice and whether

Page 83

1 or not they are practicing in a responsible way.
2       The pharmacist should also be aware of the CDC
3 guidelines that are recommending that opioids not be used
4 as first-line treatment for pain and that doses for acute
5 pain be limited.
6       Pharmacists should also just have good old
7 common sense, and if they're observing somebody who is
8 clearly impaired or intoxicated, along the lines of
9 somebody who may be misusing or addicted to opioids, that
10 should also play into their decision making.
11      For example, I have had pharmacists call me, and
12 even though I wrote a legitimate prescription for what I
13 believed was a legitimate medical indication, they have
14 called me and said, you know, I'm concerned about this
15 patient, she's presenting in a way that makes me think
16 she's intoxicated, and she's getting prescriptions,
17 multiple prescriptions from, you know, other providers.
18 Also, I have this history with this particular patient
19 prior to her being your patient, and so I know that she
20 has had X, Y or Z problem.
21      These are all emergent, relevant, health-related
22 details that need to be communicated between everybody in
23 the opioid supply chain.
24      Q.  BY MR. MOONEY:  In what way did prescription
25 opioid distribution campaigns impact prescribing rates in

Page 84

1 Nassau or Suffolk County?
2       A.  By shipping large numbers of pills very
3 efficiently so that pharmacies were heavily stocked with
4 these pills, Suffolk County, along with the rest of the
5 United States, was heavily impacted.
6       Q.  Right.  My question, though, is:  How did the
7 distribution campaign affect the rates at which doctors
8 prescribed opioids in Nassau and Suffolk County?
9       A.  I refer to this in my report.  I'd like to go to
10 that spot.
11      Okay.  So between -- as I say on page 89 of my
12 report:  "New York State data show a four-fold increase
13 in opioid mortality in the 25 to 44 age group from 2010
14 to 2016."  And that includes Suffolk County.
15      So that increase in addiction among young adults
16 is a result of the increased supply of opioids in that
17 community, and the increased supply is a result of
18 defendants' actions, including distributors and
19 pharmacies.
20      MR. MOONEY:  Move to strike.
21      Q.  Dr. Lembke, my question was:  In what way did
22 the distribution campaigns impact the rates at which
23 doctors prescribe opioids in Nassau and Suffolk County?
24      A.  Let me give you a corollary example.  I saw a
25 patient last week with alcohol abuse disorder, and I

Page 85

1 prescribed Antabuse disulfiram to him, and he was not
2 able to obtain that medication from several different
3 pharmacies in the area.  I'm not sure why.  So,
4 therefore, we thought about a different or alternative
5 medication.
6       So if I'm practicing in a region where every
7 single opioid formulation under the sun is readily
8 available at every single pharmacy, and that becomes the
9 normative way to address pain, that is -- this is an
10 example of how distributors have impacted the rates at
11 which doctors describe opioids.
12      Q.  What percentage of prescriptions for opioids are
13 due to a doctor's decision to provide a different or
14 alternative medication because the medication that they
15 want to provide is not available?
16      MR. ARBITBLIT:  Object to form.
17      THE WITNESS:  I guess I don't really understand
18 the question.
19      Q.  BY MR. MOONEY:  Well, I didn't understand your
20 answer before because I asked about Nassau and Suffolk
21 County.
22      But what I understood you to mean was when you
23 thought about prescribing a different or alternative
24 medication that wasn't available, you thought about
25 providing something else; right?

22 (Pages 82 - 85)

HIGHLY CONFIDENTIAL

Page 86

1    A. (Nods head.)
2    Q. And then you said: "If I am practicing in a
3  region where every single opioid formulation under the
4  sun is ready available" -- "readily available at every
5  single pharmacy, and that becomes the normative way to
6  address pain, that is an example of how distributors have
7  impacted the rates at which doctors prescribe opioids."
8        Is that the gist of what you said?
9    A. Yes.
10   Q. So my question is:  Taking your corollary
11 example about an alcohol -- a patient suffering from
12 alcoholism in California, what percentage of
13 prescriptions are written for opioids in Nassau or
14 Suffolk County because the doctor wasn't able to get the
15 other drug that he or she wanted because it was
16 unavailable at the pharmacy?
17   A. I don't --
18       MR. ARBITBLIT:  Object to form.
19       THE WITNESS:  I don't know.
20   Q. BY MR. MOONEY:  Are you offering on opinion on
21 the appropriate number of pills that should have been
22 distributed in the State of New York?
23   A. No.
24   Q. You've talked a couple of times about the NASEM
25 report on page 12 of your report.

Page 87

1    A. (Nods head.)
2    Q. And you referenced in romanette III that there
3  are several ways that prescription drugs are diverted to
4  non-medical use.
5        Do you recall writing that in your report?
6    A. Yes.
7    Q. And the first example you give is diversion
8  before a prescription has been filled, for example, theft
9  from production facilities or retail pharmacies; is that
10 right?
11   A. That's right.
12   Q. Are you offering any opinion about any theft
13 from a distributor in this case?
14   A. No.
15   Q. What percentage of diverted opioids are due to
16 theft from a distributor?
17   A. I don't know.
18   Q. Can we agree that actual -- can we agree that
19 actual theft is rare?
20   A. I wouldn't agree to that because I have nothing
21 to base that on.
22   Q. The second version -- the second form of
23 diversion in your report that you reference is diversion
24 via filling a prescription, for example, pursuant to
25 doctor shopping and high-frequency prescribers; is that

Page 88

1  right?
2    A. Yes.
3    Q. And the third one is diversion after the
4  prescription has been filled, for example, by subsequent
5  transfer or sale to a third party; is that right?
6    A. Yes.  Yes, that's right.
7    Q. Do you agree that after a prescription for an
8  opioid has been filled, a pharmaceutical distributor no
9  longer has control over what happens to those dispensed
10 drugs?
11       MR. ARBITBLIT:  Object to form.
12       THE WITNESS:  I think that a distributor has
13 responsibility regarding the diversion of an opioid pill
14 after it's been filled.
15   Q. BY MR. MOONEY:  My question was different:
16 After the pharmaceutical opioid has been dispensed --
17   A. Uh-huh.
18   Q. -- do you agree that the distributor no longer
19 has control over what happens to the drugs?
20       MR. ARBITBLIT:  Object to form.
21       THE WITNESS:  What do you mean by "control"?
22   Q. BY MR. MOONEY:  After one of your patients fills
23 a prescription for opioids, can CardinalHealth go to
24 their house and take the unused medication out of their
25 closet?

Page 89

1        MR. ARBITBLIT:  Object to form.
2        THE WITNESS:  No, but what CardinalHealth can do
3  is note suspicious orders or regions in which there is a
4  heavy volume of pills not justified by the need for
5  analgesia in that community and investigate.
6        MR. MOONEY:  Move to strike everything after
7  "no."
8    Q. Do you have a basis to offer an expert opinion
9  in this case that pharmaceutical distributors have the
10 ability to control what happens to prescription opioids
11 after they've been dispensed pursuant to a doctor's
12 prescription?
13   A. Again, I think I answered that.  I think those
14 things are tied.  I think a distributor has a
15 responsibility to track what happens to the prescription
16 after it's been dispensed, and in the case of finding a
17 suspicious or concerning situation, to intervene.
18   Q. In your own medical practice, have you ever
19 reported to a distributor which medications you've
20 prescribed and to whom?
21   A. No.
22   Q. Why not?
23   A. That's just not something I've ever done.
24   Q. Why not?
25   A. For the most part, I track my patients and their

23 (Pages 86 - 89)

HIGHLY CONFIDENTIAL

Page 90

1 use of the opioids that I prescribe extremely closely,
2 such that if there is diversion of any sort, it's very
3 minimal.  I catch it within the week because of the way
4 that I practice, and so I'm able to take care of that
5 situation.
6         And that is not, by the way, the standard of
7 care or it has not been the standard of care.  We're
8 trying to change that.  That's not the way that opioids
9 are commonly being prescribed and monitored.
10    Q.  Of the three types of diversion that you list in
11 romanette III on page 12, only one diversion before the
12 prescription is filled can occur when a distributor is in
13 physical possession of the prescription opioids; is that
14 right?
15    A.  Yes.
16         MR. MOONEY:  Let's take like a 15-minute break
17 and I will...
18         MR. ARBITBLIT:  Thank you.
19         THE WITNESS:  Thank you.
20         THE VIDEOGRAPHER:  Going off the record, the
21 time is 10:19 a.m.
22         (Recess.)
23         THE VIDEOGRAPHER:  Back on the record, the time
24 is 10:37 a.m.
25    Q.  BY MR. MOONEY:  Dr. Lembke, before the break,

Page 91

1 you testified that a distributor has a responsibility to
2 track what happens to the prescription after it's been
3 dispensed, and in the case of finding a suspicious or
4 concerning situation, to intervene.
5         Was that your testimony?
6    A.  Yes.
7    Q.  How is a distributor supposed to track an
8 individual prescription?
9    A.  There are other experts who will be testifying
10 on the legal responsibilities of distributors.  That's
11 not my role here.  But my opinion is that everybody in
12 the opioid supply chain has a responsibility, and the
13 unique responsibility of distributors is to scrutinize
14 and identify suspicious orders or an area of the country
15 or a pharmacy where it appears that the supply of opioids
16 is increasing beyond medical need.
17    Q.  You also said, though, before the break that a
18 distributor has a responsibility to track what happens to
19 the prescription after it has been dispensed.  My
20 question is:  How do they do that?
21    A.  I -- I can suggest ways that -- that they might
22 do that.  I think that's maybe more appropriate for
23 abatement.
24         Again, the scope of my expert testimony is
25 really about the impact of increased supply on the rates

Page 92

1 of addiction and overdose death, and the specifics of the
2 distributors responsibility from a legal perspective is
3 something that other experts will opine on.
4    Q.  So you don't have a proposal in your report as
5 to how a distributor is supposed to track individual
6 prescriptions after they've been dispensed; is that
7 correct?
8    A.  That's correct.
9    Q.  You said that you've never provided prescription
10 information to a distributor.  Have any of your
11 colleagues at Stanford?
12         MR. ARBITBLIT:  Object to form.
13         THE WITNESS:  I don't know.
14    Q.  BY MR. MOONEY:  You also said before the break
15 that you generally catch diversion within a week; is that
16 right?
17    A.  That's right.
18    Q.  How do you do that?
19    A.  We have a very high level of scrutiny and
20 stewardship in our clinic, informed by my awareness of
21 this problem and my understanding of the disease of
22 addiction.  So we dispense opioids on a weekly basis, and
23 patients come in every week, and we check the
24 prescription drug monitoring database in order to ensure
25 that they're not going to other prescribers to get the

Page 93

1 same or similar prescription or engaging in dangerous
2 co-prescribing that we weren't previously aware of.
3         We also get urine drug screens at every visit
4 early in our opioid prescribing relationship and then at
5 random intervals later, in order to ensure that the
6 patient is taking the opioid that we are prescribing to
7 them and is not taking other substances that are
8 prohibited through our patient-provider contract.
9         We have a patient-provider contract that we
10 discuss what is -- what the patient's responsibilities
11 are, what the provider's responsibilities are.
12         We also actively engage family members to gather
13 collateral information.  We regularly check the
14 electronic medical record to see what other types of
15 treatments or co-occurring medical problems the patient
16 may have received or is receiving.
17         So we have a very high level of scrutiny,
18 informed by regular monitoring, which, by the way, was
19 not the way that I was educated in medical school and
20 training.  That's something that I have implemented in my
21 practice over time in recognition of the fact that
22 patients can at any point deviate from taking their
23 opioid as prescribed because of the overwhelming pull of
24 opioid medications and the vulnerability that we all have
25 to misuse or become addicted to these medications.

24 (Pages 90 - 93)

HIGHLY CONFIDENTIAL

Page 94

1    Q.  So the high level of scrutiny that you have
2  implemented in your practice, do you consider those to be
3  best practices?
4    A.  I do, yeah.
5    Q.  And are those best practices practices that are
6  followed in the State of New York?
7        MR. ARBITBLIT:  Object to form.
8        THE WITNESS:  I would say in general across the
9  country, including New York, that those have not been
10  standard practices, primarily because defendants created
11  a climate in which opioids were considered effective,
12  safe, and in which we were taught that the risk of
13  addiction through a doctor's prescription is very rare,
14  less than 1 percent.
15        And because of that, doctors came to believe and
16  were educated to believe that they have -- they could
17  have very low levels of scrutiny, as long as they were
18  prescribing for a patient with a legitimate pain
19  condition, as if that conferred some kind of immunity to
20  the problems related to opioids.
21        A lot of my work is trying to implement the best
22  practices akin to what we do in our clinic and which
23  other clinics are doing now as well, as I alluded to
24  earlier in my conversation with the gynecologist in
25  Buffalo, New York.  But it will take an infusion of

Page 95

1  resources to provide the education and training and
2  medical infrastructure to implement best practices.
3    Q.  BY MR. MOONEY:  When you catch diversion, do you
4  alert authorities?
5        MR. ARBITBLIT:  Object to form.
6        THE WITNESS:  Our scrutiny is so close that when
7  I catch diversion in my patients -- and again, it's not
8  even that I have a certainty about diversion.  Patients
9  will seldom, if ever, admit to diversion.  But a way that
10  I might suspect division is, for example, I do a urine
11  drug screen and the urine drug screen does not detect the
12  opioid that I'm prescribing.  And then I'm very worried
13  that the patient is diverting that opioid.
14        Then I will have an informed discussion with
15  them, where I tell them about my concerns.  Typically the
16  patient will deny because that's the nature of the beast.
17        And then we will make modifications in the care
18  so that I can more closely steward that medication until
19  I have a level of certainty that the pill is not being
20  diverted.
21        If I can't obtain that level of certainty, then
22  I -- I don't prescribe that medication any longer.  I try
23  to find some kind of alternative treatment.
24    Q.  BY MR. MOONEY:  When you confirm diversion, do
25  you alert legal authorities to that diversion?

Page 96

1        MR. ARBITBLIT:  Object to form.
2        THE WITNESS:  I have not in my clinical
3  experience encountered diversion with such certainty that
4  I felt it was necessary to alert legal authorities.  I've
5  had suspicion for diversion and have acted on those
6  suspicions.
7    Q.  BY MR. MOONEY:  So when you find something
8  suspicious but can't confirm that it's suspicious, your
9  practice is to not report that suspected diversion; is
10  that right?
11    A.  That's right, because sometimes my suspicions
12  are unfounded.  So, for example, the urine drug screen
13  has a certain sensitivity and specificity which is not
14  100 percent accurate or, you know, maybe the patient
15  missed their dose for a legitimate reason, which they
16  then explained to me.
17        So a negative urine drug screen is evidence of
18  them not taking the medicine, but not because they're
19  diverting it, but because they forgot or they lost their
20  pills or what have you.
21        So, you know, I have to gather as much evidence
22  as I can to make an informed clinical judgment, but as
23  soon as there's evidence of any kind of suspiciousness, I
24  act on that immediately.  I discuss it with the patient,
25  I discuss it with their family members, I express the

Page 97

1  concern to my patient, and I change my prescribing.
2        MR. MOONEY:  Move to strike everything after
3  "that's right."
4    Q.  Dr. Lembke, the question was:  When you find
5  something suspicious but can't confirm that it's -- can't
6  confirm it's suspicious, your practice is to not report
7  that suspected diversion.
8        MR. ARBITBLIT:  Object to form.
9    Q.  BY MR. MOONEY:  Is that right?
10    A.  When I find something that's suspicious, my
11  practice is to report it to the patient, to report it to
12  concerned family members, to report it to my
13  interdisciplinary treatment team, to report it to the
14  dispensing pharmacist.  That is my standard practice.
15        I do not go to legal authorities because I have
16  never had occasion in which I was so convinced about
17  diversion that harmed -- that had the potential to harm a
18  large number of people, and I felt that I could contain
19  my -- what -- what -- what might be diversion within my
20  clinic by immediately changing my prescribing or my
21  intervention around that patient.
22    Q.  What threshold would you look for to be
23  convinced about diversion and harm that you would feel
24  the need to report it?
25        MR. ARBITBLIT:  Object to form.

25 (Pages 94 - 97)

HIGHLY CONFIDENTIAL

Page 98

1 THE WITNESS: It would depend on the
2 circumstances. These are judgment calls. But if I saw a
3 consistent repeated pattern of pills that I was
4 prescribing not being taken by my patient and ending up
5 with somebody else, I would report it.
6 Q. BY MR. MOONEY: You never called the police to
7 report diversion from your patients?
8 A. I am remembering a situation in which I was
9 discussing with police a case of diversion, but I don't
10 remember if I initiated the call or if somebody else did.
11 Q. Have you ever called the DEA to report diversion
12 from your patients?
13 A. No.
14 Q. Who is the last patient of yours who you had
15 suspicions was diverting opioids?
16 MR. ARBITBLIT: Object to form and invades
17 confidentiality.
18 THE WITNESS: Yeah, I can't talk about a
19 specific patient scenario.
20 Q. BY MR. MOONEY: What condition did the patient
21 have?
22 A. The patient had opioid use disorder, opioid
23 addiction.
24 Q. And was that patient with opioid use disorder
25 being prescribed opioids?

Page 99

1 A. Yes.
2 Q. Does every state have a medical board?
3 A. To my knowledge, yes.
4 Q. What's the New York medical board called?
5 A. New York State Medical Board.
6 Q. That's what it's called?
7 A. I believe so, yes.
8 Q. Is it true that doctors who -- or excuse me,
9 does the New York -- strike that. My microphone fell.
10 Does the New York Board of Medicine license
11 doctors?
12 A. Yes, I believe so. I believe they're a
13 licensing body as well as a monitoring organization.
14 Q. Does the State of New York also license doctors
15 who describe pain medications to prescribe those
16 medications?
17 MR. ARBITBLIT: Object to form.
18 THE WITNESS: There are multiple different
19 organizations involved in physician licensure. So the
20 State Board is -- is one of those, but when it comes
21 specifically to prescribing, the DEA is also involved.
22 Q. BY MR. MOONEY: So there's Board of Medicine
23 licensing and the DEA. Does the State of New York also
24 license prescribers to engage in controlled substance
25 activity?

Page 100

1 MR. ARBITBLIT: Object to form.
2 THE WITNESS: I'm not sure about the nuances of
3 New York State's rules and regulations regarding
4 licensure and prescribing privileges. If it's similar to
5 other states, then the Board is involved in licensure as
6 well as specifically the DEA is involved in granting
7 permission to prescribe controlled substances.
8 Q. BY MR. MOONEY: Does the New York Board of
9 Medicine have the power to investigate doctors?
10 A. Yes.
11 Q. Can it discipline doctors?
12 A. Yes.
13 Q. Can the Board of Medicine take away a doctor's
14 license?
15 A. Yes.
16 Q. If a doctor losses their medical license, can
17 they prescribe opioids?
18 A. No.
19 Q. They can't practice medicine at all in that
20 state; right?
21 A. That's right.
22 Q. Are you familiar with the Federation of State
23 Medical Boards?
24 A. Yes.
25 Q. What is the Federation of State Medical Boards?

Page 101

1 A. The Federation of State Medical Boards is the
2 umbrella organization for the individual State Medical
3 Boards.
4 Q. And is the New York State Medical Board a member
5 of the Federation of State Medical Boards?
6 A. I assume so.
7 Q. Are medical boards from all 50 states members of
8 the Federation?
9 A. I assume so, but I don't know for sure.
10 Q. Is CardinalHealth, McKesson, AmerisourceBergen
11 or Rochester Drug Co-op a member of the Federation of
12 State Medical Boards?
13 A. I don't believe so.
14 Q. As part of its work overseeing State Medical
15 Boards, did the Federation release model guidelines for
16 prescribing opioids?
17 A. Yes, they did.
18 Q. And when did the Federation first issue those
19 guidelines?
20 A. I do reference that in my report.
21 MR. MOONEY: You can take the time to look, but
22 you might look at page 26.
23 THE WITNESS: Thank you. I appreciate it.
24 So the Federation of State Medical Boards
25 published the book -- published a book. In 1998, the

26 (Pages 98 - 101)

HIGHLY CONFIDENTIAL

Page 102

1 Federation of State Medical Boards released a policy to
2 reassure doctors that they would not be prosecuted if
3 they prescribed even large amounts of opioids.  And then
4 they released a book in 2007 called "Responsible Opioid
5 Prescribing, a Physician's Guide."
6     Q.  BY MR. MOONEY:  Okay.
7     A.  Does that answer your question?
8     Q.  Sort of.
9         Did the DEA endorse the Federation's model
10 guidelines?
11     A.  I don't believe the DEA was involved in
12 endorsing the model guidelines.
13     Q.  Do you know if the DEA testified in support of
14 the Federation's model guidelines?
15     A.  If they did, I'm -- I'm not aware of that.
16     Q.  As part of the Federation's policy, did the
17 model guidelines reassure doctors that they would not be
18 prosecuted if they prescribed large amounts of opioids
19 for the treatment of pain?
20     A.  It is certainly true that through the
21 campaigning of the Pain and Policy Study Group from
22 Wisconsin, Drs. David Joranson and June Dahl, promoted by
23 the American Pain Society and funded indirectly by the
24 opioid manufacturers, that there was a lobbying campaign
25 during which Drs. Joranson and Dahl went to different

Page 103

1 state federation -- different State Medical Boards
2 encouraging them to pass laws and guidelines stating that
3 doctors who prescribed very high amounts of opioids would
4 not be -- would not be punished in any way, as long as
5 they were prescribing those opioids for the treatment of
6 pain.
7     Q.  So --
8     A.  Yes.  The answer to your question is "yes."
9     Q.  Right.  In romanette II you say:  "In 1998, the
10 Federation of State Medical Boards released a policy to
11 reassure doctors that they would not be prosecuted if
12 they prescribed even large amounts of opioids as long as
13 it was for the treatment of pain."
14         Did I read that correctly?
15     A.  Yes.
16     Q.  And that is an opinion that you hold?
17     A.  That's correct.
18     Q.  Did the Federation urge the State Medical Boards
19 to punish doctors for under-treating pain?
20     A.  Yes, they did.
21     Q.  Has the New York Board of Medicine ever punished
22 doctors for under-treating pain?
23     A.  I'm not aware of specific cases.
24     Q.  Are doctors afraid of being disciplined by their
25 State Medical Board and facing lawsuits if they don't

Page 104

1 prescribe opioids for their patients to address pain?
2     A.  That was true in the late 1990s and early aughts
3 through about 2012 or 2013.  I think that's less true
4 now.
5     Q.  Did the New York Board of Medicine implement the
6 Federation's model guidelines?
7     A.  I don't know.
8     Q.  Now, you mentioned a couple moments ago that the
9 Federation also published a book that promoted the use of
10 prescription opioids; is that right?
11     A.  That's right.
12     Q.  And what was the title of that book?
13     A.  Responsible Opioid Prescribing, a Physician's
14 Guide.
15     Q.  And when was that book released?
16     A.  2007.
17     Q.  Did CardinalHealth, McKesson, AmerisourceBergen
18 or Rochester Drug Co-op provide any funding for that
19 book?
20     A.  Not that I'm aware of.
21     Q.  The Federation didn't just publish the book
22 Responsible Opioid Prescribing, they distributed copies
23 to State Medical Boards; is that right?
24     A.  That's right.
25     Q.  And then the State Medical Boards distributed

Page 105

1 that book to its licensees?
2     A.  I don't know whether they distributed it for
3 free or if it was available for purchase, but it was
4 certainly available to their licensees.
5     Q.  So just so I make sure I understand, the
6 Federation of State Medical Boards of all of the State
7 Medical Boards published a treatment guideline and
8 published a book telling doctors that it's generally
9 accepted medical practice to prescribe the opioids as a
10 first-line treatment for chronic pain.
11         Is that accurate?
12     A.  So I have read the book Responsible Opioid
13 Prescribing, and I would say that it contains within it
14 many of the misleading promotional messages that I've
15 detailed here in my report, for example, that opioids are
16 an evidence-based treatment for chronic pain.  That is a
17 misleading message.  That the risk is low or that no dose
18 is too high, et cetera.
19         There is some good information in that book.
20 It's not all bad information.  But there's certainly
21 enough bad information in that book to make it suspect.
22     Q.  Okay.  So just focusing in on the question:  The
23 Federation of the State Medical Boards published
24 treatment guidelines and published a book telling doctors
25 that it's generally accepted medical practice to

27 (Pages 102 - 105)

HIGHLY CONFIDENTIAL

Page 106

1 prescribe opioids for chronic pain; is that right?
2    A.  That's right.
3    Q.  And is it your opinion that these guidelines
4 made the opioid epidemic worse?
5    A.  They contributed, yes.
6    Q.  And is that because the guidelines largely did
7 away with the restrictions that had previously existed on
8 how opioids were prescribed?
9    A.  It's a combination of doing away with the
10 Federation of State Medical Boards' level of scrutiny on
11 how doctors were prescribing opioids, condoning high
12 volume prescribing and high-dose prescribing.
13       But I think even more importantly, that book was
14 one of many pieces that really changed the culture around
15 opioid prescribing, such that prescribing very high doses
16 and very large volumes, even for minor and chronic pain
17 conditions, became normative in medicine.
18    Q.  Is the New York Medical Board still a member of
19 the Federation of State Medical Boards?
20    A.  I don't know.  I assume so, but I don't know.
21    Q.  Do you know if the New York Attorney General has
22 sued the Federation of State Medical Boards for
23 publishing guidelines that contributed to the opioid
24 epidemic?
25    A.  I'm not aware of that.

Page 107

1    Q.  Have you publicly condemned your colleagues on
2 State Medical Boards for promoting the model guidelines?
3    A.  Yes.
4    Q.  Where?
5    A.  I've given talks, and in my book, I talk about
6 the role of the Federation of State Medical Boards.  I
7 wouldn't say I've publicly condemned certain individual
8 colleagues, but as one brick, you know, in a larger, you
9 know, wall of this problem, the Federation of State
10 Medical Boards has played a role in contributing to the
11 opioid epidemic in the ways that I have just said and
12 also in the ways that I detail in my report.
13    Q.  Are you familiar with the Joint Commission on
14 Accreditation of Healthcare Organizations?
15    A.  Yes, I am.
16    Q.  It's often referred to as the Joint Commission?
17    A.  Yes.
18    Q.  What is the Joint Commission?
19    A.  The Joint Commission is a non-profit
20 organization that was designed to accredit hospitals to
21 ensure that patients are receiving a high level of care.
22 And hospitals and clinics are eager to get Joint
23 Commission accreditation in order to, for example, be
24 eligible for funds from Medicare and Medicaid.
25       So what the Joint Commission does is establish

Page 108

1 certain quality measures and how to meet those quality
2 measures, and hospitals and clinics who meet those
3 measures can be accredited by the Joint Commission and
4 get a kind of seal of approval, which is very important,
5 has been historically very important for healthcare
6 institutions.
7       And that seal of approval not only is a public
8 statement to the quality of their care, but again, also
9 makes them eligible for certain types of reimbursement.
10    Q.  And so does meeting those quality measures
11 depend on following the best practices that are
12 determined by the Joint Commission?
13    A.  Yes, meeting those quality measures is dependent
14 on following best practices determined by -- as
15 determined by the Joint Commission and as measured in the
16 way that the Joint Commission says they need to be
17 measured.
18    Q.  And has the Joint Commission introduced
19 standards for the treatment of pain?
20    A.  Yes.  In 2001, the Joint Commission made pain a
21 quality measure and implicitly suggested the ways in
22 which hospitals and clinics should implement that quality
23 measure.
24    Q.  And did the Joint Commission's quality measures
25 promote more liberal prescribing of opioids for pain?

Page 109

1    A.  Yes.  It was a combination not only of making
2 pain a quality measure, but also dispensing to hospitals
3 for a fee educational materials obtained from opioid
4 manufacturers on how that could be done.  And those --
5 those quote/unquote learning materials contained much of
6 the misinformation propagated by defendants that led to
7 this opioid epidemic, things like doctors who don't
8 prescribe opioids for pain are suffering from
9 quote/unquote opioid phobia and implied irrational fear
10 of opioids.
11       The idea that every pain patient can be assessed
12 using the pain scale from 1 to 10, and that should be
13 assessed using that pain scale, whether or not they
14 appear to have any kind of pain.
15       The misrepresentation of the risk of opioids,
16 including that patients -- that it's very rare for
17 patients to get addicted to opioids as long as they're
18 being prescribed by a doctor, when, in fact, there is
19 good evidence that predates this epidemic and has been
20 validated in ongoing research that the risk is actually
21 very common among patients treated for pain.  That's all
22 in my report.
23       MR. MOONEY:  Move to strike everything after
24 "yes."
25    Q.  My question was:  Did the Joint Commission's

28 (Pages 106 - 109)

HIGHLY CONFIDENTIAL

Page 110

1 quality measures promote more liberal prescribing of
2 opioids for pain?
3     A. Yes.
4     Q. And is it a practical effect of those standards
5 that hospitals had to follow them or risk losing
6 accreditation?
7     A. Yes, I believe that's true.
8     Q. Are you familiar with the concept of a vital
9 sign?
10     A. Yes, I am.
11     Q. What is a vital sign?
12     A. A vital sign is an objective measure of a
13 patient's health, including heart rate, breathing rate,
14 blood pressure and temperature.  Those four have been the
15 classic and enduring vital signs in medicine for decades.
16         The Joint Commission advocated pain measure and
17 the 1 to 10 pain scale as another way to -- as a way that
18 doctors should measure pain, and that pain should be like
19 the fifth vital sign.  That was the terminology.  I don't
20 think the Joint Commission invented that, but in their
21 collaboration with the American Pain Society and key
22 opinion leaders, came up with the idea of pain as the
23 fifth vital sign, and the Commission adopted and
24 disseminated that idea in order to meet their quality
25 measure.  So yes.

Page 111

1     Q. And what is the significance of treating pain as
2 a vital sign?
3     A. The significance of treating pain as a vital
4 sign is that any patient who walks through your office or
5 clinic or emergency room or hospital door for any reason
6 should have their pain assessed along with their blood
7 pressure, heart rate, temperature, et cetera, just as the
8 standard of care.
9         Unfortunately, there's no evidence to support
10 the use of the visual analog scale, or the 1 to 10 pain
11 scale, in terms of pain outcomes.  And in fact, data show
12 that asking patients to rate their pain on a scale from 1
13 to 10 just leads to more opioid prescribing and doesn't
14 improve pain outcomes.
15     Q. So did treating pain as a vital sign encourage
16 prescribing more opioids for pain?
17     A. Yes.
18     Q. Do patient satisfaction surveys influence
19 doctors to prescribe opioids more liberally?
20     A. Yes.
21     Q. How do they do that?
22     A. As I talk about in my report and also in my
23 book, doctors are kind of natural pleasers and natural
24 helpers, and they are very compassionate people, by and
25 large, and they want to help their patients.  And they're

Page 112

1 also eager to have their patients like them.  And so that
2 can make that dynamic between doctor and patient and
3 opioid prescribing very complicated.
4         Because opioids can be effective for pain in the
5 short-term, when doctors prescribe them, patients do
6 endorse significant, immediate relief, and that feels
7 really good for doctors.
8         And then that's -- the complexity there is added
9 to by the fact that many hospitals ask their patients to
10 rate their doctors on, you know, on how good they are, as
11 well as there are national surveys asking patients to
12 rate the hospital, did your hospital or your clinic do
13 everything in their power to address your pain.
14         And then those ratings are communicated back to
15 doctors, and if they're not good ratings, then doctors
16 really are called to task on why their patients are not
17 rating them highly, which can contribute to opioid
18 overprescribing.
19     Q. Have you quantified the impact that patient
20 satisfaction surveys have on doctors' decisions to
21 prescribe opioids?
22     A. What do you mean by "quantify"?
23     Q. Well, have you -- can you provide a percentage
24 of a doctor's decision making for which patient
25 satisfaction surveys played a role in prescribing

Page 113

1 opioids?
2     A. I can't quantify it numerically, but based on my
3 personal experience, my clinical experience, and also my
4 many conversations with doctors, patient satisfaction
5 surveys have played a big role.
6     Q. Are you aware that the DEA sets a quota on the
7 number of prescription opioids that can be manufactured
8 in a given year?
9     A. Yes.
10     Q. Do you agree that the DEA's quota impacts the
11 supply of opioids that are available?
12     A. I really think it's out of my area to opine on
13 that.  There will be other experts who will speak to
14 specific quotas and the legal obligations of
15 manufacturers vis-à-vis quotas.  That's not -- not really
16 my area.
17     Q. My question wasn't about the manufacturer's role
18 in the quota.  My question was just do you believe.  I
19 understand there may be other experts who are going to
20 opine on this.
21         My question:  Do you agree that the DEA quota
22 has an impact on the supply of prescription opioids that
23 are available in the market?
24         MR. ARBITBLIT:  Object to form.
25         THE WITNESS:  Yes.  That makes sense.

29 (Pages 110 - 113)

Page 114

1    Q.  BY MR. MOONEY:  Should the DEA's quota be lower?

2    A.  I don't feel that I really know enough about the

3  impact of quotas to be able to offer an opinion on that.

4    Q.  On page 58 of your report, you write that the

5  best evidence available shows that the risk of addiction

6  in patients taking opioids for chronic pain is between

7  10 percent and 30 percent.

8    Do you see that?

9    A.  Yes.

10    Q.  Assuming that those percentages are accurate,

11  what is the appropriate number of prescription opioids

12  that a distributor should ship to a pharmacy?

13    MR. ARBITBLIT:  Object to form.

14    THE WITNESS:  That's really outside -- those

15  calculations are outside of my expertise.

16    Q.  BY MR. MOONEY:  What percentage of Americans

17  have ever taken a prescription opioid as prescribed by a

18  doctor?

19    A.  So I do talk about that a little bit in my

20  report.  Let me refer to that section.

21    So in 2016, I coauthored an article on the use

22  of opioid agonist therapy in the treatment of opioid use

23  disorder, but as part of the quantitative analysis that

24  we did for this publication, we also assessed the

25  percentage of Medicare Part D enrollees who fill at least

Page 115

1  one opioid prescription in any given year, and we

2  calculated that more than 10 million Part D Medicare

3  enrollees are exposed to a prescription opioid in any

4  given year.

5    And the Medicare Part D sample is a good sample

6  because Medicare Part D recipients can be found across

7  the country.  So it's a very representative sample of the

8  US population.

9    And although I know that doesn't specifically

10  answer your question of what percentage of Americans have

11  ever taken a prescription opioid, it's a very large

12  number of individuals who have been prescribed an opioid.

13  I can't give you an exact percentage.

14    And this -- this data point conveys or

15  illustrates that we're talking about tens of millions of

16  Americans.

17    Q.  And in your opinion, is that tens of millions of

18  Americans number too high?

19    A.  Yes.

20    Q.  What should the number be?

21    MR. ARBITBLIT:  Object to form.

22    THE WITNESS:  It's hard for me to say at this

23  juncture what that number should be.  I think it should

24  be lower.  Exactly how much lower, I'm not sure, but I

25  think it is our responsibility both, you know, in the

Page 116

1  pharmaceutical opioid industry and in the medical

2  profession and representatives in Public Health and

3  across the nation, to try to zero in on what that lower

4  number should be.

5    Q.  BY MR. MOONEY:  Do you know if any of the

6  10 million Part D Medicare enrollees in your report had

7  their claims rejected?

8    A.  I don't know.  We did not analyze that.

9    Q.  Do you agree that heroin and fentanyl use in the

10  United States has increased over the past five years?

11    A.  Yes.

12    Q.  Is nonmedical prescription opioid use a

13  significant factor that contributed to the increase in

14  heroin and fentanyl use?

15    MR. ARBITBLIT:  Object to form.

16    THE WITNESS:  Both medical and nonmedical

17  have contributed to the use in heroin and illicit

18  fentanyl use.

19    Q.  BY MR. MOONEY:  What is "nonmedical prescription

20  opioid use"?

21    A.  Nonmedical opioid use means taking an opioid in

22  any way other than indicated by the doctor and by the

23  prescription.

24    Q.  Between medical and nonmedical prescription

25  opioid use, which one of those two has played a larger

Page 117

1  contribution in heroin and fentanyl use?

2    MR. ARBITBLIT:  Object to form.

3    THE WITNESS:  Both have played a very

4  significant role.  Legitimate prescription opioid use can

5  lead a patient to engage in nonmedical prescription

6  opioid use, which increases their risk 40-fold then of

7  progressing to heroin use, for the Compton 2016 article.

8    There's also good evidence via the McCabe 2017

9  reference in my report that medical use of prescription

10  opioids actually precedes nonmedical use, and that

11  nonmedical use followed by medical use in the McCabe 2019

12  article exacerbates the development of a substance use

13  disorder.

14    There's also the scenario in which people in the

15  last three decades, growing numbers have engaged in

16  nonmedical use because of diversion.  People who got

17  pills from a drug dealer or from a friend at school or

18  from grandma's medicine cabinet.  People who did not

19  interface at all with the medical community, which really

20  speaks to the oversupply of opioids broadly in our

21  society being a major factor in this epidemic.

22    Q.  The Muhuri report, though, said that 70 percent

23  of misusers used illegal drugs before they used opioids;

24  isn't that right?

25    A.  Go to that.

30 (Pages 114 - 117)

HIGHLY CONFIDENTIAL

Page 118

1    So as I state in my report, in a study based on
2  the National Survey of Drug Use and Health Data -- this
3  is page 96 of my report -- from 2002 to 2011, the
4  incidence of heroin use among people who reported prior
5  nonmedical use of prescription opioids was 19 times as
6  high as the incidence among persons who reported no
7  previous nonmedical use.
8    So that's an important data point to show the
9  clear association between nonmedical use of prescription
10 opioids and heroin use.  But this is also an incidence
11 study so it doesn't capture the full prevalence of
12 individuals who -- in the population who have an opioid
13 use disorder or use heroin.
14    So it's an important data point to show the
15 association between nonmedical use and heroin use, but
16 there's also a very strong association between medical
17 use and nonmedical use and then the progression to heroin
18 use.
19    If you look at page 86 of my report, McCabe
20 2017.  McCabe writes that:  "We found that the majority
21 of nonmedical users of prescription opioids involved a
22 history of medical use, and this finding should provide
23 some concern to health professionals who prescribe opioid
24 medications to adolescents, given the serious health
25 consequences associated with nonmedical use of

Page 119

1  prescription opioids."
2    So there is a very clear stepping-stone effect
3  from medical to nonmedical use to heroin use.  That's
4  not the only pathway.  There's also a pathway that begins
5  with nonmedical use, and that's become increasingly more
6  prevalent because of the increased supply, and that then
7  leads to heroin use.
8    So there's -- those -- those things are closely
9  intertwined.
10    I would also say that these pieces of evidence
11 from the peer-reviewed literature support my clinical
12 experience, in which I have had countless patients report
13 to me that their opioid addiction began with a
14 prescription from a well-intended healthcare provider for
15 the treatment of pain.
16    Q.  The Muhuri 2013 report found that more than
17 70 percent of heroin users started with illicit drugs
18 prior to their nonmedical prescription use; is that
19 right?
20    MR. ARBITBLIT:  Object to form.
21    THE WITNESS:  Could I see?  I don't have the
22 article right in front of me.  I believe you, but it
23 would be nice to look at the actual article.
24    MR. MOONEY:  Mark this as 4, I think.
25    (Exhibit 4, CBHSQ Date Review, SAMHSA, August

Page 120

1    2013, marked for identification.)
2    THE WITNESS:  Do you have a page that you quoted
3  from?
4    Q.  BY MR. MOONEY:  Yes.
5    First, can you identify what's been marked as
6  Exhibit 4 to your deposition?
7    A.  Yes.  This is Muhuri, "Associations of
8  Nonmedical Pain Reliever Use and Initiation of Heroin Use
9  in the United States."
10    Q.  Now if you would turn to the page that ends at
11 the bottom in 6042, Table 6.
12    A.  Uh-huh.
13    Q.  Just before we talk about that page, I just want
14 to clarify.  This Exhibit 4 is the report that you cite
15 in footnote 410 of your report?
16    A.  Yes.
17    Q.  Okay.  So Table 6 lays out the percentage
18 distribution of past-year nonmedical pain reliever use
19 among persons age 12 to 49 at risk for initiation of
20 nonmedical pain reliever use by prior drug use status.
21    Is that right?
22    A.  Uh-huh, uh-huh.
23    Q.  And under the "no heroin use prior to NMPR use,
24 is "NMPR" --
25    A.  Uh-huh.

Page 121

1    Q.  -- nonmedical pain reliever use?
2    A.  Uh-huh.
3    Q.  It says:  "Other illicit drug use" -- "drugs
4  used prior to NMPR use."
5    Do you see that?
6    A.  Uh-huh.
7    Q.  If you go to the right, under the column 2002 to
8  2011, it says 71.8 percent; is that right?
9    A.  Uh-huh.
10    Q.  And so does this table say that 71.8 of persons
11 who did not use heroin before using nonmedical pain
12 relievers -- or excuse me -- using pain relievers for
13 nonmedical use, were using other illicit drugs before
14 eliciting nonmedical pain reliever use?
15    A.  Yes, it does say that.
16    Q.  And then footnote 2, which follows other illicit
17 drugs, reads:  "Other illicit drugs include marijuana,
18 hashish, cocaine, including crack, hallucinogens and
19 inhalants."
20    Did I read that right?
21    A.  Yes.
22    Q.  Of all the people -- you can set that aside.
23    Of all the people who get an opioid prescription
24 from their doctor, how many go on to use heroin or
25 fentanyl?

31 (Pages 118 - 121)

HIGHLY CONFIDENTIAL

Page 122

1    A.  Well, that's a different question.
2    Q.  It is.
3    A.  That's based -- yeah.  So I think you've asked
4  that before.  The most reliable version of that -- let me
5  try to answer, again, we're better.
6        So the most reliable data show that
7  approximately 10 to 30 percent of patients treated with
8  an opioid for pain have some kind of opioid use disorder,
9  and it's the natural history of the disease of addiction
10  that patients will over time need more and more of that
11  opioid to get the same effect and that they will look for
12  cheaper and more readily available sources.
13        So when -- once people are addicted through a
14  prescription opioid, it is not uncommon for them to then
15  progress to heroin, and we do know that our heroin supply
16  has been adulterated by illicit fentanyl.
17        And so, you know, I don't have data exactly on
18  how many of those patients addicted through a
19  prescription progressed to heroin, but the odds ratios
20  from Compton 2016 show that they are 40 times more likely
21  to progress to heroin use having been exposed to a
22  prescription opioid.
23        And again, the McCabe and my own experience
24  suggests that a very large proportion of individuals who
25  have become addicted to heroin in the last 20 to 30 years

Page 123

1  started out with a prevention opioid.
2        There's also an article that I reference here
3  based on a survey study showing that three-quarters of
4  heroin users say that their first exposure to opioids was
5  a prescription opioid.  And that's page 96, Cicero, JAMA
6  Psychiatry 2014.
7        And I'll just read from that.  "In the 1960s,
8  80 percent of opioid users reported that their first
9  exposure to opioids was in the form of heroin.  By the
10  2000s, however, 75 percent of opioid users reported that
11  their first exposure to opioids was in the form of
12  prescription painkillers," really demonstrating a massive
13  paradigm shift in terms of the heroin users in this
14  country today compared to the 1960s.
15        MR. MOONEY:  Move to strike all of that.
16    Q.  Dr. Lembke, my question was:  How many people
17  who get opioid prescriptions from their doctor end up
18  going on to use heroin or fentanyl?
19        MR. ARBITBLIT:  Object to form.
20        THE WITNESS:  I couldn't give you an absolute
21  number.  I've tried to suggest an answer through
22  percentages.
23    Q.  BY MR. MOONEY:  So sitting here today, you
24  cannot provide a number of how many people who are
25  prescribed opioids by their doctor end up using heroin or

Page 124

1  fentanyl; is that correct?
2        MR. ARBITBLIT:  Object to form.
3        THE WITNESS:  Well, I did prescribe a number
4  that I think is very evidence based and reliable on what
5  percentage of patients prescribed an opioid by their
6  doctor for a legitimate pain condition will go on to
7  develop an opioid addiction, somewhere between 10 and
8  30 percent, which is very common.
9        And then if we extrapolate from that that we've
10  got tens of millions of Americans, you know, who are
11  exposed to opioids, you know, you could come up with a
12  number for that.
13    Q.  BY MR. MOONEY:  Can you come up with a number
14  for that sitting here today?
15    A.  I'd rather not give a specific number.  I think
16  the evidence is in my report and based on percentages.
17    Q.  So the answer is "no," today, sitting here, you
18  can't give a number?
19    A.  Yes, that's right.
20    Q.  On page 85 of your report in paragraph D, you
21  write:  "It is important to recognize that although many
22  of the communities hit hardest by the opioid epidemic
23  were already struggling with serious social and economic
24  problems, the sudden availability of easy access to
25  opioids, initially in prescription pill form, contributed

Page 125

1  to the economic and social devastation of many towns
2  across America."
3        Did I read that correctly?
4    A.  Yes.
5    Q.  You're not an economist, are you?
6    A.  No.
7    Q.  Are you a sociologist?
8    A.  Armchair sociologist?
9    Q.  Trained -- trained sociologist?
10    A.  I don't have any degrees in sociology, per se.
11    Q.  Have you done any independent analysis of
12  economic and social devastation across many towns in
13  America?
14    A.  No.
15    Q.  Have you done any independent analysis of the
16  causes of any economic and social devastation across many
17  towns in America?
18    A.  No.
19    Q.  Do you have any other opinions about
20  distributors that are not listed in your report, that you
21  intend to offer in this litigation?
22    A.  My opinions in the report as well as in my
23  testimony today are the opinions I intend to offer in
24  this litigation.
25    Q.  When we started this deposition, I handed you

32 (Pages 122 - 125)

HIGHLY CONFIDENTIAL

1 what was marked as Exhibit 1.
2       Do you remember that?
3     A.  Yes.
4     Q.  And you said Exhibit 1 was a -- or excuse me,
5 Exhibit 2.  I meant to say Exhibit 2.  I handed you
6 Exhibit 2.
7     A.  Yes.
8     Q.  And that was your report from your -- from this
9 case; is that right?
10     A.  Yes, that's correct.
11     Q.  And you have not referred to that report in the
12 course of answering your -- answering my questions during
13 today's deposition, that physical copy that is marked as
14 Exhibit 2; right?
15     A.  That's correct.
16     Q.  You came in with a binder today that includes
17 Post-It notes and notations?
18     A.  Yes.
19        MR. MOONEY:  I would like to mark that document
20 as Exhibit 5 to this deposition.
21        MR. ARBITBLIT:  No objection.
22        (Exhibit 5, Dr. Lembke binder, notes and
23        notations, marked for identification.)
24        MR. MOONEY:  We can take a break.
25        MR. ARBITBLIT:  Are you releasing the witness or

1 not?  You're just going to go think about it?
2        MR. MOONEY:  We've got to go see what that
3 document is.
4        MR. ARBITBLIT:  Fair enough.
5        THE VIDEOGRAPHER:  Going off the record, the
6 time is 11:27 a.m.
7        (Lunch recess.)
8        THE VIDEOGRAPHER:  Back on the record.  The time
9 is 12:16 p.m.
10        MR. MOONEY:  Dr. Lembke, I have no further
11 questions.  Thank you for your time.
12        THE WITNESS:  You're very welcome.
13             EXAMINATION
14     Q.  BY MR. CARTER:  Good afternoon, Dr. Lembke.
15     A.  Good afternoon.
16     Q.  My name is Ed Carter.  We have not met before,
17 but I represent Walmart, and I have some questions to you
18 today, okay?
19     A.  Yes.
20     Q.  Can you identify any false or misleading claim
21 about opioids made by one of the retail pharmacy
22 defendants in this case?
23     A.  No.
24     Q.  Are you aware of any marketing of opioids
25 conducted by any of the retail chain pharmacy defendants?

1     A.  No.
2     Q.  Are you aware of any pharmacy presenter at the
3 2001 CME that you attended?
4     A.  Not that I recall.
5     Q.  And am I correct in your report for this case,
6 you have not identified any marketing statements by
7 retail pharmacy defendants; correct?
8     A.  That's correct.
9     Q.  In preparing your report for this case, did you
10 consider any documents produced from the files of a
11 pharmacy defendant?
12     A.  No.
13     Q.  Have you reviewed the testimony of any employees
14 or witnesses from a pharmacy defendant in connection with
15 your work in this case?
16     A.  No.
17     Q.  Earlier today you had some comments regarding
18 the responsibility of pharmacists.  I want to follow up
19 on that, okay?
20        You mentioned that pharmacies also have a
21 responsibility in the opioid supply chain to make sure
22 that a patient customers are not being harmed by the
23 opioids that are dispensed.
24        Do you recall saying that?
25     A.  Yes, I do.

1     Q.  Okay.  Is that opinion reflected anywhere in
2 your report for this case?
3     A.  It's reflected broadly in my opinion that the
4 oversupply of opioids to Americans has been a major
5 contributor to this epidemic of addiction and overdose
6 death.
7     Q.  Does that specific claim or opinion, is that
8 noted anywhere in your report, the one that I just read
9 to you?
10     A.  I don't specify a pharmacy in my report.
11     Q.  And in your report, you do not mention any
12 pharmacy by name; correct?
13     A.  That is correct.
14     Q.  With respect to the statement you made this
15 morning regarding pharmacy responsibility to make sure
16 that patients are not being harmed by the opioids that
17 are dispensed, do you have any opinion in this case that
18 any of the pharmacy defendants did not comply with that
19 responsibility you articulated?
20     A.  I am aware based on reports in the lay press and
21 in other non-confidential documents and readings that I
22 have done that there are rogue pharmacies out there
23 dispensing very large quantities of opioids, far more
24 opioids than can be justified by the need for analgesia
25 in that community, and I don't know if any of those are

33 (Pages 126 - 129)

HIGHLY CONFIDENTIAL

1 either -- are Walgreens or Walmart.

2    Q.  Okay.  Do you know who the pharmacy defendants

3 are in the case brought by Nassau County?

4    A.  I believe Walgreens and Walmart are the pharmacy

5 defendants in the case brought by Nassau County.  CVS may

6 also be included, but I'm not sure.

7    Q.  All right.  Any other defendants that you're

8 aware of as defendants in the Nassau County case?

9    A.  No.

10    Q.  Do you know who the pharmacy defendants are in

11 the Suffolk County case?

12    A.  I believe it's the same pharmacies.

13    Q.  Okay.  Any evidence that Walgreens, Walmart or

14 CVS in Nassau County failed to comply with the

15 responsibility to ensure that their patients, customers,

16 were not being harmed by the opioids that they dispensed?

17    A.  I don't have knowledge of the specific

18 pharmacies in those counties.

19    Q.  Fair to say you have not conducted any

20 systematic analysis or review of pharmacy dispensing data

21 in Nassau County?

22    A.  Let me look at my report.  I have reviewed data

23 on page 17 as pertains to the morphine milligram

24 equivalents dispensed in the state of New York, including

25 Nassau and Suffolk Counties, as well as the duration of

1 prescriptions, namely, that in the state of New York,

2 opioid prescribing increased from 101 morphine milligram

3 equivalents in 1997 to 442 morphine milligram equivalents

4 by 2006, and again increased to 492 morphine milligram

5 equivalents per person in 2016, and this correlates with

6 the four-fold increase in opioid-related deaths in the

7 state of New York in that time period.

8    Also, the length of opioid prescriptions

9 increased during that time, going from 15 days in 2006 to

10 19 days of opioids in 2017.

11    I also have CDC data looking at the opioid

12 prescribing rates specifically in Nassau County, which

13 increased from 47 opioid prescriptions per 100 persons to

14 51 opioid prescriptions per 100 persons from 2006 to

15 2011.

16    And in Suffolk County, I reviewed data showing

17 that opioid prescriptions increased from 61 opioids per

18 100 persons to 70 prescriptions per 100 persons in 2011.

19    Those are data that I reviewed specifically

20 regarding opioid prescribing in Nassau and Suffolk County

21 and New York, in the state of New York.

22    Q.  Do you know, are any of those data sources

23 pharmacy dispensing data sources?

24    A.  I believe that the CDC data, the number of

25 opioid prescriptions per 100 persons is based on

1 pharmacy dispensing data.

2    Q.  Have you heard of ISOP?

3    A.  What does "ISOP" stand for?

4    Q.  I'm asking you.  Have you heard of that acronym?

5    A.  Oh.  I don't know the acronym.  I might know if

6 you tell me what it stands for.  It might ring a bell.

7    Q.  Have you reviewed the State of New York's PMP

8 drug data?

9    A.  Is that the prescription drug monitoring

10 database in the State of New York?

11    Q.  Yes.

12    A.  No, I have not.

13    Q.  And with respect to any specific pharmacy in

14 Nassau or Suffolk, have you analyzed their dispensing

15 history to determine whether that pharmacy has adequately

16 attended to the safety of their customers?

17    A.  No, I have not.

18    Q.  You also discussed earlier today the following

19 statement.  You said that pharmacists have a

20 responsibility to patients to ensure that the

21 prescription is appropriate, that it is a true

22 prescription, and that it is not a prescription that will

23 harm the patient.

24    Do you recall giving that testimony?

25    A.  Yes, I do.

1    Q.  Okay.  Is that -- are any of those statements

2 contained expressly in your report for this case?

3    A.  Not expressly in my report, no.

4    Q.  Do you know whether Walmart -- strike that.

5    Do you have any opinion whether Walmart

6 fulfilled its responsibility, as you described it, to

7 ensure that its patients had appropriate prescriptions,

8 true prescriptions, and prescriptions that would not harm

9 the patients?

10    A.  Yes, I do.

11    Q.  Okay.  And what is your opinion?

12    A.  I considered Walmart to be a critical actor in

13 the opioid supply chain, and the behavior of all the

14 defendants in the opioid supply chain contributed to the

15 oversupply that was the primary factor in driving the

16 current opioid epidemic.  So Walmart does bear some

17 responsibility in the epidemic.

18    MR. CARTER:  All right.  I'll respectfully move

19 to strike and reask my question.

20    Q.  Do you know whether Walmart fulfilled its

21 responsibility, as you described it, to ensure that

22 patients had appropriate prescriptions in Nassau County

23 or Suffolk County?

24    MR. ARBITBLIT:  Object to form.

25    THE WITNESS:  I believe that Walmart did not

34 (Pages 130 - 133)

HIGHLY CONFIDENTIAL

Page 134

1 fulfill its responsibility because Walmart is part of the
2 opioid supply chain.
3    Q.  BY MR. CARTER:  So what patient, either a name
4 or a case number, did Walmart fail to fulfill its
5 responsibility to ensure that it was an appropriate
6 prescription and a true prescription in Nassau and
7 Suffolk County?
8    A.  I don't have those details.
9    Q.  And where in your report do you articulate the
10 opinion that Walmart failed to fulfill its responsibility
11 in those regards?
12    A.  I don't specifically name Walmart in my report.
13    Q.  Same question with respect to Walgreens and CVS.
14    A.  Same answer.
15    Q.  Okay.  You also said that pharmacists have a
16 responsibility to check drug interactions and
17 indications.
18       Do you recall that?
19    A.  Yes, I do.
20    Q.  Is that opinion reflected anywhere in your
21 report?
22    A.  Not specifically.
23    Q.  And do you have any evidence that Walmart,
24 Walgreens or CVS failed to check drug interactions or
25 indications for any patient in Nassau or Suffolk County?

Page 135

1    A.  I -- pursuant to my prior response, I think that
2 applies here.  To the extent that Walmart, Walgreens or
3 CVS are key in the opioid supply chain, they bear some
4 responsibility for the opioid epidemic.  But I don't have
5 specific information on specific pharmacists in the
6 Suffolk or Nassau counties.
7    Q.  Did I -- what in my question led you to conclude
8 I was asking about responsibility?
9       MR. ARBITBLIT:  Object to form.
10       THE WITNESS:  Because your question was a
11 follow-up to my response earlier in the deposition where
12 I said that pharmacists bear some responsibility and that
13 there are precautions that pharmacists can make -- can
14 take.  Sorry.
15    Q.  BY MR. CARTER:  Do you have any understanding of
16 the role of community pharmacists as individual license
17 holders versus corporate policies for retail pharmacy or
18 pharmacy chains?  Is that an area of your expertise?
19    A.  I would say I'm more familiar with the
20 responsibilities of individual pharmacists, having
21 interacted with them over my 20-plus-year career.
22    Q.  Now, you also said that pharmacists play an
23 important role in educating patients about the risks and
24 benefits of medications.
25       Do you recall that?

Page 136

1    A.  Yes, I do.
2    Q.  Do you know how Walmart pharmacists performed
3 their role of educating patients about the risks and
4 benefits of prescription opioids in Nassau County or
5 Suffolk County?
6    A.  No.
7    Q.  Have you studied that for any pharmacy defendant
8 in the Nassau County or Suffolk County case?
9    A.  No, I haven't.
10    Q.  Do you have any knowledge of what information
11 pharmacists in Nassau County provide to patients at the
12 time of dispensing prescription opioids during the
13 relevant time periods for the Nassau County case?
14    A.  No.
15    Q.  Same question for Suffolk County pharmacists.
16    A.  Same answer.
17    Q.  You also testified that pharmacists have a
18 health-safety relationship with their patients.
19       Do you recall that?
20    A.  Yes.
21    Q.  Okay.  Do you have an opinion -- well, strike
22 that.
23       Does that statement appear anywhere in your
24 expert report for this case?
25    A.  I don't believe so, no.

Page 137

1    Q.  Do you have an opinion whether Walmart or any
2 pharmacy defendant violated in some way the health-safety
3 relationship with patients?
4    A.  Again, to the extent that pharmacists are an
5 important link in the opioid supply chain, and given the
6 data of overdose deaths and addiction in Nassau -- Nassau
7 and Suffolk counties, I think it's fair to say that every
8 member of that opioid supply chain failed to some extent
9 in their responsibilities vis-à-vis their patients and
10 the public in that community.
11    Q.  And does that opinion appear anywhere in your
12 report?
13    A.  Not specifically, but I do talk at length in my
14 report about supply of opioids and access to opioids as a
15 major risk factor for addiction to opioids.  I have an
16 entire section in my report called "The Tsunami Effect,"
17 which specifically refers to the rising tide of the
18 number of pills in the community, increasing access both
19 through legitimate and illicit means, putting the
20 population at risk.
21    Q.  Sitting here today, are you able to assign a
22 numeric value, either a percentage or a raw number, of
23 instances in which you contend a pharmacy defendant in
24 Nassau County failed to fulfill the health-safety
25 relationship with patient-customers?

35 (Pages 134 - 137)

HIGHLY CONFIDENTIAL

Page 138

1    A. I can't put a number on it, but I believe that
2 the pharmacies bear some -- some blame.
3    Q. Same question for Suffolk County.
4    A. Yeah, same answer.
5    Q. Do the doctors who wrote prescriptions in Nassau
6 County bear responsibility and some measure of blame?
7    A. Yes, they do.
8    Q. Same question for Suffolk.
9    A. Same answer.
10    Q. Okay. You also noted earlier that pharmacists
11 should be aware of the CDC guidelines that opioid should
12 not be used as first-line treatment.
13       Do you recall that?
14    A. Yes, I do.
15    Q. Do you know whether any Walmart pharmacist in
16 Nassau County was unaware of those CDC guidelines?
17    A. No, I don't have information at that level of
18 specificity.
19    Q. Any opinion that any pharmacist for any of the
20 pharmacy defendants in the Nassau or Suffolk County case
21 was unaware of the CDC guidelines?
22    A. I have no specific knowledge about that.
23    Q. You also mentioned that pharmacists should have
24 good old common sense.
25       Do you recall that?

Page 139

1    A. Yes, I do.
2    Q. Does that appear anywhere in your report?
3    A. No.
4    Q. Okay. Any evidence that a Walmart pharmacist in
5 Nassau County failed to exercise good old common sense?
6    A. As I answered before, the evidence as to the
7 absence of exercising good old-fashioned common sense is
8 the scourge of addiction and death due to prescription
9 opioids in those counties and in the state of New York
10 more broadly.
11    Q. Do you understand the pharmacy defendants are
12 not involved in the State of New York's case? Or do you
13 know that now that I said it?
14    A. So the defendants have changed, and so I -- I
15 haven't tracked exactly who's in what litigation. I'm
16 more broadly aware of the defendants as part of the
17 opioid supply chain.
18    Q. What aspect of common sense did a Walmart
19 pharmacist in Nassau County fail to exercise?
20    A. To the extent that there were pill mills in
21 Nassau and Suffolk County and a pharmacist filled
22 prescriptions for a pill mill doctor without trying to
23 make some effort to scrutinize or change the course of
24 that prescribing pattern, that pharmacist has
25 responsibility.

Page 140

1       To the extent that the pharmacists in Suffolk
2 and Nassau County were filling prescriptions for very
3 high doses of opioids or for very long duration or in
4 combination with benzodiazepines or in combination with
5 other sedative hypnotic-type drugs, increasing that
6 individual's risk of accidental overdose death, that
7 pharmacist had some responsibility.
8    Q. Do either of those scenarios appear anywhere in
9 your report?
10    A. Those scenarios are implied in my report in my
11 discussion of the problem of oversupply, the ways in
12 which healthcare providers were duped based on a
13 misrepresentation of the science regarding the safety and
14 efficacy of opioids.
15       The evidence that I've cited in my report and in
16 this deposition regarding the large increase of opioids
17 in Nassau and Suffolk Counties, data showing that an
18 increase in opioid prescribing in a given geographic
19 region correlate with increased rates of addiction and
20 overdose death in those counties, that's all implied.
21       Also, I would just say that in my greater body
22 of work, including in my book and other talks I've given
23 and other peer-reviewed literature that I've written, I
24 have talked at length about not the role of pharmacists
25 specifically, but the role in general of healthcare

Page 141

1 providers vis-à-vis the epidemic.
2    Q. Any other evidence that those hypotheticals
3 actually occurred in Nassau County at a Walmart pharmacy?
4    A. I don't have specifics on that, no.
5    Q. Same question for any of the pharmacy
6 defendants.
7    A. Same answer.
8    Q. And then same question for Suffolk County for
9 all pharmacy defendants.
10    A. Same answer.
11    Q. You mentioned -- and you've testified about it
12 before -- the idea of well-intentioned, well-meaning
13 physicians exercising their best medical judgement and
14 being duped.
15       Do you recall that?
16    A. Yes, I do.
17    Q. Is it fair to say that if a well-intentioned,
18 well-meaning physician who is setting out endeavoring to
19 exercise their best medical judgment under the
20 circumstances is duped, that there's no reason to think a
21 pharmacist would also -- that a pharmacist would not also
22 be duped?
23    A. Can you rephrase the question?
24    Q. Sure.
25       If doctors were duped, do you agree that

36 (Pages 138 - 141)

HIGHLY CONFIDENTIAL

Page 142

1 pharmacists were duped?
2     A. So I'm not familiar with the types of specific
3 continuing medical education that pharmacists receive.
4 It's not something that I've looked into or studied. But
5 I think it's plausible that if -- if doctors were duped,
6 pharmacists were also subject to the same kinds of
7 misinformation, but I really haven't studied that.
8     Q. Appreciating that you haven't studied the
9 continuing education requirements of pharmacists, based
10 on your experience as a licensed physician, do you have
11 any reason to believe that the substantive medical
12 training that a pharmacist receives is more robust than a
13 M.D.?
14     A. I really wouldn't want to offer an opinion on
15 whether or not it's more or less robust. To me, robust
16 is a vague term. I'm not really sure what you mean. And
17 also, as I said, I'm not familiar with the continuing
18 medical education or licensure training that pharmacists
19 receive.
20     Q. Do you think pharmacists receive more
21 substantive medical training than licensed doctors?
22     A. I feel like I answered that.
23     Q. So you don't know one way or the other?
24     A. I don't know.
25     Q. So it's possible that pharmacists actually have

Page 143

1 more in depth medical training than licensed physicians?
2     MR. ARBITBLIT:  Object to form.
3     THE WITNESS:  They would have a different type
4 of training, but it could be equally in depth.
5     Q. BY MR. CARTER:  Okay.  You also said earlier
6 that if someone -- if a pharmacist observed someone
7 intoxicated, that should play into the pharmacist's
8 decision making in determining whether to dispense.
9     Do you recall that?
10     A. Yes, I do.
11     Q. Any evidence that a pharmacy -- pharmacist at a
12 pharmacy defendant in Nassau County dispensed medication
13 to an intoxicated patient?
14     A. I have no specific knowledge of Nassau County in
15 that regard.
16     Q. Same question for Suffolk.
17     A. Same answer.
18     Q. Do you know how many pharmacies are in Nassau
19 County?
20     A. No.
21     Q. Do you know how many are in Suffolk County?
22     A. No.
23     Q. Do you know how many are in the state of New
24 York?
25     A. No.

Page 144

1     Q. Do you know what percentage of the pharmacy
2 market in Nassau County the pharmacy defendants
3 represent?
4     A. No, I do not.
5     Q. Same question for Suffolk.
6     A. Same answer.
7     Q. Have you conducted any analysis to determine
8 which pharmacies in Nassau County were filling too many
9 opioid prescriptions?
10     A. No, I haven't.
11     Q. Have you conducted any analysis to determine
12 which pharmacies in Suffolk County were filling too many
13 prescriptions?
14     A. No, I have not.
15     Q. Statewide, have you conducted any analysis to
16 determine which pharmacies in New York state were filling
17 too many prescriptions?
18     A. No.
19     Q. In exhibit -- I believe it's C to your report,
20 you provide a testimony rate schedule, and I just wanted
21 to ask you about your $800 per hour for trial testimony.
22     A. Uh-huh.
23     Q. When you travel, do you bill for your time as
24 well or only expenses?
25     A. You mean do I bill for travel time?

Page 145

1     Q. So when you travel to trial in this case, if you
2 testify, will you bill for your travel time?
3     A. I will bill to be reimbursed for my travel, and
4 I will bill for my travel time as well.
5     Q. If you hypothetically have to arrive in Long
6 Island on a Monday and you don't take the stand until
7 Wednesday, would you charge at your hourly rate for your
8 time waiting to testify on Monday and Tuesday?
9     MR. ARBITBLIT:  Object to form.
10     THE WITNESS:  No, I would not unless I spent
11 some portion of Monday or Tuesday working to prepare for
12 the trial.
13     Q. BY MR. CARTER:  Have you submitted any invoices
14 for the New York cases that have not been paid?
15     A. Yes.
16     Q. Okay.  Do you know the amount of unpaid pending
17 invoices?
18     A. No, I do not.
19     Q. Okay.  You were asked a question earlier
20 regarding the percentage of your income from your work
21 consulting and testifying in litigation versus your work
22 at Stanford.  You indicated you could not provide an
23 estimate.  I want to just follow up.
24     Do you know whether your consulting income was
25 more or less than 50 percent of your income last year?

37 (Pages 142 - 145)

HIGHLY CONFIDENTIAL

Page 146

1     A. I believe it was less, but it's not something
2 that I've actually sat down and added up and calculated.
3     Q. Okay.  Switching gears, I want to ask you about
4 addiction.
5        Do you agree that, at least in theory, all
6 addictions can be overcome?
7        MR. ARBITBLIT:  Object to form.
8        THE WITNESS:  So addiction is a disease, and
9 just like cancer, some cases of addiction are terminal
10 and some are curable or can go into remission for a
11 period of time.
12        I would say the same is true for addiction.
13 It's a chronic, relapsing and remitting disease.  Some
14 people with one course of treatment can be in remission
15 from their addiction for the rest of their lives, and
16 that can mean decades.
17        Other people, even with aggressive treatment,
18 may not be able to achieve remission and may, in fact,
19 die of their disease.
20     Q. BY MR. CARTER:  In your role as someone who
21 treats people with substance use disorders, have you ever
22 approached a treatment -- a treatment of a particular
23 patient and advised them that they would not be able to
24 overcome their addiction and the treatment would not
25 yield productive results?

Page 147

1        MR. ARBITBLIT:  Object to form.
2        THE WITNESS:  There's always room for hope.  You
3 know, I would never deprive a patient of hope.  Even if I
4 worked in a hospice setting where death was eminent,
5 there is still room for hope.
6        What I certainly would not do is recommend a
7 treatment that caused more harm than good, and I would be
8 very active in finding the best possible treatment for my
9 patient.
10     Q. BY MR. CARTER:  And it's fair to say that absent
11 some kind of involuntary commitment situation, putting
12 that aside, it's fair to say that in general, for a
13 patient to quit use of a substance, break a cycle of
14 addiction and achieve abstinence, that requires an
15 intentional act on their part to try and abstain?
16     A. So that -- that question -- the answer to that
17 question is nuanced because it's very clear that in the
18 disease of addiction, some patients lose their capacity
19 for voluntary choice, meaning that even when they deeply
20 desire to abstain from the substance, they're not able to
21 abstain. Hence a residential treatment setting for
22 chemical dependency or addiction is an appropriate
23 setting for the individual who's lost their capacity for
24 voluntary choice.
25     Q. And my question was meant to be a simpler one.

Page 148

1 Let me try it this way.
2        You are not able to quit on behalf of your
3 patients.
4        MR. ARBITBLIT:  Object to form.
5     Q. BY MR. CARTER:  True?
6        MR. ARBITBLIT:  Object to form.
7        THE WITNESS:  That is true.
8     Q. BY MR. CARTER:  You've never been able to get a
9 patient to quit against their will, absent some kind of
10 involuntary commitment setting?
11     A. Well, again, it's important to acknowledge that
12 the disease of addiction is actually a disease of the
13 will on some level.  And so when I treat addiction, I'm
14 trying to help a patient regain their ability for willful
15 choice.
16     Q. And to make a quit attempt, in the general
17 course, a patient needs sufficient internal motivation
18 and external support.  Fair?
19        MR. ARBITBLIT:  Object to form.
20     Q. BY MR. CARTER:  To make an attempt.
21     A. Uh-huh.  So I have seen cases of addiction where
22 the internal motivation is nonexistent, and yet external
23 encouragement can make it possible for that person to
24 abstain for a sufficient period of time such that they
25 can get their frontal lobe reengaged with their limbic

Page 149

1 system to be able to make a voluntary choice about their
2 consumption of that addictive substance.
3     Q. BY MR. CARTER:  What is DSM-5?
4     A. The Diagnostic and Statistic Manual of
5 Disorders, Fifth Edition.
6     Q. And how do you use that as a psychiatrist?
7     A. I use it with a grain of salt.  It is an
8 imperfect way to categorize mental illness.  It's also to
9 some extent a dictionary for communication among
10 healthcare providers.
11        I do use those criteria to make diagnoses, but I
12 also take other considerations into account in forming my
13 treatment plan.
14     Q. So you have used the criteria, the diagnostic
15 criteria and framework for an opioid use disorder as set
16 forth in DSM-5; correct?
17     A. Yes, I have used those criteria.
18     Q. And the fifth edition was published in 2013;
19 correct?
20     A. I believe so.
21     Q. It followed DSM-4-TR; correct?
22     A. Yes.
23     Q. And I believe you testified to this earlier, but
24 fair to say that if an opioid use disorder under the
25 framework articulated in DSM-5 includes a spectrum of use

38 (Pages 146 - 149)

HIGHLY CONFIDENTIAL

1 disorders?

2    A.  That's correct.

3    Q.  It ranges from mild, moderate to severe, for

4 those that have a use disorder?

5    A.  That is correct.

6    Q.  And is it fair to say that as a clinician

7 attempting a diagnosis of an opioid use disorder, you

8 want to see and you personally would expect a 360-degree

9 view of all the circumstances involved in making that

10 assessment of a patient?

11       MR. ARBITBLIT:  Object to form.

12       THE WITNESS:  Can you define what you mean by

13 360-degree view?

14    Q.  BY MR. CARTER:  So if you're approaching in a

15 clinical setting a potential diagnosis and you're

16 evaluating someone for an opioid use disorder, you want

17 to see and evaluate the full context that's available to

18 you in that setting?

19    A.  Yes, I would do that.

20    Q.  And you would consider all of the medical

21 history and data and patient evaluation available to you

22 as the clinician; correct?

23    A.  Yes, unless there was a piece of evidence that

24 was so glaring and obvious that I would not necessarily

25 be required to imminently rely on all the other pieces of

1 information, although I would still want to gather those

2 over time.  Which is to say I -- I may make a diagnosis

3 even absent a 360-degree view if there were -- was a data

4 point that made it very obvious.

5    Q.  Have you ever diagnosed a patient in a clinical

6 setting with an opioid use disorder based on aggregate

7 statistics in lieu of that patient's individual clinical

8 presentation?

9    A.  To some extent, yes.

10    Q.  So you have not conducted an analysis of a

11 patient, not figured out their substance use history,

12 their pattern, and run it through the criteria of DSM-5.

13 Instead of that, you've relied on aggregate statistics to

14 make a diagnosis.

15       Is that --

16       MR. ARBITBLIT:  Object to form.

17       THE WITNESS:  No, that's -- that's not correct.

18 I don't rely on aggregate statistics to make that

19 diagnosis.  But I do allow the reading of the science to

20 inform my interpretation of the specific clinical data

21 that I gather on a patient.

22    Q.  BY MR. CARTER:  You apply your clinical judgment

23 and medical training which includes all of the

24 constellation of factors that you've considered in the

25 course of your work and education; correct?

1    A.  I apply my clinical judgment with a healthy dose

2 of skepticism around the fact that much of the education

3 that I have received has been adulterated by corporate

4 interests.  And so I really have to do an extra due

5 diligence and dig deeper to know what the truth is.

6    Q.  Now, you testified earlier that data that shows

7 a range of 10 to 30 percent as a prevalence of somewhere

8 on the spectrum of an opioid use disorder for people

9 using opioids for chronic pain; correct?

10    A.  Yes.

11    Q.  I want to take the other end of that population.

12 So I want to use your 30 percent as the best data on the

13 high end and say, okay, so the other 70 percent, the

14 70 percent that aren't somewhere on the opioid use

15 disorder spectrum, is it fair to say that millions of

16 Americans have used opioids and not developed an opioid

17 use disorder?

18    A.  That's fair to say, except that you also want to

19 take into account the fact that they may be at ongoing

20 risk for developing an opioid use disorder, even if they

21 haven't developed it yet.

22       Furthermore, those individuals not meeting the

23 criteria for an opioid use disorder may nonetheless

24 suffer severe adverse medical consequences as a result of

25 their prolonged opioid therapy.

1       So it's essential that we, as healthcare

2 providers, do a careful risk-benefit assessment informed

3 by the unique patient history, as well as the evidence

4 showing that there is no robust or reliable data for

5 long-term efficacy of opioids and then enormous risk in

6 continuing opioids long-term.

7    Q.  But to the -- to the basic statistical point,

8 you agree that as a matter of arithmetic, there are

9 millions of Americans who have taken opioids for chronic

10 pain and not developed, to this point in time, some

11 version of an opioid use disorder?

12       MR. ARBITBLIT:  Object to form.

13       THE WITNESS:  Well, I agree as a matter of

14 statistics that there are millions of Americans who have

15 not necessarily developed an opioid use disorder, but

16 those individuals are still at high risk, and that's the

17 point that I'm trying to make.

18    Q.  BY MR. CARTER:  Okay.  Do you agree that there

19 are millions of Americans who have used opioids for

20 chronic pain and not gone on to take any kind of illegal

21 drug?

22    A.  Yes, I agree.

23    Q.  Do you agree that there are millions of

24 Americans who have taken opioids for chronic pain and not

25 committed any crime related to obtaining substances?

39 (Pages 150 - 153)

HIGHLY CONFIDENTIAL

Page 154

1    A.  Yes.
2        MR. CARTER:  Okay.  I'm going to mark as
3  Exhibit 6, a page from DSM-5.  This is the one I already
4  premarked.
5        (Exhibit 6, Opioid Use Disorder, DSM-5, page
6        543, marked for identification.)
7    Q.  BY MR. CARTER:  Now, after DSM provides the
8  criteria for diagnosis, it also includes statistics and
9  commentary about the framework for the various diagnoses
10 contained within it; correct?
11   A.  Yes.
12   Q.  And I want to ask you about the highlighted
13 language on page 543 under the heading "Prevalence."  The
14 first sentence:  "The 12-month prevalence of opioid use
15 disorder is approximately 0.37 percent among adults age
16 18 and older in the community population."
17       Did I read that correctly?
18   A.  Yes.
19   Q.  I want to read the next sentence.
20       MR. ARBITBLIT:  Before you do, I just want to
21 put an objection to the incomplete document that's being
22 provided.
23       MR. CARTER:  That's fine.
24       MR. ARBITBLIT:  And the lack of the references
25 that DSM-5 undoubtedly cites elsewhere in the document

Page 155

1  that you have not provided.
2    Q.  BY MR. CARTER:  Okay.  You have a copy of DSM-5,
3  Doctor; correct?
4    A.  I do.
5    Q.  The second sentence --
6    A.  But not right here with me.
7    Q.  Yes.
8        "This may be an underestimate because of the
9  large number of incarcerated individuals with opioid use
10 disorders."
11       Did I read that correctly?
12   A.  Uh-huh.
13   Q.  All right.  Then I want to read from the last
14 paragraph in that section that makes a comparison to
15 Europe.
16       "The 12-month prevalence of problem opioid use
17 in European countries in the community population ages 15
18 to 64 years is between 0.1 percent and 0.8 percent."
19       Did I read that correctly?
20   A.  Uh-huh.
21   Q.  The next sentence reads:  "The average
22 prevalence of problem opioid use in the European Union
23 and Norway is between 0.36 percent and 0.44 percent."
24       Did I read that correctly?
25   A.  Uh-huh.

Page 156

1    Q.  Is that a "yes"?
2    A.  Yes, you read that correct.
3    Q.  Now, when you look at the statistic DSM-5
4  quotes, the first one we read, the 0.37 percent that's an
5  American statistic, that falls within the 0.36 and 0.44
6  numbers that are the average prevalence for the European
7  Union and Norway; correct?
8    A.  Yes.
9    Q.  Okay.  Have you ever written to the American
10 Psychiatric Association suggesting revisions or
11 corrections to DSM-5?
12   A.  No, but it's a good idea.
13   Q.  Okay.  So do you dispute the numbers -- well,
14 let's take each of these in -- in part.
15       Do you dispute the 12-month prevalence of opioid
16 use disorder of 0.37 percent for Americans age 18 and
17 older?
18   A.  Can I read this document before I answer?
19   Q.  Sure.
20   A.  Okay.
21       (Interruption in proceedings.)
22       THE WITNESS:  Okay.  Yes.  Thank you.
23   Q.  BY MR. CARTER:  So my question is:  Do you
24 dispute the number in the first paragraph under
25 prevalence reported for 12-month prevalence in America?

Page 157

1    A.  So I would really like to see what they base
2  these numbers on.  That would be a good place to start.
3  And if I could review those, then I would have more to
4  say.
5        But in general, I -- I believe that reliable
6  sources quote about 2 to 4 million Americans have an
7  opioid use disorder in this country, with some reports as
8  high as 15 million Americans with opioid use disorder
9  when you included marginalized populations like
10 incarcerated individuals, which was not done for this
11 calculation.
12   Q.  Okay.  Thank you.
13   A.  Yeah.
14   Q.  You can put that aside.
15   A.  Okay.
16   Q.  Have you analyzed the medical examiner overdose
17 death data from Nassau County?  It's not in your list of
18 sources, but...
19   A.  Yes.  It's not in my list of sources, but I did
20 review the Keyes reports, which does analyze some
21 overdose death data, and I did include on page -- sorry,
22 let me find the page.
23   Q.  I'll withdraw the question and ask you a similar
24 one.
25   A.  Okay.

40 (Pages 154 - 157)

HIGHLY CONFIDENTIAL

Page 158

1    Q. Do you have an opinion in this case as to the
2  number or the identities of any particular case numbers
3  in Nassau County where a decedent was diagnosed with an
4  opioid use disorder?
5    A. No.
6    Q. Any such opinion for Suffolk County?
7    A. No.
8    Q. Are you able to look at the medical examiner's
9  chart of reported deaths and individually diagnose the
10  subjects referenced there with an opioid use disorder
11  during the course of their life?
12    A. Are you asking me if I have done that or if I
13  would be able to do that?
14    Q. So first question:  Have you?
15    A. I have not.
16    Q. And that applies to Suffolk County as well?
17    A. That's correct.
18    Q. Okay.  Looking at an autopsy report that lists
19  toxicology at time of death, does that information by
20  itself provide an individual's substance use history?
21    A. It might be indicative, but probably in and of
22  itself not sufficient.
23    Q. Is there a posthumous test for addiction or an
24  opioid use disorder?
25    A. So the diagnosis of addiction, there's no

Page 159

1  biological test for that.  There's not a brain scan or
2  blood test.  It's the accumulation of multiple sources of
3  evidence based on behaviors, but not just patient
4  self-report, other objective data of their behavior,
5  including potentially a coroner's report indicating what
6  substances were in their system at the time of death.
7    Q. Are you aware of any specific case in Nassau
8  County where an individual only ever used opioids as
9  directed under the care of a physician in the amount
10  directed and yet died of an overdose from that prescribed
11  opioid?
12    A. I'm not aware of cases like that in Suffolk or
13  Nassau counties, but I am aware of cases like that in my
14  own medical experience.
15    Q. Okay.  I want to ask you a couple questions
16  about materials you considered.
17      Have you interviewed any doctor practicing in
18  Nassau County for purposes of offering your opinions in
19  this case?
20    A. I haven't interviewed -- I haven't set out to
21  interview doctors specifically for the purposes of this
22  litigation, but I have traveled to New York and talked to
23  doctors who have experiences, and based on those
24  conversations, I have gathered knowledge about the
25  situation in New York.

Page 160

1    Q. To your knowledge, do any of the doctors that
2  you encountered in the setting you described practice in
3  Nassau County?
4    A. I don't know.
5    Q. Do you know whether any of those doctors
6  practice in Suffolk County?
7    A. I don't know.
8    Q. Okay.  Have you interviewed any employee of
9  Nassau County or Suffolk County for purposes of forming
10  your opinions in this case?
11    A. No.
12    Q. Have you interviewed any resident of Nassau
13  County or Suffolk County for purposes of forming your
14  opinions in this case?
15    A. No.
16    Q. Have you interviewed any law enforcement
17  personnel in Nassau County or Suffolk County for purposes
18  of forming your opinions in this case?
19    A. No.
20    Q. Have you interviewed any community pharmacists
21  in Nassau County or Suffolk County for purposes of
22  forming your opinions in this case?
23    A. No.
24    Q. And taking out the qualifier of purposes of
25  forming your opinion, have you ever interviewed a

Page 161

1  community pharmacist in Nassau County or Suffolk County,
2  to your knowledge?
3    A. No.
4    Q. Do you know how the opioid crisis in Nassau
5  County in 2020 compares to the situation in 2015?
6    A. So the opioid epidemic, including in the state
7  of New York, has heavily impacted the foster care system.
8    Q. And just to be clear, I want to just remind you
9  I'm only focused on Nassau County, and then I'll have a
10  separate question for Suffolk.
11    A. Okay.
12    Q. If that can guide your answer, I'd appreciate
13  it.
14    A. Okay.  Well, I don't have data specific to
15  Nassau or Suffolk County in my report and in my answer,
16  but I do have for the State of New York.
17    Q. Okay.  Since I'm not -- my client's not in the
18  New York case, I'll let others ask you about broader New
19  York data.
20    A. Okay.
21    Q. Switching gears, is it fair to say that the
22  majority of prescriptions for opioids in Nassau and
23  Suffolk County were made in good faith for a legitimate
24  medical purpose?
25      MR. ARBITBLIT:  Object to form.

41 (Pages 158 - 161)

Page 162

1    THE WITNESS:  I would not want to opine on
2  whether it was the majority or the minority of
3  prescription opioids that have -- I -- I -- it is both
4  the prescriptions made in good faith and prescriptions
5  made not in good faith that have contributed to the
6  opioid epidemic across this, country including in Suffolk
7  and Nassau County, which I do not believe are rare or
8  unusual or differ in any substantial way from the rest of
9  the United States.
10    Q.  BY MR. CARTER:  Without asking you to give a
11  qualitative comparison in terms of majority or minority,
12  do you agree that there are -- there were hundreds of
13  thousands of prescriptions for opioids in Nassau and
14  Suffolk counties that were made in good faith for a
15  legitimate medical purpose?
16    MR. ARBITBLIT:  Object to form.
17    THE WITNESS:  I would agree that many of the
18  prescriptions for opioids that actually led to harm, both
19  in individuals to whom they were prescribed as well as
20  other individuals who became exposed to opioids through
21  the oversupply, were made in good faith by the
22  prescribing physician.
23    Q.  BY MR. CARTER:  And there were also
24  prescriptions that did not lead to harm that were made in
25  good faith by the prescribing physician?

Page 163

1    A.  I think it's a minority of those prescriptions
2  that did not lead, that has not lead, that is not
3  continuing to lead to some degree of harm.
4    Q.  But they do exist?
5    A.  They do exist in very rare circumstances.
6    Q.  In this case, do you have an opinion as to any
7  specific number of prescriptions for opioids filled in
8  the Nassau or Suffolk County that were not for a
9  legitimate medical purpose?
10    MR. ARBITBLIT:  Object to form.
11    THE WITNESS:  I do not have a specific number.
12    Q.  BY MR. CARTER:  Do you have a specific
13  percentage?
14    MR. ARBITBLIT:  Object to form.
15    THE WITNESS:  Percentage wise, I would opine
16  that the large majority of prescriptions written for
17  opioids in Suffolk and Nassau County were not, in fact,
18  written for legitimate medical purposes, but not because
19  the physicians were -- were in any way practicing outside
20  of what they had been taught.  Let me rephrase that.
21    The majority of opioid prescriptions written in
22  those counties, as sort of broadly representing the
23  phenomenon in the United States, have been written for
24  what doctors thought was a legitimate purpose, but in
25  fact was not a legitimate purpose, that they were duped

Page 164

1  into believing that opioids are safe and effective
2  treatment, when, in fact, they are not safe and effective
3  for the purposes of chronic and minor pain conditions.
4    Q.  BY MR. CARTER:  Were such prescriptions, as you
5  described them, filled and dispensed by pharmacists
6  acting in good faith?
7    MR. ARBITBLIT:  Object to form.
8    THE WITNESS:  I would really have to look at the
9  specifics of the actions of a given pharmacy and a given
10  pharmacist to be able to make that determination.
11    Q.  BY MR. CARTER:  And you have not done that work
12  and therefore do not have any such opinion for this case.
13  Fair?
14    A.  Well, I do have an opinion, which I've
15  expressed, but I haven't done that specific work on a
16  specific pharmacy or a specific pharmacist in those
17  counties.
18    Q.  Sitting here today, can you tell me either a
19  number or percentage of prescriptions for opioids that
20  the pharmacy defendants in this case should have refused
21  to dispense in Nassau County?
22    A.  I think the way that you framed the question
23  simplifies the problem.  So it's not just a matter of
24  pharmacists refusing to fill a prescription; it's a
25  matter of pharmacists doing their due diligence to

Page 165

1  determine whether or not the risks outweigh the benefits
2  for a given prescription.  And I think in general, across
3  the opioid supply chain, that kind of due diligence has
4  been absent.
5    Q.  Let me reask my question.
6    Are you able to opine and provide either a
7  specific number or a specific percentage of prescriptions
8  for opioids that you believe a pharmacy defendant should
9  not have dispensed in Nassau County?
10    MR. ARBITBLIT:  Object to form.
11    THE WITNESS:  I'm not able to provide a specific
12  number or a specific percentage, but I have a qualifier,
13  if that's okay.
14    But, again, I do think that it's not as simple
15  as refusing to dispense.  And a large part of my work,
16  especially in the past three to four years, has
17  emphasized the need for compassionate tapers.  We have
18  created several generations of individuals, pain patients
19  who are now physiologically dependent on opioids and
20  should not be abruptly discontinued.
21    So I think an effective intervention here is not
22  simply to refuse to dispense, but it's to come together
23  and figure out how we can safely and compassionately care
24  for several generations of Americans who have suffered
25  iatrogenic harm.

42 (Pages 162 - 165)

HIGHLY CONFIDENTIAL

1    Q. BY MR. CARTER: Sitting here today, are you able
2  to provide an opinion regarding the number or a specific
3  percentage of prescriptions for opioids that a pharmacy
4  defendant should have refused to dispense in Suffolk
5  County?
6    A. Same answer as before.
7    Q. Okay. Have you ever worked with Dr. Judith
8  Prochaska?
9    A. Yes.
10   Q. Have you spoken to her about your testimony in
11 this case?
12   A. Not at any level of detail.
13   Q. Have you spoken to her about testifying in
14 trials on behalf of plaintiffs?
15   A. I may have mentioned that I've been retained as
16 an expert witness, but not -- not any specifics beyond
17 that.
18   Q. Are you familiar with Dr. Robert Proctor from
19 the history department at Stanford?
20   A. Yes.
21   Q. Have you ever spoken to him about testifying for
22 plaintiffs in litigation?
23   A. No.
24   Q. Okay. Have you spoken to him about your
25 opinions and work in the area of opioids?

1    A. No, I have not.
2    MR. CARTER: Those are all the questions I have,
3  time permitting. I'll just note for the record I do have
4  additional questions, and subject to the Court's
5  limitations, I have to tender the witness at this time.
6  So I just have an objection on that basis.
7    Thank you for your time, Doctor.
8    THE WITNESS: You're welcome.
9    THE VIDEOGRAPHER: Off the record again?
10   MR. CARTER: Yes, please.
11   THE VIDEOGRAPHER: Going off the record, the
12 time is 1:15 p.m.
13   (Recess.)
14   (Mr. Pyser leaves deposition room.)
15   THE VIDEOGRAPHER: Back on the record, the time
16 is 1:23 p.m.
17       EXAMINATION
18   Q. BY MR. TSAI: Good afternoon.
19   A. Good afternoon.
20   Q. Very good to see you again.
21   A. Likewise.
22   Q. One of these days we should chat more about your
23 Chinese language skills.
24   A. Uh-huh.
25   Q. So just diving right in, have you ever been

1  excluded by a Court from testifying as an expert
2  regarding marketing causation? That is, any effect
3  defendants' marketing efforts may have had on the supply
4  or sales of opioids?
5    A. I do believe in the MDL it was determined that I
6  do not have marketing expertise and so should not opine
7  on direct causation, but I would qualify that by saying
8  that I do have expertise on the extent to which
9  scientific evidence has informed or failed to inform the
10 marketing material of defendants in this case.
11   Q. And have you read the opinion excluding you from
12 offering those opinions?
13   MR. ARBITBLIT: Object to form. Vague, "those
14 opinions."
15   THE WITNESS: Yes. So could you --
16   Q. BY MR. TSAI: Those opinions that I've referred
17 to, that you've agreed that you have been excluded from
18 testifying as an expert about.
19   MR. ARBITBLIT: Object to form.
20   Do you have the order?
21   MR. TSAI: (Shakes head.)
22   THE WITNESS: So I guess could you repeat the
23 question?
24   Q. BY MR. TSAI: Yes.
25   Have you read the order that you referred to the

1  national MDL excluding you from testifying regarding
2  marketing conditions?
3    A. Yes, I have read that order. But I would say
4  that it --
5    MR. TSAI: You know, I think that we've got a
6  limited time. Let -- the admonition directly from the
7  Court is answer the question. Don't offer additional
8  opinions. So I'd like to move on.
9    Q. Do you have any degrees or training in
10 pharmacoeconomics?
11   A. No.
12   Q. Do you teach any courses on the econometrics of
13 sales or marketing?
14   A. No.
15   Q. Do you have any degrees or training in the
16 econometrics of sales or marketing?
17   A. No.
18   Q. Do you have any degrees or training in marketing
19 statistics?
20   A. No.
21   Q. Do you have any employment experience working in
22 the field of pharmaceutical marketing?
23   A. No.
24   Q. Do you belong to any professional associations
25 in the field of pharmaceutical marketing?

43 (Pages 166 - 169)

HIGHLY CONFIDENTIAL

1  A. No.
2  Q. Have you ever worked for the DA?
3     MR. ARBITBLIT:  The DA?
4  Q. BY MR. TSAI:  DEA.
5  A. No.
6  Q. Have you ever consulted for the DEA?
7  A. I have done some unpaid consulting for the DEA.
8  Q. Oh.  When was that?
9  A. That was just last week.
10  Q. Okay.  And what was the nature of that
11 consulting?
12  A. A DEA agent in Oakland who does undercover work
13 to try to figure out whether doctors in that area are
14 engaging in safe opioid prescribing consulted me about
15 what an evidence-based evaluation of a patient should
16 look like, and I spent about an hour on the phone with
17 him.
18  Q. Okay.  How many conversations did you have with
19 that DEA agent in Oakland?
20  A. One.
21  Q. Okay.  Other than that conversation, have you
22 consulted for the DEA?
23  A. No.
24  Q. Have you ever designed a suspicious order
25 monitoring program?

1  A. No.
2  Q. Do you hold yourself out as an expert in the
3  design or implementation of DEA registrant suspicious
4  order monitoring?
5  A. I think that I could offer an informed opinion
6  on what suspicious orders might look like based on my
7  clinical experience and my knowledge of addiction.
8  Q. Do you consider that informed opinion to be
9  expertise in the -- the design and implementation of a
10 DEA registrant's suspicious order monitoring systems?
11  A. I think as a front-line clinician working with
12 people with opioid addiction and as somebody who has
13 researched the opioid epidemic, I could be a useful
14 source of knowledge in designing such a system.
15  Q. Are you familiar with the concept of sameness in
16 the context of sales of generic medicines?
17  A. If by "sameness" you mean that drugs are
18 pharmacologically similar and act in a similar way.  Is
19 that what you mean by "sameness"?
20  Q. Is that your understanding of what that term
21 "sameness" means in the context of generic medicines?
22  A. That would be my guess as to what it means.
23  Q. Are you aware that makers of generic opioids did
24 not have a sales force for those generic medicines?
25  A. I am aware that makers of generic opioids did

1  not have a specific sales force for their generics, but
2  most of the opioid manufacturers' defendants in this case
3  had a combination of branded and generic opioids, and the
4  generic -- and the marketing that those defendants did
5  for their branded opioids augmented sales and influenced
6  sales in prescribing of their generic opioids.
7  Q. Are you aware of any -- can you identify any
8  defendant maker of generic opioids with a sales force in
9  New York?
10  A. I don't know specifics on their sales forces in
11 New York.  I would assume that all of the defendants have
12 deployed a sales force in New York state.
13  Q. Sorry.  I meant with respect to their portfolio
14 of generic medicine specifically.
15     MR. ARBITBLIT:  Object to form.
16     THE WITNESS:  Could you rephrase your question?
17  Q. BY MR. TSAI:  Sure.
18     Identify a defendant maker of generics that had
19 a sales force for those generic opioids in New York.
20  A. I am assuming, although I don't know for sure,
21 that all of the defendants had a sales force for opioids
22 in the state of New York.
23  Q. And by "opioids," you're referring to a sales
24 force for their branded products; correct?
25  A. Yes.  But as I said, their marketing for branded

1  products also impacted the sales of generics.
2  Q. You did no regression analysis to isolate the
3  impact on sales that any opioid marketing by any
4  individual defendant had on New York doctors and nurses;
5  is that correct?
6  A. I did no personal regression analysis.
7  Q. Okay.  You did not conduct any analysis to
8  isolate which individual prescribers in New York
9  purportedly relied upon any alleged marketing by any
10 individual defendant; correct?
11     MR. ARBITBLIT:  Object to form.
12     THE WITNESS:  On a national scale?
13  Q. BY MR. TSAI:  Again, answer the question.  I
14 limited this to New York.
15     MR. ARBITBLIT:  Object to form.
16     THE WITNESS:  I believe that most prescribers in
17 New York were the recipients of the misleading
18 promotional messages of opioid manufacturers in New York
19 state, and I base that on my discussions -- I base that
20 in part on my discussions with doctors in the state of
21 New York in my travels there.
22  Q. BY MR. TSAI:  You know, the directive from the
23 Court is you must be direct and not evade, answer the
24 question.  Otherwise, we'll be back here.
25     So I asked you very specifically about New York

44 (Pages 170 - 173)

HIGHLY CONFIDENTIAL

Page 174

1 and about individual prescribers and individual
2 defendants. So let me ask again, and if I could please
3 receive an answer to that question.
4        You did not conduct any analysis to isolate
5 which individual prescribers in New York purportedly
6 relied upon any alleged marketing by any individual
7 defendant; is that correct?
8        MR. ARBITBLIT: Object to form and object to
9 badgering and object to the precursor to the question.
10       THE WITNESS: I did not conduct individual
11 analysis of specific prescribers in the state of New
12 York.
13    Q. BY MR. TSAI: Did you conduct any actual survey
14 specific to New York regarding pharmaceutical marketing
15 that was seen or heard or otherwise communicated to
16 doctors or patients in New York?
17    A. I have had discussions with doctors in the state
18 of New York who have told me that they've been the
19 recipients of the same misleading promotional messages as
20 all the rest of us have for the past three decades and --
21 and also the statistics on addiction rates and deaths in
22 the state of New York mean that New York is not somehow a
23 exception on a national level in terms of this opioid
24 epidemic.
25       And so that leads me to conclude that

Page 175

1 prescribers in the state of New York were also duped in
2 terms of their understanding of the evidence base
3 regarding the use of opioids in the treatment of pain.
4    Q. And that wasn't my question.
5        So you conducted no comprehensive survey of
6 doctors and nurses in New York to understand what
7 marketing materials, if any, prescribers in New York
8 received from what individual defendant; is that correct?
9        MR. ARBITBLIT: Object to form.
10       THE WITNESS: I feel like I answered your
11 question to the best of my ability.
12    Q. BY MR. TSAI: So do you have a survey that you
13 can show us where you surveyed doctors and nurses in New
14 York regarding asking them for, for example,
15 Mallinckrodt, what specific marketing materials did you,
16 Dr. Smith in Nassau, receive from Mallinckrodt? Do you
17 have that to produce?
18       MR. ARBITBLIT: Object to form.
19       THE WITNESS: I don't have a survey at that
20 level of specificity.
21    Q. BY MR. TSAI: Okay. And just to confirm, even
22 though you've deleted Purdue from your report in this
23 case, in your opinion, do you still consider Purdue as a
24 contributor to the opioid situation in New York?
25    A. Yes, I do.

Page 176

1    Q. Have you done any analysis yourself quantifying
2 the contribution in your opinion of that company to the
3 opioid situation in New York?
4    A. I have not quantified the contribution, nor do I
5 think that it's my role to quantify the contribution.
6    Q. Okay. And you have not quantified the
7 contribution, nor do you believe it's your role to
8 quantify the contribution, with respect to any defendant
9 in this case.
10       Is that fair to say?
11       MR. ARBITBLIT: Object to form.
12       THE WITNESS: Well, I would quantify -- I would
13 quantify the contribution of the defendants in this case
14 by saying that without their actions, I believe the
15 opioid would not have occurred.
16    Q. BY MR. TSAI: Okay. So that's a general opinion
17 as to all defendants as a group, fair to say?
18    A. That's correct.
19    Q. So just to be clear, you have not done any
20 analysis yourself quantifying the contribution in your
21 opinion of any specific defendant business to the opioid
22 situation in New York; is that correct?
23    A. Yes.
24    Q. You believe that others, let's say outside the
25 circle of what you say is the opioid pharmaceutical

Page 177

1 industry, others bear some responsibility for the opioid
2 epidemic; is that correct?
3    A. That is correct.
4    Q. Okay. Can you show me where in your methodology
5 you quantified the extent to which those other persons
6 and entities bear responsibility for the opioid epidemic
7 in New York?
8        MR. ARBITBLIT: Object to form.
9        THE WITNESS: I don't specifically quantify the
10 responsibility of those other entities, but I do make it
11 very clear that the opioid pharmaceutical industry,
12 namely, the defendants, took advantage of some of the
13 structural problems inside medicine to leverage their
14 push for an increase in opioid prescribing.
15       And I do also make it clear that although others
16 are responsible, without the actions of the opioid
17 pharmaceutical industry, I do not believe this opioid
18 epidemic would have occurred, whereas those other
19 entities, their actions might still have occurred, and I
20 don't think it would have led to the crisis that we have
21 today.
22       In other words, the actions of defendants have
23 been instrumental.
24    Q. BY MR. TSAI: So let me complete this concept.
25       So in your methodology, there is no place you

45 (Pages 174 - 177)

HIGHLY CONFIDENTIAL

1 can point to, for example, where you quantify the extent
2 to which government policies caused or contributed to the
3 opioid epidemic in New York.
4     Is that fair to say?
5     MR. ARBITBLIT: Object to form, misstates the
6 record.
7     THE WITNESS: I don't specifically quantify, but
8 I do a lot of qualitative analysis and have done
9 qualitative analysis, both in the writing of my book and
10 in forming my opinion. And in my qualitative analysis, I
11 have apportioned responsibility, pivotal responsibility,
12 to the actions of the defendants.
13   Q. BY MR. TSAI: But no portion of your methodology
14 where you can point to where you quantify the degree of
15 responsibility that you would allocate to government
16 policies?
17     MR. ARBITBLIT: Object to form.
18     THE WITNESS: I don't give it a number, no.
19   Q. BY MR. TSAI: Okay. Same question with respect
20 to the extent to which managed care or reimbursement
21 policies caused or contributed to the opioid epidemic in
22 New York.
23     MR. ARBITBLIT: Object to form.
24     THE WITNESS: I don't give it a number, no.
25   Q. BY MR. TSAI: Same questions with respect to

1 quantifying the extent to which formulary coverage had an
2 impact on the opioid epidemic in New York.
3     MR. ARBITBLIT: Object to form.
4     THE WITNESS: So again, all of those
5 contributing factors that appear, as you were phrasing
6 the questions, to be separate from the actions of the
7 defendants were actually heavily influenced by the
8 lobbying efforts of the defendants.
9     So it's difficult for me to isolate and quantify
10 the contributing responsibility of those separate
11 factors, when those factors are not, in fact, separate
12 from the actions of the defendants. And I talk about
13 that in my report.
14   Q. BY MR. TSAI: Okay. So, again, just to ask the
15 question, I'm asking you to answer it.
16   A. Yeah.
17   Q. You did not isolate the extent to which, in your
18 opinion, formulary coverage was responsible for the
19 opioid epidemic in New York; is that correct?
20     MR. ARBITBLIT: Object to form.
21     THE WITNESS: So I didn't isolate it because I
22 don't believe it's isolateable. I believe that many of
23 these structural factors inside and outside of medicine
24 were, in fact, influenced by the opioid pharmaceutical
25 industry.

1   Q. BY MR. TSAI: Okay. You said many. I just want
2 to be clear.
3     Do you believe that every factor that you have
4 said others bear some responsibility for the opioid
5 epidemic, every contributing factor is attributable to
6 what you call the opioid pharmaceutical industry?
7     MR. ARBITBLIT: Object to form.
8     THE WITNESS: If not attributable, then actively
9 exploited by the defendants to increase the supply of
10 opioids.
11   Q. BY MR. TSAI: So let me just make the record and
12 continue.
13     Is there any part of your methodology you can
14 point to where you quantified the extent to which health
15 insurance companies dictated whether and which patient
16 was prescribed opioids and therefore contributed to the
17 opioid epidemic in New York?
18     MR. ARBITBLIT: Object to form.
19     THE WITNESS: So in my report, I do reference an
20 article on page 5 of the "Use of Opioid Agonist Therapy."
21 And this article specifically looks at opioid prescribing
22 among Medicare Part D patients and notes that at that
23 time, Medicare Part D, for example, did not cover
24 prescriptions for -- give me a moment -- methadone
25 maintenance in the treatment of opioid use disorder, and

1 that although Medicare Part D did cover
2 buprenorphine/naloxone for the treatment of opioid use
3 disorder, the whole message, or one of the major messages
4 of that article was to opine on the fact that what a --
5 what a third-party payor like Medicare will cover does
6 influence how that medication is prescribed.
7   Q. BY MR. TSAI: Okay. So let me switch gears and
8 let me make it a little more interesting.
9     Let me ask you just agree or disagree, in your
10 opinion.
11     So agree or disagree in your opinion with this
12 proposition: Proper assessment of the patient, proper
13 prescribing practices, periodic reevaluation of therapy,
14 and proper dispensing and storage are appropriate
15 measures to help limit abuse of opioid drugs.
16   A. Yes, those are appropriate measures, but
17 probably not in and of themselves sufficient.
18   Q. Same question. Agree or disagree in your
19 opinion with this proposition: Concerns about abuse,
20 addiction and diversion should not prevent the proper
21 management of pain?
22   A. Implied in your question is that the proper
23 management of pain involves prescribing opioids, and I
24 would say, especially when it comes to chronic pain, that
25 is not true, and that the proper management of chronic

46 (Pages 178 - 181)

HIGHLY CONFIDENTIAL

Page 182

1 pain would be expressly to avoid the prescribing of
2 opioids in the vast majority of cases.  Because the
3 evidence is very convincing that opioids used long-term
4 don't work and may even make the pain worse.
5       Q.  Okay.  Just to clarify, let's talk about the
6 specific context of prescribing an opioid for someone who
7 is showing long-term pain, telling her doctor she has
8 long-term pain.
9       In your opinion, would saying to a doctor,
10 "Concerns about abuse, addiction and diversion should not
11 prevent the proper management of pain," is that
12 misleading, in your opinion?
13       MR. ARBITBLIT:  Object to form.
14       THE WITNESS:  Yes, that is misleading in my
15 opinion, yeah.
16       Q.  BY MR. TSAI:  Okay.  Agree or disagree in your
17 opinion with this proposition:  The potential for these
18 risks of opioid addiction, abuse or misuse should not
19 prevent the prescribing of opioids for the proper
20 management of pain in any given patient?
21       MR. ARBITBLIT:  Object to form.
22       THE WITNESS:  I would really need you to qualify
23 your question regarding more specifically the nature of
24 the pain condition, the prognosis of the individual,
25 whether opioids were being recommended for short or

Page 183

1 long-term use.
2       But to more broadly respond, I do think that the
3 risk of opioid addiction and misuse should be front and
4 center in that healthcare provider's thoughts when
5 considering an opioid prescription.
6       Q.  BY MR. TSAI:  So is it fair to say -- this is my
7 understanding of your response, is that it depends on the
8 clinical context, things like the nature of the
9 condition, the prognosis of the specific patient, the
10 type of opioid, whether it's short-term, long-term, to --
11 to opine whether that statement that I just -- that
12 proposition that we just discussed, stating that to
13 doctors would be improper?
14       MR. ARBITBLIT:  Object to form.
15       THE WITNESS:  So the list of topics that you
16 listed are certainly important in the consideration of
17 prescribing opioids, but are not in and of themselves
18 sufficient.
19       The prescriber must also take into account the
20 broader context of the problems of abuse and diversion,
21 especially now in the United States, given the scourge of
22 addiction and death, the opioid epidemic.
23       So it's not just the individual care of that
24 patient, although very, very important.  We also have to
25 take into account the Public Health and population level

Page 184

1 health.  As well as -- as well as be able to form
2 judgment for how to prescribe the opioid based on true
3 and reliable scientific evidence.
4       Q.  BY MR. TSAI:  So let me just read that
5 proposition again.
6       The potential for these risks of opioid
7 addiction use or misuse should not prevent the
8 prescribing of opioids for the proper management of pain
9 in any given patient.
10       Do you think that that's an accurate statement?
11       MR. ARBITBLIT:  Object to form.
12       THE WITNESS:  Could you do me a favor?  Because
13 I want to make sure I accurately understand your
14 question.  Could you just say the proposition --
15       Q.  BY MR. TSAI:  Uh-huh, yes.
16       A.  That you want me to --
17       Q.  Yes.
18       A.  Okay.  Thank you.
19       Q.  The potential for these risks of opioid abuse,
20 addiction and misuse should not prevent the prescribing
21 of opioids for the proper management of pain in any given
22 patient?
23       MR. ARBITBLIT:  Object to form.
24       THE WITNESS:  I disagree with that.
25       Q.  BY MR. TSAI:  Okay.  If it were up to you, would

Page 185

1 you recommend that prescription opioid medications be
2 taken off the market?
3       A.  Of course not.
4       Q.  Okay.  Would you ban prescription opioids for
5 all pain conditions?
6       A.  Of course not.
7       Q.  Would you ban the prescription of opioid
8 medications for all pain conditions involving non-cancer
9 pain?
10       A.  Of course not.
11       Q.  Okay.  Would you recommend banning opioid
12 medications for the treatment of conditions involving
13 chronic non-cancer pain?
14       A.  Of course not.
15       Q.  Okay.  So again, agree or disagree with this
16 proposition:  There are some people for whom chronic
17 opioids for pain work?
18       A.  I would say the scenario in which chronic
19 opioids for chronic pain are more helpful than harmful is
20 a very rare scenario, and in my professional experience,
21 I have seen more harm than good come from chronic opioid
22 therapy, plus the evidence does not support the use of
23 opioids in the treatment of chronic pain.  All reliable
24 studies show that opioids are no better than Tylenol or
25 Ibuprofen, with many more incurred risks, and that the

47 (Pages 182 - 185)

HIGHLY CONFIDENTIAL

1 risk of addiction and overdose death increases with
2 increasing dose and duration of the opioid therapy.
3     Q.  All right.  This sounds a lot like commenting on
4 something I didn't ask.
5         Let me ask you very quickly again, do you
6 personally believe that there are people in the United
7 States and New York for whom chronic opioids work, for
8 which the benefit outweighs the harm?
9         MR. ARBITBLIT:  Objection.  And since counsel is
10 insisting on putting his preface before the question,
11 which is inappropriate, I'll put mine in, which is that
12 you've answered the question.  If you have anything to
13 add, you're free to do so.
14         THE WITNESS:  I do think I answered the
15 question.
16     Q.  BY MR. TSAI:  So is it a "yes," there are people
17 for whom chronic opioids work?
18         MR. ARBITBLIT:  Object to form.
19         THE WITNESS:  I am willing to consider the
20 possibility that there is a very small group of
21 individuals for whom the benefit of long-term opioids may
22 be slightly better than placebo.  But as time goes on, I
23 think the incurred risks for the vast majority of
24 individuals will outweigh any small, incremental benefit.
25     Q.  BY MR. TSAI:  Okay.  Along this line, here's a

1 slightly different question.
2         Do you agree or disagree in your opinion:  The
3 benefit of short-term opioid therapy is supported by
4 multiple clinical trials?
5     A.  So there are reliable trials showing opioids as
6 effective in treatment very short term for acute pain.
7 But there are also studies showing that even acute
8 exposure can lead to significant harm.
9         For example, in my report, I cite a study by
10 Shroeder, et al., showing that a single exposure to
11 opioids through a prescription from a dentist for young
12 people between the ages of 16 and 25, that approximately
13 6 percent of those individuals will go on to be diagnosed
14 with an opioid use disorder within that year.
15         My point only being, to be able to answer your
16 question completely, is that it's not as if the
17 short-term use of opioids is an entirely benign and
18 non-risky scenario.
19     Q.  Let's talk about evidence.  So do you -- in your
20 opinion, is there enough evidence to support the use of
21 opioids for some people presenting with chronic
22 non-cancer pain?
23         MR. ARBITBLIT:  Object to form.
24         THE WITNESS:  No, there's -- there's not
25 reliable evidence to --

1     Q.  BY MR. TSAI:  I said evidence, just any
2 evidence.
3         MR. ARBITBLIT:  Counsel, don't interrupt her
4 when she's answering.  Just Calm down and don't interrupt
5 her when she's answering.  You can comment when she's
6 done.
7         MR. TSAI:  I just wanted to clarify.
8         MR. ARBITBLIT:  You didn't want to clarify.  You
9 interrupted her.
10     Q.  BY MR. TSAI:  Since you interjected, I actually
11 intentionally framed it broadly so I just want to point
12 that out.
13         In your opinion, is there any evidence to
14 support the use of opioids for some people presenting
15 with chronic non-cancer pain?
16         MR. ARBITBLIT:  Object to form.
17         THE WITNESS:  I think there is some evidence
18 that there is a very small benefit in some people with
19 the use of opioids long-term, but most of the time that
20 benefit does not meet a clinically meaningful threshold.
21         I talk about in my report, Busse does a
22 metaanalysis looking at the efficacy of opioids long-term
23 in the treatment of pain and finds that there is -- when
24 all of that data is put together, no clinically
25 meaningful difference for those individuals compared to a

1 placebo and the risks incurred are obvious and great and
2 dose-dependent, increasing with dose duration.
3     Q.  BY MR. TSAI:  So we've heard the term "evidence
4 base," and I just want to see if we can clarify that for
5 our jury.  So let's give an example.
6         What if it works, opioid therapy works for
7 Mrs. Smith on Long Island, and she's been taking it for
8 several years, and it's proven to work in her case.
9         In your opinion, would that be an evidence-based
10 case that chronic opioid therapy works for Mrs. Smith?
11         MR. ARBITBLIT:  Object to form.
12         THE WITNESS:  So that's a really loaded question
13 because whether or not an opioid is working really
14 depends on who you ask.  And if you ask patients
15 themselves, they will often endorse that it is working,
16 when family members will report they're not getting out
17 of bed, they're not engaging in family life, they
18 complain that their pain is worse than ever.
19         So that -- I think therein lies the complexity
20 of this, that to rely on a patient's subjective account
21 alone is insufficient and often wildly inaccurate.
22         And I think the pain community in the United
23 States has widely acknowledged that subject -- subjective
24 reports of levels of pain is insufficient to assess the
25 efficacy of opioids in the treatment of chronic pain.

48 (Pages 186 - 189)

HIGHLY CONFIDENTIAL

1    The entire field of pain in the United States
2 has moved toward, for example, including function as well
3 as reports of pain relief in that assessment.
4    The Kaiser Washington Post Family Foundation
5 survey study cites that if you ask patients themselves
6 with chronic pain, who are on long-term opioid therapy,
7 whether or not they may be developing an addiction to
8 that opioid, 30 percent will endorse that they're worried
9 about that.  But when you ask their immediate family
10 members, 50 percent of their family members will endorse
11 that they're worried about that.
12    So there's this important gap between the
13 subjective experience of improvement and actual
14 improvement, and that is because opioids don't just work
15 on the new opioid receptor, they also work on the brain's
16 reward pathway.  So they're reinforcing for reasons that
17 have nothing to do with pain.
18    Q.  BY MR. TSAI:  Okay.  So I'm curious just to test
19 that.  The followup question, of course, is:  What if not
20 only Mrs. Smith herself, but also Dr. Jones, her doctor,
21 and her family members observed that the chronic opioid
22 therapy reduces her pain and does not have significant
23 side effects.
24    In your opinion, would you advise discontinuing
25 that course of therapy?

1    MR. ARBITBLIT:  Object to form.  Incomplete
2 hypothetical.
3    THE WITNESS:  I think there are rare instances
4 in which chronic opioid therapy for chronic pain may, in
5 fact, provide some small benefit.  But I would argue that
6 even in that context, intense vigilance and monitoring is
7 required and a constant reassessment of the risks,
8 benefits and alternatives.  Because at any point, that
9 could turn south, and what was previously beneficial may
10 not be.
11    But I also want to add to that, that the current
12 standard of care and monitoring procedures are not in
13 existence in this country right now, largely because of
14 the actions of defendants that persuaded prescribers that
15 they didn't really need to monitor because opioids were
16 so safe and patients wouldn't get addicted and there are
17 not problems and they work great and you can go as high
18 as you want.
19    Q.  So that intense vigilance and monitoring post
20 prescription that you advise, who does that?
21    MR. ARBITBLIT:  Object to form.
22    THE WITNESS:  That vigilance and monitoring, we
23 are all responsible for performing a level of vigilance
24 and monitoring which is within our professional scope and
25 domain.

1    So that includes prescribers, that includes
2 pharmacists, that includes pharmacies, that includes
3 distributors, that includes opioid manufacturers.
4    Q.  BY MR. TSAI:  Includes the patients themselves?
5    A.  It includes patients themselves.
6    Q.  It includes family members of patients?
7    A.  Although -- although I would say that patients
8 themselves come to us vulnerable and seeking help, and we
9 have a responsibility toward patients in pain, who are
10 incredibly vulnerable in that circumstance.
11    They rely on us to care for them, and that is
12 our responsibility.  It is not their responsibility to
13 figure out whether or not they've gotten addicted to an
14 opioid.
15    Q.  So I just want to be clear.  So in your opinion,
16 so let's say for Ms. Smith as an example.  Is it your
17 opinion that my client, Mallinckrodt, or another
18 defendant should be responsible for monitoring the signs
19 and symptoms of her post-prescription condition?
20    MR. ARBITBLIT:  Object to form.
21    THE WITNESS:  On some level, yes.
22    Q.  BY MR. TSAI:  What level?
23    A.  Well, if you are getting reports, if -- if your
24 client is getting reports that individuals are being
25 harmed by opioids, becoming dependent, getting started

1 and not being able to get off, engaging in obviously
2 addictive behavior, you have a responsibility to the
3 Public Health to do something about that.
4    Or if you are aware that the distributors that
5 ship your pills to small communities are, in fact,
6 distributing large volumes to tiny little towns that
7 could never possibly need that many pills in a billion
8 years, it's your responsibility to go to your distributor
9 colleagues and say, you know, what's going on here.
10    Q.  So a couple more questions about propositions I
11 just want to get your opinion on.
12    What about this proposition:  Abuse of opioids
13 can occur in the absence of true addiction and is
14 characterized by misuse for nonmedical purposes, often in
15 combination with other psychoactive substances?
16    A.  I'm sorry, it's not coming up on the screen the
17 way you said it.
18    Q.  I'll read the proposition again.  And just tell
19 me if you agree or disagree in your opinion.
20    Abuse of opioids can occur in the absence of
21 true addiction and is characterized by misuse for
22 nonmedical purposes, often in combination with other
23 psychoactive substances.
24    A.  I agree with that proposition.
25    Q.  Yeah.  What about this one:  Abuse and addiction

49 (Pages 190 - 193)

HIGHLY CONFIDENTIAL

1 are separate and distinct from physical dependence and
2 tolerance?
3        MR. ARBITBLIT: Object to form.
4        THE WITNESS: I believe that the distinction
5 that has been made between opioid addiction and opioid
6 dependence is primarily one of convenience for defendants
7 in this case, who tried to push the use of opioids to
8 doctors and their patients by claiming that dependence in
9 and of itself is a non-risky, non-harmful condition.
10       Q. BY MR. TSAI: So let me go back to that way I
11 stated it.
12       Abuse and addiction are separate and distinct
13 from physical dependence and tolerance.  In your opinion,
14 would stating that to doctors be improper?
15       MR. ARBITBLIT: Object to form.
16       THE WITNESS: I think that the division between
17 dependence and addiction that was made with the DSM-5 and
18 that is commonly taught is primarily an artificial
19 distinction to account for our iatrogenic crisis, and
20 that, in fact, the overlap between addiction and
21 dependence and the changes that occur in the brain in
22 those two conditions are characterized by significant
23 homology or similarity.
24       Q. BY MR. TSAI: Okay.  So you think it's
25 artificial, but do you think it's misleading or

1 inaccurate?
2        MR. ARBITBLIT: Object to form.
3        THE WITNESS: I think the promotional messages,
4 the teaching messages, the marketing messages of
5 defendants in this case have been extremely misleading
6 around dependence as a separate, distinct, and in their
7 opining, non-harmful condition.  Yes, I think that's been
8 a very misleading and artificial construct.
9        But now that we're there, now that we have tens
10 of millions of people who are dependent but not
11 necessarily meeting criteria for addiction because the
12 DSM-5 criteria made it very hard to diagnose addiction,
13 raising that bar, now we owe it to individuals to also
14 make this artificial distinction, to classify people as
15 either meeting DSM-5 criteria for addiction or meeting
16 dependence in isolation.
17       But phenomenologically, what's happening in the
18 brain is probably very similar.
19       Q. Okay.  Last one, I think.
20       Agree or disagree with this proposition: There
21 is no intrinsic limit to the analgesic effect of
22 hydromorphone.
23       MR. ARBITBLIT: Object to form.
24       MR. TSAI: I can spell it for you later.
25       THE WITNESS: This concept of no limit really

1 stems from the fact that people exposed to opioids
2 long-term develop tolerance and so invariably need a
3 higher dose to get the same effect.
4        So I believe that the intrinsic limit has to do
5 with the damage incurred by going to higher doses.
6        Q. BY MR. TSAI: Okay.  So that concept that I
7 stated, in your opinion, would stating that to doctors be
8 improper?
9        A. Yes.
10       Q. Okay.  So you talked about you're not licensed
11 to practice medicine in New York, but I just wanted to
12 kind of ask the followup question:  Have you ever treated
13 any person in New York?  And when I say "New York," I'm
14 talking about the state and the particular counties at
15 issue in this case.
16       Have you ever treated any person in New York for
17 any medical condition related to opioids?
18       A. I sometimes have patients who see me in
19 consultation in California who come from other states.  I
20 can't be -- I can't recall one having come from New York.
21       Q. Okay.  And so just to be clear, throughout your
22 career, since you've been licensed in, I think 1995,
23 you've practiced in the state of California?
24       A. That's correct.
25       Q. Okay.  Is your opinion in this case based on

1 evaluating the individual case of any specific person in
2 New York with an opioid addiction or overdose?
3        A. I don't believe so, no.
4        Q. Okay.  So in forming your opinion in this case,
5 you did not review any individual medical record
6 identifying any specific person in New York with an
7 opioid addiction or overdose; is that correct?
8        A. That is correct.
9        Q. Okay.  So, again, this is educating the jury.  A
10 medical record for a patient typically contains a section
11 for that individual patient's medical history, for
12 example; is that correct?
13       A. Yes.
14       Q. Okay.  So, for example, a patient's medical
15 record would have the information as to whether that
16 person had something like a previous diagnosis of a
17 substance use disorder or addiction; is that right?
18       A. It is well-known that the listing in the medical
19 record of diagnoses of addiction, including opioid use
20 disorder, undercount the actual cases.  And the reasons
21 for that are complicated, having to do with the lack of
22 training in medical school and residency on how to
23 diagnose addiction, as well as the enormous stigma
24 associated with those diagnoses, making prescribers
25 reluctant to put it in the medical record, even when they

50 (Pages 194 - 197)

HIGHLY CONFIDENTIAL

1 know that the diagnosis is present.  As well as patients
2 themselves being very reluctant to have that diagnosis in
3 the medical record, even in cases when they're getting
4 active treatment for opioid use disorder.
5       So -- so my point -- and this is, I think, an
6 important one to answer your question as best I can -- is
7 that when it comes to opioid misuse, overuse, and
8 addictive use, the medical record is more often than not
9 woefully incomplete.
10      Q.  So other components of a medical record would be
11 that doctors are trained to elicit, ask for, patients are
12 asked for input, provide, include family medical history;
13 correct?
14      A.  Yes.
15      Q.  Include medication history; correct?
16      A.  Yes.
17      Q.  Include treatment and diagnosis history;
18 correct?
19      A.  Yes.
20      Q.  Include review of systems; correct?
21      A.  Correct.
22      Q.  And what does "review of systems" mean?
23      A.  Review of systems is where you go through all
24 the major organ systems to see if a patient is having a
25 problem in another major organ system that may not be

1 directly relevant to the reason they are presenting in
2 your clinic, but is certainly relevant to their overall
3 medical treatment.
4       Q.  Okay.  So last time we talked, you had said, you
5 know, you'd been in practice since 1995, and I think you
6 had estimated you've seen approximately 40,000 patients
7 over the course of your career.
8       A.  (Nods head.)
9       Q.  I just want to ask:  Do you have any update to
10 that?
11      A.  No.
12      Q.  That remains your estimate of the number of
13 patients that you've seen in your career?
14      A.  Yeah.
15      Q.  And over the course of your career, you have
16 prescribed many different kinds of opioids, dating back
17 to 1995; correct?
18      MR. ARBITBLIT:  Object to form.
19      THE WITNESS:  Yes.
20      Q.  BY MR. TSAI:  All right.  And you've actually
21 prescribed nearly every kind of opioid; is that correct,
22 to your patients?
23      A.  I don't have a distinct memory, because it was
24 more than 20 years ago now, of what opioids I prescribed.
25 But I prescribed -- I was very junior.  I was in my

1 training and then I was in my residency.  So I prescribed
2 whatever -- whatever other people were prescribing, but
3 certainly plenty of hydrocodone, oxycodone and fentanyl
4 products.
5       Q.  Okay.  Do you have any basis to kind of not
6 think that you prescribed -- let me just ask it direct.
7       Did you prescribe short-acting opioids?
8       A.  Yes.
9       Q.  Did you prescribe long-acting opioids?
10      A.  Probably.
11      Q.  Did you prescribe both branded and generic
12 opioids?
13      A.  Probably.
14      Q.  Sitting here today, what is your best
15 recollection of the highest dose of an opioid that you
16 prescribed one of your patients?
17      A.  I don't have a recollection of the highest dose
18 that I prescribed.  I can tell you some of the highest
19 doses that I've seen in my patient population that others
20 are prescribing, but I don't have a recollection.
21      Q.  I just wondered if you remembered.  What
22 about -- I mean, you've estimated the number of patients
23 you've seen.  Can you estimate the number of times you
24 have prescribed an opioid to one of your patients?
25      MR. ARBITBLIT:  Objection.

1       THE WITNESS:  I really can't, and I continue to
2 prescribe opioids now, although just buprenorphine in the
3 treatment of opioid use disorder.
4       Q.  BY MR. TSAI:  Okay.  Well, is it safe to say
5 that since you've treated on the order of 40,000
6 patients, that the number of times you've prescribed an
7 opioid to one of your patients is in the thousands?
8       MR. ARBITBLIT:  Object to form.
9       THE WITNESS:  I think that's probably fair.
10      Q.  BY MR. TSAI:  And to the best of your
11 recollection, did you ever prescribe opioids to your
12 patients in combination with other drugs, in situations
13 where they were taking other drugs?
14      A.  On the inpatient setting, there's hardly a
15 patient who's just on one drug, so yes.
16      Q.  I'd like those agree or disagree.  So I'm going
17 to go back to some more, but it's a different topic.
18      So agree or disagree in your opinion:  In terms
19 of the treatment of pain, using pain medicine, each
20 individual's medication regimen should be personalized?
21      MR. ARBITBLIT:  Object to form.
22      THE WITNESS:  So, to me, that is a broad,
23 sweeping question that I would be reluctant to agree or
24 disagree on without specifics.
25      Q.  BY MR. TSAI:  So that affirmative statement "in

51 (Pages 198 - 201)

Page 202

1 the treatment of pain using pain medication, each
2 individual's medication regimen should be personalized,"
3 you're not -- you're not comfortable agreeing with that?
4        MR. ARBITBLIT:  Object to form.
5        THE WITNESS:  I -- I agree that medical
6 treatment should be personalized, but also needs to be
7 considered in the broader context of a Public Health
8 crisis.
9        Q.  BY MR. TSAI:  And in designing a medication
10 régime, personalizing it for a patient, whose -- who does
11 that?
12        MR ARBITBLIT:  Object to form.
13        THE WITNESS:  Well, that's a great question
14 because in the past 30 years, it's mainly been your
15 client who has designed that.  The work of the defendants
16 has been such a force in the way that pain is treated,
17 from the Joint Commission to the Federation of the State
18 Medical Boards to CME, that protocol is largely the
19 invention of defendants in this case.
20        Q.  BY MR. TSAI:  Here's another statement.  Agree
21 or disagree, in your opinion:  Opioids vary greatly in
22 their pharmacokinetic and pharmacodynamic profiles, which
23 in turn are influenced by route of administration and
24 individual tolerability.
25        MR. ARBITBLIT:  Object to form.

Page 203

1        THE WITNESS:  Opioids are similar and different
2 in many ways.  So there is variation between opioids in
3 the pharmacokinetics and pharmacodynamics, depending upon
4 the route of delivery.  But there are universal themes
5 for all opioids, including the way that they bind and
6 stimulate the opioid receptor, as well as the way that
7 they're rewarding in the dopamine reward pathway,
8 contributing to their addictive potential.
9        Q.  BY MR. TSAI:  Okay.  But ultimately, how about
10 this statement:  Comparing dosages across opioids and
11 individuals is challenging.
12        A.  Yes, I agree.
13        Q.  Okay.  How about this one:  Physicians should
14 individualize therapy based on a review of the patient's
15 potential risks, benefits, side effects and functional
16 assessments and monitor ongoing therapy accordingly.
17        MR. ARBITBLIT:  Object to form.
18        THE WITNESS:  I would qualify that by saying
19 that statement is true, but only when informed by a good
20 understanding of the evidence.
21        Q.  BY MR. TSAI:  Okay.
22        A.  For the benefit and risk of opioids.  And only
23 when that monitoring is done at an appropriate level of
24 vigilance to really be able to detect the harm.
25        And right now, we're not there in terms of the

Page 204

1 medical profession.  We need much more robust training,
2 and we need many more resources to create the kind of
3 medical infrastructure to make sure that safe prescribing
4 is happening and that benefits actually are outweighing
5 the risks and helping people who have become physically
6 dependent get off.
7        Q.  Right.  And so putting aside your view of the
8 state of medical training in the United States, in terms
9 of roles, do you agree that it is the role of the
10 prescribing physician to weigh the risks and benefits of
11 any pain medication when treating their individual
12 patient?
13        MR. ARBITBLIT:  Object to form.
14        THE WITNESS:  Healthcare providers, physicians,
15 nurse practitioners, other healthcare providers are not
16 working in a vacuum.  They have enormous pressures on
17 them to practice according to protocols and algorithms
18 implemented by a healthcare facility.  There are other
19 pressures that I've talked about in terms of patient
20 satisfaction surveys, et cetera.
21        So, yes, a physician needs to exercise his or
22 her best judgment, but that judgment needs to be informed
23 by the evidence, and it must be taken into account that
24 there are other pressures on physicians when it comes to
25 which medicine they choose to prescribe.

Page 205

1        So it's not always in their autonomous control.
2        Q.  BY MR. TSAI:  Okay.  Do you agree with this
3 statement:  Without more -- without detailed data
4 describing the clinical context, in particular the
5 severity of pain, it's difficult to accurately determine
6 medical appropriateness with respect to a prescription
7 for any given patient?
8        MR. ARBITBLIT:  Object to form.
9        THE WITNESS:  I disagree with that statement.
10        Q.  BY MR. TSAI:  Okay.  Well, can we agree that
11 physicians in New York appropriately prescribed opioids
12 in at least some circumstances?
13        A.  That's a big blanket statement that I would be
14 reluctant to agree to.
15        Q.  Is it your opinion that all doctors throughout
16 the state of New York who wrote prescriptions for opioid
17 medicines for their patients did so inappropriately?
18        A.  The vast majority, yes.
19        Q.  Okay.  The vast majority is different from all.
20        A.  Uh-huh.
21        Q.  Can you quantify it?
22        A.  There may be some rare instances in which opioid
23 prescribing was appropriate, but in the vast majority, I
24 and my medical colleagues across the country, including
25 the state of New York, have been describing opioids at

52 (Pages 202 - 205)

HIGHLY CONFIDENTIAL

Page 206

1 way too high doses for way too long.
2    Q. Well, we're going to be spending a lot of time
3 at trial, including the jury.  So can you put a number on
4 that?
5       MR. ARBITBLIT:  Object to form.
6    Q. BY MR. TSAI:  What, in your opinion, the
7 percentage of prescriptions by doctors in New York to
8 their patients that, in your opinion, were medically
9 inappropriate?
10       MR. ARBITBLIT:  Object to form.
11       THE WITNESS:  I have seen in my clinical
12 experience no cases of opioids at high doses for long
13 duration in which the benefits outweighed the risks, and
14 I've seen a lot of patients in my career.
15    Q. BY MR. TSAI:  Yeah.  So your answer, I just
16 heard, is your practice, and that's in California.  This
17 case is in New York.
18       So just to be clear:  Is your opinion in this
19 case based on reviewing any document enabling you to
20 identify a single actual doctor who prescribed a single
21 actual opioid pill to a single actual individual in
22 New York?
23       MR. ARBITBLIT:  Object to form.  Objection to
24 the prologue.
25       THE WITNESS:  I am aware of lay press reports of

Page 207

1 single individual doctors who prescribed single actual
2 opioid pills to single actual individuals in New York,
3 who were engaging in egregious overprescribing.
4    Q. BY MR. TSAI:  So these are reports in the
5 newspaper about pill mill doctors in New York?
6    A. That's right.
7    Q. Okay.  Other than that, can you give -- identify
8 any doctor who prescribed opioid medications to any
9 individuals in New York?
10    A. No.
11    Q. Okay.  Did you, in forming your opinion, ask for
12 information from the New York counties or from the New
13 York State regarding prescriptions that they determined
14 were medically improper?
15    A. Well, I have reviewed data on New York
16 prescribing, and it is here in my report.  I refer you to
17 page --
18    Q. Yeah, I think I know what you're -- it's the
19 Nassau County data prescribing data that you referenced.
20    A. That's correct.
21    Q. Okay.  So my question was a bit different.
22       So just let me ask this:  Is your opinion in
23 this case based on identifying concrete examples of
24 specific prescriptions of any opioids written in New York
25 that you believe, in your opinion, were medically

Page 208

1 unnecessary or inappropriate?
2    A. My opinion is not based on specific
3 prescriptions.  It's based on aggregate prescriptions.
4    Q. Okay.  Have you, in your practice, prescribed
5 any medically inappropriate prescriptions of opioids to
6 any of your patients?
7    A. Can you define "medically inappropriate"?
8    Q. I'd like to hear your definition.
9    A. Well, I think there are a couple ways to think
10 about how to define that.  Medically inappropriate might
11 be a scenario in which I know it's not the right
12 prescription for my patient and I prescribe it anyway.
13 And I have never engaged in that kind of practice.
14       But another form of medical inappropriateness is
15 where I believe that it's the appropriate prevention, but
16 I'm wrong.  But based on my belief, I prescribe the
17 prescription -- I prescribe that medication for my
18 patient.  I have engaged in that kind of error in my --
19 in my career, yes.
20    Q. So taking that definition, using that one.
21    A. The latter one?
22    Q. The latter one, yes.  How many times have you
23 prescribed a medically inappropriate prescription of an
24 opioid to your patients?
25    A. Well, as I testified previously, in the late

Page 209

1 1990s -- well, throughout the 1990s in my medical school
2 and residency training, I was engaging in inappropriate
3 opioid prescribing on a regular if not daily basis.
4 Because I was prescribing in a way that was informed by
5 the misleading promotional messages of defendants, and
6 the entire healthcare system at that point was hijacked
7 by Pharma.
8       Once I became a psychiatrist, opioid prescribing
9 was out of my scope of practice, although pain treatment
10 was not.  And then as I became more knowledgeable and
11 more invested in helping patients who had become
12 dependent or addicted to opioids, patients struggling
13 with chronic pain, and I began to research this area, I
14 got a courtesy faculty appointment in Stanford Department
15 of Pain Medicine, began to see patients in their clinics,
16 and then got the x-waiver certification to prescribe
17 buprenorphine for opioid addiction, then I resumed opioid
18 prescribing.
19       And in that context, I have made errors in
20 opioid prescribing, but I like to think those errors have
21 been few.
22    Q. Umm --
23    A. So well-intentioned errors, prescribing.  An
24 example might be thinking that a patient could steward a
25 seven-day supply of buprenorphine and discovering by

53 (Pages 206 - 209)

HIGHLY CONFIDENTIAL

Page 210

1 urine drug screen or prescription drug monitoring
2 database seven days later that no, in fact, they could
3 not.
4     Q.  Okay.  So let's talk about that example.  So
5 that's an example of diversion; right?
6     A.  Not necessarily.  So diversion means that -- as
7 you know -- just clarifying for the jury -- that the
8 pills make it to someone other than for whom they were
9 intended.  But a very common problem that can arise is
10 that patients misuse their own opioid prescription.
11        So most of the time in my clinical population,
12 it's their personal misuse of the prescription rather
13 than diversion, per se.
14        Because I can tell you most patients don't admit
15 to diversion unless it's been years in the past.  I
16 have -- I have had patients tell me about their diversion
17 activities, but usually not when they're under my care
18 and not with my prescription.  They don't do that.
19        They'll in -- in the process of recovery, talk
20 about prescriptions they received from another provider
21 in the past and diverted, which has been a good education
22 for me about diversion.
23     Q.  Well, can we agree that not every single opioid
24 medicine that one of the defendants made was diverted to
25 an illegal use?

Page 211

1     A.  Yes, we can agree.
2     Q.  Can we agree that not every single opioid
3 medicine that the defendant businesses made caused
4 someone to become addicted?
5     A.  Yes, we can agree to that.
6     Q.  Okay.  So you talked previously about examples,
7 instances in your practice where you realized that your
8 patients were giving away the opioid that you had
9 prescribed them to, you know, third parties, like
10 friends, family, to whom you did not prescribe the
11 opioid; is that right?
12     A.  Well, I want to qualify that answer.  I think I
13 would sharpen the accuracy of my response on that to
14 say -- and I did try to do this a little bit earlier in
15 the deposition -- that I have suspected in some rare
16 cases that diversion was occurring and made adjustments
17 accordingly, but it is not my clinical experience that
18 patients will openly admit to diversion such that it
19 becomes an obvious situation for involving, you know,
20 criminal justice, and that most of my knowledge from
21 patients about the diversion activities is diversion that
22 they have engaged in the distant past, after they're
23 already in recovery.
24     Q.  So these suspicious cases, for example, you
25 would get a tox screen that was inconsistent with

Page 212

1 properly using what you had prescribed; is that --
2     A.  Yes.
3     Q.  Okay.  So in -- and can you give a number as to
4 how many suspicious cases you -- over the course of your
5 career, that you've encountered in this way?
6     A.  I really can't give a number based on my
7 personal experience.  I don't tend to count like that,
8 and I wouldn't want to give you a number that was
9 inaccurate.
10     Q.  Well, could we say more than ten?
11        MR. ARBITBLIT:  Object to form.
12        THE WITNESS:  More than ten individual cases of
13 diversion?
14     Q.  BY MR. TSAI:  Where you suspected diversion in
15 your patients?
16     A.  We could probably say more than ten, yes.
17     Q.  More than a hundred?
18     A.  No, I wouldn't say more than a hundred.
19     Q.  Okay.  So when you had -- you suspected
20 diversion, how did you -- tell me how you acted to
21 counteract that suspicion, to counteract what you believe
22 was diversion?
23     A.  So I also want to qualify my prior statement
24 regarding your attempts to quantify my patient experience
25 around diversion.

Page 213

1        Diversion is not something that I was even aware
2 of or looked for or was trained to look for in medical
3 school or residency.  So in the '90s and early -- in the
4 '90s, when I was prescribing opioids as part of my role
5 as a resident or a physician in training, I didn't even
6 know what diversion meant.  Didn't have the first concept
7 about it.
8        It's really only since I've become an addiction
9 medicine specialist and I'm now running a clinic that I
10 appreciate what diversion is and have a checks and
11 balances in place to monitor, to the best of my ability,
12 what diversion is all about.  And I attribute that to the
13 lack of proper training that I got in this regard.
14        So, sorry, I just wanted to qualify that.
15     Q.  So among the checks and balances, for example,
16 did you cut off the -- stop the prescription to that
17 particular patient?  I just want to know what you do.
18     A.  Yeah.  So it depends on the individual patient.
19 And again, these aren't obvious cases of diversion where
20 these -- you know, these aren't like people who are
21 running a drug business.  This is most often -- or I
22 would say all of my patients who I am aware of may have
23 engaged in some level of diversion, I had a suspicion for
24 it.  It was not confirmed.
25        But the first order of business is to discuss

54 (Pages 210 - 213)

HIGHLY CONFIDENTIAL

Page 214

1 with the patient that I'm concerned about diversion or
2 misuse, to ask them whether or not they can verify that
3 that behavior is happening.
4      Patients will typically -- will often admit to a
5 misuse problem.  Will not typically admit to a diversion
6 problem.
7      And then what I will typically do is talk about
8 alternative treatment strategies.  You know, this is not
9 working for you.  We need to think of a higher level of
10 care or another intervention of some sort.  And there are
11 myriad treatments for opioid addiction.
12      So I will then begin to steer them in that
13 direction.
14      Q.  Okay.  So in any of these, say, double-digit
15 instances where you suspected diversion, did you need
16 Mallinckrodt or any defendant to detect and counteract
17 that diversion for your patient?
18      MR. ARBITBLIT:  Object to form.
19      THE WITNESS:  I mean, Mallinckrodt is the reason
20 that, you know, the opioid epidemic, this problem is on
21 my doorstep in the first place.  Without Mallinckrodt, I
22 probably wouldn't be an addiction specialist.
23      Q.  BY MR. TSAI:  I'm talking about your checks and
24 balances for your patients.  Did you call Mallinckrodt
25 and did you need them to do that?

Page 215

1      MR. ARBITBLIT:  Object to form.
2      Q.  BY MR. TSAI:  To take that action?
3      A.  To take what action?
4      Q.  To detect the addiction of your patient and then
5 to take an action to check and balance that?
6      MR. ARBITBLIT:  Object to form.
7      THE WITNESS:  That would be great if
8 Mallinckrodt wanted to get involved in creating an
9 infrastructure to help with that.  I think that isn't
10 beyond the scope of what might be reasonable for somebody
11 who manufactures opioids.
12      Q.  BY MR. TSAI:  I'm saying in your history, you
13 had this practice, you had these patients --
14      A.  Yes.
15      Q.  -- was Mallinckrodt involved, any defendant?
16      MR. ARBITBLIT:  Object to form.
17      THE WITNESS:  Not directly involved, but
18 indirectly involved in the way I described.
19      MR. ARBITBLIT:  Let's take a break.
20      MR. TSAI:  Okay.
21      THE VIDEOGRAPHER:  Going off the record, the
22 time is 2:31 p.m.
23      (Recess.)
24      THE VIDEOGRAPHER:  Back on the record, the time
25 is 2:48 p.m.

Page 216

1      Q.  BY MR. TSAI:  So let's take -- take up where we
2 were talking about, so let's take the example of one of
3 your actual patients, you had a suspicion that he or she
4 was diverting the opioids that you had prescribed.  For
5 example, you did a urine tox screen, it wasn't consistent
6 with his taking the regimen.
7      In any of those instances where you suspected
8 diversion, did you report that to the police or any
9 other -- any other authority?
10      MR. ARBITBLIT:  Object to form.
11      THE WITNESS:  So the suspicion for diversion
12 when a urine drug screen is negative must be included in
13 the differential diagnosis for that negative drug screen
14 in a patient who's being prescribed an opioid.  But it's
15 not the only thing that may be going on.
16      As I said before, it could be an honest error.
17 It could be an inaccuracy in the drug test itself,
18 necessitating confirmatory testing in some cases.  It
19 could be even misuse on the part of that individual, for
20 example, taking more of the drug than prescribed and then
21 running out early, and hence not having any drug in their
22 system at the time.
23      So I have never been in a situation where my
24 threshold of suspicion regarding diversion was enough to
25 motivate me to involve anybody else except for the

Page 217

1 patient and their immediate team, in some instances,
2 including family members, and also to prompt me to change
3 my care of that individual.
4      Q.  BY MR. TSAI:  Okay.
5      A.  So I always do something.
6      Q.  Yeah.
7      A.  But I have never been in a situation where
8 the -- the -- I was so convinced that diversion was
9 occurring that I then felt it needed to be reported to an
10 outside entity.
11      Q.  Okay.  So in other words, the suspicion of
12 illegal diversion could be a false positive?
13      A.  That is true.
14      Q.  All right.  It is not easy to ascertain whether
15 a suspicion of diversion, in fact, equals actual illegal
16 activity.  Agree?
17      MR. ARBITBLIT:  Object to form.  Object to form.
18      THE WITNESS:  You'll note that I said that even
19 in the absence of knowing for sure whether diversion is
20 taking place, I assume on some level that it could be and
21 I take action in response.  And that's very important
22 piece, that I don't say, oh, well, it might be happening,
23 but I'm not sure so I'm just going to continue business
24 as usual.  I don't do that.
25      Q.  BY MR. TSAI:  So in that example, at the ground

55 (Pages 214 - 217)

HIGHLY CONFIDENTIAL

Page 218

1 level when you had a suspicion of diversion, Mallinckrodt
2 or any of the defendant business -- businesses, they
3 wouldn't have known about that situation because you
4 didn't report it out.
5      Do you agree?
6      MR. ARBITBLIT:  Object to form.
7      Q.  BY MR. TSAI:  That particular instance of
8 suspected diversion?
9      MR. ARBITBLIT:  Object to form.
10      THE WITNESS:  Mallinckrodt would not have known
11 about that suspected diversion necessarily unless that
12 diversion was happening at such a high rate among so many
13 providers that it was contributing to a serious Public
14 Health problem in my community, at which point the death
15 and addiction statistics should be sufficient to alert
16 Mallinckrodt that a diversion problem is taking place.
17      Q.  BY MR. TSAI:  So in that instance -- let's talk
18 about this example of your actual patient -- you agree
19 you were in a better position compared to a Mallinckrodt
20 or any of the other defendant businesses here to detect
21 that instance of diversion?
22      MR. ARBITBLIT:  Object to form.
23      THE WITNESS:  I think you could make the
24 opposite argument, that, in fact, Mallinckrodt, which has
25 access to the ARCOS database that I, an individual

Page 219

1 front-line clinician don't have access to and don't know
2 about, would be in a better position to detect population
3 level diversion than I as an individual practitioner
4 might be.
5      Q.  BY MR. TSAI:  I didn't ask about population.
6 I'm saying Bob Chen, your patient who had failed his tox
7 screen, and you didn't report that out to anyone, how
8 would Mallinckrodt, in that example, know that there was
9 diversion going on?
10      MR. ARBITBLIT:  Objection.  Form.
11      Q.  BY MR. TSAI:  Can you explain?
12      A.  I think I did explain.  I think I gave an answer
13 to that.
14      Q.  No, that example, that they know in that.
15      Your opinion -- you're telling the jury you
16 believe Mallinckrodt should have known that Bob Chen
17 failed his tox test even though you didn't report it out
18 to anyone.  I just want to see if that's your opinion.
19      MR. ARBITBLIT:  Object to form.
20      THE WITNESS:  My opinion is broader than what
21 you're trying to get me to agree to, and that's why I'm
22 not willing to agree to it.
23      My opinion is that Mallinckrodt and other
24 defendants had access to population-level data that could
25 have informed -- that did inform their knowledge of

Page 220

1 adverse consequences due to prescription opioids that
2 they should have and could have acted on, but they did
3 not act on, and that they, in fact, are better equipped
4 to do than I, an individual practitioner, who is
5 only seeing this isolated instance of this one patient
6 and may not have an aggregate sense of what's happening
7 in the community.
8      Q.  BY MR. TSAI:  Well, the population, whether it's
9 five or ten or a hundred, is made up of individuals;
10 right?
11      MR. ARBITBLIT:  Object to form.
12      THE WITNESS:  (Nods head.)
13      Q.  BY MR. TSAI:  Okay.  So is that a "yes"?
14      A.  A population is made up of individuals.
15      Q.  Okay.  So can you explain to me in this example,
16 how you believe any defendant could have or should have
17 known about this instance of diversion?
18      MR. ARBITBLIT:  Objection.  Asked and answered
19 badgering, redundant.
20      THE WITNESS:  Yeah, I feel like I -- I answered
21 the question at the level that it needed to be answered.
22      Q.  BY MR. TSAI:  Okay.  What about for this
23 individual?
24      MR. ARBITBLIT:  Object to form.
25      Q.  BY MR. TSAI:  Because that's the level I think

Page 221

1 it needs to be answered.
2      A.  Uh-huh.
3      Q.  Okay?
4      A.  Yes.
5      MR. ARBITBLIT:  Object to form.
6      THE WITNESS:  But it's a hypothetical situation.
7 First it was Mr. Smith and then it was Mr. Chen.
8      Q.  BY MR. TSAI:  Yeah.  And the order from this
9 Court is that assumptions based on facts -- your
10 Interrogatory, that's when we asked you to assume is
11 true -- you have to answer.  So let's focus on that.
12      I assume that Mr. Chen, your patient, failed his
13 urine tox test.  You did not report it out to anyone.
14 You suspected that he was criminally diverting it by
15 selling it, giving it to people who -- who shouldn't have
16 gotten it.
17      Explain to me in that concrete example, given
18 that hypothetical you have to assume is true, how any of
19 the defendant businesses would be able to detect that
20 diversion?
21      MR. ARBITBLIT:  Objection.  Incomplete
22 hypothetical.
23      THE WITNESS:  Again, I feel like I answered it.
24 Although the defendants may not have been aware of that
25 individual isolated case of mine -- I concede that to

56 (Pages 218 - 221)

HIGHLY CONFIDENTIAL

Page 222

1 you -- they had been aware on an aggregate level of the
2 harm due to the oversupply of opioids, including the
3 problem of diversion, and yet they did nothing about it.
4      Q.  BY MR. TSAI:  So let's go back to the agree or
5 disagree.  I have some other propositions.
6          Agree or disagree in your opinion:  Patients for
7 whom chronic opioid therapy are being considered should
8 be screened for risks and contraindications.
9      A.  There is no evidence that screening patients
10 prior to initiating opioid therapy reduces their risk of
11 developing an opioid use problem.  We do not have good
12 screening tools.  So hypothetically, it makes sense, if
13 we could parse out those 30 percent of individuals who's
14 going to develop an opioid use problem from the rest,
15 that would be great, but we don't have the tools to do
16 that.
17          And in educating physicians that screening
18 actually worked, that was another form of misrepresenting
19 the evidence.
20      Q.  So just to be clear, in your opinion, would
21 stating that proposition to practitioners, "patients for
22 whom chronic opioid therapy is being considered should be
23 screened for risks and contraindications," be misleading?
24      A.  I think it's -- I think it's misleading because
25 it's incomplete.

Page 223

1      Q.  How about this one:  Before initiating chronic
2 opioid therapy, physicians should take adequate time to
3 inform patients in simple language of the associated
4 risks?
5      A.  Yes, I agree with that.
6      Q.  Okay.
7      A.  Assuming that that physician is properly
8 educated on what those risks are.
9      Q.  Okay.  How about this one:  Patient education
10 can help curb opioid misuse and reduce the risk of
11 developing opioid use disorder?
12          MR. ARBITBLIT:  Object to form.
13          THE WITNESS:  I don't think that we don't have
14 good data to show whether or not educating patients will
15 actually curb their risk of opioid misuse.  I think it's
16 a logical assumption, but it's not actually been proven
17 to be the case, and I can tell you that the way that
18 opioids working on the brain is that they are reenforcing
19 beyond what the patient may understand about their risks.
20          So it's a logical proposition, but I don't
21 believe there's evidence to actually show that educating
22 patients about the risks reduces their chances of
23 developing opioid use problem.
24      Q.  BY MR. TSAI:  Okay.  So then just to be clear:
25 Do you believe stating that proposition would be

Page 224

1 misleading to practitioners?
2      A.  Yeah, I think that would be misleading.
3      Q.  What about this one:  Physicians should also
4 perform ongoing risk-benefit assessments throughout the
5 course of therapy because problems can arise at any
6 point?
7      A.  Yes, I would agree with that.
8      Q.  Okay.  How about this one:  Patients should be
9 reevaluated at least every three months, even when stable
10 and doing well, and more frequently if problems arise?
11      A.  Yes, I agree with that.
12      Q.  Okay.  How about this:  The risk for opioid
13 abuse is increased in patients with a personal or family
14 history of substance abuse, including drug or alcohol
15 abuse or addiction, or mental illness, for example, major
16 depression?
17      A.  Yes, I agree with that.
18      Q.  Okay.  Agree or disagree in your opinion with
19 this proposition:  Patients at increased risk may still
20 be appropriately treated with modified-release opioid
21 formulations, however, these patients will require
22 intensive monitoring for signs of misuse, abuse or
23 addiction?
24          MR. ARBITBLIT:  Objection.
25          THE WITNESS:  Can you restate just because the

Page 225

1 transcription is not accurately represented.  It says
2 "real estate" opioid formulation.  So would you repeat?
3      Q.  BY MR. TSAI:  Okay.  What about this
4 proposition:  Patients at increased risk may still be
5 appropriately treated with opioid medications; however,
6 these patients will require intensive monitoring for
7 signs of misuse, abuse or addiction?
8          MR. ARBITBLIT:  Object to form.
9          THE WITNESS:  I think it's really important to
10 qualify whether we're talking about short-term opioid
11 therapy or long-term opioid therapy because the risks
12 really diverge there.
13          I do agree that even patients with addiction may
14 at times need a short-term course of opioid therapy for
15 pain and that those individuals are at increased risk.
16 But it's also true that per Edlund, the risk of
17 developing opioid use problem -- the greatest risk factor
18 is actually dose and duration of the opioid -- the higher
19 the dose, the longer the patient's on it, and that
20 risk outweighs any personal or family history of an
21 opioid use problem.
22      Q.  BY MR. TSAI:  So let's specifically substitute
23 in an extended-release opioid medication.  If we put that
24 in, patients at increased risk may still be appropriately
25 treated with an extended-release opioid formulation,

57 (Pages 222 - 225)

HIGHLY CONFIDENTIAL

Page 226

1 would you agree or disagree with that?
2     A. Can you say the whole proposition again?
3     Q. Yeah.
4        Patients at an increased risk may still be
5 appropriately treated with extended-release opioid
6 formulations; however, these patients will require
7 intensive monitoring for signs of misuse, abuse or
8 addiction?
9     MR. ARBITBLIT: Object to form.
10     THE WITNESS: I think there would -- and when
11 you say extended release, you mean short-term, long-term
12 opioid therapy. I'll object because --
13     (Interruption in proceedings.)
14     MR. TSAI: Someone's -- I think someone's not on
15 mute. We can hear you.
16     THE WITNESS: Yeah. So in general, I don't
17 agree.
18     (Interruption in proceedings.)
19     THE WITNESS: So I don't believe that opioid
20 long-term opioid therapy is --
21     (Interruption in proceedings.)
22     THE REPORTER: Can we go off the record?
23     THE VIDEOGRAPHER: Going off the record, the
24 time is 3:02 p.m.
25     (Discussion off the record.)

Page 227

1     THE VIDEOGRAPHER: Back on the record, the time
2 is 3:03 p.m.
3     Q. BY MR. TSAI: Okay. Do you agree that risk
4 factors for opioid addiction other than mere exposure
5 exist?
6     A. Yes.
7     Q. Is one of those risk factors for opioid
8 addiction a personal history of a substance use disorder?
9     A. Yes.
10     Q. Okay. Same question for family history of a
11 substance use disorder.
12     A. Correct.
13     Q. Same question for a history of doctor shopping.
14     A. Yes.
15     Q. Same question for a history of seeking early
16 refills.
17     A. So in general, doctor shopping and early refills
18 is highly correlated with prescription opioid misuse, and
19 prescription opioid misuse is highly correlated,
20 predictive of developing an opioid use disorder. So,
21 yes. Whether it's a causative or a risk factor, but yes.
22     Q. Okay. Same question: Preadolescent history of
23 sexual abuse is also a risk factor for opioid addiction.
24     A. Childhood trauma in general is a risk factor for
25 many medical conditions, including mental health

Page 228

1 conditions, including addiction, yes.
2     Q. And psychiatric comorbidities is also a risk
3 factor.
4     A. Yes.
5     Q. That's a big term, big mouthful. Can you
6 explain to the jury what that means?
7     A. That means an individual who has a psychiatric
8 disorder other than the disease of addiction. So that
9 would include everything from major depression to
10 obsessive compulsive order to bipolar disorder to
11 schizophrenia.
12     Q. Okay. So given all these risk factors, do you
13 agree that healthcare providers should assess each
14 individual for opioid risk based on specific factors?
15     MR. ARBITBLIT: Object to form.
16     THE WITNESS: Healthcare providers should assess
17 risk factors for opioid addiction informed by the
18 knowledge that patients who screen positive for those
19 risk factors are not the only patients who are at risk
20 for developing opioid use problems, and that, in fact,
21 our screening tools are not effective at predicting who
22 will and will not develop an opioid use disorder.
23        So although we have no predictive tools, I
24 nonetheless do endorse screening for those risk factors
25 as part of a complete medical exam.

Page 229

1     Q. BY MR. TSAI: Okay. So can we agree that all
2 things being equal, a person with either active or a
3 history of substance use disorders is a higher risk
4 candidate for opioid therapy than a person with no past
5 or current history of substance use disorders?
6     A. I'm not sure we actually can agree to that
7 because although we can look at large populations and see
8 who has an opioid use disorder and see who has those risk
9 factors and note higher prevalence of those risk factors
10 in patients who develop an opioid use disorder, we still
11 do not as of yet have a clinical predictive tool that
12 will allow us to screen for anything in order to be able
13 to separate who will and will not develop an opioid use
14 disorder.
15        The bottom line importantly being that even
16 patients with none of those risk factors can develop an
17 opioid use disorder, period.
18     Q. How about this: Patients who are prescribed
19 opioids are not all at equal risk for developing opioid
20 addiction?
21     A. Patients who are on higher doses for longer
22 duration are at increased risk of developing opioid risk
23 disorder. Patients who have some of the risk factors
24 you've mentioned, like co-occurring psychiatric
25 disorders, are at increased risk of developing opioid use

58 (Pages 226 - 229)

HIGHLY CONFIDENTIAL

Page 230

1 disorder, but the relative risk of dose and duration
2 outweigh the risks of those other -- those other risk
3 factors.
4     Q.  And the dose of an opioid medication for a
5 particular patient can change over time.  Agreed?
6     A.  In fact, it typically does change over time as
7 patients develop tolerance, given the way that we've been
8 practicing, to respond to tolerance by increasing the
9 dose, given the way that we have been miseducated to
10 believe that quote/unquote no dose is too high.
11    Q.  And it's the doctor who decides what dose of an
12 opioid medication his or her individual patient receives,
13 when prescribed, and over the course of treatment.
14        Do you agree?
15       MR. ARBITBLIT:  Object to form.
16       THE WITNESS:  Yes and no.
17    Q.  BY MR. TSAI:  Who else decides -- who else
18 decides the dosage regimen of a particular doctor's
19 particular patient?
20    A.  So the amount and duration and choice of the
21 opioid is heavily influenced by things like what's on the
22 pharmacy formulary for a given hospital or what that
23 patient's insurance will cover or whether or not the
24 Joint Commission infiltrated that hospital and said you'd
25 better, in so many words, prescribe opioids to any

Page 231

1 patient that endorses pain above a given level.
2        Or in a situation where a patient has demanded a
3 certain opioid prescription and rated that -- that doctor
4 poorly because of it or in a situation where that
5 patient -- that doctor may be afraid that they will get
6 sued or lose their medical license if they don't do
7 everything in their power, i.e., prescribe an opioid to
8 treat that patient's pain.
9        So lots of invisible forces inside of medicine
10 driving prescribing, which the defendants in this case
11 well understood and exploited in order to promote their
12 products.
13    Q.  Let me ask you this, and this is a hypothetical:
14 So let's assume the same dose and duration for Mrs. Smith
15 and Mr. Chen, same dose and duration.  Mrs. Smith has
16 never been depressed, never taken drugs before, never had
17 a family member who took drugs, has a high-paying job,
18 and then took an opioid medication for a legitimate pain
19 condition.
20        In your opinion, would Mrs. Smith have the same
21 risk of addiction as someone, call him Mr. Chen, with a
22 long history of severe depression, history of prior
23 illicit drug use, family history of drug use, unemployed,
24 and who was doctor shopping?
25       MR. ARBITBLIT:  Object to form.

Page 232

1       THE WITNESS:  So you've asked me a hypothetical
2 so I'm going to answer by talking about how I practice.
3 Because we're not talking about a specific patient.
4        And the way that I practice, which I think is
5 informed by the evidence and many years of clinical
6 experience, is that any patient, regardless of those --
7 having or not having those risk factors, is at risk for
8 developing an opioid use problem.  And so I treat all of
9 my patients the same in that regard, with the same level
10 of caution and the same level of monitoring and
11 vigilance.
12    Q.  BY MR. TSAI:  And you say "at risk."  My
13 question is in that scenario, comparing those two
14 individual patient cases, is it your opinion that they
15 have the same risk, different risk?  What is that?  What
16 is your opinion on that?  Not at risk, but the degree of
17 risk.
18    A.  So when we're talking about clinical care and
19 I'm sitting in my office dealing with real, live
20 patients, I fully acknowledge that I have no crystal ball
21 for being able to determine who will and will not develop
22 an opioid use problem.
23        I have seen many patients like your hypothetical
24 Mrs. Smith, high functioning, well educated, high-paying
25 job, no core current mental illness, no history of

Page 233

1 substance use problems, who goes on to very quickly
2 develop an opioid use disorder in the context of
3 receiving a prescription from a doctor.
4        Likewise, I have seen patients like your
5 hypothetical Mr. Chen -- depressed, unemployed, doctor
6 shopping -- who doesn't develop an opioid addiction.
7        So when we're talking about the level of
8 clinical care -- not population-level studies, but
9 clinical care and my ability to prognosticate, I assume I
10 have zero ability to do that.
11    Q.  Okay.  So that -- now you kind of reversed.
12 First you were in population mode and --
13    A.  Yep.
14       MR. ARBITBLIT:  Ask a question, Counsel.  Don't
15 lecture.
16    Q.  BY MR. TSAI:  So let's talk about population
17 level.
18       MR. ARBITBLIT:  Don't lecture the witness,
19 Counsel.  Ask a question.
20    Q.  MR. TSAI:  Do you have an opinion as to the
21 relative degree of risk on a population level, given that
22 scenario?
23    A.  So I cite Edlund in my report.  On page 20.
24    Q.  So we're on the same page --
25    A.  Yeah.

59 (Pages 230 - 233)

HIGHLY CONFIDENTIAL

Page 234

1  Q. -- in terms of interpreting reading Edlund, you
2  agree that Edlund was a -- was a study about
3  associations, not --
4     A. Uh-huh.
5     Q. -- not causal relationships?
6        MR. ARBITBLIT: Object to form.
7        THE WITNESS: I agree that Edlund talks about
8  risk factors in a population of individuals who were
9  exposed to opioid therapy versus not.
10    Q. BY MR. TSAI: Okay.
11    A. I'm trying to determine the risk of individuals,
12 the odds ratio of developing an opioid use disorder based
13 on a certain type of risk factor.
14       I'm looking for another place that I cite Edlund
15 in my report. Give me a moment, please.
16    Q. Okay. I don't want to spend too much time --
17    A. Okay.
18    Q. -- given our limited time. So --
19    A. I did -- I did find it.
20       If you'd like me to refer to it, page 73.
21    Q. Okay. Thank you.
22    A. The Edlund study.
23    Q. So did you do -- so other than the risk -- the
24 several risk factors for opioid addiction that we've
25 discussed, any others?

Page 235

1        MR. ARBITBLIT: I don't think she had finished
2  answering the question when she referred to Edlund. You
3  interrupted her.
4        THE WITNESS: Do you want me to finish answering
5  your other question?
6     Q. BY MR. TSAI: Actually, it seemed like you were
7  talking about something a bit different so let me just
8  ask you this: In terms of the several risk factors out
9  there, with respect to opioid addiction did you do any
10 analysis of your own in your work in this case to
11 quantify the contribution of these risk factors to opioid
12 addiction in New York specifically?
13       MR. ARBITBLIT: Object to form.
14       THE WITNESS: I do not any of my own analyses,
15 but as per my report, including on page 73, Edlund did
16 quantify these risk factors, stating that for chronic
17 high-dose opioid use, the odds ratio of approximately 122
18 is 40 times greater than for a mental health or alcohol
19 use disorder and 15 times higher than for a prior
20 non-opioid-use disorder.
21       In other words, the chronic use of opioids is
22 responsible for far more opioid use disorders than the
23 existence of identifiable risk factors for opioid use
24 disorders.
25    Q. BY MR. TSAI: And when Edlund himself says

Page 236

1  information on how average daily dose and duration of
2  opioid therapy may supply likelihood of development of an
3  incident of opioid use disorder is limited, do you have
4  any reason to dispute that conclusion by the study
5  authors?
6     A. Where is that? Where is that?
7     Q. Page 2 of Edlund, 24.
8        MR. ARBITBLIT: Do you have the article?
9        MR. TSAI: I think she's looking at it.
10       THE WITNESS: No, I don't have the article. I
11 just have my reference.
12    Q. BY MR. TSAI: Okay. Let's move on.
13       So do you agree or disagree with this
14 statement --
15       (Discussion off the record.)
16       MR. TSAI: Let me go off the record real quick.
17       THE VIDEOGRAPHER: Going off the record, the
18 time is 3:18 p.m.
19       (Exhibit 7, Pre-roll: Mischa intro, marked for
20       identification.)
21       (Discussion off the record.)
22       THE VIDEOGRAPHER: Back on the record, the time
23 is 3:20 p.m.
24    Q. BY MR. TSAI: So I just wanted to ask you about
25 this interview that you gave. This -- I handed you

Page 237

1  Exhibit 7, which is entitled "Science Versus," from
2  Gimlet Media with Wendy Zukerman. The program is
3  entitled "Opioids, Kicking America's Addiction."
4        Do you recall giving interview for this program?
5     A. Not specifically.
6     Q. Okay. Can you refer to page 4? And I'll direct
7  you to the very top of page 4. And it says: "Anna
8  Lembke, a psychiatrist at Stanford, was one of those
9  doctors who wasn't keen to treat addicts."
10       Do you see that?
11    A. Yes.
12    Q. And do you see the abbreviation "AL" henceforth
13 under that?
14    A. Yes, I do.
15    Q. Okay. Is "AL" you?
16    A. Yes.
17    Q. Okay. And does this appear to be a correct
18 transcription of your interview for this program?
19    A. Yes.
20    Q. Okay. I just wanted to quickly ask you about on
21 page 11, there is a series of footnotes. Number 15 --
22 52, sorry, states in email, "Don't let anyone tell you
23 taking a medication is swapping one addiction for
24 another. It is complete nonsense."
25       And the -- that corresponds to a sentence in the

60 (Pages 234 - 237)

HIGHLY CONFIDENTIAL

Page 238

1 text saying, "Here's how Anna and other experts think
2 about it."
3      Do you see that?
4   A.  Yes.
5   Q.  Okay.  Do you know if you still have that email?
6      MR. ARBITBLIT:  Object to form.  That's
7 misrepresenting the evidence.
8      THE WITNESS:  I have no idea.
9      MR. ARBITBLIT:  It doesn't link this to Anna in
10 any way.
11   Q.  BY MR. TSAI:  Is it your understanding that you
12 sent Wendy Zukerman an email with this statement?
13   A.  I don't have a recollection of having sent that
14 email, no.
15   Q.  Okay.  Okay.
16      So you can put that aside.
17   A.  Okay.
18      (Exhibit 8, Handwritten notes, 1/16/14, marked
19      for identification.)
20   Q.  BY MR. TSAI:  So I believe we talked about this
21 at the last deposition, but this is -- I'm handing you
22 what you produced when we requested your -- your notes in
23 connection with writing your book.
24   A.  Uh-huh.
25   Q.  -- Drug Dealer, M.D., do you recall that?

Page 239

1   A.  Yes, I do.
2   Q.  Okay.  I'm not actually sure I asked the
3 question, but does this -- can you confirm that this
4 appears to be a true and correct copy of your notes with
5 respect to interviewing folks for your book Drug Dealer,
6 M.D.?
7   A.  Yes.
8   Q.  Okay.  Now, there's one -- they're not numbered
9 so I want to ask you about --
10      MR. TSAI:  Actually, can we go off the record.
11      THE VIDEOGRAPHER:  Going off the record, the
12 time is 3:24 p.m.
13      (Discussion off the record.)
14      THE VIDEOGRAPHER:  Back on the record, the time
15 is 3:25 p.m.
16      MR. TSAI:  Thank you.
17   Q.  So I've handed you -- we're looking at
18 Exhibit 8, your notes in connection with your book.
19 Could you please turn nine pages from the beginning, and
20 I apologize.  This doesn't have -- I mean your notes do
21 not have internal pagination.  So if you could flip nine
22 full pages.
23   A.  Nine pages from where we were?
24   Q.  No, from the front.  So let's count:  One, two,
25 three, four, five, six, seven, eight.

Page 240

1   A.  Oh, you're not counting both sides?
2   Q.  Eight.  Eight flips, please.
3   A.  Just one?
4   Q.  Yes, that's one.
5   A.  Okay.
6   Q.  Since I'm not all that good at reading
7 handwriting, I just did -- I did want to just confirm the
8 accuracy of -- of the notes.
9      Do you see at top it says:  "I could control it
10 at first," and then right under that, it says "right
11 after 9/11"?
12   A.  I don't see that at the top.  I wonder if I'm on
13 the same page.  Okay, yes, I do see that now.
14   Q.  Great.  And since you know your handwriting much
15 better than I do --
16   A.  Right.
17   Q.  -- would you mind reading this particular
18 interview, this particular page?
19   A.  Sure.
20      "I could control it at first right.  After 9/11,
21 huge influx of cheap, super pure, chronic white heroin.
22 $50 could last me two to three weeks.  Am I becoming a
23 heroin addict?  I started reading William Burrough's book
24 to see if it was me.  The first time I went into heroin
25 withdrawal, I didn't know it.  I thought I just had the

Page 241

1 flu.
2      After two to three months of daily heroin use, I
3 went back to California to get away from heroin and get
4 my life together.  I talked to my mom about it.
5      Back in New York City, I got buprenorphine as
6 intramuscularly injected in a glass vial so I injected
7 and I was doing Buprenex early 2001.  It worked well the
8 first time.
9      Moved back to New York.  Six months, no heroin,
10 but then I relapsed.  Then I used needles to inject
11 heroin using the Buprenex needles.  Problems would happen
12 when I would go out and have a drink or two, even after a
13 party until 2:00 to 4:00 -- 2:00 to 4:00 in the morning,
14 at 11:00 p.m. cocaine was useful.
15      I relapsed, alcohol to cocaine to heroin.  Today
16 use to maintenance therapy.  Why not just stay on heroin?
17 Tolerance going up and up to the point where I had an
18 over a hundred dollar a day habit, trouble at school,
19 nodding off.
20   Q.  Okay.  Thank you.
21      And just one point of clarification.  On line 3,
22 when you read "cheap, super pure," is the word after that
23 China?
24   A.  Yes.
25   Q.  China, okay.

61 (Pages 238 - 241)

HIGHLY CONFIDENTIAL

Page 242

1 So in your opinion, would this individual have
2 opioid use disorder?
3 A. Yes, this individual had opioid use disorder.
4 Q. And taking this individual as an example, would
5 you include this individual in what you've termed your
6 dependence effect?
7 A. So this individual is actually a great example
8 of the tsunami effect, which is to say that although
9 she's in a minority group, having started her addiction
10 with heroin, we know that's a minority group because more
11 than 80 percent, according to Cicero, of heroin users
12 today began with a prescription opioid.
13 She is somebody who then went from heroin to
14 prescription opioids, which resulted in an exacerbation
15 of her opioid use disorder, and I describe that several
16 pages later, where she was admitted to the hospital for
17 an abscess and a skin infection. And if you don't mind,
18 I will read from my notes here to get a sense of what
19 happened to her afterwards.
20 So she -- she was -- I think it's super
21 relevant, super relevant to answering your question. So
22 if you don't mind, I'd just like to read this short
23 passage.
24 Q. Okay, sure. Which page is it?
25 A. This is just a couple pages after the page that

Page 243

1 you indicated.
2 Q. So two pages after what you just read into the
3 record?
4 A. I think so. And you will see "IV fentanyl" at
5 the top.
6 Q. That's three pages sequentially after what you
7 just read into the record. Okay.
8 A. Okay. So actually, just before the IV fentanyl
9 page, the prior page you'll see, in the second large
10 paragraph, third sentence down, it says she was clean for
11 six months. Then she had an infection at her injection
12 site, MRSA -- which stands for Methicillan-resistant
13 Staphylococcus aureus infection. Her arm was turning
14 green and puffy, really scary. Then she relapsed to her
15 dad's Dilaudid.
16 So, again, a great example of the tsunami
17 effect, just the ubiquitous supply of prescription
18 opioids in the community.
19 She was rushed to Stanford. Delirium, septic.
20 Part of her arm rotted off. Didn't tell the doctors
21 about the heroin.
22 Another great example of why it's so hard for
23 front-line doctors to intervene, because they can't get
24 the straight story from the patients themselves because
25 there's so much stigma around this problem.

Page 244

1 She worried about how people would treat her.
2 Doctors wouldn't work to save my life if they knew I
3 wanted to get pain medication. Why is a healthy
4 24-year-old -- I can't read something -- dying.
5 Then she got IV Dilaudid to treat her pain and
6 IV fentanyl. She had huge tolerance because she'd been
7 using heroin. She had surgery every other day just
8 trying to keep me alive.
9 3.5 five weeks in the ICU. At Stanford three
10 months. IV Dilaudid every day. Full -- full anesthesia
11 just to do the bandage changes every other day.
12 Flesh on calves and feet also rotted off.
13 Sedated much of the time. Couldn't walk. Couldn't use
14 on my own. IV vanco.
15 And then importantly, she spent almost three to
16 six months at Stanford. Opioids were part of her daily
17 regimen, and then she was given morphine tablets, 20 to
18 30 per month, and she was discharged with that high
19 volume of pills, which she continued to get.
20 She dissolved them in salve and injected them in
21 her pic line. So she was not given any addiction
22 treatment. There wasn't awareness of her disease.
23 Then she got 5150 because the police came along
24 and found her heating and injecting her extended-release
25 morphine.

Page 245

1 And that was the first time they realized that I
2 was basically suffering from an opioid use disorder.
3 But my -- my point in -- I think that's a really
4 important piece to include in the story because what we
5 have is this very complex relationship between illicit
6 opioids, nonmedical use of prescription opioids, and
7 legitimate use of prescription opioids. And all of those
8 things interweave in really important ways that increase
9 the risk of addiction overdose death for all Americans
10 and would only have been possible because of the
11 increased prescribing and increased supply, the nearly
12 ubiquitous access, as a result in part of defendants'
13 actions.
14 Q. And given this case history that we just
15 discussed, would you include this individual within the
16 scope of your gateway effect?
17 A. This individual wouldn't be included in gateway
18 because she didn't begin with a prescription opioid, but
19 she certainly would be included in the tsunami effect.
20 Q. As well as the dependence effect?
21 A. Yes. Because she -- the dependence effect is
22 speaking more to those individuals who have developed a
23 physiologic dependence to opioids, who don't meet clear
24 criteria for an opioid use disorder. So she would really
25 be in the tsunami effect.

62 (Pages 242 - 245)

HIGHLY CONFIDENTIAL

Page 246

1    Q.  Okay.  Would you include this individual, given
2  her case history and her development of addiction while
3  she was in New York, within the scope of your -- of New
4  York residents whose opioid addiction you would hold
5  defendants responsible for?
6        MR. ARBITBLIT:  Object to form.
7        THE WITNESS:  So obviously when she was living
8  in New York, that's when she started on heroin, not
9  prescription opioids.  But that doesn't release
10  defendants from their responsibility regarding the opioid
11  epidemic nationally, including in New York.
12    Q.  BY MR. TSAI:  So you would include this
13  individual?
14    A.  Yes, for the reasons that -- that I described
15  having to do with how her opioid addiction was made worse
16  because of the prescribing of prescription -- because of
17  access to prevention opioids that followed her heroin
18  use.
19    Q.  And she wasn't prescribed that particular
20  prescription opioid in her case; is that right?  She got
21  it from her dad.  Am I reading that correctly?
22    A.  No.  So -- so there is an instance in which she
23  got it from her father.  That was the Dilaudid.  But then
24  she received high doses of opioids inhouse, and she was
25  discharged with morphine sulfate, which she then

Page 247

1  injected.
2    Q.  Okay.  So I'm going to pivot and ask a short
3  series of questions now are that specific to my client,
4  Mallinckrodt, and then I'll pass to the other attorneys
5  who haven't had a chance to ask questions.
6        So is your opinion in this case based on any FDA
7  warning letter to Mallinckrodt?
8    A.  I am not aware of any specific FDA warning
9  letter to Mallinckrodt; however, I do know that other
10  experts will be opining on the FDA.
11    Q.  Okay.  And one of the Mallinckrodt opioid
12  medicines that you reference in your report is Xartemis.
13        Do you recall that?
14    A.  Yes.
15    Q.  And do you agree that by 2011, which was before
16  Xartemis was even on the market, opioid prescriptions per
17  person had begun decreasing in New York?
18        MR. ARBITBLIT:  Object to form.
19        THE WITNESS:  I think I do discuss this in my
20  report.  I'd like to reference my report.
21    Q.  BY MR. TSAI:  I think you're looking, perhaps,
22  for page 17 through 18.
23    A.  Thank you.
24    Q.  Yeah.
25    A.  Yes, I am.

Page 248

1        So as I state in my report:  "In the state of
2  New York, opioid prescribing increased from 101 morphine
3  milligram equivalence in 1997 to 442 by 2006 and again
4  increased to 492 per person in 2016," which would refute
5  your claim that in New York opioid prescribing started to
6  decrease around 2011.
7        It's also true that if you look at the duration
8  of the prescription in New York, the length of opioid
9  prescriptions actually increased between 2016 and 2017
10  from 15 to 19 days of opioids in 2017, an increase of
11  25 percent.
12    Q.  Okay.  Just let me try to understand.
13        In your report, you said based on a --
14        (Interruption in proceedings.)
15    Q.  BY MR. TSAI:  I read in your report based on
16  IQVA data published by County by the CDC, the opioid
17  prescribing rate in Nassau County increased from 46.0 to
18  51.1 prescriptions per hundred persons from 2006 to 2011.
19  Thereafter, prescribing decreased similarly to the rest
20  of New York state, with the rate per 100 persons of 36.0
21  in the most recent year of data available, 2017.
22        Do you see that?
23    A.  Yes, I do.
24    Q.  That's in your report?
25    A.  Yes.

Page 249

1    Q.  Okay.
2    A.  Except that I want to say the reason for that
3  apparent discrepancy -- it's not an actual discrepancy --
4  the CDC data are based on number of prescriptions written
5  per 100 persons, whereas that particular New York State
6  data is looking at how high the dose was and the length
7  of the opioid prescription.  So there are different ways
8  to measure it.
9        So in terms of overall number of prescriptions
10  written, those began to decrease around 2011, 2012, but
11  the doses appeared to have gone up and the duration of
12  prescriptions appear to have gone up.
13    Q.  I see.  Okay.
14        Is your opinion in that this case based on
15  identifying any specific examples of individuals who
16  allegedly became addicted to any opioid as a result of a
17  prescription of a Mallinckrodt product in New York?
18    A.  I don't have specific samples.
19    Q.  Okay.  And similarly, your opinion does not
20  identify a single specific overdose death that, in your
21  opinion, was allegedly the direct result of the ingestion
22  of any opioid made by Mallinckrodt; correct?
23    A.  Not at that level of specificity, no.
24    Q.  Okay.  Is your opinion in this case based on
25  identifying any specific example of a particular opioid

63 (Pages 246 - 249)

HIGHLY CONFIDENTIAL

Page 250

1 pill made by Mallinckrodt that was a suspicious order
2 diverted improperly?
3          MR. ARBITBLIT:  Object to form.
4          THE WITNESS:  Not any specific pill.
5     Q.  BY MR. TSAI:  Okay.  Is your opinion in this
6 case based on identifying any specific example of a
7 prescription of a Mallinckrodt opioid written in New York
8 by a doctor or nurse relying on a representation from
9 Mallinckrodt?
10    A.  Not at that level of specificity.
11         MR. TSAI:  Okay.  All right.
12         Let me go off the record, and I will pass the
13 witness at this time.  Thank you.
14         THE WITNESS:  You're welcome.
15         THE VIDEOGRAPHER:  Going off the record, the
16 time is 3:42 p.m.
17         (Discussion off the record.)
18         (Exhibit 9, JAN-MS-00362490, marked for
19         identification.)
20         (Exhibit 10, Highlights of Prescribing
21         Information, marked for identification.)
22         (Exhibit 11, JAN-MS-00362490, marked for
23         identification.)
24         (Exhibit 12, Highlights of Prescribing
25         Information, marked for identification.)

Page 251

1          THE VIDEOGRAPHER:  Back on the record, the time
2 is 3:48 p.m.
3              EXAMINATION
4     Q.  BY MR. EHSAN:  Good afternoon, Dr. Lembke.  We
5 met before at your prior deposition.  My name is Houman
6 Ehsan.  I represent Johnson & Johnson and the Janssen
7 defendants.  Collectively, that they manufacture
8 Duragesic transdermal fentanyl patch and Nucynta or
9 tapentadol.
10    Q.  Doctor, you had talked about an efficient
11 distribution system earlier today.
12         Do you recall that testimony?
13    A.  Yes, I do.
14    Q.  Do you consider the US Postal Service to be an
15 efficient distribution system?
16         MR. ARBITBLIT:  Object to form.
17         THE WITNESS:  Well, it is a distribution system.
18 I'm not sure how efficient it is.
19    Q.  BY MR. EHSAN:  Can it reach every small town in
20 America, rain or shine?
21    A.  I hope so.
22    Q.  You mentioned several times that easy access and
23 supply contributed to the overall opioid epidemic in the
24 United States.
25         Do you recall that testimony?

Page 252

1     A.  Yes, I do.
2     Q.  And collectively, I think you referred to it at
3 various times as the tsunami effect?
4     A.  Yes.
5     Q.  Considering access and the supply, did you
6 consider illicitly manufactured opioids that entered the
7 United States illegally?
8     A.  I think that's part of the second and third
9 waves of this epidemic.  The increased supply began with
10 prescription opioids, overprescribing, and then created a
11 population of individuals who were addicted to those
12 opioids, leading to increased demand, which then promoted
13 the illicit market.  Including heroin and illicit
14 fentanyl.
15         So I think those things are tied in a sequential
16 manner.
17    Q.  Would you agree that that supply is not going to
18 be disrupted by curbing opioid prescribing presently?
19         MR. ARBITBLIT:  Object to form.
20         THE WITNESS:  I disagree with that statement.
21    Q.  BY MR. EHSAN:  So it is your opinion that even
22 if the FDA were to ban the prescribing of all opioids,
23 that the supply side that is illicit in its manufacturing
24 and distribution would somehow be lessened by that
25 process?

Page 253

1     A.  I have never endorsed, nor would I ever endorse
2 that the FDA should ban prescribing opioids.  What I have
3 stated is that the opioids have been overprescribed and
4 overdistributed and overdispensed, leading to a tsunami
5 effect.
6         And I do believe that by engaging in safer and
7 more judicious prescribing of prescription opioids, we
8 will actually also, potentially in the long, long-term,
9 be able to curb the opioid addiction problem more
10 broadly, including addiction to illicit opioids.
11    Q.  Do you lay out how the curbing of opioid
12 prescribing and education, broadly speaking, will in the
13 long term reduce the supply of illicitly manufactured
14 opioids abroad?
15    A.  The way that I lay that out in the report and in
16 my testimony today is the way in which both nonmedical
17 use and medical use of prescription opioids are
18 interwoven and how both independently and together
19 greatly increase the risk of an individual turning to a
20 illicit source of an opioid.
21         So by managing the prescription opioid addiction
22 oversupply, overdose problem, we will potentially treat
23 the population of addicted persons we have iatrogenically
24 created and then likewise decrease the demand for illicit
25 opioids imported from elsewhere.

64 (Pages 250 - 253)

HIGHLY CONFIDENTIAL

Page 254

1    Q.  You understand that illicit opioids actually
2  release non-opioid medications that are sold on the
3  street as well?
4       MR. ARBITBLIT:  Object to form.
5       THE WITNESS:  Yes.
6    Q.  BY MR. EHSAN:  I can ask the question again.
7  Was that a "yes"?
8    A.  Yes.
9    Q.  So someone who may have no exposure to opioids
10  and may be addicted to cocaine may come into contact with
11  illicitly manufactured opioids, fentanyl, specifically;
12  correct?
13    A.  Yes, and they also may come into contact with
14  illicitly manufactured opioids.
15    Q.  Have you looked at the size of the illicitly
16  manufactured opioid market in the state of New York for
17  your expert opinions today?
18    A.  Did you say the illicitly manufactured opioid
19  market?
20    Q.  Yes, ma'am.
21    A.  I have not specifically looked at that market in
22  the state of New York.
23    Q.  Do you know what the approximate market share of
24  Duragesic is in New York?
25    A.  No, I do not.

Page 255

1    Q.  Do you know what the approximate market share of
2  Nucynta is in the state of New York?
3    A.  No, I do not.
4    Q.  Do you have any historical knowledge of the
5  market share going back in time?
6    A.  No.
7    Q.  Do you have a sense of how that market share
8  compares to the size of the illicit market in the state
9  of New York?
10    A.  No.
11    Q.  You mentioned that even short-term opioid
12  prescriptions are not entirely benign.
13       Do you recall that?
14    A.  Yes, I do.
15    Q.  Can you identify for me any prescription that
16  you've written for that is entirely benign?
17       MR. ARBITBLIT:  Object to form.
18       THE WITNESS:  No.
19    Q.  BY MR. EHSAN:  Would you agree with me that even
20  water is not entirely benign?
21       MR. ARBITBLIT:  Object to form.
22       THE WITNESS:  I would agree that even water is
23  not entirely benign.
24    Q.  BY MR. EHSAN:  As a psychiatrist, did you have
25  occasion to ever treat someone with diabetes insipidus?

Page 256

1    A.  Yes.
2    Q.  And that is potentially a fatal condition from
3  excess consumption of water; right?
4    A.  Yes, it is.
5    Q.  Did you, in your clinical practice, ever
6  encounter patients who have had difficulty making
7  co-payments for the medications that you had prescribed
8  for them?
9    A.  Yes, I have.
10    Q.  And can that financial difficulty in paying the
11  co-pay be an obstacle to the care of your patients?
12    A.  Yes, it can.
13    Q.  Now, you mentioned earlier today that you had
14  reviewed some documents that suggested that McKesson had
15  provided some free samples of Nucynta.
16       Do you recall that testimony?
17    A.  Yes, I do.
18    Q.  I want to hand you what's been marked as
19  Exhibit 9 (indicating).
20       MR. ARBITBLIT:  Do you have an extra copy?
21       MR. EHSAN:  Yes.
22    Q.  I ask you before we get to that to take a look
23  at Exhibit 3.
24    A.  Which one is Exhibit 3?
25    Q.  Exhibit 3, yes, is your supplemental reliance

Page 257

1  list.
2       Do you see item number 13 there?
3    A.  Yes.
4    Q.  It is a -- it says JAN-MS-00864412; correct?
5    A.  It does say that.
6    Q.  And the document I've handed you which has been
7  marked as Exhibit 9 bears that same Bates-stamp; correct?
8    A.  That's correct.
9    Q.  Is this one of the free samples that you were
10  referring to regarding Nucynta?
11    A.  Yes, it is.
12    Q.  I'll draw your attention to a couple of points
13  on this.  Do you see that this document has a date of
14  April 2010 at the bottom in the left-hand column midway
15  through, it says Ortho McNeill Janssen Pharmaceuticals,
16  Inc., 2009.  Then next to that, it says April 2010.
17       Do you see that?
18    A.  Yes, I do see that.
19    Q.  And then is it your opinion, Doctor, that this
20  provided the patient with free samples of Nucynta?
21       And if it helps, you can turn to the next page,
22  where it says "patient instruction," and item 1 says:
23  "Give your prescription for Nucynta along with this
24  attached savings card to your pharmacist."
25    A.  Right.  So this is a coupon -- my understanding

65 (Pages 254 - 257)

HIGHLY CONFIDENTIAL

Page 258

1 is that this is a coupon that allows the patient to be
2 able to pay less for their Nucynta prescription.
3      Q.  And do you think that's equivalent to a free
4 sample?
5      A.  Yeah, I think that could be equivalent to a free
6 sample.
7      Q.  And you understand that Nucynta is a Schedule II
8 opioid?
9      A.  Yes, I do.
10     Q.  Are you aware whether or not Schedule II opioids
11 can be given as free samples?
12     A.  Well, this is a way to undercut the Schedule II
13 regulations to make opioids more readily available.  But
14 more importantly, I cite this document as an example of
15 the ways in which opioid distributors such as McKesson
16 and opioid manufacturers such as Janssen have worked in
17 collaboration to promote opioid prescribing, contributing
18 to the oversupply problem.
19     Q.  So if a doctor writes a prescription for Nucynta
20 and a patient uses this coupon to reduce his or her
21 co-pay, you see that as a nefarious thing?
22     A.  In isolation, not necessarily.  But in the
23 broader picture of the conduct of defendants, yes, to me
24 this is worrisome, especially when it seems to me that
25 the various defendants are trying to say that the other

Page 259

1 one is to blame, when, in fact, they are working with one
2 another.
3      MR. EHSAN:  Move to strike that -- the rest of
4 your response after the beginning as nonresponsive.
5      Q.  Doctor, do you know what Nycynta's mechanism of
6 action is?
7      A.  Yes, I do.
8      Q.  What is Nucynta's mechanism of action?
9      A.  It's a norepinephrine reuptake inhibitor.
10     Q.  And you understand if Nucynta is indicated for
11 acute or chronic pain?
12     MR. ARBITBLIT:  Object to the form.
13     THE WITNESS:  Well, when you say is indicated
14 for acute or chronic pain, what are you basing that on?
15     Q.  BY MR. EHSAN:  You understand drugs come with
16 indications?
17     A.  Yes, I do.
18     Q.  Do you know that this particular Nucynta coupon,
19 is it for a Nucynta that's indicated for chronic pain?
20     MR. ARBITBLIT:  Object to form.
21     THE WITNESS:  I'd like to see the source that
22 Janssen relied upon to promote Nucynta for chronic pain.
23 It was based on what?
24     Q.  BY MR. EHSAN:  Again, I don't think you
25 understood my question so let me try it this way.

Page 260

1      I'm going to hand you what's been marked as
2 Exhibit 10 (indicating).  I will show you that.
3      So this is the -- I'll represent to you this is
4 the very first label, which is the approval for
5 tapentadol under the tradename Nucynta.  In fact, this
6 one doesn't even have the tradename in the label yet, but
7 it is tapentadol.
8      And you'll see the initial US approval was 2008,
9 and that this particular document was revised in November
10 of 2008.
11     Do you see that?
12     A.  Where does it say it was revised?  Oh, down
13 below.
14     Q.  Yes.
15     A.  I see that.
16     Q.  If you look at the indications of use, again,
17 the trade name is missing in this early label, but is an
18 opioid analgesic indicated for the relief of moderate to
19 severe acute pain in patients 18 years or older.
20     Do you see that?
21     A.  I do see that.
22     Q.  Okay.  So would this indicate at least that
23 there is a version of Nucynta that only has an acute pain
24 indication?
25     A.  This would assert that this version of Nucynta

Page 261

1 has an acute pain indication.
2      Q.  And do you see where the dosage forms and
3 strengths of the tablets are available in 50, 75 and
4 100 milligrams?
5      A.  I do see that, yes.
6      Q.  Okay.  You can put that aside.  I'm going to
7 show you one more document here (indicating).  This is
8 Exhibit 11.
9      And do you see that this is another coupon
10 where -- that the top states up to ten free pills of
11 Nucynta, 50, 75 or 100 milligram.
12     Do you see that?
13     A.  I do see that.
14     Q.  And it says, again, to the patient, that present
15 your written prescription for Nucynta.
16     Do you see that?
17     A.  Present your written prescription for up to ten
18 Nucynta.
19     Q.  50, 75 or 100 milligram tablets; correct?
20     A.  Yes.
21     Q.  These dosages would be consistent --
22     A.  I would just -- I would just add for
23 completeness, this voucher to your pharmacist, give this
24 voucher to your pharmacist to receive your free trial.
25     Q.  Again, but it requires a prescription for

66 (Pages 258 - 261)

HIGHLY CONFIDENTIAL

Page 262

1 Nucynta; correct?

2    A.  (Nods head.)

3    Q.  And presumably that doctor has made a decision

4 that Nucynta is an appropriate medication for acute

5 treatment of pain in that patient; correct?

6        MR. ARBITBLIT:  Object to form.

7    Q.  BY MR. EHSAN:  Is that a "yes"?

8    A.  Yes.

9    Q.  And that this allows the patient to offset the

10 cost of the medication; correct?

11   A.  It allows for a free trial.

12   Q.  Would that mean that -- so assume this coupon

13 didn't exist.  Would you then advocate that the patient

14 not take the medication because he or she can't afford

15 it?

16       MR. ARBITBLIT:  Object to form.

17       THE WITNESS:  I'd really have to know the

18 details of the specific case in order to weigh in on that

19 question.

20   Q.  BY MR. EHSAN:  So you can't say that it would be

21 better for the patient to get the medication he or she

22 was prescribed or not be able to afford it?  That

23 requires more information to make that distinction?

24       MR. ARBITBLIT:  Object to form.

25       THE WITNESS:  Yes.  Because given the prevailing

Page 263

1 pattern of opioid prescribing in the last ten years, I

2 can't be certain that this patient should actually be

3 prescribed an opioid analgesic, even for acute pain.

4    Q.  BY MR. EHSAN:  Do you agree that there are

5 randomized clinical trials showing efficacy of opioids

6 for the treatment of acute pain?

7    A.  I do.  But it doesn't mean that opioids are

8 without risk, even in an acute setting.  It's all about

9 the risk-benefit calculation.

10   Q.  Understood.  We, I think, established that

11 there's a risk associated with every prescription.

12       I'm going to hand you what's been marked as

13 Exhibit 12 (indicating).

14       And Doctor, I'll represent to you this is the

15 first or approval prescription -- or sorry -- labeling

16 for Nucynta ER, which is the long-acting version of

17 Nucynta, and it was actually approved in 2011, and that

18 by dating purposes, it postdates the April 2010 coupon;

19 correct?

20       This would be Exhibit 9.

21   A.  April 2010 and 2011, yes, it appears to postdate

22 that.

23   Q.  And likewise, if you look at the dosage forms

24 and strengths, it's not available in a 75-milligram

25 version, is it?

Page 264

1    A.  Where are the dosages forms and strengths?

2    Q.  So sure.  Left-hand column, next-to-last

3 segment.

4    A.  50, 100, 150, 200, 250.  No, it's not available

5 in 75.

6    Q.  So likewise, what I handed you in Exhibit 11

7 would be inconsistent with a reference to the long-acting

8 version of Nucynta; correct?

9    A.  Not necessarily because it is available in 50

10 and 100.

11   Q.  So you're suggesting the coupon is referring to

12 two different Nycyntas in the same construct?  If that's

13 your understanding, that's fine.  I'm not going to take

14 time to debate that issue, but is that your opinion?

15   A.  Well, it's not -- it's not clear to me which

16 Nucynta the coupon is referring to.

17   Q.  Okay.  Now, Doctor, if you don't mind looking at

18 again the very first page of Exhibit 12, do you see there

19 is an indication and usage section?

20   A.  Yes, I do.

21   Q.  Would you mind reading that, please.

22   A.  "Nucynta ER is an opioid analgesic indicated for

23 the management of moderate to severe chronic pain in

24 adults whom continuous around-the-clock opioid analgesic

25 is needed for an extended period of time."

Page 265

1    Q.  Would you agree with me, Doctor, that that

2 indication is for the use of Nucynta in the management of

3 chronic pain?

4        MR. ARBITBLIT:  Object to form.

5        THE WITNESS:  Yes.

6    Q.  BY MR. EHSAN:  Now, do you agree with this

7 indication for Nucynta?

8    A.  I think this indication is not supported by the

9 evidence.  I do reference some of the efficacy studies in

10 my report.  Afilalo, et al., compared Nucynta to placebo

11 and I believe oxycodone and found no clinically

12 meaningful difference in a 12-week study.

13       And as far as I know, there are no studies that

14 are placebo-controlled randomized trials longer than

15 12 weeks using Nucynta, tapentadol, in the treatment of

16 chronic pain.

17       So I feel that this indication is not informed

18 by the evidence.

19   Q.  I'll just -- two quick questions, and I realize

20 I'm trying to make things quick here, given the timing.

21       But the Afilalo study references or comparing

22 Nucynta to oxycodone, another active opioid; right?

23   A.  Yes, and to placebo.

24   Q.  Could you turn to page 12 of Exhibit 3 that I

25 handed you.  That's the label for the long-acting

67 (Pages 262 - 265)

HIGHLY CONFIDENTIAL

1 Nucynta.  You have it, I think.
2     A.  I have it?  Okay, yes.
3     Q.  If you turn to page 3 of that document.  You
4 have it.
5         Do you see that there is a series of warnings
6 surrounded by a box?
7     A.  Yes, I do.
8     Q.  Are you familiar with the term "box warning" or
9 "black box warning"?
10     A.  Yes, I am.
11     Q.  Do you see in the middle of that black box
12 warning related to Nucynta ER, there's a section titled
13 "Proper Patient Selection"?
14     A.  Uh-huh.
15     Q.  Could you please read that.
16     A.  "Nucynta is an extended-release formulation of
17 tapentadol indicated for the management of moderate to
18 severe chronic pain in adults when a continuous
19 around-the-clock opioid analgesic is needed for an
20 extended period of time."
21     Q.  Do you feel -- you believe that is a false or
22 misleading statement?
23     A.  I feel that this statement is not informed by
24 reliable evidence because it takes a study that provides
25 weak evidence for efficacy in acute pain and presumably

1 extends that to the treatment of chronic pain.
2     Q.  Do you have an understanding of what studies the
3 FDA reviewed in its approval and ultimate decision for
4 the indication of Nucynta ER?
5     A.  I believe that they did base their approval on
6 the Afilalo study and I think also the Buynak study in
7 2010.
8     Q.  And you think the totality of the evidence that
9 the FDA reviewed in connection with the indication for
10 Nucynta ER does not support the indication the FDA
11 ultimately granted Janssen for the drug; is that correct?
12     A.  Yes, I would say that's true.
13     Q.  Would you think that the FDA was just wrong on
14 this issue?
15     A.  I think the FDA was wrong on this issue, yes.
16 But there are other experts who will be opining on the
17 FDA and on FDA labeling.
18     Q.  Focusing your attention on the indication for
19 Nucynta ER, it talks about management of moderate to
20 severe chronic pain when a continuous around-the-clock
21 opioid is needed.
22         Do you see that?
23     A.  This is under "proper patient selection" again?
24     Q.  No.  If you go back to page 1.  I apologize for
25 not being very clear.  Under the "indication" section.

1     A.  Yes.
2     Q.  Now, how would a physician know that a patient
3 required around-the-clock or continuous opioid analgesic?
4         MR. ARBITBLIT:  Object to form.
5         THE WITNESS:  I guess could you be more specific
6 in your question?  It seems that the question could
7 encompass many different clinical scenarios.
8     Q.  BY MR. EHSAN:  Sure.  Let me just tell you --
9 put it differently.
10         Would it be fair to say that in order for
11 someone to require around-the-clock opioid analgesic, he
12 would qualify for the indication under Nucynta, that he
13 or she would have to be on some amount of opioids before
14 getting to the Nucynta prescription?
15     A.  Are you asking me about my opinion regarding the
16 use of opioids in the treatment of chronic pain or are
17 you asking me about the common practice?
18     Q.  Dr. Lembke, you said you had 20 years of
19 practice or medical practice experience and you relied on
20 your other clinical judgement, and I'm just taking it
21 from a perspective of a physician who's prescribed
22 opioids as well, that you don't start someone with a dose
23 of a long-acting, continuous opioid unless you know how
24 much opioids they could tolerate, i.e., they should
25 probably be on some level of regular short-acting opioids

1 and you're transitioning them to a long-acting opioid.
2         MR. ARBITBLIT:  Object to form.
3         THE WITNESS:  So I'm not sure that the actual
4 practice as it occurs in the United States necessarily
5 follows what you just said.  I think that patients are
6 started on long-acting opioids by some physicians even
7 when they've not been on short-acting opioids, so...
8     Q.  BY MR. EHSAN:  Understood.  And I'm sorry, it
9 was suggested that the United States meaning that I don't
10 have experience with the practice in the United States or
11 are you just saying that you have a different sense of
12 where I've come from in terms of my clinical experience
13 versus yours?  I'm just curious about that.
14     A.  I know nothing about your clinical experience.
15     Q.  But you believe in the United States it is not
16 standard practice to take a patient first on a
17 short-acting opioid, then transition them to a
18 long-acting opioid?
19     A.  I think that practice varies greatly and that we
20 are in a situation where many doctors without pain
21 expertise, in particular front-line primary care doctors,
22 have been put in the position of prescribing opioids
23 without really being given proper training on how to do
24 that, and so I think practice patterns vary greatly.
25     Q.  Do you know anything about the specific practice

68 (Pages 266 - 269)

HIGHLY CONFIDENTIAL

1 patterns in New York?
2     A.  I've commented previously on New York and what I
3 have looked at and what I haven't looked at.
4     Q.  Two -- two more quick questions.
5         Doctor, you said you worked with a DEA agent in
6 Oakland recently.
7         Do you recall that?
8     A.  Correct.
9     Q.  Would you be willing to provide that agent's
10 name?
11     A.  I'd be happy to do that.
12     Q.  Okay.  Can you provide that?
13     A.  I'd have to look at my records.  I --
14         MR. EHSAN:  Fair point.
15         And I'd just ask your counsel that if Dr. Lembke
16 could provide that name, that you could provide it to us.
17         MR. ARBITBLIT:  If the agent himself or herself
18 has no reason to object, then I would have no reason to
19 object.  And I don't know whether the witness has the
20 right to speak for that person.
21         If she's willing and the agent that she spoke to
22 is willing, then I'm willing.
23         MR. EHSAN:  Well, I asked her a question.  She
24 said she was willing.
25         MR. ARBITBLIT:  And you asked me a question and

1 I gave you an answer.  She may not have the authority to
2 speak for that person.
3         MR. EHSAN:  Under what --
4         MR. ARBITBLIT:  I don't know.  I'm not saying
5 that I won't provide it.  You're just making an argument
6 that doesn't necessarily have a basis.  We may be in
7 complete agreement.
8     Q.  BY MR. EHSAN:  Then, Dr. Lembke, are you aware
9 of any marketing by Janssen that led to any inappropriate
10 prescription for Duragesic or Nucynta in the state of New
11 York?
12     A.  So I'm aware of marketing efforts by Janssen and
13 lobbying efforts and funding efforts by Janssen on a
14 national level that did affect prescribing patterns
15 across all the states, including the state of New York.
16     Q.  Let me be a little more specific.
17         Can you identify a single prescription in the
18 state of New York for either Duragesic or Nucynta that
19 was -- let's just take it sequentially -- that was, one,
20 improper?
21     A.  I'm not --
22         MR. ARBITBLIT:  Object to form.
23         THE WITNESS:  At that level of specificity, no,
24 not a single prescription.
25     Q.  BY MR. EHSAN:  Two, based on a misrepresentation

1 by Janssen or any of its affiliates to the prescribing
2 doctor?
3         MR. ARBITBLIT:  Object to form.
4         THE WITNESS:  I believe that Janssen and Janssen
5 affiliates' misrepresentation have impacted prescribers
6 in New York.
7     Q.  BY MR. EHSAN:  But can you identify a single
8 doctor that was misled by Janssen?
9     A.  Yes, I can identify doctors that I have spoken
10 to in New York who said that they were misled by the
11 misrepresentations by the opioid pharmaceutical industry,
12 including Janssen, but not specifically referring to
13 Janssen.
14     Q.  So none of them specifically mentioned Janssen?
15     A.  No.
16         MR. EHSAN:  Thank you, Doctor.  I will pass the
17 witness.
18         THE VIDEOGRAPHER:  Going off the record, the
19 time is 4:17 p.m.
20         (Recess.)
21         THE VIDEOGRAPHER:  Back on the record, 4:25 p.m.
22             EXAMINATION
23     Q.  BY MS. VICARI:  Dr. Lembke, my name is Angela
24 Vicari, and I represent the ENDO and Par defendants in
25 this case.

1         Do you know what opioid medication --
2 medications ENDO manufactures?
3     A.  Yes.  ENDO manufactures OPANA ER, Percodin,
4 Percocet, and generic forms of oxycodone, oxymorphone,
5 hydromorphone and hydrocodone.
6     Q.  Do you know what opioid medications Par
7 manufactures?
8     A.  I'm not familiar with the ways in which ENDO and
9 Par relate to each other, but it could be that some of
10 those are, in fact, manufactured by Par or were
11 manufactured by Par before being acquired by ENDO.  I'm
12 not familiar with the acquisitions process.
13     Q.  And I noticed in answering that question, you're
14 referring to a document.  Is that document part of your
15 report?
16     A.  This document is part of the Complaint.
17         MS. VICARI:  Can we mark that.  I'd like to mark
18 that as an exhibit in the deposition.
19         I'd like to mark that document as Exhibit Number
20 13.  Oh, it's already marked as 5?
21         MR. ARBITBLIT:  It's part of the exhibit that
22 counsel asked earlier that we reproduce for you.  So it's
23 part of Exhibit 5.
24         MS. VICARI:  Okay.  Thank you.
25     Q.  Now, Dr. Lembke, is it your understanding that

69 (Pages 270 - 273)

HIGHLY CONFIDENTIAL

Page 274

1 other experts are offering opinions regarding the
2 adequacy of ENDO's suspicious order monitoring systems?
3    A. Yes.
4    Q. And you're not offering any opinions regarding
5 the adequacy of ENDO's suspicious order monitoring
6 systems; correct?
7    A. I'm not offering specific opinions on ENDO, but
8 as stated in my report, I do offer an opinion on the role
9 of distributors, manufacturers and pharmacies in creating
10 the oversupply that led to the opioid epidemic.
11    Q. Do you know anything about the way in which ENDO
12 monitored suspicious orders?
13    A. I know that in general, opioid manufacturers
14 look at reports of -- actually, I would -- I would defer
15 that to other experts.
16    Q. So you're not offering any opinions regarding
17 the adequacy of ENDO's suspicious order monitoring
18 system; correct?
19    A. That's correct.
20    Q. And you're not offering any opinions regarding
21 the adequacy of Par's suspicious order monitoring
22 systems; correct?
23    A. That's correct.
24    Q. And you said earlier other experts will be
25 opining on FDA issues; is that correct?

Page 275

1    A. I do mention the FDA in my report in several
2 places. If you'd like, I can go to those sections.
3    Q. My -- that's okay.
4       You're not offering any opinions regarding
5 ENDO's compliance with FDA regulations; correct?
6    A. That's correct.
7    Q. And you're not offering any opinions regarding
8 Par's compliance with FDA regulations; correct?
9    A. That is correct.
10    Q. Now, Dr. Lembke, all the documents that you
11 considered in forming your opinions are set forth in
12 Exhibit B to your report and the supplement that was
13 provided last night; correct?
14    A. That is correct, but I would add to that I was
15 the recipient of ENDO and other defendants' marketing
16 material throughout my medical career. Those are not --
17 those are not listed, but those are part of what has
18 contributed to my opinion.
19    Q. And what documents that are not listed in
20 Exhibit B or the supplement did you receive from ENDO
21 during the course of your medical career?
22    A. I can't speak to ENDO specifically, but in terms
23 of opioid manufacturers and their influence on pain as
24 the fifth vital sign on the Federation of State Medical
25 Boards on pain guidelines, I was the recipient of those

Page 276

1 marketing efforts.
2    Q. And a lot of those materials are in your report.
3 I was asking which materials that are not in Exhibit B or
4 the supplement to your report did you receive from ENDO?
5    MR. ARBITBLIT:  Object to form.
6    THE WITNESS:  As answered, the materials that
7 are cited in my report as well as my clinical experience
8 and my experience as a clinician being influenced by the
9 marketing material in real time as it unfolded in the
10 '90s and early aughts through today have contributed to
11 my opinion.
12       So I wouldn't want you to be under the mistaken
13 conclusion that it's just those listed documents gathered
14 for the purpose of writing the report.
15    Q. BY MS. VICARI:  Do you intend to offer opinions
16 at trial regarding ENDO -- any ENDO documents that are
17 not included in Exhibit B or the supplement to your
18 report?
19    A. If there's a document that you'd like me to see
20 in addition, I would be happy to review it.
21    Q. There's no document that I wish to show you.
22       Sitting here today, do you intend to offer any
23 opinions at trial concerning any ENDO documents that are
24 not included in Exhibit B or the supplement to your
25 report?

Page 277

1    A. Not unless I'm asked to review an additional
2 document, which I would be happy to do.
3    Q. And in forming your opinions as to ENDO in this
4 case, you did not consider any deposition testimony given
5 by ENDO witnesses; is that correct?
6    A. That is correct.
7    Q. And in forming your opinions in this case, you
8 did not consider any deposition testimony given by any
9 Par witnesses; is that correct?
10    A. That is correct.
11    Q. And it's fair to say that in forming your
12 opinions, you didn't review all of ENDO's opioid
13 marketing materials; correct?
14    A. That is correct.
15    Q. To the extent that you considered ENDO documents
16 in forming your opinions, you've reviewed those documents
17 thoroughly; correct?
18    A. Yes.
19    Q. And to the extent that as a result of your
20 review of an ENDO document, did you include all of the
21 statements that you believe to be misleading in your
22 report?
23    A. I included representative samples. I didn't
24 include all of the misleading documents. There were so
25 many that it would have been a very long report to

70 (Pages 274 - 277)

HIGHLY CONFIDENTIAL

1 include all of them, but I included representative
2 examples.
3    Q.  Which ENDO documents -- in your opinion, which
4 ENDO documents contained misleading statements that were
5 not included in Exhibit B to your report or the
6 supplement?
7        MR. ARBITBLIT:  Object to form.
8        THE WITNESS:  I don't remember now, but when I
9 found a statement that was repetitive of other
10 misrepresentations, I just tried to use several examples,
11 not every single example, because it would have been
12 redundant.
13    Q.  BY MS. VICARI:  Dr. Lembke, you have not
14 conducted any analyses to determine which, if any,
15 prescriptions of ENDO opioid medications in New York
16 state were medically inappropriate, have you?
17        MR. ARBITBLIT:  Object to form.
18        THE WITNESS:  As stated before along similar
19 lines of questioning, I have not analyzed documents at
20 the level of individual documents produced by ENDO in the
21 state of New York.  But I would qualify that by saying I
22 believe that prescribers in the state of New York were
23 exposed to the same misleading marketing messages as
24 doctors all across the country.
25    Q.  BY MS. VICARI:  And same question as to Suffolk

1 County.  Is your answer the same?
2    A.  Same answer.
3    Q.  And same question as to Nassau County.  Is your
4 answer the same?
5    A.  Same answer.
6    Q.  You have not conducted any analysis to determine
7 when -- whether any particular prescription of an ENDO
8 medication in New York state was influenced by ENDO's
9 marketing; correct?
10        MR. ARBITBLIT:  Object to form.
11        THE WITNESS:  I would refer to my answer to the
12 last question, which I think is essentially the same
13 answer.
14    Q.  BY MS. VICARI:  And same question as to Suffolk.
15 Is your answer -- is your answer the same?
16    A.  Yes, it is.
17    Q.  Okay.  And the same question as to Nassau
18 County.  Is your answer the same?
19    A.  Yes, it is.
20    Q.  Dr. Lembke, would you agree with me that any
21 ENDO document that was an internal-only document, not
22 seen by physicians, could not have been relied on by
23 doctors in New York state in their prescription of an
24 opioid to a patient?
25    A.  Well, I think internal documents not seen by a

1 prescribing physicians are a window into the campaign
2 that ENDO and other defendants were launching to convince
3 prescribers.
4        I think there were many instances of
5 misrepresentation for which there's documentation at all,
6 and of course, those can't be included.
7    Q.  I guess my -- my question was not as to
8 messaging; it was to the particular document.
9        Is it your -- you would agree with me that any
10 ENDO document that was internal only and never seen by a
11 physician, that document could not have been relied on by
12 a physician in making a prescribing decision; correct?
13        MR. ARBITBLIT:  Object to form.
14        THE WITNESS:  Well, I disagree with that because
15 an internal ENDO document could easily have influenced
16 the external communications with prescribers and hence
17 influence their prescribing.
18    Q.  BY MS. VICARI:  Dr. Lembke, can you identify for
19 me any individuals who died as a result of taking an
20 opioid manufactured by either ENDO or Par in either the
21 state of New York, Suffolk County or Nassau County?
22    A.  No.
23    Q.  And Dr. Lembke, can you identify for me any
24 individuals who overdosed on an opioid manufactured by
25 ENDO or Par in New York state, Suffolk County or Nassau

1 County?
2    A.  Not at the level of an individual by name.  Not
3 at that level.
4    Q.  Okay.  And if I asked the same question with
5 respect to abuse of an ENDO or Par opioid, is your answer
6 the same?
7    A.  Yes.
8    Q.  Okay.  And you can't identify for me anyone who
9 misused an ENDO or Par opioid in the state of New York,
10 Suffolk County or Nassau County, can you?
11    A.  Not by name, no.
12    Q.  And similarly, you can't identify any individual
13 who became addicted to an ENDO or Par opioid in the state
14 of New York, Suffolk County or Nassau County; correct?
15    A.  Correct.
16    Q.  Now, Dr. Lembke, when you encounter a patient
17 who you learn has abused a prescription opioid, do you
18 report that abuse as an adverse event to the manufacturer
19 of that opioid?
20    A.  I have not done that, no.
21    Q.  And when you encounter a patient who you know
22 misused a prescription opioid, do you report that as an
23 adverse event to the manufacturer of the opioid?
24    A.  I've not taken that action, but I have written
25 and spoken widely on the problem of prescription opioid

71 (Pages 278 - 281)

HIGHLY CONFIDENTIAL

Page 282

1 misuse and addictive use as a way to try to raise
2 awareness.  So I have taken other measures to raise
3 awareness.
4     Q.  But you haven't submitted an adverse event
5 report to the manufacturer in that case; correct?
6     A.  No, I haven't, and that is largely because my
7 awareness of the opioid problem really began after I
8 graduated from medical school and finished my residency
9 training, and at that point, I was not prescribing
10 opioids until I began to prescribe buprenorphine for the
11 treatment of opioid use disorder.
12     Q.  Well, when patients come to you for the
13 treatment of opioid use disorder today, you testified
14 earlier some of them are abusing prescription opioids;
15 correct?
16     A.  Yes, that is true.
17     Q.  And do they tell you which opioid they are
18 abusing?
19     A.  Sometimes they do, yes.
20     Q.  And when they tell you which opioid and they
21 are, I'll say, misusing, do you report that as an adverse
22 event to the manufacturer of that opioid?
23     A.  That has not been my practice.
24     Q.  And when you encounter a patient who you know
25 has become addicted to a prescription opioid, do you

Page 283

1 report that case of addiction to the manufacturer of the
2 opioid as an adverse event report?
3     A.  I don't report it as an adverse event report to
4 the manufacturer, but I certainly do alert the other
5 healthcare providers taking care of that patient.  I
6 alert in some instances the pharmacist who's dispensing
7 for that patient.
8     Q.  And do you report any known diversion of a
9 prescription opioid to the manufacturer as an adverse
10 event?
11     A.  As stated before, it's very hard for me to be
12 aware of diversion in real time because patients will not
13 admit to it.  It's only in the past tense that they'll
14 admit to it.  I've had instances of being suspicious of
15 diversion, but not enough to, let's say, involve criminal
16 justice or report it at that level.
17     Q.  Now, Dr. Lembke, it's your position and your
18 opinion in this case that there's no reliable scientific
19 evidence showing that the long -- that long-term opioid
20 therapy is effective for chronic non-cancer pain; is that
21 correct?
22     A.  Yes, that's correct.
23     Q.  And by "reliable scientific evidence," you mean
24 a randomized placebo-controlled trial in excess of three
25 months; is that correct?

Page 284

1     A.  Yes.
2     Q.  How would you design a randomized
3 placebo-controlled trial to determine whether opioid
4 therapy is effective for chronic non-cancer pain?
5     A.  Well, I would try to use a real clinic
6 population, not a rarified sample.  So I would try to
7 base it in a clinic and recruit patients who were
8 representative of the types of patients we see in real
9 clinical care.
10     I would try, as the SPACE trial did, to assess
11 their impressions of opioids prior to initiating therapy.
12     I would randomize those individuals to
13 comparable groups, one group to receive opioids and
14 another to receive placebo in a blinded -- double-blinded
15 fashion, so neither the providers -- prescribers or
16 patients themselves knew which they were getting.
17     Q.  Uh-huh.
18     A.  And then I would try to use comprehensive
19 measures that are clinically meaningful to assess their
20 subjective pain relief but also their objective function
21 and many other potential adverse health consequences,
22 including the risk of misuse and addictive use.  That's
23 just a start.
24     Q.  You mentioned the SPACE trial.  Do you believe
25 that there was any selection bias in the SPACE trial?

Page 285

1     A.  So the SPACE trial itself said that there was
2 some bias in favor of opioids a priori.
3     Q.  Is that the only bias that you're aware of in
4 the SPACE trial?
5     A.  Well, the SPACE trial used an opioid-naive
6 sample.  That's not a bias, but there are lots of
7 patients who are already on opioids that should also be
8 counted.
9     And, of course, you know, 12 months, although a
10 long time compared to most studies, is still probably not
11 sufficient to assess the true risk of opioid addiction.
12 When patients are receiving prescription for an opioid in
13 clinical care, there are data showing that median length
14 of time to developing an opioid addiction is
15 approximately three years.
16     MS. VICARI:  Thank you, Dr. Lembke, for your
17 time.  I'll pass the witness.
18     Can we go off the record while we pass the
19 witness.
20     MR. ARBITBLIT:  Yes, thanks for asking.
21     THE VIDEOGRAPHER:  Going off the record, the
22 time is 4:42 p.m.
23     (Discussion off the record.)
24     (Exhibit 13, ALLERGAN_MDL_01361692 - 1850,
25     marked for identification.)

72 (Pages 282 - 285)

HIGHLY CONFIDENTIAL

Page 286

1    (Exhibit 14, WIS_PPSG_003892, marked for
2    identification.)
3    THE VIDEOGRAPHER:  Back on the record, the time
4    is 4:45 p.m.
5    EXAMINATION
6    Q.  BY MS. RIVERA:  Good afternoon, Dr. Lembke.
7    A.  Good afternoon.
8    Q.  My name is Maria Rivera.  I'm from the law firm
9    of Kirkland & Ellis, and I represent Allergan Finance,
10   LLC, in this case.
11   If you wouldn't mind in Exhibit 2, which is your
12   report, turning to Appendix B, which is your relied upon
13   list.
14   And if you would turn to page 49 of that relied
15   upon list, please.
16   A.  49 of the relied upon list.  Yes, I'm there.
17   Q.  Yes, ma'am.
18   Am I correct that this is where you list the
19   document -- or the defendant-specific documents that you
20   reviewed and relied upon in reaching your opinions in
21   this case?
22   A.  Yes, this is the documents that I relied upon.
23   Q.  Okay.  And am I correct that there are six
24   Allergan-produced documents on that list?
25   A.  Yes.

Page 287

1    Q.  Okay.  So is it fair to say that those are the
2    only Allergan-specific documents that you reviewed to
3    reach any Allergan-specific opinions in your report?
4    A.  No, because I was the recipient of multiple
5    Allergan promotional material throughout my medical
6    career.  So that is also part of what forms the basis of
7    my opinion.
8    Q.  Okay.  Can you identify any specific Allergan
9    promotional material that you received during your career
10   that you're relying upon for purposes of your opinions in
11   this case?
12   A.  I do have some memories of Allergan promotional
13   material for Actiq or fentanyl lollipops through my
14   medical training because I remember being so shocked that
15   fentanyl would be put in lollypop form.
16   Q.  And is it your understanding that those are
17   Allergan products?
18   A.  Oh, sorry.  Those are Teva products.  You're
19   right.  Sorry.
20   Q.  Okay.  So let me ask my question again.
21   Do you have or can you identify any other
22   Allergan-specific documents or materials that you're
23   relying upon for your opinions in this case with respect
24   to Allergan, other than the six documents that are listed
25   in Appendix B to your report?

Page 288

1    A.  No.
2    Q.  Now you, as was mentioned, did serve a report in
3    the MDL case as well.
4    Do you recall that?
5    A.  Yes.
6    Q.  Okay.  And I'll represent to you that in that
7    case, you listed only five Allergan Bates-labeled
8    documents.  And the document that you added is number 667
9    in your New York report, and I'm going to hand that to
10   you, which has been marked Exhibit 13 (indicating.)
11   MR. ARBITBLIT:  Thank you, Counsel.
12   Q.  BY MS. RIVERA:  And let me just back up and ask
13   you one question.
14   Were the six Allergan-produced documents that
15   you reviewed provided to you by your counsel?
16   A.  Yes, they were.
17   Q.  Okay.  And do you have an understanding that
18   Allergan has produced hundreds of thousands of documents
19   in this case; correct?
20   A.  That is correct.
21   Q.  But you didn't think it was necessary to review
22   any more Allergan documents that the six that are listed
23   in your report; is that correct?
24   MR. ARBITBLIT:  Object to form.
25   THE WITNESS:  I lived through this promotional

Page 289

1    campaign, and the Allergan documents that I reviewed were
2    consistent with my lived experience of pharmaceuticals'
3    promotional messages.  So because those themes were
4    saturated, no, I don't think it was necessary.  But if
5    there are any documents that you would like me to review,
6    I would be happy to review them.
7    Q.  BY MS. RIVERA:  Okay.  But the answer to my
8    question about whether you didn't think it was necessary
9    to review any more Allergan documents that the ones that
10   are listed in Appendix B is "yes"; correct?
11   MR. ARBITBLIT:  Object to form, asked and
12   answered.
13   THE WITNESS:  I did answer that question.
14   Q.  BY MS. RIVERA:  Okay.  The document that I
15   handed you, which is Exhibit 13, is the one that you
16   added to your report.
17   In looking at this document, which is entitled
18   "ER/LA Opioid REMS," do you see that this document was
19   created by The Collaboration For REMS Education?
20   A.  Yes, I do.
21   Q.  Okay.  So in looking at this document, would you
22   agree with me that is not a document that Allergan
23   created?
24   A.  I can't be sure of that.  I'm not sure what The
25   Collaborative For REMS Education consists of.

73 (Pages 286 - 289)

HIGHLY CONFIDENTIAL

Page 290

1    Q.  Are you able to tell whether any statements in
2  this presentation are attributable to Allergan?
3    A.  This presentation, as I'm recalling it, is a
4  more general presentation on opioids, and I don't believe
5  it lists any specific opioid products, although I may be
6  wrong about that.
7    Q.  Okay.  From looking at this presentation,
8  though, you can't say that any of the statements in here
9  are attributable to Allergan; correct?
10    A.  Well, what I would say is that the promotional
11  efforts of Allergan more broadly have contributed to the
12  kinds of statements that are in these educational
13  materials that have contributed to a prescribing pattern
14  which is not consistent with the evidence.
15    Q.  Okay.  I understand, Dr. Lembke.
16      My question was:  This document doesn't have any
17  indication if the statements in it were made by Allergan
18  or not?
19    A.  Well, again, what I'm trying to -- to say is to
20  draw a distinction between specific products and the
21  paradigm shift or the cultural change in medicine around
22  opioid prescribing, which I do believe Allergan and other
23  defendants had a hand in.
24    Q.  I understand, but that wasn't my question.
25      My question is:  You can't tell from this

Page 291

1  presentation whether any of the statements in it were
2  made by Allergan or written by Allergan?
3    A.  Well, many of the references on many of these
4  slides involve organizations that received funding from
5  opioid Pharma so that it is possible that some of these
6  slides were influenced by Allergan.  So I wouldn't want
7  to say for sure.
8    Q.  It's possible, but you don't know if that's the
9  case; correct?
10    A.  Well, I wouldn't want to say that Allergan
11  didn't influence the content.  I believe that Allergan
12  and other opioid manufacturers did greatly influence the
13  content of these kinds of learning materials.
14    Q.  Okay.  Can I ask you how -- why you added this
15  to your relied upon list from your MDL report to your New
16  York report?
17      I can represent to you that it's not cited
18  anywhere in the body of your report or in your appendix
19  with respect to Allergan.
20    A.  Okay.
21    Q.  In fact, let me withdraw my question and ask you
22  a different one.
23    A.  Okay.
24    Q.  If this presentation is not listed anywhere in
25  your report or in your appendix that's specific to

Page 292

1  Allergan, can I assume that you didn't rely upon this
2  presentation in reaching your Allergan-specific opinions?
3    A.  No, that's not correct.
4    Q.  Okay.  But you can't tell me, sitting here
5  today, how you relied upon this with respect to Allergan?
6    A.  So I relied upon this as an example of
7  educational materials disseminated to healthcare
8  providers that misrepresents the evidence around opioid
9  prescribing, and I detail in many places in my report how
10  opioid manufacturers, distributors and pharmacies
11  contributed to this misrepresentation of the evidence and
12  the oversupply that's the essence of my report.
13    Q.  Okay.  Let's move on.
14      You testified earlier, I believe, that you did
15  not conduct any type of regression analysis.  I'll try to
16  get the language right.
17      You did not conduct any type of regression
18  analysis to isolate the impact that any opioid -- opioid
19  marketing by any individual defendant had on New York
20  prescribers; is that correct?
21    A.  That is correct.
22    Q.  Okay.  Am I correct that you didn't do any type
23  of analysis, regression or otherwise, to isolate the
24  impact that any opioid marketing by any individual
25  defendant had on the prescription levels of opioids in

Page 293

1  New York?
2    A.  So I read the analyses of others on specific New
3  York prescribing, and those are in my report, and I've
4  cited those in testimony.  But I did not do my own
5  individual crunching of numbers, as it were.
6    Q.  Okay.
7    A.  I have done lots of qualitative analyses that I
8  do think apply to the State of New York and Suffolk and
9  Nassau counties.
10    Q.  Understood.  And that would mean that you
11  haven't done any independent analysis to try to determine
12  the impact of Allergan-specific promotional activity on
13  the levels of prescribing in Northern California or in
14  Suffolk County or in Nassau; correct?
15    A.  Incorrect.  I believe that I have done my own
16  independent analyses, as evidenced by peer-reviewed
17  articles I've written, as evidenced by my book, that very
18  carefully details the role of opioid manufacturers --
19  Allergan is one example -- in creating the
20  overprescribing and oversupply of opioids leading to the
21  opioid epidemic.
22      That is an analysis that I did, a causal
23  analysis.
24    Q.  Okay.  Have you done -- am I correct that you
25  have not done any quantitative analysis in order to

74 (Pages 290 - 293)

Page 294

1 quantify how, if at all, Allergan's promotion contributed
2 to the level of opioid prescribing in New York?
3     A. I would respectfully disagree with that. I've
4 published a paper on which prescribers are prescribing
5 the most opioids, using a national database, Medicare
6 database, including prescribers in the state of New York.
7 And that is a quantitative analysis.
8     Q. Have you done any -- do you have an opinion and
9 are you offering an opinion about the quantitative impact
10 that Allergan's opioid marketing had on prescription
11 levels in New York?
12     A. I'm not quantifying Allergan's role, but I am
13 offering an opinion that Allergan contributed to
14 increased prescribing in the state of New York.
15     Q. Okay. But you haven't done any analysis to
16 quantify what that impact was?
17     A. Well, I have done a quantitative analysis in the
18 article that I published in JAMA looking at who is
19 prescribing opioids, and what we saw was no geographic
20 variation in that pattern across 50 states.
21         And I've also, as I said, done a qualitative
22 analysis which I believe represents the same problems in
23 New York as everywhere else in the country.
24     Q. Am I correct, Doctor, that you don't know how
25 many details Allergan sales reps conducted in New York?

Page 295

1     A. That is correct.
2     Q. And you don't know how the number of Allergan
3 details compares to any other defendants?
4     A. That is correct.
5     Q. And you don't know how many prescriptions of
6 Allergan's opioid products there were in New York?
7     A. That is correct.
8     Q. And you don't know what Allergan's market share
9 of opioid prescriptions was in New York; is that right?
10     A. That is correct.
11     Q. And am I correct that you cannot name any
12 individual doctor in New York that wrote a prescription
13 for an Allergan opioid that they would not have otherwise
14 written because of Allergan's promotional marketing?
15     MR. ARBITBLIT: Object to form.
16     THE WITNESS: Again, my prior answer regarding
17 the overall influence of the opioid industry on
18 overprescribing of opioids does apply to New York as
19 well.
20     Q. BY MS. RIVERA: But you cannot identify a
21 specific doctor in New York that wrote a prescription as
22 a result of Allergan's promotional activity; correct?
23     A. I have spoken to doctors who practice in New
24 York who communicated to me that they were influenced by
25 the misleading of the opioid pharmaceutical industry, but

Page 296

1 not at the level of specificity of naming specific opioid
2 manufacturers.
3     Q. Can you identify a specific individual who died
4 or overdosed in New York as a result of taking an
5 Allergan opioid?
6     A. Same -- same answer as the last question.
7     Q. Can you answer it for me more specifically to
8 this question? Can you identify a specific individual
9 who died or overdosed in New York, Suffolk County or
10 Nassau County, as a result of taking an Allergan opioid?
11     MR. ARBITBLIT: Object to form.
12     THE WITNESS: Not by name.
13     Q. BY MS. RIVERA: Can you identify any individual
14 in New York who became addicted to any opioid or misused
15 any opioid as a result of taking an Allergan opioid
16 product in New York?
17     A. Not by name.
18     Q. Can you identify any individual description in
19 New York, Suffolk County or Nassau County, of an Allergan
20 opioid that was medically inappropriate?
21     A. Not by name.
22     Q. Just a few more questions.
23         Based on your experience, Doctor, would you
24 agree that sometimes manufacturers will detail physicians
25 for the specific purpose of trying to promote

Page 297

1 substitution of one opioid for another opioid?
2     MR. ARBITBLIT: Object to form.
3     THE WITNESS: Can you rephrase your question?
4     Q. BY MS. RIVERA: Sure.
5         In other words, are you familiar that -- with
6 the fact that manufacturers may detail physicians in
7 order to try to convince them to switch from one opioid
8 to another opioid?
9     A. Yes.
10     Q. Okay. And if that detailing is successful and
11 the doctor switches from one opioid to another opioid,
12 that is not increase in the overall level of opioid
13 prescriptions, is it?
14     MR. ARBITBLIT: Object to form.
15     THE WITNESS: It really depends on whether or
16 not that switch, which is most commonly done to try to
17 overcome tolerance, actually leads to an increase in the
18 total of morphine milligram equivalence of that opioid,
19 which is one way to measure increase in supply.
20     Q. BY MS. RIVERA: Okay. And if it doesn't lead to
21 an increase in the total morphine milligrams and it's
22 just switching the same level of milligrams from one
23 opioid to another, that does not increase the overall
24 level of opioid prescriptions, does it?
25     MR. ARBITBLIT: Object to form.

75 (Pages 294 - 297)

HIGHLY CONFIDENTIAL

Page 298

1    THE WITNESS: Well, it might do if it leads to
2  more prolonged exposure to that opioid as a result of the
3  switch. So not only had the last three decades been
4  characterized by increasing doses of opioids, but also
5  increasing duration. More than 80 percent of individuals
6  receiving opioid therapy are on long-term opioid therapy
7  despite the absence of evidence for long-term use.
8    Q. BY MS. RIVERA: Okay. Let me hand you what's
9  been marked as Exhibit 14 very quickly (indicating).
10    MR. ARBITBLIT: Copy, please.
11    MS. RIVERA: Oh, sorry.
12    Q. In your Appendix 2, you identify some documents
13  that you believe support that manufacturers supported the
14  Wisconsin Pain and Policy Study Group?
15    A. Yes.
16    Q. Okay. And I'll represent to you that the
17  document that you cited with respect to Allergan and
18  Actavis is the document that I just handed you as
19  Exhibit 14.
20    And you can see that -- sorry, on page 5 of your
21  Appendix 2, paragraph 22 also page 5 of the Pain and
22  Policy Study Group appendix?
23    A. Yep.
24    Q. Paragraph 22?
25    A. Yep.

Page 299

1    Q. Okay. And so this is the document that you
2  cited to support that Allergan or Actavis had supported
3  that Pain and Policy Group. I'll represent to you that
4  there is no mention of Allergan or Actavis in this
5  document.
6    If that's the case, do you have any other
7  evidence that you're aware of that would suggest that
8  Allergan or Actavis supported the Wisconsin Pain and
9  Policy Group, that's not cited in your appendix?
10    A. If I cited it in the appendix I would -- and
11  it's not appearing in this document, I would really want
12  to go back and see what I was referring to.
13    Q. Okay. As you sit here today, though, you don't
14  have any other evidence that Allergan supported the Pain
15  and Policy Group; correct?
16    MR. ARBITBLIT: Object to form.
17    THE WITNESS: So I am not intimately familiar
18  with the various Allergan subsidiaries or predecessors.
19  So I wouldn't want to make that kind of global statement
20  without double-checking the source and also verify that
21  there's not some subsidiary that did contribute.
22    Q. BY MS. RIVERA: Okay. But as you sit here
23  today, you don't have any other evidence that you can
24  point to; correct?
25    A. Not right now.

Page 300

1    Q. Okay. Three more quick questions.
2    Can you identify any payments to a KOL by
3  Allergan?
4    A. Well, this $50,000, if I could verify that,
5  would serve.
6    Q. Okay. Other than that. And that's not a KOL;
7  right?
8    A. Well, it's founded and led by Dahl and Joranson,
9  who are definitely KOLs.
10    Q. Let me try it again.
11    If you look at pages 19 to 22 of your report
12  where you discuss KOLs that are sponsored by
13  manufacturers --
14    A. Uh-huh.
15    Q. -- you don't see any reference to Allergan
16  there, do you?
17    A. No. I'm not seeing any other reference.
18    MS. RIVERA: Okay. That's all I have. Pass the
19  witness.
20    Off the record, yes, please.
21    THE VIDEOGRAPHER: Going off the record, the
22  time is 5:07 p.m.
23    (Discussion off the record.)
24    THE VIDEOGRAPHER: Back on the record, the time
25  is 5:09 p.m.

Page 301

1    EXAMINATION
2    Q. BY MS. LEIBELL: Good afternoon, Dr. Lembke. My
3  name is Martha Leibell and I represent Teva
4  Pharmaceuticals USA, Inc., Cephalon, Inc., Actavis, LLC,
5  Actavis Pharma, Inc., and Watson Laboratories, Inc., in
6  the current litigation.
7    Can you tell me what medicines Actavis, LLC
8  manufactures or sells?
9    A. Yes. Is Actavis a subsidiary of Teva?
10    Q. It is a separate entity. I'm asking only about
11  Actavis, LLC.
12    A. I believe that all of the opioid manufacturers,
13  the defendants in this litigation, have manufactured some
14  form, either branded or generic hydrocodone and
15  oxycodone.
16    Q. Okay. And is it the same answer for Actavis
17  Pharma, Inc.?
18    A. Yes, same answer for Actavis Pharma, Inc.
19    Q. And same question for Watson Laboratories, Inc.?
20    A. Yes, I believe so.
21    Q. Did you review any package inserts or labels for
22  any of the medicines those three entities manufacture or
23  sell?
24    A. In my career, I have reviewed package inserts
25  for many different opioids, and I'm sure that has

76 (Pages 298 - 301)

HIGHLY CONFIDENTIAL

Page 302

1 included products that your defendant client sells.
2    Q.  For purposes of preparing for the instant
3 litigation, have you reviewed any package inserts for any
4 drugs manufactured or sold by those three entities?
5    A.  No.
6    Q.  In Appendix 1 to your report, you do not
7 identify any promotional materials published by Actavis,
8 LLC, Actavis Pharma, Inc., or Watson Laboratories, Inc.;
9 correct?
10    A.  Correct.
11    Q.  Are you aware that these three entities
12 manufacture and/or sell generic opioid medicines?
13    A.  Yes.
14    Q.  Are you aware that generic opioid medicines are
15 not marketed or promoted other than informing the public
16 of availability and pricing?
17       MR. ARBITBLIT:  Object to form.
18       THE WITNESS:  I'm aware of that, but I would add
19 that marketing for branded products influenced the
20 prescribing and supply of generic products, and in that
21 sense, the result is effectively the same for branded and
22 generic products.
23    Q.  BY MS. LEIBELL:  Are you aware of a single
24 person in Nassau County that was harmed as a result of a
25 medically inappropriate generic opioid prescription

Page 303

1 manufactured or sold by these three entities?
2       MR. ARBITBLIT:  Object to form.
3       THE WITNESS:  Not by name.
4    Q.  BY MS. LEIBELL:  Same question for Suffolk
5 County.
6    A.  Not by name.  And I would also refer you back to
7 my answer to similar questions from other defendants just
8 regarding the overall influence of opioid manufacturers,
9 distributors and pharmacies in increasing the supply,
10 which also apply to these questions here.
11    Q.  Thank you.  I was paying close attention all
12 day, but I am asking questions specifically about my
13 clients.
14       And are you aware of a single person in New York
15 state that was harmed as a result of a medically
16 inappropriate generic opioid prescription manufactured or
17 sold by the three entities I mentioned?
18    A.  Not by name.
19    Q.  Are you aware that Actiq and Fentora are TIRF
20 medicines?
21       MR. ARBITBLIT:  Object to form.
22       THE WITNESS:  I don't know what a TIRF medicine
23 is.
24    Q.  BY MS. LEIBELL:  Well, I can represent that that
25 stands for transmucosal immediate-release fentanyl.

Page 304

1    A.  Oh.  Yes, I do know what that is.
2    Q.  Okay.
3    A.  I have not heard it referred to as a TIRF
4 medicine.
5    Q.  Are you aware that they are both -- Actiq and
6 Fentora are both short-acting opioids indicated for
7 breakthrough cancer pain in opioid-tolerant patients?
8    A.  Yes, I'm aware of that, but I will say that in
9 my clinical experience, I've seen many patients who don't
10 fit that description, who have been on Actiq and Fentora.
11    Q.  Have you yourself ever prescribed a TIRF
12 medicine?
13    A.  I don't recall doing so, but I may have done
14 very early in my career when I was still in training.  I
15 certainly have not done so in the last 20 years.
16       I have, however, treated many patients who have
17 been on Actiq and Fentora.  As I stated previously in the
18 deposition, I was shocked to see patients coming into my
19 office sucking on fentanyl lollipops.
20    Q.  Have you ever prescribed a medication for
21 off-label use?
22    A.  Yes, I have.
23    Q.  Do you know what the TIRF REMS program is?
24    A.  Yes, I do.
25    Q.  Can you tell me what that stands for?

Page 305

1    A.  Well, REMS stands for Risk Evaluation and
2 Mitigation Strategy.  And again, I've not heard this term
3 TIRF before, but transmucosal immediate-release
4 medications are associated with a very specific REMS in
5 order to -- that doctors are required to take as part of
6 their responsibility before they prescribe or as they are
7 prescribing these opioids.
8    Q.  And are you aware that the TIRF REMS program was
9 implemented in March 2012?
10       MR. ARBITBLIT:  Object to form.
11       THE WITNESS:  I'm not recalling the specific
12 date, but that sounds about right.
13    Q.  BY MS. LEIBELL:  And are you aware that the TIRF
14 REMS program requires an FDA-approved medication guide to
15 be provided to patients before the medication is
16 dispensed in an outpatient setting?
17    A.  Can you repeat the question?
18    Q.  Sure.
19       Are you aware that the TIRF REMS program
20 requires an FDA-approved medication guide to be provided
21 to patients before the medicine is dispensed in an
22 outpatient setting?
23    A.  I didn't remember that, but I believe you.
24    Q.  And do you know whether or not medication guides
25 usually contain product labels?

77 (Pages 302 - 305)

HIGHLY CONFIDENTIAL

Page 306

1    A. I would really want to see the specific
2 medication guide before I could comment on that.  I can
3 say that I have reviewed the REMS.  I've personally
4 reviewed the REMS for transmucosal immediate-release
5 medications, and I think they're inadequate in order to
6 properly educate doctors about the risks and benefits of
7 opioids.
8    Q. In what respect are they inadequate?
9    A. I think they perpetrate many of the misleading
10 messages along the lines of opioids being a safe and
11 effective treatment for chronic pain and that the risk is
12 relatively low.
13      They also spend very little time in general
14 educating prescribers on addiction, what it is, how to
15 screen and intervene, how to monitor patients.  The
16 majority of the time is spent on how to initiate opioids,
17 how to maintain opioids, how to switch from one opioid to
18 another.
19    Q. Are you aware that prescribers are required to
20 certify that they understand the risks of abuse,
21 potential harm from these opioids?
22    A. Yes, I am.  But I don't think that that has made
23 much inroads in mitigating those risks.  I am familiar
24 with cases of individuals who engaged in a -- physicians
25 who engaged in egregious overprescribing, who documented

Page 307

1 that they took these REMS, but clearly their practice was
2 not informed by safe opioid prescribing.
3    Q. Are you aware that patients also must certify
4 that they've received medication guides from their
5 prescribers before they can be dispensed these
6 medications?
7    A. I don't remember that, but I believe you.
8    Q. And are you aware that the patient form
9 component requires each patient prescriber to agree that
10 they each understand the risks, consequences, and
11 approved uses of TIRF medicines?
12    A. Thank you for telling me that.  That's good to
13 know.  I would highlight, though, a paper that just came
14 out in the last month by Hayward, et al., which looked at
15 the --
16    Q. I'm so sorry to stop you just because I'm very
17 short on time.
18    A. Yes.  Specifically that paper says that -- that
19 REMS is not showing that it's having an impact.
20    Q. Okay.  I will turn to my next few final
21 questions.
22      In Appendix 1 to your report, you list
23 promotional messages that you identify as misleading and
24 identify certain defendants' promotional messages;
25 correct?

Page 308

1    A. That is correct.
2    Q. Teva Pharmaceuticals USA is not one of those
3 defendants; correct?
4    A. It is not listed in Appendix 1, that is correct.
5    Q. Cephalon, Inc., is not one of those defendants
6 listed in Appendix 1; correct?
7    A. That is correct; however, I do refer to
8 Cephalon, Inc., in my report when I discuss the influence
9 of the opioid pharmaceutical industry.  I'm happy to turn
10 to that.
11    Q. That's okay.  Would you identify -- can you tell
12 me --
13    A. Please do look at that, though, when you have a
14 moment because I would like that to be part of my -- my
15 response.  And I understand you don't have much time.
16    Q. I have reviewed it.
17    A. Great.
18    Q. Have you identified any allegedly misleading
19 promotional messages that were published by Cephalon,
20 Inc., or Teva Pharmaceuticals USA, Inc., in preparation
21 for this litigation?
22    A. So I have reviewed the way that Cephalon, Inc.,
23 promoted guidelines and professional organizations --
24    Q. I'm asking a very specific question about
25 materials published by those two entities.

Page 309

1    A. Have I reviewed --
2    Q. Yes.
3    A. -- promotional materials published by those two
4 entities; is that what you're asking me?
5    Q. Correct.  In furtherance of this litigation.
6    A. No.
7    Q. Okay.  Are you aware of any prescriber in Nassau
8 County who since 2012 was not aware of the risks and
9 indications of Actiq or Fentora before he or she wrote an
10 Actiq or Fentora prescription?
11    A. Not by name, but generally, I am aware of
12 prescribers in the state of New York who were influenced
13 by the misleading messaging of opioid manufacturers
14 regarding -- and including fentanyl lollipops.
15    Q. Same question for Suffolk County and New York
16 State?
17    A. Yes, same answer.
18    Q. Are you aware of a single person in New York
19 State, Suffolk County, or Nassau County that was harmed
20 as a result of a medically inappropriate Actiq or Fentora
21 prescription?
22    A. Not by name.
23      MS. LEIBELL:  Thank you, Dr. Lembke.
24      Off the record.
25      THE VIDEOGRAPHER:  Going off the record, the

78 (Pages 306 - 309)

HIGHLY CONFIDENTIAL

Page 310

1 time is 5:20 p.m.

2    (Discussion off the record.)

3    THE VIDEOGRAPHER:  Back on the record, the time

4 is 5:21 p.m.

5         EXAMINATION

6    Q.  BY MS. RODGERS:  Good afternoon, Dr. Lembke.  My

7 name is Megan Rodgers.  I'm with the firm Covington &

8 Burling, and I represent McKesson.  I have just a few

9 questions for you today.

10    Do you agree that in the treatment of pain, true

11 addiction is uncommon?

12    MR. ARBITBLIT:  Object to form.

13    THE WITNESS:  What do you mean by "true

14 addiction"?

15    Q.  BY MS. RODGERS:  What do you understand that

16 phrase to mean?

17    MR. ARBITBLIT:  Object to form.

18    THE WITNESS:  Well, I'm wondering why you

19 qualify it with the word "true."

20    Q.  BY MS. RODGERS:  Let me ask it a slightly

21 different way.

22    Do you agree that in the treatment of pain,

23 addiction is uncommon?

24    MR. ARBITBLIT:  Object to form.

25    THE WITNESS:  I disagree.

Page 311

1    Q.  BY MS. RODGERS:  Is that a misleading statement?

2    A.  Yes, it is.

3    Q.  Is that the kind of statement that could result

4 in overprescribing of opioid analgesics?

5    A.  Yes, it is.

6    Q.  Do you agree that individuals should not be

7 reluctant to seek pain behalf because of the fear of

8 addiction?

9    MR. ARBITBLIT:  Object to the form.

10    THE WITNESS:  Not -- can you rephrase that?

11 Sorry, end of the day, and it sort of has a double

12 negative in it.

13    Q.  BY MS. RODGERS:  Sure.

14    Do you agree that individuals should not be

15 reluctant to seen pain relief because of the fear of

16 addiction?

17    A.  Yes.

18    Q.  Is it a misleading statement to say that

19 individuals should not be reluctant to seek pain relief

20 because of the fear of addiction?

21    MR. ARBITBLIT:  Object to form.

22    THE WITNESS:  I'm having a little trouble

23 with -- I realize I'm having a little bit of trouble

24 tracking that statement.  Can you rephrase it?

25    Q.  BY MS. RODGERS:  Let me ask it again.

Page 312

1    Would you ever advise one of your clients that

2 they should not be reluctant to seek pain relief because

3 of the fear of addiction?

4    A.  Oh, I see.  I had misunderstood that previously.

5    No, I would not advise that.  I would not advise

6 that.  I would say that the risk of addiction is very

7 appropriate and necessary when it comes to taking

8 opioids, even in the context of treatment for a medical

9 condition.

10    Q.  Do you think it's a misleading statement to say

11 that individuals should not be reluctant to seek pain

12 relief because of the fear of addiction?

13    MR. ARBITBLIT:  Object to form.

14    THE WITNESS:  It's a confusing phraseology, but

15 to the extent that I think I understand what you're

16 saying, I would agree that it is a misleading statement.

17    Q.  BY MS. RODGERS:  Is that the kind of statement

18 that could result in overprescribing of opioids?

19    A.  Yes.

20    Q.  Do you agree that pain should be considered a

21 fifth vital sign?

22    A.  No.

23    Q.  Is it a misleading statement to say that pain

24 should be a considered a fifth vital sign?

25    A.  Yes.

Page 313

1    Q.  And is that the kind of statement that could

2 result in overprescribing of opioid analgesics?

3    A.  Yes.

4    Q.  Last few questions.

5    Do you agree that tolerance and physical

6 dependency may be pharmacological effects of sustained

7 use of opioid analgesics and are not synonymous with

8 addiction?

9    MR. ARBITBLIT:  Object to form.

10    THE WITNESS:  As currently defined, I would

11 agree with that statement, but whether neurobiologically

12 those are distinct phenomenon I think is uncertain.  They

13 are certainly neurobiologically related and also

14 phenomenologically related.

15    Q.  BY MS. RODGERS:  Is that the kind of statement,

16 and I'll repeat it:  Tolerance and physical dependency

17 may be pharmacological effects of sustained use of opioid

18 analgesics and are not synonymous with addiction.  Is

19 that the kind of statement that could result in

20 overprescribing of opioid analgesics?

21    A.  Yes.

22    MS. RODGERS:  Thank you.  I have no further

23 questions.

24    MR. ARBITBLIT:  All right.  So before we go off

25 the record, we have one little item that we want to

79 (Pages 310 - 313)

HIGHLY CONFIDENTIAL

Page 314

1 potentially correct having to do with the document
2 produced natively as I believe, what was it, Exhibit 13,
3 that was not the same document that was referenced in the
4 expert's report, which does, in fact, mention funding
5 from Allergan.
6        And so to the extent that the document was not
7 the same as the one that the witness referenced, we would
8 move to strike the testimony based upon that document.
9        And we have no -- it's Exhibit 14.  We have no
10 questions of the witness, but we reserve our right to
11 strike that testimony based on the wrong document.
12        MR. CARTER:  Doctor, are you going to read and
13 sign?
14        MR. ARBITBLIT:  What's the practice?
15        MR. CARTER:  I'm asking her if she's going to
16 read and sign.
17        MR. ARBITBLIT:  Well, we'll take it up.  We're
18 off the record.
19        THE VIDEOGRAPHER:  This concludes today's
20 videotaped deposition of Dr. Anna Lembke.  We're off the
21 record at 5:27 p.m.
22        Thank you.
23        (Time noted:  5:27 p.m.)
24        --oOo--
25

Page 316

1 STATE OF CALIFORNIA    ) ss:
2 COUNTY OF MARIN        )
3
4        I, LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462, do
5 hereby certify:
6        That the foregoing deposition testimony was
7 taken before me at the time and place therein set forth
8 and at which time the witness was administered the oath;
9        That testimony of the witness and all objections
10 made by counsel at the time of the examination were
11 recorded stenographically by me, and were thereafter
12 transcribed under my direction and supervision, and that
13 the foregoing pages contain a full, true and accurate
14 record of all proceedings and testimony to the best of my
15 skill and ability.
16        I further certify that I am neither counsel for
17 any party to said action, nor am I related to any party
18 to said action, nor am I in any way interested in the
19 outcome thereof.
20        IN WITNESS WHEREOF, I have subscribed my name
21 this 20th day of January, 2020.
22
23
24
25        LESLIE ROCKWOOD ROSAS, RPR, CSR NO. 3462

Page 315

1        ACKNOWLEDGMENT OF DEPONENT
2        I, ANNA LEMBKE, M.D., do hereby certify
3 that I have read the foregoing transcript of my
4 testimony taken on 1/16/2020, and further certify
5 that it is a true and accurate record of my
6 testimony (with the exception of the corrections
7 listed below):
8 Page  Line          Correction
9 ____|____|_____|_____
10 ____|____|_____|_____
11 ____|____|_____|_____
12 ____|____|_____|_____
13 ____|____|_____|_____
14 ____|____|_____|_____
15 ____|____|_____|_____
16 ____|____|_____|_____
17 ____|____|_____|_____
18 ____|____|_____|_____
19 ____|____|_____|_____
20 ____|____|_____|_____
21        _____
         ANNA LEMBKE, M.D.
22
     SUBSCRIBED AND SWORN TO BEFORE ME
23 THIS _____ DAY OF _____, 20___.
24
   _____      _____
25 (NOTARY PUBLIC)       MY COMMISSION EXPIRES:

80 (Pages 314 - 316)

HIGHLY CONFIDENTIAL

**[& - 2011]**                                                                                  Page 1

**&**

**&**   2:14 3:4 4:12,13
5:4 7:6,15 8:4,13
9:4,13 13:20 14:7
14:9,10,11,16,20
14:22,24 15:1,5,22
16:1 251:6 286:9
310:7

**0**

**0.1**   155:18
**0.36**   155:23 156:5
**0.37**   154:15 156:4
156:16
**0.44**   155:23 156:5
**0.8**   155:18
**00362490**   11:20,23
250:18,22
**003892**   12:2 286:1
**00864412**   257:4
**01361692**   12:1
285:24

**1**

**1**   11:5 13:5 16:23
29:10,23 78:5,7,17
94:14 109:12
110:17 111:10,12
126:1,4 257:22
267:24 302:6
307:22 308:4,6
**1/14/20**   11:6 13:6
**1/16/14**   11:19
238:18
**1/16/2020**   315:4
**10**   11:21 109:12
110:17 111:10,13
114:7 115:2 116:6
122:7 124:7 152:7
250:20 260:2
**10,000**   26:1

**100**   28:20 96:14
131:13,14,18,18
131:25 248:20
249:5 261:4,11,19
264:4,10
**10006**   9:16
**10019-9710**   7:9
**101**   6:16 131:2
248:2
**10:19**   90:21
**10:37**   90:24
**11**   11:23 237:21
250:22 261:8
264:6
**111**   9:15
**11501**   3:18
**11747**   4:7
**119**   11:12
**11:00**   241:14
**11:27**   127:6
**12**   11:24 28:1,6,16
70:23 71:1 86:25
90:11 120:19
154:14 155:16
156:15,25 250:24
263:13 264:18
265:12,15,24
285:9
**12/19/19**   11:8 13:8
**122**   235:17
**126**   11:14
**127**   10:9
**12:16**   127:9
**13**   11:5,7 12:1
31:10 60:8 257:2
273:20 285:24
288:10 289:15
314:2
**14**   12:2 286:1
298:9,19 314:9

**14th**   16:17
**15**   28:6 45:10
47:23 77:4 90:16
131:9 155:17
157:8 235:19
237:21 248:10
**150**   264:4
**154**   11:16
**16**   1:16 2:17 10:4
10:8 13:1,10
187:12
**167**   10:10
**17**   130:23 247:22
**18**   10:20,22 154:16
156:16 247:22
260:19
**1800**   6:16
**1850**   12:1 285:24
**18th**   4:15
**19**   18:13 28:16
71:1 118:5 131:10
248:10 300:11
**1954**   60:9,14
**1960s**   123:7,14
**1980**   31:22 32:7
**1980s**   31:12 32:9
**1990s**   31:13 32:10
43:22 63:13,14
65:13 104:2 209:1
209:1
**1995**   17:19 196:22
199:5,17
**1996**   60:14
**1997**   131:3 248:3
**1998**   101:25 103:9
**1:15**   167:12
**1:23**   167:16

**2**

**2**   11:7 13:7 18:7
18:11,15 31:11
121:16 126:5,5,6

**126:14 157:6
236:7 286:11
298:12,21
**2.5**   28:8
**20**   17:13 24:14
26:6 36:24 45:10
67:22 81:13,23
82:5 122:25
135:21 199:24
233:23 244:17
268:18 304:15
315:23
**20,000**   20:1,7
56:10
**200**   3:17 9:6 264:4
**200,000**   20:15
**2000**   17:21 63:11
**20005**   5:8
**2000s**   75:10 79:14
80:1 123:10
**2001**   60:17 61:11
61:20,24 62:11,21
63:6 64:1,3 65:1,1
65:22 66:2,13
108:20 128:3
241:7
**2002**   65:1,17 118:3
121:7
**2003**   65:20
**2006**   28:11,17
131:4,9,14 248:3
248:18
**2007**   102:4 104:16
**2008**   260:8,10
**2009**   257:16
**2010**   84:13 257:14
257:16 263:18,21
267:7
**2011**   80:5 118:3
121:8 131:15,18
247:15 248:6,18

HIGHLY CONFIDENTIAL

**[2011 - 614.281.3906]**

249:10 263:17,21
**2012**   28:11,17
58:10,15,24 59:23
60:4,4 64:14
104:3 249:10
305:9 309:8
**2013**   11:13 28:19
59:21 104:3
119:16 120:1
149:18
**2014**   28:19 123:6
**2015**   58:3,17 161:5
**2016**   40:10,13
64:22 84:14
114:21 117:7
122:20 131:5
248:4,9
**2017**   117:8 118:20
131:10 248:9,10
248:21
**2019**   18:13 19:19
117:11
**202.434.5421**   5:9
**2020**   1:16 2:17
10:4 13:1,11 35:4
161:5 316:21
**20th**   9:15 316:21
**21**   10:20,21
**212.397.1000**   4:8
**212.616.7057**   9:17
**212.836.7408**   7:10
**213.430.6326**   4:17
**21st**   31:13
**22**   298:21,24
300:11
**23**   62:13
**236**   11:18
**238**   11:19
**24**   236:7 244:4
**240**   3:17

**25**   10:21 84:13
187:12 248:11
**250**   7:8 11:20,21
11:23,24 264:4
**251**   10:11
**26**   101:22
**272**   10:12
**275**   2:14 3:8
**285**   12:1
**286**   10:13 12:2
**2900**   2:15 3:8
**2:00**   241:13,13
**2:31**   215:22
**2:48**   215:25

**3**

**3**   11:9 67:3,5
68:21 241:21
256:23,24,25
265:24 266:3
**3.5**   244:9
**30**   78:1 114:7
122:7,25 124:8
152:7,12 190:8
202:14 222:13
244:18
**300**   8:6
**3000**   8:15
**301**   10:14
**305**   4:6
**305.415.3387**   9:8
**310**   10:15
**312.494.4405**   6:8
**312.8622740**   8:8
**325**   5:17
**33131-2339**   9:7
**3462**   1:24 2:18
316:4,25
**36.0**   248:20
**360**   150:8,13 151:3
**3:02**   226:24

**3:03**   227:2
**3:18**   236:18
**3:20**   236:23
**3:24**   239:12
**3:25**   239:15
**3:42**   250:16
**3:48**   251:2

**4**

**4**   11:12 28:8
119:24,25 120:6
120:14 149:21
157:6 237:6,7
**40**   117:6 122:20
235:18
**40,000**   199:6 201:5
**400**   4:6,15
**400000/2017**   1:6
2:6 13:18
**410**   120:15
**415.315.6358**   7:19
**415.659.5987**   6:18
**415.956.1000**   3:10
**43215-2673**   5:18
**44**   84:13
**442**   131:3 248:3
**46.0**   248:17
**47**   131:13
**49**   120:19 286:14
286:16
**492**   131:4 248:4
**4:00**   241:13,13
**4:17**   272:19
**4:25**   272:21
**4:42**   285:22
**4:45**   286:4

**5**

**5**   8:16 11:14,16
22:14,19 126:20
126:22 149:3,16
149:25 151:12

154:3,5,25 155:2
156:3,11 180:20
194:17 195:12,15
273:20,23 298:20
298:21
**50**   10:21 101:7
145:25 190:10
240:22 261:3,11
261:19 264:4,9
294:20
**50,000**   300:4
**500**   19:23
**51**   131:14
**51.1**   248:18
**5150**   244:23
**516.248.3302**   3:19
**52**   10:21 237:22
**5300**   9:6
**54**   6:6
**5411**   316:24
**543**   11:17 154:6,13
**55**   10:22
**55th**   7:8
**58**   114:4
**5:07**   300:22
**5:09**   300:25
**5:20**   310:1
**5:21**   310:4
**5:27**   2:16 314:21
314:23

**6**

**6**   11:16 22:14,19
22:23 68:21
120:11,17 154:3,5
187:13
**600**   5:17
**6042**   120:11
**60654**   6:7 8:7
**61**   131:17
**614.281.3906**   5:19

**64**  155:18
**650.632.4734**  8:18
**667**  288:8
**67**  11:9

**7**

**7**  11:18 236:19
  237:1
**70**  117:22 119:17
  131:18 152:13,14
**71.8**  121:8,10
**725**  5:7
**73**  234:20 235:15
**75**  123:10 261:3,11
  261:19 263:24
  264:5
**76**  28:12 70:24

**8**

**8**  11:19 238:18
  239:18
**80**  123:8 242:11
  298:5
**800**  19:25 144:21
**85**  29:7,20 124:20
**86**  118:19
**89**  84:11
**8:06**  2:16 13:2,10

**9**

**9**  11:20 22:23 23:5
  23:17 29:9,21
  250:18 256:19
  257:7 263:20
**9/11**  240:11,20
**90071-2899**  4:16
**90s**  63:12 213:3,4
  276:10
**94105**  6:17
**94111-3339**  3:9
**94111-4006**  7:18
**94306-2112**  8:17

**96**  118:3 123:5
**9:03**  55:14
**9:26**  55:17

**a**

**a.m.**  2:16 13:2,10
  55:14,17 90:21,24
  127:6
**abatement**  91:23
**abbreviation**
  237:12
**abby**  3:6 15:3
**ability**  89:10
  148:14 175:11
  213:11 233:9,10
  316:15
**able**  46:15 49:16
  85:2 86:14 90:4
  114:3 137:21
  146:18,23 147:20
  148:2,8 149:1
  158:8,13 164:10
  165:6,11 166:1
  184:1 187:15
  193:1 203:24
  221:19 229:12
  232:21 253:9
  258:2 262:22
  290:1
**abroad**  253:14
**abruptly**  165:20
**abscess**  242:17
**absence**  139:7
  193:13,20 217:19
  298:7
**absent**  147:10
  148:9 151:3 165:4
**absolute**  123:20
**abstain**  147:15,20
  147:21 148:24
**abstinence**  147:14

**abuse**  84:25
  181:15,19 182:10
  182:18 183:20
  184:19 193:12,20
  193:25 194:12
  224:13,14,15,22
  225:7 226:7
  227:23 281:5,18
  306:20
**abused**  281:17
**abusers**  59:25
**abusing**  282:14,18
**abv.com**  9:18
**academic**  69:9
**accept**  51:6
**accepted**  41:1
  105:9,25
**access**  26:7 31:15
  52:19,20 57:4
  75:22 77:21
  124:24 137:14,18
  218:25 219:1,24
  245:12 246:17
  251:22 252:5
**accidental**  26:9
  140:6
**account**  40:7
  149:12 152:19
  183:19,25 189:20
  194:19 204:23
**accredit**  107:20
**accreditation**
  107:14,23 110:6
**accredited**  108:3
**accumulation**
  159:2
**accuracy**  211:13
  240:8
**accurate**  27:24
  34:20 49:15 62:14
  96:14 105:11

114:10 184:10
  315:5 316:13
**accurately**  47:15
  72:17 79:8,21
  184:13 205:5
  225:1
**achieve**  146:18
  147:14
**acknowledge**
  148:11 232:20
**acknowledged**
  189:23
**acknowledgment**
  315:1
**acquired**  273:11
**acquisitions**
  273:12
**acronym**  132:4,5
**act**  32:14 96:24
  147:15 171:18
  220:3
**actavis**  9:3 15:2
  298:18 299:2,4,8
  301:4,5,7,9,11,16
  301:18 302:7,8
**acted**  96:5 212:20
  220:2
**acting**  164:6 200:7
  200:9 263:16
  264:7 265:25
  268:23,25 269:1,6
  269:7,17,18 304:6
**action**  215:2,3,5
  217:21 259:6,8
  281:24 316:17,18
**actions**  35:18 74:3
  84:18 164:9
  176:14 177:16,19
  177:22 178:12
  179:6,12 191:14
  245:13

**actiq** 287:13
303:19 304:5,10
304:17 309:9,10
309:20
**active** 147:8 198:4
229:2 265:22
**actively** 44:17
58:17 93:12 180:8
**activities** 210:17
211:21
**activity** 99:25
217:16 293:12
295:22
**actor** 133:12
**actors** 35:16
**actual** 87:18,19
119:23 174:13
190:13 197:20
206:20,21,21
207:1,2 216:3
217:15 218:18
249:3 269:3
**acute** 32:8 47:2
83:4 187:6,7
259:11,14 260:19
260:23 261:1
262:4 263:3,6,8
266:25
**add** 36:25 45:25
56:24 186:13
191:11 261:22
275:14 302:18
**added** 21:4 56:13
56:17 112:8 146:2
288:8 289:16
291:14
**addict** 240:23
**addicted** 35:24
44:18 65:9 72:3
75:12,19 76:13
77:24 83:9 93:25

109:17 122:13,18
122:25 191:16
192:13 209:12
211:4 249:16
252:11 253:23
254:10 281:13
282:25 296:14
**addiction** 17:6,7,8
23:2,9 26:9 29:3
38:12 39:7,8,10
43:25 44:3 47:17
48:18 52:12,13
59:20 77:19,21
78:4 84:15 92:1
92:22 94:13 98:23
114:5 119:13
122:9 124:7 129:5
137:6,15 139:8
140:19 146:4,8,9
146:12,15,24
147:14,18,22
148:12,13,21
158:23,25 171:7
171:12 174:21
181:20 182:10,18
183:3,22 184:7,20
186:1 190:7
193:13,21,25
194:5,12,17,20
195:11,12,15
197:2,7,17,19,23
209:17 213:8
214:11,22 215:4
218:15 224:15,23
225:7,13 226:8
227:4,8,23 228:1,8
228:17 229:20
231:21 233:6
234:24 235:9,12
237:3,23 242:9
244:21 245:9

246:2,4,15 253:9
253:10,21 283:1
285:11,14 306:14
310:11,14,23
311:8,16,20 312:3
312:6,12 313:8,18
**addictions** 146:6
**addictive** 37:1,8
38:9,13,13 149:2
193:2 198:8 203:8
282:1 284:22
**addicts** 237:9
**adding** 28:19
**addition** 276:20
**additional** 39:1
167:4 169:7 277:1
**address** 65:16
85:9 86:6 104:1
112:13
**addressed** 64:15
**addresses** 64:22
**adequacy** 274:2,5
274:17,21
**adequate** 223:2
**adequately** 132:15
**adjustments**
211:16
**administer** 44:15
**administered**
316:8
**administration**
202:23
**admit** 21:4 95:9
210:14 211:18
214:4,5 283:13,14
**admitted** 242:16
**admonition** 169:6
**adolescents** 59:13
118:24
**adopted** 110:23

**adult** 59:13
**adulterated**
122:16 152:3
**adults** 84:15
154:15 264:24
266:18
**advantage** 177:12
**adverse** 152:24
220:1 281:18,23
282:4,21 283:2,3,9
284:21
**advice** 22:17 51:7
53:5,7
**advise** 190:24
191:20 312:1,5,5
**advised** 146:23
**advocacy** 78:18
**advocate** 262:13
**advocated** 110:16
**affect** 84:7 271:14
**affiliates** 272:1,5
**affirmative** 201:25
**afford** 262:14,22
**afield** 56:25
**afilalo** 265:10,21
267:6
**afraid** 103:24
231:5
**afternoon** 127:14
127:15 167:18,19
251:4 286:6,7
301:2 310:6
**afterward** 77:2
**age** 84:13 120:19
154:15 156:16
**agencies** 36:4
**agent** 170:12,19
270:5,17,21
**agent's** 270:9
**ages** 155:17
187:12

HIGHLY CONFIDENTIAL

**aggregate** 151:6
151:13,18 208:3
220:6 222:1
**aggressive** 146:17
**ago** 48:11 80:16
104:8 199:24
**agonist** 114:22
180:20
**agony** 32:8
**agree** 22:12 30:2,8
30:25 31:4,8
53:14 87:18,18,20
88:7,18 113:10,21
116:9 141:25
146:5 153:8,13,18
153:22,23 162:12
162:17 181:9,11
181:18 182:16
185:15 187:2
193:19,24 195:20
201:16,18,23
202:5,20 203:12
204:9 205:2,10,14
210:23 211:1,2,5
217:16 218:5,18
219:21,22 222:4,6
223:5 224:7,11,17
224:18 225:13
226:1,17 227:3
228:13 229:1,6
230:14 234:2,7
236:13 247:15
252:17 255:19,22
263:4 265:1,6
279:20 280:9
289:22 296:24
307:9 310:10,22
311:6,14 312:16
312:20 313:5,11
**agreed** 13:25
168:17 230:5

**agreeing** 202:3
**agreement** 20:22
21:21 22:1 55:22
271:7
**agreements** 20:19
22:6
**ahead** 74:23 75:9
**akin** 94:22
**al** 29:8 187:10
237:12,15 265:10
307:14
**alcohol** 84:25
86:11 224:14
235:18 241:15
**alcoholism** 86:12
**alert** 62:22 63:1,7
63:17 64:1,17
65:2 95:4,25 96:4
218:15 283:4,6
**algorithms** 204:17
**alive** 244:8
**allegaert** 9:13
15:22
**alleged** 173:9
174:6
**allegedly** 249:16
249:21 308:18
**allergan** 8:3 12:1
14:23 285:24
286:9,24 287:2,3,5
287:8,12,17,22,24
288:7,14,18,22
289:1,9,22 290:2,9
290:11,17,22
291:2,2,6,10,11,19
292:1,2,5 293:12
293:19 294:13,25
295:2,13 296:5,10
296:15,19 298:17
299:2,4,8,14,18
300:3,15 314:5

**allergan's** 294:1
294:10,12 295:6,8
295:14,22
**allocate** 178:15
**allow** 21:23
151:19 229:12
**allowed** 56:7
**allows** 35:4 258:1
262:9,11
**alluded** 94:23
**alternative** 85:4
85:14,23 95:23
214:8
**alternatives** 191:8
**alto** 8:16,17 61:16
**amazon** 57:14,23
**america** 125:2,13
125:17 156:25
251:20
**america's** 237:3
**american** 36:6
102:23 110:21
156:5,9
**americans** 114:16
115:10,16,18
124:10 129:4
152:16 153:9,14
153:19,24 156:16
157:6,8 165:24
245:9
**amerisourceberg...**
6:13 14:15 69:19
101:10 104:17
**amount** 21:5
79:24 145:16
159:9 230:20
268:13
**amounts** 26:2
102:3,18 103:3,12
**analgesia** 26:3
89:5 129:24

**analgesic** 195:21
260:18 263:3
264:22,24 266:19
268:3,11
**analgesics** 311:4
313:2,7,18,20
**analog** 111:10
**analyses** 235:14
278:14 293:2,7,16
**analysis** 27:2,7,12
27:14 28:10
114:23 125:11,15
130:20 144:7,11
144:15 151:10
173:2,6,7 174:4,11
176:1,20 178:8,9
178:10 235:10
279:6 292:15,18
292:23 293:11,22
293:23,25 294:7
294:15,17,22
**analyze** 116:8
157:20
**analyzed** 40:10
132:14 157:16
278:19
**anesthesia** 17:9
47:22 244:10
**angela** 7:7 14:16
272:23
**angela.vicari** 7:11
**angeles** 4:16
**anna** 1:14 2:12
10:7 11:2,7,10
13:7,13 16:25
67:6 237:7 238:1
238:9 314:20
315:2,21
**answer** 10:19
20:22 21:3,23
22:1,10,13,17 46:8

HIGHLY CONFIDENTIAL

**[answer - arbitblit]**

46:16 47:15 51:5
52:24 53:2,4,6,8
55:22 57:21 60:10
65:11 72:14 78:19
79:9,14,16,21
81:20,21 85:20
102:7 103:8
115:10 122:5
123:21 124:17
134:14 136:16
138:4,9 141:7,10
143:17 144:6
147:16 156:18
161:12,15 166:6
169:7 173:13,23
174:3 179:15
187:15 198:6
206:15 211:12
219:12 221:11
232:2 271:1 279:1
279:2,4,5,11,13,15
279:15,18 281:5
289:7,13 295:16
296:6,7 301:16,18
303:7 309:17
**answered**   21:23
53:3 89:13 139:6
142:22 175:10
186:12,14 220:18
220:20,21 221:1
221:23 276:6
289:12
**answering**   78:24
126:12,12 188:4,5
235:2,4 242:21
273:13
**answers**   50:9
**antabuse**   85:1
**anybody**   15:6 63:1
63:17 78:1 216:25

**anyway**   208:12
**apologize**   239:20
267:24
**apparent**   249:3
**appealing**   36:4
37:9,24
**appear**   109:14
136:23 137:11
139:2 140:8 179:5
237:17 249:12
**appearances**   3:1
4:1 5:1 6:1 7:1 8:1
9:1
**appeared**   249:11
**appearing**   15:6
299:11
**appears**   18:19
91:15 239:4
263:21
**appendix**   286:12
287:25 289:10
291:18,25 298:12
298:21,22 299:9
299:10 302:6
307:22 308:4,6
**applies**   135:2
158:16
**apply**   151:22
152:1 293:8
295:18 303:10
**appointment**   17:9
47:21 209:14
**apportioned**
178:11
**appreciate**   72:1
101:23 161:12
213:10
**appreciating**
142:8
**approached**   19:18
146:22

**approaching**
150:14
**appropriate**   30:11
73:15 86:21 91:22
114:11 132:21
133:7,22 134:5
147:22 181:14,16
203:23 205:23
208:15 262:4
312:7
**appropriately**
205:11 224:20
225:5,24 226:5
**appropriateness**
205:6
**approval**   108:4,7
260:4,8 263:15
267:3,5
**approved**   35:2
263:17 305:14,20
307:11
**approximate**
56:20,22,24 57:8
254:23 255:1
**approximately**
28:11 56:10 63:11
80:16 122:7
154:15 187:12
199:6 235:17
285:15
**approximation**
57:2
**april**   58:3 257:14
257:16 263:18,21
**arbitblit**   3:5 15:4
15:4 19:12 20:17
21:2,9,20 22:11
24:11 27:5 29:17
31:7 32:17 33:25
34:10 35:11 37:12
37:20 39:12 41:11

42:10,18 45:13
46:12,21 47:8
48:9 49:6,11,25
51:2,14,24 52:23
53:11,17 54:4,10
55:12,21 56:12
57:16,22,25 59:7
67:20 70:22 71:11
71:18 72:25 73:16
74:7 75:7 79:4
80:4 81:6,16 82:3
82:17 85:16 86:18
88:11,20 89:1
90:18 92:12 94:7
95:5 96:1 97:8,25
98:16 99:17 100:1
113:24 114:13
115:21 116:15
117:2 119:20
123:19 124:2
126:21,25 127:4
133:24 135:9
143:2 145:9 146:7
147:1 148:4,6,19
150:11 151:16
153:12 154:20,24
161:25 162:16
163:10,14 164:7
165:10 168:13,19
170:3 172:15
173:11,15 174:8
175:9,18 176:11
177:8 178:5,17,23
179:3,20 180:7,18
182:13,21 183:14
184:11,23 186:9
186:18 187:23
188:3,8,16 189:11
191:1,21 192:20
194:3,15 195:2,23
199:18 200:25

HIGHLY CONFIDENTIAL

**[arbitblit - authority]**

201:8,21 202:4,12
202:25 203:17
204:13 205:8
206:5,10,23
212:11 214:18
215:1,6,16,19
216:10 217:17
218:6,9,22 219:10
219:19 220:11,18
220:24 221:5,21
223:12 224:24
225:8 226:9
228:15 230:15
231:25 233:14,18
234:6 235:1,13
236:8 238:6,9
246:6 247:18
250:3 251:16
252:19 254:4
255:17,21 256:20
259:12,20 262:6
262:16,24 265:4
268:4 269:2
270:17,25 271:4
271:22 272:3
273:21 276:5
278:7,17 279:10
280:13 285:20
288:11,24 289:11
295:15 296:11
297:2,14,25
298:10 299:16
302:17 303:2,21
305:10 310:12,17
310:24 311:9,21
312:13 313:9,24
314:14,17
**arcos** 26:19 27:9
28:10,21 29:8,21
218:25

**area** 34:5 48:23
85:3 91:14 113:12
113:16 135:18
166:25 170:13
209:13
**argue** 79:24 191:5
**argument** 218:24
271:5
**argumentative**
52:23
**arithmetic** 153:8
**arm** 243:13,20
**armchair** 125:8
**arnold** 7:6 14:16
**arnoldporter.com**
7:11
**arrive** 145:5
**article** 29:8 40:10
40:13 60:13 64:14
80:24 114:21
117:7,12 119:22
119:23 123:2
180:20,21 181:4
236:8,10 294:18
**articles** 59:4
293:17
**articulate** 134:9
**articulated** 129:19
149:25
**artificial** 194:18
194:25 195:8,14
**ascertain** 217:14
**aside** 67:25 121:22
147:12 157:14
204:7 238:16
261:6
**asked** 57:20 75:13
85:20 122:3
145:19 173:25
198:12 220:18
221:10 232:1

239:2 270:23,25
273:22 277:1
281:4 289:11
**asking** 80:18
111:12 112:11
132:4 135:8
158:12 162:10
175:14 179:15
268:15,17 276:3
285:20 301:10
303:12 308:24
309:4 314:15
**aspect** 139:18
**assert** 260:25
**assess** 18:17 39:14
189:24 228:13,16
284:10,19 285:11
**assessed** 109:11,13
111:6 114:24
**assessment** 47:11
48:16 150:10
153:2 181:12
190:3
**assessments**
203:16 224:4
**assign** 137:21
**associate** 17:5
**associated** 64:19
118:25 197:24
223:3 263:11
305:4
**association** 118:9
118:15,16 156:10
**associations** 120:7
169:24 234:3
**assume** 18:18
28:14 41:24 42:2
101:6,9 106:20
172:11 217:20
221:10,12,18
231:14 233:9

262:12 292:1
**assumes** 34:17
51:24
**assuming** 18:22
73:14 114:10
172:20 223:7
**assumption**
223:16
**assumptions** 221:9
**assured** 16:20
**attached** 257:24
**attempt** 148:16,20
**attempting** 150:7
**attempts** 212:24
**attend** 56:8 60:20
61:11,13 66:12
**attended** 17:18
61:17 62:21 128:3
132:16
**attendees** 62:22
**attending** 61:5
**attention** 257:12
267:18 303:11
**attorney** 3:15 15:9
15:14 106:21
**attorneys** 247:4
**attributable** 180:5
180:8 290:2,9
**attribute** 213:12
**audio** 13:24
**aughts** 17:22 45:3
60:2 65:13 75:21
104:2 276:10
**augmented** 172:5
**august** 11:13
119:25
**aureus** 243:13
**authorities** 95:4
95:25 96:4 97:15
**authority** 216:9
271:1

**authorization**
50:12
**authors** 236:5
**autonomous** 205:1
**autopsy** 158:18
**availability**
124:24 302:16
**available** 78:1
85:8,15,24 86:4,4
105:3,4 113:11,23
114:5 122:12
150:17,21 248:21
258:13 261:3
263:24 264:4,9
**average** 155:21
156:6 236:1
**avoid** 182:1
**aware** 16:20 20:19
25:19 26:25 27:8
38:1 67:1 78:13
83:2 93:2 102:15
103:23 104:20
106:25 113:6
127:24 128:2
129:20 130:8
138:11 139:16
159:7,12,13
171:23,25 172:7
193:4 206:25
213:1,22 221:24
222:1 247:8
258:10 271:8,12
283:12 285:3
299:7 302:11,14
302:18,23 303:14
303:19 304:5,8
305:8,13,19
306:19 307:3,8
309:7,8,11,18
**awareness** 25:23
26:14,18,21 65:7

72:9 74:25 75:6,8
79:1,5,10,17,18,18
79:19 80:3,12,15
80:15,23 92:20
244:22 282:2,3,7
**awolf** 3:12

**b**

**b** 66:15 67:18 68:3
275:12,20 276:3
276:17,24 278:5
286:12 287:25
289:10
**bachelor's** 17:17
**back** 19:13 55:16
59:18 63:25 74:16
76:22 90:23
112:14 127:8
167:15 173:24
194:10 199:16
201:17 215:24
222:4 227:1
236:22 239:14
241:3,5,9 251:1
255:5 267:24
272:21 286:3
288:12 299:12
300:24 303:6
310:3
**background** 17:15
**bad** 105:20,21
**badala** 4:5 15:18
15:18,18
**badgering** 174:9
220:19
**balance** 215:5
**balances** 213:11
213:15 214:24
**ball** 232:20
**ban** 185:4,7
252:22 253:2

**bandage** 244:11
**banning** 185:11
**bar** 195:13
**bartlit** 6:4
**bartlitbeck.com**
6:9
**base** 28:23 34:2
87:21 157:1
173:19,19 175:2
189:4 267:5 284:7
**based** 24:17 25:23
25:24 26:5,21
28:21 29:8 33:18
37:15,16 42:4
45:17,17 70:24
81:9 82:7,8
105:16 113:2
118:1 122:3 123:3
124:4,16 129:20
131:25 140:12
142:9 151:6 159:3
159:23 170:15
171:6 184:2 189:9
196:25 203:14
206:19 207:23
208:2,3,16 212:6
221:9 228:14
234:12 247:6
248:13,15 249:4
249:14,24 250:6
259:23 271:25
296:23 314:8,11
**basic** 153:7
**basically** 245:2
**basing** 259:14
**basis** 22:7,10 36:8
47:3,6 48:19 89:8
92:22 167:6 200:5
209:3 271:6 287:6
**bates** 257:7 288:7

**battery** 2:14 3:8
**bcibulka** 3:13
**bear** 133:16 135:3
135:12 138:2,6
177:1,6 180:4
**bears** 257:7
**beast** 95:16
**beck** 6:4
**becoming** 35:23
75:19 76:13
192:25 240:22
**bed** 189:17
**began** 31:11,12
32:22 43:21 63:23
64:6,20 65:8,16
75:10,20 79:13
119:13 209:13,15
242:12 249:10
252:9 282:7,10
**beginning** 2:15
65:7,13 239:19
259:4
**begins** 13:12 119:4
**begun** 247:17
**behalf** 2:13 13:14
14:11,14,23,25
15:3,9,14,19,22
16:1 148:2 166:14
311:7
**behavior** 50:18
52:13 133:13
159:4 193:2 214:3
**behaviors** 159:3
**belief** 36:16 73:14
208:16
**believe** 36:10 38:9
43:8 52:10 68:8,9
73:19 74:1 94:15
94:16 99:7,12,12
101:13 102:11
110:7 113:18

119:22 130:4,12
131:24 133:25
136:25 138:1
142:11 144:19
146:1 149:20,23
157:5 162:7 165:8
168:5 173:16
176:7,14,24
177:17 179:22,22
180:3 186:6 194:4
196:4 197:3
207:25 208:15
212:21 219:16
220:16 223:21,25
226:19 230:10
238:20 253:6
265:11 266:21
267:5 269:15
272:4 277:21
278:22 284:24
290:4,22 291:11
292:14 293:15
294:22 298:13
301:12,20 305:23
307:7 314:2
**believed** 63:7 64:2
65:2 75:16 83:13
**believing** 32:21
73:9 164:1
**bell** 132:6
**belong** 169:24
**beneficial** 191:9
**benefit** 47:11
48:16 53:19 153:2
186:8,21,24 187:3
188:18,20 191:5
203:22 224:4
263:9
**benefits** 30:18
53:24 62:17
135:24 136:4

165:1 191:8
203:15 204:4,10
206:13 306:6
**benefitted** 35:17
**benign** 187:17
255:12,16,20,23
**benzodiazepines**
82:22 140:4
**berger** 9:13 15:22
**bernstein** 2:14 3:4
13:20 15:5 16:1
**best** 68:5 79:21
94:3,5,21 95:2
108:11,14 114:5
141:13,19 147:8
152:12 175:11
198:6 200:14
201:10 204:22
213:11 316:14
**better** 46:15 122:5
185:24 186:22
218:19 219:2
220:3 230:25
240:15 262:21
**beyond** 37:4,7
38:5,7,12 75:21
78:20 91:16
166:16 215:10
223:19
**bias** 284:25 285:2
285:3,6
**big** 40:12 44:21
113:5 205:13
228:5,5
**biggest** 77:20
**bill** 64:9 144:23,25
145:2,3,4
**billion** 28:6,8,12
28:16,20 37:14,19
38:2,2 70:24 71:1
193:7

**billions** 25:24
**bind** 203:5
**binder** 11:14
126:16,22
**biological** 159:1
**bipolar** 228:10
**biscayne** 9:6
**bit** 56:18 114:19
207:21 211:14
235:7 311:23
**black** 266:9,11
**blame** 138:2,6
259:1
**blanket** 205:13
**blind** 36:1
**blinded** 284:14,14
**blood** 110:14
111:6 159:2
**board** 66:14 81:13
81:24 99:2,4,5,10
99:20,22 100:5,8
100:13 101:4
103:21,25 104:5
106:18
**boards** 69:2 70:11
100:23,25 101:1,3
101:5,7,12,15,24
102:1 103:1,10,18
104:23,25 105:6,7
105:23 106:10,19
106:22 107:2,6,10
202:18 275:25
**bob** 219:6,16
**body** 42:3,4 44:16
99:13 140:21
291:18
**book** 58:17 64:20
64:23 101:25,25
102:4 104:9,12,15
104:19,21 105:1,8
105:12,19,21,24

106:13 107:5
111:23 140:22
178:9 238:23
239:5,18 240:23
293:17
**booths** 62:6
**bottom** 82:6
120:11 229:15
257:14
**boulevard** 5:17
9:6
**box** 266:6,8,9,11
**brain** 159:1
194:21 195:18
223:18
**brain's** 190:15
**branded** 172:3,5
172:24,25 200:11
301:14 302:19,21
**break** 55:11 90:16
90:25 91:17 92:14
126:24 147:13
215:19
**breakthrough**
304:7
**breathing** 110:13
**brick** 107:8
**briefly** 17:14
**bring** 57:6
**bringing** 28:19
**britt** 3:7 15:25
**broad** 40:22
201:22
**broader** 161:18
183:20 202:7
219:20 258:23
**broadhollow** 4:6
**broadly** 117:20
129:3 139:10,16
163:22 183:2
188:11 253:10,12

290:11
**broadway** 9:15
**brought** 130:3,5
**buffalo** 76:24
94:25
**buprenex** 241:7
241:11
**buprenorphine**
181:2 201:2
209:17,25 241:5
282:10
**burling** 8:13 14:25
310:8
**burrough's** 240:23
**business** 176:21
213:21,25 217:23
218:2
**businesses** 211:3
218:2,20 221:19
**busse** 188:21
**buying** 63:2
**buynak** 267:6

**c**

**c** 3:5 4:5 7:16
144:19
**cabinet** 72:8 74:6
117:18
**cabinets** 74:20
75:24 81:5,11
**cabraser** 2:14 3:4
13:19 15:4,25
**calculated** 115:2
146:2
**calculation** 56:5
157:11 263:9
**calculations**
114:15
**california** 1:15
2:15 3:9 4:16 6:17
7:18 8:17 13:1,20
60:20 61:12,16

66:14 86:12
196:19,23 206:16
241:3 293:13
316:1
**call** 83:11 98:10
180:6 214:24
231:21
**called** 37:19 46:6
61:9 77:16 82:20
83:14 98:6,11
99:4,6 102:4
112:16 137:16
**calls** 50:10 74:19
98:2
**calm** 188:4
**calves** 244:12
**camino** 8:15
**campaign** 84:7
102:24 280:1
289:1
**campaigning**
102:21
**campaigns** 83:25
84:22
**cancer** 77:3 146:9
185:8,13 187:22
188:15 283:20
284:4 304:7
**candidate** 229:4
**capacity** 147:18
147:23
**capture** 118:11
**card** 257:24
**cardinalhealth** 5:3
14:8 69:15 88:23
89:2 101:10
104:17
**care** 44:22 51:19
52:15 61:5 73:15
90:4,7,7 95:17
107:21 108:8

111:8 159:9 161:7
165:23 178:20
183:23 191:12
192:11 210:17
214:10 217:3
232:18 233:8,9
256:11 269:21
283:5 284:9
285:13
**career** 43:22 62:25
80:17 135:21
196:22 199:7,13
199:15 206:14
208:19 212:5
275:16,21 287:6,9
301:24 304:14
**careful** 45:16 57:4
82:8 153:2
**carefully** 293:18
**carter** 5:16 10:9
14:12,12 30:23,23
127:14,16 133:18
134:3 135:15
143:5 145:13
146:20 147:10
148:5,8,20 149:3
150:14 151:22
153:18 154:2,7,23
155:2 156:23
162:10,23 163:12
164:4,11 166:1
167:2,10 314:12
314:15
**case** 13:16 19:10
20:24 31:19,21
33:21 35:22 42:9
53:21 54:13 67:17
68:7 70:17 80:8
87:13 89:9,16
91:3 98:9 126:9
127:22 128:5,9,15

129:2,17 130:3,5,8
130:11 133:2
134:4 136:8,13,24
138:20 139:12
145:1 158:1,2
159:7,19 160:10
160:14,18,22
161:18 163:6
164:12,20 166:11
168:10 172:2
175:23 176:9,13
189:8,10 194:7
195:5 196:15,25
197:1,4 202:19
206:17,19 207:23
221:25 223:17
231:10 235:10
245:14 246:2,20
247:6 249:14,24
250:6 262:18
272:25 277:4,7
282:5 283:1,18
286:10,21 287:11
287:23 288:3,7,19
291:9 299:6
**cases** 22:6 75:4
103:23 145:14
146:9 148:21
159:12,13 182:2
197:20 198:3
206:12 211:16,24
212:4,12 213:19
216:18 232:14
306:24
**catch** 90:3 92:15
95:3,7
**categorize** 149:8
**causal** 234:5
293:22
**causation** 168:2,7

causative  227:21

caused  37:24
    147:7 178:2,21
    211:3

causes  125:16

caution  39:2
    232:10

caveat  31:3,8

cbhsq  11:12
    119:25

cdc  80:5 83:2
    131:11,24 138:11
    138:16,21 248:16
    249:4

cell  14:2

center  7:17 69:11
    183:4

century  31:13
    76:5

cephalon  301:4
    308:5,8,19,22

certain  61:6 96:13
    107:7 108:1,9
    231:3 234:13
    263:2 307:24

certainly  44:16
    102:20 105:4,20
    147:6 183:16
    199:2 200:3
    245:19 283:4
    304:15 313:13

certainty  95:8,19
    95:21 96:3

certification
    209:16

certified  2:18 16:3

certify  306:20
    307:3 315:2,4
    316:5,16

cetera  105:18
    111:7 204:20

chain  23:25 24:3,5
    24:9,18 25:3
    26:19 30:6 33:11
    34:6,7,12 35:8,14
    35:16 36:5,9
    50:15 56:19 57:11
    57:15,24 83:23
    91:12 127:25
    128:21 133:13,14
    134:2 135:3 137:5
    137:8 139:17
    165:3

chains  135:18

challenging
    203:11

chance  43:1,4
    247:5

chances  223:22

change  23:18
    31:25 32:3,5 33:4
    33:8 40:1,2 44:7
    52:18 90:8 97:1
    139:23 217:2
    230:5,6 290:21

changed  32:10
    106:14 139:14

changes  43:4
    194:21 244:11

changing  97:20

chapter  59:11

characterized
    193:14,21 194:22
    298:4

charge  145:7

chart  158:9

chat  167:22

cheap  240:21
    241:22

cheaper  122:12

check  30:15,15
    92:23 93:13

134:16,24 215:5

checking  82:18
    299:20

checks  213:10,15
    214:23

cheek  35:25

chemical  147:22

chen  219:6,16
    221:7,12 231:15
    231:21 233:5

chicago  6:7 8:7

chief  17:7 69:11

childhood  227:24

china  241:23,25

chinese  167:23

choice  147:19,24
    148:15 149:1
    230:20

choose  204:25

chronic  32:11,23
    43:13,18,25 44:1
    45:2,9,21 46:5
    47:1,20,24 60:10
    77:6 80:18 105:10
    105:16 106:1,16
    114:6 146:13
    152:9 153:9,20,24
    164:3 181:24,25
    185:13,16,18,19
    185:21,23 186:7
    186:17 187:21
    188:15 189:10,25
    190:6,21 191:4,4
    209:13 222:7,22
    223:1 235:16,21
    240:21 259:11,14
    259:19,22 264:23
    265:3,16 266:18
    267:1,20 268:16
    283:20 284:4
    306:11

chronologically
    46:4

cibulka  3:7 15:25
    15:25

cicero  123:5
    242:11

circle  176:25

circumstance  49:8
    53:13 54:6 65:24
    192:10

circumstances
    46:20 49:10,21
    50:3 54:14 98:2
    141:20 150:9
    163:5 205:12

cite  74:14 120:14
    187:9 233:23
    234:14 258:14

cited  60:14 140:15
    276:7 291:17
    293:4 298:17
    299:2,9,10

cites  154:25 190:5

citizens  26:1 38:23

city  241:5

claim  70:14
    127:20 129:7
    248:5

claimed  58:4

claiming  194:8

claims  116:7

clarification  47:14
    241:21

clarify  19:12,15
    19:16 20:18
    120:14 182:5
    188:7,8 189:4

clarifying  210:7

classic  110:15

classify  195:14

**clean** 243:10
**clear** 29:12 118:9
    119:2 147:17
    161:8 176:19
    177:11,15 180:2
    192:15 196:21
    206:18 222:20
    223:24 245:23
    264:15 267:25
**clearly** 80:7 83:8
    307:1
**client** 192:17,24
    202:15 247:3
    302:1
**client's** 161:17
**clients** 303:13
    312:1
**climate** 94:11
**clinic** 17:8 46:23
    46:24 69:11 77:2
    77:2 92:20 94:22
    97:20 111:5
    112:12 199:2
    213:9 284:5,7
**clinical** 26:5 42:5
    45:18 46:15 48:18
    67:23,25 68:1
    77:15 96:2,22
    113:3 119:11
    150:15 151:5,7,20
    151:22 152:1
    171:7 183:8 187:4
    205:4 206:11
    210:11 211:17
    229:11 232:5,18
    233:8,9 256:5
    263:5 268:7,20
    269:12,14 276:7
    284:9 285:13
    304:9

**clinically** 188:20
    188:24 265:11
    284:19
**clinician** 150:6,22
    171:11 219:1
    276:8
**clinics** 94:23
    107:22 108:2,22
    209:15
**clock** 264:24
    266:19 267:20
    268:3,11
**close** 95:6 303:11
**closely** 38:21 90:1
    95:18 119:8
**closet** 88:25
**cme** 61:11,15,20
    61:22,25 62:5,11
    62:21 63:6 64:3
    65:1,17,21,23 66:2
    66:13 128:3
    202:18
**cmes** 61:9 65:24
**coauthored**
    114:21
**cocaine** 121:18
    241:14,15 254:10
**collaboration** 24:5
    44:19 68:10
    110:21 258:17
    289:19
**collaborative**
    289:25
**collateral** 93:13
**colleagues** 61:22
    64:7,17,24 65:6,15
    92:11 107:1,8
    193:9 205:24
**collectively** 251:7
    252:2

**collusion** 35:23
    36:9,22
**columbus** 5:18
**column** 121:7
    257:14 264:2
**combination**
    106:9 109:1 140:4
    140:4 172:3
    193:15,22 201:12
**combing** 82:22
**come** 33:23 52:25
    66:12 74:21 92:23
    124:11,13 165:22
    185:21 192:8
    196:19,20 254:10
    254:13 259:15
    269:12 282:12
**comes** 26:18 38:10
    99:20 181:24
    198:7 204:24
    312:7
**comfortable** 202:3
**coming** 63:25 74:8
    75:11,25 80:18,23
    193:16 304:18
**comment** 42:13
    78:19 188:5 306:2
**commentary**
    154:9
**commented** 270:2
**commenting** 186:3
**comments** 128:17
**commission** 69:2
    70:11 107:13,16
    107:18,19,23,25
    108:3,12,15,16,18
    108:20 110:16,20
    110:23 202:17
    230:24 315:25
**commission's**
    108:24 109:25

**commitment**
    147:11 148:10
**committed** 153:25
**common** 48:23
    62:4 83:7 109:21
    124:8 138:24
    139:5,7,18 210:9
    268:17
**commonly** 90:9
    194:18 297:16
**communicated**
    83:22 112:14
    174:15 295:24
**communication**
    149:9
**communications**
    280:16
**communities**
    40:24 124:22
    193:5
**community** 26:3
    38:24 39:6,10,19
    64:9 69:9 80:2
    82:9 84:17 89:5
    117:19 129:25
    135:16 137:10,18
    154:16 155:17
    160:20 161:1
    189:22 218:14
    220:7 243:18
**comorbidities**
    228:2
**companies** 7:5
    14:19 180:15
**company** 69:13
    176:2
**comparable**
    284:13
**compared** 123:14
    188:25 218:19
    265:10 285:10

HIGHLY CONFIDENTIAL

compares  161:5
255:8 295:3
comparing  203:10
232:13 265:21
comparison
155:14 162:11
compass  73:23
compassionate
111:24 165:17
compassionately
44:24 46:2 165:23
compensation
56:3
complain  189:18
complaint  273:16
complete  65:23
66:20 177:24
228:25 237:24
271:7
completed  17:20
completely  187:16
completeness
261:23
complex  245:5
complexity  72:1
112:8 189:19
compliance  275:5
275:8
complicated  72:15
72:15 112:3
197:21
complies  18:9
comply  129:18
130:14
component  307:9
components
198:10
comprehensive
18:25 19:4,5
175:5 284:18

compton  117:7
122:20
compulsive  228:10
concede  221:25
concept  110:8
171:15 177:24
195:25 196:6
213:6
concern  39:16,17
39:19 63:19 65:6
75:18 97:1 118:23
concerned  50:18
65:15 83:14 97:12
214:1
concerning  25:14
25:17 89:17 91:4
276:23
concerns  16:18
95:15 181:19
182:10
conclude  135:7
174:25
concludes  314:19
conclusion  27:12
236:4 276:13
concrete  207:23
221:17
condemned  107:1
107:7
condition  75:18
94:19 98:20 124:6
182:24 183:9
192:19 194:9
195:7 196:17
231:19 256:2
312:9
conditions  32:12
32:23 54:14
106:17 164:3
169:2 185:5,8,12
194:22 227:25

228:1
condoning  106:11
conduct  16:18
173:7 174:4,10,13
258:23 292:15,17
conducted  27:2
127:25 130:19
144:7,11,15
151:10 175:5
278:14 279:6
294:25
conference  76:25
conferred  94:19
confidential  1:9
2:8 129:21
confidentiality
51:4,20 98:17
confirm  95:24
96:8 97:5,6
175:21 239:3
240:7
confirmatory
216:18
confirmed  213:24
confirming  20:25
confusing  312:14
connection  128:14
238:23 239:18
267:9
connolly  5:4 14:8
14:9
consequences
118:25 152:24
220:1 284:21
307:10
consider  57:23
68:6 94:2 128:10
150:20 171:8
175:23 186:19
251:14 252:6
277:4,8

consideration
183:16
considerations
149:12
considered  11:10
66:16,25 67:5,9,13
67:16 68:2,4
94:11 133:12
151:24 159:16
202:7 222:7,22
275:11 277:15
312:20,24
considering  183:5
252:5
consistent  98:3
216:5 261:21
289:2 290:14
consisting  26:1
consists  289:25
constant  191:7
constellation
151:24
construct  195:8
264:12
consult  51:15,18
consultant  69:12
consultation
196:19
consulted  50:21
170:6,14,22
consulting  145:21
145:24 170:7,11
consumers  30:6
30:11 64:24
consumption
149:2 256:3
contact  50:2
254:10,13
contacted  50:5
contain  18:15,19
18:22,25 19:3

97:18 305:25
316:13
**contained** 109:5
133:2 154:10
278:4
**contains** 105:13
197:10
**contend** 137:23
**content** 291:11,13
**contents** 27:22
**context** 150:17
171:16,21 182:6
183:8,20 191:6
202:7 205:4
209:19 233:2
312:8
**continue** 47:7 48:4
48:8 180:12 201:1
217:23
**continued** 4:1 5:1
6:1 7:1 8:1 9:1
244:19
**continues** 54:23
**continuing** 45:20
60:17,18,21,24
61:1,6,8 63:21
68:25 70:2 142:3
142:9,17 153:6
163:3
**continuous** 264:24
266:18 267:20
268:3,23
**contract** 93:8,9
**contraindications**
30:16 222:8,23
**contribute** 112:17
299:21
**contributed** 22:25
23:1,9 24:18
25:21 26:16 40:20
68:22 80:11 106:5

106:23 116:13,17
124:25 133:14
162:5 178:2,21
180:16 251:23
275:18 276:10
290:11,13 292:11
294:1,13
**contributing** 33:6
107:10 179:5,10
180:5 203:8
218:13 258:17
**contribution**
117:1 176:2,4,5,7
176:8,13,20
235:11
**contributor** 28:2
129:5 175:24
**control** 88:9,19,21
89:10 205:1 240:9
240:20
**controlled** 25:11
99:24 100:7
265:14 283:24
284:3
**convenience** 194:6
**conversation** 47:3
57:12 94:24
170:21
**conversations**
14:2 45:14,16
48:2,15 76:19
77:14 113:4
159:24 170:18
**convey** 69:2
**conveys** 115:14
**convince** 280:2
297:7
**convinced** 63:3,4
97:16,23 217:8
**convincing** 29:12
182:3

**cooperative** 9:12
15:23
**copies** 104:22
**copy** 78:8 126:13
155:2 239:4
256:20 298:10
**core** 232:25
**corner** 77:22
**corollary** 84:24
86:10
**coroner's** 159:5
**corporate** 135:17
152:3
**corporation** 69:20
**correct** 18:2,3
20:3,9,16 33:2,3
41:5,6 42:17 44:5
57:2,10 67:19
68:4,5 79:15 92:7
92:8 103:17 124:1
126:10,15 128:5,7
128:8 129:12,13
149:16,19,21
150:2,5,22 151:17
151:25 152:9
154:10 155:3
156:2,7 158:17
172:24 173:5,10
174:7 175:8
176:18,22 177:2,3
179:19 196:24
197:7,8,12 198:13
198:15,18,20,21
199:17,21 207:20
227:12 237:17
239:4 249:22
254:12 257:4,7,8
261:19 262:1,5,10
263:19 264:8
267:11 270:8
274:6,18,19,22,23

274:25 275:5,6,8,9
275:13,14 277:5,6
277:9,10,13,14,17
279:9 280:12
281:14,15 282:5
282:15 283:21,22
283:25 286:18,23
288:19,20,23
289:10 290:9
291:9 292:3,20,21
292:22 293:14,24
294:24 295:1,4,7
295:10,11,22
299:15,24 302:9
302:10 307:25
308:1,3,4,6,7
309:5 314:1
**correction** 315:8
**corrections** 156:11
315:6
**correctly** 23:3
31:17 62:19 69:5
78:22 103:14
125:3 154:17
155:11,19,24
246:21
**correlate** 140:19
**correlated** 227:18
227:19
**correlates** 131:5
**corresponds**
237:25
**cost** 262:10
**counsel** 13:14 14:6
16:12,19 53:2
66:24 67:10 186:9
188:3 233:14,19
270:15 273:22
288:11,15 316:10
316:16

counsel's 22:17
51:6 53:5,7 55:24
counseling 44:22
count 212:7
239:24
counted 285:8
counteract 212:21
212:21 214:16
counties 130:18,25
135:6 137:7 139:9
140:17,20 159:13
162:14 163:22
164:17 196:14
207:12 293:9
counting 240:1
countless 119:12
countries 155:17
country 3:17 24:1
25:25 34:23 38:19
54:19 55:20 76:15
76:15 91:14 94:9
115:7 123:14
157:7 162:6
191:13 205:24
278:24 294:23
county 1:2 2:2 4:3
13:17 15:19 29:11
29:19,24 54:25
55:3,5 84:1,4,8,14
84:23 85:21 86:14
130:3,5,8,11,14,21
131:12,16,20
133:22,23 134:7
134:25 136:4,5,8,8
136:11,13,15
137:24 138:3,6,16
138:20 139:5,19
139:21 140:2
141:3,8 143:12,14
143:19,21 144:2,8
144:12 157:17

158:3,6,16 159:8
159:18 160:3,6,9,9
160:13,13,17,17
160:21,21 161:1,1
161:5,9,15,23
162:7 163:8,17
164:21 165:9
166:5 207:19
248:16,17 279:1,3
279:18 280:21,21
280:25 281:1,10
281:10,14,14
293:14 296:9,10
296:19,19 302:24
303:5 309:8,15,19
309:19 316:2
couple 53:14,15
86:24 104:8
159:15 193:10
208:9 242:25
257:12
coupon 257:25
258:1,20 259:18
261:9 262:12
263:18 264:11,16
coupons 36:11,16
36:19,22 68:9
course 60:18,22,25
66:3 126:12
139:23 146:14
148:17 151:25
158:11 185:3,6,10
185:14 190:19,25
199:7,15 212:4
224:5 225:14
230:13 275:21
280:6 285:9
courses 61:1,6,8
63:21 68:25 70:3
169:12

coursework 25:3,7
25:10
court 1:1 2:1 11:5
13:5,16,22 16:3,17
78:13 168:1 169:7
173:23 221:9
court's 78:11
167:4
courtesy 17:9
47:21 209:14
cov.com 8:19
cover 180:23
181:1,5 230:23
coverage 179:1,18
covington 8:13
14:24 310:7
crack 121:18
create 18:4 37:3
66:7 204:2
created 36:11,16
36:19 68:9 94:10
165:18 252:10
253:24 289:19,23
creating 31:15
215:8 274:9
293:19
crime 52:21
153:25
criminal 211:20
283:15
criminally 221:14
crisis 22:23 23:6
23:12 58:8 64:22
161:4 177:20
194:19 202:8
criteria 149:11,14
149:15,17 151:12
152:23 154:8
195:11,12,15
245:24

critical 133:12
crunching 293:5
crystal 232:20
csr 1:24 316:4,25
cultural 290:21
culture 106:14
cum 17:17
curable 146:10
curb 223:10,15
253:9
curbing 252:18
253:11
curious 190:18
269:13
current 17:4 25:21
133:16 191:11
229:5 232:25
301:6
currently 44:1
313:10
customers 33:23
128:22 130:15
132:16 137:25
cut 213:16
cutting 74:16
cv 59:8
cvs 130:5,14
134:13,24 135:3
cycle 147:13

**d**

d 10:1 114:25
115:2,5,6 116:6
124:20 180:22,23
181:1
da 170:2,3
dad 246:21
dad's 243:15
dahl 102:22,25
300:8
daily 209:3 236:1
241:2 244:16

**damage** 196:5
**dangerous** 80:20
  80:25 82:21 93:1
**darbitblit** 3:11
**data** 26:19,19 27:9
  27:15 28:11,21
  29:9,12,21 74:8,12
  84:12 111:11
  115:14 118:2,8,14
  122:6,17 130:20
  130:22 131:11,16
  131:19,22,23,24
  132:1,8 137:6
  140:17 150:21
  151:3,20 152:6,12
  153:4 157:17,21
  159:4 161:14,19
  188:24 205:3
  207:15,19,19
  219:24 223:14
  248:16,21 249:4,6
  285:13
**database** 82:19
  92:24 132:10
  210:2 218:25
  294:5,6
**date** 11:12 13:10
  45:7 119:25
  257:13 305:12
**dating** 199:16
  263:18
**david** 102:22
**day** 5:15 62:23
  79:8 209:25
  241:18 244:7,10
  244:11 303:12
  311:11 315:23
  316:21
**days** 48:11 50:16
  53:15 131:9,10
  167:22 210:2

248:10
**dc** 5:8
**dea** 26:19 28:4
  70:24 98:11 99:21
  99:23 100:6 102:9
  102:11,13 113:6
  113:21 170:4,6,7
  170:12,19,22
  171:3,10 270:5
**dea's** 113:10 114:1
**dealer** 58:18 76:8
  117:17 238:25
  239:5
**dealing** 232:19
**death** 23:2,10 26:9
  38:12 78:4 92:1
  129:6 139:8 140:6
  140:20 147:4
  157:17,21 158:19
  159:6 183:22
  186:1 218:14
  245:9 249:20
**deaths** 29:3 131:6
  137:6 158:9
  174:21
**debate** 264:14
**decade** 54:17
  63:11,15 66:5
**decades** 40:15
  76:4 110:15
  117:15 146:16
  174:20 298:3
**decedent** 158:3
**december** 18:13
**decide** 81:25
**decides** 230:11,17
  230:18
**decision** 83:10
  85:13 112:24
  143:8 262:3 267:3
  280:12

**decisions** 112:20
**decrease** 248:6
  249:10 253:24
**decreased** 54:20
  248:19
**decreasing** 247:17
**deeper** 152:5
**deeply** 147:19
**defendant** 4:12
  5:3,14 6:3,13 7:3
  7:14 8:3,12 9:3,12
  15:23 70:16
  128:11,14 136:7
  137:2,23 143:12
  165:8 166:4 172:8
  172:18 173:4,10
  174:7 175:8 176:8
  176:21 192:18
  211:3 214:16
  215:15 218:2,20
  220:16 221:19
  286:19 292:19,25
  302:1
**defendants** 2:13
  13:14 22:5 74:3
  84:18 94:10 109:6
  127:22,25 128:7
  129:18 130:2,5,7,8
  130:10 133:14
  138:20 139:11,14
  139:16 141:6,9
  144:2 164:20
  168:3,10 172:2,4
  172:11,21 174:2
  176:13,17 177:12
  177:22 178:12
  179:7,8,12 180:9
  191:14 194:6
  195:5 202:15,19
  209:5 210:24
  219:24 221:24

231:10 245:12
  246:5,10 251:7
  258:23,25 272:24
  275:15 280:2
  290:23 295:3
  301:13 303:7
  307:24 308:3,5
**defense** 21:22
**defer** 274:14
**define** 73:1 150:12
  208:7,10
**defined** 313:10
**definitely** 300:9
**definition** 208:8
  208:20
**degree** 39:1 150:8
  150:13 151:3
  163:3 178:14
  232:16 233:21
**degrees** 125:10
  169:9,15,18
**deleted** 175:22
**delirium** 243:19
**delivered** 28:12
  70:25
**delivery** 203:4
**demand** 33:19,22
  35:19 252:12
  253:24
**demanded** 231:2
**demonstrate**
  29:12
**demonstrating**
  123:12
**dentist** 187:11
**deny** 95:16
**department** 17:9
  47:21 166:19
  209:14
**departure** 32:24
  32:25

**depend** 33:22 49:7
49:10 54:23 71:20
98:1 108:11
**dependence** 48:17
194:1,6,8,13,17,21
195:6,16 242:6
245:20,21,23
**dependency**
147:22 313:6,16
**dependent** 37:3
44:18 65:9 108:13
165:19 189:2
192:25 195:10
204:6 209:12
**depending** 203:3
**depends** 45:23
53:12 54:5,21,22
183:7 189:14
213:18 297:15
**deployed** 172:12
**deponent** 315:1
**deposition** 1:14
2:12 11:1 13:12
13:13,19 16:23
18:7 42:21 43:2,8
78:14 120:6
125:25 126:13,20
135:11 140:16
167:14 211:15
238:21 251:5
273:18 277:4,8
304:18 314:20
316:6
**depositions** 16:19
**depressed** 231:16
233:5
**depression** 224:16
228:9 231:22
**deprive** 147:3
**depth** 143:1,4

**describe** 85:11
99:15 242:15
**described** 62:16
133:6,21 160:2
164:5 215:18
246:14
**describing** 205:4
205:25
**description** 11:4
296:18 304:10
**design** 171:3,9
284:2
**designed** 107:20
170:24 202:15
**designing** 171:14
202:9
**desire** 147:20
**despite** 298:7
**detail** 107:12
166:12 292:9
296:24 297:6
**detailed** 105:15
205:3
**detailing** 297:10
**details** 83:22
134:8 262:18
293:18 294:25
295:3
**detect** 95:11
203:24 214:16
215:4 218:20
219:2 221:19
**determination**
164:10
**determine** 38:22
51:16 82:15
132:15 144:7,11
144:16 165:1
205:5 232:21
234:11 278:14
279:6 284:3

293:11
**determined** 39:15
49:22 108:12,14
108:15 168:5
207:13
**determining** 143:8
**devastation** 125:1
125:12,16
**develop** 124:7
196:2 222:14
228:22 229:10,13
229:16 230:7
232:21 233:2,6
**developed** 48:17
152:16,21 153:10
153:15 245:22
**developing** 77:20
152:20 190:7
222:11 223:11,23
225:17 227:20
228:20 229:19,22
229:25 232:8
234:12 285:14
**development**
117:12 236:2
246:2
**developmental**
59:12
**deviate** 93:22
**diabetes** 255:25
**diagnose** 158:9
195:12 197:23
**diagnosed** 151:5
158:3 187:13
**diagnoses** 149:11
154:9 197:19,24
**diagnosis** 17:8
150:7,15 151:2,14
151:19 154:8
158:25 197:16
198:1,2,17 216:13

**diagnostic** 149:4
149:14
**dictated** 180:15
**dictionary** 149:9
**die** 146:19
**died** 159:10
280:19 296:3,9
**differ** 162:8
**difference** 42:12
188:25 265:12
**differences** 41:20
41:22 42:19
**different** 40:15
62:8 85:2,4,13,23
88:15 99:18
102:25 103:1
122:1 143:3 187:1
199:16 201:17
203:1 205:19
207:21 232:15
235:7 249:7
264:12 268:7
269:11 291:22
301:25 310:21
**differential** 216:13
**differently** 268:9
**difficult** 72:14
179:9 205:5
**difficulty** 256:6,10
**dig** 152:5
**digit** 214:14
**dilaudid** 243:15
244:5,10 246:23
**diligence** 152:5
164:25 165:3
**direct** 78:2 168:7
173:23 200:6
237:6 249:21
**directed** 159:9,10
**direction** 214:13
316:12

directive 173:22
directly 50:2
64:15 169:6 199:1
215:17
director 17:6,6
disagree 22:11
181:9,11,18
182:16 184:24
185:15 187:2
193:19 195:20
201:16,18,24
202:21 205:9
222:5,6 224:18
226:1 236:13
252:20 280:14
294:3 310:25
disbursed 28:20
29:1
discharged 244:18
246:25
discipline 100:11
disciplined 103:24
discontinued
165:20
discontinuing
190:24
discovered 77:7
discovering
209:25
discrepancy 249:3
249:3
discuss 93:10
96:24,25 213:25
247:19 300:12
308:8
discussed 132:18
183:12 234:25
245:15
discussing 98:9
discussion 46:24
95:14 140:11

226:25 236:15,21
239:13 250:17
285:23 300:23
310:2
discussions 47:10
173:19,20 174:17
disease 52:13
92:21 122:9 146:8
146:13,19 147:18
148:12,12 228:8
244:22
dismay 77:7
disorder 11:16
47:3 84:25 98:22
98:24 114:23
117:13 118:13
122:8 149:15,24
150:4,7,16 151:6
152:8,15,17,20,23
153:11,15 154:5
154:15 156:16
157:7,8 158:4,10
158:24 180:25
181:3 187:14
197:17,20 198:4
201:3 223:11
227:8,11,20 228:8
228:10,22 229:8
229:10,14,17,23
230:1 233:2
234:12 235:19,20
236:3 242:2,3,15
245:2,24 282:11
282:13
disorders 17:21
146:21 149:5
150:1 155:10
229:3,5,25 235:22
235:24
dispense 30:8,25
50:20 92:22 143:8

164:21 165:15,22
166:4
dispensed 24:1
30:7 70:19 71:8
74:5 88:9,16
89:11,16 91:3,19
92:6 128:23
129:17 130:16,24
143:12 164:5
165:9 305:16,21
307:5
dispensing 29:13
30:19 34:23 97:14
109:2 129:23
130:20 131:23
132:1,14 136:12
181:14 283:6
dispersed 28:6
dispute 156:13,15
156:24 236:4
disrupted 252:18
disseminate 66:9
disseminated
25:25 110:24
292:7
dissolved 244:20
distant 211:22
distinct 194:1,12
195:6 199:23
313:12
distinction 194:4
194:19 195:14
262:23 290:20
distribute 35:9
distributed 23:25
86:22 104:22,25
105:2
distributing 34:23
193:6
distribution 25:11
25:20 26:15 27:3

27:12 28:24 34:13
57:14,24 83:25
84:7,22 120:18
251:11,15,17
252:24
distributor 23:24
24:2,4,21 33:11
34:11 36:5 37:11
39:9,13 49:4,20
50:21 51:11 61:24
62:9,10 68:7
70:16 87:13,16
88:8,12,18 89:14
89:19 90:12 91:1
91:7,18 92:5,10
114:12 193:8
distributors 24:5
24:13 25:7 28:5
33:14,18 34:18
35:9,17 36:11,16
37:18,24 48:24
68:16 69:24 70:3
70:7,12 81:3,12,20
81:23 84:18 85:10
86:6 89:9 91:10
91:13 92:2 125:20
192:3 193:4
258:15 274:9
292:10 303:9
district 20:9,24
disulfiram 85:1
diverge 225:12
diversion 28:2,8
28:15,16 33:12
38:22 39:8,17
52:21 71:2 72:6
72:17,19 87:7,23
87:23 88:3,13
90:2,10,11 92:15
95:3,7,8,9,24,25
96:3,5,9 97:7,17

97:19,23 98:7,9,11
117:16 181:20
182:10 183:20
210:5,6,13,15,16
210:22 211:16,18
211:21,21 212:13
212:14,20,22,25
213:1,6,10,12,19
213:23 214:1,5,15
214:17 216:8,11
216:24 217:8,12
217:15,19 218:1,8
218:11,12,16,21
219:3,9 220:17
221:20 222:3
283:8,12,15
**divert** 72:4
**diverted** 51:23
52:2,4,4,5,8,11
53:10 71:1 87:3
87:15 95:20
210:21,24 250:2
**diverting** 75:4
95:13 96:19 98:15
216:4 221:14
**diving** 167:25
**division** 95:10
194:16
**doctor** 39:22 40:3
45:11 46:10,18
47:17 48:8 54:1,3
54:21,23 70:21
71:2,9,15 72:12
73:3 74:5,10
75:15 76:9 82:20
82:25 86:14 87:25
100:16 109:18
112:2 114:18
116:22 121:24
123:17,25 124:6
139:22 155:3

159:17 167:7
182:7,9 190:20
206:20 207:8
227:13,17 230:11
231:3,5,24 233:3,5
250:8 251:10
257:19 258:19
259:5 262:3
263:14 264:17
265:1 270:5 272:2
272:8,16 294:24
295:12,21 296:23
297:11 314:12
**doctor's** 33:23
85:13 89:11 94:13
100:13 112:24
230:18
**doctors** 31:22,25
32:6,7 39:16 40:2
40:6,7,19,22 44:22
47:6 48:3 53:9
54:22 58:18 59:24
63:7 64:1 65:2
66:12 71:22 72:22
73:12,20,22 74:1
76:16,19 77:1,1
81:4 82:12,13
84:7,23 85:11
86:7 94:15 99:8
99:11,14 100:9,11
102:2,17 103:3,11
103:19,22,24
105:8,24 106:11
109:7 110:18
111:19,23 112:5,7
112:10,15,15,20
113:4 138:5
141:25 142:5,21
159:21,23 160:1,5
163:24 170:13
173:4,20 174:16

174:17 175:6,13
183:13 194:8,14
196:7 198:11
205:15 206:7
207:1,5 237:9
243:20,23 244:2
269:20,21 272:9
278:24 279:23
295:23 305:5
306:6
**document** 59:14
59:18 67:16,18
126:19 127:3
154:21,25 156:18
206:19 257:6,13
258:14 260:9
261:7 266:3
273:14,14,16,19
276:19,21 277:2
277:20 279:21,21
280:8,10,11,15
286:19 288:8
289:14,17,18,21
289:22 290:16
298:17,18 299:1,5
299:11 314:1,3,6,8
314:11
**documentation**
57:5 280:5
**documented**
306:25
**documents** 36:15
36:18 66:22,23
67:11,22 68:6
128:10 129:21
256:14 275:10,19
276:13,16,23
277:15,16,24
278:3,4,19,20
279:25 286:19,22
286:24 287:2,22

287:24 288:8,14
288:18,22 289:1,5
289:9 298:12
**doing** 48:16 94:23
106:9 164:25
224:10 241:7
304:13
**dollar** 37:14,19
38:2,2 241:18
**domain** 37:17
191:25
**don** 15:4
**donald** 3:5
**door** 111:5
**doorstep** 214:21
**dopamine** 203:7
**dosage** 28:6,9
230:18 261:2
263:23
**dosages** 203:10
261:21 264:1
**dose** 44:24 45:21
45:22 96:15
105:17 106:12
152:1 186:2 189:2
189:2 196:3
200:15,17 225:18
225:19 230:1,4,9
230:10,11 231:14
231:15 235:17
236:1 249:6
268:22
**doses** 46:2 83:4
106:15 140:3
196:5 200:19
206:1,12 229:21
246:24 249:11
298:4
**double** 214:14
284:14 299:20
311:11

**dr** 11:10,14 13:13
16:14 20:24 22:16
46:9 55:18 67:6
78:5 84:21 90:25
97:4 123:16
126:22 127:10,14
166:7,18 175:16
190:20 251:4
268:18 270:15
271:8 272:23
273:25 275:10
278:13 279:20
280:18,23 281:16
283:17 285:16
286:6 290:15
301:2 309:23
310:6 314:20
**draw** 257:12
290:20
**drink** 241:12
**drives** 37:3
**driving** 133:15
231:10
**drs** 102:22,25
**drug** 9:12 15:23
30:15 58:18 69:19
69:20 77:5,9,21,23
77:24 80:6 82:19
86:15 92:24 93:3
95:11,11 96:12,17
101:11 104:18
117:17 118:2
120:20 121:3
132:8,9 134:16,24
153:21 201:15
210:1,1 213:21
216:12,13,17,20
216:21 224:14
231:23,23 238:25
239:5 267:11

**drugs** 33:14,15,18
33:21,24 34:22,24
35:2,9 77:22 87:3
88:10,19 117:23
119:17 121:3,13
121:17,17 140:5
171:17 181:15
201:12,13 231:16
231:17 259:15
302:4
**dsm** 11:16 149:3
149:16,21,25
151:12 154:3,5,7
154:25 155:2
156:3,11 194:17
195:12,15
**dual** 17:8
**due** 26:7 29:2 74:3
85:13 87:15 139:8
152:4 164:25
165:3 220:1 222:2
**duped** 58:18 76:20
140:12 141:14,20
141:22,25 142:1,5
163:25 175:1
**duragesic** 251:8
254:24 271:10,18
**duration** 130:25
140:3 186:2 189:2
206:13 225:18
229:22 230:1,20
231:14,15 236:1
248:7 249:11
298:5
**dying** 35:24 244:4
**dynamic** 112:2

**e**

**e** 10:1 29:15,20
**eager** 107:22
112:1

**earlier** 41:8,9
56:18 57:12 58:14
58:23 94:24
128:17 132:18
135:11 138:10
143:5 145:19
149:23 152:6
211:14 251:11
256:13 273:22
274:24 282:14
292:14
**early** 17:21 31:13
45:3 60:2 62:25
65:13 75:10,21
79:14 80:1 93:4
104:2 213:3
216:21 227:15,17
241:7 260:17
276:10 304:14
**easier** 42:13
**easily** 57:3 76:9
280:15
**easy** 75:22 76:7
124:24 217:14
251:22
**econometrics**
169:12,16
**economic** 124:23
125:1,12,16
**economist** 125:5
**ed** 14:12 30:23
127:16
**edition** 149:5,18
**edlund** 225:16
233:23 234:1,2,7
234:14,22 235:2
235:15,25 236:7
**educate** 64:23
76:16 306:6
**educated** 93:19
94:16 223:8

232:24
**educating** 30:17
135:23 136:3
197:9 222:17
223:14,21 306:14
**education** 60:18
60:21,25 61:1,6,8
63:21 68:25 70:2
95:1 142:3,9,18
151:25 152:2
210:21 223:9
253:12 289:19,25
**educational** 17:15
109:3 290:12
292:7
**edward** 5:16
**effect** 77:17 110:4
119:2 122:11
137:16 168:2
195:21 196:3
242:6,8 243:17
245:16,19,20,21
245:25 252:3
253:5
**effective** 94:11
112:4 164:1,2
165:21 187:6
228:21 283:20
284:4 306:11
**effectively** 302:21
**effects** 190:23
203:15 313:6,17
**efficacy** 32:20
37:4 64:10 69:3
140:14 153:5
188:22 189:25
263:5 265:9
266:25
**efficient** 23:24
33:10 34:6,7,11
35:7,14 56:19

HIGHLY CONFIDENTIAL

57:11,14,24 58:1
251:10,15,18
**efficiently** 84:3
**effort** 79:21
139:23
**efforts** 36:22 66:7
168:3 179:8
271:12,13,13
276:1 290:11
**egregious** 207:3
306:25
**ehsan** 4:14 10:11
14:10,10 251:4,6
251:19 252:21
254:6 255:19,24
256:21 259:3,15
259:24 262:7,20
263:4 265:6 268:8
269:8 270:14,23
271:3,8,25 272:7
272:16
**eight** 239:25 240:2
240:2
**either** 39:7 52:6
75:3 130:1 134:3
137:22 140:8
164:18 165:6
195:15 229:2
271:18 280:20,20
301:14
**el** 8:15
**electronic** 93:14
**elicit** 198:11
**eliciting** 121:14
**eligible** 107:24
108:9
**ellis** 8:4 14:22
286:9
**else's** 36:2
**email** 237:22
238:5,12,14

**embarcadero** 7:17
**emcarter** 5:20
**emergency** 111:5
**emergent** 83:21
**eminent** 147:4
**emphasized**
165:17
**employee** 160:8
**employees** 128:13
**employment**
169:21
**enabled** 23:25
**enabling** 206:19
**encompass** 268:7
**encounter** 256:6
281:16,21 282:24
**encountered** 96:3
160:2 212:5
**encourage** 111:15
**encouragement**
148:23
**encouraging** 103:2
**endangerment**
26:7
**endeavoring**
141:18
**ended** 43:2
**endo** 7:3,3 14:17
14:17 272:24
273:2,3,8,11 274:7
274:11 275:15,20
275:22 276:4,16
276:16,23 277:3,5
277:15,20 278:3,4
278:15,20 279:7
279:21 280:2,10
280:15,20,25
281:5,9,13
**endo's** 274:2,5,17
275:5 277:12
279:8

**endorse** 102:9
112:6 189:15
190:8,10 228:24
253:1
**endorsed** 253:1
**endorses** 231:1
**endorsing** 102:12
**ends** 120:10
**enduring** 110:15
**enforcement**
52:14 160:16
**engage** 93:12
99:24 117:5
**engaged** 76:21
82:20 117:15
208:13,18 211:22
213:23 306:24,25
**engaging** 73:9,15
93:1 170:14
189:17 193:1
207:3 209:2 253:6
**england** 58:7,15
59:23 60:5 64:14
**enormous** 153:5
197:23 204:16
**enrollees** 114:25
115:3 116:6
**ensuing** 66:5
**ensure** 30:11 61:4
73:4 92:24 93:5
107:21 130:15
132:20 133:7,21
134:5
**entered** 16:18
78:16 252:6
**entire** 137:16
190:1 209:6
**entirely** 46:3
187:17 255:12,16
255:20,23

**entities** 9:3 15:2
177:6,10,19
301:22 302:4,11
303:1,17 308:25
309:4
**entitled** 237:1,3
289:17
**entity** 217:10
301:10
**epidemic** 24:16
25:22 26:17 28:25
33:7 34:12,14
74:25 76:25 78:3
80:3,7,12 81:15
106:4,24 107:11
109:7,19 117:21
124:22 129:5
133:16,17 135:4
141:1 161:6 162:6
171:13 174:24
177:2,6,18 178:3
178:21 179:2,19
180:5,17 183:22
214:20 246:11
251:23 252:9
274:10 293:21
**equal** 229:2,19
**equally** 143:4
**equals** 217:15
**equipped** 220:3
**equivalence** 248:3
297:18
**equivalent** 29:11
29:23 258:3,5
**equivalents**
130:24 131:3,3,5
**er** 263:16 264:22
266:12 267:4,10
267:19 273:3
289:18

HIGHLY CONFIDENTIAL

**errata** 43:5
**error** 208:18
  216:16
**errors** 209:19,20
  209:23
**especially** 38:11
  38:16,20 40:12
  74:11 165:16
  181:24 183:21
  258:24
**esq** 3:5,6,7,16 4:5
  5:5,6,16 6:5,15
  7:7,16 8:5,14 9:5
  9:14
**essence** 292:12
**essential** 153:1
**essentially** 279:12
**establish** 107:25
**established** 263:10
**estate** 225:2
**estimate** 21:6 71:5
  145:23 199:12
  200:23
**estimated** 199:6
  200:22
**estimates** 72:17
**et** 29:8 105:18
  111:7 187:10
  204:20 265:10
  307:14
**europe** 155:15
**european** 155:17
  155:22 156:6
**evade** 173:23
**evaluate** 150:17
**evaluating** 150:16
  197:1
**evaluation** 150:21
  170:15 305:1
**evening** 67:10

**event** 48:20 61:17
  62:22 281:18,23
  282:4,22 283:2,3
  283:10
**events** 62:6
**everybody** 82:11
  83:22 91:11
**evidence** 16:7
  20:20 45:17 46:5
  51:25 61:5 80:22
  81:9 82:8 96:17
  96:21,23 105:16
  109:19 111:9
  114:5 117:8
  119:10 124:4,16
  130:13 134:23
  139:4,6 140:15
  141:2 143:11
  150:23 153:3
  159:3 168:9
  170:15 175:2
  182:3 184:3
  185:22 187:19,20
  187:25 188:1,2,13
  188:17 189:3,9
  203:20 204:23
  222:9,19 223:21
  232:5 238:7 265:9
  265:18 266:24,25
  267:8 283:19,23
  290:14 292:8,11
  298:7 299:7,14,23
**evidenced** 293:16
  293:17
**evolution** 63:10,14
  63:18 65:12
**exacerbates**
  117:12
**exacerbation**
  242:14

**exact** 21:5 57:3
  61:18 65:21 71:13
  81:18 115:13
**exactly** 18:18
  41:15 115:24
  122:17 139:15
**exam** 228:25
**examination** 10:6
  16:13 127:13
  167:17 251:3
  272:22 286:5
  301:1 310:5
  316:10
**examiner** 157:16
**examiner's** 158:8
**example** 30:15
  36:10,11 44:23
  69:10 72:7 83:11
  84:24 85:10 86:6
  86:11 87:7,8,24
  88:4 95:10 96:12
  105:15 107:23
  175:14 178:1
  180:23 187:9
  189:5 190:2
  192:16 197:12,14
  209:24 210:4,5
  211:24 213:15
  216:2,5,20 217:25
  218:18 219:8,14
  220:15 221:17
  224:15 242:4,7
  243:16,22 249:25
  250:6 258:14
  278:11 292:6
  293:19
**examples** 207:23
  211:6 249:15
  278:2,10
**exception** 174:23
  315:6

**excess** 256:3
  283:24
**excessive** 22:25
  23:8,13
**excluded** 168:1,17
**excluding** 168:11
  169:1
**excuse** 25:15
  41:21 52:10 99:8
  121:12 126:4
**exercise** 139:5,19
  141:19 204:21
**exercising** 139:7
  141:13
**exhibit** 11:5,7,9,12
  11:14,16,18,19,20
  11:21,23,24 12:1,2
  13:5,7 16:23 18:7
  18:11,15 66:15
  67:3,5,18 68:3
  78:5,7 119:25
  120:6,14 126:1,4,5
  126:5,6,14,20,22
  144:19 154:3,5
  236:19 237:1
  238:18 239:18
  250:18,20,22,24
  256:19,23,24,25
  257:7 260:2 261:8
  263:13,20 264:6
  264:18 265:24
  273:18,19,21,23
  275:12,20 276:3
  276:17,24 278:5
  285:24 286:1,11
  288:10 289:15
  298:9,19 314:2,9
**exhibits** 11:1
**exist** 163:4,5 227:5
  262:13

existed 106:7
existence 191:13
　235:23
expect 150:8
expected 33:19,22
expenses 144:24
experience 26:5
　42:5 45:18 54:1
　67:23 68:1 77:15
　96:3 113:3,3
　119:12 122:23
　142:10 159:14
　169:21 171:7
　185:20 190:13
　206:12 211:17
　212:7,24 232:6
　268:19 269:10,12
　269:14 276:7,8
　289:2 296:23
　304:9
experiences
　159:23
experiencing
　39:10 63:18
expert 11:7 13:7
　16:19 18:1,12
　19:11,19 20:23
　56:3 78:17 89:8
　91:24 136:24
　166:16 168:1,18
　171:2 254:17
expert's 314:4
expertise 24:9,17
　25:14,17,19 44:22
　114:15 135:18
　168:6,8 171:9
　269:21
experts 20:20
　21:22 81:18 91:9
　92:3 113:13,19
　238:1 247:10

267:16 274:1,15
　274:24
expires 315:25
explain 79:9
　219:11,12 220:15
　221:17 228:6
explained 96:16
explanation 19:1
　40:21
exploited 180:9
　231:11
exposed 115:3
　122:21 124:11
　162:20 196:1
　234:9 278:23
exposure 28:3
　78:3 123:4,9,11
　187:8,10 227:4
　254:9 298:2
express 96:25
expressed 75:18
　76:19 164:15
expressing 65:6
expressly 133:2,3
　182:1
extended 225:23
　225:25 226:5,11
　244:24 264:25
　266:16,20
extends 267:1
extent 75:1 135:2
　137:4,8 139:20
　140:1 149:9 151:9
　168:8 177:5 178:1
　178:20 179:1,17
　180:14 277:15,19
　312:15 314:6
external 148:18,22
　280:16
extra 152:4 256:20

extrapolate 124:9
extreme 32:8
extremely 62:25
　71:5 90:1 195:5
eye 36:1

**f**

facilities 87:9
facility 204:18
facing 59:6 103:25
fact 35:23 36:3
　37:2 49:15 50:12
　50:14,17 64:8
　73:10 74:10 77:12
　93:21 109:18
　111:11 112:9
　146:18 152:2,19
　163:17,25 164:2
　179:11,24 181:4
　191:5 193:5
　194:20 196:1
　210:2 217:15
　218:24 220:3
　228:20 230:6
　259:1 260:5
　273:10 291:21
　297:6 314:4
factor 33:6,9,10
　33:10 116:13
　117:21 133:15
　137:15 180:3,5
　225:17 227:21,23
　227:24 228:3
　234:13
factors 77:20
　151:24 179:5,11
　179:11,23 227:4,7
　228:12,14,17,19
　228:24 229:9,9,16
　229:23 230:3
　232:7 234:8,24
　235:8,11,16,23

facts 51:24 221:9
faculty 17:22,23
　209:14
fail 134:4 139:19
failed 36:5 130:14
　134:10,24 137:8
　137:24 139:5
　168:9 219:6,17
　221:12
failure 25:20
　26:15 27:3
fair 21:22 41:7
　47:5 127:4 130:19
　137:7 141:17
　147:10,12 148:18
　149:24 150:6
　152:15,18 161:21
　164:13 176:10,17
　178:4 183:6 201:9
　268:10 270:14
　277:11 287:1
faith 32:14 161:23
　162:4,5,14,21,25
　164:6
falls 156:5
false 43:8 63:24
　70:14 127:20
　217:12 266:21
familiar 24:12
　27:21,23 34:1
　37:21 100:22
　107:13 110:8
　135:19 142:2,17
　166:18 171:15
　266:8 273:8,12
　297:5 299:17
　306:23
familiarity 82:24
family 40:6 75:23
　93:12 96:25 97:12
　189:16,17 190:4,9

HIGHLY CONFIDENTIAL

190:10,21 192:6
198:12 211:10
217:2 224:13
225:20 227:10
231:17,23
**far** 20:2,6,7,19
56:11,25 129:23
235:22 265:13
**fashion** 284:15
**fashioned** 139:7
**fatal** 256:2
**father** 246:23
**favor** 184:12
285:2
**fda** 35:2,4 247:6,8
247:10 252:22
253:2 267:3,9,10
267:13,15,17,17
274:25 275:1,5,8
305:14,20
**fear** 109:9 311:7
311:15,20 312:3
312:12
**federal** 19:17 20:8
20:11,14,24,25
21:7 28:10 41:4
41:16,23 42:1,7,15
42:22 43:7 68:14
68:18
**federation** 69:1
70:10 100:22,25
101:1,5,8,11,15,18
101:24 102:1
103:1,10,18 104:9
104:21 105:6,23
106:10,19,22
107:6,9 202:17
275:24
**federation's** 102:9
102:14,16 104:6

**fee** 109:3
**feel** 36:23 53:3
97:23 114:2
142:22 175:10
220:20 221:23
265:17 266:21,23
**feels** 112:6
**feet** 244:12
**fell** 99:9
**fellowship** 17:7,21
**felt** 79:8 96:4
97:18 217:9
**fentanyl** 116:9,14
116:18 117:1
121:25 122:16
123:18 124:1
200:3 243:4,8
244:6 251:8
252:14 254:11
287:13,15 303:25
304:19 309:14
**fentora** 303:19
304:6,10,17 309:9
309:10,20
**fewer** 74:19
**field** 169:22,25
190:1
**fifth** 110:19,23
149:5,18 275:24
312:21,24
**figure** 50:3 165:23
170:13 192:13
**figured** 151:11
**filed** 13:16
**files** 128:10
**fill** 48:24 49:3,19
82:1,7,15 114:25
164:24
**filled** 48:14 70:21
71:9,15 72:20
82:2,11,16 87:8

88:4,8,14 90:12
139:21 163:7
164:5
**filling** 87:24 140:2
144:8,12,16
**fills** 88:22
**final** 307:20
**finance** 8:3 14:23
286:9
**financial** 256:10
**financially** 62:5
**find** 29:5 76:8
95:23 96:7 97:4
97:10 157:22
234:19
**finding** 74:17 75:1
89:16 91:3 118:22
147:8
**finds** 188:23
**fine** 154:23 264:13
**finish** 61:2,3 235:4
**finished** 235:1
282:8
**firm** 13:21 286:8
310:7
**first** 19:18 32:11
50:1 51:19 60:24
76:4 80:17 83:4
87:7 101:18
105:10 120:5
123:4,8,11 138:12
154:14 156:4,24
158:14 213:6,25
214:21 221:7
233:12 240:10,20
240:24 241:8
245:1 260:4
263:15 264:18
269:16
**fit** 304:10

**five** 76:14 116:10
220:9 239:25
244:9 288:7
**flesh** 244:12
**flip** 239:21
**flips** 240:2
**floor** 4:15 9:15
**florida** 9:7
**flu** 241:1
**fly** 56:7
**focus** 221:11
**focused** 161:9
**focusing** 105:22
267:18
**fold** 84:12 117:6
131:6
**folks** 239:5
**follow** 22:16 53:5
53:7 55:24 110:5
128:18 135:11
145:23
**followed** 60:6 94:6
117:11 149:21
246:17
**following** 80:13
108:11,14 132:18
**follows** 121:16
269:5
**followup** 190:19
196:12
**footnote** 120:15
121:16
**footnotes** 237:21
**force** 171:24 172:1
172:8,12,19,21,24
202:16
**forces** 172:10
231:9
**foregoing** 315:3
316:6,13

HIGHLY CONFIDENTIAL

foremost 51:19
forgot 96:19
form 16:18 20:17
21:2,9,20 24:11
27:5 29:17 31:7
32:17 33:25 34:10
35:11 37:12,20
39:12 41:11 42:10
42:18 45:13 46:12
46:21 47:8 48:9
49:6,11,25 51:2,14
51:24 52:23 53:11
53:17 54:4,10
56:12 57:16,22,25
59:7 67:20 70:22
71:11,18 72:25
73:16 74:7 75:7
79:4 80:4 81:6,16
82:3,17 85:16
86:18 87:22 88:11
88:20 89:1 92:12
94:7 95:5 96:1
97:8,25 98:16
99:17 100:1
113:24 114:13
115:21 116:15
117:2 119:20
123:9,11,19 124:2
124:25 133:24
135:9 143:2 145:9
146:7 147:1 148:4
148:6,19 150:11
151:16 153:12
161:25 162:16
163:10,14 164:7
165:10 168:13,19
172:15 173:11,15
174:8 175:9,18
176:11 177:8
178:5,17,23 179:3
179:20 180:7,18

182:13,21 183:14
184:1,11,23
186:18 187:23
188:16 189:11
191:1,21 192:20
194:3,15 195:2,23
199:18 201:8,21
202:4,12,25
203:17 204:13
205:8 206:5,10,23
208:14 212:11
214:18 215:1,6,16
216:10 217:17,17
218:6,9,22 219:10
219:19 220:11,24
221:5 222:18
223:12 225:8
226:9 228:15
230:15 231:25
234:6 235:13
238:6 246:6
247:18 250:3
251:16 252:19
254:4 255:17,21
259:12,20 262:6
262:16,24 265:4
268:4 269:2
271:22 272:3
276:5 278:7,17
279:10 280:13
287:15 288:24
289:11 295:15
296:11 297:2,14
297:25 299:16
301:14 302:17
303:2,21 305:10
307:8 310:12,17
310:24 311:9,21
312:13 313:9
forming 67:13,16
68:2 149:12 160:9

160:13,18,22,25
178:10 197:4
207:11 275:11
277:3,7,11,16
forms 261:2
263:23 264:1
273:4 287:6
formulary 179:1
179:18 230:22
formulation 85:7
86:3 225:2,25
266:16
formulations
224:21 226:6
forth 149:16
275:11 316:7
foster 161:7
found 28:2 115:6
118:20 119:16
244:24 265:11
278:9
foundation 190:4
founded 300:8
four 84:12 110:14
131:6 165:16
239:25
framed 164:22
188:11
framework
149:15,25 154:9
francisco 1:15
2:15 3:9 6:17 7:18
13:1,20
free 36:11,17,19
36:22 105:3
186:13 256:15
257:9,20 258:3,5
258:11 261:10,24
262:11
frequency 87:25

frequently 33:1
50:8 58:21 224:10
friend 76:7 117:17
friends 75:23 76:1
211:10
front 78:5 119:22
171:11 183:3
219:1 239:24
243:23 269:21
frontal 148:25
fueled 33:7
fulfill 134:1,4,10
137:24
fulfilled 133:6,20
fulfilling 34:18
full 118:11 150:17
239:22 244:10,10
316:13
fully 72:16 232:20
function 190:2
284:20
functional 203:15
functioning
232:24
funded 102:23
funding 104:18
271:13 291:4
314:4
funds 107:24
further 127:10
313:22 315:4
316:16
furtherance 309:5
furthermore
152:22

**g**

game 21:22
gap 190:12
garguilo 11:6 13:5
16:22 78:16

gateway 245:16,17
gather 93:12
   96:21 151:1,21
gathered 159:24
   276:13
gears 146:3
   161:21 181:7
general 3:15 15:9
   15:14 36:22 46:13
   59:2 82:25 94:8
   106:21 140:25
   147:12 148:16
   157:5 165:2
   176:16 226:16
   227:17,24 274:13
   290:4 306:13
generally 41:1
   92:15 105:8,25
   309:11
generations 32:19
   165:18,24
generic 9:3 15:2
   171:16,21,23,24
   171:25 172:3,4,6,8
   172:14,19 200:11
   273:4 301:14
   302:12,14,20,22
   302:25 303:16
generics 172:1,18
   173:1
geographic 29:12
   34:14 39:18 54:19
   140:18 294:19
getting 72:7 76:1
   77:5 83:16 189:16
   192:23,24,25
   198:3 268:14
   284:16
ghertner 29:8
gimlet 237:2

gist 86:8
give 16:8 37:13
   45:7 51:3,12
   76:25,25 84:24
   87:7 115:13
   123:20 124:15,18
   162:10 178:18,24
   180:24 189:5
   207:7 212:3,6,8
   234:15 257:23
   261:23
given 39:16 45:21
   107:5 113:8 115:1
   115:4 118:24
   137:5 140:18,22
   164:9,9 165:2
   182:20 183:21
   184:9,21 205:7
   221:17 228:12
   230:7,9,22 231:1
   233:21 234:18
   244:17,21 245:14
   246:1 258:11
   262:25 265:20
   269:23 277:4,8
giving 58:20 77:11
   132:24 211:8
   221:15 237:4
glaring 150:24
glass 241:6
global 299:19
go 13:25 59:18
   72:3 74:15,23
   75:9 76:9 84:9
   88:23 97:15
   117:25 121:7,24
   124:6 127:1,2
   146:10 187:13
   191:17 193:8
   194:10 198:23
   201:17 222:4

226:22 236:16
   239:10 241:12
   250:12 267:24
   275:2 285:18
   299:12 313:24
god 16:9
goes 21:25 186:22
   233:1
going 16:22 18:6
   19:13 22:16 28:23
   34:8 51:3 53:1,7
   55:10,13 79:24
   90:20 92:25
   113:19 123:18
   127:1,5 131:9
   154:2 167:11
   193:9 196:5
   201:16 206:2
   215:21 216:15
   217:23 219:9
   222:14 226:23
   232:2 236:17
   239:11 241:17
   247:2 250:15
   252:17 255:5
   260:1 261:6
   263:12 264:13
   272:18 285:21
   288:9 300:21
   309:25 314:12,15
good 13:9 16:14
   16:15 32:14,22
   83:6 105:19
   109:19 112:7,10
   112:15 115:5
   117:8 127:14,15
   138:24 139:5,7
   147:7 156:12
   157:2 161:23
   162:4,5,14,21,25
   164:6 167:18,19

167:20 185:21
   203:19 210:21
   222:11 223:14
   240:6 251:4 286:6
   286:7 301:2
   307:12 310:6
goods 64:10
gotten 192:13
   221:16
government 178:2
   178:15
gradually 79:7
graduated 17:18
   282:8
graduating 17:17
grain 149:7
grandma's 117:18
grandparent's
   72:8
grant 9:21 13:21
granted 267:11
granting 100:6
gray 7:15 14:20
great 189:1 191:17
   202:13 215:7
   222:15 240:14
   242:7 243:16,22
   308:17
greater 140:21
   235:18
greatest 225:17
greatly 202:21
   253:19 269:19,24
   291:12
green 243:14
ground 217:25
group 84:13
   102:21 176:17
   186:20 242:9,10
   284:13 298:14,22
   299:3,9,15

**groups** 284:13
**grow** 79:7
**growing** 63:19
  74:24 75:6,8 76:5
  79:1,5,6,6,17,17
  79:18,19 80:3,11
  80:15,23 117:15
**growth** 79:9
**guess** 47:13 85:17
  168:22 171:22
  268:5 280:7
**guide** 102:5
  104:14 161:12
  305:14,20 306:2
**guideline** 105:7
**guidelines** 83:3
  101:15,19 102:10
  102:12,14,17
  103:2 104:6
  105:24 106:3,6,23
  107:2 138:11,16
  138:21 275:25
  308:23
**guides** 305:24
  307:4
**gynecologic** 77:3
**gynecologist** 94:24

**h**

**h** 5:17
**habit** 241:18
**hallucinogens**
  121:18
**hand** 16:5 256:18
  257:14 260:1
  263:12 264:2
  288:9 290:23
  298:8
**handbook** 59:12
**handed** 18:10
  125:25 126:5
  236:25 239:17

  257:6 264:6
  265:25 289:15
  298:18
**handing** 67:3
  238:21
**hands** 78:4
**handwriting**
  240:7,14
**handwritten**
  11:19 238:18
**happen** 30:3 31:5
  241:11
**happened** 65:12
  242:19
**happening** 195:17
  204:4 214:3
  217:22 218:12
  220:6
**happens** 52:18
  79:7 88:9,19
  89:10,15 91:2,18
**happy** 270:11
  276:20 277:2
  289:6 308:9
**hard** 18:17 58:19
  71:5,19 115:22
  195:12 243:22
  283:11
**hardest** 124:22
**harm** 29:2,14
  30:13 46:3 75:1
  97:17,23 132:23
  133:8 147:7
  162:18,24 163:3
  165:25 185:21
  186:8 187:8
  203:24 222:2
  306:21
**harmed** 30:7
  38:24 39:20 72:5
  82:10 97:17

  128:22 129:16
  130:16 192:25
  302:24 303:15
  309:19
**harmful** 185:19
  194:9 195:7
**hashish** 121:18
**hayward** 307:14
**head** 79:3 86:1
  87:1 168:21 199:8
  220:12 262:2
**heading** 154:13
**health** 7:3 14:17
  30:22 83:21
  110:13 116:2
  118:2,23,24
  136:18 137:2,24
  180:14 183:25
  184:1 193:3 202:7
  218:14 227:25
  235:18 284:21
**healthcare** 45:15
  46:1 64:9,17
  74:16 107:14
  108:5 119:14
  140:12,25 149:10
  153:1 183:4
  204:14,15,18
  209:6 228:13,16
  283:5 292:7
**healthy** 152:1
  244:3
**hear** 208:8 226:15
**heard** 80:19,25
  132:2,4 174:15
  189:3 206:16
  304:3 305:2
**hearing** 56:8
**heart** 110:13
  111:7

**heating** 244:24
**heavily** 84:3,5
  161:7 179:7
  230:21
**heavy** 89:4
**hehsan** 4:18
**heimann** 2:14
**held** 13:19 61:15
  61:16
**help** 16:9 73:20
  80:18 81:10,14
  111:25 148:14
  181:15 192:8
  215:9 223:10
**helped** 80:15
**helpers** 111:24
**helpful** 48:22
  73:11 185:19
**helping** 44:17 46:1
  204:5 209:11
**helps** 257:21
**henceforth** 237:12
**heroin** 116:9,14,17
  117:1,7 118:4,10
  118:13,15,17
  119:3,7,17 120:8
  120:23 121:11,24
  122:15,15,19,21
  122:25 123:4,9,13
  123:18,25 240:21
  240:23,24 241:2,3
  241:9,11,15,16
  242:10,11,13
  243:21 244:7
  246:8,17 252:13
**hide** 36:1
**hiemann** 3:4 13:20
  15:5 16:1
**high** 38:20 39:6
  53:22 87:25 92:19
  93:17 94:1 103:3

105:18 106:11,12
106:15 107:21
115:18 118:6
140:3 152:13
153:16 157:8
191:17 206:1,12
218:12 230:10
231:17 232:24,24
235:17 244:18
246:24 249:6
**higher** 196:3,5
214:9 225:18
229:3,9,21 235:19
**highest** 200:15,17
200:18
**highlight** 40:13
307:13
**highlighted**
154:12
**highlights** 11:21
11:24 250:20,24
**highly** 1:9 2:8
34:22,24 37:1
112:17 227:18,19
**hijacked** 209:6
**hipaa** 51:8
**historical** 255:4
**historically** 108:5
**history** 83:18
118:22 122:9
132:15 150:21
151:11 153:3
158:20 166:19
197:11 198:12,15
198:17 215:12
224:14 225:20
227:8,10,13,15,22
229:3,5 231:22,22
231:23 232:25
245:14 246:2

**hit** 124:22
**hold** 103:16 171:2
246:4
**holders** 135:17
**homology** 194:23
**hon** 11:5 13:5
**honest** 216:16
**hooked** 58:19
**hope** 4:15 147:2,3
147:5 251:21
**hopkins** 64:21
**hospice** 147:4
**hospital** 111:5
112:12,12 230:22
230:24 242:16
**hospitalizations**
29:10,22
**hospitals** 81:14,24
81:25 82:7 107:20
107:22 108:2,22
109:2 110:5 112:9
**houman** 4:14
14:10 251:5
**hour** 19:20,23,25
55:10 144:21
170:16
**hourly** 19:22
145:7
**hours** 56:15
**house** 88:24
**hubbard** 6:6
**huge** 54:18 240:21
244:6
**huh** 88:17 120:12
120:22,22,25
121:2,6,9 144:22
148:21 155:12,20
155:25 167:24
184:15 205:20
221:2 234:4
238:24 266:14

284:17 300:14
**humanities** 17:17
**hundred** 212:17
212:18 220:9
241:18 248:18
**hundreds** 162:12
288:18
**hydrocodone**
28:12 70:19,25
71:8 200:3 273:5
301:14
**hydromorphone**
195:22 273:5
**hyperalgesia** 46:7
**hypnotic** 140:5
**hypothetical** 82:4
191:2 221:6,18,22
231:13 232:1,23
233:5
**hypothetically**
145:5 222:12
**hypotheticals**
141:2

**i**

**i.e.** 231:7 268:24
**iatrogenic** 165:25
194:19
**iatrogenically**
253:23
**ibuprofen** 185:25
**icu** 244:9
**idea** 109:11
110:22,24 141:12
156:12 238:8
**identifiable**
235:23
**identification** 13:6
13:8 67:7 120:1
126:23 154:6
236:20 238:19
250:19,21,23,25

285:25 286:2
**identified** 11:4
18:14 67:11 128:6
308:18
**identify** 14:5
18:10 26:23 42:15
58:2,14,23 60:13
69:14 70:14 91:14
120:5 127:20
172:7,18 206:20
207:7 249:20
255:15 271:17
272:7,9 280:18,23
281:8,12 287:8,21
295:20 296:3,8,13
296:18 298:12
300:2 302:7
307:23,24 308:11
**identifying** 197:6
207:23 249:15,25
250:6
**identities** 158:2
**ii** 44:12,25 60:9
103:9 258:7,10,12
**iii** 87:2 90:11
**illegal** 71:16,20
117:23 153:20
210:25 217:12,15
**illegally** 252:7
**illicit** 116:17
119:17 121:3,13
121:16,17 122:16
137:19 231:23
245:5 252:13,13
252:23 253:10,20
253:24 254:1
255:8
**illicitly** 252:6
253:13 254:11,14
254:15,18

illinois  6:7 8:7
illness  149:8
  224:15 232:25
illustrates  115:15
immediate  112:6
  190:9 217:1
  303:25 305:3
  306:4
immediately  96:24
  97:20
imminently
  150:25
immunity  94:19
impact  28:24
  83:25 84:22 91:25
  112:19 113:22
  114:3 173:3 179:2
  292:18,24 293:12
  294:9,16 307:19
impacted  84:5
  85:10 86:7 161:7
  173:1 272:5
impacts  113:10
impaired  83:8
imperfect  149:8
implement  94:21
  95:2 104:5 108:22
implementation
  171:3,9
implemented
  93:20 94:2 204:18
  305:9
implication  77:10
implicitly  108:21
implied  79:6 109:9
  140:10,20 181:22
implies  47:13
important  30:17
  80:10,11 108:4,5
  118:8,14 124:21
  135:23 137:5

148:11 183:16,24
  190:12 198:6
  217:21 225:9
  245:4,8
importantly
  106:13 229:15
  244:15 258:14
imported  253:25
impressions
  284:11
improper  183:13
  194:14 196:8
  207:14 271:20
improperly  250:2
improve  111:14
improvement
  190:13,14
inaccuracy  216:17
inaccurate  62:24
  63:9 64:3 65:4
  189:21 195:1
  212:9
inadequate  306:5
  306:8
inappropriate
  186:11 206:9
  208:1,5,7,10,23
  209:2 271:20
  278:16 296:20
  302:25 303:16
  309:20
inappropriately
  205:17
inappropriateness
  208:14
incarcerated
  155:9 157:10
incidence  118:4,6
  118:10
incident  236:3

include  29:5 41:8
  121:17 157:21
  198:12,15,17,20
  228:9 242:5 245:4
  245:15 246:1,12
  277:20,24 278:1
included  23:23
  41:23 130:6 157:9
  216:12 245:17,19
  276:17,24 277:23
  278:1,5 280:6
  302:1
includes  84:14
  126:16 149:25
  151:23 154:8
  192:1,1,2,3,4,5,6
including  25:25
  29:3 82:12,13
  84:18 94:9 109:16
  110:13 121:18
  130:24 140:22
  159:5 161:6 162:6
  190:2 197:19
  203:5 205:24
  206:3 217:2 222:2
  224:14 227:25
  228:1 235:15
  246:11 252:13
  253:10 271:15
  272:12 284:22
  294:6 309:14
income  145:20,24
  145:25
incomplete  154:21
  191:1 198:9
  221:21 222:25
inconsistent
  211:25 264:7
incorrect  293:15
increase  24:7 29:9
  29:11,22,23 31:12

39:3 84:12,15
  116:13 131:6
  140:16,18 177:14
  180:9 245:8
  248:10 253:19
  297:12,17,19,21
  297:23
increased  26:6,8
  28:3 29:2 33:6
  75:22 77:17 78:2
  80:8 84:16,17
  91:25 116:10
  119:6 131:2,4,9,13
  131:17 140:19
  224:13,19 225:4
  225:15,24 226:4
  229:22,25 245:11
  245:11 248:2,4,9
  248:17 252:9,12
  294:14
increases  39:18
  74:18,18 117:6
  186:1
increasing  26:8
  35:18,19 80:13
  91:16 137:18
  140:5 186:2 189:2
  230:8 298:4,5
  303:9
increasingly  119:5
incredibly  192:10
incremental
  186:24
incurred  185:25
  186:23 189:1
  196:5
independent  27:2
  27:6 125:11,15
  293:11,16
independently
  253:18

**index** 13:17
**indicate** 260:22
**indicated** 47:10
  49:14 116:22
  145:22 243:1
  259:10,13,19
  260:18 264:22
  266:17 304:6
**indicating** 159:5
  256:19 260:2
  261:7 263:13
  288:10 298:9
**indication** 54:6
  83:13 260:24
  261:1 264:19
  265:2,7,8,17 267:4
  267:9,10,18,25
  268:12 290:17
**indications** 134:17
  134:25 259:16
  260:16 309:9
**indicative** 158:21
**indirectly** 102:23
  215:18
**individual** 69:8
  72:9 82:9 91:8
  92:5 101:2 107:7
  135:16,20 147:23
  151:7 159:8 173:4
  173:8,10 174:1,1,5
  174:6,10 175:8
  182:24 183:23
  197:1,5,11 202:24
  204:11 206:21
  207:1 212:12
  213:18 216:19
  217:3 218:25
  219:3 220:4,23
  221:25 228:7,14
  230:12 232:14
  242:1,3,4,5,7

245:15,17 246:1
  246:13 253:19
  278:20 281:2,12
  292:19,24 293:5
  295:12 296:3,8,13
  296:18
**individual's** 140:6
  158:20 201:20
  202:2
**individualize**
  203:14
**individually** 158:9
**individuals** 26:7
  36:23 72:11 76:10
  77:10,12 115:12
  118:12 122:24
  152:22 153:16
  155:9 157:10
  162:19,20 165:18
  186:21,24 187:13
  188:25 192:24
  195:13 203:11
  207:2,9 220:9,14
  222:13 225:15
  234:8,11 245:22
  249:15 252:11
  280:19,24 284:12
  298:5 306:24
  311:6,14,19
  312:11
**induced** 46:6
**industry** 35:25
  37:5,14,19 38:2,4
  38:10 39:5 62:5
  62:10 66:7 68:13
  68:22 69:22 70:1
  70:5,9 76:20 81:8
  116:1 177:1,11,17
  179:25 180:6
  272:11 295:17,25
  308:9

**infection** 242:17
  243:11,13
**infiltrated** 230:24
**influence** 69:9
  111:18 181:6
  275:23 280:17
  291:11,12 295:17
  303:8 308:8
**influenced** 172:5
  179:7,24 202:23
  230:21 276:8
  279:8 280:15
  291:6 295:24
  302:19 309:12
**influx** 240:21
**inform** 61:5 74:12
  151:20 168:9
  219:25 223:3
**informally** 65:5
**information** 11:22
  11:25 41:25 51:17
  62:23 63:8 64:2
  65:3 78:20 79:12
  92:10 93:13
  105:19,20,21
  135:5 136:10
  138:17 151:1
  158:19 197:15
  207:12 236:1
  250:21,25 262:23
**informed** 67:21
  92:20 93:18 95:14
  96:22 153:2 168:9
  171:5,8 203:19
  204:22 209:4
  219:25 228:17
  232:5 265:17
  266:23 307:2
**informing** 302:15
**infrastructure**
  95:2 204:3 215:9

**infusion** 94:25
**ingesting** 38:25
**ingestion** 249:21
**inhalants** 121:19
**inherent** 64:19
**inhibitor** 259:9
**inhouse** 246:24
**initial** 260:8
**initially** 124:25
**initiate** 306:16
**initiated** 98:10
**initiating** 222:10
  223:1 284:11
**initiation** 120:8,19
**inject** 241:10
**injected** 241:6,6
  244:20 247:1
**injecting** 244:24
**injection** 243:11
**innocently** 34:18
**inpatient** 201:14
**input** 198:12
**inroads** 306:23
**inserts** 301:21,24
  302:3
**inside** 177:13
  179:23 231:9
**insipidus** 255:25
**insisting** 186:10
**instance** 218:7,17
  218:21 220:5,17
  246:22
**instances** 137:23
  191:3 205:22
  211:7 214:15
  216:7 217:1 280:4
  283:6,14
**instant** 302:2
**instituted** 77:4
**institution** 63:1

institutions 108:6
instruct 20:21
  21:24 22:10 55:21
instructed 10:19
  16:21
instruction 55:25
  257:22
instrumental
  177:23
insufficient 189:21
  189:24
insurance 180:15
  230:23
intend 18:15,23
  19:1,7 41:9,24
  42:8,16 125:21,23
  276:15,22
intended 73:20
  74:1 119:14 210:9
intense 191:6,19
intensive 224:22
  225:6 226:7
intention 64:23
intentional 147:15
intentionally 72:6
  72:11 76:11
  188:11
intentioned
  141:12,17 209:23
interacted 135:21
interactions 30:15
  134:16,24
interdisciplinary
  97:13
interested 316:18
interesting 181:8
interestingly
  76:24
interests 152:4
interface 117:19

interference 14:2
interjected 188:10
intern 44:10
internal 40:7
  148:17,22 239:21
  279:21,25 280:10
  280:15
interpretation
  151:20
interpreting 234:1
interrogatory
  221:10
interrupt 188:3,4
interrupted 188:9
  235:3
interruption 14:3
  156:21 226:13,18
  226:21 248:14
intertwined 119:9
intervals 93:5
intervene 89:17
  91:4 243:23
  306:15
intervention 97:21
  165:21 214:10
interventions
  44:16
interview 159:21
  236:25 237:4,18
  240:18
interviewed
  159:17,20 160:8
  160:12,16,20,25
interviewing
  239:5
interweave 245:8
interwoven
  253:18
intimately 299:17
intoxicated 83:8
  83:16 143:7,13

intoxication 59:21
intramuscularly
  241:6
intrinsic 195:21
  196:4
intro 11:18 236:16
introduced 108:18
invades 98:16
invariably 196:2
invasion 51:4
invented 110:20
invention 202:19
inventory 34:4
invested 209:11
investigate 51:11
  89:5 100:9
invisible 231:9
invoice 21:1
invoices 20:24
  145:13,17
involuntary
  147:11 148:10
involve 39:1
  216:25 283:15
  291:4
involved 37:6 38:4
  44:17 99:19,21
  100:5,6 102:11
  118:21 139:12
  150:9 215:8,15,17
  215:18
involvement 42:3
involves 45:20,22
  181:23
involving 185:8,12
  211:19
iqva 248:16
irrational 109:9
island 145:6 189:7
isolate 173:2,8
  174:4 179:9,17,21

292:18,23
isolateable 179:22
isolated 48:20
  220:5 221:25
isolation 195:16
  258:22
isop 132:2,3
issue 101:18
  196:15 264:14
  267:14,15
issued 26:19 80:5
issues 274:25
item 257:2,22
  313:25
iv 243:4,8 244:5,6
  244:10,14

**j**

j 9:14
jama 123:5 294:18
jan 11:20,23
  250:18,22 257:4
janssen 4:12 14:11
  68:11 251:6
  257:15 258:16
  259:22 267:11
  271:9,12,13 272:1
  272:4,4,8,12,13,14
january 1:16 2:17
  10:4 13:1,10
  16:17 316:21
jerry 11:5 13:5
job 39:13 231:17
  232:25
john 5:17
johns 64:21
johnson 4:12,12
  14:11,11 251:6,6
joined 17:22
joint 69:2 70:11
  107:13,16,18,19
  107:22,25 108:3

108:12,15,16,18
108:20,24 109:25
110:16,20 202:17
230:24
**jones** 5:15 190:20
**jonesday.com**
5:20
**joranson** 102:22
102:25 300:8
**journal** 58:7,15,15
59:4,23 60:5
64:14
**judgement** 141:13
268:20
**judgment** 96:22
98:2 141:19
151:22 152:1
184:2 204:22,22
**judicious** 253:7
**judiciously** 76:18
**judith** 166:7
**jump** 22:3
**juncture** 115:23
**june** 102:22
**junior** 17:22 63:1
199:25
**jury** 189:5 197:9
206:3 210:7
219:15 228:6
**justice** 16:22
78:16 211:20
283:16
**justified** 26:2 89:4
129:24

**k**

**kaiser** 190:4
**kate** 14:13
**katherine** 6:5
**katherine.swift**
6:9

**kay** 7:6
**keen** 237:9
**keep** 34:6 244:8
**kept** 57:4
**key** 28:2 68:24
69:7,8,14,23
110:21 135:3
**keyes** 157:20
**kicking** 237:3
**kilogram** 29:10,23
**kind** 36:21 44:14
46:15 60:4 66:9
94:19 95:23 96:23
108:4 109:14
111:23 122:8
147:11 148:9
153:20 165:3
196:12 199:21
200:5 204:2
208:13,18 233:11
299:19 311:3
312:17 313:1,15
313:19
**kinds** 142:6
199:16 290:12
291:13
**kirkland** 8:4 14:22
286:9
**kirkland.com** 8:9
**knew** 244:2
284:16
**know** 21:5,10 36:4
37:23 39:9 49:1
53:9 56:5,14,17,23
57:17 60:1 61:18
63:13 64:13 65:19
65:22 71:12 72:16
76:8 77:19 78:16
81:1 82:15 83:14
83:17,19 86:19
87:17 92:13 96:14

96:21 101:9
102:13 104:7
105:2 106:20,20
106:21 107:8,9
112:10 114:2
115:9,25 116:5,8
122:15,17 124:10
124:11 129:25
130:2,10 131:22
132:5,5 133:4,20
136:2 138:15
139:13 142:23,24
143:18,21,23
144:1 145:16,24
147:3 152:5 160:4
160:5,7 161:4
169:5 172:10,20
173:22 193:9
198:1 199:5
207:18 208:11
210:7 211:9,19
213:6,17,20 214:8
214:20 219:1,8,14
238:5 240:14,25
242:10 247:9
254:23 255:1
259:5,18 262:17
265:13 268:2,23
269:14,25 270:19
271:4 273:1,6
274:11,13 281:21
282:24 285:9
291:8 294:24
295:2,5,8 303:22
304:1,23 305:24
307:13
**knowing** 73:23
217:19
**knowledge** 22:6
26:21 68:5 99:3
130:17 136:10

138:22 143:14
159:24 160:1
161:2 171:7,14
211:20 219:25
228:18 255:4
**knowledgeable**
209:10
**known** 59:24
197:18 218:3,10
219:16 220:17
283:8
**kol** 300:2,6
**kols** 300:9,12

**l**

**l** 8:14
**la** 289:18
**label** 260:4,6,17
265:25 304:21
**labeled** 288:7
**labeling** 263:15
267:17
**labels** 301:21
305:25
**laboratories** 301:5
301:19 302:8
**lack** 46:4 154:24
197:21 213:13
**landmark** 60:4
**language** 154:13
167:23 223:3
292:16
**large** 25:21 26:16
27:4 42:2 73:25
74:9 77:8 80:2
84:2 97:18 102:3
102:18 103:12
106:16 111:25
115:11 122:24
129:23 140:16
155:9 163:16
165:15 193:6

229:7 243:9
**largely** 42:20
  54:23 106:6
  191:13 202:18
  282:6
**larger** 107:8
  116:25
**lasalle** 8:6
**late** 63:12,12,14
  65:13 104:2
  208:25
**latest** 61:4
**laude** 17:17
**launching** 280:2
**lauren** 9:14 15:21
  15:21
**law** 2:13 52:14
  160:16 286:8
**laws** 103:2
**lawsuits** 103:25
**lawyer** 51:18,18
**lay** 80:14 129:20
  206:25 253:11,15
**lays** 120:17
**lchb.com** 3:11,12
  3:13
**lead** 117:5 162:24
  163:2,2,3 187:8
  297:20
**leader** 69:7,8,15
**leaders** 68:25
  69:23 110:22
**leading** 23:18 26:6
  252:12 253:4
  293:20
**leads** 111:13 119:7
  174:25 297:17
  298:1
**learn** 281:17
**learned** 66:4

**learning** 109:5
  291:13
**leaves** 167:14
**leaving** 75:3
**lecture** 233:15,18
**lectures** 58:21
  59:5 64:6
**led** 24:6 40:15,23
  109:6 135:7
  162:18 177:20
  271:9 274:10
  300:8
**left** 74:20 75:23
  257:14 264:2
**leftover** 76:2
**legal** 51:15 91:10
  92:2 95:25 96:4
  97:15 113:14
**legally** 51:17
**legitimate** 39:7,10
  71:23 72:2,4,9,13
  72:23 73:1,6,8,9
  73:13,18 74:2
  75:17,19 76:13
  77:11 83:12,13
  94:18 96:15 117:4
  124:6 137:19
  161:23 162:15
  163:9,18,24,25
  231:18 245:7
**leibell** 9:5 10:14
  15:1,1 301:2,3
  302:23 303:4,24
  305:13 309:23
**lembke** 1:14 2:12
  10:7 11:2,7,11,14
  13:7,13 16:14,25
  22:16 46:9 55:18
  67:6 78:5 84:21
  90:25 97:4 123:16
  126:22 127:10,14

237:8 251:4
  268:18 270:15
  271:8 272:23
  273:25 275:10
  278:13 279:20
  280:18,23 281:16
  283:17 285:16
  286:6 290:15
  301:2 309:23
  310:6 314:20
  315:2,21
**lembke's** 20:24
**length** 131:8
  137:13 140:24
  248:8 249:6
  285:13
**leo** 3:16 15:8,11,12
  15:13
**leslie** 1:24 2:17
  13:22 316:4,25
**lessened** 252:24
**lethal** 34:22,24
  37:8
**lethality** 37:2
**letter** 247:7,9
**level** 28:7 29:11,19
  29:24 92:19 93:17
  94:1 95:19,21
  106:10 107:21
  138:17 148:13
  166:12 174:23
  175:20 183:25
  191:23 192:21,22
  203:23 213:23
  214:9 217:20
  218:1 219:3,24
  220:21,25 222:1
  231:1 232:9,10
  233:7,8,17,21
  249:23 250:10
  268:25 271:14,23

278:20 281:2,3
  283:16 294:2
  296:1 297:12,22
  297:24
**levels** 71:2 94:17
  189:24 292:25
  293:13 294:11
**leverage** 177:13
**lewis** 9:4 15:1
**liberal** 33:5 76:21
  108:25 110:1
**liberally** 111:19
**license** 53:10
  99:10,14,24
  100:14,16 135:16
  231:6
**licensed** 55:8
  60:19 61:12
  142:10,21 143:1
  196:10,22
**licensees** 105:1,4
**licensing** 99:13,23
**licensure** 61:7
  99:19 100:4,5
  142:18
**lieff** 2:14 3:4 13:19
  15:4,25
**lies** 189:19
**lieu** 151:7
**life** 32:9 158:11
  189:17 241:4
  244:2
**likelihood** 236:2
**likewise** 167:21
  233:4 253:24
  263:23 264:6
**limbic** 148:25
**limit** 81:8 181:15
  195:21,25 196:4
**limitations** 167:5

HIGHLY CONFIDENTIAL

**limited** 40:2 79:23
83:5 169:6 173:14
234:18 236:3
**line** 10:20 22:4
32:11 82:6 83:4
105:10 138:12
171:11 186:25
219:1 229:15
241:21 243:23
244:21 269:21
315:8
**lines** 39:7 83:8
278:19 306:10
**link** 29:13 137:5
238:9
**list** 11:10 48:22
66:19,25 67:6,8,12
67:13,18 68:4
90:10 157:17,19
183:15 257:1
286:13,15,16,18
286:24 291:15
307:22
**listed** 67:17 68:3
125:20 183:16
275:17,19 276:13
287:24 288:7,22
289:10 291:24
308:4,6 315:7
**listen** 53:1 78:18
**listing** 197:18
**lists** 66:15 158:18
290:5
**literature** 63:22
77:16 119:11
140:23
**litigation** 1:6 2:6
13:15 18:1,13,16
18:23 19:2,8,17,19
20:2,6,9,12,14,25
21:8,13,16 41:5,10

41:15,16 42:1,4,17
42:22 43:7 55:19
56:4,7,11,16,21
57:9 66:16 68:14
68:19 125:21,24
139:15 145:21
159:22 166:22
301:6,13 302:3
308:21 309:5
**little** 56:18 114:19
181:8 193:6
211:14 271:16
306:13 311:22,23
313:25
**live** 77:21 232:19
**lived** 288:25 289:2
**lives** 146:15
**living** 77:25 246:7
**llc** 286:10 301:4,7
301:11 302:8
**llp** 2:14 3:4 4:13
5:4 6:4 7:6,15 8:4
8:13
**loaded** 189:12
**lobbying** 66:7
102:24 179:8
271:13
**lobe** 148:25
**logical** 223:16,20
**lollipops** 287:13
304:19 309:14
**lollypop** 287:15
**long** 17:11 18:17
43:20 56:20 77:5
80:21 94:17 103:4
103:12 109:17
140:3 145:5 153:5
153:6 182:3,7,8
183:1,10 186:21
188:19,22 189:7
190:6 196:2 200:9

206:1,12 225:11
226:11,20 231:22
253:8,8,13 263:16
264:7 265:25
268:23 269:1,6,18
277:25 283:19,19
285:10 298:6,7
**longer** 79:18,20
88:9,18 95:22
225:19 229:21
265:14
**look** 18:8 37:25
38:17,18 59:8
97:22 101:21,22
118:19 119:23
122:11 130:22
156:3 158:8 164:8
170:16 171:6
213:2 229:7 248:7
256:22 260:16
263:23 270:13
274:14 300:11
308:13
**looked** 142:4
213:2 254:15,21
270:3,3 307:14
**looking** 76:22
131:11 158:18
188:22 234:14
236:9 239:17
247:21 249:6
264:17 289:17,21
290:7 294:18
**looks** 61:18 180:21
**los** 4:16
**lose** 53:10 147:18
231:6
**losing** 110:5
**losses** 100:16
**lost** 73:22 96:19
147:23

**lot** 22:5 75:2 94:21
178:8 186:3 206:2
206:14 276:2
**lots** 45:14 231:9
285:6 293:7
**low** 94:17 105:17
306:12
**lower** 44:24 45:22
114:1 115:24,24
116:3
**lpincus** 9:18
**lporter** 6:19
**luke** 6:15 14:14
**lunch** 127:7

---

**m**

**m** 5:6,16 6:5
**m.d.** 1:14 2:12
4:14 10:7 11:2,8
13:7,13 17:19
58:18 142:13
238:25 239:6
315:2,21
**ma'am** 254:20
286:17
**magical** 53:15,19
**maintain** 61:7
306:17
**maintenance**
180:25 241:16
**major** 33:6,9,10
34:12 69:11
117:21 129:4
137:15 181:3
198:24,25 224:15
228:9
**majority** 71:12
73:17,19 118:20
161:22 162:2,11
163:16,21 182:2
186:23 205:18,19
205:23 306:16

**maker**  172:8,18
**makers**  171:23,25
**making**  58:21
   83:10 109:1
   112:24 143:8
   150:9 197:24
   256:6 271:5
   280:12
**mallinckrodt**  7:14
   14:21 175:15,16
   192:17 214:16,19
   214:21,24 215:8
   215:15 218:1,10
   218:16,19,24
   219:8,16,23 247:4
   247:7,9,11 249:17
   249:22 250:1,7,9
**managed**  178:20
**management**
   24:10 25:4 34:4
   181:21,23,25
   182:11,20 184:8
   184:21 264:23
   265:2 266:17
   267:19
**managing**  253:21
**mandated**  66:2
**mandatory**  61:7
   65:24
**manipulated**
   69:23 70:2,6,10
**manipulation**
   68:24
**manner**  252:16
**manual**  149:4
**manufacture**
   251:7 301:22
   302:12
**manufactured**
   113:7 252:6
   253:13 254:11,14

254:16,18 273:10
   273:11 280:20,24
   301:13 302:4
   303:1,16
**manufacturer**
   25:1 281:18,23
   282:5,22 283:1,4,9
**manufacturer's**
   113:17
**manufacturers**
   24:6,13 35:17
   68:15 69:25
   102:24 109:4
   113:15 172:2
   173:18 192:3
   258:16 274:9,13
   275:23 291:12
   292:10 293:18
   296:2,24 297:6
   298:13 300:13
   301:12 303:8
   309:13
**manufactures**
   215:11 273:2,3,7
   301:8
**manufacturing**
   252:23
**march**  305:9
**margin**  37:10
**marginalized**
   157:9
**maria**  8:5 14:22
   286:8
**marijuana**  121:17
**marin**  316:2
**mark**  119:24
   126:19 154:2
   273:17,17,19
**marked**  13:6,8
   18:6 67:6 120:1,5
   126:1,13,23 154:6

236:19 238:18
   250:18,21,22,25
   256:18 257:7
   260:1 263:12
   273:20 285:25
   286:1 288:10
   298:9
**market**  113:23
   144:2 185:2
   247:16 252:13
   254:16,19,21,23
   255:1,5,7,8 295:8
**marketed**  302:15
**marketing**  127:24
   128:6 168:2,3,6,10
   169:2,13,16,18,22
   169:25 172:4,25
   173:3,9 174:6,14
   175:7,15 195:4
   271:9,12 275:15
   276:1,9 277:13
   278:23 279:9
   292:19,24 294:10
   295:14 302:19
**martha**  9:5 15:1
   301:3
**martha.leibell**  9:9
**massive**  23:19
   24:6 34:13 123:12
**material**  168:10
   275:16 276:9
   287:5,9,13
**materials**  11:9
   66:15,25 67:5,9,13
   67:24 68:1,4,24
   109:3,5 159:16
   175:7,15 276:2,3,6
   277:13 287:22
   290:13 291:13
   292:7 302:7
   308:25 309:3

**matter**  16:8 34:7
   153:8,13 164:23
   164:25
**matthew**  5:5 14:7
**mccabe**  117:8,11
   118:19,20 122:23
**mcconnell**  5:17
**mckesson**  8:12
   14:25 36:18 68:8
   68:10,10 69:17
   101:10 104:17
   256:14 258:15
   310:8
**mcneill**  257:15
**mdl**  12:1 19:14
   168:5 169:1
   285:24 288:3
   291:15
**mean**  19:5,14 27:6
   32:5,13 38:6 59:1
   68:13,15,18 71:20
   85:22 88:21
   112:22 142:15
   144:25 146:16
   150:12 171:17,19
   174:22 198:22
   200:22 214:19
   226:11 239:20
   262:12 263:7
   283:23 293:10
   310:13,16
**meaning**  68:17
   141:12,18 147:19
   269:9
**meaningful**
   188:20,25 265:12
   284:19
**means**  32:18 33:12
   116:21 137:19
   171:21,22 210:6
   228:6,7

| | | | |
|---|---|---|---|
| **meant** 68:14,18 | 106:10,18,19,22 | 204:11 208:17 | 307:11 |
| 126:5 147:25 | 107:2,6,10 116:1 | 225:23 230:4,12 | **meet** 36:5 108:1,2 |
| 172:13 213:6 | 116:16,24 117:9 | 231:18 237:23 | 110:24 188:20 |
| **measure** 108:21 | 117:11,19 118:16 | 244:3 262:4,10,14 | 245:23 |
| 108:23 109:2 | 118:22 119:3 | 262:21 273:1 | **meeting** 108:10,13 |
| 110:12,16,18,25 | 141:13,19 142:3 | 279:8 304:20 | 152:22 195:11,15 |
| 138:6 249:8 | 142:11,18,21 | 305:14,15,20,24 | 195:15 |
| 297:19 | 143:1 150:20 | 306:2 307:4 | **megan** 8:14 14:24 |
| **measured** 108:15 | 151:23 152:24 | **medications** 30:19 | 310:7 |
| 108:17 | 157:16 158:8 | 30:21 37:1,8 38:6 | **melville** 4:7 |
| **measures** 108:1,2 | 159:14 161:24 | 52:7 53:9 73:5 | **member** 101:4,11 |
| 108:3,10,13,24 | 162:15 163:9,18 | 89:19 93:24,25 | 106:18 137:8 |
| 110:1 181:15,16 | 196:17 197:5,10 | 99:15,16 118:24 | 231:17 |
| 282:2 284:19 | 197:11,14,18,22 | 135:24 185:1,8,12 | **members** 36:9 |
| **mechanism** 259:5 | 197:25 198:3,8,10 | 207:8 225:5 254:2 | 75:23 93:12 96:25 |
| 259:8 | 198:12 199:3 | 256:7 273:2,6 | 97:12 101:7 |
| **media** 80:14 237:2 | 202:5,18 204:1,3,8 | 278:15 305:4 | 189:16 190:10,10 |
| **median** 285:13 | 205:6,24 208:14 | 306:5 307:6 | 190:21 192:6 |
| **medicaid** 107:24 | 209:1 213:2 | **medicine** 17:2,6,7 | 217:2 |
| **medical** 17:5,18 | 227:25 228:25 | 17:8,24 40:6,7,14 | **memories** 287:12 |
| 33:4 36:24 40:4 | 231:6 253:17 | 47:22 55:2,8 58:7 | **memory** 199:23 |
| 41:2 43:22,22 | 268:19 275:16,21 | 58:15 59:12,24 | **mental** 149:8 |
| 44:10,22 51:13 | 275:24 282:8 | 60:5 64:14 72:8 | 224:15 227:25 |
| 53:21,25 54:6,14 | 287:5,14 312:8 | 74:6,20 75:23 | 232:25 235:18 |
| 60:18,21,24 61:1,2 | **medically** 206:8 | 77:19 81:3,5,11 | **mention** 129:11 |
| 61:6,8 63:13,15,20 | 207:14,25 208:5,7 | 82:8 96:18 99:10 | 275:1 299:4 314:4 |
| 63:21 64:6 66:10 | 208:10,23 278:16 | 99:22 100:9,13,19 | **mentioned** 104:8 |
| 66:14 68:25 69:1 | 296:20 302:25 | 103:21 104:5 | 128:20 138:23 |
| 69:2,9,11 70:2,6 | 303:15 309:20 | 106:17 110:15 | 141:11 166:15 |
| 70:10 71:23 72:2 | **medicare** 107:24 | 117:18 172:14 | 229:24 251:22 |
| 72:13,23 73:2,6,8 | 114:25 115:2,5,6 | 177:13 179:23 | 255:11 256:13 |
| 73:13,15,18 80:2 | 116:6 180:22,23 | 196:11 201:19 | 272:14 284:24 |
| 83:13 87:4 89:18 | 181:1,5 294:5 | 204:25 209:15 | 288:2 303:17 |
| 91:16 93:14,15,19 | **medication** 38:13 | 210:24 211:3 | **mere** 227:4 |
| 95:2 99:2,4,5 | 38:14 39:4 50:4,7 | 213:9 231:9 | **merely** 30:20 |
| 100:16,23,25 | 59:21 60:18 74:4 | 290:21 303:22 | **message** 76:8 |
| 101:1,2,4,5,7,12 | 80:9 81:23 85:2,5 | 304:4,12 305:21 | 105:17 181:3 |
| 101:14,24 102:1 | 85:14,14,24 88:24 | **medicines** 171:16 | **messages** 62:15 |
| 103:1,10,18,25 | 95:18,22 143:12 | 171:21,24 205:17 | 63:5 66:9 69:3 |
| 104:23,25 105:6,7 | 181:6 198:15 | 247:12 301:7,22 | 105:14 173:18 |
| 105:9,23,25 | 201:20 202:1,2,9 | 302:12,14 303:20 | 174:19 181:3 |

HIGHLY CONFIDENTIAL

195:3,4,4 209:5
278:23 289:3
306:10 307:23,24
308:19
**messaging** 63:19
69:13 280:8
309:13
**met** 127:16 251:5
**metaanalysis**
188:22
**methadone** 180:24
**methicillan** 243:12
**methodology**
177:4,25 178:13
180:13
**miami** 9:7
**microphone** 99:9
**microphones** 14:1
**mid** 43:22 63:12
**middle** 266:11
**midst** 80:6
**midway** 257:14
**mild** 150:3
**mill** 39:16 40:18
40:22 139:22
207:5
**milligram** 130:23
131:2,3,4 248:3
261:11,19 263:24
297:18
**milligrams** 261:4
297:21,22
**million** 115:2
116:6 157:6,8
**millions** 115:15,17
124:10 152:15
153:9,14,19,23
195:10
**mills** 26:22,23,25
139:20

**mind** 44:16 51:19
240:17 242:17,22
264:17,21 286:11
**mine** 186:11
221:25
**mineola** 3:18
**minimal** 90:3
**minor** 32:11,23
106:16 164:3
**minority** 162:2,11
163:1 242:9,10
**minute** 90:16
**mischa** 11:18
236:19
**misconceptions**
62:16
**miseducated** 74:3
230:9
**misinformation**
65:18 109:6 142:7
**misinformed** 73:7
74:3
**misleading** 63:4
66:9 69:3 70:14
105:14,17 127:20
173:17 174:19
182:12,14 194:25
195:5,8 209:5
222:23,24 224:1,2
266:22 277:21,24
278:4,23 295:25
306:9 307:23
308:18 309:13
311:1,18 312:10
312:16,23
**misled** 32:19
272:8,10
**misrepresentation**
109:15 140:13
271:25 272:5
280:5 292:11

**misrepresentatio...**
63:3 272:11
278:10
**misrepresenting**
222:18 238:7
**misrepresents**
292:8
**missed** 96:15
**missing** 66:22
260:17
**missive** 80:10
**misstates** 178:5
**mistaken** 276:12
**misunderstood**
312:4
**misuse** 93:25
182:18 183:3
184:7,20 193:14
193:21 198:7
210:10,12 214:2,5
216:19 223:10,15
224:22 225:7
226:7 227:18,19
282:1 284:22
**misused** 281:9,22
296:14
**misusers** 117:23
**misusing** 65:9
75:12 83:9 282:21
**mitigating** 306:23
**mitigation** 305:2
**mmooney** 5:10
**mode** 233:12
**model** 101:15
102:9,12,14,17
104:6 107:2
**moderate** 150:3
260:18 264:23
266:17 267:19
**modifications**
95:17

**modified** 224:20
**mom** 241:4
**moment** 18:8
180:24 234:15
308:14
**moments** 104:8
**monday** 145:6,8
145:11
**money** 36:3 37:9
37:24
**monitor** 191:15
203:16 213:11
306:15
**monitored** 90:9
274:12
**monitoring** 25:18
82:19 92:24 93:18
99:13 132:9
170:25 171:4,10
191:6,12,19,22,24
192:18 203:23
210:1 224:22
225:6 226:7
232:10 274:2,5,17
274:21
**monologue** 78:25
**month** 16:17
154:14 155:16
156:15,25 244:18
307:14
**months** 224:9
241:2,9 243:11
244:10,16 283:25
285:9
**mood** 17:21
**mooney** 5:5 10:8
14:7,7 16:14
19:15,20 20:23
21:6,11 22:14
24:20 27:8 29:20
31:2,10 32:25

34:3,24 35:13
37:15,18,23 41:13
42:14,21 46:8,17
47:5 48:11 49:9
49:18 50:5 51:6
51:22 52:3 53:1
53:14,25 54:7,15
55:10,18,24 56:15
57:19,23 58:2
67:3,8,24 71:6,14
71:22 73:3 74:23
75:9 79:12,23
81:2,12,22 82:12
83:24 84:20 85:19
86:20 88:15,22
89:6 90:16,25
92:14 95:3,24
96:7 97:2,9 98:6
98:20 99:22 100:8
101:21 102:6
109:23 114:1,16
116:5,19 119:24
120:4 123:15,23
124:13 126:19,24
127:2,10
**moral**  73:22
**morgan**  9:4 15:1
**morganlewis.com**
9:9
**morning**  13:9
16:14,15 67:12
129:15 241:13
**morphine**  29:10
29:23 60:10
130:23 131:2,3,4
244:17,25 246:25
248:2 297:18,21
**mortality**  84:13
**motivate**  216:25
**motivation**  148:17
148:22

**mouthful**  228:5
**move**  30:24 46:8
71:6 79:25 84:20
89:6 97:2 109:23
123:15 133:18
169:8 236:12
259:3 292:13
314:8
**moved**  190:2
241:9
**mrivera**  8:9
**mrodgers**  8:19
**mrsa**  243:12
**muhuri**  117:22
119:16 120:7
**multi**  20:9 38:2
**multidistrict**  41:5
**multiple**  71:2
83:17 99:18 159:2
187:4 287:4
**mute**  226:15
**myers**  4:13 14:10
**myriad**  214:11

**n**

**n**  10:1
**naive**  285:5
**naloxone**  181:2
**name**  13:21 16:24
51:13 127:16
129:12 134:3,12
251:5 260:17
270:10,16 272:23
281:2,11 286:8
295:11 296:12,17
296:21 301:3
303:3,6,18 309:11
309:22 310:7
316:20
**named**  70:16
**naming**  296:1

**napoli**  4:4 15:19
**napolilaw.com**  4:9
**narcotics**  28:7
**nasem**  28:1,4,15
70:24 86:24
**nassau**  4:3 15:19
55:5 84:1,8,23
85:20 86:13 130:3
130:5,8,14,21,25
131:12,20 132:14
133:22 134:6,25
135:6 136:4,8,11
136:13 137:6,6,23
138:5,16,20 139:5
139:19,21 140:2
140:17 141:3
143:12,14,18
144:2,8 157:17
158:3 159:7,13,18
160:3,9,12,17,21
161:1,4,9,15,22
162:7,13 163:8,17
164:21 165:9
175:16 207:19
248:17 279:3,17
280:21,25 281:10
281:14 293:9,14
296:10,19 302:24
309:7,19
**nation**  116:3
**national**  112:11
118:2 169:1
173:12 174:23
271:14 294:5
**nationally**  246:11
**natively**  314:2
**natural**  111:23,23
122:9
**nature**  95:16
170:10 182:23
183:8

**nearly**  199:21
245:11
**necessarily**  150:24
153:15 195:11
210:6 218:11
258:22 264:9
269:4 271:6
**necessary**  53:23
96:4 288:21 289:4
289:8 312:7
**necessitating**
216:18
**need**  26:3 38:10,12
82:14 83:22 89:4
91:16 97:24
108:16 122:10
129:24 165:17
182:22 191:15
193:7 196:2 204:1
204:2 214:9,15,25
225:14
**needed**  49:22 79:9
217:9 220:21
264:25 266:19
267:21
**needles**  241:10,11
**needs**  148:17
202:6 204:21,22
221:1
**nefarious**  258:21
**negative**  77:9
96:17 216:12,13
311:12
**neighborhood**
77:22
**neighbors**  74:21
**neither**  284:15
316:16
**neurobiologically**
313:11,13

HIGHLY CONFIDENTIAL

**never**   26:2 51:9
53:20 92:9 97:16
98:6 147:3 148:8
193:7 208:13
216:23 217:7
231:16,16,16
253:1 280:10
**new**   1:1 2:1 3:15
3:18 4:7 7:9,9
9:16,16 13:17
15:9,14 19:14,15
20:2,6 26:24 27:1
41:8,15,20,24 42:8
42:16,17 52:25
54:25 55:5,8
56:11,16,21 57:9
58:7,15 59:23
60:5 64:14 77:4
84:12 86:22 94:6
94:9,25 99:4,5,9
99:10,14,23 100:3
100:8 101:4
103:21 104:5
106:18,21 130:24
131:1,7,21,21
132:7,10 139:9,12
143:23 144:16
145:14 159:22,25
161:7,16,18,18
172:9,11,12,19,22
173:4,8,14,17,18
173:21,25 174:5
174:11,14,16,18
174:22,22 175:1,6
175:7,13,24 176:3
176:22 177:7
178:3,22 179:2,19
180:17 186:7
190:15 196:11,13
196:13,16,20
197:2,6 205:11,16

205:25 206:7,17
206:22 207:2,5,9
207:12,12,15,24
235:12 241:5,9
246:3,3,8,11
247:17 248:2,5,8
248:20 249:5,17
250:7 254:16,22
254:24 255:2,9
270:1,2 271:10,15
271:18 272:6,10
278:15,21,22
279:8,23 280:21
280:25 281:9,14
288:9 291:15
292:19 293:1,2,8
294:2,6,11,14,23
294:25 295:6,9,12
295:18,21,23
296:4,9,14,16,19
303:14 309:12,15
309:18
**newspaper**   27:17
27:18 80:24 207:5
**nice**   119:23
**night**   66:24 67:12
67:19 275:13
**nine**   22:19 31:20
239:19,21,23
**nmpr**   120:23,24
121:4
**nodding**   241:19
**nods**   79:3 86:1
87:1 199:8 220:12
262:2
**non**   38:13 72:13
87:4 107:19
129:21 185:8,13
187:18,22 188:15
194:9,9 195:7
235:20 254:2

283:20 284:4
**nonexistent**
148:22
**nonmedical**
116:12,16,19,21
116:24 117:5,10
117:11,16 118:5,7
118:9,15,17,21,25
119:3,5,18 120:8
120:18,20 121:1
121:11,13,14
193:14,22 245:6
253:16
**nonresponsive**
259:4
**nonsense**   237:24
**norepinephrine**
259:9
**normative**   85:9
86:5 106:17
**north**   8:6
**northern**   293:13
**norway**   155:23
156:7
**notary**   315:25
**notations**   11:15
126:17,23
**note**   13:24 89:3
167:3 217:18
229:9
**noted**   129:8
138:10 314:23
**notes**   11:14,19
126:17,22 180:22
238:18,22 239:4
239:18,20 240:8
242:18
**noticed**   273:13
**noting**   70:24
**november**   19:18
260:9

**nuanced**   45:16
147:17
**nuances**   100:2
**nucynta**   36:19
68:9 251:8 255:2
256:15 257:10,20
257:23 258:2,7,19
259:10,18,19,22
260:5,23,25
261:11,15,18
262:1,4 263:16,17
264:8,16,22 265:2
265:7,10,15,22
266:1,12,16 267:4
267:10,19 268:12
268:14 271:10,18
**nucynta's**   259:8
**number**   11:4
13:17 24:7 27:9
28:20 40:12 54:8
54:15 57:3 61:6
61:18 76:5 81:10
82:5 86:21 97:18
113:7 114:11
115:12,18,20,23
116:4 123:21,24
124:3,12,13,15,18
131:24 134:4
137:18,22 138:1
155:9 156:24
158:2 163:7,11
164:19 165:7,12
166:2 178:18,24
199:12 200:22,23
201:6 206:3 212:3
212:6,8 237:21
249:4,9 257:2
273:19 288:8
295:2
**numbered**   239:8

HIGHLY CONFIDENTIAL

**numbers** 20:25
37:13,22 80:13
81:18 84:2 117:15
156:6,13 157:2
158:2 293:5
**numeric** 27:14
137:12
**numerically** 113:2
**numerous** 35:9
**nurse** 204:15
250:8
**nurses** 173:4
175:6,13
**nw** 5:7
**nycynta's** 259:5
**nycyntas** 264:12

**o**

**o'melveny** 4:13
14:10
**o'toole** 3:16 15:8,8
15:11,13,13
**oakland** 170:12,19
270:6
**oath** 42:24 316:8
**object** 20:21 21:2
21:9,20 24:11
27:5 29:17 31:7
32:17 33:25 34:10
35:11 37:12,20
39:12 41:11 42:10
42:18 45:13 46:12
46:21 47:8 48:9
49:6,11,25 51:2,14
51:24 52:23 53:11
53:17 54:4,10
55:21 56:12 57:16
57:22,25 59:7
67:20 70:22 71:11
71:18 72:25 73:16
74:7 75:7 79:4
80:4 81:6,16 82:3

82:17 85:16 86:18
88:11,20 89:1
92:12 94:7 95:5
96:1 97:8,25
98:16 99:17 100:1
113:24 114:13
115:21 116:15
117:2 119:20
123:19 124:2
133:24 135:9
143:2 145:9 146:7
147:1 148:4,6,19
150:11 151:16
153:12 161:25
162:16 163:10,14
164:7 165:10
168:13,19 172:15
173:11,15 174:8,8
174:9 175:9,18
176:11 177:8
178:5,17,23 179:3
179:20 180:7,18
182:13,21 183:14
184:11,23 186:18
187:23 188:16
189:11 191:1,21
192:20 194:3,15
195:2,23 199:18
201:8,21 202:4,12
202:25 203:17
204:13 205:8
206:5,10,23
212:11 214:18
215:1,6,16 216:10
217:17,17 218:6,9
218:22 219:19
220:11,24 221:5
223:12 225:8
226:9,12 228:15
230:15 231:25
234:6 235:13

238:6 246:6
247:18 250:3
251:16 252:19
254:4 255:17,21
259:12,20 262:6
262:16,24 265:4
268:4 269:2
270:18,19 271:22
272:3 276:5 278:7
278:17 279:10
280:13 288:24
289:11 295:15
296:11 297:2,14
297:25 299:16
302:17 303:2,21
305:10 310:12,17
310:24 311:9,21
312:13 313:9
**objection** 19:12
20:17 22:8 126:21
154:21 167:6
186:9 200:25
206:23 219:10
220:18 221:21
224:24
**objections** 19:13
316:9
**objective** 110:12
159:4 284:20
**obligation** 52:15
**obligations** 113:14
**observed** 143:6
190:21
**observing** 26:6
83:7
**obsessive** 228:10
**obstacle** 256:11
**obtain** 49:16 76:9
85:2 95:21
**obtained** 109:3

**obtaining** 72:12
153:25
**obvious** 150:24
151:4 189:1
211:19 213:19
**obviously** 193:1
246:7
**occasion** 97:16
255:25
**occur** 34:15 71:2
72:6,19,20 90:12
193:13,20 194:21
**occurred** 22:24
23:6,12 34:16
44:9 63:10,15
79:11,19 141:3
176:15 177:18,19
**occurring** 38:23
93:15 211:16
217:9 229:24
**occurs** 79:18
269:4
**odds** 122:19
234:12 235:17
**offer** 16:23 18:15
18:23 19:1,7,7
41:9,25 42:8,16
51:17,17 67:17
89:8 114:3 125:21
125:23 142:14
169:7 171:5 274:8
276:15,22
**offered** 41:16
**offering** 86:20
87:12 159:18
168:12 274:1,4,7
274:16,20 275:4,7
294:9,13
**office** 3:15 15:8,13
75:12 111:4
232:19 304:19

**offices** 2:13
**offset** 262:9
**oh** 15:21 28:23
    132:5 170:8
    217:22 240:1
    260:12 273:20
    287:18 298:11
    304:1 312:4
**ohio** 5:18
**okay** 15:11 27:19
    36:15 67:3 78:13
    84:11 102:6
    105:22 120:17
    127:18 128:19
    129:1 130:2,13
    133:1,11 134:15
    136:21 138:10
    139:4 143:5
    145:16,19 146:3
    152:13 153:18
    154:2 155:2 156:9
    156:13,20,22
    157:12,15,25
    158:18 159:15
    160:8 161:11,14
    161:17,20 165:13
    166:7,24 170:10
    170:18,21 173:7
    175:21 176:6,16
    177:4 178:19
    179:14 180:1
    181:7 182:5,16
    184:18,25 185:4
    185:11,15 186:25
    190:18 194:24
    195:19 196:6,10
    196:21,25 197:4,9
    197:14 199:4
    200:5 201:4 203:9
    203:13,21 205:2
    205:10,19 207:7

207:11,21 208:4
210:4 211:6 212:3
212:19 214:14
215:20 217:4,11
220:13,15,22
221:3 223:6,9,24
224:8,12,18 225:3
227:3,7,10,22
228:12 229:1
233:11 234:10,16
234:17,21 236:12
237:6,15,17,20
238:5,15,15,17
239:2,8 240:5,13
241:20,25 242:24
243:7,8 246:1
247:2,11 248:12
249:1,13,19,24
250:5,11 260:22
261:6 264:17
266:2 270:12
273:24 275:3
279:17 281:4,8
286:23 287:1,8,20
288:6,17 289:7,14
289:21 290:7,15
291:14,20,23
292:4,13,22 293:6
293:24 294:15
297:10,20 298:8
298:16 299:1,13
299:22 300:1,6,18
301:16 304:2
307:20 308:11
309:7
**old** 3:17 83:6
    138:24 139:5,7
    244:4
**older** 154:16
    156:17 260:19

**omm.com** 4:18
**once** 61:3 122:13
    209:8
**one's** 79:16
**ones** 82:1,16 289:9
**ongoing** 37:3
    109:20 152:19
    203:16 224:4
**ooo** 13:4 314:24
**op** 69:20 101:11
    104:18
**opana** 273:3
**openly** 211:18
**opine** 81:17 92:3
    113:12,20 162:1
    163:15 165:6
    168:6 181:4
    183:11
**opining** 195:7
    247:10 267:16
    274:25
**opinion** 21:8 23:11
    23:15 28:24 31:19
    33:4,8 41:10,14,25
    67:14,21 68:21,25
    69:7,8,14,23 81:2
    86:20 87:12 89:8
    91:11 103:16
    106:3 110:22
    114:3 115:17
    129:1,3,7,17 133:5
    133:11 134:10,20
    136:21 137:1,11
    138:19 142:14
    158:1,6 160:25
    163:6 164:12,14
    166:2 168:11
    171:5,8 175:23
    176:2,16,21
    178:10 179:18
    181:10,11,19

182:9,12,15,17
187:2,20 188:13
189:9 190:24
192:15,17 193:11
193:19 194:13
196:7,25 197:4
201:18 202:21
205:15 206:6,8,18
207:11,22,25
208:2 219:15,18
219:20,23 222:6
222:20 224:18
231:20 232:14,16
233:20 242:1
247:6 249:14,19
249:21,24 250:5
252:21 257:19
264:14 268:15
274:8 275:18
276:11 278:3
283:18 287:7
294:8,9,13
**opinions** 18:15,19
    18:22 19:1,3,4,6
    20:15 22:20 31:20
    42:4,7,15,20 66:16
    67:17 68:2 125:19
    125:22,23 159:18
    160:10,14,18,22
    166:25 168:12,14
    168:16 169:8
    254:17 274:1,4,7
    274:16,20 275:4,7
    275:11 276:15,23
    277:3,7,12,16
    286:20 287:3,10
    287:23 292:2
**opioid** 1:6 2:6
    11:16 13:14 20:11
    20:14 21:12,15
    22:23 23:6,11

HIGHLY CONFIDENTIAL

**[opioid - opioids]**                                                                 Page 42

24:6,13,15 25:20
25:22 26:15,16
27:4 28:6,24 29:2
29:3,9,10,11,13,14
29:15,16,18,21,22
29:23 30:2,6 31:5
31:11,22 33:5,7,8
34:13 35:13,15,24
36:5 38:10,11,14
39:4,4,18 41:5
42:3 43:24,24
44:3,9,19,25,25
45:5,12,15,21 46:6
46:10,14,19 47:2
47:12 48:15,17,18
49:17 54:2,18,19
55:19 56:3,6 58:8
58:20 59:25 64:18
64:22 66:6 68:12
68:15,22,23 69:22
69:25 70:1,5,9
72:3 73:17 74:4
74:17,25 76:1,25
77:5 78:3 80:3,12
81:7 83:23,25
84:13 85:7 86:3
88:8,13,16 91:12
93:4,6,23,24 95:12
95:13 98:22,22,24
102:4,24 104:13
104:22 105:12
106:4,15,23
107:11 109:3,7,9
111:13 112:3,17
114:17,22,22
115:1,3,11,12
116:1,12,20,21,21
116:25 117:4,6
118:12,23 119:13
121:23 122:8,8,11
122:14,22 123:1,5

123:8,10,17 124:5
124:7,22 128:21
131:2,6,8,11,13,14
131:17,20,25
133:13,14,16
134:2 135:3,4
137:5,8 138:11
139:17 140:18
144:9 149:15,24
150:7,16 151:6
152:8,14,16,20,23
152:25 153:11,15
154:5,14 155:9,16
155:22 156:15
157:7,8 158:4,10
158:24 159:11
161:4,6 162:6
163:21 165:3
170:14 171:12,13
172:2 173:3,18
174:23 175:24
176:3,15,21,25
177:1,6,11,14,16
177:17 178:3,21
179:2,19,24 180:4
180:6,17,20,21,25
181:2,15 182:6,18
183:3,5,10,22
184:2,6,19 185:1,7
185:11,21 186:2
187:3,14 189:6,10
189:13 190:6,8,15
190:21 191:4
192:3,14 194:5,5
197:2,7,19 198:4,7
199:21 200:15,24
201:3,7 203:6
205:16,22 206:21
207:2,8 208:24
209:3,8,17,17,20
210:10,23 211:2,8

211:11 214:11,20
216:14 222:7,10
222:11,14,22
223:2,10,11,15,23
224:12,20 225:2,5
225:10,11,14,17
225:18,21,23,25
226:5,12,19,20
227:4,7,18,19,20
227:23 228:14,17
228:20,22 229:4,8
229:10,13,17,19
229:22,25 230:4
230:12,21 231:3,7
231:18 232:8,22
233:2,6 234:9,12
234:24 235:9,11
235:17,20,22,23
236:2,3 242:2,3,12
242:15 245:2,18
245:24 246:4,10
246:15,20 247:11
247:16 248:2,5,8
248:16 249:7,16
249:22,25 250:7
251:23 252:18
253:9,11,20,21
254:2,16,18
255:11 258:8,15
258:16,17 260:18
263:1,3 264:22,24
265:22 266:19
267:21 268:3,11
268:23 269:1,17
269:18 272:11
273:1,6 274:10,13
275:23 277:12
278:15 279:24
280:20,24 281:5,9
281:13,17,19,22
281:23,25 282:7

282:11,13,17,20
282:22,25 283:2,9
283:19 284:3
285:5,11,12,14
289:18 290:5,22
291:5,12 292:8,10
292:18,18,24
293:18,21 294:2
294:10 295:6,9,13
295:17,25 296:1,5
296:10,14,15,15
296:20 297:1,1,7,8
297:11,11,12,18
297:23,24 298:2,6
298:6 301:12
302:12,14,25
303:8,16 304:7
306:17 307:2
308:9 309:13
311:4 313:2,7,17
313:20

**opioids**   23:1,8,14
23:19 24:19 27:13
28:3 30:7,9,20
31:1,15 32:1,7,10
32:15,21,23 33:1
33:12 34:25 35:4
35:8,20,22,24
36:12,17,25 37:6
37:10 38:4,8,14,20
38:24 39:20 40:2
40:8,16,24 43:15
43:17,20,21,24
44:1,3,8,12,19
45:1,9,15 46:4,5
46:24 47:1,1,1,2,7
47:10,24 48:5,8
49:3,19,23 51:12
51:22 52:1,3
53:15,19,21,22
54:1,16 58:4,12,22

[opioids - overprescribing]                                              Page 43

| | | | |
|---|---|---|---|
| 58:24 59:11,20,24 | 163:17 164:1,19 | 298:4 301:25 | **outpatient** 305:16 |
| 60:3,7 62:15,18 | 165:8,19 166:3,25 | 304:6 305:7 306:7 | 305:22 |
| 63:8 64:3,8 65:4 | 168:4 171:23,25 | 306:10,16,17,21 | **outside** 114:14,15 |
| 65:10 69:4 70:15 | 172:3,5,6,8,19,21 | 312:8,18 | 163:19 176:24 |
| 71:14,23 72:23 | 172:23 175:3 | **opposed** 35:8,20 | 179:23 217:10 |
| 73:13,23,24 74:2,9 | 180:10,16 181:23 | **opposite** 218:24 | **outweigh** 165:1 |
| 74:12,19,22 75:13 | 182:2,3,19,25 | **order** 11:5 13:5 | 186:24 230:2 |
| 75:13,14,17,22,23 | 183:17 184:8,21 | 16:18,20,21 28:8 | **outweighed** |
| 76:6,11,17,22 77:9 | 185:4,17,19,23,24 | 28:16 33:15,17 | 206:13 |
| 77:13 78:1 80:8 | 186:7,17,21 187:5 | 61:4,7 64:17 | **outweighing** 204:4 |
| 80:19,20,25 81:9 | 187:11,17,21 | 78:11,14,17 79:8 | **outweighs** 186:8 |
| 81:10,13 82:22,22 | 188:14,19,22 | 92:24 93:5 107:23 | 225:20 |
| 83:3,9 84:8,16,23 | 189:25 190:14 | 110:24 168:20,25 | **overall** 199:2 |
| 85:11,12 86:7,13 | 191:15 192:25 | 169:3 170:24 | 249:9 251:23 |
| 87:15 88:23 89:10 | 193:12,20 194:7 | 171:4,10 201:5 | 295:17 297:12,23 |
| 90:1,8,13 91:15 | 196:1,17 199:16 | 213:25 221:8 | 303:8 |
| 92:22 94:11,20 | 199:24 200:7,9,12 | 228:10 229:12 | **overcome** 146:6 |
| 98:15,25 100:17 | 201:2,11 202:21 | 231:11 250:1 | 146:24 297:17 |
| 101:16 102:3,18 | 203:1,2,5,10,22 | 262:18 268:10 | **overdispensed** |
| 103:3,5,12 104:1 | 205:11,25 206:12 | 274:2,5,17,21 | 253:4 |
| 104:10 105:9,15 | 207:24 208:5 | 293:25 297:7 | **overdistributed** |
| 106:1,8,11 108:25 | 209:12 213:4 | 305:5 306:5 | 253:4 |
| 109:8,10,15,17 | 215:11 216:4 | **ordered** 39:22 | **overdose** 26:9 |
| 110:2 111:16,19 | 220:1 222:2 | **ordering** 38:20 | 29:3 38:12 92:1 |
| 112:4,21 113:1,7 | 223:18 229:19 | **orders** 25:18 34:2 | 129:5 137:6 140:6 |
| 113:11,22 114:6 | 230:25 235:21 | 34:18,21 39:4,14 | 140:20 157:16,21 |
| 114:11 117:10,20 | 237:3 242:14 | 39:14,19 89:3 | 159:10 186:1 |
| 117:23 118:5,10 | 243:18 244:16 | 91:14 171:6 | 197:2,7 245:9 |
| 118:21 119:1 | 245:6,6,7,23 246:9 | 274:12 | 249:20 253:22 |
| 123:4,9,11,25 | 246:17,24 248:10 | **organ** 198:24,25 | **overdosed** 280:24 |
| 124:11,25 127:21 | 252:6,10,12,22 | **organization** | 296:4,9 |
| 127:24 128:23 | 253:2,3,7,10,14,17 | 99:13 101:2 | **overlap** 194:20 |
| 129:4,16,23,24 | 253:25 254:1,9,11 | 107:20 | **overnight** 65:12 |
| 130:16 131:10,17 | 254:14 258:10,13 | **organizations** | **overprescribed** |
| 136:4,12 137:14 | 263:5,7 268:13,16 | 99:19 107:14 | 58:4,12,25 64:8 |
| 137:14,15 139:9 | 268:22,24,25 | 291:4 308:23 | 253:3 |
| 140:3,14,16 152:9 | 269:6,7,22 282:10 | **origins** 64:16,16 | **overprescribing** |
| 152:16 153:5,6,9 | 282:14 284:11,13 | **ortho** 257:15 | 22:25 23:8,13 |
| 153:19,24 159:8 | 285:2,7 290:4 | **outcome** 316:19 | 40:11 58:22 59:15 |
| 161:22 162:3,13 | 292:25 293:20 | **outcomes** 111:11 | 59:20 60:3,7 |
| 162:18,20 163:7 | 294:5,19 295:18 | 111:14 | 64:18 112:18 |

207:3 252:10
293:20 295:18
306:25 311:4
312:18 313:2,20
**overseeing** 101:14
**overstatement**
62:17
**oversupply** 23:19
24:19 40:23 58:22
59:10,16 60:7
117:20 129:4
133:15 140:11
162:21 222:2
253:22 258:18
274:10 292:12
293:20
**overuse** 198:7
**overwhelming**
93:23
**owe** 195:13
**oxycodone** 28:12
70:19,25 71:7
200:3 265:11,22
273:4 301:15
**oxymorphone**
273:4

**p**

**p** 5:5
**p.m.** 2:16 127:9
167:12,16 215:22
215:25 226:24
227:2 236:18,23
239:12,15 241:14
250:16 251:2
272:19,21 285:22
286:4 300:22,25
310:1,4 314:21,23
**package** 301:21,24
302:3
**pad** 76:21

**page** 10:20 11:17
22:14,23 28:1
29:7,20 31:10
60:8 62:13 68:21
70:23 84:11 86:25
90:11 101:22
114:4 118:3,19
120:2,10,13 123:5
124:20 130:23
154:3,5,13 157:21
157:22 180:20
207:17 233:23,24
234:20 235:15
236:7 237:6,7,21
240:13,18 242:24
242:25 243:9,9
247:22 257:21
264:18 265:24
266:3 267:24
286:14 298:20,21
315:8
**pages** 22:19
239:19,22,23
242:16,25 243:2,6
300:11 316:13
**pagination** 239:21
**paid** 19:20 20:1,5
20:15,21 21:1,7,15
21:18 55:19 56:10
69:12 145:14
**pain** 17:10 23:22
23:24 31:15,22
32:6,8,11,23 34:13
40:14 41:2 43:13
43:18,25 44:1,9,13
44:15,23 45:2,6,10
45:21 46:5,6 47:1
47:2,20,21,24
50:25 53:16 60:10
60:19 61:12 65:23
66:3,8 74:18

75:17 76:12 77:6
80:18 83:4,5 85:9
86:6 94:18 99:15
102:19,21,23
103:6,13,19,22
104:1 105:10,16
106:1,16 108:19
108:20,25 109:2,8
109:11,12,13,14
109:21 110:2,16
110:17,18,18,21
110:22 111:1,3,6
111:10,11,12,14
111:15,16 112:4
112:13 114:6
119:15 120:8,18
120:20 121:1,11
121:12,14 122:8
124:6 152:9
153:10,20,24
164:3 165:18
175:3 181:21,23
181:24 182:1,4,7,8
182:11,20,24
184:8,21 185:5,8,9
185:13,17,19,23
187:6,22 188:15
188:23 189:18,22
189:24,25 190:1,3
190:6,17,22 191:4
192:9 201:19,19
202:1,1,16 204:11
205:5 209:9,13,15
225:15 231:1,8,18
244:3,5 259:11,14
259:19,22 260:19
260:23 261:1
262:5 263:3,6
264:23 265:3,16
266:18,25 267:1
267:20 268:16

269:20 275:23,25
283:20 284:4,20
298:14,21 299:3,8
299:14 304:7
306:11 310:10,22
311:7,15,19 312:2
312:11,20,23
**painkillers** 123:12
**palo** 8:16,17 61:16
**paper** 60:4 294:4
307:13,18
**par** 7:4,4 14:18,18
272:24 273:6,9,10
273:11 277:9
280:20,25 281:5,9
281:13
**par's** 274:21 275:8
**paradigm** 22:24
23:7,12,16,21,21
23:23 24:2,4
31:14 32:10 40:4
40:14 59:22 66:8
68:23 123:13
290:21
**paragraph** 22:23
23:5,16 29:15,20
31:11 62:13 78:17
124:20 155:14
156:24 243:10
298:21,24
**parse** 222:13
**part** 31:13 39:15
40:21 44:21 52:13
73:25,25 75:4,5,8
75:17 89:25
101:14 102:16
114:23,25 115:2,5
115:6 116:6 134:1
139:16 147:15
156:14 165:15
173:20 180:13,22

180:23 181:1
213:4 216:19
228:25 243:20
244:16 245:12
252:8 273:14,16
273:21,23 275:17
287:6 305:5
308:14
**partial** 79:16
**partially** 63:4
**particular** 50:4,6
50:19 83:18
146:22 158:2
196:14 205:4
213:17 218:7
230:5,18,19
240:17,18 246:19
249:5,25 259:18
260:9 269:21
279:7 280:8
**particularly** 32:9
**parties** 13:25
211:9
**party** 88:5 181:5
241:13 316:17,17
**pass** 103:2 247:4
250:12 272:16
285:17,18 300:18
**passage** 242:23
**passive** 30:20
**patch** 251:8
**path** 24:12
**pathway** 119:4,4
190:16 203:7
**patient** 30:6,10,13
45:12,19,23 46:11
49:5,12,21,22,23
50:19,25 51:9,13
51:20 54:14 64:24
70:21 71:10,15
73:11,24 74:11

82:20 83:15,18,19
84:25 86:11 93:6
93:8,9,15 94:18
95:13,16 96:14,24
97:1,11,21 98:4,14
98:19,20,22,24
109:11 111:4,18
112:2,19,24 113:4
117:5 128:22
132:23 134:3,25
137:25 143:13
146:23 147:3,9,13
148:9,14,17
150:10,21 151:5
151:11,21 153:3
159:3 170:15
180:15 181:12
182:20 183:9,24
184:9,22 197:10
198:24 200:19
201:15 202:10
204:12,19 205:7
208:12,18 209:24
212:24 213:17,18
214:1,17 215:4
216:14 217:1
218:18 219:6
220:5 221:12
223:9,19 230:5,12
230:19 231:1,2,5
232:3,6,14 257:20
257:22 258:1,20
261:14 262:5,9,13
262:21 263:2
266:13 267:23
268:2 269:16
279:24 281:16,21
282:24 283:5,7
307:8,9
**patient's** 48:17
49:8,10 74:6

93:10 110:13
151:7 189:20
197:11,14 203:14
225:19 230:23
231:8
**patients** 24:14
30:18,22 32:15
35:5 36:12 43:13
43:15,17 44:18,24
46:2,19,23 47:7
48:4,8 49:2,18
51:4,11 52:5,12,15
52:22 58:18 61:5
63:23 64:11 65:8
72:1 73:4,5,21
74:18 75:2,11,20
76:5,12 77:6,8
80:18,23 81:25
88:22 89:25 92:23
93:22 95:7,8 98:7
98:12 104:1
107:21 109:16,17
109:21 111:12,25
112:1,5,9,11,16
114:6 119:12
122:7,10,18 124:5
129:16 130:15
132:20 133:7,9,22
135:23 136:3,11
136:18 137:3,9
147:18 148:3
165:18 174:16
180:22 189:14
190:5 191:16
192:4,5,6,7,9
194:8 196:18
198:1,11 199:6,13
199:22 200:16,22
200:24 201:6,7,12
205:17 206:8,14
208:6,24 209:11

209:12,15 210:10
210:14,16 211:8
211:18,21 212:15
213:22 214:4,24
215:13 216:3
222:6,9,21 223:3
223:14,22 224:8
224:13,19,21
225:4,6,13,24
226:4,6 228:18,19
229:10,16,18,21
229:23 230:7
232:9,20,23 233:4
243:24 256:6,11
260:19 269:5
282:12 283:12
284:7,8,16 285:7
285:12 304:7,9,16
304:18 305:15,21
306:15 307:3
**pattern** 50:18 98:3
139:24 151:12
263:1 290:13
294:20
**patterns** 269:24
270:1 271:14
**pay** 20:12 256:11
258:2,21
**paying** 231:17
232:24 256:10
303:11
**payments** 21:12
21:22 69:14 256:7
300:2
**payor** 181:5
**pdf** 18:21
**peer** 119:11
140:23 293:16
**pellegrino** 8:5
**pending** 22:4,9
53:4 78:25 145:16

**people** 32:8 35:23
  61:17 97:18
  111:24 117:14,16
  117:18 118:4
  121:22,23 122:13
  123:16,24 146:14
  146:17,21 152:8
  171:12 185:16
  186:6,16 187:12
  187:21 188:14,18
  195:10,14 196:1
  200:2 204:5
  213:20 221:15
  244:1
**people's** 81:5,11
**percent** 29:9,21
  71:13 81:13,23
  82:5 94:14 96:14
  114:7,7 117:22
  119:17 121:8
  122:7 123:8,10
  124:8 145:25
  152:7,12,13,14
  154:15 155:18,18
  155:23,23 156:4
  156:16 187:13
  190:8,10 222:13
  242:11 248:11
  298:5
**percentage** 56:2
  70:20 71:7,9,14,16
  71:22 72:22 73:12
  74:4,9 77:8 85:12
  86:12 87:15
  112:23 114:16,25
  115:10,13 120:17
  124:5 137:22
  144:1 145:20
  163:13,15 164:19
  165:7,12 166:3
  206:7

**percentages** 81:18
  114:10 123:22
  124:16
**percocet** 273:4
**percodin** 273:3
**perform** 224:4
**performed** 136:2
**performing**
  191:23
**period** 28:17
  79:10,19,20 131:7
  146:11 148:24
  229:17 264:25
  266:20
**periodic** 181:13
**periods** 136:13
**permission** 100:7
**permitting** 167:3
**perpetrate** 306:9
**person** 52:11
  131:5 148:23
  196:13,16 197:1,6
  197:16 229:2,4
  247:17 248:4
  270:20 271:2
  302:24 303:14
  309:18
**personal** 113:3
  173:6 210:12
  212:7 224:13
  225:20 227:8
**personalized**
  201:20 202:2,6
**personalizing**
  202:10
**personally** 47:24
  150:8 186:6 306:3
**personnel** 160:17
**persons** 118:6
  120:19 121:10
  131:13,14,18,18

131:25 177:5
  248:18,20 249:5
  253:23
**perspective** 58:8,9
  58:11,16 92:2
  268:21
**persuaded** 191:14
**pertains** 130:23
**pharm** 81:22
**pharma** 209:7
  291:5 301:5,17,18
  302:8
**pharmaceutical**
  7:4,5 14:18,18
  24:21,25 25:7
  33:13 35:21,25
  37:5,10 38:4,10
  39:5 61:24 62:4,9
  62:10,10 66:6
  68:12,22 69:12,22
  70:1,5,9,15 76:20
  81:8 88:8,16 89:9
  116:1 169:22,25
  174:14 176:25
  177:11,17 179:24
  180:6 272:11
  295:25 308:9
**pharmaceuticals**
  7:3 14:17 257:15
  289:2 301:4 308:2
  308:20
**pharmacies** 24:6
  24:14 25:18 30:5
  30:8,25 33:14,17
  34:2 35:10,17
  38:19,21 48:23
  50:10 68:16 81:14
  81:24,25 82:6
  84:3,19 85:3 87:9
  128:20 129:22
  130:12,18 138:2

143:18 144:8,12
  144:16 192:2
  274:9 292:10
  303:9
**pharmacist** 82:14
  82:24 83:2 97:14
  138:15,19 139:4
  139:19,21,24
  140:7 141:21,21
  142:12 143:6,11
  161:1 164:10,16
  257:24 261:23,24
  283:6
**pharmacist's**
  143:7
**pharmacists** 30:14
  30:17,19 82:18
  83:6,11 128:18
  132:19 134:15
  135:5,12,13,16,20
  135:22 136:2,11
  136:15,17 137:4
  138:10,23 140:1
  140:24 142:1,3,6,9
  142:18,20,25
  160:20 164:5,24
  164:25 192:2
**pharmacodynamic**
  202:22
**pharmacodynam...**
  203:3
**pharmacoecono...**
  169:10
**pharmacokinetic**
  202:22
**pharmacokinetics**
  203:3
**pharmacological**
  313:6,17
**pharmacologically**
  171:18

**pharmacy** 24:23 30:3 31:5 33:15 33:23 34:4 48:13 48:21 49:2,4,20 50:2,6,14 71:3 74:5 85:8 86:5,16 91:15 114:12 127:21,25 128:2,7 128:11,14 129:10 129:12,15,18 130:2,4,10,20 131:23 132:1,13 132:15 135:17,18 136:7 137:2,23 138:20 139:11 141:3,5,9 143:11 143:12 144:1,2 164:9,16,20 165:8 166:3 230:22

**pharmacy's** 33:19 33:22

**phenomenologic...** 195:17 313:14

**phenomenon** 163:23 313:12

**phobia** 109:9

**phone** 170:16

**phrase** 310:16

**phraseology** 312:14

**phrasing** 179:5

**physical** 90:13 126:13 194:1,13 313:5,16

**physically** 204:5

**physician** 24:15 32:13 60:19 61:12 99:19 141:18 142:10 159:9 162:22,25 204:10 204:21 213:5

223:7 268:2,21 280:11,12

**physician's** 102:5 104:13

**physicians** 32:19 61:2 141:13 143:1 163:19 203:13 204:14,24 205:11 222:17 223:2 224:3 269:6 279:22 280:1 296:24 297:6 306:24

**physiologic** 245:23

**physiologically** 165:19

**pic** 244:21

**pick** 14:1

**picture** 258:23

**piece** 42:6 59:24 150:23 217:22 245:4

**pieces** 106:14 119:10 150:25

**pill** 26:21,23,25 39:16 40:18,22 88:13 95:19 124:25 139:20,22 206:21 207:5 250:1,4

**pills** 23:25 24:7,13 25:21,24 26:2,15 27:4,10 28:12,16 28:20,20 29:1 34:8,13 39:15 48:13 52:8,11,19 54:3,8,12,15 70:19 70:25 71:1,8,16 72:7,12 76:1,3 81:10 84:2,4

86:21 89:4 96:20 98:3 117:17 137:18 193:5,7 207:2 210:8 244:19 261:10

**pincus** 9:14 15:21 15:21,22

**pivot** 247:2

**pivotal** 178:11

**place** 13:25 16:21 74:15 157:2 177:25 213:11 214:21 217:20 218:16 234:14 316:7

**placebo** 186:22 189:1 265:10,14 265:23 283:24 284:3,14

**places** 33:15 72:20 275:2 292:9

**plaintiff** 3:3 4:3 15:10,15

**plaintiffs** 15:3,5 16:1 17:25 18:21 19:10 20:2,6,11,14 21:7,12 55:19 56:6 166:14,22

**plan** 149:13

**plane** 56:7

**plausible** 142:5

**play** 30:17 83:10 135:22 143:7

**played** 34:12 107:10 112:25 113:5 116:25 117:3

**please** 13:24 14:5 16:3,6,24 17:14 18:7,10 167:10 174:2 234:15

239:19 240:2 264:21 266:15 286:15 298:10 300:20 308:13

**pleasers** 111:23

**plenty** 200:3

**pllc** 4:4

**plus** 135:21 185:22

**pmp** 132:7

**point** 40:13 65:14 74:24 93:22 115:14 118:8,14 151:4 153:7,10,17 178:1,14 180:14 187:15 188:11 191:8 198:5 209:6 218:14 224:6 241:17,21 245:3 270:14 282:9 299:24

**points** 257:12

**police** 52:8,11 98:6 98:9 216:8 244:23

**policies** 135:17 178:2,16,21

**policy** 77:4 102:1 102:16,21 103:10 298:14,22 299:3,9 299:15

**poorly** 231:4

**population** 23:19 24:7 115:8 118:12 137:20 152:11 154:16 155:17 183:25 200:19 210:11 219:2,5,24 220:8,14 233:8,12 233:16,21 234:8 252:11 253:23 284:6

populations 157:9
229:7
porter 6:15 7:6
14:14,14,16
portfolio 172:13
portion 72:4
145:11 178:13
position 51:16
81:17,21 218:19
219:2 269:22
283:17
positive 43:23
217:12 228:18
possession 90:13
possibility 186:20
possible 59:10,17
59:19 142:25
147:8 148:23
245:10 291:5,8
possibly 26:2
27:24 81:20 193:7
post 28:10,18
126:17 190:4
191:19 192:19
postal 251:14
postdate 263:21
postdates 263:18
posthumous
158:23
postoperative
74:11
postoperatively
74:13
potential 37:2
38:9 97:17 150:15
182:17 184:6,19
203:8,15 284:21
306:21
potentially 159:5
253:8,22 256:2
314:1

power 100:9
112:13 231:7
ppsg 12:2 286:1
practical 110:4
practice 32:24
33:5 36:21,24
41:2 44:11,12,21
45:4,10 48:18
50:23 55:8 61:4
76:23 77:3 82:25
89:18 90:4 93:21
94:2 96:9 97:6,11
97:14 100:19
105:9,25 160:2,6
196:11 199:5
204:17 206:16
208:4,13 209:9
211:7 215:13
232:2,4 256:5
268:17,19,19
269:4,10,16,19,24
269:25 282:23
295:23 307:1
314:14
practiced 55:2,7
196:23
practices 34:4
44:7 94:3,5,5,10
94:22 95:2 108:11
108:14 181:13
practicing 24:15
83:1 85:6 86:2
159:17 163:19
230:8
practitioner 219:3
220:4
practitioners
204:15 222:21
224:1
pre 11:18 236:19

preadolescent
227:22
precautions
135:13
precedes 117:10
precursor 174:9
predates 42:3
109:19
predecessors
299:18
predicting 228:21
predictive 227:20
228:23 229:11
preface 186:10
premarked 154:4
preparation
308:20
prepare 145:11
preparing 128:9
302:2
prescribe 32:22
43:15,24,25 44:2,3
44:12 45:12 46:10
46:18,25 47:7
48:8 50:7 54:3,12
59:24 73:5,9
76:17 84:23 86:7
90:1 95:22 99:15
100:7,17 104:1
105:9 106:1 109:8
111:19 112:5,21
118:23 124:3
184:2 200:7,9,11
201:2,11 204:25
208:12,16,17
209:16 211:10
230:25 231:7
282:10 305:6
prescribed 29:15
32:1,15 33:1 35:5
40:2,8 43:17 45:5

45:9 47:24 48:13
51:23 52:1,4,7
53:10,23 54:8
70:20 71:9,15
74:4,10,13 84:8
85:1 89:20 90:9
93:23 98:25 102:3
102:18 103:3,21
106:8 109:18
114:17 115:12
123:25 124:5
159:10 162:19
180:16 181:6
199:16,21,24,25
200:1,6,16,18,24
201:6 205:11
206:20 207:1,8
208:4,23 211:9
212:1 216:4,14,20
229:18 230:13
246:19 256:7
262:22 263:3
268:21 304:11,20
prescriber 44:20
183:19 307:9
309:7
prescribers 40:12
40:16,19 87:25
92:25 99:24 173:8
173:16 174:1,5,11
175:1,7 191:14
192:1 197:24
272:5 278:22
280:3,16 284:15
292:20 294:4,6
306:14,19 307:5
309:12
prescribes 54:1
prescribing 11:21
11:24 29:9,16,21
31:11 32:21 33:5

HIGHLY CONFIDENTIAL

| | | | |
|---|---|---|---|
| 33:9 40:16,23,25 43:20,21 44:8,9 45:1,16 48:16 52:18 54:18,20 68:23 71:3 73:23 74:2 76:22 77:13 80:8 82:21 83:25 85:23 93:2,4,6 94:18 95:12 97:1 97:20 98:4 99:21 100:4 101:16 102:5 103:5 104:13,22 105:13 106:11,12,12,15 106:15 108:25 110:1 111:13,16 112:3,25 131:2,12 131:20 139:24 140:18 162:22,25 170:14 172:6 177:14 180:21 181:13,23 182:1,6 182:19 183:17 184:8,20 200:2,20 204:3,10 205:23 207:16,19 209:3,4 209:8,18,20,23 213:4 231:10 245:11 246:16 248:2,5,17,19 250:20,24 252:18 252:22 253:2,7,12 258:17 263:1 269:22 271:14 272:1 280:1,12,17 282:9 290:13,22 292:9 293:3,13 294:2,4,14,19 302:20 305:7 307:2 | **prescription** 28:3 30:4,9,11,12,13,21 31:1,6 33:14,18,21 33:24 34:8 39:8 47:12 49:3,13,16 49:19 51:1 52:6 54:1,9,16 58:4,12 58:24 63:8 64:3 65:3,9 69:4 71:4,4 71:21 72:2,5,10,20 72:23 73:10,10,13 75:2,5,5,19,22 76:13,21 80:6 82:19 83:12,24 87:3,8,24 88:4,7 88:23 89:10,12,15 90:12,13 91:2,8,19 92:9,24 93:1 94:13 104:10 113:7,22 114:11 114:17 115:1,3,11 116:12,19,23,24 117:4,5,9 118:5,9 118:21 119:1,14 119:18 121:23 122:14,19,22 123:5,12 124:25 132:9,21,22,22 134:6,6 136:4,12 139:8 162:3 164:24 165:2 183:5 185:1,4,7 187:11 191:20 192:19 205:6 208:12,17,23 210:1,10,12,18 213:16 220:1 227:18,19 231:3 233:3 242:12,14 243:17 245:6,7,18 246:9,16,20 248:8 | 249:7,17 250:7 252:10 253:7,17 253:21 255:15 257:23 258:2,19 261:15,17,25 263:11,15 268:14 271:10,17,24 279:7,23 281:17 281:22,25 282:14 282:25 283:9 285:12 292:25 294:10 295:12,21 302:25 303:16 309:10,21 **prescriptions** 39:11 48:24 50:22 71:17,23 73:12,18 74:17 76:2 77:11 81:4 82:1,7,10,15 83:16,17 85:12 86:13 92:6 123:17 131:1,8,13,14,17 131:18,25 133:7,8 133:8,22 138:5 139:22 140:2 144:9,13,17 161:22 162:4,4,13 162:18,24 163:1,7 163:16,21 164:4 164:19 165:7 166:3 180:24 205:16 206:7 207:13,24 208:3,3 208:5 210:20 247:16 248:9,18 249:4,9,12 255:12 278:15 295:5,9 297:13,24 **present** 9:21 14:4 60:14 198:1 261:14,17 | **presentation** 62:15 151:8 290:2 290:3,4,7 291:1,24 292:2 **presented** 61:20 61:22,24 62:11 65:17,22 **presenter** 128:2 **presenters** 61:21 **presenting** 83:15 187:21 188:14 199:1 **presently** 252:18 **press** 64:21 80:14 129:20 206:25 **pressure** 110:14 111:7 **pressures** 204:16 204:19,24 **prestigious** 69:10 **presumably** 262:3 266:25 **prevailing** 262:25 **prevalence** 118:11 152:7 154:13,14 155:16,22 156:6 156:15,25,25 229:9 **prevalent** 119:6 **prevent** 81:3 181:20 182:11,19 184:7,20 **prevention** 123:1 208:15 246:17 **previous** 118:7 197:16 **previously** 31:9 93:2 106:7 191:9 208:25 211:6 270:2 304:17 312:4 |

HIGHLY CONFIDENTIAL

pricing  302:16
primarily  94:10
  194:6,18
primary  44:22
  45:4 51:20 52:15
  133:15 269:21
printed  18:21
prior  31:22 32:7
  50:11 58:17 60:3
  71:2 83:19 118:4
  119:18 120:20,23
  121:4 135:1
  212:23 222:10
  231:22 235:19
  243:9 251:5
  284:11 295:16
priori  285:2
private  14:2 56:7
privileges  100:4
probable  60:2
probably  50:1
  62:1,3 65:5 66:6
  158:21 181:17
  195:18 200:10,13
  201:9 212:16
  214:22 268:25
  285:10
problem  33:11
  36:1 38:11 39:6
  40:11,20,21 58:20
  60:2 64:7,12,15,18
  64:24 65:7,16,16
  72:1 73:25 74:1
  76:17 83:20 92:21
  107:9 140:11
  155:16,22 164:23
  198:25 210:9
  214:5,6,20 218:14
  218:16 222:3,11
  222:14 223:23
  225:17,21 232:8

232:22 243:25
253:9,22 258:18
281:25 282:7
problems  59:13
  93:15 94:20
  124:24 177:13
  183:20 191:17
  224:5,10 228:20
  233:1 241:11
  294:22
procedures  191:12
proceeding  27:24
proceedings  13:3
  156:21 226:13,18
  226:21 248:14
  316:14
process  46:6 76:18
  210:19 252:25
  273:12
prochaska  166:8
proctor  166:18
produce  175:17
produced  68:7
  128:10 238:22
  278:20 286:24
  288:14,18 314:2
product  35:21
  249:17 296:16
  305:25
production  87:9
productive  146:25
products  62:7
  172:24 173:1
  200:4 231:12
  287:17,18 290:5
  290:20 295:6
  302:1,19,20,22
profession  64:17
  116:2 204:1
professional  47:4
  53:25 69:1 70:6

80:17 169:24
185:20 191:24
308:23
professionals
  118:23
professor  17:1,5
  69:10
profiles  202:22
profit  37:10
  107:19
profits  37:19,22
prognosis  182:24
  183:9
prognosticate
  233:9
program  17:6
  170:25 237:2,4,18
  304:23 305:8,14
  305:19
progress  122:15
  122:21
progressed  122:19
progressing  117:7
progression
  118:17
prohibited  93:8
prolific  31:12
  40:19
prologue  206:24
prolonged  152:25
  298:2
promote  62:6
  69:13 108:25
  110:1 231:11
  258:17 259:22
  296:25
promoted  102:22
  104:9 252:12
  302:15 308:23
promoting  107:2

promotion  294:1
promotional  36:21
  68:24 105:14
  173:18 174:19
  195:3 209:5 287:5
  287:9,12 288:25
  289:3 290:10
  293:12 295:14,22
  302:7 307:23,24
  308:19 309:3
prompt  217:2
propagated  109:6
proper  181:12,12
  181:14,20,22,25
  182:11,19 184:8
  184:21 213:13
  266:13 267:23
  269:23
properly  212:1
  223:7 306:6
proportion  122:24
proposal  92:4
proposition
  181:12,19 182:17
  183:12 184:5,14
  185:16 193:12,18
  193:24 195:20
  222:21 223:20,25
  224:19 225:4
  226:2
propositions
  193:10 222:5
prosecuted  102:2
  102:18 103:11
protocol  202:18
protocols  204:17
proven  189:8
  223:16
provide  18:1 21:6
  48:3 54:7 57:1,3
  85:13,15 95:1

104:18 112:23
118:22 123:24
136:11 144:20
145:22 158:20
165:6,11 166:2
191:5 198:12
270:9,12,16,16
271:5
**provided** 62:16,23
63:8 64:2 65:3
66:24 67:19 81:12
81:23 92:9 154:22
155:1 256:15
257:20 275:13
288:15 305:15,20
**provider** 93:8,9
119:14 210:20
**provider's** 93:11
183:4
**providers** 45:15
46:1 74:16 83:17
140:12 141:1
149:10 153:2
204:14,15 218:13
228:13,16 283:5
284:15 292:8
**provides** 154:7
266:24
**providing** 20:20
85:25
**psychiatric** 44:10
44:11 45:4 156:10
228:2,7 229:24
**psychiatrist** 44:14
47:19 66:3 149:6
209:8 237:8
255:24
**psychiatry** 17:20
59:12 123:6
**psychoactive**
193:15,23

**psychological**
44:15
**psychotropic** 80:9
**public** 36:7 37:17
52:17 58:2 59:6
80:12,15 108:7
116:2 137:10
183:25 193:3
202:7 218:13
302:15 315:25
**publication** 59:20
114:24
**publications** 60:6
**publicly** 107:1,7
**publish** 58:9
104:21
**published** 58:7
59:1,3 60:5 64:13
64:21 101:25,25
104:9 105:7,8,23
105:24 149:18
248:16 294:4,18
302:7 308:19,25
309:3
**publishing** 106:23
**puffy** 243:14
**pull** 93:23
**punish** 103:19
**punished** 103:4,21
**purchase** 105:3
**purchasers** 28:7
**purdue** 175:22,23
**pure** 240:21
241:22
**purportedly** 173:9
174:5
**purpose** 72:2,12
73:8,14,18 161:24
162:15 163:9,24
163:25 276:14
296:25

**purposes** 71:24
72:13,24 73:2,6
74:2 159:18,21
160:9,13,17,21,24
163:18 164:3
193:14,22 263:18
287:10 302:2
**pursuant** 71:16
87:24 89:11 135:1
**push** 177:14 194:7
**put** 16:16 138:1
154:21 157:14
186:11 188:24
197:25 206:3
225:23 238:16
261:6 268:9
269:22 287:15
**putting** 23:19 24:7
137:19 147:11
186:10 204:7
**pyser** 5:6 14:9
22:3,3 167:14

**q**

**qualifier** 160:24
165:12
**qualify** 30:9 43:23
44:6 168:7 182:22
203:18 211:12
212:23 213:14
225:10 268:12
278:21 310:19
**qualitative** 162:11
178:8,9,10 293:7
294:21
**quality** 108:1,1,8
108:10,13,21,22
108:24 109:2
110:1,24
**quantified** 112:19
176:4,6 177:5
180:14

**quantify** 71:19
73:19 112:22
113:2 176:5,8,12
176:13 177:9
178:1,7,14 179:9
205:21 212:24
235:11,16 294:1
294:16
**quantifying** 176:1
176:20 179:1
294:12
**quantitative**
114:23 293:25
294:7,9,17
**quantities** 129:23
**quarters** 123:3
**question** 21:3 22:4
22:9,17 26:11,13
27:11 31:3,4
34:17 41:12,19
46:9,13,16 47:13
47:14 52:24 53:3
53:4,5 57:17,20,20
59:15 62:8 63:25
65:11 69:19 71:25
72:14,15,22 78:19
78:19,21,24,25
79:2,9,13,22 81:21
82:4 84:6,21
85:18 86:10 88:15
91:20 97:4 102:7
103:8 105:22
109:25 113:17,18
113:21 115:10
122:1 123:16
133:19 134:13
135:7,10 136:15
138:3,8 141:5,8,23
143:16 144:5
145:19 147:16,17
147:25 156:23

HIGHLY CONFIDENTIAL

157:23 158:14
161:10 164:22
165:5 168:23
169:7 172:16
173:13,24 174:3,9
175:4,11 178:19
179:15 181:18,22
182:23 184:14
186:10,12,15
187:1,16 189:12
190:19 196:12
198:6 201:23
202:13 207:21
220:21 227:10,13
227:15,22 232:13
233:14,19 235:2,5
239:3 242:21
254:6 259:25
262:19 268:6,6
270:23,25 273:13
278:25 279:3,12
279:14,17 280:7
281:4 287:20
288:13 289:8,13
290:16,24,25
291:21 296:6,8
297:3 301:19
303:4 305:17
308:24 309:15
**question's** 22:9
**questioning**
278:19
**questions** 10:19
126:12 127:11,17
159:15 167:2,4
178:25 179:6
193:10 247:3,5
265:19 270:4
296:22 300:1
303:7,10,12
307:21 310:9

313:4,23 314:10
**quick** 236:16
265:19,20 270:4
300:1
**quickly** 186:5
233:1 237:20
298:9
**quit** 147:13 148:2
148:9,16
**quota** 113:6,10,18
113:21 114:1
**quotas** 113:14,15
114:3
**quote** 28:4 60:9
109:5,9 157:6
230:10
**quoted** 120:2
**quotes** 156:4
**quoting** 28:4

## r

**r** 7:7
**radical** 31:14 32:3
32:5
**radio** 80:25
**rain** 251:20
**raise** 16:5 282:1,2
**raising** 195:13
**random** 93:5
**randomize** 284:12
**randomized** 263:5
265:14 283:24
284:2
**range** 54:7,12,14
152:7
**ranges** 150:3
**rapidly** 54:20
**rare** 87:19 94:13
109:16 162:7
163:5 185:20
191:3 205:22
211:15

**rarified** 284:6
**rate** 19:22 28:14
110:13,13 111:7
111:12 112:10,12
144:20 145:7
218:12 248:17,20
**rated** 231:3
**rates** 29:2 72:17
83:25 84:7,22
85:10 86:7 91:25
131:12 140:19
174:21
**rating** 112:17
**ratings** 112:14,15
**ratio** 234:12
235:17
**ratios** 122:19
**raw** 137:22
**reach** 27:12
251:19 287:3
**reaching** 66:16
286:20 292:2
**read** 23:3,5 27:16
31:17 62:19 63:22
69:5 78:22 80:24
103:14 105:12
121:20 123:7
125:3 129:8
154:17,19 155:11
155:13,19,24
156:2,4,18 168:11
168:25 169:3
184:4 193:18
241:22 242:18,22
243:2,7 244:4
248:15 266:15
293:2 314:12,16
315:3
**readily** 24:1 78:1
85:7 86:4 122:12
258:13

**reading** 37:16
77:15 151:19
234:1 240:6,17,23
246:21 264:21
**readings** 129:21
**reads** 121:17
155:21
**ready** 26:6 86:4
**real** 8:15 225:2
232:19 236:16
276:9 283:12
284:5,8
**realize** 63:23
265:19 311:23
**realized** 211:7
245:1
**really** 21:10 34:19
45:23 49:7 53:12
54:11,21 56:22,23
71:20,25 85:17
91:25 106:14
112:7,16 113:12
113:15 114:2,14
117:19 123:12
142:7,14,16 152:4
157:1 164:8
182:22 189:12,13
191:15 195:25
201:1 203:24
212:6 213:8 225:9
225:12 243:14
245:3,8,24 262:17
269:23 282:7
297:15 299:11
306:1
**reask** 133:19
165:5
**reason** 44:6 96:15
111:5 141:20
142:11 199:1
214:19 236:4

249:2 270:18,18
**reasonable** 215:10
**reasons** 190:16
197:20 246:14
**reassessment**
191:7
**reassure** 102:2,17
103:11
**recall** 57:12 60:11
60:21 61:21 62:1
62:12,14 87:5
128:4,24 132:24
134:18 135:25
136:19 138:13,25
141:15 143:9
196:20 237:4
238:25 247:13
251:12,25 255:13
256:16 270:7
288:4 304:13
**recalling** 290:3
305:11
**receive** 72:2 142:3
142:19,20 174:3
175:16 261:24
275:20 276:4
284:13,14
**received** 18:21
20:23 21:11 50:10
67:9 93:16 152:3
175:8 210:20
246:24 287:9
291:4 307:4
**receives** 142:12
230:12
**receiving** 71:3
93:16 107:21
233:3 285:12
298:6
**receptor** 190:15
203:6

**recess** 55:15 90:22
127:7 167:13
215:23 272:20
**recipient** 63:4,20
275:15,25 287:4
**recipients** 115:6
173:17 174:19
**reciprocal** 20:18
21:21 55:23
**recognition** 93:21
**recognize** 124:21
**recognizing** 52:16
**recollection**
200:15,17,20
201:11 238:13
**recommend** 45:11
46:10 147:6 185:1
185:11
**recommendation**
48:7
**recommendations**
44:17 47:6 48:3
**recommended**
46:18 182:25
**recommending**
45:20,22 83:3
**record** 13:10 14:1
16:17,22,24 55:13
55:16 56:23 90:20
90:23 93:14 127:5
127:8 167:3,9,11
167:15 178:6
180:11 197:5,10
197:15,19,25
198:3,8,10 215:21
215:24 226:22,23
226:25 227:1
236:15,16,17,21
236:22 239:10,11
239:13,14 243:3,7
250:12,15,17

251:1 272:18,21
285:18,21,23
286:3 300:20,21
300:23,24 309:24
309:25 310:2,3
313:25 314:18,21
315:5 316:14
**recorded** 316:11
**recording** 13:24
**records** 51:13 57:4
270:13
**recovery** 210:19
211:23
**recreational** 76:11
**recruit** 284:7
**reduce** 81:10
223:10 253:13
258:20
**reduces** 190:22
222:10 223:22
**redundant** 220:19
278:12
**reed** 6:14 14:14
**reedsmith.com**
6:19
**reenforcing**
223:18
**reengaged** 148:25
**reevaluated** 224:9
**reevaluation**
181:13
**refer** 27:20 28:1
29:4 42:11 51:9
59:14 70:23 84:9
114:20 207:16
234:20 237:6
279:11 303:6
308:7
**reference** 29:5
59:18,19 60:8
87:23 101:20

117:9 123:2
180:19 236:11
247:12,20 264:7
265:9 300:15,17
**referenced** 87:2
158:10 207:19
314:3,7
**references** 29:15
29:18 154:24
265:21 291:3
**referencing** 34:6
**referred** 59:10,17
107:16 126:11
168:16,25 235:2
252:2 304:3
**referring** 23:17,18
66:23 172:23
257:10 264:11,16
272:12 273:14
299:12
**refers** 137:17
**refills** 74:19
227:16,17
**reflected** 129:1,3
134:20
**refuse** 165:22
**refused** 164:20
166:4
**refusing** 164:24
165:15
**refute** 248:4
**regain** 148:14
**regard** 143:15
213:13 232:9
**regarding** 25:11
32:20 37:22 38:19
49:15 58:22 60:6
62:17 63:19 64:10
88:13 100:3
128:17 129:15
131:20 140:13,16

145:20 166:2
168:2 169:1
174:14 175:3,14
182:23 207:13
212:24 216:24
246:10 257:10
268:15 274:1,4,16
274:20 275:4,7
276:16 295:16
303:8 309:14
**regardless** 232:6
**regards** 134:11
**regimen** 201:20
202:2 216:6
230:18 244:17
**region** 24:1 34:14
39:3,16,17,17 85:6
86:3 140:19
**regions** 28:25 29:2
38:19,22 54:19
89:3
**registrant** 171:3
**registrant's**
171:10
**regression** 173:2,6
292:15,17,23
**regret** 76:23
**regular** 47:3,6
48:19 93:18 209:3
268:25
**regularly** 47:9
65:15 93:13
**regulations** 100:3
258:13 275:5,8
**regulatory** 25:8,15
**reimbursed** 145:3
**reimbursement**
108:9 178:20
**reinforcing** 190:16
**rejected** 116:7

**rela** 25:15
**relapsed** 241:10
241:15 243:14
**relapsing** 146:13
**relate** 273:9
**related** 21:12
29:14,22 83:21
94:20 131:6
153:25 196:17
266:12 313:13,14
316:17
**relates** 41:2
**relating** 25:7 27:3
**relationship** 30:22
93:4 136:18 137:3
137:25 245:5
**relationships**
234:5
**relative** 30:15
230:1 233:21
**relatively** 306:12
**release** 101:15
224:20 225:23,25
226:5,11 244:24
246:9 254:2
266:16 303:25
305:3 306:4
**released** 102:1,4
103:10 104:15
**releasing** 126:25
**relevant** 57:18
83:21 136:13
199:1,2 242:21,21
**reliable** 122:4,6
124:4 153:4 157:5
184:3 185:23
187:5,25 266:24
283:18,23
**reliance** 256:25
**relied** 151:13
173:9 174:6

259:22 268:19
279:22 280:11
286:12,14,16,20
286:22 291:15
292:5,6
**relief** 112:6 190:3
260:18 284:20
311:15,19 312:2
312:12
**reliever** 120:8,18
120:20 121:1,14
**relievers** 31:23
121:12,12
**reluctant** 50:20
56:22 197:25
198:2 201:23
205:14 311:7,15
311:19 312:2,11
**rely** 150:25 151:18
189:20 192:11
292:1
**relying** 27:16
36:15 250:8
287:10,23
**remained** 54:16
**remains** 199:12
**remember** 98:10
126:2 278:8
287:14 305:23
307:7
**remembered**
200:21
**remembering** 98:8
**remind** 161:8
**remission** 146:10
146:14,18
**remitting** 146:13
**rems** 289:18,19,25
304:23 305:1,4,8
305:14,19 306:3,4
307:1,19

**renders** 39:25
**reneges** 39:22,24
**repeat** 26:11,13
31:2 168:22 225:2
305:17 313:16
**repeated** 98:3
**repetitive** 278:9
**rephrase** 41:12
141:23 163:20
172:16 297:3
311:10,24
**report** 11:7 13:7
18:1,4,12,14,17,25
19:7 20:8 22:15
27:20,22 28:1,2,4
28:15,19 29:4,7
31:11 36:13,14
41:4,8,9,14,16,21
41:23,24 42:1,7,8
42:15,16 49:15
52:8,10 59:9 60:8
60:17 62:13 66:15
67:4 68:3,13,14,19
68:21 70:23,24
74:15 77:16 78:8
84:9,12 86:25,25
87:5,23 92:4 96:9
97:6,11,11,12,13
97:24 98:5,7,11
101:20 105:15
107:12 109:22
111:22 114:4,20
116:6 117:9,22
118:1,3,19 119:12
119:16 120:14,15
124:16,20 125:20
125:22 126:8,11
128:5,9 129:2,8,10
129:11 130:22
133:2,3 134:9,12
134:21 136:24

HIGHLY CONFIDENTIAL

**[report - result]**

Page 55

137:12,14,16
139:2 140:9,10,15
144:19 158:18
159:4,5 161:15
175:22 179:13
180:19 187:9
188:21 189:16
207:16 216:8
218:4 219:7,17
221:13 233:23
234:15 235:15
247:12,20,20
248:1,13,15,24
253:15 265:10
273:15 274:8
275:1,12 276:2,4,7
276:14,18,25
277:22,25 278:5
281:18,22 282:5
282:21 283:1,2,3,3
283:8,16 286:12
287:3,25 288:2,9
288:23 289:16
291:15,16,18,25
292:9,12 293:3
300:11 302:6
307:22 308:8
314:4
**reported** 1:23
75:14 89:19 118:4
118:6 123:8,10
156:25 158:9
217:9
**reporter** 2:18
13:22 16:3,5,11
226:22
**reporting** 74:18
75:12,21
**reports** 25:24
26:18 27:9,9,17,18
27:18,19 28:4

42:5,12,19 70:24
80:14 129:20
157:7,20 189:24
190:3 192:23,24
206:25 207:4
274:14
**represent** 14:5
18:20 28:15 51:10
127:17 144:3
251:6 260:3
263:14 272:24
286:9 288:6
291:17 298:16
299:3 301:3
303:24 310:8
**representation**
34:20 250:8
**representative**
115:7 277:23
278:1 284:8
**representatives**
61:23 62:9 116:2
**represented** 225:1
**representing**
31:14 163:22
**represents** 294:22
**reproduce** 273:22
**reps** 294:25
**requested** 238:22
**require** 224:21
225:6 226:6
268:11
**required** 60:20
61:2,13 66:11
150:25 191:7
268:3 305:5
306:19
**requirement**
65:22 66:5,12
**requirements**
142:9

**requires** 147:14
261:25 262:23
305:14,20 307:9
**research** 66:4
74:25 109:20
209:13
**researched** 24:15
171:13
**reserve** 314:10
**residency** 17:20
61:3 63:14,21
197:22 200:1
209:2 213:3 282:8
**resident** 160:12
213:5
**residential** 147:21
**residents** 64:7
246:4
**resistant** 243:12
**resources** 95:1
204:2
**respect** 44:7
129:14 132:13
134:13 172:13
176:8 178:19,25
205:6 235:9 239:5
281:5 287:23
291:19 292:5
298:17 306:8
**respectfully**
133:18 294:3
**respond** 183:2
230:8
**response** 29:6
30:24 43:23 79:20
135:1,11 183:7
211:13 217:21
259:4 308:15
**responsibilities**
25:8,15 73:4
91:10 93:10,11

135:20 137:9
**responsibility**
30:5,10,14 34:21
36:2,3,6 37:6 38:5
38:7 39:5,23,24
51:21 52:16 64:11
82:11 88:13 89:15
91:1,12,13,18 92:2
115:25 128:18,21
129:15,19 130:15
132:20 133:6,17
133:21 134:1,5,10
134:16 135:4,8,12
138:6 139:25
140:7 177:1,6,10
178:11,11,15
179:10 180:4
192:9,12,12 193:2
193:8 246:10
305:6
**responsible** 32:13
83:1 102:4 104:13
104:22 105:12
177:16 179:18
191:23 192:18
235:22 246:5
**rest** 75:3 84:4
146:15 162:8
174:20 222:14
248:19 259:3
**restate** 224:25
**restrictions** 106:7
**result** 40:11 66:6
78:2 84:16,17
152:24 245:12
249:16,21 277:19
280:19 295:22
296:4,10,15 298:2
302:21,24 303:15
309:20 311:3
312:18 313:2,19

**resulted** 23:7,13
  242:14
**results** 146:25
**resumed** 209:17
**retail** 28:7 87:9
  127:21,25 128:7
  135:17
**retain** 19:10
**retained** 17:25
  166:15
**reuptake** 259:9
**reversed** 233:11
**review** 11:12 43:1
  119:25 130:20
  157:3,20 197:5
  198:20,22,23
  203:14 276:20
  277:1,12,20
  288:21 289:5,6,9
  301:21
**reviewed** 67:22
  119:11 128:13
  130:22 131:16,19
  132:7 140:23
  207:15 256:14
  267:3,9 277:16
  286:20 287:2
  288:15 289:1
  293:16 301:24
  302:3 306:3,4
  308:16,22 309:1
**reviewing** 206:19
**revised** 260:9,12
**revisions** 156:10
**reward** 190:16
  203:7
**rewarding** 203:7
**right** 16:5 17:2
  29:16,25 30:1
  31:23 35:1,5
  41:17,18 42:23

44:4 47:23,25
  48:1 52:22 56:11
  66:17,22 67:24
  79:23 84:6 85:25
  87:10,11 88:1,5,6
  90:14 92:16,17
  96:10,11 97:3,9
  100:20,21 103:9
  104:10,11,23,24
  106:1,2 117:24
  119:19,22 120:21
  121:7,8,20 124:19
  126:9,14 130:7
  133:18 155:6,13
  167:25 186:3
  191:13 197:17
  199:20 203:25
  204:7 207:6
  208:11 210:5
  211:11 217:14
  220:10 240:10,10
  240:16,20 246:20
  250:11 256:3
  257:25 265:22
  270:20 287:19
  292:16 295:9
  299:25 300:7
  305:12 313:24
  314:10
**ring** 132:6
**rising** 77:17
  137:17
**risk** 23:20 24:8
  47:11 48:16 53:22
  77:20 94:12
  105:17 109:15,20
  110:5 114:5 117:6
  120:19 137:15,20
  140:6 152:20
  153:2,5,16 183:3
  186:1 203:22

222:10 223:10,15
  224:4,12,19 225:4
  225:15,16,17,20
  225:24 226:4
  227:3,7,21,23,24
  228:2,12,14,17,19
  228:19,24 229:3,8
  229:9,16,19,22,22
  229:23,25 230:1,2
  231:21 232:7,7,12
  232:15,15,16,17
  233:21 234:8,11
  234:13,23,24
  235:8,11,16,23
  245:9 253:19
  263:8,9,11 284:22
  285:11 305:1
  306:11 312:6
**risks** 30:18 53:23
  62:15 64:19
  135:23 136:3
  165:1 182:18
  184:6,19 185:25
  186:23 189:1
  191:7 203:15
  204:5,10 206:13
  222:8,23 223:4,8
  223:19,22 225:11
  230:2 306:6,20,23
  307:10 309:8
**risky** 187:18 194:9
**rivera** 8:5 10:13
  14:22,22 286:6,8
  288:12 289:7,14
  295:20 296:13
  297:4,20 298:8,11
  299:22 300:18
**road** 3:17 4:6
**robert** 166:18
**robust** 142:12,15
  142:15 153:4

204:1
**rochester** 9:12
  15:23 69:20
  101:11 104:18
**rockwood** 1:24
  2:17 13:23 316:4
  316:25
**rocky** 7:16 14:20
**rocky.tsai** 7:20
**rodgers** 8:14
  10:15 14:24,24
  310:6,7,15,20
  311:1,13,25
  312:17 313:15,22
**rogue** 129:22
**role** 30:17,20
  34:12 52:14 53:21
  78:17,18 81:19
  91:11 107:6,10
  112:25 113:5,17
  117:4 135:16,23
  136:3 140:24,25
  146:20 176:5,7
  204:9 213:4 274:8
  293:18 294:12
**roles** 204:9
**roll** 11:18 236:19
**romanette** 60:9
  62:14 87:2 90:11
  103:9
**room** 14:4 111:5
  147:2,5 167:14
**root** 26:13
**ropes** 7:15 14:20
**ropesgray.com**
  7:20
**rosas** 1:24 2:17
  316:4,25
**rotted** 243:20
  244:12

HIGHLY CONFIDENTIAL

route 202:23
  203:4
rpr 1:24 2:17
  316:4,25
rules 100:3
run 151:12
running 213:9,21
  216:21
rushed 243:19
régime 202:10

**s**

safe 94:12 164:1,2
  170:14 191:16
  201:4 204:3
  306:10 307:2
safely 44:23 46:1
  165:23
safer 46:2 253:6
safety 30:22 32:20
  37:4 64:10 69:3
  132:16 136:18
  137:2,24 140:13
sal 15:18,18
sale 88:5
sales 29:11,18,23
  30:2 31:5 168:4
  169:13,16 171:16
  171:24 172:1,5,6,8
  172:10,12,19,21
  172:23 173:1,3
  294:25
salt 149:7
salvatore 4:5
salve 244:20
sameness 171:15
  171:17,19,21
samhsa 11:12
  119:25
sample 115:5,5,7
  258:4,6 284:6
  285:6

samples 36:12,17
  36:19 249:18
  256:15 257:9,20
  258:11 277:23
san 1:15 2:15 3:9
  6:17 7:18 13:1,20
sat 146:2
satisfaction
  111:18 112:20,25
  113:4 204:20
saturated 289:4
save 244:2
savings 257:24
saw 29:2 63:22
  76:4 84:24 98:2
  294:19
saying 60:10 75:25
  80:24 128:24
  168:7 176:14
  182:9 203:18
  215:12 219:6
  238:1 269:11
  271:4 278:21
  312:16
says 108:16 121:3
  121:8 225:1
  235:25 237:7
  240:9,10 243:10
  257:4,15,16,22,22
  261:14 307:18
sbadala 4:9
scale 109:12,13
  110:17 111:10,11
  111:12 173:12
scan 159:1
scary 243:14
scenario 46:15
  98:19 117:14
  185:18,20 187:18
  208:11 232:13
  233:22

scenarios 140:8,10
  268:7
schedule 44:12,25
  144:20 258:7,10
  258:12
schizophrenia
  228:11
scholer 7:6
school 17:2,18,24
  47:22 59:12 61:3
  63:13,20 76:1,2
  93:19 117:17
  197:22 209:1
  213:3 241:18
  282:8
science 32:20,22
  140:13 151:19
  237:1
scientific 168:9
  184:3 283:18,23
scope 44:11 91:24
  191:24 209:9
  215:10 245:16
  246:3
scourge 23:1,9
  139:8 183:21
screen 77:9 95:11
  95:11 96:12,17
  193:16 210:1
  211:25 216:5,12
  216:13 219:7
  228:18 229:12
  306:15
screened 222:8,23
screening 222:9
  222:12,17 228:21
  228:24
screens 77:5 93:3
scrutinize 25:20
  26:15 27:3 91:13
  139:23

scrutinizing 34:21
  38:21
scrutiny 39:2 82:8
  92:19 93:17 94:1
  94:17 95:6 106:10
se 125:10 210:13
seal 108:4,7
sean 9:21 13:21
second 6:16 79:8
  87:22,22 155:5
  243:9 252:8
section 114:20
  137:16 155:14
  197:10 264:19
  266:12 267:25
sections 275:2
sedated 244:13
sedative 140:5
sedatives 82:23
see 22:19,21 46:23
  52:14 76:9 82:19
  93:14 114:8
  119:21 121:5
  127:2 150:8,17
  157:1 167:20
  189:4 196:18
  198:24 209:15
  219:18 229:7,8
  237:10,12 238:3
  240:9,12,13,24
  243:4,9 248:22
  249:13 257:2,13
  257:17,18 258:21
  259:21 260:8,11
  260:15,20,21
  261:2,5,9,12,13,16
  264:18 266:5,11
  267:22 276:19
  284:8 289:18
  298:20 299:12
  300:15 304:18

HIGHLY CONFIDENTIAL

| | | | |
|---|---|---|---|
| 306:1 312:4 | 229:13 301:10 | 24:2,4 31:14 40:4 | 283:19 285:13 |
| **seeing** 65:8 75:11 | **septic** 243:19 | 40:14,23,25 41:1 | 307:19 |
| 75:20 80:18 220:5 | **sequential** 252:15 | 59:22 66:8 68:23 | **shows** 28:11 29:9 |
| 300:17 | **sequentially** 243:6 | 80:22 123:13 | 114:5 152:6 |
| **seek** 72:12 311:7 | 271:19 | 290:21 | **shroeder** 187:10 |
| 311:19 312:2,11 | **series** 22:19 | **shine** 251:20 | **side** 190:23 203:15 |
| **seeking** 76:11 | 237:21 247:3 | **ship** 33:14 49:4,20 | 252:23 |
| 192:8 227:15 | 266:5 | 114:12 193:5 | **sides** 20:20 240:1 |
| **seen** 36:18,23 | **serious** 27:23 37:3 | **shipped** 27:10 | **sign** 110:9,11,12 |
| 50:19 77:16 | 118:24 124:23 | 39:15 50:15 | 110:19,23 111:2,4 |
| 148:21 174:15 | 218:13 | **shipping** 84:2 | 111:15 275:24 |
| 185:21 199:6,13 | **serve** 288:2 300:5 | **shkolnik** 4:4 15:19 | 312:21,24 314:13 |
| 200:19,23 206:11 | **service** 251:14 | **shock** 77:7 | 314:16 |
| 206:14 232:23 | **serving** 56:3 | **shocked** 287:14 | **signature** 316:24 |
| 233:4 279:22,25 | **set** 19:4 121:22 | 304:18 | **significance** 111:1 |
| 280:10 304:9 | 149:15 159:20 | **shopping** 82:20 | 111:3 |
| 311:15 | 275:11 316:7 | 87:25 227:13,17 | **significant** 66:1 |
| **segment** 264:3 | **sets** 113:6 | 231:24 233:6 | 112:6 116:13 |
| **seldom** 95:9 | **setting** 67:25 | **short** 16:18 53:19 | 117:4 187:8 |
| **selection** 266:13 | 74:11 141:18 | 53:23 54:2 112:5 | 190:22 194:22 |
| 267:23 284:25 | 147:4,21,23 | 182:25 183:10 | **signs** 110:15 |
| **self** 59:21 159:4 | 148:10 150:15,18 | 187:3,6,17 200:7 | 192:18 224:22 |
| **sell** 38:8 301:23 | 151:6 160:2 | 225:10,14 226:11 | 225:7 226:7 |
| 302:12 | 201:14 263:8 | 242:22 247:2 | **similar** 65:17 93:1 |
| **selling** 75:5 221:15 | 305:16,22 | 255:11 268:25 | 100:4 157:23 |
| **sells** 301:8 302:1 | **seven** 209:25 | 269:7,17 304:6 | 171:18,18 195:18 |
| **sense** 25:19 37:14 | 210:2 239:25 | 307:17 | 203:1 278:18 |
| 38:8 83:7 113:25 | **severe** 150:3 | **shorthand** 2:18 | 303:7 |
| 138:24 139:5,7,18 | 152:24 231:22 | **show** 18:6 84:12 | **similarity** 194:23 |
| 220:6 222:12 | 260:19 264:23 | 111:11 118:8,14 | **similarly** 248:19 |
| 242:18 255:7 | 266:18 267:20 | 122:6,20 175:13 | 249:19 281:12 |
| 269:11 302:21 | **severity** 205:5 | 177:4 185:24 | **simple** 22:9 |
| **sensitive** 14:1 | **sexual** 227:23 | 223:14,21 260:2 | 165:14 223:3 |
| **sensitivity** 96:13 | **shakes** 168:21 | 261:7 276:21 | **simpler** 31:4 |
| **sent** 238:12,13 | **share** 254:23 | **showed** 32:20 | 147:25 |
| **sentence** 154:14 | 255:1,5,7 295:8 | **showing** 28:25 | **simplifies** 164:23 |
| 154:19 155:5,21 | **sharpen** 211:13 | 29:21 36:18 74:9 | **simply** 72:15 |
| 237:25 243:10 | **she'd** 244:6 | 74:14 123:3 | 165:22 |
| **separate** 161:10 | **shelf** 34:9 | 131:16 140:17 | **single** 85:7,8 86:3 |
| 179:6,10,11 194:1 | **shift** 22:24 23:7,12 | 153:4 182:7 187:5 | 86:5 187:10 |
| 194:12 195:6 | 23:16,21,21,23,23 | 187:7,10 263:5 | 206:20,20,21 |

207:1,1,2 210:23
211:2 249:20
271:17,24 272:7
278:11 302:23
303:14 309:18
**sit** 34:8 299:13,22
**site** 243:12
**sits** 74:5
**sitting** 27:21 42:14
46:17 57:1,8
74:20 81:4,10
123:23 124:14,17
137:21 164:18
166:1 200:14
232:19 276:22
292:4
**situation** 45:18,24
72:16 89:17 90:5
91:4 98:8 147:11
159:25 161:5
175:24 176:3,22
211:19 216:23
217:7 218:3 221:6
231:2,4 269:20
**situations** 201:12
**six** 28:17 239:25
241:9 243:11
244:16 286:23
287:24 288:14,22
**size** 254:15 255:8
**skepticism** 63:19
65:6 152:2
**skill** 316:15
**skills** 167:23
**skin** 242:17
**slides** 291:4,6
**slightly** 186:22
187:1 310:20
**slow** 80:22
**small** 26:1 36:10
40:11,19 186:20

186:24 188:18
191:5 193:5
251:19
**smith** 6:14 14:13
14:14 175:16
189:7,10 190:20
192:16 221:7
231:14,15,20
232:24
**social** 124:23
125:1,12,16
**societies** 69:1 70:6
**society** 23:18
77:25 102:23
110:21 117:21
**sociologist** 125:7,8
125:9
**sociology** 125:10
**sold** 52:6 64:9 76:3
77:22 254:2 302:4
303:1,17
**solemnly** 16:7
**solutions** 7:4
14:17
**somebody** 36:2
47:20 76:2 83:7,9
98:5,10 171:12
215:10 242:13
**someone's** 226:14
226:14
**soon** 96:23
**sorry** 28:23 39:24
74:23 75:9 135:14
157:21 172:13
193:16 213:14
237:22 263:15
269:8 287:18,19
298:11,20 307:16
311:11
**sort** 90:2 102:8
163:22 214:10

311:11
**sought** 36:1 78:20
79:12
**sound** 22:7
**sounds** 186:3
305:12
**source** 171:14
253:20 259:21
299:20
**sources** 122:12
131:22,23 157:6
157:18,19 159:2
**south** 4:15 9:6
191:9
**space** 284:10,24
284:25 285:1,4,5
**sparingly** 31:23
32:7
**speak** 113:13
270:20 271:2
275:22
**speakerphone** 3:7
3:16 4:5 9:14
**speaking** 19:13
245:22 253:12
**speaks** 117:20
**specialist** 66:10
77:19 213:9
214:22
**specialists** 44:23
**specialties** 40:5
65:25
**specific** 29:13
37:13,21 39:3
40:3 42:12 45:7
45:23 46:14 48:20
49:12 51:9 53:12
54:5 61:21 65:14
82:5 98:19 103:23
113:14 124:15
129:7 130:17

132:13 135:5,5
138:22 142:2
143:14 151:20
159:7 161:14
163:7,11,12
164:15,16,16
165:7,7,11,12
166:2 172:1
174:11,14 175:15
176:21 182:6
183:9 197:1,6
207:24 208:2
228:14 232:3
247:3,8 249:15,18
249:20,25 250:4,6
262:18 268:5
269:25 271:16
274:7 286:19
287:2,3,8,22 290:5
290:20 291:25
292:2 293:2,12
295:21 296:1,3,8
296:25 305:4,11
306:1 308:24
**specifically** 64:16
64:22 99:21 100:6
115:9 131:12,19
134:12,22 137:13
137:17 140:25
159:21 172:14
173:25 177:9
178:7 180:21
182:23 225:22
235:12 237:5
254:11,21 272:12
272:14 275:22
296:7 303:12
307:18
**specificity** 96:13
138:18 175:20
249:23 250:10

HIGHLY CONFIDENTIAL

271:23 296:1
**specifics** 49:8 51:3
  62:2 92:1 141:4
  164:9 166:16
  172:10 201:24
**specify** 129:10
**spectrum** 149:25
  152:8,15
**spell** 195:24
**spend** 234:16
  306:13
**spending** 206:2
**spent** 24:14 56:15
  56:20 57:2,5,9
  76:14 145:10
  170:16 244:15
  306:16
**spike** 39:3
**spikes** 39:18
**spoke** 270:21
**spoken** 16:19
  166:10,13,21,24
  272:9 281:25
  295:23
**sponsored** 300:12
**spot** 84:10
**spyser** 5:11
**square** 8:16
**ss** 316:1
**stable** 224:9
**stamp** 257:7
**stand** 43:10 48:21
  132:3 145:6
**standard** 62:7
  90:6,7 94:10
  97:14 111:8
  191:12 269:16
**standards** 108:19
  110:4
**standing** 69:10

**stands** 132:6
  243:12 303:25
  304:25 305:1
**stanford** 17:1,4,11
  17:12,18,23 47:22
  59:11 61:22 92:11
  145:22 166:19
  209:14 237:8
  243:19 244:9,16
**stanford's** 51:15
**staphylococcus**
  243:13
**start** 59:3 157:2
  268:22 284:23
**started** 16:16
  75:11 78:24 80:17
  119:17 123:1
  125:25 192:25
  240:23 242:9
  246:8 248:5 269:6
**starting** 32:9
**state** 1:1 2:1 3:15
  13:17 14:5 15:9
  15:14 16:7,24
  21:17,18 26:23,25
  55:8 66:14 69:1
  70:10 84:12 86:22
  94:6 99:2,5,14,20
  99:23 100:20,22
  100:25 101:1,2,4,5
  101:12,14,24
  102:1 103:1,1,10
  103:18,25 104:23
  104:25 105:6,6,23
  106:10,19,22
  107:2,6,9 118:1
  130:24 131:1,7,21
  132:7,10 139:9,12
  143:23 144:16
  161:6,16 172:12
  172:22 173:19,20

174:11,17,22
  175:1 196:14,23
  202:17 204:8
  205:16,25 207:13
  248:1,1,20 249:5
  254:16,22 255:2,8
  271:10,15,18
  275:24 278:16,21
  278:22 279:8,23
  280:21,25 281:9
  281:13 293:8
  294:6,14 303:15
  309:12,16,19
  316:1
**state's** 100:3
**stated** 31:8 80:7
  194:11 196:7
  253:3 274:8
  278:18 283:11
  304:17
**statement** 36:8
  43:7 58:3,6 108:8
  129:14 132:19
  136:23 183:11
  184:10 201:25
  202:20 203:10,19
  205:3,9,13 212:23
  236:14 238:12
  252:20 266:22,23
  278:9 299:19
  311:1,3,18,24
  312:10,16,17,23
  313:1,11,15,19
**statements** 58:14
  58:21,23 59:1,2,2
  59:3,4 60:3 128:6
  133:1 277:21
  278:4 290:1,8,12
  290:17 291:1
**states** 28:5,13 29:1
  31:16 34:14 56:4

70:20 71:1,8 84:5
  100:5 101:7
  116:10 120:9
  162:9 163:23
  183:21 186:7
  189:23 190:1
  196:19 204:8
  237:22 251:24
  252:7 261:10
  269:4,9,10,15
  271:15 294:20
**statewide** 144:15
**stating** 103:2
  183:12 194:14
  196:7 222:21
  223:25 235:16
**statistic** 149:4
  156:3,5
**statistical** 153:7
**statistics** 151:7,13
  151:18 153:14
  154:8 169:19
  174:21 218:15
**status** 120:20
**stay** 241:16
**steer** 214:12
**stems** 196:1
**stenographically**
  316:11
**stepping** 119:2
**steps** 81:3
**steve** 14:8
**steven** 5:6 22:3
**steward** 95:18
  209:24
**stewards** 34:22
**stewardship** 36:6
  92:20
**stigma** 197:23
  243:25

stimulate 203:6
stock 50:13
stocked 84:3
stolen 75:3
stone 119:2
stop 45:1 58:19
  213:16 307:16
storage 181:14
story 243:24 245:4
straight 243:24
strategies 214:8
strategy 305:2
street 2:15 3:8
  4:15 5:7 6:6,16
  7:8 77:22 254:3
strengths 261:3
  263:24 264:1
strike 25:15 30:24
  41:21 46:8 56:19
  71:6 79:25 84:20
  89:6 97:2 99:9
  109:23 123:15
  133:4,19 136:21
  259:3 314:8,11
strong 118:16
structural 42:20
  177:13 179:23
struggling 124:23
  209:12
students 59:6 64:6
studied 136:7
  142:4,7,8
studies 28:25
  74:14 185:24
  187:7 233:8 265:9
  265:13 267:2
  285:10
study 60:9,9,11,15
  102:21 118:1,11
  123:3 187:9 190:5
  234:2,22 236:4

265:12,21 266:24
  267:6,6 298:14,22
studying 60:1 75:1
subject 142:6
  167:4 189:23
subjective 189:20
  189:23 190:13
  284:20
subjects 158:10
submitted 18:12
  18:18 20:8 41:4
  41:14 145:13
  282:4
subscribed 315:22
  316:20
subsequent 88:4
subset 73:24
subsets 40:19
subsidiaries
  299:18
subsidiary 299:21
  301:9
substance 59:13
  99:24 117:12
  146:21 147:13,20
  149:2 151:11
  158:20 197:17
  224:14 227:8,11
  229:3,5 233:1
substances 25:12
  93:7 100:7 153:25
  159:6 193:15,23
substantial 162:8
substantive
  142:11,21
substitute 225:22
substitution 297:1
successful 297:10
sucking 304:19
sudden 124:24

suddenly 65:12
sued 106:22 231:6
suffer 52:12
  152:24
suffered 165:24
suffering 86:11
  109:8 245:2
sufficient 39:22
  148:17,24 158:22
  181:17 183:18
  218:15 285:11
suffolk 1:2 2:2
  13:17 54:25 55:2
  84:1,4,8,14,23
  85:20 86:14
  130:11,25 131:16
  131:20 132:14
  133:23 134:7,25
  135:6 136:5,8,15
  137:7 138:3,8,20
  139:21 140:1,17
  141:8 143:16,21
  144:5,12 158:6,16
  159:12 160:6,9,13
  160:17,21 161:1
  161:10,15,23
  162:6,14 163:8,17
  166:4 278:25
  279:14 280:21,25
  281:10,14 293:8
  293:14 296:9,19
  303:4 309:15,19
suggest 53:20
  91:21 123:21
  299:7
suggested 108:21
  256:14 269:9
suggesting 28:7
  156:10 264:11
suggests 122:24

suite 2:15 3:8,17
  4:6 5:17 6:16 9:6
sulfate 246:25
summa 17:17
sun 85:7 86:4
super 240:21
  241:22 242:20,21
superior 13:16
supervision
  316:12
supplement
  275:12,20 276:4
  276:17,24 278:6
supplemental 11:9
  66:25 67:5,9,18
  68:4 256:25
supply 22:25 23:8
  23:13,25 24:3,4,9
  24:18 25:3 26:6,8
  26:19 30:6 33:6
  33:11 34:6,7,11
  35:7,14,15,19 36:5
  36:9 56:19 57:11
  57:14,24 77:18
  78:3 81:8 83:23
  84:16,17 91:12,15
  91:25 113:11,22
  119:6 122:15
  128:21 133:13,14
  134:2 135:3 137:5
  137:8,14 139:17
  165:3 168:3 180:9
  209:25 236:2
  243:17 245:11
  251:23 252:5,9,17
  252:23 253:13
  297:19 302:20
  303:9
support 36:16
  62:5 102:13 111:9
  119:11 148:18

185:22 187:20
188:14 267:10
298:13 299:2
**supported** 187:3
265:8 298:13
299:2,8,14
**supposed** 39:9
91:7 92:5
**supreme** 1:1 2:1
**sure** 20:4 30:6
41:13 47:15 48:23
52:19 53:18 55:12
66:19 85:3 100:2
101:9 105:5
115:24 128:21
129:15 130:6
141:24 142:16
156:19 172:17,20
184:13 204:3
217:19,23 229:6
239:2 240:19
242:24 251:18
264:2 268:8 269:3
289:24,24 291:7
297:4 301:25
305:18 311:13
**surgery** 244:7
**surrounded** 266:6
**survey** 118:2
123:3 174:13
175:5,12,19 190:5
**surveyed** 175:13
**surveys** 111:18
112:11,20,25
113:5 204:20
**suspect** 95:10
105:21
**suspected** 96:9
97:7 211:15
212:14,19 214:15
216:7 218:8,11

221:14
**suspicion** 39:6
96:5 212:21
213:23 216:3,11
216:24 217:11,15
218:1
**suspicions** 96:6,11
98:15
**suspicious** 25:18
34:21 39:14,14
89:3,17 91:3,14
96:8,8 97:5,6,10
170:24 171:3,6,10
211:24 212:4
250:1 274:2,5,12
274:17,21 283:14
**suspiciousness**
96:23
**sustained** 313:6,17
**swapping** 237:23
**swear** 16:3
**sweeping** 201:23
**swift** 6:5 14:13
**switch** 181:7 297:7
297:16 298:3
306:17
**switches** 297:11
**switching** 146:3
161:21 297:22
**sworn** 43:10
315:22
**symptoms** 192:19
**syndrome** 37:3
**synonymous**
313:7,18
**system** 149:1
159:6 161:7
171:14 198:25
209:6 216:22
251:11,15,17
274:18

**systematic** 130:20
**systems** 171:10
198:20,22,23,24
274:2,6,22

**t**

**table** 21:25 120:11
120:17 121:10
**tables** 62:6
**tablets** 244:17
261:3,19
**take** 13:25 18:7
50:16 55:11 59:8
61:2 66:3 74:21
81:3 88:24 90:4
90:16 94:25
100:13 101:21
126:24 135:14
145:6 149:12
152:11,19 153:20
156:14 183:19,25
215:2,3,5,19 216:1
216:1,2 217:21
223:2 256:22
262:14 264:13
269:16 271:19
305:5 314:17
**taken** 2:13 13:13
25:3,6,6,10 98:4
114:17 115:11
153:9,24 185:2
204:23 231:16
281:24 282:2
315:4 316:7
**takes** 266:24
**talk** 22:4 29:7 64:7
76:25 98:18 107:5
111:22 114:19
120:13 137:13
179:12 182:5
187:19 188:21
210:4,19 214:7

218:17 233:16
**talked** 57:11 65:15
86:24 140:24
159:22 196:10
199:4 204:19
211:6 238:20
241:4 251:10
**talking** 19:16
34:25 56:18 65:5
69:24,25 70:3,7,11
76:16 115:15
196:14 214:23
216:2 225:10
232:2,3,18 233:7
235:7
**talks** 59:5 107:5
140:22 234:7
267:19
**tapentadol** 251:9
260:5,7 265:15
266:17
**taper** 44:24 46:2
46:25,25
**tapering** 45:22,23
**tapers** 165:17
**task** 112:16
**taught** 17:11
63:23 94:12
163:20 194:18
**teach** 169:12
**teaching** 17:12
58:20 195:4
**team** 97:13 217:1
**teenager** 72:7
**teenagers** 74:20
75:25
**telephonic** 14:3
**telephonically**
15:7
**tell** 46:18 48:19
49:5,23 50:25

95:15 132:6
164:18 193:18
200:18 210:14,16
212:20 223:17
237:22 243:20
268:8 282:17,20
290:1,25 292:4
301:7 304:25
308:11
**telling** 76:6 105:8
105:24 182:7
219:15 307:12
**temperature**
110:14 111:7
**ten** 212:10,12,16
220:9 261:10,17
263:1
**tend** 212:7
**tender** 167:5
**tens** 115:15,17
124:10 195:9
**tense** 283:13
**term** 53:18,19,23
54:2 68:12 112:5
142:16 153:5,6
171:20 182:3,7,8
183:1,10,10
186:21 187:3,6,17
188:19,22 189:3
190:6 196:2
225:10,11,14
226:11,11,20
228:5 253:8,13
255:11 266:8
283:19 298:6,7
305:2
**termed** 242:5
**terminal** 146:9
**terminology**
110:19

**terms** 32:19 35:18
39:4 76:21 111:11
123:13 162:11
174:23 175:2
201:18 203:25
204:8,19 234:1
235:8 249:9
269:12 275:22
**test** 158:23 159:1,2
190:18 216:17
219:17 221:13
**testified** 91:1
102:13 136:17
141:11 149:23
152:6 208:25
282:13 292:14
**testify** 145:2,8
**testifying** 19:24
91:9 145:21
166:13,21 168:1
168:18 169:1
**testimony** 43:5,11
91:5,24 125:23
128:13 132:24
144:20,21 166:10
251:12,25 253:16
256:16 277:4,8
293:4 314:8,11
315:4,6 316:6,9,14
**testing** 216:18
**teva** 9:3 15:2
287:18 301:3,9
308:2,20
**text** 76:8 238:1
**thank** 15:16,20
16:2,11 90:18,19
101:23 127:11
156:22 157:12
167:7 184:18
234:21 239:16
241:20 247:23

250:13 272:16
273:24 285:16
288:11 303:11
307:12 309:23
313:22 314:22
**thanks** 285:20
**theft** 87:8,12,16,19
**themes** 203:4
289:3
**theory** 146:5
**therapy** 54:2
114:22 152:25
180:20 181:13
185:22 186:2
187:3 189:6,10
190:6,22,25 191:4
203:14,16 222:7
222:10,22 223:2
224:5 225:11,11
225:14 226:12,20
229:4 234:9 236:2
241:16 283:20
284:4,11 298:6,6
**thereof** 316:19
**thing** 35:15 50:1
68:14,18 216:15
258:21
**things** 79:7 89:14
109:7 119:8 183:8
229:2 230:21
245:8 252:15
265:20
**think** 20:5,7 35:12
37:5 38:3,14
54:12 65:16 71:25
72:16 80:10,14
81:7 83:15 88:12
89:13,13,14 91:22
104:3 106:13
110:20 113:12
115:23,25 119:24

122:3 124:4,15
127:1 135:1 137:7
141:20 142:5,20
163:1 164:22
165:2,14,21 169:5
171:5,11 176:5
177:20 183:2
184:10 186:14,23
188:17 189:19,22
191:3 194:16,24
194:25 195:3,7,19
196:22 198:5
199:5 200:6 201:9
207:18 208:9,9
209:20 211:12
214:9 215:9
218:23 219:12,12
220:25 222:24,24
223:13,15 224:2
225:9 226:10,14
232:4 235:1 236:9
238:1 242:20
243:4 245:3
247:19,21 252:2,8
252:15 258:3,5
259:24 263:10
265:8 266:1 267:6
267:8,13,15 269:5
269:19,24 279:12
279:25 280:4
288:21 289:4,8
293:8 306:5,9,22
312:10,15 313:12
**thinking** 63:10,15
63:18 65:13
209:24
**third** 88:3,5 181:5
211:9 243:10
252:8
**thoroughly** 79:21
277:17

HIGHLY CONFIDENTIAL

**[thought - travels]**

**thought** 77:11
85:4,23,24 163:24
240:25
**thoughts** 183:4
**thousands** 61:19
162:13 201:7
288:18
**three** 7:17 40:15
54:2,8,16 90:10
117:15 123:3
165:16 174:20
224:9 239:25
240:22 241:2
243:6 244:9,15
283:24 285:15
298:3 300:1
301:22 302:4,11
303:1,17
**threshold** 97:22
188:20 216:24
**thursday** 1:16
2:16 10:4 13:1
**tide** 77:17 137:17
**tied** 89:14 252:15
**time** 13:10 15:12
17:22,24 19:24
20:12 45:5 48:7
55:14,16 57:2,5,6
57:9 59:21 62:21
63:2,6,25 64:25
66:2 71:3 77:5
79:1,7,10,19,20,24
80:17,21 90:21,23
93:21 101:21
122:10 127:6,8,11
131:7,9 136:12,13
144:23,25 145:2,4
145:8 146:11
148:24 151:2
153:10 158:19
159:6 167:3,5,7,12

167:15 169:6
180:23 186:22
188:19 199:4
206:2 210:11
215:22,24 216:22
223:2 226:24
227:1 230:5,6
234:16,18 236:18
236:22 239:12,14
240:24 241:8
244:13 245:1
250:13,16 251:1
255:5 264:14,25
266:20 272:19
276:9 283:12
285:10,14,17,22
286:3 300:22,24
306:13,16 307:17
308:15 310:1,3
314:23 316:7,8,10
**times** 86:24 118:5
122:20 200:23
201:6 208:22
225:14 235:18,19
251:22 252:3
**timing** 265:20
**tiny** 193:6
**tirf** 303:19,22
304:3,11,23 305:3
305:8,13,19
307:11
**title** 17:4 104:12
**titled** 266:12
**today** 27:21 35:4
42:14 46:17 57:1
57:6,8 78:14
123:14,23 124:14
124:17 125:23
126:16 127:18
128:17 132:18
137:21 164:18

166:1 177:21
200:14 241:15
242:12 251:11
253:16 254:17
256:13 276:10,22
282:13 292:5
299:13,23 310:9
**today's** 22:23 23:6
23:11 126:13
314:19
**told** 49:2 51:10
174:18
**tolerability** 202:24
**tolerance** 194:2,13
196:2 230:7,8
241:17 244:6
297:17 313:5,16
**tolerant** 304:7
**tolerate** 268:24
**tool** 53:20 229:11
**tools** 222:12,15
228:21,23
**top** 237:7 240:9,12
243:5 261:10
**topic** 58:20 60:6
201:17
**topics** 183:15
**total** 28:8,20 56:2
297:18,21
**totality** 267:8
**town** 251:19
**towns** 26:1 125:1
125:12,17 193:6
**tox** 211:25 216:5
219:6,17 221:13
**toxicology** 158:19
**tr** 149:21
**track** 65:21 89:15
89:25 91:2,7,18
92:5

**tracked** 139:15
**tracking** 311:24
**tracks** 62:16
**trade** 260:17
**tradename** 260:5
260:6
**trained** 63:12
125:9,9 198:11
213:2
**training** 43:22
63:16 67:23,25
93:20 95:1 142:12
142:18,21 143:1,4
151:23 169:9,15
169:18 197:22
200:1 204:1,8
209:2 213:5,13
269:23 282:9
287:14 304:14
**transcribed**
316:12
**transcript** 43:1
315:3
**transcription**
225:1 237:18
**transdermal** 251:8
**transfer** 88:5
**transition** 269:17
**transitioned** 45:3
**transitioning**
269:1
**transmucosal**
303:25 305:3
306:4
**trauma** 227:24
**travel** 144:23,25
145:1,2,3,4
**traveled** 159:22
**traveling** 76:15
**travels** 173:21

HIGHLY CONFIDENTIAL

**treat** 43:13,24,25
44:3 148:13 231:8
232:8 237:9 244:1
244:5 253:22
255:25
**treated** 32:6 48:4
109:21 122:7
196:12,16 201:5
202:16 224:20
225:5,25 226:5
304:16
**treating** 32:14
103:19,22 111:1,3
111:15 204:11
**treatment** 23:22
23:24 31:14 32:11
40:14 41:2 44:1
44:14 53:16,21
60:19 61:11 66:8
83:4 95:23 97:13
102:19 103:5,13
105:7,10,16,24
108:19 114:22
119:15 138:12
146:14,17,22,22
146:24 147:7,8,21
149:13 164:2
175:3 180:25
181:2 185:12,23
187:6 188:23
189:25 198:4,17
199:3 201:3,19
202:1,6 209:9
214:8 230:13
244:22 262:5
263:6 265:15
267:1 268:16
282:11,13 306:11
310:10,22 312:8
**treatments** 93:15
214:11

**treats** 47:20
146:21
**trial** 144:21 145:1
145:12 206:3
261:24 262:11
276:16,23 283:24
284:3,10,24,25
285:1,4,5
**trials** 166:14 187:4
187:5 263:5
265:14
**tried** 66:19 123:21
194:7 278:10
**trouble** 241:18
311:22,23
**trucks** 34:19
**true** 18:22 30:12
46:22 99:8 102:20
104:2,3 110:7
132:21 133:8
134:6 146:12
148:5,7 181:25
184:2 193:13,21
203:19 217:13
221:11,18 225:16
239:4 248:7
267:12 282:16
285:11 310:10,13
310:19 315:5
316:13
**truly** 49:14
**truth** 16:8,9,9
152:5
**try** 50:3 64:25
77:23 95:22 116:3
122:5 147:15
148:1 170:13
211:14 248:12
259:25 282:1
284:5,6,10,18
292:15 293:11

297:7,16 300:10
**trying** 32:14 73:20
76:16 90:8 94:21
139:22 148:14
153:17 219:21
234:11 244:8
258:25 265:20
290:19 296:25
**tsai** 7:16 10:10
14:20,20 167:18
168:16,21,24
169:5 170:4
172:17 173:13,22
174:13 175:12,21
176:16 177:24
178:13,19,25
179:14 180:1,11
181:7 182:16
183:6 184:4,15,25
186:16,25 188:1,7
188:10 189:3
190:18 192:4,22
194:10,24 195:24
196:6 199:20
201:4,10,25 202:9
202:20 203:9,21
205:2,10 206:6,15
207:4 212:14
214:23 215:2,12
215:20 216:1
217:4,25 218:7,17
219:5,11 220:8,13
220:22,25 221:8
222:4 223:24
225:3,22 226:14
227:3 229:1
230:17 232:12
233:16,20 234:10
235:6,25 236:9,12
236:16,24 238:11
238:20 239:10,16

246:12 247:21
248:15 250:5,11
**tsunami** 77:17
137:16 242:8
243:16 245:19,25
252:3 253:4
**tuesday** 48:10
145:8,11
**turn** 22:14 31:10
59:4 120:10 191:9
202:23 239:19
257:21 265:24
266:3 286:14
307:20 308:9
**turned** 35:25,25
**turning** 30:20
243:13 253:19
286:12
**twelfth** 5:7
**two** 42:19 48:11
80:16 116:25
194:22 232:13
239:24 240:22
241:2,12 243:2
264:12 265:19
270:4,4 271:25
308:25 309:3
**tylenol** 185:24
**type** 40:3 140:5
143:3 183:10
234:13 292:15,17
292:22
**types** 37:7 38:6
40:16 77:14 90:10
93:14 108:9 142:2
284:8
**typically** 44:12
95:15 197:10
214:4,5,7 230:6

| **u** | 290:24 306:20 | 252:7 269:4,9,10 | 120:23 121:1,3,4 |
|---|---|---|---|
| ubiquitous  243:17 | 307:10 308:15 | 269:15 | 121:11,13,14,24 |
| 245:12 | 310:15 312:15 | units  28:6,9 | 122:8,21 123:18 |
| uh  88:17 120:12 | understanding | universal  203:4 | 146:21 147:13 |
| 120:22,22,25 | 24:18 31:3 33:13 | university  17:1,16 | 149:6,7,11,15,24 |
| 121:2,6,9 144:22 | 33:16,17,20 34:3 | 17:24 64:21 69:11 | 149:25 150:4,7,16 |
| 148:21 155:12,20 | 92:21 135:15 | unnecessary  208:1 | 151:6,11 152:8,12 |
| 155:25 167:24 | 171:20 175:2 | unpaid  145:16 | 152:14,17,20,23 |
| 184:15 205:20 | 183:7 203:20 | 170:7 | 153:11,15 154:5 |
| 221:2 234:4 | 238:11 257:25 | unquote  28:9 | 154:14 155:9,16 |
| 238:24 266:14 | 264:13 267:2 | 109:5,9 230:10 | 155:22 156:16 |
| 284:17 300:14 | 273:25 287:16 | unused  74:5 81:3 | 157:7,8 158:4,10 |
| ultimate  267:3 | 288:17 | 81:4 88:24 | 158:20,24 175:3 |
| ultimately  64:21 | understood  85:22 | unusual  65:23 | 180:20,25 181:2 |
| 203:9 267:11 | 231:11 259:25 | 162:8 | 183:1 184:7 |
| umbrella  101:2 | 263:10 269:8 | update  199:9 | 185:22 187:14,17 |
| umm  209:22 | 293:10 | urge  103:18 | 187:20 188:14,19 |
| unavailable  86:16 | undoubtedly | urging  76:17 | 194:7 197:17,19 |
| unaware  138:16 | 154:25 | urine  77:5,8 93:3 | 198:4,8 201:3 |
| 138:21 | unemployed | 95:10,11 96:12,17 | 210:25 222:11,14 |
| uncertain  313:12 | 231:23 233:5 | 210:1 216:5,12 | 223:11,23 225:17 |
| uncomfortable | unfolded  276:9 | 221:13 | 225:21 227:8,11 |
| 82:5 | unfortunately | usa  301:4 308:2,20 | 227:20 228:20,22 |
| uncommon  122:14 | 62:7 111:9 | usage  264:19 | 229:3,5,8,10,13,17 |
| 310:11,23 | unfounded  96:12 | use  11:16 37:4 | 229:25 231:23,23 |
| undercount | unintentionally | 47:1,2,2,3 53:18 | 232:8,22 233:1,2 |
| 197:20 | 72:7 | 59:13 68:12,24 | 234:12 235:17,19 |
| undercover | union  155:22 | 76:11 81:9 87:4 | 235:20,21,22,23 |
| 170:12 | 156:7 | 90:1 98:22,24 | 236:3 241:2,16 |
| undercut  258:12 | unique  35:8,13,15 | 104:9 111:10 | 242:2,3,15 244:13 |
| underestimate | 35:20 36:25 38:15 | 114:21,22 116:9 | 245:2,6,7,24 |
| 155:8 | 45:18 53:22 54:13 | 116:12,14,16,17 | 246:18 253:17,17 |
| undergraduate | 91:13 153:3 | 116:18,20,21,25 | 260:16 265:2 |
| 17:16 | united  28:5,13 | 117:1,4,6,7,9,10 | 268:16 278:10 |
| understand  72:19 | 29:1 31:16 34:14 | 117:11,11,12,16 | 282:1,11,13 284:5 |
| 85:17,19 105:5 | 56:4 70:20 71:1,8 | 118:2,4,5,7,9,10 | 284:18,22 298:7 |
| 113:19 139:11 | 84:5 116:10 120:9 | 118:13,13,15,15 | 304:21 313:7,17 |
| 175:6 184:13 | 162:9 163:23 | 118:17,17,18,22 | useful  53:20 54:12 |
| 223:19 248:12 | 183:21 186:6 | 118:25 119:3,3,3,5 | 171:13 241:14 |
| 254:1 258:7 | 189:22 190:1 | 119:7,18 120:8,8 | users  118:21 |
| 259:10,15 290:15 | 204:8 251:24 | 120:18,20,20,23 | 119:17 123:4,8,10 |

HIGHLY CONFIDENTIAL

123:13 242:11
**uses** 258:20
307:11
**usual** 217:24
**usually** 210:17
305:25
**utility** 37:4

**v**

**v** 62:14
**vacuum** 204:16
**vague** 142:16
168:13
**validated** 109:20
**value** 137:22
**vanco** 244:14
**variation** 54:18
203:2 294:20
**varies** 269:19
**various** 33:12 36:4
154:9 252:3
258:25 299:18
**vary** 202:21
269:24
**vast** 182:2 186:23
205:18,19,23
**verify** 59:14 214:2
299:20 300:4
**veritext** 13:21,23
**version** 87:22
122:4 153:11
260:23,25 263:16
263:25 264:8
**versus** 135:17
145:21 234:9
237:1 269:13
**vial** 241:6
**vicari** 7:7 10:12
14:16,16 272:23
272:24 273:17,24
276:15 278:13,25
279:14 280:18

285:16
**video** 13:24
**videographer** 9:21
13:9,22 14:4 15:6
15:11,16,20,24
16:2,12 55:13,16
90:20,23 127:5,8
167:9,11,15
215:21,24 226:23
227:1 236:17,22
239:11,14 250:15
251:1 272:18,21
285:21 286:3
300:21,24 309:25
310:3 314:19
**videotaped** 1:14
2:12 13:12 314:20
**view** 150:9,13
151:3 204:7
**vigilance** 39:2
191:6,19,22,23
203:24 232:11
**vigilant** 34:22
38:11,16,18
**violated** 137:2
**violation** 51:8
**vis** 36:6,6 113:15
113:15 137:9,9
141:1,1
**visit** 93:3
**visual** 111:10
**vital** 110:8,11,12
110:15,19,23
111:2,3,15 275:24
312:21,24
**vogel** 9:13 15:22
**volume** 39:15 40:6
89:4 106:12
244:19
**volumes** 25:21
26:16 27:4 38:20

106:16 193:6
**voluntary** 147:19
147:24 149:1
**voucher** 261:23,24
**vulnerability** 26:8
93:24
**vulnerable** 192:8
192:10

**w**

**waiting** 145:8
**waiver** 209:16
**walgreens** 6:3
14:13 130:1,4,13
134:13,24 135:2
**walk** 17:14 244:13
**walks** 111:4
**wall** 107:9
**walmart** 5:14
14:12 127:17
130:1,4,13 133:4,5
133:12,16,20,25
134:1,4,10,12,23
135:2 136:2 137:1
138:15 139:4,18
141:3
**want** 16:16 27:24
47:15 51:11 54:11
55:11 56:24 85:15
111:25 120:13
128:18 142:14
145:23 146:3
150:8,16 151:1
152:11,12,18
154:12,19,20
155:13 159:15
161:8 162:1 180:1
184:13,16 188:8
188:11 189:4
191:11,18 192:15
193:11 199:9
211:12 212:8,23

213:17 219:18
234:16 235:4
239:9 240:7 249:2
256:18 276:12
291:6,10 299:11
299:19 306:1
313:25
**wanted** 80:21
86:15 144:20
188:7 196:11
213:14 215:8
236:24 237:20
244:3
**wants** 78:2
**warning** 80:5,7
247:7,8 266:8,9,12
**warnings** 266:5
**washington** 5:8
21:17,18 28:10,18
190:4
**water** 255:20,22
256:3
**watson** 301:5,19
302:8
**waves** 252:9
**way** 32:6 35:16
37:25 38:15 40:1
52:19 82:10 83:1
83:15,24 84:21
85:9 86:5 90:3,6,8
93:18,19 95:9
103:4 108:16
110:17,17 116:22
137:2 142:23
148:1 149:8 162:8
163:19 164:22
171:18 193:17
194:10 202:16
203:5,6 206:1,1
209:4 212:5
215:18 223:17

230:7,9 232:4
238:10 253:15,16
258:12 259:25
274:11 282:1
297:19 308:22
310:21 316:18
ways 87:3 91:21
107:11,12 108:21
140:11 203:2
208:9 245:8 249:7
258:15 273:8
wc.com 5:10,11
we've 16:21 55:10
73:7 77:25 124:9
127:2 169:5 189:3
230:7 234:24
weak 266:25
wednesday 145:7
week 46:23 54:8
84:25 90:3 92:15
92:23 170:9
265:12
weekly 92:22
weeks 53:15 54:2
54:16 240:22
244:9 265:15
weigh 53:23
204:10 262:18
weighing 81:19
welcome 127:12
167:8 250:14
wendy 237:2
238:12
went 49:21 63:12
102:25 240:24
241:3 242:13
west 6:6 7:8
whereof 316:20
whispers 14:2
white 240:21

wholesale 24:21
25:11 41:1
widely 189:23
281:25
wildly 189:21
willful 148:14
william 240:23
williams 5:4 14:7
14:9
willing 186:19
219:22 270:9,21
270:22,22,24
window 280:1
wis 12:2 286:1
wisconsin 102:22
298:14 299:8
wise 163:15
wish 276:21
withdraw 157:23
291:21
withdrawal
240:25
witness 10:6,19
16:4,10 18:9
19:18,19 21:4,10
21:23 24:12 27:6
29:18 31:8 32:18
34:1,11 35:12
37:13,16,21 39:13
41:12 42:11,19
45:14 46:13,22
47:9 48:10 49:7
49:12 50:1 51:15
52:1 53:12,18
54:5,11 56:13
57:17 58:1 59:8
67:21 70:23 71:12
71:19 73:1,17
74:8 75:8 79:5
80:5 81:7,17 82:4
82:18 85:17 86:19

88:12,21 89:2
90:19 92:13 94:8
95:6 96:2 98:1,18
99:18 100:2
101:23 113:25
114:14 115:22
116:16 117:3
119:21 120:2
123:20 124:3
126:25 127:12
133:25 135:10
143:3 145:10
146:8 147:2 148:7
150:12 151:17
153:13 156:22
162:1,17 163:11
163:15 164:8
165:11 166:16
167:5,8 168:15,22
172:16 173:12,16
174:10 175:10,19
176:12 177:9
178:7,18,24 179:4
179:21 180:8,19
182:14,22 183:15
184:12,24 186:14
186:19 187:24
188:17 189:12
191:3,22 192:21
194:4,16 195:3,25
199:19 201:1,9,22
202:5,13 203:1,18
204:14 205:9
206:11,25 212:12
214:19 215:7,17
216:11 217:18
218:10,23 219:20
220:12,20 221:6
221:23 223:13
224:25 225:9
226:10,16,19

228:16 230:16
232:1 233:18
234:7 235:4,14
236:10 238:8
246:7 247:19
250:4,13,14
251:17 252:20
254:5 255:18,22
259:13,21 262:17
262:25 265:5
268:5 269:3
270:19 271:23
272:4,17 276:6
278:8,18 279:11
280:14 285:17,19
288:25 289:13
295:16 296:12
297:3,15 298:1
299:17 300:19
302:18 303:3,22
305:11 310:13,18
310:25 311:10,22
312:14 313:10
314:7,10 316:8,9
316:20
witnesses 128:14
277:5,9
woefully 198:9
wolf 3:6 15:3,3
wonder 240:12
wondered 200:21
wondering 310:18
word 79:6 241:22
310:19
words 79:17
177:22 217:11
230:25 235:21
297:5
work 42:3,5 45:25
46:5,22 47:4,16
48:20 64:20 66:4

94:21 101:14
128:15 140:22
145:20,21 151:25
164:11,15 165:15
166:25 170:12
182:4 185:17
186:7,17 189:8
190:14,15 191:17
202:15 235:10
244:2
**worked**  24:20,23
24:25 147:4 166:7
170:2 222:18
241:7 258:16
270:5
**working**  56:16,21
60:1 69:12 145:11
169:21 171:11
189:13,15 204:16
214:9 223:18
259:1
**works**  189:6,6,10
**worried**  95:12
190:8,11 244:1
**worrisome**  258:24
**worse**  46:6 106:4
182:4 189:18
246:15
**write**  48:25 60:17
62:13 68:22 114:4
124:21
**writes**  118:20
258:19
**writing**  58:17
64:23 87:5 178:9
238:23 276:14
**written**  50:22 59:1
59:4 86:13 140:23
156:9 163:16,18
163:21,23 207:24
249:4,10 250:7

255:16 261:15,17
281:24 291:2
293:17 295:14
**wrong**  208:16
267:13,15 290:6
314:11
**wrote**  50:25 59:11
60:13 83:12 138:5
205:16 295:12,21
309:9

**x**

**x**  10:1 83:20
209:16
**xartemis**  247:12
247:16

**y**

**y**  83:20
**yale**  17:16
**yeah**  54:24 94:4
98:18 122:3 138:4
157:13 179:16
182:15 193:25
199:14 206:15
207:18 213:18
217:6 220:20
221:8 224:2 226:3
226:16 233:25
247:24 258:5
**year**  28:17 45:8
56:2 61:7 63:6,11
64:1 65:1 76:24
80:11 113:8 115:1
115:4 120:18
135:21 145:25
187:14 244:4
248:21
**years**  17:13 24:14
26:6 28:5,19
36:24 45:10 47:23
67:22 76:14 77:4

77:12 78:1 80:16
116:10 122:25
155:18 165:16
189:8 193:8
199:24 202:14
210:15 232:5
260:19 263:1
268:18 285:15
304:15
**yep**  233:13 298:23
298:25
**yield**  146:25
**york**  1:2 2:1 3:15
3:18 4:7 7:9,9
9:16,16 13:17
15:9,14 19:14,15
20:2,6 26:24 27:1
41:9,15,20,24 42:8
42:16,17 54:25
55:5,8 56:11,16,21
57:9 84:12 86:22
94:6,9,25 99:4,5,9
99:10,14,23 100:3
100:8 101:4
103:21 104:5
106:18,21 130:24
131:1,7,21,21
132:10 139:9
143:24 144:16
145:14 159:22,25
161:7,16,18,19
172:9,11,12,19,22
173:4,8,14,17,18
173:21,25 174:5
174:12,14,16,18
174:22,22 175:1,6
175:7,14,24 176:3
176:22 177:7
178:3,22 179:2,19
180:17 186:7
196:11,13,13,16

196:20 197:2,6
205:11,16,25
206:7,17,22 207:2
207:5,9,12,13,15
207:24 235:12
241:5,9 246:3,4,8
246:11 247:17
248:2,5,8,20 249:5
249:17 250:7
254:16,22,24
255:2,9 270:1,2
271:11,15,18
272:6,10 278:15
278:21,22 279:8
279:23 280:21,25
281:9,14 288:9
291:16 292:19
293:1,3,8 294:2,6
294:11,14,23,25
295:6,9,12,18,21
295:24 296:4,9,14
296:16,19 303:14
309:12,15,18
**york's**  132:7
139:12
**young**  59:13 84:15
187:11

**z**

**z**  83:20
**zero**  116:3 233:10
**zukerman**  237:2
238:12

**à**

**à**  36:6 113:15
137:9 141:1

New York Code

Civil Practice Law and Rules

Article 31 Disclosure, Section 3116

(a) Signing. The deposition shall be submitted to
the witness for examination and shall be read to or
by him or her, and any changes in form or substance
which the witness desires to make shall be entered
at the end of the deposition with a statement of
the reasons given by the witness for making them.
The deposition shall then be signed by the witness
before any officer authorized to administer an
oath. If the witness fails to sign and return the
deposition within sixty days, it may be used as
fully as though signed. No changes to the
transcript may be made by the witness more than
sixty days after submission to the witness for
examination.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.