1                                                               1

2      SUPREME COURT OF THE STATE OF NEW YORK
       COUNTY OF SUFFOLK: PART 48
3      ------------------------------------------------x

4      IN RE: OPIOID LITIGATION

5

6                               INDEX NO.:400000/2017

7      ------------------------------------------------x

8                               September 09, 2020
                                Central Islip, New York
9

10               MINUTES OF FRYE HEARING
                 (Testimony of Dr. Lembke)
11

12     B E F O R E:        HON. JERRY GARGUILO
                           Supreme Court Justice
13
       A P P E A R A N C E S:
14

       SIMMONS HANLY CONROY, LLC
15     **Attorneys for Suffolk County**
       112 Madison Avenue
16     New York, New York 10016
       BY:  PAUL J. HANLY, JR., ESQ.
17          JAYNE CONROY, ESQ,
            THOMAS I SHERIDAN, III, ESQ.
18          (212) 784-6401
            phanly@simmonsfirm.com
19          jconroy@simmonsfirm.com
            tsheridan@simmonsfirm.com
20
       NAPOLI SHKOLNIK, PLLC
21     **Attorneys for Nassau County**
       400 Broadhollow Road, Suite 305
22     Melville, New York 11747
       BY:  HUNTER SKOLNICK, ESQ.
23          SALVATORE C. BADALA, ESQ.
            (212)397-1000
24          pnapoli@napolilaw.com
            sbadala@napolilaw.com
25          jciaccio@napolilaw.com

```
 1                                                           2

 2
       LETITIA JAMES
 3     Attorney General for the State of New York
       Office of the New York State Attorney General
 4     28 Liberty Street
       New York, New York 10005
 5     BY:  LOIS SALDANA, Asst. Attorney General

 6

 7

 8     O'MELVENY & MEYERS, LLP
       Attorneys for Janssen Pharmaceuticals, Inc.
 9     7 Times Square
       New York, New York 10036
10     BY:  NATE ASHER, ESQ.

11

12

13

14

15

16

17

18

19                     *      *      *

20              STEPHANIE CASAGRANDE, CSR, RPR
                   OFFICIAL COURT REPORTER
21

22

23

24

25
```

```
1                    Frye Hearing - Dr. Lembke              3
2            THE CLERK:  Supreme Court, State of New
3       York, County of Suffolk, Part 48 is now in
4       session, the Honorable Jerry Garguilo
5       presiding.
6            THE COURT:  Good morning, everybody.
7            CHORUS:  Good morning.
8            THE CLERK:  The case on the calendar is
9       In Re Opioid Litigation, Index Number 400000
10      of 2017.  Your appearances, please, beginning
11      with the Plaintiff.
12           MR. HANLY:  Paul Hanly, for Suffolk
13      County.
14           MS. CONROY:  Jayne Conroy, Suffolk
15      County.
16           THE COURT:  Good morning.
17           MR. SHKOLNIK:  Hunter Shkolnik, Nassau
18      County.  Good morning, your Honor.
19           THE COURT:  Good morning.
20           MS. SALDANA:  Lois Saldana, for the New
21      York Attorney General's office.
22           THE COURT:  Good morning.
23           MS. SALDANA:  Good morning.
24           THE COURT:  Anyone else?
25           MR. BADALA:  Good morning, your Honor.
```

```
 1                    Frye Hearing - Dr. Lembke      4

 2          Salvatore Badala, for the Plaintiff.

 3               THE COURT:  Good morning.

 4               MR. ASHER:  Good morning, Nate Asher,

 5          for Janssen Defendants.

 6               MR. SHERIDAN:  Tom Sheridan, Suffolk

 7          County.

 8               THE COURT:  Good morning.

 9               My picture is on the screen.  I could do

10          without it.  All right.  A couple of

11          announcements before we get started.

12               On Friday we're going to have an

13          abbreviated session.  We have our annual 9/11

14          ceremony, which I will attend.  They commence

15          at 3 p.m. on Friday, September 11th, so we'll

16          work somewhat into the lunch hour and recess

17          thereafter, because traditionally that

18          service takes about a little more than an

19          hour.

20               I received a letter.  Apparently, the

21          Plaintiff is not going to call Dr. Keller as

22          an expert; is that correct?

23               MR. HANLY:  That's correct, your Honor.

24               THE COURT:  Okay.  So our current

25          schedule will be today, of course,
```

```
 1                    Frye Hearing - Dr. Lembke          5

 2          Dr. Lembke; tomorrow, Dr. Keyes; and on

 3          Friday, during the abbreviated session, we'll

 4          start with Dr. James Tomarken.

 5              Is everybody on board with that?

 6              MS. WELCH:  Donna Welch, for the

 7          Allergan Defendants.  We are on board with

 8          that, but we have sent a proposed Stipulation

 9          to the Plaintiffs regarding the withdrawal of

10          Lacey Keller as an expert.

11              We want to make sure that she is being

12          withdrawn for all purposes from their case in

13          chief.  We want to ensure that they are not

14          taking her down from the Frye hearing with

15          any intent to have any other of their experts

16          adopt her opinion in whole or in part or rely

17          on her opinion in whole or in part in their

18          case in chief.

19              We assume that's the intent here, but we

20          want to make sure of that before we're

21          precluded from an opportunity to engage in a

22          Frye hearing on her opinions.

23              THE COURT:  So, in other words, you want

24          to come to an agreement?

25              MS. WELCH:  Correct, your Honor.
```

1

2          THE COURT:  The letter I received

3      indicates that they may call her as a

4      rebuttal witness, and in the event they

5      choose to do so, we would have a limited Frye

6      hearing.

7          Your issue deals with whether or not any

8      other expert tends to rely on that testimony?

9          MS. WELCH:  Correct, your Honor.  Our

10     concern is simply that on the current record,

11     Plaintiffs have relied themselves on

12     Ms. Keller for purposes of summary judgment

13     briefing.  If we are withdrawing her -- if

14     they are withdrawing her as an expert, we

15     don't think that's appropriate.

16         So we believe they shouldn't be able to

17     use her opinions in response to a renewed

18     summary judgment motion, and we want to make

19     clear that their other experts in their case

20     in chief cannot simply rely on her opinions

21     that are being withdrawn, and they can't

22     adopt her opinions as their own.

23         THE COURT:  You said that twice now.

24     Work it out.  If you can't work it out, I

25     will.

```
1                    Frye Hearing - Dr. Lembke          7
2              MS. WELCH:  Thank you, your Honor.
3              MS. CONROY:  Thank you, your Honor.
4              THE COURT:  Tech people, I'm hearing
5         myself twice.  It's like a network
6         five-second delay.  Okay.  Call a witness.
7              MS. STRONG:  Your Honor, this is Sabrina
8         Strong, for Johnson & Johnson and Janssen.
9         Before we begin, I'd like to address one
10        issue, your Honor.
11             THE COURT:  Go ahead.
12             MS. STRONG:  Yesterday you received a
13        letter that was filed by some of the
14        Defendants relating to a late disclosure of
15        materials related to Katherine Keyes.
16             After that, we actually received from
17        Plaintiffs' counsel yesterday, approximately
18        4:40 p.m., a late disclosed list of
19        supplemental materials for Dr. Lembke, who is
20        scheduled to testify, as you know, this
21        morning.
22             There is 239 documents identified on
23        that supplemental materials considered list
24        that we received at 4:40 yesterday.  I have
25        not even had an opportunity to review them,
```

1

2    let alone determine whether we have access to

3    all those materials.

4         I understand they include materials from

5    1995, early 2000, materials that could have

6    been included and considered by her before

7    her deposition, before she submitted her

8    report.

9         We would ask, your Honor, that they not

10   be permitted to elicit any testimony or any

11   opinions that rely upon those materials or

12   address those materials in any way at the

13   hearing today, your Honor.  This is classic

14   sandbagging.  The discovery rules do not

15   permit for this, and so we would ask for that

16   relief, your Honor.

17        MR. HANLY:  Your Honor, they've had

18   these materials since August the 3rd when

19   they were disclosed in connection with the

20   West Virginia litigation.  So the notion that

21   they're just seeing them for the first time

22   now is simply not true.

23        The second point is, of course, as your

24   Honor knows, an expert's work, an expert's

25   opinions are not static.  They are dynamic,

```
                    Frye Hearing - Dr. Lembke              9
```

1     Frye Hearing - Dr. Lembke                    9

2     and they change over time, and many of these

3     materials were created subsequent to Dr.

4     Lembke's deposition in this case.  So we

5     really don't think that this is a serious

6     issue.

7          MS. STRONG:  Again, your Honor, I'm not

8     familiar with what has been disclosed in West

9     Virginia and what has not, but to get a list

10    of 239 documents at 4:50 the night before a

11    Frye examination is absolutely improper, your

12    Honor.

13         New York courts have plainly held that

14    the expert discovery rules are promulgated so

15    that no party will be sandbagged or

16    surprised, and that's plainly what this is.

17         And I do understand, your Honor, that

18    there are many documents.  I don't know the

19    totality because, as I said, I haven't looked

20    at the 239 documents, but I understand that

21    there are many that predate her deposition,

22    long predate her deposition.

23         THE COURT:  Okay.  In the event during

24    the course of the examination if, in fact,

25    there is reference to a contested exhibit,

```
 1                    Frye Hearing - Dr. Lembke            10

 2        note your objection and I'll rule on it at

 3        the time.

 4             Apparently, through the course of these

 5        hearings, although hundreds of exhibits have

 6        been noted, very few have actually made their

 7        way into the record.  So stay on your toes.

 8             MS. STRONG:  All right.  I will, your

 9        Honor.  I have to tell you it's hard to

10        discern that on the fly with over 700

11        initially identified by her and another 239,

12        so I'd like to have a standing objection at

13        that point, but we'll try to do our best in

14        that regard.

15             I don't know if Mr. Pyser or Mr. Carter

16        have additional points they would like to

17        make before we begin.

18             MR. PYSER:  Briefly, your Honor.  This

19        is Steve Pyser, for Cardinal Health.  Just on

20        the idea that we are aware of these because

21        they were disclosed in the West Virginia

22        litigation, not all Defendants here are in

23        the West Virginia litigation, first of all.

24             Second, there's an entirely different

25        expert report in the West Virginia
```

```
 1                    Frye Hearing - Dr. Lembke          11
 2     litigation.
 3          So if the idea is that we should expect
 4     from this witness what she's testified in
 5     West Virginia, that gets to the heart of the
 6     problem, which is that she entered a report
 7     in this case and should be testifying in line
 8     with the report in this case, and because
 9     there is a report in West Virginia that says
10     different things, that just can't be
11     bootstrapped into this case because there's a
12     materials considered list submitted at 4:39
13     p.m. the night before the Frye hearing.
14          That's just classic sandbagging, and
15     your Honor should strike it.
16          THE COURT:  Okay.  So noted.  Call a
17     witness.  I suggest you stay on your toes
18     also.  In the event an exhibit is mentioned
19     that you have a problem with, raise your
20     objection at that point.
21          And, in any event, you'll have a
22     standing objection as we proceed.
23          MS. STRONG:  Thank you, your Honor.
24          THE COURT:  Call a witness, please.
25          MR. HANLY:  Your Honor, the Plaintiffs
```

```
 1                     Frye Hearing - Dr. Lembke          12

 2            call Dr. Anna Lembke, remotely.

 3                 THE COURT:  Good morning, Doctor.

 4            Doctor, can you hear me?  Are you muted?

 5            Your lips are moving, but I don't hear

 6            anything.

 7                 DR. LEMBKE:  Yes, I'm muted.

 8                 THE COURT:  Swear the witness in,

 9            please.

10                 THE CLERK:  Yes.  Can you hear me?

11                 DR. LEMBKE:  Yes, I can.

12                 THE CLERK:  Please raise your right

13            hand.

14                 (WHEREUPON, Dr. A-N-N-A  L-E-M-B-K-E,

15            having first been duly sworn by the Clerk of

16            the Court, testified as follows:)

17                 THE CLERK:  Please state your name and

18            address for the record.

19                 THE WITNESS:  Anna Lembke, 401 Quarry

20            Road, Stanford, California, 94305.

21                 THE CLERK:  Thank you.

22                 THE COURT:  And, Dr. Lembke, good

23            morning again.  I give all witnesses a few

24            pointers that can expedite these hearings.

25                 Of course you're going to be asked some
```

```
 1                  Frye Hearing - Dr. Lembke              13

 2        questions this morning, and I suggest that

 3        you limit your answer to the information

 4        sought by the question.

 5             For example, if I were on the witness

 6        stand and I was asked on what street do I

 7        live, I would simply volunteer the name of

 8        the street.  I wouldn't give the town, the

 9        state or the ZIP code because that

10        information is not sought.

11             Number 2, although in life it is not

12        polite to commence an answer before a

13        question is complete, because we save time

14        that way; however, as you probably know

15        already, in court we require a complete

16        stenographic record of all the questions and

17        the answers.

18             So even though you know exactly where a

19        question is going, wait for the question to

20        be complete before you commence your answer.

21             And, number 3, in the event you hear the

22        word "objection" or anything that sounds like

23        "objection," just stop until you get

24        direction from the Court; fair enough?

25             THE WITNESS:  Yes.
```

```
1                      Frye Hearing - Dr. Lembke              14

2                      THE COURT:  Got it.  Good.  You may

3            proceed.

4                      MR. HANLY:  Thank you, your Honor.

5      DIRECT EXAMINATION

6      BY MR. HANLY:

7            Q.   Good morning, Dr. Lembke.

8            A    Good morning.

9            Q.   It's early morning where you are; is

10     that correct?

11           A    Yes, it is.

12           Q.   You are in your offices at Stanford

13     University School of Medicine?

14           A    Yes.

15           Q.   Now, you and I have met before, correct?

16           A    Yes.

17           Q.   I presented you in court before Judge

18     Polster some years ago in connection with the opioid

19     litigation; do you recall that?

20           A    Yes, I do.

21           Q.   All right.  Now, just as a road map for

22     where we're gonna go, today we're going to be

23     talking principally about methodology, and in order

24     to start us off on what I hope is the right foot,

25     we're going to put up on the screen the nine
```

```
 1                   Frye Hearing - Dr. Lembke              15

 2     opinions that you intend to testify to as and when

 3     this case goes to trial, okay?

 4          A    Yes.

 5          Q.   Then thereafter, we'll go through your

 6     qualifications, we'll go through the methodologies,

 7     and hopefully this will all be over in a reasonable

 8     period of time; fair enough?

 9          A    Yes.

10               MR. HANLY:  All right.  Could we put up

11          Slide Number 1, please.

12          Q.   Doctor, can you see Slide Number 1?

13          A    Yes.

14          Q.   All right.  And is this a list of the

15     nine opinions that you discuss in your report in

16     this case?

17          A    Yes.

18          Q.   All right.  And is there anything about

19     this list which is substantively different from the

20     list of opinions in your report?

21          A    No.

22          Q.   All right.  Just to go through them very

23     briefly, and I'm just going to paraphrase, your

24     Opinion Number 1 is going to be that addiction is a

25     chronic illness; Opinion Number 2 that opioid
```

1

2      prescribing grows fourfold starting in the '90s,

3      which increased the supply of deadly opioids;

4      Opinion Number 3 is that the opioid industry misled

5      doctors into believing that opioids are more

6      effective and safer than they really are.  You then

7      give some examples there.

8                Opinion Number 4 is that there's no

9      reliable evidence that opioids work for what's

10     called chronic pain.  5 is the increased supply

11     contributed to more individuals becoming addicted to

12     opioids; 6 is increased supply contributed to more

13     individuals, including newborns, becoming dependent

14     on opioids.

15               Number 7, increased supply contributed

16     to more diversion of prescription opioids; Number 8,

17     the increased supply of opioids through legal and

18     illegal sources resulted in the opioid epidemic; and

19     Opinion Number 9 is the opioid epidemic would not

20     have occurred without the pharmaceutical opioid

21     industry's misleading promotion of opioids.

22               Did I read those correctly, paraphrasing

23     in part?

24          A     Yes, you did.

25          Q.    All right.  And those are the, in sum

```
1                    Frye Hearing - Dr. Lembke              17

2     and substance, those are identical to the opinions

3     listed in your report; is that true?

4          A    Yes, that is true.

5          Q.   Okay.  You can take that slide down,

6     please.

7               Okay.  Doctor, you are currently

8     Associate Professor and Chief of the Addiction

9     Medicine Dual Diagnosis Clinic.  You are Medical

10    Director of Addiction Medicine and Program Director

11    of the Addiction Medicine Fellowship within the

12    Department of Psychiatry and Behavioral Sciences at

13    Stanford University School of Medicine; is that

14    true?

15         A    Yes.

16         Q.   Now, in that --

17              THE COURT:  Mr. Hanly, I don't mean to

18              interrupt you.  I overlooked placing

19              something on the record.

20              MR. HANLY:  Yes, your Honor.

21              THE COURT:  This applies to everybody

22              here and anyone who may be listening through

23              a live stream.  That's the rules of the Chief

24              Judge, Part 29, Section 29(1), the general

25              taking of photographs, films, or videotapes,
```

```
 1                    Frye Hearing - Dr. Lembke              18

 2            or audiotaping, broadcasting or telecasting

 3            in a courthouse, including any courtroom --

 4            and just for the record, the Court considers

 5            the locations where this is being live

 6            streamed to be part of our courtroom --

 7            office or hallway thereof, at any time or at

 8            any occasion, whether or not the Court is in

 9            session, is forbidden, unless permission of

10            the Chief Administrator of the courts or a

11            designee of the Chief Administrator is

12            obtained.

13                 So you may observe the proceedings, but

14            you may not record them, take photographic

15            images, et cetera.  Okay.  Thank you.  I'm

16            sorry, sir.

17                 MR. HANLY:  May I proceed, your Honor?

18      BY MR. HANLY:

19            Q.   Dr. Lembke, among your titles is the

20      Chief of Addiction Medicine within the Dual, dual as

21      in two, Diagnosis Clinic, true?

22            A    Yes.

23            Q.   And in that context, dual diagnosis

24      refers to a psychiatric condition on the one hand,

25      and a substance use disorder on the other, true?
```

```
 1                      Frye Hearing - Dr. Lembke          19
 2            A    That is true, yes.
 3            Q.   All right.  Now, you've been on the
 4     faculty at Stanford University School of Medicine
 5     since approximately 2003?
 6            A    Yes.
 7            Q.   All right.  And in terms of your
 8     background, you did your undergraduate work at an
 9     obscure university called Yale?
10            A    Yes.
11            Q.   And you did your medical degree at
12     Stanford University, correct?
13            A    Yes.
14            Q.   You did a partial residency in pathology
15     at Stanford, true?
16            A    Yes.
17            Q.   And following that, a full residency in
18     psychiatry at Stanford?
19            A    Yes.
20            Q.   And following that, a fellowship in mood
21     disorders within the Department of Psychiatry and
22     Behavioral Sciences, true?
23            A    Yes.
24            Q.   You are licensed to practice medicine in
25     the state of California --
```

```
 1                    Frye Hearing - Dr. Lembke          20

 2            A    Yes.

 3            Q.   -- since 1995?

 4            A    Yes.

 5            Q.   You actually received a waiver from the

 6     Drug Enforcement Administration to prescribe

 7     buprenorphine products, true?

 8            A    Yes.

 9            Q.   And what, what is the circumstance under

10     which you would prescribe buprenorphine, and you do

11     prescribe buprenorphine products?

12            A    I prescribe buprenorphine for patients

13     who have opioid use disorder, a term for opioid

14     addiction, as well as for some patients with severe

15     opioid dependence.

16            Q.   Buprenorphine is itself an opioid

17     product, true?

18            A    Yes, it is.

19            Q.   You're Board Certified, true?

20            A    Yes.

21            Q.   In psychiatry and neurology?

22            A    Yes.

23            Q.   And you are also Board Certified by the

24     American Board of Addiction Medicine; is that true?

25            A    Yes.
```

```
 1                 Frye Hearing - Dr. Lembke         21
 2          Q.    And I'm sure Justice Garguilo knows what
 3    Board Certified means, but essentially it means that
 4    peers within the same area of work as you come
 5    together and vote to give you or not give you a
 6    certificate demonstrating your expertise in the
 7    particular area; is that a fair description?
 8          A     Well, it's not really a vote by peers.
 9    It's -- you have to complete additional training to
10    get expertise in a certain area.  And then typically
11    you have to sit for and pass a board exam.
12          Q.    Okay.  But there is a board that
13    actually certifies, true?
14          A     Yes.
15          Q.    All right.  Now, you teach medical
16    students at Stanford; isn't that right?
17          A     Yes.
18          Q.    And you've been doing so for nearly 20
19    years?
20          A     That's correct.
21          Q.    And you've been recognized for your
22    excellence in teaching on two occasions; is that
23    true?
24          A     Yes.
25          Q.    You also maintain an active clinical
```

```
 1
 2     practice, true?
 3          A    Yes.
 4          Q.   And in your clinical practice, a
 5     significant portion of your students are -- sorry --
 6     of your patients are patients who have been taking
 7     prescription opioids for pain relief and have
 8     developed some sort of a use disorder; is that true?
 9          A    Yes.
10          Q.   And how many such patients would you say
11     you have treated in the last 20 years or so that
12     you've been treating them?
13          A    Well, I haven't kept count, but it's
14     certainly scores of patients over many years.
15          Q.   Scores did you say?
16          A    Yes.
17          Q.   All right.  Now, we're going to hear a
18     bit about some terms that you are very familiar
19     with, but perhaps the Court and others are not.
20               Can you just briefly explain to the
21     Court what is meant in the context of addiction
22     medicine by the term misuse.
23          A    In the context of addiction medicine,
24     misuse means taking a prescribed medication in a way
25     other than intended by the doctor who prescribed it.
```

```
 1                  Frye Hearing - Dr. Lembke        23

 2            Q.   Okay.  And how about --

 3            A    That's a very broad definition.

 4            Q.   That's all --

 5            A    Not specific, but...

 6            Q.   Thank you, Doctor.  That's all I'm

 7       asking is a very broad and brief definition so we

 8       can orient the Court in terms of your further

 9       examination, okay?

10            A    Yes.

11            Q.   And the term "dependence," what does

12       that mean in the context of addiction medicine?

13            A    That refers to patients specifically

14       with opioid dependence for first the patients who

15       have been taking opioids daily for long periods of

16       time who physiologically adapt to the presence of

17       the molecule such that if they reduce their dose or

18       stop it altogether, they experience opioid

19       withdrawal.

20            Q.   And the term "addiction," how is that

21       term used in your field?

22            A    So addiction is a complex

23       biopsychosocial disease that can broadly be defined

24       as the continued compulsive use of a substance

25       despite harm to self and/or others.
```

1

2     Q.   And without getting too technical, is

3   there a relationship between that term addiction

4   that you've just defined and something called opioid

5   use disorder, O-U-D?

6     A    Yes.  So opioid use disorder is the

7   terminology used in the Diagnostic and Statistical

8   Manual of Mental Disorders in the latest edition,

9   and it's essentially synonymous with addiction.

10    Q.   Now, in working with the patients in

11  your clinic, you develop treatment plans to deal

12  with opioid use disorder, or addiction, or

13  dependence, or misuse?

14    A    Yes.

15    Q.   And those treatment plans can include

16  nonopioid medications, true?

17    A    Yes.

18    Q.   Also nondrug plans of rehabilitation, if

19  you will?

20    A    Yes, correct.

21    Q.   Now, you also hold a position in the

22  Stanford Department of Anesthesiology and Pain

23  Medicine, true?

24    A    Yes.  I have a courtesy appointment in

25  anesthesiology and pain medicine.

1

2    Q.    And the courtesy appointment does,

3    however, enable you to treat pain patients, correct?

4    A    Yes.

5    Q.    Now, over the years of your career, is

6    there a body of scientific and medical literature

7    that you have studied to understand the relationship

8    among pain, dependence, and addiction?

9    A    Yes.

10   Q.    And have you personally contributed to

11   that body of literature?

12   A    Yes, I have.

13   Q.    Have you written peer -- what are called

14   peer-reviewed papers in that area?

15   A    Yes.

16   Q.    For the record, peer-review refers to

17   the process by which an author submits her

18   manuscript to a particular scientific journal or

19   journals, and the journal then sends the paper to

20   other experts in the field to determine whether the

21   paper is worthy of publication in that particular

22   journal.  Is that a fair description of peer-review?

23   A    Yes.

24   Q.    Now, in addition to peer-reviewed

25   papers, you've also written a book concerning

1

2     opioids and addiction, true?

3          A    Yes.

4          Q.   And I'm holding up -- can you actually

5     see me, Doctor?

6          A    Yes, yes, I can.

7          Q.   So I'm holding up rather awkwardly a

8     book that you have published called Drug Dealer M.D.

9     That is your book, correct?

10         A    That's correct.

11         Q.   Okay.  And this book was published in

12    2016, true?

13         A    Yes.

14         Q.   And 2016 was prior to the time that you

15    first came to work with lawyers in connection with

16    the opioid litigation, true?

17         A    Yes.

18         Q.   Your book was published, for example,

19    before you and I even met, true?

20         A    Yes.

21         Q.   Now, has this book received some

22    positive press, if you will?

23         A    Yes.

24         Q.   And, in fact, the New York Times

25    selected it as one of the top five books to read if

```
1                      Frye Hearing - Dr. Lembke              27

2      you wish to understand the opioid epidemic and how

3      we got to where we are today, true?

4              A    Yes.

5              Q.   Now, you began to treat patients with

6      substance abuse issues in the late 1990s, true?

7              A    That's correct.

8              Q.   And the substances that your patients

9      were abusing included prescription painkillers,

10     true?

11             A    Yes.

12             Q.   Prescription benzodiazepines?

13             A    Yes.

14             Q.   Alcohol, true?

15             A    Yes.

16             Q.   Tobacco?

17             A    Yes.

18             Q.   Marijuana?

19             A    Yes.

20             Q.   A panoply of addictive substances, true?

21             A    That's correct.

22             Q.   Now, had some of those patients that you

23     treated received opioid prescriptions from their own

24     doctors?

25             A    Yes.  The majority.
```

```
 1                    Frye Hearing - Dr. Lembke            28
 2          Q.    And they presented to you with some sort
 3    of a substance use disorder; is that true?
 4          A     That's right.
 5          Q.    Following the lawful prescription to
 6    them by their own physicians, true?
 7          A     That's correct.
 8          Q.    Did the book that you published include
 9    any information about prescription opioid deaths
10    among New York Medicaid patients?
11          A     Yes, it did.
12          Q.    And do you recall what your research
13    showed about New York Medicaid patients who had been
14    prescribed opioids?
15          A     It showed that New York Medicaid
16    patients are more likely to be prescribed an opioid
17    than the non-Medicaid patients and more likely to
18    die of an opioid overdose.
19          Q.    Now, is reading the medical literature,
20    a literature written by persons other than yourself,
21    is that a standard part of your practice as a doctor
22    and as a professor at Stanford University?
23          A     Yes, it is.
24          Q.    Why is that?  Why is that a standard
25    methodology in your work?
```

```
 1                Frye Hearing - Dr. Lembke              29
 2          A    I need to read the medical literature to
 3     stay up to date on the science, and to take good
 4     care of my patients, and also to teach medical
 5     students, Stanford undergraduates and physicians in
 6     training, residents and fellows.
 7          Q.   Let me ask you about those students.
 8               Do you develop a curriculum for those
 9     students?
10          A    Yes.
11          Q.   Is there any relationship between the
12     curriculum that you develop and the medical
13     literature written by persons other than yourself?
14          A    My curriculum is formed by my review of
15     the best evidence in the medical literature.
16          Q.   All right.  Now, in addition to the work
17     you've described thus far, were you ever appointed
18     to any panels within the state of California dealing
19     with opioid misuse?
20          A    Yes.  I was appointed to the research
21     advisory panel of California by Governor Jerry
22     Brown.
23          Q.   And what was the upshot of that panel?
24          A    Our role was mainly to assist the safety
25     of clinical trials being conducted in the State of
```

```
 1                    Frye Hearing - Dr. Lembke            30
 2     California.
 3          Q.    Now, you used the term "safety."   That's
 4     a term that we hear a lot of in the context of
 5     prescription medications, true?
 6          A     Yes.
 7          Q.    Safety and efficacy are two interrelated
 8     concepts in the pharmaceutical world, true?
 9          A     Yes.
10          Q.    And those are, those are two concepts
11     that the FDA pays particular attention to in respect
12     to prescription medications, true?
13          A     Yes.
14          Q.    Do safety and efficacy relate to
15     something called a risk-benefit profile?
16          A     Yes.
17          Q.    And just very briefly describe for
18     Justice Garguilo what that risk-benefit profile is
19     in the context of opioids.
20          A     So with opioids, it's just essential to
21     assess whether or not the safety of the opioid in a
22     given patient is -- whether or not the benefits in
23     that patient outweigh any risks or unintended
24     adverse medical consequences.
25          Q.    Okay.  Is it fair to say that safety and
```

1

2    efficacy are key concepts in the context of

3    prescription medications?

4         A    Yes.

5         Q.   And in the context of prescription

6    opioid medications?

7         A    Yes.

8         Q.   Now, in reaching the conclusions that

9    are discussed throughout your book published in

10   2016, did you apply the same methodology in reaching

11   those conclusions that you use in your professional

12   work as a scientific researcher and a medical

13   doctor?

14        A    Yes, I did.

15        Q.   And let me ask you this:  Are you

16   familiar with something known as a pharmaceutical

17   sales representative detailing?

18        A    I'm sorry, I didn't catch the last word.

19        Q.   Are you familiar with something known as

20   pharmaceutical sales representative detailing?

21        A    Yes, I am.

22        Q.   All right.  And is it fair to say that

23   that's the circumstance where a pharmaceutical

24   company sales representative goes into a doctor's

25   offices or other healthcare provider's offices and

1                        Frye Hearing - Dr. Lembke                    32

2       discusses, presents to the healthcare provider

3       purported information about particular drugs?

4            A    Yes, that's correct.

5            Q.   Now, in writing your book, did you --

6       did you have regard to any information concerning

7       sales representative representations about opioids

8       made to healthcare providers?

9            A    Yes.

10           Q.   You had access to materials in the

11      public domain concerning the kinds of statements and

12      documents that were being provided by sales

13      representatives, opioid sales representatives to

14      healthcare providers?

15           A    Yes.

16           Q.   These were documents that predated the

17      documents you received from the lawyers in

18      connection with the various opioid litigations,

19      true?

20           A    Yes.

21           Q.   Okay.  Now, since you were -- began to

22      do some work for the lawyers in the opioid

23      litigations, you were provided with internal company

24      documents concerning those promotional messages,

25      true?

```
 1                    Frye Hearing - Dr. Lembke              33
 2          A     That is correct.
 3          Q.    And you reviewed all of that material?
 4          A     Yes.
 5          Q.    And did you reach conclusions concerning
 6     the truth or falsity of those messages?
 7          A     Yes, we did.
 8          Q.    In reaching those conclusions, did you
 9     use the same methodology you have used historically
10     as a scientific researcher and a medical doctor in
11     the sphere of addiction medicine?
12          A     Yes.
13          Q.    That methodology, that series of steps
14     didn't change in any way as between pre litigation,
15     for example, and the work you've done in the
16     litigation?
17          A     No, it did not change.
18          Q.    Okay.  Now, have you undertaken any sort
19     of a program designed to correct any
20     misrepresentations that pharmaceutical sales
21     representatives made to healthcare providers in the
22     United States?
23          A     Yes.
24          Q.    And do you call that program academic
25     detailing in contrast to pharmaceutical sales rep
```

```
                         Frye Hearing - Dr. Lembke                34
1
2    detailing?
3              A    Yes, I do.
4              Q.   And in the course of -- and the nature
5    of that academic detailing program that you, that
6    you engage in, you actually go around the country
7    from time to time and provide lectures and other
8    support to healthcare providers to deal with the
9    potential misinformation they may have received from
10   the drug companies, true?
11             A    Yes.
12             Q.   And you've actually done this academic
13   detailing, among other places, right here in the
14   State of New York, true?
15             A    Yes.
16             Q.   And you've received thanks from the
17   various healthcare providers for presenting this
18   information correcting misinformation; is that
19   correct?
20             A    Yes.
21             Q.   You've been invited to many different
22   conferences and speaking opportunities throughout
23   the United States to provide this academic
24   detailing, true?
25             A    Yes.
```

```
 1                    Frye Hearing - Dr. Lembke              35
 2          Q.    And do you continue to do that work
 3    today?
 4          A     Yes, I do.
 5          Q.    And how many such talks, presentations,
 6    meetings would you say you've had since the
 7    publication of your book in 2016?
 8          A     I've had over 100 live speaking
 9    engagements since the publication of my book in
10    2016.
11          Q.    Okay.  I want to turn now to -- among
12    your peer-reviewed materials, you published a
13    research letter that looked at the patterns of
14    opioid prescribing under the federal Medicare
15    program; is that true?
16          A     Yes.
17          Q.    And what you want to look at was how
18    many scripts are being written for Medicare
19    beneficiaries over any particular period of time,
20    correct?
21          A     That's correct.
22          Q.    And tell Justice Garguilo what your work
23    discovered concerning prescribing under the Medicare
24    program.
25          A     We found that over one-third of Medicare
```

```
 1                  Frye Hearing - Dr. Lembke            36
 2     Part D patients is prescribed an opioid in any given
 3     year.
 4              Q.   In addition to what we've already
 5     discussed, have you provided any other public health
 6     service, such as consultation with any congressional
 7     bodies or with the White House?
 8              A    Yes.
 9              Q.   Just very briefly, what did you do in
10     that context?
11              A    I testified before lawmakers in
12     Washington regarding opioid safety and efficacy of
13     opioids.  I've been to White House meetings convened
14     to address how to target and abate the opioid
15     epidemic.
16                   I've talked with governors and other
17     lawmakers in states across the country regarding the
18     opioid problem.
19              Q.   Okay.  Now I want to turn to discuss a
20     bit with you the methodology that underlies the
21     actual opinions in this case, okay?
22              A    Yes.
23              Q.   All right.  Now, you already testified
24     that in, that in writing your book, you used the
25     same series of steps, methodology that you use in
```

```
 1                   Frye Hearing - Dr. Lembke              37

 2    your, in your scientific work and in your clinical

 3    practice, correct?

 4         A    Yes.

 5         Q.   And in reaching the opinion which we saw

 6    in Slide Number 1 of the nine opinions in this case,

 7    you reviewed scientific and medical literature

 8    concerning opioid papers that were written by folks

 9    other than you, correct?

10         A    Yes.

11         Q.   And how many such papers in connection

12    with this litigation -- and by "this litigation," I

13    mean not only this case, but the other cases in

14    which you've been engaged -- would you say you

15    looked at concerning opioids?

16         A    I've reviewed over 600 papers regarding

17    opioids in the medical literature for this

18    litigation.

19         Q.   Okay.  Now, when you say you reviewed

20    the 600 or so papers, let me ask you, first of all,

21    all of these papers or virtually all of these

22    papers, they have at the front something that's

23    called an abstract, right?

24         A    Yes.

25         Q.   And that's like a little summary of what
```

```
 1                    Frye Hearing - Dr. Lembke              38
 2     the whole paper is gonna be about, correct?
 3            A    Yes.
 4            Q.   So in looking at the 600 papers, did you
 5     just take a look at the abstract and move on?
 6            A    No.  My methodology is founded in
 7     in-depth analysis of these papers in order to
 8     determine whether or not the information in the
 9     abstract summary is reflected in the rest of the
10     paper and supported by the data that the authors put
11     forth.
12                 I'm also very careful to look at things,
13     like any conflicts of interest that the authors may
14     have and also who funded the study.
15            Q.   Well, let me see if I understand this.
16                 Are you saying that the abstract, which
17     summarizes the paper, in some instances might not be
18     accurate as a summary?
19            A    I'm saying that the abstract, in my
20     research, has shown that an abstract doesn't
21     necessarily reflect the true state of the data that
22     the authors put forth, nor does it necessarily
23     reflect an appropriate summative conclusion derived
24     from the data, which is relevant because most
25     healthcare providers, busy clinicians almost always
```

```
 1                    Frye Hearing - Dr. Lembke              39
 2      -- I won't say almost always, but very often just
 3      read the abstract.
 4             Q.   So do I gather from your answer, Doctor,
 5      that in reviewing the 600 papers in connection with
 6      the opioid litigation, you actually read every page
 7      of every study?
 8             A    Yes.
 9             Q.   So we have an example of what you just
10      testified to.  Could we put up Slide Number 2,
11      please.
12                  Doctor, can you see that slide?
13             A    Yes, I can.
14             Q.   Now, correct me if I'm wrong, this is a
15      part, a pullout, if you will, from a paper by a
16      Dr. Chou, C-H-O-U, that you reviewed as part of your
17      work in connection with this case, correct?
18             A    That's correct.  It's by a large number
19      of authors.  Dr. Chou is the first author.
20             Q.   Correct.  And so what we're seeing here
21      is we've pulled out the abstract, and you've
22      actually highlighted a part of the abstract that
23      reads:  "Chronic opioid therapy can be an effective
24      therapy for carefully selected and monitored
25      patients with chronic non-cancer pain."
```

```
 1                    Frye Hearing - Dr. Lembke              40

 2             Do you see that?

 3        A    Yes.

 4        Q.   And why did you highlight that as part

 5   of your testimony here today?

 6        A    I highlighted that because that

 7   statement is not reflective of the evidence, and I

 8   think it would be misleading for many readers if

 9   they only read the abstract.

10             Furthermore, the recommendations of the

11   authors are -- and I highlighted the strong

12   recommendation for the use of chronic opioid therapy

13   in the treatment of chronic non-cancer pain, which

14   they then briefly qualify with the words "low

15   quality evidence," which is strange that they would

16   have a strong recommendation for a treatment that

17   has low quality evidence.

18             Furthermore, reading more in depth, it

19   becomes evident that the authors themselves know

20   that the evidence is insufficient, the evidence for

21   the use of opioids in treatment of chronic

22   non-cancer pain is insufficient to assess the

23   effects on health outcomes, which is that third box

24   pulled out below.

25             It's also worth mentioning that that low
```

1

2   quality information is in an appendix of the

3   article.  So you really have to go digging for it.

4            THE COURT:  Excuse me.  Doctor, who

5        prepares the abstract, the author or someone

6        else?

7            THE WITNESS:  The abstract is prepared

8        by the authors.

9            THE COURT:  Okay.  Thank you.

10  BY MR. HANLY:

11       Q.   And, Doctor, essentially what you are

12  calling out is the inconsistency between the

13  sentence in the abstract that says:  "Chronic opioid

14  therapy can be effective," and the sentence at the

15  very bottom that says:  "Evidence is insufficient to

16  assess effects on health outcomes," true?  That

17  stuff --

18       A    Yes.  Yes.  And this is a pattern that

19  repeats itself throughout the medical literature

20  when looking at the data on opioid use for chronic

21  pain.

22       Q.   Now, there's something else about this

23  paper, is there not, that caught your attention?

24  Could we have Slide Number 3, please.

25            And this is from the appendix.  It's a

```
1                    Frye Hearing - Dr. Lembke            42

2      little hard to read, but this is the list of panel

3      members who participated in the promulgation of this

4      paper, true?

5             A    Yes.  So it is standards that all

6      authors who publish in peer-reviewed journals must

7      declare their financial conflicts of interest.

8                  And what's notable here is that more

9      than half of the authors in this 2009 publication

10     who strongly recommended the use of opioids in the

11     treatment of chronic pain, despite weak and

12     insufficient evidence, were, in fact, receiving

13     financial fees, consultative fees from the opioid

14     industry.

15            Q.   Okay.  And, in fact, we see here under

16     Dr. Perry Fine, he discloses that he serves on

17     advisory boards for a number of different companies,

18     including Johnson & Johnson, Purdue Pharma and Endo.

19     Do you see that?

20            A    Yes.

21                 THE COURT:  Apparently -- correct me if

22                 I'm wrong -- Dr. Fine and Dr. Portenoy appear

23                 in the original, in the original Complaint --

24                 MR. HANLY:  Precisely, your Honor.

25                 THE COURT:  -- as Defendants.
```

```
 1                    Frye Hearing - Dr. Lembke              43

 2              MR. HANLY:  As Defendants, that's

 3       correct.

 4   BY MR. HANLY:

 5         Q.   And as the Court already noted, we have

 6   Dr. Portenoy there in the box below, and

 7   Dr. Portenoy discloses consulting agreements with an

 8   extensive list of pharmaceutical companies estimated

 9   to work with four to five within a three-year

10   period, et cetera, correct?

11         A    Yes.

12         Q.   And is this in-depth analysis of

13   scientific literature published by folks other than

14   yourself, is that a standard method in order to

15   reach conclusions about, for example, the

16   effectiveness of opioids for chronic pain?

17         A    Yes.

18         Q.   And is that the methodology that you

19   followed as part of getting to your opinions in this

20   case and your opinions in your pre litigation book?

21         A    Yes.

22         Q.   Now, in looking at these 600 papers that

23   you looked at -- I'm finished with that slide.

24   Thank you.

25              In selecting the papers to review, the
```

1
2    600 or so, did you exclude papers that contained
3    views that disagreed with yours?
4         A    No.
5         Q.   Why did you include papers which
6    disagreed with yours as part of your methodology?
7         A    Well, those are the papers that would be
8    important for me to look at even more closely to
9    understand how those authors came to conclusions
10   that seem to be going in a direction different from
11   the conclusions that I'm deriving from the evidence.
12        Q.   All right.  Now, did you review
13   something that's become known, become legendary, if
14   you will, in this litigation called the Porter and
15   Jick letter?
16        A    Yes.
17             MR. HANLY:  Could we put up Slide Number
18        4, please.
19   BY MR. HANLY:
20        Q.   Now, Doctor, can you see that screen?
21        A    Yes, I can.
22        Q.   This is the entirety of the Porter and
23   Jick paper, true?
24        A    Yes.  I wouldn't even call it a paper.
25   It's a letter to the editor.

```
 1                    Frye Hearing - Dr. Lembke                45
 2          Q.   Right.  It's an 11-line, five-sentence
 3     letter to the editor from the New England Journal of
 4     Medicine in 1980 that essentially was a review of
 5     some 12,000 patient hospital charts to see whether
 6     in those charts the healthcare provider had noted
 7     any signs of addiction to the narcotic drugs that
 8     had been administered to those 12,000 patients,
 9     correct?
10          A    Yes.
11          Q.   This letter has been cited close to a
12     thousand times in the medical literature since 1980,
13     true?
14          A    Yes.
15          Q.   This letter was used by the
16     pharmaceutical opioid manufacturers to support the
17     idea that addiction in patients taking opioids was
18     extremely rare, true?
19               MS. STRONG:  Objection, your Honor.
20               THE COURT:  There's an objection.
21          What's the nature of the objection?
22               MS. STRONG:  Your Honor, it's leading.
23          I know we're being very lenient with leading,
24          but when it comes to feeding the expert
25          substantive components of the opinion, I
```

1                    Frye Hearing - Dr. Lembke              46

2          would ask that they not lead, your Honor.

3              THE COURT:  I agree.  Rephrase the

4          question.

5              MR. HANLY:  Sure thing.

6   BY MR. HANLY:

7          Q.   Dr. Lembke, employing your usual

8   methodology for examining a scientific publication,

9   did you use that methodology in connection with this

10  letter to the editor?

11         A    Yes.

12         Q.   And can you tell the Court what history

13  teaches happened after the publication of this

14  letter?

15         A    Well, I think it's important to note,

16  first, that in my review of the medical literature,

17  I saw this article frequently cited.  I also saw it

18  cited in promotional material from the opioid

19  industry.

20              But what's important to note about this

21  data point is that it's a very low quality piece of

22  evidence.  It's not purely a peer-reviewed paper.

23  It's a letter to the editor.  It's not

24  representative of the types of patients who are --

25  have become dependent on and addicted to opioids in

```
1                      Frye Hearing - Dr. Lembke          47

2     the United States today.

3               These are hospitalized patients, many of

4     who received a single dose of an opioid administered

5     by a healthcare provider.  This is not a reliable

6     piece of evidence to consider the risk of addiction

7     in ambulatory outpatients receiving opioids in large

8     quantities for long duration.

9               Nonetheless, this paper had a huge

10    influence on opioid prescribing and the healthcare

11    perspective on the safety of opioids in the

12    treatment of pain, such that it contributed to an

13    increase in opioid prescribing.

14              MR. HANLY:  Thank you, Doctor.

15              You can take that slide down now,

16         please.

17    BY MR. HANLY:

18         Q.   Now, during the course of your work in

19    this case, Doctor, we've already established that

20    you looked at certain materials provided to you by

21    the Plaintiffs' lawyers from the Defendants internal

22    files concerning statements about the safety and

23    efficacy of opioids, true?

24         A    Yes.

25         Q.   And did you, as part of your work in
```

1

2       this case, did you compare those documents, the

3       statements in those documents with the medical

4       literature to see whether the statements made by the

5       manufacturers were consistent with the medical

6       literature?

7               A    Yes, I did.

8               Q.   And what did you, as part of your

9       methodology, what did you discover?

10              A    I discovered that there were many

11      inconsistencies in terms of what the promotional

12      material was saying about the safety and efficacy

13      and what the evidence was saying about safety and

14      efficacy.

15              Q.   Now, in addition to your review of the

16      published medical literature by doctors other than

17      yourself, did you, in forming your opinions in this

18      case, did you rely on your clinical experience

19      treating patients with pain and substance use

20      issues?

21              A    Yes.

22              Q.   And can you just briefly explain how

23      your personal professional experience figured into

24      the methodology that underlies the opinions you give

25      -- you intend to give, with the Court's permission,

```
 1                    Frye Hearing - Dr. Lembke              49

 2    in this case?

 3          A     So I observed thousands of patients over

 4    the past 20 years becoming addicted to prescription

 5    opioids, and I went to the medical literature to see

 6    whether or not there was evidence to support my

 7    clinical experience, whether my clinical experience

 8    was not based in evidence.  And when my clinical

 9    experience seemed to be divergent from the evidence,

10    I tried to figure out what I might be missing in

11    terms of my clinical impression.

12               So the medical science was very

13    important, touchstone in terms of evaluating my

14    clinical experience.

15          Q.   Okay.  You used the term evidence a

16    couple of times in your answer and his Honor, I

17    believe, has heard of the concept of evidence-based

18    medicine.  Is that a concept you're familiar with?

19          A     Yes, it is.

20          Q.   And, very briefly, what does that

21    concept connote?

22          A     Evidence-based medicine speaks to the

23    idea that when we ground medical practice in science

24    we will have better medical care.  So it's important

25    to, you know, clinical experience is important, but
```

```
 1                   Frye Hearing - Dr. Lembke              50

 2     it's important to reflect on our clinical experience

 3     in the context of the scientific evidence.

 4          Q.    And do you, as part of your methodology

 5     in this case, did you -- did you employ

 6     evidence-based medicine?

 7          A    Yes.

 8          Q.    Now, let me ask you, in applying your

 9     methodology to reach your opinions in this case, did

10     you determine whether you were able to state those

11     opinions to a reasonable degree of scientific and

12     medical certainty?

13          A    Yes.

14          Q.    And are you?

15          A    Yes.

16          Q.    Now, let's talk about some basic terms.

17     Then we'll go through this section quickly, but just

18     so that we have for the record, let's start with the

19     basics.  Just tell the Court very briefly what

20     opioids are.

21          A    So opioids are molecules that bind to

22     opioid receptors in the brain, and they have very

23     powerful effects.  They can relieve pain in the

24     short-term.

25               They also stimulate a part of the brain
```

```
1                    Frye Hearing - Dr. Lembke              51

2       called the dopamine reward pathway, which is why

3       they are highly addictive.  And they also work on a

4       part of the brain called the brain stem, which

5       controls the breathing rate, and they can slow --

6       powerfully slow down the breathing rate and the

7       heart rate, which is why they're very, very lethal

8       and why people overdose and die from them.

9           Q.   All right.  Now, the first opinion of

10      your nine opinions on the list relates to addiction

11      to opioids, correct?

12          A    Yes.

13          Q.   And you state in that opinion that

14      addiction, addiction is a chronic illness.  So

15      staying with the basics, there are accepted

16      definitions of addiction within the area of

17      addiction medicine, true?

18          A    Yes.

19               MR. HANLY:  All right.  Can we put up

20          Slide Number 5, please.

21      BY MR. HANLY:

22          Q.   And while we're doing that, I will ask

23      the Doctor, is there a body called the American

24      Society of Addiction Medicine?

25          A    Yes.
```

```
 1                   Frye Hearing - Dr. Lembke              52

 2             Q.    And is that a body that you are, in some

 3       fashion, a member of?

 4             A    Yes.

 5             Q.    And that's a body that is interested in

 6       issues surrounding addiction, true?

 7             A    Yes.  It's a professional medical

 8       society for healthcare providers who treat and

 9       research addiction.

10             Q.    Okay.  And the American Society of

11       Addiction Medicine came up with this definition of

12       addiction which reads:  Addiction is a treatable,

13       chronic medical disease involving complex

14       interactions, paraphrasing, and an individual's life

15       experiences.

16                   People with addiction use substances --

17       or -- use substances.  People with addiction use

18       substances or engage in behaviors that become

19       compulsive and often continue despite harmful

20       consequences.

21                   Prevention efforts and treatment

22       approaches for addiction are generally as successful

23       as those for other chronic diseases.

24                   Did I read that correctly?

25             A    Yes.
```

1

2          Q.    Okay.  And is this definition by the

3     American Society of Addiction Medicine, is that some

4     sort of an outlier?

5          A    No.  That's a well-accepted definition

6     of addiction medicine, addiction in the field.

7          Q.    All right.  It's regarded as a -- strike

8     that.

9               Did this definition, promulgated by this

10    Society of Addiction Medicine, result from some sort

11    of a consensus of experts in the field?

12         A    Yes.

13              MR. HANLY:  Thank you.  I'm finished

14         with that.

15    BY MR. HANLY:

16         Q.    Now, there's -- just anticipating

17    potential questions from the esteemed lawyers for

18    the drug companies, there's another organization

19    called the American Psychiatric Association, which

20    has a slightly different definition of addiction,

21    true?

22         A    Yes.  You're speaking of the Diagnostic

23    and Statistical Manual of Mental Disorders?

24         Q.    Yes.  What's called the DSM.

25              And the DSM, which is a publication of

```
 1                    Frye Hearing - Dr. Lembke            54

 2     the American Psychiatric Association, it uses the

 3     term -- instead of addiction, it uses the term

 4     opioid use disorder, true?

 5          A    Yes.

 6          Q.   The Judge has heard that from prior

 7     testimony, sometimes called OUD, true?

 8          A    Yes.  I don't know what the Judge has

 9     heard before, but, yes.

10          Q.   Okay.  If you accept that, I think we'll

11     be okay.

12               Now, is there, based on your review of

13     the medical literature concerning addiction and your

14     20 years or so --

15          A    I'm sorry, I can't hear you when you

16     walk away from the microphone.  I'm sorry.

17          Q.   I'm sorry.  Based upon your experience

18     as a scientist and a doctor engaged in these -- the

19     area of addiction medicine, is there any real

20     difference between the definitions of addiction that

21     the American Society came out with and the

22     definition of opioid use disorder that the American

23     Psychiatric Association has adopted?

24          A    No.  In essence, they're saying the same

25     thing.
```

```
 1                  Frye Hearing - Dr. Lembke            55
 2          Q.   Okay.  Now, in your Opinion Number 2 in
 3     this case, which is part of Slide Number 1, but we
 4     don't need to put it up, you state:  Opioid
 5     prescribing grows fourfold starting in the 1990s,
 6     which increased the supply of potent and deadly
 7     opioids, et cetera, including in New York, correct?
 8          A    Yes.
 9          Q.   And elsewhere you've written of what you
10     call a paradigm shift in the prescribing by doctors
11     of opioids beginning in the 1990s, true?
12          A    Yes.
13          Q.   So what happened in the 1990s that was
14     different from what happened over the decades prior
15     to the 1990s in connection with physicians'
16     prescribing habits for opioids?
17          A    Yes, so this was a shift that really
18     began in the 1980s with the advent of the hospice
19     movement and then really gained momentum in the
20     1990s, but the shift was essentially the following:
21               Prior to 1980 doctors were very
22     reluctant to prescribe opioids for their patients
23     because they were concerned that their patients
24     would get addicted.
25               This was based on historical prior
```

1                      Frye Hearing - Dr. Lembke                    56

2      doctor-caused opioid epidemic back -- dating back at

3      least to the Civil War, early 1900s.  But in the

4      1990s there was a huge change in the way that

5      doctors were trained to regard opioids.

6                They were taught that opioids -- that

7      the risk of addiction to opioids are -- is very,

8      very small, as long as the opioids are being

9      prescribed by a doctor for a patient with real pain

10     and real disease, that somehow that prescription pad

11     could confer some kind of halo effect, and the fact

12     that the patient had serious pain would protect them

13     from addiction.

14                Doctors were also taught that opioids

15     are effective treatment for chronic pain and that

16     you can continue to go up on the dose without

17     endangering a patient.

18                So these were huge changes in the way

19     that opioids came to be used, and the treatment

20     really began in medical school.

21                I went to medical school in the 1990s,

22     and I was the recipient of this training.

23          Q.   And what you just described, Doctor, is

24     there any historical evidence to support what you

25     just said, for example, in the literature?

```
1                    Frye Hearing - Dr. Lembke          57
2              A    Yes.  So there are studies,
3      peer-reviewed literature showing that the risk of
4      addiction is quite common, even among patients who
5      are prescribed opioids by a doctor for pain.  And
6      those data points predate this paradigm shift that
7      occurred in the 1990s.
8                    So the bottom line is we, as a
9      healthcare institution, knew that this risk was
10     there, and then we collectively forgot it for about
11     two or three decades.
12             Q.   Your Opinion Number 2 that we've been
13     talking about, this increase of prescribing,
14     fourfold increase, four times what had been
15     prescribed earlier, is there, is there any consensus
16     in the areas of addiction medicine as to whether
17     this increase resulted in any increase in
18     unfavorable outcomes for the patients?
19                  THE COURT:  Just yes or no.  Just yes or
20             no, Doctor.
21             A    Yes.
22                  MR. HANLY:  All right.  And could we put
23             up Slide Number 6.
24     BY MR. HANLY:
25             Q.   And let me ask you, Doctor, is there, is
```

1

2    there data from the Centers for Disease Control

3    concerning the increase of prescriptions along with

4    potentially adverse events?

5         A    Yes.

6         Q.   And please describe for Justice Garguilo

7    what is, what is shown here in this, in this graph

8    with the three lines going from left to right.

9         A    This graph shows that as the sales of

10   prescription opioids increased between 1999 and

11   2010, so did opioid-related overdose deaths, as well

12   as the number of people presenting to addiction

13   treatment centers with opioid addiction.

14        Q.   Okay.  So, just for the record, the

15   green line, which is at the top, reflects sales; is

16   that correct?

17        A    Yes.

18        Q.   Of prescription opioids, yes?

19        A    Yes.  Yes, it does.

20        Q.   And the middle line is showing overdose

21   deaths; is that right, Doctor?

22        A    Yes, that's correct.

23        Q.   And the bottom line, the orange line is

24   showing treatment admissions for folks suffering

25   from opioid use disorder, true?

```
 1                   Frye Hearing - Dr. Lembke            59
 2           A    True.
 3           Q.   Okay.  Now -- and this, is this CDC data
 4      generally accepted by folks in the addiction
 5      medicine area as being reliable?
 6           A    Yes.
 7           Q.   Did you -- did you use this as part of
 8      your methodology in reaching your Opinion Number 2
 9      in this case?
10           A    Yes.
11           Q.   Okay.  Now, did this phenomenon of the
12      fourfold -- you can take that down, slide down,
13      please.
14                Did this phenomenon that you've
15      described as a fourfold increase in prescriptions,
16      did this happen also in the State of New York?
17           A    Yes, it did.
18                MR. HANLY:  Could we have Slide Number
19           7, please.
20      BY MR. HANLY:
21           Q.   Now, Slide Number 7 is titled, Amount of
22      Opioids Prescribed in State of New York between 1997
23      and 2016, almost a 20-year period, true?
24           A    Yes.
25           Q.   And I'm sure Justice Garguilo -- I hope
```

```
 1
 2   Justice Garguilo can see this, but just explain,
 3   very briefly, what do we see here?
 4        A    Well, what we see here is that in 1997,
 5   100 morphine milligram equivalent was prescribed per
 6   person in the State of New York, and between 1997
 7   and 2016 that increased almost fivefold.
 8             MR. HANLY:  Okay.  Thank you.  You can
 9        take that slide down.
10   BY MR. HANLY:
11        Q.   Now, Doctor, I want to talk a little bit
12   briefly, I hope, about the methodology and the bases
13   for your Opinion Number 3 in this case, which is
14   that the opioid industry misled doctors into
15   believing that opioids are more effective, et
16   cetera, okay?
17        A    Yes.
18        Q.   And I noticed that part of the subtitle
19   of your book, Drug Dealer M.D., is how doctors were
20   duped, correct?
21        A    Yes.
22        Q.   And can you explain to the Court what
23   you meant by that, that the doctors were duped?
24        A    The doctors were duped by the
25   pharmaceutical opioid industry into believing that
```

1                         Frye Hearing - Dr. Lembke                    61

2       opioids are safer than they really are and more

3       effective than they really are.

4                 Q.    Okay.  And in the book you talk about --

5                       MR. PYSER:  Your Honor, this is Steven

6                 Pyser for Cardinal Health.  I'm just going to

7                 register an objection and apologies for the

8                 late objection.

9                       Vague on the question, the meaning of

10                what the pharmaceutical opioid industry is

11                here.  That's not a term that really has a

12                definition, and as distributors, we don't

13                believe that to be a part of anything.

14                      I think the testimony needs to be more

15                specific.

16                      THE COURT:  I think the doctor is

17                basically testifying to her findings and

18                impressions, of course, subject to your

19                cross-examination.  Am I missing the point of

20                your objection?  If I am, tell me.

21                      MR. PYSER:  Yeah, just, your Honor, that

22                the term is vague.  What this pharmaceutical

23                opioid industry is is not defined, and it's

24                being used in a way that is very unclear

25                through the testimony.

```
 1                    Frye Hearing - Dr. Lembke            62

 2                THE COURT:  Mr. Hanly, develop that

 3           record.

 4                MR. HANLY:  I can rephrase, your Honor.

 5                THE COURT:  Rephrase it.

 6      BY MR. HANLY:

 7           Q.   Doctor, in your book you discuss the

 8      alleged fact that certain companies engaged in the

 9      manufacture of opioids created a false narrative; is

10      that fair?

11           A    Yes.

12           Q.   Okay.  And you -- and you've already

13      explained what you meant by that part of the

14      subtitle that says that the doctors were duped,

15      okay?

16           A    Yes.

17           Q.   Okay.  Now, in your book you talk about

18      certain myths that certain opioid-related companies

19      promulgated, correct?

20           A    Yes.

21                MR. HANLY:  Okay.  And let's take a look

22           at an example of a piece of marketing

23           material that, that we have as Slide Number

24           8.  Could we put up Slide Number 8, please.

25      BY MR. HANLY:
```

```
 1                    Frye Hearing - Dr. Lembke            63

 2          Q.    Doctor, Slide Number 8 is actually a

 3    page within a marketing brochure that was

 4    distributed under the auspices of something called

 5    the American Academy of Pain Medicine.  Do I have

 6    that organization correct?

 7          A     Yes.  That was not the only organization

 8    that was involved, but yes.

 9          Q.    Okay.  This also was a piece of

10    marketing material that was used and disseminated by

11    a company called Janssen; is that correct?

12          A     Yes.  This was promoted as an

13    educational booklet.

14          Q.    Okay.  And so this is the authors of

15    this piece saying that, Number 1, it is a myth that

16    opioid medications are always addictive and that the

17    true fact, appearing right there, is that many

18    studies show that opioids are rarely -- and they

19    emphasize the word rarely -- addictive when used

20    properly for the management of chronic pain,

21    correct?

22          A     Yes, that's correct.  That's what it

23    says.

24          Q.    Right.  And as part of your opinions in

25    this case, you came to the conclusion that that
```

1

2    so-called fact is, in fact, a falsehood?

3        A    Yes.

4        Q.   And explain why it's false.

5        A    Their use of the term rarely addictive

6    is not based on science.  What we see is that

7    between 10 percent and 30 percent of patients

8    prescribed an opioid by a doctor for chronic pain

9    will develop some kind of opioid use disorder.

10       Q.   Okay.

11       A    And, furthermore, this was known prior

12   to the publication of this so-called educational

13   pamphlet.

14       Q.   Okay.  And the second myth that the

15   certain companies engaged in opioid manufacture said

16   was, in fact, a myth is that opioids make it harder

17   to function normally, and what the pamphlet says is,

18   no, that's not correct.  When used correctly for

19   appropriate conditions, opioids may make it easier

20   for people to live normally.  That's what the answer

21   is supposed to be, right?

22       A    Yes.

23       Q.   And is that answer based upon the use of

24   your methodology reviewing 600 articles and your

25   20-odd years of clinical practice; is that a true

```
 1                    Frye Hearing - Dr. Lembke            65
 2     statement?
 3              A    No.
 4              Q.   Okay.  And then the last so-called myth
 5     that the certain of these companies supported is
 6     that opioid doses have to get bigger over time
 7     because the body gets used to them, and they say,
 8     well, that's not true.  The true fact is that unless
 9     the underlying cause of your pain gets worse, such
10     as with cancer or arthritis, you will probably
11     remain on the same dose or need only small increases
12     over time.
13              Is that alleged fact true or false based
14     upon your methodology in this case?
15              A    That is false.
16              MR. HANLY:  Now -- your Honor, did you
17              want to take a break at this point?
18              THE COURT:  Talk to my stenographer,
19              when her fingers get tired.
20              MR. HANLY:  I'm flying along.
21              THE COURT:  As a matter of fact, she's
22              getting a note right now from me telling me
23              to give me a heads-up when she needs a break.
24              MR. HANLY:  Okay.  I just want to make
25              sure I'm doing what the Court wants.
```

```
 1                    Frye Hearing - Dr. Lembke              66
 2    BY MR. HANLY:
 3          Q.    All right.  Now, Doctor, we actually
 4    created a slide that contains Dr. Lembke's myths
 5    about opioids, true?
 6          A    Yes.
 7                MR. HANLY:  Could we have Slide Number
 8          9, please.
 9    BY MR. HANLY:
10          Q.    And what you created here is, in part,
11    contradicts what we just saw from certain
12    opioid-related companies, correct?
13          A    Yes.
14          Q.    And we've already gone over this, but
15    very quickly, you say that it's a myth that the risk
16    of addiction is rare.  You say it's a myth that
17    opioids are effective in treating chronic pain.  You
18    say it's a myth that no dose is too high.  And you
19    say it's a myth of a concept called pseudoaddiction
20    which, am I correct, is the notion that if you're
21    craving more of the drug, you may not -- that may
22    not be addiction at all but simply your body crying
23    out for pain relief; is that correct?
24          A    Yes.  I think pseudoaddiction means that
25    if you're manifesting many of the signs and symptoms
```

```
 1                      Frye Hearing - Dr. Lembke              67
 2     of addiction, you're not really addicted, you're in
 3     pain, and the solution is to give more opioids.
 4             Q.   Okay.  And we've already established
 5     what you did in terms of your methodology with
 6     respect to Myth Number 1, that becoming addictive --
 7     addicted is rare.
 8                  With respect to Myth Number 2, that
 9     opioids are effective in treating chronic pain, just
10     very briefly, was the methodology any different that
11     you employed?
12             A    No.
13             Q.   And how about with respect to your claim
14     here that it's a myth that no dose is too high; did
15     you employ that same methodology?
16             A    Yes.
17             Q.   Did you look at -- did you look at
18     scientific papers published by people other than
19     you?
20             A    Yes.
21             Q.   Okay.  And the same with respect to Myth
22     Number 4, any difference in the methodology that you
23     used?
24             A    No.
25             Q.   Basically two components of your
```

```
1                        Frye Hearing - Dr. Lembke            68
2       methodology, is that correct, your review, in-depth
3       review of the substantial body of medical literature
4       taken together with your, what I'll call your
5       personal professional experience, meaning your
6       clinical practice and your interaction with other
7       healthcare providers; is that fair?
8               A    Yes.
9               Q.   Now, let's, let's look at Slide Number
10      10, please, and tell Justice Garguilo, this is
11      headed, Prescription Opioids are as Addictive as
12      Heroin.  That's rather a strong statement; isn't it,
13      Doctor?
14              A    Yes, it is.
15              Q.   And tell Justice Garguilo what we've
16      done here.  We've pulled out these two, two
17      quotations, quotations from a medical paper by an
18      author named Harbaugh that appeared in the Journal
19      of Pediatrics in 2018.  So what is the point of this
20      -- these quotes?
21              A    There is consensus in the medical
22      profession that heroin is -- that prescription
23      opioids, Schedule II prescription opioids are as
24      addictive as heroin, that there's really no
25      difference between heroin and prescribed opioids for
```

1    pain.

2         Q.   By the way, is the Journal of Pediatrics

3    based on your work in researching medical journals;

4    is that a peer-reviewed journal?

5         A    Yes, it is.

6         Q.   Does it have -- is it regarded as

7    reputable?

8         A    Yes, it is.

9         Q.   Now, let's next look at Slide Number 11,

10   which relates to your Opinion Number 4, and this,

11   this is Opinion Number 4, the heading, There is no

12   reliable evidence that opioids work for chronic

13   pain.  And in reaching that conclusion, what did you

14   do?

15        A    I reviewed many, many articles, clinical

16   trials, observational studies, epidemiologic studies

17   looking at whether or not long-term opioid therapy

18   is effective in the treatment of chronic pain.

19        Q.   And is this an article that you looked

20   at?

21        A    Yes.

22        Q.   Is -- and the journal is called Pain?

23        A    Yes.

24        Q.   Is that a peer-reviewed paper?

```
 1                     Frye Hearing - Dr. Lembke          70
 2          A    Yes.
 3          Q.   Is it the only paper that you relied
 4     upon in reaching your conclusion that there's no
 5     reliable evidence that opioids work for chronic
 6     pain?
 7          A    No.
 8               MR. HANLY:  Okay.  Sorry, your Honor.  I
 9          just lost my track.
10               Could we put up Slide Number 12, please.
11               MS. STRONG:  Your Honor, objection.
12          This is Sabrina Strong for Johnson & Johnson.
13          This is one of those documents, it appears,
14          your Honor, where they're relying upon
15          something that was submitted to us for the
16          first time yesterday at 4:40 p.m. from their
17          supplemental material considered list, and we
18          would object to any questions relating to
19          this document on this slide on that basis,
20          your Honor.
21               THE COURT:  Mr. Hanly.
22               MR. HANLY:  Again, your Honor,
23          Ms. Strong is a leading member of the
24          national defense team, and in that capacity,
25          she would have had access to the supplemental
```

```
 1              Frye Hearing - Dr. Lembke          71
 2       materials provided on August the 3rd in
 3       connection with the West Virginia cases.
 4            THE COURT:  Ms. Strong, early on, did
 5       the Court not rule or direct an importation
 6       of all of the information -- I'll call it
 7       information -- all of the discovery that was
 8       handed over and exchanged in the MDL handled
 9       by Judge Polster to this Court; and if so,
10       was this thing, this piece of paper, this
11       document, a part of that exchange?
12            MS. STRONG:  My understanding, your
13       Honor, is that he is referencing the West
14       Virginia case, not the MDL.  I don't believe
15       we're in the case to which he is referring,
16       but, again, I want to double-check that, but
17       that's my understanding, your Honor.
18            So, no, I don't believe he's talking
19       about materials that were produced in the
20       MDL.
21            MR. PYSER:  Your Honor, this is Steven
22       Pyser, Cardinal Health.  I am in the West
23       Virginia case.  That's why I raised it
24       earlier as well.  If I'm understanding
25       Mr. Hanly correctly, what he's referring to,
```

```
 1                    Frye Hearing - Dr. Lembke              72
 2        that is not the case before Judge Polster.
 3        And as well, incorporating discovery into the
 4        record does not mean that an expert relied on
 5        it.
 6             We have a report in this case in New
 7        York in which this document is not mentioned.
 8        If it was mentioned in another case in
 9        another opinion that takes different
10        positions, I do not believe that the witness
11        for the State can just incorporate every
12        report that Dr. Lembke has ever written,
13        including reports against Defendants --
14        excuse me -- including reports in cases in
15        which some Defendants aren't even a part of.
16        So we also object to the inclusion of this
17        document.
18             THE COURT:  I have a couple of points
19        I'd suggest.  You all entered into a
20        Stipulation in connection with these
21        hearings, part and parcel of that Stipulation
22        was that any information, any documents that
23        made their way into evidence in this case to
24        which a party objects, that objection is
25        preserved in the event of a trial.
```

1

2          The second point -- Mr. Hanly, this is

3     directed to you.  This Court made it -- and,

4     by the way, it's directed to all counsel.

5     This Court, in the last go-around, referenced

6     a case, Guerra, G-U-E-R-R-A, versus

7     D-I-T-T-A, 220 New York Slip Opinion 03771, a

8     Second Department case that just came down in

9     July of this year, and I believe -- I don't

10    believe I know that the Court suggested,

11    certainly the last session, perhaps the

12    session before that, that in connection with

13    these hearings, the Court was focusing in on

14    two very specific areas, whether or not the

15    methodology can meet the requirements of

16    general acceptance, and whether or not if the

17    methodology is appropriately applied, the

18    results can be deemed reliable.

19         Of course, as noted in the Ditta case,

20    that the actual question, the actual issue of

21    whether or not the opinion will ever make its

22    way to the finder of fact at trial relies

23    upon the foundation that is laid by the

24    person offering the evidence or the lack of

25    foundation by the person or the entities or

1

2      the lawyers opposing it.

3           We're going a long way, we have been

4      going a long way in both the direct

5      examination and the cross-examination, and

6      away from those two very, very basic

7      precepts, general acceptance and reliability.

8           The doctor is, of course, permitted to

9      -- all witnesses are permitted to, as a

10     matter of fact, they're required to set forth

11     their methodology, and the inference that the

12     person offering the evidence seeks to gain

13     from the Court, it's okay, it's generally

14     accepted methodology, and whether or not the

15     testimony indicates that the appropriate use

16     of the methodology will result in a reliable

17     conclusion, period.

18          That's the step one in what I call the

19     "Fryebert" analysis.  Step 2 will await, if

20     need be, a trial.  So here's my point -- by

21     the way, Mr. Hanly, I ask this to everybody.

22          The Court, of course, has had an

23     opportunity to review the decisions in the

24     MDL concerning this witness, and it broke

25     down to essentially two areas:  a marketing

```
1              Frye Hearing - Dr. Lembke              75
2         causation and a gateway argument or
3         suggestion.
4              Are we beyond that in this case;
5         meaning, is there something beyond those two
6         general areas that you seek to elicit from
7         this witness?  I mean, I know I have nine
8         points, but do the nine points fit within
9         that framework that Judge Polster --
10        MR. HANLY:  I think it's slightly
11        broader at least than what your Honor just
12        articulated, because Dr. Lembke's opinions
13        include --
14             THE COURT:  Gateway.
15             MR. HANLY:  Gateway, supply, the effect
16        of increased prescribing and so on.  And, of
17        course, the whole issue of marketing
18        representations made by the Defendants.
19             Now, with respect to marketing causation
20        as Judge Polster opined, that's something
21        different from the ability of a witness, such
22        as Dr. Lembke, to testify based upon her, her
23        extensive work and her methodology, and her
24        interaction with physicians throughout the
25        United States that these marketing messages
```

```
 1                  Frye Hearing - Dr. Lembke              76
 2     have an influence.
 3          That's a different, that's a different
 4     conclusion than the conclusion under some
 5     sort of marketing causation analysis.
 6          THE COURT:  He was clearly impressed
 7     with her credentials.  I believe in the short
 8     version of his decision was as to marketing
 9     causation in the absence of some kind of
10     marketing background, not only this witness,
11     but another witness would be prohibited,
12     although he does make it a point in his
13     decision to say, in all other respects, that
14     witness' opinions can be, can be pursued at
15     trial.
16          MS. STRONG:  Your Honor.
17          THE COURT:  Yes.  This is Ms. Strong?
18          MS. STRONG:  Yes.  This is Sabrina
19     Strong on behalf of Johnson & Johnson.
20          I would just note that what Mr. Hanly
21     said does not seem to comport with what Judge
22     Polster decided.  I'm reading from his
23     opinion at page 12, and it says expressly
24     (READING:)  The Court finds Lembke may not
25     testify regarding the effect that Defendants'
```

2       marketing and promotional efforts had on a

3       doctor's prescribing practices.

4            He goes on to say he's excluding those

5       opinions that purport to find Defendants'

6       marketing efforts resulted in or caused

7       increased sales and/or increased

8       prescriptions of opioids.

9            I think that's precisely what Mr. Hanly

10      was just referencing to you, your Honor, and

11      that is an issue.

12           I would agree that the scope of his

13      direct seems to be going far beyond what

14      we're talking about in terms of marketing

15      causation, which I think is what we're here

16      for, your Honor, but I just wanted to make

17      that point for clarity.

18           THE COURT:  And as I noted at page 12,

19      he also notes the Court's ruling does not in

20      any way affect Lembke's remaining opinions,

21      including the remainder of her 3rd and 5th

22      opinions regarding the inaccuracy of

23      statements and representations of Defendants'

24      marketing materials and other promotional

25      and/or educational efforts.

```
 1              Frye Hearing - Dr. Lembke              78
 2              Here's my ruling.  I'll sustain your
 3      objection.
 4              And now we'll take a 15-minute break.
 5              MS. STRONG:  Thank you, your Honor.
 6              (WHEREUPON, a short recess was taken.)
 7              THE CLERK:  Come to order.  Part 48 is
 8      back in session.
 9              THE COURT:  Remind the witness, please.
10              THE CLERK:  Oh, I'm sorry.  I remind
11      you, Doctor, you are still under oath.
12              MS. STRONG:  Your Honor, it's Sabrina
13      Strong.  One note before we begin.
14              THE COURT:  Wait a second.  Say it
15      again.
16              MS. STRONG:  Just one note before we
17      begin.  Can we have a sense of how much
18      longer Mr. Hanly intends to go?
19              This is one of those witnesses where we
20      requested two days with her, but we were
21      allotted one, and so we're concerned about
22      the amount of time.  He said he's at Opinion
23      3 of 9, I believe.  Can we have some
24      understanding in that regard?
25              THE COURT:  Perhaps everyone will heed
```

```
 1                   Frye Hearing - Dr. Lembke          79
 2          the Court's instruction.  I know Ms. Conroy
 3          did during her direct examination.  So
 4          perhaps everybody will get on board the same
 5          way.
 6               If I need more, I'll let you know.  All
 7          right.  I'd like to finish this witness
 8          today.
 9               MR. HANLY:  Judge, I'm happy to
10          volunteer.  I think maybe I have another hour
11          tops.
12               THE COURT:  Okay.
13               MS. STRONG:  Okay.  Good to know.
14               THE COURT:  He said about another hour
15          tops.
16               Do you know what "tops" means in lawyer
17          language?  Okay.  Let's go from there.  Go
18          ahead.
19               MS. STRONG:  Thank you, your Honor.
20     BY MR. HANLY:
21          Q.   Doctor, I want to briefly go back to
22     cover some aspects of the academic detailing that
23     you discussed earlier, because it figures in the
24     methodology and the bases for your opinion.
25               In the course of that academic
```

```
1                    Frye Hearing - Dr. Lembke              80
2       detailing, did you have available to you examples of
3       marketing statements made by certain of the opioid
4       manufacturers and other opioid-related companies?
5            A    Yes.
6            Q.   And did you study those statements in
7       comparison to the medical literature that you
8       reviewed?
9            A    Yes.
10           Q.   For example, if a marketing statement
11      was to the effect that addiction is a rare
12      occurrence, what corresponding scientific literature
13      would you go to to see whether that statement was
14      true or not?
15           A    I would go to the literature looking at
16      the risk of addiction in patients treated with
17      prescription opioids.
18           Q.   Does the body of medical literature that
19      you relied upon, is there anything novel about these
20      peer-reviewed papers such that they could not form a
21      basis for -- a proper basis for an opinion that you
22      would have concerning addiction?
23           A    Well, many of the papers that purported
24      to provide evidence on the risk of addiction were
25      not actually founded in a methodology that could
```

1

2    reliably report that outcome.

3         Q.   But my question, Doctor, is, is the use

4    of scientific literature written by people other

5    than you, is that a novel basis that an

6    investigator, a researcher would have regard to?

7         A    No, that's not novel.

8         Q.   Is it -- is there any degree of

9    reliability that is ascribed to that body of

10   literature, assuming it's all or mostly peer-

11   reviewed?

12        A    Yes.  So that's a foundational precept

13   of academic scholarly work is to critically review

14   the literature and that's --

15        Q.   Now -- now, the marketing materials that

16   you have reviewed in this case and that you reviewed

17   prior to being involved in this case in preparing

18   your, your book, did you try to determine when you

19   were doing the academic detailing whether your own

20   experience was similar to the experiences of other

21   doctors who may or may not have received these sorts

22   of marketing materials?

23        A    Yes.

24        Q.   And was there any consistency, or was

25   there inconsistency?

1

2      A     I heard a lot of inconsistency from my

3   peers.

4      Q.    Did that have any effect on your desire

5   to continue the program of academic detailing?

6      A     Yes.  That motivated me to continue

7   academic detailing.

8      Q.    Did academic detailing to correct these

9   misconceptions take up a small amount of time, a

10   medium amount of time, a considerable amount of

11   time, or what?

12      A     A considerable amount of time, yes.  In

13   the last four to five years, I've spent a

14   considerable amount of my professional time on this

15   project.

16      Q.    When you were academic detailing, did

17   you receive from physicians, to whom you were

18   providing this detailing, any anecdotes or

19   recitations of experiences they had had in receiving

20   and reviewing literature about the risks and

21   benefits of opioids?

22      A     Yes.  I heard a large chorus of voices

23   expressing a very similar experience and impression

24   as my own.

25      Q.    When you were taught in medical school,

```
1                    Frye Hearing - Dr. Lembke              83

2      were you taught anything about the addiction

3      propensity of opioid medications?

4            A    None.

5            Q.   And what year, again, did you finish

6      your medical school?

7            A    1995.

8            Q.   Are you aware that on December the 12th

9      1995 the FDA approved the manufacture and sale of a

10     drug called OxyContin?

11           A    Yes.

12           Q.   Now, I want to discuss briefly your --

13     the basis for your opinion and the methodology used

14     to arrive thereat concerning whether a patient would

15     need to have increased doses of an opioid over time

16     and whether such increased doses would put the

17     patient at risk of harm, okay?

18           A    Okay.

19           Q.   And among your opinions is, in sum and

20     substance, that very opinion that increased doses

21     put the patient at risk of harm; is that right?

22           A    Yes.

23           Q.   Did you just pull that opinion out of

24     the air?

25           A    No.
```

```
 1                  Frye Hearing - Dr. Lembke              84
 2           Q.   Is that opinion shared by anybody else
 3      in the world, that you're aware of?
 4           A    Yes.
 5           Q.   Is that opinion, has the CDC, the Center
 6      For Disease Control, ever issued any data, or
 7      graphs, or anything else concerning whether
 8      increased dosages over time of opioids puts the
 9      patient at increased risk?
10           A    Yes.
11                MR. HANLY:  Okay.  And could we have
12           Slide Number 13, please.
13      BY MR. HANLY:
14           Q.   Doctor, this slide is entitled Higher
15      Dosage, Higher Risk, and it reads in part, and the
16      footnote indicates that this is a publication made
17      by the Centers for Disease Control and Prevention.
18      Do you see that in Footnote Number 1?
19           A    Yes.
20           Q.   Okay.  And we quoted a little bit from,
21      from it (READING:)  Higher dosages of opioids are
22      associated with higher risk of overdose and death,
23      even relatively low dosages, 20 to 15 morphine
24      milligram equivalence, MME, per day, increased risk,
25      higher doses haven't been shown to reduce pain over
```

```
 1                  Frye Hearing - Dr. Lembke              85
 2    the long term.  Did I read that correctly?
 3          A    Yes.
 4          Q.   And what do we see?  Explain to me and
 5    Justice Garguilo what we're seeing in these, in
 6    these two graphs.
 7          A    So the graph on the left with the purple
 8    line shows that as you go from low doses of
 9    prescription opioids to higher doses of prescription
10    opioids, the risk of overdose death due to those
11    opioids increases.
12               The graph on the right shows that as the
13    yellow line shows, that as you go from lower doses
14    of opioids to higher doses of opioids, the risk of
15    any opioid overdose event increases, including
16    nonlethal overdoses that often result in patients
17    showing up in emergency rooms unconscious.
18          Q.   So in both graphs what we're seeing,
19    would it be fair to say, you take more of the stuff,
20    you're increasing your risk of a bad outcome?
21          A    Yes.
22          Q.   And this Center for Disease Control
23    piece of a report actually has two other footnotes
24    referencing two other papers supportive of the
25    statement in this document.  Do you see that, three
```

1

2    and four?

3         A    Yes.   The Bonert paper, Number 3, the

4    graph on the left comes from the Bonert paper, and

5    the graph on the right comes from the Dunn paper.

6         Q.   So my point is that this CDC publication

7    is not the only document that you looked at or

8    relied upon in reaching your opinion that increased

9    dosage increases the risk of bad outcomes; is that

10   fair?

11        A    These are not the only documents I

12   looked at.   That is correct.

13        Q.   And, in fact, so we have CDC, we have

14   Bonert, we have Dunn, that's a total of three, but

15   are there other papers peer-reviewed that are

16   reliable that reach the same or similar conclusion

17   that more drug that you give, the likelihood is

18   you're going to have a bad event?

19        A    Yes.

20        Q.   And, by the way, Bonert is a

21   publication, it looks like JAMA.  Is that the

22   Journal of the American Medical Association?

23        A    Yes, it is.

24        Q.   Is that a well-known journal?

25        A    Yes.

Q.   And the Dunn paper is from something
called the Annals of Internal Medicine, right?

A    Yes.

Q.   Are those two publications, the Journal
of the American Medical Association and the Annals
of Internal Medicine, are they both peer-reviewed?

A    Yes, they are.

Q.   Are they regarded in the field of
medicine as publications that will reliably publish
material that those publications deem to be valid,
truthful?

A    In general, yes.

Q.   Did you -- did any of these three
publications, were any of these relied upon by you
as a part of your methodology in coming to the
higher dosage, higher risk opinion that you set
forth?

A    Yes.

Q.   Now, have you -- we talked earlier about
the marketing material that says that addiction is
rare; do you remember that?

A    Yes.

Q.   And did you, in the course of your work
in connection with this case, did you look at, try

```
 1                  Frye Hearing - Dr. Lembke              88

 2    to figure out what the real percentage risk of

 3    addiction is to patients administered opioid pain

 4    medications?

 5          A    Yes.

 6          Q.    And was your methodology any different

 7    in trying to come up with some statistics about the

 8    risk of addiction, was it any different from the

 9    methodology you described at the very beginning of

10    this examination where you told Justice Garguilo

11    about the importance of a thorough review of all

12    parts of the pieces of medical literature?  Did you

13    do anything different in connection with --

14          A    No.

15          Q.    No?  Is that what you said, Doctor?

16          A    That's right.  Sorry.

17          Q.    Okay.  And did you, in the course of

18    your work, did you come across any papers that

19    themselves tried to pull together the results of a

20    number of other papers and set forth in that paper

21    what the actual risk is of addiction related harms

22    from opioids?

23          A    Yes.

24          MR. HANLY:  Okay.  Can we put up Slide

25          14, please.
```

```
 1                    Frye Hearing - Dr. Lembke            89
 2   BY MR. HANLY:
 3        Q.   Now, Slide 14 is a chart that appears to
 4   have a source as two papers; do you see that?
 5        A    Yes, I do.
 6        Q.   So one paper is by someone named,
 7   Vowles, and the other by someone named Boscarino; is
 8   that correct?
 9        A    Yes.
10        Q.   So please tell Justice Garguilo and us,
11   what are we seeing in this graph, and what is the
12   significance of this to your opinions, if any?
13        A    So the study population being examined
14   in both of these papers was specifically patients
15   being prescribed opioids for chronic pain in order
16   to determine the risk of addiction to opioids in
17   that population.
18             And what we see here is that the Vowles
19   article in 2015, which is in blue, found that
20   approximately eight to 12 percent of chronic pain
21   patients being prescribed opioids long-term will
22   become severely addicted to opioids, and
23   approximately 21 to 29 percent of those individuals
24   will misuse opioids.
25             Boscarino was another study that
```

```
 1                   Frye Hearing - Dr. Lembke              90
 2     specifically looked at the risk of addiction in this
 3     population and found similar numbers based on the
 4     DSM-IV and the DSM-V criteria.
 5          Q.    Would any of these percentages 8 to 12,
 6     13.2, 21 to 29, and 41.3, would any of those
 7     percentages, based upon your work over the decades
 8     in addiction medicine, be regarded as rare instances
 9     of adverse events?
10          A    No.  This would not be considered to be
11     rare.  This would be considered to be common.
12          Q.    Now -- thank you.  You can put that
13     slide down, please.
14               Doctor, is there any amount of --
15     withdrawn.
16               In the course of your work in connection
17     with this case, did you look at the question of
18     whether limited use of opioid painkillers could
19     result in an adverse event for the patient taking
20     the medication?
21          A    Yes.
22          Q.    And did you look at any papers,
23     peer-reviewed papers that relate to the question of
24     limited use of the drug leading to a more persistent
25     use and to an opioid use disorder?
```

```
1                    Frye Hearing - Dr. Lembke            91

2            A    Yes.

3                 MR. HANLY:  Okay.  Can we put up Slide

4            Number 15, please.  Judge, there's only 20

5            slides, so we're moving along pretty well.

6                 THE COURT:  Thank you.

7    BY MR. HANLY:

8            Q.   And this slide is titled -- entitled:

9    Even Limited Medical Exposure Can Lead To Persistent

10   Use And OUD.  That's opioid use disorder.

11                And tell the Judge what this is

12   depicting.

13           A    So these are data showing that patients

14   who are prescribed opioids for surgery, for example

15   in the Brummett paper, is thought to be an acute and

16   self-limiting cause of pain, that 5.9 to 6.5 percent

17   of those individuals will still be taking

18   prescription opioids a year later.

19                So the important thing here is that

20   they're not being diagnosed in this study with

21   opioid use disorder addiction, but they're still

22   taking the opioids a year later when one would have

23   thought that their need for opioids would long be

24   over.

25                That's relevant because we do know that
```

1

2      the longer that patients are taking opioids, the

3      higher their risk of adverse health consequences,

4      including, but not limited to, addiction.

5                  The same thing with the Delgado paper

6      showing that a very limited prescription for opioids

7      for an ankle sprain, for example, to the, you know,

8      relatively benign and self-limiting injury at 4.9

9      percent of individuals receiving an opioid for that

10     type of injury will still be taking opioids a year

11     later.

12                 Schroeder actually looked at whether or

13     not young people exposed to opioids through a dental

14     procedure will develop opioid use disorder within

15     one year and found that 6 percent of those

16     individuals exposed to opioids for a wisdom tooth

17     removal will be diagnosed with an opioid addiction

18     within the year and 10 percent for women.

19          Q.    Thank you, Doctor.

20                 And this chart has three footnotes, and

21     the footnotes are all to published papers, correct?

22          A     That is correct.

23          Q.    Okay.  And the first one is a Journal of

24     the American Medical Association, the surgery

25     journal, correct?

```
 1                    Frye Hearing - Dr. Lembke          93
 2          A    Yes.
 3          Q.   And the second, Delgado is a paper
 4    published in the Annals of Emergency Medicine?
 5          A    Yes.
 6          Q.   And the final footnote to Schroeder
 7    published in the Journal of the American Medical
 8    Association, Internal Medicine Journal, correct?
 9          A    Yes.
10          Q.   All three of these journals of low
11    regard, high regard, medium regard?
12          A    These are all high regarded competitive
13    journals.
14          Q.   Are they all peer-reviewed?
15          A    Yes.
16          Q.   Did you rely upon the findings of these
17    journals in connection with your work in this case?
18          A    Yes.
19          Q.   Is there any consensus in the medical
20    literature relating to addiction medicine, including
21    any reports of any organizations concerning the
22    question of whether there's a relationship between
23    increased supply of opioids in the country as a
24    whole and adverse outcomes?
25          A    Yes.
```

1

2      Q.    And did you look at that issue in

3   connection with your work in this case, the

4   relationship between the supply and adverse outcomes

5   for particular patients?

6      A    Yes.

7      Q.    And are there publications, peer-

8   reviewed or otherwise, that address this issue?

9      A    Yes.

10          MR. HANLY:  Could we put up Slide Number

11          17, please.

12   BY MR. HANLY:

13      Q.    And here what we've done with this slide

14   is we've put two quotations from two separate

15   reports side by side.  On the left is a quotation

16   from a report of the Association of Schools and

17   Programs of Public Health, the ASPPH, correct?

18      A    Yes.

19      Q.    Please explain to Justice Garguilo what

20   that association is.

21      A    So it's an authoritative body on public

22   health issues, including numerous very prominent

23   public health universities, like Columbia, that came

24   together to look at the opioid crisis to try to

25   figure out what caused it and how to remedy it.

And they published a report bringing
science to bear on opioids from which this quote was
taken.

Q.   And this quote, paraphrasing, is that
the tremendous expansion of the supply led to scaled
increases in prescription opioid dependence and to
the transition of many to illicit opioids, including
fentanyl, which have subsequently driven exponential
increases in overdose, correct?

A    Yes.

Q.   And that quote came from a report of
this organization published in 2019?

A    Yes.

Q.   On the right-hand side we have a quote
from something called the National Academies of
Sciences, Engineering and Medicine, sometimes called
NASEM, correct?

A    Yes.

Q.   And just very briefly, what is that
organization?

A    Again, it's an authoritative body of
experts who come together to weigh in on looking at
the science regarding major issues related to
science, engineering and medicine.  In this case,

1

2     this was a paper they wrote on the opioid crisis.

3           Q.   And that essentially -- paraphrasing it,

4     it says the data presented make a prima facie case

5     that heavy promotion of opioid prescribing by drug

6     manufacturers, including misleading claims by some,

7     and substantially increased prescribing by

8     physicians were key contributors to the increase in

9     misuse, OUD, and accompanying harms.

10               Did I read that correctly?

11          A    Yes.

12          Q.   And did you, with respect to these two

13    publications, did you read the whole publication, or

14    did you just look at the abstract?

15          A    Yes, I read the whole publication.

16          Q.   And did you, did you rely upon these

17    publications, these specific publications concerning

18    opioids in the course of carrying out your steps,

19    your methods for reaching your opinions?

20          A    Yes, but not exclusively.

21          Q.   Okay.  Well, tell Justice Garguilo again

22    what the other reliance was.

23          A    I relied on the CDC data showing that as

24    opioid prescriptions increased, so did

25    opioid-related overdose deaths and treatment

1

2      admissions.

3             I also relied on my clinical experience

4      and my interviews with many of my colleagues in

5      medicine.  And in my clinical experience, I saw

6      vastly increased opioid prescribing in the 1990s and

7      more and more patients coming in with opioid

8      addiction, more and more patients dying from opioid

9      overdose.

10            Q.   So, again, you analyzed the literature

11     written by folks other than you, and you relied on

12     what I've called your personal professional

13     experience over more than two decades?

14            A    Yes.  That's right.

15            Q.   In connection with your publications, we

16     already discussed your research letter regarding

17     prescribing to Medicare patients, correct?

18            A    Yes.

19            Q.   And there was another paper that you

20     wrote and that was published concerning

21     overprescribing; do you recall?

22            A    Yes.

23            Q.   And could you just tell Justice Garguilo

24     what that second paper was about.

25            A    We looked at which doctors in the United

```
 1                    Frye Hearing - Dr. Lembke              98
 2     States are prescribing opioids to try to detect
 3     whether or not there were geographic differences or
 4     differences by specialty.
 5               And what we found was that by volume,
 6     primary care doctors prescribe the most opioids.
 7     That makes sense, because there are more of them
 8     than other types of doctors.  And by specialty, it's
 9     pain medicine doctors that also -- that prescribe
10     the most opioids.
11               But importantly what we saw was that
12     there was not a small subset of so-called pill
13     doctors driving the increased prescribing, that
14     there was a wholesale paradigm shift and all doctors
15     across all specialties were prescribing large
16     amounts of opioids.
17               We also looked at geographic regions and
18     found that there were no differences geographically.
19     So all across the United States, there was an
20     enormous uptick in opioid prescribing based on the
21     data that we looked at.  That was our findings.
22               THE COURT:  Doctor, what constitutes
23          overprescribing?
24               THE WITNESS:  Well, overprescribing,
25          certainly prescribing more than we were in
```

```
 1                    Frye Hearing - Dr. Lembke          99
 2          the 1990s, despite the fact that we have not
 3          seen an increased need for analgesia in this
 4          country.
 5                Overprescribing we can also look at
 6          other countries, other developed nations and
 7          see how our prescribing compares to their
 8          prescribing and see that we are prescribing
 9          in some cases ten times more than other
10          developed nations with aging populations and
11          similar needs for analgesia.
12                So when I talk about overprescribing,
13          I'm really comparing the way we prescribe now
14          to the way that we prescribed before the
15          Defendants launched their campaign in the
16          1990s promoting opioids.
17                THE COURT:  Okay.  Thank you.
18     BY MR. HANLY:
19          Q.   Doctor, you, in the course of your
20     answer that you just gave before Justice Garguilo's
21     question, you talked about consistency of
22     prescribing, prescribing habits across the nation,
23     right?
24          A    Yes.
25          Q.   Now, did you look at any statistics on
```

```
 1                    Frye Hearing - Dr. Lembke              100
 2      the changes in the rate of prescribing in either New
 3      York State and/or Suffolk County and/or Nassau
 4      County?
 5            A     Yes.
 6            Q.    And can you just generally, without
 7      holding you to specific percentages, just describe
 8      generally for Justice Garguilo what you found and
 9      the extent to which, if any, that the trends, if
10      any, that you saw are different from national
11      trends?
12            A     So we saw no difference in New York
13      State compared to national trends.  New York is in
14      no way an outlier in terms of this phenomenon.  And
15      the same is true for Suffolk and Nassau County.
16            Q.    Now, Doctor, Justice Garguilo mentioned,
17      and you wrote in your book, and it's referred to
18      elsewhere concerning a phenomenon or claimed
19      phenomenon called the gateway effect, true?
20            A     Yes.
21            Q.    Just for clarity, would you just explain
22      briefly what the gateway effect is?
23            A     Patients who are prescribed opioids for
24      a medical condition can go on to misuse the opioids
25      that they have been personally prescribed, which
```

 1

 2    then subsequently can lead to a severe opioid

 3    addiction, including progression to the use of

 4    heroin and other illicit opioids.

 5          Q.   Is the gateway effect, does it have any

 6    acceptance, general acceptance or otherwise in the

 7    medical community to describe the phenomenon you

 8    just described?

 9          A    Yes.  I would say it's strongly accepted

10    in the medical community to describe what I just

11    described.

12          Q.   It's not a term that you just invented;

13    is it?

14          A    No.

15          Q.   Is there support, is there reference in

16    the medical literature to the gateway effect?

17          A    Yes.

18          MR. HANLY:  Could we put up Slide 18,

19          please.

20    BY MR. HANLY:

21          Q.   Now, Slide 18, am I correct, Doctor,

22    this is -- we've pulled out some quotes from this

23    National Academies report.  It's called a consensus

24    study report from NASEM, and it's entitled Pain

25    Management and the Opioid Epidemic.

```
 1                    Frye Hearing - Dr. Lembke            102

 2                And the quote, first quote we have is:

 3       A preponderance of evidence suggests that the major

 4       increase in prescription opioid use beginning in the

 5       late 1990s has served as a gateway to increased

 6       heroin use.

 7                And then below that, we pulled out the

 8       quote:  In any related nature of the prescription in

 9       the illicit opioid epidemic means that one cannot be

10       addressed separately from the other.

11                Did I read that correctly?

12       A    Yes.

13       Q.   And the second one, would that -- well,

14       just state to the Court what the second sentence

15       actually means in terms of prescription versus

16       illegal drugs.

17       A    It means that to really understand this

18       opioid epidemic, we have to look at the way that we

19       have been prescribing prescription opioids in the

20       house of medicine.

21                That the problem of addiction and the

22       problem of chronic pain and even nonchronic pain

23       treated with opioids, those problems are deeply

24       interrelated.

25       Q.   And, Doctor, are there any studies that
```

```
 1                   Frye Hearing - Dr. Lembke              103
 2      you're aware of that have looked at the question of
 3      gateway effect in the State of New York?
 4             A    Yes.
 5                  MR. HANLY:  Could we put up Slide Number
 6             19, please.
 7      BY MR. HANLY:
 8             Q.   Now, here we have some quotes from a
 9      paper by someone named Lankenau in the International
10      Journal of Drug Policy; do you see that?
11             A    Yes.
12             Q.   And this study was actually a study of
13      intravenous drug users in the City of New York and
14      the City of Los Angeles; is that true?
15             A    Yes.
16             Q.   And we pulled out two quotes.  One at
17      the top, paraphrasing, initiation into opioid misuse
18      was facilitated by easy access via participant's own
19      prescription, family or friends, and occurred
20      earlier than misuse of other drugs, of other illicit
21      drugs.  Prescription opioid misuse was a key feature
22      of trajectories into injection drug use and/or
23      heroin use.
24                  Did I read that correctly?
25             A    Yes.
```

```
 1                    Frye Hearing - Dr. Lembke              104

 2            Q.   And then the second is the scientific

 3       literature has identified several specific

 4       subpopulations involved in prescription opioid

 5       misuse and diversion that are so diverse that it is

 6       not feasible to study them in a single

 7       investigation.

 8                    High school students, college students,

 9       older persons and women, most of whom initially

10       obtain a prescription drug via legitimate medical

11       practices, correct?

12            A    Yes.

13            Q.   Did you rely on this study for your

14       opinion relating to the so-called gateway effect?

15            A    Yes.

16            Q.   Is this study, is this paper a

17       peer-reviewed paper?

18            A    Yes, it is.

19            Q.   Is this a reliable, or highly regarded,

20       or lowly regarded publication?

21            A    This is a reliable source.

22            Q.   What's happened between 2010 and 2017

23       with respect to New York State deaths from opioids?

24            A    There has been an increase in

25       opioid-related overdose deaths in the State of New
```

```
 1                    Frye Hearing - Dr. Lembke              105
 2     York in that timeframe.
 3              MR. HANLY:  Slide Number 20, the last
 4          slide, please.
 5     BY MR. HANLY:
 6          Q.   Doctor, I guess it's pretty clear what
 7     this shows, but why don't you explain to Justice
 8     Garguilo and us.
 9          A    This shows that between 2010 and 2017
10     the number of opioid-related overdose deaths in
11     persons aged 25 to 44 increased more than fourfold
12     in the State of New York.
13          Q.   And in a very -- in a slide very early
14     in the examination, did we see an increase over
15     roughly the same time period in the number of
16     prescriptions written in New York State?
17          A    Yes.
18              MR. HANLY:  Thank you, Doctor.  That's
19          all I have.
20              THE WITNESS:  Thank you.
21              THE COURT:  Ms. Strong, it's almost
22          12:30.  Do you want to get started, or would
23          you prefer starting after the luncheon
24          recess?
25              MS. STRONG:  Let's just start after the
```

```
 1                  Frye Hearing - Dr. Lembke            106
 2        luncheon recess, your Honor.
 3             THE COURT:  Okay.  We'll resume at 1:45.
 4             MS. STRONG:  Thank you, your Honor.
 5             (WHEREUPON, after a luncheon recess, the
 6        following was had:)
 7             MR. HANLY:  Your Honor, before
 8        Ms. Strong begins, can I put something on the
 9        record?
10             THE COURT:  Yes.  First, remind the
11        witness, then you can put something on the
12        record.
13             THE CLERK:  Doctor, I remind you you're
14        still under oath.
15             THE WITNESS:  Thank you.
16             MR. HANLY:  Your Honor, I just wanted to
17        place on the record, we had a dispute earlier
18        in the examination concerning Slide Number
19        12.  Representation was made by defense
20        counsel, in effect, that we were ambushing
21        them, they hadn't seen it.
22             I wish to point out to the Court and
23        counsel that this slide, Exhibit 12, was a
24        joint exhibit, Defendants' and Plaintiffs'
25        Exhibit in the MDL, bearing number 17232, and
```

1
2      that exhibit, joint exhibit list was created
3      and filed on September 25th 2019, which is a
4      year ago.
5          THE COURT:  Miss Strong, there was an
6      indication that that piece of paper, that
7      document, that thing, that exhibit was only
8      used in West Virginia and not part and parcel
9      of the MDL in Ohio, I just heard something
10     otherwise.
11         MS. STRONG:  I think the argument he's
12     trying to make, your Honor, is that we knew
13     of that underlying document period and the
14     abstract.  The question here is was that a
15     document that Dr. Lembke relied upon in
16     support of her opinions.
17         There are millions and millions of
18     documents in this litigation, your Honor, and
19     the question that we are here to address
20     today is the basis for Dr. Lembke's opinions,
21     and my point is that we -- the rules do not
22     allow for us to be sandbagged by documents
23     being presented to us the night before and
24     saying she, too, is relying on these
25     additional documents.  That's the point, your

```
 1                    Frye Hearing - Dr. Lembke              108
 2      Honor.
 3          THE COURT:  Okay.  So now we've heard
 4      ambushed and sandbag, all right.
 5          MS. STRONG:  I know you don't like those
 6      types of terms, but I think this is classic
 7      sandbagging, so I don't use those terms
 8      lightly, your Honor.
 9          MR. SHKOLNIK:  If I may, your Honor,
10      Napoli Shkolnik, first of all, this is New
11      York, and our rules do allow us to rely upon
12      authoritative articles that come up that
13      become available.  There's no prejudice here.
14      I think that's the rule in New York.
15          It is not sandbagging.  I don't think
16      it's appropriate to use here.  They knew
17      about this study, they knew about everything
18      that we've listed for them, and it's
19      inappropriate to suggest that it can't be
20      utilized in this process before trial, which
21      we could have supplemented even at that
22      point.  I just wanted to state based on New
23      York practice.
24          THE COURT:  If you were sitting here,
25      what should I do?
```

```
 1              Frye Hearing - Dr. Lembke              109
 2          MR. SHKOLNIK:  You've already done it,
 3     your Honor.  It's in the record.  You'll
 4     consider it, use it for what it's worth, and
 5     it's really a nonissue.
 6          THE COURT:  Here's a fair compromise.
 7     If accepted, it will go to weight, to the
 8     weight of the evidence, and not to the --
 9     whatever the opposite of the weight is.
10          MR. SHKOLNIK:  And I'm sorry for talking
11     through the mask, I apologize.
12          THE COURT:  Doctor, are you ready?
13          THE WITNESS:  Yes.
14          THE COURT:  Miss Strong, go ahead.
15          MS. STRONG:  And, Mr. Pyser, did you
16     want to say something before I begin?  I just
17     didn't want to interrupt.  Because I see you
18     on my screen.
19          MR. PYSER:  No, that's okay.
20          MS. STRONG:  Okay.  Thank you.
21          THE COURT:  Did I step on your order?
22          MS. STRONG:  No.  No, no, no.  You're
23     doing it correctly.  It's just Mr. Pyser is
24     up on my screen, and I know he's examining
25     today, I didn't know if he wanted to say
```

```
 1                 Frye Hearing - Dr. Lembke              110

 2          anything more before we begin, your Honor.

 3               THE COURT:  He's very big on my screen,

 4          too.

 5               MR. PYSER:  And I apologize to all of

 6          you.

 7     EXAMINATION BY

 8     MS. STRONG:

 9          Q.   Good afternoon, Dr. Lembke.

10          A    Good afternoon.

11          Q.   My name is Sabrina Strong, and I

12     represent Johnson & Johnson and Janssen in this

13     litigation.  I want to turn first to some specifics

14     about your training and experience.

15               You're not an economist, correct?

16          A    That is correct.

17          Q.   You do not have a degree or training in

18     marketing, correct?

19          A    That is correct.

20          Q.   You do not have any employment

21     experience working in the field of pharmaceutical

22     marketing; do you?

23          A    No.

24          Q.   You don't belong to any professional

25     associations in the field of pharmaceutical
```

```
 1                    Frye Hearing - Dr. Lembke              111
 2    marketing either, correct?
 3          A    That's correct.
 4          Q.   You also do not have any experience
 5    regarding FDA regulations that govern pharmaceutical
 6    marketing, correct?
 7          A    That's correct.
 8          Q.   You do not have any degrees or training
 9    in pharmacoeconomics?
10          A    Since I don't know what that is, the
11    answer is no.
12          Q.   We'll skip that.
13               You're aware that there is a scientific
14    field called econometrics, correct?
15          A    Yes.
16          Q.   Are you aware that that field applies
17    statistical methods to economic data?
18          A    Yes.
19          Q.   But you do not have any degrees or
20    training in econometrics of sales or marketing,
21    correct?
22          A    That is correct.
23          Q.   Okay.  So you're testifying here today
24    as a retained expert for the Plaintiffs, which in
25    this case it's the State of New York, Nassau County,
```

```
 1                    Frye Hearing - Dr. Lembke              112

 2      Suffolk County, correct?

 3              A    Yes.

 4              Q.   But before this case, you were retained

 5      by the Plaintiffs in the federal multidistrict

 6      litigation pending in Cleveland, Ohio, correct?

 7              A    Yes.

 8              Q.   You submitted a report in connection

 9      with that MDL proceeding, right?

10              A    Yes.

11                   (Video disconnected.)

12                   THE COURT:  We're back, doctor, to a

13              degree.

14                   MS. STRONG:  It sounds like everybody

15              got kicked off, your Honor; is that right?

16                   THE COURT:  Yes.  We're almost back on.

17              They're just testing.

18                   MS. STRONG:  Ready, your Honor.

19                   THE COURT:  Back on board.  Let's go.

20                   MS. STRONG:  Okay.

21              Q.   So I was just asking you, Dr. Lembke,

22      about the report you submitted in the MDL, and you

23      confirmed that you did submit a report in the MDL

24      proceeding, correct?

25              A    Yes.
```

```
 1                    Frye Hearing - Dr. Lembke            113
 2          Q.   Okay.  And there are some structural
 3     differences between your report in the MDL and your
 4     report here, but the opinions in both are the same,
 5     correct?
 6          A    Yes.
 7          Q.   You understand that Judge Polster, in
 8     the federal MDL proceeding, ruled that he would not
 9     be permitted to opine on marketing causation in his
10     court, because you do not have the marketing
11     expertise necessary to offer those causation
12     opinions, correct?
13          A    Yes.
14          Q.   Okay.  And you have distinguished the
15     question of whether opioid marketing material was
16     consistent or inconsistent with scientific evidence
17     from the question of causation, correct?
18          A    Yes.
19              MS. STRONG:  Okay.  And so we put
20          together a demonstrative that draws out that
21          distinction.
22              And, Pam, if you're able to, can you
23          pull up Slide 1, and I believe it's being
24          handed out in the court at this time as well,
25          or I would ask Mr. Asher to do so.
```

```
 1                    Frye Hearing - Dr. Lembke            114
 2          Q.   And so I'd like you to look at these
 3    questions, Dr. Lembke.
 4                Question 1 is:  Was each Defendant's
 5    promotion, if any, informed by scientific evidence?
 6                Question 2:  If not, did misleading
 7    promotion by any Defendant cause doctors to write
 8    medically inappropriate prescriptions?
 9                And then there's a third question, apart
10    from that distinction that you made between 1 and 2,
11    the third question is:  Did those prescriptions, if
12    any, lead to opioid addiction, misuse or overdose?
13                Do you see those questions, Dr. Lembke?
14          A    Yes, I do.
15          Q.   You spent a considerable amount of time
16    with Mr. Hanly talking about question 1, but I want
17    to focus on questions 2 and 3.
18                And so with that, Pam, if you can pull
19    that down, and I'll ask you some questions focusing
20    on that second question.
21                So let's talk about a doctor's decision
22    to prescribe medications to a patient.
23                At a high level you agree that opioid
24    prescribing practices depends largely on the doctor,
25    correct?
```

```
 1                    Frye Hearing - Dr. Lembke            115

 2          A    No.

 3          Q.    Well, you would agree that there is a

 4    huge variation in opioid prescribing across the

 5    country and it continues to depend largely on the

 6    doctor, right?

 7          A    No.

 8          Q.    Okay.  Do you recall being deposed in

 9    this case, Dr. Lembke, on January 16th 2020?

10          A    Yes.

11          Q.    Okay.  And I would like to show you a

12    portion of your deposition testimony.  For your

13    benefit and for the Court's benefit, I'd like to

14    refer you to page 54.

15                If Pam can put this up on the screen,

16    page 54, lines 15 through lines 24.

17                THE COURT:  Okay.

18                MS. STRONG:  And I don't know if you

19            have your transcripts with you, Dr. Lembke,

20            or if you prefer to read it off the screen.

21          Q.    Can you read that okay, Dr. Lembke?

22          A    Yes.

23          Q.    Okay.  And at your deposition on January

24    16th 2020 here in the New York case, you were asked

25    the following question:
```

```
 1              Frye Hearing - Dr. Lembke              116
 2              "Has the number of pills in a
 3    prescription for three weeks of opioids remained the
 4    same over the past decade?
 5              ANSWER:  There is huge variation in
 6    opioid prescribing across the country.  In some
 7    geographic regions opioid prescribing has decreased
 8    rapidly.  In others, it has not.  It really depends
 9    on which doctor.
10              QUESTION:  So it depends on the doctors
11    then?
12              ANSWER:  It continues to depend largely
13    on the doctor, yes."
14              Is that the testimony that you gave at
15    your deposition in this case, Dr. Lembke?
16         A    Yes, it is.
17         Q.   Okay.  And doctors are expected to weigh
18    the risks and benefits of any prescription
19    medication for each particular patient before
20    deciding to prescribe it, correct?
21         A    Yes.
22         Q.   For example, there are numerous patient-
23    specific risk factors for opioid addiction, right,
24    you believe that?
25         A    I'm sorry, can you repeat the question.
```

```
 1                    Frye Hearing - Dr. Lembke              117
 2          Q.    I can.
 3                There are numerous patient-specific risk
 4     factors for opioid addiction, correct?
 5          A    Yes.
 6          Q.   One of those risk factors is personal
 7     history of substance abuse?
 8          A    Yes.
 9          Q.   Another is family history of substance
10     abuse?
11          A    Yes.
12          Q.   Childhood trauma is another factor?
13          A    Yes.
14          Q.   And psychiatric comorbidity, correct?
15          A    Yes.
16          Q.   And by that, just for the benefit of the
17     Court and for clarity, you mean an individual who
18     has a psychiatric disorder, other than the disease
19     of addiction, which could include everything from
20     major depression, obsessive compulsive disorder,
21     bipolar disorder and schizophrenia, correct?
22          A    Yes.
23          Q.   Although you've traveled to New York and
24     you've talked with some doctors in New York, you do
25     not know whether you have talked with any doctor who
```

```
1                     Frye Hearing - Dr. Lembke            118
2      practices in Nassau County about his or her
3      experiences with prescription opioids, correct?
4            A     That is correct.
5            Q.    And the same is true for Suffolk County,
6      you do not know whether you have ever talked with a
7      doctor who practices in Suffolk County about his or
8      her experience with prescription opioids, correct?
9            A     Yes.
10           Q.    In fact, the only doctors in New York
11     who prescribe opioids that you can identify are
12     doctors reported in lay-newspapers as operating pill
13     mills, correct?
14           A     I'm sorry, could you say that again.
15           Q.    Absolutely.
16           The only doctors in New York who
17     prescribed opioids who you could identify are
18     doctors reported in lay-newspapers as operating pill
19     mills, correct?
20           A     No, that's not correct.
21           Q.    And, again, I'd like to pull up -- I
22     would like you to look at a portion of your
23     deposition testimony in this case, the January 16th
24     2020 deposition.  For everyone's benefit we're
25     turning to page 207, lines 4 through 10.
```

```
 1                    Frye Hearing - Dr. Lembke              119
 2                   Pam, if you could put that up and
 3        everyone can take a moment to get their place, page
 4        207.
 5                   You were asked at your deposition,
 6        question, line 4.
 7                   "So these are reports in the newspaper
 8        about pill mill doctors in New York?
 9                   ANSWER:  That's right.
10                   QUESTION:  Okay.  Other than that, can
11        you give -- identify any doctor who prescribed
12        opioid medications to any individuals in New York?
13                   ANSWER:  No."
14                   Dr. Lembke, that was the testimony that
15        you gave at your deposition in January, correct?
16            A    Yes.
17            Q.   So that means you didn't try to identify
18        which doctors in New York, if any, saw any of the
19        specific marketing materials you identified as
20        problematic in your report, correct?
21            A    No, that's incorrect.
22            Q.   Well, you didn't identify any doctors
23        who relied upon any specific marketing materials,
24        correct, in describing decisions?
25            A    That is incorrect.
```

```
 1                    Frye Hearing - Dr. Lembke              120
 2         Q.    Okay.  Did you identify in your report
 3    any doctors or the scope of doctors who you believed
 4    saw a particular Defendant marketing materials and
 5    actually relied upon it in making a decision; did
 6    you identify those folks in your report?
 7         A    Not in my report, no.
 8         Q.    Did you identify them at your
 9    deposition?
10         A    No.
11         Q.    In forming your opinions, in forming
12    your opinions you also didn't conduct a survey of
13    New York doctors to try to understand what factors
14    they considered in deciding to prescribe opioid
15    medication to any particular patient; did you?
16         A    What do you mean by "a survey?"
17         Q.    Well, I'm not talking about anecdotes.
18    I'm talking about a scientifically rigorous survey.
19              You didn't conduct a survey to
20    understand what factors any New York doctor
21    considered in deciding to prescribe an opioid
22    medication to any particular patient, correct?
23         A    No.
24         Q.    And you also did not conduct a survey of
25    New York doctors to try to learn what marketing
```

```
 1                    Frye Hearing - Dr. Lembke              121
 2     materials, if any, the prescribers in New York may
 3     have received from each individual Defendant, that
 4     was not part of your methodology in coming up with
 5     your opinions in this case, correct?
 6          A    No, that's incorrect.
 7          Q.    You conducted a survey, a scientifically
 8     rigorous survey to try to learn what marketing
 9     materials, if any, a prescriber in New York saw, may
10     have received from each Defendant?
11          A    So in the research for my book I
12     conducted quantitative interviews with doctors
13     providing what they relied upon in their opioid
14     prescribing, including some healthcare professionals
15     in New York.
16          Q.    Okay.  So I, I would like you to turn to
17     your January 16th 2020 deposition.  If we can pull
18     that up again.  It's page 175, line 5, and it runs
19     to line 20.  Pam, you've got that on the screen.
20               Dr. Lembke, you were asked at your
21     deposition:
22               "So you conducted no comprehensive
23     survey of doctors and nurses in New York to
24     understand what marketing materials, if any,
25     prescribers in New York received from what
```

```
 1                    Frye Hearing - Dr. Lembke              122

 2     individual Defendants; is that correct?"

 3             A    It's correct that the survey --

 4             Q.   Let me finish the question.

 5             A    I'm sorry.

 6             Q.   And so the transcript goes on to say:

 7     "I feel like I answered the question to the best of

 8     my ability."

 9                  A follow-up question is asked at line

10     12:  "So do you have a survey that you can show us

11     where you surveyed doctors and nurses in New York

12     regarding asking them, for example, Mallinckrodt,

13     what specific marketing materials did you, Dr.

14     Smith, in Nassau, receive from Mallinckrodt; do you

15     have that to produce?

16                  ANSWER:  I don't have a survey at that

17     level of specificity."

18                  That's your testimony from your

19     deposition, correct, Dr. Lembke?

20             A    Yes.

21             Q.   Okay.  And you did not do a regression

22     analysis as part of your methodology; did you?

23             A    No.

24             Q.   So to be clear to the Court, make sure

25     we're on the same page, was there a regression
```

```
1                 Frye Hearing - Dr. Lembke            123

2     analysis, is a tool that's employed to try to

3     isolate the impact of one factor on another while

4     controlling for potentially confounding factors,

5     correct?

6         A    Yes.

7         Q.   Okay.  And we've been talking about

8     doctors -- I want to shift gears for a moment.

9              Pam, can you actually put up Slide 1 for

10    us again one more time.

11             I want to remind you of what question 3

12    is.  It says:  "Did those prescriptions, if any,

13    lead to opioid addiction and misuse of use or

14    overdose?"

15             All right.  So, Pam, you can pull that

16    back down.

17             And so with that in mind, turning to

18    patients, in forming your opinions, you haven't

19    examined patient outcomes for any particular patient

20    in the State of New York who was prescribed one of

21    the Defendants' opioid medications; have you?

22        A    In my book I describe a patient who I

23    interviewed using qualitative methods who was

24    prescribed an opioid in the State of New York.

25        Q.   So in forming your opinions you relied
```

```
 1                    Frye Hearing - Dr. Lembke          124

 2     upon that, that's your experience from New York,

 3     that one anecdote?

 4          A    That is part of my experience for New

 5     York, yes.

 6          Q.   Okay.  So you've not done anything more

 7     to examine patient outcomes for any particular

 8     patient in the State of New York who was prescribed

 9     one of the Defendants' opioid medications; have you?

10          A    Not by directly interviewing a patient,

11     no.

12          Q.   And you didn't review individual medical

13     records either, correct?

14          A    Correct.

15          Q.   And you didn't actually speak to any

16     patients in Nassau or Suffolk County for purposes of

17     forming your opinions in this case at all, correct?

18          A    Correct.

19          Q.   And you mentioned that one anecdote in

20     your book.  Which drug did the patient take?

21          A    She was prescribed buprenorphine.

22          Q.   Any other drug?

23          A    No.

24          Q.   So given that you didn't examine

25     patients broadly in forming your opinions, other
```

```
1                    Frye Hearing - Dr. Lembke                125

2      than the one anecdote you gave us, you didn't talk

3      to folks in Nassau or Suffolk, you didn't talk to

4      patients there, that means that you didn't consider,

5      as part of your methodology, whether any particular

6      patient in New York suffering from chronic pain

7      actually benefited from Defendants' opioid

8      medications, correct?

9           A    I'm sorry, could you restate the

10     question?

11          Q.    Sure.

12               Given what you've said, as part of your

13     methodology you didn't consider whether any

14     particular patient in New York who suffers from

15     chronic pain actually benefited from Defendants'

16     opioid medications, correct?

17          A    I did have conversations with patients

18     in New York, others beyond the one that was in my

19     book regarding whether or not they benefited from

20     opioid medications.

21          Q.    So you got some anecdotal conversations,

22     that's what you're referring to?

23          A    I have conversations that I think go

24     beyond anecdote.

25          Q.    Okay.  But you just testified in forming
```

1
2      your opinions in this case you didn't review
3      individual medical records or talk with patients in
4      coming up with your opinions in this case; isn't
5      that correct?
6              A    I didn't review medical records, but I
7      did talk to patients.
8              Q.   Anecdotally?
9              A    I think they were interviews based on
10     quantitative methodology.
11             Q.   And are they identified in your expert
12     report, Dr. Lembke, in things that you relied upon
13     in forming your opinions in this case?
14             A    No.  We did not identify individual
15     patients in my report.
16             Q.   Because that's not part of your
17     methodology in forming your opinions in this case,
18     correct, Dr. Lembke?
19             A    No, that's not correct.
20             Q.   So you have a methodology that you
21     failed to disclose to us, Dr. Lembke; is that your
22     testimony?
23             A    No.
24             Q.   Okay.  You haven't looked at individual
25     prescribing decisions of doctors in New York, and

```
 1                    Frye Hearing - Dr. Lembke              127
```

 2   you haven't surveyed them for purposes of in terms

 3   of a scientifically rigorous survey for coming up

 4   with your, your opinions here, but your analysis

 5   does depend, in part, on your belief that there's no

 6   reliable evidence that long-term opioid therapy is

 7   effective for chronic non-cancer pain, correct?

 8        A    Yes.

 9        Q.    You recognize that the FDA has approved

10   certain prescription opioid medications for the

11   management of chronic pain, right?

12        A    Yes.

13        Q.    And, for example, the FDA has approved

14   Nucynta Er with the indication for management of

15   chronic pain, correct?

16        A    Yes.

17        Q.    The same is true for Duragesic?

18        A    Yes.

19        Q.    The same is true for Exalgo?

20        A    Yes.

21        Q.    The same is true for Kadian, correct?

22        A    Yes.

23        Q.    There are a number of generic drugs,

24   generic long-acting opioids that are also approved

25   for the management of chronic pain, correct?

```
 1                    Frye Hearing - Dr. Lembke            128

 2          A    Yes.

 3          Q.   Some of those medications are

 4    manufactured by some of the Defendants in this case,

 5    correct?

 6          A    Yes.

 7          Q.   You understand that before approving any

 8    prescription opioid medication the FDA must

 9    determine that it's safe and effective?

10          A    Well, I just lost sound.  Can you repeat

11    that?

12          Q.   Yes.

13               Can you hear me okay?

14          A    Yeah.

15          Q.   We have some volume, some noise.  I

16    don't know if you can hear it.

17          A    I hear some static, which makes it

18    harder to hear you.

19          Q.   Yes.  I think it's gone now, Dr. Lembke.

20    Can you hear me better?

21          A    Yes.  Thank you.

22          Q.   So my question was:  You understand that

23    before approving any prescription opioid medication

24    the FDA must determine that it's safe and effective

25    for its indicated use, correct?
```

1

2        A    Yes, I understand that.

3        Q.   You also understand that for a drug to

4   be approved for marketing FDA must determine that

5   the drug is effective and that the benefits outweigh

6   its potential risk to patients; is that right?

7        A    Yes.

8        Q.   But you don't believe that the totality

9   of the evidence that the FDA reviewed in connection

10  with approving prescription opioid medications for

11  treatment of chronic pain support that indication,

12  correct?

13       A    That is correct.

14       Q.   In your opinion, Dr. Lembke, the FDA was

15  just wrong on this issue, correct?

16       A    They were wrong and also to some extent

17  duped.

18       Q.   Do you believe they were wrong, Dr.

19  Lembke?  That's my question.  I would like you to

20  answer my questions.

21       A    Yes.

22       Q.   So putting aside some of the details

23  that we just covered, at bottom you believe that

24  doctors have prescribed too many opioid medications,

25  correct?

```
 1                    Frye Hearing - Dr. Lembke            130

 2          A    Yes.

 3          Q.   As part of your work in this case,

 4     you've not identified any specific prescription for

 5     an opioid medication written in the State of New

 6     York that you believe is medically unnecessary,

 7     correct?

 8               And, again, I'm focused on your work in

 9     forming your opinions for this case, that which was

10     disclosed to the Defendants.  I'm not talking about

11     anecdotal conversations you may or may not have had.

12     I'm really trying to focus on the basis of your

13     opinions in this case as disclosed to the parties.

14               So do you need me to repeat the

15     question?

16          A    Sure.

17          Q.   So as part of your work in this case, in

18     forming your opinions here you have not identified

19     any specific prescription for an opioid medication

20     written in the State of New York that you believe is

21     medically unnecessary, correct?

22          A    It's hard for me to answer that yes or

23     no.  I did research for my book, which preceded my

24     involvement in this litigation, which just formed my

25     opinion, and in that process I did qualitative
```

```
 1                  Frye Hearing - Dr. Lembke              131

 2      interviews, including with individuals in New York

 3      State.

 4               Q.   Okay.  Just so we have absolute clarity

 5      on this, why don't we go ahead and turn to page 207

 6      of your January 2020 deposition.  For everyone in

 7      the courtroom it's page 207, lines 21, and it runs

 8      on to page 208, line 3.  Pam has pulled it up.

 9      Thank you very much, Pam.

10               So at line 21 you were asked:

11               "So my question was a bit different, so

12      let me just ask this:  Is your opinion in this case

13      based on identifying concrete examples of specific

14      prescriptions of any opioids written in New York

15      that you believe, in your opinion, were medically

16      unnecessary or inappropriate?

17               ANSWER:  My opinion is not based on

18      specific prescriptions, it's based on aggregate

19      prescriptions."

20               That was the testimony that you gave in

21      your deposition in this case, correct?

22               A    Yes.

23               Q.   Did you include those qualitative

24      interviews that you just referenced?  Did you

25      include those interviews in your expert materials in
```

```
 1                    Frye Hearing - Dr. Lembke              132

 2     this case?

 3             A    Yes.

 4             Q.   Okay.  And can you identify where those

 5     are located in your expert materials?

 6             A    Defense asked for those documents.  They

 7     were copied and given to defense counsel.  They were

 8     used in deposition.  I was asked questions regarding

 9     those documents in deposition.

10             Q.   And you gave the answer, the aggregate

11     prescription is what you relied upon.  That's what

12     you testified to at the deposition, right?

13                  Your opinion is not based on specific

14     prescriptions, in terms of forming your opinion in

15     this case, it was based on aggregate prescriptions,

16     correct?

17             A    That is what I testified at the

18     deposition, yes.

19             Q.   And you can't point to any particular

20     prescription for any Janssen opioid medications and

21     tell the jury that those are medically unnecessary,

22     that's not something that you're going to do in this

23     case, correct?

24             A    No.

25                  THE COURT:  "No," or "no," not correct?
```

```
1                    Frye Hearing - Dr. Lembke            133
2              THE WITNESS:  Sorry.  Ask the question
3         again.
4         Q.   So I'll rephrase it a little bit.
5              You can't point to any particular
6    prescription for any Janssen opioid medications and
7    tell the jury that those are medically unnecessary?
8         A    No, I cannot point to any specific
9    Janssen prescriptions.
10             Q.   The same is true for Allergan, correct?
11        A    Yes.
12             Q.   And Teva?
13        A    Yes.
14             Q.   Endo?
15        A    Yes.
16             Q.   Mallinckrodt?
17        A    Yes.
18             Q.   So your opinion in this case instead is
19   that the total number of opioid prescriptions
20   written was too many, right?
21        A    Yes.
22             Q.   Even though you're focused on the total
23   number of opioid prescriptions, you still don't know
24   what the right number of opioid prescriptions is,
25   correct?
```

```
 1                    Frye Hearing - Dr. Lembke               134
 2            A    I don't think that's correct.  No, I do
 3       have an opinion about that.
 4            Q.   Okay.  So let's go and pull up your
 5       deposition.  It's page 115 -- let me ask it slightly
 6       differently before we do that, Pam, actually, one
 7       moment.
 8                 You don't know the right number of
 9       patients -- I mean, let's set aside total number of
10       prescriptions.  You don't know the right number of
11       patients who should be prescribed opioid medications
12       in this country are in New York or not; do you?
13            A    Well, I'm not sure what you mean by "the
14       right number."  I mean, I don't have a specific
15       number.  I do have an opinion that we should be
16       prescribing a lot less than we're currently
17       prescribing and for a much narrower indication.
18            Q.   Okay.  So you think it should be less,
19       but my question is what is the right number?  You
20       don't know what the right number of prescriptions
21       is, correct?
22            A    I have not calculated a single number,
23       no.
24            Q.   And, in fact, the most you've testified
25       to at your deposition is you said:  It's hard to say
```

```
 1                   Frye Hearing - Dr. Lembke            135

 2      what the number should be.  I think it should be

 3      lower.  Correct?  That's what you said at your

 4      deposition?

 5           A    Yes.

 6           Q.   Okay.  So that means you can't tell the

 7      Court, for example, how many fewer Kadian

 8      prescriptions should have been written, correct?

 9           A    As I said to the Judge earlier, a rough

10      estimate is that we're writing four to five times

11      too many opioid prescriptions compared to what we

12      were writing in the 1990s.  So that could also apply

13      to Kadian's products.

14           Q.   Is it your opinion that the correct

15      number of prescriptions is those that were written

16      in 1990?

17           A    I think we were closer to what was

18      appropriate for the actual need for analgesia in the

19      population.

20           Q.   And that was -- in 1990 you do

21      understand that the Defendants' products mostly did

22      not exist, correct?  Do you understand that?

23           A    There are a lot of products.  I don't

24      know the exact dates of every single product and

25      when it came out on the market.
```

```
 1                  Frye Hearing - Dr. Lembke              136
 2        Q.   So you don't know that most of the
 3   Defendants' products at issue in this case didn't
 4   exist in 1990; is that your testimony, Dr. Lembke?
 5        A    I'd like to see the material on that.
 6   I'm happy to review any additional material.
 7        Q.   I'm just asking if you happen to know as
 8   an expert opining in this case, whether the vast
 9   majority of the products at issue in this case did
10   not exist in 1990; do you know that or not?
11        A    Well, I, I would disagree that it's the
12   vast majority.  Morphine was available, OxyContin
13   was available, hydrocodone products were available.
14        Q.   I'm talking about the Defendants'
15   branded products at issue in this litigation as a
16   starting point, most of them did not exist; do you
17   know that or not?
18             If you don't, that's fine, Dr. Lembke.
19   I'm just trying to get an understanding of your
20   knowledge of those medications.
21        A    Well, you're wanting me to agree with
22   the statement that I'm reluctant to agree with,
23   because I would want to see more material.
24        Q.   Because you don't know, without seeing
25   more material, you can't tell me; is that fair to
```

```
 1                    Frye Hearing - Dr. Lembke              137

 2      say?

 3              A    Yes, that is fair to say.

 4              Q.   Okay.  And, you know, I just want to ask

 5      a couple more on this point, because I think it's

 6      important for us all to be clear on this.

 7                   Right now sitting here today, you can't

 8      testify as to how many fewer Nucynta prescriptions

 9      should have been written at any point in time,

10      correct?

11                   And, I mean, you know, how many should

12      have been written or should not have been written,

13      you can't do that as you sit here today, correct?

14              A    I can't provide a specific number, no.

15              Q.   The same is true for Exalgo?

16              A    Yes.

17              Q.   Actiq?

18              A    Yes.

19              Q.   That's really true for any individual

20      opioid medications that were sold or distributed or

21      dispensed by any Defendants in this case, correct?

22              A    Yes.

23              Q.   So let's talk more about the factors

24      that led to the number of prescriptions of opioids

25      in New York, generally in Suffolk and Nassau County
```

1                 Frye Hearing - Dr. Lembke                138

2        specifically.

3                     You do agree that some doctors actually

4        prescribed opioids purely for their own personal

5        profit knowing that the individuals to whom they

6        were prescribing didn't really need the medications,

7        correct?

8                A    Yes.

9                Q.   Doctors who prescribe opioids to people

10       knowing that they don't actually need the

11       medications, those doctors are commonly referred to

12       as pill mill doctors, correct?

13               A    Yes.

14               Q.   They're not prescribing opioids because

15       they believe the prescriptions are appropriate based

16       on anything anyone said, correct?

17               A    Yes.

18               Q.   That would include Defendants, they're

19       not doing it based on anything the Defendants said

20       when they're out there committing those crimes,

21       correct?

22               A    Yes.

23               Q.   You do recognize that pill mills have

24       contributed to the opioid problem, correct?

25               A    Yes.

1

2    Q.   You're aware, from at least

3    lay-newspaper articles, I believe you identified

4    those before, that there have been pill mill doctors

5    in New York, right?

6    A    Yes.

7    Q.   But you can't identify any specific pill

8    mills in New York State, correct?

9    A    Correct.

10   Q.   So it's fair to say that you haven't

11   taken steps to measure or quantify the impact of

12   pill mills in causing opioid abuse, misuse or

13   overdose, that wasn't part of your methodology,

14   correct?

15   A    That's incorrect.

16   Q.   Okay.  So let me go here.

17        I understand you published an article in

18   JAMA in 2016 with Jonathan Chen, an altered view of

19   2013 Medicaid data on opioid prescribing; are you

20   pausing because of that?

21   A    Yes.

22   Q.   Okay.  So you know that -- and thanks

23   for that Medicare data -- you know that many pill

24   mill doctors actually run all cash businesses and

25   don't accept insurance, correct?

```
1                    Frye Hearing - Dr. Lembke            140
2            A    Yes.
3            Q.   And Medicare is a form of insurance,
4       right?
5            A    Yes, it is.  Yes.
6            Q.   I need an oral answer for the
7       transcript.  Thanks, Dr. Lembke.
8                 If pill mill doctors don't accept an
9       insurance, their prescriptions wouldn't show up in
10      Medicare data, correct?
11           A    That's true.
12           Q.   So setting aside that in your 2006 JAMA
13      article addressing Medicare data you conclude -- I'm
14      sorry, setting that aside, in that article you
15      conclude that the overall increase in opioid
16      prescribing was not primarily due to pill mill
17      doctors, correct?
18           A    That's correct.
19           Q.   Okay.  But the article doesn't address
20      the impact of pill mill prescribers on specific
21      patient outcomes, correct?
22           A    That is true.
23           Q.   Okay.  And so nothing in the article
24      directly quantifies the impact of prescriptions from
25      pill mill doctors on opioid abuse, misuse and
```

```
 1                    Frye Hearing - Dr. Lembke           141
 2     overdose, fair?
 3            A     That is fair.
 4            Q.    So let's talk about doctor shopping
 5     next.
 6                  You agree that in some circumstances
 7     patients themselves engage in manipulative behaviors
 8     to obtain opioid medications from doctors, right?
 9            A     Yes.
10            Q.    And one example is you know of a patient
11     manipulating a prescriber is when a patient goes to
12     multiple doctors to get the same or similar
13     prescriptions, right?
14            A     Yes.
15            Q.    That's called doctor shopping; isn't it?
16            A     Yes, that's correct.
17            Q.    To be clear, doctor shopping patients
18     essentially lie to their doctors to get more opioid
19     prescriptions, correct?
20            A     Yes.
21            Q.    You would agree that doctor shopping
22     often leads to improper prescriptions, right?
23            A     Yes.
24            Q.    You would agree that doctor shopping is
25     certainly part of the opioid abuse problem in New
```

```
 1                    Frye Hearing - Dr. Lembke            142
 2     York, correct?
 3            A    Yes.
 4            Q.   Well, one way to identify patients who
 5     may be doctor shopping is to look at the data
 6     maintained by a state's prescription drug monitoring
 7     program, correct?
 8            A    Yes.
 9            Q.   You haven't looked at New York's
10     prescription drug monitoring program data in forming
11     your opinions in this case, correct?
12            A    That's correct.
13            Q.   So that means you have not tried to
14     identify how many prescription opioid pills were
15     dispensed improperly as a result of doctor shopping,
16     fair?
17            A    Not by looking at the prescription drug
18     monitoring database.
19            Q.   Well, it wasn't part of your methodology
20     in this case to actually measure the impact of
21     doctor shopping on the opioid abuse problem in New
22     York, correct?
23            A    That is correct.
24            Q.   So let's turn to opioid prescriptions
25     that were illegally obtained without any
```

Frye Hearing - Dr. Lembke                143

1

2     prescription at all.

3                 Illegally obtaining opioid medications

4     is often referred to as diversion, correct?

5         A    Yes.

6         Q.   Do you agree that sometimes prescription

7     opioid pills are stolen from production facilities

8     during transit from production facilities or from

9     retail pharmacies; is that right?

10        A    Yes.

11        Q.   Opioid pills that were diverted from

12    production facilities, pharmacies or during transit

13    were not prescribed by a doctor, correct?

14        A    That is correct.

15        Q.   You agree that this type of diversion

16    has been part of the opioid abuse problem in New

17    York, right?

18        A    Yes.

19        Q.   But you've not identified the number of

20    these incidents of diversion in forming your

21    causation opinion in this case; have you?

22        A    No.

23        Q.   You don't know what percentage of pills

24    are diverted from pharmacies or distributors; do

25    you?

```
1                  Frye Hearing - Dr. Lembke          144
2            A    No.
3            Q.   In fact, you aren't even offering an
4      opinion on thefts from pharmacies or distributors in
5      this case, correct?
6            A    Pardon me?
7            Q.   I just want to make sure you weren't
8      offering an opinion on thefts from pharmacies or
9      distributors in this case, correct?  Right?
10           A    I can't answer that yes or no.
11           Q.   Well, let me try, I'm going to rephrase
12     it one more time and see if we can do this before we
13     go to the deposition.
14                Are you offering any opinion in this
15     case about any theft from a distributor in this
16     case?
17           A    I am offering opinion on diversion but
18     not specifically necessarily due to theft.
19           Q.   Okay.  So I just really need you to
20     focus on the question.  That was my question.
21                You're not offering opinions on thefts
22     from pharmacies or distributors in this case,
23     correct?
24           A    Correct.
25           Q.   And so it's fair to say that you've not
```

```
 1                    Frye Hearing - Dr. Lembke              145

 2      tried to quantify the impact of this type of

 3      diversion on the opioid abuse crisis in New York;

 4      it's not part of your methodology to quantify this

 5      diversion, correct?

 6              A    That's correct.

 7              Q.   One of your opinions in this case is

 8      that increased supply of prescription opioids

 9      contributed to more individuals turning to heroin,

10      correct?

11              A    Yes.

12              Q.   You agree that heroin and other

13      illicitly manufactured opioids are supplied by drug

14      dealers and cartels, right?

15              A    Yes.

16              Q.   Despite opining on what you believe was

17      the cause of heroin use, are you aware that there

18      were many -- there were more heroin users in New

19      York City in the mid 1970s than in 2000?

20              A    I haven't seen material to that effect,

21      but I'm happy to review, and if you have something

22      you want me to read.

23              Q.   So you're not aware of that; is that

24      your testimony?

25              A    Yes.
```

1                     Frye Hearing - Dr. Lembke              146

2          Q.   You're not aware of it, correct?

3          A    That's correct.

4          Q.   No part of your methodology involved

5     looking at the illicitly manufactured opioid market

6     in New York, correct?

7          A    That's correct.

8          Q.   So let's talk more about the things that

9     may have harmed New York residents.

10              For example, do you believe that other

11    pharmaceutical companies, that are not Defendants in

12    this case, contributed to opioid related harms in

13    New York, right?

14         A    I'm sorry, could you --

15         Q.   Do you want me to say it again?

16         A    There are a lot of Defendants in this

17    case.  Are you referring to a specific opioid

18    manufacturing --

19         Q.   Right now as you sit here, do you

20    believe that other pharmaceutical companies, other

21    than the Defendants in this case, contributed to

22    opioid related harms in New York?

23         A    Yes.  I mean, I, I look at it as a sort

24    of aggregate influence.

25         Q.   Okay.  And do you believe that doctors

```
 1                    Frye Hearing - Dr. Lembke              147

 2     contributed to opioid related harms in New York,

 3     correct?

 4            A    Yes.

 5            Q.   The FDA also contributed to the harms in

 6     your opinion, correct?

 7            A    Yes.

 8            Q.   State Medical Boards and the Federation

 9     of State Medical Boards also contributed?

10            A    Yes.

11            Q.   Formulary and reimbursement policies of

12     insurance companies and other third-party pairs also

13     contributed in your opinion, correct?

14            A    Yes.

15            Q.   So let's talk a little bit about each of

16     those.

17                 Although you believe that there are

18     pharmaceutical companies other than the Defendants

19     here that bear some responsibility, you have not, as

20     part of your opinion in this case, quantified the

21     contribution of those non-Defendant pharmaceutical

22     companies; have you?

23            A    No.

24            Q.   When you say doctors bear some

25     responsibility, that means all doctors, not just the
```

1

2    pill mill doctors we discussed before, correct?

3         A    Yes.

4         Q.   Then in the course of writing your book

5    you took notes reflecting that some of your

6    colleagues just want to keep the emergency room

7    moving by getting patients out the door, right?

8         A    Yes.

9         Q.   One of your trusted colleagues said,

10   Just give them what they want, right?

11        A    Yes, she did.

12        Q.   But you haven't quantified the extent to

13   which doctors have contributed to the opioid crisis

14   in New York, correct?

15        A    Not to a specific number, no.

16        Q.   And as we discussed earlier, you think

17   the FDA got it wrong when they approved opioid

18   medications for the treatment of chronic pain,

19   correct?  I just want to make sure we're back on the

20   same page there.

21        A    Yes.

22        Q.   You also believe that the FDA

23   contributed to the prescription opioid epidemic by

24   making it easier, because I'm quoting from you,

25   making it easier for the pharmaceutical companies to

```
                        Frye Hearing - Dr. Lembke              149
 1
 2     get FDA approval from new opioids coming on the
 3     market; is that fair?
 4           A    Yes.
 5           Q.   But there's no portion of your
 6     methodology where you quantify the degree of
 7     responsibility that should be allocated to FDA,
 8     correct?
 9           A    That's correct.
10           Q.   So let's talk about some of the other
11     regulatory authorities.
12                The New York Board of Medicine has the
13     power to investigate and discipline doctors,
14     correct?
15           A    Yes.
16           Q.   It also imposes and overseas continuing
17     medical education, or CME requirements; doesn't it?
18           A    Yes.
19           Q.   The New York Board of Medicine has the
20     authority to revoke medical licenses, correct?
21           A    Yes, it does.
22           Q.   If a doctor has his or her license
23     revoked, the doctor can't prescribe opioid
24     medications, correct?
25           A    Not lawfully.
```

```
1                       Frye Hearing - Dr. Lembke              150

2              Q.    So that's correct?

3              A     That's correct.

4              Q.    And you agree that State Medical Boards,

5       including the New York Board of Medicine,

6       contributed to the opioid-related harms, right?

7              A     Yes.

8              Q.    But there's no part of your methodology

9       that quantifies the degree of responsibility that

10      should be allocated to the New York Board of

11      Medicine, correct?

12             A     That's correct.

13             Q.    You also think that model opioid

14      prescribing guidelines released by the Federation of

15      State Medical Boards made the opioid epidemic in New

16      York worse, right?

17             A     Yes.

18             Q.    So we've talked about a few government

19      regulatory agencies now but, again, to be clear, no

20      part of your methodology quantifies the

21      responsibility of any government or regulatory

22      entity, fair?

23             A     Yes.

24             Q.    You also don't, as part of your -- as

25      part of your methodology in this case, you don't
```

```
 1                    Frye Hearing - Dr. Lembke              151
 2      quantify the extent to which managed care formulary
 3      or other reimbursement policies caused or
 4      contributed to the opioid epidemic in New York,
 5      correct?
 6             A    That's correct.
 7             Q.   But you agree that managed care
 8      formulary, other reimbursement policies did
 9      influence how medication is prescribed, right?
10             A    Yes.
11             Q.   So we've talked about a number of
12      individuals and entities and other factors that you
13      believe contributed to the opioid crisis.
14                  I'd ask Pam now to pull up Slide 2 and,
15      Mr. Asher, if you can, hand that out in court.  This
16      one will be pretty quick.  And if you can go ahead
17      and pull that up.
18                  So, again, we've talked about a number
19      of individuals and entities and other factors that
20      you believed contributed to the opioid crisis, and I
21      think they'll pop up on the screen here in a moment.
22                  But to be clear, Dr. Lembke, you've not
23      specifically quantified the responsibility of any of
24      those factors; have you?
25             A    Not with a specific number, no.
```

```
1                    Frye Hearing - Dr. Lembke              152
2              MS. STRONG:  Okay.  So we just don't
3         know.
4              No further questions at this time, your
5         Honor.  Thank you, Dr. Lembke.
6              THE WITNESS:  You're welcome.
7              MR. PYSER:  Your Honor, this is Steven
8         Pyser, I'm up next.  Completely up to the
9         Court if you want to take a break now or you
10        just want me to jump in.
11             THE COURT:  We're only working for an
12        hour, so jump in.
13             THE WITNESS:  Mr. Pyser, can you improve
14        your sound at all?  The sound is not good on
15        my end, neither is my hearing.
16             MR. PYSER:  I will do my best to improve
17        my sound.
18   CROSS-EXAMINATION
19   MR. PYSER:
20        Q.   Dr. Lembke, I just want to start with
21   some questions about your personal experience.
22             Have you ever worked for a
23   pharmaceutical wholesale distributor?
24        A    No.
25        Q.   Do you have any training or expertise in
```

1

2    supply chain management?

3         A    No.

4         Q.   Do you have any training or expertise in

5    the distribution of controlled substances?

6         A    No.

7         Q.   Do you have any training or expertise in

8    suspicious order monitoring for controlled

9    substances?

10        A    No.

11        Q.   Do you have any training or expertise in

12   a distributor's legal or regulatory responsibilities

13   concerning distribution of controlled substances?

14        A    I am aware of the Controlled Substances

15   Act and its statement that every player in the

16   supply chain has a responsibility to steward those

17   pills and to monitor suspicious orders.

18        Q.   But you don't have any expertise in a

19   distributor's legal or regulatory responsibilities

20   with respect to controlled substances; do you?

21        A    I don't have specific training beyond my

22   medical training and my medical experience, no.

23        Q.   Doctor, if you could, Dr. Lembke, do you

24   recall giving a deposition in the MDL case on April

25   24th 2019?

Frye Hearing - Dr. Lembke                    154

 1

 2          A     Yes, I recall giving that deposition.

 3          Q.    Now, if you're able to control the

 4     screen and bring up page 276, lines 5 through 9, and

 5     in that deposition you were asked:

 6                "Do you have any training or expertise

 7     in a distributor's legal or regulatory

 8     responsibilities concerning the distribution of

 9     controlled substances?"

10                And you answered:  "No."

11                Is that the testimony you gave under

12     oath?

13          A     Yes.

14          Q.    Have you ever designed a suspicious

15     order monitoring program?

16          A     Yes.

17          Q.    Dr. Lembke, you recall being deposed in

18     this case in New York?

19          A     Yes.

20                MR. PYSER:  Matt, if you can pull up the

21                January 16th 2020 deposition transcript at

22                page 170, line 24, through 171, line 1.

23          Q.    You were asked:

24                "Have you ever designed a suspicious

25     order monitoring program?"

```
 1                    Frye Hearing - Dr. Lembke              155

 2              And you answered:  "No."

 3              Was that the testimony you gave under

 4    oath?

 5         A    Yes.

 6         Q.   Dr. Lembke, I'd like to ask you a little

 7    bit about something from your report on page 13 of

 8    your report in paragraph 2.  If you have it handy I

 9    can read it to you as well.  You wrote the

10    following:  "Opioid prescribing began to increase in

11    the 1980s and became prolific in the 1990s and the

12    early part of the 21st century representing a

13    radical part on shift in the treatment of pain and

14    creating more access to opioids across the United

15    States."

16              Did I read that correctly?

17         A    Yes.

18         Q.   And specifically, part of your opinion

19    is that one of the ways that the paradigm shifted is

20    that opioids became a first-line treatment for minor

21    pain conditions and chronic pain conditions; is that

22    right?

23         A    Yes.

24         Q.   As a result of that paradigm shifting in

25    the treatment of pain it was generally accepted
```

```
 1                   Frye Hearing - Dr. Lembke              156

 2      medical practice to prescribe opioids to patients

 3      for chronic non-cancer pain, correct?

 4           A    Yes.

 5           Q.   Another result of the paradigm shift was

 6      that doctors prescribed opioids in higher doses as

 7      part of the generally accepted medical practice; is

 8      that right?

 9           A    Yes.

10           Q.   And doctors, as part of generally

11      accepted medical practice, also prescribed opioids

12      on a longer term basis, correct?

13           A    Yes.

14           Q.   When we talk about generally accepted

15      medical practice, that means that's one that most

16      doctors at the time believed was the correct

17      treatment option, correct?

18           A    Yes.

19           Q.   When we talk about generally accepted

20      medical practice, that includes the State of New

21      York, as well as the rest of the country; is that

22      right?

23           A    Yes.

24           Q.   I'm going to ask you a little bit about

25      something you were asked about this morning.  Mr.
```

```
 1                      Frye Hearing - Dr. Lembke              157

 2      Hanly brought up something called the gateway

 3      effect; do you remember that this morning?

 4              A    Yes.

 5              Q.   You never used that specific phrase,

 6      gateway effect, or published that observation in any

 7      peer-review journal articles; have you?

 8              A    No.

 9              Q.   "No," you have not?

10              A    I have not published that in any peer-

11      review journal articles.  I have used that in other

12      contexts.

13              Q.   Before you were hired as an expert

14      witness in this case Mr. Hanly brought up a book

15      that you wrote, Drug Dealer, M.D.

16              A    Yes.

17              Q.   And he noted that that book was from

18      2016, right?

19              A    Yes.

20              Q.   You worked hard on the book?

21              A    Yes.

22              Q.   Had to get your facts right?

23              A    Pardon me?

24              Q.   You tried to get your facts right as to

25      what you included in the book?
```

```
 1                   Frye Hearing - Dr. Lembke            158

 2          A    Yes, I did.

 3          Q.   So in that book, before you were hired

 4     by the Plaintiffs' lawyers here, you had concluded

 5     that the relationship between doctors' prescribing

 6     patterns and the initiation of heroin use remains

 7     unclear; is that right?

 8          A    Yes.

 9          Q.   In making that finding you cited to the

10     New England Journal of Medicine, correct?

11          A    Yes.  But I believe I cited the wrong

12     citation.

13          Q.   Do you know what the right citation is?

14          A    I can't recall it now, but I had

15     intended to use something other than what I ended up

16     using, which was a later publication.

17          Q.   But the statement itself was included in

18     your book, right?

19          A    Yes.

20          Q.   That is the relationship between

21     doctors' prescribing patterns and the initiation of

22     heroin use remains unclear?

23          A    Yes.  I had a very specific idea in mind

24     with that that I didn't clarify, but I could, if

25     you'd like me to.
```

```
                        Frye Hearing - Dr. Lembke              159
 1
 2           Q.    Dr. Lembke, did you or did you not write
 3      that the relationship between doctors' prescribing
 4      patterns and the initiation of heroin use remains
 5      unclear?
 6           A    Yes.
 7           Q.    I want to shift gears a little bit
 8      towards some of the marketing issues that you were
 9      asked about this morning.
10           A     Okay.
11           Q.    Can you identify any false or misleading
12      claim about opioids made by a pharmaceutical
13      distributor that's been named as a Defendant in this
14      case?
15           A    Yes, I can.
16           Q.    Well, Dr. Lembke, I'd like to direct you
17      to your New York deposition at page 70, line 14, and
18      you were asked at the time the same exact question I
19      just asked you, and that was can you identify any
20      false or misleading claim about opioids that was
21      made by a pharmaceutical distributor that has been
22      named as a Defendant in this case, and you answered
23      that question no.
24                 Is that your testimony under oath?
25           A     Yes.  That was my testimony.
```

```
 1                    Frye Hearing - Dr. Lembke              160
 2            Q.   And it was true at the time?
 3            A    At the time it was true.
 4            Q.   That testimony was given after you
 5     submitted your report in New York State, correct?
 6            A    Yes.
 7            Q.   You've not filed a supplemental report
 8     in New York State, the report you filed is the only
 9     report we have from you in New York State; is that
10     right?
11            A    That's correct.
12            Q.   On page 6 of that report, I want to
13     refer you to opinion 3.  At opinion 3 you wrote:
14     "The pharmaceutical opioid industry contributed to
15     the paradigm shift in opioid prescribing through
16     promotional materials and its use and manipulation
17     of key opinion leaders, continuing medical education
18     courses, professional medical societies, Federation
19     of State Medical Boards, and the Joint Commission to
20     convey misleading messages about the safety and
21     effect -- and efficacy of prescription opioids."
22                 Is that a correct reading of your
23     opinion 3?
24            A    Yes.
25            Q.   So I would like to break that down and
```

```
 1                    Frye Hearing - Dr. Lembke              161
 2      just talk about the role of distributors or lack of
 3      role of distributors as to each of those, okay?
 4              A    Sure.
 5              Q.   When you say the pharmaceutical opioid
 6      industry used and manipulated key opinion leaders,
 7      you're not talking about distributors, correct?
 8              A    That's correct.
 9              Q.   When you say the pharmaceutical opioid
10      industry used and manipulated continuing medical
11      educational courses, you're not talking about
12      distributors?
13              A    No.
14              Q.   "No," you're not talking about
15      distributors?
16              A    I'm not talking about distributors, no.
17              Q.   When you say the pharmaceutical opioid
18      industry used and manipulated professional medical
19      societies, you're not talking about distributors
20      there either; are you?
21              A    No.
22              Q.   When you say the pharmaceutical opioid
23      industry used and manipulated the Federation of
24      State Medical Boards and the Joint Commission there,
25      you're not talking about distributors either; are
```

```
                          Frye Hearing - Dr. Lembke              162
 1

 2      you?

 3               A    No.

 4                    THE COURT:  You know, when a question

 5               calls for a yes or no, it might be a

 6               universal recommendation to have every

 7               witness watch the movie My Cousin Vinnie,

 8               when he is asked originally by a deputy he's

 9               told, You shot the sheriff.  He says, I shot

10               the sheriff.  Then when the deputy gets on

11               the stand, what did he say?  He says, I shot

12               the sheriff.

13                    So when you say like no to that last

14               question, you really mean something else.

15               You've been doing a good job.  You've been

16               saying, No, I do not, or yes, I do.  So for

17               purposes of the record just --

18                    THE WITNESS:  Okay.  Thank you.  I've

19               been worried to say more than yes or no.

20                    THE COURT:  All right.  Am I the only

21               person in this building that saw My Cousin

22               Vinnie?  Just curious.  Let's go.

23               Q    Let's try to clean that up, if we could,

24      because I think we understood what you were saying.

25                    For each of those last five questions
```

```
 1                    Frye Hearing - Dr. Lembke              163
 2      that I asked you about distributors, your reference
 3      there did not include any action by distributors; is
 4      that correct?
 5              A    My reference there does not include any
 6      action by distributors, that is correct.
 7                   MR. PYSER:  Thank you, Dr. Lembke, and
 8                   thank you, your Honor, as well for helping
 9                   clean up.
10                   THE COURT:  Is Mr. Carter -- he was
11                   referenced in a September 2nd letter as being
12                   an examiner; is that you, sir?
13                   MR. CARTER:  Yes, it is.
14                   THE COURT:  How are you?
15                   MR. CARTER:  I'm doing well.  I have
16                   about ten minutes of questions, so if you
17                   would like me to proceed now, I can.
18                   MR. PYSER:  I'm sorry, your Honor, I
19                   wasn't quite done.
20                   THE COURT:  I heard you say "thank you,"
21                   so that was my queue...
22                   MR. PYSER:  That was to my Cousin Vinnie
23                   reference there.
24                   THE COURT:  Mr. Carter, sit down and
25                   enjoy the show.
```

```
 1                    Frye Hearing - Dr. Lembke              164
 2              Go ahead.
 3         Q.    All right.  As part of your methodology
 4    in this case, before serving your report, Dr.
 5    Lembke, did you consider any documents produced by
 6    Cardinal Health?
 7         A    No.
 8         Q.    Okay.  And same question for
 9    AmerisourceBergen.
10              Before serving your report, did you
11    consider any documents produced by
12    AmerisourceBergen?
13         A    No.
14         Q.    As to McKesson Corporation, other than a
15    single document that was brought up at your
16    deposition, the Nucynta savings card, other than
17    that single document, did you consider any other
18    documents produced by McKesson?
19         A    Not before submitting my report, no.
20         Q.    As to that Nucynta document, you
21    describe that document as a coupon or a savings
22    card; is that right?
23         A    That's correct, yes.
24         Q.    So just talking generally about such
25    documents, a savings card that offers co-pay
```

```
                        Frye Hearing - Dr. Lembke              165
1
2    assistance for the cost of prescriptions, you
3    understand that when a patient has a card for co-pay
4    assistance, the patient still needs to obtain a
5    prescription before they can obtain the medication;
6    is that right?
7         A    Yes, of course I understand that the
8    patient still needs a prescription.
9         Q.   And if a doctor has written a
10   prescription, that means the doctor has made a
11   decision that that particular medication is the
12   appropriate medication for treatment of pain in that
13   patient; is that right?
14        A    That's harder for me to answer yes or
15   no.
16             MR. PYSER:  Bear with me one second,
17        doctor.
18        Q.   So presumably when a doctor has made a
19   decision that a medication like Nucynta is an
20   appropriate medication for acute treatment of pain
21   in the patient and issues a prescription, that
22   doctor has made a decision based on their own
23   medical judgment, correct?
24        A    Not entirely.  There are other
25   influences that are at play in a doctor's decision.
```

1

2    For example, if a drug rep came by and gave them a

3    bunch of, you know, Nucynta saving cards and asked

4    them to give them to patients, that would influence

5    that decision.

6         Q.   But the ultimate decision rather to

7    prescribe or not, that decision rests with the

8    doctor, correct?

9         A    In the most superficial sense, yes.

10        Q.   So you don't believe doctors have

11   independent judgment that they exercise with their

12   patients?

13        A    Yes.  But they can only base their

14   judgment on the knowledge that they have, and if

15   that's faulty knowledge, they can't exercise good

16   judgment.

17        Q.   Do doctors have an obligation to educate

18   themselves?

19        A    Yes, they do.

20        Q.   As part of your methodology in this

21   case, did you conduct your own analysis of

22   psychiatric data, such as the ARCOS data, to reach a

23   conclusion about distribution of opioids?

24        A    No.

25        Q.   As part of your report and your work

1

2      here, you're not able to point to any particular

3      distribution of a particular medication and say that

4      the prescriptions filled by a pharmacy as a result

5      of that distribution were medically unnecessary; you

6      can't get to that level of detail, can you?

7              A    No, not to that level of detail.

8              Q.   As part of your methodology you're not

9      offering an opinion as to the appropriate number of

10     pills that should have been distributed into the

11     State of New York; are you?

12             A    Probably I have offered an opinion on

13     that topic, and I have stated before it should be at

14     least four- or fivefold less than current

15     prescribing.

16             Q.   Beyond that four- or fivefold estimate,

17     you're not putting forth a particular number of

18     pills that you believe should have been distributed

19     in the State of New York for particular medications;

20     are you?

21             A    Not a specific number, no.

22             Q.   Same thing for Suffolk County and Nassau

23     County.  You're not offering an opinion as to the

24     specific number of opioid medications that should

25     have been distributed into Nassau or Suffolk County;

```
1                    Frye Hearing - Dr. Lembke              168

2      are you?

3           A    I'm offering the same opinion for those

4      counties as for the State of New York, as I said

5      before.

6           Q.   I'd like to draw your attention to

7      another line in your report at page 18 this time.

8      Do you have that in front of you?

9           A    Yes.  Let me just turn to it.

10          Q.   This is something that was covered a

11     little bit earlier.  It's toward the top of the

12     page, the Roman number III.  It says:  "The history

13     of prescription opioid marketing distribution

14     throughout the United States means that it's highly

15     probable that prescribing rates in those counties

16     were far lower in the 1990s before such marketing

17     and distribution campaigns were implemented by the

18     Defendants."

19               Do you see that?

20          A    Yes.

21          Q.   Okay.  I want to just ask you a couple

22     of questions about the basis for that statement.

23               Can you point to any report, article or

24     analysis which concluded that the rate at which

25     healthcare providers prescribed opioids increased
```

```
 1                    Frye Hearing - Dr. Lembke              169

 2     because pharmaceutical distributors shift

 3     prescription opioids to pharmacies?

 4          A    There are, as in my report,

 5     authoritative bodies who have weighed in on this,

 6     and I agree with them that the distribution of

 7     opioid pain pills is what contributed to the

 8     increased access to prescription pain pills, and

 9     access is a huge risk factor for misuse and

10     addiction.

11          Q.   I think maybe we're talking past each

12     other.

13               What I'm asking you is whether there's a

14     report, article or analysis which concluded the rate

15     at which the healthcare providers prescribed, the

16     prescribing decisions, are you aware of any analysis

17     which concluded that healthcare providers' decisions

18     to prescribe increased because pharmaceutical

19     distributors shift prescription medicine to

20     pharmacies?

21          A    Well, I take it, as a matter of common

22     sense, that you can't get the pills to the patients

23     unless they're distributed to the pharmacies.

24          Q.   I'm not asking about getting it to the

25     patients, though, doctor.  What I'm asking you is
```

```
 1                     Frye Hearing - Dr. Lembke              170

 2     about the healthcare providers' decision to write a

 3     prescription and whether you believe that the simple

 4     fact that a distributor shifted medication to a

 5     pharmacy caused a doctor to alter their medical

 6     judgment and write more prescription opioids?

 7          A     That's hard for me to answer yes or no

 8     because I -- my sense is it's a feed forward cycle.

 9     The more that were shift, the more patients became

10     dependent on them, the more that doctors were in a

11     position to have to continue to prescribe them.

12          Q.    So sitting here today, can you point me

13     to any academic article or study that found that

14     doctors prescribing was based on the fact that

15     distributors shift pills to pharmacies?

16          A     Yeah, I'm not sure I really understand

17     the point of the question, so it's hard for me to

18     answer it.

19          Q.    You can answer the question whether you

20     understand the point of it or not.

21               So the question is:  Are you aware of

22     any study in which the authors of the study found

23     that doctors prescribing increased because of the

24     shifting by distributors of medicine to a pharmacy?

25          A     The increased distribution meant that
```

```
 1                   Frye Hearing - Dr. Lembke              171
 2      these communities had more opioids, which meant that
 3      the general population had more access, either
 4      through legitimate prescription or otherwise, which
 5      then created the need for ongoing prescribing.
 6                   So I do think that it begins with the
 7      access and not with necessarily it's a feed forward
 8      cycle.
 9           Q.   Doctor, again, you're still not
10      answering the question.
11                   The question is pointed at doctors'
12      prescribing decisions, healthcare providers'
13      prescribing decisions, and the question is:  Can you
14      point me to a study in which the authors found that
15      doctors' prescribing increased because distributors
16      shift medication to a pharmacy?
17                   THE COURT:  Just a yes or no, doctor.
18           A    No.
19                   THE COURT:  Next question.
20           Q.   Dr. Lembke, I want to return to
21      something you said this morning actually, this was
22      point 2 of your summary.
23                   And, Matt, if you could bring up point 2
24      of the summary.
25                   So point 2 was opioid prescribing grows
```

```
 1                 Frye Hearing - Dr. Lembke            172

 2     fourfold starting in the 1990s, which increased the

 3     supply of potent and deadly opioids in the general

 4     population, including New York.

 5               That was your point this morning,

 6     correct?

 7          A    Yes.

 8          Q.   And you were trying to be accurate when

 9     you testified this morning?

10          A    Yes.

11          Q.   You told the truth in your testimony?

12          A    Yes.

13          Q.   And here what you've said is that the

14     prescribing increased the supply of opioids,

15     correct?

16          A    Yes.

17               MR. PYSER:  You can take that down,

18          Matt.

19          Q.   Is it true that without a prescription,

20     medication that shifts to a pharmacy will stay on

21     the shelves of the pharmacy; is that right, doctor?

22          A    Yes.

23          Q.   Did you interview any pharmacists in the

24     State of New York for purposes of forming your

25     opinions in this case?
```

```
1                    Frye Hearing - Dr. Lembke              173

2              A    No.

3              Q.   Can you identify for the Court a

4     specific doctor in Nassau or Suffolk County who

5     prescribed more opioids because opioids were

6     available at pharmacies?

7              A    No.

8              Q.   Can you identify a specific doctor in

9     the State of New York who prescribed more opioids

10    because opioids were available at pharmacies?

11             A    No.

12             Q.   As part of your professional practice as

13    a doctor, before you prescribe a patient a

14    medication do you regularly call the pharmacies in

15    your area from which the patient could fill that

16    prescription to see if the pharmacies have the

17    medication you want to prescribe?

18             A    Not usually.

19             Q.   Dr. Lembke, do you agree with me that

20    the large majority of opioid prescriptions written

21    in New York were written for what the doctor who

22    wrote them thought was a legitimate medical purpose?

23             A    Yes.

24             Q.   The number of pills of a particular

25    medicine that a pharmacy dispenses is dependent on
```

```
 1                    Frye Hearing - Dr. Lembke          174

 2     the prescriptions written by healthcare

 3     professionals, true?

 4               A    Yes.

 5               Q.   Doctors have a responsibility to ensure

 6     that the medications they prescribe for patients are

 7     for a legitimate medical purpose, correct?

 8               A    Yes.

 9               Q.   Pharmacists can't dispense opioids

10     without a prescription, right?

11               A    Yes.

12               MR. PYSER:  No further questions, your

13          Honor.

14               THE COURT:  Are you sure?

15               MR. PYSER:  I'm sure this time.

16               THE COURT:  Okay.  We'll take 15

17          minutes.  Thank you.

18               (WHEREUPON, a short recess was taken.)

19               THE COURT:  Okay.  I don't see the

20          witness.

21               Welcome back.

22               THE WITNESS:  Thank you.

23               THE COURT:  Of course you're still under

24          oath; you know that, correct?

25               THE WITNESS:  What is that?
```

```
 1                     Frye Hearing - Dr. Lembke              175
 2                THE COURT:  I said of course you're
 3           still under oath; you know that?
 4                THE WITNESS:  Yes, thank you.
 5                THE COURT:  Mr. Carter, you're up.
 6                MR. CARTER:  Thank you, your Honor.
 7      EXAMINATION BY
 8      MR. CARTER:
 9           Q.   Good afternoon, Dr. Lembke.  We met at
10      your deposition.  My name is Ed Carter, and I
11      represent Walmart, okay?
12           A    Yes.
13           Q.   I have just a few questions this
14      afternoon, so hopefully it will move quickly.
15                You were asked some questions earlier
16      today about some of the sources and individuals that
17      you consulted in preparation for your report as part
18      of your methodology, I want to start up to that
19      topic in connection with your work in this case.
20                You did not interview any employees of
21      Nassau County or Suffolk County; did you?
22           A    No.
23           Q.   You did not interview any law
24      enforcement officers in the two counties; did you?
25           A    No.
```

```
 1                    Frye Hearing - Dr. Lembke              176
 2         Q.   You testified earlier about addiction
 3    and specifically opioid use disorder.
 4              You cannot tell us which specific
 5    individuals or cases have opioid use disorder
 6    diagnosis in Nassau County; can you?
 7         A    No.
 8         Q.   Same question for Suffolk County?
 9         A    Same answer for Suffolk County.
10         Q.   Likewise, you do not know the number of
11    cases where a decedent in that Nassau County or
12    Suffolk County was diagnosed with an opioid use
13    disorder; do you?
14         A    No.
15              THE COURT:  You mean, "yes," that is
16         correct?
17              THE WITNESS:  That is correct.
18              MR. CARTER:  Thank you, your Honor.
19         Q.   Dr. Lembke, that is not something that
20    you calculated as part of your methodology in this
21    case; is it?
22         A    No, that is not something that I have
23    calculated.
24         Q.   Likewise, you have not studied the
25    overdose death records from either counties to
```

1
2     determine whether the individuals had a diagnosis of
3     an opioid use disorder; did you?
4          A     I did not look at whether they had a
5     diagnosis of opioid use disorder.
6          Q.    The methodology that you utilized in
7     this case is not a methodology that is generally
8     accepted by psychiatrists or diagnosee in opioid use
9     disorder in a specific individual; is it?
10         A     Can you rephrase the question?
11         Q.    Sure.
12               The methodology you employed in this
13    case to reach the nine opinions that were on the
14    first slide that you showed today on direct, that is
15    not an accepted methodology for diagnosing a patient
16    in a clinical setting with an opioid use disorder;
17    is it?
18         A     Well, as part of forming my opinion I
19    did use the methods for diagnosing opioid use
20    disorder in individual patients, and my opinion is
21    informed both by my clinical professional experience
22    and the research that I did.  So I did use that
23    methodology.
24               I couldn't form an opinion about this
25    topic unless I was able to apply the DSM criteria to

```
 1                  Frye Hearing - Dr. Lembke            178
 2      diagnosing an opioid use disorder.
 3              Q.   Maybe we're talking about two separate
 4      things.
 5                   You did not apply the DSM criteria to
 6      any patient in Nassau or Suffolk County or New York
 7      State; did you?
 8              A    No, I did not apply the DSM criteria to
 9      any specific patient, as you said.
10              Q.   Thank you.
11                   Now, if you were evaluating a patient in
12      a clinical setting for a possible opioid use
13      disorder diagnosis, you would consider the full
14      context of information available to you in that
15      clinical setting; wouldn't you?
16              A    Yes.
17              Q.   For example, you would consider the
18      patient's medical history, including their mental
19      health history, and any information regarding their
20      history of substance abuse, fair?
21              A    Yes.
22              Q.   In a clinical setting you have never
23      made a diagnosis of an opioid use disorder by
24      disregarding that context and that clinical
25      indication and instead relying exclusively on
```

```
 1                  Frye Hearing - Dr. Lembke              179

 2     aggregate epidemiological statistics, that's

 3     something you've never done in a clinical setting;

 4     is it?

 5          A    No.

 6          Q.   As part of your methodology you did not

 7     evaluate specific cases or specific individuals in

 8     Nassau County or Suffolk County to determine whether

 9     they ever had a prescription for an opioid

10     medication that was made, distributed or dispensed

11     by one of the Defendants; did you?

12          A    No.

13          Q.   As part of your work in this case, you

14     described error in some of the documents that you

15     considered, I want to follow-up on that topic, all

16     right?

17          A    Okay.

18          Q.   Did you consider any documents produced

19     from the files of a pharmacy Defendant in preparing

20     your report for this case?

21          A    Yes. -- oh, pharmacy Defendant, sorry --

22     well, after submitting this report I have reviewed

23     some files like that, but not before submitting this

24     report.

25          Q.   Not for the Defendants in the New York
```

```
 1                  Frye Hearing - Dr. Lembke           180
 2     litigation, correct?
 3          A    Correct.
 4          Q.   Okay.  And just to be clear, make sure
 5     we have it for the record, in preparing your report
 6     for this case, did you consider any documents
 7     produced from the files of a pharmacy Defendant?
 8          A    No, I did not consider documents
 9     produced from the files of a pharmacy Defendant for
10     this report.
11          Q.   As part of your work in this case, did
12     you review the testimony or depositions of any
13     employees or witnesses from a pharmacy Defendant?
14          A    No.
15          Q.   As part of your methodology in this
16     case, did you study the details of the conduct of
17     any pharmacy Defendant as it pertains to Nassau
18     County or Suffolk County?
19          A    No.
20          Q.   Using Walmart, my client, as an example,
21     did you study the details of Walmart distribution
22     policies for controlled substances in Nassau or
23     Suffolk County?
24          A    No.
25          Q.   Did you study the details of the
```

```
 1                    Frye Hearing - Dr. Lembke              181

 2      processes that Walmart put in place to empower its

 3      pharmacists to exercise their professional

 4      responsibility to evaluate prescriptions?

 5              A    No.

 6              Q.   Did you review any Walmart policies to

 7      identify a specific policy that you believe should

 8      have been changed?

 9              A    No.

10              Q.   Did you identify any specific orders for

11      opioids that a Walmart pharmacy placed that Walmart

12      should have handled differently from a distribution

13      perspective?

14              A    No.

15              Q.   Did you identify any specific

16      prescriptions that Walmart should not have filled at

17      its pharmacies?

18              A    No.

19              Q.   And if I asked you all of those

20      questions for the other three pharmacy Defendants,

21      would your answers be the same?

22              A    My answers would be the same.

23              Q.   Now I want to switch gears.  You talked

24      about marketing earlier.  I want to ask you about

25      that.
```

1

2          It's true that the pharmacy Defendants

3     never marketed opioids; did they?

4               MR. HANLY:  Objection to the form.

5               THE COURT:  Time out.  There's an

6          objection.  Mr. Carter, rephrase the

7          question.  Perhaps you should share your

8          concept of marketing with the witness so

9          we're on the same page.

10              MR. CARTER:  Sure.

11         Q.   In your report, when you offer opinions

12    regarding marketing, have you offered any marketing

13    opinions that pertain to the pharmacy Defendants?

14         A    Not in my report.

15         Q.   Okay.  And as far as you're aware, did

16    the pharmacy Defendants ever market opioids?

17         A    Yes.

18         Q.   Okay.  I'd like to show you your

19    deposition.  It's the same one from the New York

20    case that you looked at earlier today.  Bear with me

21    a moment while I get the screen.

22              THE COURT:  What's the page and line,

23          please.

24              MR. CARTER:  The page and line is going

25          to be 127, line 24, and I'm just trying to

```
 1                    Frye Hearing - Dr. Lembke          183

 2          get control so that I can present.

 3                 THE COURT:  Okay.

 4          Q.   Are you able to see my screen with your

 5     transcript up, Dr. Lembke?

 6          A    Yes, I do.  I see it.

 7          Q.   All right.  So I want to direct your

 8     attention to the last page -- or, excuse me, the

 9     last line, down here at the bottom of the page:

10                 "Are you aware of any marketing of

11     opioids conducted by any of the retail chain

12     pharmacy Defendants?"

13                 And it goes to the next page.

14                 "ANSWER:  No."

15                 Do you see that?

16          A    Yes, I do.

17          Q.   That's the testimony you provided under

18     oath in your deposition in this case, correct?

19          A    Yes.  That was true at the time.

20          Q.   That was true for purposes of your

21     report in this case, correct?

22          A    Yes.

23          Q.   Since then you've never supplemented

24     your report or put the pharmacy Defendants or anyone

25     else on notice that there's been any change or
```

```
 1                    Frye Hearing - Dr. Lembke              184

 2      errata to your sworn deposition testimony, true?

 3           A    I can't speak to what Plaintiffs'

 4      counsel has notified Defendants about, but I have

 5      reviewed other records since then, which has led to

 6      my changing my opinion on this deposition question.

 7           Q.   But whatever your opinion is, that's not

 8      something you shared with anyone in New York, to

 9      your knowledge, true?

10           A    Not in my report.

11           Q.   You don't plan on testifying at trial in

12      this case with respect to marketing by pharmacy

13      Defendants, true?

14           A    If I'm asked a question about whether or

15      not pharmacies ever marketed specific products, to

16      answer that truthfully I will have to say that I am

17      aware of that having happened.

18           Q.   We can deal with the representations of

19      the various pleadings, I won't belabor the point,

20      but in these subsequent materials that you reviewed,

21      unrelated to New York and not in your New York

22      report, do any of them relate to controlled

23      substance prescription opioids?

24           A    Yes.

25           Q.   Do any of them relate to marketing in
```

```
 1                    Frye Hearing - Dr. Lembke            185
 2    Nassau or Suffolk County?
 3         A     Possibly, but there is no geographic
 4    specific information that I'm recalling.
 5         Q.    All right.  And likewise, you cannot
 6    identify any claim about opioids made by a pharmacy
 7    Defendant that you allege was false or misleading;
 8    can you?
 9         A     Again, yes, I can, because I've reviewed
10    other materials since the deposition and since my
11    report.
12         Q.    Let me pull up -- I'd like to direct you
13    to page 127 of your deposition.  Lines 20 to 23:
14              "Can you identify any false or
15    misleading claim about opioids made by one of the
16    retail pharmacy Defendants in this case?
17              ANSWER:  No."
18              Do you see that?
19         A    Yes, I do see that.
20         Q.    That was the testimony that you provided
21    under oath in your deposition in January, correct?
22         A     Yes, that was the testimony I provided
23    then.
24         Q.    Between January and today, September
25    9th, have you issued an errata to correct your
```

```
 1                   Frye Hearing - Dr. Lembke              186

 2     testimony in the New York case?

 3          A    No.

 4          Q.   Have you issued a supplemental report to

 5     update your opinions in this case on that topic?

 6          A    No.

 7          Q.   In terms of the nine opinions that were

 8     listed on your first slide -- sorry, I'm having

 9     trouble with the mouse, your Honor, excuse my

10     technical novice.

11               Back to my question, doctor.

12               The nine opinions that are listed on

13     Slide 1 that you showed today, none of them relate

14     to any marketing statements or allegedly misleading

15     statements by the pharmacy Defendants, true?

16          A    In my report I refer to the

17     pharmaceutical opioid industry and in that I include

18     the pharmacies.

19          Q.   So is it your testimony that one of the

20     nine opinions on Slide 1 references pharmacy

21     Defendants making marketing statements?

22          A    Yes.

23          Q.   All right.  I'd like to pull up Slide 1.

24               Which one of these statements references

25     a pharmacy Defendant marketing opioids?
```

```
 1                    Frye Hearing - Dr. Lembke              187
 2              THE COURT:  It's not on the screen.
 3              MR. CARTER:  That makes it harder, so
 4         let me --
 5              THE COURT:  Can somebody help out?
 6              MR. CARTER:  Your Honor, I relied on the
 7         shared Adobe, not the entire screen.  So one
 8         second, I think I can fix this I believe.
 9              THE COURT:  Halfway there, Mr. Carter.
10         You got the other one down.
11              MR. CARTER:  Okay.
12              MR. CARTER:  Is this one up now?
13              MR. HANLY:  Yes.
14         Q.   All right.  So, Dr. Lembke, you do not
15    have any references in Slide 1 to a pharmacy
16    Defendant issuing a marketing statement, correct?
17         A    That's true.
18         Q.   Thank you.
19              And, in fact, if we go through your
20    entire report for the New York case, it's also true
21    that you do not mention any pharmacy Defendant by
22    name at any location in your report, true?
23         A    True.
24         Q.   Likewise, your report does not identify
25    any pharmacy Defendant as having, to a reasonable
```

1

2      degree of medical and scientific certainty, violated

3      a regulation or duty of care in Nassau County or

4      Suffolk County, correct, that's not anywhere in your

5      report; is it?

6            A    Correct.  That's not in my report.

7            Q.    Bottom line is, because you did not

8      analyze or study the conduct of the pharmacy

9      Defendants in Nassau and Suffolk County in

10     preparation of your report, this case, you'll not be

11     offering any opinion at trial regarding the specific

12     conduct of a pharmacy Defendant in Nassau or Suffolk

13     County; do you agree with that?

14           A    Again, if I'm asked under oath to

15     testify about the role of the pharmacies, I will

16     offer an opinion that's based on additional material

17     I've seen.

18           Q.    But sitting here today, in terms of

19     what's in your report, none of those opinions are

20     articulated with specificity in your report for this

21     case, true?

22           A    That's true.

23           Q.    Last topic.  On direct you expressed an

24     opinion that doctors were duped; do you recall that?

25           A    Yes.

```
 1                    Frye Hearing - Dr. Lembke         189
 2         Q.    I would like to follow-up on that.
 3               If doctors were duped to the point where
 4    well-intentioned doctors genuinely believed that
 5    they were exercising appropriate medical judgment in
 6    prescribing opioids, you agree that the same
 7    phenomenon would also apply to pharmacists, fair?
 8         A    Yes.  Possibly.
 9         Q.    In terms of your background and
10    training, you are not familiar with the specific
11    licensing requirements for pharmacists in New York;
12    are you?
13         A    No.
14         Q.    You don't know what kind of training
15    pharmacists in New York go through; do you?
16         A    No, I don't.
17         Q.    The education and training of
18    pharmacists is not a topic that you've studied in
19    connection for this case; is that correct?
20         A    That is correct.
21         Q.    You will not be offering an opinion at
22    trial regarding what pharmacists in Nassau or
23    Suffolk understood or believed about the risks and
24    benefits of opioid medications; will you?
25         A    No.
```

```
1                    Frye Hearing - Dr. Lembke              190

2             Q.   You will not offer an opinion, starting

3     from the specific pharmacists in those two counties,

4     acted unreasonably in filling any specific

5     prescription; will you?

6             A    Not for any specific prescription, no.

7             Q.   My final question.  As part of your

8     methodology in this case, you have not identified

9     any particular case where specific prescriptions for

10    opioids should not have been filled by a pharmacist

11    acting in good faith; have you?

12            A    Not any specific case, no.

13            MR. CARTER:  Those are all the questions

14        I have for you.  Thank you.

15            THE WITNESS:  You're welcome.

16            THE COURT:  Mr. Hanly, redirect.

17            MR. HANLY:  Thank you, your Honor.

18    REDIRECT EXAMINATION

19    MR. HANLY:

20            MR. HANLY:  Could we take down that

21        slide, please.

22            Q.   Dr. Lembke --

23            A    Yes.

24            Q.   -- I'm going to ask you a few questions

25    on redirect examination.
```

First of all, just to clarify, and
perhaps I misheard or misunderstood one of the
questions asked by Mr. Carter just a few minutes
ago, the nine opinions that you hold and would give
in this case at trial, if permitted to do so by
Justice Garguilo, have nothing to do with the
diagnosis or the diagnostic criteria for addiction,
true?

A      Well, yes and no.  I mean, I, I must be
familiar with those diagnostic criteria in order to
have a working background knowledge of this problem
more broadly.

Q.    But there's nothing referred to in the
nine opinions concerning any diagnostic criteria; is
that right?

A      Well, under opinion 1 addiction is a
chronic illness.  I do describe in brief what the
diagnostic criterion are for diagnosing an opioid
use disorder.

Q.    There was a suggestion -- withdrawn.

Is there any peer-reviewed publication,
guidelines, criteria, mandates, requirements of any
sort that provide it is necessary to do widespread
surveys of physicians in order to reach opinions,

```
 1                    Frye Hearing - Dr. Lembke          192

 2      for example, about the relationship between

 3      physicians' prescribing habits and, and consequent

 4      harms, is there any set of rules that say you have

 5      to do a survey of 10 or 100 or a thousand or a

 6      million doctors in order to have a sound basis upon

 7      which to make conclusions concerning the

 8      relationship, for example, between prescribing and

 9      ultimate harms?

10           A    No, there are no mandated requirements

11      or recommended requirements to that effect.

12           Q.   You were asked a number of questions by

13      Miss Strong concerning whether you are able to

14      quantify the relative roles of different players, if

15      you will, in the opioid saga in respect of the

16      opioid epidemic, correct?

17           A    Yes.

18           Q.   All right.  And -- but you already

19      testified, before she asked you that litany of

20      questions about your ability to give percentages,

21      that you are not an econometrician, right?

22           A    That's correct.

23           Q.   You don't have any training in

24      econometrics?

25           A    That's correct.
```

1

2      Q.   And your engagement in this case by the

3  lawyers for the communities had nothing to do with

4  you providing percentages of relative liability,

5  correct?

6      A    That's correct.

7      Q.   Now, you testified, when asked a number

8  of questions by Miss Strong about surveys, you

9  answered on several occasions that you had done

10  qualitative interviews; do you remember that?

11      A    Yes.

12      Q.   In fact, you did such interviews; is

13  that correct?

14      A    Yes, I did.

15      Q.   There was a suggestion that, that was

16  not disclosed and didn't appear anywhere in your

17  report, correct?

18      A    That was suggested, yes.

19      Q.   Right.  Do you have your report in the

20  New York litigation handy?

21      A    Yes, I do.

22      Q.   Could you turn to page 5 of that report.

23      A    Yes, I'm at page 5.

24      Q.   Right.  And up at the top is paragraph

25  number 23; do you see that?

```
 1                    Frye Hearing - Dr. Lembke        194

 2          A    Yes.

 3          Q.   And I'm just going to read the beginning

 4     part of that paragraph.  You wrote: "In forming the

 5     opinions expressed in this report, I have relied on

 6     my medical training, more than 20 years of clinical

 7     experience, and my own research on opioid

 8     prescribing.

 9               My research began circa 2001 and has

10     been multimodal.  I have done qualitative interviews

11     with patients, providers and others in the

12     healthcare field on questions related to opioid

13     prescribing."

14               Did I read that correctly?

15          A    Yes.

16          Q.   That is, in fact, true; is it not?

17          A    Yes.

18          Q.   That while you did not do surveys of 10

19     or 100 or a thousand or a million doctors or

20     patients, you did selective qualitative interviews

21     of that very same population?

22          A    Yes.

23          Q.   Now, Miss Strong also took you through a

24     number of risk factors for the development of opioid

25     use disorder or addiction, right?
```

```
 1                    Frye Hearing - Dr. Lembke           195

 2          A    Yes.

 3          Q.   But I don't recall her calling to your

 4    attention anything about dose and duration of the

 5    administration of opioids as constituting a risk

 6    factor.

 7               My question to you is:  Are dose and

 8    duration of the administration of these kinds of

 9    drugs a risk factor for the development of an

10    addiction?

11          A    Yes.  The science showed that those are

12    important risk factors for the development of

13    addiction.

14          Q.   Do you accept that science?

15          A    Yes, I do.

16          Q.   Okay.  Is that concept generally

17    accepted, that dose and duration -- in other words,

18    how strong the pills are or how many you're taking

19    and for how long are reflective or indicative of

20    what your risk would be?

21          A    Yes.  Increasing dose and duration

22    increase the risk of both addiction and overdose.

23          Q.   You were asked questions about the FDA.

24    I just want to ask you a couple of brief questions

25    about that.
```

```
1                 Frye Hearing - Dr. Lembke              196

2              The FDA does not have laboratories where

3         they do widespread testing of drugs; isn't that

4         true?

5              A    That's true.

6              Q.   In fact, in determining whether a

7         particular drug is safe and efficacious, the FDA has

8         to rely upon information provided to it by what's

9         called the response of the company that's making the

10        drug, right?

11             A    Yes.

12             Q.   So there's a kind of a necessity on the

13        part of the FDA to take at face value what is told

14        to it concerning the results of any review of safety

15        or efficacy?

16                  MS. STRONG:  Objection, your Honor.

17                  This is Sabrina Strong again.  I am

18             trying to be very lenient with leading.

19                  THE COURT:  I got it.

20                  MS. STRONG:  Leading.

21                  THE COURT:  I'll sustain it.  Rephrase

22             the question.

23                  MR. HANLY:  Okay.

24                  THE COURT:  It's too suggestive of the

25             answer.
```

```
 1                    Frye Hearing - Dr. Lembke              197

 2              MR. HANLY:  Got it, Judge.

 3         Q.    The FDA does not do its own physical

 4    research on proposed new drugs, correct?

 5         A     That's correct.

 6         Q.    Where does the FDA get information then

 7    concerning the attributes of that proposed new drug

 8    or prospective indication for that new drug; where

 9    does that information come from?

10         A     From the drug companies who are making

11    the drug and trying to get approval for the drug.

12         Q.    Now, there was a question asked by Mr.

13    Pyser as to whether you used the term gateway effect

14    in any peer-reviewed publication of yours, right?

15         A     Yes.

16         Q.    You testified that, no, that term did

17    not appear in any such publication, but, of course,

18    it does appear, in fact, it's part of the name of a

19    chapter in your book, correct?

20         A     That's true.

21         Q.    All right.  And isn't it also true that

22    subsequent to the publication of your book in 2016

23    that at least one peer-reviewed report used the term

24    gateway effect?

25         A     Yes.
```

```
1                    Frye Hearing - Dr. Lembke              198

2          Q.   And I'm just looking for that page, that

3     slide that has that on it.

4          A    I would say that gateway effect is a

5     commonly accepted term in addiction medicine.  It's

6     not a new term or a creative term.

7          Q.   But, in fact, in the year 2017, a year

8     after the publication of your book, there was

9     published a peer-reviewed article that actually

10    references the gateway effect, right?

11         A    Yes.  Which article was that?  Was that

12    the Harbaugh?

13         Q.   I believe it's Harbaugh, but I can't

14    seem to find it.

15              But in any case, we can agree that

16    subsequent to your use of the term gateway effect it

17    was used by other medical researchers and authors,

18    right?

19         A    Yes.

20              MR. PYSER:  Objection.

21              Leading again.

22              THE COURT:  I'll allow it.  Go ahead.

23              If we were going to hear an objection for

24              every leading question, we'd be here until

25              Thanksgiving.
```

```
 1                   Frye Hearing - Dr. Lembke           199
 2          Q.    Okay.   The report that I was referencing
 3    was Slide 18 that we looked at, doctor, and it's the
 4    NASEM report on pain management and the opioid
 5    epidemic.
 6              We've called out this particular slide.
 7    We see that this paper was published in 2017, the
 8    year after your book in which you used the term
 9    gateway effect, and there we see a quote from the
10    NASEM report.  "Preponderance of evidence suggests
11    that the major increase in prescription opioid use
12    beginning in the late 1990s has served as a gateway
13    to increased heroin use."
14              Did I read that correctly?
15          A    Yes.
16          Q.    You didn't write that; did you?
17          A    No.
18          Q.    You weren't part of the folks who wrote
19    this consensus study report; were you?
20          A    No.
21          Q.    All right.  Last area.  Promise, your
22    Honor.
23              Miss Strong's Slide Number 2 is, is the
24    slide that consists of these circles with various
25    things written in; do you remember that, doctor?
```

```
 1                     Frye Hearing - Dr. Lembke              200

 2           A    The one with the big question mark in

 3      red at the end?

 4           Q.   Yes.

 5           A    Okay.  Yes.

 6           Q.   Okay.  And so let me see if I can use

 7      this.  There we are.  Okay.

 8                And so Miss Strong labeled these

 9      Lembke's Factors, and let me see if I understand it.

10                Do you agree that these are some of the

11      factors that in your opinion relate to the opioid

12      epidemic?

13           A    Yes, they are some of the factors.

14           Q.   But they're not all of the factors; are

15      they?

16           A    No.

17           Q.   Because what's missing from these --

18      this collection of circles of varying --

19                THE COURT:  Mr. Hanly, ask the witness

20           what's missing.

21           Q.   What, if anything, are missing from

22      these -- from this chart?

23           A    Well, Miss Strong referred to other

24      pharmaceutical companies by which I believe she

25      meant those not involved in the litigation, so
```

```
 1                    Frye Hearing - Dr. Lembke              201

 2      that's a big circle that's missing.

 3                   What's also missing is key opinion

 4      leaders, drug detailers, drug rep detailers, the

 5      whole medical education paradigm shift that led

 6      doctors -- that doctors relied on to inform their

 7      prescribing.

 8              Q.   Should pharmaceutical manufactures be

 9      among these circles?

10              A    Yes.  So that's what I meant when I said

11      not just other pharmaceutical companies, but the

12      Defendants in this case should certainly be on this

13      list.

14              Q.   So -- well, I'm not going to lead you.

15                   Who are the others that would be

16      appropriately on the list of Dr. Lembke's Factors?

17              A    So opioid manufacturers, opioid

18      distributors, opioid pharmacies or pharmacies where

19      opioids were dispensed and distributed.

20                   MR. HANLY:  Okay.  Doctor, that is --

21                   oh, one more area.

22              Q.   Mr. Pyser brought to your attention a

23      statement in your book in which, and I'm

24      paraphrasing the statement, that prescription

25      opioids, the relationship between prescription
```

1
2      opioids and heroin use is unclear; do you recall him
3      asking you about that sentence?
4              A    Yes, I do.
5              Q.    That is a sentence that you wrote in
6      your book?
7              A    Yes.
8              Q.    Can you explain to Justice Garguilo and
9      all of us what you meant by that sentence.
10             A    Yes.  So at the time there was much
11     debate about whether or not efforts that were being
12     made at that time to curb opioid prescribing might
13     be contributing to patients who had become dependent
14     on and addicted on opioid, turning to elicit
15     sources.
16                  At the time that I published the book
17     and finished my reference list there wasn't really
18     good definitive data.
19                  Furthermore, the natural history and the
20     progression of the disease of addiction would lead
21     patients who become addicted to prescription opioid
22     to seek out more potent, more potent forms and more
23     and cheaper sources, and as the U.S. population
24     broadly became dependent on and addicted to
25     prescription opioid the drug cartels responded to

```
1                    Frye Hearing - Dr. Lembke              203

2       that increased demand by making heroin more cheaply

3       available.

4            Q.   Again, this sentence, called to your

5       attention by Mr. Pyser, was written in or around

6       2016?

7            A    That's right.  Actually, it was written

8       probably a year before that.  It takes about a year

9       between finishing a manuscript and its coming out in

10      publication, so I really finished the book in 2015.

11           Q.   The NASEM article that we looked at that

12      talked about a prescription opioid use as a gateway

13      to heroin, increased heroin use, was two years or so

14      after you wrote this sentence about the relationship

15      being unclear?

16           A    Yes, that's right.

17           Q.   And does science progress over a

18      two-year period?

19           A    Yes.  It became more clear right around

20      that time period that, in fact, prescription opioid

21      are a gateway to heroin.

22                MR. HANLY:  Thank you very much, doctor.

23           That's all I have.  Thank you, your Honor.

24                THE COURT:  Okay.  Dr. Lembke, thank you

25           very much.
```

Frye Hearing - Dr. Lembke                    204

1                    Frye Hearing - Dr. Lembke

2              THE WITNESS:  Thank you.

3              THE COURT:  You're excused.

4              THE WITNESS:  Thank you.

5              THE COURT:  With no other business, the

6         Court will close the record.

7              Thank you all.

8

9

10

11

12                        *       *       *

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              Frye Hearing - Dr. Lembke              205

 2

 3

 4              C E R T I F I C A T I O N

 5

 6         I, Stephanie Casagrande Hague, CSR, RPR,

 7     an Official Court Reporter of the State of

 8     New York, County of Suffolk, do hereby

 9     certify that the above is a true and accurate

10     transcription of my stenographic notes taken

11     in the above-entitled action on this day;

12         Furthermore, photocopies made of this

13     transcript by any party cannot be certified

14     by me to be true and accurate.

15         Therefore, only those copies bearing an

16     original signature in blue ink are official

17     certified copies.

18

19

20     _____

21     STEPHANIE CASAGRANDE HAGUE, CSR, RPR
            Official Court Reporter

22

23

24

25
```

206

**'90s** [1] - 16:2

**0**

**03771** [1] - 73:7
**09** [1] - 1:8

**1**

**1** [19] - 15:11, 15:12, 15:24, 37:6, 55:3, 63:15, 67:6, 84:18, 113:23, 114:4, 114:10, 114:16, 123:9, 154:22, 186:13, 186:20, 186:23, 187:15, 191:17
**10** [6] - 64:7, 68:10, 92:18, 118:25, 192:5, 194:18
**100** [4] - 35:8, 60:5, 192:5, 194:19
**10005** [1] - 2:4
**10016** [1] - 1:16
**10036** [1] - 2:9
**11** [1] - 69:10
**11-line** [1] - 45:2
**112** [1] - 1:15
**115** [1] - 134:5
**11747** [1] - 1:22
**11th** [1] - 4:15
**12** [8] - 70:10, 76:23, 77:18, 89:20, 90:5, 106:19, 106:23, 122:10
**12,000** [2] - 45:5, 45:8
**127** [2] - 182:25, 185:13
**12:30** [1] - 105:22
**12th** [1] - 83:8
**13** [2] - 84:12, 155:7
**13.2** [1] - 90:6
**14** [3] - 88:25, 89:3, 159:17
**15** [4] - 84:23, 91:4, 115:16, 174:16
**15-minute** [1] - 78:4
**16th** [5] - 115:9, 115:24, 118:23, 121:17, 154:21
**17** [1] - 94:11
**170** [1] - 154:22
**171** [1] - 154:22
**17232** [1] - 106:25
**175** [1] - 121:18
**18** [4] - 101:18, 101:21, 168:7, 199:3

**19** [1] - 103:6
**1900s** [1] - 56:3
**1970s** [1] - 145:19
**1980** [3] - 45:4, 45:12, 55:21
**1980s** [2] - 55:18, 155:11
**1990** [4] - 135:16, 135:20, 136:4, 136:10
**1990s** [18] - 27:6, 55:5, 55:11, 55:13, 55:15, 55:20, 56:4, 56:21, 57:7, 97:6, 99:2, 99:16, 102:5, 135:12, 155:11, 168:16, 172:2, 199:12
**1995** [4] - 8:5, 20:3, 83:7, 83:9
**1997** [3] - 59:22, 60:4, 60:6
**1999** [1] - 58:10
**1:45** [1] - 106:3

**2**

**2** [17] - 13:11, 15:25, 39:10, 55:2, 57:12, 59:8, 67:8, 74:19, 114:6, 114:10, 114:17, 151:14, 155:8, 171:22, 171:23, 171:25, 199:23
**20** [10] - 21:18, 22:11, 49:4, 54:14, 84:23, 91:4, 105:3, 121:19, 185:13, 194:6
**20-odd** [1] - 64:25
**20-year** [1] - 59:23
**2000** [2] - 8:5, 145:19
**2001** [1] - 194:9
**2003** [1] - 19:5
**2006** [1] - 140:12
**2009** [1] - 42:9
**2010** [3] - 58:11, 104:22, 105:9
**2013** [1] - 139:19
**2015** [2] - 89:19, 203:10
**2016** [11] - 26:12, 26:14, 31:10, 35:7, 35:10, 59:23, 60:7, 139:18, 157:18, 197:22, 203:6
**2017** [5] - 3:10, 104:22, 105:9, 198:7, 199:7
**2018** [1] - 68:19

**2019** [3] - 95:13, 107:3, 153:25
**2020** [7] - 1:8, 115:9, 115:24, 118:24, 121:17, 131:6, 154:21
**207** [4] - 118:25, 119:4, 131:5, 131:7
**208** [1] - 131:8
**21** [4] - 89:23, 90:6, 131:7, 131:10
**212** [1] - 1:18
**212)397-1000** [1] - 1:23
**21st** [1] - 155:12
**220** [1] - 73:7
**23** [2] - 185:13, 193:25
**239** [4] - 7:22, 9:10, 9:20, 10:11
**24** [3] - 115:16, 154:22, 182:25
**24th** [1] - 153:25
**25** [1] - 105:11
**25th** [1] - 107:3
**276** [1] - 154:4
**28** [1] - 2:4
**29** [3] - 17:24, 89:23, 90:6
**29(1** [1] - 17:24
**2nd** [1] - 163:11

**3**

**3** [13] - 4:15, 13:21, 16:4, 41:24, 60:13, 78:23, 86:3, 114:17, 123:11, 131:8, 160:13, 160:23
**30** [1] - 64:7
**305** [1] - 1:21
**3rd** [3] - 8:18, 71:2, 77:21

**4**

**4** [7] - 16:8, 44:18, 67:22, 69:11, 69:12, 118:25, 119:6
**4.9** [1] - 92:8
**400** [1] - 1:21
**400000** [1] - 3:9
**401** [1] - 12:19
**41.3** [1] - 90:6
**44** [1] - 105:11
**48** [3] - 1:2, 3:3, 78:7
**4:39** [1] - 11:12
**4:40** [2] - 7:18, 7:24, 70:16
**4:50** [1] - 9:10

**5**

**5** [6] - 16:10, 51:20, 121:18, 154:4, 193:22, 193:23
**5.9** [1] - 91:16
**54** [2] - 115:14, 115:16
**5th** [1] - 77:21

**6**

**6** [4] - 16:12, 57:23, 92:15, 160:12
**6.5** [1] - 91:16
**600** [7] - 37:16, 37:20, 38:4, 39:5, 43:22, 44:2, 64:24

**7**

**7** [4] - 2:9, 16:15, 59:19, 59:21
**70** [1] - 159:17
**700** [1] - 10:10
**784-6401** [1] - 1:18

**8**

**8** [5] - 16:16, 62:24, 63:2, 90:5

**9**

**9** [4] - 16:19, 66:8, 78:23, 154:4
**9/11** [1] - 4:13
**94305** [1] - 12:20
**9th** [1] - 185:25

**A**

**abate** [1] - 36:14
**abbreviated** [2] - 4:13, 5:3
**ability** [3] - 75:21, 122:8, 192:20
**able** [8] - 6:16, 50:10, 113:22, 154:3, 167:2, 177:25, 183:4, 192:13
**above-entitled** [1] - 205:11
**absence** [1] - 76:9
**absolute** [1] - 131:4
**absolutely** [2] - 9:11, 118:15
**abstract** [15] - 37:23, 38:5, 38:9, 38:16, 38:19, 38:20, 39:3, 39:21, 39:22, 40:9, 41:5, 41:7, 41:13,

96:14, 107:14
**abuse** [10] - 27:6, 117:7, 117:10, 139:12, 140:25, 141:25, 142:21, 143:16, 145:3, 178:20
**abusing** [1] - 27:9
**academic** [13] - 33:24, 34:5, 34:12, 34:23, 79:22, 79:25, 81:13, 81:19, 82:5, 82:7, 82:8, 82:16, 170:13
**Academies** [2] - 95:16, 101:23
**Academy** [1] - 63:5
**accept** [4] - 54:10, 139:25, 140:8, 195:14
**acceptance** [4] - 73:16, 74:7, 101:6
**accepted** [15] - 51:15, 53:5, 59:4, 74:14, 101:9, 109:7, 155:25, 156:7, 156:11, 156:14, 156:19, 177:8, 177:15, 195:17, 198:5
**access** [9] - 8:2, 32:10, 70:25, 103:18, 155:14, 169:8, 169:9, 171:3, 171:7
**accompanying** [1] - 96:9
**accurate** [4] - 38:18, 172:8, 205:9, 205:14
**Act** [1] - 153:15
**acted** [1] - 190:4
**acting** [2] - 127:24, 190:11
**action** [3] - 163:3, 163:6, 205:11
**Actiq** [1] - 137:17
**active** [1] - 21:25
**actual** [5] - 36:21, 73:20, 88:21, 135:18
**acute** [2] - 91:15, 165:20
**adapt** [1] - 23:16
**addicted** [10] - 16:11, 46:25, 49:4, 55:24, 67:2, 67:7, 89:22, 202:14, 202:21, 202:24
**addiction** [79] - 15:24, 20:14, 22:21, 22:23, 23:12, 23:20, 23:22, 24:3, 24:9, 24:12,

25:8, 26:2, 33:11, 45:7, 45:17, 47:6, 51:10, 51:14, 51:16, 51:17, 52:6, 52:9, 52:12, 52:16, 52:17, 52:22, 53:6, 53:20, 54:3, 54:13, 54:19, 54:20, 56:7, 56:13, 57:4, 57:16, 58:12, 58:13, 59:4, 66:16, 66:22, 67:2, 80:11, 80:16, 80:22, 80:24, 83:2, 87:21, 88:3, 88:8, 88:21, 89:16, 90:2, 90:8, 91:21, 92:4, 92:17, 93:20, 97:8, 101:3, 102:21, 114:12, 116:23, 117:4, 117:19, 123:13, 169:10, 176:2, 191:8, 191:17, 194:25, 195:10, 195:13, 195:22, 198:5, 202:20

**Addiction** [9] - 17:8, 17:10, 17:11, 18:20, 20:24, 51:24, 52:11, 53:3, 53:10

**Addictive** [1] - 68:11

**addictive** [7] - 27:20, 51:3, 63:16, 63:19, 64:5, 67:6, 68:24

**addition** [4] - 25:24, 29:16, 36:4, 48:15

**additional** [5] - 10:16, 21:9, 107:25, 136:6, 188:16

**address** [7] - 7:9, 8:12, 12:18, 36:14, 94:8, 107:19, 140:19

**addressed** [1] - 102:10

**addressing** [1] - 140:13

**administered** [3] - 45:8, 47:4, 88:3

**administration** [2] - 195:5, 195:8

**Administration** [1] - 20:6

**Administrator** [2] - 18:10, 18:11

**admissions** [2] - 58:24, 97:2

**Adobe** [1] - 187:7

**adopt** [2] - 5:16, 6:22

**adopted** [1] - 54:23

**advent** [1] - 55:18

**adverse** [7] - 30:24,

58:4, 90:9, 90:19, 92:3, 93:24, 94:4

**advisory** [2] - 29:21, 42:17

**affect** [1] - 77:20

**afternoon** [4] - 110:9, 110:10, 175:9, 175:14

**aged** [1] - 105:11

**agencies** [1] - 150:19

**aggregate** [5] - 131:18, 132:10, 132:15, 146:24, 179:2

**aging** [1] - 99:10

**ago** [3] - 14:18, 107:4, 191:5

**agree** [21] - 46:3, 77:12, 114:23, 115:3, 136:21, 136:22, 138:3, 141:6, 141:21, 141:24, 143:6, 143:15, 145:12, 150:4, 151:7, 169:6, 173:19, 188:13, 189:6, 198:15, 200:10

**agreement** [1] - 5:24

**agreements** [1] - 43:7

**ahead** [7] - 7:11, 79:18, 109:14, 131:5, 151:16, 164:2, 198:22

**air** [1] - 83:24

**alcohol** [1] - 27:14

**allege** [1] - 185:7

**alleged** [2] - 62:8, 65:13

**allegedly** [1] - 186:14

**Allergan** [2] - 5:7, 133:10

**allocated** [2] - 149:7, 150:10

**allotted** [1] - 78:21

**allow** [3] - 107:22, 108:11, 198:22

**almost** [6] - 38:25, 39:2, 59:23, 60:7, 105:21, 112:16

**alone** [1] - 8:2

**alter** [1] - 170:5

**altered** [1] - 139:18

**altogether** [1] - 23:18

**ambulatory** [1] - 47:7

**ambushed** [1] - 108:4

**ambushing** [1] - 106:20

**American** [13] - 20:24, 51:23, 52:10, 53:3,

53:19, 54:2, 54:21, 54:22, 63:5, 86:22, 87:6, 92:24, 93:7

**AmerisourceBergen** [2] - 164:9, 164:12

**amount** [5] - 78:22, 82:9, 82:10, 82:12, 82:14, 90:14, 114:15

**Amount** [1] - 59:21

**amounts** [1] - 98:16

**analgesia** [2] - 99:3, 99:11, 135:18

**analysis** [11] - 38:7, 43:12, 74:19, 76:5, 122:22, 123:2, 127:4, 166:21, 168:24, 169:14, 169:16

**analyze** [1] - 188:8

**analyzed** [1] - 97:10

**anecdotal** [2] - 125:21, 130:11

**anecdotally** [1] - 126:8

**anecdote** [4] - 124:3, 124:19, 125:2, 125:24

**anecdotes** [2] - 82:18, 120:17

**Anesthesiology** [1] - 24:22

**anesthesiology** [1] - 24:25

**Angeles** [1] - 103:14

**ankle** [1] - 92:7

**Anna** [1] - 12:2

**ANNA** [1] - 12:14

**anna** [1] - 12:19

**Annals** [3] - 87:3, 87:6, 93:4

**announcements** [1] - 4:11

**annual** [1] - 4:13

**ANSWER** [8] - 116:5, 116:12, 119:9, 119:13, 122:16, 131:17, 183:14, 185:17

**answer** [21] - 13:3, 13:12, 13:20, 39:4, 49:16, 64:20, 64:23, 99:20, 111:11, 129:20, 130:22, 132:10, 140:6, 144:10, 165:14, 170:7, 170:18, 170:19, 176:9, 184:16, 196:25

**answered** [5] - 122:7, 154:10, 155:2,

159:22, 193:9

**answering** [1] - 171:10

**answers** [3] - 13:17, 181:21, 181:22

**anticipating** [1] - 53:16

**apart** [1] - 114:9

**apologies** [1] - 61:7

**apologize** [2] - 109:11, 110:5

**appear** [4] - 42:22, 193:16, 197:17, 197:18

**appearances** [1] - 3:10

**appeared** [1] - 68:18

**appearing** [1] - 63:17

**appendix** [2] - 41:2, 41:25

**applied** [1] - 73:17

**applies** [2] - 17:21, 111:16

**apply** [6] - 31:10, 135:12, 177:25, 178:5, 178:8, 189:7

**applying** [1] - 50:8

**appointed** [2] - 29:17, 29:20

**appointment** [2] - 24:24, 25:2

**approaches** [1] - 52:22

**appropriate** [11] - 6:15, 38:23, 64:19, 74:15, 108:16, 135:18, 138:15, 165:12, 165:20, 167:9, 189:5

**appropriately** [2] - 73:17, 201:16

**approval** [2] - 149:2, 197:11

**approved** [6] - 83:9, 127:9, 127:13, 127:24, 129:4, 148:17

**approving** [3] - 128:7, 128:23, 129:10

**April** [1] - 153:24

**ARCOS** [1] - 166:22

**area** [10] - 21:4, 21:7, 21:10, 25:14, 51:16, 54:19, 59:5, 173:15, 199:21, 201:21

**areas** [4] - 57:16, 73:14, 74:25, 75:6

**argument** [2] - 75:2, 107:11

**arrive** [1] - 83:14

**arthritis** [1] - 65:10

**article** [15] - 41:3, 46:17, 69:20, 89:19, 139:17, 140:13, 140:14, 140:19, 140:23, 168:23, 169:14, 170:13, 198:9, 198:11, 203:11

**articles** [6] - 64:24, 69:16, 108:12, 139:3, 157:7, 157:11

**articulated** [2] - 75:12, 188:20

**ascribed** [1] - 81:9

**Asher** [3] - 4:4, 113:25, 151:15

**ASHER** [2] - 2:10, 4:4

**aside** [4] - 129:22, 134:9, 140:12, 140:14

**aspects** [1] - 79:22

**ASPPH** [1] - 94:17

**assess** [3] - 30:21, 40:22, 41:16

**assist** [1] - 29:24

**assistance** [2] - 165:2, 165:4

**Associate** [1] - 17:8

**associated** [1] - 84:22

**association** [1] - 94:20

**Association** [8] - 53:19, 54:2, 54:23, 86:22, 87:6, 92:24, 93:8, 94:16

**associations** [1] - 110:25

**Asst** [1] - 2:5

**assume** [1] - 5:19

**assuming** [1] - 81:10

**attend** [1] - 4:14

**attention** [7] - 30:11, 41:23, 168:6, 183:8, 195:4, 201:22, 203:5

**Attorney** [4] - 2:3, 2:3, 2:5, 3:21

**Attorneys** [2] - 1:15, 1:21

**attorneys** [1] - 2:8

**attributes** [1] - 197:7

**audiotaping** [1] - 18:2

**August** [2] - 8:18, 71:2

**auspices** [1] - 63:4

**author** [4] - 25:17, 39:19, 41:5, 68:18

**authoritative** [4] - 94:21, 95:22, 108:12, 169:5

**authorities** [1] -

149:11
**authority** [1] - 149:20
**authors** [14] - 38:10,
38:13, 38:22, 39:19,
40:11, 40:19, 41:8,
42:6, 42:9, 44:9,
63:14, 170:22,
171:14, 198:17
**available** [9] - 80:2,
108:13, 136:12,
136:13, 173:6,
173:10, 178:14,
203:3
**Avenue** [1] - 1:15
**await** [1] - 74:19
**aware** [16] - 10:20,
83:8, 84:3, 103:2,
111:13, 111:16,
139:2, 145:17,
145:23, 146:2,
153:14, 169:16,
170:21, 182:15,
183:10, 184:17
**awkwardly** [1] - 26:7

**B**

**background** [4] -
19:8, 76:10, 189:9,
191:12
**bad** [3] - 85:20, 86:9,
86:18
**Badala** [1] - 4:2
**BADALA** [2] - 1:23,
3:25
**base** [1] - 166:13
**based** [27] - 49:8,
49:17, 49:22, 50:6,
54:12, 54:17, 55:25,
64:6, 64:23, 65:13,
69:4, 75:22, 90:3,
90:7, 98:20, 108:22,
126:9, 131:13,
131:17, 131:18,
132:13, 132:15,
138:15, 138:19,
165:22, 170:14,
188:16
**bases** [2] - 60:12,
79:24
**basic** [2] - 50:16, 74:6
**basics** [2] - 50:19,
51:15
**basis** [10] - 70:19,
80:21, 81:5, 83:13,
107:20, 130:12,
156:12, 168:22,
192:6
**bear** [5] - 95:3,
147:19, 147:24,

165:16, 182:20
**bearing** [2] - 106:25,
205:15
**became** [5] - 155:11,
155:20, 170:9,
202:24, 203:19
**become** [8] - 44:13,
46:25, 52:18, 89:22,
108:13, 202:13,
202:21
**becomes** [1] - 40:19
**becoming** [4] - 16:11,
16:13, 49:4, 67:6
**began** [6] - 27:5,
32:21, 55:18, 56:20,
155:10, 194:9
**begin** [6] - 7:9, 10:17,
78:13, 78:17,
109:16, 110:2
**beginning** [6] - 3:10,
55:11, 88:9, 102:4,
194:3, 199:12
**begins** [2] - 106:8,
171:6
**behalf** [1] - 76:19
**Behavioral** [2] - 17:12,
19:22
**behaviors** [2] - 52:18,
141:7
**belabor** [1] - 184:19
**belief** [1] - 127:5
**belong** [1] - 110:24
**below** [3] - 40:24,
43:6, 102:7
**beneficiaries** [1] -
35:19
**benefit** [6] - 30:15,
30:18, 115:13,
117:16, 118:24
**benefited** [3] - 125:7,
125:15, 125:19
**benefits** [5] - 30:22,
82:21, 116:18,
129:5, 189:24
**benign** [1] - 92:8
**benzodiazepines** [1] -
27:12
**best** [4] - 10:13, 29:15,
122:7, 152:16
**better** [2] - 49:24,
128:20
**between** [24] - 24:3,
29:11, 33:14, 41:12,
54:20, 58:10, 59:22,
60:6, 64:7, 68:25,
93:22, 94:4, 104:22,
105:9, 113:3,
114:10, 158:5,
158:20, 159:3,
185:24, 192:2,

192:8, 201:25, 203:9
**beyond** [7] - 75:4,
75:5, 77:13, 125:18,
125:24, 153:21,
167:16
**big** [3] - 110:3, 200:2,
201:2
**bigger** [1] - 65:6
**bind** [1] - 50:21
**biopsychosocial** [1] -
23:23
**bipolar** [1] - 117:21
**bit** [11] - 22:18, 36:20,
60:11, 84:20,
131:11, 133:4,
147:15, 155:7,
156:24, 159:7,
168:11
**blue** [2] - 89:19,
205:16
**board** [6] - 5:5, 5:7,
21:11, 21:12, 79:4,
112:19
**Board** [8] - 20:19,
20:23, 20:24, 21:3,
149:12, 149:19,
150:5, 150:10
**boards** [1] - 42:17
**Boards** [6] - 147:8,
147:9, 150:4,
150:15, 160:19,
161:24
**bodies** [2] - 36:7,
169:5
**body** [12] - 25:6,
25:11, 51:23, 52:2,
52:5, 65:7, 66:22,
68:3, 80:18, 81:9,
94:21, 95:22
**Bonert** [4] - 86:3,
86:4, 86:14, 86:20
**book** [39] - 25:25,
26:8, 26:9, 26:11,
26:18, 26:21, 28:8,
31:9, 32:5, 35:7,
35:9, 36:24, 43:20,
60:19, 61:4, 62:7,
62:17, 81:18,
100:17, 121:11,
123:22, 124:20,
125:19, 130:23,
148:4, 157:14,
157:17, 157:20,
157:25, 158:3,
158:18, 197:19,
197:22, 198:8,
199:8, 201:23,
202:6, 202:16,
203:10
**booklet** [1] - 63:13

**books** [1] - 26:25
**bootstrapped** [1] -
1:11
**Boscarino** [1] - 89:7
**boscarino** [1] - 89:25
**bottom** [6] - 41:15,
57:8, 58:23, 129:23,
183:9, 188:7
**box** [2] - 40:23, 43:6
**brain** [4] - 50:22,
50:25, 51:4
**branded** [1] - 136:15
**break** [5] - 65:17,
65:23, 78:4, 152:9,
160:25
**breathing** [2] - 51:5,
51:6
**brief** [3] - 23:7,
191:18, 195:24
**briefing** [1] - 6:13
**briefly** [16] - 10:18,
15:23, 22:20, 30:17,
36:9, 40:14, 48:22,
49:20, 50:19, 60:3,
60:12, 67:10, 79:21,
83:12, 95:20, 100:22
**bring** [2] - 154:4,
171:23
**bringing** [1] - 95:2
**broad** [2] - 23:3, 23:7
**broadcasting** [1] -
18:2
**broader** [1] - 75:11
**Broadhollow** [1] -
1:21
**broadly** [4] - 23:23,
124:25, 191:13,
202:24
**brochure** [1] - 63:3
**broke** [1] - 74:24
**brought** [4] - 157:2,
157:14, 164:15,
201:22
**Brown** [1] - 29:22
**Brummett** [1] - 91:15
**building** [1] - 162:21
**bunch** [1] - 166:3
**buprenorphine** [6] -
20:7, 20:10, 20:11,
20:12, 20:16, 124:21
**business** [1] - 204:5
**businesses** [1] -
139:24
**busy** [1] - 38:25
**but..** [1] - 23:5
**BY** [29] - 2:5, 2:10,
14:6, 18:18, 41:10,
43:4, 44:19, 46:6,
47:17, 51:21, 53:15,
57:24, 59:20, 60:10,

62:6, 62:25, 66:2,
66:9, 79:20, 84:13,
89:2, 91:7, 94:12,
99:18, 101:20,
103:7, 105:5, 110:7,
175:7

**C**

**calculated** [3] -
134:22, 176:20,
176:23
**calendar** [1] - 3:8
**California** [5] - 12:20,
19:25, 29:18, 29:21,
30:2
**campaign** [1] - 99:15
**campaigns** [1] -
168:17
**cancer** [6] - 39:25,
40:13, 40:22, 65:10,
127:7, 156:3
**cannot** [6] - 6:20,
102:9, 133:8, 176:4,
185:5, 205:13
**capacity** [1] - 70:24
**card** [4] - 164:16,
164:22, 164:25,
165:3
**Cardinal** [4] - 10:19,
61:6, 71:22, 164:6
**cards** [1] - 166:3
**care** [6] - 29:4, 49:24,
98:6, 151:2, 151:7,
188:3
**career** [1] - 25:5
**careful** [1] - 38:12
**carefully** [1] - 39:24
**carrying** [1] - 96:18
**cartels** [2] - 145:14,
202:25
**Carter** [8] - 10:15,
163:10, 163:24,
175:5, 175:10,
182:6, 187:9, 191:4
**CARTER** [12] - 163:13,
163:15, 175:6,
175:8, 176:18,
182:10, 182:24,
187:3, 187:6,
187:11, 187:12,
190:13
**Casagrande** [1] -
205:6
**CASAGRANDE** [2] -
2:20, 205:20
**case** [121] - 3:8, 5:12,
5:18, 6:19, 9:4, 11:7,
11:8, 11:11, 15:3,
15:16, 36:21, 37:6,

37:13, 39:17, 43:20, 47:19, 48:2, 48:18, 49:2, 50:5, 50:9, 55:3, 59:9, 60:13, 63:25, 65:14, 71:14, 71:15, 71:23, 72:2, 72:6, 72:8, 72:23, 73:6, 73:8, 73:19, 75:4, 81:16, 81:17, 87:25, 90:17, 93:17, 94:3, 95:25, 96:4, 111:25, 112:4, 115:9, 115:24, 116:15, 118:23, 121:5, 124:17, 126:2, 126:4, 126:13, 126:17, 128:4, 130:3, 130:9, 130:13, 130:17, 131:12, 131:21, 132:2, 132:15, 132:23, 133:18, 136:3, 136:8, 136:9, 137:21, 142:11, 142:20, 143:21, 144:5, 144:9, 144:15, 144:16, 144:22, 145:7, 146:12, 146:17, 146:21, 147:20, 150:25, 153:24, 154:18, 157:14, 159:14, 159:22, 164:4, 166:21, 172:25, 175:19, 176:21, 177:7, 177:13, 179:13, 179:20, 180:6, 180:11, 180:16, 182:20, 183:18, 183:21, 184:12, 185:16, 186:2, 186:5, 187:20, 188:10, 188:21, 189:19, 190:8, 190:9, 190:12, 191:6, 193:2, 198:15, 201:12
**cases** [7] - 37:13, 71:3, 72:14, 99:9, 176:5, 176:11, 179:7
**cash** [1] - 139:24
**catch** [1] - 31:18
**caught** [1] - 41:23
**causation** [9] - 75:2, 75:19, 76:5, 76:9, 77:15, 113:9, 113:11, 113:17, 143:21
**caused** [5] - 56:2,

77:6, 94:25, 151:3, 170:5
**causing** [1] - 139:12
**CDC** [5] - 59:3, 84:5, 86:6, 86:13, 96:23
**Center** [2] - 84:5, 85:22
**Centers** [2] - 58:2, 84:17
**centers** [1] - 58:13
**Central** [1] - 1:8
**century** [1] - 155:12
**ceremony** [1] - 4:14
**certain** [10] - 21:10, 47:20, 62:8, 62:18, 64:15, 65:5, 66:11, 80:3, 127:10
**certainly** [5] - 22:14, 73:11, 98:25, 141:25, 201:12
**certainty** [2] - 50:12, 188:2
**certificate** [1] - 21:6
**certified** [2] - 205:13, 205:17
**Certified** [3] - 20:19, 20:23, 21:3
**certifies** [1] - 21:13
**certify** [1] - 205:9
**cetera** [4] - 18:15, 43:10, 55:7, 60:16
**chain** [3] - 153:2, 153:16, 183:11
**change** [5] - 9:2, 33:14, 33:17, 56:4, 183:25
**changed** [1] - 181:8
**changes** [2] - 56:18, 100:2
**changing** [1] - 184:6
**chapter** [1] - 197:19
**chart** [3] - 89:3, 92:20, 200:22
**charts** [2] - 45:5, 45:6
**cheaper** [1] - 202:23
**cheaply** [1] - 203:2
**check** [1] - 71:16
**Chen** [1] - 139:18
**Chief** [5] - 17:8, 17:23, 18:10, 18:11, 18:20
**chief** [3] - 5:13, 5:18, 6:20
**childhood** [1] - 117:12
**choose** [1] - 6:5
**CHORUS** [1] - 3:7
**chorus** [1] - 82:22
**Chou** [2] - 39:16, 39:19
**CHOU** [1] - 39:16
**chronic** [34] - 15:25,

16:10, 39:25, 40:12, 40:13, 40:21, 41:20, 42:11, 43:16, 51:14, 52:13, 52:23, 56:15, 63:20, 64:8, 66:17, 67:9, 69:13, 69:19, 70:5, 89:15, 89:20, 102:22, 125:6, 125:15, 127:7, 127:11, 127:15, 127:25, 129:11, 148:18, 155:21, 156:3, 191:18
**Chronic** [2] - 39:23, 41:13
**circa** [1] - 194:9
**circle** [1] - 201:2
**circles** [3] - 199:24, 200:18, 201:9
**circumstance** [2] - 20:9, 31:23
**circumstances** [1] - 141:6
**citation** [2] - 158:12, 158:13
**cited** [5] - 45:11, 46:17, 46:18, 158:9, 158:11
**City** [3] - 103:13, 103:14, 145:19
**Civil** [1] - 56:3
**claim** [5] - 67:13, 159:12, 159:20, 185:6, 185:15
**claimed** [1] - 100:18
**claims** [1] - 96:6
**clarify** [2] - 158:24, 191:2
**clarity** [4] - 77:17, 100:21, 117:17, 131:4
**classic** [3] - 8:13, 11:14, 108:6
**clean** [2] - 162:23, 163:9
**clear** [9] - 6:19, 105:6, 122:24, 137:6, 141:17, 150:19, 151:22, 180:4, 203:19
**clearly** [1] - 76:6
**CLERK** [9] - 3:2, 3:8, 12:10, 12:12, 12:17, 12:21, 78:7, 78:10, 106:13
**Clerk** [1] - 12:15
**Cleveland** [1] - 112:6
**client** [1] - 180:20
**clinic** [1] - 24:11
**Clinic** [2] - 17:9, 18:21

**clinical** [25] - 21:25, 22:4, 29:25, 37:2, 48:18, 49:7, 49:8, 49:11, 49:14, 49:25, 50:2, 64:25, 68:6, 69:16, 97:3, 97:5, 177:16, 177:21, 178:12, 178:15, 178:22, 178:24, 179:3, 194:6
**clinicians** [1] - 38:25
**close** [2] - 45:11, 204:6
**closely** [1] - 44:8
**closer** [1] - 135:17
**CME** [1] - 149:17
**co** [2] - 164:25, 165:3
**co-pay** [2] - 164:25, 165:3
**code** [1] - 13:9
**colleagues** [3] - 97:4, 148:6, 148:9
**collection** [1] - 200:18
**collectively** [1] - 57:10
**college** [1] - 104:8
**Columbia** [1] - 94:23
**coming** [7] - 87:16, 97:7, 121:4, 126:4, 127:3, 149:2, 203:9
**commence** [3] - 4:14, 13:12, 13:20
**Commission** [2] - 160:19, 161:24
**committing** [1] - 138:20
**common** [3] - 57:4, 90:11, 169:21
**commonly** [2] - 138:11, 198:5
**communities** [2] - 171:2, 193:3
**community** [2] - 101:7, 101:10
**comorbidity** [1] - 117:14
**companies** [19] - 34:10, 42:17, 43:8, 53:18, 62:8, 62:18, 64:15, 65:5, 66:12, 80:4, 146:11, 146:20, 147:12, 147:18, 147:22, 148:25, 197:10, 200:24, 201:11
**company** [4] - 31:24, 32:23, 63:11, 196:9
**compare** [1] - 48:2
**compared** [2] - 100:13, 135:11
**compares** [1] - 99:7

**comparing** [1] - 99:13
**comparison** [1] - 80:7
**competitive** [1] - 93:12
**Complaint** [1] - 42:23
**complete** [4] - 13:13, 13:15, 13:20, 21:9
**completely** [1] - 152:8
**complex** [2] - 23:22, 52:13
**components** [2] - 45:25, 67:25
**comport** [1] - 76:21
**comprehensive** [1] - 121:22
**compromise** [1] - 109:6
**compulsive** [3] - 23:24, 52:19, 117:20
**concept** [6] - 49:17, 49:18, 49:21, 66:19, 182:8, 195:16
**concepts** [3] - 30:8, 30:10, 31:2
**concern** [1] - 6:10
**concerned** [2] - 55:23, 78:21
**concerning** [27] - 25:25, 32:6, 32:11, 32:24, 33:5, 35:23, 37:8, 37:15, 47:22, 54:13, 58:3, 74:24, 80:22, 83:14, 84:7, 93:21, 96:17, 97:20, 100:18, 106:18, 153:13, 154:8, 191:15, 192:7, 192:13, 196:14, 197:7
**conclude** [2] - 140:13, 140:15
**concluded** [4] - 158:4, 168:24, 169:14, 169:17
**conclusion** [9] - 38:23, 63:25, 69:14, 70:4, 74:17, 76:4, 86:16, 166:23
**conclusions** [8] - 31:8, 31:11, 33:5, 33:8, 43:15, 44:9, 44:11, 192:7
**concrete** [1] - 131:13
**condition** [2] - 18:24, 100:24
**conditions** [3] - 64:19, 155:21
**conduct** [7] - 120:12, 120:19, 120:24, 166:21, 180:16,

188:8, 188:12
**conducted** [5] - 29:25, 121:7, 121:12, 121:22, 183:11
**confer** [1] - 56:11
**conferences** [1] - 34:22
**confirmed** [2] - 112:23
**conflicts** [2] - 38:13, 42:7
**confounding** [1] - 123:4
**congressional** [1] - 36:6
**connection** [22] - 8:19, 14:18, 26:15, 32:18, 37:11, 39:5, 39:17, 46:9, 55:15, 71:3, 72:20, 73:12, 87:25, 88:13, 90:16, 93:17, 94:3, 97:15, 112:8, 129:9, 175:19, 189:19
**connote** [1] - 49:21
**CONROY** [4] - 1:14, 1:17, 3:14, 7:3
**Conroy** [2] - 3:14, 79:2
**consensus** [6] - 53:11, 57:15, 68:21, 93:19, 101:23, 199:19
**consequences** [3] - 30:24, 52:20, 92:3
**consequent** [1] - 192:3
**consider** [12] - 47:6, 109:4, 125:4, 125:13, 164:5, 164:11, 164:17, 178:13, 178:17, 179:18, 180:6, 180:8
**considerable** [4] - 82:10, 82:12, 82:14, 114:15
**considered** [6] - 7:23, 8:6, 11:12, 70:17, 90:10, 90:11, 120:14, 120:21, 179:15
**considers** [1] - 18:4
**consistency** [2] - 81:24, 99:21
**consistent** [2] - 48:5, 113:16
**consists** [1] - 199:24
**constitutes** [1] - 98:22
**constituting** [1] - 195:5
**consultation** [1] - 36:6
**consultative** [1] -

42:13
**consulted** [1] - 175:17
**consulting** [1] - 43:7
**contained** [1] - 44:2
**contains** [1] - 66:4
**contested** [1] - 9:25
**context** [12] - 18:23, 22:21, 22:23, 23:12, 30:4, 30:19, 31:2, 31:5, 36:10, 50:3, 178:14, 178:24
**contexts** [1] - 157:12
**continue** [6] - 35:2, 52:19, 56:16, 82:5, 82:6, 170:11
**continued** [1] - 23:24
**continues** [2] - 115:5, 116:12
**continuing** [3] - 149:16, 160:17, 161:10
**contradicts** [1] - 66:11
**contrast** [1] - 33:25
**contributed** [21] - 16:11, 16:12, 16:15, 25:10, 47:12, 138:24, 145:9, 146:12, 146:21, 147:2, 147:5, 147:9, 147:13, 148:13, 148:23, 150:6, 151:4, 151:13, 151:20, 160:14, 169:7
**contributing** [1] - 202:13
**contribution** [1] - 147:21
**contributors** [1] - 96:8
**control** [2] - 154:3, 183:2
**Control** [4] - 58:2, 84:6, 84:17, 85:22
**controlled** [7] - 153:5, 153:8, 153:13, 153:20, 154:9, 180:22, 184:22
**Controlled** [1] - 153:14
**controlling** [1] - 123:4
**controls** [1] - 51:5
**convened** [1] - 36:13
**conversations** [4] - 125:17, 125:21, 125:23, 130:11
**convey** [1] - 160:20
**copied** [1] - 132:7
**copies** [2] - 205:15, 205:17
**Corporation** [1] -

164:14
**correct** [227] - 4:22, 4:23, 5:25, 6:9, 14:10, 14:15, 19:12, 21:20, 24:20, 25:3, 26:9, 26:10, 27:7, 27:21, 28:7, 32:4, 33:2, 33:19, 34:19, 35:20, 35:21, 37:3, 37:9, 38:2, 39:14, 39:17, 39:18, 39:20, 42:21, 43:3, 43:10, 45:9, 51:11, 55:7, 58:16, 58:22, 60:20, 62:19, 63:6, 63:11, 63:21, 63:22, 64:18, 66:12, 66:20, 66:23, 68:2, 82:8, 86:12, 89:8, 92:21, 92:22, 92:25, 93:8, 94:17, 95:10, 95:18, 97:17, 101:21, 104:11, 110:15, 110:16, 110:18, 110:19, 111:2, 111:3, 111:6, 111:7, 111:14, 111:21, 111:22, 112:2, 112:6, 112:24, 113:5, 113:12, 113:17, 114:25, 116:20, 117:4, 117:14, 117:21, 118:3, 118:4, 118:8, 118:13, 118:19, 118:20, 119:15, 119:20, 119:24, 120:22, 121:5, 122:2, 122:3, 122:19, 123:5, 124:13, 124:14, 124:17, 124:18, 125:8, 125:16, 126:5, 126:18, 126:19, 127:7, 127:15, 127:21, 127:25, 128:5, 128:25, 129:12, 129:13, 129:15, 129:25, 130:7, 130:21, 131:21, 132:16, 132:23, 132:25, 133:10, 133:25, 134:2, 134:21, 135:3, 135:8, 135:14, 135:22, 137:10, 137:13, 137:21, 138:7, 138:12, 138:16, 138:21, 138:24, 139:8,

139:9, 139:14, 139:25, 140:10, 140:17, 140:18, 140:21, 141:16, 141:19, 142:2, 142:7, 142:11, 142:12, 142:22, 142:23, 143:4, 143:13, 143:14, 144:5, 144:9, 144:23, 144:24, 145:5, 145:6, 145:10, 146:2, 146:3, 146:6, 146:7, 147:3, 147:6, 147:13, 148:2, 148:14, 148:19, 149:8, 149:9, 149:14, 149:20, 149:24, 150:2, 150:3, 150:11, 150:12, 151:5, 151:6, 156:3, 156:12, 156:16, 156:17, 158:10, 160:5, 160:11, 160:22, 161:7, 161:8, 163:4, 163:6, 164:23, 165:23, 166:8, 172:6, 172:15, 174:7, 174:24, 176:16, 176:17, 180:2, 180:3, 183:18, 183:21, 185:21, 185:25, 187:16, 188:4, 188:6, 189:19, 189:20, 192:16, 192:22, 192:25, 193:5, 193:6, 193:13, 193:17, 197:4, 197:5, 197:19
**correcting** [1] - 34:18
**correctly** [12] - 16:22, 52:24, 64:18, 71:25, 85:2, 96:10, 102:11, 103:24, 109:23, 155:16, 194:14, 199:14
**corresponding** [1] - 80:12
**cost** [1] - 165:2
**counsel** [6] - 7:17, 73:4, 106:20, 106:23, 132:7, 184:4
**count** [1] - 22:13
**counties** [5] - 168:4, 168:15, 175:24, 176:25, 190:3

**countries** [1] - 99:6
**country** [8] - 34:6, 36:17, 93:23, 99:4, 115:5, 116:6, 134:12, 156:21
**COUNTY** [1] - 1:2
**County** [40] - 1:15, 1:21, 3:3, 3:13, 3:15, 3:18, 4:7, 100:3, 100:4, 100:15, 111:25, 112:2, 118:2, 118:5, 118:7, 124:16, 137:25, 167:22, 167:23, 167:25, 173:4, 175:21, 176:6, 176:8, 176:9, 176:11, 176:12, 178:6, 179:8, 180:18, 180:23, 185:2, 188:3, 188:4, 188:9, 188:13, 205:8
**couple** [6] - 4:10, 49:16, 72:18, 137:5, 168:21, 195:24
**coupon** [1] - 164:21
**course** [23] - 4:25, 8:23, 9:24, 10:4, 12:25, 34:4, 47:18, 61:18, 73:19, 74:8, 74:22, 75:17, 79:25, 87:24, 88:17, 90:16, 96:18, 99:19, 148:4, 165:7, 174:23, 175:2, 197:17
**courses** [2] - 160:18, 161:11
**COURT** [98] - 1:2, 2:20, 3:6, 3:16, 3:19, 3:22, 3:24, 4:3, 4:8, 4:24, 5:23, 6:2, 6:23, 7:4, 7:11, 9:23, 11:16, 11:24, 12:3, 12:8, 12:22, 14:2, 17:17, 17:21, 41:4, 41:9, 42:21, 42:25, 45:20, 46:3, 57:19, 61:16, 62:2, 62:5, 65:18, 65:21, 70:21, 71:4, 72:18, 75:14, 76:6, 76:17, 77:18, 78:9, 78:14, 78:25, 79:12, 79:14, 91:6, 98:22, 99:17, 105:21, 106:3, 106:10, 107:5, 108:3, 108:24, 109:6, 109:12, 109:14, 109:21, 110:3, 112:12,

112:16, 112:19,
115:17, 132:25,
152:11, 162:4,
162:20, 163:10,
163:14, 163:20,
163:24, 171:17,
171:19, 174:14,
174:16, 174:19,
174:23, 175:2,
175:5, 176:15,
182:5, 182:22,
183:3, 187:2, 187:5,
187:9, 190:16,
196:19, 196:21,
196:24, 198:22,
200:19, 203:24,
204:3, 204:5
**court** [5] - 13:15,
14:17, 113:10,
113:24, 151:15
**Court** [33] - 1:12, 3:2,
12:16, 13:24, 18:4,
18:8, 22:19, 22:21,
23:8, 43:5, 46:12,
50:19, 60:22, 65:25,
71:5, 71:9, 73:3,
73:5, 73:10, 73:13,
74:13, 74:22, 76:24,
102:14, 106:22,
117:17, 122:24,
135:7, 152:9, 173:3,
204:6, 205:7, 205:21
**Court's** [4] - 48:25,
77:19, 79:2, 115:13
**courtesy** [2] - 24:24,
25:2
**courthouse** [1] - 18:3
**courtroom** [3] - 18:3,
18:6, 131:7
**courts** [2] - 9:13,
18:10
**Cousin** [3] - 162:7,
162:21, 163:22
**cover** [1] - 79:22
**covered** [2] - 129:23,
168:10
**craving** [1] - 66:21
**created** [6] - 9:3, 62:9,
66:4, 66:10, 107:2,
171:5
**creating** [1] - 155:14
**creative** [1] - 198:6
**credentials** [1] - 76:7
**crimes** [1] - 138:20
**crisis** [6] - 94:24, 96:2,
145:3, 148:13,
151:13, 151:20
**criteria** [8] - 90:4,
177:25, 178:5,
178:8, 191:8,

191:11, 191:15,
191:23
**criterion** [1] - 191:19
**critically** [1] - 81:13
**cross** [2] - 61:19, 74:5
**CROSS** [12] - 61:19,
74:5
**cross-examination** [2]
- 61:19, 74:5
**CROSS-
EXAMINATION** [1] -
152:18
**crying** [1] - 66:22
**CSR** [3] - 2:20, 205:6,
205:20
**curb** [1] - 202:12
**curious** [1] - 162:22
**current** [3] - 4:24,
6:10, 167:14
**curriculum** [3] - 29:8,
29:12, 29:14
**cycle** [2] - 170:8,
171:8

# D

**daily** [1] - 23:15
**data** [23] - 38:10,
38:21, 38:24, 41:20,
46:21, 57:6, 58:2,
59:3, 84:6, 91:13,
96:4, 96:23, 98:21,
111:17, 139:19,
139:23, 140:10,
140:13, 142:5,
142:10, 166:22,
202:18
**database** [1] - 142:18
**date** [1] - 29:3
**dates** [1] - 135:24
**dating** [1] - 56:2
**days** [1] - 78:20
**deadly** [3] - 16:3, 55:6,
172:3
**deal** [3] - 24:11, 34:8,
184:18
**Dealer** [3] - 26:8,
60:19, 157:15
**dealers** [1] - 145:14
**dealing** [1] - 29:18
**deals** [1] - 6:7
**death** [3] - 84:22,
85:10, 176:25
**deaths** [7] - 28:9,
58:11, 58:21, 96:25,
104:23, 104:25,
105:10
**debate** [1] - 202:11
**decade** [1] - 116:4
**decades** [4] - 55:14,
57:11, 90:7, 97:13

**decedent** [1] - 176:11
**December** [1] - 83:8
**decided** [1] - 76:22
**deciding** [3] - 116:20,
120:14, 120:21
**decision** [7] - 76:8,
76:13, 114:21,
120:5, 165:11,
165:19, 165:22,
165:25, 166:5,
166:6, 166:7, 170:2
**decisions** [7] - 74:23,
119:24, 126:25,
169:16, 169:17,
171:12, 171:13
**declare** [1] - 42:7
**decreased** [1] - 116:7
**deem** [1] - 87:11
**deemed** [1] - 73:18
**deeply** [1] - 102:23
**Defendant** [19] -
114:7, 120:4, 121:3,
121:10, 147:21,
159:13, 159:22,
179:19, 179:21,
180:7, 180:9,
180:13, 180:17,
185:7, 186:25,
187:16, 187:21,
187:25, 188:12
**Defendant's** [1] -
114:4
**Defendants** [37] - 4:5,
5:7, 7:14, 10:22,
42:25, 43:2, 47:21,
72:13, 72:15, 75:18,
99:15, 122:2, 128:4,
130:10, 137:21,
138:18, 138:19,
146:11, 146:16,
146:21, 147:18,
168:18, 179:11,
179:25, 181:20,
182:2, 182:13,
182:16, 183:12,
183:24, 184:4,
184:13, 185:16,
186:15, 186:21,
188:9, 201:12
**Defendants'** [11] -
76:25, 77:5, 77:23,
106:24, 123:21,
124:9, 125:7,
125:15, 135:21,
136:3, 136:14
**defense** [4] - 70:24,
106:19, 132:6, 132:7
**defined** [3] - 23:23,
24:4, 61:23
**definition** [9] - 23:3,

23:7, 52:11, 53:2,
53:5, 53:9, 53:20,
54:22, 61:12
**definitions** [2] - 51:16,
54:20
**definitive** [1] - 202:18
**degree** [8] - 19:11,
50:11, 81:8, 110:17,
112:13, 149:6,
150:9, 188:2
**degrees** [2] - 111:8,
111:19
**delay** [1] - 7:6
**Delgado** [2] - 92:5,
93:3
**demand** [1] - 203:2
**demonstrating** [1] -
21:6
**demonstrative** [1] -
113:20
**dental** [1] - 92:13
**Department** [4] -
17:12, 19:21, 24:22,
73:8
**dependence** [6] -
20:15, 23:11, 23:14,
24:13, 25:8, 95:7
**dependent** [6] - 16:13,
46:25, 170:10,
173:25, 202:13,
202:24
**depicting** [1] - 91:12
**deposed** [2] - 115:8,
154:17
**deposition** [39] - 8:7,
9:4, 9:21, 9:22,
115:12, 115:23,
116:15, 118:23,
118:24, 119:5,
119:15, 120:9,
121:17, 121:21,
122:19, 131:6,
131:21, 132:8,
132:9, 132:12,
132:18, 134:5,
134:25, 135:4,
144:13, 153:24,
154:2, 154:5,
154:21, 159:17,
164:16, 175:10,
182:19, 183:18,
184:2, 184:6,
185:10, 185:13,
185:21
**depositions** [1] -
180:12
**depression** [1] -
117:20
**depth** [4] - 38:7,
40:18, 43:12, 68:2

**deputy** [2] - 162:8,
162:10
**derived** [1] - 38:23
**deriving** [1] - 44:11
**describe** [8] - 30:17,
58:6, 100:7, 101:7,
101:10, 123:22,
164:21, 191:18
**described** [7] - 29:17,
56:23, 59:15, 88:9,
101:8, 101:11,
179:14
**describing** [1] -
119:24
**description** [2] - 21:7,
25:22
**designed** [3] - 33:19,
154:14, 154:24
**designee** [1] - 18:11
**desire** [1] - 82:4
**despite** [5] - 23:25,
42:11, 52:19, 99:2,
145:16
**detail** [2] - 167:6,
167:7
**detailers** [2] - 201:4
**detailing** [15] - 31:17,
31:20, 33:25, 34:2,
34:5, 34:13, 34:24,
79:22, 80:2, 81:19,
82:5, 82:7, 82:8,
82:16, 82:18
**details** [4] - 129:22,
180:16, 180:21,
180:25
**detect** [1] - 98:2
**determine** [11] - 8:2,
25:20, 38:8, 50:10,
81:18, 89:16, 128:9,
128:24, 129:4,
177:2, 179:8
**determining** [1] -
196:6
**develop** [6] - 24:11,
29:8, 29:12, 62:2,
64:9, 92:14
**developed** [3] - 22:8,
99:6, 99:10
**development** [3] -
194:24, 195:9,
195:12
**diagnosed** [3] - 91:20,
92:17, 176:12
**diagnosee** [1] - 177:8
**diagnosing** [4] -
177:15, 177:19,
178:2, 191:19
**Diagnosis** [2] - 17:9,
18:21
**diagnosis** [7] - 18:23,

176:6, 177:2, 177:5, 178:13, 178:23, 191:8
**diagnostic** [4] - 191:8, 191:11, 191:15, 191:19
**Diagnostic** [2] - 24:7, 53:22
**die** [2] - 28:18, 51:8
**difference** [4] - 54:20, 67:22, 68:25, 100:12
**differences** [4] - 98:3, 98:4, 98:18, 113:3
**different** [19] - 10:24, 11:10, 15:19, 34:21, 42:17, 44:10, 53:20, 55:14, 67:10, 72:9, 75:21, 76:3, 88:6, 88:8, 88:13, 100:10, 131:11, 192:14
**differently** [2] - 134:6, 181:12
**digging** [1] - 41:3
**DIRECT** [1] - 14:5
**direct** [9] - 71:5, 74:4, 77:13, 79:3, 159:16, 177:14, 183:7, 185:12, 188:23
**directed** [2] - 73:3, 73:4
**direction** [2] - 13:24, 44:10
**directly** [2] - 124:10, 140:24
**Director** [2] - 17:10
**disagree** [1] - 136:11
**disagreed** [2] - 44:3, 44:6
**discern** [1] - 10:10
**discipline** [1] - 149:13
**disclose** [1] - 126:21
**disclosed** [7] - 7:18, 8:19, 9:8, 10:21, 130:10, 130:13, 193:16
**discloses** [2] - 42:16, 43:7
**disclosure** [1] - 7:14
**disconnected** [1] - 112:11
**discover** [1] - 48:9
**discovered** [2] - 35:23, 48:10
**discovery** [4] - 8:14, 9:14, 71:7, 72:3
**discuss** [4] - 15:15, 36:19, 62:7, 83:12
**discussed** [6] - 31:9, 36:5, 79:23, 97:16, 148:2, 148:16

**discusses** [1] - 32:2
**Disease** [4] - 58:2, 84:6, 84:17, 85:22
**disease** [5] - 23:23, 52:13, 56:10, 117:18, 202:20
**diseases** [1] - 52:23
**disorder** [31] - 18:25, 20:13, 22:8, 24:5, 24:6, 24:12, 28:3, 54:4, 54:22, 58:25, 64:9, 90:25, 91:10, 91:21, 92:14, 117:18, 117:20, 117:21, 176:3, 176:5, 176:13, 177:3, 177:5, 177:9, 177:16, 177:20, 178:2, 178:13, 178:23, 191:20, 194:25
**Disorders** [2] - 24:8, 53:23
**disorders** [1] - 19:21
**dispense** [1] - 174:9
**dispensed** [4] - 137:21, 142:15, 179:10, 201:19
**dispenses** [1] - 173:25
**dispute** [1] - 106:17
**disregarding** [1] - 178:24
**disseminated** [1] - 63:10
**distinction** [2] - 113:21, 114:10
**distinguished** [1] - 113:14
**distributed** [8] - 63:4, 137:20, 167:10, 167:18, 167:25, 169:23, 179:10, 201:19
**distribution** [12] - 153:5, 153:13, 154:8, 166:23, 167:3, 167:5, 168:13, 168:17, 169:6, 170:25, 180:21, 181:12
**distributor** [5] - 144:15, 152:23, 159:13, 159:21, 170:4
**distributor's** [3] - 153:12, 153:19, 154:7
**distributors** [22] - 61:12, 143:24,

144:4, 144:9, 144:22, 161:2, 161:3, 161:7, 161:12, 161:15, 161:16, 161:19, 161:25, 163:2, 163:3, 163:6, 169:2, 169:19, 170:15, 170:24, 171:15, 201:18
**DITTA** [1] - 73:7
**Ditta** [1] - 73:19
**divergent** [1] - 49:9
**diverse** [1] - 104:5
**diversion** [8] - 16:16, 104:5, 143:4, 143:15, 143:20, 144:17, 145:3, 145:5
**diverted** [2] - 143:11, 143:24
**Doctor** [24] - 12:3, 23:6, 26:5, 39:4, 41:11, 44:20, 47:14, 47:19, 51:23, 56:23, 57:20, 57:25, 58:21, 60:11, 66:3, 68:13, 78:11, 81:3, 88:15, 92:19, 100:16, 101:21, 102:25, 105:18
**doctor** [67] - 12:4, 15:12, 17:7, 22:25, 28:21, 31:13, 33:10, 39:12, 41:4, 54:18, 56:2, 56:9, 57:5, 61:16, 62:7, 63:2, 64:8, 74:8, 79:21, 84:14, 90:14, 98:22, 99:19, 105:6, 106:13, 109:12, 112:12, 114:24, 115:6, 116:9, 116:13, 117:25, 118:7, 119:11, 120:20, 141:4, 141:15, 141:17, 141:21, 141:24, 142:5, 142:15, 142:21, 143:13, 149:22, 149:23, 153:23, 165:9, 165:10, 165:17, 165:18, 165:22, 166:8, 169:25, 170:5, 171:9, 171:17, 172:21, 173:4, 173:8, 173:13, 173:21, 186:11, 199:3, 199:25, 201:20,

203:22
**doctor's** [4] - 31:24, 77:3, 114:21, 165:25
**doctor-caused** [1] - 56:2
**doctors** [74] - 16:5, 27:24, 48:16, 55:10, 55:21, 56:5, 56:14, 60:14, 60:19, 60:23, 60:24, 62:14, 81:21, 97:25, 98:6, 98:8, 98:9, 98:13, 98:14, 114:7, 116:10, 116:17, 117:24, 118:10, 118:12, 118:16, 118:18, 119:8, 119:18, 119:22, 120:3, 120:13, 120:25, 121:12, 121:23, 122:11, 123:8, 126:25, 129:24, 138:3, 138:9, 138:11, 138:12, 139:4, 139:24, 140:8, 140:17, 140:25, 141:8, 141:12, 141:18, 146:25, 147:24, 147:25, 148:2, 148:13, 149:13, 156:6, 156:10, 156:16, 166:10, 166:17, 170:10, 170:14, 170:23, 174:5, 188:24, 189:3, 189:4, 192:6, 194:19, 201:6
**doctors'** [5] - 158:5, 158:21, 159:3, 171:11, 171:15
**document** [13] - 70:19, 71:11, 72:7, 72:17, 85:25, 86:7, 107:7, 107:13, 107:15, 164:15, 164:17, 164:20, 164:21
**documents** [26] - 7:22, 9:10, 9:18, 9:20, 32:12, 32:16, 32:17, 32:24, 48:2, 48:3, 70:13, 72:22, 86:11, 107:18, 107:22, 107:25, 132:6, 132:9, 164:5, 164:11, 164:18, 164:25, 179:14, 179:18, 180:6, 180:8
**domain** [1] - 32:11

**done** [10] - 33:15, 34:12, 68:16, 94:13, 109:2, 124:6, 163:19, 179:3, 193:9, 194:10
**Donna** [1] - 5:6
**door** [1] - 148:7
**dopamine** [1] - 51:2
**dosage** [2] - 86:9, 87:17
**Dosage** [1] - 84:15
**dosages** [3] - 84:8, 84:21, 84:23
**dose** [10] - 23:17, 47:4, 56:16, 65:11, 66:18, 67:14, 195:4, 195:7, 195:17, 195:21
**doses** [10] - 65:6, 83:15, 83:16, 83:20, 84:25, 85:8, 85:9, 85:13, 85:14, 156:6
**double** [1] - 71:16
**double-check** [1] - 71:16
**down** [18] - 5:14, 17:5, 47:15, 51:6, 59:12, 60:9, 73:8, 74:25, 90:13, 114:19, 123:16, 160:25, 163:24, 172:17, 183:9, 187:10, 190:20
**Dr** [66] - 1:10, 4:21, 5:2, 5:4, 7:19, 9:3, 12:2, 12:14, 12:22, 14:7, 18:19, 39:16, 39:19, 42:16, 42:22, 43:6, 43:7, 46:7, 66:4, 72:12, 75:12, 75:22, 107:15, 107:20, 110:9, 112:21, 114:3, 114:13, 115:9, 115:19, 115:21, 116:15, 119:14, 121:20, 122:13, 122:19, 126:12, 126:18, 126:21, 128:19, 129:14, 129:18, 136:4, 136:18, 140:7, 151:22, 152:5, 152:20, 153:23, 154:17, 155:6, 159:2, 159:16, 163:7, 164:4, 171:20, 173:19, 175:9, 176:19, 183:5, 187:14,

190:22, 201:16, 203:24
**DR** [2] - 12:7, 12:11
**draw** [1] - 168:6
**draws** [1] - 113:20
**driven** [1] - 95:9
**driving** [1] - 98:13
**drug** [29] - 34:10, 53:18, 66:21, 83:10, 86:17, 90:24, 96:5, 103:13, 103:22, 104:10, 124:20, 124:22, 129:3, 129:5, 142:6, 142:10, 142:17, 145:13, 166:2, 196:7, 196:10, 197:7, 197:8, 197:10, 197:11, 201:4, 202:25
**Drug** [5] - 20:6, 26:8, 60:19, 103:10, 157:15
**drugs** [9] - 32:3, 45:7, 102:16, 103:20, 103:21, 127:23, 195:9, 196:3, 197:4
**DSM** [7] - 53:24, 53:25, 90:4, 177:25, 178:5, 178:8
**DSM-IV** [1] - 90:4
**DSM-V** [1] - 90:4
**Dual** [2] - 17:9, 18:20
**dual** [2] - 18:20, 18:23
**due** [3] - 85:10, 140:16, 144:18
**duly** [1] - 12:15
**Dunn** [3] - 86:5, 86:14, 87:2
**duped** [7] - 60:20, 60:23, 60:24, 62:14, 129:17, 188:24, 189:3
**Duragesic** [1] - 127:17
**duration** [5] - 47:8, 195:4, 195:8, 195:17, 195:21
**during** [5] - 5:3, 9:23, 47:18, 79:3, 143:8, 143:12
**duty** [1] - 188:3
**dying** [1] - 97:8
**dynamic** [1] - 8:25

**E**

**early** [6] - 8:5, 14:9, 56:3, 71:4, 105:13, 155:12
**easier** [3] - 64:19,
148:24, 148:25
**easy** [1] - 103:18
**econometrician** [1] - 192:21
**econometrics** [3] - 111:14, 111:20, 192:24
**economic** [1] - 111:17
**economist** [1] - 110:15
**Ed** [1] - 175:10
**edition** [1] - 24:8
**editor** [4] - 44:25, 45:3, 46:10, 46:23
**educate** [1] - 166:17
**education** [4] - 149:17, 160:17, 189:17, 201:5
**educational** [4] - 63:13, 64:12, 77:25, 161:11
**effect** [23] - 56:11, 75:15, 76:25, 80:11, 82:4, 100:19, 100:22, 101:5, 101:16, 103:3, 104:14, 106:20, 145:20, 157:3, 157:6, 160:21, 192:11, 197:13, 197:24, 198:4, 198:10, 198:16, 199:9
**effective** [13] - 16:6, 39:23, 41:14, 56:15, 60:15, 61:3, 66:17, 67:9, 69:19, 127:7, 128:9, 128:24, 129:5
**effectiveness** [1] - 43:16
**effects** [3] - 40:23, 41:16, 50:23
**efficacious** [1] - 196:7
**efficacy** [9] - 30:7, 30:14, 31:2, 36:12, 47:23, 48:12, 48:14, 160:21, 196:15
**efforts** [5] - 52:21, 77:2, 77:6, 77:25, 202:11
**eight** [1] - 89:20
**either** [7] - 100:2, 111:2, 124:13, 161:20, 161:25, 171:3, 176:25
**elicit** [3] - 8:10, 75:6, 202:14
**elsewhere** [2] - 55:9, 100:18
**Emergency** [1] - 93:4
**emergency** [2] - 85:17, 148:6
**emphasize** [1] - 63:19
**employ** [2] - 50:5, 67:15
**employed** [3] - 67:11, 123:2, 177:12
**employees** [2] - 175:20, 180:13
**employing** [1] - 46:7
**employment** [1] - 110:20
**empower** [1] - 181:2
**enable** [1] - 25:3
**end** [2] - 152:15, 200:3
**endangering** [1] - 56:17
**ended** [1] - 158:15
**Endo** [2] - 42:18, 133:14
**enforcement** [1] - 175:24
**Enforcement** [1] - 20:6
**engage** [4] - 5:21, 34:6, 52:18, 141:7
**engaged** [4] - 37:14, 54:18, 62:8, 64:15
**engagement** [1] - 193:2
**engagements** [1] - 35:9
**engineering** [1] - 95:25
**Engineering** [1] - 95:17
**England** [2] - 45:3, 158:10
**enjoy** [1] - 163:25
**enormous** [1] - 98:20
**ensure** [2] - 5:13, 174:5
**entered** [2] - 11:6, 72:19
**entire** [2] - 187:7, 187:20
**entirely** [2] - 10:24, 165:24
**entirety** [1] - 44:22
**entities** [3] - 73:25, 151:12, 151:19
**entitled** [4] - 84:14, 91:8, 101:24, 205:11
**entity** [1] - 150:22
**Epidemic** [1] - 101:25
**epidemic** [13] - 16:18, 16:19, 27:2, 36:15, 56:2, 102:9, 102:18, 148:23, 150:15, 151:4, 192:16,
199:5, 200:12
**epidemiologic** [1] - 69:17
**epidemiological** [1] - 179:2
**equivalence** [1] - 84:24
**equivalent** [1] - 60:5
**Er** [1] - 127:14
**errata** [2] - 184:2, 185:25
**error** [1] - 179:14
**ESQ** [6] - 1:16, 1:17, 1:17, 1:22, 1:23, 2:10
**essence** [1] - 54:24
**essential** [1] - 30:20
**essentially** [8] - 21:3, 24:9, 41:11, 45:4, 55:20, 74:25, 96:3, 141:18
**established** [2] - 47:19, 67:4
**esteemed** [1] - 53:17
**estimate** [2] - 135:10, 167:16
**estimated** [1] - 43:8
**et** [4] - 18:15, 43:10, 55:7, 60:15
**evaluate** [2] - 179:7, 181:4
**evaluating** [2] - 49:13, 178:11
**event** [9] - 6:4, 9:23, 11:18, 11:21, 13:21, 72:25, 85:15, 86:18, 90:19
**events** [2] - 58:4, 90:9
**evidence** [34] - 16:9, 29:15, 40:7, 40:15, 40:17, 40:20, 42:12, 44:11, 46:22, 47:6, 48:13, 49:6, 49:8, 49:9, 49:15, 49:17, 49:22, 50:3, 50:6, 56:24, 69:13, 70:5, 72:23, 73:24, 74:12, 80:24, 102:3, 109:8, 113:16, 114:5, 127:6, 129:9, 199:10
**Evidence** [1] - 41:15
**evidence-based** [3] - 49:17, 49:22, 50:6
**evident** [1] - 40:19
**exact** [2] - 135:24, 159:18
**exactly** [1] - 13:18
**Exalgo** [2] - 127:19, 137:15
**exam** [1] - 21:11
**examination** [11] - 9:11, 9:24, 23:9, 61:19, 74:5, 79:3, 88:10, 105:14, 106:18, 190:25
**EXAMINATION** [5] - 14:5, 110:7, 152:18, 175:7, 190:18
**examine** [2] - 124:7, 124:24
**examined** [2] - 89:13, 123:19
**examiner** [1] - 163:12
**examining** [2] - 46:8, 109:24
**example** [21] - 13:5, 26:18, 33:15, 39:9, 43:15, 56:25, 62:22, 80:10, 91:14, 92:7, 116:22, 122:12, 127:13, 135:7, 141:10, 146:10, 166:2, 178:17, 180:20, 192:2, 192:8
**examples** [3] - 16:7, 80:2, 131:13
**excellence** [1] - 21:22
**exchange** [1] - 71:11
**exchanged** [1] - 71:8
**exclude** [1] - 44:2
**excluding** [1] - 77:4
**exclusively** [2] - 96:20, 178:25
**excuse** [4] - 41:4, 72:14, 183:8, 186:9
**excused** [1] - 204:3
**exercise** [2] - 166:11, 166:15, 181:3
**exercising** [1] - 189:5
**Exhibit** [2] - 106:23, 106:25
**exhibit** [6] - 9:25, 11:18, 106:24, 107:2, 107:7
**exhibits** [1] - 10:5
**exist** [4] - 135:22, 136:4, 136:10, 136:16
**expansion** [1] - 95:6
**expect** [1] - 11:3
**expected** [1] - 116:17
**expedite** [1] - 12:24
**experience** [26] - 23:18, 48:18, 48:23, 49:7, 49:9, 49:14, 49:25, 50:2, 54:17, 68:5, 81:20, 82:23, 97:3, 97:5, 97:13, 110:14, 110:21, 111:4, 118:8, 124:2,

124:4, 152:21, 153:22, 177:21, 194:7

**experiences** [4] - 52:15, 81:20, 82:19, 118:3

**expert** [14] - 4:22, 5:10, 6:8, 6:14, 9:14, 10:25, 45:24, 72:4, 111:24, 126:11, 131:25, 132:5, 136:8, 157:13

**expert's** [2] - 8:24

**expertise** [9] - 21:6, 21:10, 113:11, 152:25, 153:4, 153:7, 153:11, 153:18, 154:6

**experts** [5] - 5:15, 6:19, 25:20, 53:11, 95:23

**explain** [10] - 22:20, 48:22, 60:2, 60:22, 64:4, 85:4, 94:19, 100:21, 105:7, 202:8

**explained** [1] - 62:13

**exponential** [1] - 95:9

**exposed** [2] - 92:13, 92:16

**Exposure** [1] - 91:9

**expressed** [2] - 188:23, 194:5

**expressing** [1] - 82:23

**expressly** [1] - 76:23

**extensive** [2] - 43:8, 75:23

**extent** [4] - 100:9, 129:16, 148:12, 151:2

**extremely** [1] - 45:18

---

**F**

**face** [1] - 196:13

**facie** [1] - 96:4

**facilitated** [1] - 103:18

**facilities** [3] - 143:7, 143:8, 143:12

**fact** [29] - 9:24, 26:24, 42:12, 42:15, 56:11, 62:8, 63:17, 64:2, 64:16, 65:8, 65:13, 65:21, 73:22, 74:10, 86:13, 99:2, 118:10, 134:24, 144:3, 170:4, 170:14, 187:19, 193:12, 194:16, 196:6, 197:18, 198:7, 203:20

**factor** [5] - 117:12, 123:3, 169:9, 195:6, 195:9

**Factors** [2] - 200:9, 201:16

**factors** [15] - 116:23, 117:4, 117:6, 120:13, 120:20, 123:4, 137:23, 151:12, 151:19, 151:24, 194:24, 195:12, 200:11, 200:13, 200:14

**facts** [2] - 157:22, 157:24

**faculty** [1] - 19:4

**failed** [1] - 126:21

**fair** [22] - 13:24, 15:8, 21:7, 25:22, 30:25, 31:22, 62:10, 68:7, 85:19, 86:10, 109:6, 136:25, 137:3, 139:10, 141:2, 141:3, 142:16, 144:25, 149:3, 150:22, 178:20, 189:7

**faith** [1] - 190:11

**false** [8] - 62:9, 64:4, 65:13, 65:15, 159:11, 159:20, 185:7, 185:14

**falsehood** [1] - 64:2

**falsity** [1] - 33:6

**familiar** [7] - 9:8, 22:18, 31:16, 31:19, 49:18, 189:10, 191:11

**family** [2] - 103:19, 103:24

**far** [4] - 29:17, 77:13, 168:16, 182:15

**fashion** [1] - 52:3

**faulty** [1] - 166:15

**FDA** [21] - 30:11, 83:9, 111:5, 127:9, 127:13, 128:8, 128:24, 129:4, 129:9, 129:14, 147:5, 148:17, 148:22, 149:2, 149:7, 195:23, 196:2, 196:7, 196:13, 197:3, 197:6

**feasible** [1] - 104:6

**feature** [1] - 103:21

**federal** [3] - 35:14, 112:5, 113:8

**Federation** [4] - 147:8, 150:14, 160:18,

161:23

**feed** [2] - 170:8, 171:7

**feeding** [1] - 45:24

**fees** [2] - 42:13

**fellows** [1] - 29:6

**Fellowship** [1] - 17:11

**fellowship** [1] - 19:20

**fentanyl** [1] - 95:9

**few** [6] - 10:6, 12:23, 150:18, 175:13, 190:24, 191:4

**fewer** [2] - 135:7, 137:8

**field** [10] - 23:21, 25:20, 53:6, 53:11, 87:9, 110:21, 110:25, 111:14, 111:16, 194:12

**figure** [3] - 49:10, 88:2, 94:25

**figured** [1] - 48:23

**figures** [1] - 79:23

**filed** [4] - 7:13, 107:3, 160:7, 160:8

**files** [5] - 47:22, 179:19, 179:23, 180:7, 180:9

**fill** [1] - 173:15

**filled** [3] - 167:4, 181:16, 190:10

**filling** [1] - 190:4

**films** [1] - 17:25

**final** [2] - 93:6, 190:7

**financial** [2] - 42:7, 42:13

**finder** [1] - 73:22

**findings** [3] - 61:17, 93:16, 98:21

**fine** [1] - 136:18

**Fine** [2] - 42:16, 42:22

**fingers** [1] - 65:19

**finish** [3] - 79:7, 83:5, 122:4

**finished** [4] - 43:23, 53:13, 202:17, 203:10

**finishing** [1] - 203:9

**first** [19] - 8:21, 10:23, 12:15, 23:14, 26:15, 37:20, 39:19, 46:16, 51:9, 70:16, 92:23, 102:2, 106:10, 108:10, 110:13, 155:20, 177:14, 186:8, 191:2

**first-line** [1] - 155:20

**fit** [1] - 75:8

**five** [7] - 7:6, 26:25, 43:9, 45:2, 82:13, 135:10, 162:25

**five-second** [1] - 7:6

**five-sentence** [1] - 45:2

**fivefold** [3] - 60:7, 167:14, 167:16

**fix** [1] - 187:8

**fly** [1] - 10:10

**flying** [1] - 65:20

**focus** [3] - 114:17, 130:12, 144:20

**focused** [2] - 130:8, 133:22

**focusing** [2] - 73:13, 114:19

**folks** [8] - 37:8, 43:13, 58:24, 59:4, 97:11, 120:6, 125:3, 199:18

**follow** [3] - 122:9, 179:15, 189:2

**follow-up** [3] - 122:9, 179:15, 189:2

**followed** [1] - 43:19

**following** [7] - 19:17, 19:20, 28:5, 55:20, 106:6, 115:25, 155:10

**follows** [1] - 12:16

**foot** [1] - 14:24

**footnote** [2] - 84:16, 93:6

**Footnote** [1] - 84:18

**footnotes** [3] - 85:23, 92:20, 92:21

**forbidden** [1] - 18:9

**forgot** [1] - 57:10

**form** [4] - 80:20, 140:3, 177:24, 182:4

**formed** [2] - 29:14, 130:24

**forming** [18] - 48:17, 120:11, 123:18, 123:25, 124:17, 124:25, 125:25, 126:13, 126:17, 130:9, 130:18, 132:14, 142:10, 143:20, 172:24, 177:18, 194:4

**forms** [1] - 202:22

**formulary** [3] - 147:11, 151:2, 151:8

**forth** [6] - 38:11, 38:22, 74:10, 87:18, 88:20, 167:17

**forward** [2] - 170:8, 171:7

**foundation** [2] - 73:23, 73:25

**foundational** [1] - 81:12

**founded** [2] - 38:6, 80:25

**four** [7] - 43:9, 57:14, 82:13, 86:2, 135:10, 167:14, 167:16

**fourfold** [7] - 16:2, 55:5, 57:14, 59:12, 59:15, 105:11, 172:2

**framework** [1] - 75:9

**frequently** [1] - 46:17

**Friday** [3] - 4:12, 4:15, 5:3

**friends** [1] - 103:19

**front** [2] - 37:22, 168:8

**Frye** [5] - 5:14, 5:22, 6:5, 9:11, 11:13

**FRYE** [1] - 1:10

**Fryebert** [1] - 74:19

**full** [2] - 19:17, 178:13

**function** [1] - 64:17

**funded** [1] - 38:14

**Furthermore** [1] - 205:12

**furthermore** [4] - 40:10, 40:18, 64:11, 202:19

---

**G**

**gain** [1] - 74:12

**gained** [1] - 55:19

**GARGUILO** [1] - 1:12

**Garguilo** [20] - 3:4, 21:2, 30:18, 35:22, 58:6, 59:25, 60:2, 68:10, 68:15, 85:5, 88:10, 89:10, 94:19, 96:21, 97:23, 100:8, 100:16, 105:8, 191:7, 202:8

**Garguilo's** [1] - 99:20

**gateway** [21] - 75:2, 75:14, 75:15, 100:19, 100:22, 101:5, 101:16, 102:5, 103:3, 104:14, 157:2, 157:6, 197:13, 197:24, 198:4, 198:10, 198:16, 199:9, 199:12, 203:12, 203:21

**gather** [1] - 39:4

**gears** [3] - 123:8, 159:7, 181:23

**general** [8] - 17:24, 73:16, 74:7, 75:6, 87:13, 101:6, 171:3, 172:3

**General** [3] - 2:3, 2:3,

2:5

**General's** [1] - 3:21
**generally** [14] - 52:22,
59:4, 74:13, 100:6,
100:8, 137:25,
155:25, 156:7,
156:10, 156:14,
156:19, 164:24,
177:7, 195:16
**generic** [2] - 127:23,
127:24
**genuinely** [1] - 189:4
**geographic** [4] - 98:3,
98:17, 116:7, 185:3
**geographically** [1] -
98:18
**given** [6] - 30:22, 36:2,
124:24, 125:12,
132:7, 160:4
**go-around** [1] - 73:5
**gonna** [2] - 14:22,
38:2
**govern** [1] - 111:5
**government** [2] -
150:18, 150:21
**Governor** [1] - 29:21
**governors** [1] - 36:16
**graph** [7] - 58:7, 58:9,
85:7, 85:12, 86:4,
86:5, 89:11
**graphs** [3] - 84:7,
85:6, 85:18
**green** [1] - 58:15
**ground** [1] - 49:23
**grows** [3] - 16:2, 55:5,
171:25
**Guerra** [1] - 73:6
**GUERRA** [1] - 73:6
**guess** [1] - 105:6
**guidelines** [2] -
150:14, 191:23

**H**

**habits** [3] - 55:16,
99:22, 192:3
**HAGUE** [1] - 205:20
**Hague** [1] - 205:6
**half** [1] - 42:9
**halfway** [1] - 187:9
**hallway** [1] - 18:7
**halo** [1] - 56:11
**hand** [4] - 12:13,
18:24, 95:15, 151:15
**handed** [2] - 71:8,
113:24
**handled** [2] - 71:8,
181:12
**handy** [1] - 155:8,
193:20

**Hanly** [14] - 3:12,
17:17, 62:2, 70:21,
71:25, 73:2, 74:21,
77:9, 78:18, 114:16,
157:2, 157:14,
190:16, 200:19
**HANLY** [75] - 1:14,
1:16, 3:12, 4:23,
8:17, 11:25, 14:4,
14:6, 15:10, 17:20,
18:17, 18:18, 41:10,
42:24, 43:2, 43:4,
44:17, 44:19, 46:5,
46:6, 47:14, 47:17,
51:19, 51:21, 53:13,
53:15, 57:22, 57:24,
59:18, 59:20, 60:8,
60:10, 62:4, 62:6,
62:21, 62:25, 65:16,
65:20, 65:24, 66:2,
66:7, 66:9, 70:8,
70:22, 75:10, 75:15,
79:9, 79:20, 84:11,
84:13, 88:24, 89:2,
91:3, 91:7, 94:10,
94:12, 99:18,
101:18, 101:20,
103:5, 103:7, 105:3,
105:5, 105:18,
106:7, 106:16,
182:4, 187:13,
190:17, 190:19,
190:20, 196:23,
197:2, 201:20,
203:22
**hanly** [1] - 76:20
**happy** [3] - 79:9,
136:6, 145:21
**Harbaugh** [3] - 68:18,
198:12, 198:13
**hard** [7] - 10:9, 42:2,
130:22, 134:25,
157:20, 170:7,
170:17
**harder** [4] - 64:16,
128:18, 165:14,
187:3
**harm** [3] - 23:25,
83:17, 83:21
**harmed** [1] - 146:9
**harmful** [1] - 52:19
**harms** [9] - 88:21,
96:9, 146:12,
146:22, 147:2,
147:5, 150:6, 192:4,
192:9
**headed** [1] - 68:11
**heading** [1] - 69:12
**heads** [1] - 65:23
**heads-up** [1] - 65:23

**health** [7] - 36:5,
40:23, 41:16, 92:3,
94:22, 94:23, 178:19
**Health** [5] - 10:19,
61:6, 71:22, 94:17,
164:6
**healthcare** [22] -
31:25, 32:2, 32:8,
32:14, 33:21, 34:8,
34:17, 38:25, 45:6,
47:5, 47:10, 52:8,
57:9, 68:7, 121:14,
168:25, 169:15,
169:17, 170:2,
171:12, 174:2,
194:12
**hear** [13] - 12:4, 12:5,
12:10, 13:21, 22:17,
30:4, 54:15, 128:13,
128:16, 128:17,
128:18, 128:20,
198:23
**heard** [8] - 49:17,
54:6, 54:9, 82:2,
82:22, 107:9, 108:3,
163:20
**hearing** [7] - 5:14,
5:22, 6:6, 7:4, 8:13,
11:13, 152:15
**HEARING** [1] - 1:10
**hearings** [4] - 10:5,
12:24, 72:21, 73:13
**heart** [2] - 11:5, 51:7
**heavy** [1] - 96:5
**heed** [1] - 78:25
**held** [1] - 9:13
**help** [1] - 187:5
**helping** [1] - 163:8
**hereby** [1] - 205:8
**Heroin** [1] - 68:12
**heroin** [19] - 68:22,
68:24, 68:25, 101:4,
102:6, 103:23,
145:9, 145:12,
145:17, 145:18,
158:6, 158:22,
159:4, 199:13,
202:2, 203:2,
203:13, 203:21
**high** [6] - 66:18,
67:14, 93:11, 93:12,
104:8, 114:23
**Higher** [2] - 84:14,
84:15
**higher** [9] - 84:21,
84:22, 84:25, 85:9,
85:14, 87:17, 92:3,
156:6
**highlight** [1] - 40:4
**highlighted** [3] -

39:22, 40:6, 40:11
**highly** [3] - 51:3,
104:19, 168:14
**hired** [2] - 157:13,
158:3
**historical** [2] - 55:25,
56:24
**historically** [1] - 33:9
**history** [8] - 46:12,
117:7, 117:9,
168:12, 178:18,
178:19, 178:20,
202:19
**hold** [2] - 24:21, 191:5
**holding** [3] - 26:4,
26:7, 100:7
**HON** [1] - 1:12
**Honor** [75] - 3:18,
3:25, 4:23, 5:25, 6:9,
7:2, 7:3, 7:7, 7:10,
8:9, 8:13, 8:16, 8:17,
8:24, 9:7, 9:12, 9:17,
10:9, 10:18, 11:15,
11:23, 11:25, 14:4,
17:20, 18:17, 42:24,
45:19, 45:22, 46:2,
49:16, 61:5, 61:21,
62:4, 65:16, 70:8,
70:11, 70:14, 70:20,
70:22, 71:13, 71:17,
71:21, 75:11, 76:16,
77:10, 77:16, 78:5,
78:12, 79:19, 106:2,
106:4, 106:7,
106:16, 107:12,
107:18, 108:2,
108:8, 108:9, 109:3,
110:2, 112:15,
112:18, 152:5,
152:7, 163:8,
163:18, 174:13,
175:6, 176:18,
186:9, 187:6,
190:17, 196:16,
199:22, 203:23
**Honorable** [1] - 3:4
**hope** [3] - 14:24,
59:25, 60:12
**hopefully** [2] - 15:7,
175:14
**hospice** [1] - 55:18
**hospital** [1] - 45:5
**hospitalized** [1] - 47:3
**hour** [5] - 4:16, 4:19,
79:10, 79:14, 152:12
**house** [1] - 102:20
**House** [2] - 36:7,
36:13
**huge** [6] - 47:9, 56:4,
56:18, 115:4, 116:5,

169:9
**hundreds** [1] - 10:5
**Hunter** [1] - 3:17
**HUNTER** [1] - 1:22
**hydrocodone** [1] -
136:13

**I**

**idea** [5] - 10:20, 11:3,
45:17, 49:23, 158:23
**identical** [1] - 17:2
**identified** [10] - 7:22,
10:11, 104:3,
119:19, 126:11,
130:4, 130:18,
139:3, 143:19, 190:8
**identify** [23] - 118:11,
118:17, 119:11,
119:17, 119:22,
120:2, 120:6, 120:8,
126:14, 132:4,
139:7, 142:4,
142:14, 159:11,
159:19, 173:3,
173:8, 181:7,
181:10, 181:15,
185:6, 185:14,
187:24
**identifying** [1] -
131:13
**II** [1] - 68:23
**III** [2] - 1:17, 168:12
**illegal** [2] - 16:18,
102:16
**illegally** [2] - 142:25,
143:3
**illicit** [4] - 95:8, 101:4,
102:9, 103:20
**illicitly** [2] - 145:13,
146:5
**illness** [3] - 15:25,
51:14, 191:18
**images** [1] - 18:15
**impact** [6] - 123:3,
139:11, 140:20,
140:24, 142:20,
145:2
**implemented** [1] -
168:17
**importance** [1] - 88:11
**important** [10] - 44:8,
46:15, 46:20, 49:13,
49:24, 49:25, 50:2,
91:19, 137:6, 195:12
**importantly** [1] - 98:11
**importation** [1] - 71:5
**imposes** [1] - 149:16
**impressed** [1] - 76:6
**impression** [2] -

49:11, 82:23
**impressions** [1] -
61:18
**improper** [2] - 9:11,
141:22
**improperly** [1] -
142:15
**improve** [2] - 152:13,
152:16
**IN** [1] - 1:4
**in-depth** [3] - 38:7,
43:12, 68:2
**inaccuracy** [1] - 77:22
**inappropriate** [3] -
108:19, 114:8,
131:16
**Inc** [1] - 2:8
**incidents** [1] - 143:20
**include** [12] - 8:4,
24:15, 28:8, 44:5,
75:13, 117:19,
131:23, 131:25,
138:18, 163:3,
163:5, 186:17
**included** [4] - 8:6,
27:9, 157:25, 158:17
**includes** [1] - 156:20
**including** [19] - 16:13,
18:3, 42:18, 55:7,
72:13, 72:14, 77:21,
85:15, 92:4, 93:20,
94:22, 95:8, 96:6,
101:3, 121:14,
131:2, 150:5, 172:4,
178:18
**inclusion** [1] - 72:16
**inconsistencies** [1] -
48:11
**inconsistency** [3] -
41:12, 81:25, 82:2
**inconsistent** [1] -
113:16
**incorporate** [1] -
72:11
**incorporating** [1] -
72:3
**incorrect** [4] - 119:21,
119:25, 121:6,
139:15
**increase** [15] - 47:13,
57:13, 57:14, 57:17,
58:3, 59:15, 96:8,
102:4, 104:24,
105:14, 140:15,
155:10, 195:22,
199:11
**increased** [38] - 16:3,
16:10, 16:12, 16:15,
16:17, 55:6, 58:10,
60:7, 75:16, 77:7,

83:15, 83:16, 83:20,
84:8, 84:9, 84:24,
86:8, 93:23, 96:7,
96:24, 97:6, 98:13,
99:3, 102:5, 105:11,
145:8, 168:25,
169:8, 169:18,
170:23, 170:25,
171:15, 172:2,
172:14, 199:13,
203:2, 203:13
**increases** [6] - 65:11,
85:11, 85:15, 86:9,
95:7, 95:10
**increasing** [2] - 85:20,
195:21
**independent** [1] -
166:11
**Index** [1] - 3:9
**INDEX** [1] - 1:6
**indicated** [1] - 128:25
**indicates** [3] - 6:3,
74:15, 84:16
**indication** [6] - 107:6,
127:14, 129:11,
134:17, 178:25,
197:8
**indicative** [1] - 195:19
**individual** [10] -
117:17, 121:3,
122:2, 124:12,
126:3, 126:14,
126:24, 137:19,
177:9, 177:20
**individual's** [1] -
52:14
**individuals** [16] -
16:11, 16:13, 89:23,
91:17, 92:9, 92:16,
119:12, 131:2,
138:5, 145:9,
151:12, 151:19,
175:16, 176:5,
177:2, 179:7
**industry** [13] - 16:4,
42:14, 46:19, 60:14,
60:25, 61:10, 61:23,
160:14, 161:6,
161:10, 161:18,
161:23, 186:17
**industry's** [1] - 16:21
**inference** [1] - 74:11
**influence** [5] - 47:10,
76:2, 146:24, 151:9,
166:4
**influences** [1] -
165:25
**inform** [1] - 201:6
**information** [17] -
13:3, 13:10, 28:9,

32:3, 32:6, 34:18,
38:8, 41:2, 71:6,
71:7, 72:22, 178:14,
178:19, 185:4,
196:8, 197:6, 197:9
**informed** [2] - 114:5,
177:21
**initiation** [4] - 103:17,
158:6, 158:21, 159:4
**injection** [1] - 103:22
**injury** [2] - 92:8, 92:10
**ink** [1] - 205:16
**instances** [2] - 38:17,
90:8
**instead** [3] - 54:3,
133:18, 178:25
**institution** [1] - 57:9
**instruction** [1] - 79:2
**insufficient** [4] -
40:20, 40:22, 41:15,
42:12
**insurance** [4] -
139:25, 140:3,
140:9, 147:12
**intend** [2] - 15:2,
48:25
**intended** [2] - 22:25,
158:15
**intends** [1] - 78:18
**intent** [2] - 5:15, 5:19
**intentioned** [1] - 189:4
**interaction** [2] - 68:6,
75:24
**interactions** [1] -
52:14
**interest** [2] - 38:13,
42:7
**interested** [1] - 52:5
**Internal** [3] - 87:3,
87:7, 93:8
**internal** [2] - 32:23,
47:21
**International** [1] -
103:9
**interrelated** [2] - 30:7,
102:24
**interrupt** [2] - 17:18,
109:17
**interview** [3] - 172:23,
175:20, 175:23
**interviewed** [1] -
123:23
**interviewing** [1] -
124:10
**interviews** [10] - 97:4,
121:12, 126:9,
131:2, 131:24,
131:25, 193:10,
193:12, 194:10,
194:20

**intravenous** [1] -
103:13
**invented** [1] - 101:12
**investigate** [1] -
149:13
**investigation** [1] -
104:7
**investigator** [1] - 81:6
**invited** [1] - 34:21
**involved** [5] - 63:8,
81:17, 104:4, 146:4,
200:25
**involvement** [1] -
130:24
**involving** [1] - 52:13
**Islip** [1] - 1:8
**isolate** [1] - 123:3
**issue** [12] - 6:7, 7:10,
9:6, 73:20, 75:17,
77:11, 94:2, 94:8,
129:15, 136:3,
136:9, 136:15
**issued** [3] - 84:6,
185:25, 186:4
**issues** [7] - 27:6,
48:20, 52:6, 94:22,
95:24, 159:8, 165:21
**issuing** [1] - 187:16
**itself** [3] - 20:16,
41:19, 158:17
**IV** [1] - 90:4

## J

**JAMA** [3] - 86:21,
139:18, 140:12
**JAMES** [1] - 2:2
**James** [1] - 5:4
**Janssen** [8] - 2:8, 4:5,
7:8, 63:11, 110:12,
132:20, 133:6, 133:9
**January** [9] - 115:9,
115:23, 118:23,
119:15, 121:17,
131:6, 154:21,
185:21, 185:24
**JAYNE** [1] - 1:17
**Jayne** [1] - 3:14
**jciaccio@napolilaw.
com** [1] - 1:25
**jconroy@
simmonsfirm.com**
[1] - 1:19
**Jerry** [2] - 3:4, 29:21
**JERRY** [1] - 1:12
**Jick** [2] - 44:15, 44:23
**job** [1] - 162:15
**Johnson** [2] - 7:8,
42:18, 70:12, 76:19,
110:12

**joint** [2] - 106:24,
107:2
**Joint** [2] - 160:19,
161:24
**Jonathan** [1] - 139:18
**Journal** [10] - 45:3,
68:18, 69:3, 86:22,
87:5, 92:23, 93:7,
93:8, 103:10, 158:10
**journal** [9] - 25:18,
25:19, 25:22, 69:5,
69:23, 86:24, 92:25,
157:7, 157:11
**journals** [6] - 25:19,
42:6, 69:4, 93:10,
93:13, 93:17
**JR** [1] - 1:16
**Judge** [15] - 14:17,
17:24, 54:6, 54:8,
71:9, 72:2, 75:9,
75:20, 76:21, 79:9,
91:4, 91:11, 113:7,
135:9, 197:2
**judgment** [8] - 6:12,
6:18, 165:23,
166:11, 166:14,
166:16, 170:6, 189:5
**July** [1] - 73:9
**jump** [2] - 152:10,
152:12
**jury** [2] - 132:21, 133:7
**Justice** [21] - 1:12,
21:2, 30:18, 35:22,
58:6, 59:25, 60:2,
68:10, 68:15, 85:5,
88:10, 89:10, 94:19,
96:21, 97:23, 99:20,
100:8, 100:16,
105:7, 191:7, 202:8

## K

**Kadian** [2] - 127:21,
135:7
**Kadian's** [1] - 135:13
**Katherine** [1] - 7:15
**keep** [1] - 148:6
**Keller** [3] - 4:21, 5:10,
6:12
**kept** [1] - 22:13
**key** [6] - 31:2, 96:8,
103:21, 160:17,
161:6, 201:3
**Keyes** [2] - 5:2, 7:15
**kicked** [1] - 112:15
**kind** [5] - 56:11, 64:9,
76:9, 189:14, 196:12
**kinds** [2] - 32:11,
195:8
**knowing** [2] - 138:5,

138:10
**knowledge** [5] -
136:20, 166:14,
166:15, 184:9,
191:12
**known** [5] - 31:16,
31:19, 44:13, 64:11,
86:24
**knows** [2] - 8:24, 21:2

**L**

**labeled** [1] - 200:8
**laboratories** [1] -
196:2
**Lacey** [1] - 5:10
**lack** [2] - 73:24, 161:2
**laid** [1] - 73:23
**language** [1] - 79:17
**Lankenau** [1] - 103:9
**large** [5] - 39:18, 47:7,
82:22, 98:15, 173:20
**largely** [3] - 114:24,
115:5, 116:12
**last** [13] - 22:11,
31:18, 65:4, 73:5,
73:11, 82:13, 105:3,
162:13, 162:25,
183:8, 183:9,
188:23, 199:21
**late** [6] - 7:14, 7:18,
27:6, 61:8, 102:5,
199:12
**latest** [1] - 24:8
**launched** [1] - 99:15
**law** [1] - 175:23
**lawful** [1] - 28:5
**lawfully** [1] - 149:25
**lawmakers** [2] - 36:11,
36:17
**lawyer** [1] - 79:16
**lawyers** [8] - 26:15,
32:17, 32:22, 47:21,
53:17, 74:2, 158:4,
193:3
**lay** [3] - 118:12,
118:18, 139:3
**lay-newspaper** [1] -
139:3
**lay-newspapers** [2] -
118:12, 118:18
**lead** [6] - 46:2, 101:2,
114:12, 123:13,
201:14, 202:20
**Lead** [1] - 91:9
**leaders** [3] - 160:17,
161:6, 201:4
**leading** [5] - 45:22,
45:23, 70:23, 90:24,
196:18, 196:20,

198:21, 198:24
**leads** [1] - 141:22
**learn** [2] - 120:25,
121:8
**least** [5] - 56:3, 75:11,
139:2, 167:14,
197:23
**lectures** [1] - 34:7
**led** [4] - 95:6, 137:24,
184:5, 201:5
**left** [4] - 58:8, 85:7,
86:4, 94:15
**legal** [4] - 16:17,
153:12, 153:19,
154:7
**legendary** [1] - 44:13
**legitimate** [4] -
104:10, 171:4,
173:22, 174:7
**Lembke** [51] - 1:10,
5:2, 7:19, 12:2,
12:19, 12:22, 14:7,
18:19, 46:7, 72:12,
75:22, 76:24,
107:15, 110:9,
112:21, 114:3,
114:13, 115:9,
115:19, 115:21,
116:15, 119:14,
121:20, 122:19,
126:12, 126:18,
126:21, 128:19,
129:14, 129:19,
136:4, 136:18,
140:7, 151:22,
152:5, 152:20,
153:23, 154:17,
155:6, 159:2,
159:16, 163:7,
164:5, 171:20,
173:19, 175:9,
176:19, 183:5,
187:14, 190:22,
203:24
**LEMBKE** [3] - 12:7,
12:11, 12:14
**Lembke's** [7] - 9:4,
66:4, 75:12, 77:20,
107:20, 200:9,
201:16
**lenient** [2] - 45:23,
196:18
**less** [3] - 134:16,
134:18, 167:14
**lethal** [1] - 51:7
**LETITIA** [1] - 2:2
**letter** [14] - 4:20, 6:2,
7:13, 35:13, 44:15,
44:25, 45:3, 45:11,
45:15, 46:10, 46:14,

46:23, 97:16, 163:11
**level** [4] - 114:23,
122:17, 167:6, 167:7
**liability** [1] - 193:4
**Liberty** [1] - 2:4
**license** [1] - 149:22
**licensed** [1] - 19:24
**licenses** [1] - 149:20
**licensing** [1] - 189:11
**lie** [1] - 141:18
**life** [2] - 13:11, 52:14
**lightly** [1] - 108:8
**likelihood** [1] - 86:17
**likely** [2] - 28:16,
28:17
**likewise** [4] - 176:10,
176:24, 185:5,
187:24
**limit** [1] - 13:3
**limited** [5] - 6:5,
90:18, 90:24, 92:4,
92:6
**Limited** [1] - 91:9
**limiting** [2] - 91:16,
92:8
**line** [24] - 11:7, 57:8,
58:15, 58:20, 58:23,
85:8, 85:13, 119:6,
121:18, 121:19,
122:9, 131:8,
131:10, 154:22,
155:20, 159:17,
168:7, 182:22,
182:24, 182:25,
183:9, 188:7
**lines** [7] - 58:8,
115:16, 118:25,
131:7, 154:4, 185:13
**lips** [1] - 12:5
**list** [15] - 7:18, 7:23,
9:9, 11:12, 15:14,
15:19, 15:20, 42:2,
43:8, 51:10, 70:17,
107:2, 201:13,
201:16, 202:17
**listed** [4] - 17:3,
108:18, 186:8,
186:12
**listening** [1] - 17:22
**litany** [1] - 192:19
**literature** [34] - 25:6,
25:11, 28:19, 28:20,
29:2, 29:13, 29:15,
37:7, 37:17, 41:19,
43:13, 45:12, 46:16,
48:4, 48:6, 48:16,
49:5, 54:13, 56:25,
57:3, 68:3, 80:7,
80:12, 80:15, 80:18,
81:4, 81:10, 81:14,

82:20, 88:12, 93:20,
97:10, 101:16, 104:3
**LITIGATION** [1] - 1:4
**Litigation** [1] - 3:9
**litigation** [22] - 8:20,
10:22, 10:23, 11:2,
14:19, 26:16, 33:14,
33:16, 37:12, 37:18,
39:6, 43:20, 44:14,
107:18, 110:13,
112:6, 130:24,
136:15, 180:2,
193:20, 200:25
**litigations** [2] - 32:18,
32:23
**live** [5] - 13:7, 17:23,
18:5, 35:8, 64:20
**LLC** [1] - 1:14
**LLP** [1] - 2:8
**located** [1] - 132:5
**location** [1] - 187:22
**locations** [1] - 18:5
**Lois** [1] - 3:20
**LOIS** [1] - 2:5
**long-acting** [1] -
127:24
**long-term** [3] - 69:18,
89:21, 127:6
**look** [23] - 35:17, 38:5,
38:12, 44:8, 62:21,
67:17, 68:9, 69:10,
87:25, 90:17, 90:22,
94:2, 94:24, 96:14,
99:5, 99:25, 102:18,
114:2, 118:22,
142:5, 146:23, 177:4
**looked** [19] - 9:19,
35:13, 37:15, 43:23,
47:20, 69:20, 86:7,
86:12, 90:2, 92:12,
97:25, 98:17, 98:21,
103:2, 126:24,
142:9, 182:20,
199:3, 203:11
**looking** [9] - 38:4,
41:20, 43:22, 69:18,
80:15, 95:23,
142:17, 146:5, 198:2
**looks** [1] - 86:21
**Los** [1] - 103:14
**lost** [2] - 70:9, 128:10
**low** [7] - 40:14, 40:17,
40:25, 46:21, 84:23,
85:8, 93:10
**lower** [3] - 85:13,
135:3, 168:16
**lowly** [1] - 104:20
**lunch** [1] - 4:16
**luncheon** [3] - 105:23,
106:2, 106:5

**M**

**M.D** [3] - 26:8, 60:19,
157:15
**Madison** [1] - 1:15
**maintain** [1] - 21:25
**maintained** [1] - 142:6
**major** [4] - 95:24,
102:3, 117:20,
199:11
**majority** [4] - 27:25,
136:9, 136:12,
173:20
**Mallinckrodt** [3] -
122:12, 122:14,
133:16
**managed** [2] - 151:2,
151:7
**management** [6] -
63:20, 127:11,
127:14, 127:25,
153:2, 199:4
**Management** [1] -
101:25
**mandated** [1] - 192:10
**mandates** [1] - 191:23
**manifesting** [1] -
66:25
**manipulated** [4] -
161:6, 161:10,
161:18, 161:23
**manipulating** [1] -
141:11
**manipulation** [1] -
160:16
**manipulative** [1] -
141:7
**Manual** [2] - 24:8,
53:23
**manufacture** [3] -
62:9, 64:15, 83:9
**manufactured** [3] -
128:4, 145:13, 146:5
**manufacturers** [5] -
45:16, 48:5, 80:4,
96:6, 201:17
**manufactures** [1] -
201:8
**manufacturing** [1] -
146:18
**manuscript** [2] -
25:18, 203:9
**map** [1] - 14:21
**marijuana** [1] - 27:18
**mark** [1] - 200:2
**market** [4] - 135:25,
146:5, 149:3, 182:16
**marketed** [2] - 182:3,
184:15
**marketing** [49] -

62:22, 63:3, 63:10,
74:25, 75:17, 75:19,
75:25, 76:5, 76:8,
76:10, 77:2, 77:6,
77:14, 77:24, 80:3,
80:10, 81:15, 81:22,
87:21, 110:18,
110:22, 111:2,
111:6, 111:20,
113:9, 113:10,
113:15, 119:19,
119:23, 120:4,
120:25, 121:8,
121:24, 122:13,
129:4, 159:8,
168:13, 168:16,
181:24, 182:8,
182:12, 183:10,
184:12, 184:25,
186:14, 186:21,
186:25, 187:16
**mask** [1] - 109:11
**material** [15] - 33:3,
46:18, 48:12, 62:23,
63:10, 70:17, 87:11,
87:21, 113:15,
136:5, 136:6,
136:23, 136:25,
145:20, 188:16
**materials** [31] - 7:15,
7:19, 7:23, 8:3, 8:4,
8:5, 8:11, 8:12, 8:18,
9:3, 11:12, 32:10,
35:12, 47:20, 71:2,
71:19, 77:24, 81:15,
81:22, 119:19,
119:23, 120:4,
121:2, 121:9,
121:24, 122:13,
131:25, 132:5,
160:16, 184:20,
185:10
**Matt** [3] - 154:20,
171:23, 172:18
**matter** [2] - 65:21,
74:10, 169:21
**McKesson** [2] -
164:14, 164:18
**MDL** [12] - 71:8, 71:14,
71:20, 74:24,
106:25, 107:9,
112:9, 112:22,
112:23, 113:3,
113:8, 153:24
**mean** [15] - 17:17,
23:12, 37:13, 72:4,
75:7, 117:17,
120:16, 134:9,
134:13, 134:14,
137:11, 146:23,

162:14, 176:15,
191:10
**meaning** [3] - 61:9,
68:5, 75:5
**means** [16] - 21:3,
22:24, 66:24, 79:16,
102:9, 102:15,
102:17, 119:17,
125:4, 135:6,
142:13, 147:25,
156:15, 165:10,
168:14
**meant** [8] - 22:21,
60:23, 62:13,
170:25, 171:2,
200:25, 201:10,
202:9
**measure** [2] - 139:11,
142:20
**Medicaid** [5] - 28:10,
28:13, 28:15, 28:17,
139:19
**medical** [70] - 19:11,
21:15, 25:6, 28:19,
29:2, 29:4, 29:12,
29:15, 30:24, 31:12,
33:10, 37:7, 37:17,
41:19, 45:12, 46:16,
48:3, 48:5, 48:16,
49:5, 49:12, 49:23,
49:24, 50:12, 52:7,
52:13, 54:13, 56:20,
56:21, 68:3, 68:17,
68:21, 69:4, 80:7,
80:18, 82:25, 83:6,
88:12, 93:19,
100:24, 101:7,
101:10, 101:16,
104:10, 124:12,
126:3, 126:6,
149:17, 149:20,
153:22, 156:2,
156:7, 156:11,
156:15, 156:20,
160:17, 160:18,
161:10, 161:18,
165:23, 170:5,
173:22, 174:7,
178:18, 188:2,
189:5, 194:6,
198:17, 201:5
**Medical** [12] - 17:9,
86:22, 87:6, 91:9,
92:24, 93:7, 147:8,
147:9, 150:4,
150:15, 160:19,
161:24
**medically** [7] - 114:8,
130:6, 130:21,
131:15, 132:21,

133:7, 167:5
**Medicare** [9] - 35:14,
35:18, 35:23, 35:25,
97:17, 139:23,
140:3, 140:10,
140:13
**medication** [22] -
22:24, 90:20,
116:19, 120:15,
120:22, 128:8,
128:23, 130:5,
130:19, 151:9,
165:5, 165:11,
165:12, 165:19,
165:20, 167:3,
170:4, 171:16,
172:20, 173:14,
173:17, 179:10
**medications** [34] -
24:16, 30:5, 30:12,
31:3, 31:6, 63:16,
83:3, 88:4, 114:22,
119:12, 123:21,
124:9, 125:8,
125:16, 125:20,
127:10, 128:3,
129:10, 129:24,
132:20, 133:6,
134:11, 136:20,
137:20, 138:6,
138:11, 141:8,
143:3, 148:18,
149:24, 167:19,
167:24, 174:6,
189:24
**Medicine** [25] - 14:13,
17:9, 17:10, 17:11,
17:13, 18:20, 19:4,
20:24, 24:23, 45:4,
51:24, 52:11, 53:3,
53:10, 63:5, 87:3,
87:7, 93:4, 93:8,
95:17, 149:12,
149:19, 150:5,
150:11, 158:10
**medicine** [25] - 19:24,
22:22, 22:23, 23:12,
24:25, 33:11, 49:18,
49:22, 50:6, 51:17,
53:6, 54:19, 57:16,
59:5, 87:10, 90:8,
93:20, 95:25, 97:5,
98:9, 102:20,
169:19, 170:24,
173:25, 198:5
**medium** [2] - 82:10,
93:11
**meet** [1] - 73:15
**meetings** [2] - 35:6,
36:13

**Melville** [1] - 1:22
**member** [2] - 52:3,
70:23
**members** [1] - 42:3
**mental** [1] - 178:18
**Mental** [2] - 24:8,
53:23
**mention** [1] - 187:21
**mentioned** [5] - 11:18,
72:7, 72:8, 100:16,
124:19
**mentioning** [1] - 40:25
**messages** [4] - 32:24,
33:6, 75:25, 160:20
**met** [3] - 14:15, 26:19,
175:9
**method** [1] - 43:14
**methodologies** [1] -
15:6
**methodology** [65] -
14:23, 28:25, 31:10,
33:9, 33:13, 36:20,
36:25, 38:6, 43:18,
44:6, 46:8, 46:9,
48:9, 48:24, 50:4,
50:9, 59:8, 60:12,
64:24, 65:14, 67:5,
67:10, 67:15, 67:22,
68:2, 73:15, 73:17,
74:11, 74:14, 74:16,
75:23, 79:24, 80:25,
83:13, 87:16, 88:6,
88:9, 121:4, 122:22,
125:5, 125:13,
126:10, 126:17,
126:20, 139:13,
142:19, 145:4,
146:4, 149:6, 150:8,
150:20, 150:25,
164:3, 166:20,
167:8, 175:18,
176:20, 177:6,
177:7, 177:12,
177:15, 177:23,
179:6, 180:15, 190:8
**methods** [4] - 96:19,
111:17, 123:23,
177:19
**MEYERS** [1] - 2:8
**microphone** [1] -
54:16
**mid** [1] - 145:19
**middle** [1] - 58:20
**might** [4] - 38:17,
49:10, 162:5, 202:12
**mill** [9] - 119:8,
138:12, 139:4,
139:24, 140:8,
140:16, 140:20,
140:25, 148:2

**milligram** [2] - 60:5,
84:24
**million** [2] - 192:6,
194:19
**millions** [2] - 107:17
**mills** [5] - 118:13,
118:19, 138:23,
139:8, 139:12
**mind** [2] - 123:17,
158:23
**minor** [1] - 155:20
**MINUTES** [1] - 1:10
**minutes** [3] - 163:16,
174:17, 191:4
**misconceptions** [1] -
82:9
**misheard** [1] - 191:3
**misinformation** [2] -
34:9, 34:18
**misleading** [10] -
16:21, 40:8, 96:6,
114:6, 159:11,
159:20, 160:20,
185:7, 185:15,
186:14
**misled** [2] - 16:4,
60:14
**misrepresentations**
[1] - 33:20
**Miss** [8] - 107:5,
109:14, 192:13,
193:8, 194:23,
199:23, 200:8,
200:23
**missing** [7] - 49:10,
61:19, 200:17,
200:20, 200:21,
201:2, 201:3
**misunderstood** [1] -
191:3
**misuse** [16] - 22:22,
22:24, 24:13, 29:19,
89:24, 96:9, 100:24,
103:17, 103:20,
103:21, 104:5,
114:12, 123:13,
139:12, 140:25,
169:9
**MME** [1] - 84:24
**model** [1] - 150:13
**molecule** [1] - 23:17
**molecules** [1] - 50:21
**moment** [5] - 119:3,
123:8, 134:7,
151:21, 182:21
**momentum** [1] - 55:19
**monitor** [1] - 153:17
**monitored** [1] - 39:24
**monitoring** [6] -
142:6, 142:10,

142:18, 153:8, 154:15, 154:25
**mood** [1] - 19:20
**morning** [24] - 3:6, 3:7, 3:16, 3:18, 3:19, 3:22, 3:23, 3:25, 4:3, 4:4, 4:8, 7:21, 12:3, 12:23, 13:2, 14:7, 14:8, 14:9, 156:25, 157:3, 159:9, 171:21, 172:5, 172:9
**morphine** [3] - 60:5, 84:23, 136:12
**most** [9] - 38:24, 98:6, 98:10, 104:9, 134:24, 136:2, 136:16, 156:15, 166:9
**mostly** [2] - 81:10, 135:21
**motion** [1] - 6:18
**motivated** [1] - 82:6
**mouse** [1] - 186:9
**move** [2] - 38:5, 175:14
**movement** [1] - 55:19
**movie** [1] - 162:7
**moving** [3] - 12:5, 91:5, 148:7
**MR** [107] - 3:12, 3:17, 3:25, 4:4, 4:6, 4:23, 8:17, 10:18, 11:25, 14:4, 14:6, 17:20, 18:17, 18:18, 41:10, 42:24, 43:2, 43:4, 44:17, 44:19, 46:5, 46:6, 47:14, 47:17, 51:19, 51:21, 53:13, 53:15, 57:22, 57:24, 59:18, 59:20, 60:8, 60:10, 61:5, 61:21, 62:4, 62:6, 62:21, 62:25, 65:16, 65:20, 65:24, 66:2, 66:7, 66:9, 70:8, 70:22, 71:21, 75:10, 75:15, 79:9, 79:20, 84:11, 84:13, 88:24, 89:2, 91:3, 91:7, 94:10, 94:12, 99:18, 101:18, 101:20, 103:5, 103:7, 105:3, 105:5, 105:18, 106:7, 106:16, 108:9, 109:2, 109:10, 109:19, 110:5, 112:7, 152:16, 152:19, 154:20, 163:7, 163:13, 163:18,

163:22, 165:16, 172:17, 174:12, 174:15, 175:6, 176:18, 182:4, 182:10, 182:24, 187:3, 187:6, 187:11, 187:12, 187:13, 190:13, 190:17, 190:19, 190:20, 196:23, 197:2, 198:20, 201:20, 203:22
**MS** [40] - 3:14, 3:20, 3:23, 5:6, 5:25, 6:9, 7:2, 7:3, 7:7, 7:12, 9:7, 10:8, 11:23, 45:19, 45:22, 70:11, 71:12, 76:16, 76:18, 78:5, 78:12, 78:16, 79:13, 79:19, 105:25, 106:4, 107:11, 108:5, 109:15, 109:20, 109:22, 110:8, 112:14, 112:18, 112:20, 113:19, 115:18, 152:2, 196:16, 196:20
**multidistrict** [1] - 112:5
**multimodal** [1] - 194:10
**multiple** [1] - 141:12
**must** [5] - 42:6, 128:8, 128:24, 129:4, 191:10
**muted** [2] - 12:4, 12:7
**myth** [9] - 63:15, 64:14, 64:16, 65:4, 66:15, 66:16, 66:18, 66:19, 67:14
**Myth** [3] - 67:6, 67:8, 67:21
**myths** [2] - 62:18, 66:4

## N

**name** [6] - 12:17, 13:7, 110:11, 175:10, 187:22, 197:18
**named** [6] - 68:18, 89:6, 89:7, 103:9, 159:13, 159:22
**Napoli** [1] - 108:10
**NAPOLI** [1] - 1:20
**narcotic** [1] - 45:7
**narrative** [1] - 62:9
**narrower** [1] - 134:17
**NASEM** [5] - 95:18, 101:24, 199:4,

199:10, 203:11
**Nassau** [25] - 1:21, 3:17, 100:3, 100:15, 111:25, 118:2, 122:14, 124:16, 125:3, 137:25, 167:22, 167:25, 173:4, 175:21, 176:6, 176:11, 178:6, 179:8, 180:17, 180:22, 185:2, 188:3, 188:9, 188:12, 189:22
**NATE** [1] - 2:10
**Nate** [1] - 4:4
**nation** [1] - 99:22
**national** [3] - 70:24, 100:10, 100:13
**National** [2] - 95:16, 101:23
**nations** [2] - 99:6, 99:10
**natural** [1] - 202:19
**nature** [3] - 34:4, 45:21, 102:8
**nearly** [1] - 21:18
**necessarily** [4] - 38:21, 38:22, 144:18, 171:7
**necessary** [2] - 113:11, 191:24
**necessity** [1] - 196:12
**need** [15] - 29:2, 55:4, 65:11, 74:20, 79:6, 83:15, 91:23, 99:3, 130:14, 135:18, 138:6, 138:10, 140:6, 144:19, 171:5
**needs** [5] - 61:14, 65:23, 99:11, 165:4, 165:8
**network** [1] - 7:5
**neurology** [1] - 20:21
**never** [5] - 157:5, 178:22, 179:3, 182:3, 183:23
**NEW** [1] - 1:2
**new** [5] - 149:2, 197:4, 197:7, 197:8, 198:6
**New** [116] - 1:8, 1:16, 1:22, 2:3, 2:3, 2:4, 2:9, 3:2, 3:20, 9:13, 26:24, 28:10, 28:13, 28:15, 34:14, 45:3, 55:7, 59:16, 59:22, 60:6, 72:6, 73:7, 100:2, 100:12, 100:13, 103:3, 103:13, 104:23, 104:25, 105:12,

105:16, 108:10, 108:14, 108:22, 111:25, 115:24, 117:23, 117:24, 118:10, 118:16, 119:8, 119:12, 119:18, 120:13, 120:20, 120:25, 121:2, 121:9, 121:15, 121:23, 121:25, 122:11, 123:20, 123:24, 124:2, 124:4, 124:8, 125:6, 125:14, 125:18, 126:25, 130:5, 130:20, 131:2, 131:14, 134:12, 137:25, 139:5, 139:8, 141:25, 142:9, 142:21, 143:16, 145:3, 145:18, 146:6, 146:9, 146:13, 146:22, 147:2, 148:14, 149:12, 149:19, 150:5, 150:10, 150:15, 151:4, 154:18, 156:20, 158:10, 159:17, 160:5, 160:8, 160:9, 167:11, 167:19, 168:4, 172:4, 172:24, 173:9, 173:21, 178:6, 179:25, 182:19, 184:8, 184:21, 186:2, 187:20, 189:11, 189:15, 193:20, 205:8
**newborns** [1] - 16:13
**newspaper** [2] - 119:7, 139:3
**newspapers** [2] - 118:12, 118:18
**next** [5] - 69:10, 141:5, 152:8, 171:19, 183:13
**night** [3] - 9:10, 11:13, 107:23
**nine** [12] - 14:25, 15:15, 37:6, 51:10, 75:7, 75:8, 177:13, 186:7, 186:12, 186:20, 191:5, 191:15
**NO.:400000/2017** [1] - 1:6
**noise** [1] - 128:15
**non** [7] - 28:17, 39:25,

40:13, 40:22, 127:7, 147:21, 156:3
**non-cancer** [5] - 39:25, 40:13, 40:22, 127:7, 156:3
**non-Defendant** [1] - 147:21
**non-Medicaid** [1] - 28:17
**nonchronic** [1] - 102:22
**nondrug** [1] - 24:18
**none** [3] - 83:4, 186:13, 188:19
**nonetheless** [1] - 47:9
**nonissue** [1] - 109:5
**nonlethal** [1] - 85:16
**nonopioid** [1] - 24:16
**normally** [2] - 64:17, 64:20
**notable** [1] - 42:8
**note** [7] - 10:2, 46:15, 46:20, 65:22, 76:20, 78:13, 78:16
**noted** [7] - 10:6, 11:16, 43:5, 45:6, 73:19, 77:18, 157:17
**notes** [3] - 77:19, 148:5, 205:10
**nothing** [4] - 140:23, 191:7, 191:14, 193:3
**notice** [1] - 183:25
**noticed** [1] - 60:18
**notified** [1] - 184:4
**notion** [2] - 8:20, 66:20
**novel** [3] - 80:19, 81:5, 81:7
**novice** [1] - 186:10
**Nucynta** [6] - 127:14, 137:8, 164:16, 164:20, 165:19, 166:3
**number** [42] - 13:21, 16:15, 39:18, 42:17, 58:12, 88:20, 105:10, 105:15, 106:25, 116:2, 127:23, 133:19, 133:23, 133:24, 134:8, 134:9, 134:10, 134:14, 134:15, 134:19, 134:20, 134:22, 135:2, 135:15, 137:14, 137:24, 143:19, 148:15, 151:11, 151:18, 151:25, 167:9, 167:17, 167:21,

167:24, 168:12,
173:24, 176:10,
192:12, 193:7,
193:25, 194:24
**Number** [45] - 3:9,
13:11, 15:11, 15:12,
15:24, 15:25, 16:4,
16:8, 16:16, 16:19,
37:6, 39:10, 41:24,
44:17, 51:20, 55:2,
55:3, 57:12, 57:23,
59:8, 59:18, 59:21,
60:13, 62:23, 62:24,
63:2, 63:15, 66:7,
67:6, 67:8, 67:22,
68:9, 69:10, 69:11,
69:12, 70:10, 84:12,
84:18, 86:3, 91:4,
94:10, 103:5, 105:3,
106:18, 199:23
**numbers** [1] - 90:3
**numerous** [3] - 94:22,
116:22, 117:3
**nurses** [2] - 121:23,
122:11

# O

**O'MELVENY** [1] - 2:8
**oath** [10] - 78:11,
106:14, 154:12,
155:4, 159:24,
174:24, 175:3,
183:18, 185:21,
188:14
**object** [2] - 70:18,
72:16
**objection** [20] - 10:2,
10:12, 11:20, 11:22,
13:22, 13:23, 45:19,
45:20, 45:21, 61:7,
61:8, 61:20, 70:11,
72:24, 78:3, 182:4,
182:6, 196:16,
198:20, 198:23
**objects** [1] - 72:24
**obligation** [1] - 166:17
**obscure** [1] - 19:9
**observation** [1] -
157:6
**observational** [1] -
69:17
**observe** [1] - 18:13
**observed** [1] - 49:3
**obsessive** [1] - 117:20
**obtain** [4] - 104:10,
141:8, 165:4, 165:5
**obtained** [2] - 18:12,
142:25
**obtaining** [1] - 143:3

**occasion** [1] - 18:8
**occasions** [2] - 21:22,
193:9
**occurred** [3] - 16:20,
57:7, 103:19
**occurrence** [1] - 80:12
**OF** [4] - 1:2, 1:2, 1:10
**offer** [4] - 113:11,
182:11, 188:16,
190:2
**offered** [2] - 167:12,
182:12
**offering** [4] - 73:24,
74:12, 144:3, 144:8,
144:14, 144:17,
144:21, 167:9,
167:23, 168:3,
188:11, 189:21
**offers** [1] - 164:25
**Office** [1] - 2:3
**office** [4] - 3:21, 18:7
**officers** [1] - 175:24
**offices** [3] - 14:12,
31:25
**Official** [2] - 205:7,
205:21
**OFFICIAL** [1] - 2:20
**official** [1] - 205:16
**often** [5] - 39:2, 52:19,
85:16, 141:22, 143:4
**Ohio** [2] - 107:9, 112:6
**older** [1] - 104:9
**one** [48] - 7:9, 18:24,
26:25, 35:25, 70:13,
74:18, 78:13, 78:16,
78:19, 78:21, 89:6,
91:22, 92:15, 92:23,
102:9, 102:13,
103:16, 117:6,
123:3, 123:10,
123:20, 124:3,
124:9, 124:19,
125:2, 125:18,
134:6, 141:10,
142:4, 144:12,
145:7, 148:9,
151:16, 155:19,
156:15, 165:16,
179:11, 182:19,
185:15, 186:19,
186:24, 187:7,
187:10, 187:12,
191:3, 197:23,
200:2, 201:21
**one-third** [1] - 35:25
**ongoing** [1] - 171:5
**operating** [2] - 118:12,
118:18
**opine** [1] - 113:9
**opined** [1] - 75:20

**opining** [2] - 136:8,
145:16
**Opinion** [12] - 15:24,
15:25, 16:4, 16:19,
55:2, 57:12, 59:8,
60:13, 69:11, 69:12,
73:7, 78:22
**opinion** [62] - 5:16,
5:17, 16:8, 37:5,
45:25, 51:9, 51:13,
72:9, 73:21, 76:23,
79:24, 80:21, 83:13,
83:20, 83:23, 84:2,
84:5, 86:8, 87:17,
104:14, 129:14,
130:25, 131:12,
131:15, 131:17,
132:13, 132:14,
133:18, 134:3,
134:15, 135:14,
143:21, 144:4,
144:8, 144:14,
144:17, 147:6,
147:13, 147:20,
155:18, 160:13,
160:17, 160:23,
161:6, 167:9,
167:12, 167:23,
168:3, 177:18,
177:20, 177:24,
184:6, 184:7,
188:11, 188:16,
188:24, 189:21,
190:2, 191:17,
200:11, 201:3
**opinions** [63] - 5:22,
6:17, 6:20, 6:22,
8:11, 8:25, 15:2,
15:15, 15:20, 17:2,
36:21, 37:6, 43:19,
43:20, 48:17, 48:24,
50:9, 50:11, 51:10,
63:24, 75:12, 76:14,
77:5, 77:20, 77:22,
83:19, 89:12, 96:19,
107:16, 107:20,
113:4, 113:12,
120:11, 120:12,
121:5, 123:18,
123:25, 124:17,
124:25, 126:2,
126:4, 126:13,
126:17, 127:4,
130:9, 130:13,
130:18, 142:11,
144:21, 145:7,
172:25, 177:13,
182:11, 182:13,
186:5, 186:7,
186:12, 186:20,
188:19, 191:5,

191:15, 191:25,
194:5
**OPIOID** [1] - 1:4
**opioid** [206] - 14:18,
15:25, 16:4, 16:18,
16:19, 16:20, 20:13,
20:15, 20:16, 23:14,
23:18, 24:4, 24:6,
24:12, 26:16, 27:2,
27:23, 28:9, 28:16,
28:18, 29:19, 30:21,
31:6, 32:13, 32:18,
32:22, 35:14, 36:2,
36:12, 36:14, 36:18,
37:8, 39:6, 39:23,
40:12, 41:13, 41:20,
42:13, 45:16, 46:18,
47:4, 47:10, 47:13,
50:22, 54:4, 54:22,
55:4, 56:2, 58:11,
58:13, 58:25, 60:14,
60:25, 61:10, 61:23,
62:18, 63:16, 64:8,
64:9, 64:15, 65:6,
66:12, 69:18, 80:3,
80:4, 83:3, 83:15,
85:15, 88:3, 90:18,
90:25, 91:10, 91:21,
92:9, 92:14, 92:17,
94:24, 95:7, 96:2,
96:5, 96:24, 96:25,
97:6, 97:7, 97:8,
98:20, 101:2, 102:4,
102:9, 102:18,
103:17, 103:21,
104:4, 104:25,
105:10, 113:15,
114:12, 114:23,
115:4, 116:6, 116:7,
116:23, 117:4,
119:12, 120:14,
120:21, 121:13,
123:13, 123:21,
123:24, 124:9,
125:7, 125:16,
125:20, 127:6,
127:10, 128:8,
128:23, 129:10,
129:24, 130:5,
130:19, 132:20,
133:6, 133:19,
133:23, 133:24,
134:11, 135:11,
137:20, 138:24,
139:12, 139:19,
140:15, 140:25,
141:8, 141:18,
141:25, 142:14,
142:21, 142:24,
143:3, 143:7,
143:11, 143:16,

145:3, 146:5,
146:12, 146:17,
146:22, 147:2,
148:13, 148:17,
148:23, 149:23,
150:6, 150:13,
150:15, 151:4,
151:13, 151:20,
155:10, 160:14,
160:15, 161:5,
161:9, 161:17,
161:22, 167:24,
168:13, 169:7,
171:25, 173:20,
176:3, 176:5,
176:12, 177:3,
177:5, 177:8,
177:16, 177:19,
178:2, 178:12,
178:23, 179:9,
186:17, 189:24,
191:19, 192:15,
192:16, 194:7,
194:12, 194:24,
199:4, 199:11,
200:11, 201:17,
201:18, 202:12,
202:14, 202:21,
202:25, 203:12,
203:20
**Opioid** [2] - 3:9,
101:25
**opioid-related** [8] -
58:11, 62:18, 66:12,
80:4, 96:25, 104:25,
105:10, 150:6
**opioids** [146] - 16:3,
16:5, 16:9, 16:12,
16:14, 16:16, 16:17,
16:21, 22:7, 23:15,
26:2, 28:14, 30:19,
30:20, 32:7, 36:13,
37:15, 37:17, 40:21,
42:10, 43:16, 45:17,
46:25, 47:7, 47:11,
47:23, 49:5, 50:20,
50:21, 51:11, 55:7,
55:11, 55:16, 55:22,
56:5, 56:6, 56:7,
56:8, 56:14, 56:19,
57:5, 58:10, 58:18,
60:15, 61:2, 62:9,
63:18, 64:16, 64:19,
66:5, 66:17, 67:3,
67:9, 68:23, 68:25,
69:13, 70:5, 77:8,
80:17, 82:21, 84:8,
84:21, 85:9, 85:10,
85:11, 85:14, 88:22,
85:15, 89:16, 89:21,
89:22, 89:24, 91:14,

91:18, 91:22, 91:23, 92:2, 92:6, 92:10, 92:13, 92:16, 93:23, 95:3, 95:8, 96:18, 98:2, 98:6, 98:10, 98:16, 99:16, 100:23, 100:24, 101:4, 102:19, 102:23, 104:23, 116:3, 118:3, 118:8, 118:11, 118:17, 127:24, 131:14, 137:24, 138:4, 138:9, 138:14, 145:8, 145:13, 149:2, 155:14, 155:20, 156:2, 156:6, 156:11, 159:12, 159:20, 160:21, 166:23, 168:25, 169:3, 170:6, 171:2, 172:3, 172:14, 173:5, 173:9, 173:10, 174:9, 181:11, 182:3, 182:16, 183:11, 184:23, 185:6, 185:15, 186:25, 189:6, 190:10, 195:5, 201:19, 201:25, 202:2

**Opioids** [2] - 59:22, 68:11

**opportunities** [1] - 34:22

**opportunity** [3] - 5:21, 7:25, 74:23

**opposing** [1] - 74:2

**opposite** [1] - 109:9

**option** [1] - 156:17

**oral** [1] - 140:6

**orange** [1] - 58:23

**order** [12] - 14:23, 38:7, 43:14, 78:7, 89:15, 109:21, 153:8, 154:15, 154:25, 191:11, 191:25, 192:6

**orders** [2] - 153:17, 181:10

**organization** [5] - 53:18, 63:6, 63:7, 95:13, 95:21

**organizations** [1] - 93:21

**orient** [1] - 23:8

**original** [3] - 42:23, 205:16

**originally** [1] - 162:8

**otherwise** [4] - 94:8, 101:6, 107:10, 171:4

**OUD** [4] - 24:5, 54:7, 91:10, 96:9

**outcome** [2] - 81:2, 85:20

**outcomes** [9] - 40:23, 41:16, 57:18, 86:9, 93:24, 94:4, 123:19, 124:7, 140:21

**outlier** [2] - 53:4, 100:14

**outpatients** [1] - 47:7

**outweigh** [2] - 30:23, 129:5

**overall** [1] - 140:15

**overdose** [28] - 28:18, 51:8, 58:11, 58:20, 84:22, 85:10, 85:15, 95:10, 96:25, 97:9, 104:25, 105:10, 114:12, 123:14, 139:13, 141:2, 176:25, 195:22

**overdoses** [1] - 85:16

**overlooked** [1] - 17:18

**overprescribing** [5] - 97:21, 98:23, 98:24, 99:5, 99:12

**overseas** [1] - 149:16

**own** [11] - 6:22, 27:23, 28:6, 81:19, 82:24, 103:18, 138:4, 165:22, 166:21, 194:7, 197:3

**OxyContin** [2] - 83:10, 136:12

## P

**p.m** [4] - 4:15, 7:18, 11:13, 70:16

**pad** [1] - 56:10

**page** [32] - 39:6, 63:3, 76:23, 77:18, 115:14, 115:16, 118:25, 119:3, 121:18, 122:25, 131:5, 131:7, 131:8, 134:5, 148:20, 154:4, 154:22, 155:7, 159:17, 160:12, 168:7, 168:12, 182:9, 182:22, 182:24, 183:8, 183:9, 185:13, 193:22, 193:23, 198:2

**Pain** [4] - 24:22, 63:5,

69:23, 101:24

**pain** [55] - 16:10, 22:7, 24:25, 25:3, 25:8, 39:25, 40:13, 40:22, 41:21, 42:11, 43:16, 47:12, 48:19, 50:23, 56:9, 56:12, 56:15, 57:5, 63:20, 64:8, 65:9, 66:17, 66:23, 67:3, 67:9, 69:2, 69:14, 69:19, 70:6, 84:25, 88:3, 89:15, 89:20, 91:16, 98:9, 102:22, 125:6, 125:15, 127:7, 127:11, 127:15, 127:25, 129:11, 148:18, 155:13, 155:21, 155:25, 156:3, 165:12, 165:20, 169:7, 169:8, 199:4

**painkillers** [2] - 27:9, 90:18

**pairs** [1] - 147:12

**Pam** [11] - 113:22, 114:18, 115:15, 119:2, 121:19, 123:9, 123:15, 131:8, 131:9, 134:6, 151:14

**pamphlet** [2] - 64:13, 64:17

**panel** [3] - 29:21, 29:23, 42:2

**panels** [1] - 29:18

**panoply** [1] - 27:20

**paper** [33] - 25:19, 25:21, 38:2, 38:10, 38:17, 39:15, 41:23, 42:4, 44:23, 44:24, 46:22, 47:9, 68:17, 69:25, 70:3, 71:10, 86:3, 86:4, 86:5, 87:2, 88:20, 89:6, 91:15, 92:5, 93:3, 96:2, 97:19, 97:24, 103:9, 104:16, 104:17, 107:6, 199:7

**papers** [28] - 25:14, 25:25, 37:8, 37:11, 37:16, 37:20, 37:21, 37:22, 38:4, 38:7, 39:5, 43:22, 43:25, 44:2, 44:5, 44:7, 67:18, 80:20, 80:23, 85:24, 86:15, 88:18, 88:20, 89:4, 89:14, 90:22, 90:23, 92:21

**paradigm** [8] - 55:10,

57:6, 98:14, 155:19, 155:24, 156:5, 160:15, 201:5

**paragraph** [3] - 155:8, 193:24, 194:4

**paraphrase** [1] - 15:23

**paraphrasing** [6] - 16:22, 52:14, 95:5, 96:3, 103:17, 201:24

**parcel** [2] - 72:21, 107:8

**pardon** [2] - 144:6, 157:23

**part** [71] - 5:16, 5:17, 16:23, 18:6, 28:21, 39:15, 39:16, 39:22, 40:4, 43:19, 44:6, 47:25, 48:8, 50:4, 50:25, 51:4, 55:3, 59:7, 60:18, 61:13, 62:13, 63:24, 66:10, 71:11, 72:15, 72:21, 84:15, 87:16, 107:8, 121:4, 122:22, 124:4, 125:5, 125:12, 126:16, 127:5, 130:3, 130:17, 139:13, 141:25, 142:19, 143:16, 145:4, 146:4, 147:20, 150:8, 150:20, 150:24, 150:25, 155:12, 155:13, 155:18, 156:7, 156:10, 164:3, 166:20, 166:25, 167:8, 173:12, 175:17, 176:20, 177:18, 179:6, 179:13, 180:11, 180:15, 190:7, 194:4, 196:13, 197:18, 199:18

**PART** [1] - 1:2

**Part** [4] - 3:3, 17:24, 36:2, 78:7

**partial** [1] - 19:14

**participant's** [1] - 103:18

**participated** [1] - 42:3

**particular** [26] - 21:7, 25:18, 25:21, 30:11, 32:3, 35:19, 94:5, 116:19, 120:4, 120:15, 120:22, 123:19, 124:7, 125:5, 125:14, 132:19, 133:5, 165:11, 167:2,

167:3, 167:17, 167:19, 173:24, 190:9, 196:7, 199:6

**parties** [1] - 130:13

**parts** [1] - 88:12

**party** [4] - 9:15, 72:24, 147:12, 205:13

**pass** [1] - 21:11

**past** [3] - 49:4, 116:4, 169:11

**pathology** [1] - 19:14

**pathway** [1] - 51:2

**patient** [40] - 30:22, 30:23, 45:5, 56:9, 56:12, 56:17, 83:14, 83:17, 83:21, 84:9, 90:19, 114:22, 116:19, 116:22, 117:3, 120:15, 120:22, 123:19, 123:22, 124:7, 124:8, 124:10, 124:20, 125:6, 125:14, 140:21, 141:10, 141:11, 165:3, 165:4, 165:8, 165:13, 165:21, 173:13, 173:15, 177:15, 178:6, 178:9, 178:11

**patient's** [1] - 178:18

**patient-specific** [1] - 117:3

**patients** [70] - 20:12, 20:14, 22:6, 22:10, 22:14, 23:13, 23:14, 24:10, 25:3, 27:5, 27:8, 27:22, 28:10, 28:13, 28:16, 28:17, 29:4, 36:2, 39:25, 45:8, 45:17, 46:24, 47:3, 48:19, 49:3, 55:22, 55:23, 57:4, 57:18, 64:7, 80:16, 85:16, 88:3, 89:14, 89:21, 91:13, 92:2, 94:5, 97:7, 97:8, 97:17, 100:23, 123:18, 124:16, 125:14, 125:4, 125:17, 126:3, 126:7, 126:15, 129:6, 134:9, 134:11, 141:7, 141:17, 142:4, 148:7, 156:2, 166:4, 166:12, 169:22, 169:25, 170:9, 174:6, 177:20, 194:11, 194:20,

202:13, 202:21
**pattern** [1] - 41:18
**patterns** [4] - 35:13, 158:6, 158:21, 159:4
**PAUL** [1] - 1:16
**Paul** [1] - 3:12
**pausing** [1] - 139:20
**pay** [2] - 164:25, 165:3
**pays** [1] - 30:11
**Pediatrics** [2] - 68:19, 69:3
**peer** [25] - 25:13, 25:14, 25:16, 25:22, 25:24, 35:12, 42:6, 46:22, 57:3, 69:5, 69:25, 80:20, 81:10, 86:15, 87:7, 90:23, 93:14, 94:7, 104:17, 157:7, 157:10, 191:22, 197:14, 197:23, 198:9
**peer-review** [3] - 25:16, 25:22, 157:7
**peer-reviewed** [18] - 25:14, 25:24, 35:12, 42:6, 46:22, 57:3, 69:5, 69:25, 80:20, 86:15, 87:7, 90:23, 93:14, 104:17, 191:22, 197:14, 197:23, 198:9
**peers** [3] - 21:4, 21:8, 82:3
**pending** [1] - 112:6
**people** [10] - 7:4, 51:8, 52:16, 52:17, 58:12, 64:20, 67:18, 81:4, 92:13, 138:9
**per** [2] - 60:5, 84:24
**percent** [8] - 64:7, 89:20, 89:23, 91:16, 92:9, 92:15, 92:18
**percentage** [2] - 88:2, 143:23
**percentages** [5] - 90:5, 90:7, 100:7, 192:20, 193:4
**perhaps** [6] - 22:19, 73:11, 78:25, 79:4, 182:7, 191:3
**period** [9] - 15:8, 35:19, 43:10, 59:23, 74:17, 105:15, 107:13, 203:18, 203:20
**periods** [1] - 23:15
**permission** [2] - 18:9, 48:25
**permit** [1] - 8:15
**permitted** [5] - 8:10,

74:8, 74:9, 113:9, 191:6
**Perry** [1] - 42:16
**persistent** [1] - 90:24
**Persistent** [1] - 91:9
**person** [5] - 60:6, 73:24, 73:25, 74:12, 162:21
**personal** [6] - 48:23, 68:5, 97:12, 117:6, 138:4, 152:21
**personally** [2] - 25:10, 100:25
**persons** [4] - 28:20, 29:13, 104:9, 105:11
**perspective** [2] - 47:11, 181:13
**pertain** [1] - 182:13
**pertains** [1] - 180:17
**phanly@ simmonsfirm.com** [1] - 1:18
**Pharma** [1] - 42:18
**pharmaceutical** [34] - 16:20, 30:8, 31:16, 31:20, 31:23, 33:20, 33:25, 43:8, 45:16, 60:25, 61:10, 61:22, 110:21, 110:25, 111:5, 146:11, 146:20, 147:18, 147:21, 148:25, 152:23, 159:12, 159:21, 160:14, 161:5, 161:9, 161:17, 161:22, 169:2, 169:18, 186:17, 200:24, 201:8, 201:11
**Pharmaceuticals** [1] - 2:8
**pharmacies** [20] - 143:9, 143:12, 143:24, 144:4, 144:8, 144:22, 169:3, 169:20, 169:23, 170:15, 173:6, 173:10, 173:14, 173:16, 181:17, 184:15, 186:18, 188:15, 201:18
**pharmacist** [1] - 190:10
**pharmacists** [9] - 172:23, 174:9, 181:3, 189:7, 189:11, 189:15, 189:18, 189:22, 190:3

**pharmacoeconomics** [1] - 111:9
**pharmacy** [31] - 167:4, 170:5, 170:24, 171:16, 172:20, 172:21, 173:25, 179:19, 179:21, 180:7, 180:9, 180:13, 180:17, 181:11, 181:20, 182:2, 182:13, 182:16, 183:12, 183:24, 184:12, 185:6, 185:16, 186:15, 186:20, 186:25, 187:15, 187:21, 187:25, 188:8, 188:12
**phenomenon** [7] - 59:11, 59:14, 100:14, 100:18, 100:19, 101:7, 189:7
**photocopies** [1] - 205:12
**photographic** [1] - 18:14
**photographs** [1] - 17:25
**phrase** [1] - 157:5
**physical** [1] - 197:3
**physicians** [6] - 28:6, 29:5, 75:24, 82:17, 96:8, 191:25
**physicians'** [2] - 55:15, 192:3
**physiologically** [1] - 23:16
**picture** [1] - 4:9
**piece** [8] - 46:21, 47:6, 62:22, 63:9, 63:15, 71:10, 85:23, 107:6
**pieces** [1] - 88:12
**pill** [15] - 98:12, 118:12, 118:18, 119:8, 138:12, 138:23, 139:4, 139:7, 139:12, 139:23, 140:8, 140:16, 140:20, 140:25, 148:2
**pills** [14] - 116:2, 142:14, 143:7, 143:11, 143:23, 153:17, 167:10, 167:18, 169:7, 169:8, 169:22, 170:15, 173:24, 195:18
**place** [3] - 106:17, 119:3, 181:2

**placed** [1] - 181:11
**places** [1] - 34:13
**placing** [1] - 17:18
**plainly** [2] - 9:13, 9:16
**Plaintiff** [3] - 3:11, 4:2, 4:21
**Plaintiffs** [5] - 5:9, 6:11, 11:25, 111:24, 112:5
**Plaintiffs'** [5] - 7:17, 47:21, 106:24, 158:4, 184:3
**plan** [1] - 184:11
**plans** [3] - 24:11, 24:15, 24:18
**play** [1] - 165:25
**player** [1] - 153:15
**players** [1] - 192:14
**pleadings** [1] - 184:19
**PLLC** [1] - 1:20
**pnapoli@napolilaw. com** [1] - 1:24
**point** [34] - 8:23, 10:13, 11:20, 46:21, 61:19, 65:17, 68:19, 73:2, 74:20, 76:12, 77:17, 86:6, 106:22, 107:21, 107:25, 108:22, 132:19, 133:5, 133:8, 136:16, 137:5, 137:9, 167:2, 168:23, 170:12, 170:17, 170:20, 171:14, 171:22, 171:23, 171:25, 172:5, 184:19, 189:3
**pointed** [1] - 171:11
**pointers** [1] - 12:24
**points** [5] - 10:16, 57:6, 72:18, 75:8
**policies** [5] - 147:11, 151:3, 151:8, 180:22, 181:6
**Policy** [1] - 103:10
**policy** [1] - 181:7
**polite** [1] - 13:12
**Polster** [7] - 14:18, 71:9, 72:2, 75:9, 75:20, 76:22, 113:7
**pop** [1] - 151:21
**population** [8] - 89:13, 89:17, 90:3, 135:19, 171:3, 172:4, 194:21, 202:23
**populations** [1] - 99:10
**Portenoy** [3] - 42:22, 43:6, 43:7
**Porter** [2] - 44:14,

44:22
**portion** [4] - 22:5, 115:12, 118:22, 149:5
**position** [2] - 24:21, 170:11
**positions** [1] - 72:10
**positive** [1] - 26:22
**possible** [1] - 178:12
**possibly** [2] - 185:3, 189:8
**potent** [4] - 55:6, 172:3, 202:22
**potential** [3] - 34:9, 53:17, 129:6
**potentially** [2] - 58:4, 123:4
**power** [1] - 149:13
**powerful** [1] - 50:23
**powerfully** [1] - 51:6
**practice** [15] - 19:24, 22:2, 22:4, 28:21, 37:3, 49:23, 64:25, 68:6, 108:23, 156:2, 156:7, 156:11, 156:15, 156:20, 173:12
**practices** [5] - 77:3, 104:11, 114:24, 118:2, 118:7
**pre** [2] - 33:14, 43:20
**preceded** [1] - 130:23
**precept** [1] - 81:12
**precepts** [1] - 74:7
**precisely** [2] - 42:24, 77:9
**precluded** [1] - 5:21
**predate** [3] - 9:21, 9:22, 57:6
**predated** [1] - 32:16
**prefer** [2] - 105:23, 115:20
**prejudice** [1] - 108:13
**preparation** [2] - 175:17, 188:10
**prepared** [1] - 41:7
**prepares** [1] - 41:5
**preparing** [3] - 81:17, 179:19, 180:5
**preponderance** [2] - 102:3, 199:10
**prescribe** [22] - 20:6, 20:10, 20:11, 20:12, 55:22, 98:6, 98:9, 99:13, 114:22, 116:20, 118:11, 120:14, 120:21, 138:9, 149:23, 156:2, 166:7, 169:18, 170:11,

173:13, 173:17, 174:6
**prescribed** [34] - 22:24, 22:25, 28:14, 28:16, 36:2, 56:9, 57:5, 57:15, 60:5, 64:8, 68:25, 89:15, 89:21, 91:14, 99:14, 100:23, 100:25, 118:17, 119:11, 123:20, 123:24, 124:8, 124:21, 129:24, 134:11, 138:4, 143:13, 151:9, 156:6, 156:11, 168:25, 169:15, 173:5, 173:9
**Prescribed** [1] - 59:22
**prescriber** [2] - 121:9, 141:11
**prescribers** [3] - 121:2, 121:25, 140:20
**prescribing** [63] - 16:2, 35:14, 35:23, 47:10, 47:13, 55:5, 55:10, 55:16, 57:13, 75:16, 77:3, 96:5, 96:7, 97:6, 97:17, 98:2, 98:13, 98:15, 98:20, 98:25, 99:7, 99:8, 99:22, 100:2, 102:19, 114:24, 115:4, 116:6, 116:7, 121:14, 126:25, 134:16, 134:17, 138:6, 138:14, 139:19, 140:16, 150:14, 155:10, 158:5, 158:21, 159:3, 160:15, 167:15, 168:15, 169:16, 170:14, 170:23, 171:5, 171:12, 171:13, 171:15, 171:25, 172:14, 189:6, 192:3, 192:8, 194:8, 194:13, 201:7, 202:12
**prescription** [77] - 16:16, 22:7, 27:9, 27:12, 28:5, 28:9, 30:5, 30:12, 31:3, 31:5, 49:4, 56:10, 58:10, 58:18, 68:22, 68:23, 80:17, 85:9, 91:18, 92:6, 95:7, 102:4, 102:8, 102:15, 102:19,

103:19, 103:21, 104:4, 104:10, 116:3, 116:18, 118:3, 118:8, 127:10, 128:8, 128:23, 129:10, 130:4, 130:19, 132:11, 132:20, 133:6, 142:6, 142:10, 142:14, 142:17, 143:2, 143:6, 145:8, 148:23, 160:21, 165:5, 165:8, 165:10, 165:21, 168:13, 169:3, 169:8, 169:19, 170:3, 170:6, 171:4, 172:19, 173:16, 174:10, 179:9, 184:23, 190:5, 190:6, 199:11, 201:24, 201:25, 202:21, 202:25, 203:12, 203:20
**Prescription** [1] - 68:11
**prescriptions** [39] - 27:23, 58:3, 59:15, 77:8, 96:24, 105:16, 114:8, 114:11, 123:12, 131:14, 131:18, 131:19, 132:14, 132:15, 133:9, 133:19, 133:23, 133:24, 134:10, 134:20, 135:8, 135:11, 135:15, 137:8, 137:24, 138:15, 140:9, 140:24, 141:13, 141:19, 141:22, 142:24, 165:2, 167:4, 173:20, 174:2, 181:4, 181:16, 190:9
**presence** [1] - 23:16
**present** [1] - 183:2
**presentations** [1] - 35:5
**presented** [4] - 14:17, 28:2, 96:4, 107:23
**presenting** [2] - 34:17, 58:12
**presents** [1] - 32:2
**preserved** [1] - 72:25
**presiding** [1] - 3:5
**press** [1] - 26:22
**presumably** [1] - 165:18

**pretty** [3] - 91:5, 105:6, 151:16
**prevention** [1] - 52:21
**Prevention** [1] - 84:17
**prima** [1] - 96:4
**primarily** [1] - 140:16
**primary** [1] - 98:6
**principally** [1] - 14:23
**probable** [1] - 168:15
**problem** [10] - 11:6, 11:19, 36:18, 102:21, 102:22, 138:24, 141:25, 142:21, 143:16, 191:12
**problematic** [1] - 119:20
**problems** [1] - 102:23
**procedure** [1] - 92:14
**proceed** [4] - 11:22, 14:3, 18:17, 163:17
**proceeding** [3] - 112:9, 112:24, 113:8
**proceedings** [1] - 18:13
**process** [3] - 25:17, 108:20, 130:25
**processes** [1] - 181:2
**produce** [1] - 122:15
**produced** [7] - 71:19, 164:5, 164:11, 164:18, 179:18, 180:7, 180:9
**product** [2] - 20:17, 135:24
**production** [3] - 143:7, 143:8, 143:12
**products** [10] - 20:7, 20:11, 135:13, 135:21, 135:23, 136:3, 136:9, 136:13, 136:15, 184:15
**profession** [1] - 68:22
**professional** [12] - 31:11, 48:23, 52:7, 68:5, 82:14, 97:12, 110:24, 160:18, 161:18, 173:12, 177:21, 181:3
**professionals** [2] - 121:14, 174:3
**professor** [1] - 28:22
**Professor** [1] - 17:8
**profile** [2] - 30:15, 30:18
**profit** [1] - 138:5
**program** [10] - 33:19, 33:24, 34:5, 35:15, 35:24, 82:5, 142:7,

142:10, 154:15, 154:25
**Program** [1] - 17:10
**Programs** [1] - 94:17
**progress** [1] - 203:17
**progression** [2] - 101:3, 202:20
**prohibited** [1] - 76:11
**project** [1] - 82:15
**prolific** [1] - 155:11
**prominent** [1] - 94:22
**promise** [1] - 199:21
**promoted** [1] - 63:12
**promoting** [1] - 99:16
**promotion** [4] - 16:21, 96:5, 114:5, 114:7
**promotional** [6] - 32:24, 46:18, 48:11, 77:2, 77:24, 160:16
**promulgated** [3] - 9:14, 53:9, 62:19
**promulgation** [1] - 42:3
**propensity** [1] - 83:3
**proper** [1] - 80:21
**properly** [1] - 63:20
**proposed** [3] - 5:8, 197:4, 197:7
**prospective** [1] - 197:8
**protect** [1] - 56:12
**provide** [5] - 34:7, 34:23, 80:24, 137:14, 191:24
**provided** [9] - 32:12, 32:23, 36:5, 47:20, 71:2, 183:17, 185:20, 185:22, 196:8
**provider** [3] - 32:2, 45:6, 47:5
**provider's** [1] - 31:25
**providers** [11] - 32:8, 32:14, 33:21, 34:8, 34:17, 38:25, 52:8, 68:7, 168:25, 169:15, 194:11
**providers'** [3] - 169:17, 170:2, 171:12
**providing** [3] - 82:18, 121:13, 193:4
**pseudoaddiction** [2] - 66:19, 66:24
**Psychiatric** [3] - 53:19, 54:2, 54:23
**psychiatric** [4] - 18:24, 117:14, 117:18, 166:22
**psychiatrists** [1] -

177:8
**Psychiatry** [2] - 17:12, 19:21
**psychiatry** [2] - 19:18, 20:21
**public** [4] - 32:11, 36:5, 94:21, 94:23
**Public** [1] - 94:17
**publication** [21] - 25:21, 35:7, 35:9, 42:9, 46:8, 46:13, 53:25, 64:12, 84:16, 86:6, 86:21, 96:13, 96:15, 104:20, 158:16, 191:22, 197:14, 197:17, 197:22, 198:8, 203:10
**publications** [9] - 87:5, 87:10, 87:11, 87:15, 94:7, 96:13, 96:17, 97:15
**publish** [2] - 42:6, 87:10
**published** [21] - 26:8, 26:11, 26:18, 28:8, 31:9, 35:12, 43:13, 48:16, 67:18, 92:21, 93:4, 93:7, 95:2, 95:13, 97:20, 139:17, 157:6, 157:10, 198:9, 199:7, 202:16
**pull** [13] - 83:23, 88:19, 113:23, 114:18, 118:21, 121:17, 123:15, 134:4, 151:14, 151:17, 154:20, 185:12, 186:23
**pulled** [7] - 39:21, 40:24, 68:16, 101:22, 102:7, 103:16, 131:8
**pullout** [1] - 39:15
**Purdue** [1] - 42:18
**purely** [2] - 46:22, 138:4
**purple** [1] - 85:7
**purport** [1] - 77:5
**purported** [2] - 32:3, 80:23
**purpose** [2] - 173:22, 174:7
**purposes** [7] - 5:12, 6:12, 124:16, 127:2, 162:17, 172:24, 183:20
**pursued** [1] - 76:14
**put** [28] - 14:25, 15:10,

38:10, 38:22, 39:10, 44:17, 51:19, 55:4, 57:22, 62:24, 70:10, 83:16, 83:21, 88:24, 90:12, 91:3, 94:10, 94:14, 101:18, 103:5, 106:8, 106:11, 113:19, 115:15, 119:2, 123:9, 181:2, 183:24
**puts** [1] - 84:8
**putting** [2] - 129:22, 167:17
**Pyser** [11] - 10:15, 10:19, 61:6, 71:22, 109:15, 109:23, 152:8, 152:13, 197:13, 201:22, 203:5
**PYSER** [18] - 10:18, 61:5, 61:21, 71:21, 109:19, 110:5, 152:7, 152:16, 152:19, 154:20, 163:7, 163:18, 163:22, 165:16, 172:17, 174:12, 174:15, 198:20

### Q

**qualifications** [1] - 15:6
**qualify** [1] - 40:14
**qualitative** [6] - 123:23, 130:25, 131:23, 193:10, 194:10, 194:20
**quality** [4] - 40:15, 40:17, 41:2, 46:21
**quantified** [3] - 147:20, 148:12, 151:23
**quantifies** [3] - 140:24, 150:9, 150:20
**quantify** [6] - 139:11, 145:2, 145:4, 149:6, 151:2, 192:14
**quantitative** [2] - 121:12, 126:10
**quantities** [1] - 47:8
**Quarry** [1] - 12:19
**QUESTION** [2] - 116:10, 119:10
**questions** [28] - 13:2, 13:16, 53:17, 70:18, 114:3, 114:13, 114:17, 114:19, 129:20, 132:8,

152:4, 152:21, 162:25, 163:16, 168:22, 174:12, 175:13, 175:15, 181:20, 190:13, 190:24, 191:4, 192:12, 192:20, 193:8, 194:12, 195:23, 195:24
**queue..** [1] - 163:21
**quick** [1] - 151:16
**quickly** [2] - 50:17, 66:15, 175:14
**quite** [2] - 57:4, 163:19
**quotation** [1] - 94:15
**quotations** [3] - 68:17, 94:14
**quote** [8] - 95:3, 95:5, 95:12, 95:15, 102:2, 102:8, 199:9
**quoted** [1] - 84:20
**quotes** [4] - 68:20, 101:22, 103:8, 103:16
**quoting** [1] - 148:24

### R

**radical** [1] - 155:13
**raise** [2] - 11:19, 12:12
**raised** [1] - 71:23
**rapidly** [1] - 116:8
**rare** [7] - 45:18, 66:16, 67:7, 80:11, 87:22, 90:8, 90:11
**rarely** [3] - 63:18, 63:19, 64:5
**rate** [6] - 51:5, 51:6, 51:7, 100:2, 168:24, 169:14
**rates** [1] - 168:15
**rather** [3] - 26:7, 68:12, 166:6
**RE** [1] - 1:4
**Re** [1] - 3:9
**reach** [7] - 33:5, 43:15, 50:9, 86:16, 166:22, 177:13, 191:25
**reaching** [9] - 31:8, 31:10, 33:8, 37:5, 59:8, 69:14, 70:4, 86:8, 96:19
**read** [22] - 16:22, 26:25, 29:2, 39:3, 39:6, 40:9, 42:2, 52:24, 85:2, 96:10, 96:13, 96:15, 102:11, 103:24,

115:20, 115:21, 145:22, 155:9, 155:16, 194:3, 194:14, 199:14
**readers** [1] - 40:8
**reading** [4] - 28:19, 40:18, 76:22, 160:22
**READING** [2] - 76:24, 84:21
**reads** [3] - 39:23, 52:12, 84:15
**ready** [2] - 109:12, 112:18
**real** [4] - 54:19, 56:9, 56:10, 88:2
**really** [24] - 9:5, 16:6, 21:8, 41:3, 55:17, 55:19, 56:20, 61:2, 61:3, 61:11, 67:2, 68:24, 99:13, 102:17, 109:5, 116:8, 130:12, 137:19, 138:6, 144:19, 162:14, 170:16, 202:17, 203:10
**reasonable** [3] - 15:7, 50:11, 187:25
**rebuttal** [1] - 6:4
**recalling** [1] - 185:4
**receive** [2] - 82:17, 122:14
**received** [16] - 4:20, 6:2, 7:12, 7:16, 7:24, 20:5, 26:21, 27:23, 32:17, 34:9, 34:16, 47:4, 81:21, 121:3, 121:10, 121:25
**receiving** [4] - 42:12, 47:7, 82:19, 92:9
**receptors** [1] - 50:22
**recess** [6] - 4:16, 78:6, 105:24, 106:2, 106:5, 174:18
**recipient** [1] - 56:22
**recitations** [1] - 82:19
**recognize** [2] - 127:9, 138:23
**recognized** [1] - 21:21
**recommendation** [3] - 40:12, 40:16, 162:6
**recommendations** [1] - 40:10
**recommended** [2] - 42:10, 192:11
**record** [19] - 6:10, 10:7, 12:18, 13:16, 17:19, 18:4, 18:14, 25:16, 50:18, 58:14, 62:3, 72:4, 106:9,

106:12, 106:17, 109:3, 162:17, 180:5, 204:6
**records** [5] - 124:13, 126:3, 126:6, 176:25, 184:5
**red** [1] - 200:3
**redirect** [2] - 190:16, 190:25
**REDIRECT** [1] - 190:18
**reduce** [2] - 23:17, 84:25
**refer** [3] - 115:14, 160:13, 186:16
**reference** [6] - 9:25, 101:15, 163:2, 163:5, 163:23, 202:17
**referenced** [3] - 73:5, 131:24, 163:11
**references** [4] - 186:20, 186:24, 187:15, 198:10
**referencing** [4] - 71:13, 77:10, 85:24, 199:2
**referred** [5] - 100:17, 138:11, 143:4, 191:14, 200:23
**referring** [4] - 71:15, 71:25, 125:22, 146:17
**refers** [3] - 18:24, 23:13, 25:16
**reflect** [3] - 38:21, 38:23, 50:2
**reflected** [1] - 38:9
**reflecting** [1] - 148:5
**reflective** [2] - 40:7, 195:19
**reflects** [1] - 58:15
**regard** [8] - 10:14, 32:6, 56:5, 78:24, 81:6, 93:11
**regarded** [7] - 53:7, 69:7, 87:9, 90:8, 93:12, 104:19, 104:20
**regarding** [16] - 5:9, 36:12, 36:17, 37:16, 76:25, 77:22, 95:24, 97:16, 111:5, 122:12, 125:19, 132:8, 178:19, 182:12, 188:11, 189:22
**regions** [2] - 98:17, 116:7
**register** [1] - 61:7

**regression** [2] - 122:21, 122:25
**regularly** [1] - 173:14
**regulation** [1] - 188:3
**regulations** [1] - 111:5
**regulatory** [6] - 149:11, 150:19, 150:21, 153:12, 153:19, 154:7
**rehabilitation** [1] - 24:18
**reimbursement** [3] - 147:11, 151:3, 151:8
**relate** [6] - 30:14, 90:23, 184:22, 184:25, 186:13, 200:11
**related** [16] - 7:15, 58:11, 62:18, 66:12, 80:4, 88:21, 95:24, 96:25, 102:8, 104:25, 105:10, 146:12, 146:22, 147:2, 150:6, 194:12
**relates** [2] - 51:10, 69:11
**relating** [4] - 7:14, 70:18, 93:20, 104:14
**relationship** [12] - 24:3, 25:7, 29:11, 93:22, 94:4, 158:5, 158:20, 159:3, 192:2, 192:8, 201:25, 203:14
**relative** [2] - 192:14, 193:4
**relatively** [2] - 84:23, 92:8
**released** [1] - 150:14
**relevant** [2] - 38:24, 91:25
**reliability** [2] - 74:7, 81:9
**reliable** [11] - 16:9, 47:5, 59:5, 69:13, 70:5, 73:18, 74:16, 86:16, 104:19, 104:21, 127:6
**reliably** [2] - 81:2, 87:10
**reliance** [1] - 96:22
**relied** [19] - 6:11, 70:3, 72:4, 80:19, 86:8, 87:15, 96:23, 97:3, 97:11, 107:15, 119:23, 120:5, 121:13, 123:25, 126:12, 132:11, 187:6, 194:5, 201:6
**relief** [3] - 8:16, 22:7,

66:23

**relies** [1] - 73:22

**relieve** [1] - 50:23

**reluctant** [2] - 55:22, 136:22

**rely** [10] - 5:16, 6:8, 6:20, 8:11, 48:18, 93:16, 96:16, 104:13, 108:11, 196:8

**relying** [3] - 70:14, 107:24, 178:25

**remain** [1] - 65:11

**remainder** [1] - 77:21

**remained** [1] - 116:3

**remaining** [1] - 77:20

**remains** [3] - 158:6, 158:22, 159:4

**remedy** [1] - 94:25

**remember** [4] - 87:22, 157:3, 193:10, 199:25

**remind** [5] - 78:9, 78:10, 106:10, 106:13, 123:11

**remotely** [1] - 12:2

**removal** [1] - 92:17

**renewed** [1] - 6:17

**rep** [3] - 33:25, 166:2, 201:4

**repeat** [3] - 116:25, 128:10, 130:14

**repeats** [1] - 41:19

**rephrase** [8] - 46:3, 62:4, 62:5, 133:4, 144:11, 177:10, 182:6, 196:21

**report** [75] - 8:8, 10:25, 11:6, 11:8, 11:9, 15:15, 15:20, 17:3, 72:6, 72:12, 81:2, 85:23, 94:16, 95:2, 95:12, 101:23, 101:24, 112:8, 112:22, 112:23, 113:3, 113:4, 119:20, 120:2, 120:6, 120:7, 126:12, 126:15, 155:7, 155:8, 160:5, 160:7, 160:8, 160:9, 160:12, 164:4, 164:10, 164:19, 166:25, 168:7, 168:23, 169:4, 169:14, 175:17, 179:20, 179:22, 179:24, 180:5, 180:10, 182:11, 182:14, 183:21,

183:24, 184:10, 184:22, 185:11, 186:4, 186:16, 187:20, 187:22, 187:24, 188:5, 188:6, 188:10, 188:19, 188:20, 193:17, 193:19, 193:22, 194:5, 197:23, 199:2, 199:4, 199:10, 199:19

**reported** [2] - 118:12, 118:18

**Reporter** [2] - 205:7, 205:21

**REPORTER** [1] - 2:20

**reports** [5] - 72:13, 72:14, 93:21, 94:15, 119:7

**represent** [2] - 110:12, 175:11

**representation** [1] - 106:19

**representations** [4] - 32:7, 75:18, 77:23, 184:18

**representative** [5] - 31:17, 31:20, 31:24, 32:7, 46:24

**representatives** [3] - 32:13, 33:21

**representing** [1] - 155:12

**reputable** [1] - 69:8

**requested** [1] - 78:20

**require** [1] - 13:15

**required** [1] - 74:10

**requirements** [6] - 73:15, 149:17, 189:11, 191:23, 192:10, 192:11

**research** [12] - 28:12, 29:20, 35:13, 38:20, 52:9, 97:16, 121:11, 130:23, 177:22, 194:7, 194:9, 197:4

**researcher** [3] - 31:12, 33:10, 81:6

**researchers** [1] - 198:17

**researching** [1] - 69:4

**residency** [2] - 19:14, 19:17

**residents** [2] - 29:6, 146:9

**respect** [11] - 30:11, 67:6, 67:8, 67:13, 67:21, 75:19, 96:12, 104:23, 153:20,

184:12, 192:15

**respects** [1] - 76:13

**responded** [1] - 202:25

**response** [2] - 6:17, 196:9

**responsibilities** [3] - 153:12, 153:19, 154:8

**responsibility** [9] - 147:19, 147:25, 149:7, 150:9, 150:21, 151:23, 153:16, 174:5, 181:4

**rest** [2] - 38:9, 156:21

**restate** [1] - 125:9

**rests** [1] - 166:7

**result** [8] - 53:10, 74:16, 85:16, 90:19, 142:15, 155:24, 156:5, 167:4

**resulted** [3] - 16:18, 57:17, 77:6

**results** [2] - 73:18, 88:19, 196:14

**resume** [1] - 106:3

**retail** [3] - 143:9, 183:11, 185:16

**retained** [2] - 111:24, 112:4

**return** [1] - 171:20

**review** [25] - 7:25, 25:16, 25:22, 29:14, 43:25, 44:12, 45:4, 46:16, 48:15, 54:12, 68:2, 68:3, 74:23, 81:13, 88:11, 124:12, 126:2, 126:6, 136:6, 145:21, 157:7, 157:11, 180:12, 181:6, 196:14

**reviewed** [34] - 25:14, 25:24, 33:3, 35:12, 37:7, 37:16, 37:19, 39:16, 42:6, 46:22, 57:3, 69:5, 69:16, 69:25, 80:8, 80:20, 81:11, 81:16, 86:15, 87:7, 90:23, 93:14, 94:8, 104:17, 129:9, 179:22, 184:5, 184:20, 185:9, 191:22, 197:14, 197:23, 198:9

**reviewing** [3] - 39:5, 64:24, 82:20

**revoke** [1] - 149:20

**revoked** [1] - 149:23

**reward** [1] - 51:2

**right-hand** [1] - 95:15

**rigorous** [3] - 120:18, 121:8, 127:3

**risk** [36] - 30:15, 30:18, 47:6, 56:7, 57:3, 57:9, 66:15, 80:16, 80:24, 83:17, 83:21, 84:9, 84:22, 84:24, 85:10, 85:14, 85:20, 86:9, 87:17, 88:2, 88:8, 88:21, 89:16, 90:2, 92:3, 116:23, 117:3, 117:6, 129:6, 169:9, 194:24, 195:5, 195:9, 195:12, 195:20, 195:22

**Risk** [1] - 84:15

**risk-benefit** [2] - 30:15, 30:18

**risks** [4] - 30:23, 82:20, 116:18, 189:23

**Road** [2] - 1:21, 12:20

**road** [1] - 14:21

**role** [4] - 29:24, 161:2, 161:3, 188:15

**roles** [1] - 192:14

**Roman** [1] - 168:12

**room** [1] - 148:6

**rooms** [1] - 85:17

**rough** [1] - 135:9

**roughly** [1] - 106:3

**RPR** [3] - 2:20, 205:6, 205:20

**rule** [3] - 10:2, 71:5, 108:14

**ruled** [1] - 113:8

**rules** [6] - 8:14, 9:14, 17:23, 107:21, 108:11, 192:4

**ruling** [2] - 77:19, 78:2

**run** [1] - 139:24

**runs** [2] - 121:18, 131:7

**S**

**Sabrina** [6] - 7:7, 70:12, 76:18, 78:12, 110:11, 196:17

**safe** [3] - 128:9, 128:24, 196:7

**safer** [2] - 16:6, 61:2

**safety** [13] - 29:24, 30:3, 30:7, 30:14, 30:21, 30:25, 36:12, 47:11, 47:22, 48:12, 48:13, 160:20, 196:14

**saga** [1] - 192:15

**Saldana** [1] - 3:20

**SALDANA** [3] - 2:5, 3:20, 3:23

**sale** [1] - 83:9

**sales** [12] - 31:17, 31:20, 31:24, 32:7, 32:12, 32:13, 33:20, 33:25, 58:9, 58:15, 77:7, 111:20

**SALVATORE** [1] - 1:23

**Salvatore** [1] - 4:2

**sandbag** [1] - 108:4

**sandbagged** [2] - 9:15, 107:22

**sandbagging** [4] - 8:14, 11:14, 108:7, 108:15

**save** [1] - 13:13

**saving** [1] - 166:3

**savings** [3] - 164:16, 164:21, 164:25

**saw** [12] - 37:5, 46:17, 66:11, 97:5, 98:11, 100:10, 100:12, 119:18, 120:4, 121:9, 162:21

**sbadala@napoliaw. com** [1] - 1:24

**scaled** [1] - 95:6

**Schedule** [1] - 68:23

**schedule** [1] - 4:25

**scheduled** [1] - 7:20

**schizophrenia** [1] - 117:21

**scholarly** [1] - 81:13

**school** [5] - 56:20, 56:21, 82:25, 83:6, 104:8

**School** [3] - 14:13, 17:13, 19:4

**Schools** [1] - 94:16

**Schroeder** [2] - 92:12, 93:6

**science** [10] - 29:3, 49:12, 49:23, 64:6, 95:3, 95:24, 95:25, 195:11, 195:14, 203:17

**Sciences** [3] - 17:12, 19:22, 95:17

**scientific** [18] - 25:6, 25:18, 31:12, 33:10, 37:2, 37:7, 43:13, 46:8, 50:3, 50:11, 67:18, 80:12, 81:4, 104:2, 111:13, 113:16, 114:5, 188:2

**scientifically** [3] -

120:18, 121:7, 127:3
**scientist** [1] - 54:18
**scope** [2] - 77:12, 120:3
**scores** [2] - 22:14, 22:15
**screen** [15] - 4:9, 14:25, 44:20, 109:18, 109:24, 110:3, 115:15, 115:20, 121:19, 151:21, 154:4, 182:21, 183:4, 187:2, 187:7
**scripts** [1] - 35:18
**second** [14] - 7:6, 8:23, 10:24, 64:14, 73:2, 78:14, 93:3, 97:24, 102:13, 102:14, 104:2, 114:20, 165:16, 187:8
**Second** [1] - 73:8
**Section** [1] - 17:24
**section** [1] - 50:17
**see** [43] - 15:12, 26:5, 38:15, 39:12, 40:2, 42:15, 42:19, 44:20, 45:5, 48:4, 49:5, 60:2, 60:3, 60:4, 64:6, 80:13, 84:18, 85:4, 85:25, 89:4, 89:18, 99:7, 99:8, 103:10, 105:14, 109:17, 114:13, 136:5, 136:23, 144:12, 168:19, 173:16, 174:19, 183:4, 183:6, 183:15, 185:18, 185:19, 193:25, 199:7, 199:9, 200:6, 200:9
**seeing** [6] - 8:21, 39:20, 85:5, 85:18, 89:11, 136:24
**seek** [2] - 75:6, 202:22
**seeks** [1] - 74:12
**seem** [3] - 44:10, 76:21, 198:14
**selected** [2] - 26:25, 39:24
**selecting** [1] - 43:25
**selective** [1] - 194:20
**self** [3] - 23:25, 91:16, 92:8
**self-limiting** [2] - 91:16, 92:8
**sends** [1] - 25:19
**sense** [5] - 78:17,

98:7, 166:9, 169:22, 170:8
**sent** [1] - 5:8
**sentence** [9] - 41:13, 41:14, 45:2, 102:14, 202:3, 202:5, 202:9, 203:4, 203:14
**separate** [2] - 94:14, 178:3
**separately** [1] - 102:10
**September** [5] - 1:8, 4:15, 107:3, 163:11, 185:24
**series** [2] - 33:13, 36:25
**serious** [2] - 9:5, 56:12
**served** [2] - 102:5, 199:12
**serves** [1] - 42:16
**service** [2] - 4:18, 36:6
**serving** [2] - 164:4, 164:10
**session** [7] - 3:4, 4:13, 5:3, 18:9, 73:11, 73:12, 78:8
**set** [5] - 74:10, 87:17, 88:20, 134:9, 192:4
**setting** [7] - 140:12, 140:14, 177:16, 178:12, 178:15, 178:22, 179:3
**several** [2] - 104:3, 193:9
**severe** [2] - 20:14, 101:2
**severely** [1] - 89:22
**share** [1] - 182:7
**shared** [3] - 84:2, 184:8, 187:7
**shelves** [1] - 172:21
**SHERIDAN** [2] - 1:17, 4:6
**Sheridan** [1] - 4:6
**sheriff** [3] - 162:9, 162:10, 162:12
**shift** [16] - 55:10, 55:17, 55:20, 57:6, 98:14, 123:8, 155:13, 156:5, 159:7, 160:15, 169:2, 169:19, 170:9, 170:15, 171:16, 201:5
**shifted** [2] - 155:19, 170:4
**shifting** [2] - 155:24, 170:24
**shifts** [1] - 172:20

**Shkolnik** [2] - 3:17, 108:10
**SHKOLNIK** [5] - 1:20, 3:17, 108:9, 109:2, 109:10
**shopping** [8] - 141:4, 141:15, 141:17, 141:21, 141:24, 142:5, 142:15, 142:21
**short** [4] - 50:24, 76:7, 78:6, 174:18
**short-term** [1] - 50:24
**shot** [3] - 162:9, 162:11
**show** [6] - 63:18, 115:11, 122:10, 140:9, 163:25, 182:18
**showed** [5] - 28:13, 28:15, 177:14, 186:13, 195:11
**showing** [7] - 57:3, 58:20, 58:24, 85:17, 91:13, 92:6, 96:23
**shown** [3] - 38:20, 58:7, 84:25
**shows** [6] - 58:9, 85:8, 85:12, 85:13, 105:7, 105:9
**side** [3] - 94:15, 95:15
**signature** [1] - 205:16
**significance** [1] - 89:12
**significant** [1] - 22:5
**signs** [2] - 45:7, 66:25
**similar** [6] - 81:20, 82:23, 86:16, 90:3, 99:11, 141:12
**SIMMONS** [1] - 1:14
**simple** [1] - 170:3
**simply** [5] - 6:10, 6:20, 8:22, 13:7, 66:22
**single** [6] - 47:4, 104:6, 134:22, 135:24, 164:15, 164:17
**sit** [4] - 21:11, 137:13, 146:19, 163:24
**sitting** [4] - 108:24, 137:7, 170:12, 188:18
**skip** [1] - 111:12
**SKOLNICK** [1] - 1:22
**Slide** [37] - 15:11, 15:12, 37:6, 39:10, 41:24, 44:17, 51:20, 55:3, 57:23, 59:18, 59:21, 62:23, 62:24, 63:2, 66:7, 68:9,

69:10, 70:10, 84:12, 88:24, 89:3, 91:3, 94:10, 101:18, 101:21, 103:5, 105:3, 106:18, 113:23, 123:9, 151:14, 186:13, 186:20, 186:23, 187:15, 199:3, 199:23
**slide** [21] - 17:5, 39:12, 43:23, 47:15, 59:12, 60:9, 66:4, 70:19, 84:14, 90:13, 91:8, 94:13, 105:4, 105:13, 106:23, 177:14, 186:8, 190:21, 198:3, 199:6, 199:24
**slides** [1] - 91:5
**slightly** [3] - 53:20, 75:10, 134:5
**Slip** [1] - 73:7
**slow** [2] - 51:5, 51:6
**small** [4] - 56:8, 65:11, 82:9, 98:12
**Smith** [1] - 122:14
**so-called** [5] - 64:2, 64:12, 65:4, 98:12, 104:14
**societies** [2] - 160:18, 161:19
**Society** [5] - 51:24, 52:10, 53:3, 53:10, 54:21
**society** [1] - 52:8
**sold** [1] - 137:20
**solution** [1] - 67:3
**someone** [4] - 41:5, 89:6, 89:7, 103:9
**sometimes** [3] - 54:7, 95:17, 143:6
**somewhat** [1] - 4:16
**sorry** [20] - 18:16, 22:5, 31:18, 54:15, 54:16, 54:17, 70:8, 78:10, 88:16, 109:10, 116:25, 118:14, 122:5, 125:9, 133:2, 140:14, 146:14, 163:18, 179:21, 186:8
**sort** [8] - 22:8, 28:2, 33:18, 53:4, 53:10, 76:5, 146:23, 191:24
**sorts** [1] - 81:21
**sought** [2] - 13:4, 13:10
**sound** [5] - 128:10,

152:14, 152:17, 192:6
**sounds** [2] - 13:22, 112:14
**source** [2] - 89:4, 104:21
**sources** [4] - 16:18, 175:16, 202:15, 202:23
**speaking** [3] - 34:22, 35:8, 53:22
**speaks** [1] - 49:22
**specialties** [1] - 98:15
**specialty** [2] - 98:4, 98:8
**specific** [48] - 23:5, 61:15, 73:14, 96:17, 100:7, 104:3, 116:23, 117:3, 119:19, 119:23, 122:13, 130:4, 130:19, 131:13, 131:18, 132:13, 133:8, 134:14, 137:14, 139:7, 140:20, 146:17, 148:15, 151:25, 153:21, 157:5, 158:23, 167:21, 167:24, 173:4, 173:8, 176:4, 177:9, 178:9, 179:7, 181:7, 181:10, 181:15, 184:15, 185:4, 188:11, 189:10, 190:3, 190:4, 190:6, 190:9, 190:12
**specifically** [8] - 23:13, 89:14, 90:2, 138:2, 144:18, 151:23, 155:18, 176:3
**specificity** [2] - 122:17, 188:20
**specifics** [1] - 110:13
**spent** [2] - 82:13, 114:15
**sphere** [1] - 33:11
**sprain** [1] - 92:7
**Square** [1] - 2:9
**stand** [2] - 13:6, 162:11
**standard** [3] - 28:21, 28:24, 43:14
**standards** [1] - 42:5
**standing** [2] - 10:12, 11:22
**Stanford** [11] - 12:20, 14:12, 17:13, 19:4, 19:12, 19:15, 19:18,

227

21:16, 24:22, 28:22, 29:5
**start** [6] - 5:4, 14:24, 50:18, 105:25, 152:20, 175:18
**started** [2] - 4:11, 105:22
**starting** [6] - 16:2, 55:5, 105:23, 136:16, 172:2, 190:2
**STATE** [1] - 1:2
**State** [40] - 2:3, 2:3, 3:2, 29:25, 34:14, 59:16, 59:22, 60:6, 72:11, 100:3, 100:13, 103:3, 104:23, 104:25, 105:12, 105:16, 111:25, 123:20, 123:24, 124:8, 130:5, 130:20, 131:3, 139:8, 147:9, 150:4, 150:15, 156:20, 160:5, 160:8, 160:9, 160:19, 161:24, 167:11, 167:19, 168:4, 172:24, 173:9, 178:7, 205:7
**state** [11] - 12:17, 13:9, 19:25, 29:18, 38:21, 50:10, 51:13, 55:4, 102:14, 108:22, 147:8
**state's** [1] - 142:6
**statement** [13] - 40:7, 65:2, 68:12, 80:10, 80:13, 85:25, 136:22, 153:15, 158:17, 168:22, 187:16, 201:23, 201:24
**statements** [11] - 32:11, 47:22, 48:3, 48:4, 77:23, 80:3, 80:6, 186:14, 186:15, 186:21, 186:24
**states** [1] - 36:17
**States** [8] - 33:22, 34:23, 47:2, 75:25, 98:2, 98:19, 155:15, 168:14
**static** [2] - 8:25, 128:17
**Statistical** [2] - 24:7, 53:23
**statistical** [1] - 111:17
**statistics** [3] - 88:7, 99:25, 179:2

**stay** - 10:7, 11:17, 29:3, 172:20
**staying** [1] - 51:15
**stem** [1] - 51:4
**stenographer** [1] - 65:18
**stenographic** [2] - 13:16, 205:10
**step** [3] - 74:18, 74:19, 109:21
**Stephanie** [1] - 205:6
**STEPHANIE** [2] - 2:20, 205:20
**steps** [4] - 33:13, 36:25, 96:18, 139:11
**Steve** [1] - 10:19
**Steven** [3] - 61:5, 71:21, 152:7
**steward** [1] - 153:16
**still** [11] - 78:11, 91:17, 91:21, 92:10, 106:14, 133:23, 165:4, 165:8, 171:9, 174:23, 175:3
**stimulate** [1] - 50:25
**Stipulation** [3] - 5:8, 72:20, 72:21
**stolen** [1] - 143:7
**stop** [2] - 13:23, 23:18
**strange** [1] - 40:15
**stream** [1] - 17:23
**streamed** [1] - 18:6
**street** [2] - 13:6, 13:8
**Street** [1] - 2:4
**strike** [2] - 11:15, 53:7
**strong** [4] - 40:11, 40:16, 68:12, 195:18
**STRONG** [32] - 7:7, 7:12, 9:7, 10:8, 11:23, 45:19, 45:22, 70:11, 71:12, 76:16, 76:18, 78:5, 78:12, 78:16, 79:13, 79:19, 105:25, 106:4, 107:11, 108:5, 109:15, 109:20, 109:22, 110:8, 112:14, 112:18, 112:20, 113:19, 115:18, 152:2, 196:16, 196:20
**Strong** [18] - 7:8, 70:12, 70:23, 71:4, 76:17, 76:19, 78:13, 105:21, 106:8, 107:5, 109:14, 110:11, 192:13, 193:8, 194:23, 196:17, 200:8, 200:23

**Strong's** [1] - 199:23
**strongly** [2] - 42:10, 101:9
**structural** [1] - 113:2
**students** [7] - 21:16, 22:5, 29:5, 29:7, 29:9, 104:8
**studied** [3] - 25:7, 176:24, 189:18
**studies** [5] - 57:2, 63:18, 69:17, 102:25
**study** [22] - 38:14, 39:7, 80:6, 89:13, 89:25, 91:20, 101:24, 103:12, 104:6, 104:13, 104:16, 108:17, 170:13, 170:22, 171:14, 180:16, 180:21, 180:25, 188:8, 199:19
**stuff** [2] - 41:17, 85:19
**subject** [1] - 61:18
**submit** [1] - 112:23
**submits** [1] - 25:17
**submitted** [6] - 8:7, 11:12, 70:15, 112:8, 112:22, 160:5
**submitting** [3] - 164:19, 179:22, 179:23
**subpopulations** [1] - 104:4
**subsequent** [4] - 9:3, 184:20, 197:22, 198:16
**subsequently** [2] - 95:9, 101:2
**subset** [1] - 98:12
**substance** [11] - 17:2, 18:25, 23:24, 27:6, 28:3, 48:19, 83:20, 117:7, 117:9, 178:20, 184:23
**substances** [11] - 27:8, 27:20, 52:16, 52:17, 52:18, 153:5, 153:9, 153:13, 153:20, 154:9, 180:22
**Substances** [1] - 153:14
**substantial** [1] - 68:3
**substantially** [1] - 96:7
**substantive** [1] - 45:25
**substantively** [1] - 15:19
**subtitle** [2] - 60:18,

62:14
**successful** [1] - 52:22
**suffering** [2] - 58:24, 125:6
**suffers** [1] - 125:14
**SUFFOLK** [1] - 1:2
**Suffolk** [30] - 1:15, 3:3, 3:12, 3:14, 4:6, 100:3, 100:15, 112:2, 118:5, 118:7, 124:16, 125:3, 137:25, 167:22, 167:25, 173:4, 175:21, 176:8, 176:9, 176:12, 178:6, 179:8, 180:18, 180:23, 185:2, 188:4, 188:9, 188:12, 189:23, 205:8
**suggest** [4] - 11:17, 13:2, 72:19, 108:19
**suggested** [2] - 73:10, 193:18
**suggestion** [3] - 75:3, 191:21, 193:15
**suggestive** [1] - 196:24
**suggests** [2] - 102:3, 199:10
**Suite** [1] - 1:21
**sum** [2] - 16:25, 83:19
**summarizes** [1] - 38:17
**summary** [7] - 6:12, 6:18, 37:25, 38:9, 38:18, 171:22, 171:24
**summative** [1] - 38:23
**superficial** [1] - 166:9
**supplemental** [6] - 7:19, 7:23, 70:17, 70:25, 160:7, 186:4
**supplemented** [2] - 108:21, 183:23
**supplied** [1] - 145:13
**supply** [15] - 16:3, 16:10, 16:12, 16:15, 16:17, 55:6, 75:15, 93:23, 94:4, 95:6, 145:8, 153:2, 153:16, 172:3, 172:14
**support** [7] - 34:8, 45:16, 49:6, 56:24, 101:15, 107:16, 129:11
**supported** [2] - 38:10, 65:5
**supportive** [1] - 85:24

**supposed** [1] - 64:2
**sUPREME** [1] - 1:2
**Supreme** [2] - 1:12, 3:2
**surgery** [2] - 91:14, 92:24
**surprised** [1] - 9:16
**surrounding** [1] - 52:6
**survey** [13] - 120:12, 120:16, 120:18, 120:19, 120:24, 121:7, 121:8, 121:23, 122:3, 122:10, 122:16, 127:3, 192:5
**surveyed** [2] - 122:11, 127:2
**surveys** [3] - 191:25, 193:8, 194:18
**suspicious** [4] - 153:8, 153:17, 154:14, 154:24
**sustain** [2] - 78:2, 196:21
**swear** [1] - 12:8
**switch** [1] - 181:23
**sworn** [2] - 12:15, 184:2
**symptoms** [1] - 66:25
**synonymous** [1] - 24:9

## T

**talks** [2] - 35:5
**target** [1] - 36:14
**taught** [4] - 56:6, 56:14, 82:25, 83:2
**teach** [2] - 21:15, 29:4
**teaches** [1] - 46:13
**teaching** [1] - 21:22
**team** [1] - 70:24
**tech** [1] - 7:4
**technical** [2] - 24:2, 186:10
**telecasting** [1] - 18:2
**ten** [2] - 99:9, 163:16
**tends** [1] - 6:8
**term** [29] - 20:13, 22:22, 23:11, 23:20, 23:21, 24:3, 30:3, 30:4, 49:15, 50:24, 54:3, 61:11, 61:22, 64:5, 69:18, 85:2, 89:21, 101:12, 127:6, 156:12, 197:13, 197:16, 197:23, 198:5, 198:6, 198:16, 199:8
**terminology** [1] - 24:7

**terms** [18] - 19:7, 22:18, 23:8, 48:11, 49:11, 49:13, 50:16, 67:5, 77:14, 100:14, 102:15, 108:6, 108:7, 127:2, 132:14, 186:7, 188:18, 189:9
**testified** [14] - 11:4, 12:16, 36:11, 36:23, 39:10, 125:25, 132:12, 132:17, 134:24, 172:9, 176:2, 192:19, 193:7, 197:16
**testify** [6] - 7:20, 15:2, 75:22, 76:25, 137:8, 188:15
**testifying** [4] - 11:7, 61:17, 111:23, 184:11
**testimony** [29] - 6:8, 8:10, 40:5, 54:7, 61:14, 61:25, 74:15, 115:12, 116:14, 118:23, 119:14, 122:18, 126:22, 131:20, 136:4, 145:24, 154:11, 155:3, 159:24, 159:25, 160:4, 172:11, 180:12, 183:17, 184:2, 185:20, 185:22, 186:2, 186:19
**Testimony** [1] - 1:10
**testing** [2] - 112:17, 196:3
**Teva** [1] - 133:12
**Thanksgiving** [1] - 198:25
**THE** [124] - 1:2, 3:2, 3:6, 3:8, 3:16, 3:19, 3:22, 3:24, 4:3, 4:8, 4:24, 5:23, 6:2, 6:23, 7:4, 7:11, 9:23, 11:16, 11:24, 12:3, 12:8, 12:10, 12:12, 12:17, 12:19, 12:21, 12:22, 13:25, 14:2, 17:17, 17:21, 41:4, 41:7, 41:9, 42:21, 42:25, 45:20, 46:3, 57:19, 61:16, 62:2, 62:5, 65:18, 65:21, 70:21, 71:4, 72:18, 75:14, 76:6, 76:17, 77:18, 78:7, 78:9, 78:10, 78:14, 78:25, 79:12, 79:14, 91:6,

98:22, 98:24, 99:17, 105:20, 105:21, 106:3, 106:10, 106:13, 106:15, 107:5, 108:3, 108:24, 109:6, 109:12, 109:13, 109:14, 109:21, 110:3, 112:12, 112:16, 112:19, 115:17, 132:25, 133:2, 152:6, 152:11, 152:13, 162:4, 162:18, 162:20, 163:10, 163:14, 163:20, 163:24, 171:17, 171:19, 174:14, 174:16, 174:19, 174:22, 174:23, 174:25, 175:2, 175:4, 175:5, 176:15, 176:17, 182:5, 182:22, 183:3, 187:2, 187:5, 187:9, 190:15, 190:16, 196:19, 196:21, 196:24, 198:22, 200:19, 203:24, 204:2, 204:3, 204:4, 204:5
**theft** [2] - 144:15, 144:18
**thefts** [3] - 144:4, 144:8, 144:21
**themselves** [5] - 6:11, 40:19, 88:19, 141:7, 166:18
**therapy** [6] - 39:23, 39:24, 40:12, 41:14, 69:18, 127:6
**thereafter** [2] - 4:17, 15:5
**thereat** [1] - 83:14
**Therefore** [1] - 205:15
**thereof** [1] - 18:7
**they've** [1] - 8:17
**third** [5] - 35:25, 40:23, 114:9, 114:11, 147:12
**third-party** [1] - 147:12
**THOMAS** [1] - 1:17
**thorough** [1] - 88:11
**thousand** [3] - 45:12, 192:5, 194:19
**thousands** [1] - 49:3
**three** [10] - 43:9, 57:11, 58:8, 85:25, 86:14, 87:14, 92:20,

93:10, 116:3, 181:20
**three-year** [1] - 43:9
**throughout** [5] - 31:9, 34:22, 41:19, 75:24, 168:14
**timeframe** [1] - 105:2
**tired** [1] - 65:19
**titled** [2] - 59:21, 91:8
**titles** [1] - 18:19
**tobacco** [1] - 27:16
**today** [20] - 4:25, 8:13, 14:22, 27:3, 35:3, 40:5, 47:2, 79:8, 107:20, 109:25, 111:23, 137:7, 137:13, 170:12, 175:16, 177:14, 182:20, 185:24, 186:13, 188:18
**toes** [2] - 10:7, 11:17
**together** [6] - 21:5, 68:4, 88:19, 94:24, 95:23, 113:20
**tom** [1] - 4:6
**Tomarken** [1] - 5:4
**tomorrow** [1] - 5:2
**took** [2] - 148:5, 194:23
**tool** [1] - 123:2
**tooth** [1] - 92:16
**top** [5] - 26:25, 58:15, 103:17, 168:11, 193:24
**topic** [7] - 167:13, 175:19, 177:25, 179:15, 186:5, 188:23, 189:18
**tops** [3] - 79:11, 79:15, 79:16
**total** [4] - 86:14, 133:19, 133:22, 134:9
**totality** [2] - 9:19, 129:8
**touchstone** [1] - 49:13
**toward** [1] - 168:11
**towards** [1] - 159:8
**town** [1] - 13:8
**track** [1] - 70:9
**traditionally** [1] - 4:17
**trained** [1] - 56:5
**training** [19] - 21:9, 29:6, 56:22, 110:14, 110:17, 111:8, 111:20, 152:25, 153:4, 153:7, 153:11, 153:21, 153:22, 154:6, 189:10, 189:14, 189:17, 192:23,

194:6
**trajectories** [1] - 103:22
**transcript** [5] - 122:6, 140:7, 154:21, 183:5, 205:13
**transcription** [1] - 205:10
**transcripts** [1] - 115:19
**transit** [2] - 143:8, 143:12
**transition** [1] - 95:8
**trauma** [1] - 117:12
**traveled** [1] - 117:23
**treat** [3] - 25:3, 27:5, 52:8
**treatable** [1] - 52:12
**treated** [4] - 22:11, 27:23, 80:16, 102:23
**treating** [4] - 22:12, 48:19, 66:17, 67:9
**treatment** [22] - 24:11, 24:15, 40:13, 40:16, 40:21, 42:11, 47:12, 52:21, 56:15, 56:19, 58:13, 58:24, 69:19, 96:25, 129:11, 148:18, 155:13, 155:20, 155:25, 156:17, 165:12, 165:20
**tremendous** [1] - 95:6
**trends** [3] - 100:9, 100:11, 100:13
**trial** [10] - 15:3, 72:25, 73:22, 74:20, 76:15, 108:20, 184:11, 188:11, 189:22, 191:6
**trials** [2] - 29:25, 69:17
**tried** [5] - 49:10, 88:19, 142:13, 145:2, 157:24
**trouble** [1] - 186:9
**true** [99] - 8:22, 17:3, 17:4, 17:14, 18:21, 18:25, 19:2, 19:15, 19:22, 20:7, 20:17, 20:19, 20:24, 21:13, 21:23, 22:2, 22:8, 24:16, 24:23, 26:2, 26:12, 26:16, 26:19, 27:3, 27:6, 27:10, 27:14, 27:20, 28:3, 28:6, 30:5, 30:8, 30:12, 32:19, 32:25, 34:10, 34:14, 34:24, 35:15, 38:21, 41:16,

42:4, 44:23, 45:13, 45:18, 47:23, 51:17, 52:6, 53:21, 54:4, 54:7, 55:11, 58:25, 59:2, 59:23, 63:17, 64:25, 65:8, 65:13, 66:5, 80:14, 100:15, 100:19, 103:14, 118:5, 127:17, 127:19, 127:21, 133:10, 137:15, 137:19, 140:11, 140:22, 160:2, 160:3, 172:19, 174:3, 182:2, 183:19, 183:20, 184:2, 184:9, 184:13, 186:15, 187:17, 187:20, 187:22, 187:23, 188:21, 188:22, 191:9, 194:16, 196:4, 196:5, 197:20, 197:21, 205:9, 205:14
**trusted** [1] - 148:9
**truth** [2] - 33:6, 172:11
**truthful** [1] - 87:12
**truthfully** [1] - 184:16
**try** [12] - 10:13, 81:18, 87:25, 94:24, 98:2, 119:17, 120:13, 120:25, 121:8, 123:2, 144:11, 162:23
**trying** [8] - 88:7, 107:12, 130:12, 136:19, 172:8, 182:25, 196:18, 197:11
**tsheridan@ simmonsfirm.com** [1] - 1:19
**turn** [8] - 35:11, 36:19, 110:13, 121:16, 131:5, 142:24, 168:9, 193:22
**turning** [4] - 118:25, 123:17, 145:9, 202:14
**twice** [2] - 6:23, 7:5
**two** [28] - 18:21, 21:22, 30:7, 30:10, 57:11, 67:25, 68:16, 73:14, 74:6, 74:25, 75:5, 78:20, 85:6, 85:23, 85:24, 87:5, 89:4, 94:14, 96:12, 97:13, 103:16, 175:24, 178:3,

190:3, 203:13, 203:18

**two-year** [1] - 203:18

**type** [3] - 92:10, 143:15, 145:2

**types** [3] - 46:24, 98:8, 108:6

**typically** [1] - 21:10

## U

**U.S** [1] - 202:23

**ultimate** [2] - 166:6, 192:9

**unclear** [6] - 61:24, 158:7, 158:22, 159:5, 202:2, 203:15

**unconscious** [1] - 85:17

**under** [17] - 20:9, 35:14, 35:23, 42:15, 63:4, 76:4, 78:11, 106:14, 154:11, 155:3, 159:24, 174:23, 175:3, 183:17, 185:21, 188:14, 191:17

**undergraduate** [1] - 19:8

**undergraduates** [1] - 29:5

**underlies** [2] - 36:20, 48:24

**underlying** [2] - 65:9, 107:13

**understood** [2] - 162:24, 189:23

**undertaken** [1] - 33:18

**unfavorable** [1] - 57:18

**unintended** [1] - 30:23

**United** [8] - 33:22, 34:23, 47:2, 75:25, 97:25, 98:19, 155:14, 168:14

**universal** [1] - 162:6

**universities** [1] - 94:23

**University** [5] - 14:13, 17:13, 19:4, 19:12, 28:22

**university** [1] - 19:9

**unless** [4] - 18:9, 65:8, 169:23, 177:25

**unnecessary** [6] - 130:6, 130:21, 131:16, 132:21, 133:7, 167:5

**unreasonably** [1] - 190:4

**unrelated** [1] - 184:21

**up** [61] - 14:25, 15:10, 26:4, 26:7, 29:3, 39:10, 44:17, 51:19, 52:11, 55:4, 56:16, 57:23, 62:24, 65:23, 70:10, 82:9, 85:17, 88:7, 88:24, 91:3, 94:10, 101:18, 103:5, 108:12, 109:24, 113:23, 115:15, 118:21, 119:2, 121:4, 121:18, 122:9, 123:9, 126:4, 127:3, 131:8, 134:4, 140:9, 151:14, 151:17, 151:21, 152:8, 154:4, 154:20, 157:2, 157:14, 158:15, 162:23, 163:9, 164:15, 171:23, 175:5, 175:18, 179:15, 183:5, 185:12, 186:23, 187:12, 189:2, 193:24

**update** [1] - 186:5

**upshot** [1] - 29:23

**uptick** [1] - 98:20

**users** [2] - 103:13, 145:18

**uses** [2] - 54:2, 54:3

**usual** [1] - 46:7

**utilized** [2] - 108:20, 177:6

## V

**vague** [2] - 61:9, 61:22

**valid** [1] - 87:11

**value** [1] - 196:13

**variation** [2] - 115:4, 116:5

**various** [4] - 32:18, 34:17, 184:19, 199:24

**varying** [1] - 200:18

**vast** [2] - 136:8, 136:12

**vastly** [1] - 97:6

**version** [1] - 76:8

**versus** [2] - 73:6, 102:15

**via** [2] - 103:18, 104:10

**Video** [1] - 112:11

**videotapes** [1] - 17:25

**view** [1] - 139:18

**views** [1] - 44:3

**Vinnie** [3] - 162:7, 162:22, 163:22

**violated** [1] - 188:2

**Virginia** [11] - 8:20, 9:9, 10:21, 10:23, 10:25, 11:5, 11:9, 71:3, 71:14, 71:23, 107:8

**virtually** [1] - 37:21

**voices** [1] - 82:22

**volume** [2] - 98:5, 128:15

**volunteer** [2] - 13:7, 79:10

**vote** [2] - 21:5, 21:8

**Vowles** [2] - 89:7, 89:18

## W

**wait** [2] - 13:19, 78:14

**waiver** [1] - 20:5

**walk** [1] - 54:16

**Walmart** [8] - 175:11, 180:20, 180:21, 181:2, 181:6, 181:11, 181:16

**wants** [1] - 65:25

**War** [1] - 56:3

**Washington** [1] - 36:12

**watch** [1] - 162:7

**ways** [1] - 155:19

**weak** [1] - 42:11

**weeks** [1] - 116:3

**weigh** [2] - 95:23, 116:17

**weighed** [1] - 169:5

**weight** [3] - 109:7, 109:8, 109:9

**WELCH** [4] - 5:6, 5:25, 6:9, 7:2

**Welch** [1] - 5:6

**welcome** [3] - 152:6, 174:21, 190:15

**well-accepted** [1] - 53:5

**well-intentioned** [1] - 189:4

**well-known** [1] - 86:24

**West** [11] - 8:20, 9:8, 10:21, 10:23, 10:25, 11:5, 11:9, 71:3, 71:13, 71:22, 107:8

**WHEREUPON** [4] - 12:14, 78:6, 106:5, 174:18

**White** [2] - 36:7, 36:13

**whole** [8] - 5:16, 5:17, 38:2, 75:17, 93:24,

96:13, 96:15, 201:5

**wholesale** [2] - 98:14, 152:23

**widespread** [2] - 191:24, 196:3

**wisdom** [1] - 92:16

**wish** [2] - 27:2, 106:22

**withdrawal** [2] - 5:9, 23:19

**withdrawing** [2] - 6:13, 6:14

**withdrawn** [4] - 5:12, 6:21, 90:15, 191:21

**WITNESS** [18] - 12:19, 13:25, 41:7, 98:24, 105:20, 106:15, 109:13, 133:2, 152:6, 152:13, 162:18, 174:22, 174:25, 175:4, 176:17, 190:15, 204:2, 204:4

**witness** [21] - 6:4, 7:6, 11:4, 11:17, 11:24, 12:8, 13:5, 72:10, 74:24, 75:7, 75:21, 76:10, 76:11, 78:9, 79:7, 106:11, 157:14, 162:7, 174:20, 182:8, 200:19

**witness'** [1] - 76:14

**witnesses** [4] - 12:23, 74:9, 78:19, 180:13

**women** [2] - 92:18, 104:9

**word** [3] - 13:22, 31:18, 63:19

**words** [3] - 5:23, 40:14, 195:17

**world** [2] - 30:8, 84:3

**worried** [1] - 162:19

**worse** [2] - 65:9, 150:16

**worth** [2] - 40:25, 109:4

**worthy** [1] - 25:21

**write** [5] - 114:7, 159:2, 170:2, 170:6, 199:16

**writing** [5] - 32:5, 36:24, 135:10, 135:12, 148:4

**written** [27] - 25:13, 25:25, 28:20, 29:13, 35:18, 37:8, 55:9, 72:12, 81:4, 97:11, 105:16, 130:5, 130:20, 131:14, 133:20, 135:8,

135:15, 137:9, 137:12, 165:9, 173:20, 173:21, 174:2, 199:25, 203:5, 203:7

**wrote** [11] - 96:2, 97:20, 100:17, 155:9, 157:15, 160:13, 173:22, 194:4, 199:18, 202:5, 203:14

## Y

**Yale** [1] - 19:9

**year** [16] - 36:3, 43:9, 73:9, 83:5, 91:18, 91:22, 92:10, 92:15, 92:18, 107:4, 198:7, 199:8, 203:8, 203:18

**years** [11] - 14:18, 21:19, 22:11, 22:14, 25:5, 49:4, 54:14, 64:25, 82:13, 194:6, 203:13

**yellow** [1] - 85:13

**yesterday** [4] - 7:12, 7:17, 7:24, 70:16

**YORK** [1] - 1:2

**York** [113] - 1:8, 1:16, 1:22, 2:3, 2:3, 2:4, 2:9, 3:3, 3:21, 9:13, 26:24, 28:10, 28:13, 28:15, 34:14, 55:7, 59:16, 59:22, 60:6, 72:7, 73:7, 100:3, 100:12, 100:13, 103:3, 103:13, 104:23, 105:2, 105:12, 105:16, 108:11, 108:14, 108:23, 111:25, 115:24, 117:23, 117:24, 118:10, 118:16, 119:8, 119:12, 119:18, 120:13, 120:20, 120:25, 121:2, 121:9, 121:15, 121:23, 121:25, 122:11, 123:20, 123:24, 124:2, 124:5, 124:8, 125:6, 125:14, 125:18, 126:25, 130:6, 130:20, 131:2, 131:14, 134:12, 137:25, 139:5, 139:8, 142:2, 142:22, 143:17, 145:3, 145:19,

146:6, 146:9,
146:13, 146:22,
147:2, 148:14,
149:12, 149:19,
150:5, 150:10,
150:16, 151:4,
154:18, 156:21,
159:17, 160:5,
160:8, 160:9,
167:11, 167:19,
168:4, 172:4,
172:24, 173:9,
173:21, 178:6,
179:25, 182:19,
184:8, 184:21,
186:2, 187:20,
189:11, 189:15,
193:20, 205:8
**York's** [1] - 142:9
**young** [1] - 92:13
**yourself** [4] - 28:20,
29:13, 43:14, 48:17

## Z

**ZIP** [1] - 13:9