SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF ORANGE - COMPLEX JUSTICE CENTER
DEPARTMENT CX-102

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, acting by and through acting Santa Clara County Counsel Orry P. Korb and Orange County District Attorney Tony Rackauckas, | ) ) ) ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) NO. 2014-00725287 ) |
| PURDUE PHARMA L.P.; PURDUE PHARMA, INC.; THE PURDUE FREDERICK COMPANY, INC.; JOHNSON & JOHNSON JANSSEN PHARMACEUTICALS, INC.; ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., n/k/a JANSSEN PHARMACEUTICALS, INC., n/k/a JANSSEN PHARMACEUTICALS, INC.; ENDO HEALTH SOLUTIONS, INC.; ENDO PHARMACEUTICALS, INC.; WATSON LABORATORIES, INC.; ACTAVIS LLC; and ACTAVIS PHARMA, INC., f/k/a WATSON PHARMA, INC.; and DOES 1 through 100, inclusive, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

TRIAL PROCEEDINGS
BEFORE THE HON. PETER J. WILSON, JUDGE PRESIDING
REPORTER'S TRANSCRIPT OF REMOTE PROCEEDINGS

Tuesday, May 18, 2021

MAGNA LEGAL SERVICES
866-624-6221
www.MagnaLS.com
CAROLYN GREGOR, CSR 2351, CRR, CMR, RDR
Court Approved Reporter Pro Tem
Court Approved Reporter Pro Tem



```
 1          REMOTE APPEARANCES OF COUNSEL VIA ZOOM
 2    FOR PLAINTIFFS:
 3        ROBINSON CALCAGNIE, INC.
          BY:  MARK ROBINSON, ESQ.
 4             KEVIN F. CALCAGNIE, ESQ.
               PAUL DAGASTINO, III, ESQ.
 5        19 Corporate Plaza Drive
          Newport Beach, CA  92660
 6        kcalcagnie@robinsonfirm.com
          pdagastino@robinsonfirm.com
 7
 8        MOTLEY RICE
          Attorneys at Law
 9        BY:  FREDERICK C. BAKER, ESQ.
               MICHAEL PENDELL, ESQ.
10             SARA COUCH, ESQ.
               CHRISTOPHER MORIARTY, ESQ.
11             KRISTEN HERMIZ, ESQ.
               FIDELMA FITZPATRICK, ESQ.
12             ANDREW ARNOLD, ESQ.
               JESSICA COLOMBO, ESQ.
13        28 Bridgeside Blvd.
          Mt. Pleasant, South Carolina  29464
14        fbaker@motleyrice.com
          mpendell@motleyrice.com
15        scouch@motleyrice.com
          cmoriarty@motleyrice.com
16        khermiz@motleyrice.com
          ffitzpatrick@motleyrice.com
17        aarnold@motleyrice.com
          jcolombo@motleyrice.com
18
19
20
21
22
23
24
25
26
```



```
 1                    APPEARANCES (CONTINUED)
 2     FOR THE COUNTY OF SANTA CLARA:
           OFFICE OF THE COUNTY COUNSEL
 3         COUNTY OF SANTA CLARA
           BY:  KARUN TILAK, ESQ.
 4              KAVITA NARAYAN, ESQ.
                HANNAH KIESCHNICK, ESQ.
 5              JULIA SPIEGEL, ESQ.
                H. LUKE EDWARDS, ESQ.
 6         70 West Hedding Street, 9th Floor, East Wing
           San Jose, CA  95110-1705
 7         kavita.narayan@cco.sccgov.org
           karun.tilak@cco.sccgov.org
 8         hannah.kieschnick@cco.sccgov.org
           julia.spiegel@cco.sccgov.org
 9         luke.edwards@sccgov.org
10     FOR THE COUNTY OF LOS ANGELES:
           OFFICE OF LOS ANGELES COUNTY COUNSEL
11         BY:  ANDREA E. ROSS, ESQ.
                TRACY HUGHES, ESQ
12         500 W. Temple Street, 6th Floor
           Los Angeles, CA  90012
13         213.787.2310
           aross@counsel.lacounty.gov
14         thughes@lacounty.gov
15     FOR THE CITY OF OAKLAND:
           OFFICE OF THE CITY ATTORNEY
16         BY:  MALIA McPHERSON, ESQ.
                ZOE SAVITSKY, ESQ.
17         1 Frank H. Ogawa Plaza, 6th Floor
           Oakland, CA  94612
18         510.238.6392
           mmcpherson@oaklandcityattorney.org
19         zsavitsky@oaklandcityattorney.org
20         SKIKOS CRAWFORD SKIKOS & JOSEPH, LLP
           BY:  MARK G. CRAWFORD, ESQ.
21         One Sansome Street, Suite 2830
           San Francisco, CA  94104
22         mcrawford@skikos.com
23
24
25
26
```



```
 1                    APPEARANCES (CONTINUED)
 2   FOR THE DEFENDANTS:
 3   For Johnson & Johnson; Janssen Pharmaceuticals, Inc.;
     Ortho-McNeil-Janssen Pharmaceuticals, Inc., n/k/a Janssen
 4   Pharmaceuticals; Janssen Pharmaceutica, Inc., n/k/a
     Janssen Pharmaceuticals, Inc.:
 5
         O'MELVENY & MYERS LLP
 6       BY:  MICHAEL G. YODER, ESQ.
              AMY R. LUCAS, ESQ.
 7            STEVE BRODY, ESQ.
              AMY LAURENDEAU,ESQ.
 8            CHARLES LIFLAND, ESQ.
         1999 Avenue of the Stars
 9       Los Angeles, CA  90067
         myoder@omm.com
10       alucas@omm.com
         sbrody@omm.com
11       alaurendeau@omm.com
         clifland@@omm.com
12
13   For Endo Health Solutions and Endo Pharmaceuticals, Inc:
         HUESTON & HENNIGAN, LLP
14       BY:  JOHN C. HUESTON, ESQ.
              PADRAIC FORAN, ESQ.
15            MOEZ M. KABA, ESQ.
              STEPHEN MAYER, ESQ.
16            DAVID SARFATI, ESQ.
              JOSH BURK, ESQ.
17            KAREN DING, ESQ.
         523 West 6th Street, Suite 400
18       Los Angeles, CA  90014
         jhueston@hueston.com
19       pforan@hueston.com
         mkaba@hueston.com
20       smayer@hueston.com
         dsafarti@hueston.com
21       jburk@hueston.com
         kding@hueston.com
22
         ARNOLD & PORTER | KAYE SCHOLER
23       BY:  SEAN MORRIS, ESQ.
         777 South Figueroa Street, 44th Floor
24       Los Angeles, CA  90017-5844
         sean.morris@arnoldporter.com
25
26
```



```
 1                 APPEARANCES (CONTINUED)
 2
    For Teva, Cephalon, Watson Laboratories, Inc.; Actavis
 3  LLC, and Actavis Pharma, Inc. f/k/a Watson Pharma, Inc.:
        MORGAN, LEWIS & BOCKIUS, LLP
 4      BY:  ADAM TEITCHER, ESQ.
             COLLIE JAMES, ESQ.
 5           WENDY WEST FEINSTEIN, ESQ.
             BRIAN ERCOLE, ESQ.
 6      600 Anton Boulevard, Suite 1800
        Costa Mesa, CA  92626-7653
 7      james.collie@morganlewis.com
        adam.teitcher@morganlewis.com
 8      wendy.feinstein@morganlewis.com
        brian.ercole@morganlewis.com
 9
10  For Actavis PLC; Actavis, Inc.; Watson Pharmaceuticals,
    Inc., n/k/a Actavis, Inc.; Watson Laboratories, Inc.;
11  Actavis LLC; Actavis Pharma, Inc., f/k/a Watson Pharma,
    Inc.:
12
        KIRKLAND & ELLIS LLP
13      BY:  DONNA WELCH ESQ.
             KARL STAMPFL, ESQ.
14           ZACHARY BYER, ESQ.
             JENNIFER LEVY, ESQ.
15      300 North LaSalle
        Chicago, Illinois  60654
16      donna.welch@kirkland.com
        karl.stampfl@kirkland.com
17      zachary.byer@kirkland.com
        jennifer.levy@kirkland.com
18
    (And  other  appearances  as  may  be  found  on  Clerk's
19  Minute Order.)
20
21
22
23
24
25
26
```



```
 1                        I-N-D-E-X
 2
                                                      VOIR
 3   WITNESS          DIRECT  CROSS REDIRECT RECROSS DIRE
 4
 5   FOR THE PLAINTIFF:
 6
 7   J. BORDONA          2338            2389
     BY MS. LUCAS              2377
 8   BY MR. STAMPFL            2385
     BY MR. FORAN             2386
 9
10   A. LEMBKE            2393
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
```



```
 1                          E-X-H-I-B-I-T-S
 2     NO.                                    I.D.        EVD.
 3
       P-CA-000921   Entire Dashboard                     2392
 4     P-CA-001367                                        2455
       DEF-CA-102015                                      2333
 5     DEF-CA-102016                                      2333
 6
 7                       WITHDRAWN FROM EVIDENCE
 8     ROA 6702      All documents admitted on 5-17-21   2333
                     are now withdrawn from evidence
 9                   to include the following:
10     P-CA-000921
11     JAN-CA-102005
       JAN-CA-603066
12     JAN-CA-603067
       JAN-CA-603068
13     JAN-CA-602964
       JAN-CA-602966
14     JAN-CA-602967
       JAN-CA-602968
15     JAN-CA-602969
       JAN-CA-602970
16     JAN-CA-602971
       JAN-CA-602972
17
       DEF-CA-101976
18     DEF-CA-102005
       DEF-CA-102006
19     DEF-CA-100099
       DEF-CA-101954
20     DEF-CA-102003
       DEF-CA-102015
21     DEF-CA-102016
       DEF-CA-101952
22     DEF-CA-101953
       DEF-CA-101959
23     DEF-CA-101964
       DEF-CA-101977
24     DEF-CA-101981
       DEF-CA-101984
25     DEF-CA-102000
       DEF-CA-102001
26     DEF-CA-102002
```



Page 2330

1    FROM SANTA ANA, CALIFORNIA - TUESDAY, MAY 18, 2021

2                    MORNING SESSION

3                      9:00 A.M.

4                      -OOO-

5

6         (The following proceedings were held via Zoom

7         with all counsel appearing remotely:)

8

9         THE COURT:  Good morning, everybody.  We are

10   back on the record.  We are going to start with several

11   procedural issues.

12        One item from yesterday.  We discussed and I

13   admitted the documents identified in ROA 6702.  This was

14   the document that resulted in further discussion about

15   how to treat the IQVIA data sets and how they were to be

16   addressed.

17        On taking a look at the submission, I do not

18   think it appropriate to have admitted all of the

19   documents.  What the parties agreed was not to object to

20   admissibility of the data sets.  The agreement is

21   reciprocal regardless of which party chooses to introduce

22   the evidence.

23        It does not appear to me, looking at these

24   documents, that these are the sorts of documents that

25   should simply be admitted untethered to a witness.

26   Instead, pursuant to what the parties I think intended to



Page 2331

1  agree, if a witness intends to discuss or refer to a

2  document and the document is then admitted, there would

3  be no objection.

4        My proposal, therefore, would be to withdraw the

5  wholesale admission of these documents and instead, as

6  and when documents are proffered that are on this list,

7  there would be no objection.

8        Does any party wish to be heard on that issue?

9        MR. PENDELL:  Your Honor, yes.  I need to go

10  back and check the transcript, but I think that I did

11  actually offer the data through Ms. Keller is my

12  recollection, and I think it was admitted without

13  objection.

14        THE COURT:  Which data, Mr. Pendell?  There's a

15  whole list of databases here.

16        MR. PENDELL:  I'm sorry, your Honor.  I was

17  having a speaker problem.  I did not hear what you said.

18        THE COURT:  Which data are you referring to?

19  There's a whole list of data sets.

20        MR. PENDELL:  I apologize.  It was the IQVIA

21  data specifically.

22        THE COURT:  There are approximately ten-plus

23  different IQVIA data sets identified here.  Is it your

24  recollection that all of these were somehow admitted

25  through Keller's testimony?

26        MR. PENDELL:  No, your Honor.  I believe it was



Page 2332

1    three.  And I can give you the specific Bates numbers,

2    and I can go back and, like I said, check that transcript

3    to verify that it was those three.  And I can get

4    clarification for you by this afternoon if that's okay,

5    your Honor.

6         THE COURT:  Let's do this in the interim, then.

7    The blanket order that I entered yesterday which was that

8    everything identified on 6702, ROA 6702, was admitted is

9    withdrawn.  Those documents are not admitted on a

10   wholesale basis as listed in that document.

11        Documents previously admitted, of course, remain

12   admitted.  And if any witness -- if, through any witness,

13   counsel intend to introduce any of these identified

14   documents pursuant to this stipulation, there would be no

15   objection and they would be admitted.  But I'm not doing

16   a blanket admission of them today.

17        Mr. Pendell, on the ones that you think are

18   covered, either raise it during trial and we can address

19   it like that or file something indicating which ones you

20   believe Ms. Keller properly -- you moved to admit through

21   Ms. Keller, and I'll confirm that those are indeed

22   admitted.

23        MR. PENDELL:  Your Honor, while we were

24   speaking, it's been handed to me that it has been

25   verified -- I apologize.  There were actually two that

26   went in through Ms. Keller, and they are DEF-CA-102015



Page 2333

1  and 016.

2  THE COURT:  Both of those are in this list.  And

3  both of those, if not already formally admitted, are

4  hereby formally admitted.  102015, 102016.  Both have the

5  DEF Bates number.

6  (Whereupon, Defendants' Exhibit Nos.

7  DEF-CA-102015 and DEF-CA-102016 were received

8  in evidence.)

9  (Whereupon, exhibits previously admitted as

10  part of ROA 6702 on 5-17-21 are now withdrawn

11  from evidence.)

12  marked for identification.)

13  THE COURT:  Also a question on exhibits.

14  ROA 6812 is the People's amended list of exhibits

15  admitted during trial on May 3.  The list purports to be

16  documents actually admitted into evidence on May 3.  But

17  commencing on page 5, line 8, there are pages of data

18  sets that, according to my notes and my clerk's notes,

19  were not referred to or admitted on that date.

20  I need to understand why they're listed here and

21  what the party -- what the People had in mind.

22  MS. FITZPATRICK:  I apologize, your Honor.  I'm

23  going to have to go pull that with someone and get an

24  answer for you either by the break or immediately after

25  lunch.

26  THE COURT:  It's ROA 6812, and the question



Page 2334

1    starts on page 5, line 8.

2              MS. FITZPATRICK:  Okay.

3              THE COURT:  From there to the end, there is a

4    list -- many of which, just on a very quick review, seem

5    to mirror some of those in the previous documents we just

6    discussed, but I certainly don't have a record of them

7    being admitted on May 3.  Just take a look at that, and

8    let's discuss again when you have a chance.

9              MS. FITZPATRICK:  Certainly, your Honor.

10             THE COURT:  Picking up yesterday's issues, the

11   People's bench brief in support of admitting the data

12   from the Orange County Health Agency report.

13             Are the People ready to address that issue

14   again?

15             Ms. Fitzpatrick, you're on mute.  Was

16   Mr. Robinson going to cover this?

17             MR. ROBINSON:  Your Honor, I don't know if you

18   can hear me.  I am on mute, I think.

19             MS. FITZPATRICK:  He was, your Honor.  I see him

20   or at least see his screen.

21             THE COURT:  Mr. Robinson, are you with us?

22             MR. ROBINSON:  Can you hear me now, your Honor?

23             THE COURT:  I can hear you now.  Thank you.

24             MR. ROBINSON:  Okay.  Good, I'm sorry.

25             Really, your Honor, I'd rather not do this at

26   this time.  I think that, you know, we have -- there was



Page 2335

1    one statement by you that you're going to allow us to

2    have this evidence come in, and I think in some ways

3    you've changed positions.

4            But I think before we can really figure this all

5    out, I'd like to move on with other witnesses and

6    whatnot, your Honor, and then we can discuss this.  Part

7    of me doesn't really want to have to call other witnesses

8    and whatnot.  I do think what the Court said is accurate

9    in the transcript here I read.

10           But I really would like to wait, your Honor, and

11   maybe we can discuss this when there's not a potential

12   witness here waiting to be examined.

13           THE COURT:  We'll simply table this issue for

14   further discussion and no rulings are made with respect

15   to the request at this time.  Before the People rest,

16   obviously, we'll need to readdress the issue if the

17   People wish to do so.

18           The admissions issue may be in a similar vein.

19           Do the parties want to table that issue until we

20   don't have witnesses on deck?

21           MR. STAMPFL:  That would be fine with the

22   Allergan defendants, your Honor.

23           MR. BAKER:  That's fine with the People as well.

24           THE COURT:  Let's do that.  We'll keep that on

25   second call, so to speak, as well.

26           I did not have anything else of a procedural



Page 2336

1  nature before returning to the witnesses.  Was there

2  anything else from the parties' perspective we need to

3  address before resuming witnesses testimony?

4          MR. BAKER:  Yes, your Honor.  Fred Baker for the

5  People.  Just one issue that I briefly raised yesterday

6  to keep on your Honor's radar.

7          The defendants have listed roughly 45 live

8  will-call witnesses.  As your Honor can see, we're coming

9  down towards the end of our case.  And in order to

10  facilitate our preparations for crosses, we believe it's

11  appropriate at this point in time for the defendants to

12  begin paring back their list so that we can actually have

13  a real list to work off of.

14          THE COURT:  Mr. Baker, I'll return to that

15  issue.  I'm not likely to push it until we are at the

16  stage where the People rest so that I can appropriately

17  tell the defendants they now know the scope of the case

18  that they're meeting and they need to make their, at

19  least, firmer decisions.

20          So that issue is duly noted, and we will return

21  to it, but nothing that I think is the right thing to

22  push today.

23          How many more days of testimony, simply

24  approximately, are the People anticipating?

25          MS. FITZPATRICK:  Your Honor, we anticipate that

26  we should go through the early part of next week, Monday



Page 2337

1   or maybe into Tuesday at some point, and we will then be

2   ready to rest our case.  We have a few witnesses who are

3   left and some depositions -- and deposition transcripts

4   to get into evidence.  So we anticipate that the

5   defendants would be able to begin their case next week.

6            THE COURT:  All right.  Thank you.

7            Are the People ready with their next witness?

8            MS. McPHERSON:  Yes, your Honor.  This is Malia

9   McPherson from the Oakland City Attorney's Office for the

10  People.  The People will call Officer Julian Bordona as

11  our next witness.  And he should be in the waiting room,

12  if he is not currently on the screen.  And I see him now.

13           THE COURT:  Madam Clerk, would you swear the

14  witness, please.

15           THE CLERK:  Please raise your right hand.

16  Mr. Bordona, please raise your right hand.

17           MS. McPHERSON:  It looks like there's some

18  speaker issues.  He is generally pretty tech savvy.  So I

19  think if we give him a second.

20           THE CLERK:  Where did he go?

21           THE WITNESS:  I think I have you, ma'am.  Thank

22  you, ma'am.  Apologies.

23           THE CLERK:  No problem.  Thank you.  Let's see.

24           Do you solemnly state that the testimony you

25  shall give in this matter now pending before this court

26  will be the truth, the whole truth, and nothing but the



Page 2338

1    truth, so help you God?

2              THE WITNESS:  I do.

3              THE CLERK:  Please state your name and spell

4    your last name for the record.

5              THE WITNESS:  Julian Bordona, B-O-R-D-O-N-A.

6              THE CLERK:  Thank you.

7                   *  JULIAN BORDONA  *

8    called as a witness by and on behalf of the plaintiff,

9    having been first duly sworn, was examined and testified

10   as follows:

11             THE COURT:  Good morning.  Thank you.

12             Ms. McPherson, you may continue.

13             MS. McPHERSON:  Thank you, your Honor.

14                   * DIRECT EXAMINATION *

15   BY MS. McPHERSON:

16     Q    And thank you, Officer Bordona, for being here

17   this morning.  Let's begin.

18          Are you a current employee of the City of

19   Oakland?

20     A    Yes.

21     Q    In which City of Oakland department?

22     A    The police department.

23     Q    And what is you're current position in the

24   Oakland Police Department?

25     A    I'm currently a sworn peace officer assigned to

26   the Violent Crimes Operations Center.



Page 2339

1    Q    Great.  And we'll get to what your work entailed

2  in Oakland in greater detail in just a few minutes, but

3  for now how long have you been with the Oakland Police

4  Department?

5    A    Approximately six and a half, almost seven

6  years.

7    Q    And have you testified in court before?

8    A    Yes.

9    Q    Approximately how many times?

10   A    I would say anywhere between a dozen to two

11  dozen.

12   Q    And were all of those times for criminal

13  matters?

14   A    Yes.

15   Q    And were all of those times with the Oakland

16  Police Department?

17   A    Yes.

18   Q    And for purposes of this morning, is it okay if

19  I use the term OPD to refer to the Oakland Police

20  Department?

21   A    Yes.

22   Q    I'm going to turn now to ask you about your

23  education and work history briefly.

24       What was your first position or job as a first

25  responder?

26   A    That was an EMT, ma'am.



Page 2340

1     Q     And what does EMT stand for?

2     A     Emergency medical technician.

3     Q     Where did you attend EMT school?

4     A     Modesto Junior College.

5     Q     And after you graduated from EMT school, how

6  long did you work as an EMT?

7     A     Approximately 18 to 24 months.

8     Q     And what did you do after that?

9     A     I attended paramedic school.

10    Q     And did you graduate from paramedic school?

11    A     That would have been -- I believe it was July of

12  2005.

13    Q     And was that the same year, 2005, that you

14  received your paramedic license?

15    A     Yes.

16    Q     And what training is required to obtain a

17  paramedic license?

18    A     For that there is a classroom portion of

19  approximately -- I believe it's 320 hours.  There is a

20  clinical portion in a hospital that is approximately 240

21  hours and then clinical rotations on an ambulance of

22  anywhere between 480 to 720 hours.

23    Q     Thank you.

24          And are you still a licensed paramedic?

25    A     Yes.

26    Q     And at a high level, please explain the



MAGNA
LEGAL SERVICES

Page 2341

1  difference between an EMT and a paramedic.

2      A      An EMT is essentially an assistant to a

3  paramedic.  Paramedics are the ones administering

4  intervenous drugs and more invasive procedures for

5  patient care.

6      Q      Where did you work as a paramedic?

7      A      Stanislaus County.

8      Q      How long did you work as a paramedic in

9  Stanislaus County?

10     A      That would have been approximately 10 years, 12

11  including the EMT portion.

12     Q      And I'm going to turn now just to ask some

13  questions about your training and background work as a

14  paramedic.  In asking you questions I'm going to use the

15  term "opioids."

16            Please tell the Court your understanding of that

17  term so that we can all be on the same page when I'm

18  using the term "opioids" in my question.

19     A      Opioids speaking to either the illicit street

20  drug use or also to include prescription drugs.

21     Q      Okay.  Great.  And I think you answered this but

22  just to confirm, when I use the term opioids, you'll

23  understand that I mean both illicit and prescribed ones?

24     A      Yes.

25     Q      As part of your paramedic training, were you

26  trained in identifying and responding to opioid



Page 2342

1  overdoses?

2      A    Yes.

3      Q    At a high level, what type of training did you

4  receive to identify the response to opioid overdoses?

5      A    Recognition of signs and symptoms along with

6  what would be described as outlying factors near my

7  patient.

8      Q    Did you receive paramedic training to

9  distinguish between opioid overdoses and non-opioids

10  overdoses?

11      A    Yes.

12      Q    Please describe any training you received as a

13  paramedic to identify/distinguish between different types

14  of opioids.

15      A    From that it would be understanding the

16  different trade names that are used in prescribing, along

17  with the different paraphernalia associated with illicit

18  use.

19      Q    As a paramedic, did you respond to opioid

20  overdoses?

21      A    Yes.

22      Q    How frequently?

23      A    I would say anywhere from five to ten calls

24  within a month period.

25      Q    And as a paramedic responding to calls, which

26  types of opioids did you encounter?



Page 2343

1    A   Everything from a prescription to include

2  fentanyl, Dilaudid, things of the such, up to heroin use

3  via intravenously or through nasal use.

4    Q   How often as a paramedic did you have to

5  distinguish between different types of drug overdoses to

6  inform your response as a paramedic?

7    A   That would be any time there was an overdose

8  patient, be it accidental or intentional.

9    Q   And how frequently, if you had to estimate?

10    A   Including the accidental, I would put that

11  anywhere from 10 to 15 in a month period.

12    Q   And based on your training and field experience

13  as a paramedic, what signs and symptoms would you look

14  for as signs of an opioid overdose?

15    A   In order to determine from head to toe, you

16  would be looking at pupillary response, or how the pupils

17  respond to light, whether they're equal, the size of the

18  pupil; along with skin signs, if somebody is pale, cool

19  to the touch, diaphoretic or what's referred to as

20  sweaty; to include respirations, determining whether they

21  are below the acceptable level to sustain life; along

22  with the cognitive awareness of the patient.

23    Q   And to confirm, those are signs and symptoms you

24  would look for to confirm an opioid overdose; is that

25  correct?

26    A   Yes.



Page 2344

1    Q    Based on your training and field experience as a
2    paramedic, what other nonmedical signs would you look for
3    in identifying an opioid overdose?
4    A    With that, we would also expand our
5    visualization of the patient to include the immediate
6    scene in their area.  With that, we would be looking for
7    prescription bottles that can lead us to understanding
8    what this person may have taken, loose pills nearby.
9    Also any kind of illicit paraphernalia, be it pipes,
10   syringes, lighters, spoons with residue, anything of the
11   such.
12   Q    What was the primary method you used in response
13   to opioid overdoses as a paramedic?
14   A    Would that be referring to the treatment
15   modality?
16   Q    Yes.  Thank you.
17   A    That would be Narcan, or what's also referred to
18   as naloxone.
19   Q    And I know that we have had testimony already in
20   this case, but just so the Court understands your
21   understanding, what is Narcan?
22   A    In the most simple way to define it, it is an
23   antidote for opioid overdose.
24   Q    I'm going to transition now to asking about your
25   career in law enforcement.
26        From your career as a paramedic, what was your



Page 2345

1    first position when you transitioned to law enforcement

2    work?

3        A    As a police officer trainee in the Oakland

4    Academy.

5        Q    And to confirm, did you have any transitional

6    work from your paramedic that also incorporated law

7    enforcement work?

8        A    I did spend approximately four years assigned to

9    a SWAT team in the city of Ceres as a tactical paramedic.

10       Q    And so then you previously said you applied to

11   be a police officer; is that correct?

12       A    Yes.

13       Q    And what was your first position with OPD?

14       A    That would have been the police officer training

15   position.

16       Q    And was that part of the police academy?

17       A    Yes.

18       Q    When did you graduate from the Oakland Police

19   Academy?

20       A    July 3rd, 2014.

21       Q    And what was your first sworn role with OPD?

22       A    I would have been assigned to the patrol

23   division.

24       Q    And approximately how long were you assigned to

25   the patrol division?

26       A    That would have been approximately a year and a



Page 2346

1   half.

2        Q    What were your primary duties as a patrol

3   officer in the patrol division?

4        A    Primary duties was responding to calls for

5   service, be it generated by 911 use or flag-downs with

6   bystanders that were saying we need help here, to include

7   proactive patrol in areas that are determined to be

8   problematic in our area.

9        Q    And when you were a patrol officer, how much of

10  your time while on duty did you spend in the Oakland

11  community?

12       A    Approximately 90 percent of my time.

13       Q    And when you were out in the community, describe

14  further what your day-to-day looked like as a patrol

15  officer.

16       A    Typically, it will start at the beginning of

17  shift with a briefing, lasting anywhere from 15 to 20

18  minutes, describing events prior to our shift, events

19  that were determined to be happening during our shift,

20  and any other intelligence information that we needed to

21  have to be able to effectively police our community.  And

22  in addition to that, also forecasting any training that

23  would be happening either that day or the following day.

24       Q    And I think you described the shift change.

25            Could you further describe what the rest of your

26  day-to-day looked like as a patrol officer.



Page 2347

1    A    From there we would obtain our vehicles which we

2  were assigned, do our checkout, make sure we had all of

3  our equipment, and then proceed to answer what we call

4  call for service or anybody that has called 911 that has

5  a scene on what we call our board or the computer system

6  that dispatches.

7         From there, once we handled all the calls that

8  were in our beat, we were able to focus on proactive

9  policing and be able to assist our community resource

10  officers that have identified problems in the beat to

11  which we were assigned.

12    Q    What was your next sworn role with OPD?

13    A    From there, I tested and was accepted into our

14  crime reduction team.

15    Q    Do you still work on the crime reduction team?

16    A    Yes, under a different name.

17    Q    And I think you mentioned this earlier.  What is

18  that new name?

19    A    Approximately two months ago we transitioned our

20  name to become the Violent Crimes Operations Center.

21    Q    And describe at a high level the activities of

22  the Violent Crime Operations Center.

23    A    We handle all of the enforcements related to the

24  more violent crimes in the city.  Typically any crime

25  that results from gunfire or gang activity is what we

26  respond to.  We are the more -- boots on the ground, if



MAGNA
LEGAL SERVICES

Page 2348

1   you will, for our investigations division with our

2   investigators, who are also referred to as detectives, in

3   order to apprehend the more violent of the criminals in

4   the city of Oakland.

5       Q    And if I use the acronym VCOC, will you

6   understand that to mean the Violent Crime Operations

7   Center?

8       A    Yes.

9       Q    As a member of the VCOC, how much of your time

10  do you spend in the Oakland community?

11      A    Anywhere from 70 to 80 percent of my time.

12      Q    When you are out in the Oakland community,

13  describe what your experience of day to day looks like.

14      A    Typically, we are responding to the more violent

15  and affected areas of Oakland due to gang activity and

16  firearm-related crimes.  We can conduct anything from

17  plainclothes surveillance to include any kind of

18  narcotics sales that are related to the gang activity,

19  the firearms trafficking, along with conducting search

20  warrant services and arrest warrant service.

21      Q    And please describe at a high level any special

22  or individual responsibilities you have in addition to

23  your work in the VCOC.

24      A    In addition, I'm also assigned to our training

25  division.  I am a member of the training cadre for first

26  aid and CPR.  I currently am the subject matter expert



Page 2349

1   for the department for medicine along with conducting

2   in-service training, academy training for first aid, CPR.

3   Excuse me.  With that, I also offer policies and

4   procedures that pertain to medicine, and I am also the

5   liaison for our Narcan program.

6       Q    Thank you.  I'll turn in a minute to ask you

7   some more questions about the Narcan program.

8            You described earlier that, in your paramedic

9   training, you were trained to identify and distinguish

10  between different types of opioids.

11           For any of your positions at OPD, were you also

12  trained to identify and distinguish between different

13  types of opioids?

14      A    Yes.

15      Q    And which position did you receive that training

16  for?

17      A    That was during the academy as a police officer

18  trainee.

19      Q    What type of training did you receive?

20      A    That was identification and recognition of signs

21  and symptoms of overdoses.

22      Q    Did you receive any nonmedical training in the

23  academy about identifying and distinguish between types

24  of opioids?

25      A    Yes.

26      Q    And what type of nonmedical training did you



Page 2350

1  receive?

2      A    That was identification of paraphernalia used in

3  order to allow a subject to use illicit drugs along with

4  the recognition and identification of the drugs

5  themselves.

6      Q    I'm going to turn now to background and what

7  you've observed regarding opioids in your work in

8  Oakland.

9           Based on your personal observations in the seven

10  or so years that you've been an OPD peace officer, have

11  you observed an impact of opioids on the Oakland

12  community?

13      A    Yes.

14      Q    What have you personally observed reflecting an

15  impact of opioids on the Oakland community?

16      A    I've seen a substantial increase in just the

17  paraphernalia you see on the street.  Initially when I

18  first began working as a peace officer, it was more

19  focused into just general areas of known drug use and

20  drug trafficking.  And over the course of the last

21  several years, I've seen it explode into affecting almost

22  all areas of Oakland that I've encountered.

23      Q    Please describe any problems or effects

24  associated with opioid use that you've observed in the

25  community.

26      A    So one of the things that is most prolific to me



Page 2351

1    has been identifying that paraphernalia near my schools,

2    near my churches, various places that you would not

3    expect to see paraphernalia, especially to the degree

4    that we have seen it.

5        Q    And in the course of your duties as a peace

6    officer, where have you observed these impacts of opioids

7    on the community?

8        A    Citywide.

9        Q    I'm just going to break down some of those

10   observations a little bit further.

11            In the course of your duties as a peace officer

12   in Oakland, have you personally observed instances of

13   opioid use?

14       A    Yes.

15       Q    What types of opioids have you observed being

16   used?

17       A    I have observed --

18            MS. LUCAS:  Objection, your Honor.  This witness

19   has not been designated as an expert.

20            THE COURT:  And what part of the question does

21   the objection pertain to?

22            MS. LUCAS:  The extent that he's offering his

23   opinion on what types of opioids he's observing, then we

24   would have an objection; to the extent he's only

25   describing factual matters, we don't.

26            MR. FORAN:  And if I could, your Honor, it lacks



Page 2352

1  foundation to offer testimony about what types of opioids

2  he's observed being used.

3          THE COURT:  The objection is partly sustained to

4  this extent:  The witness can describe what he observed

5  and -- we'll start there.  The witness can describe what

6  he observed.  Whether opinions flow from that, we'll tell

7  from the questions and the answers.

8          Please proceed.

9          THE WITNESS:  Thank you, your Honor.

10          One of the things I have observed has been users

11  of opioids using a pill bottle that contains coins along

12  with pills themselves that they will shake in order to

13  break the pill form into a powder.  From that powder,

14  they are able to place it into a spoon and melt it down

15  using a lighter, draw it up via syringe.  I've also

16  observed subjects injecting opioids directly into their

17  venous system.

18  BY MS. McPHERSON:

19      Q    And why do you believe you observed opioid use

20  in those instances?

21      A    Due to the fact that this was an area that was

22  known for the trafficking of such, along with the signs

23  and symptoms that followed their use.

24      Q    And in the course of your duties as a police

25  officer, what types of opioids specifically do you think

26  that you've observed being used?



Page 2353

1      A    I would speak to heroin along with any kind of

2    pill form that may have been obtained.

3      Q    And how often have you observed instances of

4    what you believe to be opioid use in Oakland?

5           MS. LUCAS:  Objection, your Honor; foundation

6    and improper opinion.

7           THE COURT:  Overruled.

8           You may answer.

9           THE WITNESS:  Could you repeat the question,

10   ma'am?

11   BY MS. McPHERSON:

12     Q    Yes.  Give me one second.

13          How often have you observed instances of what

14   you believed to be opioid use in Oakland?

15     A    Several times.  I would put it well over two to

16   three dozen.

17     Q    And in the course of your duties as a peace

18   officer in Oakland, have you observed instances of what

19   you believe to be opioid overdoses in the community?

20     A    Yes.

21     Q    What have you observed personally regarding

22   opioid overdoses in the community?

23     A    Speaking to that, I have observed subjects

24   falling asleep during questioning.  I have observed

25   subjects that were unconscious during time frames and

26   situations where being unconscious is inappropriate.



Page 2354

1     Q     And how often have you personally observed

2  opioid overdoses in Oakland?

3     A     Five to six on my own response.

4     Q     In the course of your duties as a peace officer

5  in Oakland, have you observed opioid use paraphernalia in

6  the community?

7     A     Yes.

8     Q     What type of paraphernalia associated with

9  opioids have you observed?

10     A     Empty and discarded pill bottles, along with

11  syringes, spoons.  A common thing that is often missed by

12  the layperson to be identified as such are -- the best

13  way to describe it are, like, the tea light candles, how

14  they come in a metal tin.  Those are often given out at

15  clean needle dispensaries in order for somebody to draw

16  up in a more safe manner what they use.  Those are often

17  discarded along with the blue rubber tourniquets that are

18  handed out in the same kits.

19     Q     About how often do you observe paraphernalia

20  associated with opioid use?

21     A     Every day I step out of the police department.

22     Q     In the past seven or so years in the course of

23  your duties as a peace officer, have you observed any

24  changes or trends in opioid prevalence in the community?

25           MS. LUCAS:  Objection, your Honor; improper

26  opinion, foundation.



Page 2355

```
 1            THE COURT:  Sustained as to opinion.
 2            MS. McPHERSON:  May I be heard briefly, your
 3  Honor?
 4            THE COURT:  Yes.
 5            MS. McPHERSON:  I believe I just asked him what
 6  he had personally observed regarding changes and trends,
 7  a yes-or-no question.  And he should be able to answer
 8  based on his percipient witness testimony.
 9            THE COURT:  You're not asking him for a yes or
10  no, are you?
11            MS. McPHERSON:  That was the first question I
12  asked him.
13            THE COURT:  Just a moment.
14            The objection to the question as framed is
15  sustained.  You may rephrase your question.
16            MS. McPHERSON:  Thank you, your Honor.
17     BY MS. McPHERSON:
18     Q    Officer Bordona, in the course of your duties as
19  a peace officer, have you observed any changes or trends
20  in opioid impacts in the community?
21            MS. LUCAS:  Same objection.
22            THE COURT:  The objection is overruled.
23     BY MS. McPHERSON:
24     Q    I can repeat the question if that would be
25  helpful as well.
26     A    Yes, ma'am.
```



MAGNA
LEGAL SERVICES

Page 2356

1      Q     In the course of your duties as a peace officer,

2   have you observed any changes or trends in opioid impacts

3   in the community?

4      A     Yes.

5      Q     And what have you observed regarding changes or

6   trends in opioid impacts in the community?

7            MS. LUCAS:  Same objection.

8            THE COURT:  Overruled.

9            THE WITNESS:  What I've observed has been an

10  explosion, if you will, of the amount of paraphernalia

11  that is observed throughout the city.

12  BY MS. McPHERSON:

13     Q     Does the prevalence of opioids in the community

14  affect your work as a peace officer?

15     A     Yes.

16     Q     And how does the prevalence of opioids in the

17  community affect your work as a peace officer?

18     A      It affects it on the level of officer safety due

19  to our requirement during searches to place hands in the

20  pockets.  Oftentimes this is where needles are kept, be

21  it capped or uncapped, along with simple things as

22  tripping and falling in the street.  If there's an

23  uncapped needle in the gutter, which there typically is,

24  that can become an officer safety issue as well.

25     Q     Thank you.  I'm going to turn now to the Narcan

26  program that you mentioned earlier.  I believe you



Page 2357

1   mentioned -- said the name -- can you please tell the

2   Court the name of the program?

3       A    Oakland Police Department Narcan Program.

4       Q    And who created this program?

5       A    It was a cocreation between myself and Josh

6   Luftig, a PA that is at Highland Hospital -- or Alameda

7   County Hospital.

8       Q    And you mentioned that Josh Luftig is a PA.

9   Could you describe further who Josh Luftig is?

10      A    He is a PA that operates out of their emergency

11  department and is also the coordinator for the California

12  Bridge program.

13      Q    What is the California Bridge program?

14      A    The California Bridge program is a treatment

15  modality and resource for those wishing to stop the

16  opioid addiction that they have.

17      Q    And you said that you cocreated the program.

18  What was your role in creating the program specifically?

19      A    Mine was the liaison, if you will, from the

20  Oakland Police Department along with making sure that the

21  program itself fit within the policies and procedures of

22  our department.

23      Q    And at a high level, please explain the OPD

24  Narcan program.

25      A    The OPD Narcan program placed Narcan into the

26  hands of the officers on the streets along with the



Page 2358

1   refresher training on its use and identification of

2   opioid overdoses.

3       Q    Which part of the OPD Narcan program has already

4   been implemented?

5       A    We have implemented Phase I that is currently

6   operational and the -- what I can refer to as a pilot

7   program for Phase II.

8       Q    And briefly what is Phase I?

9       A    Phase I is the Narcan being in the hands of the

10  officers on the street along with the training for

11  recognition of overdose and treatment.

12      Q    And -- excuse me.  Briefly, what is Phase II?

13      A    Phase II is the proactive deployment of Narcan

14  into the -- in the hands of individuals that are

15  determined to be, quote, at risk.

16      Q    Which part of the OPD Narcan program have you

17  not yet implemented?

18      A    Phase III.

19      Q    And what is Phase III?

20      A    Phase III would be what could be described as a

21  leave-behind program.  To further explain, if an officer

22  were to respond to an opioid overdose and either they or

23  other first responders used Narcan, that officer would be

24  instructing the -- basically the cohabitants of where

25  this patient lived on recognition of signs and symptoms

26  along with leaving Narcan with them should this person



Page 2359

1  overdose again in the future.

2      Q    And from your perspective as one of the creators

3  of this program, why was it important for officers to be

4  trained and able to carry Narcan?

5      A    For me, it was knowing that it can have an

6  effect and actually be out there saving lives.  To me, it

7  is no different than an officer carrying a tourniquet.

8  Gunshot wounds don't want to happen or don't need to

9  happen, just like overdoses don't need to happen.  But

10  they are easily fixed.

11      Q    And when did you begin this program?

12      A    That would have been end of October 2019.

13          MS. McPHERSON:  And, your Honor, I'm going to

14  pull up a document now.  And I believe Evan is our tech

15  person right now.

16          Evan, if you could please pull up exhibit

17  labeled P-CA-001737.  And --

18          MS. LUCAS:  Your Honor, the defense has an

19  objection to this document.

20          THE COURT:  What's the objection?

21          MS. LUCAS:  Lacks foundation.  It contains

22  hearsay and double hearsay.  It's irrelevant to Phase I.

23  And 352 as well as improper opinion.

24          THE COURT:  Just a moment, please.

25          MS. McPHERSON:  Your Honor, let me know if you

26  would like me to respond at this time.



Page 2360

1          THE COURT:  Just a moment, please.

2          I have the document on my screen.  It has not

3    yet sought to be admitted.  At the moment, all that has

4    happened is the witness has been referred to the

5    document.

6          The objection to the document simply being

7    referred to is overruled.  You may continue your

8    objections on a question-by-question basis as

9    appropriate.  Let's see what the questions are.

10         Counsel may continue.

11         MS. McPHERSON:  Thank you, your Honor.

12    BY MS. McPHERSON:

13    Q    Officer Bordona, you have the document in front

14    of you; is that correct?

15    A    Yes.

16    Q    And you've had an opportunity to look through

17    it?

18    A    Yes.

19    Q    Do you recognize this document?

20    A    Yes.

21    Q    And what is this document?

22    A    This is a PowerPoint utilized for training

23    officers on the Narcan program.

24    Q    Did you create this PowerPoint?

25    A    Yes.

26    Q    And what was the purpose of this PowerPoint?



Page 2361

1      A     The purpose was to have a visual representation

2    of my training.  Due to my P.O.S.T. certified instructor

3    certification, I have to teach to the different

4    learning -- learning modalities that an adult can use,

5    one of these being visual.  And that speaks to the visual

6    side.

7      Q     So your training as an OPD officer has had

8    additional components of materials beyond what was on

9    this slide?

10     A     Yes.

11     Q     And were these materials -- this PowerPoint

12   document what was, in fact, used to train officers in the

13   OPD Narcan program?

14     A     Yes.

15     Q     Is this document maintained in OPD's records?

16     A     Yes.

17     Q     And where is this document maintained?

18     A     This is currently accessible from all sworn

19   members through the PowerDMS program.

20     Q     And just for the Court, what is the PowerDMS

21   program?

22     A     That is an archive of all of the training -- the

23   training PowerPoints, along with policies, procedures,

24   department general orders, chief's special orders.

25   Pretty much any piece of paperwork that flows through the

26   department that can be referred to as training or policy



Page 2362

1    is located in this database.

2        Q    And this is the version that you used, the

3    Version 2.4 that's labeled on the first slide here, is

4    this the version that you used to train OPD officers in

5    the Narcan program?

6        A    Yes.

7             MS. McPHERSON:  Your Honor, I'd move to have

8    this Exhibit P-CA-001737 admitted into evidence.

9             MS. LUCAS:  Objection, your Honor.  There is no

10   foundation that this is, in fact, a business record

11   underneath the evidence code.  It also contains hearsay,

12   double hearsay, and there's no foundation for many parts

13   or actually all of the parts of the contents of the

14   document.

15            THE COURT:  What's the purpose of moving its

16   admission?

17            MS. McPHERSON:  Your Honor, we understand your

18   position in this case on the narrow business records

19   exception.  To save the time of going slide by slide and

20   laying a foundation for each slide, I would admit it for

21   a nonhearsay purpose.  We are admitting it for -- to

22   prove what OPD officers were, in fact, trained with for

23   the OPD Narcan program.

24            The defendants have also put at issue in this

25   case whether the jurisdictions have taken any effort in

26   response to the opioid crisis.  So we're putting it in



Page 2363

1  evidence to -- as well as in to showing what the

2  jurisdictions, specifically Oakland, did in response to

3  the opioid problems in the community.

4       MS. LUCAS:  I also have a relevance objection,

5  your Honor, to Phase I.

6       MS. McPHERSON:  And, your Honor, this is

7  directly relevant to Phase I.  It goes to the scope of

8  the problem.  We are not admitting it to show what

9  resources or further actions would be needed, which would

10  be a Phase II issue.  We're admitting it to show the harm

11  and the existence of the public nuisance in the city of

12  Oakland.

13      MS. LUCAS:  May I be heard briefly, your Honor?

14      THE COURT:  Yes.

15      MS. LUCAS:  To the extent the relevance is the

16  scope of the problem, that directly implicates our

17  hearsay objection because the only parts of this

18  presentation that could possibly be relevant to the scope

19  of the problem contains hearsay for which there's also no

20  foundation.

21      THE COURT:  Ms. McPherson, if you are not

22  admitting it for the truth of its contents, then it

23  proves only that the Oakland Police Department has a

24  Narcan training program.  The officer has testified to

25  that.  What is the relevance of this document beyond

26  that?



Page 2364

1          MS. McPHERSON:  Your Honor, I believe it also --

2     that Officer Bordona testified that this is what officers

3     were, in fact, trained on.  So it shows the materials

4     that officers were trained on.  It lays foundation for

5     later testimony as well regarding what officers observed

6     and what Officer Bordona has observed in the city of

7     Oakland and provides foundation for that.

8          And I think just the extent of the training

9     materials are relevant to the scope of the problem and

10    what officers were trained in.

11         THE COURT:  I don't think the People can have it

12    both ways.  If it is not offered for the truth of its

13    contents, all it establishes is that Oakland Police

14    Department has a Narcan training program, to which the

15    officer has already testified.

16         The objections to the admission of the document

17    itself are sustained.

18         MS. McPHERSON:  Thank you, your Honor.

19         Evan, you may take the document down.

20    BY MS. McPHERSON:

21    Q    Officer Bordona, in whole, when do you train

22    Oakland police officers to use Narcan?

23    A    Sorry.  Could you repeat the question?

24    Q    Yes.  In whole, when do you train OPD officers

25    to use Narcan?

26    A    When they have recognized or determined to have



Page 2365

1    recognized an opioid overdose.

2        Q    Are OPD officers trained to use Narcan to

3    respond to all types of drug overdoses?

4        A    No.

5        Q    Are OPD officers trained to use Narcan to revive

6    someone who has overdosed exclusively on

7    methamphetamines?

8        A    No.

9        Q    Are OPD officers in this program trained to use

10   Narcan as a treatment, a diagnostic tool, or both?

11       A    Typically, it can be used for both.

12       Q    And can you explain that further?

13       A    Due to the fact that Narcan in and of itself is

14   utilized and only works on opioid overdoses, if you have

15   a patient that is unconscious, unresponsive, with

16   decreased respirations and you give them Narcan, when

17   they wake up, you have, in fact, determined that an

18   opioid is what they overdosed on.

19       Q    What categories of OPD officers were trained

20   using the materials that we saw but were not admitted?

21       A    Any officer that leaves the police station in

22   the capacity of being on the street in patrol.

23       Q    And do you have an estimate of how many

24   employees in OPD received Narcan training?

25       A    Anywhere between 250 to 300.

26       Q    And why do you think, in your role as the



Page 2366

1  creator of the program, there was a need to train that

2  many OPD employees in Narcan administration?

3      A    Due to the fact, through my experience in

4  talking with other officers, if you are, in fact, a

5  police officer that works in the city of Oakland, you

6  will see an overdose at some point.

7      Q    Who above you in the chain of command supported

8  the OPD Narcan program?

9      A    Everyone from the chief at the time down.

10     Q    And you mentioned the chief.  Describe any role

11  the chief played in authorizing the OPD Narcan program.

12     A    That would have been in July of 2019.  I was

13  conducting an -- a meeting, if you will, with our chief

14  and our top brass -- basically, assistant chief, deputy

15  chiefs -- explaining my vision for this program and the

16  Oakland Police Department.  From there the chief, Anne

17  Kirkpatrick, tasked me as being the person in charge for

18  this program.

19     Q    Where was the initial Narcan for the program

20  obtained?

21     A    That was through a donation from Highland

22  Hospital and the California Bridge program.

23     Q    Did you obtain Narcan from other sources for the

24  program?

25     A    Yes.

26     Q    And I will get to that.  I'm going to again pull



Page 2367

1    up the document.  Just at this point pulling it up, not

2    seeking to admit it.

3            So, Evan, please pull up P-CA-001087.

4            MS. LUCAS:  Your Honor, we also have objections

5    to this document on foundation, hearsay, double hearsay,

6    relevance to Phase I --

7            THE COURT:  Ms. Lucas, I do not need to hear

8    from you on a document unless and until anyone seeks to

9    admit it.  Please hold your objections until we -- I have

10   some idea why the document is being proffered.  That a

11   document is being referred to is not in itself

12   objectionable except in rare cases.  If it's a rare case,

13   by all means.  But please otherwise hold your objection

14   until I understand what the questions are.

15           What is this document number again, please?

16           MS. McPHERSON:  This is document -- Exhibit

17   Number P-CA-001087.

18           THE COURT:  Please proceed.

19           MS. McPHERSON:  Thank you.

20   BY MS. McPHERSON:

21       Q    Officer Bordona, do you have the document in

22   front of you?

23       A    Yes.

24       Q    Do you recognize this document?

25       A    Yes.

26       Q    What is this document?



Page 2368

1    A    This is my -- the grant application to obtain

2    further restock and supply of Narcan.

3    Q    And I think you started to answer there in

4    saying that this was your document.  Did you create this

5    grant application?

6    A    I coauthored, if you will, with Josh Luftig.

7    Q    Did you submit this grant application?

8    A    Yes.

9    Q    And did you submit this grant application on

10   behalf of the Oakland Police Department?

11   A    Yes.

12   Q    What approval did you receive to submit this

13   grant application?

14   A    This would have been approval through the -- my

15   immediate chain of command on the training section side

16   of my chain of command.

17   Q    And to submit this document on behalf of the

18   Oakland Police Department, did it need to represent the

19   views of the Oakland Police Department?

20   A    Yes.

21        MS. McPHERSON:  Your Honor, move to have this

22   document admitted into evidence.

23        MS. LUCAS:  Your Honor, we object to the

24   foundation of this document, and, in particular, those

25   first four paragraphs contain hearsay, double hearsay for

26   which he has no foundation, and improper opinion.  It's



Page 2369

1  also irrelevant to Phase I.  He's already testified that

2  the Oakland Police Department has a Narcan program.

3          THE COURT:  For what purpose is the document

4  being proffered?

5          MS. McPHERSON:  For the -- for several

6  nonhearsay purposes.

7          First, proving the police department applied for

8  a Narcan grant, which is separate than just having a

9  Narcan program as Officer Bordona had previously

10  testified.

11          It also represents the position of the Oakland

12  Police Department.  It's not being admitted for the truth

13  of that but just admitted as to the position of the

14  Oakland Police Department when it applied for the Narcan

15  and with respect to what it viewed as the need to respond

16  to the scope of the opioid crisis.

17          Officer Bordona is here testifying as a fact

18  witness, and this document is a document that he can

19  authenticate and has authenticated and laid foundation

20  for regarding the views of the Oakland Police Department.

21          MS. LUCAS:  May I be heard briefly?

22          THE COURT:  Yes.

23          MS. LUCAS:  There's been no testimony about

24  where this data came from.  In fact, at his deposition,

25  he testified that somebody else gave it to him.  And to

26  the extent this is being offered for Oakland police's



Page 2370

1    understanding of the issue, that is, in fact, for the

2    truth.

3            MS. McPHERSON:  Your Honor, may I respond to

4    that?

5            THE COURT:  Just a moment, please.

6            Ms. McPherson, what's not clear to me is the

7    same confusion, if you will, between what the People say

8    that they are proffering this for and what the People, in

9    fact, mean to proffer this for.

10           If it is not being offered for the truth of its

11   contents, what is its relevance beyond establishing that

12   the City of -- the Oakland Police Department approved --

13   applied for and received a grant to support the provision

14   of Narcan, to which the officer has already testified?

15   What does the document add to that testimony if it's not

16   admitted for the truth of its contents?

17           MS. McPHERSON:  Your Honor, it also speaks to

18   the need for Narcan at the time, the amount of Narcan

19   that the department is seeking.  I don't think that the

20   specifics at issue -- we're not seeking to admit this

21   document for the part that Ms. Lucas has concerns with,

22   but it simply goes to what defendants have repeatedly put

23   at issue in this case, which is that the jurisdictions

24   themselves do not have a belief that there's an opioid

25   problem and have not responded as if there's an opioid

26   problem.  And this document goes beyond simply that they



Page 2371

1    applied for a grant, and it goes to the views as written

2    down and formally submitted in a grant application of the

3    Oakland Police Department.

4           I believe the views of the Oakland Police

5    Department are different than the truth of the matter of

6    those views.

7           THE COURT:  The objection to the admission of

8    the document is sustained.  When the witness is

9    cross-examined on this issue or the earlier issue of the

10   Narcan training, if there is something in the

11   cross-examination that makes the contents somehow

12   additionally relevant, the issue of the admission of the

13   documents may be revisited.

14          But at the moment, since the proffer is that

15   they are not offered for the truth of their contents,

16   they have no other relevance.  And both because the

17   document itself contains hearsay and because, under a 352

18   analysis, admitting the entire document to establish a

19   fact to which the witness has already testified is more

20   likely to be confusing rather than helpful, the objection

21   is sustained.  You may revisit the question on cross if

22   that becomes appropriate.

23          Please proceed.

24          MS. McPHERSON:  Thank you, your Honor.

25          And, Evan, if could you zoom in.  I want to look

26   at the first sentence of the document.



Page 2372

1    BY MS. McPHERSON:

2    Q    I will read the first sentence.  And, Officer

3    Bordona, you can make sure that I am reading it

4    correctly.

5         It says, "The Oakland Police Department (OPD) is

6    an urban police force in Oakland, California, in Alameda

7    County, a community highly impacted by the opioid

8    crisis."

9         Do you see that sentence?

10   A    Yes.

11        MS. LUCAS:  Objection, your Honor.  The

12   objection was sustained.

13        THE COURT:  Assuming the witness confirms that

14   he can see that or heard what you read, what's the

15   question, counsel?

16        MS. McPHERSON:  I am going to ask him to -- I

17   didn't understand your ruling to mean that I could not

18   ask any further documents about this exhibit, even if it

19   was not admitted into evidence.

20        THE COURT:  That's not a response to my

21   question.

22        What is your question based upon what you have

23   just read to the witness?

24        MS. McPHERSON:  Yes, your Honor, and apologies.

25   My question is going to be whether he wrote it, lay a

26   foundation for that sentence, and whether that is his



Page 2373

1  belief as well.

2          MS. LUCAS:  In which case, that's improper

3  opinion.

4          THE COURT:  In the interest of time, the Court

5  interposes its own objection.  I thought the witness

6  expressly testified that he believes that there is an

7  opioid issue in Oakland that he has been addressing for

8  years.

9          What does this add other than an opportunity for

10  objection?

11          MS. McPHERSON:  I can move on, your Honor.

12          THE COURT:  Please.

13          MS. McPHERSON:  Thank you.

14          And, Evan, you may take the document down.

15  Thank you.

16  BY MS. McPHERSON:

17     Q    Officer Bordona, approximately -- approximately

18  how many times did OPD officers use Narcan in the initial

19  months of the program?

20     A    From the beginning of November until the end of

21  the year -- so December 31st -- there were 20 deployments

22  or uses of Narcan.

23     Q    Was this level of Narcan usage surprising to

24  you?

25     A    It was.

26     Q    Did you track whether Narcan administrations



Page 2374

1    were successful?

2        A    Yes.

3        Q    And are you able to approximate what percentage

4    of OPD Narcan administration were successful since the

5    beginning of the program?

6        A    16 reversals.

7        Q    And what percentage, would you approximate?

8        A    Approximately 80 percent.

9        Q    And what is your understanding of the term

10   "successful" here?

11       A    Meaning a subject --

12            THE COURT:  Ms. McPherson, how is this relevant

13   to Phase I?

14            MS. McPHERSON:  Your Honor, I can move on.  The

15   People believe that the scope of the problem and the

16   success rate through the Narcan reversal show the

17   existence of the scope of the problems with respect to

18   opioid overdoses in the community.

19            THE COURT:  20 uses is relevant, and I have no

20   issue with that.  Whether or not Narcan was successful, I

21   do not understand how that's in any way relevant to

22   Phase I as opposed to Phase II.

23            Please move on.

24            MS. McPHERSON:  Thank you, your Honor.

25   BY MS. McPHERSON:

26       Q    Officer Bordona, please explain whether the OPD



Page 2375

1   Narcan program is the only Narcan program in Oakland.

2       A    It is not.

3       Q    What other programs deploy Narcan?

4       A    All ambulances have Narcan available for their

5   paramedics to use, along with the Oakland Fire

6   Department, or OFD, also has Narcan available for their

7   paramedics to utilize.

8       Q    And describe the typical circumstance when you,

9   as an OPD officer, would respond to an opioid overdose

10  rather than those other entities or departments.

11      A    Common times will be what is referred to as a

12  flag-down, which refers to a citizen or subject that

13  observes a black-and-white police car in the vicinity

14  waves their hands to get our attention and then directs

15  us to a subject that is either unconscious or

16  nonresponsive.

17      Q    During the COVID-19 pandemic, has the OPD Narcan

18  program continued?

19      A    It has with -- with less ferocity, if you will.

20      Q    Can you explain that further, what you mean?

21      A    With that, when the pandemic first impacted our

22  department, we scaled back our call activity to minimize

23  contact outside of essential calls for service.

24      Q    And have you continued to track Narcan use

25  during the pandemic?

26      A    To the best of my ability, yes.



Page 2376

1    Q    Describe any continued impact of opioids in your

2    day-to-day work since the OPD Narcan program began.

3    A    To speak to the impact to my work, it has made

4    it difficult due to the fact that I am not -- I have

5    other duties as well.  This is a -- for lack of a better

6    term, a secondary assignment from my primary.

7    Q    And what do you see now when it comes to the

8    impact of opioids on the community during the pandemic?

9          MS. LUCAS:  Objection; relevance and improper

10   opinion.

11          THE COURT:  Overruled.

12          You may answer.

13          THE WITNESS:  Could you restate the question,

14   ma'am.

15   BY MS. McPHERSON:

16   Q    Of course.  What do you see now when it comes to

17   the impact of opioids on the community during the

18   pandemic?

19   A    From the best I can gather, it has not changed

20   it.  There may be an increase.  However, I'm unable to

21   assess that directly.

22          MS. McPHERSON:  Thank you, Officer Bordona.  No

23   further questions on direct at this time.

24          THE COURT:  Thank you, Ms. McPherson.

25          Cross-examination of the officer?

26          MS. LUCAS:  Thank you, your Honor.



Page 2377

1              * CROSS-EXAMINATION *

2      BY MS. LUCAS:

3      Q    Officer Bordona, my name is Amy Lucas.  I

4  represent Janssen and Johnson & Johnson.  I think we can

5  make this fairly short.

6           You talked about your experiences treating

7  people who had overdosed, and you talked a little bit

8  about clues that you saw at the scene.  But even if you

9  see clues at the scene, there's no way for you to say

10  with any certainty what substance someone overdosed on,

11  correct?

12      A    Correct.

13      Q    Even if you recognize signs and symptoms of an

14  opioid overdose, you can't decipher what specific opioid

15  caused it, can you?

16      A    No, I would say not specifically.

17      Q    And you also can't tell if that person took

18  another illicit or prescription drug besides opioids in

19  addition, correct?

20           MS. McPHERSON:  Objection; foundation.

21           THE COURT:  Overruled.

22           THE WITNESS:  I'm sorry, ma'am.  Could you

23  repeat the question?

24      BY MS. LUCAS:

25      Q    Sure.  You also can't tell if the person took

26  another illicit or prescription drug besides opioids,



Page 2378

1   correct?

2        A    That would depend on signs and symptoms that are

3   presented by the patient.  It could be difficult, but

4   again, I wouldn't be able to fully assess without doing a

5   direct assessment myself.

6        Q    But even if you're doing a direct assessment and

7   you see signs of an opioid overdose, you don't know if

8   they took something else besides opioids too, correct?

9        A    That's correct.

10       Q    And you're also aware that non-opioid drugs,

11  like methamphetamine, are being laced with opioid-like

12  illicit fentanyl in Oakland, correct?

13            MS. McPHERSON:  Objection; foundation.

14            THE COURT:  You may answer if you can.

15            THE WITNESS:  I am aware that there are

16  combinations often taken.

17  BY MS. LUCAS:

18       Q    And those are combinations of things like

19  methamphetamine and cocaine mixed with illicit fentanyl,

20  correct?

21       A    That could be.

22       Q    And, in fact, sometimes there are situations

23  where a person doesn't even know what they've overdosed

24  on, correct?

25       A    That could be possible, yes.

26       Q    And you don't know whether overdoses in Oakland



Page 2379

1  are related to prescription or illicit opioids, correct?

2          MS. McPHERSON:  Objection; foundation and

3  misstates his prior testimony.

4          THE COURT:  Overruled.

5          THE WITNESS:  I'm sorry, ma'am.  Could you

6  repeat.

7      BY MS. LUCAS:

8      Q    I said you don't know whether overdoses in

9  Oakland are related to prescription opioids or illicit

10 opioids, correct?

11     A    Not unless I am physically on scene for that

12 specific call.

13     Q    Right.  And even when you are on scene for a

14 specific all and even if you see clues, you can't say

15 with certainty what substance somebody overdosed on,

16 correct?

17     A    Not typically.

18     Q    Officer Bordona, you'd agree that there's a

19 large population of methamphetamine users in Oakland,

20 right?

21         MS. McPHERSON:  Objection; foundation.

22         THE COURT:  Sustained as to foundation.

23     BY MS. LUCAS:

24     Q    Officer Bordona, you've seen in your -- in the

25 course of your duties that there are individuals in

26 Oakland who use methamphetamine, correct?



Page 2380

1      A    Yes.

2      Q    Okay.  And you have noted that, in the course of

3  your duties, that you formed the belief that Oakland has

4  a large population of methamphetamine users?

5      A    I do believe there are a large population of

6  methamphetamine users.

7      Q    And in your experience as an officer for Oakland

8  Police Department, the biggest problem that you've

9  observed in Oakland involved drugs that are available for

10  use in intravenous form, correct?

11          MS. McPHERSON:  Objection; vague.

12          THE COURT:  Overruled.

13          THE WITNESS:  I'm sorry, ma'am.  Could you

14  repeat.

15      BY MS. LUCAS:

16      Q    Yes.  In your experience as an officer for

17  Oakland Police Department, the biggest problem that you

18  observed in Oakland involved problems that are drugs that

19  are available for intravenous use, correct?

20      A    Yes, that's correct.

21      Q    And those drugs include heroin and illicit

22  fentanyl, correct?

23      A    I could not speak to that.

24      Q    You were deposed in this action, correct?

25      A    Yes.

26      Q    And you told the truth at your deposition?



Page 2381

```
 1      A    Yes.

 2           MS. McPHERSON:  Objection.  We will see where we

 3   get, but he was deposed as the Oakland PMK, not in his

 4   personal capacity.

 5           MS. LUCAS:  Stan, could you put up Officer

 6   Bordona's deposition page 66, lines 2 through 11.

 7           "QUESTION:  Can you identify any drug that you

 8           think is most affecting Oakland?

 9           "ANSWER:  Any drug that is available for use

10           in intravenous form.

11           "QUESTION:  And which drugs with those be?

12           "ANSWER:  Heroin is probably what I would say

13           is the most well known.  Fentanyl is available

14           to be used that way.  You have got any form

15           of -- any form of an illicit drug that is able

16           to be melted down into a liquid and drawn up

17           into a syringe."

18      BY MS. LUCAS:

19      Q    Now, I want to talk briefly about --

20           You can take that down.  Thank you.

21           -- about the Narcan program that you just told

22   the Court about at Oakland Police Department.  I think

23   you said that the groundwork for the program began

24   somewhere around September of 2019, correct?

25      A    The -- the idea and the -- the meeting with the

26   chiefs happened in, I believe it was, June or July, and
```



Page 2382

1  the official groundwork, being my offering of the

2  trainings for, yes, that would speak to right around

3  September.

4      Q    Okay.  And then it launched around end of

5  October, November 2019, correct?

6      A    Yes.

7      Q    Now, Narcan can be used for any opioid, whether

8  it's an illicit opioid like heroin or fentanyl or a

9  prescription opioid, right?

10     A    Yes.

11     Q    And it can also be used if someone overdoses on

12  a non-opioid, like methamphetamine that's been laced with

13  an opioid like illicit fentanyl, correct?

14          MS. McPHERSON:  Objection; relevance.

15          THE COURT:  Ms. Lucas, what's the -- what is

16  this relevant to?

17          MS. LUCAS:  It's relevant to the fact that

18  Narcan is being used on people who don't even know that

19  they have injected opioids.

20          THE COURT:  And that has not been established

21  because...

22          MS. LUCAS:  What do you mean?  I'm not following

23  your question.

24          THE COURT:  You have already asked the officer

25  whether he can tell with certainty precisely what was

26  used.  The officer has already testified that Narcan, in



Page 2383

1    a sense, has a reverse confirmation.  If they suspect an

2    opioid, they will use it.  If it works, it was an opioid.

3         Is there something else that you are trying to

4    establish?

5         MS. LUCAS:  Only that the program is also used,

6    in fact, on those individuals.

7         THE COURT:  Please proceed.

8    BY MS. LUCAS:

9    Q    Do you need the question again, Officer Bordona?

10   A    Yes, ma'am.  Thank you.

11   Q    Sure.  Narcan can also be used if someone

12   overdoses on a non-opioid, like methamphetamine that's

13   been laced with illicit fentanyl, correct?

14   A    Reversing the fentanyl ingestion, yes.

15   Q    Correct.  So that means Narcan can be used on

16   people who unknowingly use opioids, correct?

17   A    Referred to as an accidental overdose?  Yes.

18   Q    And those accidental overdoses would be that

19   they had no idea that they had ingested an opioid,

20   correct?

21        MS. McPHERSON:  Objection; speculation.

22        THE COURT:  Ms. Lucas, asked and answered.

23   Please move on.

24   BY MS. LUCAS:

25   Q    Now, Officer Bordona, you are responsible for

26   keeping the statistics regarding the number of times that



Page 2384

1    Oakland PD has used Narcan, right?

2        A    Yes.

3        Q    And when officers at Oakland PD administer

4    Narcan, they're required to log the information and also

5    contact you to report it, correct?

6        A    Yes.

7        Q    But the officers are not required to document

8    what type of opioid they believed was in the person's

9    system that caused the overdose, correct?

10           MS. McPHERSON:  Objection; beyond the scope of

11   direct.

12           THE COURT:  Overruled.

13           THE WITNESS:  Just to make sure I answer

14   correctly, ma'am, could you repeat.

15   BY MS. LUCAS:

16       Q    Of course.  Officers are not required to

17   document what type of opioid they believed was in the

18   person's system that caused the overdose, correct?

19       A    They are not required.

20       Q    And as of the day that you were deposed in this

21   action, Oakland PD's Narcan supply was sufficient,

22   correct?

23           MS. McPHERSON:  Objection.  Phase I.

24           THE COURT:  Sustained.

25   BY MS. LUCAS:

26       Q    For Narcan, correct?



Page 2385

1      A    Yes.

2      Q    And if you need more, you can get it, correct?

3      A    Yes.

4           MS. LUCAS:  Thank you for your time,

5      Officer Bordona.  No further questions.  My colleagues

6      may have some for you.

7           THE COURT:  Thank you, Ms. Lucas.

8           Any other defendant with questions for the

9      officer?

10          MR. STAMPFL:  Yes, your Honor.  Karl Stampfl for

11     the Allergan defendants, please.

12                    * CROSS-EXAMINATION *

13     BY MR. STAMPFL:

14     Q    Officer, my name is Karl Stampfl.  I represent

15     the Allergan defendants in this case.

16          Now, you testified on direct about the opioid

17     overdoses to which you've responded.  I just want to make

18     sure.  Among those overdoses, you have certainly seen

19     indications that the individual was shooting heroin,

20     correct?

21     A    Under certain circumstances, yes.

22     Q    And you've certainly seen indications that the

23     person was using illicit fentanyl, correct?

24     A    That would be difficult to determine.  It would

25     depend on what was seen with the subject.

26     Q    Let me ask you this.  My client's opioid is



Page 2386

1    called Kadian.

2           Am I correct that you can't confirm that a

3    single one of the individuals who overdosed tested

4    positive for Kadian?

5    A    That was -- that would not speak to my level of

6    expertise.  That would be our criminalistics lab.

7    Q    So you would not be able to confirm that a

8    single one of those overdoses involves Kadian, correct?

9    A    I would not.

10          MR. STAMPFL:  Thank you.  That's all I have.

11          THE COURT:  Thank you, Mr. Stampfl.

12          Any other defendants with questions?

13          MR. FORAN:  Yes.  Very briefly, your Honor.

14                    * CROSS-EXAMINATION *

15   BY MR. FORAN:

16   Q    Good morning, Officer Bordona.

17   A    Hello, sir.

18   Q    Now, in addition to your responsibilities with

19   respect to the Narcan program, you have also worked on

20   criminal investigations on behalf of the OPD, correct?

21   A    Yes.

22   Q    And during your time at the OPD, you've worked

23   on over a hundred investigations; is that right?

24   A    I believe so, yes.

25          MS. McPHERSON:  Objection; beyond the scope of

26   direct.



Page 2387

1          THE COURT:  Mr. Foran, I assume this is going to

2    become relevant at some point?

3          MR. FORAN:  Yes.  This is going to be relevant

4    in terms of the number that involved opioids and the

5    number of those that are relevant to prescription

6    opioids.

7          THE COURT:  Please move on, Mr. Foran.  Ask your

8    questions.  Let's see where this goes.

9          MR. FORAN:  Oh.  Thank you, your Honor.

10   BY MR. FORAN:

11        Q    Of those hundred investigations, about half

12   involved drugs; is that correct?

13        A    I believe so.

14        Q    And of those investigations, about 20 to 25

15   involved opioids?

16        A    Is that coming from a statistic?  I wouldn't be

17   able to speak to that myself without looking at the

18   numbers.

19        Q    Well, that was your testimony when you were

20   deposed in February of last year, correct?

21        A    Then yes.

22        Q    And of those 20 to 25 that involved opioids, you

23   don't know how many involved prescription opioids; is

24   that correct?

25        A    Yes.

26          MS. McPHERSON:  Same objection.  Beyond the



Page 2388

1   scope of direct as to criminal investigations.

2         THE COURT:  The objection as beyond the scope is

3   overruled.  But, Mr. Foran, please avoid repetition of

4   testimony already given.

5         MR. FORAN:  Yes, your Honor.  That's all I have

6   on that point.  Just one more quick issue.

7   BY MR. FORAN:

8      Q    Officer, you are aware of the existence of

9   counterfeit prescription opioid pills in Oakland,

10  correct?

11     A    I'm aware they are out there.

12     Q    Yeah.  You're aware that there are pills that

13  are manufactured to replicate prescription opioid pills,

14  correct?

15     A    Yes, I'm aware.

16     Q    And sometimes they are dyed the same color as

17  prescription opioid pills, correct?

18         MS. McPHERSON:  Objection; foundation.

19         THE COURT:  Overruled.

20         THE WITNESS:  Can you ask one more time, sir.

21  BY MR. FORAN:

22     Q    Sure.  Yes, yes.  So sometimes these counterfeit

23  pills are dyed to be a color that would make them look

24  like the kind of pill that might come from a -- that

25  might be a prescription opioid; is that right?

26     A    I'm aware of this, yes.



MAGNA
LEGAL SERVICES

Page 2389

1      Q    And sometimes they are even stamped with a

2  number to indicate dosage or make them look genuine?

3           THE COURT:  Mr. Foran, the question is are they

4  made to look exactly like an original.  Is there a reason

5  to ask five questions on so straightforward a subject?

6           MR. FORAN:  No, your Honor.  Thank you.

7           I have no further questions.

8           THE COURT:  Thank you, Mr. Foran.

9           Does any other defendant have questions for the

10 officer?

11          MR. JAMES:  I thank Officer Bordona for his

12 service to his community and have no questions for him.

13          THE COURT:  Thank you, Mr. James.

14          Reexamination?

15          MS. McPHERSON:  Just briefly a few questions,

16 your Honor.

17               * REDIRECT EXAMINATION *

18   BY MS. McPHERSON:

19     Q    Officer Bordona, from a police officer

20 perspective in Oakland, does it matter what type of

21 opioid causes an overdose?

22     A    No, ma'am.

23     Q    And why not?

24     A    It doesn't change our treatment.

25          MS. McPHERSON:  Thank you, your Honor.  No

26 further questions.



Page 2390

1            THE COURT:  May the officer be excused?

2            MS. McPHERSON:  From the People's perspective,

3    yes.

4            MS. LUCAS:  From the defense perspective, yes.

5            And thank you, Officer Bordona, for your time

6    and service.

7            THE WITNESS:  Thank you, ma'am.

8            THE COURT:  Officer Bordona, you may stand down,

9    sir, and you are excused.  Thank you very much for your

10   time today.

11           THE WITNESS:  Thank you, your Honor.

12           THE COURT:  We will take the morning break at

13   this time.  We are adjourned until 20 to 11:00.  Thank

14   you.

15           (A brief recess is taken.)

16           THE COURT:  All right.  We are back on the

17   record.

18           Mr. Pendell has confirmed that there is one

19   additional document that was previously admitted into

20   evidence that appears on ROA 6702.  That is document

21   P-0921.  And to the extent it has not been previously

22   formally admitted, that document is admitted.

23           The People are calling as their next witness

24   Dr. Anna Lembke.

25           Ms. Fitzpatrick?

26           MS. LAURENDEAU:  Excuse me for one moment, your



Page 2391

1    Honor.  Amy Laurendeau.  May I just make a quick point on

2    Exhibit 921.  I just think there's an ambiguity on the

3    record that needs to be cleared up on Exhibit 921.

4            During Mr. Robinson's examination of Dr. Quick,

5    the Court exhibit -- or the Court admitted Exhibit 921 as

6    a one-page document, a printout screenshot, essentially,

7    of the California opioid overdose dashboard.  And I

8    believe 921 has also been admitted as the dashboard

9    itself and the underlying data.  So I do think there's an

10   ambiguity there that should be clarified for the record.

11           THE COURT:  Thank you.  Pursuant to the

12   stipulation contained in ROA 6702 -- well, let me get

13   more clarification from Mr. Pendell.

14           Mr. Pendell, with respect to this document 0921,

15   without going back through my notes, precisely what

16   portion was identified when the document was first

17   admitted and what about the dashboard is being admitted

18   other than the page that was identified at the time of

19   the witness's testimony?

20           MR. PENDELL:  Well, your Honor, it was my

21   understanding the entire dashboard was in.  And

22   Dr. Stafford relied on the dashboard extensively and used

23   far more than just a single page from that dashboard.

24           THE COURT:  That's my recollection as well.  So

25   my assumption is that at this time the entire dashboard,

26   which has the Exhibit Number 0921, is coming in.



Page 2392

1          Ms. Laurendeau, is there an issue with what the

2    parties intended under ROA 6702?

3          MS. LAURENDEAU:  There is not, your Honor.  We

4    don't object to the admissibility of the dashboard in its

5    entirety.  This is really just more of a clerical issue I

6    was raising.  At page 635 of the consolidated trial

7    transcript when Mr. Robinson was examining Dr. Quick, he

8    asked to admit and the Court admitted what was referred

9    to as Exhibit 921.

10          And the Court stated, "I admitted the one page

11    that had been shown on the screen to the doctor."  That

12    is Exhibit 921 as admitted.

13          THE COURT:  All right.  Thank you.  I appreciate

14    the clarification.  What is admitted today, then, is the

15    P-CA-0921 which constitutes the entire California Opioid

16    Overdose Surveillance Dashboard as identified in

17    ROA 6702.  Thank you.

18          P-CA-000921 in its entirety was received in

19          evidence.)

20          MR. ROBINSON:  Thank you.

21          THE COURT:  Ms. Fitzpatrick?

22          MS. FITZPATRICK:  Thank you, your Honor.  We

23    call Dr. Anna Lembke, who was here.  I saw her.

24          THE COURT:  Good afternoon.  Are you with us?

25          THE WITNESS:  Yes, I am.  Can you not see me?

26          THE COURT:  Good morning.  I can now.



Page 2393

1        Madam Clerk, would you swear the witness,

2    please.

3          THE CLERK:  Please raise your right hand.

4          Do you solemnly state that the testimony you

5    shall give today in this matter now pending before this

6    Court will be the truth, the whole truth, and nothing but

7    the truth, so help you God?

8          THE WITNESS:  Yes, I do.

9

10              *  ANNA LEMBKE, MD  *

11    called as a witness by and on behalf of the plaintiff,

12    having been first duly sworn, was examined and testified

13    as follows:

14          THE CLERK:  Please state your full name and

15    spell your last name for the record.

16          THE WITNESS:  Anna Lembke, L-E-M-B-K-E.

17          THE CLERK:  Thank you.

18              * DIRECT EXAMINATION *

19    BY MS. FITZPATRICK:

20    Q    Good morning, Dr. Lembke.  Can you tell the

21    Court your current position?

22    A    I am professor of psychiatry and addiction

23    medicine at Stanford University School of Medicine.  I am

24    medical director of addiction medicine, chief of the

25    Addiction Medicine Dual Diagnosis Clinic, and program

26    director for our addiction medicine fellowship.



Page 2394

1    Q   And, Dr. Lembke, we worked together to prepare

2  some slides for this case, correct?

3    A   That is correct.

4    Q   If we can pull up the first slide.

5         And for ease, Dr. Lembke, we're going to rely on

6  the slides to go through some of your qualifications in

7  this matter.

8         Can you tell the Court what your education is?

9    A   I did my undergraduate at Yale University.  Then

10  I got my medical degree from Stanford University.  I did

11  two years of pathology, a year of internal medicine at

12  Highland Hospital in Oakland.  And I did a psychiatry

13  residency here at Stanford and a fellowship in mood

14  disorders before joining the faculty here at Stanford.

15    Q   And when did you join the faculty at Stanford?

16    A   It was 2003.

17    Q   And are you licensed to practice medicine?

18    A   Yes, I am.

19    Q   And from when?

20    A   I'm licensed to practice medicine from -- 1995

21  was the year I graduated.

22    Q   In what areas do you practice?

23    A   I'm a psychiatrist.  I also have a courtesy

24  appointment in team medicine.  And my area of focus is

25  addiction as well as deprescribing, helping people who

26  are dependent on chemicals like opioids to slowly and



MAGNA
LEGAL SERVICES

Page 2395

 1   safely get off of them.

 2        Q    Are you board-certified in any areas?

 3        A    I am.  I am board-certified in psychiatry and

 4   neurology and also in addiction medicine.

 5        Q    And as part of your appointment at Stanford, do

 6   you teach medical students?

 7        A    I do.

 8        Q    And when did you begin to teach medical students

 9   at Stanford University?

10        A    Well, I began actually when I was a -- a medical

11   student myself as a TA, and then essentially continued on

12   in that capacity, joining the faculty, which is the

13   classic three-legged stool type of appointment, part

14   clinical work, part scholarly work, and part teaching.

15   And I've been teaching medical students and residents for

16   the past 25 years.

17        Q    In what subjects do you teach medical students

18   and residents?

19        A    I teach many different aspects related to mental

20   health.  I teach about addiction in all its various

21   forms.  I have taught extensively on the opioid epidemic,

22   including the problem of misleading messaging that has

23   influenced prescribing in medicine.  I teach on the

24   overlap between addiction, dependence, and pain.  I teach

25   about the neuroscience of addiction.

26        Q    And looking at this slide, Dr. Lembke, and your



Page 2396

1  related experience, can you tell the Court what diplomate

2  and adviser to the American Board of Addiction Medicine

3  is?

4      A    Diplomate simply means that I'm board-certified

5  in that discipline, and I have specialized training.  I

6  sat for an exam and passed that exam.  Adviser means that

7  I sat on various committees of the American Board of

8  Addiction Medicine in a senior leadership role.

9      Q    Is that the same for the diplomate of the

10  American Board of Psychiatry and Neurology?

11      A    A diplomate of the American Board of Psychiatry

12  and Neurology means I have specialty training in

13  psychiatry and neurology.  And I sat for the exam, I

14  passed the exam, and I'm board-certified.

15      Q    And looking at the next one, chief of addiction

16  medicine, dual diagnosis clinic, and medical director,

17  department of psychiatry at Stanford University, what is

18  the dual diagnosis clinic?

19      A    Dual diagnosis is a term used to identify

20  individuals who struggle with substance use disorders and

21  other addictions as well as a co-occurring mental health

22  disorder.  It also increasingly has come to mean

23  individuals who struggle with some kind of chemical

24  dependency or chemical addiction as well as chronic pain.

25          So our clinic is devoted to serving those

26  patients who struggle with mental -- with multiple mental



Page 2397

1   health issues, substance use issues, chemical dependency,

2   and also, increasingly, chronic pain.

3       Q     And what are your responsibilities as the chief

4   of addiction medicine in the dual diagnosis clinic?

5       A     I'm responsible in some sense for all the

6   patients that come through our clinic.  I'm responsible

7   for hiring and mentoring young faculty, for teaching

8   residents, medical students, visiting scholars, for

9   ensuring that the administration of the clinic and the

10  oversight of the clinic is done in a safe and

11  conscientious way consistent with medical standards.

12          So it's both an important clinical service role

13  and an important teaching/mentoring/administrative

14  leadership role.

15      Q     And you're a medical director for the deputy of

16  psychiatry.  Is that a separate appointment at Stanford?

17      A     I'm sorry.  I'm medical director for addiction

18  medicine within the department of psychiatry.  It's a

19  special designation acknowledging my expertise in

20  addiction medicine and my leadership skills in this arena

21  developing services for patients who get their care at

22  Stanford Health services.  It's become an increasingly

23  important priority for Stanford to create these services

24  because of the opioid epidemic.

25      Q     And as part of your experience at Stanford

26  University, do you -- have you done studies and research



Page 2398

1    into addiction caused by opioids?

2       A    Yes, I have.

3       Q    And, specifically, have you done research and

4    studies into addiction caused by prescription opioids?

5       A    Yes, I have.

6       Q    And have you taught medical students and

7    residents on issues related to opioid addiction?

8       A    Yes, I have.

9       Q    And how long have you been doing that?

10      A    I've been doing that for about a decade.

11      Q    And in addition to your role as teacher, you

12   also maintain, I think you said, a clinical practice; is

13   that right?

14      A    My clinical practice is under the auspices of

15   Stanford University School of Medicine.  This is not a

16   private clinical practice the way that those words might

17   imply.  I'm on the faculty at Stanford.  I'm a paid

18   employee of Stanford University.  I'm on their university

19   faculty.  And part of my role is to provide clinical

20   services.

21      Q    And are part of the clinical services that you

22   provide at Stanford University related to those who

23   suffer from opioid use disorder?

24      A    That is correct.

25      Q    Let me go back to your teaching.  I talked a

26   little bit about your teaching at Stanford University.



Page 2399

1   Do you also teach those outside of Stanford University on

2   issues related to opioid addiction?

3       A    Yes, I do.  I've given many lectures to medical

4   schools and universities all around the country on topics

5   related to opioid addiction and the opioid epidemic,

6   including the misleading messaging that is in question

7   here today.

8       Q    And I was just about to ask you have you

9   taught -- outside of Stanford Universty, have you taught

10  about the pharmaceutical opioid industry's marketing and

11  promotion of opioids?

12      A    Yes, I have.

13      Q    And have you taught on that topic in

14  relationship to the pharmaceutical opioid industry's

15  marketing of opioids and the opioid epidemic?

16      A    Yes, I have.  I've taught that in multiple

17  different contexts here at Stanford, in business school,

18  in law school, medical school, undergraduate classes.

19  I've also been invited to Duke University, Johns Hopkins

20  University, to many other universities to discuss this

21  topic.

22      Q    And have you done some research and teaching on

23  the pharmaceutical opioid industry's partnership with or

24  financial support for organizations that have influence

25  on how medicine is practiced?

26      A    Yes, I have.



Page 2400

1      Q    And have you taught that both in Stanford and

2    outside of Stanford?

3      A    Yes, I have.

4      Q    And when you've been teaching on this topic, do

5    you also include your firsthand experience with the

6    pharmaceutical opioid industry's marketing and promotion

7    of opioids?

8      A    Yes, I do.  I am of the generation that was the

9    primary target and recipient of the messaging.  And so I

10   do have firsthand, lived experience of how those messages

11   were received and how they impacted medical care.

12     Q    Can you tell the Court a little bit about your

13   firsthand experience with the pharmaceutical opioid

14   industry's marketing and promotion of opioids?

15     A    Yes, I can.

16          Early in my career after completing my training,

17   I was mandated by the state board of -- the Medical Board

18   of California in 2001 to attend an all-day, mandatory

19   seminar on the treatment of pain.  I was mandated to do

20   that in order to keep my license, as were all other

21   practicing physicians in the state of California.

22          I remember being surprised that I was being

23   mandated to go to a continuing medical education course

24   that was outside of psychiatry and mental health.  That

25   was, in my experience, unprecedented.  And at that course

26   the messages were that there is an epidemic of,



Page 2401

1    quote-unquote, undertreated pain in the United States,

2    that essentially we physicians were responsible for the

3    epidemic of undertreated pain and that the reason for our

4    responsibility had to do with our fear of prescribing

5    opioids and our, quote-unquote, opioidphobia.

6         Then the majority of the day consisted of

7    lectures on how to start opioids in patients with pain,

8    which opioids to use, how to titrate them, that they were

9    effective in treatment of chronic pain and many other

10   pain states, and that as long as we physicians were

11   prescribing them to patients in pain, it was very

12   unlikely that the patients would get addicted.

13        And that messaging continued -- I would just

14   add, because it's very important for 2001, that we were

15   also taught that pain is the fifth vital sign so that we

16   were required to ask every patient whether or not they

17   were experiencing pain, whether or not there were any

18   outward visible manifestations of pain in that patient,

19   or whether or not the patient had sought out medical care

20   expressly for pain treatment.

21        And those messages were continued throughout the

22   entire last two decades.

23   Q    And were you --

24        MR. BRODY:  Your Honor, excuse me.  Steve Brody

25   for Janssen.

26        Move to strike the last answer due to lack of



Page 2402

1  foundation. And the question was about firsthand

2  experience with the industry's marketing and promotion,

3  and Dr. Lembke described a California Medical Board

4  meeting that she attended.

5        THE COURT: Just a moment.

6        The objection is overruled.

7  BY MS. FITZPATRICK:

8    Q   Dr. Lembke, in addition to the 2001 meeting that

9  you just described, did you continue to have firsthand

10  experience in receiving marketing and promotional

11  messages concerning opioids from the pharmaceutical

12  opioid industry through your career?

13    A   Not in the last year or so.

14    Q   Prior to -- I'm asking after the single seminar

15  we talked about, did you continue after that to see

16  marketing and promotional messages in your own personal

17  career?

18    A   Yes. I continued to see those same marketing

19  and promotional messages throughout the first decade of

20  the 2000s and I think, really, well into the decade

21  between 2010 and 2020.

22    Q   And in addition to your own personal experience

23  in seeing and receiving those messages, have you done

24  research and teaching on the pharmaceutical opioid

25  industry's continuing impact on generations of doctors?

26        MR. KABA: Objection; vague as to "the



Page 2403

1    pharmaceutical opioid industry," your Honor.

2              THE COURT:  Overruled.

3              THE WITNESS:  Yes.  I have continued to teach on

4    the impact of the misleading messaging of the

5    pharmaceutical opioid industry.  And I do define that

6    concept in my report.

7         BY MS. FITZPATRICK:

8         Q    And have you also taught on the pharmaceutical

9    opioid industry's publications in the peer-reviewed

10   medical literature and how that has influenced

11   physicians' opioid prescribing practices?

12        A    Yes, I have.

13        Q    Have you testified before Congress, Dr. Lembke?

14        A    Yes, I have.

15        Q    And when did you testify before Congress?

16        A    I don't recall the exact date.  I would have to

17   look at my CV.

18        Q    Can you tell us what you testified about?

19        A    Yes.  This was the -- I testified multiple times

20   having to do with the impact of the flooding of society

21   with prescription opioids as a causative element in the

22   current opioid epidemic.

23              I've testified on ways that I think the

24   government can help redress these harms, for example, by

25   supporting more education for medical students,

26   residents, and physicians on the nature of the



Page 2404

1    interrelationship between opioid dependence, opioid

2    addiction, and chronic pain, including the creation of

3    addiction medicine in fellowships.

4           I've testified multiple times on the need to

5    create a better workforce to target the problem of opioid

6    addiction and the opioid epidemic and to use academic

7    detailing as opposed to pharma-funded messaging in order

8    to essentially reeducate physicians to reverse the

9    miseducation they've been receiving for the last

10   20 years.

11        Q    And in addition to your testimony before

12   Congress, I think you mentioned to me a couple minutes

13   ago that you taught at Duke University or have lectured

14   at Duke University; is that correct?

15        A    Yes.

16        Q    Do you remember when that was?

17        A    I believe that was last year.

18        Q    And can you tell us what you lectured on at Duke

19   University?

20        A    That was a class specifically on the ways that

21   the pharmaceutical industry's packaging and messaging of

22   the evidence can influence the ways that doctors

23   prescribe opioids.

24        Q    And who invited you to speak at that Global

25   Health Institute at Duke University?

26        A    That was the director of the course.



Page 2405

1    Q    And who was the target audience?  Who was in the
2    audience for that lecture?
3    A    They were Duke undergraduates.
4    Q    And I want to turn to your clinical experience
5    in a second, but all of the teaching that we've just been
6    talking about and your testimony before Congress and the
7    like, was that all done separate and apart from your work
8    as an expert here on behalf of the People of the State of
9    California?
10   A    Yes.  That's been done separate.
11   Q    But was it all on topics that are related to
12   your expert opinion and your testimony here today?
13   A    Much of it is related, yes.
14   Q    Let's go back to your clinical practice.  Can
15   you describe for the Court what your current clinical
16   practice is comprised of?
17   A    Our clinic now sees patients with all manner of
18   addiction.  And these are people who are addicted to
19   drugs and alcohol, including prescription drugs, as well
20   as people who have what we call process addiction.  These
21   are addictions to things that are not drugs, like
22   gambling, pornography, video games.
23        Increasingly, our clinic has also had to fill in
24   the gap to treat patients who have become physiologically
25   dependent on opioids through a prescription but do not
26   meet strict criteria for an opioid use disorder or opioid



Page 2406

1    addiction but nonetheless need professional support

2    tapering down or off of opioids.  These are the

3    individuals that I think have really fallen through the

4    cracks in terms of our efforts in the last five years or

5    so to help people harmed by the opioid epidemic.

6          And by that I mean that we have a growing number

7    of individuals who seek out our clinical care to help

8    them lower their opioid doses or get off of opioids.

9    These are individuals who are on very high doses of

10   opioids, many of them for decades through a doctor's

11   prescription, and have become physiologically dependent

12   to the point that, even though the opioids are not

13   helping their pain and, in fact, harming them, they are

14   unable to taper the opioids because of neuroadaptation

15   and extreme symptoms of withdrawal.

16         So we work with these individuals to slowly and

17   incrementally taper them down on their doses and, when we

18   can, to get them completely off of opioids.

19   Q    Now, we're going to go into some of those

20   concepts of dependence and addiction a little bit later,

21   but going back to your clinical practice, can you

22   estimate the number of patients you've treated for

23   conditions related to OUD, or opioid use disorder, or

24   dependence on opioids?

25   A    I've treated thousands of patients with opioid

26   addiction.



Page 2407

1     Q     Are most of those patients from the vicinity

2  around Stanford University?

3     A     Most of them are from the vicinity, but we have

4  patients who come from very far away, from the -- you

5  know, the Central Valley, from the Sierras.  With the

6  increasing use of telehealth since COVID and quarantine,

7  we are now seeing patients who live in Southern

8  California because they're able to see us virtually.

9     Q     Okay.  And while you're working with the

10  patients that you've described that either have OUD or

11  dependence on opioids to address those issues, do you

12  also work in developing treatment plans for their pain

13  conditions as well?

14    A     Yes.  We very much prioritize integrating pain

15  treatment with their chemical dependency or opioid

16  addiction treatment.  We've established groups

17  specifically for the growing cohort of patients that we

18  have who struggle with severe chronic pain.

19          We have a cognitive behavioral therapy group for

20  patients with chronic pain.  These are individuals in our

21  clinic who are being treated for opioid dependence or

22  opioid addiction who have chronic pain and need treatment

23  for that.  So that's a psychological intervention.

24          We also, when appropriate, use medications like

25  antidepressants to help patients with their chronic pain.

26  There are some antidepressants that have been shown to



Page 2408

1  have mild benefit in helping patients with those

2  problems.

3     Q    Dr. Lembke, several minutes ago you used a term

4  "deprescribing."  Can you tell the Court what that means?

5     A    There are more than 10 million Americans who

6  take opioids every day, many of whom at very -- many of

7  whom have done so for years and decades, some at

8  extremely high doses.

9        And those individuals are not benefiting and are

10  being harmed and, in fact, are at high risk for

11  accidental overdose and addiction with those doses yet

12  cannot get off.  So they come to our clinic voluntarily

13  or are referred by their prescribing doctors for help

14  with tapering down and off of opioids.

15        Importantly, these are individuals who are not

16  meeting the strict DSM-5 criteria for opioid use

17  disorder, otherwise known as addiction.  They are

18  physically dependent.  They have always taken their

19  opioids as prescribed.

20     Q    Dr. Lembke, do you continue to treat individuals

21  with OUD and dependence to prescription opioids today?

22     A    Yes.  It's the bulk of the practice that we do.

23  Probably about 50 percent of our patients struggle with

24  opioid addiction or opioid dependence.

25     Q    And when did you first start treating

26  individuals suffering from OUD, opioid use disorder, or



Page 2409

1  dependence on opioids?

2      A    In the early 2000s, around 2002, 2003, I started

3  seeing patients -- sorry.  That's my phone.  I'll turn it

4  off later.

5          I started seeing patients, some of whom were

6  coming in saying that they struggled with opioid

7  dependence or opioid misuse or opioid use disorder.

8          I also had a patient around 2004-2005 who died

9  of an opioid overdose.  I was treating her for something

10  else.  According to her husband, she had been taking her

11  opioids exactly as prescribed by her doctor.  And so, in

12  that sense, saying that she died of an opioid overdose is

13  really a misnomer because she did not overdose.  She was

14  taking her medications as prescribed.

15          I remember in the early days I had a mother I

16  was treating for depression who lost her son to methadone

17  who had been prescribed methadone for pain and was taking

18  it as prescribed.

19          So it was -- it really began at least to come to

20  my attention around 2003-2004.  I think it's important to

21  point out, though, that I was in a position to observe

22  the harm from opioids much earlier than other physicians

23  because of the nature of my work.

24          MR. KABA:  I am going to object and move to

25  strike everything after "in the early 2000s, around 2002,

26  2003" as both a narrative and incorporating hearsay.



Page 2410

1          MS. FEINSTEIN:  Join in that objection, your

2     Honor.

3          THE COURT:  Just a moment.  The question was

4     answered after -- or by the sentence, "I started seeing

5     patients, some of whom were coming in saying that they

6     struggled with opioid dependence or opioid misuse or

7     opioid use disorder."  Everything after that was

8     nonresponsive to the question and is stricken.

9     BY MS. FITZPATRICK:

10         Q    Doctor, moving on, do you prescribe opioids for

11    pain?

12         A    I do not prescribe opioids for pain, no.

13         Q    Do you prescribe opioids for the treatment of

14    OUD or dependence on opioids?

15         A    Yes, I prescribe the opioid buprenorphine for

16    the treatment of opioid use disorder.

17         Q    And can you explain to the Court why you would

18    write a prescription for an opioid for the treatment of

19    OUD or opioid dependence?

20         A    Buprenorphine is evidence-based treatment for

21    opioid use disorder.  And so in practicing evidence-based

22    medicine, I use that tool in appropriate patients for the

23    treatment of opioid use disorder/opioid addiction.

24         Q    And you just used the term "evidence-based

25    treatment" or "evidence-based medicine" in that answer.

26              Can you explain what that is to the Court?



Page 2411

1    A    So evidence-based medicine is the grounding of

2    our practice of medicine in scientific evidence.  We all

3    strive to practice evidence-based medicine, and I do so

4    myself.

5        Q    And what is the evidence that you're referring

6    to there?

7        A    There are multiple placebo-controlled trials

8    across decades and continents, showing that opioid

9    agonist therapy, like buprenorphine, in the treatment of

10   opioid addiction is effective.  And so I base my practice

11   on that experience and on that -- I should say on that --

12   on that literature, on that evidence.

13       Q    And does the use of buprenorphine to treat OUD

14   or dependence on opioids raise any safety concerns for

15   those patients?

16       A    Yes, of course.  An opioid is an opioid is an

17   opioid.  And people can get addicted to the opioid

18   buprenorphine.  They can misuse it.  In rare instances

19   they can overdose on it.  It needs to be very carefully

20   considered, carefully monitored, used very judiciously.

21   It's a dangerous medicine.

22       Q    Why do you use it then?

23       A    I use it as harm-reduction strategy in

24   individuals who essentially have brains that are

25   fundamentally changed by exposure to opioids.  And to

26   understand that, it's really necessary to understand the



Page 2412

1    neuroscience behind how prolonged exposure to an opioid

2    can cause neuroadaptive changes and in some instances are

3    irreversible.

4           So patients to whom we give opioids to treat

5    opioid use disorder, although on the face of it

6    counterintuitive, is the way that we allow them to

7    reestablish baseline homeostasis of the brain so that

8    they're not constantly craving opioids, and that they can

9    reengage in other recovery work, reengage with their

10   families, reengage with their professional lives, and

11   just generally pursue a life worth living.

12        Q    And we are going to get into the details of the

13   neuroscience that you just referenced there, but let me

14   ask you a couple of more questions about your background

15   first.

16          In addition to the positions that you described,

17   do you also have a position at Stanford at the department

18   of anesthesiology and pain medicine?

19        A    Yes.  I have a courtesy appointment in pain and

20   anesthesia at Stanford.

21        Q    And what is a courtesy appointment?

22        A    Courtesy appointment is recognition of faculty

23   contributions in different dimensions -- clinical

24   service, teaching, scholarly work -- to a department

25   outside of the department in which an individual has

26   their primary appointment.  So my primary appointment is



Page 2413

1   in psychiatry, but I have a courtesy appointment in pain

2   anesthesia.

3       Q    And do you consult with your colleagues at

4   Stanford about treating patients who are taking

5   prescription opioids for pain?

6       A    Yes, on a regular basis.  For many years I

7   actually went once a week to the pain clinic and was

8   embedded with my pain colleagues there on helping them

9   tackle this problem of patients coming in dependent,

10  addicted, patients with chronic pain.

11          And I continue to do that work primarily now

12  located here in our building in psychiatry but also lots

13  of what we call curbside consults on inpatients.  So

14  there's lots of collaboration and communication between

15  myself and my pain colleagues.

16      Q    Why is it necessary to collaborate between

17  people like you who deal with those who are suffering

18  from addiction or OUD or dependence and those who are

19  managing pain?

20      A    As a result of the opioid epidemic, pain

21  treatment and opioid addiction treatment have become

22  inextricably intertwined.

23      Q    Have you, in preparation for the work that

24  you've done both at Stanford outside of this courtroom

25  and in this courtroom, looked at the body of medical and

26  scientific literature that is related to OUD and



Page 2414

1   dependence on opioids?

2       A    Yes.  I have been following that literature for

3   15 to 20 years.

4       Q    And --

5            Move to the next one, Jon.

6            And have you personally contributed to that body

7   of literature?

8       A    Yes, I have.

9       Q    Can you tell the Court about the book that you

10  have published on that topic?

11      A    So I wrote this book published by Johns Hopkins

12  University Press in 2016 called Drug Dealer, MD:  How

13  Doctors Were Duped, Patients Got Hooked, and Why It's So

14  Hard to Stop.

15           The title, Drug Dealer, MD, is intentionally

16  provocative because my goal was to really communicate to

17  my colleagues within medicine as well as persons outside

18  the practice of medicine how it was that a whole

19  generation of doctors were duped into overprescribing

20  opioids for minor and chronic pain conditions, leading to

21  the opioid epidemic.

22      Q    And was that book an extension of both the

23  research and teaching you had done on some of those

24  topics prior to 2016?

25      A    Yes, it was.

26      Q    And how did you go about doing the research for



Page 2415

1   that book?

2      A   I read the medical literature.  I did interviews

3   with multiple stakeholders inside of medicine, patients

4   and providers alike.  I synthesized all of that

5   information, including my own personal experience, of the

6   misleading messaging, and I wrote a book trying to

7   genuinely understand how it was that well-educated and

8   well-intentioned prescribers were engaging in care that

9   was actually harming patients.

10      Q   Did you publish that book -- or write and

11   publish that book before you were retained as an expert

12   for any government entity in opioid litigation?

13      A   I had no contact with lawyers regarding material

14   in this book prior to writing or publishing this book in

15   2016.

16      Q   And can you tell us some of the topics that you

17   covered in that book that are pertinent to the testimony

18   you're here to offer today?

19      A   I emphasize in the book that the opioid epidemic

20   is a complex and multifactorial phenomenon, that there

21   are many -- many individuals who are culpable, including

22   physicians like myself; including patients who lied to

23   their doctors about how they were using medicine;

24   including the regulatory bodies that were meant to ensure

25   standards of care, like the Federation of State Medical

26   Boards, the Joint Commission, the FDA.



Page 2416

1          And I also implicate the opioid pharmaceutical

2     industry for the myths that they propagated under the

3     guise of science that essentially duped doctors into

4     believing that opioid prescribing in the way that it was

5     being encouraged was evidence-based when, in fact, there

6     was not evidence to support that kind of prescribing.

7     Q     And, Doctor, we're going to come back to some of

8     those messages and some of that evidence in relation to

9     these defendants, but let me just move through your

10    qualifications.

11          The BRAVO protocol, what is that?

12    A     So about five years ago, shortly around the time

13    that the 2016 CDC guidelines came out urging doctors to

14    prescribe fewer opioids; to prescribe more judiciously;

15    to not use opioids first line for pain; to, when using

16    opioids, use the lowest dose for the shortest duration.

17          What happened was that many doctors went running

18    scared and were refusing then to treat these patients,

19    leaving us with de facto opioid refugees, patients with

20    chronic pain who had been on opioids for a long period of

21    time now wandering clinic to clinic trying to find

22    somebody to help them.

23          So the BRAVO protocol was designed specifically

24    to educate doctors about, number one, the importance of

25    helping these patients and not abandoning them because of

26    medicolegal concerns, and then specifically giving them a



Page 2417

1   compassionate patient-centered approach to how to taper

2   opioid-dependent chronic pain patients to lower doses.

3        So this is a protocol to educate physicians

4   specifically for that population of chronic pain patients

5   physically dependent on opioids for whom a taper is

6   indicated.

7     Q    Thank you, Doctor.

8        In addition to -- we've talked about your

9   clinical practice; we've talked about your teaching.

10       Have you ever been interviewed on camera about

11   the opioid epidemic?

12    A    Yes, I have.  I was recently interviewed on the

13   HBO documentary called The Crime of the Century, and

14   there have been other instances.

15    Q    Now, let me go back to some of your experience

16   in treating patients.  When did you begin to treat

17   patients with substance use disorders generally?

18    A    When I first began my practice of psychiatry, I

19   was not interested in treating patients with addiction.

20   It's not something that I had received much, if any,

21   education on in medical school or even residency.  I did

22   not consider addiction at that time to be something

23   within the purview of medical treatment.

24       And it was really only as I began my practice,

25   my early career practice in 2000-2001, that I recognized

26   that my patients were not getting better in large part



Page 2418

1    because I was ignoring their substance use problems.

2          So I decided to reeducate myself on that front

3    and ultimately shifted my practice to specialize in

4    treatment of patients with substance use disorders and

5    other addictions.

6    Q    Were there any changes in the types of

7    substances that your patients were struggling with

8    between the early 2000s and about 2011-2012?

9    A    Yes.  So as I said before, in the early 2000s I

10   started seeing more and more patients coming in who were

11   addicted to prescription opioids or misusing or dependent

12   on prescription opioids.

13   Q    And did that continue to increase during the

14   first decade of the 2000s?

15   A    Yes, it did.

16   Q    And has that remained steady or continued to

17   increase in the second decade of the 2000s?

18   A    It continued to increase.  And now, as I said,

19   our clinic is probably about 50 percent of these legacy

20   pain patients who need help with either opioid dependence

21   or opioid use disorder, all of whom began with a

22   prescription opioid for the treatment of pain.

23   Q    And what do you mean by a legacy pain patient?

24   A    This is a controversial term, but essentially

25   what it refers to is individuals who have been adversely

26   impacted by the overprescribing of opioids for chronic



Page 2419

1    pain, and now we have created this generation of chronic

2    pain patients who are also dependent on or addicted to

3    opioids.  So it's a -- they're a legacy of the paradigm

4    shift in medicine that led to overprescribing.

5        Q    And in formulating your opinions in this case on

6    the causes of the prescription opioid crisis, have you

7    relied on published medical literature?

8        A    Yes, I have.

9        Q    And how have you gone about researching or

10   selecting published medical literature for your opinions?

11       A    I've monitored the major academic databases --

12   PubMed, MEDLINE, Google Scholar -- to keep up on papers

13   that are written regarding opioids, chronic pain,

14   overdose, death, whatever is out there.  I have

15   intentionally tried to look at this from all angles.

16            I specifically tried to look for studies showing

17   evidence that opioids are effective in the treatment of

18   chronic pain.  And I have not been able to find those

19   studies, but I have looked hard for those.

20            I have also looked hard for studies showing that

21   addiction is rare in patients who are prescribed opioids

22   for the treatment of chronic pain, and I have been unable

23   to find those studies as well.

24       Q    And in addition to the published literature, did

25   you also look at government data and government

26   publications as part of your research in this case?



Page 2420

1    A    What do you mean by government data or
2    government publications?
3    Q    Things that are published by the United States,
4    the California governments concerning opioids and opioid
5    use?
6    A    Yes.  So I kept up on the latest publications
7    from the CDC, for example.
8    Q    And have you also looked -- let me ask you, were
9    those the same types of information that you looked at
10   prior to becoming a retained expert in opioid litigation
11   for your research and publications concerning opioid use,
12   opioid use disorder and the causes of them?
13   A    Yes.
14   Q    And did you apply any different standards to the
15   kind of research that you did on government publications
16   and medical and scientific literature in this case than
17   you did in the research you have done prior to being
18   retained as an expert?
19   A    No.
20   Q    And in this case, in addition to that type of
21   information, did you look at the defendants' own
22   documents?
23   A    Yes, I did.
24   Q    Okay.  And did you specifically look at
25   documents that were produced by the four defendant
26   families in this case?



Page 2421

1      A    Yes, I did.

2      Q    Okay.  And can you tell me how you went about

3  selecting documents from the defendants that you relied

4  on for your opinions that are specific to the report you

5  generated in this case?

6      A    Yes.  So I was approached in 2017 by Don

7  Arbitblit from Lieff Cabraser Heimann & Bernstein asking

8  me if I was willing to be involved in federal opioid

9  litigation.  This was after the publication of my book.

10         And I initially expressed reservation about

11  that.  I hadn't done that type of work before.  I wanted

12  to be certain that my involvement would be pursuant to

13  the truth of the matter and not to some other end.  And I

14  was reassured about the desire to explore the truth in

15  this case.

16         So in my work with Lieff Cabraser Heimann &

17  Bernstein in the MDL litigation, I was given documents by

18  Don and his team to review, and I reviewed those

19  documents.  I then asked for additional documents as I

20  felt I needed them as I went along in this case.

21      Q    And what was the process of requesting and being

22  given access to additional documents from the defendants

23  in this case?

24      A    Well, for example, I might review a document

25  that they gave to me, and I would say to them, "Well, how

26  was this document actually used?  You know, who



Page 2422

1   actually -- who was the audience for this document?"  Or

2   the document might reference an article, and then I would

3   go look up that article and try to see whether or not

4   what the document actually purported to do with that

5   article was what that article actually showed.

6       Q   And how did you satisfy yourself that you had

7   seen the relevant documents from the defendants that you

8   needed in order to properly reach your opinions in this

9   case?

10      A   After reviewing multiple documents, there were

11   recurring themes that kept coming up again and again.

12   And based on saturation of those themes, I felt I had

13   seen an adequate number of documents to form an opinion.

14      Q   Just briefly outline the methodology that you

15   used to gather the information, synthesize it, and

16   generate your report in this case.

17      A   Yeah.  My opinion is based on all of the medical

18   literature that I had reviewed.  It is based on my review

19   of the documents produced by the defendants in this case.

20   It's based on 25 years of clinical experience and

21   teaching as well as my own research that I did for the

22   book Drug Dealer, MD.

23      Q   And did you rely on more than just marketing

24   studies generated by the defendants in preparing your

25   report and reaching your opinions in this case?

26      A   Yes.



Page 2423

1    Q    And by virtue of your training, your experience,

2    and your research, do you have a specialized knowledge in

3    how defendants' marketing -- the prescription opioid

4    industry's marketing of their opioids affected

5    prescribing practices by physicians?

6    A    I do think I have a specialized knowledge here,

7    which is both a combination of my scholarly work,

8    reviewing documents, reading the medical literature, as

9    well as my experiential knowledge of having been the

10   recipient of these marketing messages, of being in that

11   generation of individuals trained in the late '90s and

12   early '00s -- my generation is, in essence, the

13   overprescribing generation.

14        So because I come from inside of medicine, I am

15   a medical doctor, and I was trained in that era, I

16   contextually understand how these marketing messages

17   landed with prescribers.

18   Q    Thank you, Doctor.

19        Okay.  With that background, let me turn to some

20   basic medical 101 -- hold that -- medical 101.

21        Can you start by telling us what are opioids?

22   A    Opioids are any molecule that binds to the

23   opioid receptor and stimulate that receptor.

24   Q    And are there different types of opioids?

25   A    Yes.  Opioids can be naturally occurring,

26   meaning that they begin with the opium poppy -- for



Page 2424

1  example, morphine, codeine, thebaine.  They can also be

2  what's called semisynthetic, meaning that they begin with

3  a naturally occurring opioid from the opioid poppy and

4  then they are altered in some way in the laboratory.  And

5  most of the Schedule II prescription opioids are

6  semisynthetic.

7       And opioids can also be purely synthetic which

8  means they do not need an opium poppy precursor and are

9  made entirely in a laboratory, and that would include

10  fentanyl and methadone.

11     Q    And, Doctor, what are prescription opioids?

12     A    Prescription opioids are opioids that can be

13  obtained through a doctor's prescription and dispensed by

14  a pharmacy.

15     Q    And what is what's been called in this case

16  illicit opioids?

17     A    Illicit opioids are opioids that are obtained in

18  any way that is not prescribed.

19     Q    Do prescription opioids and illicit opioids have

20  the same effect on the brain?

21     A    Yes.  As I said before, an opioid is an opioid.

22  It doesn't matter if it comes in a pill bottle or you buy

23  it on the street.  Opioids work the same way on the

24  brain.

25     Q    And can opioids that are prescribed by a

26  physician to treat pain conditions cause addiction and



Page 2425

1  dependence?

2      A    Yes.  Opioids that are prescribed to treat pain

3  and used as prescribed can lead to the disease of opioid

4  addiction.

5      Q    Is there any reason to -- well, let me ask this:

6  Are prescription opioids any less likely to cause

7  addiction in those who take them than illicit opioids?

8      A    No.

9      Q    And we've talked earlier today in going through

10 your qualifications about addiction and dependence.

11          Can you explain to the Court what addiction is.

12     A    Addiction is a complex biopsychosocial disease

13 that can be simply defined as the continued compulsive

14 use of a substance despite harm to self and/or others.

15     Q    And is that the same as opioid use disorder, or

16 OUD?

17     A    Yes.  That is broadly speaking the same as

18 opioid use disorder, opioid addiction.  They're

19 essentially synonyms.  Opioid addiction is a more

20 commonly understood lay term, but it is not the

21 terminology used in DSM-5, which uses opioid use disorder

22 instead.

23     Q    And you also referenced earlier dependence on

24 opioids.

25          Is that different from OUD?

26     A    So dependence was singled out when the DSM-IV



Page 2426

 1   went to the DSM-5.  Previously, the word "opioid

 2   dependence" was used synonymously with the word "opioid

 3   addiction," but starting with the DSM-5, it was

 4   distinguished as referring exclusively to physiologic

 5   dependence, separate from opioid addiction per se.

 6        Most individuals who become addicted to opioids

 7   are strictly dependent on opioids.  But individuals can

 8   be dependent on opioids, taking them even as prescribed,

 9   without meeting the DSM-5 criteria for opioid use

10   disorder.

11        So these are related phenomenon but, as of the

12   DSM-5, separate and distinct.

13   Q     And what is tolerance to opioids?

14   A     Tolerance is needing more and more of an opioid

15   to get the same analgesic response.  So importantly, when

16   we are talking about tolerance, we're not talking about

17   habituation to side effects; we're talking about needing

18   more opioids over time to get the same pain relief as the

19   individual got originally.

20        The majority of patients, based on clinical

21   experience, will develop tolerance to opioids if they

22   take them every day for a period of time.  What exactly

23   that period of time is is not known and probably differs

24   from individual to individual.  But in my experience,

25   most individuals who take an opioid every day for two to

26   four weeks will develop some degree of tolerance, needing



Page 2427

1  more of that opioid over time to get the same effect.

2       I also think it's important to highlight that

3  tolerance that develops to the analgesic effect of the

4  opioid occurs more quickly than the tolerance that

5  develops to the respiratory depressant effects of the

6  opioids.  So opioids decrease breathing, decrease heart

7  rate.  That's why people can die of them.  They fall

8  asleep and don't wake up again.

9       The central problem with opioids is that

10  individuals will develop tolerance to their analgesic

11  effects, and that tolerance to the analgesic effects will

12  occur more quickly than to the respiratory depressant

13  effects, which is why, even when taking the opioids as

14  prescribed, patients can die from them.

15  Q    Can you explain to the Court what happens in the

16  brain when someone develops OUD.

17  A    In order to understand what happens in the

18  brain, when an individual becomes addicted to any

19  addictive substance, it's important to talk about some of

20  the central findings in the neuroscience in the past 75

21  years.  And the first is that pain and pleasure are

22  colocated.

23       And by that I mean that the same part of the

24  brain that processes pain also processes pleasure, and

25  pain and pleasure work like a balance, like a

26  teeter-totter on a central fulcrum.  So when I experience



Page 2428

1    pleasure, my balance tips to one side; when I experience

2    pain, it tips to the other side.

3            The fundamental difference between the

4    substances that are addictive, like opioids, and those

5    that are not is how much they tip the balance to the side

6    of pleasure.  And when they do that, they release an

7    enormous amount of dopamine in the brain for reward

8    pathways.  Dopamine is a neurotransmitter discovered in

9    the human brain in 1950s, and it allows neurons to

10   communicate because neurons are separated by a little gap

11   called a synapse, and neurotransmitters are what bridge

12   that gap for fine-tuned control of brain circuitry.

13           One of the most important rules governing this

14   pleasure-pain balance is that it wants to remain level,

15   what neuroscientists call homeostasis.  And the brain

16   will work very hard to preserve or restore neutrality.

17           So when I ingest an opioid, my balance tips to

18   the side of pleasure, I get a big release of dopamine in

19   the brain's reward pathways, and immediately the brain

20   will put the equivalent of weight on the pain side of the

21   balance to bring it level again.

22           Those weights metaphorically represent what's

23   called neuroadaptation, the downregulation of my own

24   dopamine transmission.

25           Now, the central thing to understand is that the

26   balance will not stop here once it obtains neutrality.



Page 2429

1   It will continue to tip an equal and opposite amount to

2   the side of pain, and that is a comedown or withdrawal.

3   If I wait long enough after a single use, those weights

4   come off again and the neutrality or homeostasis is

5   restored.

6           To understand what happens in the brain when

7   people become addicted is to understand what happens when

8   that exercise, abusing that addictive opioid, occurs a

9   second time.  With repeated use, the initial effects to

10  the pleasure side is weaker and shorter and the

11  aftereffect to the side of pain is longer and stronger.

12  In other words, the balance remembered, and now it needs

13  more weight on the pain side in order to restore

14  neutrality.

15          If I continue to use the opioid for days to

16  weeks to months to years, I eventually collect so much

17  weight on the pain side of my balance that, when I am not

18  using, I have a balance that is chronically tipped to the

19  side of pain.  I have a different brain than the brain I

20  started with.

21          This is why individuals with addiction will

22  relapse to substance use even months after they've

23  stopped using, even when their lives are better, they've

24  got their jobs back, they've got their spouse back,

25  they're walking around with a balance tipped to the side

26  of pain.



Page 2430

1          Now, theoretically, if they wait long enough --

2    and I can tell you, it can take months and even years for

3    all of that neuroadaptive weight to come off the

4    balance -- then eventually homeostasis will again be

5    restored.

6          Unfortunately, what we have learned is that,

7    with opioid addiction, there are individuals who may

8    never actually be able to restore homeostasis, that they

9    may, in fact, have a broken balance such that, even after

10   months or years of not using opioids, they continue to

11   experience craving, insomnia, irritability, intrusive

12   thoughts of wanting to use.

13         And those are the individuals to whom --

14         (Whereupon audio was lost by the court reporter.

15   The Court recessed until 1:30 p.m.)

16

17

18

19

20

21

22

23

24

25

26



Page 2431

1                    AFTERNOON SESSION

2

3           THE COURT:  Good afternoon, everybody.  We are

4    back on the record.

5           Dr. Lembke, I remind you that you remain under

6    oath throughout your testimony in this case.  It appears

7    that you may be on mute; so please unmute yourself.

8           And, Counsel, you may continue.

9           MS. FITZPATRICK:  Thank you, your Honor.

10   BY MS. FITZPATRICK:

11   Q    Dr. Lembke, when we broke, you had been

12   testifying about certain people that you said had a

13   broken balance.  Even after months or years of not using

14   opioids, they continued to experience cravings.  And can

15   you tell us how people who suffer from that type of OUD

16   are treated?

17   A    There are many different types of treatment for

18   people with opioid addiction.  It's a biopsychosocial

19   disease; so there are biopsychosocial treatments.

20          But the treatment that I was speaking of before

21   we broke was the use of opioid agonist therapies like

22   buprenorphine and methadone maintenance in the treatment

23   of opioid use disorder.

24   Q    And how does that type of treatment help these

25   individuals who, as you say, have a broken balance?

26   A    It's instinctively counterintuitive to think



Page 2432

1   about using opioids to treat an opioid addiction, but

2   these are opioids that have unique properties which

3   restore a homeostatic equilibrium for these individuals,

4   so they're not constantly living with cravings,

5   dysphoria, and the physiologic drive to want to use

6   opioids.

7           So it reasserts homeostasis and allows them to

8   reengage with other aspects of their lives.

9   Q    And do opioids affect people who have chronic

10  pain or for whom -- have received prescriptions for

11  chronic pain differently than people who take opioids for

12  nonmedically indicated purposes?

13  A    The fundamental process of neuroadaptation that

14  occurs in the brain leading to addiction is also the same

15  process that occurs in the brain of people who are given

16  opioids for the treatment of chronic pain.

17          One way to think about this is that people with

18  pain are not starting out with a level balance; they're

19  starting out with a balance tipped slightly to the side

20  of pain.  They receive opioids which temporarily relieves

21  their pain and reasserts a kind of homeostasis.  But with

22  repeated use over periods of time, that initial effect

23  gets weaker and shorter.  That's called tolerance.  And

24  the aftereffect gets longer and stronger.

25          And eventually they too end up with a

26  pleasure-pain balance that's weighted to the side of



Page 2433

1   pain.  In fact, there are individuals who are on opioids

2   long term that develop something called opioid-induced

3   hyperalgesia, which is just a way of saying that their

4   pain actually gets worse as a result of long-term opioid

5   therapy.

6        And if you understand neuroadaptation and the

7   attempt of the brain to correct for homeostasis by

8   weighting things down to the side of pain, then it

9   becomes more intelligible how that might happen.

10       Q    Can anyone become addicted to opioids?

11       A    With enough exposure for a long enough period of

12  time, anybody could become addicted to opioids.

13       Q    Are some people more susceptible to OUD, or

14  opioid addiction, than others?

15       A    Yes.  People come to the problem of addiction

16  with varying degrees of vulnerability.  And some are

17  definitely more susceptible than others.

18       Q    And what are the risk factors or the factors

19  that make people more susceptible to OUD than others?

20       A    Risk factors for addiction, including opioid

21  addiction, can broadly be categorized into nature,

22  nurture, and neighborhood.

23       By nature, I mean that there is an increased

24  genetic risk for becoming addicted.  If you have a

25  biological parent or grandparent with addiction, you are

26  more likely to get addicted even if raised outside of the



Page 2434

1  addictive home.

2          In terms of nurture, if you grow up in a chaotic

3  environment and you experience early childhood trauma,

4  epigenetic risk factors can contribute to your risk of

5  addiction.

6          Finally, in terms of neighborhood, one of the

7  most underappreciated risks of addiction is simple access

8  to that drug.  If you live in a neighborhood where drugs

9  are sold on the street corner, you're more likely to try

10  them and you're more likely to get addicted to them.

11          If you go to a doctor who is liberal with their

12  prescription pad when it comes to controlled substances,

13  you're more likely to be exposed to opioids and then more

14  likely to get addicted to them.

15  Q    Is there a reliable or foolproof way for a

16  physician to determine who will develop OUD as a result

17  of prescription opioids?

18  A    No, there is not.  So, in theory, because we

19  know retrospectively what the risk factors are for

20  developing opioid use disorder through a doctor's

21  prescription, we should be able to predict.  But the

22  truth is that we cannot.  And various opioid risk tools

23  or screening measures have proven to be no better than

24  chance in determining who will and will not get addicted

25  through a doctor's prescription.

26          Furthermore, all of those risk factors I just



Page 2435

1    named in terms of personal history of addiction or family

2    history of addiction or past history of trauma, those

3    risk factors pale in comparison to the risk of dose and

4    duration of exposure to the opioid.

5        Q    Can a person with OUD just stop taking opioids

6    to cure that disease?

7        A    The majority of individuals who have severe

8    opioid use disorder have a great difficulty stopping

9    opioids in the face of their disease.  They can do it,

10   but they will endure a severe acute opioid withdrawal,

11   which for some is worse than death.

12           And as I stated before, there is this protracted

13   abstinence syndrome, where their pleasure-pain balance

14   remains tipped to the side of pain, driving craving and

15   the physiologic urge to continue to use opioids.

16       Q    Among patients who are treated for pain with

17   opioids, what percentage will develop OUD according to

18   the literature?

19       A    Reliable sources show that one in four patients

20   will develop an opioid use disorder when being treated

21   with opioids for chronic pain.

22       Q    And are the risks associated with prescription

23   opioids limited to just the people who are prescribed

24   opioids?

25       A    No.  The people who are at risk include anybody

26   in society who has access to opioids whether or not those



Page 2436

1    opioids were prescribed to them.  One of the things I

2    talk about in my report is not just the gateway theory of

3    progressing from prescription opioids to illicit opioids

4    but also what I call the tsunami effect, the flooding of

5    our society with more prescription opioids, conferring

6    greater access to the population as a whole and thereby

7    increasing the risk of the entire population towards the

8    harms of prescription opioids, including dependence,

9    misuse, overdose, death, and addiction.

10       Q    How does the increased supply of prescription

11   opioids contribute to addiction and OUD rates across the

12   population?

13       A    The more access that an individual has to a

14   drug, the more likely they are to try that drug and to

15   become addicted to that drug.  Opioids are furthermore

16   unique because, different from other addictive

17   substances, opioids have been sold and marketed as

18   medicine.

19            Opioids also have a very low therapeutic index,

20   meaning that the desired effect is very near the lethal

21   effect.  Furthermore, opioids have a very caustic and

22   debilitating dependence and withdrawal syndrome, such

23   that even when people try to stop, they're often unable

24   to because of the severe symptoms of withdrawal that they

25   experience.

26       Q    I am going to pull up a slide that -- well, you



Page 2437

1   may.  Can you explain what this slide entitled

2   "Prescription Rates Rise, Deaths and ODs Rise"?

3           What is that?

4   A    This is a slide showing that, as sales of

5   prescription opioids increased between the years 1999 and

6   2010, so did treatment admissions for opioid addiction to

7   treatment centers as well as opioid overdose-related

8   deaths.

9   Q    And do you have an opinion as to whether

10  increased sale of opioids is a cause of higher rates of

11  opioid deaths and hospitalization in the United States?

12  A    Yes, I do.  I think that the increased access

13  through prescription is causal and can -- and is a

14  significant contributor to the current opioid epidemic.

15          MS. FITZPATRICK:  And can we go to Slide 5.

16          No.  Other way.  There we go.

17  BY MS. FITZPATRICK:

18  Q    And is this a slide that you put together --

19  it's the wrong slide.

20          Can you explain the basis for that opinion?

21  A    Yes, I can.  So the basis for the causality

22  opinion is the consistency of findings across not just

23  that data point that you showed, but multiple reports and

24  multiple data points.

25          Also, the strength of the association.  So not

26  merely showing a very strong association between exposure



Page 2438

1  to prescription opioids and subsequent addiction and

2  overdose deaths but also a causal relationship between

3  promoting opioids to doctors in a given region and

4  increased prescribing and overdose death in that region.

5          Beyond consistency and strength of the

6  association, there's also the temporal sequence that

7  exposure to opioids precedes addiction and overdose death

8  as well as that being a biologically plausible sequence

9  of events.  Furthermore, these opinions are not merely my

10  opinions; there are -- this is essentially the consensus

11  opinion in medicine now.

12          If you look at the National Academies of

13  Science, Engineering, and Medicine 2017 report, it states

14  very clearly that the promotion and marketing of opioids

15  led to increased prescribing, led to the current opioid

16  epidemic.  Also, the Association of Schools & Programs of

17  Public Health, a consortium of over 100 public health

18  programs in the country, including public health programs

19  in California, has also written an important treatise on

20  this topic expressing the same opinion.

21      Q    Is that the same in California?

22      A    Yes.

23      Q    And going back to the use of prescription

24  opioids, can even a limited use of prescription opioids

25  lead to OUD?

26      A    Yes.  There are data showing that even a single



Page 2439

1  prescription of an opioid in the course of medical and

2  dental treatment can increase the risk of developing

3  opioid use disorder within that year.  Also, we know that

4  even a brief exposure to opioids for the treatment of

5  acute pain can, in 5 to 10 percent of individuals, lead

6  to persistent opioid use a year to three years later.

7  And it's important to recognize that persistent opioid

8  use increases the risk of developing opioid addiction.

9       So the longer the duration of exposure to

10 prescription opioids and the higher the dose of those

11 prescription opioids, the greater the risk of developing

12 addiction and of dying from those opioids.

13    Q    Dr. Lembke, are you familiar with what's been

14 called abuse-deterrent formulations for prescription

15 opioids?

16    A    Yes, I am.

17    Q    Can you tell the Court what those are?

18    A    Those are formulations of opioids that are

19 crush-resistant, serving as a deterrent for crushing and

20 snorting and crushing and injecting, two ways in which

21 people who misuse opioids will misuse them.

22    Q    And can taking an abuse-deterrent formulation of

23 an opioid as prescribed by your physician lead to OUD or

24 opioid dependence?

25    A    The most common way that people get addicted to

26 prescription opioids is to take them exactly as



Page 2440

1   prescribed, which is to say, if they're prescribed

2   orally, then they take them orally and they misuse them

3   orally and they become addicted to them orally.

4       Q    Doctor, I want to shift a little bit, change

5   topics to something that you called the paradigm shift.

6   How were prescription opioids used before the 1990s in

7   the United States?

8       A    Prior to the 1990s doctors used opioids

9   sparingly for surgery, severe trauma, and end of life.

10      Q    Okay.  And why was it used sparingly at that

11  time?

12      A    There was widespread recognition and

13  understanding that opioids are highly dangerous drugs and

14  highly addictive.  And doctors were reluctant to give

15  their patients an addiction to opioids.

16      Q    And in the 1980s was there a discussion in the

17  medical community suggesting that opioids should be used

18  less conservatively?

19      A    Yes.  In the 1980s, there began to be

20  recognition in the house of medicine that we were not

21  doing a very good job treating pain.  This was also the

22  advent of the hospice movement imported from Europe

23  advocating for more care of patients at the end of life.

24         There were certain individuals inside of

25  medicine, key academic thought leaders, who began to

26  advocate for more liberal use of opioids in the treatment



Page 2441

1   of pain in order to help people with their suffering.

2   But there was not much data to support that.  There were

3   a few not-very-robust data points in the '80s and '90s.

4   And so the prescribing did not appreciably increase in

5   those decades.

6        Q    Did there come a point in time that the

7   prescribing started to -- the prescribing of opioids for

8   pain started to appreciably increase?

9        A    The late 1990s, early 2000s represents the

10  beginning of the paradigm shift when opioid prescribing

11  went up, quadrupling between 1989 and approximately 2012

12  across the United States nationally.  That increase in

13  opioids was because opioids became first-line treatment

14  for almost any patient in pain.  And doctors pushed the

15  dose from modest and conservative low doses to very, very

16  high doses such that it was not uncommon in that first

17  decade and beyond to see patients on 2,000 morphine

18  milligram equivalents daily for the treatment of their

19  pain.

20       Q    And when you use the term "paradigm shift," can

21  you explain to the Court what you mean by that?

22       A    What I mean by that is the standard of care for

23  how to target pain in the healthcare community shifted

24  over time.  And that was accomplished through a number of

25  ways but primarily by false and misleading messaging

26  infiltrating the very governing bodies, professional



MAGNA
LEGAL SERVICES

Page 2442

1  medical societies, and enforcement agencies that were

2  meant to protect people from the harms of opioids.

3         MR. BRODY:  Your Honor, I'd move to strike.

4  Lack of foundation.

5         THE COURT:  Just a moment.

6         I am mindful of the motions in limine,

7  Ms. Fitzpatrick.  You have laid an extensive foundation.

8  You have not laid a foundation for the marketing false

9  and misleading opinions.  The foundation objection is

10  sustained and the last answer is stricken.

11         You may restate the question or lay a

12  foundation.

13         MS. FITZPATRICK:  Thank you, your Honor.

14  BY MS. FITZPATRICK:

15  Q    And, Dr. Lembke, when we were talking before

16  about your qualifications, have you, prior to being

17  retained as an expert by the People in this case, done

18  independent research into whether there's a causal

19  relationship between what you called false and misleading

20  messages by the pharmaceutical industry and an increase

21  in the availability of prescription opioids throughout

22  the United States?

23  A    Yes, I have.  And that's in my book that was

24  published in 2016.

25  Q    And can you tell the Court how you went about

26  doing your research for that particular proposition?



Page 2443

1      A     I studied the medical literature, including

2    government documents and what was in the lay press,

3    attesting to the role of the opioid pharmaceutical

4    industry in terms of their courting key opinion leaders,

5    working together with the Federation of State Medical

6    Boards, the relationship that they had with organizations

7    like the Joint Commission, organizations like the Pain &

8    Policy Study Group, publications that were put out in

9    collaboration between the opioid pharmaceutical industry,

10   opioid manufacturers, including defendants, and key

11   opinion leaders who they promoted and professional

12   medical societies, all of which resulted in drawing the

13   medical community's attention to the promotional messages

14   that they wanted to promote in the morass of messages

15   that physicians have to wade through every day in order

16   to figure out what the science is.  So they essentially

17   used that strategy to portray marketing as science.

18           MR. BRODY:  Your Honor, I'd move to strike the

19   last answer for lack of foundation.  And also it's

20   case-specific hearsay.

21           THE COURT:  The answer isn't providing -- the

22   answer did not discuss, really, the foundation, but

23   restated -- or began to restate opinions.

24           The question also -- and perhaps the -- the

25   question was misunderstood.  The objection to the

26   previous question related to an opinion being expressed



Page 2444

 1    about false and misleading messaging.

 2         That work was done to understand what the

 3    opioid -- the pharmaceutical industry might have done

 4    still does not lay a foundation or discuss what was done

 5    to investigate or form a basis for opinions about the

 6    content being false and misleading.

 7         Ms. Fitzpatrick, the last answer is stricken.

 8    You may start again.

 9         BY MS. FITZPATRICK:

10    Q    Let me -- let me try it this way:  Dr. Lembke,

11    you had testified about the increase in prescriptions

12    between 1998 and 2012.  Can you explain to the Court what

13    happened after 2012 with respect to the prescription of

14    opioids?

15    A    You mean in terms of the number of

16    prescriptions?

17    Q    I'm sorry.  Yes, in terms of the number of

18    prescriptions.

19    A    Okay.  So starting in 2012, the number of --

20         THE COURT:  Dr. Lembke, I'm sorry to interrupt.

21    Before I hear your opinion as to what happened, I'd like

22    to understand the investigation, research work that you

23    did in order to be able to express that opinion.  So I

24    need to understand what the source of your information is

25    before I hear the opinion itself.

26         THE WITNESS:  Thank you, your Honor.  I would



Page 2445

1    like to answer that.

2            So I was the recipient, as were my colleagues,

3    of these marketing messages.  And I looked at the

4    marketing messages.  So I investigated them independently

5    prior to my involvement in this litigation, and I

6    compared those messages with the science in the medical

7    literature in order to explore whether or not those

8    messages represented the real data.

9            And the conclusion that I came to was that they

10   were false and misleading.

11           Furthermore, I, in the course of writing my book

12   Drug Dealer, MD, interviewed patients and providers about

13   their experiences with these messages and how they

14   interpreted them and the impact that the messages had on

15   their prescribing.  And that information, I then

16   subjected to a qualitative analysis which led me to my

17   current conclusions and which I do talk about in my book.

18           THE COURT:  Ms. Fitzpatrick?

19       BY MS. FITZPATRICK:

20       Q    Dr. Lembke, let's go back to your opinions

21   concerning the increase in the use of opioids between

22   2012 -- or after 2012.

23           Can you describe to the Court whether there was

24   an increase in opioid use after 2012?

25       A    So I -- in 2012 prescription opioids started to

26   go down slowly.  Around that time, overdose deaths



Page 2446

1   related to heroin went up.  And around 2015-2017, there

2   was a spike in fentanyl-related overdose deaths.

3           Prescription opioid-related overdose deaths went

4   down and/or plateaued during that time period between

5   about 2012 and 2017 but did not decline -- did not

6   considerably decline.

7       Q   And did the increased access to prescription

8   opioids between 1998 and 2012 lead to an increase in

9   dependence, OUD, overdose, and death?

10          MR. KABA:  Objection, your Honor; foundation.

11          THE COURT:  Overruled.

12          THE WITNESS:  The increased access to

13  prescription opioids between 1999 and 2012 was, I

14  believe, the biggest causative factor in the increase in

15  opioid addiction and overdose death.

16  BY MS. FITZPATRICK:

17      Q   And can you explain to the Court what the term

18  "morphine milligram equivalent," or MME, is?

19      A   It's a way of comparing different opioids that

20  have different strengths, the different potencies.  So

21  using morphine as the baseline, it's a way of then

22  comparing and contrasting the actual amount of opioids

23  that individual was getting by linking it all back to how

24  much that would be in milligrams of morphine.

25      Q   And based on the research and your methodology

26  that you explained to the Court, have MMEs declined to



Page 2447

1    the same extent as the prescription units that you

2    discussed earlier since 2012?

3       A     No, they have not.  In 1999 -- or 1997, United

4    States physicians were writing prescriptions that equated

5    to approximately 100 morphine milligram equivalents per

6    person.  By 2007, that had increased to 700 morphine

7    milligram equivalents per person.  And by 2017, that had

8    decreased to approximately 550 morphine milligram

9    equivalents per person, still five times the amount of

10   morphine prescribed -- or the amount of opioids

11   prescribed in 1997.

12      Q     Dr. Lembke, I want to turn to -- well, let me

13   ask what's the significance of MMEs not declining to

14   the -- at the same rate as the actual number of

15   prescriptions?

16      A     The significance there is that, in order to

17   appreciate the extent of the increased prescribing, it's

18   important not just to look at the numbers of

19   prescriptions written per person but also how high those

20   doses were.

21            One of the big shifts in terms of this paradigm

22   shift was this idea that no dose is too high, that if a

23   patient comes in saying that the analgesic effects have

24   worn off, you can just go up on the dose and continue to

25   go up and continue to go up with impunity and without

26   increasing risk, which is how we got to the place where,



Page 2448

1  by 2007, we were prescribing 700 morphine milligram

2  equivalents per person in the United States.

3          And just to put that into perspective, the

4  average opioid-addicted person who gets methadone

5  maintenance from a methadone maintenance clinic is on

6  approximately 100 to 150 morphine milligram equivalents

7  daily.  So as a patient with pain seeing a doctor, you

8  could get seven times the amount of effective opioids on

9  a regular basis as you would get from a methadone

10  maintenance clinic.

11     Q    So, Dr. Lembke, I want to turn to the messaging

12  around opioids, which was part of your opinions here.

13          You heard Dr. Perri testify about certain common

14  promotional messages that were used by the four

15  defendants in this case, correct?

16     A    Yes, I did.

17     Q    And have you reviewed substantially similar

18  messages to those identified by Dr. Perri to determine

19  whether those claims that are made in those messages are

20  supported by the medical and scientific evidence and

21  literature?

22     A    Yes, I have.

23     Q    And you did that as part of your research for

24  your book and the work that you were doing prior to being

25  retained as an expert by any government entity in opioid

26  litigation, correct?



Page 2449

1    A    Yes, I did.

2    Q    And let me pull up the next slide.

3         Are these the misrepresentations that Dr. Perri

4    identified and that you have seen in the promotional

5    messages that you considered and analyzed in this case?

6    A    These are the messages that I considered and

7    analyzed, yes.

8    Q    Okay.  And what I want to do is go through each

9    of those messages separately and talk about the

10   scientific or medical evidence related to those messages.

11   So if what we do is -- let's take the first one, which

12   you've identified as misrepresentation number one,

13   "Addiction to opioids prescribed for treatment of pain is

14   rare."

15   A    Yes.

16   Q    Dr. Lembke, you testified a little bit earlier

17   that about one in four people who are prescribed opioids

18   will develop some form of OUD; is that correct?

19   A    Yes, that's correct.

20   Q    Okay.  And can you explain -- can you elaborate

21   on that a little bit more for the Court?

22   A    Sure.  The most robust resource for this to date

23   is the Vowles, et al., article, showing that 21 to

24   29 percent of pain patients prescribed an opioid will

25   misuse that opioid.  And 8 to 12 percent of those

26   individuals will develop a moderate to severe opioid use



Page 2450

1    disorder.

2           Vowles is a highly reliable source because it

3    included a high number of studies, 38 studies; because it

4    didn't use arbitrary quality measures but included

5    multiple studies; and that, in fact, compared the

6    aggregate results to the highest-quality studies and

7    found that the highest-quality studies of the 38 studies

8    had a consistent finding.  The Vowles authors furthermore

9    did not have any conflicts of interest.

10   Q    Let me step back a little bit and just break

11   this down.  Rates of misuse averaged between 21 and

12   29 percent.  What does rates of misuse represent here?

13   A    So misuse in its simplest definition means using

14   an opioid differently than how the doctor prescribed it.

15   But in the Vowles study, their definition and measures of

16   opioid misuse correspond very closely with the DSM

17   criteria such that I believe that their opioid misuse

18   category is consistent with mild opioid use disorder

19   using the DSM-5 criteria.

20           And so -- sorry.

21   Q    That's okay.

22           What is mild opioid use disorder?

23   A    So the DSM-5 has 11 criteria to define and guide

24   the diagnosis of opioid use disorder.  And opioid use

25   disorder is diagnosed on a spectrum, meaning that you can

26   have a mild, moderate, or severe form depending upon how



Page 2451

1   many criteria are met.

2         So two to three criteria gives you a mild opioid

3   use disorder, four to five is a moderate opioid use

4   disorder, and six or more is a severe opioid use

5   disorder, with some qualifications.

6   Q    And, Dr. Lembke, can we go ahead -- can you

7   identify for the Court the full title of the study that

8   you were referring to here.

9   A    Oh, at the bottom you see sources Vowles, et

10  al., "Rates of Opioid Misuse, Abuse, and Addiction in

11  Chronic Pain:  A Systematic Review and Data Synthesis,"

12  published in 2015.

13  Q    Where was this published?

14  A    It was published in the journal Pain.

15  Q    If you go up to this slide, "Across most

16  calculations, rates of misuse average between 21 to

17  29 percent."  And underneath it says, "Range, 95 percent

18  confidence interval 13 to 38 percent."

19        Can you tell me what that means?

20  A    That means that, although there's a range of

21  results, we can be confident that the range occurs

22  within -- that the true result occurs within that range.

23  Q    So the true result occurs between 13 and

24  38 percent; is that right?

25  A    Yes.

26  Q    And then going on to rates of addiction average



Page 2452

 1   between 8 and 12 percent.

 2        Is that the severe OUD or moderate to severe OUD

 3   that you were talking about?

 4        A    Yes, it is.

 5        Q    And what is that confidence interval range?

 6        A    That means that we can -- with 95 percent

 7   surety, we can know that the true range is between 3 and

 8   17 percent.

 9        Q    And you had identified -- tell us why you relied

10   on this particular study for your conclusions concerning

11   the rates of both mild OUD and moderate to severe OUD in

12   pain patients.

13        A    Again, because they included a large number of

14   studies.  38 is a large number of studies for this

15   subject in terms of a meta-analysis.  The authors had no

16   conflicts of interest --

17        THE COURT:  Dr. Lembke, I did already hear your

18   explanation.  Thank you.

19        Ms. Fitzpatrick?

20        MS. FITZPATRICK:  I want to turn to the next

21   slide, Jon.

22   BY MS. FITZPATRICK:

23        Q    Okay.  And can you tell the Court what this

24   slide represents.

25        A    This slide is a timeline showing what was known

26   when in terms of the rates of addiction to prescription


MAGNA
LEGAL SERVICES

Page 2453

1   opioids among pain patients being prescribed opioids.

2   And importantly what it shows is that, dating back as

3   early as 1970s, there were studies showing that --

4   showing rates of as high as 24 percent of developing

5   addiction in a pain population being treated with

6   medicinal opioids.

7           You'll note that the second value is

8   0.03 percent, and that is the now infamous Porter and

9   Jick study that was referenced by the industry to support

10  the claim that the risk of addiction to opioids is rare

11  or less than 1 percent in individuals who are getting

12  prescribed opioids by a doctor.  So that is not a

13  reputable data point.

14          But even that aside, you'll see there's a broad

15  range of findings here, but all the findings are well

16  above the less than 1 percent that was attested to by the

17  Porter and Jick.  Furthermore, the Vowles article

18  incorporates many of the studies listed here.

19  Q    Now, turning to the next slide, what does the

20  World Health Organization consider to be rare for an

21  adverse event frequency in a pharmaceutical?

22  A    The World Health Organization has provided this

23  conceptual diagram for understanding when an adverse

24  outcome is rare versus common.  And as you can see, very

25  common is greater than or equal to 1 in 10, common is

26  greater than 1 in 100, et cetera, and very rare or rare


MAGNA
LEGAL SERVICES

Page 2454

1    is less than 1 in 10,000 or greater than 1 in 10,000,

2    less than 1,000.

3         The findings for the risk of addiction among

4    chronic pain patients or pain patients being treated for

5    opioids by any measure is not rare.

6    Q    And does that include the 8 to 12 percent for

7    the moderate to severe OUD?

8    A    Yes.  So that would -- that would suggest, then,

9    that the true rate of becoming addicted to opioids when

10   getting them from a doctor for a pain condition is common

11   or very common.

12   Q    And did you review some of the marketing and

13   promotional claims by the defendants in this case

14   concerning the rates of addiction to opioid medication?

15   A    Yes, I did.

16   Q    Okay.  And I want to turn to the next slide.

17   And these are documents that are already in evidence in

18   this case.

19        Are these some of the examples that you picked

20   that demonstrate a common message among the defendants in

21   this case that addiction to opioids prescribed for

22   treatment of pain is rare?

23        MS. FEINSTEIN:  Objection, your Honor.  The

24   Fentora document referred to on this slide has not yet

25   been entered into evidence.  So I'll object on the basis

26   of foundation and facts not in evidence.



Page 2455

```
 1              MS. FITZPATRICK:  Thank you.
 2              Your Honor, that is my error.
 3              Let's pull up 1367, Jon.
 4         BY MS. FITZPATRICK:
 5         Q    Doctor, can you take a look at the document
 6    that's before you.  And it will be in your Magna file too
 7    if you want to take a look at it in more detail.  If you
 8    turn to second page, of this, Jon.
 9              Do you recognize this document?
10         A    Yes, I do.
11         Q    And can you tell the Court what this document
12    is?
13         A    This is a document that was used internally to
14    train sales representatives on Fentora.
15              MS. FITZPATRICK:  Your Honor, I'm understanding
16    there's no objection to the admission of this document.
17    So the People will move P-CA-1367 into evidence at this
18    time.
19              THE COURT:  Any objection?
20              MS. FEINSTEIN:  No objection, your Honor.  Thank
21    you.
22              THE COURT:  P-1367 is admitted.
23              (Whereupon, Plaintiff's Exhibit No. 1367 was
24              received in evidence.)
25              MS. FITZPATRICK:  Jon, can you go back to the
26    slide that we had up.
```



Page 2456

1    BY MS. FITZPATRICK:

2        Q    And you do notice that the P-CA-1367 is in the

3    top left-hand section of this slide.  Can you explain to

4    the Court what the four boxes on this slide represent?

5        A    These represent false or misleading messages on

6    the part of defendants that purported to claim that

7    addiction to opioids prescribed for the treatment of pain

8    is rare.

9        Q    And why did you choose these examples?

10       A    These examples were just emblematic of many of

11   the documents that I reviewed.

12       Q    And do you remember what the Kadian learning

13   system is?

14       A    Yes, I do.

15       Q    All right.  Can you tell the Court why you chose

16   something from the Kadian learning system for this -- we

17   lost the slide -- the Kadian learning system for an

18   example here of what you call Misrepresentation Number 1?

19       A    The Kadian learning system, like the Fentora

20   "Introduction to Pain," was a document that was used

21   internally to train sales reps, different from, for

22   example, the "Finding Relief" document on this slide,

23   which was a patient-facing document on the Duragesic

24   website, which was a public-facing website.

25            I thought it was important to look not just at

26   internal training documents but also to patient-facing



Page 2457

1    documents to explore the synchronicity or not between the

2    messages that were being communicated to sales reps and

3    to patient consumers and prescribers directly.

4        Q    And what do you mean by "synchronicity"?

5        A    To see what was being said to sales reps versus

6    what was being said to prescribers and patient consumers.

7    And what I found was that these false and misleading

8    messages could be found in all of those places.

9        MS. FITZPATRICK:  And if we turn to the next

10    slide, Jon.

11    BY MS. FITZPATRICK:

12        Q    And is this an example --

13        A    I'm sorry.  Do I have an opportunity to talk

14    about those misleading messages?

15        Q    We are going to.  We'll go back to it, but I

16    just wanted to identify this one as well.

17        Is this, the "Finding Relief Pain Management for

18    Older Adults," is this something that you selected as

19    well as an example of these what you call

20    Misrepresentation Number 1?

21        A    Yes.

22        Q    Okay.  And can you tell the Court what was

23    significant about this document?

24        A    Again, this was a patient-facing document that

25    Janssen put together in collaboration with the American

26    Geriatric Association.  And I think what's striking here



Page 2458

1   is that the very myth that Janssen, in collaboration with

2   the American Geriatric Association, acclaimed to be

3   untrue are much closer to the truth than what they stated

4   as fact.  And I'm happy to go through them if you'd like.

5       Q    I'd like you to start with the first myth,

6   "Opioid medications are always addictive."

7       A    Okay.  So opioid medications are not always

8   addictive, but they are often addictive.  It is very

9   common for patients to get addicted when exposed to a

10  doctor's prescription.  And it is simply not true that

11  many studies show that opioids are rarely addictive when

12  used properly for the management of chronic pain.  Again

13  I cited the Vowles study, which is the meta-analysis for

14  that.

15           It states here as a myth that opioids make it

16  harder to function normally --

17      Q    Let me ask you a question about that.  The

18  Vowles study that we discussed, that was an analysis of

19  multiple different studies that had been reported in the

20  medical literature, correct?

21      A    Yes.  It was a meta-analysis.

22      Q    And did any of those studies, independently and

23  independent of the Vowles study, indicate that opioids

24  are rarely addictive when using the World Health

25  Organization standard for rare?

26      A    Only the Porter and Jick, which is not a real



Page 2459

1  study.  It was a letter to the editor based on a

2  single-point observation of hospitalized patients, many

3  of whom had received only a single dose of an opioid.

4      Q    And do you consider the Porter and Jick letter

5  to the editor to be a reliable source for basing what you

6  have called evidence-based medicine?

7      A    No.

8      Q    And why not?

9      A    As I said, it was based on a hospitalized

10 population of individuals, many of whom were exposed to

11 opioids only briefly, some with just a single dose.  That

12 can hardly be compared to outpatients receiving opioids

13 at high dose for long duration.

14     Q    And let's go to the second -- what is called

15 here by Janssen a myth.  "Opioids make it harder to

16 function normally," and underneath it says "The Facts."

17          Can you explain to the Court whether that fact

18 has basis in the medical and scientific literature?

19     A    Yes.  So this is important because it's a claim

20 for increased function and improved function and improved

21 quality of life on the part of Janssen, which is not

22 supported by any evidence.

23          And, by the way, quality of life measures are

24 very strictly considered in the scientific literature.

25 It's not a claim that can be made easily by any

26 pharmaceutical manufacturer.



Page 2460

1          And, in fact, opioids can make it harder to

2     function normally.  And, you know, for example, in my

3     report I talk about workers' compensation data showing

4     that individuals in California who went on medical leave

5     for workers' compensation and received opioids for their

6     injury or their pain were less likely to return to work

7     than individuals who received no opioids for similar

8     conditions.

9     Q     And then the last myth here is that "Opioid

10    doses have to get bigger over time because the body gets

11    used to them."  And underneath is "The Fact" that "Unless

12    underlying cause of your pain gets worse, such as with

13    cancer or arthritis, you will probably remain on the same

14    dose or need only small increases over time."

15         Can you tell the Court whether there is support

16    in the medical and scientific literature for that fact as

17    identified in this "Finding Relief Pain Management for

18    Older Adults"?

19    A     Yes.  So I think it's really important to

20    understand that there is good evidence for the use of

21    opioids in the treatment of pain short term.  But the

22    fundamental problem with using opioids daily over a

23    longer period of time -- longer being more than 12 weeks,

24    which is what we have definitionally used as the duration

25    of chronic pain, that period of time after which normal

26    tissue healing would have occurred -- that opioids



Page 2461

1  physiologically lose their ability to provide analgesia

2  because of tolerance, which is why patients need to go up

3  and up and up on their dose over time.

4       It is untrue to say that increasing the dose of

5  the opioid over time is a result of the progression of

6  the pain condition getting worse.  That is potentially

7  true, but the primary reason that opioid doses need to go

8  up over time is because of the development of tolerance,

9  which is almost universal.

10  Q    And, Doctor, I want to go back to the slide

11  before.  And without reading these documents, which the

12  Court has seen and which are in the record, can you

13  explain the messaging that is contained in these examples

14  that you chose for this slide?

15  A    Yeah.  So I want to start with the first one on

16  the left that starts "like patients."

17       Your Honor, I think the keywords here are

18  "Caregivers may need reassurance."  This really speaks to

19  the paradigm shift, the fact that prescribers were wary

20  to use opioids for good reason, but that the opioid

21  pharmaceutical industry reassured them against the

22  evidence and against, frankly, common sense that they

23  could use opioids.  And they did so in part by making a

24  distinction between what they called legitimate medical

25  reasons or legitimate pain patients and individuals who

26  are addicts, diverters getting drugs from the street.



Page 2462

1           Furthermore, I'll draw your attention to their

2    saying that physical dependence to a drug is easily

3    overcome through scheduling dosing decreases.  There is

4    nothing easy about getting an opioid-dependent patient

5    off of opioids.

6           I am working with patients now who are on year

7    three of their opioid taper.  It is incredibly burdensome

8    for them, for providers, for the healthcare system.  And

9    there is significant morbidity and mortality associated

10   with dependence.

11   Q    Dr. Lembke, if I can just make sure that the

12   record is clear that what you're referring to here is

13   excerpts from P-CA-1367 --

14   A    Yes.

15   Q    -- P-CA-001687, JAN-CA-602365, and P-CA-000251.

16   Is that right?

17   A    Yes, it is.

18   Q    And focusing on the issue of whether addiction

19   to opioid prescribed for the treatment of pain is rare,

20   did you reach an opinion on whether the promotional

21   messages that have been identified were false and

22   misleading?

23   A    Yes.  I believe these promotional messages are

24   false and misleading.

25   Q    And in addition to the ones that you've

26   identified on these two slides that we've identified in



Page 2463

1    the record, did you see examples of similar messaging

2    related to risk of addiction from opioids in the other

3    promotional material that you reviewed?

4        A    Yes, I did.

5        Q    And are they consistent messages across multiple

6    promotional channels, I will call them?

7             MR. KABA:  Objection, your Honor.  Vague.

8    Foundation.

9             THE COURT:  On vague, it's sustained.

10    BY MS. FITZPATRICK:

11        Q    Do you have an opinion, Dr. Lembke, as whether

12    the statement that the risk of addiction was rare was a

13    cause of more people being exposed to a larger supply of

14    prescription opioids in California?

15             MR. KABA:  Objection, your Honor.  Lack of

16    foundation.

17             MS. FEINSTEIN:  Objection.  Foundation.

18             THE COURT:  On foundation, sustained.

19    BY MS. FITZPATRICK:

20        Q    Dr. Lembke, have you offered testimony to the

21    United States Congress on your research concerning

22    these -- this type of marketing misrepresentation, or

23    what you call a misrepresentation, that the risk of

24    addiction was rare?

25        A    Yes.

26        Q    Okay.  And have you offered -- have you been



Page 2464

1    invited to give testimony to the United States Congress

2    on whether that statement or that marketing message was a

3    cause of more people being exposed to a larger supply of

4    prescription opioids?

5           MR. KABA:  Objection, your Honor.  Relevance.

6           THE COURT:  Sustained.

7           MS. FITZPATRICK:  Your Honor, I'm laying the

8    foundation that this is part of the work that she has

9    done and the research that she has done outside of this

10   case.

11          THE COURT:  That the same opinion is expressed

12   somewhere else adds nothing to the foundation for the

13   opinion.  The objection is not to the witness potentially

14   having said the same thing elsewhere but to the

15   foundation for the opinion.

16          The objection to foundation is sustained.  You

17   may, of course, attempt to lay a foundation.  And the

18   foundation is not "I've said it before" or "I've said it

19   often."

20   BY MS. FITZPATRICK:

21   Q    Dr. Lembke, have you done independent research

22   to determine whether there's a correlation between the

23   statements -- the marketing message that the risk of

24   addiction to opioids is rare and whether that was a cause

25   of more people being exposed to a larger supply of

26   prescription opioids?  Have you done that research?



Page 2465

1     A    Yes, I have.

2     Q    And can you explain to the Court how you did

3  that research?

4     A    I looked at the medical literature and I looked

5  at what the science actually showed about the risk of

6  addiction in patients being treated with opioids for

7  pain, and I compared that to the marketing messages to

8  see whether or not those messages were consistent with

9  the evidence in the literature.

10          And my conclusion was that those messages are

11  not --

12          MR. BRODY:  Your Honor, I'm sorry.  I object to

13  a statement of the conclusion.  The question was simply

14  whether -- how she did the research.  I'd have a

15  foundation objection.

16          THE COURT:  The question as present is limited

17  to what research was done to support an opinion.

18     BY MS. FITZPATRICK:

19     Q    Dr. Lembke, before you get to the opinions, I

20  don't want you to offer the opinions until the Court

21  allows us to do so and if the Court allows us to do so.

22  So I'm just asking you about the research that you did.

23          Is the type of research that you did into that

24  question consistent with the way research is done in your

25  field of expertise?

26     A    Yes.



Page 2466

1    Q    And can you explain that to the Court, please.

2    A    To deeply explore the science and the medical

3    literature and to come to a conclusion based on the

4    weight of the evidence is a standard way to evaluate the

5    literature.

6    Q    And is that the type of research that you do in

7    conjunction with your appointment at Stanford University?

8    A    Yes, it is.

9    Q    And earlier I think you said three legs on the

10   stool of the position that you hold at Stanford

11   University.  Is that right?

12   A    Um-hum, yes.

13   Q    Is one of those research?

14   A    Yes, it is.

15   Q    And in conjunction with that appointment at

16   Stanford and the research that you did, have you

17   researched this particular question?

18   A    Yes, I have.

19   Q    And is the way that you've researched this

20   particular question which you've described to the Court

21   consistent with the way that medical and scientific

22   research is done in your field of expertise and in

23   conjunction with your appointment at Stanford University?

24        MR. KABA:  Your Honor, I'm just going to object

25   on vagueness grounds because at this point I don't know

26   what this particular question is referring to.



Page 2467

1          THE COURT:  Ms. Fitzpatrick, or directly to the

2   witness, some confusion at the moment, certainly in my

3   mind, is as follows:  The witness, earlier on in the

4   testimony, had a slide presented that contained a list of

5   misrepresentations.  Not purporting to identify all of

6   them, but one was that addiction is rare; two was that

7   opioid use disorder could just be pseudoaddiction; and so

8   on.

9          The question at the moment is focused on the

10  contention that to say that addiction is rare is a false

11  and misleading statement.

12          Is the question whether the doctor isolated that

13  one misrepresentation from the others and is expressing

14  an opinion that that misrepresentation, that a standalone

15  misrepresentation that addiction is rare, itself caused

16  an increase in prescriptions?  And if so, what's the

17  basis for that opinion?

18          MS. FITZPATRICK:  Your Honor, in the motions in

19  limine there was no motion in limine that was raised as

20  to whether Dr. Lembke could testify about whether these

21  particular misrepresentations that we're going to go

22  through were supported by the medical and scientific

23  literature.

24          What I'd like to go through is, having

25  established this misrepresentation as her opinion that it

26  is false and misleading, is the effect of that type of



Page 2468

1  messaging on the medical community and on the prescribing

2  behaviors of physicians.

3      THE COURT:  Ms. Fitzpatrick, I understand that.

4  My question is narrower.  Is your question intended to

5  elicit from Dr. Lembke that she investigated the issue of

6  rareness -- that addiction is rare -- separate from the

7  other causes or as one of the factors which, in her

8  opinion, caused the increased writing of prescriptions?

9      MS. FITZPATRICK:  The question is whether it's

10 one of the factors, your Honor.

11     THE COURT:  That's not how the question was

12 framed.  And if the doctor is answering it and purporting

13 to lay her foundation, she needs to make clear whether

14 she's laying a foundation for an opinion that a falsity

15 about addiction being rare by itself caused an increase

16 and, if so, what's the basis; or that it's one of the

17 causes of the factors.  And even then, precisely what she

18 did to connect the dots between "I see false

19 misrepresentations on the issue of it being rare and is

20 causal, and the work I did to determine it was causal is

21 as follows."

22     MS. FITZPATRICK:  Thank you, your Honor.  I

23 think what we'll do is we will go through the

24 misrepresentations, and then I will ask about the causal

25 effect of the misrepresentations collectively at the end.

26     BY MS. FITZPATRICK:



Page 2469

1    Q    Dr. Lembke, let me turn to the second

2  misrepresentation.

3         If we could go back to that slide, Jon, Slide

4  Number 5.  Yes, Slide Number 6.

5         What did you identify as the second

6  misrepresentation?

7    A    That many patients exhibiting symptoms of opioid

8  use disorder are suffering from pseudoaddiction.

9    Q    Now, have you heard the term "pseudoaddiction"

10  before your work in OUD and opioid addiction?

11    A    I'm not sure I understand your question.

12    Q    When did the term "pseudoaddiction" first appear

13  in the medical literature?

14    A    I'm not remembering exactly when it first

15  appeared.  It was in the context of a case report

16  coauthored by David Haddox.  This case report described

17  an individual who was exhibiting signs and symptoms

18  consistent with an opioid addiction who the authors of

19  the report then determined that he, in fact, had what

20  they call pseudoaddiction.  He was in pain, and that the

21  appropriate remedy was to simply go up on the dose.

22         So that was the only data point that introduced

23  that term.  It was not based, for example, on any kind of

24  rigorous science.  It was a made-up term in a case

25  report.

26    Q    And have you done an investigation to reach a



Page 2470

1    conclusion in this case as to whether there's a valid

2    medical basis for the condition identified as

3    pseudoaddiction?

4       A    Yes.  I've reviewed the literature on

5    pseudoaddiction, and there is no valid scientific basis

6    for pseudoaddiction.  So this slide shows that that case

7    report was published in 1989 by David Haddox.  And also

8    in --

9       Q    If you can, we have to do it by question and

10   answer, if you don't mind, Dr. Lembke.

11            Can you tell me about the 2018 study that you

12   have identified as a basis for your opinions on this

13   issue of pseudoaddiction?

14      A    Yeah.  So this was an article looking at the

15   term "pseudoaddiction" in the medical literature and

16   concluding that there was no empirical evidence to

17   justify a diagnosis of pseudoaddiction.

18      Q    And what was the recommended treatment for

19   pseudoaddiction in patients who were prescribed opioids

20   for pain?

21      A    Right.  So in the false and misleading messages,

22   the implied and/or explicit recommendation for

23   pseudoaddiction was to simply go up on the dose of

24   opioids.

25      Q    And --

26            MR. KABA:  Objection, your Honor.  Move to



Page 2471

1  strike, again foundation.  And I'm just going to reassert

2  my vagueness objection as to who are the individuals or

3  entities with these messages?

4         THE COURT:  Overruled.

5    BY MS. FITZPATRICK:

6    Q    And turning to some of the promotional messages

7  from the defendants in this case, did you look through

8  the promotional messaging from these defendants in this

9  case to find examples of the use of the term

10  "pseudoaddiction"?

11    A    I would phrase it a little differently.  I would

12  say I looked at promotional messages.  And in the course

13  of looking at their promotional material, I found

14  frequent references to pseudoaddiction.

15         MS. FITZPATRICK:  And if we can go to the next

16  slide, Jon.

17    BY MS. FITZPATRICK:

18    Q    And are these some of the examples that you

19  found of the use of the term "pseudoaddiction" from these

20  particular defendants in their promotional messaging?

21    A    Yes, these are examples.

22    Q    And each of those -- yeah, each of these

23  documents is in evidence.

24         They are P-CA-399 and P-CA-251, for the record.

25         Can you tell the Court what the oxymorphone

26  learning system is?



Page 2472

1    A    The oxymorphone learning system was a document

2  used internally to train sales representatives on how to

3  think about and talk about these concepts with

4  prescribers.

5    Q    And what was the Kadian learning system?

6    A    Similarly, the Kadian learning system was used

7  to train sales reps on how to understand these concepts

8  and how to communicate them to prescribers.

9    Q    And why did you choose these examples from

10  P-CA-399 and P-CA-251 for your testimony today?

11    A    These were classic examples of how

12  pseudoaddiction appeared in internal marketing material

13  or training material.

14    Q    Are these the only examples that you saw of the

15  use of pseudoaddiction in marketing and promotional

16  materials by these defendants?

17    A    No.  I've seen many examples in the many

18  documents that I've reviewed that are consistent with

19  these examples.

20    Q    Okay.  And in your opinion, are the marketing

21  and promotional messages concerning patients exhibiting

22  OUD symptoms suffering from pseudoaddiction false or

23  misleading?

24    A    Yes, they are false and misleading.

25    Q    Can you tell us why?

26    A    So pseudoaddiction is -- it's not -- it's not a



Page 2473

1    scientific concept; it's a made-up term.  Furthermore, it

2    in a very dangerous way contributed to making it more

3    difficult for prescribers to detect and diagnose

4    addiction in their patients who had become addicted to

5    the opioids that they were prescribing.  And it

6    encouraged up-titration, increasing the dose of the

7    opioid, which paradoxically increased that patient's risk

8    of becoming further addicted to that opioid.

9         Q    And I want to --

10             Can you go back to Slide Number 5, Jon.

11             Misrepresentation Number 3, the, quote-unquote,

12   average person cannot get addicted to opioids prescribed

13   by a doctor.

14             Can you -- based on your knowledge and

15   expertise, can the average person who is prescribed

16   opioids by their doctor get addicted to those opioids?

17        A    Yes, the average person can get addicted through

18   their doctor's prescription.  Nearly anybody could get

19   addicted through a doctor's prescription, given a high

20   enough dose for a long enough duration.

21        Q    And earlier today you talked about screening

22   tools to identify patients who are at risk of developing

23   OUD.  Have you done research in the medical and

24   scientific literature into those screening tools?

25        A    Yes.  As I've stated earlier, there are no valid

26   or reliable screening tools to try to predict who will or



Page 2474

1    will not develop an opioid use disorder through a medical

2    prescription.  The opioid risk tool, which was championed

3    by Lynn Webster, one of the key opinion leaders, had been

4    shown to be no better than chance in figuring out who can

5    and cannot -- who will and will not get addicted.

6              And although it is true that individuals bring

7    varying levels of vulnerability to addiction through a

8    doctor's prescription, we in the medical community have

9    yet to discover a way to predict who those individuals

10   are and the --

11   Q    Let me just -- I don't mean to interrupt you,

12   Doctor, but I just want to make sure that we've got a

13   question and an answer for what we're doing here.

14             Jon, could you go to Slide 14.

15             So let me -- let me break this down a little

16   bit.  You just mentioned that prescreening for OUD risk

17   is no better than chance.  And I've put a slide up here.

18   Are these the articles that you rely on for that

19   particular opinion?

20   A    Yes.  So the one in the middle, the Clark, et

21   al., rereviewed the opioid risk tool and found that it

22   was no better than chance in predicting aberrant behavior

23   in the course of medical treatment.

24   Q    And it -- I don't mean to interrupt you, Doctor,

25   but we need to do it in question-and-answer format.

26             That's Clark, et al., in Pain Medicine in 2018;



Page 2475

1   is that right?

2       A    Yes.

3       Q    And can you tell me the significance of the -- I

4   think it's called Klimas; is that right?  Am I

5   pronouncing that one right?

6       A    Yeah.

7       Q    JAMA in 2019.

8       A    Yeah.  So Klimas, et al., did a more thorough

9   look at screening tools and found that, really, there was

10  no -- there were no high-quality studies demonstrating

11  whether or not you could separate out high- from low-risk

12  patients.

13      Q    Okay.  And I'd like you to talk about the Edlund

14  article in Pain Medicine 2014.

15           Let me go back one slide to Slide Number 13,

16  Jon.

17           Is this a graph from the Edlund article that you

18  had referenced on the previous slide?

19      A    Yes, it is.

20      Q    And can you let the Court know what the source

21  of this graphic is, please?

22      A    This is Edlund, et al.  The title is "The Role

23  of Opioid Prescription in Incident Opioid Abuse and

24  Dependence Among Individuals with Chronic Noncancer

25  Pain," published in the Clinical Journal of Pain, 2014.

26      Q    And can you explain to the Court what this slide



Page 2476

1    represents with respect to your opinions concerning

2    whether the average person can get addicted to opioids

3    prescribed by doctors?

4        A    Yes.  So Edlund, et al., took a very large

5    population of patients and compared those exposed to a

6    prescription opioid and those not exposed to a

7    prescription opioid to figure out if and who would

8    develop opioid use disorder and what the strength of that

9    relationship was.

10           And what Edlund, et al., found was that

11   individuals with no risk factors for opioid use disorder,

12   like prior mental health disorder -- that's what you see

13   here on the left-hand side of the screen -- or prior

14   alcohol use disorder or prior mental health disorder,

15   history or explicitly a prior opioid use disorder, were

16   at increased risk to develop opioid addiction compared to

17   those not exposed to an opioid.

18           But the very significant finding in Edlund, et

19   al., is on the right-hand side of the study showing that,

20   if you looked at risk of addiction as measured by how

21   long the patient was on the prescription opioid and how

22   high the dose was, that, importantly, for individuals

23   prescribed an opioid for three months or more, the risk

24   of developing addiction went up as a function of dose and

25   that those who received, in the red bar, more than

26   120 milligrams per day were at 122 times the risk of



Page 2477

1   developing an opioid use disorder than individuals not

2   exposed to an opioid.

3        Q    Can you explain to the Court what a low dose and

4   medium dose and a high dose is as used in this Edlund

5   study?

6        A    In that study a low dose was defined as 1 to 36

7   morphine milligram equivalents daily.  The medium dose

8   was defined as 36 to 120 morphine milligram equivalents

9   daily, and a high dose was defined as anything greater

10  than 120 morphine milligram equivalents daily.

11       Q    Okay.  And did you look at the promotional

12  messages of the defendants related to assertions that the

13  original person cannot get addicted to opioids prescribed

14  by a doctor?

15       A    Yes, I did.

16       Q    And if we turn to Slide 15.

17            Does this slide represent some of the

18  misrepresentations or some of the examples of the

19  misrepresentations that the average person cannot get

20  addicted to opioids through a doctor's prescription?

21            MS. FEINSTEIN:  Objection, your Honor, to the

22  extent that this slide includes messages from third

23  parties.  It lacks -- or it assumes facts not in evidence

24  and lacks foundation as to any particular defendant.

25            THE COURT:  Just a moment.

26            The objection is overruled.



Page 2478

1    BY MS. FITZPATRICK:

2       Q    And, Doctor, the exhibits that are already in

3    evidence that you reference on this slide are P-CA-1391,

4    P-CA-251, and P-CA-399, correct?

5       A    Yes.

6       Q    And can you tell the Court why you chose these

7    examples to demonstrate a common marketing message that

8    the average person cannot get addicted to opioids through

9    a doctor's prescription?

10      A    These were simply illustrative of this false and

11   misleading messaging.  I'm trying to make this

12   distinction between, quote-unquote, the average person or

13   what was commonly referred to in these messages as a

14   patient being treated for a legitimate pain condition and

15   to somehow make a distinction between those individuals

16   and so-called addicts or people who abuse drugs or people

17   who divert drugs, when, in fact, those individuals,

18   chronic pain patients and people who become addicted, can

19   and often are one and the same.

20      Q    And was the "American Pain Foundation:  A Guide

21   for People Living with Pain," was that a customer-facing

22   material or an internal document?

23      A    Yes, that was a patient consumer and prescriber

24   consumer outwardly facing document.

25      Q    And I think you testified that the learning

26   systems were inwardly facing documents; is that right?



Page 2479

```
 1     A    That's right.

 2     Q    And did you see consistency among the external

 3  messaging as well as the messaging that was reflected

 4  internally concerning this misrepresentation?

 5     A    Yes, I did.

 6     Q    Okay.  And did you see more examples in the

 7  promotional materials and the promotional messages from

 8  the defendants related to this Misrepresentation Number 3

 9  that the average person cannot get addicted to opioids

10  through a doctor's prescription?

11          MR. BRODY:  Objection, your Honor; vague, and

12  lacks foundation.

13          THE COURT:  Sustained.

14     BY MS. FITZPATRICK:

15     Q    The three documents here that you've represented

16  here, are those just examples of common promotional

17  messages that you have seen across --

18          THE COURT:  Ms. Fitzpatrick, your voice has, for

19  some reason, gone into a Star Wars routine is the only

20  way I can describe it.  Would you try that again?

21          MS. FITZPATRICK:  Lucky you, Judge.

22          Is that better?

23          THE COURT:  That is much better.

24          MS. FITZPATRICK:  Okay.

25          THE COURT:  You need to ask that question again.

26     BY MS. FITZPATRICK:
```



Page 2480

1    Q    The three documents that you've identified here,

2    are these examples of the common marketing message that

3    you saw across the promotional materials that you

4    reviewed in this case?

5          MR. KABA:  Objection; foundation, vague, also

6    leading.

7          THE COURT:  The vague objection is sustained.

8    BY MS. FITZPATRICK:

9    Q    Did you see other examples in the marketing

10   promotional materials from the defendants of this

11   Misrepresentation Number 3 that the average person cannot

12   get addicted to opioids through a doctor's prescription?

13         MR. BRODY:  Objection, your Honor; foundation,

14   and vague as to "defendants."

15         THE COURT:  Just a moment, please.

16         The vague objection is identified.  The

17   reference to other materials does not form the basis for

18   any opinion and is simply going to lead to a distraction

19   on cross-examination.  Unless the doctor can identify

20   them now, they should not be referred to.

21         MS. FITZPATRICK:  Your Honor, would you like me

22   to go through each of them?  Some of the documents are

23   already in evidence.

24         THE COURT:  I don't know if the doctor can

25   identify the other materials that you are referring to.

26   You may ask.



Page 2481

1    BY MS. FITZPATRICK:

2       Q   Dr. Lembke, did you look at the documents that

3    were admitted into evidence in this case?

4       A   Yes, I did.

5       Q   And did you review the documents -- the

6    defendants' own documents that were introduced into

7    evidence in this case to see whether there were other

8    examples of the Misrepresentation Number 3 that the

9    average person cannot get addicted to opioids through a

10   doctor's prescription?

11      A   Yes, I did.

12      Q   And did you see other examples of that in the

13   documents that were introduced into evidence in this

14   case?

15      MR. KABA:  Your Honor, I'm going to object again

16   on vagueness grounds.  We don't know what the witness is

17   referring to, and we have to compare what the witness is

18   testifying to to what she actually disclosed in her

19   report as well.  And it's impossible to do that with this

20   sort of question.

21      THE COURT:  The vagueness objection is

22   sustained.

23      MS. FITZPATRICK:  Your Honor, I'm just pausing

24   because I'm trying to think of the most efficient way to

25   satisfy this without necessarily having to go through

26   every single exhibit that's in evidence and identify it.



Page 2482

1    So I apologize for just pausing to think of the way that

2    I can do this most efficiently.

3        BY MS. FITZPATRICK:

4        Q    Dr. Lembke, in your opinion, are promotional

5    messages that represent that the average person cannot

6    get addicted to opioids through a doctor's prescription

7    false or misleading?

8        A    Yes, that is false and misleading.

9        Q    And why is that false and misleading?

10       A    The Edlund study shows that the biggest risk

11   conferred is the dose and duration, not prior risk

12   factors, which means that, number one, anybody on a high

13   enough dose for a long enough period of time has a very

14   high risk of becoming addicted.

15            Furthermore, the so-called average person that

16   these misleading messages are referring to is set up as

17   distinct from those individuals with, quote-unquote,

18   addictive disease who engage in pharmacy theft, forged

19   prescriptions, taking their pills from other people with

20   pain, all of which sets up in a recipient's mind this

21   false distinction between average people or legitimate

22   pain patients and those drug addicts over there who are

23   ruining it for the rest.

24            That's a false dichotomy.  Anybody receiving an

25   opioid from a doctor, even for the legitimate treatment

26   of a medical condition, is at risk of becoming addicted.



Page 2483

1   And the biggest risk factors are not their personal

2   history of addiction or mental illness but dose and

3   duration as shown by Edlund.

4          I'd also, if I may speak individually to some of

5   these misrepresentations, talk a little bit more about --

6   Q    Dr. Lembke, if it's okay, I'm going to ask -- I

7   know that you're used to lecturing, but I need to be able

8   to ask you the questions just so the record is clear.

9          I do want to turn to the actual

10  misrepresentations that you have identified on this

11  particular slide.  And if you can tell the Court why you

12  selected these misrepresentations from the "American Pain

13  Foundation:  A Guide for People Living with Pain," which

14  is P-CA-1391.

15         THE COURT:  Ms. Fitzpatrick, the witness, each

16  time you've shown her a slide like this, has confirmed

17  that these are selected because they represent examples

18  of where she believes the false and misleading statement

19  appears.  Do you want her to say something beyond that?

20         MS. FITZPATRICK:  I wanted her to tell you, your

21  Honor, why she selected these particular

22  misrepresentations or these particular selections.

23         THE COURT:  Dr. Lembke, anything you would add

24  beyond what I just said?

25         THE WITNESS:  Well, perhaps I've already

26  communicated what I wanted to communicate to you, your



Page 2484

1    Honor.  So perhaps there's no need.

2             I do think that the quote on the right-hand side

3    at the bottom possibly requires some additional

4    explanation, but perhaps not.

5             I guess I would say to you, your Honor, do you

6    have any questions about these quotes and how they relate

7    to the misrepresentation at the top?

8             THE COURT:  I do not.

9             Ms. Fitzpatrick, do you have anything else on

10   this slide?

11            MS. FITZPATRICK:  No, I don't, your Honor.

12            Your Honor, I'm going to turn to another topic.

13   Do you want me to keep going, given that it's the time --

14            THE COURT:  No.  If you're changing the subject,

15   let's take a break at this time.  We are adjourned until

16   3:10.  Thank you.

17            (A brief recess is taken.)

18            THE COURT:  Good afternoon, everybody.  We are

19   back on the record.

20            Ms. Fitzpatrick?

21            THE CLERK:  Your Honor, your screen is yellow.

22            THE COURT:  How about now?

23            THE CLERK:  Okay.

24            MS. FITZPATRICK:  I'm here, your Honor.  Thank

25   you.  Sorry about that.

26            Jon, can we go back to Slide Number 5.



Page 2485

1        BY MS. FITZPATRICK:

2        Q     Dr. Lembke, I want to talk about what you've

3    termed Misrepresentation Number 4, "Opioids are an

4    appropriate first-line, long-term treatment for chronic

5    pain."

6              Let me start with some basic propositions.

7              What is chronic pain?

8        A     Chronic pain is usually defined as pain

9    persisting past the time that would be expected for

10   normal tissue healing.  By most definitions, chronic pain

11   is pain that lasts most days for three months or more.

12   There are some definitions in the literature using six

13   months or more; but, in general, consensus has defined

14   chronic pain as pain lasting three months or more.

15       Q     And how does it differ from acute pain?

16       A     Well, acute pain is pain of a short duration; so

17   typically less than three months.

18       Q     Okay.  And why is that difference between

19   chronic pain and acute pain significant when considering

20   opioid therapies?

21       A     Number one, the evidence does support the use of

22   opioids short term in the treatment of acute pain.  There

23   is no reliable evidence that opioids work or are safe

24   when used for more than approximately 12 weeks.

25             So that's -- that's a key -- a key piece.

26       Q     And is there a difference between using opioids



Page 2486

1  long term to treat chronic pain and using opioids in the

2  short term to treat chronic pain?

3      A    Yeah.  So that's an important distinction.

4          If you have a person who has chronic low back

5  pain, for example, you've had that low back pain for

6  three months or more, and you treat them with opioids,

7  they will likely, if they tolerate the opioids,

8  experience some relief.

9          But if you give that individual an opioid every

10  day for more than three months, they will likely

11  experience tolerance, dependence, maybe even interdose

12  withdrawal.  And there is no reliable evidence that the

13  opioids are actually helping with their pain.  In fact,

14  in that instance, when patients take opioids, their

15  subjective experience of pain relief is more likely

16  treating their withdrawal from their last dose rather

17  than the underlying pain condition.

18      Q    You used a term in there, "interdose

19  withdrawal."  Can you tell the Court what that is?

20      A    Because of this process of neuroadaptation to

21  opioids and the tolerance that develops when people take

22  them every day for more than three months, because they

23  stopped working, patients will often report that they are

24  indeed clock-watching, for example, because the analgesia

25  has worn off before the time when they're supposed to

26  take their next dose.



Page 2487

1    And once tolerance and interdose withdrawal

2    occurs, that's a pretty good indication that that opioid

3    at that dose is no longer helping the patient and may, in

4    fact, be contributing to harm simply by the fact that now

5    the patient is in this cycle of interdose withdrawal.

6    And I'll leave it at that.

7    Q    Thank you.

8    If you can pull up, Jon, Slide 16.  Let me see

9    if I've got the right one.  There it is.

10    And so, Doctor, can you explain to the Court

11    what is represented on this slide entitled "Evidence of

12    opioid benefits insufficient to justify the risks"?

13    A    These are all articles in the medical literature

14    which I have reviewed which I've included in my report,

15    which represent important definitive studies of the

16    benefits of opioids in the treatment of pain lasting

17    longer than three months.

18    And in each instance, the authors concluded that

19    the evidence was insufficient or weak to support the use

20    of opioids in the treatment of -- to support the

21    long-term use of opioids -- that is, opioids daily for

22    more than 12 weeks, 12 to 16 weeks -- in the treatment of

23    chronic pain.

24    Q    And the studies that you chose are dated between

25    2009 and 2018; is that correct?

26    A    Yes.



Page 2488

1    Q    And can you tell -- point out to the Court a

2    couple of the studies that you believed most establish --

3    or are consistent with your opinions here concerning the

4    use of opioids long term to treat chronic pain?

5    A    The first one by Chou, et al., is particularly

6    significant because these were clinical guidelines for

7    the use of chronic opioid therapy published in a

8    definitive journal representing a definitive professional

9    organization, the American Academy of Pain Medicine.

10        And their assessment that there was insufficient

11   evidence to vet the effects on health outcomes was buried

12   deep in the appendix of this article, when the earlier

13   sections of this article actually strongly recommended

14   the use of opioids in the treatment of chronic pain

15   despite weak evidence.  And --

16   Q    And why did you consider the Chou article to be

17   significant for your opinions in this matter?

18   A    These were very influential guidelines on how

19   physicians should be approaching opioid therapy and the

20   treatment of chronic pain published in 2009.  And most of

21   the authors of this article, including the cochairs, were

22   receiving consulting fees by defendants in this case and

23   other opioid manufacturers.

24   Q    So let's go to the next slide.

25        And does this reference the Chou article that

26   you were just discussing?



Page 2489

 1    A    Yes, it does.

 2    Q    Okay.  And tell me, what were the clinical

 3  guidelines for the use of chronic opioid therapy in

 4  chronic noncancer pain that were advocated in this

 5  particular article?

 6    A    Well, as I said, this was a very influential

 7  article from an esteemed professional medical society,

 8  the American Academy of Pain Medicine, in conjunction

 9  with the American Pain Society, which put out these

10  guidelines.  And I think it's important to appreciate

11  that doctors practicing in the modern age rely heavily on

12  these definitive guidelines to inform them about what

13  evidence-based care should look like.

14        MS. FITZPATRICK:  And if we go to the next

15  slide, Jon.

16    BY MS. FITZPATRICK:

17    Q    This is entitled "Pain Guidelines Conflict of

18  Interest."  Dr. Lembke, can you tell the Court what this

19  represents?

20    A    So this has the authors of these guidelines,

21  many of them on the left-hand side and, on the right-hand

22  side, their conflicts and disclosures.  And, as you'll

23  see, many of them were receiving income from the

24  defendants in this case.

25        The importance of this is that the influence

26  that defendants exercised was very often in this manner


MAGNA
LEGAL SERVICES

Page 2490

1   behind the scenes, supporting individuals and

2   institutions that were promoting the expanded use of

3   opioids in the absence of evidence.

4           And, as a result, the impact on physicians like

5   me and my peers was to believe that this represented the

6   best that science has to offer when, in fact, given these

7   consultations -- or these consulting relationships, I

8   think it's fair to argue that these individuals were --

9   were biased.

10          MR. KABA:  Objection.  Move to strike that last

11  portion as lacking foundation with respect to the opinion

12  on bias, your Honor.

13          THE COURT:  No, the objection is overruled.

14     BY MS. FITZPATRICK:

15     Q    And let's go back to slide -- let me ask you

16  this:  The pain guidelines conflict of interest, the

17  cochairs, who among the defendants did -- have received

18  fee income from -- excuse me.  Let me start that all over

19  again.  It's getting late in the day for me.

20          Cochair, who among the defendants had provided a

21  fee income to the cochairs of this clinical guideline?

22     A    You can see that cochair Gilbert Fanciullo was

23  receiving income from Janssen and Teva.

24     Q    And Dr. Fine from Cephalon, Endo -- and Endo; is

25  that right?

26     A    Yes.  That's right.



Page 2491

 1     Q     And as you go down this list, there are one,

 2   two, three, four, five, six, seven -- there are more than

 3   a dozen panel members who are identified here; is that

 4   right?

 5     A     That's right.  The majority of the members were

 6   receiving some kind of funding from opioid pharma.

 7     Q     And that includes funding from Endo; is that

 8   right?

 9     A     That's correct.

10     Q     Funding from Janssen?

11     A     Yes.

12     Q     Funding from Cephalon?

13     A     Yes.

14     Q     Funding from Teva?

15     A     Yes.

16     Q     And if we can go back to Slide Number 16.

17           Now, you have identified these clinical

18   guidelines as recommending opioid therapy for Dr. Chou in

19   2009, but also indicate that there is lack of evidence.

20           Can you explain that to the Court?

21     A     Well, I mean, it's -- it's difficult, in fact,

22   to reconcile that the guidelines came out strongly in

23   favor of using opioids in the treatment of chronic pain

24   despite sufficient evidence supporting that

25   recommendation.  And, again, as I've just testified, I

26   think that the fact that the majority authors were taking



Page 2492

1    funding from pharma would support bias in this case.

2        Q    And you had testified earlier that you had done

3    an analysis and research on the -- through the medical

4    and scientific literature.

5             Did you look through that literature to

6    determine the body of literature related to the evidence

7    of opioids' benefits -- excuse me -- the evidence of the

8    benefits of using opioids long term to treat chronic

9    pain?

10       A    Yes, I did.

11       Q    Okay.  And could you find evidence in that

12   medical and scientific literature that supported the use

13   of opioids long term to treat chronic pain?

14       A    No, I could not find evidence to that effect.

15       Q    And if opioids are not an effective long-term

16   treatment option for chronic pain, what in your

17   experience as a practitioner is an effective or an

18   appropriate treatment option?

19       A    Unfortunately, we do not have very good

20   treatments for chronic pain.  And the other treatments --

21   there are many other medications that are not opioids.

22   There are many other interventions -- physical therapy,

23   psychotherapy, other mind-body strategy -- and none of

24   them have very good evidence.

25       Q    And do any of those other treatment options that

26   you have identified carry with them a risk of developing



Page 2493

1  addiction?

2      A    Not that I'm aware, no.

3      Q    And beyond the potential development of OUD and

4  the ramifications of that, are there other dangers of

5  using opioids as a first-line treatment for chronic pain

6  in patients?

7      A    There are many other side effects associated

8  with long-term opioid use.  Many people don't, in fact,

9  tolerate opioids very well, whether long term or short

10  term.  Side effects include constipation, hormone

11  changes, for example, lowered testosterone especially

12  when used chronically.  Cardiac effects are notable.

13  People can develop problems with cognition, with

14  depression.

15          There is, as I spoke of earlier, this phenomenon

16  of opioid-induced hyperalgesia, showing that individuals

17  who are on opioids long term actually can experience an

18  exacerbation of their existing pain condition and/or

19  develop pain in parts of their body where pain didn't

20  even exist before.

21      Q    Dr. Lembke, in your opinion, are messaging that

22  assert that opioids are an appropriate first-line

23  treatment for chronic pain false and misleading?

24      A    Yes, on a number of counts.  And as I said here

25  several times, there is no evidence to support their

26  effectiveness when used longer than about 12 weeks and a



Page 2494

1    mounting evidence of harm when used longer than 12 weeks.

2             And I think that the use of the term "first

3    line" is also misleading.  Opioids only in very rare

4    instances should be first-line treatment for pain.  And

5    the reason for that, even in acute pain, is that exposure

6    to opioids even in short term can set up vulnerable

7    individuals to persist in using those opioids and

8    developing addiction down the road.

9    Q    Doctor, did you look through evidences in the

10   record in this case to look for examples of this type of

11   promotional messaging?

12   A    I'm sorry.  What type of promotional messaging?

13   Q    That opioids are an appropriate first-line

14   treatment for the treatment of chronic pain.

15   A    Yes, I did.

16   Q    Okay.

17            And I want to pull up first, Jon, P-CA-000421.

18            And, Doctor, do you recognize this document?

19   A    Yes, I do.

20   Q    And is this a document that you relied on for

21   your opinions in this case?

22   A    Yes, it is.

23   Q    And is this a document that you relied on

24   concerning marketing and promotional messages in this

25   particular case?

26   A    Yes, it is.



Page 2495

1          MS. FITZPATRICK:  Your Honor, I believe there's
2    no objection to the introduction of P-CA-421.
3          MR. KABA:  No, that's -- that's not correct.  We
4    reserved objections pending the questions.  At least as
5    framed, we object on foundation grounds, your Honor.
6          THE COURT:  Ms. Fitzpatrick, what's the question
7    relating to the document?
8          MS. FITZPATRICK:  I will go through -- it's
9    going to be marketing messages in here, but if Mr. Kaba
10   prefers, I can go through the marketing messages in order
11   to identify them.
12          If we turn --
13          MR. KABA:  Your Honor, if I may, the objection
14   is as to foundation whether or not this witness can
15   testify that this was used as marketing or promotion.
16          THE COURT:  Ms. Fitzpatrick?
17          MS. FITZPATRICK:  Your Honor, it's -- on its
18   face, I don't think you need to be an expert to -- in
19   marketing and promotion to know that, when you see a
20   coupon savings card for an opioid product, that it is a
21   marketing and promotional document.
22          I'm, again, candidly surprised.  I understood
23   that there was no objection to this document, and
24   Dr. Lembke did use it and rely on it in her report as
25   something that identified some of these common marketing
26   and promotional themes that were seen throughout these



Page 2496

1    documents.  And, for that reason, we would seek to admit

2    it into evidence.

3            THE COURT:  What is the stipulation, if any,

4    regarding this document?

5            MS. FITZPATRICK:  I'm looking at an e-mail that

6    I got last night saying -- let me see -- that they are

7    reserving a right to object to any questions that might

8    be asked to any of these documents.  But beyond that,

9    there is no objection on hearsay and relevance, on

10   foundation, on business record, or anything like that.

11           THE COURT:  I don't know how to understand that

12   e-mail.  If all objections are reserved, what, if

13   anything, is stipulated or agreed?

14           MS. FITZPATRICK:  Your Honor, that there would

15   be no objections that would be raised concerning hearsay,

16   foundation, or that it was a business record.

17           THE COURT:  Is that stated in the e-mail?

18           MS. FITZPATRICK:  Yes.

19           THE COURT:  Mr. Kaba, what is the foundation

20   objection if there is no objection to foundation?

21           MR. KABA:  Your Honor, that's not what the

22   e-mail says.  The e-mail -- I'm looking at it.  It says

23   we, of course, reserve our right to object to any

24   questions that may be asked about any of these documents.

25   With respect to this specific exhibit, we said we're

26   reserving objections pending questions because we didn't



Page 2497

1     know what the witness was purporting the document to be.

2            The foundation objection, your Honor, is this

3     witness is now being asked to opine that this was

4     marketing and promotion communication.  The only way it

5     would be relevant is if it was in the plaintiff

6     jurisdiction.  There is no foundation for this witness to

7     say that this document was used in the plaintiff

8     jurisdiction as marketing or promotional messages.

9     That's the foundation objection.

10           THE COURT:  If there has been no stipulation to

11    foundation, the foundation objection is sustained.

12           MS. FITZPATRICK:  Thank you, your Honor.

13           Putting aside that -- can we just mark that for

14    later?  Okay.  Thank you.

15    BY MS. FITZPATRICK:

16    Q    Putting that aside, did you look at other

17    examples of -- from the documents that are already in

18    evidence in this case, as cited in your report, that

19    opioids are an appropriate first-line treatment for the

20    long-term treatment of chronic pain?

21    A    Yes, I did.

22    Q    Okay.  And if we can turn to Slide 19.

23           Are these some of the examples that you selected

24    that support Misrepresentation Number 4, "Opioids are an

25    appropriate first-line treatment for long-term chronic

26    pain"?



MAGNA
LEGAL SERVICES

Page 2498

```
 1      A    Yes, they are.

 2           MS. FITZPATRICK:  And just for the record, we

 3    are reflecting Exhibit P-CA-1391, Exhibit P-CA-1693,

 4    AL-CA-300050, and JAN-CA-602365.

 5           BY MS. FITZPATRICK:

 6      Q    And can you tell me why you chose these examples

 7    from the documents that are in evidence in this case as

 8    related to your opinions concerning Misrepresentation

 9    Number 4?

10      A    Yes.  And so these statements all allude in some

11    way to using opioids long term in the treatment of pain,

12    whether it's the first one, "They may be important to the

13    management of persistent pain unrelated to cancer," which

14    again supports this idea of expanded use beyond malignant

15    end-of-life pain.

16           The second one, key feature message, this is

17    important because it refers to an article in the

18    literature which was 12 weeks in duration, by Katz,

19    et al.  And this article was then used and prompted for

20    sales reps to use with prescribers in a broader statement

21    about using opioids to treat pain long term, i.e.,

22    chronic pain.

23           Kadian sales rep training one uses this "first

24    line" language, when, in fact, opioids, very dangerous

25    drug, should not be used first line, and that's supported

26    by the CDC guidelines that came out in 2016.
```



Page 2499

1          And then the "Finding Relief," that's the

2    patient-facing document that Janssen -- implying that

3    people being treated with opioids for chronic pain can

4    return to a normal existence and find that they will use

5    it long term to somehow get the life back that they had

6    when there's no evidence to support that.

7          MS. FITZPATRICK:  Go back to Slide Number 5

8    again, Jon.

9          BY MS. FITZPATRICK:

10    Q    Let's turn to misrepresentation -- what you

11    called Misrepresentation Number 5, "No dose of opioids

12    for the treatment of pain is too high."

13          Doctor, in your review of the medical and

14    scientific literature, is there evidence to support the

15    proposition that no dose of opioids for the treatment of

16    pain is too high?

17    A    No.  There's -- there's no evidence to support

18    that, and there is evidence to support the opposite.

19    Q    Okay.

20          Please go to Slide 20, Jon.

21          Does this slide reflect some of the support that

22    you have for your opinion that no dose of opioids for the

23    treatment of pain too high is a false message?

24    A    Yes.  So this shows the odds ratio or the risk

25    of overdose in individuals treated with different amounts

26    of opioids for chronic pain.  There's a group of patients



Page 2500

1   receiving no opioids, less than 20 morphine milligram

2   equivalents, 20 to 50, 50 to 100, and then greater than

3   100 and looking at their risk of overdose as a function

4   of the dose that they are receiving.  It's showing that

5   the higher the dose the higher the risk of opioid

6   overdose.

7           And this is Dunn, et al., at the bottom, but

8   these -- these findings have been replicated in other

9   studies -- the Gomes article, Bonnard, et al. -- showing

10  very similar findings.

11      Q    For the record, this is Dunn, et al., "Opioid

12  Prescriptions for Chronic Pain and Overdose:  A Cohort

13  Study."  Is that right?

14      A    That's right.

15      Q    And when was that published?

16      A    2010.

17      Q    And where was that published?

18      A    In the Annals of Internal Medicine.

19      Q    Is that a reputable journal?

20      A    Yes, it is.

21      Q    Is there a relationship between exposure to

22  opioids and the potential of overdose and deaths?

23      A    Yes.  That's what this slide is showing, that

24  the higher the exposure, the higher risk of opioid

25  overdose and death.

26      Q    And are promotional messages that state or



Page 2501

1    suggest that no dose of opioids for the treatment of pain

2    too high, do you have an opinion as to whether that is a

3    false or misleading message?

4         A    Yes.  I believe that to be false and misleading.

5         Q    Do you have any other reason than what we've

6    just discussed with the Court?

7         A    To believe that that's false and misleading?

8         Q    Yes.

9         A    Not right now.

10        Q    Okay.  And did you look through the documents

11   that are in evidence in this case to determine whether

12   there are -- to look for examples of this type of

13   promotional messaging related to no dose of opioids for

14   the treatment of chronic pain is too high for the

15   defendants in this case?

16        A    Yes, I did.

17             MS. FITZPATRICK:  Okay.  We can turn to

18   Slide 21, Jon.

19             And just for the record, this slide reflects

20   P-CA-1391, P-CA-401, P-CA-579, P-CA-625, P-CA-251.

21             BY MS. FITZPATRICK:

22        Q    And can you tell the Court why you selected

23   these examples from documents that are in evidence that

24   are related to your opinions concerning the marketing

25   message that no dose of opioids for the treatment of pain

26   is too high?



Page 2502

1    A    So the first on the left from the American Pain

2  Foundation uses language that was common in these false

3  and misleading messages, namely that no ceiling dose

4  exists.

5         It's important to clarify that,

6  pharmacologically, opioids do not have a ceiling dose.  A

7  ceiling dose is defined as finding the receptor and

8  continuing to stimulate the receptor as the amount of the

9  opioid goes up.

10         But it's misleading here to use a pharmacologic

11  term to talk about how the drug works at the cellular

12  level to communicate that that is true in a clinical

13  setting when, in fact, there's evidence showing that the

14  higher the dose the higher the morbidity and mortality.

15         Also, this juxtaposition of opioids with NSAIDs,

16  or nonsteroidal anti-inflammatory, was a common

17  misleading strategy to get providers who do struggle with

18  the side effects of NSAIDs, putting their patients at

19  higher doses in particular, mainly GI side effects --

20  ulcers, bleeding dyscrasia.  But to juxtapose that with

21  NSAIDs was a way to promote opioids saying how you can't

22  keep going up on NSAIDs or, for that matter, Tylenol

23  because of the liver damage that Tylenol can cause, but

24  opioids you can keep going up and up.

25         And then other misleading messages in the

26  statement.  I can run through the others if you like.



Page 2503

1    Q    No.  I just wanted to reflect it for the record

2    if there's anything specific in here that you need to

3    draw the judge's attention to that requires your

4    specialized skill or knowledge to explain.  Otherwise, we

5    will move on.

6    A    The only thing that I would point your Honor's

7    attention to is the frequent use of "tolerance."  For

8    example, in the Endo quote, which is second -- it's in

9    the middle on the left-hand side -- it says, "If

10   tolerance does occur, it does not mean that you will run

11   out of pain relief."

12         Your Honor, that's exactly what tolerance means.

13   It means that you will run out of pain relief.  And

14   you've got one of two options then.  You've got to go up

15   on the dose, or you've got to get off.

16   Q    And, Doctor, just so I'm clear, are these

17   examples of the type of promotional messages that you

18   believe are false or misleading?

19   A    Yes, these are examples.  And I think this idea

20   of "no dose is too high" represents a particularly

21   insidious false and misleading message among my peer

22   group of physicians.  We -- I was the recipient of these

23   messages, and I, with my peers, truly believed at one

24   point that we could just go up and up and up on the dose

25   and our patients wouldn't be harmed.  And, as a result,

26   we have an entire generation of patients who are on



Page 2504

1   extremely high, extremely dangerous doses and now

2   struggling to get off.

3          MS. FEINSTEIN:  Excuse me.  Objection, your

4   Honor, to the last response and move to strike the end of

5   that answer as unfounded hearsay as to her colleagues and

6   the causation is an improper opinion without foundation.

7          THE COURT:  Just a moment.

8          Everything after the first sentence in the

9   answer was nonresponsive to the question and is stricken.

10  BY MS. FITZPATRICK:

11  Q    And let's turn to Misrepresentation Number 6,

12  "Physiologic opioid dependence is benign and easily

13  reversible."

14         Did you look at that misrepresentation to see

15  whether it's supported in the medical and scientific

16  literature?

17  A    Yes, I did.

18  Q    So let's start with what is physiologic opioid

19  dependence?

20  A    Physiologic opioid dependence is the process of

21  neuroadaptation to the presence of the opioid, resulting

22  in downregulation of dopamine and our own endogenous or

23  internal production of our own opioids to accommodate the

24  external or exogenous influx of opioids, leading to a

25  condition where, if that individual were to lower their

26  dose of opioids or stopped abruptly, they would venture



Page 2505

1   into the classic syndrome of opioid withdrawal.

2       Q    And is there support in the medical and

3   scientific literature for the proposition that, once a

4   patient develops physiologic opioid dependence, it is

5   benign and it is easily reversible?

6       A    No.  In fact, there's a growing body of work

7   showing that, for patients who become physiologic --

8   physiologically dependent on opioids, especially chronic

9   pain patients, that lowering their dose or getting off

10  altogether is extremely difficult.

11          MS. FITZPATRICK:  If we can turn to Slide 22,

12  Jon.

13      BY MS. FITZPATRICK:

14      Q    And does this slide, entitled "Dependence is a

15  Serious Condition and Hard to Treat," summarize your

16  findings from your review of the medical and scientific

17  literature concerning whether opioid dependence is benign

18  and easily reversible?

19      A    Yes.  So these are a series of studies that

20  undertook trying to taper opioid-dependent chronic pain

21  patients who, importantly, did not meet the five criteria

22  for opioid use disorder but were -- merely met criteria

23  for physiologic dependence and struggled to get off.

24          So, for example, the Weimer study was a study

25  showing tremendous effort on the part of a large clinic

26  to help these individuals taper down and finding that it



Page 2506

1 was extremely difficult to do so.

2           And, by the way, these were individuals in whom

3 it had already been determined that the risks of

4 continuing on opioids outweighed any potential benefits.

5 In other words, they were deemed to not be experiencing

6 benefit from continuing opioids and were experiencing

7 harms.

8      Q    Dr. Lembke, can you tell the Court what

9 breakthrough pain is?

10     A    Breakthrough pain is a phenomenon of patients

11 who have become tolerant to and dependent on opioids who

12 then experience pain in the midst of a period of time

13 when that opioid should be managing or covering their

14 pain.  So breakthrough pain is, in essence, an example of

15 the development of tolerance to the analgesic effects of

16 opioid.

17     Q    And going back to your clinical experience and

18 the work that you've done, the BRAVO protocol that you

19 previously identified, is that related to this topic of

20 whether or not opioid dependence is benign and easily

21 reversible?

22     A    Yes.  The BRAVO protocol was developed in

23 recognition that tapering chronic pain patients who are

24 physically dependent on opioids to lower doses is

25 difficult to do.  And it requires a certain amount of

26 expertise.  It requires time.  It requires extensive



Page 2507

1    health services.  It requires the patient to endure quite

2    a bit of pain and suffering.

3            So the BRAVO protocol was a way to help support

4    healthcare providers in helping patients taper when the

5    risks of continuing outweighed any potential benefit.

6    And the BRAVO protocol -- sorry -- just one more thing I

7    want to add -- you know, does review the evidence of

8    risks versus benefits.

9            And the Frank, et al., article here, which is

10   the second-to-last bullet point, speaks to a growing

11   number of studies showing that when these patients do

12   taper to lower doses or off of opioids, many of them

13   experience improvement in pain.  So their pain actually

14   gets better or it gets no worse.

15       Q    And has that been something that you have seen

16   in your clinical experience in treating patients who have

17   opioid dependence?

18       A    Yes, it is.

19       Q    And in addition to the medical and scientific

20   literature that you cite here for the proposition that

21   opioid dependence can be a difficult condition to treat,

22   is that also something that you see in your clinical

23   practice in treating patients who have opioid dependence?

24       A    Yes.  A growing number of patients in our clinic

25   expressly come to us for help with opioid tapering in the

26   context of opioid dependence.  These are typically not



Page 2508

1    patients who meet criterion for opioid use disorder.

2    They are patients with chronic pain who have been taking

3    opioids for years exactly as prescribed by their doctor.

4        Q    And I want to go through -- back to this issue

5    of breakthrough pain.  And if you can turn to Slide 23.

6             And you've identified here documents in evidence

7    as P-CA-1303, the 2005 document entitled "Actiq Marketing

8    Plan."

9             What is the relevance of P-CA-1303 to your

10   opinions here concerning breakthrough pain?

11       A    I think it's important to make the distinction

12   that in somebody on hospice care who has 12 weeks to

13   live, and we're trying to relieve their agony at the end

14   of life and we give them opioids and they experience

15   breakthrough pain, in that context that it would very

16   much make sense to give them additional opioids on top of

17   that to ease their suffering because the amount of time

18   they have to live makes the issue of developing addiction

19   for that matter, you know, overdose irrelevant.

20            But in the context of treating chronic pain,

21   this notion of breakthrough pain, I think, has a very

22   deleterious effect because it then encouraged providers

23   to pile one opioid on top of another.

24            We were encouraged to have long-acting opioid

25   and then to prescribe additionally short-acting opioids

26   to be taken for, quote-unquote, breakthrough pain.  If



Page 2509

1    there was breakthrough through the short-acting opioids,

2    we were encouraged to prescribe fast-acting opioids to

3    immediately target breakthrough pain using things like

4    transmucosal fentanyl products to squash the breakthrough

5    pain.

6            But the result of all of that, ultimately, is

7    that the patient ends up on higher and higher doses,

8    develops more tolerance to those doses, which then

9    requires higher doses of both the long-acting agent and

10   the short-acting agent for breakthrough pain, increasing

11   their risk of overdose and addiction.

12       Q    And, Dr. Lembke, can you tell me, are there

13   risks to a patient while undergoing treatment for OUD or

14   opioid dependence?

15       A    I'm not sure I understand your question.

16       Q    Let me -- let me try it again.

17           Do patients who are undergoing treatment for

18   OUD, medically assisted treatment for OUD and dependence,

19   do those treatments present unique risks or independent

20   risks to patients?

21       A    Okay.  So the pharmacologic therapies that we

22   have for opioid use disorder consist of three

23   medications:  buprenorphine, commonly referred to as

24   Suboxone; methadone maintenance provided in liquid form

25   through a methadone maintenance clinic; and naltrexone,

26   which is an opioid receptor blocker.



Page 2510

1          So just focusing on the first two,

2   buprenorphine -- both methadone and buprenorphine are

3   unique opioids in that they have a very long half life.

4   And the reason why that's helpful in the treatment of

5   opioid use disorder is because it gets individuals out of

6   this cycle of intoxication, withdrawal, and drug seeking,

7   which takes so much of their energy and creativity, and

8   it achieves this steady state.

9          Also buprenorphine has some additional features

10  that make it safer than other opioids.  It is less likely

11  to cause respiratory suppression or respiratory

12  depression than other opioids, making it less likely to

13  result in accidental overdose, although it too can

14  contribute to accidental overdose, especially in

15  combination with other competing agents.

16  Q    Dr. Lembke, in your opinion, are marketing

17  messages that suggest that opioid dependence is benign

18  and easily reversible false and misleading?

19  A    Yes.

20  Q    And did you go through some of the documents

21  that are in evidence in this case to find examples of

22  promotional messaging that suggests that opioid

23  dependence is benign and easily reversible?

24  A    Yes, I did.

25  Q    If we can go to Slide 24, Jon.

26          Doctor -- do you want to take a quick break,



Page 2511

 1   Doctor?

 2       A    No.  I'm okay.

 3       Q    Okay.  I just wanted to make sure.

 4            What's up on the slide are document references

 5   P-CA-1391, P-CA-399, and P-CA-251.

 6            Are those examples of the Misrepresentation

 7   Number 6, that is, "Physiological opioid dependence is

 8   benign and easily reversible"?

 9       A    Yes, they are.

10       Q    Okay.  Can you explain to the Court why you

11   chose these three documents as examples of that marketing

12   messaging?

13       A    Yes.

14            So on the left-hand side, both of those messages

15   equate the physical dependence from opioids to dependence

16   that occurs to other medications.  Although it is true

17   that patients can habituate to blood pressure medications

18   like beta blockers, it's misleading to equate the

19   severity and morbidity associated with opioid dependence

20   and opioid withdrawal to that experienced when people

21   habituate to things like beta blockers.

22       Q    Can I just clarify that what you're talking

23   about on the left-hand side are references to P-CA-1391

24   and P-CA-399?

25       A    Yes.  Right.

26            And then the other important thing here is



Page 2512

1   there's lots of misleading messaging that talks about

2   dependence and tolerance and withdrawal not having

3   anything to do with addiction.  It's making this very

4   stark distinction between opioid use disorder and

5   physical dependence when, in fact, of the 11 criterion

6   the DSM-5 used to diagnose opioid use disorder, two of

7   those criteria are tolerance and withdrawal.

8           And these phenomena are linked.  They are not

9   distinct phenomena.

10    Q    And, Doctor, I want to turn now to something

11   that I believe you referenced earlier today, which was

12   the gateway effect.  Can you explain to the Court what

13   the term -- what you mean by gateway effect?

14           MR. BRODY:  Objection, your Honor; cumulative of

15   Dr. Stafford and Dr. Quick.

16           THE COURT:  Ms. Fitzpatrick, what would be

17   different or additional about this?

18           MS. FITZPATRICK:  Your Honor, I'm just laying --

19   truly in just a -- not too many questions -- of

20   Dr. Lembke's understanding of the gateway effect.  And

21   I'm going to tie it together with laying a foundation

22   later and asking her ultimate opinions in this case about

23   the cause and effect.

24           THE COURT:  I have not previously raised the

25   issue, nor have counsel, that the doctor has been asked

26   numerous questions that others have defined.



Page 2513

1  Breakthrough pain is one example.  Chronic pain is

2  another example.  The definition of opioid is another

3  example.

4          Cumulatively, these repetitive questions do take

5  up inordinate amounts of time.  Unless it is essential to

6  redefine gateway effect, please just ask your questions.

7      BY MS. FITZPATRICK:

8      Q    Doctor, I'm just going to ask you just a couple

9  of questions here without going into too much detail.

10         Have you done research and looked at whether

11  both medical and nonmedical use of prescription opioids

12  can be gateways to heroin use?

13     A    Yes, I have.

14     Q    And do you, based on the research that you have

15  done in this case, and your experience in treating those

16  who suffer from OUD and opioid dependence, believe that

17  both medical and nonmedical use of prescription opioids

18  can be gateways to heroin use?

19         MR. BRODY:  Same objection, your Honor;

20  cumulative of Dr. Quick and Dr. Stafford.

21         THE COURT:  Overruled.

22         THE WITNESS:  Yes, I believe that the weight of

23  the evidence shows that exposure to prescription opioids,

24  whether obtained medically or nonmedically and used

25  medically or nonmedically, increases that individual's

26  risk of using heroin at a later date.



Page 2514

```
 1      BY MS. FITZPATRICK:

 2      Q    Dr. Lembke, I want to ask you some opinions in

 3   this case.  And I can do that since it's a bench trial.

 4   I'm just going to ask you a series of questions, not what

 5   your opinion is but to what's called lay the foundation

 6   for the opinions.  So just whether you have opinions or

 7   not.  Okay?

 8      A    Okay.

 9      Q    I don't want to run afoul of any of the Court

10   orders.

11           Earlier today you testified that prior to the

12   1990s, there was a conservative consensus against the use

13   of prescription opioids for the treatment of chronic

14   pain, correct?

15      A    Yes.

16      Q    And as part of your professional research work

17   at Stanford in the areas of prescription opioids and

18   their use, have you investigated the rates in opioid

19   prescribing from the 1990s to the present?

20      A    Yes.

21      Q    And you testified about those increased rates

22   earlier today, correct?

23      A    Yes.

24      Q    And as part of your professional work at

25   Stanford in the area of prescription opioids and OUD,

26   have you investigated what -- any of the potential causes
```



Page 2515

1   of this increased rates of opioid prescribing from the

2   1990s to the present?

3       A    Yes, I have.

4       Q    And did you attempt, in doing that work, to

5   investigate factors that may have -- all factors that may

6   have contributed to this change in the conservative

7   consensus?

8       A    Yes, I did.

9       Q    And in doing this investigation, did you review

10  medical and scientific literature?

11          MR. KABA:  Objection; leading.

12          THE COURT:  Overruled.

13          THE WITNESS:  Yes, I did.

14  BY MS. FITZPATRICK:

15      Q    And how did you go about selecting or reviewing

16  medical and scientific literature in order to reach your

17  opinions?

18      A    I used search words to collect articles from the

19  literature.  I specifically looked for articles that had

20  differences of opinion so as to not leave out any

21  perspective.

22          I looked at consensus statements from learned

23  bodies like the National Academies of Sciences,

24  Engineering, and Medicine and what they had concluded

25  from similar types of literature searches.

26          I compared my reading of the literature with the



MAGNA
LEGAL SERVICES

Page 2516

1   documents provided by defendants in this case as well as

2   incorporated my own qualitative research, interviews I

3   had done with healthcare providers and patients.

4        Q    Let me -- let me break this down, Dr. Lembke.  I

5   just want to make sure that we're doing this.

6             So I had asked you about the medical and

7   scientific literature that you had researched.  Was your

8   method of going about obtaining and reviewing that

9   medical, scientific literature when you were

10  investigating the factors that may have contributed to

11  the change in the conservative consensus -- was that

12  consistent with the research techniques that you

13  regularly utilize in your position at Stanford

14  University?

15       A    Yes, it was.  And I've included everything that

16  I reviewed in the materials considered, which is more

17  than 600 articles.

18       Q    And is the methodology that you used to review

19  that medical and scientific -- to both obtain and to

20  review that medical and scientific literature -- is that

21  consistent with the way that research is done in your

22  field?

23       A    Yes, that's a standard academic approach to

24  understanding the medical science.

25       Q    Okay.  And in addition to your review of, I

26  think, over 600 medical and scientific -- well, first of



Page 2517

1   all, let me ask this:  The medical and scientific

2   literature that you reviewed and you relied on, did you

3   identify that in your expert report in this case?

4       A    Yes, I did.

5       Q    And have you also used that medical and

6   scientific literature for other academic publications by

7   you outside of an expert report in this case?

8       A    Yes, I have.

9       Q    And what academic publications are those?

10      A    I and colleagues published an analysis of a 2013

11  Medicare database looking at what types of doctors are

12  prescribing opioids and found that opioid prescribing is

13  not --

14      Q    I'm going to ask you to hold off on what the

15  actual opinions are.  Doctor, I'm just asking you the

16  methodology for how you got there, if that's okay.

17      A    Okay.  So we analyzed Medicare Part D 2013

18  database.  I've also published articles on the

19  appropriate perioperative use of buprenorphine, analyzing

20  the literature and taking expert consensus opinion.  I've

21  published articles looking at the use generally of opioid

22  agonist therapy perioperatively in patients with opioid

23  use disorder.

24          I've published articles -- and, again, this is

25  all with collaborators and colleagues -- looking at

26  weighing the risks, benefits, and alternatives of the use



MAGNA
LEGAL SERVICES

Page 2518

1    of opioids in the treatment of chronic pain to deeply

2    understand what the evidence actually shows.

3         Q    And, Doctor, I want to focus on the particular

4    issue of the factors that you investigated to

5    determine -- or to reach opinions on what contributed to

6    the change from the conservative consensus in the 19 --

7    prior to the 1990s, to the more liberal use of opioids in

8    the 2000s and beyond.  Okay?

9              So focusing on that particular opinion, have you

10   reviewed the literature -- the medical and scientific

11   literature that you identified in your report here for

12   the support of those opinions?  Have you also published

13   that -- those opinions and that work elsewhere relying on

14   the same literature?

15        A    Yes.

16        Q    And where did you publish your research outside

17   of your expert opinion in this case -- or your expert

18   report in this case?

19        A    Looking at that narrower question of how opioid

20   messaging impacted physician prescribing, my major

21   contribution to that literature is my book based on

22   qualitative interviews that I've done.

23        Q    And what other information did you rely on

24   besides the medical and scientific literature to reach

25   your opinions on whether opioid messaging impacted

26   physician prescribing?



Page 2519

1     A     Well, I looked at, you know, specific empirical

2     studies in this literature.  I also looked at consensus

3     reports.  For example, the May 2017 report in the

4     literature.

5           I then compared what I found there to the

6     misleading messaging to try and see whether or not that

7     messaging was, in fact, informed by the science.

8     Q     And going beyond whether the messaging was

9     actually informed by the science, what did you do to

10    determine whether that marketing -- those marketing

11    messages had an actual impact on access to or

12    availability of opioids?

13    A     Um-hum.

14          Well, I think, first and foremost, again, I

15    interviewed stakeholders in the medical community to find

16    out what their exposure was to any marketing and

17    messaging material on opioids and how it impacted their

18    prescribing.  And I also related it to my own personal

19    experience, having been the recipient of this messaging

20    in its heyday, and how -- how I was impacted by that

21    messaging as well as my clinical experience of seeing

22    patients being prescribed opioids from their doctors and

23    the impact that it had on those individuals.

24    Q     And is that an accepted methodology in your

25    field to reach conclusions to answer the question of

26    whether the messaging material concerning opioids



Page 2520

1    impacted prescribing of opioids?

2        A    Yes, it is.

3        Q    And you have mentioned in there how -- your own

4    personal experience of having been a recipient of this

5    messaging.  Can you tell us what your own personal

6    experience having been a recipient of this messaging was?

7        A    Yes.  I will say when I graduated from medical

8    school, I had received minimal training in addiction and

9    also minimal training in the treatment of pain.  Very

10   limited hours dedicated to either of those subjects.

11           And then in my early career -- well, in my

12   residency, I was exposed to a gradual and iterative

13   paradigm shift that was influenced by messages like pain

14   is undertreated because physicians are opioidphobic and

15   we are, in fact, harming patients because we are

16   withholding opioids.

17           I remember when the Joint Commission came to my

18   hospital and told us that pain is the fifth vital sign

19   and that we should screen every patient for pain and

20   that, if we were not doing that and doing, quote-unquote,

21   everything in our power to target their pain, then we

22   were remiss and, in fact, violating to some extent their

23   right to pain treatment.

24           And I also, again, through my entire early

25   career starting in the late 1990s to approximately 2010,

26   was repeatedly inundated with the message that, as long



Page 2521

1   as I, the physician, am prescribing to a patient with a

2   bona fide and legitimate pain condition, their chances of

3   getting addicted to the opioid that I was prescribing

4   were so small as to be discounted, negligible, not an

5   area of concern.

6        Q    And, Doctor, going beyond your own personal

7   experience --

8             THE COURT:  Ms. Fitzpatrick, just before you ask

9   the question, would you take the slide down since it

10  dominates the screen?

11            MS. FITZPATRICK:  I'm so sorry, your Honor.

12            THE COURT:  Thank you.

13  BY MS. FITZPATRICK:

14       Q    Okay.  And, Doctor, going beyond your own

15  personal experience, did you reach opinions in this case

16  as to whether the marketing misrepresentations that you

17  identified, the six misrepresentations, influenced or

18  were a cause of increased prescribing of opioids?

19       A    Yes.  I believe that the false and misleading --

20            MR. BRODY:  I'm sorry, your Honor.  The question

21  was simply whether she had reached opinions.  I object on

22  foundation grounds to the expression of those opinions.

23            THE COURT:  At this stage the question just

24  calls for a yes or a no.

25            THE WITNESS:  Can you restate the question,

26  please.



Page 2522

```
 1      BY MS. FITZPATRICK:
 2      Q    Doctor, going beyond your own personal
 3  experience, did you reach opinions in this case as to
 4  whether the marketing misrepresentations that you
 5  identified, the six misrepresentations that we discussed,
 6  were -- caused an increased prescribing of opioids by
 7  physicians?
 8      A    Yes, I did reach an opinion about that.
 9      Q    And what is that opinion?
10           MR. BRODY:  I object, your Honor; lack of
11  foundation.
12           THE COURT:  Overruled.
13           MR. KABA:  Your Honor, I would also join in that
14  objection and note that the witness testified -- when the
15  witness was testifying as to foundation, or the attempt
16  to lay foundation, one of the first things she said was
17  she interviewed stakeholders in the medical community to
18  find out about exposure to marketing and messaging.  That
19  is hearsay.
20           And insofar as it's driving an opinion with
21  respect to the plaintiff-specific jurisdiction, it's
22  case-specific hearsay for which no exception applies.
23           So I would add a hearsay objection on top of the
24  foundation objection.
25           THE COURT:  The objection is overruled.
26      BY MS. FITZPATRICK:
```



Page 2523

1      Q     And, Dr. Lembke, what is your opinion?

2      A     My opinion is that the false and misleading

3   messages on the part of the defendants was a significant

4   factor in opioid overprescribing and the development of

5   the opioid epidemic.

6            MS. FITZPATRICK:  Your Honor, we have nothing

7   further.

8            THE COURT:  Dr. Lembke, as is apparent, you will

9   need to come back.  I think rather than have examination

10  start at this hour, I'm going to adjourn at this time.

11  The defendants will begin their cross-examination at

12  9:00 a.m.

13           Now that the examination has concluded, under

14  the rules applicable to this trial, you are not allowed

15  to discuss your testimony with the People's counsel.

16  Please take that seriously.

17           THE WITNESS:  Yes, I will, your Honor.

18           THE COURT:  We are adjourned until 9:00 a.m.

19  tomorrow morning.  Thank you.

20           MS. FITZPATRICK:  Thank you, your Honor.

21           (Conclusion of proceedings at 4:14 p.m.)

22

23

24

25

26



Page 2330

REPORTER'S CERTIFICATE

I, Carolyn Gregor, CSR NO. 2351, approved court
reporter pro tempore, do hereby certify that the
foregoing Reporter's Transcript; consisting of pages
through 2523, is a full, true and correct transcription
of my shorthand notes thereof, and a full, true and
correct statement of the proceedings had in said cause,
taken via Zoom, to the best of my ability.

Dated at Newport Beach, California, this
18th day of May, 2021.

_____

CAROLYN GREGOR, CSR 2351, CRR, CM, RDR
COURT APPROVED REPORTER PRO TEMPORE



**A**

aarnold@mot...
 2:17
abandoning
 2416:25
aberrant
 2474:22
ability 2375:26
 2461:1
 2330:13
able 2337:5
 2346:21
 2347:8,9
 2352:14
 2355:7 2359:4
 2374:3 2378:4
 2381:15
 2386:7
 2387:17
 2407:8
 2419:18
 2430:8
 2434:21
 2444:23
 2483:7
abruptly
 2504:26
absence 2490:3
abstinence
 2435:13
abuse 2451:10
 2475:23
 2478:16
abuse-deterrent
 2439:14,22
abusing 2429:8
academic
 2404:6
 2419:11
 2440:25
 2516:23
 2517:6,9
Academies
 2438:12

2515:23
academy 2345:4
 2345:16,19
 2349:2,17,23
 2488:9 2489:8
acceptable
 2343:21
accepted
 2347:13
 2519:24
access 2421:22
 2434:7
 2435:26
 2436:6,13
 2437:12
 2446:7,12
 2519:11
accessible
 2361:18
accidental
 2343:8,10
 2383:17,18
 2408:11
 2510:13,14
acclaimed
 2458:2
accommodate
 2504:23
accomplished
 2441:24
accurate 2335:8
achieves 2510:8
acknowledging
 2397:19
acronym 2348:5
Actavis 1:14,14
 5:2,3,10,10,10
 5:11,11
acting 1:4,5
action 2380:24
 2384:21
actions 2363:9
Actiq 2508:7
activities

2347:21
activity 2347:25
 2348:15,18
 2375:22
actual 2446:22
 2447:14
 2483:9
 2517:15
 2519:11
acute 2435:10
 2439:5
 2485:15,16,19
 2485:22
 2494:5
ADAM 5:4
adam.teitcher...
 5:7
add 2370:15
 2373:9
 2401:14
 2483:23
 2507:7
 2522:23
addicted
 2401:12
 2405:18
 2411:17
 2413:10
 2418:11
 2419:2 2426:6
 2427:18
 2429:7
 2433:10,12,24
 2433:26
 2434:10,14,24
 2436:15
 2439:25
 2440:3 2454:9
 2458:9 2473:4
 2473:8,12,16
 2473:17,19
 2474:5 2476:2
 2477:13,20
 2478:8,18

2479:9
 2480:12
 2481:9 2482:6
 2482:14,26
 2521:3
addiction
 2357:16
 2393:22,24,25
 2393:26
 2394:25
 2395:4,20,24
 2395:25
 2396:2,8,15,24
 2397:4,17,20
 2398:1,4,7
 2399:2,5
 2404:2,3,6
 2405:18,20
 2406:1,20,26
 2407:16,22
 2408:11,17,24
 2410:23
 2411:10
 2413:18,21
 2417:19,22
 2419:21
 2424:26
 2425:4,7,10,11
 2425:12,18,19
 2426:3,5
 2429:21
 2430:7
 2431:18
 2432:1,14
 2433:14,15,20
 2433:21,25
 2434:5,7
 2435:1,2
 2436:9,11
 2437:6 2438:1
 2438:7 2439:8
 2439:12
 2440:15
 2446:15

2449:13
 2451:10,26
 2452:26
 2453:5,10
 2454:3,14,21
 2456:7
 2462:18
 2463:2,12,24
 2464:24
 2465:6 2467:6
 2467:10,15
 2468:6,15
 2469:10,18
 2473:4 2474:7
 2476:16,20,24
 2483:2 2493:1
 2494:8
 2508:18
 2509:11
 2512:3 2520:8
addictions
 2396:21
 2405:21
 2418:5
addictive
 2427:19
 2428:4 2429:8
 2434:1
 2436:16
 2440:14
 2458:6,8,8,11
 2458:24
 2482:18
addicts 2461:26
 2478:16
 2482:22
addition
 2346:22
 2348:22,24
 2377:19
 2386:18
 2398:11
 2402:8,22
 2404:11



2412:16
2417:8
2419:24
2420:20
2462:25
2507:19
2516:25
**additional**
2361:8
2390:19
2421:19,22
2484:3
2508:16
2510:9
2512:17
**additionally**
2371:12
2508:25
**address** 2332:18
2334:13
2336:3
2407:11
**addressed**
2330:16
**addressing**
2373:7
**adds** 2464:12
**adequate**
2422:13
**adjourn**
2523:10
**adjourned**
2390:13
2484:15
2523:18
**administer**
2384:3
**administering**
2341:3
**administration**
2366:2 2374:4
2397:9
**administrations**
2373:26

**admissibility**
2330:20
2392:4
**admission**
2331:5
2332:16
2362:16
2364:16
2371:7,12
2455:16
**admissions**
2335:18
2437:6
**admit** 2332:20
2362:20
2367:2,9
2370:20
2392:8 2496:1
**admitted** 7:8
2330:13,18,25
2331:2,12,24
2332:8,9,11,12
2332:15,22
2333:3,4,9,15
2333:16,19
2334:7 2360:3
2362:8
2365:20
2368:22
2369:12,13
2370:16
2372:19
2390:19,22,22
2391:5,8,17,17
2392:8,10,12
2392:14
2455:22
2481:3
**admitting**
2334:11
2362:21
2363:8,10,22
2371:18
**adult** 2361:4

**Adults** 2457:18
2460:18
**advent** 2440:22
**adverse** 2453:21
2453:23
**adversely**
2418:25
**adviser** 2396:2,6
**advocate**
2440:26
**advocated**
2489:4
**advocating**
2440:23
**affect** 2356:14
2356:17
2432:9
**afoul** 2514:9
**aftereffect**
2429:11
2432:24
**afternoon**
2332:4
2392:24
2431:1,3
2484:18
**age** 2489:11
**agencies** 2442:1
**Agency** 2334:12
**agent** 2509:9,10
**agents** 2510:15
**aggregate**
2450:6
**ago** 2347:19
2404:13
2408:3
2416:12
**agonist** 2411:9
2431:21
2517:22
**agony** 2508:13
**agree** 2331:1
2379:18
**agreed** 2330:19

2496:13
**agreement**
2330:20
**ahead** 2451:6
**aid** 2348:26
2349:2
**al** 2449:23
2451:10
2474:21,26
2475:8,22
2476:4,10,19
2488:5
2498:19
2500:7,9,11
2507:9
**Alameda** 2357:6
2372:6
**alaurendeau...**
4:11
**alcohol** 2405:19
2476:14
**alike** 2415:4
**Allergan**
2335:22
2385:11,15
**allow** 2335:1
2350:3 2412:6
**allowed** 2523:14
**allows** 2428:9
2432:7
2465:21,21
**allude** 2498:10
**all-day** 2400:18
**altered** 2424:4
**alternatives**
2517:26
**altogether**
2505:10
**alucas@omm....**
4:10
**AL-CA-300050**
2498:4
**ambiguity**
2391:2,10

**ambulance**
2340:21
**ambulances**
2375:4
**amended**
2333:14
**American**
2396:2,7,10,11
2457:25
2458:2
2478:20
2483:12
2488:9 2489:8
2489:9 2502:1
**Americans**
2408:5
**amount** 2356:10
2370:18
2428:7 2429:1
2446:22
2447:9,10
2448:8 2502:8
2506:25
2508:17
**amounts**
2499:25
2513:5
**Amy** 4:6,7
2377:3 2391:1
**ANA** 2330:1
**analgesia**
2461:1
2486:24
**analgesic**
2426:15
2427:3,10,11
2447:23
2506:15
**analysis**
2371:18
2445:16
2458:18
2492:3
2517:10



analyzed 2449:5
  2449:7
  2517:17
analyzing
  2517:19
ANDREA 3:11
ANDREW 2:12
and/or 2425:14
  2446:4
  2470:22
  2493:18
anesthesia
  2412:20
  2413:2
anesthesiology
  2412:18
Angeles 3:10,10
  3:12 4:9,18,24
angles 2419:15
Anna 2390:24
  2392:23
  2393:10,16
Annals 2500:18
Anne 2366:16
answer 2333:24
  2347:3 2353:8
  2355:7 2368:3
  2376:12
  2378:14
  2381:9,12
  2384:13
  2401:26
  2410:25
  2442:10
  2443:19,21,22
  2444:7 2445:1
  2470:10
  2474:13
  2504:5,9
  2519:25
answered
  2341:21
  2383:22
  2410:4

answering
  2468:12
answers 2352:7
anticipate
  2336:25
  2337:4
anticipating
  2336:24
antidepressants
  2407:25,26
antidote
  2344:23
anti-inflamm...
  2502:16
Anton 5:6
anybody 2347:4
  2433:12
  2435:25
  2473:18
  2482:12,24
apart 2405:7
apologies
  2337:22
  2372:24
apologize
  2331:20
  2332:25
  2333:22
  2482:1
apparent
  2523:8
appear 2330:23
  2469:12
appearances 2:1
  3:1 4:1 5:1,18
appeared
  2469:15
  2472:12
appearing
  2330:7
appears
  2390:20
  2431:6
  2483:19

appendix
  2488:12
applicable
  2523:14
application
  2368:1,5,7,9
  2368:13
  2371:2
applied 2345:10
  2369:7,14
  2370:13
  2371:1
applies 2522:22
apply 2420:14
appointment
  2394:24
  2395:5,13
  2397:16
  2412:19,21,22
  2412:26,26
  2413:1 2466:7
  2466:15,23
appreciably
  2441:4,8
appreciate
  2392:13
  2447:17
  2489:10
apprehend
  2348:3
approach
  2417:1
  2516:23
approached
  2421:6
approaching
  2488:19
appropriate
  2330:18
  2336:11
  2360:9
  2371:22
  2407:24
  2410:22

2469:21
  2485:4
  2492:18
  2493:22
  2494:13
  2497:19,25
  2517:19
appropriately
  2336:16
approval
  2368:12,14
approved 1:26
  1:26 2370:12
  2330:7,19
approximate
  2374:3,7
approximately
  2331:22
  2336:24
  2339:5,9
  2340:7,19,20
  2341:10
  2345:8,24,26
  2346:12
  2347:19
  2373:17,17
  2374:8
  2441:11
  2447:5,8
  2448:6
  2485:24
  2520:25
Arbitblit 2421:7
arbitrary
  2450:4
archive 2361:22
area 2344:6
  2346:8
  2352:21
  2394:24
  2514:25
  2521:5
areas 2346:7
  2348:15

2350:19,22
  2394:22
  2395:2
  2514:17
arena 2397:20
argue 2490:8
ARNOLD 2:12
  4:22
aross@counse...
  3:13
arrest 2348:20
arthritis
  2460:13
article 2422:2,3
  2422:5,5
  2449:23
  2453:17
  2470:14
  2475:14,17
  2488:12,13,16
  2488:21,25
  2489:5,7
  2498:17,19
  2500:9 2507:9
articles 2474:18
  2487:13
  2515:18,19
  2516:17
  2517:18,21,24
aside 2453:14
  2497:13,16
asked 2355:5,12
  2382:24
  2383:22
  2392:8
  2421:19
  2496:8,24
  2497:3
  2512:25
  2516:6
asking 2341:14
  2344:24
  2355:9
  2402:14



2421:7
2465:22
2512:22
2517:15
asleep 2353:24
2427:8
aspects 2395:19
2432:8
assert 2493:22
assertions
2477:12
assess 2376:21
2378:4
assessment
2378:5,6
2488:10
assigned
2338:25
2345:8,22,24
2347:2,11
2348:24
assignment
2376:6
assist 2347:9
assistant 2341:2
2366:14
assisted 2509:18
associated
2342:17
2350:24
2354:8,20
2435:22
2462:9 2493:7
2511:19
association
2437:25,26
2438:6,16
2457:26
2458:2
assume 2387:1
assumes
2477:23
Assuming
2372:13

assumption
2391:25
attempt 2433:7
2464:17
2515:4
2522:15
attend 2340:3
2400:18
attended 2340:9
2402:4
attention
2375:14
2409:20
2443:13
2462:1 2503:3
2503:7
attested 2453:16
attesting 2443:3
Attorney 1:6
3:15
Attorneys 2:8
Attorney's
2337:9
audience 2405:1
2405:2 2422:1
audio 2430:14
auspices
2398:14
authenticate
2369:19
authenticated
2369:19
authorizing
2366:11
authors 2450:8
2452:15
2469:18
2487:18
2488:21
2489:20
2491:26
availability
2442:21
2519:12

available 2375:4
2375:6 2380:9
2380:19
2381:9,13
Avenue 4:8
average 2448:4
2451:16,26
2473:12,15,17
2476:2
2477:19
2478:8,12
2479:9
2480:11
2481:9 2482:5
2482:15,21
averaged
2450:11
avoid 2388:3
aware 2378:10
2378:15
2388:8,11,12
2388:15,26
2493:2
awareness
2343:22
a.m 2330:3
2523:12,18

—————————
B
—————————
back 2330:10
2331:10
2332:2
2336:12
2375:22
2390:16
2391:15
2398:25
2405:14
2406:21
2416:7
2417:15
2429:24,24
2431:4
2438:23

2445:20
2446:23
2450:10
2453:2
2455:25
2457:15
2461:10
2469:3
2473:10
2475:15
2484:19,26
2486:4,5
2490:15
2491:16
2499:5,7
2506:17
2508:4 2523:9
background
2341:13
2350:6
2412:14
2423:19
Baker 2:9
2335:23
2336:4,4,14
balance 2427:25
2428:1,5,14,17
2428:21,26
2429:12,17,18
2429:25
2430:4,9
2431:13,25
2432:18,19,26
2435:13
bar 2476:25
base 2411:10
based 2343:12
2344:1 2350:9
2355:8
2372:22
2422:12,17,18
2422:20
2426:20
2446:25

2459:1,9
2466:3
2469:23
2473:14
2513:14
2518:21
baseline 2412:7
2446:21
basic 2423:20
2485:6
basically
2358:24
2366:14
basing 2459:5
basis 2332:10
2360:8 2413:6
2437:20,21
2444:5 2448:9
2454:25
2459:18
2467:17
2468:16
2470:2,5,12
2480:17
Bates 2332:1
2333:5
Beach 2:5
2330:14
beat 2347:8,10
becoming
2420:10
2433:24
2454:9 2473:8
2482:14,26
began 2350:18
2376:2
2381:23
2395:10
2409:19
2417:18,24
2418:21
2440:19,25
2443:23
beginning



2346:16
2373:20
2374:5
2441:10
**behalf** 2338:8
2368:10,17
2386:20
2393:11
2405:8
**behavior**
2474:22
**behavioral**
2407:19
**behaviors**
2468:2
**belief** 2370:24
2373:1 2380:3
**believe** 2331:26
2332:20
2336:10
2340:11,19
2352:19
2353:4,19
2355:5
2356:26
2359:14
2364:1 2371:4
2374:15
2380:5
2381:26
2386:24
2387:13
2391:8
2404:17
2446:14
2450:17
2462:23
2490:5 2495:1
2501:4,7
2503:18
2512:11
2513:16,22
2521:19
**believed**

2353:14
2384:8,17
2488:2
2503:23
**believes** 2373:6
2483:18
**believing** 2416:4
**bench** 2334:11
2514:3
**benefit** 2408:1
2506:6 2507:5
**benefiting**
2408:9
**benefits** 2487:12
2487:16
2492:7,8
2506:4 2507:8
2517:26
**benign** 2504:12
2505:5,17
2506:20
2510:17,23
2511:8
**Bernstein**
2421:7,17
**best** 2354:12
2375:26
2376:19
2490:6
2330:13
**beta** 2511:18,21
**better** 2376:5
2404:5
2417:26
2429:23
2434:23
2474:4,17,22
2479:22,23
2507:14
**beyond** 2361:8
2363:25
2370:11,26
2384:10
2386:25

2387:26
2388:2 2438:5
2441:17
2483:19,24
2493:3 2496:8
2498:14
2518:8 2519:8
2521:6,14
2522:2
**bias** 2490:12
2492:1
**biased** 2490:9
**big** 2428:18
2447:21
**bigger** 2460:10
**biggest** 2380:8
2380:17
2446:14
2482:10
2483:1
**binds** 2423:22
**biological**
2433:25
**biologically**
2438:8
**biopsychosocial**
2425:12
2431:18,19
**bit** 2351:10
2377:7
2398:26
2400:12
2406:20
2440:4
2449:16,21
2450:10
2474:16
2483:5 2507:2
**black-and-wh...**
2375:13
**blanket** 2332:7
2332:16
**bleeding**
2502:20

**blocker** 2509:26
**blockers**
2511:18,21
**blood** 2511:17
**blue** 2354:17
**Blvd** 2:13
**board** 2347:5
2396:2,7,10,11
2400:17,17
2402:3
**Boards** 2415:26
2443:6
**board-certified**
2395:2,3
2396:4,14
**BOCKIUS** 5:3
**bodies** 2415:24
2441:26
2515:23
**body** 2413:25
2414:6
2460:10
2492:6
2493:19
2505:6
**bona** 2521:2
**Bonnard** 2500:9
**book** 2414:9,11
2414:22
2415:1,6,10,11
2415:14,14,17
2415:19
2421:9
2422:22
2442:23
2445:11,17
2448:24
2518:21
**boots** 2347:26
**Bordona** 6:7
2337:10,16
2338:5,7,16
2355:18
2360:13

2364:2,6,21
2367:21
2369:9,17
2372:3
2373:17
2374:26
2376:22
2377:3
2379:18,24
2383:9,25
2385:5
2386:16
2389:11,19
2390:5,8
**Bordona's**
2381:6
**bottle** 2352:11
2424:22
**bottles** 2344:7
2354:10
**bottom** 2451:9
2484:3 2500:7
**Boulevard** 5:6
**boxes** 2456:4
**brain** 2412:7
2424:20,24
2427:16,18,24
2428:7,9,12,15
2428:19
2429:6,19,19
2432:14,15
2433:7
**brains** 2411:24
**brain's** 2428:19
**brass** 2366:14
**BRAVO**
2416:11,23
2506:18,22
2507:3,6
**break** 2333:24
2351:9
2352:13
2390:12
2450:10



2474:15
2484:15
2510:26
2516:4
**breakthrough**
2506:9,10,14
2508:5,10,15
2508:21,26
2509:1,3,4,10
2513:1
**breathing**
2427:6
**BRIAN** 5:5
**brian.ercole@...**
5:8
**bridge** 2357:12
2357:13,14
2366:22
2428:11
**Bridgeside** 2:13
**brief** 2334:11
2390:15
2439:4
2484:17
**briefing**
2346:17
**briefly** 2336:5
2339:23
2355:2 2358:8
2358:12
2363:13
2369:21
2381:19
2386:13
2389:15
2422:14
2459:11
**bring** 2428:21
2474:6
**broad** 2453:14
**broader**
2498:20
**broadly** 2425:17
2433:21

**Brody** 4:7
2401:24,24
2442:3
2443:18
2465:12
2479:11
2480:13
2512:14
2513:19
2521:20
2522:10
**broke** 2431:11
2431:21
**broken** 2430:9
2431:13,25
**building**
2413:12
**bulk** 2408:22
**bullet** 2507:10
**buprenorphine**
2410:15,20
2411:9,13,18
2431:22
2509:23
2510:2,2,9
2517:19
**burdensome**
2462:7
**buried** 2488:11
**BURK** 4:16
**business**
2362:10,18
2399:17
2496:10,16
**buy** 2424:22
**BYER** 5:14
**bystanders**
2346:6
**B-O-R-D-O-N...**
2338:5

---
**C**

**C** 2:9 4:14
**CA** 2:5 3:6,12

3:17,21 4:9,18
4:24 5:6
**Cabraser**
2421:7,16
**cadre** 2348:25
**CALCAGNIE**
2:3,4
**calculations**
2451:16
**California** 1:1,4
2330:1
2357:11,13,14
2366:22
2372:6 2391:7
2392:15
2400:18,21
2402:3 2405:9
2407:8 2420:4
2438:19,21
2460:4
2463:14
2330:14
**call** 2335:7,25
2337:10
2347:3,4,5
2375:22
2379:12
2392:23
2405:20
2413:13
2428:15
2436:4
2456:18
2457:19
2463:6,23
2469:20
**called** 2338:8
2347:4 2386:1
2393:11
2414:12
2417:13
2424:2,15
2428:11,23
2432:23

2433:2
2439:14
2440:5
2442:19
2459:6,14
2461:24
2475:4
2499:11
2514:5
**calling** 2390:23
**calls** 2342:23,25
2346:4 2347:7
2375:23
2521:24
**camera** 2417:10
**cancer** 2460:13
2498:13
**candidly**
2495:22
**candles** 2354:13
**capacity**
2365:22
2381:4
2395:12
**capped** 2356:21
**car** 2375:13
**card** 2495:20
**Cardiac**
2493:12
**care** 2341:5
2397:21
2400:11
2401:19
2406:7 2415:8
2415:25
2440:23
2441:22
2489:13
2508:12
**career** 2344:25
2344:26
2400:16
2402:12,17
2417:25

2520:11,25
**carefully**
2411:19,20
**Caregivers**
2461:18
**Carolina** 2:13
**Carolyn** 1:26
2330:7,19
**carry** 2359:4
2492:26
**carrying** 2359:7
**case** 2336:9,17
2337:2,5
2344:20
2362:18,25
2367:12
2370:23
2373:2
2385:15
2394:2 2419:5
2419:26
2420:16,20,26
2421:5,15,20
2421:23
2422:9,16,19
2422:25
2424:15
2431:6
2442:17
2448:15
2449:5
2454:13,18,21
2464:10
2469:15,16,24
2470:1,6
2471:7,9
2480:4 2481:3
2481:7,14
2488:22
2489:24
2492:1
2494:10,21,25
2497:18
2498:7



2501:11,15
2510:21
2512:22
2513:15
2514:3 2516:1
2517:3,7
2518:17,18
2521:15
2522:3
**cases** 2367:12
**case-specific**
2443:20
2522:22
**categories**
2365:19
**categorized**
2433:21
**category**
2450:18
**causal** 2437:13
2438:2
2442:18
2468:20,20,24
**causality**
2437:21
**causation**
2504:6
**causative**
2403:21
2446:14
**cause** 2412:2
2424:26
2425:6
2437:10
2460:12
2463:13
2464:3,24
2502:23
2510:11
2512:23
2521:18
2330:12
**caused** 2377:15
2384:9,18

2398:1,4
2467:15
2468:8,15
2522:6
**causes** 2389:21
2419:6
2420:12
2468:7,17
2514:26
**caustic** 2436:21
**CDC** 2416:13
2420:7
2498:26
**ceiling** 2502:3,6
2502:7
**cellular** 2502:11
**Center** 1:2
2338:26
2347:20,22
2348:7
**centers** 2437:7
**central** 2407:5
2427:9,20,26
2428:25
**Century**
2417:13
**Cephalon** 5:2
2490:24
2491:12
**Ceres** 2345:9
**certain** 2385:21
2421:12
2431:12
2440:24
2448:13
2506:25
**certainly** 2334:6
2334:9
2385:18,22
2467:2
**certainty**
2377:10
2379:15
2382:25

**CERTIFICA...**
2330:1
**certification**
2361:3
**certified** 2361:2
**certify** 2330:8
**cetera** 2453:26
**chain** 2366:7
2368:15,16
**championed**
2474:2
**chance** 2334:8
2434:24
2474:4,17,22
**chances** 2521:2
**change** 2346:24
2389:24
2440:4 2515:6
2516:11
2518:6
**changed** 2335:3
2376:19
2411:25
**changes**
2354:24
2355:6,19
2356:2,5
2412:2 2418:6
2493:11
**changing**
2484:14
**channels** 2463:6
**chaotic** 2434:2
**charge** 2366:17
**CHARLES** 4:8
**check** 2331:10
2332:2
**checkout** 2347:2
**chemical**
2396:23,24
2397:1
2407:15
**chemicals**
2394:26

**Chicago** 5:15
**chief** 2366:9,10
2366:11,13,14
2366:16
2393:24
2396:15
2397:3
**chiefs** 2366:15
2381:26
**chief's** 2361:24
**childhood**
2434:3
**choose** 2456:9
2472:9
**chooses** 2330:21
**chose** 2456:15
2461:14
2478:6
2487:24
2498:6
2511:11
**Chou** 2488:5,16
2488:25
2491:18
**CHRISTOPH...**
2:10
**chronic** 2396:24
2397:2 2401:9
2404:2
2407:18,20,22
2407:25
2413:10
2414:20
2416:20
2417:2,4
2418:26
2419:1,13,18
2419:22
2432:9,11,16
2435:21
2451:11
2454:4
2458:12
2460:25

2475:24
2478:18
2485:4,7,8,10
2485:14,19
2486:1,2,4
2487:23
2488:4,7,14,20
2489:3,4
2491:23
2492:8,13,16
2492:20
2493:5,23
2494:14
2497:20,25
2498:22
2499:3,26
2500:12
2501:14
2505:8,20
2506:23
2508:2,20
2513:1
2514:13
2518:1
**chronically**
2429:18
2493:12
**churches** 2351:2
**circuitry**
2428:12
**circumstance**
2375:8
**circumstances**
2385:21
**cite** 2507:20
**cited** 2458:13
2497:18
**citizen** 2375:12
**city** 3:15,15
2337:9
2338:18,21
2345:9
2347:24
2348:4



2356:11
2363:11
2364:6 2366:5
2370:12
**Citywide** 2351:8
**claim** 2453:10
2456:6
2459:19,25
**claims** 2448:19
2454:13
**Clara** 1:5 3:2,3
**clarification**
2332:4
2391:13
2392:14
**clarified**
2391:10
**clarify** 2502:5
2511:22
**Clark** 2474:20
2474:26
**class** 2404:20
**classes** 2399:18
**classic** 2395:13
2472:11
2505:1
**classroom**
2340:18
**clean** 2354:15
**clear** 2370:6
2462:12
2468:13
2483:8
2503:16
**cleared** 2391:3
**clearly** 2438:14
**clerical** 2392:5
**Clerk** 2337:13
2337:15,20,23
2338:3,6
2393:1,3,14,17
2484:21,23
**clerk's** 5:18
2333:18

**client's** 2385:26
**clifland** 4:11
**clinic** 2393:25
2396:16,18,25
2397:4,6,9,10
2405:17,23
2407:21
2408:12
2413:7
2416:21,21
2418:19
2448:5,10
2505:25
2507:24
2509:25
**clinical** 2340:20
2340:21
2395:14
2397:12
2398:12,14,16
2398:19,21
2405:4,14,15
2406:7,21
2412:23
2417:9
2422:20
2426:20
2475:25
2488:6 2489:2
2490:21
2491:17
2502:12
2506:17
2507:16,22
2519:21
**clock-watching**
2486:24
**closely** 2450:16
**closer** 2458:3
**clues** 2377:8,9
2379:14
**CM** 2330:19
**cmoriarty@m...**
2:15

**CMR** 1:26
**coauthored**
2368:6
2469:16
**cocaine** 2378:19
**cochair** 2490:20
2490:22
**cochairs**
2488:21
2490:17,21
**cocreated**
2357:17
**cocreation**
2357:5
**code** 2362:11
**codeine** 2424:1
**cognition**
2493:13
**cognitive**
2343:22
2407:19
**cohabitants**
2358:24
**cohort** 2407:17
2500:12
**coins** 2352:11
**collaborate**
2413:16
**collaboration**
2413:14
2443:9
2457:25
2458:1
**collaborators**
2517:25
**colleagues**
2385:5 2413:3
2413:8,15
2414:17
2445:2 2504:5
2517:10,25
**collect** 2429:16
2515:18
**collectively**

2468:25
**College** 2340:4
**COLLIE** 5:4
**colocated**
2427:22
**COLOMBO**
2:12
**color** 2388:16
2388:23
**combination**
2423:7
2510:15
**combinations**
2378:16,18
**come** 2335:2
2354:14
2388:24
2396:22
2397:6 2407:4
2408:12
2409:19
2416:7
2423:14
2429:4 2430:3
2433:15
2441:6 2466:3
2507:25
2523:9
**comedown**
2429:2
**comes** 2376:7,16
2424:22
2434:12
2447:23
**coming** 2336:8
2387:16
2391:26
2409:6 2410:5
2413:9
2418:10
2422:11
**command**
2366:7
2368:15,16

**commencing**
2333:17
**Commission**
2415:26
2443:7
2520:17
**committees**
2396:7
**common**
2354:11
2375:11
2439:25
2448:13
2453:24,25,25
2454:10,11,20
2458:9
2461:22
2478:7
2479:16
2480:2
2495:25
2502:2,16
**commonly**
2425:20
2478:13
2509:23
**communicate**
2414:16
2428:10
2472:8
2483:26
2502:12
**communicated**
2457:2
2483:26
**communication**
2413:14
2497:4
**community**
2346:11,13,21
2347:9
2348:10,12
2350:12,15,25
2351:7



2353:19,22
2354:6,24
2355:20
2356:3,6,13,17
2363:3 2372:7
2374:18
2376:8,17
2389:12
2440:17
2441:23
2468:1 2474:8
2519:15
2522:17
**community's**
2443:13
**COMPANY** 1:9
**compare**
2481:17
**compared**
2445:6 2450:5
2459:12
2465:7 2476:5
2476:16
2515:26
2519:5
**comparing**
2446:19,22
**comparison**
2435:3
**compassionate**
2417:1
**compensation**
2460:3,5
**competing**
2510:15
**completely**
2406:18
**completing**
2400:16
**complex** 1:2
2415:20
2425:12
**components**
2361:8

**comprised**
2405:16
**compulsive**
2425:13
**computer**
2347:5
**concept** 2403:6
2473:1
**concepts**
2406:20
2472:3,7
**conceptual**
2453:23
**concern** 2521:5
**concerning**
2402:11
2420:4,11
2445:21
2452:10
2454:14
2463:21
2472:21
2476:1 2479:4
2488:3
2494:24
2496:15
2498:8
2501:24
2505:17
2508:10
2519:26
**concerns**
2370:21
2411:14
2416:26
**concluded**
2487:18
2515:24
2523:13
**concluding**
2470:16
**conclusion**
2445:9
2465:10,13

2466:3 2470:1
2523:21
**conclusions**
2445:17
2452:10
2519:25
**condition**
2454:10
2461:6 2470:2
2478:14
2482:26
2486:17
2493:18
2504:25
2505:15
2507:21
2521:2
**conditions**
2406:23
2407:13
2414:20
2424:26
2460:8
**conduct**
2348:16
**conducting**
2348:19
2349:1
2366:13
**conferred**
2482:11
**conferring**
2436:5
**confidence**
2451:18
2452:5
**confident**
2451:21
**confirm**
2332:21
2341:22
2343:23,24
2345:5 2386:2
2386:7

**confirmation**
2383:1
**confirmed**
2390:18
2483:16
**confirms**
2372:13
**conflict** 2489:17
2490:16
**conflicts** 2450:9
2452:16
2489:22
**confusing**
2371:20
**confusion**
2370:7 2467:2
**Congress**
2403:13,15
2404:12
2405:6
2463:21
2464:1
**conjunction**
2466:7,15,23
2489:8
**connect** 2468:18
**conscientious**
2397:11
**consensus**
2438:10
2485:13
2514:12
2515:7,22
2516:11
2517:20
2518:6 2519:2
**conservative**
2441:15
2514:12
2515:6
2516:11
2518:6
**conservatively**
2440:18

**consider**
2417:22
2453:20
2459:4
2488:16
**considerably**
2446:6
**considered**
2411:20
2449:5,6
2459:24
2516:16
**considering**
2485:19
**consist** 2509:22
**consisted**
2401:6
**consistency**
2437:22
2438:5 2479:2
**consistent**
2397:11
2450:8,18
2463:5 2465:8
2465:24
2466:21
2469:18
2472:18
2488:3
2516:12,21
**consisting**
2330:9
**consolidated**
2392:6
**consortium**
2438:17
**constantly**
2412:8 2432:4
**constipation**
2493:10
**constitutes**
2392:15
**consult** 2413:3
**consultations**



2490:7
**consulting**
2488:22
2490:7
**consults**
2413:13
**consumer**
2478:23,24
**consumers**
2457:3,6
**contact** 2375:23
2384:5
2415:13
**contain** 2368:25
**contained**
2391:12
2461:13
2467:4
**contains**
2352:11
2359:21
2362:11
2363:19
2371:17
**content** 2444:6
**contention**
2467:10
**contents**
2362:13
2363:22
2364:13
2370:11,16
2371:11,15
**context** 2469:15
2507:26
2508:15,20
**contexts**
2399:17
**contextually**
2423:16
**continents**
2411:8
**continue**
2338:12

2360:7,10
2402:9,15
2408:20
2413:11
2418:13
2429:1,15
2430:10
2431:8
2435:15
2447:24,25
**continued** 3:1
4:1 5:1
2375:18,24
2376:1
2395:11
2401:13,21
2402:18
2403:3
2418:16,18
2425:13
2431:14
**continuing**
2400:23
2402:25
2502:8 2506:4
2506:6 2507:5
**contrasting**
2446:22
**contribute**
2434:4
2436:11
2510:14
**contributed**
2414:6 2473:2
2515:6
2516:10
2518:5
**contributing**
2487:4
**contribution**
2518:21
**contributions**
2412:23
**contributor**

2437:14
**control** 2428:12
**controlled**
2434:12
**controversial**
2418:24
**cool** 2343:18
**coordinator**
2357:11
**corner** 2434:9
**Corporate** 2:5
**correct** 2343:25
2345:11
2360:14
2377:11,12,19
2378:1,8,9,12
2378:20,24
2379:1,10,16
2379:26
2380:10,19,20
2380:22,24
2381:24
2382:5,13
2383:13,15,16
2383:20
2384:5,9,18,22
2384:26
2385:2,20,23
2386:2,8,20
2387:12,20,24
2388:10,14,17
2394:2,3
2398:24
2404:14
2433:7
2448:15,26
2449:18,19
2458:20
2478:4
2487:25
2491:9 2495:3
2514:14,22
2330:10,12
**correctly** 2372:4

2384:14
**correlation**
2464:22
**correspond**
2450:16
**Costa** 5:6
**COUCH** 2:10
**counsel** 1:5 2:1
3:2,10 2330:7
2332:13
2360:10
2372:15
2431:8
2512:25
2523:15
**counterfeit**
2388:9,22
**counterintuiti...**
2412:6
2431:26
**country** 2399:4
2438:18
**counts** 2493:24
**County** 1:2,5,5
3:2,2,3,10,10
2334:12
2341:7,9
2357:7 2372:7
**couple** 2404:12
2412:14
2488:2 2513:8
**coupon** 2495:20
**course** 2332:11
2350:20
2351:5,11
2352:24
2353:17
2354:4,22
2355:18
2356:1
2376:16
2379:25
2380:2
2384:16

2400:23,25
2404:26
2411:16
2439:1
2445:11
2464:17
2471:12
2474:23
2496:23
**court** 1:1,26,26
2330:9
2331:14,18,22
2332:6 2333:2
2333:13,26
2334:3,10,21
2334:23
2335:8,13,24
2336:14
2337:6,13,25
2338:11
2339:7
2341:16
2344:20
2351:20
2352:3 2353:7
2355:1,4,9,13
2355:22
2356:8 2357:2
2359:20,24
2360:1
2361:20
2362:15
2363:14,21
2364:11
2367:7,18
2369:3,22
2370:5 2371:7
2372:13,20
2373:4,4,12
2374:12,19
2376:11,24
2377:21
2378:14
2379:4,22



2381:22
2382:15,20,24
2383:7,22
2384:12,24
2385:7
2386:11
2387:1,7
2388:2,19
2389:3,8,13
2390:1,8,12,16
2391:5,5,11,24
2392:8,10,13
2392:21,24,26
2393:6,21
2394:8 2396:1
2400:12
2402:5 2403:2
2405:15
2408:4 2410:3
2410:17,26
2414:9
2425:11
2427:15
2430:14,15
2431:3
2439:17
2441:21
2442:5,25
2443:21
2444:12,20
2445:18,23
2446:11,17,26
2449:21
2451:7
2452:17,23
2455:11,19,22
2456:4,15
2457:22
2459:17
2460:15
2461:12
2463:9,18
2464:6,11
2465:2,16,20

2465:21
2466:1,20
2467:1 2468:3
2468:11
2471:4,25
2475:20,26
2477:3,25
2478:6
2479:13,18,23
2479:25
2480:7,15,24
2481:21
2483:11,15,23
2484:8,14,18
2484:22
2486:19
2487:10
2488:1
2489:18
2490:13
2491:20
2495:6,16
2496:3,11,17
2496:19
2497:10
2501:6,22
2504:7 2506:8
2511:10
2512:12,16,24
2513:21
2514:9
2515:12
2521:8,12,23
2522:12,25
2523:8,18
2330:7,19
**courtesy**
2394:23
2412:19,21,22
2413:1
**courting** 2443:4
**courtroom**
2413:24,25
**cover** 2334:16

**covered** 2332:18
2415:17
**covering**
2506:13
**COVID** 2407:6
**COVID-19**
2375:17
**co-occurring**
2396:21
**CPR** 2348:26
2349:2
**cracks** 2406:4
**craving** 2412:8
2430:11
2435:14
**cravings**
2431:14
2432:4
**CRAWFORD**
3:20,20
**create** 2360:24
2368:4
2397:23
2404:5
**created** 2357:4
2419:1
**creating**
2357:18
**creation** 2404:2
**creativity**
2510:7
**creator** 2366:1
**creators** 2359:2
**crime** 2347:14
2347:15,22,24
2348:6
2417:13
**crimes** 2338:26
2347:20,24
2348:16
**criminal**
2339:12
2386:20
2388:1

**criminalistics**
2386:6
**criminals**
2348:3
**crisis** 2362:26
2369:16
2372:8 2419:6
**criteria** 2405:26
2408:16
2426:9
2450:17,19,23
2451:1,2
2505:21,22
2512:7
**criterion** 2508:1
2512:5
**cross** 6:3
2371:21
**crosses** 2336:10
**cross-examin...**
2371:11
2376:25
2377:1
2385:12
2386:14
2480:19
2523:11
**cross-examined**
2371:9
**CRR** 1:26
2330:19
**crushing**
2439:19,20
**crush-resistant**
2439:19
**CSR** 1:26
2330:7,19
**culpable**
2415:21
**cumulative**
2512:14
2513:20
**Cumulatively**
2513:4

**curbside**
2413:13
**cure** 2435:6
**current** 2338:18
2338:23
2393:21
2403:22
2405:15
2437:14
2438:15
2445:17
**currently**
2337:12
2338:25
2348:26
2358:5
2361:18
**customer-faci...**
2478:21
**CV** 2403:17
**CX-102** 1:3
**cycle** 2487:5
2510:6

**D**

**D** 2517:17
**DAGASTINO**
2:4
**daily** 2441:18
2448:7
2460:22
2477:7,9,10
2487:21
**damage** 2502:23
**dangerous**
2411:21
2440:13
2473:2
2498:24
2504:1
**dangers** 2493:4
**dashboard** 7:3
2391:7,8,17,21
2391:22,23,25



2392:4,16
**data** 2330:15,20
2331:11,14,18
2331:19,21,23
2333:17
2334:11
2369:24
2391:9
2419:25
2420:1
2437:23,24
2438:26
2441:2,3
2445:8
2451:11
2453:13
2460:3
2469:22
**database** 2362:1
2517:11,18
**databases**
2331:15
2419:11
**date** 2333:19
2403:16
2449:22
2513:26
**dated** 2487:24
2330:14
**dating** 2453:2
**David** 4:16
2469:16
2470:7
**day** 2346:23,23
2348:13,13
2354:21
2384:20
2401:6 2408:6
2426:22,25
2443:15
2476:26
2486:10,22
2490:19
2330:15

**days** 2336:23
2409:15
2429:15
2485:11
**day-to-day**
2346:14,26
2376:2
**de** 2416:19
**deal** 2413:17
**Dealer** 2414:12
2414:15
2422:22
2445:12
**death** 2419:14
2435:11
2436:9 2438:4
2438:7 2446:9
2446:15
2500:25
**deaths** 2437:2,8
2437:11
2438:2
2445:26
2446:2,3
2500:22
**debilitating**
2436:22
**decade** 2398:10
2402:19,20
2418:14,17
2441:17
**decades** 2401:22
2406:10
2408:7 2411:8
2441:5
**December**
2373:21
**decided** 2418:2
**decipher**
2377:14
**decisions**
2336:19
**deck** 2335:20
**decline** 2446:5,6

**declined**
2446:26
**declining**
2447:13
**decrease** 2427:6
2427:6
**decreased**
2365:16
2447:8
**decreases**
2462:3
**dedicated**
2520:10
**deemed** 2506:5
**deep** 2488:12
**deeply** 2466:2
2518:1
**DEF** 2333:5
**defendant**
2385:8 2389:9
2420:25
2477:24
**defendants** 1:16
4:2 2333:6
2335:22
2336:7,11,17
2337:5
2362:24
2370:22
2385:11,15
2386:12
2416:9
2420:21
2421:3,22
2422:7,19,24
2423:3
2443:10
2448:15
2454:13,20
2456:6 2471:7
2471:8,20
2472:16
2477:12
2479:8

2480:10,14
2481:6
2488:22
2489:24,26
2490:17,20
2501:15
2516:1 2523:3
2523:11
**defense** 2359:18
2390:4
**define** 2344:22
2403:5
2450:23
**defined** 2425:13
2477:6,8,9
2485:8,13
2502:7
2512:26
**definitely**
2433:17
**definition**
2450:13,15
2513:2
**definitionally**
2460:24
**definitions**
2485:10,12
**definitive**
2487:15
2488:8,8
2489:12
**DEF-CA-100...**
7:19
**DEF-CA-101...**
7:21
**DEF-CA-101...**
7:22
**DEF-CA-101...**
7:19
**DEF-CA-101...**
7:22
**DEF-CA-101...**
7:23
**DEF-CA-101...**

7:17
**DEF-CA-101...**
7:23
**DEF-CA-101...**
7:24
**DEF-CA-101...**
7:24
**DEF-CA-102...**
7:25
**DEF-CA-102...**
7:25
**DEF-CA-102...**
7:26
**DEF-CA-102...**
7:20
**DEF-CA-102...**
7:18
**DEF-CA-102...**
7:18
**DEF-CA-102...**
7:4,20 2332:26
2333:7
**DEF-CA-102...**
7:5,21 2333:7
**degree** 2351:3
2394:10
2426:26
**degrees** 2433:16
**deleterious**
2508:22
**demonstrate**
2454:20
2478:7
**demonstrating**
2475:10
**dental** 2439:2
**department** 1:3
2338:21,22,24
2339:4,16,20
2349:1
2354:21
2357:3,11,20
2357:22
2361:24,26



2363:23
2364:14
2366:16
2368:10,18,19
2369:2,7,12,14
2369:20
2370:12,19
2371:3,5
2372:5 2375:6
2375:22
2380:8,17
2381:22
2396:17
2397:18
2412:17,24,25
**departments**
2375:10
**depend** 2378:2
2385:25
**dependence**
2395:24
2404:1
2406:20,24
2407:11,21
2408:21,24
2409:1,7
2410:6,14,19
2411:14
2413:18
2414:1
2418:20
2425:1,10,23
2425:26
2426:2,5
2436:8,22
2439:24
2446:9 2462:2
2462:10
2475:24
2486:11
2504:12,19,20
2505:4,14,17
2505:23
2506:20

2507:17,21,23
2507:26
2509:14,18
2510:17,23
2511:7,15,15
2511:19
2512:2,5
2513:16
**dependency**
2396:24
2397:1
2407:15
**dependent**
2394:26
2405:25
2406:11
2408:18
2413:9 2417:5
2418:11
2419:2 2426:7
2426:8 2505:8
2506:11,24
**depending**
2450:26
**deploy** 2375:3
**deployment**
2358:13
**deployments**
2373:21
**deposed**
2380:24
2381:3
2384:20
2387:20
**deposition**
2337:3
2369:24
2380:26
2381:6
**depositions**
2337:3
**deprescribing**
2394:25
2408:4

**depressant**
2427:5,12
**depression**
2409:16
2493:14
2510:12
**deputy** 2366:14
2397:15
**describe**
2342:12
2346:13,25
2347:21
2348:13,21
2350:23
2352:4,5
2354:13
2357:9
2366:10
2375:8 2376:1
2405:15
2445:23
2479:20
**described**
2342:6
2346:24
2349:8
2358:20
2402:3,9
2407:10
2412:16
2466:20
2469:16
**describing**
2346:18
2351:25
**designated**
2351:19
**designation**
2397:19
**designed**
2416:23
**desire** 2421:14
**desired** 2436:20
**despite** 2425:14

2488:15
2491:24
**detail** 2339:2
2455:7 2513:9
**detailing** 2404:7
**details** 2412:12
**detect** 2473:3
**detectives**
2348:2
**determine**
2343:15
2385:24
2434:16
2448:18
2464:22
2468:20
2492:6
2501:11
2518:5
2519:10
**determined**
2346:7,19
2358:15
2364:26
2365:17
2469:19
2506:3
**determining**
2343:20
2434:24
**deterrent**
2439:19
**develop** 2426:21
2426:26
2427:10
2433:2
2434:16
2435:17,20
2449:18,26
2474:1 2476:8
2476:16
2493:13,19
**developed**
2506:22

**developing**
2397:21
2407:12
2434:20
2439:2,8,11
2453:4
2473:22
2476:24
2477:1
2492:26
2494:8
2508:18
**development**
2461:8 2493:3
2506:15
2523:4
**develops** 2427:3
2427:5,16
2486:21
2505:4 2509:8
**devoted** 2396:25
**diagnose** 2473:3
2512:6
**diagnosed**
2450:25
**diagnosis**
2393:25
2396:16,18,19
2397:4
2450:24
2470:17
**diagnostic**
2365:10
**diagram**
2453:23
**diaphoretic**
2343:19
**dichotomy**
2482:24
**die** 2427:7,14
**died** 2409:8,12
**differ** 2485:15
**difference**
2341:1 2428:3



2485:18,26
**differences**
2515:20
**different**
2331:23
2342:13,16,17
2343:5
2347:16
2349:10,12
2359:7 2361:3
2371:5
2395:19
2399:17
2412:23
2420:14
2423:24
2425:25
2429:19
2431:17
2436:16
2446:19,20,20
2456:21
2458:19
2499:25
2512:17
**differently**
2432:11
2450:14
2471:11
**differs** 2426:23
**difficult** 2376:4
2378:3
2385:24
2473:3
2491:21
2505:10
2506:1,25
2507:21
**difficulty**
2435:8
**Dilaudid** 2343:2
**dimensions**
2412:23
**DING** 4:17

**diplomate**
2396:1,4,9,11
**DIRE** 6:3
**direct** 6:3
2338:14
2376:23
2378:5,6
2384:11
2385:16
2386:26
2388:1
2393:18
**directly** 2352:16
2363:7,16
2376:21
2457:3 2467:1
**director**
2393:24,26
2396:16
2397:15,17
2404:26
**directs** 2375:14
**discarded**
2354:10,17
**discipline**
2396:5
**disclosed**
2481:18
**disclosures**
2489:22
**discounted**
2521:4
**discover** 2474:9
**discovered**
2428:8
**discuss** 2331:1
2334:8 2335:6
2335:11
2399:20
2443:22
2444:4
2523:15
**discussed**
2330:12

2334:6 2447:2
2458:18
2501:6 2522:5
**discussing**
2488:26
**discussion**
2330:14
2335:14
2440:16
**disease** 2425:3
2425:12
2431:19
2435:6,9
2482:18
**disorder**
2396:22
2398:23
2405:26
2406:23
2408:17,26
2409:7 2410:7
2410:16,21
2412:5
2418:21
2420:12
2425:15,18,21
2426:10
2431:23
2434:20
2435:8,20
2439:3 2450:1
2450:18,22,24
2450:25
2451:3,4,5
2467:7 2469:8
2474:1 2476:8
2476:11,12,14
2476:14,15
2477:1
2505:22
2508:1
2509:22
2510:5 2512:4
2512:6

2517:23
**disorders**
2394:14
2396:20
2417:17
2418:4
**disorder/opioid**
2410:23
**dispatches**
2347:6
**dispensaries**
2354:15
**dispensed**
2424:13
**distinct** 2426:12
2482:17
2512:9
**distinction**
2461:24
2478:12,15
2482:21
2486:3
2508:11
2512:4
**distinguish**
2342:9 2343:5
2349:9,12,23
**distinguished**
2426:4
**distraction**
2480:18
**District** 1:6
**divert** 2478:17
**diverters**
2461:26
**division** 2345:23
2345:25
2346:3 2348:1
2348:25
**doctor** 2392:11
2409:11
2410:10
2416:7 2417:7
2423:15,18

2424:11
2434:11
2440:4 2448:7
2450:14
2453:12
2454:10
2455:5
2461:10
2467:12
2468:12
2473:13,16
2474:12,24
2477:14
2478:2
2480:19,24
2482:25
2487:10
2494:9,18
2499:13
2503:16
2508:3
2510:26
2511:1
2512:10,25
2513:8
2517:15
2518:3 2521:6
2521:14
2522:2
**doctors** 2402:25
2404:22
2408:13
2414:13,19
2415:23
2416:3,13,17
2416:24
2438:3 2440:8
2440:14
2441:14
2476:3
2489:11
2517:11
2519:22
**doctor's**



2406:10
2424:13
2434:20,25
2458:10
2473:18,19
2474:8
2477:20
2478:9
2479:10
2480:12
2481:10
2482:6
**document**
2330:14
2331:2,2
2332:10
2359:14,19
2360:2,5,6,13
2360:19,21
2361:12,15,17
2362:14
2363:25
2364:16,19
2367:1,5,8,10
2367:11,15,16
2367:21,24,26
2368:4,17,22
2368:24
2369:3,18,18
2370:15,21,26
2371:8,17,18
2371:26
2373:14
2384:7,17
2390:19,20,22
2391:6,14,16
2421:24,26
2422:1,2,4
2454:24
2455:5,9,11,13
2455:16
2456:20,22,23
2457:23,24
2472:1

2478:22,24
2494:18,20,23
2495:7,21,23
2496:4 2497:1
2497:7 2499:2
2508:7 2511:4
**documentary**
2417:13
**documents** 7:8
2330:13,19,24
2330:24
2331:5,6
2332:9,11,14
2333:16
2334:5
2371:13
2372:18
2420:22,25
2421:3,17,19
2421:19,22
2422:7,10,13
2422:19
2423:8 2443:2
2454:17
2456:11,26
2457:1
2461:11
2471:23
2472:18
2478:26
2479:15
2480:1,22
2481:2,5,6,13
2496:1,8,24
2497:17
2498:7
2501:10,23
2508:6
2510:20
2511:11
2516:1
**doing** 2332:15
2378:4,6
2398:9,10

2414:26
2440:21
2442:26
2448:24
2474:13
2515:4,9
2516:5
2520:20,20
**dominates**
2521:10
**Don** 2421:6,18
**donation**
2366:21
**DONNA** 5:13
**donna.welch...**
5:16
**dopamine**
2428:7,8,18,24
2504:22
**dosage** 2389:2
**dose** 2416:16
2435:3
2439:10
2441:15
2447:22,24
2459:3,11,13
2460:14
2461:3,4
2469:21
2470:23
2473:6,20
2476:22,24
2477:3,4,4,6,7
2477:9
2482:11,13
2483:2
2486:16,26
2487:3
2499:11,15,22
2500:4,5
2501:1,13,25
2502:3,6,7,14
2503:15,20,24
2504:26

2505:9
**doses** 2406:8,9
2406:17
2408:8,11
2417:2
2441:15,16
2447:20
2460:10
2461:7
2502:19
2504:1
2506:24
2507:12
2509:7,8,9
**dosing** 2462:3
**dots** 2468:18
**double** 2359:22
2362:12
2367:5
2368:25
**downregulation**
2428:23
2504:22
**dozen** 2339:10
2339:11
2353:16
2491:3
**Dr** 2390:24
2391:4,22
2392:7,23
2393:20
2394:1,5
2395:26
2402:3,8
2403:13
2408:3,20
2431:5,11
2439:13
2442:15
2444:10,20
2445:20
2447:12
2448:11,13,18
2449:3,16

2451:6
2452:17
2462:11
2463:11,20
2464:21
2465:19
2467:20
2468:5 2469:1
2470:10
2481:2 2482:4
2483:6,23
2485:2
2489:18
2490:24
2491:18
2493:21
2495:24
2506:8
2509:12
2510:16
2512:15,15,20
2513:20,20
2514:2 2516:4
2523:1,8
**draw** 2352:15
2354:15
2462:1 2503:3
**drawing**
2443:12
**drawn** 2381:16
**drive** 2:5 2432:5
**driving** 2435:14
2522:20
**drug** 2341:20
2343:5
2350:19,20
2365:3
2377:18,26
2381:7,9,15
2414:12,15
2422:22
2434:8
2436:14,14,15
2445:12



2482:22
2498:25
2502:11
2510:6
**drugs** 2341:4,20
2350:3,4
2378:10
2380:9,18,21
2381:11
2387:12
2405:19,19,21
2434:8
2440:13
2461:26
2478:16,17
**dsafarti@hue...**
4:20
**DSM** 2450:16
**DSM-IV**
2425:26
**DSM-5** 2408:16
2425:21
2426:1,3,9,12
2450:19,23
2512:6
**dual** 2393:25
2396:16,18,19
2397:4
**due** 2348:15
2352:21
2356:18
2361:2
2365:13
2366:3 2376:4
2401:26
**Duke** 2399:19
2404:13,14,18
2404:25
2405:3
**duly** 2336:20
2338:9
2393:12
**Dunn** 2500:7,11
**duped** 2414:13

2414:19
2416:3
**Duragesic**
2456:23
**duration**
2416:16
2435:4 2439:9
2459:13
2460:24
2473:20
2482:11
2483:3
2485:16
2498:18
**duties** 2346:2,4
2351:5,11
2352:24
2353:17
2354:4,23
2355:18
2356:1 2376:5
2379:25
2380:3
**duty** 2346:10
**dyed** 2388:16,23
**dying** 2439:12
**dyscrasia**
2502:20
**dysphoria**
2432:5

─── **E** ───

**E** 3:11
**earlier** 2347:17
2349:8
2356:26
2371:9
2409:22
2425:9,23
2447:2
2449:16
2466:9 2467:3
2473:21,25
2488:12

2492:2
2493:15
2512:11
2514:11,22
**early** 2336:26
2400:16
2409:2,15,25
2417:25
2418:8,9
2423:12
2434:3 2441:9
2453:3
2520:11,24
**ease** 2394:5
2508:17
**easily** 2359:10
2459:25
2462:2
2504:12
2505:5,18
2506:20
2510:18,23
2511:8
**East** 3:6
**easy** 2462:4
**editor** 2459:1,5
**Edlund** 2475:13
2475:17,22
2476:4,10,18
2477:4
2482:10
2483:3
**educate** 2416:24
2417:3
**education**
2339:23
2394:8
2400:23
2403:25
2417:21
**EDWARDS** 3:5
**effect** 2359:6
2424:20
2427:1,3

2432:22
2436:4,20,21
2467:26
2468:25
2492:14
2508:22
2512:12,13,20
2512:23
2513:6
**effective** 2401:9
2411:10
2419:17
2448:8
2492:15,17
**effectively**
2346:21
**effectiveness**
2493:26
**effects** 2350:23
2426:17
2427:5,11,11
2427:13
2429:9
2447:23
2488:11
2493:7,10,12
2502:18,19
2506:15
**efficient**
2481:24
**efficiently**
2482:2
**effort** 2362:25
2505:25
**efforts** 2406:4
**either** 2332:18
2333:24
2341:19
2346:23
2358:22
2375:15
2407:10
2418:20
2520:10

**elaborate**
2449:20
**element** 2403:21
**elicit** 2468:5
**ELLIS** 5:12
**embedded**
2413:8
**emblematic**
2456:10
**emergency**
2340:2
2357:10
**emphasize**
2415:19
**empirical**
2470:16
2519:1
**employee**
2338:18
2398:18
**employees**
2365:24
2366:2
**Empty** 2354:10
**EMT** 2339:26
2340:1,3,5,6
2341:1,2,11
**encounter**
2342:26
**encountered**
2350:22
**encouraged**
2416:5 2473:6
2508:22,24
2509:2
**Endo** 1:12,13
4:13,13
2490:24,24
2491:7 2503:8
**endogenous**
2504:22
**ends** 2509:7
**endure** 2435:10
2507:1



**end-of-life**
2498:15
**energy** 2510:7
**enforcement**
2344:25
2345:1,7
2442:1
**enforcements**
2347:23
**engage** 2482:18
**engaging** 2415:8
**Engineering**
2438:13
2515:24
**enormous**
2428:7
**ensure** 2415:24
**ensuring** 2397:9
**entailed** 2339:1
**entered** 2332:7
2454:25
**entire** 7:3
2371:18
2391:21,25
2392:15
2401:22
2436:7
2503:26
2520:24
**entirely** 2424:9
**entirety** 2392:5
2392:18
**entities** 2375:10
2471:3
**entitled** 2437:1
2487:11
2489:17
2505:14
2508:7
**entity** 2415:12
2448:25
**environment**
2434:3
**epidemic**

2395:21
2397:24
2399:5,15
2400:26
2401:3
2403:22
2404:6 2406:5
2413:20
2414:21
2415:19
2417:11
2437:14
2438:16
2523:5
**epigenetic**
2434:4
**equal** 2343:17
2429:1
2453:25
**equate** 2511:15
2511:18
**equated** 2447:4
**equilibrium**
2432:3
**equipment**
2347:3
**equivalent**
2428:20
2446:18
**equivalents**
2441:18
2447:5,7,9
2448:2,6
2477:7,8,10
2500:2
**era** 2423:15
**ERCOLE** 5:5
**error** 2455:2
**especially**
2351:3
2493:11
2505:8
2510:14
**ESQ** 2:3,4,4,9,9

2:10,10,11,11
2:12,12 3:3,4,4
3:5,5,11,11,16
3:16,20 4:6,6,7
4:8,14,14,15
4:15,16,16,17
4:23 5:4,4,5,5
5:13,13,14,14
**essence** 2423:12
2506:14
**essential**
2375:23
2513:5
**essentially**
2341:2 2391:6
2395:11
2401:2 2404:8
2411:24
2416:3
2418:24
2425:19
2438:10
2443:16
**establish**
2371:18
2383:4 2488:2
**established**
2382:20
2407:16
2467:25
**establishes**
2364:13
**establishing**
2370:11
**esteemed**
2489:7
**estimate** 2343:9
2365:23
2406:22
**et** 2449:23
2451:9
2453:26
2474:20,26
2475:8,22

2476:4,10,18
2488:5
2498:19
2500:7,9,11
2507:9
**Europe** 2440:22
**evaluate** 2466:4
**Evan** 2359:14
2359:16
2364:19
2367:3
2371:25
2373:14
**EVD** 7:2
**event** 2453:21
**events** 2346:18
2346:18
2438:9
**eventually**
2429:16
2430:4
2432:25
**everybody**
2330:9 2431:3
2484:18
**evidence** 7:7,8
2330:22
2333:8,11,16
2335:2 2337:4
2362:8,11
2363:1
2368:22
2372:19
2390:20
2392:19
2404:22
2411:2,5,12
2416:6,8
2419:17
2448:20
2449:10
2454:17,25,26
2455:17,24
2459:22

2460:20
2461:22
2465:9 2466:4
2470:16
2471:23
2477:23
2478:3
2480:23
2481:3,7,13,26
2485:21,23
2486:12
2487:11,19
2488:11,15
2490:3
2491:19,24
2492:6,7,11,14
2492:24
2493:25
2494:1 2496:2
2497:18
2498:7 2499:6
2499:14,17,18
2501:11,23
2502:13
2507:7 2508:6
2510:21
2513:23
2518:2
**evidences**
2494:9
**evidence-based**
2410:20,21,24
2410:25
2411:1,3
2416:5 2459:6
2489:13
**exacerbation**
2493:18
**exact** 2403:16
**exactly** 2389:4
2409:11
2426:22
2439:26
2469:14



2503:12
2508:3
**exam** 2396:6,6
2396:13,14
**examination**
2338:14
2389:17
2391:4
2393:18
2523:9,13
**examined**
2335:12
2338:9
2393:12
**examining**
2392:7
**example**
2403:24
2420:7
2421:24
2424:1
2456:18,22
2457:12,19
2460:2
2469:23
2486:5,24
2493:11
2503:8
2505:24
2506:14
2513:1,2,3
2519:3
**examples**
2454:19
2456:9,10
2461:13
2463:1 2471:9
2471:18,21
2472:9,11,14
2472:17,19
2477:18
2478:7 2479:6
2479:16
2480:2,9

2481:8,12
2483:17
2494:10
2497:17,23
2498:6
2501:12,23
2503:17,19
2510:21
2511:6,11
**exception**
2362:19
2522:22
**excerpts**
2462:13
**exclusively**
2365:6 2426:4
**excuse** 2349:3
2358:12
2390:26
2401:24
2490:18
2492:7 2504:3
**excused** 2390:1
2390:9
**exercise** 2429:8
**exercised**
2489:26
**exhibit** 2333:6
2359:16
2362:8
2367:16
2372:18
2391:2,3,5,5
2391:26
2392:9,12
2455:23
2481:26
2496:25
2498:3,3
**exhibiting**
2469:7,17
2472:21
**exhibits** 2333:9
2333:13,14

2478:2
**exist** 2493:20
**existence**
2363:11
2374:17
2388:8 2499:4
**existing** 2493:18
**exists** 2502:4
**exogenous**
2504:24
**expand** 2344:4
**expanded**
2490:2
2498:14
**expect** 2351:3
**expected** 2485:9
**experience**
2343:12
2344:1
2348:13
2366:3 2380:7
2380:16
2396:1
2397:25
2400:5,10,13
2400:25
2402:2,10,22
2405:4
2411:11
2415:5
2417:15
2422:20
2423:1
2426:21,24
2427:26
2428:1
2430:11
2431:14
2434:3
2436:25
2486:8,11,15
2492:17
2493:17
2506:12,17

2507:13,16
2508:14
2513:15
2519:19,21
2520:4,6
2521:7,15
2522:3
**experienced**
2511:20
**experiences**
2377:6
2445:13
**experiencing**
2401:17
2506:5,6
**experiential**
2423:9
**expert** 2348:26
2351:19
2405:8,12
2415:11
2420:10,18
2442:17
2448:25
2495:18
2517:3,7,20
2518:17,17
**expertise** 2386:6
2397:19
2465:25
2466:22
2473:15
2506:26
**explain** 2340:26
2357:23
2358:21
2365:12
2374:26
2375:20
2410:17,26
2425:11
2427:15
2437:1,20
2441:21

2444:12
2446:17
2449:20
2456:3
2459:17
2461:13
2465:2 2466:1
2475:26
2477:3
2487:10
2491:20
2503:4
2511:10
2512:12
**explained**
2446:26
**explaining**
2366:15
**explanation**
2452:18
2484:4
**explicit** 2470:22
**explicitly**
2476:15
**explode** 2350:21
**explore** 2421:14
2445:7 2457:1
2466:2
**explosion**
2356:10
**exposed**
2434:13
2458:9
2459:10
2463:13
2464:3,25
2476:5,6,17
2477:2
2520:12
**exposure**
2411:25
2412:1
2433:11
2435:4



2437:26
2438:7 2439:4
2439:9 2494:5
2500:21,24
2513:23
2519:16
2522:18
**express** 2444:23
**expressed**
2421:10
2443:26
2464:11
**expressing**
2438:20
2467:13
**expression**
2521:22
**expressly**
2373:6
2401:20
2507:25
**extension**
2414:22
**extensive**
2442:7
2506:26
**extensively**
2391:22
2395:21
**extent** 2351:22
2351:24
2352:4
2363:15
2364:8
2369:26
2390:21
2447:1,17
2477:22
2520:22
**external** 2479:2
2504:24
**extreme**
2406:15
**extremely**

2408:8 2504:1
2504:1
2505:10
2506:1
**e-mail** 2496:5
2496:12,17,22
2496:22
**E-X-H-I-B-I-...**
7:1

**F**
**F** 2:4
**face** 2412:5
2435:9
2495:18
**facilitate**
2336:10
**facing** 2478:24
2478:26
**fact** 2352:21
2361:12
2362:10,22
2364:3
2365:13,17
2366:3,4
2369:17,24
2370:1,9
2371:19
2376:4
2378:22
2382:17
2383:6
2406:13
2408:10
2416:5 2430:9
2433:1 2450:5
2458:4
2459:17
2460:1,11,16
2461:19
2469:19
2478:17
2486:13
2487:4,4

2490:6
2491:21,26
2493:8
2498:24
2502:13
2505:6 2512:5
2519:7
2520:15,22
**facto** 2416:19
**factor** 2446:14
2523:4
**factors** 2342:6
2433:18,18,20
2434:4,19,26
2435:3 2468:7
2468:10,17
2476:11
2482:12
2483:1 2515:5
2515:5
2516:10
2518:4
**facts** 2454:26
2459:16
2477:23
**factual** 2351:25
**faculty** 2394:14
2394:15
2395:12
2397:7
2398:17,19
2412:22
**fair** 2490:8
**fairly** 2377:5
**fall** 2427:7
**fallen** 2406:3
**falling** 2353:24
2356:22
**false** 2441:25
2442:8,19
2444:1,6
2445:10
2456:5 2457:7
2462:21,24

2467:10,26
2468:18
2470:21
2472:22,24
2478:10
2482:7,8,9,21
2482:24
2483:18
2493:23
2499:23
2501:3,4,7
2502:2
2503:18,21
2510:18
2521:19
2523:2
**falsity** 2468:14
**familiar**
2439:13
**families** 2412:10
2420:26
**family** 2435:1
**Fanciullo**
2490:22
**far** 2391:23
2407:4
**fast-acting**
2509:2
**favor** 2491:23
**fbaker@motl...**
2:14
**FDA** 2415:26
**fear** 2401:4
**feature** 2498:16
**features** 2510:9
**February**
2387:20
**federal** 2421:8
**Federation**
2415:25
2443:5
**fee** 2490:18,21
**fees** 2488:22
**FEINSTEIN**

5:5 2410:1
2454:23
2455:20
2463:17
2477:21
2504:3
**fellowship**
2393:26
2394:13
**fellowships**
2404:3
**felt** 2421:20
2422:12
**fentanyl** 2343:2
2378:12,19
2380:22
2381:13
2382:8,13
2383:13,14
2385:23
2424:10
2509:4
**fentanyl-relat...**
2446:2
**Fentora**
2454:24
2455:14
2456:19
**ferocity** 2375:19
**fewer** 2416:14
**ffitzpatrick@...**
2:16
**fide** 2521:2
**FIDELMA** 2:11
**field** 2343:12
2344:1
2465:25
2466:22
2516:22
2519:25
**fifth** 2401:15
2520:18
**Figueroa** 4:23
**figure** 2335:4



2443:16
2476:7
**figuring** 2474:4
**file** 2332:19
2455:6
**fill** 2405:23
**Finally** 2434:6
**financial**
2399:24
**find** 2416:21
2419:18,23
2471:9
2492:11,14
2499:4
2510:21
2519:15
2522:18
**finding** 2450:8
2456:22
2457:17
2460:17
2476:18
2499:1 2502:7
2505:26
**findings**
2427:20
2437:22
2453:15,15
2454:3 2500:8
2500:10
2505:16
**fine** 2335:21,23
2490:24
**fine-tuned**
2428:12
**Fire** 2375:5
**firearms**
2348:19
**firearm-related**
2348:16
**firmer** 2336:19
**first** 2338:9
2339:24,24
2345:1,13,21

2348:25
2349:2
2350:18
2355:11
2358:23
2362:3
2368:25
2369:7
2371:26
2372:2
2375:21
2391:16
2393:12
2394:4
2402:19
2408:25
2412:15
2416:15
2417:18
2418:14
2427:21
2441:16
2449:11
2458:5
2461:15
2469:12,14
2488:5 2494:2
2494:17
2498:12,23,25
2502:1 2504:8
2510:1
2516:26
2519:14
2522:16
**firsthand**
2400:5,10,13
2402:1,9
**first-line**
2441:13
2485:4 2493:5
2493:22
2494:4,13
2497:19,25
**fit** 2357:21

**Fitzpatrick** 2:11
2333:22
2334:2,9,15,19
2336:25
2390:25
2392:21,22
2393:19
2402:7 2403:7
2410:9 2431:9
2431:10
2437:15,17
2442:7,13,14
2444:7,9
2445:18,19
2446:16
2452:19,20,22
2455:1,4,15,25
2456:1 2457:9
2457:11
2463:10,19
2464:7,20
2465:18
2467:1,18
2468:3,9,22,26
2471:5,15,17
2478:1
2479:14,18,21
2479:24,26
2480:8,21
2481:1,23
2482:3
2483:15,20
2484:9,11,20
2484:24
2485:1
2489:14,16
2490:14
2495:1,6,8,16
2495:17
2496:5,14,18
2497:12,15
2498:2,5
2499:7,9
2501:17,21

2504:10
2505:11,13
2512:16,18
2513:7 2514:1
2515:14
2521:8,11,13
2522:1,26
2523:6,20
**five** 2342:23
2354:3 2389:5
2406:4
2416:12
2447:9 2451:3
2491:2
2505:21
**fixed** 2359:10
**flag-down**
2375:12
**flag-downs**
2346:5
**flooding**
2403:20
2436:4
**Floor** 3:6,12,17
4:23
**flow** 2352:6
**flows** 2361:25
**focus** 2347:8
2394:24
2518:3
**focused** 2350:19
2467:9
**focusing**
2462:18
2510:1 2518:9
**followed**
2352:23
**following** 7:9
2330:6
2346:23
2382:22
2414:2
**follows** 2338:10
2393:13

2467:3
2468:21
**foolproof**
2434:15
**Foran** 4:14 6:8
2351:26
2386:13,15
2387:1,3,7,9
2387:10
2388:3,5,7,21
2389:3,6,8
**force** 2372:6
**forecasting**
2346:22
**foregoing**
2330:9
**foremost**
2519:14
**forged** 2482:18
**form** 2352:13
2353:2
2380:10
2381:10,14,15
2422:13
2444:5
2449:18
2450:26
2480:17
2509:24
**formally** 2333:3
2333:4 2371:2
2390:22
**format** 2474:25
**formed** 2380:3
**forms** 2395:21
**formulating**
2419:5
**formulation**
2439:22
**formulations**
2439:14,18
**found** 5:18
2450:7 2457:7
2457:8



2471:13,19
2474:21
2475:9
2476:10
2517:12
2519:5
**foundation**
  2352:1 2353:5
  2354:26
  2359:21
  2362:10,12,20
  2363:20
  2364:4,7
  2367:5
  2368:24,26
  2369:19
  2372:26
  2377:20
  2378:13
  2379:2,21,22
  2388:18
  2402:1 2442:4
  2442:7,8,9,12
  2443:19,22
  2444:4
  2446:10
  2454:26
  2463:8,16,17
  2463:18
  2464:8,12,15
  2464:16,17,18
  2465:15
  2468:13,14
  2471:1
  2477:24
  2478:20
  2479:12
  2480:5,13
  2483:13
  2490:11
  2495:5,14
  2496:10,16,19
  2496:20
  2497:2,6,9,11

2497:11
2502:2 2504:6
2512:21
2514:5
2521:22
2522:11,15,16
2522:24
**four** 2345:8
  2368:25
  2420:25
  2426:26
  2435:19
  2448:14
  2449:17
  2451:3 2456:4
  2491:2
**framed** 2355:14
  2468:12
  2495:5
**frames** 2353:25
**Francisco** 3:21
**Frank** 3:17
  2507:9
**frankly** 2461:22
**Fred** 2336:4
**FREDERICK**
  1:9 2:9
**frequency**
  2453:21
**frequent**
  2471:14
  2503:7
**frequently**
  2342:22
  2343:9
**front** 2360:13
  2367:22
  2418:2
**fulcrum**
  2427:26
**full** 2393:14
  2451:7
  2330:10,11
**fully** 2378:4

**function**
  2458:16
  2459:16,20,20
  2460:2
  2476:24
  2500:3
**fundamental**
  2428:3
  2432:13
  2460:22
**fundamentally**
  2411:25
**funding** 2491:6
  2491:7,10,12
  2491:14
  2492:1
**further** 2330:14
  2335:14
  2346:14,25
  2351:10
  2357:9
  2358:21
  2363:9
  2365:12
  2368:2
  2372:18
  2375:20
  2376:23
  2385:5 2389:7
  2389:26
  2473:8 2523:7
**furthermore**
  2434:26
  2436:15,21
  2438:9
  2445:11
  2450:8
  2453:17
  2462:1 2473:1
  2482:15
**future** 2359:1
**f/k/a** 1:14 5:3,11

——————
**G**
——————

**G** 3:20 4:6
**gambling**
  2405:22
**games** 2405:22
**gang** 2347:25
  2348:15,18
**gap** 2405:24
  2428:10,12
**gateway** 2436:2
  2512:12,13,20
  2513:6
**gateways**
  2513:12,18
**gather** 2376:19
  2422:15
**general** 2350:19
  2361:24
  2485:13
**generally**
  2337:18
  2412:11
  2417:17
  2517:21
**generate**
  2422:16
**generated**
  2346:5 2421:5
  2422:24
**generation**
  2400:8
  2414:19
  2419:1
  2423:11,12,13
  2503:26
**generations**
  2402:25
**genetic** 2433:24
**genuine** 2389:2
**genuinely**
  2415:7
**Geriatric**
  2457:26
  2458:2
**getting** 2417:26

2446:23
2453:11
2454:10
2461:6,26
2462:4
2490:19
2505:9 2521:3
**GI** 2502:19
**Gilbert** 2490:22
**give** 2332:1
  2337:19,25
  2353:12
  2365:16
  2393:5 2412:4
  2440:14
  2464:1 2486:9
  2508:14,16
**given** 2354:14
  2388:4 2399:3
  2421:17,22
  2432:15
  2438:3
  2473:19
  2484:13
  2490:6
**gives** 2451:2
**giving** 2416:26
**Global** 2404:24
**go** 2331:9
  2332:2
  2333:23
  2336:26
  2337:20
  2394:6
  2398:25
  2400:23
  2405:14
  2406:19
  2414:26
  2417:15
  2422:3
  2434:11
  2437:15,16
  2445:20,26



2447:24,25,25
2449:8 2451:6
2451:15
2455:25
2457:15
2458:4
2459:14
2461:2,7,10
2467:21,24
2468:23
2469:3,21
2470:23
2471:15
2473:10
2474:14
2475:15
2480:22
2481:25
2484:26
2488:24
2489:14
2490:15
2491:1,16
2495:8,10
2499:7,20
2503:14,24
2508:4
2510:20,25
2515:15
**goal** 2414:16
**God** 2338:1
2393:7
**goes** 2363:7
2370:22,26
2371:1 2387:8
2502:9
**going** 2330:10
2333:23
2334:16
2335:1
2339:22
2341:12,14
2344:24
2350:6 2351:9

2356:25
2359:13
2362:19
2366:26
2372:16,25
2387:1,3
2391:15
2394:5
2406:19,21
2409:24
2412:12
2416:7 2425:9
2436:26
2438:23
2451:26
2457:15
2466:24
2467:21
2471:1
2480:18
2481:15
2483:6
2484:12,13
2495:9
2502:22,24
2506:17
2512:21
2513:8,9
2514:4 2516:8
2517:14
2519:8 2521:6
2521:14
2522:2
2523:10
**Gomes** 2500:9
**good** 2330:9
2334:24
2338:11
2386:16
2392:24,26
2393:20
2431:3
2440:21
2460:20

2461:20
2484:18
2487:2
2492:19,24
**Google** 2419:12
**governing**
2428:13
2441:26
**government**
2403:24
2415:12
2419:25,25
2420:1,2,15
2443:2
2448:25
**governments**
2420:4
**gradual** 2520:12
**graduate**
2340:10
2345:18
**graduated**
2340:5
2394:21
2520:7
**grandparent**
2433:25
**grant** 2368:1,5,7
2368:9,13
2369:8
2370:13
2371:1,2
**graph** 2475:17
**graphic** 2475:21
**great** 2339:1
2341:21
2435:8
**greater** 2339:2
2436:6
2439:11
2453:25,26
2454:1 2477:9
2500:2
**Gregor** 1:26

2330:7,19
**ground** 2347:26
**grounding**
2411:1
**grounds**
2466:25
2481:16
2495:5
2521:22
**groundwork**
2381:23
2382:1
**group** 2407:19
2443:8
2499:26
2503:22
**groups** 2407:16
**grow** 2434:2
**growing** 2406:6
2407:17
2505:6
2507:10,24
**guess** 2484:5
**guide** 2450:23
2478:20
2483:13
**guideline**
2490:21
**guidelines**
2416:13
2488:6,18
2489:3,10,12
2489:17,20
2490:16
2491:18,22
2498:26
**guise** 2416:3
**gunfire** 2347:25
**Gunshot** 2359:8
**gutter** 2356:23

_____
**H**
_____
**H** 3:5,17
**habituate**

2511:17,21
**habituation**
2426:17
**Haddox**
2469:16
2470:7
**half** 2339:5
2346:1
2387:11
2510:3
**hand** 2337:15
2337:16
2393:3
**handed** 2332:24
2354:18
**handle** 2347:23
**handled** 2347:7
**hands** 2356:19
2357:26
2358:9,14
2375:14
**HANNAH** 3:4
**hannah.kiesc...**
3:8
**happen** 2359:8
2359:9,9
2433:9
**happened**
2360:4
2381:26
2416:17
2444:13,21
**happening**
2346:19,23
**happens**
2427:15,17
2429:6,7
**happy** 2458:4
**hard** 2414:14
2419:19,20
2428:16
2505:15
**harder** 2458:16
2459:15



2460:1
**harm** 2363:10
2409:22
2425:14
2487:4 2494:1
**harmed** 2406:5
2408:10
2503:25
**harming**
2406:13
2415:9
2520:15
**harms** 2403:24
2436:8 2442:2
2506:7
**harm-reduction**
2411:23
**HBO** 2417:13
**head** 2343:15
**healing** 2460:26
2485:10
**health** 1:13 4:13
2334:12
2395:20
2396:21
2397:1,22
2400:24
2404:25
2438:17,17,18
2453:20,22
2458:24
2476:12,14
2488:11
2507:1
**healthcare**
2441:23
2462:8 2507:4
2516:3
**hear** 2331:17
2334:18,22,23
2367:7
2444:21,25
2452:17
**heard** 2331:8

2355:2
2363:13
2369:21
2372:14
2448:13
2469:9
**hearsay** 2359:22
2359:22
2362:11,12
2363:17,19
2367:5,5
2368:25,25
2371:17
2409:26
2443:20
2496:9,15
2504:5
2522:19,22,23
**heart** 2427:6
**heavily** 2489:11
**Hedding** 3:6
**Heimann**
2421:7,16
**held** 2330:6
**Hello** 2386:17
**help** 2338:1
2346:6 2393:7
2403:24
2406:5,7
2407:25
2408:13
2416:22
2418:20
2431:24
2441:1
2505:26
2507:3,25
**helpful** 2355:25
2371:20
2510:4
**helping** 2394:25
2406:13
2408:1 2413:8
2416:25

2486:13
2487:3 2507:4
**HENNIGAN**
4:13
**HERMIZ** 2:11
**heroin** 2343:2
2353:1
2380:21
2381:12
2382:8
2385:19
2446:1
2513:12,18,26
**heyday** 2519:20
**high** 2340:26
2342:3
2347:21
2348:21
2357:23
2406:9 2408:8
2408:10
2441:16
2447:19,22
2450:3 2453:4
2459:13
2473:19
2475:11
2476:22
2477:4,9
2482:12,14
2499:12,16,23
2501:2,14,26
2503:20
2504:1
**higher** 2437:10
2439:10
2500:5,5,24,24
2502:14,14,19
2509:7,7,9
**highest-quality**
2450:6,7
**Highland**
2357:6
2366:21

2394:12
**highlight** 2427:2
**highly** 2372:7
2440:13,14
2450:2
**high-quality**
2475:10
**hiring** 2397:7
**history** 2339:23
2435:1,2,2
2476:15
2483:2
**hold** 2367:9,13
2423:20
2466:10
2517:14
**home** 2434:1
**homeostasis**
2412:7
2428:15
2429:4 2430:4
2430:8 2432:7
2432:21
2433:7
**homeostatic**
2432:3
**HON** 1:20
**Honor** 2331:9
2331:16,26
2332:5,23
2333:22
2334:9,17,19
2334:22,25
2335:6,10,22
2336:4,8,25
2337:8
2338:13
2351:18,26
2352:9 2353:5
2354:25
2355:3,16
2359:13,18,25
2360:11
2362:7,9,17

2363:5,6,13
2364:1,18
2367:4
2368:21,23
2370:3,17
2371:24
2372:11,24
2373:11
2374:14,24
2376:26
2385:10
2386:13
2387:9 2388:5
2389:6,16,25
2390:11
2391:1,20
2392:3,22
2401:24
2403:1 2410:2
2431:9 2442:3
2442:13
2443:18
2444:26
2446:10
2454:23
2455:2,15,20
2461:17
2463:7,15
2464:5,7
2465:12
2466:24
2467:18
2468:10,22
2470:26
2477:21
2479:11
2480:13,21
2481:15,23
2483:21
2484:1,5,11,12
2484:21,24
2490:12
2495:1,5,13,17
2496:14,21



2497:2,12
2503:12
2504:4
2512:14,18
2513:19
2521:11,20
2522:10,13
2523:6,17,20
**Honor's** 2336:6
2503:6
**Hooked** 2414:13
**Hopkins**
2399:19
2414:11
**hormone**
2493:10
**hospice** 2440:22
2508:12
**hospital**
2340:20
2357:6,7
2366:22
2394:12
2520:18
**hospitalization**
2437:11
**hospitalized**
2459:2,9
**hour** 2523:10
**hours** 2340:19
2340:21,22
2520:10
**house** 2440:20
**HUESTON**
4:13,14
**HUGHES** 3:11
**human** 2428:9
**hundred**
2386:23
2387:11
**husband**
2409:10
**hyperalgesia**
2433:3

2493:16

_____
**I**
_____
**idea** 2367:10
2381:25
2383:19
2447:22
2498:14
2503:19
**identification**
2333:12
2349:20
2350:2,4
2358:1
**identified**
2330:13
2331:23
2332:8,13
2347:10
2354:12
2391:16,18
2392:16
2448:18
2449:4,12
2452:9
2460:17
2462:21,26,26
2470:2,12
2480:1,16
2483:10
2491:3,17
2492:26
2495:25
2506:19
2508:6
2518:11
2521:17
2522:5
**identify** 2342:4
2349:9,12
2381:7
2396:19
2451:7
2457:16

2467:5 2469:5
2473:22
2480:19,25
2481:26
2495:11
2517:3
**identifying**
2341:26
2344:3
2349:23
2351:1
**identify/distin...**
2342:13
**ignoring** 2418:1
**II** 2358:7,12,13
2363:10
2374:22
2424:5
**III** 2:4 2358:18
2358:19,20
**illicit** 2341:19
2341:23
2342:17
2344:9 2350:3
2377:18,26
2378:12,19
2379:1,9
2380:21
2381:15
2382:8,13
2383:13
2385:23
2424:16,17,19
2425:7 2436:3
**Illinois** 5:15
**illness** 2483:2
**illustrative**
2478:10
**immediate**
2344:5
2368:15
**immediately**
2333:24
2428:19

2509:3
**impact** 2350:11
2350:15
2376:1,3,8,17
2402:25
2403:4,20
2445:14
2490:4
2519:11,23
**impacted**
2372:7
2375:21
2400:11
2418:26
2518:20,25
2519:17,20
2520:1
**impacts** 2351:6
2355:20
2356:2,6
**implemented**
2358:4,5,17
**implicate**
2416:1
**implicates**
2363:16
**implied** 2470:22
**imply** 2398:17
**implying** 2499:2
**importance**
2416:24
2489:25
**important**
2359:3
2397:12,13,23
2401:14
2409:20
2427:2,19
2428:13
2438:19
2439:7
2447:18
2456:25
2459:19

2460:19
2486:3
2487:15
2489:10
2498:12,17
2502:5
2508:11
2511:26
**importantly**
2408:15
2426:15
2453:2
2476:22
2505:21
**imported**
2440:22
**impossible**
2481:19
**improper**
2353:6
2354:25
2359:23
2368:26
2373:2 2376:9
2504:6
**improved**
2459:20,20
**improvement**
2507:13
**impunity**
2447:25
**inappropriate**
2353:26
**Incident**
2475:23
**include** 7:9
2341:20
2343:1,20
2344:5 2346:6
2348:17
2380:21
2400:5 2424:9
2435:25
2454:6



2493:10
included 2450:3
2450:4
2452:13
2487:14
2516:15
includes
2477:22
2491:7
including
2341:11
2343:10
2395:22
2399:6 2404:2
2405:19
2415:5,21,22
2415:24
2433:20
2436:8
2438:18
2443:1,10
2488:21
inclusive 1:15
income 2489:23
2490:18,21,23
incorporated
2345:6 2516:2
incorporates
2453:18
incorporating
2409:26
increase
2350:16
2376:20
2418:13,17,18
2439:2 2441:4
2441:8,12
2442:20
2444:11
2445:21,24
2446:8,14
2467:16
2468:15
increased

2433:23
2436:10
2437:5,10,12
2438:4,15
2446:7,12
2447:6,17
2459:20
2468:8 2473:7
2476:16
2514:21
2515:1
2521:18
2522:6
increases
2439:8
2460:14
2513:25
increasing
2407:6 2436:7
2447:26
2461:4 2473:6
2509:10
increasingly
2396:22
2397:2,22
2405:23
incredibly
2462:7
incrementally
2406:17
independent
2442:18
2458:23
2464:21
2509:19
independently
2445:4
2458:22
index 2436:19
indicate 2389:2
2458:23
2491:19
indicated
2417:6

2432:12
indicating
2332:19
indication
2487:2
indications
2385:19,22
individual
2348:22
2385:19
2412:25
2426:19,24,24
2427:18
2436:13
2446:23
2469:17
2486:9
2504:25
individually
2483:4
individuals
2358:14
2379:25
2383:6 2386:3
2396:20,23
2406:3,7,9,16
2407:20
2408:9,15,20
2408:26
2411:24
2415:21
2418:25
2423:11
2426:6,7,25
2427:10
2429:21
2430:7,13
2431:25
2432:3 2433:1
2435:7 2439:5
2440:24
2449:26
2453:11
2459:10

2460:4,7
2461:25
2471:2 2474:6
2474:9
2475:24
2476:11,22
2477:1
2478:15,17
2482:17
2490:1,8
2493:16
2494:7
2499:25
2505:26
2506:2 2510:5
2519:23
individual's
2513:25
industry
2402:12
2403:1,5
2416:2
2442:20
2443:4,9
2444:3 2453:9
2461:21
industry's
2399:10,14,23
2400:6,14
2402:2,25
2403:9
2404:21
2423:4
inextricably
2413:22
infamous
2453:8
infiltrating
2441:26
influence
2399:24
2404:22
2489:25
influenced

2395:23
2403:10
2520:13
2521:17
influential
2488:18
2489:6
influx 2504:24
inform 2343:6
2489:12
information
2346:20
2384:4 2415:5
2420:9,21
2422:15
2444:24
2445:15
2518:23
informed
2519:7,9
ingest 2428:17
ingested
2383:19
ingestion
2383:14
initial 2366:19
2373:18
2429:9
2432:22
initially 2350:17
2421:10
injected
2382:19
injecting
2352:16
2439:20
injury 2460:6
inordinate
2513:5
inpatients
2413:13
inside 2415:3
2423:14
2440:24



insidious 2503:21
insofar 2522:20
insomnia 2430:11
instance 2486:14 2487:18
instances 2351:12 2352:20 2353:3,13,18 2411:18 2412:2 2417:14 2494:4
instinctively 2431:26
Institute 2404:25
institutions 2490:2
instructing 2358:24
instructor 2361:2
insufficient 2487:12,19 2488:10
integrating 2407:14
intelligence 2346:20
intelligible 2433:9
intend 2332:13
intended 2330:26 2392:2 2468:4
intends 2331:1
intentional 2343:8
intentionally 2414:15

2419:15
interdose 2486:11,18 2487:1,5
interest 2373:4 2450:9 2452:16 2489:18 2490:16
interested 2417:19
interim 2332:6
internal 2394:11 2456:26 2472:12 2478:22 2500:18 2504:23
internally 2455:13 2456:21 2472:2 2479:4
interposes 2373:5
interpreted 2445:14
interrelations... 2404:1
interrupt 2444:20 2474:11,24
intertwined 2413:22
interval 2451:18 2452:5
intervenous 2341:4
intervention 2407:23
interventions 2492:22
interviewed 2417:10,12

2445:12 2519:15 2522:17
interviews 2415:2 2516:2 2518:22
intoxication 2510:6
intravenous 2380:10,19 2381:10
intravenously 2343:3
introduce 2330:21 2332:13
introduced 2469:22 2481:6,13
introduction 2456:20 2495:2
intrusive 2430:11
inundated 2520:26
invasive 2341:4
investigate 2444:5 2515:5
investigated 2445:4 2468:5 2514:18,26 2518:4
investigating 2516:10
investigation 2444:22 2469:26 2515:9
investigations 2348:1 2386:20,23 2387:11,14 2388:1

investigators 2348:2
invited 2399:19 2404:24 2464:1
involved 2380:9 2380:18 2387:4,12,15 2387:22,23 2421:8
involvement 2421:12 2445:5
involves 2386:8
inwardly 2478:26
in-service 2349:2
IQVIA 2330:15 2331:20,23
irrelevant 2359:22 2369:1 2508:19
irreversible 2412:3
irritability 2430:11
isolated 2467:12
issue 2331:8 2334:13 2335:13,16,18 2335:19 2336:5,15,20 2356:24 2362:24 2363:10 2370:1,20,23 2371:9,9,12 2373:7 2374:20 2388:6 2392:1 2392:5 2462:18

2468:5,19 2470:13 2508:4,18 2512:25 2518:4
issues 2330:11 2334:10 2337:18 2397:1,1 2398:7 2399:2 2407:11
item 2330:12
iterative 2520:12
I-N-D-E-X 6:1
I.D 7:2
i.e 2498:21

J

J 1:20 6:7
JAMA 2475:7
James 5:4 2389:11,13
james.collie@... 5:7
Janssen 1:10,11 1:12 4:3,3,4,4 2377:4 2401:25 2457:25 2458:1 2459:15,21 2490:23 2491:10 2499:2
JAN-CA-1020... 7:11
JAN-CA-6023... 2462:15 2498:4
JAN-CA-6029... 7:13
JAN-CA-6029... 7:13



JAN-CA-6029...
 7:14
JAN-CA-6029...
 7:14
JAN-CA-6029...
 7:15
JAN-CA-6029...
 7:15
JAN-CA-6029...
 7:16
JAN-CA-6029...
 7:16
JAN-CA-6030...
 7:11
JAN-CA-6030...
 7:12
JAN-CA-6030...
 7:12
jburk@huest...
 4:21
jcolombo@m...
 2:17
JENNIFER
 5:14
jennifer.levy...
 5:17
JESSICA 2:12
jhueston@hu...
 4:18
Jick 2453:9,17
 2458:26
 2459:4
job 2339:24
 2440:21
jobs 2429:24
JOHN 4:14
Johns 2399:19
 2414:11
Johnson 1:10,10
 4:3,3 2377:4,4
join 2394:15
 2410:1
 2522:13
joining 2394:14

2395:12
Joint 2415:26
 2443:7
 2520:17
Jon 2414:5
 2452:21
 2455:3,8,25
 2457:10
 2469:3
 2471:16
 2473:10
 2474:14
 2475:16
 2484:26
 2487:8
 2489:15
 2494:17
 2499:8,20
 2501:18
 2505:12
 2510:25
Jose 3:6
JOSEPH 3:20
Josh 4:16
 2357:5,8,9
 2368:6
journal 2451:14
 2475:25
 2488:8
 2500:19
Judge 1:20
 2479:21
judge's 2503:3
judiciously
 2411:20
 2416:14
JULIA 3:5
Julian 2337:10
 2338:5,7
julia.spiegel@...
 3:8
July 2340:11
 2345:20
 2366:12

2381:26
June 2381:26
Junior 2340:4
jurisdiction
 2497:6,8
 2522:21
jurisdictions
 2362:25
 2363:2
 2370:23
JUSTICE 1:2
justify 2470:17
 2487:12
juxtapose
 2502:20
juxtaposition
 2502:15

K

Kaba 4:15
 2402:26
 2409:24
 2446:10
 2463:7,15
 2464:5
 2466:24
 2470:26
 2480:5
 2481:15
 2490:10
 2495:3,9,13
 2496:19,21
 2515:11
 2522:13
Kadian 2386:1
 2386:4,8
 2456:12,16,17
 2456:19
 2472:5,6
 2498:23
KAREN 4:17
Karl 5:13
 2385:10,14
karl.stampfl...

5:16
KARUN 3:3
karun.tilak@...
 3:7
Katz 2498:18
KAVITA 3:4
kavita.naraya...
 3:7
KAYE 4:22
kcalcagnie@r...
 2:6
kding@huest...
 4:21
keep 2335:24
 2336:6
 2400:20
 2419:12
 2484:13
 2502:22,24
keeping 2383:26
Keller 2331:11
 2332:20,21,26
Keller's 2331:25
kept 2356:20
 2420:6
 2422:11
KEVIN 2:4
key 2440:25
 2443:4,10
 2474:3
 2485:25,25
 2498:16
keywords
 2461:17
khermiz@mo...
 2:16
KIESCHNICK
 3:4
kind 2344:9
 2348:17
 2353:1
 2388:24
 2396:23
 2416:6

2420:15
 2432:21
 2469:23
 2491:6
KIRKLAND
 5:12
Kirkpatrick
 2366:17
kits 2354:18
Klimas 2475:4,8
know 2334:17
 2334:26
 2336:17
 2344:19
 2359:25
 2378:7,23,26
 2379:8
 2382:18
 2387:23
 2407:5
 2421:26
 2434:19
 2439:3 2452:7
 2460:2
 2466:25
 2475:20
 2480:24
 2481:16
 2483:7
 2495:19
 2496:11
 2497:1 2507:7
 2508:19
 2519:1
knowing 2359:5
knowledge
 2423:2,6,9
 2473:14
 2503:4
known 2350:19
 2352:22
 2381:13
 2408:17
 2426:23



2452:25
**Korb** 1:5
**KRISTEN** 2:11

**L**

**lab** 2386:6
**labeled** 2359:17
2362:3
**Laboratories**
1:14 5:2,10
**laboratory**
2424:4,9
**laced** 2378:11
2382:12
2383:13
**lack** 2376:5
2401:26
2442:4
2443:19
2463:15
2491:19
2522:10
**lacking** 2490:11
**lacks** 2351:26
2359:21
2477:23,24
2479:12
**laid** 2369:19
2442:7,8
**landed** 2423:17
**language**
2498:24
2502:2
**large** 2379:19
2380:4,5
2417:26
2452:13,14
2476:4
2505:25
**larger** 2463:13
2464:3,25
**LaSalle** 5:15
**lasting** 2346:17
2485:14

2487:16
**lasts** 2485:11
**late** 2423:11
2441:9
2490:19
2520:25
**latest** 2420:6
**launched**
2382:4
**Laurendeau**
2390:26
2391:1 2392:1
2392:3
**LAURENDE...**
4:7
**law** 2:8 2344:25
2345:1,6
2399:18
**lawyers** 2415:13
**lay** 2372:25
2425:20
2442:11
2443:2 2444:4
2464:17
2468:13
2514:5
2522:16
**laying** 2362:20
2464:7
2468:14
2512:18,21
**layperson**
2354:12
**lays** 2364:4
**lead** 2344:7
2425:3
2438:25
2439:5,23
2446:8
2480:18
**leaders** 2440:25
2443:4,11
2474:3
**leadership**

2396:8
2397:14,20
**leading** 2414:20
2432:14
2480:6
2504:24
2515:11
**learned** 2430:6
2515:22
**learning** 2361:4
2361:4
2456:12,16,17
2456:19
2471:26
2472:1,5,6
2478:25
**leave** 2460:4
2487:6
2515:20
**leaves** 2365:21
**leave-behind**
2358:21
**leaving** 2358:26
2416:19
**lecture** 2405:2
**lectured**
2404:13,18
**lectures** 2399:3
2401:7
**lecturing** 2483:7
**led** 2419:4
2438:15,15
2445:16
**left** 2337:3
2461:16
2502:1
**left-hand**
2456:3
2476:13
2489:21
2503:9
2511:14,23
**legacy** 2418:19
2418:23

2419:3
**LEGAL** 1:24
**legitimate**
2461:24,25
2478:14
2482:21,25
2521:2
**legs** 2466:9
**Lembke** 6:10
2390:24
2392:23
2393:10,16,20
2394:1,5
2395:26
2402:3,8
2403:13
2408:3,20
2431:5,11
2439:13
2442:15
2444:10,20
2445:20
2447:12
2448:11
2449:16
2451:6
2452:17
2462:11
2463:11,20
2464:21
2465:19
2467:20
2468:5 2469:1
2470:10
2481:2 2482:4
2483:6,23
2485:2
2489:18
2493:21
2495:24
2506:8
2509:12
2510:16
2514:2 2516:4

2523:1,8
**Lembke's**
2512:20
**lethal** 2436:20
**letter** 2459:1,4
**let's** 2332:6
2334:8
2335:24
2337:23
2338:17
2360:9 2387:8
2405:14
2445:20
2449:11
2455:3
2459:14
2484:15
2488:24
2490:15
2499:10
2504:11,18
**level** 2340:26
2342:3
2343:21
2347:21
2348:21
2356:18
2357:23
2373:23
2386:5
2428:14,21
2432:18
2502:12
**levels** 2474:7
**LEVY** 5:14
**LEWIS** 5:3
**liaison** 2349:5
2357:19
**liberal** 2434:11
2440:26
2518:7
**license** 2340:14
2340:17
2400:20



licensed
  2340:24
  2394:17,20
lied 2415:22
Lieff 2421:7,16
life 2343:21
  2412:11
  2440:9,23
  2459:21,23
  2499:5
  2508:14
  2510:3
LIFLAND 4:8
light 2343:17
  2354:13
lighter 2352:15
lighters 2344:10
limine 2442:6
  2467:19,19
limited 2435:23
  2438:24
  2465:16
  2520:10
line 2333:17
  2334:1
  2416:15
  2494:3
  2498:24,25
lines 2381:6
linked 2512:8
linking 2446:23
liquid 2381:16
  2509:24
list 2331:6,15,19
  2333:2,14,15
  2334:4
  2336:12,13
  2467:4 2491:1
listed 2332:10
  2333:20
  2336:7
  2453:18
literature
  2403:10

2411:12
2413:26
2414:2,7
2415:2 2419:7
2419:10,24
2420:16
2422:18
2423:8
2435:18
2443:1 2445:7
2448:21
2458:20
2459:18,24
2460:16
2465:4,9
2466:3,5
2467:23
2469:13
2470:4,15
2473:24
2485:12
2487:13
2492:4,5,6,12
2498:18
2499:14
2504:16
2505:3,17
2507:20
2515:10,16,19
2515:25,26
2516:7,9,20
2517:2,6,20
2518:10,11,14
2518:21,24
2519:2,4
litigation
  2415:12
  2420:10
  2421:9,17
  2445:5
  2448:26
little 2351:10
  2377:7
  2398:26

2400:12
2406:20
2428:10
2440:4
2449:16,21
2450:10
2471:11
2474:15
2483:5
live 2336:7
  2407:7 2434:8
  2508:13,18
lived 2358:25
  2400:10
liver 2502:23
lives 2359:6
  2412:10
  2429:23
  2432:8
living 2412:11
  2432:4
  2478:21
  2483:13
LLC 1:14 5:3,11
LLP 3:20 4:5,13
  5:3,12
located 2362:1
  2413:12
log 2384:4
long 2339:3
  2340:6 2341:8
  2345:24
  2398:9
  2401:10
  2416:20
  2429:3 2430:1
  2433:2,11
  2459:13
  2473:20
  2476:21
  2482:13
  2486:1 2488:4
  2492:8,13
  2493:9,17

2498:11,21
2499:5 2510:3
2520:26
longer 2429:11
  2432:24
  2439:9
  2460:23,23
  2487:3,17
  2493:26
  2494:1
long-acting
  2508:24
  2509:9
long-term
  2433:4 2485:4
  2487:21
  2492:15
  2493:8
  2497:20,25
look 2330:17
  2334:7
  2343:13,24
  2344:2
  2360:16
  2371:25
  2388:23
  2389:2,4
  2403:17
  2419:15,16,25
  2420:21,24
  2422:3
  2438:12
  2447:18
  2455:5,7
  2456:25
  2471:7 2475:9
  2477:11
  2481:2
  2489:13
  2492:5 2494:9
  2494:10
  2497:16
  2501:10,12
  2504:14

looked 2346:14
  2346:26
  2413:25
  2419:19,20
  2420:8,9
  2445:3 2465:4
  2465:4
  2471:12
  2476:20
  2513:10
  2515:19,22
  2519:1,2
looking 2330:23
  2343:16
  2344:6
  2387:17
  2395:26
  2396:15
  2470:14
  2471:13
  2496:5,22
  2500:3
  2517:11,21,25
  2518:19
looks 2337:17
  2348:13
loose 2344:8
Los 3:10,10,12
  4:9,18,24
lose 2461:1
lost 2409:16
  2430:14
  2456:17
lots 2413:12,14
  2512:1
low 2436:19
  2441:15
  2477:3,6
  2486:4,5
lower 2406:8
  2417:2
  2504:25
  2506:24
  2507:12



**lowered**
2493:11
**lowering** 2505:9
**lowest** 2416:16
**low-risk**
2475:11
**Lucas** 4:6 6:7
2351:18,22
2353:5
2354:25
2355:21
2356:7
2359:18,21
2362:9 2363:4
2363:13,15
2367:4,7
2368:23
2369:21,23
2370:21
2372:11
2373:2 2376:9
2376:26
2377:2,3,24
2378:17
2379:7,23
2380:15
2381:5,18
2382:15,17,22
2383:5,8,22,24
2384:15,25
2385:4,7
2390:4
**Lucky** 2479:21
**Luftig** 2357:6,8
2357:9 2368:6
**LUKE** 3:5
**luke.edwards...**
3:9
**lunch** 2333:25
**Lynn** 2474:3
**L-E-M-B-K-E**
2393:16
**L.P** 1:9

## M

**M** 4:15
**Madam** 2337:13
2393:1
**made-up**
2469:24
2473:1
**Magna** 1:24
2455:6
**maintain**
2398:12
**maintained**
2361:15,17
**maintenance**
2431:22
2448:5,5,10
2509:24,25
**major** 2419:11
2518:20
**majority** 2401:6
2426:20
2435:7 2491:5
2491:26
**making** 2357:20
2461:23
2473:2
2510:12
2512:3
**Malia** 3:16
2337:8
**malignant**
2498:14
**management**
2457:17
2458:12
2460:17
2498:13
**managing**
2413:19
2506:13
**mandated**
2400:17,19,23
**mandatory**
2400:18

**manifestations**
2401:18
**manner** 2354:16
2405:17
2489:26
**manufactured**
2388:13
**manufacturer**
2459:26
**manufacturers**
2443:10
2488:23
**mark** 2:3 3:20
2497:13
**marked** 2333:12
**marketed**
2436:17
**marketing**
2399:10,15
2400:6,14
2402:2,10,16
2402:18
2422:23
2423:3,4,10,16
2438:14
2442:8
2443:17
2445:3,4
2454:12
2463:22
2464:2,23
2465:7
2472:12,15,20
2478:7 2480:2
2480:9
2494:24
2495:9,10,15
2495:19,21,25
2497:4,8
2501:24
2508:7
2510:16
2511:11
2519:10,10,16

2521:16
2522:4,18
**material**
2415:13
2463:3
2471:13
2472:12,13
2478:22
2519:17,26
**materials**
2361:8,11
2364:3,9
2365:20
2472:16
2479:7 2480:3
2480:10,17,25
2516:16
**matter** 2337:25
2348:26
2371:5
2389:20
2393:5 2394:7
2421:13
2424:22
2488:17
2502:22
2508:19
**matters** 2339:13
2351:25
**MAYER** 4:15
**ma'am** 2337:21
2337:22
2339:26
2353:10
2355:26
2376:14
2377:22
2379:5
2380:13
2383:10
2384:14
2389:22
2390:7
**MCNEIL-JA...**

1:11
**McPHERSON**
3:16 2337:8,9
2337:17
2338:12,13,15
2352:18
2353:11
2355:2,5,11,16
2355:17,23
2356:12
2359:13,25
2360:11,12
2362:7,17
2363:6,21
2364:1,18,20
2367:16,19,20
2368:21
2369:25 2370:3
2370:6,17
2371:24
2372:1,16,24
2373:11,13,16
2374:12,14,24
2374:25
2376:15,22,24
2377:20
2378:13
2379:2,21
2380:11
2381:2
2382:14
2383:21
2384:10,23
2386:25
2387:26
2388:18
2389:15,18,25
2390:2
**mcrawford@...**
3:22
**MD** 2393:10
2414:12,15
2422:22
2445:12



**MDL** 2421:17
**mean** 2341:23
  2348:6 2370:9
  2372:17
  2375:20
  2382:22
  2396:22
  2406:6
  2418:23
  2420:1
  2427:23
  2433:23
  2441:21,22
  2444:15
  2457:4
  2474:11,24
  2491:21
  2503:10
  2512:13
**meaning**
  2374:11
  2423:26
  2424:2
  2436:20
  2450:25
**means** 2367:13
  2383:15
  2396:4,6,12
  2408:4 2424:8
  2450:13
  2451:19,20
  2452:6
  2482:12
  2503:12,13
**meant** 2415:24
  2442:2
**measure** 2454:5
**measured**
  2476:20
**measures**
  2434:23
  2450:4,15
  2459:23
**medical** 2340:2

2393:24
2394:10
2395:6,8,10,15
2395:17
2396:16
2397:8,11,15
2397:17
2398:6 2399:3
2399:18
2400:11,17,23
2401:19
2402:3
2403:10,25
2413:25
2415:2,25
2417:21,23
2419:7,10
2420:16
2422:17
2423:8,15,20
2423:20
2439:1
2440:17
2442:1 2443:1
2443:5,12,13
2445:6
2448:20
2449:10
2458:20
2459:18
2460:4,16
2461:24
2465:4 2466:2
2466:21
2467:22
2468:1
2469:13
2470:2,15
2473:23
2474:1,8,23
2482:26
2487:13
2489:7 2492:3
2492:12

2499:13
2504:15
2505:2,16
2507:19
2513:11,17
2515:10,16
2516:6,9,19,20
2516:24,26
2517:1,5
2518:10,24
2519:15
2520:7
2522:17
**medically**
  2509:18
  2513:24,25
**Medicare**
  2517:11,17
**medication**
  2454:14
**medications**
  2407:24
  2409:14
  2458:6,7
  2492:21
  2509:23
  2511:16,17
**medicinal**
  2453:6
**medicine** 2349:1
  2349:4
  2393:23,23,24
  2393:25,26
  2394:11,17,20
  2394:24
  2395:4,23
  2396:2,8,16
  2397:4,18,20
  2398:15
  2399:25
  2404:3
  2410:22,25
  2411:1,2,3,21
  2412:18

2414:17,18
2415:3,23
2419:4
2423:14
2436:18
2438:11,13
2440:20,25
2459:6
2474:26
2475:14
2488:9 2489:8
2500:18
2515:24
**medicolegal**
  2416:26
**medium** 2477:4
  2477:7
**MEDLINE**
  2419:12
**meet** 2405:26
  2505:21
  2508:1
**meeting**
  2336:18
  2366:13
  2381:25
  2402:4,8
  2408:16
  2426:9
**melt** 2352:14
**melted** 2381:16
**member** 2348:9
  2348:25
**members**
  2361:19
  2491:3,5
**mental** 2395:19
  2396:21,26,26
  2400:24
  2476:12,14
  2483:2
**mentioned**
  2347:17
  2356:26

2357:1,8
2366:10
2404:12
2474:16
2520:3
**mentoring**
  2397:7
**merely** 2437:26
  2438:9
  2505:22
**Mesa** 5:6
**message**
  2454:20
  2464:2,23
  2478:7 2480:2
  2498:16
  2499:23
  2501:3,25
  2503:21
  2520:26
**messages**
  2400:10,26
  2401:21
  2402:11,16,19
  2402:23
  2416:8
  2423:10,16
  2442:20
  2443:13,14
  2445:3,4,6,8
  2445:13,14
  2448:14,18,19
  2449:5,6,9,10
  2456:5 2457:2
  2457:8,14
  2462:21,23
  2463:5 2465:7
  2465:8,10
  2470:21
  2471:3,6,12
  2472:21
  2477:12,22
  2478:13
  2479:7,17



2482:5,16
2494:24
2495:9,10
2497:8
2500:26
2502:3,25
2503:17,23
2510:17
2511:14
2519:11
2520:13
2523:3
**messaging**
2395:22
2399:6 2400:9
2401:13
2403:4 2404:7
2404:21
2415:6
2441:25
2444:1
2448:11
2461:13
2463:1 2468:1
2471:8,20
2478:11
2479:3,3
2493:21
2494:11,12
2501:13
2510:22
2511:12
2512:1
2518:20,25
2519:6,7,8,17
2519:19,21,26
2520:5,6
2522:18
**met** 2451:1
2505:22
**metal** 2354:14
**metaphorically**
2428:22
**meta-analysis**

2452:15
2458:13,21
**methadone**
2409:16,17
2424:10
2431:22
2448:4,5,9
2509:24,25
2510:2
**methampheta...**
2378:11,19
2379:19,26
2380:4,6
2382:12
2383:12
**methampheta...**
2365:7
**method** 2344:12
2516:8
**methodology**
2422:14
2446:25
2516:18
2517:16
2519:24
**MICHAEL** 2:9
4:6
**middle** 2474:20
2503:9
**midst** 2506:12
**mild** 2408:1
2450:18,22,26
2451:2
2452:11
**milligram**
2441:18
2446:18
2447:5,7,8
2448:1,6
2477:7,8,10
2500:1
**milligrams**
2446:24
2476:26

**million** 2408:5
**mind** 2333:21
2467:3
2470:10
2482:20
**mindful** 2442:6
**mind-body**
2492:23
**Mine** 2357:19
**minimal** 2520:8
2520:9
**minimize**
2375:22
**minor** 2414:20
**minute** 5:19
2349:6
**minutes** 2339:2
2346:18
2404:12
2408:3
**mirror** 2334:5
**miseducation**
2404:9
**misleading**
2395:22
2399:6 2403:4
2415:6
2441:25
2442:9,19
2444:1,6
2445:10
2456:5 2457:7
2457:14
2462:22,24
2467:11,26
2470:21
2472:23,24
2478:11
2482:7,8,9,16
2483:18
2493:23
2494:3 2501:3
2501:4,7
2502:3,10,17

2502:25
2503:18,21
2510:18
2511:18
2512:1 2519:6
2521:19
2523:2
**misnomer**
2409:13
**misrepresenta...**
2449:12
2456:18
2457:20
2463:22,23
2467:13,14,15
2467:25
2469:2,6
2473:11
2479:4,8
2480:11
2481:8 2484:7
2485:3
2497:24
2498:8
2499:10,11
2504:11,14
2511:6
**misrepresenta...**
2449:3 2467:5
2467:21
2468:19,24,25
2477:18,19
2483:5,10,12
2483:22
2521:16,17
2522:4,5
**missed** 2354:11
**misstates**
2379:3
**misunderstood**
2443:25
**misuse** 2409:7
2410:6
2411:18

2436:9
2439:21,21
2440:2
2449:25
2450:11,12,13
2450:16,17
2451:10,16
**misusing**
2418:11
**mixed** 2378:19
**mkaba@hues...**
4:19
**mmcpherson...**
3:18
**MME** 2446:18
**MMEs** 2446:26
2447:13
**modalities**
2361:4
**modality**
2344:15
2357:15
**moderate**
2449:26
2450:26
2451:3 2452:2
2452:11
2454:7
**modern** 2489:11
**modest** 2441:15
**Modesto** 2340:4
**MOEZ** 4:15
**molecule**
2423:22
**moment**
2355:13
2359:24
2360:1,3
2370:5
2371:14
2390:26
2402:5 2410:3
2442:5 2467:2
2467:9



2477:25
2480:15
2504:7
**Monday**
2336:26
**monitored**
2411:20
2419:11
**month** 2342:24
2343:11
**months** 2340:7
2347:19
2373:19
2429:16,22
2430:2,10
2431:13
2476:23
2485:11,13,14
2485:17
2486:6,10,22
2487:17
**mood** 2394:13
**morass** 2443:14
**morbidity**
2462:9
2502:14
2511:19
**MORGAN** 5:3
**MORIARTY**
2:10
**morning** 2330:2
2330:9
2338:11,17
2339:18
2386:16
2390:12
2392:26
2393:20
2523:19
**morphine**
2424:1
2441:17
2446:18,21,24
2447:5,6,8,10

2448:1,6
2477:7,8,10
2500:1
**MORRIS** 4:23
**mortality**
2462:9
2502:14
**mother** 2409:15
**motion** 2467:19
**motions** 2442:6
2467:18
**MOTLEY** 2:8
**mounting**
2494:1
**move** 2335:5
2362:7
2368:21
2373:11
2374:14,23
2383:23
2387:7
2401:26
2409:24
2414:5 2416:9
2442:3
2443:18
2455:17
2470:26
2490:10
2503:5 2504:4
**moved** 2332:20
**movement**
2440:22
**moving** 2362:15
2410:10
**mpendell@m...**
2:14
**Mt** 2:13
**multifactorial**
2415:20
**multiple**
2396:26
2399:16
2403:19

2404:4 2411:7
2415:3
2422:10
2437:23,24
2450:5
2458:19
2463:5
**mute** 2334:15
2334:18
2431:7
**MYERS** 4:5
**myoder@om...**
4:9
**myth** 2458:1,5
2458:15
2459:15
2460:9
**myths** 2416:2

--------

**N**

**naloxone**
2344:18
**naltrexone**
2509:25
**name** 2338:3,4
2347:16,18,20
2357:1,2
2377:3
2385:14
2393:14,15
**named** 2435:1
**names** 2342:16
**NARAYAN** 3:4
**Narcan** 2344:17
2344:21
2349:5,7
2356:25
2357:3,24,25
2357:25
2358:3,9,13,16
2358:23,26
2359:4
2360:23
2361:13

2362:5,23
2363:24
2364:14,22,25
2365:2,5,10,13
2365:16,24
2366:2,8,11,19
2366:23
2368:2 2369:2
2369:8,9,14
2370:14,18,18
2371:10
2373:18,22,23
2373:26
2374:4,16,20
2375:1,1,3,4,6
2375:17,24
2376:2
2381:21
2382:7,18,26
2383:11,15
2384:1,4,21,26
2386:19
**narcotics**
2348:18
**narrative**
2409:26
**narrow** 2362:18
**narrower**
2468:4
2518:19
**nasal** 2343:3
**National**
2438:12
2515:23
**nationally**
2441:12
**naturally**
2423:25
2424:3
**nature** 2336:1
2403:26
2409:23
2433:21,23
**near** 2342:6

2351:1,2
2436:20
**nearby** 2344:8
**Nearly** 2473:18
**necessarily**
2481:25
**necessary**
2411:26
2413:16
**need** 2331:9
2333:20
2335:16
2336:2,18
2346:6 2359:8
2359:9 2366:1
2367:7
2368:18
2369:15
2370:18
2383:9 2385:2
2404:4 2406:1
2407:22
2418:20
2424:8
2444:24
2460:14
2461:2,7,18
2474:25
2479:25
2483:7 2484:1
2495:18
2503:2 2523:9
**needed** 2346:20
2363:9
2421:20
2422:8
**needing** 2426:14
2426:17,26
**needle** 2354:15
2356:23
**needles** 2356:20
**needs** 2391:3
2411:19
2429:12



2468:13
**negligible**
    2521:4
**neighborhood**
    2433:22
    2434:6,8
**neuroadaptati...**
    2406:14
    2428:23
    2432:13
    2433:6
    2486:20
    2504:21
**neuroadaptive**
    2412:2 2430:3
**neurology**
    2395:4
    2396:10,12,13
**neurons** 2428:9
    2428:10
**neuroscience**
    2395:25
    2412:1,13
    2427:20
**neuroscientists**
    2428:15
**neurotransmi...**
    2428:8
**neurotransmi...**
    2428:11
**neutrality**
    2428:16,26
    2429:4,14
**never** 2430:8
**new** 2347:18
**Newport** 2:5
    2330:14
**night** 2496:6
**noncancer**
    2475:24
    2489:4
**nonhearsay**
    2362:21
    2369:6

**nonmedical**
    2344:2
    2349:22,26
    2513:11,17
**nonmedically**
    2432:12
    2513:24,25
**nonresponsive**
    2375:16
    2410:8 2504:9
**nonsteroidal**
    2502:16
**non-opioid**
    2378:10
    2382:12
    2383:12
**non-opioids**
    2342:9
**normal** 2460:25
    2485:10
    2499:4
**normally**
    2458:16
    2459:16
    2460:2
**North** 5:15
**Nos** 2333:6
**notable** 2493:12
**note** 2453:7
    2522:14
**noted** 2336:20
    2380:2
**notes** 2333:18
    2333:18
    2391:15
    2330:11
**notice** 2456:2
**notion** 2508:21
**not-very-robust**
    2441:3
**November**
    2373:20
    2382:5
**NSAIDs**

2502:15,18,21
2502:22
**nuisance**
    2363:11
**number** 2333:5
    2367:15,17
    2383:26
    2387:4,5
    2389:2
    2391:26
    2406:6,22
    2416:24
    2422:13
    2441:24
    2444:15,17,19
    2447:14
    2449:12
    2450:3
    2452:13,14
    2456:18
    2457:20
    2469:4,4
    2473:10,11
    2475:15
    2479:8
    2480:11
    2481:8
    2482:12
    2484:26
    2485:3,21
    2491:16
    2493:24
    2497:24
    2498:9 2499:7
    2499:11
    2504:11
    2507:11,24
    2511:7
**numbers** 2332:1
    2387:18
    2447:18
**numerous**
    2512:26
**nurture** 2433:22

2434:2
**n/k/a** 1:11,12
    4:3,4 5:10
_____
**O**
**Oakland** 3:15
    3:17 2337:9
    2338:19,21,24
    2339:2,3,15,19
    2345:3,18
    2346:10
    2348:4,10,12
    2348:15
    2350:8,11,15
    2350:22
    2351:12
    2353:4,14,18
    2354:2,5
    2357:3,20
    2363:2,12,23
    2364:7,13,22
    2366:5,16
    2368:10,18,19
    2369:2,11,14
    2369:20,26
    2370:12
    2371:3,4
    2372:5,6
    2373:7 2375:1
    2375:5
    2378:12,26
    2379:9,19,26
    2380:3,7,9,17
    2380:18
    2381:3,8,22
    2384:1,3,21
    2388:9
    2389:20
    2394:12
**oath** 2431:6
**object** 2330:19
    2368:23
    2392:4
    2409:24

2454:25
2465:12
2466:24
2481:15
2495:5 2496:7
2496:23
2521:21
2522:10
**objection**
    2331:3,7,13
    2332:15
    2351:18,21,24
    2352:3 2353:5
    2354:25
    2355:14,21,22
    2356:7
    2359:19,20
    2360:6 2362:9
    2363:4,17
    2367:13
    2371:7,20
    2372:11,12
    2373:5,10
    2376:9
    2377:20
    2378:13
    2379:2,21
    2380:11
    2381:2
    2382:14
    2383:21
    2384:10,23
    2386:25
    2387:26
    2388:2,18
    2402:6,26
    2410:1 2442:9
    2443:25
    2446:10
    2454:23
    2455:16,19,20
    2463:7,15,17
    2464:5,13,16
    2465:15



2470:26
2471:2
2477:21,26
2479:11
2480:5,7,13,16
2481:21
2490:10,13
2495:2,13,23
2496:9,20,20
2497:2,9,11
2504:3
2512:14
2513:19
2515:11
2522:14,23,24
2522:25
**objectionable**
2367:12
**objections**
2360:8
2364:16
2367:4,9
2495:4
2496:12,15,26
**observation**
2459:2
**observations**
2350:9
2351:10
**observe** 2354:19
2409:21
**observed** 2350:7
2350:11,14,24
2351:6,12,15
2351:17
2352:2,4,6,10
2352:16,19,26
2353:3,13,18
2353:21,23,24
2354:1,5,9,23
2355:6,19
2356:2,5,9,11
2364:5,6
2380:9,18

**observes**
2375:13
**observing**
2351:23
**obtain** 2340:16
2347:1
2366:23
2368:1
2516:19
**obtained** 2353:2
2366:20
2424:13,17
2513:24
**obtaining**
2516:8
**obtains** 2428:26
**obviously**
2335:16
**occur** 2427:12
2503:10
**occurred**
2460:26
**occurring**
2423:25
2424:3
**occurs** 2427:4
2429:8
2432:14,15
2451:21,22,23
2487:2
2511:16
**October**
2359:12
2382:5
**odds** 2499:24
**ODs** 2437:2
**OFD** 2375:6
**offer** 2331:11
2349:3 2352:1
2415:18
2465:20
2490:6
**offered** 2364:12
2369:26

2370:10
2371:15
2463:20,26
**offering**
2351:22
2382:1
**Office** 3:2,10,15
2337:9
**officer** 2337:10
2338:16,25
2345:3,11,14
2346:3,9,15,26
2349:17
2350:10,18
2351:6,11
2352:25
2353:18
2354:4,23
2355:18,19
2356:1,14,17
2356:18,24
2358:21,23
2359:7
2360:13
2361:7
2363:24
2364:2,6,15,21
2365:21
2366:5
2367:21
2369:9,17
2370:14
2372:2
2373:17
2374:26
2375:9
2376:22,25
2377:3
2379:18,24
2380:7,16
2381:5
2382:24,26
2383:9,25
2385:5,9,14

2386:16
2388:8
2389:10,11,19
2389:19
2390:1,5,8
**officers** 2347:10
2357:26
2358:10
2359:3
2360:23
2361:12
2362:4,22
2364:2,4,5,10
2364:22,24
2365:2,5,9,19
2366:4
2373:18
2384:3,7,16
**official** 2382:1
**Oftentimes**
2356:20
**Ogawa** 3:17
**Oh** 2387:9
2451:9
**okay** 2332:4
2334:2,24
2339:18
2341:21
2380:2 2382:4
2407:9
2420:24
2421:2
2423:19
2440:10
2444:19
2449:8,20
2450:21
2452:23
2454:16
2457:22
2458:7
2463:26
2472:20
2475:13

2477:11
2479:6,24
2483:6
2484:23
2485:18
2489:2
2492:11
2494:16
2497:14,22
2499:19
2501:10,17
2509:21
2511:2,3,10
2514:7,8
2516:25
2517:16,17
2518:8
2521:14
**Older** 2457:18
2460:18
**omm.com** 4:11
**once** 2347:7
2413:7
2428:26
2487:1 2505:3
**ones** 2332:17,19
2341:3,23
2462:25
**one-page** 2391:6
**OPD** 2339:19
2345:13,21
2347:12
2349:11
2350:10
2357:23,25
2358:3,16
2361:7,13
2362:4,22,23
2364:24
2365:2,5,9,19
2365:24
2366:2,8,11
2372:5
2373:18



| | | | | |
|---|---|---|---|---|
| 2374:4,26 | 2515:20 | 2358:2,22 | 2414:21 | 2469:10,18 |
| 2375:9,17 | 2517:20 | 2362:26 | 2415:12,19 | 2473:7,8 |
| 2376:2 | 2518:9,17 | 2363:3 2365:1 | 2416:1,4,19 | 2474:1,2,21 |
| 2386:20,22 | 2522:8,9,20 | 2365:14,18 | 2417:11 | 2475:23,23 |
| **OPD's** 2361:15 | 2523:1,2 | 2369:16 | 2418:20,21,22 | 2476:6,7,8,11 |
| **operates** | **opinions** 2352:6 | 2370:24,25 | 2419:6 2420:4 | 2476:15,16,17 |
| 2357:10 | 2419:5,10 | 2372:7 2373:7 | 2420:10,11,12 | 2476:21,23 |
| **operational** | 2421:4 2422:8 | 2374:18 | 2421:8 2423:3 | 2477:1,2 |
| 2358:6 | 2422:25 | 2375:9 | 2423:23 | 2482:25 |
| **Operations** | 2438:9,10 | 2377:14,14 | 2424:3,3,21,21 | 2485:20 |
| 2338:26 | 2442:9 | 2378:7 2382:7 | 2425:3,15,18 | 2486:9 2487:2 |
| 2347:20,22 | 2443:23 | 2382:8,9,13 | 2425:18,19,21 | 2487:12 |
| 2348:6 | 2444:5 | 2383:2,2,19 | 2426:1,2,5,9 | 2488:7,19,23 |
| **opine** 2497:3 | 2445:20 | 2384:8,17 | 2426:14,25 | 2489:3 2491:6 |
| **opinion** 2351:23 | 2448:12 | 2385:16,26 | 2427:1,4 | 2491:18 |
| 2353:6 | 2465:19,20 | 2388:9,13,17 | 2428:17 | 2493:8 |
| 2354:26 | 2470:12 | 2388:25 | 2429:8,15 | 2495:20 |
| 2355:1 | 2476:1 2488:3 | 2389:21 | 2430:7 | 2500:5,11,24 |
| 2359:23 | 2488:17 | 2391:7 | 2431:18,21,23 | 2502:9 |
| 2368:26 | 2494:21 | 2392:15 | 2432:1 2433:4 | 2504:12,18,20 |
| 2373:3 | 2498:8 | 2395:21 | 2433:14,20 | 2504:21 |
| 2376:10 | 2501:24 | 2397:24 | 2434:20,22 | 2505:1,4,17,22 |
| 2405:12 | 2508:10 | 2398:7,23 | 2435:4,8,10,20 | 2506:13,16,20 |
| 2422:13,17 | 2512:22 | 2399:2,5,5,10 | 2437:6,7,11,14 | 2507:17,21,23 |
| 2437:9,20,22 | 2514:2,6,6 | 2399:14,15,23 | 2438:15 | 2507:25,26 |
| 2438:11,20 | 2515:17 | 2400:6,13 | 2439:1,3,6,7,8 | 2508:1,23,24 |
| 2443:4,11,26 | 2517:15 | 2402:12,24 | 2439:23,24 | 2509:14,22,26 |
| 2444:21,23,25 | 2518:5,12,13 | 2403:1,5,9,11 | 2441:10 | 2510:5,17,22 |
| 2462:20 | 2518:25 | 2403:22 | 2443:3,9,10 | 2511:7,19,20 |
| 2463:11 | 2521:15,21,22 | 2404:1,1,5,6 | 2444:3 | 2512:4,6 |
| 2464:11,13,15 | 2522:3 | 2405:26,26 | 2445:24 | 2513:2,16 |
| 2465:17 | **opioid** 2341:26 | 2406:5,8,23,25 | 2446:15 | 2514:18 |
| 2467:14,17,25 | 2342:4,9,19 | 2407:15,21,22 | 2448:25 | 2515:1 |
| 2468:8,14 | 2343:14,24 | 2408:16,24,24 | 2449:24,25,26 | 2517:12,21,22 |
| 2472:20 | 2344:3,13,23 | 2408:26 | 2450:14,16,17 | 2518:19,25 |
| 2474:3,19 | 2350:24 | 2409:6,7,7,9 | 2450:18,22,24 | 2521:3 2523:4 |
| 2480:18 | 2351:13 | 2409:12 | 2450:24 | 2523:5 |
| 2482:4 | 2352:19 | 2410:6,6,7,15 | 2451:2,3,4,10 | **opioidphobia** |
| 2490:11 | 2353:4,14,19 | 2410:16,18,19 | 2454:14 | 2401:5 |
| 2493:21 | 2353:22 | 2410:21,23 | 2458:6,7 | **opioidphobic** |
| 2499:22 | 2354:2,5,20,24 | 2411:8,10,16 | 2459:3 2460:9 | 2520:14 |
| 2501:2 2504:6 | 2355:20 | 2411:16,17,17 | 2461:5,7,20 | **opioids** 2341:15 |
| 2510:16 | 2356:2,6 | 2412:1,5 | 2462:7,19 | 2341:18,19,22 |
| 2514:5 | 2357:16 | 2413:20,21 | 2467:7 2469:7 | 2342:14,26 |



2349:10,13,24
2350:7,11,15
2351:6,15,23
2352:1,11,16
2352:25
2354:9
2356:13,16
2376:1,8,17
2377:18,26
2378:8 2379:1
2379:9,10
2382:19
2383:16
2387:4,6,15,22
2387:23
2394:26
2398:1,4
2399:11,15
2400:7,14
2401:5,7,8
2402:11
2403:21
2404:23
2405:25
2406:2,8,10,12
2406:14,18,24
2407:11
2408:6,14,19
2408:21
2409:1,11,22
2410:10,12,13
2410:14
2411:14,25
2412:4,8
2413:5 2414:1
2414:20
2416:14,15,16
2416:20
2417:5
2418:11,12,26
2419:3,13,17
2419:21
2420:4 2423:4
2423:21,22,24

2423:25
2424:5,7,11,12
2424:12,16,17
2424:17,19,19
2424:23,25
2425:2,6,7,24
2426:6,7,8,13
2426:18,21
2427:6,6,9,13
2428:4
2430:10
2431:14
2432:1,2,6,9
2432:11,16,20
2433:1,10,12
2434:13,17
2435:5,9,15,17
2435:21,23,24
2435:26
2436:1,3,3,5,8
2436:11,15,17
2436:19,21
2437:5,10
2438:1,3,7,14
2438:24,24
2439:4,10,11
2439:12,15,18
2439:21,26
2440:6,8,13,15
2440:17,26
2441:7,13,13
2442:2,21
2444:14
2445:21,25
2446:8,13,19
2446:22
2447:10
2448:8,12
2449:13,17
2453:1,1,6,10
2453:12
2454:5,9,21
2456:7
2458:11,15,23

2459:11,12,15
2460:1,5,7,21
2460:22,26
2461:20,23
2462:5 2463:2
2463:14
2464:4,24,26
2465:6
2470:19,24
2473:5,12,16
2473:16
2476:2
2477:13,20
2478:8 2479:9
2480:12
2481:9 2482:6
2485:3,22,23
2485:26
2486:1,6,7,13
2486:14,21
2487:16,20,21
2487:21
2488:4,14
2490:3
2491:23
2492:7,8,13,15
2492:21
2493:5,9,17,22
2494:3,6,7,13
2497:19,24
2498:11,21,24
2499:3,11,15
2499:22,26
2500:1,22
2501:1,13,25
2502:6,15,21
2502:24
2504:23,24,26
2505:8 2506:4
2506:6,11,24
2507:12
2508:3,14,16
2508:25
2509:1,2

2510:3,10,12
2511:15
2513:11,17,23
2514:13,17,25
2517:12
2518:1,7
2519:12,17,22
2519:26
2520:1,16
2521:18
2522:6
**opioid-addicted**
2448:4
**opioid-depen...**
2417:2 2462:4
2505:20
**opioid-induced**
2433:2
2493:16
**opioid-like**
2378:11
**opioid-related**
2446:3
**opium** 2423:26
2424:8
**opportunity**
2360:16
2373:9
2457:13
**opposed**
2374:22
2404:7
**opposite** 2429:1
2499:18
**option** 2492:16
2492:18
**options** 2492:25
2503:14
**orally** 2440:2,2
2440:3,3
**Orange** 1:2,5
2334:12
**order** 5:19
2332:7 2336:9

2343:15
2348:3 2350:3
2352:12
2354:15
2400:20
2404:7 2422:8
2427:17
2429:13
2441:1
2443:15
2444:23
2445:7
2447:16
2495:10
2515:16
**orders** 2361:24
2361:24
2514:10
**organization**
2453:20,22
2458:25
2488:9
**organizations**
2399:24
2443:6,7
**original** 2389:4
2477:13
**originally**
2426:19
**Orry** 1:5
**ORTHO** 1:10
**Ortho-McNeil...**
4:3
**OUD** 2406:23
2407:10
2408:21,26
2410:14,19
2411:13
2413:18,26
2425:16,25
2427:16
2431:15
2433:13,19
2434:16



2435:5,17
2436:11
2438:25
2439:23
2446:9
2449:18
2452:2,2,11,11
2454:7
2469:10
2472:22
2473:23
2474:16
2493:3
2509:13,18,18
2513:16
2514:25
**outcome**
  2453:24
**outcomes**
  2488:11
**outline** 2422:14
**outlying** 2342:6
**outpatients**
  2459:12
**outside** 2375:23
  2399:1,9
  2400:2,24
  2412:25
  2413:24
  2414:17
  2433:26
  2464:9 2517:7
  2518:16
**outward**
  2401:18
**outwardly**
  2478:24
**outweighed**
  2506:4 2507:5
**overcome**
  2462:3
**overdose** 2343:7
  2343:14,24
  2344:3,23

2358:11,22
2359:1 2365:1
2366:6 2375:9
2377:14
2378:7
2383:17
2384:9,18
2389:21
2391:7
2392:16
2408:11
2409:9,12,13
2411:19
2419:14
2436:9 2438:2
2438:4,7
2445:26
2446:2,3,9,15
2499:25
2500:3,6,12,22
2500:25
2508:19
2509:11
2510:13,14
**overdosed**
2365:6,18
2377:7,10
2378:23
2379:15
2386:3
**overdoses**
2342:1,4,9,10
2342:20
2343:5
2344:13
2349:21
2353:19,22
2354:2 2358:2
2359:9 2365:3
2365:14
2374:18
2378:26
2379:8
2382:11

2383:12,18
2385:17,18
2386:8
**overdose-rela...**
  2437:7
**overlap** 2395:24
**overprescribing**
  2414:19
  2418:26
  2419:4
  2423:13
  2523:4
**overruled**
  2353:7
  2355:22
  2356:8 2360:7
  2376:11
  2377:21
  2379:4
  2380:12
  2384:12
  2388:3,19
  2402:6 2403:2
  2446:11
  2471:4
  2477:26
  2490:13
  2513:21
  2515:12
  2522:12,25
**oversight**
  2397:10
**oxymorphone**
  2471:25
  2472:1
**O'MELVENY**
  4:5
**O0O** 2330:4

———————
            **P**
———————
**P** 1:5
**PA** 2357:6,8,10
**packaging**
  2404:21

**pad** 2434:12
**PADRAIC** 4:14
**page** 2333:17
  2334:1
  2341:17
  2381:6
  2391:18,23
  2392:6,10
  2455:8
**pages** 2333:17
  2330:9
**paid** 2398:17
**pain** 2395:24
  2396:24
  2397:2
  2400:19
  2401:1,3,7,9
  2401:10,11,15
  2401:17,18,20
  2404:2
  2406:13
  2407:12,14,18
  2407:20,22,25
  2409:17
  2410:11,12
  2412:18,19
  2413:1,5,7,8
  2413:10,15,19
  2413:20
  2414:20
  2416:15,20
  2417:2,4
  2418:20,22,23
  2419:1,2,13,18
  2419:22
  2424:26
  2425:2
  2426:18
  2427:21,24,25
  2428:2,20
  2429:2,11,13
  2429:17,19,26
  2432:10,11,16
  2432:18,20,21

2433:1,4,8
2435:14,16,21
2439:5
2440:21
2441:1,8,14,19
2441:23
2443:7 2448:7
2449:13,24
2451:11,14
2452:12
2453:1,5
2454:4,4,10,22
2456:7,20
2457:17
2458:12
2460:6,12,17
2460:21,25
2461:6,25
2462:19
2465:7
2469:20
2470:20
2474:26
2475:14,25,25
2478:14,18,20
2478:21
2482:20,22
2483:12,13
2485:5,7,8,8
2485:10,11,14
2485:14,15,16
2485:16,19,19
2485:22
2486:1,2,5,5
2486:13,15,17
2487:16,23
2488:4,9,14,20
2489:4,8,9,17
2490:16
2491:23
2492:9,13,16
2492:20
2493:5,18,19
2493:19,23



2494:4,5,14
2497:20,26
2498:11,13,15
2498:21,22
2499:3,12,16
2499:23,26
2500:12
2501:1,14,25
2502:1
2503:11,13
2505:9,20
2506:9,10,12
2506:14,14,23
2507:2,13,13
2508:2,5,10,15
2508:20,21,26
2509:3,5,10
2513:1,1
2514:14
2518:1 2520:9
2520:13,18,19
2520:21,23
2521:2
**pale** 2343:18
2435:3
**pandemic**
2375:17,21,25
2376:8,18
**panel** 2491:3
**papers** 2419:12
**paperwork**
2361:25
**paradigm**
2419:3 2440:5
2441:10,20
2447:21
2461:19
2520:13
**paradoxically**
2473:7
**paragraphs**
2368:25
**paramedic**
2340:9,10,14

2340:17,24
2341:1,3,6,8
2341:14,25
2342:8,13,19
2342:25
2343:4,6,13
2344:2,13,26
2345:6,9
2349:8
**paramedics**
2341:3 2375:5
2375:7
**paraphernalia**
2342:17
2344:9 2350:2
2350:17
2351:1,3
2354:5,8,19
2356:10
**parent** 2433:25
**paring** 2336:12
**part** 2333:10
2335:6
2336:26
2341:25
2345:16
2351:20
2358:3,16
2370:21
2395:5,13,14
2395:14
2397:25
2398:19,21
2417:26
2419:26
2427:23
2448:12,23
2456:6
2459:21
2461:23
2464:8
2505:25
2514:16,24
2517:17

2523:3
**particular**
2368:24
2442:26
2452:10
2466:17,20,26
2467:21
2471:20
2474:19
2477:24
2483:11,21,22
2489:5
2494:25
2502:19
2518:3,9
**particularly**
2488:5
2503:20
**parties** 2330:19
2330:26
2335:19
2336:2 2392:2
2477:23
**partly** 2352:3
**partnership**
2399:23
**parts** 2362:12
2362:13
2363:17
2493:19
**party** 2330:21
2331:8
2333:21
**passed** 2396:6
2396:14
**pathology**
2394:11
**pathways**
2428:8,19
**patient** 2341:5
2342:7 2343:8
2343:22
2344:5
2358:25

2365:15
2378:3
2401:16,18,19
2409:8
2418:23
2441:14
2447:23
2448:7 2457:3
2457:6 2462:4
2476:21
2478:14,23
2487:3,5
2505:4 2507:1
2509:7,13
2520:19
2521:1
**patients**
2396:26
2397:6,21
2401:7,11,12
2405:17,24
2406:22,25
2407:1,4,7,10
2407:17,20,25
2408:1,23
2409:3,5
2410:5,22
2411:15
2412:4 2413:4
2413:9,10
2414:13
2415:3,9,22
2416:18,19,25
2417:2,4,16,17
2417:19,26
2418:4,7,10,20
2419:2,21
2426:20
2427:14
2435:16,19
2440:15,23
2441:17
2445:12
2449:24

2452:12
2453:1 2454:4
2454:4 2458:9
2459:2 2461:2
2461:16,25
2462:6 2465:6
2469:7
2470:19
2472:21
2473:4,22
2475:12
2476:5
2478:18
2482:22
2486:14,23
2493:6
2499:26
2502:18
2503:25,26
2505:7,9,21
2506:10,23
2507:4,11,16
2507:23,24
2508:1,2
2509:17,20
2511:17
2516:3
2517:22
2519:22
2520:15
**patient's** 2473:7
**patient-center...**
2417:1
**patient-facing**
2456:23,26
2457:24
2499:2
**patrol** 2345:22
2345:25
2346:2,3,7,9
2346:14,26
2365:22
**PAUL** 2:4
**pausing** 2481:23



2482:1
**PD** 2384:1,3
**pdagastino@r...**
  2:6
**PD's** 2384:21
**peace** 2338:25
  2350:10,18
  2351:5,11
  2353:17
  2354:4,23
  2355:19
  2356:1,14,17
**peer** 2503:21
**peers** 2490:5
  2503:23
**peer-reviewed**
  2403:9
**Pendell** 2:9
  2331:9,14,16
  2331:20,26
  2332:17,23
  2390:18
  2391:13,14,20
**pending**
  2337:25
  2393:5 2495:4
  2496:26
**people** 1:4
  2333:21
  2334:13
  2335:15,17,23
  2336:5,16,24
  2337:7,10,10
  2364:11
  2370:7,8
  2374:15
  2377:7
  2382:18
  2383:16
  2390:23
  2394:25
  2405:8,18,20
  2406:5
  2411:17

2413:17
2427:7 2429:7
2431:12,15,18
2432:9,11,15
2432:17
2433:13,15,19
2435:23,25
2436:23
2439:21,25
2441:1 2442:2
2442:17
2449:17
2455:17
2463:13
2464:3,25
2478:16,16,18
2478:21
2482:19,21
2483:13
2486:21
2493:8,13
2499:3
2511:20
**People's**
  2333:14
  2334:11
  2390:2
  2523:15
**percent** 2346:12
  2348:11
  2374:8
  2408:23
  2418:19
  2439:5
  2449:24,25
  2450:12
  2451:17,17,18
  2451:24
  2452:1,6,8
  2453:4,8,11,16
  2454:6
**percentage**
  2374:3,7
  2435:17

**percipient**
  2355:8
**period** 2342:24
  2343:11
  2416:20
  2426:22,23
  2433:11
  2446:4
  2460:23,25
  2482:13
  2506:12
**periods** 2432:22
**perioperative**
  2517:19
**perioperatively**
  2517:22
**Perri** 2448:13
  2448:18
  2449:3
**persist** 2494:7
**persistent**
  2439:6,7
  2498:13
**persisting**
  2485:9
**person** 2344:8
  2358:26
  2359:15
  2366:17
  2377:17,25
  2378:23
  2385:23
  2435:5 2447:6
  2447:7,9,19
  2448:2,4
  2473:12,15,17
  2476:2
  2477:13,19
  2478:8,12
  2479:9
  2480:11
  2481:9 2482:5
  2482:15
  2486:4

**personal** 2350:9
  2381:4
  2402:16,22
  2415:5 2435:1
  2483:1
  2519:18
  2520:4,5
  2521:6,15
  2522:2
**personally**
  2350:14
  2351:12
  2353:21
  2354:1 2355:6
  2414:6
**persons** 2414:17
**person's** 2384:8
  2384:18
**perspective**
  2336:2 2359:2
  2389:20
  2390:2,4
  2448:3
  2515:21
**pertain** 2349:4
  2351:21
**pertinent**
  2415:17
**PETER** 1:20
**pforan@hues...**
  4:19
**pharma** 1:9,9
  1:14,15 5:3,3
  5:11,11 2491:6
  2492:1
**Pharmaceutica**
  4:4
**pharmaceutical**
  2399:10,14,23
  2400:6,13
  2402:11,24
  2403:1,5,8
  2404:21
  2416:1

2442:20
2443:3,9
2444:3
2453:21
2459:26
2461:21
**Pharmaceutic...**
  1:10,11,12,12
  1:13 4:3,3,4,4
  4:13 5:10
**pharmacologic**
  2502:10
  2509:21
**pharmacologi...**
  2502:6
**pharmacy**
  2424:14
  2482:18
**pharma-funded**
  2404:7
**Phase** 2358:5,7
  2358:8,9,12,13
  2358:18,19,20
  2359:22
  2363:5,7,10
  2367:6 2369:1
  2374:13,22,22
  2384:23
**phenomena**
  2512:8,9
**phenomenon**
  2415:20
  2426:11
  2493:15
  2506:10
**phone** 2409:3
**phrase** 2471:11
**physical** 2462:2
  2492:22
  2511:15
  2512:5
**physically**
  2379:11
  2408:18



2417:5
2506:24
**physician**
2424:26
2434:16
2439:23
2518:20,26
2521:1
**physicians**
2400:21
2401:2,10
2403:11,26
2404:8
2409:22
2415:22
2417:3 2423:5
2443:15
2447:4 2468:2
2488:19
2490:4
2503:22
2520:14
2522:7
**physiologic**
2426:4 2432:5
2435:15
2504:12,18,20
2505:4,7,23
**Physiological**
2511:7
**physiologically**
2405:24
2406:11
2461:1 2505:8
**picked** 2454:19
**Picking** 2334:10
**piece** 2361:25
2485:25
**pile** 2508:23
**pill** 2352:11,13
2353:2
2354:10
2388:24
2424:22

**pills** 2344:8
2352:12
2388:9,12,13
2388:17,23
2482:19
**pilot** 2358:6
**pipes** 2344:9
**place** 2352:14
2356:19
2447:26
**placebo-contr...**
2411:7
**placed** 2357:25
**places** 2351:2
2457:8
**plainclothes**
2348:17
**plaintiff** 1:7 6:5
2338:8
2393:11
2497:5,7
**PLAINTIFFS**
2:2
**Plaintiff's**
2455:23
**plaintiff-speci...**
2522:21
**Plan** 2508:8
**plans** 2407:12
**plateaued**
2446:4
**plausible** 2438:8
**played** 2366:11
**Plaza** 2:5 3:17
**PLC** 5:10
**Pleasant** 2:13
**please** 2337:14
2337:15,16
2338:3
2340:26
2341:16
2342:12
2348:21
2350:23

2352:8 2357:1
2357:23
2359:16,24
2360:1 2367:3
2367:9,13,15
2367:18
2370:5
2371:23
2373:12
2374:23,26
2383:7,23
2385:11
2387:7 2388:3
2393:2,3,14
2431:7 2466:1
2475:21
2480:15
2499:20
2513:6
2521:26
2523:16
**pleasure**
2427:21,24,25
2428:1,6,18
2429:10
**pleasure-pain**
2428:14
2432:26
2435:13
**PMK** 2381:3
**pockets** 2356:20
**point** 2336:11
2337:1 2366:6
2367:1 2387:2
2388:6 2391:1
2406:12
2409:21
2437:23
2441:6
2453:13
2466:25
2469:22
2488:1 2503:6
2503:24

2507:10
**points** 2437:24
2441:3
**police** 2338:22
2338:24
2339:3,16,19
2345:3,11,14
2345:16,18
2346:21
2349:17
2352:24
2354:21
2357:3,20
2363:23
2364:13,22
2365:21
2366:5,16
2368:10,18,19
2369:2,7,12,14
2369:20
2370:12
2371:3,4
2372:5,6
2375:13
2380:8,17
2381:22
2389:19
**police's** 2369:26
**policies** 2349:3
2357:21
2361:23
**policing** 2347:9
**policy** 2361:26
2443:8
**poppy** 2423:26
2424:3,8
**population**
2379:19
2380:4,5
2417:4 2436:6
2436:7,12
2453:5
2459:10
2476:5

**pornography**
2405:22
**Porter** 4:22
2453:8,17
2458:26
2459:4
**portion** 2340:18
2340:20
2341:11
2391:16
2490:11
**portray** 2443:17
**position**
2338:23
2339:24
2345:1,13,15
2349:15
2362:18
2369:11,13
2393:21
2409:21
2412:17
2466:10
2516:13
**positions** 2335:3
2349:11
2412:16
**positive** 2386:4
**possible**
2378:25
**possibly**
2363:18
2484:3
**potencies**
2446:20
**potential**
2335:11
2493:3
2500:22
2506:4 2507:5
2514:26
**potentially**
2461:6
2464:13



**powder** 2352:13
  2352:13
**power** 2520:21
**PowerDMS**
  2361:19,20
**PowerPoint**
  2360:22,24,26
  2361:11
**PowerPoints**
  2361:23
**practice**
  2394:17,20,22
  2398:12,14,16
  2405:14,16
  2406:21
  2408:22
  2411:2,3,10
  2414:18
  2417:9,18,24
  2417:25
  2418:3
  2507:23
**practiced**
  2399:25
**practices**
  2403:11
  2423:5
**practicing**
  2400:21
  2410:21
  2489:11
**practitioner**
  2492:17
**precedes** 2438:7
**precisely**
  2382:25
  2391:15
  2468:17
**precursor**
  2424:8
**predict** 2434:21
  2473:26
  2474:9
**predicting**

2474:22
**prefers** 2495:10
**preparation**
  2413:23
**preparations**
  2336:10
**prepare** 2394:1
**preparing**
  2422:24
**prescreening**
  2474:16
**prescribe**
  2404:23
  2410:10,12,13
  2410:15
  2416:14,14
  2508:25
  2509:2
**prescribed**
  2341:23
  2408:19
  2409:11,14,17
  2409:18
  2419:21
  2424:18,25
  2425:2,3
  2426:8
  2427:14
  2435:23
  2436:1
  2439:23
  2440:1,1
  2447:10,11
  2449:13,17,24
  2450:14
  2453:1,12
  2454:21
  2456:7
  2462:19
  2470:19
  2473:12,15
  2476:3,23
  2477:13
  2508:3

2519:22
**prescriber**
  2478:23
**prescribers**
  2415:8
  2423:17
  2457:3,6
  2461:19
  2472:4,8
  2473:3
  2498:20
**prescribing**
  2342:16
  2395:23
  2401:4,11
  2403:11
  2408:13
  2416:4,6
  2423:5 2438:4
  2438:15
  2441:4,7,7,10
  2445:15
  2447:17
  2448:1 2468:1
  2473:5
  2514:19
  2515:1
  2517:12,12
  2518:20,26
  2519:18
  2520:1 2521:1
  2521:3,18
  2522:6
**prescription**
  2341:20
  2343:1 2344:7
  2377:18,26
  2379:1,9
  2382:9 2387:5
  2387:23
  2388:9,13,17
  2388:25
  2398:4
  2403:21

2405:19,25
  2406:11
  2408:21
  2410:18
  2413:5
  2418:11,12,22
  2419:6 2423:3
  2424:5,11,12
  2424:13,19
  2425:6
  2434:12,17,21
  2434:25
  2435:22
  2436:3,5,8,10
  2437:2,5,13
  2438:1,23,24
  2439:1,10,11
  2439:14,26
  2440:6
  2442:21
  2444:13
  2445:25
  2446:3,7,13
  2447:1
  2452:26
  2458:10
  2463:14
  2464:4,26
  2473:18,19
  2474:2,8
  2475:23
  2476:6,7,21
  2477:20
  2478:9
  2479:10
  2480:12
  2481:10
  2482:6
  2513:11,17,23
  2514:13,17,25
**prescriptions**
  2432:10
  2444:11,16,18
  2447:4,15,19

2467:16
  2468:8
  2482:19
  2500:12
**presence**
  2504:21
**present** 2465:16
  2509:19
  2514:19
  2515:2
**presentation**
  2363:18
**presented**
  2378:3 2467:4
**preserve**
  2428:16
**PRESIDING**
  1:20
**press** 2414:12
  2443:2
**pressure**
  2511:17
**pretty** 2337:18
  2361:25
  2487:2
**prevalence**
  2354:24
  2356:13,16
**previous** 2334:5
  2443:26
  2475:18
**previously**
  2332:11
  2333:9
  2345:10
  2369:9
  2390:19,21
  2426:1
  2506:19
  2512:24
**primarily**
  2413:11
  2441:25
**primary**



2344:12
2346:2,4
2376:6 2400:9
2412:26,26
2461:7
**printout** 2391:6
**prior** 2346:18
 2379:3
 2402:14
 2414:24
 2415:14
 2420:10,17
 2440:8
 2442:16
 2445:5
 2448:24
 2476:12,13,14
 2476:15
 2482:11
 2514:11
 2518:7
**prioritize**
 2407:14
**priority** 2397:23
**private** 2398:16
**pro** 1:26,26
 2330:8,19
**proactive**
 2346:7 2347:8
 2358:13
**probably**
 2381:12
 2408:23
 2418:19
 2426:23
 2460:13
**problem**
 2331:17
 2337:23
 2363:8,16,19
 2364:9
 2370:25,26
 2374:15
 2380:8,17

2395:22
2404:5 2413:9
2427:9
2433:15
2460:22
**problematic**
 2346:8
**problems**
 2347:10
 2350:23
 2363:3
 2374:17
 2380:18
 2408:2 2418:1
 2493:13
**procedural**
 2330:11
 2335:26
**procedures**
 2341:4 2349:4
 2357:21
 2361:23
**proceed** 2347:3
 2352:8
 2367:18
 2371:23
 2383:7
**proceedings**
 1:19,21 2330:6
 2523:21
 2330:12
**process** 2405:20
 2421:21
 2432:13,15
 2486:20
 2504:20
**processes**
 2427:24,24
**produced**
 2420:25
 2422:19
**product**
 2495:20
**production**

2504:23
**products** 2509:4
**professional**
 2406:1
 2412:10
 2441:26
 2443:11
 2488:8 2489:7
 2514:16,24
**professor**
 2393:22
**proffer** 2370:9
 2371:14
**proffered**
 2331:6
 2367:10
 2369:4
**proffering**
 2370:8
**program** 2349:5
 2349:7
 2356:26
 2357:2,3,4,12
 2357:13,14,17
 2357:18,21,24
 2357:25
 2358:3,7,16,21
 2359:3,11
 2360:23
 2361:13,19,21
 2362:5,23
 2363:24
 2364:14
 2365:9 2366:1
 2366:8,11,15
 2366:18,19,22
 2366:24
 2369:2,9
 2373:19
 2374:5 2375:1
 2375:1,18
 2376:2
 2381:21,23
 2383:5

2386:19
2393:25
**programs**
 2375:3
 2438:16,18,18
**progressing**
 2436:3
**progression**
 2461:5
**prolific** 2350:26
**prolonged**
 2412:1
**promote**
 2443:14
 2502:21
**promoted**
 2443:11
**promoting**
 2438:3 2490:2
**promotion**
 2399:11
 2400:6,14
 2402:2
 2438:14
 2495:15,19
 2497:4
**promotional**
 2402:10,16,19
 2443:13
 2448:14
 2449:4
 2454:13
 2462:20,23
 2463:3,6
 2471:6,8,12,13
 2471:20
 2472:15,21
 2477:11
 2479:7,7,16
 2480:3,10
 2482:4
 2494:11,12,24
 2495:21,26
 2497:8

2500:26
2501:13
2503:17
2510:22
**prompted**
 2498:19
**pronouncing**
 2475:5
**propagated**
 2416:2
**properly**
 2332:20
 2422:8
 2458:12
**properties**
 2432:2
**proposal** 2331:4
**proposition**
 2442:26
 2499:15
 2505:3
 2507:20
**propositions**
 2485:6
**protect** 2442:2
**protocol**
 2416:11,23
 2417:3
 2506:18,22
 2507:3,6
**protracted**
 2435:12
**prove** 2362:22
**proven** 2434:23
**proves** 2363:23
**provide** 2398:19
 2398:22
 2461:1
**provided**
 2453:22
 2490:20
 2509:24
 2516:1
**providers**



2415:4
2445:12
2462:8
2502:17
2507:4
2508:22
2516:3
**provides** 2364:7
**providing**
2443:21
**proving** 2369:7
**provision**
2370:13
**provocative**
2414:16
**pseudoaddicti...**
2467:7 2469:8
2469:9,12,20
2470:3,5,6,13
2470:15,17,19
2470:23
2471:10,14,19
2472:12,15,22
2472:26
**psychiatrist**
2394:23
**psychiatry**
2393:22
2394:12
2395:3
2396:10,11,13
2396:17
2397:16,18
2400:24
2413:1,12
2417:18
**psychological**
2407:23
**psychotherapy**
2492:23
**public** 2363:11
2438:17,17,18
**publication**
2421:9

**publications**
2403:9
2419:26
2420:2,6,11,15
2443:8 2517:6
2517:9
**public-facing**
2456:24
**publish** 2415:10
2415:11
2518:16
**published**
2414:10,11
2419:7,10,24
2420:3
2442:24
2451:12,13,14
2470:7
2475:25
2488:7,20
2500:15,17
2517:10,18,21
2517:24
2518:12
**publishing**
2415:14
**PubMed**
2419:12
**pull** 2333:23
2359:14,16
2366:26
2367:3 2394:4
2436:26
2449:2 2455:3
2487:8
2494:17
**pulling** 2367:1
**pupil** 2343:18
**pupillary**
2343:16
**pupils** 2343:16
**PURDUE** 1:9,9
1:9
**purely** 2424:7

**purported**
2422:4 2456:6
**purporting**
2467:5
2468:12
2497:1
**purports**
2333:15
**purpose**
2360:26
2361:1
2362:15,21
2369:3
**purposes**
2339:18
2369:6
2432:12
**pursuant**
2330:26
2332:14
2391:11
2421:12
**pursue** 2412:11
**purview**
2417:23
**push** 2336:15,22
**pushed** 2441:14
**put** 2343:10
2353:15
2362:24
2370:22
2381:5
2428:20
2437:18
2443:8 2448:3
2457:25
2474:17
2489:9
**putting** 2362:26
2497:13,16
2502:18
**P-CA-000251**
2462:15
**P-CA-000421**

2494:17
**P-CA-000921**
7:3,10 2392:18
**P-CA-001087**
2367:3,17
**P-CA-001367**
7:4
**P-CA-001687**
2462:15
**P-CA-001737**
2359:17
2362:8
**P-CA-0921**
2392:15
**P-CA-1303**
2508:7,9
**P-CA-1367**
2455:17
2456:2
2462:13
**P-CA-1391**
2478:3
2483:14
2498:3
2501:20
2511:5,23
**P-CA-1693**
2498:3
**P-CA-251**
2471:24
2472:10
2478:4
2501:20
2511:5
**P-CA-399**
2471:24
2472:10
2478:4 2511:5
2511:24
**P-CA-401**
2501:20
**P-CA-421**
2495:2
**P-CA-579**

2501:20
**P-CA-625**
2501:20
**P-0921** 2390:21
**P-1367** 2455:22
**p.m** 2430:15
2523:21
**P.O.S.T** 2361:2

_____
**Q**

**quadrupling**
2441:11
**qualifications**
2394:6
2416:10
2425:10
2442:16
2451:5
**qualitative**
2445:16
2516:2
2518:22
**quality** 2450:4
2459:21,23
**quarantine**
2407:6
**question**
2333:13,26
2341:18
2351:20
2353:9 2355:7
2355:11,14,15
2355:24
2364:23
2371:21
2372:15,21,22
2372:25
2376:13
2377:23
2381:7,11
2382:23
2383:9 2389:3
2399:6 2402:1
2410:3,8



2442:11
2443:24,25,26
2458:17
2465:13,16,24
2466:17,20,26
2467:9,12
2468:4,4,9,11
2469:11
2470:9
2474:13
2479:25
2481:20
2495:6 2504:9
2509:15
2518:19
2519:25
2521:9,20,23
2521:25
**questioning**
2353:24
**questions**
2341:13,14
2349:7 2352:7
2360:9
2367:14
2376:23
2385:5,8
2386:12
2387:8 2389:5
2389:7,9,12,15
2389:26
2412:14
2483:8 2484:6
2495:4 2496:7
2496:24,26
2512:19,26
2513:4,6,9
2514:4
**question-and-...**
2474:25
**question-by-q...**
2360:8
**quick** 2334:4
2388:6 2391:1

2391:4 2392:7
2510:26
2512:15
2513:20
**quickly** 2427:4
2427:12
**quite** 2507:1
**quote** 2358:15
2484:2 2503:8
**quotes** 2484:6
**quote-unquote**
2401:1,5
2473:11
2478:12
2482:17
2508:26
2520:20

_____
## R

**R** 4:6
**Rackauckas** 1:6
**radar** 2336:6
**raise** 2332:18
2337:15,16
2393:3
2411:14
**raised** 2336:5
2433:26
2467:19
2496:15
2512:24
**raising** 2392:6
**ramifications**
2493:4
**range** 2451:17
2451:20,21,22
2452:5,7
2453:15
**rare** 2367:12,12
2411:18
2419:21
2449:14
2453:10,20,24
2453:26,26

2454:5,22
2456:8
2458:25
2462:19
2463:12,24
2464:24
2467:6,10,15
2468:6,15,19
2494:3
**rarely** 2458:11
2458:24
**rareness** 2468:6
**rate** 2374:16
2427:7
2447:14
2454:9
**rates** 2436:11
2437:2,10
2450:11,12
2451:10,16,26
2452:11,26
2453:4
2454:14
2514:18,21
2515:1
**ratio** 2499:24
**RDR** 1:26
2330:19
**reach** 2422:8
2462:20
2469:26
2515:16
2518:5,24
2519:25
2521:15
2522:3,8
**reached**
2521:21
**reaching**
2422:25
**read** 2335:9
2372:2,14,23
2415:2
**readdress**

2335:16
**reading** 2372:3
2423:8
2461:11
2515:26
**ready** 2334:13
2337:2,7
**real** 2336:13
2445:8
2458:26
**really** 2334:25
2335:4,7,10
2392:5
2402:20
2406:3
2409:13,19
2411:26
2414:16
2417:24
2443:22
2460:19
2461:18
2475:9
**reason** 2389:4
2401:3 2425:5
2461:7,20
2479:19
2494:5 2496:1
2501:5 2510:4
**reasons** 2461:25
**reassert** 2471:1
**reasserts** 2432:7
2432:21
**reassurance**
2461:18
**reassured**
2421:14
2461:21
**recall** 2403:16
**receive** 2342:4,8
2349:15,19,22
2350:1
2368:12
2432:20

**received** 2333:7
2340:14
2342:12
2365:24
2370:13
2392:18
2400:11
2417:20
2432:10
2455:24
2459:3 2460:5
2460:7
2476:25
2490:17
2520:8
**receiving**
2402:10,23
2404:9
2459:12
2482:24
2488:22
2489:23
2490:23
2491:6 2500:1
2500:4
**receptor**
2423:23,23
2502:7,8
2509:26
**recess** 2390:15
2484:17
**recessed**
2430:15
**recipient** 2400:9
2423:10
2445:2
2503:22
2519:19
2520:4,6
**recipient's**
2482:20
**reciprocal**
2330:21
**recognition**



2342:5
2349:20
2350:4
2358:11,25
2412:22
2440:12,20
2506:23
**recognize**
2360:19
2367:24
2377:13
2439:7 2455:9
2494:18
**recognized**
2364:26
2365:1
2417:25
**recollection**
2331:12,24
2391:24
**recommendat...**
2470:22
2491:25
**recommended**
2470:18
2488:13
**recommending**
2491:18
**reconcile**
2491:22
**record** 2330:10
2334:6 2338:4
2362:10
2390:17
2391:3,10
2393:15
2431:4
2461:12
2462:12
2463:1
2471:24
2483:8
2484:19
2494:10

2496:10,16
2498:2
2500:11
2501:19
2503:1
**records** 2361:15
2362:18
**recovery** 2412:9
**RECROSS** 6:3
**recurring**
2422:11
**red** 2476:25
**redefine** 2513:6
**REDIRECT** 6:3
2389:17
**redress** 2403:24
**reduction**
2347:14,15
**reeducate**
2404:8 2418:2
**reengage** 2412:9
2412:9,10
2432:8
**reestablish**
2412:7
**Reexamination**
2389:14
**refer** 2331:1
2339:19
2358:6
**reference**
2422:2 2478:3
2480:17
2488:25
**referenced**
2412:13
2425:23
2453:9
2475:18
2512:11
**references**
2471:14
2511:4,23
**referred**

2333:19
2343:19
2344:17
2348:2 2360:4
2360:7
2361:26
2367:11
2375:11
2383:17
2392:8
2408:13
2454:24
2478:13
2480:20
2509:23
**referring**
2331:18
2344:14
2411:5 2426:4
2451:8
2462:12
2466:26
2480:25
2481:17
2482:16
**refers** 2375:12
2418:25
2498:17
**reflect** 2499:21
2503:1
**reflected** 2479:3
**reflecting**
2350:14
2498:3
**reflects** 2501:19
**refresher**
2358:1
**refugees**
2416:19
**refusing**
2416:18
**regarding**
2350:7
2353:21

2355:6 2356:5
2364:5
2369:20
2383:26
2415:13
2419:13
2496:4
**regardless**
2330:21
**region** 2438:3,4
**regular** 2413:6
2448:9
**regularly**
2516:13
**regulatory**
2415:24
**relapse** 2429:22
**relate** 2484:6
**related** 2347:23
2348:18
2379:1,9
2395:19
2396:1 2398:7
2398:22
2399:2,5
2405:11,13
2406:23
2413:26
2426:11
2443:26
2446:1
2449:10
2463:2
2477:12
2479:8 2492:6
2498:8
2501:13,24
2506:19
2519:18
**relating** 2495:7
**relation** 2416:8
**relationship**
2399:14
2438:2

2442:19
2443:6 2476:9
2500:21
**relationships**
2490:7
**release** 2428:6
2428:18
**relevance**
2363:4,15,25
2367:6
2370:11
2371:16
2376:9
2382:14
2464:5 2496:9
2508:9
**relevant** 2363:7
2363:18
2364:9
2371:12
2374:12,19,21
2382:16,17
2387:2,3,5
2422:7 2497:5
**reliable** 2434:15
2435:19
2450:2 2459:5
2473:26
2485:23
2486:12
**relied** 2391:22
2419:7 2421:3
2452:9
2494:20,23
2517:2
**relief** 2426:18
2456:22
2457:17
2460:17
2486:8,15
2499:1
2503:11,13
**relieve** 2508:13
**relieves** 2432:20



2440:14
rely 2394:5
  2422:23
  2474:18
  2489:11
  2495:24
  2518:23
relying 2518:13
remain 2332:11
  2428:14
  2431:5
  2460:13
remained
  2418:16
remains
  2435:14
remedy 2469:21
remember
  2400:22
  2404:16
  2409:15
  2456:12
  2520:17
remembered
  2429:12
remembering
  2469:14
remind 2431:5
remiss 2520:22
REMOTE 1:21
  2:1
remotely 2330:7
rep 2498:23
repeat 2353:9
  2355:24
  2364:23
  2377:23
  2379:6
  2380:14
  2384:14
repeated 2429:9
  2432:22
repeatedly
  2370:22

2520:26
repetition
  2388:3
repetitive
  2513:4
rephrase
  2355:15
replicate
  2388:13
replicated
  2500:8
report 2334:12
  2384:5 2403:6
  2421:4
  2422:16,25
  2436:2
  2438:13
  2460:3
  2469:15,16,19
  2469:25
  2470:7
  2481:19
  2486:23
  2487:14
  2495:24
  2497:18
  2517:3,7
  2518:11,18
  2519:3
reported
  2458:19
reporter 1:26,26
  2430:14
  2330:8,19
Reporter's 1:21
  2330:1,9
reports 2437:23
  2519:3
represent
  2368:18
  2377:4
  2385:14
  2428:22
  2450:12

2456:4,5
2477:17
2482:5
2483:17
2487:15
representation
  2361:1
representatives
  2455:14
  2472:2
represented
  2445:8
  2479:15
  2487:11
  2490:5
representing
  2488:8
represents
  2369:11
  2441:9
  2452:24
  2476:1
  2489:19
  2503:20
reps 2456:21
  2457:2,5
  2472:7
  2498:20
reputable
  2453:13
  2500:19
request 2335:15
requesting
  2421:21
required
  2340:16
  2384:4,7,16,19
  2401:16
requirement
  2356:19
requires 2484:3
  2503:3
  2506:25,26,26
  2507:1 2509:9

rereviewed
  2474:21
research
  2397:26
  2398:3
  2399:22
  2402:24
  2414:23,26
  2419:26
  2420:11,15,17
  2422:21
  2423:2
  2442:18,26
  2444:22
  2446:25
  2448:23
  2463:21
  2464:9,21,26
  2465:3,14,17
  2465:22,23,24
  2466:6,13,16
  2466:22
  2473:23
  2492:3
  2513:10,14
  2514:16
  2516:2,12,21
  2518:16
researched
  2466:17,19
  2516:7
researching
  2419:9
reservation
  2421:10
reserve 2496:23
reserved 2495:4
  2496:12
reserving
  2496:7,26
residency
  2394:13
  2417:21
  2520:12

residents
  2395:15,18
  2397:8 2398:7
  2403:26
residue 2344:10
resource 2347:9
  2357:15
  2449:22
resources
  2363:9
respect 2335:14
  2369:15
  2374:17
  2386:19
  2391:14
  2444:13
  2476:1
  2490:11
  2496:25
  2522:21
respirations
  2343:20
  2365:16
respiratory
  2427:5,12
  2510:11,11
respond
  2342:19
  2343:17
  2347:26
  2358:22
  2359:26
  2365:3
  2369:15
  2370:3 2375:9
responded
  2370:25
  2385:17
responder
  2339:25
responders
  2358:23
responding
  2341:26



2342:25
2346:4
2348:14
**response** 2342:4
2343:6,16
2344:12
2354:3
2362:26
2363:2
2372:20
2426:15
2504:4
**responsibilities**
2348:22
2386:18
2397:3
**responsibility**
2401:4
**responsible**
2383:25
2397:5,6
2401:2
**rest** 2335:15
2336:16
2337:2
2346:25
2482:23
**restate** 2376:13
2442:11
2443:23
2521:25
**restated**
2443:23
**restock** 2368:2
**restore** 2428:16
2429:13
2430:8 2432:3
**restored** 2429:5
2430:5
**result** 2413:20
2433:4
2434:16
2451:22,23
2461:5 2490:4

2503:25
2509:6
2510:13
**resulted**
2330:14
2443:12
**resulting**
2504:21
**results** 2347:25
2450:6
2451:21
**resuming**
2336:3
**retained**
2415:11
2420:10,18
2442:17
2448:25
**retrospectively**
2434:19
**return** 2336:14
2336:20
2460:6 2499:4
**returning**
2336:1
**reversal**
2374:16
**reversals** 2374:6
**reverse** 2383:1
2404:8
**reversible**
2504:13
2505:5,18
2506:21
2510:18,23
2511:8
**Reversing**
2383:14
**review** 2334:4
2421:18,24
2422:18
2451:11
2454:12
2481:5

2499:13
2505:16
2507:7 2515:9
2516:18,20,25
**reviewed**
2421:18
2422:18
2448:17
2456:11
2463:3 2470:4
2472:18
2480:4
2487:14
2516:16
2517:2
2518:10
**reviewing**
2422:10
2423:8
2515:15
2516:8
**revisit** 2371:21
**revisited**
2371:13
**revive** 2365:5
**reward** 2428:7
2428:19
**RICE** 2:8
**right** 2336:21
2337:6,15,16
2359:15
2379:13,20
2382:2,9
2384:1
2386:23
2388:25
2390:16
2392:13
2393:3
2398:13
2451:24
2456:15
2462:16
2466:11

2470:21
2475:1,4,5
2478:26
2479:1 2487:9
2490:25,26
2491:4,5,8
2496:7,23
2500:13,14
2501:9
2511:25
2520:23
**right-hand**
2476:19
2484:2
2489:21
**rigorous**
2469:24
**Rise** 2437:2,2
**risk** 2358:15
2408:10
2433:18,20,24
2434:4,4,19,22
2434:26
2435:3,3,25
2436:7 2439:2
2439:8,11
2447:26
2453:10
2454:3 2463:2
2463:12,23
2464:23
2465:5 2473:7
2473:22
2474:2,16,21
2476:11,16,20
2476:23,26
2482:10,11,14
2482:26
2483:1
2492:26
2499:24
2500:3,5,24
2509:11
2513:26

**risks** 2434:7
2435:22
2487:12
2506:3 2507:5
2507:8
2509:13,19,20
2517:26
**ROA** 7:8
2330:13
2332:8
2333:10,14,26
2390:20
2391:12
2392:2,17
**road** 2494:8
**Robinson** 2:3,3
2334:16,17,21
2334:22,24
2392:7,20
**Robinson's**
2391:4
**robust** 2449:22
**role** 2345:21
2347:12
2357:18
2365:26
2366:10
2396:8
2397:12,14
2398:11,19
2443:3
2475:22
**room** 2337:11
**ROSS** 3:11
**rotations**
2340:21
**roughly** 2336:7
**routine** 2479:19
**rubber** 2354:17
**ruining** 2482:23
**rules** 2428:13
2523:14
**ruling** 2372:17
**rulings** 2335:14



**run** 2502:26
  2503:10,13
  2514:9
**running**
  2416:17

**S**

**safe** 2354:16
  2397:10
  2485:23
**safely** 2395:1
**safer** 2510:10
**safety** 2356:18
  2356:24
  2411:14
**sale** 2437:10
**sales** 2348:18
  2437:4
  2455:14
  2456:21
  2457:2,5
  2472:2,7
  2498:20,23
**San** 3:6,21
**Sansome** 3:21
**Santa** 1:5 3:2,3
  2330:1
**SARA** 2:10
**SARFATI** 4:16
**sat** 2396:6,7,13
**satisfy** 2422:6
  2481:25
**saturation**
  2422:12
**save** 2362:19
**saving** 2359:6
**savings** 2495:20
**SAVITSKY**
  3:16
**savvy** 2337:18
**saw** 2365:20
  2377:8
  2392:23
  2472:14

2480:3
**saying** 2346:6
  2368:4 2409:6
  2409:12
  2410:5 2433:3
  2447:23
  2462:2 2496:6
  2502:21
**says** 2372:5
  2451:17
  2459:16
  2496:22,22
  2503:9
**sbrody@omm...**
  4:10
**scaled** 2375:22
**scared** 2416:18
**scene** 2344:6
  2347:5 2377:8
  2377:9
  2379:11,13
**scenes** 2490:1
**Schedule** 2424:5
**scheduling**
  2462:3
**Scholar** 2419:12
**scholarly**
  2395:14
  2412:24
  2423:7
**scholars** 2397:8
**SCHOLER**
  4:22
**school** 2340:3,5
  2340:9,10
  2393:23
  2398:15
  2399:17,18,18
  2417:21
  2520:8
**schools** 2351:1
  2399:4
  2438:16
**science** 2416:3

2438:13
  2443:16,17
  2445:6 2465:5
  2466:2
  2469:24
  2490:6
  2516:24
  2519:7,9
**Sciences**
  2515:23
**scientific** 2411:2
  2413:26
  2420:16
  2448:20
  2449:10
  2459:18,24
  2460:16
  2466:21
  2467:22
  2470:5 2473:1
  2473:24
  2492:4,12
  2499:14
  2504:15
  2505:3,16
  2507:19
  2515:10,16
  2516:7,9,19,20
  2516:26
  2517:1,6
  2518:10,24
**scope** 2336:17
  2363:7,16,18
  2364:9
  2369:16
  2374:15,17
  2384:10
  2386:25
  2388:1,2
**scouch@motl...**
  2:15
**screen** 2334:20
  2337:12
  2360:2

2392:11
  2476:13
  2484:21
  2520:19
  2521:10
**screening**
  2434:23
  2473:21,24,26
  2475:9
**screenshot**
  2391:6
**se** 2426:5
**SEAN** 4:23
**sean.morris@...**
  4:24
**search** 2348:19
  2515:18
**searches**
  2356:19
  2515:25
**second** 2335:25
  2337:19
  2353:12
  2405:5
  2418:17
  2429:9 2453:7
  2455:8
  2459:14
  2469:1,5
  2498:16
  2503:8
**secondary**
  2376:6
**second-to-last**
  2507:10
**section** 2368:15
  2456:3
**sections** 2488:13
**see** 2334:19,20
  2336:8
  2337:12,23
  2350:17
  2351:3 2360:9
  2366:6 2372:9

2372:14
  2376:7,16
  2377:9 2378:7
  2379:14
  2381:2 2387:8
  2392:25
  2402:15,18
  2407:8 2422:3
  2441:17
  2451:9
  2453:14,24
  2457:5 2463:1
  2465:8
  2468:18
  2476:12
  2479:2,6
  2480:9 2481:7
  2481:12
  2487:8
  2489:23
  2490:22
  2495:19
  2496:6
  2504:14
  2507:22
  2519:6
**seeing** 2402:23
  2407:7 2409:3
  2409:5 2410:4
  2418:10
  2448:7
  2519:21
**seek** 2406:7
  2496:1
**seeking** 2367:2
  2370:19,20
  2510:6
**seeks** 2367:8
**seen** 2350:16,21
  2351:4
  2379:24
  2385:18,22,25
  2422:7,13
  2449:4



2461:12
2472:17
2479:17
2495:26
2507:15
sees 2405:17
selected 2457:18
2483:12,17,21
2497:23
2501:22
selecting
2419:10
2421:3
2515:15
selections
2483:22
self 2425:14
seminar
2400:19
2402:14
semisynthetic
2424:2,6
senior 2396:8
sense 2383:1
2397:5
2409:12
2461:22
2508:16
sentence
2371:26
2372:2,9,26
2410:4 2504:8
separate 2369:8
2397:16
2405:7,10
2426:5,12
2468:6
2475:11
separated
2428:10
separately
2449:9
September
2381:24

2382:3
sequence 2438:6
2438:8
series 2505:19
2514:4
Serious 2505:15
seriously
2523:16
service 2346:5
2347:4
2348:20
2375:23
2389:12
2390:6
2397:12
2412:24
services 1:24
2348:20
2397:21,22,23
2398:20,21
2507:1
serving 2396:25
2439:19
SESSION
2330:2 2431:1
set 2482:16
2494:6
sets 2330:15,20
2331:19,23
2333:18
2482:20
setting 2502:13
seven 2339:5
2350:9
2354:22
2448:8 2491:2
severe 2407:18
2435:7,10
2436:24
2440:9
2449:26
2450:26
2451:4 2452:2
2452:2,11

2454:7
severity 2511:19
shake 2352:12
shift 2346:17,18
2346:19,24
2419:4 2440:4
2440:5
2441:10,20
2447:22
2461:19
2520:13
shifted 2418:3
2441:23
shifts 2447:21
shooting
2385:14
short 2377:5
2460:21
2485:16,22
2486:2 2493:9
2494:6
shorter 2429:10
2432:23
shortest
2416:16
shorthand
2330:11
shortly 2416:12
short-acting
2508:25
2509:1,10
show 2363:8,10
2374:16
2435:19
2458:11
showed 2422:5
2437:23
2465:5
showing 2363:1
2411:8
2419:16,20
2437:4,26
2438:26
2449:23

2452:25
2453:3,4
2460:3
2476:19
2493:16
2500:4,9,23
2502:13
2505:7,25
2507:11
shown 2392:11
2407:26
2474:4 2483:3
2483:16
shows 2364:3
2453:2 2470:6
2482:10
2499:24
2513:23
2518:2
side 2361:6
2368:15
2426:17
2428:1,2,5,18
2428:20
2429:2,10,11
2429:13,17,19
2429:25
2432:19,26
2433:8
2435:14
2476:13,19
2484:2
2489:21,22
2493:7,10
2502:18,19
2503:9
2511:14,23
Sierras 2407:5
sign 2401:15
2520:18
significance
2447:13,16
2475:3
significant

2437:14
2457:23
2462:9
2476:18
2485:19
2488:6,17
2523:3
signs 2342:5
2343:13,14,18
2343:23
2344:2
2349:20
2352:22
2358:25
2377:13
2378:2,7
2469:17
similar 2335:18
2448:17
2460:7 2463:1
2500:10
2515:25
Similarly
2472:6
simple 2344:22
2356:21
2434:7
simplest
2450:13
simply 2330:25
2335:13
2336:23
2360:6
2370:22,26
2396:4
2425:13
2458:10
2465:13
2469:21
2470:23
2478:10
2480:18
2487:4
2521:21



**single** 2386:3,8
  2391:23
  2402:14
  2429:3
  2438:26
  2459:3,11
  2481:26
**singled** 2425:26
**single-point**
  2459:2
**sir** 2386:17
  2388:20
  2390:9
**situations**
  2353:26
  2378:22
**six** 2339:5
  2354:3 2451:4
  2485:12
  2491:2
  2521:17
  2522:5
**size** 2343:17
**SKIKOS** 3:20
  3:20
**skill** 2503:4
**skills** 2397:20
**skin** 2343:18
**slide** 2361:9
  2362:3,19,19
  2362:20
  2394:4
  2395:26
  2436:26
  2437:1,4,15,18
  2437:19
  2449:2
  2451:15
  2452:21,24,25
  2453:19
  2454:16,24
  2455:26
  2456:3,4,17,22
  2457:10

2461:10,14
2467:4 2469:3
2469:3,4
2470:6
2471:16
2473:10
2474:14,17
2475:15,15,18
2475:26
2477:16,17,22
2478:3
2483:11,16
2484:10,26
2487:8,11
2488:24
2489:15
2490:15
2491:16
2497:22
2499:7,20,21
2500:23
2501:18,19
2505:11,14
2508:5
2510:25
2511:4 2521:9
**slides** 2394:2,6
  2462:26
**slightly** 2432:19
**slowly** 2394:26
  2406:16
  2445:26
**small** 2460:14
  2521:4
**smayer@hues...**
  4:20
**snorting**
  2439:20
**societies** 2442:1
  2443:12
**society** 2403:20
  2435:26
  2436:5 2489:7
  2489:9

**sold** 2434:9
  2436:17
**solemnly**
  2337:24
  2393:4
**Solutions** 1:13
  4:13
**somebody**
  2343:18
  2354:15
  2369:25
  2379:15
  2416:22
  2508:12
**son** 2409:16
**sorry** 2331:16
  2334:24
  2364:23
  2377:22
  2379:5
  2380:13
  2397:17
  2409:3
  2444:17,20
  2450:20
  2457:13
  2465:12
  2484:25
  2494:12
  2507:6
  2521:11,20
**sort** 2481:20
**sorts** 2330:24
**sought** 2360:3
  2401:19
**source** 2444:24
  2450:2 2459:5
  2475:20
**sources** 2366:23
  2435:19
  2451:9
**South** 2:13 4:23
**Southern**
  2407:7

**so-called**
  2478:16
  2482:15
**sparingly**
  2440:9,10
**speak** 2335:25
  2353:1 2376:3
  2380:23
  2382:2 2386:5
  2387:17
  2404:24
  2483:4
**speaker** 2331:17
  2337:18
**speaking**
  2332:24
  2341:19
  2353:23
  2425:17
  2431:20
**speaks** 2361:5
  2370:17
  2461:18
  2507:10
**special** 2348:21
  2361:24
  2397:19
**specialize**
  2418:3
**specialized**
  2396:5 2423:2
  2423:6 2503:4
**specialty**
  2396:12
**specific** 2332:1
  2377:14
  2379:12,14
  2421:4
  2496:25
  2503:2 2519:1
**specifically**
  2331:21
  2352:25
  2357:18

2363:2
2377:16
2398:3
2404:20
2407:17
2416:23,26
2417:4
2419:16
2420:24
2515:19
**specifics**
  2370:20
**spectrum**
  2450:25
**speculation**
  2383:21
**spell** 2338:3
  2393:15
**spend** 2345:8
  2346:10
  2348:10
**SPIEGEL** 3:5
**spike** 2446:2
**spoke** 2493:15
**spoon** 2352:14
**spoons** 2344:10
  2354:11
**spouse** 2429:24
**squash** 2509:4
**Stafford**
  2391:22
  2512:15
  2513:20
**stage** 2336:16
  2521:23
**stakeholders**
  2415:3
  2519:15
  2522:17
**stamped** 2389:1
**Stampfl** 5:13
  6:8 2335:21
  2385:10,10,13
  2385:14



2386:10,11
**Stan** 2381:5
**stand** 2340:1
2390:8
**standalone**
2467:14
**standard**
2441:22
2458:25
2466:4
2516:23
**standards**
2397:11
2415:25
2420:14
**Stanford**
2393:23
2394:10,13,14
2394:15
2395:5,9
2396:17
2397:16,22,23
2397:25
2398:15,17,18
2398:22,26
2399:1,9,17
2400:1,2
2407:2
2412:17,20
2413:4,24
2466:7,10,16
2466:23
2514:17,25
2516:13
**Stanislaus**
2341:7,9
**Star** 2479:19
**stark** 2512:4
**Stars** 4:8
**start** 2330:10
2346:16
2352:5 2401:7
2408:25
2423:21

2444:8 2458:5
2461:15
2485:6
2490:18
2504:18
2523:10
**started** 2368:3
2409:2,5
2410:4
2418:10
2429:20
2441:7,8
2445:25
**starting** 2426:3
2432:18,19
2444:19
2520:25
**starts** 2334:1
2461:16
**state** 1:1,4
2337:24
2338:3 2393:4
2393:14
2400:17,21
2405:8
2415:25
2443:5
2500:26
2510:8
**stated** 2392:10
2435:12
2458:3
2473:25
2496:17
**statement**
2335:1
2463:12
2464:2
2465:13
2467:11
2483:18
2498:20
2502:26
2330:12

**statements**
2464:23
2498:10
2515:22
**states** 2401:1,10
2420:3
2437:11
2438:13
2440:7
2441:12
2442:22
2447:4 2448:2
2458:15
2463:21
2464:1
**station** 2365:21
**statistic** 2387:16
**statistics**
2383:26
**steady** 2418:16
2510:8
**step** 2354:21
2450:10
**STEPHEN** 4:15
**Steve** 4:7
2401:24
**stimulate**
2423:23
2502:8
**stipulated**
2496:13
**stipulation**
2332:14
2391:12
2496:3
2497:10
**stool** 2395:13
2466:10
**stop** 2357:15
2414:14
2428:26
2435:5
2436:23
**stopped** 2429:23

2486:23
2504:26
**stopping** 2435:8
**straightforwa...**
2389:5
**strategy**
2411:23
2443:17
2492:23
2502:17
**street** 3:6,12,21
4:17,23
2341:19
2350:17
2356:22
2358:10
2365:22
2424:23
2434:9
2461:26
**streets** 2357:26
**strength**
2437:25
2438:5 2476:8
**strengths**
2446:20
**stricken** 2410:8
2442:10
2444:7 2504:9
**strict** 2405:26
2408:16
**strictly** 2426:7
2459:24
**strike** 2401:26
2409:25
2442:3
2443:18
2471:1
2490:10
2504:4
**striking** 2457:26
**strive** 2411:3
**strong** 2437:26
**stronger**

2429:11
2432:24
**strongly**
2488:13
2491:22
**struggle**
2396:20,23,26
2407:18
2408:23
2502:17
**struggled**
2409:6 2410:6
2505:23
**struggling**
2418:7 2504:2
**student** 2395:11
**students** 2395:6
2395:8,15,17
2397:8 2398:6
2403:25
**studied** 2443:1
**studies** 2397:26
2398:4
2419:16,19,20
2419:23
2422:24
2450:3,3,5,6,7
2450:7
2452:14,14
2453:3,18
2458:11,19,22
2475:10
2487:15,24
2488:2 2500:9
2505:19
2507:11
2519:2
**study** 2443:8
2450:15
2451:7
2452:10
2453:9
2458:13,18,23
2459:1



2470:11
2476:19
2477:5,6
2482:10
2500:13
2505:24,24
**subject** 2348:26
2350:3
2374:11
2375:12,15
2385:25
2389:5
2452:15
2484:14
**subjected**
2445:16
**subjective**
2486:15
**subjects**
2352:16
2353:23,25
2395:17
2520:10
**submission**
2330:17
**submit** 2368:7,9
2368:12,17
**submitted**
2371:2
**Suboxone**
2509:24
**subsequent**
2438:1
**substance**
2377:10
2379:15
2396:20
2397:1
2417:17
2418:1,4
2425:14
2427:19
2429:22
**substances**

2418:7 2428:4
2434:12
2436:17
**substantial**
2350:16
**substantially**
2448:17
**success** 2374:16
**successful**
2374:1,4,10,20
**suffer** 2398:23
2431:15
2513:16
**suffering**
2408:26
2413:17
2441:1 2469:8
2472:22
2507:2
2508:17
**sufficient**
2384:21
2491:24
**suggest** 2454:8
2501:1
2510:17
**suggesting**
2440:17
**suggests**
2510:22
**Suite** 3:21 4:17
5:6
**summarize**
2505:15
**SUPERIOR** 1:1
**supply** 2368:2
2384:21
2436:10
2463:13
2464:3,25
**support** 2334:11
2370:13
2399:24
2406:1 2416:6

2441:2 2453:9
2460:15
2465:17
2485:21
2487:19,20
2492:1
2493:25
2497:24
2499:6,14,17
2499:18,21
2505:2 2507:3
2518:12
**supported**
2366:7
2448:20
2459:22
2467:22
2492:12
2498:25
2504:15
**supporting**
2403:25
2490:1
2491:24
**supports**
2498:14
**supposed**
2486:25
**suppression**
2510:11
**sure** 2347:2
2357:20
2372:3
2377:25
2383:11
2384:13
2385:18
2388:22
2449:22
2462:11
2469:11
2474:12
2509:15
2511:3 2516:5

**surety** 2452:7
**surgery** 2440:9
**surprised**
2400:22
2495:22
**surprising**
2373:23
**surveillance**
2348:17
2392:16
**susceptible**
2433:13,17,19
**suspect** 2383:1
**sustain** 2343:21
**sustained**
2352:3 2355:1
2355:15
2364:17
2371:8,21
2372:12
2379:22
2384:24
2442:10
2463:9,18
2464:6,16
2479:13
2480:7
2481:22
2497:11
**SWAT** 2345:9
**swear** 2337:13
2393:1
**sweaty** 2343:20
**sworn** 2338:9,25
2345:21
2347:12
2361:18
2393:12
**symptoms**
2342:5
2343:13,23
2349:21
2352:23
2358:25

2377:13
2378:2
2406:15
2436:24
2469:7,17
2472:22
**synapse** 2428:11
**synchronicity**
2457:1,4
**syndrome**
2435:13
2436:22
2505:1
**synonymously**
2426:2
**synonyms**
2425:19
**Synthesis**
2451:11
**synthesize**
2422:15
**synthesized**
2415:4
**synthetic** 2424:7
**syringe** 2352:15
2381:17
**syringes**
2344:10
2354:11
**system** 2347:5
2352:17
2384:9,18
2456:13,16,17
2456:19
2462:8
2471:26
2472:1,5,6
**Systematic**
2451:11
**systems** 2478:26

**T**

**TA** 2395:11
**table** 2335:13,19



tackle 2413:9
tactical 2345:9
take 2334:7
  2364:19
  2373:14
  2381:20
  2390:12
  2408:6 2425:7
  2426:22,25
  2430:2
  2432:11
  2439:26
  2440:2
  2449:11
  2455:5,7
  2484:15
  2486:14,21,26
  2510:26
  2513:4 2521:9
  2523:16
taken 2344:8
  2362:25
  2378:16
  2390:15
  2408:18
  2484:17
  2508:26
  2530:13
takes 2510:7
talk 2381:19
  2427:19
  2436:2
  2445:17
  2449:9
  2457:13
  2460:3 2472:3
  2475:13
  2483:5 2485:2
  2502:11
talked 2377:6,7
  2398:25
  2402:15
  2417:8,9
  2425:9

2473:21
talking 2366:4
  2405:6
  2426:16,16,17
  2442:15
  2452:3
  2511:22
talks 2512:1
taper 2406:14
  2406:17
  2417:1,5
  2462:7
  2505:20,26
  2507:4,12
tapering 2406:2
  2408:14
  2506:23
  2507:25
target 2400:9
  2404:5 2405:1
  2441:23
  2509:3
  2520:21
tasked 2366:17
taught 2395:21
  2398:6 2399:9
  2399:9,13,16
  2400:1
  2401:15
  2403:8
  2404:13
tea 2354:13
teach 2361:3
  2395:6,8,17,19
  2395:20,23,24
  2399:1 2403:3
teacher 2398:11
teaching
  2395:14,15
  2397:7
  2398:25,26
  2399:22
  2400:4
  2402:24

2405:5
2412:24
2414:23
2417:9
2422:21
teaching/ment...
  2397:13
team 2345:9
  2347:14,15
  2394:24
  2421:18
tech 2337:18
  2359:14
technician
  2340:2
techniques
  2516:12
teeter-totter
  2427:26
TEITCHER 5:4
telehealth
  2407:6
tell 2336:17
  2341:16
  2352:6 2357:1
  2377:17,25
  2382:25
  2393:20
  2394:8 2396:1
  2400:12
  2403:18
  2404:18
  2408:4 2414:9
  2415:16
  2421:2 2430:2
  2431:15
  2439:17
  2442:25
  2451:19
  2452:9,23
  2455:11
  2456:15
  2457:22
  2460:15

2470:11
2471:25
2472:25
2475:3 2478:6
2483:11,20
2486:19
2488:1 2489:2
2489:18
2498:6
2501:22
2506:8
2509:12
2520:5
telling 2423:21
Tem 1:26,26
Temple 3:12
temporal
  2438:6
temporarily
  2432:20
tempore 2330:8
  2330:19
ten 2342:23
ten-plus
  2331:22
term 2339:19
  2341:15,17,18
  2341:22
  2374:9 2376:6
  2396:19
  2408:3
  2410:24
  2418:24
  2425:20
  2433:2
  2441:20
  2446:17
  2460:21
  2469:9,12,23
  2469:24
  2470:15
  2471:9,19
  2473:1
  2485:22

2486:1,2,18
2488:4 2492:8
2492:13
2493:9,10,17
2494:2,6
2498:11,21
2499:5
2502:11
2512:13
termed 2485:3
terminology
  2425:21
terms 2387:4
  2406:4 2434:2
  2434:6 2435:1
  2443:4
  2444:15,17
  2447:21
  2452:15,26
tested 2347:13
  2386:3
testified 2338:9
  2339:7
  2363:24
  2364:2,15
  2369:1,10,25
  2370:14
  2371:19
  2373:6
  2382:26
  2385:16
  2393:12
  2403:13,18,19
  2403:23
  2404:4
  2444:11
  2449:16
  2478:25
  2491:25
  2492:2
  2514:11,21
  2522:14
testify 2403:15
  2448:13



2467:20
2495:15
**testifying**
2369:17
2431:12
2481:18
2522:15
**testimony**
2331:25
2336:3,23
2337:24
2344:19
2352:1 2355:8
2364:5
2369:23
2370:15
2379:3
2387:19
2388:4
2391:19
2393:4
2404:11
2405:6,12
2415:17
2431:6
2463:20
2464:1 2467:4
2472:10
2523:15
**testosterone**
2493:11
**Teva** 5:2
2490:23
2491:14
**thank** 2334:23
2337:6,21,23
2338:6,11,13
2338:16
2340:23
2344:16
2349:6 2352:9
2355:16
2356:25
2360:11

2364:18
2367:19
2371:24
2373:13,15
2374:24
2376:22,24,26
2381:20
2383:10
2385:4,7
2386:10,11
2387:9 2389:6
2389:8,11,13
2389:25
2390:5,7,9,11
2390:13
2391:11
2392:13,17,20
2392:22
2393:17
2417:7
2423:18
2431:9
2442:13
2444:26
2452:18
2455:1,20
2468:22
2484:16,24
2487:7
2497:12,14
2521:12
2523:19,20
**thebaine** 2424:1
**theft** 2482:18
**themes** 2422:11
2422:12
2495:26
**theoretically**
2430:1
**theory** 2434:18
2436:2
**therapeutic**
2436:19
**therapies**

2431:21
2485:20
2509:21
**therapy** 2407:19
2411:9 2433:5
2488:7,19
2489:3
2491:18
2492:22
2517:22
**thereof** 2330:11
**thing** 2336:21
2354:11
2428:25
2464:14
2503:6 2507:6
2511:26
**things** 2343:2
2350:26
2352:10
2356:21
2378:18
2405:21
2420:3 2433:8
2436:1 2509:3
2511:21
2522:16
**think** 2330:18
2330:26
2331:10,12
2332:17
2334:18,26
2335:2,4,8
2336:21
2337:19,21
2341:21
2346:24
2347:17
2352:25
2364:8,11
2365:26
2368:3
2370:19
2377:4 2381:8

2381:22
2391:2,9
2398:12
2402:20
2403:23
2404:12
2406:3
2409:20
2423:6 2427:2
2431:26
2432:17
2437:12
2457:26
2460:19
2461:17
2466:9
2468:23
2472:3 2475:4
2478:25
2481:24
2482:1 2484:2
2489:10
2490:8
2491:26
2494:2
2495:18
2503:19
2508:11,21
2516:26
2519:14
2523:9
**third** 2477:22
**thorough**
2475:8
**thought** 2373:5
2440:25
2456:25
**thoughts**
2430:12
**thousands**
2406:25
**three** 2332:1,3
2353:16
2439:6 2451:2

2462:7 2466:9
2476:23
2479:15
2480:1
2485:11,14,17
2486:6,10,22
2487:17
2491:2
2509:22
2511:11
**three-legged**
2395:13
**thughes@laco...**
3:14
**tie** 2512:21
**TILAK** 3:3
**time** 2334:26
2335:15
2336:11
2343:7
2346:10,12
2348:9,11
2353:25
2359:26
2362:19
2366:9
2370:18
2373:4
2376:23
2385:4
2386:22
2388:20
2390:5,10,13
2391:18,25
2416:12,21
2417:22
2426:18,22,23
2427:1 2429:9
2432:22
2433:12
2440:11
2441:6,24
2445:26
2446:4



2455:18
2460:10,14,23
2460:25
2461:3,5,8
2482:13
2483:16
2484:13,15
2485:9
2486:25
2506:12,26
2508:17
2513:5
2523:10
**timeline**
2452:25
**times** 2339:9,12
2339:15
2353:15
2373:18
2375:11
2383:26
2403:19
2404:4 2447:9
2448:8
2476:26
2493:25
**tin** 2354:14
**tip** 2428:5
2429:1
**tipped** 2429:18
2429:25
2432:19
2435:14
**tips** 2428:1,2,17
**tissue** 2460:26
2485:10
**title** 2414:15
2451:7
2475:22
**titrate** 2401:8
**today** 2332:16
2336:22
2390:10
2392:14

2393:5 2399:7
2405:12
2408:21
2415:18
2425:9
2472:10
2473:21
2512:11
2514:11,22
**toe** 2343:15
**told** 2380:26
2381:21
2520:18
**tolerance**
2426:13,14,16
2426:21,26
2427:3,4,10,11
2432:23
2461:2,8
2486:11,21
2487:1 2503:7
2503:10,12
2506:15
2509:8 2512:2
2512:7
**tolerant**
2506:11
**tolerate** 2486:7
2493:9
**tomorrow**
2523:19
**Tony** 1:6
**tool** 2365:10
2410:22
2474:2,21
**tools** 2434:22
2473:22,24,26
2475:9
**top** 2366:14
2456:3 2484:7
2508:16,23
2522:23
**topic** 2399:13,21
2400:4

2414:10
2438:20
2484:12
2506:19
**topics** 2399:4
2405:11
2414:24
2415:16
2440:5
**touch** 2343:19
**tourniquet**
2359:7
**tourniquets**
2354:17
**track** 2373:26
2375:24
**TRACY** 3:11
**trade** 2342:16
**trafficking**
2348:19
2350:20
2352:22
**train** 2361:12
2362:4
2364:21,24
2366:1
2455:14
2456:21
2472:2,7
**trained** 2341:26
2349:9,12
2359:4
2362:22
2364:3,4,10
2365:2,5,9,19
2423:11,15
**trainee** 2345:3
2349:18
**training**
2340:16
2341:13,25
2342:3,8,12
2343:12
2344:1

2345:14
2346:22
2348:24,25
2349:2,2,9,15
2349:19,22,26
2358:1,10
2360:22
2361:2,7,22,23
2361:26
2363:24
2364:8,14
2365:24
2368:15
2371:10
2396:5,12
2400:16
2423:1
2456:26
2472:13
2498:23
2520:8,9
**trainings** 2382:2
**transcript** 1:21
2331:10
2332:2 2335:9
2392:7 2330:9
**transcription**
2330:10
**transcripts**
2337:3
**transition**
2344:24
**transitional**
2345:5
**transitioned**
2345:1
2347:19
**transmission**
2428:24
**transmucosal**
2509:4
**trauma** 2434:3
2435:2 2440:9
**treat** 2330:15

2405:24
2408:20
2411:13
2412:4
2416:18
2417:16
2424:26
2425:2 2432:1
2486:1,2,6
2488:4 2492:8
2492:13
2498:21
2505:15
2507:21
**treated** 2406:22
2406:25
2407:21
2431:16
2435:16,20
2453:5 2454:4
2465:6
2478:14
2499:3,25
**treating** 2377:6
2408:25
2409:9,16
2413:4
2417:16,19
2440:21
2486:16
2507:16,23
2508:20
2513:15
**treatise** 2438:19
**treatment**
2344:14
2357:14
2358:11
2365:10
2389:24
2400:19
2401:9,20
2407:12,15,16
2407:22



2410:13,16,18
2410:20,23,25
2411:9
2413:21,21
2417:23
2418:4,22
2419:17,22
2431:17,20,22
2431:24
2432:16
2437:6,7
2439:2,4
2440:26
2441:13,18
2449:13
2454:22
2456:7
2460:21
2462:19
2470:18
2474:23
2482:25
2485:4,22
2487:16,20,22
2488:14,20
2491:23
2492:16,18,25
2493:5,23
2494:4,14,14
2497:19,20,25
2498:11
2499:12,15,23
2501:1,14,25
2509:13,17,18
2510:4
2514:13
2518:1 2520:9
2520:23
**treatments**
  2431:19
  2492:20,20
  2509:19
**tremendous**
  2505:25

**trends** 2354:24
  2355:6,19
  2356:2,6
**trial** 1:19
  2332:18
  2333:15
  2392:6 2514:3
  2523:14
**trials** 2411:7
**tried** 2419:15,16
**tripping**
  2356:22
**true** 2451:22,23
  2452:7 2454:9
  2458:10
  2461:7 2474:6
  2502:12
  2511:16
  2330:10,11
**truly** 2503:23
  2512:19
**truth** 2337:26
  2337:26
  2338:1
  2363:22
  2364:12
  2369:12
  2370:2,10,16
  2371:5,15
  2380:26
  2393:6,6,7
  2421:13,14
  2434:22
  2458:3
**try** 2422:3
  2434:9
  2436:14,23
  2444:10
  2473:26
  2479:20
  2509:16
  2519:6
**trying** 2383:3
  2415:6

2416:21
2478:11
2481:24
2505:20
2508:13
**tsunami** 2436:4
**Tuesday** 1:22
  2330:1 2337:1
**turn** 2339:22
  2341:12
  2349:6 2350:6
  2356:25
  2405:4 2409:3
  2423:19
  2447:12
  2448:11
  2452:20
  2454:16
  2455:8 2457:9
  2469:1
  2477:16
  2483:9
  2484:12
  2495:12
  2497:22
  2499:10
  2501:17
  2504:11
  2505:11
  2508:5
  2512:10
**turning** 2453:19
  2471:6
**two** 2332:25
  2339:10
  2347:19
  2353:15
  2394:11
  2401:22
  2426:25
  2439:20
  2451:2
  2462:26
  2467:6 2491:2

2503:14
2510:1 2512:6
**Tylenol** 2502:22
  2502:23
**type** 2342:3
  2349:19,26
  2354:8 2384:8
  2384:17
  2389:20
  2395:13
  2420:20
  2421:11
  2431:15,24
  2463:22
  2465:23
  2466:6
  2467:26
  2494:10,12
  2501:12
  2503:17
**types** 2342:13
  2342:26
  2343:5
  2349:10,13,23
  2351:15,23
  2352:1,25
  2365:3 2418:6
  2420:9
  2423:24
  2431:17
  2515:25
  2517:11
**typical** 2375:8
**typically**
  2346:16
  2347:24
  2348:14
  2356:23
  2365:11
  2379:17
  2485:17
  2507:26

**ulcers** 2502:20
**ultimate**
  2512:22
**ultimately**
  2418:3 2509:6
**Um-hum**
  2466:12
  2519:13
**unable** 2376:20
  2406:14
  2419:22
  2436:23
**uncapped**
  2356:21,23
**uncommon**
  2441:16
**unconscious**
  2353:25,26
  2365:15
  2375:15
**underappreci...**
  2434:7
**undergoing**
  2509:13,17
**undergraduate**
  2394:9
  2399:18
**undergraduates**
  2405:3
**underlying**
  2391:9
  2460:12
  2486:17
**underneath**
  2362:11
  2451:17
  2459:16
  2460:11
**understand**
  2333:20
  2341:23
  2348:6
  2362:17
  2367:14

_____ U _____



2372:17
2374:21
2411:26,26
2415:7
2423:16
2427:17
2428:25
2429:6,7
2433:6 2444:2
2444:22,24
2460:20
2468:3
2469:11
2472:7
2496:11
2509:15
2518:2
**understanding**
2341:16
2342:15
2344:7,21
2370:1 2374:9
2391:21
2440:13
2453:23
2455:15
2512:20
2516:24
**understands**
2344:20
**understood**
2425:20
2495:22
**undertook**
2505:20
**undertreated**
2401:1,3
2520:14
**Unfortunately**
2430:6
2492:19
**unfounded**
2504:5
**unique** 2432:2

2436:16
2509:19
2510:3
**United** 2401:1
2420:3
2437:11
2440:7
2441:12
2442:22
2447:3 2448:2
2463:21
2464:1
**units** 2447:1
**universal**
2461:9
**universities**
2399:4,20
**university**
2393:23
2394:9,10
2395:9
2396:17
2397:26
2398:15,18,18
2398:22,26
2399:1,9,19,20
2404:13,14,19
2404:25
2407:2
2414:12
2466:7,11,23
2516:14
**unknowingly**
2383:16
**unmute** 2431:7
**unprecedented**
2400:25
**unrelated**
2498:13
**unresponsive**
2365:15
**untethered**
2330:25
**untrue** 2458:3

2461:4
**up-titration**
2473:6
**urban** 2372:6
**urge** 2435:15
**urging** 2416:13
**usage** 2373:23
**use** 2339:19
2341:14,20,22
2342:18
2343:2,3
2346:5 2348:5
2350:3,19,24
2351:13
2352:19,23
2353:4,14
2354:5,16,20
2358:1 2361:4
2364:22,25
2365:2,5,9
2373:18
2375:5,24
2379:26
2380:10,19
2381:9 2383:2
2383:16
2396:20
2397:1
2398:23
2401:8 2404:6
2405:26
2406:23
2407:6,24
2408:16,26
2409:7 2410:7
2410:16,21,22
2410:23
2411:13,22,23
2412:5
2416:15,16
2417:17
2418:1,4,21
2420:5,11,12
2425:14,15,18

2425:21
2426:9 2429:3
2429:9,15,22
2430:12
2431:21,23
2432:5,22
2434:20
2435:8,15,20
2438:23,24
2439:3,6,8
2440:26
2441:20
2445:21,24
2449:26
2450:4,18,22
2450:24,24
2451:3,3,4
2460:20
2461:20,23
2467:7 2469:8
2471:9,19
2472:15
2474:1 2476:8
2476:11,14,15
2477:1
2485:21
2487:19,21
2488:4,7,14
2489:3 2490:2
2492:12
2493:8 2494:2
2495:24
2498:14,20
2499:4
2502:10
2503:7
2505:22
2508:1
2509:22
2510:5 2512:4
2512:6
2513:11,12,17
2513:18
2514:12,18

2517:19,21,23
2517:26
2518:7
**users** 2352:10
2379:19
2380:4,6
**uses** 2373:22
2374:19
2425:21
2498:23
2502:2
**usually** 2485:8
**utilize** 2375:7
2516:13
**utilized** 2360:22
2365:14

---
**V**

**vague** 2380:11
2402:26
2463:7,9
2479:11
2480:5,7,14,16
**vagueness**
2466:25
2471:2
2481:16,21
**valid** 2470:1,5
2473:25
**Valley** 2407:5
**value** 2453:7
**various** 2351:2
2395:20
2396:7
2434:22
**varying** 2433:16
2474:7
**VCOC** 2348:5,9
2348:23
**vehicles** 2347:1
**vein** 2335:18
**venous** 2352:17
**venture** 2504:26
**verified** 2332:25



verify 2332:3
version 2362:2,3
   2362:4
versus 2453:24
   2457:5 2507:8
vet 2488:11
vicinity 2375:13
   2407:1,3
video 2405:22
viewed 2369:15
views 2368:19
   2369:20
   2371:1,4,6
violating
   2520:22
violent 2338:26
   2347:20,22,24
   2348:3,6,14
virtually 2407:8
virtue 2423:1
visible 2401:18
vision 2366:15
visiting 2397:8
visual 2361:1,5
   2361:5
visualization
   2344:5
vital 2401:15
   2520:18
voice 2479:18
VOIR 6:2
voluntarily
   2408:12
Vowles 2449:23
   2450:2,8,15
   2451:9
   2453:17
   2458:13,18,23
vs 1:8
vulnerability
   2433:16
   2474:7
vulnerable
   2494:6

**W**

W 3:12
wade 2443:15
wait 2335:10
   2429:3 2430:1
waiting 2335:12
   2337:11
wake 2365:17
   2427:8
walking
   2429:25
wandering
   2416:21
want 2335:7,19
   2359:8
   2371:25
   2381:19
   2385:17
   2405:4 2432:5
   2440:4
   2447:12
   2448:11
   2449:8
   2452:20
   2454:16
   2455:7
   2461:10,15
   2465:20
   2473:9
   2474:12
   2483:9,19
   2484:13
   2485:2
   2494:17
   2507:7 2508:4
   2510:26
   2512:10
   2514:2,9
   2516:5 2518:3
wanted 2421:11
   2443:14
   2457:16
   2483:20,26
   2503:1 2511:3

wanting
   2430:12
wants 2428:14
warrant
   2348:20,20
Wars 2479:19
wary 2461:19
Watson 1:13,15
   5:2,3,10,10,11
waves 2375:14
way 2344:22
   2354:13
   2374:21
   2377:9
   2381:14
   2397:11
   2398:16
   2412:6 2416:4
   2424:4,18,23
   2432:17
   2433:3
   2434:15
   2437:16
   2439:25
   2444:10
   2446:19,21
   2459:23
   2465:24
   2466:4,19,21
   2473:2 2474:9
   2479:20
   2481:24
   2482:1 2497:4
   2498:11
   2502:21
   2506:2 2507:3
   2516:21
ways 2335:2
   2364:12
   2403:23
   2404:20,22
   2439:20
   2441:25
weak 2487:19

2488:15
weaker 2429:10
   2432:23
website 2456:24
   2456:24
Webster 2474:3
week 2336:26
   2337:5 2413:7
weeks 2426:26
   2429:16
   2460:23
   2485:24
   2487:22,22
   2493:26
   2494:1
   2498:18
   2508:12
weighing
   2517:26
weight 2428:20
   2429:13,17
   2430:3 2466:4
   2513:22
weighted
   2432:26
weighting
   2433:8
weights 2428:22
   2429:3
Weimer
   2505:24
WELCH 5:13
well-educated
   2415:7
well-intention...
   2415:8
WENDY 5:5
wendy.feinste...
   5:8
went 2332:26
   2413:7
   2416:17
   2421:2,20
   2426:1

2441:11
2442:25
2446:1,3
2460:4
2476:24
West 3:6 4:17
   5:5
we'll 2335:13,16
   2335:24
   2339:1 2352:5
   2352:6
   2457:15
   2468:23
we're 2336:8
   2362:26
   2363:10
   2370:20
   2394:5
   2406:19
   2416:7
   2426:16,17
   2467:21
   2474:13
   2496:25
   2508:13
   2516:5
we've 2405:5
   2407:16
   2417:8,9
   2425:9
   2462:26
   2474:12
   2501:5
whatnot 2335:6
   2335:8
wholesale
   2331:5
   2332:10
widespread
   2440:12
willing 2421:8
will-call 2336:8
WILSON 1:20
Wing 3:6



wish 2331:8
  2335:17
wishing 2357:15
withdraw
  2331:4
withdrawal
  2406:15
  2429:2
  2435:10
  2436:22,24
  2486:12,16,19
  2487:1,5
  2505:1 2510:6
  2511:20
  2512:2,7
withdrawn 7:7
  7:8 2332:9
  2333:10
withholding
  2520:16
witness 6:3
  2330:25
  2331:1
  2332:12,12
  2335:12
  2337:7,11,14
  2337:21
  2338:2,5,8
  2351:18
  2352:4,5,9
  2353:9 2355:8
  2356:9 2360:4
  2369:18
  2371:8,19
  2372:13,23
  2373:5
  2376:13
  2377:22
  2378:15
  2379:5
  2380:13
  2384:13
  2388:20
  2390:7,11,23

2392:25
2393:1,8,11,16
2403:3
2444:26
2446:12
2464:13
2467:2,3
2481:16,17
2483:15,25
2495:14
2497:1,3,6
2513:22
2515:13
2521:25
2522:14,15
2523:17
witnesses
  2335:5,7,20
  2336:1,3,8
  2337:2
witness's
  2391:19
word 2426:1,2
words 2398:16
  2429:12
  2506:5
  2515:18
work 2336:13
  2339:1,23
  2340:6 2341:6
  2341:8,13
  2345:2,6,7
  2347:15
  2348:23
  2350:7
  2356:14,17
  2376:2,3
  2395:14,14
  2405:7
  2406:16
  2407:12
  2409:23
  2412:9,24
  2413:11,23

2421:11,16
2423:7
2424:23
2427:25
2428:16
2444:2,22
2448:24
2460:6 2464:8
2468:20
2469:10
2485:23
2505:6
2506:18
2514:16,24
2515:4
2518:13
worked 2386:19
2386:22
2394:1
workers 2460:3
  2460:5
workforce
  2404:5
working
  2350:18
  2407:9 2443:5
  2462:6
  2486:23
works 2365:14
  2366:5 2383:2
  2502:11
World 2453:20
  2453:22
  2458:24
worn 2447:24
  2486:25
worse 2433:4
  2435:11
  2460:12
  2461:6
  2507:14
worth 2412:11
wouldn't 2378:4
  2387:16

2503:25
wounds 2359:8
write 2410:18
  2415:10
writing 2415:14
  2445:11
  2447:4 2468:8
written 2371:1
  2419:13
  2438:19
  2447:19
wrong 2437:19
wrote 2372:25
  2414:11
  2415:6
www.MagnaL...
  1:25

_____

**Y**

Yale 2394:9
yeah 2388:12
  2422:17
  2461:15
  2470:14
  2471:22
  2475:6,8
  2486:3
year 2340:13
  2345:26
  2373:21
  2387:20
  2394:11,21
  2402:13
  2404:17
  2439:3,6
  2462:6
years 2339:6
  2341:10
  2345:8
  2350:10,21
  2354:22
  2373:8
  2394:11
  2395:16

2404:10
2406:4 2408:7
2413:6 2414:3
2416:12
2422:20
2427:21
2429:16
2430:2,10
2431:13
2437:5 2439:6
2508:3
yellow 2484:21
yesterday
  2330:12
  2332:7 2336:5
yesterday's
  2334:10
yes-or-no
  2355:7
YODER 4:6
young 2397:7

_____

**Z**

ZACHARY
  5:14
zachary.byer...
  5:17
ZOE 3:16
zoom 2:1 2330:6
  2371:25
  2330:13
zsavitsky@oa...
  3:19

_____

**0**

0.03 2453:8
00s 2423:12
016 2333:1
0921 2391:14,26

_____

**1**

1 1:15 3:17
  2453:11,16,25
  2453:26
  2454:1,1



2456:18
2457:20
2477:6
**1,000** 2454:2
**1:30** 2430:15
**10** 2341:10
2343:11
2408:5 2439:5
2453:25
**10,000** 2454:1,1
**100** 1:15
2438:17
2447:5 2448:6
2453:26
2500:2,3
**101** 2423:20,20
**102015** 2333:4
**102016** 2333:4
**11** 2381:6
2450:23
2512:5
**11:00** 2390:13
**12** 2341:10
2449:25
2452:1 2454:6
2460:23
2485:24
2487:22,22
2493:26
2494:1
2498:18
2508:12
**120** 2476:26
2477:8,10
**122** 2476:26
**13** 2451:18,23
2475:15
**1367** 2455:3,23
**14** 2474:14
**15** 2343:11
2346:17
2414:3
2477:16
**150** 2448:6

**16** 2374:6
2487:8,22
2491:16
**17** 2452:8
**18** 1:22 2330:1
2340:7
**18th** 2330:15
**1800** 5:6
**19** 2:5 2497:22
2518:6
**1950s** 2428:9
**1970s** 2453:3
**1980s** 2440:16
2440:19
**1989** 2441:11
2470:7
**1990s** 2440:6,8
2441:9
2514:12,19
2515:2 2518:7
2520:25
**1995** 2394:20
**1997** 2447:3,11
**1998** 2444:12
2446:8
**1999** 4:8 2437:5
2446:13
2447:3

**2**
**2** 2381:6
**2,000** 2441:17
**2.4** 2362:3
**20** 2346:17
2373:21
2374:19
2387:14,22
2390:13
2404:10
2414:3
2499:20
2500:1,2
**2000s** 2402:20
2409:2,25

2418:8,9,14,17
2441:9 2518:8
**2000-2001**
2417:25
**2001** 2400:18
2401:14
2402:8
**2002** 2409:2,25
**2003** 2394:16
2409:2,26
**2003-2004**
2409:20
**2004-2005**
2409:8
**2005** 2340:12,13
2508:7
**2007** 2447:6
2448:1
**2009** 2487:25
2488:20
2491:19
**2010** 2402:21
2437:6
2500:16
2520:25
**2011-2012**
2418:8
**2012** 2441:11
2444:12,13,19
2445:22,22,24
2445:25
2446:5,8,13
2447:2
**2013** 2517:10,17
**2014** 2345:20
2475:14,25
**2014-00725287**
1:8
**2015** 2451:12
**2015-2017**
2446:1
**2016** 2414:12,24
2415:15
2416:13

2442:24
2498:26
**2017** 2421:6
2438:13
2446:5 2447:7
2519:3
**2018** 2470:11
2474:26
2487:25
**2019** 2359:12
2366:12
2381:24
2382:5 2475:7
**2020** 2402:21
**2021** 1:22
2330:1
2330:15
**21** 2449:23
2450:11
2451:16
2501:18
**213.787.2310**
3:13
**22** 2505:11
**23** 2508:5
**2333** 7:4,5,8
**2338** 6:7
**2351** 1:26
2330:7,19
**2377** 6:7
**2385** 6:8
**2386** 6:8
**2389** 6:7
**2392** 7:3
**2393** 6:10
**24** 2340:7
2453:4
2510:25
**240** 2340:20
**2455** 7:4
**25** 2387:14,22
2395:16
2422:20
**250** 2365:25

**2523** 2330:10
**28** 2:13
**2830** 3:21
**29** 2449:24
2450:12
2451:17
**29464** 2:13

———————
**3**
**3** 2333:15,16
2334:7 2452:7
2473:11
2479:8
2480:11
2481:8
**3rd** 2345:20
**3:10** 2484:16
**300** 5:15
2365:25
**31st** 2373:21
**320** 2340:19
**352** 2359:23
2371:17
**36** 2477:6,8
**38** 2450:3,7
2451:18,24
2452:14

———————
**4**
**4** 2485:3
2497:24
2498:9
**4:14** 2523:21
**400** 4:17
**44th** 4:23
**45** 2336:7
**480** 2340:22

———————
**5**
**5** 2333:17
2334:1
2437:15
2439:5 2469:4
2473:10
2484:26


MAGNA
LEGAL SERVICES

2499:7,11
**5-17-21** 7:8
2333:10
**50** 2408:23
2418:19
2500:2,2
**500** 3:12
**510.238.6392**
3:18
**523** 4:17
**550** 2447:8

**6**

**6** 2469:4
2504:11
2511:7
**6th** 3:12,17 4:17
**600** 5:6 2516:17
2516:26
**60654** 5:15
**635** 2392:6
**66** 2381:6
**6702** 7:8
2330:13
2332:8,8
2333:10
2390:20
2391:12
2392:2,17
**6812** 2333:14,26

**7**

**70** 3:6 2348:11
**700** 2447:6
2448:1
**720** 2340:22
**75** 2427:20
**777** 4:23

**8**

**8** 2333:17
2334:1
2449:25
2452:1 2454:6
**80** 2348:11

2374:8
**80s** 2441:3
**866-624-6221**
1:24

**9**

**9th** 3:6
**9:00** 2330:3
2523:12,18
**90** 2346:12
**90s** 2423:11
2441:3
**90012** 3:12
**90014** 4:18
**90017-5844** 4:24
**90067** 4:9
**911** 2346:5
2347:4
**921** 2391:2,3,5,8
2392:9,12
**92626-7653** 5:6
**92660** 2:5
**94104** 3:21
**94612** 3:17
**95** 2451:17
2452:6
**95110-1705** 3:6

