Page 1

1                UNITED STATES DISTRICT COURT
2              FOR THE NORTHERN DISTRICT OF OHIO
3                       EASTERN DIVISION
    _____
4
    IN RE: NATIONAL PRESCRIPTION   )
5   OPIATE LITIGATION,             )
                                   ) MDL No. 2804
6                                  )
    THIS DOCUMENT RELATES TO:      ) Case No. 17-md-2804
7                                  )
    Track Three Cases             )
8                                  )
    _____
9
       VIDEO-RECORDED DEPOSITION UPON ORAL EXAMINATION OF
10
                     ANNA LEMBKE, M.D.
11  _____
12
13             11:27 A.M. EDT - 8:27 A.M. PDT
14                    MAY 28, 2021
15
16
17
18
19
20     THIS DEPOSITION IS BEING TAKEN VIA VERITEXT
    VIRTUAL/TELEPHONICALLY, AND ALL PARTIES, THE WITNESS,
21      AND COURT REPORTER ARE APPEARING REMOTELY
22
23
24
25  REPORTED BY:  JUDY BONICELLI, RPR, CCR 2322, CSR 9091

```
                                                Page 2
 1                    A P P E A R A N C E S
 2    FOR THE PLAINTIFF:
 3         LIEFF CABRASER HEIMANN & BERNSTEIN
           DONALD C. ARBITBLIT
 4         (APPEARING VIA VERITEXT VIRTUAL)
           275 BATTERY STREET, 29TH FLOOR
 5         SAN FRANCISCO, CA 94111-3339
           (415) 956-1000
 6         DARBITBLIT@LCHB.COM
 7         NAPOLI SHKOLNIK PLLC
           HUNTER J. SHKOLNIK
 8         (APPEARING VIA VERITEXT VIRTUAL)
           400 BROADHOLLOW ROAD, SUITE 305
 9         MELVILLE, NY 11747
           (212) 397-1000
10         HUNTER@NAPOLILAW.COM
11         SIMMONS HANLY CONROY
           THOMAS I. SHERIDAN
12         (APPEARING VIA VERITEXT VIRTUAL)
           112 MADISON AVENUE, SEVENTH FLOOR
13         NEW YORK, NY 10016-7416
           (212) 784-6404
14         SHERIDAN@SIMMONSFIRM.COM
15
      FOR THE DEFENDANT CVS:
16
           ZUCKERMAN SPAEDER LLP
17         KYLE A. CRAWFORD
           (APPEARING VIA VERITEXT VIRTUAL)
18         1800 M STREET, NW, SUITE 1000
           WASHINGTON, DC 20036-5807
19         (202) 778-1800
           KCRAWFORD@ZUCKERMAN.COM
20
21    FOR THE DEFENDANT RITE AID:
22         MORGAN LEWIS & BOCKIUS LLP
           JOHN K. GISLESON
23         (APPEARING VIA VERITEXT VIRTUAL)
           1 OXFORD CENTRE, 32ND FLOOR
24         PITTSBURGH, PA 15219
           (412) 560-7435
25         JOHN.GISLESON@MORGANLEWIS.COM
```

```
 1                   APPEARANCES CONTINUED:
 2   FOR THE DEFENDANT RITE AID:
 3         MORGAN LEWIS & BOCKIUS LLP
           MATTHEW R. LADD
 4         (APPEARING VIA VERITEXT VIRTUAL)
           101 PARK AVENUE
 5         NEW YORK, NY 10178-0060
           (212) 309-6141
 6         MATTHEW.LADD@MORGANLEWIS.COM
 7
     FOR THE DEFENDANT WALGREENS:
 8
           BARTLIT BECK LLP
 9         KASPAR J. STOFFELMAYR
           (APPEARING VIA VERITEXT VIRTUAL)
10         54 WEST HUBBARD STREET
           COURTHOUSE PLACE - SUITE 300
11         CHICAGO, IL  60654
           (312) 494-4400
12         KASPAR.STOFFELMAYR@BARTLITBECK.COM
13
     FOR THE DEFENDANT WALMART:
14         JONES DAY
           EDWARD M. CARTER
15         (APPEARING VIA VERITEXT VIRTUAL)
           325 JOHN H. MCCONNELL BLVD, SUITE 600
16         COLUMBUS, OH 43215
           (614) 469-3939
17         MCARTER@JONESDAY.COM
18
     FOR THE DEFENDANT GIANT EAGLE:
19
           MARCUS & SHAPIRA LLP
20         ERIN GIBSON ALLEN
           (APPEARING VIA VERITEXT VIRTUAL)
21         ONE OXFORD CENTER
           301 GRANT ST, 35TH FLOOR
22         PITTSBURGH, PA 15219-1407
           (412) 471-3490
23         ALLEN@MARCUS-SHAPIRA.COM
24
     ALSO PRESENT:  Lori Talbot, Videographer
25                   Britt Cibulka
```

Page 4

1                        I N D E X
2    WITNESS:  ANNA LEMBKE, M.D.
3    EXAMINATION BY:                              PAGE
       By Mr. Gisleson                              7
4      By Mr. Stoffelmayr                          191
       By Mr. Carter                               212
5      By Ms. Allen                                263
       By Mr. Gisleson                             269
6
7     EXHIBITS MARKED FOR IDENTIFICATION          PAGE
8     Exhibit 1     Tab 12-An article dated        103
                    October 31, 2017, entitled "The
9                   Opioid Epidemic is a Symptom of
                    Our Faltering Healthcare System"
10    Exhibit 2     Tab 13-America's Addiction      109
                    Epidemic: How Did We Get Here?
11                  OSA with Dr. Anna Lembke
      Exhibit 3     Tab 3-Section 1306.04, Purpose  160
12                  of Issue of Prescription
      Exhibit 4     Tab 8-SAMHAS In Brief article   273
13
14    CVS EXHIBITS MARKED FOR IDENTIFICATION
15    CVS Exhibit 1   A two-page document entitled  263
                      "How to Stop Drug Diversion
16                    and Protect Your Pharmacy."
17
18
19
20
21
22
23
24
25

Page 5

1              FRIDAY; MAY 28, 2021

2            11:27 A.M. EDT - 8:27 A.M. PDT

3                   --oOo--

4

5            THE VIDEOGRAPHER:  We are on the record

6    at 8:27 a.m. on May 28, 2021.  This deposition is being

7    conducted using virtual technology, and all

8    participants are attending remotely.  Audio and video

9    recording will continue to take place unless all

10   parties agree to go off the record.

11            This is Media Unit 1 in the video-recorded

12   deposition of Dr. Anna Lembke, taken by Counsel for the

13   defendants in regards to National Prescription Opiate

14   Litigation filed in the United States District Court

15   for the Northern District of Ohio, Eastern Division,

16   MDL No. 2804, Case No. 17-MD-2804.

17            My name is Lori Talbot from the firm Veritext.

18   I am the videographer.  The court reporter is Judy

19   Bonicelli from the firm Veritext.  I'm not related to

20   any party in this action, nor am I financially

21   interested in the outcome.

22            If there are any objections to proceeding,

23   please state them at the time of your appearance, and

24   we'll begin with the noticing attorney, please.

25            MR. GISLESON:  My name is John Gisleson

Page 6

1   from Morgan, Lewis & Bockius on behalf of defendant

2   Rite Aid, and I will also be asking questions on behalf

3   of the pharmacy defendants.

4            MR. ARBITBLIT:  Don Arbitblit, Lieff

5   Cabraser, Heimann & Bernstein for plaintiffs.

6            MR. SHERIDAN:  Thomas Sheridan, Simmons,

7   Hanly, Conroy for plaintiffs.

8            MR. CRAWFORD:  Kyle Crawford from

9   Zuckerman Spaeder on behalf of the CVS defendants.

10            MR. STOFFELMAYR:  Kasper Stoffelmayr for

11   the Walgreens defendants.

12            MS. GIBSON ALLEN:  Good morning, this is

13   Erin Gibson Allen from Marcus & Shapira on behalf of

14   the defendant Giant Eagle.

15            MR. CARTER:  Ed Carter from Jones Day

16   for Walmart.

17            MR. GISLESON:  Will you swear the

18   witness, please?

19            THE VIDEOGRAPHER:  Thank you.

20

21            ANNA LEMBKE, M.D.,

22     sworn as a witness by the Certified Court Reporter,

23            testified as follows:

24

25

Page 7

EXAMINATION

1

2    BY MR. GISLESON:

3        Q.  Good morning.  Thank you for making time for

4    us, we appreciate it.

5        A.  Of course.

6        Q.  I know that you've had your deposition taken

7    multiple times, and that you know the rules, but just

8    so that we're on the same page, as you know, this is a

9    formal question and answer session where the court

10   reporter is taking down all the questions that I ask

11   and all the answers that you give.  If at any time I

12   ask you a question that you do not hear, would you let

13   me know so that I can repeat the question?

14       A.  Yes.

15       Q.  If at any time I ask you a question that you

16   do not understand, would you let me know so that I can

17   rephrase the question?

18       A.  Yes.

19       Q.  And do you agree to only answer those

20   questions that you have heard and understood?

21       A.  Yes.

22       Q.  And can we have an agreement, a professional

23   understanding, that you will answer the specific

24   questions that I ask and not volunteer information that

25   goes beyond the scope of my questions?

```
 1           MR. ARBITBLIT:  I'll object to that.
 2  The witness is entitled to interpret the question and
 3  answer that she sees fits, and you're entitled to
 4  interpose objections if you feel the answers are
 5  inappropriate.
 6  BY MR. GISLESON:
 7      Q.  Dr. Lembke, would you show me the professional
 8  courtesy of asking -- answering these specific
 9  questions that I ask?
10      A.  I will do my best to answer your questions.
11  If I need to elaborate in order to best answer your
12  question, then I will elaborate.
13      Q.  That's fine.  Do you agree not to volunteer
14  information that goes beyond the scope of the question
15  or that is not necessary to elaborate?
16      A.  I will do my best to answer your questions.
17      Q.  Thank you very much.  I appreciate that.
18          So what do you do for a living?
19      A.  I am a physician.
20      Q.  With whom?
21      A.  I'm employed by the Stanford University School
22  of Medicine.
23      Q.  What position do you hold?
24      A.  I am professor.  I am medical director of
25  Addiction Medicine.  I am chief of the Addiction
```

Page 9

1   Medicine Dual Diagnosis Clinic.  I am program director

2   of the Addiction Medicine Fellowship.

3         Q.   Sounds like you're busy.  Can you give some

4   detail on what it is that you do?

5         A.   I occupy the classic three-legged stool of

6   academic medicine.  I spend about 75 percent of my time

7   seeing patients and mentoring trainees in the care of

8   patients.  And I also teach and do research.

9         Q.   Do you have any areas of specialization?

10        A.   Yes.

11        Q.   Can you describe what those are, please?

12        A.   My areas include addiction medicine and

13   everything related to addiction medicine.  I also have

14   expertise in treating pain with a courtesy appointment

15   in Stanford's Department of Pain and Anesthesia.  I

16   have expertise in epidemiology, the opioid epidemic.  I

17   have expertise in marketing as regards misleading

18   messages that instigated and significantly contributed

19   to the opioid epidemic.  I have expertise in scheduled

20   drugs, the Controlled Substances Act.  I have expertise

21   in surveillance systems to detect misuse, addiction,

22   and diversion, including prescription drug monitoring

23   system.  Again, detecting red flags.  I have expertise

24   in risk factors that contribute to addiction from an

25   environmental or health perspective.

1      Q.  The expertise that you've developed, is that

2   in part a function of the patients that you have

3   treated in?

4      A.  Yes.

5      Q.  Is it also a function of the research and

6   writing that you have done?

7      A.  Yes.

8      Q.  And in particular, have you done a fair amount

9   of research and writing concerning the use of

10  prescription opioids for treating pain?

11     A.  Yes.

12     Q.  For the patients that you're seeing, what

13  percentage have a substance use disorder of some kind?

14     A.  Approximately 80 percent.

15     Q.  Of that 80 percent, approximately what

16  percentage has an opioid use disorder?

17     A.  Approximately 50 percent.

18     Q.  Now, you used the word "addiction."  How does

19  addiction relate to a substance use disorder?

20     A.  I use addiction synonymous with DSM language

21  for substance use disorder.

22     Q.  Do you treat any patients who have pain who do

23  not have a substance use disorder?

24     A.  Yes, I do.

25     Q.  Can you describe that circumstance, please?

1        A.   I treat a large number of patients who are

2    dependent, physically dependent, on opioids but do not

3    meet DSM-5 criteria for an opioid use disorder.  I

4    treat patients who have previously been dependent on

5    opioids who have chronic pain who are no longer

6    physically dependent on opioids but continue to be seen

7    by me and in our clinic for their chronic pain, and I

8    have a number of patients who have neither opioid

9    dependence nor opioid use disorder but who do have

10   chronic pain who are treated by me and in my clinic.

11        Q.   Do you consider chronic pain to be a real

12   medical condition?

13        A.   Yes.

14        Q.   Can you give examples -- strike that.

15             How do you define chronic pain?

16        A.   Chronic pain is pain lasting most days beyond

17   the usual time of tissue healing, which is generally

18   defined as three months or more.

19        Q.   In terms of chronic pain, what are the

20   different causes that you see for chronic pain?  Strike

21   that.

22             What are some of the generally accepted cases

23   of chronic pain?

24        A.   Injury to tissues, injuries to the nerves

25   themselves, and something called centralizing pain

1    disorder, which is the locus of disease in the brain

2    itself causing pain, so neuro-susceptive, neuropathic,

3    and centralizing.

4         Q.  Now, you said that you've also written

5    concerning the prescribing and use of prescription

6    opioids.  Have you done that in peer-reviewed

7    publications?

8         A.  Yes.

9         Q.  And can you describe what "peer review" means?

10        A.  Peer review means that the article is reviewed

11   by a group of anonymous peers who have expertise in

12   that area.

13        Q.  And then they have an opportunity to make

14   suggested changes or criticisms of what you've written?

15        A.  Yes.

16        Q.  And have you also written about the

17   prescribing and use of opioids in non-peer-reviewed

18   publications?

19        A.  Yes.

20        Q.  Why is the prescribing and use of prescription

21   opioids of interest to you personally?

22                  MR. ARBITBLIT:  Objection.  Vague.

23   BY MR. GISLESON:

24        Q.  You can answer.

25        A.  Could you define what you mean by

1    "personally"?

2       Q.  Sure.  Do you consider yourself an advocate

3    for patients who have chronic pain?

4       A.  I wouldn't use a loaded term like "advocate"

5    to describe my work.

6       Q.  In terms of your focus on the use of

7    prescription opioids, has that been an important part

8    or component of your work?

9       A.  My work has focused on the use of prescription

10   opioids, yes.

11      Q.  And why did you focus your work on the use of

12   prescription opioids?

13      A.  In the early 2000s, I was seeing patients

14   coming into my clinic who were dependent, misusing,

15   and/or addicted to the opioids that their doctors were

16   prescribing or had had a past history of such.

17      Q.  And as a result of that, what did that cause

18   you to do?

19      A.  I became concerned about the ways in which

20   opioids were being prescribed, dispensed, proliferating

21   in the community, and as a result, harming innocent

22   people.

23      Q.  You wrote a book called "Drug Dealer M.D."; is

24   that right?

25      A.  The full title is "Drug Dealer M.D., How

Page 14

 1   Doctors Were Duped, Patients Got Hooked, and Why It's

 2   So Hard to Stop," yes.

 3        Q.   And did you write all the words in the book?

 4        A.   Yes, I did.

 5        Q.   And is that based on your accumulated research

 6   and analysis of the prescribing use and effects of

 7   opioid medications?

 8        A.   At that time, yes.

 9        Q.   Have you issued any written public statements

10   retracting any of the views or positions that you

11   asserted in your book?

12        A.   I have qualified some of the statements in my

13   book since its publication in recognition of, you know,

14   the impacts that some of my statements have had, but I

15   haven't formally retracted anything in my book, no.

16        Q.   What do you mean "you qualified some of the

17   statements in recognition of the impact it's had"?

18        A.   I have had some people who read my comments

19   regarding fibromyalgia and expressed concern, and so

20   I've further qualified my position on that to try to

21   make it clearer if it wasn't clear from reading the

22   book.

23            Having said that, many of those individuals

24   didn't actually read my book.  They just read tweets

25   about my book.  Nonetheless, you know, in the spirit of

Page 15

1  compassion, I have tried to make that aspect clearer.

2       Q.  Anything else?

3       A.  No.

4       Q.  You graduated from Yale undergrad in 1989; is

5  that right?

6       A.  Yes.

7       Q.  And you also went to Stanford Medical School;

8  is that correct?

9       A.  Yes.

10      Q.  And you graduated in 1995?

11      A.  Yes.

12      Q.  Now, at that time, was Stanford considered one

13  of the top medical schools in the country?

14      A.  I think so, yes.

15      Q.  And has it consistently been considered one of

16  the top medical schools in the country from when you

17  attended in the early 1990s to the present?

18      A.  Yes.

19      Q.  And when you were in med school, certainly

20  they taught you how to prescribe opioid medications; is

21  that right?

22              MR. ARBITBLIT:  Objection.

23              MR. GISLESON:  Strike that.

24  BY MR. GISLESON:

25      Q.  Did any of your medical training in medical

1    school involve the prescription of opioid medications

2    for pain?

3         A.  Yes.

4         Q.  When were you hired by plaintiffs' Counsel in

5    this case, by the plaintiffs' lawyers?

6         A.  In 2017.

7         Q.  When in 2017?

8         A.  I believe it was the spring of 2017.

9         Q.  In how many different cases have you issued

10   reports?

11              MR. ARBITBLIT:  Objection as to

12   vagueness as to "issued" in terms of not disclosing

13   where Dr. Lembke has not been officially disclosed in

14   any particular case and which she might not know the

15   answer to that as to whether she's been disclosed.  So,

16   Counsel, I'd just ask for a little understanding of

17   that.  But I'm happy to recount them for you, if you

18   like.

19              MR. GISLESON:  No thanks.

20   BY MR. GISLESON:

21        Q.  So, Dr. Lembke, how many different cases have

22   you had your deposition taken?

23        A.  I've been deposed in the MDL case.  I've been

24   deposed in the New York case.  I've been deposed in the

25   California Santa Clara case.  And I believe I've been

Page 17

1    deposed in the West Virginia case.

2         Q.  Are you on retainer with the plaintiffs'

3    lawyers?

4         A.  I don't know what "retainer" means.

5         Q.  Have you been billing the plaintiffs' lawyers

6    for your time?

7         A.  Yes.

8         Q.  Have you been paid in full?

9         A.  Yes.

10        Q.  Can you approximate how much money you've

11   received to date from the plaintiffs' lawyers in the

12   different opioid cases?

13        A.  I don't know.

14        Q.  Can you estimate in any way?

15        A.  It's more than $100,000.

16        Q.  Is it more than $250,000?

17        A.  Over the cumulative years, probably.

18        Q.  Yes?

19        A.  I'm not sure.

20        Q.  Is it likely over $500,000?

21             MR. ARBITBLIT:  And I object just for a

22   moment, Counsel.  I want to understand what you're

23   asking and see whether you are agreeing to reciprocal

24   information when you say "all of the opioid litigation"

25   as opposed to a particular case.  Are you saying -- are

Page 18

1   you committing that your experts will answer the same

2   question?  Because if so, I will allow her to answer.

3   If not, I'll instruct her not to.

4   BY MR. GISLESON:

5       Q.  Let me take a step back, then, before we get

6   to that.  Approximately how much have you been paid for

7   writing your opinion in this case against the chain

8   pharmacy defendants?

9                    MR. ARBITBLIT:  Object to form.

10                   THE WITNESS:  I do not know.

11  BY MR. GISLESON:

12      Q.  Throughout this deposition, I'll refer to the

13  chain pharmacy defendants or the pharmacy defendants or

14  defendants.  Whenever I do that, I'm referring to CVS,

15  to Giant Eagle, to Rite Aid, to Walgreens, and to

16  Walmart.  Do you understand that?

17      A.  Yes, I do.

18      Q.  And for the prior reports, you said you've

19  been deposed in four cases before this one, those cases

20  all focused on the manufacturers or the big three

21  distributors:  AmerisourceBergen, Cardinal, and

22  McKesson; is that right?

23      A.  Yes.

24      Q.  And this is the first time in any opioid

25  litigation where you have expressed opinions concerning

Page 19

1   dispensing of prescription opioid medications by

2   pharmacists as -- by pharmacies as defendants; is that

3   correct?

4                    MR. ARBITBLIT:  Object to form.  Vague.

5   Are you talking about the written reports or in

6   testimony?

7   BY MR. GISLESON:

8        Q.  We'll start with the written reports.  This is

9   the first time in any opioid litigation where you have

10  expressed opinions concerning the dispensing of

11  prescription opioid medication by pharmacy defendants

12  in an opioid lawsuit, correct?

13       A.  No, that is not correct.

14       Q.  When was the other one?

15       A.  The report for the distributor case has

16  opinions regarding pharmacy defendants.

17       Q.  As to the distribution of opioid medications?

18                    MR. ARBITBLIT:  Object to form.

19                    THE WITNESS:  As to the collaboration

20  between distributors and pharmacy defendants.

21  BY MR. GISLESON:

22       Q.  And we'll come back to that collaboration you

23  say.  Now, is there a clinical definition for pain?

24       A.  There are multiple clinical definitions for

25  pain.

Page 20

1      Q.  How do you define pain?

2      A.  I -- is the question how do I define pain?

3      Q.  Yes.

4      A.  Pain is both a physical and emotional

5  experience of suffering as defined by the patient,

6  manifested in the body.

7      Q.  Is there any way to objectively measure an

8  individual's pain?

9      A.  No.

10     Q.  You said that pain includes suffering as

11  defined by the patient.  What do you mean "as defined

12  by the patient"?

13     A.  Pain is highly subjective.

14     Q.  So that in assessing an individual's pain,

15  it's necessary to look at the specific condition and

16  situation of the individual patient?

17     A.  That is certainly part of what I would look

18  at, yes.

19     Q.  Can an individual experience physical pain in

20  the absence of any identifiable disease process?

21     A.  Yes.

22     Q.  Can an individual experience pain in the

23  absence of a recognizable physical injury?

24     A.  Yes.

25     Q.  Now, prior to the 1980s, how were doctors

1    treating pain?

2              MR. ARBITBLIT:   Objection.   Vague.

3    BY MR. GISLESON:

4        Q.   Dr. Lembke, based on your research and writing

5    as well as the training you've received, do you have an

6    understanding as to how doctors were treating pain

7    prior to the 1980s?

8        A.   They were using a multimodal approach, and

9    they were using opioids very sparingly only for people

10   in severe distress, short-term, and at the very end of

11   life.

12       Q.   What do you mean by "multimodal"?

13       A.   They were using multiple different methods

14   including medications, but not exclusive to

15   medications.   They were including various methods that

16   target pain in different ways other than medication.

17       Q.   Why do you believe that the doctors were

18   prescribing opioid medication sparingly?

19       A.   My research has shown that doctors were very

20   cautious when it came to opioid prescribing prior to

21   the 1980s and 1990s because they were concerned that

22   their patients would get addicted.

23       Q.   What changed in terms of doctors' prescribing

24   practices with opioid medications for pain?

25       A.   In the late 1990s, doctors began to prescribe

Page 22

1    opioids for minor and chronic pain conditions as a

2    result of being duped by the opioid pharmaceutical

3    industry.

4         Q.   What percentage of doctors, in your view, were

5    duped by the opioid pharmaceutical industry?

6              MR. ARBITBLIT:  Objection.  Vague.

7    BY MR. GISLESON:

8         Q.   Take a step back.

9              Dr. Lembke, have you done anything to try and

10   quantify the number of doctors who in your view were

11   duped by the opioid pharmaceutical industry?

12        A.   The research that I did for my book included

13   qualitative interviews with multiple providers who had

14   trained in different settings, across different years,

15   who had different specialties, and the majority of them

16   reported being duped by the opioid pharmaceutical

17   industry.

18        Q.   Is it your belief that a majority of doctors

19   who were prescribing opioid medications were duped by

20   the opioid pharmaceutical industry?

21        A.   Yes, it is.

22        Q.   Were any doctors in Lake County or Trumbull

23   County, Ohio, duped into prescribing opioid

24   medications?

25        A.   Since the campaigns to mislead doctors were

1   national campaigns, I have no reason to believe that

2   the doctors in Lake and Trumbull County were an

3   exception.  So I think it's very likely that they too

4   were duped into overprescribing.

5        Q.  Now, in terms of the standards for prescribing

6   opioid medications, we're obviously talking about

7   doctors.  Do the same standards apply to nurse

8   practitioners, dentists, and physician assistants who

9   had prescriptive privileges to opioid medications as

10  applied to doctors?

11                 MR. ARBITBLIT:  Objection.  Compound.

12  BY MR. GISLESON:

13       Q.  Let me rephrase the question.

14            In terms of the prescription of opioid

15  medications for pain, how did the standards that

16  applied to doctors compare to the standards that

17  applied to other prescribers of opioid medications?

18       A.  Could you define "other prescribers"?

19       Q.  Sure.  Nurse practitioners, physician

20  assistants, dentists, and anyone else who had a DEA

21  license that permitted them to prescribe opioid

22  medications.

23                 MR. ARBITBLIT:  Same objection.

24                 THE WITNESS:  The paradigm shift that

25  occurred in opioid prescribing beginning late 1990s was

Page 24

 1    a national paradigm shift.  It shifted the culture in

 2    medicine across the board around opioid prescribing,

 3    and as such, I believe that anybody who prescribed

 4    opioids was affected by that paradigm shift.

 5    BY MR. GISLESON:

 6        Q.  When you talk about a paradigm shift, do you

 7    mean that the medical standard of care for prescribing

 8    opioid medications changed?

 9                    MR. ARBITBLIT:  Objection.

10                    THE WITNESS:  No, I wouldn't use that

11    language.

12    BY MR. GISLESON:

13        Q.  What do you mean by a paradigm shift?

14        A.  I mean that it became commonly accepted for

15    opioids to be first-line treatment for many different

16    types of pain conditions, and that doctors were shamed

17    through the use of terms like "opioid phobia" and

18    quote, unquote, undertreatment of pain, into

19    prescribing more opioids and they were also misled into

20    believing that opioids are more effective than they

21    actually are and less risky than they actually are.

22              In particular, they were told that as long as

23    they were prescribing to a patient with a bona fide

24    pain condition, it was very unlikely or very rare that

25    that patient would become addicted to the opioid that

Page 25

```
 1    they were prescribing.
 2         Q.   What do you mean by first-line treatment?
 3         A.   Opioids became the go-to remedy for all
 4    different types of pain.
 5         Q.   When you say it was commonly accepted for
 6    opioids to be the first-line treatment for many
 7    different types of pain conditions, does that mean that
 8    there was a national practice in terms of the
 9    circumstances under which prescription opioids
10    medications could be prescribed for pain?
11                   MR. ARBITBLIT:  Object to form.
12             (Reporter clarification.)
13    BY MR. GISLESON:
14         Q.   Sorry.
15             With a paradigm shift, what was the medical
16    standard of care based on your research and analysis
17    for prescribing opioid medications for pain?
18                   MR. ARBITBLIT:  Objection.
19                   THE WITNESS:  I'm not sure how you're
20    defining the term "standard of care" or how you're
21    using that term in this question.
22    BY MR. GISLESON:
23         Q.   Under what circumstances, once this paradigm
24    shift occurred, were doctors consistent, with their
25    professional medical responsibilities, permitted to
```

Page 26

1    prescribe opioid medications for pain?

2                    MR. ARBITBLIT:  Objection.

3                    THE WITNESS:  Again, the way you frame

4    the question in terms of "permitted to prescribe," I'm

5    not quite sure what you're getting at or how best to

6    answer that.

7    BY MR. GISLESON:

8        Q.  Did doctors violate any professional codes

9    applicable to the practice of medicine by prescribing

10   opioid medications for pain?

11                   MR. ARBITBLIT:  Objection.  Overbroad.

12                   THE WITNESS:  Could you be more specific

13   about what codes you're referring to?

14   BY MR. GISLESON:

15       Q.  Sure.  Were there standards that applied to

16   doctors once this paradigm shift changed for when

17   opioid medications could be prescribed for pain?

18                   MR. ARBITBLIT:  Objection.

19                   THE WITNESS:  Yeah, what do you mean by

20   "standards"?

21   BY MR. GISLESON:

22       Q.  As a medical doctor, you don't know what a

23   standard is when it comes to prescribing opioid

24   medications for patients?

25                   MR. ARBITBLIT:  Object to form.

Page 27

1   Argumentative.

2                   THE WITNESS:  To me, that's a vague term

3   that is not commonly used among doctors.  We don't talk

4   about standards.

5   BY MR. GISLESON:

6       Q.  What word or phrase do you use to describe

7   what the protocol or practice is for prescribing opioid

8   medications for pain?

9       A.  We talk about evidence-based medicine.  We

10  talk about guidelines.  We talk about quality measures.

11      Q.  Once this paradigm shift occurred, in your

12  view, did doctors at that point have discretion to

13  prescribe opioid medications as a first-line treatment

14  for pain?

15                  MR. ARBITBLIT:  Objection.  Overbroad.

16                  THE WITNESS:  Yeah, I'm not sure quite

17  what you mean by "did they have discretion."

18  BY MR. GISLESON:

19      Q.  Did the medical profession, once this paradigm

20  shift occurred, make any effort to standardize the

21  prescribing of opioid medications for pain?

22                  MR. ARBITBLIT:  Objection.  Overbroad.

23                  THE WITNESS:  It wasn't so much a matter

24  of standardizing.  It was a matter of what the messages

25  were around the benefits and harms of opioids as well

Page 28

1    as other incentives that would influence prescribing

2    one way or another.

3    BY MR. GISLESON:

4        Q.  Your view was that the paradigm shift in

5    medicine toward liberal opioid prescribing has been a

6    major factor contributing to the increased supply that

7    fueled, in your view, the opioid epidemic; is that

8    right?

9        A.  Yes.

10       Q.  When you say that the paradigm shift was a

11   major factor contributing to the increased supply of

12   opioid medications, what do you mean?

13       A.  I mean that through false and misleading

14   messages on the part of defendants, prescribers were

15   misled into believing that opioids are more effective

16   for the treatment of pain than they actually are, in

17   particular chronic pain, and that the risks of

18   prescribing, even at very high doses, even for very

19   long duration, were minimal.

20            Doctors were also told that pain was

21   undertreated, that it was essentially their fault

22   because they were not prescribing enough opioids; they

23   were opioid phobic.  And doctors were furthermore

24   educated that because the chances of their patients

25   getting addicted to the opioids, they were prescribing

Page 29

1    was very low, that they essentially needn't pay much

2    attention to that problem, and that if a patient

3    presented looking as if they might be developing an

4    addiction, they were actually pseudo-addicted and the

5    proper response was to go up on the opioids.

6         Q.  So the change in -- strike that.

7              This paradigm shift then resulted in a larger

8    number of opioid medications being prescribed?

9         A.  Yes.

10        Q.  And in your view, were doctors acting in the

11   belief that there was a legitimate medical purpose for

12   prescribing opioids medications for pain?

13                  MR. ARBITBLIT:  Objection.  Overbroad.

14                  THE WITNESS:  I do believe that the

15   majority of doctors believed that they were prescribing

16   for a legitimate medical purpose.

17   BY MR. GISLESON:

18        Q.  When you say a majority, approximately how

19   many?

20        A.  I couldn't really put a number on it.

21        Q.  Can you estimate it in any way?

22                  MR. ARBITBLIT:  Objection.

23                  THE WITNESS:  Not beyond saying

24   majority.

25

Page 30

1    BY MR. GISLESON:

2         Q.  Is it your belief that a majority of the

3    prescribers in Lake and Trumbull Counties, Ohio,

4    believed that there was a legitimate medical purpose

5    for prescribing opioids for pain?

6         A.  Because they were duped, I do believe that the

7    national campaign spread to every corner of America and

8    includes Lake and Trumbull Counties.

9         Q.  And pain, in fact, had been undertreated is

10   that right?

11        A.  Pain is still undertreated if you look at

12   outcomes, especially for chronic pain.

13        Q.  Before the paradigm shift, had pain been

14   undertreated?

15        A.  It really depends how you're defining

16   undertreatment.

17        Q.  How do you define undertreatment as it existed

18   prior to the paradigm shift?

19        A.  The truth is we have very poor treatments for

20   chronic pain, and in that sense, chronic pain is

21   undertreated because we don't have good treatments, but

22   I do not agree with the premise that opioids are

23   underprescribed or were underprescribed prior to the

24   1990s.

25        Q.  For how long have there been poor treatments

Page 31

1    for chronic pain?

2        A.  To this day, we continue to have very limited

3    ability to effectively treat people with severe chronic

4    pain.

5        Q.  Was there poor treatment for chronic pain both

6    before and after the paradigm shift?

7        A.  Yes.

8        Q.  Why, in your view, is there poor treatment for

9    chronic pain?

10       A.  Modern medicine and modern science has yet to

11   figure out how to effectively treat chronic pain.

12       Q.  Has that been a process of trial and error

13   from before the paradigm shift to the present?

14                MR. ARBITBLIT:  Object to form.

15                THE WITNESS:  I'm not sure what you mean

16   by "trial and error."

17   BY MR. GISLESON:

18       Q.  Has the medical profession pursued different

19   approaches to the treatment of pain over time?

20       A.  Well, the medical profession pursues different

21   treatments to all kinds of diseases for which there is

22   not good treatment.

23       Q.  And that applies to pain?

24       A.  Yes.

25       Q.  Do you have any explanation, based upon the

Page 32

1    research, analysis, and training you've done, as to why

2    it is that even until today modern medicine still has

3    not developed good treatment for chronic pain?

4         A.   I'm sorry, could you restate the question?

5         Q.   Do you have any understanding, based on the

6    research, analysis, and training that you have or have

7    performed, why it is that even to this point modern

8    medicine still does not have good treatment for chronic

9    pain?

10         A.   Chronic pain is simply difficult to treat.

11         Q.   Do doctors and other prescribers exercise

12   professional judgment in identifying what the

13   prescriber believes to be an appropriate course of

14   treatment for pain?

15                   MR. ARBITBLIT:  Object to form.

16                   THE WITNESS:  Prescribers and other

17   healthcare professionals can only exercise judgment if

18   they're exercising their judgment on facts and good

19   information.  If they don't have access to the facts

20   and to the science, then they're not able to -- or to

21   the data, they're not able to exercise their judgment.

22   BY MR. GISLESON:

23         Q.   Now, this paradigm shift affected your

24   generation of doctors?

25         A.   Yes.

1    Q.  Can you describe what you were taught in

2  medical school about pain?

3    A.  I received a little training in medical school

4  about pain, not all that much, and the same is true for

5  addiction.

6    Q.  Were you told at that time while in medical

7  school that pain was undertreated?

8    A.  Yes, I believe so.

9    Q.  And do you believe that that was occurring,

10  from the research you've done at medical schools all

11  across the country, that folks in medical school were

12  being told that pain was undertreated?

13                MR. ARBITBLIT:  Objection.

14                THE WITNESS:  I do believe that there

15  were messages in medical schools at that time that pain

16  was undertreated, yes.

17  BY MR. GISLESON:

18    Q.  When you were in medical school, did Stanford,

19  one of the elite medical schools in the country at the

20  time, provide information to you about the risks

21  associated with prescribing opioid medications?

22    A.  Very little.

23    Q.  Why do you believe that was?

24                MR. ARBITBLIT:  Objection.

25                THE WITNESS:  The understanding of

1 addiction, especially to prescription medications, has

2 been relatively ignored in medical school education

3 until more recently.

4 BY MR. GISLESON:

5     Q.  When you say, "more recently," when?

6     A.  As I've written, one of the silver linings of

7 the tragedy of the opioid epidemic is that it has

8 forced medical schools to acknowledge the problem of

9 addiction and to recognize that addiction is disease

10 and that we, as healthcare providers, have a

11 responsibility to target and treat the disease of

12 addiction.

13     Q.  When you were in medical school, were you

14 provided information about how to monitor for misuse or

15 abuse of prescription opioid medications?

16     A.  Not that I recall, no.

17     Q.  You mentioned that doctors were shamed into

18 prescribing opioid medications.  Can you explain that?

19     A.  Yes.  Starting in the late 1990s, early 2000s

20 through multiple different educational pathways

21 including peer-reviewed literature, continuing medical

22 education, and drug reps showing up on our doorsteps,

23 Joint Commission standards, Federation of State Medical

24 Board standards, various guidelines of physicians, were

25 told, No. 1, that pain is undertreated, and No. 2, that

Page 35

1  part of the reason that pain is undertreated is because

2  we, prescribers, are opioid phobic.  And if we would

3  just prescribe opioids more liberally to our patients

4  in pain, then pain wouldn't be undertreated.

5      Q.  Do you believe that that shaming, as you

6  describe it, had an effect on opioid prescribing

7  practices among doctors and other prescribers?

8      A.  Yes, I do.

9      Q.  That shaming came through professional medical

10  organizations to doctors?

11              MR. ARBITBLIT:  Objection.

12  BY MR. GISLESON:

13      Q.  Did any professional medical organizations

14  engage in shaming of doctors to cause them to prescribe

15  more opioid medications?

16              MR. ARBITBLIT:  Objection.

17              MR. GISLESON:  On what basis?

18              MR. ARBITBLIT:  It's vague.

19  BY MR. GISLESON:

20      Q.  Do you know what a professional medical

21  organization is, Dr. Lembke?

22      A.  Yes.

23      Q.  Did any professional medical organizations

24  engage in shaming of doctors?

25      A.  Yes.

Page 36

1      Q.   Which ones?

2      A.   The American Academy of Pain Medicine, the

3  American Pain Society, the Joint Commission, the

4  Federation of State Medical Boards.

5      Q.   Do any of those have regulatory authority over

6  doctors who prescribe opioid medications?

7                 MR. ARBITBLIT:  Objection.  Calls for a

8  legal conclusion.

9  BY MR. GISLESON:

10     Q.   Do you have an understanding, based on your

11  own experience as a doctor and the research writing and

12  experience you have in the medical profession including

13  as to opioid medications, whether any of those entities

14  that you identify play a role in regulating doctors?

15     A.   Well, they all played a role.

16     Q.   And when you say they played a role in

17  regulating doctors, how?

18     A.   Well, the Joint Commission is a very powerful

19  organization that sets quality measures that hospitals

20  have to follow in particular if they want to get Joint

21  Commission accreditation and receive Medicaid and

22  Medicare reimbursement.  And the Joint Commission was

23  instrumental in propagating the idea of pain as a fifth

24  vital sign, including using material provided by them

25  by Purdue Pharma to train doctors on how to meet their

Page 37

1   pain quality measures, including material that

2   reiterated many of the false and misleading messages

3   around opioids from the undertreatment of pain and

4   opioids being the answer to that, to the problem being

5   the doctors being opioid phobic, to pain being

6   effective for longer than it is effective and with less

7   risk.  Those were all parts of the myths that were

8   propagated.

9           The Federation of State Medical Boards,

10  likewise, has an enormous influence on how physicians

11  practice.  Physicians are very fearful of getting

12  citations or being sued if they violate the standards

13  of the Federation of State Medical Boards.  And the

14  Federation of State Medical Boards collaborated with

15  opioid manufacturers to publish a book by Scott Fishman

16  called "Responsible Opioid Prescribing" as well as to

17  establish state guidelines around opioid prescribing,

18  all of which included pro-opioid messages that were

19  inconsistent with the science.

20          Professional medical societies like the

21  American Academy of Pain Medicine, the American Pain

22  Society, had many on their leadership committees and on

23  their board who were paid consultants by pharma.  In my

24  report, I refer to the deposition of -- can I look at

25  my report for a moment?

Page 38

1      Q.  Of course.

2      A.  I believe his name is Joel Saper, but he was a

3   member of those professional medical societies who from

4   the inside attested to the fact that the abstracts that

5   were chosen and the talks that were given were very

6   heavily influenced by what he called narcopharma.

7      Q.  Do you consider those professional

8   organizations to have acted in the best interests of

9   the doctors that they were regulating?

10     A.  No.

11     Q.  Do you consider those professional medical

12  organizations to have acted in the best interest of the

13  patients who were being treated for pain by the doctors

14  who they regulated?

15     A.  No.

16     Q.  Well, didn't the academic institutions like

17  Stanford speak up and object to the Joint Commission or

18  the State boards of medicine with respect to what they

19  were instructing about the use of opioid medications

20  for pain?

21     A.  Yes.

22     Q.  How?

23     A.  Well, I was one of the earliest voices from

24  inside the medical profession to talk about those very

25  things with the publication of my book and also, yeah,

Page 39

1   with the publication of my book in 2016.

2        Q.  Why, in your view -- strike that.

3            Now with all these different professional

4   medical organizations promoting the treatment of pain

5   with opioid medications, what effect did that have, in

6   your view, based on your research and your training, on

7   which specialties were prescribing opioid medications?

8        A.  I have published on this topic, and I have

9   demonstrated that across all medical specialties,

10  doctors increased prescribing.  This was not the result

11  of the small subset of so-called pill-mill doctors.

12  This was a paradigm shift across medical specialties.

13       Q.  Were there any medical specialties that

14  refused to liberally prescribe opioid medications for

15  pain?

16       A.  It essentially became impossible to refuse to

17  do that in the climate that was created in the early

18  2000s and continuing to some extent into the present

19  day.

20       Q.  Were any of those medical organizations,

21  whether the state Board of Medicine or the Joint

22  Commission ever threatening disciplinary actions

23  against doctors who failed to treat a patient's pain?

24       A.  Yes.

25       Q.  To what extent did that happen?

Page 40

1        A.   In my book, I specifically refer to two cases

2    brought against individuals, prescribers in California,

3    who were sued for failing to adequately treat their

4    patient's pain.

5        Q.   Sued by the medical board?

6        A.   I think the plaintiffs were the individuals

7    who were allegedly harmed.

8        Q.   The patients?

9        A.   Yes.

10        Q.   The Ohio Board of Medicine regulates doctors

11    who prescribe opioid medications in Ohio; is that

12    right?

13        A.   Yes.

14        Q.   Did the Ohio Board of Medicine similarly

15    encourage doctors in Ohio to liberally prescribe opioid

16    medications for pain?

17        A.   Can I look at my report for a moment?

18        Q.   Yes.  If this is going to take a while,

19    Dr. Lembke, we can move on.

20        A.   Yeah, I think I have something in my report.

21    I can't find it now.  I can try to answer this question

22    later after having --

23        Q.   I can go back to it.  But is it your belief

24    that doctors in Ohio, like doctors elsewhere in the

25    country, felt under pressure to prescribe opioid

Page 41

1    medications for pain?

2         A.   Yes.

3         Q.   And that was true for both acute pain as well

4    as chronic pain?

5         A.   Yes.

6         Q.   In terms of the medical specialties that were

7    prescribing opioid medications, did that include

8    primary care?

9         A.   Yes.

10        Q.   Oncology?

11        A.   Yes.

12        Q.   Surgeons and different disciplines?

13        A.   Yes.

14        Q.   Orthopedic doctors?

15        A.   Yes.

16        Q.   Geriatric doctors?

17        A.   Yes.

18        Q.   Dentists?

19        A.   Yes.

20        Q.   What other practice areas were prescribing

21   opioid medications for pain?

22        A.   Many different types of doctors were and are

23   prescribing opioids for pain as well as non-M.D.

24   practitioners like nurse practitioners.

25        Q.   Are there any other medical specialties that I

Page 42

1  didn't identify that were also prescribing opioid

2  medications for pain?

3      A.  Yes.  If you look at my report, I do cite the

4  article that we published using a Medicare 2013

5  database, looking at who was prescribing opioids, and

6  there it includes a long list of the specialties,

7  longer than what you stated.

8      Q.  Which practice areas or medical specialties

9  were prescribing the most opioid medications for pain?

10              MR. ARBITBLIT:  Objection.  Vague.

11  BY MR. GISLESON:

12      Q.  Let me rephrase the question.

13          Did you do any analysis to determine who was

14  prescribing the most opioid medications by medical

15  specialty?

16      A.  Yes.

17      Q.  Who was it?

18      A.  I'd like to look at that part of my report

19  just so I'm precise.  I do remember, but I want to get

20  it just right.

21      Q.  I think if you go to page 24 you wrote, "By

22  specialty, pain doctors prescribe more opioids than

23  doctors in any other specialties; however, by volume,

24  family medicine and internal medicine doctors account

25  for the most opioids because there are more of them."

1          I had trouble understanding the difference

2     about who was actually prescribing more.  In terms of

3     MME, which is morphine milligram equivalent, which

4     specialty was prescribing more opioid medications?

5                    MR. ARBITBLIT:  Object to form.

6     BY MR. GISLESON:

7          Q.   Okay.  Let me rephrase the question.

8          When you wrote, "By specialty, pain doctors

9     prescribe more opioids than doctors in any other

10    specialties," what did you mean by "more opioids"?

11         A.   By that it meant if you look at the number of

12    prescriptions per specialty, there are more pain

13    specialists -- the number is higher for pain

14    specialists.  But if you look at the total number of

15    prescriptions written in the United States, there are

16    more for family medicine and internal medicine doctors

17    because there are more of those types of doctors.

18         Q.   Was it within the scope of practice for the

19    family medicine and internal medicine doctors to

20    prescribe opioid medications for pain?

21                    MR. ARBITBLIT:  Object to form.

22    BY MR. GISLESON:

23         Q.   Based on the research and analysis you've done

24    concerning opioid medication prescribing practices, did

25    you evaluate whether it was in the scope of practice

1    for family medicine and internal medicine doctors to

2    prescribe opioid medications for pain?

3                    MR. ARBITBLIT:  Object to form, vague.

4                    THE WITNESS:  I can't answer that as a

5    yes or no.

6    BY MR. GISLESON:

7        Q.  Did you write any articles at any point

8    expressing the view that family medicine doctors and

9    internal medicine doctors should not be prescribing

10   opioid medications for pain?

11       A.  I would not have stated it that simply because

12   it's not that simple.

13       Q.  Why not?

14       A.  Family medicine and internal medicine doctors

15   who work in a busy primary care practice where they

16   have 15 minutes to see a complex patient are not in a

17   position to prescribe opioids long-term and/or high

18   dose to a patient with chronic pain unless and if

19   they're also doing that in consultation with a pain

20   medicine doctor, and even then, there is not good

21   evidence to support the use of opioids long-term in the

22   treatment of chronic pain.

23                And the pressure, the time pressure, on

24   doctors to treat these patients, to have satisfied

25   customers, to deal with all that complexity, just

Page 45

1   overburdens what could be possible for somebody to be

2   able to exercise good judgment and due diligence,

3   especially in light of the misleading messages that

4   primary care doctors were exposed to and have been

5   exposed to.

6        Q.  Have you analyzed why it was that family

7   medicine and internal medicine doctors who had only 15

8   minutes to see a complex patient were prescribing

9   opioid medications for pain without consulting a pain

10  specialist?

11       A.  Yes, I have.

12       Q.  What did you find?

13       A.  I found that the opioid pharmaceutical

14  industry heavily targeted primary care doctors to

15  prescribe more opioids and that that influence that

16  they exercised was effective.

17       Q.  By "opioid pharmaceutical industry," do you

18  mean manufacturers?

19               MR. ARBITBLIT:  Objection.

20               THE WITNESS:  I mean -- as I state in my

21  report, I mean manufacturers, distributors, and

22  pharmacies.

23  BY MR. GISLESON:

24       Q.  Can you identify any chain pharmacy defendant,

25  CVS, Giant Eagle, Rite Aid, Walgreens, or Walmart who

Page 46

1    targeted a prescriber anywhere in Ohio to encourage

2    that prescriber to write opioid medication

3    prescriptions?

4        A.   These were national campaigns that targeted

5    doctors everywhere in the United States, and that would

6    include Ohio and Lake and Trumbull Counties.

7        Q.   My focus, Doctor, is on the chain pharmacy

8    defendants.  Can you identify any chain pharmacy

9    defendant that specifically targeted doctors to

10   encourage those doctors to prescribe opioid

11   medications?

12       A.   Yes.

13       Q.   Who?

14       A.   Let me look at my report.

15       Q.   We'll come back to that, Doctor, to save time.

16       A.   I'm happy to give examples, but happy to come

17   back to whatever you like.

18       Q.   Yeah, unfortunately, I'm time-constrained.

19   Although if Counsel would like to give me a second day,

20   we can go into more detail.  I'll come back and pick it

21   up later.

22            Now, you said that in your report, and I think

23   you've already testified to this here, that opioid

24   overprescribing isn't really the result of a small

25   subset of high volume or pill-mill prescribers, but it

Page 47

1   was much broader than that throughout the medical

2   profession.  Have you analyzed any or identified any

3   pill-mill prescribers in Lake or Trumbull Counties?

4       A.  No.

5       Q.  Do you agree that a prescriber, whether a

6   doctor a dentist or someone else who has a high-volume

7   practice for opioid prescriptions, can still issue

8   those prescriptions for legitimate medical purpose?

9                   MR. ARBITBLIT:  Object to form.

10                  THE WITNESS:  It would really depend on

11  how high volume.

12  BY MR. GISLESON:

13      Q.  In your view, what is such a high volume that

14  it is impossible for the doctor to be issuing those

15  prescriptions for legitimate medical purpose?

16      A.  Well, it wouldn't just include an assessment

17  of the volume or a sudden increase in the volume from

18  prior prescribing.  It would also include assessing the

19  nature of the relationship between the prescriber and

20  the patient as well as whether or not the opioid was

21  issued for a legitimate medical condition.

22      Q.  So in your experience, it's not enough just to

23  look at the total number of opioid prescriptions that a

24  prescriber is issuing, you need to look specifically at

25  the individual patient?

Page 48

1        MR. ARBITBLIT:  Object to form.

2        THE WITNESS:  No.

3  BY MR. GISLESON:

4        Q.  Is that fair?

5        A.  No, I wouldn't say that's fair.  I would say

6  at some point if the volume is so great it trumps other

7  considerations because of the public health impact and

8  the public nuisance that very high volumes of opioids

9  in society can create.

10       Q.  Is there any standard, based on the research

11 you've done, as to the point at which the volume of

12 opioid prescriptions is so great that it trumps other

13 considerations because of the public health impact?

14       A.  There is consensus now in medicine that the

15 quadrupling of the supply of opioids between the late

16 1990s and approximately 2012 was causative in the

17 quadrupling of admissions to treatment programs for

18 opioid addiction and opioid-related overdose deaths.

19            So given that broad consensus and the

20 appreciation for the causal nature of those phenomena,

21 I think that most people in the medical profession

22 would agree that once you're doubling, tripling,

23 quadrupling the supply in a very short of amount of

24 time in a specific region, you're contributing to a

25 public nuisance.

Page 49

1        Q.   Doctor, I don't mean to be rude, but I need to

2    move to strike that answer because it really wasn't

3    responsive to my question.  The question is, is there

4    any standard based on the research you've done for when

5    a particular prescriber's volume of opioid

6    prescriptions is so great that it trumps all other

7    considerations as to whether that prescriber is issuing

8    those prescriptions for legitimate medical purpose?

9                   MR. ARBITBLIT:  Object to form.

10                   THE WITNESS:  I think for a standard for

11   that, one could look at some of the DEA regulations in

12   certain regions that have identified high prescribing

13   and how they define that.

14   BY MR. GISLESON:

15        Q.   Can you identify a specific number that the

16   DEA has identified by regulation as to what the volume

17   is that is so great that the prescriber can no longer

18   be issuing legitimate medical -- strike that.

19             Can you identify any DEA regulation anywhere

20   in the country that specifically identifies a

21   particular volume of opioid prescriptions that renders

22   a prescriber's prescriptions not to have a legitimate

23   medical purpose?

24        A.   Well, there are federal regulations regarding

25   the prescribing of the opioid buprenorphine limiting

Page 50

1    that to initially 30 patients and then later more than

2    100 patients in recognition of the fact that specific

3    limits do have an impact on the public nuisance or the

4    harm to the public health.

5         Q.   So there should be a regulation that the

6    plaintiffs can point to in this case that would

7    identify what that specific volume is of prescriptions

8    that is so high the prescriber's prescriptions can no

9    longer have legitimate medical purpose?

10                    MR. ARBITBLIT:   Object to form.

11                    THE WITNESS:   Sorry, could you repeat

12   the question to me?   It was hard to understand.   I

13   wasn't sure how it linked to what I said previously.

14   BY MR. GISLESON:

15        Q.   Based on your answer, there should be a

16   regulation issued by the DEA someplace that identifies

17   what the standard is for when a prescriber's volume of

18   opioid prescriptions is so high that the prescriber can

19   no longer have a legitimate medical purpose for issuing

20   the prescriptions?

21                    MR. ARBITBLIT:   Objection.

22   Argumentative.   Misstates the record.

23                    THE WITNESS:   No, I didn't say that.

24   BY MR. GISLESON:

25        Q.   Now, you mentioned a couple of times a

Page 51

1   "legitimate medical purpose."  What, in your

2   experience -- and we'll talk about since the paradigm

3   shift -- was a legitimate medical purpose based on the

4   pronouncements of the various medical organizations for

5   issuing an opioid medical prescription for pain?

6                   MR. ARBITBLIT:  Objection.  Vague.

7   BY MR. GISLESON:

8       Q.  Do you know what a legitimate medical purpose

9   is when it comes to prescribing opioid medications?

10                  MR. ARBITBLIT:  Objection.  Vague.

11                  THE WITNESS:  I do have a section in my

12  report where I talk about the legitimate use of opioids

13  based on the evidence.

14  BY MR. GISLESON:

15      Q.  I'm not talking about the evidence.  I'm

16  talking about the paradigm shift.  Under the paradigm

17  shift, what were legitimate medical purposes for

18  prescribing opioid medications for pain?

19                  MR. ARBITBLIT:  Objection.

20  Argumentative.  Vague.

21                  THE WITNESS:  The way that opioids have

22  been prescribed since the late 1990s have been, in many

23  instances, not legitimate because they were not

24  informed by science.

25

1    BY MR. GISLESON:

2        Q.  I understand that's your position, but the

3    question is, for these different medical specialties

4    who were issuing prescriptions for pain, what were the

5    legitimate medical purposes that were recognized among

6    those different specialties for issuing opioid

7    prescriptions?

8                    MR. ARBITBLIT:  Objection.  Vague.

9    Argumentative.  Asked and answered.

10                   THE WITNESS:  Yeah, I feel like I

11   answered that question.

12   BY MR. GISLESON:

13       Q.  But you didn't.

14                   MR. ARBITBLIT:  Argumentative.  Not a

15   question.

16   BY MR. GISLESON:

17       Q.  You said before that you believe the majority

18   of prescribers were issuing prescriptions because they

19   believed that there was a legitimate medical purpose

20   for the opioid prescription; is that right?

21       A.  Yes.

22       Q.  And from your research and analysis, what were

23   the legitimate medical purposes that those prescribers

24   were using in connection with issuing the

25   prescriptions?

Page 53

```
 1                    MR. ARBITBLIT:  Objection.  Vague.
 2    Misstates the record.  Do you want to rephrase it so
 3    that they believe they were legitimate, that would be
 4    different from trying to mislead the witness into
 5    saying they were legitimate without the belief.
 6                    MR. GISLESON:  Please stop coaching the
 7    witness.
 8                    MR. ARBITBLIT:  Please stop asking
 9    repetitive, argumentative questions.
10    BY MR. GISLESON:
11        Q.  Dr. Lembke?
12        A.  Yes.
13        Q.  You said that in your view at least the
14    majority of prescribers nationally were writing opioid
15    prescriptions because they believed that those
16    prescriptions had a legitimate medical purpose.  What
17    did you understand those legitimate medical purposes to
18    be?
19                    MR. ARBITBLIT:  Objection.
20    Argumentative.
21                    THE WITNESS:  As I said before, they
22    believed that they were writing opioid prescriptions
23    for a legitimate medical purpose because they were
24    duped, when in fact, their prescribing was not
25    legitimate because it was not informed by the science.
```

Page 54

1    BY MR. GISLESON:

2        Q.  In terms of legitimate medical purpose, was

3    that pain?

4                    MR. ARBITBLIT:  Object to form.

5                    THE WITNESS:  That would be an

6    overstatement of my opinion and too broad.

7                    THE VIDEOGRAPHER:  This is Lori, the

8    videographer, and I'm sorry to interrupt but I just

9    want to let you know that Hunter entered the room, and

10   I'm not completely familiar with attorneys so I just

11   wanted to let you know.  Thank you.

12   BY MR. GISLESON:

13       Q.  Now, once this paradigm shift occurred, were

14   the prescribers expected to exercise professional

15   medical judgment in deciding whether to prescribe

16   opioid medications?

17                    MR. ARBITBLIT:  Object to form.

18                    THE WITNESS:  They were -- they had

19   great difficulty exercising appropriate medical

20   judgment for a number of different reasons.

21   BY MR. GISLESON:

22       Q.  That wasn't my question.  Were prescribers

23   expected to exercise professional judgment in issuing

24   prescriptions for opioid medications?

25                    MR. ARBITBLIT:  Objection.  Vague.

Page 55

```
 1                    THE WITNESS:  Again, I think it's
 2     important in order to understand the truth of the
 3     matter that it was nearly impossible for doctors to
 4     exercise their clinical judgment when they were not
 5     given accurate information about the true risks and
 6     benefits.
 7     BY MR. GISLESON:
 8         Q.  Move to strike as nonresponsive.
 9             Are you trained to exercise judgment when you
10     were in medical school when it came to issuing opioid
11     medications?
12                    MR. ARBITBLIT:  Object to form.
13                    THE WITNESS:  I think every professional
14     person will try to exercise their best judgment if
15     their intentions are good.  But it's impossible to
16     exercise your judgment if you don't have the data that
17     you need to make a good decision.
18     BY MR. GISLESON:
19         Q.  When doctors were prescribing opioid
20     medications for what they believed to be legitimate
21     medical purposes, what were the different areas where
22     they were exercising judgment?
23                    MR. ARBITBLIT:  Object to form.
24     BY MR. GISLESON:
25         Q.  Do you have an understanding, Doctor, as to
```

Page 56

```
1   the process by which doctors should undergo during the
2   time that this paradigm shift occurred for evaluating
3   whether to prescribe an opioid medication for pain?
4              MR. ARBITBLIT:  Object to form.
5              THE WITNESS:  I'm not sure I understand
6   what you mean by "process."
7   BY MR. GISLESON:
8        Q.  Is it your view that once the paradigm shift
9   occurred, that doctors believed they could simply issue
10  opioid medication prescriptions without evaluating an
11  individual patient's specific medical condition and
12  needs?
13             MR. ARBITBLIT:  Object to form.
14             THE WITNESS:  First of all, the paradigm
15  shift occurred in an iterative process.  It was
16  cumulative.  It didn't happen overnight.  And secondly,
17  I do believe that the false and misleading messages and
18  the enormous pressure on physicians to address the
19  epidemic of undertreated pain and to overcome their
20  opioid phobia overwhelmed their ability to exercise
21  their clinical judgment.
22  BY MR. GISLESON:
23       Q.  Is that true for all of the prescribers in the
24  United States?
25             MR. ARBITBLIT:  Object to form.
```

Page 57

1                    THE WITNESS:  That's not what I said.  I

2    think that is overstating it.

3    BY MR. GISLESON:

4        Q.  What analysis -- strike that.

5              What is the standard that you applied in

6    saying that prescribers all across the United States

7    were overwhelmed in their ability to exercise clinical

8    judgment when it came to prescribing opioids?

9                    MR. ARBITBLIT:  Object to form.

10                   THE WITNESS:  I base that on my own

11   medical education, on my own exposure to these

12   misleading messages, and to the various pressures to

13   prescribe opioids.  I base that on my research that I

14   did for my book.  I base that on my review of the

15   documents that were available to me through discovery,

16   and I base that on my review of the medical literature

17   and the evidence on the benefits and risks of opioids

18   and how that differs from the messages that were being

19   amplified and promulgated across medicine in a way that

20   made it virtually impossible for physicians to exercise

21   their clinical judgment because of the enormous

22   pressure on them to prescribe more opioids.

23                   MR. ARBITBLIT:  Counsel, we've been

24   going for 75 minutes, do you have a natural stopping

25   point for a break?

Page 58

1                    MR. GISLESON:  Yeah, we can take a

2      break.

3                    MR. ARBITBLIT:  Do you want to keep it

4      to ten minutes, try to move along?

5                    MR. GISLESON:  Yeah, that's fine.

6                    MR. ARBITBLIT:  Thank you.

7                    THE VIDEOGRAPHER:  We are going off the

8      record at 9:46.

9                    (Recess taken 9:46 p.m. to 9:57 p.m.)

10                    THE VIDEOGRAPHER:  We are back on the

11     record.  The time is 9:57.  Please proceed.

12     BY MR. GISLESON:

13          Q.  Dr. Lembke, we were talking about the

14     different professional medical organizations that were

15     responsible for this paradigm shift.  Do you have your

16     book "Drug Dealer M.D." handy?

17                    MR. ARBITBLIT:  Object to form.  Object

18     to the prelude.  That wasn't part of the question and

19     move to strike it.

20     BY MR. GISLESON:

21          Q.  Dr. Lembke, you referenced the Joint

22     Commission as well as the various Federation of State

23     Medical Boards.  What I would like to do is turn to

24     your book.  Am I holding up a copy of your book?

25          A.  Mr. Gisleson, you froze in the middle of that.

```
                                                    Page 59
 1    Can you restate the comment or question?
 2         Q.   Sure.   Does this appear to be a copy of your
 3    book?
 4         A.   Yes, that is a copy of my book.
 5         Q.   And can you hold up your copy of the book to
 6    make sure that we're both on the same book, same page.
 7    Thanks.   If you can go to page 72, please.   The first
 8    full paragraph you wrote, "Big medical was the engine
 9    by which" --
10                   THE VIDEOGRAPHER:   Counsel, your audio
11    is cutting out.
12    BY MR. GISLESON:
13         Q.   Dr. Lembke, if you turn to page 72 of your
14    book, the first full paragraph --
15         A.   I'm sorry, your audio is cutting in and out.
16                   MR. ARBITBLIT:   Can't hear you, Counsel.
17                   MR. CARTER:   I was going to say why
18    don't we go off the record, you know, hang up and then
19    dial back in for you.
20                   MR. GISLESON:   Can you hear me?
21                   MR. ARBITBLIT:   We can hear you now.
22                   MR. GISLESON:   Okay, great.
23    BY MR. GISLESON:
24         Q.   So Dr. Lembke, turning to your book on page 72
25    in the first full paragraph, you wrote in the first two
```

Page 60

1    sentences, "Big medicine was the engine behind the

2    opioid paradigm shift and big pharma, the stealthy and

3    powerful caboose.  Big medicine provided legitimacy and

4    big pharma the funds to push the message along."

5           That is an accurate statement of what you

6    wrote?

7    A.  It is what I wrote, yes.

8    Q.  And then if we go to the prior page, please,

9    you see on that page there is a heading for the engine

10   and the caboose; is that right?

11   A.  Yes.

12   Q.  And if we look at the last paragraph on that

13   page, you wrote, "Manufacturers of opioid painkillers

14   have contributed to the opioid epidemic that has

15   ravaged the United States, but blame cannot be placed

16   on big pharma alone."  And your reference there to big

17   pharma refers to the manufacturers in that paragraph,

18   correct?

19   A.  Yes.

20   Q.  You then write, "Blame lies with doctors as

21   well, especially those in academia and other positions

22   of leadership who ignored the" --

23   A.  Oh, you froze again.

24   Q.  Again --

25          (Reporter clarification.)

```
                                                Page 61

 1                 MR. GISLESON:  Can you hear me?

 2   BY MR. GISLESON:

 3        Q.  Let me start over again.  I apologize.

 4             Dr. Lembke, so you wrote at the bottom of

 5   page 71 under the heading, "The Engine and the Caboose,

 6   manufacturers of opioid painkillers have contributed to

 7   the opioid epidemic that has ravaged the United States,

 8   but blame cannot be placed on big pharma alone.  Blame

 9   lies with doctors as well, especially those in academia

10   and other positions of leadership who ignored the

11   evidence on risk and efficacy in pursuit of their own

12   agenda, an agenda that originated in a desire to help

13   but then lost its way."

14             So that when you criticize academia, are you

15   criticizing your own people at Stanford and other

16   medical schools around the country?

17                 MR. ARBITBLIT:  Object to form.

18   BY MR. GISLESON:

19        Q.  Who did you encompass by your use of the word

20   "academia"?

21        A.  I was mainly referring to key opinion leaders

22   who were paid by the opioid pharmaceutical industry to

23   promote pro-opioid messaging departing from the

24   evidence.

25        Q.  Key opinion leaders in academia?
```

Page 62

1      A.   Many of them are from academia, not all.

2      Q.   And when you say "academia," you're referring

3  to medical schools?

4      A.   I'm referring to people who are leaders in the

5  field who publish articles that influence the field,

6  who speak at continuing medical education that

7  influences the field.

8      Q.   You then write, "Blame also lies with

9  regulatory agencies like the Federation of State

10  Medical Boards, the Joint Commission, and the FDA."

11          That's the big medicine to whom you're

12  referring?

13                  MR. ARBITBLIT:  I'll object.  You can't

14  just stop in the middle of the sentence, Counsel.  I'll

15  object to the form of that.  You want to read the rest

16  of the question, or should the witness read it?

17                  MR. GISLESON:  No.

18  BY MR. GISLESON:

19      Q.   Dr. Lembke, you refer to big medicine was the

20  engine behind the opioid paradigm shift.  The big

21  medicine, as you reference in that paragraph, is

22  Federation of State Medical Boards, the Joint

23  Commission, and the FDA; is that correct?

24                  MR. ARBITBLIT:  Object to form.

25                  THE WITNESS:  So this is a paragraph

Page 63

1   that is speaking of different entities that have some

2   blame in the opioid epidemic.  And I mention multiple

3   different entities, including the Federation of State

4   Medical Boards, the Joint Commission, and the FDA.  But

5   those are not the exclusive entities that constitute

6   big medicine.

7   BY MR. GISLESON:

8        Q.  If you turn to page 57 of the book, in terms

9   of big pharma, you write on page 57 in the second full

10  paragraph, "What began as a good faith effort to

11  improve the lives of patients in pain, soon gave way to

12  an epidemic of opioid painkiller overprescribing.  The

13  pharmaceutical industry, big pharma, specifically the

14  makers of opioid painkillers like OxyContin, Purdue

15  Pharma, played a pivotal role in the epidemic."

16          And that's still your view, correct?

17       A.  It is my view that the pharmaceutical industry

18  also includes distributors and pharmacies.

19       Q.  That's not what you wrote in this big, is it?

20       A.  No, at the time I wrote this book I had not

21  researched the role of distributors and pharmacies to

22  the extent that I have now.

23       Q.  Well, in your 156-page book, you never, not

24  even once, blame any chain pharmacy defendant for the

25  opioid crisis, correct?

Page 64

1         A.   In my 2016 book, that's correct.

2         Q.   And you certainly knew it at the time you were

3    writing this book that pharmacies were dispensing

4    opioid medications pursuant to prescriptions that were

5    being issued by doctors who briefed that they had a

6    legitimate medical purpose for doing so, right?

7                        MR. ARBITBLIT:  Object to form.

8                        THE WITNESS:  At the time I wrote this

9    book, yes, I understood how pharmacies work.

10   BY MR. GISLESON:

11        Q.   Do you view Purdue Pharma as being culpable

12   for the opioid epidemic?

13        A.   Yes.

14        Q.   And your reference when you say, "the

15   pharmaceutical industry, big pharma, specifically the

16   makers of opioid painkillers like OxyContin," you're

17   referring to manufacturers of opioid medications,

18   right?

19        A.   In my book, that is correct.

20        Q.   And in fact, right now, you're appearing in a

21   TV show for HBO called "Crime of the Century"; is that

22   right?

23        A.   It's a documentary, yes.

24        Q.   And it's a documentary about the Sackler

25   family who owned or started Purdue Pharma?

Page 65

1          A.  Yes.

2                    MR. ARBITBLIT:  Objection.

3     BY MR. GISLESON:

4          Q.  And your view was that Purdue Pharma and the

5     Sackler family have significant culpability,

6     responsibility, for the opioid epidemic; is that right?

7          A.  As I've stated in my book and in my report,

8     there is lots of blame to go around, but certainly

9     Purdue has played an important role in the creation of

10    the opioid epidemic.  They are not the sole actors,

11    however.

12         Q.  And it was Purdue Pharma that, in your view,

13    was making false messages or giving false messages of

14    substantial benefit and low risk of opioid medications?

15                    MR. ARBITBLIT:  Object to form.

16    Misstates the testimony.

17    BY MR. GISLESON:

18         Q.  Strike that.  Did Purdue Pharma issue messages

19    to doctors of substantial benefit and low risk of

20    opioid medications?

21         A.  Purdue was not alone in promoting misleading

22    messages, but yes, Purdue was responsible for

23    misleading messages as well.

24         Q.  Can you go to page 128 of your book, please?

25    You have a section on page 128 that starts, "Doctors as

Page 66

1   Baristas"; is that correct?

2       A.  Yes.

3       Q.  And these are your views based on your

4   education, training, and experience as a doctor who

5   speaks publicly as well as researches extensively

6   issues relating to the opioid epidemic; is that right?

7                   MR. ARBITBLIT:  Objection.  Object to

8   form.

9                   THE WITNESS:  I'm sorry.  Could you

10  restate the question?

11  BY MR. GISLESON:

12      Q.  Sure.  Are the views that you express in the

13  first paragraph under "Doctors as Baristas" ones that

14  are based on your education, training, experience, and

15  research relating to the prescription of opioid

16  medications?

17      A.  Can you just give me a moment to read the

18  paragraph?

19      Q.  Actually, why don't you read it out loud,

20  please?

21                  MR. ARBITBLIT:  Why don't you read the

22  whole thing.  She's got the right to read it before she

23  starts reading out loud, Counsel.  Take your time.

24                  THE WITNESS:  Would you like me to read

25  it out loud now?

Page 67

1    BY MR. GISLESON:

2         Q.   Please.

3         A.   "The current prescription drug epidemic is not

4    the result of the small population of deviant doctors

5    willfully harming patients, although those doctors

6    exist.  Rather, it is the result of a large population

7    of well-intended doctors working in healthcare

8    factories that prioritize throughput of body parts on

9    an assembly line over whole patient health.  The result

10   is overprescribing, which is faster and better

11   reimbursed than educating or empathizing with patients.

12        "Pills that are addictive are particularly

13   likely to be overprescribed because they provide

14   patient customers with short-term satisfaction and a

15   proxy for human attachment, but not necessarily

16   improved health.

17        "When autonomy is truncated and professional

18   status is linked to" --

19        (Reporter clarification.)

20        A.   -- "earning power, in patient satisfaction

21   surveys, doctors are vulnerable to objectifying

22   patients as commodities rather than seeing them as

23   people.  Patients are vulnerable to utilizing doctors

24   as nothing more than a source of drugs."

25        Q.   You refer to the concept of the Toyotaization

Page 68

1    of medicine.  Is that what you're describing here?

2        A.  Yes, in part.

3        Q.  Could you describe what you mean by the

4    Toyotaization of medicine?

5        A.  What I mean is that doctors -- the majority of

6    doctors now work as salaried employees for large

7    institutions and their practice is very heavily

8    dictated by many pressures inside that institution,

9    including pressures to see patients more quickly,

10   pressures to have satisfied customers with rating

11   surveys.

12       It is very common that a patient will have

13   multiple doctors for multiple different healthcare

14   problems, making it difficult to know, despite you

15   know, electronic medical record, exactly what kind of

16   care a patient is receiving from another provider or

17   exactly what kind of medication they're being

18   prescribed, which can result inadvertently in dangerous

19   drug-drug combinations or overprescribing.

20       The bottom line is that in many ways, doctors

21   have lost an enormous amount of autonomy.  They're

22   subject to Joint Commission quality measures, pain

23   guidelines and other guidelines promulgated by

24   professional medical societies and other different

25   entities that essentially dictate how doctors practice

Page 69

1   and how they prescribe medications.

2       Q.  Does that apply to how they prescribe opioid

3   medications for pain?

4       A.  Yes.

5       Q.  Do you blame those institutions for creating

6   that environment for doctors and other prescribers?

7       A.  As I've stated in my book and in my report,

8   there is lots of blame to go around, but the opioid

9   pharmaceutical industry was really the key instigating

10  factor for this paradigm shift.

11      Q.  Move to strike.  Nonresponsive.  Doctor, I'm

12  not trying to be rude.

13          You're talking about those institutions that

14  were putting pressure on doctors to prescribe opioid

15  medications.  What were the institutions?

16      A.  Well, the institutions included the opioid

17  pharmaceutical industry that essentially both directly

18  targeted doctors with an aggressive sales force and

19  aggressive marketing campaign, but also targeted

20  patients and targeted the various institutions that I

21  mentioned inside of medicine that were promoting

22  opioids.

23      Q.  When you wrote that "the current prescription

24  drug epidemic is not the result of a small population

25  of deviant doctors willfully harming patients, although

Page 70

1   those doctors exist, rather it is the result of a large

2   population of well-intended doctors working in

3   healthcare factories that prioritize throughput of body

4   parts on an assembly line over whole patient health,"

5   what are the "healthcare factories" that you reference

6   there?

7        A.   Large, integrated healthcare centers where

8   most physicians work today.

9        Q.   Is that around the country?

10       A.   Yes, it is.

11       Q.   Including those institutions in Ohio?

12       A.   Yes.

13       Q.   Do you consider the Cleveland Clinic to also

14   be guilty of what you describe in this paragraph?

15       A.   Yes.

16       Q.   Could you go to page 26 of your report,

17  please?  If you look under Item No. 4, you wrote, "The

18  pharmaceutical opioid industry contributed

19  substantially to the paradigm shift in opioid

20  prescribing through misleading messaging about the

21  safety and efficacy of prescription opioids.  The

22  industry disseminated these misleading messages through

23  an aggressive sales force, key opinion leaders, medical

24  school curricula, continuing medical education courses,

25  clinical decision support tools, professional medical

Page 71

1   societies, patient advocacy groups, and the Federation

2   of State Medical Boards and the Joint Commission"; is

3   that right?

4       A.  Yes, that's what it says there.

5       Q.  Now, in terms of the aggressive sales force,

6   did any of the chain pharmacy defendants -- aggressive

7   sales force that targeted doctors in Trumbull and Lake

8   Counties?

9       A.  I'm sorry, but you froze in the middle.  Can

10  you restate the question?

11      Q.  Sure.  Did any of the chain pharmacy

12  defendants use a sales force, which you describe as

13  aggressive sales force, in Lake County or Trumbull

14  County to target doctors?

15      A.  They collaborated with the sales force that

16  was employed by the opioid manufacturers.

17      Q.  That was not my question, Doctor.  The

18  question is, did the chain pharmacy defendants have an

19  aggressive sales force that themselves targeted

20  prescribers in Lake and Trumbull Counties?

21      A.  To some extent the pharmacists themselves

22  functioned as a sales force.

23      Q.  Did the chain pharmacy defendants have a

24  formal sales force that targeted defendants -- that

25  targeted prescribers by going to their offices --

Page 72

1              MR. ARBITBLIT:  Object to form.

2    BY MR. GISLESON:

3        Q.  -- and encouraging them to prescribe opioid

4    medications?

5        A.  As far as I know, the pharmacy defendants did

6    not specifically hire drug reps who went to patients'

7    offices, but they used many other methods to

8    collaborate with those drug reps to promote false and

9    misleading messages to prescribers and to patients.

10   And the pharmacists themselves functioned as laundered

11   intermediaries to promote false and misleading

12   messaging.

13       Q.  Move to strike as nonresponsive.

14           Who employed the drug reps?

15       A.  The drug reps as -- I guess I would ask how

16   are you using that term, drug reps?

17       Q.  Who employed the drug reps?

18              MR. ARBITBLIT:  Objection.  Asked for

19   clarification.

20              THE WITNESS:  What -- yeah, what do you

21   mean by "drug reps"?

22   BY MR. GISLESON:

23       Q.  Have you never heard of a drug rep?

24       A.  Of course I have, but I want to make sure you

25   and I are using the same definition.

1       Q.   Someone employed by a pharmaceutical

2   manufacturer to promote its drugs --

3                   MR. ARBITBLIT:  Object to form.

4   BY MR. GISLESON:

5       Q.   -- to doctors directly.

6       A.   Okay.  Thank you.  Can you repeat your

7   question?

8       Q.   Sure.  Did any of the chain pharmacy

9   defendants employ drug reps to make sales calls on

10  doctors who were prescribing opioid medications?

11      A.   Not directly.  But they did collaborate with

12  those drug reps.

13      Q.   How did any chain pharmacy defendant in Ohio

14  collaborate with manufacturer's drug reps to contact

15  prescribers in Ohio?

16                  MR. ARBITBLIT:  Object to form.

17                  THE WITNESS:  On page 79 of my report,

18  romanette 6.

19  BY MR. GISLESON:

20      Q.   So on that page you write, "Walgreens allowed

21  Purdue sales reps to make calls on Walgreens healthcare

22  supervisors who oversaw 70 to a hundred retail stores";

23  is that right?

24      A.   That's one example, yes.

25      Q.   That's not a target to a doctor, is it?

Page 74

1    Strike that.

2          That does not involve any Walgreens employee

3    speaking with a doctor to encourage that doctor to

4    prescribe opioid medications, correct?

5        A.   Well, Walgreens pharmacists speak with doctors

6    on a daily basis, so what drug reps disseminate to

7    pharmacists is very likely to be further disseminated

8    to doctors.

9        Q.   What factual basis do you have to say that a

10   pharmacist for any of the chain pharmacy defendants in

11   Ohio in fact communicated a manufacturer's message

12   concerning opioid medications to a prescriber in Ohio?

13                   MR. ARBITBLIT:   Object to form.

14                   THE WITNESS:   On page 97 of my report, I

15   talk about how Rite Aid pharmacy "collaborated with the

16   American Pain Foundation, a patient advocacy

17   organization funded largely by the pharmaceutical

18   opioid industry to create a patient-facing educational

19   pamphlet on pain to ensure customers receive the kind

20   of information that will make a difference and" --

21   BY MR. GISLESON:

22       Q.   That does not involve targeting doctors with

23   an aggressive sales force, is it?

24            Doctor, the only aggressive sales force you

25   can identify is the one that was the drug reps working

Page 75

1   for an opioid manufacturer, correct?

2        A.  As I've stated before, the pharmacy defendants

3   closely collaborated with the opioid manufacturers

4   including the drug reps to propagate the same false and

5   misleading messages.

6        Q.  Move to strike as nonresponsive.

7            Doctor, the only aggressive sales force you

8   can identify is the one where the drug reps were

9   working for an opioid manufacturer, correct?

10               MR. ARBITBLIT:  Object to form.

11               THE WITNESS:  Again, I would argue that

12  the pharmacies themselves became an aggressive sales

13  force.

14  BY MR. GISLESON:

15       Q.  You have no factual basis to say that any

16  chain pharmacy defendant in fact made sales calls on

17  prescribers in Ohio encouraging those prescribers to

18  prescribe more opioid medications, correct?

19       A.  I'm not aware of pharmacy defendant employees

20  themselves going to doctors' offices, but in other ways

21  by direct to patient promotion, and frankly, by

22  promoting the false and misleading messages to their

23  own pharmacists, they did propagate this

24  misinformation.

25       Q.  Move to strike the second part of the answer

Page 76

1   as nonresponsive.

2          Doctor, if you look at page 27 of your report,

3   you have the heading "For Aggressive Sales Force"?

4          A.  Yes, I do.

5          Q.  You wrote, "As explained below, the

6   pharmaceutical opioid industry retained an aggressive

7   sales force incentivized to target doctors' offices and

8   pharmacies to increase sales, thereby increasing the

9   number of people exposed to opioids."  Is that correct?

10         A.  That's what I wrote there, yes.

11         Q.  And by the reference to "incentivized to

12  target pharmacies," that includes chain pharmacy

13  defendants, correct?

14         A.  Yes.

15         Q.  In the next paragraph you wrote, "In 2012, the

16  pharmaceutical industry spent $15 billion on

17  face-to-face sales and promotional activity.  These

18  face-to-face promotional activities rely primarily on

19  sales representatives and" --

20         A.  I'm sorry, you cut out in the last little bit.

21         Q.  After sales --

22             (Reporter clarification.)

23         Q.  How about now?  Can you hear me?  Sometimes

24  when I click on mute and then unmute, that helps.

25             If you look at the second paragraph that you

Page 77

1  wrote under "aggressive sales force," you wrote that

2  "In 2012, the pharmaceutical industry spent $15 billion

3  on face-to-face sales and promotional activity.  These

4  face-to-face promotional activities rely primarily on

5  sales representatives," in parentheses you wrote drug

6  reps, "who market their products directly to doctors'

7  offices and pharmacies."  Is that right?

8       A.  Yes, that's what I wrote there.

9       Q.  If you turn, please, to page 37, you made

10 reference to key opinion leaders as being ones who were

11 trying to drive this paradigm shift; is that right?

12      A.  Yes.

13      Q.  And the key opinion leaders were ones who were

14 hired by the opioid manufacturers in your view,

15 correct?

16      A.  The key opinion leaders were also hired by the

17 pharmaceutical defendants.

18      Q.  Well, you wrote, "to encourage doctors to

19 prescribe more opioids, opioid manufacturers promoted

20 the careers of physicians who were sympathetic to their

21 cause"; is that correct?

22      A.  That's what I wrote there, yes, but on page 83

23 of my report I talk about, for example, Walgreens'

24 Brody, a pharmacist, being promoted as a key opinion

25 leader to create pharmacy superstores."

Page 78

1          And also getting back to your earlier question

2    regarding whether or not these agents had direct

3    contact with doctors, I do say in romanette 12 in the

4    middle of page 83 quoting from Walgreens' pharmacist

5    Brody that the "doctors will have the assurance that

6    the pain meds will be filled by a pharmacist less

7    likely to question his or her prescribing habits,"

8    unquote.

9        Q.   Do you realize, Dr. Lembke, that what you're

10   citing there are internal Purdue emails?

11       A.   Yes, I do.

12       Q.   Did you speak with any of the individuals at

13   Purdue who participated in that email exchange?

14       A.   No.

15       Q.   Do you know whether the Purdue individuals who

16   were involved in that email exchange accurately

17   recorded what they discussed with Walgreens during

18   those meetings?

19              MR. ARBITBLIT:   Object to form.

20   BY MR. GISLESON:

21       Q.   Do you know whether the individuals --

22       A.   Frozen again.

23       Q.   Do you know whether the Purdue individuals --

24   and their interactions with Walgreens and Mr. Brody?

25       A.   I'm sorry, can you say it again?  You cut out.

1      Q.  Do you know whether the Walgreens individuals

2  who participated in that internal Purdue -- strike

3  that.

4          Do you know whether the Purdue individuals who

5  participated in the internal email exchanges accurately

6  described what they were told by Mr. Brody?

7                  MR. ARBITBLIT:  Objection.

8                  THE WITNESS:  I've not seen anything to

9  the contrary.

10 BY MR. GISLESON:

11     Q.  What investigation, if any, did you do into

12 whether the Purdue individuals accurately recounted any

13 conversations they had with Mr. Brody?

14     A.  I reviewed thousands of documents.  I've not

15 seen anything to dispute this account.

16     Q.  And you also have not seen anything to

17 demonstrate that the internal Purdue individuals

18 accurately described the conversation with Mr. Brody,

19 correct?

20                  MR. ARBITBLIT:  Object to form.

21                  THE WITNESS:  I have no reason to

22 question their description of the interactions with

23 Mr. Brody.

24 BY MR. GISLESON:

25     Q.  So in your view, in your experience, it's

Page 80

1   reliable to you -- strike that.

2           In your experience you think it's reasonable

3   to rely on what Purdue Pharma -- wrote in internal

4   emails?

5       A.  You cut out in the middle.  Sorry, can you say

6   that again?

7       Q.  Sure.  Based on all the different documents

8   you've read and the research you've done, do you think

9   it's reasonable to rely on the accuracy and veracity of

10  what internal Purdue representatives write in emails

11  about their interactions with pharmacies and others?

12                  MR. ARBITBLIT:  Object to form.

13                  THE WITNESS:  My review of Purdue's very

14  internal private documents has led me to believe that

15  those internal and private email exchanges are some of

16  the most revealing regarding Purdue's strategies and

17  what they knew when and generally how they went about

18  marketing opioids.

19  BY MR. GISLESON:

20      Q.  You also refer to CMEs or continuing medical

21  education.  Who was presenting the CMEs that you

22  reference?

23      A.  Well, as pertains to the defendants, I have a

24  whole section on the kinds of continuing medical

25  education provided to pharmacists that were created in

1  close collaboration in many instances with opioid

2  manufacturers and perpetuated the same false and

3  misleading messages.

4      Q.  It was the manufacturers who were providing

5  the continuing medical education to the prescribing

6  doctors; is that correct?

7      A.  No.  On page 84, I specifically reference a

8  Walgreens University document from 2017 where Purdue

9  was, in fact, Walgreens' student at this continuing

10  medical education event.

11      Q.  What year was that?

12      A.  That was 2017, Walgreens University 2017.

13      Q.  Any other examples you can identify?

14      A.  Yes.  Brody was a pharmacist, key opinion

15  leader for Walgreens, who spoke at continuing medical

16  education conferences for pharmacists.  Page 85 of my

17  report, Rite Aid collaborated with Purdue to provide

18  multiple in-service programs to pharmacists that

19  promoted opioid use under the guise of, quote, "proper

20  pain management education."  And then below, I describe

21  that continuing medical education in more detail.

22      Q.  Does any of this provide any continuing

23  medical education to the prescribing doctors in Ohio?

24      A.  This is continuing medical education for the

25  pharmacists.

Page 82

1      Q.  Did any of the chain pharmacy defendants

2   provide continuing medical education to prescribing

3   practitioners in Ohio concerning opioid medications?

4      A.  Not formally that I know of.

5      Q.  In your experience, it was the manufacturers

6   who were providing the continuing medical education to

7   the prescribing doctors for opioid medications; is that

8   right?

9      A.  Yes, in parallel with the pharmacy defendants

10  describing similarly misleading continuing medical

11  education for pharmacists.

12     Q.  You're assuming, aren't you, that the

13  pharmacists themselves knew that what they were saying

14  was false as to the safety and efficacy of opioid

15  medications, correct?

16     A.  I'm assuming no such thing.

17     Q.  So you don't know whether the chain pharmacy

18  defendants believed in good faith that prescribing

19  opioid medications for chronic pain was a legitimate

20  medical purpose?

21               MR. ARBITBLIT:  Object to form.

22               THE WITNESS:  I'm sorry, could you

23  rephrase the question?

24  BY MR. GISLESON:

25     Q.  You do not know whether the chain pharmacy

Page 83

1    defendants believed in good faith that prescribing

2    opioid medications for chronic pain was a legitimate

3    medical purpose?

4              MR. ARBITBLIT:  Object to form.

5              THE WITNESS:  My reading of the evidence

6    is that the pharmacy defendants were indifferent to the

7    legitimate -- the legitimate or illegitimate purpose of

8    the opioids that they were dispensing.  They were

9    primarily focused on profit motives.

10   BY MR. GISLESON:

11        Q.  Objection.  Move to strike as nonresponsive.

12            You also refer to clinical decision support

13   tools -- relating to opioid medications?

14        A.  I'm sorry, you cut out in the middle.  Can you

15   restate that question, if there was one?

16        Q.  Sure.  On page 53 of your report, you refer to

17   clinical decisions support tools.  What are they?

18        A.  Those are things like nudges in the electronic

19   medical record to encourage certain types of

20   prescribing.  Those are things like posters on the

21   walls of exam rooms encouraging using certain tools to

22   assess the patient.

23        Q.  Those were provided by pharmaceutical

24   manufacturers?

25        A.  The ones that I'm aware of, yes, although --

Page 84

1    I'll just leave it at that.

2        Q.  I'll have you turn to page 59, please, of your

3    report.  You also believe that the Federation of State

4    Medical Boards was involved with changing the paradigm

5    of care for opioid medications, and if we look on

6    page 59 under the Federation of State Medical Boards,

7    item Roman Numeral II, you wrote, "In 1998, the FSMB,

8    Federation of State Medical Boards, released a policy

9    to reassure doctors that they would not be prosecuted

10   for the treatment of pain.  Further, the FSMB urged

11   state medical boards to punish doctors for

12   undertreating pain.  Doctors lived in fear of

13   disciplinary action from the state medical boards and

14   the lawsuit that usually followed if they denied a

15   patient opioid painkillers."

16           Was that true in Ohio?

17       A.  Yes.

18       Q.  Was that true around the country --

19       A.  I'm sorry, you froze again in the middle.

20       Q.  Was that true around the country as well?  Was

21   that true around the country as well?

22       A.  Yes.

23       Q.  You also wrote that, "In 2007 the FSMB

24   published a book promoting the use of opioid

25   painkillers.  This book was sponsored by a consortium

Page 85

1   that included Abbott Laboratories, Alpharma

2   Pharmaceuticals --

3           (Reporter clarification.)

4       Q.  -- Cephalon, Inc., Endo Pharmaceuticals, and

5   the University of Wisconsin Pain and Policy Study

6   Group; is that correct, Doctor?

7       A.  Yes.

8       Q.  And those are manufacturers other than the

9   University of Wisconsin Pain and Policy Study Group,

10  correct?

11      A.  Yes.

12      Q.  On page 60, you refer to changes in the law in

13  Ohio and that in 1998, Ohio passed the Intractable Pain

14  Act; is that right?

15      A.  Yes.

16      Q.  And in your view, what effects did the Ohio

17  Intractable Pain Act in 1998 have on the prescription

18  of opioid medications for pain?

19      A.  As I state in my report, it essentially opened

20  the floodgates for doctors to treat chronic pain with

21  prescription opioids.

22      Q.  So the Ohio legislature effectively encouraged

23  prescribers to issue prescriptions for opioid

24  medications for pain?

25      A.  They did take some actions that led to that,

1   yes.

2        Q.   The Joint Commission, you had mentioned them

3   as well, and that's on page 62 of your report.  You

4   said, "The Joint Commission accredits healthcare

5   organizations and programs including in hospitals."  Is

6   that right?

7        A.   You froze in the middle.  Sorry.

8        Q.   "The Joint Commission is an organization that

9   accredits hospitals and other medical healthcare

10  organizations"; is that right?

11       A.   Yes.

12       Q.   Now, you say that "In 2001, the Joint

13  Commission made pain the fifth vital sign alongside

14  heart rate, temperature, respiratory rate, and blood

15  pressure."

16            Did the Joint Commission making pain the fifth

17  vital sign have an effect on prescribing opioid

18  medications?

19       A.   Yes, as did pharmacy defendants' promotion of

20  those Joint Commission quality measures.

21       Q.   Move to strike the second part of that

22  referring to the pharmacies.

23            The Joint Commission has control over whom in

24  the American healthcare system?

25                 MR. ARBITBLIT:  Object to form.

1              THE WITNESS:  The Joint Commission

2    accredits hospitals; a lot of hospitals need and want

3    Joint Commission accreditation because it's part of how

4    they get reimbursed.

5    BY MR. GISLESON:

6         Q.  So that the Joint Commission was establishing

7    guidelines, then, for these hospitals for the

8    prescription of opioid medication?

9         A.  Well, the Joint Commission specifically

10   emphasized certain misleading messages around opioids

11   that would contribute to this paradigm shift, and they

12   specifically used Purdue Pharma material to do that,

13   messages like pain is undertreated, and opioids are the

14   answer, and doctors are opioid phobic, and doctors need

15   to do everything in their power to address a patient's

16   pain or they're reneging on their responsibility as

17   healthcare providers.

18        Q.  Did the Joint Commission receive any funding

19   from Purdue?

20        A.  I'm not recalling if they received direct

21   funding, but they did use Purdue Pharma marketing

22   material, and they sold that material to hospitals so

23   the hospitals could try to meet the Joint Commission

24   quality standards.

25        Q.  Then all these different organizations, in

Page 88

1    your view, contributed to the paradigm shift, which in

2    turn led to overprescribing, in your view, of opioid

3    medications; is that right?

4                    MR. ARBITBLIT:  Object to form.

5                    THE WITNESS:  The pharmacy defendants

6    would be in that group of individuals and organizations

7    that contributed to the paradigm shift that led to the

8    opioid epidemic, yes.

9    BY MR. GISLESON:

10        Q.  Move to strike as nonresponsive.

11            Do you agree that the prescription drug

12   epidemic, in your view, is first and foremost an

13   epidemic of overprescribing?

14        A.  It's an epidemic of the oversupply of opioids,

15   and one of the important ways that opioids get into

16   society is through a doctor's prescription.

17        Q.  Move to strike as nonresponsive.

18            Do you agree the prescription drug epidemic is

19   first and foremost an epidemic of overprescribing?

20        A.  I would say it's an epidemic of

21   overprescribing, overdistribution, and overdispensing.

22        Q.  Go to your book, please at page 25.  Under an

23   "Epidemic of Overprescribing," you wrote, "The

24   prescription drug epidemic is first and foremost an

25   epidemic of overprescribing."  Is that correct?

Page 89

1      A.   That's what I wrote here.

2      Q.   And you also said, "The extent to which

3   doctors rely on prescription drugs, especially

4   scheduled drugs, to treat their patients for even

5   routine, non-life-threatening medical conditions is

6   unprecedented."

7           That was an accurate statement then when you

8   wrote the book, correct?

9      A.   I'm sorry, where is that?

10     Q.   In the same paragraph.  "But today, the extent

11  to which doctors rely on prescription drugs, especially

12  scheduled drugs, to treat their patients for even

13  routine, non-life threatening medical conditions is

14  unprecedented," correct?

15     A.   Yes, that's what I wrote there.

16     Q.   Would you turn to page 57, please, of your

17  book.  In the first full paragraph on page 57 you

18  write, "In the early 1980s, however, professional

19  medical opinion on the use of opioid pain relievers

20  began to change in favor of using opioids more

21  liberally."

22          That was an accurate statement based on your

23  research; is that right?

24     A.   I think I would clarify that a little bit by

25  saying that there were individuals and publications as

1   early as the 1980s and probably even before that were

2   promoting more liberal use of opioids.  But it really

3   didn't take off until the late 1990s when the

4   pharmaceutical opioid industry amplified those

5   messages.

6        Q.  You then write, "The number of patients living

7   with pain was growing due to an aging population, to

8   more people undergoing and surviving complicated

9   surgeries, and to more people being kept alive with

10   life-threatening illnesses."  And then you also say

11   that hospice care was beginning to develop.  Is that

12   right?

13        A.  Yes.

14        Q.  And those were all accurate explanations as to

15   why there was an increase in chronic pain in the United

16   States, true?

17        A.  Yes, but it doesn't follow that there should

18   have been an increase in opioid prescribing.

19        Q.  Were doctors in the 1980s and 1990s, based on

20   the research you've done, aware that the number of

21   patients living with pain was growing?

22        A.  I think that doctors became more aware that in

23   the 1990s and early 2000s.

24        Q.  Were doctors also aware in connection with

25   prescribing prescription opioid medications that there

Page 91

1   was an aging population that was experiencing chronic

2   pain?

3        A.  Yes.  Again, I think doctors began to be aware

4   of that.

5        Q.  Could you go to page 19 of your report,

6   please?  You say in Paragraph No. 3, "Opioid

7   prescribing began to increase in the 1980s and became

8   prolific in the 1990s and the early part of the 21st

9   century representing a radical paradigm shift in the

10   treatment of pain and creating more access to opioids

11   across the United States."

12        You then write under B1, "From 1996 to 2011,

13   there was a 1,448 percent increase in the medical use

14   of opioids with increases of 690 percent from 1995 to

15   2004 and 100 percent from 2004 to 2011."

16        What did you mean by "medical use"?

17        A.  That the main way that the oversupply was

18   occurring was through the flooding of prescription

19   opioids obtained through a prescription or otherwise

20   diverted.

21        Q.  You then wrote, "Over the same time period,

22   opioids misuse increased more dramatically,

23   4,680 percent from 1996 to 2011, with increases of

24   1,372 percent from 1996 through 2004, and 245 percent

25   from 2004 to 2011."

Page 92

1           When you talk in terms of misuse, that's a

2    patient's failure to use the opioid medication as

3    prescribed by the healthcare provider?

4                 MR. ARBITBLIT:  Object to form.

5    BY MR. GISLESON:

6        Q.   What do you mean by "misuse" --

7        A.   So misuse --

8        Q.   -- in that sentence?

9        A.   So misuse is a term that is used differently

10   in different contexts.  Sometimes misuse is very

11   strictly defined as a patient using an opioid

12   medication in any way other than prescribed, which

13   could include, for example, the doctor saying take one

14   pill in the morning and one at night and instead the

15   patient takes one pill at noon and one at night.

16          But that's not the definition that I'm talking

17   about here.  I'm talking about the kind of misuse which

18   is consistent with early signs and symptoms of an

19   opioid use problem.

20       Q.   And that is true even with prescriptions that

21   were issued for legitimate medical purpose, that a

22   patient could still misuse them despite the legitimate

23   medical purpose?

24       A.   Again, I think you and I probably are not

25   going to come to agreement on the term of "legitimate

Page 93

1   medical purpose" because I want to be very clear that

2   although doctors were prescribing opioids for minor and

3   chronic pain conditions, that wasn't really a

4   legitimate use of the opioids.  It wasn't

5   evidence-based that they were duped into doing that,

6   but, yes, I can agree that many of the problems of

7   misuse, if not the majority, came -- that those

8   individuals who were misusing opioids got them directly

9   or indirectly from a doctor's prescription.

10      Q.  And to be fair, it's your view that opioid

11  medication should never be used for long-term chronic

12  pain; is that right?

13              MR. ARBITBLIT:  Object to form.

14              THE WITNESS:  That is not true.  I have

15  not said that, and in my report as well as in public

16  forums where I've spoken on this topic, I have

17  specifically said that there may be a very small subset

18  of individuals who might benefit from the use of

19  opioids long-term in the treatment of chronic pain, but

20  those individuals would be the rare exception.

21  BY MR. GISLESON:

22      Q.  Do the majority of prescribers even today

23  still prescribe opioid medications for long-term

24  chronic pain?

25              MR. ARBITBLIT:  Object to form.

Page 94

1           THE WITNESS:  So prescribers --

2    BY MR. GISLESON:

3        Q.  Strike that.

4           What percentage of prescribers today prescribe

5    opioid medications for long-term chronic pain?

6        A.  So prescribers today are caught between a rock

7    and a hard place in that there are millions of

8    opioid-dependent chronic pain legacy patients who are

9    now physically dependent on opioids, and it would be

10   inhumane to just simply cut them off because they would

11   go into debilitating and even potentially

12   life-threatening opioid withdrawal.

13          So many ongoing prescriptions for opioids in

14   the treatment of chronic pain are actually in harm

15   reduction strategy to prevent debilitating withdrawal

16   and part of a taper strategy as doctors attempt to get

17   these high-dose, long-term chronic pain patients to

18   lower, safer doses.

19       Q.  Can you explain what you mean by "taper"?

20       A.  Taper means to lower the dose of a medication

21   over time.  Taper usually implies that is done at a

22   pace that the patient can tolerate.

23       Q.  So in your view, a doctor should not just cut

24   off a patient from opioid medication prescriptions when

25   the patient has an opioid use disorder?

Page 95

1      A.   No, that's not what I said.

2      Q.   You said, "It would be inhumane to simply cut

3  off a patient because they would go into debilitating

4  and potentially life-threatening opioid withdrawal."

5      A.   Right.  So there is a distinction between

6  people who are physically dependent on opioids, and

7  that was the population I was referring to.  And I

8  believe if you look at my statement, you'll see that

9  was the case.  That is an overlapping population but a

10  distinct population from those who have DSM-5 opioid

11  use disorder.

12      Q.   Is there anything on prescriptions in Ohio

13  that identify whether a patient has an opioid use

14  disorder?

15            MR. ARBITBLIT:  Object to form.

16            THE WITNESS:  Typically, the

17  prescription itself does not include the medical

18  condition for which the opioid is being prescribed.

19  BY MR. GISLESON:

20      Q.   Well, is it necessary to do an official DSM-5

21  diagnosis to determine whether someone has opioid use

22  disorder?

23      A.   In order to make a formal diagnosis of opioid

24  use disorder, it is best to use the DSM-5 criteria

25  because that's the professional criteria that is

Page 96

1   considered the best standard today.  But there are many

2   harbingers and signs and symptoms of an opioid problem

3   that might fall short of a DSM-5 diagnosable opioid use

4   disorder.

5       Q.  Is special training necessary to diagnose

6   someone with opioid use disorder under the DSM-5?

7                   MR. ARBITBLIT:  Object to form.

8                   THE WITNESS:  I think special training

9   is always great, but, you know, if it walks like a duck

10  and talks like a duck, it's probably a duck.

11  BY MR. GISLESON:

12      Q.  Do you believe the prescription should

13  identify patients who have opioid dependence or opioid

14  use disorder?

15      A.  I think in many instances that would be a

16  HIPAA violation.

17      Q.  So from your perspective, then, how is a

18  pharmacist to know that a patient has opioid dependence

19  or an opioid use disorder if it's not on the

20  prescription?

21                  MR. ARBITBLIT:  Object to form.

22                  THE WITNESS:  Yeah, thank you for asking

23  that.  I think that's a really good and important

24  question.  There are many actions that a pharmacist can

25  take in order to try to ferret out whether or not a

Page 97

1   patient is struggling from the disease of addiction or

2   on their way to developing that disease.  One of them

3   is to check the prescription drug monitoring database

4   to see whether or not there are red flags.  Another of

5   them is to call the prescribing doctor and have a

6   discussion about any concerns that the pharmacist may

7   have regarding that prescription and the patient's

8   potential or manifestation of an opioid use problem.

9           Another is the appearance of the patient

10  themselves when they present to pick up their

11  prescription, as well as other demographic factors

12  regarding that individual.  If they're paying with

13  cash, if they've traveled a far distance in order to

14  obtain the prescription.  These are all well-known red

15  flags for misuse and diversion, which are a key part of

16  a pharmacist's role in drug utilization review.

17  BY MR. GISLESON:

18      Q.  You don't have anything in your report, do

19  you, that identifies the extent to which any of the

20  chain pharmacy defendants reviewed OARRS reports as far

21  as dispensing opioid --

22          (Reporter clarification.)

23      Q.  -- OARRS reports, O-A-A-R-S reports in

24  connection with dispensing opioid medications?

25      A.  Well, what my report does contain is lots of

Page 98

1    information on the fact that OARRS was never mandated

2    in any kind of complete way by pharmacy defendants,

3    although they could have done that very early on and

4    made a big difference in terms of the volume of pills

5    going out into the public.

6            And on top of that, there were so many

7    pressures and incentives on pharmacists themselves to

8    dispense quickly and to ignore the red flags that would

9    have made it -- that leads me to believe that the

10   checking of the OARRS database was far less than it

11   should have been.

12       Q.   Move to strike as nonresponsive.

13           You also indicate that opioid overprescribing

14   after surgery is part of the general overprescribing

15   that happens.  Is that because the prescribers are

16   including too many pills in the prescription?

17       A.   Yes.  It's well recognized that surgery can be

18   a gateway to opioid dependence, misuse, addiction, and

19   overdose.

20       Q.   Does a prescriber exercise judgment in

21   deciding how many pills to prescribe for pain?

22                   MR. ARBITBLIT:  Objection to form.

23                   THE WITNESS:  As I've said before, the

24   ability to exercise judgment is impacted by many

25   things.  The standard way that doctors learn is see

Page 99

1   one, do one, teach one.  When we're in our training and

2   we have an attending who has been misguided by the

3   industry to prescribe large volumes of pills after

4   surgery, we take that as what we should also be doing.

5   BY MR. GISLESON:

6       Q.  And doctors have different reasons for why

7   they prescribe a certain number of pills following

8   surgery; is that correct?

9               MR. ARBITBLIT:  Object to form.  Vague.

10  Overbroad.

11  BY MR. GISLESON:

12      Q.  Doctor, you can answer?

13      A.  Can you please restate the question?

14      Q.  Sure.  Do you understand that different

15  doctors have different practices as to the number of

16  pills they prescribe for pain following a surgery?

17      A.  I would generally disagree with that statement

18  as relates to the way opioids were prescribed beginning

19  in the late 1990s up through most of the last two

20  decades, especially given the electronic medical record

21  and the way in which that record often automatically

22  populated the number of pills based on this

23  misconception that the benefits are greater than they

24  really are, and the risks are less than they really

25  are.

Page 100

1    Q.  When you say, "automatically populated the

2    number of pills," what is the quantity to which you're

3    referring?

4    A.  There are multiple studies now showing that

5    the way that opioids were prescribed in the early 2000s

6    until just several years ago, really, was to prescribe

7    far more pills than, for example, postsurgical patients

8    actually needed, and by reducing those number of pills,

9    discovering that the patients had no increase in their

10   postoperative pain, and the realization among the

11   medical community that the number of pills had been

12   excessive.

13   Q.  Go to your book, please, page 96.  You wrote

14   on page 96 in this first full paragraph, "Doctors are

15   more likely to prescribe opioids and other addictive

16   medications to patients on Medicaid, many of whom were

17   receiving disability payments."

18        Over what period of time, was that correct?

19   A.  I'm not sure.

20   Q.  Can you estimate?

21   A.  No.  I'd have to go back and look.

22   Q.  You then write, "People receiving Medicaid are

23   prescribed painkillers at twice the rate of

24   non-Medicaid patients, and they die from prescription

25   overdoses at six times the rate."

Page 101

1           Based on your research, do you have an

2    understanding as to why people receiving Medicaid are

3    prescribed painkillers at twice the rate of

4    non-Medicaid patients?

5         A.   I believe it's because people on Medicaid have

6    less access to other non-medication treatments for

7    pain.

8         Q.   So why, in your experience, would a doctor

9    prescribe more painkillers to Medicaid patients when

10   they lack access to other non-medication treatments?

11                MR. ARBITBLIT:  Object to form.

12                THE WITNESS:  I think doctors are trying

13   to help their patients.  They want to do what's ever

14   within their power to help that patient, and if they've

15   been misguided into believing that opioids actually

16   work long-term for chronic pain and they don't have any

17   other resources, then they will use opioids.

18   BY MR. GISLESON:

19        Q.   Is that reasonable in your view for doctors to

20   prescribe additional opioid medications to patients who

21   lacked access to non-medication treatments?

22                MR. ARBITBLIT:  Object to form.

23                HE WITNESS:  Again, if doctors have been

24   educated to believe, contrary to the evidence, that

25   opioids are safe and effective in the treatment of

Page 102

1  chronic pain, then they are more likely to prescribe
2  opioids for those indications.
3            MR. GISLESON:  Could you turn, please --
4  Matt Ladd, could you go to Tab 12, please?
5            MR. LADD:  Don, do you want Tab 12
6  marked as Exhibit 1?
7            MR. ARBITBLIT:  I just want to
8  interject, Counsel, that if you're referring to a
9  document that you've provided to the witness and to
10  Counsel, may she open an envelope with it?  And
11  otherwise, we would object to using it.
12            MR. GISLESON:  It would probably help.
13  Yeah, that's fine.
14            MR. ARBITBLIT:  Dr. Lembke, do you have
15  a large -- like, a box of FedEx documents?
16            THE WITNESS:  This one?  I have three
17  different FedEx packages.
18            MR. ARBITBLIT:  I think Mr. Giselson's
19  box is the largest.
20            THE WITNESS:  Okay.  Matthew Ladd,
21  Morgan, Lewis & Bockius.
22            MR. ARBITBLIT:  That's his firm.
23            MR. GISLESON:  I take that as a point of
24  pride.
25            MR. ARBITBLIT:  I figured you would.

Page 103

1    You're taking the lead; you should have the biggest

2    box.

3                    THE WITNESS:  I have to get a tool to

4    open this.

5                    MR. CRAWFORD:  John, should we go off

6    the record now?

7                    MR. GISLESON:  Yeah, that's fine.

8                    THE VIDEOGRAPHER:  We are going off the

9    record at 11:09.

10                    (Recess taken 11:09 a.m. to 11:11 a.m.)

11                    THE VIDEOGRAPHER:  We are back on the

12    record.  The time is 11:11.  Please proceed.

13                    (Exhibit 1 marked for identification.)

14    BY MR. GISLESON:

15        Q.  Dr. Lembke, are you familiar with the "British

16    Medical Journal"?

17        A.  Yes.

18        Q.  And is that a peer-reviewed publication?

19        A.  Yes.

20        Q.  Is it well regarded in the medical community?

21        A.  Yes.

22        Q.  If we look at what has been marked as

23    Exhibit 1, is this a true and correct copy of an

24    article dated October 31, 2017, that you wrote entitled

25    "The Opioid Epidemic is a Symptom of Our Faltering

                                        Page 104

1    Healthcare System"?

2         A.  I'm sorry, I don't know -- I have a big binder

3    here.  I'm not sure.  Is this --

4         Q.  Yes, Tab 12.

5         A.  Tab 12, okay.

6         Q.  Which we've marked as Exhibit 1.

7         A.  Can I just take a moment to look at it to make

8    sure that's what I wrote?

9         Q.  Sure.

10        A.  Okay, yes.

11        Q.  Is this a true and correct copy of an article

12   you wrote for the "British Journal" entitled, "The

13   Opioid Epidemic is a Symptom of Our Healthcare System"?

14        A.  Yes.

15        Q.  This was published on October 31, 2017; is

16   that right?

17        A.  Yes.

18        Q.  As of this time, had you been retained by the

19   plaintiffs' lawyers in opioid litigation?

20        A.  Just barely, yes.

21        Q.  You wrote, "Much hullabaloo was made last week

22   of President Trump formally declaring the U.S. opioid

23   epidemic a public health emergency," correct?

24        A.  Yes.

25        Q.  And the U.S. opioid epidemic, that included

Page 105

1    heroin, right, and fentanyl?

2         A.  Yes, at that time.

3         Q.  And if you skip down a paragraph you wrote,

4    "Not long after Trump's announcement, the critics piled

5    on, myself included.  Most of the naysayers complained

6    that he had promised to declare the opioid epidemic a

7    national emergency, which would have granted immediate

8    access to Stafford funding, somewhere in the millions

9    rather than the paltry $57,000 purported to be sitting

10   in the U.S. Public Health Emergency Fund," right?

11        A.  Yes.

12        Q.  You then write, "But whether it's the $57,000

13   in the Public Health Emergency Fund, millions in the

14   Stafford Fund, or even billions from an appropriations

15   committee, an infusion of money to fight the epidemic

16   is going to have little impact.  The opioid epidemic is

17   a system of our faltering healthcare system, and until

18   we see sweeping changes in the way healthcare is

19   delivered in this country, no amount of the throwing

20   money at the problem is going to make it go away."

21            That was your generally held belief as of the

22   time you wrote in article, correct?

23        A.  Yes.

24        Q.  You then write in the next paragraph, "This

25   opioid epidemic is first and foremost an epidemic of

1    overprescribing."  And you would certainly agree with

2    that statement?

3         A.  Yes, as I qualified earlier, it's the

4    prescribing plus the dispensing, but yes.

5         Q.  In the next page you wrote, "Perverse

6    incentives inside of medicine drive overprescribing.

7    American doctors are paid by how many medical services

8    they provide, not by whether patients get better.

9    Services that involve writing a prescription, injecting

10   a medicine, or performing a surgical procedure, pay far

11   more than educating patients about healthy lifestyle

12   changes or providing them with non-opioid,

13   non-medication alternatives for pain, such as physical

14   therapy, psychotherapy, and massage, all of which have

15   been shown to work better than medications for chronic

16   pain conditions."

17         That was your generally held belief as of the

18   time that you wrote this article, correct?

19         A.  Yes.

20         Q.  And that's also based on the research as well

21   as your experience working in hospitals and with

22   patients; is that right?

23         A.  Yes.

24         Q.  You then wrote, "Doctors' salary and

25   professional advancement are tied by how well patients

                                        Page 107

1    rate them on patient satisfaction surveys.  Doctors are

2    desperate to avoid bad ratings and will write a

3    prescription for an opioid even when it's not indicated

4    to avoid a dissatisfied customer."

5           What basis did you have for making those

6    statements?

7       A.  I base that on the work -- the research that I

8    did for my book.

9       Q.  You then write, "At the same time that doctors

10   are incentivized to prescribe opioid medications, they

11   are not trained or paid much to treat addiction."

12          Why do you believe that is?

13      A.  Well, I believe that they're incentivized in

14   many different ways.  They're incentivized through the

15   false and misleading messages on the part of

16   defendants, they're incentivized because of the

17   increasingly short amount of time they have to actually

18   see people.  They're incentivized because of the

19   structure and the churn in the modern healthcare

20   system.

21      Q.  When you write that doctors are not trained or

22   paid much to treat addiction, do you consider that a

23   failure of the American medical system?

24      A.  Yes.

25      Q.  You go on to write that "getting insurance

                                                    Page 108

1    companies to pay for addiction treatment is still a

2    bureaucratic maze of carve-outs, prior authorizations,

3    and failed first criteria."

4            Is that still the case?

5        A.  It's gotten better, but that's still the case,

6    yes.

7        Q.  What did you mean by "bureaucratic maze of

8    carve-outs"?

9        A.  Well, before the Mental Health Parity and

10   Addictions Equity Act --

11           (Reporter clarification.)

12       A.  -- of 2008, followed by the Affordable Care

13   Act, it was difficult to get insurance coverage for

14   addiction treatment.

15       Q.  And "prior authorizations" mean you need to

16   get prior approval from an insurance company before a

17   certain treatment?

18       A.  That's right.

19       Q.  And what is "fail first criteria"?

20       A.  You have to try another treatment first before

21   you can be allowed to have the treatment that the

22   doctor is trying to give you.

23       Q.  The next paragraph you wrote, "The opioid

24   epidemic will improve only when doctors get paid to get

25   patients better, including treating addiction."

Page 109

1        Are doctors now getting paid to get patients

2   better?

3        A.   I would say we're still not where we need to

4   be with that.

5        Q.   You wrote that the "opioid epidemic is a

6   symptom of our faltering healthcare system and until we

7   see sweeping changes in the way healthcare is delivered

8   in this country, no amount of throwing money at the

9   problem is going to make it go away."

10        Have the sweeping changes in the way

11   healthcare is delivered in this country occurred?

12        A.   No.

13        Q.   If you can go, please, to Tab 13.

14             (Exhibit 2 marked for identification.)

15             MR. LADD:   Tab 13 is being marked as

16   Lembke Exhibit 2.

17   BY MR. GISLESON:

18        Q.   Thank you.

19        Dr. Lembke, I'd like to show you what has been

20   marked as Lembke Exhibit 2.  Are you familiar with an

21   organization called Shatterproof?

22        A.   Yes.

23        Q.   And it was founded by a gentleman named Gary

24   Mendell?

25        A.   Yes.

Page 110

1      Q.   And Shatterproof focuses on addiction issues;

2   is that right?

3      A.   Yes.

4      Q.   And you agreed to do a Q & A with Shatterproof

5   on America's Prescription Epidemic:  How Did We Get

6   Here?  Q & A with Anna Lembke," correct?

7      A.   I don't specifically recall that, but.

8      Q.   This is dated February 1, 2017.

9      A.   Which exhibit are you looking at?

10      Q.   Tab 13, which we marked as Exhibit 2.

11      A.   This is the one entitled "America's Addiction

12   Epidemic:  How Did We Get Here?  Q & A" --

13      Q.   Yes.

14      A.   Okay.

15      Q.   Do you recall submitting a written piece, one

16   or more, to a Shatterproof publication?

17      A.   No, I don't recall submitting a written piece.

18   Might this have been an oral interview?

19      Q.   Let me ask you this:  The question on the

20   first page is, "Most of us are at least somewhat

21   familiar with alcoholism and street drug addiction, but

22   addiction to prescribed drugs, and opioids in

23   particular, seems a much newer epidemic.  When and why

24   did this problem suddenly become so much larger?"

25           And then the answer is, "The current

Page 111

1   prescription drug epidemic is first and foremost an

2   epidemic of overprescribing, not just of opioid

3   painkillers but of other controlled medicines such as

4   sedatives (Xanax) and stimulants (Ritalin)."

5           Do you agree with the statement there?

6                   MR. ARBITBLIT:  I'm going to object to

7   the form of the question, and Dr. Lembke, if you

8   recognize this as something that you participated in

9   and gave that answer, you may answer the question.  But

10  if you don't recognize it, I'm going to instruct you

11  not to answer something just because Counsel has read

12  it as something that purports to be your statement.

13                  MR. GISLESON:  Please don't coach the

14  witness, and that also was not my question.

15  BY MR. GISLESON:

16      Q.  Dr. Lembke, my question is do you agree with

17  the statement that, "The current prescription drug

18  epidemic is first and foremost an epidemic of

19  overprescribing, not just of opioid painkiller but of

20  other controlled medications such as sedatives (Xanax)

21  and stimulants"?

22      A.  I think the current opioid epidemic is

23  primarily a result of too many prescription opioids,

24  but certainly co-prescribing with other --

25              (Reporter clarification.)

Page 112

1          A.  -- medications like benzodiazapine and

2     stimulants is also of significant concern.

3          Q.  And in your experience, based on your

4     research, have doctors been overprescribing sedatives

5     and stimulant too?

6          A.  Yes.

7          Q.  Next question, at the same page says, "What

8     factors caused this rapid and relatively recent rise in

9     the number of opioid pills prescribed by doctors?"

10              And this states, "The factors driving op --

11     strike that.

12              This states, "The factors driving

13     overprescribing are many and complex."

14              Do you agree with that statement?

15          A.  Yes.

16          Q.  This then says, "Here are some of the most

17     important," and this identifies "cultural narratives

18     that promote pills as quick fixes for pain."

19              Do you agree that that is a factor in

20     overprescribing?

21          A.  Yes.

22          Q.  It also says, "Medical disability scenarios

23     that hinge on patients taking pills and staying sick as

24     a way to secure an income."

25              Do you agree with that statement that that is

Page 113

1   a factor driving overprescriptions?

2        A.  I think you skipped the second one.

3        Q.  Do you agree that "medical disability

4   scenarios that hinge on patients taking pills and

5   staying sick as a way to secure an income," are a

6   factor driving overprescriptions?

7                    MR. ARBITBLIT:  Object to form.

8                    THE WITNESS:  That is one of the factors

9   I've written about in my book.

10  BY MR. GISLESON:

11       Q.  For how long has that been a factor driving

12  overprescriptions?

13       A.  I don't know.

14       Q.  Can you estimate in any way?

15       A.  No.

16       Q.  More than ten years?

17       A.  I don't know.

18       Q.  More than five years?

19       A.  I don't know.

20       Q.  Can you explain what is meant by "medical

21  disability scenarios that hinge on patients taking

22  pills and staying sick as a way to secure an income"?

23       A.  As I talk about in my book, there are ways in

24  which our disability system has replaced welfare such

25  that individuals who are living in poverty, who also,

Page 114

1   many of them, struggle with chronic pain, get a monthly

2   disability check based on their pain diagnosis.  And

3   they're very reliant on that income in order to

4   survive.

5           And my point here is really that the

6   healthcare system is not taking care of these people

7   necessarily in the way that it should by forcing them

8   to use disability as a way to pay their bills.

9       Q.  Do you agree that "a new medical bureaucracy

10  that is focused on the bottom line favoring pills,

11  procedures, and patient satisfaction over patients

12  getting well was a driving factor in overprescribing"?

13      A.  Yes, and I think that the pharmacy defendants

14  know a lot about that since they used similar methods

15  to incentivize dispensing.

16      Q.  Move to strike everything after "yes."

17          Do you have an understanding of what is meant

18  by "new medical bureaucracy that is focused on the

19  bottom line"?

20      A.  As I said, you know, the majority of

21  healthcare providers now work as salaried employees in

22  large, integrated healthcare centers.  They have

23  reduced autonomy.  They are beholding to pain

24  guidelines, Joint Commission quality measures, there is

25  pressure to practice what is called evidence-based

Page 115

1    medicine, and so they are very reliant on what it says

2    in the medical literature with, I might add, little

3    training on how to filter through that medical

4    literature for biases such as studies funded and

5    written by pharmaceutical opioid-defendant authors.

6         Q.  It also states that "a driving factor in

7    overprescribing is disjointed medical care and

8    antiquated privacy laws that make it impossible for the

9    right hand to know what the left hand is prescribing."

10        Do you agree with that?

11        A.  Yes.

12        Q.  Can you explain what that means?

13        A.  As I said before, many patients have different

14   doctors for different disease states, and until the

15   prescription drug monitoring database came along, it

16   was very difficult to know what other doctors were

17   prescribing, so difficult then to sort out, for

18   example, dangerous co-prescribing or duplicate

19   prescriptions.

20        And then HIPAA and 42 CFR, the privacy laws,

21   make it difficult at times for prescribers to

22   communicate with others around a patient's condition

23   because they need to, by law, respect the privacy of

24   the patient except in emergent situations.

25        Q.  It then says, "Interwoven through all of this

Page 116

1    is the complex interpersonal dynamic between doctors

2    and patients, riddled with mutual deception, wishful

3    thinking, wounded pride, and desperate attempts on both

4    sides to pretend that a doctor's only mission is to

5    heal and a patient's only mission to recover from

6    illness."

7            Do you agree with that statement?

8        A.  I agree that it's a complex interpersonal

9    dynamic, yes.

10       Q.  Is it likely you wrote that paragraph?

11       A.  Yes.

12       Q.  Next question is, "What has changed in

13   medicine that is driving physicians to prescribe so

14   much more than was once the case?"

15           And this states, "The biggest change in

16   medicine, which has contributed significantly to the

17   prescription drug epidemic, has been the mass exodus of

18   physicians out of physician-owned practices and into

19   integrated healthcare institutions.

20           "Prior to 2000, the majority of doctors worked

21   in physician-owned practices.  Today, the majority of

22   doctors are salaried employees in large healthcare

23   conglomerates with billing quotas, patient satisfaction

24   surveys, and hospital quality measures, driving them to

25   provide a certain kind of care, even when that care is

Page 117

1    against their better judgment and/or the health of the

2    patient."

3            Is that what you referred to earlier in your

4    testimony?

5        A.  I'm sorry, could you say that again?

6        Q.  Do you agree with that statement that I just

7    read?

8        A.  Yes.

9        Q.  And then the second-to-the-last line you

10   wrote, "But when it comes to prescribing pills as a

11   short-term quick fix for complex problems, top-down

12   medicine has been a disaster."

13           Do you agree with that statement?

14       A.  Yes.

15       Q.  On the next page in the paragraph before the

16   question, "What role has big pharma played in the rise

17   in prescription levels?"  This states, "Over the course

18   of the past century, these changes in the way medicine

19   and society view pain have allowed for lessening the

20   burden of suffering for many people with pain."

21           Do you agree with that statement?

22       A.  I think when that statement is referring to,

23   for example -- actually, if you don't mind, can I read

24   the preceding paragraphs?  Because it seems like this

25   refers to -- the statement these changes refers to the

Page 118

1   preceding paragraph, so I want to make sure I know what

2   it's referring to.

3              MR. GISLESON:  We can go off the record

4   so you can do that.  Why don't we go off the record so

5   she can read it.

6              THE VIDEOGRAPHER:  Okay, thank you.  We

7   are going off the record at 11:33.

8              (Recess taken 11:33 p.m. to 11:36 p.m.)

9              THE VIDEOGRAPHER:  We are back on the

10  record the time is 11:36.  Please proceed.

11  BY MR. GISLESON:

12     Q.  This paragraph says, "Over the course of the

13  past century, these changes in the way medicine and

14  society view pain have allowed for a lessening of the

15  burden of suffering for many people with pain; however,

16  this altered perspective has also inadvertently

17  contributed to the opioid epidemic by encouraging

18  doctors to overprescribe opioids for chronic pain as a

19  way to make the elimination of all pain the goal of

20  medical treatment."

21         Do you agree with that statement?

22     A.  Well, I wrote that statement.  I think I would

23  qualify in this context whether or not I agree with it.

24     Q.  You then wrote, "Emerging evidence suggests

25  that opioids are not effective when used long-term for

```
                                    Page 119
 1   pain.  They are very effective for short-term, i.e.,
 2   1-3-day pain."
 3             When you talk about emerging evidence, was
 4   that evidence that was emerging in or about
 5   February 2017?
 6        A.  No, in fact, there was plenty of evidence
 7   already in existence that opioids are harmful, that
 8   they're addictive.  And there was no evidence that they
 9   work in the treatment of chronic pain.
10        Q.  You chose to use the phrase "emerging
11   evidence," right?
12        A.  Well, that's what it says there.  But it's
13   very clear that there is no evidence showing benefits
14   of opioids longer than about 12 weeks.
15        Q.  The next page, please, under the question,
16   "What can stop the overprescribing of drugs in the
17   U.S.?"  You wrote, "Unfortunately, the prescription
18   drug epidemic is likely to continue for the foreseeable
19   future unless we do more to target the unseen forces
20   driving the epidemic."
21             You go on to write, "What it will take to stop
22   the overprescribing of opioids and other pills is a
23   restructuring of medicine to a system which reimburses
24   doctors to provide the kind of treatment that actually
25   helps pain in the long-term."
```

1          You agree with that statement, correct?

2      A.   Which statement are we talking about here?

3      Q.   "What it will take to stop the overprescribing

4    of opioids and other pills is a restructuring of

5    medicine to a system which reimburses doctors to

6    provide the kind of treatment that actually helps pain

7    in the long-term."

8      A.   That change is only part of the change that we

9    need to make to --

10      Q.   Has that restructuring occurred?

11              MR. ARBITBLIT:  Objection.

12   Argumentative.  Interrupting the witness who is not

13   done with her answer.

14   BY MR. GISLESON:

15      Q.   I'm sorry, Dr. Lembke.  Continue.

16      A.   I'm sorry, what was your question?

17      Q.   I inadvertently cut you off.  I apologize.

18      A.   So what is in this document here is a partial

19   representation in truncated form of my opinion.  Also,

20   importantly of note, you know, in the list of what

21   factors caused the opioid epidemic, you left off -- of

22   all the factors that were listed here, you left off the

23   one that says, "Corporations that are in cahoots

24   with organized medicine --

25              (Reporter clarification.)

Page 121

1       A.   "Corporations that are in cahoots with

2    organized medicine, misrepresenting medical science to

3    promote pill taking," and also, the section after the

4    question "What role has big pharma played in the rising

5    prescription levels," where I say, "big pharma, a

6    nickname for the multibillion-dollar pharmaceutical

7    industry has always been in the business of getting

8    doctors to prescribe more drugs, and they have used

9    every tactic at their disposal to do that."

10         So I think your questions have really

11   misrepresented this document and also my opinion,

12   because you left out important sections.

13      Q.   Move to strike as nonresponsive.

14         If you look at the fourth page at the bottom,

15   the question is, "Can you explain why some individuals

16   may be dependent on a substance, including opioids,

17   whereas others are more than just dependent but rather

18   are addicted?"

19         You wrote, "The great and enduring mystery in

20   the field of addiction is why some people can use

21   addictive substances in moderation and never get

22   hooked, while others eventually progress to addictive

23   behavior.  The risk is some combination of nature,

24   nurture, and neighborhood?"

25         And that still today is an accurate statement,

Page 122

1    right?

2        A.   Yes, as well as my further statement that the

3    greatest risk factor of all is simple access to the

4    drug.

5        Q.   You then wrote, "The risk of developing

6    addiction increases fourfold if the individual has a

7    biological parent or grandparent with addiction.

8    Mental illness and early trauma increase the risk of

9    addiction.  Growing up in an environment in which

10   maladaptive substance use is modeled and condoned is

11   also a risk factor.  Perhaps the greatest risk factor

12   of all is simple access.  If alcohol and drugs are

13   readily available, the individual is at greater risk to

14   use them and become addicted to them."

15            And all of that was that true when you wrote

16   it in 2017, and it remains true?

17       A.   Yes.

18       Q.   Was that true before 2017 as well?

19       A.   Are you saying was that my opinion before

20   2017?

21       Q.   Yes.

22       A.   Yes.  I mean, there was a point in my career

23   when I didn't understand much about addiction myself,

24   so I could only really form these opinions after I had

25   done research and had the clinical experience and

Page 123

1  knowledge.

2      Q.  And then on that same page under the question,

3  "Tell us what one can expect about addiction recovery

4  success rates.  Is the forecast rosy or dim?

5  Improving?"

6          And you wrote, "It's a myth that people with

7  addiction don't get better.  About 50 percent of people

8  who get addiction treatment get into recovery, response

9  rates that are on par with those who get depression --

10  treatment.  Many recover without any professional

11  treatment at all.  Those who actively participate in AA

12  and other 12-step groups have outcomes on par with

13  those who get professionally mediated treatment, like

14  cognitive behavioral therapy.  AA may even be better

15  than CBT long-term, for those who have a goal of

16  abstinence."

17          Do you still agree with that statement?

18      A.  Yes.

19      Q.  And is that currently the case, that it's a

20  myth that people with addiction don't get better?

21              MR. ARBITBLIT:  Objection to form.

22              THE WITNESS:  I think that the general

23  public as well as healthcare providers lack knowledge

24  about addiction and addiction treatment, and there is

25  kind of a pessimistic sense out there that people with

Page 124

1    addiction will always be addicted, when in fact, people

2    with addiction are average people across all walks of

3    life, and that with treatment people can get into

4    recovery.

5    BY MR. GISLESON:

6         Q.   Is it still the case that about 50 percent of

7    people who get addiction treatment get into recovery?

8         A.   That is based on an article by McLellan, et

9    al., comparing the outcomes in patients who get

10   treatment for addiction to patients who get treatment

11   for other chronic illnesses with a behavioral component

12   like Type 2 diabetes showing that in treatment people

13   with addiction look similar to people with other

14   chronic illnesses with behavioral components, that the

15   response rate across the board, that's referring to a

16   different article by Humphries, et al., showing that on

17   average response rates are about 50 percent.

18                  MR. GISLESON:  Okay, why don't we take a

19   break for lunch.  Or breakfast.  Don, how much time do

20   you want to take, 20 minutes?  Half an hour?

21                  MR. ARBITBLIT:  That's up to you.

22                  MR. GISLESON:  Dr. Lembke, what's best

23   for you?

24                  THE WITNESS:  How many hours are we in

25   now?

Page 125

1          THE VIDEOGRAPHER:  Should with we go off

2  the record and then discuss?

3          MR. GISLESON:  Yes, please.

4          THE VIDEOGRAPHER:  We are going off the

5  record at 11:45.

6          (Recess taken 11:45 a.m. to 12:14 p.m.)

7          THE VIDEOGRAPHER:  We are back on the

8  record.  The time is 12:14.  Please proceed.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                     AFTERNOON SESSION

2             11:27 A.M. EDT 12:14 p.m. PDT

3                      --o0o--

4                EXAMINATION RESUMED

5   BY MR. GISLESON:

6       Q.  Dr. Lembke, have you ever practiced pharmacy?

7       A.  If by that you mean am I a pharmacist, no.

8       Q.  Did you ever attend pharmacy school?

9       A.  No.

10       Q.  Do you have a degree in pharmacy?

11       A.  No.

12       Q.  Have you ever trained as a pharmacy

13 technician?

14       A.  No.

15       Q.  Have you ever worked in a pharmacy?

16       A.  No.

17       Q.  Have you ever dispensed opioid medications?

18       A.  No.

19       Q.  Have you taken any classes with pharmacists?

20       A.  Not that I'm aware of.

21       Q.  Have you ever trained pharmacists in the

22 dispensing of opioid medications?

23       A.  It's possible that in many talks I've given

24 there were pharmacists in the audience.

25       Q.  Have you ever trained pharmacists on the

Page 127

1    dispensing of opioid medications?

2         A.   Again, I've given many talks on the safety and

3    efficacy of opioids and on the problem of increased

4    supply and exposure as a major risk factor for

5    addiction to opioids, and in those talks, some of which

6    were CME talks and some of which were not, it's very

7    possible that there were pharmacists in the audience.

8         Q.   Have you ever given a talk to pharmacists in

9    which you were advising the pharmacists specifically

10   what steps they should follow before dispensing an

11   opioid medication?

12        A.   No.

13        Q.   Have you ever worked for the Drug Enforcement

14   Administration?

15        A.   No.

16        Q.   Have you ever worked for a state Board of

17   Pharmacy?

18        A.   No.

19        Q.   Pharmacists are regulated by a state Board of

20   Pharmacy; is that right?

21        A.   Yes.

22        Q.   The Board of Medicine does not regulate

23   pharmacists; is that correct?

24        A.   That's correct.

25        Q.   Before writing the report that we've looked at

Page 128

1   today, have you ever held yourself out as an expert in

2   the practice of pharmacy?

3        A.  I am an expert in the practice of detecting

4   misuse, diversion, addiction.  I do have expertise in

5   the Controlled Substances Act and scheduled drugs, and

6   I do have expertise in terms of my collaborative

7   responsibility in relationship with pharmacists with

8   whom I have multiple encounters on any given clinic

9   day.  I also have expertise in the prescription drug

10  monitoring database which is a tool that pharmacists

11  use.

12       Q.  I'll ask again.  Have you ever specifically

13  held yourself out as an expert in the practice of

14  pharmacy before you wrote this expert report?

15                 MR. ARBITBLIT:  Object to form.

16                 THE WITNESS:  Again, I do think I have

17  expertise in terms of pharmacy practices, vis-a-vis the

18  opioid epidemic, and I have held myself out as such.

19  BY MR. GISLESON:

20       Q.  Have you ever given a talk in which you told

21  the attendees that you were an expert in the practice

22  of pharmacies by pharmacists?

23       A.  No.

24       Q.  Before issuing this report, had you ever

25  evaluated whether a pharmacist complied with the duties

1   applicable to a pharmacist in dispensing an opioid

2   medication pursuant to a prescription?

3       A.  Yes.

4       Q.  When?

5       A.  As part of the research for my book, I

6   interviewed multiple stakeholders and representatives

7   within medicine, including pharmacists, and had

8   discussions around their experiences with opioid misuse

9   and diversion.

10      Q.  Other than speaking with pharmacists, have you

11  taken any classes on what a pharmacist should do before

12  dispensing an opioid medication?

13      A.  Well, pharmacists and doctors have similar

14  responsibilities when it comes to detecting and

15  allowing access to controlled substances, so in that

16  sense, there is an overlapping education.

17      Q.  Have you taken any classes that were specific

18  to the steps that a pharmacist must take before

19  dispensing an opioid medication?

20                  MR. ARBITBLIT:  Object to form.

21                  THE WITNESS:  My answer to that would be

22  I've actually taught on the subject of what steps

23  pharmacists should take before dispensing an opioid

24  medication.  It's part of my -- it's part of my broader

25  expertise in addiction medicine.

Page 130

1   BY MR. GISLESON:

2       Q.  And to whom did you teach that issue?

3       A.  I've given multiple talks within Stanford and

4   outside regarding how to use the prescription drug

5   monitoring database, what constitutes red flags for

6   opioid misuse and diversion.  I have talked outside of

7   Stanford, if I didn't say that already, on the same and

8   I've also published articles on red flags for misuse

9   and diversion of opioids.  Beyond my book, that is.

10      Q.  What training did pharmacists in Ohio receive

11  in pharmacy school concerning their corresponding

12  responsibility?

13      A.  I assume that pharmacists in Ohio received the

14  same training that pharmacists received nationally.

15      Q.  Do you know for a fact what training they

16  received on their corresponding responsibility while in

17  pharmacy school?

18      A.  I don't have specific knowledge about pharmacy

19  schools in Ohio, but I have no evidence to suggest that

20  it's any different from pharmacy training nationally.

21      Q.  And what do you understand pharmacy training

22  is nationally concerning a pharmacist's corresponding

23  responsibility?

24      A.  A pharmacist -- one of the pillars of drug

25  utilization review is to detect for misuse and

Page 131

1  diversion of controlled substances.  It's a major

2  aspect of a pharmacist's job.  They are taught to look

3  out for red flags, and there is a long list of red

4  flags that pharmacists are trained on.

5      Q.  Do you know what courses pharmacists take in

6  pharmacy school?

7      A.  As I said, pharmacists are trained on

8  detecting misuse and diversion, identifying red flags

9  and doing what is in their corresponding responsibility

10  as outlined by the Controlled Substances Act to prevent

11  misuse and diversion.

12      Q.  Did you do any research on the practice of

13  pharmacy in connection with the report that you've

14  given in this case?

15      A.  Yes.

16      Q.  What was the research?

17      A.  I've reviewed a number of articles on the

18  nature of a pharmacist's job, I've reviewed the

19  regulations and the policies that the defendants put in

20  place regarding the detection of red flags and a

21  pharmacist's role in terms of misuse and diversion.

22  I've researched lay press articles on whether or not

23  pharmacists actually have the time and ability to do

24  their due diligence around detecting and preventing red

25  flags.

Page 132

1      Q.   Anything else?

2      A.   Can you repeat the question?

3      Q.   What resource did you do on the practice of

4   pharmacy in connection with the report that you've

5   given in this case?

6      A.   Can I review my report for a moment?  I have

7   looked at the medical literature on pharmacists and

8   pharmacy dispensing.  I have looked at DEA decisions on

9   enforcement for pharmacies.  I have looked at documents

10  from the National Association of Chain Drugstores, and

11  again, I have looked at the defendants' policies and

12  procedures over time regarding red flags, PDMP, and

13  dispensing.

14     Q.   Where in your report does it identify the

15  research that you did relating to the practice of

16  pharmacy?

17     A.   On page 103 at romanette 15, I discuss the

18  research on the dangers of opioid and benzodiazapine

19  prescribing and describe that as early as 2002 there

20  were known risks combining opioids and benzodiazepines

21  and that it is the responsibility of pharmacies to be

22  aware of dangers of co-prescribing that are described

23  in the medical literature and incorporate those into

24  their practices.  That literature is described on

25  page 103, 104 of my report onto page 105, again, on

Page 133

1   page 107.

2      Q.  That's research generally relating to

3   co-prescribing.  I'm asking what research generally you

4   did on the practice of pharmacy by licensed

5   pharmacists.

6      A.  In addition to the many documents I reviewed

7   provided by the defendants in discovery, I also cite a

8   number of different articles in my report at different

9   places regarding pharmacy practice.  For example, on

10   page -- for example, on page 124, I cite an article by

11   Marilyn Bullock called, "The Evolution of the PDMP" in

12   "Pharmacy Times."  And she states, I quote, "mandating

13   that all prescribers and pharmacists enroll in PDMPs

14   and requiring more frequent data reports would create a

15   more unified fight against drug diversion.  Because

16   pharmacists verify countless controlled substances

17   every day, they can greatly affect drug diversion.

18   Reviewing the PDMP prior to dispensing could become a

19   part of the regular workflow regardless of a

20   pharmacist's respected state mandates PDMP query and

21   reporting.  PDMP may not be the sole solution to the

22   opioid crisis or other drug diversion, but they

23   represent progress in combatting the epidemic."

24         Also, again, as stated before in multiple

25   places in my report, I look at articles discussing the

Page 134

1    conditions in which pharmacists work, including

2    specifically an article on page 151 from the University

3    of Cincinnati.  This article describes a study of Rite

4    Aid pharmacy in which they report that Rite Aid

5    pharmacists typically spent far less than 15 minutes on

6    each prescription.  In fact, according to a University

7    of Cincinnati study of Rite Aid's prescription fill

8    rates in 2011, Rite Aid pharmacists spent on average

9    3.22 minutes on any given prescription or 18.66 scripts

10   per hour.  This fill rate is a recipe for prescribing

11   errors, providing inadequate time to investigate red

12   flags or fulfill the corresponding responsibility to

13   dispense controlled substances only for legitimate

14   medical purposes.

15        Q.  Can you identify any other articles you read

16   in connection with your report that relate to the

17   practice of pharmacy?

18        A.  Yes, there are other articles in my report.

19        Q.  How much time did you spend researching

20   articles relating to the practice of pharmacy?

21        A.  I don't have a specific number of hours.

22        Q.  Can you estimate it in any way?

23        A.  Many hours.

24        Q.  And all the research that you described in

25   your report on the practice of pharmacy is research

```
                                      Page 135
 1   that you performed after the plaintiffs' lawyers asked
 2   you to express an opinion about the chain pharmacy
 3   defendants; is that right?
 4        A.  The majority, yes.
 5        Q.  Have you published any peer-review articles
 6   that address the practice of pharmacy?
 7        A.  Well, I have published -- I have published
 8   articles on red flags, how to detect them, what
 9   constitutes a red flag in terms of opioid prescribing.
10        Q.  Have you published any peer-review articles on
11   any other subject?
12        A.  I've published --
13                 MR. ARBITBLIT:  Object to form.
14                 THE WITNESS:  -- widely on the opioid
15   epidemic which is pertain to pharmacy practice.
16   BY MR. GISLESON:
17        Q.  Have you published any peer-reviewed articles
18   specific to the practice of licensed pharmacists in
19   dispensing opioid medications?
20        A.  I do believe that much of my writing is
21   relevant to the practice of pharmacy.
22        Q.  I'm not asking about relevance.  Have you
23   published any peer-reviewed articles specific to the
24   practice of licensed pharmacists in dispensing opioid
25   medications?
```

```
                                              Page 136

 1                MR. ARBITBLIT:  Object to form.

 2                THE WITNESS:  My publications are

 3   directed broadly to various stakeholders inside of

 4   medicine, and that would include pharmacists.

 5   BY MR. GISLESON:

 6       Q.  Did you review any of the prescriptions in

 7   this case to determine whether they contained any red

 8   flags?

 9       A.  By that, do you mean the specific notes

10   regarding specific prescriptions?

11       Q.  The specific prescription itself.

12       A.  No.  Those are not --

13       Q.  Have you reviewed any prescription data?

14                MR. ARBITBLIT:  Object to form.

15                THE WITNESS:  What do you mean by

16   "prescription data"?

17   BY MR. GISLESON:

18       Q.  Data that is maintained by one of the chain

19   pharmacy defendants that identifies opioid medications

20   that have been dispensed by that pharmacy defendant?

21       A.  Yes.

22       Q.  What data did you review?

23       A.  So if you give me a moment to find it, please.

24   Page 84 of my report contains a table with specific

25   data on Walgreens' income due to the sale of OxyContin
```

Page 137

1     importantly showing that their annualized income in

2     2010 was roughly the same as their annualized income in

3     2017.

4          Q.   Anything else -- strike that.

5               Any other pharmacy data relating to

6     prescriptions for opioid medications that have been

7     filled?

8          A.   Again, on page 92, there is a table showing

9     the average prescription size and number of OxyContin

10    prescriptions written for Walgreens pharmacies.

11         Q.   Can you tell from that data whether the

12    prescriptions were issued for legitimate medical

13    purpose?

14                   MR. ARBITBLIT:  Object to form.

15                   THE WITNESS:  Again, I'm reluctant to

16    respond to your use of the term "legitimate medical

17    purpose" because I don't think we're talking about that

18    in the same way.

19    BY MR. GISLESON:

20         Q.   Any other prescription data by one of the

21    chain pharmacy defendants that you've reviewed?

22         A.   Please give me a moment.  And by "data," are

23    you referring to numbers?

24         Q.   Correct.

25         A.   Uh-huh.  On page 101, there was a survey

Page 138

1   performed by the National Association of Boards of

2   Pharmacies showing that 83 percent of pharmacies

3   surveyed believed that distractions due to performance

4   metrics or measured wait times contributed to

5   dispensing errors, and that 49 percent felt specific

6   time measurements were a significant contributing

7   factor which could reduce time for drug utilization

8   review and ultimately result in unsafe prescribing.

9        Q.  Did you ask plaintiffs' Counsel to give you

10  access to any pharmacy defendant's data to show the

11  specific number of Schedule 2 opioid medication

12  prescriptions that that pharmacy filled?

13                 MR. ARBITBLIT:  I'll object and instruct

14  not to answer with respect to discussions with Counsel.

15  BY MR. GISLESON:

16       Q.  Did you request the opportunity to review any

17  chain pharmacy defendants' prescription data to

18  identify the average duration of any opioid

19  prescription?

20                 MR. ARBITBLIT:  Same instruction.

21                 MR. GISLESON:  You instruct her not to

22  answer?

23                 MR. ARBITBLIT:  Yes.

24  BY MR. GISLESON:

25       Q.  Have you written any articles that

Page 139

1  specifically analyze a pharmacist's corresponding

2  responsibility when dispensing an opioid medication?

3      A.  No.

4      Q.  Have you written any articles that

5  specifically addresses the operation of a pharmacy as

6  applied to prescription opioid medications?

7      A.  I do address pharmacies in my book "Drug

8  Dealer M.D.," although briefly.

9      Q.  And what you say in your book on pharmacies

10  there was that Internet pharmacies dispensed a very

11  high percentage of controlled substances, correct?

12      A.  Well, relative to their total prescribing,

13  yes, but in terms of absolute numbers of prescriptions,

14  those numbers are far higher for the brick-and-mortar

15  pharmacies.

16      Q.  And in terms of the percentage of controlled

17  versus non-controlled substances, the brick-and-mortar

18  pharmacies prescribe a much lower percentage of

19  controlled related to non-controlled substances,

20  correct?

21      A.  I believe that is true.

22      Q.  Have you written any articles about the

23  pharmacy supply chain management?

24      A.  I have published on that.

25      Q.  What have you published?

Page 140

1      A.   I believe in my book I do address -- well, I

2   do address in my book the importance of access as a

3   risk factor and the widespread availability across the

4   country to opioids as a major risk factor for opioid

5   addiction and overdose deaths.  And I also have

6   published in the --

7           (Reporter clarification.)

8      A.   -- Journal of the American Medical Association

9   an analysis of a Medicare 2013 database to look at

10  opioid prescribing.  I have two publications in JAMA on

11  that topic using the Medicare database with the

12  explicit emphasis in those articles of Medicare being a

13  nationally representative sample demonstrating that

14  these effects are widespread through every corner of

15  the United States.

16     Q.   Have you written any articles that address the

17  process by which opioid medications specifically go

18  from a manufacturer to a dispensing pharmacy?

19     A.   I have not written on the nuts and bolts of

20  that process, no.

21     Q.   How many articles, approximately, have you

22  published on the opioid crisis?

23     A.   It would depend on whether we're talking about

24  peer-reviewed articles or lay press articles.

25     Q.   Both.

Page 141

1      A.   I could get my CV out and count if you'd like.

2      Q.   Greater than how many?

3      A.   Why don't I get my CV out and count.

4      Q.   Let me ask you this:  So whatever articles

5  you've written, are in your CV, right?

6      A.   Yes.  Actually, so for example, you proffered

7  today a document that you stated that I wrote but I

8  think that may, in fact, be the result of an oral

9  interview which was then transcribed into written form.

10  I'm not sure because I don't explicitly remember that

11  document or that interview.

12     Q.   In how many published articles, whether

13  peer-reviewed or not prior to writing your expert

14  report in this case have you attributed the opioid, in

15  your words, epidemic to the chain pharmacy defendants?

16     A.   So prior to me being retained in this case, I

17  had written and taught and spoken publicly on the

18  involvement of the opioid pharmaceutical industry

19  without necessarily specifically calling out the

20  pharmacies.

21     Q.   Can you identify even a single article that

22  you've written in which you call out the pharmacies as

23  being the cause or one of the causes of the opioid

24  epidemic?

25     A.   Except for that brief mention in my book that

Page 142

1   you and I just spoke of, no.

2       Q.  Have you read any peer-reviewed articles that

3   address -- strike that.

4           Have you read any peer-reviewed articles that

5   assign blame for the opioid epidemic on the chain

6   pharmacy defendants?

7       A.  I have read and also included in my report

8   multiple definitive articles which have blamed the

9   opioid pharmaceutical industry broadly for the

10  epidemic, and I take that to include pharmacies.

11      Q.  Can you identify even a single peer-reviewed

12  article that assigns blame for the opioid epidemic

13  specifically to the chain pharmacy defendants in this

14  case?

15              MR. ARBITBLIT:  Object to form.

16              THE WITNESS:  As I sit here today, I am

17  not recalling an article that specifically names the

18  pharmacy defendants in the case today, but I've already

19  mentioned to you at least one article that is in my

20  report regarding what pharmacies could have and should

21  have done to prevent the opioid epidemic.

22  BY MR. GISLESON:

23      Q.  What is a community pharmacist?

24      A.  I assume that that means somebody who works in

25  a relatively smallish community and is identified in

1  that community as somebody who is a pharmacist.

2      Q.  Walk through the process from intake to

3  dispensing that in your view a pharmacist working for

4  one of the -- strike that.

5          Walk me through the process from intake to

6  dispensing that in your view a reasonable pharmacist in

7  Ohio must follow before dispensing an opioid medication

8  pursuant to a prescription.

9                  MR. ARBITBLIT:  Object to form.

10                 THE WITNESS:  What do you mean by

11  "reasonable"?

12  BY MR. GISLESON:

13      Q.  Walk me through the process from intake to

14  dispensing that under applicable Ohio law and

15  regulations a pharmacist must follow before dispensing

16  an opioid medication pursuant to prescription.

17                 MR. ARBITBLIT:  Object to form.  Calls

18  for a legal conclusion.

19  BY MR. GISLESON:

20      Q.  Let me rephrase the question.  Do you have an

21  understanding as to the process that a pharmacist in

22  Ohio must follow from intake to dispensing when filling

23  a prescription for an opioid medication?

24                 MR. ARBITBLIT:  Object to form.

25                 THE WITNESS:  Yes.

1          MR. ARBITBLIT:  You can answer.  Object

2    to form.

3    BY MR. GISLESON:

4         Q.  What's the process?

5         A.  The pharmacist must identify that the right

6    person is getting the right drug for the right amount

7    and duration and the correct medical indication from a

8    prescriber with whom they have a legitimate

9    relationship in the course of the normal care of that

10   prescriber.  And in addition, the pharmacist must do

11   his or her due diligence to make sure that any

12   prescription for a controlled substance is not being

13   misused or diverted in some way.

14        Q.  What is the process that the Rite Aid

15   pharmacists in Ohio specifically followed when filling

16   an opioid medication prescription?

17             MR. ARBITBLIT:  Object to form.  Vague.

18   Overbroad.

19             THE WITNESS:  So it would really depend

20   on the time that you're talking about since Rite Aid's

21   policies changed over time.

22   BY MR. GISLESON:

23        Q.  I'm asking for the detailed steps from intake

24   until it goes out the door.  What do the Rite Aid

25   pharmacists do?

Page 145

1              MR. ARBITBLIT:  Object to form.  Vague.

2     Overbroad.

3     BY MR. GISLESON:

4         Q.  You can answer.

5         A.  The pharmacist looks at the prescription from

6     the provider.  The pharmacist assures themselves that

7     the person presenting the prescription is either the

8     patient, him or herself or some responsible party, who

9     will get that prescription to the patient.  The

10    pharmacist looks at the amount, the duration.

11            The pharmacist hopefully looks at prescribing

12    history, not just for that individual patient but also

13    the prescriber, to see whether or not there are any red

14    flags there.  The pharmacist looks for drug-drug

15    interactions, and then the pharmacist looks carefully

16    for red flags to determine whether or not there are any

17    concerns for dangerous polypharmacy, misuse, diversion,

18    allergies.

19            Once all of that is completed, then the

20    pharmacist, using the information that they have, needs

21    to exercise their professional judgment as to whether

22    or not the medication can and should be dispensed.

23            If there are red flags, then the pharmacist is

24    obligated to investigate those red flags, and if the

25    investigation proves that there is good suspicion for

Page 146

1  misuse, diversion, not being dispensed for legitimate

2  medical purpose or not being dispensed in the usual --

3  in the usual patient-provider relationship, then that

4  individual should not dispense the medication.

5       If they determine after investigating the red

6  flag that in fact there is good cause to dispense

7  medication, then they can dispense the medication.  As

8  they're dispensing the medication to the patient, they

9  play a very important advisory role, making sure that

10  the patient, him or herself, is educated about the

11  medication, what its purposes is, how to take it, any

12  side effects to be worried about and any other

13  questions that they may have.

14     Q.  You said that the pharmacist exercises

15  professional judgment whether to dispense an opioid

16  medication.  What do you mean by "professional

17  judgment"?

18     A.  Well, those were not my exact words.  I

19  believe my exact words were that they would exercise

20  their professional judgment based on the data and

21  information that they have.  So if --

22     Q.  You said --

23          MR. ARBITBLIT:  You're interrupting

24  Counsel.  She's answering a question, and you're

25  interrupting her.

Page 147

1    BY MR. GISLESON:

2        Q.  Proceed, please.

3        A.  So if that pharmacist has access to good

4    information, then they can exercise their professional

5    judgment.  If they're disempowered either by not having

6    access or not having time or not being encouraged to do

7    their due diligence, then they will not be exercising

8    their clinical good judgment.

9        Q.  What did you mean when you said that the

10   pharmacist exercises professional judgment whether or

11   not the medication can and should be dispensed?

12                   MR. ARBITBLIT:  Object to form.

13                   THE WITNESS:  Well, the process of

14   exercising good judgment means taking into account all

15   of the information that you have access to, along with

16   your commonsense and your other decision-making

17   abilities to come to a conclusion.  But that can't be

18   seen in isolation.  That must be seen in the broader

19   context of what other pressures are on that individual.

20   And in this case in particular, there are and have been

21   pressures on pharmacists that have superseded their

22   ability to exercise their judgment at all regarding

23   dispensing opioids.  And I'm happy to go to examples in

24   my report if that would be helpful.

25

Page 148

1  BY MR. GISLESON:

2      Q.  What did you do as part of your report

3  preparation to determine whether Rite Aid's pharmacists

4  exercised good judgment in deciding whether to fill

5  opioid prescriptions?

6      A.  I looked at the way that Rite Aid pharmacists

7  were educated and what kind of information they had

8  access to.  And I determined that Rite Aid corporate

9  leadership collaborated with opioid manufacturers and

10  propagated some of the same myths around opioid

11  prescribing that were generally rolled out to

12  prescribers, also to pharmacists.

13          I looked at Rite Aid's policies regarding

14  pressures on dispensing -- give me a moment here.  And

15  found that issues related to incentivizing, dispensing,

16  understaffing, and poor enforcement contributed to

17  pressure on pharmacists to dispense opioids, even in

18  the presence of red flags.  I looked at DEA claims of

19  violations of the Controlled Substances Act that stated

20  that Rite Aid knowingly filled prescriptions for

21  controlled substances that were not issued for a

22  legitimate medical purpose pursuant to a valid

23  physician-patient relationship.

24          Again, I looked at things like the store bonus

25  program where Rite Aid staff pharmacists were eligible

Page 149

1   for a bonus based on 80 percent from store profits and

2   20 percent from customer satisfaction from controlled

3   substance prescriptions that were included in that

4   bonus calculation.  Again, Rite Aid's 2009 prescription

5   incentive bonus program designed to, quote, "reward our

6   pharmacy and front and associates for increasing their

7   overall prescription business," unquote, which

8   encouraged pharmacists to contact patients to pick up

9   their pain medicine as a way to increase prescription

10  sales.

11      Q.  Did you analyze the exercised professional

12  judgment by Rite Aid pharmacists at any specific store

13  in Lake or Trumbull County?

14      A.  I did analyze a partnership between Rite Aid

15  and -- just one moment, please -- and the American --

16      Q.  I'm sorry, continue.

17      A.  I did analyze a collaboration between Rite Aid

18  and the American Pain Foundation on a brochure called

19  "The Pain Relief Guide," which was promoted on radio

20  stations in Ohio, including Cleveland, Ohio.

21      Q.  Do you know the names of any of the

22  pharmacists who work for the chain pharmacy defendants

23  in Lake or Trumbull Counties?

24      A.  One moment, please.  I don't believe so, no.

25      Q.  Do you know how many pharmacists each of the

1    pharmacy defendants has in Trumbull and Lake Counties?

2         A.  No.

3         Q.  Do you know what the average duration was for

4    prescriptions that were filled for controlled

5    substances by any of the chain pharmacy defendants?

6         A.  No.

7         Q.  What was the process that the chain -- strike

8    that.

9              You understand that corresponding

10   responsibility applies only to the pharmacist, right?

11                  MR. ARBITBLIT:  Objection.  Misleading.

12                  THE WITNESS:  I would disagree with

13   that.  I think the DEA, some of the DEA enforcement

14   rulings have made it very clear that the corresponding

15   responsibility applies not just to the pharmacists but

16   also to the pharmacies.

17   BY MR. GISLESON:

18        Q.  You understand that it's the pharmacist who

19   exercises the judgment whether to dispense an opioid

20   medication, correct?

21                  MR. ARBITBLIT:  Object to form.

22                  THE WITNESS:  Again, that judgment

23   cannot be adequately exercised in an environment where

24   pharmacists are not given the information or the

25   support or the time or the incentives to exercise their

Page 151

1    judgment.

2    BY MR. GISLESON:

3         Q.   Do you understand that it's the pharmacist who

4    exercises the judgment whether to dispense an opioid

5    medication, correct?

6                   MR. ARBITBLIT:   Object to form.   Asked

7    and answered.

8    BY MR. GISLESON:

9         Q.   Can you answer the question, Dr. Lembke?

10        A.   One moment.   Okay.   I would just refer to my

11   report on page 142 where Walgreens pharmacist Robert

12   Yaeger wrote in an email to inform Walgreens that store

13   managers had challenged his attempts to override his

14   refusal to fill a prescription for a C2 medication, and

15   that such conduct was part of a larger problem.

16   Mr. Yaeger talked about -- so basically Mr. Yaeger

17   refused to fill a prescription for an opioid following

18   Walgreens' good faith dispensing policies and the

19   reason that -- and when he did that, two of the

20   managers challenged him.   He described their behavior

21   as, quote, "extremely intimidating and persuasive," end

22   quote.   He said that this was not an isolated event,

23   that this was happening across multiple Walgreens

24   pharmacies.   He described --

25        Q.   Are you able to evaluate the exercise of any

Page 152

1   individual -- strike that.

2          Are you able to identify how any individual

3   pharmacist went about the process of exercising

4   professional judgment in filling a prescription for an

5   opioid medication?

6                    MR. ARBITBLIT:  Object to form.

7                    THE WITNESS:  I mean that's like asking

8   me do I know how people exercise judgment.

9   BY MR. GISLESON:

10     Q.  Correct.  Are you able to identify how any

11  individual pharmacist in Lake and Trumbull Counties for

12  any of the chain pharmacies in fact went about the

13  practice of exercising professional judgment when

14  filling a prescription for an opioid medication?

15                   MR. ARBITBLIT:  Object to form.

16                   THE WITNESS:  Yes.  So as I state in my

17  report, there were -- these policies were national

18  policies and the systemic problems that existed in

19  defendants' pharmacies across the nation including Lake

20  and Trumbull County essentially disempowered

21  pharmacists from exercising their clinical judgment.

22  BY MR. GISLESON:

23     Q.  How do know that any pharmacist for a chain

24  pharmacy in Lake and Trumbull County, in fact, was

25  disempowered from exercising clinical judgment?

Page 153

1      A.   I haven't seen any evidence to the contrary.

2  I would be happy to evaluate that if you have evidence

3  to the contrary, but again, these were national

4  policies.  I have no reason to believe that Lake and

5  Trumbull Counties are an exception in any way.

6      Q.   How do we test your theory that pharmacists

7  for the chain defendants in Lake and Trumbull County

8  were disempowered from exercising clinical judgment?

9              MR. ARBITBLIT:  Object to form.

10             THE WITNESS:  I don't think it's a

11  theory that I have.  I think there is plenty of

12  evidence that when you have 3.22 minutes to fill

13  a prescription, it's going to be very difficult to do

14  your due diligence to make sure that you explore red

15  flags.

16  BY MR. GISLESON:

17      Q.   Did you do any analysis of the time to fill

18  prescriptions for any of the chain defendants in Lake

19  or Trumbull Counties?

20      A.   No, but the University of Cincinnati did.

21  They studied Rite Aid's prescription fill rates in

22  2011.

23      Q.   And that involves fill rates for all

24  medications, not just controlled substances, correct?

25      A.   That's correct.

Page 154

1      Q.  And how can we test whether time pressures in

2   fact caused one of the pharmacists for a chain pharmacy

3   to dispense an opioid medication that did not have a

4   legitimate medical purpose?

5                  MR. ARBITBLIT:  Object to form.

6                  THE WITNESS:  Could you rephrase the

7   question?  I'm not really sure I understood.

8   BY MR. GISLESON:

9      Q.  You claim that time pressures caused

10  pharmacists in Lake and Trumbull County to dispense

11  opioid medications that should not have been dispensed,

12  right?

13     A.  That's not the only factor, but yes, that's

14  one the factors.

15     Q.  How do we determine the extent to which that

16  occurred?

17                  MR. ARBITBLIT:  Object to form.

18  BY MR. GISLESON:

19     Q.  Stated differently, what did you do to

20  determine whether time pressures, in fact, caused any

21  of the pharmacists for the chain defendants to dispense

22  an opioid medication that should not have been

23  dispensed?

24     A.  Again, I think that the trends that are

25  documented to be occurring nationally at defendants'

Page 155

1    pharmacies would also have been occurring at the

2    pharmacies in Lake and Trumbull County.  I'd just refer

3    you to page 102 of my report where I cite a number of

4    different articles saying "pharmacy staffing levels can

5    threaten patients' lives" in the journal drug topics.

6    Also, pharmacists' workload contributes to errors in

7    the "Science Daily."  Those are footnotes 508 and 509.

8        Q.  What did you do, though, to determine whether

9    those findings, in fact, apply to the chain defendants'

10   pharmacists in Lake and Trumbull Counties?

11       A.  Again --

12              MR. ARBITBLIT:  Object to form.  Asked

13   and answered.

14              THE WITNESS:  I don't have any evidence

15   to suggest that what was being practiced nationally

16   according to pharmacy defendants' chain drugstore

17   policies would not be equally applied to pharmacies in

18   Lake or Trumbull County.

19   BY MR. GISLESON:

20       Q.  Do you have any affirmative evidence for any

21   prescriptions in Lake and Trumbull County that time

22   pressures, in fact, caused prescriptions for opioid

23   medications to be issued without a legitimate medical

24   purpose?

25              MR. ARBITBLIT:  Object to form.  Asked

Page 156

1    and answered multiple times.

2                  MR. GISLESON:  She's not answering it.

3                  MR. ARBITBLIT:  That's your opinion.

4    BY MR. GISLESON:

5         Q.  Please answer the question.

6         A.  And I feel like I answered the question.

7         Q.  Are you able to quantify in any way the number

8    of pharmacists for chain pharmacy defendants who, in

9    your view, experienced time pressure that caused them

10   to fill an opioid medication prescription without a

11   legitimate medical purpose?

12        A.  Well, on page 102, the investigation of

13   prescribing practices conducted by the "Chicago

14   Tribune" in 2016 found that 49 percent of chain

15   pharmacies committed fundamental errors in dispensing

16   prescription of two medications --

17             (Reporter clarification.)

18        A.  -- that were contraindicated for concurrent

19   use due to risks of severe and potentially fatal

20   adverse effects without warning customers of the

21   danger.  The investigators tested 255 pharmacies and

22   found CVS, the nation's largest pharmacy retailer by

23   store count, had the highest fill rate of any chain in

24   the "Tribune" tests.

25        Q.  Did any of that data apply to Lake or Trumbull

                                        Page 157

 1   Counties?

 2                   MR. ARBITBLIT:  You're interrupting.

 3   It's habitual now.  Stop interrupting her.

 4            Finish your sentence, please, Doctor.

 5                   THE WITNESS:  Dispensing the medications

 6   with no warning 63 percent of the time.  Walgreens, one

 7   of CVS's main competitors had the lowest failure rate

 8   at 30 percent but that's still missing nearly one in

 9   three interactions.  And also, Walmart pharmacies

10   committed similar errors at a rate of 43 percent.

11   BY MR. GISLESON:

12       Q.  What does a pharmacist do when performing a

13   drug utilization review?

14                   MR. ARBITBLIT:  Objection.  Vague.

15   Overbroad.

16            You can answer if you have an answer.

17                   THE WITNESS:  I feel like I answered

18   that before.  Was there an aspect of my prior answer

19   that left something wanting?

20   BY MR. GISLESON:

21       Q.  Before this lawsuit, had you ever evaluated

22   prescriptions that had been dispensed for opioid

23   medications by a pharmacy to determine whether the

24   pharmacist dispensed prescriptions without a legitimate

25   medical purpose?

Page 158

1      A.   Not in any systematic way, no.

2      Q.   Can you identify any pharmacist working for

3    one of the chain pharmacy defendants that dispensed

4    opioid medications without a prescription?

5                    MR. ARBITBLIT:  Objection.  Form.

6                    THE WITNESS:  There are multiple DEA

7    enforcement actions cited in my report, and those

8    enforcement actions do identify individual prescribers

9    by name as well as pharmacists who dispensed --

10   BY MR. GISLESON:

11     Q.   Can you identify any?  Sorry.

12     A.   Dispense.

13     Q.   Go ahead.

14     A.   Yeah, who dispensed opioids not in the context

15   of a legitimate medical condition.

16     Q.   Can you identify any pharmacists working in

17   Lake or Trumbull Counties that dispensed opioid

18   medications without a prescription?

19                    MR. ARBITBLIT:  Objection.

20                    THE WITNESS:  Again, I think that what

21   was happening nationally was also happening in Lake and

22   Trumbull County.  I don't have any data to the

23   contrary, but I can't identify a specific pharmacist by

24   name in Lake or Trumbull County.

25

```
                                           Page 159
 1   BY MR. GISLESON:
 2        Q.  Did you speak with any pharmacists in Ohio?
 3        A.  No.
 4        Q.  Have you been to either Lake County or
 5   Trumbull County?
 6        A.  I don't -- I may have.  I may have briefly.
 7        Q.  Do you know how many pharmacy stores Rite Aid
 8   has in Lake County?
 9        A.  I do not.
10        Q.  Do you know how many pharmacists Rite Aid has
11   in Lake County?
12        A.  No.
13        Q.  Do you know how many pharmacy stores Rite Aid
14   has in Trumbull County?
15        A.  No.
16        Q.  Do you know how many pharmacists Rite Aid has
17   in Trumbull County?
18        A.  No.
19        Q.  Do you know how many stores or pharmacists any
20   of the chain pharmacy defendants have in either in Lake
21   or Trumbull County?
22        A.  No.
23             MR. GISLESON:  Mr. Ladd, can you please
24   get Tab 3?  And Dr. Lembke, if you can go to Tab 3,
25   please.
```

1                    (Exhibit 3 marked for identification.)

2                    MR. LADD:  Tab 3 has been marked as

3    Lembke Exhibit 3.

4    BY MR. GISLESON:

5        Q.  I'd like to show you what has been marked as

6    Lembke Exhibit 3.  Have you read Section 1306.04,

7    Purpose of Issue of Prescription?

8        A.  Yes, I have.

9        Q.  Do you understand this is part of the

10   Controlled Substances Act?

11       A.  Yes, I do.

12       Q.  This says, "A prescription for a controlled

13   substance to be effective, must be issued for

14   legitimate medical purpose by an individual

15   practitioner acting in the usual course of his

16   professional practice."

17           What do you understand the phrase "legitimate

18   medical purpose" to be in that paragraph?

19       A.  An evidence-based purpose.

20       Q.  What do you mean by "evidence-based purpose"?

21       A.  There is evidence in the literature showing

22   the potential benefits in the use of that medication

23   for that condition outweigh the potential harms.

24       Q.  Does the same standard for legitimate medical

25   purpose apply to the prescriber as it does to the

Page 161

1    pharmacist dispensing the opioid medication?

2                    MR. ARBITBLIT:  I'm going to object, and

3    interpose it calls for legal conclusion.  Belated

4    objection to the prior question on the same grounds.

5    BY MR. GISLESON:

6        Q.  Do you have an understanding as to whether the

7    reference to legitimate medical purpose has the same

8    meaning for a prescriber as it does under the statute

9    for a pharmacist?

10                    MR. ARBITBLIT:  Same objection.

11                    THE WITNESS:  I don't have an opinion on

12   that.

13   BY MR. GISLESON:

14       Q.  Do you know how to determine whether a

15   prescription for an opioid medication has a legitimate

16   medical purpose?

17                    MR. ARBITBLIT:  Objection.  Vague.  May

18   or may not call for a legal conclusion depending on

19   whether you're referring to the regulation.

20   BY MR. GISLESON:

21       Q.  Do you have the technical ability, based on

22   your training, education, and experience, to evaluate

23   whether a prescription for an opioid medication has a

24   legitimate medical purpose?

25                    MR. ARBITBLIT:  Same objection.

```
 1              THE WITNESS:  Yeah, it would really
 2    depend at what point in my career you were talking
 3    about.  If you were talking about earlier in my career
 4    when I, too, had been duped by the opioid
 5    pharmaceutical industry, I would not have had the
 6    ability to determine that.  Having --
 7    BY MR. GISLESON:
 8        Q.  At what point did you have the ability to
 9    determine whether an opioid medication prescription had
10    a legitimate medical purpose?
11              MR. ARBITBLIT:  Object to form.
12              THE WITNESS:  It was a gradual awareness
13    in the early 2000s as I realized that what I had been
14    taught and what I had been told due to the influence of
15    the opioid pharmaceutical industry about the benefits
16    and harms of opioids was not, in fact, based in
17    evidence, and then as I began to review that evidence
18    and also appreciate the extent to which the opioid
19    pharmaceutical industry really amplified myths about
20    opioids, that I could make a decision about the use of
21    opioids in the treatment of pain.
22    BY MR. GISLESON:
23        Q.  What is the prospect that -- so you're saying
24    the first time as a practicing physician you were able
25    to determine whether an opioid medication prescription
```

1    had a legitimate medical purpose was the early 2000s?

2                    MR. ARBITBLIT:  Object to form.

3    Misstates the testimony.

4                    THE WITNESS:  Yeah, that overstates my

5    opinion.  I'm speaking especially in terms of the use

6    of opioids in the treatment of chronic pain as well as

7    the use of opioids first line for minor pain conditions

8    and the overprescribing in quantity MMEs and the

9    over-dispensing that occurred as a result of paradigm

10   shift.

11   BY MR. GISLESON:

12       Q.  What is the process that you follow to

13   determine whether a prescription opioid has a

14   legitimate medical purpose for someone with chronic

15   pain?

16       A.  Well, in this case, the process required

17   unravelling years of mis-education, which is something

18   that I am in a unique position to do because I am in an

19   academic medical center.  I have more time than the

20   average clinician does to deeply study the literature

21   and to consider these things.  Also, by virtue of being

22   an addiction medical specialist, I was really seeing

23   some of the earliest sentinel presentations of patients

24   becoming addicted to opioids through their doctor's

25   prescription, not something that the average clinician

Page 164

1    would be in a position to see or appreciate.  So I came

2    to this much sooner informed by my clinical experience,

3    my reading of the evidence.

4        Q.  What is the specific information on which you

5    rely in order to determine whether a prescription from

6    opioid medication has a legitimate medical purpose?

7                    MR. ARBITBLIT:  Object to form.

8                    THE WITNESS:  I relied on the medical

9    literature, looking through that literature for studies

10   that might show benefits of opioids longer than three

11   months in the treatment of chronic pain and not finding

12   any such evidence.  I also looked for what the risks

13   are associated with opioids at high doses, especially

14   long-term, and found evidence showing that the risks

15   are high, including addiction and overdose death.

16           I then was able to compare the evidence to the

17   misleading messages that I and my peers had been

18   exposed to and see that there was a serious

19   discrepancy.

20   BY MR. GISLESON:

21       Q.  What patient-specific information did you

22   consider evaluating whether opioid medications have a

23   legitimate medical purpose for a specific patient?

24                    MR. ARBITBLIT:  Object to form.

25                    THE WITNESS:  I'm sorry, could you say

Page 165

1    that again?

2    BY MR. GISLESON:

3        Q.   Sure.   What patient-specific information do

4    you consider when evaluating whether a patient should

5    be issued a prescription for an opioid medication?

6                        MR. ARBITBLIT:   Objection.   Overbroad.

7                        THE WITNESS:   I take many different

8    factors into account but not in a vacuum, so those

9    patient-specific factors like their diagnosis, their

10   history, what other treatments they've tried, how

11   they've responded to those treatments, those all

12   matter, but those cannot be taken in isolation.

13            Especially when it comes to opioid

14   prescribing, I need to consider their family situation.

15   I need to consider more broadly the opioid epidemic and

16   what's happening not just to my individual patients but

17   what is happening to the public health.   And when in

18   the midst of an opioid epidemic, I have to consider

19   that the risks of misuse and diversion are very, very

20   high as evidenced by the epidemic itself.

21            So it's many different factors, not just

22   patient-specific factors but also what's happening in

23   the world, what's happening in medicine, the reality of

24   an opioid epidemic.   That must come into my

25   consideration as well.

Page 166

1    BY MR. GISLESON:

2         Q.   What documents do you review relating to a

3    specific patient in evaluating whether to prescribe an

4    opioid medication?

5         A.   I rely on the prescription drug monitoring

6    database; very important.  I rely on that patient's

7    prior medical records when I have access to those.  I

8    try to get collateral information from other

9    prescribers, from pharmacists.  I rely on what the

10   patient him or herself says about their disease

11   process.

12        Q.   Anything else?

13        A.   I also rely on epidemiologic data, what very

14   large data trends show in terms of treatments and

15   outcomes, risks, benefits, and alternatives.

16        Q.   Any other patient-specific documentation or

17   information on which you rely?

18        A.   Sometimes I rely on laboratory studies when

19   those are indicated.

20        Q.   X-rays?

21        A.   Yes, sometimes.

22        Q.   Anything else?

23        A.   Well, there are other laboratory studies, but.

24        Q.   Is there a generally-applicable standard in

25   the medical community for what a legitimate medical

Page 167

1   purpose means for a prescription for opioid

2   medications?

3                    MR. ARBITBLIT:  Object to form.

4                    THE WITNESS:  The language that is used

5   today in medicine is evidence-based medicine.  That is

6   the mantra that overrides almost everything that we do.

7   If there is evidence for a particular treatment or

8   evidence to suggest that the harms of that treatment

9   outweigh any potential benefits, then that is our

10  guiding light.

11  BY MR. GISLESON:

12      Q.  Is the prescriber supposed to weigh the risks

13  and the benefits of opioid treatment?

14                   MR. ARBITBLIT:  Object to form.

15                   THE WITNESS:  The prescriber can only

16  weigh risks and benefits to the extent that they know

17  what those risks and benefits are.

18  BY MR. GISLESON:

19      Q.  How was the pharmacist, in your view, supposed

20  to determine whether a prescription for opioid

21  medications has a legitimate medical purpose?

22      A.  The pharmacist has many different vehicles by

23  which to do that.  The pharmacists could have and

24  should have checked the prescription drug monitoring

25  database to look for red flags for misuse and diversion

Page 168

1   for a given prescription.  The pharmacies should have

2   made that mandatory for their pharmacists.  The

3   pharmacies should have made available to pharmacists

4   data, not just on patient red flags but also on

5   prescriber red flags, and which prescribers might be

6   engaging in the equivalent of pill-mill prescribing.

7          The pharmacists need to, and the pharmacies,

8   need to keep up with the medical literature on the

9   potential risks and benefits including dangerous drug

10  combinations.  The pharmacies and pharmacists also need

11  to have policies and incentives in place that allow

12  pharmacists to actually exercise their due diligence

13  and good judgment.  And then there are also, as I've

14  stated before, other data that a pharmacist and a

15  pharmacy can rely on to suggest possible misuse and

16  diversion that even the prescribing doctor does not

17  have access to.  Which is why this corresponding

18  responsibility is so important for everybody in the

19  supply chain.

20      Q.  And then the pharmacist, in your view, is to

21  take all that information in the context of the

22  prescription in the individual patient and make the

23  decision whether or not to dispense the opioid

24  medication?

25              MR. ARBITBLIT:  Object to form.

Page 169

1             THE WITNESS:  If the pharmacist has
2   access to true information and is working in an
3   environment where they're encouraged to do their due
4   diligence and to not dispense when red flags, after
5   being appropriately investigated, have demonstrated
6   that the potential risks outweigh the harms, only then
7   can pharmacists exercise their clinical judgment and
8   make a decision about dispensing.
9   BY MR. GISLESON:
10      Q.  Whose standard is that?
11             MR. ARBITBLIT:  Object to form.
12             THE WITNESS:  That's the Controlled
13   Substances Act.
14   BY MR. GISLESON:
15      Q.  What do you mean by "true information"?
16      A.  One of the problems with the Ohio prescription
17   drug monitoring database laws is that pharmacists were
18   required to check -- only after they had detected red
19   flags for misuse and diversion, when, in fact, checking
20   the prescription drug monitoring database is the very
21   way that a pharmacist could determine if there are red
22   flags for misuse and diversion.  Without checking that
23   database, it's not possible to know if those red flags
24   exist.  A pharmacist --
25      Q.  I'm sorry, continue.

Page 170

1      A.  So a pharmacist trying to exercise his or her

2  good clinical judgment on whether or not to dispense,

3  cannot do so unless they have availed themselves of all

4  of the data at their disposal.

5          Now, a pharmacist is not going to have access

6  to every piece of data in the known universe, but what

7  they have access to, they need to check in order to

8  make an informed clinical decision.

9              MR. ARBITBLIT:  Counsel, we've been

10  going for 75 minutes.  That seems to be a reasonable

11  time for a ten-minute break, if you're at a break

12  point.

13              MR. GISLESON:  Yeah, that's fine.

14              THE VIDEOGRAPHER:  We are going off the

15  record at 1:29.

16              (Recess taken 1:29 p.m. to 1:42 p.m.)

17              THE VIDEOGRAPHER:  We are back on the

18  record.  The time is 1:42.  Please proceed.

19  BY MR. GISLESON:

20      Q.  How many years of school does a pharmacist

21  have to complete in order to become a licensed

22  pharmacist?

23      A.  I don't know.

24      Q.  What are the requirements for a pharmacist --

25  strike that.

1          What are the requirements for a pharmacist to

2     achieve a Doctorate of Pharmacy?

3          A.  I assume it's additional training.

4          Q.  Specifically, what must a pharmacist do to

5     achieve a doctorate in pharmacy?

6          A.  I don't know.

7          Q.  Do pharmacists take any internships while

8     they're in pharmacy school?

9          A.  Probably.

10         Q.  What?

11         A.  I don't know the specific names.

12         Q.  Do pharmacists receive any training in

13    pharmacy school relevant to satisfying their

14    corresponding responsibility?

15         A.  Yes, I would assume so.

16         Q.  Do you know for a fact whether pharmacists

17    receive any training in pharmacy school on what they

18    must do to satisfy their corresponding responsibility

19    when it comes to dispensing opioid medications?

20         A.  No.

21         Q.  What information is on the licensing exam for

22    pharmacists?

23                   MR. ARBITBLIT:  Object to form.

24                   THE WITNESS:  I have never looked at a

25    licensing exam so I can't tell you at that specific

Page 172

1   level of detail.

2   BY MR. GISLESON:

3       Q.  What continuing medical education requirements

4   do pharmacists have in Ohio?

5       A.  I don't know what their exact requirement

6   numbers, but like all healthcare providers they have

7   additional continuing education requirements.

8       Q.  Did you do any investigation into what those

9   continuing medical education requirements are in Ohio?

10      A.  No.

11      Q.  What's the difference between a pharmacist and

12  a pharmacy technician?

13      A.  Level of training.

14      Q.  What is a pharmacy technician permitted to do?

15      A.  I don't know exactly the difference in

16  responsibilities.

17      Q.  Can you identify any pharmacists for any of

18  the chain pharmacy defendants who knowingly dispensed

19  an opioid medication without a legitimate medical

20  purpose?

21      A.  Not by name, but my opinion is based on the

22  aggregate.

23      Q.  Go to page 76 in your report, please.  In

24  paragraph 6 you write, "Pharmacies leveraged their

25  unique and pivotal position in the opioid supply chain

Page 173

1    to contribute to the unprecedented and unchecked flow

2    of opioid pain pills into the community."

3            What do you mean by "unchecked flow of opioid

4    pain pills into the community"?

5        A.   By that I mean where pharmacy defendants had

6    an opportunity to assess for misuse and diversion and

7    opioids not dispensed for a legitimate medical

8    condition for a legitimate physician-patient

9    relationship, they did not take those opportunities to

10   the extent that they should have as early as they

11   should have, with as much due diligence as they should

12   have.  And instead, they did the opposite and

13   incentivized the outflow of prescriptions, or as one of

14   the pharmacy defendants, a manager stated their stores

15   became a literal, quote, unquote, "funnel for opioid

16   prescriptions getting out into the community."

17       Q.   Is it your testimony that none of the

18   pharmacists for the chain pharmacy defendants assessed

19   opioid prescriptions for misuse and diversion?

20                   MR. ARBITBLIT:  Objection.  Misstates.

21                   THE WITNESS:  That's not what I said.

22   BY MR. GISLESON:

23       Q.   Do you agree that the pharmacists for the

24   chain pharmacy defendants assessed whether misuse and

25   diversion would occur with respect to particular opioid

                                        Page 174

1    medication prescriptions?

2                    MR. ARBITBLIT:  Object to form.

3                    THE WITNESS:  The evidence in aggregate

4    shows that pharmacists were disempowered and unable to

5    exercise their clinical judgment because they neither

6    had the time nor access to the necessary information to

7    determine misuse and diversion when dispensing opioids.

8    And furthermore, they were highly incentivized through

9    bonuses, et cetera, to dispense more opioids.  So where

10   pharmacy defendants could have and should have put on

11   the brakes, instead they pressed down on the

12   accelerator.

13   BY MR. GISLESON:

14       Q.  What work did you perform to determine whether

15   pharmacists for the chain pharmacy defendants assessed

16   whether misuse and diversion would occur with respect

17   to particular opioid medication prescriptions in Lake

18   and Trumbull County?

19       A.  Well, I reviewed DEA evidence.  I reviewed

20   internal documents from defendants themselves.  I

21   reviewed the CSA.  I reviewed the messages that went to

22   pharmacists and directly to patient consumers and

23   through that steppingstone to prescribers themselves.

24   I reviewed the collaborations that pharmacy defendants

25   had with distributors and manufacturers, which the

1   documents themselves describe as, quote, unquote,

2   "mutually beneficial arrangements."

3           All of those evidence in aggregate speak to a

4   national and systemic policy among defendants'

5   pharmacies for not doing their part to combat the

6   opioid epidemic and contributing to the opioid epidemic

7   including Lake and Trumbull Counties because I have not

8   seen any evidence to suggest that by some miracle Lake

9   and Trumbull Counties are different from the rest of

10  the United States.

11      Q.  What tests did you perform to determine

12  whether any pharmacists for any of the chain pharmacy

13  defendants were financially incentivized to fill opioid

14  medication prescriptions without a legitimate medical

15  purpose?

16      A.  The financial incentive programs across

17  defendants' pharmacies were national types of policies.

18      Q.  Anything specific to the pharmacists in Lake

19  and Trumbull Counties?

20      A.  I don't have any reason to believe Lake and

21  Trumbull Counties are an exception.

22      Q.  Did you perform any tests of any kind or

23  analyses to determine whether the pharmacists in Lake

24  and Trumbull County for the chain pharmacy defendants,

25  in fact, filled opioid prescriptions without a

Page 176

1    legitimate medical purpose because of incentive

2    programs that were made available?

3                    MR. ARBITBLIT:  Objection.  Vague.

4                    THE WITNESS:  My report is my analysis.

5    The aggregate of all of the information in my report

6    taken together, lead me to the opinion that pharmacists

7    in Lake and Trumbull County were operating in the same

8    conditions as pharmacists in defendants' pharmacies all

9    over the United States.

10   BY MR. GISLESON:

11       Q.  So in terms of your assessment of the chain

12   defendants' pharmacists and pharmacies in Lake and

13   Trumbull County, you are relying on evidence from

14   outside of Lake and Trumbull County to draw your

15   conclusions?

16                   MR. ARBITBLIT:  Objection.  Misstates

17   the record.

18                   THE WITNESS:  I'm relying on all kinds

19   of different evidence, and I would just add that

20   evidence demonstrating defendant pharmacies dispensing

21   opioids in a way that put the public at-risk also puts

22   Lake and Trumbull County at-risk because we know that

23   these pills migrate from Florida all the way up the

24   Blue Highway to Ohio.

25                   In my report, there is a DEA enforcement

1   showing that one of the prescribers who the DEA found

2   negligent had patients who were filling prescriptions

3   in Ohio, even though he himself resided in Florida, so

4   these pills travel.

5   BY MR. GISLESON:

6       Q.   When you say that there was an unchecked flow

7   of opioid pain pills into Lake and Trumbull Counties,

8   is it your testimony that the pharmacists for the chain

9   defendants did not evaluate the individual

10  prescriptions to determine whether they had a

11  legitimate medical purpose?

12              MR. ARBITBLIT:  Object to form.

13  Misstates the record.

14              THE WITNESS:  Again, my opinion and my

15  testimony and what's in my report all speaks to the

16  pharmacy defendants not having done enough early enough

17  to really prevent the opioid epidemic.  Although it was

18  within their will and their power to do so, they chose

19  to nibble at the edges, getting away with bear minimum

20  instead of what they really could have done to prevent

21  misuse and diversion.

22  BY MR. GISLESON:

23      Q.   You said that doctors were duped.  Do you

24  believe pharmacists could have been duped as well about

25  the safety and efficacy of opioids?

Page 178

1      A.   I think the more important question is whether

2  or not pharmacies themselves were duped, and it's very

3  clear that pharmacies themselves were not duped, that

4  the pharmacy leadership was in active collaboration

5  with on opioid manufacturers and distributors to

6  increase the supply of opioids, because it was mutually

7  beneficial for their business bottom line.

8           And in instances that I cite in my report,

9  pharmacies were, in fact, leading the way.  Walgreens

10 University is a nice example of that, but there are

11 others.  So pharmacies were not duped.

12     Q.   Move to strike as nonresponsive.

13          You said that doctors were duped.  Do you

14 believe that pharmacists in Lake and Trumbull County

15 working for the chain pharmacy defendants could have

16 been duped as well about the safety and efficacy of

17 opioid medications?

18     A.   It's certainly possible that individual

19 pharmacists were duped, but even those who knew the

20 evidence were clearly not allowed to exercise their

21 clinical judgment based on science because of the

22 pressures on them to dispense large amounts of opioids.

23 And I cited the letter from a Mr. Yaeger talking about

24 how he actually felt physically intimidated by his

25 pharmacy managers to dispense prescription opioids,

Page 179

1   even when he had investigated the presence of a red

2   flag and decided not to dispense.  And there are many,

3   many other examples showing that pharmacies across the

4   nation, including defendant pharmacies, felt similarly.

5       Q.  Move to strike as nonresponsive except for the

6   point about it being certainly possible that individual

7   pharmacists were duped.

8           If you can go, please, to page 76 and to 77

9   you write, "Their coordinated efforts to create demand

10  including advertising specific opioid products at the

11  pharmacy counter, building opioid superstores to

12  enhance unrestricted flow of opioid pain pills,

13  spreading misinformation about the safety and efficacy

14  of opioid pain pills, arguing with pro-opioid industry

15  and advocacy and lobbying organizations and then

16  ignoring red flags for misuse and diversion including

17  concerns expressed by their own pharmacists, failing to

18  provide pharmacists with sufficient time, resources, or

19  incentives to investigate red flags and failing to use

20  or analyze their own dispensing data to assist

21  pharmacies in identifying red flags."

22          Can you identify any pharmacy anywhere in the

23  country that aggregates their dispensing data and runs

24  analyses to look for prescriber red flags?

25      A.  It's my belief that pharmacies had and have

Page 180

1    the ability to create that kind of database, and as

2    part of their corresponding responsibility, according

3    to the Controlled Substance Act it is on pharmacies to

4    create a surveillance system that will detect and

5    prevent misuse and diversion.  So if pharmacy

6    defendants are going to claim they don't have that kind

7    of database, they certainly could make one.

8        Q.  Move to strike as nonresponsive.

9            Can you identify any pharmacy anywhere in the

10   country that aggregates dispensing data and runs an

11   analysis to look for prescriber red flags?

12       A.  One moment, please.  I'm ready, sorry.  I

13   would refer to page 124 of my report where I state that

14   "no CVS policy or procedure that I have reviewed makes

15   reference to pharmacist's ability to utilize CVS's own

16   dispensing data to assist in identifying prescriber

17   related red flags such as overprescribing, prescribing

18   of higher dosages, prescribing patterns, or percentage

19   of controlled and non-controlled prescribing."

20           I infer that CVS did not make its database

21   available to its pharmacies for such information, and

22   furthermore, CVS made it more difficult to access that

23   information in the 2004 policy and procedure on

24   professional practices, quote, "blanket decisions based

25   on a practitioner's prescribing habits or customer's

                                      Page 181

1    appearance are unprofessional and may be illegal," and

2    yet despite that statement, in their 2004 policy --

3         Q.  Doctor, again, you're not answering the

4    question that I asked.  My specific question --

5         A.  I'm almost there.  I'm getting there.

6              As you see, according to their policy in 2014,

7    they actually were able to implement a system whereby

8    pharmacists could issue blanket prescription vetoes for

9    certain providers.  So that's page 128 of my report

10   where I say the policy allowed CVS to block, quote,

11   "prescribers who CVS, as part of corresponding

12   responsibility, has decided not to dispense their

13   controlled substance prescriptions.

14              "So contrary to the ROPP described above

15   effective in 2004, the 2014 policy appears to confirm

16   that CVS had the ability to issue blanket refusals to

17   fill based on the prescriber's behavior regardless of

18   patient red flags."

19              So clearly, they had the data, they had access

20   to the data, they, in certain instances, created the

21   database.

22        Q.  Move to strike as nonresponsive.

23             Now, is it your position that the pharmacies

24   created demand for patients to use prescription

25   opioids?

Page 182

1          A.  Yes.

2          Q.  How?

3          A.  So just again referring to my Opinion No. 6 on

4     page 76, pharmacies were in a unique position,

5     straddling distributors, manufacturers, and the

6     patients themselves.  Pharmacies are -- and pharmacists

7     are among the most trusted healthcare professionals

8     that we have today based on consumer survey reports.

9     So these individuals are very influential when it comes

10    to patient's beliefs about prescriptions.  And it's

11    very clear that the pharmacies collaborated with

12    manufacturers and distributors to train their

13    pharmacists to propagate non-evidence-based ideas about

14    the use of opioids in the treatment of pain.

15          And furthermore, had programs in place where

16    pharmacists were incentivized to promote certain

17    products at the pharmacy counter, which these types of

18    programs were typically named adherence -- adherence

19    programs.

20          There is also evidence that the pharmacy

21    defendants were invested in collaborating with Purdue

22    to create so-called opioid superstores.  These were

23    pharmacies that were basically the equivalent of

24    pill-mill clinics for pharmacies where opioids would

25    always be readily available and where prescriptions

Page 183

1    would not be questioned, contributing to the

2    unrestricted flow of opioid pain pills.

3            There is plenty of evidence that the

4    pharmacies create a demand by spreading misinformation

5    about the safety and efficacy of pain pills.  In many

6    different ways, partnering, not just with opioid

7    manufacturers and distributors to do that, but also

8    partnering with professional medical societies and

9    creating patient-facing brochures in order to propagate

10   myths about opioids, which contributed to paradigm

11   shift, which contributed to the increase in supply of

12   opioids.

13       Q.  Specifically as to Lake and Trumbull Counties,

14   do you have any evidence that in Lake or Trumbull

15   County any of the chain pharmacy defendants in fact

16   caused a patient to obtain an opioid prescription that

17   patient otherwise would not have obtained?

18               MR. ARBITBLIT:  Objection.  Form.

19               THE WITNESS:  So the paradigm shift was

20   a national paradigm shift, and Lake and Trumbull

21   Counties are not exclusive to that, and my report does

22   contain specific instances of these misleading messages

23   which created a paradigm shift being disseminated in

24   Ohio and very likely also in Lake and Trumbull

25   Counties.

Page 184

1    BY MR. GISLESON:

2         Q.  Do you have any evidence that in Lake or

3    Trumbull Counties any of the chain pharmacy defendants

4    in fact caused a patient to obtain an opioid

5    prescription that the patient otherwise would not have

6    obtained?

7                        MR. ARBITBLIT:  Object to form.

8                        THE WITNESS:  Again, I have no evidence

9    to the contrary and lots of evidence showing that this

10   is a national -- this was a national campaign, that

11   these are systemic issues, that these are top-down

12   corporate policies that affect the entire chain.

13   BY MR. GISLESON:

14        Q.  Do you have any evidence that in Lake or

15   Trumbull County any of the chain pharmacy defendants in

16   fact caused a patient to obtain an opioid prescription

17   that patient otherwise would not have obtained?

18                        MR. ARBITBLIT:  Objection.  Form.  Asked

19   and answered.

20                        MR. GISLESON:  She hasn't answered it.

21                        MR. ARBITBLIT:  That's your opinion.

22                        MR. GISLESON:  That's a fact.

23   BY MR. GISLESON:

24        Q.  Answer the question, please, Doctor.

25                        MR. ARBITBLIT:  It's your opinion that

Page 185

1   that's a fact.

2   BY MR. GISLESON:

3       Q.  Answer the question, please, Doctor.

4       A.  Yeah, I've answered that question to the

5   best --

6       Q.  No, you haven't.

7               MR. ARBITBLIT:  Argumentative.

8   BY MR. GISLESON:

9       Q.  Can you identify any specific prescriber in

10  Lake or Trumbull County that issued a prescription for

11  an opioid medication because of a specific action taken

12  by a pharmacist at one of the chain pharmacies in Lake

13  or Trumbull County?

14              MR. ARBITBLIT:  Object to form.

15  Badgering.

16              THE WITNESS:  I don't have a different

17  answer than the answer I have given before.

18  BY MR. GISLESON:

19      Q.  So you cannot identify any specific piece of

20  evidence from Lake or Trumbull County to support your

21  opinion?

22              MR. ARBITBLIT:  Object to form.

23  Badgering.  Argumentative.  Asked and answered.

24              THE WITNESS:  Yeah, that misstates that

25  I've said before.

Page 186

1   BY MR. GISLESON
2        Q.   Do you agree that it's wrong for an expert to
3   be totally biased in a lawsuit?
4        A.   That's just rude.
5        Q.   Do you agree that it's wrong for an expert to
6   be totally biased in a lawsuit?
7                      MR. ARBITBLIT:  Object to form.
8                      THE WITNESS:  If you're implying that
9   I'm totally biased, I'm not.
10  BY MR. GISLESON:
11       Q.   Do you agree that it's wrong for an expert to
12  be totally biased in litigation?
13       A.   I don't have an answer to that question.  You
14  know, you're obviously trying to imply something about
15  me.  I don't think that that question really warrants
16  an answer.
17       Q.   You said that "opioid manufacturers and
18  distributors worked together with pharmacies to market
19  specific opioids at the pharmacy counter."
20            What marketing occurred at the pharmacy
21  counter in Lake and Trumbull Counties?
22       A.   Pharmacists in the defendants' chains were the
23  recipients of promotional messages that were very
24  pro-opioid.  I do talk in my report about the direct
25  ADHERE program in which Butrans and Kadian were

Page 187

1   promoted at the pharmacy counter.  Specifically Walmart

2   and Giant Eagle partnered with McKesson around that.

3        Q.  Did you identify any marketing that occurred

4   at the pharmacy counter in Lake or Trumbull County by

5   any of the pharmacy defendants?

6        A.  Part of the marketing that occurred was the

7   promotion of coupons for discounted opioids and the

8   exchange of those coupons with embedded promotional

9   material occurred at the pharmacy counter.

10       Q.  Whose coupons?

11       A.  Janssen, Nucynta, and Duragesic.

12       Q.  So these were manufacture coupons, not a chain

13   pharmacy defendant's coupon?

14       A.  That's correct.  Although the distributors and

15   the pharmacies collaborated around those coupons.

16   There was also advertising for specific opioid products

17   in the pharmacies.

18       Q.  What do you mean?

19       A.  On page 71 of my report, a 2012 document

20   titled "McKesson Manufacturing Marketing," talks about

21   how, quote, "McKesson partners with pharmaceutical

22   manufacturers such as Cephalon to define and actually

23   customize strategies targeting key awareness, sales,

24   and distribution goals at all stages of the product

25   cycle."

Page 188

1      Q.  So are you faulting, then, the chain pharmacy

2    defendants for accepting from their customers a

3    manufacturer's coupon that made opioid medication more

4    affordable?

5                    MR. ARBITBLIT:  Object to form.

6                    THE WITNESS:  No.  That is not what I

7    said.

8    BY MR. GISLESON:

9      Q.  Can you identify any chain pharmacy pharmacist

10   in Lake or Trumbull County who dispensed an opioid

11   medication without a legitimate medical purpose because

12   the customer presented a coupon?

13     A.  I do believe that somewhere in my report is

14   evidence for these coupons being used in Ohio, probably

15   including Lake and Trumbull County.  On page 75 of my

16   report, in 2013, McKesson promoted its pharmacy

17   intervention program by letting Purdue know about their

18   pharmacy brand kit.

19                    (Reporter clarification.)

20     A.  "The brand-specific pharmacy kit is mailed to

21   each participating pharmacy prior to launch.  This kit

22   includes a cover letter and coaching guide.  Purdue

23   will have the opportunity to participate in the

24   development and review of all pharmacy materials

25   specific to their program.  The brand kit can also

Page 189

1   include any additional resources that pharmacists

2   should read as well as patient brochures to hand out

3   during the coaching session.  Purdue would develop and

4   provide," unquote.

5           It goes on to page 76 and also prior to page

6   74, about how page 71 --

7       Q.  Move to strike as nonresponsive.

8       A.  Also on page 78, CVS CareMark courted opioid

9   manufacturers by promising, quote, "identifying

10  patients who may benefit from your product," unquote,

11  and increasing, quote, "awareness of new treatments of

12  therapies," unquote, including a pharmacy literature

13  display to, quote, "educate patients via literature

14  located adjacent to prescription counter."

15      Q.  Move to strike --

16      A.  The same --

17      Q.  -- nonresponsive.

18      A.  -- for 2011 document states, quote,

19  "Communicate your products --

20      Q.  Thank you.  You've responded, Doctor.

21      A.  Thank you.

22      Q.  You're now just wasting time.

23          Are you able to design a study that could

24  determine the extent to which individuals in Lake and

25  Trumbull County developed an opioid use disorder as a

Page 190

1   result of taking an opioid medication under a doctor's

2   care?

3                   MR. ARBITBLIT:  Object to form.

4                   THE WITNESS:  So again, I cite

5   literature in my report that has conducted such studies

6   looking at the risk of becoming addicted to opioids in

7   patients with chronic pain who have become addicted

8   specifically to the opioids their doctors are

9   prescribing, and I detail that study in my report.

10  BY MR. GISLESON:

11      Q.  Are there any studies specific to Lake and

12  Trumbull Counties as to individuals who developed

13  opioid use disorder as a result of taking prescription

14  opioids pursuant to a doctor's prescription?

15                  MR. ARBITBLIT:  Object to form.

16                  THE WITNESS:  Again, there is no reason

17  to believe that Lake and Trumbull County will be

18  outliers in this case.

19  BY MR. GISLESON:

20      Q.  Does the report in this case contain all of

21  your opinions?

22      A.  Based on the materials reviewed to date, yes.

23      Q.  And does it identify all of the materials on

24  which you relied in forming your opinions?

25      A.  Yes.

1      Q.   Is all of the wording in the report yours?

2      A.   Yes.

3      Q.   Did you copy any of the material in your

4   report from another source?

5      A.   Not as far as I know, no.  I mean, this is --

6   I have issued prior reports, and so there is --

7      Q.   Which report which report did you update with

8   this one?

9      A.   I'm sorry.  I don't understand your question.

10      Q.   Did you update a prior report in creating this

11   report?

12      A.   My process of research has been ongoing over

13   many years, and as I review more material, I assess it

14   and I revise the report as I go along based on the

15   information, the new information that I gather.

16   Nothing that I have reviewed has changed my fundamental

17   opinion.

18      Q.   Did you start with a prior report that you

19   supplemented to include allegations against the

20   pharmacy defendants?

21      A.   Yes.

22      Q.   Which report?

23      A.   The MDL report.

24      Q.   For which track?

25      A.   The original MDL report and then a subsequent

```
                                          Page 192

 1   West Virginia report.

 2                  MR. GISLESON:  Don, I have more

 3   questions but to make sure that the other folks have a

 4   chance to ask their pharmacy-specific questions, I'm

 5   going to pass the witness for now.  Is that all right?

 6                  MR. ARBITBLIT:  Well, it's okay with me.

 7   I'm not saying that there is going to be time left when

 8   they're done.

 9                  MR. GISLESON:  I realize that.  So

10   Kasper?

11                  MR. STOFFELMAYR:  I can ask a few

12   questions.  Doctor, are you okay to keep going or do

13   you need a break?

14                  THE WITNESS:  I'm okay.

15                  MR. STOFFELMAYR:  Okay, thank you.

16                       EXAMINATION

17   BY MR. STOFFELMAYR:

18      Q.  Doctor, my name is Kasper Stoffelmayr, and I

19   represent the Walgreens chain.  I want to start with a

20   couple of questions, not about pharmacies but about

21   heroin addiction.  That's also one of your areas of

22   expertise, correct?

23      A.  Yes.

24      Q.  As I understand it, and please correct me if

25   I'm misusing the terminology, there is a group, maybe a
```

Page 193

1   small group of heroin addicts who are sometimes called

2   high-functioning addicts who can remain -- you know,

3   have heroin use careers that can last many years or

4   decades, correct?

5        A.  Yes.

6        Q.  And am I right that that is relatively unusual

7   for somebody to be able to continue using heroin for

8   decades without having something catastrophic happen?

9        A.  I really couldn't answer that.  There is not a

10  lot of data or much written on that group.  It's known

11  to exist, but there is not a lot of information.

12       Q.  Let me ask it this way:  Among the people you

13  treat or have encountered in your professional career,

14  am I right that most heroin users will use heroin for a

15  period of years and then will either successfully be

16  able to stop using heroin to recover or unfortunately

17  pass away, that it's unusual for someone to have used

18  heroin for a decade by the time you see them?

19       A.  I wouldn't say that's true.  In my clinical

20  experience, I have had patients who have used heroin

21  for a very long time.  The biggest problem with that

22  population is not about the molecule itself because

23  really it's fundamentally the same as a prescription

24  opioid.  The difference is how they can obtain it.  And

25  because heroin is illegal, they have to engage in

Page 194

1   illegal activity to get their drug, which introduces

2   other factors and other variables.  So they may seek

3   treatment, not because they've had some kind of

4   catastrophic event, but because they've run into law

5   enforcement problems.

6       Q.  Let me ask the question this way.  Let me ask

7   more broadly about opioid use more generally.  I don't

8   need to ask specifically about heroin use.  But among

9   people who misuse opioids, whether it's heroin or

10  non-medical use of prescription drugs, is there any

11  data available on what's the average length of

12  someone's opioid misuse career -- if there is a better

13  term, please tell me -- the average length of their

14  period of opioid misuse before they either successfully

15  seek treatment or do unfortunately pass away or stop

16  using for other reasons?

17      A.  Well, there are some data suggesting that on

18  average it takes about three years to develop an opioid

19  use disorder from the time that the prescription opioid

20  was initiated.  That's slightly different from the

21  question you're asking, which is once the opioid use

22  disorder has developed, how long it takes them to get

23  into treatment or have some kind of catastrophic event.

24  And I'm not right now recalling any specific data on

25  that.  I think that's probably really hard data to come

Page 195

1   by because people are not going to be forthcoming about

2   their opioid addiction in most instances.

3       Q.  Is there any way you're aware of to

4   investigate this question:  If we look at the

5   population of heroin users today, either nationwide or

6   pick a geography, but if we look at the population of

7   heroin users today to be able to determine how many of

8   them were misusing heroin or a different opioid, say,

9   five years ago or 10 years ago or 15 years ago?

10      A.  I'm not -- it's not coming to mind right now,

11  you know, specific data on that.

12      Q.  All right.  Let me switch gears.  You

13  mentioned Walgreens University two or three times

14  today.  You recall that, correct?

15      A.  Yes.

16      Q.  Now, Walgreens University is not actually

17  mentioned anywhere in your report, is it?

18      A.  The document that is called Walgreens

19  University is cited in my report.

20      Q.  Correct.  There is a document cited in your

21  report that if you pull up the document it says

22  Walgreens University, but there is no discussion of

23  this university in the report, correct?

24      A.  No, I do discuss this footnote 417.  I discuss

25  that Walgreens collaborated with Purdue, is manifest by

1    the remarkable sales of OxyContin at Walgreens

2    pharmacies.  And in this Walgreens University document,

3    they talk about how Walgreens distributes 374 million

4    of Purdue's prescription product, 16.8 percent, and how

5    Walgreens is the largest of the greater than 200 retail

6    chains --

7           (Reporter clarification.)

8        A.   -- that dispense Purdue prescription products.

9    And then, likewise, romanette 17 talks about how

10   OxyContin sales at Walgreens stores continue to be very

11   high, even through 2017.  And then I include this

12   table, all of which is from that document.

13       Q.   That is a document -- strike that.

14           The document you're describing is a Purdue

15   presentation, correct?

16       A.   I would have to refresh my memory on that.  My

17   recollection is that Purdue executives went to a

18   Walgreens site and actually on a Walgreens campus led

19   by Walgreens top representatives had this exchange.

20   So --

21       Q.   The table, for example, at the bottom of

22   page 84 of your report, that is a table that you cut

23   and pasted out of a Purdue presentation, correct?

24       A.   That table is out of the same Walgreens

25   University document.

Page 197

1       Q.  That document is a Purdue presentation,

2   correct?

3       A.  I'm not exactly remembering.

4       Q.  If we looked at it, we would see a Purdue logo

5   on it, wouldn't we?

6           MR. ARBITBLIT:  Counsel, if you have the

7   document, you might save some time.

8           MR. STOFFELMAYR:  I do not have the

9   document, sir.  She cited that she cut and pasted it

10  into her report.  I'm asking her -- she's mentioned

11  Walgreens University several times.  I need to know --

12          MR. ARBITBLIT:  She said she didn't

13  remember that specific -- she said she didn't remember

14  that specific document.

15      Dr. Lembke, if you have a recollection, you

16  can offer it.

17          THE WITNESS:  I don't remember if the

18  Purdue logo was at the top.  I do remember that this

19  was an event that occurred on a Walgreens campus with

20  Purdue executives going to the campus to engage in this

21  collaborative exchange which was called Walgreens

22  University.

23  BY MR. STOFFELMAYR:

24      Q.  Dr. Lembke, tell me everything you know about

25  Walgreens University.

1      A.  Well, can we pull up the document?

2      Q.  We cannot.  Tell me everything you know about

3  Walgreens University.

4              MR. ARBITBLIT:  Object to form.  Without

5  the document, it's -- that's all.

6              MR. STOFFELMAYR:  We don't need your

7  testimony, Don.

8              MR. ARBITBLIT:  Yeah, object to form.

9              THE WITNESS:  I have told you in my

10  report what I had to say about the document.  It's in

11  my report.  And beyond that, I would really like to

12  look at the document itself to refresh my recollection.

13  BY MR. STOFFELMAYR:

14      Q.  Do you have any information about Walgreens

15  University other than what is in the one document cited

16  in your report?

17      A.  No.

18      Q.  In preparing your report, did you make any

19  effort to learn anything at all about Walgreens

20  University?

21              MR. ARBITBLIT:  Object to form.

22              THE WITNESS:  Yes.  I wanted to know

23  whether or not it was a Purdue-led initiative or a

24  Walgreens-led initiative, and based on what I reviewed,

25  as I'm recalling as I sit here today, that this was a

Page 199

1  Walgreen-led initiative on the Walgreens campus

2  entitled Walgreens University and that Purdue was, in

3  effect, their student.

4  BY MR. STOFFELMAYR:

5       Q.  Did you Google Walgreens University?

6       A.  No.

7       Q.  Other than review one document about Walgreens

8  University, what steps did you take to learn about

9  Walgreens University?

10       A.  As I'm recalling, I tried my best to do due

11  diligence about who was actually initiating this

12  meeting, and as I'm recalling today, it was a

13  Walgreens-led collaboration with Purdue.  Walgreens was

14  not the passive recipient of Purdue material.  This was

15  something that Walgreens was invested in.

16       Q.  I think you misunderstood my question, Doctor.

17  Other than reviewing one document, what steps did you

18  take to educate yourself about Walgreens University?

19       A.  I'm not recalling that I took any additional

20  steps.

21       Q.  How did you locate the one document about

22  Walgreens University that we've been discussing?

23       A.  That was provided to me by Counsel as part of

24  discovery.

25       Q.  Do you remember earlier in response to some

Page 200

1  questions from Mr. Gisleson you described Walgreens

2  University as providing continuing medical education to

3  prescribing doctors.  Do you recall talking about that?

4      A.  Well --

5          MR. ARBITBLIT:  Object to form,

6  misstates.

7  BY MR. STOFFELMAYR:

8      Q.  That does not misstate at all.  I'll read it

9  out loud if you like.

10         Go ahead, Doctor.

11     A.  Sure, could you read it out loud?  That would

12 be great.

13     Q.  The question Mr. Gisleson asked you was, "It

14 was the manufacturers who were providing the continuing

15 medical education to the prescribing doctors; is that

16 correct?"

17         Dr. Lembke, you said, "No, on page 84, I

18 specifically reference a Walgreens University document

19 from 2017 where Purdue was, in fact, Walgreens' student

20 at this continuing medical education event."

21         Do you recall now that you earlier testified

22 that Walgreens University was involved in providing

23 continuing medical education to prescribing doctors?

24     A.  Yes, it's fair to say that my answer was not

25 entirely accurate in the sense that Walgreens

Page 201

1  University was prescribing -- was communicating

2  information to Purdue pharma reps, and not prescribers.

3      Q.  And in fact, you're not aware of any instance

4  in which Walgreens or any other pharmacy chain provided

5  continuing medical education to prescribing doctors,

6  correct?

7      A.  That is correct.

8          (Reporter clarification.)

9      Q.  I'm sorry.  I said let's look on page 84,

10 there is a chart you mentioned, Doctor, showing

11 OxyContin sales at Walgreens stores, correct?

12     A.  Yes.

13     Q.  And do you see that between 2010 and 2011, the

14 sales went up by 33.9 percent according to this chart?

15     A.  Yes.

16     Q.  Why is that?  Do you have any understanding at

17 all?

18     A.  Well, that's consistent with national trends

19 in opioid prescribing that increased through 2012, 2013

20 before, generally, they began to decrease again.

21     Q.  Why was the increase from 2010 to 2011 so

22 large compared to the increase between 2011 and 2012?

23     A.  I'm not sure.

24     Q.  Did anything other than increased prescribing

25 change between 2010 and 2011 that might help to explain

Page 202

1    that 33.9 percent increase?

2        A.  Not that I can think of right now.

3        Q.  Okay, then you see in 2013, it goes down by

4    17.6 percent.  Do you see that?

5        A.  Yes.

6        Q.  Do you have any understanding of why OxyContin

7    sales at Walgreens went down so much between 2012 and

8    2013?

9        A.  That general time frame may be because it was

10   around that time that the CDC came out saying that

11   we're in the midst of a prescription drug epidemic

12   implicating prescription opioids as a major causative

13   factor.  With those types of pronouncements, typically

14   there is some delay in terms of the response.  That is

15   also roughly the time that opioid prescribing

16   nationally began to decrease, so that may explain the

17   decrease at that point.

18       Q.  The chart you have on page 84, that shows

19   sales measured in dollars, not dosage units or MME,

20   correct?

21       A.  That is true, yes.

22       Q.  During this time period from 2010 to 2017, did

23   the price of OxyContin -- excuse me.  Let me ask that

24   more clearly.

25           During this time period we're looking at, 2010

Page 203

1    to 2017, does the price of OxyContin remain constant?

2         A.  I don't know.

3         Q.  If we had a chart that showed sales volumes

4    from 2010 to 2017 at Walgreens but measured in dosage

5    units or MME rather than dollars, would the trend look

6    the same?

7         A.  Again, I don't know.

8         Q.  You mentioned a Walgreens employee named Bob

9    Brody.  Do you remember that?

10        A.  Yes.

11        Q.  Is it your understanding that Mr. Brody was a

12   senior executive at Walgreens?

13        A.  No.

14        Q.  What was his job as far as you know?

15        A.  He was a Walgreens pharmacist.  He was a

16   Walgreens pharmacist who became a spokesperson for

17   these superstores.

18        Q.  Where was Mr. Brody located?

19        A.  I believe Florida.

20        Q.  Do you see on page 83, paragraph Roman 12 --

21        A.  I'm sorry, your audio --

22        Q.  I'm sorry.  Do you have in front of you small

23   Roman 12 on page 83 of your report?

24        A.  Yes.

25        Q.  And there you write "Walgreens pharmacist

Page 204

1   Brody's protocol recommendations included, quote, the

2   24-hour stores increase their narcotic inventory as

3   much as eight-fold to cover each area."

4        Do you see that?

5        A.  Yes.

6        Q.  Did you mean to imply there that Mr. Brody

7   recommended that all Walgreens 24-hour stores should

8   increase their inventory this way?

9        A.  Well, I don't know if he was including all

10  stores, but he was certainly including some stores, and

11  this as a kind of general strategy.

12       Q.  When you decided what parts of this document

13  to quote in your report, you did not intend to be

14  misleading, did you?  I assume not.

15       A.  No.

16       Q.  How many of these superstores did Mr. Brody

17  open up?

18       A.  I don't know if any superstores were actually

19  opened up, but it's more the point here that this was a

20  strategy that was being considered by Walgreens.

21       Q.  Was this strategy being considered by anybody

22  else at Walgreens other than Mr. Brody?

23       A.  Well, according to a November 1999 Purdue

24  memorandum, Bob Brody's plan to promote OxyContin was

25  successfully implemented by Walgreens, including

1   continuing medical education presentations to

2   pharmacists in which Bob Brody was an invited speaker.

3   So he was, in a sense, representing Walgreens at this

4   continuing medical education conference.

5        Q.  My question, Doctor -- I think you may have

6   lost sight of the question.  My question was, was

7   Mr. Brody's superstore strategy, as you called it, was

8   it being considered by anybody at Walgreens other than

9   Mr. Brody?

10       A.  Well, Mr. Brody was a Walgreens pharmacist --

11       Q.  Anybody else?

12       A.  What's that?

13       Q.  I said Mr. Brody was a Walgreens pharmacist.

14   That's one person.  Do we have anybody else we can pin

15   this on?

16                 MR. ARBITBLIT:  Object to form.

17                 THE WITNESS:  I don't see anything else

18   in my report to that effect.

19   BY MR. STOFFELMAYR:

20       Q.  You said you reviewed thousands of documents;

21   is that correct?

22       A.  Yes.

23       Q.  That includes thousands of internal Purdue

24   documents and thousands of internal Walgreens

25   documents?

1            MR. ARBITBLIT:  Object to form.

2            THE WITNESS:  I've reviewed thousands of

3    documents.  I couldn't parse out how many for each

4    individual defendant.

5    BY MR. STOFFELMAYR:

6       Q.  But you certainly reviewed the internal

7    documents from Purdue and Walgreens that Counsel gave

8    to you and suggested that you review?

9       A.  Yes.

10      Q.  And in all of those Purdue and Walgreens

11   internal documents, did you see any reference to

12   Mr. Brody's superstore strategy, as you called it,

13   anywhere in Ohio or anywhere else besides Florida?

14      A.  Only in the documents cited in my report.

15      Q.  And the documents cited, as we've discussed,

16   was limited to Mr. Brody's comments in Florida,

17   correct?

18      A.  Yes.

19      Q.  You mentioned --

20      A.  Sorry, your audio cut out.

21      Q.  I'm sorry.  When I look down at my notes, I

22   apologize.

23           You mentioned a couple of times during your

24   testimony an email from a Walgreens pharmacist named

25   Yaeger, I think.  Do you recall that?

Page 207

1      A.   Yes.

2      Q.   Where was pharmacist Yaeger located?

3      A.   I believe it was Michigan.

4      Q.   Do you think it might have been California?

5      A.   Let me take a look.  It's not in my report and

6  I'm not remembering, but if you represent to me that

7  it's California, I'll believe that it's California.

8      Q.   As far as you know, anyway, Mr. Yaeger was not

9  located in Ohio.

10     A.   That's correct.

11     Q.   And the document you cite is a document in

12 which Mr. Yaeger emails his concerns to a senior person

13 at Walgreens, correct?

14     A.   Yes.

15     Q.   And the email is then forwarded further inside

16 the Walgreens organization, correct?

17     A.   Yes, I believe so.

18     Q.   Other than the document you cite, did you

19 review any other documents about what happened next at

20 Walgreens, how this complaint was investigated, what

21 they concluded, anything like that?

22     A.   No.

23     Q.   Why not?

24     A.   Limited time, lots of documents.  I'm happy to

25 review that, if you'd like me to.

Page 208

1    Q.  We're not going to have time today, but I do

2  appreciate that.

3         How did you come across this email from

4  Mr. Yaeger to other folks at Walgreens?

5    A.  This was provided me by Counsel.

6    Q.  Did Counsel provide you with any other

7  documents describing how Mr. Yaeger's complaint was

8  investigated and what steps were taken or what

9  conclusions were drawn?

10   A.  No.

11   Q.  Did Counsel provide you with any Purdue

12  documents in which people at Purdue were unhappy about

13  their inability to get access to Walgreens pharmacists?

14   A.  I believe I have seen such documents, yes.

15   Q.  Did you see documents where people at

16  Walgreens -- excuse me, strike that.  I'll start over.

17        Did you see documents where people at Purdue

18  were unhappy that Walgreens' pharmacists were refusing

19  to fill prescriptions for OxyContin?

20   A.  I have seen documents where Purdue expressed

21  dismay about certain pharmacies that were, in their

22  words, overly concerned with DEA regulations.  I'm not

23  now recalling which pharmacies those were or where they

24  were located, but I have seen these types of documents.

25   Q.  Did you see Purdue documents where people at

1  Purdue were unhappy that they thought Walgreens

2  policies were too restrictive about dispensing opioid

3  medications?

4      A.  Yes, I have seen those types of documents.

5      Q.  I'm going --

6      A.  I'm sorry, when you --

7      Q.  I'm going to switch gears again to something

8  completely different.

9          Appendix 1 to your report includes a list of

10 misleading promotional messages, correct?

11     A.  Yes.

12     Q.  And there are five parts.  You describe

13 misleading promotional messages by a company called

14 Purdue Pharma, by companies called Teva and Cephalon,

15 by Janssen, by Endo, and by Allergan, correct?

16     A.  Yes.

17     Q.  And all told, Appendix 1 to your report is,

18 give or take, 40 pages, single-spaced, quoting the

19 misleading statements they made and providing your

20 commentary on why you believe they're misleading?

21     A.  I haven't counted the pages, but if you did, I

22 will accept that.

23     Q.  40 pages doesn't sound out of the ballpark?

24     A.  No.

25     Q.  And in prior reports, you also included

Page 210

1    misleading statements by a company called Mallinckrodt.

2        A.  Yes.

3            (Reporter clarification.)

4        Q.  Mallinckrodt.  I can spell it for you off the

5    record.

6            Let me ask the question again, Doctor, just so

7    we're not interrupted.

8            In prior expert reports, you've also provided

9    a list of misleading statements by a company called

10   Mallinckrodt, correct?

11       A.  Yes.

12       Q.  Why did you not include the Mallinckrodt

13   misleading statements in this report?

14       A.  As I'm recollecting now, these various opioid

15   manufacturer entities have gone by different names with

16   a very complex transition from one LLC to another.  It

17   could be that Mallinckrodt is included under a

18   different name here.  I'm not exactly remembering why

19   Mallinckrodt is no longer in the appendix specifically

20   under that name.

21       Q.  To be -- strike that.

22           If it turns out to be the case, and I'll tell

23   you that it is, but you can confirm this yourself

24   later, if it turns out that Mallinckrodt is independent

25   of the five companies you list in Appendix 1 to your

1    report here, for the sake of completeness, would it

2    make sense to take the Mallinckrodt misleading

3    statements and add them to the five companies you have

4    in your Appendix 1 to your report?

5        A.  So this report has gone through various

6    iterations over time depending upon who the defendants

7    are and what additional material I have reviewed.  So I

8    wouldn't want to say yay or nay to whether or not

9    Mallinckrodt being included here in this case makes

10   sense.  I'm not recalling -- if they were removed from

11   a prior report, I'm not recalling why.

12       Q.  Let me ask it this way:  You haven't changed

13   your mind about Mallinckrodt's misleading statements,

14   about your prior reports and Mallinckrodt's misleading

15   statements, you haven't changed your mind about that?

16       A.  I haven't changed my mind, no.

17       Q.  In none of your reports in any of the lawsuits

18   where you've given a report, have you included a

19   similar appendix with a list of misleading promotional

20   messages by pharmacy chains, correct?

21                  MR. ARBITBLIT:  Object to form.

22                  THE WITNESS:  I do have a pharmacy

23   specific section of my report.  I did debate with

24   myself whether or not it would make sense to include it

25   in the body of the report or to make a separate

Page 212

1    appendix and ultimately decided I would include it in

2    the body of the report.

3    BY MR. STOFFELMAYR:

4        Q.  If we asked you to, you could do an appendix

5    like that, correct, where we could look at what you

6    think are the misleading promotional statements by

7    pharmacy chains?

8        A.  I mean I could do that.  You know, I think

9    the -- the -- the key to the pharmacy chains'

10   collaboration in those false and misleading messages

11   was the way in which they collaborated with opioid

12   manufacturers and other entities in medicine.

13       Q.  But to be clear about the answer to my

14   question, if you wanted to, you could do a similar

15   appendix with a list of misleading promotional messages

16   by each pharmacy chain, that is something you would be

17   able to do?

18       A.  Probably, yes.

19       Q.  Last couple of questions, you understand that

20   this case is set to go to trial in Cleveland in

21   October, correct?

22       A.  Yes.

23       Q.  And if the plaintiffs' lawyers ask you to, do

24   you intend to come to Cleveland and testify in front of

25   the jury?

Page 213

 1      A.  Yes.

 2      Q.  If the defendants' ask you and buy you a plane

 3  ticket, would you come at our request as well?

 4      A.  I'm not sure I'm understanding your question.

 5      Q.  If I sent you an email or sent Mr. Arbitblit

 6  an email and said we would like Dr. Lembke to come

 7  Cleveland to testify in front of the jury, we'll pay

 8  for her plane ticket, would you agree to do that?

 9                  MR. ARBITBLIT:  Objection --

10                  THE WITNESS:  Yes.

11                  MR. STOFFELMAYR:  Thank you.

12          Dr. Lembke, thank you so much for your time.

13  I know it's Friday afternoon.  I will sit down now and

14  let the others ask questions so we can all -- I won't

15  say go home because some of us are already home, but

16  get to wherever we would rather be.

17                  MR. ARBITBLIT:  So before you switch to

18  another Counsel, we've been going for about 70 minutes,

19  let's take our last break.

20                  THE VIDEOGRAPHER:  We are going off the

21  record at 2:50.

22                  (Recess taken 2:50 p.m. to 3:01 p.m.)

23                  THE VIDEOGRAPHER:  We are back on the

24  record.  The time is 3:01, please proceed.

25

Page 214

EXAMINATION

1

BY MR. CARTER:

2

3     Q.  Good afternoon, Dr. Lembke.  Are you okay to

4 continue?

5     A.  Yes, I am.

6     Q.  We've met before, but my name is Ed Carter,

7 and I represent Walmart, and I have a few questions for

8 you today, all right?

9     A.  Okay.

10    Q.  I want to start with a logistics question.

11 What did you bring with you to the deposition today?

12    A.  I have a paper copy of my report, and I have

13 the document --

14    Q.  Do you have any other?

15    A.  I have the document --

16    Q.  Sorry, go ahead.

17    A.  I have the documents that defendant sent to

18 me.

19    Q.  Any other materials with you in the room?

20    A.  No.

21    Q.  Well, and you do have a copy of your book,

22 correct?

23    A.  Yes.

24    Q.  And book, exhibits, that we sent, and a paper

25 copy of your report; that's everything, correct?

Page 215

1    A.  Yes.

2    Q.  Does your paper copy of your report have notes

3  or margin area?

4    A.  It has post-its to serve as an index so I can

5  try to find things more quickly.

6    Q.  Anything other than post-its?

7    A.  No.

8    Q.  All right.  Switching gears, did any pharmacy

9  in Lake or Trumbull County conduct itself in a way that

10  you consider to be compliant with best practices in the

11  requirements under the Controlled Substances Act?

12         MR. ARBITBLIT:  Object to form.

13         THE WITNESS:  Again, my opinions on Lake

14  and Trumbull County are based on my review of national

15  policies of the defendants' policies and procedures,

16  and so my opinion of those policies and procedures for

17  good and for bad are the same nationally as they are in

18  Lake and Trumbull County because I have no evidence to

19  suggest that Lake and Trumbull County are outliers.

20  BY MR. CARTER:

21    Q.  So with respect to the defendant pharmacies

22  named in this case, is it your opinion that every

23  pharmacy location for one of the defendant pharmacies

24  in Lake or Trumbull County was acting in a

25  non-compliant way?

Page 216

1        A.  My opinion is not based on every pharmacy or

2   every pharmacist.  My opinion is looking at the

3   aggregate evidence to determine what the policies and

4   procedures were in defendant chains' pharmacies and to

5   form my opinion based on that.

6        Q.  Did you conduct any systematic review of the

7   defendant pharmacies in Lake or Trumbull County to

8   identify the good pharmacy locations and distinguish

9   them from bad pharmacy locations?

10                  MR. ARBITBLIT:  Object to form.

11                  THE WITNESS:  So my systematic review is

12  my report and my opinion is based on aggregate data,

13  and Trumbull and Lake Counties are not, in my opinion,

14  outliers for what was happening nationally.

15  BY MR. CARTER:

16       Q.  Is there any county in the country that you

17  would identify as an outlier from the national pattern?

18       A.  Opioid prescribing patterns suggest that there

19  are counties in the country that were more affected by

20  the oversupply of opioids than others, but that the

21  problem extended to everywhere in the United States,

22  that it wasn't localized to any specific state or

23  region, although clearly, there are differences,

24  geographic differences in the severity of the opioid

25  epidemic region to region.

1      Q.   And what are -- what differences, if any, were

2  there in Lake and Trumbull County in terms of the

3  degree of severity?

4      A.   The degree of severity in Lake and Trumbull

5  County is generally consistent with national trends.

6      Q.   And so how would you describe it in a

7  quantitative way?

8      A.   Can you give me a moment to look at my report?

9      Q.   Sure.

10      A.   So on page 3 of Appendix 3, I've included a

11  table that shows national opioid prescribing trends per

12  100 persons in the United States compared to the state

13  of Ohio, compared to Lake County, and compared to

14  Trumbull County.  And as you can see, the number of

15  prescriptions written per 100 persons between 2006 and

16  2019 in Lake County is consistent with the numbers

17  written nationally, although the peak in Lake County in

18  2012 --

19           (Reporter clarification.)

20      A.   -- was 90.2 prescriptions written per 100

21  persons compared to 81.3 prescriptions per 100 persons

22  written in the United States generally.

23           If you look at Trumbull County, you'll see

24  that the Trumbull County averages are higher than

25  national averages starting in 2006 and peaking in 2010

Page 218

1   at 114 prescriptions per 100 persons, and then

2   decreasing to national averages by 2019.

3          I have other data in this specific location

4   appendix detailing prescription opioid overdose deaths

5   in Lake County and Trumbull County as well as Ohio

6   overall.  And what you can see on page 4 in Figure 5 is

7   that unintentional fatal drug poisoning rates and

8   distribution rates of prescription opioids in grams per

9   100,000 population by year in Ohio went up between 1997

10  and 2007.  And again, those are roughly consistent with

11  national trends, or really even higher, but roughly a

12  quadrupling of opioid-related -- or drug poisoning

13  overdose deaths, opioid-related overdose deaths between

14  the late 1990s and approximately 2007.

15      Q.  So with the chart on page 3 that indicates the

16  prescribing rates, do you -- did you analyze that

17  against the rate within either Lake or Trumbull County

18  at which there was evidence-based, legitimate

19  prescribing of opioid medications?

20              MR. ARBITBLIT:  Object to form.

21              THE WITNESS:  Yeah, I can't answer your

22  question because of the way it's formulated.

23  BY MR. CARTER:

24      Q.  Let me try a simple example using the chart

25  and maybe that will make more sense.  If you look at

Page 219

1   2006, the first line of data on page 3 of Appendix 3,

2   you see the prescribing rate per 100 persons in Lake

3   County is listed as 72.3, correct?

4        A.  Are we back to page 3?  I'm sorry, say that

5   again what year?

6        Q.  Yes.  For the first year in the chart, 2006,

7   the data point for Lake County is 72.3, correct?

8        A.  Yes.

9        Q.  Do you know what number or percentage of that

10   72.3 represents evidence-based, legitimate prescribing?

11        A.  Well, it is my opinion that any increase prior

12   to late 1990s in opioid prescribing is probably not

13   legitimate opioid prescribing because it's contrary to

14   the evidence showing that the risks of prescribing at

15   higher doses for longer duration outweigh the benefits.

16   So given that there is --

17        Q.  So -- I'm sorry, go ahead.

18        A.  Yeah, I was just going to say the -- there is

19   no explanation for the increase in prescribing in Lake

20   County over that time period except for the promotional

21   strategies and the increased supply.

22        Q.  So if I'm understanding you correctly, is it

23   your testimony that if we went back and pulled an

24   equivalent data point for Lake County from the late

25   1990s before the increase in messaging and used that as

Page 220

1   a baseline, that the prescribing rate per 100 persons

2   up to that baseline would be consistent with

3   evidence-based, legitimate prescribing?

4       A.  So that's overstating my testimony, because

5   it's -- my testimony is based on aggregate, and

6   everything I've looked at and the sudden increase in

7   prescribing and the supply, it's not to say that every

8   single prescription prior to that sudden increase was a

9   legitimate prescription.

10      Q.  So in 1990, to the extent an opioid was

11  prescribed in Lake County, is it your testimony that

12  there was illegitimate prescription for opioid

13  medications in Lake County in 1990?

14      A.  So I think ever since opioids have been around

15  and prescribed by doctors and dispensed, there have

16  been instances of illegitimate prescribing and

17  dispensing, but I think the fraction was much, much

18  smaller prior to the paradigm shift that started in the

19  late 1990s.

20      Q.  So looking back at this 2006 data point for

21  Lake County that we were discussing, the 72.3, is it

22  your testimony that 100 percent of that 72.3 is not

23  evidence-based, legitimate medical prescribing?

24      A.  No.

25      Q.  So some portion of that would be

Page 221

1    evidence-based, legitimate medical prescribing, but

2    you're not able to put a specific number on it; is that

3    a fair understanding of your testimony with respect to

4    that data point?

5              MR. ARBITBLIT:  Object to form.

6              THE WITNESS:  Well, what I've -- what

7    I've said before, and I'll try to say it again is that

8    the difference between the 2006 rates of prescribing

9    and the prescribing that existed prior to, say, 1996,

10    that through that change, a much higher percentage of

11    the prescribing was not for a legitimate medical

12    purpose.

13    BY MR. CARTER:

14       Q.  Are you able to identify -- well, strike that.

15          Have you conducted an analysis of the

16    prescribing in Lake County to enable you to identify a

17    specific number or a specific percentage of the

18    prescriptions there that were evidence-based,

19    legitimate prescriptions?

20       A.  I think the analysis can be inferred from the

21    CDC data showing that as the number of prescriptions

22    quadrupled between the late 1990s and the mid-2007 time

23    frame, 2012 time frame, since so many people were dying

24    from prescription opioids, I think it is safe to infer

25    that a large percentage of individuals who died were

Page 222

1  not receiving opioids for a legitimate medical purpose.

2       Q.  Now, you just described that as a "large

3  percentage."  Are you able to put a specific number to

4  it?

5       A.  Again, I would say that the quadrupling

6  between -- times four from the late 1990s to the peak,

7  which is around 2011, 2012, would be the increased

8  number that is not explained by legitimate medical

9  condition.

10       Q.  All right.  I want to jump through to the

11  bottom of the chart on page 3 and look at the same

12  Column 43.1 for 2019.

13            Do you see that?

14       A.  Yes.

15       Q.  Is that 43.1 prescribing rate, does that

16  represent evidence-based, legitimate medical

17  prescriptions for opioids in Lake County?

18                 MR. ARBITBLIT:  Object to form.

19                 THE WITNESS:  So this table starts at

20  2006.  It doesn't include information from the late

21  1990s up through 2006.  And in general, what national

22  trends show is that although prescribing -- opioid

23  prescribing has decreased since its peak around 2012,

24  it's still higher than the late 1990s levels, implying

25  that a significant percentage of that 43.1 is, let's

1    say, legacy prescribing in addition to not prescribing

2    for a legitimate medical condition.  And I'm happy to

3    explain that further if it would be helpful.

4    BY MR. CARTER:

5        Q.  Compassionate prescribing to titrate users

6    with dependence, that would be considered a legitimate

7    prescribing practice from your perspective, correct?

8        A.  Well, I wouldn't use the word "titrate," I

9    would use the word taper.  But yes, compassionate

10   tapering would be a legitimate use.

11       Q.  Now, I pulled out, for exemplar purposes, the

12   2006 data for Lake County, and the 2019 data for Lake

13   County, if I asked you the same questions for Trumbull

14   County would you provide the same answers in terms of

15   reference to the testimony and the data?

16       A.  Yes.

17       Q.  And would you provide the same answer if I

18   picked out any of those years in this chart on page 3

19   of Appendix 3?

20                MR. ARBITBLIT:  Objection to form.

21   Vague.

22                THE WITNESS:  Yes.

23   BY MR. CARTER:

24       Q.  All right.  So putting the chart aside, in

25   your expert opinion, what is the appropriate level of

Page 224

1   evidence-based opioid prescribing that would be

2   legitimate for Lake County for any year?

3                    MR. ARBITBLIT:  Object to form.  Asked

4   and answered.

5                    THE WITNESS:  Yes, I do feel I answered

6   that.  Is there something different or more that you

7   would like from me?

8   BY MR. CARTER:

9       Q.  I'm asking if you could put a prescribing rate

10  per hundred or a percentage or a volume, a quantitative

11  response to what you believe is an appropriate

12  evidence-based, legitimate level of prescribing for

13  Lake County.

14      A.  I think legitimate, evidence-based prescribing

15  has to include both quantitative and qualitative

16  assessments.  Quantitatively, as I've said before, per

17  person I believe that we need to reduce prescribing

18  back to the pre-1996 levels, and then qualitatively,

19  it's important that opioid prescribing be

20  evidence-based.

21      Q.  Would you provide the same answer for Trumbull

22  County?

23      A.  Yes.

24      Q.  And is that your best answer for both

25  counties?

Page 225

1       A.  Yes.

2       Q.  Thank you.

3            I want to ask you about pharmacies in Lake

4  County that are not operated by one of the defendant

5  chains in this case, so non-defendant pharmacies.  Have

6  you conducted any systematic analysis of the policies,

7  practices related to dispensing of any non-defendant

8  pharmacy in Lake County?

9       A.  Again, my assessment is an aggregate looking

10  at national chain policies.  I have no reason to

11  believe that pharmacies in Lake and Trumbull County are

12  exempt from that, including pharmacies that are not

13  named in this case.

14      Q.  So can you identify for me any pharmacy that

15  is not a defendant in this case for which you have

16  analyzed, on a national level, their policies,

17  procedures, training related to dispensing of opioid

18  medications?

19      A.  I have focused on the pharmacies that are

20  named as defendants in this case.

21      Q.  You say you've focused on them.  Have you

22  conducted a systematic analysis on a national basis of

23  any pharmacy that is not Giant Eagle, Rite Aid,

24  Walmart, Walgreens, or CVS?

25      A.  No.

Page 226

1       Q.  So sitting here today, are you able to compare

2   how the policies related to dispensing opioids of the

3   defendants in this case compare to any other pharmacy

4   across the nation?

5       A.  No.

6       Q.  Similar question, are you able to compare the

7   policies related to pharmacist training of any of the

8   pharmacy defendants in this case to any other

9   non-defendant pharmacy across the nation?

10      A.  No.

11      Q.  In terms of guidance provided to pharmacists

12  related to their exercise of corresponding

13  responsibility, are you able to compare the policies

14  and practices of any of the pharmacy defendants in this

15  case to any other pharmacy across the nation?

16      A.  No.

17      Q.  Same question for policies related to

18  investigation and due diligence on red flags, are you

19  able to compare any of the policies that the pharmacies

20  in this case had over time to any other pharmacy across

21  the nation?

22      A.  Well, I have looked at DEA enforcement

23  regulations, which do include pharmacies that are not

24  part of defendant pharmacies.  Giant Eagle Pharmacy, I

25  believe is not one of the defendant pharmacies.  Sorry,

Page 227

1   not Giant Eagle.  I misspoke.  Wait a moment, please.

2   Sorry, the East Main Street Pharmacy in Ohio.

3       Q.  And you cited that DEA Enforcement Action and

4   order in your report, correct?

5       A.  What do you mean "in order"?

6       Q.  I said you cited the DEA suspension order in

7   your expert report for this case, correct?

8       A.  Yes, I did.  Page 106.

9       Q.  All right.  Other than East Main Street

10  Pharmacy, is there any other non-defendant pharmacy

11  across the nation where you have familiarity with their

12  policies related to red flag investigation and due

13  diligence?

14      A.  Yes, on page 107, I talk about a Zion Clinic

15  Pharmacy that was the subject --

16      Q.  I'm sorry, go ahead.

17      A.  That was the subject of DEA action.

18      Q.  And so for East Main Street Pharmacy and Zion

19  Pharmacy, other than reading the DEA Enforcement

20  Action, did you actually go to the primary sources and

21  pull policies for either of those pharmacies for

22  purposes of your analysis?

23      A.  No.

24      Q.  Sitting here today, do you know one way or

25  another whether any of the non-defendant pharmacies in

1  Lake County performed their dispensing duties at a

2  level that you would judge to be compliant with best

3  practices in the CSA?

4              MR. ARBITBLIT:  Object to form.

5              THE WITNESS:  I did not specifically

6  look at non-defendant pharmacies outside of East Main

7  Street Clinic and Zion Clinic Pharmacies.

8  BY MR. CARTER:

9      Q.  So same question for Trumbull County?

10     A.  Yes.

11     Q.  Same answer?

12     A.  Yes.

13     Q.  I want to ask you a broader question.  Do you

14  agree that most pharmacists across the country try to

15  do the right thing in dispensing medications to

16  patients?

17             MR. ARBITBLIT:  Object to form.

18             THE WITNESS:  I believe that the systems

19  under which most pharmacies -- most pharmacists have

20  been working in defendant pharmacy chains have made it

21  impossible for them to do the right thing.

22  BY MR. CARTER:

23     Q.  So my question is broader, and I'm asking

24  irrespective of the defendant pharmacies, as a

25  practice, is it your opinion that most pharmacists

Page 229

1   across the country working in every pharmacy in the

2   country, that most of them are trying to do the right

3   thing by their patients?

4                   MR. ARBITBLIT:  Object to form.

5                   THE WITNESS:  I would -- I would say

6   that most of them are trying to do the right thing,

7   yes.

8   BY MR. CARTER:

9        Q.  And with respect to the chain defendant

10  pharmacies in this case, do you agree that most of the

11  pharmacists working for the chain defendants try to do

12  the right thing?

13                  MR. ARBITBLIT:  Object to form.

14                  THE WITNESS:  Yes.

15  BY MR. CARTER:

16       Q.  When were you retained to perform your work

17  for this case?

18       A.  I was retained by the MDL in 2017.

19       Q.  When were you first given the assignment that

20  you answered with your report for this case, track

21  three case?

22       A.  2017.  I mean the original MDL included

23  manufacturers, distributors, and pharmacies.

24       Q.  Okay, so the first time you were asked to

25  assess whether the pharmacies played a role in

Page 230

1    contributing to an opioid crisis, that was in 2017?

2        A.  My focus at that point was not the pharmacies.

3    I had not yet had a chance to review the internal

4    documents that I later had the opportunity to review

5    that allowed me to form an opinion about defendant

6    pharmacies.

7        Q.  When was the first point in time when you

8    started the process of focusing on the pharmacies?

9        A.  I'm not remembering specifically.  I've been

10   working on this case for a number of years now and I

11   don't remember exactly when my focus on the pharmacies

12   began.

13       Q.  If we looked at the invoices that you've

14   produced for this case track three, would that reflect

15   the entirety of the work that you've performed on this

16   specific case track?

17       A.  Probably not the entirety because I was

18   probably reviewing documents relating to pharmacies

19   prior to that.

20       Q.  Okay.  Exhibit B to your report includes

21   materials considered, and we received a supplemental

22   list of materials considered last night.  Combining

23   those two lists, is that the full universe of materials

24   that you've considered for purposes of this expert

25   report?

Page 231

1      A.  Yes.

2      Q.  I'll represent to you that on Exhibit B there

3  are two dozen documents that Walmart produced bearing

4  Walmart's Bates numbers.  Does that sound correct to

5  you?  If you're looking at Exhibit B, it's page 88.

6      A.  Yes.

7      Q.  All right.  Was it your intention to identify

8  in Exhibit B all of the Walmart produced documents that

9  you considered for purposes of this case?

10      A.  Those documents in Exhibit B plus the other

11  documents that I reviewed, again, including DEA

12  actions, the medical literature, everything that I've

13  cited here is what I used in forming my opinion.

14      Q.  All right.  And so for the documents that were

15  produced by Walmart, entries 1740 through 1763 in

16  Exhibit B, do you see that?

17      A.  Yes.

18      Q.  How did you identify and select those Walmart

19  documents for purposes of your methodology in this

20  case?

21      A.  Those documents were provided me by Counsel,

22  and after reviewing, if I had further questions or

23  wanted further documents, I asked for them and then

24  additional documents were provided when available.

25      Q.  Did you request any Walmart produced documents

Page 232

1    that were not provided to you?

2         A.  Yes.

3         Q.  What Walmart documents did you ask for that

4    you did not receive in response?

5         A.  I would have liked to have looked at the

6    specific notes by pharmacists around how they handled

7    red flags.

8         Q.  Anything else?

9         A.  That's the main one.

10        Q.  Do you think that 24 documents is a sufficient

11   sample size for a review of Walmart's dispensing

12   policies from the time period of 2006 through to today?

13        A.  I do believe that those documents in

14   combination with the other documents that I've reviewed

15   were sufficient, yes.

16        Q.  Included in the documents that you listed in

17   Exhibit B are pharmacy operations manuals or POMs.  Do

18   you recall that?

19        A.  Yes.

20        Q.  Do you know how many POMs you included in

21   Exhibit B?

22        A.  I believe 3 or 4.  I'm not remembering right

23   now.

24        Q.  Do you know how many POMs Walmart had that

25   impact the area of dispensing?

Page 233

1       A.  No.

2       Q.  If I represented to you that Walmart had more

3  than 50 POMs, do you agree that reviewing 3 or 4 out of

4  50 POMs is not a systematic review of the pharmacy

5  operations manual?

6              MR. ARBITBLIT:  Object to form.

7              THE WITNESS:  No, I don't agree.

8  BY MR. CARTER:

9       Q.  So it's your testimony to the jury that it's

10 possible to get a systematic analysis of Walmart's

11 pharmacy operations manual by reviewing 3 or 4 of the

12 POMs?

13             MR. ARBITBLIT:  Object to form.

14 Misstates.

15             THE WITNESS:  Again, those POMs were not

16 reviewed in isolation.  I reviewed those in the broader

17 context of many other documents about Walmart's

18 practices and policies.

19 BY MR. CARTER:

20      Q.  But those many other documents did not include

21 approximately four dozen additional POMs, correct?

22      A.  I reviewed the Department of Justice 2020

23 report, as well as various DEA reports, which may have

24 well included the review of POMs.

25      Q.  Putting aside reading the work of others, did

Page 234

1   you yourself set out to conduct a systematic review of

2   Walmart's dispensing policies?

3                   MR. ARBITBLIT:  Object to form.

4                   THE WITNESS:  I believe that I reviewed

5   a sufficient amount of material to form an opinion on

6   Walmart's dispensing policies.

7   BY MR. CARTER:

8       Q.  You mentioned the 2020 DOJ report.  Are you

9   referring to the lawsuit that DOJ filed against Walmart

10  in Delaware?

11      A.  Yes.

12      Q.  Do you understand -- well, strike that.

13          Did you ask for and review Walmart's answer to

14  that complaint?

15      A.  Yes.

16      Q.  And did you conduct a systematic comparison

17  between the allegations in the complaint and Walmart's

18  response and the answer?

19      A.  I believe so, yes.

20      Q.  Did you ask for copies of any of the exhibits

21  or policies or documents that were cited in Walmart's

22  answer to the complaint?

23      A.  I'm not remembering a specific document, but

24  it's likely that I reviewed some of the documents cited

25  in the Walmart complaint.

Page 235

1       Q.  And just to be clear, I'm asking you about

2   Walmart's answer to DOJ's complaints; do you

3   understand?

4       A.  Walmart's answer, yes.

5       Q.  Would you agree it would be -- it would be

6   highly improper to base your opinions simply on a

7   complaint filed by one party in a lawsuit without

8   looking at the full facts; fair?

9                   MR. ARBITBLIT:  Object to form.

10                  THE WITNESS:  I do think I looked at the

11  full facts.

12  BY MR. CARTER:

13      Q.  Right, and I'm not asking you what you looked

14  at at this point because you've already told me that.

15  I'm asking you do you agree that merely looking at the

16  complaint without looking at the full facts, that would

17  be a problematic expert method?

18      A.  Well, the complaint was very thorough but,

19  yes, I agree it would be good to look at multiple

20  documents.

21      Q.  To the extent you quote from the DOJ's

22  complaint in your expert report, do you agree that if

23  Walmart wins that case in front of a jury, that the

24  quotations from the DOJ's complaint would be

25  invalidated?

Page 236

1               MR. ARBITBLIT:  Objection.  Speculative.

2               THE WITNESS:  Based on my review, I

3      don't believe that that would be invalidated, no.

4      BY MR. CARTER:

5          Q.  So if a jury disagreed with the DOJ's

6      complaint, would you accept that jury's determination?

7               MR. ARBITBLIT:  Object to form.

8               THE WITNESS:  What do you mean by

9      "accept that determination"?

10     BY MR. CARTER:

11         Q.  So if the DOJ case is litigated before this

12     case and the jury sides with Walmart in the DOJ

13     complaint, would you amend or retract your reliance on

14     the DOJ's complaint for your report in this case?

15              MR. ARBITBLIT:  Object to form.

16              THE WITNESS:  Whether or not I relied on

17     the DOJ report in this case, my opinion is unchanged.

18     BY MR. CARTER:

19         Q.  For all of the portions in your report where

20     you have quoted from the DOJ's complaint against

21     Walmart, did you conduct any independent analysis to

22     verify or corroborate what you've quoted in your report

23     from the DOJ?

24         A.  Yes, I did additional analysis to verify.

25         Q.  All right.  Switching gears, when was there a

Page 237

1  medical consensus that prescription opioids were a

2  cause of increased abuse, overdose, and mortality?

3      A.  I would say that that consensus emerged

4  slowly, probably beginning around 2011 when the CDC

5  said that we were in the midst of a prescription drug

6  epidemic, but I would say even then many prescribers

7  remained unaware of the extent to which their own

8  prescribing was contributing to the epidemic.  Probably

9  wasn't until 2016 with the publication of the CDC

10  guidelines that there was broad awareness.

11      Q.  You indicated in response to questioning from

12  Mr. Gisleson that your own personal evolution was

13  something that occurred in the 2000s.  Is there a

14  particular point in time by which you can definitively

15  say that you, Dr. Anna Lembke, were aware of the role

16  of opioid medications in abuse, addiction, and

17  mortality?

18                  MR. ARBITBLIT:  Objection.  Form.

19                  THE WITNESS:  I would say it was an

20  iterative process that occurred over time.  There

21  wasn't a single moment in time where I became aware.

22  BY MR. CARTER:

23      Q.  And I appreciate that.  Was there a point in

24  time by which you can say definitively you had that

25  awareness?  I mean, by the time you wrote your book,

Page 238

1    for example, you were aware of that, correct?

2        A.  Yes.

3        Q.  Was there a date prior to the publication of

4    your book by which you would be comfortable saying that

5    iterative process had run its course?

6        A.  Probably about 2013, 2014.

7        Q.  I want to ask you about page 108 of your

8    report, romanette -- in section I, romanette I.  I

9    guess that would be romanette 1, sorry.  Tell me when

10   you're there.

11       A.  Okay, I'm there.

12       Q.  All right, so in romanette 1 you wrote, "By

13   2005, the prescription opioid epidemic was several

14   years into its evolution, having begun in the mid to

15   late 1990s.  As you recounted previously in this

16   report, the medical literature, CDC data, and articles

17   in the lay press had made clear that prescription

18   opioids were the cause of a significant spike in

19   overdose and mortality."

20           Did I read that correctly?

21       A.  Yes.

22       Q.  I want to ask you about that last sentence.

23   To the extent the medical literature, the CDC data, and

24   articles in the lay press had made clear that

25   prescription opioids were the cause of a significant

Page 239

1    spike in overdose and mortality, is that something that

2    you yourself, Dr. Lembke, were aware of by 2005?

3        A.  No.

4        Q.  And that was before the time period that you

5    testified earlier by which you would agree there was a

6    scientific and medical consensus to that effect,

7    correct?

8        A.  I'm sorry.  What testimony are you referring

9    to?

10       Q.  Strike that.  I'll ask a cleaner question.

11           Is it your opinion in this paragraph,

12   romanette 1, that Walmart should have known in 2005

13   something that you yourself, as a physician from

14   Stanford, did not understand?

15       A.  Yes.

16       Q.  Is it your testimony that pharmacists working

17   in Lake or Trumbull County should have understood, in

18   2005, something that you yourself did not understand?

19               MR. ARBITBLIT:  Object to form.

20               THE WITNESS:  I think that the

21   pharmacies had access to information that I as an

22   individual prescriber did not have, and therefore,

23   would have and could have known earlier than I could

24   have known.

25

Page 240

1    BY MR. CARTER:

2        Q.   Now, you cite in this section as well as

3    previously, the East Main Street case that we

4    discussed, correct?

5        A.   Yes.

6        Q.   Now, you note in footnote 530 at the bottom of

7    this page that the affirmants of suspension order was

8    published on October 27, 2010, correct?

9        A.   Yes.

10       Q.   You include a parenthetical to indicate that

11   it was describing misconduct in 2005 and 2006 as the

12   basis for the DEA enforcement, correct?

13       A.   Yes.

14       Q.   You understand that Walmart and the other

15   pharmacy defendants would not have been privy to a DEA

16   enforcement action prior to its publication in October

17   of 2010, correct?

18       A.   Yes, that makes sense.

19       Q.   So you don't mean to be suggesting by this

20   section of your report that the pharmacies were on

21   notice in 2005 that the DEA was investigating East Main

22   Street pharmacy in Columbus, Ohio, are you?

23       A.   Specifically the East Main Street example, no.

24       Q.   Do you know what the typical timeline is for a

25   DEA investigation of a pharmacy?  Is this approximately

1    four-year period on the East Main Street case, is that

2    a typical timeline for a DEA action?

3        A.  I don't know.

4        Q.  Now, I want to continue on the same page to

5    romanette 2.  You reference Section 1703 of Walmart's

6    pharmacy operations manual.  Do you see that?

7        A.  Yes.

8        Q.  Now, that section was titled and dealt with

9    "Forged and Altered Prescriptions," correct, at least

10   in the 2005 edition?

11       A.  Give me a moment.  Yes.

12       Q.  Do you have any evidence that Walmart in Lake

13   or Trumbull County -- well, strike that.

14           Do you have any evidence that Walmart

15   pharmacists in Lake or Trumbull County filled

16   improperly a forged or altered prescription?

17       A.  Again, I have no evidence to the contrary.

18       Q.  You've said that a couple times that you have

19   no evidence to the contrary.  Did you look for evidence

20   to see whether the POM actually worked one way or the

21   other?

22               MR. ARBITBLIT:  Object to form.

23               THE WITNESS:  I did request the pharmacy

24   notes.

25

Page 242

1    BY MR. CARTER:

2        Q.  Why did you request -- why did you request the

3    notes?

4        A.  To see specifically what pharmacists

5    identified as red flags and what they didn't identify

6    as red flags and how they investigated those red flags,

7    if they did investigate them.

8        Q.  Do you know what the standard nationally was

9    in 2005 for documenting a suspected forged or altered

10   prescription?

11                   MR. ARBITBLIT:  Object to form.

12                   THE WITNESS:  I believe that I do, yes.

13   BY MR. CARTER:

14       Q.  And what was the standard nationally that

15   applied to pharmacies and pharmacists with respect to

16   forged or altered prescriptions in 2005?

17       A.  Looking for different types of handwriting on

18   a prescription, looking for a prescription written with

19   language not consistent with the way that doctors

20   usually write prescriptions, looking for prescriptions

21   that might have been photocopied, looking for

22   prescriptions that might have had things crossed out or

23   edited.

24       Q.  And what's the practice if a pharmacist in

25   Lake County was presented with a prescription with one

Page 243

1    of those criteria in 2005, what were they supposed to

2    do with that prescription?

3         A.  As with any red flag, pharmacists would have

4    been required to further investigate before --

5         Q.  Would they be required to -- would they be

6    required to confiscate a prescription?

7         A.  I'm not sure.

8         Q.  Would they be required to write void or some

9    kind of notation on the face of the prescription?

10        A.  Yes.

11        Q.  And what's your basis for that?

12        A.  My study of pharmacy practice, 20-plus years

13   of treating patients, and interacting with pharmacists.

14        Q.  And so you're prepared to state the

15   credibility of your testimony that that was a national

16   standard for pharmacists in 2005?

17                  MR. ARBITBLIT:  Object to form.  Excuse

18   me, object to form.

19                  THE WITNESS:  I'm not saying that that

20   was the national standard in 2005.  It's my

21   understanding that that is the national standard, that

22   has been the national standard, and is the standard

23   today.

24   BY MR. CARTER:

25        Q.  Was that the standard in Ohio in 2005 at the

Page 244

1    time of this POM?

2         A.  I have no reason to think otherwise.

3         Q.  And do you have any evidence that a Walmart

4    pharmacist failed to follow POM 1703 in Lake or

5    Trumbull County?

6                   MR. ARBITBLIT:  Object to form.

7                   THE WITNESS:  I have the evidence

8    provided by the DOJ complaint.  I have the evidence

9    provided by the DEA citation that Walmart was

10   repeatedly dispensing prescriptions outside of a

11   legitimate medical purpose.

12   BY MR. CARTER:

13        Q.  Do either of those two sources contain facts

14   specific to Lake or Trumbull County?

15        A.  Not as far as I know.

16        Q.  Okay.  I want to turn to the next page of your

17   report, page 109, romanette 3.  There is a discussion

18   of the 2007 "New York Times" report.  Do you see that?

19        A.  Yes.

20        Q.  And then at the end of that paragraph you

21   conclude, quote, "This widely publicized event gave

22   further notice to pharmacy defendants and to the world

23   at large that OxyContin, a very popular and profitable

24   drug, carried major risks of abuse and that the risks

25   had been downplayed."

1          Did I read that correctly?

2      A.  Yes.

3      Q.  Was that something that you were aware of in

4  May of 2007?

5      A.  I was beginning to be aware, but as I said, it

6  was an evolution, and I wasn't fully aware.

7      Q.  I want to ask you a broader question.  What

8  was the first year in which the DEA provided a public

9  and official guidance to pharmacists or pharmacies

10  identifying distance traveled as a red flag?

11      A.  I don't know.

12      Q.  When was the first time the DEA issued public

13  guidance to pharmacies identifying a trinity

14  prescription or combination prescription as a red flag?

15      A.  Well, certainly by 2010 with the East Main

16  Street case and probably before then, but I don't know

17  exactly.

18      Q.  Same question for cash payments.

19      A.  Again, no later than 2010.

20      Q.  And then last one in this series, same

21  question for high volume prescribers.

22      A.  I'm not sure.  I don't know.

23      Q.  All right, I want to ask you about romanette 6

24  on page 110 of your report.  The romanette starts on

25  page 109, but I want to ask you about the sentence in

Page 246

1   italics in the middle of that top paragraph on

2   page 110.  Let me know when you're there.

3        A.  Okay.

4        Q.  So in the middle of that paragraph you wrote,

5   "In each example, Walmart's compliance unit knew that

6   its pharmacists were continuing to be presented with

7   prescriptions issued by those prescribers and that

8   based on the reported red flags there was a very high

9   probability that the prescribers were regularly issuing

10  invalid controlled substance prescriptions."

11       Did I read that correctly?

12       A.  Yes.

13       Q.  Do you know whether any of those prescribers

14  were located in Lake or Trumbull?

15       A.  Well, right below that I talk about how one of

16  the examples in that report was a Florida physician

17  whose patients filled prescriptions at Walmart stores

18  in 32 states around the country, including Ohio, and I

19  don't know specifically if it went to pharmacies in

20  Lake and Trumbull County, but could have been.

21       Q.  And did any of those physicians, including the

22  one that you identify as an example, were any of them

23  not licensed by the state where they were practicing

24  medicine at the time that they were issuing

25  prescriptions?

Page 247

1      A.   I'm not recalling right now.  I do recall in

2  the many documents I have reviewed the pharmacy

3  defendants filling prescriptions for individuals whose

4  DEA licenses had expired, for example, but I'm not

5  recalling if that's specifically true in this case.

6      Q.   And in the examples described in romanette 6

7  of your report, were there any prescribers who had DEA

8  registrations that had been revoked?

9      A.   I'm not specifically remembering.

10     Q.   Let me ask you a broader question to see if I

11 can streamline things.  Are you aware of any situation

12 where any pharmacy defendant in Lake or Trumbull County

13 filled a prescription that was written by an unlicensed

14 or unregistered prescriber?

15     A.   Again, I don't have any evidence to the

16 contrary.  I don't have any specific evidence to that

17 effect, but these were problems that were occurring at

18 Walmart's and Rite Aids and CVSs and the other

19 defendants all around the country.

20     Q.   I want to switch gears.  You previously

21 testified that because you were part of that generation

22 impacted by the paradigm shift, that you unknowingly

23 and unwittingly wrote prescriptions that would have

24 been diverted by patients; is that correct?

25     A.   Yes.

Page 248

1      Q.  Are you able to quantify how many of your

2  well-intentioned prescriptions would have been diverted

3  by your patients?

4      A.  No, and again, I don't have definitive proof

5  that they were, and usually it was, you know, in

6  retrospect.  So I can't quantify that.

7      Q.  All right.  Romanette 9 on page 111.

8          MR. CRAWFORD:  Hey, Ed, I think there

9  is, like, 40 minutes left.  Just a heads-up.

10         MR. CARTER:  Okay.  I'll wrap up here,

11  Kyle.  Thank you.

12  BY MR. CARTER:

13     Q.  Romanette 9.

14     A.  Yes.

15     Q.  You wrote, "The absence of red flags for

16  opioids plus benzodiazapines and for the trinity of

17  those two drugs plus a muscle relaxer is a significant

18  omission that failed to properly instruct Walmart's

19  pharmacists as to both the potential for diversion,

20  since the drugs were known to increase the high among

21  drug users and the increased risks of medical

22  complications, especially the synergistic effects on

23  respiratory depression which were known to increase the

24  risk of overdose and death well before 2009."

25          Is it your testimony that that was an

Page 249

1    intentional omission?

2        A.   It is my testimony that Walmart and other

3    pharmacy defendants could have done more and chose not

4    to.

5        Q.   And is it your testimony that that topic was

6    not addressed by Walmart pharmacist training outside

7    the POMs?

8        A.   It's my testimony that Walmart failed to make

9    that combination a red flag, thereby triggering

10   pharmacists to investigate.

11       Q.   Last topic, and then I'm going to hand off to

12   other Counsel.  Do you agree that pharmacists have

13   sources of information beyond policies from their

14   chains?

15       A.   Yes.

16       Q.   Do you agree that pharmacists have

17   professional knowledge, training, and experience that

18   they get separate and apart from any support of their

19   managing chains?

20       A.   Yes, but my impression is that a lot of their

21   training is organized by the managing chains.

22       Q.   And you agree that pharmacists have

23   professional knowledge and training beyond, for

24   example, in the case of Walmart, the POMs?

25       A.   Yes.

Page 250

1      Q.  So pharmacist's exercise of professional

2   judgment and skill is not limited to what is written in

3   an official corporate policy, fair?

4                    MR. ARBITBLIT:  Object to form.

5                    THE WITNESS:  I think their ability to

6   exercise their professional judgment is going to be

7   very strongly influenced by what is in the POM and what

8   they're incentivized to do.

9   BY MR. CARTER:

10     Q.  My question was, is there exercise of

11  professional judgment and skill limited to what is

12  written in an official corporate policy?

13                   MR. ARBITBLIT:  Objection.  Asked and

14  answered.

15                   THE WITNESS:  I think I answered that.

16  BY MR. CARTER:

17     Q.  Is it your testimony to the jury that if it's

18  not in a corporate policy, a Walmart pharmacist or a

19  Walgreens pharmacist or any other chain defendant

20  pharmacist doesn't know what to do?

21                   MR. ARBITBLIT:  Objection.  Misstates

22  the testimony.

23                   THE WITNESS:  My testimony --

24  BY MR. CARTER:

25     Q.  I want to be clear; I'm asking a separate

Page 251

1    question.  Is it your testimony to the jury that if

2    it's not in a corporate policy, the chain defendant

3    pharmacists don't know what to do?

4                    MR. ARBITBLIT:  Object to form.

5                    THE WITNESS:  Again, I would say that

6    the corporate chain policy has a huge impact on what

7    pharmacies -- pharmacists will do.  And there may be

8    other sources of knowledge, but they will be less

9    influential than the pharmacy chain policy, the

10   management, and the various incentive plans that are in

11   place.

12   BY MR. CARTER:

13       Q.  Last question, on page 118 of your report, you

14   quote, in romanette 27, an email that is quoted in a

15   ProPublica story, and it's the last two words of

16   romanette 27, a reference to driving sales.  Do you see

17   that?

18       A.  Yes.

19       Q.  Do you know that the individual who offered

20   that email was deposed in this litigation?

21       A.  No.  I didn't know that.

22       Q.  If the author of that email was testifying

23   under oath about that email, would that be relevant

24   information that you would want to consider in forming

25   your opinion?

Page 252

1      A.  I would certainly be happy to read the

2  deposition or the testimony of that individual.  It

3  doesn't negate what is here, what was written and what

4  was quoted.

5      Q.  And you haven't conducted that review to this

6  point, correct?

7      A.  That's correct.

8              MR. CARTER:  All right, I yield to Kyle.

9                  EXAMINATION

10  BY MR. CRAWFORD:

11      Q.  Dr. Lembke, my name is Kyle Crawford, and I'm

12  Counsel for the CVS defendants.

13          On page 6 of your report you write,

14  "Throughout my career I have interacted with pharmacies

15  and pharmacists thousands of times."

16          Is that true today?

17      A.  What do you mean?  Is what true today?

18      Q.  Is it true that you've interacted with

19  thousands of pharmacies and pharmacists throughout your

20  career?

21      A.  Yes, I think that's true.  I've interacted

22  with -- I have a long career.  I've interacted with

23  many pharmacists and pharmacies.

24      Q.  And did you interact with thousands of

25  pharmacies and pharmacists before 2019?

Page 253

1      A.   Yes.   That's the cumulative interactions over

2      a 25-plus-ear career.

3      Q.   Would a prescription opioid epidemic have

4      existed if Purdue did not market opioids?

5      A.   That's hard to say.   Certainly Purdue was a

6      major player in creating the paradigm shift which led

7      to increased prescribing, which led to the opioid

8      epidemic.   Whether or not other defendants -- I believe

9      even in the absence of Purdue's role, it's possible and

10     likely that the other defendants would have taken a

11     similar role, but it's hard to say.

12     Q.   Would a prescription opioid epidemic have

13     existed had manufacturers did not market opioids?

14     A.   I do think the marketing of opioids by opioid

15     manufacturers was a major factor in the creation of the

16     opioid epidemic.   It's hard for me to say one way or

17     the other if the distributors' culpability and the

18     pharmacies' culpability independent of that would have

19     created the opioid epidemic.   I think everybody in the

20     supply chain contributed to the opioid epidemic.

21     Q.   Can you name any other company that

22     contributed more to the opioid epidemic than Purdue?

23     A.   In terms of opioid manufacturers, certainly

24     Purdue was the major player, but I also think that the

25     distributors and the pharmacies played a huge role.

Page 254

1      Q.  If the standard of care around treating pain
2   had not become more liberal in the 1990s and 2000s,
3   would there have been a prescription opioid epidemic?
4                  MR. ARBITBLIT:  Object to form.
5   BY MR. CRAWFORD:
6      Q.  You can answer.
7      A.  Can you state the question again or rephrase?
8      Q.  If the standard of care around treating pain
9   had not become more liberal in the 1990s and 2000s,
10  would there have been a prescription opioid epidemic?
11                 MR. ARBITBLIT:  Object to form.
12                 THE WITNESS:  Well, the -- the changes
13  in the way that opioids were prescribed in the late
14  1990s and the 2000s represent the paradigm shift that
15  was influenced by many factors, including significantly
16  the opioid pharmaceutical industry.  Without the
17  influence of the opioid pharmaceutical industry, I
18  don't believe that the opioid epidemic would have
19  occurred.
20  BY MR. CRAWFORD:
21     Q.  Would a prescription opioid epidemic have
22  existed if doctors did not overprescribe prescription
23  opioids?
24                 MR. ARBITBLIT:  Object to form.
25                 THE WITNESS:  Again, I don't think it's

Page 255

1    possible to look at this problem in isolation.  There

2    are many individuals and many entities to blame, and

3    everybody played their part and contributed to the

4    opioid epidemic.

5    BY MR. CRAWFORD:

6        Q.  Has the CVS pharmacy ever called you or your

7    office to inquire about a controlled substance

8    prescription?

9        A.  Yes.

10       Q.  Approximately how many times?

11       A.  Many times.  I really can't count.

12       Q.  And do you know if any CVS pharmacy has

13   refused to fill one of your prescriptions?

14       A.  Yes.

15       Q.  Do you know how many times?

16       A.  I'm recalling one instance where a CVS

17   pharmacy was concerned with the way that one of my

18   patients was presenting to pick up her prescription and

19   as a result did not dispense to that patient.  The

20   pharmacist called me and let me know.

21       Q.  Before issuing this expert report, had you

22   ever stated that CVS specifically contributed to an

23   opioid epidemic?

24       A.  I don't believe I've named CVS specifically,

25   except in this expert report, obviously.

Page 256

1      Q.  Do you have any personal knowledge of any CVS

2   pharmacist not properly exercising corresponding

3   responsibility?

4                  MR. ARBITBLIT:  Object to form.

5                  THE WITNESS:  Yes.

6   BY MR. CRAWFORD:

7      Q.  Setting aside -- are you thinking of a

8   specific instance, or are you thinking of aggregate --

9   your knowledge about what happened at the aggregate

10  level?

11     A.  Specific and aggregate.

12     Q.  What's the specific instance in which CVS

13  pharmacists did not properly exercise their

14  corresponding responsibility?

15     A.  I have done many assessments of

16  prescription -- prescription drug monitoring database

17  in California and seen patients of mine who were

18  dispensed multiple prescriptions for the same or

19  similar substances, dispensed dangerous combinations in

20  very high doses for long durations, patients who were

21  engaging in doctor shopping and pharmacy shopping,

22  early refills, including at CVS pharmacies.  That's

23  suggesting that the pharmacy did not do their due

24  diligence to properly investigate red flags.

25     Q.  Did any of this occur in Lake or Trumbull

Page 257

1   County?

2       A.  So I practice in California, so my specific

3   examples are California, but again, I have no reason to

4   think that things are different in Lake and Trumbull

5   County.

6       Q.  Did CVS have signs in its store promoting

7   prescription opioids?

8       A.  If you give me one moment.

9               MR. CRAWFORD:  If this is going to take

10  a few moments, let's go off the record.

11              THE VIDEOGRAPHER:  We are going off the

12  record at 4:11.

13              (Discussion off the record.)

14              THE VIDEOGRAPHER:  We are back on the

15  record.  The time is 4:11.

16              THE WITNESS:  On page 78 of my report I

17  discuss how CVS CareMark promoted opioid products using

18  targeted endorsements, including a pharmacy literature

19  display to educate patients by literature located

20  adjacent to prescription counter.

21  BY MR. CRAWFORD:

22      Q.  Dr. Lembke, you're aware that you're citing a

23  document that lists potential literature, aren't you?

24  Are you aware of any actual signs in CVS stores

25  promoting opioids?

Page 258

1      A.   Well, again, I -- I haven't seen anything to

2   refute that CVS engaged in these collaborations with

3   opioid manufacturers to promote specific products at

4   the counter.

5      Q.   Dr. Lembke, what did the signs say in CVS

6   stores that promoted opioids?

7      A.   Again, on page 79, CVS promoted the

8   opportunity to advertise specific direct-to-consumer

9   advertising of specific products on --

10     Q.   Move to strike.

11          My question is what did the sign say, not was

12  there an opportunity for there to be signs, was there a

13  possibility.  If you don't know what the sign said,

14  that's fine, and we can move on.

15     A.   Yeah, I'm not sure what the sign said.

16     Q.   Did CVS ever pay key opinion leaders?

17     A.   Not that I'm finding.

18     Q.   Did CVS ever pay medical schools to influence

19  curriculum regarding the treatment of pain?

20     A.   Not that I know of.

21     Q.   Does CVS employ sales representatives who

22  marketed prescription opioids to doctors?

23     A.   CVS collaborated with opioid manufacturers,

24  sales representatives, and other entities like Partners

25  Against Pain and JCAHO, but as far as I know they did

Page 259

1   not employ their own drug reps.

2        Q.  Have you reviewed the contents of any

3   continuing education presented to CVS pharmacists?

4        Let me withdraw the question; ask it

5   differently.  Are you aware of any false statements

6   contained in continuing education classes that CVS

7   provided its pharmacists about prescription opioids?

8        A.  Just give me a moment.  Not that I'm able to

9   identify right now.

10       Q.  You mentioned earlier CVS's prescriber

11  monitoring program.  Do you recall that?

12       A.  Can you tell me --

13       Q.  Let me try and ask -- all right.  You

14  mentioned earlier a CVS prescriber monitoring program,

15  and I'll represent to you that that's a program in

16  which CVS decides whether to suspend pharmacies for

17  filling the prescriptions of certain doctors.  Do you

18  recall that?

19       A.  Yes.

20       Q.  Is that kind of program required by law?

21       A.  No.

22       Q.  Would you agree that CVS's prescriber

23  monitoring program was a helpful tool?

24                 MR. ARBITBLIT:  Object to form.

25                 THE WITNESS:  Are you specifically

Page 260

1   referring to the 2014 policy on page 128 of my report?

2   BY MR. CRAWFORD:

3       Q.  I'm asking -- you're opining in your opinion

4   that CVS failed to have effective controls against

5   diversion, correct?

6       A.  Yes.

7       Q.  All right.  And my question is, was CVS's

8   prescriber monitoring program a helpful tool in -- let

9   me -- let me rephrase.

10          Was the CVS prescriber monitoring program a

11  helpful tool that contributed to CVS in fact having

12  some effective controls against diversion?

13      A.  Yes.

14      Q.  And in your opinion you state that CVS could

15  have implemented this program 15 years earlier,

16  correct?

17      A.  Yes.

18      Q.  And what's the basis of your opinion that CVS

19  could have implemented this program in the year 2000?

20      A.  Because CVS would have had this data.

21      Q.  Are you offering an opinion that it would have

22  been technically feasible to create this program in the

23  year 2000?

24      A.  Maybe not the year 2000, but I believe it

25  would have been technically feasible earlier than 2014.

1      Q.  You've never designed an algorithm to identify

2  prescribers --

3          (Reporter clarification.)

4      A.  I'm sorry.  Could you say that again?

5      Q.  Let me withdraw the question.  Aside from CVSs

6  prescriber monitoring program, has CVS done anything

7  helpful to combat the opioid problem?

8      A.  Yes, I do believe CVS has taken some measures

9  to combat the opioid problem.

10     Q.  What are those measures?

11     A.  Over time, in an iterative process, CVS did

12  change its policies and procedures regarding red flags

13  in their investigation.

14     Q.  Anything else?

15     A.  I believe that CVS has also sponsored some

16  drug take-back days.  I believe CVS also may have

17  participated in improving access to Naloxone.

18     Q.  Anything else?

19     A.  Not outside what's in my report.

20     Q.  Are you aware that CVS uses data to analyze

21  dispensing trends of its pharmacies?

22     A.  Yes.

23     Q.  And would that also be something that you

24  would say was helpful for CVS to have done?

25     A.  Yes.

1          MR. ARBITBLIT:  Object to form.

2   BY MR. CRAWFORD:

3          Q.  All right.  Are you aware that CVS also

4   monitors patients receiving high doses and high MMEs of

5   prescription opioids?

6          A.  I believe that is a later change, but I'm not

7   sure.

8          Q.  Aside from relying on plaintiffs' Counsel to

9   provide you with documents, did you do anything else to

10  determine whether CVS had effective controls against

11  diversion?

12          MR. ARBITBLIT:  Object to form.

13          THE WITNESS:  Yes.  I mean, I

14  investigated the medical literature.  Again, in my

15  research for my book, I talked to pharmacists.  So it

16  wasn't just me relying on the documents provided by

17  Counsel.  I also used my education, experience, medical

18  literature, the available reports.

19  BY MR. CRAWFORD:

20          Q.  How many CVS pharmacists have you talked to in

21  preparing this expert report?

22          MR. ARBITBLIT:  Object to form.

23          THE WITNESS:  I've talked to many CVS

24  pharmacists over the years.  I didn't specifically

25  reach out to a single CVS pharmacist while preparing

Page 263

1   this report, but I had already had many interactions

2   and encounters with CVS pharmacists over many years.

3   BY MR. CRAWFORD:

4       Q.  Were any of them working in Ohio?

5       A.  Not as far as I'm aware.  No.

6               MR. CRAWFORD:  Let's go off the record.

7               THE VIDEOGRAPHER:  We are going off the

8   record at 4:23.

9               (Discussion off the record.)

10              THE VIDEOGRAPHER:  We are back on the

11  record.  The time is 4:27.  Please proceed.

12          (CVS Exhibit 1 marked for identification.)

13  BY MR. CRAWFORD:

14      Q.  All right, Dr. Lembke, I'm marking as CVS

15  Exhibit 1 a two-page document entitled "How to Stop

16  Drug Diversion and Protect Your Pharmacy."

17          Do you see this document?

18      A.  Yes, I do.

19      Q.  And I'll represent -- well, and do you see at

20  the bottom of the document it's dated 2001?

21      A.  2001 Purdue Pharma LLP.

22      Q.  Yes.  Have you reviewed this document?

23      A.  I probably have.  It looks similar to many

24  documents that I reviewed, but I don't know if I've

25  reviewed this specific one.

Page 264

1      Q.  You just reviewed the document off the record?

2      A.  Oh, yes, I just reviewed it here.  I thought

3  you meant prior to today's testimony.

4      Q.  Are there any false statements contained in

5  this brochure?

6                    MR. ARBITBLIT:  Object to form.

7                    THE WITNESS:  No.  But this is only a

8  portion of the document, so hard to say if the document

9  itself contains false statements, but I don't see

10 anything in these two pages that you've given me.

11 BY MR. CRAWFORD:

12     Q.  I'll represent to you that this is the

13 entirety of the brochure entitled "How to Stop Drug

14 Diversion and Protect Your Pharmacy."

15                    MR. CRAWFORD:  That's all I have.  I'll

16 pass the witness.

17                          EXAMINATION

18 BY MS. GIBSON ALLEN:

19     Q.  Good afternoon -- evening, Dr. Lembke.  Hi, my

20 name is Erin.  We met briefly at the beginning of your

21 deposition.  I represent Giant Eagle, a defendant in

22 this litigation.

23          Have you ever had occasion to visit the Giant

24 Eagle?

25     A.  No.

Page 265

1      Q.  So you've never interacted with a Giant Eagle

2  pharmacist?

3      A.  No.

4      Q.  And you're aware that Giant Eagle is not a

5  national pharmacy?

6      A.  Yes.

7      Q.  I'd like to ask you a question about an

8  opinion you have on page 93 of your report in

9  romanette 33.  And I believe romanette 33 falls under

10  the heading "Pharmacy defendants spread misinformation

11  about the safety and efficacy of opioids," correct?

12      A.  Yes.

13      Q.  And on page 93 in romanette 33 you reference a

14  series of internal Purdue emails from the year 2000; is

15  that correct?

16      A.  Yes.

17      Q.  Those are 21 years old; is that correct?

18  21-year-old emails from Purdue?

19      A.  Yes.

20      Q.  Thank you.  And you reference that in those

21  emails, Purdue sales representative says that they

22  worked contacts at Giant Eagle to initiate a mailing,

23  something called 550 Littmann CEs, which you have in

24  parens, are continuing education program materials, and

25  then your report goes on to describe what the emails

Page 266

1    say.

2         Have you reviewed any evidence in this case

3    indicating that Giant Eagle ever distributed the

4    Littmann continuing education materials to its

5    pharmacists?

6         A.  No, but I have no evidence to the contrary.

7         Q.  You have no evidence either way; you just have

8    these 21-year-old Purdue emails, correct?

9         A.  That's correct.

10        Q.  I'd like to take you now to page 155 in your

11   report.  In romanette 2 on page 155 you mention that

12   "Giant Eagle did not adopt a controlled substance

13   dispensing guideline policy until July 22, 2013."  Is

14   that correct?

15        A.  Yes.

16        Q.  Did you review any testimony or evidence in

17   this case regarding what policies or procedures Giant

18   Eagle pharmacists had access to, either physically in

19   their stores or online before 2013?

20        A.  Can you just give me a moment?

21        Q.  Uh-huh.

22        A.  So I did evaluate a number of documents, for

23   example, December of 2011 I evaluated a settlement

24   agreement with the Ohio Board of Pharmacy related to

25   Giant Eagle's failure to deter and detect the theft and

Page 267

1     diversion of controlled substances at its Chardon, Ohio

2     pharmacy.  I also reviewed documents from 2012 and --

3     showing that Giant Eagle pharmacists were incentivized

4     with a bonus plan if they prescribed larger number of

5     units to patients who came into Giant Eagle pharmacies.

6          Q.  So I appreciate that you reviewed some other

7     documents relating to Giant Eagle.  My question,

8     though, was not that.  My question was did you review

9     any testimony or evidence in this case regarding the

10    policies or procedures that a pharmacist would have

11    access to in their stores in their stores physically or

12    online prior to 2013?  That would be a simple yes or

13    no.

14         A.  Yeah, the answer is no.

15         Q.  Thank you.  I wanted to ask you a question

16    also about you reference on the next page in subheading

17    5 which you just mentioned, Giant Eagle's bonus plan.

18    Have you seen any evidence in this case about what

19    percentage that bonus comprises of the overall annual

20    salary of the Giant Eagle pharmacist?

21         A.  If I have, I don't remember.

22         Q.  Okay, thank you.

23              And Dr. Lembke, are you familiar with any

24    limitations in the regulation establishing Ohio's PDMP

25    as to whether, and there are certain circumstances as

Page 268

1   to who, and under what circumstances someone is

2   permitted to access OARRS, the OARRS database?

3       A.  So my understanding of the regulations

4   regarding the OARRS database is that in 2011 there were

5   regulations that mandated that a pharmacist check the

6   OARRS database if they detected certain red flags.  But

7   as I've written here and as I've testified, that was

8   backwards because, in fact, checking the database a

9   priority is the way to detect red flags in the first

10  place.

11      Q.  Right, but again, that wasn't my question.  My

12  question was are there limitations on who and under

13  what circumstances OARRS can be accessed.  So for

14  example, is it appropriate for a pharmacist to access

15  OARRS to check to see if their neighbor, because

16  they're curious, has had controlled -- prescriptions

17  for controlled substances filled?

18      A.  No, that would be a HIPAA violation.

19      Q.  Okay.  And so would it be appropriate for a

20  pharmacist to check OARRS if they were curious about a

21  co-worker or if somebody else had had a prescription

22  for a controlled substance filled?

23      A.  No.  That would not be appropriate.

24      Q.  So it is appropriate to have some limitations

25  on when a pharmacist can or cannot access OARRS,

Page 269

1   correct?

2       A.  Well, those limitations are for people who are

3   not interacting with pharmacists in their professional

4   capacity.  But in your professional capacity, I can't

5   think of any limitation that would make sense for why a

6   pharmacist wouldn't check the PDMP when the PDMP is

7   among single most important things that can be checked

8   to prevent misuse and diversion.

9       Q.  Thank you.  Is it ever appropriate to

10  prescribe a benzodiazapine for a patient who is also

11  taking opioid medications?

12      A.  There are certain instances and certain

13  treatment settings where that is appropriate, yes.

14      Q.  And is it ever appropriate to dispense a

15  benzodiazapine for a patient who is also on opioids?

16      A.  I'm sorry, is that different from the last

17  question?

18      Q.  One was regarding prescribing and one was

19  dispensing.

20      A.  Yes, in some rare instances it is appropriate

21  to dispense.

22              MS. ALLEN:  That's the end of my

23  questions.  I think there are three minutes left, by my

24  math.  I don't know if any of my co-counsel has a

25  follow-up question and would like to use those last

Page 270

1    three minutes.

2                    THE VIDEOGRAPHER:  Sounds like there is

3    nothing further for the record?

4                    MR. GISLESON:  Can we go off the record

5    and tell me how much time we have left?

6                    THE VIDEOGRAPHER:  She is correct, three

7    minutes, but we can go off the record.  Are we going

8    off the record just for the moment or for the day?

9                    MR. GISLESON:  We can go back on the

10   record.

11                        EXAMINATION

12   BY MR. GISLESON:

13       Q.  Dr. Lembke can you get your book, please,

14   "Drug Dealer M.D." and turn to page 126.

15       A.  Mr. Gisleson, I can't see you.

16       Q.  You're better for it.

17           Can you turn to page 126, please.  Under the

18   heading, "Practicing with blinders on, not Toyota after

19   all?"  You wrote, "Good communication between doctors

20   today is essentially to good care.  Most patients have

21   more than one doctor taking care of them, or they

22   change doctors frequently due to insurance changes and

23   other provisions of the managed care environment.  Each

24   doctor is busy prescribing the pills he or she believes

25   will treat the patient while other doctors are

Page 271

1    prescribing other pills.  It is entirely commonplace to
2    encounter a patient who is getting a stimulant from a
3    psychiatrist --
4             (Reporter clarification.)
5        Q.  You wrote, "Most patients have more than one
6    doctor taking care of them, or they change doctors
7    frequently due to insurance changes or other provisions
8    of the managed care environment.  Each doctor is busy
9    prescribing the pills he or she believes will treat the
10   patient while other doctors are prescribing other
11   pills.  It is entirely commonplace to encounter a
12   patient who is getting a stimulant from a psychiatrist
13   for attention deficit disorder, an opioid painkiller
14   from a pain doctor for fibromyalgia, and a
15   benzodiazapine from a primary care doctor for sleep."
16            That's consistent with your research and
17   experience in terms of that being entirely commonplace,
18   correct?
19       A.  It being entirely commonplace does not make it
20   right.
21       Q.  And lastly, are you familiar with the
22   Substance Abuse and Mental Health Services
23   Administration?
24       A.  Yes.
25       Q.  Do you consider their published materials to

Page 272

1    be the kind of materials on which professionals in the

2    substance abuse field rely?

3        A.   It would depend on the publication you were

4    talking about.

5        Q.   Do you agree with the statement, "PDMP data

6    are best used in conjunction with other sources of

7    information, including clinical assessment before

8    making any determination about aberrant behavior

9    because no validated and standardized criteria for the

10   threshold of questionable activity have been

11   established"?

12                 MR. ARBITBLIT:  Object to form.

13                 THE WITNESS:  I'd like to review that

14   document.

15                 MR. GISLESON:  Why don't we go off the

16   record.

17                 MR. ARBITBLIT:  We're not going off the

18   record, Counsel, unless we're done.  You've used your

19   time.

20                 MR. GISLESON:  She wants to review the

21   document.

22             Matt, can you show her, please, what was in

23   Tab 8 and mark that as the next exhibit?

24                 THE WITNESS:  Is there more time or are

25   we out of time?

Page 273

1              MR. ARBITBLIT:  We're out of time, but

2    I'm going to allow this last question since you asked

3    to review the document.

4              MR. LADD:  Tab 8 is being marked as

5    Lembke Exhibit 4.

6              (Exhibit 4 marked for identification.)

7    BY MR. GISLESON:

8        Q.  You reviewed this SAMHSA In Brief?

9        A.  I'm sorry, is this in the documents that were

10   sent to me?

11       Q.  Yes, I'm sorry, Tab 8.

12       A.  Okay.

13             MR. SHERIDAN:  While she's looking, may

14   I request that the pending question be reread?

15             THE WITNESS:  Yes, could you reread the

16   question to that I know why I'm looking at this

17   document?

18   BY MR. GISLESON:

19       Q.  The first question was have you reviewed this

20   SAMHSA In Brief?

21       A.  Okay, and what came after that?

22       Q.  And the next question is, which I asked you

23   before, to give it context, if you go to the fourth

24   page, the first full paragraph on the left-hand column

25   says, "Behavior that suggests substance misuse, a

Page 274

1    substance use disorder, or a diversion is known as

2    aberrant drug-related behavior.  PDMP data can alert a

3    practitioner to aberrant behavior such as doctor

4    shopping, obtaining overlapping prescriptions from

5    different doctors for intended non-medical use, or

6    pharmacy shopping, visiting multiple pharmacies to fill

7    multiple prescriptions.  These are called multiple

8    provider episodes.  PDMP data are best used in

9    conjunction with other sources of information,

10   including clinical assessment before making any

11   determinations about aberrant behavior because no

12   validated and standardized criteria for the threshold

13   of questionable activity have been established."

14        Do you agree with what is written there by the

15   Substance Abuse and Mental Health Services

16   Administration?

17        A.  I'm going to review the document now.  Okay,

18   I'm ready to respond.

19        Q.  Do you agree with what the Substance Abuse

20   Administration wrote that I just read to you?

21        A.  Yes.  Are we back on the record?

22        Q.  Yes.

23        A.  Okay.  So what you read to me was taken out of

24   context.  The section that you read is clearly directed

25   towards practitioners and prescribers, not pharmacists.

Page 275

1    The section that follows and proceeds is directed

2    towards pharmacists, so -- and I think what is

3    important to emphasize that this document makes it very

4    clear that both prescribers and pharmacists should be

5    checking the PDMP consistently in order to prevent

6    misuse and diversion.

7         Prescribers and pharmacists have access to

8    different types of information, and the statement here,

9    which you specifically point out that "the PDMP data

10   are best used in conjunction with other sources of

11   information" is directed to prescribers in this

12   document.  For example, the very next item is including

13   a clinical assessment, so a clinical assessment is done

14   by a prescriber, not by a pharmacist.

15        And furthermore, the document does cite to

16   some attempt here to quantify proposed operational

17   definition, for example, written by different

18   prescribers and filled at three or more pharmacies.

19   But most importantly, this section is directed towards

20   prescribers.  The statement you identified is directed

21   towards prescribers, and what follows at the bottom of

22   that same page is the statement "not only prescribers

23   but also pharmacists are enhancing patient care through

24   their use of the PDMP.  For example, pharmacists can

25   identify interaction risks from multiple prescriptions.

Page 276

1   Pharmacists can also initiate conversations with

2   patients whose prescriptions use patterns indicate

3   possible substance misuse," et cetera, et cetera.

4           So what this document stands for is that both

5   prescribers and pharmacists should be checking the PDMP

6   to prevent misuse and diversion.

7       Q.  And you agree with the statements, then, in

8   this document?

9               MR. ARBITBLIT:  We're done, Counsel you

10  had your last question.  We're done.

11              MR. GISLESON:  She hadn't answered the

12  question.

13  BY MR. GISLESON:

14      Q.  Do you agree with the statements in the

15  document, Doctor?

16      A.  I answered your question.

17      Q.  No, you didn't.  Do you agree with the

18  statements in the document?

19              MR. ARBITBLIT:  She said she has

20  answered it.  We're done.

21              MR. GISLESON:  She hasn't.

22              MR. ARBITBLIT:  That's your opinion.

23  You've stated that several times.  You mislead her, she

24  answered that you misled her, and we're done.

25              MR. GISLESON:  Actually, that's false,

Page 277

1    as you know, because that's in the section entitled,

2    "How prescribers and pharmacists use PDMP data."  It's

3    unfortunate that Dr. Lembke chooses not to ask -- or

4    chooses not to answer directly questions that she is

5    asked.  If you're instructing that the deposition is

6    over and that she is unwilling, unable, or for what

7    whatever other reason won't answer the question, well,

8    then that's fine.

9                    MR. ARBITBLIT:  I think she's answered

10   the question.  She thinks she's answered the question.

11   We're done.

12                   MR. GISLESON:  Thank you for your time.

13   It's been a pleasure.

14                   THE VIDEOGRAPHER:  Thank you.  One

15   moment, please.  This concludes today's testimony given

16   by Dr. Anna Lembke.  The total number of media units

17   used was five.  All media will be retained by Veritext

18   on a local secure drive and redundantly stored in the

19   Veritext-managed Amazon cloud S3 services for

20   preservation purposes.  We are off the record at 4:52.

21   Thank you.

22                   (Signature reserved.)

23                   (Deposition concluded at 4:52 p.m. PDT)

24

25

Page 278

REPORTER'S CERTIFICATE

1

2

3    I, JUDY BONICELLI, the undersigned Certified

4 Court Reporter, pursuant to RCW 5.28.010 authorized to

5 administer oaths and affirmations in and for the State

6 of Washington, do hereby certify:

7    That the sworn testimony and/or proceedings, a

8 transcript of which is attached, was given before me at

9 the time and place stated therein; that any and/or all

10 witness(es) were duly sworn to testify to the truth;

11 that the sworn testimony and/or proceedings were by me

12 stenographically recorded and transcribed under my

13 supervision, to the best of my ability; that the

14 foregoing transcript contains a full, true, and

15 accurate record of all the sworn testimony and/or

16 proceedings given and occurring at the time and place

17 stated in the transcript; that I am in no way related

18 to any party to the matter, nor to any counsel, nor do

19 I have any financial interest in the event of the

20 cause.

21    WITNESS MY HAND and DIGITAL SIGNATURE this 17th

22 day of November, 2017.

23    *Judy Bonicelli*

24    JUDY BONICELLI, RPR, CCR

     Washington Certified Court Reporter, CCR 2322

25

Page 279

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

June 3, 2021

To: DONALD C. ARBITBLIT

Case Name: National Prescription Opiate Litigation - Track 3 v.

Veritext Reference Number: 4611739

Witness:  Anna Lembke, M.D.       Deposition Date:  5/28/2021

Dear Sir/Madam:

Enclosed please find a deposition transcript.  Please have the witness

review the transcript and note any changes or corrections on the

included errata sheet, indicating the page, line number, change, and

the reason for the change.  Have the witness' signature notarized and

forward the completed page(s) back to us at the Production address
shown

above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of

this letter, the reading and signing will be deemed waived.

Sincerely,
Production Department



NO NOTARY REQUIRED IN CA

Page 280

1                    DEPOSITION REVIEW
                  CERTIFICATION OF WITNESS
2
     ASSIGNMENT REFERENCE NO: 4611739
3    National Prescription Opiate Litigation - Track 3 v.
     DATE OF DEPOSITION: 5/28/2021
4    WITNESS' NAME: Anna Lembke, M.D.
5          In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6    my testimony or it has been read to me.
7          I have made no changes to the testimony
     as transcribed by the court reporter.
8

     _____          _____
9    Date                             Anna Lembke, M.D.
10         Sworn to and subscribed before me, a
     Notary Public in and for the State and County,
11   the referenced witness did personally appear
     and acknowledge that:
12
           They have read the transcript;
13         They signed the foregoing Sworn
           Statement; and
14         Their execution of this Statement is of
           their free act and deed.
15
           I have affixed my name and official seal
16
     this _____ day of_____, 20_____.
17
                     _____
18                   Notary Public
19                   _____
                     Commission Expiration Date
20
21
22
23
24
25

Page 281

1                 DEPOSITION REVIEW
              CERTIFICATION OF WITNESS
2
    ASSIGNMENT REFERENCE NO: 4611739
3   National Prescription Opiate Litigation - Track 3 v.
    DATE OF DEPOSITION: 5/28/2021
4   WITNESS' NAME: Anna Lembke, M.D.
5         In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7         I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
8   well as the reason(s) for the change(s).
9         I request that these changes be entered
    as part of the record of my testimony.
10
          I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____          _____
    Date                          Anna Lembke, M.D.
14
          Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17        They have read the transcript;
          They have listed all of their corrections
18        in the appended Errata Sheet;
          They signed the foregoing Sworn
19        Statement; and
          Their execution of this Statement is of
20        their free act and deed.
21        I have affixed my name and official seal
22  this _____ day of_____, 20_____.
23        _____
          Notary Public
24
          _____
25        Commission Expiration Date

Page 282

1                          ERRATA SHEET

                VERITEXT LEGAL SOLUTIONS MIDWEST

2                      ASSIGNMENT NO: 4611739

3        PAGE/LINE(S) /        CHANGE        /REASON

4        _____

5        _____

6        _____

7        _____

8        _____

9        _____

10       _____

11       _____

12       _____

13       _____

14       _____

15       _____

16       _____

17       _____

18       _____

19

         _____         _____

20       Date                     Anna Lembke, M.D.

21       SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

22       DAY OF _____, 20_____ .

23                       _____

                         Notary Public

24

                         _____

25                       Commission Expiration Date

| & | | | |
|---|---|---|---|

**&**   2:3,22 3:3,19 6:1,5,13 102:21 110:4,6,12

**1**

**1**   2:23 4:8,15 5:11 34:25 102:6 103:13,23 104:6 110:8 209:9,17 210:25 211:4 238:9,12 239:12 263:12,15
**1,372**   91:24
**1,448**   91:13
**1-3**   119:2
**10**   195:9
**100**   50:2 91:15 217:12,15,20,21 218:1 219:2 220:1 220:22
**100,000**   17:15 218:9
**1000**   2:18
**10016-7416**   2:13
**101**   3:4 137:25
**10178-0060**   3:5
**102**   155:3 156:12
**103**   4:8 132:17,25
**104**   132:25
**105**   132:25
**106**   227:8
**107**   133:1 227:14
**108**   238:7
**109**   4:10 244:17 245:25
**110**   245:24 246:2
**1100**   279:1
**111**   248:7
**112**   2:12

**114**   218:1
**11747**   2:9
**118**   251:13
**11:09**   103:9,10
**11:11**   103:10,12
**11:27**   1:13 5:2 126:2
**11:33**   118:7,8
**11:36**   118:8,10
**11:45**   125:5,6
**12**   4:8 78:3 102:4 102:5 104:4,5 119:14 123:12 203:20,23
**124**   133:10 180:13
**126**   270:14,17
**128**   65:24,25 181:9 260:1
**12:14**   125:6,8 126:2
**13**   4:10 109:13,15 110:10
**1306.04**   4:11 160:6
**142**   151:11
**15**   44:16 45:7 76:16 77:2 132:17 134:5 195:9 260:15
**151**   134:2
**15219**   2:24
**15219-1407**   3:22
**155**   266:10,11
**156**   63:23
**16.8**   196:4
**160**   4:11
**17**   1:6 5:16 196:9
**17.6**   202:4
**1703**   241:5 244:4
**1740**   231:15
**1763**   231:15

**17th**   278:21
**18.66**   134:9
**1800**   2:18
**1820**   279:2
**19**   91:5
**191**   4:4
**1980s**   20:25 21:7 21:21 89:18 90:1 90:19 91:7
**19854**   278:23
**1989**   15:4
**1990**   220:10,13
**1990s**   15:17 21:21 21:25 23:25 30:24 34:19 48:16 51:22 90:3,19,23 91:8 99:19 218:14 219:12,25 220:19 221:22 222:6,21 222:24 238:15 254:2,9,14
**1995**   15:10 91:14
**1996**   91:12,23,24 221:9 224:18
**1997**   218:9
**1998**   84:7 85:13,17
**1999**   204:23
**1:29**   170:15,16
**1:42**   170:16,18

**2**

**2**   4:10 34:25 109:14,16,20 110:10 124:12 138:11 241:5 266:11
**20**   124:20 149:2 243:12 280:16 281:22 282:22
**200**   196:5
**2000**   116:20 260:19,23,24

265:14
**2000s**   13:13 34:19 39:18 90:23 100:5 162:13 163:1 237:13 254:2,9,14
**2001**   86:12 263:20 263:21
**2002**   132:19
**20036-5807**   2:18
**2004**   91:15,15,24 91:25 180:23 181:2,15
**2005**   238:13 239:2 239:12,18 240:11 240:21 241:10 242:9,16 243:1,16 243:20,25
**2006**   217:15,25 219:1,6 220:20 221:8 222:20,21 223:12 232:12 240:11
**2007**   84:23 218:10 218:14 221:22 244:18 245:4
**2008**   108:12
**2009**   149:4 248:24
**2010**   137:2 201:13 201:21,25 202:22 202:25 203:4 217:25 240:8,17 245:15,19
**2011**   91:12,15,23 91:25 134:8 153:22 189:18 201:13,21,22,25 222:7 237:4 266:23 268:4
**2012**   48:16 76:15 77:2 187:19 201:19,22 202:7

217:18 221:23
222:7,23 267:2
**2013** 42:4 140:9
188:16 201:19
202:3,8 238:6
266:13,19 267:12
**2014** 181:6,15
238:6 260:1,25
**2016** 39:1 64:1
156:14 237:9
**2017** 4:8 16:6,7,8
81:8,12,12 103:24
104:15 110:8
119:5 122:16,18
122:20 137:3
196:11 200:19
202:22 203:1,4
229:18,22 230:1
278:22
**2019** 217:16 218:2
222:12 223:12
252:25
**202** 2:19
**2020** 233:22 234:8
**2021** 1:14 5:1,6
279:4
**21** 265:17,18 266:8
**212** 2:9,13 3:5 4:4
**216-523-1313**
279:3
**21st** 91:8
**22** 266:13
**2322** 1:25 278:24
**24** 42:21 204:2,7
232:10
**245** 91:24
**25** 88:22 253:2
**250,000** 17:16
**255** 156:21
**26** 70:16

**263** 4:5,15
**269** 4:5
**27** 76:2 240:8
251:14,16
**273** 4:12
**275** 2:4
**28** 1:14 5:1,6
**2804** 1:5,6 5:16,16
**29th** 2:4
**2:50** 213:21,22

### 3

**3** 4:11,11 91:6
159:24,24 160:1,2
160:3,6 217:10,10
218:15 219:1,1,4
222:11 223:18,19
232:22 233:3,11
244:17 279:4,6
280:3 281:3
**3.22** 134:9 153:12
**30** 50:1 157:8
**300** 3:10
**301** 3:21
**305** 2:8
**309-6141** 3:5
**31** 4:8 103:24
104:15
**312** 3:11
**32** 246:18
**325** 3:15
**32nd** 2:23
**33** 265:9,9,13
**33.9** 201:14 202:1
**35th** 3:21
**37** 77:9
**374** 196:3
**397-1000** 2:9
**3:01** 213:22,24

### 4

**4** 4:12 70:17 218:6
232:22 233:3,11
273:5,6
**4,680** 91:23
**40** 209:18,23 248:9
**400** 2:8
**412** 2:24 3:22
**415** 2:5
**417** 195:24
**42** 115:20
**43** 157:10
**43.1** 222:12,15,25
**43215** 3:16
**44114** 279:2
**4611739** 279:7
280:2 281:2 282:2
**469-3939** 3:16
**471-3490** 3:22
**49** 138:5 156:14
**494-4400** 3:11
**4:11** 257:12,15
**4:23** 263:8
**4:27** 263:11
**4:52** 277:20,23

### 5

**5** 11:3 95:10,20,24
96:3,6 218:6
267:17
**5.28.010** 278:4
**5/28/2021** 279:8
280:3 281:3
**50** 10:17 123:7
124:6,17 233:3,4
**500,000** 17:20
**508** 155:7
**509** 155:7
**53** 83:16
**530** 240:6

**54** 3:10
**550** 265:23
**560-7435** 2:24
**57** 63:8,9 89:16,17
**57,000** 105:9,12
**59** 84:2,6

### 6

**6** 73:18 172:24
182:3 245:23
247:6 252:13
**60** 85:12
**600** 3:15
**60654** 3:11
**614** 3:16
**62** 86:3
**63** 157:6
**690** 91:14

### 7

**7** 4:3
**70** 73:22 213:18
**71** 61:5 187:19
189:6
**72** 59:7,13,24
**72.3** 219:3,7,10
220:21,22
**74** 189:6
**75** 9:6 57:24
170:10 188:15
**76** 172:23 179:8
182:4 189:5
**77** 179:8
**778-1800** 2:19
**78** 189:8 257:16
**784-6404** 2:13
**79** 73:17 258:7

### 8

**8** 4:12 272:23
273:4,11
**80** 10:14,15 149:1

**81.3** 217:21
**83** 77:22 78:4
138:2 203:20,23
**84** 81:7 136:24
196:22 200:17
201:9 202:18
**85** 81:16
**88** 231:5
**8:27** 1:13 5:2,6

**9**

**9** 248:7,13
**90.2** 217:20
**9091** 1:25
**92** 137:8
**93** 265:8,13
**94111-3339** 2:5
**956-1000** 2:5
**96** 100:13,14
**97** 74:14
**9:46** 58:8,9
**9:57** 58:9,11

**a**

**a.m.** 1:13,13 5:2,2
5:6 103:10,10
125:6 126:2
**aa** 123:11,14
**abbott** 85:1
**aberrant** 272:8
274:2,3,11
**abilities** 147:17
**ability** 31:3 56:20
57:7 98:24 131:23
147:22 161:21
162:6,8 180:1,15
181:16 250:5
278:13
**able** 32:20,21 45:2
151:25 152:2,10
156:7 162:24
164:16 181:7

189:23 193:7,16
195:7 212:17
221:2,14 222:3
226:1,6,13,19
248:1 259:8
**absence** 20:20,23
248:15 253:9
**absolute** 139:13
**abstinence** 123:16
**abstracts** 38:4
**abuse** 34:15 237:2
237:16 244:24
271:22 272:2
274:15,19
**academia** 60:21
61:9,14,20,25 62:1
62:2
**academic** 9:6
38:16 163:19
**academy** 36:2
37:21
**accelerator** 174:12
**accept** 209:22
236:6,9
**accepted** 11:22
24:14 25:5
**accepting** 188:2
**access** 32:19 91:10
101:6,10,21 105:8
122:3,12 129:15
138:10 140:2
147:3,6,15 148:8
166:7 168:17
169:2 170:5,7
174:6 180:22
181:19 208:13
239:21 261:17
266:18 267:11
268:2,14,25 275:7
**accessed** 268:13

**account** 42:24
79:15 147:14
165:8
**accreditation**
36:21 87:3
**accredits** 86:4,9
87:2
**accumulated** 14:5
**accuracy** 80:9
**accurate** 55:5 60:5
89:7,22 90:14
121:25 200:25
278:15
**accurately** 78:16
79:5,12,18
**achieve** 171:2,5
**acknowledge** 34:8
280:11 281:16
**act** 9:20 85:14,17
108:10,13 128:5
131:10 148:19
160:10 169:13
180:3 215:11
280:14 281:20
**acted** 38:8,12
**acting** 29:10
160:15 215:24
**action** 5:20 84:13
185:11 227:3,17
227:20 240:16
241:2
**actions** 39:22
85:25 96:24 158:7
158:8 231:12
**active** 178:4
**actively** 123:11
**activities** 76:18
77:4
**activity** 76:17 77:3
194:1 272:10
274:13

**actors** 65:10
**actual** 257:24
**acute** 41:3
**add** 115:2 176:19
211:3
**addicted** 13:15
21:22 24:25 28:25
29:4 121:18
122:14 124:1
163:24 190:6,7
**addiction** 4:10
8:25,25 9:2,12,13
9:21,24 10:18,19
10:20 29:4 33:5
34:1,9,9,12 48:18
97:1 98:18 107:11
107:22 108:1,14
108:25 110:1,11
110:21,22 121:20
122:6,7,9,23 123:3
123:7,8,20,24,24
124:1,2,7,10,13
127:5 128:4
129:25 140:5
163:22 164:15
192:21 195:2
237:16
**addictions** 108:10
**addictive** 67:12
100:15 119:8
121:21,22
**addicts** 193:1,2
**addition** 133:6
144:10 223:1
**additional** 101:20
171:3 172:7 189:1
199:19 211:7
231:24 233:21
236:24
**address** 56:18
87:15 135:6 139:7

140:1,2,16 142:3
279:15
**addressed**  249:6
**addresses**  139:5
**adequately**  40:3
150:23
**adhere**  186:25
**adherence**  182:18
182:18
**adjacent**  189:14
257:20
**administer**  278:5
**administration**
127:14 271:23
274:16,20
**admissions**  48:17
**adopt**  266:12
**advancement**
106:25
**adverse**  156:20
**advertise**  258:8
**advertising**  179:10
187:16 258:9
**advising**  127:9
**advisory**  146:9
**advocacy**  71:1
74:16 179:15
**advocate**  13:2,4
**affect**  133:17
184:12
**affirmants**  240:7
**affirmations**  278:5
**affirmative**  155:20
**affixed**  280:15
281:21
**affordable**  108:12
188:4
**afternoon**  126:1
213:13 214:3
264:19

**agencies**  62:9
**agenda**  61:12,12
**agents**  78:2
**aggregate**  172:22
174:3 175:3 176:5
216:3,12 220:5
225:9 256:8,9,11
**aggregates**  179:23
180:10
**aggressive**  69:18
69:19 70:23 71:5
71:6,13,19 74:23
74:24 75:7,12
76:3,6 77:1
**aging**  90:7 91:1
**ago**  100:6 195:9,9
195:9
**agree**  5:10 7:19
8:13 30:22 47:5
48:22 88:11,18
93:6 106:1 111:5
111:16 112:14,19
112:25 113:3
114:9 115:10
116:7,8 117:6,13
117:21 118:21,23
120:1 123:17
173:23 186:2,5,11
213:8 228:14
229:10 233:3,7
235:5,15,19,22
239:5 249:12,16
249:22 259:22
272:5 274:14,19
276:7,14,17
**agreed**  110:4
**agreeing**  17:23
**agreement**  7:22
92:25 266:24
**ahead**  158:13
200:10 214:16

219:17 227:16
**aid**  2:21 3:2 6:2
18:15 45:25 74:15
81:17 134:4,4,8
144:14,24 148:6,8
148:20,25 149:12
149:14,17 159:7
159:10,13,16
225:23
**aid's**  134:7 144:20
148:3,13 149:4
153:21
**aids**  247:18
**al**  124:9,16
**alcohol**  122:12
**alcoholism**  110:21
**alert**  274:2
**algorithm**  261:1
**alive**  90:9
**allegations**  191:19
234:17
**allegedly**  40:7
**allen**  3:20,23 4:5
6:12,13 264:18
269:22
**allergan**  209:15
**allergies**  145:18
**allow**  18:2 168:11
273:2
**allowed**  73:20
108:21 117:19
118:14 178:20
181:10 230:5
**allowing**  129:15
**alongside**  86:13
**alpharma**  85:1
**altered**  118:16
241:9,16 242:9,16
**alternatives**
106:13 166:15

**amazon**  277:19
**amend**  236:13
**america**  30:7
**america's**  4:10
110:5,11
**american**  36:2,3
37:21,21 74:16
86:24 106:7
107:23 140:8
149:15,18
**amerisourceberg...**
18:21
**amount**  10:8
48:23 68:21
105:19 107:17
109:8 144:6
145:10 234:5
**amounts**  178:22
**amplified**  57:19
90:4 162:19
**analyses**  175:23
179:24
**analysis**  14:6
25:16 32:1,6
42:13 43:23 52:22
57:4 140:9 153:17
176:4 180:11
221:15,20 225:6
225:22 227:22
233:10 236:21,24
**analyze**  139:1
149:11,14,17
179:20 218:16
261:20
**analyzed**  45:6
47:2 225:16
**anesthesia**  9:15
**anna**  1:10 4:2,11
5:12 6:21 110:6
237:15 277:16
279:8 280:4,9

281:4,13 282:20

**announcement**
105:4

**annual** 267:19

**annualized** 137:1
137:2

**anonymous** 12:11

**answer** 7:9,19,23
8:3,10,11,16 12:24
16:15 18:1,2 26:6
37:4 40:21 44:4
49:2 50:15 75:25
87:14 99:12
110:25 111:9,9,11
120:13 129:21
138:14,22 144:1
145:4 151:9 156:5
157:16,16,18
184:24 185:3,17
185:17 186:13,16
193:9 200:24
212:13 218:21
223:17 224:21,24
228:11 234:13,18
234:22 235:2,4
254:6 267:14
277:4,7

**answered** 52:9,11
151:7 155:13
156:1,6 157:17
184:19,20 185:4
185:23 224:4,5
229:20 250:14,15
276:11,16,20,24
277:9,10

**answering** 8:8
146:24 156:2
181:3

**answers** 7:11 8:4
223:14

**antiquated** 115:8

**anybody** 24:3
204:21 205:8,11
205:14

**anyway** 207:8

**apart** 249:18

**apologize** 61:3
120:17 206:22

**appear** 59:2
280:11 281:15

**appearance** 5:23
97:9 181:1

**appearances** 3:1

**appearing** 1:21
2:4,8,12,17,23 3:4
3:9,15,20 64:20

**appears** 181:15

**appended** 281:11
281:18

**appendix** 209:9,17
210:19,25 211:4
211:19 212:1,4,15
217:10 218:4
219:1 223:19

**applicable** 26:9
129:1 143:14
166:24

**applied** 23:10,16
23:17 26:15 57:5
139:6 155:17
242:15

**applies** 31:23
150:10,15

**apply** 23:7 69:2
155:9 156:25
160:25

**appointment** 9:14

**appreciate** 7:4
8:17 162:18 164:1
208:2 237:23
267:6

**appreciation**
48:20

**approach** 21:8

**approaches** 31:19

**appropriate** 32:13
54:19 223:25
224:11 268:14,19
268:23,24 269:9
269:13,14,20

**appropriately**
169:5

**appropriations**
105:14

**approval** 108:16

**approximate**
17:10

**approximately**
10:14,15,17 18:6
29:18 48:16
140:21 218:14
233:21 240:25
255:10

**arbitblit** 2:3 6:4,4
8:1 12:22 15:22
16:11 17:21 18:9
19:4,18 21:2 22:6
23:11,23 24:9
25:11,18 26:2,11
26:18,25 27:15,22
29:13,22 31:14
32:15 33:13,24
35:11,16,18 36:7
42:10 43:5,21
44:3 45:19 47:9
48:1 49:9 50:10
50:21 51:6,10,19
52:8,14 53:1,8,19
54:4,17,25 55:12
55:23 56:4,13,25
57:9,23 58:3,6,17
59:16,21 61:17

62:13,24 64:7
65:2,15 66:7,21
72:1,18 73:3,16
74:13 75:10 78:19
79:7,20 80:12
82:21 83:4 86:25
88:4 92:4 93:13
93:25 95:15 96:7
96:21 98:22 99:9
101:11,22 102:7
102:14,18,22,25
111:6 113:7
120:11 123:21
124:21 128:15
129:20 135:13
136:1,14 137:14
138:13,20,23
142:15 143:9,17
143:24 144:1,17
145:1 146:23
147:12 150:11,21
151:6 152:6,15
153:9 154:5,17
155:12,25 156:3
157:2,14 158:5,19
161:2,10,17,25
162:11 163:2
164:7,24 165:6
167:3,14 168:25
169:11 170:9
171:23 173:20
174:2 176:3,16
177:12 183:18
184:7,18,21,25
185:7,14,22 186:7
188:5 190:3,15
192:6 197:6,12
198:4,8,21 200:5
205:16 206:1
211:21 213:5,9,17
215:12 216:10

218:20 221:5
222:18 223:20
224:3 228:4,17
229:4,13 233:6,13
234:3 235:9 236:1
236:7,15 237:18
239:19 241:22
242:11 243:17
244:6 250:4,13,21
251:4 254:4,11,24
256:4 259:24
262:1,12,22 264:6
272:12,17 273:1
276:9,19,22 277:9
279:5
**area** 12:12 204:3
215:3 232:25
**areas** 9:9,12 41:20
42:8 55:21 192:21
**argue** 75:11
**arguing** 179:14
**argumentative**
27:1 50:22 51:20
52:9,14 53:9,20
120:12 185:7,23
**arrangements**
175:2
**article** 4:8,12
12:10 42:4 103:24
104:11 105:22
106:18 124:8,16
133:10 134:2,3
141:21 142:12,17
142:19
**articles** 44:7 62:5
130:8 131:17,22
133:8,25 134:15
134:18,20 135:5,8
135:10,17,23
138:25 139:4,22
140:12,16,21,24

140:24 141:4,12
142:2,4,8 155:4
238:16,24
**aside** 223:24
233:25 256:7
261:5 262:8
**asked** 52:9 72:18
135:1 151:6
155:12,25 181:4
184:18 185:23
200:13 212:4
223:13 224:3
229:24 231:23
250:13 273:2,22
277:5
**asking** 6:2 8:8
17:23 53:8 96:22
133:3 135:22
144:23 152:7
194:21 197:10
224:9 228:23
235:1,13,15
250:25 260:3
**aspect** 15:1 131:2
157:18
**assembly** 67:9
70:4
**asserted** 14:11
**assess** 83:22 173:6
191:13 229:25
**assessed** 173:18,24
174:15
**assessing** 20:14
47:18
**assessment** 47:16
176:11 225:9
272:7 274:10
275:13,13
**assessments**
224:16 256:15

**assign** 142:5
**assignment** 229:19
280:2 281:2 282:2
**assigns** 142:12
**assist** 179:20
180:16
**assistants** 23:8,20
**associated** 33:21
164:13
**associates** 149:6
**association** 132:10
138:1 140:8
**assume** 130:13
142:24 171:3,15
204:14
**assuming** 82:12,16
**assurance** 78:5
**assures** 145:6
**attached** 278:8
281:7
**attachment** 67:15
**attempt** 94:16
275:16
**attempts** 116:3
151:13
**attend** 126:8
**attended** 15:17
**attendees** 128:21
**attending** 5:8 99:2
**attention** 29:2
271:13
**attested** 38:4
**attorney** 5:24
**attorneys** 54:10
**attributed** 141:14
**audience** 126:24
127:7
**audio** 5:8 59:10,15
203:21 206:20
**author** 251:22

**authority** 36:5
**authorizations**
108:2,15
**authorize** 281:11
**authorized** 278:4
**authors** 115:5
**automatically**
99:21 100:1
**autonomy** 67:17
68:21 114:23
**availability** 140:3
**available** 57:15
122:13 168:3
176:2 180:21
182:25 194:11
231:24 262:18
**availed** 170:3
**ave** 279:1
**avenue** 2:12 3:4
**average** 124:2,17
134:8 137:9
138:18 150:3
163:20,25 194:11
194:13,18
**averages** 217:24
217:25 218:2
**avoid** 107:2,4
**aware** 75:19 83:25
90:20,22,24 91:3
126:20 132:22
195:3 201:3
237:15,21 238:1
239:2 245:3,5,6
247:11 257:22,24
259:5 261:20
262:3 263:5 265:4
**awareness** 162:12
187:23 189:11
237:10,25

**b**

**b** 230:20 231:2,5,8
231:10,16 232:17
232:21
**b1** 91:12
**back** 18:5 19:22
22:8 40:23 46:15
46:17,20 58:10
59:19 78:1 100:21
103:11 118:9
125:7 170:17
213:23 219:4,23
220:20 224:18
257:14 261:16
263:10 270:9
274:21 279:15
**backwards** 268:8
**bad** 107:2 215:17
216:9
**badgering** 185:15
185:23
**ballpark** 209:23
**barely** 104:20
**baristas** 66:1,13
**bartlit** 3:8
**bartlitbeck.com**
3:12
**base** 57:10,13,14
57:16 107:7 235:6
**based** 14:5 21:4
25:16 27:9 31:25
32:5 36:10 39:6
43:23 48:10 49:4
50:15 51:3,13
66:3,14 80:7
89:22 90:19 93:5
99:22 101:1
106:20 112:3
114:2,25 124:8
146:20 149:1
160:19,20 161:21

162:16 167:5
172:21 178:21
180:24 181:17
182:8,13 190:22
191:14 198:24
215:14 216:1,5,12
218:18 219:10
220:3,5,23 221:1
221:18 222:16
224:1,12,14,20
236:2 246:8
**baseline** 220:1,2
**basically** 151:16
182:23
**basis** 35:17 74:6,9
75:15 107:5
225:22 240:12
243:11 260:18
**bates** 231:4
**battery** 2:4
**bear** 177:19
**bearing** 231:3
**beck** 3:8
**becoming** 163:24
190:6
**began** 21:25 63:10
89:20 91:3,7
162:17 201:20
202:16 230:12
**beginning** 23:25
90:11 99:18 237:4
245:5 264:20
**begun** 238:14
**behalf** 6:1,2,9,13
**behavior** 121:23
151:20 181:17
272:8 273:25
274:2,3,11
**behavioral** 123:14
124:11,14

**beholding** 114:23
**belated** 161:3
**belief** 22:18 29:11
30:2 40:23 53:5
105:21 106:17
179:25
**beliefs** 182:10
**believe** 16:8,25
21:17 23:1 24:3
29:14 30:6 33:8,9
33:14,23 35:5
38:2 52:17 53:3
56:17 80:14 84:3
95:8 96:12 98:9
101:5,24 107:12
107:13 135:20
139:21 140:1
146:19 149:24
153:4 175:20
177:24 178:14
188:13 190:17
203:19 207:3,7,17
208:14 209:20
224:11,17 225:11
226:25 228:18
232:13,22 234:4
234:19 236:3
242:12 253:8
254:18 255:24
260:24 261:8,15
261:16 262:6
265:9
**believed** 29:15
30:4 52:19 53:15
53:22 55:20 56:9
82:18 83:1 138:3
**believes** 32:13
270:24 271:9
**believing** 24:20
28:15 101:15

**beneficial** 175:2
178:7
**benefit** 65:14,19
93:18 189:10
**benefits** 27:25
55:6 57:17 99:23
119:13 160:22
162:15 164:10
166:15 167:9,13
167:16,17 168:9
219:15
**benzodiazapine**
112:1 132:18
269:10,15 271:15
**benzodiazapines**
248:16
**benzodiazepines**
132:20
**bernstein** 2:3 6:5
**best** 8:10,11,16
26:5 38:8,12
55:14 95:24 96:1
124:22 185:5
199:10 215:10
224:24 228:2
272:6 274:8
275:10 278:13
**better** 67:10 106:8
106:15 108:5,25
109:2 117:1 123:7
123:14,20 194:12
270:16
**beyond** 7:25 8:14
11:16 29:23 130:9
198:11 249:13,23
**biased** 186:3,6,9
186:12
**biases** 115:4
**big** 18:20 59:8
60:1,2,3,4,16,16
61:8 62:11,19,20

63:6,9,13,19 64:15
98:4 104:2 117:16
121:4,5
**biggest**  103:1
116:15 193:21
**billing**  17:5 116:23
**billion**  76:16 77:2
**billions**  105:14
**bills**  114:8
**binder**  104:2
**biological**  122:7
**bit**  76:20 89:24
**blame**  60:15,20
61:8,8 62:8 63:2
63:24 65:8 69:5,8
142:5,12 255:2
**blamed**  142:8
**blanket**  180:24
181:8,16
**blinders**  270:18
**block**  181:10
**blood**  86:14
**blue**  176:24
**blvd**  3:15
**board**  24:2 34:24
37:23 39:21 40:5
40:10,14 124:15
127:16,19,22
266:24
**boards**  36:4 37:9
37:13,14 38:18
58:23 62:10,22
63:4 71:2 84:4,6,8
84:11,13 138:1
**bob**  203:8 204:24
205:2
**bockius**  2:22 3:3
6:1 102:21
**body**  20:6 67:8
70:3 211:25 212:2

**bolts**  140:19
**bona**  24:23
**bonicelli**  1:25 5:19
278:3,24
**bonus**  148:24
149:1,4,5 267:4,17
267:19
**bonuses**  174:9
**book**  13:23 14:3
14:11,13,15,22,24
14:25 22:12 37:15
38:25 39:1 40:1
57:14 58:16,24,24
59:3,4,5,6,14,24
63:8,20,23 64:1,3
64:9,19 65:7,24
69:7 84:24,25
88:22 89:8,17
100:13 107:8
113:9,23 129:5
130:9 139:7,9
140:1,2 141:25
214:21,24 237:25
238:4 262:15
270:13
**bottom**  61:4 68:20
114:10,19 121:14
178:7 196:21
222:11 240:6
263:20 275:21
**box**  102:15,19
103:2
**brain**  12:1
**brakes**  174:11
**brand**  188:18,20
188:25
**break**  57:25 58:2
124:19 170:11,11
192:13 213:19
**breakfast**  124:19

**brick**  139:14,17
**brief**  4:12 141:25
273:8,20
**briefed**  64:5
**briefly**  139:8
159:6 264:20
**bring**  214:11
**british**  103:15
104:12
**britt**  3:25
**broad**  48:19 54:6
237:10
**broader**  47:1
129:24 147:18
228:13,23 233:16
245:7 247:10
**broadhollow**  2:8
**broadly**  136:3
142:9 165:15
194:7
**brochure**  149:18
264:5,13
**brochures**  183:9
189:2
**brody**  77:24 78:5
78:24 79:6,13,18
79:23 81:14 203:9
203:11,18 204:6
204:16,22 205:2,9
205:10,13
**brody's**  204:1,24
205:7 206:12,16
**brought**  40:2
**building**  179:11
**bullock**  133:11
**buprenorphine**
49:25
**burden**  117:20
118:15
**bureaucracy**
114:9,18

**bureaucratic**
108:2,7
**business**  121:7
149:7 178:7
**busy**  9:3 44:15
270:24 271:8
**butrans**  186:25
**buy**  213:2

| c |
|---|

**c**  2:1,3 279:5
**c2**  151:14
**ca**  2:5 279:25
**caboose**  60:3,10
61:5
**cabraser**  2:3 6:5
**cahoots**  120:23
121:1
**calculation**  149:4
**california**  16:25
40:2 207:4,7,7
256:17 257:2,3
**call**  97:5 141:22
161:18
**called**  11:25 13:23
37:16 38:6 39:11
64:21 109:21
114:25 133:11
149:18 182:22
193:1 195:18
197:21 205:7
206:12 209:13,14
210:1,9 255:6,20
265:23 274:7
**calling**  141:19
**calls**  36:7 73:9,21
75:16 143:17
161:3
**campaign**  30:7
69:19 184:10
**campaigns**  22:25
23:1 46:4

**campus** 196:18 197:19,20 199:1
**capacity** 269:4,4
**cardinal** 18:21
**care** 9:7 24:7 25:16,20 41:8 44:15 45:4,14 68:16 84:5 90:11 108:12 114:6 115:7 116:25,25 144:9 190:2 254:1 254:8 270:20,21 270:23 271:6,8,15 275:23
**career** 122:22 162:2,3 193:13 194:12 252:14,20 252:22 253:2
**careers** 77:20 193:3
**carefully** 145:15
**caremark** 189:8 257:17
**carried** 244:24
**carter** 3:14 4:4 6:15,15 59:17 214:2,6 215:20 216:15 218:23 221:13 223:4,23 224:8 228:8,22 229:8,15 233:8,19 234:7 235:12 236:4,10,18 237:22 240:1 242:1,13 243:24 244:12 248:10,12 250:9,16,24 251:12 252:8
**carve** 108:2,8
**case** 1:6 5:16 16:5 16:14,23,24,25

17:1,25 18:7 19:15 50:6 95:9 108:4,5 116:14 123:19 124:6 131:14 132:5 136:7 141:14,16 142:14,18 147:20 163:16 190:18,20 210:22 211:9 212:20 215:22 225:5,13,15,20 226:3,8,15,20 227:7 229:10,17 229:20,21 230:10 230:14,16 231:9 231:20 235:23 236:11,12,14,17 240:3 241:1 245:16 247:5 249:24 266:2,17 267:9,18 279:6
**cases** 1:7 11:22 16:9,21 17:12 18:19,19 40:1
**cash** 97:13 245:18
**catastrophic** 193:8 194:4,23
**caught** 94:6
**causal** 48:20
**causative** 48:16 202:12
**cause** 13:17 35:14 77:21 141:23 146:6 237:2 238:18,25 278:20
**caused** 112:8 120:21 154:2,9,20 155:22 156:9 183:16 184:4,16
**causes** 11:20 141:23

**causing** 12:2
**cautious** 21:20
**cbt** 123:15
**ccr** 1:25 278:24,24
**cdc** 202:10 221:21 237:4,9 238:16,23
**center** 3:21 163:19
**centers** 70:7 114:22
**centralizing** 11:25 12:3
**centre** 2:23
**century** 64:21 91:9 117:18 118:13
**cephalon** 85:4 187:22 209:14
**certain** 49:12 83:19,21 87:10 99:7 108:17 116:25 181:9,20 182:16 208:21 259:17 267:25 268:6 269:12,12
**certainly** 15:19 20:17 64:2 65:8 106:1 111:24 178:18 179:6 180:7 204:10 206:6 245:15 252:1 253:5,23
**certificate** 278:1 281:11
**certification** 280:1 281:1
**certified** 6:22 278:3,24
**certify** 278:6
**ces** 265:23
**cetera** 174:9 276:3 276:3

**cfr** 115:20
**chain** 18:7,13 45:24 46:7,8 63:24 71:6,11,18 71:23 73:8,13 74:10 75:16 76:12 82:1,17,25 97:20 132:10 135:2 136:18 137:21 138:17 139:23 141:15 142:5,13 149:22 150:5,7 152:12,23 153:7 153:18 154:2,21 155:9,16 156:8,14 156:23 158:3 159:20 168:19 172:18,25 173:18 173:24 174:15 175:12,24 176:11 177:8 178:15 183:15 184:3,12 184:15 185:12 187:12 188:1,9 192:19 201:4 212:16 225:10 229:9,11 250:19 251:2,6,9 253:20
**chains** 186:22 196:6 211:20 212:7,9 216:4 225:5 228:20 249:14,19,21
**challenged** 151:13 151:20
**chance** 192:4 230:3
**chances** 28:24
**change** 29:6 89:20 116:15 120:8,8 201:25 221:10

261:12 262:6
270:22 271:6
279:13,14 281:8
282:3
**changed** 21:23
24:8 26:16 116:12
144:21 191:16
211:12,15,16
**changes** 12:14
85:12 105:18
106:12 109:7,10
117:18,25 118:13
254:12 270:22
271:7 279:12
280:7 281:7,9
**changing** 84:4
**chardon** 267:1
**chart** 201:10,14
202:18 203:3
218:15,24 219:6
222:11 223:18,24
**check** 97:3 114:2
169:18 170:7
268:5,15,20 269:6
**checked** 167:24
269:7
**checking** 98:10
169:19,22 268:8
275:5 276:5
**chicago** 3:11
156:13
**chief** 8:25
**chooses** 277:3,4
**chose** 119:10
177:18 249:3
**chosen** 38:5
**chronic** 11:5,7,10
11:11,15,16,19,20
11:23 13:3 22:1
28:17 30:12,20,20
31:1,3,5,9,11 32:3

32:8,10 41:4
44:18,22 82:19
83:2 85:20 90:15
91:1 93:3,11,19,24
94:5,8,14,17
101:16 102:1
106:15 114:1
118:18 119:9
124:11,14 163:6
163:14 164:11
190:7
**churn** 107:19
**cibulka** 3:25
**cincinnati** 134:3,7
153:20
**circumstance**
10:25
**circumstances**
25:9,23 267:25
268:1,13
**citation** 244:9
**citations** 37:12
**cite** 42:3 133:7,10
155:3 178:8 190:4
207:11,18 240:2
275:15
**cited** 158:7 178:23
195:19,20 197:9
198:15 206:14,15
227:3,6 231:13
234:21,24
**citing** 78:10
257:22
**civil** 280:5 281:5
**claim** 154:9 180:6
**claims** 148:18
**clara** 16:25
**clarification** 25:12
60:25 67:19 72:19
76:22 85:3 97:22
108:11 111:25

120:25 140:7
156:17 188:19
196:7 201:8 210:3
217:19 261:3
271:4
**clarify** 89:24
**classes** 126:19
129:11,17 259:6
**classic** 9:5
**cleaner** 239:10
**clear** 14:21 93:1
119:13 150:14
178:3 182:11
212:13 235:1
238:17,24 250:25
275:4
**clearer** 14:21 15:1
**clearly** 178:20
181:19 202:24
216:23 274:24
**cleveland** 70:13
149:20 212:20,24
213:7 279:2
**click** 76:24
**climate** 39:17
**clinic** 9:1 11:7,10
13:14 70:13 128:8
227:14 228:7,7
**clinical** 19:23,24
55:4 56:21 57:7
57:21 70:25 83:12
83:17 122:25
147:8 152:21,25
153:8 164:2 169:7
170:2,8 174:5
178:21 193:19
272:7 274:10
275:13,13
**clinician** 163:20
163:25

**clinics** 182:24
**close** 81:1
**closely** 75:3
**cloud** 277:19
**cme** 127:6
**cmes** 80:20,21
**coach** 111:13
**coaching** 53:6
188:22 189:3
**codes** 26:8,13
**cognitive** 123:14
**collaborate** 72:8
73:11,14
**collaborated**
37:14 71:15 74:15
75:3 81:17 148:9
182:11 187:15
195:25 212:11
258:23
**collaborating**
182:21
**collaboration**
19:19,22 81:1
149:17 178:4
199:13 212:10
**collaborations**
174:24 258:2
**collaborative**
128:6 197:21
**collateral** 166:8
**columbus** 3:16
240:22
**column** 222:12
273:24
**combat** 175:5
261:7,9
**combatting**
133:23
**combination**
121:23 232:14
245:14 249:9

combinations 68:19 168:10 256:19

combining 132:20 230:22

come 19:22 46:15 46:16,20 92:25 147:17 165:24 194:25 208:3 212:24 213:3,6

comes 26:23 51:9 117:10 129:14 165:13 171:19 182:9

comfortable 238:4

coming 13:14 195:10

comment 59:1

commentary 209:20

comments 14:18 206:16

commission 34:23 36:3,18,21,22 38:17 39:22 58:22 62:10,23 63:4 68:22 71:2 86:2,4 86:8,13,16,20,23 87:1,3,6,9,18,23 114:24 280:19 281:25 282:25

committed 156:15 157:10

committee 105:15

committees 37:22

committing 18:1

commodities 67:22

common 68:12

commonly 24:14 25:5 27:3

commonplace 271:1,11,17,19

commonsense 147:16

communicate 115:22 189:19

communicated 74:11

communicating 201:1

communication 270:19

community 13:21 100:11 103:20 142:23,25 143:1 166:25 173:2,4,16

companies 108:1 209:14 210:25 211:3

company 108:16 209:13 210:1,9 253:21

compare 23:16 164:16 226:1,3,6 226:13,19

compared 201:22 217:12,13,13,21

comparing 124:9

comparison 234:16

compassion 15:1

compassionate 223:5,9

competitors 157:7

complained 105:5

complaint 207:20 208:7 234:14,17 234:22,25 235:7 235:16,18,22,24 236:6,13,14,20 244:8

complaints 235:2

complete 98:2 170:21

completed 145:19 279:15

completely 54:10 209:8

completeness 211:1

complex 44:16 45:8 112:13 116:1 116:8 117:11 210:16

complexity 44:25

compliance 246:5

compliant 215:10 215:25 228:2

complicated 90:8

complications 248:22

complied 128:25

component 13:8 124:11

components 124:14

compound 23:11

comprises 267:19

concept 67:25

concern 14:19 112:2

concerned 13:19 21:21 208:22 255:17

concerning 10:9 12:5 18:25 19:10 43:24 74:12 82:3 130:11,22

concerns 97:6 145:17 179:17 207:12

conclude 244:21

concluded 207:21 277:23

concludes 277:15

conclusion 36:8 143:18 147:17 161:3,18

conclusions 176:15 208:9

concurrent 156:18

condition 11:12 20:15 24:24 47:21 56:11 95:18 115:22 158:15 160:23 173:8 222:9 223:2

conditions 22:1 24:16 25:7 89:5 89:13 93:3 106:16 134:1 163:7 176:8

condoned 122:10

conduct 151:15 215:9 216:6 234:1 234:16 236:21

conducted 5:7 156:13 190:5 221:15 225:6,22 252:5

conference 205:4

conferences 81:16

confirm 181:15 210:23

confiscate 243:6

conglomerates 116:23

conjunction 272:6 274:9 275:10

connection 52:24 90:24 97:24 131:13 132:4 134:16

**conroy** 2:11 6:7
**consensus** 48:14
  48:19 237:1,3
  239:6
**consider** 11:11
  13:2 38:7,11
  70:13 107:22
  163:21 164:22
  165:4,14,15,18
  215:10 251:24
  271:25
**consideration**
  165:25
**considerations**
  48:7,13 49:7
**considered** 15:12
  15:15 96:1 204:20
  204:21 205:8
  223:6 230:21,22
  230:24 231:9
**consistent** 25:24
  92:18 201:18
  217:5,16 218:10
  220:2 242:19
  271:16
**consistently** 15:15
  275:5
**consortium** 84:25
**constant** 203:1
**constitute** 63:5
**constitutes** 130:5
  135:9
**constrained** 46:18
**consultants** 37:23
**consultation** 44:19
**consulting** 45:9
**consumer** 182:8
  258:8
**consumers** 174:22
**contact** 73:14 78:3
  149:8

**contacts** 265:22
**contain** 97:25
  183:22 190:20
  244:13
**contained** 136:7
  259:6 264:4
**contains** 136:24
  264:9 278:14
**contents** 259:2
**context** 118:23
  147:19 158:14
  168:21 233:17
  273:23 274:24
**contexts** 92:10
**continue** 5:9 11:6
  31:2 119:18
  120:15 149:16
  169:25 193:7
  196:10 214:4
  241:4
**continued** 3:1
**continuing** 34:21
  39:18 62:6 70:24
  80:20,24 81:5,9,15
  81:21,22,24 82:2,6
  82:10 172:3,7,9
  200:2,14,20,23
  201:5 205:1,4
  246:6 259:3,6
  265:24 266:4
**contraindicated**
  156:18
**contrary** 79:9
  101:24 153:1,3
  158:23 181:14
  184:9 219:13
  241:17,19 247:16
  266:6
**contribute** 9:24
  87:11 173:1

**contributed** 9:18
  60:14 61:6 70:18
  88:1,7 116:16
  118:17 138:4
  148:16 183:10,11
  253:20,22 255:3
  255:22 260:11
**contributes** 155:6
**contributing** 28:6
  28:11 48:24 138:6
  175:6 183:1 230:1
  237:8
**control** 86:23
**controlled** 9:20
  111:3,20 128:5
  129:15 131:1,10
  133:16 134:13
  139:11,16,17,19
  139:19 144:12
  148:19,21 149:2
  150:4 153:24
  160:10,12 169:12
  180:3,19,19
  181:13 215:11
  246:10 255:7
  266:12 267:1
  268:16,17,22
**controls** 260:4,12
  262:10
**conversation**
  79:18
**conversations**
  79:13 276:1
**coordinated** 179:9
**copies** 234:20
**copy** 58:24 59:2,4
  59:5 103:23
  104:11 191:3
  214:12,21,25
  215:2

**corner** 30:7
  140:14
**corporate** 148:8
  184:12 250:3,12
  250:18 251:2,6
**corporations**
  120:23 121:1
**correct** 15:8 19:3
  19:12,13 60:18
  62:23 63:16,25
  64:1,19 66:1 74:4
  75:1,9,18 76:9,13
  77:15,21 79:19
  81:6 82:15 85:6
  85:10 88:25 89:8
  89:14 99:8 100:18
  103:23 104:11,23
  105:22 106:18
  110:6 120:1
  127:23,24 137:24
  139:11,20 144:7
  150:20 151:5
  152:10 153:24,25
  187:14 192:22,24
  193:4 195:14,20
  195:23 196:15,23
  197:2 200:16
  201:6,7,11 202:20
  205:21 206:17
  207:10,13,16
  209:10,15 210:10
  211:20 212:5,21
  214:22,25 219:3,7
  223:7 227:4,7
  231:4 233:21
  238:1 239:7 240:4
  240:8,12,17 241:9
  247:24 252:6,7
  260:5,16 265:11
  265:15,17 266:8,9
  266:14 269:1

270:6 271:18
**corrections** 279:12
281:17
**correctly** 219:22
238:20 245:1
246:11
**corresponding**
130:11,16,22
131:9 134:12
139:1 150:9,14
168:17 171:14,18
180:2 181:11
226:12 256:2,14
**corroborate**
236:22
**counsel** 5:12 16:4
16:16 17:22 46:19
57:23 59:10,16
62:14 66:23 102:8
102:10 111:11
138:9,14 146:24
170:9 197:6
199:23 206:7
208:5,6,11 213:18
231:21 249:12
252:12 262:8,17
269:24 272:18
276:9 278:18
**count** 141:1,3
156:23 255:11
**counted** 209:21
**counter** 179:11
182:17 186:19,21
187:1,4,9 189:14
257:20 258:4
**counties** 30:3,8
46:6 47:3 71:8,20
149:23 150:1
152:11 153:5,19
155:10 157:1
158:17 175:7,9,19

175:21 177:7
183:13,21,25
184:3 186:21
190:12 216:13,19
224:25
**countless** 133:16
**country** 15:13,16
33:11,19 40:25
49:20 61:16 70:9
84:18,20,21
105:19 109:8,11
140:4 179:23
180:10 216:16,19
228:14 229:1,2
246:18 247:19
**county** 22:22,23
23:2 71:13,14
149:13 152:20,24
153:7 154:10
155:2,18,21
158:22,24 159:4,5
159:8,11,14,17,21
174:18 175:24
176:7,13,14,22
178:14 183:15
184:15 185:10,13
185:20 187:4
188:10,15 189:25
190:17 215:9,14
215:18,19,24
216:7,16 217:2,5
217:13,14,16,17
217:23,24 218:5,5
218:17 219:3,7,20
219:24 220:11,13
220:21 221:16
222:17 223:12,13
223:14 224:2,13
224:22 225:4,8,11
228:1,9 239:17
241:13,15 242:25

244:5,14 246:20
247:12 257:1,5
280:10 281:15
**couple** 50:25
192:20 206:23
212:19 241:18
**coupon** 187:13
188:3,12
**coupons** 187:7,8
187:10,12,15
188:14
**course** 7:5 32:13
38:1 72:24 117:17
118:12 144:9
160:15 238:5
**courses** 70:24
131:5
**court** 1:1,21 5:14
5:18 6:22 7:9
278:4,24 280:7
**courted** 189:8
**courtesy** 8:8 9:14
**courthouse** 3:10
**cover** 188:22
204:3
**coverage** 108:13
**crawford** 2:17 6:8
6:8 103:5 248:8
252:10,11 254:5
254:20 255:5
256:6 257:9,21
260:2 262:2,19
263:3,6,13 264:11
264:15
**create** 48:9 74:18
77:25 133:14
179:9 180:1,4
182:22 183:4
260:22
**created** 39:17
80:25 181:20,24

183:23 253:19
**creating** 69:5
91:10 183:9
191:10 253:6
**creation** 65:9
253:15
**credibility** 243:15
**crime** 64:21
**crisis** 63:25 133:22
140:22 230:1
**criteria** 11:3 95:24
95:25 108:3,19
243:1 272:9
274:12
**criticisms** 12:14
**criticize** 61:14
**criticizing** 61:15
**critics** 105:4
**crossed** 242:22
**csa** 174:21 228:3
**csr** 1:25
**culpability** 65:5
253:17,18
**culpable** 64:11
**cultural** 112:17
**culture** 24:1
**cumulative** 17:17
56:16 253:1
**curious** 268:16,20
**current** 67:3 69:23
110:25 111:17,22
**currently** 123:19
**curricula** 70:24
**curriculum**
258:19
**customer** 107:4
149:2 188:12
**customer's** 180:25
**customers** 44:25
67:14 68:10 74:19
156:20 188:2

**customize** 187:23
**cut** 76:20 78:25
 80:5 83:14 94:10
 94:23 95:2 120:17
 196:22 197:9
 206:20
**cutting** 59:11,15
**cv** 141:1,3,5
**cvs** 2:15 4:14,15
 6:9 18:14 45:25
 156:22 180:14,20
 180:22 181:10,11
 181:16 189:8
 225:24 252:12
 255:6,12,16,22,24
 256:1,12,22 257:6
 257:17,24 258:2,5
 258:7,16,18,21,23
 259:3,6,14,16
 260:4,10,11,14,18
 260:20 261:6,8,11
 261:15,16,20,24
 262:3,10,20,23,25
 263:2,12,14
**cvs's** 157:7 180:15
 259:10,22 260:7
**cvss** 247:18 261:5
**cycle** 187:25

**d**

**d** 4:1
**daily** 74:6 155:7
**danger** 156:21
**dangerous** 68:18
 115:18 145:17
 168:9 256:19
**dangers** 132:18,22
**darbitblit** 2:6
**data** 32:21 55:16
 133:14 136:13,16
 136:18,22,25
 137:5,11,20,22

138:10,17 146:20
156:25 158:22
166:13,14 168:4
168:14 170:4,6
179:20,23 180:10
180:16 181:19,20
193:10 194:11,17
194:24,25 195:11
216:12 218:3
219:1,7,24 220:20
221:4,21 223:12
223:12,15 238:16
238:23 260:20
261:20 272:5
274:2,8 275:9
277:2
**database** 42:5
 97:3 98:10 115:15
 128:10 130:5
 140:9,11 166:6
 167:25 169:17,20
 169:23 180:1,7,20
 181:21 256:16
 268:2,4,6,8
**date** 17:11 190:22
 238:3 279:8 280:3
 280:9,19 281:3,13
 281:25 282:20,25
**dated** 4:8 103:24
 110:8 263:20
**day** 3:14 6:15 31:2
 39:19 46:19 119:2
 128:9 133:17
 270:8 278:22
 280:16 281:22
 282:22
**days** 11:16 261:16
 279:18
**dc** 2:18
**dea** 23:20 49:11,16
 49:19 50:16 132:8

148:18 150:13,13
158:6 174:19
176:25 177:1
208:22 226:22
227:3,6,17,19
231:11 233:23
240:12,15,21,25
241:2 244:9 245:8
245:12 247:4,7
**deal** 44:25
**dealer** 13:23,25
 58:16 139:8
 270:14
**dealt** 241:8
**dear** 279:10
**death** 164:15
 248:24
**deaths** 48:18
 140:5 218:4,13,13
**debate** 211:23
**debilitating** 94:11
 94:15 95:3
**decade** 193:18
**decades** 99:20
 193:4,8
**december** 266:23
**deception** 116:2
**decided** 179:2
 181:12 204:12
 212:1
**decides** 259:16
**deciding** 54:15
 98:21 148:4
**decision** 55:17
 70:25 83:12
 147:16 162:20
 168:23 169:8
 170:8
**decisions** 83:17
 132:8 180:24

**declare** 105:6
**declaring** 104:22
**decrease** 201:20
 202:16,17
**decreased** 222:23
**decreasing** 218:2
**deed** 280:14
 281:20
**deemed** 279:19
**deeply** 163:20
**defendant** 2:15,21
 3:2,7,13,18 6:1,14
 45:24 46:9 63:24
 73:13 75:16,19
 115:5 136:20
 176:20 179:4
 206:4 214:17
 215:21,23 216:4,7
 225:4,5,7,15 226:9
 226:24,25 227:10
 227:25 228:6,20
 228:24 229:9
 230:5 247:12
 250:19 251:2
 264:21
**defendant's**
 138:10 187:13
**defendants** 5:13
 6:3,9,11 18:8,13
 18:13,14 19:2,11
 19:16,20 28:14
 46:8 71:6,12,18,23
 71:24 72:5 73:9
 74:10 75:2 76:13
 77:17 80:23 82:1
 82:9,18 83:1,6
 86:19 88:5 97:20
 98:2 107:16
 114:13 131:19
 132:11 133:7
 135:3 136:19

137:21 138:17
141:15 142:6,13
142:18 149:22
150:1,5 152:19
153:7,18 154:21
154:25 155:9,16
156:8 158:3
159:20 172:18
173:5,14,18,24
174:10,15,20,24
175:4,13,17,24
176:8,12 177:9,16
178:15 180:6
182:21 183:15
184:3,15 186:22
187:5 188:2
191:20 211:6
213:2 215:15
225:20 226:3,8,14
229:11 240:15
244:22 247:3,19
249:3 252:12
253:8,10 265:10
**deficit** 271:13
**define** 11:15 12:25
20:1,2 23:18
30:17 49:13
187:22
**defined** 11:18 20:5
20:11,11 92:11
**defining** 25:20
30:15
**definition** 19:23
72:25 92:16
275:17
**definitions** 19:24
**definitive** 142:8
248:4
**definitively**
237:14,24

**degree** 126:10
217:3,4
**delaware** 234:10
**delay** 202:14
**delivered** 105:19
109:7,11
**demand** 179:9
181:24 183:4
**demographic**
97:11
**demonstrate**
79:17
**demonstrated**
39:9 169:5
**demonstrating**
140:13 176:20
**denied** 84:14
**dentist** 47:6
**dentists** 23:8,20
41:18
**departing** 61:23
**department** 9:15
233:22 279:22
**depend** 47:10
140:23 144:19
162:2 272:3
**dependence** 11:9
96:13,18 98:18
223:6
**dependent** 11:2,2
11:4,6 13:14 94:8
94:9 95:6 121:16
121:17
**depending** 161:18
211:6
**depends** 30:15
**deposed** 16:23,24
16:24 17:1 18:19
251:20
**deposition** 1:9,20
5:6,12 7:6 16:22

18:12 37:24
214:11 252:2
264:21 277:5,23
279:8,11 280:1,3
281:1,3
**depression** 123:9
248:23
**describe** 9:11
10:25 12:9 13:5
27:6 33:1 35:6
68:3 70:14 71:12
81:20 132:19
175:1 209:12
217:6 265:25
**described** 79:6,18
132:22,24 134:24
151:20,24 181:14
200:1 222:2 247:6
**describes** 134:3
**describing** 68:1
82:10 196:14
208:7 240:11
**description** 79:22
**design** 189:23
**designed** 149:5
261:1
**desire** 61:12
**desperate** 107:2
116:3
**despite** 68:14
92:22 181:2
**detail** 9:4 46:20
81:21 172:1 190:9
**detailed** 144:23
**detailing** 218:4
**detect** 9:21 130:25
135:8 180:4
266:25 268:9
**detected** 169:18
268:6

**detecting** 9:23
128:3 129:14
131:8,24
**detection** 131:20
**deter** 266:25
**determination**
236:6,9 272:8
**determinations**
274:11
**determine** 42:13
95:21 136:7
145:16 146:5
148:3 154:15,20
155:8 157:23
161:14 162:6,9,25
163:13 164:5
167:20 169:21
174:7,14 175:11
175:23 177:10
189:24 195:7
216:3 262:10
**determined** 148:8
**develop** 90:11
189:3 194:18
**developed** 10:1
32:3 189:25
190:12 194:22
**developing** 29:3
97:2 122:5
**development**
188:24
**deviant** 67:4 69:25
**diabetes** 124:12
**diagnosable** 96:3
**diagnose** 96:5
**diagnosis** 9:1
95:21,23 114:2
165:9
**dial** 59:19
**dictate** 68:25

dictated 68:8
die 100:24
died 221:25
difference 43:1
74:20 98:4 172:11
172:15 193:24
221:8
differences 216:23
216:24 217:1
different 11:20
16:9,21 17:12
21:13,16 22:14,14
22:15 24:15 25:4
25:7 31:18,20
34:20 39:3 41:12
41:22 52:3,6 53:4
54:20 55:21 58:14
63:1,3 68:13,24
80:7 87:25 92:10
99:6,14,15 102:17
107:14 115:13,14
124:16 130:20
133:8,8 155:4
165:7,21 167:22
175:9 176:19
183:6 185:16
194:20 195:8
209:8 210:15,18
224:6 242:17
257:4 269:16
274:5 275:8,17
differently 92:9
154:19 259:5
differs 57:18
difficult 32:10
68:14 108:13
115:16,17,21
153:13 180:22
difficulty 54:19
digital 278:21

diligence 45:2
131:24 144:11
147:7 153:14
168:12 169:4
173:11 199:11
226:18 227:13
256:24
dim 123:4
direct 75:21 78:2
87:20 186:24
258:8
directed 136:3
274:24 275:1,11
275:19,20
directly 69:17
73:5,11 77:6 93:8
174:22 277:4
director 8:24 9:1
disability 100:17
112:22 113:3,21
113:24 114:2,8
disagree 99:17
150:12
disagreed 236:5
disaster 117:12
disciplinary 39:22
84:13
disciplines 41:12
disclosed 16:13,15
disclosing 16:12
discounted 187:7
discovering 100:9
discovery 57:15
133:7 199:24
discrepancy
164:19
discretion 27:12
27:17
discuss 125:2
132:17 195:24,24
257:17

discussed 78:17
206:15 240:4
discussing 133:25
199:22 220:21
discussion 97:6
195:22 244:17
257:13 263:9
discussions 129:8
138:14
disease 12:1 20:20
34:9,11 97:1,2
115:14 166:10
diseases 31:21
disempowered
147:5 152:20,25
153:8 174:4
disjointed 115:7
dismay 208:21
disorder 10:13,16
10:19,21,23 11:3,9
12:1 94:25 95:11
95:14,22,24 96:4,6
96:14,19 189:25
190:13 194:19,22
271:13 274:1
dispense 98:8
134:13 146:4,6,7
146:15 148:17
150:19 151:4
154:3,10,21
158:12 168:23
169:4 170:2 174:9
178:22,25 179:2
181:12 196:8
255:19 269:14,21
dispensed 13:20
126:17 136:20
139:10 145:22
146:1,2 147:11
154:11,23 157:22
157:24 158:3,9,14

158:17 172:18
173:7 188:10
220:15 256:18,19
dispensing 19:1,10
64:3 83:8 97:21
97:24 106:4
114:15 126:22
127:1,10 129:1,12
129:19,23 132:8
132:13 133:18
135:19,24 138:5
139:2 140:18
143:3,6,7,14,15,22
146:8 147:23
148:14,15 151:18
156:15 157:5
161:1 163:9 169:8
171:19 174:7
176:20 179:20,23
180:10,16 209:2
220:17 225:7,17
226:2 228:1,15
232:11,25 234:2,6
244:10 261:21
266:13 269:19
display 189:13
257:19
disposal 121:9
170:4
dispute 79:15
dissatisfied 107:4
disseminate 74:6
disseminated
70:22 74:7 183:23
distance 97:13
245:10
distinct 95:10
distinction 95:5
distinguish 216:8
distractions 138:3

**distress** 21:10
**distributed** 266:3
**distributes** 196:3
**distribution** 19:17
  187:24 218:8
**distributor** 19:15
**distributors** 18:21
  19:20 45:21 63:18
  63:21 174:25
  178:5 182:5,12
  183:7 186:18
  187:14 229:23
  253:17,25
**district** 1:1,2 5:14
  5:15
**diversion** 4:15
  9:22 97:15 128:4
  129:9 130:6,9
  131:1,8,11,21
  133:15,17,22
  145:17 146:1
  165:19 167:25
  168:16 169:19,22
  173:6,19,25 174:7
  174:16 177:21
  179:16 180:5
  248:19 260:5,12
  262:11 263:16
  264:14 267:1
  269:8 274:1 275:6
  276:6
**diverted** 91:20
  144:13 247:24
  248:2
**division** 1:3 5:15
**doctor** 26:22
  36:11 44:20 46:7
  46:15 47:6,14
  49:1 55:25 66:4
  69:11 71:17 73:25
  74:3,3,24 75:7

76:2 85:6 92:13
94:23 97:5 99:12
101:8 108:22
157:4 168:16
181:3 184:24
185:3 189:20
192:12,18 199:16
200:10 201:10
205:5 210:6
256:21 270:21,24
271:6,8,14,15
274:3 276:15
**doctor's** 88:16
93:9 116:4 163:24
190:1,14
**doctorate** 171:2,5
**doctors** 13:15 14:1
20:25 21:6,17,19
21:23,25 22:4,10
22:18,22,25 23:2,7
23:10,16 24:16
25:24 26:8,16
27:3,12 28:20,23
29:10,15 32:11,24
34:17 35:7,10,14
35:24 36:6,14,17
36:25 37:5 38:9
38:13 39:10,11,23
40:10,15,24,24
41:14,16,22 42:22
42:23,24 43:8,9,16
43:17,19 44:1,8,9
44:14,24 45:4,7,14
46:5,9,10 55:3,19
56:1,9 60:20 61:9
64:5 65:19,25
66:13 67:4,5,7,21
67:23 68:5,6,13,20
68:25 69:6,14,18
69:25 70:1,2 71:7
71:14 73:5,10

74:5,8,22 75:20
76:7 77:6,18 78:3
78:5 81:6,23 82:7
84:9,11,12 85:20
87:14,14 89:3,11
90:19,22,24 91:3
93:2 94:16 98:25
99:6,15 100:14
101:12,19,23
106:7,24 107:1,9
107:21 108:24
109:1 112:4,9
115:14,16 116:1
116:20,22 118:18
119:24 120:5
121:8 129:13
177:23 178:13
190:8 200:3,15,23
201:5 220:15
242:19 254:22
258:22 259:17
270:19,22,25
271:6,10 274:5
**document** 1:6 4:15
81:8 102:9 120:18
121:11 141:7,11
187:19 189:18
195:18,20,21
196:2,12,13,14,25
197:1,7,9,14 198:1
198:5,10,12,15
199:7,17,21
200:18 204:12
207:11,11,18
214:13,15 234:23
257:23 263:15,17
263:20,22 264:1,8
264:8 272:14,21
273:3,17 274:17
275:3,12,15 276:4
276:8,15,18

**documentary**
  64:23,24
**documentation**
  166:16
**documented**
  154:25
**documenting**
  242:9
**documents** 57:15
  79:14 80:7,14
  102:15 132:9
  133:6 166:2
  174:20 175:1
  205:20,24,25
  206:3,7,11,14,15
  207:19,24 208:7
  208:12,14,15,17
  208:20,24,25
  209:4 214:17
  230:4,18 231:3,8
  231:10,11,14,19
  231:21,23,24,25
  232:3,10,13,14,16
  233:17,20 234:21
  234:24 235:20
  247:2 262:9,16
  263:24 266:22
  267:2,7 273:9
**doing** 44:19 64:6
  93:5 99:4 131:9
  175:5
**doj** 234:8,9 236:11
  236:12,17,23
  244:8
**doj's** 235:2,21,24
  236:5,14,20
**dollar** 121:6
**dollars** 202:19
  203:5
**don** 6:4 102:5
  124:19 192:2

198:7
**donald** 2:3 279:5
**door** 144:24
**doorsteps** 34:22
**dosage** 202:19
  203:4
**dosages** 180:18
**dose** 44:18 94:17
  94:20
**doses** 28:18 94:18
  164:13 219:15
  256:20 262:4
**doubling** 48:22
**downplayed**
  244:25
**dozen** 231:3
  233:21
**dr** 4:11 5:12 8:7
  16:13,21 21:4
  22:9 35:21 40:19
  53:11 58:13,21
  59:13,24 61:4
  62:19 78:9 102:14
  103:15 109:19
  111:7,16 120:15
  124:22 126:6
  151:9 159:24
  197:15,24 200:17
  213:6,12 214:3
  237:15 239:2
  252:11 257:22
  258:5 263:14
  264:19 267:23
  270:13 277:3,16
**dramatically**
  91:22
**draw** 176:14
**drawn** 208:9
**drive** 77:11 106:6
  277:18

**driving** 112:10,12
  113:1,6,11 114:12
  115:6 116:13,24
  119:20 251:16
**drug** 4:15 9:22
  13:23,25 34:22
  58:16 67:3 68:19
  68:19 69:24 72:6
  72:8,14,15,16,17
  72:21,23 73:9,12
  73:14 74:6,25
  75:4,8 77:5 88:11
  88:18,24 97:3,16
  110:21 111:1,17
  115:15 116:17
  119:18 122:4
  127:13 128:9
  130:4,24 133:15
  133:17,22 138:7
  139:7 144:6
  145:14,14 155:5
  157:13 166:5
  167:24 168:9
  169:17,20 194:1
  202:11 218:7,12
  237:5 244:24
  248:21 256:16
  259:1 261:16
  263:16 264:13
  270:14 274:2
**drugs** 9:20 67:24
  73:2 89:3,4,11,12
  110:22 119:16
  121:8 122:12
  128:5 194:10
  248:17,20
**drugstore** 155:16
**drugstores** 132:10
**dsm** 10:20 11:3
  95:10,20,24 96:3,6

**dual** 9:1
**duck** 96:9,10,10
**due** 45:2 90:7
  131:24 136:25
  138:3 144:11
  147:7 153:14
  156:19 162:14
  168:12 169:3
  173:11 199:10
  226:18 227:12
  256:23 270:22
  271:7
**duly** 278:10
**duped** 14:1 22:2,5
  22:11,16,19,23
  23:4 30:6 53:24
  93:5 162:4 177:23
  177:24 178:2,3,11
  178:13,16,19
  179:7
**duplicate** 115:18
**duragesic** 187:11
**duration** 28:19
  138:18 144:7
  145:10 150:3
  219:15
**durations** 256:20
**duties** 128:25
  228:1
**dying** 221:23
**dynamic** 116:1,9

**e**

**e** 2:1,1 4:1
**eagle** 3:18 6:14
  18:15 45:25 187:2
  225:23 226:24
  227:1 264:21,24
  265:1,4,22 266:3
  266:12,18 267:3,5
  267:7,20

**eagle's** 266:25
  267:17
**ear** 253:2
**earlier** 78:1 106:3
  117:3 162:3
  199:25 200:21
  239:5,23 259:10
  259:14 260:15,25
**earliest** 38:23
  163:23
**early** 13:13 15:17
  34:19 39:17 89:18
  90:1,23 91:8
  92:18 98:3 100:5
  122:8 132:19
  162:13 163:1
  173:10 177:16
  256:22
**earning** 67:20
**east** 227:2,9,18
  228:6 240:3,21,23
  241:1 245:15
**eastern** 1:3 5:15
**ed** 6:15 214:6
  248:8
**edges** 177:19
**edited** 242:23
**edition** 241:10
**edt** 1:13 5:2 126:2
**educate** 189:13
  199:18 257:19
**educated** 28:24
  101:24 146:10
  148:7
**educating** 67:11
  106:11
**education** 34:2,22
  57:11 62:6 66:4
  66:14 70:24 80:21
  80:25 81:5,10,16
  81:20,21,23,24

82:2,6,11 129:16
161:22 163:17
172:3,7,9 200:2,15
200:20,23 201:5
205:1,4 259:3,6
262:17 265:24
266:4
educational 34:20
74:18
edward 3:14
effect 35:6 39:5
86:17 199:3
205:18 239:6
247:17
effective 24:20
28:15 37:6,6
45:16 101:25
118:25 119:1
160:13 181:15
260:4,12 262:10
effectively 31:3,11
85:22
effects 14:6 85:16
140:14 146:12
156:20 248:22
efficacy 61:11
70:21 82:14 127:3
177:25 178:16
179:13 183:5
265:11
effort 27:20 63:10
198:19
efforts 179:9
eight 204:3
either 145:7 147:5
159:4,20 193:15
194:14 195:5
218:17 227:21
244:13 266:7,18
elaborate 8:11,12
8:15

electronic 68:15
83:18 99:20
eligible 148:25
elimination
118:19
elite 33:19
email 78:13,16
79:5 80:15 151:12
206:24 207:15
208:3 213:5,6
251:14,20,22,23
279:17
emails 78:10 80:4
80:10 207:12
265:14,18,21,25
266:8
embedded 187:8
emerged 237:3
emergency 104:23
105:7,10,13
emergent 115:24
emerging 118:24
119:3,4,10
emotional 20:4
empathizing 67:11
emphasis 140:12
emphasize 275:3
emphasized 87:10
employ 73:9
258:21 259:1
employed 8:21
71:16 72:14,17
73:1
employee 74:2
203:8
employees 68:6
75:19 114:21
116:22
enable 221:16
enclosed 279:11

encompass 61:19
encounter 271:2
271:11
encountered
193:13
encounters 128:8
263:2
encourage 40:15
46:1,10 74:3
77:18 83:19
encouraged 85:22
147:6 149:8 169:3
encouraging 72:3
75:17 83:21
118:17
endo 85:4 209:15
endorsements
257:18
enduring 121:19
enforcement
127:13 132:9
148:16 150:13
158:7,8 176:25
194:5 226:22
227:3,19 240:12
240:16
engage 35:14,24
193:25 197:20
engaged 258:2
engaging 168:6
256:21
engine 59:8 60:1,9
61:5 62:20
enhance 179:12
enhancing 275:23
enormous 37:10
56:18 57:21 68:21
enroll 133:13
ensure 74:19
entered 54:9 281:9

entire 184:12
280:5 281:5
entirely 200:25
271:1,11,17,19
entirety 230:15,17
264:13
entities 36:13 63:1
63:3,5 68:25
210:15 212:12
255:2 258:24
entitled 4:8,15 8:2
8:3 103:24 104:12
110:11 199:2
263:15 264:13
277:1
entries 231:15
envelope 102:10
environment 69:6
122:9 150:23
169:3 270:23
271:8
environmental
9:25
epidemic 4:9,10
9:16,19 28:7 34:7
56:19 60:14 61:7
63:2,12,15 64:12
65:6,10 66:6 67:3
69:24 88:8,12,13
88:14,18,19,20,23
88:24,25 103:25
104:13,23,25
105:6,15,16,25,25
108:24 109:5
110:5,12,23 111:1
111:2,18,18,22
116:17 118:17
119:18,20 120:21
128:18 133:23
135:15 141:15,24
142:5,10,12,21

165:15,18,20,24
175:6,6 177:17
202:11 216:25
237:6,8 238:13
253:3,8,12,16,19
253:20,22 254:3
254:10,18,21
255:4,23
**epidemiologic**
166:13
**epidemiology** 9:16
**episodes** 274:8
**equally** 155:17
**equity** 108:10
**equivalent** 43:3
168:6 182:23
219:24
**erin** 3:20 6:13
264:20
**errata** 279:13,18
281:7,10,18 282:1
**error** 31:12,16
**errors** 134:11
138:5 155:6
156:15 157:10
**es** 278:10
**especially** 30:12
34:1 45:3 60:21
61:9 89:3,11
99:20 163:5
164:13 165:13
248:22
**essentially** 28:21
29:1 39:16 68:25
69:17 85:19
152:20 270:20
**establish** 37:17
**established** 272:11
274:13
**establishing** 87:6
267:24

**estimate** 17:14
29:21 100:20
113:14 134:22
**et** 124:8,16 174:9
276:3,3
**evaluate** 43:25
151:25 153:2
161:22 177:9
266:22
**evaluated** 128:25
157:21 266:23
**evaluating** 56:2,10
164:22 165:4
166:3
**evening** 264:19
**event** 81:10
151:22 194:4,23
197:19 200:20
244:21 278:19
**eventually** 121:22
**everybody** 168:18
253:19 255:3
**evidence** 27:9
44:21 51:13,15
57:17 61:11,24
83:5 93:5 101:24
114:25 118:24
119:3,4,6,8,11,13
130:19 153:1,2,12
155:14,20 160:19
160:20,21 162:17
162:17 164:3,12
164:14,16 167:5,7
167:8 174:3,19
175:3,8 176:13,19
176:20 178:20
182:13,20 183:3
183:14 184:2,8,9
184:14 185:20
188:14 215:18
216:3 218:18

219:10,14 220:3
220:23 221:1,18
222:16 224:1,12
224:14,20 241:12
241:14,17,19,19
244:3,7,8 247:15
247:16 266:2,6,7
266:16 267:9,18
**evidenced** 165:20
**evolution** 133:11
237:12 238:14
245:6
**exact** 146:18,19
172:5
**exactly** 68:15,17
172:15 197:3
210:18 230:11
245:17
**exam** 83:21
171:21,25
**examination** 1:9
4:3 7:1 126:4
192:16 214:1
252:9 264:17
270:11
**example** 73:24
77:23 92:13 100:7
115:18 117:23
133:9,10 141:6
178:10 196:21
218:24 238:1
240:23 246:5,22
247:4 249:24
266:23 268:14
275:12,17,24
**examples** 11:14
46:16 81:13
147:23 179:3
246:16 247:6
257:3

**exception** 23:3
93:20 153:5
175:21
**excessive** 100:12
**exchange** 78:13,16
187:8 196:19
197:21
**exchanges** 79:5
80:15
**exclusive** 21:14
63:5 183:21
**excuse** 202:23
208:16 243:17
**executed** 281:10
**execution** 280:14
281:19
**executive** 203:12
**executives** 196:17
197:20
**exemplar** 223:11
**exempt** 225:12
**exercise** 32:11,17
32:21 45:2 54:14
54:23 55:4,9,14,16
56:20 57:7,20
98:20,24 145:21
146:19 147:4,22
150:25 151:25
152:8 168:12
169:7 170:1 174:5
178:20 226:12
250:1,6,10 256:13
**exercised** 45:16
148:4 149:11
150:23
**exercises** 146:14
147:10 150:19
151:4
**exercising** 32:18
54:19 55:22 147:7
147:14 152:3,13

152:21,25 153:8
256:2
**exhibit** 4:8,10,11
4:12,15 102:6
103:13,23 104:6
109:14,16,20
110:9,10 160:1,3,6
230:20 231:2,5,8
231:10,16 232:17
232:21 263:12,15
272:23 273:5,6
**exhibits** 4:7,14
214:24 234:20
**exist** 67:6 70:1
169:24 193:11
**existed** 30:17
152:18 221:9
253:4,13 254:22
**existence** 119:7
**exodus** 116:17
**expect** 123:3
**expected** 54:14,23
**experience** 20:5
20:19,22 36:11,12
47:22 51:2 66:4
66:14 79:25 80:2
82:5 101:8 106:21
112:3 122:25
161:22 164:2
193:20 249:17
262:17 271:17
**experienced** 156:9
**experiences** 129:8
**experiencing** 91:1
**expert** 128:1,3,13
128:14,21 141:13
186:2,5,11 210:8
223:25 227:7
230:24 235:17,22
255:21,25 262:21

**expertise** 9:14,16
9:17,19,20,23 10:1
12:11 128:4,6,9,17
129:25 192:22
**experts** 18:1
**expiration** 280:19
281:25 282:25
**expired** 247:4
**explain** 34:18
94:19 113:20
115:12 121:15
201:25 202:16
223:3
**explained** 76:5
222:8
**explanation** 31:25
219:19
**explanations**
90:14
**explicit** 140:12
**explicitly** 141:10
**explore** 153:14
**exposed** 45:4,5
76:9 164:18
**exposure** 57:11
127:4
**express** 66:12
135:2
**expressed** 14:19
18:25 19:10
179:17 208:20
**expressing** 44:8
**extended** 216:21
**extensively** 66:5
**extent** 39:18,25
63:22 71:21 89:2
89:10 97:19
154:15 162:18
167:16 173:10
189:24 220:10
235:21 237:7

238:23
**extremely** 151:21

**f**

**face** 76:17,17,18
76:18 77:3,3,4,4
243:9
**facing** 74:18 183:9
**fact** 30:9 38:4 50:2
53:24 64:20 74:11
75:16 81:9 98:1
119:6 124:1
130:15 134:6
141:8 146:6
152:12,24 154:2
154:20 155:9,22
162:16 169:19
171:16 175:25
178:9 183:15
184:4,16,22 185:1
200:19 201:3
260:11 268:8
**factor** 28:6,11
69:10 112:19
113:1,6,11 114:12
115:6 122:3,11,11
127:4 138:7 140:3
140:4 154:13
202:13 253:15
**factories** 67:8 70:3
70:5
**factors** 9:24 97:11
112:8,10,12 113:8
120:21,22 154:14
165:8,9,21,22
194:2 254:15
**facts** 32:18,19
235:8,11,16
244:13
**factual** 74:9 75:15
**fail** 108:19

**failed** 39:23 108:3
244:4 248:18
249:8 260:4
**failing** 40:3 179:17
179:19
**failure** 92:2
107:23 157:7
266:25
**fair** 10:8 48:4,5
93:10 200:24
221:3 235:8 250:3
**faith** 63:10 82:18
83:1 151:18
**fall** 96:3
**falls** 265:9
**false** 28:13 37:2
56:17 65:13,13
72:8,11 75:4,22
81:2 82:14 107:15
212:10 259:5
264:4,9 276:25
**faltering** 4:9
103:25 105:17
109:6
**familiar** 54:10
103:15 109:20
110:21 267:23
271:21
**familiarity** 227:11
**family** 42:24 43:16
43:19 44:1,8,14
45:6 64:25 65:5
165:14
**far** 72:5 97:13,20
98:10 100:7
106:10 134:5
139:14 191:5
203:14 207:8
244:15 258:25
263:5

**faster** 67:10
**fatal** 156:19 218:7
**fault** 28:21
**faulting** 188:1
**favor** 89:20
**favoring** 114:10
**fda** 62:10,23 63:4
**fear** 84:12
**fearful** 37:11
**feasible** 260:22,25
**february** 110:8
  119:5
**federal** 49:24
**federation** 34:23
  36:4 37:9,13,14
  58:22 62:9,22
  63:3 71:1 84:3,6,8
**fedex** 102:15,17
**feel** 8:4 52:10
  156:6 157:17
  224:5
**fellowship** 9:2
**felt** 40:25 138:5
  178:24 179:4
**fentanyl** 105:1
**ferret** 96:25
**fibromyalgia**
  14:19 271:14
**fide** 24:23
**field** 62:5,5,7
  121:20 272:2
**fifth** 36:23 86:13
  86:16
**fight** 105:15
  133:15
**figure** 31:11 218:6
**figured** 102:25
**filed** 5:14 234:9
  235:7
**fill** 134:7,10 148:4
  151:14,17 153:12

153:17,21,23
156:10,23 175:13
181:17 208:19
255:13 274:6
**filled** 78:6 137:7
  138:12 148:20
  150:4 175:25
  241:15 246:17
  247:13 268:17,22
  275:18
**filling** 143:22
  144:15 152:4,14
  177:2 247:3
  259:17
**filter** 115:3
**financial** 175:16
  278:19
**financially** 5:20
  175:13
**find** 40:21 45:12
  136:23 215:5
  279:11
**finding** 164:11
  258:17
**findings** 155:9
**fine** 8:13 58:5
  102:13 103:7
  170:13 258:14
  277:8
**finish** 157:4
**firm** 5:17,19
  102:22
**first** 18:24 19:9
  24:15 25:2,6
  27:13 56:14 59:7
  59:14,25,25 66:13
  88:12,19,24 89:17
  100:14 105:25
  108:3,19,20
  110:20 111:1,18
  162:24 163:7

219:1,6 229:19,24
230:7 245:8,12
268:9 273:19,24
**fishman** 37:15
**fits** 8:3
**five** 113:18 195:9
  209:12 210:25
  211:3 277:17
**fix** 117:11
**fixes** 112:18
**flag** 135:9 146:6
  179:2 227:12
  243:3 245:10,14
  249:9
**flags** 9:23 97:4,15
  98:8 130:5,8
  131:3,4,8,20,25
  132:12 134:12
  135:8 136:8
  145:14,16,23,24
  148:18 153:15
  167:25 168:4,5
  169:4,19,22,23
  179:16,19,21,24
  180:11,17 181:18
  226:18 232:7
  242:5,6,6 246:8
  248:15 256:24
  261:12 268:6,9
**floodgates** 85:20
**flooding** 91:18
**floor** 2:4,12,23
  3:21
**florida** 176:23
  177:3 203:19
  206:13,16 246:16
**flow** 173:1,3 177:6
  179:12 183:2
**focus** 13:6,11 46:7
  230:2,11

**focused** 13:9 18:20
  83:9 114:10,18
  225:19,21
**focuses** 110:1
**focusing** 230:8
**fold** 204:3
**folks** 33:11 192:3
  208:4
**follow** 36:20 90:17
  127:10 143:7,15
  143:22 163:12
  244:4 269:25
**followed** 84:14
  108:12 144:15
**following** 99:7,16
  151:17
**follows** 6:23 275:1
  275:21
**footnote** 195:24
  240:6
**footnotes** 155:7
**force** 69:18 70:23
  71:5,7,12,13,15,19
  71:22,24 74:23,24
  75:7,13 76:3,7
  77:1
**forced** 34:8
**forces** 119:19
**forcing** 114:7
**forecast** 123:4
**foregoing** 278:14
  280:13 281:18
**foremost** 88:12,19
  88:24 105:25
  111:1,18
**foreseeable** 119:18
**forged** 241:9,16
  242:9,16
**form** 18:9 19:4,18
  25:11 26:25 31:14
  32:15 43:5,21

| | | | |
|---|---|---|---|
| 44:3 47:9 48:1 | 230:5 233:6,13 | **friday** 5:1 213:13 | **future** 119:19 |
| 49:9 50:10 54:4 | 234:3,5 235:9 | **front** 149:6 203:22 | **g** |
| 54:17 55:12,23 | 236:7,15 237:18 | 212:24 213:7 | **gary** 109:23 |
| 56:4,13,25 57:9 | 239:19 241:22 | 235:23 | **gateway** 98:18 |
| 58:17 61:17 62:15 | 242:11 243:17,18 | **froze** 58:25 60:23 | **gather** 191:15 |
| 62:24 64:7 65:15 | 244:6 250:4 251:4 | 71:9 84:19 86:7 | **gears** 195:12 |
| 66:8 72:1 73:3,16 | 254:4,11,24 256:4 | **frozen** 78:22 | 209:7 215:8 |
| 74:13 75:10 78:19 | 259:24 262:1,12 | **fsmb** 84:7,10,23 | 236:25 247:20 |
| 79:20 80:12 82:21 | 262:22 264:6 | **fueled** 28:7 | **general** 98:14 |
| 83:4 86:25 88:4 | 272:12 | **fulfill** 134:12 | 123:22 202:9 |
| 92:4 93:13,25 | **formal** 7:9 71:24 | **full** 13:25 17:8 | 204:11 222:21 |
| 95:15 96:7,21 | 95:23 | 59:8,14,25 63:9 | **generally** 11:17,22 |
| 98:22 99:9 101:11 | **formally** 14:15 | 89:17 100:14 | 80:17 99:17 |
| 101:21 111:7 | 82:4 104:22 | 230:23 235:8,11 | 105:21 106:17 |
| 113:7 120:19 | **forming** 190:24 | 235:16 273:24 | 133:2,3 148:11 |
| 122:24 123:21 | 231:13 251:24 | 278:14 | 166:24 194:7 |
| 128:15 129:20 | **formulated** 218:22 | **fully** 245:6 | 201:20 217:5,22 |
| 135:13 136:1,14 | **forthcoming** 195:1 | **function** 10:2,5 | **generation** 32:24 |
| 137:14 141:9 | **forums** 93:16 | **functioned** 71:22 | 247:21 |
| 142:15 143:9,17 | **forward** 279:15 | 72:10 | **gentleman** 109:23 |
| 143:24 144:2,17 | **forwarded** 207:15 | **functioning** 193:2 | **geographic** 216:24 |
| 145:1 147:12 | **found** 45:13 | **fund** 105:10,13,14 | **geography** 195:6 |
| 150:21 151:6 | 148:15 156:14,22 | **fundamental** | **geriatric** 41:16 |
| 152:6,15 153:9 | 164:14 177:1 | 156:15 191:16 | **getting** 26:5 28:25 |
| 154:5,17 155:12 | **foundation** 74:16 | **fundamentally** | 37:11 78:1 107:25 |
| 155:25 158:5 | 149:18 | 193:23 | 109:1 114:12 |
| 162:11 163:2 | **founded** 109:23 | **funded** 74:17 | 121:7 144:6 |
| 164:7,24 167:3,14 | **four** 18:19 222:6 | 115:4 | 173:16 177:19 |
| 168:25 169:11 | 233:21 241:1 | **funding** 87:18,21 | 181:5 271:2,12 |
| 171:23 174:2 | **fourfold** 122:6 | 105:8 | **giant** 3:18 6:14 |
| 177:12 183:18 | **fourth** 121:14 | **funds** 60:4 | 18:15 45:25 187:2 |
| 184:7,18 185:14 | 273:23 | **funnel** 173:15 | 225:23 226:24 |
| 185:22 186:7 | **fraction** 220:17 | **further** 14:20 74:7 | 227:1 264:21,23 |
| 188:5 190:3,15 | **frame** 26:3 202:9 | 84:10 122:2 | 265:1,4,22 266:3 |
| 198:4,8,21 200:5 | 221:23,23 | 207:15 223:3 | 266:12,17,25 |
| 205:16 206:1 | **francisco** 2:5 | 231:22,23 243:4 | 267:3,5,7,17,20 |
| 211:21 215:12 | **frankly** 75:21 | 244:22 270:3 | **gibson** 3:20 6:12 |
| 216:5,10 218:20 | **free** 280:14 281:20 | **furthermore** | 6:13 264:18 |
| 221:5 222:18 | **frequent** 133:14 | 28:23 174:8 | **giselson's** 102:18 |
| 223:20 224:3 | **frequently** 270:22 | 180:22 182:15 | **gisleson** 2:22 4:3,5 |
| 228:4,17 229:4,13 | 271:7 | 275:15 | 5:25,25 6:17 7:2 |

8:6 12:23 15:23
15:24 16:19,20
18:4,11 19:7,21
21:3 22:7 23:12
24:5,12 25:13,22
26:7,14,21 27:5,18
28:3 29:17 30:1
31:17 32:22 33:17
34:4 35:12,17,19
36:9 42:11 43:6
43:22 44:6 45:23
47:12 48:3 49:14
50:14,24 51:7,14
52:1,12,16 53:6,10
54:1,12,21 55:7,18
55:24 56:7,22
57:3 58:1,5,12,20
58:25 59:12,20,22
59:23 61:1,2,18
62:17,18 63:7
64:10 65:3,17
66:11 67:1 72:2
72:22 73:4,19
74:21 75:14 78:20
79:10,24 80:19
82:24 83:10 87:5
88:9 92:5 93:21
94:2 95:19 96:11
97:17 99:5,11
101:18 102:3,12
102:23 103:7,14
109:17 111:13,15
113:10 118:3,11
120:14 124:5,18
124:22 125:3
126:5 128:19
130:1 135:16
136:5,17 137:19
138:15,21,24
142:22 143:12,19
144:3,22 145:3

147:1 148:1
150:17 151:2,8
152:9,22 153:16
154:8,18 155:19
156:2,4 157:11,20
158:10 159:1,23
160:4 161:5,13,20
162:7,22 163:11
164:20 165:2
166:1 167:11,18
169:9,14 170:13
170:19 172:2
173:22 174:13
176:10 177:5,22
184:1,13,20,22,23
185:2,8,18 186:1
186:10 188:8
190:10,19 192:2,9
200:1,13 237:12
270:4,9,12,15
272:15,20 273:7
273:18 276:11,13
276:21,25 277:12
**give** 7:11 9:3 11:14
46:16,19 66:17
108:22 136:23
137:22 138:9
148:14 209:18
217:8 241:11
257:8 259:8
266:20 273:23
**given** 38:5 48:19
55:5 99:20 126:23
127:2,8 128:8,20
130:3 131:14
132:5 134:9
150:24 168:1
185:17 211:18
219:16 229:19
264:10 277:15
278:8,16

**giving** 65:13
**go** 5:10 25:3 29:5
40:23 42:21 46:20
59:7,18 60:8 65:8
65:24 69:8 70:16
88:22 91:5 94:11
95:3 100:13,21
102:4 103:5
105:20 107:25
109:9,13 118:3,4
119:21 125:1
140:17 147:23
158:13 159:24
172:23 179:8
191:14 200:10
212:20 213:15
214:16 219:17
227:16,20 257:10
263:6 270:4,7,9
272:15 273:23
**goal** 118:19
123:15
**goals** 187:24
**goes** 7:25 8:14
144:24 189:5
202:3 265:25
**going** 40:18 57:24
58:7 59:17 71:25
75:20 92:25 98:5
103:8 105:16,20
109:9 111:6,10
118:7 125:4
153:13 161:2
170:5,10,14 180:6
192:5,7,12 195:1
197:20 208:1
209:5,7 213:18,20
219:18 249:11
250:6 257:9,11
263:7 270:7
272:17 273:2

274:17
**good** 6:12 7:3
30:21 31:22 32:3
32:8,18 44:20
45:2 55:15,17
63:10 82:18 83:1
96:23 145:25
146:6 147:3,8,14
148:4 151:18
168:13 170:2
214:3 215:17
216:8 235:19
264:19 270:19,20
**google** 199:5
**gotten** 108:5
**gradual** 162:12
**graduated** 15:4,10
**grams** 218:8
**grandparent**
122:7
**grant** 3:21
**granted** 105:7
**great** 48:6,12 49:6
49:17 54:19 59:22
96:9 121:19
200:12
**greater** 99:23
122:13 141:2
196:5
**greatest** 122:3,11
**greatly** 133:17
**grounds** 161:4
**group** 12:11 85:6
85:9 88:6 192:25
193:1,10
**groups** 71:1
123:12
**growing** 90:7,21
122:9
**guess** 72:15 238:9

**guidance** 226:11
245:9,13
**guide** 149:19
188:22
**guideline** 266:13
**guidelines** 27:10
34:24 37:17 68:23
68:23 87:7 114:24
237:10
**guiding** 167:10
**guilty** 70:14
**guise** 81:19

**h**

**h** 3:15
**habits** 78:7 180:25
**habitual** 157:3
**half** 124:20
**hand** 115:9,9
189:2 249:11
273:24 278:21
**handled** 232:6
**handwriting**
242:17
**handy** 58:16
**hang** 59:18
**hanly** 2:11 6:7
**happen** 39:25
56:16 193:8
**happened** 207:19
256:9
**happening** 151:23
158:21,21 165:16
165:17,22,23
216:14
**happens** 98:15
**happy** 16:17 46:16
46:16 147:23
153:2 207:24
223:2 252:1
**harbingers** 96:2

**hard** 14:2 50:12
94:7 194:25 253:5
253:11,16 264:8
**harm** 50:4 94:14
**harmed** 40:7
**harmful** 119:7
**harming** 13:21
67:5 69:25
**harms** 27:25
160:23 162:16
167:8 169:6
**hbo** 64:21
**heading** 60:9 61:5
76:3 265:10
270:18
**heads** 248:9
**heal** 116:5
**healing** 11:17
**health** 9:25 48:7
48:13 50:4 67:9
67:16 70:4 104:23
105:10,13 108:9
117:1 165:17
271:22 274:15
**healthcare** 4:9
32:17 34:10 67:7
68:13 70:3,5,7
73:21 86:4,9,24
87:17 92:3 104:1
104:13 105:17,18
107:19 109:6,7,11
114:6,21,22
116:19,22 123:23
172:6 182:7
**healthy** 106:11
**hear** 7:12 59:16,20
59:21 61:1 76:23
**heard** 7:20 72:23
**heart** 86:14
**heavily** 38:6 45:14
68:7

**heimann** 2:3 6:5
**held** 105:21
106:17 128:1,13
128:18
**help** 61:12 101:13
101:14 102:12
201:25
**helpful** 147:24
223:3 259:23
260:8,11 261:7,24
**helps** 76:24 119:25
120:6
**heroin** 105:1
192:21 193:1,3,7
193:14,14,16,18
193:20,25 194:8,9
195:5,7,8
**hey** 248:8
**hi** 264:19
**high** 28:18 44:17
46:25 47:6,11,13
48:8 49:12 50:8
50:18 94:17
139:11 164:13,15
165:20 193:2
196:11 245:21
246:8 248:20
256:20 262:4,4
**higher** 43:13
139:14 180:18
217:24 218:11
219:15 221:10
222:24
**highest** 156:23
**highly** 20:13 174:8
235:6
**highway** 176:24
**hinge** 112:23
113:4,21
**hipaa** 96:16
115:20 268:18

**hire** 72:6
**hired** 16:4 77:14
77:16
**history** 13:16
145:12 165:10
**hold** 8:23 59:5
**holding** 58:24
**home** 213:15,15
**hooked** 14:1
121:22
**hopefully** 145:11
**hospice** 90:11
**hospital** 116:24
**hospitals** 36:19
86:5,9 87:2,2,7,22
87:23 106:21
**hour** 124:20
134:10 204:2,7
**hours** 124:24
134:21,23
**hubbard** 3:10
**huge** 251:6 253:25
**huh** 137:25 266:21
**hullabaloo** 104:21
**human** 67:15
**humphries** 124:16
**hundred** 73:22
224:10
**hunter** 2:7,10 54:9

**i**

**i.e.** 119:1
**idea** 36:23
**ideas** 182:13
**identifiable** 20:20
**identification** 4:7
4:14 103:13
109:14 160:1
263:12 273:6
**identified** 47:2
49:12,16 142:25
242:5 275:20

**identifies** 49:20
50:16 97:19
112:17 136:19
**identify** 36:14
42:1 45:24 46:8
49:15,19 50:7
74:25 75:8 81:13
95:13 96:13
132:14 134:15
138:18 141:21
142:11 144:5
152:2,10 158:2,8
158:11,16,23
172:17 179:22
180:9 185:9,19
187:3 188:9
190:23 216:8,17
221:14,16 225:14
231:7,18 242:5
246:22 259:9
261:1 275:25
**identifying** 32:12
131:8 179:21
180:16 189:9
245:10,13
**ignore** 98:8
**ignored** 34:2
60:22 61:10
**ignoring** 179:16
**ii** 84:7
**il** 3:11
**illegal** 181:1
193:25 194:1
**illegitimate** 83:7
220:12,16
**illness** 116:6 122:8
**illnesses** 90:10
124:11,14
**immediate** 105:7
**impact** 14:17 48:7
48:13 50:3 105:16

232:25 251:6
**impacted** 98:24
247:22
**impacts** 14:14
**implement** 181:7
**implemented**
204:25 260:15,19
**implicating**
202:12
**implies** 94:21
**imply** 186:14
204:6
**implying** 186:8
222:24
**importance** 140:2
**important** 13:7
55:2 65:9 88:15
96:23 112:17
121:12 146:9
166:6 168:18
178:1 224:19
269:7 275:3
**importantly**
120:20 137:1
275:19
**impossible** 39:16
47:14 55:3,15
57:20 115:8
228:21
**impression** 249:20
**improper** 235:6
**improperly**
241:16
**improve** 63:11
108:24
**improved** 67:16
**improving** 123:5
261:17
**inability** 208:13
**inadequate** 134:11

**inadvertently**
68:18 118:16
120:17
**inappropriate** 8:5
**incentive** 149:5
175:16 176:1
251:10
**incentives** 28:1
98:7 106:6 150:25
168:11 179:19
**incentivize** 114:15
**incentivized** 76:7
76:11 107:10,13
107:14,16,18
173:13 174:8
175:13 182:16
250:8 267:3
**incentivizing**
148:15
**include** 9:12 41:7
46:6 47:16,18
92:13 95:17 136:4
142:10 189:1
191:19 196:11
210:12 211:24
212:1 222:20
224:15 226:23
233:20 240:10
**included** 22:12
37:18 69:16 85:1
104:25 105:5
142:7 149:3 204:1
209:25 210:17
211:9,18 217:10
229:22 232:16,20
233:24 279:13
**includes** 20:10
30:8 42:6 63:18
76:12 188:22
205:23 209:9
230:20

**including** 9:22
21:14,15 34:21
36:12,24 37:1
63:3 68:9 70:11
75:4 86:5 98:16
108:25 121:16
129:7 134:1
149:20 152:19
164:15 168:9
175:7 179:4,10,16
188:15 189:12
204:9,10,25
225:12 231:11
246:18,21 254:15
256:22 257:18
272:7 274:10
275:12
**income** 112:24
113:5,22 114:3
136:25 137:1,2
**inconsistent** 37:19
**incorporate**
132:23
**incorporated**
281:12
**increase** 47:17
76:8 90:15,18
91:7,13 100:9
122:8 149:9 178:6
183:11 201:21,22
202:1 204:2,8
219:11,19,25
220:6,8 248:20,23
**increased** 28:6,11
39:10 91:22 127:3
201:19,24 219:21
222:7 237:2
248:21 253:7
**increases** 91:14,23
122:6

**increasing** 76:8
149:6 189:11
**increasingly**
107:17
**independent**
210:24 236:21
253:18
**index** 215:4
**indicate** 98:13
240:10 276:2
**indicated** 107:3
166:19 237:11
**indicates** 218:15
**indicating** 266:3
279:13
**indication** 144:7
**indications** 102:2
**indifferent** 83:6
**indirectly** 93:9
**individual** 20:16
20:19,22 47:25
56:11 97:12 122:6
122:13 145:12
146:4 147:19
152:1,2,11 158:8
160:14 165:16
168:22 177:9
178:18 179:6
206:4 239:22
251:19 252:2
**individual's** 20:8
20:14
**individuals** 14:23
40:2,6 78:12,15,21
78:23 79:1,4,12,17
88:6 89:25 93:8
93:18,20 113:25
121:15 182:9
189:24 190:12
221:25 247:3
255:2

**industry** 22:3,5,11
22:17,20 45:14,17
61:22 63:13,17
64:15 69:9,17
70:18,22 74:18
76:6,16 77:2 90:4
99:3 121:7 141:18
142:9 162:5,15,19
179:14 254:16,17
**infer** 180:20
221:24
**inferred** 221:20
**influence** 28:1
37:10 45:15 62:5
162:14 254:17
258:18
**influenced** 38:6
250:7 254:15
**influences** 62:7
**influential** 182:9
251:9
**inform** 151:12
**information** 7:24
8:14 17:24 32:19
33:20 34:14 55:5
74:20 98:1 145:20
146:21 147:4,15
148:7 150:24
164:4,21 165:3
166:8,17 168:21
169:2,15 171:21
174:6 176:5
180:21,23 191:15
191:15 193:11
198:14 201:2
222:20 239:21
249:13 251:24
272:7 274:9 275:8
275:11
**informed** 51:24
53:25 164:2 170:8

**infusion** 105:15
**inhumane** 94:10
95:2
**initially** 50:1
**initiate** 265:22
276:1
**initiated** 194:20
**initiating** 199:11
**initiative** 198:23
198:24 199:1
**injecting** 106:9
**injuries** 11:24
**injury** 11:24 20:23
**innocent** 13:21
**inquire** 255:7
**inside** 38:4,24 68:8
69:21 106:6 136:3
207:15
**instance** 201:3
255:16 256:8,12
**instances** 51:23
81:1 96:15 178:8
181:20 183:22
195:2 220:16
269:12,20
**instigated** 9:18
**instigating** 69:9
**institution** 68:8
**institutions** 38:16
68:7 69:5,13,15,16
69:20 70:11
116:19
**instruct** 18:3
111:10 138:13,21
248:18
**instructing** 38:19
277:5
**instruction** 138:20
**instrumental**
36:23

**insurance** 107:25
108:13,16 270:22
271:7
**intake** 143:2,5,13
143:22 144:23
**integrated** 70:7
114:22 116:19
**intend** 204:13
212:24
**intended** 67:7 70:2
274:5
**intention** 231:7
**intentional** 249:1
**intentioned** 248:2
**intentions** 55:15
**interact** 252:24
**interacted** 252:14
252:18,21,22
265:1
**interacting** 243:13
269:3
**interaction** 275:25
**interactions** 78:24
79:22 80:11
145:15 157:9
253:1 263:1
**interest** 12:21
38:12 278:19
**interested** 5:21
**interests** 38:8
**interject** 102:8
**intermediaries**
72:11
**internal** 42:24
43:16,19 44:1,9,14
45:7 78:10 79:2,5
79:17 80:3,10,14
80:15 174:20
205:23,24 206:6
206:11 230:3
265:14

**internet** 139:10
**internships** 171:7
**interpersonal** 116:1,8
**interpose** 8:4 161:3
**interpret** 8:2
**interrupt** 54:8
**interrupted** 210:7
**interrupting** 120:12 146:23,25 157:2,3
**intervention** 188:17
**interview** 110:18 141:9,11
**interviewed** 129:6
**interviews** 22:13
**interwoven** 115:25
**intimidated** 178:24
**intimidating** 151:21
**intractable** 85:13 85:17
**introduces** 194:1
**invalid** 246:10
**invalidated** 235:25 236:3
**inventory** 204:2,8
**invested** 182:21 199:15
**investigate** 134:11 145:24 179:19 195:4 242:7 243:4 249:10 256:24
**investigated** 169:5 179:1 207:20 208:8 242:6 262:14

**investigating** 146:5 240:21
**investigation** 79:11 145:25 156:12 172:8 226:18 227:12 240:25 261:13
**investigators** 156:21
**invited** 205:2
**invoices** 230:13
**involve** 16:1 74:2 74:22 106:9
**involved** 78:16 84:4 200:22
**involvement** 141:18
**involves** 153:23
**irrespective** 228:24
**isolated** 151:22
**isolation** 147:18 165:12 233:16 255:1
**issue** 4:12 47:7 56:9 65:18 85:23 130:2 160:7 181:8 181:16
**issued** 14:9 16:9 16:12 47:21 50:16 64:5 92:21 137:12 148:21 155:23 160:13 165:5 185:10 191:6 245:12 246:7
**issues** 66:6 110:1 148:15 184:11
**issuing** 47:14,24 49:7,18 50:19 51:5 52:4,6,18,24 54:23 55:10

128:24 246:9,24 255:21
**italics** 246:1
**item** 70:17 84:7 275:12
**iterations** 211:6
**iterative** 56:15 237:20 238:5 261:11

**j**

**j** 2:7 3:9
**jama** 140:10
**janssen** 187:11 209:15
**jcaho** 258:25
**job** 131:2,18 203:14
**joel** 38:2
**john** 2:22 3:15 5:25 103:5
**john.gisleson** 2:25
**joint** 34:23 36:3,18 36:20,22 38:17 39:21 58:21 62:10 62:22 63:4 68:22 71:2 86:2,4,8,12 86:16,20,23 87:1,3 87:6,9,18,23 114:24
**jones** 3:14 6:15
**jonesday.com** 3:17
**journal** 103:16 104:12 140:8 155:5
**judge** 228:2
**judgment** 32:12 32:17,18,21 45:2 54:15,20,23 55:4,9 55:14,16,22 56:21 57:8,21 98:20,24

117:1 145:21 146:15,17,20 147:5,8,10,14,22 148:4 149:12 150:19,22 151:1,4 152:4,8,13,21,25 153:8 168:13 169:7 170:2 174:5 178:21 250:2,6,11
**judy** 1:25 5:18 278:3,24
**july** 266:13
**jump** 222:10
**june** 279:4
**jury** 212:25 213:7 233:9 235:23 236:5,12 250:17 251:1
**jury's** 236:6
**justice** 233:22

**k**

**k** 2:22
**kadian** 186:25
**kaspar** 3:9
**kaspar.stoffelma...** 3:12
**kasper** 6:10 192:10,18
**kcrawford** 2:19
**keep** 58:3 168:8 192:12
**kept** 90:9
**key** 61:21,25 69:9 70:23 77:10,13,16 77:24 81:14 97:15 187:23 212:9 258:16
**kind** 10:13 68:15 68:17 74:19 92:17 98:2 116:25 119:24 120:6

123:25 148:7
175:22 180:1,6
194:3,23 204:11
243:9 259:20
272:1
**kinds** 31:21 80:24
176:18
**kit** 188:18,20,21
188:25
**knew** 64:2 80:17
82:13 178:19
246:5
**know** 7:6,7,8,13
7:16 14:13,25
16:14 17:4,13
18:10 26:22 35:20
51:8 54:9,11
59:18 68:14,15
72:5 78:15,21,23
79:1,4 82:4,17,25
96:9,18 104:2
113:13,17,19
114:14,20 115:9
115:16 118:1
120:20 130:15
131:5 149:21,25
150:3 152:8,23
159:7,10,13,16,19
161:14 167:16
169:23 170:23
171:6,11,16 172:5
172:15 176:22
186:14 188:17
191:5 193:2
195:11 197:11,24
198:2,22 203:2,7
203:14 204:9,18
207:8 212:8
213:13 219:9
227:24 232:20,24
240:24 241:3

242:8 244:15
245:11,16,22
246:2,13,19 248:5
250:20 251:3,19
251:21 255:12,15
255:20 258:13,20
258:25 263:24
269:24 273:16
277:1
**knowingly** 148:20
172:18
**knowledge** 123:1
123:23 130:18
249:17,23 251:8
256:1,9
**known** 97:14
132:20 170:6
193:10 239:12,23
239:24 248:20,23
274:1
**kyle** 2:17 6:8
248:11 252:8,11

**l**

**laboratories** 85:1
**laboratory** 166:18
166:23
**lack** 101:10
123:23
**lacked** 101:21
**ladd** 3:3 102:4,5
102:20 109:15
159:23 160:2
273:4
**lake** 22:22 23:2
30:3,8 46:6 47:3
71:7,13,20 149:13
149:23 150:1
152:11,19,24
153:4,7,18 154:10
155:2,10,18,21
156:25 158:17,21

158:24 159:4,8,11
159:20 174:17
175:7,8,18,20,23
176:7,12,14,22
177:7 178:14
183:13,14,20,24
184:2,14 185:10
185:12,20 186:21
187:4 188:10,15
189:24 190:11,17
215:9,13,18,19,24
216:7,13 217:2,4
217:13,16,17
218:5,17 219:2,7
219:19,24 220:11
220:13,21 221:16
222:17 223:12,12
224:2,13 225:3,8
225:11 228:1
239:17 241:12,15
242:25 244:4,14
246:14,20 247:12
256:25 257:4
**language** 10:20
24:11 167:4
242:19
**large** 11:1 67:6
68:6 70:1,7 99:3
102:15 114:22
116:22 166:14
178:22 201:22
221:25 222:2
244:23
**largely** 74:17
**larger** 29:7 110:24
151:15 267:4
**largest** 102:19
156:22 196:5
**lasting** 11:16
**lastly** 271:21

**late** 21:25 23:25
34:19 48:15 51:22
90:3 99:19 218:14
219:12,24 220:19
221:22 222:6,20
222:24 238:15
254:13
**launch** 188:21
**laundered** 72:10
**law** 85:12 115:23
143:14 194:4
259:20
**laws** 115:8,20
169:17
**lawsuit** 19:12
84:14 157:21
186:3,6 234:9
235:7
**lawsuits** 211:17
**lawyers** 16:5 17:3
17:5,11 104:19
135:1 212:23
**lay** 131:22 140:24
238:17,24
**lchb.com** 2:6
**lead** 103:1 176:6
**leader** 77:25 81:15
**leaders** 61:21,25
62:4 70:23 77:10
77:13,16 258:16
**leadership** 37:22
60:22 61:10 148:9
178:4
**leading** 178:9
**leads** 98:9
**learn** 98:25 198:19
199:8
**leave** 84:1
**led** 80:14 85:25
88:2,7 196:18
198:23,24 199:1

199:13 253:6,7
**left** 115:9 120:21
  120:22 121:12
  157:19 192:7
  248:9 269:23
  270:5 273:24
**legacy** 94:8 223:1
**legal** 36:8 143:18
  161:3,18 279:1
  282:1
**legged** 9:5
**legislature** 85:22
**legitimacy** 60:3
**legitimate** 29:11
  29:16 30:4 47:8
  47:15,21 49:8,18
  49:22 50:9,19
  51:1,3,8,12,17,23
  52:5,19,23 53:3,5
  53:16,17,23,25
  54:2 55:20 64:6
  82:19 83:2,7,7
  92:21,22,25 93:4
  134:13 137:12,16
  144:8 146:1
  148:22 154:4
  155:23 156:11
  157:24 158:15
  160:14,17,24
  161:7,15,24
  162:10 163:1,14
  164:6,23 166:25
  167:21 172:19
  173:7,8 175:14
  176:1 177:11
  188:11 218:18
  219:10,13 220:3,9
  220:23 221:1,11
  221:19 222:1,8,16
  223:2,6,10 224:2
  224:12,14 244:11

**lembke** 1:10 4:2
  4:11 5:12 6:21 8:7
  16:13,21 21:4
  22:9 35:21 40:19
  53:11 58:13,21
  59:13,24 61:4
  62:19 78:9 102:14
  103:15 109:16,19
  109:20 110:6
  111:7,16 120:15
  124:22 126:6
  151:9 159:24
  160:3,6 197:15,24
  200:17 213:6,12
  214:3 237:15
  239:2 252:11
  257:22 258:5
  263:14 264:19
  267:23 270:13
  273:5 277:3,16
  279:8 280:4,9
  281:4,13 282:20
**length** 194:11,13
**lessening** 117:19
  118:14
**letter** 178:23
  188:22 279:19
**letting** 188:17
**level** 172:1,13
  223:25 224:12
  225:16 228:2
  256:10
**levels** 117:17
  121:5 155:4
  222:24 224:18
**leveraged** 172:24
**lewis** 2:22 3:3 6:1
  102:21
**liberal** 28:5 90:2
  254:2,9

**liberally** 35:3
  39:14 40:15 89:21
**license** 23:21
**licensed** 133:4
  135:18,24 170:21
  246:23
**licenses** 247:4
**licensing** 171:21
  171:25
**lieff** 2:3 6:4
**lies** 60:20 61:9
  62:8
**life** 21:11 89:5,13
  90:10 94:12 95:4
  124:3
**lifestyle** 106:11
**light** 45:3 167:10
**liked** 232:5
**likewise** 37:10
  196:9
**limitation** 269:5
**limitations** 267:24
  268:12,24 269:2
**limited** 31:2
  206:16 207:24
  250:2,11
**limiting** 49:25
**limits** 50:3
**line** 24:15 25:2,6
  27:13 67:9 68:20
  70:4 114:10,19
  117:9 163:7 178:7
  219:1 279:13
  281:7 282:3
**linings** 34:6
**linked** 50:13 67:18
**list** 42:6 120:20
  131:3 209:9 210:9
  210:25 211:19
  212:15 230:22

**listed** 120:22
  219:3 232:16
  281:7,17
**listing** 281:7
**lists** 230:23 257:23
**literal** 173:15
**literature** 34:21
  57:16 115:2,4
  132:7,23,24
  160:21 163:20
  164:9,9 168:8
  189:12,13 190:5
  231:12 238:16,23
  257:18,19,23
  262:14,18
**litigated** 236:11
**litigation** 1:5 5:14
  17:24 18:25 19:9
  104:19 186:12
  251:20 264:22
  279:6 280:3 281:3
**little** 16:16 33:3,22
  76:20 89:24
  105:16 115:2
**littmann** 265:23
  266:4
**lived** 84:12
**lives** 63:11 155:5
**living** 8:18 90:6,21
  113:25
**llc** 210:16
**llp** 2:16,22 3:3,8
  3:19 263:21
**loaded** 13:4
**lobbying** 179:15
**local** 277:18
**localized** 216:22
**locate** 199:21
**located** 189:14
  203:18 207:2,9
  208:24 246:14

257:19
**location** 215:23
  218:3
**locations** 216:8,9
**locus** 12:1
**logistics** 214:10
**logo** 197:4,18
**long** 24:22 28:19
  30:25 42:6 44:17
  44:21 93:11,19,23
  94:5,17 101:16
  105:4 113:11
  118:25 119:25
  120:7 123:15
  131:3 164:14
  193:21 194:22
  252:22 256:20
**longer** 11:5 37:6
  42:7 49:17 50:9
  50:19 119:14
  164:10 210:19
  219:15
**look** 20:15,17
  30:11 37:24 40:17
  42:3,18 43:11,14
  46:14 47:23,24
  49:11 60:12 70:17
  76:2,25 84:5 95:8
  100:21 103:22
  104:7 121:14
  124:13 131:2
  133:25 140:9
  167:25 179:24
  180:11 195:4,6
  198:12 201:9
  203:5 206:21
  207:5 212:5 217:8
  217:23 218:25
  222:11 228:6
  235:19 241:19
  255:1

**looked** 127:25
  132:7,8,9,11 148:6
  148:13,18,24
  164:12 171:24
  197:4 220:6
  226:22 230:13
  232:5 235:10,13
**looking** 29:3 42:5
  110:9 164:9 190:6
  202:25 216:2
  220:20 225:9
  231:5 235:8,15,16
  242:17,18,20,21
  273:13,16
**looks** 145:5,10,11
  145:14,15 263:23
**lori** 3:24 5:17 54:7
**lost** 61:13 68:21
  205:6
**lot** 87:2 114:14
  193:10,11 249:20
**lots** 65:8 69:8
  97:25 184:9
  207:24
**loud** 66:19,23,25
  200:9,11
**low** 29:1 65:14,19
**lower** 94:18,20
  139:18
**lowest** 157:7
**lunch** 124:19

**m**

**m** 2:18 3:14
**m.d.** 1:10 4:2 6:21
  13:23,25 41:23
  58:16 139:8
  270:14 279:8
  280:4,9 281:4,13
  282:20
**madam** 279:10

**madison** 2:12
**mailed** 188:20
**mailing** 265:22
**main** 91:17 157:7
  227:2,9,18 228:6
  232:9 240:3,21,23
  241:1 245:15
**maintained**
  136:18
**major** 28:6,11
  127:4 131:1 140:4
  202:12 244:24
  253:6,15,24
**majority** 22:15,18
  29:15,18,24 30:2
  52:17 53:14 68:5
  93:7,22 114:20
  116:20,21 135:4
**makers** 63:14
  64:16
**making** 7:3 65:13
  68:14 86:16 107:5
  146:9 147:16
  272:8 274:10
**maladaptive**
  122:10
**mallinckrodt**
  210:1,4,10,12,17
  210:19,24 211:2,9
**mallinckrodt's**
  211:13,14
**managed** 270:23
  271:8 277:19
**management**
  81:20 139:23
  251:10
**manager** 173:14
**managers** 151:13
  151:20 178:25
**managing** 249:19
  249:21

**mandated** 98:1
  268:5
**mandates** 133:20
**mandating** 133:12
**mandatory** 168:2
**manifest** 195:25
**manifestation**
  97:8
**manifested** 20:6
**mantra** 167:6
**manual** 233:5,11
  241:6
**manuals** 232:17
**manufacture**
  187:12
**manufacturer**
  73:2 75:1,9
  140:18 210:15
**manufacturer's**
  73:14 74:11 188:3
**manufacturers**
  18:20 37:15 45:18
  45:21 60:13,17
  61:6 64:17 71:16
  75:3 77:14,19
  81:2,4 82:5 83:24
  85:8 148:9 174:25
  178:5 182:5,12
  183:7 186:17
  187:22 189:9
  200:14 212:12
  229:23 253:13,15
  253:23 258:3,23
**manufacturing**
  187:20
**marcus** 3:19,23
  6:13
**margin** 215:3
**marilyn** 133:11
**mark** 272:23

| | | | |
|---|---|---|---|
| **marked** 4:7,14<br>102:6 103:13,22<br>104:6 109:14,15<br>109:20 110:10<br>160:1,2,5 263:12<br>273:4,6<br>**market** 77:6<br>186:18 253:4,13<br>**marketed** 258:22<br>**marketing** 9:17<br>69:19 80:18 87:21<br>186:20 187:3,6,20<br>253:14<br>**marking** 263:14<br>**mass** 116:17<br>**massage** 106:14<br>**material** 36:24<br>37:1 87:12,22,22<br>187:9 191:3,13<br>199:14 211:7<br>234:5<br>**materials** 188:24<br>190:22,23 214:19<br>230:21,22,23<br>265:24 266:4<br>271:25 272:1<br>**math** 269:24<br>**matt** 102:4 272:22<br>**matter** 27:23,24<br>55:3 165:12<br>278:18<br>**matthew** 3:3<br>102:20<br>**matthew.ladd** 3:6<br>**maze** 108:2,7<br>**mcarter** 3:17<br>**mcconnell** 3:15<br>**mckesson** 18:22<br>187:2,20,21<br>188:16 | **mclellan** 124:8<br>**md** 1:6 5:16<br>**mdl** 1:5 5:16 16:23<br>191:23,25 229:18<br>229:22<br>**mean** 12:25 14:16<br>20:11 21:12 24:7<br>24:13,14 25:2,7<br>26:19 27:17 28:12<br>28:13 31:15 43:10<br>45:18,20,21 49:1<br>56:6 68:3,5 72:21<br>91:16 92:6 94:19<br>108:7,15 122:22<br>126:7 136:9,15<br>143:10 146:16<br>147:9 152:7<br>160:20 169:15<br>173:3,5 187:18<br>191:5 204:6 212:8<br>227:5 229:22<br>236:8 237:25<br>240:19 252:17<br>262:13<br>**meaning** 161:8<br>**means** 12:9,10<br>17:4 94:20 115:12<br>142:24 147:14<br>167:1<br>**meant** 43:11<br>113:20 114:17<br>264:3<br>**measure** 20:7<br>**measured** 138:4<br>202:19 203:4<br>**measurements**<br>138:6<br>**measures** 27:10<br>36:19 37:1 68:22<br>86:20 114:24<br>116:24 261:8,10 | **med** 15:19<br>**media** 5:11 277:16<br>277:17<br>**mediated** 123:13<br>**medicaid** 36:21<br>100:16,22,24<br>101:2,4,5,9<br>**medical** 8:24<br>11:12 15:7,13,16<br>15:25,25 24:7<br>25:15,25 26:22<br>27:19 29:11,16<br>30:4 31:18,20<br>33:2,3,6,10,11,15<br>33:18,19 34:2,8,13<br>34:21,23 35:9,13<br>35:20,23 36:4,12<br>37:9,13,14,20 38:3<br>38:11,24 39:4,9,12<br>39:13,20 40:5<br>41:6,25 42:8,14<br>47:1,8,15,21 48:21<br>49:8,18,23 50:9,19<br>51:1,3,4,5,8,17<br>52:3,5,19,23 53:16<br>53:17,23 54:2,15<br>54:19 55:10,21<br>56:11 57:11,16<br>58:14,23 59:8<br>61:16 62:3,6,10,22<br>63:4 64:6 68:15<br>68:24 70:23,24,25<br>71:2 80:20,24<br>81:5,10,15,21,23<br>81:24 82:2,6,10,20<br>83:3,19 84:4,6,8<br>84:11,13 86:9<br>89:5,13,19 91:13<br>91:16 92:21,23<br>93:1 95:17 99:20<br>100:11 103:16,20 | **med** 106:7 107:23<br>112:22 113:3,20<br>114:9,18 115:2,3,7<br>118:20 121:2<br>132:7,23 134:14<br>137:12,16 140:8<br>144:7 146:2<br>148:22 154:4<br>155:23 156:11<br>157:25 158:15<br>160:14,18,24<br>161:7,16,24<br>162:10 163:1,14<br>163:19,22 164:6,8<br>164:23 166:7,25<br>166:25 167:21<br>168:8 172:3,9,19<br>173:7 175:14<br>176:1 177:11<br>183:8 188:11<br>194:10 200:2,15<br>200:20,23 201:5<br>205:1,4 220:23<br>221:1,11 222:1,8<br>222:16 223:2<br>231:12 237:1<br>238:16,23 239:6<br>244:11 248:21<br>258:18 262:14,17<br>274:5<br>**medicare** 36:22<br>42:4 140:9,11,12<br>**medication** 19:11<br>21:16,18 43:24<br>46:2 56:3,10<br>68:17 87:8 92:2<br>92:12 93:11 94:20<br>94:24 101:6,10,21<br>106:13 127:11<br>129:2,12,19,24<br>138:11 139:2 |

143:7,16,23
144:16 145:22
146:4,7,7,8,11,16
147:11 150:20
151:5,14 152:5,14
154:3,22 156:10
160:22 161:1,15
161:23 162:9,25
164:6 165:5 166:4
168:24 172:19
174:1,17 175:14
185:11 188:3,11
190:1
**medications** 14:7
15:20 16:1 19:1
19:17 21:14,15,24
22:19,24 23:6,9,15
23:17,22 24:8
25:10,17 26:1,10
26:17,24 27:8,13
27:21 28:12 29:8
29:12 33:21 34:1
34:15,18 35:15
36:6,13 38:19
39:5,7,14 40:11,16
41:1,7,21 42:2,9
42:14 43:4,20
44:2,10 45:9
46:11 51:9,18
54:16,24 55:11,20
64:4,17 65:14,20
66:16 69:1,3,15
72:4 73:10 74:4
74:12 75:18 82:3
82:7,15,19 83:2,13
84:5 85:18,24
86:18 88:3 90:25
93:23 94:5 97:24
100:16 101:20
106:15 107:10
111:3,20 112:1

126:17,22 127:1
135:19,25 136:19
137:6 139:6
140:17 153:24
154:11 155:23
156:16 157:5,23
158:4,18 164:22
167:2,21 171:19
178:17 209:3
218:19 220:13
225:18 228:15
237:16 269:11
**medicine** 8:22,25
9:1,2,6,12,13 24:2
26:9 27:9 28:5
31:10 32:2,8 36:2
37:21 38:18 39:21
40:10,14 42:24,24
43:16,16,19,19
44:1,1,8,9,14,14
44:20 45:7,7
48:14 57:19 60:1
60:3 62:11,19,21
63:6 68:1,4 69:21
106:6,10 115:1
116:13,16 117:12
117:18 118:13
119:23 120:5,24
121:2 127:22
129:7,25 136:4
149:9 165:23
167:5,5 212:12
246:24
**meds** 78:6
**meet** 11:3 36:25
87:23
**meeting** 199:12
**meetings** 78:18
**melville** 2:9
**member** 38:3

**memorandum**
204:24
**memory** 196:16
**mendell** 109:24
**mental** 108:9
122:8 271:22
274:15
**mention** 63:2
141:25 266:11
**mentioned** 34:17
50:25 69:21 86:2
142:19 195:13,17
197:10 201:10
203:8 206:19,23
234:8 259:10,14
267:17
**mentoring** 9:7
**merely** 235:15
**message** 60:4
74:11
**messages** 9:18
27:24 28:14 33:15
37:2,18 45:3
56:17 57:12,18
65:13,13,18,22,23
70:22 72:9 75:5
75:22 81:3 87:10
87:13 90:5 107:15
164:17 174:21
183:22 186:23
209:10,13 211:20
212:10,15
**messaging** 61:23
70:20 72:12
219:25
**met** 214:6 264:20
**method** 235:17
**methodology**
231:19
**methods** 21:13,15
72:7 114:14

**metrics** 138:4
**michigan** 207:3
**mid** 221:22 238:14
**middle** 58:25
62:14 71:9 78:4
80:5 83:14 84:19
86:7 246:1,4
**midst** 165:18
202:11 237:5
**midwest** 279:17
282:1
**migrate** 176:23
**mill** 39:11 46:25
47:3 168:6 182:24
**milligram** 43:3
**million** 196:3
**millions** 94:7
105:8,13
**mind** 117:23
195:10 211:13,15
211:16
**mine** 256:17
**minimal** 28:19
**minimum** 177:19
**minor** 22:1 93:2
163:7
**minute** 170:11
**minutes** 44:16
45:8 57:24 58:4
124:20 134:5,9
153:12 170:10
213:18 248:9
269:23 270:1,7
**miracle** 175:8
**mis** 163:17
**misconception**
99:23
**misconduct**
240:11
**misguided** 99:2
101:15

**misinformation**
75:24 179:13
183:4 265:10
**mislead** 22:25
53:4 276:23
**misleading** 9:17
28:13 37:2 45:3
56:17 57:12 65:21
65:23 70:20,22
72:9,11 75:5,22
81:3 82:10 87:10
107:15 150:11
164:17 183:22
204:14 209:10,13
209:19,20 210:1,9
210:13 211:2,13
211:14,19 212:6
212:10,15
**misled** 24:19
28:15 276:24
**misrepresented**
121:11
**misrepresenting**
121:2
**missing** 157:8
**mission** 116:4,5
**misspoke** 227:1
**misstate** 200:8
**misstates** 50:22
53:2 65:16 163:3
173:20 176:16
177:13 185:24
200:6 233:14
250:21
**misunderstood**
199:16
**misuse** 9:21 34:14
91:22 92:1,6,7,9
92:10,17,22 93:7
97:15 98:18 128:4
129:8 130:6,8,25

131:8,11,21
145:17 146:1
165:19 167:25
168:15 169:19,22
173:6,19,24 174:7
174:16 177:21
179:16 180:5
194:9,12,14 269:8
273:25 275:6
276:3,6
**misused** 144:13
**misusing** 13:14
93:8 192:25 195:8
**mme** 43:3 202:19
203:5
**mmes** 163:8 262:4
**modeled** 122:10
**moderation**
121:21
**modern** 31:10,10
32:2,7 107:19
**molecule** 193:22
**moment** 17:22
37:25 40:17 66:17
104:7 132:6
136:23 137:22
148:14 149:15,24
151:10 180:12
217:8 227:1
237:21 241:11
257:8 259:8
266:20 270:8
277:15
**moments** 257:10
**money** 17:10
105:15,20 109:8
**monitor** 34:14
**monitoring** 9:22
97:3 115:15
128:10 130:5
166:5 167:24

169:17,20 256:16
259:11,14,23
260:8,10 261:6
**monitors** 262:4
**monthly** 114:1
**months** 11:18
164:11
**morgan** 2:22 3:3
6:1 102:21
**morganlewis.com**
2:25 3:6
**morning** 6:12 7:3
92:14
**morphine** 43:3
**mortality** 237:2,17
238:19 239:1
**mortar** 139:14,17
**motives** 83:9
**move** 40:19 49:2
55:8 58:4,19
69:11 72:13 75:6
75:25 83:11 86:21
88:10,17 98:12
114:16 121:13
178:12 179:5
180:8 181:22
189:7,15 258:10
258:14
**multibillion** 121:6
**multimodal** 21:8
21:12
**multiple** 7:7 19:24
21:13 22:13 34:20
63:2 68:13,13
81:18 100:4 128:8
129:6 130:3
133:24 142:8
151:23 156:1
158:6 235:19
256:18 274:6,7,7
275:25

**muscle** 248:17
**mute** 76:24
**mutual** 116:2
**mutually** 175:2
178:6
**mystery** 121:19
**myth** 123:6,20
**myths** 37:7 148:10
162:19 183:10

**n**

**n** 2:1 4:1
**naloxone** 261:17
**name** 5:17,25 38:2
158:9,24 172:21
192:18 210:18,20
214:6 252:11
253:21 264:20
279:6 280:4,15
281:4,21
**named** 109:23
182:18 203:8
206:24 215:22
225:13,20 255:24
**names** 142:17
149:21 171:11
210:15
**napoli** 2:7
**napolilaw.com**
2:10
**narcopharma**
38:6
**narcotic** 204:2
**narratives** 112:17
**nation** 152:19
179:4 226:4,9,15
226:21 227:11
**nation's** 156:22
**national** 1:4 5:13
23:1 24:1 25:8
30:7 46:4 105:7
132:10 138:1

152:17 153:3
175:4,17 183:20
184:10,10 201:18
215:14 216:17
217:5,11,25 218:2
218:11 222:21
225:10,16,22
243:15,20,21,22
265:5 279:6 280:3
281:3
**nationally** 53:14
130:14,20,22
140:13 154:25
155:15 158:21
202:16 215:17
216:14 217:17
242:8,14
**nationwide** 195:5
**natural** 57:24
48:20 121:23
131:18
**nature** 47:19
**nay** 211:8
**naysayers** 105:5
**nearly** 55:3 157:8
**necessarily** 67:15
114:7 141:19
**necessary** 8:15
20:15 95:20 96:5
174:6
**need** 8:11 47:24
49:1 55:17 87:2
87:14 108:15
109:3 115:23
120:9 165:14,15
168:7,8,10 170:7
192:13 194:8
197:11 198:6
224:17
**needed** 100:8

**needn't** 29:1
**needs** 56:12
145:20
**negate** 252:3
**negligent** 177:2
**neighbor** 268:15
**neighborhood**
121:24
**neither** 11:8 174:5
**nerves** 11:24
**neuro** 12:2
**neuropathic** 12:2
**never** 63:23 72:23
93:11 98:1 121:21
171:24 261:1
265:1
**new** 2:13 3:5
16:24 114:9,18
189:11 191:15
244:18
**newer** 110:23
**nibble** 177:19
**nice** 178:10
**nickname** 121:6
**night** 92:14,15
230:22
**non** 12:17 41:23
89:5,13 100:24
101:4,6,10,21
106:12,13 139:17
139:19 180:19
182:13 194:10
215:25 225:5,7
226:9 227:10,25
228:6 274:5
**nonresponsive**
55:8 69:11 72:13
75:6 76:1 83:11
88:10,17 98:12
121:13 178:12
179:5 180:8

181:22 189:7,17
**noon** 92:15
**normal** 144:9
**northern** 1:2 5:15
**notarized** 279:14
**notary** 279:25
280:10,18 281:15
281:23 282:23
**notation** 243:9
**note** 120:20 240:6
279:12
**notes** 136:9 206:21
215:2 232:6
241:24 242:3
**notice** 240:21
244:22
**noticing** 5:24
**november** 204:23
278:22
**nucynta** 187:11
**nudges** 83:18
**nuisance** 48:8,25
50:3
**number** 11:1,8
22:10 29:8,20
43:11,13,14 47:23
49:15 54:20 76:9
90:6,20 99:7,15,22
100:2,8,11 112:9
131:17 133:8
134:21 137:9
138:11 155:3
156:7 217:14
219:9 221:2,17,21
222:3,8 230:10
266:22 267:4
277:16 279:7,13
**numbers** 137:23
139:13,14 172:6
217:16 231:4
281:7

**numeral** 84:7
**nurse** 23:7,19
41:24
**nurture** 121:24
**nuts** 140:19
**nw** 2:18
**ny** 2:9,13 3:5

**o**

**o** 97:23
**o0o** 126:3
**oarrs** 97:20,23
98:1,10 268:2,2,4
268:6,13,15,20,25
**oath** 251:23
**oaths** 278:5
**object** 8:1 17:21
18:9 19:4,18
25:11 26:25 31:14
32:15 38:17 43:5
43:21 44:3 47:9
48:1 49:9 50:10
54:4,17 55:12,23
56:4,13,25 57:9
58:17,17 61:17
62:13,15,24 64:7
65:15 66:7 72:1
73:3,16 74:13
75:10 78:19 79:20
80:12 82:21 83:4
86:25 88:4 92:4
93:13,25 95:15
96:7,21 99:9
101:11,22 102:11
111:6 113:7
128:15 129:20
135:13 136:1,14
137:14 138:13
142:15 143:9,17
143:24 144:1,17
145:1 147:12
150:21 151:6

[object - opinion]

152:6,15 153:9
154:5,17 155:12
155:25 161:2
162:11 163:2
164:7,24 167:3,14
168:25 169:11
171:23 174:2
177:12 184:7
185:14,22 186:7
188:5 190:3,15
198:4,8,21 200:5
205:16 206:1
211:21 215:12
216:10 218:20
221:5 222:18
224:3 228:4,17
229:4,13 233:6,13
234:3 235:9 236:7
236:15 239:19
241:22 242:11
243:17,18 244:6
250:4 251:4 254:4
254:11,24 256:4
259:24 262:1,12
262:22 264:6
272:12
**objectifying**  67:21
**objection**  12:22
15:22 16:11 21:2
22:6 23:11,23
24:9 25:18 26:2
26:11,18 27:15,22
29:13,22 33:13,24
35:11,16 36:7
42:10 45:19 50:21
51:6,10,19 52:8
53:1,19 54:25
65:2 66:7 72:18
79:7 83:11 98:22
120:11 123:21
150:11 157:14

158:5,19 161:4,10
161:17,25 165:6
173:20 176:3,16
183:18 184:18
213:9 223:20
236:1 237:18
250:13,21
**objections**  5:22
8:4
**objectively**  20:7
**obligated**  145:24
**obtain**  97:14
183:16 184:4,16
193:24
**obtained**  91:19
183:17 184:6,17
**obtaining**  274:4
**obviously**  23:6
186:14 255:25
**occasion**  264:23
**occupy**  9:5
**occur**  173:25
174:16 256:25
**occurred**  23:25
25:24 27:11,20
54:13 56:2,9,15
109:11 120:10
154:16 163:9
186:20 187:3,6,9
197:19 237:13,20
254:19
**occurring**  33:9
91:18 154:25
155:1 247:17
278:16
**october**  4:8 103:24
104:15 212:21
240:8,16
**offer**  197:16
**offered**  251:19

**offering**  260:21
**office**  255:7
**offices**  71:25 72:7
75:20 76:7 77:7
**official**  95:20
245:9 250:3,12
280:15 281:21
**officially**  16:13
**oh**  3:16 60:23
264:2
**ohio**  1:2 5:15
22:23 30:3 40:10
40:11,14,15,24
46:1,6 70:11
73:13,15 74:11,12
75:17 81:23 82:3
84:16 85:13,13,16
85:22 95:12
130:10,13,19
143:7,14,22
144:15 149:20,20
159:2 169:16
172:4,9 176:24
177:3 183:24
188:14 206:13
207:9 217:13
218:5,9 227:2
240:22 243:25
246:18 263:4
266:24 267:1
279:2
**ohio's**  267:24
**okay**  43:7 59:22
73:6 102:20 104:5
104:10 110:14
118:6 124:18
151:10 192:6,12
192:14,15 202:3
214:3,9 229:24
230:20 238:11
244:16 246:3

248:10 267:22
268:19 273:12,21
274:17,23
**old**  265:17,18
266:8
**omission**  248:18
249:1
**once**  25:23 26:16
27:11,19 48:22
54:13 56:8 63:24
116:14 145:19
194:21
**oncology**  41:10
**ones**  36:1 66:13
77:10,13 83:25
**ongoing**  94:13
191:12
**online**  266:19
267:12
**ooo**  5:3
**op**  112:10
**open**  102:10 103:4
204:17
**opened**  85:19
204:19
**operated**  225:4
**operating**  176:7
**operation**  139:5
**operational**
275:16
**operations**  232:17
233:5,11 241:6
**opiate**  1:5 5:13
279:6 280:3 281:3
**opining**  260:3
**opinion**  18:7 54:6
61:21,25 70:23
77:10,13,16,24
81:14 89:19
120:19 121:11
122:19 135:2

[opinion - opioids]

156:3 161:11
163:5 172:21
176:6 177:14
182:3 184:21,25
185:21 191:17
215:16,22 216:1,2
216:5,12,13
219:11 223:25
228:25 230:5
231:13 234:5
236:17 239:11
251:25 258:16
260:3,14,18,21
265:8 276:22
**opinions** 18:25
19:10,16 122:24
190:21,24 215:13
235:6
**opioid** 4:9 9:16,19
10:16 11:3,8,9
14:7 15:20 16:1
17:12,24 18:24
19:1,9,11,12,17
21:18,20,24 22:2,5
22:11,16,19,20,23
23:6,9,14,17,21,25
24:2,8,17,25 25:17
26:1,10,17,23 27:7
27:13,21 28:5,7,12
28:23 29:8 33:21
34:7,15,18 35:2,6
35:15 36:6,13
37:5,15,16,17,18
38:19 39:5,7,14
40:11,15,25 41:7
41:21 42:1,9,14
43:4,20,24 44:2,10
45:9,13,17 46:2,10
46:23 47:7,20,23
48:12,18,18 49:5
49:21,25 50:18

51:5,9,18 52:6,20
53:14,22 54:16,24
55:10,19 56:3,10
56:20 60:2,13,14
61:6,7,22,23 62:20
63:2,12,14,25 64:4
64:12,16,17 65:6
65:10,14,20 66:6
66:15 69:2,8,14,16
70:18,19 71:16
72:3 73:10 74:4
74:12,18 75:1,3,9
75:18 76:6 77:14
77:19 81:1,19
82:3,7,14,19 83:2
83:13 84:5,15,24
85:18,23 86:17
87:8,14 88:2,8
89:19 90:4,18,25
91:6 92:2,11,19
93:10,23 94:5,8,12
94:24,25 95:4,10
95:13,18,21,23
96:2,3,6,13,13,18
96:19 97:8,21,24
98:13,18 101:20
103:25 104:13,19
104:22,25 105:6
105:16,25 106:12
107:3,10 108:23
109:5 111:2,19,22
112:9 115:5
118:17 120:21
126:17,22 127:1
127:11 128:18
129:1,8,12,19,23
130:6 132:18
133:22 135:9,14
135:19,24 136:19
137:6 138:11,18
139:2,6 140:4,10

140:17,22 141:14
141:18,23 142:5,9
142:12,21 143:7
143:16,23 144:16
146:15 148:5,9,10
150:19 151:4,17
152:5,14 154:3,11
154:22 155:22
156:10 157:22
158:4,17 161:1,15
161:23 162:4,9,15
162:18,25 163:13
164:6,22 165:5,13
165:15,18,24
166:4 167:1,13,20
168:23 171:19
172:19,25 173:2,3
173:15,19,25
174:17 175:6,6,13
175:25 177:7,17
178:5,17 179:10
179:11,12,14,14
182:22 183:2,6,16
184:4,16 185:11
186:17,24 187:16
188:3,10 189:8,25
190:1,13 193:24
194:7,12,14,18,19
194:21 195:2,8
201:19 202:15
209:2 210:14
212:11 216:18,24
217:11 218:4,12
218:13,19 219:12
219:13 220:10,12
222:22 224:1,19
225:17 230:1
237:16 238:13
253:3,7,12,14,16
253:19,20,22,23
254:3,10,16,17,18

254:21 255:4,23
257:17 258:3,23
261:7,9 269:11
271:13
**opioids** 10:10 11:2
11:5,6 12:6,17,21
13:7,10,12,15,20
21:9 22:1 24:4,15
24:19,20 25:3,6,9
27:25 28:15,22,25
29:5,12 30:5,22
35:3 37:3,4 41:23
42:5,22,25 43:9,10
44:17,21 45:15
48:8,15 51:12,21
57:8,13,17,22
69:22 70:21 76:9
77:19 80:18 83:8
85:21 87:10,13
88:14,15 89:20
90:2 91:10,14,19
91:22 93:2,4,8,19
94:9,13 95:6
99:18 100:5,15
101:15,17,25
102:2 110:22
111:23 118:18,25
119:7,14,22 120:4
121:16 127:3,5
130:9 132:20
140:4 147:23
148:17 158:14
162:16,20,21
163:6,7,24 164:10
164:13 173:7
174:7,19 176:21
177:25 178:6,22
178:25 181:25
182:14,24 183:10
183:12 186:19
187:7 190:6,8,14

194:9 202:12
216:20 218:8
220:14 221:24
222:1,17 226:2
237:1 238:18,25
248:16 253:4,13
253:14 254:13,23
257:7,25 258:6,22
259:7 262:5
265:11 269:15
**opportunities**
173:9
**opportunity** 12:13
138:16 173:6
188:23 230:4
258:8,12
**opposed** 17:25
**opposite** 173:12
**oral** 1:9 110:18
141:8
**order** 8:11 55:2
95:23 96:25 97:13
114:3 164:5 170:7
170:21 183:9
227:4,5,6 240:7
275:5
**organization**
35:21 36:19 74:17
86:8 109:21
207:16
**organizations**
35:10,13,23 38:8
38:12 39:4,20
51:4 58:14 86:5
86:10 87:25 88:6
179:15
**organized** 120:24
121:2 249:21
**original** 191:25
229:22

**originated** 61:12
**orthopedic** 41:14
**osa** 4:11
**outcome** 5:21
**outcomes** 30:12
123:12 124:9
166:15
**outflow** 173:13
**outlier** 216:17
**outliers** 190:18
215:19 216:14
**outlined** 131:10
**outs** 108:2,8
**outside** 130:4,6
176:14 228:6
244:10 249:6
261:19
**outweigh** 160:23
167:9 169:6
219:15
**overall** 149:7
218:6 267:19
**overbroad** 26:11
27:15,22 29:13
99:10 144:18
145:2 157:15
165:6
**overburdens** 45:1
**overcome** 56:19
**overdispensing**
88:21
**overdistribution**
88:21
**overdose** 48:18
98:19 140:5
164:15 218:4,13
218:13 237:2
238:19 239:1
248:24
**overdoses** 100:25

**overlapping** 95:9
129:16 274:4
**overly** 208:22
**overnight** 56:16
**overprescribe**
118:18 254:22
**overprescribed**
67:13
**overprescribing**
23:4 46:24 63:12
67:10 68:19 88:2
88:13,19,21,23,25
98:13,14 106:1,6
111:2,19 112:4,13
112:20 114:12
115:7 119:16,22
120:3 163:8
180:17
**overprescriptions**
113:1,6,12
**override** 151:13
**overrides** 167:6
**oversaw** 73:22
**overstatement**
54:6
**overstates** 163:4
**overstating** 57:2
220:4
**oversupply** 88:14
91:17 216:20
**overwhelmed**
56:20 57:7
**owned** 64:25
116:18,21
**oxford** 2:23 3:21
**oxycontin** 63:14
64:16 136:25
137:9 196:1,10
201:11 202:6,23
203:1 204:24
208:19 244:23

**p**

**p** 2:1,1
**p.m.** 58:9,9 118:8
118:8 125:6 126:2
170:16,16 213:22
213:22 277:23
**pa** 2:24 3:22
**pace** 94:22
**packages** 102:17
**page** 4:3,7,15 7:8
42:21 59:6,7,13,24
60:8,9,13 61:5
63:8,9,23 65:24,25
70:16 73:17,20
74:14 76:2 77:9
77:22 78:4 81:7
81:16 83:16 84:2
84:6 85:12 86:3
88:22 89:16,17
91:5 100:13,14
106:5 110:20
112:7 117:15
119:15 121:14
123:2 132:17,25
132:25 133:1,10
133:10 134:2
136:24 137:8,25
151:11 155:3
156:12 172:23
179:8 180:13
181:9 182:4
187:19 188:15
189:5,5,6,8 196:22
200:17 201:9
202:18 203:20,23
217:10 218:6,15
219:1,4 222:11
223:18 227:8,14
231:5 238:7 240:7
241:4 244:16,17
245:24,25 246:2

248:7 251:13
252:13 257:16
258:7 260:1
263:15 265:8,13
266:10,11 267:16
270:14,17 273:24
275:22 279:13,15
281:7 282:3
**pages** 209:18,21
209:23 264:10
**paid** 17:8 18:6
37:23 61:22 106:7
107:11,22 108:24
109:1
**pain** 9:14,15 10:10
10:22 11:5,7,10,11
11:15,16,16,19,20
11:23,25 12:2
13:3 16:2 19:23
19:25 20:1,2,4,8
20:10,13,14,19,22
21:1,6,16,24 22:1
23:15 24:16,18,24
25:4,7,10,17 26:1
26:10,17 27:8,14
27:21 28:16,17,20
29:12 30:5,9,11,12
30:13,20,20 31:1,4
31:5,9,11,19,23
32:3,9,10,14 33:2
33:4,7,12,15 34:25
35:1,4,4 36:2,3,23
37:1,3,5,21,21
38:13,20 39:4,15
39:23 40:4,16
41:1,3,4,21,23
42:2,9,22 43:8,12
43:13,20 44:2,10
44:18,19,22 45:9,9
51:5,18 52:4 54:3
56:3,19 63:11

68:22 69:3 74:16
74:19 78:6 81:20
82:19 83:2 84:10
84:12 85:5,9,13,17
85:18,20,24 86:13
86:16 87:13,16
89:19 90:7,15,21
91:2,10 93:3,12,19
93:24 94:5,8,14,17
98:21 99:16
100:10 101:7,16
102:1 106:13,16
112:18 114:1,2,23
117:19,20 118:14
118:15,18,19
119:1,2,9,25 120:6
149:9,18,19
162:21 163:6,7,15
164:11 173:2,4
177:7 179:12,14
182:14 183:2,5
190:7 254:1,8
258:19,25 271:14
**painkiller** 63:12
111:19 271:13
**painkillers** 60:13
61:6 63:14 64:16
84:15,25 100:23
101:3,9 111:3
**paltry** 105:9
**pamphlet** 74:19
**paper** 214:12,24
215:2
**par** 123:9,12
**paradigm** 23:24
24:1,4,6,13 25:15
25:23 26:16 27:11
27:19 28:4,10
29:7 30:13,18
31:6,13 32:23
39:12 51:2,16,16

54:13 56:2,8,14
58:15 60:2 62:20
69:10 70:19 77:11
84:4 87:11 88:1,7
91:9 163:9 183:10
183:19,20,23
220:18 247:22
253:6 254:14
**paragraph** 59:8
59:14,25 60:12,17
62:21,25 63:10
66:13,18 70:14
76:15,25 89:10,17
91:6 100:14 105:3
105:24 108:23
116:10 117:15
118:1,12 160:18
172:24 203:20
239:11 244:20
246:1,4 273:24
**paragraphs**
117:24
**parallel** 82:9
**parens** 265:24
**parent** 122:7
**parentheses** 77:5
**parenthetical**
240:10
**parity** 108:9
**park** 3:4
**parse** 206:3
**part** 10:2 13:7
20:17 28:14 35:1
42:18 58:18 68:2
75:25 86:21 87:3
91:8 94:16 97:15
98:14 107:15
120:8 129:5,24,24
133:19 148:2
151:15 160:9
175:5 180:2

181:11 187:6
199:23 226:24
247:21 255:3
281:9
**partial** 120:18
**participants** 5:8
**participate** 123:11
188:23
**participated** 78:13
79:2,5 111:8
261:17
**participating**
188:21
**particular** 10:8
16:14 17:25 24:22
28:17 36:20 49:5
49:21 110:23
147:20 167:7
173:25 174:17
237:14
**particularly** 67:12
**parties** 1:20 5:10
**partnered** 187:2
**partnering** 183:6
183:8
**partners** 187:21
258:24
**partnership**
149:14
**parts** 37:7 67:8
70:4 204:12
209:12
**party** 5:20 145:8
235:7 278:18
**pass** 192:5 193:17
194:15 264:16
**passed** 85:13
**passive** 199:14
**pasted** 196:23
197:9

pathways 34:20
patient 20:5,11,12
20:16 24:23,25
29:2 44:16,18
45:8 47:20,25
67:9,14,20 68:12
68:16 70:4 71:1
74:16,18 75:21
83:22 84:15 92:11
92:15,22 94:22,24
94:25 95:3,13
96:18 97:1,9
101:14 107:1
114:11 115:24
116:23 117:2
145:8,9,12 146:3,8
146:10 148:23
164:21,23 165:3,4
165:9,22 166:3,10
166:16 168:4,22
173:8 174:22
181:18 183:9,16
183:17 184:4,5,16
184:17 189:2
255:19 269:10,15
270:25 271:2,10
271:12 275:23
patient's 39:23
40:4 56:11 87:15
92:2 97:7 115:22
116:5 166:6
182:10
patients 9:7,8 10:2
10:12,22 11:1,4,8
13:3,13 14:1
21:22 26:24 28:24
35:3 38:13 40:8
44:24 50:1,2
63:11 67:5,11,22
67:23 68:9 69:20
69:25 72:6,9 89:4

89:12 90:6,21
94:8,17 96:13
100:7,9,16,24
101:4,9,13,20
106:8,11,22,25
108:25 109:1
112:23 113:4,21
114:11 115:13
116:2 124:9,10
149:8 155:5
163:23 165:16
177:2 181:24
182:6 189:10,13
190:7 193:20
228:16 229:3
243:13 246:17
247:24 248:3
255:18 256:17,20
257:19 262:4
267:5 270:20
271:5 276:2
pattern 216:17
patterns 180:18
216:18 276:2
pay 29:1 106:10
108:1 114:8 213:7
258:16,18
paying 97:12
payments 100:17
245:18
pdmp 132:12
133:11,18,20,21
267:24 269:6,6
272:5 274:2,8
275:5,9,24 276:5
277:2
pdmps 133:13
pdt 1:13 5:2 126:2
277:23
peak 217:17 222:6
222:23

peaking 217:25
peer 12:6,9,10,17
34:21 103:18
135:5,10,17,23
140:24 141:13
142:2,4,11
peers 12:11
164:17
pending 273:14
people 13:22
14:18 21:9 31:3
48:21 61:15 62:4
67:23 76:9 90:8,9
95:6 100:22 101:2
101:5 107:18
114:6 117:20
118:15 121:20
123:6,7,20,25
124:1,2,3,7,12,13
152:8 193:12
194:9 195:1
208:12,15,17,25
221:23 269:2
percent 9:6 10:14
10:15,17 91:13,14
91:15,23,24,24
123:7 124:6,17
138:2,5 149:1,2
156:14 157:6,8,10
196:4 201:14
202:1,4 220:22
percentage 10:13
10:16 22:4 94:4
139:11,16,18
180:18 219:9
221:10,17,25
222:3,25 224:10
267:19
perform 174:14
175:11,22 229:16

performance
138:3
performed 32:7
135:1 138:1 228:1
230:15
performing
106:10 157:12
period 91:21
100:18 193:15
194:14 202:22,25
219:20 232:12
239:4 241:1
permitted 23:21
25:25 26:4 172:14
268:2
perpetuated 81:2
person 55:14
144:6 145:7
205:14 207:12
224:17
personal 237:12
256:1
personally 12:21
13:1 280:11
281:15
persons 217:12,15
217:21,21 218:1
219:2 220:1
perspective 9:25
96:17 118:16
223:7
persuasive 151:21
pertain 135:15
pertains 80:23
perverse 106:5
pessimistic 123:25
pharma 36:25
37:23 60:2,4,16,17
61:8 63:9,13,15
64:11,15,25 65:4
65:12,18 80:3

| | | | |
|---|---|---|---|
| 87:12,21 117:16 | 226:19,23,24,25 | 265:2 267:10,20 | 186:22 189:1 |
| 121:4,5 201:2 | 227:21,25 228:6,7 | 268:5,14,20,25 | 205:2 208:13,18 |
| 209:14 263:21 | 228:19,24 229:10 | 269:6 275:14 | 226:11 228:14,19 |
| **pharmaceutical** | 229:23,25 230:2,6 | **pharmacist's** | 228:25 229:11 |
| 22:2,5,11,16,20 | 230:8,11,18 | 97:16 130:22 | 232:6 239:16 |
| 45:13,17 61:22 | 239:21 240:20 | 131:2,18,21 | 241:15 242:4,15 |
| 63:13,17 64:15 | 242:15 245:9,13 | 133:20 139:1 | 243:3,13,16 245:9 |
| 69:9,17 70:18 | 246:19 251:7 | 180:15 250:1 | 246:6 248:19 |
| 73:1 74:17 76:6 | 252:14,19,23,25 | **pharmacists** 19:2 | 249:10,12,16,22 |
| 76:16 77:2,17 | 253:18,25 256:22 | 71:21 72:10 74:5 | 251:3,7 252:15,19 |
| 83:23 90:4 115:5 | 259:16 261:21 | 74:7 75:23 80:25 | 252:23,25 256:13 |
| 121:6 141:18 | 267:5 274:6 | 81:16,18,25 82:11 | 259:3,7 262:15,20 |
| 142:9 162:5,15,19 | 275:18 | 82:13 98:7 126:19 | 262:24 263:2 |
| 187:21 254:16,17 | **pharmacist** 74:10 | 126:21,24,25 | 266:5,18 267:3 |
| **pharmaceuticals** | 77:24 78:4,6 | 127:7,8,9,19,23 | 269:3 274:25 |
| 85:2,4 | 81:14 96:18,24 | 128:7,10,22 129:7 | 275:2,4,7,23,24 |
| **pharmacies** 19:2 | 97:6 126:7 128:25 | 129:10,13,23 | 276:1,5 277:2 |
| 45:22 63:18,21 | 129:1,11,18 | 130:10,13,14 | **pharmacy** 4:16 |
| 64:3,9 75:12 76:8 | 130:24 142:23 | 131:4,5,7,23 132:7 | 6:3 18:8,13,13 |
| 76:12 77:7 80:11 | 143:1,3,6,15,21 | 133:5,13,16 134:1 | 19:11,16,20 45:24 |
| 86:22 128:22 | 144:5,10 145:5,6 | 134:5,8 135:18,24 | 46:7,8 63:24 71:6 |
| 132:9,21 137:10 | 145:10,11,14,15 | 136:4 144:15,25 | 71:11,18,23 72:5 |
| 138:2,2 139:7,9,10 | 145:20,23 146:14 | 147:21 148:3,6,12 | 73:8,13 74:10,15 |
| 139:15,18 141:20 | 147:3,10 150:10 | 148:17,25 149:8 | 75:2,16,19 76:12 |
| 141:22 142:10,20 | 150:18 151:3,11 | 149:12,22,25 | 77:25 82:1,9,17,25 |
| 150:16 151:24 | 152:3,11,23 | 150:15,24 152:21 | 83:6 86:19 88:5 |
| 152:12,19 155:1,2 | 157:12,24 158:2 | 153:6 154:2,10,21 | 97:20 98:2 114:13 |
| 155:17 156:15,21 | 158:23 161:1,9 | 155:6,10 156:8 | 126:6,8,10,12,15 |
| 157:9 168:1,3,7,10 | 167:19,22 168:14 | 158:9,16 159:2,10 | 127:17,20 128:2 |
| 172:24 175:5,17 | 168:20 169:1,21 | 159:16,19 166:9 | 128:14,17 130:11 |
| 176:8,12,20 178:2 | 169:24 170:1,5,20 | 167:23 168:2,3,7 | 130:17,18,20,21 |
| 178:3,9,11 179:3,4 | 170:22,24 171:1,4 | 168:10,12 169:7 | 131:6,13 132:4,8 |
| 179:21,25 180:3 | 172:11 185:12 | 169:17 171:7,12 | 132:16 133:4,9,12 |
| 180:21 181:23 | 188:9 203:15,16 | 171:16,22 172:4 | 134:4,17,20,25 |
| 182:4,6,11,23,24 | 203:25 205:10,13 | 172:17 173:18,23 | 135:2,6,15,21 |
| 183:4 185:12 | 206:24 207:2 | 174:4,15,22 | 136:19,20 137:5 |
| 186:18 187:15,17 | 216:2 226:7 | 175:12,18,23 | 137:21 138:10,12 |
| 192:20 196:2 | 242:24 244:4 | 176:6,8,12 177:8 | 138:17 139:5,23 |
| 208:21,23 215:21 | 249:6 250:18,19 | 177:24 178:14,19 | 140:18 141:15 |
| 215:23 216:4,7 | 250:20 255:20 | 179:7,17,18 181:8 | 142:6,13,18 149:6 |
| 225:3,5,11,12,19 | 256:2 262:25 | 182:6,13,16 | 149:22 150:1,5 |

[pharmacy - policies]  Page 42

152:24 154:2
155:4,16 156:8,22
157:23 158:3
159:7,13,20
168:15 171:2,5,8
171:13,17 172:12
172:14,18 173:5
173:14,18,24
174:10,15,24
175:12,24 177:16
178:4,15,25
179:11,22 180:5,9
182:17,20 183:15
184:3,15 186:19
186:20 187:1,4,5,9
187:13 188:1,9,16
188:18,20,21,24
189:12 191:20
192:4 201:4
211:20,22 212:7,9
212:16 215:8,23
216:1,8,9 225:8,14
225:23 226:3,8,9
226:14,15,20,24
227:2,10,10,15,18
227:19 228:20
229:1 232:17
233:4,11 240:15
240:22,25 241:6
241:23 243:12
244:22 247:2,12
249:3 251:9 255:6
255:12,17 256:21
256:23 257:18
263:16 264:14
265:5,10 266:24
267:2 274:6
**phenomena** 48:20
**phobia** 24:17
56:20

**phobic** 28:23 35:2
37:5 87:14
**phone** 279:3
**photocopied**
242:21
**phrase** 27:6
119:10 160:17
**physical** 20:4,19
20:23 106:13
**physically** 11:2,6
94:9 95:6 178:24
266:18 267:11
**physician** 8:19
23:8,19 116:18,21
148:23 162:24
173:8 239:13
246:16
**physicians** 34:24
37:10,11 56:18
57:20 70:8 77:20
116:13,18 246:21
**pick** 46:20 97:10
149:8 195:6
255:18
**picked** 223:18
**piece** 110:15,17
170:6 185:19
**piled** 105:4
**pill** 39:11 46:25
47:3 92:14,15
121:3 168:6
182:24
**pillars** 130:24
**pills** 67:12 98:4,16
98:21 99:3,7,16,22
100:2,7,8,11 112:9
112:18,23 113:4
113:22 114:10
117:10 119:22
120:4 173:2,4
176:23 177:4,7

179:12,14 183:2,5
270:24 271:1,9,11
**pin** 205:14
**pittsburgh** 2:24
3:22
**pivotal** 63:15
172:25
**place** 3:10 5:9 94:7
131:20 168:11
182:15 251:11
268:10 278:9,16
**placed** 60:15 61:8
**places** 133:9,25
**plaintiff** 2:2
**plaintiffs** 6:5,7
16:4,5 17:2,5,11
40:6 50:6 104:19
135:1 138:9
212:23 262:8
**plan** 204:24 267:4
267:17
**plane** 213:2,8
**plans** 251:10
**play** 36:14 146:9
**played** 36:15,16
63:15 65:9 117:16
121:4 229:25
253:25 255:3
**player** 253:6,24
**please** 5:23,24
6:18 9:11 10:25
53:6,8 58:11 59:7
60:8 65:24 66:20
67:2 70:17 77:9
84:2 88:22 89:16
91:6 99:13 100:13
102:3,4 103:12
109:13 111:13
118:10 119:15
125:3,8 136:23
137:22 147:2

149:15,24 156:5
157:4 159:23,25
170:18 172:23
179:8 180:12
184:24 185:3
192:24 194:13
213:24 227:1
263:11 270:13,17
272:22 277:15
279:11,11
**pleasure** 277:13
**plenty** 119:6
153:11 183:3
**pllc** 2:7
**plus** 106:4 231:10
243:12 248:16,17
253:2
**point** 27:12 32:7
44:7 48:6,11 50:6
57:25 102:23
114:5 122:22
162:2,8 170:12
179:6 202:17
204:19 219:7,24
220:20 221:4
230:2,7 235:14
237:14,23 252:6
275:9
**poisoning** 218:7
218:12
**policies** 131:19
132:11 144:21
148:13 151:18
152:17,18 153:4
155:17 168:11
175:17 184:12
209:2 215:15,15
215:16 216:3
225:6,10,16 226:2
226:7,13,17,19
227:12,21 232:12

233:18 234:2,6,21
249:13 261:12
266:17 267:10
**policy** 84:8 85:5,9
175:4 180:14,23
181:2,6,10,15
250:3,12,18 251:2
251:6,9 260:1
266:13
**polypharmacy**
145:17
**pom** 241:20 244:1
244:4 250:7
**poms** 232:17,20,24
233:3,4,12,15,21
233:24 249:7,24
**poor** 30:19,25 31:5
31:8 148:16
**popular** 244:23
**populated** 99:22
100:1
**population** 67:4,6
69:24 70:2 90:7
91:1 95:7,9,10
193:22 195:5,6
218:9
**portion** 220:25
264:8
**portions** 236:19
**position** 8:23
14:20 44:17 52:2
163:18 164:1
172:25 181:23
182:4
**positions** 14:10
60:21 61:10
**possibility** 258:13
**possible** 45:1
126:23 127:7
168:15 169:23
178:18 179:6

233:10 253:9
255:1 276:3
**post** 215:4,6
**posters** 83:20
**postoperative**
100:10
**postsurgical** 100:7
**potential** 97:8
160:22,23 167:9
168:9 169:6
248:19 257:23
**potentially** 94:11
95:4 156:19
**poverty** 113:25
**power** 67:20 87:15
101:14 177:18
**powerful** 36:18
60:3
**practice** 25:8 26:9
27:7 37:11 41:20
42:8 43:18,25
44:15 47:7 68:7
68:25 114:25
128:2,3,13,21
131:12 132:3,15
133:4,9 134:17,20
134:25 135:6,15
135:18,21,24
152:13 160:16
223:7 228:25
242:24 243:12
257:2
**practiced** 126:6
155:15
**practices** 21:24
35:7 43:24 99:15
116:18,21 128:17
132:24 156:13
180:24 215:10
225:7 226:14
228:3 233:18

**practicing** 162:24
246:23 270:18
**practitioner**
160:15 274:3
**practitioner's**
180:25
**practitioners** 23:8
23:19 41:24,24
82:3 274:25
**pre** 224:18
**preceding** 117:24
118:1
**precise** 42:19
**prelude** 58:18
**premise** 30:22
**preparation** 148:3
**prepared** 243:14
**preparing** 198:18
262:21,25
**prescribe** 15:20
21:25 23:21 26:1
26:4 27:13 35:3
35:14 36:6 39:14
40:11,15,25 42:22
43:9,20 44:2,17
45:15 46:10 54:15
56:3 57:13,22
69:1,2,14 72:3
74:4 75:18 77:19
93:23 94:4 98:21
99:3,7,16 100:6,15
101:9,20 102:1
107:10 116:13
121:8 139:18
166:3 269:10
**prescribed** 13:20
24:3 25:10 26:17
29:8 51:22 68:18
92:3,12 95:18
99:18 100:5,23
101:3 110:22

112:9 220:11,15
254:13 267:4
**prescriber** 32:13
46:1,2 47:5,19,24
49:7,17 50:18
74:12 98:20 144:8
144:10 145:13
160:25 161:8
167:12,15 168:5
179:24 180:11,16
185:9 239:22
247:14 259:10,14
259:22 260:8,10
261:6 275:14
**prescriber's** 49:5
49:22 50:8,17
181:17
**prescribers** 23:17
23:18 28:14 30:3
32:11,16 35:2,7
40:2 46:25 47:3
52:18,23 53:14
54:14,22 56:23
57:6 69:6 71:20
71:25 72:9 73:15
75:17,17 85:23
93:22 94:1,4,6
98:15 115:21
133:13 148:12
158:8 166:9 168:5
174:23 177:1
181:11 201:2
237:6 245:21
246:7,9,13 247:7
261:2 274:25
275:4,7,11,18,20
275:21,22 276:5
277:2
**prescribing** 12:5
12:17,20 13:16
14:6 21:18,20,23

22:19,23 23:5,25
24:2,7,19,23 25:1
25:17 26:9,23
27:7,21 28:1,5,18
28:22,25 29:12,15
30:5 33:21 34:18
35:6 37:16,17
39:7,10 41:7,20,23
42:1,5,9,14 43:2,4
43:24 44:9 45:8
47:18 49:12,25
51:9,18 53:24
55:19 57:8 70:20
73:10 78:7 81:5
81:23 82:2,7,18
83:1,20 86:17
90:18,25 91:7
93:2 97:5 106:4
111:24 115:9,17
115:18 117:10
132:19,22 133:3
134:10 135:9
138:8 139:12
140:10 145:11
148:11 156:13
165:14 168:6,16
180:17,18,19,25
190:9 200:3,15,23
201:1,5,19,24
202:15 216:18
217:11 218:16,19
219:2,10,12,13,14
219:19 220:1,3,7
220:16,23 221:1,8
221:9,11,16
222:15,22,23
223:1,1,5,7 224:1
224:9,12,14,17,19
237:8 253:7
269:18 270:24
271:1,9,10

prescription 1:4
4:12 5:13 9:22
10:10 12:5,20
13:7,9,12 16:1
19:1,11 23:14
25:9 34:1,15 51:5
52:20 66:15 67:3
69:23 70:21 85:17
85:21 87:8 88:11
88:16,18,24 89:3
89:11 90:25 91:18
91:19 93:9 95:17
96:12,20 97:3,7,11
97:14 98:16
100:24 106:9
107:3 110:5 111:1
111:17,23 115:15
116:17 117:17
119:17 121:5
128:9 129:2 130:4
134:6,7,9 136:11
136:13,16 137:9
137:20 138:17,19
139:6 143:8,16,23
144:12,16 145:5,7
145:9 149:4,7,9
151:14,17 152:4
152:14 153:13,21
156:10,16 158:4
158:18 160:7,12
161:15,23 162:9
162:25 163:13,25
164:5 165:5 166:5
167:1,20,24 168:1
168:22 169:16,20
178:25 181:8,24
183:16 184:5,16
185:10 189:14
190:13,14 193:23
194:10,19 196:4,8
202:11,12 218:4,8

220:8,9,12 221:24
237:1,5 238:13,17
238:25 241:16
242:10,18,18,25
243:2,6,9 245:14
245:14 247:13
253:3,12 254:3,10
254:21,22 255:8
255:18 256:16,16
257:7,20 258:22
259:7 262:5
268:21 279:6
280:3 281:3
prescriptions
43:12,15 46:3
47:7,8,15,23 48:12
49:6,8,21,22 50:7
50:8,18,20 52:4,7
52:18,25 53:15,16
53:22 54:24 56:10
64:4 85:23 92:20
94:13,24 95:12
115:19 136:6,10
137:6,10,12
138:12 139:13
148:5,20 149:3
150:4 153:18
155:21,22 157:22
157:24 173:13,16
173:19 174:1,17
175:14,25 177:2
177:10 181:13
182:10,25 208:19
217:15,20,21
218:1 221:18,19
221:21 222:17
241:9 242:16,20
242:20,22 244:10
246:7,10,17,25
247:3,23 248:2
255:13 256:18

259:17 268:16
274:4,7 275:25
276:2
prescriptive 23:9
presence 148:18
179:1
present 3:24 15:17
31:13 39:18 97:10
presentation
196:15,23 197:1
presentations
163:23 205:1
presented 29:3
188:12 242:25
246:6 259:3
presenting 80:21
145:7 255:18
preservation
277:20
president 104:22
press 131:22
140:24 238:17,24
pressed 174:11
pressure 40:25
44:23,23 56:18
57:22 69:14 86:15
114:25 148:17
156:9
pressures 57:12
68:8,9,10 98:7
147:19,21 148:14
154:1,9,20 155:22
178:22
pretend 116:4
prevent 94:15
131:10 142:21
177:17,20 180:5
269:8 275:5 276:6
preventing 131:24
previously 11:4
50:13 238:15

240:3 247:20
**price** 202:23 203:1
**pride** 102:24
116:3
**primarily** 76:18
77:4 83:9 111:23
**primary** 41:8
44:15 45:4,14
227:20 271:15
**prior** 18:18 20:25
21:7,20 30:18,23
47:18 60:8 108:2
108:15,16 116:20
133:18 141:13,16
157:18 161:4
166:7 188:21
189:5 191:6,10,18
209:25 210:8
211:11,14 219:11
220:8,18 221:9
230:19 238:3
240:16 264:3
267:12
**prioritize** 67:8
70:3
**priority** 268:9
**privacy** 115:8,20
115:23
**private** 80:14,15
**privileges** 23:9
**privy** 240:15
**pro** 37:18 61:23
179:14 186:24
**probability** 246:9
**probably** 17:17
90:1 92:24 96:10
102:12 171:9
188:14 194:25
212:18 219:12
230:17,18 237:4,8
238:6 245:16

263:23
**problem** 29:2 34:8
37:4 92:19 96:2
97:8 105:20 109:9
110:24 127:3
151:15 193:21
216:21 255:1
261:7,9
**problematic**
235:17
**problems** 68:14
93:6 117:11
152:18 169:16
194:5 247:17
**procedure** 106:10
180:14,23 280:5
281:5
**procedures** 114:11
132:12 215:15,16
216:4 225:17
261:12 266:17
267:10
**proceed** 58:11
103:12 118:10
125:8 147:2
170:18 213:24
263:11
**proceeding** 5:22
**proceedings** 278:7
278:11,16
**proceeds** 275:1
**process** 20:20
31:12 56:1,6,15
140:17,20 143:2,5
143:13,21 144:4
144:14 147:13
150:7 152:3
163:12,16 166:11
191:12 230:8
237:20 238:5
261:11

**produced** 230:14
231:3,8,15,25
**product** 187:24
189:10 196:4
**production** 279:15
279:17,22
**products** 77:6
179:10 182:17
187:16 189:19
196:8 257:17
258:3,9
**profession** 27:19
31:18,20 36:12
38:24 47:2 48:21
**professional** 7:22
8:7 25:25 26:8
32:12 35:9,13,20
35:23 37:20 38:3
38:7,11 39:3
54:14,23 55:13
58:14 67:17 68:24
70:25 89:18 95:25
106:25 123:10
145:21 146:15,16
146:20 147:4,10
149:11 152:4,13
160:16 180:24
183:8 193:13
249:17,23 250:1,6
250:11 269:3,4
**professionally**
123:13
**professionals**
32:17 182:7 272:1
**professor** 8:24
**proffered** 141:6
**profit** 83:9
**profitable** 244:23
**profits** 149:1
**program** 9:1
148:25 149:5

186:25 188:17,25
259:11,14,15,20
259:23 260:8,10
260:15,19,22
261:6 265:24
**programs** 48:17
81:18 86:5 175:16
176:2 182:15,18
182:19
**progress** 121:22
133:23
**proliferating**
13:20
**prolific** 91:8
**promised** 105:6
**promising** 189:9
**promote** 61:23
72:8,11 73:2
112:18 121:3
182:16 204:24
258:3
**promoted** 77:19
77:24 81:19
149:19 187:1
188:16 257:17
258:6,7
**promoting** 39:4
65:21 69:21 75:22
84:24 90:2 257:6
257:25
**promotion** 75:21
86:19 187:7
**promotional** 76:17
76:18 77:3,4
186:23 187:8
209:10,13 211:19
212:6,15 219:20
**promulgated**
57:19 68:23
**pronouncements**
51:4 202:13

**proof** 248:4

**propagate** 75:4,23
   182:13 183:9

**propagated** 37:8
   148:10

**propagating** 36:23

**proper** 29:5 81:19

**properly** 248:18
   256:2,13,24

**proposed** 275:16

**propublica** 251:15

**prosecuted** 84:9

**prospect** 162:23

**protect** 4:16
   263:16 264:14

**protocol** 27:7
   204:1

**proves** 145:25

**provide** 33:20
   67:13 81:17,22
   82:2 106:8 116:25
   119:24 120:6
   179:18 189:4
   208:6,11 223:14
   223:17 224:21
   262:9

**provided** 34:14
   36:24 60:3 80:25
   83:23 102:9 133:7
   199:23 201:4
   208:5 210:8
   226:11 231:21,24
   232:1 244:8,9
   245:8 259:7
   262:16

**provider** 68:16
   92:3 145:6 146:3
   274:8

**providers** 22:13
   34:10 87:17
   114:21 123:23

172:6 181:9

**providing** 81:4
   82:6 106:12
   134:11 200:2,14
   200:22 209:19

**provisions** 270:23
   271:7

**proxy** 67:15

**pseudo** 29:4

**psychiatrist** 271:3
   271:12

**psychotherapy**
   106:14

**public** 14:9 48:7,8
   48:13,25 50:3,4
   93:15 98:5 104:23
   105:10,13 123:23
   165:17 176:21
   245:8,12 280:10
   280:18 281:15,23
   282:23

**publication** 14:13
   38:25 39:1 103:18
   110:16 237:9
   238:3 240:16
   272:3

**publications** 12:7
   12:18 89:25 136:2
   140:10

**publicized** 244:21

**publicly** 66:5
   141:17

**publish** 37:15 62:5

**published** 39:8
   42:4 84:24 104:15
   130:8 135:5,7,7,10
   135:12,17,23
   139:24,25 140:6
   140:22 141:12
   240:8 271:25

**pull** 195:21 198:1
   227:21

**pulled** 219:23
   223:11

**punish** 84:11

**purdue** 36:25
   63:14 64:11,25
   65:4,9,12,18,21,22
   73:21 78:10,13,15
   78:23 79:2,4,12,17
   80:3,10 81:8,17
   87:12,19,21
   182:21 188:17,22
   189:3 195:25
   196:8,14,17,23
   197:1,4,18,20
   198:23 199:2,13
   199:14 200:19
   201:2 204:23
   205:23 206:7,10
   208:11,12,17,20
   208:25 209:1,14
   253:4,5,22,24
   263:21 265:14,18
   265:21 266:8

**purdue's** 80:13,16
   196:4 253:9

**purported** 105:9

**purports** 111:12

**purpose** 4:11
   29:11,16 30:4
   47:8,15 49:8,23
   50:9,19 51:1,3,8
   52:19 53:16,23
   54:2 64:6 82:20
   83:3,7 92:21,23
   93:1 137:13,17
   146:2 148:22
   154:4 155:24
   156:11 157:25
   160:7,14,18,19,20

160:25 161:7,16
   161:24 162:10
   163:1,14 164:6,23
   167:1,21 172:20
   175:15 176:1
   177:11 188:11
   221:12 222:1
   244:11

**purposes** 51:17
   52:5,23 53:17
   55:21 134:14
   146:11 223:11
   227:22 230:24
   231:9,19 277:20

**pursuant** 64:4
   129:2 143:8,16
   148:22 190:14
   278:4

**pursued** 31:18

**pursues** 31:20

**pursuit** 61:11

**push** 60:4

**put** 29:20 131:19
   174:10 176:21
   221:2 222:3 224:9

**puts** 176:21

**putting** 69:14
   223:24 233:25

**q**

**quadrupled**
   221:22

**quadrupling**
   48:15,17,23
   218:12 222:5

**qualified** 14:12,16
   14:20 106:3

**qualify** 118:23

**qualitative** 22:13
   224:15

**qualitatively**
   224:18

**quality** 27:10
36:19 37:1 68:22
86:20 87:24
114:24 116:24
**quantify** 22:10
156:7 248:1,6
275:16
**quantitative** 217:7
224:10,15
**quantitatively**
224:16
**quantity** 100:2
163:8
**query** 133:20
**question** 7:9,12,13
7:15,17 8:2,12,14
18:2 20:2 23:13
25:21 26:4 32:4
40:21 42:12 43:7
49:3,3 50:12 52:3
52:11,15 54:22
58:18 59:1 62:16
66:10 71:10,17,18
73:7 78:1,7 79:22
82:23 83:15 96:24
99:13 110:19
111:7,9,14,16
112:7 116:12
117:16 119:15
120:16 121:4,15
123:2 132:2
143:20 146:24
151:9 154:7 156:5
156:6 161:4 178:1
181:4,4 184:24
185:3,4 186:13,15
191:9 194:6,21
195:4 199:16
200:13 205:5,6,6
210:6 212:14
213:4 214:10

218:22 226:6,17
228:9,13,23
239:10 245:7,18
245:21 247:10
250:10 251:1,13
254:7 258:11
259:4 260:7 261:5
265:7 267:7,8,15
268:11,12 269:17
269:25 273:2,14
273:16,19,22
276:10,12,16
277:7,10,10
**questionable**
272:10 274:13
**questioned** 183:1
**questioning**
237:11
**questions** 6:2 7:10
7:20,24,25 8:9,10
8:16 53:9 121:10
146:13 192:3,4,12
192:20 200:1
212:19 213:14
214:7 223:13
231:22 269:23
277:4
**quick** 112:18
117:11
**quickly** 68:9 98:8
215:5
**quite** 26:5 27:16
**quotas** 116:23
**quotations** 235:24
**quote** 24:18 81:19
133:12 149:5
151:21,22 173:15
175:1 180:24
181:10 187:21
189:9,11,13,18
204:1,13 235:21

244:21 251:14
**quoted** 236:20,22
251:14 252:4
**quoting** 78:4
209:18

**r**

**r** 2:1 3:3 97:23
**radical** 91:9
**radio** 149:19
**rapid** 112:8
**rare** 24:24 93:20
269:20
**rate** 86:14,14
100:23,25 101:3
107:1 124:15
134:10 156:23
157:7,10 218:17
219:2 220:1
222:15 224:9
**rates** 123:4,9
124:17 134:8
153:21,23 218:7,8
218:16 221:8
**rating** 68:10
**ratings** 107:2
**ravaged** 60:15
61:7
**rays** 166:20
**rcw** 278:4
**reach** 262:25
**read** 14:18,24,24
62:15,16 66:17,19
66:21,22,24 80:8
111:11 117:7,23
118:5 134:15
142:2,4,7 160:6
189:2 200:8,11
238:20 245:1
246:11 252:1
274:20,23,24
280:5,6,12 281:5,6

281:17
**readily** 122:13
182:25
**reading** 14:21
66:23 83:5 164:3
227:19 233:25
279:19
**ready** 180:12
274:18
**real** 11:11
**reality** 165:23
**realization** 100:10
**realize** 78:9 192:9
**realized** 162:13
**really** 29:20 30:15
46:24 47:10 49:2
69:9 90:2 93:3
96:23 99:24,24
100:6 114:5
121:10 122:24
144:19 154:7
162:1,19 163:22
177:17,20 186:15
193:9,23 194:25
198:11 218:11
255:11
**reason** 23:1 35:1
79:21 151:19
153:4 175:20
190:16 225:10
244:2 257:3 277:7
279:14 281:8
282:3
**reasonable** 80:2,9
101:19 143:6,11
170:10
**reasons** 54:20 99:6
194:16
**reassure** 84:9
**recall** 34:16 110:7
110:15,17 195:14

200:3,21 206:25
232:18 247:1
259:11,18
**recalling** 87:20
142:17 194:24
198:25 199:10,12
199:19 208:23
211:10,11 247:1,5
255:16
**receipt** 279:18
**receive** 36:21
74:19 87:18
130:10 171:12,17
232:4
**received** 17:11
21:5 33:3 87:20
130:13,14,16
230:21
**receiving** 68:16
100:17,22 101:2
222:1 262:4
**recess** 58:9 103:10
118:8 125:6
170:16 213:22
**recipe** 134:10
**recipient** 199:14
**recipients** 186:23
**reciprocal** 17:23
**recognition** 14:13
14:17 50:2
**recognizable**
20:23
**recognize** 34:9
111:8,10
**recognized** 52:5
98:17
**recollecting**
210:14
**recollection**
196:17 197:15
198:12

**recommendations**
204:1
**recommended**
204:7
**record** 5:5,10
50:22 53:2 58:8
58:11 59:18 68:15
83:19 99:20,21
103:6,9,12 118:3,4
118:7,10 125:2,5,8
170:15,18 176:17
177:13 210:5
213:21,24 257:10
257:12,13,15
263:6,8,9,11 264:1
270:3,4,7,8,10
272:16,18 274:21
277:20 278:15
281:9
**recorded** 1:9 5:11
78:17 278:12
**recording** 5:9
**records** 166:7
**recount** 16:17
**recounted** 79:12
238:15
**recover** 116:5
123:10 193:16
**recovery** 123:3,8
124:4,7
**red** 9:23 97:4,14
98:8 130:5,8
131:3,3,8,20,24
132:12 134:11
135:8,9 136:7
145:13,16,23,24
146:5 148:18
153:14 167:25
168:4,5 169:4,18
169:21,23 179:1
179:16,19,21,24

180:11,17 181:18
226:18 227:12
232:7 242:5,6,6
243:3 245:10,14
246:8 248:15
249:9 256:24
261:12 268:6,9
**reduce** 138:7
224:17
**reduced** 114:23
**reducing** 100:8
**reduction** 94:15
**redundantly**
277:18
**refer** 18:12 37:24
40:1 62:19 67:25
80:20 83:12,16
85:12 151:10
155:2 180:13
**reference** 60:16
62:21 64:14 70:5
76:11 77:10 80:22
81:7 161:7 180:15
200:18 206:11
223:15 241:5
251:16 265:13,20
267:16 279:7
280:2 281:2
**referenced** 58:21
280:11 281:15
**referred** 117:3
**referring** 18:14
26:13 61:21 62:2
62:4,12 64:17
86:22 95:7 100:3
102:8 117:22
118:2 124:15
137:23 161:19
182:3 234:9 239:8
260:1

**refers** 60:17
117:25,25
**refills** 256:22
**reflect** 230:14
**refresh** 196:16
198:12
**refusal** 151:14
**refusals** 181:16
**refuse** 39:16
**refused** 39:14
151:17 255:13
**refusing** 208:18
**refute** 258:2
**regarded** 103:20
**regarding** 14:19
19:16 49:24 78:2
80:16 97:7,12
130:4 131:20
132:12 133:9
136:10 142:20
147:22 148:13
258:19 261:12
266:17 267:9
268:4 269:18
**regardless** 133:19
181:17
**regards** 5:13 9:17
**region** 48:24
216:23,25,25
**regions** 49:12
**registrations**
247:8
**regular** 133:19
**regularly** 246:9
**regulate** 127:22
**regulated** 38:14
127:19
**regulates** 40:10
**regulating** 36:14
36:17 38:9

**regulation** 49:16 49:19 50:5,16 161:19 267:24
**regulations** 49:11 49:24 131:19 143:15 208:22 226:23 268:3,5
**regulatory** 36:5 62:9
**reimbursed** 67:11 87:4
**reimbursement** 36:22
**reimburses** 119:23 120:5
**reiterated** 37:2
**relate** 10:19 134:16
**related** 5:19 9:13 48:18 139:19 148:15 180:17 218:12,13 225:7 225:17 226:2,7,12 226:17 227:12 266:24 274:2 278:17
**relates** 1:6 99:18
**relating** 66:6,15 83:13 132:15 133:2 134:20 137:5 166:2 230:18 267:7
**relationship** 47:19 128:7 144:9 146:3 148:23 173:9
**relative** 139:12
**relatively** 34:2 112:8 142:25 193:6
**relaxer** 248:17

**released** 84:8
**relevance** 135:22
**relevant** 135:21 171:13 251:23
**reliable** 80:1
**reliance** 236:13
**reliant** 114:3 115:1
**relied** 164:8 190:24 236:16
**relief** 149:19
**relievers** 89:19
**reluctant** 137:15
**rely** 76:18 77:4 80:3,9 89:3,11 164:5 166:5,6,9,13 166:17,18 168:15 272:2
**relying** 176:13,18 262:8,16
**remain** 193:2 203:1
**remained** 237:7
**remains** 122:16
**remarkable** 196:1
**remedy** 25:3
**remember** 42:19 141:10 197:13,13 197:17,18 199:25 203:9 230:11 267:21
**remembering** 197:3 207:6 210:18 230:9 232:22 234:23 247:9
**remotely** 1:21 5:8
**removed** 211:10
**renders** 49:21
**reneging** 87:16

**rep** 72:23
**repeat** 7:13 50:11 73:6 132:2
**repeatedly** 244:10
**repetitive** 53:9
**rephrase** 7:17 23:13 42:12 43:7 53:2 82:23 143:20 154:6 254:7 260:9
**replaced** 113:24
**report** 19:15 37:24 37:25 40:17,20 42:3,18 45:21 46:14,22 51:12 65:7 69:7 70:16 73:17 74:14 76:2 77:23 81:17 83:16 84:3 85:19 86:3 91:5 93:15 97:18 97:25 127:25 128:14,24 131:13 132:4,6,14,25 133:8,25 134:4,16 134:18,25 136:24 141:14 142:7,20 147:24 148:2 151:11 152:17 155:3 158:7 172:23 176:4,5,25 177:15 178:8 180:13 181:9 183:21 186:24 187:19 188:13,16 190:5,9,20 191:1,4 191:7,7,10,11,14 191:18,22,23,25 192:1 195:17,19 195:21,23 196:22 197:10 198:10,11 198:16,18 203:23 204:13 205:18

206:14 207:5 209:9,17 210:13 211:1,4,5,11,18,23 211:25 212:2 214:12,25 215:2 216:12 217:8 227:4,7 229:20 230:20,25 233:23 234:8 235:22 236:14,17,19,22 238:8,16 240:20 244:17,18 245:24 246:16 247:7 251:13 252:13 255:21,25 257:16 260:1 261:19 262:21 263:1 265:8,25 266:11
**reported** 1:25 22:16 246:8
**reporter** 1:21 5:18 6:22 7:10 25:12 60:25 67:19 76:22 85:3 97:22 108:11 111:25 120:25 140:7 156:17 188:19 196:7 201:8 210:3 217:19 261:3 271:4 278:4,24 280:7
**reporter's** 278:1
**reporting** 133:21
**reports** 16:10 18:18 19:5,8 97:20,23,23 133:14 182:8 191:6 209:25 210:8 211:14,17 233:23 262:18

**represent** 133:23
192:19 207:6
214:7 222:16
231:2 254:14
259:15 263:19
264:12,21
**representation**
120:19
**representative**
140:13 265:21
**representatives**
76:19 77:5 80:10
129:6 196:19
258:21,24
**represented** 233:2
**representing** 91:9
205:3
**represents** 219:10
**reps** 34:22 72:6,8
72:14,15,16,17,21
73:9,12,14,21 74:6
74:25 75:4,8 77:6
201:2 259:1
**request** 138:16
213:3 231:25
241:23 242:2,2
273:14 281:9,11
**required** 163:16
169:18 243:4,5,6,8
259:20 279:25
**requirement**
172:5
**requirements**
170:24 171:1
172:3,7,9 215:11
**requiring** 133:14
**reread** 273:14,15
**research** 9:8 10:5
10:9 14:5 21:4,19
22:12 25:16 32:1
32:6 33:10 36:11

39:6 43:23 48:10
49:4 52:22 57:13
66:15 80:8 89:23
90:20 101:1
106:20 107:7
112:4 122:25
129:5 131:12,16
132:15,18 133:2,3
134:24,25 191:12
262:15 271:16
**researched** 63:21
131:22
**researches** 66:5
**researching**
134:19
**reserved** 277:22
**resided** 177:3
**resource** 132:3
**resources** 101:17
179:18 189:1
**respect** 38:18
115:23 138:14
173:25 174:16
215:21 221:3
229:9 242:15
**respected** 133:20
**respiratory** 86:14
248:23
**respond** 137:16
274:18
**responded** 165:11
189:20
**response** 29:5
123:8 124:15,17
199:25 202:14
224:11 232:4
234:18 237:11
**responsibilities**
25:25 129:14
172:16

**responsibility**
34:11 65:6 87:16
128:7 130:12,16
130:23 131:9
132:21 134:12
139:2 150:10,15
168:18 171:14,18
180:2 181:12
226:13 256:3,14
**responsible** 37:16
58:15 65:22 145:8
**responsive** 49:3
**rest** 62:15 175:9
**restate** 32:4 59:1
66:10 71:10 83:15
99:13
**restrictive** 209:2
**restructuring**
119:23 120:4,10
**result** 13:17,21
22:2 39:10 46:24
67:4,6,9 68:18
69:24 70:1 111:23
138:8 141:8 163:9
190:1,13 255:19
**resulted** 29:7
**resumed** 126:4
**retail** 73:22 196:5
**retailer** 156:22
**retained** 76:6
104:18 141:16
229:16,18 277:17
**retainer** 17:2,4
**retract** 236:13
**retracted** 14:15
**retracting** 14:10
**retrospect** 248:6
**returned** 279:18
**revealing** 80:16
**review** 12:9,10
57:14,16 80:13

97:16 130:25
132:6 135:5,10
136:6,22 138:8,16
157:13 162:17
166:2 188:24
191:13 199:7
206:8 207:19,25
215:14 216:6,11
230:3,4 232:11
233:4,24 234:1,13
236:2 252:5
266:16 267:8
272:13,20 273:3
274:17 279:12
280:1 281:1
**reviewed** 12:6,10
12:17 34:21 79:14
97:20 103:18
131:17,18 133:6
135:17,23 136:13
137:21 140:24
141:13 142:2,4,11
174:19,19,21,21
174:24 180:14
190:22 191:16
198:24 205:20
206:2,6 211:7
231:11 232:14
233:16,16,22
234:4,24 247:2
259:2 263:22,24
263:25 264:1,2
266:2 267:2,6
273:8,19
**reviewing** 133:18
199:17 230:18
231:22 233:3,11
**revise** 191:14
**revoked** 247:8
**reward** 149:5

**riddled** 116:2
**right** 13:24 15:5
  15:21 18:22 28:8
  30:10 40:12 42:20
  52:20 60:10 64:6
  64:18,20,22 65:6
  66:6,22 71:3
  73:23 77:7,11
  82:8 85:14 86:6
  86:10 88:3 89:23
  90:12 93:12 95:5
  104:16 105:1,10
  106:22 108:18
  110:2 115:9
  119:11 122:1
  127:20 135:3
  141:5 144:5,6,6
  150:10 154:12
  192:5 193:6,14
  194:24 195:10,12
  202:2 214:8 215:8
  222:10 223:24
  227:9 228:15,21
  229:2,6,12 231:7
  231:14 232:22
  235:13 236:25
  238:12 245:23
  246:15 247:1
  248:7 252:8 259:9
  259:13 260:7
  262:3 263:14
  268:11 271:20
**rise** 112:8 117:16
**rising** 121:4
**risk** 9:24 37:7
  61:11 65:14,19
  121:23 122:3,5,8
  122:11,11,13
  127:4 140:3,4
  176:21,22 190:6
  248:24

**risks** 28:17 33:20
  55:5 57:17 99:24
  132:20 156:19
  164:12,14 165:19
  166:15 167:12,16
  167:17 168:9
  169:6 219:14
  244:24,24 248:21
  275:25
**risky** 24:21
**ritalin** 111:4
**rite** 2:21 3:2 6:2
  18:15 45:25 74:15
  81:17 134:3,4,7,8
  144:14,20,24
  148:3,6,8,13,20,25
  149:4,12,14,17
  153:21 159:7,10
  159:13,16 225:23
  247:18
**road** 2:8
**robert** 151:11
**rock** 94:6
**role** 36:14,15,16
  63:15,21 65:9
  97:16 117:16
  121:4 131:21
  146:9 229:25
  237:15 253:9,11
  253:25
**rolled** 148:11
**roman** 84:7
  203:20,23
**romanette** 73:18
  78:3 132:17 196:9
  238:8,8,9,12
  239:12 241:5
  244:17 245:23,24
  247:6 248:7,13
  251:14,16 265:9,9
  265:13 266:11

**room** 54:9 214:19
**rooms** 83:21
**ropp** 181:14
**rosy** 123:4
**roughly** 137:2
  202:15 218:10,11
**routine** 89:5,13
**rpr** 1:25 278:24
**rude** 49:1 69:12
  186:4
**rules** 7:7 280:5
  281:5
**rulings** 150:14
**run** 194:4 238:5
**runs** 179:23
  180:10

**s**

**s** 2:1 97:23 279:15
  281:8,8 282:3
**s3** 277:19
**sackler** 64:24 65:5
**safe** 101:25 221:24
**safer** 94:18
**safety** 70:21 82:14
  127:2 177:25
  178:16 179:13
  183:5 265:11
**sake** 211:1
**salaried** 68:6
  114:21 116:22
**salary** 106:24
  267:20
**sale** 136:25
**sales** 69:18 70:23
  71:5,7,12,13,15,19
  71:22,24 73:9,21
  74:23,24 75:7,12
  75:16 76:3,7,8,17
  76:19,21 77:1,3,5
  149:10 187:23
  196:1,10 201:11

201:14 202:7,19
  203:3 251:16
  258:21,24 265:21
**samhas** 4:12
**samhsa** 273:8,20
**sample** 140:13
  232:11
**san** 2:5
**santa** 16:25
**saper** 38:2
**satisfaction** 67:14
  67:20 107:1
  114:11 116:23
  149:2
**satisfied** 44:24
  68:10
**satisfy** 171:18
**satisfying** 171:13
**save** 46:15 197:7
**saying** 17:25 29:23
  53:5 57:6 82:13
  89:25 92:13
  122:19 155:4
  162:23 192:7
  202:10 238:4
  243:19
**says** 71:4 112:7,16
  112:22 115:1,25
  118:12 119:12
  120:23 160:12
  166:10 195:21
  265:21 273:25
**scenarios** 112:22
  113:4,21
**schedule** 138:11
**scheduled** 9:19
  89:4,12 128:5
**school** 8:21 15:7
  15:19 16:1 33:2,3
  33:7,11,18 34:2,13
  55:10 70:24 126:8

130:11,17 131:6
170:20 171:8,13
171:17
**schools** 15:13,16
33:10,15,19 34:8
61:16 62:3 130:19
258:18
**science** 31:10
32:20 37:19 51:24
53:25 121:2 155:7
178:21
**scientific** 239:6
**scope** 7:25 8:14
43:18,25
**scott** 37:15
**scripts** 134:9
**seal** 280:15 281:21
**second** 46:19 63:9
75:25 76:25 86:21
113:2 117:9
**secondly** 56:16
**section** 4:11 51:11
65:25 80:24 121:3
160:6 211:23
238:8 240:2,20
241:5,8 274:24
275:1,19 277:1
**sections** 121:12
**secure** 112:24
113:5,22 277:18
**sedatives** 111:4,20
112:4
**see** 11:20 17:23
44:16 45:8 60:9
68:9 95:8 97:4
98:25 105:18
107:18 109:7
145:13 164:1,18
181:6 193:18
197:4 201:13
202:3,4 203:20

204:4 205:17
206:11 208:15,17
208:25 217:14,23
218:6 219:2
222:13 231:16
241:6,20 242:4
244:18 247:10
251:16 263:17,19
264:9 268:15
270:15
**seeing** 9:7 10:12
13:13 67:22
163:22
**seek** 194:2,15
**seen** 11:6 79:8,15
79:16 147:18,18
153:1 175:8
208:14,20,24
209:4 256:17
258:1 267:18
**sees** 8:3
**select** 231:18
**senior** 203:12
207:12
**sense** 30:20 123:25
129:16 200:25
205:3 211:2,10,24
218:25 240:18
269:5
**sent** 213:5,5
214:17,24 273:10
**sentence** 62:14
92:8 157:4 238:22
245:25
**sentences** 60:1
**sentinel** 163:23
**separate** 211:25
249:18 250:25
**series** 245:20
265:14

**serious** 164:18
**serve** 215:4
**service** 81:18
**services** 106:7,9
271:22 274:15
277:19
**session** 7:9 126:1
189:3
**set** 212:20 234:1
**sets** 36:19
**setting** 256:7
**settings** 22:14
269:13
**settlement** 266:23
**seventh** 2:12
**severe** 21:10 31:3
156:19
**severity** 216:24
217:3,4
**shamed** 24:16
34:17
**shaming** 35:5,9,14
35:24
**shapira** 3:19 6:13
**shapira.com** 3:23
**shatterproof**
109:21 110:1,4,16
**sheet** 279:13 281:7
281:10,18 282:1
**sheridan** 2:11,14
6:6,6 273:13
**shift** 23:24 24:1,4
24:6,13 25:15,24
26:16 27:11,20
28:4,10 29:7
30:13,18 31:6,13
32:23 39:12 51:3
51:16,17 54:13
56:2,8,15 58:15
60:2 62:20 69:10
70:19 77:11 87:11

88:1,7 91:9
163:10 183:11,19
183:20,23 220:18
247:22 253:6
254:14
**shifted** 24:1
**shkolnik** 2:7,7
**shopping** 256:21
256:21 274:4,6
**short** 21:10 48:23
67:14 96:3 107:17
117:11 119:1
**show** 8:7 64:21
109:19 138:10
160:5 164:10
166:14 222:22
272:22
**showed** 203:3
**showing** 34:22
100:4 119:13
124:12,16 137:1,8
138:2 160:21
164:14 177:1
179:3 184:9
201:10 219:14
221:21 267:3
**shown** 21:19
106:15 279:16
**shows** 174:4
202:18 217:11
**sick** 112:23 113:5
113:22
**side** 146:12
**sides** 116:4 236:12
**sight** 205:6
**sign** 36:24 86:13
86:17 258:11,13
258:15
**signature** 277:22
278:21,23 279:14

[signed - specifically]

**signed** 280:13
281:18
**significant** 65:5
112:2 138:6
222:25 238:18,25
248:17
**significantly** 9:18
116:16 254:15
**signing** 279:19
**signs** 92:18 96:2
257:6,24 258:5,12
**silver** 34:6
**similar** 114:14
124:13 129:13
157:10 211:19
212:14 226:6
253:11 256:19
263:23
**similarly** 40:14
82:10 179:4
**simmons** 2:11 6:6
**simmonsfirm.com**
2:14
**simple** 44:12
122:3,12 218:24
267:12
**simply** 32:10
44:11 56:9 94:10
95:2 235:6
**sincerely** 279:21
**single** 141:21
142:11 209:18
220:8 237:21
262:25 269:7
**sir** 197:9 279:10
**sit** 142:16 198:25
213:13
**site** 196:18
**sitting** 105:9 226:1
227:24

**situation** 20:16
165:14 247:11
**situations** 115:24
**six** 100:25
**size** 137:9 232:11
**skill** 250:2,11
**skip** 105:3
**skipped** 113:2
**sleep** 271:15
**slightly** 194:20
**slowly** 237:4
**small** 39:11 46:24
67:4 69:24 93:17
193:1 203:22
**smaller** 220:18
**smallish** 142:25
**societies** 37:20
38:3 68:24 71:1
183:8
**society** 36:3 37:22
48:9 88:16 117:19
118:14
**sold** 87:22
**sole** 65:10 133:21
**solution** 133:21
**solutions** 279:1
282:1
**somebody** 45:1
142:24 143:1
193:7 268:21
**someone's** 194:12
**someplace** 50:16
**somewhat** 110:20
**soon** 63:11
**sooner** 164:2
**sorry** 25:14 32:4
50:11 54:8 59:15
66:9 71:9 76:20
78:25 80:5 82:22
83:14 84:19 86:7
89:9 104:2 117:5

120:15,16 149:16
158:11 164:25
169:25 180:12
191:9 201:9
203:21,22 206:20
206:21 209:6
214:16 219:4,17
226:25 227:2,16
238:9 239:8 261:4
269:16 273:9,11
**sort** 115:17
**sound** 209:23
231:4
**sounds** 9:3 270:2
**source** 67:24
191:4
**sources** 227:20
244:13 249:13
251:8 272:6 274:9
275:10
**spaced** 209:18
**spaeder** 2:16 6:9
**sparingly** 21:9,18
**speak** 38:17 62:6
74:5 78:12 159:2
175:3
**speaker** 205:2
**speaking** 63:1
74:3 129:10 163:5
**speaks** 66:5
177:15
**special** 96:5,8
**specialist** 45:10
163:22
**specialists** 43:13
43:14
**specialization** 9:9
**specialties** 22:15
39:7,9,12,13 41:6
41:25 42:6,8,23
43:10 52:3,6

**specialty** 42:15,22
43:4,8,12
**specific** 7:23 8:8
20:15 26:12 48:24
49:15 50:2,7
56:11 129:17
130:18 134:21
135:18,23 136:9
136:10,11,24
138:5,11 149:12
158:23 164:4,21
164:23 165:3,9,22
166:3,16 171:11
171:25 175:18
179:10 181:4
183:22 185:9,11
185:19 186:19
187:16 188:20,25
190:11 192:4
194:24 195:11
197:13,14 211:23
216:22 218:3
221:2,17,17 222:3
230:16 232:6
234:23 244:14
247:16 256:8,11
256:12 257:2
258:3,8,9 263:25
**specifically** 40:1
46:9 47:24 49:20
63:13 64:15 72:6
81:7 87:9,12
93:17 110:7 127:9
128:12 134:2
139:1,5 140:17
141:19 142:13,17
144:15 171:4
183:13 187:1
190:8 194:8
200:18 210:19
228:5 230:9

240:23 242:4
246:19 247:5,9
255:22,24 259:25
262:24 275:9
**speculative** 236:1
**spell** 210:4
**spend** 9:6 134:19
**spent** 76:16 77:2
134:5,8
**spike** 238:18 239:1
**spirit** 14:25
**spoke** 81:15 142:1
**spoken** 93:16
141:17
**spokesperson**
203:16
**sponsored** 84:25
261:15
**spread** 30:7
265:10
**spreading** 179:13
183:4
**spring** 16:8
**st** 3:21
**staff** 148:25
**staffing** 155:4
**stafford** 105:8,14
**stages** 187:24
**stakeholders**
129:6 136:3
**standard** 24:7
25:16,20 26:23
48:10 49:4,10
50:17 57:5 96:1
98:25 160:24
166:24 169:10
242:8,14 243:16
243:20,21,22,22
243:25 254:1,8
**standardize** 27:20

**standardized**
272:9 274:12
**standardizing**
27:24
**standards** 23:5,7
23:15,16 26:15,20
27:4 34:23,24
37:12 87:24
**stands** 276:4
**stanford** 8:21 15:7
15:12 33:18 38:17
61:15 130:3,7
239:14
**stanford's** 9:15
**start** 19:8 61:3
191:18 192:19
208:16 214:10
**started** 64:25
220:18 230:8
**starting** 34:19
217:25
**starts** 65:25 66:23
222:19 245:24
**state** 5:23 34:23
36:4 37:9,13,14,17
38:18 39:21 45:20
58:22 62:9,22
63:3 71:2 84:3,6,8
84:11,13 85:19
127:16,19 133:20
152:16 180:13
216:22 217:12
243:14 246:23
254:7 260:14
278:5 280:10
**stated** 42:7 44:11
65:7 69:7 75:2
133:24 141:7
148:19 154:19
168:14 173:14

255:22 276:23
278:9,17
**statement** 60:5
89:7,22 95:8
99:17 106:2 111:5
111:12,17 112:14
112:25 116:7
117:6,13,21,22,25
118:21,22 120:1,2
121:25 122:2
123:17 181:2
272:5 275:8,20,22
280:13,14 281:19
281:19
**statements** 14:9
14:12,14,17 107:6
209:19 210:1,9,13
211:3,13,15 212:6
259:5 264:4,9
276:7,14,18
**states** 1:1 5:14
43:15 46:5 56:24
57:6 60:15 61:7
90:16 91:11
112:10,12 115:6
115:14 116:15
117:17 133:12
140:15 175:10
176:9 189:18
216:21 217:12,22
246:18
**stations** 149:20
**status** 67:18
**statute** 161:8
**staying** 112:23
113:5,22
**stealthy** 60:2
**stenographically**
278:12
**step** 18:5 22:8
123:12

**steppingstone**
174:23
**steps** 127:10
129:18,22 144:23
199:8,17,20 208:8
**stimulant** 112:5
271:2,12
**stimulants** 111:4
111:21 112:2
**stoffelmayr** 3:9
4:4 6:10,10
192:11,15,17,18
197:8,23 198:6,13
199:4 200:7
205:19 206:5
212:3 213:11
**stool** 9:5
**stop** 4:15 14:2
53:6,8 62:14
119:16,21 120:3
157:3 193:16
194:15 263:15
264:13
**stopping** 57:24
**store** 148:24 149:1
149:12 151:12
156:23 257:6
**stored** 277:18
**stores** 73:22 159:7
159:13,19 173:14
196:10 201:11
204:2,7,10,10
246:17 257:24
258:6 266:19
267:11,11
**story** 251:15
**straddling** 182:5
**strategies** 80:16
187:23 219:21
**strategy** 94:15,16
204:11,20,21

205:7 206:12
**streamline** 247:11
**street** 2:4,18 3:10
110:21 227:2,9,18
228:7 240:3,22,23
241:1 245:16
**strictly** 92:11
**strike** 11:14,20
15:23 29:6 39:2
49:2,18 55:8 57:4
58:19 65:18 69:11
72:13 74:1 75:6
75:25 79:2 80:1
83:11 86:21 88:10
88:17 94:3 98:12
112:11 114:16
121:13 137:4
142:3 143:4 150:7
152:1 170:25
178:12 179:5
180:8 181:22
189:7,15 196:13
208:16 210:21
221:14 234:12
239:10 241:13
258:10
**strongly** 250:7
**structure** 107:19
**struggle** 114:1
**struggling** 97:1
**student** 81:9 199:3
200:19
**studied** 153:21
**studies** 100:4
115:4 164:9
166:18,23 190:5
190:11
**study** 85:5,9 134:3
134:7 163:20
189:23 190:9
243:12

**subheading**
267:16
**subject** 68:22
129:22 135:11
227:15,17
**subjective** 20:13
**submitting** 110:15
110:17
**subscribed** 280:10
281:14 282:21
**subsequent** 191:25
**subset** 39:11 46:25
93:17
**substance** 10:13
10:19,21,23
121:16 122:10
144:12 149:3
160:13 180:3
181:13 246:10
255:7 266:12
268:22 271:22
272:2 273:25
274:1,15,19 276:3
**substances** 9:20
121:21 128:5
129:15 131:1,10
133:16 134:13
139:11,17,19
148:19,21 150:5
153:24 160:10
169:13 215:11
256:19 267:1
268:17
**substantial** 65:14
65:19
**substantially**
70:19
**success** 123:4
**successfully**
193:15 194:14
204:25

**sudden** 47:17
220:6,8
**suddenly** 110:24
**sued** 37:12 40:3,5
**suffering** 20:5,10
117:20 118:15
**sufficient** 179:18
232:10,15 234:5
**suggest** 130:19
155:15 167:8
168:15 175:8
215:19 216:18
**suggested** 12:14
206:8
**suggesting** 194:17
240:19 256:23
**suggests** 118:24
273:25
**suite** 2:8,18 3:10
3:15 279:2
**superior** 279:1
**superseded** 147:21
**superstore** 205:7
206:12
**superstores** 77:25
179:11 182:22
203:17 204:16,18
**supervision**
278:13
**supervisors** 73:22
**supplemental**
230:21
**supplemented**
191:19
**supply** 28:6,11
48:15,23 127:4
139:23 168:19
172:25 178:6
183:11 219:21
220:7 253:20

**support** 44:21
70:25 83:12,17
150:25 185:20
249:18
**supposed** 167:12
167:19 243:1
**sure** 13:2 17:19
23:19 25:19 26:5
26:15 27:16 31:15
50:13 56:5 59:2,6
66:12 71:11 72:24
73:8 80:7 83:16
99:14 100:19
104:3,8,9 118:1
141:10 144:11
146:9 153:14
154:7 165:3 192:3
200:11 201:23
213:4 217:9 243:7
245:22 258:15
262:7
**surgeons** 41:12
**surgeries** 90:9
**surgery** 98:14,17
99:4,8,16
**surgical** 106:10
**surveillance** 9:21
180:4
**survey** 137:25
182:8
**surveyed** 138:3
**surveys** 67:21
68:11 107:1
116:24
**survive** 114:4
**surviving** 90:8
**susceptive** 12:2
**suspected** 242:9
**suspend** 259:16
**suspension** 227:6
240:7

**suspicion** 145:25
**swear** 6:17
**sweeping** 105:18
  109:7,10
**switch** 195:12
  209:7 213:17
  247:20
**switching** 215:8
  236:25
**sworn** 6:22 278:7
  278:10,11,15
  280:10,13 281:14
  281:18 282:21
**sympathetic** 77:20
**symptom** 4:9
  103:25 104:13
  109:6
**symptoms** 92:18
  96:2
**synergistic** 248:22
**synonymous**
  10:20
**system** 4:9 9:23
  86:24 104:1,13
  105:17,17 107:20
  107:23 109:6
  113:24 114:6
  119:23 120:5
  180:4 181:7
**systematic** 158:1
  216:6,11 225:6,22
  233:4,10 234:1,16
**systemic** 152:18
  175:4 184:11
**systems** 9:21
  228:18

**t**

**tab** 4:8,10,11,12
  102:4,5 104:4,5
  109:13,15 110:10
  159:24,24 160:2

  272:23 273:4,11
**table** 136:24 137:8
  196:12,21,22,24
  217:11 222:19
**tactic** 121:9
**take** 5:9 18:5 22:8
  40:18 58:1 66:23
  85:25 90:3 92:13
  96:25 99:4 102:23
  104:7 119:21
  120:3 124:18,20
  129:18,23 131:5
  142:10 146:11
  165:7 168:21
  171:7 173:9 199:8
  199:18 207:5
  209:18 211:2
  213:19 257:9
  261:16 266:10
**taken** 1:20 5:12
  7:6 16:22 58:9
  103:10 118:8
  125:6 126:19
  129:11,17 165:12
  170:16 176:6
  185:11 208:8
  213:22 253:10
  261:8 274:23
**takes** 92:15 194:18
  194:22
**talbot** 3:24 5:17
**talk** 24:6 27:3,9,10
  27:10 38:24 51:2
  51:12 74:15 77:23
  92:1 113:23 119:3
  127:8 128:20
  186:24 196:3
  227:14 246:15
**talked** 130:6
  151:16 262:15,20
  262:23

**talking** 19:5 23:6
  51:15,16 58:13
  69:13 92:16,17
  120:2 137:17
  140:23 144:20
  162:2,3 178:23
  200:3 272:4
**talks** 38:5 96:10
  126:23 127:2,5,6
  130:3 187:20
  196:9
**taper** 94:16,19,20
  94:21 223:9
**tapering** 223:10
**target** 21:16 34:11
  71:14 73:25 76:7
  76:12 119:19
**targeted** 45:14
  46:1,4,9 69:18,19
  69:20 71:7,19,24
  71:25 257:18
**targeting** 74:22
  187:23
**taught** 15:20 33:1
  129:22 131:2
  141:17 162:14
**teach** 9:8 99:1
  130:2
**technical** 161:21
**technically** 260:22
  260:25
**technician** 126:13
  172:12,14
**technology** 5:7
**telephonically**
  1:20
**tell** 123:3 137:11
  171:25 194:13
  197:24 198:2
  210:22 238:9
  259:12 270:5

**temperature**
  86:14
**ten** 58:4 113:16
  170:11
**term** 13:4 21:10
  25:20,21 27:2
  44:17,21 67:14
  72:16 92:9,25
  93:11,19,23 94:5
  94:17 101:16
  117:11 118:25
  119:1,25 120:7
  123:15 137:16
  164:14 194:13
**terminology**
  192:25
**terms** 11:19 13:6
  16:12 21:23 23:5
  23:14 24:17 25:8
  26:4 41:6 43:2
  54:2 63:8 71:5
  92:1 98:4 128:6
  128:17 131:21
  135:9 139:13,16
  163:5 166:14
  176:11 202:14
  217:2 223:14
  226:11 253:23
  271:17
**test** 153:6 154:1
**tested** 156:21
**testified** 6:23
  46:23 200:21
  239:5 247:21
  268:7
**testify** 212:24
  213:7 278:10
**testifying** 251:22
**testimony** 19:6
  65:16 117:4 163:3
  173:17 177:8,15

198:7 206:24
219:23 220:4,5,11
220:22 221:3
223:15 233:9
239:8,16 243:15
248:25 249:2,5,8
250:17,22,23
251:1 252:2 264:3
266:16 267:9
277:15 278:7,11
278:15 280:6,7
281:6,9,12
**tests** 156:24
175:11,22
**teva** 209:14
**thank** 6:19 7:3
8:17 54:11 58:6
73:6 96:22 109:18
118:6 189:20,21
192:15 213:11,12
225:2 248:11
265:20 267:15,22
269:9 277:12,14
277:21
**thanks** 16:19 59:7
**theft** 266:25
**theory** 153:6,11
**therapies** 189:12
**therapy** 106:14
123:14
**thing** 66:22 82:16
228:15,21 229:3,6
229:12
**things** 38:25 83:18
83:20 98:25
148:24 163:21
215:5 242:22
247:11 257:4
269:7
**think** 15:14 23:3
40:6,20 42:21

46:22 48:21 49:10
55:1,13 57:2 80:2
80:8 89:24 90:22
91:3 92:24 96:8
96:15,23 101:12
102:18 111:22
113:2 114:13
117:22 118:22
121:10 123:22
128:16 137:17
141:8 150:13
153:10,11 154:24
158:20 178:1
186:15 194:25
199:16 202:2
205:5 206:25
207:4 212:6,8
220:14,17 221:20
221:24 224:14
232:10 235:10
239:20 244:2
248:8 250:5,15
252:21 253:14,19
253:24 254:25
257:4 269:5,23
275:2 277:9
**thinking** 116:3
256:7,8
**thinks** 277:10
**thirty** 279:18
**thomas** 2:11 6:6
**thorough** 235:18
**thought** 209:1
264:2
**thousands** 79:14
205:20,23,24
206:2 252:15,19
252:24
**threaten** 155:5
**threatening** 39:22
89:5,13 90:10

94:12 95:4
**three** 1:7 9:5 11:18
18:20 102:16
157:9 164:10
194:18 195:13
229:21 230:14
269:23 270:1,6
275:18
**threshold** 272:10
274:12
**throughput** 67:8
70:3
**throwing** 105:19
109:8
**ticket** 213:3,8
**tied** 106:25
**time** 5:23 7:3,11
7:15 9:6 11:17
14:8 15:12 17:6
18:24 19:9 31:19
33:6,15,20 44:23
46:15,18 48:24
56:2 58:11 63:20
64:2,8 66:23
91:21 94:21
100:18 103:12
104:18 105:2,22
106:18 107:9,17
118:10 124:19
125:8 131:23
132:12 134:11,19
138:6,7 144:20,21
147:6 150:25
153:17 154:1,9,20
155:21 156:9
157:6 162:24
163:19 170:11,18
174:6 179:18
189:22 192:7
193:18,21 194:19
197:7 202:9,10,15

202:22,25 207:24
208:1 211:6
213:12,24 219:20
221:22,23 226:20
229:24 230:7
232:12 237:14,20
237:21,24,25
239:4 244:1
245:12 246:24
257:15 261:11
263:11 270:5
272:19,24,25
273:1 277:12
278:9,16
**timeline** 240:24
241:2
**times** 7:7 50:25
100:25 115:21
133:12 138:4
156:1 195:13
197:11 206:23
222:6 241:18
244:18 252:15
255:10,11,15
276:23
**tissue** 11:17
**tissues** 11:24
**title** 13:25
**titled** 187:20 241:8
**titrate** 223:5,8
**today** 32:2 70:8
89:10 93:22 94:4
94:6 96:1 116:21
121:25 128:1
141:7 142:16,18
167:5 182:8 195:5
195:7,14 198:25
199:12 208:1
214:8,11 226:1
227:24 232:12
243:23 252:16,17

270:20
**today's** 264:3
277:15
**told** 24:22 28:20
33:6,12 34:25
79:6 128:20
162:14 198:9
209:17 235:14
**tolerate** 94:22
**tool** 103:3 128:10
259:23 260:8,11
**tools** 70:25 83:13
83:17,21
**top** 15:13,16 98:6
117:11 184:11
196:19 197:18
246:1
**topic** 39:8 93:16
140:11 249:5,11
**topics** 155:5
**total** 43:14 47:23
139:12 277:16
**totally** 186:3,6,9
186:12
**toyota** 270:18
**toyotaization**
67:25 68:4
**track** 1:7 191:24
229:20 230:14,16
279:6 280:3 281:3
**tragedy** 34:7
**train** 36:25 182:12
**trained** 22:14 55:9
107:11,21 126:12
126:21,25 131:4,7
**trainees** 9:7
**training** 15:25
21:5 32:1,6 33:3
39:6 66:4,14 96:5
96:8 99:1 115:3
130:10,14,15,20

130:21 161:22
171:3,12,17
172:13 225:17
226:7 249:6,17,21
249:23
**transcribed** 141:9
278:12 280:7
**transcript** 278:8
278:14,17 279:11
279:12 280:5,12
281:5,11,17
**transition** 210:16
**trauma** 122:8
**travel** 177:4
**traveled** 97:13
245:10
**treat** 10:22 11:1,4
31:3,11 32:10
34:11 39:23 40:3
44:24 85:20 89:4
89:12 107:11,22
193:13 270:25
271:9
**treated** 10:3 11:10
38:13
**treating** 9:14
10:10 21:1,6
108:25 243:13
254:1,8
**treatment** 24:15
25:2,6 27:13
28:16 31:5,8,19,22
32:3,8,14 39:4
44:22 48:17 84:10
91:10 93:19 94:14
101:25 108:1,14
108:17,20,21
118:20 119:9,24
120:6 123:8,10,11
123:13,24 124:3,7
124:10,10,12

162:21 163:6
164:11 167:7,8,13
182:14 194:3,15
194:23 258:19
269:13
**treatments** 30:19
30:21,25 31:21
101:6,10,21
165:10,11 166:14
189:11
**trend** 203:5
**trends** 154:24
166:14 201:18
217:5,11 218:11
222:22 261:21
**trial** 31:12,16
212:20
**tribune** 156:14,24
**tried** 15:1 165:10
199:10
**triggering** 249:9
**trinity** 245:13
248:16
**tripling** 48:22
**trouble** 43:1
**true** 33:4 41:3
55:5 56:23 84:16
84:18,20,21 90:16
92:20 93:14
103:23 104:11
122:15,16,18
139:21 169:2,15
193:19 202:21
247:5 252:16,17
252:18,21 278:14
**trumbull** 22:22
23:2 30:3,8 46:6
47:3 71:7,13,20
149:13,23 150:1
152:11,20,24
153:5,7,19 154:10

155:2,10,18,21
156:25 158:17,22
158:24 159:5,14
159:17,21 174:18
175:7,9,19,21,24
176:7,13,14,22
177:7 178:14
183:13,14,20,24
184:3,15 185:10
185:13,20 186:21
187:4 188:10,15
189:25 190:12,17
215:9,14,18,19,24
216:7,13 217:2,4
217:14,23,24
218:5,17 223:13
224:21 225:11
228:9 239:17
241:13,15 244:5
244:14 246:14,20
247:12 256:25
257:4
**trump** 104:22
**trump's** 105:4
**trumps** 48:6,12
49:6
**truncated** 67:17
120:19
**trusted** 182:7
**truth** 30:19 55:2
278:10
**try** 14:20 22:9
40:21 55:14 58:4
87:23 96:25
108:20 166:8
215:5 218:24
221:7 228:14
229:11 259:13
**trying** 53:4 69:12
77:11 101:12
108:22 170:1

186:14 229:2,6
**turn** 58:23 59:13
  63:8 77:9 84:2
  88:2 89:16 102:3
  244:16 270:14,17
**turning** 59:24
**turns** 210:22,24
**tv** 64:21
**tweets** 14:24
**twice** 100:23 101:3
**two** 4:15 40:1
  59:25 99:19
  140:10 151:19
  156:16 195:13
  230:23 231:3
  244:13 248:17
  251:15 263:15
  264:10
**type** 124:12
**types** 24:16 25:4,7
  41:22 43:17 83:19
  175:17 182:17
  202:13 208:24
  209:4 242:17
  275:8
**typical** 240:24
  241:2
**typically** 95:16
  134:5 182:18
  202:13

**u**

**u.s.** 104:22,25
  105:10 119:17
**uh** 137:25 266:21
**ultimately** 138:8
  212:1
**unable** 174:4
  277:6
**unaware** 237:7
**unchanged** 236:17

**unchecked** 173:1
  173:3 177:6
**undergo** 56:1
**undergoing** 90:8
**undergrad** 15:4
**underprescribed**
  30:23,23
**undersigned** 278:3
**understaffing**
  148:16
**understand** 7:16
  17:22 18:16 50:12
  52:2 53:17 55:2
  56:5 99:14 122:23
  130:21 150:9,18
  151:3 160:9,17
  191:9 192:24
  212:19 234:12
  235:3 239:14,18
  240:14
**understanding**
  7:23 16:16 21:6
  32:5 33:25 36:10
  43:1 55:25 101:2
  114:17 143:21
  161:6 201:16
  202:6 203:11
  213:4 219:22
  221:3 243:21
  268:3
**understood** 7:20
  64:9 154:7 239:17
**undertreated**
  28:21 30:9,11,14
  30:21 33:7,12,16
  34:25 35:1,4
  56:19 87:13
**undertreating**
  84:12
**undertreatment**
  24:18 30:16,17

37:3
**unfortunate** 277:3
**unfortunately**
  46:18 119:17
  193:16 194:15
**unhappy** 208:12
  208:18 209:1
**unified** 133:15
**unintentional**
  218:7
**unique** 163:18
  172:25 182:4
**unit** 5:11 246:5
**united** 1:1 5:14
  43:15 46:5 56:24
  57:6 60:15 61:7
  90:15 91:11
  140:15 175:10
  176:9 216:21
  217:12,22
**units** 202:19 203:5
  267:5 277:16
**universe** 170:6
  230:23
**university** 8:21
  81:8,12 85:5,9
  134:2,6 153:20
  178:10 195:13,16
  195:19,22,23
  196:2,25 197:11
  197:22,25 198:3
  198:15,20 199:2,5
  199:8,9,18,22
  200:2,18,22 201:1
**unknowingly**
  247:22
**unlicensed** 247:13
**unmute** 76:24
**unprecedented**
  89:6,14 173:1

**unprofessional**
  181:1
**unquote** 24:18
  78:8 149:7 173:15
  175:1 189:4,10,12
**unravelling**
  163:17
**unregistered**
  247:14
**unrestricted**
  179:12 183:2
**unsafe** 138:8
**unseen** 119:19
**unusual** 193:6,17
**unwilling** 277:6
**unwittingly**
  247:23
**update** 191:7,10
**urged** 84:10
**use** 10:9,13,16,19
  10:20,21,23 11:3,9
  12:5,17,20 13:4,6
  13:9,11 14:6
  24:10,17 27:6
  38:19 44:21 51:12
  61:19 71:12 81:19
  84:24 87:21 89:19
  90:2 91:13,16
  92:2,19 93:4,18
  94:25 95:11,13,21
  95:24,24 96:3,6,14
  96:19 97:8 101:17
  114:8 119:10
  121:20 122:10,14
  128:11 130:4
  137:16 156:19
  160:22 162:20
  163:5,7 179:19
  181:24 182:14
  189:25 190:13
  193:3,14 194:7,8

194:10,19,21
223:8,9,10 269:25
274:1,5 275:24
276:2 277:2
**users** 193:14 195:5
195:7 223:5
248:21
**uses** 261:20
**usual** 11:17 146:2
146:3 160:15
**usually** 84:14
94:21 242:20
248:5
**utilization** 97:16
130:25 138:7
157:13
**utilize** 180:15
**utilizing** 67:23

**v**

**v** 279:6 280:3
281:3
**vacuum** 165:8
**vague** 12:22 19:4
21:2 22:6 27:2
35:18 42:10 44:3
51:6,10,20 52:8
53:1 54:25 99:9
144:17 145:1
157:14 161:17
176:3 223:21
**vagueness** 16:12
**valid** 148:22
**validated** 272:9
274:12
**variables** 194:2
**various** 21:15
34:24 51:4 57:12
58:22 69:20 136:3
210:14 211:5
233:23 251:10

**vehicles** 167:22
**veracity** 80:9
**verify** 133:16
236:22,24
**veritext** 1:20 2:4,8
2:12,17,23 3:4,9
3:15,20 5:17,19
277:17,19 279:1,7
282:1
**veritext.com.**
279:17
**versus** 139:17
**vetoes** 181:8
**video** 1:9 5:8,11
**videographer** 3:24
5:5,18 6:19 54:7,8
58:7,10 59:10
103:8,11 118:6,9
125:1,4,7 170:14
170:17 213:20,23
257:11,14 263:7
263:10 270:2,6
277:14
**view** 22:4,10 27:12
28:4,7 29:10 31:8
39:2,6 44:8 47:13
53:13 56:8 63:16
63:17 64:11 65:4
65:12 77:14 79:25
85:16 88:1,2,12
93:10 94:23
101:19 117:19
118:14 143:3,6
156:9 167:19
168:20
**views** 14:10 66:3
66:12
**violate** 26:8 37:12
**violation** 96:16
268:18

**violations** 148:19
**virginia** 17:1
192:1
**virtual** 1:20 2:4,8
2:12,17,23 3:4,9
3:15,20 5:7
**virtually** 57:20
**virtue** 163:21
**vis** 128:17,17
**visit** 264:23
**visiting** 274:6
**vital** 36:24 86:13
86:17
**voices** 38:23
**void** 243:8
**volume** 42:23
46:25 47:6,11,13
47:17,17 48:6,11
49:5,16,21 50:7,17
98:4 224:10
245:21
**volumes** 48:8 99:3
203:3
**volunteer** 7:24
8:13
**vulnerable** 67:21
67:23

**w**

**wait** 138:4 227:1
**waived** 279:19
**walgreen** 199:1
**walgreens** 3:7
6:11 18:15 45:25
73:20,21 74:2,5
77:23 78:4,17,24
79:1 81:8,9,12,15
136:25 137:10
151:11,12,18,23
157:6 178:9
192:19 195:13,16
195:18,22,25

196:1,2,3,5,10,18
196:18,19,24
197:11,19,21,25
198:3,14,19,24
199:1,2,5,7,9,13
199:13,15,18,22
200:1,18,19,22,25
201:4,11 202:7
203:4,8,12,15,16
203:25 204:7,20
204:22,25 205:3,8
205:10,13,24
206:7,10,24
207:13,16,20
208:4,13,16,18
209:1 225:24
250:19
**walk** 143:2,5,13
**walks** 96:9 124:2
**walls** 83:21
**walmart** 3:13 6:16
18:16 45:25 157:9
187:1 214:7
225:24 231:3,8,15
231:18,25 232:3
232:24 233:2
234:9,25 235:23
236:12,21 239:12
240:14 241:12,14
244:3,9 246:17
249:2,6,8,24
250:18
**walmart's** 231:4
232:11 233:10,17
234:2,6,13,17,21
235:2,4 241:5
246:5 247:18
248:18
**want** 17:22 36:20
42:19 53:2 54:9
58:3 62:15 72:24

87:2 93:1 101:13
102:5,7 118:1
124:20 192:19
211:8 214:10
222:10 225:3
228:13 238:7,22
241:4 244:16
245:7,23,25
247:20 250:25
251:24
**wanted** 54:11
198:22 212:14
231:23 267:15
**wanting** 157:19
**wants** 272:20
**warning** 156:20
157:6
**warrants** 186:15
**washington** 2:18
278:6,24
**wasting** 189:22
**way** 17:14 20:7
26:3 28:2 29:21
51:21 57:19 61:13
63:11 91:17 92:12
97:2 98:2,25
99:18,21 100:5
105:18 109:7,10
112:24 113:5,14
113:22 114:7,8
117:18 118:13,19
134:22 137:18
144:13 148:6
149:9 153:5 156:7
158:1 169:21
176:21,23 178:9
193:12 194:6
195:3 204:8
211:12 212:11
215:9,25 217:7
218:22 227:24

241:20 242:19
253:16 254:13
255:17 266:7
268:9 278:17
**ways** 13:19 21:16
68:20 75:20 88:15
107:14 113:23
183:6
**we've** 57:23 104:6
127:25 170:9
199:22 206:15
213:18 214:6
**week** 104:21
**weeks** 119:14
**weigh** 167:12,16
**welfare** 113:24
**went** 15:7 72:6
80:17 152:3,12
174:21 196:17
201:14 202:7
218:9 219:23
246:19
**west** 3:10 17:1
192:1
**widely** 135:14
244:21
**widespread** 140:3
140:14
**willfully** 67:5
69:25
**wins** 235:23
**wisconsin** 85:5,9
**wishful** 116:2
**withdraw** 259:4
261:5
**withdrawal** 94:12
94:15 95:4
**witness** 1:20 4:2
6:18,22 8:2 18:10
19:19 23:24 24:10
25:19 26:3,12,19

27:2,16,23 29:14
29:23 31:15 32:16
33:14,25 44:4
45:20 47:10 48:2
49:10 50:11,23
51:11,21 52:10
53:4,7,21 54:5,18
55:1,13 56:5,14
57:1,10 62:16,25
64:8 66:9,24
72:20 73:17 74:14
75:11 79:8,21
80:13 82:22 83:5
87:1 88:5 93:14
94:1 95:16 96:8
96:22 98:23
101:12,23 102:9
102:16,20 103:3
111:14 113:8
120:12 123:22
124:24 128:16
129:21 135:14
136:2,15 137:15
142:16 143:10,25
144:19 147:13
150:12,22 152:7
152:16 153:10
154:6 155:14
157:5,17 158:6,20
161:11 162:1,12
163:4 164:8,25
165:7 167:4,15
169:1,12 171:24
173:21 174:3
176:4,18 177:14
183:19 184:8
185:16,24 186:8
188:6 190:4,16
192:5,14 197:17
198:9,22 205:17
206:2 211:22

213:10 215:13
216:11 218:21
221:6 222:19
223:22 224:5
228:5,18 229:5,14
233:7,15 234:4
235:10 236:2,8,16
237:19 239:20
241:23 242:12
243:19 244:7
250:5,15,23 251:5
254:12,25 256:5
257:16 259:25
262:13,23 264:7
264:16 272:13,24
273:15 278:10,21
279:8,11 280:1,4
280:11 281:1,4,15
**witness'** 279:14
**word** 10:18 27:6
61:19 223:8,9
**wording** 191:1
**words** 14:3 141:15
146:18,19 208:22
251:15
**work** 13:5,8,9,11
44:15 64:9 68:6
70:8 101:16
106:15 107:7
114:21 119:9
134:1 149:22
174:14 229:16
230:15 233:25
**worked** 116:20
126:15 127:13,16
186:18 241:20
265:22
**worker** 268:21
**workflow** 133:19
**working** 67:7 70:2
74:25 75:9 106:21

[working - zuckerman.com]

143:3 158:2,16
169:2 178:15
228:20 229:1,11
230:10 239:16
263:4
**workload** 155:6
**works** 142:24
**world** 165:23
244:22
**worried** 146:12
**wounded** 116:3
**wrap** 248:10
**write** 14:3 44:7
46:2 60:20 62:8
63:9 73:20 80:10
89:18 90:6 91:12
100:22 105:12,24
107:2,9,21,25
119:21 172:24
179:9 203:25
242:20 243:8
252:13
**writing** 10:6,9
18:7 21:4 36:11
53:14,22 64:3
106:9 127:25
135:20 141:13
**written** 12:4,14,16
14:9 19:5,8 34:6
43:15 110:15,17
113:9 115:5
137:10 138:25
139:4,22 140:16
140:19 141:5,9,17
141:22 193:10
217:15,17,20,22
242:18 247:13
250:2,12 252:3
268:7 274:14
275:17

**wrong** 186:2,5,11
**wrote** 13:23 42:21
43:8 59:8,25 60:6
60:7,13 61:4
63:19,20 64:8
69:23 70:17 76:5
76:10,15 77:1,1,5
77:8,18,22 80:3
84:7,23 88:23
89:1,8,15 91:21
100:13 103:24
104:8,12,21 105:3
105:22 106:5,18
106:24 108:23
109:5 116:10
117:10 118:22,24
119:17 121:19
122:5,15 123:6
128:14 141:7
151:12 237:25
238:12 246:4
247:23 248:15
270:19 271:5
274:20

**x**

**x** 4:1 166:20
**xanax** 111:4,20

**y**

**yaeger** 151:12,16
151:16 178:23
206:25 207:2,8,12
208:4
**yaeger's** 208:7
**yale** 15:4
**yay** 211:8
**yeah** 26:19 27:16
38:25 40:20 46:18
52:10 58:1,5
72:20 96:22
102:13 103:7

158:14 162:1
163:4 170:13
185:4,24 198:8
218:21 219:18
258:15 267:14
**year** 81:11 218:9
219:5,6 224:2
241:1 245:8
260:19,23,24
265:14,18 266:8
**years** 17:17 22:14
100:6 113:16,18
163:17 170:20
191:13 193:3,15
194:18 195:9,9,9
223:18 230:10
238:14 243:12
260:15 262:24
263:2 265:17
**yield** 252:8
**york** 2:13 3:5
16:24 244:18

**z**

**zion** 227:14,18
228:7
**zuckerman** 2:16
6:9
**zuckerman.com**
2:19

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.