1

```
SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK: PART 48
------------------------------------------------x

IN RE: OPIOID LITIGATION


                        INDEX NO.:400000/2017



------------------------------------------------x

                        July 12, 2021
                        Central Islip, New York


                MINUTES OF TRIAL



B E F O R E:        HON. JERRY GARGUILO
                    Supreme Court Justice




SIMMONS HANLY CONROY, LLC
Attorneys for Suffolk County
112 Madison Avenue
New York, New York 10016
BY:  JAYNE CONROY, ESQ,
     LAURA S. FITZPATRICK, ESQ.
     DANIEL P. BLOUIN, ESQ.
     JUSTIN PRESNAL, ESQ.



NAPOLI SHKOLNIK, PLLC
Attorneys for Nassau County
400 Broadhollow Road, Suite 305
Melville, New York 11747
BY:  HUNTER J. SHKOLNIK, ESQ.
     PAUL J. NAPOLI, ESQ.
     SALVATORE C. BADALA, ESQ.
     JOSEPH L. CIACCIO, ESQ.
```

2

<u>LETITIA JAMES</u>
**Attorney General of the State of New York**
Office of the New York State Attorney General
28 Liberty Street
New York, New York 10005
BY:  JOHN OLESKE, ASST. ATTORNEY GENERAL
     MICHAEL REISMAN, ASST. ATTORNEY GENERAL
     PETER POPE, ASST. ATTORNEY GENERAL
     MONICA HANNA, ASST. ATTORNEY GENERAL
     DIANE N. JOHNSTON, ASST. ATTORNEY GENERAL


<u>ARNOLD & PORTER KAYE SCHOLER, LLP</u>
**Attorneys for Endo Health Solutions, Inc.,**
**Endo Pharmaceuticals, Inc., Par Pharmaceutical,**
**Inc., & Par Pharmaceutical Companies, Inc.**
250 West 55th Street
New York, New York 10019-9710
BY:  JAMES D. HERSCHLEIN, ESQ.
     ANDREW K. SOLOW, ESQ.
     PAMELA J. YATES, ESQ.
     DIANA STERK, ESQ.


<u>MORGAN, LEWIS & BOCKIUS, LLP</u>
**Attorneys for Cephalon, Inc., Teva Pharmaceuticals**
**USA, Inc., Watson Laboratories, Inc., Actavis, LLC,**
**& Actavis Pharma, Inc., F/K/A Watson Pharma, Inc.**
1000 Louisiana Street
Suite 4000
Houston, Texas 77002
BY:  NANCY L. PATTERSON, ESQ.
     HARVEY BARTLE, ESQ.


<u>KIRKLAND & ELLIS, LLP</u>
**Attorneys for Allergan Finance, LLC,**
**F/K/A Actavis, Inc.,**
**F/K/A Watson Parmaceuticals, Inc.**
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
BY: MIKE BROCK, P.C.

3

KIRKLAND & ELLIS, LLP
**Attorneys for Allergan Finance, LLC,**
**F/K/A Actavis, Inc.,**
**F/K/A Watson Parmaceuticals, Inc.**
300 North LaSalle
Chicago, Illinois 60654
BY: TIMOTHY W. KNAPP, ESQ.


COVINGTON & BURLING, LLP
**Attorneys for McKesson Corp. and**
**PSS World Medical, Inc.**
The New York Times Building
620 Eighth Avenue
New York, New York 10018
BY: ANDREW STANNER, ESQ.
    DAVID LUTTINGER, ESQ.
    GREGORY L. HALPERIN, ESQ.


WILLIAMS & CONNOLLY, LLP
**Attorneys for Cardinal Health, Inc. &**
**Kinray, LLC**
725 Twelfth Street, N.W
Washington, DC 20005
BY: STEVEN M. PYSER, ESQ.
    MATTHEW P. MOONEY, ESQ.


REED SMITH, LLP
**Attorneys for AmerisourceBergen Drug Corporation**
**Bellco Drug Corp., &**
**American Medical Distributors, Inc., ("ABDC")**
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, Pennsylvania 19103
BY: MICHAEL J. SALIMBENE, ESQ.

4

GIBBONS P.C.
**Attorney for AmerisourceBergen ("ABDC")**
One Pennsylvania Plaza
New York, New York 10119
BY: PAUL E. ASFENDIS, ESQ.


FOLEY & LARDNER, LLP
**Attorneys for Anda, Inc.**
111 Huntington Avenue
Boston, Massachusetts 02199
BY: JAMES W. MATTHEWS, ESQ.
    ANA FRANCISCO, ESQ.
    KATY E. KOSKI, ESQ.

*       *       *

STEPHANIE CASAGRANDE HAGUE, CSR, RPR
SR. COURT REPORTER

In Re: Opioid Trial                    5

1

2          THE CLERK:  Supreme Court is now in

3    session.  The Honorable Jerry Garguilo

4    presiding.

5          Good morning, your Honor.

6          THE COURT:  Good morning everybody.

7    Good morning.  Please be seated.

8          THE CLERK:  This is continuing trial In

9    Re:  Opioid Litigation.  Jury is not present.

10         So yesterday I'm looking at my email 5

11   p.m. goes by, nothing; 6 p.m. goes by,

12   nothing; 7 p.m., I'm doing good.  8 p.m. I'm

13   watching Shark Week, that was almost appro

14   po.  Nine o'clock, now I'm giving one of

15   these, right.  Then 9:20, boom, the phone

16   goes off.  And you folks, some of you

17   continue to submit after the midnight hour.

18         I need some help.  I spent sometime this

19   weekend, for instance, on the Day, D-A-Y,

20   transcripts, and we also spent sometime on

21   the one, actually, I think it's Pyfer.

22         Oh, Brennan, excuse me.  I did Day

23   myself, of course, and I asked for the

24   assistance of my law secretary, Miss Galteri,

25   in connection with Brennan.

July 12, 2021

```
1                   In Re: Opioid Trial              6
2        I'm aware of the issue that was brought
3    up by Mr. Oleske on Friday.  I'm trying to
4    look for a method that makes it manageable
5    for the Court to inform you as to what the
6    Court's rulings are on the contested portions
7    of each deposition.
8        And, Mr. Oleske, as I understand it, the
9    only assistance, as far as your research in
10   the case, the only assistance, and if I'm
11   wrong you'll tell me, that the Court can
12   reach out for is with a "judicial employee."
13       MR. OLESKE:  Yes, your Honor.  Including
14   the law department.  So I think --
15       THE COURT:  According to research, I can
16   access the law department?
17       MR. OLESKE:  The direction from the case
18   law is, in fact, that's what a reverse
19   saying, the Court should have relied on the
20   law department.
21       THE COURT:  It should?
22       MR. OLESKE:  Yes.
23       THE COURT:  So, in other words, if I
24   engage the assistance of the law department,
25   we're okay.
```

```
 1                    In Re: Opioid Trial              7

 2          MR. OLESKE:  That's what the case law

 3     suggests, your Honor, yes.

 4          THE COURT:  All of you feel the same

 5     way?  I don't see anybody saying no.

 6          MR. PRESNAL:  Well, Judge --

 7          THE COURT:  Understand something,

 8     nothing leaves my desk.  Nothing leaves my

 9     desk without an intensely careful review

10     so...

11          MR. PRESNAL:  Judge, we did a little bit

12     of research over the weekend, and I do think

13     that you could appoint referees to hear and

14     report on these issues, which is what I think

15     you have in mind.  In other words, not to

16     make direct rulings, but to make

17     recommendations to you.

18          We're still discussing that issue with

19     the Defendants, and we're not all on the same

20     page, although I do think that we, in general

21     terms, see it the same way.

22          THE COURT:  If by the end of the day you

23     can tell me if there's any consensus, of

24     course, I'll hear it.

25          MR. PRESNAL:  There may be some
```

July 12, 2021

In Re: Opioid Trial                          8

1

2      procedural requirements of doing it via the

3      hear and report method that have to be done,

4      but that seems to be what the options --

5           THE COURT:  You mention job title of

6      people in the law department, the court

7      attorney referee, that's their actual job

8      title.

9           Okay, next step.  I spent some time

10     reviewing the past short form orders of this

11     Court in connection with many of the issues

12     that I anticipate hearing this morning.

13          Oh, by the way, does anybody know what

14     July 17th is -- excuse me, June 17th is?  I

15     think it's the anniversary, I think it's the

16     date that I got the assignment from the

17     coordinating panel.  I'll serve cupcakes,

18     something.

19          Now, go back to June 18th, 2018, motion

20     sequence 001 through 0019, which was

21     originally -- which was -- it was an

22     all-encompassing motion to dismiss.  The part

23     and parcel of it was Endo's petition to

24     dismiss for referencing the AOD.  As you

25     know, that motion was denied.

July 12, 2021

```
 1                   In Re: Opioid Trial              9

 2          At page 16 in this Court's short form

 3       order I noted the following -- and, by the

 4       way, I raise this because it was also raised

 5       in the motions in limine that were submitted

 6       prior to the commencement of trial.

 7          At page -- again, at page 16, Endo's

 8       argument pursuant to CPLR 3211(a)(5) that the

 9       Plaintiffs' claims against it are barred by

10       an assurance of discontinuance executed on

11       March 16th -- excuse me -- March 2016

12       concerning its marketing Opana ER, its

13       branded version of the semi-synthetic opioid

14       analgesic Oxymorphone, is rejected.

15          On page 17 the Court goes on to note:

16       In addition, the assurance states that

17       nothing contained herein shall be construed

18       to deprive any member or other person or

19       entity of any private right under law or

20       equity, and that it does not limit in any way

21       the Attorney General's power to take actions

22       against Endo for either noncompliance with

23       its terms or noncompliance with any

24       applicable order as to "with respect to any

25       matters that are not part of the covered
```

In Re: Opioid Trial                    10

1    conduct."  We do know, of course, the subject
2    matter of the AOD was Opana, and there was
3    again a cutoff date of 2016.
4        The Court further notes on the page 18:
5    Moreover, the March -- moreover, the March
6    2016 assurance of discontinuance does not
7    immunize Endo from civil actions for
8    subsequent fraudulent activities within New
9    York or bar the counties from bringing law or
10   equity claims against it for practices within
11   their respective jurisdictions.
12       Now, keep in mind, that motion way back
13   when, that's sequence 001, did not involve
14   the State.  It was -- at that point the only
15   Plaintiffs participating were all the
16   Counties.
17       At motion sequence 064, the Court made
18   additional findings, again, as concerns the
19   AOD issues, at page 3:  In addition, the
20   assurance of discontinuance states that,
21   again, nothing contained herein shall be
22   construed to deprive any member or person or
23   entity of any private right under law or
24   equity.  Again, that was, of course, noted in

July 12, 2021

```
                        In Re: Opioid Trial                11
 1
 2      the early decision.  And it does not limit in
 3      any way the Attorney General's powers to take
 4      actions against the moving Defendants for
 5      either noncompliance with its terms or
 6      noncompliance with any of the applicable law.
 7          Then it notes:  With respect to any
 8      matters that are not part of the covered
 9      conduct, significantly, the moving Defendants
10      neither admitted or denied the Attorney
11      General's various findings of unlawful
12      practices, statements or omissions under the
13      General Business Law 349 and 350 regarding
14      the marketing of Opana.
15          On the same page it notes:  The March
16      2016 assurance of discontinuance does not bar
17      the various claims asserted against the
18      moving Defendants by the Attorney General in
19      the instant action.  While the assurance of
20      discontinuance is an enforceable contract
21      between the Attorney General and the moving
22      Defendants, the purpose of such agreement was
23      to resolve, without formal litigation, the
24      claims that the moving Defendants engaged in
25      deceptive consumer practices in violation of
```

```
 1                    In Re: Opioid Trial              12
 2        General Business Law 349 and 350 in the
 3        marketing of Opana.
 4             Then at motion sequence 163, once again,
 5        the AOD issue comes up, including today it's
 6        the sixth time we've heard about it.
 7             The Court notes at page 2:  The
 8        Defendants argue that they are entitled to an
 9        order barring the State of New York from
10        predicating this public nuisance claims on
11        evidence related to their marketing of Opana
12        ER during the period prior to 2016 and on
13        evidence related to their unbranded marketing
14        of prescription opioids in general.
15             Again, I think there's a Stipulation in
16        the motions in limine that the State will not
17        go into Opana marketing prior to the
18        effective date of the AOD.
19             Then this decision at page 2 goes on to
20        note the following:  In any event, the
21        Defendants failed to demonstrate a prima
22        facie case that the March 2016 agreement with
23        the Attorney General extended to their
24        marketing and supply of prescription opioids,
25        other than Opana.  Fundamental principle of
```

```
                        In Re: Opioid Trial                    13
 1
 2      contract interpretation is that an agreement
 3      should be construed in accordance with
 4      parties' intent.  The best evidence of what
 5      the parties -- the best evidence of what the
 6      parties' Agreement intends what they say in
 7      their writing.  In a written agreement that
 8      is complete, clear and unambiguous on its
 9      face must be enforced according to its
10      planned meaning.
11         Then at page 3:  The Defendants failed
12      to make a prima facie case that the term
13      covered conduct in the assurance of
14      discontinuance must be interpreted as
15      including the promotion and marketing of
16      Opana ER and other prescription opioids
17      performed by third parties.
18          Instead, the language shows that the
19      Attorney General's inquiry was directed at
20      the Defendants' own statements, misstatements
21      and omissions about Opana ER, particularly
22      those made in printed materials posted on
23      their public website and conveyed to their
24      sales representatives to health providers,
25      and that it concluded their marketing
```

July 12, 2021

```
 1                    In Re: Opioid Trial              14
 2        practice, statements and omissions regarding
 3        that prior violated General Business Law 349
 4        and 350.
 5            Then again at motion sequence 236,
 6        again, the AOD issue came up.  In connection
 7        with a petition seeking severance, the Court
 8        noted any potential prejudice to Endo flowing
 9        from the AOD is better dealt with a careful
10        -- with careful instructions to the jury
11        rather than trying the case three times,
12        which was suggested in the petition, so three
13        trials involving Endo.
14            There was a presumption that jurors will
15        obey a judge's limiting instructions, see
16        Robert A. Baker and Vincent Alexander
17        evidence in New York State and federal courts
18        Section 1-19, second edition.
19            Then you go through the rulings of this
20        Court in connection with the form motions in
21        limine, go to page 7, one-third down the
22        page:  Defendant Endo's motion in limine
23        regarding its assurance of discontinuance
24        with the State, the ruling, the Court will
25        abide by its short form orders as concerns
```

In Re: Opioid Trial                    15

1    the AOD.

2         That's a history of the litigation

3    involving the AOD.  It seems to the Court

4    that, and I believe it's been stipulated,

5    that as the AOD or anything in it reflects on

6    the marketing of Opana prior to the -- up to

7    the date of the AOD is out of bounds, but any

8    other products are, in fact, not barred by

9    the language of the assurance of

10   discontinuance.

11        MR. REISMAN:  Your Honor, if I may?

12        THE COURT:  Is it Reisman or Reisman

13   (pronouncing)?

14        MR. REISMAN:  If I may just interject

15   for a moment.

16        THE COURT:  I beg your pardon?

17        MR. REISMAN:  If I may just interject

18   for a moment.  Michael Reisman from the

19   Attorney General's office for the State of

20   New York.

21        In fact, there is no -- your Honor

22   referred just now to a Stipulation.  I am not

23   aware of any such Stipulation.  There is a --

24   the AOD is a document, of course, that the

```
1                    In Re: Opioid Trial              16
2       Court has considered, but with respect to the
3       issues at hand, the State late last night,
4       apologies for the lateness, about 11:30,
5       filed the letter with the Court attempting to
6       delineate these issues, and the issue is that
7       the AOD, as your Honor has observed, and as
8       Endo's counsel has observed, relates to
9       marketing of Opana ER.  That evidence, as
10      your Honor knows, may come in still if it
11      addresses other issues, such as Endo's use of
12      front groups and KOLs, third passage --
13          THE COURT:  The third part involving as
14      per this Court's prior short form orders is
15      allowable.
16          MR. REISMAN:  Okay.
17          THE COURT:  If that's what you're
18      saying.  It specifically says that in the
19      Court's prior determinations.
20          MR. REISMAN:  Yes, your Honor.
21          In our letter last night we explained
22      that because this is a public nuisance
23      action, evidence concerning Endo's knowledge
24      of abuse and diversion, including its
25      knowledge gained through marketing and
```

July 12, 2021

1

2    research and so on regarding Opana ER, is

3    within bounds.  It is within bounds because,

4    as your Honor saw in the letter, after March

5    1st of 2016, the FDA asked Endo, in a very

6    extraordinary situation, to withdraw,

7    reformulate Opana ER from the market due to

8    the risks of abuse.  And then ultimately Endo

9    did that, and Opana ER, the reformulated

10   version, was pulled from the market and,

11   ultimately, the FDA withdrew its approval.

12        So our position is that the events post

13   March 1st 2016 call into question:  What did

14   Endo know and when did they know it about the

15   abuse and diversion of Opana ER?

16        And just one final point I would make,

17   your Honor, and apologies if I was not clear

18   about this on Friday, the AOD specifically

19   concerns Opana ER.  It does not concern Opana

20   immediate release or Opana IR.

21        The Oxymorphone document that your Honor

22   considered on Friday refers generally to

23   Oxymorphone.  It does not refer specifically

24   to Opana ER or Opana IR.  So that is another

25   key distinction as we made in the letter that

1                       In Re: Opioid Trial              18

2        was filed last night.

3             MR. SOLOW:  Andrew Solow for the Endo

4        Defendants.

5             THE COURT:  Good morning, Mr. Solow.

6             MR. SOLOW:  Your Honor, we don't

7        disagree with your Honor's recitation of the

8        history of the AOD motions, and I acknowledge

9        there have been several of them.

10            If I could, your Honor, to simplify

11       things moving forward.  Your Honor's rulings

12       were as stated.  If we could just have a

13       continuing objection on our position, as your

14       Honor knows, we have now up in front of the

15       Appellate Division on issues that your Honor

16       has ruled are outside the AOD, that could

17       certainly streamline things.  That's my first

18       request, your Honor.

19            THE COURT:  The answer is yes,

20       continuing objection -- continuing exception

21       noted.

22            MR. SOLOW:  Thank you, your Honor.

23            So turning then, your Honor, to the

24       issue at hand is what appears to be a

25       disagreement about the scope of marketing

July 12, 2021

```
1                    In Re: Opioid Trial              19

2       that is covered conduct.

3           As your Honor knows, you asked on Friday

4       for us to provide you a history in a

5       submission to Miss Liccardi.  I sent that

6       email last night, I believe before the Shark

7       Week viewing.

8           Your Honor, I call your specific

9       attention to the covered conduct paragraphs

10      of the AOD, paragraphs 11 through 35.

11          So while your Honor's short form orders

12      refer, respectfully, in the shorthand to

13      marketing, if you review those paragraphs of

14      the covered conduct, there are quite a bit of

15      subsections within there.  And I'll just read

16      those titles for the record, your Honor.

17      There is covered within "Covered Conduct,"

18      the crush-resistance of reformulated Opana

19      ER.  The addictiveness of Opana.  Certain

20      statements distinguishing Opana ER from

21      OxyContin.  Certain statements that suggest

22      you can achieve higher functions from Opana

23      ER.  Statements and omissions related to

24      Opana ER studies.  Detail of problem New York

25      healthcare providers by certain Endo sales
```

```
 1                    In Re: Opioid Trial              20
 2      representatives in connection with the
 3      promotion of Opana ER.  Marketing statements
 4      directed to healthcare providers and
 5      patients.
 6           So, your Honor, our position, within the
 7      scope of your Honor's short form orders, is
 8      that there is quite an extensive amount of
 9      "covered conduct" covered by the AOD.  And
10      all we are asking for, your Honor, consistent
11      with what your Honor ruled on Friday, is
12      those items are out of bounds for the
13      Attorney General.
14           I did read Mr. Reisman's letter last
15      night after at 10 to 12 and, your Honor,
16      that's the issue.  It appears to us there is
17      an attempt at overreaching.  Again, it
18      harkens back to this concept of
19      Courtwright -- Dr. Courtwright.  That even
20      though they seem to on one side be saying,
21      yes, we acknowledge the marketing prior to
22      March 2016 is out, they then say, but we're
23      allowed to actually put that evidence in to
24      support other claims about conduct that
25      happened after 2017.
```

```
 1              In Re: Opioid Trial                21

 2          Your Honor, our position is that is a

 3     clear violation and out of bounds.

 4          THE COURT:  How about I'm willing to

 5     read to the jury that portion of the AOD?

 6          MR. SOLOW:  Well, your Honor, if I may.

 7     That's why I referred your Honor to the

 8     motion in limine, not to reargue the motion,

 9     but your Honor asked us to refresh your

10     recollection.

11          THE COURT:  You did.

12          MR. SOLOW:  Right.  And that's the

13     issue, your Honor.  It is a Settlement

14     Agreement.  As set forth in the case law in

15     our motion in limine, the jury is not

16     entitled to rely upon that.

17          I understand your Honor is now taking

18     the position that the way to work around this

19     are limiting instructions, that's the

20     problem.  You now have -- if you want to

21     submit to the jury the issue of what covered

22     conduct is, right, your Honor noted in the

23     short form orders we neither admit nor deny

24     any of that.

25          So on one hand we're now going to have
```

In Re: Opioid Trial                    22

2    the jury deciding factual issues about why --

3    what the State is barred from proceeding

4    under this cause of action.  On the other

5    hand I've got the same jury who's deciding

6    the case against the Counties who are not

7    allowed to know about the Settlement

8    Agreement, because it's a Settlement

9    Agreement, there is significant case law on

10   that.  There are not admissions, contrary to

11   arguments your Honor has heard, it can't go

12   to notice.  So that's the problem, your

13   Honor.

14       And I understand and respect the fact

15   that your Honor has ruled on that, and we've

16   taken it up on appeal, but that's the very

17   issue, your Honor.

18       At a certain point, now that you have

19   granted us a continuing objection around what

20   is -- what your Honor has held is not

21   marketing, for example, third-party

22   marketing, the issue, your Honor, of now

23   debating and letting the State put in as an

24   issue of fact whether, for example, the Opana

25   ER pre-approval training manual, which there

```
                         In Re: Opioid Trial                    23
 1

 2    is deposition testimony establishing without

 3    a doubt that it is the Opana ER training

 4    manual, your Honor instructed the jury Friday

 5    they're not allowed to consider that for the

 6    State, but now we're going to have the State

 7    use that document just so the jury can

 8    determine that, in fact, it is covered under

 9    the AOD.

10         In the meantime, the jury, as the

11    Counties' jury, is now hearing the very

12    Settlement Agreement they're not entitled to

13    hear because there are no admissions.  It

14    does not go to notice.  So, admittedly, your

15    Honor, that's the conundrum we have.

16         So I don't believe submitting -- reading

17    paragraphs 11 through 35, which we neither

18    admit nor deny to the jury, just to allow Mr.

19    Reisman to use a document which, candidly, we

20    think, as a matter of law, your Honor can

21    determine is clearly, under your short form

22    orders, covered as a covered conduct.  That's

23    the issue, your Honor.

24         THE COURT:  Thank you.

25         Mr. Reisman, very briefly.
```

July 12, 2021

In Re: Opioid Trial                    24

1

2      MR. REISMAN:  Yes, sir, understood.

3          So to cut to the chase here, so there is

4      a type of evidence regarding Endo, Endo's

5      statements made during marketing to

6      healthcare providers regarding the alleged

7      crush-resistant properties of reformulated

8      Opana ER.  The State has no intention of

9      introducing that type of evidence in this

10     trial.

11         THE COURT:  That's what I was referring

12     to.  Yeah, keep going.

13         MR. REISMAN:  Yes.  Yes.  And I think

14     we're agreed on that.

15             However, there is evidence concerning

16     Endo's knowledge of abuse and diversion at

17     the company level, at the marketing executive

18     level, their call plan strategies, the extent

19     of their detailing in New York, the extent of

20     their payments to healthcare providers in New

21     York, generally, as reflected in things like

22     open database, all those sorts of, types of

23     evidence are relevant to the question of what

24     Endo knew about abuse and diversion of

25     opioids generally and regarding Opana ER

In Re: Opioid Trial                      25

1  specifically because, as we know, it was

2  withdrawn from the market because of abuse,

3  and that happened after March 1st 2016 and

4  that brings into play, it brings within

5  bounds, all of the evidence regarding what

6  Endo knew.

7  THE COURT:  Okay.  Bring the witness in,

8  please.

9  Make your objections in realtime.

10  MR. SOLOW:  Thank you, your Honor.

11  THE COURT:  I'm reserving all your

12  objections and your exceptions.  Make them in

13  realtime also.  The witness, please.

14  Oh, by the way, somebody noticed there

15  may be some Jewish holidays coming up real

16  soon.  There was actually an article in the

17  Long Island paper yesterday about three that

18  are coming up real soon.  So we'll make some

19  inquiries with the administration here as to

20  the availability of the facilities on those

21  days.

22  Good morning, Doctor.

23  THE WITNESS:  Good morning.

24  THE CLERK:  Good morning, Doctor.  I

Continued Direct/Dr. Lembke                    26

1
2          remind you you're still under oath.  You may

3          be seated.

4               THE COURT:  Bring the jury in, please.

5          Thank you.

6               THE CLERK:  All jurors are present and

7          properly seated, your Honor.

8               THE COURT:  Please be seated everybody.

9          Ms. Conroy.

10               MS. CONROY:  Thank you, your Honor.

11          Good morning.  Good morning, your Honor.

12          Good morning, Dr. Lembke.

13               THE WITNESS:  Good morning.

14               MS. CONROY:  Welcome back.

15               THE WITNESS:  Thank you.

16      CONTINUED DIRECT EXAMINATION OF DR. LEMBKE BY

17      MS. CONROY:

18           Q.   Just to sort of recap for everyone, last

19      week we talked about addiction, correct?

20           A    Yes.

21           Q.   And withdrawal, tolerance, dependence,

22      we talked about those concepts?

23           A    Yes, we did.

24           Q.   Okay.  And you also spoke about dose and

25      duration of the medication, how long someone took an

```
 1              Continued Direct/Dr. Lembke            27
 2     opioid and how high the dose might have been.
 3          A    Yes.
 4          Q.   And you explained chronic pain versus
 5     acute pain versus cancer pain.
 6          A    Yes.
 7          Q.   Okay.  And you also talked about the
 8     methods that promotional messages could reach
 9     doctors.  Could you just give me -- just remind the
10     jury specifically what those were.
11          A    Promotional messages reach doctors
12     through what's called drug reps who are employed by
13     the pharmaceutical industry to go out to doctors'
14     offices and hospitals to market their products.
15               MR. PYSER:  Objection, your Honor.
16               Just a clarification of the term "the
17          pharmaceutical industry."
18               THE COURT:  Yes.  Ms. Conroy, we
19          discussed that the term --
20               MS. CONROY:  Yes.
21          Q.   Do you recall that?
22               THE COURT:  Dr. Lembke --
23          A    Yes.  So they're hired by certain opioid
24     manufacturers to go out to the doctors' offices and
25     hospitals to market certain opioid products, but
```

1              Continued Direct/Dr. Lembke          28

2      promotional messages are also conveyed through

3      things like continuing medical education, which

4      doctors are required to attend in order to maintain

5      licensure.

6              The point of continuing medical

7      education is to keep them up-to-date on science.

8      Promotional messages are also conveyed through key

9      opinion leaders who are leaders in their field,

10     often from prestigious institutions who are in many

11     cases receiving payment from certain opioid

12     manufacturers to go and give these talks and promote

13     what certain opioid manufacturers call their key

14     promotional messages.

15             Opioids are also promoted through

16     journal articles that are published in peer-review

17     literature.  These studies are sometimes funded by

18     the opioid manufacturers and/or the authors are

19     employed by certain opioid manufacturers or are paid

20     consultants of certain manufacturers.

21             Certain opioid manufacturers also

22     promote their messages by ingratiating themselves

23     and lobbying certain regulatory bodies, so the State

24     regulatory bodies or things like Joint Commission,

25     which I talked about, which is an organization that

1

2   accredits hospitals without which those hospitals

3   would not be able to receive payments from insurers

4   like Medicare.

5            Certain opioid manufacturers have also

6   created relationships with the Federation of State

7   Medical Boards, and you'll remember the Federation

8   of State Medical Boards is the organization that

9   polices doctors to make sure that they are not

10   engaged in unsafe and dangerous practices; that they

11   are, as the hippocratic oath would say, first do no

12   harm in their treatment of patients.

13       Q.   Thank you.

14            The next topic I would like to get into

15   with you is:  What is the rate of addiction to

16   prescription opioids when they are used to treat

17   chronic pain patients?  Do you know that rate?

18       A    Yeah.  So I've looked extensively at the

19   scientific literature on this topic, which is to say

20   the topic of how many people who are prescribed

21   opioids by their doctor for a chronic pain condition

22   have an opioid addiction, and the most reliable

23   evidence shows that about 8 to 12 percent of

24   patients getting an opioid from a doctor for a

25   chronic pain addiction have an opioid addiction.

Continued Direct/Dr. Lembke                30

1

2      Q.   That's 8 to 12 percent?

3      A    Yes.

4      Q.   What do you rely on for this figure?

5      A    I rely primarily on a meta-analysis by

6   Vowles.  Meta-analysis is the study that combines a

7   bunch of different studies into one and analyzes

8   that data to come up with a number that represents

9   all of those studies, and the Vowles is the

10  definitive work on this question because it includes

11  studies that specifically set out to find out the

12  rates of misuse and addiction among chronic pain

13  patients getting opioids from their doctor.

14           In comparison to other studies that have

15  claimed to explore this question, which don't

16  actually ask patients about misuse and addiction,

17  but expect patients to volunteer that information

18  and base their results on whether or not the patient

19  brought it up themselves, and that's highly

20  problematic, because misuse, opioid misuse, and

21  opioid addiction are highly shameful behaviors.

22  Patients would not naturally volunteer to their

23  doctor that they're misusing the opioids their

24  doctor is giving them.

25           So it's really essential when trying to

```
 1                  Continued Direct/Dr. Lembke        31

 2       figure out the rates of addiction in this population

 3       that we do things like ask the patient about it or

 4       give them questionnaires that might explore that or

 5       test their urine for the presence of that drug or

 6       another drug.  And Vowles has exactly done that, the

 7       study that I rely on.

 8                    It's taken new world patients from

 9       primary care clinics, from pain clinics, and it's

10       included only those studies that actually sought to

11       illicit the specific information about whether those

12       patients were misusing or addicted to opioids.

13            Q.   And so that study determined 8 to 12

14       percent of the patients would become addicted,

15       correct?

16            A    That study shows that among chronic pain

17       patients taking an opioid, about 8 to 12 percent of

18       them are addicted to opioids.

19            Q.   And what does that mean with respect to

20       the risk of addiction, how does that fall in line, 8

21       to 12 percent; what does that mean?

22            A    So in medicine if you're trying to

23       communicate to patients or providers whether or not

24       a risk is common, uncommon, very common, a very good

25       point of reliance is a scale from World Health
```

1

2      Organization.  And the World Health Organization has

3      said that if the risk of an adverse event from

4      taking a drug is somewhere between 1 percent and 10

5      percent, then that's a common risk and they use the

6      language of common.  If the risk is greater than 10

7      percent, that is considered very common.

8                  So according to the Vowles

9      meta-analysis, with the risk of 8 to 12 percent,

10     that means that the likelihood of being addicted in

11     a population of chronic pain patients getting

12     opioids is common to very common.

13                 I would also add that this definition of

14     common to very common is the same definition that

15     can be found in some opioid manufacturer labels.

16                 So, for example, a label for Opana ER,

17     which is an Endo product, says in the label that a

18     risk factor is common if it is between 1 and 10

19     percent of the population manifesting that problem

20     as a result of taking the drug.

21          Q.   And so the risk of addiction to

22     prescription opioids when taken by a chronic pain

23     patient is a far cry from rare, correct?

24          A    That is correct.

25          Q.   Now, I would like to move on to talk

```
 1              Continued Direct/Dr. Lembke          33

 2    with you about some specific promotional messages,

 3    and I'd like you to refer to what was marked as

 4    Exhibit P-27812.  It is pretty big and it has -- it

 5    has an email on the front, but what I'm going to be

 6    asking you about is the document that has Kadian on

 7    it with a ribbon.  27812.

 8            A    Yes, I have that.

 9            Q.   Doctor, what is the drug Kadian?

10            A    Kadian is a long-acting form of

11    morphine.

12            Q.   And if you could turn to, I think it

13    might be easiest if I give you the actual page of

14    the document and then I'll give you the Bates No.

15    So page 28 of the document and the Bates No. is --

16    I'll put it up here -- Allergan MDL 01610549; do you

17    have that page?

18            A    Yes, I do.

19            Q.   And we spoke a little bit about this on

20    Friday.  Do you see the term it says:  Despite the

21    improvements in pain management that have occurred

22    over the past decade several barriers to effective

23    pain control remain, and do you see the third bullet

24    point, opioid phobia?

25            A    Yes, I see that.
```

```
 1                     Continued Direct/Dr. Lembke              34

 2            Q.    Okay.  And what is opioid phobia?

 3            A     Opioid phobia, in the way that it is

 4       used here, refers to an irrational fear on the part

 5       of the prescriber that their, that their patient

 6       will get addicted to opioids through their

 7       prescription.

 8            Q.    And now I'd like you to turn to page 31

 9       of the document, and it's Allergan MDL 01610552.

10       And if you could take a look at the very bottom it

11       says:  Although some progress has been made in

12       providing good pain control to every patient, many

13       factors still interfere with pain management.  These

14       include inadequate education of healthcare

15       providers, fear of regulatory action by clinicians

16       and inappropriate fear of addiction.

17                  Do you see that?

18            A     Yes, I do.

19            Q.    Is it inappropriate for a clinician or a

20       physician prescribing an opioid to a chronic pain

21       patient to fear addiction?

22            A     No, it is not.

23            Q.    And why is that?

24            A     Because, as I just said, the risk of

25       becoming addicted through a doctor's prescription
```

July 12, 2021

```
 1              Continued Direct/Dr. Lembke              35
 2    for treatment of chronic pain is actually common or
 3    very common.   Anybody can get addicted.
 4         Q.   And is it actually inappropriate in a
 5    learning manual for sales representatives, who are
 6    going to promote Kadian, to suggest that a fear of
 7    addiction is inappropriate?
 8         A    Yes.   I believe that these kinds of
 9    statements are false and misleading and shouldn't
10    have been included in training manuals.
11         Q.   Next, I'd like you to turn to page 76 of
12    the manual, and it is Allergan MDL 01610597, on page
13    76 of the manual.   And do you see what I have
14    highlighted here:   Substance abuse will be seen in a
15    few patients in every -- what does CBP stand for?
16         A    Chronic benign pain.
17         Q.   And what is chronic benign pain?
18         A    Non-cancer pain.
19         Q.   And it goes on to say:   Perhaps largely
20    because patients attempting to obtain opioids will
21    eventually end up at a pain management practice.
22    However, despite the continued unscientific beliefs
23    of some clinicians, there is no evidence that simply
24    taking opioids for a period of time will cause
25    substance abuse or addiction.
```

1          Continued Direct/Dr. Lembke          36

2               Do you see that?

3     A     Yes, I do.

4     Q.    Is that true?

5     A     No, it is not.

6     Q.    Is it false?

7     A     Yes, it's false.

8     Q.    Now, if you go further down on the page,

9     it says at the very last line:  Educating clinicians

10    about these guidelines will help to ease their fears

11    of prescribing for patients with chronic benign

12    pain, and it's under a section entitled:  Guidelines

13    for Opioid Use in Chronic Benign Pain.

14               Do you see that?

15    A     Yes, I do.

16    Q.    Can you explain to the jury what is

17    meant by "guidelines."

18    A     Guidelines, when that word is used, it

19    has a strong influence on physicians, especially if

20    it comes from an esteemed organization or was

21    authored by leaders in the field.

22               Busy clinicians do not have time, the

23    way that I have had time, to read them in articles

24    to establish what the science really shows.  They

25    definitively rely on these condensed guidelines to

```
 1              Continued Direct/Dr. Lembke              37

 2     summarize the evidence for them so that they know

 3     how best to practice and care for their patients.

 4              So guidelines tend to be very

 5     influential.  That word alone carries weight in

 6     terms of informing a clinician's decisionmaking

 7     capacity.

 8              Q.   And let me just take a moment to ask

 9     you, given your expertise, you are an addiction

10     specialist, correct?

11              A    That's correct.

12              Q.   Are you in a different position than

13     other clinicians to evaluate national guidelines?

14              A    Well, I think that I'm -- vis-à-vis the

15     opioid epidemic?

16              Q.   Yes, sorry.  I'll be specific, yes,

17     talking -- not with everything.  Your specialty is

18     addiction, correct?

19              A    Yes.

20              Q.   So are you in a different position than

21     a clinician who has a different specialty in

22     evaluating guidelines with respect to opioids?

23              A    Yes.  My background and knowledge allows

24     me to really appreciate what is true and what is

25     false about these guidelines on the treatment of
```

1

2    pain using opioids.

3              The average physician out there has very

4    little training in addiction medicine.  We get

5    almost no training in medical school and, in

6    general, very little in our residency, which is that

7    apprenticeship period that follows medical school.

8              So the reason that I was able to see

9    problems with opioid prescribing in my clinical

10   practice much earlier than the average clinician is

11   not because I am smarter or anything like that, it's

12   because I'm an addiction medicine doctor so they

13   were coming into my clinic, whereas other types of

14   clinicians oftentimes they don't have -- well, they

15   don't have the training and education, even under

16   the best of circumstances, even with training, it's

17   hard to detect, and then, of course, in modern

18   medicine today very often there is not the

19   opportunity of continuity of care to be able to see

20   what happens to your patient after you prescribe the

21   opioid.

22             So it's very, very hard for the average

23   clinician to see that the opioid epidemic was

24   happening as it was sort of exploding in our

25   society.

Continued Direct/Dr. Lembke                    39

1

2          Q.    And if we could now take a look at page

3     77 of the manual, which is Allergan MDL 01610598, it

4     talks about three national guidelines that have been

5     published.  Do you see that?

6          A    Yes.

7          Q.    And one is the American Academy of Pain

8     Medicine; do you know what that is?

9          A    Yes, I do.

10         Q.    Okay.  And what is that?

11         A    That's what's called a professional

12    medical society, and in this case it's a society of

13    pain doctors and pain healthcare providers, people

14    who specialize in the field of pain treatment.

15         Q.    And is that the same for the American

16    Pain Society, the same sort of group?

17         A    Yes.

18         Q.    And they published a consensus

19    statement, The Use of Opioids for the Treatment of

20    Chronic Pain; do you see that?

21         A    Yes.

22         Q.    And have you reviewed that document?

23         A    Yes.

24         Q.    And do you have an opinion as to whether

25    or not it fairly states the risks of addiction to a

Continued Direct/Dr. Lembke                    40

1    clinician prescribing opioids for a pain patient?

2         A    That document states that it actually

3    recommends opioids in treatment of chronic pain.

4    So, again, we're not talking about short-term use

5    for acute pain from which there is good evidence,

6    we're talking about long-term use greater than three

7    months of chronic pain for which there is no

8    reliable evidence, and this document actually

9    recommends the use of opioids in the treatment of

10   chronic pain, despite the absence of evidence to

11   support that.

12        Q.   And if you take a look a little further

13   down, another guideline is the Federation of State

14   Medical Boards.  It's developed model guidelines for

15   the use of controlled substances for the treatment

16   of pain.  Can you explain for the jury what the

17   Federation of State Medical Boards is?

18        A    So, again, the Federation of State

19   Medical Boards is like the police of doctors making

20   sure that doctors are practicing safe medicine and

21   if they're not, then the Federation of State Medical

22   Boards can sanction that individual and potentially

23   even revoke their medical license.

24        Q.   And, Doctor, do you know or have you

Continued Direct/Dr. Lembke                    41

2    researched how the model guidelines came about?

3        A    Yes.  So in my research, you know, one

4    of the distressing and shocking discoveries for me

5    was how many of these regulatory bodies, which I had

6    just simply assumed were operating based on the best

7    science, were, in fact, being lobbied by and funded

8    by certain opioid manufacturers, including

9    Defendants in this case.

10           And when I struggled to figure out why a

11   guideline would recommend opioids in the treatment

12   of chronic pain in the absence of evidence or

13   profligate the misleading promotional messages that

14   we've been talking about today and last week, what

15   came to light in my research was that it's, it's the

16   funding and a close relationship they had with

17   certain opioid manufacturers that influenced their

18   guidelines in absence of the evidence to support

19   their recommendations.

20           Specifically I -- for example, there's

21   an organization out of Wisconsin called the Pain and

22   Policy Study Group, and the Pain and Policy Study

23   Group was influential in terms of the Federation of

24   State Medical Boards' guidelines.  The Pain and

25   Policy Study Group received tens of thousands of

July 12, 2021

```
1                    Continued Direct/Dr. Lembke                42

2      dollars from certain opioid manufacturers and then

3      aggressively lobbied the Federation of State Medical

4      Boards to make it easier for doctors to prescribe

5      opioids at very high doses without getting into

6      trouble.

7                    The Pain and Policy Study Group also

8      lobbied state legislatures to pass Intractable Pain

9      Act that basically made it possible for doctors not

10     to prescribe opioids to patients who asked for them.

11                    So, in other words, lobbying by opioid

12     manufacturers, certain opioid manufacturers and

13     payments from certain opioid manufacturers to the

14     Federation of State Medical Boards through front

15     groups like the Pain and Policy Study Group created

16     a scenario in which doctors had no choice but to

17     prescribe more opioids and, essentially, were duped

18     by these misinformed guidelines and misleading

19     messages.

20                    If I could refer to my report, I'd like

21     to share a couple of quotes from the leaders of the

22     Pain and Policy Study Group.  Would that be all

23     right?

24                    THE COURT:  Doctor, there's an

25              objection.  Wait for Ms. Conroy to get there.
```

1               Continued Direct/Dr. Lembke          43

2          Thank you.

3          Q.   Yes, if you could refer to your report,

4     and I believe you do have some quotes from Pain

5     Policy Study Group leaders that you have identified,

6     and if you could read those to the jury.

7          A    So, first of all, just, you know, a

8     financial list of contributions between 2000 and

9     2007 from the Pain and Policy Study Group out of

10    Wisconsin attested to receiving tens of thousands of

11    dollars from certain opioid manufacturers, including

12    Endo Pharmaceuticals, Cephalon and Alpharma, and

13    emails --

14              MR. BARTLE:  Objection.  Instruct the

15          jury --

16              THE COURT:  Is that mic turned on?

17              MR. BARTLE:  Sorry.  Harvey Bartle,

18          Morgan, Lewis & Bockius.  We ask you to

19          instruct the jury again with regard to

20          connection as to pain medicine.

21              THE COURT:  Neither me nor my law

22          secretary can make out what you're saying.

23              MR. BARTLE:  Sorry, your Honor.  We

24          discussed this previously.  We ask you to

25          instruct the jury again with regard to

July 12, 2021

1

2      connection as to pain medicine.

3          THE COURT:  I got it.

4          MR. SHKOLNIK:  Your Honor, the witness

5      is identifying the actual entities that made

6      the payments.

7          THE COURT:  I heard that.

8          I think the objection is really not an

9      objection, it's a heads-up or a precautionary

10     suggestion.  And I told you this before, and

11     I'll say it one more time, I'll probably say

12     it a lot more as we progress.  Eventually,

13     the -- any witness' testimony has to be

14     connected to a specific Defendant in the case

15     because that's how you'll eventually

16     determine whether there is or is not

17     responsibility.

18         The suggestion was -- so the objection,

19     I remind you of that and every time it

20     happens, you'll know that.  I do note that

21     the witness' answer did name specific

22     Defendants.  So proceed.

23         MR. KNAPP:  Your Honor, Tim Knapp on

24     behalf of Allergan.  Just an objection.

25     There was a reference to Defendants.  Of

July 12, 2021

```
 1              Continued Direct/Dr. Lembke           45
 2         course, Dr. Lembke mentioned Alpharma, which
 3         is not a defendant.
 4              THE COURT:  They've been told countless
 5         times "Defendants" is nondescriptive of any
 6         specific party in this lawsuit.  That means,
 7         again -- I told you I'd say it again, I just
 8         did -- Defendants is just a generic term that
 9         does not identify a specific party.  When the
10         witness does identify a specific party, you
11         may consider it, but, like I told you early
12         on, I'll give you an instruction, certainly
13         at the end of this case, as to your
14         consideration of any, any expert testimony.
15         You know, we anticipate quite a few.
16         Proceed.
17              A    I'm going to read to you a quote from a
18    Dr. Georgeson, who was the Director of the Wisconsin
19    Pain and Policy Study Group, in an email to a
20    certain opioid manufacturer and he said --
21              MR. KNAPP:  Your Honor, objection.
22              MR. HERSCHLEIN:  Objection, your Honor.
23              THE COURT:  What is the objection?
24              MR. HERSCHLEIN:  The witness is reading
25         from a document.  She said she's reading a
```

July 12, 2021

```
                        Continued Direct/Dr. Lembke            46
 1

 2        quote.  I guess it's an out-of-court

 3        statement that the witness is going to offer

 4        for the truth.  We don't even know what

 5        document --

 6              THE COURT:  Hearsay objection?

 7              MR. HERSCHLEIN:  Hearsay.  Apologies,

 8        your Honor.

 9              THE COURT:  Both of you say it's a

10        hearsay objection.

11              MR. HERSCHLEIN:  Apologies, your Honor.

12              THE COURT:  Was this document that

13        you're reading from, was it included in your

14        report of things that you considered in

15        connection with your testimony, Doctor; yes

16        or no?

17              THE WITNESS:  Yes, your Honor.

18              THE COURT:  Overruled.

19              MR. KNAPP:  Your Honor, I restate the

20        objection that --

21              THE COURT:  So noted.

22              MR. KNAPP:  Thank you.

23              THE COURT:  Thank you.

24        A     And this is a quote.  "We have improved

25     state medical board policies.  Many states now have
```

```
1                  Continued Direct/Dr. Lembke        47
2       improved pain opioid policies that address concerns
3       about regulatory scrutiny.  We developed much of it
4       from behind the scenes.  We wrote the two models
5       that states have used.  The medical board guidelines
6       from California and the model guideline of the
7       Federation of State Medical Boards.
8                 Similarly, another quote written from
9       another Director, Dr. Gillson of the Pain and Policy
10      Study Group, this time to a representative in North
11      Dakota.  He writes quote:  Well, the representative
12      from North Dakota where they passed one of these
13      Intractable Pain Act that made it very difficult for
14      doctors not to prescribe opioids if the patient
15      requested them.  The representative from North
16      Dakota writes, quote --
17                 MR. HERSCHLEIN:  Objection, your Honor.
18            Jurisdiction, North Dakota.
19                 THE COURT:  Folks, although it's a
20            lovely state, why don't we skip that one.
21                 Go ahead.
22                 MS. CONROY:  I think that's the only
23            quote, your Honor.
24                 MR. SHKOLNIK:  Your Honor, I don't want
25            to say anymore than the quote that's being
```

2    referenced shows the national policy

3    applicable to the Federation of State Boards.

4         THE COURT:  Ms. Conroy, rephrase the

5         question.

6         MS. CONROY:  Yes.

7    Q.   Can you -- can you read the quote

8    without referring to the actual state and also let

9    me ask you first:  Does the quote you're about to

10   read refer to more than just an individual state

11   guideline?

12        MR. HERSCHLEIN:  Same objection, your

13        Honor.

14        THE COURT:  Overruled.

15   A    Yes.  It refers to the Pain and Policy

16   Study Groups' actions nationally.

17   Q.   Okay.  Please proceed.

18   A    So the quote to the executive or the

19   email to the executive of the Pain and Policy Study

20   Group said:  "Did you guys have a hand in this one?"

21   And the response was from Gillson of the Pain and

22   Policy Study Group:  "I'm impressed that you could

23   detect our fingerprints.  I will wear gloves next

24   time.  Yes, we work with Bruce Levi, Executive

25   Director of the North Dakota Medical Association to

```
1                    Continued Direct/Dr. Lembke                49

2       change the Intractable Treatment Pain Act to a

3       general pain statute which also removed the

4       prescribing restrictions for addicts."

5           Q.    And, Doctor, these guidelines were

6       intended to assist clinicians in feeling more

7       reassured about prescribing opioids to pain

8       patients, correct?

9           A     I think it even went beyond that where

10      it actually put pressure on prescribers to prescribe

11      opioids, and it, essentially, changed the way that

12      opioids are used in medicine.

13          Q.    Doctor, I'd now like you to refer to

14      page 84 of the document and it is -- I think we

15      stopped the Elmo from jumping around -- Allergan MDL

16      01601605, and toward the top it says:  At the end of

17      the 1990s, however, the increasing frequency of

18      diversion and abuse of opioid medications drew

19      widespread public attention.

20              And that's true; isn't it?

21          A     The end of the 1990s was really the

22      beginning of the opioid epidemic.

23          Q.    And then the last sentence of that

24      paragraph:  As a result, many clinicians became

25      afraid to prescribe opioids for chronic benign pain;
```

```
 1              Continued Direct/Dr. Lembke        50

 2    do you see that?

 3         A    Yes, I see that, but I don't think that

 4    mischaracterizes --

 5              THE COURT:  The answer is just yes or

 6         no.  You see that, correct?

 7              Next question.

 8              THE WITNESS:  Yes, your Honor.

 9         Q.   And do you have an opinion about that?

10         A    Yes, I do.

11         Q.   And what is that?

12         A    I think that this paragraph, although

13    acknowledging the problem of diversion of opioid

14    medication, gets it wrong in terms of the timing of

15    when it drew widespread public attention or when

16    many clinicians became afraid to prescribe opioids.

17              It really wasn't until about 2016 that

18    the average clinician appreciated their role in the

19    opioid epidemic, and where we started to see a shift

20    and an awareness in the medical profession was late

21    1990s was really when the promotion took off which

22    changed prescribing, increased prescribing, which

23    led to the opioid epidemic.

24         Q.   And if you look at the next paragraph it

25    says most clinicians have only a superficial
```

Continued Direct/Dr. Lembke                    51

1

2     understanding of what substance abuse really is, are

3     not skilled at recognizing the symptoms of the

4     problem and have no knowledge of the diversion and

5     illicit resale of controlled medications.  That's

6     really what you were just talking about, correct,

7     that it took a long time for clinicians to reach

8     that understanding?

9          A    Yes.

10         Q.   And -- but in this document, at least to

11    the sales force for Kadian, they are telling the

12    sales force that clinicians don't have a good

13    understanding, correct?

14         A    Here in this document, yes, it states

15    something that is true, that clinicians do not have

16    a good understanding how to screen or intervene for

17    addiction.

18         Q.   And despite that, throughout the

19    document we see references to low addiction rates,

20    the benefits of opioids for chronic pain --

21              MR. KNAPP:  Objection, Judge.

22              THE COURT:  Sustained.

23              In fact, It's what's called repetitive

24         direct, so go elsewhere.  Thank you.

25              MS. CONROY:  Great.

```
 1                    Continued Direct/Dr. Lembke              52
 2             You can put that document away, Doctor.
 3             I'm going to talk about Teva now, and
 4         I'd like to offer into evidence P18151.
 5             MR. BARTLE:  I would just like to see
 6         it, your Honor.  I would like to see it.
 7             MS. CONROY:  No, we're getting it.
 8             MR. BARTLE:  Your Honor, we object.
 9         This is not disclosed.
10             THE COURT:  Let me take a look and I'll
11         ask a question or two.
12             MR. BARTLE:  This didn't become an
13         exhibit, your Honor, until last night.
14             THE COURT:  The nature of your objection
15         is?
16             MR. BARTLE:  It's not in their
17         disclosure.  She never testified about it.
18         It's not in the report.  We obtained that
19         exhibit last evening.
20             THE COURT:  Mr. Bartle suggested that is
21         not in the expert disclosure; is it?
22             MS. CONROY:  It is not, your Honor.
23         What I would like to do, this is -- I would
24         like the doctor to assume these products and,
25         subject to connection, offer this as an
```

July 12, 2021

```
1              Continued Direct/Dr. Lembke          53

2        exhibit.

3              THE COURT:  Okay.  You may pose a

4        hypothetical question.  All of you may pose

5        hypothetical questions to any expert, but I

6        will tell the jury the following:

7              An expert in a question and answer may

8        be asked to assume certain facts as if they

9        were in evidence.  It's called hypothetical

10       question.  They want you to assume A, B, C,

11       D, E and F or whatever, right.

12             The witness is permitted to answer.

13       However, if those facts that are the basis of

14       the hypothetical question are not

15       independently proved during the course of the

16       trial, that testimony will be not considered

17       by you and I'll strike it.

18             MR. BARTLE:  We maintain our objection.

19             THE COURT:  So noted.

20       Q.   Doctor --

21             THE COURT:  No.  Forget it, go ahead.

22       It's fine.

23       Q.   Doctor, I would like you to assume that

24   Teva sold controlled substances, CT2 products that

25   included Actiq; have you heard of Actiq?
```

1

2        A    Yes.

3        Q.   And could you describe what Actiq is?

4        A    It's a -- essentially, it's a fentanyl

5  lollipop.

6        Q.   And what does that mean, like an actual

7  lollipop?

8        A    It means it's fentanyl on the end of a

9  stick that you put in your mouth and the fentanyl is

10  absorbed through the mucosa.  So that's the way it

11  gets into the bloodstream.

12        Q.   And how would you describe fentanyl

13  versus other opioid products with respect to

14  potency?

15        A    Fentanyl is one of the most potent

16  opioid pharmaceuticals we have.  It's 50 to 100

17  times more potent than morphine.

18        Q.   Doctor, I would also like you to assume

19  that Teva sold a fentanyl patch.

20        Have you heard of a fentanyl patch?

21        A    Yes.

22        Q.   And how does that work?

23        A    It's the same molecule fentanyl with the

24  same potency, but instead of getting it to the

25  bloodstream through the mucosa in your mouth, it's a

1                    Continued Direct/Dr. Lembke                    55

2      patch that goes on the skin and it penetrates the

3      skin and gets into the bloodstream that way.

4           Q.   And I would like you to assume that Teva

5      sold Fentora, are you familiar with Fentora?

6           A    Yes.

7           Q.   And what is that?

8           A    That is a buccal tablet that, again, is

9      not swallowed but rather held in the cheek and

10     absorbed through what they call effervescence

11     through the mucosa.

12          Q.   And why is it that there are products

13     for pain that are put into the mouth or can be

14     transmitted just by putting up into your cheek?

15          A    There are instances when patients can't

16     take the medication in other ways.  For example,

17     they might not be able to swallow; perhaps they're

18     at very end of life or they've had some severe type

19     of chemotherapy and they maybe got erosive ulcers in

20     their throat; perhaps they're intubated in the ICU,

21     which means they got a breathing tube down their

22     throat.

23               So it's important to have multiple

24     modalities for getting the medication, in this case

25     opioids, into the system.

Continued Direct/Dr. Lembke                    56

1

2          Q.    I would also like you to assume that

3     Teva sold generic Actiq, as well as generic

4     OxyContin.

5                Are you familiar with OxyContin?

6          A    Yes.

7          Q.    And who originally manufactured

8     OxyContin?

9          A    OxyContin was originally manufactured by

10    Purdue Pharmaceuticals.

11         Q.    And what is either generic OxyContin or

12    OxyContin; what is it actually?

13         A    OxyContin is a long-acting form of

14    oxycodone and it's dosed approximately twice per

15    day.  It's a very -- it's also a very potent opioid.

16               And do you want me to get into the

17    unique aspects of the capsule?

18         Q.    No, it's okay, just what it is, and it's

19    not fentanyl, correct?

20         A    It's not fentanyl, but they are both in

21    the class of opioid.

22         Q.    Thank you.

23               MS. CONROY:  I would like to offer into

24               evidence P18376.

25               THE COURT:  While they're marking that,

July 12, 2021

```
 1          Continued Direct/Dr. Lembke        57
 2     during that question and answer, Dr. Lembke
 3     was asked to assume five or six facts, all
 4     right.  Those facts must be independently
 5     established in order for that evidence to be
 6     admissible, but, like I said, we allow
 7     experts to answer hypothetical questions.
 8     Understood?
 9          MR. BARTLE:  Your Honor, I don't have an
10     objection presently subject to laying a
11     foundation.  The witness has no personal
12     knowledge of this document.  To the extent it
13     does come in later, just note our objection.
14          THE COURT:  Thank you.  Let me see the
15     document.
16          You've heard the objection?
17          MS. CONROY:  I'm sorry, your Honor?
18          THE COURT:  I said you heard the
19     objection?
20          MS. CONROY:  Foundation?
21          THE COURT:  Also, the witness has no
22     personal knowledge of the document and
23     foundation was a secondary objection.
24          Do I have that right, Mr. Bartle?
25          MR. BARTLE:  It's both, your Honor.
```

July 12, 2021

Continued Direct/Dr. Lembke

58

1
2          What I'm saying is we understand it's a

3     document she relied upon in her disclosure.

4     She can give her opinions about this

5     document.  But she did not create it, she did

6     not make it, she is not employed by the

7     company.  So whether or not it comes in later

8     --

9          THE COURT:  You stipulate to CPLR

10    4540(a) document; yes or no?

11          MR. BARTLE:  It was produced.

12          THE COURT:  Say again.

13          MR. BARTLE:  Just note my objection.

14    I'm not trying to prohibit the witness from

15    talking about it.

16          MS. CONROY:  Yes, it was produced, your

17    Honor.

18          MR. PRESNAL:  And offered by his client.

19          THE COURT:  Okay.  Overruled.

20          Exception duly noted.

21     Q.    Doctor, is Exhibit P18376 a type of

22    document that you would rely on in formulating your

23    opinions in this case?

24     A     Yes, it is.

25     Q.    And did you consider Exhibit P18376 in

```
                        Continued Direct/Dr. Lembke              59
 1
 2      formulating your opinions?
 3              A    Yes, I did.
 4              Q.   And what is the document?
 5              A    This is a 2005 Actiq marketing plan, so
 6      internal documents describing the company's plan for
 7      marketing their drug Actiq, the fentanyl lollipop.
 8              Q.   And let me show you the front page of
 9      the document, and is that the lollipop?
10              A    Yes.
11              Q.   Now, I would like you to turn to page 39
12      of the document, then I will get to the Bates No. --
13      Bates Teva MDL A 100 -- I'm sorry -- 01159362.
14                   I direct your attention to where it says
15      abuse, addiction and diversion; do you see that?
16              A    Yes, I do.
17              Q.   And it says:  Unfortunately,
18      undertreatment of pain continues to be a widespread
19      problem; is that true?
20              A    Pain is a huge problem in this country,
21      but to say that it is undertreated and to then
22      follow that with a discussion of prescription
23      opioids is one of the ways that certain opioid
24      manufacturers shamed doctors into prescribing
25      opioids.
```

1

2      By juxtaposing the problem of the

3  undertreatment of pain with marketing or promotional

4  messages about their product, they essentially were

5  communicating to doctors, it's undertreated because

6  you're not willing to prescribe opioids.

7      So, yes, pain is a problem; opioids are

8  not the answer.

9      Q.   And if you could just read to the jury

10  the next sentence, because I think that actually

11  explains what you just said.

12      A    It has been postulated that one reason

13  why pain is undertreated is due to physician fear of

14  prescribing opioid analgesic medications, opioid

15  phobia.

16      Q.   And what does that mean?

17      A    That essentially means that the problem

18  of undertreatment is the physicians' fault, because

19  they're not willing to use opioids to treat pain.

20      Q.   And we saw just a few minutes ago with

21  the Kadian document, we saw the term opioid phobia;

22  do you recall that?

23      A    Yes.

24      Q.   And here we see it a little different,

25  opiophobia here in the Teva document, the Actiq

July 12, 2021

1

2   document, correct?

3         A    Yes.   There are two common spellings.

4   One is with a D at the end of opioid.   One is

5   without the D.   They're the same term, essentially.

6         Q.   And being used by two different

7   Defendants?

8         A    Yes.   This was a common key message that

9   appears in multiple promotional documents.

10               THE COURT:  Okay.   There's an objection.

11               MR. BARTLE:  I'm sorry, your Honor,

12         Ms. Conroy states two different Defendants.

13               MS. CONROY:   The Kadian Defendant that

14         we just looked at.

15               THE COURT:  I'll sustain the objection.

16               The portion of the testimony that's not

17         specifically distributed, i.e, to Defendants,

18         is stricken.   I'm not precluding you, but be

19         more direct in your examination.

20         Q.   This morning which two Defendants did we

21   see a reference to either opioid phobia or

22   opiophobia?

23         A    Kadian, Allergan Pharmaceuticals, and I

24   believe we saw records as well to Endo, or not yet.

25         Q.    Not yet, but here, this one.

July 12, 2021

| | Continued Direct/Dr. Lembke | 62 |

1

2    A    This is Teva, Cephalon.

3    Q.    Thank you.

4         Now, was Actiq indicated for specific

5    kind of pain?

6    A    Yes.  So Actiq, the fentanyl lollipop,

7    was FDA-approved for breakthrough cancer pain.  Very

8    specific and narrow indication, breakthrough cancer

9    pain.

10   Q.    And what does that mean if a drug is

11   approved for a specific use by the FDA?  And please

12   use this as an example, the Actiq and cancer pain

13   versus chronic pain.

14   A    That means that if a physician were to

15   prescribe Actiq, the fentanyl lollipop for something

16   other than breakthrough cancer pain, they would be

17   prescribing it off-label, off of the FDA label.

18   Q.    Now, I'd like you to turn to page 45 of

19   the document and it is Teva MDL 01159368, and I

20   would like to direct your attention to Actiq, 2005

21   positioning.  What does that mean?

22   A    That means that this is about how they

23   were going to position their promotion of the

24   product to prescribers.

25   Q.    And if you take a look at the section in

Continued Direct/Dr. Lembke                    63

1

2    bold, can you read that for the jury.

3           A    (READING:)  Actiq is fentanyl in a

4    unique oral transmucosal delivery system that

5    provides the most rapid onset of analgesia of any

6    non-invasive opioid formulation available which

7    makes it the ideal agent for BTP or rapid onset,

8    such as BTCP.

9           Q.   And what does BTCP stand for?

10          A    Breakthrough pain.

11          Q.   And what is rapid onset pain?

12          A    Pain that comes on all of a sudden.

13          Q.   Does breakthrough pain only occur with

14   cancer?

15          A    No.

16          Q.   What about rapid onset pain?

17          A    That is also not exclusive to cancer.

18          Q.   So what is being said here is that Actiq

19   is an ideal agent for breakthrough pain or rapid

20   onset pain, both of which are not exclusively cancer

21   pain?

22          A    That's correct.

23          Q.   And if you could now turn to page 37 --

24   actually, we'll cut it a little bit short and go to

25   page 25.

July 12, 2021

| | Continued Direct/Dr. Lembke | 64 |

1    Continued Direct/Dr. Lembke    64

2    And page 25 is Teva MDL 10 -- I'm

3    sorry -- 01159348, and at the top of the page, and

4    I'll show you on page 24, the section we're looking

5    at is physician usage.  What does that mean?

6    A    That means how doctors were using the

7    Actiq fentanyl lollipop.

8    Q.    And could you read this top two

9    sentences or just read the first sentence on the

10    top.

11    A    (READING:)  Based on physician

12    reporting, 90 percent of Actiq use is for

13    breakthrough pain outside of cancer, with the

14    majority of use 55 percent of the total being for

15    chronic back pain.  This broad use of Actiq suggests

16    there are many prescribers who...

17    Q.    And you can go on.

18    A    ...understand or are experienced

19    prescribing fentanyl, treat the pain

20    pathophysiology, not the disease state or the

21    etiology.  Etiology means cause of the pain.

22    Understand the benefit that Actiq affords their

23    patients and are comfortable utilizing it beyond its

24    labeled indication.

25    Q.    What's happening here, Doctor?

1

2      A      Essentially what this is saying is that

3   the corporation recognizes that out in real life

4   Actiq, the fentanyl lollipop, is most commonly

5   prescribed for people who don't have any kind of

6   cancer at all, and that in current prescribers of

7   the Actiq fentanyl lollipop, most of their patients

8   have things like chronic low-back pain.

9      Q.   And is there a risk of addiction

10  dependence, overdose and death with the increased

11  use of a fentanyl lollipop like Actiq?

12     A      Absolutely.  So one of the core features

13  of the opioid epidemic is not just that opioids were

14  being prescribed for more people at higher doses for

15  longer periods of time, but that they have been

16  prescribed for broader indications, meaning for

17  minor pain conditions, for chronic pain conditions,

18  the types of conditions for which there's no

19  evidence that the benefits of opioids outweigh the

20  risks.

21     Q.   And, Doctor, let's for a minute talk

22  about some of the practical ways that this sort of

23  promotion would take place of Actiq.

24          If you could turn to page 78 of the

25  document Teva MDL A 01159401, and what I'm showing

Continued Direct/Dr. Lembke                    66

2  you is a part of the appendix which had the budget

3  for 2005, the tactical budget, and do you see the

4  section that says Medical Education?

5           A    Yes, I do.

6           Q.    Okay.  And can you describe at least

7  what is expected to be budgeted and for what

8  purposes.

9           A    This shows that the makers of Actiq were

10  willing to pay millions of dollars to promote their

11  product to physicians and other healthcare

12  prescribers.  You could see here that they spent

13  more than 9 million dollars to support continuing

14  medical education.

15           Remember, that's the mandatory

16  educational meetings doctors have to go to to stay

17  up to date and to keep their license.  Consultants

18  meetings, that's the meetings with their key opinion

19  leaders and other individuals who will help them

20  promote their product, and also speaker training, so

21  that's where they would create slides and

22  essentially create a script for key opinion leaders

23  to go out to educational conferences and use that

24  script in order to promote their product and promote

25  opioids more generally.

July 12, 2021

1

2        Q.   And when you were just referring to

3    conferences, is that the increased presence at pain

4    conferences?

5        A    Yes.  So a major strategy was to go to

6    meetings and gatherings of professionals in the

7    field of medicine.

8             So I talked a little bit about

9    professional medical societies, like the American

10   Academy of Pain Medicine, the American Pain Society

11   where everybody in the field comes together once or

12   twice a year to be at a conference, to be educated

13   at that conference, and this shows that money was

14   spent in order to be at those conferences, to be

15   able to meet and greet with doctors, to tell them

16   about their product, to give little promotional

17   gizmos:  hats, pens.

18       Q.   And if we could take a look at page 80,

19   Teva MDL A 01159403, this is appendix 8, which is

20   the 2005 medical meeting plan, and I would direct

21   your attention to where I've highlighted.

22            Can you explain to the jury what this

23   is.

24       A    This is just detailing a specific

25   conference with the date and the location and how

Continued Direct/Dr. Lembke                 68

1

2     many specialties in the field of pain might have

3     shown up at that conference.

4          Q.    So this is an American Pain Society

5     conference that will take place in late March in

6     2005 in Boston, correct?

7          A    Yes.

8          Q.    And the products that will be discussed,

9     GAB and Actiq, and then if you look above the

10    specialty, what does that mean when it says

11    specialty pain?  What does that mean?

12         A    Doctors who specialize in treating

13    patients with pain.

14         Q.    And so they would anticipate that 2000

15    doctors would be in Boston for this American Pain

16    Society conference and their specialty would be

17    pain, correct?

18         A    That's right.

19              THE COURT:  Members of the jury, I did

20         tell you if any of you need a break just let

21         the court officer know, okay.  Don't be shy.

22         Q.    I'm going to move on to another

23    document.  This one is in evidence, P24979, it's the

24    Fentora Learning System, and I think you have it up

25    there, Doctor, 24979, and it has an email on the

```
 1                  Continued Direct/Dr. Lembke          69
 2    front of it, but it looks like --
 3              THE COURT:  Hold off.  Two of our jurors
 4         would appreciate a break.
 5              MS. CONROY:  Okay.
 6              THE COURT:  We'll take a 20-minute
 7         recess.  I think it takes 20 minutes just to
 8         get through the system, so to speak, so we'll
 9         take a 20-minute recess.
10              Don't discuss the case amongst
11         yourselves or with anyone else until the
12         appropriate time.
13              Thank you.
14              THE COURT OFFICER:  All rise.  Jury
15         exiting.
16              (WHEREUPON, a short recess was taken.)
17              THE CLERK:  Come to order.  Supreme
18         Court is back in session.
19              THE COURT:  Be seated.  Just so you
20         know, I checked the holiday dates on the
21         recess, we're okay.  The next time the school
22         is closed is Labor Day.
23              Okay, bring the jury back.
24              THE CLERK:  I remind you, Doctor, you're
25         still under oath.
```

THE COURT OFFICER:  All rise.  Jury entering.

THE CLERK:  All jurors are present and properly seated.

THE COURT:  Be seated.  Thank you.

Ms. Conroy.

CONTINUED DIRECT EXAMINATION OF DR. LEMBKE BY

MS. CONROY:

Q.   Doctor, just before the break we were looking at P24979, it's the Fentora Learning System; do you have that?

A    Yes.

Q.   And could you remind the jury what is Fentora?

A    Fentora is the fentanyl tablet that goes into the cheek that is absorbed transmucosally.

Q.   And who manufactures and sells Fentora?

A    Teva, Cephalon.

Q.   And I'd like to direct -- and what is Fentora indicated for?

A    Breakthrough cancer pain.

Q.   If you could take a look at page 40 of the document and it is Teva MDL A 00890346, section that says:  Like patients, caregivers may need

1    reassurance that few people using opioids for a

2    legitimate medical reason become addicted to the

3    drug.  Do you see that?

4        A    Yes, I do.

5        Q.    "Few people," that's not common or very

6    common, correct?

7        A    To say "few people" is inconsistent with

8    the science showing that addiction is common or very

9    common in people being prescribed opioids for

10   chronic pain.

11       Q.    Is that statement false?

12       A    Yes.

13       Q.    And the statement goes on and says:  And

14   that physical dependence to a drug is easily

15   overcome to scheduled dose decreases if the patient

16   improves to the point where opioids are no longer

17   needed; do you see that?

18       A    Yes, I do.

19       Q.    Is physical dependence to a drug easily

20   overcome?

21       A    Not for most people, no.

22       Q.    And why is that?

23       A    Because the brain and the body adapts to

24   the presence of the drug, so literally it changes

Continued Direct/Dr. Lembke                72

the brain.  So when a dose goes down or the

medication is stopped abruptly, patients will

experience the classic syndromes of opioid

withdrawal.  And even beyond the immediate two to

three weeks of acute physical withdrawal, there can

be a persistent psychological syndrome called

protracted abstinence syndrome characterized by

ongoing irritability, depression, anxiety, insomnia

and craving for the drug.

    Q.   Is there a difference between physical

dependence to fentanyl versus oxycodone or a

different type of opioid?

    A    Well, because fentanyl is so much more

potent than other opioids, you're effectively giving

that person more opioids.  We do know that the risk

of addiction is dose and duration dependant, and

addiction is commonly accompanied by physical

dependence.

       And when I say that it's dose and

duration dependant, what I mean is that the more

opioid you're on, and the longer you're on them, the

more likely you are to become addicted to that

opioid.

    Q.   Is it false that physical dependence to

1
2     a drug is easily overcome through scheduled dosing
3     decreases?
4          A    That's false for the vast majority of
5     people, yes.
6          Q.    If you could turn to page 45 of the
7     document, which is Teva MDL A 00890351.
8               And I think we took a look at this
9     document the other day.  In patients without
10    personal or family history of substance abuse
11    addiction resulting from exposure to opioid therapy
12    is uncommon.  Is that statement true?
13         A    No.
14         Q.    Because the risk of addiction is common
15    to very common, correct?
16         A    Yes.  And because -- although it is true
17    that if you have a personal or a family history of
18    addiction and your doctor gives you an opioid for
19    pain, you're more likely than the average person to
20    get addicted to that opioid because of the genetic
21    or inherited factors that we talked about, as well
22    as the childhood nurture factors.
23               But even though that is true, the
24    biggest risk of getting addicted to an opioid that a
25    doctor gives you for pain is how much they gave you

Continued Direct/Dr. Lembke                    74

1   and how long you were on it, and that risk trumps

2   the other inborn genetic risks based on personal or

3   family history.

4           Furthermore, even with no personal or

5   family history of getting addicted to anything, it's

6   still common for patients to get addicted when they

7   get put on an opioid by their doctor, and doctors

8   can't predict who will and will not get addicted

9   once they get started on opioids.

10          Q.    Is this statement that addiction risk is

11  uncommon false?

12          A    Yes.  So this is, again, a reference to

13  that Porter and Jick letter to the editor, which was

14  cited as a study and isn't really a study.

15  Remember that hospitalized study, study of

16  hospitalized patients showing that there are more

17  than four out of 11,882 developed a "narcotic

18  addiction" and how that is not really evidence

19  because it was a hospitalized sample, which is not

20  consistent with the real world population of

21  outpatients walking around with things like chronic

22  low-back pain, and because many of those individuals

23  just got a single dose or got a very low dose for

24  short duration.

July 12, 2021

|   |   |   |
|---|---|---|
| 1 | Continued Direct/Dr. Lembke | 75 |

2       So, again, this is misleading because it

3    looks like it blends science in numbers by using a

4    citation that wasn't robust enough to be used for

5    this kind of statement.

6    Q.   And now if you could turn to page 49,

7    Teva MDL A 00890355.  You're going to be looking at

8    the top of the page.  It says:  Pain appears to

9    reduce the euphoric effects of opioids so people

10    taking opioids to manage their pain may be at a

11    lower risk for addiction.

12       What are they saying here?

13    A   So this is a really important misleading

14    key message that was put out there by certain opioid

15    manufacturers and it had a huge impact on doctors.

16    Q.   Doctor, can I just stop you there.

17       We can talk specifically, this is a

18    message being put out by Teva with respect to

19    Fentora, correct?

20       MR. BARTLE:  Objection, your Honor.  I'm

21       sorry, your Honor, never mind.  Withdraw the

22       objection.

23    Q.   I'm sorry, you can go ahead, Doctor.

24       THE COURT:  Go ahead.

25    A   Okay.  So just to answer the question,

July 12, 2021

```
 1              Continued Direct/Dr. Lembke          76
 2     what this statement essentially stands for is that
 3     there's something biologically unique about a
 4     patient who has pain, such that if they take an
 5     opioid that their doctor gave them for the pain,
 6     they're somehow magically immune from getting
 7     addicted.
 8              This was very persuasive for doctors
 9     trained starting in the late 1990s for the last two
10     decades.
11              In doing research for my books I talked
12     to many doctors about what their education and
13     impressions were of opioids for pain and many of
14     them told me that they were convinced by statements
15     like this that somehow as long as they were
16     prescribing the opioid to a real patient with real
17     pain, that the patient was very unlikely to get
18     addicted.  That's how we ended up with the opioid
19     epidemic.  This is patently not true.
20          Q.   Is this statement false?
21          A    Yes, it is.
22          Q.   Let's take a look at the next paragraph
23     where it says:  Certain behaviors are sometimes
24     mistaken for addiction.  If patients receive
25     inadequate pain relief they may exhibit drug seeking
```

July 12, 2021

1                    Continued Direct/Dr. Lembke            77

2      behaviors.  This is called pseudoaddiction.

3                  What is pseudoaddiction?

4          A    Pseudoaddiction is a made-up term and it

5      essentially means fake addiction.

6          Q.   And where does this originate from?

7          A    This term was originally coined by two

8      authors who published a case report in a peer-review

9      medical journal.  A case report is a description of

10     a single patient.

11                 And what they described was a young man,

12     who I believe had leukemia, who had pain and it was

13     being treated with opioid, but who engaged in what's

14     called drug seeking behaviors, like making up, you

15     know, gestures to demonstrate that he was in more

16     pain, putting a lot of work into getting more pain

17     medicine, which these authors then describe as

18     pseudoaddiction, essentially, essentially saying

19     that if you have a patient who is demonstrating all

20     the signs and symptoms of having become addicted,

21     they're not really addicted, they're pseudo addicted

22     and in pain, and you need to go up on the pain

23     medicine.

24                 And the only real criteria for sorting

25     out, according to these -- this concept, who's

Continued Direct/Dr. Lembke                78

1
2      addicted and who's pseudo addicted is to ask the
3      patient if they have pain, and if they say yes, then
4      you should go up on the pain medicine, because you
5      should treat to whatever the patient says, ignoring
6      anything else.  That is essentially what happened.
7              And the problem with this concept was
8      that it made it very difficult for prescribers to
9      diagnose addiction in the context of treating a
10     patient with opioid for pain, because even when you
11     saw somebody who was doing all the things that
12     people with addiction do:  lying, you know, getting
13     drugs from multiple prescribers, you know, doing a
14     lot of thinking, a lot of effort to get more
15     opioids, you really weren't allowed to say that they
16     were addicted because you had to call them pseudo
17     addicted to increase the opioid.
18             The other tragic impact of this concept
19     is it really deprived those individuals who became
20     addicted through their doctors' prescriptions
21     getting appropriate addiction treatment that might
22     have saved their lives.
23        Q.   Doctor, is using the concept of
24     pseudoaddiction false promotion?
25        A    Yes.  It's false, but it also encouraged

1
2      higher dosage of opioid prescribing, right, because

3      the solution for pseudoaddiction was to go up on a

4      meter.

5                   MR. BARTLE:  I'm going to object to this

6              question and answer and request a short

7              sidebar on this.  It's outside the scope.

8                   THE COURT:  Give me the question back,

9              please.  Oh, by the way, you're all directed

10             to the Court's decision short form order

11             dated November 12th 2020 as concerns --

12                  MR. BARTLE:  I believe that's what I'm

13             referring to, your Honor.

14                  THE COURT:  So you're suggesting he's

15             outside the scope of an allowable area?

16                  MR. BARTLE:  Correct.

17                  THE COURT:  Okay.  Read me the question,

18             please.

19                  (WHEREUPON, the requested portion was

20             read by the reporter.)

21                  THE COURT:  Marketing is out of bounds;

22             promotion is not.

23                  Overruled.

24        Q.   I believe you actually answered the

25      question already; did you?

July 12, 2021

1

2          A     Yes.

3                THE COURT:  The Court notes in the

4          footnote there's a distinction between the

5          two that's subject to consideration.

6                Go ahead.

7                MS. CONROY:  Thank you, your Honor.

8          Q.    Doctor, is there any empirical evidence

9    to support the concept of pseudoaddiction?

10          A     No.  In reviewing the literature there

11   is no empirical evidence to support the concept of

12   pseudoaddiction.  No scientific evidence to support

13   this concept.

14          Q.    You can put that document away, doctor,

15   or both of those documents.

16                And for my next question, doctor, I

17   would like you to assume that there is an Endo

18   document entitled:  Opioid Analgesic Advanced Sales

19   Training from 2003, okay?

20                MR. HERSCHLEIN:  Objection, your Honor.

21          That's improper.

22                THE COURT:  Let's see where it goes.

23                Oh, by the way, this document you're

24          asking the witness to assume, has it been

25          exchanged?

```
 1                  Continued Direct/Dr. Lembke        81
 2              MS. CONROY:  Yes, your Honor.
 3              THE COURT:  Exchanged in the course of
 4         discovery?
 5              MS. CONROY:  Yes, it was.  And it was
 6         used by both Defendants and Plaintiffs in
 7         opening statements.
 8              THE COURT:  Okay.
 9              MR. HERSCHLEIN:  Your Honor, it's not in
10         her report.  It's not part of her referenced
11         materials.
12              Your Honor ruled clearly last week that
13         it's out of bounds.  Those are your words.
14              THE COURT:  This is a very late
15         disclosure?
16              MR. HERSCHLEIN:  Last night, 7:12.
17              THE COURT:  Okay.  Sustained.
18              MS. CONROY:  Thank you, your Honor.
19              THE COURT:  I don't know if you have to
20         thank me for sustaining your objections, but
21         I'll take it.
22              MS. CONROY:  That's okay.  We'll get to
23         that document.
24         Q.   I would like to draw your attention to a
25    document that is in evidence, P23771, and it's the
```

1

2    Oxymorphone learning system.

3              MR. HERSCHLEIN:  Your Honor, at the

4         appropriate time we would ask for the

5         limiting instruction that you gave on this

6         document last week, because we're coming back

7         to it.

8              THE COURT:  Okay.  You have to give me a

9         clue which limiting instruction I gave.

10             MR. HERSCHLEIN:  It has to do with the

11        AOD.

12             THE COURT:  Oh, okay.

13             There was, members of the jury, there

14        was a prior dispute between Endo and the

15        State of New York which was resolved back in

16        2016.  It was resolved by something called an

17        AOD, an assurance of discontinuance.  That

18        thing that we call an AOD eliminated certain

19        product and certain conduct from

20        consideration, certainly going back in time.

21             As we progress I will, in all

22        probability, be giving you additional

23        instructions regarding that.  The medication

24        is Opana, it was the subject of the dispute,

25        and that dispute was resolved.  Resolved,

```
 1                Continued Direct/Dr. Lembke         83
 2          resolved with no admission of liability or
 3          fault, all right, so keep that in mind.
 4               Was that the one I gave or close enough?
 5               MR. HERSCHLEIN:  Pretty close, your
 6          Honor.  Also Opana ER.
 7               THE COURT:  Okay, Opana ER, yes.
 8               MR. SHKOLNIK:  Your Honor, the
 9          instruction is supposed to be limited to the
10          State and not the Counties.
11               THE COURT:  By the way, the Counties,
12          yeah.  The Counties were not a party -- thank
13          you for reminding me -- the Counties were not
14          a party to that dispute, so whatever you may
15          hear during Miss Conroy's examination, to the
16          extent that it refers to this Opana ER and
17          has some connection to that thing I called an
18          AOD, it's not applicable to the State.
19               Go ahead.
20          Q.   Doctor, if you would turn to page 25 of
21     the Oxymorphone Risk Management Program.
22               And do you see where it says, Approach
23     to selling OxyContin?
24          A    I do.
25          Q    And who was the manufacturer of
```

July 12, 2021

```
 1                  Continued Direct/Dr. Lembke          84

 2      OxyContin?

 3             A     Purdue Pharmaceuticals.

 4             Q.    And which Defendant is writing this

 5      document?

 6             A     This document is being written by Endo

 7      Pharmaceuticals.

 8             Q.    And it says:  With the initial success

 9      of OxyContin, Purdue put a lot of effort into

10      marketing and promoting it.  They promoted the use

11      of OxyContin for both cancer and non-cancer pain,

12      significantly increased their sales force and used

13      multiple promotional approaches.

14                  Do you see that?

15             A     Yes, I do.

16             Q.    And you're familiar with that from your

17      research, correct?

18             A     Correct.

19             Q.    If we could turn the page.

20                  Endo references possible factors

21      contributing to problems.  Do you see that?

22             A     Yes, I do.

23             Q.    And it says:  Once the abuse and

24      diversion problem with OxyContin became known, the

25      reasons for contributing to the problem began to be
```

1

2    investigated; do you see that?

3         A    Yes, I do.

4         Q.   And then down a little bit further it

5    talks about improper marketing; do you see that?

6         A    Yes.

7         Q.   You had read through this document?

8         A    Yes, I have.

9         Q.   Was Endo aware of the consequences of

10   the misleading and false promotion by Purdue of its

11   drug OxyContin?

12             MR. HERSCHLEIN:  Objection, your Honor.

13             I think there's a mill on corporate

14             knowledge.

15             THE COURT:  The way the question was put

16             to you I'll sustain the objection.

17             You're asking what somebody was aware

18             of, so even though it's an inanimate object,

19             a corporation, you can't call for the

20             operation of the mind of the entity.

21             Go ahead.  I'm not precluding you, but

22             I'm suggesting another way perhaps.

23             MS. CONROY:  I'll rephrase, your Honor.

24        Q.   Were you able to determine from the

25   pages 26 and 27, information that Endo was able to

```
 1              Continued Direct/Dr. Lembke              86
 2    determine from the problems that Purdue faced with
 3    OxyContin?
 4              THE COURT:  Just say yes or no.
 5    A    Yes.
 6    Q.   And what were they?
 7    A    Well, it's clear from this document that
 8    Endo Pharmaceuticals was well aware that Purdue was
 9    cited by the FDA for things like advertisements in
10    journals, for suggesting that OxyContin could be
11    used as initial therapy or was often referred to as
12    first line treatment.  That it could be used in
13    older people.  And importantly, that Purdue
14    overstated the benefits and minimized the addiction
15    risk of its products.
16              MR. HERSCHLEIN:  Your Honor, I would
17              object and move to strike the answer which
18              began "it was clear that Endo was well
19              aware."  It's directly contrary to the
20              ruling.
21              THE COURT:  I'll strike -- that portion
22              of the answer is stricken.  If you can go to
23              a specific -- in other words, when I strike
24              it, remove it from your mind, that portion of
25              the answer.  You can go to the document.
```

Continued Direct/Dr. Lembke                87

MS. CONROY:  I will, your Honor.

THE COURT:  Thank you.

Q.    Doctor, do you see where it says, under Improper Marketing, there are explanations of what Purdue was cited for by the FDA; do you see that?

A    Yes, I do see that.

Q.    And one was for several advertisement violations between 2000 and 2003; do you see that?

A    Yes.

Q.    And this is an Endo document reciting this, correct?

A    That is correct.

Q.    And then they also talk about an advertisement in a medical journal that implies that OxyContin had been studied in all types of arthritis; do you see that?

A    That's correct.

Q.    Is arthritis a chronic pain -- something that creates chronic pain?

A    Yes.

Q.    It also talks about OxyContin could be used as initial therapy in elderly patients without support for any of those plans; do you see that?

A    Yes, I do.

2      Q.    And that is Endo reciting what it

3   understood Purdue to have done that was improper?

4      A    Yes.

5      Q.    Then it says:  A second more serious

6   citation was for journal ads.

7           What are journal ads?

8      A    They're advertisements in medical

9   journals that doctors read.

10     Q.    (READING:)  And those ads minimized the

11  drug's risks and overstated its efficacy; do you see

12  that?

13     A    Yes, I do.

14     Q.    (READING:)  Failed to present

15  information from the boxed warning on potentially

16  fatal risks and abuse potential and omitted

17  information about limitations on its indication; do

18  you see that?

19     A    Yes, I do.

20     Q.    When it talks about limitations on its

21  indication, what does that refer to?

22     A    That means they went beyond what the FDA

23  said the drug could be used for.

24     Q.    And is that similar to what we were

25  talking about when we were talking about Fentora and

1               Continued Direct/Dr. Lembke          89

2     Actiq being indicated only for cancer, for

3     breakthrough cancer pain?

4          A    Yes, that's a similar example.

5          Q.    Then it says:  Purdue's website for

6     OxyContin also had information inconsistent with its

7     labeling and lacked risk of information for use in

8     postoperative pain; do you see that?

9          A    Yes, I do.

10          Q.    And is it your opinion that this

11     information written by Endo in its Oxymorphone

12     document was known by Endo?

13          A    Yes.  If they wrote it in their

14     document, they clearly knew it.

15          Q.    Then it talks about several videos

16     produced by Purdue were found to contain other

17     substantiated claims about patient's quality of

18     life, inability to perform activities of daily

19     living while minimizing risks and claiming a low

20     likelihood of addiction; do you see that?

21          A    Yes, I do.

22          Q.    It's your opinion Endo was aware of this

23     and aware that Purdue had been found to have

24     improperly marketed OxyContin by the FDA as a result

25     of some of these claims?

```
 1                  Continued Direct/Dr. Lembke          90
 2              MR. HERSCHLEIN:  Objection, your Honor.
 3              THE COURT:  Can I hear that question
 4         again.  Can you read that back, please.
 5              (WHEREUPON, the requested portion was
 6         read by the reporter.)
 7              THE COURT:  Overruled.
 8              You can answer.
 9         A    Yes, it's clear to me that Endo
10    Pharmaceuticals was aware of what Purdue, what they
11    wrote about it in their own document.
12         Q.   If you could turn to page 14 of the
13    document, the actual page 14.  Could you read where
14    I have highlighted.  Can you see it?
15         A    Yes, I can see it.  Do you want me to
16    read it out loud?
17         Q.   Oh, read it out loud, I'm sorry.
18         A    (READING:)  Physicians can differentiate
19    addiction from pseudoaddiction by speaking to the
20    patient about his/her pain and increasing the
21    patient's opioid dose to increase pain relief.
22              Pseudo-addictive behaviors, such as
23    clock watching, counting down the time until the
24    next dose will resolve when the pain is properly
25    treated.
```

Continued Direct/Dr. Lembke                91

1

2          Q.   Are those statements false?

3          A    Those are false and misleading, yes.

4          Q.   Doctor, in your opinion, did Endo jump

5     on the Purdue bandwagon with respect to the

6     promotion of its drug Oxymorphone?

7               MR. HERSCHLEIN:  Object to the form,

8          your Honor.

9               THE COURT:  Sustained.  Sustained.

10         Q.   Is the pseudoaddiction claim false

11    promotion, in your opinion?

12         A    Yes, it is.

13         Q.   Thank you.  You can put that one away.

14              Doctor, have all of the prescription

15    opioids that we've talked about today been approved

16    by the Food and Drug Administration, the FDA?

17         A    Yes, they have.

18         Q.   And have you assigned some

19    responsibility for the opioid epidemic to the FDA?

20         A    Yes, I have.

21         Q.   Are you an expert in FDA regulations?

22         A    No, I'm not.

23         Q.   Do you understand that Dr. Kessler,

24    former Commissioner of the FDA, is going to testify

25    here?

```
1                    Continued Direct/Dr. Lembke          92

2          A    Yes.  That is my understanding.

3          Q.   Are you familiar with the labels that

4    come with prescription opioids?

5          A    Yes.

6          Q.   And do those labels include a risk of

7    addiction and overdose?

8          A    Yes, they do.

9          Q.   Now, do doctors get more of their

10   information about prescription opioids from labels

11   or from somewhere else, in your opinion?

12         A    From somewhere else.  Labels are not the

13   main source of information for doctors.  It's all

14   the other things we talked about:  continuing

15   medical education, key opinion leaders, journal

16   articles, the Joint Commission of Quality Measures

17   Guidlines, the Federation of State Medical Boards

18   tells them what they need to do, what their teachers

19   tell them they need to do.

20         Q.   Does the FDA sell opioids?

21         A    No, it does not.

22         Q.   Do they profit -- does the FDA profit

23   from opioid sales?

24         A    Not as far as I know, no.

25         Q.   Does the FDA make any promotional
```

July 12, 2021

```
1              Continued Direct/Dr. Lembke        93
2    statements about opioids?
3         A    No.
4         Q.   Do you draw any distinction between the
5    responsibility of the manufacturing Defendants,
6    Endo, Allergan and Teva on the one hand from the FDA
7    on the other?
8              MR. BARTLE:  Your Honor, I still make my
9         objection based upon your prior ruling
10        regarding scope of this witness' testimony.
11             THE COURT:  Can I have the question
12        back.
13             (WHEREUPON, the requested portion was
14        read by the reporter.)
15             THE COURT:  Overruled.
16             Just yes or no.
17        A    Yes, I do draw a distinction.
18        Q.   And what is that distinction?
19        A    To me, the responsibility and obligation
20   of certain opioid manufacturers promoting these
21   products is much greater in regards to the opioid
22   epidemic.  Essentially, they were maximizing profits
23   at the expense of public health and safety.
24             THE COURT:  Ms. Conroy, the nature of
25        your objection was, I think, was that you
```

Continued Direct/Dr. Lembke                94

2      mentioned three parties in connection with

3      one question, and I think it was suggested --

4           MR. BARTLE:  That was not the nature of

5      my objection.

6           THE COURT:  It would have been a good

7      one.

8           MR. BARTLE:  It wasn't the one I made.

9           THE COURT:  It would have been a good

10     one.  I think Saturday Night Live would say,

11     Never mind...

12          Go ahead.

13     Q.   Dr. Lembke, I want you to assume that

14  each of the three Defendant manufacturers, Endo,

15  Teva and Allergan in their opening statements --

16          MR. BARTLE:  Your Honor, I would object

17     to this question with regard to corporate

18     separateness.

19          MS. CONROY:  All right, I'll do it that

20     way, that's fine.

21          THE COURT:  Sustained.

22     Q.   I want you to assume that Endo in its

23  opening statement by Mr. Herschlein argued that the

24  New York State Department of Health itself repeated

25  the message that addiction is rare in patients

Continued Direct/Dr. Lembke                    95

1
2    taking opioids for pain.
3            Does it surprise you that the New York
4    State Department of Health would make a statement
5    like that:  Addiction is rare?
6            MR. HERSCHLEIN:  Objection, your Honor.
7        I believe your Honor ruled last week this
8        witness is not to be commenting on attorney
9        statements.
10           THE COURT:  No, no, I don't think I did.
11       I certainly don't think I did.  I customarily
12       will allow a witness to be confronted with a
13       suggestion that was made.  However, I don't
14       like the word "surprise."
15           MS. CONROY:  Okay.
16           THE COURT:  So sustained.
17           MR. HERSCHLEIN:  Second objection, your
18       Honor, is this is not in her report.
19           THE COURT:  This is not what?
20           MR. HERSCHLEIN:  This is not within the
21       witness' expert report.
22           THE COURT:  Okay.  Overruled.  You can
23       answer.
24    Q.   Let me rephrase --
25           THE COURT:  Take the word surprise out.

```
 1                    Continued Direct/Dr. Lembke            96
 2              Use a different word.  There's got to be a
 3         better one.
 4         Q.   Was that unexpected?
 5         A    Yes.
 6         Q.   And why is that?
 7         A    The fact that these misleading messages
 8    appear in other places is evidence of the
 9    effectiveness of the promotional campaign.
10              Certainly opioid manufacturers were able
11    to infiltrate every layer of medicine and medicine
12    regulatory bodies and policymakers in order to
13    promote opioids as a class, which in turn increased
14    sales of their opioid products.
15         Q.   And would your answer be the same if a
16    statement was made by Teva or by Allergan?
17         A    Yes, it would.
18         Q.   Thank you.
19              Now, we have looked at several
20    promotional statements that were made by certain
21    opioid Defendants, correct, over the last three
22    days?
23         A    Yes, that's correct.
24         Q.   And were those messages, some of them,
25    and I'll go into them specifically, misleading?
```

July 12, 2021

1

2      A    Yes.

3      Q.   And one of them is addiction is rare; is

4  that right?

5      A    Well, the word "rare" itself is not, is

6  not necessarily always used.  Sometimes the word is

7  uncommon or there's minimal risk as long as you're

8  prescribing to a patient with pain.

9      Q.   Did you see promotional statements

10  talking about addiction is rare or uncommon or

11  minimal risk or something along those lines when you

12  looked at Allergan Finance, LLC documents?

13      A    Yes.

14      Q.   Did you see such misleading or false

15  messages about addiction in Endo documents?

16      A    I have seen such statements in Endo

17  documents, yes.

18      Q.   And what about in Teva documents?

19      A    Yes.

20      Q.   Pseudoaddiction, did you see misleading

21  messages about pseudoaddiction in Allergan Finance

22  documents?

23      A    Yes.

24      Q.   In Endo documents?

25      A    Yes.

July 12, 2021

```
 1                 Continued Direct/Dr. Lembke          98
 2          Q.    In Teva documents?
 3          A     Yes.
 4          Q.    And did you see statements about
 5   dependence and that it's easy to deal with or
 6   normal, things along that line?
 7          A     Yes.
 8          Q.    Did you see such statements in Allergan
 9   Finance documents?
10          A     Yes.
11          Q.    In Endo documents?
12          A     Yes.
13          Q.    In Teva documents?
14          A     Yes.
15          Q.    Were all of those statements made --
16   strike that.
17                Those statements, were they false?
18          A     False and misleading, yes.
19                MR. BARTLE:  Your Honor, I would ask
20          that that document be marked and we be
21          provided copies of it.
22                THE COURT:  That's fair.
23                MS. CONROY:  That's fine.
24                THE COURT:  Let's mark it now.
25                (WHEREUPON, Document was hereby marked
```

1

2          as Plaintiffs' Demo 500 in evidence.)

3               THE COURT:  We'll see that copies are

4          distributed at the next break.

5               MS. CONROY:  We can make a copy now.

6          Q.    Doctor, in your opinion, is there a

7     relationship between false promotional messages and

8     the increased sale of opioids?

9          A     Yes.

10         Q.    And what is that relationship?

11              MR. HERSCHLEIN:  Objection, your Honor.

12         This is footnote 8.

13              THE COURT:  The document is right in

14         front of me as we speak.  It's the

15         question -- I'll sustain the objection.  I'm

16         not precluding you, but if you don't have it,

17         just look at footnote number 8 in the

18         November 12th 2020 short form order.

19              MS. CONROY:  Your Honor, I'm referring

20         to promotional messages in this question.

21              THE COURT:  Make it promotional.

22         Q.    Is there a relationship between

23    promotional messages and the sale of opioids?

24              MR. HERSCHLEIN:  Your Honor --

25              THE COURT:  I think the sales aspect of

                    Continued Direct/Dr. Lembke                    100

1
2          the question is the basis of the objection,
3          so I'll sustain it, but there's something
4          other than sales between --
5               MS. CONROY:  Sure.
6          Q.   Is there a relationship between
7     promotional messages and physicians prescribing
8     opioids?
9          A    Yes.
10              MR. HERSCHLEIN:  Your Honor, the
11         objection is there's not been a foundation
12         laid as required by footnote 8 for the
13         distinction between marketing and promotion.
14         The Defendants' position is that there is no
15         distinction.
16              MR. PRESNAL:  With all due respect -
17              THE COURT:  Do me a favor, put your mask
18         down when you talk to me.
19              MR. PRESNAL:  Sorry, Judge.  With all
20         due respect, she has examined this confluence
21         between this massive marketing campaign and
22         the fact that there was a massive increase in
23         the prescribing of opioids as described it
24         this paradigm shift in the treatment of
25         chronic pain.

```
                    Continued Direct/Dr. Lembke        101

 1

 2              MR. KNAPP:  Your Honor, again, I would

 3         object to the colloquy as inappropriate.

 4              THE COURT:  Ms. Conroy, you may seek

 5         testimony between what we've seen and

 6         quantity, all right.

 7         Q.   Doctor, have you seen a relationship

 8    between the promotional messages that you reviewed

 9    and the quantity of opioids in New York State, Long

10    Island, or the Counties?

11              THE COURT:  Just yes or no.

12         A    Yes.

13         Q.   And what is that relationship?

14         A    The promotional messages targeting

15    doctors and other healthcare institutions led to

16    increased prescribing of opioids, which led to a

17    greater supply of opioids in the community.

18         Q.   And what did that lead to?

19         A    That led to more people becoming

20    addicted to opioids, more people overdosing on

21    opioids and more people dying from opioids.

22         Q.   And where did that take us?

23         A    Those individuals, many of them,

24    progressed to heroin and illicit fentanyl.

25         Q.   And is there a term for that, that
```

July 12, 2021

1

2     progression to heroin or illicit fentanyl?

3            A     Yes.  It's called the gateway phenomenon

4     or gateway hypothesis where individuals start out

5     with pain pills prescribed by their doctor or

6     perhaps pain pills that were prescribed to somebody

7     else in the family, which they took from the

8     medicine cabinet for the right reasons, and then the

9     individual ultimately gets addicted to the opioid

10    and then looks for cheaper and more available

11    sources over time, which is illicit sources like

12    heroin and illicit fentanyl.

13           Q.    Doctor, you call that what?

14           A     The gateway theory or the gateway

15    phenomenon.

16           Q.    Is that your term or do others use that

17    as well?

18           A     That's a term that I have used, as well

19    as -- and others have used that term as well.

20                 MS. CONROY:  Thank you, Doctor.  I have

21           no further questions at this time.

22                 THE COURT:  Mr. Shkolnik?

23                 MR. SHKOLNIK:  Your Honor, I'm going to

24           have about 45 minutes to an hour.  Could we

25           take our -- I could condense it if we took

1

2    our lunch break at 12:15 or 12:30, that would

3    really help, unless the Court wants me to

4    stop.  I will be happy to do it either way.

5        THE COURT:  That's okay.  Members of the

6    jury, are you hungry?

7        We'll break for lunch.  We'll resume at

8    1:30.  Don't discuss the case among

9    yourselves or with anyone else until the

10   appropriate time.

11       Thank you.

12       MS. CONROY:  Thank you.

13       THE COURT OFFICER:  All rise.  Jury

14   exiting.

15       THE COURT:  See everybody at 1:30.

16   Thank you.

17

18

19                  *     *     *

20

21

22

23

24

25

```
 1                    In Re: Opioid Trial              104

 2                 C E R T I F I C A T I O N

 3

 4          I, Stephanie Casagrande Hague, CSR, RPR,

 5      an Official Court Reporter of the State of

 6      New York, County of Suffolk, do hereby

 7      certify that the above is a true and accurate

 8      transcription of my stenographic notes taken

 9      in the above-entitled action on this day;

10          Furthermore, photocopies made of this

11      transcript by any party cannot be certified

12      by me to be true and accurate.

13          Therefore, only those copies bearing an

14      original signature in blue ink are official

15      certified copies.

16

17

18      _____

19      STEPHANIE CASAGRANDE HAGUE, CSR, RPR
             Official Court Reporter

20

21

22

23

24

25
```

## 0

**001** [2] - 8:20, 10:14
**0019** [1] - 8:20
**00890346** [1] - 70:24
**00890351** [1] - 73:7
**00890355** [1] - 75:7
**01159348** [1] - 64:3
**01159362** [1] - 59:13
**01159368** [1] - 62:19
**01159401** [1] - 65:25
**01159403** [1] - 67:19
**01601605** [1] - 49:16
**01610549** [1] - 33:16
**01610552** [1] - 34:9
**01610597** [1] - 35:12
**01610598** [1] - 39:3
**02199** [1] - 4:7
**064** [1] - 10:18

## 1

**1** [2] - 32:4, 32:18
**1-19** [1] - 14:18
**10** [5] - 20:15, 32:4, 32:6, 32:18, 64:2
**100** [2] - 54:16, 59:13
**1000** [1] - 2:17
**10005** [1] - 2:4
**10016** [1] - 1:17
**10018** [1] - 3:9
**10019-9710** [1] - 2:11
**10119** [1] - 4:3
**11** [2] - 19:10, 23:17
**11,882** [1] - 74:18
**111** [1] - 4:7
**112** [1] - 1:16
**11747** [1] - 1:22
**11:30** [1] - 16:4
**12** [8] - 1:8, 20:15, 29:23, 30:2, 31:13, 31:17, 31:21, 32:9
**12:15** [1] - 103:2
**12:30** [1] - 103:2
**12th** [2] - 79:11, 99:18
**1301** [1] - 2:23
**14** [2] - 90:12, 90:13
**16** [2] - 9:2, 9:7
**163** [1] - 12:4
**16th** [1] - 9:11
**17** [1] - 9:15
**1717** [1] - 3:20
**17th** [2] - 8:14
**18** [1] - 10:5
**18th** [1] - 8:19
**19103** [1] - 3:21
**1990s** [4] - 49:17, 49:21, 50:21, 76:9
**1:30** [2] - 103:8, 103:15

**1st** [3] - 17:5, 17:13, 25:4

## 2

**2** [2] - 12:7, 12:19
**20** [1] - 69:7
**20-minute** [2] - 69:6, 69:9
**2000** [3] - 43:8, 68:14, 87:9
**20004** [1] - 2:23
**20005** [1] - 3:15
**2003** [2] - 80:19, 87:9
**2005** [5] - 59:5, 62:20, 66:3, 67:20, 68:6
**2007** [1] - 43:9
**2016** [12] - 9:11, 10:4, 10:7, 11:16, 12:12, 12:22, 17:5, 17:13, 20:22, 25:4, 50:17, 82:16
**2017** [1] - 20:25
**2018** [1] - 8:19
**2020** [2] - 79:11, 99:18
**2021** [1] - 1:8
**236** [1] - 14:5
**24** [1] - 64:4
**24979** [1] - 68:25
**25** [3] - 63:25, 64:2, 83:20
**250** [1] - 2:10
**26** [1] - 85:25
**27** [1] - 85:25
**27812** [1] - 33:7
**28** [2] - 2:3, 33:15

## 3

**3** [2] - 10:20, 13:11
**300** [1] - 3:4
**305** [1] - 1:22
**31** [1] - 34:8
**3100** [1] - 3:20
**3211(a)(5** [1] - 9:8
**349** [3] - 11:13, 12:2, 14:3
**35** [2] - 19:10, 23:17
**350** [3] - 11:13, 12:2, 14:4
**37** [1] - 63:23
**39** [1] - 59:11

## 4

**40** [1] - 70:23
**400** [1] - 1:22
**4000** [1] - 2:17
**45** [3] - 62:18, 73:6, 102:24

**4540(a** [1] - 58:10
**48** [1] - 1:2
**49** [1] - 75:6

## 5

**5** [1] - 5:10
**50** [1] - 54:16
**500** [1] - 99:2
**55** [1] - 64:14
**55th** [1] - 2:10

## 6

**6** [1] - 5:11
**60654** [1] - 3:4
**620** [1] - 3:9

## 7

**7** [2] - 5:12, 14:21
**725** [1] - 3:14
**76** [2] - 35:11, 35:13
**77** [1] - 39:3
**77002** [1] - 2:18
**78** [1] - 65:24
**7:12** [1] - 81:16

## 8

**8** [11] - 5:12, 29:23, 30:2, 31:13, 31:17, 31:20, 32:9, 67:19, 99:12, 99:17, 100:12
**80** [1] - 67:18
**84** [1] - 49:14

## 9

**9** [1] - 66:13
**90** [1] - 64:12
**9:20** [1] - 5:15

## A

**ABDC** [2] - 3:19, 4:2
**abide** [1] - 14:25
**able** [8] - 29:3, 38:8, 38:19, 55:17, 67:15, 85:24, 85:25, 96:10
**above-entitled** [1] - 104:9
**abruptly** [1] - 72:3
**absence** [3] - 40:11, 41:12, 41:18
**absolutely** [1] - 65:12
**absorbed** [3] - 54:10, 55:10, 70:17
**abstinence** [1] - 72:8
**abuse** [14] - 16:24, 17:8, 17:15, 24:16, 24:24, 25:3, 35:14, 35:25, 49:18, 51:2, 59:15, 73:10, 84:23, 88:16
**Academy** [2] - 39:7, 67:10
**access** [1] - 6:16
**accompanied** [1] - 72:18
**accordance** [1] - 13:3
**according** [4] - 6:15, 13:9, 32:8, 77:25
**accredits** [1] - 29:2
**accurate** [2] - 104:7, 104:12
**achieve** [1] - 19:22
**acknowledge** [2] - 18:8, 20:21
**acknowledging** [1] - 50:13
**Act** [3] - 42:9, 47:13, 49:2
**Actavis** [4] - 2:16, 2:16, 2:22, 3:3
**acting** [2] - 33:10, 56:13
**action** [5] - 11:19, 16:23, 22:4, 34:15, 104:9
**actions** [4] - 9:21, 10:8, 11:4, 48:16
**Actiq** [25] - 53:25, 54:3, 56:3, 59:7, 60:25, 62:4, 62:6, 62:12, 62:15, 62:20, 63:3, 63:18, 64:7, 64:12, 64:15, 64:22, 65:4, 65:7, 65:11, 65:23, 66:9, 68:9, 89:2
**activities** [2] - 10:9, 89:18
**actual** [6] - 8:7, 33:13, 44:5, 48:8, 54:6, 90:13
**acute** [3] - 27:5, 40:6, 72:6
**adapts** [1] - 71:24
**add** [1] - 32:13
**addicted** [26] - 31:12, 31:14, 31:18, 32:10, 34:6, 34:25, 35:3, 71:3, 72:23, 73:20, 73:24, 74:6, 74:7, 74:9, 76:7, 76:18, 77:20, 77:21, 78:2, 78:16, 78:17, 78:20, 101:20, 102:9
**addiction** [47] - 26:19, 29:15, 29:22, 29:25, 30:12, 30:16, 30:21, 31:2, 31:20, 32:21, 34:16, 34:21, 35:7, 35:25, 37:9, 37:18, 38:4, 38:12, 39:25, 51:17, 51:19, 59:15, 65:9, 71:9, 72:17, 72:18, 73:11, 73:14, 73:18, 74:11, 74:19, 75:11, 76:24, 77:5, 78:9, 78:12, 78:21, 86:14, 89:20, 90:19, 92:7, 94:25, 95:5, 97:3, 97:10, 97:15
**addictive** [1] - 90:22
**addictiveness** [1] - 19:19
**addicts** [1] - 49:4
**addition** [2] - 9:16, 10:20
**additional** [2] - 10:19, 82:22
**address** [1] - 47:2
**addresses** [1] - 16:11
**Administration** [1] - 91:16
**administration** [1] - 55:20
**admissible** [1] - 57:6
**admission** [1] - 83:2
**admissions** [2] - 22:10, 23:13
**admit** [2] - 21:23, 23:18
**admitted** [1] - 11:10
**admittedly** [1] - 23:14
**ads** [3] - 88:6, 88:7, 88:10
**Advanced** [1] - 80:18
**adverse** [1] - 32:3
**advertisement** [2] - 87:8, 87:15
**advertisements** [2] - 86:9, 88:8
**affords** [1] - 64:22
**afraid** [2] - 49:25, 50:16
**agent** [2] - 63:7, 63:19
**aggressively** [1] - 42:3
**ago** [1] - 60:20
**agreed** [1] - 24:14
**Agreement** [2] - 13:6, 21:14, 22:8, 22:9, 23:12
**agreement** [4] - 11:22, 12:22, 13:2, 13:7
**ahead** [8] - 47:21, 53:21, 75:23, 75:24, 80:6, 83:19, 85:21,

94:12
**Alexander** [1] - 14:16
**all-encompassing** [1] - 8:22
**alleged** [1] - 24:6
**Allergan** [15] - 2:21, 3:2, 33:16, 34:9, 35:12, 39:3, 44:24, 49:15, 61:23, 93:6, 94:15, 96:16, 97:12, 97:21, 98:8
**allow** [3] - 23:18, 57:6, 95:12
**allowable** [2] - 16:15, 79:15
**allowed** [4] - 20:23, 22:7, 23:5, 78:15
**allows** [1] - 37:23
**almost** [2] - 5:13, 38:5
**alone** [1] - 37:5
**Alpharma** [2] - 43:12, 45:2
**American** [7] - 3:19, 39:7, 39:15, 67:9, 67:10, 68:4, 68:15
**AmerisourceBergen** [2] - 3:18, 4:2
**amount** [1] - 20:8
**ANA** [1] - 4:8
**analgesia** [1] - 63:5
**Analgesic** [1] - 80:18
**analgesic** [2] - 9:14, 60:14
**analysis** [3] - 30:5, 30:6, 32:9
**analyzes** [1] - 30:7
**Anda** [1] - 4:6
**Andrew** [1] - 18:3
**ANDREW** [2] - 2:12, 3:10
**anniversary** [1] - 8:15
**answer** [16] - 18:19, 44:21, 50:5, 53:7, 53:12, 57:2, 57:7, 60:8, 75:25, 79:6, 86:17, 86:22, 86:25, 90:8, 95:23, 96:15
**answered** [1] - 79:24
**anticipate** [3] - 8:12, 45:15, 68:14
**anxiety** [1] - 72:9
**AOD** [24] - 8:24, 10:3, 10:20, 12:5, 12:18, 14:6, 14:9, 15:2, 15:4, 15:6, 15:8, 15:25, 16:7, 17:18, 18:8, 18:16, 19:10, 20:9, 21:5, 23:9, 82:11, 82:17, 82:18, 83:18

**apologies** [4] - 16:4, 17:17, 46:7, 46:11
**appeal** [1] - 22:16
**appear** [1] - 96:8
**Appellate** [1] - 18:15
**appendix** [2] - 66:2, 67:19
**applicable** [4] - 9:24, 11:6, 48:3, 83:18
**appoint** [1] - 7:13
**appreciate** [2] - 37:24, 69:4
**appreciated** [1] - 50:18
**apprenticeship** [1] - 38:7
**appro** [1] - 5:13
**Approach** [1] - 83:22
**approaches** [1] - 84:13
**appropriate** [4] - 69:12, 78:21, 82:4, 103:10
**approval** [2] - 17:11, 22:25
**approved** [3] - 62:7, 62:11, 91:15
**Arch** [1] - 3:20
**area** [1] - 79:15
**argue** [1] - 12:8
**argued** [1] - 94:23
**argument** [1] - 9:8
**arguments** [1] - 22:11
**ARNOLD** [1] - 2:8
**arthritis** [2] - 87:17, 87:19
**article** [1] - 25:17
**articles** [3] - 28:16, 36:23, 92:16
**ASFENDIS** [1] - 4:4
**aspect** [1] - 99:25
**aspects** [1] - 56:17
**asserted** [1] - 11:17
**assigned** [1] - 91:18
**assignment** [1] - 8:16
**assist** [1] - 49:6
**assistance** [4] - 5:24, 6:9, 6:10, 6:24
**Association** [1] - 48:25
**ASST** [5] - 2:4, 2:5, 2:5, 2:6, 2:6
**assume** [12] - 52:24, 53:8, 53:10, 53:23, 54:18, 55:4, 56:2, 57:3, 80:17, 80:24, 94:13, 94:22
**assumed** [1] - 41:6
**assurance** [10] - 9:10, 9:16, 10:7, 10:21,

11:16, 11:19, 13:13, 14:23, 15:10, 82:17
**attempt** [1] - 20:17
**attempting** [2] - 16:5, 35:20
**attend** [1] - 28:4
**attention** [7] - 19:9, 49:19, 50:15, 59:14, 62:20, 67:21, 81:24
**attested** [1] - 43:10
**Attorney** [11] - 2:2, 2:3, 9:21, 11:3, 11:10, 11:18, 11:21, 12:23, 13:19, 15:20, 20:13
**attorney** [3] - 4:2, 8:7, 95:8
**ATTORNEY** [5] - 2:4, 2:5, 2:5, 2:6, 2:6
**Attorneys** [9] - 1:16, 1:21, 2:9, 2:15, 3:2, 3:7, 3:13, 3:18, 4:6
**attorneys** [1] - 2:21
**authored** [1] - 36:21
**authors** [3] - 28:18, 77:8, 77:17
**availability** [1] - 25:21
**available** [2] - 63:6, 102:10
**Avenue** [4] - 1:16, 2:23, 3:9, 4:7
**average** [5] - 38:3, 38:10, 38:22, 50:18, 73:19
**aware** [9] - 6:2, 15:24, 85:9, 85:17, 86:8, 86:19, 89:22, 89:23, 90:10
**awareness** [1] - 50:20

---

# B

**background** [1] - 37:23
**BADALA** [1] - 1:24
**Baker** [1] - 14:16
**bandwagon** [1] - 91:5
**bar** [2] - 10:10, 11:16
**barred** [3] - 9:9, 15:9, 22:3
**barriers** [1] - 33:22
**barring** [1] - 12:9
**Bartle** [3] - 43:17, 52:20, 57:24
**BARTLE** [23] - 2:19, 43:14, 43:17, 43:23, 52:5, 52:8, 52:12, 52:16, 53:18, 57:9, 57:25, 58:11, 58:13, 61:11, 75:20, 79:5,

79:12, 79:16, 93:8, 94:4, 94:8, 94:16, 98:19
**base** [1] - 30:18
**based** [4] - 41:6, 64:11, 74:3, 93:9
**basis** [2] - 53:13, 100:2
**Bates** [4] - 33:14, 33:15, 59:12, 59:13
**bearing** [1] - 104:13
**became** [4] - 49:24, 50:16, 78:19, 84:24
**become** [5] - 31:14, 52:12, 71:3, 72:23, 77:20
**becoming** [2] - 34:25, 101:19
**beg** [1] - 15:17
**began** [2] - 84:25, 86:18
**beginning** [1] - 49:22
**behalf** [1] - 44:24
**behaviors** [5] - 30:21, 76:23, 77:2, 77:14, 90:22
**behind** [1] - 47:4
**beliefs** [1] - 77:2
**Bellco** [1] - 3:19
**benefit** [1] - 64:22
**benefits** [5] - 51:20, 65:19, 86:14
**benign** [4] - 35:16, 35:17, 36:11, 49:25
**Benign** [1] - 36:13
**best** [5] - 13:4, 13:5, 37:3, 38:16, 41:6
**better** [2] - 14:9, 96:3
**between** [17] - 11:21, 32:4, 32:18, 43:8, 72:11, 80:4, 82:14, 87:9, 93:4, 99:7, 99:22, 100:4, 100:6, 100:13, 100:21, 101:5, 101:8
**beyond** [4] - 49:9, 64:23, 72:5, 88:22
**big** [1] - 33:4
**biggest** [1] - 73:24
**biologically** [1] - 76:3
**bit** [6] - 7:11, 19:14, 33:19, 63:24, 67:8, 85:4
**blends** [1] - 75:3
**bloodstream** [3] - 54:11, 54:25, 55:3
**BLOUIN** [1] - 1:18
**blue** [1] - 104:14
**board** [2] - 46:25, 47:5
**Boards** [11] - 29:7,

29:8, 40:15, 40:18, 40:20, 40:23, 42:4, 42:14, 47:7, 48:3, 92:17
**Boards'** [1] - 41:24
**Bockius** [1] - 43:18
**BOCKIUS** [1] - 2:15
**bodies** [4] - 28:23, 28:24, 41:5, 96:12
**body** [1] - 71:24
**bold** [1] - 63:2
**books** [1] - 76:11
**boom** [1] - 5:15
**Boston** [3] - 4:7, 68:6, 68:15
**bottom** [1] - 34:10
**bounds** [8] - 15:8, 17:3, 20:12, 21:3, 25:6, 79:21, 81:13
**boxed** [1] - 88:15
**brain** [2] - 71:24, 72:2
**branded** [1] - 9:13
**break** [6] - 68:20, 69:4, 70:10, 99:4, 103:2, 103:7
**breakthrough** [9] - 62:7, 62:8, 62:16, 63:10, 63:13, 63:19, 64:13, 70:22, 89:3
**breathing** [1] - 55:21
**Brennan** [2] - 5:22, 5:25
**briefly** [1] - 23:25
**bring** [3] - 25:8, 26:4, 69:23
**bringing** [1] - 10:10
**brings** [2] - 25:5
**broad** [1] - 64:15
**broader** [1] - 65:16
**Broadhollow** [1] - 1:22
**BROCK** [1] - 2:24
**brought** [2] - 6:2, 30:19
**Bruce** [1] - 48:24
**BTCP** [2] - 63:8, 63:9
**BTP** [1] - 63:7
**buccal** [1] - 55:8
**budget** [2] - 66:2, 66:3
**budgeted** [1] - 66:7
**Building** [1] - 3:8
**bullet** [1] - 33:23
**bunch** [1] - 30:7
**BURLING** [1] - 3:7
**Business** [3] - 11:13, 12:2, 14:3
**busy** [1] - 36:22
**BY** [8] - 2:4, 2:18, 3:5, 3:15, 3:21, 4:8, 26:16, 70:8

# C

**cabinet** [1] - 102:8
**California** [1] - 47:6
**campaign** [2] - 96:9, 100:21
**cancer** [16] - 27:5, 35:18, 62:7, 62:8, 62:12, 62:16, 63:14, 63:17, 63:20, 64:13, 65:6, 70:22, 84:11, 89:2, 89:3
**candidly** [1] - 23:19
**cannot** [1] - 104:11
**capacity** [1] - 37:7
**capsule** [1] - 56:17
**Cardinal** [1] - 3:13
**care** [3] - 31:9, 37:3, 38:19
**careful** [3] - 7:9, 14:9, 14:10
**caregivers** [1] - 70:25
**carries** [1] - 37:5
**CASAGRANDE** [2] - 4:22, 104:18
**Casagrande** [1] - 104:4
**case** [19] - 6:10, 6:17, 7:2, 12:22, 13:12, 14:11, 21:14, 22:6, 22:9, 39:12, 41:9, 44:14, 45:13, 55:24, 58:23, 69:10, 77:8, 77:9, 103:8
**cases** [1] - 28:11
**CBP** [1] - 35:15
**Central** [1] - 1:9
**Cephalon** [4] - 2:15, 43:12, 62:2, 70:19
**certain** [27] - 19:19, 19:25, 22:18, 27:23, 27:25, 28:11, 28:13, 28:19, 28:20, 28:21, 28:23, 29:5, 41:8, 41:17, 42:2, 42:12, 42:13, 43:11, 45:20, 53:8, 59:23, 75:14, 76:23, 82:18, 82:19, 93:20, 96:20
**Certain** [1] - 19:21
**certainly** [5] - 18:17, 45:12, 82:20, 95:11, 96:10
**certified** [2] - 104:11, 104:15
**certify** [1] - 104:7
**change** [1] - 49:2
**changed** [2] - 49:11, 50:22
**changes** [1] - 71:25

**characterized** [1] - 72:8
**chase** [1] - 24:3
**cheaper** [1] - 102:10
**checked** [1] - 69:20
**cheek** [3] - 55:9, 55:14, 70:17
**chemotherapy** [1] - 55:19
**Chicago** [1] - 3:4
**childhood** [1] - 73:22
**choice** [1] - 42:16
**Chronic** [2] - 36:13, 39:20
**chronic** [28] - 27:4, 29:17, 29:21, 29:25, 30:12, 31:16, 32:11, 32:22, 34:20, 35:2, 35:16, 35:17, 36:11, 40:4, 40:8, 40:11, 41:12, 49:25, 51:20, 62:13, 64:15, 65:8, 65:17, 71:11, 74:22, 87:19, 87:20, 100:25
**CIACCIO** [1] - 1:24
**circumstances** [1] - 38:16
**citation** [2] - 75:4, 88:6
**cited** [3] - 74:15, 86:9, 87:6
**civil** [1] - 10:8
**claim** [1] - 91:10
**claimed** [1] - 30:15
**claiming** [1] - 89:19
**claims** [8] - 9:9, 10:11, 11:17, 11:24, 12:10, 20:24, 89:17, 89:25
**clarification** [1] - 27:16
**class** [2] - 56:21, 96:13
**classic** [1] - 72:4
**clear** [6] - 13:8, 17:17, 21:3, 86:7, 86:18, 90:9
**clearly** [3] - 23:21, 81:12, 89:14
**CLERK** [7] - 5:2, 5:8, 25:25, 26:6, 69:17, 69:24, 70:4
**client** [1] - 58:18
**clinic** [1] - 38:13
**clinical** [1] - 38:9
**clinician** [6] - 34:19, 37:21, 38:10, 38:23, 40:2, 50:18
**clinician's** [1] - 37:6
**clinicians** [13] - 34:15, 35:23, 36:9, 36:22,

37:13, 38:14, 49:6, 49:24, 50:16, 50:25, 51:7, 51:12, 51:15
**clinics** [2] - 31:9
**clock** [1] - 90:23
**close** [3] - 41:16, 83:4, 83:5
**closed** [1] - 69:22
**clue** [1] - 82:9
**coined** [1] - 77:7
**colloquy** [1] - 101:3
**combines** [1] - 30:6
**comfortable** [1] - 64:23
**coming** [4] - 25:16, 25:19, 38:13, 82:6
**commencement** [1] - 9:6
**commenting** [1] - 95:8
**Commission** [2] - 28:24, 92:16
**Commissioner** [1] - 91:24
**common** [21] - 31:24, 32:5, 32:6, 32:7, 32:12, 32:14, 32:18, 35:2, 35:3, 61:3, 61:8, 71:6, 71:7, 71:9, 71:10, 73:14, 73:15, 74:7
**commonly** [2] - 65:4, 72:18
**communicate** [1] - 31:23
**communicating** [1] - 60:5
**community** [1] - 101:17
**Companies** [1] - 2:10
**company** [2] - 24:17, 58:7
**company's** [1] - 59:6
**comparison** [1] - 30:14
**complete** [1] - 13:8
**concept** [8] - 20:18, 77:25, 78:7, 78:18, 78:23, 80:9, 80:11, 80:13
**concepts** [1] - 26:22
**concern** [1] - 17:19
**concerning** [3] - 9:12, 16:23, 24:15
**concerns** [5] - 10:19, 14:25, 17:19, 47:2, 79:11
**concluded** [1] - 13:25
**condense** [1] - 102:25
**condensed** [1] - 36:25
**condition** [1] - 29:21

**conditions** [3] - 65:17, 65:18
**Conduct** [1] - 19:17
**conduct** [11] - 10:2, 11:9, 13:13, 19:2, 19:9, 19:14, 20:9, 20:24, 21:22, 23:22, 82:19
**conference** [6] - 67:12, 67:13, 67:25, 68:3, 68:5, 68:16
**conferences** [4] - 66:23, 67:3, 67:4, 67:14
**confluence** [1] - 100:20
**confronted** [1] - 95:12
**connected** [1] - 44:14
**connection** [11] - 5:25, 8:11, 14:6, 14:20, 20:2, 43:20, 44:2, 46:15, 52:25, 83:17, 94:2
**CONNOLLY** [1] - 3:13
**CONROY** [33] - 1:15, 1:17, 26:10, 26:14, 26:17, 27:20, 47:22, 48:6, 51:25, 52:7, 52:22, 56:23, 57:17, 57:20, 58:16, 61:13, 69:5, 70:9, 80:7, 81:2, 81:5, 81:18, 81:22, 85:23, 87:2, 94:19, 95:15, 98:23, 99:5, 99:19, 100:5, 102:20, 103:12
**Conroy** [8] - 26:9, 27:18, 42:25, 48:4, 61:12, 70:7, 93:24, 101:4
**Conroy's** [1] - 83:15
**consensus** [2] - 7:23, 39:18
**consequences** [1] - 85:9
**consider** [3] - 23:5, 45:11, 58:25
**consideration** [3] - 45:14, 80:5, 82:20
**considered** [5] - 16:2, 17:22, 32:7, 46:14, 53:16
**consistent** [2] - 20:10, 74:21
**construed** [3] - 9:17, 10:23, 13:3
**consultants** [2] - 28:20, 66:17
**consumer** [1] - 11:25
**contain** [1] - 89:16

**contained** [2] - 9:17, 10:22
**contested** [1] - 6:6
**context** [1] - 78:9
**continue** [1] - 5:17
**CONTINUED** [2] - 26:16, 70:8
**continued** [1] - 35:22
**continues** [1] - 59:18
**continuing** [9] - 5:8, 18:13, 18:20, 22:19, 28:3, 28:6, 66:13, 92:14
**continuity** [1] - 38:19
**contract** [2] - 11:20, 13:2
**contrary** [2] - 22:10, 86:19
**contributing** [2] - 84:21, 84:25
**contributions** [1] - 43:8
**control** [2] - 33:23, 34:12
**controlled** [3] - 40:16, 51:5, 53:24
**conundrum** [1] - 23:15
**conveyed** [3] - 13:23, 28:2, 28:8
**convinced** [1] - 76:14
**coordinating** [1] - 8:17
**copies** [4] - 98:21, 99:3, 104:13, 104:15
**copy** [1] - 99:5
**core** [1] - 65:12
**Corp** [2] - 3:7, 3:19
**corporate** [2] - 85:13, 94:17
**corporation** [2] - 65:3, 85:19
**Corporation** [1] - 3:18
**Correct** [1] - 79:16
**correct** [26] - 26:19, 31:15, 32:23, 32:24, 37:10, 37:11, 37:18, 49:8, 50:6, 51:6, 51:13, 56:19, 61:2, 63:22, 68:6, 68:17, 71:7, 73:15, 75:19, 84:17, 84:18, 87:12, 87:13, 87:18, 96:21, 96:23
**counsel** [1] - 16:8
**counties** [1] - 10:10
**Counties** [7] - 10:17, 22:6, 83:10, 83:11, 83:12, 83:13, 101:10
**Counties'** [1] - 23:11

**counting** [1] - 90:23
**countless** [1] - 45:4
**country** [1] - 59:20
**COUNTY** [1] - 1:2
**County** [3] - 1:16, 1:21, 104:6
**couple** [1] - 42:21
**course** [9] - 5:23, 7:24, 10:2, 10:25, 15:25, 38:17, 45:2, 53:15, 81:3
**COURT** [113] - 1:2, 4:22, 5:6, 6:15, 6:21, 6:23, 7:4, 7:7, 7:22, 8:5, 15:13, 15:17, 16:13, 16:17, 18:5, 18:19, 21:4, 21:11, 23:24, 24:11, 25:8, 25:12, 26:4, 26:8, 27:18, 27:22, 42:24, 43:16, 43:21, 44:3, 44:7, 45:4, 45:23, 46:6, 46:9, 46:12, 46:18, 46:21, 46:23, 47:19, 48:4, 48:14, 50:5, 51:22, 52:10, 52:14, 52:20, 53:3, 53:19, 53:21, 56:25, 57:14, 57:18, 57:21, 58:9, 58:12, 58:19, 61:10, 61:15, 68:19, 69:3, 69:6, 69:14, 69:19, 70:2, 70:6, 75:24, 79:8, 79:14, 79:17, 79:21, 80:3, 80:22, 81:3, 81:8, 81:14, 81:17, 81:19, 82:8, 82:12, 83:7, 83:11, 85:15, 86:4, 86:21, 87:3, 90:3, 90:7, 91:9, 93:11, 93:15, 93:24, 94:6, 94:9, 94:21, 95:10, 95:16, 95:19, 95:22, 95:25, 98:22, 98:24, 99:3, 99:13, 99:21, 99:25, 100:17, 101:4, 101:11, 102:22, 103:5, 103:13, 103:15
**court** [3] - 8:6, 46:2, 68:21
**Court** [21] - 1:13, 5:2, 6:5, 6:11, 6:19, 8:11, 9:15, 10:5, 10:18, 12:7, 14:7, 14:20, 14:24, 15:4, 16:2, 16:5, 69:18, 80:3, 103:3, 104:5, 104:19
**Court's** [5] - 6:6, 9:2,

16:14, 16:19, 79:10
**courts** [1] - 14:17
**Courtwright** [2] - 20:19
**covered** [13] - 9:25, 11:8, 13:13, 19:2, 19:9, 19:14, 19:17, 20:9, 21:21, 23:8, 23:22
**Covered** [1] - 19:17
**COVINGTON** [1] - 3:17
**CPLR** [2] - 9:8, 58:9
**craving** [1] - 72:10
**create** [3] - 58:5, 66:21, 66:22
**created** [2] - 29:6, 42:15
**creates** [1] - 87:20
**criteria** [1] - 77:24
**crush** [2] - 19:18, 24:7
**crush-resistance** [1] - 19:18
**crush-resistant** [1] - 24:7
**cry** [1] - 32:23
**CSR** [3] - 4:22, 104:4, 104:18
**CT2** [1] - 53:24
**cupcakes** [1] - 8:17
**current** [1] - 65:6
**customarily** [1] - 95:11
**cut** [2] - 24:3, 63:24
**cutoff** [1] - 10:4

**D**

**daily** [1] - 89:18
**Dakota** [5] - 47:11, 47:12, 47:16, 47:18, 48:25
**dangerous** [1] - 29:10
**DANIEL** [1] - 1:18
**data** [1] - 30:8
**database** [1] - 24:22
**date** [7] - 8:16, 10:4, 12:18, 15:8, 28:7, 66:17, 67:25
**dated** [1] - 79:11
**dates** [1] - 69:20
**DAVID** [1] - 3:10
**DAY** [1] - 5:19
**days** [2] - 25:22, 96:22
**DC** [2] - 2:23, 3:15
**deal** [1] - 98:5
**dealt** [1] - 14:9
**death** [1] - 65:10
**debating** [1] - 22:23
**decade** [1] - 33:22
**decades** [1] - 76:10

**deceptive** [1] - 11:25
**deciding** [2] - 22:2, 22:5
**decision** [3] - 11:2, 12:19, 79:10
**decisionmaking** [1] - 37:6
**decreases** [2] - 71:16, 73:3
**Defendant** [5] - 14:22, 44:14, 61:13, 84:4, 94:14
**defendant** [1] - 45:3
**Defendants** [22] - 7:19, 11:4, 11:9, 11:18, 11:22, 11:24, 12:8, 12:21, 13:11, 18:4, 41:9, 44:22, 44:25, 45:5, 45:8, 61:7, 61:12, 61:17, 61:20, 81:6, 93:5, 96:21
**Defendants'** [2] - 13:20, 100:14
**definition** [2] - 32:13, 32:14
**definitive** [1] - 30:10
**definitively** [1] - 36:25
**delineate** [1] - 16:6
**delivery** [1] - 63:4
**Demo** [1] - 99:2
**demonstrate** [2] - 12:21, 77:15
**demonstrating** [1] - 77:19
**denied** [2] - 8:25, 11:10
**deny** [2] - 21:23, 23:18
**department** [5] - 6:14, 6:16, 6:20, 6:24, 8:6
**Department** [2] - 94:24, 95:4
**dependant** [2] - 72:17, 72:21
**dependence** [8] - 26:21, 65:10, 71:15, 71:20, 72:12, 72:19, 72:25, 98:5
**deposition** [2] - 6:7, 23:2
**depression** [1] - 72:9
**deprive** [2] - 9:18, 10:23
**deprived** [1] - 78:19
**describe** [4] - 54:3, 54:12, 66:6, 77:17
**described** [2] - 77:11, 100:23
**describing** [1] - 59:6
**description** [1] - 77:9

**desk** [2] - 7:8, 7:9
**despite** [4] - 33:20, 35:22, 40:11, 51:18
**detail** [1] - 19:24
**detailing** [2] - 24:19, 67:24
**detect** [2] - 38:17, 48:23
**determinations** [1] - 16:19
**determine** [5] - 23:8, 23:21, 44:16, 85:24, 86:2
**determined** [1] - 31:13
**developed** [3] - 40:15, 47:3, 74:18
**diagnose** [1] - 78:9
**DIANA** [1] - 2:13
**DIANE** [1] - 2:6
**difference** [1] - 72:11
**different** [9] - 30:7, 37:12, 37:20, 37:21, 60:24, 61:6, 61:12, 72:13, 96:2
**differentiate** [1] - 90:18
**difficult** [2] - 47:13, 78:8
**DIRECT** [2] - 26:16, 70:8
**direct** [7] - 7:16, 51:24, 59:14, 61:19, 62:20, 67:20, 70:20
**directed** [2] - 13:19, 20:4, 79:9
**direction** [1] - 6:17
**directly** [1] - 86:19
**Director** [3] - 45:18, 47:9, 48:25
**disagree** [1] - 18:7
**disagreement** [1] - 18:25
**disclosed** [1] - 52:9
**disclosure** [4] - 52:17, 52:21, 58:3, 81:15
**discontinuance** [9] - 9:10, 10:7, 10:21, 11:16, 11:20, 13:14, 14:23, 15:11, 82:17
**discoveries** [1] - 41:4
**discovery** [1] - 81:4
**discuss** [2] - 69:10, 103:8
**discussed** [3] - 27:19, 43:24, 68:8
**discussing** [1] - 7:18
**discussion** [1] - 59:22
**disease** [1] - 64:20
**dismiss** [2] - 8:22, 8:24

**dispute** [4] - 82:14, 82:24, 82:25, 83:14
**distinction** [7] - 17:25, 80:4, 93:4, 93:17, 93:18, 100:13, 100:15
**distinguishing** [1] - 19:20
**distressing** [1] - 41:4
**distributed** [2] - 61:17, 99:4
**Distributors** [1] - 3:19
**diversion** [9] - 16:24, 17:15, 24:16, 24:24, 49:18, 50:13, 51:4, 59:15, 84:24
**Division** [1] - 18:15
**doctor** [32] - 29:21, 29:24, 30:13, 30:23, 30:24, 33:9, 38:12, 42:24, 49:13, 52:24, 53:20, 53:23, 54:18, 58:21, 70:10, 73:18, 73:25, 74:8, 75:16, 76:5, 78:23, 80:8, 80:14, 80:16, 83:20, 87:4, 91:4, 91:14, 99:6, 101:7, 102:5, 102:13
**Doctor** [12] - 25:23, 25:25, 40:25, 46:15, 49:5, 52:2, 64:25, 65:21, 68:25, 69:24, 75:23, 102:20
**doctor's** [1] - 34:25
**doctors** [26] - 27:9, 27:11, 28:4, 29:9, 39:13, 40:20, 40:21, 42:4, 42:9, 42:16, 47:14, 59:24, 60:5, 64:6, 66:16, 67:15, 68:12, 68:15, 74:8, 75:15, 76:8, 76:12, 88:9, 92:9, 92:13, 101:15
**doctors'** [3] - 27:13, 27:24, 78:20
**document** [56] - 15:25, 17:21, 23:7, 23:19, 33:6, 33:14, 33:15, 34:9, 39:22, 40:3, 40:9, 45:25, 46:5, 46:12, 49:14, 51:10, 51:14, 51:19, 52:2, 57:12, 57:15, 57:22, 58:3, 58:5, 58:10, 58:22, 59:4, 59:9, 59:12, 60:21, 60:25, 61:2, 62:19, 65:25, 68:23, 70:24,

73:7, 73:9, 80:14, 80:18, 80:23, 81:23, 81:25, 82:6, 84:5, 84:6, 85:7, 86:7, 86:25, 87:11, 89:12, 89:14, 90:11, 90:13, 98:20, 99:13
**Document** [1] - 98:25
**documents** [13] - 59:6, 61:9, 80:15, 97:12, 97:15, 97:17, 97:18, 97:22, 97:24, 98:2, 98:9, 98:11, 98:13
**dollars** [4] - 42:2, 43:11, 66:10, 66:13
**done** [3] - 8:3, 31:6, 88:3
**dosage** [1] - 79:2
**dose** [10] - 26:24, 27:2, 71:16, 72:17, 72:17, 72:20, 74:24, 90:21, 90:24
**dosed** [1] - 56:14
**doses** [2] - 42:5, 65:14
**dosing** [1] - 73:2
**doubt** [1] - 23:3
**down** [8] - 14:21, 36:8, 40:14, 55:21, 72:2, 85:4, 90:23, 100:18
**DR** [2] - 26:16, 70:8
**Dr** [9] - 20:19, 26:12, 27:22, 45:2, 45:18, 47:9, 57:2, 91:23, 94:13
**draw** [3] - 81:24, 93:4, 93:17
**drew** [2] - 49:18, 50:15
**drug** [19] - 27:12, 31:5, 31:6, 32:4, 32:20, 33:9, 59:7, 62:10, 71:4, 71:15, 71:20, 71:25, 72:10, 73:2, 76:25, 77:14, 85:11, 88:23, 91:6
**Drug** [3] - 3:18, 3:19, 91:16
**drug's** [1] - 88:11
**drugs** [1] - 78:13
**due** [4] - 17:7, 60:13, 100:16, 100:20
**duly** [1] - 58:20
**duped** [1] - 42:17
**duration** [4] - 26:25, 72:17, 72:21, 74:25
**during** [5] - 12:12, 24:5, 53:15, 57:2, 83:15
**dying** [1] - 101:21

## E

**early** [1] - 11:2, 45:11
**ease** [1] - 36:10
**easier** [1] - 42:4
**easiest** [1] - 33:13
**easily** [3] - 71:15, 71:20, 73:2
**easy** [1] - 98:5
**edition** [1] - 14:18
**editor** [1] - 74:14
**educated** [1] - 67:12
**educating** [1] - 36:9
**Education** [1] - 66:4
**education** [7] - 28:3, 28:7, 34:14, 38:15, 66:14, 76:12, 92:15
**educational** [2] - 66:16, 66:23
**effective** [2] - 12:18, 33:22
**effectively** [1] - 72:15
**effectiveness** [1] - 96:9
**effects** [1] - 75:9
**effervescence** [1] - 55:10
**efficacy** [1] - 88:11
**effort** [2] - 78:14, 84:9
**Eighth** [1] - 3:9
**either** [5] - 9:12, 12:12, 11:5, 56:11, 61:21, 103:4
**elderly** [1] - 87:23
**eliminated** [1] - 82:18
**ELLIS** [2] - 2:21, 3:2
**Elmo** [1] - 49:15
**elsewhere** [1] - 51:24
**email** [5] - 5:10, 19:6, 33:5, 45:19, 48:19, 68:25
**emails** [1] - 43:13
**empirical** [2] - 80:8, 80:11
**employed** [3] - 27:12, 28:19, 58:6
**employee** [1] - 6:12
**encompassing** [1] - 8:22
**encouraged** [1] - 78:25
**end** [8] - 7:22, 35:21, 45:13, 49:16, 49:21, 54:8, 55:18, 61:4
**ended** [1] - 76:18
**Endo** [39] - 2:9, 2:9, 9:22, 10:8, 14:8, 14:13, 17:5, 17:8, 17:14, 18:3, 19:25, 24:4, 24:24, 25:7, 32:17, 43:12, 61:24,

80:17, 82:14, 84:6, 84:20, 85:9, 85:25, 86:8, 86:18, 87:11, 88:2, 89:11, 89:12, 89:22, 90:9, 91:4, 93:6, 94:14, 94:22, 97:15, 97:16, 97:24, 98:11
**Endo's** [8] - 8:23, 9:7, 14:22, 16:8, 16:11, 16:23, 24:4, 24:16
**enforceable** [1] - 11:20
**enforced** [1] - 13:9
**engage** [1] - 6:24
**engaged** [3] - 11:24, 29:10, 77:13
**entering** [1] - 70:3
**entities** [1] - 44:5
**entitled** [6] - 12:8, 21:16, 23:12, 36:12, 80:18, 104:9
**entity** [3] - 9:19, 10:24, 85:20
**epidemic** [9] - 37:15, 38:23, 49:22, 50:19, 50:23, 65:13, 76:19, 91:19, 93:22
**equity** [4] - 9:20, 10:11, 10:25
**ER** [24] - 9:12, 12:12, 13:16, 13:21, 16:9, 17:2, 17:7, 17:9, 17:15, 17:19, 17:24, 19:19, 19:20, 19:23, 19:24, 20:3, 22:25, 23:3, 24:8, 24:25, 32:16, 83:6, 83:7, 83:16
**erosive** [1] - 55:19
**especially** [1] - 36:19
**ESQ** [25] - 1:17, 1:18, 1:18, 1:19, 1:23, 1:23, 1:24, 1:24, 2:11, 2:12, 2:12, 2:13, 2:18, 2:19, 3:5, 3:10, 3:10, 3:11, 3:15, 3:16, 3:21, 4:4, 4:8, 4:8, 4:9
**essential** [1] - 30:25
**essentially** [14] - 42:17, 49:11, 54:4, 60:4, 60:17, 61:5, 65:2, 66:22, 76:2, 77:5, 77:18, 78:6, 93:22
**establish** [1] - 36:24
**established** [1] - 57:5
**establishing** [1] - 23:2
**esteemed** [1] - 36:20

**etiology** [2] - 64:21
**euphoric** [1] - 75:9
**evaluate** [1] - 37:13
**evaluating** [1] - 37:22
**evening** [1] - 52:19
**event** [2] - 12:20, 32:3
**events** [1] - 17:12
**eventually** [3] - 35:21, 44:12, 44:15
**evidence** [34] - 12:11, 12:13, 13:4, 13:5, 14:17, 16:9, 16:23, 20:23, 24:4, 24:9, 24:15, 24:23, 25:6, 29:23, 35:23, 37:2, 40:6, 40:9, 40:11, 41:12, 41:18, 52:4, 53:9, 56:24, 57:5, 65:19, 68:23, 74:19, 80:8, 80:11, 80:12, 81:25, 96:8, 99:2
**exactly** [1] - 31:6
**examination** [2] - 61:19, 83:15
**EXAMINATION** [2] - 26:16, 70:8
**examined** [1] - 100:20
**example** [7] - 22:21, 22:24, 32:16, 41:20, 55:16, 62:12, 89:4
**exception** [2] - 18:20, 58:20
**exceptions** [1] - 25:13
**exchanged** [2] - 80:25, 81:3
**exclusive** [1] - 63:17
**exclusively** [1] - 63:20
**excuse** [3] - 5:22, 8:14, 9:11
**executed** [1] - 9:10
**Executive** [1] - 48:24
**executive** [3] - 24:17, 48:18, 48:19
**exhibit** [4] - 52:13, 52:19, 53:2, 76:25
**Exhibit** [3] - 33:4, 58:21, 58:25
**exiting** [2] - 69:15, 103:14
**expect** [1] - 30:17
**expected** [1] - 66:7
**expense** [1] - 93:23
**experience** [1] - 72:4
**experienced** [1] - 64:18
**expert** [6] - 45:14, 52:21, 53:5, 53:7, 91:21, 95:21
**expertise** [1] - 37:9
**experts** [1] - 57:7

**explain** [3] - 36:16, 40:17, 67:22
**explained** [2] - 16:21, 27:4
**explains** [1] - 60:11
**explanations** [1] - 87:5
**exploding** [1] - 38:24
**explore** [2] - 30:15, 31:4
**exposure** [1] - 73:11
**extended** [1] - 12:23
**extensive** [1] - 20:8
**extensively** [1] - 29:18
**extent** [4] - 24:18, 24:19, 57:12, 83:16
**extraordinary** [1] - 17:6

## F

**F/K/A** [5] - 2:16, 2:22, 2:22, 3:3, 3:3
**face** [1] - 13:9
**faced** [1] - 86:2
**facie** [2] - 12:22, 13:12
**facilities** [1] - 25:21
**fact** [10] - 6:18, 15:9, 15:22, 22:14, 22:24, 23:8, 41:7, 51:23, 96:7, 100:22
**factor** [1] - 32:18
**factors** [4] - 34:13, 73:21, 73:22, 84:20
**facts** [4] - 53:8, 53:13, 57:3, 57:4
**factual** [1] - 22:2
**failed** [3] - 12:21, 13:11, 88:14
**fair** [1] - 98:22
**fairly** [1] - 39:25
**fake** [1] - 77:5
**fall** [1] - 31:20
**false** [19] - 35:9, 36:6, 36:7, 37:25, 71:12, 72:25, 73:4, 74:12, 76:20, 78:24, 78:25, 85:10, 91:2, 91:3, 91:10, 97:14, 98:17, 98:18, 99:7
**familiar** [4] - 55:5, 56:5, 84:16, 92:3
**family** [5] - 73:10, 73:17, 74:4, 74:6, 102:7
**far** [3] - 6:9, 32:23, 92:24
**fatal** [1] - 88:16
**fault** [2] - 60:18, 83:3
**favor** [1] - 100:17

**FDA** [17] - 17:5, 17:11, 62:7, 62:11, 62:17, 86:9, 87:6, 88:22, 89:24, 91:16, 91:19, 91:21, 91:24, 92:20, 92:22, 92:25, 93:6
**FDA-approved** [1] - 62:7
**fear** [6] - 34:4, 34:15, 34:16, 34:21, 35:6, 60:13
**fears** [1] - 36:10
**features** [1] - 65:12
**federal** [1] - 14:17
**Federation** [12] - 29:6, 29:7, 40:14, 40:18, 40:19, 40:22, 41:23, 42:3, 42:14, 47:7, 48:3, 92:17
**fentanyl** [25] - 54:4, 54:8, 54:9, 54:12, 54:15, 54:19, 54:20, 54:23, 56:19, 56:20, 59:7, 62:6, 62:15, 63:3, 64:7, 64:19, 65:4, 65:7, 65:11, 70:16, 72:12, 72:14, 101:24, 102:2, 102:12
**Fentora** [10] - 55:5, 68:24, 70:11, 70:15, 70:16, 70:18, 70:21, 75:19, 88:25
**few** [6] - 35:15, 45:15, 60:20, 71:2, 71:6, 71:8
**field** [6] - 28:9, 36:21, 39:14, 67:7, 67:11, 68:2
**figure** [3] - 30:4, 31:2, 41:10
**filed** [2] - 16:5, 18:2
**final** [1] - 17:16
**Finance** [5] - 2:21, 3:2, 97:12, 97:21, 98:9
**financial** [1] - 43:8
**findings** [2] - 10:19, 11:11
**fine** [3] - 53:22, 94:20, 98:23
**fingerprints** [1] - 48:23
**first** [6] - 18:17, 29:11, 43:7, 48:9, 64:9, 86:12
**FITZPATRICK** [1] - 1:18
**five** [1] - 57:3
**flowing** [1] - 14:8

**FOLEY** [1] - 4:6
**folks** [1] - 5:16
**Folks** [1] - 47:19
**follow** [1] - 59:22
**following** [3] - 9:3, 12:20, 53:6
**follows** [1] - 38:7
**Food** [1] - 91:16
**footnote** [4] - 80:4, 99:12, 99:17, 100:12
**force** [3] - 51:11, 51:12, 84:12
**forget** [1] - 53:21
**form** [14] - 8:10, 9:2, 14:20, 14:25, 16:14, 19:11, 20:7, 21:23, 23:21, 33:10, 56:13, 79:10, 91:7, 99:18
**formal** [1] - 11:23
**former** [1] - 91:24
**formulating** [2] - 58:22, 59:2
**formulation** [1] - 63:6
**forth** [1] - 21:14
**forward** [1] - 18:11
**foundation** [4] - 57:11, 57:20, 57:23, 100:11
**four** [1] - 74:18
**FRANCISCO** [1] - 4:8
**fraudulent** [1] - 10:9
**frequency** [1] - 49:17
**Friday** [7] - 6:3, 17:18, 17:22, 19:3, 20:11, 23:4, 33:20
**front** [7] - 16:12, 18:14, 33:5, 42:14, 59:8, 69:2, 99:14
**functions** [1] - 19:22
**fundamental** [1] - 12:25
**funded** [2] - 28:17, 41:7
**funding** [1] - 41:16
**furthermore** [1] - 74:5
**Furthermore** [1] - 104:10

# G

**GAB** [1] - 68:9
**gained** [1] - 16:25
**Galteri** [1] - 5:24
**Garguilo** [1] - 5:3
**GARGUILO** [1] - 1:12
**gateway** [4] - 102:3, 102:4, 102:14
**gatherings** [1] - 67:6
**general** [4] - 7:20, 12:14, 38:6, 49:3

**General** [9] - 2:2, 2:3, 11:13, 11:18, 11:21, 12:2, 12:23, 14:3, 20:13
**GENERAL** [5] - 2:4, 2:5, 2:5, 2:6, 2:6
**General's** [5] - 9:21, 11:3, 11:11, 13:19, 15:20
**generally** [4] - 17:22, 24:21, 24:25, 66:25
**generic** [4] - 45:8, 56:3, 56:11
**genetic** [2] - 73:20, 74:3
**Georgeson** [1] - 45:18
**gestures** [1] - 77:15
**GIBBONS** [1] - 4:2
**Gillson** [2] - 47:9, 48:21
**given** [1] - 37:9
**gizmos** [1] - 67:17
**gloves** [1] - 48:23
**granted** [1] - 22:19
**great** [1] - 51:25
**greater** [4] - 32:6, 40:7, 93:21, 101:17
**greet** [1] - 67:15
**GREGORY** [1] - 3:11
**Group** [12] - 41:22, 41:23, 41:25, 42:7, 42:15, 42:22, 43:5, 43:9, 45:19, 47:10, 48:20, 48:22
**group** [1] - 39:16
**groups** [2] - 16:12, 42:15
**Groups'** [1] - 48:16
**guess** [1] - 46:2
**guideline** [4] - 40:14, 41:11, 47:6, 48:11
**guidelines** [17] - 36:10, 36:12, 36:17, 36:18, 36:25, 37:4, 37:13, 37:22, 37:25, 39:4, 40:15, 41:2, 41:18, 41:24, 42:18, 47:5, 49:5
**Guidlines** [1] - 92:17
**guys** [1] - 48:20

# H

**Hague** [1] - 104:4
**HAGUE** [2] - 4:22, 104:18
**HALPERIN** [1] - 3:11
**hand** [6] - 16:3, 18:24, 21:25, 22:5, 48:20, 93:6

**HANLY** [1] - 1:15
**HANNA** [1] - 2:6
**happy** [1] - 103:4
**hard** [2] - 38:17, 38:22
**harkens** [1] - 20:18
**harm** [1] - 29:12
**HARVEY** [1] - 2:19
**Harvey** [1] - 43:17
**hats** [1] - 67:17
**heads** [1] - 44:9
**heads-up** [1] - 44:9
**Health** [6] - 2:9, 3:13, 31:25, 32:2, 94:24, 95:4
**health** [2] - 13:24, 93:23
**healthcare** [8] - 19:25, 20:4, 24:6, 24:20, 34:14, 39:13, 66:11, 101:15
**hear** [6] - 7:13, 7:24, 8:3, 23:13, 83:15, 90:3
**heard** [7] - 12:6, 22:11, 44:7, 53:25, 54:20, 57:16, 57:18
**hearing** [2] - 8:12, 23:11
**hearsay** [3] - 46:6, 46:7, 46:10
**held** [2] - 22:20, 55:9
**help** [4] - 5:18, 36:10, 66:19, 103:3
**hereby** [2] - 98:25, 104:6
**herein** [2] - 9:17, 10:22
**heroin** [3] - 101:24, 102:2, 102:12
**HERSCHLEIN** [23] - 2:11, 45:22, 45:24, 46:7, 46:11, 47:17, 48:12, 80:20, 81:9, 81:16, 82:3, 82:10, 83:5, 85:12, 86:16, 90:2, 91:7, 95:6, 95:17, 95:20, 99:11, 99:24, 100:10
**Herschlein** [1] - 94:23
**high** [2] - 27:2, 42:5
**higher** [3] - 19:22, 65:14, 79:2
**highlighted** [3] - 35:14, 67:21, 90:14
**highly** [2] - 30:19, 30:21
**hippocratic** [1] - 29:11
**hired** [1] - 27:23
**his/her** [1] - 90:20
**history** [7] - 15:3,

18:8, 19:4, 73:10, 73:17, 74:4, 74:6
**hold** [1] - 69:3
**holiday** [1] - 69:20
**holidays** [1] - 25:16
**HON** [1] - 1:12
**Honor** [100] - 5:5, 6:13, 7:3, 15:12, 15:22, 16:7, 16:10, 16:20, 17:4, 17:17, 17:21, 18:6, 18:10, 18:14, 18:15, 18:18, 18:22, 18:23, 19:3, 19:8, 19:16, 20:6, 20:10, 20:11, 20:15, 21:2, 21:6, 21:7, 21:9, 21:13, 21:17, 21:22, 22:11, 22:13, 22:15, 22:17, 22:20, 22:22, 23:4, 23:15, 23:20, 23:23, 25:11, 26:7, 26:10, 26:11, 27:15, 43:23, 44:4, 44:23, 45:21, 45:22, 46:8, 46:11, 46:17, 46:19, 47:17, 47:23, 47:24, 48:13, 50:8, 52:6, 52:8, 52:13, 52:22, 57:9, 57:17, 57:25, 58:17, 61:11, 75:20, 75:21, 79:13, 80:7, 80:20, 81:2, 81:9, 81:12, 81:18, 82:3, 83:6, 83:8, 85:12, 85:23, 86:16, 87:2, 90:2, 91:8, 93:8, 94:16, 95:6, 95:7, 95:18, 98:19, 99:11, 99:19, 99:24, 100:10, 101:2, 102:23
**Honor's** [4] - 18:7, 18:11, 19:11, 20:7
**Honorable** [1] - 5:3
**hospitalized** [3] - 74:16, 74:17, 74:20
**hospitals** [4] - 27:14, 27:25, 29:2
**hour** [2] - 5:17, 102:24
**Houston** [1] - 2:18
**huge** [2] - 59:20, 75:15
**hungry** [1] - 103:6
**HUNTER** [1] - 1:23
**Huntington** [1] - 4:7
**hypothesis** [1] - 102:4
**hypothetical** [5] - 53:4, 53:5, 53:9, 53:14, 57:7

**I**

**i.e** [1] - 61:17
**ICU** [1] - 55:20
**ideal** [2] - 63:7, 63:19
**identified** [1] - 43:5
**identify** [2] - 45:9, 45:10
**identifying** [1] - 44:5
**ignoring** [1] - 78:5
**illicit** [6] - 31:11, 51:5, 101:24, 102:2, 102:11, 102:12
**Illinois** [1] - 3:4
**immediate** [2] - 17:20, 72:5
**immune** [1] - 76:6
**immunize** [1] - 10:8
**impact** [2] - 75:15, 78:18
**implies** [1] - 87:15
**important** [2] - 55:23, 75:13
**importantly** [1] - 86:13
**impressed** [1] - 48:22
**impressions** [1] - 76:13
**improper** [3] - 80:21, 85:5, 88:3
**Improper** [1] - 87:5
**improperly** [1] - 89:24
**improved** [2] - 46:24, 47:2
**improvements** [1] - 33:21
**improves** [1] - 71:17
**IN** [1] - 1:4
**inability** [1] - 89:18
**inadequate** [2] - 34:14, 76:25
**inanimate** [1] - 85:18
**inappropriate** [5] - 34:16, 34:19, 35:4, 35:7, 101:3
**inborn** [1] - 74:3
**Inc** [17] - 2:9, 2:9, 2:10, 2:15, 2:16, 2:16, 2:22, 2:22, 3:3, 3:3, 3:8, 3:13, 3:19, 4:6
**include** [2] - 34:14, 92:6
**included** [4] - 31:10, 35:10, 46:13, 53:25
**includes** [1] - 30:10
**including** [6] - 6:13, 12:5, 13:15, 16:24, 41:8, 43:11
**inconsistent** [2] - 71:8, 89:6

**increase** [3] - 78:17, 90:21, 100:22
**increased** [7] - 50:22, 65:10, 67:3, 84:12, 96:13, 99:8, 101:16
**increasing** [2] - 49:17, 90:20
**independently** [2] - 53:15, 57:4
**INDEX** [1] - 1:5
**indicated** [3] - 62:4, 70:21, 89:2
**indication** [4] - 62:8, 64:24, 88:17, 88:21
**indications** [1] - 65:16
**individual** [3] - 40:23, 48:10, 102:9
**individuals** [5] - 66:19, 74:23, 78:19, 101:23, 102:4
**industry** [2] - 27:13, 27:17
**infiltrate** [1] - 96:11
**influence** [1] - 36:19
**influenced** [1] - 41:17
**influential** [2] - 37:5, 41:23
**inform** [1] - 6:5
**information** [10] - 30:17, 31:11, 85:25, 88:15, 88:17, 89:6, 89:7, 89:11, 92:10, 92:13
**informing** [1] - 37:6
**ingratiating** [1] - 28:22
**inherited** [1] - 73:21
**initial** [3] - 84:8, 86:11, 87:23
**ink** [1] - 104:14
**inquiries** [1] - 15:20
**inquiry** [1] - 13:19
**insomnia** [1] - 72:9
**instance** [1] - 5:19
**instances** [1] - 55:15
**instant** [1] - 11:19
**instead** [2] - 13:18, 54:24
**institutions** [2] - 28:10, 101:15
**instruct** [3] - 43:14, 43:19, 43:25
**instructed** [1] - 23:4
**instruction** [4] - 45:12, 82:5, 82:9, 83:9
**instructions** [4] - 14:10, 14:15, 21:19, 82:23
**insurers** [1] - 29:3

**intended** [1] - 49:6
**intends** [1] - 13:6
**intensely** [1] - 7:9
**intent** [1] - 13:4
**intention** [1] - 24:8
**interfere** [1] - 34:13
**interject** [2] - 15:15, 15:18
**internal** [1] - 59:6
**interpretation** [1] - 13:2
**interpreted** [1] - 13:14
**intervene** [1] - 51:16
**Intractable** [3] - 42:8, 47:13, 49:2
**introducing** [1] - 24:9
**intubated** [1] - 55:20
**invasive** [1] - 63:6
**investigated** [1] - 85:2
**involve** [1] - 10:14
**involving** [3] - 14:13, 15:4, 16:13
**IR** [2] - 17:20, 17:24
**irrational** [1] - 34:4
**irritability** [1] - 72:9
**Island** [2] - 25:18, 101:10
**Islip** [1] - 1:9
**issue** [13] - 6:2, 7:18, 12:5, 14:6, 16:6, 18:24, 20:16, 21:13, 21:21, 22:17, 22:22, 22:24, 23:23
**issues** [8] - 7:14, 8:11, 10:20, 16:3, 16:6, 16:11, 18:15, 22:2
**items** [1] - 20:12
**itself** [2] - 94:24, 97:5

**J**

**JAMES** [3] - 2:2, 2:11, 4:8
**JAYNE** [1] - 1:17
**Jerry** [1] - 5:3
**JERRY** [1] - 1:12
**Jewish** [1] - 25:16
**Jick** [1] - 74:14
**job** [2] - 8:5, 8:7
**JOHN** [1] - 2:4
**JOHNSTON** [1] - 2:6
**Joint** [2] - 28:24, 92:16
**JOSEPH** [1] - 1:24
**journal** [6] - 28:16, 77:9, 87:15, 88:6, 88:7, 92:15
**journals** [2] - 86:10, 88:9
**Judge** [4] - 7:6, 7:11,

51:21, 100:19
**judge's** [1] - 14:15
**judicial** [1] - 6:12
**July** [2] - 1:8, 8:14
**jump** [1] - 91:4
**jumping** [1] - 49:15
**June** [2] - 8:14, 8:19
**jurisdiction** [1] - 47:18
**jurisdictions** [1] - 10:12
**jurors** [2] - 14:14, 26:6, 69:3, 70:4
**jury** [32] - 5:9, 14:10, 21:5, 21:15, 21:21, 22:2, 22:5, 23:4, 23:7, 23:10, 23:11, 23:18, 26:4, 27:10, 36:16, 40:17, 43:6, 43:15, 43:19, 43:25, 53:6, 60:9, 63:2, 67:22, 68:19, 69:14, 69:23, 70:2, 70:14, 82:13, 103:6, 103:13
**Justice** [1] - 1:13
**JUSTIN** [1] - 1:19
**juxtaposing** [1] - 60:2

**K**

**Kadian** [8] - 33:6, 33:9, 33:10, 35:6, 51:11, 60:21, 61:13, 61:23
**KATY** [1] - 4:9
**KAYE** [1] - 2:8
**keep** [5] - 10:13, 24:12, 28:7, 66:17, 83:3
**Kessler** [1] - 91:23
**key** [8] - 17:25, 28:8, 28:13, 61:8, 66:18, 66:22, 75:14, 92:15
**kind** [2] - 62:5, 65:5, 75:5
**kinds** [1] - 35:8
**kinray** [1] - 3:14
**KIRKLAND** [2] - 2:21, 3:2
**Knapp** [1] - 44:23
**KNAPP** [7] - 3:5, 44:23, 45:21, 46:19, 46:22, 51:21, 101:2
**knowledge** [8] - 16:23, 16:25, 24:16, 37:23, 51:4, 57:12, 57:22, 85:14
**known** [2] - 84:24, 89:12
**knows** [3] - 16:10, 18:14, 19:3

**KOLs** [1] - 16:12
**KOSKI** [1] - 4:9

**L**

**label** [4] - 32:16, 32:17, 62:17
**labeled** [1] - 64:24
**labeling** [1] - 89:7
**labels** [5] - 32:15, 92:3, 92:6, 92:10, 92:12
**Labor** [1] - 69:22
**Laboratories** [1] - 2:16
**lacked** [1] - 89:7
**laid** [1] - 100:12
**language** [3] - 13:18, 15:10, 32:6
**LARDNER** [1] - 4:6
**largely** [1] - 35:19
**LaSalle** [1] - 3:4
**last** [17] - 16:3, 16:21, 18:2, 19:6, 20:14, 26:18, 36:9, 41:14, 49:23, 52:13, 52:19, 76:9, 81:12, 81:16, 82:6, 95:7, 96:21
**late** [5] - 16:3, 50:20, 68:5, 76:9, 81:14
**lateness** [1] - 16:4
**LAURA** [1] - 1:18
**law** [16] - 5:24, 6:14, 6:16, 6:18, 6:20, 6:24, 7:2, 8:6, 9:19, 10:10, 10:24, 11:6, 21:14, 22:9, 23:20, 43:21
**Law** [3] - 11:13, 12:2, 14:3
**lawsuit** [1] - 45:6
**layer** [1] - 96:11
**laying** [1] - 57:10
**lead** [1] - 101:18
**leaders** [8] - 28:9, 36:21, 42:21, 43:5, 66:19, 66:22, 92:15
**Learning** [2] - 68:24, 70:11
**learning** [2] - 35:5, 82:2
**least** [2] - 51:10, 66:6
**leaves** [2] - 7:8
**led** [4] - 50:23, 101:15, 101:16, 101:16
**legislatures** [1] - 42:8
**legitimate** [1] - 71:3
**Lembke** [5] - 26:12, 27:22, 45:2, 57:2, 94:13

112

**LEMBKE** [2] - 26:16, 70:8
**LETITIA** [1] - 2:2
**letter** [6] - 16:5, 16:21, 17:4, 17:25, 20:14, 74:14
**letting** [1] - 22:23
**leukemia** [1] - 77:12
**level** [2] - 24:17, 24:18
**Levi** [1] - 48:24
**LEWIS** [1] - 2:15
**Lewis** [1] - 43:18
**liability** [1] - 83:2
**Liberty** [1] - 2:3
**Liccardi** [1] - 19:5
**license** [2] - 40:24, 66:17
**licensure** [1] - 28:5
**life** [3] - 55:18, 65:3, 89:18
**light** [1] - 41:15
**likelihood** [2] - 32:10, 89:20
**likely** [2] - 72:23, 73:19
**limine** [6] - 9:5, 12:16, 14:21, 14:22, 21:8, 21:15
**limit** [2] - 9:20, 11:2
**limitations** [2] - 88:17, 88:20
**limited** [1] - 83:9
**limiting** [4] - 14:15, 21:19, 82:5, 82:9
**line** [4] - 31:20, 36:9, 86:12, 98:6
**lines** [1] - 97:11
**list** [1] - 43:8
**literally** [1] - 71:25
**literature** [3] - 28:17, 29:19, 80:10
**litigation** [2] - 11:23, 15:3
**LITIGATION** [1] - 1:4
**Litigation** [1] - 5:9
**Live** [1] - 94:10
**lives** [1] - 78:22
**living** [1] - 89:19
**LLC** [6] - 1:15, 2:16, 2:21, 3:2, 3:14, 97:12
**LLP** [8] - 2:8, 2:15, 2:21, 3:2, 3:7, 3:13, 3:18, 4:6
**lobbied** [3] - 41:7, 42:3, 42:8
**lobbying** [2] - 28:23, 42:11
**location** [1] - 67:25
**Logan** [1] - 3:20

**lollipop** [10] - 54:5, 54:7, 59:7, 59:9, 62:6, 62:15, 64:7, 65:4, 65:7, 65:11
**long-acting** [2] - 33:10, 56:13
**long-term** [1] - 40:7
**look** [13] - 6:4, 34:10, 39:2, 40:13, 50:24, 52:10, 62:25, 67:18, 68:9, 70:23, 73:8, 76:22, 99:17
**looked** [4] - 29:18, 61:14, 96:19, 97:12
**looking** [4] - 5:10, 64:4, 70:11, 75:7
**looks** [3] - 69:2, 75:3, 102:10
**loud** [2] - 90:16, 90:17
**Louisiana** [1] - 2:17
**lovely** [1] - 47:20
**low** [5] - 51:19, 65:8, 74:23, 74:24, 89:19
**low-back** [2] - 65:8, 74:23
**lower** [1] - 75:11
**lunch** [2] - 103:2, 103:7
**LUTTINGER** [1] - 3:10
**lying** [1] - 78:12

## M

**made-up** [1] - 77:4
**Madison** [1] - 1:16
**magically** [1] - 76:6
**main** [1] - 92:13
**maintain** [2] - 28:4, 53:18
**major** [1] - 67:5
**majority** [2] - 64:14, 73:4
**makers** [1] - 66:9
**man** [1] - 77:11
**manage** [1] - 75:10
**manageable** [1] - 6:4
**management** [3] - 33:21, 34:13, 35:21
**Management** [1] - 83:21
**mandatory** [1] - 66:15
**manifesting** [1] - 32:19
**manual** [6] - 22:25, 23:4, 35:5, 35:12, 35:13, 39:3
**manuals** [1] - 35:10
**manufactured** [2] - 56:7, 56:9
**manufacturer** [3] -

32:15, 45:20, 83:25
**manufacturers** [20] - 27:24, 28:12, 28:13, 28:18, 28:19, 28:20, 28:21, 29:5, 41:8, 41:17, 42:2, 42:12, 42:13, 43:11, 59:24, 75:15, 93:20, 94:14, 96:10
**manufactures** [1] - 70:18
**manufacturing** [1] - 93:5
**March** [11] - 9:11, 10:6, 11:15, 12:22, 17:4, 17:13, 20:22, 25:4, 68:5
**mark** [1] - 98:24
**marked** [3] - 33:3, 98:20, 98:25
**market** [5] - 17:7, 17:10, 25:3, 27:14, 27:25
**marketed** [1] - 89:24
**Marketing** [1] - 87:5
**marketing** [28] - 9:12, 11:14, 12:3, 12:11, 12:13, 12:17, 12:24, 13:15, 13:25, 15:7, 16:9, 16:25, 18:25, 19:13, 20:3, 20:21, 22:21, 22:22, 24:5, 24:17, 59:5, 59:7, 60:3, 79:21, 84:10, 85:5, 100:13, 100:21
**marking** [1] - 56:25
**mask** [1] - 100:17
**Massachusetts** [1] - 4:7
**massive** [2] - 100:21, 100:22
**materials** [2] - 13:22, 81:11
**matter** [2] - 10:3, 23:20
**matters** [2] - 9:25, 11:8
**MATTHEW** [1] - 3:16
**MATTHEWS** [1] - 4:8
**maximizing** [1] - 93:22
**McKesson** [1] - 3:7
**MDL** [13] - 33:16, 34:9, 35:12, 39:3, 49:15, 59:13, 62:19, 64:2, 65:25, 67:19, 70:24, 73:7, 75:7
**mean** [10] - 31:19, 31:21, 54:6, 60:16, 62:10, 62:21, 64:5,

68:10, 68:11, 72:21
**meaning** [2] - 13:10, 65:16
**means** [11] - 32:10, 45:6, 54:8, 55:21, 60:17, 62:14, 62:22, 64:6, 64:21, 77:5, 88:22
**meant** [1] - 36:17
**meantime** [1] - 23:10
**Measures** [1] - 92:16
**Medical** [15] - 3:8, 3:19, 29:7, 29:8, 40:15, 40:18, 40:20, 40:22, 41:24, 42:3, 42:14, 47:7, 48:25, 66:4, 92:17
**medical** [17] - 28:3, 28:6, 38:5, 38:7, 39:12, 40:24, 46:25, 47:5, 50:20, 66:14, 67:9, 67:20, 71:3, 77:9, 87:15, 88:8, 92:15
**Medicare** [1] - 29:4
**medication** [6] - 26:25, 50:14, 55:16, 55:24, 72:3, 82:23
**medications** [3] - 49:18, 51:5, 60:14
**Medicine** [3] - 39:8, 67:10
**medicine** [15] - 31:22, 38:4, 38:12, 38:18, 40:21, 43:20, 44:2, 49:12, 67:7, 77:17, 77:23, 78:4, 96:11, 102:8
**meet** [1] - 67:15
**meeting** [1] - 67:20
**meetings** [4] - 66:16, 66:18, 67:6
**Melville** [1] - 1:22
**member** [2] - 9:18, 10:23
**members** [3] - 68:19, 82:13, 103:5
**mention** [1] - 8:5
**mentioned** [2] - 45:2, 94:2
**message** [4] - 61:8, 75:14, 75:18, 94:25
**messages** [20] - 27:8, 27:11, 28:2, 28:8, 28:14, 28:22, 33:2, 41:13, 42:19, 60:4, 96:7, 96:24, 97:15, 97:21, 99:7, 99:20, 99:23, 100:7, 101:8, 101:14

**meta** [3] - 30:5, 30:6, 32:9
**meta-analysis** [3] - 30:5, 30:6, 32:9
**meter** [1] - 79:4
**method** [2] - 6:4, 8:3
**methods** [1] - 27:8
**mic** [1] - 43:16
**MICHAEL** [2] - 2:5, 3:21
**Michael** [1] - 15:19
**midnight** [1] - 5:17
**might** [6] - 27:2, 31:4, 33:13, 55:17, 68:2, 78:21
**MIKE** [1] - 2:24
**mill** [1] - 85:13
**million** [1] - 66:13
**millions** [1] - 66:10
**mind** [6] - 7:15, 10:13, 75:21, 83:3, 85:20, 86:24
**mind..** [1] - 94:11
**minimal** [2] - 97:7, 97:11
**minimized** [2] - 86:14, 88:10
**minimizing** [1] - 89:19
**minor** [1] - 65:17
**minute** [1] - 65:21
**minutes** [3] - 60:20, 69:7, 102:24
**MINUTES** [1] - 1:10
**mischaracterizes** [1] - 50:4
**misinformed** [1] - 42:18
**misleading** [12] - 35:9, 41:13, 42:18, 75:2, 75:13, 85:10, 91:3, 96:7, 96:25, 97:14, 97:20, 98:18
**Miss** [3] - 5:24, 19:5, 83:15
**misstatements** [1] - 13:20
**mistaken** [1] - 76:24
**misuse** [4] - 30:12, 30:16, 30:20
**misusing** [2] - 30:23, 31:12
**modalities** [1] - 55:24
**model** [3] - 40:15, 41:2, 47:6
**models** [1] - 47:4
**modern** [1] - 38:17
**molecule** [1] - 54:23
**moment** [3] - 15:16, 15:19, 37:8
**money** [1] - 67:13

**MONICA** [1] - 2:6
**months** [1] - 40:8
**MOONEY** [1] - 3:16
**moreover** [2] - 10:6
**Morgan** [1] - 43:18
**MORGAN** [1] - 2:15
**morning** [13] - 5:5,
5:6, 5:7, 8:12, 18:5,
25:23, 25:24, 25:25,
26:11, 26:12, 26:13,
61:20
**morphine** [2] - 33:11,
54:17
**most** [7] - 29:22,
50:25, 54:15, 63:5,
65:4, 65:7, 71:22
**motion** [11] - 8:19,
8:22, 8:25, 10:13,
10:18, 12:4, 14:5,
14:22, 21:8, 21:15
**motions** [4] - 9:5,
12:16, 14:20, 18:8
**mouth** [3] - 54:9,
54:25, 55:13
**move** [3] - 32:25,
68:22, 86:17
**moving** [6] - 11:4,
11:9, 11:18, 11:21,
11:24, 18:11
**MR** [77] - 6:13, 6:17,
6:22, 7:2, 7:6, 7:11,
7:25, 15:12, 15:15,
15:18, 16:16, 16:20,
18:3, 18:6, 18:22,
21:6, 21:12, 24:2,
24:13, 25:11, 27:15,
43:14, 43:17, 43:23,
44:4, 44:23, 45:21,
45:22, 45:24, 46:7,
46:11, 46:19, 46:22,
47:17, 47:24, 48:12,
51:21, 52:5, 52:8,
52:12, 52:16, 53:18,
57:9, 57:25, 58:11,
58:13, 58:18, 61:11,
75:20, 79:5, 79:12,
80:20, 81:9, 81:16,
82:3, 82:10, 83:5,
83:8, 85:12, 86:16,
90:2, 91:7, 93:8,
94:4, 94:8, 94:16,
95:6, 95:17, 95:20,
98:19, 99:11, 99:24,
100:10, 100:16,
100:19, 101:2,
102:23
**MS** [30] - 26:10, 26:17,
27:20, 47:22, 48:6,
51:25, 52:7, 52:22,
56:23, 57:17, 57:20,

58:16, 61:13, 69:5,
70:9, 80:7, 81:2,
81:5, 81:18, 81:22,
85:23, 87:2, 94:19,
95:15, 98:23, 99:5,
99:19, 100:5,
102:20, 103:12
**mucosa** [3] - 54:10,
54:25, 55:11
**multiple** [4] - 55:23,
61:9, 78:13, 84:13
**must** [3] - 13:9, 13:14,
57:4

# N

**N.W** [2] - 2:23, 3:14
**name** [1] - 44:21
**NANCY** [1] - 2:18
**NAPOLI** [2] - 1:21,
1:23
**narcotic** [1] - 74:18
**narrow** [1] - 62:8
**Nassau** [1] - 1:21
**national** [3] - 37:13,
39:4, 48:2
**nationally** [1] - 48:16
**naturally** [1] - 30:22
**nature** [3] - 52:14,
93:24, 94:4
**necessarily** [1] - 97:6
**need** [6] - 5:18, 68:20,
70:25, 77:22, 92:18,
92:19
**needed** [1] - 71:18
**never** [2] - 52:17,
75:21
**Never** [1] - 94:11
**new** [1] - 31:8
**NEW** [1] - 1:2
**New** [27] - 1:9, 1:17,
1:22, 2:2, 2:3, 2:4,
2:11, 3:8, 3:9, 4:3,
10:9, 12:9, 14:17,
15:21, 19:24, 24:19,
24:20, 82:15, 94:24,
95:3, 101:9, 104:6
**next** [12] - 8:9, 29:14,
35:11, 48:23, 50:7,
50:24, 60:10, 69:21,
76:22, 80:16, 90:24,
99:4
**Night** [1] - 94:10
**night** [7] - 16:3, 16:21,
18:2, 19:6, 20:15,
52:13, 81:16
**nine** [1] - 5:14
**NO.:400000/2017** [1] -
1:5
**non** [3] - 35:18, 63:6,

84:11
**non-cancer** [2] -
35:18, 84:11
**non-invasive** [1] -
63:6
**noncompliance** [4] -
9:22, 9:23, 11:5,
11:6
**nondescriptive** [1] -
45:5
**normal** [1] - 98:6
**North** [6] - 3:4, 47:10,
47:12, 47:15, 47:18,
48:25
**note** [5] - 9:15, 12:20,
44:20, 57:13, 58:13
**noted** [8] - 9:3, 10:25,
14:8, 18:21, 21:22,
46:21, 53:19, 58:20
**notes** [6] - 10:5, 11:7,
11:15, 12:7, 80:3,
104:8
**nothing** [6] - 5:11,
5:12, 7:8, 9:17,
10:22
**notice** [2] - 22:12,
23:14
**noticed** [1] - 25:15
**November** [2] - 79:11,
99:18
**nuisance** [2] - 12:10,
16:22
**number** [2] - 30:8,
99:17
**numbers** [1] - 75:3
**nurture** [1] - 73:22

# O

**o'clock** [1] - 5:14
**oath** [3] - 26:2, 29:11,
69:25
**obey** [1] - 14:15
**object** [7] - 52:8, 79:5,
85:18, 86:17, 91:7,
94:16, 101:3
**objection** [44] - 18:13,
18:20, 22:19, 27:15,
42:25, 43:14, 44:8,
44:9, 44:18, 44:24,
45:21, 45:22, 45:23,
46:6, 46:10, 46:20,
47:17, 48:12, 51:21,
52:14, 53:18, 57:10,
57:13, 57:16, 57:19,
57:23, 58:13, 61:10,
61:15, 75:20, 75:22,
80:20, 85:12, 85:16,
90:2, 93:9, 93:25,
94:5, 95:6, 95:17,

99:11, 99:15, 100:2,
100:11
**objections** [3] - 25:10,
25:13, 81:20
**obligation** [1] - 93:19
**observed** [2] - 16:7,
16:8
**obtain** [1] - 35:20
**obtained** [2] - 52:18
**occur** [1] - 63:13
**occurred** [1] - 33:21
**OF** [6] - 1:2, 1:2, 1:10,
26:16, 70:8
**off-label** [1] - 62:17
**offer** [4] - 46:3, 52:4,
52:25, 56:23
**offered** [1] - 58:18
**Office** [1] - 2:3
**office** [1] - 15:20
**officer** [1] - 68:21
**OFFICER** [3] - 69:14,
70:2, 103:13
**offices** [2] - 27:14,
27:24
**Official** [2] - 104:5,
104:19
**official** [1] - 104:14
**often** [3] - 28:10,
38:18, 86:11
**oftentimes** [1] - 38:14
**older** [1] - 86:13
**OLESKE** [5] - 2:4,
6:13, 6:17, 6:22, 7:2
**Oleske** [2] - 6:3, 6:8
**omissions** [4] - 11:12,
13:21, 14:2, 19:23
**omitted** [1] - 88:16
**once** [4] - 12:4, 67:11,
74:10, 84:23
**One** [1] - 4:3
**one** [31] - 5:14, 5:21,
14:21, 17:16, 20:20,
21:25, 30:7, 39:7,
41:3, 44:11, 47:12,
47:20, 48:20, 54:15,
59:23, 60:12, 61:4,
61:25, 65:12, 68:23,
83:4, 87:8, 91:13,
93:6, 94:3, 94:7,
94:8, 94:10, 96:3,
97:3
**one-third** [1] - 14:21
**ongoing** [1] - 72:9
**onset** [5] - 63:5, 63:7,
63:11, 63:16, 63:20
**Opana** [35] - 9:12,
10:3, 11:14, 12:3,
12:11, 12:17, 12:25,
13:16, 13:21, 15:7,
16:9, 17:2, 17:7,

17:9, 17:15, 17:19,
17:20, 17:24, 19:18,
19:19, 19:20, 19:22,
19:24, 20:3, 22:24,
23:3, 24:8, 24:25,
32:16, 82:24, 83:6,
83:7, 83:16
**open** [1] - 24:22
**opening** [3] - 81:7,
94:15, 94:23
**operating** [1] - 41:6
**operation** [1] - 85:20
**opinion** [12] - 28:9,
39:24, 50:9, 66:18,
66:22, 89:10, 89:22,
91:4, 91:11, 92:11,
92:15, 99:6
**opinions** [3] - 58:4,
58:23, 59:2
**opioid** [77] - 9:13,
27:2, 27:23, 27:25,
28:11, 28:13, 28:18,
28:19, 28:21, 29:5,
29:22, 29:24, 29:25,
30:20, 30:21, 31:17,
32:15, 33:24, 34:2,
34:3, 34:20, 37:15,
38:9, 38:21, 38:23,
41:8, 41:17, 42:2,
42:11, 42:12, 42:13,
43:11, 45:20, 47:2,
49:18, 49:22, 50:13,
50:19, 50:23, 54:13,
54:16, 56:15, 56:21,
59:23, 60:14, 60:21,
61:4, 61:21, 63:6,
65:13, 72:4, 72:13,
72:22, 72:24, 73:11,
73:18, 73:20, 73:24,
74:8, 75:14, 76:5,
76:16, 76:18, 77:13,
78:10, 78:17, 79:2,
90:21, 91:19, 92:23,
93:20, 93:21, 96:10,
96:14, 96:21, 102:9
**Opioid** [3] - 5:9, 36:13,
80:18
**OPIOID** [1] - 1:4
**opioids** [68] - 12:14,
12:24, 13:16, 24:25,
28:15, 29:16, 29:21,
30:13, 30:23, 31:12,
31:18, 32:12, 32:22,
34:6, 35:20, 35:24,
37:22, 38:2, 40:2,
40:4, 40:10, 41:11,
42:5, 42:10, 42:17,
47:14, 49:7, 49:11,
49:12, 49:25, 50:16,
51:20, 55:25, 59:23,

113

59:25, 60:6, 60:7, 60:19, 65:13, 65:19, 66:25, 71:2, 71:10, 71:17, 72:15, 72:16, 74:10, 75:9, 75:10, 76:13, 78:15, 91:15, 92:4, 92:10, 92:20, 93:2, 95:2, 96:13, 99:8, 99:23, 100:8, 100:23, 101:9, 101:16, 101:17, 101:20, 101:21
**Opioids** [1] - 39:19
**opiophobia** [2] - 60:25, 61:22
**opportunity** [1] - 38:19
**options** [1] - 8:4
**oral** [1] - 63:4
**order** [11] - 9:3, 9:24, 12:9, 28:4, 57:5, 66:24, 67:14, 69:17, 79:10, 96:12, 99:18
**orders** [7] - 8:10, 14:25, 16:14, 19:11, 20:7, 21:23, 23:22
**Organization** [2] - 32:2
**organization** [4] - 28:25, 29:8, 36:20, 41:21
**original** [1] - 104:14
**originally** [4] - 8:21, 56:7, 56:9, 77:7
**originate** [1] - 77:6
**out-of-court** [1] - 46:2
**outpatients** [1] - 74:22
**outside** [4] - 18:16, 64:13, 79:7, 79:15
**outweigh** [1] - 65:19
**overcome** [3] - 71:16, 71:21, 73:2
**overdose** [2] - 65:10, 92:7
**overdosing** [1] - 101:20
**overreaching** [1] - 20:17
**overruled** [7] - 46:18, 48:14, 58:19, 79:23, 90:7, 93:15, 95:22
**overstated** [2] - 86:14, 88:11
**own** [2] - 13:20, 90:11
**oxycodone** [2] - 56:14, 72:12
**OxyContin** [20] - 19:21, 56:4, 56:5, 56:8, 56:9, 56:11, 56:12, 56:13, 83:23,

84:2, 84:9, 84:11, 84:24, 85:11, 86:3, 86:10, 87:16, 87:22, 89:6, 89:24
**Oxymorphone** [7] - 9:14, 17:21, 17:23, 82:2, 83:21, 89:11, 91:6

## P

**P-27812** [1] - 33:4
**P.C** [2] - 2:24, 4:2
**p.m** [4] - 5:11, 5:12
**P18151** [1] - 52:4
**P18376** [3] - 56:24, 58:21, 58:25
**P23771** [1] - 81:25
**P24979** [2] - 68:23, 70:11
**page** [40] - 7:20, 9:2, 9:7, 9:15, 10:5, 10:20, 11:15, 12:7, 12:19, 13:11, 14:21, 14:22, 33:13, 33:15, 33:17, 34:8, 35:11, 35:12, 36:8, 39:2, 49:14, 59:8, 59:11, 62:18, 63:23, 63:25, 64:2, 64:3, 64:4, 65:24, 67:18, 70:23, 73:6, 75:6, 75:8, 83:20, 84:19, 90:12, 90:13
**pages** [1] - 85:25
**paid** [1] - 28:19
**Pain** [24] - 36:13, 39:7, 39:16, 39:20, 41:21, 41:22, 41:24, 42:7, 42:8, 42:15, 42:22, 43:4, 43:9, 45:19, 47:9, 47:13, 48:15, 48:19, 48:21, 49:2, 67:10, 68:4, 68:15
**pain** [106] - 27:4, 27:5, 29:17, 29:21, 29:25, 30:12, 31:9, 31:16, 32:11, 32:22, 33:21, 33:23, 34:12, 34:13, 34:20, 35:2, 35:16, 35:17, 35:18, 35:21, 36:12, 38:2, 39:13, 39:14, 40:2, 40:4, 40:6, 40:8, 40:11, 40:17, 41:12, 43:20, 44:2, 47:2, 49:3, 49:7, 49:25, 51:20, 55:13, 59:18, 59:20, 60:3, 60:7, 60:13, 60:19, 62:5, 62:7, 62:9, 62:12, 62:13,

62:16, 63:10, 63:11, 63:12, 63:13, 63:16, 63:19, 63:20, 63:21, 64:13, 64:15, 64:19, 64:21, 65:8, 65:17, 67:3, 68:2, 68:11, 68:13, 68:17, 70:22, 71:11, 73:19, 73:25, 74:23, 75:8, 75:10, 76:4, 76:5, 76:13, 76:17, 76:25, 77:12, 77:16, 77:22, 78:3, 78:4, 78:10, 84:11, 87:19, 87:20, 89:3, 89:8, 90:20, 90:21, 90:24, 95:2, 97:8, 100:25, 102:5, 102:6
**PAMELA** [1] - 2:12
**panel** [1] - 8:17
**paper** [1] - 25:18
**Par** [2] - 2:9, 2:10
**paradigm** [1] - 100:24
**paragraph** [4] - 49:24, 50:12, 50:24, 76:22
**paragraphs** [4] - 19:9, 19:10, 19:13, 23:17
**parcel** [1] - 8:23
**pardon** [1] - 15:17
**Parmeceuticals** [2] - 2:22, 3:3
**PART** [1] - 1:2
**part** [7] - 8:22, 9:25, 11:8, 16:13, 34:4, 66:2, 81:10
**participating** [1] - 10:16
**particularly** [1] - 13:21
**parties** [3] - 13:5, 13:17, 94:2
**parties'** [2] - 13:4, 13:6
**party** [7] - 22:21, 45:6, 45:9, 45:10, 83:12, 83:14, 104:11
**pass** [1] - 42:8
**passage** [1] - 16:12
**passed** [1] - 47:12
**past** [2] - 8:10, 33:22
**patch** [3] - 54:19, 54:20, 55:2
**patently** [1] - 76:19
**pathophysiology** [1] - 64:20
**patient** [20] - 30:18, 31:3, 32:23, 34:5, 34:12, 34:21, 38:20, 40:2, 47:14, 71:16, 76:4, 76:16, 76:17, 77:10, 77:19, 78:3, 78:5, 78:10, 90:20,

97:8
**patient's** [2] - 89:17, 90:21
**patients** [32] - 20:5, 29:12, 29:17, 29:24, 30:13, 30:16, 30:17, 30:22, 31:8, 31:12, 31:14, 31:17, 31:23, 32:11, 35:15, 35:20, 36:11, 37:3, 42:10, 49:8, 55:15, 64:23, 65:7, 68:13, 70:25, 72:3, 73:9, 74:7, 74:17, 76:24, 87:23, 94:25
**PATTERSON** [1] - 2:18
**PAUL** [2] - 1:23, 4:4
**pay** [1] - 66:10
**payment** [1] - 28:11
**payments** [4] - 24:20, 29:3, 42:13, 44:6
**peer** [2] - 28:16, 77:8
**peer-review** [1] - 28:16, 77:8
**penetrates** [1] - 55:2
**Pennsylvania** [3] - 2:23, 3:21, 4:3
**pens** [1] - 67:17
**people** [17] - 8:6, 29:20, 39:13, 65:5, 65:14, 71:2, 71:6, 71:8, 71:10, 71:22, 73:5, 75:9, 78:12, 86:13, 101:19, 101:20, 101:21
**per** [2] - 16:14, 56:14
**percent** [12] - 29:23, 30:2, 31:14, 31:17, 31:21, 32:4, 32:5, 32:7, 32:9, 32:19, 64:12, 64:14
**perform** [1] - 89:18
**performed** [1] - 13:17
**perhaps** [5] - 35:19, 55:17, 55:20, 85:22, 102:6
**period** [3] - 12:12, 35:24, 38:7
**periods** [1] - 65:15
**permitted** [1] - 53:12
**persistent** [1] - 72:7
**person** [4] - 9:18, 10:23, 72:16, 73:19
**personal** [6] - 57:11, 57:22, 73:10, 73:17, 74:3, 74:5
**persuasive** [1] - 76:8
**PETER** [1] - 2:5
**petition** [3] - 8:23,

14:7, 14:12
**Pharma** [2] - 2:16
**pharmaceutical** [2] - 27:13, 27:17
**Pharmaceutical** [2] - 2:9, 2:10
**pharmaceuticals** [1] - 54:16
**Pharmaceuticals** [9] - 2:9, 2:15, 43:12, 56:10, 61:23, 84:3, 84:7, 86:8, 90:10
**phenomenon** [2] - 102:3, 102:15
**Philadelphia** [1] - 3:21
**phobia** [6] - 33:24, 34:2, 34:3, 60:15, 60:21, 61:21
**phone** [1] - 5:15
**photocopies** [1] - 104:10
**physical** [6] - 71:15, 71:20, 72:6, 72:11, 72:18, 72:25
**physician** [6] - 34:20, 38:3, 60:13, 62:14, 64:5, 64:11
**physicians** [4] - 36:19, 66:11, 90:18, 100:7
**physicians'** [1] - 60:18
**pills** [2] - 102:5, 102:6
**place** [2] - 65:23, 68:5
**places** [1] - 96:8
**Plaintiffs** [2] - 10:16, 81:6
**Plaintiffs'** [2] - 9:9, 99:2
**plan** [4] - 24:18, 59:5, 59:6, 67:20
**planned** [1] - 13:10
**plans** [1] - 87:24
**play** [1] - 25:5
**Plaza** [1] - 4:3
**PLLC** [1] - 1:21
**po** [1] - 5:14
**point** [7] - 10:15, 17:16, 22:18, 28:6, 31:25, 33:24, 71:17
**police** [1] - 40:20
**polices** [1] - 29:9
**policies** [2] - 46:25, 47:2
**policy** [1] - 48:2
**Policy** [13] - 41:22, 41:25, 42:7, 42:15, 42:22, 43:5, 43:9, 45:19, 47:9, 48:15, 48:19, 48:22
**policymakers** [1] - 96:12

**POPE** [1] - 2:5
**population** [4] - 31:2, 32:11, 32:19, 74:21
**Porter** [1] - 74:14
**PORTER** [1] - 2:8
**portion** [7] - 21:5, 61:16, 79:19, 86:21, 86:24, 90:5, 93:13
**portions** [1] - 6:6
**pose** [2] - 53:3, 53:4
**position** [9] - 17:12, 18:13, 20:6, 21:2, 21:18, 37:12, 37:20, 62:23, 100:14
**positioning** [1] - 62:21
**possible** [2] - 42:9, 84:20
**post** [1] - 17:12
**posted** [1] - 13:22
**postoperative** [1] - 89:8
**postulated** [1] - 60:12
**potency** [2] - 54:14, 54:24
**potent** [4] - 54:15, 54:17, 56:15, 72:15
**potential** [2] - 14:8, 88:16
**potentially** [2] - 40:23, 88:15
**power** [1] - 9:21
**powers** [1] - 11:3
**practical** [1] - 65:22
**practice** [4] - 14:2, 35:21, 37:3, 38:10
**practices** [4] - 10:11, 11:12, 11:25, 29:10
**practicing** [1] - 40:21
**pre** [1] - 22:25
**pre-approval** [1] - 22:25
**precautionary** [1] - 44:9
**precluding** [3] - 61:18, 85:21, 99:16
**predicating** [1] - 12:10
**predict** [1] - 74:9
**prejudice** [1] - 14:8
**prescribe** [10] - 38:20, 42:4, 42:10, 42:17, 47:14, 49:10, 49:25, 50:16, 60:6, 62:15
**prescribed** [7] - 29:20, 65:5, 65:14, 65:16, 71:10, 102:5, 102:6
**prescriber** [1] - 34:5
**prescribers** [7] - 49:10, 62:24, 64:16, 65:6, 66:12, 78:8, 78:13

**prescribing** [18] - 34:20, 36:11, 38:9, 40:2, 49:4, 49:7, 50:22, 59:24, 60:14, 62:17, 64:19, 76:16, 79:2, 97:8, 100:7, 100:23, 101:16
**prescription** [11] - 12:14, 12:24, 13:16, 29:16, 32:22, 34:7, 34:25, 59:22, 91:14, 92:4, 92:10
**prescriptions** [1] - 78:20
**presence** [3] - 31:5, 67:3, 71:25
**present** [4] - 5:9, 26:6, 70:4, 88:14
**presently** [1] - 57:10
**presiding** [1] - 5:4
**PRESNAL** [7] - 1:19, 7:6, 7:11, 7:25, 58:18, 100:16, 100:19
**pressure** [1] - 49:10
**prestigious** [1] - 28:10
**presumption** [1] - 14:14
**pretty** [2] - 33:4, 83:5
**previously** [1] - 43:24
**prima** [2] - 12:21, 13:12
**primarily** [1] - 30:5
**primary** [1] - 31:9
**principle** [1] - 12:25
**printed** [1] - 13:22
**private** [2] - 9:19, 10:24
**probability** [1] - 82:22
**problem** [14] - 19:24, 21:20, 22:12, 32:19, 50:13, 51:4, 59:19, 59:20, 60:2, 60:7, 60:17, 78:7, 84:24, 84:25
**problematic** [1] - 30:20
**problems** [3] - 38:9, 84:21, 86:2
**procedural** [1] - 8:2
**proceed** [3] - 44:22, 45:16, 48:17
**proceeding** [1] - 22:3
**produced** [3] - 58:11, 58:16, 89:16
**product** [8] - 32:17, 60:4, 62:24, 66:11, 66:20, 66:24, 67:16, 82:19
**products** [11] - 15:9,

27:14, 27:25, 52:24, 53:24, 54:13, 55:12, 68:8, 86:15, 93:21, 96:14
**profession** [1] - 50:20
**professional** [2] - 39:11, 67:9
**professionals** [1] - 67:6
**profit** [2] - 92:22
**profits** [1] - 93:22
**profligate** [1] - 41:13
**Program** [1] - 83:21
**progress** [3] - 34:11, 44:12, 82:21
**progressed** [1] - 101:24
**progression** [1] - 102:2
**prohibit** [1] - 58:14
**promote** [8] - 28:12, 28:22, 35:6, 66:10, 66:20, 66:24, 96:13
**promoted** [2] - 28:15, 84:10
**promoting** [2] - 84:10, 93:20
**promotion** [11] - 13:15, 20:3, 50:21, 62:23, 65:23, 78:24, 79:22, 85:10, 91:6, 91:11, 100:13
**promotional** [22] - 27:8, 27:11, 28:2, 28:8, 28:14, 33:2, 41:13, 60:3, 61:9, 67:16, 84:13, 92:25, 96:9, 96:20, 97:9, 99:7, 99:20, 99:21, 99:23, 100:7, 101:8, 101:14
**pronouncing** [1] - 15:14
**properly** [3] - 26:7, 70:5, 90:24
**properties** [1] - 24:7
**protracted** [1] - 72:8
**proved** [1] - 53:15
**provide** [1] - 19:4
**provided** [1] - 98:21
**providers** [8] - 13:24, 19:25, 20:4, 24:6, 24:20, 31:23, 34:15, 39:13
**provides** [1] - 63:5
**providing** [1] - 34:12
**pseudo** [4] - 77:21, 78:2, 78:16, 90:22
**pseudo-addictive** [1] - 90:22

**pseudoaddiction** [12] - 77:2, 77:3, 77:4, 77:18, 78:24, 79:3, 80:9, 80:12, 90:19, 91:10, 97:20, 97:21
**PSS** [1] - 3:8
**psychological** [1] - 72:7
**public** [6] - 12:10, 13:23, 16:22, 49:19, 50:15, 93:23
**published** [4] - 28:16, 39:5, 39:18, 77:8
**pulled** [1] - 17:10
**Purdue** [13] - 56:10, 84:3, 84:9, 85:10, 86:2, 86:8, 86:13, 87:6, 88:3, 89:16, 89:23, 90:10, 91:5
**Purdue's** [1] - 89:5
**purpose** [1] - 11:22
**purposes** [1] - 66:8
**pursuant** [1] - 9:8
**put** [15] - 20:23, 22:23, 33:16, 49:10, 52:2, 54:9, 55:13, 74:8, 75:14, 75:18, 80:14, 84:9, 85:15, 91:13, 100:17
**putting** [2] - 55:14, 77:16
**Pyfer** [1] - 5:21
**PYSER** [2] - 3:15, 27:15

## Q

**quality** [1] - 89:17
**Quality** [1] - 92:16
**quantity** [2] - 101:6, 101:9
**questionnaires** [1] - 31:4
**questions** [3] - 53:5, 57:7, 102:21
**quite** [3] - 19:14, 20:8, 45:15
**quote** [11] - 45:17, 46:2, 46:24, 47:8, 47:11, 47:16, 47:23, 47:25, 48:7, 48:9, 48:18
**quotes** [2] - 42:21, 43:4

## R

**raise** [1] - 9:4
**raised** [1] - 9:4
**rapid** [5] - 63:5, 63:7,

63:11, 63:16, 63:19
**rare** [6] - 32:23, 94:25, 95:5, 97:3, 97:5, 97:10
**rate** [2] - 29:15, 29:17
**rates** [3] - 30:12, 31:2, 51:19
**rather** [2] - 14:11, 55:9
**Re** [1] - 5:9
**RE** [1] - 1:4
**reach** [4] - 6:12, 27:8, 27:11, 51:7
**read** [21] - 19:15, 20:14, 21:5, 36:23, 43:6, 45:17, 48:7, 48:10, 60:9, 63:2, 64:8, 64:9, 79:20, 85:7, 88:9, 90:4, 90:6, 90:13, 90:16, 90:17, 93:14
**Read** [1] - 79:17
**reading** [6] - 23:16, 45:24, 45:25, 46:13, 64:11, 88:14
**READING** [3] - 63:3, 88:10, 90:18
**real** [7] - 25:16, 25:19, 65:3, 74:21, 76:16, 77:24
**really** [16] - 30:25, 36:24, 37:24, 44:8, 49:21, 50:17, 50:21, 51:2, 51:6, 74:15, 74:19, 75:13, 77:21, 78:15, 78:19, 103:3
**realtime** [2] - 25:10, 25:14
**reargue** [1] - 21:8
**reason** [3] - 38:8, 60:12, 71:3
**reasons** [2] - 84:25, 102:8
**reassurance** [1] - 71:2
**reassured** [1] - 49:7
**recap** [1] - 26:18
**receive** [2] - 29:3, 76:24
**received** [1] - 41:25
**receiving** [2] - 28:11, 43:10
**recess** [4] - 69:7, 69:9, 69:16, 69:21
**recitation** [1] - 18:7
**reciting** [2] - 87:11, 88:2
**recognizes** [1] - 65:3
**recognizing** [1] - 51:3
**recollection** [1] - 21:10
**recommend** [1] -

41:11
**recommendations** [2] - 7:17, 41:19
**recommends** [2] - 40:4, 40:10
**record** [1] - 19:16
**records** [1] - 61:24
**reduce** [1] - 75:9
**REED** [1] - 3:18
**refer** [8] - 17:23, 19:12, 33:3, 42:20, 43:3, 48:10, 49:13, 88:21
**referee** [1] - 8:7
**referees** [1] - 7:13
**reference** [3] - 44:25, 61:21, 74:13
**referenced** [2] - 48:2, 81:10
**references** [2] - 51:19, 84:20
**referencing** [1] - 8:24
**referred** [3] - 15:23, 21:7, 86:11
**referring** [5] - 24:11, 48:8, 67:2, 79:13, 99:19
**refers** [4] - 17:22, 34:4, 48:15, 83:16
**reflected** [1] - 24:21
**reflects** [1] - 15:6
**reformulate** [1] - 17:7
**reformulated** [3] - 17:9, 19:18, 24:7
**refresh** [1] - 21:9
**regard** [3] - 43:19, 43:25, 94:17
**regarding** [10] - 11:13, 14:2, 14:23, 17:2, 24:4, 24:6, 24:25, 25:6, 82:23, 93:10
**regards** [1] - 93:21
**regulations** [1] - 91:21
**regulatory** [6] - 28:23, 28:24, 34:15, 41:5, 47:3, 96:12
**Reisman** [5] - 15:13, 15:19, 23:19, 23:23
**REISMAN** [8] - 2:5, 15:12, 15:15, 15:18, 16:16, 16:20, 24:2, 24:13
**Reisman's** [1] - 20:14
**rejected** [1] - 9:14
**related** [3] - 12:11, 12:13, 19:23
**relates** [1] - 16:8
**relationship** [7] - 41:16, 99:7, 99:10, 99:22, 100:6, 101:7,

101:13
**relationships** [1] - 29:6
**release** [1] - 17:20
**relevant** [1] - 24:23
**reliable** [2] - 29:22, 40:9
**reliance** [1] - 31:25
**relied** [2] - 6:19, 58:3
**relief** [2] - 76:25, 90:21
**rely** [6] - 21:16, 30:4, 30:5, 31:7, 36:25, 58:22
**remain** [1] - 33:23
**remember** [3] - 29:7, 66:15, 74:16
**remind** [1] - 26:2, 27:9, 44:19, 69:24, 70:14
**reminding** [1] - 83:13
**remove** [1] - 86:24
**removed** [1] - 49:3
**repeated** [1] - 94:24
**repetitive** [1] - 51:23
**rephrase** [3] - 48:4, 85:23, 95:24
**report** [11] - 7:14, 8:3, 42:20, 43:3, 46:14, 52:18, 77:8, 77:9, 81:10, 95:18, 95:21
**Reporter** [2] - 104:5, 104:19
**reporter** [3] - 79:20, 90:6, 93:14
**REPORTER** [1] - 4:22
**reporting** [1] - 64:12
**representative** [3] - 47:10, 47:11, 47:15
**representatives** [3] - 13:24, 20:2, 35:5
**represents** [1] - 30:8
**reps** [1] - 27:12
**request** [2] - 18:18, 79:6
**requested** [4] - 47:15, 79:19, 90:5, 93:13
**required** [2] - 28:4, 100:12
**requirements** [1] - 8:2
**resale** [1] - 51:5
**research** [8] - 6:9, 6:15, 7:12, 17:2, 41:3, 41:15, 76:11, 84:17
**researched** [1] - 41:2
**reserving** [1] - 25:12
**residency** [1] - 38:6
**resistance** [1] - 19:18
**resistant** [1] - 24:7

**resolve** [2] - 11:23, 90:24
**resolved** [5] - 82:15, 82:16, 82:25, 83:2
**respect** [11] - 9:24, 11:7, 16:2, 22:14, 31:19, 37:22, 54:13, 75:18, 91:5, 100:16, 100:20
**respectfully** [1] - 19:12
**respective** [1] - 10:12
**response** [1] - 48:21
**responsibility** [4] - 44:17, 91:19, 93:5, 93:19
**restate** [1] - 46:19
**restrictions** [1] - 49:4
**result** [3] - 32:20, 49:24, 89:24
**resulting** [1] - 73:11
**results** [1] - 30:18
**resume** [1] - 103:7
**reverse** [1] - 6:18
**review** [4] - 7:9, 19:13, 28:16, 77:8
**reviewed** [2] - 39:22, 101:8
**reviewing** [2] - 8:10, 80:10
**revoke** [1] - 40:24
**ribbon** [1] - 33:7
**rise** [3] - 69:14, 70:2, 103:13
**Risk** [1] - 83:21
**risk** [21] - 31:20, 31:24, 32:3, 32:5, 32:6, 32:9, 32:18, 32:21, 34:24, 65:9, 72:16, 73:14, 73:24, 74:2, 74:11, 75:11, 86:15, 89:7, 92:6, 97:7, 97:11
**risks** [7] - 17:8, 39:25, 65:20, 74:3, 88:11, 88:16, 89:19
**Road** [1] - 1:22
**Robert** [1] - 14:16
**robust** [1] - 75:4
**role** [1] - 50:18
**RPR** [4] - 4:22, 104:4, 104:18
**ruled** [5] - 18:16, 20:11, 22:15, 81:12, 95:7
**ruling** [3] - 14:24, 86:20, 93:9
**rulings** [4] - 6:6, 7:16, 14:19, 18:11

**S**

**safe** [1] - 40:21
**safety** [1] - 93:23
**sale** [2] - 99:8, 99:23
**Sales** [1] - 80:18
**sales** [10] - 13:24, 19:25, 35:5, 51:11, 51:12, 84:12, 92:23, 96:14, 99:25, 100:4
**SALIMBENE** [1] - 3:21
**SALVATORE** [1] - 1:24
**sample** [1] - 74:20
**sanction** [1] - 40:23
**Saturday** [1] - 94:10
**saved** [1] - 78:22
**saw** [5] - 17:4, 60:20, 60:21, 61:24, 78:11
**scale** [1] - 31:25
**scenario** [1] - 42:16
**scenes** [1] - 47:4
**scheduled** [2] - 71:16, 73:2
**SCHOLER** [1] - 2:8
**school** [3] - 38:5, 38:7, 69:21
**science** [5] - 28:7, 36:24, 41:7, 71:9, 75:3
**scientific** [2] - 29:19, 80:12
**scope** [5] - 18:25, 20:7, 79:7, 79:15, 93:10
**screen** [1] - 51:16
**script** [2] - 66:22, 66:24
**scrutiny** [1] - 47:3
**seated** [7] - 5:7, 26:3, 26:7, 26:8, 69:19, 70:5, 70:6
**second** [3] - 14:18, 88:5, 95:17
**secondary** [1] - 57:23
**secretary** [2] - 5:24, 43:22
**section** [5] - 36:12, 62:25, 64:4, 66:4, 70:24
**Section** [1] - 14:18
**see** [55] - 7:5, 7:21, 14:15, 33:20, 33:23, 33:25, 34:17, 35:13, 36:2, 36:14, 38:8, 38:19, 38:23, 39:5, 39:20, 50:2, 50:3, 50:6, 50:19, 51:19, 52:5, 52:6, 57:14, 59:15, 60:24, 61:21,

66:3, 66:12, 71:4, 71:18, 80:22, 83:22, 84:14, 84:21, 85:2, 85:5, 87:4, 87:6, 87:7, 87:9, 87:17, 87:24, 88:11, 88:18, 89:8, 89:20, 90:14, 90:15, 97:9, 97:14, 97:20, 98:4, 98:8, 99:3, 103:15
**seek** [1] - 101:4
**seeking** [3] - 14:7, 76:25, 77:14
**seem** [1] - 20:20
**sell** [1] - 92:20
**selling** [1] - 83:23
**sells** [1] - 70:18
**semi** [1] - 9:13
**semi-synthetic** [1] - 9:13
**sent** [1] - 19:5
**sentence** [3] - 49:23, 60:10, 64:9
**sentences** [1] - 64:9
**separateness** [1] - 94:18
**sequence** [5] - 8:20, 10:14, 10:18, 12:4, 14:5
**serious** [1] - 88:5
**serve** [1] - 8:17
**session** [2] - 5:3, 69:18
**set** [2] - 21:14, 30:11
**Settlement** [4] - 21:13, 22:7, 22:8, 23:12
**several** [4] - 18:9, 33:22, 87:8, 89:15, 96:19
**severance** [1] - 14:7
**severe** [1] - 55:18
**shall** [2] - 9:17, 10:22
**shamed** [1] - 59:24
**shameful** [1] - 30:21
**share** [1] - 42:21
**Shark** [2] - 5:13, 19:6
**shift** [2] - 50:19, 100:24
**Shkolnik** [1] - 102:22
**SHKOLNIK** [6] - 1:21, 1:23, 44:4, 47:24, 83:8, 102:23
**shocking** [1] - 41:4
**short** [15] - 8:10, 9:2, 14:25, 16:14, 19:11, 20:7, 21:23, 23:21, 40:5, 63:24, 69:16, 74:25, 79:6, 79:10, 99:18
**short-term** [1] - 40:5

117

**shorthand** [1] - 19:12
**show** [2] - 59:8, 64:4
**showing** [3] - 65:25, 71:9, 74:17
**shown** [1] - 68:3
**shows** [7] - 13:18, 29:23, 31:16, 36:24, 48:2, 66:9, 67:13
**shy** [1] - 68:21
**side** [1] - 20:20
**sidebar** [1] - 79:7
**signature** [1] - 104:14
**significant** [1] - 22:9
**significantly** [2] - 11:9, 84:12
**signs** [1] - 77:20
**similar** [2] - 88:24, 89:4
**similarly** [1] - 47:8
**SIMMONS** [1] - 1:15
**simplify** [1] - 18:10
**simply** [2] - 35:23, 41:6
**single** [2] - 74:24, 77:10
**situation** [1] - 17:6
**six** [1] - 57:3
**sixth** [1] - 12:6
**skilled** [1] - 51:3
**skin** [2] - 55:2, 55:3
**skip** [1] - 47:20
**slides** [1] - 66:21
**smarter** [1] - 38:11
**SMITH** [1] - 3:18
**so..** [1] - 7:10
**societies** [1] - 67:9
**society** [3] - 38:25, 39:12
**Society** [4] - 39:16, 67:10, 68:4, 68:16
**sold** [4] - 53:24, 54:19, 55:5, 56:3
**Solow** [2] - 18:3, 18:5
**SOLOW** [7] - 2:12, 18:3, 18:6, 18:22, 21:6, 21:12, 25:11
**solution** [1] - 79:3
**Solutions** [1] - 2:9
**someone** [1] - 26:25
**sometime** [2] - 5:18, 5:20
**sometimes** [3] - 28:17, 76:23, 97:6
**somewhere** [3] - 32:4, 92:11, 92:12
**soon** [2] - 25:17, 25:19
**sorry** [11] - 37:16, 43:17, 43:23, 57:17,

59:13, 61:11, 64:3, 75:21, 75:23, 90:17, 100:19
**sort** [4] - 26:18, 38:24, 39:16, 65:22
**sorting** [1] - 77:24
**sorts** [1] - 24:22
**sought** [1] - 31:10
**source** [1] - 92:13
**sources** [2] - 102:11
**speaker** [1] - 66:20
**speaking** [1] - 90:19
**specialist** [1] - 37:10
**specialize** [2] - 39:14, 68:12
**specialties** [1] - 68:2
**specialty** [5] - 37:17, 37:21, 68:10, 68:11, 68:16
**specific** [14] - 19:8, 31:11, 33:2, 37:16, 44:14, 44:21, 45:6, 45:9, 45:10, 62:4, 62:8, 62:11, 67:24, 86:23
**specifically** [10] - 16:18, 17:18, 17:23, 25:2, 27:10, 30:11, 41:20, 61:17, 75:17, 96:25
**spellings** [1] - 61:3
**spent** [5] - 5:18, 5:20, 8:9, 66:12, 67:14
**Square** [1] - 3:20
**SR** [1] - 4:22
**stand** [2] - 35:15, 63:9
**stands** [1] - 76:2
**STANNER** [1] - 3:10
**start** [1] - 102:4
**started** [2] - 50:19, 74:10
**starting** [1] - 76:9
**STATE** [1] - 1:2
**state** [6] - 42:8, 46:25, 47:20, 48:8, 48:10, 64:20
**State** [34] - 2:2, 2:3, 10:15, 12:9, 12:16, 14:17, 14:24, 15:20, 16:3, 22:3, 22:23, 23:6, 24:8, 28:23, 29:6, 29:8, 40:14, 40:18, 40:19, 40:22, 41:24, 42:3, 42:14, 47:7, 48:3, 82:15, 83:10, 83:18, 92:17, 94:24, 95:4, 101:9, 104:5
**statement** [12] - 39:19, 46:3, 71:12, 71:14,

73:12, 74:11, 75:5, 76:2, 76:20, 94:23, 95:4, 96:16
**statements** [22] - 11:12, 13:20, 14:2, 19:20, 19:21, 19:23, 20:3, 24:5, 35:9, 76:14, 81:7, 91:2, 93:2, 94:15, 95:9, 96:20, 97:9, 97:16, 98:4, 98:8, 98:15, 98:17
**states** [8] - 9:16, 10:21, 39:25, 40:3, 46:25, 47:5, 51:14, 61:12
**statute** [1] - 49:3
**stay** [1] - 66:16
**stenographic** [1] - 104:8
**step** [1] - 8:9
**STEPHANIE** [2] - 4:22, 104:18
**Stephanie** [1] - 104:4
**STERK** [1] - 2:13
**STEVEN** [1] - 3:15
**stick** [1] - 54:9
**still** [7] - 7:18, 16:10, 26:2, 34:13, 69:25, 74:7, 93:8
**stipulate** [1] - 58:9
**stipulated** [1] - 15:5
**Stipulation** [3] - 12:15, 15:23, 15:24
**stop** [2] - 75:16, 103:4
**stopped** [2] - 49:15, 72:3
**strategies** [1] - 24:18
**strategy** [1] - 67:5
**streamline** [1] - 18:17
**Street** [5] - 2:3, 2:10, 2:17, 3:14, 3:20
**stricken** [2] - 61:18, 86:22
**strike** [5] - 53:17, 86:17, 86:21, 86:23, 98:16
**strong** [1] - 36:19
**struggled** [1] - 41:10
**studied** [1] - 87:16
**studies** [7] - 19:24, 28:17, 30:7, 30:9, 30:11, 30:14, 31:10
**study** [8] - 30:6, 31:7, 31:13, 31:16, 74:15, 74:16
**Study** [13] - 41:22, 41:25, 42:7, 42:15, 42:22, 43:5, 43:9, 45:19, 47:10, 48:16,

48:19, 48:22
**subject** [5] - 10:2, 52:25, 57:10, 80:5, 82:24
**submission** [1] - 19:5
**submit** [2] - 5:17, 21:21
**submitted** [1] - 9:5
**submitting** [1] - 23:16
**subsections** [1] - 19:15
**subsequent** [1] - 10:9
**substance** [4] - 35:14, 35:25, 51:2, 73:10
**substances** [2] - 40:16, 53:24
**substantiated** [1] - 89:17
**success** [1] - 84:8
**sudden** [1] - 63:12
**SUFFOLK** [1] - 1:2
**Suffolk** [1] - 104:6
**suggest** [2] - 19:21, 35:6
**suggested** [3] - 14:12, 52:20, 94:3
**suggesting** [3] - 79:14, 85:22, 86:10
**suggestion** [3] - 44:10, 44:18, 95:13
**suggests** [2] - 7:3, 64:15
**Suite** [3] - 1:22, 2:17, 3:20
**summarize** [1] - 37:2
**superficial** [1] - 50:25
**supply** [2] - 12:24, 101:17
**support** [8] - 20:24, 40:12, 41:18, 66:13, 80:9, 80:11, 80:12, 87:24
**supposed** [1] - 83:9
**SUPREME** [1] - 1:2
**Supreme** [3] - 1:13, 5:2, 69:17
**surprise** [3] - 95:3, 95:14, 95:25
**sustain** [4] - 61:15, 85:16, 99:15, 100:3
**sustained** [6] - 51:22, 81:17, 91:9, 94:21, 95:16
**sustaining** [1] - 81:20
**swallow** [1] - 55:17
**swallowed** [1] - 55:9
**symptoms** [2] - 51:3, 77:20
**syndrome** [2] - 72:7,

72:8
**syndromes** [1] - 72:4
**synthetic** [1] - 9:13
**System** [2] - 68:24, 70:11
**system** [4] - 55:25, 63:4, 69:8, 82:2

---

**T**

---

**tablet** [2] - 55:8, 70:16
**tactical** [1] - 66:3
**talks** [6] - 28:12, 39:4, 85:5, 87:22, 88:20, 89:15
**targeting** [1] - 101:14
**teachers** [1] - 92:18
**tend** [1] - 37:4
**tens** [2] - 41:25, 43:10
**term** [15] - 13:12, 27:16, 27:19, 33:20, 40:5, 40:7, 45:8, 60:21, 61:5, 77:4, 77:7, 101:25, 102:16, 102:18, 102:19
**terms** [6] - 7:21, 9:23, 11:5, 37:6, 41:23, 50:14
**test** [1] - 31:5
**testified** [1] - 52:17
**testify** [1] - 91:24
**testimony** [8] - 23:2, 44:13, 45:14, 46:15, 53:16, 61:16, 93:10, 101:5
**Teva** [24] - 2:15, 52:3, 53:24, 54:19, 55:4, 56:3, 59:13, 60:25, 62:2, 62:19, 64:2, 65:25, 67:19, 70:19, 70:24, 73:7, 75:7, 75:18, 93:6, 94:15, 96:16, 97:18, 98:2, 98:13
**Texas** [1] - 2:18
**THE** [124] - 1:2, 5:2, 5:6, 5:8, 6:15, 6:21, 6:23, 7:4, 7:7, 7:22, 8:5, 15:13, 15:17, 16:13, 16:17, 18:5, 18:19, 21:4, 21:11, 23:24, 24:11, 25:8, 25:12, 25:24, 25:25, 26:4, 26:6, 26:8, 26:13, 26:15, 27:18, 27:22, 42:24, 43:16, 43:21, 44:3, 44:7, 45:4, 45:23, 46:6, 46:9, 46:12, 46:17,

46:18, 46:21, 46:23, 47:19, 48:4, 48:14, 50:5, 50:8, 51:22, 52:10, 52:14, 52:20, 53:3, 53:19, 53:21, 56:25, 57:14, 57:18, 57:21, 58:9, 58:12, 58:19, 61:10, 61:15, 68:19, 69:3, 69:6, 69:14, 69:17, 69:19, 69:24, 70:2, 70:4, 70:6, 75:24, 79:8, 79:14, 79:17, 79:21, 80:3, 80:22, 81:3, 81:8, 81:14, 81:17, 81:19, 82:8, 82:12, 83:7, 83:11, 85:15, 86:4, 86:21, 87:3, 90:3, 90:7, 91:9, 93:11, 93:15, 93:24, 94:6, 94:9, 94:21, 95:10, 95:16, 95:19, 95:22, 95:25, 98:22, 98:24, 99:3, 99:13, 99:21, 99:25, 100:17, 101:4, 101:11, 102:22, 103:5, 103:13, 103:15

**themselves** [2] - 28:22, 30:19
**theory** [1] - 102:14
**therapy** [3] - 73:11, 86:11, 87:23
**Therefore** [1] - 104:13
**they've** [2] - 45:4, 55:18
**thinking** [1] - 78:14
**third** [6] - 13:17, 14:21, 16:12, 16:13, 22:21, 33:23
**third-party** [1] - 22:21
**thousands** [2] - 41:25, 43:10
**Three** [1] - 3:20
**three** [9] - 14:11, 14:12, 25:18, 39:4, 40:7, 72:6, 94:2, 94:14, 96:21
**throat** [2] - 55:20, 55:22
**throughout** [1] - 51:18
**Tim** [1] - 44:23
**timing** [1] - 50:14
**TIMOTHY** [1] - 3:5
**title** [2] - 8:5, 8:8
**titles** [1] - 19:16
**today** [4] - 12:5, 38:18, 41:14, 91:15
**together** [1] - 67:11

**tolerance** [1] - 26:21
**took** [6] - 26:25, 50:21, 51:7, 73:8, 102:7, 102:25
**top** [5] - 49:16, 64:3, 64:8, 64:10, 75:8
**topic** [3] - 29:14, 29:19, 29:20
**total** [1] - 64:14
**toward** [1] - 49:16
**tragic** [1] - 78:18
**trained** [1] - 76:9
**training** [8] - 22:25, 23:3, 35:10, 38:4, 38:5, 38:15, 38:16, 66:20
**Training** [1] - 80:19
**transcript** [1] - 104:11
**transcription** [1] - 104:8
**transcripts** [1] - 5:20
**transmitted** [1] - 55:14
**transmucosal** [1] - 63:4
**transmucosally** [1] - 70:17
**treat** [4] - 29:16, 60:19, 64:19, 78:5
**treated** [2] - 77:13, 90:25
**treating** [2] - 68:12, 78:9
**Treatment** [1] - 39:19, 49:2
**treatment** [11] - 29:12, 35:2, 37:25, 39:14, 40:4, 40:10, 40:16, 41:11, 78:21, 86:12, 100:24
**trial** [4] - 5:8, 9:6, 24:10, 53:16
**TRIAL** [1] - 1:10
**trials** [1] - 14:13
**trouble** [1] - 42:6
**true** [11] - 36:4, 37:24, 49:20, 51:15, 59:19, 73:12, 73:16, 73:23, 76:19, 104:7, 104:12
**trumps** [1] - 74:2
**truth** [1] - 46:4
**trying** [5] - 6:3, 14:11, 30:25, 31:22, 58:14
**tube** [1] - 55:21
**turn** [13] - 33:12, 34:8, 35:11, 59:11, 62:18, 63:23, 65:24, 73:6, 75:6, 83:20, 84:19, 90:12, 96:13
**turned** [1] - 43:16
**turning** [1] - 18:23

**Twelfth** [1] - 3:14
**twice** [2] - 56:14, 67:12
**two** [12] - 47:4, 52:11, 61:3, 61:6, 61:12, 61:20, 64:8, 69:3, 72:5, 76:9, 77:7, 80:5
**type** [5] - 24:4, 24:9, 55:18, 58:21, 72:13
**types** [4] - 24:22, 38:13, 65:18, 87:16

**U**

**ulcers** [1] - 55:19
**ultimately** [3] - 17:8, 17:11, 102:9
**unambiguous** [1] - 13:8
**unbranded** [1] - 12:13
**uncommon** [5] - 31:24, 73:12, 74:12, 97:7, 97:10
**under** [11] - 9:19, 10:24, 11:12, 22:4, 23:8, 23:21, 26:2, 36:12, 38:15, 69:25, 87:4
**understood** [3] - 24:2, 57:8, 88:3
**undertreated** [3] - 59:21, 60:5, 60:13
**undertreatment** [3] - 59:18, 60:3, 60:18
**unexpected** [1] - 96:4
**unfortunately** [1] - 59:17
**unique** [3] - 56:17, 63:4, 76:3
**unlawful** [1] - 11:11
**unless** [1] - 103:3
**unlikely** [1] - 76:17
**unsafe** [1] - 29:10
**unscientific** [1] - 35:22
**up** [24] - 6:3, 12:5, 14:6, 15:7, 18:14, 22:16, 25:16, 25:19, 28:7, 30:8, 30:19, 33:16, 35:21, 44:9, 55:14, 66:17, 68:3, 68:24, 76:18, 77:4, 77:14, 77:22, 78:4, 79:3
**up-to-date** [1] - 28:7
**urine** [1] - 31:5
**USA** [1] - 2:16
**usage** [1] - 64:5
**utilizing** [1] - 64:23

**V**

**various** [2] - 11:11, 11:17
**vast** [1] - 73:4
**version** [2] - 9:13, 17:10
**versus** [5] - 27:4, 27:5, 54:13, 62:13, 72:12
**via** [1] - 8:2
**videos** [1] - 89:15
**viewing** [1] - 19:7
**Vincent** [1] - 14:16
**violated** [1] - 14:3
**violation** [2] - 11:25, 21:3
**violations** [1] - 87:9
**vis-à-vis** [1] - 37:14
**volunteer** [2] - 30:17, 30:22
**Vowles** [4] - 30:6, 30:9, 31:6, 32:8

**W**

**wait** [1] - 42:25
**walking** [1] - 74:22
**wants** [1] - 103:3
**warning** [1] - 88:15
**Washington** [2] - 2:23, 3:15
**watching** [2] - 5:13, 90:23
**Watson** [4] - 2:16, 2:16, 2:22, 3:3
**ways** [3] - 55:16, 59:23, 65:22
**wear** [1] - 48:23
**website** [2] - 13:23, 89:5
**week** [5] - 26:19, 41:14, 81:12, 82:6, 95:7
**Week** [2] - 5:13, 19:7
**weekend** [2] - 5:19, 7:12
**weeks** [1] - 72:6
**weight** [1] - 37:5
**welcome** [1] - 26:14
**West** [1] - 2:10
**whereas** [1] - 38:13
**WHEREUPON** [5] - 69:16, 79:19, 90:5, 93:13, 98:25
**who..** [1] - 64:16
**widespread** [3] - 49:19, 50:15, 59:18
**WILLIAMS** [1] - 3:13
**willing** [4] - 21:4, 60:6, 60:19, 66:10

**Wisconsin** [3] - 41:21, 43:10, 45:18
**withdraw** [2] - 17:6, 75:21
**withdrawal** [3] - 26:21, 72:5, 72:6
**withdrawn** [1] - 25:3
**withdraw** [1] - 17:11
**witness** [13] - 25:8, 25:14, 44:4, 45:10, 45:24, 46:3, 53:12, 57:11, 57:21, 58:14, 80:24, 95:8, 95:12
**WITNESS** [5] - 25:24, 26:13, 26:15, 46:17, 50:8
**witness'** [4] - 44:13, 44:21, 93:10, 95:21
**word** [7] - 36:18, 37:5, 95:14, 95:25, 96:2, 97:5, 97:6
**words** [5] - 6:23, 7:15, 42:11, 81:13, 86:23
**world** [2] - 31:8, 74:21
**World** [3] - 3:8, 31:25, 32:2
**writes** [2] - 47:11, 47:16
**writing** [2] - 13:7, 84:4
**written** [4] - 13:7, 47:8, 84:6, 89:11
**wrote** [3] - 47:4, 89:13, 90:11

**Y**

**YATES** [1] - 2:12
**year** [1] - 67:12
**yesterday** [2] - 5:10, 25:18
**YORK** [1] - 1:2
**York** [27] - 1:9, 1:17, 1:22, 2:2, 2:3, 2:4, 2:11, 3:8, 3:9, 4:3, 10:10, 12:9, 14:17, 15:21, 19:24, 24:19, 24:21, 82:15, 94:24, 95:3, 101:9, 104:6
**young** [1] - 77:11
**yourselves** [2] - 69:11, 103:9