Page 1

1              IN THE UNITED STATES DISTRICT COURT

2               FOR THE NORTHERN DISTRICT OF OHIO

3                        EASTERN DIVISION

4

5    MDL NO. 2804

6    CASE NO. 17-md-2804

7    Hon. Dan A. Polster

8

9    IN RE: NATIONAL PRESCRIPTION OPIATE LITIGATION

10

11   THIS DOCUMENT RELATES TO:

12   TRACK THREE CASES

13

14

15

16              REMOTE VIDEO DEPOSITION OF

17            DANIEL CHARLES MALONE, PH.D.

18

19                    May 28, 2021

20

21

22   REPORTED BY:    Laura H. Nichols

23                   Certified Realtime Reporter,

24                   Registered Professional

25                   Reporter and Notary Public

1           A P P E A R A N C E S

2              (All Appearing Remotely)

3

4   FOR THE PLAINTIFFS:

5           Mr. Peter H. Weinberger

6           Attorney at Law

7           Spangenberg Shibley & Liber LLP

8           1001 Lakeside Avenue East

9           Suite 1700

10          Cleveland, Ohio 44114

11          (216) 600-0114

12          pweinberger@spanglaw.com

13

14  FOR DEFENDANTS CVS PHARMACY, INC.; CVS INDIANA,

15  LLC; CVS RX SERVICES, INC.; CVS TN DISTRIBUTION,

16  LLC and OHIO CVS STORES, LLC:

17          Mr. Daniel Moylan

18          Attorney at Law

19          Zuckerman Spaeder

20          100 East Pratt Street

21          Suite 2440

22          Baltimore, Maryland 21202-1031

23          (410) 949-1159

24          dmoylan@zuckerman.com

25

```
 1              A P P E A R A N C E S

 2              (All Appearing Remotely)

 3

 4   FOR THE DEFENDANTS GIANT EAGLE, INC. and

 5   HBC SERVICE COMPANY:

 6          Mr. Joshua A. Kobrin

 7          Attorney at Law

 8          Marcus & Shapira LLP

 9          One Oxford Centre

10          35th Floor

11          Pittsburgh, Pennsylvania 15219

12          (412) 471-3490

13          kobrin@marcus-shapira.com

14

15   FOR THE DEFENDANT, WALMART, INC.:

16          Ms. Tara A. Fumerton

17          Attorney at Law

18          Jones Day

19          77 West Wacker

20          Suite 3500

21          Chicago, Illinois 60601-1692

22          (312) 782-3939

23          tfumerton@jonesday.com

24

25
```

Page 4

```
1              A P P E A R A N C E S

2               (All Appearing Remotely)

3

4    ALSO FOR THE DEFENDANT, WALMART, INC.:

5          Ms. Jordan Gleeson

6          Attorney at Law

7          Jones Day

8          2727 North Harwood Street

9          Dallas, Texas 75201

10         (214) 220-3939

11         jgleeson@jonesday.com

12   -and-

13         Ms. Kristin K. Zinsmaster

14         Attorney at Law

15         Jones Day

16         90 South Seventh Street

17         Suite 4950

18         Minneapolis, Minnesota 55402

19         (612) 217-8800

20         kzinsmaster@jonesday.com

21

22

23

24

25
```

```
 1                A P P E A R A N C E S

 2                 (All Appearing Remotely)

 3

 4   FOR THE DEFENDANTS, WALGREENS BOOTS ALLIANCE, INC.;

 5   WALGREEN CO.; AND WALGREEN EASTERN CO., INC.:

 6           Mr. Brian C. Swanson

 7           Attorney at Law

 8           Bartlit Beck

 9           Courthouse Place

10           54 West Hubbard Street

11           Chicago, Illinois 60654

12           (312) 494-4400

13           sharon.desh@bartlitbeck.com

14

15   FOR THE DEFENDANT, RITE AID:

16           Mr. John M. Maloy

17           Attorney at Law

18           Morgan, Lewis & Bockius LLP

19           101 Park Avenue

20           New York, New York 10178-0060

21           (212) 309-6000

22           jmaloy@morganlewis.com

23

24

25
```

1              A P P E A R A N C E S

2              (All Appearing Remotely)

3

4   OTHERS PRESENT:

5          Mr. Jonathan Jaffe

6          Consultant for Plaintiffs

7

8          Mr. Justin Bond, Videographer

9          Veritext Legal Solutions

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 7

1                    INDEX OF EXAMINATION

2

3                                            Page:

4    DEPONENT:  DANIEL CHARLES MALONE, PH.D.        11

5    EXAMINATION BY MS. FUMERTON                    12

6    EXAMINATION BY MR. KOBRIN                     268

7    EXAMINATION BY MR. WEINBERGER                 277

8    REEXAMINATION BY MS. FUMERTON                 307

9

10                    INDEX OF EXHIBITS

11

12                                            Page:

13   Exhibit 1                                  16-18

14        An Expert Report for the National

15   Prescription Opiate Litigation, MDL 2804,

16   Provided by Daniel C. Malone, Ph.D., April

17   15, 2021

18   Exhibit 2                                  17-02

19        Attachment 1, Curriculum Vitae of

20   Daniel C. Malone, Ph.D.

21   Exhibit 3                                  17-08

22        Article:  Perspective, Abusive

23   Prescribing of Controlled Substances - A

24   Pharmacy View; The New England Journal of

25   Medicine

1                INDEX OF EXHIBITS (Continuing)

2

3                                             Page:

4     Exhibit 4                                 95-15

5           Email string with attachment, Bates

6     Numbers ENDO-OPIOID_MDL-06622037 through

7     ENDO-OPIOID_MDL-06622038.xlsx

8     (Confidential)

9     Exhibit 5                                 124-09

10          Article:  Recommendations for

11    Selecting Drug-Drug Interactions for

12    Clinical Decision Support

13    Exhibit 6                                 160-23

14          Article:  Designing and Evaluating

15    Contexualized Drug-Drug Interaction

16    Algorithms; JAMA

17    Exhibit 7                                 210-22

18          Article:  Evaluation of

19    Machine-Learning Algorithms for Predicting

20    Opioid Overdose Risk Among Medicare

21    Beneficiaries with Opioid Prescriptions;

22    JAMA

23

24

25

Page 9

1            INDEX OF EXHIBITS (Continuing)

2

3                                          Page:

4    Exhibit 8                              223-10

5          Article:  Using Machine Learning to

6    Predict Risk of Incident Opioid Use

7    Disorder Among Fee-for-Service Medicare

8    Beneficiaries:  A Prognostic Study; PLOS

9    ONE

10   Exhibit 9                              227-23

11         Malone Billing Hours

12   Exhibit 10                             309-07

13         PowerPoint:  Telecommunication

14   Standards for Pharmacy and Health

15   informatics

16

17

18

19

20

21

22

23

24

25

Page 10

1              S T I P U L A T I O N

2              IT IS STIPULATED AND AGREED, by and

3    between the parties, through their respective

4    counsel, that the deposition of DANIEL CHARLES

5    MALONE, PH.D. may be taken before Laura H. Nichols,

6    Commissioner, Certified Realtime Reporter,

7    Registered Professional Reporter and Notary Public;

8              That it shall not be necessary for

9    any objections to be made by counsel to any

10   questions, except as to form or leading questions,

11   and that counsel for the parties may make

12   objections and assign grounds at the time of trial,

13   or at the time said deposition is offered in

14   evidence, or prior thereto.

15

16

17

18

19

20

21

22

23

24

25

Page 11

1            I, Laura H. Nichols, a Certified

2   Realtime Reporter and Registered Professional

3   Reporter of Birmingham, Alabama, and a Notary

4   Public for the State of Alabama at Large, acting as

5   Commissioner, certify that on this date, as

6   provided by the Federal Rules of Civil Procedure of

7   the United States District Court, and the foregoing

8   stipulation of counsel, there came before me

9   remotely via Zoom, on May 28, 2021, commencing at

10  10:08 a.m. EDT, DANIEL CHARLES MALONE, PH.D.,

11  witness in the above cause, for oral examination,

12  whereupon the following proceedings were had:

13

14                  *     *     *

15            THE VIDEOGRAPHER:  Good morning.

16  Today is May 28th, 2021.  We are on the record at

17  10:08 a.m.  Today we will take a videotaped

18  deposition in Case Number 17-md-2804.  This

19  deposition is being held remotely.

20            Would you please swear the witness.

21

22            DANIEL CHARLES MALONE, PH.D.,

23  having been first duly sworn, was examined and

24  testified as follows:

25

Page 12

1   EXAMINATION BY MS. FUMERTON:

2          Q.     Good morning, Dr. Malone.  I

3   introduced myself off the record, but my name is

4   Tara Fumerton, and I represent Walmart in this

5   action.

6                 I am going to be the primary

7   questioner on behalf of the other pharmacy

8   defendants, as well as Walmart today, although some

9   other counsel for the pharmacy defendants might ask

10  you questions at some point during the day.

11                Can you please state your full name

12  and spell your last name for the record?

13         A.     Daniel Charles Malone, M-A-L-O-N-E.

14         Q.     Where do you live?

15         A.     Primary residence is in Oro Valley,

16  Arizona.

17         Q.     Is that where you are today?

18         A.     It is, yes.

19         Q.     Okay.  And are you giving testimony

20  from your home today?

21         A.     Yes, I am.

22         Q.     Is anyone else in the room with you?

23         A.     No, not at this moment.

24         Q.     And do you expect anyone to be in the

25  room with you at any time throughout the day while

Page 13

```
1    you are on camera?
2              A.      There may be people passing through
3    the common area that I am in, but nobody should be
4    in the room that I am in on a continuous basis.
5              Q.      And I don't mean to pry, but are you
6    just talking family members or something along
7    those lines?
8              A.      Yeah, yeah, my son and my wife, yes.
9              Q.      And you understand that you are not
10   permitted to communicate with your counsel or
11   anybody else while you are giving testimony,
12   correct?
13             A.      I do understand that, thank you.
14             Q.      And are you --
15             MR. WEINBERGER:  So can we just --
16   let me just interject.  I said I wasn't going to
17   say much, but I am not his counsel.  I am counsel
18   for the plaintiff.  I have retained him as an
19   expert, but I am not his lawyer.
20             MS. FUMERTON:  Okay.  I was going to
21   get to that question, so thank you for that
22   clarification and I will be able to skip that
23   question.
24             Q.      (BY MS. FUMERTON:)  Are you using
25   your computer today?
```

Page 14

1          A.      Yes, I am.

2          Q.      And so if at any point -- I know it

3    is a little awkward doing this by remote

4    deposition, but if you can't hear me or if you lose

5    connection, please just, as the court reporter

6    said, wave your hands or do something else so that

7    we make sure we have a good connection throughout

8    the day.

9                  Do you understand the oath that you

10   just took?

11         A.      I do.

12         Q.      And you agree to answer every

13   question I ask today truthfully, to the very best

14   of your ability?

15         A.      I do.

16         Q.      Do you have any notes or materials

17   with you today?

18         A.      I have the materials that were

19   provided by, I guess, the -- the docket or the

20   firms -- I get the packets that were sent.  So,

21   yes, I have that information.

22         Q.      You referenced --

23         A.      Yes.

24         Q.      You referenced -- just for the

25   record, we had sent you copies of potential

Page 15

1    exhibits that we might be using at your deposition

2    today.

3                    Beyond those documents, do you have

4    any other documents with you today?

5            A.      I have a copy of the article that I

6    am assuming is included in the documents that was

7    published in the New England Journal of Medicine.

8            Q.      Can you give a little more

9    specificity as to which article you are referring

10    to?

11            A.      Yes, one second, please.  It is an

12    article by Betses and Brennan in New England

13    Journal of Medicine, Volume 369, Issue 11, from

14    September 12th, 2013.

15            Q.      Okay.  Do you have any notes on that

16    article?

17            A.      No, I have not taken any notes.

18            Q.      Okay.  And just so that the record is

19    clear, can you actually pull out what is Tab 16 in

20    the material that we sent you.  I just want to

21    confirm that that is the same article that you have

22    in front of you.

23            A.      Okay.

24                    THE REPORTER:  16?

25            A.      16, yes.

Page 16

1                    MS. FUMERTON:  Yes.  That is going to

2       be marked as an exhibit, although before marking

3       exhibits actually, I want to -- once Dr. Malone

4       gets access to that, we will mark it as an exhibit.

5       But I don't want to mark it as Exhibit 1.

6              Q.      (BY MS. FUMERTON:)  Is this the

7       document that is the same one that you have in

8       front of you?

9              A.      It is, yes.

10             Q.      It is identical in all respects?

11             A.      I believe so.

12             Q.      Okay.

13                    MS. FUMERTON:  Why don't we take the

14      time to mark some documents as an exhibit.  I think

15      before we start, I had you pull out a copy of your

16      expert report.  We are going to go ahead and mark

17      that as Exhibit 1.

18                    (Exhibit 1 was marked for

19                    identification.)

20             Q.      (BY MS. FUMERTON:)  And I will

21      authenticate it in a little bit, but I am just

22      marking the exhibits right now.  And then as

23      Exhibit 2, we are going to mark your CV which I

24      also had asked you to pull out.  Do you have those

25      two documents in front of you?

Page 17

1          A.     I do.

2                 (Exhibit 2 was marked for

3                 identification.)

4          Q.     (BY MS. FUMERTON:)  Okay.  Great.

5    Then let's mark the document that you just pulled

6    out, the New England Journal of Medicine article as

7    Exhibit 3.

8                 (Exhibit 3 was marked for

9                 identification.)

10         Q.     (BY MS. FUMERTON:)  Okay.  If you

11   just will hold on to those, we will come back to

12   them.

13                Do you have any other documents with

14   you today?

15         A.     No.

16         Q.     Have you been deposed in the past?

17         A.     Not as an expert, no.

18         Q.     In what context were you deposed in

19   the past?

20         A.     As a plaintiff in a traffic accident

21   in 1987.

22         Q.     Is that the only time that you have

23   been deposed?

24         A.     Yes, it is.

25         Q.     Have you ever testified at trial or

Page 18

1    other court or legal proceedings, other than the

2    one you just mentioned?

3         A.    No.

4         Q.    Okay.  Well, since 1987 was a while

5    ago, just a few reminders of the deposition

6    process.  Please give verbal answers.  We can see

7    each other, but the court reporter needs to hear a

8    verbal answer in order to be able to report it.

9              I will do my best not to talk over

10   you or Mr. Weinberger, so if you could please try

11   to wait until I finish a question to give

12   Mr. Weinberger time to object to the question

13   before answering, that would be great.  Obviously,

14   our goal is just to create a clear record.

15             If I ask a question that you don't

16   understand, please ask me to rephrase it.  And from

17   time to time, Mr. Weinberger might object to some

18   of the questions that I ask.  Unless he -- I don't

19   even know that he can instruct you not to answer

20   since he is not your counsel, but unless somebody

21   instructs you not to answer, please go ahead and

22   answer the question despite the objection.

23             Also feel free to take -- or to ask

24   to take a break at any point in time.  I will take

25   just regular breaks as we go along, but if for

Page 19

1   whatever reason we have gone on too long and you

2   need to take a break, please let me know.  My only

3   ask is that you answer any pending question before

4   you take the break.

5                 Do you have any questions about how

6   this is going to proceed today?

7          A.     No, I don't.  Thank you.

8          Q.     Okay.  Is there anything that would

9   prevent you from testifying fully, completely and

10  honestly in this matter today?

11         A.     Not that I am aware of, no.

12         Q.     Are you taking any medications that

13  might impede your ability to recall information or

14  answer questions honestly?

15         A.     No, I am not.

16         Q.     What did you do to prepare for your

17  deposition?

18         A.     I was provided a list of documents

19  that are listed in my report, so I reviewed those

20  documents.  And I also referred to references that

21  I was familiar with through my professional

22  experience, and I guess -- and also read a couple

23  of articles with respect to -- my own articles,

24  with respect to what we had done previously in some

25  of my own research.

Page 20

1          Q.     Anything else?

2          A.     No.  Well, I'm sorry.  I should

3    mention I met with plaintiffs' counsel, so --

4          Q.     And who are you referring to as

5    plaintiffs' counsel?

6          A.     Mr. Weinberger.

7          Q.     Did you meet with anybody else

8    purporting to represent plaintiffs?

9          A.     No.

10         Q.     Do you have an understanding of who

11   the plaintiffs are in this action?

12         A.     I believe so.

13         Q.     What is that understanding?

14         A.     I believe it is the -- I guess in a

15   broad context, the individuals that have been

16   harmed through the use of opioid -- opioids in, I

17   guess, the state of Ohio is where this particular

18   jurisdiction is, so --

19         Q.     Okay.  Do you have any more

20   specificity than that as to --

21         A.     No.

22         Q.     -- who the plaintiffs are in this

23   case?  And how did you arrive at that understanding

24   as to who the plaintiffs were?

25                MR. WEINBERGER:  Can I just make sure

```
 1    that you are reminded of the fact that anything

 2    that came from me, you -- it is within our work

 3    product privilege, and you are not to answer

 4    questions with respect to any conversations or

 5    information you got from me as a result of those

 6    conversations.

 7              Q.    (BY MS. FUMERTON:)  So --

 8              MR. WEINBERGER:  You can say, you

 9    know, I had a conversation with Mr. Weinberger,

10    that is fine.

11              MS. FUMERTON:  Yeah, I am going to

12    disagree with what Mr. Weinberger expressed a

13    little bit.  I think to the extent that you are

14    relying on any information for purposes of your

15    opinion, even if that came from plaintiffs'

16    counsel, you are required to testify about it.

17              But other conversations associated

18    may be covered by the work product privilege that

19    Mr. Weinberger references.

20              Q.    (BY MS. FUMERTON:)  So I guess if the

21    answer is you learned from plaintiffs' counsel,

22    that is fine.  But I will ask my question again --

23    or do you recall what the question was?

24              A.    Go ahead and restate the question if

25    you don't mind, please.
```

Page 22

1          Q.     Sure.  I think you said that you
2     understood that the plaintiffs in the action were
3     individuals who were allegedly harmed and residing
4     in the state of Ohio.  And my question was how did
5     you arrive at that understanding?
6          A.     Yeah.  I guess the -- the depositions
7     indicated that the docket -- or I guess the case of
8     the plaintiffs, so -- so reading those documents as
9     part of preparing for my testimony and my expert
10    report, so --
11         Q.     Are you referring to the
12    depositions -- oh, I'm sorry.
13         A.     Yeah, the depositions that were given
14    by the representatives of the various firms,
15    organizations, yes.  Yeah.  I have not seen the
16    actual Complaint.
17         Q.     Okay.  Another one of my questions.
18    So you have not read the Complaint in this matter,
19    correct?
20         A.     No, I have not.
21         Q.     And so you were just in your deducing
22    from some of the materials that you read in the
23    depositions as to who the plaintiffs were in this
24    action?
25         A.     Correct.

1       Q.      You mentioned that you met with

2  Mr. Weinberger.  How many times did you meet with

3  Mr. Weinberger in preparation for your deposition?

4       A.      I believe it was four different

5  meetings in preparation.

6       Q.      When was the first meeting?

7       A.      Earlier this month.  I would have to

8  get out the calendar and look at it.  Can I do

9  that?

10      Q.      That is okay.

11      A.      Okay.

12      Q.      I will ask you that -- I think early

13 this month will suffice.  How long was that

14 meeting?

15      A.      I believe the initial meeting was

16 somewhere between an hour and two hours.

17      Q.      And when you refer to the initial

18 meeting, you mean initial meeting for preparation

19 for this deposition, not the first time you met

20 Mr. Weinberger?

21      A.      Yes.  Your question was about

22 meetings for the deposition.  Yes.

23      Q.      When was -- was that meeting remote

24 or in person?

25      A.      All of my meetings have been remote.

Page 24

1          Q.     Okay.  And was there anybody else who

2    participated in that meeting other than yourself

3    and Mr. Weinberger?

4          A.     No.

5          Q.     When was the next time that you met?

6          A.     I believe it was the following week.

7    So I think it was early May.

8          Q.     Early on --

9          A.     Mid May once and then once last week

10   and yesterday.  So basically about, if I remember

11   correctly, once a month -- once a week during the

12   month of May.

13         Q.     Okay.  And for your meeting, the

14   second meeting that you had in May, was anybody

15   present for that other than -- or did anybody else

16   participate in that other than yourself and

17   Mr. Weinberger?

18         A.     No.

19         Q.     What about the meeting last week, did

20   anybody participate in that other than yourself and

21   Mr. Weinberger?

22         A.     No.

23         Q.     And I didn't ask, but that second

24   meeting you had, approximately how long was that?

25         A.     Probably similar duration, less

Page 25

1    than -- less than two hours, between one and two

2    hours.

3         Q.    What about your meeting last week,

4    how long was that?

5         A.    Similar duration, yeah.  Between one

6    and two hours.

7         Q.    And yesterday?

8         A.    It was less than two hours, probably

9    about an hour and a half.

10        Q.    And for the last two meetings, it was

11   just yourself and Mr. Weinberger again?

12        A.    That is correct.

13        Q.    And for all four meetings, nobody

14   participated in the phone or otherwise listened in,

15   to your knowledge?

16        A.    To my knowledge, no.

17        Q.    Okay.  You said that in preparation

18   for your deposition, you were provided a list of

19   documents that were in your report.  Who were you

20   provided those documents -- or who provided you

21   those documents?

22        A.    I was given a link to the documents

23   via -- I believe it was a cloud service.  And those

24   materials came from, I believe, a law firm -- I

25   could tell you exactly who that is if I was allowed

Page 26

1    to look at my email.  But I believe it came from

2    Dr. -- Mr. Weinberger's office or associated with

3    Mr. Weinberger.

4          Q.    Okay.  And is every single document

5    that was provided to you in that link referenced in

6    the body of your report itself?

7          A.    I believe so, but I did not check

8    through every document that was in those links

9    so --

10         Q.    Okay.  I am distinguishing this

11   between your report and then your CV, which you

12   obviously have a very lengthy CV with lots of

13   publications.  I am excluding those for the moment.

14   But just referring to the documents that are

15   referenced in your expert report.  Are those the

16   documents that you were provided?

17         A.    Yes.

18         Q.    And then you mentioned, I think, that

19   you reviewed some references -- let me back up for

20   a second.  In preparation for your deposition, did

21   you review every single one of those documents?

22         A.    Yes, I did.

23         Q.    Okay.  About how long did it take you

24   to do that?

25         A.    It was probably in the neighborhood

Page 27

1    of seventeen hours or so.

2         Q.    Is that the first time you had seen

3    those documents?

4         A.    It was.

5         Q.    And when were you provided that link?

6         A.    Early April, I believe, the first

7    week of April.

8         Q.    Okay.  And so did you re-review those

9    documents in preparation for your deposition?

10        A.    I did.

11        Q.    And how long did it take you to

12   re-review those documents?

13        A.    I didn't re-review all of those

14   documents.  So approximately three hours.

15        Q.    Do you recall which ones you did

16   re-review?

17        A.    There's probably more than forty

18   documents that I looked at, so there's ones that

19   were certainly more prominent and others were less

20   interesting to me.

21        Q.    What was more prominent to you?

22        A.    The New England Journal of Medicine

23   article that I mentioned previously.

24        Q.    That was -- I'm sorry.  Is that what

25   has been marked as Exhibit 3?

1          A.      Exhibit 3, yes.  The materials from

2     CVS specifically.  Their 2012 SAS program, looking

3     at computing red flags.  They had another SAS

4     program, it appears from 2014 -- again, I guess the

5     title is computing red flags from their dispensing

6     data.  So those took the majority of my effort to

7     refamiliarize myself with.

8          Q.      Okay.  Well, which ones did you find

9     less interesting?

10         A.      The documents associated with the

11    certification of the deposition and clerical errors

12    within the deposition so --

13         Q.      Okay.  I think you also mentioned

14    that you read a couple of articles that you had

15    written.  Which articles did you re-review for

16    purposes of your deposition?

17         A.      So it would be the article that was

18    published in -- one second here.  Let me -- I am

19    referring to my CV.

20         Q.      Okay.

21         A.      That is Exhibit 2.  I will also look

22    at it.  I guess I am just taking the time to make

23    sure I am stating it correctly.

24         Q.      If there's a particular page, too,

25    that you are looking at, that would be helpful.

                                                    Page 29

1          A.     Yeah.  Yeah, I will give you that

2     information.

3                 So it is Page 12.  The first author

4     is Malone, myself.  It is the middle of the page,

5     published in Medical Care.  It is highlighted with

6     the cursor at the moment.

7          Q.     Okay.  Any other articles?

8          A.     That is the primary one that I looked

9     at.  The other one that was, I guess, relevant in

10    this context or somewhat relevant in this context

11    is -- I will find it here.

12                It is on the next page.  The first

13    author is Abarca, Jacob.  You scrolled down past

14    it, "Computerized Drug-Drug Interaction Alerts."

15         Q.     Okay.  Any others?

16         A.     No.

17         Q.     Why did you choose to re-review those

18    two articles?

19         A.     I felt they were germane to my

20    experience related to the course -- to the case,

21    excuse me.

22         Q.     Was there anything -- any materials

23    that you reviewed in preparation for your

24    deposition that you had not seen before?

25         A.     In terms of provided by the --

Page 30

1        Q.      Or to the -- yes -- anything?

2        A.      I am sorry.  I don't understand your

3   question.

4        Q.      Let me ask a better question, and --

5   did you review any documents that aren't mentioned

6   in your report or your CV in preparation for your

7   deposition?

8        A.      No.

9        Q.      Other than Mr. Weinberger, did you

10  talk to anybody about the testimony that you are

11  going to give today?

12       A.      No.

13       Q.      Mr. Weinberger has already

14  represented for the record that he is not

15  representing you in your personal capacity for

16  purposes of this deposition.  Do you have any other

17  counsel that is representing you in connection with

18  this matter?

19       A.      No.

20       Q.      If you could grab in front of you

21  Exhibit 1.

22       A.      I have it, thank you.

23       Q.      And for the record, Exhibit 1 is

24  labeled "An Expert Report for the National

25  Prescription Opioid Litigation, MDL 2804, Provided

Page 31

```
 1   by Daniel C. Malone, BS Pharmacy, MS, Ph.D., FACMP,

 2   Professor, Department of Pharmacotherapy,

 3   University of Utah."  And it is dated April 15th,

 4   2021.

 5                   Is Exhibit 1 a copy of the report

 6   that you submitted in this litigation?

 7        A.     It is.

 8        Q.     And it is dated April 15th, 2021,

 9   correct?

10        A.     That is correct.

11        Q.     Is that the date you completed it?

12        A.     It is.

13        Q.     And if you turn to Page 8 of your

14   report, is that your signature?

15        A.     Yes, it is.

16        Q.     Is this the only expert report that

17   you have submitted in connection with this matter?

18        A.     It is.

19        Q.     And if I refer to Exhibit 1 as your

20   report, will you understand what I am referring to?

21        A.     I believe so, thank you.

22        Q.     Does your report contain a complete

23   and accurate statement of all the opinions you

24   intend to offer in connection with this matter?

25        A.     It does.
```

1          Q.       Does your report contain a complete

2    and accurate statement of all of the bases for the

3    opinions you formed in connection with this matter?

4          A.       It does.

5          Q.       Does your report contain all the

6    facts that you considered in forming your opinions?

7          A.       In general, yes.  I mean I did not

8    list the specific -- you know, at the detail level

9    based upon what was provided to me, I did not, you

10   know, cite the particular page or statement from

11   the various supporting documents that I reviewed.

12         Q.       But if it was a document that you

13   were relying on for purposes of your opinion, you

14   would have included it in your report?

15         A.       Yes.

16         Q.       Did you talk to anybody in forming

17   your opinions that are set forth in your report?

18         A.       No.  I did not.

19         Q.       In forming your opinions, were you

20   asked to assume any facts?

21         A.       No.

22         Q.       Did you make any base assumptions in

23   forming your opinions?

24         A.       I believe not, no.

25         Q.       Did anybody assist you in writing

Page 33

1   your report?

2          A.      No, they did not.

3          Q.      Before you signed your report, you

4   reviewed it carefully and ensured that you agreed

5   with all its contents, correct?

6          A.      Yes.

7          Q.      Do you take full responsibility for

8   all the words that are contained in your report?

9          A.      I do.

10         Q.      Do you understand all the terms that

11  are used in your report?

12         A.      Yes, I do.

13         Q.      You issued your report on University

14  of Utah letterhead, correct?

15         A.      That is right, as my employer.

16         Q.      The University of Utah is not

17  endorsing this report, correct?

18         A.      That is correct.  That is correct.

19         Q.      Have you ever testified as an expert

20  before?

21         A.      No, ma'am.

22         Q.      Has the Court ever found you

23  qualified to testify as an expert in any capacity?

24                 MR. WEINBERGER:  Objection to form.

25  Go ahead.

1          A.     No.

2          Q.     (BY MS. FUMERTON:)  Have you ever

3    consulted as an expert before?

4          A.     Yes, I have.

5          Q.     In what context?

6          A.     It was a medication error or adverse

7    event, and I was contacted by a potential

8    plaintiff's lawyer to review the contents of that

9    Complaint.

10          And I rendered an opinion to the

11    plaintiff's attorney about the legitimacy of the

12    Complaint with regards to that medication safety

13    issue.

14          Q.     When was this?

15          A.     1994.

16          Q.     Do you recall what medication was at

17    issue?

18          A.     Yeah, it was an antibiotic called

19    gentamicin.

20          Q.     And what ultimately was your opinion,

21    do you recall?

22          MR. WEINBERGER:  Objection.  But go

23    ahead.

24          A.     The plaintiffs had asked if the

25    pharmacist had been contributory to the

Page 35

1  individual's injuries, and my conclusion was they

2  had not.

3          Q.     (BY MS. FUMERTON:)  We are going to

4  come back to your report in more detail.

5               If you could put in front of you what

6  has been previously marked as Exhibit 2.

7          A.     I have it.

8          Q.     And for the record -- great.  For the

9  record, this was an attachment, Attachment 1 to

10  your expert report; is that correct?

11         A.     Yes.  Yes, it is.

12         Q.     And is this a true and accurate copy

13  of your current CV?

14         A.     Yes, it is.

15         Q.     Is all the information contained in

16  it accurate as of today?

17         A.     As far as I know, yes.

18         Q.     Did you prepare Attachment 1?

19         A.     Yes, I did.

20         Q.     It has a date of March 2021; is that

21  when you prepared it?

22         A.     I update it every time with those

23  dates, every time I make edits to the document.  So

24  that was the last time I had edited the document.

25  This document has been, I guess, edited since

Page 36

1   probably 1995 continuously.

2                As I have a new publication occur, I

3   add it to the document, or new paper that is

4   accepted for a meeting, I add it to the document.

5   So it is continuous -- it is a dynamic document in

6   that regard.

7        Q.    Does it contain all of your

8   employment history post pharmacy school?

9        A.    No, it doesn't.  It contains --

10       Q.    Okay.  Earlier I asked if it was true

11  and accurate.  I guess my question is do you know

12  offhand what is missing from your CV?

13       A.    So my current version of my CV

14  represents my academic work experience primarily.

15  Since I guess the majority of what is represented

16  in that document represents my graduate,

17  postgraduate and employment after obtaining my

18  pharmacy degree.

19       Q.    Okay.  You are currently a professor

20  in the Department of Pharmacotherapy in Skaggs

21  College of Pharmacy at the University of Utah,

22  correct?

23       A.    That is correct.

24       Q.    And am I butchering how you pronounce

25  that department name?

Page 37

```
 1              A.      Pharmacotherapy.  No, you are not.
 2              Q.      And pharmacotherapy refers to the
 3      medical treatment by means of drugs; is that right?
 4              A.      Generally speaking, that would be a
 5      good characterization.
 6              Q.      Would you characterize it
 7      differently?
 8              A.      Not necessarily, no.
 9              Q.      And you have held your position at
10      the University of Utah since October of 2019,
11      correct?
12              A.      That's correct.
13              Q.      And I am going to ask you a series of
14      questions.  Feel free to refer to your CV as
15      necessary, but if you can answer them off the top
16      of your head, feel free to do that too.
17              A.      Okay.
18              Q.      You began your career in academia in
19      1993; is that right?
20              A.      That is correct.
21              Q.      And that is almost thirty years ago,
22      right?
23              A.      That's correct, yeah.
24              Q.      So you have been employed in academia
25      for the last almost thirty years?
```

Page 38

1          A.     That is correct, yeah.

2          Q.     You started as a research associate

3    in 1993 at the School of Pharmacy at the University

4    of Washington, correct?

5          A.     That is correct.

6          Q.     And then you moved to an assistant

7    professor of pharmacy at the University of Colorado

8    Health Center -- excuse me, University of Colorado

9    Health Science Center in October of 1994, correct?

10         A.     That is correct.

11         Q.     And can you please explain what the

12   difference is between an assistant professor and a

13   professor?

14         A.     Well, there's three levels of rank in

15   the academic world:  There's assistant, associate

16   and full professor.  So assistant professor

17   generally means without tenure, there's no

18   guarantee of a position within the organization.

19   So -- and all new hires, generally speaking, coming

20   out of their graduate studies or post-doctoral

21   fellowship experiences are hired at the assistant

22   level.  So it is the lowest level.

23              The next level is associate level,

24   and that is an individual who has been employed for

25   usually a period of five to six years.  They

Page 39

1   undergo both an internal and external peer review

2   of their accomplishments and skills.  And assuming

3   satisfactory performance, and I will use the term

4   "satisfactory" fairly loosely here.  Actually

5   there's a fairly high level of performance expected

6   in order to move to the associate level.

7                   After, again, a period of time,

8   the -- an individual can submit to be granted

9   professor title.  So no stipulation.  And, again,

10  internal and external review of the candidate's

11  accomplishments is conducted, and pending

12  successful review of that, the person is promoted

13  to what is considered a full professor, which,

14  therefore, we drop the title "assistant" or

15  "associate."

16      Q.    As used in your CV, when you are

17  listed as an associate professor, is that a tenured

18  track position, or is that a tenured position, not

19  tenured track?  Let me rephrase the question.

20                  Is the associate professor title in

21  your CV represented as a tenured position?

22      A.    It does.

23      Q.    And what is the typical length of a

24  tenure track position?

25      A.    As in the length to obtain a tenured

Page 40

1  position?

2         Q.     Yes, what is the typical length?

3         A.     Again, it is five or six years.  It

4  could be seven, depending upon the institution.

5         Q.     Okay.  So you started off as

6  assistant professor of pharmacy, and was that a

7  tenured track position then?

8         A.     It was a tenured -- I'm sorry.  The

9  initial position I accepted at the University of

10 Colorado was not tenured track, but I switched to

11 tenured track after two years.

12        Q.     Okay.

13        A.     So not -- not all assistant professor

14 positions are tenure tracked.

15        Q.     Okay.  And so you were an assistant

16 professor at the University of Colorado for about

17 six years, correct?

18        A.     Five years, yes.  From '94 to '99,

19 yeah.  Yeah.

20        Q.     Okay.  And then you moved to become

21 an assistant professor at the University of

22 Arizona, correct?

23        A.     That is correct.

24        Q.     And was that a tenured track

25 position?

Page 41

1              A.      It was.

2              Q.      And you did not obtain tenure at the

3   University of Colorado, correct?

4              A.      I did not apply for tenure, no.

5              Q.      You were an assistant professor at

6   the University of Arizona for almost two years; is

7   that right?

8              A.      I believe so, yes.

9              Q.      And then in July of 2001, you were

10  promoted to associate professor; is that right?

11             A.      It has been a long time.  So I have

12  to even look myself to see when I was promoted.

13                     (Pause.)

14             A.      Yes, that is correct.

15             Q.      (BY MS. FUMERTON:)  And did you get

16  tenure at that time in July of 2001?

17             A.      No, I did not.  It was a delayed

18  tenure clock.  I was promoted without tenure, and I

19  received tenure two years later.

20             Q.      Why was it a delayed tenure clock?

21             A.      Be -- so when you change

22  institutions, organizations, they don't want to

23  tenure somebody they don't know, generally

24  speaking.  So technically my clock as assistant

25  professor started over when I changed institutions.

Page 42

1   So I --

2           Q.      Why did you change -- I'm sorry.  Go

3   ahead.

4           A.      So when I joined the University of

5   Arizona, my tenure clock started at zero, and I was

6   given six years to demonstrate my skills and my

7   abilities to become tenured.  So after two years, I

8   went up for promotion, and two years later I was

9   promoted -- or I was granted tenure.

10          Q.      So were you granted tenure in 2003?

11          A.      I believe that is correct.

12          Q.      Why did you move from the University

13  of Colorado to the University of Arizona?

14          A.      Two primary reasons.  The research

15  group at the University of Arizona was recognized

16  as one of the top research groups in the nation.

17  And the second reason is the colleagues that I had

18  at University of Arizona were individuals that I

19  had known and I wanted to work with the specific

20  individuals.

21          Q.      Which individuals are those?

22          A.      The two faculty members were Brenda

23  Motheral and Emily Cox.

24          Q.      Were you told at the University of

25  Colorado that you would not make tenure?

```
                                                   Page 43

 1              A.      No.   In fact, my third-year review

 2      suggested that I was in the process of -- or at

 3      least I had a very positive three-year review for

 4      tenure.

 5              Q.      So I think, if my notes are correct,

 6      your best recollection is that you obtained tenure

 7      in July of 2003, approximately --

 8              A.      Uh-huh.

 9              Q.      -- at the University of Arizona.  And

10      then were you promoted in July 2006 to become a

11      full professor at that time?

12              A.      Yes, I was, uh-huh.

13              Q.      And you were also an associate

14      professor at the College of Public Health, correct?

15              A.      Yes.  That was an affiliated title,

16      yes.

17              Q.      And so what does an affiliated title

18      mean?  Was that a dual appointment, or how does

19      that work?

20              A.      It was a nonfunded position.  So they

21      didn't support my salary, and it allowed me to

22      support their mission and goals within the College

23      of Public Health.

24              Q.      Okay.  And then your next job is back

25      where you are now, which is the University of Utah
```

1    in October of 2019, correct?

2          A.    Correct.  I was at the University of

3    Arizona for twenty years and then moved, yes.

4          Q.    And why did you move to the

5    University of Utah in October of 2019?

6          A.    Again, it had to do with the

7    availability of colleagues that were doing the type

8    of research that I was interested in doing.

9          Q.    And who are those colleagues that

10   were doing the work that you were interested in

11   doing?

12         A.    With the Department of Biomedical

13   Informatics at the University of Utah, Ken Kawamoto

14   and Guilherme Del Fiol are the two principals.  In

15   addition, there's a post-doctoral fellow that they

16   had hired named Thomas Reese that had been involved

17   in some of my earlier research remotely.  So I had

18   hoped to work with him with my move to Utah.

19         Q.    And what was the work that you were

20   interested in doing?

21         A.    It is continuation of my primary

22   research, is preventing drug-drug interactions.

23         Q.    I will have some questions about that

24   later on but wanted to round out your background.

25               So I want to switch gears a little

Page 45

1    bit to just your education.  You obtained a BS in

2    pharmacy in 1987 from the University of Colorado,

3    correct?

4              A.     That is correct, yes.

5              Q.     And is that a four-year program, a

6    six-year program?  How does that work?

7              A.     It was a five-year program.  And

8    the -- the general education of pharmacists at that

9    period of time was a minimum of two years prior to

10   admittance to the program and three years in the

11   program.  Because I had changed degree paths, it

12   took me six years from my initial entry into

13   college to finishing that program.

14             Q.     What was your initial degree path?

15             A.     Undecided.  So I explored various

16   degree paths, including geology, journalism, radio,

17   television, film.

18             Q.     So you were at the University of

19   Colorado in an undergraduate capacity for six

20   years; is that right?

21             A.     No, it is not.  I spent two years --

22   at that time, it was called Mesa State, which is a

23   four-year degree-granting institution in Grand

24   Junction, Colorado.  I did two years there, and

25   then four years at the University of Colorado.

Page 46

1        Q.     Did you go directly from Mesa State
2   to the University of Colorado?
3        A.     I did.  In 1983.
4        Q.     In 1983.  Did you go directly to Mesa
5   State out of high school?
6        A.     Yes, I did.
7        Q.     Where did you attend high school?  We
8   won't go back to elementary school.
9        A.     That is good because I moved a lot
10  when I was a kid.  I went to high school in Grand
11  Junction, Colorado at Grand Junction Central.
12       Q.     But in all seriousness, I actually
13  was going to ask that question as sort of where you
14  grew up, what area of the country?
15       A.     I grew up in Colorado.  My father
16  worked for the Department of Agriculture, so we
17  moved about every two years.
18       Q.     But within Colorado?
19       A.     All within Colorado, yes.
20       Q.     In 1990 you obtained an MS in Health
21  Outcomes at the University of Texas at Austin,
22  correct?
23       A.     That is right.
24       Q.     So did you go directly from the
25  University of Colorado to the University of Texas?

Page 47

1          A.     No, I did not.

2          Q.     Okay.

3          A.     I worked -- I'm sorry.  I worked as a

4    pharmacist in a hospital in Pueblo, Colorado.  I

5    also did relief work as a pharmacist at various

6    pharmacies in Southern Colorado.

7          Q.     I want to talk more about your

8    experience as a practicing pharmacist too.  But

9    just so my notes are clear, so in 1987 you did --

10   between 1987 and 1990 you worked as a pharmacist in

11   various capacities; is that right?

12         A.     From 1987 to 1993 I worked as a

13   pharmacist in various capacities.

14         Q.     So you worked as a pharmacist while

15   you were pursuing your master's?

16         A.     And Ph.D. as well, yes.

17         Q.     Okay.

18         A.     Just on a part-time basis.

19         Q.     Going back to your MS in Health

20   Outcomes at the University of Texas, what is Health

21   Outcomes?

22         A.     It is a general area of research

23   having to do with the intersection of health

24   interventions and the associated results of those

25   interventions in terms of everything from economic,

1    reducing healthcare costs or increasing healthcare

2    costs all the way through patient-reported

3    outcomes:  Satisfaction, quality of life, symptoms

4    of disease, resolution of symptoms of disease.  So

5    it is a very broad term.  Encompasses a lot of

6    discipline -- applied disciplines.

7            Q.      Would you agree that the focus on

8    health outcomes is improving the health of society?

9            A.      I would agree with that statement,

10   yes, generally.

11           Q.      Do you agree that managing pain is

12   one of those goals?

13           A.      Yes.

14           Q.      Did you write a master's thesis to

15   obtain your MS?

16           A.      I sure -- yes, I did.

17           Q.      What was the topic of that master's

18   thesis?

19           A.      It was to look at a program where we

20   instituted additional services within community

21   pharmacies to improve patient satisfaction.  And, I

22   guess, my thesis focused on the patient

23   satisfaction, but there are other components of

24   that program that examined other attributes, such

25   as pharmacy performance, you know.

1          Q.     Was your master's thesis focus at all

2     on opioids?

3          A.     No, it was not specifically to

4     opioids.

5          Q.     And in 1993, you obtained your Ph.D.

6     in Health Outcomes, correct?

7          A.     Yes, I did.

8          Q.     And what was the topic of your

9     dissertation?

10         A.      It was associated with

11    medication-associated adverse events, and

12    litigation around those adverse events, and the

13    effect of that litigation on pharmaceutical

14    manufacturers.

15         Q.     Did that involve opioids?

16         A.      I don't recall that opioids were a

17    part of any of the attributes that I looked at at

18    that particular time.

19         Q.     And then from 1993 to 1994, I believe

20    your CV lists you as a post-doctoral fellow at the

21    University of Washington?

22         A.     Uh-huh.

23         Q.     Is that right?

24         A.     That is correct.

25         Q.     And did that overlap with your

Page 50

1   position as a research assistant at the University

2   of Washington?

3          A.     Yeah, they are dual appointments,

4   yes.

5          Q.     And what was your area of research at

6   that time?

7          A.     Varied.  I worked with -- again,

8   along the similar lines of health outcomes, but we

9   were looking at the effect of medications on

10  patients' symptoms and -- in a general context and

11  also the economics associated with using those

12  medications in those particular disease states.

13                 So it included clinical trial

14  research.  It included developing patient-reported

15  outcomes, tools and measures to capture patient

16  satisfaction and medication adherence.

17         Q.     You mentioned that you were studying

18  the effect of medications.  Were any of those

19  medications opioids?

20         A.     No.

21         Q.     And I see that you have an -- acronym

22  is probably the wrong word, but a title after your

23  last name which is FACMP.  What does that stand

24  for?

25         A.     I am a Fellow of the Academy of

```
                                                     Page 51
 1   Managed Care Pharmacy.  So Managed --
 2           Q.      And what does that --
 3           A.      The Academy of Managed Care Pharmacy
 4   is an organization that represents pharmacists that
 5   work in managed care.  So these are generally
 6   represented by pharmacy benefit managers, health
 7   insurance organizations, other organizations that
 8   examine medication use at a population level or
 9   provide drug benefits at a population level.  So I
10   am a fellow of that academy.
11           Q.      And when did you become a fellow of
12   that academy?
13           A.      That is -- off the top of my head, I
14   think it was 2014-2015, if I remember correctly.
15   It has been a while.
16           Q.      Your CV is very long.  Is it listed
17   in your CV?  I might have missed it, in full
18   disclosure.
19           A.      It may be at the back.  Hang on one
20   second.  2013.  It is listed on Page 49 at the
21   bottom of the page.
22           Q.      And how does one become a fellow
23   of --
24           A.      Oh, there is --
25                   THE REPORTER:  I couldn't hear you.
```

Page 52

1   You overlapped.

2          Q.    (BY MS. FUMERTON:)  Sure, I will just

3   repeat my question.

4                How does one become a fellow of the

5   Academy of Managed Care Pharmacy?

6          A.    There's a set of criteria that one

7   needs to fulfill and apply to become a fellow.  It

8   includes attributes of involvement in the

9   organization, research or activities associated

10  with, I guess, the mission objectives that the

11  organization -- that align with the mission of the

12  objectives of the organization.

13               My primary reason for being selected

14  as a fellow was my research related to the practice

15  of pharmacy.

16         Q.    And who selects you?  So what is the

17  nomination process?

18         A.    It is done by a committee within the

19  organization, within the academy.  So there's a --

20  I guess I would best describe it as a peer,

21  individuals who evaluate a person's application.

22         Q.    And you mentioned application.  So do

23  you apply to become a fellow?

24         A.    You have to apply to become a fellow,

25  yes.

1          Q.      And what does that application

2     entail?

3          A.      Providing documentation of your

4     activities, as mentioned previously, so, you know,

5     what committees I have served on with the

6     organization, what contributions I have made to the

7     organization, publications, presentations,

8     experience in the -- associated with the field that

9     the organization represents.

10         Q.      Do you hold any other professional

11    certifications, titles or licenses?

12         A.      At one point in time, I was an

13    emergency medical technician, so EMT.  But beyond

14    that, I cannot recall any.

15         Q.      When were you an EMT?

16         A.      1986 to 1989.

17         Q.      Have you ever faced any disciplinary

18    actions in your field?

19         A.      From -- could you qualify

20    disciplinary?

21         Q.      Say it in the broadest sense, meaning

22    disciplinary from sort of a reprimand, a warning,

23    an investigation into conduct.

24         A.      Okay.

25         Q.      How --

Page 54

```
 1          A.      I indirectly dispensed a medication
 2    one time, so my immediate supervisor told me about
 3    that.
 4          Q.      When was that?
 5          A.      It was probably 1990.
 6          Q.      What was the medication?
 7          A.      I don't recall.
 8          Q.      Who was your employer?
 9          A.      Walgreens.
10          Q.      Do you recall how you incorrectly
11    dispensed it?
12          A.      It was the -- just the wrong -- a
13    similar name on the shelf, so the wrong bottle was
14    selected.
15          Q.      Was there an adverse event --
16          A.      No, the patient never took -- no, the
17    patient never took the medication.
18          Q.      Anything -- any other disciplinary
19    actions that you have ever faced --
20          A.      No.
21          Q.      -- either as a pharmacist or in
22    academia?
23          A.      No.
24          Q.      Have you ever had any license
25    revoked?
```

Page 55

1          A.     No.

2          Q.     Have you ever been convicted of a

3    crime other than a misdemeanor traffic violation?

4          A.     No.

5          Q.     I am going to switch subjects a

6    little bit to your experience as a pharmacist, and

7    we have been going for a little bit over an hour,

8    so why don't we take just a ten-minute break and

9    get back started, if that works?

10         A.     That is fine.  Thank you.

11                THE VIDEOGRAPHER:  Okay.  We are off

12   the record at 11:07.

13                (Whereupon, a break was had from

14                11:07 a.m. until 11:37 a.m. EDT)

15                THE VIDEOGRAPHER:  We are back on the

16   record at 11:37.

17                MS. FUMERTON:  I was just saying,

18   just for the record, Mr. Weinberger had some

19   internet issues, we took a little bit of a longer

20   break, but I think we are all set now hopefully and

21   moving forward, so we will continue.

22         Q.     (BY MS. FUMERTON:)  Dr. Malone, I

23   want to talk a little bit about your experience as

24   a pharmacist now.  Are you a licensed pharmacist?

25         A.     At the moment, no, I am not.  And

Page 56

1    pardon the interruption on your line of

2    questioning.  I want to clarify one of my previous

3    statements from earlier.

4                 You asked me about which documents I

5    looked at.  There were two documents that are not

6    in my report that I have looked at since my report

7    was written.  One of them is a document that was

8    generated by Carmen Catizone in response to this

9    particular litigation, I believe.  And the second

10   is a document produced by the State Board of

11   Pharmacy for Ohio, from the State of Ohio,

12   regarding a survey that was conducted, I believe

13   last year, about pharmacists' work experiences.

14                 So I have received both those

15   documents.

16              Q.     Okay.

17              A.     My apologies for failing to mention

18   them.  They are not in my report and didn't pertain

19   to the basis of my report, but I just wanted to

20   clarify that for the record.

21              Q.     Okay.  And so you did not rely on

22   those for purposes of your report, correct?

23              A.     No, I did not, no.

24              Q.     Okay.  So I think I was asking you,

25   you were a licensed pharmacist, and I think you

Page 57

1   said you are not currently?

2          A.      That's correct.

3          Q.      And so, according to your report, it

4   states that you had a pharmacist's license that was

5   active in Colorado until 2019.  Is that an accurate

6   statement?

7          A.      That is correct.

8          Q.      And so when did you first obtain that

9   license in Colorado?

10         A.      In, I believe, July of 1987.

11         Q.      So from July 1987 until -- do you

12  know what month in 2019?

13         A.      I believe it was October.

14         Q.      Until October of 2019, you were a

15  licensed pharmacist in Colorado, correct?

16         A.      I am sorry.  No, until 2018, I was a

17  licensed pharmacist.  And my apologies, that

18  that -- and -- let me back up here.

19                 I relinquished --

20         Q.      Are you referencing something that

21  would be helpful for us to look at too?

22         A.      I am looking at my CV, and my CV has

23  it wrong too.  So on Page 51 of my CV, pharmacy

24  licensure, there -- because I don't practice, have

25  not practiced pharmacy for quite some time.  I

```
 1   guess I forgot to update this.

 2                   I was licensed in the state of

 3   Colorado up through 2018 and licensed in the state

 4   of Texas to practice pharmacy up through 2019.  It

 5   currently says present, so please correct that

 6   error.

 7           Q.    Okay.  So let's just make sure that

 8   the record is clear.  So you were a licensed

 9   pharmacist in Colorado from 1987 to 2018.  Is that

10   correct?

11           A.    That's correct.  That's correct.

12           Q.    And is that -- and is that your

13   correct pharmacist license number listed in your

14   CV?

15           A.    That was the license number I was

16   issued, yes.

17           Q.    And were you licensed continuously

18   from 1987 to 2018?

19           A.    Yes, I was.

20           Q.    Okay.  And then with respect to

21   Texas, you obtain that pharmacy license in 1988; is

22   that correct?

23           A.    That is correct.

24           Q.    And that -- you held that license

25   until 2019?  Is that correct?
```

Page 59

1           A.      Yes.  November 30th, 2019.

2           Q.      And where are you getting the

3     November 30th date from?

4           A.      That is the date that my license

5     expired because I didn't renew it.

6           Q.      Oh, you just knew that?  I didn't

7     know if you were looking at something.  You just

8     remember that --

9           A.      No.  No.  I just know that off the

10    top of my head.  Sorry, Nicole -- or Laura, I'm

11    sorry.

12                  Yes, I knew that off the top of my

13    head because it was recent.

14          Q.      Okay.  So turning to Exhibit 1, which

15    is your report, Page 1 in the first paragraph --

16                  MS. FUMERTON:  I don't know, Kristin,

17    if we can pull it up.

18          Q.      (BY MS. FUMERTON:)  But you say, if

19    you are following along, Dr. Malone, in the first

20    paragraph on Page 1, the last sentence says, "Since

21    1983 I have pursued an academic career but kept my

22    licenses active until 2019 (Colorado) and 2020

23    (Texas)."  That statement is incorrect, right?

24          A.      Thank you for pointing that out.

25    Actually, that statement is correct; what I just

Page 60

1   said was wrong.  I apologize, the years kind of run

2   together here.

3                 No, I let the Colorado license lapse

4   in '19 -- I let the Texas license, again, because I

5   knew that November 20th or 30th date -- just last

6   fall.  So I'm sorry, yeah.  So we are in 2021.  So

7   that statement is correct.  My CV is the one that

8   is incorrect.  So my apologies on that.

9           Q.    Okay.  But let's be clear.  I think

10  you had just testified, so with respect to the

11  state of Texas, your current testimony is now that

12  your pharmacy license was active from 1988 to

13  November 30th, 2020; is that correct?

14          A.    That's correct, yes.  My apologies

15  for the misstatement.

16          Q.    And earlier you testified that you

17  let your license -- your license expired for

18  Colorado in 2018.  Are you saying now that that is

19  2019?

20          A.    That's correct, yes.

21          Q.    So your CV is incorrect as far as

22  your licensure status?

23          A.    Yes.

24                MR. WEINBERGER:  Objection, form.

25          Q.    (BY MS. FUMERTON:)  But your report

Page 61

1    is accurate?

2              A.      That is correct, yes.

3              Q.      You mentioned it has been a long time

4    since you have practiced as a pharmacist.  In fact,

5    you have not practiced as a pharmacist in almost

6    thirty years, correct?

7              A.      Almost twenty-eight years since I

8    have worked as a pharmacist, correct.

9              Q.      And the last time that you practiced

10   in pharmacy was in 1983, correct?

11             A.      Correct.

12             Q.      And for your entire career, you have

13   practiced as a pharmacist for less than six years

14   in total; is that right?

15             A.      That's correct.

16             Q.      And you first started practicing as a

17   pharmacist in 1987; is that correct?

18             A.      That is.

19             Q.      And you earlier testified that when

20   you went into the master's program in 1990, you

21   started practicing part-time, correct?

22             A.      Yes.

23             Q.      From 1987 to 1990 when you entered

24   that program, did you work as a pharmacist

25   full-time?

Page 62

1          A.      From 1987 to 1988, I worked as a

2     pharmacist full-time.

3          Q.      And what does "full-time" mean?

4          A.      Forty hours a week or more.

5          Q.      And then what happened in 1988?

6          A.      I started graduate school at the

7     University of Texas.

8          Q.      I have my dates -- I apologize --

9     slightly off.  So in 1988 you began graduate

10    school, and you started working part-time as a

11    pharmacist then; is that right?

12         A.      I started working as a pharmacist

13    part-time in the fall of 1988.

14         Q.      And you continued to work part-time

15    as a pharmacist from fall of 1988 until 1993; is

16    that right?

17         A.      That is correct.  That is correct.

18         Q.      And when you say part -- when you say

19    part-time, how many hours per week, approximately,

20    were you working as a pharmacist during those

21    years?

22         A.      Approximately twenty.

23         Q.      For that entire time period, from

24    1988 -- from fall of 1990 -- let me start over.

25                 When you say that it was

Page 63

1    approximately twenty hours per week, was that for

2    the entire time period from the fall of 1988 until

3    1993?

4            A.      I believe so.

5            Q.      Did it vary at all?

6            A.      Of course.

7            Q.      What about through the summer months,

8    did you work more than, less than, or were you

9    always just working the maximum of about twenty

10   hours per week?

11           A.      The amount of work that I did

12   depended upon the pharmacy operations that I was

13   working for and their needs.  And if somebody would

14   call in sick, I would go in and fill in a shift.

15               In addition to my normal duties, I

16   would also work at semester breaks occasionally,

17   like over the holidays, provide extra relief during

18   those times.

19           Q.      And so if you -- I'm sorry.  I didn't

20   mean to interrupt you.  Go ahead.

21           A.      I was going to say, so the amount of

22   work would vary depending on the demands, and

23   usually I supported more than one organization as a

24   pharmacist.

25           Q.      Okay.  What would the range be, if

Page 64

1   you were to give one, as far as the least amount

2   you would work during a week to sort of the most

3   you would work during a week?

4         A.    From zero to probably fifty hours.

5         Q.    So let's talk about when you were a

6   full-time pharmacist from 1987 to 19 -- until the

7   fall of 1988.  So did you work, just to put a

8   little finer point on it, from the fall of 1987 to

9   the fall of 1988, basically one year, as a

10  full-time pharmacist?

11        A.    I started in -- my position in June

12  of 1987 and worked through August of 1988 at a

13  hospital in Colorado.

14              I also at times supported other

15  retail pharmacy operations in the Southern Colorado

16  area during that time frame.

17        Q.    What other retail pharmacy operations

18  in Southern Colorado did you support during that

19  time frame?

20        A.    Independent pharmacy that was located

21  in Pueblo and also Walmart located in Canyon City

22  and Salida, Colorado.

23        Q.    Okay.  So still focusing on the time

24  period between June 1987 to August 1988, you worked

25  as a pharmacist at a hospital in Colorado.  What

Page 65

1    was the name of that hospital?

2           A.     St. Mary-Corwin.

3           Q.     And were you working full-time at St.

4    Mary-Corwin?

5           A.     Yes.

6           Q.     You also mentioned during that time

7    frame you worked for an independent pharmacy.  What

8    was the name of that independent pharmacy?

9           A.     I don't recall.

10          Q.     Tab 1 -- I'm sorry, Exhibit 2 which

11   is your CV, at 51 lists a number of pharmacies.

12   Would that refresh your recollection as to what

13   pharmacy that was?

14          A.     That pharmacy is not on that list.

15   The primary ones -- the primary pharmacies I worked

16   at are shown on Page 51.

17          Q.     Okay.  So --

18          A.     When I say primary, ones that I

19   worked more than just, you know, probably eighty to

20   a hundred hours at.

21                 Well, let me clarify that.  Yeah,

22   that statement is probably accurate.  Well, that is

23   not quite true.  There was another hospital that I

24   worked at over that time frame that I probably

25   worked more than eighty hours at, so --

Page 66

1        Q.      Okay.

2        A.      So this is not a complete listing of

3   every pharmacy I worked at.

4        Q.      This is a list of the main pharmacies

5   that you worked at, correct?

6        A.      Uh-huh.

7        Q.      Would you say that you were a relief

8   pharmacist at any of the other ones that are not

9   listed here?

10        A.      Yes.

11        Q.      You worked at those part-time if they

12   weren't listed here?

13        A.      Correct.

14        Q.      And you specifically mentioned

15   Walmart.  You worked at Walmart as a relief

16   pharmacist for less than two months, correct?

17        A.      Hard to quantify in terms of time,

18   just from the standpoint that I filled in at the

19   store in Canyon City over the course of several

20   months in the summer of 19 -- I believe

21   spring/summer of 1988.  And then I guess there was

22   a discrepancy that basically -- they needed relief

23   help in winter of 19 -- I guess it was winter of

24   1988 as well.

25                So -- but, you know, probably less

Page 67

1   than twenty total shifts at Walmart over that time

2   frame.

3          Q.     Less than twenty shifts, is it fair

4   to say were fewer than two or three months?

5                 THE REPORTER:  Were fewer than --

6          Q.     (BY MS. FUMERTON:)  -- two to three

7   months?

8          A.     No.  Because it encompassed all the

9   way to the end of the year, 1988.

10         Q.     Okay.

11         A.     I worked between Christmas and New

12  Year's at the Walmart in Salida, Colorado.

13         Q.     How long was a typical shift?

14         A.     Well, the pharmacy would typically

15  open at 9:00 in the morning and go to 6:00 in the

16  evening at those times, so -- and there was no

17  lunch break or any relief.  You know, so that was

18  continuous.

19         Q.     So you have not worked at a Walmart

20  pharmacy since the winter of 1988, correct?

21         A.     That's correct.

22         Q.     Do you know what ConnexUs is?

23         A.     I believe it is a software program,

24  but I am not sure.

25         Q.     Okay.

1    A.    I believe that is Walmart's software

2   program.

3    Q.    You have never used ConnexUs,

4   correct?

5    A.    That's correct.  When I worked for

6   Walmart -- when I first started working with

7   Walmart, we used a typewriter.

8    Q.    Okay.  So you mentioned that on Page

9   51 of Exhibit 2, which is your CV, these were the

10  main pharmacies that you practiced at.  Do you

11  recall the names of any other pharmacies that you

12  have practiced with?

13   A.    The names, no.  There were a couple

14  of independent pharmacies in Austin, Texas that

15  asked me to come in and do relief work on occasion

16  because pharmacists were either sick or needed

17  relief for various other reasons.  Those were

18  usually limited in duration to a single shift or a

19  couple of shifts, cover a weekend.

20   Q.    With respect to Walgreens --

21   A.    Specific names of those -- I'm sorry.

22  The specific names of those pharmacies --

23   Q.    It is my fault.

24   A.    The specific names of those

25  pharmacies, I don't recall.  It has been a long

Page 69

1    time.

2            Q.      With respect to Walgreens, your CV

3    lists your working there from 1988 to 1989.  Do you

4    recall the specific months where you began and

5    left?

6            A.      I believe it was August of 1988, and

7    I don't recall the month in 1989.  I think they

8    continued to use me occasionally after 1989 to

9    support them, but I wasn't on -- I think, as I

10   said, I don't recall being on their schedule on a

11   regular basis.

12           Q.      You worked for them for approximately

13   a year on a part-time basis, correct?

14           A.      Approximately, yes.

15           Q.      You have never worked on site at a

16   Rite Aid pharmacy, correct?

17           A.      That's correct.

18           Q.      And you have never worked for a CVS

19   pharmacy, correct?

20           A.      That's correct.

21           Q.      You also have never worked for a

22   Giant Eagle pharmacy, correct?

23           A.      Yes.

24           Q.      And with respect to Rite Aid, CVS and

25   Giant Eagle, you have never worked for any of those

Page 70

1    entities in any other capacity, correct?

2            A.      Correct.

3            Q.      And with respect to Walmart, other

4    than a few months, less than twenty shifts, back in

5    the late '80s, you have never worked for Walmart in

6    any other capacity, correct?

7            A.      That's correct.

8            Q.      And other than what you described as

9    your work for Walgreens, you have never worked for

10   them in any other capacity, correct?

11           A.      That's correct.

12           Q.      You have never worked in the home

13   office of any pharmacy company, correct?

14           A.      That's correct.

15           Q.      And you have never worked in a data

16   governance function of any pharmacy company,

17   correct?

18           A.      Correct.

19           Q.      You were not relying on your

20   experience at Walmart in forming any of your

21   opinions in this case, correct?

22           A.      That is correct.

23           Q.      And you are similarly not relying

24   on --

25           A.      I'm sorry.  Let me restate that.

Page 71

1           Except for at the time I worked for
2   Walgreens, and I think it is still true today, they
3   used a centralized computer system for processing
4   prescriptions and have continued to use a
5   centralized computer system for processing
6   prescriptions.
7           So that knowledge, I don't think --
8   which I gained in 1988, I think still remains
9   relevant to my opinions.
10          Q.    So let me make sure the record is
11  clear.  When we did this the first time, this
12  happened that Walmart and Walgreens got confused.
13  So my question was originally that you were not
14  relying on any of your experience at Walmart in
15  forming any of your opinions in this case, correct;
16  and you said that's correct.  You are not changing
17  that testimony, correct?
18          A.    You are stating that correctly, yes.
19  I am stating -- I was trying to clarify my
20  experience at Walgreens and the fact that
21  Walgreens, in -- when I worked for that
22  organization, began working for that organization,
23  and up through the materials that I reviewed for
24  this case, it appears that they have maintained a
25  central pharmacy server to maintain pharmacy

Page 72

1   records or computer system to maintain pharmacy

2   records.  And I relied on that information as part

3   of the bases for my opinions.

4           Q.    Right.  But your only experience with

5   Walgreens, to be clear, is back in the late 1980s

6   and the materials then you reviewed that are listed

7   in your report, correct?

8           A.    So if you define "experience" as

9   employment, you are correct.  I have interacted

10  with Walgreens from a research standpoint since

11  that time, and we have published papers together.

12          Q.    I am going to get into that a little

13  bit later, too, but what specifically are you

14  thinking of, in what area of research?

15          A.    We -- I worked with, at the time,

16  Carl Bertram with Walgreens and their database to

17  look at dispensing associated with medications for

18  individuals.  I believe it was -- the purpose of

19  that particular study examined issues in gender

20  utilization of medications.

21          Q.    You said at that time -- (audio

22  distortion).

23          A.    Quite frankly --

24              MR. WEINBERGER:  Tara -- Tara, you

25  have a tendency to not let him -- I mean it is not

Page 73

1    frequent, but let him finish his answer, please,

2    before you get into your question.  Thanks.

3              MS. FUMERTON:  Sure.  I apologize if

4    I am interrupting you.  It is not my intent.

5              A.    So I am trying to find the particular

6    article that we published.  It was back in the

7    2000s decade, if I remember correctly.  And I don't

8    know if it actually went to a publication or if it

9    was just a podium -- or a meeting presentation.

10             Oh, here it is.  Yeah, so this was

11   Page 12 of Exhibit 2, top of Page 12.  First author

12   is Anthony.  Second author is Lee.  Third author is

13   Bertram.  We published a paper using data from

14   Walgreens at that time frame.

15             Q.    (BY MS. FUMERTON:)  Did that data

16   involve opioids at all?

17             A.    It probably did involve opioids, but

18   I don't recall.  It wasn't focused on opioids,

19   so --

20             Q.    So since leaving the pharmacy

21   practice in 1993, have you done any continuing

22   education to maintain your licenses?

23             A.    Definitely.

24             Q.    And describe generally what that

25   would entail.

1          A.      Each state board sets forth their

2     requirements for maintenance of that license, and

3     usually it is somewhere between twelve to fifteen

4     hours of continuing medication -- continuing

5     education each year.  So State Board of Texas,

6     basically, said you had to have, if I remember

7     correctly, thirty hours over a two-year period.

8     Colorado required, I believe, it was twelve hours

9     per year, so it had to be done within the year.

10               And then each state board over time

11    modified, to some extent, what exactly that

12    education had to focus on.  So I had usually many

13    more hours of continuing education than necessary

14    to recertify my license.

15          Q.      For both Texas and Colorado are there

16    two tiers of licensures; in other words, there's an

17    active if you are practicing versus an inactive

18    that you could maintain?

19          A.      I believe there is an inactive

20    status, and technically, I think that is my status

21    with both of those boards.

22          Q.      Okay.  But up until the dates we were

23    talking about before, 2019 and 2020, you were

24    active and still had to meet these yearly CLE

25    requirements; is that right?

1          A.      That is correct.

2          Q.      Do you recall taking any continuing

3     education that specifically dealt with a

4     pharmacist's corresponding responsibility?

5          A.      I don't.

6          Q.      Do you recall taking any continuing

7     education that specifically dealt with the

8     identification of red flags for opioid

9     prescriptions?

10         A.      I don't.

11         Q.      Do you recall any continuing

12    education that you took that was specific to

13    opioids in any manner?

14         A.      I don't.

15         Q.      Going back to your CV, if you want to

16    reference it, since I know we have identified a few

17    inaccuracies:  Does your CV accurately list all of

18    your professional memberships?  It is the second to

19    last page of Exhibit 2.

20         A.      That membership list changes over

21    time, has changed over time.  So -- so it doesn't

22    include every organization I have ever belonged to.

23              Let's see.  Again, these are pages I

24    visit infrequently, I guess, when I maintain this

25    document.  I am no longer an active member of the

1   American Pharmacists Association.

2          Q.     When did you stop becoming a member

3   of that association?

4          A.     I believe my membership expired in

5   probably December of 2019, but I would have to go

6   back and check my records to ascertain if that is

7   the correct date.

8          Q.     Do you recall when you became a

9   member of that association?

10         A.     1986.

11         Q.     Is there a reason that you did not

12  renew your licenses for Colorado and for Texas?

13         A.     I had no intention of practicing

14  pharmacy again as a pharmacist.  My running joke

15  was I was licensed in two states, dangerous in

16  fifty, so I chose not to -- I did not feel

17  comfortable going to practice as a pharmacist.

18  Even though my license was active and I could have,

19  it was not my intention to practice as a

20  pharmacist.

21         Q.     Are there any other association

22  memberships that are listed there that you know you

23  no longer belong to?

24         A.     No, the rest of them are still

25  current.

Page 77

1        Q.     And are there any other memberships

2    that you recall that are not listed there that you

3    were a member of at one point in time?

4        A.     Yes, I was a member of the American

5    Associations of Colleges -- I'm sorry.  American

6    College of Clinical Pharmacy, ACCP.  I was a member

7    of Academy Health.  I am a member -- I guess it is

8    not one that you renew, but I am a member of the

9    pharmacy leadership organization, Phi Lambda Sigma.

10   Those are the ones that come to the top of mind.

11             There might be other organizations I

12   was a member of temporarily over my career, but I

13   don't -- it seems like there was one organization

14   that was only around for a short period of time.

15   It didn't last very long, so obviously, I am not a

16   member of them anymore.

17        Q.     I am going to switch to your area of

18   research and your publications.  And I know there

19   are quite a few, and we are not going to walk

20   through all of them.

21             But I think it would be helpful if

22   you could have Exhibit 1, which is your report, in

23   front of you and then also have your CV, which is

24   Exhibit 2, handy as well.

25             In general, what would you say has

Page 78

1   been your primary research focus during your career

2   in academia?

3           A.      The safe use of medications.

4           Q.      Any medications in particular?

5           A.      No, not necessarily.

6           Q.      Has your research focused on the use

7   of all types of medications equally?

8           A.      Well, you need to qualify equally.

9   My focus is a function of the degree of harm that

10  might be associated with a particular medication.

11  And also my experience as a researcher is also

12  predicated by potential solutions to mitigate that

13  harm.

14                  So I haven't focused on all

15  medications equally.

16          Q.      Would you agree that over your career

17  your focus has not been on opioids in particular?

18          A.      I have contributed to papers that

19  have focused on opioids, but the vast majority of

20  my research has been focused on drug-drug

21  interactions.  So -- and which do include opioid

22  medications at times.

23                  And I am not sure if that answers

24  your question.  So --

25          Q.      Okay --

1          A.      Would you like to restate.

2          Q.      I will.  You said that the vast

3    majority of your research has been focused on

4    drug-drug interaction.  Would you agree that the

5    vast majority of your research has not been focused

6    on drug-drug interactions involving opioids?

7          A.      I'm smiling because there are some

8    drug interactions that do involve opioid

9    medications, yeah.  So it is difficult for me to

10   answer your question as phrased because

11   occasionally opioid medications are a component of

12   my research.

13                 Is that a fair statement?  Does that

14   answer your question?

15         Q.      Not -- not quite.  Let me try it

16   again.  I appreciate that you have occasionally

17   done research on opioid medications as part of

18   drug-drug interactions.  But I have read a lot of

19   your material, and the vast majority of it does not

20   seem to mention opioids at all; is that a fair

21   statement?

22                 MR. WEINBERGER:  Objection --

23   objection as to form, misleading.  Assumes facts

24   not in evidence.  You can answer.

25         A.      I'm sorry, Pete, you broke up there

Page 80

1    with that last statement.

2              MR. WEINBERGER:  Sure.  Assumes facts

3    not in evidence.

4         Q.   (BY MS. FUMERTON:)  I am asking what

5    your research is focused on, and you said the vast

6    majority of your research is focused on drug-drug

7    interaction, correct?

8         A.   That is correct.

9         Q.   And the vast majority of the

10   drug-drug interactions that you have researched do

11   not involve opioids, correct?

12             MR. WEINBERGER:  Objection to form.

13        A.   Again, it -- opioids -- so the number

14   of drug interactions that I have focused on is

15   somewhat limited, or limited to those that tend to

16   be associated with harm.

17             And, therefore, you know, of those,

18   you know, opioids constitutes one class of

19   medications that are involved in some of those drug

20   interactions.  So the statement "vast" is overly

21   broad.  You know, so I can't say -- I can't agree

22   with your statement because the number of drug

23   interactions that are clinically important or

24   relevant is fewer than most people imagine.  So we

25   are talking in the neighborhood of twenty-five or

1    thirty different medication combinations that are

2    relevant for my research, and of those twenty-five

3    to thirty, opioids constitutes three or four

4    different combinations.

5              Q.    (BY MS. FUMERTON:)  So the vast

6    majority of combinations that you research do not

7    involve opioids, correct?

8                   MR. WEINBERGER:  Objection.  Asked

9    and answered.  Go ahead.  You can answer.

10             A.    Opioids are included in my research.

11   My research is not focused specifically on opioids.

12             Q.    (BY MS. FUMERTON:)  And I am not

13   disputing that you have ever done some research on

14   opioids, but you have been in academia for thirty

15   years.  And what I am trying to get a sense of is

16   the extent to which your research has involved

17   opioids.

18                  And I think you mentioned that

19   there's twenty-five or thirty drug combinations

20   that are particularly relevant to your research,

21   and only three or four of them are opioids,

22   correct?

23             A.    Three or four drug pairs that we

24   focused on, on that, are opioids, that is correct.

25                  And, you know, maybe I could -- so

Page 82

1    the term "vast" is what is hanging me up.  When you

2    use that term, I guess I am assuming that you are

3    meaning almost all of my research.  And I have

4    exception with that characterization.

5            Q.    Would you say ninety percent of your

6    research does not involve opioids?

7            A.    As a function of my papers, you know,

8    I can't agree with a specific number, but it is --

9    but it is somewhere in that sense, you know.  So it

10   is not every -- you know, my research focus is not

11   opioids per se directly.

12              I --

13       Q.    A --

14       A.    If I could just qualify that

15   statement.

16              MR. WEINBERGER:  Go ahead.

17       Q.    (BY MS. FUMERTON:)  Sure.

18       A.    So I have been involved in research

19   that has looked at opioid use and abuse as a part

20   of a research team, and we have published those

21   papers over the past three years in various

22   journals.

23              So -- so that research, I guess,

24   falls under the notion of opioid-related research.

25       Q.    Okay.  If we look at your report on

Page 83

1  Page 1, I am looking at the second full paragraph,

2  you write, "My research career over the past

3  twenty-nine years has been focused on improving

4  medication and patient safety.  This work has

5  largely been supported by the Agency For Healthcare

6  Research and Quality (AHRQ)."  Is that correct?

7          A.     Yes, it is.

8          Q.     What percentage of that work that was

9  supported by AHRQ focused on opioids?

10         A.     Almost all of my work funded by AHRQ

11 is focused on drug interactions.  So back to my

12 previous statements.  Drug interactions have been a

13 component of that -- opioids have been a component

14 of the drug interactions I have studied.  None of

15 these grants are specific to opioid medication use

16 where I am listed as the principal investigator.

17 However --

18         Q.     And in fact, some of those -- go

19 ahead.

20         A.     Hang on a second.

21                If you do look at -- so I focused on

22 those grants where I was the principal investigator

23 on the particular research project because those

24 are the grants I am responsible for.

25                If you look on Page 29 of my CV, so I

Page 84

1    guess Exhibit 2, the top of Page 29, there's a

2    grant that was funded by the National Institute For

3    Drug Abuse where I am a co-investigator, along with

4    other investigators from the University of

5    Pittsburgh, University of Florida, University of

6    Utah and the University of Arizona.

7            Q.    Okay.  But you have received funding

8    from AHRQ that has been directed to specifically

9    researching other medications that are not opioids,

10   correct?

11           A.    That is correct.

12           Q.    And AHRQ does have resources -- let

13   me try again, see if I can get the word out.

14                 AHRQ has researchers that are focused

15   on opioids, correct?

16           A.    That is outside my area of expertise.

17   I don't know what they fund.

18           Q.    Okay.  But you are not one of the

19   researchers that AHRQ funds that focuses on

20   opioids, right?

21                 MR. WEINBERGER:  Objection to form.

22           Q.    (BY MS. FUMERTON:)  I will restate

23   the question.

24           A.    As stated previously, my research --

25   I can't answer that question because that is

Page 85

1   outside my area of expertise.

2           Q.      Okay.

3           A.      I can tell you what I have been

4   funded to do, but I can't tell you what they have

5   been funded to do.

6           Q.      Fair enough.  In your report, looking

7   back at that same paragraph for Exhibit 1, after

8   discussing AHRQ, you say you have "also received

9   funding from the Centers for Disease Control and

10  Prevention, various state agencies and also the

11  pharmaceutical industry."

12              Did I read that correctly?

13          A.      Uh-huh.

14          Q.      Is that an accurate statement?

15          A.      Yes, it is.

16          Q.      And does your CV, which is Exhibit 2,

17  disclose all instances in which you have received

18  funding from the pharmaceutical industry?

19          A.      As an academic and researcher, yes,

20  it does.

21          Q.      Have you ever received funding from

22  the pharmaceutical industry in the context outside

23  of your career as an academic and researcher?

24          A.      So I have served as a consultant to

25  the pharmaceutical industry, usually related to

Page 86

1    cost effectiveness and health outcomes research.

2    But those are not, you know, research projects.  It

3    is giving advice.

4            Q.    Okay.

5            A.    So those are not -- those are not

6    listed in my academic CV because those are not, in

7    my opinion, academic activities.

8            Q.    So I think at the beginning of the

9    deposition, I asked you if you had ever served as a

10   consultant, if you had ever consulted as an expert

11   before.

12           A.    Oh.

13           Q.    And you mentioned one particular

14   instance as a plaintiff.  So I just want to clarify

15   to make sure that I have gotten the full

16   understanding of your consulting work.

17           A.    Oh, my apologies.  I thought your

18   question was related to legal activities as an

19   expert.

20                 As an expert in general, no, that --

21   I have consulted through the pharmaceutical

22   industry, lots of different organizations over

23   time, professional organizations, National

24   Institutes of Health as an expert reviewer on

25   grants, various entities that -- the Food and Drug

1  Administration, I guess I do have that listed on my

2  CV as more of an academic activity, but I have been

3  paid for those activities.

4          I have been employed as a consultant

5  to review materials or to give advice to various

6  pharmaceutical companies over time and, I guess

7  broader context, you know, different healthcare

8  organizations.  So the list is extensive, let's put

9  it that way.

10          Q.    Okay.  Yeah, I appreciate that

11  clarification, so let me see if I can just narrow

12  it down a little bit.  You have listed in your CV a

13  number of instances in which you have consulted

14  with different stakeholders in the pharmaceutical

15  industry, correct?

16          A.    In my CV?  No, I don't -- I don't

17  list my consulting activities in my CV.

18          Q.    Okay.  So this is what I am just

19  trying to make sure that we are not talking past

20  each other and I am understanding what you are

21  saying.

22          So you do, though, in your CV, have

23  listed a number of various research and other -- I

24  don't want to put words in your mouth, but what

25  would you describe, I guess, what you have listed

Page 88

1   on your CV along these lines and what would you

2   describe as not listed on your CV so we can sort of

3   narrow down sort of what we are talking about?

4        A.     Funds for research.  So activities

5   that support research are listed in my CV.  And

6   that includes funds that I have received over the

7   years from various pharmaceutical organizations.

8              What is not listed in my CV are

9   consulting activities that generally do not fall

10  under the term of "research," so they are advising,

11  giving opinion, those activities are not listed in

12  my CV.

13       Q.     Okay.  You have had a long career.

14  So I am going to try to talk globally, and we can

15  get into specifics.

16             Approximately how many of these

17  consulting activities do you think you have had in

18  your career?

19       A.     Oh, it would be challenging to say

20  because they come and go so frequently.  Like, you

21  know, probably in the neighborhood of fifty or so.

22       Q.     And do you have a separate consulting

23  company that you do this activity through?

24       A.     Yes.

25       Q.     What is your consulting company?

Page 89

1          A.      Strategic Therapeutics.

2          Q.      And how long have you had that

3    company?

4          A.      I think since 2004.

5          Q.      Is that when you began consulting in

6    this capacity?

7          A.      No.  I probably started consulting in

8    19 -- probably 1989 -- I'm sorry, 1999 or 2000,

9    somewhere around in there.

10         Q.      Okay.  All right.  So staying with

11   your consulting activity, outside of your academic

12   research, have you consulted for pharmaceutical

13   manufacturers of opioids?

14         A.      I believe I attended one meeting in

15   2000 or 2001 -- well, let me clarify that.  Yeah,

16   it must have been -- it must have been in 2002,

17   June of 2002, I attended one meeting, and I believe

18   that the sponsor of that meeting was Purdue Pharma.

19         Q.      And what was the purpose of your

20   attending that meeting?

21         A.      They were -- it was an advisory

22   board, so there were probably fifteen different

23   advisors besides myself giving them advice on how

24   to conduct health outcomes research.

25         Q.      Were you paid for that?

```
 1          A.      Yes, I was.

 2          Q.      How much?

 3          A.      I don't recall.

 4          Q.      More than ten thousand dollars?

 5          A.      No.

 6          Q.      More than one thousand dollars?

 7          A.      Probably, but I don't recall.

 8          Q.      Do you recall the specific issue that

 9  you were advising them on?

10          A.      No, I do not.

11          Q.      Do you recall issuing any paper or

12  creating any work product as part of that?

13          A.      No, we did not -- or I did not.

14          Q.      Do you recall who else made up that

15  advisory board?

16          A.      I recall some of the other

17  participants, but I don't recall all.

18          Q.      What other participants do you

19  recall?

20          A.      Ray Townsend was one of the

21  participants.  Sean Sullivan was another

22  participant.  And those are two individuals that I

23  just know through my training and just being in the

24  field.  Those are the ones that I can definitely

25  identify off the top of my head.
```

Page 91

1          Q.      Okay.  Have you ever -- other than

2     that one meeting, have you ever consulted for a

3     pharmaceutical manufacturer of opioids?

4          A.      Oh, I would assume so, given that

5     manufacturers tend to make multiple products.  So

6     Johnson & Johnson -- I have consulted for Johnson &

7     Johnson.  I believe they do have opioid products.

8     My consulting activities have not focused on opioid

9     products per se.

10         Q.      Do you have an approximate sense of

11    how much money you have made from consulting for

12    pharmaceutical manufacturers?

13         A.      Collectively?

14         Q.      Yes.

15         A.      It has been a long time.  So it is in

16    the neighborhood of -- my guess is somewhere

17    between twenty-five thousand dollars a year to

18    forty thousand dollars a year on average over the,

19    you know, majority of my career.

20         Q.      And that is specific to

21    pharmaceutical manufacturers; is that right?

22         A.      Oh, no.  No.  That would include all

23    organizations, I guess.

24         Q.      Okay.

25         A.      So included in that might be, you

Page 92

1   know, serving -- helping out a health plan or a

2   nonpharmaceutical manufacturer.  So --

3          Q.    Is the majority of the work that you

4   do for consulting for pharmaceutical manufacturers?

5          A.    I think that is a fair statement,

6   yes.

7          Q.    Do you recall any other instances in

8   which your consulting involved opioids

9   specifically?

10          A.    No.

11          Q.    Have you ever consulted for a

12   pharmacy company?  And let me ask a better

13   question.  Have you ever consulted for a retail

14   chain pharmacy?

15          A.    None comes to mind at the moment, but

16   I guess I would have to go back through my records

17   to determine if that is accurate.

18          Q.    What about a --

19          A.    I can --

20          Q.    Go ahead.

21          A.    I have just done so many activities,

22   been asked to participate in various activities

23   over the course of my career.  I just can't recall

24   them all off the top of my head.

25          Q.    Do you recall whether you consulted

Page 93

1    for any independent pharmacies?

2           A.    I -- no, I have not, no.

3           Q.    What about drug distributors, have

4    you ever consulted for a drug distributor?

5           A.    Not to my recollection.  You are

6    talking drug wholesaler?

7           Q.    Yes.

8           A.    Is that what you mean by distributor?

9    Yeah, I don't recall -- well, okay.  So here is a

10   fine line.  Some of the -- I think

11   AmerisourceBergen owns a group called Ascendant.

12   Ascendant does consulting for the industry.  So I

13   have advised Ascendant.  So I guess indirectly

14   there's a relationship there.

15          Q.    Has your work or your consultation

16   with Ascendant involved opioids?

17          A.    I don't recall it involving opioids,

18   no.

19          Q.    Okay.  I am going to go back to where

20   I started on this before I got a little bit off

21   track, but I am glad we cleared that up.

22                Does your CV disclose all instances

23   of funding for research purposes that you have

24   received from the pharmaceutical industry?

25          A.    It discloses all research funding

Page 94

1    that has been given to a university entity.  So as

2    far as I know.  And the reason I am hedging this is

3    because when you say "research funding," I may have

4    served as a consultant on a project that was funded

5    to another university or group where I advised,

6    consulted with that research activity.

7            Q.    Okay.  Have you ever received funding

8    from Endo Pharmaceuticals, to your knowledge?

9                 MR. WEINBERGER:  From who?  I'm

10   sorry.  I didn't hear it.

11           Q.    (BY MS. FUMERTON:)  Endo

12   Pharmaceuticals.

13                MR. WEINBERGER:  Okay.

14           A.    I don't recall.  So the answer is --

15   I don't believe so.

16           Q.    (BY MS. FUMERTON:)  Are you familiar

17   with the phrase "HOPE field scientists"?

18           A.    If you mean health outcomes liaison

19   scientists or health outcomes and pharmacoeconomics

20   liaison, then, yes, I am familiar with that.

21           Q.    What about HOPE, standing for Health

22   Outcomes and Pharmacoeconomics?

23           A.    At the University of Arizona, there's

24   a center called Center For Health Outcomes and

25   Pharmacoeconomics Research.  So -- so HOPE could

Page 95

1   represent a number of different, I guess,

2   activities or organizations or individuals,

3   depending upon the context that that is used.

4            Q.     Can you pull out Tab 6 and 7 from

5   your book or from your box?

6            A.     Okay.

7                   MS. FUMERTON:  And I am going to mark

8   these collectively as -- what are we on, Exhibit 4?

9                   THE REPORTER:  Yes.

10                  MS. ZINMASTER:  That is what we are

11  on, yes, Tara.

12                  MR. WEINBERGER:  Tara, you said 6 and

13  7?

14                  MS. FUMERTON:  Yes.

15                  (Exhibit 4 was marked for

16                  identification.)

17           Q.     (BY MS. FUMERTON:)  Now, while you

18  are doing that, Dr. Malone, just for the record,

19  Exhibit 4 is an email and attachment with a Bates

20  number starting ENDO-OPIOID_MDL-06622037.

21           A.     I am sorry.  Could you please repeat?

22           Q.     Yeah.  I was just saying for the

23  record, so that the document can be identified,

24  what the Bates number is.  That is that little

25  imprint at the very bottom right-hand corner, so I

Page 96

1    wasn't asking you a question about it yet.  Please

2    take your time to look at the document.

3               I will represent that you are not on

4    this email at all, and so I don't anticipate

5    necessarily that you would have seen this document

6    before, but I want to ask some questions about

7    that.

8               So just back for the record, again,

9    this is Exhibit 4.  It is an email and attachment.

10   The attachment ends in 2038.  It is an Excel

11   spreadsheet.  And it is from Kent Summers to Kevin

12   O'Brien copying some folks, dated August 9th, 2012.

13               And Dr. Malone, please take the time

14   to review the document.  I am going to ask you

15   about a particular portion of this spreadsheet that

16   I think we can help -- just one line of it

17   actually.  But --

18               MR. WEINBERGER:  This is -- both of

19   these documents -- excuse me.  So you have

20   marked -- so these two documents combined are

21   Exhibit 4?

22               MS. FUMERTON:  Yes.  It is the email

23   and attachment.

24               MR. WEINBERGER:  So in my -- in my

25   envelope -- Ms. Fumerton --

1              MS. ZINMASTER:  Mr. Weinberger, what

2     is Tab 7 is an Excel spreadsheet.  And to the

3     extent we couldn't authenticate the printout of the

4     Excel spreadsheet, we included it on a thumb drive

5     in case we ended up with a disagreement there.  But

6     the document that is Tab 7 that we have marked as

7     part of Exhibit 4 is an Excel spreadsheet that

8     native is on that disk.

9              MR. WEINBERGER:  Okay.  Thank you.

10             MS. FUMERTON:  I see this is not

11    going to be an issue because I am just going to

12    have some questions to see if it refreshes his

13    recollection about something.  I'm not going to ask

14    him to authenticate the spreadsheet unless he has

15    seen it.

16         Q.    (BY MS. FUMERTON:)  Dr. Malone, have

17    you --

18             MR. WEINBERGER:  You have totally

19    confused me, but I am easily confused so -- all

20    right.  Go ahead.

21         Q.    (BY MS. FUMERTON:)  Follow along, I

22    am -- Dr. Malone, you have taken a second to

23    review.  Are you ready for me to ask a couple of

24    questions?

25         A.    Yeah, please go ahead.

Page 98

1          Q.     I will start with the first one.

2     Have you ever seen this email or attachment before?

3          A.     No.

4          Q.     Okay.  I will represent that it was

5     produced in the MDL litigation.  Do you know who

6     Kent Summers is or Kevin O'Brien?  That is the

7     individuals that are at the primary two lines at

8     the top of the email.

9          A.     I do know Kent at least -- yeah, I

10    know Kent.  I have met so many people over my

11    career, I don't recall Kevin directly.

12         Q.     Okay.  And how do you know Kent?

13         A.     We have been in the same field of

14    research.  So I mean that extends -- health

15    outcomes research.  So his doctoral degree is

16    similar to mine, yeah.  And I have --

17         Q.     And --

18         A.     And I was asked to review

19    Dr. Summers' promotion packet when he was going up

20    for promotion when he was at University.

21         Q.     Okay.  And Dr. Summers appears, at

22    least on this email, to be the vice president of

23    Health Outcomes and Pharmacoeconomics, Clinical

24    Development and Medical Sciences for Endo Health

25    Solutions.  Is that how you know him?

Page 99

1          A.      No, I knew him before that.

2          Q.      Let me ask a better question.  Yeah,

3    I apologize, that was a poor question.

4                  Were you aware that he worked for

5    Endo Health Solutions at one point?

6          A.      Yes, I was.

7          Q.      Okay.  And if you look down below,

8    there's another email from Tim Birner to

9    Mr. Summers or Dr. Summers.  I can't recall, did

10   you say whether or not you knew Tim Birner?

11         A.      I believe I had met the gentleman.

12   Again, it is not somebody I worked with or have

13   knowledge of working with.  Again, I --

14         Q.      And --

15         A.      I'm sorry.  I cut you off.

16         Q.      No.  No.  No.  I need to count to two

17   before I ask a question so I am not cutting you

18   off.  It is my fault.

19                 The subject line at the bottom email

20   says "a hundred forty-one examples of supporting

21   OPANA® for the HOPE field scientists."

22                 Do you see that?

23         A.      Uh-huh.

24         Q.      Does that refresh your recollection

25   as to what a HOPE field scientist is?

1          A.     Yes, it does.  How they are using --

2          Q.     What is a HOPE field scientist?

3          A.      So the broad area of Health Outcomes

4     and Pharmacoeconomic Research incorporates the

5     effectiveness, the costs, the adverse events, side

6     effects, patient-reported outcomes.  So it is a

7     very broad field that is used in the

8     pharmaceutical -- by the pharmaceutical industry

9     and those of us who do research in this general --

10    in the general area of health outcomes to represent

11    a fairly diverse group of disciplines, let's put it

12    that way.

13         Q.     Were you a HOPE field scientist?

14         A.      No.  Well, I am sorry.  Was I -- so

15    when you say "HOPE field," that means -- in my

16    opinion, HOPE field basically -- a field scientist

17    is somebody that represents a company, a

18    pharmaceutical company that is not based at the

19    primary organization's location.  So these are

20    individuals that are employed in different

21    geographic locations than the primary place of

22    business.

23              So many pharmaceutical companies

24    employ these individuals.  Usually they are

25    healthcare professionals, they are either

Page 101

1  physicians, pharmacists, may have a Ph.D., and

2  their goal is to provide information to the

3  community at large, mainly -- when I say "community

4  at large," usually managed care organizations,

5  physicians, other learned professionals, and also

6  to gather information and bring it back to the

7  organization for designing future research or

8  engagement activities.

9          Q.     Okay.  Can I -- so I appreciate the

10  explanation, but going back to my question, I'm not

11  sure I know what the answer is now.

12                Were you a HOPE field scientist?

13          A.     I was never employed by a

14  pharmaceutical company.  So, no, I was not a HOPE

15  field scientist.

16          Q.     So if you look at the second email on

17  the first page of Exhibit 4, so the bottom email,

18  Tim Birner appears to be writing to Kent Summers

19  and says, "Morning, Kent.  After our discussion

20  about transparency last week, I asked the field

21  team to provide me with a list of current

22  opportunities/efforts related to OPANA®.  Attached

23  is a list of one hundred forty-one specific ways

24  the field HOPE team is engaged with customers to

25  support OPANA®."  Do you see that?

```
                                                    Page 102

 1              A.      Uh-huh.  Yes, I do.

 2              Q.      Were you ever engaged with customers

 3    to support OPANA®?

 4                      MR. WEINBERGER:  Objection to the

 5    form.

 6              A.      I'm not sure what you mean by

 7    "engaged."  Did they ever talk to me about their

 8    research?  Probably.  Did I actually do research

 9    for them?  No.

10              Q.      (BY MS. FUMERTON:)  Okay.  If you can

11    look to the attached spreadsheet, then, I am going

12    to draw your attention to the second page.  And

13    about halfway down the page, you will see listed as

14    Dan Malone, University of Arizona.

15              A.      Uh-huh.

16              Q.      And under the column of "Strategy,"

17    it appears this says, "Collaborative author on

18    manuscripts using research by Health Analytics

19    4Q11, regarding the management and decisions made

20    by health plans and PBMs to manage DDI,

21    specifically focusing on CYP."

22                      Sir, is that right?

23              A.      I believe that is what it says, yes.

24              Q.      Are you the Dan Malone that is

25    referenced there?
```

Page 103

1          A.     I am.

2          Q.     Okay.  And so Endo is describing the

3   spreadsheet that you are on as a list of a hundred

4   forty-one specific ways that the Field HOPE team is

5   engaged with customers to support OPANA®, right?

6                 MR. WEINBERGER:  Objection to form.

7   Assumes facts not in evidence.  Speculative.  Go

8   ahead.  You can answer.

9          A.     Based upon what they wrote, so --

10  yeah, I can't comment on what their intent was with

11  that email.

12         Q.     (BY MS. FUMERTON:)  I am not asking

13  what their intent was.  But what I am asking is why

14  are you listed on this spreadsheet, to cut to the

15  chase.  Do you know?

16         A.     So I --

17                MR. WEINBERGER:  Objection.  So wait,

18  wait.  Let me object.  Wait, let me object.  I'm

19  sorry.  Objection.  You did make certain

20  assumptions.  This is a document that he obviously

21  has -- was not a part of nor has he ever seen

22  before.  And so I am objecting as to form and that

23  it assumes evidence -- or facts not in evidence.

24  Go ahead.

25                MS. FUMERTON:  Well, I've been

Page 104

1    waiting to say this to you:  I object to your

2    speaking objections and coaching of the witness.

3    So just say "objection to the form," and that is

4    sufficient.

5                    MR. WEINBERGER:  Well, do you want to

6    go back over your transcript?

7                    MS. FUMERTON:  Well, I --

8                    MR. WEINBERGER:  Wait.  Wait.  Wait.

9    Wait, please.  Do you want to go back over the many

10   deposition transcripts where you have interposed

11   objections way beyond objections as to form?  Do

12   you want to do that?

13                   Because there's a litany of those

14   kinds of objections and statements on the record in

15   just the few depositions that you and I have

16   participated in.  So I am going to object as I feel

17   appropriate.  Thank you.

18          Q.    (BY MS. FUMERTON:)  Dr. Malone, can

19   you answer the question?  We can have the court

20   reporter read it back if you don't remember what it

21   is at this point.

22          A.    That would be helpful.  Thank you.

23                THE REPORTER:  One moment.

24                (Record read.)

25          A.    So the reason I think my name is

Page 105

1   there is I do recall a meeting with Kent and one of

2   their individuals in -- I guess -- I don't know

3   about the specific dates.  I met with so many

4   people over so many years.

5            But I do recall them coming to my

6   office while I was employed at the University of

7   Arizona and talking about my research related to

8   drug interactions.  And they had, I guess -- their

9   goal was to engage me in some of their activities.

10  I don't recall it -- it manifesting in much, but

11  again, I have done so many activities over time, I

12  don't recall the specifics.

13           Q.    (BY MS. FUMERTON:)  Looking at the

14  spreadsheet, it says, "Collaborative author on

15  manuscript, using research for Health Analytics

16  4Q11, regarding the management and decisions made

17  by health plans and PBM to manage DDI, specifically

18  focusing on CYP."  Do you know what "collaborative

19  author on manuscript" is referring to?

20           MR. WEINBERGER:  Objection, form.

21           A.    I think they wanted to engage me to

22  participate in a -- a manuscript that they were

23  working on at the time.

24           Q.    (BY MS. FUMERTON:)  Do you recall

25  what the subject matter of that manuscript was?

Page 106

1          A.     Beyond what is written on that page,

2     I don't recall.  I don't know if this manuscript

3     ever went anywhere or if it was even written.  I

4     would have to go back and look at my files, and

5     quite frankly, I don't know if I have files on

6     this.

7          Q.     And the last portion of that entry

8     says, "specifically focusing on CYP."  Do you see

9     that?

10         A.     Uh-huh.

11         Q.     What is that referring to, if you

12    know?

13                MR. WEINBERGER:  Objection to the

14    form.

15         A.     So CYP is a common abbreviation for

16    Cytochrome P450.  It is an enzyme that metabolizes

17    drugs.  There's multiple variants of Cytochrome

18    P450.

19                And medications such as oxycodone,

20    and other medications are metabolized via this

21    enzyme.  Many -- I won't say all drugs, but most

22    drugs are metabolized to some extent by variants of

23    Cytochrome P450.

24         Q.     (BY MS. FUMERTON:)  Does that give

25    you -- refresh your recollection at all about what

Page 107

1  you might have been engaged with Endo about?

2        A.     No, it does not.  I mean my research,

3  you know, includes drug interactions and, again,

4  all of them have some variants of Cytochrome P450.

5  Obviously, my lack of recollection with regards to

6  this tells me that it was -- that it was one of the

7  many conversations that I have with organizations

8  that come through wanting to engage me, and most of

9  which never lead to any fruitful activities or

10  interesting findings, unremarkable to me.

11        Q.    Did you ever do any work in

12  connection with Endo in the Pharmacy Quality

13  Alliance?

14        A.     Not to my recollection.  Pharmacy

15  Quality Alliance is an organization that is

16  probably supported by -- well, it is supported by

17  the pharmaceutical industry.  So the question is

18  rather broad, so I would imagine -- but I haven't

19  received funds from the Pharmacy Quality Alliance

20  to do my research.

21        Q.    And after talking about all this,

22  does this refresh your recollection at all about

23  whether you have received funds from Endo related

24  to OPANA®?

25                   MR. WEINBERGER:  Objection, form.

1          A.     I don't recall.  With respect to

2    Pharmacy Quality Alliance, we provided -- when I

3    say "we," my research group, had come up with a

4    list of medications that Pharmacy Quality

5    Alliance -- a list of -- I'm sorry, drug

6    interactions, medications involved with drug

7    interactions that the Pharmacy Quality Alliance

8    subsequently adopted and used as a quality

9    measure -- I shouldn't say as a quality measure --

10   as a potential quality measure.

11               But beyond that, you are -- the

12   threads that are there are relatively thin.  I

13   don't recall the specifics of this activity

14   beyond -- beyond what I am seeing on the screen.

15          Q.     Did you ever receive any funding for

16   research from a pharmacy that dispenses opioids?

17          A.     For research, no, not that I can

18   recall.

19          Q.     What about for something other than

20   research?

21          A.     Pharmacy is pretty broad, so that

22   would include pharmacy chains.  And I am not

23   recalling any off the top of my head.  Nothing

24   stands out.

25          Q.     Going back to your report, and I am

Page 109

1  looking at Page 1, third sentence, it states, "The

2  balance of my research has been federally

3  supported."  When you refer to the "balance of your

4  research," what do you -- what do you mean there?

5          A.      The balance of funds to support my

6  research.

7          Q.      I guess I am asking what you mean by

8  "balance."  Do you mean the majority?

9          A.      Oh, definitely, yeah.  Definitely the

10  majority.

11          Q.      Okay.  And you say, "Starting in 2001

12  with the Arizona Center for Education and Research

13  on Therapeutics, A-Z-C-E-R-T."  Is that -- do you

14  refer to it that way, do you refer to it as AzCERT,

15  or how do you refer to that acronym?

16          A.      AzCERT.

17          Q.      So I am not going to remember this.

18  AzCERT, is that right?

19          A.      The state abbreviation, A-Z as in

20  Arizona.

21          Q.      Oh, AzCERT?

22          A.      There you go.

23          Q.      Okay.  And you say, reading on in

24  that sentence, "the principal focus on preventing

25  drug-drug interactions," and we have talked about

Page 110

1    that at length some already, correct?

2                I just want to clarify a few things.

3    AzCERT refers to the Arizona Center for Education

4    and Research on Therapeutics, correct?

5          A.     That is correct.

6          Q.     And are you still involved with

7    AzCERT today?

8          A.     Yes.  It is -- at the time starting

9    in 2001, it was housed at the University of

10   Arizona.  It is no longer housed within the

11   University of Arizona, but, yes, I am.

12         Q.     Where is it housed now?

13         A.     It is its own entity.  It is a

14   nonprofit organization.

15         Q.     Is that nonprofit crediblemeds.org?

16         A.     That is correct.  Well, Credible Meds

17   is part -- Credible Meds is part of AzCERT.

18         Q.     Okay.  So AzCERT is a nonprofit

19   organization; is that correct?

20         A.     Yes.

21         Q.     And Credible Meds is a subset of

22   that?

23         A.     As far as I understand, yes.

24         Q.     Okay.  Does AzCERT maintain a

25   website, to your knowledge?

Page 111

1          A.      Yes.

2          Q.      And is that website named

3    crediblemeds.org?

4          A.      Yes.  Well, that is one website.

5    They might have others, but that is the one I am

6    most familiar with.

7          Q.      And that came into existence in 2014,

8    about.  Is that right?

9          A.      Yeah, that was about the -- that was

10   about the time that the principal investigator left

11   the University of Arizona and created this -- took

12   the entity, I guess, outside of the University

13   setting, created the nonprofit organization.  So

14   that sounds about right.

15         Q.      Do you agree that Credible Meds is

16   best known for its QT drugs list of drugs that have

17   a risk of QT prolongation and cardiac arrythmia?

18         A.      Yes.

19         Q.      And what is QT prolongation?

20         A.      It is a cardiac -- so in the

21   electrical signal in the cardiac muscle, there are

22   different waves of electric signal that occur.  QT

23   represents the Q-wave and the T-wave.  QT

24   prolongation is the notion of time, the distance

25   between those two different waves occurring.  Those

Page 112

1   are important from the standpoint of if that time

2   is too long, the repolarization, it doesn't occur

3   in a proper sequence, leading to an arrythmia, and

4   the arrythmia can result in death.

5        Q.     And you have done a lot of research

6   on QT drugs, correct?

7        A.     They have been one of the components

8   of drugs that I have studied, yes.

9        Q.     But not just one of the components.

10  I mean you have done a significant amount of

11  research on QT drugs, correct?

12       A.     I will agree with your

13  characterization, yes.

14       Q.     Okay.  And opioids are not a QT drug,

15  correct?

16       A.     I would have to go back and look.

17  There are hundreds of drugs that are listed on the

18  QT as known or possibly caused QTc prolongation.

19  They are not -- opioid medications are not the --

20  on the known risk list.  Whether they are on the

21  possible or probable list, I would have to check.

22       Q.     You don't know, correct?

23       A.     Off the top of my head, no.

24       Q.     Okay.  And so AzCERT, or either

25  itself or through Credible Meds, provides paid

```
                                        Page 113
 1   products for healthcare providers and systems to

 2   utilize, correct?

 3                   THE REPORTER:  I'm sorry.  I can't

 4   hear you.  "Provides" --

 5                   MS. FUMERTON:  I'm sorry.  I will

 6   move closer.  I was coming -- far away.  Let me

 7   just reask the question because it was a poor

 8   question too.

 9           Q.     (BY MS. FUMERTON:)  AzCERT provides

10   paid products for healthcare providers to utilize,

11   correct?

12           A.     Paid products?  No, they are free.

13           Q.     Okay.  So I am specifically thinking

14   of QT drugs.  Is that a product that AzCERT

15   provides?

16           A.     A listing of medications that have

17   been associated with QT prolongation, yes, they

18   maintain that list.

19           Q.     And Med Safety Scan?

20           A.     That is -- it is one of their

21   products, yes.

22           Q.     And are you involved with those

23   products in any capacity?

24           A.     By default, my research is based on

25   some of those medications, yes.  And I am also a
```

Page 114

1    volunteer member of the board of directors for

2    Credible Meds.

3            Q.      What other boards do you sit on?

4            A.      None.

5            Q.      Are they listed in your CV?

6            A.      No.  No.

7            Q.      The only board you sit on is Credible

8    Meds?

9            A.      The only board I am on at the current

10   time, yes.

11           Q.      What about in the past, have you sat

12   on any other boards?

13           A.      I sat on a board for the Academy of

14   Managed Care Pharmacy at one point in time as a --

15   they had a spinoff organization that the name -- it

16   was an educational entity that AMCP created, asked

17   me to be on that board.  I was also on the board of

18   directors for the International Society for

19   Pharmacoeconomics and Outcomes Research.

20           Q.      Okay.

21           A.      I was also president of that

22   organization.

23           Q.      If we go back to your report on Page

24   1, continuing where we left off, sort of the top

25   two-thirds of the second paragraph, you write

1  "Within the AzCERT I led multiple investigations to

2  evaluate health system issues concerning preventing

3  drug interactions from 2001 to 2011."  Did I read

4  that accurately?

5         A.     Yes.

6         Q.     And is that a true statement?

7         A.     Yes.

8         Q.     And did any of those investigations

9  specifically involve opioids?

10         A.     I believe so.  One of the --

11  methadone, I guess I will put it in the broad

12  category, opioid-like medications.  It is known to

13  prolong QTc interval, so --

14         Q.     Other than methadone, was there any

15  opioids?

16         A.     I don't recall off the top of my

17  head.

18         Q.     Do you know what scheduled methadone

19  is, the DEA scheduled drug?

20         A.     I should know.  If I was a

21  pharmacist, I would know.  But I haven't kept up

22  with it.  I imagine it is probably -- well, it is

23  either a Schedule I or Schedule II, and I am

24  assuming it is probably Schedule II since it is

25  available.

```
                                            Page 116

 1                    MR. WEINBERGER:  So can I just

 2    interrupt?  Is this a good time to --

 3                    MS. FUMERTON:  Sure.

 4                    MR. WEINBERGER:  It is --

 5                    MS. FUMERTON:  Yeah.

 6                    MR. WEINBERGER:  It is 1:08 Eastern

 7    Time.

 8                    MS. FUMERTON:  Yeah, let's go off the

 9    record.

10                    THE VIDEOGRAPHER:  Okay.  We are off

11    the record at 1:08.

12                    (Whereupon, a break was had from 1:08

13                    p.m. until 1:23 p.m. EDT)

14                    THE VIDEOGRAPHER:  We are back on the

15    record at 1:23.

16          Q.     (BY MS. FUMERTON:)  Dr. Malone, do

17    you maintain a CV that you use for consulting

18    purposes?

19          A.     I do not, no.

20          Q.     So if you are sort of pitching your

21    services to a pharmaceutical manufacturer, for

22    example, do you provide them with any sort of

23    written materials?

24                    MR. WEINBERGER:  Objection, form.

25          A.     No, I don't.  I don't.
```

Page 117

1          Q.      (BY MS. FUMERTON:)  Do you have --

2          A.      I don't solicit services directly.

3    They usually contact me.

4          Q.      Okay.

5          A.      We don't advertise our services.

6          Q.      Do you have -- do you have a list of

7    consulting engagements that you have been involved

8    with through Strategic Therapeutics?

9                  MR. WEINBERGER:  Objection to form.

10         A.      No, I don't.  No, I don't.

11         Q.      (BY MS. FUMERTON:)  If you wanted a

12   list of all the consulting engagements that you

13   have had, how would you put that together?

14                 MR. WEINBERGER:  Objection, form.

15         A.      I would have to go back and look at

16   income statements or financial records in order to

17   determine that.

18         Q.      (BY MS. FUMERTON:)  Does Strategic

19   Therapeutic maintain financial records showing what

20   entities pays you funds?

21                 MR. WEINBERGER:  Objection to form.

22         A.      Yes, it does.

23         Q.      (BY MS. FUMERTON:)  Going back to

24   your report, I want to talk about a conference

25   grant that was supported by AHRQ, and I am

1    specifically looking about, again, a little over

2    halfway through the -- or a little less than

3    halfway through the second paragraph where it says

4    "building the" -- I think that's just a typo, I

5    think it is supposed to be "building on that

6    success."

7                      Do you see that?

8                      MS. FUMERTON:  Kristin, can we pull

9    it up.  Maybe he is having trouble locating it.

10                     MS. ZINMASTER:  Sorry about that.

11   Just a moment.

12         Q.     (BY MS. FUMERTON:)  If you can put up

13   the rest of it -- yeah, it's Page 1 of the report

14   and sort of a little above the -- halfway through

15   the second paragraph, above the second -- midway

16   through the second paragraph.  I don't know a less

17   confusing way to find it.

18         A.     I found it.

19         Q.     But I am looking at the sentence that

20   says "building."  "Building" -- and I think it was

21   supposed to read "on that success, I led a large

22   conference grant supported by AHRQ," and then

23   there's a series of numbers which read

24   1R13HS021826.  And then it says, in parentheses,

25   "PI: Malone," correct?

Page 119

1          A.     Yes.

2          Q.     And that number is referring to a

3     grant number; is that right?

4          A.     Correct.

5          Q.     And this large conference grant

6     supported by AHRQ was "to develop standards for

7     drug interactions, evaluations, classification and

8     communication for clinical decision support

9     systems."  Did I read that correctly?

10         A.     Yes.

11         Q.     Did you develop any standards as part

12    of that activity described there for opioid drug

13    interactions?

14         A.     Yes, we did.  And I --

15         Q.     What are those standards?

16         A.     I would say we published three papers

17    that resulted in that conference.  So my use of the

18    term "standards" here, I guess would fall also

19    under the rubric of recommendations for best

20    practices.  So not technical standards in that they

21    weren't adopted by a standard-setting organization,

22    but these were recommendations for these three

23    components:  Evaluation, classification and

24    communication of drug interaction information used

25    within decision support systems.

1          Q.     Okay.  Do you recall specifically

2     what your best practices were with respect to

3     opioids that you developed?

4          A.     This particular research focused on

5     drug interactions.  It did not focus on opioids, so

6     I don't necessarily understand your question.  Drug

7     interaction.

8          Q.     So I asked the question did you

9     develop any standards as part of that activity

10    described there for opioid drug interactions, and

11    you said yes, we did.

12         A.     Oh, I'm sorry.  I misheard.  It

13    wasn't -- we didn't develop opioid standards.  I

14    did not hear the word "opioid" in answering your

15    question.

16         Q.     Thank you for that clarification.

17         A.     Yeah, my apology.

18         Q.     So I think the answer to my question

19    then, just if I would repeat it, with respect to

20    this grant and your research, you did not develop

21    any standards for opioid drug interactions,

22    correct?

23         A.     So opioids could be a part of those

24    drug interactions, but it wasn't specific to

25    opioids.

1          Q.      So to the extent it applies generally

2     to all medications, opioids are a medication, it

3     would have applied.  But the research was not

4     specific to opioid drug interactions, correct?

5          A.      That is correct.

6          Q.      So piecing these things together, so

7     tell me if I am wrong, so on your CV, this grant is

8     listed as "Drug-Drug Interaction, Clinical Decision

9     Support Conference Series."  Is that right?

10             Let me see if I can point you to a

11    particular page.  Specifically I am looking at Page

12    29 of your CV.

13         A.      That is correct.

14         Q.      And was that a series of conferences?

15         A.      Yes, it was.

16         Q.      And do you recall whether opioids

17    were specifically discussed at those conferences?

18         A.      I do not.

19         Q.      And looking at your CV, Exhibit 2,

20    the amount listed there is two hundred and

21    eighty-seven thousand five hundred and ninety-six

22    plus forty thousand from drug knowledge vendors.

23             Do you see that?

24         A.      Uh-huh.

25         Q.      And what does the two hundred and

Page 122

1    eighty-seven thousand five hundred ninety-six
2    number signify?
3            A.      That is the amount of support that
4    was provided by the Agency For Healthcare Research
5    and Quality.
6            Q.      And you received an additional forty
7    thousand from drug knowledge vendors.  Is that
8    right?
9            A.      That is correct.
10           Q.      And what does drug knowledge vendors
11   refer to?
12           A.      Those companies that produce drug
13   knowledge data or information.  So those would
14   include First Databank, I believe Multispan --
15   Multispan is the product.  I'm not sure if it was
16   them or their parent company that helped support
17   us.
18                   Gold Standard is another company that
19   is a drug knowledge vendor.  I don't recall whether
20   they contributed to this support or not.  It has
21   been a while since I have looked at that.
22           Q.      You referred to Multispan.  I'm not
23   sure if I am familiar with that.
24           A.      Medi-Span.
25           Q.      Okay.  And you mentioned their parent

Page 123

1    company -- I want to say parent company, but that

2    might be wrong.  But Medi-Span is owned by Wolters

3    Kluwer; is that right?

4            A.    As far as I know, yes.

5            Q.    And it says "percent effort, five

6    percent."  What does that mean?

7            A.    That means that that is the amount of

8    support that I used on an annual basis to

9    accomplish these activities.  So you could

10   attribute it to, you know, essentially five hours a

11   week or four hours a week.

12           Q.    I didn't get enough sleep last night.

13   Can you -- what is the calculation you are doing?

14           A.    So basically it is forty hours a week

15   times five percent.

16           Q.    Okay.

17           A.    So I guess that is eight hours.

18           Q.    I see something on your CV, something

19   that is referred to as drug knowledge database

20   vendors -- excuse me.  Is that the same thing as

21   drug knowledge vendors?

22           A.    It is.

23           Q.    So First Databank, Medi-Span, Gold

24   Standard; is that right?

25           A.    Correct.

Page 124

```
 1        Q.    Can you pull up what is Tab 12 from
 2   the box of materials that we sent you?
 3             MR. WEINBERGER:  I'm sorry.  Which
 4   one?
 5             MS. FUMERTON:  Tab 12.
 6        A.    I have it.
 7             MS. FUMERTON:  And for the record, we
 8   are marking this as Defendants' Exhibit 5.
 9             (Exhibit 5 was marked for
10             identification.)
11        Q.    (BY MS. FUMERTON:)  And it appears to
12   be a manuscript titled "Recommendations for
13   Selecting Drug-Drug Interactions for Clinical
14   Decision Support."  And it is dated April 15th,
15   2016.
16             Dr. Malone, I will give you a second
17   to review this, but I'm not going to ask you about
18   the entirety of it.
19        A.    Okay.
20        Q.    Dr. Malone, is Exhibit 5 an article
21   that you coauthored?
22        A.    Yes, it is.
23        Q.    And I didn't count them all up, but
24   there's a number of people listed at the top of
25   that article.  Are those all individuals who are
```

Page 125

1    also coauthors?

2           A.      Yes, they are.

3           Q.      And your name is listed last.  Does

4    that have any significance?

5           A.      It does.  I am the senior author on

6    the paper.

7           Q.      And what does a senior author

8    signify?

9           A.      Usually the senior author is the

10   individual that was responsible for obtaining the

11   funding and providing the overall direction for the

12   research.

13          Q.      Does it signify at all your

14   contribution to the written portion of the article?

15                  That is a bad question.  Let me ask

16   it a different way.

17                  Does it signify at all the amount of

18   your involvement in writing the paper?

19          A.      Typically, yes, it does.

20          Q.      Again, how so?

21          A.      The concept for the project is

22   usually developed by the principal investigator of

23   the grant, and, therefore, becomes the senior

24   author on the papers.  And they are responsible for

25   the conduct of the grant and all phases of how the

Page 126

1    grant works.

2              So in this case, this particular

3    paper was supported by that conference grant series

4    that you alluded to a minute ago.  So my role as a

5    principal investigator on the grant is to ensure

6    that our work is represented in the public domain,

7    and this is one way of representing that.

8         Q.    Okay.  And this article is published

9    on April 15th, 2016; is that right?

10        A.    It is, yes.  That is the date.

11        Q.    Okay.  So looking at the bottom of

12   the first page of Exhibit 5, there's the abstract.

13   It states, "The purpose is to recommend principles

14   for including drug-drug interactions, DDIs, in

15   clinical decision support."

16             Do you see that?

17        A.    I do.

18        Q.    And was that the purpose of this

19   paper?

20        A.    Yes, it was.

21        Q.    On the next page is the Results, Page

22   2 of Exhibit 5.  The second to last sentence within

23   Results you write, "We recommend judicious

24   classification of DDIs as contraindicated as only a

25   small set of drug combinations are truly

Page 127

1    contraindicated."  Do you see that?

2            A.    I do.

3            Q.    Is that statement also true for

4    opioids?

5            A.    I'm sorry.  I don't understand your

6    question.  What do you mean by "also true for

7    opioids"?

8            Q.    Well, you said you recommend

9    judicious classification of DDIs as

10   contraindicated.  What do you mean by that?

11           A.    Oh, okay.  The tendency of the

12   editors that produce the drug knowledge, use the

13   term -- in our opinion, use the term

14   "contraindicated" excessively, suggesting that

15   medications could not be used together, you know,

16   in any circumstances.

17                 And this recommendation is cautioning

18   against the use of that phrase "Contraindicated,"

19   because in many instances the risk/benefit equation

20   associated with using those medications together

21   overwhelms the risks associated with the drug

22   interactions -- the benefits exceed the risk, and

23   it would make sense to give a combination to the

24   patient, even if there was a risk of a drug

25   interaction.

1          So that applies to any drug
2    interaction, not -- not -- so we are not making it
3    specific to a given medication or medication class.
4          Q.    Is it a general statement that you
5    should construe contraindications to be narrow so
6    that you are not having a lot of alerts that need
7    to be overwritten?  Is that a fair statement?
8                MR. WEINBERGER:  Object to the form.
9    Go ahead.
10          A.    That is the -- that is one of the
11   consequences of using a term such as
12   "contraindicated," that you generate an alert and
13   prescribers may view the benefits of the
14   combination to exceed the risks and administer
15   those medications to the patient.
16          Q.    (BY MS. FUMERTON:)  Because often
17   with lots of types of medications there's a
18   benefits and risk component to it that needs to be
19   weighed, correct?
20          A.    I wouldn't say often.  I would say
21   every single time, yes.
22          Q.    And the focus of this paper is that
23   your findings -- there were a lot of alerts for
24   contraindications where, in fact, the benefits
25   outweighed the risks.  So they shouldn't have been

Page 129

1  contraindications in the first place; is that fair?

2                    MR. WEINBERGER:  Objection, form.

3        A.      The paper or the work group that

4  produced this paper identified examples as part of

5  our discussion where the term "contraindicated" was

6  used and, in our opinion, inappropriately so.  So,

7  yes.  We suggest a more judicious use of the term

8  "contraindicated."

9        Q.      (BY MS. FUMERTON:)  And so you would

10  also agree that it would be best practice to use a

11  narrow classification of DDIs as contraindicated

12  when you are looking at opioids and other

13  combinations, correct?

14                    MR. WEINBERGER:  Objection, form.

15        A.      Yes.

16        Q.      (BY MS. FUMERTON:)  If you go down

17  to, I guess still in that section, the results, it

18  says, "Finally, we recommend more research to

19  identify methods to safely reduce repetitive and

20  less relevant alerts."  Did I read that correctly?

21        A.      Yes, you did.

22        Q.      And why was there a goal to safely

23  reduce repetitive and less relevant alerts?

24                    MR. WEINBERGER:  Objection, form.

25        A.      Clinicians receive many alerts in the

1    course of their interaction with their computer

2    systems.  And many of these alerts are not relevant

3    at the time that that alert is generated, based

4    upon either the drug or the patient

5    characteristics.

6            Q.    (BY MS. FUMERTON:)  And too many

7    alerts result in alert fatigue, correct?

8                  MR. WEINBERGER:  Objection to the

9    form.

10           A.    Yes.

11           Q.    (BY MS. FUMERTON:)  And what is alert

12   fatigue?

13           A.    That is -- I guess I don't have a

14   precise definition of it.  But it is the notion

15   that repeated warnings on the same problem would

16   result in an individual kind of tuning out that

17   information, so not paying as close of attention to

18   it as they should when it is truly important.  So

19   an alert fatigue --

20           Q.    And you --

21           A.    Go ahead.

22           Q.    No, I am sorry.  I didn't -- go

23   ahead.

24           A.    And this particular paper is, I

25   guess, attempting to get at the issue of

Page 131

1    theoretical problems versus, you know, documented,
2    well-established problems associated with drug
3    interactions.
4            Q.    Do you agree that reducing alert
5    fatigue improves patient safety?
6                    MR. WEINBERGER:  Objection, form.
7            A.    There's no studies to demonstrate
8    that at this point.  That is a scientific premise
9    of many of the activities that we undertake.  But
10   as far as I am aware, there have been no studies to
11   document that that relationship holds.
12                   But that is the -- in general, the
13   thought that if we reduce alert fatigue, that you
14   will reduce inappropriate overrides.
15           Q.    (BY MS. FUMERTON:)  And improve
16   patient safety, correct?
17           A.    And thereby improve patient safety,
18   yes.
19           Q.    And you believe that to be true,
20   correct?
21           A.    Yes, it is my scientific premise that
22   that would be a correct interpretation.
23           Q.    Do you know if there's a consensus
24   within the medical community as to what set of
25   opioid combinations are truly contraindicated?

Page 132

```
 1          A.      No, I am not.
 2          Q.      If we look down at Background and
 3   Significance section on Page 2, you write that "The
 4   contents that the vast majority of DDI decision
 5   support systems in the United States is created,
 6   maintained and sold by drug knowledge base vendors
 7   that use their own approach for evaluating and
 8   classifying the clinical importance of DDIs."
 9                  Did I read that correctly?
10          A.      You did, yes.
11          Q.      And one of the drug knowledge base
12   vendors that you are referring to there is
13   Medi-Span, correct?
14          A.      Yes.
15          Q.      And you go on, it says -- skipping
16   one sentence, going to the next one, it says,
17   "Ubiquitous and low clinical relevance alerts have
18   contributed to considerable clinician frustration
19   and dissatisfaction, and reported override rates
20   for DDI alerts consistently exceed ninety percent."
21                  Did I read that correctly?
22          A.      I believe you did, yes.
23          Q.      And that is a problem, correct?
24          A.      In my opinion, yes.
25          Q.      And why is it a problem?
```

1        A.     It is the relationship between the

2    noise and the signal.  There's so much noise that

3    it is very challenging for individuals to pick up

4    the signal.  And --

5        Q.     So --

6        A.     Go ahead.  I'm sorry.

7        Q.     So if you are flagging ninety percent

8    of a particular medication, for example, that just

9    becomes noise to the person having to evaluate

10   whether or not there truly is an issue, correct?

11              MR. WEINBERGER:  Objection, form.

12       A.     Yes, I agree with that.

13       Q.     (BY MS. FUMERTON:)  Do you agree that

14   alert fatigue is more than just a frustration; it

15   can lead to clinicians to respond inappropriately?

16       A.     I would generally agree with that

17   statement, that clinicians may, at times --

18   although the evidence heretofore is lacking -- but

19   the general perception of the field, in my opinion,

20   is that alert fatigue does contribute to important

21   signals being missed.

22              And, you know, keeping in mind that

23   all drugs are dangerous if used inappropriately,

24   but in the case of drug interactions, there are

25   certain drug pairs that we probably need to stop

Page 134

1    and think about whether, you know, these two

2    medications should be used concurrently.

3                  And I guess I would just put it in a

4    broader context of any medication that has a high

5    potential for adverse effects, whether there be a

6    drug interaction or any other consequence, adverse

7    event, you know, we want clinicians to slow down

8    and think about the ordering and dispensing of

9    those medications.  And I use the term "clinician"

10   fairly broadly, encompassing prescribers and

11   pharmacists.

12        Q.     Right.  So you believe that alert

13   fatigue can lead to pharmacists responding

14   inappropriately, correct?

15                  MR. WEINBERGER:  Objection, form.

16        A.     There's lots of alerts that

17   pharmacists receive.  And, therefore, we would

18   assume that some of those are relevant, some of

19   those are less relevant.  And if we could figure

20   out which ones are important, more important, then

21   they would focus their attention on those.

22                  And I guess it gets back to this

23   premise that, you know, these medications are

24   dangerous, and, again, if used in the wrong context

25   or in the wrong situation, could result in harm to

Page 135

1    the patient.

2              So the goal of computers and alerts

3    that are generated -- not just drug interaction but

4    general drug utilization alerts, is to bring to the

5    attention of the practitioner that there is

6    something they need to pay attention to.

7              And the premise of most of this

8    particular paper is that because there are many

9    theoretical nonsubstantiated warnings out there,

10   that those are making it challenging for the

11   prescribers to understand when they need to stop

12   and think -- and pharmacists too -- when they need

13   to stop and think about potential harm that could

14   result in either writing that prescription or

15   dispensing that prescription to a patient.

16        Q.    (BY MS. FUMERTON:)  The goal is to

17   sort of create an alert system that is as narrow as

18   possible so that the pharmacist, for example,

19   doesn't tune out the noise of all sorts of

20   unnecessary flags, correct?

21              MR. WEINBERGER:  Objection to the

22   form.

23        A.    As narrow as necessary.  I mean you

24   could make an alert system very narrow.  So you

25   could turn off alerts, and that is what people have

                                        Page 136

1   done, they have turned off alerts in some

2   instances, and that provides no benefit at all

3   because now you don't know what you are missing.  I

4   think that famous quote was, "We don't know what we

5   don't know."

6                   And, you know, so turning off the

7   system is what some organizations have done with

8   respect to drug utilization alerts.  And, in fact,

9   it is usually what some organizations do, depending

10  upon the level of the alert, they reduce the alerts

11  because they could perceive them to be irrelevant.

12                  That is not the solution that we are

13  recommending.  The solution we are recommending is

14  providing the most appropriate warnings to be

15  given, and that needs to be based upon the clinical

16  relevance and the likelihood of harm associated

17  with that.

18                  So that is the premise of almost all

19  of my research.  It is not that -- we can't just

20  turn all of these off and eliminate alerts.

21  There's just way too much medical information for

22  the clinicians to have to memorize and know in the

23  back of their minds.  And that is just humanly

24  impossible.  But what we need to do is design

25  systems that bring to the forefront those warnings

1    that need to be paid attention to, and that is the

2    premise of this paper.

3                    So I am sorry about that long-winded

4    answer, but that is the focus of much of my

5    research is to identify those situations where it

6    is imperative that we provide that information to a

7    clinician to say don't -- you really want to think

8    about the risk/benefit calculi in this situation

9    because these are dangerous medications that could

10   harm the patient if used inappropriately.

11            Q.    (BY MS. FUMERTON:)  I just want to be

12   clear.  When you are referring to "these

13   medications," you are talking about medications in

14   general, not particularly a particular class of

15   medications?

16            A.    Yeah -- I would say that, you know,

17   the FDA is supplying, you know, prescription

18   medications, potentially dangerous medications if

19   used inappropriately.  That is why we have a

20   licensed prescriber to use them, right.  And then

21   within that, there are groups of medications,

22   depending upon your phylum -- so for drug

23   interactions, there are certain medications for --

24   as we have been talking about for opioids, you

25   know, they are controlled substances, meaning they

Page 138

1    result in a higher level of standard that needs to

2    be practiced when dealing with those medications.

3                    So those -- those kind of notions are

4    embodied in the alerting systems or should be

5    embodied in the alerting systems that are out

6    there.

7            Q.    All right.  But even with respect to

8    opioids, I think your general premise still holds

9    that the alerts with respect to opioids should be

10   as judicious as possible, in other words, as narrow

11   as possible, because otherwise, the risk/benefit

12   analysis will cause the pharmacist to have alert

13   fatigue?

14                   MR. WEINBERGER:  Objection, form.

15           A.    I -- I can't say "as narrow as

16   possible."  It needs to be clinically relevant.

17   Whether that is narrow or not is going to be a

18   function of many factors.  It is going to be a

19   function of, you know, what medication is being

20   dispensed, to what type of patient is it being

21   dispensed, under what circumstance is it being

22   dispensed.

23                   So we certainly don't want to cry

24   wolf all the time when a patient is not at harm.

25   So dispensing of, you know, a legitimate

Page 139

1   prescription pursuant to, you know, all of the

2   other criteria that are necessary to dispense a

3   medication, and that includes opioid medications,

4   shouldn't trigger a warning.

5              On the other hand, situations where

6   there's a potential for harm to the patient -- and

7   I keep coming back to this notion of harm.  I am

8   putting it under -- I guess you could put lots of

9   things under the notion of harm, but could be

10  mental, physical, economic harm, all of those

11  things, you know, pharmacists or the healthcare

12  system should, you know, limit exposure to harm to

13  the extent possible.

14          Q.     (BY MS. FUMERTON:)  So let's look

15  some more at Exhibit 5.  I am looking at the

16  results, Key Question 1, "What process should be

17  used to develop and maintain a standard set of

18  DDIs?"  And I am going to butcher the name,

19  Phansalkar, et al., second sentence?

20          A.     Phansalkar, you had it correct.

21          Q.     "Identified an initial set of high

22  priority DDIs through an ONC task order that could

23  be used as a minimum standard for electronic health

24  record systems."  Did I read that correctly?

25          A.     Yes, you did.

1          Q.     What is an ONC task order?

2          A.     ONC stands for the Office of the

3   National Coordinator.  The Office of the National

4   Coordinator is the standard-setting organization

5   under the Department of Health and Human Services

6   that specifies the minimum requirements for

7   effective electronic health systems, which includes

8   use of clinical decision support as it applies to

9   medications.  So there's a number of specific

10  statements that this federal agency has promoted to

11  ensure that electronic health record systems are

12  used in accordance with the ultimate outcome of

13  improving patient safety, improving health

14  outcomes.

15         Q.     How is an initial set of high

16  priority DDIs identified?

17         A.     That particular author created an

18  expert panel and then also used their listing of

19  medications from one particular healthcare system

20  and evaluated various drug combinations to arrive

21  at a number -- a relatively small number of drug

22  interaction pairs.

23         Q.     Were opioids included in any of the

24  high priority DDIs?

25         A.     I don't recall off the top of my

Page 141

1    head.

2         Q.    Well, does Exhibit 5 tell you the

3    answer to that?

4              MR. WEINBERGER:  I'm sorry.  I didn't

5    hear the question.  What was the question?

6         Q.    (BY MS. FUMERTON:)  Yeah.  My

7    question was does Exhibit 5 tell you the answer to

8    that.  So my question was were opioids included in

9    any of the high priority DD developments?

10             MR. WEINBERGER:  Understood.

11             MS. FUMERTON:  Dr. Malone said he

12   couldn't recall off the top of his head.

13        Q.    (BY MS. FUMERTON:)  So I guess I

14   would refer you to Exhibit 5 to see if you know the

15   answer?

16        A.    You would have to go to Reference

17   Number 23 in order to answer -- I would have to go

18   to Reference 23 to answer your question.

19        Q.    And when you say "Reference 23," you

20   are talking about on Page 12?

21        A.    The screen has changed, but let me

22   double-check.  Oh, yes, it is Page 12, yeah.  Thank

23   you.

24        Q.    If you turn to the next page --

25   actually I didn't finish reading that sentence, so

Page 142

1    let's stay on Page 3 for a second.

2                    So that individual has "identified an

3    initial set of high priority DDIs through an ONC

4    task order that could be used as a minimum standard

5    for electronic health record systems and a set of

6    DDIs that should be noninterruptive in order to

7    reduce alert fatigue."  Did I read that correctly?

8          A.     Yes, you did.

9          Q.     And what does "noninterruptive in

10   order to reduce alert fatigue" mean?

11         A.     It means there's alerts -- let me

12   explain the relationship between an interruptive

13   and noninterruptive, to answer your question.

14                    So an interruptive alert is one that

15   requires the recipient of that alert to stop the

16   process of what they are doing and somehow

17   acknowledge that alert.  That may be required to

18   check a box, type in letters or, you know, type a

19   response.

20                    A noninterruptive alert is

21   information that is presented perhaps on the

22   screen, but it does not inhibit the work flow of

23   the practitioner.

24                    So pharmacists or pharmacy technician

25   could continue to process the medication order so

Page 143

1   it doesn't inhibit the next action, intended
2   action, in the absence of the alert, so the work
3   flow continues.
4          Q.     And so, in your view, a
5   noninterruptive alert is preferable to an
6   interruptive alert, correct?
7          A.     No, it depends.  I'm sorry to
8   disagree with you, but it depends.  There are
9   certain situations where you do want to get the
10  attention of the clinician or the pharmacist or the
11  pharmacy personnel and say, listen, this is
12  important that you pay attention to what is
13  happening here.
14              So there are times when you do want
15  to say stop and think about this.  There are
16  situations -- you know, other situations where that
17  information is perhaps interesting or nice to know
18  or is less relevant or less likely to cause harm is
19  generally the notion here.  So in those situations,
20  you know, you might present the information but not
21  require what we call a click to continue.
22              So when you talk to physicians and
23  pharmacists, you know, the overriding statement is
24  how many clicks does it take me to resolve that
25  problem or to deal with that issue, how many things

Page 144

1    do I have to do to address that issue.

2                    So it is not just alert fatigue, but

3    I guess click fatigue.  They don't want to have to

4    check a bunch of boxes for things that are trivial.

5            Q.     Okay.

6            A.     So --

7            Q.     But to go back to looking --

8                    MR. WEINBERGER:  Excuse me.  I think

9    he was finishing his answer.

10           A.     And I apologize for the delay.  I was

11   going to say, there are situations where

12   medications are -- you need a higher level of

13   attention to the use of that medication.

14                   And, you know, the -- in the

15   materials I reviewed, there were situations where

16   they focused on, say, narrow therapeutic index

17   drugs as medications where they had created within

18   their systems, you know, special screens that

19   looked different or brought attention to those

20   medications while they were being dispensed.  And

21   so those are -- those are situations -- not just

22   drug interactions, but it applies to lots of

23   different situations where you really want the

24   pharmacists and the pharmacy staff to think about

25   more carefully the situation, the context to which

Page 145

1   the information -- the drug is being used.

2                   And, obviously, with opioid

3   medications as being, you know, part of a closed

4   distribution system, and I guess other medications

5   are used with opioids that, you know, people talk

6   about the trinity notion, muscle relaxants and

7   other products, you know, the goal is to provide

8   information at the time that that information is

9   useful to the clinician, the pharmacists so that

10  they can make the best decision about how that

11  medication can be safely used.

12                  So I don't want to diminish the

13  importance of these warnings to the point where all

14  warnings are useless.  If we thought that, then we

15  would take away stop signs.  So we don't do that.

16  You know, we put stop signs on roads where there

17  needs to be attention by the driver to pay

18  attention to what the cross traffic is.

19                  And that applies the same with drug

20  utilization review.  There needs to be stop signs

21  when you have potential for the patient, not the

22  pharmacist but the patient to be harmed.

23          Q.    (BY MS. FUMERTON:)  Okay.  Well, I am

24  going to strike the vast majority of that as

25  nonresponsive, which I appreciate your explanation,

Page 146

1    but we have gone way far afield of what my initial

2    question was.

3              A.      Okay.

4              Q.      So I want to make sure that the

5    record is clear because I think you trailed off

6    into something completely different.

7                      You were talking about these

8    materials that you reviewed.  That is not in

9    connection with this article, correct, or are you

10   talking about in connection with these articles --

11                     MR. WEINBERGER:  Wait, before you

12   answer that question.  Are you done, Tara, because

13   I want to interpose an objection?

14                     MS. FUMERTON:  Sure.

15                     MR. WEINBERGER:  So I object and move

16   to strike the comments with respect to your

17   comments on his last answer.

18                     But go ahead and answer the question.

19                     MS. FUMERTON:  Would strike your

20   comment, so it will be an endless loop.  Let's move

21   on from that.

22             Q.      (BY MS. FUMERTON:)  So when you were

23   referring to certain materials, what were you

24   referring to?  I mean you sort of gave a long

25   answer there.  Were you talking about in connection

Page 147

1    with this article that we were just talking about

2    or something else?

3                    MR. WEINBERGER:  Objection to form.

4    Go ahead.

5            A.     I'm sorry.  I was referring to the

6    materials that I was asked to review as a part of

7    this particular litigation.

8            Q.     (BY MS. FUMERTON:)  So you said that

9    "in the materials I reviewed, there were situations

10   where they focused on, say, narrow therapeutic

11   index drugs as medications where they had created

12   within their system special screens that looked

13   different or brought attention to those medications

14   while they were being dispensed.  And so those

15   are -- those are situations, not just drug

16   interactions but applies to lots of different

17   situations where you really want the pharmacists

18   and the pharmacy staff to think about more

19   carefully the situation."

20                    So you are not discussing drug-drug

21   interactions in that testimony, correct?

22           A.     No.  In answer to your -- so I will

23   disagree with your characterization, I am sorry.

24   Drug interactions could be a part of that.  The

25   specific example I gave was not a drug interaction.

Page 148

1  It was a narrow therapeutic situation.

2         Q.     Are you saying that you thought that

3  in certain materials you reviewed that you saw

4  there were too narrow of a therapeutic index of

5  drugs as medication?

6                MR. WEINBERGER:  Objection to form.

7         A.    I am sorry.  Perhaps I am using too

8  much health language here.

9                The narrow therapeutic index

10  medications are a class of medications that are

11  inherently more dangerous because they have

12  potential for significant adverse events.  The

13  classic example we use is warfarin.  Too much

14  warfarin, you bleed; too little warfarin, you clot.

15  So the range to which the warfarin needs to be used

16  is narrow.

17                And one of the defendants in this

18  case produced a document that specifically called

19  out in their electronic system narrow therapeutic

20  index drugs.  So warfarin is one example of a

21  narrow therapeutic index drug.

22         Q.     (BY MS. FUMERTON:)  What defendant

23  are you thinking of and what document are you

24  thinking of?

25         A.     If I am correct, it was with respect

Page 149

1    to Rite Aid, and it was one of the -- one of the

2    documents dealing with their -- I believe they use

3    NextGen computer system.

4           Q.    So what is your -- are you offering

5    any opinion about the Rite Aid's NextGen system in

6    your expert report?

7           A.    I am just using it as an example as

8    to where an organization has used an extra level of

9    safety as a part of the dispensing process by

10   bringing that to the alert, that information to the

11   forefront of the pharmacist's minds by the way they

12   present the warning.

13          Q.    I see.  You are using that as an

14   example of a good thing that Rite Aid was doing to

15   alert information to a pharmacist?

16          A.    That is correct, yes.

17          Q.    Okay.  Okay.  So going back to sort

18   of this subject of this paper, which I think

19   ultimately the goal was to reduce alert fatigue,

20   right, to create DDI standards that would reduce

21   alert fatigue?  Is that a fair summary?

22                MR. WEINBERGER:  Objection to the

23   form.

24          A.    That is one of the goals, yes.  Yeah.

25   Our purpose was --

1          Q.     (BY MS. FUMERTON:)  And --

2          A.     -- not just alert fatigue but, I

3    guess, improving the signal when it was important.

4          Q.     Okay.  If we go to Page 4, the last

5    sentence of the top paragraph, it says, "This

6    undertaking is not trivial and requires substantial

7    resources."

8               Do you see that?

9          A.     I do.

10         Q.     And you agree that it is a

11   significant undertaking, correct?

12         A.     Yeah, and the context of that needs

13   to be stated because there are thousands of drug

14   interactions promulgated in these drug warning

15   databases, and many of which are not clinically

16   relevant.

17              Because there's over a hundred

18   thousand drug products on the market today, you

19   know, carefully sifting through that evidence and

20   then putting the appropriate level of warning on

21   that evidence for that drug combination is a

22   significant amount of work.  So that is what

23   that statement refers to.

24         Q.     And you are not offering any opinions

25   in this matter as to what the appropriate level of

Page 151

1   warning would be for any drug combination involving

2   opioids, correct?

3          A.      Restate the question.  I'm sorry.

4          Q.      Sure.  In this litigation and in your

5   expert report, you are not offering any opinions as

6   to what an appropriate level of warning would be

7   for any particular drug combination involving

8   opioids, correct?

9          A.      That is correct, no.

10         Q.      You are saying there should be a

11  system, but you are not saying what the system

12  specifically should alert?

13         A.      That is correct.

14         Q.      Fair?

15                 And the next paragraph on Page 4, you

16  write, "In light of these issues and ongoing

17  challenges, we recommend forming a national

18  consensus panel of experts to create and maintain a

19  standard set of clinically-relevant DDIs for CDS

20  systems with oversight by a national organization

21  to ensure that the process is transparent,

22  systematic and evidence driven."

23                 Do you see that?

24         A.      Yes, I do.

25         Q.      And you agree with that

Page 152

1    recommendation?

2           A.    Yes, I do.

3           Q.    To your knowledge, has that ever

4    happened?

5           A.    No.  Funding has never resulted in

6    that to occur.  And just the -- again, the context

7    matters here.

8                 If you were to take First Databank's

9    drug interaction evidence and put it next to

10   Medi-Span's drug interaction evidence, there's a

11   significant number of discrepancies between those

12   two databases.  So if a pharmacist worked for one

13   pharmacy organization and used MultiSpan -- excuse

14   me, Medi-Span, and another organization that uses

15   First Databank, they may get entirely different

16   warnings based upon that.

17                Therefore, our intent with that

18   statement was to create a unifying standard of

19   which interactions were important to warn and

20   classification of that by an expert group to reduce

21   the discrepancy across these vendors that provide

22   this information.

23          Q.    Right.  And in your view, the

24   solution to that is to create this national

25   consensus panel of experts to unify those standards

Page 153

1   and alerts, technically, correct?

2          A.     That's correct, yes.

3          Q.     On Page 8 under Question 3, the

4   question is, "Can/should a list of contraindicated

5   drug pairs be established?"

6                THE REPORTER:  I can't understand you

7   and I don't see the document.

8                MS. FUMERTON:  Sure.  I will slow

9   down.

10         Q.     (BY MS. FUMERTON:)  On Page 8 of

11  Exhibit 5, under Key Question 3, the question is,

12  "Can/should a list of contraindicated drug pairs be

13  established?"

14               And the first sentence, I think,

15  Dr. Malone, is just what you were referring to,

16  that it is important to recognize that there has

17  been inconsistent use of the term "contraindicated"

18  in various drug information sources, correct?

19         A.     Yes.

20         Q.     "Contraindicated DDIs are those for

21  which no situations have been identified where the

22  benefit of the combination outweighs the risk."

23  You agree with that statement, correct?

24         A.     Yes.

25         Q.     If we go down to the middle of that

Page 154

1    page, it says, "Classifying an interaction as

2    'contraindicated' should be done judiciously and

3    perhaps infrequently, as only a small set of drug

4    combinations are absolutely contraindicated."

5                   You agree with that statement,

6    correct?

7          A.     I do.

8          Q.     Are you aware of whether or not there

9    are any opioids combination for which the benefit

10   of the com -- I'm sorry.  Let me restate this

11   question.

12                  Are you aware of whether or not there

13   are contraindicated DDIs for opioids where there

14   are no situations that have been identified where

15   the benefit of the combination outweighs the risk?

16                  If I ask a stupid question, please

17   tell me it is a stupid question because when I am

18   looking at it, I realize it might be.

19                  When I use a term, I want to be

20   clear.  When you say "contraindicated DDIs," what

21   you are talking about are two -- the combination of

22   two drugs are contraindicated, right?

23         A.     Generally speaking, people refer to

24   just two, but could apply to three, yeah.

25         Q.     To more?

Page 155

1          A.      Yeah.

2          Q.      Are you aware of any drug-drug

3   interactions involving opioids for which there are

4   no situations that have been identified where the

5   benefit of the combination outweighs the risk?

6          A.      I'm not aware of any, no.

7          Q.      If you go to Page 9 of this article,

8   I am looking at the first full paragraph on Page 9.

9   It says, "Keeping in mind the five 'rights' for

10  health IT medication safety (right information,

11  right person, right CDS format, right channel,

12  right time in work flow), there are situations

13  where DDI notification is repetitive or

14  irrelevant."

15              Did I read that correctly?

16         A.      Yes.

17         Q.      So it says, "For example, in some

18  systems, DDI alerts may be generated for refills or

19  continuations of existing medications.  Changes in

20  dosing, strength, time of administration, and

21  transfer between inpatient units can result in

22  repetitive alerts that contribute to alert fatigue.

23  Some experts advocate the ability to suppress

24  alerts at the time of renewal of

25  previously-tolerated medication combinations for

Page 156

1    the same patient."

2                    Do you see that?

3         A.      Yes, I do.

4         Q.      Do you agree with suppressing alerts

5    at the time of renewal of previously-tolerated

6    medication combinations involving the same patient?

7         A.      It depends.  So keep in mind that

8    individuals on this panel included those that work

9    in the inpatient setting where you may move a

10   patient from a higher level of care to a lower

11   level care, and that -- that -- you know, that

12   alert has been presented once and adjudicated by

13   both the prescriber and/or the pharmacist.

14                    So -- so there are times when

15   suppression of those warnings is -- is appropriate.

16        Q.      Right.  So even in the outpatient

17   context, if a pharmacist is presented with a

18   prescription for a particular patient, and they

19   evaluate the circumstances specific to that patient

20   and determine that it is appropriate to fill that

21   medication, then the next time that patient comes

22   in, they can sort of rely on the fact that they

23   have already previously looked at information, sort

24   of cleared any concerns they had when deciding to

25   fill that medication for that patient again?

Page 157

1   Correct?

2               MR. WEINBERGER:  Objection to the

3   form.

4        A.    If the -- the context here, again,

5   was more focused on inpatient.

6               In the outpatient setting, I believe

7   that practitioners probably want to interpret the

8   situation that way, but that is not always the

9   case.  The patient situation may have changed

10  between the first fill and the second fill.

11              So -- and there are some, you know,

12  warnings that probably don't need to be displayed

13  the second time around, and there are other

14  warnings that might need to be displayed the second

15  time around depending on the situation.

16              So we would have to get into the

17  specific -- we would have to talk about, you know,

18  the patient, the drugs, the type of warning that is

19  being -- you know, would be generated and, you

20  know, the -- I guess external factors, I will just

21  try to put it in a broader context, associated with

22  that medication.

23              So it could be appropriate in

24  situations, and -- or, you know, so it is not a

25  carte blanche.  So I just want to be careful about

Page 158

1   giving that impression.

2           Q.     (BY MS. FUMERTON:)  Well, and I

3   think, you know, if we keep reading on that

4   sentence, we may get to the point which is, it

5   states, "Patients with long-term use of certain

6   medications may have demonstrated their capacity to

7   tolerate them, and suppressing alerts for refills

8   might be an option for some circumstances,"

9   correct?  Do you agree with that statement?

10          A.     I agree with that statement, yes.  We

11  wrote that.

12          Q.     And based on your prior explanation,

13  you also agreed that in order to evaluate whether

14  or not there is a cause for concern, you really

15  have to look at the individual circumstances of

16  that patient, correct?

17          A.     That is correct.

18          Q.     And so you agree that a particular

19  DDI alert may be intelligently ignored for a

20  specific patient, right?

21          A.     That is correct, I agree.

22          Q.     So you have -- on your CV, you have

23  listed meaningful drug interaction alerts as one of

24  the grants that you were -- or one of the topics, I

25  guess, for a grant that you received.

1          And I will give you a specific page.

2      A.     Excuse me, Tara.  So I recognize that

3  it is getting late in the day for some people, or

4  at least past lunchtime for some people.  So if

5  there's a desire to break for lunch, maybe this

6  would be the time to do it.

7          MS. FUMERTON:  Totally up to you.  I

8  will go forever if somebody doesn't stop me, so

9  that is fine.  We can go for another half hour.  It

10  is totally up to you.

11          MR. WEINBERGER:  So why don't we take

12  a break right now.  And should we break for, say,

13  forty-five minutes, Dr. Malone?

14          MS. FUMERTON:  I was going to suggest

15  thirty just because we had a little bit of a delay

16  earlier, but if that is not enough time for

17  folks -- I mean thirty would be my preference, but

18  it is up to you, again, Dr. Malone --

19          MR. WEINBERGER:  So as you can see,

20  Dr. Malone, rarely do Tara and I agree even on some

21  of the more trivial issues.  But I say that in just

22  an abundance of humor.

23          So what is your preference?  You and

24  the court reporter are the most important people to

25  consider.

```
                                             Page 160

 1          A.     I can do whatever.  I am not going

 2    anywhere.  So -- so I am happy to do --

 3                 MS. FUMERTON:  Let's go off the

 4    record.

 5                 THE VIDEOGRAPHER:  Okay.  We will go

 6    off the record at 2:29.

 7                 (Whereupon, a break was had from 2:29

 8                 p.m. until 3:17 p.m. EDT)

 9                 THE VIDEOGRAPHER:  We are back on the

10    record at 3:17.

11          Q.     (BY MS. FUMERTON:)  Good afternoon,

12    Dr. Malone.  You understand you are still under

13    oath, correct?

14          A.     I understand that, Ms. Fumerton.

15    Thank you.

16          Q.     Can you please grab what has been

17    marked as Tab 10.  And while you are doing it, we

18    are also going to be pulling up Tab 11 and Tab 13,

19    if you want to grab those.

20                 But we are going to start with Tab

21    10.

22                 (Exhibit 6 was marked for

23                 identification.)

24                 MS. FUMERTON:  And so we are going to

25    mark what was Tab 10 as Exhibit 6.  And for the
```

Page 161

1    record, it is an article titled "Designing and
2    Evaluating Conceptualized Drug-Drug Interaction
3    Algorithms."  And it was received on January 29th,
4    2020 and it looks like accepted on March 9th, 2021.
5              Dr. Malone, I will give you a minute
6    to look at this, and let me know when you are ready
7    for some questions.
8         A.    Okay.  Getting all of the documents
9    together.
10        Q.    (BY MS. FUMERTON:)  And we are just
11   looking at the Tab 10 first, if that helps.  You
12   don't have to pull the other ones out yet.
13        A.    Okay.
14              (Pause.)
15        A.    Okay.  Go ahead.
16        Q.    (BY MS. FUMERTON:)  So Exhibit 6 is
17   an article titled "Designing and Evaluating and
18   Contextualized Drug-Drug Interaction Algorithms"
19   that you coauthored, correct?
20        A.    It is.
21        Q.    And your name is listed last, so this
22   is an example where you were a senior author.  I
23   apologize.  I think I am misremembering the term
24   you used previously.
25        A.    That is correct.  Senior author.

Page 162

1        Q.      Senior author?  Okay.  Great.  This

2    is another article where you are analyzing how to

3    reduce alert fatigue, correct?

4        A.      Yes, it is.

5        Q.      And evaluating the appropriateness of

6    alerts, you agree that contextual factors are

7    important, correct?

8        A.      Yes, I do.

9        Q.      And you also agree that individual

10   patient characteristics are important, correct?

11       A.      They can be, yes.

12       Q.      In fact, if you look at the abstract,

13   in the third sentence under the objective, it

14   states, "Existing alerting systems for DDIs are

15   often simplistic in nature or do not take the

16   specific patient context into consideration,

17   leading to overly sensitive alerts."  Correct?

18       A.      It does state that, yes.

19       Q.      And you agree with that statement,

20   correct?

21       A.      Yes, we wrote that.

22       Q.      Well, you wrote it and you agree with

23   it, correct?

24       A.      Yes, I do.

25       Q.      Okay.  In the Results section of the

Page 163

1    abstract, it talks about how "algorithms and

2    computable knowledge artifacts were developed and

3    validated for a total of eight high priority DDIs."

4    Do you see that?

5          A.    Yes, I do.

6          Q.    What makes something a high priority

7    DDI?

8          A.    The potential for harm.  So the

9    likelihood that a patient who experiences these

10   dangerous combinations of medications could be

11   harmed.  So the premise of this paper and, in fact,

12   most of my research is identifying situations where

13   patients may be placed at great risk of harm, and

14   that is what we mean by higher priority or

15   clinically-relevant algorithms.

16         Q.    And so one of the eight DDIs --

17   strike that.

18                One of the high -- one of the eight

19   high priority DDIs that you looked at involved an

20   opioid, correct?

21         A.    I believe so, yes.

22         Q.    If you need to reference it, it is on

23   Table 3 on Page 6.

24                And the DDI that you identified with

25   that opioid is Fluconazole?  Fluconazole?  If you

1  could pronounce it correctly for me.

2          A.      Fluconazole.

3          Q.      Fluconazole, thank you.  So the DDI

4  here is an opioid and Fluconazole.  What is a

5  Fluconazole?

6          A.      It is an antifungal medication.

7          Q.      So you didn't identify as one of the

8  high priority DDIs an opioid and a benzodiazepine,

9  correct?

10          A.      No.  And --

11          Q.      And you didn't identify --

12                  MR. WEINBERGER:  Wait.

13                  MS. FUMERTON:  Yes or no question.

14                  MR. WEINBERGER:  No, no.  He was --

15  you interrupted him -- interrupted him.  He was in

16  the middle of completing his answer.  Please allow

17  him to complete his answer.

18                  MS. FUMERTON:  Well, it was a yes or

19  no answer -- question and he answered no.  But if

20  you want to redirect him, I'm sure that --

21                  MR. WEINBERGER:  No, I am not going

22  to redirect him.  I'm going to -- I want you to

23  allow him to finish his answer.  Go ahead,

24  Dr. Malone.

25          Q.      (BY MS. FUMERTON:)  Okay.  And

Page 165

1    again --

2                    MR. WEINBERGER:  Go ahead, Dr.

3    Malone?

4         A.     This particular interaction does not

5    involve the benzodiazapine class.

6         Q.     (BY MS. FUMERTON:)  Okay.  And one of

7    the -- you did not identify as one of the eight

8    high priority DDIs an opioid and a muscle relaxer,

9    correct?

10        A.     That is correct.

11                    THE REPORTER:  I didn't understand

12   that last word.

13        Q.     (BY MS. FUMERTON:)  Muscle --

14        A.     Relaxant.

15        Q.     An opioid and a muscle relaxer,

16   correct?

17        A.     It was not one of the algorithms we

18   developed, no, that combination was not.

19        Q.     And if you turn to Page 2 of your

20   article that is Exhibit 6.  About the

21   second-to-last paragraph before Objectives, it

22   says, "Unfortunately, most systems currently

23   trigger DDI alerts based on the pair-wise

24   combinations of the drugs involved.  Thus, there

25   tends to be little or no consideration by the

                                        Page 166

1    systems of contextual factors.  However, the

2    specificity of an alert to an individual patient

3    characteristics play a major role in alert

4    acceptance."

5                    Do you agree with those statements?

6         A.     Yeah.  So the -- so the notion here

7    is that when an alert appears, it should be

8    relevant to the patient, it should be relevant to

9    the drug and relevant to the situation.

10                   So when there's -- you know, to put

11   it in context of the opioids, when a medication is

12   for legitimate medical use, you know, for a patient

13   that needs the medication, you shouldn't be firing

14   alerts that say, you know, do not dispense this

15   medication.  Just like in drug interactions, you

16   should not be telling people that, hey, there's a

17   major problem when, in fact, because of the

18   contextual situation, we shouldn't be saying, you

19   know -- you know, warning there's a problem when

20   there's really not.  It gets back to this notion of

21   crying wolf.

22        Q.     Right.  So -- and context matters.

23   So for example, if you have a blanket alert that

24   anything over twenty-five miles get flagged, but

25   you are sitting in Ohio and the Cleveland Clinic is

Page 167

1   more than twenty-five miles away, that flag doesn't

2   make any sense, correct?

3                    MR. WEINBERGER:  Objection, form.

4            A.      It depends on many other situations

5   as to, you know, how -- you know, how that

6   information was generated.  So it may make a lot of

7   sense that that is a flag that is important.  So --

8   and it may not.  So my -- the premise of this paper

9   is we put all of these into -- more than just a

10  yes/no dichotomous situation.  These algorithms

11  that we tested in this particular paper consider a

12  number of different factors before an alert would

13  be generated or we would recommend that an alert be

14  generated.  Or in the absence of that information,

15  that an alert be generated.  And in situations

16  where the patient is not at risk, then the alert

17  would not be generated.

18                   So that is the whole premise of the

19  paper.  It is not that we are saying don't generate

20  alerts; it is that we are saying you need to make

21  an alert be smart to the situation in which the

22  patient, the drug and the provider find themselves

23  in.

24                   And I want to say the provider,

25  meaning inpatient versus outpatient, you know, and

1   that could extend to an oncology physician versus a

2   family practice physician versus a neurologist

3   versus -- any other sort of other characteristics

4   that could be -- or should be incorporated into

5   these systems.

6          Q.    (BY MS. FUMERTON:)  And your

7   algorithms oftentimes use lots of different data

8   points pulled together in a complicated fashion to

9   make that determination, because you are trying to

10  put in as much context as possible; is that right?

11         A.    Yeah, to the extent the evidence

12  supports it, yes.

13         Q.    And so to go back to my statement,

14  you agree that context matters with respect to

15  alerts, right?

16         A.    I would say generally, yes, that is

17  true.

18         Q.    So again, if you are sitting in the

19  middle of Ohio, the Cleveland Clinic, which is

20  probably one of the most well-respected health

21  systems, is sitting more than twenty-five miles

22  away from your pharmacy, having a blanket alert

23  that every time a medication that comes from the

24  Cleveland Clinic gets flagged because it is

25  twenty-five miles -- more than twenty-five miles

Page 169

1    away makes no sense, correct?

2                     MR. WEINBERGER:  Objection, form.

3              A.     It would depend, so -- I don't know.

4              Q.     (BY MS. FUMERTON:)  It would depend

5    on what?

6              A.     On the other attributes and what

7    the -- how that alert was configured and for what

8    it was configured for.  So there's -- you are

9    giving me one piece of information that would be --

10   you know, that -- you know, I don't know the other

11   pieces of the information that would be relevant.

12   And -- you know, so it just -- you are asking a

13   very -- what sounds like a very simple question,

14   but it is more complex than that.

15             Q.     But it is a very simple -- it is a

16   very simple slide, so that is why I want to get to

17   this point of your article and studying this issue

18   of alert fatigue.

19                    And so if you have a very simplistic

20   flag like anything over twenty-five miles, and you

21   don't take into context the fact that the Cleveland

22   Clinic is more than twenty-five miles away, having

23   a singular flag of just twenty-five miles makes no

24   sense and contributes to the alert fatigue,

25   correct?

1              MR. WEINBERGER:  Objection, form.

2     Asked and answered.  Go ahead.

3         A.    I guess I will just refer to my

4     previous answer.

5         Q.    (BY MS. FUMERTON:)  Well,

6     respectfully, you didn't answer -- you didn't give

7     an answer to my previous question.  And so I will

8     ask it again.

9         A.    Okay.

10        Q.    We are talking about, you know, a

11    single flag, not in context, of twenty-five miles,

12    saying that you should review and you should alert

13    on any prescription that comes in for more than

14    twenty-five miles away.  That is exactly the type

15    of simplistic flag that you have been researching

16    ways to avoid, correct?

17             MR. WEINBERGER:  Objection.

18        A.    Actually, we haven't been doing any

19    of the geospatial analysis that you are talking

20    about.  And as you indicated earlier, in terms of

21    excessive use of opioids has not been my primary

22    area of research.  And I -- so given those two

23    facts, the question you are asking is really beyond

24    my expertise of whether that is an appropriate flag

25    or not or whether that is a simplistic flag that

Page 171

1   should be used or shouldn't be used.  That is not

2   my area of expertise.

3          Q.    (BY MS. FUMERTON:)  And the

4   excessive -- what is the excessive use of opioids

5   is also not your area of expertise, correct?

6          A.    Determining, you know, the decision

7   point what is an excessive use of opioids, that is

8   correct, that is not my area of expertise.  My area

9   of expertise is creating algorithms that can

10  identify potential problems and assessing those

11  algorithms and using the data that is available to

12  me to help contextualize or make that information

13  useful to the person having to make a decision

14  based on that information.

15         Q.    Okay.  So take your expertise,

16  though, which is creating these algorithms.

17         A.    Yes.

18         Q.    And with your expertise, you would

19  never create such a simplistic algorithm that

20  simply flags something as simply inappropriate

21  because it is more than twenty-five miles away,

22  correct?

23               MR. WEINBERGER:  Objection, form.

24         A.    That is not my area of research, so I

25  can't -- you know, I can't say that it is -- I

1    would or wouldn't do that.  It is just not

2    something -- it could be done is what I am saying.

3    That is the basis of my report.  Whether it is

4    appropriate or not or whether it is relevant or not

5    is for others to decide.  That is not my area of

6    expertise.

7              Q.    (BY MS. FUMERTON:)  So you don't

8    think that having an alert that would flag all

9    prescriptions coming in more than twenty-five miles

10   away would result in alert fatigue?

11             MR. WEINBERGER:  Objection, form.

12             A.    I don't know how many prescriptions

13   come in from more than twenty-five miles away.  So

14   may be a very few, may be a lot; it probably

15   depends upon the pharmacy.

16             If you are in Rangely, Colorado,

17   where you have, you know, probably two prescribers

18   within a hundred miles of you, just about every

19   prescription that doesn't come from those two

20   prescribers is more than a hundred miles away and

21   may not be a relevant alert.

22             In the middle of Ohio, you know, it

23   may make sense that that is an appropriate --

24   inappropriate distance.  That is not my area of

25   expertise.

Page 173

1              So contextual doesn't just mean that

2    the patient -- only taking into account the

3    patient.  It means that, you know, for one

4    pharmacy, it might be one radius or another

5    pharmacy it would be another radius.  And what

6    constitutes an excessive amount of alerts, you

7    know, I don't know.

8              Every prescription, you know, we are

9    not talking about every prescription, I don't

10   think, in this litigation.  We are talking about

11   opioids which, you know, isn't every prescription.

12             So, you know, you are

13   overgeneralizing, I think, and so I can't -- you

14   know, so, therefore, I want to make sure that my

15   answer is clear, that it depends upon how this is

16   operationalized as to whether it would be

17   appropriate or inappropriate and result in excess

18   alerts or maybe not enough.  I don't know.

19        Q.    (BY MS. FUMERTON:)  So you are

20   offering no opinions in this case as to what

21   appropriate alerts might be; is that right?

22        A.    My area of expertise is in drug

23   interactions, and to the extent that opiates are a

24   part of drug interactions, then I think my opinion

25   is relevant.  In terms of determining what sort of

1   alerts should be generated with respect to opioid

2   prescriptions, those have been defined by somebody

3   else.  I didn't design those rules.  I haven't

4   studied those rules.  I haven't studied the

5   implementation of those rules.

6          Q.     So you -- so you don't know if those

7   rules -- it would make sense -- you are offering no

8   opinion one way or the other as to whether it makes

9   sense to implement the rules that other people are

10  opining on, correct?

11         A.     That is right.  I am not.  I am not

12  saying that they are good or bad rules.

13         Q.     You are just saying that you can

14  develop systems that have alerts; is that right?

15         A.     Uh-huh.

16         Q.     But you are offering no opinion as to

17  what those alerts might be?

18         A.     That's correct.

19         Q.     And you are offering no opinion as to

20  whether or not any of the pharmacy defendants, in

21  fact, had systems that alerted, correct?

22         A.     Restate that question.  I want to

23  hear it again.  I'm sorry.

24         Q.     You are not opining on -- your

25  opinion -- and I don't mean to -- let me ask it

Page 175

1   this way:  You are opining that it is possible to

2   create systems that have alerts.  You have no

3   opinion on what that system should look like,

4   correct?

5          A.     I would -- no, I am not going to

6   agree with that statement.  I have a sense of what

7   that system should look like.  I just don't know --

8   so in the context of red flags -- so I will use

9   that term because it is used in many of the

10  documents by the DEA and others.  The DEA developed

11  the red flags.  I don't know -- I am not an expert

12  on the development of red flags with respect to

13  opioid medications, and I don't know if the DEA's

14  decision rules with respect to those are

15  appropriate or inappropriate.  I haven't studied

16  that, so I am not trying to come up with a set of

17  rules or say that I have a set of rules that should

18  have been used.

19          I am saying that within these

20  organizations, they had the wherewithal and the

21  means and the capability.  And, in fact, the

22  evidence presented to me as part of my review

23  offered solutions to operationalize those rules or

24  those red flags.

25          My expertise is that those systems

1    were in place and could have generated those

2    warnings had these defendants chose to do that.

3    And, in fact, I think, based upon, you know, given

4    the timeline, I think some of those systems have

5    actually been implemented.  So -- but I think the

6    -- the basis of my testimony is on the fact that,

7    you know, even though these things have been in

8    place, the data systems have been in place, the

9    computers have been in place for many, many years,

10   it is only recently that those tools have been made

11   available to the pharmacists.

12              So whether those tools are using the

13   right cut point, twenty-five miles, thirty miles,

14   ten miles, I have no opinion as to whether that is

15   an appropriate rule and whether that would generate

16   too many alerts.

17        Q.    But your research is in -- and we

18   have looked at a lot of it today -- in alert

19   fatigue, correct?

20        A.    As it applies to drug interactions,

21   yes.

22        Q.    Well --

23        A.    So --

24        Q.    Is there a reason why alert fatigue

25   would apply differently for drug interactions as

Page 177

1  opposed to any other alert?

2       A.     Yeah, most definitely, yeah, most

3  definitely.  There are alerts that you don't -- in

4  situations where it makes -- the patient could be

5  harmed, have a tremendous degree of harm by the

6  administration of two agents or even a single agent

7  under particular circumstances.  And that is what

8  these systems are designed to prevent.  They are

9  designed to engage the end user, the physician to

10  pharmacist, to assist them in the knowledge that

11  they need to have or -- I shouldn't say the

12  knowledge, the information -- they have the

13  knowledge.  It is providing them useful information

14  at the time that they are making the decision.

15            So from my perspective, you know, if

16  you don't provide -- given the types of -- I

17  shouldn't say the types -- the number of different

18  medication orders that come through a pharmacy in a

19  given day, a small proportion of those -- or a

20  proportion of those are going to be related to

21  opioids.  And therefore, you know, when those

22  orders come through, you know, there is a

23  potential, you know, for any one of those orders to

24  fall into one of those categories the DEA has

25  classified as a red flag.

Page 178

1          And there are systems in place to

2    help the pharmacists adjudicate that particular

3    medication order against those -- should be, the

4    system should be in place.  The data is there, the

5    system wasn't -- to adjudicate that red flag or

6    those red flags.

7          Q.     If you are not -- if you are not

8    opining on whether or not a system should have any

9    particular red flag or not, how do you know whether

10   the data is there?  Do you even know what the data

11   is to assert -- to be able to figure out whether or

12   not the red flag can alert?

13         A.     You know, the great thing about

14   pharmacy --

15              MR. WEINBERGER:  Objection to form.

16   Go ahead.  Go ahead.

17         A.     The great thing about pharmacy and

18   pharmaceuticals is that the data fields have

19   largely been standardized across the entire

20   industry for many, many years.

21              As I indicated in my report, the

22   National Council for Prescription Drug Programs has

23   standardized the submission of claims data and,

24   therefore, largely the submission of how this data

25   is stored within these computer systems that allows

Page 179

1    us to be able to say, yeah, these medications are

2    opioid medications.

3                   It is easy for us to identify those

4    based upon attributes that are maintained in these

5    databases, by not only the pharmacy but also the

6    drug knowledge vendors, et cetera.

7                   So they have prospective DUR systems

8    capable of using that information to provide the

9    pharmacist with assistance in dispensing the

10   medication.

11                  So I am suggesting that the systems

12   are -- have largely been intact for nearly twenty

13   years to allow the organizations -- and I will use

14   that term loosely here -- organizations to develop

15   tools to help the pharmacists adjudicate

16   prescription orders, including opioid medications.

17   And they do that and have done that since 19 --

18   over 1999 -- 1990, excuse me, it was passed where

19   the pharmacist, via that particular piece of

20   federal legislation, was required under prospective

21   drug utilization review to do a number of

22   activities.  Computer systems have made those

23   activities much easier to be done as a part of

24   their day-to-day practice.  Alerts --

25             Q.    (BY MS. FUMERTON:)  Okay.  I think --

Page 180

1    I am going to interrupt you.

2           A.     Sorry.

3           Q.     You are so far afield of my question

4    at this point in time.

5                  MR. WEINBERGER:  If you -- wait.

6    Wait.  Wait.

7           Q.     (BY MS. FUMERTON:)  Your opinion is

8    that --

9                  MS. FUMERTON:  No.  No.

10          Q.     (BY MS. FUMERTON:)  So your opinion

11   is that -- that the pharmacies should have provided

12   tools to help the pharmacists adjudicate

13   prescription orders.  Is that right?

14          A.     They do and they should.  They do do

15   it via prospective DUR.

16          Q.     What do you think they should do

17   differently than they already are doing?

18                 MR. WEINBERGER:  Tara, please.  Tara,

19   please.

20                 MS. FUMERTON:  Pete, stop.  I don't

21   care -- I want to ask my question.

22                 MR. WEINBERGER:  I'm going to

23   terminate the deposition because I am not going to

24   let you continually cut off this witness.

25                 Now, if you go back --

Page 181

1                    MS. FUMERTON:  He went on a -- he

2       went on a soliloquy so far afield, that for the

3       last two minutes that -- no, we have to be able to

4       have a deposition that is answers -- questions and

5       answers, not just self-serving statements.

6                    MR. WEINBERGER:  Wait.  Now you are

7       interrupting me.  Now you are interrupting.  Please

8       let me have my say on the record, and then you can

9       say whatever you want to say.

10                   Now, if you go back to the question,

11      the convoluted question that you asked before he

12      gave you that long answer, I think you will see the

13      reason why the answer was the way it was.

14                   Now, you keep asking the same

15      question over and over again, and you don't like

16      the answers that you are getting.  I am sorry about

17      that.

18                   But I am not going to permit you to

19      continue to take this deposition while you are

20      interrupting the witness.  We didn't -- we don't do

21      that with your witnesses; we don't do that with

22      your experts, and you are not going to do it with

23      this expert.

24                   MS. FUMERTON:  Are you done lecturing

25      me?  Because I don't want to hear it, Pete.  So

Page 182

1    let's continue on.  I will ask my question --

2                    MR. WEINBERGER:  I am warning you.  I

3    am warning you.  If you continue to do it, I am

4    going to stop the deposition.

5                    MS. FUMERTON:  You do what you feel

6    you need to do, Pete.  But, again, I can ask

7    questions and get answers to them.

8                    So -- and I have had Special Master

9    Cohen direct witnesses to answer yes/no questions,

10   "yes, no" and you have been there when he has done

11   that as well.

12         Q.    (BY MS. FUMERTON:)  So again, I am

13   going to go back to what I was asking before.  What

14   specifically do you think the pharmacies should

15   have been doing that they were not doing?

16                    MR. WEINBERGER:  Objection, form.

17         A.    The pharmacy -- the pharmacist was

18   operating in a data vacuum with respect to red flag

19   warnings, as far as I could tell from the materials

20   provided to me, you know, by the various

21   defendants.

22                    I saw no evidence that they had used

23   the data at their disposal to create a dashboard, a

24   speedometer, so to speak, that would allow them to

25   inform -- help inform their decision process about

Page 183

1    dispens -- as to whether a particular opioid

2    prescription was legitimate or not.

3            Q.    (BY MS. FUMERTON:)  Can you point to

4    any particular pharmacy that has done what you

5    think should have been done in the entire industry?

6            A.    Well, IMS Health provided -- whether

7    they have done, implemented it or not is another

8    matter.  I cannot point to a particular pharmacy.

9                  But IMS Health provided such a

10   dashboard, offered such a dashboard to one of the

11   defendants in 2012, I believe.  And it had those

12   elements that I am referring to, you know, those

13   red flags and an approach to presenting that

14   information.

15                 So is it -- to me the question is was

16   it technically feasible to create such a dashboard?

17   Yes, it was.  It is up to the defendants to ask

18   the -- answer the question of why they did or

19   didn't do it.  So --

20           Q.    And you have no opinion as to whether

21   or not they did or did not do that, correct; you

22   don't know one way or the other?

23           A.    Based upon what I have seen, I have

24   seen no evidence that they did that.  So if the

25   materials that I reviewed -- so the materials I

Page 184

1   reviewed didn't provide evidence that they had done

2   that in the time frame that I was instructed to

3   consider my comments or my expert opinion, which

4   was --

5           Q.    What is the time frame that you were

6   asked to consider?

7           A.    I believe it was up through 2018.

8           Q.    Okay.  So, for example, we are going

9   to get there in a second, but I am sure you noticed

10  there weren't that many that you looked at.  The

11  last Walmart document you looked at was from 2012.

12  Did you ask to look at any Walmart documents after

13  2012?

14          A.    I didn't note the date of the

15  materials that were presented to me.

16          Q.    You don't know --

17          A.    So if the date was --

18          Q.    Well --

19          A.    If the date was on the document, I

20  noted that.  But I don't know what other documents

21  Walmart has generated since 2012 that would be

22  relevant to this case.  That is information I don't

23  have at my disposal.  I only know that what was

24  provided to me.

25          Q.    Who provided --

Page 185

```
 1            A.      So if they had -- well, I am assuming
 2    that was part of the discovery process, so --
 3            Q.      Okay.  So let's stop here for a
 4    second.  Why don't you pull out your report, and we
 5    are going to come back to this other stuff, but I
 6    want you to turn to Page 3 of your report.
 7            A.      Okay.
 8            Q.      These are listed -- Page 3 of your
 9    report, you list the materials reviewed that you
10    relied on as a basis for your report, correct?
11            A.      Yes.
12            Q.      And it goes on to Page 4 for other
13    defendants as well, right?
14            A.      That is correct, yes.
15            Q.      For Walmart, you relied on four
16    documents; is that right?
17            A.      Yes.
18            Q.      Is it your understanding that those
19    were the only four documents that Walmart has
20    produced in this litigation?
21            A.      No, I'm sorry.  You said Walmart?
22    I'm sorry.
23                    MR. WEINBERGER:  Tara, it is --
24    Number 1 is testimony and exhibits, right?  You are
25    talking about there's --
```

1           MS. FUMERTON:  Hey, Pete, I'm asking

2    him the question.  You can't answer the question

3    for him.  I am asking him.  Please don't answer the

4    question for the witness.

5           A.     So under Number 1 for Walmart,

6    testimony and exhibits under deposition, under the

7    deposition for Mr. Townzen, there were probably

8    twenty or thirty different PDFs of the ConnexUs

9    software system that were displayed there.  So

10   those were usually manual -- manuals about how

11   those systems work.

12          Q.     (BY MS. FUMERTON:)  You think there

13   were twenty or thirty manuals, that is your

14   testimony, produced by Walmart?

15          A.     No.  No.  No.  Well, there's probably

16   not twenty -- probably not twenty documents but

17   there were a large number of documents, PDF files,

18   of different sections of the manual for ConnexUs.

19          Q.     So is it your understanding that this

20   document that you listed here, the testimony and

21   exhibits from Darren Townzen's deposition and the

22   three other ConnexUs documents, are the only

23   documents that were produced in litigation?

24          MR. WEINBERGER:  Objection, form.

25          A.     I have no knowledge.

Page 187

1          Q.     (BY MS. FUMERTON:)  If there had been

2    documents that were relevant after 2012, would you

3    have wanted to see those?

4                  MR. WEINBERGER:  Objection, form.

5          A.     Sure.

6          Q.     (BY MS. FUMERTON:)  Did you ask

7    plaintiffs to see them?

8                  MR. WEINBERGER:  Objection, form.

9          A.     I did not.

10         Q.     (BY MS. FUMERTON:)  Did you tell

11   plaintiffs what type of documents you would like to

12   see?

13                 MR. WEINBERGER:  Objection, form.

14         A.     The main piece of evidence I was

15   looking for was information about the operations of

16   the organization, so to the extent that that was

17   provided to me, that is what I relied on.

18         Q.     (BY MS. FUMERTON:)  Are you aware

19   that there were hundreds of policy and manuals that

20   were produced by Walmart in this litigation, none

21   of which you cite here?

22                 MR. WEINBERGER:  Objection, form.

23         A.     I have no knowledge.

24         Q.     (BY MS. FUMERTON:)  So plaintiff

25   selected which documents you should review and base

Page 188

1    your opinions, is that correct?

2                    MR. WEINBERGER:  Objection, form.

3            A.      I don't know.

4            Q.      (BY MS. FUMERTON:)  How did you

5    select the documents that you were to review, then?

6            A.      I don't know who came up with this

7    list.

8            Q.      You did not come up with this list;

9    is that right?

10           A.      No.  I did not come up with this

11   list.  This is what I was provided.

12                   MR. WEINBERGER:  We will stipulate

13   that we came up with a list of documents and

14   provided them to him.

15           Q.      (BY MS. FUMERTON:)  So you did not

16   have any understanding of who was selecting the

17   documents that were being provided to you?

18           A.      What do you mean by "understanding"?

19           Q.      Did you understand who was selecting

20   the documents for you to review and base your

21   opinions on?

22                   MR. WEINBERGER:  Objection, form.

23           A.      Again, I am trying to understand your

24   question.  My apologies.  Could you please rephrase

25   that question?

Page 189

1           Q.      (BY MS. FUMERTON:)  What was your

2    understanding of who selected the documents for you

3    to review?

4           A.      I -- hmm.  I am trying to recall the

5    conversation about --

6                   MR. WEINBERGER:  Anything that you

7    and I discussed, I don't want you to disclose.

8    They are privileged.

9                   Tara, I have already told you that we

10   are stipulating that I selected, you know, as part

11   of the plaintiff's team, the documents to be

12   provided to Dr. Malone for his review.

13                  MS. FUMERTON:  I am entitled to

14   understand what the expert's understanding was of

15   the documents on which he is basing his opinion.

16          Q.      (BY MS. FUMERTON:)  So, Dr. Malone,

17   are you telling me that you had no understanding of

18   what documents or what universe of documents you

19   were looking at?

20                  MR. WEINBERGER:  Objection.  Form.

21          A.      I was -- so I was not given a list of

22   potential documents to examine and then selected

23   only certain documents.  So the focus of my expert

24   witness testimony has to deal with the feasibility

25   to generate warnings to the pharmacists.  So my --

Page 190

1   my expectation was that I was provided materials

2   that would allow me to assess the feasibility of

3   generating those warnings.

4          Q.    (BY MS. FUMERTON:)  Generating what

5   warnings?

6          A.     The feasibility.  So we have been

7   talking about red flags alerts, although I know you

8   haven't used the term.  That is, I guess, the

9   general premise here is that the DEA has come out

10  with warnings that pharmacists should -- pharmacies

11  and pharmacists and prescribers should all be

12  cognizant of when dispensing -- prescribing and

13  dispensing opioids and other medications that could

14  contribute to abuse of these controlled substances,

15  these dangerous substances.

16             So my scope of work was determining

17  whether the systems were in place to be able to

18  generate algorithms that would help the pharmacist

19  fulfill that duty and help the pharmacy fulfill

20  that duty, because it is not just the pharmacist.

21  Many times pharmacists don't even see the warnings.

22  They are presented to a technician.

23         Q.     What is your basis for asserting that

24  the DEA has come out with warnings that pharmacies

25  and pharmacists and prescribers should be cognizant

Page 191

1   of when dispensing and prescribing opioids?

2          A.      The Controlled Substances Act --

3   well, I may not -- there is a document that I have

4   seen that part of my former profession, pharmacy,

5   that had a series of warnings that should not be --

6   that should be considered when dispensing opioid

7   medication.  And, in fact, I think it is within

8   these documents as well.

9          Q.      Which document are you relying on for

10  that?

11         A.      I would have to investigate.  So if

12  you go under CVS, Item Number 5, 2012, the CVS

13  Corporate PowerPoint outlining red flag reports and

14  also the next document, PowerPoint outlining red

15  flags and their enhanced program.

16         Q.      And so your understanding is that

17  those documents represented what the DEA said were

18  appropriate red flags, and you designed the system

19  to flag --

20         A.      Those are consistent with what the

21  DEA -- I'm sorry.  I talked on top of you.  Please

22  restate.

23         Q.      You said they are consistent with

24  what the DEA said.  How do you know that?  How do

25  you know that those are consistent with what the

Page 192

1    DEA said?  To answer that question, wouldn't you

2    have to know what the DEA said?

3           A.    Yes, you would.  And those are

4    consistent with other documents, other professional

5    trade publications that I have seen associated with

6    red flag warnings.

7                 I am looking to see if there's

8    another document that had it.

9           Q.    You testified earlier that all the

10   documents that you relied upon --

11                MR. WEINBERGER:  I think he was

12   still -- I think he was not finished with his

13   answer, Tara.  He was looking for additional

14   information.  Let him finish his answer.

15                THE REPORTER:  Somebody is not muted.

16   I hear something in the background.

17                MR. WEINBERGER:  There's some noise

18   outside my window.  Let me just see if that -- is

19   that better?

20                THE REPORTER:  Yes.  It is not

21   interfering with me hearing it.  We are okay.

22          A.    I probably need to go to the

23   deposition materials for the various defendants.  I

24   believe there was information within those

25   documents, but I don't recall which of them had

Page 193

1    that information.

2              Q.      (BY MS. FUMERTON:)  Do you know how

3    many documents the pharmacy defendants produced in

4    this case?

5              A.      I do not.

6              Q.      Would you be surprised to learn that

7    there were hundreds of thousands, if not millions

8    of pages of documents produced by the pharmacy

9    defendants?

10             A.      No, I would not be surprised.  These

11   are very large organizations.

12             Q.      How many pages do you think you

13   looked at?

14             A.      Oh, more than five hundred.  I

15   probably looked at closer to a thousand pages of

16   documents across the various depositions and

17   groups.

18             Q.      And it took you seventeen hours to do

19   that, right?

20             A.      Uh-huh.

21             Q.      Did you understand that you were

22   provided with all relevant documents you would need

23   to form your opinions in this case?

24             A.      I was -- whether it was all, no.

25             Q.      Do you feel comfortable giving an

1    expert opinion if you don't have all relevant

2    documents?

3              MR. WEINBERGER:  Objection, form.

4         A.    If the Court would like me to review

5    all of the relevant documents, I would be happy to,

6    if they feel that there's other documents that are

7    relevant.

8         Q.    (BY MS. FUMERTON:)  That wasn't my

9    question.  My question was:  Do you feel

10   comfortable giving an expert opinion if you don't

11   have all the relevant information?

12             MR. WEINBERGER:  Objection, form.

13   Assumes facts not in evidence.

14        A.    I don't know if I don't have all of

15   the relevant information.

16        Q.    (BY MS. FUMERTON:)  Do you know that

17   you have all the relevant information?

18        A.    I know what I have.  I don't know

19   what I don't know.

20        Q.    Did you ask plaintiffs what they

21   didn't give you?

22        A.    I'm sorry.  I didn't hear the

23   question.

24        Q.    Did you ask plaintiffs what documents

25   they had they did not give you?

Page 195

1                   MR. WEINBERGER:  Objection, form.

2           A.     No, I did not.

3           Q.     (BY MS. FUMERTON:)  So you just

4    assumed, as a basis for your expert opinion, that

5    plaintiffs gave you the relevant documents

6    necessary to form your expert opinion, correct?

7           A.     That is correct.  I assumed that I

8    had the relevant documents that were necessary for

9    me to evaluate this situation, and my opinion is,

10   whether or not the data was in place within these

11   organizations, the data systems were in place

12   within these organizations.

13                  And I would -- I would have known

14   that regardless of whether the -- you know, I had

15   those other hundred thousand documents or something

16   that you are referring to because the practice of

17   pharmacy has been standardized with respect to

18   these data elements that we have been referring to.

19                  There's no dispute scientifically

20   about what information is available as -- drug

21   information is available as a part of the

22   dispensing process, in a general sense, that could

23   have been used to inform a practitioner about

24   whether a medication was being used for a

25   legitimate medical purpose.  That is not in

Page 196

1    dispute.  That is -- we have been working with this

2    data since the 1990s.  So I don't need a document

3    to generate -- to state that that is the case.

4    What --

5              Q.    So to be clear -- go ahead.

6              MR. WEINBERGER:  Objection.  I don't

7    think he finished his answer.

8              MS. FUMERTON:  I stopped, Pete.

9              Q.    (BY MS. FUMERTON:)  Go ahead,

10   Dr. Malone.

11             A.    So the premise of my expert testimony

12   is whether the data systems were available to be

13   able to create these warning systems.

14             Q.    And you knew those data systems were

15   available without even looking at a single

16   document, correct?

17             A.    Because it is the practice of

18   pharmacy -- these data -- my own research has

19   demonstrated the ability to pull the data out of

20   these organizations.  I used -- I have used data

21   from CVS.  I have used data from Walgreens.  So I

22   know that those data exist within those systems.

23   Because it is part of the business of pharmacy.

24   And it is a part of the pharmacy practice

25   environment that these data exist.

1          They are required by state law for
2     some data elements.  They are required by federal
3     law for other data elements.  They are required by
4     prescription standards for other data elements.
5               So there's no dispute, in my opinion,
6     about whether the data systems existed within the
7     organizations.
8          Q.    Right.  And you knew that without
9     even looking at a single document or even
10    talking -- right?
11         A.    Yes.
12         Q.    Okay.  And you are not opining that
13    any defendant failed to comply with any of those
14    state or federal requirements as to what data they
15    should have maintained, correct?
16         A.    That's correct.  I have no opinion on
17    that matter.
18         Q.    And really, the data that you are
19    talking about is the dispensing data, right?
20         A.    Primarily, you are right.  So when
21    you say "dispensing data," it includes, obviously,
22    you know, the prescription information.  So
23    information about the prescription, information
24    about the prescriber, information about the
25    patient, information about the drug product.

1          But there's other data that these

2    organizations have at their disposal as well that,

3    you know, are relevant, especially as it relates to

4    purchasing.  So those data are maintained by these

5    systems -- you know, within these systems.  So --

6    and how you get those medications from the

7    wholesaler to the pharmacy, those systems have been

8    established for a long period of time.

9          Granted, it has been a long time

10   since I have been a pharmacist, but even back, you

11   know, thirty years ago we used electronic data

12   systems to transfer that information to the drug

13   wholesalers to get the authority to be able to fill

14   the prescriptions.  Those systems have been in

15   place a long, long time.

16        Q.    So the materials you reviewed

17   actually weren't relevant to your opinions because

18   you held those opinions before you even looked at

19   the documents, right?

20        A.    All drug interaction alerts are based

21   upon the availability of those data as well.  So,

22   yes.  Now, what these documents provided to me was,

23   I guess, more detail about how -- what their

24   systems had within their system -- within their

25   organization and how they operationalized some of

Page 199

1   that data.

2          Q.    Great.  So let's talk about that.

3   Give an example of how Walmart operationalized its

4   dispensing data for drug-drug interaction.

5          A.    Walmart, I don't think, provided

6   those level of details.  CVS did, and more so, I

7   believe.  And those were in the depositions, right.

8                So I asked within those depositions

9   of the representatives of Walmart, CVS, Rite Aid,

10  what have you, there were statements made by those

11  individuals representing that they had used either

12  First Databank or Medi-Span as a part of their drug

13  distribution systems.  So which particular one they

14  used, you know, was probably dependent upon

15  corporate decisions.

16         Q.    What is your basis for saying that

17  Walmart did not provide that level of detail?

18         A.    I am sorry.  Walmart -- I did not

19  receive that level of detail about -- so you asked

20  me the question, you know, how did Walmart

21  determine its drug-drug interaction systems or how

22  did they operationalize their drug interaction

23  systems.

24                Well, I think it is not germane to

25  this case as to which drug knowledge database

Page 200

1    vendor they used, how they laid out those tables

2    within their ConnexUs RX -- ConnexUs system.  But

3    their screen shots that were provided to me

4    indicated that they were using drug utilization

5    review processes within their organization.

6         Q.    So what was Walmart doing -- not

7    doing that you think it should have been doing?

8         A.    As it relates to opioids, in my

9    opinion -- and, you know, maybe it is doing

10   something and I am not aware of it.

11              But it should be providing the

12   pharmacists with information in realtime about

13   those attributes that would suggest that the

14   medication is being used inappropriately.  And when

15   I am saying medication, I am talking about opiates,

16   opioids.

17        Q.    But you don't know and you are

18   offering no opinion --

19              MR. WEINBERGER:  Wait --

20        Q.    (BY MS. FUMERTON:) -- what those

21   attributes were, right?  You are not offering any

22   opinion on what those attributes should be?

23        A.    No, because those have been defined

24   by others.  I'm not -- I'm not saying that those

25   are the right attributes or the wrong attributes.

Page 201

```
 1   We have already covered that.

 2           Q.      (BY MS. FUMERTON:)  Right.  So you

 3   are not offering any opinion as to whether or not

 4   Walmart was correctly evaluating the relevant

 5   attributes, correct?

 6           A.      That is not what I said.  You said --

 7   please restate the question to make sure I

 8   understood.

 9           Q.      You said I am not saying -- this is

10   quote, "I am not saying that those are the right

11   attributes or the wrong attributes; you have

12   already covered that."  I agree we have already

13   covered that.

14                   So you are not offering opinions one

15   way or the other as to whether Walmart was

16   appropriately identifying attributes?

17           A.      That is correct.

18           Q.      And that is true for all the other

19   pharmacy defendants in this case too?

20           A.      That is correct.

21           Q.      You mentioned the NCPDP standard,

22   correct?

23           A.      Yes, I did.

24           Q.      And specifically, you referenced

25   Script 5.0, right?
```

Page 202

1           A.      I did, yes.

2           Q.      And you suggested that that data

3    standard is related to the submission of third

4    party claims to PBMs, right?

5           A.      Yes, I did.  Well, Script 5.0 --

6           Q.      But Script 5.0 is the electronic --

7                   MR. WEINBERGER:  You are talking

8    over --

9                   THE REPORTER:  I didn't hear you.

10                  MR. WEINBERGER:  You are talking over

11   him.  He was trying to answer your question, finish

12   his answer.

13          A.      NCPDP does a fairly lousy job of

14   delineating what is their electronic prescribing

15   initiative and what is their dispensing initiative,

16   in my opinion.

17                  The version of the document that I

18   have, which 5.0 is dated, it is no longer in

19   practice, but as I indicated in my statement, that

20   they have updated that.

21                  I don't subscribe to NCPDP, so I am

22   not familiar with the data elements in the latest

23   version of their third-party claims processing

24   standard.

25                  But, yeah, they do -- to answer your

Page 203

1  question, they do have an electronic prescribing

2  standard as well as a third-party claims standard.

3          Q.      (BY MS. FUMERTON:)  You just don't

4  know which is which, right?

5          A.      Well, as I have indicated, NCPDP does

6  a poor job of naming their standards.  I know which

7  is which, but how they refer to them has varied

8  over time.

9          Q.      Okay.  So -- okay.  So what does

10  NCPDP call the standard relating to the submission

11  of the claims to PBM?

12          A.      They had a very -- I am trying to

13  recall off the top of my head.  The -- because they

14  have changed that name over time.

15              Like I said, they had a very generic

16  name for a while.  So off the top of my head, I'm

17  not sure what they are doing.  I would have to go

18  back and look.

19          Q.      Is your report accurate?

20          A.      As I stated in the report, the

21  document I have from 2005 called it Script Version

22  5 --

23          Q.      Okay.

24          A.      I know there was Version 5.1, Version

25  5.2, Version 5.3, etcetera.  So what version they

Page 204

1   are currently on, I am not sure.  The reason I

2   mentioned this particular standard is it is, and

3   has been, the pharmacy claims data standard, or

4   variants thereof, since this period of time and

5   probably even before that.

6           Q.    Just so the testimony is clear, it is

7   your position in your expert testimony that Script

8   Version 5.0 at some point in time was the NCPDP

9   standard relating to the submission of third-party

10  claims to PBM; is that correct?

11          A.    It is -- I want the ability to

12  clarify that later.

13          Q.    Well, okay.  This is your expert

14  report.

15          A.    So -- I recognize that.  I may have a

16  technical error there.

17          Q.    You are unsure of whether that

18  information that you reviewed and how you describe

19  it is accurate; is that true?

20          A.    Not how I describe it.  It is what it

21  is called.  So whether it is considered Script or

22  another name was applied to it -- early on, they --

23  as I mentioned early on -- this is before

24  electronic prescribing.  Electronic prescribing has

25  only been around for like since the last -- the

Page 205

1    last fifteen years or so.  So this document refers

2    to a standard that was in use well before then.

3            Q.      You just don't know what the standard

4    was called?

5            A.      Yeah.  I may have misrepresented the

6    name of the standard.  But the data elements are --

7    the version that I referred to is accurate, and the

8    data elements that are in that version are

9    accurate.

10           Q.      What do you mean the version that you

11   referred to is accurate?

12           A.      Well, the document that I had had

13   Version 5.0.  So NCPDP used a -- used a -- used a

14   different naming convention than it uses now, as

15   far as I can recall, so --

16           Q.      You agree that when you come up with

17   a hypothetical algorithm in an academic setting

18   that you have to apply it to the real world setting

19   to see if it actually works, correct?

20           A.      That is part of the validation

21   process, yes.

22           Q.      So the system you claim that the

23   pharmacies should have had, how have you tested to

24   see if those work in the real world?

25           A.      So clarify -- please make your

Page 206

1    question more specific.  What systems I am

2    claiming?

3           Q.     Well, I have been trying to get that

4    answer too.

5                  Whatever the systems are that you are

6    claiming the pharmacies should have implemented,

7    how have you tested to see whether or not those

8    work in the real world?

9           A.     I have not been provided the data nor

10   the algorithms to test those systems, although I

11   will refer to the New England Journal of Medicine

12   article, from CVS employees that instituted some of

13   those systems and demonstrated that they could

14   identify prescribers that were prescribing excess

15   numbers of medications.

16                 So -- and I --

17          Q.     So CVS --

18          A.     Go ahead.

19          Q.     So CVS was doing what you think it

20   should have been doing?

21          A.     Had the capability to do what it

22   should have been doing.  They reported it -- they

23   could have been doing that.

24          Q.     Do you know whether they were?

25          A.     No.

1        Q.      Does the article that you reference,
2   Exhibit 3, does that contain all the systems that
3   you think the pharmacy defendants should have been
4   using?

5        A.      I am sorry.  You are referring to
6   Article 3?

7        Q.      Exhibit 3, which is the article that
8   you were referencing, right?

9        A.      Okay.  You need to refresh my memory.
10  We have talked about several articles.  Which --

11       Q.      Exhibit 3, the CVS one that you were
12  just referencing.

13       A.      I'm sorry.  Okay.  Restate the
14  question.

15       Q.      Does Exhibit 3 describe all of the
16  systems that you think the pharmacy defendants
17  should have been using?

18       A.      No.

19       Q.      Okay.  So you have not tested in any
20  way whether or not the systems you think the
21  pharmacies should have been using could, in fact,
22  have been used in the real world, correct?

23       A.      As I stated earlier, I wasn't given
24  the data to test the systems.  However, if you look
25  at the SAS program developed by CVS, and that

Page 208

1    program I referred to previously, the 2012 SAS

2    program written by a CVS vendor, AGI, computing red

3    flags from their dispensing data, and a 2014 SAS

4    program written by a CVS vendor, computing red

5    flags from their dispensing data, both of those

6    documents had information related to the

7    following -- as near as I can remember, the

8    following red flags. ████████████████

     █████████████████████████████████

     █████████████████████████████████████

     ████████████████     ███████████████

     ███████████████     █████████████████

     ██████████████████████████████████

     ████████████████████████

     ██████████     █████████████████████████

     █████████     ████████████████████

     ██████████████████████

     █████████████     ██████████████

     ██████████████████████████████

     ████████████████████████

21    within the store.  A whole host of metrics that

22    were generated via those programs.

23                    Whether that information -- whether

24    that information was actually presented to a

25    pharmacist as part of their dispensing is -- is

1  unclear to me.  I would not provide any information

2  that that information was or was not provided to

3  pharmacists when they were dispensing medications.

4         Q.    Is it your expert opinion that all

5  that information that you just described should

6  have been provided to pharmacists when evaluating a

7  prescription?

8         A.    In general, yes, if it is relevant,

9  right.  So it gets back to the general question --

10         Q.    Do you --

11         MR. WEINBERGER:  Objection.  Let him

12  answer the question, please.  Don't interrupt him.

13         A.    It gets back to the general question

14  of, you know, is this for a legitimate medical

15  purpose.  And to assist the pharmacists in their

16  duties and the pharmacy staff in their duties, you

17  know, prospective drug utilization programs exist

18  within the pharmacy.  And, therefore, by extension

19  of that analogy, you know, we provide warnings

20  associated with different types of medications,

21  okay.

22              It is entirely feasible within these

23  organizations to produce those dashboards to give

24  the pharmacists information about how much out of

25  balance, quote/unquote, this prescription they are

Page 210

1    receiving is relative to other medications being

2    dispensed for that same medication at the same

3    pharmacy or by that same prescriber or given that

4    same distance -- all of those components, the data

5    systems were available and could have been used to

6    provide the pharmacists that information.

7            Q.    (BY MS. FUMERTON:)  You are saying it

8    could have been.  Are you saying it should have

9    been?

10            I am trying to figure out what your

11    expert opinion is.  Are you saying that it should

12    have been, all that information should have been

13    provided to a pharmacist on a dashboard for them to

14    look at every time they are filling an opioid

15    prescription?

16            A.    That -- they should -- I'm sorry.  It

17    is outside my expertise to say it should have been.

18            Q.    Can you turn to -- I don't know if

19    you pulled it out.  It was Tab 11 in your box.

20            A.    No, one second.  All right.

21                  (Exhibit 7 was marked for

22                  identification.)

23            A.    Okay.

24            Q.    (BY MS. FUMERTON:)  For the record,

25    we have marked as Defendants' Exhibit 7 an article

1    titled "Evaluation of Machine-Learning Algorithms

2    for Predicting Opioid Overdose Risk Among Medicare

3    Beneficiaries With Opioid Prescriptions," and it is

4    dated March 22nd, 2019.  Is that correct,

5    Dr. Malone?

6            A.    Yes, that is correct.

7            Q.    And under the abstract, you write or

8    describe, rather, the importance of your study,

9    which states that "Current approaches to

10   identifying individuals at high risk for opioid

11   overdose target many patients who are not truly at

12   high risk."  Correct?

13           A.    That is written there, yes.

14           Q.    Well, was that the importance of the

15   study?

16           A.    I am sorry.  That question didn't --

17   I didn't hear that question.

18           Q.    I am not just asking what words are

19   written in the paper.  I am asking if you agree

20   that that is the importance of the study, what is

21   written there?

22           A.    I want you to restate the entire

23   question, please.

24           Q.    Okay.  Do you agree that the

25   importance of the study is that current approaches

Page 212

1    to identifying individuals at high risk for opioid

2    overdose target many patients who are not truly at

3    high risk?

4         A.    I guess the defining question or the

5    defining component of that question is "many."

6    Some patients, yes.  They should not be defined as

7    high risk.  Others do need to be defined as high

8    risk.

9         Q.    Why did you write "many"?

10        A.    I guess in a general context.  And in

11   this particular paper, we -- we looked at lots of

12   different attributes that might predict

13   inappropriate use.  And there's lots of -- as

14   indicated by, I guess, just prescriptions for

15   opioids, there's many medications that are used

16   appropriately for opioids, and then there's a lot

17   of, you know, in my opinion, evidence to suggest

18   that they are overused.

19             So --

20        Q.    Sure.  Do you agree -- strike that.

21             You agree that many patients can take

22   opioids safely, correct?

23        A.    Yes.

24        Q.    Do you agree that the vast majority

25   of patients who take opioids take them safely?

Page 213

1         A.     No.

2         Q.     What percentage of patients who take

3    opioids do you think don't do so safely?

4         A.     I don't know what percentage.  I just

5    know -- you used the term "vast majority."  That is

6    a nebulous term, and I can't agree with that

7    statement.

8         Q.     So you don't know one way or the

9    other.  You are not supposed to agree with the

10   statement.

11              You are just saying, I don't know one

12   way or the other whether or not the vast majority

13   of patients who take opioids take them safely

14   because it a nebulous statement?

15              MR. WEINBERGER:  Objection, form.

16        A.     I don't think anybody is -- well,

17   strike that.

18              I am sorry.  I don't want to -- we

19   don't state in this paper whether patients are

20   taking them appropriately.  We are focusing on

21   patients that were at risk of an overdose or abuse,

22   I guess, or have a medication overdose -- opioid

23   overdose.

24              So the answer to your question is

25   there's some evidence to suggest that, you know,

Page 214

1    medications are being used inappropriately and

2    result in opioid abuse or overdose.

3            Q.     (BY MS. FUMERTON:)  So, right.  And

4    so if you look at the results of your study, in

5    fact, on the same page, less than one percent of

6    the subjects of the study taking opioids had an

7    overdose episode, correct?

8            A.     I -- I am looking at the data.  I'm

9    sorry.  I want to answer your question.

10           Q.     I can tell you -- yeah.  I can point

11   you, and you can tell me if I am looking at the

12   wrong thing.

13           A.     Okay.

14           Q.     I am looking at the Results section

15   on the first page.  And it says .6 percent had at

16   least one overdose episode.

17           A.     Yeah, I guess the question becomes --

18   I'm not sure I can conclude what you are

19   suggesting, given that this is a subset of the data

20   that we are talking about here.

21                  So I am trying to be precise in my

22   answer to your question.  The number that is stated

23   in that Results section is 0.6 percent had at least

24   one overdose.  But there were other components

25   within that population that were evaluated.

Page 215

1              So whether that represents the entire

2    sample, I don't know.  And although I am a coauthor

3    on the paper, I didn't do the analysis.  My input

4    into this particular paper was more on

5    conceptualization and definitions stage, but I did

6    not run the programs to generate those results.

7         Q.    So what if you look to Page -- maybe

8    this will help, on Page 5 of the study, you look at

9    the results and the patient characteristics.

10        A.    Yeah.  So there -- yes, there we have

11   a little bit more information.  So across that

12   group in this data set, the definition of overdose,

13   according to a diagnostic criteria, is shown there,

14   yes.

15             So ranging from relatively low to, I

16   guess, in the high risk group, yes, less than one

17   percent.  So your statement is accurate.

18        Q.    The objective of your study was to

19   develop and validate a machine-learning algorithm

20   to predict opioid overdose risks among Medicare

21   beneficiaries of at least one opioid prescription,

22   correct?

23        A.    Of this particular paper, yes, it

24   was.

25        Q.    And the study excluded cancer

Page 216

1   patients from that algorithm, correct?

2          A.      Yes, we did.

3          Q.      Why?

4          A.      From the standpoint that cancer

5   patients have a unique type of pain and, therefore,

6   may require different dosing of opioid medications.

7   So -- and to try to be as precise as we could

8   with -- so we don't want to confound the results by

9   having a group in there that is using the

10  medications for a legitimate medical purpose.

11         Q.      But if you had included the cancer

12  patients in the study, that would have caused a

13  greater number of false positive alarms, correct?

14         A.      It could, yes.  I am not sure it

15  would, but it could.  So I guess you are asking me

16  to project what the results would be.

17                 It is potentially true that that

18  would have happened, yes.  However --

19         Q.      And that is --

20         A.      -- keep in mind, the outcome we were

21  trying to predict here is opioid overdose.  So they

22  would have -- so it may or may not have.  You know,

23  these -- these algorithms are relatively complex,

24  and it may not have come out as an important

25  factor.

1           So I can't speculate.  I shouldn't

2    speculate as to whether it would or would not.

3    Because we don't know.

4           Q.    Well, but you were involved with the

5    design of the study, and you purposely excluded

6    them because cancer patients often take larger and

7    longer doses of opioids, correct?

8           A.    They can take certainly different

9    doses, and they may be on them for a longer period

10   of time.

11          Q.    Not just different but the larger

12   doses, right?

13          A.    I -- it is beyond my expertise to be

14   able to say that.

15          Q.    You also excluded hospice patients

16   for the same reason, right?

17          A.    Correct.

18          Q.    And in fact, your model identified

19   that seventy-five percent of those individuals

20   receiving an opioid were in a low-risk group with a

21   negligible overdose rate, correct?

22          A.    Let me look at that real quick.

23   Would you mind showing me where you are getting

24   that statement from?

25          Q.    I think it is mentioned in several

Page 218

1 different places.  One page it is on is Page 10 of

2 the report.  Let me see if I can find another for

3 you.

4             So another place you can look is Page

5 6, the Risk Stratification Using Predictive

6 Probability.

7       A.    So we do see on Page 10 that Medicare

8 beneficiaries -- so, again, specific to Medicare

9 beneficiaries -- had a -- yeah, yeah.  So we say

10 approximately seventy-five percent had a negligible

11 risk of overdose.  Yes.

12       Q.    And so you would agree that an alert

13 system that would capture that seventy-five percent

14 would contribute to alert fatigue, correct?

15             MR. WEINBERGER:  Objection to form.

16       A.    I'm not sure how the -- so it gets

17 back to how the alert system is designed.  So you

18 need to design the system to take that into -- to

19 take into account whether the patients would fall

20 into those categories.  So there's a remaining

21 twenty-five percent --

22       Q.    (BY MS. FUMERTON:)  Right.  So --

23       A.    -- remaining twenty-five percent that

24 we have to worry about.  So in -- and so let me be

25 clear here, Ms. Fumerton.

1             Alert -- running a program to

2    determine whether a patient is at risk is one

3    thing.  Displaying that information or requiring

4    the pharmacist to look at that information as part

5    of the process is another.  Right.

6             So the whole premise of my research

7    is to -- is to basically not display alerts when

8    they are not relevant.  So when they are not

9    relevant, we don't need to waste the prescriber's

10   time or the pharmacist's time, correct.  So that is

11   the whole premise.

12            So it all depends upon what the --

13   what the use was and how -- and how the program was

14   designed to detect that use or misuse as to whether

15   it would be, you know, a good thing or a bad thing.

16            The biggest --

17        Q.    But if your report --

18            MR. WEINBERGER:  He was in the middle

19   of answering your --

20            MS. FUMERTON:  I am not doing it

21   intentionally.

22            MR. WEINBERGER:  Well, let him

23   finish.  If you know he pauses, then just hold off

24   on your question.

25        A.    So with respect --

Page 220

1          Q.     (BY MS. FUMERTON:)  Want to go

2    back --

3          A.     With respect to alert fatigue, the

4    solution -- as I stated earlier, the solution is

5    not to turn off all alerts or have no alerts.  The

6    situation is to make the alerts appropriate for the

7    situation.

8               So, you know, back to your simple

9    suggestion earlier:  When the prescription is at

10   24.9 miles, that is not twenty-five miles.  But if

11   that was where the pill mill was located, then, you

12   know, it would be relevant to have that --

13   something relevant there to indicate that that was

14   a problem to the pharmacist.

15              So, again, it depends upon how those

16   contextual factors would have played into that

17   particular scenario.  You want me to -- to make a

18   general statement that all alerts are bad, and they

19   are not.  They are -- or at least I get the sense

20   that you want me to make that statement.  My

21   apologies for putting words in your mouth.

22         Q.     Yeah, no.  Absolutely not.

23   Absolutely not.  I am not suggesting in any way

24   shape or form that all alerts are bad.

25              What I am suggesting, based on your

Page 221

1    research and your statements you have made in your

2    articles, is that if you have a system that alerts

3    seventy-five percent of the time when there's a

4    negligible risk to the individual, that that

5    contributes to alert fatigue.

6                    MR. WEINBERGER:  Objection.

7            Q.    (BY MS. FUMERTON:)  And that you

8    should instead be looking for flags that flag only

9    on those individuals that truly are at risk.

10                   MR. WEINBERGER:  Objection to form.

11           Q.    (BY MS. FUMERTON:)  Do you agree with

12   that?

13           A.    I don't know if seventy-five -- so in

14   this analysis, we looked at overdose risks or a

15   diagnosis of overdose.  Is it the only metric to

16   build the rule on?  No, it is not.

17                   So that number may be -- is likely

18   different than seventy-five percent.

19           Q.    (BY MS. FUMERTON:)  And it goes back

20   to context, right, of what you said earlier, that

21   you need to understand the context of the

22   situation, the individual patients, the individual

23   locations of the pharmacies, all of that stuff is

24   relevant to this determination of whether or not a

25   particular patient is at risk.  Right?

1          A.      That is true.  That is -- you know,

2     yeah.  And --

3          Q.      And so -- I mean you used the example

4     in one place twenty-five miles away is nothing.

5     That is what is going to be commonplace for

6     somebody to do, so it would be inappropriate to

7     flag all prescriptions coming more than twenty-five

8     percent [sic] in that instance.

9                 If there's another circumstance where

10    the facts are different, then it could be

11    appropriate.  But you are not opining one way or

12    the other on what particular metrics would be

13    appropriate for a pharmacy to implement, correct?

14         A.      Yes.

15                THE VIDEOGRAPHER:  I apologize for

16    the interruption.  This is the videographer.  I

17    need to have a ten second stop to create a video

18    file.

19                MS. FUMERTON:  We have been going for

20    a while.  Why don't we take a five -- a ten-minute

21    break.  How about that?

22                THE VIDEOGRAPHER:  We are off the

23    record at 4:49.

24                MS. FUMERTON:  So we will come back

25    at 4:00.  Yeah.

```
                                              Page 223

 1                    (Whereupon, a break was had from 4:49

 2                    p.m. until 5:06 p.m. EDT)

 3                    THE VIDEOGRAPHER:  We are back on the

 4          record at 5:06.

 5                    Q.     (BY MS. FUMERTON:)  Okay.

 6          Dr. Malone, do you have the envelope that is marked

 7          Tab 13?

 8                    A.     Yes.

 9                    (Exhibit 8 was marked for

10                    identification.)

11                    Q.     (BY MS. FUMERTON:)  Could you please

12          open that?  And for the record, we are going to

13          mark this as Exhibit 8.

14                    And also for the record, it is an

15          article entitled "Using Machine Learning to Predict

16          Risk of Incident Opioid Use Disorder Among

17          Fee-for-Service Medicare Beneficiaries:  A

18          Prognostic Study."

19                    And Dr. Malone, I actually have a

20          really simple question for you on this document,

21          and then we will move on.

22                    A.     Okay.  Go ahead when you are ready.

23                    Q.     I just wanted to confirm that Exhibit

24          8 is an article that you coauthored, dated July

25          17th, 2020.
```

Page 224

1          A.     Yes.

2          Q.     Okay.  Dr. Malone, who asked you --

3                 MS. FUMERTON:  We can take this one

4    down.

5          Q.     (BY MS. FUMERTON:)  Dr. Malone, who

6    asked you to be an expert in this matter?

7          A.     Mr. Weinberger.

8          Q.     When did he ask you to be an expert?

9          A.     I think it was the spring.  I would

10   imagine somewhere around the last week of March, I

11   believe, somewhere around there.  I could look at

12   my calendar.

13         Q.     Last week of March?

14         A.     Yeah.

15         Q.     March 2021?

16         A.     Yes, this year, yes.

17         Q.     Did you know Mr. Weinberger prior to

18   March 2021?

19         A.     I did not.

20         Q.     Did he reach out to you?

21         A.     Yes, he did.

22         Q.     Did he reach out to you with anybody

23   else?

24         A.     I believe we had an initial call with

25   one other individual on the line.  I don't recall

Page 225

1    who that was.

2           Q.     Do you know if that individual was an

3    attorney?

4           A.     I don't know for sure, but I believe

5    so.

6           Q.     Do you understand it was an attorney

7    for plaintiffs in this litigation?

8           A.     I -- I am assuming it was.  But,

9    again, I just had a name.  I didn't receive any

10   credentials or anything else from this individual.

11   I guess maybe an email I received at one point.

12   So --

13          Q.     Have you been retained by anyone else

14   to provide expert testimony in any opioid-related

15   litigation?

16          A.     Several years ago I was asked to

17   be -- to be retained.  A firm out of Dallas had

18   contacted me.  So there was one meeting and never

19   heard again.  And I can't remember what year that

20   was, but several years ago.

21          Q.     Did you understand that it had to do

22   with the National Opioid Litigation or something

23   else?

24          A.     It had to do with opioid litigation.

25   Whether it was national in scope is another matter.

Page 226

1          Q.     And so you believe you were retained

2     in the last week of March 2021; is that right?

3          A.     Let me verify the date, please.

4          Q.     What are you accessing?

5          A.     My calendar on my phone.  I am trying

6     to see if I had a meeting in my calendar.  I do not

7     see it.  So, again, I think it was about then.

8          Q.     And when did you receive the

9     documents that you listed in your report that you

10    relied on for purposes of your testimony?

11         A.     Around the first week of April.  I

12    was told my report was due the 15th or 16th of

13    April.

14         Q.     You are being compensated in this

15    matter at a rate of three hundred eighty dollars

16    per hour, correct?

17         A.     That is correct.

18         Q.     Are you being compensated at any

19    different amount for testimony?

20         A.     This is my only expert testimony.

21         Q.     I apologize.  Are you only -- my

22    question was unclear.

23              Are you charging only three hundred

24    and eighty dollars per hour -- let me restate that.

25              Are you charging three hundred eighty

Page 227

1   dollars per hour for all activity in connection

2   with this, or do you have a different rate,

3   depending on what the activity is?

4           A.    I am not sure of my agreement with

5   that regard, whether I put a different rate for

6   in-court appearance or not.  I think there's a

7   travel rate or I proposed -- I would have to go

8   back and look at those documents.  So off the top

9   of my head, I can't recall.

10          Q.    Have you submitted any invoices for

11  your work?

12          A.    I did not submit an invoice per se in

13  terms of, you know, in a formal -- I submitted a

14  time sheet that had a calculation of hours to date

15  to Mr. Weinberger.

16                Yeah, that was yesterday, I believe.

17          Q.    So Mr. Weinberger --

18          A.    Maybe the day before.  I'm sorry.

19                MS. FUMERTON:  We are going to mark

20  as Exhibit 9 a spreadsheet that Mr. Weinberger

21  provided to us, I believe, yesterday.

22                (Exhibit 9 was marked for

23                identification.)

24          A.    Okay.

25          Q.    (BY MS. FUMERTON:)  And so since it

Page 228

1   was provided yesterday, we didn't have time to send

2   it out to you, but it is just one page and we will

3   put it on the screen.

4           A.      Uh-huh.

5           Q.      Are you familiar with this document?

6           A.      I created that document, yes.

7           Q.      Okay.  And is this a document that

8   you were just referencing that you provided to

9   Mr. Weinberger that references your time spent on

10  this matter to date?

11          A.      It does.

12          Q.      And is this an accurate reflection of

13  the time that you spent working on this matter?

14          A.      Up through the 20th of May, yes, it

15  does.

16          Q.      Okay.  And how much time do you think

17  you have spent since May 20th?

18          A.      Including today?

19          Q.      Not including today because we are

20  not done yet.

21          A.      I wish it was.  Probably another four

22  hours.

23          Q.      And so earlier you testified that you

24  spent seventeen hours reviewing the materials that

25  are listed in your expert report, correct?

1          A.     Uh-huh.

2          Q.     How long do you estimate that you

3    spent writing the report?

4          A.     Somewhere in the neighborhood of two

5    hours.  I mean part of it was reviewing the

6    material as I was taking notes and putting together

7    my thoughts.  So it is interspersed throughout.

8          Q.     Do you still have copies of those

9    notes?

10         A.     I do.

11         Q.     Did I understand you had four

12   meetings of about two hours each, so eight hours,

13   and that you re-reviewed documents for about

14   another three hours?  So I'm not a math major, but

15   that seems to add up more than the nineteen that

16   are listed here.

17                Can you explain that?

18         A.     So the three hours you just referred

19   to, you know, are not shown here.

20         Q.     Okay.

21         A.     So what was the other parts of that?

22   I'm sorry.

23         Q.     You said you had four meetings?

24         A.     Yeah, not all of those meetings are

25   represented here.

Page 230

1          Q.      Okay.

2          A.      Again, it was through the 20th.

3          Q.      Right.  So two of the meetings were

4    represented here?

5          A.      I believe so.

6          Q.      So still that would be seventeen

7    hours of reviewing documents, four hours of

8    meetings, two hours to write the report?  Something

9    is off with the math, right?

10         A.      Well, maybe I didn't state it

11   clearly.  So the writing of the report occurred

12   while I was putting those documents together --

13   occurred while I was reviewing the other documents.

14   So the attributes that I was including -- so two

15   hours in terms of, you know, finalizing the report,

16   putting it in the right format, putting it on the

17   right letterhead, etcetera, so --

18         Q.      And according to this, the first day

19   you started working on this matter was April 6th,

20   2021; is that accurate?

21         A.      That is the first day I started

22   reviewing documents, yes.

23         Q.      Did you have staff or anyone else

24   assist you?

25         A.      No.

Page 231

1          Q.     Did the University of Utah separately

2    compensate you for your time with this report?

3          A.     No.

4          Q.     Okay.  We can put that document away.

5                 Grab your report.  I have a couple

6    more questions about specifically what is written

7    in there.  So that is Exhibit 1.

8                 So I want to flip actually first to

9    the back part of your report, starting on Page 7.

10   And would you agree that the summary of your

11   opinion is that "pharmacy chain organizations

12   created, purchased or aggregated data that could

13   have been used to reduce the inappropriate use of

14   opioids and other medications.  The data elements

15   required for the above activities has long resided

16   (since at least 2006 and likely years before that

17   time) within databases, and accumulation of such

18   data across multiple pharmacies permitted the

19   opportunity to inform pharmacists and pharmacy

20   staff to potential illegitimate opioid use"?

21         A.     I'm sorry.  Your question is, is that

22   an accurate statement?  Is that what you are

23   saying?

24         Q.     Do you agree that that is a summary

25   of your opinions that you are offering in this

Page 232

1    matter?

2           A.      Yes, it is.

3           Q.      And are you offering any other

4    opinion other than that?

5           A.      No.

6           Q.      If you will flip back to Page 2 of

7    your report.  And you talk about issues addressed,

8    and you have seven questions listed here, correct?

9           A.      Yes.

10          Q.      Who came up with those seven

11   questions?

12          A.      Those were derived from the documents

13   I reviewed.  So in particular, the CVS SAS program.

14   The questions posed to me are -- posed to me by the

15   plaintiffs' counsel in terms of these attributes,

16   and also the DEA documents I talked about

17   previously about the red flags.  So -- and again --

18          Q.      We are not sure --

19          A.      Yeah, and again, even though I am no

20   longer a pharmacist, you know, the information

21   about, you know, appropriate legitimate use of

22   prescription medications is -- those documents --

23   what constitutes those appropriate use has been

24   available for a long period of time.

25                  So I don't recall specifically where

Page 233

1    that -- where these -- all of these attributes --

2    or where that document is located.  But these are

3    things that we are well aware of in the pharmacy

4    community.  So these are common knowledge issues.

5           Q.    So what did plaintiffs ask you to

6    opine on?  I mean you obviously didn't-- to put

7    context in it, just sort of come up with just

8    say -- I am going to issue an opinion on whatever I

9    want.

10           What were you asked to do with

11   respect to --

12           A.    Please go to my summary.  Please go

13   back to the summary.  So the question was whether

14   the organizations, defendants, would have had at

15   their disposal the data that would have then

16   allowed them to create systems to prevent

17   inappropriate use.

18           So in particular, the data elements

19   to do those activities, in terms of identifying

20   these red flags, you know, doctor shopping,

21   pharmacy shopping, inappropriate quantities,

22   inappropriate prescribing by certain medical

23   specialties relative to their peer organizations --

24   peers, using multiple medications concurrently.

25   That is what I was asked to opine on.  Could you

Page 234

1   create systems to reduce the use -- to create

2   flags, create approaches to reduce the use.

3                So my statement "could have been used

4   to reduce the inappropriate use of medications"

5   is -- I saw no evidence that they did use those

6   tools.

7         Q.     Okay.  So now we are going back to

8   the statement that you said "no evidence that they

9   used those tools," so I guess we are going back

10   there again.

11                Let's start off.  I mean you said --

12   let's take Walmart, for example.  You looked at the

13   ConnexUs screen shots.  Are you familiar with what

14   a patient profile is?

15         A.     Yes, ma'am.

16         Q.     And that contains lots of information

17   for the pharmacists, correct?

18         A.     It does, yes.

19         Q.     It contains information about prior

20   fill history?

21         A.     Yes.

22         Q.     It contains information about where

23   the patient lives?

24         A.     It will have the patient's address,

25   yes.

1          Q.      And where the patient lives in

2     relation to the pharmacy because the pharmacist

3     knows what pharmacy they are in, right?

4          A.      Well, yeah.  By deduction, yes, the

5     pharmacist can determine that.

6          Q.      Right.  And the pharmacist knows

7     where the prescriber is located, right?

8          A.      The pharmacy -- well, it depends upon

9     what information is presented on that screen.  So

10    physicians do have an office address associated

11    with their DEA registration, so --

12         Q.      Is it your opinion that ConnexUs did

13    not show the pharmacist what the address of the

14    prescribers?

15         A.      No.  I am not -- I am not saying that

16    at all.  I am just saying I don't know -- so

17    physicians may practice in different locations.  So

18    you are making -- so the statements you are making

19    are overly broad, you know.  So there is an address

20    for the prescriber, that is true.

21         Q.      Well, I'm sorry.  What address

22    information then -- I mean you talk in your report

23    about understanding geospatial analysis, right,

24    which effectively, for those of us who don't have

25    as many fancy degrees, is just where are people in

Page 236

1    relation to other people, right?

2          A.    Yeah, I mean, exactly, that is the

3    basic premise of it.  And it is predicated on the

4    data that is in this system.  So the data in this

5    system is the registration address used by the

6    doctor associated with it.  Where the practitioner

7    actually is when they write the prescription may or

8    may not be at that office.

9               So, you know, I mean, in general, you

10   know, theoretically, somebody would actually

11   practice where their DEA registration is, but that

12   may not be where they wrote the prescription.

13              So you are trying to put a blanket

14   statement -- it appears you are trying to put a

15   blanket statement around the address of the

16   physician when they wrote the prescription, and

17   that information is just not there necessarily.

18         Q.    So the pharmacy didn't have that

19   data?  I am just trying to understand your

20   position.  Did they have that data or they didn't

21   have that data?

22         A.    They have the data of the DEA

23   registration, yes.

24         Q.    That data also was available to the

25   pharmacist, right?

Page 237

1          A.      Yeah, they have to have that data.

2     They have to have that data.

3          Q.      Okay.  So understanding the location

4     of the pharmacy, understanding the location of the

5     patient, understanding the location of the doctor,

6     which is all available within ConnexUs, and when a

7     pharmacist is filling out, how are you saying that

8     you saw no evidence that they used those tools?

9          A.      The -- let me put it in this context:

10    If you have a car that has a tachometer, does it

11    tell you what speed you're going?  No, it tells you

12    how fast the engine is going, right?  But yet it is

13    information that is available to you.  So you need

14    to transform the tachometer with how the

15    transmission and the wheels so that you can get a

16    speed where you know how fast the vehicle is

17    moving.

18               What I am suggesting is knowing

19    isolated bits of data do not necessarily allow --

20    yes, the pharmacist could sit there and try to do

21    the mental calculations about, okay, where is this

22    patient, how far is this patient from my pharmacy.

23    Do I really know where that address is or do I not

24    know?  Okay.

25               You know, so I have to sit there and

Page 238

1    mentally calculate how many blocks is represented

2    by that address.  So for the vast -- for some

3    patients, I shouldn't say vast majority -- for some

4    patients, they get their pharmacies --

5    prescriptions filled within a legitimate area, and

6    they are not pharmacy shopping.

7                      But with opioid medications, I think,

8    because even cited in the papers that we have

9    reported, there's a significant increase of the use

10   of these agents.

11                     So basically, the guardrails weren't

12   on the system to be able to, at a glance, measure

13   every time, you know -- so every time the

14   pharmacist had to stop and do a calculation, okay,

15   where is this patient relative to my pharmacy,

16   where is this doctor relative to my pharmacy, it

17   required -- you know, it could have been presented

18   in a dashboard format, a distance or, you know --

19   so they would have had to look for that information

20   and assembled it at the same time they are

21   assembling all the other information about the

22   prescription and all the other information about

23   the patient.  That is why we do prospective DUR.

24   That patient profile contains lots of drugs.

25                     Does the pharmacist know about those

1  drug interactions?  They probably know some of

2  them.  Do they know all of them off the top of

3  their head?  No, they don't.  That is why the

4  computer is there to assist them in the process.

5            So the data is there.  It is how the

6  data should be used and reported.  So that -- my

7  basis is that the data was there.  It could have

8  been used to help the pharmacist make a decision,

9  help the pharmacy staff make a decision.  So I am

10  not arguing the data is not there, yeah.

11       Q.    You are not arguing that the data was

12  not available to the pharmacists either, correct?

13       A.     There is data that was not available

14  to the pharmacists.  There's no data about how

15  their store rates compared to other stores, how the

16  use of these agents compares to other stores, how

17  that particular prescriber, is that within the

18  normal practice of that prescriber.  Do I know

19  every physician within, you know, a geographic

20  location within twenty-five miles and what their

21  normal practice is?  No, I don't.  I would imagine

22  that most pharmacists would say no, they don't.

23            So what I am advocating for is that

24  there could have been metrics to give the

25  pharmacists information about which prescription --

Page 240

1    which prescriptions were for legitimate medical

2    purpose and which ones weren't.

3              Q.    So you are offering no expert

4    opinions on which prescriptions were for a

5    legitimate medical purpose and which ones weren't,

6    correct?

7              A.    That's right.

8              Q.    And going back to what we talked

9    about before, you used as an example, you take

10   twenty-five miles.  What is more helpful to me as a

11   pharmacist filling a prescription knowing that

12   Sally, who comes in and lives down the street, is

13   filling a prescription, and I can see from the face

14   of it that it was from the Cleveland Clinic -- is

15   that more helpful to me, or is it more helpful to

16   come from geospatial analysis with random figures

17   thrown on it?

18              MR. WEINBERGER:  Objection.

19              Q.    (BY MS. FUMERTON:)  You can -- right,

20   I mean the pharmacist has access to, every time

21   they are filling a prescription, the information

22   that tells them how far away the prescriber is, how

23   far away the patient is?  I mean they have that --

24   access to that information as a pharmacist.

25              A.    Sure, they could stop and Google --

Page 241

1    use Google maps or any other program to figure out

2    the distance is what you're suggesting.

3            Q.    No.  I'm not suggesting that at all.

4    I'm not suggesting that at all.

5                  For example, I don't care -- why

6    would it be -- you are sitting here and telling me

7    that it is more relevant the exact mileage that a

8    patient traveled to get to the Cleveland Clinic as

9    opposed to the fact that they went to the Cleveland

10   Clinic?

11           A.    No, I'm not telling you that.

12           Q.    Right.  So then who needs to Google

13   Maps anything?  They see on the face of the

14   prescription that it is coming from the Cleveland

15   Clinic.  They know, right?

16           A.    Presumably, yes.

17           Q.    Going back to your seven questions

18   because I do have some specifics about these.

19           A.    Okay.

20           Q.    You said that you came up with these

21   seven questions on your own, correct?

22           A.    No, I did not.  As I said, these came

23   from a variety of materials.

24           Q.    Okay.  Well, where did Question 1

25   come from?  "Conduct drug utilization analysis and

Page 242

1   provide meaningful metrics to assist pharmacists --

2              THE REPORTER:  I'm sorry.  You are

3   going to have to slow down -- hold on.  You are

4   going to have to slow down.

5              Where did Question 1 come from?

6   "Conduct" --

7        Q.    (BY MS. FUMERTON:)  -- "drug

8   utilization analyses and provide meaningful metrics

9   to assist pharmacists and pharmacy staff to

10  identify and prevent inappropriate use of opioids

11  and other medications, both within and across

12  pharmacies within their organization."

13       A.    That particular statement is -- is

14  derived from A, my own knowledge; B, the CVS SAS

15  programs that were provided to me.

16       Q.    What is a PDMP?

17       A.    Prescription Drug Monitoring Program.

18       Q.    And what does the PDMP do?

19       A.    Theoretically, it provides a profile

20  for a given patient about how often a certain type

21  of medication has been dispensed for that

22  particular patient.  It typically comes from

23  pharmacy organizations or pharmacists or

24  pharmacies, and it allows the pharmacists to

25  determine if that particular individual had had a

Page 243

1   recent prescription dispensed of a certain class or

2   type as defined by the particular PDMP.

3           Q.      And what is the PDMP in the state of

4   Ohio?

5           A.      I believe it is called OARRS.

6           Q.      And how long has it been in place?

7           A.      I'm not sure.  I didn't study that.

8   It is beyond my expertise.

9           Q.      Do you know how long -- so you are

10  not an expert in the OARRS database or its use,

11  correct?

12          A.      No, I am not.

13          Q.      And you don't know for how long

14  Walmart pharmacists, for example, have had access

15  to the OARRS database, correct?

16          A.      That's correct.

17          Q.      And the OARRS database can provide

18  evidence of pharmacy shopping, correct?

19          A.      Given that it is the PDMP, it could,

20  yes.

21          Q.      And it provides evidence of doctor

22  shopping, correct?

23          A.      It could, yes.

24          Q.      And, in fact, PDMPs are better than

25  individual pharmacy data because it aggregates

Page 244

```
 1   information across pharmacies, not just within a

 2   particular chain, correct?

 3          A.     I don't know if I agree with the

 4   characterization "better."  It contains

 5   theoretically more data, if that is what you mean

 6   by "better."  Because it is -- to your point, it

 7   does represent data across multiple pharmacy types,

 8   the pharmacy organizations.

 9          Q.     So you have no opinion on whether or

10   not it would be better for a pharmacist to be able

11   to view whether or not a patient was seeking to

12   fill prescriptions outside their pharmacy chain as

13   opposed to just inside their pharmacy chain?

14                 MR. WEINBERGER:  Objection, form.

15          A.     I don't have an opinion about that

16   particular attribute.  I guess what I am trying to

17   get to is how that information presented to the

18   pharmacist can probably, and probably does, matter.

19   And if you allow me to give another analogy, if you

20   want cars to stop at a particular intersection, you

21   put up a stop sign of a certain size.  You could

22   also write "stop" in the middle of the road as

23   well.  One of these is probably more effective than

24   the other.

25                 So I guess my presumption here is
```

Page 245

1    that the PDMPs give you a medication profile where

2    you -- with the pharmacist, the pharmacy staff --

3    who knows who actually looked at the data -- would

4    have to scan and make judgments about -- or have to

5    calculate time between fills, amounts, quantities

6    dispensed, etcetera.  So a dashboard could have

7    been created that basically said yep, you know, we

8    don't see any -- any flags here, you know.

9                 So let's take the situation where the

10   prescription is legitimate, the patient needs the

11   medication, and yet they have had thirty

12   prescriptions over the last year for various

13   medical issues that are in the database.

14                So the pharmacist has to sit there

15   and evaluate that.  Okay.  And say, you know, what

16   is going on here, you know.  That takes time and

17   energy for the pharmacist.

18                On the other hand, if the diagnosis,

19   which is in the pharmacy data or could be in the

20   pharmacy data, is there, combined with that piece

21   of information, it is like oh, this patient is in

22   hospice care.

23                So that information in the PDMP could

24   have been pulled into the pharmacy system, and an

25   alert wouldn't have been generated to the

Page 246

1    pharmacist about that particular prescription

2    because the patient -- it is for a legitimate

3    medical purpose.

4                    The problem was that that data sits

5    there in its raw form with no guardrails, what is

6    appropriate, what is inappropriate, how many

7    milligram -- morphine milligram equivalents is too

8    much.  There's no guardrails.  It doesn't tell the

9    pharmacist anything about the typical pattern of

10   use for that particular patient or that particular

11   prescriber or that particular diagnosis.

12                   All of that data was sitting on

13   defendants' servers.  They could have analyzed that

14   and created metrics that said, hey, this

15   prescription exceeds a five percent threshold.

16   And, in fact, there are documents that these

17   organizations had actually created those metrics.

18   It is like oh, this is a five percent threshold or

19   here is the two percent threshold.

20                   And the paper that was published in

21   the New England Journal of Medicine, they

22   identified -- if I may refer back to that document,

23   they identified, as they stated -- so this is

24   Exhibit 3 -- we identified --

25            Q.    (BY MS. FUMERTON:)  Hopefully, you

Page 247

1    are going to be able to answer my question at this

2    point.

3            A.      I guess what I am saying is, you

4    asked the question, you know, would the PDMP data

5    be useful.  And I am saying, yeah, it is useful,

6    but it is not the most useful data that could have

7    been provided to the pharmacist or the pharmacy

8    staff.

9                    You know, my argument is with respect

10   to Number 1, which is what you asked me about, your

11   question, is conduct meaningful drug utilization

12   providing meaningful metrics to assist the

13   pharmacist and pharmacy staff.

14                   The PDMP provides generally -- again,

15   I'm not an expert on the OARRS system -- may or may

16   not have provided meaningful metrics to the

17   pharmacists.

18                   MR. SWANSON:  This is Brian Swanson

19   for Walgreens.  I move to strike as nonresponsive.

20           Q.      (BY MS. FUMERTON:)  Okay.  There's a

21   lot thrown out there.  So we would respectfully

22   ask, just so that we don't need to go beyond, to

23   try to restrict your answers to the questions I am

24   asking.

25           A.      Okay.

1      Q.     You make a comment -- I will sort of

2   go back through them.

3             You said, for example, there might be

4   a five percent threshold and that will tell you

5   whether you are seeing a five percent threshold.

6   Okay.  So what does that tell you about whether or

7   not that prescription is appropriate or not?

8      A.     That piece of information in and of

9   itself doesn't, but it -- but it gives the

10  pharmacists -- so if it does exceed the five

11  percent threshold, it gives the pharmacist the

12  opportunity to investigate more.  So we do this

13  with drug interaction warnings.

14            So we have moderate, severe,

15  contraindicated in some systems.  So if the warning

16  comes back moderate, the pharmacist, you know,

17  should, you know, consider, you know, what is going

18  on with the patient, how long have they been on it,

19  what is the dose of the medication, what is the

20  route, what is the strength, what are the

21  directions for use.

22            So prospective drug utilization

23  programs are designed to assist the decision-making

24  of the pharmacist.  Does the pharmacist need to

25  know there's been five case reports associated with

Page 249

1   that drug interaction, and of those five case

2   reports, three patients ended up in the hospital?

3   Typically that level of detail isn't there.

4                   But with the PDMPs -- some PDMPs do.

5   And, again, I'm not familiar with OARRS system.

6   But what some of those systems do, they provided a

7   listing just like the patient profile that didn't

8   give any sense to how the data should be

9   interpreted, so --

10                  Q.    Okay.  Again, I am going to strike as

11  nonresponsive because, frankly, you don't know what

12  OARRS does or does not do, right?  So you are not

13  offering any opinion whatsoever as to whether or

14  not OARRS actually provided this information of

15  your seven questions that you thought the

16  pharmacists should have access to, right?

17                  MR. WEINBERGER:  Objection.  Earlier

18  you asked him to compare OARRS to what the -- the

19  proposed system that he would have suggested that

20  these defendants could have utilized.

21                  So you have asked him about OARRS.

22  He said he didn't know what OARRS did, and then you

23  asked him to compare the two.

24                  MS. FUMERTON:  Exactly.  No, I

25  didn't.  So you know, I didn't do that at all.  He

1   went on to talk about some other random state or

2   hypothetical -- that is the problem here, right.  I

3   mean, technically, this entire report is based on

4   hypotheticals.

5                   THE REPORTER:  I can't understand

6   you.  Hold on.  Hold on.  I can't understand you.

7   "Exactly.  No, I didn't at all.  He went on to talk

8   about some other random" --

9                   MS. FUMERTON:  PDMP.  He has

10  testified he does not know anything about what

11  OARRS can and cannot do.  Full stop.

12           A.     And you --

13                  MS. FUMERTON:  So I am just saying

14  having him testify about what some hypothetical

15  other PDMP might do is completely irrelevant to

16  this case, and that is why it is completely

17  nonresponsive to my question, and I am going to

18  move to strike it.

19           Q.     (BY MS. FUMERTON:)  But going back to

20  this dashboard, again, you can't point to any

21  examples of this dashboard ever being utilized in

22  practice that has all of these elements that you

23  describe, correct?

24           A.     That is correct.

25           Q.     With respect to the dashboard, this

Page 251

1    hypothetical dashboard that you have created, at

2    the end of the day, that is not going to tell you

3    whether or not the prescription is appropriate or

4    inappropriate, even if it could exist, correct?

5            A.      That is correct.

6            Q.      It is the pharmacist's judgment,

7    assessing the totality of the circumstances, to

8    make a determination as to whether, in their

9    professional judgment, they view that the

10   prescription is appropriate to fill, correct?

11           A.      State that last part.  I'm sorry.  It

12   broke up.

13           Q.      At the end of the day, it is the

14   pharmacist who has to make the professional

15   judgment, assessing the totality of the

16   circumstances, as to whether or not it is

17   appropriate to fill the prescription?

18           A.      Yes, pharmacists have that

19   responsibility.

20           Q.      And --

21           A.      But I guess I would add to that, as

22   it applies to drug interactions, and other data --

23   we see dangerous combinations dispensed to patients

24   all the time, even though these systems -- even

25   though, I should say, some systems are probably in

Page 252

1    place.

2                    But I guess the point I would make is

3    that these systems have heretofore largely not

4    assisted the pharmacists in a meaningful way is

5    kind of my preposition here.  Is that --

6         Q.    So you are saying that the DUR

7    systems do not assist the pharmacists in a

8    meaningful way?

9         A.    In some instances.  Depends upon the

10   situation.  But in some instances they don't seem

11   to help the pharmacists at all.

12        Q.    And do you understand what alerts

13   Walmart had in place for its DUR system?

14        A.    No, I don't.  I know generally what

15   alerts are in place in pharmacy practice, but what

16   specific alerts Walmart was using, no, I am not

17   aware of all of those.

18        Q.    Are you aware of whether or not

19   Walmart tailored specific alerts to its system?

20        A.    No, I am not aware.

21        Q.    In your opinion, you said that

22   pharmacies should do that, right?

23        A.    State the question again.  In my

24   opinion what?

25        Q.    In your report you state that

Page 253

1    pharmacies should request specific -- I take it

2    back.

3              You are not offering any opinions

4    about what they should have done.  But they could

5    have asked --

6         A.    They could have asked --

7              THE REPORTER:  Hold on.  Y'all talked

8    over each other.

9         Q.    (BY MS. FUMERTON:)  I will rephrase

10   the question.

11             In your report, you state that

12   pharmacies could have requested edits to

13   off-the-shelf programs that Medi-Span, for example,

14   provides, correct?

15        A.    Where am I saying that?  I'm sorry.

16   I want to make sure I am --

17        Q.    So if you look on Page 7 of your

18   report, at the bottom of the page, the bottom of

19   the middle paragraph, you say, "Finally,

20   pharmaceutical organizations could have requested

21   such algorithms be included in Medi-Span or other

22   drug knowledge data vendors," correct?

23        A.    Yes.  As purchasers of those, yes,

24   they could have asked those organizations to create

25   algorithms, especially as it relates to in -- in

Page 254

1   this specifically, to Medi-Span and/or First

2   Databank.  You know, algorithms for drug

3   interactions, or two drugs, multidrug combinations

4   could have been requested.  I saw no evidence that

5   those had been requested by the -- by the pharmacy

6   organizations.

7           Q.      Plaintiffs didn't provide that to

8   you, right?

9           A.      I'm sorry?

10          Q.      I said plaintiffs didn't provide that

11  to you, right?

12          A.      I don't know.

13          Q.      Well, would it be relevant to your

14  opinion if there were documents that showed that

15  those requests were made?

16          A.      Sure, it would.

17          Q.      And you mentioned stuff about

18  algorithms based on days' supply or early refill

19  notifications.  Are you aware of whether or not

20  Walmart did that?

21          A.      No.

22          Q.      So you don't know what Walmart did

23  provide to its pharmacists, correct?

24          A.      Beyond what was provided to me, no, I

25  am not aware what was in their computer system.

Page 255

1          Q.       Are you aware of what is in the

2    computer system of any of the other defendants,

3    other than what is specifically mentioned in your

4    report?

5          A.       The -- I am just going to make sure I

6    am making my statement correct here.  I had no

7    evidence that they provided any of the content

8    associated with those -- go to Page -- I'm sorry,

9    Page 7 -- no, I'm sorry.  Where am I getting -- key

10   questions page.  I guess this is Page 3.  Well,

11   Page 2.

12                  Starting on Page 2.  So I didn't see

13   any evidence beyond -- that this was provided to

14   pharmacists in a summarized manner.  So if it

15   exists, I have not seen it.

16         Q.       Your second question is, was it

17   possible, using data available to chain pharmacy

18   organizations, to provide pharmacists with alert

19   warnings about overprescribing by certain licensed

20   subscribers, correct?

21         A.       Yeah.

22         Q.       And you have no opinion, though, as

23   to what overprescribing is, correct?

24         A.       The definition of what would

25   constitute overprescribing would probably vary by

Page 256

1    medical speciality.  But no, I don't have a defined

2    number if you are looking for that number.

3         Q.    For number three you say, "Detect

4    inappropriate prescribing and consumption using

5    geospatial data analysis."  And again, we have

6    established that is just where the pharmacy is

7    located, where the patient is located and where the

8    prescriber is located, right?

9         A.    That is correct.

10        Q.    Number four, "Detect excessive dose

11   and quantity, accounting for prescriber specialty

12   and practice," correct?

13        A.    Again, that is what the document

14   says, yes.

15        Q.    Well, that is what you wrote, right?

16        A.    And that is what I wrote, yes.

17        Q.    Okay.  And you are not offering any

18   opinions as to what is an acceptable dose or

19   quantity for a particular prescriber specialty,

20   correct?

21        A.    That's right.

22        Q.    And Number 5 is "Identify potential

23   pharmacy shopping by consumers seeking opioids and

24   other medications," correct?

25        A.    Yes.

1          Q.       And you don't know what OARRS

2    provided, but if OARRS did provide information to

3    pharmacies about whether patients were visiting

4    multiple pharmacies, that would provide this

5    information, correct?

6          A.       It could provide it, yes.

7          Q.       Are you aware of any attempts to do a

8    national PDMP?

9          A.       I haven't followed the issue that

10   closely, no.

11         Q.       Do you think it would be useful to

12   have a national PDMP?

13         A.       Insomuch with adjoining states --

14   let's take for example Southern Ohio where you have

15   Kentucky and across the border from Cincinnati,

16   and, you know, if you had two different systems

17   operating on that border, that would be, you

18   know -- or defined by that border, that makes it

19   very challenging for a pharmacist in one state to

20   be able to ascertain what is going on in the other

21   state, even though the geographic distance is

22   relatively close.

23              So -- so I could imagine in those

24   situations that might be useful.

25         Q.       Number 6 is "Identify use of drug

Page 258

1    combinations, so-called 'Holy Trinity,' using

2    pharmacy data," correct?

3           A.    Yes.

4           Q.    And each of the pharmacies' DUR

5    systems that were in place actually did identify

6    drug combinations, correct?

7                 THE REPORTER:  Actually did identify

8    drug --

9                 MS. FUMERTON:  Combinations.

10                MR. WEINBERGER:  Objection, form.

11          A.    Based upon the depositions of the

12   representatives from the individuals that appeared

13   that they all used Medi-Span or First Databank,

14   which would be able to identify drug interactions.

15   I am not aware of First Databank or Medi-Span

16   having -- in the time frame we are talking about

17   having -- having this Holy Trinity as a part of the

18   program.

19          Q.    (BY MS. FUMERTON:)  What is the Holy

20   Trinity?

21          A.    It is the medications you referred to

22   earlier, right?  So opioid, a muscle relaxant, a

23   benzodiazepine.

24          Q.    Are you offering an expert opinion as

25   to whether or not those medications are

Page 259

1    contraindicated?

2          A.     No.  I didn't come up with -- I

3    didn't come up with the name.

4          Q.     Are you offering an expert opinion as

5    to whether it is appropriate for those medications

6    to be dispensed to the same patient?

7          A.     Nope.

8          Q.     Number 7 is "Detect overuse through

9    early refills or new prescriptions," correct?

10          A.     Yes.

11          Q.     Is it your opinion -- well, are you

12    aware that Walmart had a system in place to detect

13    early refill?

14          A.     I am aware that they had -- they had

15    that within the store, yes.

16          Q.     So when you say that the tools

17    weren't given to the pharmacists, this was a tool

18    that was given to the pharmacy, right?

19                MR. WEINBERGER:  Objection.

20          A.     The screen shot that I saw, there was

21    a warning about an early refill, what have you.  I

22    don't know the algorithm behind that.

23          Q.     (BY MS. FUMERTON:)  Well, you said

24    earlier that you saw no evidence that these tools

25    were provided to the pharmacist, so that is not a

Page 260

1    true statement, right?

2              MR. WEINBERGER:  Objection, form.

3         Q.    (BY MS. FUMERTON:)  You did see

4    evidence that at least some of these tools were

5    provided to the pharmacists?

6              MR. WEINBERGER:  Objection, form.

7         A.    The -- I guess the -- the context

8    that I should have added to that statement -- and I

9    apologize that I didn't put it in there -- within a

10   store, we know that we can detect early refills.

11   And that is common pharmacy knowledge.

12              What I should have added to that

13   statement was early refills, getting it from, you

14   know, other pharmacies within the chain.  So I -- I

15   don't know if that was available or not.

16        Q.    (BY MS. FUMERTON:)  The PDMP shows

17   that, right?

18              MR. WEINBERGER:  Objection, form.

19        A.    It may, yes.

20        Q.    (BY MS. FUMERTON:)  So you -- so that

21   I understand a little bit how you did your report.

22   So you asked these seven questions, but I don't see

23   seven answers.

24              So if you look to then your

25   evaluation of the key questions, it looks like you

1    have it divided into two sections, the first one

2    being drug utilization review of prescription

3    level, correct?  Page 4?

4                   MR. WEINBERGER:  Objection to the

5    comments.  Go ahead.

6         A.     I'm sorry.  Could you repeat the

7    question?

8         Q.     (BY MS. FUMERTON:)  Sure.  You asked

9    seven questions or you identified seven key

10   questions, correct?

11        A.     I did.

12        Q.     And then you have an evaluation of

13   the key questions, correct?

14        A.     I do, yes.

15        Q.     And you didn't divide it up into

16   seven different sections, correct?

17        A.     No, I did not, no.

18        Q.     Okay.  So looking at the first one,

19   you have drug utilization review at the

20   prescription level, correct?  And I am looking at

21   Page 4.

22        A.     Uh-huh.

23        Q.     You have a semicolon -- sorry, you

24   have a colon.  And so that answers the first key

25   question that you had.  Correct?

Page 262

1          A.     Well, it -- it actually could answer
2     more than that.  So that paragraph that starts on
3     the bottom of Page 4 and continues on to the top of
4     Page 5 addresses drug utilization, addresses part
5     of Question 2, addresses Question 4 and addresses
6     Question 6.
7          Q.     So if you look on Page 5, you have a
8     statement that says, "However, these vendors don't
9     provide warnings based on aggregate prescription
10    use or at the prescriber level."  Do you see that?
11         A.     Please highlight it, if you don't
12    mind, Kristin.
13         Q.     (BY MS. FUMERTON:)  Just at the top
14    of Page 5.  It says --
15         A.     I found it.  Yes, I did find it.
16    Thank you.
17         Q.     Are you familiar with duplicative
18    therapy warnings?
19         A.     Oh, yeah, I am, yes.  That is not
20    what I was -- no, I am not referring to duplicative
21    therapy here.
22         Q.     What are you referring to?
23         A.     So the drug knowledge database
24    vendors focus at the drug and the patient level.
25    They don't integrate prescriber information.

Page 263

1          Q.      I am not following.  How is

2    that aggregate prescription use?

3                  You say, "These vendors don't provide

4    warnings based on aggregate prescription use."

5    They do do that, right?

6          A.      So I guess we could dither about the

7    definition of "aggregate prescription" use.  With

8    aggregate prescription use, I was referring to the

9    concept of across patients, not within patients.

10   So Medi-Span and First Databank focus at the within

11   patient level.

12                 So this comment refers to aggregation

13   across patients within a store, within -- by a

14   provider or by a provider specialty or by a medical

15   diagnosis.

16         Q.      So let's say that you have a

17   prescriber, and ninety percent of the prescriptions

18   they write are opioids.  Does that tell you the

19   prescription is inappropriate?

20         A.      Not necessarily.

21         Q.      Does it tell you it is appropriate?

22         A.      Not necessarily.

23         Q.      It doesn't tell you one way or the

24   other, right?

25         A.      It can give -- well, my premise is it

1    can give you a measure of whether it would be

2    appropriate or inappropriate.

3              Q.    And a pharmacist must assess still

4    whether or not that information is appropriate,

5    correct?

6              A.    That is true, yes.

7              Q.    Next you have "creating opioid

8    specific red flags."  Do you see that?

9              A.    Uh-huh.

10             Q.    Were you asked to assume that any

11   particular attributes were red flags?

12             A.    Yes, I have -- well, I guess I

13   interpreted that based upon my own understanding of

14   the problem of opioid use.  I am sorry if I --

15   would you restate that question to make sure I

16   answered it correctly?

17             Q.    Were you asked to assume that any

18   particular attributes were red flags for purposes

19   of your opinion?

20             A.    Was I asked to assume?  I don't

21   know -- no, I was not asked to assume.  These are

22   attributes that, in the pharmacy profession, we are

23   well aware of them.

24             Q.    Do you agree with the statement that

25   most DUR warnings are, therefore, not relevant to

Page 265

1    inappropriate opioid use?

2           A.    I am sure -- I am not sure your

3    question -- could you restate?

4           Q.    Do you agree that most DUR warnings

5    are not relevant to inappropriate opioid use?

6           A.    I don't have any data to -- well,

7    thank you.

8                 This is probably true, yes.

9           Q.    You wrote it in your report, correct?

10          A.    This is true, yes.  Yes.  I am sorry.

11   I was putting it in a broader context.

12                So, yeah, so the warnings generated

13   by First Databank and Medi-Span do not assess the

14   appropriateness of opiate use.

15          Q.    Yes.

16          A.    I'm sorry.  We went between

17   paragraphs there, so my train of thought was mixed

18   up.

19                MR. WEINBERGER:  Been a long day.

20          Q.    (BY MS. FUMERTON:)  Well, in fact --

21   but the dashboards that you are talking about don't

22   identify inappropriate prescription use either,

23   right?

24          A.    I am not sure what right you are

25   referring to.  So the dashboard what?

Page 266

1          Q.     The dashboards, these dashboards that

2     you have talked about that nobody has ever

3     implemented --

4          A.     Uh-huh.

5          Q.     -- they don't identify inappropriate

6     prescription use either, correct?

7                 MR. WEINBERGER:  Objection, form.

8          A.     No.  I can't say that.  So when you

9     say inappropriate -- are you saying inappropriate

10    opioid use or inappropriate use?

11         Q.     (BY MS. FUMERTON:)  It is your

12    dashboard.  Which one --

13         A.     You are suggesting -- okay.  Again,

14    making sure I understand your question.

15                So you are suggesting what they could

16    have done versus what they have?

17                MR. WEINBERGER:  Objection.

18         A.     I'm sorry.

19         Q.     (BY MS. FUMERTON:)  Well, we know

20    these dashboards don't exist in practice, right,

21    nobody has done it before?

22         A.     Well, DUR --

23         Q.     But hypothetically, you said --

24                MR. WEINBERGER:  Can we -- let's just

25    slow down.  Let her ask the question and listen to

Page 267

1    the question, and then answer it, okay?  I realize

2    it is late in the day, so we are getting all

3    confused.

4                    MS. FUMERTON:  I'm not confused at

5    all.

6            Q.     (BY MS. FUMERTON:)  But with respect

7    to the dashboards that you are saying could have

8    been created, those don't identify inappropriate

9    opioid use either, correct?

10           A.     No.  That is not correct.  They

11   could.

12           Q.     So the dashboard itself will tell you

13   whether or not the appropriate -- the opioid use is

14   appropriate or inappropriate?

15           A.     Oh, I -- now I understand your

16   question.  The dashboard would give you a sense or

17   degree that this may or may not be a problem

18   prescription.  Is it going to be --

19                   MS. FUMERTON:  Why don't we take a

20   break.

21           A.     Is it going to be definitive?  No.

22   It is not going to be definitive.

23                   MR. WEINBERGER:  Okay.

24                   MS. FUMERTON:  Why don't we take a

25   break, and I will look at my notes to see if we --

Page 268

1   to see what more I may or may not have.  You want

2   to take a ten-minute break?

3                    THE VIDEOGRAPHER:  Okay.  We will go

4   off the record at 6:11.

5                    (Off-the-record discussion.)

6                    (Whereupon, a break was had from 6:11

7                    p.m. until 6:20 p.m. EDT)

8                    THE VIDEOGRAPHER:  We are back on the

9   record at 6:21.

10                    MS. FUMERTON:  Dr. Malone, thank you

11  for your time today.  I don't have any further

12  questions, subject to any redirect that

13  Mr. Weinberger might ask you.  But I know that

14  Mr. Kobrin has some questions for you, so I am

15  going to go off the video now.  Thank you very

16  much.

17

18

19  EXAMINATION BY MR. KOBRIN:

20          Q.     Hey, Dr. Malone, my name is Josh

21  Kobrin.  I am from the law firm of Marcus &

22  Shapira.  We represent Giant Eagle, and I just have

23  a handful of quick questions for you.  I don't mean

24  to drag this out.

25                    I just want to go back a little

Page 269

1    earlier in the day we talked about the size of the

2    productions in this case and that you spent

3    approximately seventeen hours reviewing documents.

4    Do you recall that conversation?

5              A.    Yes, I do.

6              Q.    And I don't mean to go back through

7    that at all.  I just wanted to have context for the

8    questions I just had on follow-up.

9                    Among the Giant Eagle documents, by

10   that I mean the documents that Giant Eagle produced

11   from its business records in this litigation, you

12   looked at a total of four of those Giant Eagle

13   documents in preparation for your expert report.

14   That is correct, right?

15             A.    Just like the others, the testimony

16   from Lynn Shirk, and there may have been exhibits

17   associated with that folder.  And --

18             Q.    Uh-huh.  I'm sorry.  Did you say the

19   testimony of -- you are referring to the

20   Christopher Miller testimony?

21             A.    No.  I believe the name I had on here

22   was Lynn Shirk.

23                   Okay.  I'm looking at the wrong -- my

24   bad.  Okay.  Now we are down to it.

25             Q.    You were looking at Rite Aid, right?

1    Rite Aid was right under there.

2          A.    Yes, I am.  So exhibits that would

3    have been in that folder or subfolder would have

4    been the documents I looked at.

5          Q.    And I will represent to you that

6    there were only actually two documents that were

7    exhibits to the Christopher Miller deposition that

8    were produced by Giant Eagle.  So taking those two,

9    as well as the other two that you reference under

10   Giant Eagle on this page of your report, which is

11   Page 4, you looked at a total of four documents

12   produced by Giant Eagle in preparation for your

13   report, correct?

14         A.    I believe so.

15         Q.    And none of those documents had any

16   information about how Giant Eagle pharmacists used

17   the patient profile in their system, did they?

18         A.    I didn't see anything, no, sir.

19         Q.    And none of those documents had any

20   information about how Giant Eagle pharmacists used

21   the OARRS PDMP system from the State of Ohio,

22   correct?

23         A.    That is correct.

24         Q.    And none of those documents had any

25   information about how Giant Eagle analyzes

Page 271

1    dispensing data, correct?

2          A.     I don't recall any information

3    associated with that, no.

4          Q.     And you didn't see any dispensing

5    guidelines that were part of Giant Eagle's

6    production, correct?

7          A.     So the DUR screens may have contained

8    information about -- so may contain things that may

9    be considered dispensing guidelines, but I don't

10   recall anything that said specifically dispensing

11   guidelines for using -- or for dispensing these

12   medications or those medications, no, I don't

13   recall that.

14         Q.     The only thing you recall is an

15   example of a DUR screen; is that what you are

16   saying?

17         A.     Yes.

18         Q.     So you knew they had a DUR system?

19         A.     Yes, I did.

20         Q.     But you didn't see any dispensing

21   guideline created by Giant Eagle?

22         A.     I did not.

23         Q.     You didn't see any dispensing

24   policies created by Giant Eagle?

25         A.     I did not.

Page 272

1        Q.     And you didn't see any dispensing

2   procedures or procedure documents created by Giant

3   Eagle?

4        A.     I did not.

5        Q.     Did you at any point ask counsel for

6   the plaintiffs in this case whether those documents

7   existed?

8        A.     No.  Those are outside the scope of

9   my -- no, I did not.

10        Q.     Are you saying that those documents

11   had no relevance to your report?

12        A.     To the question about whether the

13   systems were in place to create the data that I was

14   suggesting?  Those documents weren't relevant to

15   that report.

16        Q.     So any dispensing procedures,

17   policies or guidelines have no relevance to whether

18   these systems were in place at Giant Eagle?

19        A.     I can't answer that question, whether

20   they have no relevance.  They have no relevance to

21   my report, yes, no relevance to my report.

22        Q.     So whether there were guidelines,

23   policies and procedures have no relevance to your

24   report?

25        A.     That's correct.

Page 273

1          Q.      Any work I believe -- well, I don't
2    want to say -- you have worked at I know pharmacies
3    in the past.  Have you ever been behind the counter
4    at a Giant Eagle pharmacy?
5          A.      No, sir.
6          Q.      Have you ever been in a Giant Eagle?
7          A.      No, sir.
8          Q.      Do you know what a Giant Eagle is?
9          A.      I really don't, no.  Whether it is a
10   stand-alone pharmacy or whether it is a grocery
11   store pharmacy or -- you know, what -- what you
12   have for a front end or what you have for a back
13   end, no.
14         Q.      You have no idea?
15         A.      I'm not aware of it, no.
16         Q.      Did you ever ask plaintiffs' counsel
17   for any additional information about the defendants
18   in this case?
19         A.      I did not, no.
20         Q.      Do you know how the computer -- do
21   you know how the computer servers worked at Giant
22   Eagle's retail locations?
23         A.      Through the deposition, there was
24   some information about that.  It was fairly
25   cursory.  So I wouldn't say I have an intimate

Page 274

1    knowledge of that data system, but it appeared that
2    those -- based upon what that -- the responses to
3    the -- contained within the deposition, it appeared
4    that there was some coordination of that data
5    across the systems, not necessarily live but
6    aggregated either at the end of the day or at some
7    time during the day.
8              Q.    Do you have enough information to
9    understand how they work?
10             A.    I believe so.
11             Q.    Do you have enough information -- do
12   you have enough information to understand how Giant
13   Eagle's centralized computer services work?
14             A.    Well, your definition of work may be
15   an issue here.  So what do you mean by "work"?
16             Q.    How they function, how they collect
17   data, how they analyze data, how they back up data.
18             A.    I did not see any documents
19   associated with those activities.
20             Q.    Were the computer servers at Giant
21   Eagle's retail locations -- now that we have kind
22   of clarified what "work" means, do you have enough
23   information to understand how they gather data,
24   assess data, back up data, analyze data, store
25   data?

Page 275

1          A.      There was some information about how
2     they put those data sets together.
3          Q.      Which data sets are you talking
4     about?
5          A.      Well, prescription record data, as it
6     appeared that that information was transferred to
7     that central facility or their servers or whatever
8     they have.  And I think there was reference to an
9     off-site data server as well.
10               But the details of that were not
11     provided in that document.
12          Q.      All right.
13          A.      And --
14          Q.      Do you feel like you have enough
15     understanding of how they worked to have an expert
16     opinion on it?
17          A.      An expert opinion as respect to the
18     materials that I produced, yes.
19          Q.      As to your report, describing an
20     expert opinion on how the servers work?
21          A.      I made no statement or assertions
22     about how the servers work in my report.
23          Q.      So you don't have an expert opinion
24     on how the computer systems at Giant Eagle work?
25          A.      No, I don't.

Page 276

1          Q.     Okay.  Do you have an expert or -- do

2    you know enough about the technological

3    capabilities of Giant Eagle's computer systems to

4    have an expert opinion on that?

5          A.     Restate the question.  I want to make

6    sure I understand.

7          Q.     Do you have enough information about

8    the technological capabilities at Giant Eagle to

9    have an expert opinion as to that?

10          A.     That is a very broad question.  I

11   would say some attributes I probably have enough

12   information.  Other attributes, I probably don't.

13          Q.     So you are not --

14          A.     I am not asserting that I am fully

15   and completely informed about Giant Eagle's

16   processes and computer systems.

17          Q.     Are you expressing an expert opinion

18   as to Giant Eagle's technological capabilities,

19   computer systems and processes in your expert

20   report?

21          A.     No, I am not.

22          Q.     Not at all?

23          A.     Not specific to Giant Eagle, no.

24          Q.     Okay.

25                 MR. KOBRIN:  All right.  I am good.

Page 277

1    I don't know if any of my other co-defendants have

2    a couple of questions for you as well.  I will pass

3    to them, and if they don't, I will pass the

4    witness.

5                    Does anyone else have any questions?

6                    MR. SWANSON:  Nothing for Walgreens,

7    thank you.

8                    MR. KOBRIN:  Pete, you are muted.

9                    MR. WEINBERGER:  I am ready to do

10   some questioning unless there are questions from

11   any of the other defendants.  All right.

12

13   EXAMINATION BY MR. WEINBERGER:

14        Q.    Dr. Malone, I have got a few

15   questions to ask you.  You have been patient.  Just

16   a few more questions, and then there may be some

17   questions as a result of my questions.

18                    So I want you to pull out Exhibit

19   Number 9, please.  Sorry, Exhibit 7, which was the

20   journal article that you coauthored entitled

21   "Evaluation of Machine Learning Algorithms For

22   Predicting Opioid Overdose Risks," if you can pull

23   it out.

24        A.    Okay.

25        Q.    Got it in front of you?

Page 278

1            A.      I do.

2            Q.      Okay.  So if this -- is it true that

3    this study was of Medicare beneficiaries?

4            A.      I am just going to make sure -- we

5    have done some work together with our data sets, so

6    I'm going to make sure that this -- yes, this is

7    the Medicare beneficiaries, yes.

8            Q.      Right.  And if you go down to the

9    Results section, it says that the beneficiaries had

10   similar characteristics, meaning SD age,

11   sixty-eight.  Does that mean that the sample size

12   or the sample had an age mean of sixty-eight years

13   old?

14                   MS. FUMERTON:  Objection, form.

15           Q.      (BY MR. WEINBERGER:)  See under

16   Results, just in the first page, under Results.

17                   MS. FUMERTON:  Objection, leading.

18           Q.      (BY MR. WEINBERGER:)  First sentence?

19           A.      Yes, the mean age with standard

20   deviation was sixty-eight with a standard deviation

21   variance of 14.5 years.

22           Q.      So if this was a study that was

23   looking at data from Medicare patients, one would

24   assume this would be an older population, right?

25                   MS. FUMERTON:  Object to the form.

Page 279

1   Objection, leading.

2          A.    Medicare provides benefits to both

3   older adults and disabled adults.  And let me look

4   real quick in the Methods here to determine if

5   there was any other --

6               (Pause.)

7          A.    So the sample is limited to Medicare

8   beneficiaries between January 1st, 2011 and

9   December 31st, 2015.  This is under the Methods

10  design sample.  These were fee-for-service adult

11  beneficiaries, so we don't include any children.

12  Did not have cancer and received one or more

13  prescriptions during the study period.

14               So it could include Medicare

15  beneficiaries who qualify for Medicare due to a

16  disability under the Social Security

17  Administration's definition of disability.

18          Q.    (BY MR. WEINBERGER:)  With a mean age

19  of sixty-eight in terms of this group of patients,

20  would you agree that that is an elderly portion of

21  the population generally?

22          A.    Yes, I would.

23               MS. FUMERTON:  Object to the form.

24          Q.    (BY MR. WEINBERGER:)  And you know,

25  you were asked earlier by Ms. Fumerton about the

```
1   twenty-five percent were at risk, the seventy-five
2   percent were not at risk.  You recall that
3   questioning?
4            A.     Uh-huh.
5            Q.     Yes?
6                   MS. FUMERTON:  Objection, form.
7            A.     I do.
8            Q.     (BY MR. WEINBERGER:)  Okay.  So is
9   this sample of patients, from your perspective,
10  representative of patients in our population that
11  utilize or are prescribed opioids?
12                  MS. FUMERTON:  Objection, form.
13           Q.     (BY MR. WEINBERGER:)  In terms of age
14  group?
15           A.     By definition, the Medicare sample is
16  a limited sample of the population.  So through
17  inference, it is not the totality of individuals
18  that would receive an opioid medication, by a long
19  way.
20           Q.     So is it fair or not to use the kinds
21  of percentages that Ms. Fumerton used in terms of
22  applying that to opioid risk of overdose in the
23  general population?
24           A.     The study --
25                  MS. FUMERTON:  Object to the form.
```

```
                                            Page 281

 1          A.     My apologies.  The study only applies

 2   to the Medicare beneficiaries that were in the

 3   study.  So it can't be inferred that this applies

 4   across all populations.

 5          Q.     (BY MR. WEINBERGER:)  Or across the

 6   population in general that is prescribed and uses

 7   opioid prescriptions, right?

 8          A.     That is correct.

 9                 MS. FUMERTON:  Objection to the form.

10          Q.     (BY MR. WEINBERGER:)  Now, you were

11   asked some questions about -- let me go to your

12   report.  So pull out Exhibit 2, please.

13          A.     Okay.

14          Q.     Exhibit 1, sorry.

15          A.     Oh, yeah.

16          Q.     So at the top of Page 2 of your

17   report, if you would pull that out.

18          A.     Okay.

19          Q.     You describe your twenty years

20   studying the issue of drug-drug interactions, do

21   you see that?

22          A.     Yes, I do.

23          Q.     Just read that paragraph to yourself

24   for a moment, please.

25          A.     Okay.
```

1          Q.     So with respect to your research on

2     drug-drug interactions, have you become familiar

3     with dispensing data and how dispensing data is

4     stored at pharmacies over a number of years?

5                    MS. FUMERTON:  Object to the form.

6          A.     Yes, I am.  Yes, I am.

7          Q.     (BY MR. WEINBERGER:)  And have you --

8     and so you have -- you have used that information,

9     then, as part of your research?

10         A.     Yes.  Yes, I have.

11                   MS. FUMERTON:  Objection to the form.

12         Q.     (BY MR. WEINBERGER:)  And how is it

13    then that you have used data, dispensing data, with

14    respect to studying drug-drug interactions, and

15    coming up with answers to issues like how one warns

16    about potential interactions?

17                   MS. FUMERTON:  Objection, form.

18         A.     So the -- the length that we have

19    tried to establish in the literature through our

20    research is -- is using data from -- from

21    pharmacies and other information about those drug

22    interactions and demonstrating that -- that there

23    is many drug interactions that get through the

24    system and are not prevented, and then trying to

25    provide ways to change those systems, such that

Page 283

1    they provide useful information to the pharmacist

2    and the pharmacy staff.

3            Q.    (BY MR. WEINBERGER:)  So have you

4    created, either yourself or with colleagues,

5    software -- software algorithms using dispensing

6    data to create alert systems for use at pharmacies

7    or in the healthcare field?

8            A.    Yes, we have.

9                  MS. FUMERTON:  Objection, form.

10           Q.    (BY MR. WEINBERGER:)  And is -- so in

11   terms of your expertise and experience, what is

12   the -- what is the methodology that you utilize in

13   order to create the software algorithms, just

14   generally speaking?  What is the methodology that

15   you use?

16           A.    The --

17                 MS. FUMERTON:  Objection, form.

18           A.    The general approach is that we

19   use -- you know, we are usually evaluating specific

20   drug combinations, so we need to be able to

21   identify the unique drug agents, and that is done

22   via a variety of therapeutic classification systems

23   and also ways to represent those -- those drug

24   products.

25                 So every drug product dispensing at

Page 284

1    its state is linked to a National Drug Code.  That

2    National Drug Code is used as part of the process

3    of filling the prescription and typically submitted

4    to third party payors, via the NCPDP

5    Telecommunications Standard.  I will clarify that.

6    It was not the Script Standard, the

7    Telecommunications Standard.  And that standard

8    provides the basis for how information is -- what

9    information is typically stored in pharmacy data

10   and how that information can be processed.  You

11   know, so how we can develop our tools.

12            In addition, we use the medical

13   literature to supplement that information, and also

14   we use electronic health records data to look at

15   how medications are used to help supplement our

16   algorithms as well.

17            So it is a multilayered process of

18   assimilating evidence across multiple, I guess,

19   data sets or sources -- sources is probably the

20   best word.

21       Q.    (BY MR. WEINBERGER:)  And is that a

22   well-recognized methodology for taking information

23   and data and creating algorithms that then leads to

24   drug-drug interaction, warnings and alerts?

25                 MS. FUMERTON:  Objection, form.

1        A.      Our methods are standard within the

2    health outcomes research field.  So we provide --

3    we are not developing novel techniques to develop

4    those algorithms.

5              So I guess, in general, to your

6    question, yes, those are standard methods that we

7    use.  Each drug pair will have a different set of

8    attributes that will require additional data

9    elements that we will consider.  So some of that is

10   incorporated in our tools and may not have been

11   included in previous or other vendor's systems.

12        Q.      (BY MR. WEINBERGER:)  Okay.  And has

13   that -- has that experience in terms of using data

14   to develop algorithms to create alert warning

15   systems -- does that inform you as to your opinions

16   in this case regarding systems that could have been

17   designed with respect to red flags?

18        A.      Yes, it does.

19        Q.      How does it --

20              MS. FUMERTON:  Object to the form.

21        Q.      (BY MR. WEINBERGER:)  How does it

22   inform you?

23              MS. FUMERTON:  Objection, form.

24        A.      So the issues that I addressed in my

25   particular report focused on attributes of

Page 286

1    so-called red flags and how that information could

2    be -- or is maintained within the defendants' data

3    that they maintain on their servers or within their

4    systems.

5            Q.      (BY MR. WEINBERGER:)  And so you were

6    asked to address the issue of the feasibility, in

7    this case, of the defendants using their

8    computer -- computerized corporate databases of

9    dispensing data to develop a warning or alert

10   system regarding red flags that would be a tool for

11   use by the pharmacist.  Is that true?

12           A.      That is, yes.

13                   MS. FUMERTON:  Objection, form.

14   Leading.

15           Q.      (BY MR. WEINBERGER:)  And how is it

16   that you know from your experience with respect to

17   drug-drug interaction algorithm development that

18   the development of a red flag alert system is

19   feasible?  How is it --

20                   MS. FUMERTON:  Objection, form.

21           Q.      (BY MR. WEINBERGER:)  How is it you

22   know that?

23                   MS. FUMERTON:  Objection, form.

24   Misstates the prior testimony and assumes something

25   he hasn't said.

1          A.     Well, I did say that pharmacy

2     systems -- pharmacy data has been standardized for

3     a long time.  So my research with respect to

4     drug-drug interactions is built upon that

5     standardization of that data and that information

6     and how that information is collected, stored

7     within the pharmacy systems.

8                So across my career, we have utilized

9     data that have come out of those systems, and have

10    used that information to develop our tools, our

11    evaluation of particular drug pairs and then to

12    inform designing of tools that would hopefully

13    reduce exposure to harmful drug combinations.

14          Q.     (BY MR. WEINBERGER:)  And how is it

15    that that experience informed you, or did it inform

16    you, as to -- to answer the question of the

17    feasibility of the defendants creating a similar

18    system with respect to red flag warnings?

19                MS. FUMERTON:  Objection, form.

20    Objection, leading.

21          A.     So the data within those systems, as

22    I mentioned, largely standardized and then -- and

23    standardized for a long time.  Therefore, you know,

24    the metrics that are of interest with respect to

25    opioid use, in my opinion, are -- and the ones that

Page 288

1    I put in my report -- are immediately answerable

2    using those data within those organizations.

3                So there's -- we are not suggesting

4    they create any novel data sets or require new

5    information to be collected in order to be able to

6    inform their systems of what would constitute a

7    potential warning that a pharmacist should pay

8    closer attention with respect to dispensing a

9    medication.

10               These medications are -- are --

11   controlled substance -- controlled substances in

12   general are ones that have a high potential for

13   abuse, misuse and, unfortunately, patient safety.

14               So when I evaluated the information

15   that was presented to me and the key questions I

16   was answering, the notion that, you know, you could

17   create these systems was a resounding yes.  These

18   systems, it was possible to create these dashboards

19   and, in fact, it appears that one of the

20   defendants, you know, ran -- built the software

21   program to do such a thing.

22               Whether it was actually used or sent

23   to pharmacies or pharmacists, I am not aware.  But

24   the New England Journal of Medicine report or

25   paper, I believe that was Exhibit 3 maybe --

Page 289

1          Q.     This --

2          A.     -- the Bestes and Brennan paper,

3     uh-huh, you know, demonstrated that they had those

4     systems available to do those metrics.

5               MR. SWANSON:  This is Brian Swanson

6     for Walgreens.  I move to strike that as

7     nonresponsive.

8          Q.     (BY MR. WEINBERGER:)  And you also

9     confirmed that CVS, the CVS SAS program created

10    such a design?

11         A.     Yes, it did.

12         Q.     Okay.  So with respect to the

13    documents that were provided to you by me to review

14    and formulate your opinions with respect to the

15    issues addressed at Page 2 of your report, were you

16    provided with the information about how each of

17    these defendants accumulated dispensing data at the

18    store level and sent, transmitted that data to a

19    centralized corporate data bank?

20               MR. SWANSON:  Leading, objection.

21               MS. FUMERTON:  He didn't even know,

22    Pete, until you said today that you are the one

23    providing the information.  It is an absurd

24    question.

25         Q.     (BY MR. WEINBERGER:)  You can answer.

Page 290

 1          A.      In the depositions that I reviewed

 2  were statements from representatives of the company

 3  about how they maintained their data systems.  And

 4  I used that information to make the basis of my

 5  report that the analyses that I was suggesting were

 6  entirely feasible within those organizations.

 7          Q.      And you also used your own -- strike

 8  that.

 9          Did you also use your own personal

10  knowledge from the work that you had done in your

11  research regarding what dispensing data is -- is

12  customarily stored at the corporate level of these

13  national chain pharmacies?

14          A.      Yes.

15          MS. FUMERTON:  Objection, form.

16          A.      I'm sorry.  Yes.  My prior research

17  experience with -- with these organizations, with

18  at least -- with two of these organizations, CVS

19  Caremark and Walgreens, we used that data

20  collaboratively -- collaboratively with them to

21  generate findings.

22          So I am very aware of the data that

23  they had within their organizations and that it was

24  assimilated across stores within their

25  organization.

1          Q.     (BY MR. WEINBERGER:)  How is it

2    that -- that dispensing data, national dispensing

3    data, with respect to a retail pharmacy chain like

4    a CVS or Walgreens is -- contains information that

5    the dispensing data at a particular store does not

6    contain?  Or how is it different -- let me just ask

7    you that.  How is it different?  I will stop there.

8                    How does it differ?

9                    MR. SWANSON:  Objection.

10                   MS. FUMERTON:  Objection, form.

11         A.     The data that is available within the

12   store is limited to patients that visit that store,

13   typically, and through -- depending upon the

14   organization, depending -- they potentially could

15   look up data at another store at the patient

16   level -- if -- depending upon their system, and how

17   their system was configured.  So I am not -- not

18   making any statements about whether these -- all of

19   these defendants had that capability.  That is kind

20   of outside the scope of whether the systems could

21   have been created at the organization level.  At

22   the organization level now you are combining data

23   across multiple stores.  You are -- the

24   assimilation of that data -- the pharmacists

25   filling the prescriptions are not data analysts,

Page 292

1    are not necessarily able to run reports realtime in

2    a way that would help them inform the legitimacy of

3    filling a prescription at that point in time.

4                    So information about that particular

5    patient across all stores could be provided --

6    could have been provided to the pharmacist

7    realtime, and it could have been specified, not

8    just as a patient profile.  It includes every

9    medication.  So the pharmacist has to go through

10   line by line trying to figure out which medications

11   are relevant to the opioid prescription that may be

12   presented to them versus which ones are not.  So

13   that information could be provided to the

14   pharmacists.

15                   The other thing is there's no, you

16   know, guardrails in the data that the pharmacist

17   has provided to them.  They don't have a situation

18   whether this is an outlier prescription or not.  So

19   the pharmacist is having to make those judgment

20   calls without any supporting tools.

21                   So at the pharmacy level, yes,

22   they -- they know some of their patients well,

23   probably, because they come in for prescriptions

24   frequently.  But they certainly don't know

25   everybody that walks through the pharmacy door.

Page 293

1             And if you have a relief pharmacist,

2     they probably, you know, are not familiar with that

3     clientele whatsoever.

4             So having those dashboards available

5     for a pharmacist to look at and say, you know,

6     there's a couple of things that are concerning; I

7     need to resolve this, is -- is -- is data that is

8     maintained at the central pharmacy or the central

9     location across stores, not within stores,

10    necessarily.

11         Q.    (BY MR. WEINBERGER:)  How about

12    information about prescribers, what is the

13    difference between the data at one store versus

14    data kept at a corporate, centrally-located

15    computer system?

16             MS. FUMERTON:  Objection.  Form and

17    lack of foundation.

18             MR. SWANSON:  Also undisclosed

19    opinion.

20         Q.    (BY MR. WEINBERGER:)  You can answer.

21         A.    Every pharmacy has, when they

22    dispense a medication, a prescriber is associated

23    with that medication.  And we have used that data

24    to look at prescribing by the same prescriber or

25    not the same prescriber for drug interactions.  So

Page 294

1   it is possible to use that information for all

2   sorts of things.

3                   In this case, in this particular

4   situation, knowing the characteristics of that

5   prescriber with respect to specialty and in

6   relation to other specialists -- other prescribers

7   with that same specialty could have helped inform

8   the pharmacist that this particular prescriber was

9   an outlier relative to his or her peers.

10                  And again, I refer back to the

11  analysis conducted by CVS that identified, if I

12  remember correctly, forty-two different prescribers

13  that were excessively prescribing.

14                  So pharmacists at the store level are

15  not going to have access to that summary

16  information across prescriptions written by the

17  physician.  So they may be familiar with a

18  physician, but they may not know how that clientele

19  for that physician -- so they don't get all the

20  patients for that physician.  Typically, patients

21  go lots of different places.  And by having more

22  data -- I won't say it is perfect data

23  necessarily -- but more data, they could have

24  helped inform the pharmacist, when filling a

25  prescription, with respect to whether this

Page 295

1    represented an outlier situation or whether it was

2    within the normal scope of practice.

3            Q.    Would centrally located and kept data

4    regarding prescribers also identify patterns of

5    prescribing?

6                    MR. SWANSON:  Objection, leading.

7                    MS. FUMERTON:  Object, form.  Object

8    to this whole -- object, leading.  Object to this

9    whole line of questioning that is not disclosed

10   anywhere in his report.

11           And we have already established

12   earlier on that his expert testimony in this case

13   is what is in the four corners of this report.

14           So I'm not really sure what you are

15   doing here, Pete, but all this testimony that you

16   are eliciting is inappropriate and goes beyond the

17   scope of the cross-examination certainly.

18                    MR. WEINBERGER:  So --

19                    MR. SWANSON:  I join that objection.

20                    MS. FUMERTON:  I never mentioned the

21   words "centrally located prescribers."

22           Q.    (BY MR. WEINBERGER:)  So in your

23   report on Page 5, you do have the last paragraph

24   where you, in the second sentence, state, "Because

25   of data standardization, analysis could have been

Page 296

1    done -- could have been performed using measures of

2    variants to identify outlier behavior with respect

3    to, A, quantity per prescription by medication,

4    product and strength."

5                    What does that mean?

6                    MS. FUMERTON:  Object to the form.

7            A.      Basically, it refers to whether a

8    medication order is within typical or normal

9    limits.  And it could be done at the unique

10   medication level.  So thinking of, you know,

11   oxycodone versus hydrocodone versus, you know,

12   benzodiazepines such as Diazepam, what have you,

13   you can look at the strength or quantity and start

14   to get metrics on how that prescription that the

15   pharmacist is trying to evaluate is related to

16   other prescriptions that the pharmacy organization

17   has dispensed to other patients.

18           Q.      (BY MR. WEINBERGER:)  Can you use

19   that same information to evaluate the prescriber?

20           A.      Yes, you can.

21                   MR. SWANSON:  Objection.

22                   MS. FUMERTON:  Object to the form.

23           Q.      (BY MR. WEINBERGER:)  Item C says,

24   "Number of prescriptions written for opiate and

25   other medications by prescriber."  How is it that

                                                        Page 297

1    centrally located and collected data from across a

2    pharmacy's stores is an advantage over just

3    information from one store regarding a prescriber?

4                    MS. FUMERTON:  Objection, form.

5    Objection, leading.

6            A.    Well, back to -- so, again, I will

7    show or refer back to the CVS's own SAS program

8    where they did this, and they reported the results

9    in the New England Journal of Medicine,

10   demonstrating that their ability to aggregate the

11   information across stores and -- you know, so I

12   guess across specific medications within that --

13   you know, so -- you know, maybe it is an oxycodone

14   twenty milligram tablet in one prescription, and it

15   is an oxycodone -- I'm sorry, ten milligram tablet

16   in one, and it is Oxycodone 5 in the other.

17                    So you would be able to discern

18   patterns of prescribing behavior and, therefore,

19   also look at how that relates to normative practice

20   of medicine within that specialty or subspecialty

21   by the prescriber.

22            Q.    (BY MR. WEINBERGER:)  So you were

23   asked earlier about your source of information

24   regarding the red flags that you identified in your

25   report, which you identified in your Issues section

Page 298

1   of your report, Page 2, and in this Page 5 of your

2   report, the paragraph -- this full paragraph,

3   "Creating Opioid Specific Red Flags."  Do you

4   remember those questions about your source for the

5   red flags?

6          A.     I do.

7          Q.     Did you -- you were supplied with a

8   copy of the report of Carmen Catizone, our pharmacy

9   expert?

10         A.     Yes, I was.

11                MS. FUMERTON:  Objection, form.

12  Pete, you specifically represented that he did not

13  rely on that report in any way, shape or form.

14         Q.     (BY MR. WEINBERGER:)  Did Dr. -- did

15  Mr. Catizone's report and his description of those

16  red flags confirm for you -- whether you relied on

17  it -- confirm for you the list of red flags that

18  you were utilizing in your analysis?

19                MS. FUMERTON:  Objection, form.  And

20  objection to the misstatement both to me and to the

21  Court as to the effect of the amended report on

22  Mr. Malone's report, which you said was not

23  influenced in any way, shape or form.

24                To the extent that you are now asking

25  him to say whether or not something confirmed

Page 299

1    something, that does go to the methodology of his

2    expert report and is completely inappropriate and

3    unethical.

4                    MR. WEINBERGER:  So you talked about

5    his amended report.  I am talking about -- I said

6    that his opinions are not changed by the amended

7    report.

8            Q.    (BY MR. WEINBERGER:)  I am talking

9    about the report, the original report that was

10   created and sent to you.  Did it confirm the list

11   of -- the categories of red flags that you utilized

12   in your analysis?

13           A.    It did.

14                   MS. FUMERTON:  Again, objection.

15   Pete, you represented that the original report was

16   not something that he relied on for purposes of his

17   expert report in email communication, and that is

18   in writing.

19           A.    I did not rely on that report for

20   purposes of generating my report.  It was provided

21   to me after my report had been submitted.  And his

22   question, as I understand it, just to be clear, is

23   did Carmen's report or Carmen's document confirm or

24   support the attributes that I have identified.

25                   And by and large, they are largely

```
                                              Page 300

 1    aligned.  His is much more extensive than mine,

 2    but --

 3              Q.    (BY MR. WEINBERGER:)  So you -- thank

 4    you.

 5              MS. FUMERTON:  Objection to outside

 6    the scope of the direct examination.  Again -- or

 7    the cross-examination.

 8              Pete, if you want to give a

 9    deposition of your own witness, which is a little

10    odd, but frankly, whatever, you should have noticed

11    the deposition.  We could have fought for it then.

12    But this entire line of questioning goes beyond

13    anything that I asked.  Specifically I did not ask

14    a single question about Carmen Catizone.

15              Q.    (BY MR. WEINBERGER:)  So the -- you

16    were asked whether or not this -- the feasibility

17    of this red flag alert system or this dashboard

18    that you described it as would actually identify an

19    improper prescription.  Do you recall that line of

20    questioning?

21              A.    I did.

22              Q.    What is the -- from a pharmacist's

23    standpoint, what is the purpose of evaluating a

24    prescription based upon red flags?

25              MR. SWANSON:  Object to form.
```

Page 301

1              MS. FUMERTON:  Obviously.  Goes

2      beyond his report.  He has already established he

3      is not an expert on red flags or the identification

4      of red flags.

5              MR. SWANSON:  Calls for opinion --

6          Q.    (BY MR. WEINBERGER:)  You can answer.

7          A.    So the -- this falls under the

8      general rubric of prospective drug utilization

9      review, of which drug-drug interactions is one

10     component and obviously red flags for opioids is

11     another.

12             You know, as I have stated, just to

13     be clear, I am not an expert on generation of red

14     flags.  So that is not my area of interest.  But my

15     research, we weren't evaluating prescription data

16     for red flags.

17             But that said, the -- the whole

18     purpose of this sort of data provided to the

19     pharmacist -- and when I say "this data," a

20     dashboard that says "there may potentially be a

21     problem," is to allow the pharmacist other tools to

22     determine if this medication or this prescription

23     order would warrant further investigation.

24         Q.    (BY MR. WEINBERGER:)  Okay.  Thanks.

25             THE REPORTER:  Okay.  On that last

Page 302

1    answer, did you say, but my research, "we are
2    evaluating" or "we aren't evaluating" prescription
3    data for red flags?
4           A.    My research does not evaluate
5    prescription data for red flags.  Has not.
6                 THE REPORTER:  Thank you.
7           A.    Yeah, you are welcome, Laura.
8           Q.    (BY MR. WEINBERGER:)  So in your
9    report and in your testimony you talked about the
10   use of corporate-wide dispensing data aggregated
11   across patients -- aggregated across prescribers
12   and across prescriptions.
13                What is -- would you explain the
14   importance of aggregating that information as
15   relates to your opinions in this case?
16                MS. FUMERTON:  Objection, form.
17   Objection, lack of foundation.  Objection, goes
18   beyond the scope of his opinion.
19                He is not testifying as to the
20   importance of it.  He is asking you -- he has
21   established his opinion is on whether it could have
22   been done, not whether or not it was important to
23   do so.
24           A.    Correct.
25           Q.    (BY MR. WEINBERGER:)  So how is it

Page 303

1    important to your opinions?

2            A.      Correct.

3            Q.      That is fine --

4                    MS. FUMERTON:  He just said correct.

5    He hasn't established -- he just said correct to

6    what I said, which is that he has not said and does

7    not have an opinion that it is important to

8    aggregate information.

9            Q.      (BY MR. WEINBERGER:)  So let me

10   rephrase the question.  You testified about

11   aggregating this data as relates to patients'

12   prescriptions and prescribers, correct?  You

13   testified about that --

14           A.      Yes.

15           Q.      -- in your examination.  How is

16   that --

17                   MS. FUMERTON:  Object to the form and

18   leading.  I was just requesting that I have --

19           Q.      (BY MR. WEINBERGER:)  How is that

20   relevant --

21                   MS. FUMERTON:  Dr. Malone, if you

22   could give me a second to object a second after his

23   question, that would be helpful.

24                   THE REPORTER:  Hold on.  Hold on.

25   Hold on.  I can't get y'all talking at one time.

Page 304

```
 1                   "Object to the form."  Then what else
 2      did you say?
 3                   MS. FUMERTON:  That is what I was
 4      just saying.  I was just requesting that I have an
 5      opportunity to object because Dr. Malone is jumping
 6      in and answering these questions before they
 7      finish.  So I just need an opportunity to object so
 8      I am not speaking over either Pete or Dr. Malone.
 9                   MR. WEINBERGER:  We will give you
10      plenty of time to state your objection, which you
11      have told me you are not supposed to be saying
12      anything but objection as to form.
13           Q.    (BY MR. WEINBERGER:)  But anyway,
14      let's go back.
15                   In the course of answering
16      Ms. Fumerton's questions, you talked about the
17      importance of aggregating information utilizing
18      corporate dispensing data as relates to patients,
19      prescriptions and prescribers.  Do you recall that
20      testimony?
21           A.    Yes.
22                   MS. FUMERTON:  Objection, form.
23      Misstates the prior testimony.
24           Q.    (BY MR. WEINBERGER:)  And how is that
25      aggregation of data relevant to your opinions
```

Page 305

1  regarding the feasibility of these defendants

2  creating an alert system based upon their own

3  dispensing data?

4                    MS. FUMERTON:  Objection, form.

5  Objection, lack of foundation.  He hasn't

6  established that it is relevant.

7          Q.     (BY MR. WEINBERGER:)  Go ahead, you

8  can answer.

9                    MS. FUMERTON:  Objection, leading

10  him.

11          Q.     (BY MR. WEINBERGER:)  You can answer.

12          A.     It is a key component of my report

13  that this data be able to be aggregated across the

14  organizations' business units, i.e., pharmacies, in

15  order to give, again, the pharmacists an accurate

16  picture that not only reflects their own store but

17  reflects the prescribers' behavior beyond their

18  store, the utilization of that medication beyond

19  their store, the utilization -- or the quantity and

20  dose or morphine equivalence beyond their limited

21  pharmacy practice at that facility.

22                    So that ability to accumulate that

23  information and provide some metrics back to the

24  pharmacist is necessary to be done at the corporate

25  level, not at the -- can't be done -- cannot be

Page 306

1    efficiently done at the store level and would

2    require a different set of tools within the

3    pharmacy that probably are not available to the

4    day-to-day practicing pharmacist.

5                       MR. WEINBERGER:  Thank you,

6    Dr. Malone.  Those are all the questions I have.

7                       MS. FUMERTON:  I think we need to

8    take a five- or ten-minute break, and then I am

9    sure we are going to have a series of additional

10   questions.  So why don't we take a five- or

11   ten-minute break, then we will get back.

12                      MR. WEINBERGER:  Can the videographer

13   tell me what -- how much time was taken by

14   Ms. Fumerton, please, and how much time I took?

15                      THE VIDEOGRAPHER:  Well, yes.  She

16   stopped at the -- she -- at the last break, we were

17   at six hours and thirteen minutes.  And then you

18   began.  So we are on the record now for fifty-one

19   minutes.  And you and another gentleman were

20   questioning.

21                      MR. WEINBERGER:  How much -- do you

22   know how many minutes I spent?

23                      THE VIDEOGRAPHER:  I would have to

24   look through the log here.  Give me a second.

25                      MR. WEINBERGER:  Because I think you

Page 307

1    included Josh's questions.

2               THE VIDEOGRAPHER:  Yeah.  Yeah.  Let

3    me look through the log.

4               THE REPORTER:  Do you want to go off

5    the record?

6               MR. WEINBERGER:  Yeah, we can go off

7    the record.

8               THE VIDEOGRAPHER:  We can go off the

9    record at 7:13.

10              (Whereupon, a break was had from 7:13

11              p.m. until 7:23 p.m. EDT)

12              THE VIDEOGRAPHER:  We are back on the

13    record at 7:23.

14

15   REEXAMINATION BY MS. FUMERTON:

16        Q.    Dr. Malone, do you understand that

17   you were under oath when you were answering

18   questions from Mr. Weinberger?

19        A.    Yes.

20        Q.    Do you understand that you are still

21   under oath now?

22        A.    I do.

23        Q.    Did you have telephone calls with

24   Mr. Weinberger during any breaks today?

25        A.    When he was -- not at the break.

Page 308

1   Well, I guess it was during the break when he

2   couldn't get on the -- or his internet crashed, he

3   called me because we were trying to reach him.

4           Q.      Did you have any other?

5           A.      Conversations, no, I did not speak or

6   communicate with Mr. Weinberger via phone, email,

7   text or otherwise.

8           Q.      Did you communicate with anybody

9   else?

10          A.      No, ma'am.

11          Q.      Did you take notes during your

12  testimony today?

13          A.      No, ma'am.

14          Q.      Did you have any documents other than

15  the exhibits that we marked in front of you today?

16          A.      The -- I was trying to recall my own

17  error with regards to the NCPDP Script issue that

18  you raised, the Telecommunications Standard.  So I

19  pulled up a PowerPoint presentation that I had used

20  during one of the breaks just to refresh my memory

21  as to what those standards were.

22          MS. FUMERTON:  I am going to formally

23  request that we get a copy of that PowerPoint

24  presentation that Dr. Malone reviewed.

25          Q.      (BY MS. FUMERTON:)  Can you describe

Page 309

1    what the PowerPoint presentation is?

2           A.     Sure.  Would you like to see it on

3    screen?

4           Q.     Sure.

5           A.     Okay.

6                  (Exhibit 10 was marked for

7                  identification after the deposition

8                  was concluded.  The reporter was

9                  supplied the requested document via

10                 email by Mr. Weinberger.)

11                 MS. FUMERTON:  And actually, why

12   don't we mark this as -- what are we at, Exhibit

13   10?

14                 MS. ZINSMASTER:  That is where we are

15   at.  I don't have the ability to mark this because

16   I don't have the document.

17                 MR. WEINBERGER:  I have us as we are

18   up to Exhibit 8.  Maybe I am missing an exhibit.

19                 MS. FUMERTON:  Exhibit 9 was the

20   spreadsheet.

21                 MR. WEINBERGER:  Oh, yeah, yeah.

22   Yes.  Right.  You are right.

23          Q.     (BY MS. FUMERTON:)  How many pages is

24   this document?

25          A.     I'm not sure how many slides are in

Page 310

1    it.

2              Q.      Did you create this document?

3              A.      I did.  Thirty slides.

4              Q.      When did you create this document?

5              A.      Probably three or four years ago.

6    Part of a class I taught on pharmacy informatics.

7              Q.      Did you rely on this document for

8    purposes of your expert opinion today?

9              A.      I did pull it up, yeah.  And the --

10   the page -- it confused me, I guess, when I was

11   putting my document together.  So these are all

12   data points that are used in pharmacy systems, but

13   this is a slide that confused me.  I misread --

14   when I was referencing the standard, I misread this

15   particular document.

16              So I used the Script Standard Version

17   5.0.  It actually should have been

18   Telecommunications Standard 5.1 in my document.

19   I'll correct that for the record.

20              Q.      Okay.  So I just want to make sure

21   what your testimony is now.  So your current

22   testimony -- and let me pull your expert report

23   out.  Can you please keep it on that page that you

24   are on?

25              A.      Sure.  I will pull the screen up.

```
                                            Page 311
 1          Q.     So in your expert report on Page 4,
 2    you say that you reviewed the National Council for
 3    Prescription Drug Programs, NCPDP, Technical
 4    Standard documentation called Script V5.0.
 5                  And that is on Page 4 of your report,
 6    correct?
 7          A.     Yes.  And that is the error I was
 8    trying to correct.
 9          Q.     And so what is the correct statement
10    that you think it should say?
11          A.     It should say Telecommunications
12    Standard Version 5.1.
13          Q.     And you are certain that is the right
14    one this time?
15          A.     Yes, ma'am.
16          Q.     What is Telecommunications Standard
17    D.0?
18          A.     I'm sorry.  I think you cut out.
19          Q.     What is Telecommunications Standard
20    D.0?
21          A.     D, as in delta, .0?
22          Q.     Uh-huh.
23          A.     Are you deriving that from what is on
24    my screen?
25          Q.     Nope.
```

Page 312

1          A.      I am not familiar with D.O.

2                  MS. FUMERTON:  You can take down this

3     document.  But as I said before, I would request a

4     copy.  So if you can send a copy of that to

5     Mr. Weinberger, we are marking that as Exhibit 10.

6     So if the court reporter would like us to do it a

7     different way, we can talk off the record about how

8     to make sure we get it on the record.

9          Q.      (BY MS. FUMERTON:)  During the course

10    of your deposition today, is there any other

11    documents that you researched?

12         A.      No.

13         Q.      Mr. Weinberger, during his lengthy

14    direct examination of you, asked you a series of

15    questions about your methodology with respect to

16    your research involving DDI, correct?

17         A.      Yes, he did.

18         Q.      You have never developed the specific

19    algorithms that you say that the pharmacies in this

20    case could have developed, correct?

21         A.      No, I have not written that code, no.

22         Q.      You have never attempted to write

23    that code, correct?

24         A.      That's correct.

25         Q.      You are not aware of anybody else

Page 313

1   that has attempted to write that code, correct?

2          A.    No.

3          Q.    You are not aware of any

4   peer-reviewed journals discussing creating such a

5   system, correct?

6          A.    So the publication in the New England

7   Journal of Medicine by the CVS authors used the

8   code to do those things that I cited in my report.

9          MS. FUMERTON:  I am moving to strike

10  that as nonresponsive.

11         MR. SWANSON:  Join.

12         A.    So you asked me if anybody else had

13  used peer-reviewed code to do those activities.

14  And yes, there is a report out there.

15         Q.    (BY MS. FUMERTON:)  Okay.  So but

16  earlier you testified that what was done in the New

17  England Journal of Medicine article was not

18  equivalent to the dashboard that you were talking

19  about that the pharmacies could create, correct?

20         MR. WEINBERGER:  Objection, form.

21         A.    So when you say "code," that implies

22  one specific meaning.  A dashboard is a completely

23  different thing.  I think you asked me about code.

24  Could you repeat the question?

25         Q.    (BY MS. FUMERTON:)  Well, I am

```
                                            Page 314
 1    actually asking you about algorithm.  I think you
 2    started to use the word "code."
 3            A.     Okay.
 4            Q.     So let's go back.  I had asked you
 5    earlier, and if you need to correct this testimony,
 6    that is fine, too, since you are correcting other
 7    testimony.
 8                   But earlier I had asked you whether
 9    or not the system that CVS had described in that
10    article was equivalent to the dashboards that you
11    are opining in your report the pharmacy defendants
12    could have created.
13                   And you testified no, that wasn't; it
14    was a portion of what you think they could do, but
15    it was not equivalent to what you were opining was
16    what they could do, correct?
17            A.     Yes.
18            Q.     Okay.  So what I am asking you -- so
19    you are standing by that testimony.  You are not
20    adopting -- you are saying that what the pharmacy
21    defendants could have done is what CVS had done in
22    that article, correct?
23            A.     You talk so fast, sometimes it is
24    hard for me to capture everything.  Say it again.
25            Q.     Yeah.  So you are standing by your
```

Page 315

1    prior testimony, when I was originally asking you a

2    question, that the program described in Exhibit 3

3    was not equivalent to the dashboards that you were

4    opining in your report the pharmacy defendants

5    could have created, correct?

6              A.    Correct.

7              Q.    And so my question, to be very

8    specific, is not whether anybody, if someone has

9    done some portion of this.  I am asking you are you

10   aware of any instance on which there is the system

11   that you are describing in your report that has

12   been evaluated in a peer-reviewed journal?

13                   MR. WEINBERGER:  Objection, form.

14             A.    No.

15             Q.    (BY MS. FUMERTON:)  Do you know of

16   anybody who has evaluated that other than you?

17                   MR. WEINBERGER:  Objection, form.

18             A.    I believe -- so Carmen Catizone's

19   report goes beyond what I had opined.  So there --

20   in terms of -- are you saying put in -- so let's be

21   clear.

22                   Are we talking developed as in

23   conceptualized, or are we talking in terms of

24   production, actually used in a pharmacy

25   environment?  Because I think we're referring to --

Page 316

1          Q.      (BY MS. FUMERTON:)  Well, let's start
2     with the latter first.
3          A.      Conceptualized.
4          Q.      We have already established it has
5     never been used in a pharmacy environment, correct?
6          A.      Fair enough, yes.
7          Q.      Okay.  So I am talking about what you
8     are theorizing in your report is a system that
9     could have been created.  Are you aware of anybody
10    else who has theorized that the same system that
11    you are opining about in your report is something
12    that the pharmacy defendants could have done?
13                 MR. WEINBERGER:  Objection, form.
14         A.      Yes.
15         Q.      (BY MS. FUMERTON:)  And who is that?
16         A.      Mr. Catizone's report indicates that
17    those -- based upon my reading of his report, seems
18    to suggest that those processes are entirely
19    capable within the pharmacy system's data that I
20    alluded to.
21         Q.      So you think that Dr. Catizone is
22    giving the same expert opinion in this case that
23    you are?
24         A.      No.
25         Q.      Do you think that Dr. Catizone is

Page 317

1   giving a broader expert opinion, that your expert

2   opinion is subsumed within his report; is that

3   correct?

4          A.    Some components are, yes.

5          Q.    Is the entirety of it subsumed within

6   Dr. Catizone's report?

7          A.    No.

8          Q.    So I am asking again, for the

9   dashboard, which has lots of different attributes

10  that you have described --

11         A.    Uh-huh.

12         Q.    -- are you aware of anybody else who

13  has opined that all of those different attributes

14  could be combined into a single dashboard to be

15  used by a retail chain pharmacy?

16              MR. WEINBERGER:  Objection, form.

17         A.    No, I am not.  I am sorry.  I don't

18  want to contradict myself because it sounds like

19  you are asking the same question you asked me a

20  minute ago when I mentioned Carmen Catizone.

21         Q.    (BY MS. FUMERTON:)  No.

22         A.    Okay.  So please restate the

23  question.

24         Q.    (BY MS. FUMERTON:)  I asked you, do

25  you think that Dr. Catizone is giving a broader

Page 318

1  expert opinion, that your expert opinion is

2  subsumed within his report.  You said some

3  components are.  I asked you if the entirety of

4  your opinions are subsumed within Dr. Catizone's

5  report.  You testified no.

6                Then I asked you, so I am asking

7  again, for the dashboard you are opining that the

8  retail pharmacy defendants could have created, are

9  you aware of anybody else that has opined that all

10  of those different attributes could be combined

11  into a single dashboard to be used by a retail

12  chain pharmacy.  Your answer was no, correct?

13        A.    That's correct, yeah.

14            (Pause.)

15            MS. FUMERTON:  I have a note

16  someplace, so I'm going to go off of memory.  Does

17  anybody else have any other questions?  Because

18  otherwise, I just have a request.

19                Okay.  My request is that you

20  preserve the notes that you said you took in

21  connection with creating your expert report and

22  that you preserve the financial records for your

23  consulting company.  And with that, I don't have

24  any further questions.

25            MR. WEINBERGER:  Dr. Malone, I have

Page 319

1  no further questions.  Thank you for your testimony

2  today and for your patience, your professionalism.

3  And we will be talking.

4          A.      Okay.

5                  MS. FUMERTON:  Thank you.

6          A.      Sorry to make it a late day for

7  everybody.  Have a good evening.

8                  MR. WEINBERGER:  That's not your

9  fault.

10                 THE VIDEOGRAPHER:  We will go off the

11  record at 7:38.

12

13          (Deposition concluded at 7:38 p.m. EDT)

14

15              FURTHER THE DEPONENT SAITH NOT

16

17

18

19

20

21

22

23

24

25

1               C E R T I F I C A T E

2

3

4   STATE OF ALABAMA

5   JEFFERSON COUNTY

6

7               I hereby certify that the above and

8   foregoing deposition was taken down by me in

9   stenotypy, and the questions and answers thereto

10  were reduced to typewriting under my supervision,

11  and that the foregoing represents a true and

12  correct transcript of the deposition given by said

13  witness upon said hearing, to the best of my

14  ability.

15              I further certify that I am neither

16  of counsel nor of kin to the parties to the action,

17  nor am I in anywise interested in the result of

18  said cause.

19

20  

21      LAURA H. NICHOLS

        Commissioner-Notary Public, State of AL

22      ACCR License No. 3, Exp. 9/30/2021

        GA CCR No. 2714, Exp. 4/1/2022

23      TN LCR No. 679, Exp. 6/30/2021

        Transcript Certified on 6/1/2021

24

25

```
                                                      Page 321
1                          Veritext Legal Solutions
                               1100 Superior Ave
2                                  Suite 1820
                            Cleveland, Ohio 44114
3                           Phone: 216-523-1313
4
     June 3, 2021
5
     To: Peter H. Weinberger, Esq.
6
     Case Name: National Prescription Opiate Litigation - Track 3
7
     Veritext Reference Number: 4615080
8
     Witness:  Daniel Charles Malone, Ph.D.   Deposition Date:  5/28/2021
9
10   Dear Sir/Madam:
11
     Enclosed please find a deposition transcript.  Please have the witness
12
     review the transcript and note any changes or corrections on the
13
     included errata sheet, indicating the page, line number, change, and
14
     the reason for the change.  Have the witness' signature notarized and
15
     forward the completed page(s) back to us at the Production address
16   shown
17   above, or email to production-midwest@veritext.com.
18
     If the errata is not returned within thirty days of your receipt of
19
     this letter, the reading and signing will be deemed waived.
20
21   Sincerely,
22   Production Department
23
24
25   NO NOTARY REQUIRED IN CA
```

```
 1                   DEPOSITION REVIEW
                   CERTIFICATION OF WITNESS
 2

     ASSIGNMENT REFERENCE NO: 4615080
 3   CASE NAME: National Prescription Opiate Litigation - Track 3
     DATE OF DEPOSITION: 5/28/2021
 4   WITNESS' NAME: Daniel Charles Malone, Ph.D.
 5         In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
 6   my testimony or it has been read to me.
 7         I have made no changes to the testimony
     as transcribed by the court reporter.
 8

     _____         _____
 9   Date                    Daniel Charles Malone, Ph.D.
10         Sworn to and subscribed before me, a
     Notary Public in and for the State and County,
11   the referenced witness did personally appear
     and acknowledge that:
12

           They have read the transcript;
13         They signed the foregoing Sworn
                 Statement; and
14         Their execution of this Statement is of
                 their free act and deed.
15

           I have affixed my name and official seal
16
     this _____ day of_____, 20____.
17
                     _____
18                   Notary Public
19                   _____
                     Commission Expiration Date
20

21

22

23

24

25
```

Page 323

```
 1                    DEPOSITION REVIEW
                   CERTIFICATION OF WITNESS
 2
      ASSIGNMENT REFERENCE NO: 4615080
 3    CASE NAME: National Prescription Opiate Litigation - Track 3
      DATE OF DEPOSITION: 5/28/2021
 4    WITNESS' NAME: Daniel Charles Malone, Ph.D.
 5         In accordance with the Rules of Civil
      Procedure, I have read the entire transcript of
 6    my testimony or it has been read to me.
 7         I have listed my changes on the attached
      Errata Sheet, listing page and line numbers as
 8    well as the reason(s) for the change(s).
 9         I request that these changes be entered
      as part of the record of my testimony.
10
           I have executed the Errata Sheet, as well
11    as this Certificate, and request and authorize
      that both be appended to the transcript of my
12    testimony and be incorporated therein.
13    _____        _____
      Date                    Daniel Charles Malone, Ph.D.
14
           Sworn to and subscribed before me, a
15    Notary Public in and for the State and County,
      the referenced witness did personally appear
16    and acknowledge that:
17         They have read the transcript;
           They have listed all of their corrections
18             in the appended Errata Sheet;
           They signed the foregoing Sworn
19             Statement; and
           Their execution of this Statement is of
20             their free act and deed.
21         I have affixed my name and official seal
22    this _____ day of_____, 20____.
23             _____
               Notary Public
24
               _____
25             Commission Expiration Date
```

Page 324

1                        ERRATA SHEET
              VERITEXT LEGAL SOLUTIONS MIDWEST
2                   ASSIGNMENT NO: 4615080
3      PAGE/LINE(S) /        CHANGE        /REASON
4      _____
5      _____
6      _____
7      _____
8      _____
9      _____
10     _____
11     _____
12     _____
13     _____
14     _____
15     _____
16     _____
17     _____
18     _____
19

       _____      _____
20     Date                 Daniel Charles Malone, Ph.D.
21     SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22     DAY OF _____, 20_____ .
23                   _____
                     Notary Public
24
                     _____
25                   Commission Expiration Date

| & | |
| --- | --- |
| **&** | 2:7 3:8 5:18 |
| | 91:6,6 268:21 |

**0**

**0** 311:21
**0.6** 214:23
**06622037** 8:6
95:20
**06622038.xlsx** 8:7

**1**

**1** 7:13,19 16:5,17
16:18 30:21,23
31:5,19 35:9,18
59:14,15,20 65:10
77:22 83:1 85:7
109:1 114:24
118:13 139:16
185:24 186:5
231:7 241:24
242:5 247:10
281:14
**10** 9:12 160:17,21
160:25 161:11
218:1,7 309:6,13
312:5
**100** 2:20
**1001** 2:8
**101** 5:19
**10178-0060** 5:20
**10:08** 11:10,17
**11** 7:4 15:13
160:18 210:19
**1100** 321:1
**11:07** 55:12,14
**11:37** 55:14,16
**12** 7:5 29:3 73:11
73:11 124:1,5
141:20,22
**124-09** 8:9

**12th** 15:14
**13** 160:18 223:7
**14.5** 278:21
**15** 7:17
**15219** 3:11
**15th** 31:3,8 124:14
126:9 226:12
**16** 15:19,24,25
**16-18** 7:13
**160-23** 8:13
**16th** 226:12
**17** 1:6 11:18
**17-02** 7:18
**17-08** 7:21
**1700** 2:9
**17th** 223:25
**1820** 321:2
**18409** 320:20
**19** 60:4 64:6 66:20
66:23 89:8 179:17
**1980s** 72:5
**1983** 46:3,4 59:21
61:10
**1986** 53:16 76:10
**1987** 17:21 18:4
45:2 47:9,10,12
57:10,11 58:9,18
61:17,23 62:1
64:6,8,12,24
**1988** 58:21 60:12
62:1,5,9,13,15,24
63:2 64:7,9,12,24
66:21,24 67:9,20
69:3,6 71:8
**1989** 53:16 69:3,7
69:8 89:8
**1990** 46:20 47:10
54:5 61:20,23
62:24 179:18
**1990s** 196:2

**1993** 37:19 38:3
47:12 49:5,19
62:15 63:3 73:21
**1994** 34:15 38:9
49:19
**1995** 36:1
**1999** 89:8 179:18
**1:23** 116:13,15
**1r13hs021826**
118:24
**1st** 279:8

**2**

**2** 7:18 16:23 17:2
28:21 35:6 65:10
68:9 73:11 75:19
77:24 84:1 85:16
121:19 126:22
132:3 165:19
232:6 255:11,12
262:5 281:12,16
289:15 298:1
**20** 322:16 323:22
324:22
**2000** 89:8,15
**2000s** 73:7
**2001** 41:9,16 89:15
109:11 110:9
115:3
**2002** 89:16,17
**2003** 42:10 43:7
**2004** 89:4
**2005** 203:21
**2006** 43:10 231:16
**2011** 115:3 279:8
**2012** 28:2 96:12
183:11 184:11,13
184:21 187:2
191:12 208:1
**2013** 15:14 51:20
**2014** 28:4 111:7
208:3

**2014-2015** 51:14
**2015** 279:9
**2016** 124:15 126:9
**2018** 57:16 58:3,9
58:18 60:18 184:7
**2019** 37:10 44:1,5
57:5,12,14 58:4,25
59:1,22 60:19
74:23 76:5 211:4
**2020** 59:22 60:13
74:23 161:4
223:25
**2021** 1:19 7:17
11:9,16 31:4,8
35:20 60:6 161:4
224:15,18 226:2
230:20 321:4
**2038** 96:10
**20th** 60:5 228:14
228:17 230:2
**210-22** 8:17
**212** 5:21
**21202-1031** 2:22
**214** 4:10
**216** 2:11
**216-523-1313**
321:3
**217-8800** 4:19
**220-3939** 4:10
**223-10** 9:4
**227-23** 9:10
**22nd** 211:4
**23** 141:17,18,19
**24.9** 220:10
**2440** 2:21
**268** 7:6
**2714** 320:22
**2727** 4:8
**277** 7:7
**28** 1:19 11:9

**2804** 1:5,6 7:15
11:18 30:25
**28th** 11:16
**29** 83:25 84:1
121:12
**29th** 161:3

**3**

**3** 7:21 17:7,8
27:25 28:1 142:1
153:3,11 163:23
185:6,8 207:2,6,7
207:11,15 246:24
255:10 288:25
315:2 320:22
321:4,6 322:3
323:3
**307** 7:8
**309-07** 9:12
**309-6000** 5:21
**30th** 59:1,3 60:5
60:13
**312** 3:22 5:12
**31st** 279:9
**3500** 3:20
**35th** 3:10
**369** 15:13
**3:17** 160:8,10

**4**

**4** 8:4 95:8,15,19
96:9,21 97:7
101:17 150:4
151:15 185:12
261:3,21 262:3,5
270:11 311:1,5
**4/1/2022** 320:22
**410** 2:23
**412** 3:12
**44114** 2:10 321:2
**4615080** 321:7
322:2 323:2 324:2

**471-3490** 3:12
**49** 51:20
**494-4400** 5:12
**4950** 4:17
**4:00** 222:25
**4q11** 102:19
105:16

**5**

**5** 8:9 124:8,9,20
126:12,22 139:15
141:2,7,14 153:11
191:12 203:22
215:8 256:22
262:4,7,14 295:23
297:16 298:1
**5.0** 201:25 202:5,6
202:18 204:8
**5.0.** 205:13 310:17
**5.1** 203:24 310:18
**5.1.** 311:12
**5.2** 203:25
**5.3** 203:25
**5/28/2021** 321:8
322:3 323:3
**51** 57:23 65:11,16
68:9
**54** 5:10
**55402** 4:18
**5:06** 223:2,4

**6**

**6** 8:13 95:4,12
160:22,25 161:16
163:23 165:20
214:15 218:5
257:25 262:6
**6/1/2021** 320:23
**6/30/2021** 320:23
**600-0114** 2:11
**60601-1692** 3:21

**60654** 5:11
**612** 4:19
**679** 320:23
**6:00** 67:15
**6:20** 268:7
**6:21** 268:9
**6th** 230:19

**7**

**7** 8:17 95:4,13
97:2,6 210:21,25
231:9 253:17
255:9 259:8
277:19
**75201** 4:9
**77** 3:19
**782-3939** 3:22
**7:23** 307:11,13
**7:38** 319:11,13

**8**

**8** 9:4 31:13 153:3
153:10 223:9,13
223:24 309:18
**80s** 70:5

**9**

**9** 9:10 155:7,8
227:20,22 277:19
309:19
**9/30/2021** 320:22
**90** 4:16
**94** 40:18
**949-1159** 2:23
**95-15** 8:4
**99** 40:18
**9:00** 67:15
**9th** 96:12 161:4

**a**

**a.m.** 11:10,17
55:14,14

**abarca** 29:13
**abbreviation**
106:15 109:19
**abilities** 42:7
**ability** 14:14 19:13
155:23 196:19
204:11 297:10
305:22 309:15
320:14
**able** 13:22 18:8
178:11 179:1
181:3 190:17
196:13 198:13
217:14 238:12
244:10 247:1
257:20 258:14
283:20 288:5
292:1 297:17
305:13
**absence** 143:2
167:14
**absolutely** 154:4
220:22,23
**abstract** 126:12
162:12 163:1
211:7
**absurd** 289:23
**abundance** 159:22
**abuse** 82:19 84:3
190:14 213:21
214:2 288:13
**abusive** 7:22
**academia** 37:18
37:24 54:22 78:2
81:14
**academic** 36:14
38:15 59:21 85:19
85:23 86:6,7 87:2
89:11 205:17
**academy** 50:25
51:3,10,12 52:5,19

77:7 114:13
**acceptable** 256:18
**acceptance** 166:4
**accepted** 36:4 40:9
  161:4
**access** 16:4 240:20
  240:24 243:14
  249:16 294:15
**accessing** 226:4
**accident** 17:20
**accomplish** 123:9
**accomplishments**
  39:2,11
**account** 173:2
  218:19
**accounting** 256:11
**accp** 77:6
**accr** 320:22
**accumulate**
  305:22
**accumulated**
  289:17
**accumulation**
  231:17
**accurate** 31:23
  32:2 35:12,16
  36:11 57:5 61:1
  65:22 85:14 92:17
  203:19 204:19
  205:7,9,11 215:17
  228:12 230:20
  231:22 305:15
**accurately** 75:17
  115:4
**acknowledge**
  142:17 322:11
  323:16
**acronym** 50:21
  109:15
**act** 191:2 322:14
  323:20

**acting** 11:4
**action** 12:5 20:11
  22:2,24 143:1,2
  320:16
**actions** 53:18
  54:19
**active** 57:5 59:22
  60:12 74:17,24
  75:25 76:18
**activities** 52:9
  53:4 86:7,18 87:3
  87:17 88:4,9,11,17
  91:8 92:21,22
  95:2 101:8 105:9
  105:11 107:9
  123:9 131:9
  179:22,23 231:15
  233:19 274:19
  313:13
**activity** 87:2 88:23
  89:11 94:6 108:13
  119:12 120:9
  227:1,3
**actual** 22:16
**add** 36:3,4 229:15
  251:21
**added** 260:8,12
**addition** 44:15
  63:15 284:12
**additional** 48:20
  122:6 192:13
  273:17 285:8
  306:9
**address** 144:1
  234:24 235:10,13
  235:19,21 236:5
  236:15 237:23
  238:2 286:6
  321:15
**addressed** 232:7
  285:24 289:15

**addresses** 262:4,4
  262:5,5
**adherence** 50:16
**adjoining** 257:13
**adjudicate** 178:2,5
  179:15 180:12
**adjudicated**
  156:12
**administer** 128:14
**administration**
  87:1 155:20 177:6
**administration's**
  279:17
**admittance** 45:10
**adopted** 108:8
  119:21
**adopting** 314:20
**adult** 279:10
**adults** 279:3,3
**advantage** 297:2
**adverse** 34:6
  49:11,12 54:15
  100:5 134:5,6
  148:12
**advertise** 117:5
**advice** 86:3 87:5
  89:23
**advised** 93:13 94:5
**advising** 88:10
  90:9
**advisors** 89:23
**advisory** 89:21
  90:15
**advocate** 155:23
**advocating** 239:23
**affiliated** 43:15,17
**affixed** 322:15
  323:21
**afield** 146:1 180:3
  181:2

**afternoon** 160:11
**age** 278:10,12,19
  279:18 280:13
**agencies** 85:10
**agency** 83:5 122:4
  140:10
**agent** 177:6
**agents** 177:6
  238:10 239:16
  283:21
**aggregate** 262:9
  263:2,4,7,8 297:10
  303:8
**aggregated** 231:12
  274:6 302:10,11
  305:13
**aggregates** 243:25
**aggregating**
  302:14 303:11
  304:17
**aggregation**
  263:12 304:25
**agi** 208:2
**ago** 18:5 37:21
  126:4 198:11
  225:16,20 310:5
  317:20
**agree** 14:12 48:7,9
  48:11 78:16 79:4
  80:21 82:8 111:15
  112:12 129:10
  131:4 133:12,13
  133:16 150:10
  151:25 153:23
  154:5 156:4 158:9
  158:10,18,21
  159:20 162:6,9,19
  162:22 166:5
  168:14 175:6
  201:12 205:16
  211:19,24 212:20

212:21,24 213:6,9
218:12 221:11
231:10,24 244:3
264:24 265:4
279:20
**agreed** 10:2 33:4
158:13
**agreement** 227:4
**agriculture** 46:16
**ahead** 16:16 18:21
21:24 33:25 34:23
42:3 63:20 81:9
82:16 83:19 92:20
97:20,25 103:8,24
128:9 130:21,23
133:6 146:18
147:4 161:15
164:23 165:2
170:2 178:16,16
196:5,9 206:18
223:22 261:5
305:7
**ahrq** 83:6,9,10
84:8,12,14,19 85:8
117:25 118:22
119:6
**aid** 5:15 69:16,24
149:1,14 199:9
269:25 270:1
**aid's** 149:5
**al** 139:19 320:21
**alabama** 11:3,4
320:4
**alarms** 216:13
**alert** 128:12 130:3
130:7,11,19 131:4
131:13 133:14,20
134:12 135:17,24
136:10 138:12
142:7,10,14,15,17
142:20 143:2,5,6

144:2 149:10,15
149:19,21 150:2
151:12 155:22
156:12 158:19
162:3 166:2,3,7,23
167:12,13,15,16
167:21 168:22
169:7,18,24
170:12 172:8,10
172:21 176:18,24
177:1 178:12
218:12,14,17
219:1 220:3 221:5
245:25 255:18
283:6 285:14
286:9,18 300:17
305:2
**alerted** 174:21
**alerting** 138:4,5
162:14
**alerts** 29:14 128:6
128:23 129:20,23
129:25 130:2,7
132:17,20 134:16
135:2,4,25 136:1,8
136:10,20 138:9
142:11 153:1
155:18,22,24
156:4 158:7,23
162:6,17 165:23
166:14 167:20
168:15 173:6,18
173:21 174:1,14
174:17 175:2
176:16 177:3
179:24 190:7
198:20 219:7
220:5,5,6,18,24
221:2 252:12,15
252:16,19 284:24

**algorithm** 171:19
205:17 215:19
216:1 259:22
286:17 314:1
**algorithms** 8:16
8:19 161:3,18
163:1,15 165:17
167:10 168:7
171:9,11,16
190:18 206:10
211:1 216:23
253:21,25 254:2
254:18 277:21
283:5,13 284:16
284:23 285:4,14
312:19
**align** 52:11
**aligned** 300:1
**allegedly** 22:3
**alliance** 5:4
107:13,15,19
108:2,5,7
**allow** 164:16,23
179:13 182:24
190:2 237:19
244:19 301:21
**allowed** 25:25
43:21 233:16
**allows** 178:25
242:24
**alluded** 126:4
316:20
**amcp** 114:16
**amended** 298:21
299:5,6
**american** 76:1
77:4,5
**amerisourceberg...**
93:11
**amount** 63:11,21
64:1 112:10

121:20 122:3
123:7 125:17
150:22 173:6
226:19
**amounts** 245:5
**analogy** 209:19
244:19
**analyses** 242:8
290:5
**analysis** 138:12
170:19 215:3
221:14 235:23
240:16 241:25
256:5 294:11
295:25 298:18
299:12
**analysts** 291:25
**analytics** 102:18
105:15
**analyze** 274:17,24
**analyzed** 246:13
**analyzes** 270:25
**analyzing** 162:2
**annual** 123:8
**answer** 14:12 18:8
18:19,21,22 19:3
19:14 21:3,21
37:15 73:1 79:10
79:14,24 81:9
84:25 94:14
101:11 103:8
104:19 120:18
137:4 141:3,7,15
141:17,18 142:13
144:9 146:12,17
146:18,25 147:22
164:16,17,19,23
170:4,6,7 173:15
181:12,13 182:9
183:18 186:2,3
192:1,13,14 196:7

202:11,12,25
206:4 209:12
213:24 214:9,22
247:1 262:1 267:1
272:19 287:16
289:25 293:20
301:6 302:1 305:8
305:11 318:12
**answerable** 288:1
**answered** 81:9
164:19 170:2
264:16
**answering** 18:13
120:14 219:19
288:16 304:6,15
307:17
**answers** 18:6
78:23 181:4,5,16
182:7 247:23
260:23 261:24
282:15 320:9
**anthony** 73:12
**antibiotic** 34:18
**anticipate** 96:4
**antifungal** 164:6
**anybody** 13:11
20:7 24:1,14,15,20
30:10 32:16,25
213:16 224:22
308:8 312:25
313:12 315:8,16
316:9 317:12
318:9,17
**anymore** 77:16
**anyway** 304:13
**anywise** 320:17
**apologies** 56:17
57:17 60:8,14
86:17 188:24
220:21 281:1

**apologize** 60:1
62:8 73:3 99:3
144:10 161:23
222:15 226:21
260:9
**apology** 120:17
**appear** 322:11
323:15
**appearance** 227:6
**appeared** 258:12
274:1,3 275:6
**appearing** 2:2 3:2
4:2 5:2 6:2
**appears** 28:4
71:24 98:21
101:18 102:17
124:11 166:7
236:14 288:19
**appended** 323:11
323:18
**application** 52:21
52:22 53:1
**applied** 48:6 121:3
204:22
**applies** 121:1
128:1 140:8
144:22 145:19
147:16 176:20
251:22 281:1,3
**apply** 41:4 52:7,23
52:24 154:24
176:25 205:18
**applying** 280:22
**appointment**
43:18
**appointments**
50:3
**appreciate** 79:16
87:10 101:9
145:25

**approach** 132:7
183:13 283:18
**approaches** 211:9
211:25 234:2
**appropriate**
104:17 136:14
150:20,25 151:6
156:15,20 157:23
170:24 172:4,23
173:17,21 175:15
176:15 191:18
220:6 222:11,13
232:21,23 246:6
248:7 251:3,10,17
259:5 263:21
264:2,4 267:13,14
**appropriately**
201:16 212:16
213:20
**appropriateness**
162:5 265:14
**approximate**
91:10
**approximately**
24:24 27:14 43:7
62:19,22 63:1
69:12,14 88:16
218:10 269:3
**april** 7:16 27:6,7
31:3,8 124:14
126:9 226:11,13
230:19
**area** 13:3 46:14
47:22 50:5 64:16
72:14 77:17 84:16
85:1 100:3,10
170:22 171:2,5,8,8
171:24 172:5,24
173:22 238:5
301:14

**arguing** 239:10,11
**argument** 247:9
**arizona** 12:16
40:22 41:6 42:5
42:13,15,18 43:9
44:3 84:6 94:23
102:14 105:7
109:12,20 110:3
110:10,11 111:11
**arrive** 20:23 22:5
140:20
**arrythmia** 111:17
112:3,4
**article** 7:22 8:10
8:14,18 9:5 15:5,9
15:12,16,21 17:6
27:23 28:17 73:6
124:20,25 125:14
126:8 146:9 147:1
155:7 161:1,17
162:2 165:20
169:17 206:12
207:1,6,7 210:25
223:15,24 277:20
313:17 314:10,22
**articles** 19:23,23
28:14,15 29:7,18
146:10 207:10
221:2
**artifacts** 163:2
**ascendant** 93:11
93:12,13,16
**ascertain** 76:6
257:20
**asked** 16:24 32:20
34:24 36:10 56:4
68:15 81:8 86:9
92:22 98:18
101:20 114:16
120:8 147:6 170:2
181:11 184:6

199:8,19 224:2,6
225:16 233:10,25
247:4,10 249:18
249:21,23 253:5,6
253:24 260:22
261:8 264:10,17
264:20,21 279:25
281:11 286:6
297:23 300:13,16
312:14 313:12,23
314:4,8 317:19,24
318:3,6
**asking** 56:24 80:4
96:1 103:12,13
109:7 169:12
170:23 181:14
182:13 186:1,3
211:18,19 216:15
247:24 298:24
302:20 314:1,18
315:1,9 317:8,19
318:6
**assembled** 238:20
**assembling** 238:21
**assert** 178:11
**asserting** 190:23
276:14
**assertions** 275:21
**assess** 190:2 264:3
265:13 274:24
**assessing** 171:10
251:7,15
**assign** 10:12
**assignment** 322:2
323:2 324:2
**assimilated** 290:24
**assimilating**
284:18
**assimilation**
291:24

**assist** 32:25
177:10 209:15
230:24 239:4
242:1,9 247:12
248:23 252:7
**assistance** 179:9
**assistant** 38:6,12
38:15,16,21 39:14
40:6,13,15,21 41:5
41:24 50:1
**assisted** 252:4
**associate** 38:2,15
38:23 39:6,15,17
39:20 41:10 43:13
**associated** 21:17
26:2 28:10 47:24
49:10,11 50:11
52:9 53:8 72:17
78:10 80:16
113:17 127:20,21
131:2 136:16
157:21 192:5
209:20 235:10
236:6 248:25
255:8 269:17
271:3 274:19
293:22
**association** 76:1,3
76:9,21
**associations** 77:5
**assume** 32:20 91:4
134:18 264:10,17
264:20,21 278:24
**assumed** 195:4,7
**assumes** 79:23
80:2 103:7,23
194:13 286:24
**assuming** 15:6
39:2 82:2 115:24
185:1 225:8

**assumptions** 32:22
103:20
**attached** 101:22
102:11 323:7
**attachment** 7:19
8:5 35:9,9,18
95:19 96:9,10,23
98:2
**attempted** 312:22
313:1
**attempting** 130:25
**attempts** 257:7
**attend** 46:7
**attended** 89:14,17
**attending** 89:20
**attention** 102:12
130:17 134:21
135:5,6 137:1
143:10,12 144:13
144:19 145:17,18
147:13 288:8
**attorney** 2:6,18
3:7,17 4:6,14 5:7
5:17 34:11 225:3
225:6
**attribute** 123:10
244:16
**attributes** 48:24
49:17 52:8 169:6
179:4 200:13,21
200:22,25,25
201:5,11,11,16
212:12 230:14
232:15 233:1
264:11,18,22
276:11,12 285:8
285:25 299:24
317:9,13 318:10
**audio** 72:21
**august** 64:12,24
69:6 96:12

**austin** 46:21 68:14
**authenticate** 16:21
97:3,14
**author** 29:3,13
73:11,12,12
102:17 105:14,19
125:5,7,9,24
140:17 161:22,25
162:1
**authority** 198:13
**authorize** 323:11
**authors** 313:7
**availability** 44:7
198:21
**available** 115:25
171:11 176:11
195:20,21 196:12
196:15 210:5
232:24 236:24
237:6,13 239:12
239:13 255:17
260:15 289:4
291:11 293:4
306:3
**ave** 321:1
**avenue** 2:8 5:19
**average** 91:18
**avoid** 170:16
**aware** 19:11 99:4
131:10 154:8,12
155:2,6 187:18
200:10 233:3
252:17,18,20
254:19,25 255:1
257:7 258:15
259:12,14 264:23
273:15 288:23
290:22 312:25
313:3 315:10
316:9 317:12
318:9

**awkward** 14:3
**azcert** 109:14,16
  109:18,21 110:3,7
  110:17,18,24
  112:24 113:9,14
  115:1

**b**

**b** 242:14
**back** 17:11 26:19
  35:4 43:24 46:8
  47:19 51:19 55:9
  55:15 57:18 70:4
  72:5 73:6 75:15
  76:6 83:11 85:7
  92:16 93:19 96:8
  101:6,10 104:6,9
  104:20 106:4
  108:25 112:16
  114:23 116:14
  117:15,23 134:22
  136:23 139:7
  144:7 149:17
  160:9 166:20
  168:13 180:25
  181:10 182:13
  185:5 198:10
  203:18 209:9,13
  218:17 220:2,8
  221:19 222:24
  223:3 227:8 231:9
  232:6 233:13
  234:7,9 240:8
  241:17 246:22
  248:2,16 250:19
  253:2 268:8,25
  269:6 273:12
  274:17,24 294:10
  297:6,7 304:14
  305:23 306:11
  307:12 314:4
  321:15

**background** 44:24
  132:2 192:16
**bad** 125:15 174:12
  219:15 220:18,24
  269:24
**balance** 109:2,3,5
  109:8 209:25
**baltimore** 2:22
**bank** 289:19
**bartlit** 5:8
**bartlitbeck.com**
  5:13
**base** 32:22 132:6
  132:11 187:25
  188:20
**based** 32:9 100:18
  103:9 113:24
  130:3 136:15
  152:16 158:12
  165:23 171:14
  176:3 179:4
  183:23 198:20
  220:25 250:3
  254:18 258:11
  262:9 263:4
  264:13 274:2
  300:24 305:2
  316:17
**bases** 32:2 72:3
**basic** 236:3
**basically** 24:10
  64:9 66:22 74:6
  100:16 123:14
  219:7 238:11
  245:7 296:7
**basing** 189:15
**basis** 13:4 47:18
  56:19 69:11,13
  123:8 172:3 176:6
  185:10 190:23
  195:4 199:16

239:7 284:8 290:4
**bates** 8:5 95:19,24
**beck** 5:8
**becoming** 76:2
**began** 37:18 62:9
  69:4 71:22 89:5
  306:18
**beginning** 86:8
**behalf** 12:7
**behavior** 296:2
  297:18 305:17
**believe** 16:11
  20:12,14 23:4,15
  24:6 25:23,24
  26:1,7 27:6 31:21
  32:24 41:8 42:11
  49:19 56:9,12
  57:10,13 63:4
  66:20 67:23 68:1
  69:6 72:18 74:8
  74:19 76:4 89:14
  89:17 91:7 94:15
  99:11 102:23
  115:10 122:14
  131:19 132:22
  134:12 149:2
  157:6 163:21
  183:11 184:7
  192:24 199:7
  224:11,24 225:4
  226:1 227:16,21
  230:5 243:5
  269:21 270:14
  273:1 274:10
  288:25 315:18
**belong** 76:23
**belonged** 75:22
**beneficiaries** 8:21
  9:8 211:3 215:21
  218:8,9 223:17
  278:3,7,9 279:8,11

279:15 281:2
**benefit** 51:6
  127:19 136:2
  137:8 138:11
  153:22 154:9,15
  155:5
**benefits** 51:9
  127:22 128:13,18
  128:24 279:2
**benzodiazapine**
  165:5
**benzodiazepine**
  164:8 258:23
**benzodiazepines**
  296:12
**bertram** 72:16
  73:13
**best** 14:13 18:9
  43:6 52:20 111:16
  119:19 120:2
  129:10 145:10
  284:20 320:13
**bestes** 289:2
**betses** 15:12
**better** 30:4 92:12
  99:2 192:19
  243:24 244:4,6,10
**beyond** 15:3 53:13
  104:11 106:1
  108:11,14,14
  170:23 217:13
  243:8 247:22
  254:24 255:13
  295:16 300:12
  301:2 302:18
  305:17,18,20
  315:19
**biggest** 219:16
**billing** 9:11
**biomedical** 44:12

**birmingham** 11:3
**birner** 99:8,10
  101:18
**bit** 16:21 21:13
  45:1 55:6,7,19,23
  72:13 87:12 93:20
  159:15 215:11
  260:21
**bits** 237:19
**blanche** 157:25
**blanket** 166:23
  168:22 236:13,15
**bleed** 148:14
**blocks** 238:1
**board** 56:10 74:1
  74:5,10 89:22
  90:15 114:1,7,9,13
  114:17,17
**boards** 74:21
  114:3,12
**bockius** 5:18
**body** 26:6
**bond** 6:8
**book** 95:5
**boots** 5:4
**border** 257:15,17
  257:18
**bottle** 54:13
**bottom** 51:21
  95:25 99:19
  101:17 126:11
  253:18,18 262:3
**box** 95:5 124:2
  142:18 210:19
**boxes** 144:4
**break** 18:24 19:2,4
  55:8,13,20 67:17
  116:12 159:5,12
  159:12 160:7
  222:21 223:1
  267:20,25 268:2,6

306:8,11,16
  307:10,25 308:1
**breaks** 18:25
  63:16 307:24
  308:20
**brenda** 42:22
**brennan** 15:12
  289:2
**brian** 5:6 247:18
  289:5
**bring** 101:6 135:4
  136:25
**bringing** 149:10
**broad** 20:15 48:5
  80:21 100:3,7
  107:18 108:21
  115:11 235:19
  276:10
**broader** 87:7
  134:4 157:21
  265:11 317:1,25
**broadest** 53:21
**broadly** 134:10
**broke** 79:25
  251:12
**brought** 144:19
  147:13
**bs** 31:1 45:1
**build** 221:16
**building** 118:4,5
  118:20,20
**built** 287:4 288:20
**bunch** 144:4
**business** 100:22
  196:23 269:11
  305:14
**butcher** 139:18
**butchering** 36:24

**c**

**c** 2:1 3:1 4:1 5:1,6
  6:1 7:16,20 31:1
  109:13 296:23
  320:1,1
**ca** 321:25
**calculate** 238:1
  245:5
**calculation** 123:13
  227:14 238:14
**calculations**
  237:21
**calculi** 137:8
**calendar** 23:8
  224:12 226:5,6
**call** 63:14 143:21
  203:10 224:24
**called** 34:18 45:22
  93:11 94:24
  148:18 203:21
  204:21 205:4
  243:5 258:1 286:1
  308:3 311:4
**calls** 292:20 301:5
  307:23
**camera** 13:1
**cancer** 215:25
  216:4,11 217:6
  279:12
**candidate's** 39:10
**canyon** 64:21
  66:19
**capabilities** 276:3
  276:8,18
**capability** 175:21
  206:21 291:19
**capable** 179:8
  316:19
**capacities** 47:11
  47:13

**capacity** 30:15
  33:23 45:19 70:1
  70:6,10 89:6
  113:23 158:6
**capture** 50:15
  218:13 314:24
**car** 237:10
**cardiac** 111:17,20
  111:21
**care** 29:5 51:1,3,5
  52:5 101:4 114:14
  156:10,11 180:21
  241:5 245:22
**career** 37:18 59:21
  61:12 77:12 78:1
  78:16 83:2 85:23
  88:13,18 91:19
  92:23 98:11 287:8
**careful** 157:25
**carefully** 33:4
  144:25 147:19
  150:19
**caremark** 290:19
**carl** 72:16
**carmen** 56:8 298:8
  300:14 315:18
  317:20
**carmen's** 299:23
  299:23
**cars** 244:20
**carte** 157:25
**case** 1:6 11:18
  20:23 22:7 29:20
  70:21 71:15,24
  97:5 126:2 133:24
  148:18 157:9
  173:20 184:22
  193:4,23 196:3
  199:25 201:19
  248:25 249:1
  250:16 269:2

272:6 273:18
285:16 286:7
294:3 295:12
302:15 312:20
316:22 321:6
322:3 323:3
**cases** 1:12
**categories** 177:24
218:20 299:11
**category** 115:12
**catizone** 56:8
298:8 300:14
316:21,25 317:20
317:25
**catizone's** 298:15
315:18 316:16
317:6 318:4
**cause** 11:11
138:12 143:18
158:14 320:18
**caused** 112:18
216:12
**cautioning** 127:17
**ccr** 320:22
**cds** 151:19 155:11
**center** 38:8,9
94:24,24 109:12
110:3
**centers** 85:9
**central** 46:11
71:25 275:7 293:8
293:8
**centralized** 71:3,5
274:13 289:19
**centrally** 293:14
295:3,21 297:1
**centre** 3:9
**certain** 103:19
133:25 137:23
143:9 146:23
148:3 158:5

189:23 233:22
242:20 243:1
244:21 255:19
311:13
**certainly** 27:19
138:23 217:8
292:24 295:17
**certificate** 323:11
**certification** 28:11
322:1 323:1
**certifications**
53:11
**certified** 1:23 10:6
11:1 320:23
**certify** 11:5 320:7
320:15
**cetera** 179:6
**chain** 92:14
231:11 244:2,12
244:13 255:17
260:14 290:13
291:3 317:15
318:12
**chains** 108:22
**challenges** 151:17
**challenging** 88:19
133:3 135:10
257:19
**change** 41:21 42:2
282:25 321:13,14
323:8 324:3
**changed** 41:25
45:11 75:21
141:21 157:9
203:14 299:6
**changes** 75:20
155:19 321:12
322:7 323:7,9
**changing** 71:16
**channel** 155:11

**characteristics**
130:5 162:10
166:3 168:3 215:9
278:10 294:4
**characterization**
37:5 82:4 112:13
147:23 244:4
**characterize** 37:6
**charging** 226:23
226:25
**charles** 1:17 7:4
10:4 11:10,22
12:13 321:8 322:4
322:9 323:4,13
324:20
**chase** 103:15
**check** 26:7 76:6
112:21 141:22
142:18 144:4
**chicago** 3:21 5:11
**children** 279:11
**choose** 29:17
**chose** 76:16 176:2
**christmas** 67:11
**christopher**
269:20 270:7
**cincinnati** 257:15
**circumstance**
138:21 222:9
**circumstances**
127:16 156:19
158:8,15 177:7
251:7,16
**cite** 32:10 187:21
**cited** 238:8 313:8
**city** 64:21 66:19
**civil** 11:6 322:5
323:5
**claim** 205:22
**claiming** 206:2,6

**claims** 178:23
202:4,23 203:2,11
204:3,10
**clarification** 13:22
87:11 120:16
**clarified** 274:22
**clarify** 56:2,20
65:21 71:19 86:14
89:15 110:2
204:12 205:25
284:5
**class** 80:18 128:3
137:14 148:10
165:5 243:1 310:6
**classic** 148:13
**classification**
119:7,23 126:24
127:9 129:11
152:20 283:22
**classified** 177:25
**classifying** 132:8
154:1
**cle** 74:24
**clear** 15:19 18:14
47:9 58:8 60:9
71:11 72:5 137:12
146:5 154:20
173:15 196:5
204:6 218:25
299:22 301:13
315:21
**cleared** 93:21
156:24
**clearly** 230:11
**clerical** 28:11
**cleveland** 2:10
166:25 168:19,24
169:21 240:14
241:8,9,14 321:2
**click** 143:21 144:3

clicks 143:24
clientele 293:3
  294:18
clinic 166:25
  168:19,24 169:22
  240:14 241:8,10
  241:15
clinical 8:12 50:13
  77:6 98:23 119:8
  121:8 124:13
  126:15 132:8,17
  136:15 140:8
clinically 80:23
  138:16 150:15
  151:19 163:15
clinician 132:18
  134:9 137:7
  143:10 145:9
clinicians 129:25
  133:15,17 134:7
  136:22
clock 41:18,20,24
  42:5
close 130:17
  257:22
closed 145:3
closely 257:10
closer 113:6
  193:15 288:8
clot 148:14
cloud 25:23
coaching 104:2
coauthor 215:2
coauthored
  124:21 161:19
  223:24 277:20
coauthors 125:1
code 284:1,2
  312:21,23 313:1,8
  313:13,21,23
  314:2

cognizant 190:12
  190:25
cohen 182:9
collaborative
  102:17 105:14,18
collaboratively
  290:20,20
colleagues 42:17
  44:7,9 283:4
collect 274:16
collected 287:6
  288:5 297:1
collectively 91:13
  95:8
college 36:21
  43:14,22 45:13
  77:6
colleges 77:5
colon 261:24
colorado 38:7,8
  40:10,16 41:3
  42:13,25 45:2,19
  45:24,25 46:2,11
  46:15,18,19,25
  47:4,6 57:5,9,15
  58:3,9 59:22 60:3
  60:18 64:13,15,18
  64:22,25 67:12
  74:8,15 76:12
  172:16
column 102:16
com 154:10
combination
  127:23 128:14
  150:21 151:1,7
  153:22 154:9,15
  154:21 155:5
  165:18
combinations 81:1
  81:4,6,19 126:25
  129:13 131:25

140:20 154:4
  155:25 156:6
  163:10 165:24
  251:23 254:3
  258:1,6,9 283:20
  287:13
combined 96:20
  245:20 317:14
  318:10
combining 291:22
come 17:11 35:4
  68:15 77:10 88:20
  107:8 108:3
  172:13,19 175:16
  177:18,22 185:5
  188:8,10 190:9,24
  205:16 216:24
  222:24 233:7
  240:16 241:25
  242:5 259:2,3
  287:9 292:23
comes 92:15
  156:21 168:23
  170:13 240:12
  242:22 248:16
comfortable 76:17
  193:25 194:10
coming 38:19
  105:5 113:6 139:7
  172:9 222:7
  241:14 282:15
commencing 11:9
comment 103:10
  146:20 248:1
  263:12
comments 146:16
  146:17 184:3
  261:5
commission
  322:19 323:25
  324:25

commissioner
  10:6 11:5 320:21
committee 52:18
committees 53:5
common 13:3
  106:15 233:4
  260:11
commonplace
  222:5
communicate
  13:10 308:6,8
communication
  119:8,24 299:17
community 48:20
  101:3,3 131:24
  233:4
companies 87:6
  100:23 122:12
company 3:5
  70:13,16 88:23,25
  89:3 92:12 100:17
  100:18 101:14
  122:16,18 123:1,1
  290:2 318:23
compare 249:18
  249:23
compared 239:15
compares 239:16
compensate 231:2
compensated
  226:14,18
complaint 22:16
  22:18 34:9,12
complete 31:22
  32:1 66:2 164:17
completed 31:11
  321:15
completely 19:9
  146:6 250:15,16
  276:15 299:2
  313:22

completing 164:16
complex 169:14
  216:23
complicated 168:8
comply 197:13
component 79:11
  83:13,13 128:18
  212:5 301:10
  305:12
components 48:23
  112:7,9 119:23
  210:4 214:24
  317:4 318:3
computable 163:2
computer 13:25
  71:3,5 72:1 130:1
  149:3 178:25
  179:22 239:4
  254:25 255:2
  273:20,21 274:13
  274:20 275:24
  276:3,16,19 286:8
  293:15
computerized
  29:14 286:8
computers 135:2
  176:9
computing 28:3,5
  208:2,4
concept 125:21
  263:9
conceptualization
  215:5
conceptualized
  161:2 315:23
  316:3
concern 158:14
concerning 115:2
  293:6
concerns 156:24

conclude 214:18
concluded 309:8
  319:13
conclusion 35:1
concurrently
  134:2 233:24
conduct 53:23
  89:24 125:25
  241:25 242:6
  247:11
conducted 39:11
  56:12 294:11
conference 117:24
  118:22 119:5,17
  121:9 126:3
conferences
  121:14,17
confidential 8:8
configured 169:7
  169:8 291:17
confirm 15:21
  223:23 298:16,17
  299:10,23
confirmed 289:9
  298:25
confound 216:8
confused 71:12
  97:19,19 267:3,4
  310:10,13
confusing 118:17
connection 14:5,7
  30:17 31:17,24
  32:3 107:12 146:9
  146:10,25 227:1
  318:21
connexus 67:22
  68:3 186:8,18,22
  200:2,2 234:13
  235:12 237:6
consensus 131:23
  151:18 152:25

consequence
  134:6
consequences
  128:11
consider 159:25
  167:11 184:3,6
  248:17 285:9
considerable
  132:18
consideration
  162:16 165:25
considered 32:6
  39:13 191:6
  204:21 271:9
consistent 191:20
  191:23,25 192:4
  208:10
consistently
  132:20
constitute 255:25
  288:6
constitutes 80:18
  81:3 173:6 232:23
construe 128:5
consultant 6:6
  85:24 86:10 87:4
  94:4
consultation 93:15
consulted 34:3
  86:10,21 87:13
  89:12 91:2,6
  92:11,13,25 93:4
  94:6
consulting 86:16
  87:17 88:9,17,22
  88:25 89:5,7,11
  91:8,11 92:4,8
  93:12 116:17
  117:7,12 318:23
consumers 256:23

consumption
  256:4
contact 117:3
contacted 34:7
  225:18
contain 31:22 32:1
  32:5 36:7 207:2
  271:8 291:6
contained 33:8
  35:15 271:7 274:3
contains 36:9
  234:16,19,22
  238:24 244:4
  291:4
content 255:7
contents 33:5 34:8
  132:4
context 17:18
  20:15 29:10,10
  34:5 50:10 85:22
  87:7 95:3 134:4
  134:24 144:25
  150:12 152:6
  156:17 157:4,21
  162:16 166:11,22
  168:10,14 169:21
  170:11 175:8
  212:10 221:20,21
  233:7 237:9 260:7
  265:11 269:7
contextual 162:6
  166:1,18 173:1
  220:16
contextualize
  171:12
contextualized
  161:18
contexualized
  8:15
continually
  180:24

**continuation**
44:21
**continuations**
155:19
**continue** 55:21
142:25 143:21
181:19 182:1,3
**continued** 62:14
69:8 71:4
**continues** 143:3
262:3
**continuing** 8:1 9:1
73:21 74:4,4,13
75:2,6,11 114:24
**continuous** 13:4
36:5 67:18
**continuously** 36:1
58:17
**contradict** 317:18
**contraindicated**
126:24 127:1,10
127:14,18 128:12
129:5,8,11 131:25
153:4,12,17,20
154:2,4,13,20,22
248:15 259:1
**contraindications**
128:5,24 129:1
**contribute** 133:20
155:22 190:14
218:14
**contributed** 78:18
122:20 132:18
**contributes**
169:24 221:5
**contribution**
125:14
**contributions** 53:6
**contributory**
34:25

**control** 85:9
**controlled** 7:23
137:25 190:14
191:2 288:11,11
**convention** 205:14
**conversation** 21:9
189:5 269:4
**conversations**
21:4,6,17 107:7
308:5
**convicted** 55:2
**convoluted** 181:11
**coordination**
274:4
**coordinator** 140:3
140:4
**copies** 14:25 229:8
**copy** 15:5 16:15
31:5 35:12 298:8
308:23 312:4,4
**copying** 96:12
**corner** 95:25
**corners** 295:13
**corporate** 191:13
199:15 286:8
289:19 290:12
293:14 302:10
304:18 305:24
**correct** 13:12
22:19,25 25:12
31:9,10 33:5,14,17
33:18,18 35:10
36:22,23 37:11,12
37:20,23 38:1,4,5
38:9,10 40:17,22
40:23 41:3,14
42:11 43:5,14
44:1,2 45:3,4
46:22 49:6,24
56:22 57:2,7,15
58:5,10,11,11,13

58:22,23,25 59:25
60:7,13,14,20 61:2
61:6,8,10,11,15,17
61:21 62:17,17
66:5,13,16 67:20
67:21 68:4,5
69:13,16,17,19,20
69:22 70:1,2,6,7
70:10,11,13,14,17
70:18,21,22 71:15
71:16,17 72:7,9
75:1 76:7 80:7,8
80:11 81:7,22,24
83:6 84:10,11,15
87:15 110:1,4,5,16
110:19 112:6,11
112:15,22 113:2
113:11 118:25
119:4 120:22
121:4,5,13 122:9
123:25 128:19
129:13 130:7
131:16,20,22
132:13,23 133:10
134:14 135:20
139:20 143:6
146:9 147:21
148:25 149:16
150:11 151:2,8,9
151:13 153:1,2,18
153:23 154:6
157:1 158:9,16,17
158:21 160:13
161:19,25 162:3,7
162:10,17,20,23
163:20 164:9
165:9,10,16 167:2
169:1,25 170:16
171:5,8,22 174:10
174:18,21 175:4
176:19 183:21

185:10,14 188:1
195:6,7 196:16
197:15,16 201:5
201:17,20,22
204:10 205:19
207:22 211:4,6,12
212:22 214:7
215:22 216:1,13
217:7,17,21
218:14 219:10
222:13 226:16,17
228:25 232:8
234:17 239:12
240:6 241:21
243:11,15,16,18
243:22 244:2
250:23,24 251:4,5
251:10 253:14,22
254:23 255:6,20
255:23 256:9,12
256:20,24 257:5
258:2,6 259:9
261:3,10,13,16,20
261:25 264:5
265:9 266:6 267:9
267:10 269:14
270:13,22,23
271:1,6 272:25
281:8 302:24
303:2,4,5,12
310:19 311:6,8,9
312:16,20,23,24
313:1,5,19 314:5
314:16,22 315:5,6
316:5 317:3
318:12,13 320:12
**correcting** 314:6
**corrections** 321:12
323:17
**correctly** 24:11
28:23 51:14 71:18

73:7 74:7 85:12
119:9 129:20
132:9,21 139:24
142:7 155:15
164:1 201:4
208:13 264:16
294:12
**corresponding**
75:4
**corwin** 65:2,4
**cost** 86:1
**costs** 48:1,2 100:5
**council** 178:22
311:2
**counsel** 10:4,9,11
11:8 12:9 13:10
13:17,17 18:20
20:3,5 21:16,21
30:17 232:15
272:5 273:16
320:16
**count** 99:16
124:23
**counter** 273:3
**country** 46:14
**county** 320:5
322:10 323:15
**couple** 19:22
28:14 68:13,19
97:23 231:5 277:2
293:6
**course** 29:20 63:6
66:19 92:23 130:1
304:15 312:9
**court** 1:1 11:7
14:5 18:1,7 33:22
104:19 159:24
194:4 227:6
298:21 312:6
322:7

**courthouse** 5:9
**cover** 68:19
**covered** 21:18
201:1,12,13
**cox** 42:23
**crashed** 308:2
**create** 18:14
135:17 149:20
151:18 152:18,24
171:19 175:2
182:23 183:16
196:13 222:17
233:16 234:1,1,2
253:24 272:13
283:6,13 285:14
288:4,17,18 310:2
310:4 313:19
**created** 111:11,13
114:16 132:5
140:17 144:17
147:11 228:6
231:12 245:7
246:14,17 251:1
267:8 271:21,24
272:2 283:4 289:9
291:21 299:10
314:12 315:5
316:9 318:8
**creating** 90:12
171:9,16 264:7
284:23 287:17
298:3 305:2 313:4
318:21
**credentials** 225:10
**credible** 110:16,17
110:21 111:15
112:25 114:2,7
**crediblemeds.org**
110:15 111:3
**crime** 55:3

**criteria** 52:6 139:2
215:13
**cross** 145:18
295:17 300:7
**cry** 138:23
**crying** 166:21
**current** 35:13
36:13 60:11 76:25
101:21 114:9
211:9,25 310:21
**currently** 36:19
57:1 58:5 165:22
204:1
**curriculum** 7:19
**cursor** 29:6
**cursory** 273:25
**customarily**
290:12
**customers** 101:24
102:2 103:5
**cut** 99:15 103:14
176:13 180:24
311:18
**cutting** 99:17
**cv** 16:23 26:11,12
28:19 30:6 35:13
36:12,13 37:14
39:16,21 49:20
51:16,17 57:22,22
57:23 58:14 60:7
60:21 65:11 68:9
69:2 75:15,17
77:23 83:25 85:16
86:6 87:2,12,16,17
87:22 88:1,2,5,8
88:12 93:22 114:5
116:17 121:7,12
121:19 123:18
158:22
**cvs** 2:14,14,15,15
2:16 28:2 69:18

69:24 191:12,12
196:21 199:6,9
206:12,17,19
207:11,25 208:2,4
232:13 242:14
289:9,9 290:18
291:4 294:11
313:7 314:9,21
**cvs's** 297:7
**cyp** 102:21 105:18
106:8,15
**cytochrome**
106:16,17,23
107:4

**d**

**d** 311:21
**d.0** 311:17,20
**d.0.** 312:1
**dallas** 4:9 225:17
**dan** 1:7 102:14,24
**dangerous** 76:15
133:23 134:24
137:9,18 148:11
163:10 190:15
251:23
**daniel** 1:17 2:17
7:4,16,20 10:4
11:10,22 12:13
31:1 321:8 322:4
322:9 323:4,13
324:20
**darren** 186:21
**dashboard** 182:23
183:10,10,16
210:13 238:18
245:6 250:20,21
250:25 251:1
265:25 266:12
267:12,16 300:17
301:20 313:18,22
317:9,14 318:7,11

**dashboards**
209:23 265:21
266:1,1,20 267:7
288:18 293:4
314:10 315:3
**data** 28:6 70:15
73:13,15 122:13
168:7 171:11
176:8 178:4,10,10
178:18,23,24
182:18,23 195:10
195:11,18 196:2
196:12,14,18,19
196:20,21,22,25
197:2,3,4,6,14,18
197:19,21 198:1,4
198:11,21 199:1,4
202:2,22 204:3
205:6,8 206:9
207:24 208:3,5
210:4 214:8,19
215:12 231:12,14
231:18 233:15,18
236:4,4,19,20,21
236:22,24 237:1,2
237:19 239:5,6,7
239:10,11,13,14
243:25 244:5,7
245:3,19,20 246:4
246:12 247:4,6
249:8 251:22
253:22 255:17
256:5 258:2 265:6
271:1 272:13
274:1,4,17,17,17
274:23,24,24,24
274:25 275:2,3,5,9
278:5,23 282:3,3
282:13,13,20
283:6 284:9,14,19
284:23 285:8,13

286:2,9 287:2,5,9
287:21 288:2,4
289:17,18,19
290:3,11,19,22
291:2,3,5,11,15,22
291:24,25 292:16
293:7,13,14,23
294:22,22,23
295:3,25 297:1
301:15,18,19
302:3,5,10 303:11
304:18,25 305:3
305:13 310:12
316:19
**databank** 122:14
123:23 152:15
199:12 254:2
258:13,15 263:10
265:13
**databank's** 152:8
**database** 72:16
123:19 199:25
243:10,15,17
245:13 262:23
**databases** 150:15
152:12 179:5
231:17 286:8
**date** 11:5 31:11
35:20 59:3,4 60:5
76:7 126:10
184:14,17,19
226:3 227:14
228:10 321:8
322:3,9,19 323:3
323:13,25 324:20
324:25
**dated** 31:3,8 96:12
124:14 202:18
211:4 223:24
**dates** 35:23 62:8
74:22 105:3

**day** 3:18 4:7,15
12:10,25 14:8
159:3 177:19
179:24,24 227:18
230:18,21 251:2
251:13 265:19
267:2 269:1 274:6
274:7 306:4,4
319:6 322:16
323:22 324:22
**days** 254:18
321:18
**dd** 141:9
**ddi** 102:20 105:17
132:4,20 149:20
155:13,18 158:19
163:7,24 164:3
165:23 312:16
**ddis** 126:14,24
127:9 129:11
132:8 139:18,22
140:16,24 142:3,6
151:19 153:20
154:13,20 162:14
163:3,16,19 164:8
165:8
**dea** 115:19 175:10
175:10 177:24
190:9,24 191:17
191:21,24 192:1,2
232:16 235:11
236:11,22
**dea's** 175:13
**deal** 143:25
189:24
**dealing** 138:2
149:2
**dealt** 75:3,7
**dear** 321:10
**death** 112:4

**decade** 73:7
**december** 76:5
279:9
**decide** 172:5
**deciding** 156:24
**decision** 8:12
119:8,25 121:8
124:14 126:15
132:4 140:8
145:10 171:6,13
175:14 177:14
182:25 239:8,9
248:23
**decisions** 102:19
105:16 199:15
**deducing** 22:21
**deduction** 235:4
**deed** 322:14
323:20
**deemed** 321:19
**default** 113:24
**defendant** 3:15
4:4 5:15 148:22
197:13
**defendants** 2:14
3:4 5:4 12:8,9
124:8 148:17
174:20 176:2
182:21 183:11,17
185:13 192:23
193:3,9 201:19
207:3,16 210:25
233:14 246:13
249:20 255:2
273:17 277:1,11
286:2,7 287:17
288:20 289:17
291:19 305:1
314:11,21 315:4
316:12 318:8

**define** 72:8
**defined** 174:2
200:23 212:6,7
243:2 256:1
257:18
**defining** 212:4,5
**definitely** 73:23
90:24 109:9,9
177:2,3
**definition** 130:14
215:12 255:24
263:7 274:14
279:17 280:15
**definitions** 215:5
**definitive** 267:21
267:22
**degree** 36:18
45:11,14,16,23
78:9 98:15 177:5
267:17
**degrees** 235:25
**del** 44:14
**delay** 144:10
159:15
**delayed** 41:17,20
**delineating** 202:14
**delta** 311:21
**demands** 63:22
**demonstrate** 42:6
131:7
**demonstrated**
158:6 196:19
206:13 289:3
**demonstrating**
282:22 297:10
**department** 31:2
36:20,25 44:12
46:16 140:5
321:22
**depend** 169:3,4

**depended** 63:12
**dependent** 199:14
**depending** 40:4
63:22 95:3 136:9
137:22 157:15
227:3 291:13,14
291:16
**depends** 143:7,8
156:7 167:4
172:15 173:15
219:12 220:15
235:8 252:9
**deponent** 7:4
319:15
**deposed** 17:16,18
17:23
**deposition** 1:16
10:4,13 11:18,19
14:4 15:1 18:5
19:17 23:3,19,22
25:18 26:20 27:9
28:11,12,16 29:24
30:7,16 86:9
104:10 180:23
181:4,19 182:4
186:6,7,21 192:23
270:7 273:23
274:3 300:9,11
309:7 312:10
319:13 320:8,12
321:8,11 322:1,3
323:1,3
**depositions** 22:6
22:12,13,23
104:15 193:16
199:7,8 258:11
290:1
**derived** 232:12
242:14
**deriving** 311:23

**describe** 52:20
73:24 87:25 88:2
204:18,20 207:15
211:8 250:23
281:19 308:25
**described** 70:8
119:12 120:10
209:5 300:18
314:9 315:2
317:10
**describing** 103:2
275:19 315:11
**description** 298:15
**design** 136:24
174:3 217:5
218:18 279:10
289:10
**designed** 177:8,9
191:18 218:17
219:14 248:23
285:17
**designing** 8:14
101:7 161:1,17
287:12
**desire** 159:5
**despite** 18:22
**detail** 32:8 35:4
198:23 199:17,19
249:3
**details** 199:6
275:10
**detect** 219:14
256:3,10 259:8,12
260:10
**determination**
168:9 221:24
251:8
**determine** 92:17
117:17 156:20
199:21 219:2
235:5 242:25

279:4 301:22
**determining** 171:6
173:25 190:16
**develop** 119:6,11
120:9,13,20
139:14 174:14
179:14 215:19
284:11 285:3,14
286:9 287:10
**developed** 120:3
125:22 163:2
165:18 175:10
207:25 312:18,20
315:22
**developing** 50:14
285:3
**development**
98:24 175:12
286:17,18
**developments**
141:9
**deviation** 278:20
278:20
**diagnosis** 221:15
245:18 246:11
263:15
**diagnostic** 215:13
**diameter** 208:14
**diazepam** 296:12
**dichotomous**
167:10
**differ** 291:8
**difference** 38:12
293:13
**different** 23:4 81:1
81:4 86:22 87:7
87:14 89:22 95:1
100:20 111:22,25
125:16 144:19,23
146:6 147:13,16
152:15 167:12

168:7 177:17
186:8,18 205:14
209:20 212:12
216:6 217:8,11
218:1 221:18
222:10 226:19
227:2,5 235:17
257:16 261:16
285:7 291:6,7
294:12,21 306:2
312:7 313:23
317:9,13 318:10
**differently** 37:7
176:25 180:17
**difficult** 79:9
**diminish** 145:12
**direct** 182:9 300:6
312:14
**directed** 84:8
**direction** 125:11
**directions** 248:21
**directly** 46:1,4,24
82:11 98:11 117:2
**directors** 114:1,18
**disability** 279:16
279:17
**disabled** 279:3
**disagree** 21:12
143:8 147:23
**disagreement** 97:5
**discern** 297:17
**disciplinary** 53:17
53:20,22 54:18
**discipline** 48:6
**disciplines** 48:6
100:11
**disclose** 85:17
93:22 189:7
**disclosed** 295:9
**discloses** 93:25

**disclosure** 51:18
**discovery** 185:2
**discrepancies**
152:11
**discrepancy** 66:22
152:21
**discussed** 121:17
189:7
**discussing** 85:8
147:20 313:4
**discussion** 101:19
129:5 268:5
**disease** 48:4,4
50:12 85:9
**disk** 97:8
**disorder** 9:7
223:16
**dispens** 183:1
**dispense** 139:2
166:14 293:22
**dispensed** 54:1,11
138:20,21,22
144:20 147:14
210:2 242:21
243:1 245:6
251:23 259:6
296:17
**dispenses** 108:16
**dispensing** 28:5
72:17 134:8
135:15 138:25
149:9 179:9
190:12,13 191:1,6
195:22 197:19,21
199:4 202:15
208:3,5,25 209:3
271:1,4,9,10,11,20
271:23 272:1,16
282:3,3,13 283:5
283:25 286:9
288:8 289:17

290:11 291:2,2,5
302:10 304:18
305:3
**dispensings**
208:17
**display** 219:7
**displayed** 157:12
157:14 186:9
**displaying** 219:3
**disposal** 182:23
184:23 198:2
233:15
**dispute** 195:19
196:1 197:5
**disputing** 81:13
**dissatisfaction**
132:19
**dissertation** 49:9
**distance** 111:24
172:24 208:11
210:4 238:18
241:2 257:21
**distinguishing**
26:10
**distortion** 72:22
**distribution** 2:15
145:4 199:13
**distributor** 93:4,8
**distributors** 93:3
**district** 1:1,2 11:7
**dither** 263:6
**diverse** 100:11
**divide** 261:15
**divided** 261:1
**division** 1:3
**dmoylan** 2:24
**docket** 14:19 22:7
**doctor** 208:8
233:20 236:6
237:5 238:16
243:21

**doctoral** 38:20
44:15 49:20 98:15
**document** 1:11
16:7 17:5 26:4,8
32:12 35:23,24,25
36:3,4,5,16 56:7
56:10 75:25 95:23
96:2,5,14 97:6
103:20 131:11
148:18,23 153:7
184:11,19 186:20
191:3,9,14 192:8
196:2,16 197:9
202:17 203:21
205:1,12 223:20
228:5,6,7 231:4
233:2 246:22
256:13 275:11
299:23 309:9,16
309:24 310:2,4,7
310:11,15,18
312:3
**documentation**
53:3 311:4
**documented** 131:1
**documents** 15:3,4
15:6 16:14,25
17:13 19:18,20
22:8 25:19,20,21
25:22 26:14,16,21
27:3,9,12,14,18
28:10 30:5 32:11
56:4,5,15 96:19,20
149:2 161:8
175:10 184:12,20
185:16,19 186:16
186:17,22,23
187:2,11,25 188:5
188:13,17,20
189:2,11,15,18,18
189:22,23 191:8

191:17 192:4,10
192:25 193:3,8,16
193:22 194:2,5,6
194:24 195:5,8,15
198:19,22 208:6
226:9 227:8
229:13 230:7,12
230:13,22 232:12
232:16,22 246:16
254:14 269:3,9,10
269:13 270:4,6,11
270:15,19,24
272:2,6,10,14
274:18 289:13
308:14 312:11
**doing** 14:3 44:7,8
44:10,11,20 95:18
123:13 142:16
149:14 160:17
170:18 180:17
182:15,15 200:6,7
200:7,9 203:17
206:19,20,22,23
219:20 295:15
**dollars** 90:4,6
91:17,18 226:15
226:24 227:1
**domain** 126:6
**door** 292:25
**dose** 248:19
256:10,18 305:20
**doses** 217:7,9,12
**dosing** 155:20
216:6
**double** 141:22
**dr** 12:2 16:3 26:2
55:22 59:19 95:18
96:13 97:16,22
98:19,21 99:9
104:18 116:16
124:16,20 141:11

153:15 159:13,18
159:20 160:12
161:5 164:24
165:2 189:12,16
196:10 211:5
223:6,19 224:2,5
268:10,20 277:14
298:14 303:21
304:5,8 306:6
307:16 308:24
316:21,25 317:6
317:25 318:4,25
**drag** 268:24
**draw** 102:12
**drive** 97:4
**driven** 151:22
**driver** 145:17
**drop** 39:14
**drug** 8:11,11,15
8:15 29:14,14
44:22,22 51:9
78:20,20 79:4,4,6
79:6,8,18,18 80:6
80:6,10,10,14,19
80:22 81:19,23
83:11,12,14 84:3
86:25 93:3,4,6
105:8 107:3 108:5
108:6 109:25,25
112:14 115:3,19
119:7,12,24 120:5
120:6,10,21,24
121:4,8,8,22 122:7
122:10,12,19
123:19,21 124:13
124:13 126:14,14
126:25 127:12,21
127:24 128:1
130:4 131:2 132:6
132:11 133:24,25
134:6 135:3,4

136:8 137:22
140:20,21 144:22
145:1,19 147:15
147:20,20,24,25
148:21 150:13,14
150:18,21 151:1,7
152:9,10 153:5,12
153:18 154:3
155:2,2 158:23
161:2,2,18,18
166:9,15 167:22
173:22,24 176:20
176:25 178:22
179:6,21 195:20
197:25 198:12,20
199:4,4,12,21,21
199:22,25 200:4
209:17 239:1
241:25 242:7,17
247:11 248:13,22
249:1 251:22
253:22 254:2
257:25 258:6,8,14
261:2,19 262:4,23
262:24 281:20,20
282:2,2,14,14,21
282:23 283:20,21
283:23,25 284:1,2
284:24,24 285:7
286:17,17 287:4,4
287:11,13 293:25
301:8,9,9 311:3
**drugs** 37:3 106:17
106:21,22 111:16
111:16 112:6,8,11
112:17 113:14
133:23 144:17
147:11 148:5,20
154:22 157:18
165:24 238:24
254:3

**dual** 43:18 50:3
**due** 226:12 279:15
**duly** 11:23
**duplicative** 262:17
262:20
**dur** 179:7 180:15
238:23 252:6,13
258:4 264:25
265:4 266:22
271:7,15,18
**duration** 24:25
25:5 68:18
**duties** 63:15
209:16,16
**duty** 190:19,20
**dynamic** 36:5

**e**

**e** 2:1,1 3:1,1 4:1,1
5:1,1 6:1,1 12:13
109:13 320:1,1
**eagle** 3:4 69:22,25
268:22 269:9,10
269:12 270:8,10
270:12,16,20,25
271:21,24 272:3
272:18 273:4,6,8
275:24 276:8,23
**eagle's** 271:5
273:22 274:13,21
276:3,15,18
**earlier** 23:7 36:10
44:17 56:3 60:16
61:19 159:16
170:20 192:9
207:23 208:12
220:4,9 221:20
228:23 249:17
258:22 259:24
269:1 279:25
295:12 297:23
313:16 314:5,8

**early** 23:12 24:7,8
27:6 204:22,23
254:18 259:9,13
259:21 260:10,13
**easier** 179:23
**easily** 97:19
**east** 2:8,20
**eastern** 1:3 5:5
116:6
**easy** 179:3
**economic** 47:25
139:10
**economics** 50:11
**edited** 35:24,25
**editors** 127:12
**edits** 35:23 253:12
**edt** 11:10 55:14
116:13 160:8
223:2 268:7
307:11 319:13
**education** 45:1,8
73:22 74:5,12,13
75:3,7,12 109:12
110:3
**educational**
114:16
**effect** 49:13 50:9
50:18 298:21
**effective** 140:7
244:23
**effectively** 235:24
**effectiveness** 86:1
100:5
**effects** 100:6 134:5
**efficiently** 306:1
**effort** 28:6 123:5
**efforts** 101:22
**eight** 61:7 123:17
163:3,16,18 165:7
229:12 278:11,12
278:20 279:19

**eighty** 65:19,25
121:21 122:1
226:15,24,25
**either** 54:21 68:16
100:25 112:24
115:23 130:4
135:14 199:11
239:12 265:22
266:6 267:9 274:6
283:4 304:8
**elderly** 279:20
**electric** 111:22
**electrical** 111:21
**electronic** 139:23
140:7,11 142:5
148:19 198:11
202:6,14 203:1
204:24,24 284:14
**elementary** 46:8
**elements** 183:12
195:18 197:2,3,4
202:22 205:6,8
231:14 233:18
250:22 285:9
**eliciting** 295:16
**eliminate** 136:20
**email** 8:5 26:1
95:19 96:4,9,22
98:2,8,22 99:8,19
101:16,17 103:11
225:11 299:17
308:6 309:10
321:17
**embodied** 138:4,5
**emergency** 53:13
**emily** 42:23
**employ** 100:24
**employed** 37:24
38:24 87:4 100:20
101:13 105:6

**employees** 206:12
**employer** 33:15
54:8
**employment** 36:8
36:17 72:9
**emt** 53:13,15
**enclosed** 321:11
**encompassed** 67:8
**encompasses** 48:5
**encompassing**
134:10
**ended** 97:5 249:2
**endless** 146:20
**endo** 8:6,7 94:8,11
95:20 98:24 99:5
103:2 107:1,12,23
**endorsing** 33:17
**ends** 96:10
**energy** 245:17
**engage** 105:9,21
107:8 177:9
**engaged** 101:24
102:2,7 103:5
107:1
**engagement** 101:8
**engagements**
117:7,12
**engine** 237:12
**england** 7:24 15:7
15:12 17:6 27:22
206:11 246:21
288:24 297:9
313:6,17
**enhanced** 191:15
**ensure** 126:5
140:11 151:21
**ensured** 33:4
**entail** 53:2 73:25
**entered** 61:23
323:9

**entire** 61:12 62:23
63:2 178:19 183:5
211:22 215:1
250:3 300:12
322:5 323:5
**entirely** 152:15
209:22 290:6
316:18
**entirety** 124:18
317:5 318:3
**entities** 70:1 86:25
117:20
**entitled** 189:13
223:15 277:20
**entity** 94:1 110:13
111:12 114:16
**entry** 45:12 106:7
**envelope** 96:25
223:6
**environment**
196:25 315:25
316:5
**enzyme** 106:16,21
**episode** 214:7,16
**equally** 78:7,8,15
**equation** 127:19
**equivalence**
305:20
**equivalent** 313:18
314:10,15 315:3
**equivalents** 246:7
**errata** 321:13,18
323:7,10,18 324:1
**error** 34:6 58:6
204:16 308:17
311:7
**errors** 28:11
**especially** 198:3
253:25
**esq** 321:5

**essentially** 123:10
**establish** 282:19
**established** 131:2
153:5,13 198:8
256:6 295:11
301:2 302:21
303:5 305:6 316:4
**estimate** 229:2
**et** 139:19 179:6
**etcetera** 203:25
230:17 245:6
**evaluate** 52:21
115:2 133:9
156:19 158:13
195:9 245:15
296:15,19 302:4
**evaluated** 140:20
214:25 288:14
315:12,16
**evaluating** 8:14
132:7 161:2,17
162:5 201:4 209:6
283:19 300:23
301:15 302:2,2
**evaluation** 8:18
119:23 211:1
260:25 261:12
277:21 287:11
**evaluations** 119:7
**evening** 67:16
319:7
**event** 34:7 54:15
134:7
**events** 49:11,12
100:5 148:12
**everybody** 292:25
319:7
**evidence** 10:14
79:24 80:3 103:7
103:23,23 133:18
150:19,21 151:22

152:9,10 168:11
175:22 182:22
183:24 184:1
187:14 194:13
212:17 213:25
234:5,8 237:8
243:18,21 254:4
255:7,13 259:24
260:4 284:18
**exact** 241:7
**exactly** 25:25
74:11 170:14
236:2 249:24
250:7
**examination** 7:1,5
7:6,7 11:11 12:1
268:19 277:13
295:17 300:6,7
303:15 312:14
**examine** 51:8
189:22
**examined** 11:23
48:24 72:19
**example** 116:22
133:8 135:18
147:25 148:13,20
149:7,14 155:17
161:22 166:23
184:8 199:3 222:3
234:12 240:9
241:5 243:14
248:3 253:13
257:14 271:15
**examples** 99:20
129:4 250:21
**exceed** 127:22
128:14 132:20
248:10
**exceeds** 246:15
**excel** 96:10 97:2,4
97:7

**exception** 82:4
**excess** 173:17
206:14
**excessive** 170:21
171:4,4,7 173:6
256:10
**excessively** 127:14
294:13
**excluded** 215:25
217:5,15
**excluding** 26:13
**excuse** 29:21 38:8
96:19 123:20
144:8 152:13
159:2 179:18
**executed** 323:10
**execution** 322:14
323:19
**exhibit** 7:13,18,21
8:4,9,13,17 9:4,10
9:12 16:2,4,5,14
16:17,18,23 17:2,7
17:8 27:25 28:1
28:21 30:21,23
31:5,19 35:6
59:14 65:10 68:9
73:11 75:19 77:22
77:24 84:1 85:7
85:16 95:8,15,19
96:9,21 97:7
101:17 121:19
124:8,9,20 126:12
126:22 139:15
141:2,7,14 153:11
160:22,25 161:16
165:20 207:2,7,11
207:15 210:21,25
223:9,13,23
227:20,22 231:7
246:24 277:18,19
281:12,14 288:25

309:6,12,18,18,19
312:5 315:2
**exhibits** 7:10 8:1
9:1 15:1 16:3,22
185:24 186:6,21
269:16 270:2,7
308:15
**exist** 196:22,25
209:17 251:4
266:20
**existed** 197:6
272:7
**existence** 111:7
**existing** 155:19
162:14
**exists** 255:15
**exp** 320:22,22,23
**expect** 12:24
**expectation** 190:1
**expected** 39:5
**experience** 19:22
29:20 36:14 47:8
53:8 55:6,23
70:20 71:14,20
72:4,8 78:11
283:11 285:13
286:16 287:15
290:17
**experiences** 38:21
56:13 163:9
**expert** 7:14 13:19
16:16 17:17 22:9
26:15 30:24 31:16
33:19,23 34:3
35:10 86:10,19,20
86:24 140:18
149:6 151:5
152:20 175:11
181:23 184:3
189:23 194:1,10
195:4,6 196:11

204:7,13 209:4
210:11 224:6,8
225:14 226:20
228:25 240:3
243:10 247:15
258:24 259:4
269:13 275:15,17
275:20,23 276:1,4
276:9,17,19
295:12 298:9
299:2,17 301:3,13
310:8,22 311:1
316:22 317:1,1
318:1,1,21
**expert's** 189:14
**expertise** 84:16
85:1 170:24 171:2
171:5,8,9,15,18
172:6,25 173:22
175:25 210:17
217:13 243:8
283:11
**experts** 151:18
152:25 155:23
181:22
**expiration** 322:19
323:25 324:25
**expired** 59:5 60:17
76:4
**explain** 38:11
142:12 229:17
302:13
**explanation**
101:10 145:25
158:12
**explored** 45:15
**exposure** 139:12
287:13
**expressed** 21:12
**expressing** 276:17

**extend** 168:1
**extends** 98:14
**extension** 209:18
**extensive** 87:8
300:1
**extent** 21:13 74:11
81:16 97:3 106:22
121:1 139:13
168:11 173:23
187:16 298:24
**external** 39:1,10
157:20
**extra** 63:17 149:8

**f**

**f** 320:1
**face** 240:13 241:13
**faced** 53:17 54:19
**facility** 275:7
305:21
**facmp** 31:1 50:23
**fact** 21:1 43:1 61:4
71:20 83:18
128:24 136:8
156:22 162:12
163:11 166:17
169:21 174:21
175:21 176:3,6
191:7 207:21
214:5 217:18
241:9 243:24
246:16 265:20
288:19
**factor** 216:25
**factors** 138:18
157:20 162:6
166:1 167:12
220:16
**facts** 32:6,20 79:23
80:2 103:7,23
170:23 194:13
222:10

**faculty** 42:22
**failed** 197:13
**failing** 56:17
**fair** 67:3 79:13,20
85:6 92:5 128:7
129:1 149:21
151:14 280:20
316:6
**fairly** 39:4,5
100:11 134:10
202:13 273:24
**fall** 60:6 62:13,15
62:24 63:2 64:7,8
64:9 88:9 119:18
177:24 218:19
**falls** 82:24 301:7
**false** 216:13
**familiar** 19:21
94:16,20 111:6
122:23 202:22
228:5 234:13
249:5 262:17
282:2 293:2
294:17 312:1
**family** 13:6 168:2
**famous** 136:4
**fancy** 235:25
**far** 35:17 60:21
64:1 94:2 110:23
113:6 123:4
131:10 146:1
180:3 181:2
182:19 205:15
237:22 240:22,23
**fashion** 168:8
**fast** 237:12,16
314:23
**father** 46:15
**fatigue** 130:7,12
130:19 131:5,13
133:14,20 134:13

138:13 142:7,10
144:2,3 149:19,21
150:2 155:22
162:3 169:18,24
172:10 176:19,24
218:14 220:3
221:5
**fault** 68:23 99:18
319:9
**fda** 137:17
**feasibility** 189:24
190:2,6 286:6
287:17 300:16
305:1
**feasible** 183:16
209:22 286:19
290:6
**federal** 11:6
140:10 179:20
197:2,14
**federally** 109:2
**fee** 9:7 223:17
279:10
**feel** 18:23 37:14,16
76:16 104:16
182:5 193:25
194:6,9 275:14
**fellow** 44:15 49:20
50:25 51:10,11,22
52:4,7,14,23,24
**fellowship** 38:21
**felt** 29:19
**fewer** 67:4,5 80:24
**field** 53:8,18 90:24
94:17 98:13 99:21
99:25 100:2,7,13
100:15,16,16
101:12,15,20,24
103:4 133:19
283:7 285:2

**fields** 178:18
**fifteen** 74:3 89:22
205:1 208:13
**fifty** 64:4 76:16
88:21 306:18
**figure** 134:19
178:11 210:10
241:1 292:10
**figures** 240:16
**file** 222:18
**files** 106:4,5
186:17
**fill** 63:14 156:20
156:25 157:10,10
198:13 234:20
244:12 251:10,17
**filled** 66:18 238:5
**filling** 210:14
237:7 240:11,13
240:21 284:3
291:25 292:3
294:24
**fills** 245:5
**film** 45:17
**finalizing** 230:15
**finally** 129:18
253:19
**financial** 117:16
117:19 318:22
**find** 28:8 29:11
73:5 118:17
167:22 218:2
262:15 321:11
**findings** 107:10
128:23 290:21
**fine** 21:10,22
55:10 93:10 159:9
303:3 314:6
**finer** 64:8
**finish** 18:11 73:1
141:25 164:23

192:14 202:11
219:23 304:7
**finished** 192:12
196:7
**finishing** 45:13
144:9
**fiol** 44:14
**firing** 166:13
**firm** 25:24 225:17
268:21
**firms** 14:20 22:14
**first** 11:23 23:6,19
27:2,6 29:3,12
57:8 59:15,19
61:16 68:6 71:11
73:11 98:1 101:17
122:14 123:23
126:12 129:1
152:8,15 153:14
155:8 157:10
161:11 199:12
214:15 226:11
230:18,21 231:8
254:1 258:13,15
261:1,18,24
263:10 265:13
278:16,18 316:2
**five** 38:25 40:3,18
45:7 80:25 81:2
81:19 91:17
121:21 122:1
123:5,10,15 155:9
159:13 166:24
167:1 168:21,25
168:25 169:20,22
169:23 170:11,14
171:21 172:9,13
176:13 193:14
217:19 218:10,13
218:21,23 220:10
221:3,13,18 222:4

222:7,20 239:20
240:10 246:15,18
248:4,5,10,25
249:1 280:1,1
306:8,10
**flag** 167:1,7
169:20,23 170:11
170:15,24,25
172:8 177:25
178:5,9,12 182:18
191:13,19 192:6
221:8 222:7
286:18 287:18
300:17
**flagged** 166:24
168:24
**flagging** 133:7
**flags** 28:3,5 75:8
135:20 171:20
175:8,11,12,24
178:6 183:13
190:7 191:15,18
208:3,5,8,8,9,10
221:8 232:17
233:20 234:2
245:8 264:8,11,18
285:17 286:1,10
297:24 298:3,5,16
298:17 299:11
300:24 301:3,4,10
301:14,16 302:3,5
**flip** 231:8 232:6
**floor** 3:10
**florida** 84:5
**flow** 142:22 143:3
155:12
**fluconazole**
163:25,25 164:2,3
164:4,5
**focus** 48:7 49:1
74:12 78:1,9,17

82:10 109:24
120:5 128:22
134:21 137:4
189:23 262:24
263:10
**focused** 48:22
73:18 78:6,14,19
78:20 79:3,5 80:5
80:6,14 81:11,24
83:3,9,11,21 84:14
91:8 120:4 144:16
147:10 157:5
285:25
**focuses** 84:19
**focusing** 64:23
102:21 105:18
106:8 213:20
**folder** 269:17
270:3
**folks** 96:12 159:17
**follow** 97:21 269:8
**followed** 257:9
**following** 11:12
24:6 59:19 208:7
208:8 263:1
**follows** 11:24
**food** 86:25
**forefront** 136:25
149:11
**foregoing** 11:7
320:8,11 322:13
323:18
**forever** 159:8
**forgot** 58:1
**form** 10:10 33:24
60:24 79:23 80:12
84:21 102:5 103:6
103:22 104:3,11
105:20 106:14
107:25 116:24
117:9,14,21 128:8

**[form - fumerton]** Page 22

129:2,14,24 130:9
131:6 133:11
134:15 135:22
138:14 147:3
148:6 149:23
157:3 167:3 169:2
170:1 171:23
172:11 178:15
182:16 186:24
187:4,8,13,22
188:2,22 189:20
193:23 194:3,12
195:1,6 213:15
218:15 220:24
221:10 244:14
246:5 258:10
260:2,6,18 266:7
278:14,25 279:23
280:6,12,25 281:9
282:5,11,17 283:9
283:17 284:25
285:20,23 286:13
286:20,23 287:19
290:15 291:10
293:16 295:7
296:6,22 297:4
298:11,13,19,23
300:25 302:16
303:17 304:1,12
304:22 305:4
313:20 315:13,17
316:13 317:16
**formal** 227:13
**formally** 308:22
**format** 155:11
230:16 238:18
**formed** 32:3
**former** 191:4
**forming** 32:6,16
32:19,23 70:20
71:15 151:17

**formulate** 289:14
**forth** 32:17 74:1
**forty** 27:17 62:4
91:18 99:20
101:23 103:4
121:22 122:6
123:14 159:13
294:12
**forward** 55:21
321:15
**fought** 300:11
**found** 33:22
118:18 262:15
**foundation** 293:17
302:17 305:5
**four** 23:4 25:13
45:5,23,25 81:3,21
81:23 123:11
185:15,19 228:21
229:11,23 230:7
256:10 269:12
270:11 295:13
310:5
**frame** 64:16,19
65:7,24 67:2
73:14 184:2,5
258:16
**frankly** 72:23
106:5 249:11
300:10
**free** 18:23 37:14
37:16 113:12
322:14 323:20
**frequent** 73:1
**frequently** 88:20
292:24
**front** 15:22 16:8
16:25 30:20 35:5
77:23 273:12
277:25 308:15

**fruitful** 107:9
**frustration** 132:18
133:14
**fulfill** 52:7 190:19
190:19
**full** 12:11 33:7
38:16 39:13 43:11
51:17 61:25 62:2
62:3 64:6,10 65:3
83:1 86:15 155:8
250:11 298:2
**fully** 19:9 276:14
**fumerton** 3:16 7:5
7:8 12:1,4 13:20
13:24 16:1,6,13,20
17:4,10 21:7,11,20
34:2 35:3 41:15
52:2 55:17,22
59:16,18 60:25
67:6 73:3,15 80:4
81:5,12 82:17
84:22 94:11,16
95:7,14,17 96:22
96:25 97:10,16,21
102:10 103:12,25
104:7,18 105:13
105:24 106:24
113:5,9 116:3,5,8
116:16 117:1,11
117:18,23 118:8
118:12 124:5,7,11
128:16 129:9,16
130:6,11 131:15
133:13 135:16
137:11 139:14
141:6,11,13
145:23 146:14,19
146:22 147:8
148:22 150:1
153:8,10 158:2
159:7,14 160:3,11

160:14,24 161:10
161:16 164:13,18
164:25 165:6,13
168:6 169:4 170:5
171:3 172:7
173:19 179:25
180:7,9,10,20
181:1,24 182:5,12
183:3 186:1,12
187:1,6,10,18,24
188:4,15 189:1,13
189:16 190:4
193:2 194:8,16
195:3 196:8,9
200:20 201:2
203:3 210:7,24
214:3 218:22,25
219:20 220:1
221:7,11,19
222:19,24 223:5
223:11 224:3,5
227:19,25 240:19
242:7 246:25
247:20 249:24
250:9,13,19 253:9
258:9,19 259:23
260:3,16,20 261:8
262:13 265:20
266:11,19 267:4,6
267:19,24 268:10
278:14,17,25
279:23,25 280:6
280:12,21,25
281:9 282:5,11,17
283:9,17 284:25
285:20,23 286:13
286:20,23 287:19
289:21 290:15
291:10 293:16
295:7,20 296:6,22
297:4 298:11,19

299:14 300:5
301:1 302:16
303:4,17,21 304:3
304:22 305:4,9
306:7,14 307:15
308:22,25 309:11
309:19,23 312:2,9
313:9,15,25
315:15 316:1,15
317:21,24 318:15
319:5
**fumerton's** 304:16
**function** 70:16
78:9 82:7 138:18
138:19 274:16
**fund** 84:17
**funded** 83:10 84:2
85:4,5 94:4
**funding** 84:7 85:9
85:18,21 93:23,25
94:3,7 108:15
125:11 152:5
**funds** 84:19 88:4,6
107:19,23 109:5
117:20
**further** 268:11
301:23 318:24
319:1,15 320:15
**future** 101:7

**g**

**ga** 320:22
**gained** 71:8
**gather** 101:6
274:23
**gears** 44:25
**gender** 72:19
**general** 32:7 45:8
47:22 50:10 77:25
86:20 100:9,10
128:4 131:12
133:19 135:4

137:14 138:8
190:9 195:22
209:8,9,13 212:10
220:18 236:9
280:23 281:6
283:18 285:5
288:12 301:8
**generally** 37:4
38:17,19 41:23
48:10 51:5 73:24
88:9 121:1 133:16
143:19 154:23
168:16 247:14
252:14 279:21
283:14
**generate** 128:12
167:19 176:15
189:25 190:18
196:3 215:6
290:21
**generated** 56:8
130:3 135:3
155:18 157:19
167:6,13,14,15,17
174:1 176:1
184:21 208:22
245:25 265:12
**generating** 190:3
190:4 299:20
**generation** 301:13
**generic** 203:15
**gentamicin** 34:19
**gentleman** 99:11
306:19
**geographic** 100:21
239:19 257:21
**geology** 45:16
**geospatial** 170:19
235:23 240:16
256:5

**germane** 29:19
199:24
**getting** 59:2 159:3
161:8 181:16
217:23 255:9
260:13 267:2
**giant** 3:4 69:22,25
268:22 269:9,10
269:12 270:8,10
270:12,16,20,25
271:5,21,24 272:2
272:18 273:4,6,8
273:21 274:12,20
275:24 276:3,8,15
276:18,23
**give** 15:8 18:6,11
29:1 30:11 64:1
87:5 106:24
124:16 127:23
159:1 161:5 170:6
194:21,25 199:3
209:23 239:24
244:19 245:1
249:8 263:25
264:1 267:16
300:8 303:22
304:9 305:15
306:24
**given** 22:13 25:22
42:6 91:4 94:1
128:3 136:15
170:22 176:3
177:16,19 189:21
207:23 208:11,20
210:3 214:19
242:20 243:19
259:17,18 320:12
**gives** 248:9,11
**giving** 12:19 13:11
86:3 88:11 89:23
158:1 169:9

193:25 194:10
316:22 317:1,25
**glad** 93:21
**glance** 238:12
**gleeson** 4:5
**globally** 88:14
**go** 16:16 18:21,25
21:24 33:25 34:22
42:2 46:1,4,8,24
63:14,20 67:15
76:5 81:9 82:16
83:18 88:20 92:16
92:20 93:19 97:20
97:25 103:7,24
104:6,9 106:4
109:22 112:16
114:23 116:8
117:15 128:9
129:16 130:21,22
132:15 133:6
141:16,17 144:7
146:18 147:4
150:4 153:25
155:7 159:8,9
160:3,5 161:15
164:23 165:2
168:13 170:2
178:16,16 180:25
181:10 182:13
191:12 192:22
196:5,9 203:17
206:18 220:1
223:22 227:7
233:12,12 247:22
248:2 255:8 261:5
268:3,15,25 269:6
278:8 281:11
292:9 294:21
299:1 304:14
305:7 307:4,6,8
314:4 318:16

319:10

**goal** 18:14 101:2
105:9 129:22
135:2,16 145:7
149:19

**goals** 43:22 48:12
149:24

**goes** 185:12
221:19 295:16
300:12 301:1
302:17 315:19

**going** 12:6 13:16
13:20 16:1,16,23
19:6 21:11 30:11
35:3 37:13 46:13
47:19 55:5,7
63:21 72:12 75:15
76:17 77:17,19
88:14 93:19 95:7
96:14 97:11,11,13
98:19 101:10
102:11 104:16
108:25 109:17
117:23 124:17
132:16 138:17,18
139:18 144:11
145:24 149:17
159:14 160:1,18
160:20,24 164:21
164:22 175:5
177:20 180:1,22
180:23 181:18,22
182:4,13 184:8
185:5 222:5,19
223:12 227:19
233:8 234:7,9
237:11,12 240:8
241:17 242:3,4
245:16 247:1
248:17 249:10
250:17,19 251:2

255:5 257:20
267:18,21,22
268:15 278:4,6
294:15 306:9
308:22 318:16

**gold** 122:18
123:23

**good** 11:15 12:2
14:7 37:5 46:9
116:2 149:14
160:11 174:12
219:15 276:25
319:7

**google** 240:25
241:1,12

**gotten** 86:15

**governance** 70:16

**grab** 30:20 160:16
160:19 231:5

**graduate** 36:16
38:20 62:6,9

**grand** 45:23 46:10
46:11

**grant** 84:2 117:25
118:22 119:3,5
120:20 121:7
125:23,25 126:1,3
126:5 158:25

**granted** 39:8 42:9
42:10 198:9

**granting** 45:23

**grants** 83:15,22,24
86:25 158:24

**great** 17:4 18:13
35:8 162:1 163:13
178:13,17 199:2

**greater** 216:13

**grew** 46:14,15

**grocery** 273:10

**grounds** 10:12

**group** 42:15 93:11
94:5 100:11 108:3
129:3 152:20
215:12,16 216:9
217:20 279:19
280:14

**groups** 42:16
137:21 193:17

**guarantee** 38:18

**guardrails** 238:11
246:5,8 292:16

**guess** 14:19 19:22
20:14,17 21:20
22:6,7 28:4,22
29:9 35:25 36:11
36:15 48:22 52:10
52:20 58:1 66:21
66:23 75:24 77:7
82:2,23 84:1 87:1
87:6,25 91:16,23
92:16 93:13 95:1
105:2,8 109:7
111:12 115:11
119:18 123:17
129:17 130:13,25
134:3,22 139:8
141:13 144:3
145:4 150:3
157:20 158:25
170:3 190:8
198:23 212:4,10
212:14 213:22
214:17 215:16
216:15 225:11
234:9 244:16,25
247:3 251:21
252:2 255:10
260:7 263:6
264:12 284:18
285:5 297:12
308:1 310:10

**guideline** 271:21

**guidelines** 271:5,9
271:11 272:17,22

**guilherme** 44:14

**h**

**h** 1:22 2:5 10:5
11:1 320:21 321:5

**half** 25:9 159:9

**halfway** 102:13
118:2,3,14

**hand** 95:25 139:5
245:18

**handful** 268:23

**hands** 14:6

**handy** 77:24

**hang** 51:19 83:20

**hanging** 82:1

**happened** 62:5
71:12 152:4
216:18

**happening** 143:13

**happy** 160:2 194:5

**hard** 66:17 314:24

**harm** 78:9,13
80:16 134:25
135:13 136:16
137:10 138:24
139:6,7,9,10,12
143:18 163:8,13
177:5

**harmed** 20:16
22:3 145:22
163:11 177:5

**harmful** 287:13

**harwood** 4:8

**hbc** 3:5

**head** 37:16 51:13
59:10,13 90:25
92:24 108:23
112:23 115:17
141:1,12 203:13

203:16 227:9
239:3
**health** 9:14 38:8,9
43:14,23 46:20
47:19,20,23 48:8,8
49:6 50:8 51:6
77:7 86:1,24
89:24 92:1 94:18
94:19,21,24 98:14
98:23,24 99:5
100:3,10 102:18
102:20 105:15,17
115:2 139:23
140:5,7,11,13
142:5 148:8
155:10 168:20
183:6,9 284:14
285:2
**healthcare** 48:1,1
83:5 87:7 100:25
113:1,10 122:4
139:11 140:19
283:7
**hear** 14:4 18:7
51:25 94:10 113:4
120:14 141:5
174:23 181:25
192:16 194:22
202:9 211:17
**heard** 225:19
**hearing** 192:21
320:13
**hedging** 94:2
**held** 11:19 37:9
58:24 198:18
**help** 66:23 96:16
171:12 178:2
179:15 180:12
182:25 190:18,19
215:8 239:8,9
252:11 284:15

292:2
**helped** 122:16
294:7,24
**helpful** 28:25
57:21 77:21
104:22 240:10,15
240:15 303:23
**helping** 92:1
**helps** 161:11
**heretofore** 133:18
252:3
**hey** 166:16 186:1
246:14 268:20
**high** 39:5 46:5,7
46:10 134:4
139:21 140:15,24
141:9 142:3 163:3
163:6,18,19 164:8
165:8 211:10,12
212:1,3,7,7 215:16
288:12
**higher** 138:1
144:12 156:10
163:14
**highlight** 262:11
**highlighted** 29:5
**hired** 38:21 44:16
**hires** 38:19
**history** 36:8
234:20
**hmm** 189:4
**hold** 17:11 53:10
219:23 242:3
250:6,6 253:7
303:24,24,25
**holds** 131:11
138:8
**holidays** 63:17
**holy** 258:1,17,19
**home** 12:20 70:12

**hon** 1:7
**honestly** 19:10,14
**hope** 94:17,21,25
99:21,25 100:2,13
100:15,16 101:12
101:14,24 103:4
**hoped** 44:18
**hopefully** 55:20
246:25 287:12
**hospice** 217:15
245:22
**hospital** 47:4
64:13,25 65:1,23
249:2
**host** 208:21
**hour** 23:16 25:9
55:7 159:9 226:16
226:24 227:1
**hours** 9:11 23:16
25:1,2,6,8 27:1,14
62:4,19 63:1,10
64:4 65:20,25
74:4,7,8,13 123:10
123:11,14,17
193:18 227:14
228:22,24 229:5
229:12,12,14,18
230:7,7,8,15 269:3
306:17
**housed** 110:9,10
110:12
**hubbard** 5:10
**huh** 43:8,12 49:22
66:6 85:13 99:23
102:1,15 106:10
121:24 174:15
193:20 228:4
229:1 261:22
264:9 266:4
269:18 280:4
289:3 311:22

317:11
**human** 140:5
**humanly** 136:23
**humor** 159:22
**hundred** 65:20
99:20 101:23
103:3 121:20,21
121:25 122:1
150:17 172:18,20
193:14 195:15
226:15,23,25
**hundreds** 112:17
187:19 193:7
**hydrocodone**
296:11
**hypothetical**
205:17 250:2,14
251:1
**hypothetically**
266:23
**hypotheticals**
250:4

| **i** |
| --- |

**i.e.** 305:14
**idea** 273:14
**identical** 16:10
**identification**
16:19 17:3,9 75:8
95:16 124:10
160:23 210:22
223:10 227:23
301:3 309:7
**identified** 75:16
95:23 129:4
139:21 140:16
142:2 153:21
154:14 155:4
163:24 217:18
246:22,23,24
261:9 294:11
297:24,25 299:24

**identify** 90:25
129:19 137:5
164:7,11 165:7
171:10 179:3
206:14 242:10
256:22 257:25
258:5,7,14 265:22
266:5 267:8
283:21 295:4
296:2 300:18
**identifying** 163:12
201:16 211:10
212:1 233:19
**ignored** 158:19
**ii** 115:23,24
**illegitimate** 231:20
**illinois** 3:21 5:11
**imagine** 80:24
107:18 115:22
224:10 239:21
257:23
**immediate** 54:2
**immediately** 288:1
**impede** 19:13
**imperative** 137:6
**implement** 174:9
222:13
**implementation**
174:5
**implemented**
176:5 183:7 206:6
266:3
**implies** 313:21
**importance** 132:8
145:13 211:8,14
211:20,25 302:14
302:20 304:17
**important** 80:23
112:1 130:18
133:20 134:20,20
143:12 150:3

152:19 153:16
159:24 162:7,10
167:7 216:24
302:22 303:1,7
**impossible** 136:24
**impression** 158:1
**imprint** 95:25
**improper** 300:19
**improve** 48:21
131:15,17
**improves** 131:5
**improving** 48:8
83:3 140:13,13
150:3
**ims** 183:6,9
**inaccuracies** 75:17
**inactive** 74:17,19
**inappropriate**
131:14 171:20
172:24 173:17
175:15 212:13
222:6 231:13
233:17,21,22
234:4 242:10
246:6 251:4 256:4
263:19 264:2
265:1,5,22 266:5,9
266:9,10 267:8,14
295:16 299:2
**inappropriately**
129:6 133:15,23
134:14 137:10,19
200:14 214:1
**incident** 9:6
223:16
**include** 75:22
78:21 91:22
108:22 122:14
279:11,14
**included** 15:6
32:14 50:13,14

81:10 91:25 97:4
140:23 141:8
156:8 216:11
253:21 285:11
307:1 321:13
**includes** 52:8 88:6
107:3 139:3 140:7
197:21 292:8
**including** 45:16
126:14 179:16
228:18,19 230:14
**income** 117:16
**inconsistent**
153:17
**incorporated**
168:4 285:10
323:12
**incorporates**
100:4
**incorrect** 59:23
60:8,21
**incorrectly** 54:10
**increase** 238:9
**increasing** 48:1
**independent** 64:20
65:7,8 68:14 93:1
**index** 7:1,10 8:1
9:1 144:16 147:11
148:4,9,20,21
**indiana** 2:14
**indicate** 220:13
**indicated** 22:7
170:20 178:21
200:4 202:19
203:5 208:12
212:14
**indicates** 316:16
**indicating** 321:13
**indirectly** 54:1
93:13

**individual** 38:24
39:8 125:10
130:16 142:2
158:15 162:9
166:2 221:4,22,22
224:25 225:2,10
242:25 243:25
**individual's** 35:1
**individuals** 20:15
22:3 42:18,20,21
52:21 72:18 90:22
95:2 98:7 100:20
100:24 105:2
124:25 133:3
156:8 199:11
211:10 212:1
217:19 221:9
258:12 280:17
**industry** 85:11,18
85:22,25 86:22
87:15 93:12,24
100:8 107:17
178:20 183:5
**inference** 280:17
**inferred** 281:3
**influenced** 298:23
**inform** 182:25,25
195:23 231:19
285:15,22 287:12
287:15 288:6
292:2 294:7,24
**informatics** 9:15
44:13 310:6
**information** 14:21
19:13 21:5,14
29:2 35:15 72:2
101:2,6 119:24
122:13 130:17
136:21 137:6
142:21 143:17,20
145:1,8,8 149:10

149:15 152:22
153:18 155:10
156:23 167:6,14
169:9,11 171:12
171:14 177:12,13
179:8 183:14
184:22 187:15
192:14,24 193:1
194:11,15,17
195:20,21 197:22
197:23,23,24,25
198:12 200:12
204:18 208:6,19
208:23,24 209:1,2
209:5,24 210:6,12
215:11 219:3,4
232:20 234:16,19
234:22 235:9,22
236:17 237:13
238:19,21,22
239:25 240:21,24
244:1,17 245:21
245:23 248:8
249:14 257:2,5
262:25 264:4
270:16,20,25
271:2,8 273:17,24
274:8,11,12,23
275:1,6 276:7,12
282:8,21 283:1
284:8,9,10,13,22
286:1 287:5,6,10
288:5,14 289:16
289:23 290:4
291:4 292:4,13
293:12 294:1,16
296:19 297:3,11
297:23 302:14
303:8 304:17
305:23

informed 276:15
287:15
infrequently
75:24 154:3
inherently 148:11
inhibit 142:22
143:1
initial 23:15,17,18
40:9 45:12,14
139:21 140:15
142:3 146:1
224:24
initiative 202:15
202:15
injuries 35:1
inpatient 155:21
156:9 157:5
167:25
input 215:3
inside 244:13
insomuch 257:13
instance 86:14
222:8 315:10
instances 85:17
87:13 92:7 93:22
127:19 136:2
252:9,10
institute 84:2
instituted 48:20
206:12
institutes 86:24
institution 40:4
45:23
institutions 41:22
41:25
instruct 18:19
instructed 184:2
instructs 18:21
insurance 51:7
intact 179:12

integrate 262:25
intelligently
158:19
intend 31:24
intended 143:1
intent 73:4 103:10
103:13 152:17
intention 76:13,19
intentionally
219:21
interacted 72:9
interaction 8:15
29:14 79:4 80:7
119:24 120:7
121:8 127:25
128:2 130:1 134:6
135:3 140:22
147:25 152:9,10
154:1 158:23
161:2,18 165:4
198:20 199:4,21
199:22 248:13
249:1 284:24
286:17
interactions 8:11
44:22 78:21 79:6
79:8,18 80:10,14
80:20,23 83:11,12
83:14 105:8 107:3
108:6,7 109:25
115:3 119:7,13
120:5,10,21,24
121:4 124:13
126:14 127:22
131:3 133:24
137:23 144:22
147:16,21,24
150:14 152:19
155:3 166:15
173:23,24 176:20
176:25 239:1

251:22 254:3
258:14 281:20
282:2,14,16,22,23
287:4 293:25
301:9
interest 287:24
301:14
interested 44:8,10
44:20 320:17
interesting 27:20
28:9 107:10
143:17
interestingly
208:16
interfering 192:21
interject 13:16
internal 39:1,10
international
114:18
internet 55:19
308:2
interpose 146:13
interposed 104:10
interpret 157:7
interpretation
131:22
interpreted 249:9
264:13
interrupt 63:20
116:2 180:1
209:12
interrupted
164:15,15
interrupting 73:4
181:7,7,20
interruption 56:1
222:16
interruptive
142:12,14 143:6
intersection 47:23
244:20

interspersed 229:7
interval 115:13
interventions 47:24,25
intimate 273:25
introduced 12:3
investigate 191:11 248:12
investigation 53:23 301:23
investigations 115:1,8
investigator 83:16 83:22 84:3 111:10 125:22 126:5
investigators 84:4
invoice 227:12
invoices 227:10
involve 49:15 73:16,17 79:8 80:11 81:7 82:6 115:9 165:5
involved 44:16 80:19 81:16 82:18 92:8 93:16 108:6 110:6 113:22 117:7 163:19 165:24 217:4
involvement 52:8 125:18
involving 79:6 93:17 151:1,7 155:3 156:6 312:16
irrelevant 136:11 155:14 250:15
isolated 237:19
issue 15:13 34:13 34:17 90:8 97:11 130:25 133:10 143:25 144:1

169:17 233:8 257:9 274:15 281:20 286:6 308:17
issued 33:13 58:16
issues 55:19 72:19 115:2 151:16 159:21 208:11 232:7 233:4 245:13 282:15 285:24 289:15 297:25
issuing 90:11
item 191:12 296:23

**j**

jacob 29:13
jaffe 6:5
jama 8:16,22
january 161:3 279:8
jefferson 320:5
jgleeson 4:11
jmaloy 5:22
job 43:24 202:13 203:6
john 5:16
johnson 91:6,6,6,7
join 295:19 313:11
joined 42:4
joke 76:14
jonathan 6:5
jones 3:18 4:7,15
jonesday.com 3:23 4:11,20
jordan 4:5
josh 268:20
josh's 307:1
joshua 3:6
journal 7:24 15:7 15:13 17:6 27:22

206:11 246:21 277:20 288:24 297:9 313:7,17 315:12
journalism 45:16
journals 82:22 313:4
judgment 251:6,9 251:15 292:19
judgments 245:4
judicious 126:23 127:9 129:7 138:10
judiciously 154:2
july 41:9,16 43:7 43:10 57:10,11 223:24
jumping 304:5
junction 45:24 46:11,11
june 64:11,24 89:17 321:4
jurisdiction 20:18
justin 6:8

**k**

k 4:13
kawamoto 44:13
keep 139:7 156:7 158:3 181:14 216:20 310:23
keeping 133:22 155:9
ken 44:13
kent 96:11 98:6,9 98:10,12 101:18 101:19 105:1
kentucky 257:15
kept 59:21 115:21 293:14 295:3
kevin 96:11 98:6 98:11

key 139:16 153:11 255:9 260:25 261:9,13,24 288:15 305:12
kid 46:10
kin 320:16
kind 60:1 130:16 138:3 252:5 274:21 291:19
kinds 104:14 280:20
kluwer 123:3
knew 59:6,12 60:5 99:1,10 196:14 197:8 271:18
know 14:2 18:19 19:2 21:9 32:8,10 35:17 36:11 41:23 48:25 53:4 57:12 59:7,9,16 65:19 66:25 67:17,22 73:8 75:16 76:22 77:18 80:17,18,21 81:25 82:7,9,10 84:17 86:2 87:7 88:21 90:23 91:19 92:1 94:2 98:5,9 98:10,12,25 101:11 103:15 105:2,18 106:2,5 106:12 107:3 112:22 115:18,20 115:21 118:16 123:4,10 127:15 131:1,23 133:22 134:1,7,23 136:3,4 136:5,6,22 137:16 137:17,25 138:19 138:25 139:1,11 139:12 141:14 142:18 143:16,17

143:20,23 144:14
144:18 145:3,5,7
145:16 150:19
156:11 157:11,17
157:19,20,24
158:3 161:6
166:10,12,14,19
166:19 167:5,5,25
169:3,10,10,10,12
170:10 171:6,25
172:12,17,22
173:3,7,7,8,11,12
173:14,18 174:6
175:7,11,13 176:3
176:7 177:15,21
177:22,23 178:9
178:10,13 182:20
183:12,22 184:16
184:20,23 188:3,6
189:10 190:7
191:24,25 192:2
193:2 194:14,16
194:18,18,19
195:14 196:22
197:22 198:3,5,11
199:14,20 200:9
200:17 203:4,6,24
205:3 206:24
209:14,17,19
210:18 212:17
213:4,5,8,11,25
215:2 216:22
217:3 219:15,23
220:8,12 221:13
222:1 224:17
225:2,4 227:13
229:19 230:15
232:20,21 233:20
235:16,19 236:9
236:10 237:16,23
237:24,25 238:13

238:17,18,25
239:1,2,18,19
241:15 243:9,13
244:3 245:7,8,15
245:16 247:4,9
248:16,17,17,25
249:11,22,25
250:10 252:14
254:2,12,22 257:1
257:16,18 259:22
260:10,14,15
264:21 266:19
268:13 273:2,8,11
273:20,21 276:2
277:1 279:24
283:19 284:11
286:16,22 287:23
288:16,20 289:3
289:21 292:16,22
292:24 293:2,5
294:18 296:10,11
297:11,13,13
301:12 306:22
315:15
**knowing** 237:18
240:11 294:4
**knowledge** 25:15
25:16 71:7 94:8
99:13 110:25
121:22 122:7,10
122:13,19 123:19
123:21 127:12
132:6,11 152:3
163:2 177:10,12
177:13 179:6
186:25 187:23
199:25 233:4
242:14 253:22
260:11 262:23
274:1 290:10

**known** 42:19
111:16 112:18,20
115:12 195:13
**knows** 235:3,6
245:3
**kobrin** 3:6,13 7:6
268:14,19,21
276:25 277:8
**kristin** 4:13 59:16
118:8 262:12
**kzinsmaster** 4:20

**l**

**l** 10:1 12:13
**labeled** 30:24
**lack** 107:5 293:17
302:17 305:5
**lacking** 133:18
**laid** 200:1
**lakeside** 2:8
**lambda** 77:9
**language** 148:8
**lapse** 60:3
**large** 11:4 101:3,4
118:21 119:5
186:17 193:11
299:25
**largely** 83:5
178:19,24 179:12
252:3 287:22
299:25
**larger** 217:6,11
**late** 70:5 72:5
159:3 267:2 319:6
**latest** 202:22
**laura** 1:22 10:5
11:1 59:10 302:7
320:21
**law** 2:6,18 3:7,17
4:6,14 5:7,17
25:24 197:1,3
268:21

**lawyer** 13:19 34:8
**lcr** 320:23
**lead** 107:9 133:15
134:13
**leadership** 77:9
**leading** 10:10
112:3 162:17
278:17 279:1
286:14 287:20
289:20 295:6,8
297:5 303:18
305:9
**leads** 284:23
**learn** 193:6
**learned** 21:21
101:5
**learning** 8:19 9:5
211:1 215:19
223:15 277:21
**leaving** 73:20
**lecturing** 181:24
**led** 115:1 118:21
**lee** 73:12
**left** 69:5 111:10
114:24
**legal** 6:9 18:1
86:18 321:1 324:1
**legislation** 179:20
**legitimacy** 34:11
292:2
**legitimate** 138:25
166:12 183:2
195:25 209:14
216:10 232:21
238:5 240:1,5
245:10 246:2
**length** 39:23,25
40:2 110:1 282:18
**lengthy** 26:12
312:13

**letter** 321:19
**letterhead** 33:14
  230:17
**letters** 142:18
**level** 32:8 38:22,22
  38:23,23 39:5,6
  51:8,9 136:10
  138:1 144:12
  149:8 150:20,25
  151:6 156:10,11
  199:6,17,19 249:3
  261:3,20 262:10
  262:24 263:11
  289:18 290:12
  291:16,21,22
  292:21 294:14
  296:10 305:25
  306:1
**levels** 38:14
**lewis** 5:18
**liaison** 94:18,20
**liber** 2:7
**license** 54:24 57:4
  57:9 58:13,15,21
  58:24 59:4 60:3,4
  60:12,17,17 74:2
  74:14 76:18
  320:22
**licensed** 55:24
  56:25 57:15,17
  58:2,3,8,17 76:15
  137:20 255:19
**licenses** 53:11
  59:22 73:22 76:12
**licensure** 57:24
  60:22
**licensures** 74:16
**life** 48:3
**light** 151:16
**likelihood** 136:16
  163:9

**limit** 139:12
**limited** 68:18
  80:15,15 279:7
  280:16 291:12
  305:20
**limits** 296:9
**line** 56:1 93:10
  96:16 99:19
  224:25 292:10,10
  295:9 300:12,19
  321:13 323:7
  324:3
**lines** 13:7 50:8
  88:1 98:7
**link** 25:22 26:5
  27:5
**linked** 284:1
**links** 26:8
**list** 19:18 25:18
  32:8 65:14 66:4
  75:17,20 87:8,17
  101:21,23 103:3
  108:4,5 111:16
  112:20,21 113:18
  117:6,12 153:4,12
  185:9 188:7,8,11
  188:13 189:21
  298:17 299:10
**listed** 19:19 39:17
  51:16,20 58:13
  66:9,12 72:6
  76:22 77:2 83:16
  86:6 87:1,12,23,25
  88:2,5,8,11 102:13
  103:14 112:17
  114:5 121:8,20
  124:24 125:3
  158:23 161:21
  185:8 186:20
  226:9 228:25
  229:16 232:8

323:7,17
**listen** 143:11
  266:25
**listened** 25:14
**listing** 66:2 113:16
  140:18 249:7
  323:7
**lists** 49:20 65:11
  69:3
**litany** 104:13
**literature** 282:19
  284:13
**litigation** 1:9 7:15
  30:25 31:6 49:12
  49:13 56:9 98:5
  147:7 151:4
  173:10 185:20
  186:23 187:20
  225:7,15,22,24
  269:11 321:6
  322:3 323:3
**little** 14:3 15:8
  16:21 21:13 44:25
  55:6,7,19,23 64:8
  72:12 87:12 93:20
  95:24 118:1,2,14
  148:14 159:15
  165:25 215:11
  260:21 268:25
  300:9
**live** 12:14 274:5
**lives** 234:23 235:1
  240:12
**llc** 2:15,16,16
**llp** 2:7 3:8 5:18
**located** 64:20,21
  220:11 233:2
  235:7 256:7,7,8
  293:14 295:3,21
  297:1

**locating** 118:9
**location** 100:19
  237:3,4,5 239:20
  293:9
**locations** 100:21
  221:23 235:17
  273:22 274:21
**log** 306:24 307:3
**long** 19:1 23:13
  24:24 25:4 26:23
  27:11 41:11 51:16
  61:3 67:13 68:25
  77:15 88:13 89:2
  91:15 112:2 137:3
  146:24 158:5
  181:12 198:8,9,15
  198:15 229:2
  231:15 232:24
  243:6,9,13 248:18
  265:19 280:18
  287:3,23
**longer** 55:19 75:25
  76:23 110:10
  202:18 217:7,9
  232:20
**look** 23:8 26:1
  28:21 41:12 48:19
  57:21 72:17 82:25
  83:21,25 96:2
  99:7 101:16
  102:11 106:4
  112:16 117:15
  132:2 139:14
  158:15 161:6
  162:12 175:3,7
  184:12 203:18
  207:24 210:14
  214:4 215:7,8
  217:22 218:4
  219:4 224:11
  227:8 238:19

253:17 260:24
262:7 267:25
279:3 284:14
291:15 293:5,24
296:13 297:19
306:24 307:3
**looked** 27:18 29:8
49:17 56:5,6
82:19 122:21
144:19 147:12
156:23 163:19
176:18 184:10,11
193:13,15 198:18
208:12,15,16,18
212:11 221:14
234:12 245:3
269:12 270:4,11
**looking** 28:2,25
50:9 57:22 59:7
83:1 85:6 105:13
109:1 118:1,19
121:11,19 126:11
129:12 139:15
144:7 154:18
155:8 161:11
187:15 189:19
192:7,13 196:15
197:9 214:8,11,14
221:8 256:2
261:18,20 269:23
269:25 278:23
**looks** 161:4 260:25
**loop** 146:20
**loosely** 39:4
179:14
**lose** 14:4
**lot** 46:9 48:5 79:18
112:5 128:6,23
167:6 172:14
176:18 212:16
247:21

**lots** 26:12 86:22
128:17 134:16
139:8 144:22
147:16 168:7
212:11,13 234:16
238:24 294:21
317:9
**lousy** 202:13
**low** 132:17 215:15
217:20
**lower** 156:10
**lowest** 38:22
**lunch** 67:17 159:5
**lunchtime** 159:4
**lynn** 269:16,22

## m

**m** 5:16 12:13
**ma'am** 33:21
234:15 308:10,13
311:15
**machine** 8:19 9:5
211:1 215:19
223:15 277:21
**madam** 321:10
**main** 66:4 68:10
187:14
**maintain** 71:25
72:1 73:22 74:18
75:24 110:24
113:18 116:17
117:19 139:17
151:18 286:3
**maintained** 71:24
132:6 179:4
197:15 198:4
286:2 290:3 293:8
**maintenance** 74:2
**major** 166:3,17
229:14
**majority** 28:6
36:15 78:19 79:3

79:5,19 80:6,9
81:6 91:19 92:3
109:8,10 132:4
145:24 212:24
213:5,12 238:3
**making** 128:2
135:10 177:14
235:18,18 248:23
255:6 266:14
291:18
**malone** 1:17 7:4
7:16,20 9:11 10:5
11:10,22 12:2,13
16:3 29:4 31:1
55:22 59:19 95:18
96:13 97:16,22
102:14,24 104:18
116:16 118:25
124:16,20 141:11
153:15 159:13,18
159:20 160:12
161:5 164:24
165:3 189:12,16
196:10 211:5
223:6,19 224:2,5
268:10,20 277:14
303:21 304:5,8
306:6 307:16
308:24 318:25
321:8 322:4,9
323:4,13 324:20
**malone's** 298:22
**maloy** 5:16
**manage** 102:20
105:17
**managed** 51:1,3
51:5 52:5 101:4
114:14
**management**
102:19 105:16

**managers** 51:6
**managing** 48:11
**manifesting**
105:10
**manner** 75:13
255:14
**manual** 186:10,18
**manuals** 186:10
186:13 187:19
**manufacturer**
91:3 92:2 116:21
**manufacturers**
49:14 89:13 91:5
91:12,21 92:4
**manuscript**
105:15,19,22,25
106:2 124:12
**manuscripts**
102:18
**maps** 241:1,13
**march** 35:20
161:4 211:4
224:10,13,15,18
226:2
**marcus** 3:8,13
268:21
**mark** 16:4,5,14,16
16:23 17:5 95:7
160:25 223:13
227:19 309:12,15
**marked** 16:2,18
17:2,8 27:25 35:6
95:15 96:20 97:6
124:9 160:17,22
210:21,25 223:6,9
227:22 308:15
309:6
**market** 150:18
**marking** 16:2,22
124:8 312:5

mary 65:2,4
maryland 2:22
master 182:8
master's 47:15
48:14,17 49:1
61:20
material 15:20
79:19 229:6
materials 14:16,18
22:22 25:24 28:1
29:22 71:23 72:6
87:5 116:23 124:2
144:15 146:8,23
147:6,9 148:3
182:19 183:25,25
184:15 185:9
190:1 192:23
198:16 228:24
241:23 275:18
math 229:14 230:9
matter 19:10
22:18 30:18 31:17
31:24 32:3 105:25
150:25 183:8
197:17 224:6
225:25 226:15
228:10,13 230:19
232:1 244:18
matters 152:7
166:22 168:14
maximum 63:9
md 1:6 11:18
mdl 1:5 7:15 8:6,7
30:25 95:20 98:5
mean 13:5 23:18
32:7 43:18 62:3
63:20 72:25 93:8
94:18 98:14 102:6
107:2 109:4,7,8
112:10 123:6
127:6,10 135:23

142:10 146:24
159:17 163:14
173:1 174:25
188:18 205:10
222:3 229:5 233:6
234:11 235:22
236:2,9 240:20,23
244:5 250:3
268:23 269:6,10
274:15 278:11,12
278:19 279:18
296:5
meaning 53:21
82:3 137:25
167:25 278:10
313:22
meaningful
158:23 242:1,8
247:11,12,16
252:4,8
means 37:3 38:17
100:15 123:7
142:11 173:3
175:21 274:22
measure 108:9,9
108:10 238:12
264:1
measures 50:15
296:1
med 113:19
medi 122:24 123:2
123:23 132:13
152:10,14 199:12
253:13,21 254:1
258:13,15 263:10
265:13
medical 29:5 37:3
53:13 98:24
131:24 136:21
166:12 195:25
209:14 216:10

233:22 240:1,5
245:13 246:3
256:1 263:14
284:12
medicare 8:20 9:7
211:2 215:20
218:7,8 223:17
278:3,7,23 279:2,7
279:14,15 280:15
281:2
medication 34:6
34:12,16 49:11
50:16 51:8 54:1,6
54:17 74:4 78:10
81:1 83:4,15
121:2 128:3,3
133:8 134:4
138:19 139:3
142:25 144:13
145:11 148:5
155:10,25 156:6
156:21,25 157:22
164:6 166:11,13
166:15 168:23
177:18 178:3
179:10 191:7
195:24 200:14,15
210:2 213:22
242:21 245:1,11
248:19 280:18
288:9 292:9
293:22,23 296:3,8
296:10 301:22
305:18
medications 19:12
50:9,12,18,19
72:17,20 78:3,4,7
78:15,22 79:9,11
79:17 80:19 84:9
106:19,20 108:4,6
112:19 113:16,25

115:12 121:2
127:15,20 128:15
128:17 134:2,9,23
137:9,13,13,15,18
137:18,21,23
138:2 139:3 140:9
140:19 144:12,17
144:20 145:3,4
147:11,13 148:10
148:10 155:19
158:6 163:10
175:13 179:1,2,16
190:13 198:6
206:15 208:10,18
209:3,20 210:1
212:15 214:1
216:6,10 231:14
232:22 233:24
234:4 238:7
242:11 256:24
258:21,25 259:5
271:12,12 284:15
288:10 292:10
296:25 297:12
medicine 7:25
15:7,13 17:6
27:22 206:11
246:21 288:24
297:9,20 313:7,17
meds 110:16,17,21
111:15 112:25
114:2,8
meet 20:7 23:2
74:24
meeting 23:6,14
23:15,18,18,23
24:2,13,14,19,24
25:3 36:4 73:9
89:14,17,18,20
91:2 105:1 225:18
226:6

**meetings** 23:5,22
23:25 25:10,13
229:12,23,24
230:3,8
**member** 75:25
76:2,9 77:3,4,6,7,8
77:12,16 114:1
**members** 13:6
42:22
**membership**
75:20 76:4
**memberships**
75:18 76:22 77:1
**memorize** 136:22
**memory** 207:9
308:20 318:16
**mental** 139:10
237:21
**mentally** 238:1
**mention** 20:3
56:17 79:20
**mentioned** 18:2
23:1 26:18 27:23
28:13 30:5 50:17
52:22 53:4 61:3
65:6 66:14 68:8
81:18 86:13
122:25 201:21
204:2,23 217:25
254:17 255:3
287:22 295:20
317:20
**mesa** 45:22 46:1,4
**met** 20:3 23:1,19
24:5 98:10 99:11
105:3
**metabolized**
106:20,22
**metabolizes**
106:16

**methadone** 115:11
115:14,18
**methodology**
283:12,14 284:22
299:1 312:15
**methods** 129:19
279:4,9 285:1,6
**metric** 221:15
**metrics** 208:21
222:12 239:24
242:1,8 246:14,17
247:12,16 287:24
289:4 296:14
305:23
**mid** 24:9
**middle** 29:4
153:25 164:16
168:19 172:22
219:18 244:22
253:19
**midway** 118:15
**midwest** 321:17
324:1
**mile** 208:13
**mileage** 241:7
**miles** 166:24 167:1
168:21,25,25
169:20,22,23
170:11,14 171:21
172:9,13,18,20
176:13,13,14
220:10,10 222:4
239:20 240:10
**mill** 220:11
**miller** 269:20
270:7
**milligram** 246:7,7
297:14,15
**millions** 193:7
**mind** 21:25 77:10
92:15 133:22

155:9 156:7
216:20 217:23
262:12
**minds** 136:23
149:11
**mine** 98:16 300:1
**minimum** 45:9
139:23 140:6
142:4
**minneapolis** 4:18
**minnesota** 4:18
**minute** 55:8 126:4
161:5 222:20
268:2 306:8,11
317:20
**minutes** 159:13
181:3 306:17,19
306:22
**misdemeanor** 55:3
**misheard** 120:12
**misleading** 79:23
**misread** 310:13,14
**misremembering**
161:23
**misrepresented**
205:5
**missed** 51:17
133:21
**missing** 36:12
136:3 309:18
**mission** 43:22
52:10,11
**misstatement**
60:15 298:20
**misstates** 286:24
304:23
**misuse** 219:14
288:13
**mitigate** 78:12
**mixed** 265:17

**model** 217:18
**moderate** 248:14
248:16
**modified** 74:11
**moment** 12:23
26:13 29:6 55:25
92:15 104:23
118:11 281:24
**money** 91:11
**monitoring** 242:17
**month** 23:7,13
24:11,12 57:12
69:7
**months** 63:7 66:16
66:20 67:4,7 69:4
70:4
**morgan** 5:18
**morganlewis.com**
5:22
**morning** 11:15
12:2 67:15 101:19
**morphine** 246:7
305:20
**motheral** 42:23
**mouth** 87:24
220:21
**move** 39:6 42:12
44:4,18 113:6
146:15,20 156:9
223:21 247:19
250:18 289:6
**moved** 38:6 40:20
44:3 46:9,17
**moving** 55:21
237:17 313:9
**moylan** 2:17
**multidrug** 254:3
**multilayered**
284:17
**multiple** 91:5
106:17 115:1

231:18 233:24
244:7 257:4
284:18 291:23
**multispan** 122:14
122:15,22 152:13
**muscle** 111:21
145:6 165:8,13,15
258:22
**muted** 192:15
277:8

**n**

**n** 2:1 3:1 4:1 5:1
6:1 10:1 12:13
**name** 12:3,11,12
36:25 50:23 54:13
65:1,8 104:25
114:15 125:3
139:18 161:21
203:14,16 204:22
205:6 225:9 259:3
268:20 269:21
321:6 322:3,4,15
323:3,4,21
**named** 44:16
111:2
**names** 68:11,13,21
68:22,24
**naming** 203:6
205:14
**narrow** 87:11 88:3
128:5 129:11
135:17,23,24
138:10,15,17
144:16 147:10
148:1,4,9,16,19,21
**nation** 42:16
**national** 1:9 7:14
30:24 84:2 86:23
140:3,3 151:17,20
152:24 178:22
225:22,25 257:8

257:12 284:1,2
290:13 291:2
311:2 321:6 322:3
323:3
**native** 97:8
**nature** 162:15
**ncpdp** 201:21
202:13,21 203:5
203:10 204:8
205:13 284:4
308:17 311:3
**near** 208:7
**nearly** 179:12
**nebulous** 213:6,14
**necessarily** 37:8
78:5 96:5 120:6
236:17 237:19
263:20,22 274:5
292:1 293:10
294:23
**necessary** 10:8
37:15 74:13
135:23 139:2
195:6,8 305:24
**need** 19:2 78:8
99:16 128:6
133:25 135:6,11
135:12 136:24
137:1 144:12
157:12,14 163:22
167:20 177:11
182:6 192:22
193:22 196:2
207:9 212:7
218:18 219:9
221:21 222:17
237:13 247:22
248:24 283:20
293:7 304:7 306:7
314:5

**needed** 66:22
68:16
**needs** 18:7 52:7
63:13 128:18
136:15 138:1,16
145:17,20 148:15
150:12 166:13
241:12 245:10
**negligible** 217:21
218:10 221:4
**neighborhood**
26:25 80:25 88:21
91:16 229:4
**neither** 320:15
**neurologist** 168:2
**never** 54:16,17
68:3 69:15,18,21
69:25 70:5,9,12,15
101:13 107:9
152:5 171:19
225:18 295:20
312:18,22 316:5
**new** 5:20,20 7:24
15:7,12 17:6
27:22 36:2,3
38:19 67:11
206:11 246:21
259:9 288:4,24
297:9 313:6,16
**nextgen** 149:3,5
**nice** 143:17
**nichols** 1:22 10:5
11:1 320:21
**nicole** 59:10
**night** 123:12
**nine** 83:3
**nineteen** 229:15
**ninety** 82:5 121:21
122:1 132:20
133:7 263:17

**noise** 133:2,2,9
135:19 192:17
**nomination** 52:17
**nonfunded** 43:20
**noninterruptive**
142:6,9,13,20
143:5
**nonpharmaceuti...**
92:2
**nonprofit** 110:14
110:15,18 111:13
**nonresponsive**
145:25 247:19
249:11 250:17
289:7 313:10
**nonsubstantiated**
135:9
**nope** 259:7 311:25
**normal** 63:15
239:18,21 295:2
296:8
**normative** 297:19
**north** 4:8
**northern** 1:2
**notarized** 321:14
**notary** 1:25 10:7
11:3 320:21
321:25 322:10,18
323:15,23 324:23
**note** 184:14
318:15 321:12
**noted** 184:20
**notes** 14:16 15:15
15:17 43:5 47:9
229:6,9 267:25
308:11 318:20
**noticed** 184:9
300:10
**notification**
155:13

**notifications** 254:19
**notion** 82:24 111:24 130:14 139:7,9 143:19 145:6 166:6,20 288:16
**notions** 138:3
**novel** 285:3 288:4
**november** 59:1,3 60:5,13
**number** 11:18 58:13,15 65:11 80:13,22 82:8 87:13,23 95:1,20 95:24 119:2,3 122:2 124:24 140:9,21,21 141:17 152:11 167:12 177:17 179:21 185:24 186:5,17 191:12 208:10 214:22 216:13 221:17 247:10 256:2,2,3 256:10,22 257:25 259:8 277:19 282:4 296:24 321:7,13
**numbers** 8:6 118:23 206:15 323:7

**o**

**o** 10:1 12:13
**o'brien** 96:12 98:6
**oarrs** 243:5,10,15 243:17 247:15 249:5,12,14,18,21 249:22 250:11 257:1,2 270:21

**oath** 14:9 160:13 307:17,21
**object** 18:12,17 103:18,18 104:1 104:16 128:8 146:15 278:25 279:23 280:25 282:5 285:20 295:7,7,8,8 296:6 296:22 300:25 303:17,22 304:1,5 304:7
**objecting** 103:22
**objection** 18:22 33:24 34:22 60:24 79:22,23 80:12 81:8 84:21 102:4 103:6,17,19 104:3 105:20 106:13 107:25 116:24 117:9,14,21 129:2 129:14,24 130:8 131:6 133:11 134:15 135:21 138:14 146:13 147:3 148:6 149:22 157:2 167:3 169:2 170:1 170:17 171:23 172:11 178:15 182:16 186:24 187:4,8,13,22 188:2,22 189:20 194:3,12 195:1 196:6 209:11 213:15 218:15 221:6,10 240:18 244:14 249:17 258:10 259:19 260:2,6,18 261:4 266:7,17 278:14

278:17 279:1 280:6,12 281:9 282:11,17 283:9 283:17 284:25 285:23 286:13,20 286:23 287:19,20 289:20 290:15 291:9,10 293:16 295:6,19 296:21 297:4,5 298:11,19 298:20 299:14 300:5 302:16,17 302:17 304:10,12 304:22 305:4,5,9 313:20 315:13,17 316:13 317:16
**objections** 10:9,12 104:2,11,11,14
**objective** 162:13 215:18
**objectives** 52:10 52:12 165:21
**obtain** 39:25 41:2 48:15 57:8 58:21
**obtained** 43:6 45:1 46:20 49:5
**obtaining** 36:17 125:10
**obviously** 18:13 26:12 77:15 103:20 107:5 145:2 197:21 233:6 301:1,10
**occasion** 68:15
**occasionally** 63:16 69:8 79:11,16
**occur** 36:2 111:22 112:2 152:6
**occurred** 230:11 230:13

**occurring** 111:25
**october** 37:10 38:9 44:1,5 57:13,14
**odd** 300:10
**offer** 31:24
**offered** 10:13 175:23 183:10
**offering** 149:4 150:24 151:5 173:20 174:7,16 174:19 200:18,21 201:3,14 231:25 232:3 240:3 249:13 253:3 256:17 258:24 259:4
**offhand** 36:12
**office** 26:2 70:13 105:6 140:2,3 235:10 236:8
**official** 322:15 323:21
**oftentimes** 168:7
**oh** 22:12 51:24 59:6 73:10 86:12 86:17 88:19 91:4 91:22 109:9,21 120:12 127:11 141:22 193:14 245:21 246:18 262:19 267:15 281:15 309:21
**ohio** 1:2 2:10,16 20:17 22:4 56:11 56:11 166:25 168:19 172:22 243:4 257:14 270:21 321:2
**okay** 12:19 13:20 15:15,18,23 16:12 17:4,10 18:4 19:8

20:19 22:17 23:10
23:11 24:1,13
25:17 26:4,10,23
27:8 28:8,13,20
29:7,15 36:10,19
37:17 40:5,12,15
40:20 43:24 47:2
47:17 53:24 55:11
56:16,21,24 58:7
58:20 59:14 60:9
63:25 64:23 65:17
66:1 67:10,25
68:8 74:22 78:25
82:25 84:7,18
85:2 86:4 87:10
87:18 88:13 89:10
91:1,24 93:9,19
94:7,13 95:6 97:9
98:4,12,21 99:7
101:9 102:10
103:2 109:11,23
110:18,24 112:14
112:24 113:13
114:20 116:10
117:4 120:1
122:25 123:16
124:19 126:8,11
127:11 144:5
145:23 146:3
149:17,17 150:4
160:5 161:8,13,15
162:1,25 164:25
165:6 170:9
171:15 179:25
184:8 185:3,7
192:21 197:12
203:9,9,23 204:13
207:9,13,19
209:21 210:23
211:24 214:13
223:5,22 224:2

227:24 228:7,16
229:20 230:1
231:4 234:7 237:3
237:21,24 238:14
241:19,24 245:15
247:20,25 248:6
249:10 256:17
261:18 266:13
267:1,23 268:3
269:23,24 276:1
276:24 277:24
278:2 280:8
281:13,18,25
285:12 289:12
301:24,25 309:5
310:20 313:15
314:3,18 316:7
317:22 318:19
319:4
**old** 278:13
**older** 278:24 279:3
**onc** 139:22 140:1,2
142:3
**once** 16:3 24:9,9
24:11,11 156:12
**oncology** 168:1
**ones** 27:15,18 28:8
65:15,18 66:8
77:10 90:24
134:20 161:12
240:2,5 287:25
288:12 292:12
**ongoing** 151:16
**opana** 99:21
101:22,25 102:3
103:5 107:24
**open** 67:15 223:12
**operating** 182:18
257:17
**operationalize**
175:23 199:22

**operationalized**
173:16 198:25
199:3
**operations** 63:12
64:15,17 187:15
**opiate** 1:9 7:15
265:14 296:24
321:6 322:3 323:3
**opiates** 173:23
200:15
**opine** 233:6,25
**opined** 315:19
317:13 318:9
**opining** 174:10,24
175:1 178:8
197:12 222:11
314:11,15 315:4
316:11 318:7
**opinion** 21:15
32:13 34:10,20
86:7 88:11 100:16
127:13 129:6
132:24 133:19
149:5 173:24
174:8,16,19,25
175:3 176:14
180:7,10 183:20
184:3 189:15
194:1,10 195:4,6,9
197:5,16 200:9,18
200:22 201:3
202:16 209:4
210:11 212:17
231:11 232:4
233:8 235:12
244:9,15 249:13
252:21,24 254:14
255:22 258:24
259:4,11 264:19
275:16,17,20,23
276:4,9,17 287:25

293:19 301:5
302:18,21 303:7
310:8 316:22
317:1,2 318:1,1
**opinions** 31:23
32:3,6,17,19,23
70:21 71:9,15
72:3 150:24 151:5
173:20 188:1,21
193:23 198:17,18
201:14 231:25
240:4 253:3
256:18 285:15
289:14 299:6
302:15 303:1
304:25 318:4
**opioid** 8:6,7,20,21
9:6 20:16 30:25
75:8 78:21 79:8
79:11,17 82:19,24
83:15 91:7,8
95:20 112:19
115:12 119:12
120:10,13,14,21
121:4 131:25
139:3 145:2
163:20,25 164:4,8
165:8,15 174:1
175:13 179:2,16
183:1 191:6
208:18 210:14
211:2,3,10 212:1
213:22 214:2
215:20,21 216:6
216:21 217:20
223:16 225:14,22
225:24 231:20
238:7 258:22
264:7,14 265:1,5
266:10 267:9,13
277:22 280:18,22

281:7 287:25 292:11 298:3

**opioids** 20:16 49:2 49:4,15,16 50:19 73:16,17,18 75:13 78:17,19 79:6,20 80:11,13,18 81:3,7 81:10,11,14,17,21 81:24 82:6,11 83:9,13 84:9,15,20 89:13 91:3 92:8 93:16,17 108:16 112:14 115:9,15 120:3,5,23,25 121:2,16 127:4,7 129:12 137:24 138:8,9 140:23 141:8 145:5 151:2 151:8 154:9,13 155:3 166:11 170:21 171:4,7 173:11 177:21 190:13 191:1 200:8,16 208:20 212:15,16,22,25 213:3,13 214:6 217:7 231:14 242:10 256:23 263:18 280:11 301:10

**opportunities** 101:22

**opportunity** 231:19 248:12 304:5,7

**opposed** 177:1 241:9 244:13

**option** 158:8

**oral** 11:11

**order** 18:8 39:6 117:16 139:22

140:1 141:17 142:4,6,10,25 158:13 178:3 283:13 288:5 296:8 301:23 305:15

**ordering** 134:8

**orders** 177:18,22 177:23 179:16 180:13

**organization** 38:18 51:4 52:9 52:11,12,19 53:6,7 53:9 63:23 71:22 71:22 75:22 77:9 77:13 101:7 107:15 110:14,19 111:13 114:15,22 119:21 140:4 149:8 151:20 152:13,14 187:16 198:25 200:5 208:14 242:12 290:25 291:14,21 291:22 296:16

**organization's** 100:19

**organizations** 22:15 41:22 51:7 51:7 77:11 86:22 86:23 87:8 88:7 91:23 95:2 101:4 107:7 136:7,9 175:20 179:13,14 193:11 195:11,12 196:20 197:7 198:2 209:23 231:11 233:14,23 242:23 244:8 246:17 253:20,24 254:6 255:18

288:2 290:6,17,18 290:23 305:14

**original** 299:9,15

**originally** 71:13 315:1

**oro** 12:15

**outcome** 140:12 216:20

**outcomes** 46:21 47:20,21 48:3,8 49:6 50:8,15 86:1 89:24 94:18,19,22 94:24 98:15,23 100:3,6,10 114:19 140:14 285:2

**outlier** 292:18 294:9 295:1 296:2

**outlining** 191:13 191:14

**outpatient** 156:16 157:6 167:25

**outside** 84:16 85:1 85:22 89:11 111:12 192:18 210:17 244:12 272:8 291:20 300:5

**outweighed** 128:25

**outweighs** 153:22 154:15 155:5

**overall** 125:11

**overdose** 8:20 211:2,11 212:2 213:21,22,23 214:2,7,16,24 215:12,20 216:21 217:21 218:11 221:14,15 277:22 280:22

**overgeneralizing** 173:13

**overlap** 49:25

**overlapped** 52:1

**overly** 80:20 162:17 235:19

**overprescribing** 255:19,23,25

**override** 132:19

**overrides** 131:14

**overriding** 143:23

**oversight** 151:20

**overuse** 259:8

**overused** 212:18

**overwhelms** 127:21

**overwritten** 128:7

**owned** 123:2

**owns** 93:11

**oxford** 3:9

**oxycodone** 106:19 296:11 297:13,15 297:16

**p**

**p** 2:1,1 3:1,1 4:1,1 5:1,1 6:1,1 10:1

**p.m.** 116:13,13 160:8,8 223:2,2 268:7,7 307:11,11 319:13

**p450** 106:16,18,23 107:4

**packet** 98:19

**packets** 14:20

**page** 7:3,12 8:3 9:3 28:24 29:3,4 29:12 31:13 32:10 51:20,21 57:23 59:15,20 65:16 68:8 73:11,11 75:19 83:1,25

84:1 101:17
102:12,13 106:1
109:1 114:23
118:13 121:11,11
126:12,21,21
132:3 141:20,22
141:24 142:1
150:4 151:15
153:3,10 154:1
155:7,8 159:1
163:23 165:19
185:6,8,12 214:5
214:15 215:7,8
218:1,1,4,7 228:2
231:9 232:6
253:17,18 255:8,9
255:10,10,11,12
261:3,21 262:3,4,7
262:14 270:10,11
278:16 281:16
289:15 295:23
298:1,1 310:10,23
311:1,5 321:13,15
323:7 324:3
**pages** 75:23 193:8
193:12,15 309:23
**paid** 87:3 89:25
112:25 113:10,12
137:1
**pain** 48:11 216:5
**pair** 165:23 285:7
**pairs** 81:23 133:25
140:22 153:5,12
287:11
**panel** 140:18
151:18 152:25
156:8
**paper** 36:3 73:13
90:11 125:6,18
126:3,19 128:22
129:3,4 130:24

135:8 137:2
149:18 163:11
167:8,11,19
211:19 212:11
213:19 215:3,4,23
246:20 288:25
289:2
**papers** 72:11
78:18 82:7,21
119:16 125:24
238:8
**paragraph** 59:15
59:20 83:1 85:7
114:25 118:3,15
118:16 150:5
151:15 155:8
165:21 253:19
262:2 281:23
295:23 298:2,2
**paragraphs**
265:17
**pardon** 56:1
**parent** 122:16,25
123:1
**parentheses**
118:24
**park** 5:19
**part** 22:9 47:18
49:17 61:21 62:10
62:13,14,18,19
66:11 69:13 72:2
79:17 82:19 90:12
97:7 103:21
110:17,17 119:11
120:9,23 129:4
145:3 147:6,24
149:9 173:24
175:22 179:23
185:2 189:10
191:4 195:21
196:23,24 199:12

205:20 208:25
219:4 229:5 231:9
251:11 258:17
262:4 271:5 282:9
284:2 310:6 323:9
**participant** 90:22
**participants** 90:17
90:18,21
**participate** 24:16
24:20 92:22
105:22
**participated** 24:2
25:14 104:16
**particular** 20:17
28:24 32:10 49:18
50:12 56:9 72:19
73:5 78:4,10,17
83:23 86:13 96:15
120:4 121:11
126:2 130:24
133:8 135:8
137:14 140:17,19
147:7 151:7
156:18 158:18
165:4 167:11
177:7 178:2,9
179:19 183:1,4,8
199:13 204:2
212:11 215:4,23
220:17 221:25
222:12 232:13
233:18 239:17
242:13,22,25
243:2 244:2,16,20
246:1,10,10,11
256:19 264:11,18
285:25 287:11
291:5 292:4 294:3
294:8 310:15
**particularly** 81:20
137:14

**parties** 10:3,11
320:16
**parts** 229:21
**party** 202:4,23
203:2 204:9 284:4
**pass** 277:2,3
**passed** 179:18
**passing** 13:2
**path** 45:14
**paths** 45:11,16
**patience** 319:2
**patient** 48:2,21,22
50:14,15 54:16,17
83:4 100:6 127:24
128:15 130:4
131:5,16,17 135:1
135:15 137:10
138:20,24 139:6
140:13 145:21,22
156:1,6,10,18,19
156:21,25 157:9
157:18 158:16,20
162:10,16 163:9
166:2,8,12 167:16
167:22 173:2,3
177:4 197:25
215:9 219:2
221:25 234:14,23
235:1 237:5,22,22
238:15,23,24
240:23 241:8
242:20,22 244:11
245:10,21 246:2
246:10 248:18
249:7 256:7 259:6
262:24 263:11
270:17 277:15
288:13 291:15
292:5,8
**patient's** 234:24

**patients** 50:10
158:5 163:13
211:11 212:2,6,21
212:25 213:2,13
213:19,21 216:1,5
216:12 217:6,15
218:19 221:22
238:3,4 249:2
251:23 257:3
263:9,9,13 278:23
279:19 280:9,10
291:12 292:22
294:20,20 296:17
302:11 303:11
304:18
**pattern** 246:9
**patterns** 295:4
297:18
**pause** 41:13
161:14 279:6
318:14
**pauses** 219:23
**pay** 135:6 143:12
145:17 288:7
**paying** 130:17
**payors** 284:4
**pays** 117:20
**pbm** 105:17
203:11 204:10
**pbms** 102:20
202:4
**pdf** 186:17
**pdfs** 186:8
**pdmp** 242:16,18
243:2,3,19 245:23
247:4,14 250:9,15
257:8,12 260:16
270:21
**pdmps** 243:24
245:1 249:4,4

**peer** 39:1 52:20
233:23 313:4,13
315:12
**peers** 233:24
294:9
**pending** 19:3
39:11
**pennsylvania** 3:11
**people** 13:2 80:24
98:10 105:4
124:24 135:25
145:5 154:23
159:3,4,24 166:16
174:9 235:25
236:1
**perceive** 136:11
**percent** 82:5 123:5
123:6,15 132:20
133:7 214:5,15,23
215:17 217:19
218:10,13,21,23
221:3,18 222:8
246:15,18,19
248:4,5,11 263:17
280:1,2
**percentage** 83:8
213:2,4
**percentages**
280:21
**perception** 133:19
**perfect** 294:22
**performance** 39:3
39:5 48:25
**performed** 296:1
**period** 38:25 39:7
45:9 62:23 63:2
64:24 74:7 77:14
198:8 204:4 217:9
232:24 279:13
**permit** 181:18

**permitted** 13:10
231:18
**person** 23:24
39:12 133:9
155:11 171:13
**person's** 52:21
**personal** 30:15
290:9
**personally** 322:11
323:15
**personnel** 143:11
**perspective** 7:22
177:15 280:9
**pertain** 56:18
**pertaining** 208:19
**pete** 79:25 180:20
181:25 182:6
186:1 196:8 277:8
289:22 295:15
298:12 299:15
300:8 304:8
**peter** 2:5 321:5
**ph.d.** 1:17 7:4,16
7:20 10:5 11:10
11:22 31:1 47:16
49:5 101:1 321:8
322:4,9 323:4,13
324:20
**phansalkar**
139:19,20
**pharma** 89:18
**pharmaceutical**
49:13 85:11,18,22
85:25 86:21 87:6
87:14 88:7 89:12
91:3,12,21 92:4
93:24 100:8,8,18
100:23 101:14
107:17 116:21
253:20

**pharmaceuticals**
94:8,12 178:18
**pharmacies** 47:6
48:21 65:11,15
66:4 68:10,11,14
68:22,25 93:1
180:11 182:14
190:10,24 205:23
206:6 207:21
221:23 231:18
238:4 242:12,24
244:1 252:22
253:1,12 257:3,4
258:4 260:14
273:2 282:4,21
283:6 288:23
290:13 305:14
312:19 313:19
**pharmacist** 34:25
47:4,5,8,10,13,14
54:21 55:6,24,24
56:25 57:15,17
58:9,13 61:4,5,8
61:13,17,24 62:2
62:11,12,15,20
63:24 64:6,10,25
66:8,16 76:14,17
76:20 115:21
135:18 138:12
143:10 145:22
149:15 152:12
156:13,17 177:10
179:9,19 182:17
190:18,20 198:10
208:25 210:13
219:4 220:14
232:20 235:2,5,6
235:13 236:25
237:7,20 238:14
238:25 239:8
240:11,20,24

244:10,18 245:2
245:14,17 246:1,9
247:7,13 248:11
248:16,24,24
251:14 257:19
259:25 264:3
283:1 286:11
288:7 292:6,9,16
292:19 293:1,5
294:8,24 296:15
301:19,21 305:24
306:4
**pharmacist's** 57:4
75:4 149:11
219:10 251:6
300:22
**pharmacists** 45:8
51:4 56:13 68:16
76:1 101:1 134:11
134:13,17 135:12
139:11 142:24
143:23 144:24
145:9 147:17
176:11 178:2
179:15 180:12
189:25 190:10,11
190:21,25 200:12
208:17 209:3,6,15
209:24 210:6
231:19 234:17
239:12,14,22,25
242:1,9,23,24
243:14 247:17
248:10 249:16
251:18 252:4,7,11
254:23 255:14,18
259:17 260:5
270:16,20 288:23
291:24 292:14
294:14 305:15

**pharmacoecono...**
100:4
**pharmacoecono...**
94:19,22,25 98:23
114:19
**pharmacotherapy**
31:2 36:20 37:1,2
**pharmacy** 2:14
7:24 9:14 12:7,9
31:1 36:8,18,21
38:3,7 40:6 45:2
48:25 51:1,3,6
52:5,15 56:11
57:23,25 58:4,21
60:12 61:10 63:12
64:15,17,20 65:7,8
65:13,14 66:3
67:14,20 69:16,19
69:22 70:13,16
71:25,25 72:1
73:20 76:14 77:6
77:9 92:12,14
107:12,14,19
108:2,4,7,16,21,22
114:14 142:24
143:11 144:24
147:18 152:13
168:22 172:15
173:4,5 174:20
177:18 178:14,17
179:5 182:17
183:4,8 190:19
191:4 193:3,8
195:17 196:18,23
196:24 198:7
201:19 204:3
207:3,16 208:9
209:16,18 210:3
222:13 231:11,19
233:3,21 235:2,3,8
236:18 237:4,22

238:6,15,16 239:9
242:9,23 243:18
243:25 244:7,8,12
244:13 245:2,19
245:20,24 247:7
247:13 252:15
254:5 255:17
256:6,23 258:2
259:18 260:11
264:22 273:4,10
273:11 283:2
284:9 287:1,2,7
291:3 292:21,25
293:8,21 296:16
298:8 305:21
306:3 310:6,12
314:11,20 315:4
315:24 316:5,12
316:19 317:15
318:8,12
**pharmacy's** 297:2
**phases** 125:25
**phi** 77:9
**phone** 25:14 226:5
308:6 321:3
**phrase** 94:17
127:18
**phrased** 79:10
**phylum** 137:22
**physical** 139:10
**physician** 168:1,2
177:9 208:15
236:16 239:19
294:17,18,19,20
**physicians** 101:1,5
143:22 235:10,17
**pi** 118:25
**pick** 133:3
**picture** 305:16
**piece** 169:9 179:19
187:14 245:20

248:8
**pieces** 169:11
**piecing** 121:6
**pill** 220:11
**pitching** 116:20
**pittsburgh** 3:11
84:5
**place** 5:9 100:21
129:1 176:1,8,8,9
178:1,4 190:17
195:10,11 198:15
218:4 222:4 243:6
252:1,13,15 258:5
259:12 272:13,18
**placed** 163:13
**places** 218:1
294:21
**plaintiff** 13:18
17:20 86:14
187:24
**plaintiff's** 34:8,11
189:11
**plaintiffs** 2:4 6:6
20:3,5,8,11,22,24
21:15,21 22:2,8,23
34:24 187:7,11
194:20,24 195:5
225:7 232:15
233:5 254:7,10
272:6 273:16
**plan** 92:1
**plans** 102:20
105:17
**play** 166:3
**played** 220:16
**please** 11:20 12:11
14:5 15:11 18:6
18:10,16,21 19:2
21:25 38:11 58:5
73:1 95:21 96:1
96:13 97:25 104:9

154:16 160:16
164:16 180:18,19
181:7 186:3
188:24 191:21
201:7 205:25
209:12 211:23
223:11 226:3
233:12,12 262:11
277:19 281:12,24
306:14 310:23
317:22 321:11,11
**plenty** 304:10
**plos** 9:8
**plus** 121:22
**podium** 73:9
**point** 12:10 14:2
18:24 53:12 64:8
77:3 99:5 104:21
114:14 121:10
131:8 145:13
158:4 169:17
171:7 176:13
180:4 183:3,8
204:8 214:10
225:11 244:6
247:2 250:20
252:2 272:5 292:3
**pointing** 59:24
**points** 168:8
310:12
**policies** 271:24
272:17,23
**policy** 187:19
**polster** 1:7
**poor** 99:3 113:7
203:6
**population** 51:8,9
214:25 278:24
279:21 280:10,16
280:23 281:6

**populations** 281:4
**portion** 96:15
106:7 125:14
279:20 314:14
315:9
**posed** 232:14,14
**position** 37:9
38:18 39:18,18,21
39:24 40:1,7,9,25
43:20 50:1 64:11
204:7 236:20
**positions** 40:14
**positive** 43:3
216:13
**possible** 112:21
135:18 138:10,11
138:16 139:13
168:10 175:1
255:17 288:18
294:1
**possibly** 112:18
**post** 36:8 38:20
44:15 49:20
**postgraduate**
36:17
**potential** 14:25
34:7 78:12 108:10
134:5 135:13
139:6 145:21
148:12 163:8
171:10 177:23
189:22 231:20
256:22 282:16
288:7,12
**potentially** 137:18
216:17 291:14
301:20
**powerpoint** 9:13
191:13,14 308:19
308:23 309:1

**practice** 52:14
57:24 58:4 73:21
76:17,19 129:10
168:2 179:24
195:16 196:17,24
202:19 235:17
236:11 239:18,21
250:22 252:15
256:12 266:20
295:2 297:19
305:21
**practiced** 57:25
61:4,5,9,13 68:10
68:12 138:2
**practices** 119:20
120:2
**practicing** 47:8
61:16,21 74:17
76:13 306:4
**practitioner** 135:5
142:23 195:23
236:6
**practitioners**
157:7
**pratt** 2:20
**precise** 130:14
214:21 216:7
**predicated** 78:12
236:3
**predict** 9:6 212:12
215:20 216:21
223:15
**predicting** 8:19
211:2 277:22
**predictive** 218:5
**preferable** 143:5
**preference** 159:17
159:23
**premise** 131:8,21
134:23 135:7
136:18 137:2

138:8 163:11
167:8,18 190:9
196:11 219:6,11
236:3 263:25
**preparation** 23:3
23:5,18 25:17
26:20 27:9 29:23
30:6 269:13
270:12
**prepare** 19:16
35:18
**prepared** 35:21
**preparing** 22:9
**preposition** 252:5
**prescribed** 280:11
281:6
**prescriber** 137:20
156:13 197:24
208:11 210:3
235:7,20 239:17
239:18 240:22
246:11 256:8,11
256:19 262:10,25
263:17 293:22,24
293:25 294:5,8
296:19,25 297:3
297:21
**prescriber's** 219:9
**prescribers**
128:13 134:10
135:11 172:17,20
190:11,25 206:14
235:14 293:12
294:6,12 295:4,21
302:11 303:12
304:19 305:17
**prescribing** 7:23
190:12 191:1
202:14 203:1
204:24,24 206:14
233:22 256:4

293:24 294:13
295:5 297:18
**prescription** 1:9
7:15 30:25 135:14
135:15 137:17
139:1 156:18
170:13 172:19
173:8,9,11 178:22
179:16 180:13
183:2 197:4,22,23
209:7,25 210:15
215:21 220:9
232:22 236:7,12
236:16 238:22
239:25 240:11,13
240:21 241:14
242:17 243:1
245:10 246:1,15
248:7 251:3,10,17
261:2,20 262:9
263:2,4,7,8,19
265:22 266:6
267:18 275:5
284:3 292:3,11,18
294:25 296:3,14
297:14 300:19,24
301:15,22 302:2,5
311:3 321:6 322:3
323:3
**prescriptions** 8:21
71:4,6 75:9 172:9
172:12 174:2
198:14 208:19
211:3 212:14
222:7 238:5 240:1
240:4 244:12
245:12 259:9
263:17 279:13
281:7 291:25
292:23 294:16
296:16,24 302:12

303:12 304:19
**present** 6:4 24:15
58:5 143:20
149:12
**presentation** 73:9
308:19,24 309:1
**presentations** 53:7
**presented** 142:21
156:12,17 175:22
184:15 190:22
208:24 235:9
238:17 244:17
288:15 292:12
**presenting** 183:13
**preserve** 318:20
318:22
**president** 98:22
114:21
**presumably**
241:16
**presumption**
244:25
**pretty** 108:21
**prevent** 19:9
177:8 233:16
242:10
**prevented** 282:24
**preventing** 44:22
109:24 115:2
**prevention** 85:10
**previous** 56:2
83:12 170:4,7
285:11
**previously** 19:24
27:23 35:6 53:4
84:24 155:25
156:5,23 161:24
208:1 232:17
**primarily** 36:14
197:20

**primary** 12:6,15
29:8 42:14 44:21
52:13 65:15,15,18
78:1 98:7 100:19
100:21 170:21
**principal** 83:16,22
109:24 111:10
125:22 126:5
**principals** 44:14
**principles** 126:13
**printout** 97:3
**prior** 10:14 45:9
158:12 224:17
234:19 286:24
290:16 304:23
315:1
**priority** 139:22
140:16,24 141:9
142:3 163:3,6,14
163:19 164:8
165:8
**privilege** 21:3,18
**privileged** 189:8
**probability** 218:6
**probable** 112:21
**probably** 24:25
25:8 26:25 27:17
36:1 50:22 54:5
64:4 65:19,22,24
66:25 73:17 76:5
88:21 89:7,8,22
90:7 102:8 107:16
115:22,24 133:25
157:7,12 168:20
172:14,17 186:7
186:15,16 192:22
193:15 199:14
204:5 228:21
239:1 244:18,18
244:23 251:25
255:25 265:8

276:11,12 284:19
292:23 293:2
306:3 310:5
**problem** 130:15
132:23,25 143:25
166:17,19 220:14
246:4 250:2
264:14 267:17
301:21
**problems** 131:1,2
171:10
**procedure** 11:6
272:2 322:5 323:5
**procedures** 272:2
272:16,23
**proceed** 19:6
**proceedings** 11:12
18:1
**process** 18:6 43:2
52:17 139:16
142:16,25 149:9
151:21 182:25
185:2 195:22
205:21 219:5
239:4 284:2,17
**processed** 284:10
**processes** 200:5
276:16,19 316:18
**processing** 71:3,5
202:23
**produce** 122:12
127:12 209:23
**produced** 56:10
98:5 129:4 148:18
185:20 186:14,23
187:20 193:3,8
269:10 270:8,12
275:18
**product** 21:3,18
90:12 113:14
122:15 197:25

283:25 296:4
**production** 271:6
315:24 321:15,17
321:22
**productions** 269:2
**products** 91:5,7,9
113:1,10,12,21,23
145:7 150:18
283:24
**profession** 191:4
264:22
**professional** 1:24
10:7 11:2 19:21
53:10 75:18 86:23
192:4 251:9,14
**professionalism**
319:2
**professionals**
100:25 101:5
**professor** 31:2
36:19 38:7,12,13
38:16,16 39:9,13
39:17,20 40:6,13
40:16,21 41:5,10
41:25 43:11,14
**profile** 234:14
238:24 242:19
245:1 249:7
270:17 292:8
**prognostic** 9:8
223:18
**program** 28:2,4
45:5,6,7,10,11,13
48:19,24 61:20,24
67:23 68:2 191:15
207:25 208:1,2,4
219:1,13 232:13
241:1 242:17
258:18 288:21
289:9 297:7 315:2

**programs** 178:22
208:22 209:17
215:6 242:15
248:23 253:13
311:3
**project** 83:23 94:4
125:21 216:16
**projects** 86:2
**prolong** 115:13
**prolongation**
111:17,19,24
112:18 113:17
**prominent** 27:19
27:21
**promoted** 39:12
41:10,12,18 42:9
43:10 140:10
**promotion** 42:8
98:19,20
**promulgated**
150:14
**pronounce** 36:24
164:1
**proper** 112:3
**proportion** 177:19
177:20
**proposed** 227:7
249:19
**prospective** 179:7
179:20 180:15
209:17 238:23
248:22 301:8
**provide** 51:9
63:17 101:2,21
116:22 137:6
145:7 152:21
177:16 179:8
209:1,19 210:6
225:14 242:1,8
243:17 254:7,10

254:23 255:18
257:2,4,6 262:9
263:3 282:25
283:1 285:2
305:23
**provided** 7:16
11:6 14:19 19:18
25:18,20,20 26:5
26:16 27:5 29:25
30:25 32:9 108:2
122:4 180:11
182:20 183:6,9
184:24,25 187:17
188:11,14,17
189:12 190:1
193:22 198:22
199:5 200:3 206:9
209:2,6 210:13
227:21 228:1,8
242:15 247:7,16
249:6,14 254:24
255:7,13 257:2
259:25 260:5
275:11 289:13,16
292:5,6,13,17
299:20 301:18
**provider** 167:22
167:24 263:14,14
**providers** 113:1
113:10
**provides** 112:25
113:4,9,15 136:2
242:19 243:21
247:14 253:14
279:2 284:8
**providing** 53:3
125:11 136:14
177:13 200:11
247:12 289:23
**pry** 13:5

**public** 1:25 10:7
11:4 43:14,23
126:6 320:21
322:10,18 323:15
323:23 324:23
**publication** 36:2
73:8 313:6
**publications** 26:13
53:7 77:18 192:5
**published** 15:7
28:18 29:5 72:11
73:6,13 82:20
119:16 126:8
246:20
**pueblo** 47:4 64:21
**pull** 15:19 16:15
16:24 59:17 95:4
118:8 124:1
161:12 185:4
196:19 277:18,22
281:12,17 310:9
310:22,25
**pulled** 17:5 168:8
210:19 245:24
308:19
**pulling** 160:18
**purchased** 231:12
**purchasers** 253:23
**purchasing** 198:4
**purdue** 89:18
**purporting** 20:8
**purpose** 72:18
89:19 126:13,18
149:25 195:25
209:15 216:10
240:2,5 246:3
300:23 301:18
**purposely** 217:5
**purposes** 21:14
28:16 30:16 32:13
56:22 93:23

116:18 226:10 264:18 299:16,20 310:8

**pursuant** 139:1

**pursued** 59:21

**pursuing** 47:15

**put** 35:5 64:7 87:8 87:24 100:11 115:11 117:13 118:12 134:3 139:8 145:16 152:9 157:21 166:10 167:9 168:10 227:5 228:3 231:4 233:6 236:13,14 237:9 244:21 260:9 275:2 288:1 315:20

**putting** 139:8 150:20 220:21 229:6 230:12,16 230:16 265:11 310:11

**pweinberger** 2:12

**q**

**qt** 111:16,17,19,22 111:23 112:6,11 112:14,18 113:14 113:17

**qtc** 112:18 115:13

**qualified** 33:23

**qualify** 53:19 78:8 82:14 279:15

**quality** 48:3 83:6 107:12,15,19 108:2,4,7,8,9,10 122:5

**quantify** 66:17

**quantities** 233:21 245:5

**quantity** 256:11 256:19 296:3,13 305:19

**question** 13:21,23 14:13 18:11,12,15 18:22 19:3 21:22 21:23,24 22:4 23:21 30:3,4 36:11 39:19 46:13 52:3 71:13 73:2 78:24 79:10,14 84:23,25 86:18 92:13 96:1 99:2,3 99:17 101:10 104:19 107:17 113:7,8 120:6,8,15 120:18 125:15 127:6 139:16 141:5,5,7,8,18 142:13 146:2,12 146:18 151:3 153:3,4,11,11 154:11,16,17 164:13,19 169:13 170:7,23 174:22 180:3,21 181:10 181:11,15 182:1 183:15,18 186:2,2 186:4 188:24,25 192:1 194:9,9,23 199:20 201:7 202:11 203:1 206:1 207:14 209:9,12,13 211:16,17,23 212:4,5 213:24 214:9,17,22 219:24 223:20 226:22 231:21 233:13 241:24 242:5 247:1,4,11

250:17 252:23 253:10 255:16 261:7,25 262:5,5,6 264:15 265:3 266:14,25 267:1 267:16 272:12,19 276:5,10 285:6 287:16 289:24 299:22 300:14 303:10,23 313:24 315:2,7 317:19,23

**questioner** 12:7

**questioning** 56:2 277:10 280:3 295:9 300:12,20 306:20

**questions** 10:10,10 12:10 18:18 19:5 19:14 21:4 22:17 37:14 44:23 96:6 97:12,24 161:7 181:4 182:7,9 231:6 232:8,11,14 241:17,21 247:23 249:15 255:10 260:22,25 261:9 261:10,13 268:12 268:14,23 269:8 277:2,5,10,15,16 277:17,17 281:11 288:15 298:4 304:6,16 306:6,10 307:1,18 312:15 318:17,24 319:1 320:9

**quick** 217:22 268:23 279:4

**quite** 57:25 65:23 72:23 77:19 79:15 106:5

**quote** 136:4 201:10 209:25

**r**

**r** 2:1 3:1 4:1 5:1 6:1 109:13 320:1

**radio** 45:16

**radius** 173:4,5

**raised** 308:18

**ran** 288:20

**random** 240:16 250:1,8

**range** 63:25 148:15

**rangely** 172:16

**ranging** 215:15

**rank** 38:14

**rarely** 159:20

**rate** 217:21 226:15 227:2,5,7

**rates** 132:19 239:15

**raw** 246:5

**ray** 90:20

**reach** 224:20,22 308:3

**read** 19:22 22:18 22:22 28:14 79:18 85:12 104:20,24 115:3 118:21,23 119:9 129:20 132:9,21 139:24 142:7 155:15 281:23 322:5,6,12 323:5,6,17

**reading** 22:8 109:23 141:25 158:3 316:17 321:19

**ready** 97:23 161:6 223:22 277:9

| | | | |
|---|---|---|---|
| **real** 205:18,24 | 232:25 269:4 | **record** 11:16 12:3 | **reduce** 129:19,23 |
| 206:8 207:22 | 271:2,10,13,14 | 12:12 14:25 15:18 | 131:13,14 136:10 |
| 217:22 279:4 | 280:2 300:19 | 18:14 30:14,23 | 142:7,10 149:19 |
| **realize** 154:18 | 304:19 308:16 | 35:8,9 55:12,16,18 | 149:20 152:20 |
| 267:1 | **recalling** 108:23 | 56:20 58:8 71:10 | 162:3 231:13 |
| **really** 137:7 | **receipt** 321:18 | 95:18,23 96:8 | 234:1,2,4 287:13 |
| 144:23 147:17 | **receive** 108:15 | 104:14,24 116:9 | **reduced** 320:10 |
| 158:14 166:20 | 129:25 134:17 | 116:11,15 124:7 | **reducing** 48:1 |
| 170:23 197:18 | 199:19 225:9 | 139:24 140:11 | 131:4 |
| 223:20 237:23 | 226:8 280:18 | 142:5 146:5 160:4 | **reese** 44:16 |
| 273:9 295:14 | **received** 41:19 | 160:6,10 161:1 | **reexamination** 7:8 |
| **realtime** 1:23 10:6 | 56:14 84:7 85:8 | 181:8 210:24 | 307:15 |
| 11:2 200:12 292:1 | 85:17,21 88:6 | 222:23 223:4,12 | **refamiliarize** 28:7 |
| 292:7 | 93:24 94:7 107:19 | 223:14 268:4,5,9 | **refer** 23:17 31:19 |
| **reask** 113:7 | 107:23 122:6 | 275:5 306:18 | 37:14 109:3,14,14 |
| **reason** 19:1 42:17 | 158:25 161:3 | 307:5,7,9,13 | 109:15 122:11 |
| 52:13 76:11 94:2 | 225:11 279:12 | 310:19 312:7,8 | 141:14 154:23 |
| 104:25 176:24 | **receiving** 210:1 | 319:11 323:9 | 170:3 203:7 |
| 181:13 204:1 | 217:20 | **records** 72:1,2 | 206:11 246:22 |
| 217:16 321:14 | **recertify** 74:14 | 76:6 92:16 117:16 | 294:10 297:7 |
| 323:8 324:3 | **recipient** 142:15 | 117:19 269:11 | **reference** 75:16 |
| **reasons** 42:14 | **recognize** 153:16 | 284:14 318:22 | 141:16,18,19 |
| 68:17 | 159:2 204:15 | **red** 28:3,5 75:8 | 163:22 207:1 |
| **recall** 19:13 21:23 | **recognized** 42:15 | 175:8,11,12,24 | 270:9 275:8 321:7 |
| 27:15 34:16,21 | 284:22 | 177:25 178:5,6,9 | 322:2 323:2 |
| 49:16 53:14 54:7 | **recollection** 43:6 | 178:12 182:18 | **referenced** 14:22 |
| 54:10 65:9 68:11 | 65:12 93:5 97:13 | 183:13 190:7 | 14:24 26:5,15 |
| 68:25 69:4,7,10 | 99:24 106:25 | 191:13,14,18 | 102:25 201:24 |
| 73:18 75:2,6,11 | 107:5,14,22 | 192:6 208:2,4,8,8 | 322:11 323:15 |
| 76:8 77:2 90:3,7,8 | **recommend** | 208:9,9 232:17 | **references** 19:20 |
| 90:11,14,16,17,19 | 126:13,23 127:8 | 233:20 264:8,11 | 21:19 26:19 228:9 |
| 92:7,23,25 93:9,17 | 129:18 151:17 | 264:18 285:17 | **referencing** 57:20 |
| 94:14 98:11 99:9 | 167:13 | 286:1,10,18 | 207:8,12 228:8 |
| 105:1,5,10,12,24 | **recommendation** | 287:18 297:24 | 310:14 |
| 106:2 108:1,13,18 | 127:17 152:1 | 298:3,5,16,17 | **referred** 19:20 |
| 115:16 120:1 | **recommendations** | 299:11 300:17,24 | 122:22 123:19 |
| 121:16 122:19 | 8:10 119:19,22 | 301:3,4,10,13,16 | 205:7,11 208:1 |
| 140:25 141:12 | 124:12 | 302:3,5 | 229:18 258:21 |
| 189:4 192:25 | **recommending** | **redirect** 164:20,22 | **referring** 15:9 |
| 203:13 205:15 | 136:13,13 | 268:12 | 20:4 22:11 26:14 |
| 224:25 227:9 | | | 28:19 31:20 |

105:19 106:11
119:2 132:12
137:12 146:23,24
147:5 153:15
183:12 195:16,18
207:5 262:20,22
263:8 265:25
269:19 315:25
**refers**  37:2 110:3
150:23 205:1
263:12 296:7
**refill**  254:18
259:13,21
**refills**  155:18
158:7 259:9
260:10,13
**reflection**  228:12
**reflects**  305:16,17
**refresh**  65:12
99:24 106:25
107:22 207:9
308:20
**refreshes**  97:12
**regard**  36:6 227:5
**regarding**  56:12
102:19 105:16
285:16 286:10
290:11 295:4
297:3,24 305:1
**regardless**  195:14
**regards**  34:12
107:5 308:17
**registered**  1:24
10:7 11:2
**registration**
235:11 236:5,11
236:23
**regular**  18:25
69:11
**related**  29:20
52:14 82:24 85:25

86:18 101:22
105:7 107:23
177:20 202:3
208:6,18 225:14
296:15
**relates**  1:11 198:3
200:8 253:25
297:19 302:15
303:11 304:18
**relating**  203:10
204:9
**relation**  235:2
236:1 294:6
**relationship**  93:14
131:11 133:1
142:12
**relative**  210:1
233:23 238:15,16
294:9
**relatively**  108:12
140:21 215:15
216:23 257:22
**relaxant**  165:14
258:22
**relaxants**  145:6
**relaxer**  165:8,15
**relevance**  132:17
136:16 272:11,17
272:20,20,21,23
**relevant**  29:9,10
71:9 80:24 81:2
81:20 129:20,23
130:2 134:18,19
138:16 143:18
150:16 151:19
163:15 166:8,8,9
169:11 172:4,21
173:25 184:22
187:2 193:22
194:1,5,7,11,15,17
195:5,8 198:3,17

201:4 209:8 219:8
219:9 220:12,13
221:24 241:7
254:13 264:25
265:5 272:14
292:11 303:20
304:25 305:6
**relied**  72:2 185:10
185:15 187:17
192:10 226:10
298:16 299:16
**relief**  47:5 63:17
66:7,15,22 67:17
68:15,17 293:1
**relinquished**
57:19
**rely**  56:21 156:22
298:13 299:19
310:7
**relying**  21:14
32:13 70:19,23
71:14 191:9
**remaining**  218:20
218:23
**remains**  71:8
**remember**  24:10
51:14 59:8 73:7
74:6 104:20
109:17 208:7,13
225:19 294:12
298:4
**reminded**  21:1
**reminders**  18:5
**remote**  1:16 14:3
23:23,25
**remotely**  2:2 3:2
4:2 5:2 6:2 11:9
11:19 44:17
**rendered**  34:10
**renew**  59:5 76:12
77:8

**renewal**  155:24
156:5
**repeat**  52:3 95:21
120:19 261:6
313:24
**repeated**  130:15
**repetitive**  129:19
129:23 155:13,22
**rephrase**  18:16
39:19 188:24
253:9 303:10
**repolarization**
112:2
**report**  7:14 16:16
18:8 19:19 22:10
25:19 26:6,11,15
30:6,24 31:5,14,16
31:20,22 32:1,5,14
32:17 33:1,3,8,11
33:13,17 35:4,10
56:6,6,18,19,22
57:3 59:15 60:25
72:7 77:22 82:25
85:6 108:25
114:23 117:24
118:13 149:6
151:5 172:3
178:21 185:4,6,9
185:10 203:19,20
204:14 218:2
219:17 226:9,12
228:25 229:3
230:8,11,15 231:2
231:5,9 232:7
235:22 250:3
252:25 253:11,18
255:4 260:21
265:9 269:13
270:10,13 272:11
272:15,21,21,24
275:19,22 276:20

281:12,17 285:25
288:1,24 289:15
290:5 295:10,13
295:23 297:25
298:1,2,8,13,15,21
298:22 299:2,5,7,9
299:9,15,17,19,20
299:21,23 301:2
302:9 305:12
310:22 311:1,5
313:8,14 314:11
315:4,11,19 316:8
316:11,16,17
317:2,6 318:2,5,21
**reported** 1:22 48:2
50:14 100:6
132:19 206:22
238:9 239:6 297:8
**reporter** 1:23,25
10:6,7 11:2,3 14:5
15:24 18:7 51:25
67:5 95:9 104:20
104:23 113:3
153:6 159:24
165:11 192:15,20
202:9 242:2 250:5
253:7 258:7
301:25 302:6
303:24 307:4
309:8 312:6 322:7
**reports** 191:13
248:25 249:2
292:1
**represent** 12:4
20:8 95:1 96:3
98:4 100:10 244:7
268:22 270:5
283:23
**representative**
280:10

**representatives**
22:14 199:9
258:12 290:2
**represented** 30:14
36:15 39:21 51:6
126:6 191:17
229:25 230:4
238:1 295:1
298:12 299:15
**representing**
30:15,17 126:7
199:11
**represents** 36:14
36:16 51:4 53:9
100:17 111:23
215:1 320:11
**reprimand** 53:22
**request** 253:1
308:23 312:3
318:18,19 323:9
323:11
**requested** 253:12
253:20 254:4,5
309:9
**requesting** 303:18
304:4
**requests** 254:15
**require** 143:21
216:6 285:8 288:4
306:2
**required** 21:16
74:8 142:17
179:20 197:1,2,3
231:15 238:17
321:25
**requirements** 74:2
74:25 140:6
197:14
**requires** 142:15
150:6

**requiring** 219:3
**research** 19:25
38:2 42:14,16
44:8,17,22 47:22
50:1,5,14 52:9,14
72:10,14 77:18
78:1,6,20 79:3,5
79:12,17 80:5,6
81:2,6,10,11,13,16
81:20 82:3,6,10,18
82:20,23,24 83:2,6
83:23 84:24 86:1
86:2 87:23 88:4,5
88:10 89:12,24
93:23,25 94:3,6,25
98:14,15 100:4,9
101:7 102:8,8,18
105:7,15 107:2,20
108:3,16,17,20
109:2,4,6,12 110:4
112:5,11 113:24
114:19 120:4,20
121:3 122:4
125:12 129:18
136:19 137:5
163:12 170:22
171:24 176:17
196:18 219:6
221:1 282:1,9,20
285:2 287:3
290:11,16 301:15
302:1,4 312:16
**researched** 80:10
312:11
**researcher** 78:11
85:19,23
**researchers** 84:14
84:19
**researching** 84:9
170:15

**resided** 231:15
**residence** 12:15
**residing** 22:3
**resolution** 48:4
**resolve** 143:24
293:7
**resounding** 288:17
**resources** 84:12
150:7
**respect** 19:23,24
21:4 58:20 60:10
68:20 69:2,24
70:3 108:1 120:2
120:19 136:8
138:7,9 146:16
148:25 168:14
174:1 175:12,14
182:18 195:17
219:25 220:3
233:11 247:9
250:25 267:6
275:17 282:1,14
285:17 286:16
287:3,18,24 288:8
289:12,14 291:3
294:5,25 296:2
312:15
**respected** 168:20
**respectfully** 170:6
247:21
**respective** 10:3
**respects** 16:10
**respond** 133:15
**responding** 134:13
**response** 56:8
142:19
**responses** 274:2
**responsibility**
33:7 75:4 251:19
**responsible** 83:24
125:10,24

**rest**  76:24 118:13
**restate**  21:24
　70:25 79:1 84:22
　151:3 154:10
　174:22 191:22
　201:7 207:13
　211:22 226:24
　264:15 265:3
　276:5 317:22
**restrict**  247:23
**result**  21:5 112:4
　130:7,16 134:25
　135:14 138:1
　155:21 172:10
　173:17 214:2
　277:17 320:17
**resulted**  119:17
　152:5
**results**  47:24
　126:21,23 129:17
　139:16 162:25
　214:4,14,23 215:6
　215:9 216:8,16
　278:9,16,16 297:8
**retail**  64:15,17
　92:13 273:22
　274:21 291:3
　317:15 318:8,11
**retained**  13:18
　225:13,17 226:1
**returned**  321:18
**review**  26:21 27:8
　27:12,13,16 28:15
　29:17 30:5 34:8
　39:1,10,12 43:1,3
　87:5 96:14 97:23
　98:18 124:17
　145:20 147:6
　170:12 175:22
　179:21 187:25
　188:5,20 189:3,12

194:4 200:5 261:2
261:19 289:13
301:9 321:12
322:1 323:1
**reviewed**  19:19
　26:19 29:23 32:11
　33:4 71:23 72:6
　144:15 146:8
　147:9 148:3
　183:25 184:1
　185:9 198:16
　204:18 229:13
　232:13 290:1
　308:24 311:2
　313:4,13 315:12
**reviewer**  86:24
**reviewing**  228:24
　229:5 230:7,13,22
　269:3
**revoked**  54:25
**right**  16:22 33:15
　37:3,19,22 41:7,10
　45:20 46:23 47:11
　49:23 59:23 61:14
　62:11,16 72:4
　74:25 84:20 89:10
　91:21 95:25 97:20
　102:22 103:5
　109:18 111:8,14
　119:3 121:9 122:8
　123:3,24 126:9
　134:12 137:20
　138:7 149:20
　152:23 154:22
　155:10,11,11,11
　155:12 156:16
　158:20 159:12
　166:22 168:10,15
　173:21 174:11,14
　176:13 180:13
　185:13,16,24

188:9 193:19
197:8,10,19,20
198:19 199:7
200:21,25 201:2
201:10,25 202:4
203:4 207:8 209:9
210:20 214:3
217:12,16 218:22
219:5 221:20,25
226:2 230:3,9,16
230:17 235:3,6,7
235:23 236:1,25
237:12 240:7,19
241:12,15 249:12
249:16 250:2
252:22 254:8,11
256:8,15,21
258:22 259:18
260:1,17 263:5,24
265:23,24 266:20
269:14,25 270:1
275:12 276:25
277:11 278:8,24
281:7 309:22,22
311:13
**rights**  155:9
**risk**  8:20 9:6
　111:17 112:20
　127:19,22,24
　128:18 137:8
　138:11 153:22
　154:15 155:5
　163:13 167:16
　211:2,10,12 212:1
　212:3,7,8 213:21
　215:16 217:20
　218:5,11 219:2
　221:4,9,25 223:16
　280:1,2,22
**risks**  127:21
　128:14,25 215:20

221:14 277:22
**rite**  5:15 69:16,24
　149:1,5,14 199:9
　269:25 270:1
**road**  244:22
**roads**  145:16
**role**  126:4 166:3
**room**  12:22,25
　13:4
**round**  44:24
**route**  248:20
**rubric**  119:19
　301:8
**rule**  176:15 221:16
**rules**  11:6 174:3,4
　174:5,7,9,12
　175:14,17,17,23
　322:5 323:5
**run**  60:1 215:6
　292:1
**running**  76:14
　219:1
**rx**  2:15 200:2

---

**s**

**s**  2:1 3:1 4:1 5:1
　6:1 10:1 321:15
　323:8,8 324:3
**safe**  78:3
**safely**  129:19,22
　145:11 212:22,25
　213:3,13
**safety**  34:12 83:4
　113:19 131:5,16
　131:17 140:13
　149:9 155:10
　288:13
**saith**  319:15
**salary**  43:21
**salida**  64:22 67:12
**sally**  240:12

**sample** 215:2
278:11,12 279:7
279:10 280:9,15
280:16
**sas** 28:2,3 207:25
208:1,3 232:13
242:14 289:9
297:7
**sat** 114:11,13
**satisfaction** 48:3
48:21,23 50:16
**satisfactory** 39:3,4
**saw** 148:3 182:22
234:5 237:8 254:4
259:20,24
**saying** 55:17 60:18
87:21 95:22 148:2
151:10,11 166:18
167:19,20 170:12
172:2 174:12,13
175:19 199:16
200:15,24 201:9
201:10 210:7,8,11
213:11 231:23
235:15,16 237:7
247:3,5 250:13
252:6 253:15
266:9 267:7
271:16 272:10
304:4,11 314:20
315:20
**says** 58:5 59:20
99:20 101:19
102:17,23 105:14
106:8 118:3,20,24
123:5 129:18
132:15,16 150:5
154:1 155:9,17
165:22 214:15
256:14 262:8,14
278:9 296:23

301:20
**scan** 113:19 245:4
**scenario** 220:17
**schedule** 69:10
115:23,23,24
**scheduled** 115:18
115:19
**school** 36:8 38:3
46:5,7,8,10 62:6
62:10
**science** 38:9
**sciences** 98:24
**scientific** 131:8,21
**scientifically**
195:19
**scientist** 99:25
100:2,13,16
101:12,15
**scientists** 94:17,19
99:21
**scope** 190:16
225:25 272:8
291:20 295:2,17
300:6 302:18
**screen** 108:14
141:21 142:22
200:3 228:3
234:13 235:9
259:20 271:15
309:3 310:25
311:24
**screens** 144:18
147:12 271:7
**script** 201:25
202:5,6 203:21
204:7,21 284:6
308:17 310:16
311:4
**scrolled** 29:13
**sd** 278:10

**se** 82:11 91:9
227:12
**seal** 322:15 323:21
**sean** 90:21
**second** 15:11
24:14,23 26:20
28:18 42:17 51:20
56:9 73:12 75:18
83:1,20 97:22
101:16 102:12
114:25 118:3,15
118:15,16 124:16
126:22 139:19
142:1 157:10,13
157:14 165:21
184:9 185:4
210:20 222:17
255:16 295:24
303:22,22 306:24
**section** 129:17
132:3 162:25
214:14,23 278:9
297:25
**sections** 186:18
261:1,16
**security** 279:16
**see** 18:6 41:12
50:21 75:23 84:13
87:11 97:10,12
99:22 101:25
102:13 106:8
118:7 121:10,23
123:18 126:16
127:1 141:14
149:13 150:8
151:23 153:7
156:2 159:19
163:4 181:12
187:3,7,12 190:21
192:7,18 205:19
205:24 206:7

218:2,7 226:6,7
240:13 241:13
245:8 251:23
255:12 260:3,22
262:10 264:8
267:25 268:1
270:18 271:4,20
271:23 272:1
274:18 278:15
281:21 309:2
**seeing** 108:14
248:5
**seeking** 244:11
256:23
**seen** 22:15 27:2
29:24 96:5 97:15
98:2 103:21
183:23,24 191:4
192:5 255:15
**select** 188:5
**selected** 52:13
54:14 187:25
189:2,10,22
**selecting** 8:11
124:13 188:16,19
**selects** 52:16
**self** 181:5
**semester** 63:16
**semicolon** 261:23
**send** 228:1 312:4
**senior** 125:5,7,9
125:23 161:22,25
162:1
**sense** 53:21 81:15
82:9 91:10 127:23
167:2,7 169:1,24
172:23 174:7,9
175:6 195:22
220:19 249:8
267:16

sensitive 162:17
sent 14:20,25
  15:20 124:2
  288:22 289:18
  299:10
sentence 59:20
  109:1,24 118:19
  126:22 132:16
  139:19 141:25
  150:5 153:14
  158:4 162:13
  278:18 295:24
separate 88:22
separately 231:1
september 15:14
sequence 112:3
series 37:13
  118:23 121:9,14
  126:3 191:5 306:9
  312:14
seriousness 46:12
served 53:5 85:24
  86:9 94:4
server 71:25 275:9
servers 246:13
  273:21 274:20
  275:7,20,22 286:3
service 3:5 9:7
  25:23 223:17
  279:10
services 2:15
  48:20 116:21
  117:2,5 140:5
  274:13
serving 92:1 181:5
set 32:17 52:6
  55:20 126:25
  131:24 139:17,21
  140:15 142:3,5
  151:19 154:3
  175:16,17 215:12

285:7 306:2
sets 74:1 275:2,3
  278:5 284:19
  288:4
setting 111:13
  119:21 140:4
  156:9 157:6
  205:17,18
seven 40:4 121:21
  122:1 232:8,10
  241:17,21 249:15
  260:22,23 261:9,9
  261:16
seventeen 27:1
  193:18 228:24
  230:6 269:3
seventh 4:16
seventy 217:19
  218:10,13 221:3
  221:13,18 280:1
severe 248:14
shape 220:24
  298:13,23
shapira 3:8 268:22
shapira.com 3:13
sharon.desh 5:13
sheet 227:14
  321:13 323:7,10
  323:18 324:1
shelf 54:13 253:13
shibley 2:7
shift 63:14 67:13
  68:18
shifts 67:1,3 68:19
  70:4
shirk 269:16,22
shopping 208:9,9
  233:20,21 238:6
  243:18,22 256:23
short 77:14

shot 259:20
shots 200:3 234:13
show 235:13 297:7
showed 254:14
showing 117:19
  217:23
shown 65:16
  215:13 229:19
  321:16
shows 260:16
sic 222:8
sick 63:14 68:16
side 100:5
sifting 150:19
sigma 77:9
sign 244:21
signal 111:21,22
  133:2,4 150:3
signals 133:21
signature 31:14
  320:20 321:14
signed 33:3 322:13
  323:18
significance 125:4
  132:3
significant 112:10
  148:12 150:11,22
  152:11 238:9
signify 122:2
  125:8,13,17
signing 321:19
signs 145:15,16,20
similar 24:25 25:5
  50:8 54:13 98:16
  278:10 287:17
similarly 70:23
simple 169:13,15
  169:16 220:8
  223:20
simplistic 162:15
  169:19 170:15,25

171:19
simply 171:20,20
sincerely 321:21
single 26:4,21
  68:18 128:21
  170:11 177:6
  196:15 197:9
  300:14 317:14
  318:11
singular 169:23
sir 102:22 270:18
  273:5,7 321:10
sit 114:3,7 237:20
  237:25 245:14
site 69:15 275:9
sits 246:4
sitting 166:25
  168:18,21 241:6
  246:12
situation 134:25
  137:8 144:25
  147:19 148:1
  157:8,9,15 166:9
  166:18 167:10,21
  195:9 220:6,7
  221:22 245:9
  252:10 292:17
  294:4 295:1
situations 137:5
  139:5 143:9,16,16
  143:19 144:11,15
  144:21,23 147:9
  147:15,17 153:21
  154:14 155:4,12
  157:24 163:12
  167:4,15 177:4
  257:24
six 38:25 40:3,17
  42:6 45:6,12,19
  61:13 121:21
  122:1 306:17

**sixty** 278:11,12,20
  279:19
**size** 244:21 269:1
  278:11
**skaggs** 36:20
**skills** 39:2 42:6
**skip** 13:22
**skipping** 132:15
**sleep** 123:12
**slide** 169:16
  310:13
**slides** 309:25
  310:3
**slightly** 62:9
**slow** 134:7 153:8
  242:3,4 266:25
**small** 126:25
  140:21 154:3
  177:19
**smart** 167:21
**smiling** 79:7
**social** 279:16
**society** 48:8
  114:18
**software** 67:23
  68:1 186:9 283:5
  283:5,13 288:20
**sold** 132:6
**solicit** 117:2
**soliloquy** 181:2
**solution** 136:12,13
  152:24 220:4,4
**solutions** 6:9
  78:12 98:25 99:5
  175:23 321:1
  324:1
**somebody** 18:20
  41:23 63:13 99:12
  100:17 159:8
  174:2 192:15
  222:6 236:10

**someplace** 318:16
**somewhat** 29:10
  80:15
**son** 13:8
**sorry** 20:2 22:12
  27:24 30:2 40:8
  42:2 47:3 57:16
  59:10,11 60:6
  63:19 65:10 68:21
  70:25 77:5 79:25
  89:8 94:10 95:21
  99:15 100:14
  103:19 108:5
  113:3,5 118:10
  120:12 124:3
  127:5 130:22
  133:6 137:3 141:4
  143:7 147:5,23
  148:7 151:3
  154:10 174:23
  180:2 181:16
  185:21,22 191:21
  194:22 199:18
  207:5,13 210:16
  211:16 213:18
  214:9 227:18
  229:22 231:21
  235:21 242:2
  251:11 253:15
  254:9 255:8,9
  261:6,23 264:14
  265:10,16 266:18
  269:18 277:19
  281:14 290:16
  297:15 311:18
  317:17 319:6
**sort** 46:13 53:22
  64:2 88:2,3
  114:24 116:20,22
  118:14 135:17
  146:24 149:17

  156:22,23 168:3
  173:25 233:7
  248:1 301:18
**sorts** 135:19 294:2
**sounds** 111:14
  169:13 317:18
**source** 297:23
  298:4
**sources** 153:18
  284:19,19
**south** 4:16
**southern** 47:6
  64:15,18 257:14
**spaeder** 2:19
**span** 122:24 123:2
  123:23 132:13
  152:14 199:12
  253:13,21 254:1
  258:13,15 263:10
  265:13
**span's** 152:10
**spangenberg** 2:7
**spanglaw.com**
  2:12
**speak** 182:24
  308:5
**speaking** 37:4
  38:19 41:24 104:2
  154:23 283:14
  304:8
**special** 144:18
  147:12 182:8
**specialists** 294:6
**speciality** 256:1
**specialties** 233:23
**specialty** 208:15
  256:11,19 263:14
  294:5,7 297:20
**specific** 32:8 42:19
  68:21,22,24 69:4
  75:12 82:8 83:15

  90:8 91:20 101:23
  103:4 105:3
  120:24 121:4
  128:3 140:9
  147:25 156:19
  157:17 158:20
  159:1 162:16
  206:1 218:8
  252:16,19 253:1
  264:8 276:23
  283:19 297:12
  298:3 312:18
  313:22 315:8
**specifically** 28:2
  49:3 66:14 72:13
  75:3,7 81:11 84:8
  92:9 102:21
  105:17 106:8
  113:13 115:9
  118:1 120:1
  121:11,17 148:18
  151:12 182:14
  201:24 231:6
  232:25 254:1
  255:3 271:10
  298:12 300:13
**specificity** 15:9
  20:20 166:2
**specifics** 88:15
  105:12 108:13
  241:18
**specified** 292:7
**specifies** 140:6
**speculate** 217:1,2
**speculative** 103:7
**speed** 237:11,16
**speedometer**
  182:24
**spell** 12:12
**spent** 45:21 228:9
  228:13,17,24

229:3 269:2
306:22
**spinoff** 114:15
**sponsor** 89:18
**spreadsheet** 96:11
96:15 97:2,4,7,14
102:11 103:3,14
105:14 227:20
309:20
**spring** 66:21 224:9
**st** 65:2,3
**staff** 144:24
147:18 209:16
230:23 231:20
239:9 242:9 245:2
247:8,13 283:2
**stage** 215:5
**stakeholders**
87:14
**stand** 50:23
273:10
**standard** 119:21
122:18 123:24
138:1 139:17,23
140:4 142:4
151:19 152:18
201:21 202:3,24
203:2,2,10 204:2,3
204:9 205:2,3,6
278:19,20 284:5,6
284:7,7 285:1,6
308:18 310:14,16
310:18 311:4,12
311:16,19
**standardization**
287:5 295:25
**standardized**
178:19,23 195:17
287:2,22,23
**standards** 9:14
119:6,11,15,18,20

120:9,13,21
149:20 152:25
197:4 203:6
308:21
**standing** 94:21
314:19,25
**standpoint** 66:18
72:10 112:1 216:4
300:23
**stands** 108:24
140:2
**start** 16:15 62:24
98:1 160:20
234:11 296:13
316:1
**started** 38:2 40:5
41:25 42:5 55:9
61:16,21 62:6,10
62:12 64:11 68:6
89:7 93:20 230:19
230:21 314:2
**starting** 95:20
109:11 110:8
231:9 255:12
**starts** 262:2
**state** 11:4 12:11
20:17 22:4 45:22
46:1,5 56:10,11
58:2,3 60:11 74:1
74:5,10 85:10
109:19 162:18
196:3 197:1,14
213:19 230:10
243:3 250:1
251:11 252:23,25
253:11 257:19,21
270:21 284:1
295:24 304:10
320:4,21 322:10
323:15

**stated** 84:24
150:13 203:20
207:23 214:22
220:4 246:23
301:12
**statement** 31:23
32:2,10 48:9 57:6
59:23,25 60:7
65:22 79:13,21
80:1,20,22 82:15
85:14 92:5 115:6
127:3 128:4,7
133:17 143:23
150:23 152:18
153:23 154:5
158:9,10 162:19
168:13 175:6
202:19 213:7,10
213:14 215:17
217:24 220:18,20
231:22 234:3,8
236:14,15 242:13
255:6 260:1,8,13
262:8 264:24
275:21 311:9
322:13,14 323:19
323:19
**statements** 56:3
83:12 104:14
117:16 140:10
166:5 181:5
199:10 221:1
235:18 290:2
291:18
**states** 1:1 11:7
50:12 57:4 76:15
109:1 126:13
132:5 158:5
162:14 211:9
257:13

**stating** 28:23
71:18,19
**status** 60:22 74:20
74:20
**stay** 142:1
**staying** 89:10
**stenotypy** 320:9
**stipulate** 188:12
**stipulated** 10:2
**stipulating** 189:10
**stipulation** 11:8
39:9
**stop** 76:2 133:25
135:11,13 142:15
143:15 145:15,16
145:20 159:8
180:20 182:4
185:3 222:17
238:14 240:25
244:20,21,22
250:11 291:7
**stopped** 196:8
306:16
**store** 66:19 208:20
208:21 239:15
259:15 260:10
263:13 273:11
274:24 289:18
291:5,12,12,15
293:13 294:14
297:3 305:16,18
305:19 306:1
**stored** 178:25
282:4 284:9 287:6
290:12
**stores** 2:16 239:15
239:16 290:24
291:23 292:5
293:9,9 297:2,11
**strategic** 89:1
117:8,18

**strategy** 102:16
**stratification** 218:5
**street** 2:20 4:8,16 5:10 240:12
**strength** 155:20 248:20 296:4,13
**strike** 145:24 146:16,19 163:17 212:20 213:17 247:19 249:10 250:18 289:6 290:7 313:9
**string** 8:5
**studied** 83:14 112:8 174:4,4 175:15
**studies** 38:20 131:7,10
**study** 9:8 72:19 211:8,15,20,25 214:4,6 215:8,18 215:25 216:12 217:5 223:18 243:7 278:3,22 279:13 280:24 281:1,3
**studying** 50:17 169:17 281:20 282:14
**stuff** 185:5 221:23 254:17
**stupid** 154:16,17
**subfolder** 270:3
**subject** 99:19 105:25 149:18 268:12
**subjects** 55:5 214:6
**submission** 178:23 178:24 202:3 203:10 204:9
**submit** 39:8 227:12
**submitted** 31:6,17 227:10,13 284:3 299:21
**subscribe** 202:21
**subscribed** 322:10 323:14 324:21
**subscribers** 255:20
**subsequently** 108:8
**subset** 110:21 214:19
**subspecialty** 208:16 297:20
**substance** 288:11
**substances** 7:23 137:25 190:14,15 191:2 288:11
**substantial** 150:6
**subsumed** 317:2,5 318:2,4
**success** 118:6,21
**successful** 39:12
**suffice** 23:13
**sufficient** 104:4
**suggest** 129:7 159:14 200:13 212:17 213:25 316:18
**suggested** 43:2 202:2 249:19
**suggesting** 127:14 179:11 214:19 220:23,25 237:18 241:2,3,4 266:13 266:15 272:14 288:3 290:5
**suggestion** 220:9
**suite** 2:9,21 3:20 4:17 321:2
**sullivan** 90:21
**summarized** 255:14
**summary** 149:21 231:10,24 233:12 233:13 294:15
**summer** 63:7 66:20,21
**summers** 96:11 98:6,19,21 99:9,9 101:18
**superior** 321:1
**supervision** 320:10
**supervisor** 54:2
**supplement** 284:13,15
**supplied** 298:7 309:9
**supply** 254:18
**supplying** 137:17
**support** 8:12 43:21,22 64:18 69:9 88:5 101:25 102:3 103:5 109:5 119:8,25 121:9 122:3,16,20 123:8 124:14 126:15 132:5 140:8 299:24
**supported** 63:23 64:14 83:5,9 107:16,16 109:3 117:25 118:22 119:6 126:3
**supporting** 32:11 99:20 292:20
**supports** 168:12
**supposed** 118:5,21 213:9 304:11
**suppress** 155:23
**suppressing** 156:4 158:7
**suppression** 156:15
**sure** 14:7 20:25 22:1 28:23 48:16 52:2 58:7 67:24 71:10 73:3 78:23 80:2 82:17 86:15 87:19 101:11 102:6 116:3 122:15,23 146:4 146:14 151:4 153:8 164:20 173:14 184:9 187:5 201:7 203:17 204:1 212:20 214:18 216:14 218:16 225:4 227:4 232:18 240:25 243:7 253:16 254:16 255:5 261:8 264:15 265:2,2,24 266:14 276:6 278:4,6 295:14 306:9 309:2,4,25 310:20 310:25 312:8
**surprised** 193:6 193:10
**survey** 56:12
**swanson** 5:6 247:18,18 277:6 289:5,5,20 291:9 293:18 295:6,19 296:21 300:25

301:5 313:11
**swear** 11:20
**switch** 44:25 55:5
77:17
**switched** 40:10
**sworn** 11:23
322:10,13 323:14
323:18 324:21
**symptoms** 48:3,4
50:10
**system** 71:3,5 72:1
115:2 135:17,24
136:7 139:12
140:19 145:4
147:12 148:19
149:3,5 151:11,11
175:3,7 178:4,5,8
186:9 191:18
198:24 200:2
205:22 218:13,17
218:18 221:2
236:4,5 238:12
245:24 247:15
249:5,19 252:13
252:19 254:25
255:2 259:12
270:17,21 271:18
274:1 282:24
286:10,18 287:18
291:16,17 293:15
300:17 305:2
313:5 314:9
315:10 316:8,10
**system's** 316:19
**systematic** 151:22
**systems** 113:1
119:9,25 130:2
132:5 136:25
138:4,5 139:24
140:7,11 142:5
144:18 151:20

155:18 162:14
165:22 166:1
168:5,21 174:14
174:21 175:2,25
176:4,8 177:8
178:1,25 179:7,11
179:22 186:11
190:17 195:11
196:12,13,14,22
197:6 198:5,5,7,12
198:14,24 199:13
199:21,23 206:1,5
206:10,13 207:2
207:16,20,24
210:5 233:16
234:1 248:15
249:6 251:24,25
252:3,7 257:16
258:5 272:13,18
274:5 275:24
276:3,16,19
282:25 283:6,22
285:11,15,16
286:4 287:2,7,9,21
288:6,17,18 289:4
290:3 291:20
310:12

**t**

**t** 10:1,1 109:13
111:23 320:1,1
**tab** 15:19 65:10
95:4 97:2,6 124:1
124:5 160:17,18
160:18,20,25
161:11 210:19
223:7
**table** 163:23
**tables** 200:1
**tablet** 297:14,15
**tachometer**
237:10,14

**tailored** 252:19
**take** 11:17 16:13
18:23,24,24 19:2,4
26:23 27:11 33:7
55:8 96:2,13
143:24 145:15
152:8 159:11
162:15 169:21
171:15 181:19
212:21,25,25
213:2,13,13 217:6
217:8 218:18,19
222:20 224:3
234:12 240:9
245:9 253:1
257:14 267:19,24
268:2 306:8,10
308:11 312:2
**taken** 10:5 15:17
97:22 306:13
320:8
**takes** 245:16
**talk** 18:9 30:10
32:16 47:7 55:23
64:5 88:14 102:7
117:24 143:22
145:5 157:17
199:2 232:7
235:22 250:1,7
312:7 314:23
**talked** 109:25
191:21 207:10
232:16 240:8
253:7 266:2 269:1
299:4 302:9
304:16
**talking** 13:6 74:23
80:25 87:19 88:3
93:6 105:7 107:21
137:13,24 141:20
146:7,10,25 147:1

154:21 170:10,19
173:9,10 185:25
190:7 197:10,19
200:15 202:7,10
214:20 258:16
265:21 275:3
299:5,8 303:25
313:18 315:22,23
316:7 319:3
**talks** 163:1
**tara** 3:16 12:4
72:24,24 95:11,12
146:12 159:2,20
180:18,18 185:23
189:9 192:13
**target** 211:11
212:2
**task** 139:22 140:1
142:4
**taught** 310:6
**team** 82:20 101:21
101:24 103:4
189:11
**technical** 119:20
204:16 311:3
**technically** 41:24
74:20 153:1
183:16 250:3
**technician** 53:13
142:24 190:22
**techniques** 285:3
**technological**
276:2,8,18
**telecommunicati...**
9:13
**telecommunicati...**
284:5,7 308:18
310:18 311:11,16
311:19
**telephone** 307:23

television  45:17
tell  25:25 85:3,4
    121:7 141:2,7
    154:17 182:19
    187:10 214:10,11
    237:11 246:8
    248:4,6 251:2
    263:18,21,23
    267:12 306:13
telling  166:16
    189:17 241:6,11
tells  107:6 237:11
    240:22
temporarily  77:12
ten  55:8 90:4
    176:14 208:13
    222:17,20 268:2
    297:15 306:8,11
tend  80:15 91:5
tendency  72:25
    127:11
tends  165:25
tenure  38:17
    39:24 40:14 41:2
    41:4,16,18,18,19
    41:20,23 42:5,9,10
    42:25 43:4,6
tenured  39:17,18
    39:19,21,25 40:7,8
    40:10,11,24 42:7
term  39:3 48:5
    82:1,2 88:10
    119:18 127:13,13
    128:11 129:5,7
    134:9 153:17
    154:19 158:5
    161:23 175:9
    179:14 190:8
    213:5,6
terminate  180:23

terms  29:25 33:10
    47:25 66:17
    170:20 173:25
    227:13 230:15
    232:15 233:19
    279:19 280:13,21
    283:11 285:13
    315:20,23
test  206:10 207:24
tested  167:11
    205:23 206:7
    207:19
testified  11:24
    17:25 33:19 60:10
    60:16 61:19 192:9
    228:23 250:10
    303:10,13 313:16
    314:13 318:5
testify  21:16 33:23
    250:14
testifying  19:9
    302:19
testimony  12:19
    13:11 22:9 30:10
    60:11 71:17
    147:21 176:6
    185:24 186:6,14
    186:20 189:24
    196:11 204:6,7
    225:14 226:10,19
    226:20 269:15,19
    269:20 286:24
    295:12,15 302:9
    304:20,23 308:12
    310:21,22 314:5,7
    314:19 315:1
    319:1 322:6,7
    323:6,9,12
texas  4:9 46:21,25
    47:20 58:4,21
    59:23 60:4,11

62:7 68:14 74:5
    74:15 76:12
text  308:7
tfumerton  3:23
thank  13:13,21
    19:7 30:22 31:21
    55:10 59:24 97:9
    104:17,22 120:16
    141:22 160:15
    164:3 262:16
    265:7 268:10,15
    277:7 300:3 302:6
    306:5 319:1,5
thanks  73:2
    301:24
theoretical  131:1
    135:9
theoretically  551:
    236:10 242:19
    244:5
theorized  316:10
theorizing  316:8
therapeutic
    117:19 144:16
    147:10 148:1,4,9
    148:19,21 283:22
therapeutics  89:1
    109:13 110:4
    117:8
therapy  262:18,21
thereof  204:4
thereto  10:14
    320:9
thesis  48:14,18,22
    49:1
thin  108:12
thing  123:20
    149:14 178:13,17
    214:12 219:3,15
    219:15 271:14
    288:21 292:15

313:23
things  110:2 121:6
    139:9,11 143:25
    144:4 176:7 233:3
    271:8 293:6 294:2
    313:8
think  16:14 21:13
    22:1 23:12 24:7
    26:18 28:13 43:5
    51:14 55:20 56:24
    56:25 60:9 69:7,9
    71:2,7,8 74:20
    77:21 81:18 86:8
    88:17 89:4 92:5
    93:10 96:16
    104:25 105:21
    118:4,5,20 120:18
    134:1,8 135:12,13
    136:4 137:7 138:8
    143:15 144:8,24
    146:5 147:18
    149:18 153:14
    158:3 161:23
    172:8 173:10,13
    173:24 176:3,4,5
    179:25 180:16
    181:12 182:14
    183:5 186:12
    191:7 192:11,12
    193:12 196:7
    199:5,24 200:7
    206:19 207:3,16
    207:20 213:3,16
    217:25 224:9
    226:7 227:6
    228:16 238:7
    257:11 275:8
    306:7,25 311:10
    311:18 313:23
    314:1,14 315:25
    316:21,25 317:25

**thinking** 72:14
113:13 148:23,24
296:10
**third** 43:1 73:12
109:1 162:13
202:3,23 203:2
204:9 284:4
**thirds** 114:25
**thirteen** 306:17
**thirty** 37:21,25
61:6 74:7 81:1,3
81:14,19 159:15
159:17 176:13
186:8,13 198:11
245:11 310:3
321:18
**thomas** 44:16
**thought** 86:17
131:13 145:14
148:2 249:15
265:17
**thoughts** 229:7
**thousand** 90:4,6
91:17,18 121:21
121:22 122:1,7
150:18 193:15
195:15
**thousands** 150:13
193:7
**threads** 108:12
**three** 1:12 27:14
38:14 43:3 45:10
67:4,6 81:3,21,23
82:21 119:16,22
154:24 186:22
226:15,23,25
229:14,18 249:2
256:3 310:5
**threshold** 246:15
246:18,19 248:4,5
248:11

**thrown** 240:17
247:21
**thumb** 97:4
**tiers** 74:16
**tim** 99:8,10 101:18
**time** 10:12,13
12:25 16:14 17:22
18:12,17,17,24
23:19 24:5 27:2
28:22 35:22,23,24
39:7 41:11,16
43:11 45:9,22
47:18 49:18 50:6
53:12 54:2 57:25
61:3,9,21,25 62:2
62:3,10,13,14,19
62:23 63:2 64:6
64:10,16,19,23
65:3,6,24 66:11,17
67:1 69:1,13 71:1
71:11 72:11,15,21
73:14 74:10 75:21
75:21 77:3,14
86:23 87:6 91:15
96:2,13 105:11,23
110:8 111:10,24
112:1 114:10,14
116:2,7 128:21
130:3 138:24
145:8 155:12,20
155:24 156:5,21
157:13,15 159:6
159:16 168:23
177:14 180:4
184:2,5 198:8,9,15
203:8,14 204:4,8
210:14 217:10
219:10,10 221:3
227:14 228:1,9,13
228:16 231:2,17
232:24 238:13,13

238:20 240:20
245:5,16 251:24
258:16 268:11
274:7 287:3,23
292:3 303:25
304:10 306:13,14
311:14
**timeline** 176:4
**times** 23:2 63:18
64:14 67:16 78:22
123:15 133:17
143:14 156:14
190:21
**title** 28:5 39:9,14
39:20 43:15,17
50:22
**titled** 124:12 161:1
161:17 211:1
**titles** 53:11
**tn** 2:15 320:23
**today** 11:16,17
12:8,17,20 13:25
14:13,17 15:2,4
17:14 19:6,10
30:11 35:16 71:2
110:7 150:18
176:18 228:18,19
268:11 289:22
307:24 308:12,15
310:8 312:10
319:2
**told** 42:24 54:2
189:9 226:12
304:11
**tolerate** 158:7
**tolerated** 155:25
156:5
**tool** 259:17 286:10
**tools** 50:15 176:10
176:12 179:15
180:12 234:6,9

237:8 259:16,24
260:4 284:11
285:10 287:10,12
292:20 301:21
306:2
**top** 37:15 42:16
51:13 59:10,12
73:11 77:10 84:1
90:25 92:24 98:8
108:23 112:23
114:24 115:16
124:24 140:25
141:12 150:5
191:21 203:13,16
227:8 239:2 262:3
262:13 281:16
**topic** 48:17 49:8
**topics** 158:24
**total** 61:14 67:1
163:3 269:12
270:11
**totality** 251:7,15
280:17
**totally** 97:18 159:7
159:10
**townsend** 90:20
**townzen** 186:7
**townzen's** 186:21
**track** 1:12 39:18
39:19,24 40:7,10
40:11,24 93:21
321:6 322:3 323:3
**tracked** 40:14
**trade** 192:5
**traffic** 17:20 55:3
145:18
**trailed** 146:5
**train** 265:17
**training** 90:23
**transcribed** 322:7

[transcript - understanding]                                    Page 57

| | | | |
|---|---|---|---|
| **transcript** 104:6 320:12,23 321:11 321:12 322:5,12 323:5,11,17 | **truly** 126:25 130:18 131:25 133:10 211:11 212:2 221:9 | 208:13 218:21,23 220:10 222:4,7 239:20 240:10 280:1 281:19 297:14 | **typo** 118:4 |
| | | | **u** |
| **transcripts** 104:10 **transfer** 155:21 198:12 | **truthfully** 14:13 **try** 18:10 79:15 84:13 88:14 | **two** 16:25 23:16 25:1,1,6,8,10 29:18 40:11 41:6 | **u** 10:1 **ubiquitous** 132:17 **uh** 43:8,12 49:22 |
| **transferred** 275:6 **transform** 237:14 | 157:21 216:7 237:20 247:23 | 41:19 42:7,8,14,22 44:14 45:9,21,24 | 66:6 85:13 99:23 102:1,15 106:10 |
| **transmission** 237:15 | **trying** 71:19 73:5 81:15 87:19 168:9 | 46:17 56:5 66:16 67:4,6 74:7,16 | 121:24 174:15 193:20 228:4 |
| **transmitted** 289:18 | 175:16 188:23 189:4 202:11 | 76:15 90:22 96:20 98:7 99:16 111:25 | 229:1 261:22 264:9 266:4 |
| **transparency** 101:20 | 203:12 206:3 210:14 214:21 | 114:25 121:20,25 134:1 152:12 | 269:18 280:4 289:3 311:22 |
| **transparent** 151:21 | 216:21 226:5 236:13,14,19 | 154:21,22,24 170:22 172:17,19 | 317:11 **ultimate** 140:12 |
| **travel** 227:7 **traveled** 241:8 | 244:16 282:24 292:10 296:15 | 177:6 181:3 229:4 229:12 230:3,8,14 | **ultimately** 34:20 149:19 |
| **treatment** 37:3 **tremendous** 177:5 | 308:3,16 311:8 **tune** 135:19 | 246:19 249:23 254:3 257:16 | **unclear** 209:1 226:22 |
| **trial** 10:12 17:25 50:13 | **tuning** 130:16 **turn** 31:13 135:25 | 261:1 270:6,8,9 290:18 294:12 | **undecided** 45:15 **undergo** 39:1 |
| **tried** 282:19 **trigger** 139:4 | 136:20 141:24 165:19 185:6 | **type** 44:7 138:20 142:18,18 157:18 | **undergraduate** 45:19 |
| 165:23 **trinity** 145:6 258:1 | 210:18 220:5 **turned** 136:1 | 170:14 187:11 216:5 242:20 | **understand** 13:9 13:13 14:9 18:16 |
| 258:17,20 **trivial** 144:4 150:6 | **turning** 59:14 136:6 | 243:2 **types** 78:7 128:17 | 30:2 31:20 33:10 110:23 120:6 |
| 159:21 **trouble** 118:9 | **twelve** 74:3,8 **twenty** 44:3 61:7 | 177:16,17 209:20 244:7 | 127:5 135:11 153:6 160:12,14 |
| **true** 35:12 36:10 65:23 71:2 115:6 | 62:22 63:1,9 67:1 67:3 70:4 80:25 | **typewriter** 68:7 **typewriting** | 165:11 188:19,23 189:14 193:21 |
| 127:3,6 131:19 168:17 201:18 | 81:2,19 83:3 91:17 166:24 | 320:10 **typical** 39:23 40:2 | 221:21 225:6,21 229:11 236:19 |
| 204:19 216:17 222:1 235:20 | 167:1 168:21,25 168:25 169:20,22 | 67:13 246:9 296:8 **typically** 67:14 | 250:5,6 252:12 260:21 266:14 |
| 260:1 264:6 265:8 265:10 278:2 | 169:23 170:11,14 171:21 172:9,13 | 125:19 242:22 249:3 284:3,9 | 267:15 274:9,12 274:23 276:6 |
| 286:11 320:11 | 176:13 179:12 186:8,13,16,16 | 291:13 294:20 | 299:22 307:16,20 **understanding** 20:10,13,23 22:5 86:16 87:20 |

185:18 186:19
188:16,18 189:2
189:14,17 191:16
235:23 237:3,4,5
264:13 275:15
**understood**  22:2
141:10 201:8
**undertake**  131:9
**undertaking**  150:6
150:11
**undisclosed**
293:18
**unethical**  299:3
**unfortunately**
165:22 288:13
**unify**  152:25
**unifying**  152:18
**unique**  216:5
283:21 296:9
**united**  1:1 11:7
132:5
**units**  155:21
305:14
**universe**  189:18
**university**  31:3
33:13,16 36:21
37:10 38:3,7,8
40:9,16,21 41:3,6
42:4,12,13,15,18
42:24 43:9,25
44:2,5,13 45:2,18
45:25 46:2,21,25
46:25 47:20 49:21
50:1 62:7 84:4,5,5
84:6 94:1,5,23
98:20 102:14
105:6 110:9,11
111:11,12 231:1
**unnecessary**
135:20

**unquote**  209:25
**unremarkable**
107:10
**unsure**  204:17
**update**  35:22 58:1
**updated**  202:20
**use**  9:6 20:16 39:3
51:8 69:8 71:4
78:3,6 82:2,19
83:15 116:17
119:17 127:12,13
127:18 129:7,10
132:7 134:9
137:20 140:8
144:13 148:13
149:2 153:17
154:19 158:5
166:12 168:7
170:21 171:4,7
175:8 179:13
205:2 212:13
219:13,14 223:16
231:13,20 232:21
232:23 233:17
234:1,2,4,5 238:9
239:16 241:1
242:10 243:10
246:10 248:21
257:25 262:10
263:2,4,7,8 264:14
265:1,5,14,22
266:6,10,10 267:9
267:13 280:20
283:6,15,19
284:12,14 285:7
286:11 287:25
290:9 294:1
296:18 302:10
314:2
**useful**  145:9
171:13 177:13

247:5,5,6 257:11
257:24 283:1
**useless**  145:14
**user**  177:9
**uses**  152:14
205:14 281:6
**usually**  38:25
63:23 68:18 74:3
74:12 85:25
100:24 101:4
117:3 125:9,22
136:9 186:10
283:19
**utah**  31:3 33:14,16
36:21 37:10 43:25
44:5,13,18 84:6
231:1
**utilization**  72:20
135:4 136:8
145:20 179:21
200:4 209:17
241:25 242:8
247:11 248:22
261:2,19 262:4
301:8 305:18,19
**utilize**  113:2,10
280:11 283:12
**utilized**  249:20
250:21 287:8
299:11
**utilizing**  298:18
304:17

**v**

**v5.0.**  311:4
**vacuum**  182:18
**validate**  215:19
**validated**  163:3
**validation**  205:20
**valley**  12:15
**variance**  278:21

**variants**  106:17,22
107:4 204:4 296:2
**varied**  50:7 203:7
**variety**  241:23
283:22
**various**  22:14
32:11 45:15 47:5
47:11,13 68:17
82:21 85:10 86:25
87:5,23 88:7
92:22 140:20
153:18 182:20
192:23 193:16
245:12
**vary**  63:5,22
255:25
**vast**  78:19 79:2,5
79:19 80:5,9,20
81:5 82:1 132:4
145:24 212:24
213:5,12 238:2,3
**vehicle**  237:16
**vendor**  122:19
200:1 208:2,4
**vendor's**  285:11
**vendors**  121:22
122:7,10 123:20
123:21 132:6,12
152:21 179:6
253:22 262:8,24
263:3
**verbal**  18:6,8
**verify**  226:3
**veritext**  6:9 321:1
321:7 324:1
**veritext.com.**
321:17
**version**  36:13
202:17,23 203:21
203:24,24,25,25
204:8 205:7,8,10

205:13 310:16
311:12
**versus** 74:17 131:1
167:25 168:1,2,3
266:16 292:12
293:13 296:11,11
**vice** 98:22
**video** 1:16 222:17
268:15
**videographer** 6:8
11:15 55:11,15
116:10,14 160:5,9
222:15,16,22
223:3 268:3,8
306:12,15,23
307:2,8,12 319:10
**videotaped** 11:17
**view** 7:24 128:13
143:4 152:23
244:11 251:9
**violation** 55:3
**visit** 75:24 291:12
**visiting** 257:3
**vitae** 7:19
**volume** 15:13
208:19,20
**volunteer** 114:1

**w**

**wacker** 3:19
**wait** 18:11 103:17
103:18,18 104:8,8
104:8,9 146:11
164:12 180:5,6,6
181:6 200:19
**waiting** 104:1
**waived** 321:19
**walgreen** 5:5,5
**walgreens** 5:4
54:9 68:20 69:2
70:9 71:2,12,20,21
72:5,10,16 73:14

196:21 247:19
277:6 289:6
290:19 291:4
**walk** 77:19
**walks** 292:25
**walmart** 3:15 4:4
12:4,8 64:21
66:15,15 67:1,12
67:19 68:6,7 70:3
70:5,20 71:12,14
184:11,12,21
185:15,19,21
186:5,14 187:20
199:3,5,9,17,18,20
200:6 201:4,15
234:12 243:14
252:13,16,19
254:20,22 259:12
**walmart's** 68:1
**want** 15:20 16:3,5
41:22 44:25 47:7
55:23 56:2 75:15
86:14 87:24 96:6
104:5,9,12 110:2
117:24 123:1
134:7 137:7,11
138:23 143:9,14
144:3,23 145:12
146:4,13 147:17
154:19 157:7,25
160:19 164:20,22
167:24 169:16
173:14 174:22
180:21 181:9,25
185:6 189:7
204:11 211:22
213:18 214:9
216:8 220:1,17,20
231:8 233:9
244:20 253:16
268:1,25 273:2

276:5 277:18
300:8 307:4
310:20 317:18
**wanted** 42:19
44:24 56:19
105:21 117:11
187:3 223:23
269:7
**wanting** 107:8
**warfarin** 148:13
148:14,14,15,20
**warn** 152:19
**warning** 53:22
139:4 149:12
150:14,20 151:1,6
157:18 166:19
182:2,3 196:13
248:15 259:21
285:14 286:9
288:7
**warnings** 130:15
135:9 136:14,25
145:13,14 152:16
156:15 157:12,14
176:2 182:19
189:25 190:3,5,10
190:21,24 191:5
192:6 209:19
248:13 255:19
262:9,18 263:4
264:25 265:4,12
284:24 287:18
**warns** 282:15
**warrant** 301:23
**washington** 38:4
49:21 50:2
**waste** 219:9
**wave** 14:6 111:23
111:23
**waves** 111:22,25

**way** 48:2 67:9
87:9 100:12
104:11 109:14
118:17 125:16
126:7 136:21
146:1 149:11
157:8 174:8 175:1
181:13 183:22
201:15 207:20
213:8,12 220:23
222:11 252:4,8
263:23 280:19
292:2 298:13,23
312:7
**ways** 101:23 103:4
170:16 282:25
283:23
**website** 110:25
111:2,4
**week** 24:6,9,11,19
25:3 27:7 62:4,19
63:1,10 64:2,3
101:20 123:11,11
123:14 224:10,13
226:2,11
**weekend** 68:19
**weighed** 128:19
**weinberger** 2:5
7:7 13:15 18:10
18:12,17 20:6,25
21:8,9,12,19 23:2
23:3,20 24:3,17,21
25:11 26:3 30:9
30:13 33:24 34:22
55:18 60:24 72:24
79:22 80:2,12
81:8 82:16 84:21
94:9,13 95:12
96:18,24 97:1,9,18
102:4 103:6,17
104:5,8 105:20

106:13 107:25
116:1,4,6,24 117:9
117:14,21 124:3
128:8 129:2,14,24
130:8 131:6
133:11 134:15
135:21 138:14
141:4,10 144:8
146:11,15 147:3
148:6 149:22
157:2 159:11,19
164:12,14,21
165:2 167:3 169:2
170:1,17 171:23
172:11 178:15
180:5,18,22 181:6
182:2,16 185:23
186:24 187:4,8,13
187:22 188:2,12
188:22 189:6,20
192:11,17 194:3
194:12 195:1
196:6 200:19
202:7,10 209:11
213:15 218:15
219:18,22 221:6
221:10 224:7,17
227:15,17,20
228:9 240:18
244:14 249:17
258:10 259:19
260:2,6,18 261:4
265:19 266:7,17
266:24 267:23
268:13 277:9,13
278:15,18 279:18
279:24 280:8,13
281:5,10 282:7,12
283:3,10 284:21
285:12,21 286:5
286:15,21 287:14

289:8,25 291:1
293:11,20 295:18
295:22 296:18,23
297:22 298:14
299:4,8 300:3,15
301:6,24 302:8,25
303:9,19 304:9,13
304:24 305:7,11
306:5,12,21,25
307:6,18,24 308:6
309:10,17,21
312:5,13 313:20
315:13,17 316:13
317:16 318:25
319:8 321:5
**weinberger's**  26:2
**welcome**  302:7
**went**  42:8 46:10
  61:20 73:8 106:3
  181:1,2 241:9
  250:1,7 265:16
**west**  3:19 5:10
**whatsoever**
  249:13 293:3
**wheels**  237:15
**wherewithal**
  175:20
**wholesaler**  93:6
  198:7
**wholesalers**
  198:13
**wide**  302:10
**wife**  13:8
**winded**  137:3
**window**  192:18
**winter**  66:23,23
  67:20
**wise**  165:23
**wish**  228:21
**witness**  11:11,20
  104:2 180:24

181:20 186:4
189:24 277:4
300:9 320:13
321:8,11 322:1,4
322:11 323:1,4,15
**witnesses**  181:21
  182:9
**witness'**  321:14
**wolf**  138:24
  166:21
**wolters**  123:2
**word**  50:22 84:13
  120:14 165:12
  284:20 314:2
**words**  33:8 74:16
  87:24 138:10
  211:18 220:21
  295:21
**work**  21:2,18
  36:14 42:19 43:19
  44:10,18,19 45:6
  47:5 51:5 56:13
  61:24 62:14 63:8
  63:11,16,22 64:2,3
  64:7 68:15 70:9
  83:4,8,10 86:16
  90:12 92:3 93:15
  107:11 126:6
  129:3 142:22
  143:2 150:22
  155:12 156:8
  186:11 190:16
  205:24 206:8
  227:11 273:1
  274:9,13,14,15,22
  275:20,22,24
  278:5 290:10
**worked**  46:16 47:3
  47:3,10,12,14 50:7
  61:8 62:1 64:12
  64:24 65:7,15,19

65:24,25 66:3,5,11
66:15 67:11,19
68:5 69:12,15,18
69:21,25 70:5,9,12
70:15 71:1,21
72:15 99:4,12
152:12 273:2,21
275:15
**working**  62:10,12
  62:20 63:9,13
  65:3 68:6 69:3
  71:22 99:13
  105:23 196:1
  228:13 230:19
**works**  55:9 126:1
  205:19
**world**  38:15
  205:18,24 206:8
  207:22
**worry**  218:24
**write**  48:14 83:2
  114:25 126:23
  132:3 151:16
  211:7 212:9 230:8
  236:7 244:22
  263:18 312:22
  313:1
**writing**  32:25
  101:18 125:18
  135:14 229:3
  230:11 299:18
**written**  28:15 56:7
  106:1,3 116:23
  125:14 208:2,4,10
  211:13,19,21
  231:6 294:16
  296:24 312:21
**wrong**  50:22 54:12
  54:13 57:23 60:1
  121:7 123:2
  134:24,25 200:25

[wrong - zuckerman.com]

Page 61

201:11 214:12
269:23
**wrote**   103:9
  158:11 162:21,22
  236:12,16 256:15
  256:16 265:9

### y

**y'all**   253:7 303:25
**yeah**   13:8,8 21:11
  22:6,13,15 25:5
  29:1,1 34:18
  37:23 38:1 40:19
  40:19 50:3 60:6
  65:21 73:10 79:9
  87:10 89:15 93:9
  95:22 97:25 98:9
  98:16 99:2 103:10
  109:9 111:9 116:5
  116:8 118:13
  120:17 137:16
  141:6,22 149:24
  150:12 154:24
  155:1 166:6
  168:11 177:2,2
  179:1 202:25
  205:5 214:10,17
  215:10 218:9,9
  220:22 222:2,25
  224:14 227:16
  229:24 232:19
  235:4 236:2 237:1
  239:10 247:5
  255:21 262:19
  265:12 281:15
  302:7 307:2,2,6
  309:21,21 310:9
  314:25 318:13
**year**   43:1,3 45:5,6
  45:7,23 56:13
  64:9 67:9 69:13
  74:5,7,9,9 91:17

91:18 224:16
  225:19 245:12
**year's**   67:12
**yearly**   74:24
**years**   37:21,25
  38:25 40:3,11,17
  40:18 41:6,19
  42:6,7,8 44:3 45:9
  45:10,12,20,21,24
  45:25 46:17 60:1
  61:6,7,13 62:21
  81:15 82:21 83:3
  88:7 105:4 176:9
  178:20 179:13
  198:11 205:1
  225:16,20 231:16
  278:12,21 281:19
  282:4 310:5
**yep**   245:7
**yesterday**   24:10
  25:7 227:16,21
  228:1
**york**   5:20,20

### z

**z**   109:13,19
**zero**   42:5 64:4
**zinmaster**   95:10
  97:1 118:10
**zinsmaster**   4:13
  309:14
**zoom**   11:9
**zuckerman**   2:19
**zuckerman.com**
  2:24

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.