1          UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF OHIO
2                EASTERN DIVISION
3

    IN RE: NATIONAL        )
4   PRESCRIPTION           )   MDL No. 2804
    OPIATE LITIGATION      )
5   _____    )   Case No.
                           )   1:17-MD-2804
6                          )
    THIS DOCUMENT RELATES  )   Hon. Dan A.
7   TO ALL CASES           )   Polster
8

            FRIDAY, JULY 12, 2019
9

    HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10           CONFIDENTIALITY REVIEW
11                VOLUME II
                    - - -
12
13        Videotaped deposition of Michael
14   Mapes, held at the offices of The Mining
15   Exchange, A Wyndham Grand Hotel & Spa, 8
16   South Nevada Avenue, Colorado Springs,
17   Colorado, commencing at 8:01 a.m., on the
18   above date, before Carrie A. Campbell,
19   Registered Diplomate Reporter and Certified
20   Realtime Reporter.
21
22
23                  - - -
        GOLKOW LITIGATION SERVICES
24    877.370.3377 ph | 917.591.5672 fax
             deps@golkow.com
25

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A P P E A R A N C E S :
 2
       LANIER LAW FIRM, P.C.
 3     BY:  W. MARK LANIER
            wml@lanierlawfirm.com
 4          RACHEL LANIER
            rachel.lanier@lanierlawfirm.com
 5          ROBERT LEONE
            robert.leone@lanierlawfirm.com
 6     10940 W. Sam Houston Parkway N., Suite 100
       Houston, Texas 77064
 7     (713) 659-5200
 8
 9     GREENE, KETCHUM, FARRELL, BAILEY
       & TWEEL LLP
10     BY:  PAUL T. FARRELL, JR.
            paul@greeneketchum.com
11     419 Eleventh Street
       Huntington, West Virginia 25701
12     (314) 525-9115
13
14     MCHUGH FULLER LAW GROUP
       BY:  MICHAEL J. FULLER, JR.
15          mike@mchughfuller.com
            AJ ELKINS
16          aj@mchughfuller.com
            (VIA REALTIME STREAM)
17     97 Elias Whiddon Road
       Hattiesburg, Mississippi 39402
18     (601) 261-2220
19
20     SIMMONS HANLY CONROY LLC
       BY:  LAURA L. FITZPATRICK
21          lfitzpatrick@simmonsfirm.com
            SANFORD SMOKLER
22          ssmokler@simmonsfirm.com
            (VIA REALTIME STREAM)
23     112 Madison Avenue
       New York, New York  10016-7416
24     (212) 784-6400
25
```

```
 1       BARON & BUDD, P.C.
         BY:   MARK PIFKO
 2             mpifko@baronbudd.com
               JAY LICHTER
 3             jlichter@baronbudd.com
               (VIA REALTIME STREAM)
 4             STERLING CLUFF
               scluff@baronbudd.com
 5             (VIA REALTIME STREAM)
         15910 Ventura Boulevard, Suite 1600
 6       Encino, California 91436
         (818) 839-2333
 7
 8
         SPANGENBERG SHIBLEY & LIBER LLP
 9       BY:   PETER WEINBERGER
               pweinberger@spanglaw.com
10             (VIA TELECONFERENCE)
         1001 Lakeside Avenue East, Suite 1700
11       Cleveland, Ohio 44114
         (216) 600-0114
12
13
         MOTLEY RICE LLC
14       BY:   LINDA SINGER
               lsinger@motleyrice.com
15             (VIA REALTIME STREAM)
               AMANDA UNTERREINER
16             aunterreiner@motleyrice.com
               (VIA REALTIME STREAM)
17       401 Ninth Street NW, Suite 1001
         Washington, DC 20004
18       (202) 232-5504
19
20       LEVIN PAPANTONIO THOMAS MITCHELL
         RAFFERTY PROCTOR, P.A.
21       BY:   PAGE POERSCHKE
               ppoerschke@levinlaw.com
22             (VIA REALTIME STREAM)
         316 South Baylen Street
23       Pensacola, Florida 32502
         (850) 435-7000
24       Counsel for Plaintiffs
25
```

```
 1      NAPOLI SHKOLNIK, PLLC
        BY:   HUNTER SHKOLNIK
 2            hunter@napolilaw.com
              (VIA TELECONFERENCE)
 3            SHAYNA SACKS
              ssacks@napolilaw.com
 4            (VIA REALTIME STREAM)
              JOSEPH CIACCIO
 5            JCiaccio@napolilaw.com
              (VIA REALTIME STREAM)
 6      360 Lexington Avenue, 11th Floor
        New York, New York 10017
 7      (212) 397-1000
        Counsel for Cuyahoga County
 8
 9
        US DEPARTMENT OF JUSTICE
10      BY:   JAMES R. BENNETT, II
              james.bennett4@usdoj.gov
11      United States Courthouse
        801 West Superior Avenue, Suite 400
12      Cleveland, Ohio 44113
        (216) 622-3988
13
        and
14
        US DEPARTMENT OF JUSTICE
15      BY:   MARIAMA C. SPEARS
              mariama.c.spears@usdoj.gov
16      8701 Morrisette Drive
        Springfield, Virginia 22152
17      (202) 598-6204
        Representing the US DOJ and the Witness
18
19
        REED SMITH LLP
20      BY:   SHANNON MCCLURE
              smcclure@reedsmith.com
21            ABIGAIL PIERCE
              abigail.pierce@reedsmith.com
22      1717 Arch Street, Suite 3100
        Philadelphia, Pennsylvania 19103
23      (215) 851-8100
        Counsel for AmerisourceBergen
24
25
```

```
 1      WILLIAMS & CONNOLLY LLP
        BY:  JENNIFER G. WICHT
 2           jwicht@wc.com
             BRAD MASTERS
 3           bmasters@wc.com
        725 Twelfth Street, N.W.
 4      Washington, DC 20005
        (202) 434-5331
 5      Counsel for Cardinal Health, Inc.
 6
 7      COVINGTON & BURLING LLP
        BY:  CHRISTOPHER K. EPPICH
 8           ceppich@cov.com
        1999 Avenue of the Stars
 9      Los Angeles, California 90067
        (424) 332-4764
10
        and
11
        BY:  MEGHAN E. MONAGHAN
12           mmonaghan@cov.com
        850 Tenth Street, NW
13      Washington, DC 20001-4956
        (202) 662-6000
14      Counsel for McKesson Corporation
15
16      JONES DAY
        BY:  NEAL J. STEPHENS
17           nstephens@jonesday.com
             PATRICK BEISELL
18           pbeisell@jonesday.com
             (VIA TELECONFERENCE)
19      1755 Embarcadero Road
        Palo Alto, California 94303
20      (650) 739-3939
        Counsel for Walmart
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1       KIRKLAND & ELLIS, LLP
         BY:   JENNIFER LEVY
 2             jennifer.levy@kirkland.com
               CATIE VENTURA
 3             catie.ventura@kirkland.com
         1301 Pennsylvania Avenue, N.W.
 4       Washington, DC 20004
         (202) 879-5000
 5       Counsel for Allergan Finance, LLC
 6
 7

         BARTLIT BECK LLP
 8       BY:   KATE SWIFT
               kswift@bartlit-beck.com
 9       54 West Hubbard Street, Suite 300
         Chicago, Illinois 60654
10       (312) 494-4400
         Counsel for Walgreens
11
12

         DECHERT LLP
13       BY:   ERIK W. SNAPP
               erik.snapp@dechert.com
14       35 West Wacker Drive, Suite 3400
         Chicago, Illinois  60601
15       (312) 646-5800
         Counsel for Purdue Pharma
16
17

         ROPES & GRAY, LLP
18       BY:   WILLIAM DAVISON
               william.davison@ropesgray.com
19       800 Boylston Street
         Boston, Massachusetts 02199-3600
20       (617) 951-7000
         Counsel for Mallinckrodt & SpecGx
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        BARNES & THORNBURG LLP
          BY:  WILLIAM A. HAHN
 2             william.hahn@btlaw.com
          11 South Meridian Street
 3        Indianapolis, Indiana  46204-3535
          (317) 236-1313
 4        Counsel for HD Smith
 5
 6        MORGAN, LEWIS & BOCKIUS LLP
          BY:  JOHN P. LAVELLE, JR.
 7             john.lavelle@morganlewis.com
          1701 Market Street
 8        Philadelphia, Pennsylvania 19103-2921
          (215) 963-5000
 9        Counsel for Rite Aid
10
11        LOCKE LORD LLP
          BY:  BRANDAN MONTMINY
12             brandan.montminy@lockelord.com
          2200 Ross Avenue, Suite 2800
13        Dallas, Texas 75201
          (214) 740-8445
14        Counsel for Henry Schein, Inc., and
          Henry Schein Medical Systems, Inc.
15
16
          ZUCKERMAN SPAEDER LLP
17        BY:  ANTHONY M. RUIZ
               aruiz@zuckerman.com
18             (VIA TELECONFERENCE AND STREAM)
          1800 M Street NW, Suite 1000
19        Washington, DC  20036-5807
          (202) 778-1800
20        Counsel for CVS Indiana, LLC, and
          CVS RX Services, Inc.
21
22
23
24
25
```

```
 1       O'MELVENY & MYERS LLP
         BY:   RYAN SYNDER
 2             rsnyder@omm.com
               (VIA TELECONFERENCE AND STREAM)
 3             AMY LUCAS
               alucas@omm.com
 4             (VIA REALTIME STREAM)
               SETH BAGLIN
 5             sbaglin@omm.com
               (VIA REALTIME STREAM)
 6       1999 Avenue of the Stars, 8th Floor
         Los Angeles, California 90067
 7       (213) 430-6326
 8       and
 9       TUCKER ELLIS LLP
         BY:   JEFFREY C. SINDELAR, JR.
10             jeffrey.sindelar@tuckerellis.com
               (VIA TELECONFERENCE)
11       950 Main Avenue, Suite 1100
         Cleveland, Ohio  44113-7213
12       (216) 696-3697
         Counsel for Janssen and Johnson &
13       Johnson
14
15       MORGAN, LEWIS & BOCKIUS LLP
         BY:   MAUREEN K. BARBER
16             valerie.toth@morganlewis.com
               (VIA TELECONFERENCE AND STREAM)
17       One Oxford Centre, 32nd Floor
         Pittsburgh, Pennsylvania 15219-6401
18       (412) 560-3300
         Counsel for Teva Pharmaceuticals
19       USA, Inc., Cephalon, Inc., Watson
         Laboratories, Inc., Actavis LLC,
20       Actavis Pharma, Inc., f/k/a Watson
         Pharma, Inc.
21
22
23
24
25
```

```
 1        MARCUS & SHAPIRA LLP
          BY:   JOSHUA A. KOBRIN
 2              kobrin@Marcus-Shapira.com
                (VIA TELECONFERENCE AND STREAM)
 3        301 Grant Street, 35th Floor
          Pittsburgh, Pennsylvania 15219-6401
 4        (412) 338-4690
          Counsel for HBC
 5
 6
          FOX ROTHSCHILD LLP
 7        BY:   ZACHARY MARTIN
                Zmartin@foxrothschild.com
 8              (VIA TELECONFERENCE)
          2700 Kelly Road, Suite 300
 9        Warrington, Pennsylvania  18976-3624
          (215) 345-7500
10        Counsel for Prescription Supply, Inc.
11
12        CAVITCH FAMILO & DURKIN, CO., L.P.A.
          BY:   ERIC J. WEISS
13              eweiss@cavitch.com
                (VIA TELECONFERENCE)
14        1300 East 9th Street
          Cleveland, Ohio  44114
15        (216) 621-7860
          Counsel for Discount Drug Mart
16
17
          FOLEY & LARDNER LLP
18        BY:   KATY K. KOSKI
                kkoski@foley.com
19              (VIA REALTIME STREAM)
          111 Huntington Avenue, Suite 2500
20        Boston, Massachusetts 02199-7610
          (617) 342-4000
21        Counsel for Anda
22
23
24
25
```

```
 1        BAILEY WYANT PLLC
          BY:  JUSTIN TAYLOR
 2             jtaylor@baileywyant.com
               (VIA REALTIME STREAM)
 3        500 Virginia Street East, Suite 600
          Charleston, West Virginia 25301
 4        (304) 345-4222
          Counsel for West Virginia Board of
 5        Pharmacy

 6

 7   ALSO PRESENT:

 8        SPECIAL MASTER DAVID R. COHEN
          david@specialmaster.law
 9        24400 Chagrin Boulevard, Suite 300
          Cleveland, Ohio 44122
10        (216) 831-0001

11

          Juan Wilson, Lanier Law Firm
12        Georgia Macy, Lanier Law Firm

13

14   VIDEOGRAPHER:

          DAN LAWLOR,
15        Golkow Litigation Services

16                     - - -

17

18

19

20

21

22

23

24

25
```

```
 1                          INDEX
 2                                              PAGE
 3     APPEARANCES.................................. 312
 4     EXAMINATIONS
 5       BY MR. LANIER.............................. 324
 6       BY MS. MCCLURE............................. 509
 7       BY MR. EPPICH.............................. 522
 8       BY MS. FITZPATRICK......................... 537
 9
10                        EXHIBITS
11       No.      Description                     Page
12     Mapes 4A    July 23, 1998 US Department of   454
                   Justice, DEA letter to Chris
13                 Zimmerman,
                   ABDCMDL00269347 -
14                 ABDCMDL00269357
15     Mapes 20    ABDC Privilege Log - Alaska      332
                   Subpoena,
16                 ABDCMDL00037421 -
                   ABDCMDL00037422
17
       Mapes 21    "The Drug Industry's Triumph     345
18                 Over the DEA,"
                   Higham and Bernstein
19
       Mapes 22    E-mail(s).                       355
20                 His-MDL-00064822 -
                   his-MDL-00064825
21
       Mapes 23    E-mail(s),                       358
22                 His-MDL-00650515 -
                   his-MDL-00650522
23
       Mapes 24    Mike Mapes LinkedIn profile      360
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

| | | | |
|---|---|---|---|
| 1 | Mapes 25 | Organizational chart, | 365 |
| 2 | | ABDCMDL00046783 -<br>ABDCMDL00046788 | |
| 3 | Mapes 26 | E-mail(s), | 395 |
| 4 | | ABDCMDL00315883 -<br>ABDCMDL00315884 | |
| 5 | Mapes 27 | Conference call with Mr. John<br>Gilbert, December 6, 2005 | 401 |
| 6 | | memorandum,<br>US-DEA-00000369 - | |
| 7 | | US-DEA-00000370 | |
| 8 | Mapes 28 | January 18, 2006 letter from<br>McKesson to Joseph T. | 407 |
| 9 | | Rannazzisi,<br>US-DEA-00000503 - | |
| 10 | | US-DEA-00000506 | |
| 11 | Mapes 29 | Settlement and Release Agreement<br>and Administrative Memorandum of | 408 |
| 12 | | Agreement,<br>MCKMDL00337001 - MCKMDL00337024 | |
| 13 | | | |
| 14 | Mapes 30 | Internet Pharmacy Data meeting<br>with AmerisourceBergen DEA<br>Headquarters August 10, 2005 | 412 |
| 15 | | | |
| 16 | Mapes 31 | Suspicious Order Reporting<br>Policy and Procedure, | 456 |
| 17 | | ABDCMDL00478320 -<br>ABDCMDL00478322 | |
| 18 | Mapes 32 | Mark Lanier handwritten<br>demonstratives | 509 |
| 19 | | | |
| 20 | Mapes 33 | Deposition of Michael Mapes,<br>September 16, 2016,<br>ABDCMDL00046855 - | 517 |
| 21 | | ABDCMDL00046856; ABDCMDL00046909<br>- ABDCMDL000466910 | |
| 22 | | | |
| 23 | Mapes 34 | 1:17-md-0804-DAP, list of<br>attorneys | 522 |
| 24 | Mapes 35 | Handwritten demonstratives by<br>plaintiffs further marked up by | 537 |
| 25 | | defendants | |

Highly Confidential - Subject to Further Confidentiality Review

```
1    Mapes 36    Irpino Law Firm Memorandum, from      541
                 Pearl Robertson to File, Date
2                July 11, 2019
3    Mapes 37    Excerpt from Volume II of the         543
                 deposition of Thomas Prevoznik,
4                April 18, 2019
5    Mapes 38    Appendix B,                           553
                 MCKMDL00355349 - MCKMDL00355415
6
         (Exhibits attached to the deposition.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    VIDEOGRAPHER:  We are now on
 2           the record.  My name is Dan Lawlor.
 3           I'm the videographer with Golkow
 4           Litigation Services.
 5                    Today's date is July 12, 2019.
 6           The time is 8:01 a.m.
 7                    This video deposition is being
 8           held in Colorado Springs, Colorado, in
 9           the matter of National Prescription
10           Opiate Litigation, MDL Number 2804.
11                    This is the continuing
12           deposition of Michael Mapes.  The
13           court reporter is Carrie Campbell.
14                    And, Mr. Mapes, I remind you
15           that you're still under oath from
16           yesterday, and please proceed.
17                         EXAMINATION
18    QUESTIONS BY MR. LANIER:
19           Q.    Sir, you are Mr. Mapes?
20           A.    Yes.
21           Q.    You gave a deposition yesterday
22    with a bunch of lawyers for the opioid
23    companies asking you questions, right?
24                    MS. MCCLURE:  Form.
25                    THE WITNESS:  Right.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    QUESTIONS BY MR. LANIER:
2         Q.    You had the distributors asking
3    you questions; you had some of the pharmacies
4    asking you questions, correct?
5         A.    Yes.
6         Q.    Through their lawyers?
7         A.    Right.
8         Q.    Okay.  You understand I
9    represent the plaintiffs in this case, the
10   counties, the folks that have brought the
11   lawsuit.
12              You understand that?
13        A.    Yes.
14        Q.    All right.  One of the things I
15   found interesting yesterday is one of the
16   lawyers, I believe it was the young lady for
17   the AmerisourceBergen group company -- let's
18   find where we've got -- there it is -- made a
19   big point of saying to you on the record for
20   the jury "we've never met before."
21              MS. MCCLURE:  Form.
22   QUESTIONS BY MR. LANIER:
23        Q.    Do you remember that?
24        A.    Yes.
25        Q.    And you, "Oh, no, I've never
```

```
 1    met you."

 2                    Remember?

 3         A.     Well, not those exact words,

 4    but that -- yes.

 5         Q.     And y'all went on and on about

 6    two meetings that you had with plaintiffs'

 7    lawyers, oh, a year or so ago where you never

 8    even could remember the names of the lawyers

 9    there or the faces, right?

10                    MS. MCCLURE:  Objection.

11                    MR. EPPICH:  Objection.

12         Misstates testimony.

13                    THE WITNESS:  Correct, I didn't

14         remember the names of the attorneys

15         that were there.

16    QUESTIONS BY MR LANIER:

17         Q.     Right.

18                    And remember they were -- you

19    were asked over and over, could it be any

20    lawyers in this room?  You know, we're in a

21    room with, what, more lawyers than people --

22    I mean, you've got 20-plus lawyers in this

23    room, don't you?

24                    MS. MCCLURE:  Objection to

25         form.  Compound.  Misstates the
```

```
 1          record.

 2                  MR. EPPICH:  Objection.

 3          Characterization.

 4    QUESTIONS BY MR. LANIER:

 5          Q.    I mean, just listen to how many

 6    of them are objecting.

 7                  You've got a bunch of them in

 8    here, don't you?

 9          A.    Yes.

10          Q.    And not one lawyer do you

11    recognize from that meeting?

12          A.    That's correct.

13          Q.    And not one name do you

14    remember from that meeting?

15                  MS. MCCLURE:  Form.

16                  THE WITNESS:  I remember a

17          couple of names at the meeting now,

18          but I didn't remember those yesterday.

19    QUESTIONS BY MR. LANIER:

20          Q.    Did you go back and look at

21    some notes or something?

22          A.    Yes, I looked at my calendar.

23          Q.    Oh, okay.

24                  What were the names that you

25    went back and did homework on overnight?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      I saw one was Richard Fields.

 2          Q.      I've never heard of him.

 3                  Who is he?

 4          A.      He's an attorney representing

 5   some plaintiffs.

 6          Q.      Who?

 7          A.      I'm not sure.

 8          Q.      Me either.

 9                  Who else?

10          A.      See, I don't remember the name

11   of the other one.

12          Q.      Okay.  But you understand

13   you're here to tell the truth?

14          A.      Yes.

15          Q.      And you understand that's to be

16   the whole truth?

17          A.      Yes.

18          Q.      And you're not supposed to

19   shade things or make things look one way just

20   because of relationships or things like that,

21   right?

22          A.      Correct.

23          Q.      And what struck me as odd is in

24   all of the talk that the Amerisource lawyer

25   did with you and the other lawyers, and we've
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    never met before, blah-blah-blah, you never

2    told the jury you sure had met her client,

3    AmerisourceBergen, on many times, hadn't you?

4                MS. MCCLURE:  Objection to

5         form.  Misstates the witness'

6         testimony.  Mischaracterizes the

7         record.

8                THE WITNESS:  Yeah, I did

9         mention, I'm not sure it was to her,

10        that I did consulting for

11        AmerisourceBergen.

12   QUESTIONS BY MR. LANIER:

13        Q.    Yeah, but by "did consulting,"

14   that's one thing.

15               But in terms of having meetings

16   and all the rest of this stuff, you met with

17   AmerisourceBergen a whole lot, didn't you?

18               MS. MCCLURE:  Form.

19               THE WITNESS:  With anyone from

20        the company or --

21   QUESTIONS BY MR. LANIER:

22        Q.    Yes, sir.

23        A.    And are we talking about during

24   my time at DEA or post-DEA?

25        Q.    I'm talking about post-DEA.
```

Highly Confidential - Subject to Further Confidentiality Review

1         A.      Yes, because I was working with

2    them, consulting with them.

3         Q.      Well, you weren't just working

4    with them, consulting with them.  You

5    understand they've got you on their

6    organizational charts?

7         A.      Okay.

8         Q.      You understand that they had

9    you doing confidential work for them that

10   they don't want anybody to know about?

11             MS. MCCLURE:  Objection to

12        form.

13             THE WITNESS:  Looking at things

14        for them, yes.

15   QUESTIONS BY MR. LANIER:

16        Q.      So you met AmerisourceBergen,

17   her client, the lawyer's client, even though

18   the lawyer made a big show out of the fact

19   she'd personally not met you, true?

20             MS. MCCLURE:  Form.

21             THE WITNESS:  Yes, I've met

22        with AmerisourceBergen.

23   QUESTIONS BY MR. LANIER:

24        Q.      And you do privileged work for

25   AmerisourceBergen, don't you, confidential

Highly Confidential - Subject to Further Confidentiality Review

```
 1    work?

 2            A.      I did.

 3            Q.      I mean, we've got -- do you

 4    know what a privilege log is?

 5            A.      Yes.

 6            Q.      A privilege log is where

 7    lawyers don't want to give up documents in

 8    litigation --

 9                    MS. MCCLURE:  Objection to

10            form.

11    QUESTIONS BY MR. LANIER:

12            Q.      -- so instead of --

13                    MR. LANIER:  Can I get the

14            question finished, please?

15                    MS. MCCLURE:  I thought you

16            were finished.

17                    MR. LANIER:  Oh, no, there

18            wasn't a question there.

19    QUESTIONS BY MR. LANIER:

20            Q.      A privilege log is when lawyers

21    don't want to give up documents during

22    litigation because they believe that they're

23    privileged for some reason, and so they --

24                    MS. MCCLURE:  Objection to the

25            narrative.
```

```
 1              MR. LANIER:  Can I finish
 2         before you object, please?  Otherwise
 3         it makes it really hard to cut a video
 4         to play.
 5              Special Master, I'd ask that I
 6         be allowed to finish my question
 7         before the objection.
 8              MS. MCCLURE:  Special Master,
 9         it wasn't a question.  I --
10              SPECIAL MASTER COHEN:  Will you
11         just wait for the objection to be
12         posed until the question is asked.
13         You'll still have time to lodge it.
14  QUESTIONS BY MR. LANIER:
15       Q.    You understand that lawyers on
16  behalf of their clients will produce
17  privilege logs when they believe that there
18  are documents that they do not want to hand
19  out because those documents have a privilege
20  or some reason that they may have.
21              Do you understand about that?
22              MS. MCCLURE:  Objection to
23         form.
24              THE WITNESS:  Yes.
25              (Mapes Exhibit 20 marked for
```

```
 1              identification.)

 2     QUESTIONS BY MR. LANIER:

 3         Q.     I'm going to hand you a

 4     document we're going to mark as Exhibit

 5     Number 20.  And this is just one sample, but

 6     you'll look at this, and this is a privilege

 7     log by ABDC.

 8              Do you know what that

 9     abbreviation stands for?

10              MR. BENNETT:  Counsel, do you

11         have a copy for me?

12              MR. LANIER:  Yes.

13     QUESTIONS BY MR. LANIER:

14         Q.     Do you know what that

15     abbreviation stands for?

16         A.     Yes, I do.

17         Q.     What does that stand for?

18         A.     AmerisourceBergen Drug Company.

19         Q.     That's the client of the young

20     lady that was asking you the questions saying

21     over and over "we've never met before,"

22     right?

23              MS. MCCLURE:  Objection to

24         form.

25              THE WITNESS:  Yes.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. LANIER:

 2         Q.     And so that company produces

 3    this privilege log, and they've got a

 4    document down here, just one example, but

 5    it's the first privileged document on the log

 6    that dates from December of 2009, Michael

 7    Mapes being the author of the document.

 8              Do you see that?

 9         A.     I do.

10         Q.     And it's evidently under the

11    description a report that you prepared --

12    thank you.

13              It is a report you prepared at

14    the direction of a lawyer, not the head

15    lawyer, just a vice president and associate

16    general counsel.

17              Do you see that?

18         A.     I do.

19         Q.     Providing information to assist

20    with rendering of legal advice on their order

21    monitoring program review.

22              Do you see that?

23         A.     I do.

24         Q.     So when I say you did

25    privileged work for them, even though the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    lawyer had you tell the jury that you'd never

 2    met her before, the truth of the matter is

 3    you've been working with their lawyers,

 4    haven't you?

 5             MS. MCCLURE:  Form.

 6             THE WITNESS:  Yes.

 7    QUESTIONS BY MR. LANIER:

 8        Q.    So you may not have met that

 9    lawyer for AmerisourceBergen, but you were

10    working for other lawyers, weren't you?

11        A.    Yes.

12        Q.    And that's all part of what you

13    did with the company as their man helping

14    them with the diversion control program,

15    right?

16             MS. MCCLURE:  Form.

17             THE WITNESS:  That's correct.

18    QUESTIONS BY MR. LANIER:

19        Q.    Well, we'll get into that in a

20    little bit, but I want to start out with a

21    roadmap and show you what I plan on asking

22    you today.

23             Okay?

24        A.    Okay.

25        Q.    I call your roadmap -- that's
```

```
1    you, right there, Michael Mapes, right?

2         A.     Yes.

3         Q.     Tried to get a good picture.

4                You okay with that picture?

5         A.     It is what it is.

6         Q.     Oh, it's not bad.

7                How old do you think that

8    picture is?

9         A.     Three years maybe.

10        Q.     Okay.  You shaved for that

11   picture.  You didn't shave for the jury

12   today, did you?

13        A.     I did not.

14        Q.     That's all right.

15               U-turn road.

16               Your career has taken a lot of

17   twists and turns, hasn't it?

18               MS. MCCLURE:  Form.

19               THE WITNESS:  In what regard?

20   QUESTIONS BY MR. LANIER:

21        Q.     Well, I mean, you're all over

22   the map.  You've done work for the

23   government.  You've done work for industry,

24   lots of different parts of industry.  You've

25   got companies that you've kind of helped
```

```
 1    start and help get off the ground.  You've

 2    got -- you claim expertise in a lot of

 3    different areas, right?

 4              MS. MCCLURE:  Form.  Compound.

 5         Characterization.

 6              THE WITNESS:  I have experience

 7         in a lot of areas, yes.

 8    QUESTIONS BY MR. LANIER:

 9         Q.    And so here's what I'd like to

10    do.  I'd like to look at this road, and I'd

11    like to consider your personal background

12    first.  We'll make a stop there.

13              Then we're going to make a stop

14    at your time with the DEA, and then we're

15    going to make a stop at your time doing work

16    for industry.

17              And let's see if maybe your

18    testimony kind of rotates around based upon

19    where you are and who you're working for.

20              Okay?

21         A.    Okay.

22              MR. BENNETT:  Objection.

23    QUESTIONS BY MR. LANIER:

24         Q.    Now, in that regard, the first

25    stop we're going to make is personal
```

1    background.  And I'm going to keep a sheet of

2    your personal background, and we're going to

3    mark these documents that I'm showing to the

4    jury as an exhibit so that both sides have

5    them and we've got the benefit of them as a

6    demonstrative exhibit for the jury.

7              Your personal background, you

8    gave us a lot of it yesterday, but what I'd

9    like to do is sort of go in and look at you

10   from another angle.

11             Are you familiar with the

12   concern that has been expressed about a

13   revolving door between government and

14   industry?

15        A.    Yes.

16        Q.    And a revolving door -- you

17   know, most doors are just a door that's, you

18   know, this, with a doorknob.  But a revolving

19   door is one of those doors that tends to

20   revolve around, such that you've got an

21   ability to go in one way and out the other.

22             Do you follow me?

23        A.    Yes.

24        Q.    And the concern has been one

25   because there seem to be people who work for

1    the DEA and spend their time making

2    connections, learning the ins and outs,

3    learning the niceties of how things work, but

4    then they'll retire or take their pension

5    from the DEA and go to work for industry, the

6    very companies that they were supposed to be

7    looking over, right?

8              MS. MCCLURE:  Form.

9              MR. EPPICH:  Objection.

10        Argumentative.

11             THE WITNESS:  And could you

12        restate the question again?

13   QUESTIONS BY MR. LANIER:

14        Q.    Sure.

15             The reason the revolving door

16   is a concern is because there seems to be a

17   pattern of folks working for the DEA who then

18   go to work for the very industries they were

19   supposed to be overseeing, correct?

20             MS. MCCLURE:  Form.

21        Argumentative.

22             THE WITNESS:  Yes, I went to

23        work with the industries after

24        retiring from DEA.

25

```
1    QUESTIONS BY MR. LANIER:
2         Q.    Yeah.  You worked at DEA, and
3    they have a mandatory retirement, don't they?
4              MS. MCCLURE:  Form.
5              THE WITNESS:  Not in the
6         diversion control program.
7    QUESTIONS BY MR. LANIER:
8         Q.    So you did not have a mandatory
9    retirement; you could have kept working
10   there?
11        A.    Yes.
12        Q.    But you chose to retire?
13        A.    Yes, I did.
14        Q.    You chose to retire at what
15   age, 65?  70?
16        A.    55.
17        Q.    Oh, you retired at 55.
18              Did you get a pension?
19        A.    Yes.
20        Q.    What percentage of your pay was
21   your pension?
22        A.    I don't really recall.
23        Q.    How much were you making a year
24   when you retired?
25        A.    I'm not certain of that number.
```

```
1              Q.     Well, you got to have a general

2       idea.  I mean, you're remembering

3       conversations yesterday that happened

4       12 years ago, 14 years ago.  Surely you've

5       got a general idea how much money you used to

6       make.

7                   MS. MCCLURE:  Form.

8            Argumentative.

9                   THE WITNESS:  Generally 120,

10           125,000.

11      QUESTIONS BY MR. LANIER:

12             Q.     All right.  So making something

13      in the range -- I'll do that squiggle mark --

14      of 120 to 125,000 per year.

15                  Now, when you retired -- that

16      had been your salary.  When you retired, you

17      got a percentage of that as your retirement

18      pay, correct?

19             A.     That's correct.

20             Q.     And you don't know even roughly

21      what percentage?

22                  MS. MCCLURE:  Form.  Asked and

23           answered.

24                  THE WITNESS:  Roughly 55 or

25           60 percent.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. LANIER:
 2         Q.    All right.  So you would get
 3    roughly -- and that's still today, I assume,
 4    right?
 5         A.    Yes.
 6               MS. SWIFT:  We've got the
 7    realtime --
 8               MR. LANIER:  Y'all want to go
 9         off the record?  Okay.
10               VIDEOGRAPHER:  We're going off
11         record.  The time is 8:17.
12          (Off the record at 8:17 a.m.)
13               VIDEOGRAPHER:  We're going back
14         on record.  Beginning of Media File 2.
15         The time is 8:21.
16    QUESTIONS BY MR. LANIER:
17         Q.    Before the technical glitch,
18    you and I had made clear that you were
19    drawing about half of your salary now that
20    you're in retirement, maybe a little more,
21    maybe 60 percent, so somewhere around $75,000
22    a year?
23         A.    That's correct.
24         Q.    But while you retired from the
25    DEA, so the jury's clear, you just started
```

1    going to work for industry, didn't you?

2                    MS. MCCLURE:  Form.

3                    THE WITNESS:  Yes, I did work

4         for industry.

5    QUESTIONS BY MR. LANIER:

6         Q.    In fact, there's an expression

7    that y'all use; you were hired up --

8                    MS. MCCLURE:  Form.

9    QUESTIONS BY MR. LANIER:

10        Q.    -- by industry, weren't you?

11                   MS. MCCLURE:  Foundation.

12                   THE WITNESS:  I haven't heard

13        that expression.

14   QUESTIONS BY MR LANIER:

15        Q.    You've never heard the

16   expression "hired up"?

17        A.    No, I haven't.

18        Q.    Okay.

19                   MS. MCCLURE:  Mr. Lanier,

20        consistent with the practice during

21        the Rannazzisi deposition, I do note

22        that you are writing information on

23        the sheet of paper you have in front

24        of me in advance of asking the witness

25        the question and in advance of the

```
1        witness confirming that yes or no he's
2        familiar with the concept of "hired
3        up."
4             So I would request, again, that
5        you refrain from writing information
6        on the sheet which suggests that it
7        is, in fact, information obtained from
8        Mr. Mapes until Mr. Mapes has, in
9        fact, provided you with that
10       information.
11            MR. LANIER:  I'm allowed --
12       he's an adverse witness.  I'm allowed
13       to lead him, so I'm allowed to write
14       questions that may be leading in that
15       way.
16            I'm also allowed to write any
17       note I want to in terms of "look at
18       this, please, and tell me if you agree
19       with that statement."
20            You show him a document; I show
21       him a demonstrative.  Nobody, no
22       lawyer in any trial I've ever been in,
23       has to ask questions before they use a
24       demonstrative or show a demonstrative
25       to a witness, and this is no
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           different.
 2                   MS. MCCLURE:  I continue to
 3           maintain my objection.
 4                   MR. LANIER:  Okay.
 5    QUESTIONS BY MR. LANIER:
 6        Q.    So you've not heard that
 7    expression "hired up" by industry?
 8        A.    No, I have not.
 9        Q.    All right.  Let's see if we can
10    find some of where it may come from.
11                   You read the New York -- I mean
12    the Washington Post ever?
13        A.    I have in the past.
14        Q.    Are you familiar with the
15    article "The Drug Industry's Triumph Over the
16    DEA"?  I'm going to mark it as Exhibit
17    Number 21.
18                   (Mapes Exhibit 21 marked for
19           identification.)
20    QUESTIONS BY MR. LANIER:
21        Q.    Put it up here for the jury to
22    see.
23                   Are you familiar with this
24    article, sir?
25                   MS. MCCLURE:  Mr. Lanier, while
```

```
 1          Mr. Mapes is taking the opportunity to

 2          review the document that you've put in

 3          front of you him, I would also note

 4          that Mr. Mapes is not an adverse

 5          witness at this point.  You did

 6          cross-notice the deposition.

 7               MR. LANIER:  You will find that

 8          I often notice the deposition of

 9          adverse witnesses.  A cross-notice is

10          not what defines him as an adverse

11          witness.

12               MS. MCCLURE:  You have not

13          established adversity; nevertheless, I

14          continue to maintain my objection to

15          the extent that you write information

16          on a sheet of paper and suggest for

17          the jury that it is --

18               MR. LANIER:  Timeout.

19               MS. MCCLURE:  -- in fact,

20          information that Mr. Mapes has

21          provided.

22               MR. LANIER:  May I suggest that

23          all objections except to form and

24          responsiveness have been reserved

25          under the rules, and that we're trying
```

```
 1          to get out of this today in an

 2          expedient manner and that I'm spending

 3          more time talking to you on the record

 4          and hearing you talk to me than I am

 5          the witness.  And that's no way to get

 6          this done.

 7               And I'm under a limited time

 8          perspective of what I can do, so I'd

 9          ask you to adhere to the rules or I

10          will ask the special master to

11          intervene.

12               MS. MCCLURE:  I am adhering to

13          the rules, and I also note that we

14          were talking during the time Mr. Mapes

15          was taking the opportunity to review a

16          lengthy document that you have placed

17          before him.

18     QUESTIONS BY MR. LANIER:

19          Q.    Sir, are you familiar with this

20     document?

21          A.    I don't believe I've seen the

22     document itself before.  I've heard

23     discussions about it.

24          Q.    All right.  You've heard

25     discussions about this article that is
```

1    subtitled "Amid a targeted lobbying effort,

2    Congress weakened the DEA's ability to go

3    after drug distributors even as opioid deaths

4    continue to rise, a Washington Post and

5    60 Minutes investigation finds."

6              You're at least familiar with

7    the fact this article's out there even if you

8    haven't read it, fair?

9         A.    Yes.

10        Q.    In fact, you were contacted by

11   60 Minutes but you chose not to speak to

12   them, true?

13             MS. MCCLURE:  Objection.

14        Foundation.  Leading.  Form.

15             THE WITNESS:  That's correct.

16   QUESTIONS BY MR. LANIER:

17        Q.    Now, in this article I direct

18   your attention to what is marked in the

19   corner as page 53.15.  It's a chart that I've

20   got on the overhead.

21             Do you find that chart?

22        A.    Yes.

23        Q.    It says, "At least 56 DEA and

24   justice officials went to work for the

25   pharmaceutical industry.  Pharmaceutical

Highly Confidential - Subject to Further Confidentiality Review

1    companies and the law firms that represent

2    them hired at least 56 former officials since

3    2000."

4              And then you got all of these

5    yellow dots that show the people.

6              Do you see that?

7              MR. STEPHENS:  Object to form.

8              THE WITNESS:  I do.

9    QUESTIONS BY MR. LANIER:

10        Q.    You're one of these dots,

11   aren't you?

12             MR. STEPHENS:  Object to form.

13             MR. EPPICH:  Objection.

14        Foundation.  Calls for speculation.

15             THE WITNESS:  I don't know that

16        I am, because it's not -- there aren't

17        names with the majority of the dots.

18   QUESTIONS BY MR. LANIER:

19        Q.    Well, let's put it this way:

20   You are someone who was a DEA official who

21   went to work for the pharmaceutical industry

22   since 2000, aren't you?

23             MS. MCCLURE:  Form.

24        Foundation.

25             THE WITNESS:  Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
1    QUESTIONS BY MR. LANIER:

2         Q.    You did that in 2007 or '8?

3         A.    2008.

4         Q.    So this row right here may not

5    have a dot for you, but we at least know that

6    Michael Mapes belongs in that column, fair?

7              MS. MCCLURE:  Form.  Leading.

8              MR. EPPICH:  Object to the

9         demonstrative.  Misstates the

10        testimony.

11             THE WITNESS:  Yes.

12   QUESTIONS BY MR. LANIER:

13        Q.    All right.  Now, in this

14   regard, sir, this idea of a revolving door,

15   you being -- working governing industry and

16   then all of a sudden you going to work for

17   industry, you get paid by industry when they

18   hire you to do their work, don't you?

19             MS. MCCLURE:  Form.

20        Foundation.  Leading.

21             THE WITNESS:  Yes.

22   QUESTIONS BY MR. LANIER:

23        Q.    So in addition to the money

24   that you were getting in retirement from the

25   government, you start making money from
```

```
 1    industry, fair?

 2              MS. MCCLURE:  Form.

 3              THE WITNESS:  Yes.

 4    QUESTIONS BY MR. LANIER:

 5         Q.    And the money you've made from

 6    industry, is that based always on an hourly

 7    rate or was it ever on a project or as a

 8    salary?

 9         A.    A little of both.

10         Q.    All right.  So tell us -- you

11    know, American taxpayers are continuing to

12    pay you your retirement benefit while

13    industry is paying you to do work for them.

14    Tell us how industry is paying you.

15              MS. SWIFT:  Objection.

16         Leading.

17              MS. MCCLURE:  Objection.

18         Leading.  Form.

19    QUESTIONS BY MR. LANIER:

20         Q.    That is a bad question.  Let me

21    reask it.

22              Sir, how has industry been

23    paying you since 2008?

24              MS. MCCLURE:  Form.

25              THE WITNESS:  Mostly by the
```

```
 1        hour.

 2    QUESTIONS BY MR. LANIER:

 3        Q.    All right.  What's your hourly

 4    rate been?

 5              MS. MCCLURE:  Form.

 6              THE WITNESS:  It has changed.

 7              It started at $100 an hour, and the

 8              most recent sum at $300 an hour.

 9    QUESTIONS BY MR. LANIER:

10        Q.    If you were to work 40 hours a

11    week, which maybe you do more, maybe you do

12    less, but if you work 40 hours a week, full

13    time, for 50 weeks out of the year, take a

14    couple weeks vacation, that would be

15    2,000 hours a year.  2,000 hours a year, is

16    that somewhere between 200,000 and 600,000

17    per year you now make or could make doing

18    industry work in addition to your retirement

19    from DEA?

20              Did I do that right?

21              MS. MCCLURE:  Form.

22              Speculation.  And object to the

23              narrative and the testimony by the

24              plaintiffs' attorney.  Incomplete

25              hypothetical.
```

```
 1                    THE WITNESS:  I think you're

 2            correct if I worked 40 hours a week,

 3            50 weeks a year, but I don't.

 4    QUESTIONS BY MR. LANIER:

 5            Q.    Right.

 6                  Are you getting paid for your

 7    testimony here?

 8            A.    No.

 9            Q.    Okay.  Because I know you've

10    been hired by one of the companies in this

11    case right now, haven't you?

12                    MS. MCCLURE:  Form.  Misstates

13            the witness' testimony.

14                    THE WITNESS:  Yes.

15    QUESTIONS BY MR. LANIER:

16            Q.    Tell the jury who's hired you,

17    who you're working for right now, that was

18    asking you questions yesterday.

19                    MS. WICHT:  Object to form.

20                    THE WITNESS:  The Williams

21            Connolly firm.

22    QUESTIONS BY MR. LANIER:

23            Q.    And who do they represent, to

24    your knowledge?

25            A.    Cardinal Health.
```

```
 1          Q.     Now, sir, we've got -- I went

 2     on the Internet.

 3               MR. LANIER:  Do I have copies

 4        of this?

 5               While they're getting that, let

 6        me take a step back.

 7     QUESTIONS BY MR LANIER:

 8          Q.     You went out to these companies

 9     you used to oversee.  You went out to these

10     companies and you actually solicited their

11     business, didn't you?

12               MS. MCCLURE:  Form.

13        Speculation.  Foundation.

14               THE WITNESS:  No, I didn't.

15     QUESTIONS BY MR. LANIER:

16          Q.     You didn't send letters to

17     these companies saying, "Hey, I'm out of the

18     door now.  I'm out of the DEA.  I'm ready to

19     work for you"?

20          A.     No, I did not.

21               MS. MCCLURE:  Form.

22     QUESTIONS BY MR. LANIER:

23          Q.     Now, see, I got, for example,

24     what looked to me like you asking Henry

25     Schein if they would like you to work for
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   them.
 2              MS. MCCLURE:  Form.
 3        Foundation.  Leading.
 4   QUESTIONS BY MR. LANIER:
 5        Q.    Do you not remember that at
 6   all?
 7        A.    No, I don't.
 8              (Mapes Exhibit 22 marked for
 9        identification.)
10   QUESTIONS BY MR. LANIER:
11        Q.    I'm going to hand you a
12   document that we'll mark as Exhibit
13   Number 22.
14              There you go, sir.  Exhibit
15   Number 22 looks like an e-mail from an
16   MR Mapes.
17              Is that you?
18        A.    Yes, it is.
19        Q.    And it is, subject, consulting
20   proposal.
21              Do you see that?
22        A.    Yes.
23        Q.    You sent an e-mail to this
24   Michael DiBello where you said, "Attached is
25   a proposal for due diligence consulting for
```

```
 1    Henry Schein, Inc."

 2               Did I read that correctly?

 3         A.    Yes.

 4         Q.    Who is Henry Schein, Inc.?

 5         A.    They are a -- a distributor of

 6    pharmaceuticals.

 7         Q.    Yeah, they get opioids from the

 8    people who make them and get them to the

 9    people that sell them, right?

10         A.    Yes.

11         Q.    They are a distributor of

12    opioids, along with other drugs, I assume,

13    fair?

14         A.    Yes.

15               MR. HAHN:  Objection.  Form.

16    QUESTIONS BY MR. LANIER:

17         Q.    And you did a proposal for

18    consulting.

19               Do you see that?

20         A.    Yes, I do.

21         Q.    And consulting is what this

22    industry work you do is called.  You call

23    this consulting work, don't you?

24         A.    Yes.

25         Q.    And so what you did is back in
```

```
 1    2011 is you sent an e-mail out with a

 2    proposal --

 3         A.     In re -- yes, I did, in

 4    response to their request.

 5         Q.     They asked you to pitch your

 6    services to them?

 7              MS. MCCLURE:  Form.

 8              THE WITNESS:  Yes.

 9    QUESTIONS BY MR. LANIER:

10         Q.     And then you pitched your

11    services to them?

12         A.     Yes.

13         Q.     Okay.  So you only pitch your

14    services if they come to you first and say,

15    "Would you pitch your services"?

16         A.     Yes.

17         Q.     And then you send them these

18    elaborate proposals for consulting --

19              MR. EPPICH:  Objection.

20    QUESTIONS BY MR. LANIER:

21         Q.     -- where you talk about what

22    you will do to provide them consulting

23    services related to their due diligence

24    investigations of their current or potential

25    customers.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              See that?
2              MS. MCCLURE:  Form.
3    QUESTIONS BY MR. LANIER:
4         Q.    You see that?
5         A.    Yes, I see that.
6         Q.    Now, that wasn't your first
7    correspondence with them.  You actually say
8    you didn't pitch yourself to them, but I want
9    to give you another document and see if it
10   changes your mind.
11             I'll mark this one as Exhibit
12   Number 23.
13             (Mapes Exhibit 23 marked for
14        identification.)
15   QUESTIONS BY MR. LANIER:
16        Q.    Do you have Exhibit Number 23
17   in front of you?
18        A.    Yes.
19        Q.    It's another e-mail, but it's
20   one that you sent out before this last
21   exhibit, correct?
22             The one we were just looking
23   at, Exhibit Number 22, was May the 10th.  Oh,
24   oh, oh.  No, this is afterwards.  This is
25   May 26th, isn't it?
```

```
 1                    See that date?
 2        A.     Yes, I do.
 3        Q.     May 26, you're sending an
 4   e-mail where you attach a draft of the letter
 5   concerning their SOM program.
 6                    What does SOM stand for?
 7        A.     Suspicious order monitoring.
 8        Q.     That's what the government
 9   requires these companies to do; they are to
10   monitor suspicious orders for drugs, right?
11                    MR. HAHN:  Objection.  Form.
12                    THE WITNESS:  Yes.
13   QUESTIONS BY MR. LANIER:
14        Q.     You said, "I have attached a
15   draft of the letter concerning that program
16   at Henry Schein.  I have some background in
17   the letter about the DEA requirements, as I
18   believe I'm a unique position to talk about
19   those requirements."
20                    See that?
21        A.     Yes.
22        Q.     Sir, you were certainly telling
23   folks that you were the man for the job,
24   weren't you?
25                    MS. MCCLURE:  Form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  Yes.

 2                    (Mapes Exhibit 24 marked for

 3             identification.)

 4     QUESTIONS BY MR. LANIER:

 5          Q.    Now, I'll give you Exhibit

 6     Number 24.  This is a copy of your LinkedIn

 7     page.

 8                    LinkedIn is one of these

 9     Internet things where people can list their

10     information on a professional level; is that

11     right?

12                    MS. MCCLURE:  Form.

13                    THE WITNESS:  It is.

14     QUESTIONS BY MR. LANIER:

15          Q.    And so we've got you, Mike

16     Mapes.

17                    Did you do your own LinkedIn

18     page?

19          A.    I did.

20          Q.    iSAW Solutions, CEO.  That

21     means you're the boss of the bosses.  You are

22     the chief executive, right?

23          A.    There are no other bosses, but,

24     yes, there's only two people in the company.

25          Q.    You and who?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           A.      My brother.
 2           Q.      All right.  What's your
 3    brother's background and training?
 4           A.      He does accounting and tax
 5    preparation.
 6           Q.      Okay.  Because I was looking at
 7    this, and, I mean, you hold yourself out to
 8    be an expert in a lot of different areas,
 9    don't you?
10                   MS. MCCLURE:  Form.
11    QUESTIONS BY MR. LANIER:
12           Q.      You see this page, "Industry
13    Knowledge"?
14                   Do you see it?
15           A.      I see it.
16           Q.      I mean, criminal
17    investigations?  National security?
18    Litigation?  Firearms?
19                   MS. MCCLURE:  Is there a
20    question?
21    QUESTIONS BY MR. LANIER:
22           Q.      Physical security, defense --
23                   MS. MCCLURE:  Objection.
24    QUESTIONS BY MR. LANIER:
25           Q.      -- tactics, regulatory affairs,
```

Highly Confidential - Subject to Further Confidentiality Review

1    asset protection.

2                Did I read those right?

3        A.    You read those -- they're on

4    the page, but those aren't things that I put

5    in.

6        Q.    Do you think they just

7    automatically appear on your LinkedIn page?

8                MR. EPPICH:  Objection.

9        Argumentative.

10               MS. MCCLURE:  Objection.

11       Foundation.

12               THE WITNESS:  I don't know

13       where they came from.

14   QUESTIONS BY MR. LANIER:

15       Q.    Well, you're the one who did

16   your LinkedIn page.

17       A.    Yes.

18       Q.    Did you not know when you do

19   LinkedIn you have to check the areas where

20   you have expertise or industry knowledge so

21   that people know when to use you?

22               MS. MCCLURE:  Form.

23       Foundation.

24               THE WITNESS:  Well, I did not

25       check any of those areas.

```
 1    QUESTIONS BY MR. LANIER:

 2         Q.    Do you think that they're

 3    default areas that just show up on

 4    everybody's LinkedIn page?

 5              Because I promise you they're

 6    not on mine.

 7              MS. MCCLURE:  Object to the

 8         narrative.  Form.  Foundation.

 9         Speculation.  Argumentative.

10              THE WITNESS:  No.

11    QUESTIONS BY MR. LANIER:

12         Q.    I mean, you're going to consult

13    on the police?  You're going to consult on --

14    well, now regulatory requirements, that's --

15    you've already shown us that, right?

16              MS. MCCLURE:  Form.

17    QUESTIONS BY MR. LANIER:

18         Q.    Right?

19              Regulatory requirements, that

20    one may be legit.

21         A.    Yes.

22              MS. MCCLURE:  Form.

23    QUESTIONS BY MR. LANIER:

24         Q.    But come on, counterterrorism?

25         A.    I don't know where that came
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    from.

 2         Q.     Huh.

 3                Then there are like information

 4    on the last page where you've got like

 5    endorsements.  Some lawyer named Daniel

 6    Christopher says, "Mike" --

 7                That's your first name, right?

 8         A.     Yes.

 9         Q.     -- "has the knowledge and

10    experience to solve problems and give perfect

11    outcome-oriented recommendations and

12    planning."

13                Do you see that?

14         A.     I do.

15         Q.     Outcome-oriented, other than

16    the fact it's not spelled right, that's what

17    these pharmaceutical companies have hired you

18    to do, give outcome-oriented recommendations.

19                You're trying to get them to

20    where they want to be, aren't you?

21                MS. MCCLURE:  Objection.  Form.

22         Compound.  Incomplete hypothetical.

23         Foundation.  Misstates the witness'

24         testimony.

25                THE WITNESS:  Yes, I'm trying
```

```
 1          to get them to understand the rules

 2          and procedures to be in compliance.

 3   QUESTIONS BY MR. LANIER:

 4          Q.    And that's why companies like

 5   AmerisourceBergen put you into their

 6   corporate charts.

 7                MS. MCCLURE:  Objection.

 8          Leading.

 9   QUESTIONS BY MR. LANIER:

10          Q.    Right?

11                MS. MCCLURE:  Leading.

12          Foundation.

13                THE WITNESS:  I don't know why

14          they added me to their chart.

15                (Mapes Exhibit 25 marked for

16          identification.)

17   QUESTIONS BY MR. LANIER:

18          Q.    Let me give you a document that

19   we'll mark as Exhibit Number 25, and it's

20   actually a set of documents that have come.

21                Gives us an idea of how the

22   company charted out the associates -- let's

23   start up here, the bold.  "Associates

24   assigned to provide resources for the

25   diversion control program."
```

Highly Confidential - Subject to Further Confidentiality Review

1           Do you see that?

2           MR. EPPICH:  Objection.

3      Foundation.

4           THE WITNESS:  Yes, I do.

5  QUESTIONS BY MR. LANIER:

6      Q.    Now, understand that -- make

7  sure that we're clear on our terms here.

8  There is within the pharmaceutical world a

9  closed loop when it comes to drugs like

10 opioids.  Opioids only belong within a closed

11 loop.

12          MS. MCCLURE:  Objection to the

13     narrative.

14 QUESTIONS BY MR. LANIER:

15     Q.    Correct?

16     A.    Yeah.

17          MR. EPPICH:  Objection.  Form.

18 QUESTIONS BY MR. LANIER:

19     Q.    And so in here you've got the

20 companies that are, I guess, importing,

21 bringing in the opium, the materials for the

22 opioids.  You've got the importers.

23          You've got the companies that

24 are manufacturing the pills or the medicine,

25 whatever.  You've got the manufacturers.

```
 1                    You've got the people who are

 2      passing those out, the distributors.

 3                    And then you've got the

 4      pharmacies at the end that are supposed to be

 5      getting them to the sick, right?

 6                    MS. MCCLURE:  Objection.

 7                    MS. SWIFT:  Objection.

 8            Leading.

 9                    MS. MCCLURE:  Form.

10            Foundation.  Incomplete

11            representation.  Object to the

12            narrative by counsel.

13                    THE WITNESS:  Yes, all those

14            are registrants that would handle

15            controlled substances.

16      QUESTIONS BY MR. LANIER:

17            Q.    And that's the word that you

18      were using "registrants," because they have

19      to register with the government.  And if they

20      are not registered and accepted, it's illegal

21      for them to market in opioids, isn't it?

22                    MS. MCCLURE:  Objection.  Form.

23            Leading.  Foundation.

24                    MS. SWIFT:  Objection.  Form.

25
```

```
 1    QUESTIONS BY MR. LANIER:

 2         Q.     True?

 3         A.     It is illegal for them to

 4    handle opioids if they're not registered,

 5    yes.

 6         Q.     And so when we talk about

 7    diversion, diversion is when these pills

 8    somehow, somewhere, go outside the loop and

 9    they are diverted.  And instead of going to

10    properly prescribed patients, they get

11    diverted into an improper use, right?

12              MS. MCCLURE:  Objection.

13         Leading.  Foundation.  Misstates.

14              THE WITNESS:  Correct.

15    QUESTIONS BY MR. LANIER:

16         Q.     Okay.  So we're looking at the

17    associates that were assigned to provide

18    resources for the diversion control program,

19    the program to keep these drugs from being

20    diverted, right?

21         A.     Yes.

22         Q.     Because these are dangerous

23    drugs, true?

24              MS. MCCLURE:  Form.

25              THE WITNESS:  I don't know what
```

```
 1          you mean by "dangerous."

 2     QUESTIONS BY MR. LANIER:

 3          Q.     They can kill you?

 4                 MS. MCCLURE:  Form.

 5     QUESTIONS BY MR. LANIER:

 6          Q.     They can do damage to you if

 7     you are taking them improperly, in an

 8     improper dose at an improper time?

 9          A.     They could.

10          Q.     They can be addictive?

11          A.     Yes.

12          Q.     That's dangerous to me.  Is

13     that dangerous to you?

14          A.     Yes.

15          Q.     Okay.  So we can agree these

16     are dangerous drugs?

17          A.     Yes.

18          Q.     All right.  And so you want to

19     keep them from being diverted.  And not only

20     do you want to, the distributors are required

21     by law to do a number of different things to

22     stop diversion of opioids, aren't they?

23          A.     They are.

24                 MS. WICHT:  Object to the form.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. LANIER:

 2         Q.    And the law they are supposed

 3    to follow is what?

 4         A.    The Controlled Substances Act.

 5         Q.    And it sets out

 6    responsibilities, doesn't it?

 7         A.    It does.

 8         Q.    Okay.  And so here we see for

 9    AmerisourceBergen in Exhibit 25 associates

10    assigned to provide resources for the

11    diversion control program, and it starts up

12    here with a vice president and an

13    administrative assistant.

14              You see all of that?

15         A.    Yes.

16         Q.    Look at this.  Mike Mapes, DEA

17    consultant.  You made their chart.

18              Did you know that?

19              MS. MCCLURE:  Objection to

20         form.

21              THE WITNESS:  I see that.

22    QUESTIONS BY MR. LANIER:

23         Q.    And if I follow the chart

24    right, they've got you basically reporting to

25    the vice president, don't they?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 MS. MCCLURE:  Objection.  Form.

 2                 THE WITNESS:  I didn't report

 3          to the vice president.  It was mainly

 4          with Steve Mays, the director of CSRA.

 5   QUESTIONS BY MR. LANIER:

 6          Q.    This fellow that's lateral to

 7   you on the chart?

 8          A.    Yes.

 9          Q.    So practically speaking, the

10   vice president didn't take your cares or

11   concerns.  You didn't even know technically

12   you were reporting to him; is that right?

13                 MS. MCCLURE:  Form.

14          Foundation.

15                 THE WITNESS:  Practically I

16          reported to Steve Mays.

17   QUESTIONS BY MR. LANIER:

18          Q.    Now, also of note here, it

19   looks like these aren't people who are just

20   fully assigned to diversion control.

21   Everyone already had a full-time job in

22   addition to doing this work; is that right?

23                 MS. MCCLURE:  Form.

24          Foundation.  Calls for speculation.

25                 THE WITNESS:  I'm not aware of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              the full-time jobs that others on the

 2              chart would have.

 3      QUESTIONS BY MR. LANIER:

 4           Q.     But do you see where it says,

 5      "Everyone already has a full-time job"?

 6           A.     I see what that says, yes.

 7                  MS. MCCLURE:  Objection.

 8      QUESTIONS BY MR. LANIER:

 9           Q.     Like diversion control program,

10      that's just an afterthought.  That's

11      something you do in extra time, when you got

12      a little extra time.  Hey, you got a few

13      extra minutes in addition to your full-time

14      job, would you come do this critical work to

15      make sure the drugs don't get diverted?

16                  MS. MCCLURE:  Form.  Misstates

17              the record.  Foundation.  Calls for

18              speculation.

19      QUESTIONS BY MR. LANIER:

20           Q.     Did you know about any of that?

21                  MS. MCCLURE:  All of the same

22              objections.

23                  THE WITNESS:  No.

24      QUESTIONS BY MR. LANIER:

25           Q.     And there are multiple sheets
```

1    to the exhibit that I've given you that are

2    just different charts that they've done over

3    the times that have you in it.

4              You worked for

5    AmerisourceBergen for a long time, didn't

6    you?

7              MS. MCCLURE:  Objection.

8        Leading.  Foundation.

9              Objection to the continuing

10        narrative by counsel.

11              THE WITNESS:  Yes, I did.

12   QUESTIONS BY MR. LANIER:

13       Q.    Okay.  Now, one more thing that

14   I want to cover before we leave here is there

15   are some people you know who have been

16   designated as experts by the plaintiffs that

17   I think maybe you worked with, and I need to

18   know if you're going to say anything bad

19   about at trial.

20              You understand what I'm asking

21   you?

22       A.    Yes.

23              MS. MCCLURE:  Form.

24   QUESTIONS BY MR. LANIER:

25       Q.    Did you work in the DEA Detroit

```
 1    office with Jim Geldhof, who later became the

 2    regional supervisor?

 3         A.    No.

 4         Q.    You did not?

 5         A.    We worked in the Detroit office

 6    at different times.

 7         Q.    Okay.  Do you know Jim Geldhof?

 8         A.    Yes.

 9         Q.    Good guy?

10               MS. MCCLURE:  Form.

11               THE WITNESS:  Yes.

12    QUESTIONS BY MR. LANIER:

13         Q.    Know what he's doing?

14         A.    Yes.

15         Q.    Honest?

16               MS. MCCLURE:  Form.

17               THE WITNESS:  As far as I know.

18    QUESTIONS BY MR. LANIER:

19         Q.    Reliable?

20               MS. MCCLURE:  Form.

21               THE WITNESS:  As far as I know.

22    QUESTIONS BY MR. LANIER:

23         Q.    All right.  Jim Rafalski, who

24    did the ARCOS and field analysis work, do you

25    know Jim Rafalski?
```

```
 1          A.     I know the name more than I
    know the person.
 2
 3          Q.     All right.
 4          A.     I may have met him a couple of
 5   times.
 6          Q.     You're not able to comment on
 7   him --
 8          A.     No.
 9          Q.     -- one way or the other.
10                 The jury is also going to hear
11   from Joe Rannazzisi.
12                 You know Joe Ran, don't you?
13          A.     Yes.
14          Q.     Good man?
15                 MS. MCCLURE:  Form.
16                 THE WITNESS:  Yes.
17   QUESTIONS BY MR. LANIER:
18          Q.     Honest?
19          A.     Yes.
20          Q.     Reliable?
21          A.     Yes.
22          Q.     Okay.  We are through the first
23   stop on your roadmap, personal background.
24                 Next stop, DEA.
25                 The DEA stop is going to take
```

1    about an hour or so.  We've been going

2    54 minutes.

3              Are you good to keep going?

4    A.    Yes.

5    Q.    Okay.

6              MS. LEVY:  While we're in

7    transition, can we ask the court reporter if

8    she can refresh the realtime?

9              MR. LANIER:  Let's go off the

10        record for you to refresh the

11        realtime, and I'm going to run down

12        the hall to use the restroom.

13        (Off the record at 8:55 a.m.)

14             VIDEOGRAPHER:  We're going back

15        on record.  Beginning of Media File 3.

16        The time is 9:03.

17   QUESTIONS BY MR. LANIER:

18   Q.    Mr. Mapes, we have finished

19   that first stop on my roadmap of your

20   personal background.

21             You with me?

22   A.    Yes.

23   Q.    And now I want to ask you about

24   questions and subjects that were asked of you

25   yesterday by the lawyers for the various

Highly Confidential - Subject to Further Confidentiality Review

```
 1    companies.

 2              Okay?

 3    A.        Yes.

 4    Q.        And I've divided them up into

 5    two different areas:  those matters that

 6    arose while you were working for the DEA, and

 7    those matters that arose generally while

 8    you've been doing industry work.

 9              Okay?

10    A.        Okay.

11    Q.        And so our first stop are the

12    matters while you were working with the DEA.

13    A.        Okay.

14    Q.        Now, in this regard, we'll

15    focus in on the DEA time.  We'll keep a

16    little running list of notes for this stop,

17    but in general you covered a number of

18    different subjects that came up yesterday,

19    and I kind of want to isolate each one and

20    talk about them.

21              Okay?

22    A.        Okay.

23    Q.        So one subject that you talked

24    about a lot was Internet pharmacy issues.

25              Correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     Yes.
 2          Q.     And so these are pharmacies
 3   that exist somehow on the worldwide web more
 4   than they do, you know, in a building down
 5   the street.
 6               MS. MCCLURE:  Form.
 7               MR. LANIER:  That's supposed to
 8          be a keyboard and a monitor.  I'm not
 9          very good at this, am I?
10               MS. MCCLURE:  Objection.  Form.
11          Narrative.
12               MR. LANIER:  Bad art.
13   QUESTIONS BY MR. LANIER:
14          Q.     Internet pharmacies.  That's
15   different than a storefront pharmacy, right?
16          A.     It's different in that it's a
17   website that refers people to a doctor and a
18   storefront pharmacy.
19          Q.     To go pick up their pills?
20          A.     Or have them delivered, yes.
21          Q.     All right.  Now, the Internet
22   pharmacy issues that you talked about
23   yesterday, can we agree that this became a
24   huge problem as part of the opioid mess?
25               MR. BENNETT:  Objection.
```

```
 1              Vague.
 2    QUESTIONS BY MR. LANIER:
 3         Q.      Would you agree with me?
 4                 MR. EPPICH:  Objection to form.
 5                 THE WITNESS:  I don't recall it
 6         being part of the opioid issue,
 7         because the majority of the drugs
 8         being dispensed from pharmacies that
 9         were related to the Internet were not
10         opioids.  They were phentermine and
11         benzodiazepines and those kinds of
12         things.
13    QUESTIONS BY MR. LANIER:
14         Q.      So you're not aware of how many
15    opioids were actually being dispensed by
16    these Internet pharmacies?
17         A.      There were some, but it wasn't
18    the major part of the pharmacies in the
19    beginning.
20         Q.      Interesting.
21                 So you believe that the
22    Internet pharmacy problem was more than
23    simply an opioid problem; it applied to other
24    drugs as well?
25                 MS. MCCLURE:  Form.  Misstates
```

```
 1            the witness' testimony.

 2       QUESTIONS BY MR. LANIER:

 3            Q.      Fair?

 4            A.      Yes, it did.

 5            Q.      But it was a huge problem.  It

 6       was one that required direct attention,

 7       right?

 8            A.      Yes.

 9                    MS. MCCLURE:  Form.

10       QUESTIONS BY MR. LANIER:

11            Q.      And in that regard, sir, I got

12       to ask you:  Where were these pharmacies

13       getting their drugs?

14                    MS. MCCLURE:  Form.

15       QUESTIONS BY MR. LANIER:

16            Q.      Whether they were opioids or

17       the benzodiazepines or whatever they were,

18       where were they getting them from?

19                    MS. MCCLURE:  Form.

20                    MR. EPPICH:  Objection.

21            Foundation.

22                    THE WITNESS:  From registered

23            wholesalers.

24       QUESTIONS BY MR. LANIER:

25            Q.      Are those what we call
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    distributors?

 2          A.      Yes.

 3          Q.      Those are companies like

 4    AmerisourceBergen?

 5                  MS. MCCLURE:  Form.

 6    QUESTIONS BY MR. LANIER:

 7          Q.      McKesson?  Cardinal?

 8          A.      Yes, they're distributors.

 9          Q.      I mean, those are in our --

10    going back to our picture drawing, those are

11    these people who take them from the

12    manufacturers and get them to the pharmacies,

13    right?

14          A.      That's correct.

15          Q.      And so you've got this huge

16    problem with these Internet pharmacies.  The

17    pharmacies are getting their drugs from the

18    distributors.

19                  My question to you is:  Did the

20    major distributors bring this problem to the

21    DEA's attention?

22          A.      No.

23          Q.      You mean McKesson didn't tell

24    y'all about this?

25                  MS. MCCLURE:  Form.
```

```
 1                    MR. EPPICH:  Object to the

 2          form.

 3                    MS. MCCLURE:  Scope.

 4                    MR. BENNETT:  I'm going to join

 5          the scope objection.

 6                    You can answer that question

 7          yes or no only.

 8                    THE WITNESS:  No.

 9     QUESTIONS BY MR. LANIER:

10          Q.    AmerisourceBergen didn't say,

11     "Hey, we figured out there's a big problem

12     out there where there's a diversion issue

13     that's occurring with these Internet

14     pharmacies."

15                    You didn't get that huge alert

16     from AmerisourceBergen?

17                    MS. MCCLURE:  Form.  Compound.

18          Scope.

19                    MR. BENNETT:  Objection.

20          Scope.

21                    You can answer that question

22          yes or no only.

23                    THE WITNESS:  No.

24     QUESTIONS BY MR. LANIER:

25          Q.    From Cardinal?
```

```
 1              MS. MCCLURE:  Form.

 2       Foundation.  Scope.

 3              MR. BENNETT:  Same objection.

 4       Same instruction.

 5              THE WITNESS:  No.

 6   QUESTIONS BY MR. LANIER:

 7       Q.    Well, aren't these distributors

 8   required under law to know their customers?

 9              MR. EPPICH:  Objection.  Form.

10              MS. MCCLURE:  Form.

11              MR. EPPICH:  Calls for a legal

12       conclusion.

13              MS. SWIFT:  Foundation.

14   QUESTIONS BY MR. LANIER:

15       Q.    Let me reask it.

16              Haven't you preached

17   vociferously, stridently, strongly, loudly,

18   clearly, that the distributors are required

19   to know their customers?

20              MS. MCCLURE:  Form.  Compound.

21              MR. EPPICH:  Object to the

22       form.

23              THE WITNESS:  Yes, and that

24       started with the Distributor

25       Initiative, mostly.
```

```
 1    QUESTIONS BY MR. LANIER:
 2         Q.     Well, you say it started there.
 3                The obligation for them to know
 4    their customers didn't start there.  This --
 5    did it?
 6                MR. EPPICH:  Objection.
 7                MS. MCCLURE:  Form.
 8         Argumentative.  Leading.
 9                MS. SWIFT:  Foundation.
10                MR. EPPICH:  Objection.  Form.
11         Calls for a legal conclusion.
12                THE WITNESS:  No, the
13         regulations did not change.
14    QUESTIONS BY MR. LANIER:
15         Q.     Right.
16                That law that closes this loop,
17    that requires the distributors to only give
18    to registered and approved pharmacies for
19    legitimate purposes to stop diversion.  I
20    mean, knowing their customers, knowing the
21    pharmacies, that's diversion control 101,
22    isn't it?
23                MS. MCCLURE:  Form.  Narrative
24         by counsel.  Foundation.  Leading.
25         Misstates.  Calls for a legal
```

1        conclusion.

2                THE WITNESS:  Yes, it's basic.

3                MS. MCCLURE:  And again,

4        continuing objection to counsel's

5        filling in information on a sheet of

6        paper implying that it comes from the

7        witness before providing the

8        information through counsel.

9                MR. LANIER:  If it helps you,

10       I've had at least one judge -- two

11       judges, two federal judges, tell me I

12       have to do that because otherwise it

13       consumes too much time.  I don't know

14       if that helps you.

15               MS. MCCLURE:  Well, we don't

16       have any such ruling here, so it

17       doesn't help me, and I continue to

18       maintain all of those objections.

19               MR. LANIER:  I'll give you a

20       running objection on that so you don't

21       consume my time continuing to say it.

22               MS. MCCLURE:  Great.

23   QUESTIONS BY MR. LANIER:

24       Q.    Internet pharmacy concerns.

25   Let's talk about what some of the concerns

1    were.

2              Okay?

3        A.    Okay.

4        Q.    First of all, we know the law

5    is the law is the law.

6              MS. MCCLURE:  Form.

7    QUESTIONS BY MR. LANIER:

8        Q.    Fair?

9              MR. BENNETT:  Objection.

10   Vague.

11             MR. EPPICH:  Form.  Vague.

12   QUESTIONS BY MR. LANIER:

13       Q.    Let me be more clear.  Some

14   people don't understand what I mean.

15             This law for the Controlled

16   Substances Act, that doesn't apply just to

17   Internet pharmacies, does it?

18             MR. EPPICH:  Objection.  Form.

19             THE WITNESS:  It applies to all

20        handlers of controlled substances.

21   QUESTIONS BY MR. LANIER:

22       Q.    Yeah.  There's not a -- where's

23   the note I just used?

24             Aren't distributors required to

25   know their customers, diversion control 101,

```
1    that's not only applicable to Internet

2    pharmacies; it applies to all their

3    customers, doesn't it?

4              MS. SWIFT:  Objection.  Form.

5              MS. MCCLURE:  Form.  Compound.

6              MS. WICHT:  Foundation.

7         Mischaracterizes testimony.

8              THE WITNESS:  It applies to all

9         registrants, yes.

10   QUESTIONS BY MR. LANIER:

11        Q.    Yeah.  Everybody in the loop,

12   right?

13        A.    Yes.

14        Q.    And so when the lawyers talked

15   to you about these Internet pharmacy

16   concerns, let's just make real clear that the

17   law that we're talking about is -- the same

18   law applies to all pharmacies, whether

19   they're Internet or not.

20             MR. EPPICH:  Objection to form.

21   QUESTIONS BY MR. LANIER:

22        Q.    True?

23             MR. EPPICH:  Objection to form,

24        vague, and calls for a legal

25        conclusion.
```

```
 1                 MS. MCCLURE:  Leading.

 2                 MR. BENNETT:  You can answer.

 3                 THE WITNESS:  It does.

 4     QUESTIONS BY MR. LANIER:

 5          Q.    I mean, there's no special law

 6     for Internet pharmacies, right?

 7                 MS. MCCLURE:  Form.

 8                 THE WITNESS:  There is a

 9          separate registration category for

10          Internet pharmacies, so there are some

11          unique rules for Internet pharmacies.

12     QUESTIONS BY MR. LANIER:

13          Q.    No fuss about that at all.

14                But in terms of the opioid loop

15     and what the distributors have to do, there's

16     no special law for distributors that pertains

17     to how they treat Internet pharmacies versus

18     others, is there?

19                 MS. MCCLURE:  Form.

20                 THE WITNESS:  No.

21     QUESTIONS BY MR. LANIER:

22          Q.    And I've got to ask you, these

23     rogue Internet pharmacies -- that's a term we

24     heard yesterday with you and the distributor

25     lawyers, or maybe -- yes.
```

```
 1              How do these rogue Internet

 2   pharmacies get their pills historically?

 3        A.    Well, all pharmacies get them

 4   from wholesalers, from the distributors.

 5        Q.    Are we supposed to believe that

 6   AmerisourceBergen, Cardinal and McKesson

 7   can't figure out a fake pharmacy?

 8              MS. MCCLURE:  Objection.

 9        Leading.

10              MR. EPPICH:  Objection.

11              MS. MCCLURE:  Form.

12        Foundation.  Argumentative.

13              THE WITNESS:  I don't know.

14   QUESTIONS BY MR. LANIER:

15        Q.    I mean, have you heard the

16   expression "ignorance is no excuse"?

17        A.    Yes.

18        Q.    I mean, if you get pulled over

19   for speeding, do you get out of it if you

20   say, "Hey, I'm sorry, it's not my fault; I

21   wasn't looking at my speedometer"?

22              You can't get out of it that

23   way, can you?

24              MS. MCCLURE:  Form.

25              THE WITNESS:  I don't know.
```

```
1    QUESTIONS BY MR. LANIER:

2         Q.    Have you ever tried that one?

3         A.    No, I haven't.

4         Q.    I'll bet you don't ever try

5    that one either.

6               I mean, that one is just not

7    going to work now, Mr. Mapes, is it?

8               MS. MCCLURE:  Form.

9    QUESTIONS BY MR. LANIER:

10        Q.    Would you expect it to?

11              MS. MCCLURE:  Form.

12              THE WITNESS:  I don't know.

13   QUESTIONS BY MR. LANIER:

14        Q.    Now, AmerisourceBergen had a

15   meeting with you concerning these Internet

16   pharmacies, and we got Exhibit Number 7 that

17   was handed to us yesterday as part of that

18   meeting, correct?

19        A.    That's correct.

20        Q.    You had an Internet

21   presentation with AmerisourceBergen,

22   August 10, 2005, and you wrote it up.

23              MS. MCCLURE:  Form.

24              THE WITNESS:  Actually, someone

25        else wrote it up, but I signed it,
```

```
 1          yes.
 2     QUESTIONS BY MR. LANIER:
 3          Q.     Okay.  And a point was made
 4     yesterday by the lawyer for
 5     AmerisourceBergen, Ms. McClure, that after
 6     the presentation, Mr. Mays --
 7               Do you see that?
 8          A.     Yes, I do.
 9          Q.     And that's the same Mr. Mays
10     that you wound up reporting to when you went
11     to work for AmerisourceBergen --
12          A.     Correct.
13          Q.     -- two years later?
14               MS. MCCLURE:  Form.
15     QUESTIONS BY MR. LANIER:
16          Q.     So two years before you went to
17     work for him, he informed representatives of
18     the DEA that AmerisourceBergen does not want
19     to be associated with this type of illegal
20     activities, and it reviews its customers
21     thoroughly before engaging in business with
22     them.
23               Do you see that?
24          A.     I do.
25          Q.     Now, I asked you before if
```

```
 1    distributors were required to know their

 2    customers, and you said, "Well, that's what

 3    it ultimately worked into, but they didn't

 4    always do that earlier."

 5              Do you remember that?

 6    A.      Yes.

 7    Q.      And I said, "But the law has

 8    always been that way," right?

 9              MS. MCCLURE:  Form.  Calls for

10         a legal conclusion.

11              THE WITNESS:  It has.

12    QUESTIONS BY MR. LANIER:

13    Q.      And we see that here, that

14    AmerisourceBergen was trying to tell you or

15    the DEA that they were, in fact, reviewing

16    their customers thoroughly before engaging in

17    business with them, and they don't want to be

18    associated with this type of illegal

19    activity.

20              Do you see that?

21    A.      I do.

22    Q.      Now this, sir, shows us -- let

23    me go back to this.

24              So AmerisourceBergen, you have

25    this meeting with them.  If we look
```

Highly Confidential - Subject to Further Confidentiality Review

1    thoroughly at Exhibit Number 7, it shows the

2    glaring problems with the way Amerisource was

3    doing business, doesn't it?

4                  MS. MCCLURE:  Objection.

5         Leading.  Foundation.  Form.

6                  THE WITNESS:  It shows examples

7         that we use to -- to them about what

8         we considered Internet pharmacies that

9         they had distributed to.

10   QUESTIONS BY MR. LANIER:

11        Q.    Well, it not only does that,

12   sir, but it says in very plain English, the

13   purpose of your meeting with them was "to

14   address the illegal" --

15                Do you see that word?

16        A.    Yes.

17        Q.    -- "the illegal domestic

18   Internet pharmacy problem and their source of

19   supply."

20                Do you see that as well?

21        A.    I do.

22        Q.    The source of their supply, if

23   we're telling the whole truth, was

24   AmerisourceBergen, among others, true?

25                MS. MCCLURE:  Objection to

```
 1            form.  Leading.  Speculation.

 2            Foundation.

 3                 THE WITNESS:  Yes, in these

 4            examples.

 5     QUESTIONS BY MR. LANIER:

 6            Q.    Yeah.

 7                 In other words,

 8     AmerisourceBergen may have language where

 9     they tell you, "Oh, look, we don't want to be

10     associated with this.  We review our

11     customers thoroughly before engaging in

12     business with them."

13                 They say that to the DEA.  You

14     see?

15            A.    Yes.

16            Q.    And the lawyer for

17     AmerisourceBergen has you look at that for

18     the jury and -- you remember?

19            A.    Yes.

20            Q.    And she said, "And if there was

21     any other information, it would be course of

22     practice to put it into this memo so we can

23     trust that reasonably this is all the

24     information that there was."

25                 MS. MCCLURE:  Form.
```

```
 1    QUESTIONS BY MR. LANIER:

 2         Q.     Right?

 3         A.     Yes, that's what she said.

 4         Q.     Do you have the expression --

 5    there's a lot of different ones.  You know,

 6    it's one thing to say one thing, but the

 7    truth isn't always what people say.

 8              Right?

 9              MS. MCCLURE:  Form.  Leading.

10              THE WITNESS:  That's correct.

11    QUESTIONS BY MR. LANIER:

12         Q.     You've heard the expression "I

13    want to see someone walk the walk instead of

14    talk the talk"?

15         A.     Yes.

16         Q.     Or "practice what they preach"?

17         A.     Yes.

18              (Mapes Exhibit 26 marked for

19              identification.)

20    QUESTIONS BY MR. LANIER:

21         Q.     Okay.  And the reason I'm

22    asking that is because I've looked at Exhibit

23    Number 26.  I want to give a copy of it to

24    you and the lawyers around the room, a chance

25    for the jury to see it.
```

```
 1                 Do you have Exhibit Number 26
 2      in front of you?
 3           A.     I do.
 4           Q.     See --
 5                 MR. BENNETT:  Counsel, may he
 6           have a moment to finish reviewing the
 7           document?
 8                 MR. LANIER:  Yeah.  The only
 9           part that I need to ask you about
10           initially is the very bottom e-mail
11           from you.  It says, "Michael R.
12           Mapes," and it's a real short, little
13           e-mail.
14                 So if you'll review it, and in
15           the interest of time I'll read it to
16           the jury at the same time you're
17           reading it.
18      QUESTIONS BY MR. LANIER:
19           Q.     Do you see that e-mail from you
20      down at the bottom?
21           A.     Yes.
22           Q.     "Steve, at the meeting at
23      DEA" --
24                 And that Steve is Steve Mays?
25      He's the fellow you ultimately started
```

1    working for a couple years later?

2              MS. MCCLURE:  Form.

3    QUESTIONS BY MR. LANIER:

4         Q.    Right?

5         A.    Yes.

6         Q.    "Steve, at the meeting at DEA,

7    I was not sure if your company had sold

8    controlled substances to any of the

9    pharmacies that were used as examples in the

10   presentation.  We checked ARCOS" --

11             What is ARCOS?

12        A.    It's a system that collects

13   data from registrants concerning sales of

14   Schedule II and III narcotic drugs.

15        Q.    It is a system you guys have

16   that will get all of the information about

17   who's selling the drugs and who they're

18   selling them to?

19        A.    Yes.

20        Q.    All right.  "We checked the

21   system that collects info on drug sales,

22   ARCOS, and found you made several sales to

23   Example Number 2 on page 10 of the printed

24   presentation.  It's a Florida pharmacy that's

25   now out of business.  Your sales were mostly

1    hydrocodone products."

2              That's an opiate drug, isn't

3    it?

4         A.    It is.

5         Q.    So while the lawyer will show

6    you and the jury that Mr. Mays informed you

7    guys that they didn't want to be associated

8    with this type of illegal activity and they

9    reviewed their customers thoroughly, the

10   truth of the matter is, y'all went back and

11   checked and AmerisourceBergen was, in fact,

12   supplying drugs to this illegal, domestic

13   Internet pharmacy problem, correct?

14              MS. MCCLURE:  Form.

15        Foundation.  Leading.

16              MR. BENNETT:  Objection.

17        Scope.

18              You can answer that question

19        yes or no only.

20              THE WITNESS:  Yes.

21   QUESTIONS BY MR. LANIER:

22        Q.    And you said that the Internet

23   pharmacy problem was not generally opioids,

24   it was more benzo drugs, but this was mostly

25   opioid.

1              MS. MCCLURE:  Form.  Leading.

2     QUESTIONS BY MR. LANIER:

3          Q.    Wasn't it?

4          A.    Yes.

5          Q.    So we can look at the entire

6     story and see that AmerisourceBergen's

7     business included the illegal Internet

8     pharmacies that were subject to your

9     investigation on the issue of opioids, true?

10             MR. BENNETT:  Form.

11          Foundation.  Leading.

12             THE WITNESS:  It included one

13          of the Internet pharmacies that we

14          used as an example in the

15          presentations, yes.

16     QUESTIONS BY MR. LANIER:

17          Q.    And you don't know whether or

18     not the DEA checked on the other example

19     y'all used, do you?

20             MS. MCCLURE:  Form.

21          Mischaracterizes the document.

22             THE WITNESS:  I believe that's

23          the only one of the examples in the

24          presentation that AmerisourceBergen

25          had distributed to.

```
 1    QUESTIONS BY MR. LANIER:

 2         Q.    And you have three examples in

 3    the presentation.  So you've got

 4    AmerisourceBergen on one-third of them?

 5         A.    Yes.

 6         Q.    Okay.  Still on the subject of

 7    Internet pharmacies.

 8               You met with McKesson on the

 9    Internet pharmacies, didn't you?

10         A.    Yes.

11         Q.    McKesson is another one of

12    these distributors, correct?

13         A.    Yes, they are a distributor.

14         Q.    And McKesson was participating

15    in the problem, too, weren't they?

16               MR. EPPICH:  Objection to the

17         form.  Foundation.  Vague.

18               MS. MCCLURE:  Leading.

19               MR. BENNETT:  Objection.

20         Vague.  Objection.  Scope.

21    QUESTIONS BY MR. LANIER:

22         Q.    The question pending is,

23    McKesson was participating in the problem,

24    too, true?

25               MR. EPPICH:  Same objections.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1                THE WITNESS:  I don't know to
2          what extent they were involved in
3          distributing to any of the pharmacies
4          that are in the examples here.
5    QUESTIONS BY MR. LANIER:
6          Q.     All right.  Well, you've seen
7    Exhibit Number 8, which is the presentation
8    that y'all did -- write-up of the
9    presentation that y'all did with McKesson,
10   September 1 of 2005, correct?
11         A.     Yes.
12                (Mapes Exhibit 27 marked for
13         identification.)
14   QUESTIONS BY MR. LANIER:
15         Q.     And then if we want to take it
16   a step further, I'll give you a document that
17   we'll mark as Exhibit Number 27.
18                And Exhibit Number 27 -- do you
19   have it in front of you?
20         A.     I do.
21         Q.     -- is one where -- take a
22   moment and look at it, but I'll show you the
23   part that I'm interested in so it saves
24   everybody some time.
25                It talks about John Gilbert,
```

1    the legal counsel for McKesson, representing

2    McKesson, contacting you and Kyle Wright,

3    responding to questions about sales of

4    controlled substances by McKesson to six

5    Internet pharmacies that were located in the

6    Miami field division.

7              And then I'm specifically going

8    to ask you about this.  You'll see it

9    references that they were briefed -- McKesson

10   was briefed by the DEA on September 1st of

11   2005, and the ARCOS report for the month of

12   October revealed that McKesson distribution

13   center in Lakeland, Florida, distributed over

14   2 million dosage units of hydrocodone --

15             Now, that's an opioid, right?

16   A.      Yes, it is.

17   Q.      -- to six suspected illicit

18   Internet pharmacies.  They even filed

19   suspicious order reports involving these same

20   pharmacies but still distributed them.

21             Do you see that?

22   A.      I do.

23   Q.      Does that help refresh your

24   recollection of whether or not McKesson was

25   participating in this problem of Internet

```
 1    pharmacies as well, illegal Internet

 2    pharmacies?

 3              MR. EPPICH:  Objection to form.

 4         Characterization.

 5              THE WITNESS:  It does.

 6    QUESTIONS BY MR. LANIER:

 7         Q.    And in fact, were they

 8    participating in the problem?  Is that true?

 9              MR. EPPICH:  Objection to form.

10         Vague.  Foundation.

11              THE WITNESS:  Yes.

12    QUESTIONS BY MR. LANIER:

13         Q.    And the McKesson lawyer, if we

14    look at the whole truth, he never showed you

15    that follow-up document, did he?

16              MR. EPPICH:  Objection.

17         Argumentative.

18              THE WITNESS:  Which

19         follow-up --

20    QUESTIONS BY MR. LANIER:

21         Q.    The one that I had to show you

22    because you couldn't remember whether or not

23    McKesson contributed to this problem.  And I

24    showed you Exhibit 27.

25              MR. EPPICH:  Objection.  Form.
```

```
 1          Misstates testimony.

 2    QUESTIONS BY MR. LANIER:

 3          Q.    You'd never been shown that

 4    before, had you?

 5               MR. EPPICH:  Objection.  Form.

 6          Misstates testimony.

 7               THE WITNESS:  No, I had not.

 8    QUESTIONS BY MR. LANIER:

 9          Q.    And so now that you see it and

10    see the whole truth, you've got an ability to

11    determine whether or not McKesson was

12    participating, fair?

13          A.    Yes.

14          Q.    All right.  Now, one other

15    thing I found interesting.  When the lawyer

16    for McKesson was asking you questions, he

17    said, "You would typically note in the

18    meeting," and he referenced the meeting

19    notes, "if more had been said that meeting."

20               MR. EPPICH:  Objection.

21          Misstates.

22    QUESTIONS BY MR. LANIER:

23          Q.    He was talking about Exhibit

24    Number 7.

25               Do you recall that?
```

1          MR. EPPICH:  Objection.

2     Misstates testimony.

3          THE WITNESS:  Yes.

4  QUESTIONS BY MR. LANIER:

5     Q.    And in truth of fact, he's

6  probably right.  If something significant had

7  been said at the meeting, y'all would have

8  noted it, true?

9          MR. EPPICH:  Objection.

10    Misstates.  Leading.  Form.

11         THE WITNESS:  Yes.

12  QUESTIONS BY MR. LANIER:

13    Q.    Which tells us that the

14  distributor did not confess to the problem at

15  the meeting.

16         MR. EPPICH:  Objection.

17  QUESTIONS BY MR. LANIER:

18    Q.    Because McKesson -- if McKesson

19  had said, "Hey, we're doing this," or "We're

20  selling with blinders on and we're not

21  looking," or "We hadn't been following this

22  stuff," or "We haven't been checking for

23  diversion the way the law says," if they had

24  told you at the meeting, you surely would

25  have noted it, wouldn't you?

Highly Confidential - Subject to Further Confidentiality Review

```
1                    MR. EPPICH:  Objection to the
2         form.  Misstates testimony.
3                    THE WITNESS:  Yes.
4    QUESTIONS BY MR. LANIER:
5         Q.    So they didn't tell you that at
6    the meeting, we can surmise.  Y'all had to go
7    dig it out from all of the files that you've
8    got in the ARCOS data, as you call it, right?
9         A.    Yes.
10                   MR. EPPICH:  Objection to form.
11   QUESTIONS BY MR. LANIER:
12        Q.    In fact, McKesson not only did
13   it, but y'all wound up sending them a show
14   cause order, didn't you?
15                   MS. MCCLURE:  Scope.
16                   THE WITNESS:  I don't recall if
17        there was one.
18   QUESTIONS BY MR. LANIER:
19        Q.    There was at least discussion
20   of one.  I think I may be one when I say "one
21   issued."
22                   There was discussion of a show
23   cause order, right?
24                   MR. EPPICH:  Objection.
25        Foundation.  Form.
```

```
 1    QUESTIONS BY MR. LANIER:
 2         Q.    Did you know that when that
 3    lawyer was asking you questions yesterday,
 4    that there had been a discussion of a show
 5    cause order?
 6               MS. WICHT:  Scope.
 7               MR. EPPICH:  I'll object to the
 8          scope and form.
 9    QUESTIONS BY MR. LANIER:
10         Q.    Can you answer the question,
11    please?
12         A.    I'm reading through it.
13         Q.    That's coming up for the next
14    question.  First answer the one pending,
15    please.
16         A.    It had been mentioned at a
17    meeting with McKesson as of -- as a possible
18    sanction.
19               (Mapes Exhibit 28 marked for
20          identification.)
21    QUESTIONS BY MR. LANIER:
22         Q.    Yeah.
23               I've just handed you Exhibit
24    Number 28.
25               Well, let's -- I don't think in
```

```
1    light of your answer that I need to deal with
2    that exhibit, so you can set it aside.  We'll
3    come back to it if we need to.
4               I mean, ultimately the Lakeland
5    problem is what led to a $13 million
6    settlement between McKesson and the US
7    Department of Justice, or the DEA, in 2008.
8               Did you know that?
9               MR. EPPICH:  Objection to form.
10        Misstates facts.
11              THE WITNESS:  No, I didn't -- I
12         wasn't aware of everything that led to
13         the settlement because I had retired
14         prior to that.
15   QUESTIONS BY MR. LANIER:
16        Q.    Did you ever see the settlement
17   and release agreement?
18        A.    I did not.
19              (Mapes Exhibit 29 marked for
20         identification.)
21   QUESTIONS BY MR. LANIER:
22        Q.    I'll hand it to you -- a copy
23   of it to you marked as Exhibit Number 29.
24   It's long.  I don't need you to -- you're
25   welcome to go through the whole thing, but I
```

Highly Confidential - Subject to Further Confidentiality Review

1    want to direct your attention specifically to

2    the background section.  Just right there at

3    the start.

4                August 4, 2006, you were still

5    at the DEA at that time, weren't you?

6         A.    I was.

7         Q.    By its deputy administrator,

8    Joseph T. Rannazzisi, issued an order to show

9    cause to McKesson with respect to its

10   Lakeland distribution center in Lakeland,

11   Florida.

12               Do you see that?

13        A.    I do.

14        Q.    Order number 1 alleged, among

15   other things, that "McKesson failed to

16   maintain effective controls at the Lakeland

17   facility against diversion of particular

18   controlled substances."

19               Do you see that as well?

20        A.    I do.

21               MR. EPPICH:  Objection.  Form.

22   QUESTIONS BY MR. LANIER:

23        Q.    And then it says that,

24   "Whereas, on November 1, 2007, Mr. Rannazzisi

25   issued a second order to show cause to

Highly Confidential - Subject to Further Confidentiality Review

1    McKesson with respect to its Landover

2    distribution in Maryland for failing to

3    maintain effective controls."

4              Did you see that as well?

5              MR. EPPICH:  Objection.  Form.

6         Foundation.

7              THE WITNESS:  Yes, I see that.

8    QUESTIONS BY MR. LANIER:

9         Q.    Now, when defendants fail to

10   maintain effective control, is that a good

11   thing or a bad thing?

12             MR. EPPICH:  Objection.  Form.

13             THE WITNESS:  It's a bad thing.

14   QUESTIONS BY MR. LANIER:

15        Q.    Why?

16        A.    Because that may allow drugs to

17   be diverted.

18        Q.    And then I've got to fill in

19   the blank here on my question for you.

20             In response to the questions by

21   the lawyer from McKesson, "If more had been

22   said at the meetings of note, it would have

23   been noted," no distributor confessed.

24             That's true, isn't it?

25             MS. MCCLURE:  Objection.  Form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Misstates testimony.  Argumentative.

 2                   MR. EPPICH:  I'll join in those

 3              objections.  Foundation.  Vague.

 4                   THE WITNESS:  Yes.

 5     QUESTIONS BY MR. LANIER:

 6         Q.    Okay.  Next.  All of the -- let

 7     me do it this way.

 8                   The questions that I've asked

 9     you about Internet pharmacies, as far as

10     Cardinal Health is concerned, you also met

11     with them, right?

12         A.    With counsel for Cardinal

13     Health, yes.

14         Q.    And we have the notes from that

15     as Exhibit Number 9 that we looked at

16     yesterday, correct?

17                   MS. WICHT:  Object to form.

18                   THE WITNESS:  Yes, that is

19              correct.

20     QUESTIONS BY MR. LANIER:

21         Q.    And Cardinal Health never

22     confessed to having problems?

23                   MS. WICHT:  Object to form.

24     QUESTIONS BY MR. LANIER:

25         Q.    Did they?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. WICHT:  I'm sorry.  Object

 2         to form, foundation and vague.

 3                    THE WITNESS:  They did not.

 4    QUESTIONS BY MR. LANIER:

 5         Q.    And yet you know Cardinal

 6    Health was also trafficking in the pills to

 7    the Internet pharmacies that were illegal or

 8    illicit, right?

 9                    MS. WICHT:  Object to form.

10         Foundation.  Vague.  Argumentative.

11                    THE WITNESS:  They were selling

12         pills to pharmacies, yes.

13    QUESTIONS BY MR. LANIER:

14         Q.    Failing to maintain effective

15    controls against diversion, true?

16                    MS. WICHT:  Object to form.

17         Foundation.  Calls for a legal

18         conclusion.  Leading.  Object to the

19         improper demonstrative.

20                    THE WITNESS:  Yes.

21                    (Mapes Exhibit 30 marked for

22         identification.)

23    QUESTIONS BY MR. LANIER:

24         Q.    Okay.  Now, if we want to see

25    specifically some of what you've done, I
```

Highly Confidential - Subject to Further Confidentiality Review

1    found a color set we can show the jury of

2    your presentation.  I think the record will

3    reflect in the exhibit, it's Exhibit 30.  I'm

4    marking it now.  That this is the one that

5    you gave to AmerisourceBergen.

6                 But your presentation was

7    basically the same to each of these

8    distributors, true?

9                 MS. MCCLURE:  Asked and

10        answered.

11                THE WITNESS:  Yes.

12   QUESTIONS BY MR. LANIER:

13       Q.    So Exhibit 30 is the actual

14   data.

15                And you told these folks about

16   these Internet issues, but the Internet

17   issues had been around for years before this

18   meeting, hadn't they?

19                MS. MCCLURE:  Form.

20        Foundation.  Misstates the witness'

21        testimony.

22                THE WITNESS:  I'm not certain

23        what time the Internet issues started.

24   QUESTIONS BY MR. LANIER:

25       Q.    Well, look on Slide 9.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    The Internet policy, at least,
 2       that you reference --
 3                    MR. BENNETT:  Hang on a second,
 4            Counsel.  He's trying to find --
 5                    MR. LANIER:  Oh, yeah, because
 6            they're not numbered.
 7       QUESTIONS BY MR. LANIER:
 8            Q.    So it's the one that says "DEA
 9       Internet policy."
10                    Do you see that?
11            A.    I do.
12            Q.    The Internet policy was 2001,
13       the policy that you said was specific for the
14       Internet registration issues, right?
15            A.    No, I believe that's the policy
16       about prescriptions being issued by a doctor
17       acting in the usual course of professional
18       practice, not specifically relating to
19       Internet.
20            Q.    Okay.  So the 2001 is not the
21       Internet policy date?
22            A.    No.
23            Q.    Thank you.  That helps clarify.
24                    If you will flip to page 21,
25       it's the slide entitled -- the first one
```

1    entitled "Suspicious Orders."  Several slides

2    have that title.

3                Do you see it?

4        A.    Yes.

5        Q.    Now, the suspicious orders --

6    21 CFR means the Code of Federal Regulations.

7    That's the regulations that have been enacted

8    that have the authority of law, right?

9                MS. MCCLURE:  Leading.

10               THE WITNESS:  Correct.

11   QUESTIONS BY MR. LANIER:

12       Q.    1301.74, that's part of what

13   was asked you about yesterday, correct?

14       A.    That's correct.

15       Q.    It requires that the

16   registrants design and operate a system to

17   identify suspicious orders.

18               Do you see that?

19       A.    Yes.

20       Q.    And registrants here are these

21   distributors in our closed-loop drawing,

22   correct?

23               MS. MCCLURE:  Form.

24          Foundation.  Misstates.

25               THE WITNESS:  Yes, among

1      others.

2    QUESTIONS BY MR. LANIER:

3         Q.    Yeah, you've got to register

4    also as a manufacturer and a pharmacist, but

5    this requirement to identify suspicious

6    orders, you were specifically talking at that

7    point in time to the distributors, fair?

8              MS. MCCLURE:  Leading.

9              THE WITNESS:  Yes.

10   QUESTIONS BY MR. LANIER:

11        Q.    And this law that requires that

12   they design and operate a system to identify

13   these suspicious orders had been in effect

14   since when?

15             MS. MCCLURE:  Form.  Calls for

16        a legal conclusion.

17             THE WITNESS:  I don't know when

18        that regulation first was in effect.

19   QUESTIONS BY MR. LANIER:

20        Q.    But it was the 1970s, wasn't

21   it?

22             MS. MCCLURE:  Leading.

23             THE WITNESS:  I believe so.

24   QUESTIONS BY MR. LANIER:

25        Q.    And this is the same law that

Highly Confidential - Subject to Further Confidentiality Review

1    requires them to report suspicious orders to

2    the DEA when discovered, fair?

3                    MS. MCCLURE:  Form.  Calls for

4        a legal conclusion.

5                    THE WITNESS:  It is.

6    QUESTIONS BY MR. LANIER:

7        Q.    So this is the company's

8    requirement to design and operate the system.

9    It's not the DEA's job --

10                   MS. MCCLURE:  Same objection.

11   QUESTIONS BY MR. LANIER:

12       Q.    -- right?

13       A.    That's correct.

14       Q.    And then on suspicious orders,

15   report -- the next slide, "Reporting a

16   suspicious order to the DEA does not" --

17                   And you put that in all caps

18   for your presentation, didn't you?

19       A.    Yes.

20       Q.    -- "does not relieve the

21   distributor of the responsibility to maintain

22   effective controls."

23                   You can't just report the

24   suspicious order; you still have to maintain

25   effective controls, don't you?

1          A.     Yes.

2          Q.     Because it's the distributor's

3    decision whether or not they're going to ship

4    those suspicious drugs or not, isn't it?

5                 MS. MCCLURE:  Form.  Leading.

6                 THE WITNESS:  Yes.

7    QUESTIONS BY MR. LANIER:

8          Q.     And that's your next slide.

9    You said, "The DEA cannot tell a distributor

10   if an order is legitimate or not.  The

11   distributor must determine which orders are

12   suspicious and then make a sales decision."

13                Correct?

14                MR. EPPICH:  Objection.

15        Misstates the document.

16                THE WITNESS:  Correct.

17   QUESTIONS BY MR. LANIER:

18         Q.     Now, that's kind of a weird

19   thing, but let's -- at the risk of stating

20   the obvious, every drug the distributor

21   sells, the distributor's making money on that

22   transaction, right?

23                MS. MCCLURE:  Form.

24        Foundation.  Calls for speculation.

25        Leading.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  I don't know for
 2           certain, but we were never involved in
 3           the financial portion of things.
 4      QUESTIONS BY MR. LANIER:
 5           Q.     Well, you know that there are
 6      companies that operate for profit?
 7           A.     Yes.
 8           Q.     And you know they make their
 9      profit distributing drugs.  You call them a
10      wholesaler at times, right?
11           A.     Yes.
12                  MS. MCCLURE:  Form.
13      QUESTIONS BY MR. LANIER:
14           Q.     Because they take from the
15      manufacturer and they put in the hands of the
16      pharmacies, right?
17                  MR. EPPICH:  Objection.  Form.
18           Foundation.  Calls for speculation --
19                  MS. MCCLURE:  Leading.
20                  MR. EPPICH:  -- to this and the
21           prior question.
22                  THE WITNESS:  Yes.
23      QUESTIONS BY MR. LANIER:
24           Q.     And you know that that's
25      generally how they make their money.  They're
```

1    not sitting on the street corner with a cup

2    saying, "We do our work for free; would you

3    please give us money"?

4                    MS. MCCLURE:  All the same

5            objections, plus argumentative, plus

6            compound.

7                    THE WITNESS:  It would be an

8            assumption that that's how they're

9            making their money.

10   QUESTIONS BY MR. LANIER:

11           Q.    Yeah.  Have you ever known a

12   big distributor of opioids that's a nonprofit

13   company?

14           A.    No.

15           Q.    All right.  So you've got a

16   company that's got to make a sales decision,

17   knowing if they ship and sell the product

18   they make their money, most likely.  And yet

19   it's their decision, it's not the DEA's, in

20   the normal course of events, absent some

21   order, right?

22                    MR. EPPICH:  Objection.  Form.

23           Misstates testimony.

24                    MS. MCCLURE:  Leading.

25                    THE WITNESS:  Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. LANIER:

 2         Q.    And so in your summary sheet,

 3    which is right toward the end, you had to

 4    tell them that any "distributor selling

 5    controlled substances that are being

 6    dispensed outside the course of professional

 7    practice must stop immediately."

 8              You had to tell them that,

 9    right?

10              MS. MCCLURE:  Form.  Compound.

11         Leading.

12              THE WITNESS:  We did tell them

13         that, yes.

14    QUESTIONS BY MR. LANIER:

15         Q.    But, I mean, that's a gimme.

16    Should be, shouldn't it?

17              MS. MCCLURE:  Argumentative.

18         Form.  Foundation.  Leading.

19              THE WITNESS:  It should be.

20    QUESTIONS BY MR. LANIER:

21         Q.    Right before you left the DEA

22    to go do work as a consultant for

23    AmerisourceBergen and others, there was a

24    show cause order that was issued.  It was

25    Exhibit 12 that you were shown yesterday,
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    this order to show cause and immediate

 2    suspension of registration to

 3    AmerisourceBergen in 2007.

 4              Do you see that?

 5    A.    Yes.

 6    Q.    And the order to show cause was

 7    based on the respondent -- that would be

 8    AmerisourceBergen, right?

 9              MS. MCCLURE:  Form.

10              THE WITNESS:  Yes.

11    QUESTIONS BY MR. LANIER:

12    Q.    -- failing to maintain

13    effective controls against diversion of

14    particular controlled substances, in

15    violation of the law.

16              Do you see that?

17    A.    I do.

18    Q.    Several of their largest

19    purchasers of hydrocodone --

20              That's an opioid, right?

21    A.    It is.

22    Q.    -- in 2005 and 2006 were

23    pharmacies engaged in schemes to dispense

24    controlled substances based on prescriptions

25    that are issued for other than a legitimate
```

Highly Confidential - Subject to Further Confidentiality Review

1    medical purpose and by physicians acting

2    outside the usual course of professional

3    practice.

4                  That's while you were there,

5    wasn't it?

6         A.    Yes.

7         Q.    I mean, y'all were listing it

8    here.  Y'all have got over a million doses of

9    these opioids in just one year at one place,

10   right?

11                MS. MCCLURE:  Form.

12                THE WITNESS:  Correct.

13   QUESTIONS BY MR. LANIER:

14        Q.    And you've got them doing it

15   under similarly suspicious circumstances to a

16   number of different pharmacies, don't you?

17                MS. MCCLURE:  Form.  Vague.

18                THE WITNESS:  Yes.

19   QUESTIONS BY MR. LANIER:

20        Q.    And then y'all's investigation

21   and your work and what you knew is that

22   public information regarding several of the

23   pharmacy customers was readily available to

24   AmerisourceBergen.

25                MS. MCCLURE:  Form.  Scope.

```
 1    QUESTIONS BY MR. LANIER:

 2         Q.      That's true, isn't it?

 3         A.      Yes.

 4         Q.      And had AmerisourceBergen

 5    attempted to learn about these pharmacies

 6    prior to filling the suspicious orders, they

 7    would have known many of the named pharmacies

 8    were filling prescriptions issued by

 9    physicians acting outside the usual course of

10    professional practice, in violation of the

11    law, wouldn't they?

12              MS. MCCLURE:  Form.

13              THE WITNESS:  That's correct.

14    QUESTIONS BY MR. LANIER:

15         Q.      And this is all work that

16    happened while you were at the DEA, isn't it?

17         A.      It is.

18         Q.      It continues on page 3 to talk

19    about how they sold over 5.2 million dose

20    units of this opioid to pharmacies that bore

21    the characteristics that the DEA described in

22    that very October -- August 2005 meeting,

23    correct?

24              MS. MCCLURE:  Form.

25              THE WITNESS:  Yes.
```

```
 1    QUESTIONS BY MR. LANIER:

 2         Q.    So y'all met with them.  You

 3    made it clear what the law was, and they,

 4    afterwards, continued to sell in violation of

 5    the law, based upon the way you understood

 6    it, correct?

 7              MS. MCCLURE:  Objection.  Form.

 8         Foundation.  Leading.

 9              THE WITNESS:  Correct.

10    QUESTIONS BY MR. LANIER:

11         Q.    Interestingly, you were shown

12    yesterday Exhibit Number 18, which is this

13    summary of the DEA HDMA meeting.

14              HDMA, who are they?

15         A.    They're a trade association,

16    the Healthcare Distribution Management

17    Association.

18         Q.    This is a trade association.

19    This is an organization that the pharmacy

20    companies fund and join, right?

21              MS. MCCLURE:  Form.

22              MS. WICHT:  Object to form.

23              MS. MCCLURE:  Foundation.

24              THE WITNESS:  Yes.

25
```

```
 1     QUESTIONS BY MR. LANIER:

 2          Q.     And you were meeting with them.

 3     You were one of the DEA attendees, right?

 4          A.     Correct.

 5          Q.     And then I was reading this

 6     Exhibit 18 they showed you yesterday, and it

 7     says that y'all "prioritize who to meet with

 8     on a combination of wholesale distributor

 9     sales volumes and tracing back to where you

10     felt the source of the products for illicit

11     Internet pharmacies was located."

12                 Is that true?

13                 MS. MCCLURE:   Form.

14     QUESTIONS BY MR. LANIER:

15          Q.     So in other words, y'all met

16     with the volume source problems first?

17          A.     We met with those wholesalers

18     that handled the largest volumes of

19     controlled substances first.

20          Q.     Yeah.

21                 So that means you met first

22     with the AmerisourceBergen, I guess, right?

23          A.     Yes.

24          Q.     Who did you meet with next?

25          A.     I believe it was Cardinal.
```

```
1          Q.      Who did you meet with next?
2          A.      McKesson.
3          Q.      Have you heard the expression
4    "the big three" when it comes to
5    distributors?
6          A.      Yes.
7          Q.      Those are the big three, aren't
8    they?
9          A.      They are referred to as that.
10         Q.      Now, it's apparent by us
11   reading this -- it's apparent by us reading
12   this that holding shipments that were
13   suspicious was a new thing for Amerisource in
14   2007, true?
15         A.      Yes.
16         Q.      I mean, they made that point
17   yesterday.  They never did that before, did
18   they, to your knowledge?
19         A.      Not that I'm aware of, no.
20         Q.      I mean, think of this:  Before
21   that, AmerisourceBergen would be suspicious
22   that this might be an order that could be
23   diverted, and they'd just sell it anyway --
24              MS. MCCLURE:  Form.
25         Foundation.
```

```
 1     QUESTIONS BY MR. LANIER:

 2          Q.     -- wouldn't they?

 3          A.     They were reporting things

 4     after shipment, yes.

 5          Q.     In other words, oh, we have our

 6     suspicions that this may be illegal, may be

 7     used for wrong purposes, may hurt the public,

 8     may hurt health.  We have suspicions this can

 9     be diverted, but we're going to sell anyway.

10               MS. MCCLURE:  Objection.

11     QUESTIONS BY MR. LANIER:

12          Q.     That was their policy --

13               MS. MCCLURE:  Objection.

14          Misstates.

15     QUESTIONS BY MR. LANIER:

16          Q.     -- before 2007, wasn't it?

17               MS. MCCLURE:  Objection.

18          Misstates the record.  Form.

19          Foundation.

20               THE WITNESS:  I don't know that

21          it was a policy of theirs.

22     QUESTIONS BY MR. LANIER:

23          Q.     Well, it was their practice --

24               MS. MCCLURE:  All the same.

25
```

```
 1      QUESTIONS BY MR. LANIER:

 2            Q.     -- wasn't it?

 3            A.     Yes.

 4            Q.     I mean, you told these

 5      companies that under the old Harrison

 6      Narcotic Act -- you know what that is, right?

 7            A.     Yes.

 8            Q.     That's what preceded the

 9      Controlled Substances Act?

10            A.     Correct.

11            Q.     And you would talk to these

12      companies about this US Supreme Court

13      explaining the need to hold suspicious

14      shipments, didn't you?

15            A.     In those meetings, yes.

16            Q.     And the case you were citing

17      from the US Supreme Court -- I looked at your

18      meeting notes -- 1943, Direct Sales versus

19      United States, correct?

20            A.     Yes.

21            Q.     So you knew since 1943 about

22      the need to hold suspicious orders --

23                   MR. EPPICH:  Object to form.

24      QUESTIONS BY MR. LANIER:

25            Q.     -- didn't you?
```

```
1              MR. EPPICH:  Object to form.

2              THE WITNESS:  I don't recall

3         the details of that case and what it

4         refers to, but it was a case from...

5    QUESTIONS BY MR. LANIER:

6         Q.    From 1943, Direct Sales versus

7    the United States, where the petitioner was a

8    registered drug manufacturer and wholesaler,

9    and they were selling to Dr. Tate in such

10   quantities and so frequently that it must

11   have known he couldn't dispense the amounts

12   lawfully, and so he was distributing them

13   illegally.  And they were continuing to ship

14   to him even after they should have known

15   this, and that's what they got nailed for.

16              That's the case, isn't it?

17              MS. MCCLURE:  Form.

18              MR. EPPICH:  Objection.

19              THE WITNESS:  Yes.

20   QUESTIONS BY MR. LANIER:

21        Q.    And you included that case in

22   what you gave the companies?

23        A.    Yes, we did.

24        Q.    And that was an opioid case,

25   wasn't it?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. MCCLURE:  Form.

 2                    THE WITNESS:  It was.

 3    QUESTIONS BY MR. LANIER:

 4        Q.    So this idea that, ah, geez, we

 5    couldn't know, I mean, you gave them a case

 6    that said since 1943 the US Supreme Court

 7    said that you should be holding these things,

 8    right?

 9                    MS. MCCLURE:  Form.

10          Foundation.  Misstates.

11                    THE WITNESS:  Yes, the Supreme

12          Court said that you should have known.

13    QUESTIONS BY MR. LANIER:

14        Q.    And with all due respect, have

15    you seen a chart of how the opioid crisis

16    exploded in Summit and Cuyahoga Counties --

17    Cuyahoga County?  Sorry, I'm from Lubbock,

18    Texas.  We don't do that well.

19                    Cuyahoga County?

20        A.    No, I have not.

21        Q.    So no one showed you the chart

22    that was prepared, and it's in the expert

23    report of Craig McCann.  I want to make it

24    real clear he's one of our experts, but I

25    don't think anybody disputes this chart.
```

```
 1              MS. MCCLURE:  Note for the

 2         record significant laughter, and

 3         objection to characterization

 4         regarding the plaintiffs' exhibit.

 5   QUESTIONS BY MR. LANIER:

 6         Q.     This is actually from Rafalski,

 7   Jim Rafalski, originally.  And it shows --

 8              MR. EPPICH:  Objection.

 9   QUESTIONS BY MR. LANIER:

10         Q.     -- the huge -- I mean, boy,

11   this is all we had.  If we were just looking

12   at this, you'd say, man, what happened in

13   1999 and 2000?  All of a sudden the sales

14   just went through the roof?

15              Do you see that?

16              MS. SWIFT:  Objection.

17              MS. MCCLURE:  Objection.

18         Characterization.  Scope.

19              THE WITNESS:  I see an

20         increase.

21   QUESTIONS BY MR. LANIER:

22         Q.     Yeah.  And then -- but that's

23   nothing compared to what happened after that.

24   That's a mountain, isn't it?

25              MS. SWIFT:  Objection.
```

```
 1          Mischaracterizes the evidence.

 2                  MS. MCCLURE:  Objection.

 3          Narrative.  Scope.

 4                  THE WITNESS:  Yes, it's another

 5          large increase.

 6     QUESTIONS BY MR. LANIER:

 7          Q.    We're taking the deposition,

 8     your deposition today, in Colorado Springs

 9     where you live, right?

10          A.    Yes.

11          Q.    Is that Pikes Peak I saw out

12     the window?

13          A.    Could have been.

14          Q.    14,000-plus feet?

15          A.    Yes.

16          Q.    I mean, you know mountains,

17     don't you?

18                  MS. MCCLURE:  Form.

19                  THE WITNESS:  Yes.

20     QUESTIONS BY MR. LANIER:

21          Q.    So when a company sees a

22     suspicious order, the company's got to make

23     this decision:  Do we sell it and make our

24     money, or do we hold it and investigate it?

25                  That's the company's decision,
```

Highly Confidential - Subject to Further Confidentiality Review

1    right?

2              MS. MCCLURE:  Form.  Compound.

3              THE WITNESS:  It is.

4    QUESTIONS BY MR. LANIER:

5         Q.    Always has been the company's

6    decision, hasn't it?

7         A.    It has.

8         Q.    And common sense weighs in to

9    this just as much as the law and everything

10   else, doesn't it?

11             MS. MCCLURE:  Form.

12             THE WITNESS:  Yes.

13   QUESTIONS BY MR. LANIER:

14        Q.    And decency weighs in on this,

15   too, and concern for public good and public

16   health, right?

17             MS. MCCLURE:  Form.

18             THE WITNESS:  Yes.

19   QUESTIONS BY MR. LANIER:

20        Q.    And so faced with that on one

21   side of the coin, and on the other side of

22   the coin or the ledger you've got corporate

23   profits and business, right?

24             MS. MCCLURE:  Form.

25             THE WITNESS:  Yeah, those are

Highly Confidential - Subject to Further Confidentiality Review

1       factors they need to consider.

2    QUESTIONS BY MR. LANIER:

3       Q.    All right.  In this regard, I

4    asked Joe Rannazzisi some questions in his

5    deposition, and I'd like to -- I've got the

6    notes that I made from his deposition, and

7    I'd like to just ask you some questions based

8    on those notes to see if you agree or

9    disagree?

10          Okay?

11       A.    Okay.

12          MS. MCCLURE:  Objection.  Based

13       on the notes, mischaracterized

14       Mr. Rannazzisi's actual testimony.

15    QUESTIONS BY MR. LANIER:

16       Q.    "All registrants are required

17    to maintain effective control against

18    diversion."  I'm going to put your answers in

19    blue.

20          Do you agree or disagree?

21       A.    Agree.

22       Q.    And so this is blue for

23    Mr. Mapes.

24          "The registrant is required to

25    report a suspicious order to the DEA."

Highly Confidential - Subject to Further Confidentiality Review

1               Do you agree?

2         A.      Yes.

3         Q.      "The registrant is required to

4    maintain a system to detect suspicious

5    orders."

6               Do you agree with that part?

7         A.      Yes.

8         Q.      And "It's a business decision,

9    but they must identify suspicious orders."

10              Do you agree?

11        A.      Yes.

12        Q.      And "They should not ship

13   suspicious orders without full due diligence

14   that resolves their suspicions."

15              Do you agree?

16        A.      I agree.

17              MS. WICHT:  Object to form on

18        the last question.

19   QUESTIONS BY MR. LANIER:

20        Q.      I don't need ask you this one

21   because we've covered it with our own

22   drawing, although I did a better drawing for

23   him, didn't I?

24              Let's just work through it.

25              A closed system of

1    distribution, that's what we called a loop,

2    right?

3              Agreed?

4    A.    Yes.

5    Q.    And it accounts for the drugs

6    from the manufacturing to the patient, agree?

7    A.    Yes.

8    Q.    And this system, it's for the

9    legal obligation to secure, keep records and

10   control against diversion, agree?

11   A.    Yes.

12             MS. SWIFT:  Object to form.

13   QUESTIONS BY MR. LANIER:

14   Q.    Manufacturers, they make money

15   off the manufacturing and selling of the

16   pills, generally, true?

17             MR. EPPICH:  Objection.

18        Foundation.

19             MS. MCCLURE:  Form.

20        Foundation.

21   QUESTIONS BY MR. LANIER:

22   Q.    Let me ask it this way, and I

23   don't think that's the way I asked

24   Mr. Rannazzisi.

25             Manufacturers manufacture pills

Highly Confidential - Subject to Further Confidentiality Review

1    and sell them, general course of business,

2    right?

3              I'm not saying they don't give

4    samples.  I'm not saying they don't, you

5    know, have some that they may put under

6    various programs, but they manufacture pills,

7    fair?

8         A.    Yeah, various dosage forms.

9         Q.    And the distributors are the

10   middleman who send out the money -- or take

11   orders and get paid as a bridge, agreed?

12             MR. EPPICH:  Objection.  Form.

13   QUESTIONS BY MR. LANIER:

14        Q.    Between the manufacturers and

15   retailers?

16             MR. EPPICH:  Object to the

17        form.

18             THE WITNESS:  Yes.

19   QUESTIONS BY MR. LANIER:

20        Q.    Would you agree that they are a

21   key component to this registration system?

22             MR. EPPICH:  Object to form.

23             THE WITNESS:  Yes.

24   QUESTIONS BY MR. LANIER:

25        Q.    Would you agree that they must

```
 1    be vigilant, and by that include due

 2    diligence, knowing their customers and

 3    looking at suspicious orders, agreed?

 4              MR. EPPICH:  Objection.  Form.

 5         Vague.

 6              MS. SWIFT:  Objection.  Legal

 7         conclusion.

 8              MR. EPPICH:  Calls for a legal

 9         conclusion.

10              THE WITNESS:  Yes.

11    QUESTIONS BY MR. LANIER:

12         Q.    And would you agree that this

13    is critical to stop diversion?

14              MR. EPPICH:  Object to the

15         form.

16              THE WITNESS:  Yes.

17    QUESTIONS BY MR. LANIER:

18         Q.    And I've asked you if you know

19    whether or not the more they sell, the more

20    money they make.

21              You assume that to be true, but

22    you don't know firsthand, fair?

23         A.    That's correct.

24         Q.    All right.  We'll leave that

25    unmarked.
```

1           Now, in 2005, Joe Rannazzisi

2    says he sat down with the distributors, he

3    explained the law as he interpreted it and

4    what was expected.

5           Were you in on that meeting?

6           MS. WICHT:  Objection.

7      Foundation.

8           MS. MCCLURE:  Objection to the

9      extent it mischaracterizes what

10     Mr. Rannazzisi testified to.

11          THE WITNESS:  I don't know

12     which meeting he may have been

13     referring to.

14   QUESTIONS BY MR. LANIER:

15     Q.    Okay.  So don't know if you

16   were there.

17          Did you know that those

18   meetings took place?

19          MS. MCCLURE:  Continuing

20     objection.  Same.

21          THE WITNESS:  The meetings I'm

22     aware of were the Distributor

23     Initiative meetings that we've talked

24     about already, and he was at, I

25     believe, one of those.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. LANIER:

 2         Q.     So you know -- whoops.  You

 3    know about those meetings with the

 4    distributors where you were involved

 5    explaining the law?

 6         A.     Yes.

 7         Q.     Okay.  And then in 2006 and

 8    2007, he sent letters telling them to

 9    remember their responsibilities.

10              Did you know about that?

11         A.     Yes.

12              MS. MCCLURE:  Form.

13    Mischaracterizes the document.

14    QUESTIONS BY MR. LANIER:

15         Q.     And then he testified the

16    companies, at least several companies, didn't

17    do what they were directed to do.  They

18    didn't comply.

19              You know that to be true, at

20    least for the McKesson story -- I mean, the

21    AmerisourceBergen story we were talking about

22    before, right?

23              MS. MCCLURE:  Objection.  Form.

24    Foundation.  Mischaracterizes the

25    witness' testimony.
```

```
 1                    THE WITNESS:  Yeah, I know

 2          there were continuing issues.

 3    QUESTIONS BY MR. LANIER:

 4          Q.     Well, not just continuing

 5    issues, continuing violations based upon your

 6    interpretation?

 7                    MS. MCCLURE:  All the same

 8          objections plus asked and answered.

 9          Argumentative.

10    QUESTIONS BY MR. LANIER:

11          Q.     And by "your" I mean you,

12    individually, not the DEA.

13                    MS. MCCLURE:  All the same.

14                    MR. BENNETT:  Objection.

15          Scope.

16                    You may answer that question

17          yes or no only.

18                    THE WITNESS:  Yes.

19    QUESTIONS BY MR. LANIER:

20          Q.     Okay.  And the company changed

21    the law.  They lobbied hard to get a bill

22    passed that changed the ability of the DEA to

23    control distributors, didn't they?

24                    MS. MCCLURE:  Form.

25          Foundation.  Compound.  Misstates the
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              record.  Vague.

 2                      THE WITNESS:  There was a

 3              change in the law, yes.

 4    QUESTIONS BY MR. LANIER:

 5              Q.    We'll look at how much the

 6    company spent to lobby for that in a little

 7    bit, if we have time.

 8                      And diversion causes overdose

 9    and deaths, 16,000 in 2014 to 2015.  That's

10    consistent with what you knew as well, right?

11                      MR. EPPICH:  Objection.

12              Foundation.

13                      THE WITNESS:  No, I don't know

14              what the numbers are.  I wasn't with

15              DEA at that point and don't know.

16    QUESTIONS BY MR. LANIER:

17              Q.    Okay.  Now, "if the companies

18    are asserting a roadblock," I asked

19    Mr. Rannazzisi in his deposition, "that the

20    DEA was part of the problem, that you didn't

21    do your job right or that Joe Ran didn't do

22    his job right or the others," Joe Ran

23    disagreed and said the DEA tried to stop

24    diversion and to clean up the supply chain.

25                      Do you think that the DEA was
```

1    the problem?

2                MS. MCCLURE:  Form.

3                MR. EPPICH:  Objection.  Form.

4         Misstates the testimony.

5                MR. BENNETT:  Objection.

6         Scope.  This is not a 30(b)(6) witness

7         here to testify on behalf of DEA.

8                If you have a personal opinion

9         based on your personal experiences,

10        you may answer the question.

11               THE WITNESS:  I believe the DEA

12        worked within the resources they had

13        to address the problem.

14    QUESTIONS BY MR. LANIER:

15        Q.    Uh-huh.

16               Would you agree that if the

17    companies stopped diversions, the DEA's never

18    even going to be an issue?

19               If the companies truly did what

20    the law told them to do, the DEA's not a

21    problem on this, right?

22               MS. MCCLURE:  Form.

23        Speculation.  Foundation.  Calls for a

24        legal conclusion and scope.

25               MS. WICHT:  Incomplete

Highly Confidential - Subject to Further Confidentiality Review

```
 1            hypothetical.

 2                    MR. BENNETT:  Same instruction.

 3                    THE WITNESS:  I believe that

 4            DEA would always have to be there to

 5            provide oversight, so it would

 6            continue.

 7    QUESTIONS BY MR. LANIER:

 8            Q.    Right.  To make sure the

 9    oversight is there.

10                    But if the companies have

11    stopped diversion, oversight is pretty

12    simple, right?

13                    MS. MCCLURE:  All the same

14            objections.  Leading.

15                    THE WITNESS:  Yes.

16    QUESTIONS BY MR. LANIER:

17            Q.    And then if there's an argument

18    that the distributors, the manufacturers,

19    pharmacies, they were just confused, you know

20    from your work that those companies have

21    lawyers that are inside the company and

22    lawyers that they hire outside the companies,

23    right?

24                    MS. SWIFT:  Objection.

25            Leading.
```

```
 1                 THE WITNESS:  That's correct.

 2     QUESTIONS BY MR. LANIER:

 3          Q.     And the DEA hasn't and doesn't

 4     give legal counsel, true?

 5                 MS. MCCLURE:  Form.

 6                 MR. EPPICH:  Objection.

 7          Misstates testimony.

 8                 MS. MCCLURE:  Foundation.

 9          Misstates the testimony and the

10          record.

11                 THE WITNESS:  That's correct.

12     QUESTIONS BY MR. LANIER:

13          Q.     And some companies, you know

14     for a fact, hired former employees from the

15     DEA so they had that resource available as

16     well, true?

17                 MS. MCCLURE:  Foundation.

18                 THE WITNESS:  True.

19     QUESTIONS BY MR. LANIER:

20          Q.     And if a company is confused,

21     they can always stop selling until they get

22     their questions answered, can't they?

23                 MS. MCCLURE:  Leading.

24                 MS. WICHT:  Foundation.

25                 THE WITNESS:  Yes, they could.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. LANIER:  All right.  That

 2            ends our second stop on the road.

 3            We're ready to go to the third stop.

 4                    If we could take a break for

 5            about five minutes and I'll clean up

 6            this mess.

 7                    VIDEOGRAPHER:  Going off

 8            record.  The time is 10:12.

 9             (Off the record at 10:12 a.m.)

10                    VIDEOGRAPHER:  We're going back

11            on record.  Beginning of Media File 4.

12            The time is 10:23.

13    QUESTIONS BY MR. LANIER:

14            Q.    Mr. Mapes, on the road that we

15    were doing, we've done your personal

16    background, we've done your work for your

17    DEA.

18                    Now I want to talk to you about

19    some of the industry issues that arose when

20    you were with industry and some of the

21    questions that industry asked you today.

22                    And as a reminder, you still do

23    work for industry today, right?

24                    MS. MCCLURE:  Form.

25                    THE WITNESS:  In what form?
```

```
 1     QUESTIONS BY MR. LANIER:

 2          Q.     Well, you're a consultant to

 3     one of the parties in this litigation, to

 4     Cardinal, correct?

 5          A.     Yes.

 6          Q.     And I assume you're still --

 7     your services are still out there to hire if

 8     they need help on some DEA issue, fair?

 9          A.     No.

10          Q.     You don't do that anymore?

11          A.     No.

12          Q.     So now your consulting is

13     limited to the legal arena for these

14     companies?

15          A.     To this one instance, yes.

16          Q.     All right.  Now, in that

17     regard, sir, let's talk then about your

18     industry work and let's stop there on our

19     road.

20                 Okay?

21          A.     Okay.

22          Q.     I want to begin with a question

23     from the AmerisourceBergen lawyer.

24                 Now, the AmerisourceBergen

25     lawyer told you that the DEA had approved
```

1    their suspicious order monitoring system at

2    one point in time.

3              You were surprised by that,

4    remember?

5              MS. MCCLURE:  Objection to the

6         narrative.  Objection to misstates the

7         record.  Form.

8              THE WITNESS:  No, I don't

9         believe I was surprised by that.

10   QUESTIONS BY MR. LANIER:

11        Q.    Okay.  Then I may have

12   misunderstood you yesterday.

13              In regard to Exhibit Number 5,

14   going back to 1998 where the DEA said that

15   they would grant approval of the request to

16   implement on a nationwide basis the newly

17   developed system to identify and report

18   suspicious orders for controlled substances,

19   you already knew about that before yesterday?

20              MS. MCCLURE:  Form.

21              THE WITNESS:  What year was

22        this?

23   QUESTIONS BY MR. LANIER:

24        Q.    1998.

25        A.    I don't believe I had seen that

1    particular memo before yesterday.

2         Q.    Okay.  Well, then that's what I

3    was saying.  You did not know before

4    yesterday about this -- it was Exhibit 4.

5    I'll give you another copy of Exhibit 4 from

6    yesterday.

7              Exhibit 4 is this 1998 approval

8    of the request to implement nationwide a

9    newly developed system to identify and report

10   suspicious orders.

11             Do you see that?

12        A.    Yes.

13        Q.    Now, you say today that you

14   knew about this; you'd just not seen it?

15        A.    I had not seen it before

16   yesterday.

17        Q.    Okay.  But yesterday it was set

18   forward before you as the method of providing

19   information being approved or the entire

20   monitoring system being approved?

21             MS. MCCLURE:  Form.

22   QUESTIONS BY MR. LANIER:

23        Q.    Which was it?

24        A.    This appears to me to approve

25   the system to identify and report suspicious

```
 1    orders, so that would be their entire system.

 2         Q.    Okay.  So in that regard, look

 3    at -- let's do it this way.

 4               Did you ever look at the

 5    system?

 6               MS. MCCLURE:  Form.  Vague.

 7               THE WITNESS:  Did I look at --

 8    QUESTIONS BY MR. LANIER:

 9         Q.    Yeah.

10         A.    -- which system and --

11         Q.    At what was approved?

12         A.    -- at what point in time?

13         Q.    Have you looked at the system

14    that was approved that she was talking about?

15               MS. MCCLURE:  Form.  Vague.

16               THE WITNESS:  No.

17    QUESTIONS BY MR. LANIER:

18         Q.    By the way, all of this was

19    dealing with methamphetamines, not opioids,

20    right?

21               MS. MCCLURE:  Form.  Misstates

22       the document.  Foundation.  Leading.

23    QUESTIONS BY MR. LANIER:

24         Q.    Same law, same requirements to

25    deal with it, but these were all dealing with
```

```
 1    methamphetamines back then, weren't they?

 2              MS. MCCLURE:  All the same

 3         objections.

 4              THE WITNESS:  I believe they

 5         were dealing with both, the chemicals,

 6         the listed chemicals, and controlled

 7         substances.

 8    QUESTIONS BY MR. LANIER:

 9         Q.    If you'll look on the page

10    that's marked -- it's one of the overhead

11    letters, December 30, 1997.  It's about three

12    or four pages in.  It's got down in the lower

13    right-hand corner the number 350.

14              Do you see that?

15         A.    Yes.

16         Q.    It talks about how the

17    Methamphetamine Control Act requires

18    distributors to report suspicious orders of

19    listed chemicals to the DEA.

20              MS. MCCLURE:  So I note that

21         the Exhibit 4 that you've just handed

22         out does have a different set of Bates

23         numbers applied to it, so the

24         reference to 350 that you read out for

25         the December 30th letter actually, in
```

1           this copy that you just handed to the

2           witness, ends in 786.

3                    MR. LANIER:  Okay.  Thank you

4           for helping us do that.

5      QUESTIONS BY MR. LANIER:

6           Q.    So she wants you to look at

7      page 786 instead of 9350.  It's been produced

8      in multiple ways.  Same document, though.

9                    So Exhibit 4, page 786 in the

10     corner --

11                   MS. MCCLURE:  So we should

12          designate --

13     QUESTIONS BY MR. LANIER:

14          Q.    -- is talking about the

15     Methamphetamine Control Act?

16                   Do you see that?

17                   MS. MCCLURE:  So two things.

18          We should designate this document

19          you've handed the witness as 4A in

20          light of the fact that it is, in fact,

21          a different Bates numbers set.

22                   And I continue to maintain all

23          of the same previously articulated

24          objections to your characterization of

25          the document.

```
 1                  (Mapes Exhibit 4A marked for

 2          identification.)

 3     QUESTIONS BY MR. LANIER:

 4          Q.    Do you see that, sir?

 5          A.    I do.

 6          Q.    This is talking about the need

 7     to report suspicious orders of ephedrine and

 8     pseudoephedrine.

 9                 Do you see that?

10                 MS. MCCLURE:  Continuing

11          objection to the use of the document

12          and the witness' testimony and...

13     QUESTIONS BY MR. LANIER:

14          Q.    Do you see that, sir?

15          A.    I do.

16          Q.    That's Sudafed.  The concern

17     was people taking Sudafed and buying large

18     amounts of it and using it to manufacture

19     crack; is that right?

20          A.    No.

21                 MS. MCCLURE:  Continuing

22          objection.

23     QUESTIONS BY MR. LANIER:

24          Q.    What was the concern?

25          A.    They were using it to
```

1    manufacture methamphetamine.

2         Q.    Crack's not methamphetamine?

3         A.    No.

4         Q.    Okay.  I grew up in Lubbock.

5    We didn't know this stuff.

6               But they make drugs off of it.

7    They make illegal drugs, right?

8         A.    Yes.

9         Q.    Speed?

10        A.    Yes.

11        Q.    It's not opioids, is it?

12        A.    No, it's not.

13             MS. MCCLURE:  Form.

14   QUESTIONS BY MR. LANIER:

15        Q.    Methamphetamine Control Act

16   doesn't apply to opioids, does?

17             MS. MCCLURE:  Form.  Calls for

18        a legal conclusion.

19             THE WITNESS:  It does not.

20   QUESTIONS BY MR. LANIER:

21        Q.    Okay.  But just aside from the

22   fact that she gave you a methamphetamine --

23   deal -- the bottom line is, if you look at

24   it, the plan that was approved says that

25   they're going to hold shipping while

Highly Confidential - Subject to Further Confidentiality Review

```
 1     contacting and reporting it to the DEA.

 2               Did she tell you that?

 3               MS. MCCLURE:  Form.

 4          Mischaracterizes the document.

 5          Continuing objection to all of the

 6          previous ones I had identified.

 7               THE WITNESS:  I don't remember

 8          specifically what she said yesterday.

 9          There were a lot of questions.

10     QUESTIONS BY MR. LANIER:

11          Q.    Well, she never gave you the

12     actual -- never gave it to you, never gave it

13     to the jury, the actual suspicious order

14     monitoring system she says was approved.

15               She never gave it to you, did

16     she?

17               MS. MCCLURE:  Form.

18               THE WITNESS:  That's correct.

19               (Mapes Exhibit 31 marked for

20          identification.)

21     QUESTIONS BY MR. LANIER:

22          Q.    Well, let me give it to you.

23     We'll mark it as Exhibit Number 31.

24     Exhibit 31, suspicious order policy and

25     procedure for Bergen.
```

```
 1                    This is before they got bought

 2    out by Amerisource.

 3                    Do you see that?

 4         A.    I see that.

 5         Q.    The old company, before they

 6    got bought out by Amerisource, knew what is a

 7    suspicious order.  They're able to cite the

 8    regulation on that, aren't they?

 9                    MS. MCCLURE:  Form.  Leading.

10    QUESTIONS BY MR. LANIER:

11         Q.    Do you see that?

12         A.    I see that.

13         Q.    And they talk about they knew

14    what the division manager's responsibility

15    was, that they had to "design and operate a

16    system to disclose to the registrant

17    suspicious orders of controlled substances."

18                    They knew that, didn't they?

19         A.    It's included in the memo.

20         Q.    But if you go to the last page,

21    you'll see some things at the very end, the

22    very last thing they have to say about it.

23                    "It is imperative each division

24    manager understand these computer reports do

25    not relieve them of their responsibility to
```

1    report suspicious orders, especially large

2    single orders.  Remember, the reports contain

3    information on actual sales only and do not

4    necessarily reflect actual orders."

5              Do you see where I'm reading?

6         A.    I do.

7         Q.    Talks about the different

8    formats, but then it says, "If these

9    customers' orders fit the suspicious order

10   criteria explained above" --

11             You tracking with me?

12        A.    Yes.

13        Q.    -- "you must contact DEA to

14   report the order before actually shipping the

15   merchandise.  This must be done even if you

16   decide to cut the order back for business

17   reasons.  Again, in this case, it is the

18   order that is suspicious, not the actual

19   shipment."

20             Did you see that?

21        A.    Yes, I see that.

22        Q.    In other words, don't ship it

23   until you report it to the FDA {sic}?

24             MS. MCCLURE:  Form.

25

Highly Confidential - Subject to Further Confidentiality Review

```
1    QUESTIONS BY MR. LANIER:

2         Q.    That was in the program, wasn't

3    it?

4         A.    To DEA.

5         Q.    To DEA, I apologize.  Let me

6    ask it again.

7               In other words, don't ship it

8    until you report it to the DEA?

9               MS. MCCLURE:  Form.

10              THE WITNESS:  That's correct.

11   QUESTIONS BY MR. LANIER:

12        Q.    Well, that's not what the

13   company was doing once they'd been bought out

14   by Amerisource, is it?

15              MS. MCCLURE:  Form.  Calls

16        for -- foundation.

17   QUESTIONS BY MR. LANIER:

18        Q.    Go ahead and answer.

19        A.    They were not doing that.

20        Q.    Yeah.

21              So they even quit the policy

22   that they had claimed to have gotten approved

23   for on the methamphetamine front, right?

24              MS. MCCLURE:  Form.

25        Foundation.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  I don't know if
 2        they quit the policy, there were
 3        lapses or what, but, yeah, there were
 4        instances where it wasn't followed.
 5   QUESTIONS BY MR. LANIER:
 6        Q.    Yeah.
 7              Okay.  Now I want to ask you
 8   some specific questions from the industries.
 9              Walmart asked you a bunch of
10   questions.  Put Walmart up here.
11              The Walmart lawyer, you
12   remember him?
13        A.    Yes.
14        Q.    And the Walmart lawyer got here
15   and sat in this very chair and said, quote,
16   "Do you agree that good leaders hold
17   themselves accountable for the decisions they
18   make?"
19              Do you remember him asking you
20   that?
21        A.    Yes.
22        Q.    Well, I got a question.
23              If that's true for good leaders
24   inside the DEA and other places, that sure
25   ought to be true for Walmart, shouldn't it?
```

```
 1          A.      Yes.

 2          Q.      In other words, Walmart, if

 3     they're good leaders in Walmart, they ought

 4     to hold themselves accountable for the

 5     decisions they're making, fair?

 6          A.      Fair.

 7          Q.      Then he asked you this:  "Do

 8     you agree the American public" -- and I've

 9     written this out word for word, but it's

10     really a complicated question.  I had trouble

11     understanding it, so I want to read it

12     carefully.  I want you to read it with me.  I

13     want the jury to be able to read it.

14                  He said to you:  "Do you agree

15     the American public has a right to expect

16     that the leaders of our law enforcement

17     agencies will lead their teams in a fashion

18     consistent with the standards?"

19                  Remember that?

20          A.      Generally, yes.

21          Q.      And you generally agreed with

22     it, right?

23          A.      Yeah.

24          Q.      Well, do you agree the American

25     has a public -- has a right to expect that
```

1    the leaders of huge companies like Walmart

2    will lead their teams to follow the law and

3    not try to get away with actions that

4    endanger our communities and people?

5         A.    Yes.

6         Q.    I mean, company CEOs shouldn't

7    expect special treatment when it comes to

8    breaking the law, right?

9         A.    That's right.

10         Q.    Ignorance of law is no excuse,

11    right?

12         A.    Right.

13         Q.    Then he asked you this:  "Would

14    you agree that drug traffickers and diverters

15    are the ones who potentially benefit if the

16    DEA decides to isolate itself from

17    individuals who help advance the DEA's

18    diversion investigations who are outside of

19    DEA?"

20              Again, I had to read that like

21    three or four times to understand it, but do

22    you understand that question?

23         A.    I'm reading it again right now.

24         Q.    I think what he was saying in

25    everyday language is, if someone's not doing

```
1    their job right, the drug traffickers and the

2    diverters can potentially benefit.  That's

3    from the Walmart guy.

4              Right?

5              MR. STEPHENS:  Object to form.

6              THE WITNESS:  That is what I

7        think he's saying, yes.

8    QUESTIONS BY MR. LANIER:

9        Q.    All right.  Well, let's just be

10   real clear.

11             The drug traffickers here,

12   they're the people who are selling the

13   opioids, aren't they?

14             MR. STEPHENS:  Object to form.

15   QUESTIONS BY MR. LANIER:

16       Q.    Drug traffickers, they traffic,

17   they sell opioids, right?

18             MR. STEPHENS:  Object to form.

19             THE WITNESS:  In my mind,

20        traffickers are the ones that would

21        illegally sell as opposed to

22        legitimately sell.

23   QUESTIONS BY MR. LANIER:

24       Q.    No fuss about that either.

25             Because if a distributor, even
```

1    if it's a legal company instead of some

2    fellow on the street, if that distributor is

3    not following the law, they're selling the

4    drugs illegally, aren't they?

5         A.    They could be, yes.

6         Q.    And so the traffickers, the

7    ones selling it illegally, and the diverters,

8    they're the ones who potentially benefit if

9    they can get away with it.

10              That's what this means, in

11   effect, isn't it?

12              MR. STEPHENS:  Object to form.

13              THE WITNESS:  It could mean

14       that, yes.

15   QUESTIONS BY MR. LANIER:

16        Q.    Yeah.  If we go back to our

17   little model, if we assume that the drug

18   companies -- if we can assume that these

19   distributors are for profit, they're going to

20   buy from the manufacturer and get it at a

21   wholesale cost, or get it at a cost that they

22   can then wholesale it to the pharmacies,

23   right?

24              MR. EPPICH:  Objection.

25        Foundation.

```
 1    QUESTIONS BY MR. LANIER:

 2         Q.    Now, there's a bunch of folks

 3    that actually hit both of these columns.  By

 4    that I mean they're distributors and

 5    pharmacies.  They get to make the money from

 6    both ends of that, aren't there?

 7              MS. SWIFT:  Objection.

 8         Leading.  Mischaracterizes the

 9         evidence.

10              THE WITNESS:  There are people

11         who are registered both as

12         distributors and pharmacies, yes.

13    QUESTIONS BY MR. LANIER:

14         Q.    People like Walmart?

15         A.    Yes.

16         Q.    Walgreens?  CVS?

17         A.    CVS, yes.  Walgreens, I'm not

18    sure.

19         Q.    Okay.  I mean, they're the ones

20    who profit.  They make money off these sales,

21    don't they?

22              MR. STEPHENS:  Object to form.

23              THE WITNESS:  Again, I never

24         have been involved in the financial

25         end of things so don't really...
```

```
 1    QUESTIONS BY MR. LANIER:

 2         Q.    All right.  Here's another one

 3    from the Walmart lawyer.  He said:  "You're

 4    not aware of any deadline that the DEA set

 5    that changed this practice related to the

 6    shipping of suspicious orders."

 7              Do you remember that?

 8         A.    Yes.

 9         Q.    I mean, come on, you give them

10    the 1943 decision from the Supreme Court,

11    right?

12              MR. STEPHENS:  Object to form.

13         Foundation.

14    QUESTIONS BY MR. LANIER:

15         Q.    The law -- right?  You gave it

16    to them, right?

17              MR. STEPHENS:  Objection.

18              THE WITNESS:  Gave that to

19         whom, Walmart?

20    QUESTIONS BY MR. LANIER:

21         Q.    Well, you gave it to different

22    distributors, but, I mean, it's -- Walmart's

23    lawyers, their in-house legal team, that

24    is -- they've got, like, lots of lawyers on

25    it.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    They have access to the Supreme
 2      Court just as well as you, don't they?
 3            A.      I'm sure they do.
 4            Q.      Okay.  So you have your 1943
 5      decision, but the law itself, that was from
 6      the 1970s, wasn't it?
 7            A.      Yes.
 8            Q.      And did the DEA ever tell the
 9      companies, "Oh, go ahead, just ship those
10      suspicious orders.  It's following the law
11      when you ship a suspicious order.  You don't
12      need to do due diligence.  You don't need to
13      check into it.  You don't -- yeah, it's
14      excessive, yeah, it's suspicious, yeah, it's
15      probably going to be diverted, but just ship
16      it anyway and make the money"?
17                    Did y'all ever tell them to do
18      that?
19            A.      I never did.
20                    MS. WICHT:  Object to form.
21      QUESTIONS BY MR. LANIER:
22            Q.      Do you know anyone who ever
23      did?
24                    MR. EPPICH:  Object to form.
25                    MS. WICHT:  Object to form.
```

```
 1    QUESTIONS BY MR. LANIER:

 2         Q.     At the DEA?

 3         A.     No, I don't.

 4         Q.     That's the company's decision

 5    whether or not they want to understand the

 6    law and follow the law, right?

 7              MS. MCCLURE:  Form.  Calls for

 8         a legal conclusion.

 9              THE WITNESS:  Yes.

10    QUESTIONS BY MR. LANIER:

11         Q.     It's the company's decision

12    whether or not they want to ship a suspicious

13    order or hold it, isn't it?

14         A.     It is.

15         Q.     And your answers about Walmart

16    apply to any of the other companies that that

17    Walmart lawyer said he was asking questions

18    on behalf of that were in the same or similar

19    shoes, fair?

20              MR. STEPHENS:  Object to form.

21              MR. EPPICH:  Object to form.

22         Vague.

23              THE WITNESS:  Yes.

24    QUESTIONS BY MR. LANIER:

25         Q.     Now, the Walmart lawyer asked
```

```
1    you some other things.  He said -- I couldn't

2    follow this.  It sounded to me like the

3    Walmart lawyer is blaming the DEA for not

4    disclosing who their informants and their

5    sources are for diversion problems.

6                 MR. STEPHENS:  Object to form.

7    QUESTIONS BY MR. LANIER:

8         Q.      Did you remember those

9    questions?

10        A.      The general line of questions,

11   yes.

12        Q.      Yeah.

13                I mean, is the DEA supposed to

14   be telling people, "Oh, here are our

15   informants, and here's how we figured out

16   who's breaking the law and who's not"?

17                MR. STEPHENS:  Object to form.

18   QUESTIONS BY MR. LANIER:

19        Q.      I mean, y'all aren't supposed

20   to tell that to the companies that you're

21   investigating, are you?

22        A.      No.

23        Q.      And the fact that you're not

24   telling Walmart about how you figured out

25   AmerisourceBergen may or may not be breaking
```

1    the law, that doesn't excuse Walmart for

2    breaking the law, does it?

3                MR. STEPHENS:  Object to form.

4         Foundation.

5                THE WITNESS:  No, it does not.

6    QUESTIONS BY MR. LANIER:

7         Q.    And then he says, "The DEA can

8    get a search warrant."

9                Remember that question?

10        A.    I do.

11        Q.    Well, Walmart doesn't need a

12   search warrant to look in its own closet,

13   does it?

14               MR. STEPHENS:  Object to form.

15               THE WITNESS:  No.

16   QUESTIONS BY MR. LANIER:

17        Q.    I mean, if you want to go look

18   into the bowels of Walmart's records and what

19   they're doing and their due diligence and

20   all, you may need to get a search warrant if

21   you're working for the DEA, but Walmart

22   doesn't need a search warrant to go

23   investigate their own processes and

24   procedures, do they?

25        A.    No.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.     I mean, this whole idea of the

2    DEA's -- can get a search warrant when

3    Walmart can't, Walmart doesn't need that

4    search warrant to look at their own records,

5    fair?

6          A.     That's fair.

7          Q.     And by the same token, does

8    Walmart need a grand jury before they can

9    figure out if Walmart is diverting or selling

10   to bad pharmacies?

11         A.     I don't believe so.

12         Q.     Does Walmart need a grand jury

13   before they figure out whether or not they're

14   selling on bad prescriptions that are

15   obviously suspicious on their face?

16               MR. STEPHENS:  Object to form.

17               MS. MCCLURE:  Object to form.

18               MR. EPPICH:  Scope.

19               THE WITNESS:  No.

20   QUESTIONS BY MR. LANIER:

21         Q.     Does Walmart need a subpoena to

22   see what information Walmart has?

23         A.     No.

24         Q.     Does Walmart need the FBI to

25   see what information Walmart has?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     No.

 2          Q.     And then the Walmart lawyer

 3     said, "Yeah, the DEA has lots of tools for

 4     fighting diversion."

 5                 Remember that?

 6          A.     Yes.

 7          Q.     Walmart can see in realtime an

 8     excessive flood of pills going out.  That's

 9     an ability they've got the DEA doesn't have

10     realtime, true?

11                 MR. STEPHENS:  Object to form.

12                 THE WITNESS:  I don't really

13          know all the capabilities of their

14          system, so it would be a guess.

15     QUESTIONS BY MR. LANIER:

16          Q.     Well, if they're going out

17     through their pharmacies, they got a

18     pharmacist who's selling them.  I mean, it's

19     happening at their store in realtime.

20                 They can see that, fair?

21                 MR. STEPHENS:  Object to form.

22          Scope.

23                 THE WITNESS:  They should be

24          able to see that, yes.

25
```

```
 1    QUESTIONS BY MR. LANIER:

 2         Q.     That's a valuable tool, isn't

 3    it?

 4         A.     Yes.

 5         Q.     Next.  He said:  "The DEA can

 6    use undercover folks."

 7                Remember that?

 8         A.     Yes.

 9         Q.     Well, Walmart can, too, can't

10    they?

11                Look, have you ever seen those

12    mystery shoppers, where they dress people up

13    and just have them pretend they're someone

14    else in the store?

15         A.     Yes.

16         Q.     I mean, they can put people in

17    the store that don't have "Greetings, I'm

18    from Walmart" on their clothes to watch the

19    people who are coming in to peddle or buy

20    these things, can't they?

21         A.     They could.

22                MR. STEPHENS:  Object to form.

23    QUESTIONS BY MR. LANIER:

24         Q.     Everybody who works at Walmart

25    doesn't have to have the Walmart greeter blue
```

Highly Confidential - Subject to Further Confidentiality Review

1    on, do they?

2         A.    No.

3         Q.    And then he asked you these

4    questions about the DEA being able to use

5    hidden room bugs.

6              Remember that?

7         A.    I do.

8         Q.    Heck, Walmart sells hidden room

9    bugs.

10             Did you know that?

11        A.    I did not.

12        Q.    Did you know that they hide

13   cameras all over their stores?

14             MR. STEPHENS:  Object to form.

15             THE WITNESS:  I assume they do.

16   QUESTIONS BY MR. LANIER:

17        Q.    They hide the cameras inside

18   the stores and they got cameras outside their

19   stores; did you know that?

20             MR. STEPHENS:  Object to form.

21             THE WITNESS:  I've seen cameras

22        outside.

23   QUESTIONS BY MR. LANIER:

24        Q.    They've got security guys

25   driving around in the parking lots of some of

1     their stores; did you know that?

2          A.     Yes.

3          Q.     Did you know that Walmart has

4     security forces that have trained people how

5     to pick up and stop shoplifters?

6          A.     Yes.

7          Q.     In other words, if someone is

8     going to get something from Walmart illegally

9     that's going to affect Walmart's bottom line,

10    they've got an entire force set up that

11    trains people to stop that.

12               MR. STEPHENS:  Object to form.

13    QUESTIONS BY MR. LANIER:

14         Q.     But have you ever seen Walmart

15    have an entire force --

16               MR. STEPHENS:  Scope.

17    QUESTIONS BY MR. LANIER:

18         Q.     -- set up how to train people

19    how to find suspicious orders from the people

20    who are coming in with the prescriptions and

21    buying the pills in their stores?

22               MR. STEPHENS:  Object to form.

23         Scope.

24               THE WITNESS:  I have never had

25         discussions with Walmart about their

1          suspicious order procedures and their

2          training and those kind of things.

3     QUESTIONS BY MR. LANIER:

4          Q.     All right.  Next.  The Walmart

5     lawyer asked you questions about whether Joe

6     Rannazzisi or the DEA shared the ARCOS data

7     with companies, right?

8          A.     Yes.

9          Q.     Now, let's flesh out ARCOS data

10    for just a moment.

11             ARCOS data, that is this --

12    each company, each registrant, is required to

13    turn in data to the DEA about drugs that

14    they're selling.  Opioids is what we're

15    concerned about here, opioids they're

16    selling, right?

17         A.     That's correct.

18         Q.     And each company has their own

19    data, right?

20         A.     Yes, they do.

21         Q.     But one company doesn't have

22    the data of another company, right?

23         A.     That's correct.

24         Q.     So Walmart can't see who CVS is

25    selling their drugs to and who's writing

```
 1    their prescriptions, right?

 2              CVS's data is in a silo for CVS

 3    that they can know, but Walmart doesn't get

 4    that competitive edge of knowing what CVS is

 5    doing, fair?

 6         A.    That's correct, except that it

 7    doesn't get to the level of prescription

 8    data.  It's wholesalers selling to retail

 9    pharmacies.

10         Q.    Still they --

11         A.    Manufacturers to wholesalers.

12         Q.    That's fine.

13              They don't know, gee, that

14    store is selling more opioids than this

15    store.  Maybe we need to put something in

16    that location so we can get on that

17    prescription gravy train.

18              That type of information is a

19    competitive edge if one company gets it on

20    another, fair?

21              MR. STEPHENS:  Object to form.

22              THE WITNESS:  It could be.

23    QUESTIONS BY MR. LANIER:

24         Q.    And so the companies

25    themselves, they won't agree to share in the
```

```
 1    data, at least based upon your experience --

 2         A.    I am --

 3         Q.    -- inside the DEA and out,

 4    right?

 5         A.    I have not seen them agree to

 6    share it.

 7         Q.    All right.  Never seen them --

 8    see.

 9               I mean, if the lawyer for

10    Walmart wants to make a big deal out of this,

11    then Walmart could easily give its ARCOS data

12    to CVS if he thought it was an important

13    thing to do, couldn't they?

14               MR. STEPHENS:  Object to form.

15               THE WITNESS:  They could.

16    QUESTIONS BY MR. LANIER:

17         Q.    I mean, if Walmart thought it

18    was going to help this opioid crisis by

19    sharing its own sales data with its

20    competitors, there's nothing the DEA, the

21    DOJ, the FBI, the CIA, the US Constitution,

22    the Magna Carta, there's nothing The Ten

23    Commandments would do to stop that, right?

24         A.    Not that I'm aware of.

25               MR. EPPICH:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MS. MCCLURE:  Objection.

 2          Foundation.  Form.

 3                    MR. EPPICH:  Calls for a legal

 4          conclusion.

 5     QUESTIONS BY MR. LANIER:

 6          Q.     Did you know the DOJ won't

 7     agree to share the ARCOS data from one

 8     company to another?

 9                    MR. BENNETT:  And I'm going to

10          interject an objection to the last

11          question.  Scope.  He doesn't speak on

12          behalf of Department of Justice or

13          DEA.

14                    MR. LANIER:  True.

15                    MR. BENNETT:  I'll also

16          interject an objection to this

17          question for the same reasons.

18               If you have an opinion in your

19          personal capacity, you may answer.

20                    MR. LANIER:  And that's what

21          I'm asking, thank you, your opinion in

22          a personal capacity based on your

23          experience.

24     QUESTIONS BY MR LANIER:

25          Q.     You haven't seen the DOJ just
```

```
 1    open up pell-mell this data to everybody,

 2    have you, the Department of Justice?

 3         A.    I understand that there may be

 4    some type of way to share a limited subset of

 5    the data, but I don't know the details of

 6    that.

 7         Q.    Yeah.

 8               It's not easy to get, but each

 9    company's got their own data; that's the

10    bottom line, right?

11         A.    Yes.

12         Q.    And the enforcement that the

13    DEA did when you've seen it from the outside

14    or when you were there based on your personal

15    experience -- not secret data.  I don't want

16    to go behind the curtain of how y'all did

17    stuff, and I don't want you speaking for the

18    DEA.  Just what you know from your personal

19    knowledge and public information.

20               We know publicly enforcement

21    always comes from a company's own data --

22               MS. MCCLURE:  Form.  Misstates.

23    QUESTIONS BY MR. LANIER:

24         Q.    -- true?

25               MR. STEPHENS:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  As well as other

 2          sources.

 3     QUESTIONS BY MR. LANIER:

 4          Q.     Right.

 5                    But you use the company's ARCOS

 6     data in McKesson -- let me write that down,

 7     "with other sources."

 8                    But for McKesson, for

 9     example -- or, no, AmerisourceBergen.  When

10     y'all held AmerisourceBergen responsible for

11     selling wrong through one of their

12     facilities --

13                    You and I looked at that

14     earlier, remember?

15          A.     Yes.

16          Q.     -- that was based on their

17     ARCOS data --

18          A.     It was.

19          Q.     -- their own data.

20                    Okay.  And then the lawyer from

21     Walmart asked you, he said:  "Rogue Internet

22     pharmacies, those were the greatest threat of

23     diversion."

24                    Remember that?

25          A.     Yes.
```

```
 1          Q.     Well, those rogue Internet

 2    pharmacies, weren't they basically shut down

 3    by around 2009?

 4          A.     Generally, yes.

 5          Q.     So if the problem continued

 6    past there, the problem can't just be rogue

 7    Internet pharmacies.  That's simple logic,

 8    right?

 9                 MR. STEPHENS:  Object to form.

10          Misstates the testimony.

11                 MS. MCCLURE:  Form.

12                 THE WITNESS:  That's correct.

13    QUESTIONS BY MR. LANIER:

14          Q.     So I gave you that chart

15    earlier.  2009's right here.  It's not like

16    once y'all shut down the rogue Internet

17    pharmacies they didn't continue to be a

18    problem.

19                 See what I'm talking about?

20                 MS. SWIFT:  Object to form.

21                 MS. MCCLURE:  Form.

22                 MR. EPPICH:  Object to the use

23          of this document.

24                 THE WITNESS:  Yes, I see what

25          you're talking about.
```

```
 1    QUESTIONS BY MR. LANIER:

 2         Q.    Okay.  And again, your answers

 3    on these Walmart questions would apply

 4    equally to the other folks he was asking

 5    questions on behalf of.

 6               CVS, they've got their own

 7    data, right?

 8         A.    Yes.

 9         Q.    Walgreens has got their own

10    data, right?

11         A.    Yes.

12         Q.    Now, the McKesson lawyer asked

13    you some questions.

14               Do you remember those?

15         A.    Not specifically, but...

16         Q.    All right.  Let's look at some

17    of them.

18               First of all, the McKesson

19    lawyer asked you about the requirement of

20    Section 1301.74(a), and he said:  "It's only

21    to see if a customer is registered."

22               Do you remember that?

23               MR. EPPICH:  Object to form.

24         Objection to the extent it misstates

25         the question.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. LANIER:

 2         Q.     You remember he asked you, he

 3    said:  "The requirements of the law" -- and

 4    he used Exhibit 3, and he put Exhibit 3 up

 5    there which has 1301.74(a) -- "before

 6    distributing a controlled substance to any

 7    person who the registrant does not know to be

 8    registered to possess, got to make a good

 9    faith inquiry to determine if they were

10    registered to possess the controlled

11    substance."

12              And he asked you about that,

13    remember?

14         A.     Yes.

15         Q.     Well, have you ever seen those

16    magicians who do a sleight of hand where they

17    distract you over here while they're doing

18    something over there?

19              Are you familiar with that?

20         A.     Yes.

21         Q.     Okay.  He asked you like

22    1301.74(a) is the only part of this law.

23              It's not the only part of the

24    law, is it?

25              MR. EPPICH:  Object to form.
```

1        Misstates the question.

2               THE WITNESS:  No, it's not.

3    QUESTIONS BY MR. LANIER:

4        Q.    So when he asked you, the

5    requirement of 1301.74(a) is only to see if a

6    customer is registered, that's not the only

7    section that applies to these distributors.

8               They got to do more than that,

9    don't they?

10              MR. EPPICH:  Object to form.

11       Vague.

12              THE WITNESS:  Yes, they do.

13   QUESTIONS BY MR. LANIER:

14       Q.    They got to do subpoint (b)

15   that came after his subpoint (a).  I've

16   highlighted it here on Exhibit 3.

17              Do you see it?

18       A.    I do.

19       Q.    "The registrant," McKesson in

20   this case, "shall design" -- or any of the

21   other distributors -- "shall design and

22   operate a system to disclose to the

23   registrant suspicious orders of controlled

24   substances.  The registrant shall inform the

25   field division office of the administration

1   in his area of suspicious orders when

2   discovered."

3              By the way, it says "when

4   discovered," doesn't it?

5        A.    Yes.

6        Q.    This is that 1970s law?

7        A.    It is.

8        Q.    "Suspicious orders include

9   orders of unusual size, orders deviating

10  substantially from a normal pattern, orders

11  of unusual frequency."

12             That's included, but that's not

13  an exclusive list of what makes something

14  suspicious, fair?

15             MR. EPPICH:  Objection.  Calls

16        for a legal conclusion.  Foundation.

17             THE WITNESS:  Yes, that's fair.

18  QUESTIONS BY MR. LANIER:

19        Q.    All right.  And so my question

20  is, he followed up by saying this:  "Does

21  1301.74 say distributors can't ship

22  suspicious orders?"

23             Remember that?

24        A.    Yes.

25             MR. EPPICH:  Objection.  Form.

1      Misstates the question.

2    QUESTIONS BY MR. LANIER:

3        Q.     Well, that's not the part that

4    tells you you can't ship them.  You're not

5    allowed to sell something that you are

6    suspicious may be used for illegal purposes,

7    are you?

8              MS. MCCLURE:  Form.

9         Foundation.  Calls for a legal

10        conclusion.  Misstates.

11             MS. WICHT:  Vague.

12             THE WITNESS:  That's correct.

13   QUESTIONS BY MR. LANIER:

14       Q.     Okay.  Good.

15             Anyway, even setting the law

16   aside, what's most important, community

17   health and safety or company profits --

18             MR. EPPICH:  Objection.

19   QUESTIONS BY MR. LANIER:

20       Q.     -- for selling illegal drugs?

21             MR. EPPICH:  Objection to form.

22        Argumentative.

23             MS. WICHT:  Scope.

24             MS. MCCLURE:  Foundation.

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. LANIER:

 2        Q.    This is a no-brainer.  You

 3    ought to be able to get this one?

 4            MS. MCCLURE:  Objection.

 5        Argumentative.

 6            MR. BENNETT:  I'll join in the

 7        objection.  Argumentative.

 8            MR. LANIER:  All right.  Let me

 9        go back to the original question.

10            SPECIAL MASTER COHEN:

11        Sustained.

12    QUESTIONS BY MR. LANIER:

13        Q.    Even setting the law aside,

14    what's most important, community health and

15    safety or company profits from selling

16    illegal drugs?

17            MR. EPPICH:  Object to form.

18        Foundation.

19            MS. WICHT:  Scope.

20            THE WITNESS:  In my opinion,

21        it's the health and safety.

22    QUESTIONS BY MR. LANIER:

23        Q.    And then the McKesson lawyer

24    asked you this one.  He said:  "Isn't it true

25    there are other causes of the opioid crisis,
```

```
1    like illegal prescribing?"
2              Remember that?
3    A.     Yes.
4    Q.     "Question:  A good suspicious
5    order monitoring system can even help catch
6    illegal prescribing, can't it?"
7              MR. EPPICH:  Objection to form.
8              MR. HAHN:  Objection.
9              THE WITNESS:  Yes, it can.
10   QUESTIONS BY MR. LANIER:
11   Q.     And then he said:
12   "Distributors can't control what happens to
13   pills once the pills are delivered to the
14   customer of the pharmacy?"
15             Remember that one?
16   A.     Yes.
17             MR. EPPICH:  Objection.
18   QUESTIONS BY MR. LANIER:
19   Q.     But the distributor has a ton
20   of control before that, don't they?
21             MR. EPPICH:  Objection.  Form.
22        Foundation.  Vague.
23             THE WITNESS:  Yes, they do.
24   QUESTIONS BY MR. LANIER:
25   Q.     And then the McKesson lawyer
```

1    said:  "The DEA" -- and he talked about your

2    staffing and your Internet policies -- the

3    DEA staffing, not yours, and Internet

4    policies -- or Internet pharmacies, and

5    whether or not they had enough staff.

6              And you said:  "I don't know if

7    they did or didn't."

8              You wouldn't go along with him

9    on that, remember?

10             MR. EPPICH:  Objection.

11        Argumentative.  Misstates the

12        testimony and questions.

13             THE WITNESS:  Yes, I remember

14        that.

15   QUESTIONS BY MR. LANIER:

16        Q.    Well, my question is pretty

17   simple.  If the companies do their jobs

18   right, the DEA had plenty of manpower when

19   you were there, didn't it?

20             MR. EPPICH:  Objection.  Calls

21        for a legal conclusion.

22   QUESTIONS BY MR. LANIER:

23        Q.    Based on your opinion?

24             MR. EPPICH:  Objection.  Form.

25             MS. MCCLURE:  Objection.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Scope.

 2                  MR. BENNETT:  Objection.

 3          Scope.

 4                  You're not speaking on behalf

 5          of the DEA.  You may give your

 6          personal opinion.

 7    QUESTIONS BY MR. LANIER:

 8          Q.     True?

 9          A.     I really can't comment on that

10    because there's so many other things that

11    DEA's involved in.  It's not just --

12          Q.     Ah, and you shouldn't comment

13    on that stuff.  You're right.  You're right.

14    I'll pull that down.  I don't want y'all to

15    divulge DEA secrets.

16                  Okay.  Shifting gears to some

17    stuff from AmerisourceBergen's lawyer and

18    others.

19                  You were asked this question by

20    AmerisourceBergen yesterday:  "In the course

21    of your role as a diversion investigator and

22    a group supervisor, you accepted these

23    excessive purchase reports as compliant with

24    the Controlled Substances Act?"

25                  Do you remember that?
```

1        A.      Yes.

2        Q.      Sir, but after-the-fact

3    reporting of suspicious orders has never been

4    in compliance with federal law according to

5    your understanding of the DEA's guidance

6    provided to registrants, true?

7               MS. MCCLURE:  Objection.  Form.

8          Scope.  Vague.  Misstates the witness'

9          prior testimony.  Foundation.  Asked

10         and answered.

11              MR. BENNETT:  You can answer.

12              THE WITNESS:  It was the

13         practice, but they may not have been

14         in compliance with the regulations.

15   QUESTIONS BY MR. LANIER:

16        Q.      Right?

17              They may have been breaking the

18   regulations for a long time --

19              MS. MCCLURE:  All same

20         objections.

21   QUESTIONS BY MR. LANIER:

22        Q.      -- right?

23        A.      Yes.

24        Q.      Okay.  I mean, that's part of

25   what this is about, you understand?

Highly Confidential - Subject to Further Confidentiality Review

```
 1           A.      Yes.

 2           Q.      Okay.  Good.

 3                   And I just want to clarify a

 4   couple things for the record.  The lawyer

 5   just objected and said I mischaracterized

 6   your testimony.  I've got here the actual

 7   draft from the court reporter.  I don't think

 8   I mischaracterized it.  I think I wrote it

 9   exactly the way it is, so I don't know what

10   she meant when she said I mischaracterized

11   it.

12                   But you see that's exactly what

13   you said yesterday?  It's exactly what the

14   question was.

15                   MS. MCCLURE:  That was in

16           response to your second question, not

17           the first.

18   QUESTIONS BY MR. LANIER:

19           Q.      Do you see that?

20           A.      I see that.

21           Q.      And now she says that was in

22   response to my second question, not the

23   first.

24                   Sir, you hadn't testified about

25   the second question until I asked you, true?
```

```
 1                  MS. MCCLURE:  Again,
 2          mischaracterizes.
 3                  THE WITNESS:  True.
 4     QUESTIONS BY MR. LANIER:
 5          Q.    I got that testimony on that
 6     from a Mr. Thomas Prevoznik.
 7                  Do you know him?
 8          A.    I do.
 9          Q.    Mr. Prevoznik was the actual
10     designate by the DEA to speak on behalf of
11     the DEA, as opposed to you, who's just
12     speaking as you, right?
13          A.    Correct.
14          Q.    And I did write it exactly
15     right, in spite of the lawyer's objection.
16                  "Has after-the-fact reporting
17     of suspicious orders ever been in
18     compliance" -- ever been in compliance --
19     "with federal law according to the DEA's
20     guidance provided to registrants?"
21                  The answer was:  "No."  And
22     that's from the DEA witness.
23                  So he would agree with you that
24     this is a true statement:  After-the-fact
25     reporting has never been in compliance,
```

1    right?

2              MS. WICHT:  Object to form.

3              MS. MCCLURE:  Form.

4              THE WITNESS:  Yes.

5    QUESTIONS BY MR. LANIER:

6         Q.    That's why the law says it's

7    when -- I'm using Exhibit 30 -- yeah, here it

8    is.  Exhibit 3.  The law is specific and says

9    you're supposed to turn in suspicious orders

10   "when discovered by the registrant," not at

11   the end of the month after you've sold them

12   and made the money?

13             MS. MCCLURE:  Form.

14   QUESTIONS BY MR. LANIER:

15        Q.    Right?

16             MS. MCCLURE:  Calls for a legal

17        conclusion.

18             THE WITNESS:  It does say "when

19        discovered," yes.

20   QUESTIONS BY MR. LANIER:

21        Q.    And you knew who Linden Barber

22   was, didn't you?

23        A.    Yes.

24             MR. LANIER:  I want to take a

25        break for five minutes, please.

```
 1              VIDEOGRAPHER:  We're going off

 2         record.  The time is 11:08.

 3          (Off the record at 11:08 a.m.)

 4              VIDEOGRAPHER:  We're going back

 5         on record.  Beginning of Media File 5.

 6         Time is 11:23.

 7    QUESTIONS BY MR LANIER:

 8         Q.    Sir, just a few final things I

 9    want to make sure that I've covered, and I'll

10    pass the witness, and we'll be through with

11    your road for this moment, though I think I

12    get to come back and we'll travel another

13    road together in a little bit.

14              The DEA may answer a specific

15    question about whether part of a system is

16    appropriate, and the DEA will give its

17    opinion.

18              We know that based on your

19    testimony yesterday, right?

20              MR. BENNETT:  Objection.

21         Scope.

22              He doesn't speak for the DEA.

23         He may speak about his practices while

24         he was at the DEA.

25              MR. LANIER:  Great point.
```

```
 1    QUESTIONS BY MR. LANIER:
 2         Q.    When you were at the DEA, you
 3    yourself and people you observed may answer a
 4    specific question about whether or not part
 5    of a system's appropriate.
 6              The DEA hasn't given its
 7    opinion on that to distributors and others,
 8    right?
 9         A.    Generally, yes.
10         Q.    But the DEA does not do legal
11    work for the industry, true?
12              MR. BENNETT:  Same objection.
13    Same instruction.
14    QUESTIONS BY MR. LANIER:
15         Q.    Based on what you know?
16              MR. EPPICH:  Object to form.
17              THE WITNESS:  Based on what I
18    know, that's true.
19    QUESTIONS BY MR. LANIER:
20         Q.    And industry, based on what you
21    know, is required to interpret and follow the
22    law.  That's part of the honor system and the
23    law if they want to be allowed to make money
24    selling opioids, true?
25              MS. MCCLURE:  Objection.
```

1        Compound.

2                MS. WICHT:  Objection to form.

3                MR. EPPICH:  Object to form.

4                THE WITNESS:  It's part of the

5        requirement if they want to continue

6        to be registered to handle controlled

7        substances.

8    QUESTIONS BY MR. LANIER:

9        Q.      In other words, if they want to

10   legally sell opioids, industry is required to

11   interpret and follow the law, true?

12       A.      True.

13       Q.      Now, the AmerisourceBergen

14   lawyer pointed out yesterday that determining

15   suspicious orders is subjective.  There's not

16   a formula that is a litmus test where you can

17   say yes/no automatically.

18                A computer is not going to do

19   it, right?

20       A.      That's correct.

21       Q.      This is a reason that you need

22   to be hypervigilant if you're a registrant,

23   if you're a distributor.  You need to truly

24   know your customer and truly look for

25   suspicious orders and truly do your due

```
1    diligence if it looks like something might be

2    suspicious, true?

3              MS. MCCLURE:  Objection.

4       Vague.  Compound.

5              MR. EPPICH:  Object to form.

6       Calls for a legal conclusion.

7              THE WITNESS:  Yeah, the

8       registrants need to be vigilant.

9    QUESTIONS BY MR. LANIER:

10      Q.     And in fairness, they need to

11   be very vigilant, or I put it hypervigilant.

12   They really need to pay attention to this,

13   don't they?

14             MS. MCCLURE:  Same objections.

15             MR. EPPICH:  Object to form.

16      Calls for a legal conclusion.

17             THE WITNESS:  Yes.

18   QUESTIONS BY MR. LANIER:

19      Q.     This is based on your

20   understanding.  I know you're not

21   interpreting the law.  But this is from your

22   perspective the legal responsibility of the

23   distributor, true?

24             MR. EPPICH:  Object to the

25      form.  Calls for a legal conclusion.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  THE WITNESS:  True.

 2     QUESTIONS BY MR. LANIER:

 3          Q.     Now, you were asked another

 4     curious question yesterday about is it

 5     possible that 90 percent of orders shipped

 6     are suspicious, and you said you don't see

 7     how 90 percent of the orders shipped to be a

 8     suspicious number.

 9                  Do you remember that?

10          A.     I do.

11          Q.     Now, did you ever read the

12     deposition given by the DEA in this case,

13     someone speaking on behalf of the DEA?

14          A.     I did not.

15          Q.     I want to show you part of

16     Mr. Prevoznik's deposition.  It's Volume II

17     from April 18, 2019.  Let me give you some of

18     the testimony that I'm going to reference so

19     you can look at it.

20                  I'm specifically interested in

21     what starts at the bottom of page 628.  This

22     is questioning by Mr. Farrell.  Mr. Farrell

23     has been one of the key lawyers for years in

24     trying to chase down this data and

25     information.
```

1          Okay?

2                    MR. EPPICH:  Object to form.

3                    MS. MCCLURE:  Object to the

4          narrative.

5     QUESTIONS BY MR. LANIER:

6          Q.    Do you know him?  He's a

7     handsome fellow from West Virginia, real

8     athletic.

9                    MS. LEVY:  Objection.

10                   THE WITNESS:  I don't recall

11         him.

12    QUESTIONS BY MR. LANIER:

13         Q.    Okay.  He's sitting right over

14    there.

15              Seriously, Mr. Farrell asked:

16    "Do you agree" -- this is to the DEA.  "Do

17    you agree if a wholesale distributor gets a

18    flag of a suspicious order, that they've

19    determined to be a suspicious order, and that

20    they block that shipment, that they should

21    terminate all future sales to that same

22    customer until they can rule out that

23    diversion is occurring?"

24              Do you see the question?

25         A.    I do.

```
 1          Q.      And you're going to find this
 2    really stunning, but there's lots of
 3    objections before the answer.
 4                  Everybody should object to me
 5    saying that.
 6                  Strike what I just said.  That
 7    actually is objectionable.
 8                  The answer is:  "Yes, I would
 9    agree."
10                  Do you see that?
11          A.      I do.
12          Q.      So if, in fact, that once there
13    is a flag of a suspicious order, someone's
14    determined something's suspicious, a
15    suspicious order, and as a result, all of the
16    orders to that pharmacy, customer, are
17    stopped until a real determination is made
18    that rules out diversion, that could really
19    change the picture and actually make
20    90 percent of orders shipped suspicious --
21                  MS. SWIFT:  Object to the form
22          of the question.
23    QUESTIONS BY MR. LANIER:
24          Q.      -- in certain years that are at
25    issue here.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    Would you agree?
 2                    MS. SWIFT:  Object to form.
 3                    MR. EPPICH:  Object to form.
 4          Incomplete hypothetical.  Calls for
 5          speculation.
 6                    MS. MCCLURE:  Foundation.
 7                    THE WITNESS:  No, I wouldn't
 8          agree with that.
 9     QUESTIONS BY MR. LANIER:
10          Q.    Well, let's just be real clear
11     then.
12                    You hadn't done the math, had
13     you?
14          A.    This is the first time I've
15     seen this.
16          Q.    In other words, when the lawyer
17     asked you yesterday, "Would you be" -- "Would
18     you agree with the idea that 90 percent of
19     the orders shipped are suspicious?" and you
20     said, "No," you hadn't done that math, have
21     you?
22                    MS. WICHT:  Object to form.
23          Mischaracterizes.
24     QUESTIONS BY MR. LANIER:
25          Q.    You're guessing?
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              MS. WICHT:  Mischaracterizes
2        the testimony yesterday.
3              THE WITNESS:  Yes, that's my
4        opinion.
5   QUESTIONS BY MR. LANIER:
6        Q.    Yeah.  It's your opinion based
7   upon no research?
8              MS. MCCLURE:  Objection.
9   QUESTIONS BY MR. LANIER:
10       Q.    You have not researched the
11  question of how many pharmacies had
12  suspicious orders that had not done their due
13  diligence and had not resolved them and
14  continued to sell.
15             You have not done the math on
16  that, have you?
17       A.    I have not.
18             MS. WICHT:  Objection to form.
19  QUESTIONS BY MR. LANIER:
20       Q.    Thank you.
21             And then the last thing I want
22  to do on your industry work and our stop
23  there is -- lest there be any concern, I want
24  to go over and ask you if you are aware of
25  certain things, if you have personal
```

Highly Confidential - Subject to Further Confidentiality Review

1    knowledge.

2              Rite Aid, they're a pharmacy,

3    right?

4         A.    Yes.

5         Q.    Do you know about them paying a

6    $5 million fine in 2009 for filling

7    prescriptions that were not issued for

8    legitimate medical purposes and failing to

9    notify the DEA of significant thefts and

10   losses that they were required -- and other

11   records they were required to keep under the

12   Controlled Substances Act?

13              MR. BENNETT:  Objection.

14              MR. LAVELLE:  Object to form.

15              MR. BENNETT:  Objection.

16        Scope.

17              You may answer that question

18        yes or no only.

19              THE WITNESS:  No.

20   QUESTIONS BY MR. LANIER:

21        Q.    Did you know about CVS in 2013

22   having to pay an $11 million fine for

23   recordkeeping violations under the Controlled

24   Substances Act?

25              MR. BENNETT:  You can answer.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  Yes or no?
 2    QUESTIONS BY MR. LANIER:
 3         Q.     Yes, sir.
 4                    MR. BENNETT:  You can answer
 5         the question.
 6                    THE WITNESS:  Yes.
 7    QUESTIONS BY MR. LANIER:
 8         Q.     Did you know about CVS in 2015
 9    paying a $22 million fine?
10         A.     No.
11         Q.     2016, paying an $8 million
12    fine?
13         A.     No, I don't recall that.
14         Q.     2017, paying a $5 million fine?
15         A.     No.
16         Q.     Do you know about Walgreens in
17    2013 paying an $80 million fine --
18                    MS. SWIFT:  Objection.  Form.
19    QUESTIONS BY MR. LANIER:
20         Q.     -- for filling prescriptions
21    that they knew or should have known were not
22    issued for a legitimate medical purpose?
23                    MS. SWIFT:  Object to form.
24                    MR. BENNETT:  Objection.
25         Scope.
```

```
 1                    You may answer that question

 2         yes or no only.

 3                    THE WITNESS:  Yes.

 4     QUESTIONS BY MR. LANIER:

 5         Q.    Well, these aren't rogue

 6     Internet pharmacies, are they?

 7         A.    No.

 8         Q.    Do you know any other fines of

 9     pharmacies off the top of your head?

10         A.    I do not.

11         Q.    So fining the companies, have

12     you found fining the companies doesn't always

13     seem to work?

14                    MR. EPPICH:  Object to form.

15                    THE WITNESS:  That's correct.

16     QUESTIONS BY MR. LANIER:

17         Q.    The DEA used to have at its

18     disposal a tool it no longer has, true?

19                    MR. BENNETT:  Objection.

20         Vague.

21                    MS. MCCLURE:  Form.

22                    THE WITNESS:  I'm not aware

23         that any tools have been taken away.

24     QUESTIONS BY MR. LANIER:

25         Q.    Are you familiar with the
```

```
 1     Marino Bill?

 2                MS. MCCLURE:  Vague.

 3                THE WITNESS:  No.

 4     QUESTIONS BY MR. LANIER:

 5          Q.    It was subject to that article

 6     that we looked at earlier that had the yellow

 7     dots, the Marino Bill -- I think there's just

 8     one N in Marino -- that took away some of the

 9     powers of the DEA.

10                You're not familiar with that?

11                MS. MCCLURE:  Form.

12          Foundation.  Mischaracterizes.

13                THE WITNESS:  I had not heard

14          of that name, but I've heard of a bill

15          that has different requirements than

16          they had in the past.

17     QUESTIONS BY MR. LANIER:

18          Q.    So you don't have any knowledge

19     of whether or not the DEA still has today all

20     of the same tools at its disposal that it had

21     when you were there?

22          A.    No, I don't know.

23                MR. LANIER:  Okay.  Brings me

24          to the end of the road.  I'll pass the

25          witness.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MS. MCCLURE:  Off the record.

 2              VIDEOGRAPHER:  We're going off

 3         record.  The time is 11:36.

 4              (Mapes Exhibit 32 marked for

 5         identification.)

 6         (Off the record at 11:36 a.m.)

 7              VIDEOGRAPHER:  We're going back

 8         on the record.  Beginning of Media

 9         File Number 6.  The time is 12:59.

10                   RE-EXAMINATION

11    QUESTIONS BY MS. MCCLURE:

12         Q.    Good afternoon, Mr. Mapes.

13         A.    Good afternoon.

14         Q.    Just a reminder, my name is

15    Shannon McClure.  I represent

16    AmerisourceBergen Drug Corporation.  I just

17    have a few follow-up questions for you today.

18              I'm going to be talking about

19    certain things that Mr. Lanier talked to you

20    about, so it may seem less like the roadmap

21    that Mr. Lanier had and a little more

22    scattershot.  So if at any time you'd like me

23    to clarify a little bit more about where I

24    am, that's the nature of conducting this part

25    of the examination, which is a response to
```

Highly Confidential - Subject to Further Confidentiality Review

 1    what the plaintiffs have done.

 2              Will you agree that if at any

 3    time you would like me to orient you as to

 4    what we're talking about, just let me know.

 5              Okay?

 6    A.      Okay.

 7    Q.      Do you recall Mr. Lanier asking

 8    you about some audits and work that you had

 9    done on behalf of AmerisourceBergen Drug

10    Corporation after you had left DEA?

11    A.      Yes.

12    Q.      And that included audits of

13    AmerisourceBergen's order monitoring program

14    and diversion control program, right?

15    A.      Yes.

16    Q.      And those are audits that we

17    talked about yesterday, first, before

18    Mr. Lanier questioned you today when we

19    talked about your post-DEA consulting work,

20    right?

21    A.      Yes.

22    Q.      And Mr. Lanier showed you a

23    privilege log marked as Exhibit 20 and asked

24    you about the fact that several entries here

25    indicated that you were involved in these.

Highly Confidential - Subject to Further Confidentiality Review

1          Do you recall looking at this

2    document, Exhibit Number 20?

3          A.    Yes.

4          Q.    Okay.  And those audits that

5    you conducted on behalf of AmerisourceBergen,

6    we did, in fact, talk about yesterday that

7    you had done several years of audits in which

8    you generally found that the company was in

9    compliance.

10          Do you recall that?

11          A.    Yes.

12          Q.    And that's basically walking

13    the walk, in the language that Mr. Lanier had

14    used.  You found in your review of the order

15    monitoring program of AmerisourceBergen that

16    AmerisourceBergen was walking the walk,

17    right?

18          A.    Generally, yes.

19          Q.    And so Mr. Lanier presented

20    this document to you and the jury, and it

21    seemed -- and acted like all those audits

22    were, in fact, not produced in this case and

23    were not going to be available and had not

24    been produced by AmerisourceBergen.

25          Was that your understanding of

Highly Confidential - Subject to Further Confidentiality Review

1    the situation yesterday --

2         A.    Yeah.

3         Q.    -- or earlier today?  I'm

4    sorry.

5         A.    Yes.

6         Q.    Okay.  He didn't tell you that,

7    in fact, every single one of the documents on

8    this list that we're looking at here, which

9    comprises two pages, had, in fact, been

10   produced by AmerisourceBergen.  He didn't

11   tell you that, right?

12        A.    That's correct.

13        Q.    Okay.  Thank you.

14             Mr. Mapes, does DEA have ethics

15   rules in place about post-DEA employment for

16   DEA employees like yourself who leave or

17   retire?

18             MR. BENNETT:  Objection.

19        Scope.

20             You can answer based on your

21        personal knowledge but not on behalf

22        of DEA.

23             THE WITNESS:  Yes, there are.

24   QUESTIONS BY MS. MCCLURE:

25        Q.    And you followed those

Highly Confidential - Subject to Further Confidentiality Review

1    post-employment ethics rules?

2         A.    Yes.

3         Q.    Thank you.

4               Mr. Lanier's questions to you

5    seemed to imply and seemed to say to me, at

6    least, and perhaps the jury as well, that

7    there was -- that you, as a former DEA

8    agent -- or former DEA diversion investigator

9    and your various roles in DEA, had done

10   something wrong by leaving DEA and then going

11   to work for industry.

12              Do you recall those questions?

13        A.    I recall the questions, yes.

14        Q.    Okay.  And, in fact, your role

15   as a consultant, am I stating it accurately

16   to say that you were trying to help companies

17   be compliant with DEA regulations and policy

18   and the Controlled Substances Act?

19        A.    That's correct.

20        Q.    And compliance with the

21   Controlled Substances Act would be something

22   that the DEA, in your experience, would want

23   and expect of registrants, right?

24        A.    That's correct.

25        Q.    And so your goal and DEA's goal

Highly Confidential - Subject to Further Confidentiality Review

```
 1    are the same in your conducting of your

 2    consulting business today, or for the --

 3    since you left DEA, not today, correct?

 4              MR. BENNETT:  Objection.

 5         Scope.

 6              You may speak in your personal

 7         capacity, but you may not speak on

 8         behalf of DEA in answering this

 9         question.

10              THE WITNESS:  Yes, they are.

11    QUESTIONS BY MS. MCCLURE:

12         Q.    And do you think that there's

13    anything wrong that you've done in consulting

14    for various industry participants to help

15    them be compliant with the Controlled

16    Substances Act and DEA policies and

17    procedures in your post-DEA work?

18         A.    No.

19         Q.    And moving on to a different

20    topic -- as I said, this would be less like a

21    roadmap and more like stops along the way.

22              To orient you to what we're

23    going to be talking about next, I want to

24    show you the document that was marked as

25    Exhibit 4 and Exhibit 4A, same document, just
```

Highly Confidential - Subject to Further Confidentiality Review

1    different Bates numbers, which are a series

2    of letters between 1996 and 1998 regarding

3    DEA's approval of Amerisource -- I'm sorry,

4    of Bergen's newly developed system to

5    identify and report suspicious orders for

6    controlled substances.

7              Do you recall this document?

8        A.    Yes.

9        Q.    And Mr. Lanier's questions to

10   you seemed to suggest that he thought that

11   this document related only to

12   methamphetamine, the Methamphetamine Control

13   Act, and phentermine is the -- or Sudafed.

14             But is it your understanding

15   that this document relates only to

16   methamphetamine or pseudoephedrine, or does

17   it in your mind relate more broadly?

18       A.    I believe it relates to

19   controlled substances and regulated

20   chemicals.

21       Q.    Okay.  And so the language here

22   is that this is "an approval of the newly

23   developed system to both identify and report

24   suspicious orders for controlled substances

25   and regulated chemicals," right?

```
 1          A.      Yes.

 2          Q.      And, in fact, if we look at the

 3     original letter -- one moment.

 4                  Well, I'll just use the one

 5     that has my underlining in it because,

 6     really, what does it matter.

 7                  If we look at the original

 8     letter dated September 30, 1996, that

 9     Mr. Zimmerman wrote to Mr. Gitchel, it, in

10     fact, talks about "an innovative, new system

11     to both monitor and report customer orders of

12     controlled substances which fit the

13     suspicious order criteria outlined in 21 CFR

14     1301.74(b)."

15                  Do you see that?

16          A.      Yes.

17          Q.      Okay.  And that's -- so it is

18     your understanding, having reviewed this

19     series of letters marked as Exhibit 4 and

20     Exhibit 4A, that that's an approval of

21     AmerisourceBergen's entire suspicious order

22     monitoring and diversion control system, not

23     just dealing with listed chemicals or

24     Sudafed -- or the listed chemical that would

25     go into the manufacturing of methamphetamine?
```

```
 1        A.      That would be the Sudafed.

 2        Q.      Okay.  So this system, this

 3   approval, is for the entire diversion control

 4   program and suspicious order monitoring

 5   system, based on what you've seen in these

 6   letters?

 7        A.      For the entire suspicious order

 8   monitoring system, yes.

 9        Q.      Okay.  Thank you.

10                And so looking again at a

11   demonstrative document that Mr. Lanier had

12   shown you, I want to make sure I have this

13   right, that this approved not only the method

14   of providing information but the system that

15   was used to identify suspicious orders as

16   well, correct?

17        A.      Yes.

18        Q.      And that this was not just

19   related to methamphetamines, it was related

20   to all controlled substances, whether it's

21   methamphetamine, opioids or anything else

22   that's regulated under 1301.74(b), correct?

23        A.      Yes.

24                (Mapes Exhibit 33 marked for

25        identification.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MS. MCCLURE:

 2         Q.    I'm going to hand you a

 3    document that's been marked Exhibit 33.

 4               Let me know when you've had a

 5    chance to review that.

 6         A.    Okay.

 7         Q.    And so you testified in a

 8    lawsuit in West Virginia in 2016, correct?

 9         A.    Yes.

10         Q.    And in that you testified that

11    the shift from ship and then report to

12    instead halt and investigate was a gradual

13    change, right?

14         A.    Yes, it was.

15         Q.    And that the regulations did

16    not change, but the DEA's interpretation of

17    them did, right?

18         A.    Yes.

19         Q.    And that companies were

20    responding to DEA's changed interpretation

21    and then coming up with programs to handle

22    that new different expectation, right?

23         A.    That's correct.

24         Q.    And there was not a date

25    certain by which companies were expected or
```

1    anticipated to implement the changes to DEA's

2    new interpretation of 1301.74(b)?

3         A.    That's correct.

4         Q.    And so here Mr. Lanier had

5    excerpted a statement you had made to me

6    yesterday when I was originally talking to

7    you, right, and that you had accepted these

8    excessive purchase reports as compliant with

9    the Controlled Substances Act, right?

10             That's what you testified to

11   yesterday?

12        A.    Yes.

13        Q.    And then Mr. Lanier presented

14   you with this document that said that

15   essentially after-the-fact reporting of

16   suspicious orders has never been in

17   compliance with federal law according to the

18   DEA's guidance.

19             That testimony, to the extent

20   that this actually reflects your testimony,

21   which I don't believe it does, is not

22   actually consistent with the testimony you

23   gave earlier yesterday or with the testimony

24   you gave in 2016 when you were under oath in

25   that proceeding, correct?

```
 1                    MR. BENNETT:  Objection.  Form.

 2                    MR. LANIER:  Objection.  Form.

 3                    MR. BENNETT:  Misstates

 4          testimony.

 5                    THE WITNESS:  The regulation

 6          didn't change.  So the regulation was

 7          still there, but the practice was to

 8          allow them to send the excessive

 9          purchase reports and that that was

10          considered to be in compliance, even

11          though the regulation hadn't changed

12          to allow that or to not allow that.

13     QUESTIONS BY MS. MCCLURE:

14          Q.    And so that was -- the

15     submission of excessive purchase reports was

16     considered, in your experience at DEA, to be

17     in compliance with the Controlled Substances

18     Act for the period of time that those reports

19     were accepted, correct?

20          A.    Yes.

21          Q.    Just one moment.

22                And in addition, I just asked

23     you a question as to whether they were in

24     compliance with the Controlled Substances

25     Act.
```

```
 1                    They were also then in

 2      compliance -- I just asked you a question

 3      that stated that they were in compliance --

 4      the acceptance of the excessive purchase

 5      reports is being compliant -- was compliant

 6      with the Controlled Substances Act.

 7                    They were also compliant with

 8      the regulations that underscored and

 9      implemented that act, correct?

10                MR. BENNETT:  Objection.

11           Scope.

12                You may answer based on your

13           personal understanding, but you may

14           not speak on behalf of DEA.

15                THE WITNESS:  Personally we

16           accepted them, the excessive purchase

17           reports, as compliant for the

18           suspicious order monitoring, yes.

19                MS. MCCLURE:  Okay.  Thank you,

20           Mr. Mapes.

21                I have no further questions,

22           and at this time I turn my time over

23           to counsel for additional defendants.

24                Thank you very much.

25                MR. LANIER:  Make sure there's
```

```
1              no fuss.  I'm going to have one of the

2              other lawyers do our recross.

3                   Nobody's got any problem with

4         that, do they?

5                   Thank you.

6                   (Mapes Exhibit 34 marked for

7         identification.)

8                        RE-EXAMINATION

9    QUESTIONS BY MR. EPPICH:

10        Q.    Good afternoon, Mr. Mapes.  My

11   name is Chris Eppich.  Once again, I'm from

12   the McKesson company.

13        A.    Good afternoon.

14        Q.    I'm going to hand you what I've

15   marked as Exhibit Number 34 in this

16   litigation.

17              Exhibit 34, Mr. Mapes, is a

18   partial list of the attorneys in this case.

19              Do you see at the top of the

20   page it says, "1:17-md-02804-DAP, In Re:

21   National Prescription Opiate Litigation, Dan

22   Aaron Polster presiding"?

23              Do you see that, sir?

24        A.    I do.

25        Q.    And then it says "attorneys."
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              Do you see that, sir?
2         A.    Yes.
3         Q.    If we could turn to page 2 of
4    Exhibit 34, the third name down, sir, Richard
5    W. Fields, do you recognize that name?
6         A.    Yes.
7         Q.    Is Mr. Fields the attorney that
8    you met with during the summer and the fall
9    2018?
10        A.    Yes, he's one of them.
11        Q.    And do you see under
12   Mr. Fields' name he has his firm name,
13   Fields, PLLC?
14              Do you see that?
15        A.    Yes.
16        Q.    And then the address of his
17   firm?
18              Do you see that?
19        A.    Yes.
20        Q.    Did you have your meetings at
21   the Fields law firm in 2018 at that address,
22   if you recall?
23        A.    I don't believe it was.
24        Q.    Do you see under Mr. Fields'
25   address and e-mail it says the words "lead
```

1    attorney, attorney to be noticed"?

2              Do you see that, sir?

3    A.    Yes.

4    Q.    Earlier today, plaintiffs'

5    counsel asked you questions about two of its

6    expert witnesses, Mr. Jim Geldhof and Mr. Jim

7    Rafalski.

8              Do you remember that

9    discussion?

10   A.    Yes, I do.

11   Q.    Now, in your time at DEA, did

12   you have an opportunity to work on projects

13   with Mr. Geldhof?

14             MR. BENNETT:  Objection.

15        Scope.

16             You can answer that question

17        yes or no only.

18             THE WITNESS:  Yes.

19   QUESTIONS BY MR. EPPICH:

20   Q.    You had the opportunity to

21   evaluate his work product?

22   A.    No.

23   Q.    Do you have any personal

24   knowledge as to his experience,

25   qualifications or effectiveness with DEA

```
 1    diversion issues?

 2         A.    Yes.

 3         Q.    Did you have an opportunity to

 4    work with Mr. Rafalski while at DEA?

 5         A.    No.

 6         Q.    Did you ever have an

 7    opportunity to evaluate Mr. Rafalski's work?

 8         A.    No.

 9         Q.    Did you have an opportunity --

10    oh, strike that.

11               So you have no personal

12    knowledge as to Mr. Rafalski's experience,

13    qualifications or effectiveness with DEA

14    diversion issues; is that correct?

15         A.    That's correct.

16         Q.    If I could ask you to turn to

17    Exhibit 26.

18               Sir, do you have Exhibit 26 in

19    your hand?

20         A.    Yes, I do.

21         Q.    Plaintiffs' counsel asked you

22    some questions about your e-mail on the

23    bottom of page 1 and continuing on to page 2.

24               Do you remember those

25    questions?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Yes.

 2          Q.      Now, Mr. Mays at

 3     AmerisourceBergen then responded to your

 4     original e-mail in this chain.  He responded

 5     on Tuesday, August 16, 2005.

 6                  Do you see that e-mail on

 7     page 1?

 8          A.      I do.

 9          Q.      He says, "Mike, thanks for the

10     info.  I would love to know the name of the

11     pharmacy.  It looks like the picture in the

12     presentation indicates that Example Number 2

13     is a warehouse of some type.  I'm very

14     concerned that this type of location would

15     have received retail pharmacy licensing and a

16     DEA registration in the first place."

17                  Do you see that, sir?

18          A.      I do.

19          Q.      And you respond at the top of

20     the page on August 16, 2005.  You respond to

21     Mr. Mays and you say, "Steve, we are also

22     concerned that a pharmacy such as the one in

23     the picture could be licensed by the state

24     authorities and obtain a DEA registration.

25     For that reason, DEA is physically inspecting
```

```
 1     pharmacy locations in some parts of the

 2     country before they are authorized to receive

 3     a DEA registration to be sure that they are,

 4     in fact, a retail pharmacy.  DEA can no

 5     longer rely on a state physical inspection

 6     before a state license is issued."

 7              Do you see that, sir?

 8     A.     I do.

 9     Q.     Now, August 2005, that was

10     during the distributor briefings that you

11     were providing to certain distributors on

12     Internet pharmacy issues, correct?

13     A.     Yes.

14     Q.     And you shared ABDC's concern

15     that a pharmacy such as the one that you

16     discussed with ABDC could receive a DEA

17     registration, correct?

18     A.     Yes.

19     Q.     Now, prior to this time, DEA

20     did not inspect pharmacies before approving

21     the pharmacy applicant's registration,

22     correct?

23              DEA was -- let me just stop

24     there.

25              Let me strike it.  I'll ask it
```

```
1    again.

2              Now, prior to this time, DEA

3    did not inspect pharmacies before approving

4    the pharmacy's registration, correct?

5              MR. BENNETT:  Objection.

6         Scope.  This is outside the area that

7         he's authorized.  He's also not

8         authorized to speak on behalf of DEA

9         or what DEA did.

10             He may answer based on his

11        personal experience what he or the

12        diversion investigators working under

13        him did.

14             THE WITNESS:  We did not

15        routinely inspect physical locations

16        for retail pharmacies.

17   QUESTIONS BY MR. EPPICH:

18        Q.    Instead, DEA was relying on

19   state inspections -- states' inspections of

20   pharmacy applicants, right?

21             MR. BENNETT:  Objection.

22        Scope.  He's not authorized to speak

23        on behalf of DEA or what DEA did.

24             He may testify about what he

25        personally did in his position at DEA
```

Highly Confidential - Subject to Further Confidentiality Review

 1          and what he relied on.

 2                  THE WITNESS:  Yes, we -- the

 3          groups that I was involved with relied

 4          on the state license and the fact that

 5          there had been an inspection, a

 6          physical inspection, to obtain the

 7          state license.

 8     QUESTIONS BY MR. EPPICH:

 9          Q.    But the state inspections were

10     not detecting Internet pharmacies, were they?

11                  MR. BENNETT:  Objection.

12          Scope.

13                  You may talk based in your

14          personal knowledge and not on behalf

15          of DEA.

16                  THE WITNESS:  In my experience,

17          they were not always detecting that.

18     QUESTIONS BY MR. EPPICH:

19          Q.    And so DEA changed the policy,

20     right?

21                  MR. BENNETT:  Objection.

22          Scope.

23                  This witness has not been

24          authorized to testify regarding DEA

25          policy or changes in policy.

```
 1                  To the extent he has personal

 2          experience or knowledge as far as

 3          changes, he may say what he observed

 4          while he was at DEA.

 5                  THE WITNESS:  My personal

 6          experience at the time in the Denver

 7          division was that it did not require

 8          us to do inspections of retail

 9          pharmacy applicants because the state

10          board in Colorado was doing

11          appropriate inspections.

12   QUESTIONS BY MR. EPPICH:

13          Q.    But you're aware of other

14   divisions throughout the country where

15   inspections of pharmacies were occurring,

16   correct?

17          A.    Yes.

18          Q.    Now, in your experience, DEA

19   started to physically inspect pharmacies

20   seeking DEA registrations to distribute --

21   let me strike that.

22                  Mr. Mapes, earlier today

23   plaintiffs' counsel asked you some questions

24   about DEA's distributor briefing with

25   McKesson.
```

1          Do you remember that

2  discussion?

3          A.     Yes.

4          Q.     And DEA's distributor briefing

5  with McKesson led to a series of telephone

6  conferences and meetings with McKesson as the

7  two discussed the DEA's new guidance and the

8  Internet pharmacy concern, right?

9          A.     It did.

10         Q.     DEA identified six suspected

11 Internet pharmacies to McKesson as part of

12 these meetings, correct?

13         A.     I'd have to -- I don't remember

14 the exact number, but...

15         Q.     But the DEA identified

16 suspected Internet pharmacies to McKesson

17 during these meetings?

18         A.     Yes.

19         Q.     McKesson stopped supplying

20 those pharmacies, right?

21              MR. BENNETT:  You can answer,

22       if you know.

23              THE WITNESS:  I don't recall

24       specifically without looking at the

25       documentation.

1    QUESTIONS BY MR. EPPICH:

2         Q.    Well, in fact, one of the

3    pharmacies that McKesson stopped supplying

4    sued the DEA because McKesson immediately

5    stopped supplying controlled substances to

6    that pharmacy after meeting with DEA.

7              Do you recall that?

8         A.    No, I do not.

9         Q.    Do you recall testifying at a

10   federal district court hearing in Florida in

11   2006 in the case of United Prescription

12   Services versus Alberto Gonzales and Karen

13   Tardy {sic}?

14        A.    I remember testifying in

15   Florida, yes.

16        Q.    And do you recall that that

17   testimony was in relation to McKesson's

18   immediate cease of supplying controlled

19   substances to that pharmacy?

20        A.    I don't remember the substance

21   of the testimony.

22        Q.    But it's fair to say that

23   following the discussions that DEA had with

24   McKesson during these distributor meetings,

25   that McKesson acted promptly to address the

```
 1     concerns of the DEA?

 2               MR. BENNETT:  Objection.

 3          Scope.

 4               This witness is not authorized

 5          to disclose nonpublic information

 6          about DEA activities or investigations

 7          that they may have had.

 8               To the extent that you can

 9          answer this question with publicly

10          available information, you may answer.

11               THE WITNESS:  And the question

12          again?

13     QUESTIONS BY MR. EPPICH:

14          Q.    I'll restate the question, sir.

15               It's fair to say that following

16     the discussions the DEA had with McKesson

17     during these distributor meetings, that

18     McKesson acted promptly to address the

19     concerns of the DEA?

20               MR. BENNETT:  Do you understand

21          my instruction in responding to that

22          question?

23               THE WITNESS:  Yes.

24               MR. BENNETT:  Okay.

25               THE WITNESS:  I can't really
```

Highly Confidential - Subject to Further Confidentiality Review

1        say.

2        QUESTIONS BY MR. EPPICH:

3            Q.      You don't recall?

4            A.      I just don't recall.

5            Q.      Now, earlier today the

6        plaintiffs' counsel asked you and showed you

7        a slide.  He asked you some questions about

8        other causes of the opioid crisis, e.g.,

9        illegal prescribing.

10               Do you remember this

11       conversation?

12           A.      Yes.

13           Q.      And he asked you whether or not

14       a good suspicious order monitoring system can

15       help catch that.

16               Do you remember that testimony,

17       sir?

18           A.      Yes.

19           Q.      Are you familiar with HIPAA?

20           A.      Yes.

21           Q.      What is HIPAA?

22           A.      The Health Insurance Privacy

23       Act or something like that.

24           Q.      Now, pursuant to that Act,

25       distributors don't have access to a patient's

Highly Confidential - Subject to Further Confidentiality Review

```
 1    medical records, correct?

 2          A.      Generally, no.

 3          Q.      And distributors are not in the

 4    doctor's office when the doctor and the

 5    patient are talking, are they?

 6          A.      Not in my experience, no.

 7          Q.      Now, you'll recall that

 8    plaintiffs' counsel asked you -- he presented

 9    the following question to you earlier today

10    in a slide titled "Diversion Control 101."

11                  He asked you:  "If a company

12    sees a suspicious order, the company has a

13    choice to make, ship/sell or hold and

14    investigate."

15                  Do you remember this slide?

16          A.      Yes.

17          Q.      But this question isn't found

18    in the Controlled Substances Act, is it?

19          A.      It doesn't say that

20    specifically in the Controlled Substances

21    Act, no.

22          Q.      And it doesn't say this

23    specifically in the regulations, correct?

24          A.      No.

25          Q.      You started to ask distributors
```

```
 1    to ask themselves this question as a part of
 2    the distributor briefings, correct?
 3         A.    We did.
 4               MR. EPPICH:  Thank you,
 5         Mr. Mapes.  I have no further
 6         questions.
 7               We can go off the record.
 8               VIDEOGRAPHER:  We're going off
 9         the record.  The time is 1:33.
10          (Off the record at 1:33 p.m.)
11               VIDEOGRAPHER:  Going back on
12         the record.  Beginning of Media
13         File 7.  Time, 1:39.
14               MR. EPPICH:  Just a quick
15         housekeeping issue.
16               For the record, let's go ahead
17         and mark as Exhibit 4A, document
18         bearing Bates number ABDCMDL00269347
19         through 358.
20               And let's mark as Exhibit 35
21         three pages from the demonstratives
22         that plaintiffs presented this
23         morning, further marked up by
24         defendants.
25               We can go off.
```

```
 1              (Mapes Exhibit 35 marked for

 2         identification.)

 3              VIDEOGRAPHER:  Going off record

 4         at 1:40.

 5          (Off the record at 1:40 p.m.)

 6              VIDEOGRAPHER:  We're going back

 7         on record.  Beginning Media File 8.

 8         The time is 1:59.

 9              RE-EXAMINATION

10    QUESTIONS BY MS. FITZPATRICK:

11         Q.    Good afternoon, Mr. Mapes.  We

12    met briefly yesterday, but my name is Laura

13    Fitzpatrick, and I'm here on behalf of the

14    plaintiffs, and I'm going to take over for

15    Mr. Lanier for a little bit.

16              I want to just kind of reorient

17    you and the jury here.  I'd like to talk --

18    just a second.

19              I'd like to kind of redirect

20    us, call this my redirect roadmap that

21    Ms. Lanier made for me here.

22              I'd like to take us from the

23    muddy waters that you were brought into over

24    the last, I think, 45 minutes or so, back on

25    to what I'm going to call clarity road.
```

1          Okay?

2     A.     Okay.

3     Q.     All right.  Now, you were shown

4  by the ABDC lawyer the document that we've

5  referred to as the methamphetamine document,

6  and there were some suggestions that ABDC had

7  a policy that the DEA approved of.

8          Do you recall that?

9          MS. MCCLURE:  Form.

10          THE WITNESS:  Yes.

11  QUESTIONS BY MS. FITZPATRICK:

12     Q.     Okay.  Now, would you agree

13  with me that a policy is no good if a company

14  doesn't follow it?

15     A.     Yes.

16     Q.     And would you agree that if

17  someone doesn't put their seat belt on and

18  they get into a car wreck, they may not be

19  protected by the seat belt?

20          MS. MCCLURE:  Form.

21          THE WITNESS:  Correct.

22  QUESTIONS BY MS. FITZPATRICK:

23     Q.     Okay.  Thank you.

24          Now, with respect to

25  Ms. McClure's questions to you about the ABDC

```
1    audits and the privilege log, you said that

2    you found the company just generally

3    compliant; is that right?

4                 MS. MCCLURE:  Form.

5                 THE WITNESS:  Yes.

6    QUESTIONS BY MS. FITZPATRICK:

7         Q.    Okay.  So does that mean that

8    if you only shoplift once a month instead of

9    every time that you enter a store that it's

10   not going to be against the law?

11                Still against the law,

12   correct --

13                MS. MCCLURE:  Form.  Vague.

14   QUESTIONS BY MS. FITZPATRICK:

15        Q.    -- whether you do it once a

16   month or every day?

17                MS. MCCLURE:  Form.  Vague.

18        Compound.  Ambiguous.  Scope.

19                THE WITNESS:  That's not what I

20        meant by saying "generally compliant."

21   QUESTIONS BY MS. FITZPATRICK:

22        Q.    What did you mean?

23        A.    I meant that there were minor

24   improvements that could be made, but they

25   were being generally compliant with their
```

Highly Confidential - Subject to Further Confidentiality Review

1    policies.

2          Q.     Compliant with their policy,

3    correct?

4          A.     Yes.

5          Q.     Okay.  Now, Ms. McClure made a

6    big deal about you only appearing on one page

7    of a privilege log.

8                 Do you recall that --

9                 MS. MCCLURE:  Form.  Mis --

10   QUESTIONS BY MS. FITZPATRICK:

11         Q.     -- line of questioning?

12                MS. MCCLURE:  Form.

13         Mischaracterizes.

14                THE WITNESS:  She did say that

15         I was on that page of the privilege

16         log, yes.

17   QUESTIONS BY MS. FITZPATRICK:

18         Q.     And only that page, correct?

19                MS. MCCLURE:  Objection.

20         Misstates the question.

21                THE WITNESS:  I don't recall

22         that, but...

23   QUESTIONS BY MS. FITZPATRICK:

24         Q.     Okay.  I'll represent to you

25   that Ms. McClure put -- well, let's have the

Highly Confidential - Subject to Further Confidentiality Review

1    exhibit, actually.  I think it was Exhibit

2    Number 1 -- 2?

3                   MS. MCCLURE:  20.

4                   MS. FITZPATRICK:  I'm sorry,

5         20, yes, first of today.

6    QUESTIONS BY MS. FITZPATRICK:

7         Q.     Thank you.

8                   So, Mr. Mapes, Ms. McClure had

9    you look at Exhibit Number 20.

10                  Do you see Exhibit Number 20 on

11   the screen in front of you?

12        A.     Yes.

13        Q.     And she said this was only one

14   page where you appeared on the ABDC privilege

15   log, correct?

16                  MS. MCCLURE:  Objection to

17        form.  Misstates the record.

18                  THE WITNESS:  I don't remember

19        her exact language.

20                  (Mapes Exhibit 36 marked for

21        identification.)

22   QUESTIONS BY MS. FITZPATRICK:

23        Q.     Okay.  Well, I'm going to show

24   you what we're going to mark as Exhibit

25   Number 36, which is a memorandum that was

Highly Confidential - Subject to Further Confidentiality Review

1    done by some of the plaintiffs.  Here you go.

2              Do you have Exhibit 36 in front

3    of you?

4         A.    Yes.

5         Q.    Okay.  Now, would you agree

6    here with me, sir, that this is not just one

7    entry on a privilege log, that there are

8    several pages here where you are listed on

9    ABDC's privilege log?

10             And I might add that you're

11   also listed on the Henry Schein privilege log

12   as well as the Par and Endo privilege log.

13             Did you know that, sir?

14             MS. MCCLURE:  Objection.  Form.

15        Compound.  Misstates the record.

16             THE WITNESS:  I see that I am

17        several places on the

18        AmerisourceBergen privilege log.

19   QUESTIONS BY MS. FITZPATRICK:

20        Q.    Okay.  Thank you.

21             So it's more than just one,

22   correct?

23        A.    Yes.

24        Q.    Okay.  Thank you, sir.

25             Now, there were some questions

```
1    about -- the ABDC lawyer asked you about the

2    gradual change, she called it a gradual

3    change, in what the companies were doing to

4    be in compliance with the law.

5              Do you recall that line of

6    questioning?

7         A.    Yes.

8         Q.    Okay.  Now, did the questions

9    that the ABDC lawyer asked you change

10   anything about your testimony earlier today,

11   that this has always been the law?

12              MS. MCCLURE:  Objection to the

13         form.  Compound.

14              THE WITNESS:  It has always

15         been the law but not necessarily the

16         practice of what DEA accepted.

17   QUESTIONS BY MS. FITZPATRICK:

18        Q.    But you would agree with me

19   that whether DEA accepted it or not, the law

20   was the law, correct?

21              MS. MCCLURE:  Objection to the

22         form.  Calls for a legal conclusion.

23              THE WITNESS:  Yes.

24              (Mapes Exhibit 37 marked for

25         identification.)
```

```
 1    QUESTIONS BY MS. FITZPATRICK:

 2         Q.    And in fact, speaking of the

 3    DEA, I will mark as Exhibit Number 37 an

 4    excerpt of the DEA's 30(b)(6) testimony.

 5              Here you go, sir.

 6              And do you understand what

 7    30(b)(6) testimony is, sir?

 8         A.    Yes.

 9         Q.    So it means that the person

10    speaking is speaking for the company, not

11    just in their personal capacity, correct?

12              MS. MCCLURE:  Form.

13              THE WITNESS:  For the Agency,

14    yes.

15    QUESTIONS BY MS. FITZPATRICK:

16         Q.    For the Agency.

17              All right.  I'd like you to

18    take a look at what Mr. Prevoznik said.  He

19    was asked:  "Does the DEA take the position

20    that a registrant of controlled substances

21    has a duty to block shipments of suspicious

22    order?"

23              The DEA's answer was:  "Yes.

24              He was also asked:  "Is that

25    now and always has been the law in the United
```

```
 1    States of America?"

 2              What was his answer, sir?

 3    A.      "Yes."

 4              MS. FITZPATRICK:  Thank you.

 5              MS. MCCLURE:  Objection to the

 6        narrative statements from counsel.

 7    QUESTIONS BY MS. FITZPATRICK:

 8        Q.    All right, sir, I'd like to

 9    talk a little bit about McKesson.

10              Now, the McKesson lawyer talked

11    to you about relying on state inspectors.

12              Do you recall that testimony?

13    A.      Yes.

14        Q.    Okay.  Let me ask you this:

15    Does the DEA -- is the DEA a multimillion

16    dollar corporation?

17              MR. EPPICH:  Object to the

18        form.

19              THE WITNESS:  It's not a

20        corporation.

21    QUESTIONS BY MS. FITZPATRICK:

22        Q.    Okay.  Does it have endless

23    resources?

24              MS. MCCLURE:  Form.

25              THE WITNESS:  No.
```

1    QUESTIONS BY MS. FITZPATRICK:

2         Q.    Okay.  If the companies had

3    maintained effective controls, there wouldn't

4    be much to inspect, would there?

5              MS. MCCLURE:  Objection.  Asked

6         and answered.  Scope, in terms this is

7         supposed to be recross.

8              MR. STEPHENS:  And objection.

9         Form.

10   QUESTIONS BY MS. FITZPATRICK:

11        Q.    You can answer, Mr. Mapes.

12        A.    There would still be a lot to

13   inspect to be sure that they were maintaining

14   effective controls, so the oversight of those

15   companies.

16        Q.    But if a company fails to

17   maintain effective controls, there's a lot

18   more to inspect, isn't there?

19        A.    That's correct.

20             MS. MCCLURE:  Form.

21   QUESTIONS BY MS. FITZPATRICK:

22        Q.    Okay.  Thank you.

23             All right.  Now, there was --

24   another part of the blame game today was

25   the -- when we talked about the Internet

```
 1    pharmacies.  The McKesson lawyer talked to

 2    you about the Internet pharmacies and how

 3    they got their registrations and that their

 4    registrations were granted by the DEA.

 5              Do you recall that line of

 6    questioning?

 7              MS. MCCLURE:  Objection.

 8         Argumentative.

 9              MR. EPPICH:  Objection to the

10         form and characterization.

11              THE WITNESS:  Yes.

12    QUESTIONS BY MS. FITZPATRICK:

13         Q.    Okay.  Defendants have a duty

14    to know their customers, correct?

15              MR. EPPICH:  Objection.  Calls

16         for a legal conclusion.  Form.

17              THE WITNESS:  Yes.

18              MS. MCCLURE:  Scope.

19    QUESTIONS BY MS. FITZPATRICK:

20         Q.    Is the DEA a registrant?

21         A.    Yes.

22         Q.    The DEA is a registrant and has

23    a duty to prevent against abuse and

24    diversion?

25              MR. BENNETT:  Objection.
```

1    Scope.

2        You may not speak on behalf of

3    DEA.  You may speak on your personal

4    understanding, if you have one.

5        THE WITNESS:  DEA's

6    registrations are not as distributors

7    or manufacturers.  They're as

8    analytical laboratories and that kind

9    of thing, so they have different

10   requirements.

11  QUESTIONS BY MS. FITZPATRICK:

12       Q.    Correct.

13       And the DEA does not

14  distribute, manufacture or sell opioids, does

15  it?

16       A.    It does not.

17       Q.    Okay.  Thank you.

18       MR. EPPICH:  Objection to the

19   extent the demonstrative does not

20   reflect the testimony.

21       MS. FITZPATRICK:  I'll fix that

22   right now.

23  QUESTIONS BY MS. FITZPATRICK:

24       Q.    The DEA is not the same type of

25  registrant, correct?

```
 1            A.      Yes.

 2            Q.      Thank you, sir.

 3                    Now, I believe you already

 4     testified to this today but to make sure that

 5     there's no confusion for the jury, where do

 6     Internet pharmacies get their pills?

 7                    MS. MCCLURE:  Again, asked and

 8            answered.  Scope.  Outside of the

 9            scope of redirect.

10     QUESTIONS BY MS. FITZPATRICK:

11            Q.      Do they get them from the DEA,

12     sir?

13                    MS. MCCLURE:  All the same

14            objections.

15                    THE WITNESS:  No.

16     QUESTIONS BY MS. FITZPATRICK:

17            Q.      Okay.  Does the United States

18     government provide these?

19            A.      No.

20            Q.      Okay.  The manufacturers,

21     distributors and pharmacies provide opioids,

22     correct?

23                    MS. MCCLURE:  All the same

24            objections, including scope of

25            recross.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  Yes.
 2    QUESTIONS BY MS. FITZPATRICK:
 3          Q.      Thank you.
 4                  Now, the McKesson lawyer talked
 5    to you a little bit about the duty to ship
 6    and when that -- when that duty existed and
 7    when it didn't.
 8                  The CSA, which Mr. Lanier put
 9    in front of you, says "report when
10    discovered," does it not?
11                  MR. EPPICH:  Object to the
12          form.
13                  MS. MCCLURE:  Form.  Calls for
14          a legal conclusion.
15                  THE WITNESS:  The CSA does not.
16          The regulations do.
17    QUESTIONS BY MS. FITZPATRICK:
18          Q.      Excuse me, yes.  Apologies.
19                  The regulations say -- let me
20    fix this.  The regulations say "report when
21    discovered," correct?
22          A.      Yes.
23                  MS. MCCLURE:  Same objections.
24    QUESTIONS BY MS. FITZPATRICK:
25          Q.      Okay.  Now, I looked up the
```

```
 1    definition of the word "when" because I was a

 2    little confused about why we were still

 3    fighting about this.  But the definition of

 4    "when" is "at or during that time."

 5                 Is that your understanding of

 6    the definition of "when"?

 7                 MS. MCCLURE:  Same objections,

 8         including outside the scope of

 9         recross.

10                 THE WITNESS:  When, yes.

11    QUESTIONS BY MS. FITZPATRICK:

12         Q.    Thank you, sir.

13                 Now, the McKesson lawyer talked

14    to you about McKesson's reactions and

15    responses to the DEA feeling the need to

16    reach out to McKesson and inform them that

17    they were distributing pills to some of the

18    rogue Internet pharmacies.

19                 Do you recall that line of

20    questioning?

21         A.    Yes.

22         Q.    Okay.

23                 MR. EPPICH:  Objection to the

24         form.  Misstates the testimony.

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MS. FITZPATRICK:
 2         Q.    And the McKesson lawyer
 3    represented to you that McKesson reacted
 4    promptly.
 5              Do you recall that?
 6              MR. BENNETT:  You can answer.
 7              THE WITNESS:  Yes.
 8    QUESTIONS BY MS. FITZPATRICK:
 9         Q.    Sir, isn't it true that
10    McKesson got busted?
11              MR. EPPICH:  Objection.
12         Argumentative.
13              MS. MCCLURE:  Form.
14         Argumentative.
15    QUESTIONS BY MS. FITZPATRICK:
16         Q.    I forget the exact exhibit
17    number --
18              MR. EPPICH:  Calls for
19         speculation.
20    QUESTIONS BY MS. FITZPATRICK:
21         Q.    -- but Mr. Lanier showed you a
22    copy of the 2007 McKesson settlement
23    agreement.
24              Do you recall that?
25              MR. EPPICH:  Objection.
```

```
 1              Misstates the document.  Form.

 2                   THE WITNESS:  Yes.

 3    QUESTIONS BY MS. FITZPATRICK:

 4         Q.    Okay.  And, sir, did you know

 5    that they did it again?

 6                   MR. EPPICH:  Objection.

 7         Argumentative.  Form.

 8                   MS. MCCLURE:  Form.

 9                   THE WITNESS:  I'm not aware of

10         what happened after that time, no.

11              (Mapes Exhibit 38 marked for

12         identification.)

13    QUESTIONS BY MS. FITZPATRICK:

14         Q.    All right.  Sir, I'm going to

15    mark for you Exhibit Number 38, I believe

16    this is.

17                   All right.  Sir, I'd like you

18    to turn to --

19                   MR. BENNETT:  Counsel, can he

20         have a minute to review the document?

21                   MS. FITZPATRICK:  Oh, sure.

22                   Well, and I'll tell you, the

23         only page I'm going to be looking at

24         is the one that ends in 5352 at the

25         bottom for the McKesson Bates.
```

```
 1              MR. EPPICH:  Object to the
 2         scope and use of this document on
 3         redirect.
 4              MS. MCCLURE:  And scope in
 5         terms of authorization.
 6              MR. BENNETT:  Review as much of
 7         this as you need to familiarize
 8         yourself with the document.
 9              THE WITNESS:  Okay.
10    QUESTIONS BY MS. FITZPATRICK:
11         Q.    Mr. Mapes, do you see paragraph
12    number 2 on the page labeled 5352?  That's
13    really the only paragraph I'm going to be
14    talking to you about and -- just a few
15    sentences in that paragraph.
16              Do you see I have it here on
17    the screen in front of you?
18              MR. EPPICH:  Objection.  Scope.
19         Foundation.  Calls for speculation.
20              MR. BENNETT:  And I'll object
21         to the extent the witness needs more
22         time to familiarize himself with the
23         document before he answers questions.
24              Whenever you're prepared,
25         please let her know that you're ready
```

```
 1              to go forward.

 2                    THE WITNESS:  Okay.

 3     QUESTIONS BY MS. FITZPATRICK:

 4         Q.    And let's try this.  Let me --

 5     why don't I start, and if you have any

 6     questions or if you feel you need to look at

 7     any other of the pages, then we can do that.

 8                    Does that work for you, sir?

 9         A.    Okay.

10         Q.    All right.  So if you follow

11     with me here, it states:  "McKesson

12     acknowledges that at various times during the

13     period from January 1, 2009" --

14                    That's after the 2007

15     settlement agreement, correct?

16                    MR. EPPICH:  Objection.  Scope.

17          Foundation.  Calls for speculation.

18                    THE WITNESS:  Yes, it is.

19     QUESTIONS BY MS. FITZPATRICK:

20         Q.    Okay.

21                    -- "up through and including

22     the effective date of this agreement, it did

23     not identify or report to the DEA certain

24     orders placed by certain pharmacies which

25     should have been detected by McKesson as
```

Highly Confidential - Subject to Further Confidentiality Review

1    suspicious based on the guidance contained in

2    the DEA letters about the requirements set

3    forth in 21 CFR Section 1301.74(b)."

4                   And 74(b), that's the section

5    that Mr. Lanier had to point out to you,

6    correct?  The McKesson lawyer hadn't shown

7    you that one initially?

8                   MS. MCCLURE:  Form.  Compound.

9          Argumentative.

10                  MR. EPPICH:  Objection.

11         Misstates testimony.  Form.  Scope.

12         Foundation.

13                  THE WITNESS:  I don't recall

14         when that was first pointed out.

15   QUESTIONS BY MS. FITZPATRICK:

16         Q.    Okay.  And 21 USC Section

17   842(a)(5), "McKesson has taken steps to

18   prevent such conduct from occurring in the

19   future, including the measures delineated in

20   the compliance addendum."

21                  Did I read that correctly?

22                  MR. EPPICH:  Objection.

23         Foundation.  Calls for speculation.

24         Scope.

25                  THE WITNESS:  Yes.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MS. FITZPATRICK:

 2         Q.    And I found it interesting that

 3    the same language about McKesson taking steps

 4    to prevent such conduct from occurring in the

 5    future appears in the 2007 settlement

 6    agreement as well.

 7              Did you know that, sir?

 8              MR. EPPICH:  Objection.  Scope.

 9         Foundation.  Calls for speculation.

10              THE WITNESS:  No, I didn't.

11    QUESTIONS BY MS. FITZPATRICK:

12         Q.    So, sir, even if the DEA is

13    using the tools that the lawyer for Walmart

14    talked about for quite a bit yesterday, one

15    such being a suspension order and having the

16    Department of Justice -- supporting the

17    Department of Justice and entering into a

18    settlement agreement, that doesn't

19    necessarily mean the company won't do it

20    again, correct?

21              MR. EPPICH:  Objection.  Scope.

22         Foundation.  Calls for speculation.

23         Calls for legal conclusion and

24         misstates facts.

25              MR. STEPHENS:  Objection.  Also
```

```
 1          misstates the question and the

 2          testimony.

 3   QUESTIONS BY MS. FITZPATRICK:

 4          Q.     You can answer, sir.

 5          A.     I have now forgotten the

 6   question.

 7          Q.     No problem.  So I'll read it

 8   back.

 9                 Even if the DEA is using the

10   tools -- you recall the discussion with the

11   Walmart lawyer yesterday about the tools

12   available to the DEA that in his opinion

13   another person may not have access to.

14                 Do you recall that?

15          A.     I do.

16          Q.     Okay.  So even if the DEA is

17   using those tools, one of which being a

18   suspension order that could lead to a

19   settlement agreement, that does not mean that

20   the company is not going to continue to break

21   the law, does it?

22                 MR. EPPICH:  Objection.  Scope.

23   Form.  Calls for speculation.

24                 THE WITNESS:  It does not.

25
```

```
 1    QUESTIONS BY MS. FITZPATRICK:

 2         Q.    And the fact that McKesson, in

 3    2007, signed a settlement agreement and

 4    agreed to not do it again, they did it again,

 5    didn't they?

 6              MR. EPPICH:  Objection.  Form.

 7         Foundation.  Scope.  Misstates the

 8         documents and testimony and misstates

 9         facts.

10    QUESTIONS BY MS. FITZPATRICK:

11         Q.    Didn't they admit to doing

12    that, sir?

13              MR. EPPICH:  Same objections.

14              THE WITNESS:  Yes, they did.

15    QUESTIONS BY MS. FITZPATRICK:

16         Q.    Okay.  Do you think it's just

17    the cost of doing business for the company?

18              MR. EPPICH:  Objection.

19         Argumentative.

20    QUESTIONS BY MS. FITZPATRICK:

21         Q.    These settlement agreements?

22              MR. EPPICH:  Objection.

23         Argumentative.  Form.  Calls for

24         speculation.  Scope.

25              THE WITNESS:  No, I don't think
```

```
 1              it's just the cost of doing business.

 2      QUESTIONS BY MS. FITZPATRICK:

 3              Q.      Okay.  And that's your opinion

 4      sitting here today as a paid consultant for

 5      one of the companies that's a defendant in

 6      this litigation, correct?

 7              A.      Yes.

 8              MS. MCCLURE:  Objection.

 9              Argumentative.

10      QUESTIONS BY MS. FITZPATRICK:

11              Q.      Now, I want to ask -- the last

12      thing I'm going to ask you about is the

13      lawyer for McKesson talked to you a lot about

14      HIPAA and that companies don't have patient

15      medical records.

16              Do you recall that?

17              A.      I recall the discussion, yes.

18              Q.      Okay.  And I believe what he

19      was getting at was he was trying to make the

20      point with you that because the companies --

21      because he represented to you that companies

22      did not have the patient medical records,

23      there was no way for the companies to monitor

24      overprescribers.

25              Was that your understanding?
```

```
 1              MR. EPPICH:  Objection.

 2        Misstates the question and testimony.

 3        Form.

 4              THE WITNESS:  That wasn't my

 5        understanding of his question.

 6   QUESTIONS BY MS. FITZPATRICK:

 7        Q.    Okay.  Let me ask you this:  Do

 8   you think it would be more fair if the

 9   McKesson lawyer had told you the whole truth,

10   had talked with you and told the jury the

11   whole truth?

12              MS. MCCLURE:  Objection.

13        Argumentative.  Scope.

14        Mischaracterizes the questions.

15              MR. EPPICH:  I'll join in that

16        objection.  Thank you very much.

17              THE WITNESS:  And the question

18        is that the --

19   QUESTIONS BY MS. FITZPATRICK:

20        Q.    Is it important to tell the

21   whole truth, is the question.

22              MS. MCCLURE:  All those same

23        objections.

24              THE WITNESS:  Yes.

25
```

```
 1    QUESTIONS BY MS. FITZPATRICK:

 2         Q.    Okay.  And did you know that

 3    manufacturers have the data of not only their

 4    top prescribers but all prescribers?

 5              MR. EPPICH:  Objection.  Form.

 6         Foundation.  Calls for speculation.

 7         Vague.

 8              MS. MCCLURE:  Scope.  Both of

 9         the Touhy notice as well as outside

10         the scope of redirect.

11    QUESTIONS BY MS. FITZPATRICK:

12         Q.    You can answer, sir.

13         A.    I know that there is data

14    available to manufacturers.  Whether it's

15    complete and of all prescribers, I don't

16    know, but --

17         Q.    So you don't -- I'm sorry, sir,

18    were you finished?

19         A.    Yeah.  I don't know the

20    completeness and the scope of the data, but

21    there is some data available, yes.

22         Q.    Okay.  And the companies can do

23    the red flag test without a prescription

24    record, correct?

25              MS. MCCLURE:  Objection.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Vague.  Ambiguous.  Foundation.

 2            Scope, both of Touhy and redirect.

 3                  MR. EPPICH:  Also object that

 4            the demonstrative does not reflect the

 5            witness' testimony if it is meant to

 6            do so.

 7                  MS. MCCLURE:  But I assume we

 8            still have a standing objection to

 9            those.

10                  MS. FITZPATRICK:  You do, and

11            it's a demonstrative.  I can write

12            whatever I want.  It doesn't have to

13            be exactly what the witness says.

14      QUESTIONS BY MS. FITZPATRICK:

15            Q.    But go ahead, Mr. Mapes.

16                  MR. EPPICH:  Just making a

17            record in case you want to use it at

18            trial.

19                  THE WITNESS:  That's correct.

20                  MS. FITZPATRICK:  Okay.  Let me

21            take a minute.  I don't think we have

22            anything else, but let me just...

23                  All right.  We're done.  Thank

24            you, Mr. Mapes.

25                  MR. BENNETT:  Mr. Mapes, you'll
```

```
 1        have an opportunity to read this
 2        deposition or you can waive that
 3        right.  It's up to you to decide
 4        whether you want to review it or
 5        whether you want to waive signature.
 6              THE WITNESS:  And if I review
 7        it and find something that I --
 8              MR. BENNETT:  You would have
 9        the right in your errata sheet to
10        correct errors.
11              But you have to tell the court
12        reporter now, and if you don't tell
13        her anything, then you don't waive
14        signature and you'll get it to review.
15              THE WITNESS:  Yeah, I think I'd
16        rather review it.
17              MR. BENNETT:  He does not want
18        to waive signature.  Thank you.
19              All right.  Thank you,
20   Mr. Mapes.
21              VIDEOGRAPHER:  This concludes
22        today's deposition.  The time is 2:22.
23   (Deposition concluded at 2:22 p.m.)
24                 - - - - - - -
25
```

```
 1                         CERTIFICATE
 2
 3              I, CARRIE A. CAMPBELL, Registered
      Diplomate Reporter, Certified Realtime
 4    Reporter and Certified Shorthand Reporter, do
      hereby certify that prior to the commencement
 5    of the examination, Michael Mapes, was duly
      sworn by me to testify to the truth, the
 6    whole truth and nothing but the truth.
 7              I DO FURTHER CERTIFY that the
      foregoing is a verbatim transcript of the
 8    testimony as taken stenographically by and
      before me at the time, place and on the date
 9    hereinbefore set forth, to the best of my
      ability.
10
               I DO FURTHER CERTIFY that I am
11    neither a relative nor employee nor attorney
      nor counsel of any of the parties to this
12    action, and that I am neither a relative nor
      employee of such attorney or counsel, and
13    that I am not financially interested in the
      action.
14
15
16
               _Carrie A. Campbell_____
17             CARRIE A. CAMPBELL,
               NCRA Registered Diplomate Reporter
18             Certified Realtime Reporter
               Notary Public
19             Dated:  July  13, 2019
20
21
22
23
24
25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                INSTRUCTIONS TO WITNESS

 2

 3            Please read your deposition over

 4    carefully and make any necessary corrections.

 5    You should state the reason in the

 6    appropriate space on the errata sheet for any

 7    corrections that are made.

 8            After doing so, please sign the

 9    errata sheet and date it.  You are signing

10    same subject to the changes you have noted on

11    the errata sheet, which will be attached to

12    your deposition.

13            It is imperative that you return

14    the original errata sheet to the deposing

15    attorney within thirty (30) days of receipt

16    of the deposition transcript by you.  If you

17    fail to do so, the deposition transcript may

18    be deemed to be accurate and may be used in

19    court.

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              ACKNOWLEDGMENT OF DEPONENT

2

3

4              I,_____, do

     hereby certify that I have read the foregoing
5    pages and that the same is a correct
     transcription of the answers given by me to
6    the questions therein propounded, except for
     the corrections or changes in form or
7    substance, if any, noted in the attached
     Errata Sheet.

8

9

10

11

12   _____

     Michael Mapes                DATE
13

14

15   Subscribed and sworn to before me this

16   _____ day of _____, 20 _____.

17   My commission expires: _____

18

19   Notary Public

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                - - - - - - -

                     ERRATA

 2                - - - - - - -

 3      PAGE    LINE    CHANGE/REASON

 4      _____   _____   _____

 5      _____   _____   _____

 6      _____   _____   _____

 7      _____   _____   _____

 8      _____   _____   _____

 9      _____   _____   _____

10      _____   _____   _____

11      _____   _____   _____

12      _____   _____   _____

13      _____   _____   _____

14      _____   _____   _____

15      _____   _____   _____

16      _____   _____   _____

17      _____   _____   _____

18      _____   _____   _____

19      _____   _____   _____

20      _____   _____   _____

21      _____   _____   _____

22      _____   _____   _____

23      _____   _____   _____

24      _____   _____   _____

25
```

```
1                          - - - - - -

                      LAWYER'S NOTES
2                          - - - - - -

3       PAGE    LINE

4       _____   _____   _____

5       _____   _____   _____

6       _____   _____   _____

7       _____   _____   _____

8       _____   _____   _____

9       _____   _____   _____

10      _____   _____   _____

11      _____   _____   _____

12      _____   _____   _____

13      _____   _____   _____

14      _____   _____   _____

15      _____   _____   _____

16      _____   _____   _____

17      _____   _____   _____

18      _____   _____   _____

19      _____   _____   _____

20      _____   _____   _____

21      _____   _____   _____

22      _____   _____   _____

23      _____   _____   _____

24      _____   _____   _____

25
```