Page 1

1              THE UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF OHIO

3                    EASTERN DIVISION

4

5   IN RE NATIONAL PRESCRIPTION      )

    OPIATE LITIGATION,               )

6                                    )MDL No. 2804

    County of Lake, Ohio v           )

7   Purdue Pharma L.P., et al.,      )Case No. 1:17-md-2804

    Case No. 18-op-45032             )

8                                    )Judge Dan Aaron

    County of Trumbull, Ohio v.      )Polster

9   Purdue Pharma, L.P., et al.,     )

    Case No. 18-op-47079             )

10                                   )

    Track 3 Cases                    )

11

12           The videotaped videoconference deposition

13    of CRAIG J. McCANN, Ph.D., called for examination

14    pursuant to the Rules of Civil Procedure for the

15    United States District Courts pertaining to the

16    taking of depositions, taken in McLean, Virginia,

17    on the 11th day of June, 2021, at the hour of

18    8:05 a.m.

19

20

21

22

23    Reported by:  Gina M. Luordo, CSR, RPR, CRR

24    License No.:  084-004143

25    APPEARING REMOTELY FROM COOK COUNTY, ILLINOIS

```
                                              Page 2
 1    REMOTE APPEARANCES:
 2             LEVIN PAPANTONIO, RAFFERTY, PROCTOR,
               BUCHANAN, O'BRIEN, BARR & MOUGEY, P.A.
 3             BY:  MR. PETER J. MOUGEY
                   MS. PAGE POERSCHKE
 4             316 South Baylen Street
               Pesacola, Florida  32591
 5             (850) 435-7068
               pmougey@levinlaw.com
 6             ppoerschke@levinlaw.com
                   Representing Plaintiffs Executive
 7                 Committee;
 8
               THE LANIER LAW FIRM
 9             BY:  MS. ALEX ABSTON
               10940 W. Sam Houston Pkwy N, Suite 100
10             Houston, Texas  77064
               (713) 659-5200
11             alex.abston@lanierlawfirm.com
                   Representing the Plaintiffs;
12
13             BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
               BY:  MS. KATHERIN M. SWIFT
14             54 West Hubbard Street, Suite 300
               Chicago, Illinois 60654
15             (312) 494-4445
               kate.swift@bartlitbeck.com
16                 Representing Walgreens Boots
                   Alliance, Inc., Walgreen Co. and
17                 Walgreen Eastern Co., Inc.
18
               MARCUS & SHAPIRA
19             BY:  MR. JOSHUA A. KOBRIN
               One Oxford Centre, 35th Floor
20             Pittsburgh, Pennsylvania  15219
               (412) 358-5208
21              kobrin@marcus-shapira.com
                   Representing Giant Eagle, Inc. and
22                 HBC Service Company;
23
24
25
```

```
 1    REMOTE APPEARANCES (continued):
 2              JONES DAY
                BY:  MS. TARA A. FUMERTON
 3              77 West Wacker Drive
                Chicago, Illinois 60601
 4              (312) 269-4335
                tfumerton@jonesday.com
 5                   Representing Walmart;
 6
                ZUCKERMAN SPAEDER LLP
 7              BY:  MR. KYLE A. CRAWFORD
                1800 M Street, NW, Suite 1000
 8              Washington, DC  20036-5807
                (202) 778-1825
 9              kcrawford@zuckerman.com
                     Representing CVS Pharmacy, Inc.;
10
11              MORGAN, LEWIS & BOCKIUS LLP
                BY:  MR. JOHN M. MALOY
12              1701 Market Street
                Philadelphia, Pennsylvania  19103-2921
13              (215) 963-5328
                john.maloy@morganlewis.com
14                   Representing Rite Aid Defendants.
15
16                       * * * * *
17
18
19
20
21
22
23
24
      Also Present:  Mr. Dave Young - Videographer
25                   Mr. Isaac Horner - Concierge
```

Page 4

```
1                        I N D E X
2     WITNESS                         EXAMINATION
3     CRAIG J. McCANN, Ph.D.
4          By Ms. Swift                    9
5          By Mr. Kobrin                 190
6          By Ms. Fumerton              258
7          By Mr. Maloy                 311
8
9                      E X H I B I T S
10    NUMBER           DESCRIPTION                PAGE
11    Exhibit 1        Expert Report of Craig J.    42
12                     McCann, Ph.D., CFA
13                     April 16, 2021
14    Exhibit 2        Expert Report of Craig J.    42
15                     McCann, Ph.D., CFA
16                     May 4, 2021
17    Exhibit 3        Second Supplemental Expert   42
18                     Report of Craig J. McCann,
19                     Ph.D., CFA May 19, 2021
20    Exhibit 4        Appendix 8 Flagged           51
21                     Transaction Reports
22                     Excerpts
23    Exhibit 5        Appendix 8 Flagged           70
24                     Transaction
25                     Reports Full Version
```

1                     E X H I B I T S

2    NUMBER          DESCRIPTION                PAGE

3    Exhibit 6       Track Three Case Management    83

4                    Order Nunc Pro Tunc

5    Exhibit 7       Plaintiffs' Discovery          85

6                    Submission Pursuant to Case

7                    Management Order and

8                    Responses and Objections to

9                    Pharmacy Defendants' First

10                   Set of Interrogatories to

11                   Plaintiffs

12   Exhibit 8       Exhibit A Red Flag Criteria    87

13   Exhibit 9       Exhibit B CT Summary of        91

14                   Dispensing Red Flag Analysis

15   Exhibit 10      Highlighted Flag Total        107

16                   Summary and Bar Chart

17   Exhibit 11      Appendix 14                   127

18   Exhibit 12      Pharmacist Expert             150

19                   Supplemental Opinion Carmen A.

20                   Catizone, MS, RPh, DPh

21   Exhibit 13      Plaintiffs' Written Responses 175

22                   to Certain 30(b)(6) Topics

23   Exhibit 14      E-mail Chain                  177

24   Exhibit 15      Invoice Dated June 3, 2021    184

25

1                    E X H I B I T S

2    NUMBER            DESCRIPTION                PAGE

3    Exhibit 16    Flagged HCP Shipments for    195

4                  Giant Eagle Pharmacy #4002

5    Exhibit 17    Indexed Comparison of Growth  213

6                  in HCP DEA Quota & in

7                  Dispensing by Giant Eagle in

8                  Lake & Trumbull Counties

9                  in MME

10   Exhibit 18    Market Share of At-Issue      216

11                 Opioids

12   Exhibit 19    Variable Name Chart           234

13   Exhibit 20    Example Giant Eagle           244

14                 Transactions for a Single

15                 Prescriber Flagged by

16                 Plaintiffs Using Method 13

17   Exhibit 21    Excerpts from Appendix 10     271

18

19

20

21

22

23

24

25

```
                                              Page 7

 1       THE VIDEOGRAPHER:  Good morning.  We're going

 2   on the record at 8:05 a.m. on June 11, 2021.

 3   Please note that the microphones are sensitive, may

 4   pick up whispering, private conversations, and

 5   cellular interference.  Please turn off all cell

 6   phones and place them away from the microphones as

 7   they can interfere with the deposition audio.

 8   Audio and video recording will continue to take

 9   place unless parties agree to go off the record.

10            This is media unit 1 of the video recorded

11   deposition of Craig McCann taken by counsel for the

12   defendants in the matter of In Re: National

13   Prescription Opiate Litigation filed in the United

14   States District Court, Northern District of Ohio,

15   Eastern Division, Case No. 1:17-md-2804.

16            My name is Dave Young.  I'm the

17   videographer.  Our court reporter is Gina Luordo.

18   We are both representing Veritext Legal Solutions.

19   I am not related to any party in this action, nor

20   am I financially interested in the outcome.

21            Counsel and all present will state their

22   appearances and affiliations for the record.  If

23   there are any objections to this proceeding, please

24   state them at the time of your appearance beginning

25   with the noticing attorney.
```

Page 8

1      MS. SWIFT:  Kate Swift for Walgreens.

2      MR. CRAWFORD:  Kyle Crawford from Zuckerman

3    Spaeder for CVS.

4      THE VIDEOGRAPHER:  Nobody else?

5      MS. SWIFT:  You're muted, Peter.

6      MR. MOUGEY:  Peter Mougey on behalf of the

7    Plaintiffs Executive Committee.

8      THE WITNESS:  Craig McCann, I'm the witness

9    today.

10      MS. POERSCHKE:  Page Poerschke for the

11    plaintiffs.

12      MR. MALOY:  John Maloy for the Rite Aid

13    defendants from Morgan, Lewis & Bockius.

14      MS. FUMERTON:  Tara Fumerton for Walmart, Inc.

15    from Jones Day.

16      THE VIDEOGRAPHER:  Will the court reporter

17    please swear in the witness, and then we can

18    proceed.

19                          (Whereupon, the witness was

20                           sworn.)

21

22

23

24

25

1          CRAIG J. McCANN, Ph.D.,

2    having been first duly sworn, was examined and

3    testified as follows:

4                    EXAMINATION

5    BY MS. SWIFT:

6        Q.    Good morning.  Dr. McCann, do you have any

7    notes or anything else with you today for the

8    deposition?

9        A.    No.  I have a blank yellow pad, and I have

10   a clean copy of the text portion of the initial

11   expert report and the two supplements.  Other than

12   that, all I have in the room here is the documents

13   that you sent me and your co-counsel sent me.

14       Q.    And do the copies of your reports that you

15   have with you have any handwritten notes or sticky

16   post-its or anything else like that on them?

17       A.    No.

18       Q.    I see that your counsel -- I see your

19   counsel on the screen to defend the deposition.

20   Are you and counsel together today, or are you in

21   separate locations?

22       A.    We're in separate locations.

23       Q.    Where are you testifying from today?

24       A.    I'm in the conference room of my offices

25   in McLean, Virginia.

Page 10

1      Q.    Dr. McCann, you've given prior testimony

2   in the opioids litigation a number of times,

3   correct?

4      A.    Yes.

5      Q.    I'm going to list off to the best of my

6   ability the various times you've testified, and the

7   point of that is to make sure I've got everything.

8   So I'll ask, as I go through the list, if I miss

9   anything.  That's what I'm going to be looking for.

10  I think I've got it all.

11          You testified in the Summit County and

12  Cuyahoga County cases, Track 1 of the MDL, correct?

13     A.    Yes.  I filed expert reports and gave a

14  deposition.  There was no final hearing that I'm

15  aware of.

16     Q.    You also gave testimony in a New York

17  deposition, correct?

18     A.    Yes.

19     Q.    You gave testimony in New York in what's

20  called a Frye hearing, correct?

21     A.    Right.  I also filed expert reports and

22  gave a deposition.

23     Q.    Right now I'm just focusing on the

24  testimony.  We'll get to the reports in a minute,

25  okay?

Page 11

1      A.   Yes.

2      Q.   You also gave deposition testimony in the

3  Huntington Cabell case in West Virginia; is that

4  right?

5      A.   Yes.

6      Q.   You also gave testimony at trial in the

7  Huntington Cabell, West Virginia case, correct?

8      A.   Yes.

9      Q.   You gave testimony in another Ohio case

10 brought by the Ohio Attorney General, is that

11 right, in a deposition?

12     A.   Yes.

13     Q.   Do you have a copy of the transcript of

14 your Ohio AG deposition?

15     A.   I don't know.  I might have, but I don't

16 know.

17     Q.   If your lawyers asked you to provide a

18 copy of that to us, would you agree to do that?

19     A.   Yes, of course.

20     Q.   Did I miss any testimony that you've given

21 in the opioids litigation?

22     A.   I don't think so.  I would have to check

23 my resumé just to be sure because the first

24 instance goes back a couple of years, but I don't

25 think so.  I think you've got them all.

1      Q.   Is the testimony that you gave in all of

2   those depositions and hearings and the one trial,

3   is all of that testimony, to the best of your

4   knowledge, still true and accurate as you sit here

5   today?

6      A.   Yes.  There might be -- as any time you

7   testify for eight hours or 16 hours, there might be

8   an answer or two that you would articulate

9   differently, better, differently, but I -- I'm not

10   aware of any -- any answer I gave that's materially

11   incorrect, certainly nothing that I gave that I

12   would go back -- nothing material that I would go

13   back and change, I don't think.

14      Q.   On the distribution side, you've offered

15   testimony about a number of flagging methods at the

16   various depositions and hearings and the trial.

17          Is all of the testimony that you've

18   offered about your flagging methods for flagging

19   orders that were shipped, does all of that

20   testimony apply the same way in the Lake and

21   Trumbull County case that you're here to testify

22   about today?

23      A.   Yes, although, there is one additional

24   flagging method today that wasn't in the previous

25   discussion.  So you can't port over just the

1    discussions from the last time or the last few, but

2    yes, I think they all do apply.  The previous

3    discussions do apply today.

4        Q.   I think there are actually two new

5    methods, and I appreciate that clarification.  Let

6    me ask the question a little bit more precisely.

7             There are five methods that you talk about

8    in your Lake and Trumbull County report that you've

9    also talked about in reports, depositions,

10   hearings, trial testimony around the country.  Is

11   your testimony about those five methods, would it

12   be the same if I asked you those questions again

13   today as it was when lawyers asked you about them

14   the other times you've testified about them?

15       A.   Yes.

16       Q.   So I don't have to go back through and ask

17   you all the same questions I've asked you before

18   about those five methods; is that fair?

19       A.   Yes.  Thank you.

20       Q.   We learned just yesterday afternoon from

21   the plaintiff's lawyers that you also issued a

22   report in a case in Dallas; is that correct?

23       A.   Correct.

24       Q.   The plaintiffs had told us they can't give

25   us that report.  And so I'm going to ask you some

Page 14

1    questions about it, but I don't have it.  So I'm

2    kind of in the dark about that one.

3            In that Dallas case, I understand you

4    offered opinions against a number of drug

5    manufacturers, Purdue, Johnson & Johnson, Janssen

6    Pharmaceuticals, Endo Pharmaceuticals, Allergan,

7    Actavis, and Watson; is that correct?

8        A.   I'd have to pull out the report and have a

9    look at it because although it was filed on Monday,

10   it was originally scheduled to be filed six months

11   ago, and we had it finalized several times along

12   the way, and it was just exchanged on Monday.  I

13   would have to check, but that sounds right.

14       Q.   You offered opinions about a number of

15   manufacturers, pharmaceutical manufacturers, in the

16   Dallas case?

17       A.   I believe that's correct.  I can describe

18   the report a little bit to you.  That might help.

19       Q.   That's okay.  All I'm trying to do is

20   figure out who you covered in the report right now.

21   Thank you, sir.

22            You also offered opinions in that Dallas

23   case against a number of distributors, including

24   McKesson, Cardinal, AmerisourceBergen; is that

25   right?

1      A.    Correct.

2      Q.    You also offered opinions in the Dallas

3   report against a number of doctors, Dr. Richard

4   Andrews, Dr. Theodore Okechuku, and Dr. Nicholas

5   Padron; is that correct?

6      A.    I don't think so.  I think that -- I don't

7   think that you're describing the report correctly.

8   I don't recall any discussion of any individual

9   doctors.

10     Q.    All right.  The contention in that Dallas

11   case, to the extent you know, is the contention

12   that those manufacturers and distributors that I

13   listed to you, that they caused the opioids crisis?

14     A.    I don't know.  I don't recall.  I didn't,

15   in the report, address any liability issue at all

16   that I'm aware of.

17     Q.    Are the opinions that you offered against

18   the manufacturers and the distributors in the

19   Dallas case comparable to opinions you've offered

20   against manufacturers and distributors in other

21   opioids cases?

22     A.    Yes.

23     Q.    You did not offer any opinions against any

24   manufacturers or distributors or doctors in your

25   Lake and Trumbull County report, correct, sir?

Page 16

1      A.   I'm sorry.  Could you ask that again,
2   please?
3      Q.   Sure.  In the report that you provided to
4   us in the Lake and Trumbull County case in Ohio,
5   you did not offer any opinions against
6   manufacturers, distributors, or doctors, correct?
7      A.   No, I don't think that's correct.  The
8   distributor part is what caught me.  I think that
9   the report is treating the chain pharmacies as
10  distributors.  So in their role as distributors,
11  the Lake and Trumbull County report does, in fact,
12  cover them.
13     Q.   You didn't offer any opinions in the Lake
14  and Trumbull County case against McKesson,
15  Cardinal, AmerisourceBergen, or any manufacturers
16  or any doctors, correct?
17     A.   Correct.
18     Q.   Who is the plaintiff in the Dallas case
19  where you issued a report?
20     A.   It's Dallas County, and it's in state
21  court there in the state MDL as I understand it.
22     Q.   You did not offer any opinions in the
23  Dallas County case against CVS, Giant Eagle, Rite
24  Aid, Walgreens, or Walmart, correct?
25     A.   I don't recall if that's correct.  They

Page 17

1    may be included in some of the figures and tables

2    as in their role as distributor.  The report is

3    really just a summary of the ARCOS data.  So to the

4    extent that they show up in figures or tables, they

5    may be included somewhere.  I don't recall pointing

6    them out specifically in any way.

7         Q.    And you served that report on Monday; is

8    that correct?

9         A.    Correct.  I'm sorry.  The lawyers served

10   it on Monday.

11        Q.    The Dallas County plaintiff did not sue

12   CVS, Giant Eagle, Rite Aid, Walgreens, or Walmart,

13   correct?  They're not defendants in that case?

14        A.    Not that I recall.

15        Q.    You also offered opinions in another Ohio

16   case separate from the one that we're talking about

17   today, correct, sir, the case brought by the Ohio

18   Attorney General?

19        A.    I served under two Ohio cases, the

20   Cuyahoga and Summit case and that one, yes.

21        Q.    The Ohio Attorney General is the top

22   lawyer in the state.  Is that your understanding?

23        A.    Yes.

24        Q.    In the Ohio case brought by the State

25   Attorney General, you offered opinions against the

Page 18

1    distributors, McKesson, Cardinal, ABDC, or

2    AmerisourceBergen, and Miami-Luken; is that

3    correct?

4        A.   I don't recall the details.  That's 15 or

5    18 months ago.  I don't recall as I sit here.

6        Q.   You don't remember who you've offered

7    opinions about in other cases?

8        A.   Not 15 or 18 months ago.  I recall it was

9    the distributors.  I know of it as the Ohio

10   distributors case, but you read off a list of

11   distributors, including Miami-Luken, and I just

12   don't recall whether they were all defendants or if

13   there were, in fact, more than you listed.

14       Q.   The Ohio Attorney General case is another

15   case that my client, Walgreens, is not a defendant

16   in.  So your attorneys won't give us that report

17   either.  I understand they don't think they're

18   allowed to.  So as with the Dallas report, I don't

19   have the report.  I don't have the transcript.

20            Would you agree with me that Walgreens is

21   not a defendant in the Ohio distributors case?

22       A.   Well, you must know, and so I wouldn't

23   disagree with you, but I don't know.  I don't

24   recall as I sit here.  I would have to check, and I

25   can easily check.  I don't know from memory.

1      Q.   Do you recall that the Ohio Attorney

2   General did not bring claims, and you did not offer

3   opinions about any of the chain pharmacies,

4   Walgreens, Walmart, CVS, Rite Aid, and Giant Eagle?

5      A.   No, I don't recall.

6      Q.   You don't recall at all the defendants

7   that are involved in the cases that you've offered

8   opinions in?

9      MR. MOUGEY:  Asked and answered.

10      THE WITNESS:  I know generally whether a case

11   was a distributor case or a manufacturer case, but

12   going back 15 months or two years, I can't tell you

13   what the claims were, what -- what the individual

14   defendants were that were in those cases.  I can

15   tell you, but I just can't tell you from memory as

16   I sit here.

17   BY MS. SWIFT:

18      Q.   The Ohio Attorney General case is not a

19   pharmacy case, correct, sir?

20      A.   At least not the one that I was involved

21   in.

22      Q.   Are you aware of any case brought by the

23   Attorney General of Ohio that is a pharmacy case?

24      A.   No, I don't know one way or the other.

25      Q.   Your attorneys have represented to us that

Page 20

1     one of the distributors in the Ohio Attorney

2     General case is Miami-Luken.  They're a distributor

3     of opioids.

4              Do you understand that?

5         A.   Yes.

6         Q.   Do you know that criminal charges have

7     been brought against Miami-Luken for the illegal

8     distribution of opioids?

9         A.   Not as I sit here.  If I knew that, if I

10    came across it, I've since forgotten.

11        Q.   You -- you have not offered any opinions

12    against Miami-Luken in the Lake and Trumbull County

13    cases, correct, sir?

14        A.   Miami-Luken would be mentioned in my

15    report and appendices.  So I've been taking your

16    questions, when you say offered any opinions

17    against, to mean do I mention them anywhere.  So

18    Miami-Luken is mentioned, I believe, in what we've

19    been calling the pharmacy reports, but I don't

20    recall in the text mentioning Miami-Luken anywhere.

21        Q.   You applied your flagging methods on the

22    distribution side to a particular set of pharmacies

23    in the Lake and Trumbull County cases, correct,

24    sir?

25        A.   Correct.

1      Q.   You didn't apply any of your flagging

2   analyses to identify flagged orders shipped by

3   Miami-Luken in the Lake and Trumbull County case,

4   correct?

5      A.   Correct.

6      Q.   Why not?

7      A.   I wasn't asked to.

8      Q.   And when you say you weren't asked to, do

9   you mean the plaintiffs' lawyers who have retained

10  you for this case did not tell you we'd like you to

11  offer opinions against Miami-Luken?

12     A.   Correct.  You continue to use a term that

13  I'm not adopting fully when you say offered

14  opinions against.  I report the processing of ARCOS

15  data and the results of running particular

16  algorithms on them.  It's just arithmetic.  If you

17  want to refer to that as offering opinions against,

18  then that's how I understand you're using the term,

19  but --

20     Q.   How about this?

21     A.   -- I don't recall -- I don't recall being

22  asked to run the SOMS examples on the data for

23  anybody other than the five or six firms we ran it

24  on.

25     Q.   The plaintiffs' lawyers did not ask you to

Page 22

1    run your flagging analysis on anybody except the
2    five pharmacy defendants in Lake and Trumbull,
3    correct?
4         A.   Correct.
5         Q.   And therefore, you did not apply your
6    flagging analysis to anybody but the five pharmacy
7    defendants that are in Lake and Trumbull, correct?
8         A.   Yes, I think that's correct.
9         Q.   That's true even though you did apply a
10   flagging analysis against different distributors in
11   the Ohio Attorney General case?
12        A.   Yes, of course.
13        Q.   Do your opinions in the State of Ohio case
14   brought by the Ohio Attorney General, are those --
15   are the flagging analyses that you performed in
16   that case, are they statewide?
17        A.   I don't recall.
18        Q.   In the State of Ohio case brought by the
19   Attorney General of Ohio, did you conduct analyses
20   to identify flagged orders?
21        A.   I don't recall.
22        Q.   Did another consultant hired by the
23   plaintiffs' lawyers in the Ohio Attorney General
24   case offer opinions that the flagged orders that
25   you don't recall whether you applied in that case

Page 23

1    were suspicious and shouldn't have been shipped

2    without the distributor first conducting due

3    diligence?

4        A.   I don't know.  I know there was another

5    witness who testified on DEA issues, but I don't

6    recall which witness that was or what testimony

7    they gave.

8        Q.   You don't recall whether that was Jim

9    Rafalsky or somebody else?

10       A.   Correct.  There are two or three names

11   that come to mind, and I just don't recall as I sit

12   here.  I didn't interact with them over the Ohio AG

13   case in any way, and I don't recall if I ever knew

14   who was the DEA expert in that case.

15       Q.   If I say the name Joe Rannazzisi to you,

16   does that refresh your recollection?

17       A.   It doesn't refresh my recollection.  I

18   know the name, but I don't know whether it was

19   Mr. Rannazzisi or Mr. Rafalsky or someone else who

20   served as the DEA expert in that case.

21       Q.   You didn't flag any orders shipped by

22   Walgreens or any other pharmacy in the case brought

23   by the Ohio Attorney General, correct?

24       A.   I don't recall.

25       Q.   I've got to say I'm really at a

1    disadvantage here because I don't have your report.

2    I don't have your deposition from the Ohio AG case,

3    and you don't seem to remember anything about it.

4    I'm afraid we're going to have to object and leave

5    this deposition open and come back later and ask

6    you questions about that deposition and report

7    because it's, you know, an Ohio case.  It's

8    directly relevant to your opinions in this case,

9    and I'm completely unable to ask you about it if I

10    don't have those materials.

11       MR. MOUGEY:  Kate, if you want to leave this

12    deposition open, we can call it right now, and you

13    can do it later, but you know -- you knew when you

14    started this morning that you didn't have the

15    material because the plaintiffs and the State of

16    Ohio have a protective order in that case.  So if

17    you want to -- if you want to leave something open

18    today, then I suggest that we just stop it here and

19    do the rest of it when you have the material that

20    you need.  I'm not going to agree to keep it open.

21       MS. SWIFT:  Well, I understand that.  I didn't

22    expect you would.  I've got to make my objection

23    for the record.  I did not expect this witness not

24    to have any recollection at all about opinions he's

25    offered in another case on these exact same issues.

Page 25

1        MR. MOUGEY:  I'm sorry that it surprises you,

2    but it doesn't surprise me at all.  It's over

3    several years of overlapping defendants of

4    remembering which defendant was in which case, and

5    I don't find that surprising at all.  So at this

6    point, maybe we ought to -- if you want to leave it

7    open, then we need to go back to Special Master

8    Cohen.

9        MS. SWIFT:  He's going to join in a little bit.

10   Let's keep going.  He's going join.  When he gets

11   on, we can talk about it.

12       MR. MOUGEY:  Kate, let's not play games.  You

13   knew you didn't have the report when we started

14   this morning.  We're all here.  So if you want to

15   start keeping things open -- I anticipated this.  I

16   called it when I said you didn't have the reports

17   that Kate is going to try to keep this deposition

18   open.

19            You knew you didn't have the reports.  You

20   knew you didn't have the reports.  You have, I

21   think -- I don't remember how many in total.  You

22   have almost 10, and you're missing a couple.  So if

23   you want to make sure you have every one, then

24   that's fine.  That's your prerogative, but then

25   let's go ahead and kick the rest of it.

1      MS. SWIFT:  I know you'd love to do that,

2   Peter.  We're going to do our best to finish.

3   We're going to keep going.  We can talk about it

4   with Special Master Cohen when he joins.

5      MR. MOUGEY:  Best counts in horseshoes and hand

6   grenades.  I mean, today we are finishing, and

7   we're not keeping things open for you to come back

8   and take the 80th deposition of Dr. McCann.  So if

9   you want to keep it open --

10      MS. SWIFT:  I understand your position.

11      MR. MOUGEY:  -- we'll address it as soon as

12   Special Master Cohen gets back in.  And if he's not

13   back within the hour because you all wanted to

14   finish Rafalsky today, then I suggest we go ahead

15   and have him come in because I don't want this to

16   continue for the rest of the day and then waiting

17   for Special Master Cohen and then you try to keep

18   it open.

19   BY MS. SWIFT:

20      Q.   Did you use any of the same flagging

21   methods in the Ohio Attorney General case that you

22   used in the Lake and Trumbull County case, sir?

23      A.   If I used flagging methods in the Ohio AG

24   case, then I used some of the same methods as in

25   this case, that's correct.

1      Q.   Which flagging methods did you use in the

2    Ohio Attorney General case?

3      A.   If I used flagging methods in the Ohio

4    Attorney General case, I very likely used what

5    we're calling the trailing six months maximum,

6    maybe the trailing six months maximum with a

7    threshold fixed after the first trigger is hit, the

8    two times and three times national average, the

9    8,000 maximum monthly dosage units, and the maximum

10   daily dosage units.  So those are the six that come

11   to mind.  If I used flagging methods in that case,

12   then I used at least five of those six.

13     Q.   You keep saying if you used flagging

14   methods.  Do you recall one way or the other

15   whether you used flagging methods in the Ohio AG

16   case?

17     A.   It's 18 months ago.  I don't remember.  I

18   think I did because it was a distributor case, and

19   I think I did.  It would be natural that I did, but

20   I just don't recall with certainty.

21     Q.   Are there opioids cases where you've

22   offered opinions against distributors where you

23   have not used flagging methods?

24     A.   I think the Dallas County report filed

25   earlier this week does not include any flagging

Page 28

1   analysis.  It doesn't.  It's just sort of the

2   processing and summary of the ARCOS data is my

3   recollection, no SOMS examples, really nothing much

4   else.  It was a very simple, short report, a subset

5   of all of the reports that you've had.

6       Q.   Other than the Dallas County case, are

7   there any other cases where you've offered opinions

8   against distributors where you did not apply a

9   flagging analysis?

10      A.   I don't think so, not that I recall as I

11  sit here.

12      Q.   You testified during your West Virginia

13  deposition that you spoke with Mr. Rafalsky,

14  plaintiff's hired DEA consultant, in August of

15  2020, so just before that deposition last year.

16          Was that call that you had with

17  Mr. Rafalsky, was that at his request?  At your

18  request?  At the plaintiffs' request?  Something

19  else?

20      A.   I don't recall the call or the testimony

21  that you're referring to.

22      Q.   Well, let me ask you this.  Sorry.  Go

23  ahead.

24      A.   I have not ever initiated a call with

25  Mr. Rafalsky.  So if it was a call, it was either

Page 29

1    at his request or the attorneys handling him or

2    some other plaintiffs' attorney requested the call.

3        Q.   Have you spoken with Mr. Rafalsky since

4    the phone call that you had with him leading up to

5    your deposition in the West Virginia case?

6        A.   Yes.

7        Q.   When did you speak with Mr. Rafalsky after

8    that?

9        A.   I'm sorry.  What was the date that you're

10   referring to of a call?

11       Q.   Sure.  It was August 29, 2020, just before

12   your deposition in the West Virginia case.

13       A.   Okay.  So in the last nine months, nine or

14   10 months, I have spoken to Mr. Rafalsky a couple

15   of times.  I don't think more than three times, but

16   either two times or three times.  And I can't give

17   you a date.  I can't even give you a month other

18   than maybe the most recent time I spoke to him,

19   which was sometime in May.

20       Q.   Did you speak to Mr. Rafalsky prior to

21   submitting your Lake and Trumbull County report

22   about that report?

23       A.   I don't recall whether I did or not.

24       Q.   You said your most recent conversation

25   with him was probably in May.  Can you give me any

Page 30

1    estimate of when the other conversations with him

2    would have been that you referenced, the one or

3    two?

4         A.   No.  I can't get any finer than sometime

5    between August and May.  And I don't recall whether

6    it was one or two other than the one in May I

7    described.  I may have dropped into a call briefly

8    for a minute or two that he participated in where

9    maybe other members of my staff were involved, and

10   I may have dropped into an office and said hello or

11   something once or twice, but I think I've only

12   been -- I've only participated in a substantive

13   call with Mr. Rafalsky a couple of times since

14   August of last year.

15        Q.   What were those substantive calls with

16   Mr. Rafalsky about since August of last year?

17        A.   My recollection -- I wasn't the primary

18   mover in any call with him, but my recollection is

19   that it was to discuss the underlying data and the

20   results of the example SOMS methods that we

21   implemented.

22        Q.   Who was the primary mover in any call with

23   Mr. Rafalsky?

24        A.   Well, some combination of Mr. Rafalsky and

25   lawyers working with Mr. Rafalsky.

Page 31

1        Q.    How long did you speak to Mr. Rafalsky all
2    together in the calls that you've referenced?
3        A.    Well, I don't think any of the calls were
4    longer -- that I participated in anyway, longer
5    than a half hour, and I think there was probably
6    two of them.  So somewhere between 30 minutes and
7    60 minutes total, I think.
8        Q.    You said that your recollection is you
9    discussed the underlying data and the results of
10   the example SOMS methods that you implemented.
11          What do you mean by that?  Did you pull up
12   actual orders that flagged on your flagging methods
13   and talk about them, or what do you mean?
14       A.    We may have, although, I'm not recalling.
15   We may have brought up on the screen -- it would be
16   a Zoom call at least in one instance, and we may
17   have brought up on the screen an Excel file with
18   flagged orders and sort of discussed them a little
19   bit, or we may have used stylized orders to walk
20   through the analysis again.  I'm not recalling the
21   details, and I don't recall whether the call that I
22   do have some recollection of related to this
23   particular case, Lake and Trumbull County, or not.
24       Q.    What is a stylized order?
25       A.    Well, if I wanted to explain how these

Page 32

1   example flagging methods work, I might create a

2   hypothetical with orders on various days throughout

3   the month and maybe trailing over the course of a

4   year or two and then identify how an order would

5   trigger one of these various flags.  That's what I

6   mean by a stylized order.

7        Q.   You think you may have shown on a screen

8   with Mr. Rafalsky just stylized orders that you

9   created, a hypothetical stylized order, not actual

10  flagged orders?

11       A.   I don't recall with certainty, but I think

12  that we discussed actual orders with orders up on

13  the screen.  But I've had two or three calls, Zoom

14  calls, with Mr. Rafalsky over the last year where

15  we had this sort of discussion, and I can't tell

16  you for certain which of those we looked at actual

17  transaction data in as opposed to the results of

18  our analysis.  I just don't recall as I sit here.

19       Q.   So is it fair to say you don't recall --

20  strike that.

21            You don't recall whether you looked at any

22  actual orders with Mr. Rafalsky?

23       A.   Well, I think we did.  I'm pretty sure

24  that we did, but I can't tell you with certainty we

25  did.  I can't tell you 100 percent, but I recall --

Page 33

1      I recall being on, as I said, two or three Zoom

2      calls and one or two telephonic calls over the last

3      year, and we did discuss individual orders

4      reflecting these example flagging methods that were

5      flagged and presented in an Excel file, but I

6      don't -- for his review.  I don't recall whether

7      that discussion was over Zoom or over a traditional

8      teleconference, and I don't recall whether it was

9      nine months ago or three months ago.

10         Q.   You said a few minutes ago that you

11     thought you had talked to Mr. Rafalsky in the last

12     nine months no more than three times, and just now

13     I heard you say two to three Zoom calls and one to

14     two phone calls.  So which is it?  How many times

15     have you spoken to him?

16         A.   Well, you only read back part of my

17     answer.  I said over the last year in what I said

18     just now.  Whether it's three times over the last

19     nine months or four times over the last year, I

20     don't recall.

21         Q.   Is it fair to say you haven't spoken to

22     Mr. Rafalsky more than five times about your Lake

23     and Trumbull report?

24         A.   Yes, definitely.

25         Q.   Do you think it's odd that the plaintiffs'

Page 34

1     lawyers have asked you to submit reports in half a

2     dozen cases or so, but haven't coordinated more

3     substantive discussions between you and the DEA

4     consultant whose methods you're relying on?

5          A.    No, not at all.

6          Q.    Why not?

7          A.    Well, because I think we've had enough

8     discussion for us to implement the example flagging

9     methods to the ARCOS data and defendant transaction

10    data where it is available.  I -- I have never felt

11    that Mr. Rafalsky or Mr. Rannazzisi, if he was

12    involved in a case, were not available to me if I

13    needed additional guidance.  I got all of the

14    guidance I felt we needed, and I would not see any

15    benefit, any value, to any further interaction with

16    them.

17         Q.    You don't think it would be important for

18    the plaintiffs' lawyers or Mr. Rafalsky or

19    Mr. Rannazzisi or whichever hired plaintiffs'

20    consultant you're working with, you don't think it

21    would be important to make sure you were

22    coordinating very closely with them to make sure

23    you're properly implementing their methods?

24         MR. MOUGEY:  Objection.  Compound.

25

Page 35

1    BY MS. SWIFT:

2        Q.    Did you understand the question?

3        A.    I did.  What I'm telling you is I think

4    they did that.  The previous question you asked is

5    do I not think they should have had more access

6    between us, more interaction.  I'm saying no, I

7    don't believe so.

8        Q.    You haven't asked to have any more

9    conversations with Mr. Rafalsky than the ones

10   you've already had; is that fair?

11       A.    Correct.

12       Q.    Have you ever spoken to Carmen Catizone?

13       A.    Yes.

14       Q.    Who is Carmen Catizone?

15       A.    I know of him as the pharmacy expert used

16   by the plaintiffs in this case and maybe one or two

17   other cases I'm involved in, but I know him

18   primarily for this case.

19       Q.    What other cases are you involved in with

20   Mr. Catizone?

21       A.    I don't know.  I just recall having a call

22   with him participating maybe a year ago, and I

23   don't recall whether that was related to CT 3 or

24   not.  It might have been another case, and I may be

25   wrong when I say a year ago, but sometime last

Page 36

1    summer or early fall.

2         Q.    How many times have you spoken to

3    Mr. Catizone?

4         A.    Maybe just once.  Maybe a second time.

5         Q.    On each of those occasions, how long did

6    you speak to Mr. Catizone?

7         A.    Well, the very first time, which I'm not

8    really counting as having spoken to him, I was just

9    listening in on a conference call with 30 lawyers

10   and Mr. Catizone and myself, and I don't recall

11   that either one of us said very much.  Then the

12   only substantive call -- there may be two.  There

13   may be one teleconference call and one Zoom call,

14   and they were a discussion of various prescription

15   flagging methods that we implemented as examples of

16   what could be done with the prescription dispensing

17   data.

18        Q.    When did you have that conversation about

19   the red flag methods for prescriptions?

20        A.    Well, we had the teleconference call --

21   call or calls before filing the initial expert

22   report.  There was also discussion between staff in

23   my office and Mr. Catizone.  If you're asking what

24   conversations I had with Mr. Catizone, there would

25   have been, I think, one teleconference call

1    sometime before the initial expert report was filed

2    and one Zoom call since then.

3        Q.   When you say one teleconference call

4    before the initial expert report was filed, do you

5    mean your April 16, 2021 report?

6        A.   Correct.

7        Q.   And you said you had one call since then.

8    When was that call?

9        A.   I'm sorry.  There may be one or two other

10   calls.  I'm placing a call that we had on a

11   Saturday morning that was a little bit lengthy, and

12   the Zoom call that I -- and that was before the

13   expert report was filed.  And there may have been

14   one other teleconference call that I participated

15   in.  And as I said, my office had much more

16   interaction with him than I did.  The Zoom call was

17   either two or three weeks ago to my recollection.

18       Q.   I'm just trying to make sure I'm following

19   you and you're not adding additional calls now and

20   just restating what you said before.

21            Am I correct that you think you had one or

22   two calls with Mr. Catizone before April 16, 2021?

23       A.   Yes.  I said one or two, and then I think

24   I modified that a minute ago to be certainly two.

25   So if it's certainly two, maybe it's possible there

1    was a third, but there's -- I recall a Saturday

2    morning call that I hadn't -- that wasn't top of

3    mind when I answered your question a couple minutes

4    ago.  So perhaps, a couple of calls with

5    Mr. Catizone.  I mean definitely a couple of calls

6    with Mr. Catizone and attorneys that I participated

7    in before the expert report was filed and then one

8    Zoom call since.

9        Q.    What did you discuss in the lengthy

10   Saturday morning call before you submitted your

11   April 16th report?

12       A.    Well, the different flagging methods for

13   dispensed prescriptions.

14       Q.    You said it was a lengthy call.

15       A.    Well, that's sort of what I recall.

16   There's 43 in the report.  So if you spend a minute

17   talking about each, it's a 45-minute call.  So it

18   was walking through these methods and discussing

19   them.

20       Q.    You said you had one Zoom call after

21   submitting your April 16th report.  When was that

22   call?

23       A.    I think you've asked me that a couple of

24   times now.  It was two or three weeks ago.

25       Q.    Was it before or after May 19th?

```
                                              Page 39

 1        A.    I don't recall.  It was around then.

 2   Whether it was before or after, I can't tell you.

 3        Q.    Was it before or after you submitted your

 4   second supplemental report?

 5        A.    It's the same date.  I don't know.

 6        Q.    Did you speak with Mr. Catizone about your

 7   second supplemental report?

 8        A.    I did not.  My office may have, but I did

 9   not.

10        Q.    Sitting here today --

11        A.    Not as I recall.

12        Q.    And you don't know whether anybody at your

13   office spoke to Mr. Catizone about your second

14   supplemental report?

15        A.    Correct.

16        Q.    Who on your staff has spoken with

17   Mr. Catizone?

18        A.    I'm not 100 percent sure, but I think Mike

19   Yan, Y-a-n, and Chuan Qin.  Chuan is C-h-u-a-n, and

20   Qin is Q-i-n.

21        Q.    You said that your staff participated in

22   more conversations with Mr. Catizone than you did.

23   Do I have that correct?

24        A.    Yes.

25        Q.    How often have your staff spoken to
```

Page 40

1   Mr. Catizone?

2       A.    I don't know.  I know that they

3   participated in conference calls with attorneys and

4   Mr. Catizone.  Whether that was -- I have no idea

5   whether that was twice or 20 times.

6       Q.    Did you ever discuss your combination red

7   flags with Mr. Catizone?

8       A.    I don't believe so.

9       Q.    Have you ever spoken to any other

10  consultants who are working for the plaintiffs'

11  lawyers in the Lake and Trumbull County cases

12  besides Mr. Rafalsky and Mr. Catizone?

13      A.    I apologize.  I was still thinking about

14  the previous question to make sure I answered it

15  correctly.  I didn't want to have any uncertainty

16  in my mind.  There is just a very slight shade of

17  uncertainty as to whether -- whether the call that

18  I had with Mr. Catizone included any discussion of

19  a combination red flags.  I just don't recall, but

20  I apologize for that.  That was my pause.

21          Could you ask me this question again,

22  please?

23      Q.    Have you ever spoken to any other

24  consultants who are working for the plaintiffs'

25  lawyers in the Lake and Trumbull County cases

Page 41

1    besides Mr. Rafalsky and Mr. Catizone?

2        A.    I believe only, perhaps, Professor Cutler.

3    I was on a Zoom call with Professor Cutler and

4    20 other people once, and I think that was related

5    to this case.  I may also have been CC'd on some

6    e-mails between my office and attorneys handling

7    Professor Cutler, but I didn't participate

8    substantively in those e-mail exchanges.

9        Q.    Did you and Mr. Cutler ever have any

10   substantive discussions about the opinions offered

11   in your report or the opinions offered in his

12   report in the Lake and Trumbull County cases?

13       A.    I don't recall ever having any discussion

14   with him about his opinions in this case or any

15   other case.

16       Q.    What about your opinions?

17       A.    I believe there was discussion in a Zoom

18   call that we both participated in about our results

19   and which portions of our results he was using or

20   fed into his analysis, and my recollection is he

21   was looking for just some additional explanation or

22   confirmation that his understanding of our analysis

23   was correct.  I don't recall myself, you know,

24   participating other than being one of 20 people on

25   the Zoom call and interacting a little bit.  That's

Page 42

1    my recollection of that call.  That was a couple of

2    months ago, I think.

3         Q.   Did you have any follow-up conversation --

4    well, strike that.

5              Was the Zoom call with Professor Cutler

6    before April 16th?

7         A.   Yes, almost certainly.

8         Q.   Did you talk to him again in connection

9    with your May 19th report?

10        A.   No.

11        Q.   All right.  If you would, please, sir,

12   I'll ask you to take out the envelopes that you've

13   got in your box.  They should say WAG 2, 3 and 4.

14   These are your reports.

15        A.   Yes.

16        Q.   You can go ahead and open then.

17        MS. SWIFT:  And we'll go ahead and introduce

18   these as -- Isaac, I'm going to throw you for a

19   loop right off the bat.  They're marked as 2, 3,

20   and 4 in the Exhibit Share, but I want them to be

21   1, 2, and 3 if you could, please.

22                        (Whereupon, McCANN Deposition

23                        Exhibit Nos. 1-3 were marked

24                        for identification.)

25

Page 43

1    BY MS. SWIFT:

2        Q.   And while we're doing that, Dr. McCann, do

3    you have in front of you now your April 16, 2021

4    report, your May 4, 2021 supplemental report, and

5    your May 19, 2021 second supplemental report?

6        A.   Yes.

7        Q.   Those will be Exhibits 1, 2, and 3

8    respectively to your deposition.

9             Are those three reports, do they contain

10   all of the opinions that you anticipate offering at

11   trial in the Lake and Trumbull County cases?

12       A.   Well, not on the sheets of paper that you

13   put in front of me because there are 10,000 pages

14   of appendices which might be used as demonstratives

15   or as evidence at trial, but they're all referenced

16   in these reports.  So if you include the referenced

17   appendices, then I think the answer is yes, as far

18   as I know as I sit here today.

19       Q.   I believe the Appendix 12 to your report

20   actually has something like 24,000 pages, but if I

21   understand what you just said, the three reports

22   that you have in front of you, plus all of the

23   appendices that are far too big to put in a box and

24   send to you, all of that together contains the

25   opinions that you anticipate offering at trial in

1    this case?

2         A.   Yes, as I sit here certainly.

3         Q.   As you sit here today, do you have any

4    additional opinions that are not reflected in your

5    three reports plus their appendices?

6         A.   No.

7         Q.   Do the three reports marked Exhibits 1, 2,

8    and 3 and their associated appendices contain all

9    of the bases for your opinions that you plan to

10   offer in Lake and Trumbull?

11        A.   Yes.  At least if the bases are not

12   attached, they're referenced.  So at a high level,

13   think of the ARCOS data.  The ARCOS data is

14   ultimately the source material for a lot of what

15   you're describing as my opinions.  I don't believe

16   that that is anywhere in the report or the

17   appendices other than referenced in the report.  So

18   if you include referenced materials, then the

19   answer is yes.

20        Q.   Your appendices include thousands and

21   thousands of charts that, as I understand it, you

22   have told us is drawn from the ARCOS data.

23             Are there any charts or other supporting

24   materials that you plan on using at trial to

25   explain your opinions that aren't actually included

Page 45

1   in any of your reports or appendices?

2       A.   Well, almost certainly.  That will, of

3   course, be up to the lawyers who are presenting me

4   to the jury, to the judge and the jury, but there

5   may be simplified versions or slightly reformatted

6   versions of those 24,000 pages that you mentioned

7   that would be more user-friendly, but, you know,

8   mildly so as a result of some reformatting, but the

9   content of anything that I can imagine using at

10  trial is in the report and the appendices.

11      Q.   I don't understand what you mean when you

12  say the content is included if you're anticipating

13  adding still more charts for trial.

14      A.   Well, for example, some of the exhibits

15  show a list of pharmacies, maybe a list of, I'll

16  make it up, but 185 pharmacies, and maybe a

17  demonstrative might only list the first 20 of them,

18  or another chart in the appendices might have a lot

19  of detail in small print, maybe 100 numbers on it.

20  And maybe for purposes of explaining a point to a

21  jury, it might be important to only include four of

22  those numbers on a simple demonstrative.

23           So that's what I mean by there might be

24  demonstratives or summaries of the data and

25  exhibits created, but just to simplify a

Page 46

1   presentation that would otherwise be too dense or

2   too complicated.

3       Q.   Sitting here today, do you know that your

4   charts and appendices attached to your reports are

5   incomplete?

6       A.   No, not beyond just what I said.

7       Q.   But you anticipate that there will be

8   additional charts that have not been provided to us

9   yet that you may use at trial.

10          Do I understand that correctly?

11      A.   If counsel would like to use a

12  demonstrative made up of the content that is in

13  these reports and the judge allows it, I think that

14  would be more effective than putting up some of

15  these number-dense exhibits, but that's not up to

16  me.

17      Q.   Do you have any of those simplified

18  additional charts that you've been describing, the

19  less number-dense exhibits?  Do you have any of

20  those prepared already as we sit here today?

21      A.   Not that I'm aware of.

22      Q.   When did the plaintiffs' lawyers first

23  contact you about the Lake and Trumbull County

24  case?

25      A.   I'm not sure, but I think a year ago.  I

Page 47

1     may have that off by a couple of months, but

2     sometime ago.

3         Q.   Did you personally do the work necessary

4     to reach the opinions in those reports, Exhibits 1,

5     2, and 3?

6         A.   I did the work that was necessary by me to

7     reach these opinions, but I was attended to or

8     assisted by staff.

9         Q.   Did you write the reports, or did your

10    staff write the reports?

11        A.   I wrote virtually every paragraph.  There

12    may have been some paragraphs where drafts were --

13    drafts of the paragraphs were written by staff that

14    I then edited, copied, expanded.  Ultimately, I

15    adopt as my writing every sentence that's here.

16        Q.   Did you share your reports with any of the

17    other hired consultants working for the plaintiffs'

18    lawyers?

19        A.   I did not.

20        Q.   Do you know if anybody else did?

21        A.   No.

22        Q.   There's a resumé included at Page 188 of

23    your April 16th report.  Is that resumé complete

24    and up-to-date?

25        A.   Well, close, but not quite for the reasons

Page 48

1    we've already discussed.  There is a May 4th

2    supplement.  There was a May 19th second

3    supplement.  There was the Dallas County June 7th

4    report.  So those three items would be on a resumé

5    I produced as of yesterday.  Today's deposition

6    would be on one I produce as of the end of the day

7    today.  But other than those items, I'm not

8    recalling anything that would be different between

9    the April 16th resumé and the one today.

10       Q.   In your prior cases involving the

11   pharmacies, you've always used the five flagging

12   methods that we've spent a fair amount of time

13   talking about, correct?

14       A.   I think so.  You and I have gone back and

15   forth a few minutes ago about Ohio.  I can't tell

16   you with certainty that I used the these five

17   flagging methods in that case, but my recollection

18   is I did, and my recollection is that I've done so

19   in every case except the Dallas County case.

20       Q.   And in this case, you've added two new

21   methods.  So now we're up to seven methods in the

22   Lake and Trumbull County case, correct?

23       A.   May I look at my report?

24       Q.   Yeah.  You can look at the April 16th

25   report table of contents at little I, little I

Page 49

1    lists them.  I believe Method 2 and Method 7 are

2    the new ones, but you'll correct me.

3         A.    Yeah.  The reason I was pausing a little

4    bit is I think Method 2 has been used in a prior

5    expert report.  So the only one fully new for this

6    report is Method 7, but Method 2 and Method 7 may

7    not have been in, for instance, the Cuyahoga and

8    Summit County report.

9         Q.    They also weren't in the New York report,

10   correct?

11        A.    I don't recall.

12        Q.    Well, put it this way.  Method 2 and

13   Method 7 have never appeared in any report that you

14   issued in a case involving my client or any of the

15   other pharmacies?

16        A.    Right.  It may have been in the Cabell

17   County, City of Huntington case that we're

18   referring to as CT 2.

19        Q.    The pharmacies aren't in the Cabell County

20   case, correct, sir?

21        A.    Not that I'm aware of.

22        Q.    And you just testified at trial in that

23   case within the last month, right?

24        A.    Correct.

25        Q.    One of the new methods is Method 2, and

1    that is the trailing six-month maximum monthly

2    fixed after first triggered threshold, correct?

3        A.    Yes.

4        Q.    And sometimes I've noted that as Method 2.

5    Sometimes I've called it Method B.  Do you have a

6    preference?

7        A.    I don't, but for the sake of not having

8    any confusion since the report calls it Method 2,

9    maybe we should stick with that.

10       Q.    It does in the table of contents.  That's

11   fair.

12             You offered testimony about Method 2 in

13   the Cabell County trial, correct?

14       A.    I think so.

15       Q.    Is that testimony on how Method 2 works

16   that you offered in Cabell County, that all applies

17   here, too?  It's all the same?

18       A.    Yes.

19       Q.    Is it fair to say that Method 2 is the

20   same as Method 1, but without the assumption that

21   every order after the first flagged order is also

22   flagged?

23       A.    Well, there's more than just that

24   difference, but that's one of the differences.

25       Q.    Why did you add Method 2 to your flagging

1    analysis?

2        A.    Because counsel suggested that as an

3    alternative example that could be applied to the

4    ARCOS data and the defendant transaction data.

5        Q.    All right.  I would like you to please

6    take out of your box Exhibit 5 and open that up,

7    please.  And what this is, Dr. McCann, is just an

8    excerpt of your Appendix 8.  Your appendices tend

9    to be very, very large, and so we try to excerpt

10   them to make it easier on folks.

11       MS. SWIFT:  Isaac, if you would please add this

12   as the next exhibit, and let us know what number

13   that's going to be.  I think we're at 4.

14       THE CONCIERGE:  4, correct.

15                        (Whereupon, McCANN Deposition

16                        Exhibit No. 4 was marked for

17                        identification.)

18   BY MS. SWIFT:

19       Q.    Dr. McCann, do you have that in front of

20   you, and do you agree with me that Exhibit 4 is an

21   excerpt from your Appendix 8?

22       A.    Yes.

23       Q.    You can see you very helpfully included

24   page numbers at the bottom, and what I'd like to

25   direct your attention to are just two of the pages

                                                          Page 52

1    in this excerpt.  The first one is Page 786.  Do

2    you have that?

3         A.   Yes.

4         Q.   This page of your Appendix 8 reflects

5    total shipments to Lake County, Ohio identified by

6    the Common Sense Method - Maximum Monthly Trailing

7    Six-Month Pharmacy Specific Threshold.  That's

8    Method No. 1, right?

9         A.   Yes.

10        Q.   And we're looking at shipments to

11   Walgreens pharmacies from 2006 to 2014?

12        A.   Yes.

13        Q.   Under Method 1, you flagged 91.2 -- sorry.

14   Strike that.

15             Under Method 1, you flagged 91.1 percent

16   of the dosage units of hydrocodone, correct?

17        A.   Yes.

18        Q.   Now, if you would, please, flip to

19   Page 795.

20        A.   Yes.

21        Q.   And this shows the same information, but

22   for Method 2, correct?

23        A.   Correct.

24        Q.   Under Method 2, you flag 24.1 percent of

25   the dosage units of hydrocodone for Walgreens,

Page 53

1    right?

2         A.    Correct.

3         Q.    So going from Method 1 to Method 2, we

4    jump from 91 percent flagged to just 24 percent

5    flagged, correct?

6         A.    Correct.

7         Q.    Is it fair to say that that dramatic

8    difference comes from the fact that Method 2 gets

9    rid of the assumption that every order after the

10   first order is flagged?  Is that what's doing most

11   of the work there?

12        A.    Well, I would have to think through that a

13   little bit.  I don't know about the dramatic

14   qualifier you put on the difference.  The

15   difference is just numbers, but the difference is

16   that -- is the result of the calculation being

17   different.  So it's not -- as you point out, it is

18   not that every shipment after that first flagged

19   shipment is flagged, but rather, only every

20   shipment thereafter that it would cause a month's

21   total to exceed the fixed -- the threshold that was

22   first triggered gets flagged.

23            Actually, these two results have different

24   interpretations.  And so I'm not at all surprised

25   that one of them is 90 percent, and the other is

1   24 percent.

2        Q.    Both Method 1 and Method 2 are called

3   Maximum Monthly Trailing Six-Month Pharmacy

4   Specific Thresholds, correct?

5        A.    Correct.

6        Q.    And that means they are both looking at

7   the previous six months to determine the maximum

8   amount sold in that six-month period?

9        A.    Correct.

10        Q.    But Method 2 doesn't use the recurrent

11   flagging assumption that you use in Method 1,

12   correct?

13        A.    Correct.

14        Q.    And therefore, Method 2 drops down to

15   flagging just 24 percent as opposed to 91 percent?

16        A.    Correct.

17        Q.    And you took issue with my qualifier of

18   calling that a dramatic difference.  You don't

19   think it's dramatic to drop from 91 percent to

20   24 percent?

21        A.    Well, they mean different things.  So in

22   some context, 91 percent meaning one thing and

23   24 percent resulting from a different calculation

24   meaning something different would not be a dramatic

25   difference because you're not really measuring the

Page 55

1    same thing.  They ought to be interpreted

2    differently.

3            Now, if they really ought to have the same

4    interpretation and operating on the same data and

5    one gave you 91 percent and the other 24 percent, I

6    would say that's a dramatic difference, but not as

7    I interpret these numbers.

8        Q.   If you got a 91 percent on a test, you

9    would feel very differently about it than if you

10   got a 24 percent on the test.  Would you agree with

11   that?

12       A.   That's a perfect example of an explanation

13   I'm trying to give you.

14       Q.   All right.  You don't have any opinion on

15   which method as between Method 1 and Method 2 is

16   the right way to flag orders as a substantive

17   matter, correct?

18       A.   Correct.

19       Q.   Flagging 91 percent of all orders, you

20   testified previously that it's a caricature to say

21   that that means 91 percent of the orders were

22   suspicious.  Do you remember that testimony?

23       A.   Correct.

24       Q.   You believe it's a caricature to say that

25   all of the orders you flagged were actually

Page 56

1    suspicious?

2         A.    Correct, at least by that method, the one

3    that we've been talking about, Method 1.

4         Q.    Well, let's look at a different method.  I

5    think this is actually the same method.

6              If you look at -- we're sticking to

7    Appendix 8.  Look at Page 3 of Appendix 8.  It's

8    actually the second page of the excerpt.

9         A.    Yes.

10        Q.    In this page, we're still looking at

11   Method 1, the Maximum Monthly Trailing Six-Month

12   Threshold Method, but this Page 3 of Appendix 8

13   shows the numbers for all of the pharmacy

14   defendants, correct?

15        A.    Yes.

16        Q.    And it shows that you flagged 94 percent

17   of all orders for oxycodone and 90 percent of all

18   orders or hydrocodone for the five defendants in

19   Lake and Trumbull, correct?

20        A.    Correct.

21        Q.    You believe it's a caricature to say that

22   all of those orders that you flagged are actually

23   suspicious?

24        A.    I don't recall the exact question and

25   answer that I was asked before where I described

1   the statement that was being made by you or

2   co-counsel as a caricature.  It's not a correct

3   interpretation of those numbers to say that every

4   order thereafter was suspicious.

5        Q.   It's also not a correct interpretation of

6   those numbers to say that all of the flagged orders

7   were diverted, right, sir?

8        A.   Right.  Certainly neither of those

9   interpretations of that data are interpretations

10  that I'm adopting.  They're arithmetic, and I can

11  explain the arithmetic better than saying they were

12  suspicious or not suspicious.

13       Q.   It's not your --

14       A.   Someone else will give that testimony.

15       Q.   But it's not your opinion that any of

16  those orders were diverted, correct?

17       A.   I have no opinion one way or the other.

18       Q.   You have no opinion one way or the other

19  whether any of those orders were suspicious?

20       A.   Correct.

21       Q.   You haven't seen any evidence suggesting

22  that any of your flagged orders were actually

23  diverted, correct, sir?

24       A.   I haven't looked, but I have no idea one

25  way or the other.

1      Q.    All right.  The other new method in the

2    Lake and Trumbull report is -- I have it here as

3    Method G, but let's go with the numbers, Method 7,

4    correct?

5      A.    Yes.  I apologize.  I see the subsections

6    are labeled A, B, C, D, E.

7      Q.    Thank you.

8      A.    So Method 2 is in Section B, and Method 7

9    is in Section G.  Whichever way you want to call

10   them is fine with me.

11     Q.    Is it fair to say that Method 1, 2, and 7

12   or Method A, B, and G, all three of those methods

13   are based at least in some sense or they're

14   supposed to be based on the method used in the

15   Masters Pharmaceuticals case?

16     A.    At least in some sense as you said, yes.

17     Q.    We now have three variations on the

18   maximum monthly trailing six-month threshold,

19   right?  That's those same three methods?

20     A.    Correct.

21     Q.    Do you have any opinion whether Method A,

22   B, or G is the right way to do the maximum monthly

23   trailing six-month threshold method?

24     A.    No, they're all the right way.  They're

25   all -- they're all useful illustrations of applying

Page 59

1    a flagging method to the ARCOS data supplemented
2    with the defendant transaction data.  None of them
3    exactly replicate what is done in the -- described
4    in the Masters manual or alluded to more vaguely in
5    the Masters opinion.
6         Q.   As a substantive matter, you don't have
7    any opinion about whether A, B, or G is better or
8    worse than any other method?
9         A.   Correct.
10        Q.   Have you ever talked to Mr. Rafalsky about
11   that fact?
12        A.   About my opinion as to which of these is
13   best?
14        Q.   No.  Have you ever talked to Mr. Rafalsky
15   about which of those three methods, A, B, and G, he
16   thinks is the best one?
17        A.   No.
18        Q.   You don't have any opinion about whether
19   Methods C through F are the right way to identify
20   suspicious orders either, correct?
21        A.   Correct.
22        Q.   Let's go back to your Appendix 8.  That's
23   Exhibit 4.  And just to take a step back,
24   Appendix 8 is the section of your report that
25   Mr. Rafalsky relied on to show the results of the

Page 60

1    flagging methods.

2           Are you aware of that?

3      A.   No.

4      Q.   Appendix 8 is the section of your report

5    that identifies the results of your flagging

6    methods, though, right?

7      A.   Yes.

8      Q.   And we were looking at Page 3 of

9    Appendix 8 before.  That's the one that shows

10   shipments by all defendants to all of our

11   pharmacies in Lake and Trumbull Counties, and then

12   it has the percentages of orders that are flagged

13   by one of your methods, correct?

14     A.   Correct.

15     Q.   And you show those percentages of flagged

16   orders in a variety of ways, right?  You show

17   percentage of total transactions, dosage units,

18   etcetera?

19     A.   Yes.

20     Q.   And you also show that information for a

21   variety of prescription opioid medications,

22   correct?

23     A.   Correct.

24     Q.   You can't tell from Page 3 of Appendix 8

25   which individual stores received any of the orders

1    you flagged, right?

2         A.    Not from this page, no.

3         Q.    It's just a table of rolled-up numbers for

4    all shipments to all of the defendants' pharmacies

5    in the two counties?

6         A.    Correct.

7         Q.    The same is true for the chart on Page 4

8    of Appendix 8, right?  It's a flagging analysis

9    shown in the aggregate?

10        A.    Correct.

11        Q.    Page 4 shows a bar chart of all of

12   defendants' shipments of oxycodone to all stores in

13   the two counties all rolled up together?

14        A.    Correct.

15        Q.    Do you recall that there's a DEA

16   regulation that defines suspicious orders to

17   include orders of unusual size, orders deviating

18   substantially from a normal pattern, and orders of

19   unusual frequency?  We've talked about that before?

20        A.    Yes.

21        Q.    You can't tell from the charting on Page 4

22   which of the defendants' pharmacies in Lake and

23   Trumbull Counties may have received an order of

24   unusual size however you choose to define unusual,

25   right?

1      A.    Not from this page, but certainly from

2    some of the other 24 or 30,000 pages of the

3    underlying data, yes.

4      Q.    Well, in Appendix 8, I don't think we have

5    quite that many pages.  Appendix 8 is the only

6    appendix where you've identified the results of

7    your flagging analysis, right?

8      A.    No, I don't think that's true.  The code

9    and the data that we produced to you will produce

10   output and includes all of the individual

11   transactions identifying all of the pharmacies that

12   it ships to.

13     Q.    And I'm talking about the charts that you

14   put together and put in your appendices so that the

15   lawyers who aren't data consultants can look at it.

16   I understand what you're saying that you have code

17   that somebody can go and look at.

18           In the charts you produced and attached to

19   your report, Appendix 8 is where you show us the

20   visual depiction of your flagging analysis,

21   correct?

22     A.    Correct.

23     Q.    You can't tell from the charts in

24   Appendix 8 whether any particular order that you

25   flagged for a particular store was of unusual size

Page 63

1   no matter how you define unusual?

2       A.   If what you're asking is are there

3   individual transactions identified in any way

4   whether they were of unusual size or not or in any

5   way, are there any individual transactions listed

6   in these summary tables and figures, of course,

7   not.

8       Q.   You can't identify any particular order

9   from the charts in Appendix 8?

10      A.   Correct.  These are summarizing those

11  individual orders that are available to you in the

12  underlying data.

13      Q.   You can't tell whether any particular

14  pharmacy in Lake and Trumbull County received any

15  particular order that deviated substantially from a

16  normal pattern no matter how you choose to define

17  deviation, normal, or pattern from any of the

18  charts in Appendix 8?

19      A.   Not from the charts that summarize that

20  data, but the data is underlying these charts and

21  available to you easily in what we produced to you.

22      Q.   Understood.  Did you produce the

23  underlying data and code that you've been talking

24  about to Mr. Rafalsky?

25      A.   Not that I'm aware of.  I didn't produce

Page 64

1    it to anybody except the attorneys.

2        Q.   You can't tell from the charts in

3    Appendix 8 whether any of the pharmacies in Lake

4    and Trumbull County received orders of unusual

5    frequency however you might define that term?

6        A.   I'm sorry.  That question was a little

7    different than the prior question.  Can you ask

8    that again, please?

9        Q.   You can't tell from the charts in

10   Appendix 8 whether any of the pharmacies in Lake

11   and Trumbull County received orders of unusual

12   frequency however you might define that term?

13       A.   I don't think that's correct.  I would

14   have to look, but I think somewhere here, but it

15   may be in a different appendix, we've got the

16   results of flagging methods graphed for individual

17   pharmacies.  I just have to check that.  Visually

18   that's in my memory.

19       Q.   Why don't you take a look at your table of

20   contents in your reports, and let me know what

21   appendix you think that is because as far as we can

22   tell, Appendix 8 is the only one that identifies

23   the results of your flagging analyses.

24       THE VIDEOGRAPHER:  Excuse me.  I have about

25   seven minutes before I have to change the media.

Page 65

1    Just letting you know.

2        MS. SWIFT:  Thank you.  I appreciate it.

3        THE WITNESS:  Well, looking at the table of

4    contents won't help me, but what I'm referring to

5    is in the excerpt that you put in front of me of

6    Appendix 8.  We've got, for instance, Page 4, which

7    is a line -- a bar chart, and there may be another

8    one later.  And this is for the distributors to all

9    their pharmacies.

10           I believe visually I see something that

11   looks like this with shipments to an individual

12   pharmacy identified by its DEA number, and it looks

13   very similar.  It's got blue sections and red

14   sections, the red sections being transactions or

15   dosage units that are flagged.  I'll just have to

16   verify that, but visually I'm seeing that in my

17   memory.

18   BY MS. SWIFT:

19       Q.   All right.  I'm going to go ahead and

20   introduce another exhibit that's the full version

21   of Appendix 8.  It's not in your box because these

22   appendices are huge, but I want you to have the

23   opportunity to see it and tell me what you're

24   talking about.  It's going to take forever to do

25   it.  We'll try to do that.

Page 66

1          Is what you're talking about, Dr. McCann,

2     the fact that you've got -- well, we'll come back

3     to it once that's loaded.  I don't want to do it

4     without you having it in front of you.

5          Would you agree with me that even with

6     respect to charts for individual pharmacies in

7     Appendix 8, you can't say anything about any

8     particular individual order in those charts?

9     A.   Yes.

10    Q.   You can't tell from the flagging analyses

11    in Appendix 8 whether some individual pharmacies

12    have more flags than other pharmacies.  Is that a

13    fair statement?

14    A.   I don't think so.  If I'm visualizing it

15    correctly, you could see some pharmacies that had

16    very few or very short red sections in their red

17    and blue bars and other pharmacies that had, you

18    know, primarily red.  So certainly it's possible to

19    compare one pharmacy to another based on these bar

20    charts.

21    Q.   The flagging analyses in Appendix 8 are

22    only applied to the five defendant pharmacies,

23    correct?

24    A.   Yes.

25    Q.   The flagging methods that you used lead to

Page 67

1   very different results depending on the method,

2   correct?

3       A.   Well, the interpretations are different so

4   that the numbers, if that's what you mean by the

5   results, the numbers are different as you look at

6   one of these methods versus another.

7       Q.   So, for example, sticking with the

8   excerpts that you've got in hard copy, if you look

9   at Page 813 of Appendix 8, that shows the results

10  of Method D, the three times trailing 12-month

11  average, right?

12      A.   Yes.

13      Q.   And for Walgreens, zero orders are flagged

14  for hydrocodone, correct, using that method?

15      A.   Correct.

16      Q.   But then if you look at Page 831 of

17  Appendix 8, that shows the results of Method F, the

18  Maximum Daily Dosage Units Method?

19      A.   Yes.

20      Q.   And there for Walgreens, 100 percent of

21  the orders for hydrocodone are flagged, correct?

22      A.   Correct.

23      Q.   So depending on which method you use, you

24  get a range literally from zero flagged orders to

25  100 percent of orders flagged, right?

Page 68

1      A.    For Walgreens for hydrocodone, that's

2    correct.

3      Q.    You have no opinion on whether these

4    methods would provide any helpful information to

5    someone trying to determine whether diversion of

6    opioids is occurring in the real world, right?

7      A.    No, I wouldn't say that.  I believe these

8    methods do -- would provide useful information in

9    at least a couple of ways.

10     Q.    All right.  Go ahead and tell me what

11   those ways are.

12     A.    Well, the first and the primary maybe only

13   way that I'm putting them to use is to show what --

14   what the distributor defendants here could have

15   done with the data that they had.  Not to say they

16   would have done any one of these seven things, but

17   these are seven illustrations of what could be done

18   with the data to implement some sort of

19   supervision.

20          I'm not saying any one of these particular

21   methods ought to have been used, but I'm just

22   implementing the methods on the cleaned-up data and

23   trying to explain how the results should be

24   interpreted.  I think that that provides useful

25   information to someone, perhaps, in real time

Page 69

1    thinking about how to surveil their shipments.

2        Q.    But you're not a subject matter expert who

3    is going to come in and offer any explanation about

4    how methods that range from zero flagged orders to

5    100 percent of flagged orders can help you figure

6    out if there's diversion of opioids going on in the

7    real world.  That's not going to be you, right?

8        A.    Well, that was a compound question, but

9    I -- so the first part of your question, you're

10   right.  I'm not a subject matter expert.  The rest

11   of your question, I think, dealt with whether I

12   intend to explain to the Court how these seven

13   methods could be used to implement some sort of a

14   monitoring system.  The answer to that is also no.

15      MS. SWIFT:  I understand we need to go off the

16   record to change the tape.

17      THE VIDEOGRAPHER:  We are going off the record.

18   The time now is 9:34.

19                        (Whereupon, a short break was

20                        taken.)

21      THE VIDEOGRAPHER:  We are back on the record.

22   This is the start of media No. 2.  The time is

23   9:54.

24

25

Page 70

1                    (Whereupon, McCANN Deposition
2                    Exhibit No. 5 was marked for
3                    identification.)
4      BY MS. SWIFT:
5           Q.   Dr. McCann, I'm going to share my screen
6      and show you what we've introduced as Exhibit 5,
7      which is the full version of your Appendix 8.
8                Do you see that on the screen?
9           A.   Yes.
10          Q.   I believe that you testified before the
11     break that you thought that there were somewhere in
12     Appendix 8 your flagged transaction reports,
13     reports for individual pharmacies; is that right?
14          A.   Or close.  What I said was somewhere in
15     the appendices, I visualized graphs that look
16     similar that were specific to individual
17     pharmacies.
18          Q.   Well, Appendix 8 is where you show the
19     results of your flagging analysis, the flagged
20     orders for each of your methods, correct?
21          A.   Yes.
22          Q.   I flipped through the full version of
23     Appendix 8, it's about 2,600 pages, on the break,
24     and I'm happy to do it on the record.  I didn't see
25     any flagging reports in Appendix 8 for individual

1    pharmacies.

2            Would you like me to flip through it with

3    you so that you can confirm that's true?

4        A.   No.  If you've done it, I'm sure that's

5    correct.  It may be a slightly different version of

6    these bar charts that I'm thinking about that are

7    pharmacy-specific, for instance, that show

8    shipments of the different opioids collectively or

9    individually maybe with national state averages

10   overlaid.  So they have a similar look, but they're

11   not exactly the same.

12       Q.   To be clear, what I'm focused on is your

13   flagging analyses.  Sitting here today, can you

14   identify any appendices that you have produced to

15   us that show flagging analyses for individual

16   pharmacies?

17       A.   Not that I'm aware of.  Not that I can

18   recall as I sit here.

19       Q.   Okay.  You ran your distribution flagging

20   analyses two different ways, once looking at

21   distribution from the pharmacies' own distribution

22   centers to their own pharmacies, and then the

23   second analysis looks at distribution from any and

24   all distributors to those same pharmacies, correct?

25       A.   Correct.

Page 72

1      Q.   Those two different ways of running your

2  flagging analyses also lead to different results?

3      A.   Correct.

4      Q.   Take a look, if you would, please -- I'll

5  put it on the screen.  This is Page 489 of

6  Appendix 8.  Do you see that?

7      A.   Yes.

8      Q.   At Page 489 of Appendix 8, you can see

9  that you've got zero flagged orders of oxycodone

10 for CVS under your Method A, correct?  This should

11 also be in your hard copy excerpt.

12     A.   Yes.

13     Q.   And then if you look at Page 1732 of

14 Appendix 8, you see that for the same -- the very

15 same method, Method A, there you flagged

16 96.3 percent of orders of oxycodone for CVS,

17 correct?

18     A.   Yes, but you may not be interpreting those

19 two sets of numbers correctly or fully.

20     Q.   Well, let me ask my question.  I'm right

21 that both of those numbers that we just looked at,

22 zero flagged orders on Page 489 and the

23 96.3 percent of flagged orders on Page 1732, both

24 of those numbers reflect results for Method A?

25     A.   Correct.

Page 73

1      Q.   In the first page, Page 489, you did not

2   include any shipments except those that CVS made

3   from its own distribution centers, correct?

4      A.   CVS didn't make any shipments from its own

5   distribution centers.  That's why the number of

6   flagged transactions is zero because the number of

7   transactions, period, is zero.

8      Q.   But in the second page on Page 1732, you

9   get 96.3 percent flagged orders because there

10  you're including shipments from other distributors

11  like Cardinal or McKesson or AmerisourceBergen,

12  correct?

13     A.   To CVS pharmacies, correct.

14     Q.   You don't have any substantive opinion

15  about whether it's appropriate under the law to

16  include shipments from other distributors to CVS

17  pharmacies in a flagging analysis, right?

18     A.   Correct.

19     Q.   You don't have any opinion whatsoever on

20  whether the Controlled Substances Act requires CVS

21  to monitor and report shipments from other

22  distributors, right?

23     A.   Correct.

24     Q.   Do you have any plans to add additional

25  flagging methods to your opinions in the future?

Page 74

1    A.   Not as I sit here.  There may well be

2    other illustrations of flagging methods that will

3    come up over the next few years, and it might be

4    useful to show how they operate on the data, but

5    I'm not aware of any such additional example I'd

6    like to illustrate.

7    Q.   I'm not talking about examples.  We talked

8    about that a bit before, and I understand you don't

9    have any additional examples created that you

10   haven't given us, right?

11   A.   Correct.

12   Q.   I'm talking about additional flagging

13   methods.  You know, we've been working on these

14   cases for several years now.  We've had five

15   methods, and then it went to six, and now we're at

16   seven.

17        Do I understand your testimony to be that

18   sitting here today, you're not planning on adding

19   any others?

20   A.   There's a whole bunch of color in that

21   question that I'm not accepting, but I agree with

22   that statement that I'm not intending, as I sit

23   here, to add any additional illustrations of what

24   flagging methods could be applied to the ARCOS

25   data.

1      Q.   I'm sorry.  I'm not communicating clearly,

2   I think.  I'm not asking about examples or

3   illustrations.  I'm asking about the methods

4   themselves.

5            As you sit here today, do you anticipate

6   adding additional flagging methods on the

7   distribution side besides the seven that we now

8   have?

9      MR. MOUGEY:  Objection.

10      THE WITNESS:  You don't like my answer, but

11   it's the same answer.  I think of each of these

12   methods as illustrations or as examples of what can

13   be done with the data.  And so when I say I'm not

14   thinking about any additional illustrations or

15   examples of what can be done with the data, I mean

16   I'm not thinking about a Method 8.

17   BY MS. SWIFT:

18      Q.   Okay.  Am I right that you can't tell me

19   that you won't add additional flagging methods?

20      A.   Correct.

21      Q.   In the Lake and Trumbull County cases, you

22   concluded that the pharmacies reported all of their

23   shipments of opioid medications to DEA's ARCOS

24   database, correct?

25      A.   I'm sorry.  I think the answer is no, but

1     could you read that again?  Ask that again, please.

2          Q.    In the Lake and Trumbull County cases, you

3     concluded that the pharmacies reported all of their

4     shipments of opioid medications to DEA's ARCOS

5     database, correct?

6          A.    No.

7          Q.    Are you quibbling with that because you

8     found some small deviations between the defendants'

9     transactional data and what you saw in DEA's ARCOS

10    data?

11         A.    I don't think that it's a quibble or that

12    the deviations are small.  In the case of Walmart,

13    I think there's several months where there are

14    significant shipments missing from the ARCOS data

15    that we see in the defendant transaction data.  And

16    for some of the other distributor chain

17    distributors, we see maybe one or two months where

18    the shipments missing in the ARCOS data are quite

19    substantial.  That's how I would characterize it.

20         Q.    Other than those one or two months for

21    certain distributors, and I think you said several

22    months for Walmart, are there any other aspects of

23    the defendants' transaction data that you think are

24    missing from ARCOS?

25         A.    Not that I can think of as I sit here.

Page 77

1     Q.    You have ARCOS data for all of the five

2    pharmacies dating from 2006 to 2014; is that right?

3     A.    Correct.

4     Q.    As you sit here today, you can't identify

5    more than a handful of months of data that are

6    missing from the ARCOS data; is that right?

7     A.    Missing largely or in their entirety from

8    a particular distribution center.  There are other

9    months where the differences are there, but they're

10   small.

11    Q.    Am I right that you compared the DEA's

12   ARCOS data to the defendants' transactional data in

13   order to make a conclusion about the reliability of

14   the ARCOS data?

15    A.    Yes.

16    Q.    You concluded that the ARCOS data produced

17   by the DEA was very, very similar to the

18   transactional data produced by the pharmacies,

19   correct?

20    A.    Correct.

21    Q.    DEA also makes summaries of the ARCOS

22   database available to the public, correct?

23    A.    Yes.

24    Q.    The DEA has done that for decades, right?

25    A.    I don't know how far back it goes, but a

Page 78

1    couple decades worth of data is available.  I don't
2    know when they started putting the retail drug
3    summary reports up.
4         Q.   At last as far back as 2006?
5         A.   I don't know.  I accessed them in 2018.
6    Whether they were first put up in 2006 or not, I
7    don't know.
8         Q.   Take a look at Paragraph 18 of your
9    April 16th report, please.
10        A.   Yes.
11        Q.   You concluded that the ARCOS data is
12   reliable, in part, because it closely matches the
13   DEA's retail drug summary reports for January 2006
14   through December 2014, correct?
15        A.   Yes.
16        Q.   Those retail drug summary reports from the
17   DEA are available to the public, correct?
18        A.   Correct.
19        Q.   That's true for all 50 states.  You say
20   that in Paragraph 18 of your report?
21        A.   Correct.
22        Q.   The flagged order opinions that we've been
23   discussing this morning all relate to the shipping
24   of opioids from a distributor to a pharmacy,
25   correct?

Page 79

1      A.    I'm sorry.  I missed the first couple of

2    words in your question.

3      Q.    The flagged order opinions we've been

4    discussing this morning all relate to the shipping

5    of opioids from a distributor to a pharmacy,

6    correct?

7      A.    Correct.

8      Q.    You've offered those distribution-related

9    opinions in roughly a half dozen opioids cases.  Is

10   that a fair statement?

11     A.    Yes.

12     Q.    For the first time in this case, the Lake

13   and Trumbull County case, you've also offered

14   opinions related to the pharmacies dispensing of

15   opioids, the filling of prescriptions at the

16   pharmacy counter, correct?

17     A.    Correct.

18     Q.    You calculated numbers of so-called red

19   flag prescriptions that the pharmacies dispensed,

20   right?

21     A.    Correct.

22     Q.    You did not come up with the criteria that

23   were used to identify a red flag prescription.  Am

24   I right about that?

25     A.    Yes.

Page 80

1     Q.    You took criteria from somebody else and
2     applied them to the pharmacies' dispensing data; is
3     that fair?
4     A.    Correct.
5     Q.    You only -- you only applied red flag
6     criteria to prescriptions filled by the five
7     pharmacies that are defendants in this case, right?
8     A.    Bear with me a minute, please.  Yes.
9     Q.    Are you aware that the Ohio Board of
10    Pharmacy produced dispensing data for every
11    pharmacy in the state in this case?
12    A.    Generally, I'm aware that there was, but I
13    think it's referred to as OARRS data produced if
14    that's what you're referring to.
15    Q.    That is what I am referring to.  You're
16    aware that the Ohio Board of Pharmacy produced its
17    OARRS data for every pharmacy in the state of Ohio?
18    A.    Generally I'm aware of that.  I wouldn't
19    confirm, as I sit here, that it was for every
20    pharmacy in the state of Ohio, but in general,
21    that's how I understand the data.
22    Q.    Did you run any red flag analyses over the
23    data for other pharmacies besides the five that are
24    in this case?
25    A.    No.  We didn't use the OARRS data.

Page 81

1     Q.   Why not?

2     A.   It's a two-part answer there, I guess, but

3  we didn't use the OARRS data.

4     Q.   Why didn't you use the OARRS data?

5     A.   Well, the OARRS data doesn't contain the

6  same information as the defendant dispensing data

7  does.  In particular, my recollection is that it

8  only identifies the three-digit zip code that the

9  patient lives in, and so you can't usefully measure

10  the distance between the patient and the pharmacy.

11  You can't usefully estimate it between the patient

12  and the pharmacy or the patient and the prescriber,

13  and that is -- that distance is a component of a

14  number of the prescription red flagging methods.

15     Q.   Are you aware that the drug name appears

16  in the OARRS data?

17     A.   Yes.  Yes.

18     Q.   The NDC number for the drug appears in the

19  OARRS data?

20     A.   I didn't look at the data in detail.  I'm

21  not disputing that those items are there.  I'm

22  saying that the main thing, the reason we didn't

23  use it was because of the three-digit zip code

24  issue on the patient.  I don't recall what else is

25  there.

Page 82

1      Q.    Okay.  If I said to you that the drug
2    name, the NDC number, the date the prescription was
3    filled, the quantity dispensed, the dosage form,
4    the day supply, the prescriber's name, the quantity
5    prescribed, the method of payment, all of that
6    information is in the OARRS data, do you have any
7    reason to dispute that?
8      A.    No.
9      Q.    Is there any other reason besides the one
10   that you've mentioned about the zip code that you
11   did not run any flagging analyses on the OARRS
12   data?
13     A.    There may be other reasons, but that was a
14   sufficient reason to not run it on the OARRS data.
15     Q.    Can you think of any other reasons as we
16   sit here today?
17     A.    No.
18     Q.    The number of red flag prescriptions that
19   you've identified or that have been identified in
20   this case has been something of a moving target.
21          Would you agree with me that the number of
22   red flag prescriptions that you've identified has
23   changed over the course of the case?
24     A.    No, I don't think so, and I wouldn't
25   characterize it as a moving target.  I think there

1    are different calculations that were asked for, and

2    the resulting number, the quantum is different, but

3    that's because they're different calculations.

4        Q.   All right.  Let's walk through a bit of

5    that history because I just want to make sure we're

6    on the same page with what we're talking about.

7        MS. SWIFT:  And Isaac, I'm going to ask you to

8    introduce some additional exhibits as we go through

9    this, please.

10   BY MS. SWIFT:

11       Q.   The first one is in your box, Dr. McCann,

12   and it's -- for Isaac's sake, it's Exhibit 7, and

13   we'll introduce this.  I think it will be No. 6.

14       THE CONCIERGE:  6, yes.

15                        (Whereupon, McCANN Deposition

16                        Exhibit No. 6 was marked for

17                        identification.)

18   BY MS. SWIFT:

19       Q.   Sorry.  For you, Dr. McCann, it's 7 in the

20   box.  It will be marked as 6.  I know that's

21   confusing.

22       A.   Yes.

23       Q.   This exhibit that we marked for the

24   deposition as Exhibit No. 6 says on the top of this

25   Track 3 Case Management Order Nunc Pro Tunc.

Page 84

1          Do you see that?

2      A.   Yes.

3      Q.   If you turn to Page 3 of this exhibit, do

4  you see the deadline of June 19, 2020?

5      A.   Yes.

6      Q.   It says that plaintiffs shall identify for

7  defendants the prescriptions they and their experts

8  conclude caused them the harm for which they seek

9  relief, the methodology or methodologies they and

10 their experts used to reach such a conclusion, and

11 the electronic scripts or analytical programs used

12 by plaintiffs and/or their experts to implement

13 that methodology by June 19th of 2020.

14          Do you see that?

15     A.   Yes.

16     Q.   Were you aware of that deadline?

17     MR. MOUGEY:  Objection.

18     THE WITNESS:  I don't recall.  It's a year ago

19 now, but I probably was at the time.  I just don't

20 recall.

21 BY MS. SWIFT:

22     Q.   Now I'd like you to take out what's in

23 your box as WAG 9.  This will be Exhibit 7.

24

25

Page 85

1                    (Whereupon, McCANN Deposition

2                    Exhibit No. 7 was marked for

3                    identification.)

4    BY MS. SWIFT:

5        Q.   9 in the box is going to be marked as 7.

6    Dr. McCann, do you see that what we're marking as

7    Exhibit 7 is a document that says Plaintiffs'

8    Discovery Submission Pursuant to Case Management

9    Order and Responses and Objections to Pharmacy

10   Defendants' First Set of Interrogatories?

11       A.   Yes.

12       Q.   Have you ever seen this document before?

13       A.   I don't think so.

14       Q.   You can see that it's dated and signed by

15   Peter Mougey June 19, 2020, correct?

16       A.   Yes.

17       Q.   If you look at Page 3 of Exhibit 7,

18   please -- well, let's start at Page 2, request

19   No. 25.  Do you see that?

20       A.   Yes.

21       Q.   It says identify each prescription which

22   you contend supports your claims in this case

23   caused harm for which you seek to recover in this

24   case or should not have been filled, and then it

25   asks for some specific information about those

Page 86

1    prescriptions.

2            Do you see that?

3        A.    Yes.

4        Q.    On Page 3 in the plaintiffs' response, do

5    you see on the third line the reference to

6    Exhibit A?

7        A.    Yes.

8        Q.    The response says that Exhibit A

9    identifies red flag criteria or identifying red

10   flag prescriptions.

11           Do you see that?

12       A.    Yes.

13       Q.    Then it references an Exhibit B, and it

14   says Exhibit B identifies a summary of red flagged

15   prescriptions.

16           Do you see that?

17       A.    Yes.

18       Q.    The response from the plaintiffs notes

19   that 25 percent of all prescriptions produced in

20   the case have red flags.

21           Do you see that?

22       A.    I would read the sentence into the record.

23   I'm not sure it's exactly as you said it.  It's

24   close.

25       Q.    It says -- the sentence reads a total of

Page 87

1    1,106,170 prescriptions, 25.46 percent of the total

2    prescriptions produced, were flagged by at least

3    one red flag criteria, correct?

4         A.   Correct.

5         Q.   I apologize if I just asked you this, but

6    have you seen this response before?

7         A.   No, not that I recall.

8         Q.   Well, that might make it hard to answer

9    this question, but do you know if you helped the

10   plaintiffs put this response together?

11        A.   I didn't personally.  Certainly my office

12   ran the red flag analysis and produced results

13   that, I think, fed into this.  I might be wrong

14   about that, but that's my kind of vague

15   recollection.

16        Q.   Well, I would like to show you Exhibits A

17   and B and see if we can confirm that.  If you

18   would, please, take out WAG 10 from your box.

19        MS. SWIFT:  And Isaac, if you would go ahead

20   and introduce that, I'd appreciate.  Are we at

21   Exhibit 8, Isaac?

22        THE CONCIERGE:  8, correct.

23                        (Whereupon, McCANN Deposition

24                        Exhibit No. 8 was marked for

25                        identification.)

1          THE WITNESS:  Yes.

2     BY MS. SWIFT:

3          Q.    Dr. McCann, do you see that Exhibit 8

4     includes 27 red flag criteria?

5          A.    Yes.

6          Q.    Have you seen this document before?

7          A.    I don't believe so, not in this form

8     anyway.

9          Q.    Do you have any idea where these 27 red

10    flags came from?

11         A.    Well, generally in my initial expert

12    report, there's a footnote that just gives my

13    general understanding.

14         Q.    And we'll get to your April report in a

15    little bit, but focusing on these 27 red flags that

16    the plaintiffs disclosed to us in June of 2020, do

17    you know who put those red flag criteria together?

18         A.    No, not in any complete sense.

19         Q.    Do you know in an incomplete sense?

20         A.    Well, they were provided to my office --

21    to my office by counsel.  So how they assembled

22    those 27 from different sources, I don't know.

23    Ultimately, I attribute the 27 methods to counsel

24    who provided them to me.

25         Q.    Do you know whether plaintiffs' lawyers

Page 89

1    drafted these 27 red flag criteria?

2         A.   I don't know who all contributed to the

3    drafting, but clearly counsel would have

4    contributed to the drafting.  After all, it's an

5    exhibit to their brief or their response.

6         Q.   Who among the plaintiffs' lawyers provided

7    you with these 27 red flag criteria?

8         A.   I don't know.  I would have to go back and

9    check the correspondence.

10        Q.   Do you know whether these 27 red flag

11   criteria that are marked as Exhibit 8 were drafted

12   by another hired consultant who is working for the

13   plaintiffs' lawyers?

14        A.   I don't know.

15        Q.   Do you know whether someone with expertise

16   in pharmacy practice put together these 27 red flag

17   criteria?

18        A.   I don't know.

19        Q.   Have you ever talked to the plaintiffs'

20   pharmacy consultant, Carmen Catizone, about these

21   27 red flag criteria?

22        A.   Not in any detail.  There was some

23   discussion of these, perhaps, in one or two or

24   three calls with Mr. Catizone -- not one or two or

25   three.  Three or four calls over the last year with

Page 90

1    Mr. Catizone.  I don't recall whether -- I don't

2    recall to what extent these 27 were discussed, but

3    the discussion was primarily on the first 16 that

4    are in my report.

5         Q.   And we'll get to this in more detail, but

6    just to try to make sure we're on the same page,

7    your April 16 report lists 43 red flags, correct?

8         A.   Correct.

9         Q.   The first 16 red flags are the ones that

10   came from Mr. Catizone; is that right?

11        A.   That's my understanding.  We also got them

12   from counsel, but my understanding is they came

13   ultimately from Mr. Catizone.

14        Q.   And we can go one by one and compare them

15   if you'd like, but do you know sitting here without

16   doing that that Flags 17 through 43 in your report

17   are the same as the 27 red flags we're looking at

18   right now?

19        A.   I don't know with certainty because I

20   haven't seen Exhibit 8 before, but they very likely

21   are.

22        Q.   You said you think you talked to

23   Mr. Catizone a little bit, but not in detail about

24   these 27 flags.

25             What specifically did you discuss with him

Page 91

1   about the 27?

2        A.   I don't know whether we did or not.  We

3   may have had some fleeting discussion of the 27.

4   As I said, the discussion that I recall was really

5   about the first 16.

6        Q.   Did you ever discuss with Mr. Catizone the

7   27 red flag criteria reflected in Exhibit 8 before

8   June 19th of 2020?

9        A.   I'm sorry.  I missed a little part of

10  that.  Can you ask that again?

11       Q.   Sure.  Did you ever discuss with

12  Mr. Catizone the 27 red flag criteria that are

13  reflected in Exhibit 8 before June 19, 2020?

14       A.   Almost definitely not, but I can't be

15  100 percent sure, but almost certainly not.

16       Q.   Have you ever talked to any other hired

17  consultant working for the plaintiffs' lawyers

18  about the 27 red flag criteria?

19       A.   I don't think so, not that I recall and

20  certainly not in any substantive way.

21       Q.   Now I'd like you to open what's WAG 11 in

22  your box and will be Exhibit 9.

23                     (Whereupon, McCANN Deposition

24                     Exhibit No. 9 was marked for

25                     identification.)

Page 92

1    BY MS. SWIFT:

2        Q.    This is the Exhibit B that was referenced

3    in the plaintiffs' discovery responses that we

4    looked at a few minutes ago that talked about the

5    25 percent of prescriptions being flagged.

6            Do you recognize it?

7        A.    No.

8        Q.    Do you know whether this document reflects

9    your work or the work of your firm?

10       A.    Well, I believe it reflects our work.

11       Q.    Why do you believe it reflects your work?

12       A.    Well, because in the past, I have seen

13   Excel files or PDF printouts that included what you

14   have in Column 1 here, the Red Flag Method

15   identified as Red Flag 1 through Red Flag 27.  And

16   I've seen the number of flagged prescriptions and

17   the percentages.  So I've seen data that looks like

18   this.

19            As I said, I haven't seen this particular

20   document or this format, but I've seen work like

21   this.  And it's actually a lot of work to get to

22   here.  So I don't think someone else did it.  I

23   think we probably created the numbers that go into

24   this particular exhibit.

25       Q.    There are numbers of flagged prescriptions

Page 93

1    reflected in Exhibit 9 for the five pharmacy

2    defendants for red flags numbered 1 through 27.

3         Do you know whether those numbers are

4    based on the 27 red flag criteria we were looking

5    at a moment ago?

6    A.   I believe they are, but I don't know that

7    with certainty because I'm not familiar with this

8    precise document; but they look like the results of

9    analysis that we've done for those 27 red flags.

10   Q.   Do you know whether this analysis shows

11   prescriptions that caused the plaintiffs harm?

12   A.   I don't know.

13   Q.   Did you do anything at all in the course

14   of your work for the plaintiffs' lawyers to

15   determine whether any red flagged prescription

16   caused plaintiffs harm?

17   A.   No.

18   Q.   Did you know that the plaintiffs' lawyers

19   have relied on this analysis to show the

20   prescriptions they and their experts conclude

21   caused them the harm for which they seek relief in

22   this case?

23   A.   Well, I don't think that's consistent,

24   your statement just now, with the order that you

25   showed me earlier, but in any case, I'm not aware

Page 94

1    one way or the other.

2         Q.   Let's look at it again.  I don't want

3    there to be any confusion.

4              That's Exhibit 6, which was 7 in your box.

5    And at Page 3, the Court said plaintiffs shall

6    identify for defendants the prescriptions they and

7    their experts conclude caused them the harm for

8    which they seek relief, correct?

9         A.   Correct.

10        Q.   Have you ever talked to any other hired

11   consultant working for the plaintiffs' lawyers

12   about how your red flag prescription analysis might

13   demonstrate harm caused to the plaintiffs in this

14   case?

15        A.   I don't believe so.  The closest would

16   have been in some discussions that I participated

17   in with Professor Cutler, but I don't recall

18   whether that particular -- as you've phrased it,

19   whether that came up.  I don't think so because

20   Professor Cutler was not explaining his methodology

21   to me.  We were explaining our calculations to him.

22   So the information flow is not as your question

23   would imply.

24        Q.   And if I understand your testimony, you

25   weren't explaining to Mr. Cutler how your red flag

1    analysis of prescriptions might have shown harm to

2    the plaintiffs.  That wasn't part of your work?

3         A.   Correct.

4         Q.   On the interrogatory responses that are

5    marked as Exhibit 8 that you looked at a moment

6    ago -- that's wrong.  The rog responses are 7.

7         A.   I apologize.  I wasn't writing the number

8    on the paper.

9         Q.   I appreciate that.

10        A.   That's 7 of the plaintiffs' discovery

11   submission?

12        Q.   Yes.  If you go back to the page we were

13   looking at before, which was Page 3 where the

14   exhibits are mentioned, there's also reference to

15   Exhibits C, D, and E.

16             Do you see those on Page 3?

17        A.   Yes.

18        Q.   Exhibit C is titled Patients With High

19   Annual Dosage Units.  B is a Subset of Eight Flags,

20   and E is Prescriptions Flagged Multiple Times.

21             Do those exhibits reflect your work as

22   well to the best of your knowledge?

23        A.   Yes.

24        Q.   Why did you put those together?  Was it

25   just the plaintiffs' lawyers asked you to run some

Page 96

1    analysis, or was there more to it than that?

2        A.    I didn't put those together.  Maybe I

3    misunderstood your prior question.  These subsets

4    or different combinations reflect our

5    implementation of the 27 flagging methods to our

6    cleaning of the dispensing data.  Whether -- we

7    certainly would not have specified particular

8    subsets, but we may have been given particular

9    subsets and asked to create the numbers, the

10   results for those subsets.  I don't know one way or

11   another whether they did.

12           That -- we certainly didn't create or

13   define these subsets or combinations and -- but

14   nonetheless, I believe that the results here

15   reflect our work.  Again, I can't imagine that

16   anybody else did the underlying flagging of the

17   prescriptions.

18       Q.    Do you know who did create those subsets

19   for you to run the data on?

20       A.    No.

21       Q.    Did you ever talk to any other hired

22   consultant for the plaintiffs about Exhibits C, D,

23   and E reflected here?

24       A.    Not that I recall.  I don't think so.

25       Q.    Do you know what the purpose of putting

Page 97

```
 1    together those exhibits was?
 2        A.    No.
 3        Q.    Take out for me, if you would, please,
 4    your April 16th report.
 5        A.    Yes.
 6        Q.    And turn, if you would, to Page 150.
 7        A.    Yes.
 8        Q.    This is the section of your report about
 9    red flags on dispensing data, correct?
10        A.    Correct.
11        Q.    You list starting at Page 150 43 red
12    flags, right?
13        A.    Yes.
14        Q.    I believe you said a few moments ago that
15    you weren't certain that Flags 17 through 43 were
16    the same 27 flags we were talking about a few
17    minutes ago.  So what I'd like to do is compare
18    them so that we can be certain about it.
19             Do you have the red flag criteria handy?
20        A.    Is that Exhibit A?
21        Q.    Yes.
22        A.    I'm sorry.  What exhibit are you calling
23    that in this deposition, please?
24        Q.    I am calling that one Exhibit 8.
25        A.    Okay.  Yes, I have it.
```

1      Q.    Would you agree with me that your Flag 17

2   in your April report is the same as Flag 1 in

3   Exhibit 8?

4      A.    Yes.  The wording is a little bit

5   different, but I looked at the first three, and I

6   think that the wording in the two documents

7   describe the same three methods.

8      Q.    Just to make sure I understand what you're

9   saying, you believe your Red Flags 17, 18, and 19

10   from the April report are the same as Flags 1, 2,

11   and 3 in Exhibit 8?

12      A.    Yes.  The wording, the structure of the

13   sentences and the order is different, but as I read

14   them quickly, they seem to be saying the same

15   thing.

16      Q.    Great.  Look at No. 19 for me then.  Would

17   you agree that that's the same -- No. 19 in your

18   April 2021 report is the same as No. 4 in

19   Exhibit 8?

20      A.    I think the language in the expert report

21   is a little more precise.  On that example, there's

22   a little bit more information in my description on

23   Item 19 than in the Exhibit 8 at No. 4, but they're

24   referring to the same thing.

25      Q.    Would you agree that No. 20 in your April

1    report is the same as No. 5 in Exhibit 8?

2        A.   Yes.  I can't recall the quantification.

3    I think that my 21 has a little bit more

4    information than the description at Item 5 and, I

5    think, is a little bit more precise.  The wording

6    of these are slightly different as was true for the

7    first four, but I think they're describing the same

8    methods.

9        Q.   So just to be clear, though, your 20 in

10   the April report is the same as 5 in Exhibit 8?

11       A.   Yes, I believe so.

12       Q.   What about 21 in the April report, is that

13   the same as No. 6 in Exhibit 8?

14       A.   Yes.  The description -- as with the first

15   five, the description is slightly different, but

16   they're referring to the same test.

17       Q.   22, is that the same as No. 7 in

18   Exhibit 8?

19       A.   I'm sorry.  The numbering is -- I keep

20   getting confused by our numbering.  I think 23

21   lines up with 7; is that correct?

22       Q.   I have to ask you.  You're the only one

23   who's under oath.

24            Is it your understanding that 23 is the

25   same as No. 7?

Page 100

1        A.   Yes.  In some of your questions, you've
2    been off by one number, I think.
3        Q.   All right.  Let's go back.
4             You're confident 23 is the same as 7?
5        A.   Well, let me read it carefully.  Yes.
6        Q.   What about 22?
7        A.   6.
8        Q.   21, where does 21 fit in?
9        A.   It lines up with 5.
10       Q.   And what about 20?
11       A.   It lines up with 4.  19 lines up with 3.
12   18 lines up with 2.  17 lines up with 1.  That's
13   why I say you were -- somehow you got off one
14   number, and it was confusing me.
15       Q.   Okay.  Does 24 -- does 24 line up with 8?
16       A.   Yes.
17       Q.   Does 25 line up with 9?
18       A.   Yes.
19       Q.   Is 26 the same as 10?
20       A.   Yes.
21       Q.   Is 27 the same as 11?
22       A.   Yes.
23       Q.   Is 28 the same as 12?
24       A.   Yes.
25       Q.   Is 29 the same as 13?

Page 101

```
 1        A.   Yes.

 2        Q.   Is 30 the same as 14?

 3        A.   Yes.

 4        Q.   Is 31 the same as 15?

 5        A.   Yes.

 6        Q.   Is 32 the same as 16?

 7        A.   Yes.

 8        Q.   Is 33 the same as 17?

 9        A.   Yes.

10        Q.   Is 34 the same as 18?

11        A.   Yes.

12        Q.   Is 35 the same as 19?

13        A.   Yes.

14        Q.   Is 36 the same as 20?

15        A.   Yes.

16        Q.   Is 37 the same as 21?

17        A.   Yes.

18        Q.   Is 38 the same as 22?

19        A.   Yes.

20        Q.   Is 39 the same as 23?

21        A.   Yes.

22        Q.   Is 40 the same as 24?

23        A.   Yes.

24        Q.   Is 41 the same as 25?

25        A.   41 is an example where there's just a
```

1    little bit more information.  I didn't pause on

2    every one that we've gone through, but 41, you can

3    see it says that the two prescriptions were

4    dispensed to a patient within a single day on two

5    different days.  I guess that is the same as 25.  I

6    had to pause on that for a second, but yes, I

7    believe they're the same.

8        Q.   Do you know why there are differences in

9    the wording of some of these?

10       A.   Well, because the response was written by

11   lawyers, and my expert report was written by me and

12   my staff.  And as we were writing up how the code

13   is implemented, there might be some slight detail

14   that needed to be said a little more precisely or

15   said differently, or in any case, we used slightly

16   different language.  I think it just reflects that

17   one set of people wrote the interrogatory answers

18   trying to explain these 27 flags, and my staff and

19   I were trying to explain the same flags and wrote

20   those explanations in our words.

21       Q.   Do you know whether anyone with pharmacy

22   expertise reviewed either the 27 red flags

23   reflected in Exhibit 8 or the same ones we've been

24   going through in your report to confirm that they

25   were, in fact, the same and would flag the same

1    prescriptions?

2        A.   Well, I don't see what expertise that

3    person would have to make that judgment.  I think

4    that's a different issue, but in any case, I don't

5    know who reviewed or had input into the Exhibit A

6    that we're looking at or who, for that matter,

7    reviewed our descriptions.

8        Q.   Is No. 42 in your April 2021 report the

9    same as No. 26 in Exhibit 8?

10       A.   Yes.

11       Q.   Is No. 43 the same as No. 27?

12       A.   Yes.

13       Q.   The red flags 17 through 43 in your April

14   2021 report are the same as the 27 red flags

15   described in the June 2020 interrogatory responses

16   and attached to those responses as Exhibit A,

17   correct?

18       A.   Correct.

19       Q.   The slight wording variations that you

20   identified as we went through those, is it your

21   understanding that those didn't have any effect on

22   the numbers of prescriptions that would be flagged

23   by any of those 27 flags?

24       A.   Correct.  There is -- in some of the early

25   ones we looked at, there was a little bit of

1    ambiguity over whether the window, the 20-day

2    window or 45-day window or 60-day window, referred

3    to the fill dates or the written dates.  There's

4    just a little bit of ambiguity there.  I think our

5    description is clear what we are referring to.

6         And so with that possible quibble to use

7    your term from earlier, they should result -- they

8    should -- if you implement my 17 through 43 or

9    Exhibit 8, 1 through 27, you should get the same

10   results implementing it on the same data.

11       Q.   Do you know, sitting here today, whether

12   that ambiguity that you just referenced makes a

13   difference in the number of flagged prescriptions?

14       A.   Well, it will make a difference if you use

15   fill dates rather than dispense dates.  I'm sorry.

16   Fill dates rather than written dates.

17       Q.   Do you know whether the original 27 flags

18   that were identified in June 2020, whether the

19   analysis using those flags used a different date

20   than you did in your April 2021 report?

21       A.   No.  I'm just sitting here with you

22   comparing the descriptions in these two documents.

23       Q.   You can't identify anyone with pharmacy

24   expertise who provided the plaintiffs' lawyers with

25   these 27 red flags that we just walked through,

Page 105

1   correct?

2       A.   Correct.

3       Q.   All right.  That leaves Flags 1 through 16

4   in your April 2021 report.  Those are new as of the

5   April report, correct?

6       A.   Well, I don't know if they were in

7   existence in some other document on some earlier

8   date, but they're in the April 16th report is all I

9   can tell you.

10      Q.   You didn't put those 16 red flags in any

11  other previous report, correct, sir?

12      A.   Correct.

13      Q.   Who provided you with the 16 new red flags

14  that appear in the April report?

15      A.   I don't know about new, but if you're

16  talking about 1 through 16, the same as 17 through

17  43.  Counsel provided them to me.

18      Q.   You have a footnote on Page 150, and I

19  think you may have referenced it earlier before we

20  got to it in the report.  Take a look at that one,

21  please.  It's footnote 44.  And you say that it's

22  your understanding that each of the red flag

23  criteria can be found in or is supported by a

24  variety of sources.

25          What is the basis of that understanding?

1      A.   Counsel.

2      Q.   You don't cite any actual documents here

3   in footnote 44 supporting the red flag criteria.

4   You say a non-exhaustive list of examples of such

5   support can be found at Appendix 12.

6           Do I have that right?

7      A.   Yes.

8      Q.   Appendix 12 is the one that's more than

9   24,000 pages long, right, sir?

10     A.   I don't recall.

11     Q.   Do you recall that you have an appendix

12  that's more than 24,000 pages long?

13     A.   Well, I was saying more than 10,000 pages

14  earlier, and you said it was more than 24,000.  So

15  I don't have any reason to disagree with you.

16     Q.   But you say in footnote 44 that

17  Appendix 12 is not exhaustive.  Do you anticipate

18  adding still more pages to Appendix 12 at some

19  other later date?

20     A.   Not as I sit here, no.

21     Q.   You didn't put together the flagging

22  criteria reflected in your report based on your own

23  review or your staff's review of documents and

24  other sources, correct?

25     A.   Correct.

1       Q.    Who did that, if you know?

2       A.    I don't know.  As I said, I received these

3    flagging methods from counsel.  I don't know how

4    they assembled them.

5       Q.    Okay.  Let's take a look at -- it's WAG 15

6    in your box.  This is going to be an excerpt in

7    Appendix 12, the 24,000-pager.

8       MS. SWIFT:  And I believe this will be

9    Exhibit 10, Isaac.

10                         (Whereupon, McCANN Deposition

11                         Exhibit No. 10 was marked for

12                         identification.)

13   BY MS. SWIFT:

14      Q.    All right.  Take a look at Page 38 of the

15   excerpted Appendix 12.  It shows the number of

16   prescriptions flagged for 11 of the 16 -- the first

17   16 red flags reflected in your April report,

18   correct?

19      A.    Yes.

20      Q.    Why did you show numbers for just 11 of

21   the 16?

22      A.    Because counsel asked us to include as an

23   exhibit this information.

24      Q.    No other reason than that?

25      A.    Correct.

1      Q.    Take a look at Page 245 of Appendix 12.

2    It should be the very next page in the excerpt.  Do

3    you see that?

4      A.    Yes.

5      Q.    Page 245 of Appendix 12 identifies the

6    number of flagged prescriptions for the original

7    27 flags and the 16 new ones, right?  It's all 43.

8            Oh, no.  It looks like you don't have all

9    of them.  You just have the first 34.

10     A.    Correct.

11     Q.    I wonder if I can show you the rest to

12   make sure we're on the same page.  Give me one

13   second.

14           Can you see that on the screen, sir?

15     A.    Yes.

16     Q.    You can see at the bottom, the page

17   numbering says Page 1 of Appendix 12, and the

18   heading is Highlighted Flag Total Summary and Bar

19   Chart, correct?

20     A.    Yes.

21     Q.    And can you see at the top, it says Page 1

22   of 24,336?

23     A.    Yes.

24     Q.    All right.  We were looking at Page 245.

25   So we'll start there.

Page 109

1          And if I go to Page 246, can you confirm

2     for me that Pages 245 and 246 of Appendix 12

3     identify the number of flagged prescriptions both

4     from the original 27 red flags that we looked at

5     from June of 2020 plus the 16 red flags that are

6     also included in your April report?

7          A.   Yes, that appears to be the case.

8          Q.   Then if you would, please, look at

9     Page 290 of Appendix 12, and we'll do the same

10    thing because I think it carries over as well.

11         Page 290 of Appendix 12 and also carrying

12    over to 291, which I've got on the screen,

13    identifies the number of flagged prescriptions for

14    each of the red flags in your April 2021 report for

15    Walgreens, correct?

16         A.   Yes.

17         Q.   Okay.  Take out for me, if you would,

18    please, the May 19th second supplemental report.

19         When did you complete your May 19th

20    report?

21         A.   No earlier than May 19th.

22         Q.   Do you remember whether you completed it

23    on May 19th or sometime before that?

24         A.   Yes.  I meant my prior answer on May 19th.

25         Q.   Did you -- did you physically sign it on

Page 110

1    May 19th as well?

2        A.    I believe so.  That's a screen capture of

3    my signature that was appended to it.  I reviewed

4    it last on May 19th and approved it to be sent to

5    the attorneys.  When that screen capture of my

6    signature was put on it, whether it was on the 19th

7    or the 18th, I can't tell you.

8        Q.    Why did you issue this second supplemental

9    report on May 19th?

10       A.    Well, of course, at the highest level,

11   because I was asked to do so.  And I have some

12   general understanding, but not a very in-depth

13   understanding, of why I was asked to do so.

14       Q.    What's your general understanding of why

15   you were asked to issue this report on May 19th?

16       A.    Well, it was -- it was in support of some

17   of the back and forth between plaintiffs and

18   defendants over sampling of some due diligence

19   files, and there was some -- my recollection was

20   that there was some interest in narrowing the

21   number of flagged prescriptions to a subset from

22   which a random sample would be drawn to review the

23   due diligence notes.  That's my entire

24   understanding.  I don't understand any more than

25   what I've just described to you about the reasons

Page 111

1   for it.

2       Q.   All right.  I'm going to start with

3   Paragraph 4 of the May 19th report.

4           It says that you recreated certain figures

5   from the April report using what you're calling

6   combination red flag prescriptions, correct?

7       A.   Yes.

8       Q.   Why didn't you recreate Figures 36 to 45

9   or Figures 56 to 65?

10      A.   We have to pull them out, but I think the

11  reason is those are recurrent -- what has been

12  referred to as recurrent flagging methods, and

13  there is something a little illogical about

14  combining the combination red flags from the first

15  16, which are not in any version recurrent with the

16  recurrent version of the later flags.  And exactly

17  how you explain the result of that combination if

18  you were to do it that way is not at all clear.

19  There's not a clear interpretation of that

20  combination in my view.

21          We struggled with that a little bit and

22  decided that since there wasn't a clear

23  interpretation of using that combination of one of

24  the first 16 from Mr. Catizone and the recurrent

25  version of the subsequent flags, we decided not to

Page 112

1    do that.

2        Q.   The recurrent flagging analyses that you

3    just referred to, those are analyses where you

4    identified the first prescription in time that

5    flagged on a particular red flag criteria, and then

6    you simply marked all subsequent prescriptions for

7    the same patient or the same doctor as flagged.

8            Did I get that right?

9        A.   Close.  To be precise, if the flag is

10   keyed off of the patient, then subsequent

11   prescriptions filled by that patient are flagged.

12   If the flag is keyed off of the doctor, then

13   subsequent prescriptions written by that doctor are

14   filled and flagged.  Some of the flags are keyed

15   off of both doctor and patient.  And in that case,

16   both prescriptions written by that doctor or filled

17   by that patient would be flagged.

18       Q.   Is -- the recurrent flagging, is it

19   reflected in your report starting at Page 150?

20   When you did it in a recurrent way, you have like a

21   P behind the criteria or a D and sometimes both.

22   Is that how you reflect how you're doing the

23   recurrent flagging?

24       A.   Yes.

25       Q.   Is it fair to say that the recurrent

1     flagging that you did with respect to your red flag

2     prescription analyses is similar to what you did

3     with recurrent flagging on the distribution side

4     with your flagged order analyses?

5          A.   Well, they're very different, but they

6     have -- the contexts are very different, but some

7     aspect of the interpretation is similar in the two

8     contexts.

9          Q.   For both of them, am I right that what you

10    are doing in the analysis is identifying one

11    flagged order or one flagged prescription, and then

12    based on that first flag, you identify subsequent

13    orders or prescriptions as also flagged?

14         A.   I would say it a little different.  You

15    apply the flagging methods, and from the first

16    flagged shipment or first flagged prescription

17    onward, you count up the shipments or prescriptions

18    measured by transactions or dosage units or

19    something else, and you divide that accumulated

20    amount at the end by the total transactions or

21    prescriptions.  That gives you some measure of how

22    early in the relationship between the distributor

23    and the pharmacy or the patient and the pharmacy or

24    the doctor and the pharmacy these various methods

25    might have first picked up a problem with a

1  pharmacy, with a patient or with a doctor.

2       So in that sense, the interpretation is

3  similar in the two contexts, although, the contexts

4  are very different.

5       Q.   Your May 19th supplemental report does not

6  include any recurrent flagging analysis for

7  prescriptions, correct?

8       A.   Correct.

9       Q.   Is it fair to say that you have disclaimed

10  the earlier opinions from the April report with

11  respect to recurrent flagging meaning you're not

12  planning on talking about those at trial?

13      A.   Well, I don't understand disclaiming, but

14  I'm not disavowing the work that I've done in the

15  initial report other than, perhaps, Appendix 8C,

16  which I can explain.  And I'm only planning to

17  discuss whatever -- at trial whatever Mr. Mougey

18  asks me and the judge allows me to discuss.

19      Q.   So you don't know one way or the other

20  whether you're going to be asked to testify about

21  the recurrent flagging analysis that appears in

22  your April report?

23      A.   Correct.

24      Q.   You're not disavowing it?

25      A.   Correct.  I think it's very useful

Page 115

1    information.  So, of course -- and I think there

2    will be implemented calculations to provide that

3    useful information correctly.  So yes, I'm not

4    disavowing it.  Whether it ends up being used at

5    trial or not, I don't know.

6        Q.    In Paragraph 4 of the May 19th report, you

7    talk about some of your appendices.

8            Did you intend to replace Appendices 12A

9    to 12G with the new Appendices 14A to 14G?

10       A.    No.

11       Q.    You're just adding new ones?

12       A.    Correct.

13       Q.    Do you plan to talk about Appendix 12A to

14   12G at trial?

15       A.    If I'm asked, sure.

16       Q.    Let's look at Paragraph 5 of the May 19

17   report.

18           In this May 19 report, you've introduced a

19   new set of red flags that you call combination red

20   flags, right?

21       A.    I might say it a little bit differently,

22   but that's close, yes.

23       Q.    The combination red flags identify 884,166

24   prescriptions, correct?

25       A.    Correct.

1      Q.    That's a different number of flagged

2   prescriptions than you identified in June of 2020

3   using the original 27 flags, correct?

4      A.    If you're referring to the lawyers'

5   response, then I don't think that your question is

6   accurate.  I didn't identify those, and I didn't --

7   I didn't write that response, but they're

8   different, obviously, than the results of a

9   flagging method -- of the 27 flagging methods that

10   are described in that response because they

11   don't -- they're a subset, if you will, because

12   they have to both flag one of those 27, and they

13   have to flag one of the first 16 we've been

14   referring to as the Catizone flag.  So it's a

15   subset of those flags that were flagged

16   prescriptions that were, perhaps, referenced in

17   that June 2020 pleading.

18      Q.    Let's go back to Exhibit 7.  That's the

19   lawyer response that you just referred to.

20           On Page 3, we went through it before.

21   That's where it talks about Exhibit A, that

22   original 27 red flag criteria, and Exhibit B is the

23   summary red flag analysis that you said reflected

24   your work, but identifies 1.1 million flagged

25   prescriptions, correct?

1     A.     Correct.

2     Q.     The 1.1 million prescriptions were the

3  flagged prescriptions identified by the 27 original

4  flags on June 19, 2020, correct?

5     A.     That appears to be the case, yes.

6     Q.     The combination red flags that you

7  identified on May 19th identified a different

8  number of prescriptions, correct?

9     A.     A subset of the 1.1 million, yes.

10     Q.     The combination red flags you identified

11  in your May 19th report also reflect a different

12  number of flagged prescriptions than you identified

13  in your April 2021 report using the 16 new red

14  flags, right?

15     A.     A subset of that number, yes.  It's

16  narrowed from what is described in plaintiffs'

17  response, Exhibit 17.

18     Q.     And I understand you're offering an

19  explanation.  I didn't ask for an explanation.

20  We're going to get to it.  I promise you.

21           Right now I'm just trying to establish

22  that the number of combination red flagged

23  prescriptions that you identified in the May report

24  is different than the number of red flagged

25  prescriptions you identified in the April report.

Page 118

1    That's true?

2         A.    It's smaller because it's a subset, yes.

3         Q.    The combination red flags are the third

4    set of flagging methods that you've disclosed for

5    identifying problematic prescriptions.  Is that a

6    fair statement?

7         A.    No.

8         Q.    Why not?

9         A.    Because I didn't disclose anything other

10   than my initial report, which is April 16th, and my

11   second supplemental report just takes a subset of

12   those same 43 flagging methods, prescriptions that

13   trigger one of the first 16 and simultaneously

14   trigger one of the subsequent 27.  That is not

15   three different flagging methods.  It's one

16   flagging method.

17        Q.    Well, it's 43 flagging methods if I

18   understand your testimony.

19        A.    It's one set of flagging methods.  You

20   just suggested that I have now offered three

21   different sets of flagging methods.  I'm just

22   saying that's not true.

23        Q.    You have disclosed three different sets of

24   prescriptions with red flags on them?

25        A.    No, that's not true.

1       MR. MOUGEY:  Objection.

2   BY MS. SWIFT:

3       Q.   In June of 2020 in the lawyer response

4   relying on your work, a universe of 1.1 million

5   prescriptions were identified with red flags,

6   correct?

7       A.   That appears to be true.

8       Q.   In your April report, you identified

9   additional red flags that flagged an additional

10  million prescriptions give or take.

11          Is that a fair statement?

12      MR. MOUGEY:  Objection.

13      THE WITNESS:  No.  I don't know where you're

14  getting that additional million or -- you're just

15  mischaracterizing these two documents, I think.

16  BY MS. SWIFT:

17      Q.   All right.  Let's go back to Appendix 12.

18  It's Exhibit 10.  This is the excerpt, and can you

19  look at Page 245 for me?

20      A.   Yes.

21      Q.   Page 245 shows for all defendants'

22  prescriptions red flags, we have the first 34 on

23  Page 245, and then the rest were on Page 246.

24          Do you remember we saw that a few minutes

25  ago?

 1      A.    Yes.

 2      Q.    And do you see where it says at the top of

 3   245 flagged for any reason, and it reflects

 4   2.4 million prescriptions?

 5      A.    Correct.

 6      Q.    53.6 percent of the total prescriptions

 7   produced in the case?

 8      A.    Correct.

 9      Q.    That's a different number of prescriptions

10   than were disclosed in June of 2020, correct?

11      A.    Correct.

12      Q.    In the May report, the combination red

13   flags identify 884,000 prescriptions, correct?

14      A.    Correct.

15      Q.    Would you agree with me, and we can do the

16   math, that that represents about 19 percent of the

17   total prescriptions in the case, which are also

18   reflected in Appendix 12 that we were just looking

19   at?  Do you need me to point -- it's Page 245 of

20   Appendix 12 again shows that the total number of

21   prescriptions produced in the case is about

22   4.5 million.

23      A.    Yes.  Thank you.

24      Q.    Would you agree with me that 884,000 is

25   about 19 percent of 4.6 million?

```
                                        Page 121
 1        A.   Yes.
 2        Q.   Is it your opinion that 19 percent of the
 3   prescriptions produced in this case should not have
 4   been filled?
 5        A.   No.
 6        Q.   You didn't do anything to try to determine
 7   whether any of those prescriptions were improperly
 8   filled.  Is that a fair statement?
 9        A.   Correct.  Yes.
10        Q.   You don't have any idea whether any
11   prescription produced in this case was improperly
12   filled, correct?
13        A.   Correct.
14        Q.   You didn't do anything to try to determine
15   whether any prescription produced in this case was
16   illegitimate, meaning not written for a legitimate
17   medical purpose?
18        A.   Correct.
19        Q.   You have no idea whether any prescription
20   produced in this case was illegitimate?
21        A.   Correct.
22        Q.   And it's certainly not your opinion that
23   884,000 prescriptions in Lake and Trumbull County
24   were diverted, correct, sir?
25        A.   Correct.
```

Page 122

1    Q.   Would you agree that it would be a
2  caricature to say that those 884,000 prescriptions
3  were diverted?
4    A.   I don't know if I would say it was a
5  caricature, but I don't know of any basis for
6  saying that.  I wouldn't say it.
7    Q.   You did not look to see whether any
8  prescription produced by the pharmacies in this
9  case was diverted?
10   A.   Correct.
11   Q.   You have not seen any evidence of
12 illegitimate prescriptions filled by any of the
13 pharmacies in this case in the course of your work?
14   A.   Correct.
15   Q.   You also haven't seen any evidence that
16 any prescription filled by any of the pharmacies in
17 this case was diverted, correct?
18   A.   Correct.
19   Q.   Your work identifying red flagged
20 prescriptions did not involve figuring out whether
21 any prescriptions were illegitimate or diverted,
22 correct?
23   A.   Correct.
24   Q.   You have no opinion in this case that any
25 prescriptions were diverted, fair?

Page 123

1      A.    Correct.

2      Q.    Your combination red flags as described in

3   the May 19th report flagged 19 percent of the

4   prescriptions produced in the case.  Yet, in your

5   distribution analysis that we talked about first

6   thing this morning, we talked about the fact that

7   for some methods, you flagged 100 percent of

8   orders, correct?

9      A.    There's a great big disconnect between

10  those two, but I think the two factual statements

11  are correct.

12     Q.    So long as those flagged orders went to

13  fill legitimate prescriptions, could you agree that

14  there is no resulting harm from the fact that the

15  order was flagged?

16     A.    No, that definitely would be untrue.

17     Q.    Why?

18     A.    Well, my understanding, and it's just a

19  layman's understanding having worked in the ARCOS

20  data and this litigation now for three plus years,

21  is that any sort of flagging method that would have

22  been implemented, including these six or seven

23  illustrations, identify shipments or, perhaps,

24  prescriptions in this context as well that ought to

25  have been subject to some due diligence before the

1    order was shipped or the prescription was filled.

2         That doesn't mean that every order that

3    would trigger such a flag or every prescription

4    that would trigger such a flag would, if shipped or

5    filled, with certainty have been diverted.  It's

6    only that a system that effectively surveilled

7    orders and prescriptions being filled would have

8    been useful in stopping orders to problematic

9    pharmacies or stopped pharmacies from filling

10   prescriptions written by bad doctors or submitted

11   by bad patients.  The fact that the particular

12   order that is flagged by one of these methods

13   didn't result itself in a bad prescription and a

14   drug being diverted doesn't mean that there was no

15   harm by virtue of these sorts of systems not being

16   in place and extensive due diligence being done on

17   orders or on prescriptions.

18        So I think what you said is exactly wrong,

19   although, I'm not a subject matter expert, and I

20   haven't offered any opinions along the lines of the

21   question you just asked me.

22        Q.   Well, I appreciate that.  I understand

23   you're not the one who is going to offer an opinion

24   about the actual harm that the plaintiffs claim to

25   have suffered; is that fair?

Page 125

1      A.    Yes.

2      Q.    But you've said that there are other ways

3   that you believe the plaintiffs can be harmed that

4   have nothing to do with whether the actual

5   prescriptions were filled were diverted.  Is that

6   your understanding?

7      A.    No.  I apologize.  My answer was so long,

8   you lost the import of it and all of the stuff that

9   was around the import.  If I may just very briefly,

10  what I'm saying is in your prior question, you

11  asked me if a prescription gets flagged in one of

12  these methods and if you actually look at a

13  shipment, an order, and if you looked at that

14  specific order in the data and you could trace that

15  order through the pharmacy to patients and doctors

16  and find no diversion, no abuse, doesn't that mean

17  there was no harm by the fact that there was no

18  flagging method, and I'm saying no, that's not --

19  that doesn't follow at all.

20          The flagging methods or some type of

21  systematic surveillance is there as a programmatic

22  check on bad pharmacies, bad doctors, bad patients.

23  The fact that, one, you can identify -- one order

24  that you can identify in the flagging method

25  results didn't lead to diversion doesn't mean there

Page 126

1   was no harm by there not being such a flagging

2   method in place at all.

3        THE VIDEOGRAPHER:  We need to change the media

4   when you get a moment.

5        MS. SWIFT:  Let's go ahead and do it.  Thanks,

6   Dave.

7        THE VIDEOGRAPHER:  We're going off the record.

8   The time now is 11:30.

9                        (Whereupon, a short break was

10                        taken.)

11       THE VIDEOGRAPHER:  We are back on the record.

12   This is the start to media No. 3.  The time is

13   11:43.

14   BY MS. SWIFT:

15       Q.   Dr. McCann, turning back to -- it's what

16   I've marked as Exhibit 10.  It's the little excerpt

17   of Appendix 12.  Do you have that handy?

18       A.   Yes.

19       Q.   And then if you could, because I'm going

20   to do some comparisons, pull out of your box what's

21   behind tab -- or it's in Envelope 16.

22       MS. SWIFT:  And we'll mark this one Exhibit 11,

23   please, Isaac.

24

25

Page 127

1                    (Whereupon, McCANN Deposition

2                    Exhibit No. 11 was marked for

3                    identification.)

4    BY MS. SWIFT:

5        Q.   Is the document that I marked as

6    Exhibit 11, do you recognize that as Appendix 14 to

7    your May 19th report?

8        A.   Yes.

9        Q.   I'll represent to you we changed it in one

10   small respect.  We added page numbers.

11       A.   Thank you.

12       Q.   Starting with the excerpt from Appendix 12

13   marked as Exhibit 10, take a look, if you would,

14   please, at Page 635.

15            Do you recognize that as the impact

16   analysis from your April 16th report?

17       A.   Yes.

18       Q.   And then if you would, please, look at

19   Page 321 of Appendix 14.

20       A.   Yes.

21       Q.   Is that the impact analysis associated

22   with your May 19th report?

23       A.   Yes.

24       Q.   Does the impact analysis in Appendix 14

25   replace the impact analysis from Appendix 12?

1      A.    No.   It's not a corrected Appendix 12 if

2   you'd like.   It's an Appendix 14.   It's an

3   additional appendix or an additional supplement.

4   It reflects something different.

5      Q.    What is an impact analysis?

6      A.    I believe that's Professor Cutler's term,

7   not my term, and these are calculations in support

8   of Professor Cutler.  So I think you'll have to

9   address that question to him.

10      Q.    You don't have an understanding of what

11   this impact analysis is that is included in your

12   Appendix 12 or the one in Appendix 14?

13      A.    No, other than it's support for Professor

14   Cutler.

15      Q.    You don't have an understanding of the

16   purpose of the impact analysis in either

17   Appendix 12 or Appendix 14?

18      A.    Not beyond what I've just said.

19      Q.    I know you said before that you spoke with

20   Professor Cutler at least briefly.  Did you speak

21   with Mr. Cutler about the impact analysis in

22   Appendix 12 or the one in Appendix 14?

23      A.    No.

24      Q.    Did you speak to him about the fact that

25   you were preparing these impact analyses?

1      A.   No, I didn't personally.  Other people in

2    my office who created -- who did the analysis and

3    created these exhibits communicated with the

4    attorneys who communicated with attorneys who

5    communicated with Professor Cutler or, in some

6    fashion, interacted indirectly with Professor

7    Cutler to create the inputs that he was looking for

8    in his analysis, but I didn't -- I wasn't involved

9    in any of that.

10     Q.   What did Mr. Cutler tell the attorneys who

11   told the attorneys who told your staff?  What did

12   he tell them to do?

13     A.   I have no idea.

14     Q.   Who would know?

15     A.   That particular question, I think, could

16   only be answered by Professor Cutler, and I don't

17   know that it went through two layers of lawyers or

18   if the communication was via phone calls or e-mails

19   where counsel and Professor Cutler and staff from

20   my office were involved.  All I know is that I was

21   not involved in any of that.

22     Q.   Well, I'm struggling.  You included those

23   two impact analyses in Appendix -- in appendices to

24   your report.  What was your understanding of why

25   they were included?

1    A.    As I said, because I understood that

2    Professor Cutler would find them useful.

3        Q.    What is the difference between the impact

4    analysis in Appendix 12 and the impact analysis in

5    Appendix 14?

6        A.    The difference is the third, fourth,

7    fifth, and six columns of percentage figures in

8    Appendix 12 have been replaced by the third and

9    fourth percentage figures, columns, and percentage

10   figures in Appendix 14, and that is -- Appendix 14

11   reflects a subset, a smaller group of the

12   prescriptions that are identified in Appendix or

13   summarized in Appendix 12.  So it's narrowing down

14   the set of prescriptions that feed into these

15   calculations.

16       Q.    And what are these calculations?  What are

17   we looking at here?

18       A.    Well, both in Appendix 12 and Appendix 14,

19   they're percentages of MME flagged by, in the case

20   of Appendix 12, 11 red flags and run both in a

21   recurrent and a nonrecurrent fashion.  In

22   Appendix 14, the percent is the MME and

23   prescriptions that are flagged by one of the first

24   16 methods -- at least one of the first 16 methods

25   and at least one of the subsequent 27 methods,

Page 131

1    which I defined in my May 19th report to be the

2    combination red flag prescriptions divided by the

3    total MME in the prescriptions that were dispensed.

4         Q.   MME, that stands for morphine milligram

5    equivalent; is that right?

6         A.   Yes.

7         Q.   Is it fair to say that MME is a measure

8    that allows you to compare different opioids by

9    their potency?

10        A.   Yes.  That's how I understand it and use

11   it.

12        Q.   The new impact analysis in Appendix 14 of

13   the May 19th report does not include the recurrent

14   flagging of dispensing data, correct?

15        A.   Yes.  I think we've discussed that earlier

16   when we were talking about the 880 some thousand

17   prescriptions that were flagged by one of the -- at

18   least one of the first 16 methods and at least one

19   of the subsequent 27 methods.

20        Q.   The percentages in your impact analysis,

21   they're a percentage of MME as you just said.  You

22   didn't do an analysis reflecting the percentage of

23   prescriptions that reflect on your combination red

24   flags, correct?

25        A.   I don't know if we did or not.  I know

1    that this is what we were asked to produce.  As I

2    said, my understanding is this is what was

3    requested by Professor Cutler.

4         Q.   We saw before that the 884,000 combination

5    red flag prescriptions, that's about 19 percent of

6    the total prescriptions in the case.  Do you

7    remember that?

8         A.   Yes.

9         Q.   If you had provided percentages in the

10   impact analysis based on flagged prescriptions, the

11   percentages would have been much lower, right?

12        A.   I'm not 100 percent sure, but your

13   intuition is the same as mine.  I think that would

14   be the case, but there might be some wrinkle that

15   I'm not recognizing as I sit here.

16        Q.   The new impact analysis at Page 321 of

17   Appendix 14 shows that you flagged between 30 and

18   36 percent of opioids by MME, right?

19        A.   Over the entire time period as opposed to

20   an individual year, yes.

21        Q.   Am I right that the reason you did this

22   impact analysis in terms of MME as opposed to

23   prescriptions or some other measure was that

24   because it was your understanding that's what

25   Mr. Cutler wanted?

Page 133

1      A.   Yes.

2      Q.   Okay.  Let's go back to the May 19th

3  report, please, and I want to ask you some

4  questions about Page 10.  This is a section of the

5  report called Unique Doctors and Patients, correct?

6      A.   Yes.

7      Q.   Does this section of the May 19th report

8  relate to the revisions you made to the red flags?

9      A.   I didn't make revisions to the red flags.

10  I'm not sure what you mean.

11      Q.   Well, you define in your May 19th report

12  something called combination red flags, correct?

13      A.   Correct.

14      Q.   And that comes up with a new number of

15  flagged prescriptions of 884,000, which we talked

16  about a bunch today, right?

17      MR. MOUGEY:  Kate, I'm sorry to interrupt you.

18  Are you -- what exhibit number did you put on the

19  May 19th?

20      MS. SWIFT:  That's No. 3.

21      THE WITNESS:  The combination red flag

22  prescriptions are a subset of the prescriptions

23  that were flagged by any of the red flagging

24  methods, and so the number is smaller.

25

Page 134

1   BY MS. SWIFT:

2       Q.   Well, right, but you have to do something

3   different to get to the different number, right?

4   It's not just an application of the original red

5   flags?

6       A.   Well, I think it is.  The difference is

7   trivial compared to the commonality that what's in

8   common is virtually all of the work, and what's

9   different is trivial.  It is saying that the

10  prescription has to be flagged by at least one of

11  the first 16 and at least one of the subsequent 27.

12  This is something you would do in a single column

13  in Excel.

14          It's a trivial change, but it narrows the

15  set of flagged prescriptions because this

16  applies -- this additional constraint on them, it

17  reduced the number from 2.4 million or whatever you

18  showed me in an earlier exhibit to 880,000.  It's a

19  subset.

20      Q.   So it's your testimony that a trivial

21  change in the red flag criteria resulted in a

22  reduction from 2.4 million flagged prescriptions to

23  just 880,000?  Do I have that right?

24      A.   No, you absolutely do not.  You just

25  mischaracterized what I said.  The flagging

1    methods, the 43 flagging methods are the same in

2    the April report and in the May 19th supplement.

3    In the May 19th supplement, all of the same

4    43 flagging methods are implemented in exactly the

5    same way, and that's a significant amount of work.

6         What I said was if you then require that a

7    prescription to be counted as a combination regular

8    flagged prescription to hit one of the flags in the

9    first -- at least one of the flags in the first 16

10   and at least one of the flags in the first 27, then

11   that's a significant restriction, and it results in

12   a much smaller data subset, 880,000.  It has a

13   significant impact, but the arithmetic is kind of

14   trivial.  As I said, it would be done in a simple

15   Excel file, but the flagging methods which are

16   quite complicated, quite complex are unchanged

17   between April and May.

18        Q.   My only question on Page 10 of the

19   May 19th report was whether that section on unique

20   doctors and patients related to the revisions you

21   made to the red flags?

22        A.   I'm telling you I don't think I made any

23   revisions to the red flags.  I think we're talking

24   past each other.

25        Q.   Does the section on Page 10 called Unique

Page 136

1    Doctors and Patients have anything whatsoever to do

2    with your combination red flags?

3         A.   Yes.

4         Q.   What does the section on Page 10 have to

5    do with your combination red flags?

6         A.   It comes up in a number of doctors and

7    patients who were involved in at least one

8    prescription that hit at least one of the first 16

9    red flags and at least one of the subsequent 27 red

10   flags.  It also goes on to count up the number of

11   subsequent prescriptions written by doctors who

12   were involved in one of those prescriptions, and

13   the number of -- the number of prescriptions

14   written by those doctors and the number of

15   prescriptions filled by those patients involved in

16   a red flag prescription that triggered -- a

17   prescription that triggered one of the first 16 and

18   one -- at least one of the next 27 red flags.

19        Q.   Did you ever share this doctors and

20   patients analysis with any other hired consultant

21   working for the plaintiffs' lawyers?

22        A.   I did not.

23        Q.   Do you know if anybody else did?

24        A.   No.

25        Q.   Did you ever talk about this section on

Page 137

1    doctors and patients with Mr. Catizone?

2        A.    No.

3        Q.    Did you ever talk about this section of

4    your May 19th report on unique doctors and patients

5    with any other hired consultants for the

6    plaintiffs?

7        A.    No.

8        Q.    This section of your May 19th report on

9    doctors and patients identifies more than 4 million

10   prescriptions written by the doctors who wrote

11   prescriptions identified by your red flag -- strike

12   that.

13            This section of your May 19th supplemental

14   report identifies more than 4 million prescriptions

15   written by the doctors who wrote prescriptions

16   identified in the combination red flags, correct?

17       A.    Yes.

18       Q.    It also identifies hundreds of thousands

19   of prescriptions filled by patients who initially

20   filled prescriptions identified by your combination

21   red flags, correct?

22       A.    Correct.

23       Q.    Would you agree with me that this section

24   of your May 19th report identifies more than

25   90 percent of all the prescriptions produced in the

1    case?

2         A.    Yes.

3         Q.    You don't have any opinion that any of

4    those prescriptions should not have been filled,

5    correct?

6         A.    Correct.

7         Q.    No opinion that any of them are

8    illegitimate?

9         A.    Correct.

10        Q.    No opinion that any of them were diverted?

11        A.    Correct.

12        Q.    You have no opinion that there was

13   anything at all wrong with those prescriptions?

14        A.    Correct.

15        Q.    Did you look at any of the individual

16   prescriptions written by the doctors that are

17   reflected at very high level in this section of

18   your report?

19        A.    No.

20        Q.    Did you look at any of the individual

21   prescriptions filled by these patients?

22        A.    I'm sorry.  I may have read more into your

23   prior question than you intended.  I reviewed the

24   dispensed prescription data.  So in that sense, I

25   reviewed prescriptions written by at least some

Page 139

1    prescribers and filled by at least some --

2    submitted by some patients and filled by some

3    pharmacies.

4            I thought in the prior question, you were

5    asking me whether I reviewed a physical

6    prescription written by a doctor like my doctor

7    might write out a prescription for me, and I said

8    that I did not do that.  If what you meant by the

9    prior question was did I look at any individual

10   record in the data, the answer is yes.  So that

11   answer would be yes also to this most recent

12   question.

13       Q.    Beyond coming up with the numbers that are

14   reflected in your May 19th report, did you perform

15   any analysis on individual doctors?

16       A.    Not that I recall.

17       Q.    What about individual patients?

18       A.    Again, not that I recall.  I looked at the

19   data and sorted it as I was reviewing the data to

20   see how it looked when you grouped by patient or by

21   prescriber, but that didn't rise to the level of

22   some analysis of the prescriptions written by any

23   prescriber or filled by any patient.

24       Q.    All right.  Turn back, if you would,

25   please, to the excerpt of Appendix 12, and take a

```
1    look at Page 8791.  It should be the last page.

2    This page says it is a monthly summary of pharmacy

3    dispensing of opioid prescriptions for Dr. David

4    Demangone.

5              What is this?

6         MR. MOUGEY:  Would you mind pointing us to a

7    specific exhibit?  I apologize.

8         MS. SWIFT:  Sure.  It's Exhibit 10.

9    BY MS. SWIFT:

10        Q.   Let me just re-ask the question.

11        A.   Sure.

12        Q.   What are we looking at at Page 8791 of

13   Appendix 12, which says monthly summary of pharmacy

14   dispensing of opioid prescriptions for Dr. David

15   Demangone?

16        A.   I think that fully describes it.  It's --

17   it's the prescriptions filled by CVS for fentanyl

18   written by this doctor identified by summed up by

19   month.

20        Q.   Did you look at any of Dr. Demangone's

21   prescriptions?

22        A.   Not that I recall.

23        Q.   You -- did you prepare summaries like this

24   for each pharmacy defendant for a handful of

25   prescribers, do you remember?
```

1      A.   I'm sorry.  I don't remember.

2      Q.   To the extent that you've got other

3  summaries like this for a handful of other

4  prescribers in your appendices, do you recall

5  whether you looked at any of those other

6  prescribers' prescriptions?

7      A.   Not beyond summarizing the data as this

8  exhibit does.  I didn't evaluate any individual

9  prescriptions for some characteristic other than

10  they were written for the drug identified in the

11  exhibit by the prescriber identified in the exhibit

12  and filled by the defendant.

13      Q.   Did you talk to Mr. Catizone about any

14  specific prescribers?

15      A.   No.

16      Q.   Did you talk to any other hired consultant

17  about any specific prescribers?

18      A.   No.

19      Q.   Let's go back, please, to the May 19th

20  report, which is Exhibit 3.  I would like to ask

21  you about Paragraph 3.

22           Paragraph 3 reflects the assignment you

23  were given for the May 19th report, correct?

24      A.   Yes.

25      Q.   You wrote I've been asked to file this

1    additional report, the second supplemental McCann

2    report, to summarize those prescriptions that were

3    triggered by a combination of at least one of the

4    first 16 red flag computations and at least one of

5    the subsequent 27 red flag computations, and then

6    in parentheses, you describe those as combination

7    red flag prescriptions, correct?

8         A.    Correct.

9         Q.    The 16 combination red flags in the May

10   report are different from any of the individual

11   43 red flag criteria that we walked through in the

12   April report, correct?

13        A.    I'm sorry.  Could you ask that again,

14   please?

15        Q.    The 16 combination red flags in the May

16   report are different from any of the individual

17   43 red flag criteria that we walked through in the

18   April report, correct?

19        A.    I'm sorry.  I'm confused by that question.

20   I can ask a question if you'd like, or I can let

21   you try it again.

22        Q.    What's confusing about the question?

23        A.    Well, there aren't 16 combination red flag

24   computations in this report.  There are -- in fact,

25   there are no additional red flag computations in

1    this report.  There's 43, the same 43 as there was

2    in the April report.  There's just a requirement

3    that a prescription trigger one of the first 16

4    from the April report and at least one of the

5    subsequent 27 from the April report.  And if it

6    does trigger at least two or more as I've said,

7    then they're identified as combination red flag

8    prescriptions.  There is no 16 combination red flag

9    computations or methods in this report.

10       Q.    The flags described starting at Page 150

11   of the April 16th report identified different

12   numbers of prescriptions than the combination red

13   flags in the May 19th report, correct?

14       A.    Correct.

15       Q.    We saw before on Page 290 of Appendix 12,

16   that identifies the number of flagged prescriptions

17   for each of the original 43 flags for Walgreens in

18   the April report.  Do you remember that?

19       A.    Yes.

20       Q.    When you issued the May 19th report, you

21   provided a new Appendix 14, correct?

22       A.    Right.  New?  I -- I attached an

23   Appendix 14.  It is not revising a previous

24   Appendix 14.  It's a wholly new Appendix 14.

25       Q.    That's what I said.  You attached -- you

Page 144

1    gave us a new Appendix 14 when you issued the

2    May 19th report?

3         A.   Well, when you say new, there's some

4    confusion in my mind about new versus old.  There's

5    no old Appendix 14.  There's an Appendix 14, and

6    there's only one.

7         Q.   And we didn't get it until May 19th,

8    correct?

9         A.   Correct.

10        Q.   Appendix 14 at Page 33, and you might want

11   to go to Page 43 before I ask the question.  Do you

12   have that in front of you?

13        A.   Yes.

14        Q.   Appendix 14 at Page 33 shows the numbers

15   of prescriptions flagging on 16 red flag

16   computations specific to Walgreens, correct?

17        A.   Correct.

18        Q.   The numbers of flagged prescriptions for

19   Walgreens that appear on Page 290 of Appendix 12

20   are different than the numbers of flagged

21   prescriptions for Walgreens that appear at Page 33

22   of Appendix 14, correct?

23        A.   I apologize.  Can you ask me that again,

24   please?

25        Q.   I would be happy to.

Page 145

1          Do you have 290 in front of you from

2     Appendix 12?

3          A.   Yes.

4          Q.   And you have Page 33 from Appendix 14?

5          A.   Yes.

6          Q.   The numbers of flagged prescriptions for

7     Walgreens that appear on Page 290 of Appendix 12

8     are different than the numbers that appear for

9     Walgreens for flagged prescriptions at Page 33 of

10    Appendix 14, correct?

11         A.   Correct.  They're more expansive.  Page 33

12    is a narrower definition, and you end up with lower

13    numbers.

14         Q.   We couldn't do the exercise that we did

15    before tying the original 27 red flags that were

16    disclosed in June of 2020 to the Flags 17 through

17    43 in your April 2021 report.  We couldn't do that

18    tying together, which goes with which, between

19    Page 290 of Appendix 12 and Page 33 of Appendix 14,

20    correct?

21         A.   I'm sorry.  I'm not understanding that

22    question.

23         Q.   Well, let me try it this way.

24              The red flag criteria described starting

25    at Page 150 of your April 16 report, the first

Page 146

1    16 flags identify the numbers of flagged
2    prescriptions that are identified at Page 290 of
3    Appendix 12 for Red Flag 1 through 16, correct?
4         A.   Correct.
5         Q.   Red Flag Computation 1 through 16 on
6    Page 33 of Appendix 14 identifies different numbers
7    of prescriptions, correct?
8         A.   A subset.  It's the same numbers that were
9    on Page 290 with the added requirement that for
10   each of these 1 through 16.  To be included on
11   Page 33, they also have to have triggered at least
12   one of the subsequent 27.
13        Q.   It's not the same numbers at all.  Red
14   flag No. 1 on Page 290 of Appendix 12 flagged
15   18,226 prescriptions, correct?
16        A.   Correct.
17        Q.   But on Page 33 of Appendix 14, red flag
18   Computation 1 flagged 7,414 prescriptions.  Totally
19   different.
20        A.   That's not totally different.  It's what I
21   just said.  It's the same 18,226 that are flagged
22   by Red Flag No. 1 restricted to only those that
23   also flagged at least one of 27 through 43.
24   They're not completely different.  Those 7,414 are
25   included in the 18,226, but it's a subset of those

Page 147

1    that also flagged at least one of the subsequent

2    27.

3         Q.    Dr. McCann, let me try to keep this really

4    simple.

5              It's not your testimony that 18,226 is the

6    same as 7,414?

7         A.    They're, obviously, different numbers,

8    yes.

9         Q.    They're, obviously, different numbers.

10   Thank you very much, sir.

11             And that's true for all of the red flags

12   that are listed on Page 290 of Appendix 12 as

13   compared to Page 33 of Appendix 14.

14        A.    In every case for the reason I just gave

15   you, yes.

16        Q.    I understand there may be a reason.  My

17   only question is Red Flags 1 through 16 from the

18   April report as reflected in Appendix 12 flag

19   different numbers of prescriptions than Red Flag

20   Computation 1 through 16 from your May 19th report?

21        A.    They're different calculations.  So they

22   result in different values.

23        Q.    The 16 red flags identified as No. 1

24   through 16 in your April report starting at

25   Page 150, those 16 red flags do not flag the number

1    of prescriptions shown in Appendix 14 of your

2    May 19th report, correct, sir?

3         A.   I'm sorry.  Could you ask that again,

4    please?

5         Q.   Sure.  The first 16 red flags listed in

6    your April report starting at Page 150, those flags

7    do not flag the number of prescriptions shown in

8    Appendix 14 of your May 19th report, correct?

9         A.   The numbers in the April report include

10   all of the transactions that are identified or

11   summarized in the May report and some additional

12   ones.

13        Q.   My question was pretty simple, sir.  It

14   was just whether the numbers were different.

15        A.   No, that wasn't your question, but if that

16   is your question, then I agree with you, yes.

17        Q.   The numbers you identified for the red

18   flags in your April 16 report, Flags 1 through 16,

19   the numbers are different than what you identified

20   in Appendix 14 of your May 19th report?

21        A.   Yes.

22        Q.   Do you understand that Carmen Catizone has

23   also provided an expert report in this case?  Do

24   you know that he provided one in April of this

25   year, the same date that you provided your initial

1    report?

2        A.    No.

3        Q.    Do you know that Mr. Catizone provided a

4    supplemental report on May 19, the same day as your

5    supplemental report?

6        A.    No.

7        Q.    I think you said before that you do know

8    that Mr. Catizone has been retained by the

9    plaintiffs' lawyers to offer pharmacy opinions in

10   this case; is that true?

11       A.    Yes.

12       Q.    If you could please take out the new

13   exhibit that we got to this morning.

14       MS. SWIFT:  And Isaac, I think it's correct in

15   the Exhibit Share, and it's WAG 17.

16       MR. MOUGEY:  Kate, will you hold on for a

17   second to make sure we got it?

18       MS. SWIFT:  Yeah.  I apologize.  We didn't

19   drive to wherever you are to bring you a new one,

20   Peter.  It should be correct in the Exhibit Share,

21   though.  And if you want to take a minute to print

22   it, that's fine.

23       MR. MOUGEY:  No.  It's okay.  I don't want to

24   hold you up.  So that's fine.  Are you going to

25   share, Kate?

Page 150

1      MS. SWIFT:  Yeah.  Isaac is going to do that

2    for me.

3      MR. MOUGEY:  That's great.  No, that's fine,

4    Kate.  Go ahead.

5      MS. SWIFT:  Thank you.  I appreciate it, Peter.

6    BY MS. SWIFT:

7      Q.   Okay.  Dr. McCann, do you have -- and this

8    will be, first of all -- so if I'm allowed to keep

9    the numbers confusing, I think this will be

10    Exhibit 12.

11      MS. SWIFT:  Am I right about that, Isaac?

12      THE CONCIERGE:  Yes.  Would you like me to

13    screen share that document?

14      MS. SWIFT:  I don't think it's necessary unless

15    somebody else on the line wants it.

16                        (Whereupon, McCANN Deposition

17                        Exhibit No. 12 was marked for

18                        identification.)

19    BY MS. SWIFT:

20      Q.   Dr. McCann, can you confirm for me that

21    what you have in front of you that we've marked as

22    Exhibit 12 is Mr. Catizone's May 19, 2021 report?

23      A.   I haven't seen the document before.  I see

24    on the first page, it describes it as pharmacist

25    expert supplemental opinion, Carmen A. Catizone,

Page 151

1    and on the last page, I see the May 19th date.

2        Q.    You said you haven't seen this report

3    before.  Is it fair to say that you didn't have any

4    input in putting it together?

5        A.    I personally didn't.

6        Q.    Do you know if anybody from your office

7    did?

8        A.    I don't know.

9        Q.    Have you ever talked to Mr. Catizone about

10   his May 19th report?

11       A.    Not that I'm aware of.

12       Q.    Has anybody from your office talked to

13   Mr. Catizone about his May 19th report?

14       A.    Not that I'm aware of.

15       Q.    Turn if you would, please, to Page 32.

16       A.    Yes.

17       Q.    Do you see the third paragraph on that

18   page that starts defendants in this action?

19       A.    Yes.

20       Q.    It says I have relied upon SLCG and Craig

21   McCann to review and calculate the number of

22   prescriptions dispensed, the amount the dosage

23   units dispensed, and the morphine milligram

24   equivalents dispensed for each red flag by pharmacy

25   chain that I have identified below.  These

Page 152

1   summaries can be found in Dr. McCann's report as

2   Red Flags 1 through 16, red flag computations.

3            Did you know that Mr. Catizone was relying

4   on you for information in his report?

5       A.   I don't know if I knew that, but I sort of

6   understood that.  As I said, I didn't see his

7   report.  So I can't say that I knew that.  I

8   haven't read any of his explanation of his

9   analysis, but generally, I understood that some --

10  there was some back and forth between my office and

11  Mr. Catizone about what calculations he would find

12  useful in developing his opinions.  So my general

13  understanding was that he would be using some

14  information, but I'm not aware of any of the

15  details.

16      Q.   Do you know how Mr. Catizone got the

17  information that he relies on from you and your

18  staff?

19      A.   No.

20      Q.   Did you or your staff do anything to check

21  and make sure that the information in

22  Mr. Catizone's report accurately reflected your

23  work?

24      A.   Not that I'm aware of.  I certainly

25  didn't.  I don't know whether anybody in my office

Page 153

1    did.  I think not.  I don't think that we ever saw

2    a draft of this report.  I certainly didn't, but I

3    don't know whether anybody in my office did or not.

4         Q.   Now, I want to compare the red flag

5    criteria in Mr. Catizone's May 19th report to the

6    criteria in your original April 16th report.  He

7    says that he's using the same 16 red flags, but I

8    understand from your testimony that you don't know

9    one way or the other.  So I'd like to see if we can

10   get on the same page with that.

11        Can you take out your April 16th report so

12   that we can do that with the red flags that are

13   described in Mr. Catizone's report?

14        A.   Yes.

15        Q.   Do you have them both in front of you?

16        A.   I do.

17        Q.   On Page 32 of Mr. Catizone's report, he

18   shows your first two red flags under No. 1.

19        Do you see that?  It's 1A and 1B.

20        A.   Yes.

21        Q.   Those first two are the same as 1 and 2 at

22   Page 150 and 151 of your April report?

23        A.   Yes.

24        Q.   Catizone Red Flag 2 on doctor shopping is

25   the same as your Red Flag No. 3, correct?

Page 154

1      A.   I'm sorry.  Where in Mr. Catizone's report
2  do you find that?  I see Page 35.  I'm sorry.  I
3  don't see where he states --
4      Q.   He says doctor shopping -- let's see.  The
5  data reveals as follows regarding patient was
6  dispensed opioid prescriptions with overlapping
7  days of supply that were written by two or more
8  prescribers.
9           Do you see that?
10      A.   Yes.  That's the same as my No. 3.
11      Q.   And then Catizone Red Flag 3 is the same
12  as your Red Flag 4, correct?
13      A.   Yes.
14      Q.   Catizone Red Flag 4A is the same as your
15  Red Flag 5, correct?
16      A.   I'm sorry.  Where will I find that,
17  please, in Mr. Catizone's report?
18      Q.   It's Page 38, patient was dispensed an
19  opioid, a benzodiazapine, and a muscle relaxer for
20  overlapping days supply.
21      A.   Yes.
22      Q.   So that aspect of Catizone Red Flag 4 is
23  the same as your Red Flag 5, correct?
24      A.   Correct.
25      Q.   Then the next one on Page 38 of

Page 155

1    Mr. Catizone's report, which I'll refer to as 4B,

2    is the same as your 6.  Would you agree with that?

3         A.   I'm sorry.  You're putting me at a

4    terrible disadvantage.  When you ask me to say yes,

5    will you please point to me in Mr. Catizone's

6    report?  You know, sometimes you're going forward

7    three or four pages, and it's not labeled 4B.  I'm

8    not sure what you're referring to.

9         Q.   It's on Page 38.  It says patient was

10   dispensed an opioid, a benzodiazapine, and a muscle

11   relaxer on the same day, and all the prescriptions

12   were written by the same prescriber.

13             That's the same as your Flag No. 6,

14   correct?

15        A.   Yes.

16        Q.   Turn to 40 of Catizone's report, please.

17        A.   Yes.

18        Q.   I'm going to call this one 5A, and it's

19   just above the table on Page 40.  It says an opioid

20   and a benzodiazapine were dispensed to a patient

21   within 30 days of one another.

22             That's the same as your Red Flag No. 7,

23   correct?

24        A.   Yes.

25        Q.   Then same page, what I'll call

Page 156

1   Catizone 5B, when a patient was dispensed an opioid

2   and a benzodiazapine on the same day and all the

3   prescriptions were written by the same prescriber,

4   that is the same as your Flag No. 8, correct?

5       A.   Correct.

6       Q.   Turning to Page 41 of Catizone.  Catizone

7   No. 6 in the middle of the page, patient was

8   dispensed two short-acting opioid drugs on the same

9   day.  That's your Flag 9, correct?

10      A.   Yes.

11      Q.   We're going to go over to Page 45 of

12  Catizone, what I'm going to call 7A at the top of

13  the page.  Patient was dispensed an opioid

14  prescription of over 200 MME per day before 2018 or

15  over 50 MME per day after January 1, 2018.

16           That's your Red Flag No. 10, correct?

17      A.   Correct.

18      Q.   Then what I'll call Catizone 7B where a

19  patient -- same page where a patient was dispensed

20  an opioid prescription over 200 MME per day before

21  2018 or over 90 MME per day after January 1, 2018,

22  that's your Flag 11, correct?

23      A.   Correct.

24      Q.   Then we'll go to No. 8 at the bottom of

25  Page 46 of Catizone.  An opioid was dispensed to at

1    least four different patients on the same day, and

2    the opioid prescriptions were for the same base

3    drug, strength, and dosage form and were written by

4    the same prescriber.  That's your Flag 12, correct?

5        A.   Correct.

6        Q.   What we'll call Catizone 8B is at the top

7    of Page 47.  An opioid was dispensed to at least

8    three different patients within an hour, and the

9    opioid prescriptions were for the same base drug,

10   strength, and dosage form, and were written by the

11   same prescriber.

12          That's your 13, correct?

13       A.   Correct.

14       Q.   Flipping over to Page 48 of Catizone,

15   Catizone 9, an opioid prescription was refilled

16   more than five days before the patient's previous

17   prescription should have run out.

18          That's your 14, correct?

19       A.   Correct.

20       Q.   Then Catizone 10 is on Page 49.  Just

21   above the table, a patient was dispensed more than

22   210 days supply of all opioids combined in a

23   six-month period.  That's your flag 15, correct?

24       A.   Correct.

25       Q.   Then flipping to 50 of Catizone,

Page 158

1    Catizone 11, a patient was dispensed an opioid and

2    paid cash.  That's your Flag 16, correct?

3        A.    Correct.

4        Q.    The red flag criteria described in

5    Mr. Catizone's May 19th report at Pages 32 through

6    50 are identical to the first 16 red flag criteria

7    described in your April 16 report at Pages 150 to

8    152, correct?

9        A.    Yes.

10       Q.    Catizone's May 19th report includes the

11   same red flag criteria as Red Flags 1 through 16 in

12   your April report?

13       A.    Correct.

14       Q.    But Mr. Catizone's numbers of flagged

15   prescriptions in the May 19th report are different

16   than the numbers of prescriptions you identified

17   for those same 16 red flags in your April report,

18   correct?

19       A.    I don't know.  I've not seen

20   Mr. Catizone's report before.

21       Q.    Let's go back to Page 32 of Mr. Catizone's

22   report, and we'll take a look again at Page 290 of

23   Appendix 12, and that is Exhibit 10.

24            You see on Page 33 of Catizone's May 19

25   report, the first flag listed says -- I'll wait

Page 159

1    until -- are you with me?

2        A.    I think so.  What page in Appendix 12 do

3    you want me on, please?

4        Q.    290.  And you recall that Page 290 of

5    Exhibit 12 shows the numbers of red flag

6    prescriptions for those first 16 red flags that we

7    just walked through for Walgreens specifically.  We

8    talked about that before?

9        A.    Yes.

10       Q.    It also shows additional numbers, but I'm

11   going to focus on the 16.

12             On Mr. Catizone's May 19th report at

13   Page 33, the first flag listed says an opioid was

14   dispensed to a patient who traveled more than

15   25 miles to visit the pharmacy, right?

16       A.    Correct.

17       Q.    And we've already established that's

18   exactly the same as Flag 1 from your April report,

19   right?

20       A.    Correct.

21       Q.    For Walgreens, Mr. Catizone says that that

22   red flag identified 7,414 prescriptions, correct?

23       A.    Correct.

24       Q.    But your Appendix 12 at 290 where you

25   reported the results of those same red flags shows

Page 160

1    a different number, correct?

2         A.   No.  I'm sure you're not intending to

3    mislead, Ms. Swift, but there's some very serious

4    confusion in that question.

5         Q.   Red Flag No. 1 has identified at Page 290

6    of Appendix 12 18,226 prescriptions, correct?

7         A.   That's correct.

8         Q.   The same -- so then -- we're not going to

9    do this for all of them, but the same is true for

10   Catizone Flag 1B, which is your Flag 2.

11   Mr. Catizone identifies one number of flagged

12   prescriptions for Walgreens, but your Appendix 12

13   at Page 290 identifies a different one, correct?

14        A.   For a very obvious reason that I think you

15   know.

16        Q.   Sir, we've just gone through and

17   established that the first 16 flags in your April

18   report are identical to the 16 flags in

19   Mr. Catizone's report, correct?

20        A.   In their description, that is correct.

21        Q.   And we also painstakingly went through and

22   established that Page 290 of Appendix 12 identifies

23   the number of prescriptions flagged on each of

24   those 16 criteria for Walgreens, correct?

25        A.   With the requirement that they also flag

Page 161

1    one of the subsequent 27.  That number of 7,414, I

2    believe, is a number that you showed me a few

3    minutes ago from Appendix 14.

4        Q.    That's correct, sir.  That's absolutely

5    right, and we can put the page from Appendix 14 up

6    as well if that would help you alleviate the

7    confusion.

8        A.    I'm not confused.

9        Q.    I'm not confused either, sir.  You

10   testified unequivocally of the number of flagged

11   prescriptions identified in Appendix 12 at

12   Page 290, that's the number of flagged

13   prescriptions for Flags 1 through 16 in your

14   April 16th report, correct?

15       A.    Correct.

16       Q.    And you also testified that Flags 1

17   through 16 in your April 16th report are identical

18   to Flags 1 through 16 in Mr. Catizone's May 19th

19   report?

20       A.    I did not say that.  What I said was the

21   description in the text that you showed me from the

22   April report matches the description of the text in

23   Mr. Catizone's report.

24       Q.    That's exactly what I was trying to ask

25   you.  It matches the description identically,

Page 162

1   correct?

2       A.   Not identically, but very close.

3       Q.   It matches the description close enough

4   that you wouldn't expect to have a difference in

5   the number of flagged prescriptions?

6       A.   Unless you had the added requirement that

7   the prescriptions flagged one of the other 27.

8       Q.   Did you see anywhere on Page 32 to 50 in

9   Mr. Catizone's report an explanation that he was

10  qualifying any of those numbers with that qualifier

11  that you just gave us?

12      MR. MOUGEY:  Objection.

13      THE WITNESS:  I haven't -- I haven't read this

14  report.  You gave me what is over 100 pages of text

15  a few minutes ago and showed me a few sentences.  I

16  can't tell you what else is in here.

17  BY MS. SWIFT:

18      Q.   That's fine, but we walked through every

19  single description of Mr. Catizone's Red Flags 1

20  through 16, right, sir?

21      THE WITNESS:  No, we did not.

22      MR. MOUGEY:  Objection.

23      THE WITNESS:  We walked through a sentence in

24  each section describing that method, no preamble to

25  those discussions, and not even the entire

Page 163

1    discussion for any one of them.  So you're just

2    mischaracterizing, I think, what we did.

3    BY MS. SWIFT:

4        Q.   You also testified that you've never had a

5    conversation with Mr. Catizone about the

6    combination red flags that added the qualifier you

7    described today, correct, sir?

8        A.   I don't recall whether I did or not.

9        Q.   Sitting here today, you can't identify any

10   time you ever spoke to Mr. Catizone about your

11   combination red flags?

12       A.   Not other than what I said earlier, which

13   was I had a Zoom call with Mr. Catizone and others

14   sometime around May 19th or shortly before.

15       Q.   Well, the transcript will reflect what it

16   reflects.  I believe you testified you did not

17   discuss with Mr. Catizone your May 19th report.  Is

18   that true or false?

19       A.   I don't believe that's what the transcript

20   will reflect.  It reflects -- I testified that I

21   had a call with Mr. Catizone two or three weeks

22   ago, and you asked me whether that was before the

23   May 19 report.  I said it may have been.  I don't

24   recall.

25       Q.   And you don't recall discussing the

1    combination red flags with Mr. Catizone, correct?

2         A.    I don't recall that level of detail of the

3    conversation.

4         Q.    Do you know what time of day you finished

5    your supplemental report on May 19th?

6         A.    No.  It was late in the day, but I don't

7    know what time.

8         Q.    I recognize that you want to give your

9    explanation about why the numbers are different in

10   Mr. Catizone's report than they are in the

11   corresponding page of Appendix 12 showing the

12   numbers of red flags for the original red flags,

13   but you agree with me that 7,414 is a different

14   number than 18,226, correct?

15        A.    They reflect the result of a different

16   calculation, and they are a different number.  My

17   fifth grade daughter will recognize that those are

18   different numbers.

19        Q.    For Combination Red Flag No. 1 from your

20   May 19th report, which of the original 27 red flags

21   also identified prescriptions?

22        A.    I'm sorry.  I didn't understand that.

23   Could you ask it again, please?

24        Q.    If I have your testimony correctly, your

25   explanation of the combination red flags is that

1    that's supposed to identify -- take No. 1 to keep

2    it simple.  Combination Red Flag No. 1 is meant to

3    flag prescriptions that are triggered by

4    Mr. Catizone's Flag No. 1 if that prescription also

5    flags on one of the 27 original red flags, correct?

6         A.    Correct.

7         Q.    My question is which of the original

8    27 red flags identified prescriptions for

9    Combination Red Flag No. 1?

10        A.    I don't know as I sit here.  It would have

11   been some combination of 1 through 27 of those 27

12   depending on a particular prescription that was

13   flagged by Catizone No. 1.  For some prescriptions,

14   it would be not flagged by any of the 27.  For

15   others, it might be flagged by 23 of the 27.  I

16   don't know as I sit here.

17        Q.    You can't say which of the original 27 red

18   flags identified prescriptions in any of the 16

19   combination red flags?  Is that a fair statement?

20        A.    I can't as I sit here.  You can in the

21   backup material that you have for these two

22   reports, but I don't know.  Those documents are not

23   in front of me.  If they were, I would tell you.

24        Q.    Do you know if the backup materials that

25   you're talking about were ever provided to

Page 166

1    Mr. Catizone?

2         A.    I don't know.

3         Q.    You didn't provide them to him, correct?

4         A.    I did not.

5         Q.    To come up with the combination red flag

6    prescriptions, is it fair to say what you did was

7    just to have your computers run algorithms across

8    the data?

9         A.    Yes.

10        Q.    There's no assessment of the doctors or

11   patients associated with any of those descriptions

12   as far as the work you did?

13        A.    Correct.

14        Q.    Once you came up with the numbers of

15   prescriptions identified by your combination red

16   flags in the May 19th report, did you or your staff

17   go and look at any of these flagged prescriptions

18   to determine whether it made sense substantively to

19   flag them?

20        A.    No.

21        Q.    You didn't do anything to determine

22   whether those prescriptions were suspicious?

23        A.    Correct.

24        Q.    Do you know if anybody did that, either at

25   your staff or anywhere else in the world?

Page 167

1     A.   No.
2     Q.   You don't have any opinion about whether
3   any of the 27 original red flags are appropriate
4   ways to identify suspicious prescriptions, correct?
5     A.   Correct.
6     Q.   You don't have an opinion on whether any
7   of the 27 original red flags has a basis and a
8   statute of regulation, correct?
9     A.   Correct.
10     Q.   Are you aware of anyone with any pharmacy
11   expertise who has weighed in on the appropriateness
12   of the original 27 red flags?
13     A.   You asked me that earlier.  No.
14     Q.   Do you know why -- strike that.
15          Do you know whether Mr. Catizone has
16   anything at all to say about the original 27 red
17   flags?
18     A.   No.
19     Q.   Do you have any idea if any of the red
20   flag methods that you've applied in this case
21   account for things like a pharmacy's proximity to
22   hospitals, hospice centers, or nursing homes?
23     A.   No.
24     Q.   Do you know if any of the red flag methods
25   that you've applied in this case account for things

Page 168

1    like different types of doctors having different

2    prescribing habits?

3        A.   No.

4        Q.   Your Red Flag No. 1 in the April 16th

5    report, this is at Page 150 of the report, is about

6    patients traveling more than 25 miles to visit the

7    pharmacy, right?

8        A.   Yes.

9        Q.   Did you run any analysis on longer

10   distances than 25 miles to see how that would

11   affect your numbers?

12       A.   I don't recall doing that for this report,

13   but that is a number that can be varied to make it

14   10 miles or make it 50 miles, and the code we

15   provided allows you to do that easily.  So I think

16   at one point maybe before being involved in

17   creating this report, we may have run that code

18   with different values, but I don't recall doing

19   that and don't recall the results.

20       Q.   You didn't produce any results for flags

21   using different distances other than 25 miles,

22   correct?

23       A.   Correct.  And I should qualify that the

24   25 miles is not driving distance.  It's, as they

25   say, as the crow flies.  I would think of that as a

1   straight line, but the mathematicians in my office

2   actually explain to me it's a curved line; but it's

3   the distance from the middle of the patient's zip

4   code to the address of the pharmacy in this example

5   in a straight line across the globe.

6           So when we use 25 miles, that's actually

7   more than 25 miles as you would drive it driving

8   distance.  That 25 miles is Point A to Point B in a

9   straight line on the globe.

10      Q.   Well, however you calculate your 25-mile

11  distance, you didn't produce results for any

12  distances other than 25 miles, fair?

13      A.   Correct.  We produced a tool that would

14  allow you to do that.  The results we report were

15  only for the 25 miles requested by Mr. Catizone.

16      Q.   On the subject of doctor shopping, did you

17  run any analysis to see how many patients received

18  a prescription from five prescribers in a one-month

19  period?

20      A.   Not that I recall.  A similar answer, the

21  code we provided makes it easy to make that change,

22  but we were asked for the results of the methods we

23  implemented.

24      Q.   Did the plaintiffs' lawyers ask you to run

25  any other red flag analyses besides those that

Page 170

1    appear in your reports and appendices?

2        A.   I don't think so.  Not that I recall.

3        Q.   Other than the 43 flags described in your

4    April 16th report and the combination red flags

5    described in your May 19th report, did you run any

6    other red flag analyses on the pharmacy defendants'

7    dispensing data?

8        A.   I don't believe so, not other than what I

9    described a minute ago when I said, for instance,

10   that 25-mile parameter could be altered to 15 miles

11   or to 40 miles.  We may have done some sensitivity

12   analysis like that when we were writing the code

13   and developing it, but I don't recall seeing any

14   results other than what we were asked to produce,

15   which was the results setting that parameter to

16   25 miles.

17       Q.   We've talked about your distribution

18   opinions.  We talked about those first this

19   morning, the flagged order analyses, correct?

20       A.   Yes.

21       Q.   You flagged orders of oxycodone and

22   hydrocodone based on seven flagging methods, right?

23       A.   Yes.

24       Q.   You saw -- depending on the method, you

25   flagged anywhere from zero to 100 percent of

1    orders, fair?

2         A.    No, not fair.

3         Q.    Well, the transcript will say what it

4    says.  You flagged different numbers of orders

5    depending on what method you were using to do the

6    flagging, correct?

7         A.    Correct.

8         Q.    We also talked about your dispensing

9    opinions.  You flagged prescriptions based on a

10   variety of red flag criteria, right?

11        A.    Yes.

12        Q.    I believe you did testify that the overall

13   number of flagged prescriptions in your May 19th

14   report were about 19 percent of prescriptions.

15             Do you remember that testimony?

16        A.    No.  I don't think that correctly

17   characterized what's in the May 19th report.

18        Q.    Do you remember the math problem we did of

19   884,000 prescriptions divided by the overall number

20   of prescriptions produced and roughly 4.5 million?

21        A.    Yes.  We agree on that calculation.

22        Q.    And that's 19 percent roughly, right, sir?

23        A.    Correct.

24        Q.    Did you do any analysis to determine

25   whether your flagged orders on the distribution

```
1    side are in any way connected to the flagged
2    prescriptions that you identified?
3         A.    I don't think so.
4         Q.    Could you have done that?
5         A.    Maybe.  I'd have to give it some thought
6    and talk to my people here.  There might be some
7    interesting analysis that could be done there.  We
8    only received the dispensing data in this case --
9    I'm sorry.  The defendant transaction data in this
10   case in the last week before my April report was
11   due, I think.
12        Q.    What transaction data are you talking
13   about?
14        A.    Well, we started out with the ARCOS data,
15   and then we received individual, what I call,
16   transaction data, defendant transaction data.  It's
17   different data for -- for the five chain
18   pharmacies.  We talked already about filling in the
19   Walmart gap in the ARCOS data with that data.  And
20   that data included some data before and after
21   depending on the defendant, but before and after
22   the ARCOS time period, which may or may not line up
23   with the dispensing data that we received.  All I
24   was saying was that some of the data that might go
25   into that analysis that you asked me about was
```

Page 173

1    produced in -- to me anyway, in the week before the

2    expert report was due.

3         So I hadn't given any thought to the

4    analysis that you're describing until you're asking

5    me about it just now.  It's interesting.

6    Q.    I'm just -- I'm confused because I don't

7    know what data you would have not received until a

8    week before the report was due.  I apologize if you

9    just said it and I'm -- was it a particular

10   defendant's transaction data that you didn't

11   receive until a week before the report was due?

12   A.    Right.  I think it was some of the

13   defendant transaction data.  I don't know if it was

14   for all of the five chain pharmacies, but for some

15   of them even early in the week that the report was

16   due -- the report was due, I think, on a Friday,

17   and I think on Monday or Tuesday, we got some

18   defendant transaction data.  There was not time to

19   do anything more than just summarize that data,

20   which is what you'll see in the April 16th report.

21        There's no SOMS run, for instance, on that

22   data, but then in the supplement, May 4th, there's

23   some SOMS run on the individual defendant

24   transaction data, including the data before and

25   after the ARCOS period.  That was -- that was

1    because we didn't have time with that data before

2    the April 16th report to do that analysis.

3         Q.   You've had the ARCOS data for several

4    years now, correct?

5         A.   Correct.

6         Q.   Is the reason that you didn't do an

7    analysis of any connection between the flagged

8    orders and the flagged prescriptions because you

9    didn't have that defendant transaction data that

10   you just referenced?

11        A.   No.  I hadn't thought about it until you

12   mentioned it, but we -- I hadn't thought about it

13   until you mentioned it.

14        MS. SWIFT:  I'm not quite done, unfortunately,

15   but I recognize that it's 1:00.  I'm happy to keep

16   going and try to finish before lunch, but if you'd

17   like to break for lunch, I'm happy to do that, too.

18        THE WITNESS:  No.  I'd like to break now,

19   please.

20        MS. SWIFT:  Okay.

21        THE VIDEOGRAPHER:  We are going off the record.

22   The time now is 12:58.

23                        (Whereupon, a lunch break was

24                        taken.)

25        THE VIDEOGRAPHER:  We are back on the record.

Page 175

1      This is the start of media No. 4.  The time is

2      1:39.

3                              (Whereupon, McCANN Deposition

4                              Exhibit No. 13 was marked for

5                              identification.)

6      BY MS. SWIFT:

7          Q.   Dr. McCann, we've introduced Exhibit 13.

8      Do you have that in front of you?  It says

9      Plaintiffs' Written Responses to Certain 30(B)(6)

10     Topics.

11         A.   Yes.

12         Q.   Have you seen this document before?

13         A.   No.

14         Q.   Do you understand that the federal rules,

15     Rule 30(b)(6), provides us the right to obtain

16     testimony of the plaintiff counties?

17         A.   I've heard the term 30(b)(6) witness used

18     many times in my career.  I don't understand the

19     basis for that other than I think of it as a

20     corporate representative or something like that.

21         Q.   Do you have an understanding that a

22     corporate representative deposition under

23     Rule 30(b)(6) binds the counties as though they

24     were actual people testifying under oath?

25         MR. MOUGEY:  Objection.

Page 176

1      THE WITNESS:  No, I don't have that

2    understanding.

3    BY MS. SWIFT:

4      Q.    Take a look, if you would, please, at

5    Page 10 of these plaintiff responses.  Do you see

6    Topics 11 and 12 on Page 10.

7      A.    Yes.

8      Q.    We asked the counties in Topics 11 and 12

9    to tell us what they knew about opioids

10   prescriptions that our pharmacies filled that the

11   counties contend were not for a legitimate purpose

12   or that were diverted.

13         Do you see that in Topics 11 and 12 on

14   Page 10?

15     A.    Yes.

16     Q.    Then they provide a response that's pretty

17   similar for both topics.  The county said that they

18   have identified certain prescriptions, and then at

19   the end of each response, they say the list of such

20   prescriptions is being provided contemporaneously

21   with these responses through a data link.

22         Do you have any idea whether you or your

23   staff was responsible for putting together that

24   list of prescriptions?

25     A.    No.

Page 177

1      MS. SWIFT:  Isaac, if you would, please,

2   introduce the exhibit that's WAG 19.

3   BY MS. SWIFT:

4      Q.   And Dr. McCann, if you can take that one

5   out of your box.  I think that's going to be

6   Exhibit 14.

7                         (Whereupon, McCANN Deposition

8                         Exhibit No. 14 was marked for

9                         identification.)

10  BY MS. SWIFT:

11     Q.   Exhibit 14 is an e-mail dated May 1, 2021

12  from Joseph Ciaccio.  Do you see that?

13     A.   Yes.

14     Q.   And it's to me, correct, among others?

15     A.   Yes.

16     Q.   And then the subject line is CT 3

17  Plaintiff's Deficient Responses to 30(B)(6)

18  Topics 11 and 12, correct?

19     A.   Yes.

20     Q.   On Page 1 of this e-mail, Mr. Ciaccio

21  provides a Dropbox link that he says replaces all

22  of the coding in response to 30(b)(6) and answers

23  all of our questions.

24          Do you see that?

25     A.   Yes.

Page 178

1      Q.   And then one of the answers refers to your
2   Method 2.  Do you see that on Page 1?
3      A.   Yes.
4      Q.    It says Method 2, Trailing Six-Month
5   Maximum Monthly, Fixed After First Trigger
6   Threshold?
7      A.   Yes.
8      Q.   Does that refresh your recollection about
9   whether you had any input on the plaintiffs'
10   responses to these 30(b)(6) topics where we ask
11   them to identify prescriptions we filled they
12   contend were either illegitimate or diverted?
13      A.   No.
14      MR. MOUGEY:  Objection.
15   BY MS. SWIFT:
16      Q.   All right.  I'd like you to look at the
17   e-mail from Mr. Ciaccio dated April 26th at
18   8:49 p.m.  It's on Page 3.
19           Do you have it?
20      A.   Yes.
21      Q.   He says in the first line of his e-mail to
22   me in their 30(b)(6) responses, plaintiffs
23   identified, A, a group of prescriptions that they
24   believe were not issued for a legitimate medical
25   purpose or were not issued by an individual

Page 179

1    practitioner acting in the usual course of his or

2    her professional practice, Topic 11; and, B, a

3    group of prescriptions that plaintiffs believe were

4    diverted, Topic 12.

5             Did I read that correctly?

6        A.   Yes.

7        Q.   You don't have any idea whether you or

8    your staff was involved in putting together the

9    list of prescriptions that plaintiffs identified in

10   these responses?

11       MR. MOUGEY:  Objection.

12       THE WITNESS:  Correct.

13   BY MS. SWIFT:

14       Q.   Let me see if this helps.  Do you see my

15   e-mail from April 27th at 6:18 p.m.?

16       A.   Yes.

17       Q.   I said thanks, Joe, but this doesn't

18   respond to most of our questions, and then I said I

19   copied and pasted those questions below.  And the

20   first bullet point says the Cocktail Rules,

21   Cocktail Flag 1, 2.xlsx workbook appears to provide

22   10 brand new flags and to identify prescriptions

23   that were not flagged in plaintiffs' June 2020 red

24   flag analysis.  Please let us know if plaintiffs

25   intend to assert that these newly identified

Page 180

1      prescriptions caused them harm for which plaintiffs

2      seek relief.

3              Did the names of that workbook that I

4      referenced in that e-mail refresh your recollection

5      as to whether you and your firm had anything to do

6      with putting together these lists of prescriptions

7      that plaintiffs identified?

8          MR. MOUGEY:  Objection.

9          THE WITNESS:  No, they don't refresh my

10     recollection.  I have seen those terms C1,

11     underscore, INDIC, underscore, all through C10

12     underscore, INDIC, underscore, all in the coding

13     for the red flag analysis.  So that -- it's not a

14     matter of refreshing my recollection, but there

15     appears to be some connection between at least your

16     paragraph here and the coding that generates our

17     red flags, but that's not refreshing my

18     recollection.  It's just what I'm inferring looking

19     at the documents.

20     BY MS. SWIFT:

21         Q.   Do those terms C1, underscore, INDIC,

22     underscore, all through C10, underscore, INDIC,

23     underscore, ALL, do those refer to -- are those

24     names of red flags as they appear in your coding?

25         A.   Well, not names of the flags, but I think

1    they might be naming output files that are created

2    by the code.  I'd have to go back to look at it to

3    tell you precisely, but that's my recollection.

4         Q.   You think those terms are names of the

5    output files that are created by the code you wrote

6    to identify red flags in this case?

7         A.   Well, I think so.  You have the same code

8    I'm talking about, and the code will have those

9    terms in it.  I would just have to look at the code

10   again to make sure, but just from memory, those

11   might be labeling some output files.  I just have

12   to go back and look at the code.

13        I just recall seeing that labeling

14   pneumonic.  Exactly how it was used in the code, I

15   don't remember, but it is not plain English.  And

16   so I see you quoting it in this paragraph, and I

17   saw it in our codes.  So there's some connection

18   between your paragraph and that code.

19        Q.   Just so I understand the terminology, when

20   you say an output file, is that just a reference to

21   the file that you generate that identifies

22   prescriptions that have red flags on them?

23        A.   Well, it could.  I would have to look, but

24   it could be creating an interim step file that is

25   then used and ultimately not saved, but some

1    subsequent file saved as a result of running the

2    routine, or it could be an actual file that is

3    saying when the code is run, and so you would see a

4    file with that name on it.  I just don't recall.

5    It's been a while since I looked at the code.  I

6    just don't recall exactly how those terms are used.

7         Q.   Have you or your firm ever performed any

8    analysis on the pharmacies' dispensing data to

9    identify prescriptions that you believe are

10   illegitimate?

11        A.   No.

12        Q.   Have you or your firm ever performed any

13   analysis on the pharmacies' dispensing data to

14   identify prescriptions that you believe were

15   diverted?

16        A.   No.

17        Q.   Are you aware of any other consultant

18   doing so, performing an analysis to identify

19   prescriptions filled by the pharmacy defendants

20   that were either illegitimate or diverted?

21        A.   No.

22        Q.   You don't have any opinion in this case

23   that any of the pharmacies' failure to comply with

24   one of your seven flagging methods means that that

25   pharmacy did anything wrong, right, sir?

Page 183

1    A.    Correct.

2    Q.    You don't even have an opinion that any of

3  the pharmacies actually did fail to comply with

4  your flagging approaches, correct?

5    A.    Correct.

6    Q.    And that's because you didn't look at that

7  as part of your work in this case, right?

8    A.    Correct.    It just wasn't part of the scope

9  of my work.

10    Q.    You don't have an opinion in this case

11  that any of the pharmacies that are defendants

12  oversupplied opioids, correct?

13    A.    I don't have an expert opinion on that.

14    Q.    You don't have any opinion that any of the

15  pharmacies' conduct had any impact on doctors who

16  may have been overprescribing opioids, correct?

17    A.    Correct.

18    Q.    You don't have an opinion that any of the

19  pharmacies in this case created the opioids crisis

20  in Ohio, correct?

21    A.    Correct.

22    Q.    You don't have an opinion that any of the

23  pharmacies in this case contributed to the opioids

24  crisis in Ohio, right?

25    A.    I don't have an expert opinion on that

Page 184

1    topic.
2        Q.   You don't have an opinion that any of the
3    pharmacies in this case was a substantial factor of
4    the opioids crisis in Ohio; is that right, sir?
5        A.   I don't have an expert opinion on that
6    topic.
7        Q.   You don't have an opinion that any of the
8    pharmacies in this case created a significant
9    interference with public health or safety, right?
10       MR. MOUGEY:   Objection.
11       THE WITNESS:   I don't have an expert opinion on
12   that topic.
13   BY MS. SWIFT:
14       Q.   And you don't have an opinion that any of
15   the pharmacy defendants in this case caused the
16   opioids crisis, right?
17       A.   Correct.
18       Q.   The last thing I would like to show you is
19   behind -- well, it's in your envelope marked
20   WAG 21.
21       MS. SWIFT:   And this will be Exhibit 15,
22   please, Isaac.
23                          (Whereupon, McCANN Deposition
24                          Exhibit No. 15 was marked for
25                          identification.)

1    BY MS. SWIFT:

2        Q.    This document that I marked as Exhibit 15

3    is a one-page invoice from you dated June 3, 2021,

4    correct?

5        A.    Yes.

6        Q.    Is this the -- how do I ask this?

7             Have you produced to your attorneys so

8    that they could produce to us all of the invoices

9    that you have submitted for work that you've done

10   on the opioids cases?

11       A.    Could you break that question down a

12   little bit and maybe ask it again, please?

13       Q.    I'll ask it again.  I don't want to break

14   it down because I'm trying to get the overall.

15            I'm trying to figure out if we have all of

16   the invoices that you have submitted for work on

17   opioids litigation?

18       A.    The answer is definitely no, it can't be.

19       Q.    Why is that?

20       A.    Well, I've done work for other sets of

21   lawyers besides the lawyers involved in this case

22   in other opioid cases, and even the work that I did

23   for substantially the set of lawyers in this case

24   but for work in other cases may not have been

25   produced to you, although I submitted them to the

Page 186

1    lawyers in those cases.

2        Q.   Is the document, the invoice that I marked

3    as Exhibit 11 -- sorry.  Strike that.

4            The invoice that I marked as Exhibit 15,

5    does that reflect all of the work that you've done

6    on the Lake and Trumbull County case?

7        A.   Up through June 3rd, yes.

8        Q.   How much work have you done on the Lake

9    and Trumbull County case since June 3rd?

10       A.   Not very much.  I don't know how much my

11   staff have put in in the last eight days.  I have

12   spent some part of those last eight days preparing

13   for this deposition.  I don't know how much time

14   anybody else has put in the last -- this would be

15   the last invoice or summary of invoices created.

16   The next invoice would be created at the end of the

17   month, and I don't know what -- what time there

18   would be up through June 11th on that invoice yet.

19       Q.   You said that this was an invoice or a

20   summary of invoices, and I'll note that this

21   invoice is just one page, and it has one line, it

22   looks like, for the work performed by each person

23   over the course of the entire year.

24           Are there other invoices that provide more

25   detail than this one that actually explain what

1    each person did?

2         A.    I don't know about explain what each

3    person did, but there were monthly invoices that

4    had itemized hourly entries with a brief

5    description, and we were asked to create a summary

6    invoice that reflected all of the time by each

7    timekeeper, the time, the date range over which

8    those entries were reflecting work, and the total

9    amount of hours in billing for timekeeper.  That's

10   what this exhibit is.

11        Q.    Did you submit monthly invoices to the

12   plaintiffs' lawyers?

13        A.    Correct.

14        MS. SWIFT:  We'll just ask that those be

15   produced, please.  And I assume you'll say we need

16   to follow up.  Let me just say this.  Peter, do you

17   object to producing the monthly invoices?

18        MR. MOUGEY:  I don't know what our agreements

19   are with you all about what we've agreed to produce

20   where.  And not knowing necessarily what orders are

21   in other cases, I don't want to tell you that I

22   don't have a problem with it.  If you just give me

23   some time to double-check because a lot of this

24   work isn't through us.  I just wanted to make sure.

25        MS. SWIFT:  As I understand it, this invoice

Page 188

1      that we have, the one-pager that's just the

2      summary, is just for the work in Track 3.

3      BY MS. SWIFT:

4          Q.    Is that right, Dr. McCann?

5          A.    Yes.

6          Q.    And there are monthly invoices as well

7      that relate to the work you've performed in

8      Track 3?

9          A.    Correct.

10         MS. SWIFT:  So we would at least request those,

11     and if you object to those, just let me know,

12     Peter.

13         MR. MOUGEY:  That sounds good.

14     BY MS. SWIFT:

15         Q.    And then -- okay.  So for Track 3 through

16     June 3rd, you and your firm billed roughly

17     $794,000?

18         A.    Correct.

19         Q.    How much have you and your firm billed for

20     all the opioids cases that you've worked on in the

21     last several years?

22         A.    I'm not sure precisely, but if you take

23     into account all of the early work that was done in

24     the first 18 months just processing the ARCOS data,

25     producing summary reports for a lot of different

Page 189

1    clients, ultimately all -- virtually all State

2    Attorney Generals around the country, plus CT 1,

3    CT 2, CT 3, and maybe a dozen other significant

4    projects, 5 or $6 million.

5        MS. SWIFT:  I do not have any other questions

6    right now.  I think others have a few.  I'm

7    honestly not even sure who's going to go next.

8        THE WITNESS:  Thank you, Ms. Swift.

9        MS. SWIFT:  Thank you, Dr. McCann.

10       MR. KOBRIN:  Can we take a quick break, a

11   two-minute break, to make sure we're all on the

12   same page for everything?

13       MR. MOUGEY:  Sure.  I had a question, but more

14   than okay to go off, and I can ask my question once

15   we get off.

16       THE VIDEOGRAPHER:  We are going off the record.

17   The time now is 2:00.

18                          (Whereupon, a short break was

19                          taken.)

20       THE VIDEOGRAPHER:  We are back on the record.

21   This is the start of media No. 5.  The time is

22   2:12.

23       MR. KOBRIN:  Hi, Dr. McCann.  My name is Josh

24   Kobrin.  I represent Giant Eagle and their

25   pharmacies as well as HSBC Service Company, which

Page 190

1    is warehouse that they run.  We haven't met yet,

2    but it's good to meet you.  Hopefully we'll be

3    quick, and this will be painless.  I know you want

4    to get out of here relatively soon.

5                        EXAMINATION

6    BY MR. KOBRIN:

7        Q.   I'm wondering if you could look at your

8    report, which, I think, is Exhibit 1.  Can you just

9    go to the page in the table of contents which is

10   marked small Roman Numeral II?

11       A.   Yes.

12       Q.   There's a section there that is larger

13   Roman Number VII and VIII, which are all about

14   summaries.  It says the opioid distributor summary

15   and opioid chain pharmacy summary.

16            Do you see that, what I'm talking about?

17       A.   Yes.

18       Q.   And these are all the methods that you use

19   to flag distribution from warehouses to pharmacies.

20   Is that accurate?

21       A.   Yes.

22       Q.   Now, several of these methods use the term

23   trailing, right, like Method 1, Method 2, Method 3,

24   Method 4, and Method 7.  They all use the word

25   trailing in them, right?

Page 191

1     A.   Yes.

2     Q.   Can you tell me what that means in the

3  context of these methods?  What does trailing mean?

4     A.   It means that as you're evaluating

5  shipments over time primarily between 2006 and

6  2014, the context in which you evaluate them is

7  some recent time period that moves forward with the

8  transactions.  It's sort of like the transactions

9  that you're evaluating, if you move forward, you

10  trail along with you a window -- a recent window of

11  data that you use to evaluate the transactions

12  you're looking at.

13     Q.   Is it fair to say there has to be a --

14  well, let me know if I'm understanding you

15  correctly.

16          There has to be a history of distribution

17  in order to apply these methods, is that -- is that

18  accurate?  For example, a six-month trailing method

19  has to have six months of distribution history in

20  order for the method to start applying.  A 12-month

21  trailing has to have 12 months of trailing of

22  distribution in order for the method to start

23  applying.  Is that accurate?

24     A.   No, not quite.  It would be true that

25  Methods 1, 2, and 7 require six months of shipments

1    to a particular pharmacy before that pharmacy's

2    orders are subject to the method; but No. 3 and

3    No. 4 where it says trailing 12-month average, that

4    is comparing the pharmacies' orders to the trailing

5    12 months shipments by that distributor to all

6    pharmacies.  And so the pharmacy you're looking at

7    doesn't have to have 12 months of data, but you do

8    have to have some data for some shipments at least

9    to other pharmacies for those two to apply.

10        Q.   I think I understand.  So for -- I think

11   you said that applied to 3 and 4.  So for 1, 2, and

12   7, you would need a history for that particular

13   pharmacy and for the warehouse, but for 3 and 4,

14   you might just -- you would only need a history for

15   the warehouse?

16        A.   Or for other warehouses of the

17   distributor.  We're calculating the average across

18   all of the warehouses for that distributor.  We're

19   not separating it out by warehouse.

20        Q.   So if you'll -- let me explain.  In our

21   situation, Giant Eagle only has one warehouse

22   functioning at any single time.  So for us, the

23   entire distribution operation is a single

24   warehouse.

25             Does that make sense?

Page 193

1          A.    Yes.

2          Q.    So when I speak in terms of a warehouse,

3     I'm speaking in terms of Giant Eagle's entire

4     distribution operation.  So you're right to clarify

5     that as to potentially other defendants and anytime

6     my question might apply to other defendants; but in

7     this case, Giant Eagle only has one warehouse.

8               Is that all right?  You understand that?

9          A.    Yes.

10         Q.    Rather, one warehouse at any single time.

11              All right.  So let's look at Method 3,

12    which is on 75.

13         A.    Yes.

14         Q.    It's twice the trailing 12-month average

15    pharmacy dosage units.  You explained it a little

16    just now, but could you briefly just explain how

17    Method 3 works?

18         A.    Sure.  I visualize things in like an Excel

19    spreadsheet.  So if you let me explain it in sort

20    of the terms of an Excel spreadsheet, imagine that

21    the spreadsheet includes monthly shipments from HBC

22    to each individual pharmacy that it serviced at any

23    point over the last 12 months, and you've got in

24    the rows the preceding 12 months, last month, the

25    month before, the month before that.  You've got

Page 194

1    12 rows that are reflecting months, trailing

2    12 months, and in the columns, you've got different

3    pharmacies that HBC serviced.

4           For some of those months, HBC might not

5    have shipped anything to the pharmacy.  For

6    other -- so that would be a blank cell in the Excel

7    spreadsheet.  For other months, maybe HBC shipped

8    to all of the pharmacies that it ever shipped to in

9    those 12 months in that particular month, and so

10   the row would be completely filled in all the way

11   across.  But in any case, let's say that you had

12   100 pharmacies and you had 12 months.  That would

13   be 120 cells, month pharmacy cells, over the prior

14   one year.

15          If you average across those 120 cells, you

16   would get the trailing 12-month average monthly

17   shipments to a pharmacy, and then the flagging

18   method would double whatever that number is, so

19   twice the trailing 12-month average, and would

20   compare the shipments to the pharmacy you're

21   looking at this month to that threshold.

22     Q.   I think I can -- it's a little different

23   than what you've just described, but why don't we

24   look at it -- you might have it, Mr. McCann.  If

25   you don't, we can put it up on the screen.  It's

Page 195

1    GE McCann 11.

2         A.    I'm sorry.  I don't know what that is.

3         Q.    That's one of the documents.  We'll mark

4    that as the next exhibit.

5                        (Whereupon, McCANN Deposition

6                        Exhibit No. 16 was marked for

7                        identification.)

8         MR. MOUGEY:  I don't mean to be difficult.  I

9    apologize for interrupting.  I just wanted the

10   record to reflect that we got those at about 5:00,

11   6:00 in the morning this morning, which I apologize

12   again for the color, but this is just a reoccurring

13   problem with getting stuff on time from you guys,

14   Josh.

15        MR. KOBRIN:  I disagree with the last statement

16   but I understand you're getting it on the record.

17   That's a fair statement.  I know that they were

18   inadvertently sent early this morning, and I'm

19   sorry about that.

20        MR. MOUGEY:  I understand, but it actually

21   happened to me the last time we had a deposition.

22        MR. KOBRIN:  No.  We're not going to litigate

23   that now.

24        MR. MOUGEY:  I'm not asking you to litigate it.

25   I just want you to get the documents to us on time

Page 196

1    when the deadlines have been clearly delineated for

2    months, and your office doesn't seem able to meet

3    deadlines.  I'm simply asking for the common

4    courtesy of getting the documents on time when the

5    Court has ordered.  Simple as that.  Thank you.

6         MR. KOBRIN:  Good deal.  Thank you, Peter.

7    BY MR. KOBRIN:

8         Q.   Dr. McCann, this chart that you see on the

9    screen there is the flags that --- the 12 -- the

10   twice 12 trailing -- excuse me, twice trailing

11   12-month average flags for one of the Giant Eagle

12   stores, No. 4002, at Churchill Commons.  Do you see

13   that?  And these were HCP, hydrocodone combination

14   product, shipments from our HBC distribution

15   facility.

16        Does this make sense to you what we're

17   kind of charting in this spreadsheet?  It's a

18   little different than what you said.  Instead of

19   showing the averages developing, it's showing the

20   flagged orders at that store.  Do you see that?

21        A.   I'm sorry.  I'm confused by this document.

22   Is this -- is any part of this something that I

23   created?

24        Q.   No.  No.  We created this with your flags.

25   This is created from the data that you provided.

1    A.   All right.  I don't understand it.  Maybe

2  you can explain it to me some more.

3    Q.   Sure.  Do you remember when HBC began

4  distribution?

5    A.   No.  We could see that in my report, but I

6  don't recall offhand when.

7    Q.   I can represent to you that as it says on

8  this sheet, HBC did not distribute until November

9  2009.

10    A.   Okay.

11    Q.   So HBC began distributing to Giant Eagle

12  pharmacies, that's the name of the warehouse, HBC,

13  in November 2009.  And so my question to you, which

14  I think you've already explained, is why do the

15  flags not start until December 2010?  And I think

16  that's because you needed a 12-month period in

17  order to develop the 12-month trailing average.  Is

18  that accurate?

19    A.   Correct.

20    Q.   So there wouldn't be anything to flag in,

21  say, September of 2010 because there was not a

22  12 preceding months by which to average because

23  nothing was coming out of that warehouse prior to

24  November of 2009.  No hydrocodone combination

25  product had been distributed from the warehouse

1    prior to November of 2009.

2           Does that make sense?

3       A.   I would say it slightly different.  There

4    were certainly shipments in September of 2010 to be

5    flagged.  It's just they're not flagged by this

6    method.

7       Q.   So there were no shipments to be flagged

8    by this method.  Why do you say there were

9    certainly shipments to be flagged?

10      A.   Well, because there were shipments.  I

11   mean, there were shipments subject to a flagging

12   method, maybe in this example, Methods 1, 2, or 7

13   for sure and also, for that matter, 5 and 6, just

14   not 4 and 5, just not these two methods that depend

15   on having 12 months of history across pharmacy

16   service by the distributor.

17      Q.   Do you mean to say that they would have

18   definitely flagged, or do you just mean that there

19   were shipments?  You said there were shipments to

20   be flagged.

21      A.   Well, yes.  When you say there were no

22   shipments to be flagged, you were the one who, in

23   your question, I think, said well, there would be

24   no shipments to be flagged.  I don't know that

25   that's a true statement at all.  There were

1     shipments, and they could have been flagged by one

2     of the other methods.  They just can't be flagged

3     by this one.

4          Q.   They cannot be flagged by this one?

5          A.   That's correct.  That would be my

6     interpretation.

7          Q.   And they could, but they wouldn't

8     necessarily be flagged by any other flag method,

9     correct?

10         A.   Correct.

11         Q.   Do you recall that HBC closed in 2014?

12         A.   No.  I'm sorry.  I don't.

13         Q.   Do you know whether or not Giant Eagle had

14    another distribution warehouse after the closure of

15    HBC?

16         A.   I'm sorry.  I don't recall those details

17    as I sit here.

18         Q.   Did you review any documents relating to

19    the operation of Giant Eagle's distribution

20    facilities?

21         A.   Yes, not for this case, but these issues

22    that you're asking me about now are ones that I

23    knew about and reviewed in some prior case that HBC

24    was involved in.  I'm just not six months or a year

25    later remembering those details.

Page 200

1          Q.   Would that have been the other -- the

2    Track 1 case in the opioid MDL?

3          MR. MOUGEY:  Objection.

4          THE WITNESS:  Very likely.

5    BY MR. KOBRIN:

6          Q.   Do you -- did you review or research or

7    understand at the time you created -- strike that.

8               At the time you created or worked on these

9    methods, did you understand the history of Giant

10   Eagle's distribution operations?

11         A.   I didn't create these methods, but as I

12   was working on them and implementing them, I

13   learned something about the institutional detail of

14   HBC and Giant Eagle.  I'm just not recalling what I

15   learned.

16         Q.   Remind me who created these methods again.

17         A.   Well, they were provided to me by counsel.

18   My understanding is that they developed them with

19   input from DEA experts, including Mr. Rafalsky.

20         Q.   So you received these from counsel, and at

21   the time you said you reviewed documents, and you

22   understood the history of Giant Eagle's

23   distribution operations at the time that you

24   applied the methods that you were given by counsel?

25         A.   Yes.  It would have been prior to that

1    because in processing the ARCOS data, we saw

2    shipments from distributors to pharmacies in the

3    ARCOS data.  We produced reports summarizing

4    different distributors' behavior.  And at that

5    time, two or three years ago, HBC was a little

6    different than the others.  I understood at the

7    time what the differences were, but I'm not

8    recalling them now.

9        Q.   You understood the differences, as you

10   explained them, at the time that you applied the

11   methods, but you can't explain those differences

12   today?

13       A.   Correct.  Well, if we looked at the -- at

14   my April 16th expert report, you'll see that I have

15   graphs showing HBC's distribution shipments, and we

16   can see the timing of when they started and when

17   they, perhaps, paused and restarted.  So the

18   transaction information that's in this report,

19   which you haven't turned me to that page yet --

20       Q.   I'm not trying to hide the ball.  If we

21   can put up -- I don't know what exhibit it is.  I

22   don't want to state the wrong thing, but the prior

23   exhibit, which was GE McCann 11.  It was

24   Exhibit 16, I believe, if we can put that back up.

25            So as we already explained, HBC did not

1    start distributing until November of 2009, and then

2    it closed in October of 2014.  Does that ring a

3    bell to you?

4         A.   This graph isn't helping me in any way,

5    but Page 50 of my report shows that clearly.

6         Q.   So you would agree that it opened in

7    November 2009 and closed in early October of 2014?

8         MR. MOUGEY:  Objection.

9         THE WITNESS:  That appears to be correct,

10   approximately anyway.

11   BY MR. KOBRIN:

12        Q.   Okay.  Let's click to the next page in

13   this.  In March of 2016, another facility replaced

14   it.  There were no distributions from Giant Eagle

15   to itself from October 2014 until March of 2016

16   when GERx opened, Giant Eagle Rx Distribution

17   Center.  Does this ring a bell to you?

18        A.   No.

19        Q.   And it began distributing controlled

20   substances in March of 2016.

21        A.   Okay.

22        Q.   Is that correct based on what you have in

23   your knowledge and analysis?

24        A.   No.  The exhibit that I'm looking at, the

25   figure on Page 50 of my report shows the shipments

Page 203

1    stopping in 2014 and doesn't show them restarting.

2    Maybe if we looked at my supplemental exhibit, we

3    would have some additional data for HBC.

4        Q.   Well, HBC did not start again.  A facility

5    called GERx opened in March of 2016.

6             Do you recall this?  Did you ever learn

7    about this?

8        A.   I'm not recalling this detail whatever it

9    is that you're showing me.

10       Q.   My question for you, Dr. McCann, is if

11   GERx opened in March of 2016, why is the twice

12   trailing 12-month average immediately flagging

13   orders from GERx to any facility if it had not been

14   opened in a previous 12-month period in order to

15   establish a twice trailing 12-month average?

16       A.   I'm sorry.  I don't know anything about

17   this document you put in front of me.  It's the

18   first time I've seen it.

19       Q.   That's fine.

20       A.   I'll have to look at -- I'll have to get a

21   copy of this document and look at the --

22       Q.   Mr. McCann, I'm not -- I'm not asking you

23   what you have to do.  I'm asking you is there a

24   reason that you would have flagged orders during

25   the 12-month period immediately following the

1    opening of GERx in March of 2016 using Method 3?

2         MR. MOUGEY:  Objection.

3         THE WITNESS:  I'm not interrupting you, and if

4    you'll let me finish, I'll be brief.  I don't know

5    whether this is -- what you're representing here is

6    correct and, if it is correct, what the explanation

7    for it is.  I just don't know.  This is the first

8    time I've seen this.

9    BY MR. KOBRIN:

10        Q.   This is your data, Mr. McCann.  I'll

11   represent to you that it's correct and that your

12   Method 3 began flagging distributions to Giant

13   Eagle Pharmacy 4002 in April of 2016 using Method 3

14   despite the fact that the distribution facility

15   opened in March of 2016.

16        MR. MOUGEY:  Objection.

17   BY MR. KOBRIN:

18        Q.   And I'm asking you if you can explain

19   that.

20        A.   It could be that you're wrong or -- -

21        Q.   I'm asking you, representing this is

22   correct, can you explain that?  I'm not asking you

23   to tell me whether I'm wrong or not, tell me

24   whether you messed up or not.  I'm just asking you

25   can you explain that?

1      MR. MOUGEY:  Josh, that's enough.  That's

2    enough.  You've interrupted Dr. McCann about three

3    or four times.  You've put in front of him a

4    chart -- I haven't interrupted.  You've put in

5    front of him a chart that's not his.  He doesn't

6    have to accept your representations about what this

7    chart is or isn't.  If you have a question, why

8    don't you ask him from his charts.  And if you

9    don't want to and you want to continue to use your

10   chart, that's fine, but please let him answer your

11   question without interrupting him.

12   BY MR. KOBRIN:

13      Q.   I have a question pending.  Do you want it

14   read back to you?

15      MR. MOUGEY:  Well, then I object to the

16   two-paragraph question that you asked.  It had

17   about six questions in it.

18      MR. KOBRIN:  It didn't.  Do you want to read it

19   back?  Can we have the court reporter quickly read

20   back the question?

21   BY MR. KOBRIN:

22      Q.   Dr. McCann, if you want to answer the

23   question if you know what the question was still.

24      MR. MOUGEY:  I'll read it back for you.  I'm

25   asking you to --

1      MR. KOBRIN:  I'm not asking you to read it

2   back, Peter.  That's highly inappropriate.  I asked

3   the court reporter to read it back.

4                            (Whereupon, the record was

5                            read as requested.)

6      MR. MOUGEY:  Renew my objection.

7      THE WITNESS:  As I was starting to say, there

8   are two possibilities.  One is that you're

9   incorrect.  I have no way of knowing whether you

10   are or not, but one possibility is that you're

11   incorrect.  The second is that you are correct, but

12   there is an explanation that I'm not aware of as I

13   sit here because this is the first time I've seen

14   this.

15          And I'm happy to look into it and confirm

16   either that you're incorrect or the reason why the

17   data is as it is.  This is certainly not my

18   document, and I have no idea what you've done here.

19   BY MR. KOBRIN:

20      Q.   Sir, Dr. McCann, I just want to make sure

21   we're clear.  Your only potential explanations are

22   that I'm incorrect or that there is an explanation.

23   Is it possible that there's an error in the

24   algorithm?

25      MR. MOUGEY:  Objection.

1      THE WITNESS:  Very unlikely because this code

2    has been gone over by experts for the distributors,

3    manufacturers, and pharmacy defendants in eight or

4    10 cases over the last three or four years.  So

5    it's possible that there's something that no one

6    else but you have uncovered, but I'm doubting that.

7    BY MR. KOBRIN:

8      Q.   If these are, indeed, flagged under

9    Method 3 starting in April of 2016 and continuing

10   in four months in 2016, if these are, indeed,

11   flagged in Method 3, would you agree that that is

12   an error?

13     A.   No.  I would have to investigate what the

14   explanation for it is.  If you're correct, then

15   there is very likely an explanation for it, but I

16   just can't tell you without reviewing this offline

17   with my staff, maybe getting a copy of this exhibit

18   that you put in front of me for the first time and

19   a transcript of what you've represented this to

20   show.  I don't know whether it shows that or not.

21     Q.   I just want to make sure the record is

22   narrowly clear.

23          When you say there's an explanation, could

24   that explanation be that there's an error in the

25   algorithm, or are you saying there's an explanation

1    that makes these flags correct?

2         MR. MOUGEY:  Objection.

3         THE WITNESS:  Oh, an explanation that makes

4    these flags correct.  It's very unlikely that

5    there's any issue with the algorithm for the reason

6    that I already said.

7    BY MR. KOBRIN:

8         Q.   And there's no chance that there's an

9    error in your report or your representations

10   regarding the data?

11        MR. MOUGEY:  Objection.

12        THE WITNESS:  I didn't say there was no chance.

13   That mischaracterized it.  I just said it was

14   highly unlikely.

15   BY MR. KOBRIN:

16        Q.   So you think it's highly unlikely this is

17   caused by any error in your report?

18        MR. MOUGEY:  Objection.

19        THE WITNESS:  That's correct, although, as

20   we've discussed this morning, just one of my

21   appendices has 24,000 pages of charts.

22   BY MR. KOBRIN:

23        Q.   I know.

24        A.   It's quite possible that in 24,000 pages,

25   there's a page that has an error in it.  We're all

1    humanly imperfect.  If there are 24,000 pages

2    reflecting tens of millions of calculations, then

3    it's possible somewhere in a giant haystack, you

4    found a needle, but I just need to investigate it a

5    little bit.

6        Q.   Is it also possible, Dr. McCann, that this

7    error regarding GERx opening in 2016 replicated

8    across all of the methods that have the word

9    trailing in them?

10       MR. MOUGEY:  Objection.

11       THE WITNESS:  There's no evidence that there's

12   an error here, but in any case, if there was, it is

13   not the same.  As I said, Methods 3 and 4 are

14   different than 1, 2, and 7.

15   BY MR. KOBRIN:

16       Q.   And this is 3, but 1, 2, and 7 as well as

17   3 and 4 all require a trailing period.  They all

18   require a period before you can start flagging

19   orders, and I'm asking is it possible that this

20   error was made throughout your report with regard

21   to GERx distribution?

22       MR. MOUGEY:  Objection.

23       THE WITNESS:  There's no error here.

24   BY MR. KOBRIN:

25       Q.   There's no error?

Page 210

1      A.   Well, at least I haven't been convinced by

2   this exhibit that you put up in front of me.

3      Q.   Okay.  So you've got this exhibit now.

4   You let me know.  You can check into this.

5      MR. MOUGEY:  Josh, that's about the third time

6   you've interrupted Dr. McCann in the last

7   30 seconds.  Please let him finish his answer.

8      MR. KOBRIN:  Thank you, Peter.

9   BY MR. KOBRIN:

10     Q.   I'm going to give you this chart, and if

11  you find an error, you'll let us know?

12     A.   If you had given this to me yesterday, I

13  probably could have told you this morning, but I

14  don't have the document.  I still don't have the

15  document.

16     Q.   Dr. McCann, did you testify about this

17  error in Track 1 in the case against Summit and

18  Cuyahoga Counties?

19     MR. MOUGEY:  Objection.

20  BY MR. KOBRIN:

21     Q.   Did you testify about the trailing error

22  with regard to distributions from GERx in a

23  different litigation against Ohio counties where

24  you made this same error?

25     A.   Well, I think you lawyers would say

1   assumes facts not in evidence.  I don't see

2   anything that you put in front of me that

3   identifies an error.  So you keep saying this

4   error.  You said it now 10 times in your last

5   20 questions.  I just don't think that's accurate.

6   At least I don't know that it is, and I'll have to

7   look into it.

8        MR. KOBRIN:  Move to strike as nonresponsive.

9   BY MR. KOBRIN:

10       Q.   Did you testify about an error in the GERx

11  distribution data in another litigation?

12       MR. MOUGEY:  Objection.  Josh, if you have some

13  sort of a transcript rather than -- this is like

14  the 30th time you all deposed Dr. McCann.  If you

15  have something you want to show him, please do so.

16       THE WITNESS:  I don't recall this issue ever

17  being raised before with me.

18  BY MR. KOBRIN:

19       Q.   If you can go to GE McCann 1.

20            Do you know anything about the DEA's role

21  in setting quotas for controlled substances?

22       A.   No.

23       Q.   Do you know that the DEA sets quotas based

24  on prospective legitimate need for controlled

25  substances?

Page 212

1      A.   No.

2      Q.   Do you have any knowledge at all then

3   about DEA quotas?

4      A.   No, not other than that they're published,

5   and I only know that because it was raised in this

6   litigation.  I don't know anything about it.

7      Q.   When was it raised in this litigation?

8      A.   Probably in my first deposition, which

9   would be the CT 1 deposition, roughly in May of

10  2019.

11     Q.   And what do you recall being raised about

12  it in May of 2019?

13     A.   I remember the defendants trying to argue

14  that they couldn't have possibly done anything

15  wrong because as they shipped more and more

16  opioids, the DEA increased quotas each year sort of

17  using it as a shield.  There's a whole lot wrong

18  with that logic from my perspective, but I'm not a

19  subject matter expert.  I'm not an expert on the

20  DEA quotas.

21     Q.   You never analyzed the DEA quotas?

22     MR. MOUGEY:  Objection.

23     THE WITNESS:  Correct.

24  BY MR. KOBRIN:

25     Q.   Have you ever asked plaintiffs' counsel

Page 213

1    anything about the DEA quotas or asked for

2    information about the DEA quotas?

3        A.    No.

4        Q.    Let's put up McCann 1, which I think will

5    be Exhibit 17.

6                        (Whereupon, McCANN Deposition

7                        Exhibit No. 17 was marked for

8                        identification.)

9    BY MR. KOBRIN:

10       Q.    This is a chart that shows the DEA quotas.

11   You didn't do this analysis, did you?

12       A.    Correct.

13       Q.    And contrary to what you just said, this

14   analysis actually shows dispensation by Giant Eagle

15   decreasing while the DEA quotas increased; isn't

16   that correct?

17       MR. MOUGEY:  Objection.

18       THE WITNESS:  That's not contrary to what I

19   just testified to.

20   BY MR. KOBRIN:

21       Q.    This chart, which shows hydrocodone

22   combination products dispensed by Giant Eagle and

23   the quotas from the DEA, shows Giant Eagle

24   dispensation of hydrocodone combination products

25   decreasing while the DEA quotas increased; isn't

Page 214

1    that correct?

2         MR. MOUGEY:  Objection.

3         THE WITNESS:  For one year, yes.

4    BY MR. KOBRIN:

5         Q.   And what year are you looking at?

6         A.   2013.

7         Q.   What about 2014?

8         A.   Well, it doesn't look like the quota

9    increased in 2014.

10        Q.   So it looks like it stays the same?

11        A.   Correct.

12        Q.   What happens to the dispensed hydrocodone

13   combination products for Giant Eagle?

14        A.   It looks like it declined.

15        Q.   What about 2015?

16        A.   It looks like it declined.

17        MR. MOUGEY:  Objection.

18   BY MR. KOBRIN:

19        Q.   Thank you.

20             And you didn't -- you didn't do this

21   analysis again just to clarify even though this was

22   raised in CT 1?

23        A.   This is completely outside of my scope of

24   my report.  And again, I don't know that this

25   exhibit that you just put in front of me here on

Page 215

1   the screen is accurate, but I'm just responding to

2   the questions you're asking me about this exhibit.

3        Q.   Yeah.  I'll represent to you that it's

4   accurate.  We'll flip to the second one, which

5   shows the same trend for oxycodone.

6             Do you see that?

7        MR. MOUGEY:  Objection.

8   BY MR. KOBRIN:

9        Q.   Oxycodone dispensing versus the DEA quota

10  for oxycodone.  Do you see that?

11       MR. MOUGEY:  Objection.

12       THE WITNESS:  I see the document, but I don't

13  see -- I don't understand, even with your

14  representation, what this document reflects.  Look

15  at the title.  It says Indexed Comparison of

16  Growth.  What does that mean?  I don't know.

17  BY MR. KOBRIN:

18       Q.   That means if they were at the same point

19  in 2006, which direction did they go?  Do you see

20  the quota go up between 2006 and 2007?  Do you see

21  that?

22       A.   Yes.

23       Q.   And you see the dispensing by Giant Eagle

24  go down between 2006 and 2007?

25       A.   Yes.

Page 216

1      MR. MOUGEY:  Josh, can I just have a standing

2   objection to all of your self-made charts here?

3      MR. KOBRIN:  Fine.

4   BY MR. KOBRIN:

5      Q.   Let's go on to GE McCann 3, which I

6   believe will be 18.

7                        (Whereupon, McCANN Deposition

8                        Exhibit No. 18 was marked for

9                        identification.)

10  BY MR. KOBRIN:

11     Q.   You talked earlier about the decision not

12  to use the OARRS data.

13          Do you recall that, Dr. McCann?

14     A.   Yes.

15     Q.   And that you decided not to use the OARRS

16  data because it had a three-digit zip code rather

17  than a five-digit zip code.

18          Do you recall that, Dr. McCann?

19     A.   For the patient, correct.

20     Q.   And your concern was that because you only

21  had a three-digit zip code for the patient, it

22  would be more difficult to do the distance analyses

23  required by some of your methods, correct?

24     A.   It's not a matter of being more difficult.

25  It's just it couldn't be done in any meaningful way

1    if -- because the three-digit zip codes include a

2    lot of areas where the radius of a circle from the

3    midpoint would be more than 25 miles.  So to have a

4    25-mile criterion for a flagging method between the

5    patient and a prescriber, a patient and a pharmacy

6    just doesn't make any sense in the context of a

7    three-digit zip code.

8         Q.    That might be the case in some situations

9    for a five-digit zip code as well, couldn't it?

10        A.    Yes.

11        Q.    But I think you make a fair point that a

12   three-digit zip code doesn't provide the same level

13   of accuracies as the center of a five-digit zip

14   code would.  Is that accurate?

15        A.    It's more than that, but it's that, yes.

16        Q.    And why is accuracy important in this?  Is

17   it because for the distance measurement, precision

18   matters?

19        A.    Not so much.  It's that if you had a

20   five-digit zip code and had a patient in one and a

21   pharmacy or a prescriber in another where the

22   centers of those two zip codes are -- the center of

23   the patient's zip code to the precise location of

24   the pharmacy or prescriber is more than 25 miles,

25   if you group them into a three-digit zip code that

Page 218

1    encompasses the area that the patient and the

2    prescriber or patient and pharmacy is, you don't

3    trigger that flag anymore because they appear to be

4    at exactly the same location, the center of the

5    three-digit zip code or something like that.

6            I'm not quite articulating that

7    explanation exactly right.  If I tried it again,

8    I'd get it closer, but it's just a -- you're not

9    flagging hardly anything if you use three-digit zip

10   codes.  You're just missing a lot making it not

11   worthwhile applying the flags at all.  You're still

12   missing some if you're using a three-digit zip code

13   for the -- you're just missing -- you're still

14   missing some if you're using -- even if you were

15   using a five-digit zip code, but a three-digit zip

16   code is just not useful.

17       Q.   Is there any reason you would use a

18   five-digit zip code instead of an address?

19       A.   There might be.  It might be a matter of

20   convenience or some sort of processing or

21   programming capabilities.  Certainly there would be

22   some context where that would be appropriate.

23       Q.   But it might be more inaccurate in some

24   other contexts, correct?

25       A.   Yes.

Page 219

1      Q.   Can we look at the next exhibit?  I don't

2  want to get too caught up on these.  These are

3  analyses that we conducted using the OARRS data.

4  And as you can see on this one, which relates to

5  all at-issue opioids, it shows the Giant Eagle

6  market share based on transactions and MMEs and

7  then the market share for oxycodone oral solids

8  that are a strength of 30 milligrams or greater.

9           And it shows, assuming it's accurate,

10  Dr. McCann -- and I'm not asking you to adopt it.

11  I'm not asking you to accept this and to testify to

12  it, but would you agree that it shows that Giant

13  Eagle's market share is greater in the at-issue

14  opioids generally than it is in the stronger

15  oxycodone 30-milligram or greater strength opioids?

16      MR. MOUGEY:  Objection.

17      THE WITNESS:  That is so confusing.  You just

18  said you were not asking me to accept it and

19  testify to it.  Now you're asking me to accept it

20  and testify to it.

21  BY MR. KOBRIN:

22      Q.   I'm asking you to accept what it says in

23  the chart.

24           Do you understand what we're saying in the

25  chart?

Page 220

1        A.   No.

2        MR. MOUGEY:   Not really.

3    BY MR. KOBRIN:

4        Q.    You don't understand it?

5        MR. MOUGEY:   Objection.

6    BY MR. KOBRIN:

7        Q.   Do you understand the term under-indexing,

8    Dr. McCann?

9        A.   No.

10       Q.   Do you understand when somebody has a

11   certain market share in a product and then their

12   market share in a sub-product is smaller?  It shows

13   that they are selling less of the smaller product,

14   the sub-product --

15       MR. MOUGEY:   Objection.

16   BY MR. KOBRIN:

17       Q.    -- than would be expected based on their

18   overall market share?  Does that make sense to you?

19   Do you understand that theory?

20       A.    No.  I would understand that comparison of

21   the relative absolute number is relative

22   percentages, but I don't know about that as a

23   theory or, you know, I'm not sure what you would

24   tend to argue from that.  I would have to think

25   about that.

1      Q.   Let me ask you this.  Do market share

2    analyses like this one require any distance

3    analysis?  This analysis doesn't look at distance,

4    does it, Dr. McCann?

5      A.   No.  It just looks at a specific

6    geographic point, not the distance between two

7    geographic points.

8      Q.   It doesn't have any geographic points,

9    does it, Dr. McCann?

10     A.   That's not true.  It requires that the

11   pharmacies be in Lake or Trumbull Counties.

12     Q.   For this analysis?

13     A.   Well, I didn't do this analysis, but the

14   way you've labeled it, you said at-issue opioids,

15   Lake and Trumbull Counties.  So you're saying that

16   these -- as I understand it, and I'm just trying to

17   understand something that you put in front of me

18   for the first time 30 seconds ago, you seem to be

19   saying these are shipments to pharmacies that are

20   physically located in Lake and Trumbull County.  So

21   there is a geographic aspect.

22     Q.   Sir, it doesn't have any distance-related

23   aspect, does it, Dr. McCann?

24     A.   I don't know.  It's not my document.  It

25   doesn't seem to, but I don't know.

Page 222

1      Q.   Does this analysis require a five-digit

2  zip code, Dr. McCann?

3      A.   I don't know.  How can you ask me to

4  testify to this?  You start out by saying you were

5  not going to ask me to testify to this.  I can't

6  accept it, and I can't testify to it.  I don't

7  know.

8      Q.   Do market share analyses like this one

9  require a five-digit zip code, Dr. McCann?

10     A.   They might.  It would depend on the -- the

11  geographic area covered by the market share.

12     Q.   I said require.  So they might.  You're

13  saying they might.  I'm saying do they require a

14  five-digit zip code?  Do they require the

15  pharmacies or any of the parties involved in this

16  analysis to provide you with a five-digit zip code

17  as to their location?

18     A.   I don't know.  I didn't do this analysis.

19  I have no idea what it is.

20     Q.   Let's talk generally.  If you were doing a

21  market share analysis for Lake County, would you

22  need to have a five-digit zip code for all of the

23  entities that you were doing market share analysis

24  for?

25     A.   I would need more finely an address.  I

1    would need something to identify that it was, in

2    fact, in Lake County or in Trumbull County.

3         Q.   And outside of that, would you need any

4    kind of zip code for patients or for pharmacies?

5         A.   Outside of needing a zip code, I would not

6    need a zip code, no.  That's correct.

7         Q.   Why would you need a zip code to do a

8    market share analysis?

9         A.   I would need an address.

10        Q.   Would you need a patient zip code?

11        A.   No.

12        Q.   And the OARRS problem was patient zip

13   codes, wasn't it, Dr. McCann?

14        A.   Correct.

15        Q.   So you could do a market share analysis

16   without the patient zip code, the five-digit

17   patient zip code, that you claimed OARRS did not

18   provide, correct?

19        A.   I'm so confused.  The market share

20   analysis of what.

21        Q.   You could do a market share analysis of

22   pharmacies' market share in Lake County or Trumbull

23   County without knowing a five-digit zip code or any

24   zip code for patients in Lake County and Trumbull

25   County, correct?

Page 224

1        MR. MOUGEY:  Objection.

2        THE WITNESS:  I wouldn't use OARRS data.  Are

3    you telling me --

4    BY MR. KOBRIN:

5        Q.   I'm telling you you could have done a

6    market share analysis for the OARRS data, couldn't

7    you have?

8        MR. MOUGEY:  Objection.

9        THE WITNESS:  I don't know.  I didn't think

10   about it.  I wouldn't use OARRS data.  I would use

11   the ARCOS data, or I would use the defendant

12   transaction data.  I don't understand why you're --

13   BY MR. KOBRIN:

14       Q.   How could you do a market share analysis

15   with ARCOS data or the defendant transaction data?

16       MR. MOUGEY:  Objection.  Argumentative.

17       THE WITNESS:  Well, because the ARCOS data

18   identifies the distributors and the pharmacies.  So

19   if you wanted to do a market share analysis of

20   distributors, shipping to pharmacies in Lake and

21   Trumbull County, you would do it with the ARCOS

22   data.  I'm completely confused by this line of

23   question.

24       Q.   What if you wanted to analyze dispensed

25   products?

1        MR. MOUGEY:  Objection.

2        THE WITNESS:  I would still use the ARCOS data,

3    not the OARRS data.

4    BY MR. KOBRIN:

5        Q.   You would use the ARCOS data?

6        A.   Correct.

7        Q.   But that's distribution data, isn't it,

8    Dr. McCann?

9        A.   But it's --

10       MR. MOUGEY:  Same objection.

11       THE WITNESS:  It's not just distribution data.

12   It's equal like the other side of the coin.  It's

13   receipts of opioids by pharmacies identified down

14   to their street address.  So you identify the

15   pharmacies that are in Lake and Trumbull.  And with

16   the exception of some very small rounding error due

17   to changes in inventory, you calculate market share

18   using the ARCOS data.  There would be no reason to

19   use the OARRS data.

20   BY MR. KOBRIN:

21       Q.   Did you do any kind of market share data

22   using the ARCOS data then?  If you could have done

23   that and you could have done it across all

24   pharmacies in Lake and Trumbull County, did you

25   ever do that?

Page 226

1         A.    Yes.

2         MR. MOUGEY:  Objection.

3    BY MR. KOBRIN:

4         Q.    You did do a market share analysis across

5    all pharmacies in Lake and Trumbull County?

6         A.    Yes.

7         Q.    And did you compare the non-defendant

8    pharmacies to the defendant pharmacies in this

9    litigation?

10        A.    Not that I recall in the way you've put up

11   this demonstrative in front of me, but I believe

12   the appendices also include market shares of

13   distributors in Lake and Trumbull County, and that

14   would include both defendants and non-defendants.

15        Q.    We're not talking about distributors, sir.

16   We're talking about pharmacies.  We're talking

17   about the dispensing pharmacies.

18            You said that you would use distribution

19   to those pharmacies as a proxy for dispensing for

20   their market share, and I'm asking you if you did

21   an analysis of the pharmacies' market share in Lake

22   and Trumbull Counties?

23        MR. MOUGEY:  Objection.

24        THE WITNESS:  I'm getting more and more

25   confused by your confusing questions because I've

Page 227

1    got an exhibit that shows the, I believe, MME or

2    dosage units received by each pharmacy in Lake and

3    Trumbull County, and then in there, I also show

4    which distributors shipped to each of those

5    pharmacies.  So it seems to be all in my report

6    already, but I may not have cross-tabulated it in a

7    way you're suggesting.  I just don't know because

8    I'm now extremely confused.

9    BY MR. KOBRIN:

10        Q.    That's very helpful.

11            Did you do it for each pharmacy by

12   location?

13        MR. MOUGEY:  Objection.

14        THE WITNESS:  When you talk about pharmacy, I

15   think -- I have been thinking, like Ms. Swift,

16   you're referring to the chain pharmacies who are

17   here as distributor defendants.  And if you're

18   meaning the physical location of the pharmacy, the

19   sort of retail store, then I go back to the answer

20   that I gave you.

21            I have a listing of the retail stores in

22   Lake and Trumbull County, what their receipts are,

23   I think, in dosage units and MME, and I have in

24   those reports the distributors, including the chain

25   distributors, who ship to that location.  So I

Page 228

1    think the answer is yes to all of that.
2    BY MR. KOBRIN:
3        Q.   You have that broken out by drug or just
4    drug quantities in MME?
5        A.   I don't recall.
6        Q.   Do you recall whether you included
7    non-defendant pharmacies in that analysis?
8        A.   I believe so.  I don't recall with
9    certainty, but there's something called -- it's a
10   whole appendix called Pharmacy Reports.  That's
11   where you'll find it all.
12       Q.   So did you have any kind of analysis, or
13   do you have any conclusions regarding the MME share
14   for dispensing by non-defendant pharmacies?
15       A.   I'm sorry.  Could you clarify that
16   question, when you say non-defendant pharmacies,
17   what you mean.
18       Q.   Do you have any conclusions or analysis of
19   the market share of non-defendant pharmacies?
20   There are other pharmacies who aren't defendants in
21   this case; isn't that right, Dr. McCann?
22       A.   I don't think of the defendants here as
23   pharmacies.  I think of them as chain pharmacy
24   companies that are here in their role as
25   distributors.  So if your question is are there

Page 229

1    non-defendant distributors who I have data for and

2    did I calculate their shipments to retail

3    pharmacies compared to the chain distributors, I

4    have the data in these reports, but I don't recall

5    tabulating it exactly the way you're describing.

6        Q.   Is your position that the chain pharmacies

7    who are defendants in this case are only defendants

8    as distributors in this case?

9        MR. MOUGEY:  Objection.

10        THE WITNESS:  No.  They're here both in their

11    role as distributors and as dispensers.

12    BY MR. KOBRIN:

13        Q.   Sir, I'm talking about as dispensers here.

14    Is that clear?

15        A.   No, it has not been clear.

16        Q.   Okay.  So now that's clear, we're talking

17    about dispensing as I said earlier.

18            Did you do any analysis of the

19    non-defendant pharmacies that are in Lake and

20    Trumbull County?

21        A.   Yes.

22        Q.   Did you analyze the market share held by

23    the non-defendant pharmacies?

24        A.    I have information on the total shipments,

25    the pharmacies, in Lake and Trumbull in my report,

Page 230

1    and I have the shipments by the defendants to their

2    pharmacies in Lake and Trumbull.  Is that what

3    you're asking me?

4         Q.   I'm asking you if you have any analysis of

5    the dispensing done by the non-defendant

6    pharmacies, the pharmacies that are located in Lake

7    and Trumbull County that are not defendants in this

8    litigation.

9              You said that you analyzed market share

10   across Lake and Trumbull County, and I'm asking you

11   if you had any conclusions regarding non-defendant

12   pharmacies and their market share in Lake and

13   Trumbull County.

14        MR. MOUGEY:  Objection.

15        THE WITNESS:  I did not say that I analyzed

16   market share.  What I said is that the data is in

17   my report where you could calculate a market share,

18   and you would see that if you go to the pharmacy

19   reports.  There's a list of roughly 200 pharmacies.

20   Only 50 or 60 of those are pharmacies operated by

21   the defendants in this case.  You could add up the

22   amounts shipped to pharmacies that were owned by

23   the defendants in this case and divide it by the

24   total, and you would get a market share, but I

25   didn't do that calculation.

Page 231

1    BY MR. KOBRIN:

2        Q.    You didn't do the calculation of market

3    share in Lake and Trumbull County?

4        A.    Not that I recall.

5        Q.    Thank you much.

6              You didn't use it using OARRS data or

7    ARCOS data; is that correct?

8        MR. MOUGEY:  Objection.

9        THE WITNESS:  Correct.  I'm sorry.  I didn't do

10   the calculation.  The data is in my report.

11   BY MR. KOBRIN:

12       Q.    You didn't do any analysis of market

13   share?

14       MR. MOUGEY:  Josh, please let him finish.

15   BY MR. KOBRIN:

16       Q.    I'm sorry, Dr. McCann.

17       A.    I don't recall whether there's a percent

18   market share reported anywhere, but the data to do

19   the calculation easily is in the report.

20       Q.    To the best of your recollection, you

21   didn't do any analysis of market share using any of

22   the data that you had at your disposal, correct?

23       A.    No.  I did market share for every single

24   pharmacy physical location.  What I didn't do is

25   add up the physical locations that are owned or

Page 232

1    operated by the defendants in this case and divide

2    it by the total.

3           So there is a market share for each

4    pharmacy.  There is just not a summation of those

5    numbers across the 50 or 60 pharmacies that are

6    owned by the defendants.

7    Q.   You didn't do a market share for the

8    non-defendant pharmacies.  You didn't do an

9    analysis of the market share of the non-defendant

10   pharmacies in this litigation, did you, Dr. McCann?

11        MR. MOUGEY:  Objection.

12        THE WITNESS:  That's also not true.  By

13   definition, I did it for every single pharmacy,

14   including the non-defendant pharmacies, and there

15   may be 120 or 140 of them.  If you -- and I've got

16   an exhibit that reflects each of them.  If you add

17   up those numbers and divide by the total -- it's

18   just on three pages of paper or something.  If you

19   add up those numbers and divide by the total, you

20   get the market share of the non-defendant

21   pharmacies.

22   BY MR. KOBRIN:

23        Q.   So we can use your data to understand the

24   MME market share of the non-defendant pharmacies in

25   Lake and Trumbull County?

1      A.   I believe that's correct.  You'd have to

2   look at Appendix 8 to confirm that, but I believe

3   that's correct.

4      Q.   And we can do that by different product

5   lines, for example, oxycodone 30 milligram or

6   stronger?

7      A.   Not to that level of detail, I don't

8   think, but I'd have to look just to make sure.

9      Q.   Could we do an analysis showing how much

10  of the stronger opioids were flowing through the

11  non-defendant pharmacies versus the defendant

12  pharmacies?

13     A.   Well, sure, easily in the data that I

14  provided to you with the report, but it may not be

15  in the text or the appendix right now of the

16  report.

17     Q.   And that would show what was distributed

18  to the non-defendant pharmacies from the major

19  distributors?

20     A.   Yes.

21     Q.   And that analysis is in this litigation?

22     A.   I didn't say it was.

23     Q.   You just said that that is there.  Sorry.

24  The data is in this litigation.  Strike that.

25          The data to do that analysis is a part of

Page 234

1    your report in this litigation?

2        A.   Yes.

3        Q.   But you did not do that analysis using the

4    ARCOS or the OARRS data in this litigation?

5        A.   Correct.

6        Q.   Let's look at GE McCann 8, which will be

7    Exhibit 19, I think.

8                        (Whereupon, McCANN Deposition

9                        Exhibit No. 19 was marked for

10                       identification.)

11   BY MR. KOBRIN:

12       Q.   And what we're going to be looking at are

13   the variables that were produced in this litigation

14   by Giant Eagle.

15            Do you recognize these field names?

16       A.   No.

17       Q.   Do you know what they mean?

18       A.   Well, going down through them, there are

19   some that are pretty descriptive that I think I

20   know what they mean, but others, I don't.

21       Q.   For example, NDC, underscore, NO probably

22   means NDC number, right?

23       A.   Pretty good with that one.

24       Q.   Do you know what the one under that one

25   means, FILL, underscore, DTE?

Page 235

1      A.   Yes.  I would interpret that to be the

2   fill date of the prescription.

3      Q.   What about at the bottom, TX, underscore,

4   DTE, underscore, TME?

5      A.   Well, because it includes what looks like

6   a time component, I would think it's when the

7   prescription was filled, but I'm not sure why it

8   has that particular name.  I'd have to look at it.

9      Q.   What about record, underscore, date?

10      A.   I'm not sure what that's referring to.

11      Q.   When you did your analysis, did you ask

12   anyone what these fields meant?

13      A.   Oh, yes.  The different -- the five

14   different chain distributors have different names

15   on what are basically the same fields, slightly

16   different names, and we reconciled that.  So I am

17   sure that we knew what each of these fields were

18   and how they corresponded to a named field in one

19   of the other distributor defendants' data.  I just

20   don't recall, as I sit here, looking at these

21   couple of items from HBC what they mean, but yes.

22      Q.   I just want to -- I don't want to be

23   accused of interrupting you, but I do want to

24   clarify this is dispensing data fields.  So we're

25   talking about dispensing here again.

1      A.   Yes.

2      Q.   I just want to make sure there's no

3   confusion about that.

4      A.   I apologize.  Yes.  You're right.

5      Q.   No.  There's no need for an apology.  I

6   just want to make sure I'm clear.

7           So for these dispensing data fields, you

8   said you're sure you know how, but you're not sure

9   if anyone asked to be written discovery or any

10   other discovery method what these fields meant?

11      A.   Right.  I'm not aware that we had any

12   problem understanding these fields, but without the

13   actual data below these field names, it's a little

14   bit hard for me to look at the field name and tell

15   you what that field is.  If you've shown me all of

16   the data, and especially after we reviewed it in

17   light of the other defendants' dispensing data,

18   we -- we understood all of the fields that we

19   needed to understand.  I just don't know, as I'm

20   sitting here without the benefit of the underlying

21   data, exactly what some of these fields mean.

22      Q.   So with the underlying data, you were able

23   to fully understand all these fields and reconcile

24   them?

25      A.   At least the fields we wanted to use, yes.

Page 237

1      Q.    Were there any fields, sir, that you

2   didn't want to use?

3      A.    I don't know whether with respect to HBC,

4   but I recall what sticks in my mind is another

5   distributor defendant, chain pharmacy defendant's

6   dispensing data had three fields that looked like

7   they were naming something different, but the --

8   there were date fields, and they were identical

9   dates.  There were some other issues, but in a lot

10  of the data sets, there were superfluous fields,

11  fields that we didn't need to use.  So I'm not

12  claiming that we resolved any uncertainty around

13  all of the fields, including fields that we thought

14  were superfluous that we didn't use, but we did

15  resolve any uncertainty that we had about any field

16  that we wanted to use.

17     Q.    How did you resolve those issues or

18  uncertainties for fields that you wanted to use?

19     A.    Well, the meaning of that label became

20  clear typically when you looked at the context, if

21  you looked at the data that was below the field

22  name.

23     Q.    So you resolved it by looking at the data?

24     A.    Yes.  There may have been some instance

25  where we had to go back to counsel and ask for some

1    clarification on a field name because, as I said,

2    the different defendants used some variations of

3    names for these fields, but that didn't seem to be

4    a big problem.  A bigger problem was with the

5    underlying data itself, not with what the field

6    names meant.

7         Q.   Well, to your recollection, did you ever

8    ask anyone to go back to Giant Eagle and ask what

9    any of these fields meant or to resolve any issues?

10        A.   Not that I'm aware of, no.

11        Q.   You might have already said this in your

12   explanation.  I apologize if you did.  Strike that.

13             Did pharmacy defendants provide all the

14   data fields that plaintiffs requested for the

15   entire discovery period?

16        A.   I don't know.

17        Q.   You don't know?  Well, what would you --

18   to your recollection, were there any situations in

19   which pharmacy defendants didn't provide all the

20   fields that plaintiffs requested for the entire

21   discovery period?

22        A.   I don't know.  That seems to be a

23   discussion that doesn't involve me.  It's between

24   the lawyers for the plaintiffs and for the

25   defendants and what the plaintiffs asked for and

1    what the defendants provided.  I don't know.  All I

2    could tell you is what we used, you got it because

3    you provided it to us.

4        Q.   If you didn't have a field that was

5    necessary for the entire discovery period, how did

6    you resolve that issue?

7        A.   I don't think there was any data field

8    that was completely empty for the entire discovery

9    period, but within the data sets that each firm

10   produced, there would be some records where a field

11   was left blank that ought to have been filled in.

12             To give you an example, the -- there

13   should be a DEA number and an NPI number for every

14   prescriber.  And in some cases, there were neither

15   a DEA number or NPI number, or there would be just

16   a DEA number and not the NPI number or the reverse,

17   just the NPI number, not the DEA number.  In other

18   situations, there would -- there would be missing

19   fill time or something else.

20             So there were -- there's some missing

21   data, but not that I recall for the entire time

22   period for every record.

23       Q.   What would you do if there was missing

24   data for a portion of the discovery period, for

25   example, as you said, the NPI number or the fill

Page 240

1    date?

2         A.   I think you'll see this in the code, but

3    generally, if there was no NPI or DEA number, and

4    that was fairly rare, but if there was neither of

5    those in the dispensing data, we set that record

6    aside and didn't use it.  If there was a DEA number

7    and multiple NPI numbers, which we see in some

8    cases for the same DEA number and then some blank

9    NPI numbers, we would assign the most frequent NPI

10   number matching that DEA number to the blank fields

11   for the NPI number rather than lose those records.

12            Similarly, if there were blank DEA numbers

13   for an NPI number, but elsewhere in the data, we

14   found the DEA number associated with that NPI

15   number, we would fill in the DEA number.  So we

16   would treat that as just whoever was entering the

17   data didn't enter both the NPI and the DEA number,

18   and we would fill it in.  These are relatively

19   infrequent, but that's the sort of thing where

20   rather than completely disregard that record, we

21   would fill it in based on other information that

22   the defendant provided to us.

23        Q.   Would you also fill in information for

24   date and time fields that were empty for a period

25   of discovery?

1     A.    Not for dates, but for some of the
2  defendants, they didn't provide the fill time for
3  approximately half of the dispensed prescriptions.
4  For some of the defendants, they provided the fill
5  time for almost every single prescription.  So
6  there's a little variation there.  For the missing
7  fill times, we used 12:00 noon for all of those
8  missing fill times.
9     Q.    So if there was no fill time, you put in
10  12:00 noon as a default for all of them.  Is that
11  accurate?
12     A.    Correct.
13     Q.    Were you at all concerned when you did
14  that, that that would lead to false positives for
15  any of your analyses of the dispensing data?
16     A.    Well, it could go either way, but we
17  couldn't lose -- for those defendants that didn't
18  provide the fill time for 40 or 50 percent of the
19  transactions, couldn't lose all of those records.
20     Q.    And that's because you want to have an
21  apples-to-apples comparison between the different
22  defendants?  Is that why, that you need to have the
23  same info for each of the defendants?
24     A.    Well, no, but if you're a defendant and
25  you don't want McCann to run any flags on the

Page 242

1    dispensed prescriptions that involve fill time, if

2    you can accomplish that by just not providing the

3    data, including fill time, then that would sort of

4    defeat the purpose of me doing the analysis that

5    I've done.  I've done the analysis.  The code shows

6    that for missing fill times, we filled in

7    noon, and I'm explaining it to you.  The couple of

8    defendants that did that can always, of course, fix

9    the data that they provided, but that's --

10        Q.   You're saying that they didn't provide the

11   date to you because they didn't want you to be able

12   to analyze the date?

13        A.   No.  I'm not saying that at all.

14        MR. MOUGEY:  Objection.

15   BY MR. KOBRIN:

16        Q.   If a defendant didn't have a time stamp on

17   its transactions prior to a certain date, you put

18   the time stamp as noon for all those transactions,

19   correct?

20        A.   It goes beyond that.  If there's a missing

21   fill time, we used 12:00 noon.

22        Q.   If there's a missing transaction time, you

23   use 12:00 noon, too, don't you?

24        A.   All of our time-sensitive flags are based

25   on fill time.

1     Q.   What does fill time mean to you?

2     A.   I'm not a pharmacy subject matter expert,

3  but I understand it to be the time that the

4  prescription is filled.

5     Q.   What does that mean, Dr. McCann?

6     A.   Well, just as a layperson, when I walk up

7  to the counter and submit a prescription, it's that

8  time or minutes later.  If the prescription is

9  called in by my doctor, maybe the fill time is

10  earlier than that.

11     Q.   So you're not sure what the fill time --

12  we're talking about a specific time.  You're not

13  sure what that fill time means?

14     A.   I've told you what I understand the field

15  fill time across the defendants' dispensing data

16  means.

17     Q.   What does it mean?  I'm still not sure.

18  Can you just tell me again?  What is the act that

19  is happening?  It's a particular time.  It's an

20  hour and a minute.  What is happening at the fill

21  time?

22     A.   Well, I think the pharmacist is putting

23  the pills in my bottle -- in the bottle that I

24  ultimately buy, but I don't know that for a fact.

25     Q.   So you don't know for sure what fill time

Page 244

1    means?

2        A.   Correct.  I think Mr. Catizone would have

3    to explain that.  I just see the fill time

4    reflected in the dispensing data across the

5    defendants, and I was asked to run flagging methods

6    based, in part, on those fill times.

7        Q.   Do you know what transaction time means in

8    the date/time field that we looked at, TX,

9    underscore, DTE, underscore, TME?  Do you know what

10   that means?

11       A.   No.

12       Q.   And we already established that you don't

13   know what record date means?

14       A.   Correct.  We also previously established

15   that I didn't know what transaction date/time

16   meant.

17       Q.   Would you look at GE McCann 10, which I

18   believe will be Exhibit 20?

19                      (Whereupon, McCANN Deposition

20                      Exhibit No. 20 was marked for

21                      identification.)

22   BY MR. KOBRIN:

23       Q.   This is data that we drew from your flag

24   data.  We just chose a single prescriber who was

25   flagged for plaintiffs using Method 13.  As you may

Page 245

1    recall, Method 13 in your report, and I'm reading

2    from Page 152 of your report, which is Exhibit 1,

3    is an opioid dispensed to at least three different

4    patients within an hour, and the opioid

5    prescriptions were for the same base drug,

6    strength, and dosage form, and were written by the

7    same prescriber.

8         Do you see that?

9         A.   Yes.

10        Q.   Now, Giant Eagle didn't have a transaction

11   date/time in 2012.  They upgraded their systems and

12   began providing it around 2013, 2014.

13        So as you've explained, you can see that

14   you put 12:00 noon in as the fill time; is that

15   correct?

16        A.   Well, your lead-in said that they didn't

17   have a transaction date/time.  I guess they also

18   didn't have a fill time.

19        Q.   That is correct.  There is missing fill

20   time for the first two and for the last one.  So

21   you put noon for all of them, correct?

22        A.   Correct.

23        Q.   And because you put noon for all of them,

24   they all flagged for your dispensing Method 13 that

25   they were dispensed within an hour?

Page 246

1      A.    Correct.

2      Q.    And you based that on fill time, correct?

3      A.    Correct.

4      Q.    Now, you just told me that fill time, to

5  your understanding, meant pills being put in the

6  bottle; is that correct?

7      A.    That was my layman's understanding.

8      Q.    Okay.  Do you think that that is when the

9  drug is dispensed, or for putting a time on

10  something, the dispense time would be when the drug

11  is handed to the patient?

12      A.    I don't know.  Neither of these times say

13  dispense time.  They say transaction time or fill

14  time, and I was just told to run the algorithms on

15  fill time.

16      Q.    So you put noon in for fill time?

17      A.    If the defendant didn't provide the fill

18  time, that's correct.

19      Q.    So that would inherently mean that it

20  would flag for 13 if it was otherwise responsive to

21  that flag because it was, obviously, within the

22  same hour if they were all being filled, excuse me,

23  at noon, correct?

24      A.    If three different patients received the

25  same drug, same strength, same dosage form from the

```
 1    same provider, they would get flagged.  That's

 2    correct.

 3        Q.    Because you put them all at noon, correct?

 4        A.    Well, that's right, because you didn't

 5    provide the fill time.

 6        Q.    Are you accusing defendants of having not

 7    provided it in response to discovery, or are you

 8    saying we just don't have the fill time?  I'm

 9    confused by your comment.

10        MR. MOUGEY:  Objection.

11        THE WITNESS:  I'm just saying that you did not

12    provide a fill time, and so either we disregard

13    half of HBC's dispensing data for purposes of

14    applying dispensing flags, or we fill in a fill

15    time.  That seems to be the two choices.  Either --

16    BY MR. KOBRIN:

17        Q.    I'll make clear that --

18        A.    Either half of your data is of no use, or

19    we have to do the best we can with it.

20        Q.    And the best you can was to give them all

21    the same time, correct?

22        A.    Correct.

23        MR. MOUGEY:  Objection.

24    BY MR. KOBRIN:

25        Q.    But you don't know what fill date, record
```

1    date, or TX DTE TME actually mean, correct?

2        A.   Correct.  We're pretty good on fill date,

3    right, but record date, I'd have to go back and

4    look at a bunch of data, and I might be able to

5    infer what record date or transaction date means,

6    but as we're sitting here, you're asking me really

7    primarily just with those header labels.  I can't

8    tell you for sure.

9        Q.   Why are we good on fill date?  I just want

10   to make sure I didn't miss something.

11            You said we're good on fill date.  What do

12   you mean by that?

13       A.   Well, you've got a -- in some of the data,

14   you've got date and time, and for some of the

15   defendants, those fields are concatenated.  We have

16   both the date and the time.

17       Q.   Those are from you, Dr. McCann.  Those

18   were not provided by defendant, Giant Eagle.  Those

19   were created by plaintiffs.

20       A.   I'll have to go back and check.

21       Q.   The fill -- I'm sorry.

22       A.   I feel comfortable with the fill date.  I

23   feel less comfortable with the fill time,

24   obviously, because so much of HBC's records don't

25   include a fill time.

Page 249

1     Q.   Sir, I asked you what fill time meant, and

2   you said you're comfortable with the fill time.

3          Are you saying you're comfortable with

4   what fill time means?

5     MR. MOUGEY:  Objection.

6     THE WITNESS:  I mean I'm comfortable using the

7   data in the fill time record provided by the

8   defendants for purposes of applying the

9   prescription red flags.

10  BY MR. KOBRIN:

11    Q.   So you believe that it's -- strike that.

12         You're comfortable using the fill date for

13  Flagging Method 13 and the dispensing flags?

14    A.   Yes.

15    MS. FUMERTON:  Hey, Josh, does it make sense --

16  oh, sorry.  I didn't mean to interrupt you -- just

17  to take a break sometime soon?

18    MR. KOBRIN:  Yeah.

19  BY MR. KOBRIN:

20    Q.   Are you -- so you're comfortable that fill

21  date is the time that an opioid was dispensed?

22    A.   No.  You said that wrong.

23    Q.   Well, you used it for 13, and 13 is an

24  opioid that was dispensed to at least three

25  different patients within an hour.

```
                                            Page 250
 1        A.    But in your question just now, you said
 2    comfortable using the fill date as the time.  I'm
 3    sorry.  I think you mean fill time as the time
 4    or --
 5        Q.    Well, we don't have any fill -- you put
 6    the time in as 12:00 noon, correct?
 7        A.    Right.
 8        Q.    You also used the fill date, you said?
 9        A.    Correct.
10        Q.    And you said we're comfortable with the
11    fill date here.  So you're comfortable using the
12    fill date for Method 13, correct?
13        A.    If I understand your question, yes.
14        Q.    So you're comfortable that the fill date
15    is the date the opioid was dispensed?
16        A.    I'm comfortable running the flag on the
17    fill date as I was instructed.
18        MR. KOBRIN:  Let's take a quick break.
19        THE VIDEOGRAPHER:  We are going off the record.
20    The time is now 3:34.
21                        (Whereupon, a short break was
22                        taken.)
23        THE VIDEOGRAPHER:  We are back on the record.
24    This is the start to media No. 6.  The time is
25    3:52.
```

Page 251

1    BY MR. KOBRIN:

2        Q.   Dr. McCann, if we can jump back to the

3    same exhibit we were on previously.  It's

4    Exhibit 20.

5             In the situations in which there is no

6    fill date or transaction date/time, do you know

7    where you got the fill date in both the fill date

8    and the fill time columns that were created by you?

9    I think you're muted, Dr. McCann.

10       A.   Thank you.  Yes.  Not as I sit here.  I

11   don't recall.  I would have to check.

12       Q.   And is it fair to say that the date in the

13   fill date that you created and the date in the fill

14   time field that you created, that they should be

15   the same?  Strike that.

16            Let me just preface it with there's a date

17   in the fill date field that you created, and

18   there's a date in the fill time along with the

19   12:00 noon time that you put into these

20   transactions.

21            Is it fair to say that the date in both of

22   those fields, the date and the fill date and the

23   date and the fill time, should be the same date?

24       A.   I think so.  I would have to check with

25   the staff that worked on all of this data to see if

Page 252

1   there's some exception to that, but I think that

2   would be the rule certainly.

3       Q.   Can you think of a reason why the date in

4   the fill date field that you created would be

5   different from the date that you put in the fill

6   time you created?

7       A.   Not as I sit here.  I really just can't

8   give it any thought as I sit here, but I'll just

9   have to think about it offline.

10      Q.   Because you can't answer that question

11  right now?

12      A.   Correct.  I can't think of any reason

13  right now, but it may be I'm just not able to think

14  about it right now.  I'll have to think about it

15  offline and look at the data, not just these five

16  records, but the data more generally.

17      Q.   If we could -- we talked about earlier how

18  you added the 12:00 noon date for any time there

19  was not a transaction time or fill time; is that

20  correct?

21      A.   There was a little confusion in your

22  question, but where there was a fill time missing,

23  we filled in 12:00 noon.

24      Q.   Did plaintiffs request a fill time?

25      A.   I have no idea.  We didn't get a fill time

Page 253

1     for virtually all of the dispensed prescriptions

2     for at least three of the five defendants, and for

3     a couple of them, we received a fill time in

4     roughly half of the dispensed prescriptions.

5          Q.   But you don't know whether plaintiffs

6     actually asked for a fill time?

7          A.   Correct.

8          Q.   Would it make sense that defendants might

9     not have provided a fill time if plaintiffs didn't

10    ask for a fill time?

11         MR. MOUGEY:  Objection.

12         THE WITNESS:  I don't know.  Certainly three of

13    the defendants provided fill times for all of the

14    transactions, all the -- so I don't know.  It

15    wouldn't seem to make sense to me, but I don't

16    know.

17    BY MR. KOBRIN:

18         Q.   Did you notice at all that the addition of

19    the 12:00 noon fill time for Giant Eagle led to any

20    false positives?

21         A.   Well, there wouldn't be any false

22    positives identified so far anyway.  They would

23    only be identified if you then subsequently

24    provided the actual fill times rather than the

25    missing fill times.  If you provided the actual

Page 254

1   fill times, we could compare the results of the

2   flagging methods on the complete data with the

3   flagging methods on the data you did provide, and

4   we could figure out whether there were any false

5   positives as a result of that data you didn't

6   provide.

7        Q.   If there were no fill time records to

8   provide, did you notice any unusual trends that

9   were caused by the use of a 12:00 noon fill time

10  anytime there was no fill time record to provide?

11       A.   No.

12       Q.   Could we look really quick at Exhibit 11

13  at Page 208?  We were looking at Method 13 for

14  dispensing.  Do you recall that, Dr. McCann?

15       A.   Yes.

16       Q.   And this is for Giant Eagle in Lake and

17  Trumbull County.  We've highlighted Red Flag

18  Competition 13, and I represented to you earlier

19  that there was no time stamp for transactions at

20  Giant Eagle until 2013, 2014.

21            Do you recall that?

22       A.   I don't recall the dates that you gave me

23  before, but I recall you saying something like

24  that.

25       Q.   Did you notice any unusual trend in the

                                                    Page 255

1    flags for Computation 13 for Giant Eagle between

2    2006 to 2012 versus the trends after there was a

3    transaction time beginning in 2013-14?

4        A.   Well, I don't know the trends or

5    transaction times, but I see the percents flagged

6    under Flag 13 are much higher from 2006 to 2012

7    than they are from 2013 on.

8        Q.   And 2006 to 2012 is the period in which

9    you inserted a 12:00 noon time stamp on the

10   transactions, correct?  For any transaction --

11   missing transaction time, you put 12:00 noon for

12   2006 to 2012, correct?

13       A.   We did it for all years, not just those

14   years.  Any transaction record that didn't have a

15   fill time, we put in a fill time rather than lose

16   the record.

17       Q.   I represented to you that Giant Eagle

18   started collecting fill times in 2013, 2014.  So

19   you wouldn't have had to fill in the 12:00 noon

20   time, correct?

21       A.   No.  We would still fill in the 12:00 noon

22   time after if any of the later dispensed

23   prescriptions, the fill time was not included.

24   Anytime the fill time was not included, we filled

25   it in with 12:00.

Page 256

1      Q.   And if they were collected and produced to

2   you from 2013 approximately through the end of the

3   discovery period, you wouldn't have had to put the

4   12:00 noon fill time in, correct?

5      A.   Right.  Of course, that would also be true

6   for 2006 to 2012.  It's true that if the data had

7   been provided, we wouldn't have to fill in the

8   data.

9      Q.   But you're not even sure if the plaintiffs

10  asked for the data, correct?

11     A.   I don't know what the plaintiffs asked

12  for.  I think you just represented that HBC

13  produced it in any case for some of the years, but

14  not other years.

15     Q.   They produced the transaction date and the

16  transaction time.

17     A.   Okay.

18     Q.   Isn't that correct?

19     A.   I don't know.  You're the one who is

20  making the representation.

21     Q.   Well, did you only use fill time for

22  Method 13?

23     A.   I would have to go back and check and see

24  what we did.  It seems like HBC has a particular

25  problem with times, but I just have to go back and

1  look at the details of how we resolved all of the

2  different issues.

3      Q.   If Giant Eagle provided a date and a time

4  for that field that we talked about earlier, TX,

5  underscore, DTE, underscore, TME, do you know if

6  you used that in Method 13?

7      A.   I don't know.  I'll have to go back and

8  look at exactly what we did to resolve whatever

9  issues there are with the HBC data.

10      Q.   This is the Giant Eagle dispensing data,

11  Dr. McCann.

12      A.   Yes.

13      Q.   This doesn't have anything to do with HBC.

14  Do you understand that, Dr. McCann?

15      A.   I don't think that it has nothing to do

16  with HBC.  You see the title of the exhibit says

17  Giant Eagle HBC Combination Red Flag Prescription

18  Summary.

19      Q.   Who put that there, Dr. McCann?

20      A.   We did.

21      Q.   Okay.  You understand that HBC is the

22  warehouse though, right, Dr. McCann?

23      A.   Yes.

24      MR. KOBRIN:  Subject to there being any

25  additional time to ask questions, I'm going to pass

Page 258

1    the witness.

2        MS. FUMERTON:  I'll start over.  This is Tara

3    Fumerton on behalf of Walmart, Inc.  Dr. McCann, we

4    met several moons ago in a conference room before

5    the pandemic hit, but it's nice to see you again.

6    I actually think we can just keep going on the

7    record if that's okay with everybody that we don't

8    need to take a break?

9        MR. MOUGEY:  Okay with me.

10       THE WITNESS:  Good to see you, ma'am.  Yes.

11       MS. FUMERTON:  Okay.  Great.

12                       EXAMINATION

13   BY MS. FUMERTON:

14       Q.   So Dr. McCann, when Ms. Swift was asking

15   you some questions earlier during the day, she

16   asked you if you were disavowing anything in your

17   report, and you said nothing except for maybe

18   Appendix 8C.

19            Do you recall saying something along those

20   lines?

21       A.   Yes.

22       Q.   Okay.  So I want to talk about 8C.  Tell

23   me what you meant by that comment.

24       A.   Well, I don't mean to single out Walmart,

25   but there was a few months of transaction data

Page 259

```
 1    missing from ARCOS that was in the Walmart-produced

 2    defendant transactions, and we received that

 3    sometime in the week preceding when the expert

 4    report was due.  And we didn't have time to do

 5    everything we would have wanted to do with all of

 6    the defendant transaction data, but because of that

 7    gap in the ARCOS data for Walmart, we did try to

 8    use the Walmart data in my initial report.  We used

 9    the Walmart data to fill in that three-month gap,

10    approximately three-month gap, and we ran some

11    analysis on the Walmart data, the ARCOS data and

12    the defendant transaction data combined, and we

13    reported that in 8C.

14            When we get to the supplemental report a

15    couple of weeks later, we analyzed all of the

16    defendant transaction data, not just Walmart's, and

17    we create a supplemental 8A, and it -- it replaces

18    8C.  It's in addition to 8A and 8D that were

19    attached to the initial report, but it should be

20    thought of as -- at least the portion of it that

21    refers to Walmart as replacing 8C.

22       Q.   Okay.  You've said a lot there.  I just

23    want to unpack it.  I think I was following, but I

24    want to make sure I do fully understand this.

25            So let's back up for a second.  You
```

Page 260

1     provided an opinion about Walmart's distribution

2     data and Walmart's ARCOS data in Track 1, correct?

3          A.    Correct.

4          Q.    And I recall from your Track 1 report that

5     you had identified in that report that there was

6     a -- I think you described in that report a minor

7     discrepancy between the ARCOS data and the Walmart

8     transactional data.

9               Do you recall that?

10         A.    I'm sorry.  I don't, but that's quite

11    likely the case.  I think that was true across the

12    distributors.

13         Q.    Okay.  And so what I'm trying to

14    understand is then it sounds like you thought this

15    was a new issue, and so I'm trying to understand

16    what's new about it because you also in your

17    report, and I do want to walk through this,

18    detailed this issue as well in your report that was

19    served on April 16th, correct?

20         A.    Yes.

21         Q.    So why don't we start there, and let's

22    work our way up to what happened with respect to

23    8C.

24               So if you have your report in front of

25    you, I think it was marked as Exhibit 1, I'm going

Page 261

1   to refer to some paragraphs.  If you want to
2   reference your report, you can.  Just for the issue
3   of time, I don't think you necessarily need to pull
4   it out, but on Page 199 of your report,
5   Paragraph 241, you conclude that after correcting
6   for a relatively small number of records, the ARCOS
7   data produced by the DEA is complete and reliable,
8   correct?
9        A.   I apologize.  I missed the page and
10  paragraph reference.
11       Q.   Not an issue.  Let's pull it out then.
12  It's Page 99, Paragraph 241.
13       A.   I can find it now.  I was just looking at
14  the wrong page.  I'm still not seeing the same page
15  number and paragraph you're referring to.
16       Q.   You know what, I might have the number
17  wrong.  I apologize.  Hold on one second.  I'm
18  sorry.  It is 186, Paragraph 249 -- 241.  To be
19  clear, it's Page -- it's getting late in the day,
20  Page 186, Paragraph 241.
21       A.   Yes.
22       Q.   Okay.  And just so the record is clear,
23  Paragraph 241 states that after correcting a
24  relatively small number of records, ARCOS data
25  produced by the DEA is complete and reliable.

Page 262

1              Is that accurate?

2       A.    Yes.

3       Q.    You stand by that opinion, correct?

4       A.    I do.

5       Q.    And you, in fact, conclude that's true

6    with respect to Walmart, too, correct?

7       A.    Yes.

8       Q.    And specifically if we go to Page -- which

9    I'm going to look before I say it this time,

10   Page 60, Paragraph 112, you state that other than

11   some missing shipments from ARCOS in a few months

12   between December 2012 and August 2013, the two data

13   sets match perfectly.

14            And that's referring to the ARCOS data and

15   the Walmart data that was produced with respect to

16   Lake and Trumbull County, correct?

17      A.    Yes.

18      Q.    So April 16th, you're aware that there was

19   a small discrepancy, and you had Walmart's

20   transactional data, correct?

21      A.    Correct.

22      Q.    So when you said that you recently got

23   some new data that wasn't available in time for the

24   report, what are you referring to?

25      A.    We got this Walmart data and other

Page 263

1    defendant transaction data approximately a week,

2    some of it within just a few days, but a week

3    before the Friday the expert report was due.  So we

4    were able to do this type of analysis, including

5    what you're seeing in Figure 11 on Page 60,

6    Figure 10 on the page before in those three or four

7    days or a week that we had the data.

8              What we didn't do was run any SOMS

9    analysis on the defendant transaction data outside

10   of the ARCOS time period with anybody but Walmart.

11   We tried to do something with the Walmart data

12   because we just mastered the Walmart data a little

13   bit more fully in that last few days than we did

14   the other defendant transaction data.  The reason

15   we did that was we were trying to fill in this

16   three or four months or five months.

17             It was -- there was one other issue that

18   we discovered that had a little impact on a couple

19   of the other defendants, but a bigger impact on

20   Walmart, and that is the ARCOS data had three

21   pharmacies, I forget the other two defendants, but

22   one was for Walmart where they identified a

23   pharmacy with Mahoning County, but the defendant

24   transaction data identified a pharmacy with

25   Trumbull County.  And then when we -- we

Page 264

1    investigated those three pharmacies, we found they

2    were, in fact, in Trumbull County.

3            So that occurred between the April 16th

4    report and the May 4th supplement.  So in those two

5    weeks, we looked again at defendant transaction

6    data, saw that there was a pharmacy there in your

7    defendant transaction data that was not identified

8    as a Trumbull or Lake County pharmacy in the ARCOS

9    data.  So there were really two differences as you

10   go from 8C to the Walmart component supplemental

11   8A.  It's more fully incorporating the defendant

12   transaction data in the SOMS and adding this

13   additional pharmacy that's in your defendant

14   transaction data that was not in ARCOS identified

15   as Trumbull.

16       Q.   Okay.  The reason I'm confused, and you

17   might not know this, but I can represent that we

18   produced our transactional data for our

19   distribution into Lake and Trumbull County back in

20   September of 2020.

21           So do you have any understanding of why

22   you were receiving that just a couple of weeks

23   before your report was due?

24       A.   Not a couple of weeks, less than seven

25   days, maybe as little as three or four days for a

Page 265

1    couple of the data sets.  I don't know why.

2        Q.   Who provided that to you?

3        A.   Counsel.

4        Q.   Did counsel explain to you at all why that

5    data was coming in to you at that time?

6        A.   No.

7        Q.   So just to make sure that I'm clear,

8    Appendix 8C was also provided on April 16th with

9    your original report, correct?

10       A.   Correct.

11       Q.   But your testimony now is that you're not

12   sure that 8C is accurate, or what is your position

13   with respect to 8C?

14       MR. MOUGEY:  Objection.

15       THE WITNESS:  It accurately does what it says

16   it does, but the supplemental 8A includes analysis

17   of Walmart that is more complete for the reasons

18   I've given you.

19            The primary difference between

20   supplemental 8A and 8C with respect to Walmart, I

21   think, is this additional pharmacy, plus the

22   bookends, if you will, the additional data that

23   Walmart provided outside of the ARCOS time period.

24   That's why I said I would replace 8C altogether

25   with the portion of Walmart that's in

Page 266

1    supplemental 8A.

2    BY MS. FUMERTON:

3        Q.   So I appreciate the explanation now, but

4    with all due respect, is there any way that I can

5    tell this from looking at your reports themselves

6    putting aside the thousands and tens of thousands

7    of appendices?

8        A.   I don't know.

9        Q.   Because I will tell you in the report,

10   body of the report, I couldn't find 8C referenced

11   anywhere.  You do reference 8A, and you do

12   reference 8B, but there is no reference to 8C.

13       A.   In which report?

14       Q.   Your April 16th report.  So, for example,

15   if you go to where you describe Appendix 8 in your

16   original report.

17       A.   Can you help me find that, please?

18       Q.   I will try.  If you can go to Page 225,

19   you talk about Appendix A, eight flag transaction

20   reports, correct?

21       A.   Yes.

22       Q.   And Paragraph 275 talks about Appendix 8A,

23   and Paragraph 276 talks about Appendix 8B?

24       A.   Yes.

25       Q.   Then Paragraph 277 talks about how it's

Page 267

1    2,623 pages?

2         A.   Yes.

3         Q.   Okay.  And then if I understand your

4    testimony correctly, it's your May 4th report,

5    which is Exhibit -- well, before we move on, do you

6    agree there's no reference to Exhibit or

7    Appendix 8C in your original report, correct?

8         A.   Well, at least not on that page.  I

9    haven't looked at all of the pages.  I don't know,

10   but if you're telling me it's not there, I would

11   accept that.

12        Q.   Okay.  So then if we turn to what was

13   marked as Exhibit 2 earlier, which is your May 4th

14   report, where in this report -- it's a shorter

15   report.  So maybe you can help me find it -- do you

16   explain that we're supposed to replace Supplemental

17   8A -- I'm sorry, replace Appendix 8C with

18   Supplemental 8A?

19        A.   Well, I don't see that there explicitly,

20   but in the description of Appendix -- Supplemental

21   Appendix 8A, which starts at the bottom of Page 6

22   and goes over onto the top of Page 7, that

23   description would seem to apply to 8C for Walmart.

24   I just have to line up Appendix 8C with this

25   description.  And then if you looked at Appendix --

Page 268

1    Supplemental Appendix 8A here, you would see a

2    difference between this discussion of Walmart, the

3    results of running these examples, SOMS methods

4    SOMS Walmart data in Supplemental 8A with the

5    previous results in 8C.  I agree with you I could

6    have added a sentence or two that would have made

7    it easier for you.

8         Q.   A heads up would have been helpful for us

9    in understanding that this was going on.  So okay.

10   Now I think I understand.

11        So nobody should be relying on 8C; is that

12   correct?  The analysis you want people to rely on

13   is the one that is in the -- with respect to

14   Walmart is in Supplemental 8A?

15        A.   Yes.  Thank you.

16        Q.   Okay.  And I'm still not quite getting

17   this part, though.  What do you understand the

18   difference to be between Supplemental 8A and 8C?

19   And I'm not -- is it simply you had more time, so

20   you think you did a better job with it, or do you

21   actually use different data?

22        A.   I think other than the addition of another

23   Walmart pharmacy in Trumbull County, the numbers

24   will be the same.  For instance, if you look at the

25   numbers for Lake County in Supplemental 8A, I think

Page 269

1    they match up with the numbers for Lake County in

2    the initial reports 8C.  I think the difference in

3    the numbers is really in Trumbull County, and it's

4    explained by this additional pharmacy that isn't

5    reflected in the ARCOS data as being in Trumbull

6    County, but was reflected in the -- in the Walmart

7    data as being in Trumbull County and, in fact, is

8    in Trumbull County as we investigated.

9        Q.   Okay.  So I haven't had the opportunity to

10   do that comparison yet because I didn't understand

11   that this was sort of what you were intending to

12   do.  So I reserve an opportunity to sort of do the

13   comparison and ask any additional questions on that

14   later, but I do want to move on from this topic

15   unless there's anything else you think that I

16   should know with respect to what changes you made

17   specific to Walmart with respect to 8A and 8C.

18        Let me be clear.  There's an original 8A,

19   which makes it even more complicated.  So it's the

20   supplemental 8A that was provided on May 4th and

21   the original 8C that was provided on April 16th.

22        A.   Okay.

23        Q.   Is there anything else, or it's the one

24   pharmacy and this data that somehow mysteriously

25   showed up only a couple days before your report?

Page 270

1      A.   Well, there are a couple of issues with

2   the formatting in 8C and some labels and stuff, and

3   I would just ignore 8C.  What we were trying to do

4   in 8C for Walmart is done more fully and explained

5   more clearly in the Supplemental 8A and there,

6   there's also the same analysis done for the other

7   defendants.  8C had just had Walmart in it.  I

8   think we should just disregard 8C and replace it

9   with that Supplemental 8A.  In fact, had we just

10   described it as Replacement 8C.  It might have made

11   things simpler.

12      Q.   Okay.  Switching subjects on you, you have

13   an envelope that has two small documents in it.

14   I'll represent we're also going to maybe show you

15   an Excel spreadsheet just live because there's no

16   way to really print it out, but do you have those

17   envelopes in front of you?

18      A.   Yes.

19      Q.   So if you can pull out what has been

20   marked as Tab 2.

21      MS. FUMERTON:  And what exhibit number are we

22   on now?

23      THE CONCIERGE:  21.

24      MS. FUMERTON:  Okay.  We'll mark this as

25   Exhibit 21.

Page 271

1                          (Whereupon, McCANN Deposition

2                          Exhibit No. 21 was marked for

3                          identification.)

4    BY MS. FUMERTON:

5         Q.    And I'll represent for the record, it's

6    excerpts from Appendix 10 of your report.  We just

7    pulled out some specific pages.

8              So if you turn to the first page of -- I'm

9    not going to have you turn to the first page.  I'm

10   going to have you turn to the page that's labeled

11   1425.  It's your original page numbering of

12   Exhibit 10, which has been marked as Exhibit 21.

13   Are you there?

14        A.    I like the first page.  I hope you'll

15   bring me back there.  What page are you taking me

16   to, please, again?  1425?

17        Q.    1425.

18        A.    I'm there.  Yes.  Thank you.

19        Q.    Okay.  So on Pages 1425, and it spills

20   over to 1427, you provide an analysis by MME of the

21   total opioid distribution into Lake and Trumbull

22   Counties by company, correct?

23        A.    Yes.

24        Q.    And for Walmart, you conclude that

25   Walmart's market share of the total opioids

Page 272

1    distributed into Lake and Trumbull County by MME is

2    3.48 percent, correct?

3        A.    Yes.

4        Q.    And if we go forward a few more pages in

5    what's been marked as Exhibit 21, your Appendix 10

6    excerpt, to Page 1456.

7        A.    Yes.

8        Q.    And on Page 1456 through 57, you provide

9    an analysis by MME of the total opioid distribution

10    into Lake County by company, correct?

11        A.    Yes.

12        Q.    And for Walmart, you conclude that

13    Walmart's market share of the total opioids

14    distributed into Lake County by MME is

15    5.99 percent, correct?

16        A.    Correct.

17        Q.    And if we keep going to Pages 1483 of this

18    excerpt --

19        A.    Yes.

20        Q.    On Pages 1483 to 84 of this excerpt of

21    Appendix 10, you provide an analysis by MME of the

22    total opioids distribution into Trumbull County by

23    company, correct?

24        A.    Right.

25        Q.    And for Walmart, you conclude that

Page 273

1    Walmart's market share of the total opioids

2    distributed into Trumbull County by MME is

3    1.93 percent, correct?

4        A.   Correct.  I'm sorry.  Before we leave this

5    one, this is the ARCOS data, and this is Trumbull

6    County.  So this doesn't include a Walmart pharmacy

7    that's in Trumbull County.  So that number would

8    change very slightly if we include that pharmacy

9    that ARCOS describes as being in Mahoning County, I

10   think, but it will still be a small number like

11   1.93 percent.  It will just be a little bit bigger.

12       Q.   All right.  I was going to circle back to

13   this in a minute, but you're there now.  So let's

14   talk about this additional pharmacy that you found.

15            So is that something then that's missing

16   from all of your reports other than Supplemental

17   Appendix 8A?

18       A.   It's not so much missing.  We report these

19   statistics based on what's in the ARCOS data, and

20   that would include the pharmacies that are

21   identified in the ARCOS data in Trumbull County.

22   So I'm not saying I want to change this exhibit to

23   reflect that additional pharmacy, but I mentioned

24   that pharmacy a couple of times.  So I'm just

25   pointing out where it might have an impact if you

Page 274

1    were to include it.  We only include it for

2    purposes of the SOMS analysis that gets reported in

3    the Supplemental 8A.

4         Q.   Okay.  So you're a numbers guy, right?

5         A.   Yes.

6         Q.   I'm not trying to be cute, but you are

7    here to sort of crunch the numbers.  You've

8    referred to yourself as sort of a human calculator,

9    I think, before, correct?

10        A.   Yes.

11        Q.   So what I'm trying to understand is for my

12   client, what numbers to rely on or what numbers

13   you're intending to give opinions on.  So can we

14   then understand and rely that the opinions that

15   you're going to be offering at trial are going to

16   relate to the three reports that you submitted in

17   Track 3 understanding that Supplemental Appendix 8A

18   replaces Supplemental -- I'm sorry, replaces

19   Original Appendix 8C, and then we can otherwise say

20   this is what Dr. McCann is going to testify about

21   with respect to Walmart coming into trial?

22        A.   Yes, I would think so other than the

23   development of some demonstratives or some summary

24   exhibits of the underlying data that would come in

25   as evidence.  I'm not withholding anything from

Page 275

1   you.  I've given you all of the analysis that we've

2   done in these three reports, and I've explained the

3   difference between the first report and the

4   supplemental report and this issue about the

5   pharmacy that is in Trumbull County that isn't

6   identified as such in ARCOS.  I'm likely to give

7   some, you know, explanation of that if I'm asked at

8   trial.

9       Q.   So -- but as far as your opinions and

10  however you decide to treat this one particular

11  pharmacy, as your reports currently stand, with the

12  exception of replacing 8C with Supplemental 8A,

13  that's how you plan to describe your treatment of

14  the Walmart pharmacies in Lake and Trumbull County,

15  correct?

16      A.   Yes, subject to the explanation I gave you

17  a minute ago.  There might be demonstratives that

18  are some distillation, some simplification of these

19  exhibits or tables and maybe some what I understand

20  to be referred to as 1006 exhibits that might be

21  summaries of the data that would be entered as

22  evidence.

23      Q.   Well, actually, let me go to my next set

24  of questions, and it might clear this up a little

25  bit more.

1          So let's go back to the first page of

2     what's been marked as Exhibit 21.  I think you said

3     you like that page.  Why do you like that page?

4          A.   Well, I was asked extensively in the prior

5     questioning about whether I had done market shares

6     of any non-defendant pharmacies or of the

7     non-defendant pharmacies in the aggregate, and I

8     tried to explain, although, I think we were talking

9     past each other.  This exact page, you can see here

10    I list each of the pharmacies in Lake and Trumbull

11    County and the dosage units, weight, and MME of any

12    of the 12 opioids shipped to those pharmacies.  And

13    as you go down through here, you can see which ones

14    are part of the defendant chains and which ones are

15    not.

16          And so if you wanted market shares, it

17    would be a fairly simple calculation to take this

18    in Excel format and do the calculations.  This is

19    what I was referring to.

20          Q.   And to be fair, this page doesn't actually

21    show the market share.  You would have to do some

22    additional calculations, correct?

23          A.   Well, to be fair, you would have to add up

24    all of the numbers in one of these columns.  You

25    would do it in an Excel spreadsheet in 10 seconds,

Page 277

1    and then you would have to divide each of the cells

2    above that by that sum to get a percent share.  So

3    you're right it's not done on here, but we're

4    25 seconds away from it being done here.  It's

5    trivial.

6        Q.   Okay.  All right.  So let's back up a

7    little bit.

8             So Appendix -- Pages 89 -- I'm sorry.  891

9    through 94, it spans four pages.  You have provided

10   an analysis of the total opioid shipments to Lake

11   and Trumbull County retail and chain pharmacies,

12   correct?

13       A.   As reflected in ARCOS, yes.

14       Q.   As reflected in ARCOS.  And this analysis

15   identifies for each retailer chain pharmacy in Lake

16   and Trumbull County the total dosage unit, weight

17   in milligrams, and MME of certain opioids purchased

18   by that individual pharmacy for the 2006-2014 time

19   period as reflected by ARCOS, correct?

20       A.   Correct.

21       Q.   And these pharmacies are sorted in

22   descending order of total MME purchased by each

23   pharmacy, correct?

24       A.   Correct.

25       Q.   So the top pharmacy on this list is an

Page 278

1    independent pharmacy, correct?

2         A.    Yes, it appears to be.

3         Q.    And it's a pharmacy called Franklin

4    Pharmacy and Healthcare?

5         A.    Yes.

6         Q.    And according to your analysis, Franklin

7    Pharmacy and Healthcare purchased 241,341,833 MMEs

8    of opioids, correct?

9         A.    Correct.

10        Q.    Now, if we look down this list, the first

11   Walmart store is about a little over two-thirds of

12   the way down.  It's next to the Page No. 128, and

13   it's Store No. 1863, correct?

14        A.    Yes.

15        Q.    And this would be the top Walmart pharmacy

16   in Lake and Trumbull Counties by total MME,

17   correct?

18        A.    Correct, unless that other one is higher,

19   but certainly it's the highest that's listed in

20   Walmart in Lake or Trumbull County.  I'm sorry.

21   Listed in ARCOS for Lake or Trumbull County.

22        Q.    So that's where I'm at a little bit of a

23   disadvantage, and that's what I was trying to get

24   at earlier because I'm now completely confused as

25   to what you think what pharmacy is missing.  So you

Page 279

1    think -- and I took a walk through all the Walmart

2    pharmacies on this list.

3           So you tell me if you think the Walmart

4    pharmacy you're thinking about is not on this list.

5    Is that fair?

6       A.    Sure.

7       Q.    So this is -- next to what was numbered

8    Page 128, we have Walmart Pharmacy 1863, right?

9       A.    Yes.

10      Q.    And if you count them, and take your time

11   if you want to do it, there are 29 other pharmacies

12   in Lake and Trumbull Counties that purchased more

13   opioids by MMEs than that one Walmart store,

14   correct?

15      A.    Yes.

16      Q.    And according to this analysis, Walmart

17   Store 1863 purchased 36,084,271 MME of opioids,

18   correct?

19      A.    Correct.

20      Q.    And doing simple math, getting to your

21   point earlier, if you compare that to Franklin

22   Pharmacy and Healthcare, Franklin Pharmacy and

23   Healthcare purchased more than six and a half times

24   the number of opioids weighted by MME than Walmart

25   Store 1863, correct?

Page 280

1           A.    Yes.

2           Q.    And the other Walmart pharmacies in Lake

3      and Trumbull County purchased even fewer dose units

4      in MME of opioids, correct?

5           A.    Yes.

6           Q.    So let's keep going down this list.  So I

7      want to keep on this pharmacy issue to make sure

8      it's clear.

9                 The next Walmart pharmacy that I see is on

10     the following page by Line 187.  Do you see that?

11     That's Pharmacy 3608?

12          A.    Yes.

13          Q.    And if we keep going down, you'll see

14     there's a Sam's Pharmacy, and that's because

15     Walmart, when it was a self-distributor for a

16     period of time, distributed to both Walmart and

17     Sam's pharmacies, correct?

18          A.    Yes.

19          Q.    And so the Sam's Pharmacy, if you go down

20     the list, there's one at 255, and that's

21     Store 6327, correct?

22          A.    Yes.

23          Q.    And then keep going down.  At Line 291, we

24     have Walmart Pharmacy 2197, correct?

25          A.    Correct.

```
                                                   Page 281
 1        Q.    And then a couple down more, we have
 2   Walmart Pharmacy 10 -- I'm sorry.  Walmart
 3   Pharmacy 1857?
 4        A.    Yes.
 5        Q.    And we flip a page.  We have another Sam's
 6   Pharmacy, 4846?
 7        A.    Yes.
 8        Q.    Do you see that?
 9              And then below that, we have Walmart
10   Pharmacy 3860?
11        A.    Yes.
12        Q.    And below that, we have Walmart
13   Pharmacy 2197, right?
14        A.    Right.  Yes.
15        Q.    So you can keep looking on the next page
16   if you want, but that's all of the Walmart
17   pharmacies and Sam's I see on your list.  And if we
18   total them, they're not that many.  We have six
19   Walmart pharmacies listed here and two Sam's,
20   correct?
21        A.    Yes.
22        Q.    Now, I will note one other thing, though.
23   If you look at Line 291, you see that refers to
24   Walmart Pharmacy 2197?
25        A.    Yes.
```

Page 282

1      Q.   And if you look at Line 382 of the next

2   page, you also see Walmart Pharmacy 2197.  It

3   appears that this Walmart pharmacy is being counted

4   twice, correct, or it seems to be counted twice.

5   It's being listed twice.

6      A.   But they're different DEA numbers.  So

7   it's a different set of transactions.  The

8   transactions are not being counted twice, but for

9   some reason during some time period, that store had

10   a different DEA number, or Walmart changed the

11   store number on a physical location.  I don't know

12   which it is.

13      Q.   Sure.  And look, I'll represent to you

14   that the store number didn't change.  It's still --

15   in both instances, it's Store 2197, and you reflect

16   that on your chart; but if you look at the

17   addresses, the addresses change.  So not surprising

18   that it got a new DEA number, right?

19      A.   Right.

20      Q.   And we can look at some other data later,

21   but I'll show you, too, so there's no overlapping.

22   You actually have charts that show this that there

23   was data for one period of time for the one

24   pharmacy and after that, another time.  So you're

25   not double counting the number of opioids.  There

Page 283

1   might be some double counting we'll get to in a few

2   minutes, but not at least with respect to this page

3   you're not double counting anything, right?

4        A.   Okay.

5        Q.   So having looked at this now and gone

6   through all the Walmart pharmacies that are listed

7   here and the two Sam's, can you tell me whether

8   this pharmacy you're thinking of that caused you

9   trouble before is included or not included on this

10  list?

11       A.   I believe it's not included.

12       Q.   So can you tell me what -- anything more

13  about what you think is not included, or how would

14  I know what pharmacy?  How can we figure out,

15  looking at all the materials you provided, what

16  pharmacy you think is missing off of this list?

17       A.   Well, if we look at Supplemental 8A, the

18  data that underlies that supplemental appendix that

19  was provided to you will include an additional

20  Walmart location that is not on this list, but I

21  could make it easier, I think, by letting counsel

22  know precisely what that Walmart location is, and

23  they can share it with you.  There does appear to

24  be another Walmart location.

25            In fact, an easier way for you to tell

Page 284

1    that is to look at your own data produced in this

2    case for Trumbull County pharmacies, and I think

3    you'll find another Walmart pharmacy in your data

4    produced for Trumbull County that is not on this

5    list that was not in the ARCOS data as a Trumbull

6    County pharmacy, but was instead in the ARCOS data

7    as a Mahoning County pharmacy.

8        Q.   But you're not intending to amend this

9    report -- this particular appendix of your report,

10   correct?

11       A.   Correct.  This report accurately reflects

12   what's in the ARCOS data.  It's just that the ARCOS

13   data identifies one of your pharmacies in the wrong

14   county according to you, and I think that's

15   correct.

16       Q.   Well, I haven't made a representation just

17   to be clear, but that's your -- your opinion is

18   that there is one additional store that was

19   appropriately included in Supplemental 8A, correct,

20   that was missing from 8C?

21       A.   Well, we didn't independently go out and

22   discover this.  It's that there was -- in addition

23   to these pharmacies, you provided data for another

24   pharmacy, and when we looked at the pharmacy, we

25   see it's in Trumbull County.

1          So I think you correctly provided it to

2     us.  That's the source of our inclusion of that

3     pharmacy in Supplemental 8A.  It's really your data

4     that prompted it.

5          Q.   Well, respectfully, we produced that data,

6     and I don't even know what data you're referring to

7     because some of it was produced even earlier,

8     almost a year ago.  So this is why it's a little

9     bit confusing to try to understand what you're

10    saying in your report.  I think you made the record

11    clear before that the only thing that you did

12    change is Supplemental 8A, and the rest of your

13    report you're standing by.

14          So we don't have to do it now, but I did

15    actually do the math that you were just describing.

16    I'm not good at Excel.  So I'll confess I didn't do

17    it using Excel.  I did it the old-school way, but

18    basically adding up all the MME shipments and then

19    all the Walmart shipments, you can calculate the

20    market share, correct, based on this chart?

21          A.   Yes.

22          Q.   I calculated it being 3.15 percent for

23    Walmart pharmacies in Lake and Trumbull Counties.

24          Do you have any reason to disagree with

25    that number?

Page 286

1      A.   No.   That's consistent with one of the

2    other pages we just looked at.   For one of the

3    counties, it was a little bit higher, one of the

4    counties, a little bit lower than that number.

5      Q.   Okay.   I'm going to switch gears on you

6    again, although, keep this Exhibit 21 out because I

7    think it might be helpful to understand my line of

8    questioning.

9           So I want to talk about your Method 3, the

10   twice trailing 12-month average for pharmacy doses

11   units.   So it's described on Page 75 on your report

12   if you want to open it.   I bet you know it by heart

13   at this point, too.

14          So for this approach, you flagged

15   transactions that cause the number of dosage units

16   shipped by distributor defendant to a pharmacy in

17   the calendar -- let me start over.

18          For this approach, and that's Method 3,

19   you flagged transactions that caused the number of

20   dosage units shipped by distributor defendants to a

21   pharmacy in a calendar month to exceed twice the

22   trailing 12-month average dosage units to retail

23   and chain pharmacies served by the distributor

24   defendants, correct?

25     A.   Yes.

Page 287

1      Q.   So as applied to Walmart, you looked at

2  whether a shipment of opioids by Walmart to a

3  Walmart or Sam's Club pharmacy in Lake or Trumbull

4  County caused the number of dosage units shipped to

5  that pharmacy by Walmart to exceed twice the

6  per-store per-month average for that drug for all

7  Walmart and Sam's Clubs Pharmacies in Lake and

8  Trumbull Counties for the preceding 12 months,

9  correct?

10     A.   Yes.

11     Q.   And so to calculate the per-store

12 per-month average that was used to derive this

13 threshold, you took the total amount shipped by

14 Walmart to the Walmart and Sam's Club Pharmacies

15 for the preceding 12-month period and divided that

16 by 12 to get a monthly average and divided the

17 result by the total number of Walmart and Sam's

18 Club Pharmacies in Lake and Trumbull County,

19 correct?

20     A.   No.

21     Q.   Okay.  So explain what I got wrong.

22     A.   Well, for the ARCOS time period anyway, it

23 would be a national average that we're calculating.

24 And so it would be taking Walmart's shipments to

25 all of the Walmart and Sam's Club pharmacies that

Page 288

1    it shipped to each month over the prior 12 months

2    and -- so in my example earlier, if you had

3    12 months and 100 pharmacies, you would have

4    possibly 1,200 values that you would be adding up,

5    but some of those would be blank because there

6    might be a pharmacy that Walmart didn't ship any,

7    I'll make it up, but morphine to or any hydrocodone

8    to in a particular month.  So for that drug and

9    that pharmacy month, there would be a blank.

10           So rather than 1,200 observations, there

11   might be -- positive values.  Instead of there

12   being 1,200, there might be 1,150.  It's a little

13   bit less than 12 months times 100 pharmacies, but

14   whatever the total number of positive amounts are,

15   add up all of the shipments, divide by that number

16   1,150 in my example.  That gives you the monthly

17   average the pharmacies that Walmart shipped to over

18   the prior year.  And then each particular month,

19   you're comparing shipments to a pharmacy in Lake or

20   Trumbull County, not an average to Lake and

21   Trumbull County, but to each pharmacy, you're

22   comparing that pharmacy's shipments that month to

23   the 12-month average calculated the way I just

24   described it for the prior 12 months across the

25   nation.

1      Q.    Let me make sure that I'm correct about

2   this.

3            So what you're saying is that the average

4   that was calculated and used as the threshold for

5   Method 3 is the national average, not the average

6   to Lake and Trumbull County?

7      A.    Certainly for the ARCOS time period.

8      Q.    Okay.  And then you do Method 3 for -- on

9   the distributor data in Supplemental 8A, right?

10     A.    Right.  And there, we're still using the

11  national average where we've got 12 months of ARCOS

12  data, but we're using the average of the defendant

13  transaction data where we have less than 12 months

14  of trailing 12 months of national data.

15     Q.    And so for the national data, when you

16  were calculating the averages, did you exclude

17  those instances in which -- like what did you use

18  for -- is it the -- the numerator, right?  So did

19  you -- the total number of pharmacies -- sorry.

20  The total number of shipments divided by the total

21  number of pharmacies, right, for the average is the

22  denominator?

23     A.    Close.  It's the total amount of shipments

24  divided by the number of pharmacy month

25  combinations where Walmart ships some positive

Page 290

1    quantity to a pharmacy.

2         Q.    So anytime there was a zero in the data,

3    you excluded it?

4         A.    It's not so much excluded it, but it just

5    doesn't count into the average of shipments to

6    pharmacies that Walmart shipped to.

7         Q.    You used way too big of numbers for me

8    last time.  So I'm going to dumb it down slightly

9    and see if I can understand.

10           Let's say we have 10 pharmacies total,

11   okay?

12        A.    Yes.

13        Q.    And for shipments of -- let's use

14   hydrocodone.  Only five of those pharmacies

15   received shipments of hydrocodone, and let's say it

16   was 100 units of hydrocodone.

17           Are you going to take the 100 units and

18   divide it by 10 to get the average, or are you

19   taking the 100 units and dividing by 5 to get the

20   average?

21        A.    Dividing it by 5.

22        Q.    Okay.  And so I incorrectly use the word

23   excluded.  Is that what the issue is?  So anytime

24   if you have a shipment, if you have data and there

25   was a zero showing up in that, you would then take

Page 291

1    that pharmacy out of the calculation in the

2    denominator?

3         A.   No.  If there were other months that that

4    pharmacy got shipments, the quantities in those

5    other months are included.  We're not taking that

6    pharmacy out.

7         Q.   Okay.  I'm following now.  So let's say

8    you have the first pharmacy of the 10.  For the

9    first three years, it received zero shipments, and

10   for the next seven years, it received five bottles

11   a month.

12        You would include those zero years as well

13   as the five bottles a month because it was

14   receiving shipments; is that correct?

15        A.   No.  In your example, let's say that that

16   is one of 10 pharmacies, and the other nine

17   pharmacies receives some shipment every single

18   month.  So all 12 months those nine pharmacies

19   receive something.  That would be -- 9 times 12 is

20   108, but this pharmacy that you're describing now

21   didn't get any shipments for the first three

22   months, did get shipments for the last seven

23   months.

24        So I would take the 98 months -- I'm

25   sorry.  108 months for the nine pharmacies that got

Page 292

1    something every single month, and I would add to

2    that the seven observations where this 10th

3    pharmacy got shipments to get a total of 115, and I

4    would divide the total shipments to these

5    pharmacies in the prior year by 115 -- I'm sorry,

6    by 107 -- 117, not by 120.

7        Q.   Is the mistake I'm making -- oh, I'm

8    sorry.  I thought you were finished.  Go ahead.

9        A.   The denominator is the number of months

10   with positive shipments.  So that would be three

11   less than 120 in your example.  The reason for that

12   is, if I may explain, that you have -- for

13   distributors generally, you have pharmacies

14   dropping out or pharmacies coming into commerce

15   with a distributor.  And if you don't do it the way

16   I've described it, you calculate too low an

17   average.

18           In fact, what I'm doing is increasing the

19   calculated average, therefore, making this

20   threshold a little bit higher and harder to hit.

21   So the difference between what you're suggesting

22   and what I'm suggesting is I'm going to flag fewer

23   shipments with the way I calculate the average than

24   I would if I included the zeros.

25       Q.   I think I understand now and I think your

Page 293

1    last explanation because it would be incorrect to

2    just use the total number of pharmacies because if

3    the pharmacy hadn't opened, for example, until

4    later in that year, it would be unfair to include

5    zero in those shipments because it would be

6    artificially low as a threshold, correct?

7         A.   I don't know about unfair, but the problem

8    would be -- an example of the problem would be a

9    pharmacy that was only operating -- only doing

10   business with you for the first six months or the

11   last six months.  If you included all 12 months for

12   that pharmacy, you end up with a lower average, and

13   it's not reflecting the average shipments to

14   pharmacies that you're dealing with on a monthly

15   basis.

16        Q.   So is that true, the explanation you just

17   gave, the same for like Method 4, for example?

18   Whenever you're calculating an average, you're

19   calculating the national average in the way that

20   you just described?

21        A.   Yes.

22        Q.   All right.  I want to go to fill time

23   again for a minute.

24             I think you testified clearly earlier if

25   the fill time hour and minute was missing, you just

1    put in 12:00 noon, correct?

2        A.    Correct.

3        Q.    And I think you said, though, that doing

4    that could go either way as far as how it affects

5    the number, and that's what I don't understand

6    because if you -- you also testified that all of

7    our time-sensitive flags are based on fill time.

8    And so if you have 12:00 for all of your fill times

9    and for a flag like Flag 13, you're flagging

10   something within an hour of each other, you will

11   always meet that criteria, correct?

12       A.    If there are enough transactions.  Like in

13   that example, it was three or more patients filling

14   effectively exactly the same prescription written

15   by the same doctor.  That's correct.

16       Q.    Effectively reading out of -- by inserting

17   the 12:00 noon for all entries, you're essentially

18   reading out of Flag 13 that one-hour requirement,

19   correct?

20       A.    Well, not quite, but I do like how you

21   said that.  It's close.  It would be -- it would be

22   close if you just didn't ever report fill times in

23   the data that you produced or if there were blocks

24   of years or months or days where you didn't include

25   fill time, but if there were transactions in the

1    same year or months or days where you do include

2    fill time on the same days you don't include fill

3    time in other transactions, it's not exactly

4    reading out the fill time requirement.

5         Q.   It's not reading out the fill time

6    requirement when you have something other than your

7    artificially inserted 12:00 noon, but whenever you

8    artificially insert 12:00 noon, it is reading out

9    that hour requirement from Flag 13, correct?

10        A.   Well, I don't know about artificially, but

11   if you -- if you don't include that fill time that

12   is missing from the data, then for at least a

13   couple of the defendants, you can't run some of

14   these flagging methods on roughly half of the data

15   that was produced.  That's what I meant by saying

16   it could go either way.  I think what you're

17   pointing out is that it is going to flag more

18   prescriptions or combinations of prescriptions than

19   if the data provided had been complete and we used

20   fill time, but if we --

21        Q.   In your expert opinion -- again, I'm so

22   sorry.

23        A.   I apologize I'm so long-winded.  I'll just

24   finish it quickly if I can.  If you don't include

25   the fill time and just disregard half of

Page 296

1     transactions, then you're clearly undercounting the

2     flags -- the prescriptions that should be flagged

3     by examples like Flag 13.  So it goes both ways.

4          Q.   Now, the both ways thing, say that again.

5     I'm not seeing that because I only see it as

6     increasing the number of flagged prescriptions.

7               When is including a noon time stamp for

8     all those prescriptions ever going to decrease the

9     number of flagged prescriptions?

10         A.   I'm sorry.  I may not be using it could go

11    either way in the same way that you are.  Maybe I'm

12    using it incorrectly.  What I'm saying is if the

13    alternative is to just disregard those transactions

14    for some of the -- for two of the defendants at

15    least, just disregarding half of the data that you

16    provided, so if I just forget about that data, then

17    because there isn't a fill time associated with it

18    and I find that in the rest of the data where they

19    do provide fill time, I'm flagging 5 percent of the

20    transactions, that tells me that I'm losing a bunch

21    of prescriptions that should have been flagged by

22    throwing away the data where there was no fill time

23    provided.

24         Q.   But those transactions are now being

25    flagged -- aren't being flagged pursuant to Red

1   Flag 13.  They're being flagged pursuant to a

2   variant of Red Flag 13 that reads out the hour

3   requirement, correct?

4        A.   I've explained it the best I can.

5        Q.   Well, let me ask you a different question

6   then.

7             In your expert opinion, when the data is

8   missing so you can't run an analysis, is it okay to

9   just make up the data?

10       A.   I'm not just making up the data.

11       Q.   Who suggested that it should all be noon?

12       A.   I don't recall.  I gave you other examples

13  where we filled in data like an NPI number or a DEA

14  number based on other data that was available.

15       Q.   Absolutely.  So you figured out what an

16  NPI or DEA number was that tied to a particular

17  prescriber, but in this instance when you were just

18  missing a time, you just tried to find out some

19  other -- use some other way to figure out that

20  information.  You just put in noon for every single

21  time.

22            So, for example, for the NPI, would it

23  have been okay to just put the same NPI number in

24  if the NPI number was missing for all prescribers

25  that were missing an NPI?

Page 298

1      MR. MOUGEY:  Was there a question in there?

2   Objection.

3      MS. FUMERTON:  Absolutely there was a question

4   there.

5      MR. MOUGEY:  It felt like more of a --

6      MS. FUMERTON:  He's trying to use the NPI

7   number as an example.  So I'm asking him would it

8   have been okay if the NPI number was missing just

9   for all prescribers that do not have an NPI to

10  identify them with the same NPI number.

11     MR. MOUGEY:  Objection.

12     THE WITNESS:  Well, not in that case because

13  you've provided other information in the data that

14  you did provide that allowed us to refine our

15  estimate of what the right NPI number is.  You

16  didn't do that with the fill time.

17  BY MS. FUMERTON:

18     Q.   So you just made up a number?

19     A.   It's not made up a number.

20     Q.   Fine.  Who made up noon?

21     MR. MOUGEY:  Objection.

22     THE WITNESS:  I don't recall how we came to

23  decide that noon was the number we would use.

24  BY MS. FUMERTON:

25     Q.   But --

1       MR. MOUGEY:  Tara, it's pretty easy if you --

2    BY MS. FUMERTON:

3       Q.   -- you could have used 1:00, right, or you

4    could have used 2:00, or you could have used random

5    numbers, right?  Why do you choose to use the same

6    number for all of them?

7       MR. MOUGEY:  Objection.  Or he could have used

8    the right time if you would have produced it.  I

9    don't understand this line of questioning.  We

10   don't have a crystal ball.  You all produce the

11   data.  We use it.

12      MS. FUMERTON:  Actually, we do have a crystal

13   ball.  Actually, we do have a crystal ball, and the

14   Court ordered certain fields be produced, and one

15   of them was not fill date, time, and hour.  And so

16   we can get to the point of what they used for

17   Walmart on that when they did have the data, but

18   again, plaintiffs knew what analyses they wanted to

19   run.  They could have asked for data instead of

20   just making the data up and then running the

21   analyses.

22   BY MS. FUMERTON:

23      Q.   So I will ask my question again then,

24   Mr. McCann.

25           Did you come up with the idea to just

Page 300

1    insert noon for all of the times of fill when that

2    was not available?

3        MR. MOUGEY:  Objection.

4        THE WITNESS:  As I said a few minutes ago, I

5    don't recall the back-and-forth discussion with my

6    staff when we decided that rather than discard that

7    data for purposes of running these red flags, we

8    would put in a fill time of 12:00 noon.

9    BY MS. FUMERTON:

10       Q.   The plaintiffs instructed you to do that?

11       MR. MOUGEY:  Objection.

12       THE WITNESS:  I just answered it three times or

13   four times.  I don't recall the discussion, and

14   that would include I don't recall a discussion with

15   the plaintiffs' counsel about this.

16   BY MS. FUMERTON:

17       Q.   Are you aware that Walmart did not produce

18   a fill time hour and minute for any of its records?

19       A.   No.

20       Q.   Are you aware that Walmart produced a

21   drop-off time hour and minute?

22       A.   No, I don't recall.

23       Q.   Would it be appropriate to use Walmart's

24   drop-off time hour and minute as the fill time hour

25   and minute?

Page 301

1      A.   If that was the only time we were given,

2   yes.

3      Q.   So no matter what time you were given,

4   that's what you were going to use?  It didn't have

5   to have any real nexus to the fill time?

6      A.   No, that's, obviously, not correct.

7      Q.   So you viewed the drop-off time hour and

8   minute was the same as fill time hour and minute;

9   is that right?

10      A.   No, but what I'm saying is if you

11   systematically provide a drop-off time rather than

12   fill time for all of your dispensing data, we would

13   use that rather than fill time.  We would use the

14   time you gave us.

15      Q.   And then when we didn't give you time, you

16   made it up, correct?

17      MR. MOUGEY:  Objection.  Geez.

18      MS. FUMERTON:  What's the objection?

19      THE WITNESS:  Asked and answered.

20      MR. MOUGEY:  Asked and answered.  Made it up.

21   Argumentative.  I mean, are you serious, Tara?

22      MS. FUMERTON:  Are you really going to say that

23   cross-examination questions are argumentative?

24   Okay.  That's fine.

25

1    BY MS. FUMERTON:

2         Q.   So going back to Red Flag 13 --

3         MR. MOUGEY:   Tara, you've used the word made it

4    up about 13 times.  We've objected each time.  It's

5    sarcastic.  It's not necessary.  And quite frankly,

6    there's no audience or jury here that you're

7    playing this in front of.  So I would ask you, just

8    like Mr. Korbin, to just tone it down and knock it

9    off.

10        MS. FUMERTON:   Again, I disagree.

11   BY MS. FUMERTON:

12        Q.   If you want to say not made it up, what's

13   your -- you picked the number; is that fair?  Made

14   up the wrong number.  You picked the number,

15   correct?

16        A.   Correct.

17        Q.   So can you explain to me what the

18   difference between your Tab 13 and Tab 26 is, if

19   anything?

20        A.   Yes.

21        Q.   Well, I can read it for us.  Red Flag 13

22   is on Page 152.  It says an opioid was dispensed to

23   at least three different patients within an hour,

24   and the opioid prescriptions were for the same base

25   drug, strength, and dosage form and were written by

Page 303

1    the same prescriber.

2            Did I get that right?

3        A.    Yes.

4        Q.    And if we go to Page 154, Flag 26 is an

5    opioid dispensed to at least three different

6    patients within an hour and the opioid

7    prescriptions were for the same base drug,

8    strength, and dosage form and were written by the

9    same prescriber, correct?

10       A.    Yes.

11       Q.    So what's the difference between the two?

12       A.    It's a little bit complicated, but if you

13   look at Page 150, so a couple of pages earlier,

14   it's Paragraph 212.  I see a spelling error there

15   proving the truism I said a few minutes ago that

16   we're all humanly imperfect; but if you read that,

17   you'll see what I'm trying to convey there is, and

18   it will be clearer for anybody who is reviewing the

19   code, that in the first 16 flags, what we've

20   sometimes referred to as the Catizone flags, all of

21   the prescriptions in the group of prescriptions

22   that trigger a flag are included as flagged

23   prescriptions.  In the subsequent 27, the

24   prescription that first causes the flag to be

25   triggered and any prescription that would fit into

Page 304

1    the same flag in the following 30 minutes is

2    included.

3            To give you an example, if you had a --

4    and maybe it's the one that you're looking at.  If

5    there is some three-prescription scenario that

6    would trip a flag and the three of them are in an

7    hour under the Catizone version of that flag, the

8    three prescriptions go into the bucket of flagged

9    prescriptions.  In the later version of a similar

10   flag, only the third prescription if they were at

11   different times in the hour get flagged.  If there

12   is a fourth prescription within 30 minutes of that

13   third one that would also fit into that flag, then

14   it's included, but it's -- essentially that's the

15   difference between 13 and 26.

16       Q.   You just saved me a bunch of foundational

17   questions.  Okay.  I think I understand, but let me

18   just go through this to make sure.

19            So for both Flag 13 and Flag 26, there's

20   this within-an-hour criteria that for those

21   prescriptions that you picked a time of noon to

22   include effectively reads it out for those

23   prescriptions.  I get it for the other

24   prescriptions where you had data that you could

25   actually analyze that one-hour limitation could

1    affect what was happening with the flagging, but

2    for all of the other ones, for both 13 and 26, the

3    insertion of noon for all those prescriptions reads

4    out the hour limitation, correct?

5         A.   It doesn't really, or at least it doesn't

6    fully because you could have two prescriptions that

7    have missing fill times that had 12:00 noon filled

8    in and a third prescription where there is a fill

9    time and it's 11:45.  So there is some impact of

10   the fill time that you provided in the data.  So it

11   doesn't fully read it out, but there's some

12   weakening of this time requirement as a result of

13   the data missing.  That's correct.

14        Q.   So the weakening only occurs where for

15   that same day, you did have some time data that was

16   produced by the defendants and some that wasn't.

17   Otherwise, if, for that entire day, there was no

18   time information produced for that particular

19   defendant, it completely reads it out, correct?

20        A.   Other than the three prescriptions for the

21   same drug written by the same prescriber had to be

22   that day.

23        Q.   Right, but it reads out the hour

24   requirement, correct?

25        A.   Correct.

1      Q.    I'm skipping it in the interest of time.

2   I can show you an Excel that shows similar, I

3   think, to a prior defendant that that whole

4   information is missing from 2006 to 2013 across the

5   board for Walmart prescriptions.  So I don't know

6   if there are instances you're talking about, but

7   generally speaking, defendants either had the

8   information or they didn't.  It's not as if some

9   prescriptions on a day would typically have it and

10  some wouldn't, correct, or you don't know?

11     A.    Well, I don't know.  For some defendants

12  that produced the fill time for the entire time

13  period, there are some missing fill times in some

14  of the data sort of interspersed with transactions

15  where there is fill time.  So I don't know whether

16  it's true that in the later period when you're

17  saying Walmart started providing the fill time,

18  that the fill time is there in every transaction.

19  I don't know if that's the case.

20     Q.    But prior to that point in time when there

21  was no fill time that was available that was

22  produced, so from 2006 through March of 2013 for

23  Walmart, the hour time would have been read out of

24  Flag 13 and Flag 26, correct?

25     A.    Well, subject to the more complete

1    explanation I have given you and discussed already,

2    yes.

3        Q.   So the other thing that I wanted to

4    clarify -- so we talked about that Flag 13 and 26

5    is this limitation.  So in addition to Flag 13 and

6    26, there were also several flags in which you had

7    this 30-minute limitator -- limitator is probably

8    not even a word.  A 30-minute limitation that would

9    exclude certain prescriptions, correct?

10       A.   I'm missing the question.  Would you like

11   to point me to an example?

12       Q.   Yeah.  Well, I'm actually just talking

13   about what we just read.  You were asked to

14   identify sets of prescriptions that meet certain

15   criteria and to flag prescriptions dispensed within

16   30 minutes of the first dispensed prescription,

17   which caused the set of prescriptions that meet

18   each criteria.

19       A.   Yes.

20       Q.   And that's applicable to Methods 17

21   through 36 and Methods 38 through 43, correct?

22       A.   Yes.

23       Q.   So for all of those methods when you have

24   inserted noon as the time period for all of the

25   particular prescriptions on a given day, all of

Page 308

1    these prescriptions as the other criteria were met

2    would have been flagged, correct?

3        A.   I think you're way overstating the impact

4    now because many of the methods in 17 through 36

5    and 38 through 43 are not time-dependent just

6    like -- look at the very first one, 17.  There's no

7    impact of time there at all.  So I think you're

8    overstating it.

9        Q.   But there is impact -- but there is impact

10   of time.  The flag itself doesn't talk about time,

11   but then as you said, you were asked to identify

12   sets of prescriptions that meet these criteria and

13   to flag prescriptions dispensed within 30 minutes

14   of the first dispensed prescription.  So while the

15   flags you just described might, on its face, not

16   have a time requirement, you have inserted a time

17   requirement with this 30 minutes, correct?

18       A.   No, I don't think it has any impact on 17.

19   If there's another prescription that would fit the

20   pattern that's described in 17, it doesn't matter

21   what the time is.  So within 30 minutes makes no

22   difference.

23       Q.   So let's take an example.  I'll try to do

24   it globally.

25            If you take Flag 25, for example, which

1    reads an opioid was dispensed to at least four

2    different patients on the same day, and the opioid

3    prescriptions were for the same base drug,

4    strength, and dosage form and were written by the

5    same prescriber, correct?

6         A.   Correct.

7         Q.   For this red flag, you would typically

8    exclude the first three prescriptions among the

9    group prescriptions that triggered this red flag,

10   correct, and only count the four in your

11   compilation of flagged prescriptions?

12        A.   Correct.

13        Q.   If all prescriptions in this group were

14   filled within 30 minutes of the previous

15   prescription, you didn't exclude those first three

16   prescriptions from being flagged, correct?

17        A.   I don't recall.  I'd have to check to be

18   100 percent sure.

19        Q.   Are you 99 percent sure I'm right?

20        A.   No, I'm not 99 percent sure.  I would have

21   to check.  I'm not recalling as I sit here.

22        Q.   Let's say I am right after you go back and

23   check and you realize that I am right.  In the

24   scenario then that we described where you have four

25   prescriptions, and let's say they were filled at

1    9:00 a.m., 10:00 a.m., 11:00 a.m. and noon, only

2    one prescription would be flagged.  All the other

3    criteria are met, but if, for the same set of

4    prescriptions because the time date fill were

5    missing, you inserted noon for all of those, all

6    four of those prescriptions would be flagged,

7    correct?

8        A.   I would have to confirm that, but that

9    seems intuitive to me.  I'm not disagreeing with

10   you, but I don't know that that's the case.

11       Q.   What would you do to figure out if I was

12   right?

13       A.   I would look at the data that we've

14   provided to you with detailed records of the

15   flagged transactions or alternatively look at the

16   code.  Either one of those, I think, would inform

17   me, and I'd talk to my staff about it.

18       MS. FUMERTON:  Why don't we take a quick break

19   so we can group to see how many additional

20   questions we have if that's okay, and then we will

21   back.  So is a five-, 10-minute break okay with

22   you, Dr. McCann?

23       THE WITNESS:  Yes.  Thank you.

24       THE VIDEOGRAPHER:  We are going off the record.

25   The time now is 5:22.

```
                                           Page 311
 1                    (Whereupon, a short break was
 2                    taken.)
 3       THE VIDEOGRAPHER:  We are back on the record.
 4    This is the start of media No. 7.  The time is
 5    5:30.
 6       MS. FUMERTON:  Dr. McCann, thank you for your
 7    time this afternoon.  That's all the questions I
 8    have now subject to sort of our ongoing objection
 9    earlier about I don't feel that the supplements are
10    fully disclosed with respect to us, but I have no
11    further questions at this time.  I'm passing the
12    witness.  So thank you.
13       THE WITNESS:  Thank you, ma'am.  Good to see
14    you again.
15       MR. MALOY:  Hi, Dr. McCann.  My name is John
16    Maloy.  I represent the Rite Aid defendants.  Can
17    you hear me okay?
18       THE WITNESS:  Yes.  Thank you, Mr. Maloy.
19       MR. MALOY:  Dr. McCann, and I guess for this
20    matter, Peter, I will endeavor to be brief, and I
21    think we can do that.
22                    EXAMINATION
23    BY MR. MALOY:
24       Q.   So Dr. McCann, earlier today you testified
25    about shipments to CVS Pharmacies from non-CVS
```

Page 312

1    distributors.  Do you recall that testimony?

2        A.   Yes.

3        Q.   During that testimony, you said that you

4    don't have any substantive opinion about whether it

5    is appropriate under the law to include shipments

6    from other distributors to CVS Pharmacies in a

7    flagging analysis, correct?

8        A.   No.  I think it was a little different.

9    What I said was -- I don't think it's a matter of

10   whether it's appropriate under the law for me to do

11   the flagging illustration the way I did.  I think

12   the question was really whether the law requires

13   the chain distributors to incorporate the other

14   distributors' shipments to their pharmacies in the

15   chain distributors' assessment of its shipments to

16   the pharmacies.

17           At least that's how I interpreted the

18   question, and my answer was I'm not a subject

19   matter expert.  I don't know the answer to that.

20   I'm not aware one way or the other.

21       Q.   We'll let the transcript reflect what it

22   reflects, but you're not here providing any

23   substantive opinion as to what is appropriate under

24   the law for a distributor of opioids?

25       A.   Correct.

Page 313

1    Q.   And so that would apply to all of the
2  defendants, CVS, Rite Aid, Giant Eagle, Walgreens,
3  and Walmart, correct?
4    A.   Correct.
5    Q.   And similarly, you don't have an opinion
6  whatsoever as to whether the Controlled Substances
7  Act requires Rite Aid to monitor and track
8  shipments from non-Rite Aid distributors, correct?
9    A.   Correct.
10   Q.   And then just two final questions.
11       With respect to the market share
12  discussion we had earlier, were you able to
13  calculate the pharmacy specific market share data
14  in your report for any time period beyond 2014?
15   A.   I don't think I would be able to with the
16  data that's available to me, no.
17   Q.   Are you aware that the OARRS data that was
18  produced in this litigation was available through
19  2018?
20   A.   I don't recall the time period that the
21  OARRS data we received covered.
22   Q.   Does it sound correct that it would be
23  available through 2018?
24   A.   I don't know one way or another.  I was
25  thinking about the ARCOS data or the defendant

Page 314

1    transaction data in response to your prior question

2    two questions ago.  I wasn't thinking about the

3    OARRS data, but I guess, you could calculate a

4    market share by pharmacy using the OARRS data.  It

5    would be a little different than what you would

6    calculate using the ARCOS data or the defendant

7    transaction data, but you could do it with the

8    OARRS data as well.

9         MR. MALOY:  Thank you, Dr. McCann.  I don't

10   have any other questions.  And subject to any other

11   questions from my co-defendants, I'll pause right

12   there.

13        THE WITNESS:  Thank you, Mr. Maloy.

14        MS. FUMERTON:  So my understanding -- oh, Josh.

15   I'm sorry.  I didn't want to step on your toes.  Do

16   we have any more questions?

17        MR. KOBRIN:  No.  You're good.  I think I was

18   joining back for the same reason for what you were

19   about to say.

20        MS. FUMERTON:  I think -- Dr. McCann, thank you

21   for your time today.  I don't know if Ms. Swift is

22   coming back on, but I think there aren't any

23   further questions at this time.

24        THE WITNESS:  Thank you, ma'am.

25        THE VIDEOGRAPHER:  This concludes today's

Page 315

1    deposition.  The time now is 5:35 p.m.

2              (FURTHER DEPONENT SAITH NAUGHT.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 316

1    STATE OF ILLINOIS   )

2                        )    SS:

3    COUNTY OF C O O K   )

4              I, GINA M. LUORDO, a notary public within

5    and for the County of Cook County and State of

6    Illinois, do hereby certify that heretofore,

7    to-wit, on June 11, 2021, remotely appeared before

8    me CRAIG J. McCANN, Ph.D., in a cause now pending

9    and undetermined in the United States District

10   Court, Northern District of Ohio, In Re: National

11   Prescription Opiate Litigation.

12             I further certify that the said CRAIG J.

13   McCANN, Ph.D. was first duly sworn to testify the

14   truth, the whole truth and nothing but the truth in

15   the cause aforesaid; that the testimony then given

16   by said witness was reported stenographically by me

17   in the presence of the said witness, and afterwards

18   reduced to typewriting by Computer-Aided

19   Transcription, and the foregoing is a true and

20   correct transcript of the testimony so given by

21   said witness as aforesaid.

22             I further certify that the signature to

23   the foregoing deposition was not waived by counsel

24   for the respective parties.

25             I further certify that the taking of this

Page 317

1   deposition was pursuant to notice and that there

2   were remotely present at the deposition the

3   attorneys hereinbefore mentioned.

4           I further certify that I am not counsel

5   for nor in any way related to the parties to this

6   suit, nor am I in any way interested in the outcome

7   thereof.

8           IN TESTIMONY WHEREOF:  I have hereunto set

9   my hand and affixed my notarial seal this 16th day

10  of June, 2021.

11

12

13

14

15

16          NOTARY PUBLIC, COOK COUNTY, ILLINOIS

17          LIC. NO. 084-004143

18

19

20

21

22

23

24

25

```
                                                        Page 318
 1                      Veritext Legal Solutions
                            1100 Superior Ave
 2                              Suite 1820
                          Cleveland, Ohio 44114
 3                       Phone: 216-523-1313
 4
     June 16, 2021
 5
     To: PETER J. MOUGEY
 6
     Case Name: National Prescription Opiate Litigation - Track 3
 7
     Veritext Reference Number: 4628702
 8
     Witness:  Craig J. McCann, Ph.D.        Deposition Date:  6/11/2021
 9
10   Dear Sir/Madam:
11
     Enclosed please find a deposition transcript.  Please have the witness
12
     review the transcript and note any changes or corrections on the
13
     included errata sheet, indicating the page, line number, change, and
14
     the reason for the change.  Have the witness' signature notarized and
15
     forward the completed page(s) back to us at the Production address
16   shown
17   above, or email to production-midwest@veritext.com.
18
     If the errata is not returned within thirty days of your receipt of
19
     this letter, the reading and signing will be deemed waived.
20
21   Sincerely,
22   Production Department
23
24
25   NO NOTARY REQUIRED IN CA
```

```
 1                     DEPOSITION REVIEW
                     CERTIFICATION OF WITNESS
 2

      ASSIGNMENT REFERENCE NO: 4628702
 3    CASE NAME: National Prescription Opiate Litigation - Track 3
      DATE OF DEPOSITION: 6/11/2021
 4    WITNESS' NAME: Craig J. McCann, Ph.D.
 5          In accordance with the Rules of Civil
      Procedure, I have read the entire transcript of
 6    my testimony or it has been read to me.
 7          I have made no changes to the testimony
      as transcribed by the court reporter.
 8

      _____        _____
 9    Date                    Craig J. McCann, Ph.D.
10          Sworn to and subscribed before me, a
      Notary Public in and for the State and County,
11    the referenced witness did personally appear
      and acknowledge that:
12
            They have read the transcript;
13          They signed the foregoing Sworn
            Statement; and
14          Their execution of this Statement is of
            their free act and deed.
15
            I have affixed my name and official seal
16
      this _____ day of_____, 20_____.
17
                  _____
18                Notary Public
19                _____
                  Commission Expiration Date
20
21
22
23
24
25
```

Page 320

```
 1                  DEPOSITION REVIEW
                  CERTIFICATION OF WITNESS
 2
      ASSIGNMENT REFERENCE NO: 4628702
 3    CASE NAME: National Prescription Opiate Litigation - Track 3
      DATE OF DEPOSITION: 6/11/2021
 4    WITNESS' NAME: Craig J. McCann, Ph.D.
 5          In accordance with the Rules of Civil
      Procedure, I have read the entire transcript of
 6    my testimony or it has been read to me.
 7          I have listed my changes on the attached
      Errata Sheet, listing page and line numbers as
 8    well as the reason(s) for the change(s).
 9          I request that these changes be entered
      as part of the record of my testimony.
10
            I have executed the Errata Sheet, as well
11    as this Certificate, and request and authorize
      that both be appended to the transcript of my
12    testimony and be incorporated therein.
13    _____        _____
      Date                    Craig J. McCann, Ph.D.
14
            Sworn to and subscribed before me, a
15    Notary Public in and for the State and County,
      the referenced witness did personally appear
16    and acknowledge that:
17          They have read the transcript;
            They have listed all of their corrections
18          in the appended Errata Sheet;
            They signed the foregoing Sworn
19          Statement; and
            Their execution of this Statement is of
20          their free act and deed.
21          I have affixed my name and official seal
22    this _____ day of_____, 20_____.
23          _____
            Notary Public
24
            _____
25          Commission Expiration Date
```

Page 321

ERRATA SHEET

VERITEXT LEGAL SOLUTIONS MIDWEST

ASSIGNMENT NO: 4628702

PAGE/LINE(S) /          CHANGE          /REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____          _____

Date                     Craig J. McCann, Ph.D.

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

DAY OF _____, 20_____ .

_____

Notary Public

_____

Commission Expiration Date

**[& - 14]**

**&**

**&** 2:2,13,18 3:11
6:6,8 8:13 14:5

**0**

**084-004143** 1:24
317:17

**1**

**1** 4:11 7:10 10:12
42:21 43:7 44:7
47:4 50:20 52:8
52:13,15 53:3
54:2,11 55:15
56:3,11 58:11
92:14,15 93:2
98:2,10 100:12
104:9 105:3,16
108:17,21 146:3,5
146:10,14,18,22
147:17,20,23
148:18 152:2
153:18,21 156:15
156:21 158:11
159:18 160:5
161:13,16,18
162:19 164:19
165:1,2,4,9,11,13
168:4 177:11,20
178:2 179:21
189:2 190:8,23
191:25 192:11
198:12 200:2
209:14,16 210:17
211:19 212:9
213:4 214:22
245:2 260:2,4,25
**1,106,170** 87:1
**1,150** 288:12,16
**1,200** 288:4,10,12
**1-3** 42:23

**1.1** 116:24 117:2,9
119:4
**1.93** 273:3,11
**10** 5:15 6:17 25:22
29:14 87:18
100:19 107:9,11
119:18 126:16
127:13 133:4
135:18,25 136:4
140:8 156:16
157:20 158:23
168:14 176:5,6,14
179:22 207:4
211:4 244:17
263:6 271:6,12
272:5,21 276:25
281:2 290:10,18
291:8,16 310:21
**10,000** 43:13
106:13
**100** 2:9 32:25
39:18 45:19 67:20
67:25 69:5 91:15
123:7 132:12
162:14 170:25
194:12 288:3,13
290:16,17,19
309:18
**1000** 3:7
**1006** 275:20
**107** 5:15 292:6
**108** 291:20,25
**10940** 2:9
**10:00** 310:1
**10th** 292:2
**11** 5:17 7:2 91:21
100:21 107:16,20
126:22 127:2,6
130:20 156:22
158:1 176:6,8,13
177:18 179:2

186:3 195:1
201:23 254:12
263:5 316:7
**1100** 318:1
**112** 262:10
**115** 292:3,5
**117** 292:6
**11:00** 310:1
**11:30** 126:8
**11:43** 126:13
**11:45** 305:9
**11th** 1:17 186:18
**12** 5:18 43:19
67:10 100:23
106:5,8,17,18
107:7,15 108:1,5
108:17 109:2,9,11
119:17 120:18,20
126:17 127:12,25
128:1,12,17,22
130:4,8,13,18,20
139:25 140:13
143:15 144:19
145:2,7,19 146:3
146:14 147:12,18
150:10,17,22
157:4 158:23
159:2,5,24 160:6
160:12,22 161:11
164:11 176:6,8,13
177:18 179:4
191:20,21 192:3,5
192:7 193:14,23
193:24 194:1,2,9
194:12,16,19
196:9,10,11
197:16,17,22
198:15 203:12,14
203:15,25 276:12
286:10,22 287:8
287:15,16 288:1,3

288:13,23,24
289:11,13,14
291:18,19 293:11
**120** 194:13,15
232:15 292:6,11
**127** 5:17
**128** 278:12 279:8
**12:00** 241:7,10
242:21,23 245:14
250:6 251:19
252:18,23 253:19
254:9 255:9,11,19
255:21,25 256:4
294:1,8,17 295:7,8
300:8 305:7
**12:58** 174:22
**12a** 115:8,13
**12g** 115:9,14
**13** 5:21 6:16
100:25 157:12
175:4,7 244:25
245:1,24 246:20
249:13,23,23
250:12 254:13,18
255:1,6 256:22
257:6 294:9,18
295:9 296:3 297:1
297:2 302:2,4,18
302:21 304:15,19
305:2 306:24
307:4,5
**14** 5:17,23 101:2
127:6,19,24 128:2
128:12,17,22
130:5,10,10,18,22
131:12 132:17
143:21,23,24,24
144:1,5,5,10,14,22
145:4,10,19 146:6
146:17 147:13
148:1,8,20 157:18

161:3,5 177:6,8,11
**140**   232:15
**1425**   271:11,16,17
  271:19
**1427**   271:20
**1456**   272:6,8
**1483**   272:17,20
**14a**   115:9
**14g**   115:9
**15**   5:24 18:4,8
  19:12 101:4 107:5
  157:23 170:10
  184:21,24 185:2
  186:4
**150**   5:18 97:6,11
  105:18 112:19
  143:10 145:25
  147:25 148:6
  153:22 158:7
  168:5 303:13
**151**   153:22
**152**   158:8 245:2
  302:22
**15219**   2:20
**154**   303:4
**16**   4:13 6:3 12:7
  37:5,22 43:3 90:3
  90:7,9 91:5 101:6
  105:3,10,13,16
  107:16,17,21
  108:7 109:5
  111:15,24 116:13
  117:13 118:13
  126:21 130:24,24
  131:18 134:11
  135:9 136:8,17
  142:4,9,15,23
  143:3,8 144:15
  145:25 146:1,3,5
  146:10 147:17,20
  147:23,24,25

148:5,18,18 152:2
153:7 158:2,6,7,11
158:17 159:6,11
160:17,18,24
161:13,17,18
162:20 165:18
195:6 201:24
303:19 318:4
**16th**   38:11,21 42:6
  47:23 48:9,24
  78:9 97:4 105:8
  118:10 127:16
  143:11 153:6,11
  161:14,17 168:4
  170:4 173:20
  174:2 201:14
  260:19 262:18
  264:3 265:8
  266:14 269:21
  317:9
**17**   6:5 90:16 97:15
  98:1,9 100:12
  101:8 103:13
  104:8 105:16
  117:17 145:16
  149:15 213:5,7
  307:20 308:4,6,18
  308:20
**1701**   3:12
**1732**   72:13,23 73:8
**175**   5:21
**177**   5:23
**18**   1:7,9 6:10 18:5
  18:8 27:17 78:8
  78:20 98:9 100:12
  101:10 188:24
  216:6,8
**18,226**   146:15,21
  146:25 147:5
  160:6 164:14

**1800**   3:7
**1820**   318:2
**184**   5:24
**185**   45:16
**1857**   281:3
**186**   261:18,20
**1863**   278:13 279:8
  279:17,25
**187**   280:10
**188**   47:22
**18th**   110:7
**19**   4:19 6:12 43:5
  84:4 85:15 91:13
  98:9,16,17,23
  100:11 101:12
  115:16,18 117:4
  120:16,25 121:2
  123:3 132:5 149:4
  150:22 158:24
  163:23 171:14,22
  177:2 234:7,9
**190**   4:5
**19103-2921**   3:12
**195**   6:3
**199**   261:4
**19th**   38:25 42:9
  48:2 84:13 91:8
  109:18,19,21,23
  109:24 110:1,4,6,9
  110:15 111:3
  114:5 115:6 117:7
  117:11 123:3
  127:7,22 131:1,13
  133:2,7,11,19
  135:2,3,19 137:4,8
  137:13,24 139:14
  141:19,23 143:13
  143:20 144:2,7
  147:20 148:2,8,20
  151:1,10,13 153:5
  158:5,10,15

159:12 161:18
163:14,17 164:5
164:20 166:16
170:5 171:13,17
**1:00**   174:15 299:3
**1:17**   1:7 7:15
**1:39**   175:2
**1a**   153:19
**1b**   153:19 160:10

**2**

**2**   4:14 42:13,19,21
  43:7 44:7 47:5
  49:1,4,6,12,18,25
  50:4,8,12,15,19,25
  52:22,24 53:3,8
  54:2,10,14 55:15
  58:8,11 69:22
  85:18 98:10
  100:12 153:21,24
  160:10 178:2,4
  189:3 190:23
  191:25 192:11
  198:12 209:14,16
  267:13 270:20
**2,600**   70:23
**2,623**   267:1
**2.4**   120:4 134:17
  134:22
**2.xlsx**   179:21
**20**   6:13 40:5 41:4
  41:24 45:17 98:25
  99:9 100:10
  101:14 104:1
  211:5 244:18,20
  251:4 319:16
  320:22 321:22
**200**   156:14,20
  230:19
**20036-5807**   3:8
**2006**   52:11 77:2
  78:4,6,13 191:5

**[2006 - 3]**

215:19,20,24
255:2,6,8,12 256:6
306:4,22
**2006-2014** 277:18
**2007** 215:20,24
**2009** 197:9,13,24
198:1 202:1,7
**2010** 197:15,21
198:4
**2012** 245:11 255:2
255:6,8,12 256:6
262:12
**2013** 214:6 245:12
254:20 255:7,18
256:2 262:12
306:4,22
**2013-14** 255:3
**2014** 52:11 77:2
78:14 191:6
199:11 202:2,7,15
203:1 214:7,9
245:12 254:20
255:18 313:14
**2015** 214:15
**2016** 202:13,15,20
203:5,11 204:1,13
204:15 207:9,10
209:7
**2018** 78:5 156:14
156:15,21,21
313:19,23
**2019** 212:10,12
**202** 3:8
**2020** 28:15 29:11
84:4,13 85:15
88:16 91:8,13
103:15 104:18
109:5 116:2,17
117:4 119:3
120:10 145:16
179:23 264:20

**2021** 1:17 4:13,16
4:19 5:24 7:2 37:5
37:22 43:3,4,5
98:18 103:8,14
104:20 105:4
109:14 117:13
145:17 150:22
177:11 185:3
316:7 317:10
318:4
**208** 254:13
**21** 6:17 99:3,12
100:8,8 101:16
184:20 270:23,25
271:2,12 272:5
276:2 286:6
**210** 157:22
**212** 303:14
**213** 6:5
**215** 3:13
**216** 6:10
**216-523-1313**
318:3
**2197** 280:24
281:13,24 282:2
282:15
**22** 99:17 100:6
101:18
**225** 266:18
**23** 99:20,24 100:4
101:20 165:15
**234** 6:12
**24** 53:4 54:1,15,20
54:23 55:5,10
62:2 100:15,15
101:22
**24,000** 43:20 45:6
106:9,12,14 107:7
208:21,24 209:1
**24,336** 108:22

**24.1** 52:24
**241** 261:5,12,18,20
261:23
**241,341,833** 278:7
**244** 6:13
**245** 108:1,5,24
109:2 119:19,21
119:23 120:3,19
**246** 109:1,2 119:23
**249** 261:18
**25** 85:19 86:19
92:5 100:17
101:24 102:5
159:15 168:6,10
168:21,24 169:6,7
169:8,10,12,15
170:10,16 217:3,4
217:24 277:4
308:25
**25.46** 87:1
**255** 280:20
**258** 4:6
**26** 100:19 103:9
302:18 303:4
304:15,19 305:2
306:24 307:4,6
**269-4335** 3:4
**26th** 178:17
**27** 88:4,9,15,22,23
89:1,7,10,16,21
90:2,17,24 91:1,3
91:7,12,18 92:15
93:2,4,9 96:5
97:16 100:21
102:18,22 103:11
103:14,23 104:9
104:17,25 108:7
109:4 116:3,9,12
116:22 117:3
118:14 130:25
131:19 134:11

135:10 136:9,18
142:5 143:5
145:15 146:12,23
147:2 161:1 162:7
164:20 165:5,8,11
165:11,14,15,17
167:3,7,12,16
303:23
**271** 6:17
**275** 266:22
**276** 266:23
**277** 266:25
**27th** 179:15
**28** 100:23
**2804** 1:6,7 7:15
**29** 29:11 100:25
279:11
**290** 109:9,11
143:15 144:19
145:1,7,19 146:2,9
146:14 147:12
158:22 159:4,4,24
160:5,13,22
161:12
**291** 109:12 280:23
281:23
**2:00** 189:17 299:4
**2:12** 189:22

---

**3**

---

**3** 1:10 4:17 5:24
35:23 42:13,19,21
43:7 44:8 47:5
56:7,12 60:8,24
83:25 84:3 85:17
86:4 94:5 95:13
95:16 98:11
100:11 116:20
126:12 133:20
141:20,21,22
153:25 154:10,11
177:16 178:18

185:3 188:2,8,15
189:3 190:23
192:2,11,13
193:11,17 204:1
204:12,13 207:9
207:11 209:13,16
209:17 216:5
274:17 286:9,18
289:5,8 318:6
319:3 320:3
**3.15** 285:22
**3.48** 272:2
**30** 5:22 31:6 36:9
101:2 132:17
155:21 175:9,15
175:17,23 177:17
177:22 178:10,22
210:7 219:8,15
221:18 233:5
304:1,12 307:7,8
307:16 308:13,17
308:21 309:14
**30,000** 62:2
**300** 2:14
**30th** 211:14
**31** 101:4
**311** 4:7
**312** 2:15 3:4
**316** 2:4
**32** 101:6 151:15
153:17 158:5,21
162:8
**321** 127:19 132:16
**32591** 2:4
**33** 101:8 144:10,14
144:21 145:4,9,11
145:19 146:6,11
146:17 147:13
158:24 159:13
**34** 101:10 108:9
119:22

**35** 101:12 154:2
**358-5208** 2:20
**35th** 2:19
**36** 101:14 111:8
132:18 307:21
308:4
**36,084,271** 279:17
**3608** 280:11
**37** 101:16
**38** 101:18 107:14
154:18,25 155:9
307:21 308:5
**382** 282:1
**3860** 281:10
**39** 101:20
**3:34** 250:20
**3:52** 250:25
**3rd** 186:7,9 188:16

**4**

**4** 4:16,20 42:13,20
43:4 51:13,14,16
51:20 59:23 61:7
61:11,21 65:6
98:18,23 100:11
111:3 115:6 137:9
137:14 154:12,22
175:1 190:24
192:3,11,13
198:14 209:13,17
293:17
**4.5** 120:22 171:20
**4.6** 120:25
**40** 101:22 155:16
155:19 170:11
241:18
**4002** 6:4 196:12
204:13
**41** 101:24,25 102:2
156:6
**412** 2:20

**42** 4:11,14,17
103:8
**43** 38:16 90:7,16
97:11,15 103:11
103:13 104:8
105:17 108:7
118:12,17 135:1,4
142:11,17 143:1,1
143:17 144:11
145:17 146:23
170:3 307:21
308:5
**435-7068** 2:5
**44** 105:21 106:3,16
**44114** 318:2
**45** 38:17 104:2
111:8 156:11
**45032** 1:7
**46** 156:25
**4628702** 318:7
319:2 320:2 321:2
**47** 157:7
**47079** 1:9
**48** 157:14
**4846** 281:6
**489** 72:5,8,22 73:1
**49** 157:20
**494-4445** 2:15
**4a** 154:14
**4b** 155:1,7
**4th** 48:1 173:22
264:4 267:4,13
269:20

**5**

**5** 4:23 51:6 70:2,6
99:1,4,10 100:9
115:16 154:15,23
189:4,21 198:13
198:14 290:19,21
296:19

**5.99** 272:15
**50** 78:19 156:15
157:25 158:6
162:8 168:14
202:5,25 230:20
232:5 241:18
**51** 4:20
**53.6** 120:6
**54** 2:14
**56** 111:9
**57** 272:8
**5:00** 195:10
**5:22** 310:25
**5:30** 311:5
**5:35** 315:1
**5a** 155:18
**5b** 156:1

**6**

**6** 5:3,22 83:13,14
83:16,20,24 94:4
99:13 100:7 155:2
155:13 156:7
175:9,15,17,23
177:17,22 178:10
178:22 189:4
198:13 250:24
267:21
**6/11/2021** 318:8
319:3 320:3
**60** 31:7 104:2
230:20 232:5
262:10 263:5
**60601** 3:3
**60654** 2:14
**6327** 280:21
**635** 127:14
**65** 111:9
**659-5200** 2:10
**6:00** 195:11
**6:18** 179:15

**7**

**7**   5:5 49:1,6,6,13
58:3,8,11 83:12,19
84:23 85:2,5,7,17
94:4 95:6,10
99:17,21,25 100:4
116:18 155:22
190:24 191:25
192:12 198:12
209:14,16 267:22
311:4
**7,414**   146:18,24
147:6 159:22
161:1 164:13
**70**   4:23
**713**   2:10
**75**   193:12 286:11
**77**   3:3
**77064**   2:10
**778-1825**   3:8
**7832**   317:15
**786**   52:1
**794,000**   188:17
**795**   52:19
**7a**   156:12
**7b**   156:18
**7th**   48:3

**8**

**8**   4:20,23 5:12
51:8,21 52:4 56:7
56:7,12 59:22,24
60:4,9,24 61:8
62:4,5,19,24 63:9
63:18 64:3,10,22
65:6,21 66:7,11,21
67:9,17 70:7,12,18
70:23,25 72:6,8,14
75:16 87:21,22,24
88:3 89:11 90:20
91:7,13 95:5

97:24 98:3,11,19
98:23 99:1,10,13
99:18 100:15
102:23 103:9
104:9 156:4,24
233:2 234:6
266:15
**8,000**   27:9
**80th**   26:8
**813**   67:9
**83**   5:3
**831**   67:16
**84**   272:20
**85**   5:5
**850**   2:5
**87**   5:12
**8791**   140:1,12
**880**   131:16
**880,000**   134:18,23
135:12
**884,000**   120:13,24
121:23 122:2
132:4 133:15
171:19
**884,166**   115:23
**89**   277:8
**891**   277:8
**8:05**   1:18 7:2
**8:49**   178:18
**8a**   259:17,18
264:11 265:16,20
266:1,11,22
267:17,18,21
268:1,4,14,18,25
269:17,18,20
270:5,9 273:17
274:3,17 275:12
283:17 284:19
285:3,12 289:9
**8b**   157:6 266:12
266:23

**8c**   114:15 258:18
258:22 259:13,18
259:21 260:23
264:10 265:8,12
265:13,20,24
266:10,12 267:7
267:17,23,24
268:5,11,18 269:2
269:17,21 270:2,3
270:4,7,8,10
274:19 275:12
284:20
**8d**   259:18

**9**

**9**   4:4 5:13 84:23
85:5 91:22,24
93:1 100:17 156:9
157:15 291:19
**90**   53:25 56:17
137:25 156:21
**91**   5:13 53:4 54:15
54:19,22 55:5,8,19
55:21
**91.1**   52:15
**91.2**   52:13
**94**   56:16 277:9
**96.3**   72:16,23 73:9
**963-5328**   3:13
**98**   291:24
**99**   261:12 309:19
309:20
**9:00**   310:1
**9:34**   69:18
**9:54**   69:23

**a**

**a.m.**   1:18 7:2
310:1,1,1
**aaron**   1:8
**abdc**   18:1

**ability**   10:6
**able**   196:2 236:22
242:11 248:4
252:13 263:4
313:12,15
**absolute**   220:21
**absolutely**   134:24
161:4 297:15
298:3
**abston**   2:9
**abuse**   125:16
**accept**   205:6
219:11,18,19,22
222:6 267:11
**accepting**   74:21
**access**   35:5
**accessed**   78:5
**accomplish**   242:2
**account**   167:21,25
188:23
**accumulated**
113:19
**accuracies**   217:13
**accuracy**   217:16
**accurate**   12:4
116:6 190:20
191:18,23 197:18
211:5 215:1,4
217:14 219:9
241:11 262:1
265:12
**accurately**   152:22
265:15 284:11
**accused**   235:23
**accusing**   247:6
**acknowledge**
319:11 320:16
**act**   73:20 243:18
313:7 319:14
320:20

**actavis** 14:7
**acting** 156:8 179:1
**action** 7:19 151:18
**actual** 31:12 32:9
32:12,16,22 106:2
124:24 125:4
175:24 182:2
236:13 253:24,25
**add** 50:25 51:11
73:24 74:23 75:19
230:21 231:25
232:16,19 276:23
288:15 292:1
**added** 48:20
127:10 146:9
162:6 163:6
252:18 268:6
**adding** 37:19
45:13 74:18 75:6
106:18 115:11
264:12 285:18
288:4
**addition** 253:18
259:18 268:22
284:22 307:5
**additional** 12:23
34:13 37:19 41:21
44:4 46:8,18
73:24 74:5,9,12,23
75:6,14,19 83:8
119:9,9,14 128:3,3
134:16 142:1,25
148:11 159:10
203:3 257:25
264:13 265:21,22
269:4,13 273:14
273:23 276:22
283:19 284:18
310:19
**address** 15:15
26:11 128:9 169:4

218:18 222:25
223:9 225:14
318:15
**addresses** 282:17
282:17
**adopt** 47:15
219:10
**adopting** 21:13
57:10
**affect** 168:11
305:1
**affiliations** 7:22
**affixed** 317:9
319:15 320:21
**aforesaid** 316:15
316:21
**afraid** 24:4
**afternoon** 13:20
311:7
**ag** 11:14 23:12
24:2 26:23 27:15
**aggregate** 61:9
276:7
**ago** 14:11 18:5,8
27:17 33:9,9,10
35:22,25 37:17,24
38:4,24 42:2
46:25 47:2 48:15
84:18 92:4 93:5
95:6 97:14,17
119:25 161:3
162:15 163:22
170:9 201:5
221:18 258:4
275:17 285:8
300:4 303:15
314:2
**agree** 7:9 11:18
18:20 24:20 51:20
55:10 66:5 74:21
82:21 98:1,17,25

120:15,24 122:1
123:13 137:23
148:16 155:2
164:13 171:21
202:6 207:11
219:12 267:6
268:5
**agreed** 187:19
**agreements**
187:18
**ahead** 25:25 26:14
28:23 42:16,17
65:19 68:10 87:19
126:5 150:4 292:8
**aid** 3:14 8:12
16:24 17:12 19:4
311:16 313:2,7,8
**aided** 316:18
**al** 1:7,9
**alex** 2:9
**alex.abston** 2:11
**algorithm** 206:24
207:25 208:5
**algorithms** 21:16
166:7 246:14
**allergan** 14:6
**alleviate** 161:6
**alliance** 2:16
**allow** 169:14
**allowed** 18:18
150:8 298:14
**allows** 46:13
114:18 131:8
168:15
**alluded** 59:4
**altered** 170:10
**alternative** 51:3
296:13
**alternatively**
310:15

**altogether** 265:24
**ambiguity** 104:1,4
104:12
**amend** 284:8
**amerisourceberg...**
14:24 16:15 18:2
73:11
**amount** 48:12
54:8 113:20 135:5
151:22 187:9
287:13 289:23
**amounts** 230:22
288:14
**analyses** 21:2
22:15,19 64:23
66:10,21 71:13,15
71:20 72:2 80:22
82:11 112:2,3
113:2,4 128:25
129:23 169:25
170:6,19 216:22
219:3 221:2 222:8
241:15 299:18,21
**analysis** 5:14 22:1
22:6,10 28:1,9
31:20 32:18 41:20
41:22 51:1 61:8
62:7,20 70:19
71:23 73:17 87:12
93:9,10,19 94:12
95:1 96:1 104:19
113:10 114:6,21
116:23 123:5
127:16,21,24,25
128:5,11,16,21
129:2,8 130:4,4
131:12,20,22
132:10,16,22
136:20 139:15,22
152:9 168:9
169:17 170:12

171:24 172:7,25
173:4 174:2,7
179:24 180:13
182:8,13,18
202:23 213:11,14
214:21 221:3,3,12
221:13 222:1,16
222:18,21,23
223:8,15,20,21
224:6,14,19 226:4
226:21 228:7,12
228:18 229:18
230:4 231:12,21
232:9 233:9,21,25
234:3 235:11
242:4,5 259:11
263:4,9 265:16
268:12 270:6
271:20 272:9,21
274:2 275:1
277:10,14 278:6
279:16 297:8
312:7
**analytical** 84:11
**analyze** 224:24
229:22 242:12
304:25
**analyzed** 212:21
230:9,15 259:15
**andrews** 15:4
**annual** 95:19
**answer** 12:8,10
33:17 43:17 44:19
56:25 69:14 75:10
75:11,25 81:2
87:8 109:24 125:7
139:10,11 169:20
185:18 205:10,22
210:7 227:19
228:1 252:10
312:18,19

**answered** 19:9
38:3 40:14 129:16
300:12 301:19,20
**answers** 102:17
177:22 178:1
**anticipate** 43:10
43:25 46:7 75:5
106:17
**anticipated** 25:15
**anticipating** 45:12
**anybody** 21:23
22:1,6 39:12
47:20 64:1 96:16
136:23 151:6,12
152:25 153:3
166:24 186:14
263:10 303:18
**anymore** 218:3
**anytime** 193:5
254:10 255:24
290:2,23
**anyway** 31:4 88:8
173:1 202:10
253:22 287:22
**apologize** 40:13,20
58:5 87:5 95:7
125:7 140:7
144:23 149:18
173:8 195:9,11
236:4 238:12
261:9,17 295:23
**apology** 236:5
**appear** 105:14
144:19,21 145:7,8
170:1 180:24
218:3 283:23
319:11 320:15
**appearance** 7:24
**appearances** 2:1
3:1 7:22

**appeared** 49:13
316:7
**appearing** 1:25
**appears** 81:15,18
109:7 114:21
117:5 119:7
179:21 180:15
202:9 278:2 282:3
**appended** 110:3
320:11,18
**appendices** 20:15
43:14,17,23 44:5,8
44:17,20 45:1,10
45:18 46:4 51:8
62:14 65:22 70:15
71:14 115:7,8,9
129:23 141:4
170:1 208:21
226:12 266:7
**appendix** 4:20,23
5:17 6:17 43:19
51:8,21 52:4 56:7
56:7,12 59:22,24
60:4,9,24 61:8
62:4,5,6,19,24
63:9,18 64:3,10,15
64:21,22 65:6,21
66:7,11,21 67:9,17
70:7,12,18,23,25
72:6,8,14 106:5,8
106:11,17,18
107:7,15 108:1,5
108:17 109:2,9,11
114:15 115:13
119:17 120:18,20
126:17 127:6,12
127:19,24,25
128:1,2,3,12,12,17
128:17,22,22
129:23 130:4,5,8
130:10,10,12,13

130:18,18,20,22
131:12 132:17
139:25 140:13
143:15,21,23,24
143:24 144:1,5,5
144:10,14,19,22
145:2,4,7,10,19,19
146:3,6,14,17
147:12,13,18
148:1,8,20 158:23
159:2,24 160:6,12
160:22 161:3,5,11
164:11 228:10
233:2,15 258:18
265:8 266:15,19
266:22,23 267:7
267:17,20,21,24
267:25 268:1
271:6 272:5,21
273:17 274:17,19
277:8 283:18
284:9
**apples** 241:21,21
**applicable** 307:20
**application** 134:4
**applied** 20:21
22:25 51:3 66:22
74:24 80:2,5
167:20,25 192:11
200:24 201:10
287:1
**applies** 50:16
134:16
**apply** 12:20 13:2,3
21:1 22:5,9 28:8
113:15 191:17
192:9 193:6
267:23 313:1
**applying** 58:25
191:20,23 218:11
247:14 249:8

**appreciate** 13:5
65:2 87:20 95:9
124:22 150:5
266:3
**approach** 286:14
286:18
**approaches** 183:4
**appropriate** 73:15
167:3 218:22
300:23 312:5,10
312:23
**appropriately**
284:19
**appropriateness**
167:11
**approved** 110:4
**approximately**
202:10 241:3
256:2 259:10
263:1
**april** 4:13 37:5,22
38:11,21 42:6
43:3 47:23 48:9
48:24 78:9 88:14
90:7 97:4 98:2,10
98:18,25 99:10,12
103:8,13 104:20
105:4,5,8,14
107:17 109:6,14
111:5 114:10,22
117:13,25 118:10
119:8 127:16
135:2,17 142:12
142:18 143:2,4,5
143:11,18 145:17
145:25 147:18,24
148:6,9,18,24
153:6,11,22 158:7
158:12,17 159:18
160:17 161:14,17
161:22 168:4

170:4 172:10
173:20 174:2
178:17 179:15
201:14 204:13
207:9 260:19
262:18 264:3
265:8 266:14
269:21
**arcos** 17:3 21:14
28:2 34:9 44:13
44:13,22 51:4
59:1 74:24 75:23
76:4,9,14,18,24
77:1,6,12,14,16,21
78:11 123:19
172:14,19,22
173:25 174:3
188:24 201:1,3
224:11,15,17,21
225:2,5,18,22
231:7 234:4 259:1
259:7,11 260:2,7
261:6,24 262:11
262:14 263:10,20
264:8,14 265:23
269:5 273:5,9,19
273:21 275:6
277:13,14,19
278:21 284:5,6,12
284:12 287:22
289:7,11 313:25
314:6
**area** 218:1 222:11
**areas** 217:2
**argue** 212:13
220:24
**argumentative**
224:16 301:21,23
**arithmetic** 21:16
57:10,11 135:13

**articulate** 12:8
**articulating** 218:6
**artificially** 293:6
295:7,8,10
**aside** 240:6 266:6
**asked** 11:17 13:12
13:13,17 19:9
21:7,8,22 34:1
35:4,8 38:23
56:25 83:1 87:5
95:25 96:9 107:22
110:11,13,15
114:20 115:15
124:21 125:11
132:1 141:25
163:22 167:13
169:22 170:14
172:25 176:8
187:5 205:16
206:2 212:25
213:1 236:9
238:25 244:5
249:1 253:6
256:10,11 258:16
275:7 276:4
299:19 301:19,20
307:13 308:11
**asking** 36:23 63:2
75:2,3 139:5
173:4 195:24
196:3 199:22
203:22,23 204:18
204:21,22,24
205:25 206:1
209:19 215:2
219:10,11,18,19
219:22 226:20
230:3,4,10 248:6
258:14 298:7
**asks** 85:25 114:18

**articulate** 12:8
**aspect** 113:7
154:22 221:21,23
**aspects** 76:22
**assembled** 88:21
107:4
**assert** 179:25
**assessment** 166:10
312:15
**assign** 240:9
**assignment** 141:22
319:2 320:2 321:2
**assisted** 47:8
**associated** 44:8
127:21 166:11
240:14 296:17
**assume** 187:15
**assumes** 211:1
**assuming** 219:9
**assumption** 50:20
53:9 54:11
**attached** 44:12
46:4 62:18 103:16
143:22,25 259:19
320:7
**attended** 47:7
**attention** 51:25
**attorney** 7:25
11:10 17:18,21,25
18:14 19:1,18,23
20:1 22:11,14,19
22:23 23:23 26:21
27:2,4 29:2 189:2
**attorneys** 18:16
19:25 29:1 38:6
40:3 41:6 64:1
110:5 129:4,4,10
129:11 185:7
317:3
**attribute** 88:23
**audience** 302:6

**audio** 7:7,8
**august** 28:14
  29:11 30:5,14,16
  262:12
**authorize** 320:11
**available** 34:10,12
  63:11,21 77:22
  78:1,17 262:23
  297:14 300:2
  306:21 313:16,18
  313:23
**ave** 318:1
**average** 27:8
  67:11 192:3,17
  193:14 194:15,16
  194:19 196:11
  197:17,22 203:12
  203:15 286:10,22
  287:6,12,16,23
  288:17,20,23
  289:3,5,5,11,12,21
  290:5,18,20
  292:17,19,23
  293:12,13,18,19
**averages** 71:9
  196:19 289:16
**aware** 10:15 12:10
  15:16 19:22 46:21
  49:21 60:2 63:25
  71:17 74:5 80:9
  80:12,16,18 81:15
  84:16 93:25
  151:11,14 152:14
  152:24 167:10
  182:17 206:12
  236:11 238:10
  262:18 300:17,20
  312:20 313:17

**b**

**b** 4:9 5:1,13,22 6:1
  50:5 58:6,8,12,22
  59:7,15 86:13,14
  87:17 92:2 95:19
  116:22 169:8
  175:9,15,17,23
  177:17,22 178:10
  178:22 179:2
**back** 11:24 12:12
  12:13 13:16 19:12
  24:5 25:7 26:7,12
  26:13 33:16 48:14
  59:22,23 66:2
  69:21 77:25 78:4
  89:8 95:12 100:3
  110:17 116:18
  119:17 126:11,15
  133:2 139:24
  141:19 152:10
  158:21 174:25
  181:2,12 189:20
  201:24 205:14,19
  205:20,24 206:2,3
  227:19 237:25
  238:8 248:3,20
  250:23 251:2
  256:23,25 257:7
  259:25 264:19
  271:15 273:12
  276:1 277:6 300:5
  302:2 309:22
  310:21 311:3
  314:18,22 318:15
**backup** 165:21,24
**bad** 124:10,11,13
  125:22,22,22
**ball** 201:20 299:10
  299:13,13
**bar** 5:16 61:11
  65:7 66:19 71:6

108:18
**barr** 2:2
**bars** 66:17
**bartlit** 2:13
**bartlitbeck.com**
  2:15
**base** 157:2,9 245:5
  302:24 303:7
  309:3
**based** 58:13,14
  66:19 93:4 106:22
  113:12 132:10
  170:22 171:9
  202:22 211:23
  219:6 220:17
  240:21 242:24
  244:6 246:2
  273:19 285:20
  294:7 297:14
**bases** 44:9,11
**basically** 235:15
  285:18
**basis** 105:25 122:5
  167:7 175:19
  293:15
**bat** 42:19
**baylen** 2:4
**bear** 80:8
**beck** 2:13
**began** 197:3,11
  202:19 204:12
  245:12
**beginning** 7:24
  255:3
**behalf** 8:6 258:3
**behavior** 201:4
**believe** 14:17
  20:18 35:7 40:8
  41:2,17 43:19
  44:15 49:1 55:24
  56:21 65:10 68:7

70:10 88:7 92:10
  92:11 93:6 94:15
  96:14 97:14 98:9
  99:11 102:7 107:8
  110:2 125:3 128:6
  161:2 163:16,19
  170:8 171:12
  178:24 179:3
  182:9,14 201:24
  216:6 226:11
  227:1 228:8 233:1
  233:2 244:18
  249:11 283:11
**bell** 202:3,17
**benefit** 34:15
  236:20
**benzodiazapine**
  154:19 155:10,20
  156:2
**best** 10:5 12:3 26:2
  26:5 59:13,16
  95:22 231:20
  247:19,20 297:4
**bet** 286:12
**better** 12:9 57:11
  59:7 268:20
**beyond** 46:6
  128:18 139:13
  141:7 242:20
  313:14
**big** 43:23 123:9
  238:4 290:7
**bigger** 238:4
  263:19 273:11
**billed** 188:16,19
**billing** 187:9
**binds** 175:23
**bit** 13:6 14:18 25:9
  31:19 37:11 41:25
  49:4 53:13 74:8
  83:4 88:15 90:23

**[bit - case]** Page 10

98:4,22 99:3,5
102:1 103:25
104:4 111:21
115:21 185:12
209:5 236:14
263:13 273:11
275:25 277:7
278:22 285:9
286:3,4 288:13
292:20 303:12
**blank** 9:9 194:6
239:11 240:8,10
240:12 288:5,9
**blocks** 294:23
**blue** 65:13 66:17
**board** 80:9,16
306:5
**bockius** 3:11 8:13
**body** 266:10
**bookends** 265:22
**boots** 2:16
**bottle** 243:23,23
246:6
**bottles** 291:10,13
**bottom** 51:24
108:16 156:24
235:3 267:21
**box** 42:13 43:23
51:6 65:21 83:11
83:20 84:23 85:5
87:18 91:22 94:4
107:6 126:20
177:5
**brand** 179:22
**break** 69:19 70:11
70:23 126:9
174:17,18,23
185:11,13 189:10
189:11,18 249:17
250:18,21 258:8
310:18,21 311:1

**brief** 89:5 187:4
204:4 311:20
**briefly** 30:7 125:9
128:20 193:16
**bring** 19:2 149:19
271:15
**broken** 228:3
**brought** 11:10
17:17,24 19:22
20:7 22:14,18
23:22 31:15,17
**buchanan** 2:2
**bucket** 304:8
**bullet** 179:20
**bunch** 74:20
133:16 248:4
296:20 304:16
**business** 293:10
**buy** 243:24

**c**

**c** 39:19 58:6 59:19
95:15,18 96:22
316:3
**c1** 180:10,21
**c10** 180:11,22
**ca** 318:25
**cabell** 11:3,7 49:16
49:19 50:13,16
**calculate** 151:21
169:10 225:17
229:2 230:17
285:19 287:11
292:16,23 313:13
314:3,6
**calculated** 79:18
285:22 288:23
289:4 292:19
**calculating** 192:17
287:23 289:16
293:18,19

**calculation** 53:16
54:23 164:16
171:21 230:25
231:2,10,19
276:17 291:1
**calculations** 83:1
83:3 94:21 115:2
128:7 130:15,16
147:21 152:11
209:2 276:18,22
**calculator** 274:8
**calendar** 286:17
286:21
**call** 24:12 28:16,20
28:24,25 29:2,4,10
30:7,13,18,22
31:16,21 35:21
36:9,12,13,13,20
36:21,25 37:2,3,7
37:8,10,12,14,16
38:2,8,10,14,17,20
38:22 40:17 41:3
41:18,25 42:1,5
58:9 115:19
155:18,25 156:12
156:18 157:6
163:13,21 172:15
**called** 1:13 10:20
25:16 50:5 54:2
79:18 133:5,12
135:25 203:5
228:9,10 243:9
278:3
**calling** 20:19 27:5
54:18 97:22,24
111:5
**calls** 30:15 31:2,3
32:13,14 33:2,2,13
33:14 36:21 37:10
37:19,22 38:4,5
40:3 50:8 89:24

89:25 129:18
**capabilities**
218:21
**capture** 110:2,5
**cardinal** 14:24
16:15 18:1 73:11
**career** 175:18
**carefully** 100:5
**caricature** 55:20
55:24 56:21 57:2
122:2,5
**carmen** 5:19 35:12
35:14 89:20
148:22 150:25
**carries** 109:10
**carrying** 109:11
**case** 1:7,7,9 5:3,6
7:15 11:3,7,9
12:21 13:22 14:3
14:16,23 15:11,19
16:4,14,18,23
17:13,16,17,20,24
18:10,14,15,21
19:10,11,11,18,19
19:22,23 20:2
21:3,10 22:11,13
22:16,18,24,25
23:13,14,20,22
24:2,7,8,16,25
25:4 26:21,22,24
26:25 27:2,4,11,16
27:18 28:6 29:5
29:12 31:23 34:12
35:16,18,24 41:5
41:14,15 44:1
46:24 48:17,19,19
48:20,22 49:14,17
49:20,23 58:15
76:12 79:12,13
80:7,11,24 82:20
82:23 83:25 85:8

85:22,24 86:20
93:22,25 94:14
102:15 103:4
109:7 112:15
117:5 120:7,17,21
121:3,11,15,20
122:9,13,17,24
123:4 130:19
132:6,14 138:1
147:14 148:23
149:10 167:20,25
172:8,10 181:6
182:22 183:7,10
183:19,23 184:3,8
184:15 185:21,23
186:6,9 193:7
194:11 199:21,23
200:2 209:12
210:17 217:8
228:21 229:7,8
230:21,23 232:1
256:13 260:11
284:2 298:12
306:19 310:10
318:6 319:3 320:3
**cases** 1:10 10:12
15:21 17:19 18:7
19:7,14 20:13,23
27:21 28:7 34:2
35:17,19 40:11,25
41:12 43:11 48:10
74:14 75:21 76:2
79:9 185:10,22,24
186:1 187:21
188:20 207:4
239:14 240:8
**cash** 158:2
**catizone** 5:20
35:12,14,20 36:3,6
36:10,23,24 37:22
38:5,6 39:6,13,17

39:22 40:1,4,7,12
40:18 41:1 89:20
89:24 90:1,10,13
90:23 91:6,12
111:24 116:14
137:1 141:13
148:22 149:3,8
150:25 151:9,13
152:3,11,16
153:24 154:11,14
154:22 156:1,6,6
156:12,18,25
157:6,14,15,20,25
158:1 159:21
160:10,11 163:5
163:10,13,17,21
164:1 165:13
166:1 167:15
169:15 244:2
303:20 304:7
**catizone's** 150:22
152:22 153:5,13
153:17 154:1,17
155:1,5,16 158:5
158:10,14,20,21
158:24 159:12
160:19 161:18,23
162:9,19 164:10
165:4
**caught** 16:8 219:2
**cause** 53:20
286:15 316:8,15
**caused** 15:13 84:8
85:23 93:11,16,21
94:7,13 180:1
184:15 208:17
254:9 283:8
286:19 287:4
307:17
**causes** 303:24

**cc'd** 41:5
**cell** 7:5 194:6
**cells** 194:13,13,15
277:1
**cellular** 7:5
**center** 77:8 202:17
217:13,22 218:4
**centers** 71:22 73:3
73:5 167:22
217:22
**centre** 2:19
**certain** 5:22 32:16
76:21 97:15,18
111:4 175:9
176:18 220:11
242:17 277:17
299:14 307:9,14
**certainly** 12:11
37:24,25 42:7
44:2 45:2 57:8
62:1 66:18 87:11
91:15,20 96:7,12
121:22 152:24
153:2 198:4,9
206:17 218:21
252:2 253:12
278:19 289:7
**certainty** 27:20
32:11,24 48:16
90:19 93:7 124:5
228:9
**certificate** 320:11
**certification** 319:1
320:1
**certify** 316:6,12
316:22,25 317:4
**cfa** 4:12,15,19
**chain** 5:23 16:9
19:3 76:16 151:25
172:17 173:14
190:15 227:16,24

228:23 229:3,6
235:14 237:5
277:11,15 286:23
312:13,15
**chains** 276:14
**chance** 208:8,12
**change** 12:13
64:25 69:16 126:3
134:14,21 169:21
273:8,22 282:14
282:17 285:12
318:13,14 320:8
321:3
**changed** 82:23
127:9 282:10
**changes** 225:17
269:16 318:12
319:7 320:7,9
**characteristic**
141:9
**characterize** 76:19
82:25
**characterized**
171:17
**charges** 20:6
**chart** 5:16 6:12
45:18 61:7,11
65:7 108:19 196:8
205:4,5,7,10
210:10 213:10,21
219:23,25 282:16
285:20
**charting** 61:21
196:17
**charts** 44:21,23
45:13 46:4,8,18
62:13,18,23 63:9
63:18,19,20 64:2,9
66:6,8,20 71:6
205:8 208:21
216:2 282:22

**check** 11:22 14:13
18:24,25 64:17
89:9 125:22
152:20 187:23
210:4 248:20
251:11,24 256:23
309:17,21,23
**chicago** 2:14 3:3
**choices** 247:15
**choose** 61:24
63:16 299:5
**chose** 244:24
**chuan** 39:19,19
**churchill** 196:12
**ciaccio** 177:12,20
178:17
**circle** 217:2
273:12
**cite** 106:2
**city** 49:17
**civil** 1:14 319:5
320:5
**claim** 124:24
**claimed** 223:17
**claiming** 237:12
**claims** 19:2,13
85:22
**clarification** 13:5
238:1
**clarify** 193:4
214:21 228:15
235:24 307:4
**clean** 9:10
**cleaned** 68:22
**cleaning** 96:6
**clear** 71:12 99:9
104:5 111:18,19
111:22 206:21
207:22 229:14,15
229:16 236:6
237:20 247:17

261:19,22 265:7
269:18 275:24
280:8 284:17
285:11
**clearer** 303:18
**clearly** 75:1 89:3
196:1 202:5 270:5
293:24 296:1
**cleveland** 318:2
**click** 202:12
**client** 18:15 49:14
274:12
**clients** 189:1
**close** 47:25 70:14
86:24 112:9
115:22 162:2,3
289:23 294:21,22
**closed** 199:11
202:2,7
**closely** 34:22
78:12
**closer** 218:8
**closest** 94:15
**closure** 199:14
**club** 287:3,14,18
287:25
**clubs** 287:7
**cocktail** 179:20,21
**code** 62:8,16 63:23
81:8,23 82:10
102:12 168:14,17
169:4,21 170:12
181:2,5,7,8,9,12
181:14,18 182:3,5
207:1 216:16,17
216:21 217:7,9,12
217:14,20,23,25
218:5,12,15,16,18
222:2,9,14,16,22
223:4,5,6,7,10,16
223:17,23,24

240:2 242:5
303:19 310:16
**codes** 181:17
217:1,22 218:10
223:13
**coding** 177:22
180:12,16,24
**cohen** 25:8 26:4,12
26:17
**coin** 225:12
**collected** 256:1
**collecting** 255:18
**collectively** 71:8
**color** 74:20 195:12
**column** 92:14
134:12
**columns** 130:7,9
194:2 251:8
276:24
**combination**
30:24 40:6,19
111:6,14,17,20,23
115:19,23 117:6
117:10,22 118:3
120:12 123:2
131:2,23 132:4
133:12,21 135:7
136:2,5 137:16,20
142:3,6,9,15,23
143:7,8,12 163:6
163:11 164:1,19
164:25 165:2,9,11
165:19 166:5,15
170:4 196:13
197:24 213:22,24
214:13 257:17
**combinations** 96:4
96:13 289:25
295:18
**combined** 157:22
259:12

**combining** 111:14
**come** 23:11 24:5
26:7,15 27:10
66:2 69:3 74:3
79:22 166:5
274:24 299:25
**comes** 53:8 133:14
136:6
**comfortable**
248:22,23 249:2,3
249:6,12,20 250:2
250:10,11,14,16
**coming** 139:13
197:23 265:5
274:21 292:14
314:22
**comment** 247:9
258:23
**commerce** 292:14
**commission**
319:19 320:25
321:25
**committee** 2:7 8:7
**common** 52:6
134:8 196:3
**commonality**
134:7
**commons** 196:12
**communicated**
129:3,4,5
**communicating**
75:1
**communication**
129:18
**companies** 228:24
**company** 2:22
189:25 271:22
272:10,23
**comparable** 15:19
**compare** 66:19
90:14 97:17 131:8

153:4 194:20
226:7 254:1
279:21
**compared** 77:11
134:7 147:13
229:3
**comparing** 104:22
192:4 288:19,22
**comparison** 6:5
215:15 220:20
241:21 269:10,13
**comparisons**
126:20
**competition**
254:18
**compilation**
309:11
**complete** 47:23
88:18 109:19
254:2 261:7,25
265:17 295:19
306:25
**completed** 109:22
318:15
**completely** 24:9
146:24 194:10
214:23 224:22
239:8 240:20
278:24 305:19
**complex** 135:16
**complicated** 46:2
135:16 269:19
303:12
**comply** 182:23
183:3
**component** 81:13
235:6 264:10
**compound** 34:24
69:8
**computation**
146:5,18 147:20

255:1
**computations**
142:4,5,24,25
143:9 144:16
152:2
**computer** 316:18
**computers** 166:7
**concatenated**
248:15
**concern** 216:20
**concerned** 241:13
**concierge** 3:25
51:14 83:14 87:22
150:12 270:23
**conclude** 84:8
93:20 94:7 261:5
262:5 271:24
272:12,25
**concluded** 75:22
76:3 77:16 78:11
**concludes** 314:25
**conclusion** 77:13
84:10
**conclusions**
228:13,18 230:11
**conduct** 22:19
183:15
**conducted** 219:3
**conducting** 23:2
**conference** 9:24
36:9 40:3 258:4
**confess** 285:16
**confident** 100:4
**confirm** 71:3
80:19 87:17
102:24 109:1
150:20 206:15
233:2 310:8
**confirmation**
41:22

**confused** 99:20
142:19 161:8,9
173:6 196:21
223:19 224:22
226:25 227:8
247:9 264:16
278:24
**confusing** 83:21
100:14 142:22
150:9 219:17
226:25 285:9
**confusion** 50:8
94:3 144:4 160:4
161:7 236:3
252:21
**connected** 172:1
**connection** 42:8
174:7 180:15
181:17
**consistent** 93:23
286:1
**constraint** 134:16
**consultant** 22:22
28:14 34:4,20
89:12,20 91:17
94:11 96:22
136:20 141:16
182:17
**consultants** 40:10
40:24 47:17 62:15
137:5
**contact** 46:23
**contain** 43:9 44:8
81:5
**contains** 43:24
**contemporaneou...**
176:20
**contend** 85:22
176:11 178:12
**content** 45:9,12
46:12

**contention** 15:10
15:11
**contents** 48:25
50:10 64:20 65:4
190:9
**context** 54:22
123:24 191:3,6
217:6 218:22
237:20
**contexts** 113:6,8
114:3,3 218:24
**continue** 7:8 21:12
26:16 205:9
**continued** 3:1
**continuing** 207:9
**contrary** 213:13
213:18
**contributed** 89:2,4
183:23
**controlled** 73:20
202:19 211:21,24
313:6
**convenience**
218:20
**conversation**
29:24 36:18 42:3
163:5 164:3
**conversations** 7:4
30:1 35:9 36:24
39:22
**convey** 303:17
**convinced** 210:1
**cook** 1:25 316:5
317:16
**coordinated** 34:2
**coordinating**
34:22
**copied** 47:14
179:19
**copies** 9:14

**copy** 9:10 11:13
11:18 67:8 72:11
203:21 207:17
**corporate** 175:20
175:22
**correct** 10:3,12,17
10:20 11:7 13:22
13:23 14:7,17
15:1,5,25 16:6,7
16:16,17,24,25
17:8,9,13,17 18:3
19:19 20:13,23,25
21:4,5,12 22:3,4,7
22:8 23:10,23
26:25 35:11 37:6
37:21 39:15,23
41:23 48:13,22
49:2,10,20,24 50:2
50:13 51:14 52:16
52:22,23 53:2,5,6
54:4,5,9,12,13,16
55:17,18,23 56:2
56:14,19,20 57:2,5
57:16,20,23 58:4
58:20 59:9,20,21
60:13,14,22,23
61:6,10,14 62:21
62:22 63:10 64:13
66:23 67:2,14,15
67:21,22 68:2
70:20 71:5,24,25
72:3,10,17,25 73:3
73:12,13,18,23
74:11 75:20,24
76:5 77:3,19,20,22
78:14,17,18,21,25
79:6,7,16,17,21
80:4 85:15 87:3,4
87:22 90:7,8 94:8
94:9 95:3 97:9,10
99:21 103:17,18

103:24 105:1,2,5
105:11,12 106:24
106:25 107:18,25
108:10,19 109:15
111:6 114:7,8,23
114:25 115:12,24
115:25 116:3,25
117:1,4,8 119:6
120:5,8,10,11,13
120:14 121:9,12
121:13,18,21,24
121:25 122:10,14
122:17,18,22,23
123:1,8,11 131:14
131:24 133:5,12
133:13 137:16,21
137:22 138:5,6,9
138:11,14 141:23
142:7,8,12,18
143:13,14,21
144:8,9,16,17,22
145:10,11,20
146:3,4,7,15,16
148:2,8 149:14,20
153:25 154:12,15
154:23,24 155:14
155:23 156:4,5,9
156:16,17,22,23
157:4,5,12,13,18
157:19,23,24
158:2,3,8,13,18
159:16,20,22,23
160:1,6,7,13,19,20
160:24 161:4,14
161:15 162:1
163:7 164:1,14
165:5,6 166:3,13
166:23 167:4,5,8,9
168:22,23 169:13
170:19 171:6,7,23
174:4,5 177:14,18

179:12 183:1,4,5,8
183:12,16,17,20
183:21 184:17
185:4 187:13
188:9,18 197:19
199:5,9,10 201:13
202:9,22 204:6,6
204:11,22 206:11
207:14 208:1,4,19
212:23 213:12,16
214:1,11 216:19
216:23 218:24
223:6,14,18,25
225:6 231:7,9,22
233:1,3 234:5
241:12 242:19
244:2,14 245:15
245:19,21,22
246:1,2,3,6,18,23
247:2,3,21,22
248:1,2 250:6,9,12
252:12,20 253:7
255:10,12,20
256:4,10,18 260:2
260:3,19 261:8
262:3,6,16,20,21
265:9,10 266:20
267:7 268:12
271:22 272:2,10
272:15,16,23
273:3,4 274:9
275:15 276:22
277:12,19,20,23
277:24 278:1,8,9
278:13,17,18
279:14,18,19,25
280:4,17,21,24,25
281:20 282:4
284:10,11,15,19
285:20 286:24
287:9,19 289:1

291:14 293:6
294:1,2,11,15,19
295:9 297:3 301:6
301:16 302:15,16
303:9 305:4,13,19
305:24,25 306:10
306:24 307:9,21
308:2,17 309:5,6
309:10,12,16
310:7 312:7,25
313:3,4,8,9,22
316:20
**corrected** 128:1
**correcting** 261:5
261:23
**corrections** 318:12
320:17
**correctly** 15:7
40:15 46:10 66:15
72:19 115:3
164:24 171:16
179:5 191:15
267:4 285:1
**corresponded**
235:18
**correspondence**
89:9
**corresponding**
164:11
**counsel** 7:11,21
9:13,18,19,20
46:11 51:2 57:2
88:21,23 89:3
90:12 105:17
106:1 107:3,22
129:19 200:17,20
200:24 212:25
237:25 265:3,4
283:21 300:15
316:23 317:4

**count** 113:17
136:10 279:10
290:5 309:10
**counted** 135:7
282:3,4,8
**counter** 79:16
243:7
**counties** 6:8 60:11
61:5,13,23 175:16
175:23 176:8,11
210:18,23 221:11
221:15 226:22
271:22 278:16
279:12 285:23
286:3,4 287:8
**counting** 36:8
282:25 283:1,3
**country** 13:10
189:2
**counts** 26:5
**county** 1:6,8,25
10:11,12 12:21
13:8 15:25 16:4
16:11,14,20,23
17:11 20:12,23
21:3 26:22 27:24
28:6 29:21 31:23
40:11,25 41:12
43:11 46:23 48:3
48:19,22 49:8,17
49:19 50:13,16
52:5 63:14 64:4
64:11 75:21 76:2
79:13 121:23
176:17 186:6,9
221:20 222:21
223:2,2,22,23,24
223:25 224:21
225:24 226:5,13
227:3,22 229:20
230:7,10,13 231:3

232:25 254:17
262:16 263:23,25
264:2,8,19 268:23
268:25 269:1,3,6,7
269:8 272:1,10,14
272:22 273:2,6,7,9
273:21 275:5,14
276:11 277:11,16
278:20,21 280:3
284:2,4,6,7,14,25
287:4,18 288:20
288:21 289:6
316:3,5,5 317:16
319:10 320:15
**couple** 11:24
25:22 29:14 30:13
38:3,4,5,23 42:1
47:1 68:9 78:1
79:1 235:21 242:7
253:3 259:15
263:18 264:22,24
265:1 269:25
270:1 273:24
281:1 295:13
303:13
**course** 11:19
22:12 32:3 45:3
63:6 82:23 93:13
110:10 115:1
122:13 179:1
186:23 242:8
256:5
**court** 1:1 7:14,17
8:16 16:21 69:12
94:5 196:5 205:19
206:3 299:14
316:10 319:7
**courtesy** 196:4
**courts** 1:15
**cover** 16:12

**covered** 14:20
222:11 313:21
**craig** 1:13 4:3,11
4:14,18 7:11 8:8
9:1 151:20 316:8
316:12 318:8
319:4,9 320:4,13
321:20
**crawford** 3:7 8:2,2
**create** 32:1 96:9
96:12,18 129:7
187:5 200:11
259:17
**created** 32:9 45:25
74:9 92:23 129:2
129:3 181:1,5
183:19 184:8
186:15,16 196:23
196:24,25 200:7,8
200:16 248:19
251:8,13,14,17
252:4,6
**creating** 168:17
181:24
**criminal** 20:6
**crisis** 15:13 183:19
183:24 184:4,16
**criteria** 5:12 79:22
80:1,6 86:9 87:3
88:4,17 89:1,7,11
89:17,21 91:7,12
91:18 93:4 97:19
105:23 106:3,22
112:5,21 116:22
134:21 142:11,17
145:24 153:5,6
158:4,6,11 160:24
171:10 294:11
304:20 307:15,18
308:1,12 310:3

**criterion** 217:4
**cross** 227:6 301:23
**crow** 168:25
**crr** 1:23
**crunch** 274:7
**crystal** 299:10,12
299:13
**csr** 1:23
**ct** 5:13 35:23
49:18 177:16
189:2,3,3 212:9
214:22
**currently** 275:11
**curved** 169:2
**cute** 274:6
**cutler** 41:2,3,7,9
42:5 94:17,20,25
128:8,14,20,21
129:5,7,10,16,19
130:2 132:3,25
**cutler's** 128:6
**cuyahoga** 10:12
17:20 49:7 210:18
**cvs** 3:9 8:3 16:23
17:12 19:4 72:10
72:16 73:2,4,13,16
73:20 140:17
311:25,25 312:6
313:2

| d |
| --- |

**d** 4:1 58:6 67:10
95:15 96:22
112:21
**daily** 27:10 67:18
**dallas** 13:22 14:3
14:16,22 15:2,10
15:19 16:18,20,23
17:11 18:18 27:24
28:6 48:3,19
**dan** 1:8

**dark** 14:2
**data** 17:3 21:15,22
28:2 30:19 31:9
32:17 34:9,10
36:17 44:13,13,22
45:24 51:4,4 55:4
57:9 59:1,2 62:3,9
62:15 63:12,20,20
63:23 68:15,18,22
74:4,25 75:13,15
76:9,10,14,15,18
76:23 77:1,5,6,12
77:12,14,16,18
78:1,11 80:2,10,13
80:17,21,23,25
81:3,4,5,6,16,19
81:20 82:6,12,14
92:17 96:6,19
97:9 104:10
123:20 125:14
131:14 135:12
138:24 139:10,19
139:19 141:7
154:5 166:8 170:7
172:8,9,12,14,16
172:16,17,19,19
172:20,20,23,24
173:7,10,13,18,19
173:22,24,24
174:1,3,9 176:21
182:8,13 188:24
191:11 192:7,8
196:25 201:1,3
203:3 204:10
206:17 208:10
211:11 216:12,16
219:3 224:2,6,10
224:11,12,15,15
224:17,22 225:2,3
225:5,7,11,18,19
225:21,22 229:1,4

230:16 231:6,7,10
231:18,22 232:23
233:13,24,25
234:4 235:19,24
236:7,13,16,17,21
236:22 237:6,10
237:21,23 238:5
238:14 239:7,9,21
239:24 240:5,13
240:17 241:15
242:3,9 243:15
244:4,23,24
247:13,18 248:4
248:13 249:7
251:25 252:15,16
254:2,3,5 256:6,8
256:10 257:9,10
258:25 259:6,7,8,9
259:11,11,12,16
260:2,2,7,8 261:7
261:24 262:12,14
262:15,20,23,25
263:1,7,9,11,12,14
263:20,24 264:6,7
264:9,12,14,18
265:1,5,22 268:4
268:21 269:5,7,24
273:5,19,21
274:24 275:21
282:20,23 283:18
284:1,3,5,6,12,13
284:23 285:3,5,6
289:9,12,13,14,15
290:2,24 294:23
295:12,14,19
296:15,16,18,22
297:7,9,10,13,14
298:13 299:11,17
299:19,20 300:7
301:12 304:24
305:10,13,15

306:14 310:13
313:13,16,17,21
313:25 314:1,3,4,6
314:7,8
**database** 75:24
76:5 77:22
**date** 29:9,17 39:5
47:24 82:2 104:19
105:8 106:19
148:25 151:1
187:7 235:2,9
237:8 240:1,24
242:11,12,17
244:8,13,15
245:11,17 247:25
248:1,2,3,5,5,9,11
248:14,16,22
249:12,21 250:2,8
250:11,12,14,15
250:17 251:6,6,7,7
251:12,13,13,16
251:17,18,21,22
251:22,23,23
252:3,4,5,18
256:15 257:3
299:15 310:4
318:8 319:3,9,19
320:3,13,25
321:20,25
**dated** 5:24 85:14
177:11 178:17
185:3
**dates** 104:3,3,15
104:15,16,16
237:9 241:1
254:22
**dating** 77:2
**daughter** 164:17
**dave** 3:24 7:16
126:6

**david** 140:3,14
**day** 1:17 3:2 8:15
26:16 48:6 82:4
102:4 104:1,2,2
149:4 155:11
156:2,9,14,15,20
156:21 157:1
164:4,6 258:15
261:19 305:15,17
305:22 306:9
307:25 309:2
317:9 319:16
320:22 321:22
**days** 32:2 102:5
154:7,20 155:21
157:16,22 186:11
186:12 263:2,7,13
264:25,25 269:25
294:24 295:1,2
318:18
**dc** 3:8
**dea** 6:6 23:5,14,20
28:14 34:3 61:15
65:12 77:17,21,24
78:17 200:19
211:23 212:3,16
212:20,21 213:1,2
213:10,15,23,25
215:9 239:13,15
239:16,17 240:3,6
240:8,10,12,14,15
240:17 261:7,25
282:6,10,18
297:13,16
**dea's** 75:23 76:4,9
77:11 78:13
211:20
**deadline** 84:4,16
**deadlines** 196:1,3
**deal** 196:6

**dealing** 293:14
**dealt** 69:11
**dear** 318:10
**decades** 77:24
78:1
**december** 78:14
197:15 262:12
**decide** 275:10
298:23
**decided** 111:22,25
216:15 300:6
**decision** 216:11
**declined** 214:14
214:16
**decrease** 296:8
**decreasing** 213:15
213:25
**deed** 319:14
320:20
**deemed** 318:19
**default** 241:10
**defeat** 242:4
**defend** 9:19
**defendant** 18:15
18:21 25:4 34:9
51:4 59:2 66:22
76:15 81:6 140:24
141:12 172:9,16
172:21 173:13,18
173:23 174:9
224:11,15 226:7,8
228:7,14,16,19
229:1,19,23 230:5
230:11 232:8,9,14
232:20,24 233:11
233:11,18 237:5
240:22 241:24
242:16 246:17
248:18 259:2,6,12
259:16 263:1,9,14
263:23 264:5,7,11

264:13 276:6,7,14
286:16 289:12
305:19 306:3
313:25 314:6
**defendant's**
173:10 237:5
**defendants** 3:14
5:9 7:12 8:13
17:13 18:12 19:6
19:14 22:2,7 25:3
56:14,18 60:10
61:4,12,22 68:14
76:8,23 77:12
80:7 84:7 85:10
93:2 94:6 110:18
119:21 151:18
170:6 182:19
183:11 184:15
193:5,6 207:3
212:13 226:14,14
227:17 228:20,22
229:7,7 230:1,7,21
230:23 232:1,6
235:19 236:17
238:2,13,19,25
239:1 241:2,4,17
241:22,23 242:8
243:15 244:5
247:6 248:15
249:8 253:2,8,13
263:19,21 270:7
286:20,24 295:13
296:14 305:16
306:7,11 311:16
313:2 314:11
**deficient** 177:17
**define** 61:24 63:1
63:16 64:5,12
96:13 133:11
**defined** 131:1

**defines** 61:16
**definitely** 33:24
38:5 91:14 123:16
185:18 198:18
**definition** 145:12
232:13
**delineated** 196:1
**demangone** 140:4
140:15
**demangone's**
140:20
**demonstrate**
94:13
**demonstrative**
45:17,22 46:12
226:11
**demonstratives**
43:14 45:24
274:23 275:17
**denominator**
289:22 291:2
292:9
**dense** 46:1,15,19
**department**
318:22
**depend** 198:14
222:10
**dependent** 308:5
**depending** 67:1,23
165:12 170:24
171:5 172:21
**depiction** 62:20
**deponent** 315:2
**deposed** 211:14
**deposition** 1:12
7:7,11 9:8,19
10:14,17,22 11:2
11:11,14 24:2,5,6
24:12 25:17 26:8
28:13,15 29:5,12
42:22 43:8 48:5

51:15 70:1 83:15
83:24 85:1 87:23
91:23 97:23
107:10 127:1
150:16 175:3,22
177:7 184:23
186:13 195:5,21
212:8,9 213:6
216:7 234:8
244:19 271:1
315:1 316:23
317:1,2 318:8,11
319:1,3 320:1,3
**depositions** 1:16
12:2,16 13:9
**depth** 110:12
**derive** 287:12
**descending** 277:22
**describe** 14:17
98:7 142:6 266:15
275:13
**described** 30:7
56:25 59:3 103:15
110:25 116:10
117:16 123:2
143:10 145:24
153:13 158:4,7
163:7 170:3,5,9
194:23 260:6
270:10 286:11
288:24 292:16
293:20 308:15,20
309:24
**describes** 140:16
150:24 273:9
**describing** 15:7
44:15 46:18 99:7
162:24 173:4
229:5 285:15
291:20

**description** 4:10
5:2 6:2 98:22 99:4
99:14,15 104:5
160:20 161:21,22
161:25 162:3,19
187:5 267:20,23
267:25
**descriptions** 103:7
104:22 166:11
**descriptive** 234:19
**despite** 204:14
**detail** 45:19 81:20
89:22 90:5,23
102:13 164:2
186:25 200:13
203:8 233:7
**detailed** 260:18
310:14
**details** 18:4 31:21
152:15 199:16,25
257:1
**determine** 54:7
68:5 93:15 121:6
121:14 166:18,21
171:24
**develop** 197:17
**developed** 200:18
**developing** 152:12
170:13 196:19
**development**
274:23
**deviated** 63:15
**deviating** 61:17
**deviation** 63:17
**deviations** 76:8,12
**difference** 50:24
53:8,14,15,15
54:18,25 55:6
104:13,14 130:3,6
134:6 162:4
265:19 268:2,18

269:2 275:3
292:21 302:18
303:11 304:15
308:22
**differences** 50:24
77:9 102:8 201:7
201:9,11 264:9
**different** 22:10
38:12 48:8 53:17
53:23 54:21,23,24
56:4 64:7,15 67:1
67:3,5 71:5,8,20
72:1,2 83:1,2,3
88:22 96:4 98:5
98:13 99:6,15
102:5,16 103:4
104:19 113:5,6,14
114:4 116:1,8
117:7,11,24
118:15,21,23
120:9 128:4 131:8
134:3,3,9 142:10
142:16 143:11
144:20 145:8
146:6,19,20,24
147:7,9,19,21,22
148:14,19 157:1,8
158:15 160:1,13
164:9,13,15,16,18
168:1,1,18,21
171:4 172:17
188:25 194:2,22
196:18 198:3
201:4,6 209:14
210:23 233:4
235:13,14,14,16
237:7 238:2
241:21 245:3
246:24 249:25
252:5 257:2
268:21 282:6,7,10

297:5 302:23
303:5 304:11
309:2 312:8 314:5
**differently** 12:9,9
55:2,9 102:15
115:21
**difficult** 195:8
216:22,24
**digit** 81:8,23
216:16,17,21
217:1,7,9,12,13,20
217:25 218:5,9,12
218:15,15,18
222:1,9,14,16,22
223:16,23
**diligence** 23:3
110:18,23 123:25
124:16
**direct** 51:25
**direction** 215:19
**directly** 24:8
**disadvantage** 24:1
155:4 278:23
**disagree** 18:23
106:15 195:15
285:24 302:10
**disagreeing** 310:9
**disavowing**
114:14,24 115:4
258:16
**discard** 300:6
**disclaimed** 114:9
**disclaiming**
114:13
**disclose** 118:9
**disclosed** 88:16
118:4,23 120:10
145:16 311:10
**disconnect** 123:9
**discover** 284:22

**discovered** 263:18
**discovery** 5:5 85:8
92:3 95:10 236:9
236:10 238:15,21
239:5,8,24 240:25
247:7 256:3
**discrepancy** 260:7
262:19
**discuss** 30:19 33:3
38:9 40:6 90:25
91:6,11 114:17,18
163:17
**discussed** 31:9,18
32:12 48:1 90:2
131:15 208:20
307:1
**discussing** 38:18
78:23 79:4 163:25
**discussion** 12:25
15:8 32:15 33:7
34:8 36:14,22
40:18 41:13,17
89:23 90:3 91:3,4
163:1 238:23
268:2 300:5,13,14
313:12
**discussions** 13:1,3
34:3 41:10 94:16
162:25
**dispensation**
213:14,24
**dispense** 104:15
246:10,13
**dispensed** 38:13
79:19 82:3 102:4
131:3 138:24
151:22,23,24
154:6,18 155:10
155:20 156:1,8,13
156:19,25 157:7
157:21 158:1

159:14 213:22
214:12 224:24
241:3 242:1 245:3
245:25 246:9
249:21,24 250:15
253:1,4 255:22
302:22 303:5
307:15,16 308:13
308:14 309:1
**dispensers** 229:11
229:13
**dispensing** 5:14
6:7 36:16 79:14
80:2,10 81:6 96:6
97:9 131:14 140:3
140:14 170:7
171:8 172:8,23
182:8,13 215:9,23
226:17,19 228:14
229:17 230:5
235:24,25 236:7
236:17 237:6
240:5 241:15
243:15 244:4
245:24 247:13,14
249:13 254:14
257:10 301:12
**disposal** 231:22
**dispute** 82:7
**disputing** 81:21
**disregard** 240:20
247:12 270:8
295:25 296:13
**disregarding**
296:15
**distance** 81:10,13
168:24 169:3,8,11
216:22 217:17
221:2,3,6,22
**distances** 168:10
168:21 169:12

**distillation** 275:18
**distribute** 197:8
**distributed** 197:25
233:17 272:1,14
273:2 280:16
**distributing**
197:11 202:1,19
**distribution** 12:14
20:8,22 71:19,21
71:21,23 73:3,5
75:7 77:8 79:8
113:3 123:5
170:17 171:25
190:19 191:16,19
191:22 192:23
193:4 196:14
197:4 199:14,19
200:10,23 201:15
202:16 204:14
209:21 211:11
225:7,11 226:18
260:1 264:19
271:21 272:9,22
**distributions**
202:14 204:12
210:22
**distributor** 16:8
17:2 19:11 20:2
23:2 27:18 68:14
76:16 78:24 79:5
113:22 190:14
192:5,17,18
198:16 227:17
235:19 237:5
280:15 286:16,20
286:23 289:9
292:15 312:24
**distributors** 14:23
15:12,18,20,24
16:6,10,10 18:1,9
18:10,11,21 20:1

22:10 27:22 28:8
65:8 71:24 73:10
73:16,22 76:17,21
201:2,4 207:2
224:18,20 226:13
226:15 227:4,24
227:25 228:25
229:1,3,8,11
233:19 235:14
260:12 292:13
312:1,6,13,14,15
313:8
**district** 1:1,2,15
7:14,14 316:9,10
**diversion** 68:5
69:6 125:16,25
**diverted** 57:7,16
57:23 121:24
122:3,9,17,21,25
124:5,14 125:5
138:10 176:12
178:12 179:4
182:15,20
**divide** 113:19
230:23 232:1,17
232:19 277:1
288:15 290:18
292:4
**divided** 131:2
171:19 287:15,16
289:20,24
**dividing** 290:19,21
**division** 1:3 7:15
**doctor** 112:7,12,13
112:15,16 113:24
114:1 139:6,6
140:18 153:24
154:4 169:16
243:9 294:15
**doctors** 15:3,9,24
16:6,16 124:10

125:15,22 133:5
135:20 136:1,6,11
136:14,19 137:1,4
137:9,10,15
138:16 139:15
166:10 168:1
183:15
**document** 85:7,12
88:6 92:8,20 93:8
105:7 127:5
150:13,23 175:12
185:2 186:2
196:21 203:17,21
206:18 210:14,15
215:12,14 221:24
**documents** 9:12
98:6 104:22 106:2
106:23 119:15
165:22 180:19
195:3,25 196:4
199:18 200:21
270:13
**doing** 43:2 53:10
90:16 112:22
113:10 168:12,18
182:18 222:20,23
242:4 279:20
292:18 293:9
294:3
**dosage** 27:9,10
52:16,25 60:17
65:15 67:18 82:3
95:19 113:18
151:22 157:3,10
193:15 227:2,23
245:6 246:25
276:11 277:16
286:15,20,22
287:4 302:25
303:8 309:4

**dose** 280:3
**doses** 286:10
**double** 187:23
194:18 282:25
283:1,3
**doubting** 207:6
**dozen** 34:2 79:9
189:3
**dph** 5:20
**dr** 9:6 10:1 15:3,4
15:4 26:8 43:2
51:7,19 66:1 70:5
83:11,19 85:6
88:3 126:15 140:3
140:14,20 147:3
150:7,20 152:1
175:7 177:4 188:4
189:9,23 196:8
203:10 205:2,22
206:20 209:6
210:6,16 211:14
216:13,18 219:10
220:8 221:4,9,23
222:2,9 223:13
225:8 228:21
231:16 232:10
243:5 248:17
251:2,9 254:14
257:11,14,19,22
258:3,14 274:20
310:22 311:6,15
311:19,24 314:9
314:20
**draft** 153:2
**drafted** 89:1,11
**drafting** 89:3,4
**drafts** 47:12,13
**dramatic** 53:7,13
54:18,19,24 55:6
**drawn** 44:22
110:22

**drew** 244:23
**drive** 3:3 149:19
169:7
**driving** 168:24
169:7
**drop** 54:19 300:21
300:24 301:7,11
**dropbox** 177:21
**dropped** 30:7,10
**dropping** 292:14
**drops** 54:14
**drug** 14:4 78:2,13
78:16 81:15,18
82:1 124:14
141:10 157:3,9
228:3,4 245:5
246:9,10,25 287:6
288:8 302:25
303:7 305:21
309:3
**drugs** 156:8
**dte** 234:25 235:4
244:9 248:1 257:5
**due** 23:2 110:18
110:23 123:25
124:16 172:11
173:2,8,11,16,16
225:16 259:4
263:3 264:23
266:4
**duly** 9:2 316:13
**dumb** 290:8

**e**

**e** 4:1,9 5:1,23 6:1
41:6,8 58:6 95:15
95:20 96:23
129:18 177:11,20
178:17,21 179:15
180:4
**eagle** 2:21 6:4,7,13
16:23 17:12 19:4

189:24 192:21
193:7 196:11
197:11 199:13
200:14 202:14,16
204:13 213:14,22
213:23 214:13
215:23 219:5
234:14 238:8
245:10 248:18
253:19 254:16,20
255:1,17 257:3,10
257:17 313:2
**eagle's** 193:3
199:19 200:10,22
219:13
**earlier** 27:25
93:25 104:7 105:7
105:19 106:14
109:21 114:10
131:15 134:18
163:12 167:13
216:11 229:17
243:10 252:17
254:18 257:4
258:15 267:13
278:24 279:21
285:7 288:2
293:24 303:13
311:9,24 313:12
**early** 36:1 103:24
113:22 173:15
188:23 195:18
202:7
**easier** 51:10 268:7
283:21,25
**easily** 18:25 63:21
168:15 231:19
233:13
**eastern** 1:3 2:17
7:15

**easy** 169:21 299:1
**edited** 47:14
**effect** 103:21
**effective** 46:14
**effectively** 124:6
294:14,16 304:22
**eight** 12:7 95:19
186:11,12 207:3
266:19
**either** 18:17 28:25
29:16 36:11 37:17
59:20 102:22
128:16 161:9
166:24 178:12
182:20 206:16
241:16 247:12,15
247:18 294:4
295:16 296:11
306:7 310:16
**electronic** 84:11
**email** 318:17
**empty** 239:8
240:24
**enclosed** 318:11
**encompasses**
218:1
**endeavor** 311:20
**endo** 14:6
**ends** 115:4
**english** 181:15
**enter** 240:17
**entered** 275:21
320:9
**entering** 240:16
**entire** 110:23
132:19 162:25
186:23 192:23
193:3 238:15,20
239:5,8,21 305:17
306:12 319:5
320:5

**entirety** 77:7
**entities** 222:23
**entries** 187:4,8
  294:17
**envelope** 126:21
  184:19 270:13
**envelopes** 42:12
  270:17
**equal** 225:12
**equivalent** 131:5
**equivalents**
  151:24
**errata** 318:13,18
  320:7,10,18 321:1
**error** 206:23
  207:12,24 208:9
  208:17,25 209:7
  209:12,20,23,25
  210:11,17,21,24
  211:3,4,10 225:16
  303:14
**especially** 236:16
**essentially** 294:17
  304:14
**establish** 117:21
  203:15
**established** 159:17
  160:17,22 244:12
  244:14
**estimate** 30:1
  81:11 298:15
**et** 1:7,9
**etcetera** 60:18
**evaluate** 141:8
  191:6,11
**evaluating** 191:4,9
**everybody** 258:7
**evidence** 43:15
  57:21 122:11,15
  209:11 211:1
  274:25 275:22

**exact** 24:25 56:24
  276:9
**exactly** 59:3 71:11
  86:23 111:16
  124:18 135:4
  159:18 161:24
  181:14 182:6
  218:4,7 229:5
  236:21 257:8
  294:14 295:3
**examination** 1:13
  4:2 9:4 190:5
  258:12 301:23
  311:22
**examined** 9:2
**example** 6:13
  30:20 31:10 32:1
  33:4 34:8 45:14
  51:3 55:12 67:7
  74:5 98:21 101:25
  169:4 191:18
  198:12 233:5
  234:21 239:12,25
  266:14 288:2,16
  291:15 292:11
  293:3,8,17 294:13
  297:22 298:7
  304:3 307:11
  308:23,25
**examples** 21:22
  28:3 36:15 74:7,9
  75:2,12,15 106:4
  268:3 296:3
  297:12
**exceed** 53:21
  286:21 287:5
**excel** 31:17 33:5
  92:13 134:13
  135:15 193:18,20
  194:6 270:15
  276:18,25 285:16

285:17 306:2
**exception** 225:16
  252:1 275:12
**excerpt** 51:8,9,21
  52:1 56:8 65:5
  72:11 107:6 108:2
  119:18 126:16
  127:12 139:25
  272:6,18,20
**excerpted** 107:15
**excerpts** 4:22 6:17
  67:8 271:6
**exchanged** 14:12
**exchanges** 41:8
**exclude** 289:16
  307:9 309:8,15
**excluded** 290:3,4
  290:23
**excuse** 64:24
  196:10 246:22
**executed** 320:10
**execution** 319:14
  320:19
**executive** 2:6 8:7
**exercise** 145:14
**exhaustive** 106:4
  106:17
**exhibit** 4:11,14,17
  4:20,23 5:3,5,12
  5:12,13,13,15,17
  5:18,21,23,24 6:3
  6:5,10,12,13,17
  42:20,23 51:6,12
  51:16,20 59:23
  65:20 70:2,6
  83:12,16,23,24
  84:3,23 85:2,7,17
  86:6,8,13,14 87:21
  87:24 88:3 89:5
  89:11 90:20 91:7
  91:13,22,24 92:2

92:24 93:1 94:4
  95:5,18 97:20,22
  97:24 98:3,11,19
  98:23 99:1,10,13
  99:18 102:23
  103:5,9,16 104:9
  107:9,11,23
  116:18,21,22
  117:17 119:18
  126:16,22 127:2,6
  127:13 133:18
  134:18 140:7,8
  141:8,11,11,20
  149:13,15,20
  150:10,17,22
  158:23 159:5
  175:4,7 177:2,6,8
  177:11 184:21,24
  185:2 186:3,4
  187:10 190:8
  195:4,6 201:21,23
  201:24 202:24
  203:2 207:17
  210:2,3 213:5,7
  214:25 215:2
  216:8 219:1 227:1
  232:16 234:7,9
  244:18,20 245:2
  251:3,4 254:12
  257:16 260:25
  267:5,6,13 270:21
  270:25 271:2,12
  271:12 272:5
  273:22 276:2
  286:6
**exhibits** 43:7 44:7
  45:14,25 46:15,19
  47:4 83:8 87:16
  95:14,15,21 96:22
  97:1 129:3 274:24
  275:19,20

existence 105:7
expanded 47:14
expansive 145:11
expect 24:22,23
 162:4
expected 220:17
expert 4:11,14,17
 5:18 9:11 10:13
 10:21 23:14,20
 35:15 36:21 37:1
 37:4,13 38:7 49:5
 69:2,10 88:11
 98:20 102:11
 124:19 148:23
 150:25 173:2
 183:13,25 184:5
 184:11 201:14
 212:19,19 243:2
 259:3 263:3
 295:21 297:7
 312:19
expertise 89:15
 102:22 103:2
 104:24 167:11
experts 84:7,10,12
 93:20 94:7 200:19
 207:2
expiration 319:19
 320:25 321:25
explain 31:25
 44:25 57:11 68:23
 69:12 102:18,19
 111:17 114:16
 169:2 186:25
 187:2 192:20
 193:16,19 197:2
 201:11 204:18,22
 204:25 244:3
 265:4 267:16
 276:8 287:21
 292:12 302:17

explained 193:15
 197:14 201:10,25
 245:13 269:4
 270:4 275:2 297:4
explaining 45:20
 94:20,21,25 242:7
explanation 41:21
 55:12 69:3 117:19
 117:19 152:8
 162:9 164:9,25
 204:6 206:12,22
 207:14,15,23,24
 207:25 208:3
 218:7 238:12
 266:3 275:7,16
 293:1,16 307:1
explanations
 102:20 206:21
explicitly 267:19
extensive 124:16
extensively 276:4
extent 15:11 17:4
 90:2 141:2
extremely 227:8

## f

f 59:19 67:17
face 308:15
facilities 199:20
facility 196:15
 202:13 203:4,13
 204:14
fact 16:11 18:13
 53:8 59:11 66:2
 102:25 123:6,14
 124:11 125:17,23
 128:24 142:24
 204:14 223:2
 243:24 262:5
 264:2 269:7 270:9
 283:25 292:18

factor 184:3
facts 211:1
factual 123:10
fail 183:3
failure 182:23
fair 13:18 32:19
 33:21 35:10 48:12
 50:11,19 53:7
 58:11 66:13 79:10
 80:3 112:25 114:9
 118:6 119:11
 121:8 122:25
 124:25 131:7
 151:3 165:19
 166:6 169:12
 171:1,2 191:13
 195:17 217:11
 251:12,21 276:20
 276:23 279:5
 302:13
fairly 240:4
 276:17
fall 36:1
false 163:18
 241:14 253:20,21
 254:4
familiar 93:7
far 43:17,23 64:21
 77:25 78:4 166:12
 253:22 275:9
 294:4
fashion 129:6
 130:21
fed 41:20 87:13
federal 175:14
feed 130:14
feel 55:9 248:22,23
 311:9
felt 34:10,14 298:5
fentanyl 140:17

fewer 280:3
 292:22
field 234:15
 235:18 236:13,14
 236:15 237:15,21
 238:1,5 239:4,7,10
 243:14 244:8
 251:14,17 252:4
 257:4
fields 235:12,15,17
 235:24 236:7,10
 236:12,18,21,23
 236:25 237:1,6,8
 237:10,11,13,13
 237:18 238:3,9,14
 238:20 240:10,24
 248:15 251:22
 299:14
fifth 130:7 164:17
figure 14:20 69:5
 185:15 202:25
 254:4 263:5,6
 283:14 297:19
 310:11
figured 297:15
figures 17:1,4 63:6
 111:4,8,9 130:7,9
 130:10
figuring 122:20
file 31:17 33:5
 135:15 141:25
 181:20,21,24
 182:1,2,4
filed 7:13 10:13,21
 14:9,10 27:24
 37:1,4,13 38:7
files 92:13 110:19
 181:1,5,11
filing 36:21
fill 104:3,15,16
 123:13 234:25

235:2 239:19,25
240:15,18,21,23
241:2,4,7,8,9,18
242:1,3,6,21,25
243:1,9,11,13,15
243:20,25 244:3,6
245:14,18,19
246:2,4,13,15,16
246:17 247:5,8,12
247:14,14,25
248:2,9,11,21,22
248:23,25 249:1,2
249:4,7,12,20
250:2,3,5,8,11,12
250:14,17 251:6,7
251:7,8,13,13,17
251:18,22,23
252:4,5,19,22,24
252:25 253:3,6,9
253:10,13,19,24
253:25 254:1,7,9
254:10 255:15,15
255:18,19,21,23
255:24 256:4,7,21
259:9 263:15
293:22,25 294:7,8
294:22,25 295:2,2
295:4,5,11,20,25
296:17,19,22
298:16 299:15
300:1,8,18,24
301:5,8,12,13
305:7,8,10 306:12
306:13,15,17,18
306:21 310:4
**filled** 80:6 82:3
85:24 112:11,14
112:16 121:4,8,12
122:12,16 124:1,5
124:7 125:5
136:15 137:19,20

138:4,21 139:1,2
139:23 140:17
141:12 176:10
178:11 182:19
194:10 235:7
239:11 242:6
243:4 246:22
252:23 255:24
297:13 305:7
309:14,25
**filling** 79:15 124:9
172:18 294:13
**final** 10:14 313:10
**finalized** 14:11
**financially** 7:20
**find** 25:5 125:16
130:2 152:11
154:2,16 210:11
228:11 261:13
266:10,17 267:15
284:3 296:18
297:18 318:11
**fine** 25:24 58:10
149:22,24 150:3
162:18 203:19
205:10 216:3
298:20 301:24
**finely** 222:25
**finer** 30:4
**finish** 26:2,14
174:16 204:4
210:7 231:14
295:24
**finished** 164:4
292:8
**finishing** 26:6
**firm** 2:8 92:9
180:5 182:7,12
188:16,19 239:9
**firms** 21:23

**first** 5:9 9:2 11:23
23:2 27:7 36:7
45:17 46:22 50:2
50:21 52:1 53:10
53:18,22 68:12
69:9 73:1 78:6
79:1,12 83:11
85:10 90:3,9 91:5
98:5 99:7,14
107:16 108:9
111:14,24 112:4
113:12,15,16,25
116:13 118:13
119:22 123:5
130:23,24 131:18
134:11 135:9,9,10
136:8,17 142:4
143:3 145:25
148:5 150:8,24
153:18,21 158:6
158:25 159:6,13
160:17 170:18
178:5,21 179:20
188:24 203:18
204:7 206:13
207:18 212:8
221:18 245:20
271:8,9,14 275:3
276:1 278:10
291:8,9,21 293:10
303:19,24 307:16
308:6,14 309:8,15
316:13
**fit** 100:8 303:25
304:13 308:19
**five** 13:7,11,18
21:23 22:2,6
27:12 33:22 48:11
48:16 56:18 66:22
74:14 77:1 80:6
80:23 93:1 99:15

157:16 169:18
172:17 173:14
216:17 217:9,13
217:20 218:15,18
222:1,9,14,16,22
223:16,23 235:13
252:15 253:2
263:16 290:14
291:10,13 310:21
**fix** 242:8
**fixed** 27:7 50:2
53:21 178:5
**flag** 5:12,14,15
23:21 36:19 52:24
55:16 79:19,23
80:5,22 82:18,22
86:9,10 87:3,12
88:4,17 89:1,7,10
89:16,21 91:7,12
91:18 92:14,15,15
93:4 94:12,25
97:19 98:1,2
102:25 105:22
106:3 108:18
111:6 112:5,9,12
113:1,12 116:12
116:13,14,22,23
124:3,4 131:2
132:5 133:21
134:21 136:16
137:11 142:4,5,7
142:11,17,23,25
143:7,8 144:15
145:24 146:3,5,14
146:17,22 147:18
147:19,25 148:7
151:24 152:2
153:4,24,25
154:11,12,14,15
154:22,23 155:13
155:22 156:4,9,16

156:22 157:4,23
158:2,4,6,11,25
159:5,13,18,22
160:5,10,10,25
164:19 165:2,3,4,9
166:5,19 167:20
167:24 168:4
169:25 170:6
171:10 179:21,24
180:13 190:19
197:20 199:8
218:3 244:23
246:20,21 250:16
254:17 255:6
257:17 266:19
292:22 294:9,9,18
295:9,17 296:3
297:1,2 302:2,21
303:4,22,24 304:1
304:6,7,10,13,19
304:19 306:24,24
307:4,5,15 308:10
308:13,25 309:7,9

**flagged** 4:20,23
6:3,15 21:2 22:20
22:24 31:12,18
32:10 33:5 50:21
50:22 52:13,15
53:4,5,10,18,19,22
55:25 56:16,22
57:6,22 60:12,15
61:1 62:25 65:15
67:13,21,24,25
69:4,5 70:12,19
72:9,15,22,23 73:6
73:9 78:22 79:3
86:14 87:2 92:5
92:16,25 93:15
95:20 103:22
104:13 107:16
108:6 109:3,13

110:21 112:5,7,11
112:14,17 113:4
113:11,11,13,16
113:16 116:1,15
116:24 117:3,12
117:22,24 119:9
120:3 122:19
123:3,7,12,15
124:12 125:11
130:19,23 131:17
132:10,17 133:15
133:23 134:10,15
134:22 135:8
143:16 144:18,20
145:6,9 146:1,14
146:18,21,23
147:1 158:14
160:11,23 161:10
161:12 162:5,7
165:13,14,15
166:17 170:19,21
170:25 171:4,9,13
171:25 172:1
174:7,8 179:23
196:20 198:5,5,7,9
198:18,20,22,24
199:1,2,4,8 203:24
207:8,11 244:25
245:24 247:1
255:5 286:14,19
296:2,6,9,21,25,25
297:1 303:22
304:8,11 308:2
309:11,16 310:2,6
310:15

**flagging** 12:15,18
12:18,24 20:21
21:1 22:1,6,10,15
26:20,23 27:1,3,11
27:13,15,23,25
28:9 31:12 32:1

33:4 34:8 36:15
38:12 48:11,17
50:25 54:11,15
55:19 59:1 60:1,5
61:8 62:7,20
64:16,23 66:10,21
66:25 70:19,25
71:13,15,19 72:2
73:17,25 74:2,12
74:24 75:6,19
81:14 82:11 96:5
96:16 106:21
107:3 111:12
112:2,18,23 113:1
113:3,15 114:6,11
114:21 116:9,9
118:4,12,15,16,17
118:19,21 123:21
125:18,20,24
126:1 131:14
133:23 134:25
135:1,4,15 144:15
170:22 171:6
182:24 183:4
194:17 198:11
203:12 204:12
209:18 217:4
218:9 244:5
249:13 254:2,3
294:9 295:14
296:19 305:1
312:7,11

**flags** 32:5 40:7,19
66:12 86:20 88:10
88:15 90:7,9,16,17
90:24 93:2,9
95:19 97:9,12,15
97:16 98:9,10
102:18,19,22
103:13,14,23
104:17,19,25

105:3,10,13
107:17 108:7
109:4,5,14 111:14
111:16,25 112:14
115:19,20,23
116:3,15 117:4,6
117:10,14 118:3
118:24 119:5,9,22
120:13 123:2
130:20 131:24
133:8,9,12 134:5
135:8,9,10,21,23
136:2,5,9,10,18
137:16,21 142:9
142:15 143:10,13
143:17 145:15,16
146:1 147:11,17
147:23,25 148:5,6
148:18,18 152:2
153:7,12,18
158:11,17 159:6
159:25 160:17,18
161:13,16,18
162:19 163:6,11
164:1,12,12,20,25
165:5,5,8,18,19
166:16 167:3,7,12
167:17 168:20
170:3,4 179:22
180:17,24,25
181:6,22 196:9,11
196:24 197:15
208:1,4 218:11
241:25 242:24
247:14 249:9,13
255:1 294:7 296:2
300:7 303:19,20
307:6 308:15

**fleeting** 91:3
**flies** 168:25

**flip** 52:18 71:2
215:4 281:5
**flipped** 70:22
**flipping** 157:14,25
**floor** 2:19
**florida** 2:4
**flow** 94:22
**flowing** 233:10
**focus** 159:11
**focused** 71:12
**focusing** 10:23
88:15
**folks** 51:10
**follow** 42:3 125:19
187:16
**following** 37:18
203:25 259:23
280:10 291:7
304:1
**follows** 9:3 154:5
**footnote** 88:12
105:18,21 106:3
106:16
**foregoing** 316:19
316:23 319:13
320:18
**forever** 65:24
**forget** 263:21
296:16
**forgotten** 20:10
**form** 82:3 88:7
157:3,10 245:6
246:25 302:25
303:8 309:4
**format** 92:20
276:18
**formatting** 270:2
**forth** 48:15 110:17
152:10 300:5
**forward** 155:6
191:7,9 272:4

318:15
**found** 76:8 105:23
106:5 152:1 209:4
240:14 264:1
273:14
**foundational**
304:16
**four** 33:19 45:21
89:25 99:7 155:7
157:1 205:3 207:4
207:10 263:6,16
264:25 277:9
300:13 309:1,10
309:24 310:6
**fourth** 130:6,9
304:12
**franklin** 278:3,6
279:21,22
**frankly** 302:5
**free** 319:14 320:20
**frequency** 61:19
64:5,12
**frequent** 240:9
**friday** 173:16
263:3
**friendly** 45:7
**front** 43:3,13,22
51:19 65:5 66:4
144:12 145:1
150:21 153:15
165:23 175:8
203:17 205:3,5
207:18 210:2
211:2 214:25
221:17 226:11
260:24 270:17
302:7
**frye** 10:20
**full** 4:25 65:20
70:7,22

**fully** 21:13 49:5
72:19 140:16
236:23 259:24
263:13 264:11
270:4 305:6,11
311:10
**fumerton** 3:2 4:6
8:14,14 249:15
258:2,3,11,13
266:2 270:21,24
271:4 298:3,6,17
298:24 299:2,12
299:22 300:9,16
301:18,22 302:1
302:10,11 310:18
311:6 314:14,20
**functioning**
192:22
**further** 34:15
311:11 314:23
315:2 316:12,22
316:25 317:4
**future** 73:25

**g**

**g** 58:3,9,12,22 59:7
59:15
**games** 25:12
**gap** 172:19 259:7
259:9,10
**ge** 195:1 201:23
211:19 216:5
234:6 244:17
**gears** 286:5
**geez** 301:17
**general** 11:10
17:18,21,25 18:14
19:2,18,23 20:2
22:11,14,19,23
23:23 26:21 27:2
27:4 80:20 88:13
110:12,14 152:12

**generally** 19:10
80:12,18 88:11
152:9 219:14
222:20 240:3
252:16 292:13
306:7
**generals** 189:2
**generate** 181:21
**generates** 180:16
**geographic** 221:6
221:7,8,21 222:11
**gerx** 202:16 203:5
203:11,13 204:1
209:7,21 210:22
211:10
**getting** 99:20
119:14 195:13,16
196:4 207:17
226:24 261:19
268:16 279:20
**giant** 2:21 6:4,7,13
16:23 17:12 19:4
189:24 192:21
193:3,7 196:11
197:11 199:13,19
200:9,14,22
202:14,16 204:12
209:3 213:14,22
213:23 214:13
215:23 219:5,12
234:14 238:8
245:10 248:18
253:19 254:16,20
255:1,17 257:3,10
257:17 313:2
**gina** 1:23 7:17
316:4
**give** 13:24 18:16
29:16,17,25 55:13
57:14 108:12
119:10 164:8

172:5 187:22
210:10 239:12
247:20 252:8
274:13 275:6
301:15 304:3
**given** 10:1 11:20
74:1 96:8 141:23
173:3 200:24
210:12 265:18
275:1 301:1,3
307:1,25 316:15
316:20
**gives** 88:12 113:21
288:16
**globally** 308:24
**globe** 169:5,9
**go** 7:9 10:8 12:12
12:12 13:16 25:7
25:25 26:14 28:22
42:16,17 58:3
59:22 62:17 65:19
68:10 69:15 83:8
87:19 89:8 90:14
92:23 95:12 100:3
109:1 116:18
119:17 126:5
133:2 141:19
144:11 150:4
156:11,24 158:21
166:17 172:24
181:2,12 189:7,14
190:9 211:19
215:19,20,24
216:5 227:19
230:18 237:25
238:8 241:16
248:3,20 256:23
256:25 257:7
262:8 264:10
266:15,18 272:4
275:23 276:1,13

280:19 284:21
292:8 293:22
294:4 295:16
296:10 303:4
304:8,18 309:22
**goes** 11:24 77:25
136:10 145:18
242:20 267:22
296:3
**going** 7:1 10:5,9
13:25 19:12 24:4
24:20 25:9,10,10
25:17 26:2,3,3
42:18 51:13 53:3
65:19,24 69:3,6,7
69:17 70:5 83:7
85:5 102:24 107:6
111:2 114:20
117:20 124:23
126:7,19 149:24
150:1 155:6,18
156:11,12 159:11
160:8 174:16,21
177:5 189:7,16
195:22 210:10
222:5 234:12,18
250:19 257:25
258:6 260:25
262:9 268:9
270:14 271:9,10
272:17 273:12
274:15,15,20
280:6,13,23 286:5
290:8,17 292:22
295:17 296:8
301:4,22 302:2
310:24
**good** 7:1 9:6
188:13 190:2
196:6 234:23
248:2,9,11 258:10

285:16 311:13
314:17
**grade** 164:17
**graph** 202:4
**graphed** 64:16
**graphs** 70:15
201:15
**great** 98:16 123:9
150:3 258:11
**greater** 219:8,13
219:15
**grenades** 26:6
**group** 130:11
178:23 179:3
217:25 303:21
309:9,13 310:19
**grouped** 139:20
**growth** 6:5 215:16
**guess** 81:2 102:5
245:17 311:19
314:3
**guidance** 34:13,14
**guy** 274:4
**guys** 195:13

## h

**h** 4:9 5:1 6:1 39:19
**habits** 168:2
**half** 31:5 34:1 79:9
241:3 247:13,18
253:4 279:23
295:14,25 296:15
**hand** 26:5 317:9
**handed** 246:11
**handful** 77:5
140:24 141:3
**handling** 29:1
41:6
**handwritten** 9:15
**handy** 97:19
126:17

**happened** 195:21
260:22
**happening** 243:19
243:20 305:1
**happens** 214:12
**happy** 70:24
144:25 174:15,17
206:15
**hard** 67:8 72:11
87:8 236:14
**harder** 292:20
**harm** 84:8 85:23
93:11,16,21 94:7
94:13 95:1 123:14
124:15,24 125:17
126:1 180:1
**harmed** 125:3
**haystack** 209:3
**hbc** 2:22 193:21
194:3,4,7 196:14
197:3,8,11,12
199:11,15,23
200:14 201:5,25
203:3,4 235:21
237:3 256:12,24
257:9,13,16,17,21
**hbc's** 201:15
247:13 248:24
**hcp** 6:3,6 196:13
**header** 248:7
**heading** 108:18
**heads** 268:8
**health** 184:9
**healthcare** 278:4,7
279:22,23
**hear** 311:17
**heard** 33:13
175:17
**hearing** 10:14,20
**hearings** 12:2,16
13:10

**heart** 286:12
**held** 229:22
**hello** 30:10
**help** 14:18 65:4
 69:5 161:6 266:17
 267:15
**helped** 87:9
**helpful** 68:4
 227:10 268:8
 286:7
**helpfully** 51:23
**helping** 202:4
**helps** 179:14
**hereinbefore**
 317:3
**heretofore** 316:6
**hereunto** 317:8
**herman** 2:13
**hey** 249:15
**hi** 189:23 311:15
**hide** 201:20
**high** 44:12 95:18
 138:17
**higher** 255:6
 278:18 286:3
 292:20
**highest** 110:10
 278:19
**highlighted** 5:15
 108:18 254:17
**highly** 206:2
 208:14,16
**hired** 22:22 28:14
 34:19 47:17 89:12
 91:16 94:10 96:21
 136:20 137:5
 141:16
**history** 83:5
 191:16,19 192:12
 192:14 198:15
 200:9,22

**hit** 27:7 135:8
 136:8 258:5
 292:20
**hold** 149:16,24
 261:17
**homes** 167:22
**honestly** 189:7
**hope** 271:14
**hopefully** 190:2
**horner** 3:25
**horseshoes** 26:5
**hospice** 167:22
**hospitals** 167:22
**hour** 1:17 26:13
 31:5 157:16 243:20
 245:4,25 246:22
 249:25 293:25
 294:10,18 295:9
 297:2 299:15
 300:18,21,24,24
 301:7,8 302:23
 303:6 304:7,11,20
 304:25 305:4,23
 306:23
**hourly** 187:4
**hours** 12:7,7 187:9
**houston** 2:9,10
**hsbc** 189:25
**hubbard** 2:14
**huge** 65:22
**human** 274:8
**humanly** 209:1
 303:16
**hundreds** 137:18
**huntington** 11:3,7
 49:17
**hydrocodone**
 52:16,25 56:18
 67:14,21 68:1
 170:22 196:13
 197:24 213:21,24

214:12 288:7
 290:14,15,16
**hypothetical** 32:2
 32:9

**i**

**idea** 40:4 57:24
 88:9 121:10,19
 129:13 167:19
 176:22 179:7
 206:18 222:19
 252:25 299:25
**identical** 158:6
 160:18 161:17
 237:8
**identically** 161:25
 162:2
**identification**
 42:24 51:17 70:3
 83:17 85:3 87:25
 91:25 107:12
 127:3 150:18
 175:5 177:9
 184:25 195:7
 213:8 216:9
 234:10 244:21
 271:3
**identified** 52:5
 62:6 63:3 65:12
 82:19,19,22 92:15
 103:20 104:18
 112:4 116:2 117:3
 117:7,7,10,12,23
 117:25 119:5,8
 130:12 137:11,16
 137:20 140:18
 141:10,11 143:7
 143:11 146:2
 147:23 148:10,17
 148:19 151:25
 158:16 159:22
 160:5 161:11

164:21 165:8,18
 166:15 172:2
 176:18 178:23
 179:9,25 180:7
 225:13 253:22,23
 260:5 263:22,24
 264:7,14 273:21
 275:6
**identifies** 60:5
 64:22 81:8 86:9
 86:14 108:5
 109:13 116:24
 137:9,14,18,24
 143:16 146:6
 160:11,13,22
 181:21 211:3
 224:18 277:15
 284:13
**identify** 21:2
 22:20 32:4 59:19
 63:8 71:14 77:4
 79:23 84:6 85:21
 94:6 104:23 109:3
 113:12 115:23
 116:6 120:13
 123:23 125:23,24
 146:1 163:9 165:1
 167:4 178:11
 179:22 181:6
 182:9,14,18 223:1
 225:14 298:10
 307:14 308:11
**identifying** 62:11
 86:9 113:10 118:5
 122:19
**ignore** 270:3
**ii** 190:10
**illegal** 20:7
**illegitimate** 121:16
 121:20 122:12,21
 138:8 178:12

182:10,20
**illinois** 1:25 2:14
3:3 316:1,6
317:16
**illogical** 111:13
**illustrate** 74:6
**illustration** 312:11
**illustrations** 58:25
68:17 74:2,23
75:3,12,14 123:23
**imagine** 45:9
96:15 193:20
**immediately**
203:12,25
**impact** 127:15,21
127:24,25 128:5
128:11,16,21,25
129:23 130:3,4
131:12,20 132:10
132:16,22 135:13
183:15 263:18,19
273:25 305:9
308:3,7,9,9,18
**imperfect** 209:1
303:16
**implement** 34:8
68:18 69:13 84:12
104:8
**implementation**
96:5
**implemented**
30:21 31:10 36:15
102:13 115:2
123:22 135:4
169:23
**implementing**
34:23 68:22
104:10 200:12
**imply** 94:23
**import** 125:8,9

**important** 34:17
34:21 45:21
217:16
**improperly** 121:7
121:11
**inaccurate** 218:23
**inadvertently**
195:18
**inappropriate**
206:2
**include** 27:25
43:16 44:18,20
45:21 61:17 73:2
73:16 107:22
114:6 131:13
148:9 217:1
226:12,14 248:25
273:6,8,20 274:1,1
283:19 291:12
293:4 294:24
295:1,2,11,24
300:14 304:22
312:5
**included** 17:1,5
40:18 44:25 45:12
47:22 51:23 92:13
109:6 128:11
129:22,25 146:10
146:25 172:20
228:6 255:23,24
283:9,9,11,13
284:19 291:5
292:24 293:11
303:22 304:2,14
318:13
**includes** 62:10
88:4 158:10
193:21 235:5
265:16
**including** 14:23
18:11 73:10

123:22 173:24
200:19 227:24
232:14 237:13
242:3 263:4 296:7
**inclusion** 285:2
**incomplete** 46:5
88:19
**incorporate**
312:13
**incorporated**
320:12
**incorporating**
264:11
**incorrect** 12:11
206:9,11,16,22
293:1
**incorrectly** 290:22
296:12
**increased** 212:16
213:15,25 214:9
**increasing** 292:18
296:6
**independent** 278:1
**independently**
284:21
**indexed** 6:5
215:15
**indexing** 220:7
**indic** 180:11,12,21
180:22
**indicating** 318:13
**indirectly** 129:6
**individual** 15:8
19:13 33:3 60:25
62:10 63:3,5,11
64:16 65:11 66:6
66:8,11 70:13,16
70:25 71:15
132:20 138:15,20
139:9,15,17 141:8
142:10,16 172:15

173:23 178:25
193:22 277:18
**individually** 71:9
**infer** 248:5
**inferring** 180:18
**info** 241:23
**inform** 310:16
**information** 52:21
60:20 68:4,8,25
81:6 82:6 85:25
94:22 98:22 99:4
102:1 107:23
115:1,3 152:4,14
152:17,21 201:18
213:2 229:24
240:21,23 297:20
298:13 305:18
306:4,8
**infrequent** 240:19
**inherently** 246:19
**initial** 9:10 36:21
37:1,4 88:11
114:15 118:10
148:25 259:8,19
269:2
**initially** 137:19
**initiated** 28:24
**input** 103:5 151:4
178:9 200:19
**inputs** 129:7
**insert** 295:8 300:1
**inserted** 255:9
295:7 307:24
308:16 310:5
**inserting** 294:16
**insertion** 305:3
**instance** 11:24
31:16 49:7 65:6
71:7 170:9 173:21
237:24 268:24
297:17

**instances** 282:15 289:17 306:6
**institutional** 200:13
**instructed** 250:17 300:10
**intend** 69:12 115:8 179:25
**intended** 138:23
**intending** 74:22 160:2 269:11 274:13 284:8
**interact** 23:12
**interacted** 129:6
**interacting** 41:25
**interaction** 34:15 35:6 37:16
**interest** 110:20 306:1
**interested** 7:20 317:6
**interesting** 172:7 173:5
**interfere** 7:7
**interference** 7:5 184:9
**interim** 181:24
**interpret** 55:7 235:1
**interpretation** 55:4 57:3,5 111:19,23 113:7 114:2 199:6
**interpretations** 53:24 57:9,9 67:3
**interpreted** 55:1 68:24 312:17
**interpreting** 72:18
**interrogatories** 5:10 85:10

**interrogatory** 95:4 102:17 103:15
**interrupt** 133:17 249:16
**interrupted** 205:2 205:4 210:6
**interrupting** 195:9 204:3 205:11 235:23
**interspersed** 306:14
**introduce** 42:17 65:20 83:8,13 87:20 177:2
**introduced** 70:6 115:18 175:7
**intuition** 132:13
**intuitive** 310:9
**inventory** 225:17
**investigate** 207:13 209:4
**investigated** 264:1 269:8
**invoice** 5:24 185:3 186:2,4,15,16,18 186:19,21 187:6 187:25
**invoices** 185:8,16 186:15,20,24 187:3,11,17 188:6
**involve** 122:20 238:23 242:1
**involved** 19:7,20 30:9 34:12 35:17 35:19 129:8,20,21 136:7,12,15 168:16 179:8 185:21 199:24 222:15

**involving** 48:10 49:14
**isaac** 3:25 42:18 51:11 83:7 87:19 87:21 107:9 126:23 149:14 150:1,11 177:1 184:22
**isaac's** 83:12
**issue** 6:10 15:15 54:17 81:24 103:4 110:8,15 208:5 211:16 219:5,13 221:14 239:6 260:15,18 261:2 261:11 263:17 275:4 280:7 290:23
**issued** 13:21 16:19 49:14 143:20 144:1 178:24,25
**issues** 23:5 24:25 199:21 237:9,17 238:9 257:2,9 270:1
**item** 98:23 99:4
**itemized** 187:4
**items** 48:4,7 81:21 235:21

**j**

**j** 1:13 2:3 4:3,11 4:14,18 9:1 316:8 316:12 318:5,8 319:4,9 320:4,13 321:20
**janssen** 14:5
**january** 78:13 156:15,21
**jim** 23:8
**job** 268:20

**joe** 23:15 179:17
**john** 3:11 8:12 311:15
**john.maloy** 3:13
**johnson** 14:5,5
**join** 25:9,10
**joining** 314:18
**joins** 26:4
**jones** 3:2 8:15
**jonesday.com** 3:4
**joseph** 177:12
**josh** 189:23 195:14 205:1 210:5 211:12 216:1 231:14 249:15 314:14
**joshua** 2:19
**judge** 1:8 45:4 46:13 114:18
**judgment** 103:3
**jump** 53:4 251:2
**june** 1:17 5:24 7:2 48:3 84:4,13 85:15 88:16 91:8 91:13 103:15 104:18 109:5 116:2,17 117:4 119:3 120:10 145:16 179:23 185:3 186:7,9,18 188:16 316:7 317:10 318:4
**jury** 45:4,4,21 302:6

**k**

**k** 316:3
**kate** 8:1 24:11 25:12,17 133:17 149:16,25 150:4
**kate.swift** 2:15

| | | | l |
|---|---|---|---|

**katherin** 2:13
**kcrawford** 3:9
**keep** 24:20 25:10
  25:17 26:3,9,17
  27:13 99:19 147:3
  150:8 165:1
  174:15 211:3
  258:6 272:17
  280:6,7,13,23
  281:15 286:6
**keeping** 25:15
  26:7
**keyed** 112:10,12
  112:14
**kick** 25:25
**kind** 14:2 87:14
  135:13 196:17
  223:4 225:21
  228:12
**knew** 20:9 23:13
  24:13 25:13,19,20
  152:5,7 176:9
  199:23 235:17
  299:18
**knock** 302:8
**know** 11:15,16
  15:11,14 18:9,22
  18:23,25 19:10,24
  20:6 23:4,4,18,18
  24:7,13 26:1
  35:15,17,21 39:5
  39:12 40:2,2
  41:23 43:18 45:7
  46:3 47:20 51:12
  53:13 64:20 65:1
  66:18 74:13 77:25
  78:2,5,7 83:20
  87:9 88:17,19,22
  88:25 89:2,8,10,14
  89:15,18 90:15,19
  91:2 92:8 93:3,6

93:10,12,18 96:10
96:18,25 102:8,21
103:5 104:11,17
105:6,15 107:1,2,3
114:19 115:5
119:13 122:4,5
128:19 129:14,17
129:20 131:25,25
136:23 148:24
149:3,7 151:6,8
152:3,5,16,25
153:3,8 155:6
158:19 160:15
164:4,7 165:10,16
165:22,24 166:2
166:24 167:14,15
167:24 173:7,13
179:24 186:10,13
186:17 187:2,18
188:11 190:3
191:14 195:2,17
198:24 199:13
201:21 203:16
204:4,7 205:23
207:20 208:23
210:4,11 211:6,20
211:23 212:5,6
214:24 215:16
220:22,23 221:24
221:25 222:3,7,18
224:9 227:7
234:17,20,24
236:8,19 237:3
238:16,17,22
239:1 243:24,25
244:7,9,13,15
246:12 247:25
251:6 253:5,12,14
253:16 255:4
256:11,19 257:5,7
261:16 264:17

265:1 266:8 267:9
269:16 275:7
282:11 283:14,22
285:6 286:12
293:7 295:10
306:5,10,11,15,19
310:10 312:19
313:24 314:21
**knowing** 187:20
  206:9 223:23
**knowledge** 12:4
  95:22 202:23
  212:2
**kobrin** 2:19,21 4:5
  189:10,23,24
  190:6 195:15,22
  196:6,7 200:5
  202:11 204:9,17
  205:12,18,21
  206:1,19 207:7
  208:7,15,22
  209:15,24 210:8,9
  210:20 211:8,9,18
  212:24 213:9,20
  214:4,18 215:8,17
  216:3,4,10 219:21
  220:3,6,16 224:4
  224:13 225:4,20
  226:3 227:9 228:2
  229:12 231:1,11
  231:15 232:22
  234:11 242:15
  244:22 247:16,24
  249:10,18,19
  250:18 251:1
  253:17 257:24
  314:17
**korbin** 302:8
**kyle** 3:7 8:2

**l.p.** 1:7,9
**label** 237:19
**labeled** 58:6 155:7
  221:14 271:10
**labeling** 181:11,13
**labels** 248:7 270:2
**lake** 1:6 6:8 12:20
  13:8 15:25 16:4
  16:11,13 20:12,23
  21:3 22:2,7 26:22
  29:21 31:23 33:22
  40:11,25 41:12
  43:11 44:10 46:23
  48:22 52:5 56:19
  58:2 60:11 61:22
  63:14 64:3,10
  75:21 76:2 79:12
  121:23 186:6,8
  221:11,15,20
  222:21 223:2,22
  223:24 224:20
  225:15,24 226:5
  226:13,21 227:2
  227:22 229:19,25
  230:2,6,10,12
  231:3 232:25
  254:16 262:16
  264:8,19 268:25
  269:1 271:21
  272:1,10,14
  275:14 276:10
  277:10,15 278:16
  278:20,21 279:12
  280:2 285:23
  287:3,7,18 288:19
  288:20 289:6
**language** 98:20
  102:16
**lanier** 2:8

lanierlawfirm.com
   2:11
large   51:9
largely   77:7
larger   190:12
late   164:6 261:19
law   2:8 73:15
   312:5,10,12,24
lawyer   17:22
   116:19 119:3
lawyers   11:17
   13:13,21 17:9
   21:9,25 22:23
   30:25 34:1,18
   36:9 40:11,25
   45:3 46:22 47:18
   62:15 88:25 89:6
   89:13 91:17 93:14
   93:18 94:11 95:25
   102:11 104:24
   116:4 129:17
   136:21 149:9
   169:24 185:21,21
   185:23 186:1
   187:12 210:25
   238:24
layers   129:17
layman's   123:19
   246:7
layperson   243:6
lead   66:25 72:2
   125:25 241:14
   245:16
leading   29:4
learn   203:6
learned   13:20
   200:13,15
leave   24:4,11,17
   25:6 273:4
leaves   105:3

led   253:19
left   239:11
legal   7:18 318:1
   321:1
legitimate   121:16
   123:13 176:11
   178:24 211:24
lengthy   37:11 38:9
   38:14
letter   318:19
letting   65:1 283:21
level   44:12 110:10
   138:17 139:21
   164:2 217:12
   233:7
levin   2:2
levinlaw.com   2:5
   2:6
lewis   3:11 8:13
liability   15:15
lic   317:17
license   1:24
light   236:17
limitation   304:25
   305:4 307:5,8
limitator   307:7,7
line   65:7 86:5
   100:15,17 150:15
   169:1,2,5,9 172:22
   177:16 178:21
   186:21 224:22
   267:24 280:10,23
   281:23 282:1
   286:7 299:9
   318:13 320:7
   321:3
lines   99:21 100:9
   100:11,11,12,12
   124:20 233:5
   258:20

link   176:21 177:21
list   10:5,8 18:10
   45:15,15,17 97:11
   106:4 176:19,24
   179:9 230:19
   276:10 277:25
   278:10 279:2,4
   280:6,20 281:17
   283:10,16,20
   284:5
listed   15:13 18:13
   63:5 147:12 148:5
   158:25 159:13
   278:19,21 281:19
   282:5 283:6 320:7
   320:17
listening   36:9
listing   227:21
   320:7
lists   49:1 90:7
   180:6
literally   67:24
litigate   195:22,24
litigation   1:5 7:13
   10:2 11:21 123:20
   185:17 210:23
   211:11 212:6,7
   226:9 230:8
   232:10 233:21,24
   234:1,4,13 313:18
   316:11 318:6
   319:3 320:3
little   13:6 14:18
   25:9 31:18 37:11
   41:25 48:25,25
   49:3 53:13 64:6
   88:15 90:23 91:9
   98:4,21,22 99:3,5
   102:1,14 103:25
   104:4 111:13,21
   113:14 115:21

126:16 185:12
   193:15 194:22
   196:18 201:5
   209:5 236:13
   241:6 252:21
   263:12,18 264:25
   273:11 275:24
   277:7 278:11,22
   285:8 286:3,4
   288:12 292:20
   303:12 312:8
   314:5
live   270:15
lives   81:9
llp   2:13 3:6,11
loaded   66:3
located   221:20
   230:6
location   217:23
   218:4 222:17
   227:12,18,25
   231:24 282:11
   283:20,22,24
locations   9:21,22
   231:25
logic   212:18
long   31:1 36:5
   106:9,12 123:12
   125:7 295:23
longer   31:4,4
   168:9
look   14:9 48:23,24
   56:4,6,7 62:15,17
   64:14,19 67:5,8,16
   70:15 71:10 72:4
   72:13 78:8 81:20
   85:17 93:8 94:2
   98:16 105:20
   107:5,14 108:1
   109:8 115:16
   119:19 122:7

125:12 127:13,18
138:15,20 139:9
140:1,20 158:22
166:17 176:4
178:16 181:2,9,12
181:23 183:6
190:7 193:11
194:24 203:20,21
206:15 211:7
214:8 215:14
219:1 221:3 233:2
233:8 234:6 235:8
236:14 244:17
248:4 252:15
254:12 257:1,8
262:9 268:24
278:10 281:23
282:1,13,16,20
283:17 284:1
303:13 308:6
310:13,15
**looked** 32:16,21
57:24 72:21 92:4
95:5 98:5 103:25
109:4 125:13
139:18,20 141:5
182:5 201:13
203:2 237:6,20,21
244:8 264:5 267:9
267:25 283:5
284:24 286:2
287:1
**looking** 10:9 41:21
52:10 54:6 56:10
60:8 65:3 71:20
90:17 93:4 95:13
103:6 108:24
120:18 129:7
130:17 140:12
180:18 191:12
192:6 194:21

202:24 214:5
234:12 235:20
237:23 254:13
261:13 266:5
281:15 283:15
304:4
**looks** 65:11,12
71:23 92:17 108:8
186:22 214:10,14
214:16 221:5
235:5
**loop** 42:19
**lose** 240:11 241:17
241:19 255:15
**losing** 296:20
**lost** 125:8
**lot** 44:14 45:18
92:21 187:23
188:25 212:17
217:2 218:10
237:9 259:22
**love** 26:1
**low** 292:16 293:6
**lower** 132:11
145:12 286:4
293:12
**luken** 18:2,11 20:2
20:7,12,14,18,20
21:3,11
**lunch** 174:16,17
174:23
**luordo** 1:23 7:17
316:4

---

**m**

**m** 1:23 2:13 3:7,11
316:4
**ma'am** 258:10
311:13 314:24
**madam** 318:10
**mahoning** 263:23
273:9 284:7

**mail** 5:23 41:8
177:11,20 178:17
178:21 179:15
180:4
**mails** 41:6 129:18
**main** 81:22
**major** 233:18
**making** 218:10
256:20 292:7,19
297:10 299:20
**maloy** 3:11 4:7
8:12,12 311:15,16
311:18,19,23
314:9,13
**management** 5:3,7
83:25 85:8
**manual** 59:4
**manufacturer**
19:11
**manufacturers**
14:5,15,15 15:12
15:18,20,24 16:6
16:15 207:3
**march** 202:13,15
202:20 203:5,11
204:1,15 306:22
**marcus** 2:18,21
**mark** 126:22
195:3 270:24
**marked** 42:19,23
44:7 51:16 70:2
83:16,20,23 85:2,5
87:24 89:11 91:24
95:5 107:11 112:6
126:16 127:2,5,13
150:17,21 175:4
177:8 184:19,24
185:2 186:2,4
190:10 195:6
213:7 216:8 234:9
244:20 260:25

267:13 270:20
271:2,12 272:5
276:2
**market** 3:12 6:10
219:6,7,13 220:11
220:12,18 221:1
222:8,11,21,23
223:8,15,19,21,22
224:6,14,19
225:17,21 226:4
226:12,20,21
228:19 229:22
230:9,12,16,17,24
231:2,12,18,21,23
232:3,7,9,20,24
271:25 272:13
273:1 276:5,16,21
285:20 313:11,13
314:4
**marking** 85:6
**master** 25:7 26:4
26:12,17
**mastered** 263:12
**masters** 58:15
59:4,5
**match** 262:13
269:1
**matches** 78:12
161:22,25 162:3
**matching** 240:10
**material** 12:12
24:15,19 44:14
165:21
**materially** 12:10
**materials** 24:10
44:18,24 165:24
283:15
**math** 120:16
171:18 279:20
285:15

**mathematicians**
169:1
**matter** 7:12 55:17
59:6 63:1,16 69:2
69:10 103:6
124:19 180:14
198:13 212:19
216:24 218:19
243:2 301:3
308:20 311:20
312:9,19
**matters** 217:18
**maximum** 27:5,6
27:9,9 50:1 52:6
54:3,7 56:11
58:18,22 67:18
178:5
**mccann** 1:13 4:3
4:12,15,18 7:11
8:8 9:1,6 10:1
26:8 42:22 43:2
51:7,15,19 66:1
70:1,5 83:11,15,19
85:1,6 87:23 88:3
91:23 107:10
126:15 127:1
142:1 147:3 150:7
150:16,20 151:21
175:3,7 177:4,7
184:23 188:4
189:9,23 194:24
195:1,5 196:8
201:23 203:10,22
204:10 205:2,22
206:20 209:6
210:6,16 211:14
211:19 213:4,6
216:5,7,13,18
219:10 220:8
221:4,9,23 222:2,9
223:13 225:8

228:21 231:16
232:10 234:6,8
241:25 243:5
244:17,19 248:17
251:2,9 254:14
257:11,14,19,22
258:3,14 271:1
274:20 299:24
310:22 311:6,15
311:19,24 314:9
314:20 316:8,13
318:8 319:4,9
320:4,13 321:20
**mccann's** 152:1
**mckesson** 14:24
16:14 18:1 73:11
**mclean** 1:16 9:25
**md** 1:7 7:15
**mdl** 1:6 10:12
16:21 200:2
**mean** 20:17 21:9
26:6 31:11,13
32:6 37:5 38:5
45:11,23 54:21
67:4 75:15 124:2
124:14 125:16,25
133:10 191:3
195:8 198:11,17
198:18 215:16
228:17 234:17,20
235:21 236:21
243:1,5,17 246:19
248:1,12 249:6,16
250:3 258:24
301:21
**meaning** 54:22,24
114:11 121:16
227:18 237:19
**meaningful**
216:25

**means** 54:6 55:21
182:24 191:2,4
215:18 234:22,25
243:13,16 244:1,7
244:10,13 248:5
249:4
**meant** 109:24
139:8 165:2
235:12 236:10
238:6,9 244:16
246:5 249:1
258:23 295:15
**measure** 81:9
113:21 131:7
132:23
**measured** 113:18
**measurement**
217:17
**measuring** 54:25
**media** 7:10 64:25
69:22 126:3,12
175:1 189:21
250:24 311:4
**medical** 121:17
178:24
**medications** 60:21
75:23 76:4
**meet** 190:2 196:2
294:11 307:14,17
308:12
**members** 30:9
**memory** 18:25
19:15 64:18 65:17
181:10
**mention** 20:17
**mentioned** 20:14
20:18 45:6 82:10
95:14 174:12,13
273:23 317:3
**mentioning** 20:20

**messed** 204:24
**met** 190:1 258:4
308:1 310:3
**method** 6:16 12:24
49:1,1,4,6,6,6,12
49:13,25 50:4,5,8
50:12,15,19,20,25
52:6,8,13,15,22,24
53:3,3,8 54:2,2,10
54:11,14 55:15,15
55:15 56:2,3,4,5
56:11,12 58:1,3,3
58:8,8,11,12,14,21
58:23 59:1,8 67:1
67:10,14,17,18,23
72:10,15,15,24
75:16 82:5 92:14
116:9 118:16
123:21 125:18,24
126:2 162:24
170:24 171:5
178:2,4 190:23,23
190:23,24,24
191:18,20,22
192:2 193:11,17
194:18 198:6,8,12
199:8 204:1,12,13
207:9,11 217:4
236:10 244:25
245:1,24 249:13
250:12 254:13
256:22 257:6
286:9,18 289:5,8
293:17
**methodologies**
84:9
**methodology** 84:9
84:13 94:20
**methods** 12:15,18
13:5,7,11,18 20:21
26:21,23,24 27:1,3

27:11,14,15,23
30:20 31:10,12
32:1 33:4 34:4,9
34:23 36:15,19
38:12,18 48:12,17
48:21,21 49:25
58:12,19 59:15,19
60:1,6,13 64:16
66:25 67:6 68:4,8
68:21,22 69:4,13
70:20 73:25 74:2
74:13,15,24 75:3,6
75:12,19 81:14
88:23 96:5 98:7
99:8 107:3 111:12
113:15,24 116:9
118:4,12,15,17,19
118:21 123:7
124:12 125:12,20
130:24,24,25
131:18,19 133:24
135:1,1,4,15 143:9
167:20,24 169:22
170:22 182:24
190:18,22 191:3
191:17,25 198:12
198:14 199:2
200:9,11,16,24
201:11 209:8,13
216:23 244:5
254:2,3 268:3
295:14 307:20,21
307:23 308:4
**miami** 18:2,11
20:2,7,12,14,18,20
21:3,11
**microphones** 7:3,6
**middle** 156:7
169:3
**midpoint** 217:3

**midwest** 318:17
321:1
**mike** 39:18
**mildly** 45:8
**mile** 169:10
170:10 217:4
**miles** 159:15 168:6
168:10,14,14,21
168:24 169:6,7,8
169:12,15 170:10
170:11,16 217:3
217:24
**milligram** 131:4
151:23 219:15
233:5
**milligrams** 219:8
277:17
**million** 116:24
117:2,9 119:4,10
119:14 120:4,22
120:25 134:17,22
137:9,14 171:20
189:4
**millions** 209:2
**mind** 23:11 27:11
38:3 40:16 140:6
144:4 237:4
**mine** 132:13
**minor** 260:6
**minute** 10:24 30:8
37:24 38:16,17
80:8 149:21 170:9
189:11 243:20
273:13 275:17
293:23,25 300:18
300:21,24,25
301:8,8 307:7,8
310:21
**minutes** 31:6,7
33:10 38:3 48:15
64:25 92:4 97:17

119:24 161:3
162:15 243:8
283:2 300:4
303:15 304:1,12
307:16 308:13,17
308:21 309:14
**mischaracterized**
134:25 208:13
**mischaracterizing**
119:15 163:2
**mislead** 160:3
**missed** 79:1 91:9
261:9
**missing** 25:22
76:14,18,24 77:6,7
218:10,12,13,14
239:18,20,23
241:6,8 242:6,20
242:22 245:19
252:22 253:25
255:11 259:1
262:11 273:15,18
278:25 283:16
284:20 293:25
295:12 297:8,18
297:24,25 298:8
305:7,13 306:4,13
307:10 310:5
**mistake** 292:7
**misunderstood**
96:3
**mme** 6:9 130:19
130:22 131:3,4,7
131:21 132:18,22
156:14,15,20,21
227:1,23 228:4,13
232:24 271:20
272:1,9,14,21
273:2 276:11
277:17,22 278:16
279:17,24 280:4

285:18
**mmes** 219:6 278:7
279:13
**modified** 37:24
**moment** 93:5 95:5
126:4
**moments** 97:14
**monday** 14:9,12
17:7,10 173:17
**monitor** 73:21
313:7
**monitoring** 69:14
**month** 29:17 32:3
49:23 50:1 52:7
54:3,8 56:11
58:18,23 67:10
140:19 157:23
169:18 178:4
186:17 191:18,20
192:3 193:14,24
193:25,25 194:9
194:13,16,19,21
196:11 197:16,17
203:12,14,15,25
259:9,10 286:10
286:21,22 287:6
287:12,15 288:1,8
288:9,18,22,23
289:24 291:11,13
291:18 292:1
**month's** 53:20
**monthly** 27:9 50:1
52:6 54:3 56:11
58:18,22 140:2,13
178:5 187:3,11,17
188:6 193:21
194:16 287:16
288:16 293:14
**months** 14:10 18:5
18:8 19:12 27:5,6
27:17 29:13,14

33:9,9,12,19 42:2
47:1 54:7 76:13
76:17,20,22 77:5,9
188:24 191:19,21
191:25 192:5,7
193:23,24 194:1,2
194:4,7,9,12 196:2
197:22 198:15
199:24 207:10
258:25 262:11
263:16,16 287:8
288:1,3,13,24
289:11,13,14
291:3,5,18,22,23
291:24,25 292:9
293:10,11,11
294:24 295:1
**moons** 258:4
**morgan** 3:11 8:13
**morganlewis.com**
3:13
**morning** 7:1 9:6
24:14 25:14 37:11
38:2,10 78:23
79:4 123:6 149:13
170:19 195:11,11
195:18 208:20
210:13
**morphine** 131:4
151:23 288:7
**mougey** 2:2,3 8:6
8:6 19:9 24:11
25:1,12 26:5,11
34:24 75:9 84:17
85:15 114:17
119:1,12 133:17
140:6 149:16,23
150:3 162:12,22
175:25 178:14
179:11 180:8
184:10 187:18

188:13 189:13
195:8,20,24 200:3
202:8 204:2,16
205:1,15,24 206:6
206:25 208:2,11
208:18 209:10,22
210:5,19 211:12
212:22 213:17
214:2,17 215:7,11
216:1 219:16
220:2,5,15 224:1,8
224:16 225:1,10
226:2,23 227:13
229:9 230:14
231:8,14 232:11
242:14 247:10,23
249:5 253:11
258:9 265:14
298:1,5,11,21
299:1,7 300:3,11
301:17,20 302:3
318:5
**move** 191:9 211:8
267:5 269:14
**mover** 30:18,22
**moves** 191:7
**moving** 82:20,25
**multiple** 95:20
240:7
**muscle** 154:19
155:10
**muted** 8:5 251:9
**mysteriously**
269:24

**n**

**n** 2:9 4:1 39:19,19
39:20
**name** 6:12 7:16
23:15,18 81:15
82:2,4 182:4
189:23 197:12

235:8 236:14
237:22 238:1
311:15 318:6
319:3,4,15 320:3,4
320:21
**named** 235:18
**names** 23:10 180:3
180:24,25 181:4
234:15 235:14,16
236:13 238:3,6
**naming** 181:1
237:7
**narrowed** 117:16
**narrower** 145:12
**narrowing** 110:20
130:13
**narrowly** 207:22
**narrows** 134:14
**nation** 288:25
**national** 1:5 7:12
27:8 71:9 287:23
289:5,11,14,15
293:19 316:10
318:6 319:3 320:3
**natural** 27:19
**naught** 315:2
**ndc** 81:18 82:2
234:21,22
**necessarily** 187:20
199:8 261:3
**necessary** 47:3,6
150:14 239:5
302:5
**need** 24:20 25:7
69:15 120:19
126:3 187:15
192:12,14 209:4
211:24 222:22,25
223:1,3,6,7,9,10
236:5 237:11
241:22 258:8

261:3
**needed** 34:13,14
102:14 197:16
236:19
**needing** 223:5
**needle** 209:4
**neither** 57:8
239:14 240:4
246:12
**never** 34:10 49:13
163:4 212:21
**new** 10:16,19 13:4
48:20 49:2,5,9,25
58:1 105:4,13,15
108:7 115:9,11,19
117:13 131:12
132:16 133:14
143:21,22,24
144:1,3,4 149:12
149:19 179:22
260:15,16 262:23
282:18
**newly** 179:25
**nexus** 301:5
**nice** 258:5
**nicholas** 15:4
**nine** 29:13,13 33:9
33:12,19 291:16
291:18,25
**non** 106:4 226:7
226:14 228:7,14
228:16,19 229:1
229:19,23 230:5
230:11 232:8,9,14
232:20,24 233:11
233:18 276:6,7
311:25 313:8
**nonrecurrent**
130:21
**nonresponsive**
211:8

**noon** 241:7,10
242:7,18,21,23
245:14,21,23
246:16,23 247:3
250:6 251:19
252:18,23 253:19
254:9 255:9,11,19
255:21 256:4
294:1,17 295:7,8
296:7 297:11,20
298:20,23 300:1,8
304:21 305:3,7
307:24 310:1,5
**normal** 61:18
63:16,17
**northern** 1:2 7:14
316:10
**nos** 42:23
**notarial** 317:9
**notarized** 318:14
**notary** 316:4
317:16 318:25
319:10,18 320:15
320:23 321:23
**note** 7:3 186:20
281:22 318:12
**noted** 50:4
**notes** 9:7,15 86:18
110:23
**notice** 253:18
254:8,25 317:1
**noticing** 7:25
**november** 197:8
197:13,24 198:1
202:1,7
**npi** 239:13,15,16
239:17,25 240:3,7
240:9,9,11,13,14
240:17 297:13,16
297:22,23,24,25
298:6,8,9,10,15

**number** 4:10 5:2
6:2 10:2 12:15
14:4,14,23 15:3
46:15,19 51:12
65:12 73:5,6
81:14,18 82:2,18
82:21 83:2 92:16
95:7 100:2,14
104:13 107:15
108:6 109:3,13
110:21 116:1
117:8,12,15,22,24
120:9,20 133:14
133:18,24 134:3
134:17 136:6,10
136:13,13,14
143:16 147:25
148:7 151:21
160:1,11,23 161:1
161:2,10,12 162:5
164:14,16 168:13
171:13,19 190:13
194:18 220:21
234:22 239:13,13
239:15,15,16,16
239:17,17,25
240:3,6,8,10,10,11
240:13,14,15,15
240:17 261:6,15
261:16,24 270:21
273:7,10 279:24
282:10,11,14,18
282:25 285:25
286:4,15,19 287:4
287:17 288:14,15
289:19,20,21,24
292:9 293:2 294:5
296:6,9 297:13,14
297:16,23,24
298:7,8,10,15,18
298:19,23 299:6

302:13,14,14
318:7,13
**numbered** 93:2
279:7
**numbering** 99:19
99:20 108:17
271:11
**numbers** 45:19,22
51:24 53:15 55:7
56:13 57:3,6 58:3
61:3 67:4,5 72:19
72:21,24 79:18
92:23,25 93:3
96:9 103:22
107:20 127:10
139:13 143:12
144:14,18,20
145:6,8,13 146:1,6
146:8,13 147:7,9
147:19 148:9,14
148:17,19 150:9
158:14,16 159:5
159:10 162:10
164:9,12,18
166:14 168:11
171:4 232:5,17,19
240:7,9,12 268:23
268:25 269:1,3
274:4,7,12,12
276:24 282:6
290:7 299:5 320:7
**numeral** 190:10
**numerator** 289:18
**nunc** 5:4 83:25
**nursing** 167:22
**nw** 3:7

**o**

**o** 316:3,3
**o'brien** 2:2
**oarrs** 80:13,17,25
81:3,4,5,16,19

82:6,11,14 216:12
216:15 219:3
223:12,17 224:2,6
224:10 225:3,19
231:6 234:4
313:17,21 314:3,4
314:8
**oath** 99:23 175:24
**object** 24:4 187:17
188:11 205:15
**objected** 302:4
**objection** 24:22
34:24 75:9 84:17
119:1,12 162:12
162:22 175:25
178:14 179:11
180:8 184:10
200:3 202:8 204:2
204:16 206:6,25
208:2,11,18
209:10,22 210:19
211:12 212:22
213:17 214:2,17
215:7,11 216:2
219:16 220:5,15
224:1,8,16 225:1
225:10 226:2,23
227:13 229:9
230:14 231:8
232:11 242:14
247:10,23 249:5
253:11 265:14
298:2,11,21 299:7
300:3,11 301:17
301:18 311:8
**objections** 5:8
7:23 85:9
**observations**
288:10 292:2
**obtain** 175:15

obvious 160:14
obviously 116:8
147:7,9 246:21
248:24 301:6
occasions 36:5
occurred 264:3
occurring 68:6
occurs 305:14
october 202:2,7,15
odd 33:25
offer 15:23 16:5
16:13,22 19:2
21:11 22:24 44:10
69:3 124:23 149:9
offered 12:14,18
14:4,14,22 15:2,17
15:19 17:15,25
18:6 19:7 20:11
20:16 21:13 24:25
27:22 28:7 41:10
41:11 50:12,16
79:8,13 118:20
124:20
offering 21:17
43:10,25 117:18
274:15
offhand 197:6
office 30:10 36:23
37:15 39:8,13
41:6 87:11 88:20
88:21 129:2,20
151:6,12 152:10
152:25 153:3
169:1 196:2
offices 9:24
official 319:15
320:21
offline 207:16
252:9,15
oh 108:8 208:3
235:13 249:16

292:7 314:14
ohio 1:2,6,8 7:14
11:9,10,14 16:4
17:15,17,19,21,24
18:9,14,21 19:1,18
19:23 20:1 22:11
22:13,14,18,19,23
23:12,23 24:2,7,16
26:21,23 27:2,3,15
48:15 52:5 80:9
80:16,17,20
183:20,24 184:4
210:23 316:10
318:2
okay 10:25 14:19
29:13 71:19 75:18
82:1 97:25 100:15
107:5 109:17
133:2 149:23
150:7 174:20
188:15 189:14
197:10 202:12,21
210:3 229:16
246:8 256:17
257:21 258:7,9,11
258:22 259:22
260:13 261:22
264:16 267:3,12
268:9,16 269:9,22
270:12,24 271:19
274:4 277:6 283:4
286:5 287:21
289:8 290:11,22
291:7 297:8,23
298:8 301:24
304:17 310:20,21
311:17
okechuku 15:4
old 144:4,5 285:17
once 30:11 36:4
41:4 66:3 71:20

166:14 189:14
ones 35:9 49:2
90:9 102:23
103:25 108:7
115:11 148:12
199:22 276:13,14
305:2
ongoing 311:8
onward 113:17
op 1:7,9
open 24:5,12,17
24:20 25:7,15,18
26:7,9,18 42:16
51:6 91:21 286:12
opened 202:6,16
203:5,11,14
204:15 293:3
opening 204:1
209:7
operate 74:4
operated 230:20
232:1
operating 55:4
293:9
operation 192:23
193:4 199:19
operations 200:10
200:23
opiate 1:5 7:13
316:11 318:6
319:3 320:3
opinion 5:19 55:14
57:15,17,18 58:21
59:5,7,12,18 68:3
73:14,19 121:2,22
122:24 124:23
138:3,7,10,12
150:25 167:2,6
182:22 183:2,10
183:13,14,18,22
183:25 184:2,5,7

184:11,14 260:1
262:3 284:17
295:21 297:7
312:4,23 313:5
opinions 14:4,14
14:22 15:2,17,19
15:23 16:5,13,22
17:15,25 18:7
19:3,8 20:11,16
21:11,14,17 22:13
22:24 24:8,24
27:22 28:7 41:10
41:11,14,16 43:10
43:25 44:4,9,15,25
47:4,7 73:25
78:22 79:3,9,14
114:10 124:20
149:9 152:12
170:18 171:9
274:13,14 275:9
opioid 60:21 75:23
76:4 140:3,14
154:6,19 155:10
155:19 156:1,8,13
156:20,25 157:2,7
157:9,15 158:1
159:13 185:22
190:14,15 200:2
245:3,4 249:21,24
250:15 271:21
272:9 277:10
302:22,24 303:5,6
309:1,2
opioids 6:11 10:2
11:21 15:13,21
20:3,8 27:21 68:6
69:6 71:8 78:24
79:5,9,15 131:8
132:18 157:22
176:9 183:12,16
183:19,23 184:4

184:16 185:10,17
188:20 212:16
219:5,14,15
221:14 225:13
233:10 271:25
272:13,22 273:1
276:12 277:17
278:8 279:13,17
279:24 280:4
282:25 287:2
312:24
**opportunity** 65:23
269:9,12
**opposed** 32:17
54:15 132:19,22
**oral** 219:7
**order** 5:4,7 24:16
31:24 32:4,6,9
50:21,21 53:9,10
57:4 61:23 62:24
63:8,15 66:8
77:13 78:22 79:3
83:25 85:9 93:24
98:13 113:4,11
123:15 124:1,2,12
125:13,14,15,23
170:19 191:17,20
191:22 197:17
203:14 277:22
**ordered** 196:5
299:14
**orders** 12:19 21:2
22:20,24 23:21
31:12,18,19 32:2,8
32:10,12,12,22
33:3 55:16,19,21
55:25 56:17,18,22
57:6,16,19,22
59:20 60:12,16,25
61:16,17,17,18
63:11 64:4,11

67:13,21,24,25
69:4,5 70:20 72:9
72:16,22,23 73:9
113:13 123:8,12
124:7,8,17 170:21
171:1,4,25 174:8
187:20 192:2,4
196:20 203:13,24
209:19
**original** 104:17
108:6 109:4 116:3
116:22 117:3
134:4 143:17
145:15 153:6
164:12,20 165:5,7
165:17 167:3,7,12
167:16 265:9
266:16 267:7
269:18,21 271:11
274:19
**originally** 14:10
**ought** 25:6 55:1,3
68:21 123:24
239:11
**outcome** 7:20
317:6
**output** 62:10
181:1,5,11,20
**outside** 214:23
223:3,5 263:9
265:23
**overall** 171:12,19
185:14 220:18
**overlaid** 71:10
**overlapping** 25:3
154:6,20 282:21
**overprescribing**
183:16
**overstating** 308:3
308:8

**oversupplied**
183:12
**owned** 230:22
231:25 232:6
**oxford** 2:19
**oxycodone** 56:17
61:12 72:9,16
170:21 215:5,9,10
219:7,15 233:5

---

**p**

**p** 112:21
**p.a.** 2:2
**p.m.** 178:18
179:15 315:1
**pad** 9:9
**padron** 15:5
**page** 2:3 4:10 5:2
6:2 8:10 47:22
51:24 52:1,4,19
56:7,8,10,12 60:8
60:24 61:2,7,11,21
62:1 65:6 67:9,16
72:5,8,13,22,23
73:1,1,8,8 83:6
84:3 85:17,18
86:4 90:6 94:5
95:12,13,16 97:6
97:11 105:18
107:14 108:1,2,5
108:12,16,17,21
108:24 109:1,9,11
112:19 116:20
119:19,21,23,23
120:19 127:10,14
127:19 132:16
133:4 135:18,25
136:4 140:1,1,2,12
143:10,15 144:10
144:11,14,19,21
145:4,7,9,11,19,19
145:25 146:2,6,9

146:11,14,17
147:12,13,25
148:6 150:24
151:1,15,18
153:10,17,22
154:2,18,25 155:9
155:19,25 156:6,7
156:11,13,19,25
157:7,14,20
158:21,22,24
159:2,4,13 160:5
160:13,22 161:5
161:12 162:8
164:11 168:5
176:5,6,14 177:20
178:2,18 185:3
186:21 189:12
190:9 201:19
202:5,12,25
208:25 245:2
254:13 261:4,9,12
261:14,14,19,20
262:8,10 263:5,6
266:18 267:8,21
267:22 271:8,9,10
271:11,14,15
272:6,8 276:1,3,3
276:9,20 278:12
279:8 280:10
281:5,15 282:2
283:2 286:11
302:22 303:4,13
318:13,15 320:7
321:3
**pager** 107:7 188:1
**pages** 43:13,20
45:6 51:25 62:2,5
70:23 106:9,12,13
106:18 109:2
155:7 158:5,7
162:14 208:21,24

209:1 232:18
267:1,9 271:7,19
272:4,17,20 277:8
277:9 286:2
303:13
paid 158:2
painless 190:3
painstakingly
160:21
palenchar 2:13
pandemic 258:5
papantonio 2:2
paper 43:12 95:8
232:18
paragraph 47:11
78:8,20 111:3
115:6,16 141:21
141:22 151:17
180:16 181:16,18
205:16 261:5,10
261:12,15,18,20
261:23 262:10
266:22,23,25
303:14
paragraphs 47:12
47:13 261:1
parameter 170:10
170:15
parentheses 142:6
part 16:8 33:16
69:9 78:12 81:2
91:9 95:2 183:7,8
186:12 196:22
233:25 244:6
268:17 276:14
320:9
participate 41:7
participated 30:8
30:12 31:4 37:14
38:6 39:21 40:3
41:18 94:16

participating
35:22 41:24
particular 20:22
21:15 31:23 62:24
62:25 63:8,13,15
66:8 68:20 77:8
81:7 92:19,24
94:18 96:7,8
112:5 124:11
129:15 165:12
173:9 192:1,12
194:9 235:8
243:19 256:24
275:10 284:9
288:8,18 297:16
305:18 307:25
parties 7:9 222:15
316:24 317:5
party 7:19
pass 257:25
passing 311:11
pasted 179:19
patient 81:9,10,11
81:12,24 102:4
112:7,10,11,15,17
113:23 114:1
139:20,23 154:5
154:18 155:9,20
156:1,7,13,19,19
157:21 158:1
159:14 216:19,21
217:5,5,20 218:1,2
223:10,12,16,17
246:11
patient's 157:16
169:3 217:23
patients 95:18
124:11 125:15,22
133:5 135:20
136:1,7,15,20
137:1,4,9,19

138:21 139:2,17
157:1,8 166:11
168:6 169:17
223:4,24 245:4
246:24 249:25
294:13 302:23
303:6 309:2
pattern 61:18
63:16,17 308:20
pause 40:20 102:1
102:6 314:11
paused 201:17
pausing 49:3
payment 82:5
pdf 92:13
pending 205:13
316:8
pennsylvania 2:20
3:12
people 41:4,24
102:17 129:1
172:6 175:24
268:12
percent 32:25
39:18 52:15,24
53:4,4,25 54:1,15
54:15,19,20,22,23
55:5,5,8,10,19,21
56:16,17 67:20,25
69:5 72:16,23
73:9 86:19 87:1
91:15 92:5 120:6
120:16,25 121:2
123:3,7 130:22
132:5,12,18
137:25 170:25
171:14,22 231:17
241:18 272:2,15
273:3,11 277:2
285:22 296:19
309:18,19,20

percentage 60:17
130:7,9,9 131:21
131:22
percentages 60:12
60:15 92:17
130:19 131:20
132:9,11 220:22
percents 255:5
perfect 55:12
perfectly 262:13
perform 139:14
performed 22:15
182:7,12 186:22
188:7
performing
182:18
period 54:8 73:7
132:19 157:23
169:19 172:22
173:25 191:7
197:16 203:14,25
209:17,18 238:15
238:21 239:5,9,22
239:24 240:24
255:8 256:3
263:10 265:23
277:19 280:16
282:9,23 287:15
287:22 289:7
306:13,16 307:24
313:14,20
person 103:3
186:22 187:1,3
personally 47:3
87:11 129:1 151:5
319:11 320:15
perspective
212:18
pertaining 1:15
pesacola 2:4

**peter** 2:3 8:5,6
26:2 85:15 149:20
150:5 187:16
188:12 196:6
206:2 210:8
311:20 318:5
**ph.d.** 1:13 4:3,12
4:15,19 9:1 316:8
316:13 318:8
319:4,9 320:4,13
321:20
**pharma** 1:7,9
**pharmaceutical**
14:15
**pharmaceuticals**
14:6,6 58:15
**pharmacies** 16:9
19:3 20:22 45:15
45:16 48:11 49:15
49:19 52:11 60:11
61:4,22 62:11
64:3,10,17 65:9
66:6,11,12,15,17
66:22 70:13,17
71:1,16,21,22,24
73:13,17 75:22
76:3 77:2,18
79:14,19 80:2,7,23
122:8,13,16 124:9
124:9 125:22
139:3 172:18
173:14 176:10
182:8,13,23 183:3
183:11,15,19,23
184:3,8 189:25
190:19 192:4,6,9
194:3,8,12 197:12
201:2 221:11,19
222:15 223:4,22
224:18,20 225:13
225:15,24 226:5,8

226:8,16,17,19,21
227:5,16 228:7,14
228:16,19,20,23
229:3,6,19,23,25
230:2,6,6,12,19,20
230:22 232:5,8,10
232:14,21,24
233:11,12,18
263:21 264:1
273:20 275:14
276:6,7,10,12
277:11,21 279:2
279:11 280:2,17
281:17,19 283:6
284:2,13,23
285:23 286:23
287:7,14,18,25
288:3,13,17
289:19,21 290:6
290:10,14 291:16
291:17,18,25
292:5,13,14 293:2
293:14 311:25
312:6,14,16
**pharmacist** 5:18
150:24 243:22
**pharmacy** 3:9 5:9
6:4 19:19,23
20:19 22:2,6
23:22 35:15 52:7
54:3 56:13 63:14
65:12 66:19 71:7
78:24 79:5,16
80:10,11,16,17,20
81:10,12 85:9
89:16,20 93:1
102:21 104:23
113:23,23,24
114:1 125:15
140:2,13,24 149:9
151:24 159:15

167:10 168:7
169:4 170:6
182:19,25 184:15
190:15 192:1,6,13
193:15,22 194:5
194:13,17,20
198:15 204:13
207:3 217:5,21,24
218:2 227:2,11,14
227:18 228:10,23
230:18 231:24
232:4,13 237:5
238:13,19 243:2
263:23,24 264:6,8
264:13 265:21
268:23 269:4,24
273:6,8,14,23,24
275:5,11 277:15
277:18,23,25
278:1,3,4,7,15,25
279:4,8,22,22
280:7,9,11,14,19
280:24 281:2,3,6
281:10,13,24
282:2,3,24 283:8
283:14,16 284:3,6
284:7,24,24 285:3
286:10,16,21
287:3,5 288:6,9,19
288:21 289:24
290:1 291:1,4,6,8
291:20 292:3
293:3,9,12 313:13
314:4
**pharmacy's**
167:12 192:1
288:22
**philadelphia** 3:12
**phone** 29:4 33:14
129:18 318:3

**phones** 7:6
**phrased** 94:18
**physical** 139:5
227:18 231:24,25
282:11
**physically** 109:25
221:20
**pick** 7:4
**picked** 113:25
302:13,14 304:21
**pills** 243:23 246:5
**pittsburgh** 2:20
**pkwy** 2:9
**place** 7:6,9 124:16
126:2
**placing** 37:10
**plain** 181:15
**plaintiff** 16:18
17:11 175:16
176:5
**plaintiff's** 13:21
28:14 177:17
**plaintiffs** 2:6,11
5:5,11,21 6:16 8:7
8:11 13:24 21:9
21:25 22:23 24:15
28:18 29:2 33:25
34:18,19 35:16
40:10,24 46:22
47:17 84:6,12
85:7 86:4,18
87:10 88:16,25
89:6,13,19 91:17
92:3 93:11,14,16
93:18 94:5,11,13
95:2,10,25 96:22
104:24 110:17
117:16 124:24
125:3 136:21
137:6 149:9
169:24 175:9

178:9,22 179:3,9
179:23,24 180:1,7
187:12 212:25
238:14,20,24,25
244:25 248:19
252:24 253:5,9
256:9,11 299:18
300:10,15
**plan** 44:9,24
115:13 275:13
**planning** 74:18
114:12,16
**plans** 73:24
**play** 25:12
**playing** 302:7
**pleading** 116:17
**please** 7:3,5,23
8:17 16:2 40:22
42:11,21 51:5,7,11
52:18 64:8 72:4
76:1 78:9 80:8
83:9 85:18 87:18
97:3,23 105:21
109:8,18 126:23
127:14,18 133:3
139:25 141:19
142:14 144:24
148:4 149:12
151:15 154:17
155:5,16 159:3
164:23 174:19
176:4 177:1
179:24 184:22
185:12 187:15
205:10 210:7
211:15 231:14
266:17 271:16
318:11,11
**plus** 43:22 44:5
109:5 123:20
189:2 265:21

**pmougey** 2:5
**pneumonic** 181:14
**poerschke** 2:3
8:10,10
**point** 10:7 25:6
45:20 53:17
120:19 155:5
168:16 169:8,8
179:20 193:23
215:18 217:11
221:6 279:21
286:13 299:16
306:20 307:11
**pointing** 17:5
140:6 273:25
295:17
**points** 221:7,8
**polster** 1:8
**port** 12:25
**portion** 9:10
239:24 259:20
265:25
**portions** 41:19
**position** 26:10
229:6 265:12
**positive** 288:11,14
289:25 292:10
**positives** 241:14
253:20,22 254:5
**possibilities** 206:8
**possibility** 206:10
**possible** 37:25
66:18 104:6
206:23 207:5
208:24 209:3,6,19
**possibly** 212:14
288:4
**post** 9:16
**potency** 131:9
**potential** 206:21

**potentially** 193:5
**ppoerschke** 2:6
**practice** 89:16
179:2
**practitioner** 179:1
**preamble** 162:24
**preceding** 193:24
197:22 259:3
287:8,15
**precise** 93:8 98:21
99:5 112:9 217:23
**precisely** 13:6
102:14 181:3
188:22 283:22
**precision** 217:17
**preface** 251:16
**preference** 50:6
**prepare** 140:23
**prepared** 46:20
**preparing** 128:25
186:12
**prerogative** 25:24
**prescribed** 82:5
**prescriber** 6:15
81:12 139:21,23
141:11 155:12
156:3 157:4,11
217:5,21,24 218:2
239:14 244:24
245:7 297:17
303:1,9 305:21
309:5
**prescriber's** 82:4
**prescribers** 139:1
140:25 141:4,6,14
141:17 154:8
169:18 297:24
298:9
**prescribing** 168:2
**prescription** 1:5
7:13 36:14,16

60:21 79:23 81:14
82:2 85:21 93:15
94:12 112:4 113:2
113:11,16 121:11
121:15,19 122:8
122:16 124:1,3,13
125:11 134:10
135:7,8 136:8,16
136:17 138:24
139:6,7 143:3
156:14,20 157:15
157:17 165:4,12
169:18 235:2,7
241:5 243:4,7,8
249:9 257:17
294:14 303:24,25
304:5,10,12 305:8
307:16 308:14,19
309:15 310:2
316:11 318:6
319:3 320:3
**prescriptions**
36:19 38:13 79:15
79:19 80:6 82:18
82:22 84:7 86:1
86:10,15,19 87:1,2
92:5,16,25 93:11
93:20 94:6 95:1
95:20 96:17 102:3
103:1,22 104:13
107:16 108:6
109:3,13 110:21
111:6 112:6,11,13
112:16 113:13,17
113:21 114:7
115:24 116:2,16
116:25 117:2,3,8
117:12,23,25
118:5,12,24 119:5
119:10,22 120:4,6
120:9,13,17,21

121:3,7,23 122:2
122:12,20,21,25
123:4,13,24 124:7
124:10,17 125:5
130:12,14,23
131:2,3,17,23
132:5,6,10,23
133:15,22,22
134:15,22 136:11
136:12,13,15
137:10,11,14,15
137:19,20,25
138:4,13,16,21,25
139:22 140:3,14
140:17,21 141:6,9
142:2,7 143:8,12
143:16 144:15,18
144:21 145:6,9
146:2,7,15,18
147:19 148:1,7
151:22 154:6
155:11 156:3
157:2,9 158:15,16
159:6,22 160:6,12
160:23 161:11,13
162:5,7 164:21
165:3,8,13,18
166:6,15,17,22
167:4 171:9,13,14
171:19,20 172:2
174:8 176:10,18
176:20,24 178:11
178:23 179:3,9,22
180:1,6 181:22
182:9,14,19 241:3
242:1 245:5 253:1
253:4 255:23
295:18,18 296:2,6
296:8,9,21 302:24
303:7,21,21,23
304:8,9,21,23,24

305:3,6,20 306:5,9
307:9,14,15,17,25
308:1,12,13 309:3
309:8,9,11,13,16
309:25 310:4,6
**presence** 316:17
**present** 3:24 7:21
317:2
**presentation** 46:1
**presented** 33:5
**presenting** 45:3
**pretty** 32:23
148:13 176:16
234:19,23 248:2
299:1
**previous** 12:24
13:2 35:4 40:14
54:7 105:11
143:23 157:16
203:14 268:5
309:14
**previously** 55:20
244:14 251:3
**primarily** 35:18
66:18 90:3 191:5
248:7
**primary** 30:17,22
68:12 265:19
**print** 45:19 149:21
270:16
**printouts** 92:13
**prior** 10:1 29:20
48:10 49:4 64:7
96:3 109:24
125:10 138:23
139:4,9 194:13
197:23 198:1
199:23 200:25
201:22 242:17
276:4 288:1,18,24
292:5 306:3,20

314:1
**private** 7:4
**pro** 5:4 83:25
**probably** 29:25
31:5 84:19 92:23
210:13 212:8
234:21 307:7
**problem** 113:25
171:18 187:22
195:13 223:12
236:12 238:4,4
256:25 293:7,8
**problematic** 118:5
124:8
**procedure** 1:14
319:5 320:5
**proceed** 8:18
**proceeding** 7:23
**processing** 21:14
28:2 188:24 201:1
218:20
**proctor** 2:2
**produce** 48:6 62:9
63:22,25 132:1
168:20 169:11
170:14 185:8
187:19 299:10
300:17
**produced** 48:5
62:9,18 63:21
71:14 77:16,18
80:10,13,16 86:19
87:2,12 120:7,21
121:3,11,15,20
122:8 123:4
137:25 169:13
171:20 173:1
185:7,25 187:15
201:3 234:13
239:10 256:1,13
256:15 259:1

261:7,25 262:15
264:18 284:1,4
285:5,7 294:23
295:15 299:8,14
300:20 305:16,18
306:12,22 313:18
**producing** 187:17
188:25
**product** 196:14
197:25 220:11,12
220:13,14 233:4
**production** 318:15
318:17,22
**products** 213:22
213:24 214:13
224:25
**professional** 179:2
**professor** 41:2,3,7
42:5 94:17,20
128:6,8,13,20
129:5,6,16,19
130:2 132:3
**programmatic**
125:21
**programming**
218:21
**programs** 84:11
**projects** 189:4
**promise** 117:20
**prompted** 285:4
**properly** 34:23
**prospective**
211:24
**protective** 24:16
**provide** 11:17
68:4,8 115:2
166:3 176:16
179:21 186:24
217:12 222:16
223:18 238:13,19
241:2,18 242:10

246:17 247:5,12
254:3,6,8,10
271:20 272:8,21
296:19 298:14
301:11
**provided** 16:3
46:8 88:20,24
89:6 104:24
105:13,17 132:9
143:21 148:23,24
148:25 149:3
165:25 168:15
169:21 176:20
196:25 200:17
233:14 239:1,3
240:22 241:4
242:9 247:7
248:18 249:7
253:9,13,24,25
256:7 257:3 260:1
265:2,8,23 269:20
269:21 277:9
283:15,19 284:23
285:1 295:19
296:16,23 298:13
305:10 310:14
**provider** 247:1
**provides** 68:24
175:15 177:21
**providing** 242:2
245:12 306:17
312:22
**proving** 303:15
**proximity** 167:21
**proxy** 226:19
**public** 77:22 78:17
184:9 316:4
317:16 319:10,18
320:15,23 321:23
**published** 212:4

**pull** 14:8 31:11
111:10 126:20
261:3,11 270:19
**pulled** 271:7
**purchased** 277:17
277:22 278:7
279:12,17,23
280:3
**purdue** 1:7,9 14:5
**purpose** 96:25
121:17 128:16
176:11 178:25
242:4
**purposes** 45:20
247:13 249:8
274:2 300:7
**pursuant** 1:14 5:6
85:8 296:25 297:1
317:1
**put** 43:13,23 49:12
53:14 62:14,14
65:5 72:5 78:6
87:10 88:17 89:16
95:24 96:2 105:10
106:21 110:6
133:18 161:5
186:11,14 194:25
201:21,24 203:17
205:3,4 207:18
210:2 211:2 213:4
214:25 221:17
226:10 241:9
242:17 245:14,21
245:23 246:5,16
247:3 250:5
251:19 252:5
255:11,15 256:3
257:19 294:1
297:20,23 300:8
**putting** 46:14
68:13 78:2 96:25

151:4 155:3
176:23 179:8
180:6 243:22
246:9 266:6

**q**

**qin** 39:19,20
**qualifier** 53:14
54:17 162:10
163:6
**qualify** 168:23
**qualifying** 162:10
**quantification**
99:2
**quantities** 228:4
291:4
**quantity** 82:3,4
290:1
**quantum** 83:2
**question** 13:6 35:2
35:4 38:3 40:14
40:21 56:24 64:6
64:7 69:8,9,11
72:20 74:21 79:2
87:9 94:22 96:3
116:5 124:21
125:10 128:9
129:15 135:18
138:23 139:4,9,12
140:10 142:19,20
142:22 144:11
145:22 147:17
148:13,15,16
160:4 165:7
185:11 189:13,14
193:6 197:13
198:23 203:10
205:7,11,13,16,20
205:23,23 224:23
228:16,25 250:1
250:13 252:10,22
297:5 298:1,3

299:23 307:10
312:12,18 314:1
**questioning** 276:5
286:8 299:9
**questions** 13:12,17
14:1 20:16 24:6
100:1 133:4
177:23 179:18,19
189:5 205:17
211:5 215:2
226:25 257:25
258:15 269:13
275:24 301:23
304:17 310:20
311:7,11 313:10
314:2,10,11,16,23
**quibble** 76:11
104:6
**quibbling** 76:7
**quick** 189:10
190:3 250:18
254:12 310:18
**quickly** 98:14
205:19 295:24
**quite** 47:25 62:5
76:18 135:16,16
174:14 191:24
208:24 218:6
260:10 268:16
294:20 302:5
**quota** 6:6 214:8
215:9,20
**quotas** 211:21,23
212:3,16,20,21
213:1,2,10,15,23
213:25
**quoting** 181:16

**r**

**radius** 217:2
**rafalsky** 23:9,19
26:14 28:13,17,25

29:3,7,14,20 30:13
30:16,23,24,25
31:1 32:8,14,22
33:11,22 34:11,18
35:9 40:12 41:1
59:10,14,25 63:24
200:19

**rafferty** 2:2

**raised** 211:17
212:5,7,11 214:22

**ran** 21:23 71:19
87:12 259:10

**random** 110:22
299:4

**range** 67:24 69:4
187:7

**rannazzisi** 23:15
23:19 34:11,19

**rare** 240:4

**reach** 47:4,7 84:10

**read** 18:10 33:16
76:1 86:22 98:13
100:5 138:22
152:8 162:13
179:5 205:14,18
205:19,24 206:1,3
206:5 302:21
303:16 305:11
306:23 307:13
319:5,6,12 320:5,6
320:17

**reading** 245:1
294:16,18 295:4,5
295:8 318:19

**reads** 86:25 297:2
304:22 305:3,19
305:23 309:1

**real** 68:6,25 69:7
301:5

**realize** 309:23

**really** 17:3 23:25
28:3 36:8 54:25
55:3 91:4 147:3
220:2 248:6 252:7
254:12 264:9
269:3 270:16
285:3 301:22
305:5 312:12

**reason** 49:3 81:22
82:7,9,14 106:15
107:24 111:11
120:3 132:21
147:14,16 160:14
174:6 203:24
206:16 208:5
218:17 225:18
252:3,12 263:14
264:16 282:9
285:24 292:11
314:18 318:14
320:8 321:3

**reasons** 47:25
82:13,15 110:25
265:17

**recall** 15:8,14
16:25 17:5,14
18:4,5,8,12,24
19:1,5,6 20:20
21:21,21 22:17,21
22:25 23:6,8,11,13
23:24 27:14,20
28:10,20 29:23
30:5 31:21 32:11
32:18,19,21,25
33:1,6,8,20 35:21
35:23 36:10 38:1
38:15 39:1,11
40:19 41:13,23
49:11 56:24 61:15
71:18 81:24 84:18
84:20 87:7 90:1,2

91:4,19 94:17
96:24 99:2 106:10
106:11 139:16,18
140:22 141:4
159:4 163:8,24,25
164:2 168:12,18
168:19 169:20
170:2,13 181:13
182:4,6 197:6
199:11,16 203:6
211:16 212:11
216:13,18 226:10
228:5,6,8 229:4
231:4,17 235:20
237:4 239:21
245:1 251:11
254:14,21,22,23
258:19 260:4,9
297:12 298:22
300:5,13,14,22
309:17 312:1
313:20

**recalling** 31:14,20
48:8 200:14 201:8
203:8 309:21

**receipt** 318:18

**receipts** 225:13
227:22

**receive** 173:11
291:19

**received** 60:25
61:23 63:14 64:4
64:11 107:2
169:17 172:8,15
172:23 173:7
200:20 227:2
246:24 253:3
259:2 290:15
291:9,10 313:21

**receives** 291:17

**receiving** 264:22
291:14

**recognize** 92:6
127:6,15 164:8,17
174:15 234:15

**recognizing**
132:15

**recollection** 23:16
23:17 24:24 28:3
30:17,18 31:8,22
37:17 41:20 42:1
48:17,18 81:7
87:15 110:19
178:8 180:4,10,14
180:18 181:3
231:20 238:7,18

**reconcile** 236:23

**reconciled** 235:16

**record** 7:2,9,22
24:23 69:16,17,21
70:24 86:22 126:7
126:11 139:10
174:21,25 189:16
189:20 195:10,16
206:4 207:21
235:9 239:22
240:5,20 244:13
247:25 248:3,5
249:7 250:19,23
254:10 255:14,16
258:7 261:22
271:5 285:10
310:24 311:3
320:9

**recorded** 7:10

**recording** 7:8

**records** 239:10
240:11 241:19
248:24 252:16
254:7 261:6,24
300:18 310:14

**recover** 85:23
**recreate** 111:8
**recreated** 111:4
**recurrent** 54:10
  111:11,12,15,16
  111:24 112:2,18
  112:20,23,25
  113:3 114:6,11,21
  130:21 131:13
**red** 5:12,14 36:19
  40:6,19 65:13,14
  66:16,16,18 79:18
  79:23 80:5,22
  81:14 82:18,22
  86:9,9,14,20 87:3
  87:12 88:4,9,15,17
  89:1,7,10,16,21
  90:7,9,17 91:7,12
  91:18 92:14,15,15
  93:2,4,9,15 94:12
  94:25 97:9,11,19
  98:9 102:22
  103:13,14 104:25
  105:10,13,22
  106:3 107:17
  109:4,5,14 111:6
  111:14 112:5
  113:1 115:19,19
  115:23 116:22,23
  117:6,10,13,22,24
  118:3,24 119:5,9
  119:22 120:12
  122:19 123:2
  130:20 131:2,23
  132:5 133:8,9,12
  133:21,23 134:4
  134:21 135:21,23
  136:2,5,9,9,16,18
  137:11,16,21
  142:4,5,7,9,11,15
  142:17,23,25

143:7,8,12 144:15
145:15,24 146:3,5
146:13,17,22
147:11,17,19,23
147:25 148:5,17
151:24 152:2,2
153:4,7,12,18,24
153:25 154:11,12
154:14,15,22,23
155:22 156:16
158:4,6,11,11,17
159:5,6,22,25
160:5 162:19
163:6,11 164:1,12
164:12,19,20,25
165:2,5,8,9,17,19
166:5,15 167:3,7
167:12,16,19,24
168:4 169:25
170:4,6 171:10
179:23 180:13,17
180:24 181:6,22
249:9 254:17
257:17 296:25
297:2 300:7 302:2
302:21 309:7,9
**reduced** 134:17
  316:18
**reduction** 134:22
**refer** 21:17 155:1
  180:23 261:1
**reference** 86:5
  95:14 181:20
  261:2,10 266:11
  266:12,12 267:6
  318:7 319:2 320:2
**referenced** 30:2
  31:2 43:15,16
  44:12,17,18 92:2
  104:12 105:19
  116:16 174:10

180:4 266:10
319:11 320:15
**references** 86:13
**referred** 80:13
  104:2 111:12
  112:3 116:19
  274:8 275:20
  303:20
**referring** 28:21
  29:10 49:18 65:4
  80:14,15 98:24
  99:16 104:5 116:4
  116:14 155:8
  227:16 235:10
  261:15 262:14,24
  276:19 285:6
**refers** 178:1
  259:21 281:23
**refilled** 157:15
**refine** 298:14
**reflect** 72:24 95:21
  96:4,15 112:22
  117:11 131:23
  163:15,20 164:15
  186:5 195:10
  273:23 282:15
  312:21
**reflected** 44:4 91:7
  91:13 93:1 96:23
  102:23 106:22
  107:17 112:19
  116:23 120:18
  138:17 139:14
  147:18 152:22
  187:6 244:4 269:5
  269:6 277:13,14
  277:19
**reflecting** 33:4
  131:22 187:8
  194:1 209:2
  293:13

**reflects** 52:4 92:8
  92:10,11 102:16
  120:3 128:4
  130:11 141:22
  163:16,20 215:14
  232:16 284:11
  312:22
**reformatted** 45:5
**reformatting** 45:8
**refresh** 23:16,17
  178:8 180:4,9
**refreshing** 180:14
  180:17
**regard** 209:20
  210:22
**regarding** 154:5
  208:10 209:7
  228:13 230:11
**regular** 135:7
**regulation** 61:16
  167:8
**relate** 78:23 79:4
  133:8 188:7
  274:16
**related** 7:19 31:22
  35:23 41:4 79:8
  79:14 135:20
  221:22 317:5
**relates** 219:4
**relating** 199:18
**relationship**
  113:22
**relative** 220:21,21
**relatively** 190:4
  240:18 261:6,24
**relaxer** 154:19
  155:11
**relevant** 24:8
**reliability** 77:13
**reliable** 78:12
  261:7,25

| | | | |
|---|---|---|---|
| **relied** 59:25 93:19 | 14:8,18,20 15:3,7 | 143:20 144:2 | 285:13 286:11 |
| 151:20 | 15:15,25 16:3,9,11 | 145:17,25 147:18 | 294:22 313:14 |
| **relief** 84:9 93:21 | 16:19 17:2,7 | 147:20,24 148:2,6 | **reported** 1:23 |
| 94:8 180:2 | 18:16,18,19 20:15 | 148:8,9,11,18,20 | 75:22 76:3 159:25 |
| **relies** 152:17 | 21:14 24:1,6 | 148:23 149:1,4,5 | 231:18 259:13 |
| **rely** 268:12 274:12 | 25:13 27:24 28:4 | 150:22 151:2,10 | 274:2 316:16 |
| 274:14 | 29:21,22 33:23 | 151:13 152:1,4,7 | **reporter** 7:17 8:16 |
| **relying** 34:4 119:4 | 36:22 37:1,4,5,13 | 152:22 153:2,5,6 | 205:19 206:3 |
| 152:3 268:11 | 38:7,11,16,21 39:4 | 153:11,13,17,22 | 319:7 |
| **remember** 18:6 | 39:7,14 41:11,12 | 154:1,17 155:1,6 | **reports** 4:21,25 |
| 24:3 25:21 27:17 | 42:9 43:4,4,5,19 | 155:16 158:5,7,10 | 9:14 10:13,21,24 |
| 55:22 109:22 | 44:16,17 45:10 | 158:12,15,17,20 | 13:9 20:19 25:16 |
| 119:24 132:7 | 47:23 48:4,23,25 | 158:22,25 159:12 | 25:19,20 28:5 |
| 140:25 141:1 | 49:5,6,8,9,13 50:8 | 159:18 160:18,19 | 34:1 42:14 43:9 |
| 143:18 171:15,18 | 58:2 59:24 60:4 | 161:14,17,19,22 | 43:16,21 44:5,7 |
| 181:15 197:3 | 62:19 73:21 78:9 | 161:23 162:9,14 | 45:1 46:4,13 47:4 |
| 212:13 | 78:20 88:12,14 | 163:17,23 164:5 | 47:9,10,16 64:20 |
| **remembering** 25:4 | 90:4,7,16 97:4,8 | 164:10,20 166:16 | 70:12,13,25 78:3 |
| 199:25 | 98:2,10,18,20 99:1 | 168:5,5,12,17 | 78:13,16 165:22 |
| **remind** 200:16 | 99:10,12 102:11 | 169:14 170:4,5 | 170:1 188:25 |
| **remote** 2:1 3:1 | 102:24 103:8,14 | 171:14,17 172:10 | 201:3 227:24 |
| **remotely** 1:25 | 104:20 105:4,5,8 | 173:2,8,11,15,16 | 228:10 229:4 |
| 316:7 317:2 | 105:11,14,20 | 173:20 174:2 | 230:19 266:5,20 |
| **renew** 206:6 | 106:22 107:17 | 190:8 197:5 | 269:2 273:16 |
| **reoccurring** | 109:6,14,18,20 | 201:14,18 202:5 | 274:16 275:2,11 |
| 195:12 | 110:9,15 111:3,5 | 202:25 208:9,17 | **represent** 127:9 |
| **replace** 115:8 | 112:19 114:5,10 | 209:20 214:24 | 189:24 197:7 |
| 127:25 265:24 | 114:15,22 115:6 | 227:5 229:25 | 204:11 215:3 |
| 267:16,17 270:8 | 115:17,18 117:11 | 230:17 231:10,19 | 264:17 270:14 |
| **replaced** 130:8 | 117:13,23,25 | 233:14,16 234:1 | 271:5 282:13 |
| 202:13 | 118:10,11 119:8 | 245:1,2 258:17 | 311:16 |
| **replacement** | 120:12 123:3 | 259:4,8,14,19 | **representation** |
| 270:10 | 127:7,16,22 | 260:4,5,6,17,18,24 | 215:14 256:20 |
| **replaces** 177:21 | 129:24 131:1,13 | 261:2,4 262:24 | 284:16 |
| 259:17 274:18,18 | 133:3,5,7,11 135:2 | 263:3 264:4,23 | **representations** |
| **replacing** 259:21 | 135:19 137:4,8,14 | 265:9 266:9,10,13 | 205:6 208:9 |
| 275:12 | 137:24 138:18 | 266:14,16 267:4,7 | **representative** |
| **replicate** 59:3 | 139:14 141:20,23 | 267:14,14,15 | 175:20,22 |
| **replicated** 209:7 | 142:1,2,10,12,16 | 269:25 271:6 | **represented** 19:25 |
| **report** 4:11,14,18 | 142:18,24 143:1,2 | 273:18 275:3,4 | 207:19 254:18 |
| 9:11 13:8,22,25 | 143:4,5,9,11,13,18 | 284:9,9,11 285:10 | 255:17 256:12 |

**representing** 2:6
2:11,16,21 3:5,9
3:14 7:18 204:5
204:21
**represents** 120:16
**request** 28:17,18
28:18 29:1 85:18
188:10 252:24
320:9,11
**requested** 29:2
132:3 169:15
206:5 238:14,20
**require** 135:6
191:25 209:17,18
221:2 222:1,9,12
222:13,14
**required** 216:23
318:25
**requirement**
143:2 146:9
160:25 162:6
294:18 295:4,6,9
297:3 305:12,24
308:16,17
**requires** 73:20
221:10 312:12
313:7
**research** 200:6
**reserve** 269:12
**resolve** 237:15,17
238:9 239:6 257:8
**resolved** 237:12
237:23 257:1
**respect** 66:6 113:1
114:11 127:10
237:3 260:22
262:6,15 265:13
265:20 266:4
268:13 269:16,17
274:21 283:2
311:10 313:11

**respectfully** 285:5
**respective** 316:24
**respectively** 43:8
**respond** 179:18
**responding** 215:1
**response** 86:4,8,18
87:6,10 89:5
102:10 116:5,7,10
116:19 117:17
119:3 176:16,19
177:22 247:7
314:1
**responses** 5:8,21
85:9 92:3 95:4,6
103:15,16 175:9
176:5,21 177:9
178:10,22 179:10
**responsible**
176:23
**responsive** 246:20
**rest** 24:19 25:25
26:16 69:10
108:11 119:23
285:12 296:18
**restarted** 201:17
**restarting** 203:1
**restating** 37:20
**restricted** 146:22
**restriction** 135:11
**result** 45:8 53:16
104:7 111:17
124:13 147:22
164:15 182:1
254:5 287:17
305:12
**resulted** 134:21
**resulting** 54:23
83:2 123:14
**results** 21:15
30:20 31:9 32:17
41:18,19 53:23

59:25 60:5 62:6
64:16,23 67:1,5,9
67:17 68:23 70:19
72:2,24 87:12
93:8 96:10,14
104:10 116:8
125:25 135:11
159:25 168:19,20
169:11,14,22
170:14,15 254:1
268:3,5
**resumé** 11:23
47:22,23 48:4,9
**retail** 78:2,13,16
227:19,21 229:2
277:11 286:22
**retailer** 277:15
**retained** 21:9
149:8
**returned** 318:18
**reveals** 154:5
**reverse** 239:16
**review** 33:6
106:23,23 110:22
151:21 199:18
200:6 318:12
319:1 320:1
**reviewed** 102:22
103:5,7 110:3
138:23,25 139:5
199:23 200:21
236:16
**reviewing** 139:19
207:16 303:18
**revising** 143:23
**revisions** 133:8,9
135:20,23
**richard** 15:3
**rid** 53:9
**right** 10:21,23
11:4,11 14:13,20

14:25 15:10 24:12
42:11,19 49:16,23
51:5 52:8 53:1
55:14,16 57:7,8
58:1,19,22,24
59:19 60:6,16
61:1,8,25 62:7
65:19 67:11,25
68:6,10 69:7,10
70:13 72:20 73:17
73:22 74:10 75:18
77:2,6,11,24 79:20
79:24 80:7 83:4
90:10,18 97:12
100:3 105:3 106:6
106:9 107:14
108:7,24 111:2
112:8 113:9
115:20 117:14,21
119:17 131:5
132:11,18,21
133:16 134:2,3,23
139:24 143:22
150:11 159:15,19
161:5 162:20
168:7 170:22
171:10,22 173:12
175:15 178:16
182:25 183:7,24
184:4,9,16 188:4
189:6 190:23,25
193:4,8,11 197:1
218:7 228:21
233:15 234:22
236:4,11 247:4
248:3 250:7
252:11,13,14
256:5 257:22
272:24 273:12
274:4 277:3,6
279:8 281:13,14

282:18,19 283:3
289:9,10,18,21
293:22 298:15
299:3,5,8 301:9
303:2 305:23
309:19,22,23
310:12 314:11
**ring**  202:2,17
**rise**  139:21
**rite**  3:14 8:12
16:23 17:12 19:4
311:16 313:2,7,8
**rog**  95:6
**role**  16:10 17:2
211:20 228:24
229:11
**rolled**  61:3,13
**roman**  190:10,13
**room**  9:12,24
258:4
**roughly**  79:9
171:20,22 188:16
212:9 230:19
253:4 295:14
**rounding**  225:16
**routine**  182:2
**row**  194:10
**rows**  193:24 194:1
**rph**  5:20
**rpr**  1:23
**rule**  175:15,23
252:2
**rules**  1:14 175:14
179:20 319:5
320:5
**run**  21:22 22:1
80:22 82:11,14
95:25 96:19
130:20 157:17
166:7 168:9,17
169:17,24 170:5

173:21,23 182:3
190:1 241:25
244:5 246:14
263:8 295:13
297:8 299:19
**running**  21:15
72:1 182:1 250:16
268:3 299:20
300:7
**rx**  202:16

**s**

**s**  4:9 5:1 6:1
318:15 320:8,8
321:3
**safety**  184:9
**saith**  315:2
**sake**  50:7 83:12
**sam**  2:9
**sam's**  280:14,17
280:19 281:5,17
281:19 283:7
287:3,7,14,17,25
**sample**  110:22
**sampling**  110:18
**sarcastic**  302:5
**saturday**  37:11
38:1,10
**saved**  181:25
182:1 304:16
**saw**  76:9 119:24
132:4 143:15
153:1 170:24
181:17 201:1
264:6
**saying**  27:13 35:6
57:11 62:16 68:20
81:22 98:9,14
106:13 118:22
122:6 125:10,18
134:9 172:24
182:3 207:25

211:3 219:24
221:15,19 222:4
222:13,13 242:10
242:13 247:8,11
249:3 254:23
258:19 273:22
285:10 289:3
295:15 296:12
301:10 306:17
**says**  83:24 84:6
85:7,21 86:8,14,25
102:3 108:17,21
111:4 120:2 140:2
140:13 151:20
153:7 154:4 155:9
155:19 158:25
159:13,21 171:4
175:8 177:21
178:4,21 179:20
190:14 192:3
197:7 215:15
219:22 257:16
265:15 302:22
**scenario**  304:5
309:24
**scheduled**  14:10
**school**  285:17
**scope**  183:8
214:23
**scott**  2:13
**screen**  9:19 31:15
31:17 32:7,13
70:5,8 72:5
108:14 109:12
110:2,5 150:13
194:25 196:9
215:1
**scripts**  84:11
**seal**  317:9 319:15
320:21

**second**  4:17 36:4
39:4,7,13 43:5
48:2 56:8 71:23
73:8 102:6 108:13
109:18 110:8
118:11 142:1
149:17 206:11
215:4 259:25
261:17
**seconds**  210:7
221:18 276:25
277:4
**section**  58:8,9
59:24 60:4 97:8
133:4,7 135:19,25
136:4,25 137:3,8
137:13,23 138:17
162:24 190:12
**sections**  65:13,14
65:14 66:16
**see**  9:18,18 34:14
51:23 58:5 65:10
65:23 66:15 70:8
70:24 72:6,8,14
76:15,17 84:1,4,14
85:6,14,19 86:2,5
86:11,16,21 87:17
88:3 95:16 102:3
103:2 108:3,14,16
108:21 120:2
122:7 139:20
150:23 151:1,17
152:6 153:9,19
154:2,3,4,9 158:24
162:8 168:10
169:17 173:20
176:5,13 177:12
177:24 178:2
179:14,14 181:16
182:3 190:16
196:8,12,20 197:5

201:14,16 211:1
215:6,10,12,13,19
215:20,23 219:4
230:18 240:2,7
244:3 245:8,13
251:25 255:5
256:23 257:16
258:5,10 267:19
268:1 276:9,13
280:9,10,13 281:8
281:17,23 282:2
284:25 290:9
296:5 303:14,17
310:19 311:13
seeing 65:16
170:13 181:13
261:14 263:5
296:5
seek 84:8 85:23
93:21 94:8 180:2
seen 57:21 85:12
87:6 88:6 90:20
92:12,16,17,19,20
122:11,15 150:23
151:2 158:19
175:12 180:10
203:18 204:8
206:13
self 216:2 280:15
selling 220:13
send 43:24
sense 52:6 58:13
58:16 88:18,19
114:2 138:24
166:18 192:25
196:16 198:2
217:6 220:18
249:15 253:8,15
sensitive 7:3
242:24 294:7

sensitivity 170:11
sent 9:13,13 110:4
195:18
sentence 47:15
86:22,25 162:23
268:6
sentences 98:13
162:15
separate 9:21,22
17:16
separating 192:19
september 197:21
198:4 264:20
serious 160:3
301:21
served 17:7,9,19
23:20 260:19
286:23
service 2:22
189:25 198:16
serviced 193:22
194:3
set 5:10 20:22
85:10 102:17
115:19 118:4,19
130:14 134:15
185:23 240:5
275:23 282:7
307:17 310:3
317:8
sets 72:19 118:21
118:23 185:20
211:23 237:10
239:9 262:13
265:1 307:14
308:12
setting 170:15
211:21
seven 48:21 64:25
68:16,17 69:12
74:16 75:7 123:22

170:22 182:24
264:24 291:10,22
292:2
shade 40:16
shapira 2:18
shapira.com 2:21
share 6:10 42:20
47:16 70:5 136:19
149:15,20,25
150:13 219:6,7,13
220:11,12,18
221:1 222:8,11,21
222:23 223:8,15
223:19,21,22
224:6,14,19
225:17,21 226:4
226:20,21 228:13
228:19 229:22
230:9,12,16,17,24
231:3,13,18,21,23
232:3,7,9,20,24
271:25 272:13
273:1 276:21
277:2 283:23
285:20 313:11,13
314:4
shares 226:12
276:5,16
sheet 197:8 318:13
320:7,10,18 321:1
sheets 43:12
shield 212:17
ship 227:25 288:6
shipment 53:18,19
53:20 113:16
125:13 287:2
290:24 291:17
shipments 6:3
52:5,10 60:10
61:4,12 65:11
69:1 71:8 73:2,4

73:10,16,21 75:23
76:4,14,18 113:17
123:23 191:5,25
192:5,8 193:21
194:17,20 196:14
198:4,7,9,10,11,19
198:19,22,24
199:1 201:2,15
202:25 221:19
229:2,24 230:1
262:11 277:10
285:18,19 287:24
288:15,19,22
289:20,23 290:5
290:13,15 291:4,9
291:14,21,22
292:3,4,10,23
293:5,13 311:25
312:5,14,15 313:8
shipped 12:19
21:2 23:1,21
124:1,4 194:5,7,8
212:15 227:4
230:22 276:12
286:16,20 287:4
287:13 288:1,17
290:6
shipping 78:23
79:4 224:20
ships 62:12 289:25
shopping 153:24
154:4 169:16
short 28:4 66:16
69:19 126:9 156:8
189:18 250:21
311:1
shorter 267:14
shortly 163:14
show 17:4 45:15
59:25 60:15,16,20
62:19 68:13 70:6

70:18 71:7,15
74:4 87:16 93:19
107:20 108:11
184:18 203:1
207:20 211:15
227:3 233:17
270:14 276:21
282:21,22 306:2
**showed** 93:25
134:18 161:2,21
162:15 269:25
**showing** 164:11
196:19,19 201:15
203:9 233:9
290:25
**shown** 32:7 61:9
95:1 148:1,7
236:15 318:16
**shows** 52:21 56:13
56:16 60:9 61:11
67:9,17 93:10
107:15 119:21
120:20 132:17
144:14 153:18
159:5,10,25 202:5
202:25 207:20
213:10,14,21,23
215:5 219:5,9,12
220:12 227:1
242:5 306:2
**side** 12:14 20:22
75:7 113:3 172:1
225:12
**sign** 109:25
**signature** 110:3,6
316:22 317:15
318:14
**signed** 85:14
319:13 320:18
**significant** 76:14
135:5,11,13 184:8

189:3
**signing** 318:19
**similar** 65:13
70:16 71:10 77:17
113:2,7 114:3
169:20 176:17
304:9 306:2
**similarly** 240:12
313:5
**simple** 28:4 45:22
135:14 147:4
148:13 165:2
196:5 276:17
279:20
**simpler** 270:11
**simplification**
275:18
**simplified** 45:5
46:17
**simplify** 45:25
**simply** 112:6
196:3 268:19
**simultaneously**
118:13
**sincerely** 318:21
**single** 6:14 102:4
134:12 162:19
192:22,23 193:10
231:23 232:13
241:5 244:24
258:24 291:17
292:1 297:20
**sir** 14:21 15:25
17:17 19:19 20:13
20:24 26:22 42:11
49:20 57:7,23
105:11 106:9
108:14 121:24
147:10 148:2,13
160:16 161:4,9
162:20 163:7

171:22 182:25
184:4 206:20
221:22 226:15
229:13 237:1
249:1 318:10
**sit** 12:4 18:5,24
19:16 20:9 23:11
28:11 32:18 43:18
44:2,3 46:20
71:18 74:1,22
75:5 76:25 77:4
80:19 82:16
106:20 132:15
165:10,16,20
199:17 206:13
235:20 251:10
252:7,8 309:21
**sitting** 39:10 46:3
71:13 74:18 90:15
104:11,21 163:9
236:20 248:6
**situation** 192:21
**situations** 217:8
238:18 239:18
251:5
**six** 14:10 21:23
27:5,6,10,12 50:1
52:7 54:3,7,8
56:11 58:18,23
74:15 123:22
130:7 157:23
178:4 191:18,19
191:25 199:24
205:17 279:23
281:18 293:10,11
**size** 61:17,24
62:25 63:4
**skipping** 306:1
**slcg** 151:20
**slight** 40:16
102:13 103:19

**slightly** 45:5 71:5
99:6,15 102:15
198:3 235:15
273:8 290:8
**small** 45:19 76:8
76:12 77:10
127:10 190:10
225:16 261:6,24
262:19 270:13
273:10
**smaller** 118:2
130:11 133:24
135:12 220:12,13
**sold** 54:8
**solids** 219:7
**solutions** 7:18
318:1 321:1
**somebody** 23:9
62:17 80:1 150:15
220:10
**soms** 21:22 28:3
30:20 31:10
173:21,23 263:8
264:12 268:3,4
274:2
**soon** 26:11 190:4
249:17
**sorry** 16:1 17:9
25:1 28:22 29:9
37:9 52:13 64:6
75:1,25 79:1
83:19 91:9 97:22
99:19 104:15
133:17 138:22
141:1 142:13,19
145:21 148:3
154:1,2,16 155:3
164:22 172:9
186:3 195:2,19
196:21 199:12,16
203:16 228:15

231:9,16 233:23
248:21 249:16
250:3 260:10
261:18 267:17
273:4 274:18
277:8 278:20
281:2 289:19
291:25 292:5,8
295:22 296:10
314:15
**sort**  28:1 31:18
32:15 38:15 68:18
69:13 123:21
152:5 191:8
193:19 211:13
212:16 218:20
227:19 240:19
242:3 269:11,12
274:7,8 306:14
311:8
**sorted**  139:19
277:21
**sorts**  124:15
**sound**  313:22
**sounds**  14:13
188:13 260:14
**source**  44:14
285:2
**sources**  88:22
105:24 106:24
**south**  2:4
**spaeder**  3:6 8:3
**spans**  277:9
**speak**  29:7,20 31:1
36:6 39:6 128:20
128:24 193:2
**speaking**  193:3
306:7
**special**  25:7 26:4
26:12,17

**specific**  52:7 54:4
70:16 71:7 85:25
125:14 140:7
141:14,17 144:16
221:5 243:12
269:17 271:7
313:13
**specifically**  17:6
90:25 159:7 262:8
**specified**  96:7
**spelling**  303:14
**spend**  38:16
**spent**  48:12
186:12
**spills**  271:19
**spoke**  28:13 29:18
39:13 128:19
163:10
**spoken**  29:3,14
33:15,21 35:12
36:2,8 39:16,25
40:9,23
**spreadsheet**
193:19,20,21
194:7 196:17
270:15 276:25
**ss**  316:2
**staff**  30:9 36:22
39:16,21,25 47:8
47:10,13 102:12
102:18 129:11,19
152:18,20 166:16
166:25 176:23
179:8 186:11
207:17 251:25
300:6 310:17
**staff's**  106:23
**stamp**  242:16,18
254:19 255:9
296:7

**stand**  262:3
275:11
**standing**  216:1
285:13
**stands**  131:4
**start**  25:15 69:22
85:18 108:25
111:2 126:12
175:1 189:21
191:20,22 197:15
202:1 203:4
209:18 222:4
250:24 258:2
260:21 286:17
311:4
**started**  24:14
25:13 78:2 172:14
201:16 255:18
306:17
**starting**  97:11
112:19 127:12
143:10 145:24
147:24 148:6
206:7 207:9
**starts**  151:18
267:21
**state**  7:21,24 16:20
16:21 17:22,24
22:13,18 24:15
71:9 80:11,17,20
189:1 201:22
262:10 316:1,5
319:10 320:15
**statement**  57:1
66:13 74:22 79:10
93:24 118:6
119:11 121:8
165:19 195:15,17
198:25 319:13,14
320:19,19

**statements**  123:10
**states**  1:1,15 7:14
78:19 154:3
261:23 316:9
**statewide**  22:16
**statistics**  273:19
**statute**  167:8
**stays**  214:10
**stenographically**
316:16
**step**  59:23 181:24
314:15
**stick**  50:9
**sticking**  56:6 67:7
**sticks**  237:4
**sticky**  9:15
**stop**  24:18
**stopped**  124:9
**stopping**  124:8
203:1
**store**  62:25 196:20
227:19 278:11,13
279:13,17,25
280:21 282:9,11
282:14,15 284:18
287:6,11
**stores**  60:25 61:12
196:12 227:21
**straight**  169:1,5,9
**street**  2:4,14 3:7
3:12 225:14
**strength**  157:3,10
219:8,15 245:6
246:25 302:25
303:8 309:4
**strike**  32:20 42:4
52:14 137:11
167:14 186:3
200:7 211:8
233:24 238:12
249:11 251:15

**stronger** 219:14
  233:6,10
**structure** 98:12
**struggled** 111:21
**struggling** 129:22
**stuff** 125:8 195:13
  270:2
**stylized** 31:19,24
  32:6,8,9
**sub** 220:12,14
**subject** 69:2,10
  123:25 124:19
  169:16 177:16
  192:2 198:11
  212:19 243:2
  257:24 275:16
  306:25 311:8
  312:18 314:10
**subjects** 270:12
**submission** 5:6
  85:8 95:11
**submit** 34:1
  187:11 243:7
**submitted** 38:10
  39:3 124:10 139:2
  185:9,16,25
  274:16
**submitting** 29:21
  38:21
**subscribed** 319:10
  320:14 321:21
**subsections** 58:5
**subsequent** 111:25
  112:6,10,13
  113:12 118:14
  130:25 131:19
  134:11 136:9,11
  142:5 143:5
  146:12 147:1
  161:1 182:1
  303:23

**subsequently**
  253:23
**subset** 28:4 95:19
  110:21 116:11,15
  117:9,15 118:2,11
  130:11 133:22
  134:19 135:12
  146:8,25
**subsets** 96:3,8,9
  96:10,13,18
**substances** 73:20
  202:20 211:21,25
  313:6
**substantial** 76:19
  184:3
**substantially**
  61:18 63:15
  185:23
**substantive** 30:12
  30:15 34:3 36:12
  41:10 55:16 59:6
  73:14 91:20 312:4
  312:23
**substantively** 41:8
  166:18
**sue** 17:11
**suffered** 124:25
**sufficient** 82:14
**suggest** 24:18
  26:14
**suggested** 51:2
  118:20 297:11
**suggesting** 57:21
  227:7 292:21,22
**suit** 317:6
**suite** 2:9,14 3:7
  318:2
**sum** 277:2
**summaries** 45:24
  77:21 140:23
  141:3 152:1

  190:14 275:21
**summarize** 63:19
  142:2 173:19
**summarized**
  130:13 148:11
**summarizing**
  63:10 141:7 201:3
**summary** 5:13,16
  17:3 28:2 63:6
  78:3,13,16 86:14
  108:18 116:23
  140:2,13 186:15
  186:20 187:5
  188:2,25 190:14
  190:15 257:18
  274:23
**summation** 232:4
**summed** 140:18
**summer** 36:1
**summit** 10:11
  17:20 49:8 210:17
**superfluous**
  237:10,14
**superior** 318:1
**supervision** 68:19
**supplement** 48:2,3
  128:3 135:2,3
  173:22 264:4
**supplemental** 4:17
  5:19 39:4,7,14
  43:4,5 109:18
  110:8 114:5
  118:11 137:13
  142:1 149:4,5
  150:25 164:5
  203:2 259:14,17
  264:10 265:16,20
  266:1 267:16,18
  267:20 268:1,4,14
  268:18,25 269:20
  270:5,9 273:16

  274:3,17,18 275:4
  275:12 283:17,18
  284:19 285:3,12
  289:9
**supplemented**
  59:1
**supplements** 9:11
  311:9
**supply** 82:4 154:7
  154:20 157:22
**support** 106:5
  110:16 128:7,13
**supported** 105:23
**supporting** 44:23
  106:3
**supports** 85:22
**supposed** 58:14
  165:1 267:16
**sure** 10:7 11:23
  16:3 25:23 29:11
  32:23 34:21,22
  37:18 39:18 40:14
  46:25 71:4 83:5
  86:23 90:6 91:11
  91:15 98:8 108:12
  115:15 132:12
  133:10 140:8,11
  148:5 149:17
  152:21 155:8
  160:2 181:10
  187:24 188:22
  189:7,11,13
  193:18 197:3
  198:13 206:20
  207:21 220:23
  233:8,13 235:7,10
  235:17 236:2,6,8,8
  243:11,13,17,25
  248:8,10 256:9
  259:24 265:7,12
  279:6 280:7

282:13 289:1
304:18 309:18,19
309:20
**surprise** 25:2
**surprised** 53:24
**surprises** 25:1
**surprising** 25:5
282:17
**surveil** 69:1
**surveillance**
125:21
**surveilled** 124:6
**suspicious** 23:1
55:22 56:1,23
57:4,12,12,19
59:20 61:16
166:22 167:4
**swear** 8:17
**swift** 2:13 4:4 8:1
8:1,5 9:5 19:17
24:21 25:9 26:1
26:10,19 35:1
42:17 43:1 51:11
51:18 65:2,18
69:15 70:4 75:17
83:7,10,18 84:21
85:4 87:19 88:2
92:1 107:8,13
119:2,16 126:5,14
126:22 127:4
133:20 134:1
140:8,9 149:14,18
150:1,5,6,11,14,19
160:3 162:17
163:3 174:14,20
175:6 176:3 177:1
177:3,10 178:15
179:13 180:20
184:13,21 185:1
187:14,25 188:3
188:10,14 189:5,8

189:9 227:15
258:14 314:21
**switch** 286:5
**switching** 270:12
**sworn** 8:20 9:2
316:13 319:10,13
320:14,18 321:21
**system** 69:14
124:6
**systematic** 125:21
**systematically**
301:11
**systems** 124:15
245:11

### t

**t** 4:9 5:1 6:1
**tab** 126:21 270:20
302:18,18
**table** 48:25 50:10
61:3 64:19 65:3
155:19 157:21
190:9
**tables** 17:1,4 63:6
275:19
**tabulated** 227:6
**tabulating** 229:5
**take** 7:8 26:8
42:12 51:6 59:23
64:19 65:24 72:4
78:8 84:22 87:18
97:3 105:20 107:5
107:14 108:1
109:17 119:10
127:13 139:25
149:12,21 153:11
158:22 165:1
176:4 177:4
188:22 189:10
249:17 250:18
258:8 276:17
279:10 290:17,25

291:24 308:23,25
310:18
**taken** 1:16 7:11
69:20 126:10
174:24 189:19
250:22 311:2
**takes** 118:11
**talk** 13:7 25:11
26:3 31:13 42:8
96:21 115:7,13
136:25 137:3
141:13,16 172:6
222:20 227:14
258:22 266:19
273:14 286:9
308:10 310:17
**talked** 13:9 33:11
59:10,14 61:19
74:7 89:19 90:22
91:16 92:4 94:10
123:5,6 133:15
151:9,12 159:8
170:17,18 171:8
172:18 216:11
252:17 257:4
307:4
**talking** 17:16
38:17 48:13 56:3
62:13 63:23 65:24
66:1 74:7,12 83:6
97:16 105:16
114:12 131:16
135:23 165:25
172:12 181:8
190:16 226:15,16
226:16 229:13,16
235:25 243:12
276:8 306:6
307:12
**talks** 116:21
266:22,23,25

**tape** 69:16
**tara** 3:2 8:14
258:2 299:1
301:21 302:3
**target** 82:20,25
**teleconference**
33:8 36:13,20,25
37:3,14
**telephonic** 33:2
**tell** 19:12,15,15
21:10 32:15,24,25
39:2 48:15 60:24
61:21 62:23 63:13
64:2,9,22 65:23
66:10 68:10 75:18
105:9 110:7
129:10,12 162:16
165:23 176:9
181:3 187:21
191:2 204:23,23
207:16 236:14
239:2 243:18
248:8 258:22
266:5,9 279:3
283:7,12,25
**telling** 35:3 135:22
224:3,5 267:10
**tells** 296:20
**tend** 51:8 220:24
**tens** 209:2 266:6
**term** 21:12,18
64:5,12 104:7
128:6,7 175:17
190:22 220:7
**terminology**
181:19
**terms** 132:22
180:10,21 181:4,9
182:6 193:2,3,20
**terrible** 155:4

**test** 55:8,10 99:16

**testified** 9:3 10:6
10:11 13:14 23:5
28:12 49:22 55:20
70:10 161:10,16
163:4,16,20
213:19 293:24
294:6 311:24

**testify** 12:7,21
114:20 171:12
210:16,21 211:10
219:11,19,20
222:4,5,6 274:20
316:13

**testifying** 9:23
175:24

**testimony** 10:1,16
10:19,24 11:2,6,9
11:20 12:1,3,15,17
12:20 13:10,11
23:6 28:20 50:12
50:15 55:22 57:14
74:17 94:24
118:18 134:20
147:5 153:8
164:24 171:15
175:16 265:11
267:4 312:1,3
316:15,20 317:8
319:6,7 320:6,9,12

**texas** 2:10

**text** 9:10 20:20
161:21,22 162:14
233:15

**tfumerton** 3:4

**thank** 13:19 14:21
58:7 65:2 120:23
127:11 147:10
150:5 189:8,9
196:5,6 210:8
214:19 231:5

251:10 268:15
271:18 310:23
311:6,12,13,18
314:9,13,20,24

**thanks** 126:5
179:17

**theodore** 15:4

**theory** 220:19,23

**thereof** 317:7

**thing** 54:22 55:1
81:22 98:15,24
109:10 123:6
184:18 201:22
240:19 281:22
285:11 296:4
307:3

**things** 25:15 26:7
54:21 68:16
167:21,25 193:18
270:11

**think** 10:10 11:22
11:25,25 12:13
13:2,4 15:6,6,7
16:7,8 18:17 22:8
25:21 27:18,19,24
28:10 29:15 30:11
31:3,5,7 32:7,11
32:23 33:25 34:7
34:17,20 35:3,5
36:25 37:21,23
38:23 39:18 41:4
42:2 43:17 44:13
46:13,25 48:14
49:4 50:14 51:13
53:12 54:19 56:5
62:4,8 64:13,14,21
66:14 68:24 69:11
75:2,11,25 76:11
76:13,21,23,25
80:13 82:15,24,25
83:13 85:13 87:13

90:22 91:19 92:22
92:23 93:23 94:19
96:24 98:6,20
99:3,5,7,20 100:2
102:16 103:3
104:4 105:19
109:10 111:10
114:25 115:1
116:5 119:15
123:10 124:18
128:8 129:15
131:15 132:13
134:6 135:22,23
140:16 149:7,14
150:9,14 153:1,1
159:2 160:14
163:2 168:15,25
170:2 171:16
172:3,11 173:12
173:16,17 175:19
177:5 180:25
181:4,7 189:6
190:8 192:10,10
194:22 197:14,15
198:23 208:16
210:25 211:5
213:4 217:11
220:24 224:9
227:15,23 228:1
228:22,23 233:8
234:7,19 235:6
239:7 240:2
243:22 244:2
246:8 250:3 251:9
251:24 252:1,3,9
252:12,13,14
256:12 257:15
258:6 259:23
260:6,11,25 261:3
265:21 268:10,20
268:22,25 269:2

269:15 270:8
273:10 274:9,22
276:2,8 278:25
279:1,3 283:13,16
283:21 284:2,14
285:1,10 286:7
292:25,25 293:24
294:3 295:16
304:17 306:3
308:3,7,18 310:16
311:21 312:8,9,11
313:15 314:17,20
314:22

**thinking** 40:13
69:1 71:6 75:14
75:16 227:15
279:4 283:8
313:25 314:2

**thinks** 59:16

**third** 38:1 86:5
118:3 130:6,8
151:17 210:5
304:10,13 305:8

**thirds** 278:11

**thirty** 318:18

**thought** 33:11
70:11 139:4 172:5
173:3 174:11,12
237:13 252:8
259:20 260:14
292:8

**thousand** 131:16

**thousands** 44:20
44:21 137:18
266:6,6

**three** 5:3 23:10
27:8 29:15,16
32:13 33:1,9,12,13
33:18 37:17 38:24
43:9,21 44:5,7
48:4 58:12,17,19

59:15 67:10 81:8
81:23 89:24,25,25
98:5,7 118:15,20
118:23 123:20
155:7 157:8
163:21 201:5
205:2 207:4
216:16,21 217:1,7
217:12,25 218:5,9
218:12,15 232:18
237:6 245:3
246:24 249:24
253:2,12 259:9,10
263:6,16,20 264:1
264:25 274:16
275:2 291:9,21
292:10 294:13
300:12 302:23
303:5 304:5,6,8
305:20 309:8,15
**threshold** 27:7
50:2 52:7 53:21
56:12 58:18,23
178:6 194:21
287:13 289:4
292:20 293:6
**thresholds** 54:4
**throw** 42:18
**throwing** 296:22
**tied** 297:16
**time** 7:24 12:6
13:1 29:18 36:4,7
48:12 68:25 69:18
69:22 79:12 84:19
112:4 126:8,12
132:19 163:10
164:4,7 172:22
173:18 174:1,22
175:1 186:13,17
187:6,7,23 189:17
189:21 191:5,7

192:22 193:10
195:13,21,25
196:4 200:7,8,21
200:23 201:5,7,10
203:18 204:8
206:13 207:18
210:5 211:14
221:18 235:6
239:19,21 240:24
241:2,5,9,18 242:1
242:3,16,18,21,22
242:24,25 243:1,3
243:8,9,11,12,13
243:15,19,21,25
244:3,7,8,15
245:11,14,17,18
245:20 246:2,4,9
246:10,13,13,14
246:15,16,18
247:5,8,12,15,21
248:14,16,23,25
249:1,2,4,7,21
250:2,3,3,6,20,24
251:6,8,14,18,19
251:23 252:6,18
252:19,19,22,24
252:25 253:3,6,9
253:10,19 254:7,9
254:10,19 255:3,9
255:11,15,15,20
255:22,23,24
256:4,16,21 257:3
257:25 259:4
261:3 262:9,23
263:10 265:5,23
268:19 277:18
279:10 280:16
282:9,23,24
287:22 289:7
290:8 293:22,25
294:7,7,25 295:2,3

295:4,5,11,20,25
296:7,17,19,22
297:18,21 298:16
299:8,15 300:8,18
300:21,24,24
301:1,3,5,7,8,11
301:12,13,14,15
302:4 304:21
305:9,10,12,15,18
306:1,12,12,15,17
306:18,20,21,23
307:24 308:5,7,10
308:10,16,16,21
310:4,25 311:4,7
311:11 313:14,20
314:21,23 315:1
**timekeeper** 187:7
187:9
**times** 10:2,6 13:14
14:11 27:8,8
29:15,15,16,16
30:13 33:12,14,18
33:19,22 36:2
38:24 40:5 67:10
95:20 175:18
205:3 211:4 241:7
241:8 242:6 244:6
246:12 253:13,24
253:25 254:1
255:5,18 256:25
273:24 279:23
288:13 291:19
294:8,22 300:1,12
300:13 302:4
304:11 305:7
306:13
**timing** 201:16
**title** 215:15 257:16
**titled** 95:18
**tme** 235:4 244:9
248:1 257:5

**today** 8:9 9:7,20
9:23 12:5,22,24
13:3,13 17:17
24:18 26:6,14
39:10 43:18 44:3
46:3,20 48:7,9
71:13 74:18 75:5
77:4 82:16 104:11
133:16 163:7,9
201:12 311:24
314:21
**today's** 48:5
314:25
**toes** 314:15
**told** 13:24 44:22
129:11,11 210:13
243:14 246:4,14
**tone** 302:8
**tool** 169:13
**top** 17:21 38:2
83:24 108:21
120:2 156:12
157:6 267:22
277:25 278:15
**topic** 179:2,4
184:1,6,12 269:14
**topics** 5:22 175:10
176:6,8,13,17
177:18 178:10
**total** 5:15 25:21
31:7 52:5 53:21
60:17 86:25 87:1
108:18 113:20
120:6,17,20 131:3
132:6 187:8
229:24 230:24
232:2,17,19
271:21,25 272:9
272:13,22 273:1
277:10,16,22
278:16 281:18

287:13,17 288:14
289:19,20,20,23
290:10 292:3,4
293:2
**totally** 146:18,20
**trace** 125:14
**track** 1:10 5:3
10:12 83:25 188:2
188:8,15 200:2
210:17 260:2,4
274:17 313:7
318:6 319:3 320:3
**traditional** 33:7
**trail** 191:10
**trailing** 27:5,6
32:3 50:1 52:6
54:3 56:11 58:18
58:23 67:10 178:4
190:23,25 191:3
191:18,21,21
192:3,4 193:14
194:1,16,19
196:10,10 197:17
203:12,15 209:9
209:17 210:21
286:10,22 289:14
**transaction** 4:21
4:24 32:17 34:9
51:4 59:2 70:12
76:15,23 172:9,12
172:16,16 173:10
173:13,18,24
174:9 201:18
224:12,15 242:22
244:7,15 245:10
245:17 246:13
248:5 251:6
252:19 255:3,5,10
255:11,14 256:15
256:16 258:25
259:6,12,16 263:1

263:9,14,24 264:5
264:7,12,14
266:19 289:13
306:18 314:1,7
**transactional** 76:9
77:12,18 260:8
262:20 264:18
**transactions** 6:14
60:17 62:11 63:3
63:5 65:14 73:6,7
113:18,20 148:10
191:8,8,11 219:6
241:19 242:17,18
251:20 253:14
254:19 255:10
259:2 282:7,8
286:15,19 294:12
294:25 295:3
296:1,13,20,24
306:14 310:15
**transcribed** 319:7
**transcript** 11:13
18:19 163:15,19
171:3 207:19
211:13 312:21
316:20 318:11,12
319:5,12 320:5,11
320:17
**transcription**
316:19
**traveled** 159:14
**traveling** 168:6
**treat** 240:16
275:10
**treating** 16:9
**treatment** 275:13
**trend** 215:5
254:25
**trends** 254:8 255:2
255:4

**trial** 11:6 12:2,16
13:10 43:11,15,25
44:24 45:10,13
46:9 49:22 50:13
114:12,17 115:5
115:14 274:15,21
275:8
**tried** 218:7 263:11
276:8 297:18
**trigger** 27:7 32:5
118:13,14 124:3,4
143:3,6 178:5
218:3 303:22
**triggered** 50:2
53:22 136:16,17
142:3 146:11
165:3 303:25
309:9
**trip** 304:6
**trivial** 134:7,9,14
134:20 135:14
277:5
**trouble** 283:9
**true** 12:4 22:9
61:7 62:8 71:3
78:19 99:6 118:1
118:22,25 119:7
147:11 149:10
160:9 163:18
191:24 198:25
221:10 232:12
256:5,6 260:11
262:5 293:16
306:16 316:19
**truism** 303:15
**trumbull** 1:8 6:8
12:21 13:8 15:25
16:4,11,14 20:12
20:23 21:3 22:2,7
26:22 29:21 31:23
33:23 40:11,25

41:12 43:11 44:10
46:23 48:22 56:19
58:2 60:11 61:23
63:14 64:4,11
75:21 76:2 79:13
121:23 186:6,9
221:11,15,20
223:2,22,24
224:21 225:15,24
226:5,13,22 227:3
227:22 229:20,25
230:2,7,10,13
231:3 232:25
254:17 262:16
263:25 264:2,8,15
264:19 268:23
269:3,5,7,8 271:21
272:1,22 273:2,5,7
273:21 275:5,14
276:10 277:11,16
278:16,20,21
279:12 280:3
284:2,4,5,25
285:23 287:3,8,18
288:20,21 289:6
**truth** 316:14,14,14
**try** 25:17 26:17
51:9 65:25 90:6
121:6,14 142:21
145:23 147:3
174:16 259:7
266:18 285:9
308:23
**trying** 14:19 37:18
55:13 68:5,23
102:18,19 117:21
161:24 185:14,15
201:20 212:13
221:16 260:13,15
263:15 270:3
274:6,11 278:23

298:6 303:17
**tuesday** 173:17
**tunc** 5:4 83:25
**turn** 7:5 84:3 97:6
 139:24 151:15
 155:16 267:12
 271:8,9,10
**turned** 201:19
**turning** 126:15
 156:6
**twice** 30:11 40:5
 193:14 194:19
 196:10,10 203:11
 203:15 282:4,4,5,8
 286:10,21 287:5
**two** 9:11 12:8 13:4
 17:19 19:12 23:10
 27:8 29:16 30:3,6
 30:8 31:6 32:4,13
 33:1,2,13,14 35:16
 36:12 37:9,17,22
 37:23,24,25 38:24
 48:20 51:25 53:23
 61:5,13 71:20
 72:1,19 76:17,20
 81:2 89:23,24
 98:6 102:3,4
 104:22 113:7
 114:3 119:15
 123:10,10 129:17
 129:23 143:6
 153:18,21 154:7
 156:8 163:21
 165:21 189:11
 192:9 198:14
 201:5 205:16
 206:8 217:22
 221:6 245:20
 247:15 262:12
 263:21 264:4,9
 268:6 270:13

278:11 281:19
 283:7 296:14
 303:11 305:6
 313:10 314:2
**tx** 235:3 244:8
 248:1 257:4
**tying** 145:15,18
**type** 125:20 263:4
**types** 168:1
**typewriting**
 316:18
**typically** 237:20
 306:9 309:7

**u**

**u** 39:19
**ultimately** 44:14
 47:14 88:23 90:13
 181:25 189:1
 243:24
**unable** 24:9
**uncertainties**
 237:18
**uncertainty** 40:15
 40:17 237:12,15
**unchanged** 135:16
**uncovered** 207:6
**undercounting**
 296:1
**underlies** 283:18
**underlying** 30:19
 31:9 62:3 63:12
 63:20,23 96:16
 236:20,22 238:5
 274:24
**underscore** 180:11
 180:11,12,12,21
 180:22,22,23
 234:21,25 235:3,4
 235:9 244:9,9
 257:5,5

**understand** 14:3
 16:21 18:17 20:4
 21:18 24:21 26:10
 35:2 43:21 44:21
 45:11 46:10 62:16
 69:15 74:8,17
 80:21 94:24 98:8
 110:24 114:13
 117:18 118:18
 124:22 131:10
 147:16 148:22
 153:8 164:22
 175:14,18 181:19
 187:25 192:10
 193:8 195:16,20
 197:1 200:7,9
 215:13 219:24
 220:4,7,10,19,20
 221:16,17 224:12
 232:23 236:19,23
 243:3,14 250:13
 257:14,21 259:24
 260:14,15 267:3
 268:10,17 269:10
 274:11,14 275:19
 285:9 286:7 290:9
 292:25 294:5
 299:9 304:17
**understanding**
 17:22 41:22 88:13
 90:11,12 99:24
 103:21 105:22,25
 110:12,13,14,24
 123:18,19 125:6
 128:10,15 129:24
 132:2,24 145:21
 152:13 175:21
 176:2 191:14
 200:18 236:12
 246:5,7 264:21
 268:9 274:17

314:14
**understood** 63:22
 130:1 152:6,9
 200:22 201:6,9
 236:18
**undetermined**
 316:9
**unequivocally**
 161:10
**unfair** 293:4,7
**unfortunately**
 174:14
**unique** 133:5
 135:19,25 137:4
**unit** 7:10 277:16
**united** 1:1,15 7:13
 316:9
**units** 27:9,10
 52:16,25 60:17
 65:15 67:18 95:19
 113:18 151:23
 193:15 227:2,23
 276:11 280:3
 286:11,15,20,22
 287:4 290:16,17
 290:19
**universe** 119:4
**unpack** 259:23
**untrue** 123:16
**unusual** 61:17,19
 61:24,24 62:25
 63:1,4 64:4,11
 254:8,25
**upgraded** 245:11
**use** 21:12 26:20
 27:1 46:9,11
 54:10,11 67:23
 68:13 80:25 81:3
 81:4,23 104:6,14
 131:10 169:6
 190:18,22,24

191:11 205:9
216:12,15 218:9
218:17 224:2,10
224:10,11 225:2,5
225:19 226:18
231:6 232:23
236:25 237:2,11
237:14,16,18
240:6 242:23
247:18 254:9
256:21 259:8
268:21 289:17
290:13,22 293:2
297:19 298:6,23
299:5,11 300:23
301:4,13,13
**useful** 58:25 68:8
68:24 74:4 114:25
115:3 124:8 130:2
152:12 218:16
**usefully** 81:9,11
**user** 45:7
**usual** 179:1

**v**

**v** 1:6,8
**vague** 87:14
**vaguely** 59:4
**value** 34:15
**values** 147:22
168:18 288:4,11
**variable** 6:12
**variables** 234:13
**variant** 297:2
**variation** 241:6
**variations** 58:17
103:19 238:2
**varied** 168:13
**variety** 60:16,21
105:24 171:10
**various** 10:6 12:16
32:2,5 36:14

113:24
**verify** 65:16
**veritext** 7:18
318:1,7 321:1
**veritext.com.**
318:17
**version** 4:25 65:20
70:7,22 71:5
111:15,16,25
304:7,9
**versions** 45:5,6
**versus** 67:6 144:4
215:9 233:11
255:2
**video** 7:8,10
**videoconference**
1:12
**videographer** 3:24
7:1,17 8:4,16
64:24 69:17,21
126:3,7,11 174:21
174:25 189:16,20
250:19,23 310:24
311:3 314:25
**videotaped** 1:12
**view** 111:20
**viewed** 301:7
**vii** 190:13
**viii** 190:13
**virginia** 1:16 9:25
11:3,7 28:12 29:5
29:12
**virtually** 47:11
134:8 189:1 253:1
**virtue** 124:15
**visit** 159:15 168:6
**visual** 62:20
**visualize** 193:18
**visualized** 70:15
**visualizing** 66:14

**visually** 64:17
65:10,16

**w**

**w** 2:9
**wacker** 3:3
**wag** 42:13 84:23
87:18 91:21 107:5
149:15 177:2
184:20
**wait** 158:25
**waiting** 26:16
**waived** 316:23
318:19
**walgreen** 2:16,17
**walgreens** 2:16
8:1 16:24 17:12
18:15,20 19:4
23:22 52:11,25
67:13,20 68:1
109:15 143:17
144:16,19,21
145:7,9 159:7,21
160:12,24 313:2
**walk** 31:19 83:4
243:6 260:17
279:1
**walked** 104:25
142:11,17 159:7
162:18,23
**walking** 38:18
**walmart** 3:5 8:14
16:24 17:12 19:4
76:12,22 172:19
258:3,24 259:1,7,8
259:9,11,21 260:7
262:6,15,25
263:10,11,12,20
263:22 264:10
265:17,20,23,25
267:23 268:2,4,14
268:23 269:6,17

270:4,7 271:24
272:12,25 273:6
274:21 275:14
278:11,15,20
279:1,3,8,13,16,24
280:2,9,15,16,24
281:2,2,9,12,16,19
281:24 282:2,3,10
283:6,20,22,24
284:3 285:19,23
287:1,2,3,5,7,14
287:14,17,25
288:6,17 289:25
290:6 299:17
300:17,20 306:5
306:17,23 313:3
**walmart's** 259:16
260:1,2 262:19
271:25 272:13
273:1 287:24
300:23
**want** 21:17 24:11
24:17,17 25:6,14
25:23 26:9,15
40:15 42:20 58:9
65:22 66:3 83:5
94:2 133:3 144:10
149:21,23 153:4
159:3 164:8
185:13 187:21
190:3 195:25
201:22 205:9,9,13
205:18,22 206:20
207:21 211:15
219:2 235:22,22
235:23 236:2,6
237:2 241:20,25
242:11 248:9
258:22 259:23,24
260:17 261:1
268:12 269:14

273:22 279:11
280:7 281:16
286:9,12 293:22
302:12 314:15
**wanted** 26:13
31:25 132:25
187:24 195:9
224:19,24 236:25
237:16,18 259:5
276:16 299:18
307:3
**wants** 150:15
**warehouse** 190:1
192:13,15,19,21
192:24 193:2,7,10
197:12,23,25
199:14 257:22
**warehouses**
190:19 192:16,18
**washington** 3:8
**watson** 14:7
**way** 12:20 14:12
17:6 19:24 23:13
27:14 49:12 55:16
57:17,18,25 58:9
58:22,24 59:19
63:3,5 68:13
91:20 94:1 96:10
111:18 112:20
114:19 135:5
145:23 153:9
172:1 194:10
202:4 206:9
216:25 221:14
226:10 227:7
229:5 241:16
260:22 266:4
270:16 278:12
283:25 285:17
288:23 290:7
292:15,23 293:19

294:4 295:16
296:11,11 297:19
308:3 312:11,20
313:24 317:5,6
**ways** 60:16 68:9
68:11 71:20 72:1
125:2 167:4 296:3
296:4
**we've** 20:18 34:7
48:1,12 56:3
61:19 64:15 65:6
70:6 74:13,14
78:22 79:3 93:9
102:2,23 116:13
131:15 150:21
159:17 160:16
170:17 175:7
187:19 208:20
254:17 275:1
289:11 302:4
303:19 310:13
**weakening** 305:12
305:14
**week** 27:25 172:10
173:1,8,11,15
259:3 263:1,2,7
**weeks** 37:17 38:24
163:21 259:15
264:5,22,24
**weighed** 167:11
**weight** 276:11
277:16
**weighted** 279:24
**went** 74:15 103:20
116:20 123:12
129:17 160:21
**west** 2:14 3:3 11:3
11:7 28:12 29:5
29:12
**whatsoever** 73:19
136:1 313:6

**whereof** 317:8
**whichever** 34:19
58:9
**whispering** 7:4
**wholly** 143:24
**winded** 295:23
**window** 104:1,2,2
104:2 191:10,10
**wit** 316:7
**withholding**
274:25
**witness** 4:2 8:8,8
8:17,19 19:10
23:5,6 24:23 65:3
75:10 84:18 88:1
119:13 133:21
162:13,21,23
174:18 175:17
176:1 179:12
180:9 184:11
189:8 200:4 202:9
204:3 206:7 207:1
208:3,12,19
209:11,23 211:16
212:23 213:18
214:3 215:12
219:17 224:2,9,17
225:2,11 226:24
227:14 229:10
230:15 231:9
232:12 247:11
249:6 253:12
258:1,10 265:15
298:12,22 300:4
300:12 301:19
310:23 311:12,13
311:18 314:13,24
316:16,17,21
318:8,11 319:1,4
319:11 320:1,4,15

**witness'** 318:14
**wonder** 108:11
**wondering** 190:7
**word** 190:24 209:8
290:22 302:3
307:8
**wording** 98:4,6,12
99:5 102:9 103:19
**words** 79:2 102:20
**work** 32:1 47:3,6
53:11 92:9,9,10,11
92:20,21 93:14
95:2,21 96:15
114:14 116:24
119:4 122:13,19
134:8 135:5
152:23 166:12
183:7,9 185:9,16
185:20,22,24
186:5,8,22 187:8
187:24 188:2,7,23
260:22
**workbook** 179:21
180:3
**worked** 123:19
188:20 200:8
251:25
**working** 30:25
34:20 40:10,24
47:17 74:13 89:12
91:17 94:11
136:21 200:12
**works** 50:15
193:17
**world** 68:6 69:7
166:25
**worse** 59:8
**worth** 78:1
**worthwhile**
218:11

**wrinkle** 132:14
**write** 47:9,10
 116:7 139:7
**writing** 47:15 95:7
 102:12 170:12
**written** 5:21 47:13
 102:10,11 104:3
 104:16 112:13,16
 121:16 124:10
 136:11,14 137:10
 137:15 138:16,25
 139:6,22 140:18
 141:10 154:7
 155:12 156:3
 157:3,10 175:9
 236:9 245:6
 294:14 302:25
 303:8 305:21
 309:4
**wrong** 35:25 87:13
 95:6 124:18
 138:13 182:25
 201:22 204:20,23
 212:15,17 249:22
 261:14,17 284:13
 287:21 302:14
**wrote** 47:11
 102:17,19 137:10
 137:15 141:25
 181:5

**x**

**x** 4:1,9 5:1 6:1

**y**

**y** 39:19
**yan** 39:19
**yeah** 48:24 49:3
 149:18 150:1
 215:3 249:18
 307:12

**year** 28:15 30:14
 30:16 32:4,14
 33:3,17,19 35:22
 35:25 46:25 84:18
 89:25 132:20
 148:25 186:23
 194:14 199:24
 212:16 214:3,5
 285:8 288:18
 292:5 293:4 295:1
**years** 11:24 19:12
 25:3 74:3,14
 123:20 174:4
 188:21 201:5
 207:4 255:13,14
 256:13,14 291:9
 291:10,12 294:24
**yellow** 9:9
**yesterday** 13:20
 48:5 210:12
**york** 10:16,19
 49:9
**young** 3:24 7:16

**z**

**zero** 67:13,24 69:4
 72:9,22 73:6,7
 170:25 290:2,25
 291:9,12 293:5
**zeros** 292:24
**zip** 81:8,23 82:10
 169:3 216:16,17
 216:21 217:1,7,9
 217:12,13,20,22
 217:23,25 218:5,9
 218:12,15,15,18
 222:2,9,14,16,22
 223:4,5,6,7,10,12
 223:16,17,23,24
**zoom** 31:16 32:13
 33:1,7,13 36:13
 37:2,12,16 38:8,20

**41**:3,17,25 42:5
 163:13
**zuckerman** 3:6
 8:2
**zuckerman.com**
 3:9

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.