```
 1            UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF OHIO
 2                 EASTERN DIVISION
 3
      IN RE: NATIONAL            )
 4    PRESCRIPTION               )  MDL No. 2804
      OPIATE LITIGATION          )
 5    _____   )  Case No.
                                 )  1:17-MD-2804
 6                               )
      THIS DOCUMENT RELATES TO: )  Hon. Dan A.
 7    CASE TRACK THREE           )  Polster
 8
              MONDAY, FEBRUARY 15, 2021
 9
       HIGHLY CONFIDENTIAL - SUBJECT TO FURTHER
10               CONFIDENTIALITY REVIEW
11                     - - -
12            Remote videotaped deposition of
13    Giant Eagle 30(b)(6) designee Christopher
14    Miller, held at the location of the witness
15    commencing at 10:10 a.m. Eastern Time, on the
16    above date, before Carrie A. Campbell,
17    Registered Diplomate Reporter and Certified
18    Realtime Reporter.
19
20
21                     - - -
22
            GOLKOW LITIGATION SERVICES
23      877.370.3377 ph | 917.591.5672 fax
                 deps@golkow.com
24
25
```

```
 1      R E M O T E     A P P E A R A N C E S :

 2

 3

        LEVIN PAPANTONIO THOMAS MITCHELL
 4      RAFFERTY PROCTOR, P.A.
        BY:  PETER MOUGEY
 5           pmougey@levinlaw.com
             JEFF GADDY
 6           jgaddy@levinlaw.com
             LAURA DUNNING
 7           ldunning@levinlaw.com
             PAGE POERSCHKE
 8           ppoerschke@levinlaw.com
             JULIA METTS
 9           jmetts@levinlaw.com
        316 South Baylen Street
10      Pensacola, Florida 32502
        (850) 435-7000
11

12      and

13

        LANIER LAW FIRM, P.C.
14      BY:  MILDRED CONROY
             mildred.Conroy@Lanierlawfirm.Com
15      126 East 56th Street
        New York, New York 10022
16      (212) 421-2800

17

        and
18

19      NAPOLI SHKOLNIK, PLLC
        BY:  HUNTER J. SHKOLNIK
20           hunter@Napolilaw.Com
             SALVATORE C. BADALA
21           SBadala@NapoliLaw.Com
        270 Munoz Rivera Avenue, Suite 201
22      Hato Rey, Puerto Rico 00918
        (833) 271-4502
23

24      and

25
```

```
 1      WAGSTAFF & CARTMELL LLP
        BY:   THOMAS SIDLINGER
 2           tsidlinger@wcllp.com
        4740 Grand Avenue, Suite 300
 3      Kansas City, Missouri  64112
        (816) 701-1100
 4      Counsel for Plaintiffs
 5
 6
        MARCUS & SHAPIRA LLP
 7      BY:  JOSH KOBRIN
             kobrin@Marcus-Shapira.com
 8      301 Grant Street, 35th Floor
        Pittsburgh, Pennsylvania 15219-6401
 9      (412) 338-4690
        Counsel for HBC
10
11
12
    ALSO PRESENT:
13
        JOSH GAY, Levin Papantonio
14
        JONATHAN JAFFE, Its-Your-Internet
15
16
    VIDEOGRAPHER:
17      DANNY ORTEGA,
        Golkow Litigation Services
18
19
    TRIAL TECHNICIAN:
20      GINA VELDMAN,
        Precision Trial Solutions
21
                        - - -
22
23
24
25
```

```
 1                      INDEX
 2                                        PAGE
 3   APPEARANCES..................................    2
 4   EXAMINATIONS
 5     BY MR. MOUGEY............................    6
 6     BY MR. KOBRIN........................... 265
 7     BY MR. MOUGEY........................... 269
 8
 9                     EXHIBITS
10    No.   Description                         Page
11   1     Notice of Document Deposition         27
            Pursuant to Rule 30(B)(6) and
12          Document Request Pursuant to Rule
            30(B)(2) and Rule 34 to Giant Eagle
13
      3     Christopher Miller, PharmD, résumé     8
14
      4     Chapter One Introduction to          172
15          Pharmacy,
            HBC_MDL00190685 - HBC_MDL00190876
16
      5     4729-5-20 Prospective drug           177
17          utilization review
18   6     E-mail(s),                            212
            GE_TL00001798 - GE_TL00001816
19
      7     Peter Mougey handwritten notes       264
20
21     (Exhibits attached to the deposition.)
22    CERTIFICATE..................................276
23    ACKNOWLEDGMENT OF DEPONENT...................278
24    ERRATA......................................279
25    LAWYER'S NOTES..............................280
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                VIDEOGRAPHER:  We are now on
 2        the record.
 3                My name is Danny Ortega, and
 4        I'm the legal videographer for Golkow
 5        Litigation Services.
 6                Today's date is February 15,
 7        2021, and the time is 10:10 a.m.
 8                This video deposition is being
 9        held in the matter of National
10        Prescription Opiate Litigation MDL,
11        for the United States District Court
12        for Northern District of Ohio, Eastern
13        Division.
14                The deponent today is Chris
15        Miller.
16                All counsel will be noted on
17        the stenographic record.
18                The court reporter today is
19        Carrie Campbell, who will now swear in
20        the witness.
21
22                CHRISTOPHER MILLER,
23    of lawful age, having been first duly sworn
24    to tell the truth, the whole truth and
25    nothing but the truth, deposes and says on
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   behalf of the Plaintiffs, as follows:

 2

 3              DIRECT EXAMINATION

 4   QUESTIONS BY MR. MOUGEY:

 5       Q.    Good morning, Mr. Miller.  My

 6   name's Peter Mougey.  I represent the

 7   plaintiffs in this litigation.

 8              How are you doing this morning?

 9       A.    I'm well.

10              How are you, sir?

11       Q.    I'm well.  I don't know about

12   anybody else, but I'm having just a tad bit

13   of trouble hearing you.

14              Can you move your mic closer or

15   are you at -- as close --

16       A.    How is that, sir?  Is that

17   better?

18       Q.    That's better, yes.

19              Mr. Miller, you should have a

20   box of documents next to you that have a

21   series of manila folders in them.

22              Do you have those handy?

23       A.    I do have the box here,

24   unopened.

25       Q.    Okay.  Why don't you go ahead
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   and open that up, if you can.
 2              MR. MOUGEY:  Gina, we just
 3        received Mr. Miller's CV, or résumé,
 4        so it's -- I don't think you have it.
 5        So, Josh, I'm just going to e-mail it
 6        to Gina.
 7              Gina, is that something you can
 8        pull up?  If not, I can just do it --
 9              GINA VELDMAN:  Yes, of course.
10        Just go ahead and e-mail it to me, and
11        I can get it right in.
12              MR. MOUGEY:  Okay.  All right.
13        Gina, it's on the way from Madison
14        Shelquist from my office.
15   QUESTIONS BY MR. MOUGEY:
16        Q.     Mr. Miller, while we're pulling
17   up the document, I just wanted to walk
18   through some of your background, if you
19   would, sir.
20              Okay?
21        A.     Sure.
22        Q.     And let's start off with
23   school.
24              You went to the University of
25   Pittsburgh, PharmD, correct?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    I went to the University of
 2   Pittsburgh where I earned my PharmD, that's
 3   correct.
 4          Q.    Yes.
 5                And undergrad as well?
 6          A.    Undergrad I attended the
 7   University of Pittsburgh at Johnstown for my
 8   undergraduate requirements to -- for
 9   admission to the school of pharmacy.
10          Q.    Okay.  Great.  Thank you.
11                Mr. Miller, for your
12   convenience I have your CV, or your résumé,
13   right here in front of you.
14                Do you see that, sir?
15          A.    I do, yes.
16                (Miller Exhibit 3 marked for
17          identification.)
18   QUESTIONS BY MR. MOUGEY:
19          Q.    All right.  I'll just mark that
20   as Exhibit 3.
21                Your education is at the top of
22   your CV, or résumé, Mr. Miller.  And you
23   finished your academic studies at University
24   of Pittsburgh with your PharmD in April
25   of 2008, correct, sir?
```

```
 1           A.      I'm sorry, I didn't -- you said
 2    2008, correct?
 3           Q.      Yes.
 4           A.      Yes, I did.
 5           Q.      Okay.  And so when you finished
 6    school in 2008, you started with Giant Eagle.
 7    And actually you were working with them as an
 8    intern, right, right before you finished,
 9    correct, sir?
10           A.      That is correct.
11           Q.      And your only prior work
12    history before then was with a -- two other
13    pharmacies that were intern positions while
14    you were in school, correct, sir?
15           A.      That is correct.
16           Q.      In your experience at Giant
17    Eagle, has -- from -- progressed from intern
18    to staff pharmacist, pharmacy manager to
19    pharmacy district manager, and your current
20    position is pharmacy quality and compliance,
21    correct, sir?
22           A.      That is correct.
23           Q.      Sir, I would like to just focus
24    on your last two roles from July of 2019
25    until the current time, which are senior
```

Highly Confidential - Subject to Further Confidentiality Review

1   manager, pharmacy compliance, and I think the

2   title changed with senior manager, pharmacy

3   quality and compliance.

4           Okay, sir?

5       A.      Sure.

6           Just to clarify, the title

7   necessarily didn't change.  I just had added

8   responsibilities due to a retirement in the

9   company.

10      Q.      Okay.  Perfect.

11          Why don't -- just -- would you

12  give me just a brief description of what your

13  day-to-day duties are, your job description

14  as both pharmacy compliance and pharmacy

15  quality and compliance since July of 2019?

16      A.      Sure.

17          So with pharmacy compliance,

18  it's making sure that all of our pharmacies

19  in our operating states are following any

20  state or federal requirements, in addition to

21  making sure that any accreditations that we

22  hold are maintained, in addition to assist

23  our wholesaling -- or our wholesaler, our

24  internal wholesaler, to make sure that they

25  keep their accreditation and licensure

Highly Confidential - Subject to Further Confidentiality Review

```
 1   present, along with licensure of all of our
 2   pharmacies, and additional requirements with
 3   our wholesaler regarding suspicious order
 4   monitoring as well.
 5        Q.    Sir, let me drill down on a
 6   couple of those areas.
 7             You mentioned state or federal
 8   requirements.  In relation to Schedule II
 9   through V opiates prescriptions, what does
10   your job include regarding state or federal
11   requirements -- state or federal
12   requirements?
13        A.    To -- for clarification, do you
14   mean with the pharmacy, with the wholesaler,
15   or in general?
16        Q.    In general.  What does your job
17   entail?
18             What you mentioned state or
19   federal requirements in your job description,
20   what does that mean to you in respect to your
21   job day-to-day duties with pharmacy
22   compliance or pharmacy quality?
23        A.    Sure.
24             As I had previously stated,
25   it's to make sure that our pharmacies and our
```

```
 1   pharmacists comply with federal and state
 2   regulations.
 3        Q.    Yes, sir.  A little more meat
 4   on the bone, so to speak, would be helpful.
 5              What do you mean by that?
 6        A.    To make sure that our
 7   pharmacies and our pharmacists comply with
 8   state and federal regulations.
 9        Q.    I get that part, the part
10   they're complying with state and federal
11   regs.
12              But what specifically, state
13   and federal regs, are you referring to?
14   What -- in regard to Schedule II through V
15   prescription opiates?
16        A.    To make sure that we follow any
17   state and federal regulation -- or, I'm
18   sorry, let me rephrase that.
19              We follow all federal -- state
20   and federal regulations, no matter if it's
21   regarding opiates or noncontrolled
22   substances.
23        Q.    Anything in particular jump to
24   mind this Monday morning?
25              MR. KOBRIN:  Object to form.
```

```
 1                   THE WITNESS:  What do you mean?
 2   QUESTIONS BY MR. MOUGEY:
 3        Q.    Well, you've mentioned about
 4   four times generally that -- to make sure
 5   that we comply with state and federal
 6   requirements.  I get that.
 7                   What specifically -- what
 8   specific state and federal requirements in
 9   regard to prescriptions of Schedule II
10   opiates fall under your purview as the senior
11   manager of pharmacy quality and compliance?
12              MR. KOBRIN:  Object to form.
13         Asked and answered.
14              THE WITNESS:  I'm sorry, Josh,
15         I couldn't understand what you said.
16              MR. KOBRIN:  I just objected to
17         form and said it was asked and
18         answered.  Don't worry about that.
19              You can answer.
20              THE WITNESS:  There's nothing
21         particular that I would -- that comes
22         to mind.  We follow all -- part of my
23         responsibility is to make sure our
24         pharmacists and pharmacies comply with
25         all federal and state requirements.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. MOUGEY:

 2         Q.     All right.  So you've been in

 3    this role since -- at least senior manager of

 4    pharmacy compliance since July of 2019,

 5    correct?

 6         A.     Correct.

 7         Q.     And prior to that, you were a

 8    pharmacy district manager beginning in July

 9    of 2014 until now, correct?  I'm sorry, until

10    June of 2019?

11         A.     That is correct.

12         Q.     And part of that job

13    description included supervision of regional

14    pharmacy operations, correct?

15         A.     That is correct.

16         Q.     And also part of that job

17    description was monitoring state and federal

18    laws for compliance, correct?

19         A.     That is correct.

20         Q.     And so, sir, since July

21    of 2014, your job at Giant Eagle has been to

22    ensure that pharmacy operations comply with

23    state and federal laws in respect to at least

24    Schedule II through V opiates.  Correct, sir?

25         A.     My responsibility would be to
```

1  make sure that we follow all federal and

2  state regulations.

3      Q.    And so, sir, sitting here today

4  in -- with your job description including

5  complying with state and federal regulations

6  in relation to Schedule II through V opiate

7  prescriptions, you can't recall one specific

8  state or federal requirement that your job

9  included to make sure your folks were in

10  compliance?

11          MR. KOBRIN:  Object to form.

12      Asked and answered.  And this whole

13      line is beyond the scope.

14          And I understand that we're

15      doing a lot of background, and I'm

16      willing to give you some latitude on

17      that, but I don't think we need to

18      kind of rehash the same questions over

19      and over again, as they're all beyond

20      the scope.

21  QUESTIONS BY MR. MOUGEY:

22      Q.    One point -- can you point me

23  to one state or federal reg that from June of

24  '14 until now, in relation to Schedule II

25  through V opiate prescriptions, that your job

Highly Confidential - Subject to Further Confidentiality Review

1    included to make sure Giant Eagle was in

2    compliance?

3                    MR. KOBRIN:  Object to form.

4            Beyond the scope.

5                    THE WITNESS:  I can.

6    QUESTIONS BY MR. MOUGEY:

7            Q.    Okay.  And would that be that

8    you recall?

9            A.    Would you like me to start on

10   the federal level or on a particular state?

11           Q.    Pick it.  You pick where you

12   start.

13           A.    On the federal left there's the

14   Controlled Substance Act.  There's various

15   FDA requirements regarding prescription --

16   regarding prescription drugs as well,

17   including on the wholesaler side.

18                    On the state side, there's --

19   every state that we operate in has various

20   regulations as well, too.

21           Q.    And, sir, that's what -- that's

22   to the extent that you recall any specific

23   requirements that your job included

24   overseeing from June of '14 to now?

25                    MR. KOBRIN:  Object to form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    THE WITNESS:  I'm sorry, I
 2        don't understand your question.
 3                    Are you asking if I have more
 4        specific information?
 5   QUESTIONS BY MR. MOUGEY:
 6        Q.    I'm asking for some specifics
 7   other than, we complied with state and
 8   federal regulations in respect to Schedule II
 9   through V opiates at Giant Eagle.
10                    Anything other than CSA, FDA
11   and state regs?  Anything specific?
12                    MR. KOBRIN:  Object to form.
13                    THE WITNESS:  I'm sorry, I'm
14        not -- are you asking me do I -- can I
15        state individual codes?  Is that what
16        you're looking for?
17                    I'm not understanding your
18        question.
19   QUESTIONS BY MR. MOUGEY:
20        Q.    In your job, your day-to-day
21   duties, complying with state and federal regs
22   as applied to Schedule II through V opiates,
23   prescriptions at Giant Eagle, what specific
24   information can you point me to that you were
25   ensuring Giant Eagle was complying with the
```

```
 1   applicable rules and regs?
 2        A.     To kind of reconfirm up what I
 3   stated before, we were -- we comply with all
 4   federal and state regulations.  I'm not sure
 5   what you're looking for with a specific
 6   answer.
 7        Q.     When I say "job description,"
 8   you understand what I mean by "job
 9   description," right?
10        A.     I do, yes.
11        Q.     And when you show up every
12   morning, whatever time you get there, and
13   you're there all day, your job description
14   includes kind of what you do on a day-to-day
15   basis, right?
16        A.     Yes, that's accurate.
17        Q.     Can you point me to any
18   information, day-to-day job description, of
19   what types of activities you were ensuring
20   that Giant Eagle complied with all state and
21   federal regs in relation to Schedule II
22   through V opiates?
23        A.     So to clarify your question,
24   you mentioned day-to-day activities, not
25   specific regulations; is that correct?
```

```
 1          Q.     We're talking about your
 2   résumé, right?  Got your résumé up, right?
 3          A.     I currently do not see my
 4   résumé.
 5          Q.     Okay.  Well, we're talking
 6   about your job description and what you do
 7   every day.  Okay?  We're pointing to specific
 8   language in your résumé like "monitor state
 9   and federal laws for compliance."
10              What do you mean on your résumé
11   that you complied or monitored state and
12   federal laws for compliance at Giant Eagle
13   from June of '14 all the way to today in
14   relation to Schedule II to Schedule V
15   opiates?
16              MR. KOBRIN:  Objection.  Form.
17              THE WITNESS:  Just as I stated
18          on my résumé, or on my curriculum
19          vitae, to monitor federal and state
20          regulations for compliance.
21   QUESTIONS BY MR. MOUGEY:
22          Q.     All right, we're going to come
23   back to that in more detail.
24              But for now, you also mentioned
25   wholesaler SOMS was part of your job
```

```
 1   description.
 2               What did you mean by wholesaler
 3   SOMS in compliance -- in relation to
 4   Schedule II through V opiates?
 5               MR. KOBRIN:  Object to form.
 6         Beyond the scope.
 7               THE WITNESS:  SOMS stands for
 8         suspicious order monitoring.
 9   QUESTIONS BY MR. MOUGEY:
10         Q.    Yes, sir, thank you.  And I
11   appreciate that.
12               But what do you mean in your
13   job description?  Your day-to-day duties,
14   what did you do from your position as
15   pharmacy district manager, all the way up to
16   senior manager, pharmacy quality and
17   compliance?
18               What were your day-to-day job
19   duties to ensure that the wholesaler
20   suspicious order monitoring systems complied
21   with the applicable federal and state laws?
22               MR. KOBRIN:  Object to form,
23         beyond the scope, and misrepresents
24         his prior testimony.
25               THE WITNESS:  To clarify your
```

Highly Confidential - Subjected to Further Confidentiality Review

1    question, my responsibilities of

2    suspicious order monitoring only took

3    place starting in July of 2019.

4  QUESTIONS BY MR. MOUGEY:

5    Q.    So the description on your

6  résumé, "monitor state and federal laws for

7  compliance" as the pharmacy district manager

8  did not include anything to do with

9  wholesaler, SOMS, suspicious order monitoring

10 systems and policies?

11        MR. KOBRIN:  Object to form.

12        THE WITNESS:  There would be a

13    time when the -- at that time the

14    senior -- or manager or senior manager

15    of pharmacy compliance may ask the

16    pharmacy district manager for

17    additional information regarding a

18    specific location.

19        So I wouldn't say that I wasn't

20    involved, but it wasn't on my

21    day-to-day responsibilities.

22 QUESTIONS BY MR. MOUGEY:

23    Q.    All right.  Your wholesaler

24 SOMS responsibilities.  I'm going to take out

25 day to day, so maybe that will make it a

Highly Confidential - Subject to Further Confidentiality Review

1    litter easier.

2           Your pharmacy -- senior manager

3    pharmacy compliance and pharmacy quality,

4    what did your obligations include regarding

5    wholesaler SOMS?

6           MR. KOBRIN:  Object to form.

7       Beyond the scope.  Asked and answered

8       in the last question.

9           THE WITNESS:  My

10      responsibilities would be to monitor

11      orders for controlled substances

12      placed for our -- with our wholesaler

13      to make sure that they were not of a

14      suspicious nature.

15   QUESTIONS BY MR. MOUGEY:

16      Q.     And what did you do,

17   Mr. Miller, to ensure that Giant Eagle

18   complied with the applicable state and

19   federal laws monitoring wholesaler SOMS?

20      A.     Reviewed various pieces of data

21   elements in addition to suing an external

22   vendor to assist with that process.

23      Q.     And what various pieces of data

24   elements in addition to the external vendor

25   did you do to assist that process?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. KOBRIN:  Object to form.

 2              This is well beyond the scope,

 3         and it's well beyond the scope of

 4         Track 3.

 5              I'm going to let this go for a

 6         little bit because, Peter, because I

 7         think there's some background, but I

 8         suggest you move on at a reasonable

 9         point because -- Peter, just let me

10         get this on the record.

11              If this becomes about

12         suspicious order monitoring and the

13         issues that were covered in discovery

14         in Track 1, which closed several

15         months ago, then I think we're going

16         to have a problem in this deposition.

17              MR. MOUGEY:  Thanks, Josh.

18              I'm just simply asking for a

19         job description, and all I've -- I've

20         gotten answers, "I comply with all

21         state and federal regs."

22              I just asked him, "What did you

23         do?" and I'm going to follow up with

24         the same exact question I just asked,

25         which is very, very simple.  What
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          various pieces of data elements in

 2          addition to the external vendor did

 3          you use to assist you in the process

 4          wherein you monitored wholesaler SOMS?

 5                  MR. KOBRIN:  Right.  And I'm

 6          saying that that very question is

 7          really targeted towards the issues

 8          that are in Track 1 and that have

 9          nothing to do with this litigation,

10          nothing to do with this deposition,

11          and nothing to do with the topics that

12          were noticed for this deposition.

13          This is a 30(b)(6) that is about

14          data --

15                  MR. MOUGEY:  Thank you,

16          Mr. Miller.

17                  MR. KOBRIN:  -- reporting and

18          collecting data.  So I'm a little

19          concerned.

20                  But you're right, it's fair for

21          you to go into background.  I'm okay

22          with that.  I'm just telling you that

23          I don't want this to be something

24          where I suddenly come out of nowhere

25          and say, you know, we're going to end
```

```
 1          this deposition.

 2               I just -- I don't think this

 3          should be the topic of this

 4          deposition.  I think you'd agree with

 5          me on that.

 6               So if you're going to go into

 7          depth on this and this is going to

 8          continue, I'm just saying we're going

 9          to have a problem.

10               MR. MOUGEY:  Hardly in depth.

11          All we've gotten right now is that "we

12          comply with all state and federal

13          regs."

14               So, Mr. Korbin {sic}, you've

15          just said more in your two or three

16          speaking objections than Dr. Miller

17          has said in the first 20 minutes.

18     QUESTIONS BY MR. MOUGEY:

19          Q.    Mr. Miller, again, the question

20     I'm asking, sir, that you can answer, is,

21     what do you mean on your -- in your job

22     responsibilities where you reviewed various

23     pieces of data elements in addition to using

24     external vendor to assist with SOMS review in

25     relation to wholesalers?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                 MR. KOBRIN:  Object to form.
 2        Beyond the scope.
 3                 THE WITNESS:  We look at
 4        current -- we look at trends regarding
 5        dispensing quantities of dispensed
 6        quantities ordered.  We look at
 7        ordering patterns, team members that
 8        would be ordering, and -- in addition
 9        to the vendor that we also utilize to
10        monitor those trends as well.
11   QUESTIONS BY MR. MOUGEY:
12        Q.    So is it fair to say in the
13   monitoring of wholesale vendors that you use
14   dispensing data?
15        A.    As part of that, that is
16   correct.
17        Q.    Amazingly, that's what we're
18   here to talk about today is dispensing data.
19                 Out of your folder, if you
20   would please pull 169, what I've marked as
21   Miller Exhibit 1.
22        A.    Sorry, Mr. Mougey.  You said
23   169, correct?
24        Q.    Folder 169.  It's a manila
25   folder.  169 is on the label.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      Yes, I see it.

 2          Q.      Marked this as exhibit --

 3   Miller Exhibit 1 --

 4               (Miller Exhibit 1 marked for

 5          identification.)

 6   QUESTIONS BY MR. MOUGEY:

 7          Q.      -- Mr. Miller, and it's titled

 8   "Notice of Document Deposition Pursuant to

 9   Rule 30(b)(6)."

10               Do you see that, sir?

11          A.      I do, yes.

12          Q.      Sir, have you seen this before?

13          A.      I've seen it very briefly, yes.

14          Q.      Sir, if you would, please turn

15   to page 2 of Miller Exhibit 1.

16               Duty to prepare.  Do you see

17   that, sir, at the bottom of the page?

18          A.      I do, yes.

19          Q.      And the first sentence reads,

20   sir, "The testimony elicited in the

21   deposition represents Giant Eagle's

22   knowledge, not the individual deponent's

23   knowledge."

24               Do you see that, sir?

25          A.      I do, yes.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Sir, do you understand today

2  that you are here testifying on behalf of

3  Giant Eagle?

4    A.    I do understand, yes.

5    Q.    And, sir, the answers to your

6  questions, these aren't -- as we go forward,

7  Mr. Miller, the answers to your questions

8  represent responses by the corporation.

9    A.    I understand.

10    Q.    All right.  So instead of

11  having a Mr. Miller jersey on today, you have

12  a Giant Eagle jersey on.

13        Does that make sense?

14    A.    It does.

15    Q.    And as the representative of

16  Giant Eagle, still under the Duty to Prepare

17  section, you must "conduct a thorough

18  investigation in response to the deposition

19  notice," and that a witness, and that's you,

20  "must be prepared to testify all matters

21  known or reasonably available to the

22  organization."

23        Do you see that, sir?

24    A.    I do, yes.

25    Q.    And, sir, have you conducted a

```
 1   thorough investigation?

 2       A.     I believe so, yes.

 3       Q.     I'm sorry, say that again?

 4       A.     I believe so, yes.

 5       Q.     Let me just -- have you -- have

 6   you conducted a thorough investigation to

 7   prepare yourself on the topics that -- 1 and

 8   2 that are listed in the subpoena?

 9       A.     Yes.

10       Q.     So I apologize.  I'm getting a

11   lot of -- I'm getting some humming and

12   feedback.  Is anybody else?

13       A.     I also hear a little humming

14   and feedback.

15              MR. KOBRIN:  Does that mean

16       it's coming from me somehow?

17              MR. MOUGEY:  I don't know.

18       There's a lot of people on.

19              Is there a way to tell where

20       it's coming from?  Maybe it's me.

21              (Discussion off the record.)

22   QUESTIONS BY MR. MOUGEY:

23       Q.     So, Mr. Miller, did you

24   interview anyone in preparation, outside of

25   counsel, for -- to prepare for your
```

Highly Confidential - Subject to Further Confidentiality Review

1   deposition today?

2       A.      I'm sorry, to clarify your

3   question, did you mean talk to anybody

4   without counsel present or outside of talking

5   to counsel?

6       Q.      Let's do with counsel present

7   just to be the broader.  And I don't want to

8   know what you talked to counsel about.

9           But have you -- did you

10  interview anyone to prepare yourself today

11  for your testimony?

12      A.      Yes, I did.

13      Q.      And who was it that you spoke

14  with, sir?

15      A.      I talked to numerous

16  individuals.  Robert McClune.

17      Q.      Robert McClune?

18      A.      That is correct.

19      Q.      All right.  And other than

20  Mr. McClune, who did you speak with?

21      A.      Joseph Lazzaro.

22      Q.      All right.

23      A.      Mahesh Murthy.  James Cornwell.

24  Steven Mittereder.

25      Q.      Can you spell that last one for

Highly Confidential - Subject to Further Confidentiality Review

1   me?

2          A.      To my best that I can,

3   M-i-t-t-e-r-d-e-r {sic}.

4          Q.      Pronounce it one more time for

5   me?

6          A.      Mittereder.

7          Q.      Okay.  Great.

8                  Anyone else?

9          A.      Michael Chappell.

10         Q.      Anybody else?

11         A.      I believe that's it.

12         Q.      Okay.  All right.  Robert

13  McClure {sic}.  Tell us what you spoke with

14  Robert McClure about.

15                 MR. KOBRIN:  I'm going to

16         object to form.  And those

17         conversations happened with me

18         present, so I'm going to ask that -- I

19         understand that that's privileged, and

20         I'm going to tell the witness not to

21         answer that.

22                 I'm sure if you want to talk

23         about how long he spoke and other

24         stuff, but I was infinitely involved

25         in those conversations, Peter.

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. MOUGEY:
 2         Q.     What was the topic that you
 3    spoke to Dr. McClure about -- or Mr. McClure,
 4    I'm sorry?
 5              MR. KOBRIN:  We can talk
 6         generally about which topics of the
 7         two topics, but I don't want you to go
 8         beyond the two topics that have been
 9         noticed.
10              I can tell you right now I'll
11         stipulate that that's what he talked
12         to them about, was the two topics in
13         the notice.  I don't want him to get
14         more specific than that because I
15         think that's privileged.
16              I mean, that may have been what
17         you meant by "topics," but I want to
18         clarify that.
19              So if you want to -- Chris, if
20         you want to look at the topics and
21         tell him which topics you think you
22         talked about {audio interruption} --
23              MR. MOUGEY:  No, that's not
24         what I want him to do.
25              You're instructing the witness
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          not to answer what part of his

 2          investigation was and his

 3          conversations with these individuals?

 4                MR. KOBRIN:  He can talk about

 5          his investigation generally and how he

 6          researched this stuff.  I don't want

 7          him to get into his conversations with

 8          individuals that he had with me.

 9          Those are conversations with me and

10          other individuals.

11                MR. MOUGEY:  I'm not asking

12          about conversations he had with you.

13          I'm asking about conversations --

14                MR. KOBRIN:  Okay.  Well, if he

15          had any conversations independent of

16          me, he can talk about them if they're

17          related to his preparation for today.

18          But if they were at my instruction or

19          if they were with me, then I think

20          they're privileged.

21                So you can inquire into that.

22    QUESTIONS BY MR. MOUGEY:

23          Q.    Were there lawyers present at

24    each one of these individuals you just gave

25    us, at each one of your conversations with
```

1   those people?

2        A.     I'm sorry, are you asking if my

3   conversations with these individuals had

4   counsel present?

5        Q.     That's what I'm asking.

6        A.     Yes.

7        Q.     Explain to me what

8   Mr. McClure's role at Giant Eagle is -- was.

9        A.     When he was overseeing pharm --

10  when he had a role within pharmacy, he was

11  overseeing the pharmacy procurement team,

12  which involves pharmacy analytics.

13       Q.     And when was Mr. McClure with

14  Giant Eagle?

15       A.     I didn't look at his personnel

16  file.  I don't have the specific ranges.  But

17  he's still with Giant Eagle.

18       Q.     Who identified these people for

19  you to go talk to?

20       A.     Counsel.

21       Q.     Do you know Mr. McClure?

22       A.     I do, yes.

23       Q.     That's a bad question.

24              Do you know Mr. McClure outside

25  of the meeting you had in preparation for

```
 1   today?
 2        A.     Do you mean do I know
 3   Mr. McClune socially?
 4        Q.     Outside of the meetings you had
 5   to prepare for your testimony today, do you
 6   know Mr. McClure {sic}?
 7        A.     Yes.
 8               MR. KOBRIN:  It's McClune,
 9        Peter.
10   QUESTIONS BY MR. MOUGEY:
11        Q.     Is there still a
12   pharmacy procurement team, Mr. Miller?
13        A.     There is, yes.
14        Q.     And who is in charge of the
15   pharmacy procurement team now?
16        A.     Currently it is Aaron Hart.
17        Q.     And do you have an
18   understanding of what the pharmacy
19   procurement team does at Giant Eagle?
20        A.     I do.
21        Q.     And what is -- what is the
22   scope of that department within Giant Eagle?
23        A.     Currently it's for ordering --
24   ordering prescription medications for use in
25   our warehouse.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         Q.      Outside of ordering, what else
 2    does pharmacy procurement do within HBC?
 3                 MR. KOBRIN:  Object to form.
 4         Beyond the scope.
 5                 THE WITNESS:  I'm sorry, do you
 6         mean within Giant Eagle?
 7    QUESTIONS BY MR. MOUGEY:
 8         Q.      Yes.
 9         A.      They also have -- they also
10    maintain a few individuals that complete
11    analytics.
12         Q.      What do you mean by
13    "analytics"?
14         A.      Creating --
15                 MR. KOBRIN:  Object to form.
16         Beyond the scope.
17                 THE WITNESS:  Creating reports.
18    QUESTIONS BY MR. MOUGEY:
19         Q.      What kind of reports?
20                 MR. KOBRIN:  Object to form.
21         Beyond the scope.
22                 THE WITNESS:  Analyzing
23         prescription -- prescription data,
24         ordering data.
25
```

Highly Confidential - Subject to Further Confidentiality Review

1    QUESTIONS BY MR. MOUGEY:

2        Q.    When you say "analyzing

3    prescription data," what do you mean,

4    Mr. Miller?

5            MR. KOBRIN:  Object to form.

6            Again, we're kind of treading

7        threading into new territory.

8            You can answer, if you know,

9        Chris.

10           THE WITNESS:  Are you looking

11       for specifics or generality,

12       Mr. Mougey?

13   QUESTIONS BY MR. MOUGEY:

14       Q.    Well, right now I'm just asking

15   you to explain what you mean in analyzing

16   pharmacy data within the procurement team.

17           MR. KOBRIN:  Again, object to

18       form.  Beyond the scope.

19           But you can answer to the

20       extent that you know, Chris.

21           THE WITNESS:  We look at drug

22       utilizations for potential orders or

23       what orders we might -- or what

24       prescriptions we may want to move into

25       our warehouse based on cost, in

Highly Confidential - Subject to Further Confidentiality Review

```
 1          addition to drug usage at pharmacies,

 2          based on, you know, if we need to

 3          increase or decrease supply within our

 4          warehouse.

 5   QUESTIONS BY MR. MOUGEY:

 6          Q.     When you say "drug

 7   utilizations," what do you mean, Mr. Miller?

 8               MR. KOBRIN:  Object to form.

 9          Beyond the scope.

10               THE WITNESS:  The quantity of

11          drugs dispensed.

12   QUESTIONS BY MR. MOUGEY:

13          Q.     Is that similar to a drug

14   utilization review, or DUR?

15          A.     It is not.

16          Q.     Is pharmacy procurement, as far

17   as you understand, more of a logistics

18   managing supply and demand?

19          A.     That's a way to look at it,

20   yes.

21          Q.     Is there any compliance role

22   within pharmacy procurement analyzing

23   pharmacy data in relation to the state and

24   federal regs you mentioned earlier?

25               MR. KOBRIN:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Beyond the scope.

 2                 You can answer, if you know,

 3            Chris.

 4                 THE WITNESS:  There's

 5            compliance pieces to ensure that

 6            paperwork is completed and filed.

 7    QUESTIONS BY MR. MOUGEY:

 8            Q.    What kind of compliance pieces,

 9    Mr. Miller?  Complying with what?

10                 MR. KOBRIN:  Object to form,

11            asked and answered, and beyond the

12            scope.

13                 You can answer, if you know,

14            Chris.

15                 MR. MOUGEY:  Josh, can I ask

16            you a favor?  If -- can we just have a

17            standing -- if you're going to make

18            objections to form and objections to

19            scope, obviously that's within your

20            purview.

21                 But if you could just hold back

22            the direction to answer, and let's --

23            can we just conclude that Mr. Miller

24            can answer, and if you instruct him

25            not to answer, obviously then we can
```

```
 1           deal with that as it comes up.  But
 2           just to shorten down your objections.
 3                MR. KOBRIN:  I think that's
 4           reasonable in some situations.  There
 5           may be situations in which I want to
 6           express something to Mr. Miller, and
 7           I'd rather do it on the record -- I
 8           mean, I'd rather make a record of it
 9           because I want him to know that he's
10           good to answer it.
11                MR. MOUGEY:  I appreciate that,
12           Mr. Kobrin, but I also don't want
13           you-all interspersed in my transcript,
14           which right now you are.  And you've
15           given multiple speaking objections.
16                If you could please limit your
17           objections to the proper objection,
18           that would be fantastic.  And also,
19           just shorten down the -- addressing
20           the witness whether to answer or not
21           so I don't have so much of you on the
22           transcript.
23    QUESTIONS BY MR. MOUGEY:
24           Q.   So, Mr. Miller --
25                MR. KOBRIN:  I'll do my best on
```

Highly Confidential - Subject to Further Confidentiality Review

```
1         that, Peter, but as you know, the
2         special master has already decided
3         that some speaking objections, similar
4         or if not identical to the ones I've
5         made, are completely acceptable in
6         this case.  And I don't think I've
7         actually made any speaking objections
8         beyond the fact that I've told the
9         witness that he can answer.  So if you
10        don't want me to do that, I won't do
11        that going forward as much unless I
12        see a necessity for it.
13             But I think it's also fair to
14        say that the witness was not prepped
15        on these issues because they're well
16        beyond the scope of the topics.  So he
17        may not know them or he may not feel
18        comfortable doing his own personal
19        testimony about them because, as
20        you've told him, he's wearing a Giant
21        Eagle jersey, not a Chris Miller
22        jersey.
23             MR. MOUGEY:  Certainly.  And
24        that was about as clear a speaking
25        objection as I can get.  You've said
```

```
 1           more than Mr. Miller in the last 30 or

 2           45 minutes.  So let's just go back to

 3           Mr. Miller.

 4    QUESTIONS BY MR. MOUGEY:

 5           Q.    Let me see if I can -- is there

 6    any compliance role within pharmacy

 7    procurement analyzing pharmacy data in

 8    relation to the state and federal regs that

 9    you identified earlier?

10               MR. KOBRIN:  Object to form.

11           Object to beyond the scope.

12               THE WITNESS:  Mr. Mougey, are

13           you asking with the analysis or with

14           the actual procurement?

15    QUESTIONS BY MR. MOUGEY:

16           Q.    Well, you mentioned earlier

17    when testimony was that in part of the

18    pharmacy procurement role that they analyze

19    data, correct, sir?

20           A.    That is correct.

21           Q.    So what I'm asking you, sir,

22    is, was there any compliance role within

23    pharmacy procurement and the data that it

24    analyzed in relation to compliance with state

25    and federal regs?
```

```
 1              MR. KOBRIN:  Object to form.
 2              THE WITNESS:  With regarding
 3         procurement -- with regarding
 4         procurement, there is recordkeeping
 5         aspects insofar as making sure the DEA
 6         forms 222 are complete.  Invoices are
 7         marked as received and complete.
 8    QUESTIONS BY MR. MOUGEY:
 9         Q.    What role was Mr. Murphy {sic}
10    in at Giant Eagle?
11         A.    Mr. Murthy oversaw the
12    individuals who run analytics.  So he was
13    manager of pharmacy analytics, I believe his
14    title was.
15         Q.    Part of our job today,
16    Mr. Miller, between you and I, is to get our
17    lingo down as much as we can and we're saying
18    the same things.
19              When you say "run analytics,"
20    what do you mean?
21         A.    The analysis of the pharmacy
22    data.
23         Q.    Okay.  So your definition of
24    analytics is analysis of pharmacy data.
25              What pharmacy data are you
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    referencing in respect to Mr. Murthy and

 2    running analytics?

 3              MR. KOBRIN:  Object to form.

 4         Beyond the scope.

 5              THE WITNESS:  Any drug usage.

 6         It could be drug dispensing, drug

 7         ordering, insurance use or

 8         insurance -- percentage of what

 9         particular type of insurance is being

10         used.  It would be the analysis of

11         pharmacy ordering and dispensing data

12         in general.

13              MR. MOUGEY:  I'll tell you

14         what.  I'd like to take a few-minute

15         break, and let's figure out what the

16         humming and the noise is in the

17         background.

18              MR. KOBRIN:  Is that still on?

19              MR. MOUGEY:  Yes, I'm still --

20              MR. KOBRIN:  Is that still

21         bothering all of you guys?  Hold on

22         one second.  Let me hit mute and see

23         if it's --

24              MR. MOUGEY:  It's bothering me.

25              MR. KOBRIN:  I'm afraid it's my
```

```
 1          machine, because I'm not hearing it.

 2               Can you hold on one sec?

 3               MR. MOUGEY:  It's like feedback

 4          almost.

 5               (Discussion off the record.)

 6               MR. MOUGEY:  Let's go ahead and

 7          go off for a second.

 8               VIDEOGRAPHER:  The time right

 9          now is 10:48 a.m.  We are off the

10          record.

11           (Off the record at 10:48 a.m.)

12               VIDEOGRAPHER:  The time right

13          now is 11 a.m.  We are back on the

14          record.

15     QUESTIONS BY MR. MOUGEY:

16          Q.    All right.  Mr. Miller, the

17     second person I think you identified you met

18     with is -- his first name was Joseph?

19          A.    Joseph Lazzaro.

20          Q.    Mr. Lazzaro.

21               What was Mr. Lazzaro's role at

22     Giant Eagle?

23          A.    Mr. Lazzaro oversees the

24     information technology of pharmacy.

25          Q.    And Mr. or Mrs. Murphy?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.     Mr. Murthy, Mahesh Murthy, was
 2    the manager or senior manager of pharmacy
 3    analytics.
 4          Q.     Is pharmacy analytics a
 5    different group or department than pharmacy
 6    procurement?
 7          A.     If falls under the pharmacy
 8    procurement team.
 9          Q.     Okay.  And I think I have James
10    or Jane Cartwall {sic}?
11          A.     James Cornwell?
12          Q.     Okay.
13          A.     He is the manager of pharmacy
14    support.  He is under Mr. Lazzaro.
15          Q.     And what's your understanding
16    of pharmacy support?  What is their role?
17          A.     To assist with any dispensing
18    software issues and support the stores with
19    any technological glitches.
20          Q.     And Steven Mittereder?
21          A.     He is a technologies support
22    representative outside of pharmacy who helps
23    support the -- our data warehouse.
24          Q.     Who helps support the what?
25    I'm sorry?
```

```
 1          A.     It's okay.  Are you getting --
 2   are you getting an echo still?
 3          Q.     Just your audio quality is
 4   not -- is not good.
 5                 And I think, quite frankly,
 6   it's probably a little bit of combination of
 7   what we identified earlier, and my guess is
 8   it's also the quality of the mic.  So we'll
 9   just have to deal with it.
10                 Okay.  What I believe you said
11   is that his role was technology support
12   outside of pharmacy who helps support our
13   data warehouse.
14                 Is that what you said, sir?
15          A.     That is correct.
16          Q.     Okay.  And then I think the
17   last individual you identified was Michael --
18   is it Chipperole {sic}?
19          A.     Chappell.
20          Q.     Chappell?
21          A.     Yes, sir.
22          Q.     And what was Michael Chappell's
23   role?
24          A.     He oversees pharmacy
25   operations.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.      Did you meet with these people

 2    individually or as a group?

 3          A.      Mostly with a group.

 4          Q.      Mostly with a group.

 5                  And did you meet with any of

 6    them individually?

 7          A.      Not that I recall.  Most of

 8    them were all in conversations.

 9          Q.      Okay.  So when you say "most of

10    them" were in a group, but you don't recall

11    any individual, you don't recall any

12    individual meetings?

13          A.      I don't recall an individual

14    meeting with any particular individual,

15    correct.

16          Q.      And when we say "as a group,"

17    do you mean each of these people were present

18    at each of the meetings?

19          A.      Not everybody was present at

20    each meeting.  They were -- group meetings

21    occurred throughout different times.

22          Q.      Okay.  So these meetings were

23    with different -- different people in this

24    group?

25          A.      There were different meetings
```

1   with the different peoples in this group at

2   different times.

3          Q.      How many different meetings

4   were there?

5          A.      To my best recall, more than

6   five.

7          Q.      Okay.  "More than five" meaning

8   50 or "more than five," maybe six?

9          A.      I'd say more than five.  I'm

10  guessing less than ten.  I didn't count --

11         Q.      Okay.  More than five, less

12  than ten.

13                 And how long were the meetings

14  on average?

15         A.      They ranged in length.  I'd say

16  on average, two to three hours.

17         Q.      Did you take notes during these

18  meetings?

19         A.      Under direction of counsel,

20  yes.

21         Q.      And do you have those notes

22  with you today?

23         A.      I do not currently in front of

24  me.

25         Q.      Do you have access to them

Highly Confidential - Subject to Further Confidentiality Review

```
 1    wherever you are, your office or house?

 2         A.     I do.

 3              MR. KOBRIN:  I'm going to

 4         object to form.  Those were taken, and

 5         they were taken with my guidance, and

 6         I was on all those calls.  They were

 7         Zoom calls, just for clarity, Peter.

 8              MR. MOUGEY:  And, Mr. Kobrin,

 9         is it your direction today to tell --

10         advise Mr. Miller not to answer any

11         questions about any of the

12         conversations that occurred when

13         Mr. Miller was educating himself to

14         fulfill his obligations as the

15         corporate rep?

16              MR. KOBRIN:  No.  I think there

17         are probably zones of questioning,

18         such as you've just conducted

19         effectively here, that don't get to

20         privileged information.  It's only the

21         privileged content that I'm concerned

22         about.

23              MR. MOUGEY:  Well, I just asked

24         him what these folks' role was.  I

25         asked earlier what the
```

Highly Confidential -- Subject to Further Confidentiality Review

1    conversations -- what he discussed

2    with each of these individuals, and

3    you instructed him not to answer.

4         Is that going to be -- if I

5    start asking any questions about what

6    was discussed during these group

7    meetings, is your instruction to

8    Mr. Miller going to be not to

9    answer -- not to answer these

10   questions?

11        MR. KOBRIN:  No, I think I

12   said -- and if I wasn't clear enough,

13   I apologize.  But I think I said that

14   you could ask him which topics he

15   spoke about, but I stipulated that

16   conversations were about the two

17   topics.

18        If you want to get into

19   generalities about what areas they

20   discussed with him, that could be

21   allowable, but I think you're treading

22   really close to the privilege.  And so

23   I don't want him to answer without

24   recognizing that he's providing

25   privileged information.

```
 1            So I'm a little wary of you

 2       getting into conversations with myself

 3       and my client and client

 4       representatives that I think are

 5       clearly privileged, and so I would

 6       suggest --

 7            MR. MOUGEY:  I'm not asking

 8       about -- Mr. Korbin -- and I feel like

 9       I'm wasting a lot time on this, more

10       than we have in any of these other

11       four of these.

12            Mr. Kobrin, I haven't --

13            MR. KOBRIN:  Kobrin.

14            MR. MOUGEY:  I haven't asked

15       any questions about conversations with

16       you.  And I'm not -- I don't care if

17       you were there or not.

18            What I'm asking you is, in

19       your -- what you directed Mr. Miller.

20       And I specifically understood what you

21       told Mr. Miller was if he wanted to

22       tell me whether it was Topic 1 or

23       Topic 2, he can answer that, but

24       outside of that he wasn't going to

25       answer any questions.  Maybe you had
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1         an opportunity over our five-minute

 2         break to go consult one of your

 3         colleagues.

 4              But the fact of Mr. Miller's

 5         conversations as part of his

 6         obligation to educate himself today to

 7         testify, your instruction to

 8         Mr. Miller today is not to answer

 9         specific questions about what was

10         discussed in these meetings with other

11         Giant Eagle employees, correct?

12              MR. KOBRIN:  Let me be clear

13         here, Peter.

14              MR. MOUGEY:  Yes.

15              MR. KOBRIN:  I don't want to

16         waste a lot of time.

17              MR. MOUGEY:  Well, it's too

18         late.

19              MR. KOBRIN:  I was involved in

20         asking and providing information

21         during all of these conversations.  I

22         was not a mere bystander.

23              So any of these conversations

24         were privileged, all right?  All of

25         these people were also client
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          representatives.  They all work for

 2          Giant Eagle, as does Mr. Miller, and

 3          Giant Eagle is my client.

 4               MR. MOUGEY:  All right.

 5               MR. KOBRIN:  So if you want to

 6          try and ask questions, you can see if

 7          you can ask them without breaching the

 8          privilege.  But I would request that

 9          you be careful in doing so because I

10          think we can both recognize that those

11          conversations with me and my clients

12          are privileged.

13               MR. MOUGEY:  What I'm asking

14          and what I believe that you already

15          instructed the witness to answer --

16          and I'd like to move on from here.

17          I'm not asking about Mr. Miller's

18          conversations with you.  I've never

19          asked him about any conversations with

20          you.

21               What I'm asking is, I'd like

22          to -- I'd like to ask Mr. Miller about

23          questions he had with each of these

24          individuals, conversations he had with

25          each of these individuals, and the
```

```
1         specific information discussed.
2              The fact that you're present at
3         those meetings does not make those
4         meetings privileged.
5              And I just want you to -- I
6         want to clearly state on the record, I
7         don't want to waste any time, because
8         I want to come back later if I need
9         and preserve whatever rights we have.
10             But other than pointing to 1 or
11        2, Topics 1 or 2, my understanding is
12        you've told -- you've instructed
13        Mr. Miller not to answer specific
14        questions about what was specifically
15        discussed during these informational
16        meetings when he was educating himself
17        for today's testimony.
18             MR. KOBRIN:  I said you can try
19        and ask what he generally discussed,
20        but I've also made clear that your
21        representation of those conversations
22        is inaccurate.  I was not a mere
23        bystander.  I was answering and asking
24        questions during all of those
25        conversations.  So the bulk of those
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1           conversations, under law in federal
 2           court, are privileged.
 3                If you want to try and get more
 4           specific than the topics, you can try,
 5           and you can see if those questions
 6           don't breach the privilege.
 7                My advice to you was that you
 8           ask on Topics 1 and 2 because I will
 9           concede that those questions don't
10           breach the privilege, and I won't
11           interfere or object.  And I know you
12           don't want me objecting.
13                So if you want to try and go
14           beyond Topics 1 and 2, you can try.
15           I'm telling you right now, I'm not
16           going to assert the privilege if you
17           ask purely about whether they talked
18           about Topic 1 or 2.
19                Does that make sense?
20      QUESTIONS BY MR. MOUGEY:
21           Q.    Mr. Miller, what specific
22      topics -- what did you discuss with
23      Mr. McClure {sic}?
24           A.    The maintenance of our --
25                MR. KOBRIN:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    And Chris, I would just ask you
 2           to please be careful not to breach the
 3           privilege, share any information in a
 4           conversation that I was involved in
 5           with you or Mr. McClune.
 6    QUESTIONS BY MR. MOUGEY:
 7           Q.     What did you discuss with
 8    Mr. McClure {sic} specifically?
 9           A.     How our data is stored.
10           Q.     What did you discuss
11    specifically with Mr. Lazzeer?
12           A.     Lazzaro?  To clarify?
13           Q.     Yes, Lazzaro, Lazzeer.  Yes,
14    sir.
15           A.     I'm not aware of a Mr. Lazzeer,
16    but Mr. Lazzaro we talked about the record
17    and the storage of our data.
18           Q.     And Mr. Murthy?
19           A.     The same as the previous
20    answer, the recording and the maintenance of
21    our data.
22           Q.     And Mr. Cornwall {sic}?
23           A.     The same answer.  The
24    maintenance and storage of our data.
25           Q.     Your conversations with each of
```

Highly Confidential - Subject to Further Confidentiality Review

1    these people were about the maintenance and

2    storage of our data?

3         A.     That is correct.

4         Q.     Mr. Miller, let's see if you

5    and I can get some lingo down, just kind of

6    start building out what our goals are for

7    today.

8                If I -- if I use the term "user

9    interface," does that make sense to you?

10        A.     Do you mean the dispensing

11   software -- the recordkeeping

12   system software?

13        Q.     I'm just asking you -- sir,

14   just focus on the question I asked you.

15               Do you know what a user

16   interface is?

17        A.     I'm asking a clarifying

18   question, sir.

19        Q.     Do you know what a user

20   interface is?

21        A.     Again, I'm asking a

22   clarification question.

23               Are you referencing the

24   recording and dispensing software?

25        Q.     You understand this litigation

Highly Confidential - Subject to Further Confidentiality Review

```
 1   is about opiates, right, sir?

 2        A.     I do.

 3        Q.     It's about opiate

 4   prescriptions, correct, sir?

 5        A.     That's my general

 6   understanding, yes.

 7        Q.     And you understand we're here

 8   today to talk about data and maintenance,

 9   collection, of opiate data kept at Giant

10   Eagle, right?

11        A.     Yes.

12        Q.     Okay.  I'm glad we cleared that

13   up.

14               So a user interface in that

15   context, do you understand what that is?

16        A.     And again, I'm asking a

17   clarification question, if you're referring

18   to the recording and dispensing software.

19        Q.     What do you mean by the word

20   "software"?

21        A.     A computer program.

22        Q.     A computer program.

23               What software, computer

24   program, was used at the store level by the

25   pharmacist and the teams?
```

```
 1          A.    We currently use the PDX

 2    product Workflow, EPS Workflow.

 3          Q.    I'm sorry, you went out on me

 4    again, sir.

 5                PDX product Workflow, EPS

 6    Workflow?  Is that what you said?

 7          A.    That is correct.  The product

 8    is by -- a product by PDX, and it's called

 9    EPS Workflow.

10          Q.    Now, if I use the -- if I use

11    the term "local" or "store level," what does

12    that mean to you?

13          A.    Just that.  Information or

14    storage at the store level.

15          Q.    Okay.  So you referred to just

16    the PDX as just PDX?

17          A.    That's how we refer to it

18    in-house, that's correct.

19          Q.    Okay.  So is any pharmacy data

20    stored at the store level?

21          A.    Yes.

22          Q.    And explain -- if I use the

23    word "data architecture" or "architecture,"

24    does that make sense to you?

25          A.    It does.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.      And what does that mean to you,
 2   Mr. Miller?
 3          A.      The data that would be
 4   stored -- the encompassing data that would be
 5   stored at the local level.
 6          Q.      Did you use the word -- was it
 7   "counseling" data?
 8          A.      That could be data that would
 9   be stored at the local level.
10          Q.      What -- when you said "data," I
11   thought you said "counseling."
12                  What did you -- what was your
13   answer to when I asked about what
14   architecture means to you, data architecture?
15          A.      I believe my response was
16   encompassing data, not counseling data.
17                  MR. MOUGEY:  I'll tell you
18          what, Mr. Kobrin, let's do this.  I'm
19          not going to do this all day.  Okay?
20          I'm having trouble --
21                  MR. KOBRIN:  I can hear him.
22                  MR. MOUGEY:  Well, the court
23          reporter is having trouble and I'm
24          having trouble, and --
25                  MR. KOBRIN:  Hold on.  Hold on.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Hold on.  Calm down, Peter.
 2               MR. MOUGEY:  No, no, no --
 3               MR. KOBRIN:  I'm trying to
 4          resolve this, because the couple times
 5          here you've said you cut out, he's
 6          cutting out for me.  And I don't know
 7          if that's because you guys are further
 8          away.
 9               Is there anyone on tech from
10          Golkow who would know why I'm not
11          having this problem and you are?
12               MR. MOUGEY:  Carrie's been
13          doing this a long time, and I've sat
14          through enough depositions that I know
15          it's almost verbatim what comes out of
16          the witness' mouth, and I think both
17          of us are having trouble.  So
18          whether --
19               MR. KOBRIN:  Hey, Carrie --
20               MR. MOUGEY:  Hold on a second.
21               MR. SHKOLNIK:  Can we go off
22          the record while this conversation
23          happens so we're not eating up more of
24          this time?
25               MR. MOUGEY:  I'll tell you
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          what.  You --

 2               MR. KOBRIN:  I want to see --

 3               MR. MOUGEY:  Hold on a second.

 4               MR. KOBRIN:  You seem to be

 5          accusing us of something here.

 6               MR. MOUGEY:  No one is accusing

 7          you of anything, but I'm not going to

 8          conduct this depo like this.  So as

 9          Hunter suggested, let's go off the

10          record.  I'm okay with trying to fix

11          this problem, but I've pretty much

12          wasted almost an hour with trying to

13          fix this stuff.

14               So let's go off the record

15          and --

16               MR. KOBRIN:  Before we go off

17          the record -- hold on.  Before we go

18          off the record, can I just ask Carrie:

19          Where are you?

20               COURT REPORTER:  I'm in

21          St. Louis, Missouri.

22               MR. KOBRIN:  Okay.

23               GINA VELDMAN:  It has nothing

24          to do with our geographical location.

25               MR. MOUGEY:  Absolutely not.
```

```
 1              MR. KOBRIN:  Okay.  Then I want
 2       the record to reflect I'm not having
 3       this problem, and I don't know if the
 4       witness is having this problem.  I
 5       don't deny that you are having a
 6       problem.  I understand.  I'm not
 7       disputing that.  It's just not
 8       something that we're experiencing --
 9       or I'm experiencing.
10              Chris, are you experiencing
11       this problem?
12              MR. MOUGEY:  I'm asking -- I'll
13       tell you what.  This is --
14              MR. KOBRIN:  We can go off the
15       record.
16              MR. MOUGEY:  We're off the
17       record.  Thank you.
18              VIDEOGRAPHER:  The time right
19       now is 11:17 a.m.  We are off the
20       record.
21        (Off the record at 11:17 a.m.)
22              VIDEOGRAPHER:  The time right
23       now is 11:24 a.m.  We're back on the
24       record.
25
```

```
 1   QUESTIONS BY MR. MOUGEY:
 2        Q.    All right.  Mr. Miller, in
 3   response to my last question, you used the
 4   term "encompassing data."
 5              What did you mean, sir?
 6        A.    The all-encompassing data that
 7   would be stored on the local server from the
 8   computer software system.
 9        Q.    And what is included in that
10   all-encompassing?  Does that mean every data
11   piece that you-all collect at a store level
12   at Giant Eagle is stored at the local level?
13        A.    That is correct.
14        Q.    All of it?
15        A.    Everything that would be
16   inputted into the software system, yes.
17        Q.    So everything that's put in --
18   when you say "the software system," I want to
19   make sure we're saying the same thing.
20              PDX, correct?
21        A.    That is correct.
22        Q.    So all information, all data,
23   that is put into PDX is stored at the local
24   level?
25        A.    Yes, that is correct.
```

1    Q.    And by local level, we mean at

2    the store level, correct?

3    A.    That is correct.  Under local

4    server level at the store.

5    Q.    And so that was my next

6    question.

7    So there is a server at each of

8    the local stores, correct?

9    A.    Yes, that is correct.

10    Q.    And I believe you already

11    identified that there's also a data

12    warehouse, correct?

13    A.    That is correct.

14    Q.    What do you mean when you

15    say -- when you use the term or terms "data

16    warehouse"?

17    A.    It's a remote server that is

18    used to store -- used to store data for the

19    company.

20    Q.    And where is that remote server

21    located?

22    A.    There are two.  There is one at

23    our corporate headquarters, and there is one

24    at a backup facility, which is a distribution

25    center for the company.

```
 1          Q.     So one at headquarters and one

 2   at a distribution center.

 3                 Is that -- do I have that

 4   right?

 5          A.     That is correct.  There's a

 6   primary and then a -- and then a backup as a

 7   secondary.

 8          Q.     Okay.  Are you familiar with

 9   the term "archive"?

10          A.     I am, yes.

11          Q.     And what do you understand an

12   archive to mean?

13          A.     To my knowledge, archive means

14   historical records or to back up historical

15   records.

16          Q.     All right.  So let's track the

17   flow of data from the entry at PDX to the

18   local level, to the data warehouse, and if in

19   fact there's another step to archive.

20                 Okay?

21          A.     Sure.

22          Q.     All right.  So let's just start

23   with a -- an easy example.  Let's use a hard

24   prescription and -- a paper prescription.

25                 You know what I mean, right?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.      I do, yes.

 2              Q.      All right.  So then there's

 3    some patient profile information at the store

 4    level that's inputted for a new hardcopy --

 5    new patient with a hardcopy prescription,

 6    right?

 7              A.      That's correct.

 8              Q.      And that information is

 9    imported or input through PDX, correct?

10              A.      That is correct.

11              Q.      And then that same information

12    then is stored at the local level, correct?

13              A.      That is correct.

14              Q.      And if I use the term "patient

15    profile," does that make sense to you?

16              A.      It does make sense.

17                      Just to clarify, when we refer

18    to patient profile, does that include the

19    prescription data or just the patient

20    demographics?

21              Q.      You tell me.

22              A.      When I think of generally as a

23    patient profile, I traditionally think of the

24    patient demographics, with the prescription

25    profile being a part or -- a part of the
```

Highly Confidential - Subject to Further Confidentiality Review

1   patient profile.

2       Q.     Okay.  So if you and I use

3   "patient profile," you mean that to include

4   the demographics about the patient and the --

5   and prescription information, correct?

6       A.     That's correct.  Just wanted to

7   make sure we're on the same page when we're

8   talking lingo today.

9       Q.     Sure.  I appreciate that.

10          So the patient profile

11  information that's put in through PDX and

12  goes to the local server, how fast is that

13  information available on PDX at the local

14  level?  Instantaneously?

15      A.     There are instantaneous backups

16  to the local server.

17      Q.     Okay.  But that's -- what I'm

18  asking is a little different.

19          Is there only one portal or one

20  computer at each Giant Eagle pharmacy or are

21  there more than one?

22      A.     I'm sorry, you mean servers or

23  computers?  I just wanted to clarify what you

24  meant.

25      Q.     Computers.

Highly Confidential - Subject to Further Confidentiality Review

1    A.    Yeah, there are multiple

2   computers within a pharmacy.

3    Q.    So if a technician is putting

4   information, patient profile information,

5   into PDX, how fast is that information

6   available to other computers at a Giant

7   Eagle?

8    A.    Within the same pharmacy,

9   correct?

10   Q.    Same pharmacy.

11   A.    As soon as the profile is

12  saved, meaning that the profile is completely

13  data entered, it's viewable instantaneous on

14  other computers.

15   Q.    Okay.  And let's stick with

16  that same patient profile for a new patient

17  inputted through PDX.  How frequently is the

18  local server information then exported to the

19  data warehouse?

20   A.    Nightly.

21   Q.    Nightly.

22         And now is that the

23  all-encompassing data that we referenced

24  earlier?

25   A.    No, there are certain tables

 1   within data warehouse that collect data, so

 2   not all the information -- not all the

 3   information locally is backed up on the data

 4   warehouse.

 5       Q.    All right.  We're going to come

 6   back to which information is backed up on the

 7   data warehouse.

 8            Okay?

 9            Once a patient profile is

10   imported through PDX and is stored nightly,

11   at least the subset on the data warehouse,

12   can other Giant Eagle pharmacies see the

13   information on the -- stored at the data

14   warehouse?

15       A.    I just wanted to clarify the

16   question.  Do stores have access to the data

17   warehouse or can stores see other patient

18   profiles?

19       Q.    All right.  Let's do it this

20   way.

21            Data warehouse -- I'm sorry.

22   Patient profiles imported on PDX at the store

23   level.  Can other Giant Eagle pharmacies view

24   the patient profile on that same day that

25   it's input?

Highly Confidential - Subject to Further Confidentiality Review

1      A.      They can, yes.  There is a

2  service that is offered by PDX that is

3  referenced as RX.com.  That allows the

4  interconnectivity of data among locations in

5  relative near time.

6      Q.      All right.  So we have two

7  separate -- I think you referred to them as

8  software.  You have PDX and RX.com.

9              Is that fair?

10     A.      Just to clarify, RX.com, think

11 of it as a server that is hosted by PDX

12 themselves.

13     Q.      Is the interface on RX.com for

14 the user the same as it is with PDX at the

15 store level?

16     A.      Correct.  There's no separate

17 software.  The service of RX.com is built in

18 within the PDX software.

19     Q.      If a pharmacist or a tech logs

20 on through PDX within that first 24 hours

21 when it's stored at the local level, can that

22 pharmacist see the patient profile at another

23 Giant Eagle store --

24     A.      Yes, they can.

25     Q.      -- if they're not using RX.com?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     If they're not using RX.com,

2    no.  The RX.com is the inter -- is a --

3    again, is that interconnectivity among all of

4    our locations.

5          Q.     All right.  By

6    interconnectivity, however, the store level,

7    pharmacist or the tech, has to log on through

8    the web versus logging on at the store level,

9    correct?

10         A.     That is not correct.  The

11   RX.com service is built in within the

12   dispensing software.  There's not a separate

13   portal or a website.

14         Q.     I'm not -- when a pharmacist or

15   a tech at the store level is looking at their

16   computer screen, is there a different path

17   for PDX than RX.com?

18         A.     There is -- no, there's not.

19   Thinking of it -- think of it as if I'm

20   pulling up a profile for John Smith.  The

21   information for John Smith would pull from

22   the RX.com server to show information from

23   other locations.

24         Q.     Okay.  So let me -- let's see

25   if we can do that within the -- the larger

```
 1    architecture.

 2              So you have a -- where is the

 3    RX.com server stored?

 4         A.    To my -- it's a service

 5    provided by PDX.  So I -- I don't know the

 6    exact location of it, but PDX headquarters is

 7    in Dallas-Fort Worth area.

 8         Q.    Is a patient profile

 9    information for Giant Eagle stored at -- on a

10    PDX server at any point in time in this

11    process?

12         A.    It would be on the RX.com

13    server.

14         Q.    And the RX.com server is PDX,

15    correct?

16         A.    That is correct.

17         Q.    Okay.  So when we were tracking

18    the flow of information prior, information's

19    input through PDX, stored at the local level,

20    exported nightly to the data warehouse.

21              Am I saying that accurately?

22         A.    That's correct.  In addition to

23    the -- in addition to the local -- stored on

24    the local server.  In near realtime, that

25    information is also pinged to the RX.com
```

```
 1   server as well.
 2        Q.     Okay.  So from the local
 3   server, the data for -- that's input through
 4   PDX has two paths:  one to the PDX server and
 5   one to Giant Eagle's data warehouse, correct?
 6        A.     Relatively correct.
 7               So the RX.com server would be
 8   in near realtime, and the data warehouse
 9   would be uploaded nightly after the
10   pharmacy -- after the pharmacy closed.
11        Q.     All right.  So at the store
12   level when a pharmacist or a tech logs on to
13   PDX, is that through a button or a tab or a
14   link?
15        A.     They would launch the software
16   from an icon on the computer -- on the
17   desk -- on the computer desktop.  To log in,
18   they would either need their credentials of a
19   username and password, or the software also
20   has biometric capabilities where they can
21   place their finger down on a biometric
22   scanner to log in.
23        Q.     Okay.  So the process you
24   described through logging on to PDX, that
25   would also log on the user then to RX.com.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  Am I saying that correctly?

 2      A.      RX -- just so we can kind of

 3  clarify.

 4                  RX.com isn't a separate

 5  software.  It's built into the PDX software.

 6  So think of it as a inter --

 7  interconnectivity of data within the software

 8  system.

 9                  Does that help clarify that?

10      Q.      It does, but let me make sure

11  I -- the way I said it, but help me.

12                  So I said the process you just

13  described, logging on to PDX, that would also

14  enable the user to access data on RX.com

15  automatically.

16                  Did I say that correctly?

17      A.      From a generality standpoint,

18  that's correct.

19      Q.      Okay.  Now, let's kind of --

20  help me walk through some time frames.

21                  So the sequence you just

22  described to me, how long has that been in

23  place at Giant Eagle with data flow from PDX

24  to the local server, to both the data

25  warehouse and PDX's servers?  How long has
```

Highly Confidential - Subject to Further Confidentiality Review

1    that been in place?

2         A.     Data warehouse has been in

3    place, to my best recollection, prior to

4    2006.

5              RX.com goes back even farther

6    to approximately 2002, 2003 time frame.

7         Q.     Okay.  All right.  That was

8    helpful.

9              I'm going to switch to, Gina,

10   if I could, to -- I'm going to share the ELMO

11   from right here in front of me.

12             So, Mr. Miller, I've created a

13   chart to try to help both of us see if we can

14   communicate.  And you've accurately -- and

15   we're going to try to record it down for our

16   own purposes.  And we can change headers or

17   definitions or whatever to help match with

18   Giant Eagle's data collection process.

19             Okay, sir?

20        A.     Sure.

21        Q.     I'm going to start real easy.

22   This patient profile information underneath

23   1, who collects the data - pharmacist, tech.

24             That patient profile

25   information is on a new patient, hardcopy

```
 1    prescription, is captured or collected at the
 2    store level, correct?
 3         A.    That is correct.
 4         Q.    Okay.  So I'm going to write
 5    down just the "pharmacist and/or the tech."
 6               Is that right?
 7         A.    Can we also include intern as
 8    well?
 9         Q.    Sure.
10               And for simplicity today, why
11    don't -- can we refer to store level as
12    pharmacist, tech or intern, unless you tell
13    me something different.
14               Is that fair?
15         A.    That's fair.
16         Q.    Okay.  And that data for the
17    patient profile, which we'll get into some of
18    the specifics in a minute, that data is
19    recorded on the local server, correct?
20         A.    That is correct.
21         Q.    And then on the -- it's
22    exported to the data warehouse nightly,
23    correct?
24         A.    That is correct.
25         Q.    Okay.  And then what do you
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   refer to -- is it PDX.com -- the server, PDX,

 2   or how do you -- what do you --

 3        A.    We can -- we reference it as

 4   RX.com.

 5        Q.    And to me that's a little

 6   confusing because that sounds like a website,

 7   but I'm talking about the server.

 8              But you're cool with RX.com?

 9        A.    That's what we refer to it as.

10   That's its proper name.  So I understand the

11   confusion of a website, but it's not.

12        Q.    It's not.  Okay.

13              So -- and RX.com, I'm going to

14   put down NRT for near realtime.  Is that

15   accurate?

16        A.    That's accurate.

17        Q.    Okay.  And then the next step

18   is, I'm going to put DW, or data warehouse,

19   correct?

20        A.    Are you referencing the data

21   warehouse steps -- on step 2 where it says

22   "nightly"?  Is that the same data warehouse?

23        Q.    I don't know.  I want you to

24   help me with that because we stopped there.

25   So let's build that out a little bit more.
```

```
 1                Okay?

 2       A.      So just to clarify, it has

 3   "local" and then "DW nightly."  Then you

 4   started to write "data warehouse" again.

 5                Is there -- there's only one

 6   data warehouse.

 7       Q.      Okay.  You had mentioned

 8   earlier there were two servers, one at

 9   headquarters and one at an off-site location

10   that's backed up.  Help me understand the

11   difference between those two.

12       A.      There -- it's -- one is just a

13   duplication of another in case of a server

14   failure.  So same information.

15       Q.      All right.  Great.

16                So now we hit briefly on

17   archive.

18                Is there any archiving other

19   than the data warehouse or RX.com?

20       A.      Sure.

21                The pharmacy archive table is

22   built within RX -- or, I'm sorry, is built

23   within data warehouse.

24       Q.      Okay.  So when we talk about

25   the data hitting the data warehouse, that's
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    also where the archiving takes place?

2         A.    That is correct.

3         Q.    Okay.  So from a general --

4    very general description, local, data

5    warehouse nightly, RX.com, near realtime,

6    that includes archiving, correct?

7         A.    That is correct.

8         Q.    Okay.  So let's continue across

9    the page.  And I'm just going to X out that

10   next column, is data saved to a centralized

11   data location, because we hit it in column C.

12              We've caught column E as well.

13              And then F, just for

14   clarification, the patient profile, hardcopy

15   data, is it stored anywhere else other than

16   RX.com, the data warehouses and the local

17   servers at the store level?

18        A.    Hardcopy prescription -- if

19   we're referencing just hardcopy

20   prescriptions, the actual physical hard copy

21   itself would be stored within the pharmacy in

22   files.

23        Q.    Okay.  In paper files?

24        A.    That is correct.

25        Q.    Okay.
```

```
 1          A.      In addition to the electronic

 2    image there, the hard copies are also

 3    maintained.

 4          Q.      Okay.  I'm going to come back

 5    to column C, and I'm going to write down

 6    "hard copy - store level."

 7                  Is that correct?

 8          A.      That is correct.

 9          Q.      Okay.  So I'm just going to put

10    an X on column F, is it maintained anywhere

11    else, because we have local server, data

12    warehouse, RX.com, hardcopy -- hardcopy

13    prescriptions at the store level.

14                  Nowhere else, correct?

15          A.      That is correct.

16          Q.      Okay.  All right.  Column G,

17    how long is data retained in the data storage

18    location.  So let's do each one of those

19    individually.  Okay?

20                  So we're still on patient

21    profile.  How long --

22          A.      Okay.

23          Q.      -- is that data retained on the

24    local server?

25          A.      For at least two years plus the
```

Highly Confidential - Subject to Further Confidentiality Review

1    current year.

2         Q.    Okay.  I'm going to put "at

3    least two years, plus current year."

4                That's for local, right?

5         A.    That is correct.

6         Q.    Okay.  Let's do the data

7    warehouses.

8                How long is the patient profile

9    information stored at the data warehouse

10   level?

11        A.    For at least ten years.

12        Q.    Okay.  And how about RX.com?

13        A.    For at least two years.

14        Q.    Okay.  So DW, you said at least

15   ten years?

16        A.    That is correct.

17        Q.    And RX.com, at least two years,

18   correct?

19        A.    That is correct.

20        Q.    Okay.  Now, let's go to H.

21                Is data -- data outside --

22   we're talking about the patient profile.

23                How long can the store level

24   review patient profile information through

25   PDX at the local level?

```
 1          A.     For at least two years plus the
 2   current year.
 3          Q.     Okay.  Should I say local?  Is
 4   that -- or is that more just through PDX?
 5                 Let me do it this way.
 6          A.     It would be --
 7          Q.     Go ahead.
 8          A.     No, I'm sorry, go ahead,
 9   please.  If you had -- if you wanted to ask a
10   different way, go ahead.
11          Q.     Let me ask it -- let me make
12   sure we can -- maybe we can break it into two
13   questions.
14                 Is the patient profile
15   information stored at the local store level
16   and visible for two years to the pharmacist,
17   tech and intern?
18          A.     For at least two years plus the
19   current year.
20          Q.     And that's -- okay.  That's at
21   local -- and visible to the pharmacist,
22   intern, tech, correct?
23          A.     That is correct.
24          Q.     Okay.  Now, let me stop for a
25   second and go back to a prior answer about
```

1  the scope of the information saved at the

2  data warehouse or RX.com.

3              Is the scope of the information

4  saved on the data warehouse in RX.com the

5  same?

6      A.     No, they would be -- they would

7  be -- they would contain different --

8  potentially they could contain different

9  materials of a prescription.

10     Q.     Okay.  Now, we know the

11 temporal scope, or the time saved, on data

12 warehouse is longer, at least ten years, than

13 RX.com, which is at least two plus the

14 current year.

15             Did I say that right?

16     A.     That would be correct.

17     Q.     Okay.  So to me, I'm not

18 talking about the temporal scope.  I'm

19 referencing the types of information stored

20 at the data warehouse in RX.com.

21             Can you give me a general

22 description?

23             Is there an easy way to do it

24 for us to understand the types of information

25 stored on RX.com versus the type of

Highly Confidential - Subject to Further Confidentiality Review

```
 1    information stored at the data warehouse?

 2         A.    We can try -- we can try to

 3    walk -- walk through it.

 4               The RX.com information would be

 5    patient profile information, so patient

 6    demographics, information related -- the data

 7    related to the filling of a prescription.  So

 8    the hard copy, the drug, strength, refills,

 9    quantities, the prescriber who wrote the

10    prescription.

11         Q.    Okay.

12         A.    Whereas data warehouse -- data

13    warehouse is going to contain other metadata

14    around that.

15         Q.    Okay.  So the data warehouse

16    information, that scope is broader than

17    RX.com?

18         A.    In the sense of more -- in the

19    sense of "broader" meaning additional data

20    captures, yes.

21         Q.    Meaning additional data capture

22    at the data warehouse as compared to RX.com?

23         A.    To my best of knowledge, yes,

24    that is correct.

25         Q.    Is the data that is captured at
```

Highly Confidential - Subject to Further Confidentiality Review

1  RX.com a subset of the data captured at the

2  data warehouse?

3      A.    By "subset" do you mean like --

4  like specific data?  What do you mean by

5  "subset"?

6            You mean more limited data?

7      Q.    No.  Subset to me is a piece of

8  a small -- of a larger data pull.

9            And what I mean by that is, is

10  RX.com, the data stored on RX.com, different

11  than the data stored at the data warehouse?

12      A.    The data -- the data itself

13  would be the same.  So there's nothing to

14  be -- for example, one data field would be

15  different on RX.com than it would be at data

16  warehouse, if that's what you mean.

17      Q.    And let me ask just kind of one

18  follow-up question.

19            If -- just use the alphabet.

20  The data stored at the data warehouse is A

21  through Z, as an example.  Okay?

22      A.    Uh-huh.

23      Q.    RX.com, is it A through M,

24  meaning it's a portion of a broader set of

25  data stored on the data warehouse?

Highly Confidential - Subject to Further Confidentiality Review

1        A.      Yes, that would be a correct

2   example.

3        Q.      Okay.  And I apologize if

4   you've already explained this, but I'm having

5   trouble understanding or thinking of a reason

6   why you would duplicate storing data on

7   RX.com of the larger set that's stored at the

8   data warehouse.

9              What's the reason for that?

10             MR. KOBRIN:  Object to form.

11        Beyond the scope.

12   QUESTIONS BY MR. MOUGEY:

13        Q.      Go ahead.

14        A.      Giant Eagle itself does not own

15   the PDX RX.com server.  It's a service that's

16   built into the recordkeeping and dispensing

17   software.

18        Q.      Okay.  And I get that.

19             But if the data is already

20   stored at the data warehouse and it's a

21   broader set than what's at RX.com, why would

22   PDX simply not interface with the data

23   warehouse and pull directly from the data

24   warehouse?  What's the point of having

25   RX.com?

```
 1                    MR. KOBRIN:  Object to form.
 2                    THE WITNESS:  The service of
 3            RX.com is the interconnectivity of
 4            information among the stores.  Data --
 5            the information stored in data
 6            warehouse does not have that
 7            capability.
 8      QUESTIONS BY MR. MOUGEY:
 9            Q.    All right.  And at the store
10      level, through PDX -- well, let's do -- can a
11      pharmacist or a tech or an intern pull or
12      query information from the data warehouses?
13                    MR. KOBRIN:  Object to form.
14            Beyond the scope.
15                    THE WITNESS:  No.  Pharmacy
16            technicians or interns would not have
17            the capability to query data
18            warehouse.  They would be able to --
19            if they needed additional information,
20            they can always make that request
21            through pharmacy information
22            technology team.
23      QUESTIONS BY MR. MOUGEY:
24            Q.    Okay.  So on the visibility
25      side, the store level has no visibility to
```

1  the data stored at the data warehouse over

2  ten years unless it's by specific request; is

3  that fair?

4           MR. KOBRIN:  Object to form.

5     Beyond the scope.

6           THE WITNESS:  Yes, correct.

7  QUESTIONS BY MR. MOUGEY:

8     Q.    The pharmacist, the tech, the

9  intern, store level, through PDX, does have

10 visibility into RX.com over the data stored

11 for two years, correct?

12    A.    That is correct.

13    Q.    Okay.  All right.  Let's see if

14 we can capture those two.

15           So RX.com visible for two years

16 plus current year, right?

17    A.    I would say at least two years

18 plus the current year.

19    Q.    Okay.  Okay.  Now, one step I

20 missed here is -- and I apologize if I

21 already asked you and I just missed it.  At

22 the local level, how often is the information

23 purged?

24    A.    So the information on the local

25 server is maintained for at least two years

1    plus the current year.

2        Q.    Okay.

3        A.    And oftentimes the information

4    has remained there longer based on

5    capabilities of purging.  But then you get

6    into different time frames based on each

7    location, based on the amount of data that

8    would be stored.  So that's why the general

9    answer is at least two years plus the current

10   year.

11       Q.    But on an information pull from

12   store 1, store 2, store 3, through PDX, if it

13   wanted to see a patient history, it could --

14   the store would be able to pull that through

15   RX.com?

16             MR. KOBRIN:  Object to form.

17             THE WITNESS:  Yes.  That would

18        be correct.

19   QUESTIONS BY MR. MOUGEY:

20       Q.    We've talked about the flow of

21   information kind of downstream from the store

22   level to the RX.com to the data warehouse.

23   Let's talk about maybe it moving upstream, or

24   the other way.

25             Is there data that moves

Highly Confidential - Subject to Further Confidentiality Review

1    upstream, meaning from the data warehouse or

2    RX.com back to the local level servers?

3         A.     There would be.  There would be

4    information from RX.com that would flow into

5    another pharmacy.

6              So in the example earlier,

7    store A would fill a prescription.  Later,

8    say a couple months later, store B would --

9    that patient would go to store B for that --

10   for another prescription.  That information

11   would flow from RX.com into store B.  That

12   patient profile and prescription history

13   would flow to store B.

14        Q.     And let's make sure we're

15   saying the same thing.

16              I understand that it would

17   flow, meaning that the store level could see

18   the data through PDX and then RX.com, but

19   would that example you just gave, would that

20   data for that patient then be stored at the

21   local level?

22        A.     It would be, yes, once it's

23   pulled over.  That is correct.

24        Q.     All right.  Help me to

25   understand that, because that would be --

Highly Confidential - Subject to Further Confidentiality Review

1    that same -- the example you gave, that same

2    prescription then would be duplicated, or

3    even replicated three times, at the local

4    level at each server and then also RX.com.

5                Am I -- do I have that right?

6                MR. KOBRIN:  Object to form.

7                THE WITNESS:  The prescription

8          that would have been filled at store B

9          would be at the local server at store

10         B, and then it would be at RX.com.

11               If that patient would go back

12         to store A, the information then would

13         flow to store A.  Store A would see

14         the visibility of store B, the

15         prescription that store B filled.

16   QUESTIONS BY MR. MOUGEY:

17         Q.    Yes, sir, and I got the

18   visibility part.  But as far as the data then

19   being replicated, would that prescription --

20   that patient profile and prescription history

21   for that patient be at store A, store B and

22   RX.com?

23         A.    The patient profile itself

24   would be at three different locations at that

25   point, correct.

Highly Confidential - Subject to Further Confidentiality Review

1      Q.     So if I'm at store level and I

2    pull a patient profile who -- a patient

3    that's visited multiple Giant Eagle stores to

4    fill prescriptions, and I'm running queries

5    through PDX, is that data pulled from RX.com

6    or the local server?

7      A.     The information would be pulled

8    from RX.com, in which the local servers would

9    feed to RX.com.

10            So if I would have a new

11   patient come in, RX.com would pull the

12   patient profile information to be visible in

13   another location.

14     Q.     All right.  So visibility,

15   RX.com for at least two years and current

16   year.

17            And the answer would be the

18   same at the local level, correct?

19     A.     That is correct.  At least two

20   years plus the current year on the local

21   server.

22     Q.     Okay.  So local and RX.com

23   visibility at the store level for at least

24   two years and current year.

25            Did I have that -- did I say

Highly Confidential -- Subject to Further Confidentiality Review

1    that right?

2         A.    Local year -- I'm sorry, local

3    would be two -- at least two years plus the

4    current year.

5         Q.    Right.

6               Which is the same as RX.com,

7    correct?

8         A.    That is correct.

9         Q.    Okay.  All right.  Let's leave

10   I open for a minute.

11              So let's go back and change our

12   fact pattern just a little bit.  We were

13   talking about a new patient, and we were

14   talking about a hardcopy prescription.

15              Would you explain to me the

16   process for an electronic prescription?

17        A.    Sure.

18              So who -- so are we talking

19   about an electronic prescription for a new

20   patient?

21        Q.    Yes, sir.  Thank you.

22        A.    Okay.  Collecting of the data

23   would look a little bit different as if it

24   was -- if it was a new patient, the -- most

25   of the information would be gathered from the

```
 1    electronic prescription itself, but it could
 2    still be collected from a pharmacist, tech or
 3    an intern.
 4         Q.    All right.  Is there -- so
 5    let's talk about the patient profile for
 6    electronic and hard copy.
 7              How are the records for an
 8    electronic prescription for an existing
 9    patient matched with existing profiles?
10         A.    An electronic prescription
11    would come in with -- and again, in the
12    header of the electronic prescription it
13    would show patient demographic information.
14    That demographic information would be matched
15    to a patient profile by a pharmacy team
16    member.
17         Q.    Is it manual, the matching of
18    the electronic prescription for an existing
19    patient?
20         A.    At times, yes.  There would be
21    times where electronic prescriptions would be
22    coming -- come in as a refill request.  So a
23    doctor would respond electronically to a
24    refill request where that patient demographic
25    information would be already prepopulated.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Q.     All right.  Other than that on

2     the electronic prescription where the patient

3     profile information is auto-populated, are

4     there any other descriptions -- are there any

5     other differences in the process and data

6     retention that we just walked through?

7          A.     There would not be, no.

8          Q.     Okay.  All right.  Let me -- we

9     talk about this process through the -- I

10    think you used the words "demographic

11    information."  And I want to go down this

12    chart to patient prescription history,

13    patient comments and what other data fields

14    there are.  So let's just focus on these one

15    by one.

16              What information was captured,

17    or is captured, manually by the pharmacist,

18    tech, intern, at the store level with a

19    hardcopy prescription?

20              I think you -- I have name,

21    age, address, phone number, date of birth.

22              Are those all correct?

23              MR. KOBRIN:  Object to form.

24              THE WITNESS:  Those would all

25         be -- those would all be part of the

```
 1          demographic information.
 2     QUESTIONS BY MR. MOUGEY:
 3          Q.     Okay.  What other -- what other
 4     demographic information under the patient
 5     profile would you include that was collected
 6     at the store level?
 7          A.     There would also be insurance
 8     information related to the patient.
 9          Q.     Okay.  Anything else?
10          A.     In part, in the dispensing
11     software system, there's also patient gender
12     that is captured.
13          Q.     Okay.  Anything else?
14          A.     No.  Those would be the
15     required information of collecting for a new
16     prescription.
17          Q.     All right.  So let's talk about
18     this next line here, patient prescription
19     history.
20               So obviously if there's a
21     history, it's an existing patient.
22               Does that make sense?
23          A.     So existing patient has -- we
24     filled prescriptions for before, correct?
25          Q.     Yes.  Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              So store level pulls up the,

 2   you know, type -- pulls up the patient

 3   profile, correct?

 4        A.     That is correct.

 5        Q.     At the point of the

 6   prescription -- and I'm talking about

 7   controlled substance prescriptions.  At the

 8   point of prescriptions, how does the store

 9   level match patient profiles to make sure

10   they have the right patient?

11        A.     They would use the patient

12   name, patient date of birth, and at times

13   they would also confirm via address and phone

14   number.

15              So they would use the -- they

16   would use the patient demographics to match

17   to the correct patient.

18        Q.     All right.  So patient name,

19   date of birth, and at times the phone number,

20   correct?

21        A.     And address.

22        Q.     Government ID?  Any number

23   taken at the -- when the prescription is

24   presented?

25        A.     No, there would not be.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     Okay.  So other prescriptions,

 2     the prescription history, how does that

 3     appear once the -- or does it appear once the

 4     profile for that patient is selected?

 5          A.     The patient -- the patient

 6     prescription history would appear within the

 7     patient profile.  There is a separate --

 8     there's a separate tab that says "RX history"

 9     on it.

10          Q.     And the RX history is -- I'm

11     going to use the words "auto-populated" from

12     the tab, right?

13          A.     I'm sorry, what do you mean

14     auto -- I'm not understanding your question.

15               Do you mean -- the tab's there

16     to view the patient prescription history.

17          Q.     Okay.  So the store level

18     doesn't need to go searching for the

19     prescription history.  It's on a tab right in

20     the patient profile?

21          A.     That is accurate, yes.

22          Q.     Click the tab "prescription

23     history."  Auto-populates.  They're all right

24     there.  Makes sense?

25               MR. KOBRIN:  Object to form.
```

```
 1                    THE WITNESS:  Yes.
 2   QUESTIONS BY MR. MOUGEY:
 3        Q.     Okay.  So -- now we haven't
 4   nailed done exactly the subset of information
 5   that was stored at RX.com of data warehouse.
 6                    Let's talk about the
 7   prescription history.
 8                    Is the prescription history
 9   stored at both RX.com and the data warehouse?
10        A.     Yes, that is correct.
11        Q.     So for the same periods of time
12   that we just walked through, at least two
13   years and the current year?
14        A.     For local, that is correct.
15        Q.     Yes, sir.
16                    And that's also correct for
17   RX.com, correct?
18        A.     That is correct.
19        Q.     Okay.  So both patient profile
20   and the prescription history are visible at
21   the store level for at least two years and
22   the current year, correct?
23        A.     That is correct.
24        Q.     All right.  So let's see if we
25   can -- under the patient prescription
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   history, I'm going to just -- if I put on a

 2   tab in -- I'm sorry, I'm getting all of my

 3   acronyms mixed up.  PDX?

 4       A.     That is correct, yes.

 5              And if you want to even clarify

 6   farther, on a tab within the patient profile.

 7   So I'd have to look up the patient first to

 8   view that specific patient's profile --

 9       Q.     Yep.

10       A.     -- or RX history.

11       Q.     Makes sense.  Okay.  All right.

12              So I have patient prescription

13   history on a tab in PDX in patient profile.

14              Okay?

15       A.     Yes.

16       Q.     And are your answers for

17   prescription history the same as far as where

18   the data is recorded, how long visibility,

19   the same across the page for prescription

20   history as it was for patient profile?

21       A.     Column -- or column C would be

22   correct.

23       Q.     Okay.  So I'm just going to put

24   little quotes here, meaning kind of the same

25   as above.  I'll just write it down, "same as
```

1    above."  All right?

2              We go across the page.

3         A.    Column G would also be correct.

4         Q.    Okay.

5              And how about H?  I'll get it a

6    little closer for you.

7         A.    Thank you.  Thank you so much.

8         Q.    No problem.

9              We have local and RX.com

10   visible for two years and current year, and I

11   have in paren, at least two years.

12        A.    That is accurate.

13        Q.    Okay.  All right.  Now, does

14   PDX also have a patient comment field?

15        A.    Do you mean a patient -- like a

16   patient note field?

17        Q.    Yes, sir.  Notes, comments,

18   whatever you want to call it, yes, sir.

19        A.    Yes, as part -- as part of the

20   patient profile, there is a patient note

21   area.

22        Q.    Okay.  So I'm going to write

23   down "patient note."

24              Now, who has access to include

25   notes in -- so same question as B.  Who can

1    put notes into the patient notes field at the

2    store level?

3         A.    So the same as above.  The

4    pharmacist, technician and interns would all

5    have the ability to enter a patient note.

6         Q.    Okay.  So I'll write down

7    "pharmacist, tech and intern."

8              Do you know how many characters

9    are available in the patient note field?

10        A.    I do not know.

11        Q.    All right.  Are the answers for

12   the patient note field, as far as storage and

13   visibility, the same as they were for your

14   prior answers for the patient profile and the

15   prescription history?

16        A.    For local and RX.com, they

17   would be the same.

18        Q.    Okay.  Is there any other

19   information that we're missing in the patient

20   profile -- I have number 4 now -- that we

21   haven't hit already?

22        A.    There are a few different --

23   other data elements that would be collected

24   in the patient profile.  There would be some

25   clinical information if received from the

Highly Confidential - Subject to Further Confidentiality Review

1    physician electronically, such as patient

2    blood pressure, patient weight.  Emergency

3    contact information can also be recorded for

4    patients.

5         Q.    Okay.

6         A.    There would be -- there would

7    be med synchronization data that could be

8    kept within the patient profile.  And what I

9    mean, "med synchronization," that would be

10   taking maintenance medications, so

11   maintenance being prescriptions that are

12   being used on a routine basis to treat a

13   disease state, so that the patient could pick

14   up their refills at the same time every month

15   rather than having to make multiple trips to

16   the pharmacy.

17        Q.    Okay.  Anything else that comes

18   to mind?

19        A.    And then automatic refill -- if

20   authorized by the patient, automatic refill

21   data would be stored within the patient

22   profile as well.

23        Q.    Okay.  Anything else?

24        A.    One additional data field of --

25   would be the patient authorizing non-safety

Highly Confidential - Subject to Further Confidentiality Review

1    caps versus safety caps.  So the type of lid

2    that would be on the prescription vial, that

3    would also be contained within that patient

4    profile.

5         Q.    Is that the ones that are the

6    kind of child-preventative caps?

7         A.    Exactly.  Exactly.  The

8    standard for dispensing would be using the

9    childproof caps, but patients can ask and

10   request to have an -- guess like a flip-off

11   cap, like an easy-open cap.

12        Q.    All right.  Sometimes that --

13        A.    Would also be in the patient

14   profile.

15        Q.    Sometimes I think those are

16   Peter Mougey-preventative caps, but, yes.

17              Anything else you can think of?

18        A.    Nothing comes to mind at this

19   point.

20        Q.    Okay.  Now, safe to conclude

21   answers as far as retention and visibility on

22   the local and RX.com are the same?

23        A.    I'm sorry, did you say -- I had

24   a hard time hearing you.

25              Did you say local and RX.com?

```
 1        Q.     Yes, sir.
 2               Your responses that you gave as
 3    far as how the data is stored, whether it be
 4    upstream, downstream, and the retention
 5    periods, the same for this -- the additional
 6    data in patient profile?
 7        A.     For local and RX.com, that
 8    would be correct.
 9        Q.     Okay.  Where would information
10    like allergies or known medical conditions,
11    anything like that, be?  Would that be in the
12    patient profile as well?
13        A.     It would be.  There -- as part
14    of the patient profile, as I mentioned, the
15    RX history tab, there's a specific tab for
16    allergies of the patient that we would
17    collect from the patient.
18        Q.     Okay.  Help me if you can --
19        A.     And did you -- I'm sorry, you
20    also mentioned about diagnosis or disease
21    states, correct?
22        Q.     Right.
23        A.     There's also -- there is also
24    an area in the patient profile for disease
25    states and for diagnosis codes.
```

Highly Confidential - Subject to Further Confidentiality Review

1          Q.      Okay.  And there's -- and I

2     think I've seen some screenshots, but there's

3     different tabs for different types of

4     information, correct?

5          A.      Relatively speaking, that is

6     correct, yes.

7          Q.      Okay.  Let me throw one more

8     variable into the question.

9               Existing patient presents a

10    prescription on the two years.  If the

11    patient comes in month after month after

12    month for more than two years, is the -- at

13    least two years and the current year, does

14    the data then roll off if the patient is

15    active?

16         A.      Do you mean if the patient is

17    actively filling the same prescription or

18    different prescriptions?

19         Q.      Let's say different

20    prescriptions.

21         A.      The storage would be for at

22    least two years plus the current year.

23         Q.      All right.  So where I'm going

24    is that -- let's just assume for a minute

25    that a patient is not active for at least two

1    years plus the current year, and then they

2    come back and it's year 4.

3              Would the data, based on the

4    patient profile that we just walked through

5    on rows 1, 2 and 3 and 4, would that then be

6    purged off of the local RX.com and would not

7    be visible at the store level?

8         A.    The patient profile with

9    regards to patient -- the patient

10   demographics, the patient notes and some of

11   the other data that would be in the patient

12   profile would remain on the local server.  To

13   date, we have not purged patient profiles.

14             The patient history -- the

15   patient prescription history would be on a

16   case-by-case basis if that's -- if

17   information would have been purged in

18   archives off that local server.

19        Q.    Okay.  So let's stay there for

20   a minute.  Let's put a different variable and

21   say that the -- it's longer than at least two

22   years and the current year, and the patient

23   presents a different prescription, meaning

24   one that he hadn't filled or she hadn't

25   filled before.

Highly Confidential - Subject to Further Confidentiality Review

1              Does the patient profile and

2      prescription history roll off?

3          A.      It does not necessarily roll

4      off.  It would have to be an active task of

5      what you mentioned, the purging and archiving

6      that information.

7          Q.      What do you mean by necessarily

8      it has to be an "active task"?  What's an

9      active task mean?

10         A.      Meaning somebody from the

11     information technology department would have

12     to go into a specific location and from,

13     using their language, purge that data after

14     two and a half -- or after two years plus the

15     current year.  It's not done on a routine

16     basis at this current time.

17         Q.      All right.  Let me -- let me

18     make sure I'm following you.

19              So when you inserted the

20     language "at least two years" on each of

21     these, when is the last time that Giant Eagle

22     has purged or deleted patient profiles on

23     either the local --

24         A.      The last time --

25         Q.      Go ahead.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.     I was just going to say, I'm

 2      not aware of the last -- the last time it was

 3      occurred.  It would occur either for storage

 4      reasons that we'd have to -- there's been

 5      cases where high-volume stores have had to

 6      turn over, reuse, old prescription numbers

 7      just because of the lack of space and the

 8      lack of numerical characters, but I don't

 9      have a relative time frame of when that

10      occurred.

11              Q.     So we went -- is there any way

12      for you to provide information, store by

13      store, how long the lookback was at the store

14      level for patient profiles or prescription

15      history?

16                     MR. KOBRIN:  Object to form.

17              Beyond the scope.

18                     THE WITNESS:  To clarify your

19              question, do you mean is there --

20              would there be a way to know when

21              information was, to use the term,

22              purged from that patient profile?

23      QUESTIONS BY MR. MOUGEY:

24              Q.     Yes.

25              A.     That information might be
```

1    available, but I'm not relatively sure.

2        Q.    So when you're using the word

3    "at least" -- or words "at least two years"

4    at the local RX.com, some stores it may be

5    longer because they're not as busy, for

6    example, than high-volume stores that may

7    need to purge or delete patient information

8    on a more regular basis?

9        A.    That's one -- that would be a

10   scenario that would be correct.

11       Q.    So there's not a consistent

12   record retention or field retention for

13   RX.com, store by store, other than it's there

14   for at least two years?

15           MR. KOBRIN:  Object to form.

16           THE WITNESS:  To clarify your

17       question, you mean a local server,

18       correct?

19   QUESTIONS BY MR. MOUGEY:

20       Q.    Well, let's do the local server

21   first.

22           There isn't a consistent data

23   retention for patient profile or prescription

24   history other than at least two years,

25   correct?

```
1              MR. KOBRIN:  Object to form.
2        Misrepresents prior testimony.
3              THE WITNESS:  The consistent
4        practice is keeping information on the
5        local server for at least two years
6        plus the current year.
7   QUESTIONS BY MR. MOUGEY:
8        Q.     Exactly.
9              So some stores may be longer,
10  but there isn't a consistent practice other
11  than at least two years, correct?
12             MR. KOBRIN:  Object to form.
13             THE WITNESS:  Two years -- at
14       least two years plus the current year.
15  QUESTIONS BY MR. MOUGEY:
16       Q.     Yes, two years plus the current
17  year.
18             Some stores may be longer; some
19  stores may not be.  Correct?
20             MR. KOBRIN:  Object to form.
21             THE WITNESS:  That is correct.
22  QUESTIONS BY MR. MOUGEY:
23       Q.     Okay.  And is that the same
24  answer for RX.com as it is for local?
25       A.     I can't -- I can't speak to the
```

Highly Confidential - Subject to Further Confidentiality Review

1   processes of PDX actively doing it and

2   removing information from RX.com, so I can't

3   answer that question.

4       Q.     Mr. Miller, I believe you

5   testified that to date we have not purged

6   patient profiles.

7              Did I get that right?

8       A.     The patient demographic

9   information, if you're referring to that,

10  that is correct.  The patient would remain on

11  the local server.

12      Q.     Okay.  And that's true across

13  all Giant Eagle stores?

14      A.     To the best of my knowledge,

15  that is correct.

16      Q.     All right.  Same question

17  but -- well, let me make sure.

18             When we say "demographic,"

19  we're talking about name, age, address,

20  phone, date of birth, correct?

21      A.     That is correct.

22      Q.     Okay.  Now, for prescription

23  history, we're sticking with the at least two

24  years and the current year, correct?

25      A.     Yes, that is correct.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. MOUGEY:  Mr. Kobrin and
 2       Mr. Miller, if is this a good time for
 3       about a ten-minute a break, that would
 4       be great.
 5              MR. KOBRIN:  You good to take a
 6       break, Chris?
 7              THE WITNESS:  Yeah.
 8              MR. KOBRIN:  Are you hungry,
 9       Chris?  Are you okay?
10              THE WITNESS:  I was going to
11       say, could we take maybe about a half
12       an hour so I could get some lunch?
13              MR. KOBRIN:  Or do you want to
14       do it in like -- they're an hour ahead
15       of us, Chris, is the only thing.  But
16       if you're hungry now -- could we do it
17       now, Peter?  I don't want to mess you
18       guys up.
19              MR. MOUGEY:  I'm okay either
20       way.
21              Mr. Miller, are you at the -- I
22       mean, do you have -- is a half an hour
23       enough?  Are you at the office?  Do
24       you need to go grab a sandwich or
25       something?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  I'm a two-minute
 2        walk from my kitchen, so...
 3              MR. MOUGEY:  All right.  Well,
 4        then -- Josh, whatever you -- half an
 5        hour is fine, 45 minutes.
 6              MR. KOBRIN:  Let's go off the
 7        record and debate.
 8              VIDEOGRAPHER:  The time right
 9        now is 12:24 p.m.  We are off the
10        record.
11         (Off the record at 12:24 p.m.)
12              VIDEOGRAPHER:  The time right
13        now is 12:41 p.m.  We're back on the
14        record.
15    QUESTIONS BY MR. MOUGEY:
16        Q.    Mr. Miller, are you familiar
17    with RapidFill?
18        A.    I am, yes.
19        Q.    What's RapidFill?
20        A.    RapidFill was the computer
21    system that we had previous to our current
22    version of EPS Workflow.
23        Q.    Explain in a little more detail
24    what Giant Eagle uses RapidFill internally
25    for.
```

```
 1              MR. KOBRIN:  Object to form.
 2              THE WITNESS:  RapidFill was
 3         used as the dispensing --
 4         recordkeeping and dispensing software
 5         previous to our current of EPS
 6         Workflow.  It's the same PDX product.
 7    QUESTIONS BY MR. MOUGEY:
 8         Q.    All right.  I'm -- I apologize,
 9    but to me we're using PDX, EPS and RapidFill.
10              They're not the same though,
11    correct?
12         A.    PDX -- they're all main --
13    they're all owned and designed by PDX.
14    RapidFill is a different -- is a version,
15    Workflow -- the current version is a
16    diversion.
17              So a little bit different
18    with -- unique to how work is processed, but
19    the general recordkeeping fields are, in a
20    sense, the same.
21         Q.    All right.  Let me go back and
22    try each one of these individually.
23              I thought you and I identified
24    right out of the gates that PDX and EPS were
25    the same -- I think you referred to them as
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   software.
 2         A.     That is correct.
 3         Q.     Okay.  So RapidFill is a
 4   different software than PDX and -- what was
 5   it?  EPS?
 6         A.     Not necessarily.  EPS RapidFill
 7   and EPS Workflow are different versions of a
 8   PDX product.
 9         Q.     So when I've been referring to
10   PDX the last hour, hour and a half, I have
11   not left out a different software package
12   that the -- at the store level, meaning EPS,
13   have I?
14         A.     From what we were discussing
15   around the patient demographics, no, there
16   would be no change between RapidFill and
17   Workflow.
18         Q.     Okay.  So no difference
19   between -- from what we've covered to date,
20   right now, there's been -- PDX, EPS and
21   RapidFill, up to this point where we are
22   right now, no difference?
23               MR. KOBRIN:  Object to form.
24               THE WITNESS:  That is -- that
25         is accurate insofar as the patient
```

Highly Confidential - Subject to Further Confidentiality Review

1    profile.

2  QUESTIONS BY MR. MOUGEY:

3    Q.    Same thing with prescription

4  history?

5    A.    That is correct.

6    Q.    Same answer with patient note?

7    A.    That is correct.

8    Q.    Okay.  So -- and we're going to

9  come back to this, but explain the difference

10 then with RapidFill and PDX.  Where do they

11 start to diverge?

12           MR. KOBRIN:  Object to form.

13           THE WITNESS:  So to clarify the

14      answer, both are PDX products.  One is

15      called RapidFill.  One is called

16      Workflow.

17           So the differences -- I believe

18      you're trying to -- referencing the

19      differences between RapidFill and

20      Workflow.

21 QUESTIONS BY MR. MOUGEY:

22    Q.    Okay.  So PDX is more of the

23 umbrella, and below PDX we have Workflow and

24 RapidFill; is that accurate?

25    A.    That is correct.

```
 1          Q.     Okay.  So some stores use
 2   RapidFill and some stores use Workflow?
 3                 MR. KOBRIN:  Object to form.
 4                 THE WITNESS:  RapidFill was
 5          rolled out around the 2011 to 2013
 6          time frame with stores going on at
 7          different times.  Obviously we had to
 8          roll that out.
 9                 Workflow, the conversion to
10          Workflow, took place around the
11          2015-2016 time frame.
12   QUESTIONS BY MR. MOUGEY:
13          Q.     What's the difference between
14   RapidFill and Workflow?
15                 MR. KOBRIN:  Object to form.
16                 THE WITNESS:  The way that --
17          the way that work is processed or how
18          a prescription would flow through
19          the -- I hate to use the word "pun" --
20          but the workflow of a prescription
21          would slightly be different between
22          the two programs.
23   QUESTIONS BY MR. MOUGEY:
24          Q.     How many stores are using
25   RapidFill and how many stores are using
```

```
 1   Workflow?  And I'm in the 2015, 2020 time

 2   frame.

 3        A.     All -- currently all stores are

 4   on the EPS Workflow platform.

 5        Q.     That's currently.

 6               Let's just do, you know,

 7   2013 -- let me do it another way.

 8               Has there been a migration from

 9   RapidFill to Workflow?

10        A.     The migration would have been

11   just during the raw period of converting --

12   converting stores on a -- on a period of

13   time, getting all the -- the entire chain

14   over to Workflow, if that's what you mean.

15        Q.     So let me just start it the

16   easy way.

17               The migration is from -- I want

18   to make sure I don't have it backwards.

19               Is the migration from RapidFill

20   to Workflow or do I have it backwards?

21        A.     It would be from RapidFill to

22   Workflow.  You're correct.

23        Q.     All right.  So when did the

24   migration from RapidFill to Workflow begin?

25        A.     Around the 2015 time frame it
```

Highly Confidential - Subject to Further Confidentiality Review

1  began, and we finished the chain around the

2  2016 time frame.

3      Q.    Okay.  So for '15, '16, there

4  were some stores that were operating on

5  RapidFill, some stores that were operating on

6  Workflow, fair?

7      A.    During that conversion time,

8  that is correct.

9      Q.    Okay.  But at post-'16, all

10  stores were on Workflow?

11      A.    That is correct.

12      Q.    Okay.  Store level -- before we

13  move into prescriber, store level, can --

14  with PDX, can pharmacists, techs, interns,

15  see any patient data from pharmacies outside

16  of Giant Eagle?

17      A.    The -- the only prescription

18  data that would be visible from outside of

19  Giant Eagle would be either from insurance

20  companies, where that prescription would be

21  flagged by an insurance company for some sort

22  of patient care issue, or controlled -- for

23  controlled substances would be visible via

24  OARRS.  I'm sorry, the PDMP in the state of

25  Ohio or in any of the states that we operate

1    in.

2         Q.    Okay.  So Ohio-specific, what's

3    visible to the -- at the store level is Giant

4    Eagle data, OARRS and potentially TPPs?

5         A.    I'm sorry, TPPs?

6         Q.    Third-party payer?

7         A.    Oh, yes, that is correct.

8         Q.    Okay.  The patient note field

9    that we discussed earlier, can notes be

10   deleted at the store level?

11        A.    Do you mean from that

12   individual patient?

13        Q.    Yes.

14        A.    They can be deleted by a user

15   at the store level.

16        Q.    And do we have a -- can it be

17   deleted by any of the pharmacists, tech,

18   and/or an intern?

19        A.    To my best recollection, yes,

20   that is correct.

21        Q.    And intern, define what -- you

22   used the word "intern" before.

23              What do you mean when -- when

24   we reference an intern?

25        A.    It would be a state-registered

Highly Confidential - Subject to Further Confidentiality Review

1  individual who is in a active academic

2  program within a school of pharmacy.

3       Q.    Okay.  We come back to the

4  share from here, from our chart.  This next

5  section that's kind of a pinkish color is the

6  prescriber information.

7            And similar to what we did

8  above, we can change -- change categories or

9  headers to fit kind of your understanding,

10  Mr. Miller, or Giant Eagle's system.

11            But let's use the same example

12  as a hardcopy prescription presented, new

13  patient.

14            What information about the

15  prescriber is collected at the store level?

16       A.    To kind of -- so kind of going

17  with the prescriber information, we use a

18  external database that is provided from

19  LexisNexis to maintain a -- to maintain

20  prescriber profiles on a central level which

21  can be pulled down to the store.

22            If you're referencing -- from a

23  hardcopy prescription, we'd be looking at the

24  patient's -- or I'm sorry, the prescriber's

25  name, address, phone number, DEA, NPI number

Highly Confidential - Subject to Further Confidentiality Review

1    and their state license number as well.

2          Q.     Okay.  Patient presents

3    hardcopy prescription, new patient.

4                 How does the store level match

5    the physician on the prescription with PDX

6    and LexisNexis?

7                 MR. KOBRIN:  Object to form.

8                 THE WITNESS:  We can use -- you

9          can use the prescriber's name.  You

10         can search by DEA registration number.

11         You can also search by NPI number as

12         well to match the correct -- to match

13         the correct prescriber.

14   QUESTIONS BY MR. MOUGEY:

15         Q.     All right.  Is there -- is that

16   done in an automated system or is it manual

17   at the store level where a specific

18   prescriber profile is selected?

19         A.     For referencing the current

20   scenario of a hardcopy prescription, that

21   would be done by a user at the store level.

22         Q.     Okay.  And would the user at

23   the store level be the same as we were

24   defining store level prior - pharmacist, tech

25   or an intern?

```
 1          A.      That is correct.
 2          Q.      All right.  So is it accurate
 3   then here, under prescriber-identifying
 4   information, that it would be pharmacist,
 5   tech or intern with data pulled from
 6   LexisNexis?
 7          A.      The information would be -- for
 8   the hardcopy prescription scenario, the
 9   information would be searched by the
10   prescriber's name, DEA registration number or
11   NPI, and can pull -- and would pull the
12   patient's -- I'm sorry, the patient -- the
13   prescriber's profile from the central
14   database.
15          Q.      And by "central database," are
16   you referring to LexisNexis?
17          A.      That is correct.
18          Q.      All right.  So at the store
19   level, would the pharmacist, tech, intern, be
20   able to search LexisNexis through PDX?
21          A.      Yes.  The LexisNexis
22   information is provided to us from
23   LexisNexis.  To my best recollection, their
24   database is given to us upon roughly every
25   month, so we would pull that information into
```

Highly Confidential - Subject to Further Confidentiality Review

```
1    our central host.

2         Q.     I think we're talking --

3         A.     Or onto our central server.

4         Q.     I think we're talking past each

5    other.  Let me -- so at the -- at the store

6    level, through PDX, the data is pulled off of

7    Giant Eagle's internal servers, correct?

8         A.     For the information provided by

9    LexisNexis, that is correct.

10        Q.     Right.

11               But it was -- it's downloaded

12   from LexisNexis on a monthly basis into Giant

13   Eagle's system, correct?

14        A.     Roughly on a monthly basis.  It

15   could be more or it could be less.  I just

16   know it's roughly around a monthly basis.

17        Q.     Is the data that's pulled from

18   LexisNexis stored at the local level or at

19   the data warehouse or both?

20        A.     It would be stored at the local

21   level.  There would be aspects to the

22   prescriber that would also be stored in data

23   warehouse related to that prescription.

24        Q.     Okay.  So the data pull from

25   LexisNexis on roughly a monthly basis, that
```

Highly Confidential - Subject to Further Confidentiality Review

1  data pull is duplicated and stored on each

2  local Giant Eagle server?

3      A.      When I would pull the

4  information from the central database, that

5  prescriber profile would also be stored then

6  on the local server as well.

7      Q.      All right.  I'm not talking

8  about pulling it and then storing it.  I'm

9  talking about the initial -- the monthly pull

10  from LexisNexis, is that export stored at the

11  local servers initially or the data

12  warehouse?

13      A.      Separate from the data

14  warehouse.  It would be stored on the -- on a

15  central server that Giant Eagle hosts.  And

16  then when I would search for the prescriber

17  on the local level, it would pull that

18  information down.

19      Q.      Okay.  So there's a bank of

20  servers that store the LexisNexis prescriber

21  information, separate from the data warehouse

22  and separate from the local servers?

23      A.      It could be on the same server

24  in a different area.  I'm not familiar with

25  what server it's actually stored on.  It's

1    referred to as the central host.

2        Q.     But you don't know if the

3    central host is the same as the data

4    warehouse or different --

5        A.     I'm not sure if it's --

6            MR. KOBRIN:  Object to form.

7            THE WITNESS:  I am not -- I'm

8        not familiar if it's on the same

9        Oracle server or not.  It could be on

10       a different server, but it's on the

11       central host.

12   QUESTIONS BY MR. MOUGEY:

13       Q.     Okay.  But sitting here today,

14   you don't know the initial import of

15   LexisNexis on the prescriber information,

16   whether the central server and the data

17   warehouse are the same?

18           MR. KOBRIN:  Object to form.

19           THE WITNESS:  That is correct.

20       I'm not sure if the data from

21       LexisNexis is stored within data

22       warehouse or in a separate location on

23       a server.

24   QUESTIONS BY MR. MOUGEY:

25       Q.     Okay.  Now let's go back up to

Highly Confidential - Subject to Further Confidentiality Review

1  where a local store level has a hardcopy

2  prescription on a new patient.

3           The information is pulled from

4  the central server; is that fair?

5      A.    That is correct.

6      Q.    Okay.  And the -- with the

7  information pulled from the central server

8  that was exported from LexisNexis, the

9  pharmacist, tech or intern manually select

10 the prescriber; is that correct?

11     A.    For the hardcopy prescription,

12 that is correct.

13     Q.    All right.  Let me see if I can

14 catch that then.

15          So I have pharmacist, tech,

16 intern, select doctor profile from central

17 server populated through data LexisNexis.

18          Is that accurate?

19     A.    Can you reference -- instead of

20 doctor profile, can you use prescriber?

21 Because there would be -- there's

22 practitioners or physician assistants as well

23 that can prescribe.

24     Q.    Sure.  All right.

25          The pharmacist, tech and intern

1  select the prescriber from the central server

2  populated through data from LexisNexis.

3         Is that accurate?

4     A.    That's accurate.

5     Q.    Okay.  Now, when did Giant

6  Eagle begin using LexisNexis to pull data for

7  specific prescribers?

8     A.    To my best recollection, it's

9  around the 2012, 2013 time frame.

10    Q.    All right.  Prior to 2012,

11 2013, who did Giant Eagle use -- let me ask

12 that again.

13        Prior to 2012, 2013, when Giant

14 Eagle began to use LexisNexis, what was Giant

15 Eagle's process to pull prescriber

16 information when a hardcopy prescription was

17 presented?

18    A.    Prescriber infor -- prescriber

19 information would be created and maintained

20 at the local pharmacy.

21    Q.    And what resources were

22 available to the local pharmacy -- or store

23 level to create a prescriber profile?

24    A.    I'm sorry, I don't understand

25 the question.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                What do you mean by

 2   "resources"?

 3        Q.    Well, I mean, just -- I mean,

 4   what did they do?  What did the store level

 5   do to populate the prescriber info in all the

 6   fields in Giant Eagle's database when a new

 7   patient hardcopy prescription was presented?

 8        A.    Stores could use the ability to

 9   use the information that would be available

10   on the prescription, such as the prescriber's

11   name, licensure, address, phone number.

12                There's also a searchable DEA

13   database that you can go in to verify

14   licensure information with regards to DEA.

15   And each state maintains a database of

16   licensure information as well.

17        Q.    Let's do each one of those

18   independently.

19                Is there a field that the

20   pharmacist would -- the store level would use

21   to identify whether or not it searched a DEA

22   database for specific prescriber information

23   prior to 2012 or 2013?

24        A.    There would be a note --

25   there's a prescriber note field that could be
```

Highly Confidential - Subject to Further Confidentiality Review

1    used by a pharmacist to document that

2    information.

3         Q.     But there's no specific field

4    in Giant Eagle, 2012, 2013 and prior, where

5    at the store level it would identify whether

6    they searched a DEA database?

7         A.     Just to clarify, do you mean a

8    specific field that is stated as search DEA

9    database, question mark, and then yes/no?  Is

10   that what you mean?

11        Q.     I don't -- I'm generally

12   asking.  I'm not asking whether you and I

13   come up with the specific name of the field.

14             What I'm asking you is,

15   generally speaking, is there anyplace on

16   Giant Eagle's system that documented whether

17   or not the store level searched a DEA

18   database prior to 2012, 2013, when populating

19   prescriber information?

20             MR. KOBRIN:  Object to form.

21             THE WITNESS:  A pharmacy -- a

22        pharmacy team member could enter

23        information in the prescriber profile

24        under -- in the notes section.

25

```
 1   QUESTIONS BY MR. MOUGEY:

 2        Q.    Yep.   Right.   We've covered

 3   that, and I appreciate that answer again, but

 4   my question is a little different.   I get

 5   that they can put it in notes.

 6              Is there any specific field

 7   documenting where the store level would say,

 8   we searched a DEA database when populating

 9   the fields necessary for the prescriber

10   profile?

11              MR. KOBRIN:   Object to form.

12        Asked and answered.

13   QUESTIONS BY MR. MOUGEY:

14        Q.    I think it's relatively simple.

15   It's no, right?

16        A.    I -- as I previously stated,

17   in -- other than the prescriber note field

18   within the prescriber profile, there is not a

19   specific field that states DEA profile

20   searched on the DEA database.

21        Q.    Yeah, let's not get -- look,

22   we're going to go take lunch in a few

23   minutes.   Let's not -- you've said that

24   twice.

25              I'm not asking you for specific
```

1    language, okay?  I didn't ask you if it says,

2    "DEA searched, question mark."  That's not

3    what I asked.

4              What I asked was, is there

5    anywhere, with whatever name you want to put

6    on it, other than notes, that confirms that

7    the store level searched a DEA database when

8    populating the fields necessary for a

9    prescriber profile?

10        A.    As I previously answered, the

11   prescriber profile has a note field where a

12   pharmacy team member can enter that

13   information.

14        Q.    Other than notes, there's no

15   other column you can point to, right, sir?

16        A.    A field specifically for

17   searching the DEA database?

18              Other than -- other than

19   entering that into the patient -- or a

20   prescriber note fields, there's not a

21   specific field for that.

22        Q.    Okay.  Same assumption with the

23   hard copy.  Assume for a minute that the

24   prescriber did not exist in Giant Eagle's

25   system.  How, then, was information entered

Highly Confidential - Subject to Further Confidentiality Review

1    regarding the prescriber profile?

2              MR. KOBRIN:  Object to form.

3              THE WITNESS:  Do you mean

4       previous to LexisNexis or at any time?

5    QUESTIONS BY MR. MOUGEY:

6       Q.    Both.  Let's do prior to 2012,

7    '13, with LexisNex -- I mean, pre-LexisNexis

8    and post-LexisNexis.

9       A.    Sure.  To answer the first part

10   of the question, pre-LexisNexis, a pharmacy

11   team member would have a create a prescriber

12   profile.

13      Q.    And post-LexisNexis?

14      A.    It would be very unusual for a

15   prescriber profile to not exist, but in

16   cases -- there would be cases such as

17   veterinarian names that may have to be

18   created that they would follow the same

19   process as before.

20      Q.    What fields is data collected

21   in from LexisNexis on the -- for the

22   prescriber profile?

23      A.    Sure.

24              There's a prescriber's name,

25   their address, their phone number, DEA

Highly Confidential - Subject to Further Confidentiality Review

```
 1   registration number, NPI number, any state
 2   credentials that are listed.
 3              There is a field for the type
 4   of prescriber, so such as internist,
 5   podiatrist, dentist.
 6              There -- and then any other --
 7   I just want -- I'm just trying to run through
 8   them all, so I apologize.
 9              And then different -- so under
10   addresses would also be different -- if the
11   doctor practices at multiple clinics,
12   different addresses would be in there as
13   well, along with phone numbers and fax
14   numbers.
15        Q.    So where I have prescriber
16   specialty under number 7, was that
17   information pulled from LexisNexis post-2012,
18   '13?
19        A.    That is correct, that would be
20   supplied by LexisNexis.
21        Q.    Okay.  And that's automatically
22   populated from LexisNexis in the prescriber
23   profile, correct?
24        A.    Yes, that is part of the
25   LexisNexis data.
```

1      Q.     Okay.  All right.  So I've made

2  a note of that under prescriber specialty,

3  LexisNexis, 2012-2013 until current.

4           All right.  For prescriber

5  specialty prior to LexisNexis, 2012-2013,

6  that would be filled out manually at the

7  store level?

8      A.     That would be -- that would be

9  correct, under a prescriber profile.

10      Q.     Okay.  So I've made a note

11  here:  Prior to LexisNexis, manually

12  populated at store level.

13           Is that accurate?

14      A.     Yes, it would have to be

15  manually populated by a team member -- by a

16  pharmacy team member, that is correct.

17      Q.     All right.  Number 6,

18  prescriber license suspended, not suspended.

19           Any information pulled by Giant

20  Eagle from LexisNexis, 2012-2013 to the

21  current?

22      A.     That is correct.  LexisNexis

23  would -- with a physician, nurse

24  practitioner, et cetera, would be

25  suspended -- would be suspended, LexisNexis

1    would provide that information.

2        Q.    Okay.  Prior to 2012-2013?

3        A.    There would be communications

4    from state boards from the -- and the DEA for

5    when a practitioner would be suspended, that

6    we have the ability to update that

7    prescriber's credentials as suspended.

8        Q.    All right.  You said "we have

9    the ability to update."

10            Does that mean there was

11   somebody specific that was assigned to taking

12   that information that was coming in from the

13   DEA and the state boards that would then

14   populate Giant Eagle's database?

15       A.    Specifically --

16            MR. KOBRIN:  Object to form.

17       Beyond the scope.

18            THE WITNESS:  Specifically one

19       person, I wouldn't say so.

20            Information would be collected

21       from different resources.  It could

22       have come from a pharmacy.  It could

23       have come from a pharmacy district

24       leader.  It could have come from

25       somebody in compliance.  And then that

1          information would flow to information

2          technologies, who could update or

3          block a prescriber.

4     QUESTIONS BY MR. MOUGEY:

5          Q.     So essentially everybody was

6     responsible for getting that information to

7     IT for the prescriber profile, but no one --

8     no-buck-stops here person you could point to?

9          A.     No, it would be multiple people

10    collecting that information.

11         Q.     I mean, really -- it's not

12    multiple people.  It was pharmacists,

13    interns, techs, compliance.  Everybody at

14    Giant Eagle was responsible for keeping their

15    eye to the ground to see the information from

16    the DEA and state boards, and then they would

17    tell the IT department.

18               Is that what you're saying?

19               MR. KOBRIN:  Object to form.

20               THE WITNESS:  Information could

21         be collected from various different

22         data points to inform IT, if that's

23         what you're asking.

24    QUESTIONS BY MR. MOUGEY:

25         Q.     I understand it could be.  I

Highly Confidential - Subject to Further Confidentiality Review

1    understand they have the ability to.  I

2    understand they might.

3              What I'm asking you is, is

4    there anything that there's a buck-stops-here

5    person or a department whose job it was to

6    make sure that that information that was

7    available about specific prescribers losing

8    their license, that that was notated on Giant

9    Eagle's database so everyone could see it?

10             MR. KOBRIN:  Object to form.

11        Beyond the scope.

12             THE WITNESS:  If you're

13        referencing a specific department, it

14        would be the responsibility of the

15        pharmacy department to do so.

16   QUESTIONS BY MR. MOUGEY:

17        Q.    Well, I'm not referencing a

18   different department.  I'm asking you.

19             What department, who, was

20   charged with the responsibility of

21   determining whether or not a prescriber or

22   anyone who issued prescriptions with opiates

23   had lost their license in making sure that

24   information was on Giant Eagle's database?

25             MR. KOBRIN:  Object to form.

```
 1              THE WITNESS:  I'm sorry, you
 2         referenced -- are you referencing a
 3         specific person or a department at
 4         this point?  Both are mentioned in
 5         your question.
 6    QUESTIONS BY MR. MOUGEY:
 7         Q.    I'm asking you, sir.  Who was
 8    the buck-stops-here person or department
 9    responsible for gathering publicly available
10    information or information your office
11    purchased and making sure whether or not the
12    prescriber's licensure information was
13    accurately reported on Giant Eagle's servers?
14              MR. KOBRIN:  Object to form.
15         Beyond the scope.
16              THE WITNESS:  It was the
17         responsibility of those individuals
18         within the pharmacy department down --
19         and including pharmacists.
20    QUESTIONS BY MR. MOUGEY:
21         Q.    So everyone in the entire
22    pharmacy department, everyone within Giant
23    Eagle, was all supposed to be watching for
24    licensure information and reporting it to IT.
25              Is that what you're saying,
```

Highly Confidential - Subject to Further Confidentiality Review

1  sir?

2           MR. KOBRIN:  Object to form.

3       Beyond the scope.

4           THE WITNESS:  To clarify your

5       question, you said "everybody within

6       Giant Eagle."

7           It would just be within --

8       those within the pharmacy department.

9  QUESTIONS BY MR. MOUGEY:

10      Q.    Every person.  That's what I

11 said, sir.  Listen to my question.

12          Everyone in the entire pharmacy

13 department within Giant Eagle was all

14 supposed to be looking for licensure

15 information and reporting it to IT so it

16 could be accurately reflected on the

17 databases, correct?

18          MR. KOBRIN:  Object to form.

19      Beyond the scope.

20          THE WITNESS:  To properly

21      answer your question, different people

22      may have had different access to

23      information with -- regarding a

24      contact from a state board, an e-mail

25      that would be sent out, potentially

Highly Confidential - Subject to Further Confidentiality Review

1        information from an insurance company.

2        So there could be multiple people that

3        have -- would receive that information

4        that would pass it along to

5        information technologies.

6   QUESTIONS BY MR. MOUGEY:

7        Q.    Right.

8              But I -- the word "could" in

9   your answer, right?  So I'm not asking about

10  who could.

11             So, sir, if we go back to your

12  subpoena today that you -- we covered this

13  morning, that you were supposed to educate

14  yourself on collection, correct?

15             You agree with me on

16  collection, right?

17       A.    As in -- as in both subject

18  matters testimony on page 3?  Is that

19  correct?

20       Q.    Yes.

21       A.    Yes, I would agree to that.

22       Q.    Okay.  Who, or what department,

23  at Giant Eagle was responsible for collecting

24  prescriber licensing information and

25  recording it on Giant Eagle's servers?

```
 1              MR. KOBRIN:  Object to form.
 2         Beyond the scope.  The topic is about
 3         dispensing data.
 4              THE WITNESS:  And to -- the --
 5         previously answered would be that
 6         there are multiple individuals that
 7         would be responsible for that now, and
 8         including pharmacists at the store
 9         level filling a prescription.
10    QUESTIONS BY MR. MOUGEY:
11         Q.    All right.  I get the pharmacy
12    level, everyone in the pharmacy department.
13              But who are these multiple
14    individuals you're talking about that are
15    responsible for collection?
16              MR. KOBRIN:  Object to form.
17         Beyond the scope.  Asked and answered.
18    QUESTIONS BY MR. MOUGEY:
19         Q.    If you don't know, it's okay
20    just to say you don't know.  But telling me
21    multiple people is not responsive to my
22    question.
23              What I'm asking you, sir, is,
24    who collected licensure information
25    specifically regarding whether or not
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   doctors' licenses has been suspended?  Who at

 2   Giant Eagle -- whose job was it?

 3              MR. KOBRIN:  Object to form.

 4         Beyond the scope.  Same objection

 5         regarding asked and answered.

 6              THE WITNESS:  And to state my

 7         prior answer, there would be multiple

 8         individuals that could collect that

 9         information, including pharmacists,

10         pharmacy interns, potentially a

11         technician, loss prevention, while

12         working with state Boards of Pharmacy

13         and the DEA, could find that

14         information out.

15              There could be information

16         flowing from an insurance company that

17         the third-party team might have found

18         answers to.

19              So again, multiple individuals

20         could have collected that information.

21   QUESTIONS BY MR. MOUGEY:

22         Q.    That's -- how many people are

23   in the pharmacy department at Giant Eagle

24   through 2000s?  Hundreds?

25              MR. KOBRIN:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

 1          Beyond the scope.

 2               THE WITNESS:  I'm not aware of

 3          a specific number.

 4     QUESTIONS BY MR. MOUGEY:

 5          Q.    Sir, I'd like just a simple yes

 6     or no.

 7               Can you point me to any

 8     department that was responsible for

 9     collecting information identifying whether or

10     not a doctor had lost his license?

11               MR. KOBRIN:  Object to form.

12          Beyond the scope.  Asked and answered.

13               THE WITNESS:  Other than my

14          previous answer that there are

15          multiple individuals who could collect

16          that information, is there a specific

17          person within Giant Eagle or Giant

18          Eagle pharmacy that was responsible

19          for that?  No.  It would be a team

20          effort to collect that information.

21     QUESTIONS BY MR. MOUGEY:

22          Q.    And that's what -- I didn't ask

23     you for a specific person.  I'm simply

24     asking:  Can you point me to a department,

25     rather than saying the entire pharmacy

Highly Confidential - Subject to Further Confidentiality Review

```
 1   operation, that was responsible for capturing

 2   whether or not a prescriber had lost their

 3   license?

 4             MR. KOBRIN:  Same objection.

 5             I think there might be a little

 6       confusion here, Peter, because the

 7       pharmacy department is a department

 8       within Giant Eagle.  Giant Eagle is a

 9       large grocery chain.

10             MR. MOUGEY:  Josh, I'm not

11       swearing you in.

12   QUESTIONS BY MR. MOUGEY:

13       Q.    How many pharmacies are

14   there --

15             MR. MOUGEY:  Josh --

16             MR. KOBRIN:  You want to keep

17       going round and round, that's fine.

18       I'm just trying to help you.

19             MR. MOUGEY:  I do.  I want an

20       answer.  I appreciate it, but I don't

21       want or need your help.

22   QUESTIONS BY MR. MOUGEY:

23       Q.    Mr. Miller, how many -- there's

24   200 pharmacies, correct, sir, give or take,

25   at Giant Eagle through the 2000s, correct?
```

```
 1            MR. KOBRIN:  Object to form.
 2       Beyond the scope.
 3            THE WITNESS:  That's an
 4       approximation, yes, that is correct.
 5  QUESTIONS BY MR. MOUGEY:
 6       Q.    And there are hundreds and
 7  hundreds of pharmacists employed by Giant
 8  Eagle during that time of these 200
 9  pharmacies, correct?
10            MR. KOBRIN:  Beyond the scope.
11            THE WITNESS:  That would be
12       relatively correct.
13  QUESTIONS BY MR. MOUGEY:
14       Q.    There are hundreds of
15  technicians that are employed at Giant Eagle
16  at these 200 pharmacies, correct, sir?
17            MR. KOBRIN:  Beyond the scope.
18            THE WITNESS:  That's relatively
19       correct.
20  QUESTIONS BY MR. MOUGEY:
21       Q.    And is it your answer today,
22  sir, that all of these hundreds of
23  pharmacists and all of these hundreds of
24  interns -- I'm sorry, technicians, those are
25  the individuals that were responsible for
```

1   capturing or collecting information about

2   doctors losing their license and forwarding

3   that to IT so it would be on the database?

4               MR. KOBRIN:  Object to form.

5          Beyond the scope.  Asked and answered.

6          Misrepresents his prior testimony.

7               THE WITNESS:  I believe that

8          would be inaccurate, as they would be

9          part of the individuals that would

10         have collected -- that could have

11         potentially collected that

12         information.

13  QUESTIONS BY MR. MOUGEY:

14      Q.     See, sir, there you go again

15  with the "could," the "potential."  I didn't

16  ask you potentially.  I didn't ask you could.

17  I didn't ask you if you had the ability.

18              I'm asking:  What department

19  was responsible for identifying prescribers

20  that had lost their license and forwarding

21  that to IT?

22              MR. KOBRIN:  Object to form.

23         Beyond the scope.  Asked and answered.

24              THE WITNESS:  That would be --

25              MR. KOBRIN:  Argumentative.

```
 1              THE WITNESS:  To specifically
 2         answer your question of what
 3         department, that would be the pharmacy
 4         department.
 5    QUESTIONS BY MR. MOUGEY:
 6         Q.    How many people are in the
 7    pharmacy department?
 8              MR. KOBRIN:  Beyond the scope.
 9              THE WITNESS:  That would --
10         that would include corporate team
11         members, and that would include every
12         pharmacy technician, pharmacist,
13         pharmacy intern, within the company.
14    QUESTIONS BY MR. MOUGEY:
15         Q.    So what your answer to my
16    question about who was responsible for
17    collecting data, whether or not a prescriber
18    had lost their license, your answer is the
19    entire pharmacy department, consisting of
20    hundreds of people?
21              MR. KOBRIN:  Object to form.
22         Beyond the scope.  Asked and answered.
23         Misrepresents testimony.
24              THE WITNESS:  My -- as I stated
25         in previous answers, there could be
```

```
 1            multiple individuals where that
 2            information might have been presented
 3            to.
 4    QUESTIONS BY MR. MOUGEY:
 5         Q.    Sir, I'm entitled to an answer,
 6    a clean answer.  Not "multiple," not "might."
 7            Your testimony today is that
 8    the entire pharmacy department, consisting of
 9    hundreds of people, was responsible for
10    identifying doctors that had lost their
11    license and reporting that to Giant Eagle's
12    technology team, correct, sir?
13            MR. KOBRIN:  Object to form.
14        Asked and answered.  Argumentative.
15        Beyond the scope.
16            THE WITNESS:  As I stated in my
17        previous answer, there were multiple
18        individuals within pharmacy department
19        where that information may have been
20        presented to collect.
21    QUESTIONS BY MR. MOUGEY:
22         Q.    Sir, you're using the word
23    "may" again.  And to me, I feel like you're
24    not sure what the answer is.
25            So there were multiple
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    individuals within the pharmacy department

 2    where that information may have been

 3    presented to collect.

 4                Mr. Miller --

 5         A.     That is an accurate statement,

 6    correct.

 7         Q.     And you can't point to anybody

 8    specific or any team specific out of the

 9    hundreds of individuals in the pharmacy

10    department that were responsible for

11    collecting that information?

12                MR. KOBRIN:  Object to form.

13           Asked and answered.  Well beyond the

14           scope.

15                MR. MOUGEY:  Oh, for goodness

16           sake.

17                MR. KOBRIN:  Argumentative.

18                MR. MOUGEY:  The collection of

19           data about prescriber's licenses is

20           exactly what we're here to talk about.

21                MR. KOBRIN:  Which one?  Which

22           topic?  Which topic, Peter?  Topic 1?

23                MR. MOUGEY:  Whichever one you

24           want to pick.  There's the whole two

25           of them.  You read them while we're
```

1          off and make sure --

2                MR. KOBRIN:  I'm looking at

3          them right now, and I -- if you're

4          going to engage on this and you want

5          to challenge my objection, which topic

6          are you asking questions about?

7     QUESTIONS BY MR. MOUGEY:

8          Q.    Mr. Miller --

9                MR. KOBRIN:  I'm sorry?

10    QUESTIONS BY MR. MOUGEY:

11         Q.    Mr. Miller --

12               MR. KOBRIN:  Peter, which topic

13         are you asking questions about?

14    QUESTIONS BY MR. MOUGEY:

15         Q.    Mr. Miller --

16               MR. KOBRIN:  Peter, if you're

17         not going to answer my question, I'm

18         going to stop this right now.

19               MR. MOUGEY:  Then stop it.

20               MR. KOBRIN:  This is getting

21         obscene.  You're harassing the

22         witness.  You're asking the same thing

23         over and over again.

24               I don't understand what topic

25         this is in.  I don't think the witness

Highly Confidential - Subject to Further Confidentiality Review

```
 1          does.
 2                  You've gotten an answer.  You
 3          said -- you're demanding that you
 4          deserve a specific answer, and I'd
 5          like to know on what topic basis do
 6          you deserve a specific answer.
 7     QUESTIONS BY MR. MOUGEY:
 8          Q.    Mr. Miller, is --
 9                MR. KOBRIN:  Okay.
10     QUESTIONS BY MR. MOUGEY:
11          Q.    -- is a doctor licensure
12     information part of the prescriber profile at
13     Giant Eagle?
14          A.    Just to -- do you mean the
15     prescriber licensure insofar as their DEA
16     registration or state license number?  Is
17     that correct?  Is that what you are
18     referencing?
19          Q.    And what we've talking about
20     the last ten minutes, about whether or not
21     the doctor's license was suspended.  That's
22     specifically what I'm talking about.
23                Do you agree that whether or
24     not the doctor's license was suspended is
25     data collected by Giant Eagle?
```

```
 1              MR. KOBRIN:  Object to form.
 2              THE WITNESS:  Data collected
 3         for -- data collected by Giant Eagle
 4         would be the DEA registration number,
 5         NPI number and state license
 6         credentials as part of the prescriber
 7         profile.
 8    QUESTIONS BY MR. MOUGEY:
 9         Q.    And prior to 2012 and prior to
10    2013 where the information was pulled by
11    LexisNexis, what group of individuals was
12    responsible for collecting whether or not a
13    doctor was licensed?
14              MR. KOBRIN:  Object to form.
15         Beyond the scope.  Asked and answered.
16              The topic doesn't say, tell us
17         who is responsible for collecting
18         metadata related to the dispensing
19         data.
20              This is ridiculous.  He's given
21         you an answer.
22              You can answer, if you can,
23         Chris, but I think we've gone around
24         and around on this many times.
25
```

```
 1    QUESTIONS BY MR. MOUGEY:

 2         Q.     Can you point me to a specific

 3    group of people or department, other than the

 4    hundreds of people in the pharmacy

 5    department, that are responsible for

 6    collecting whether or not a doctor is

 7    licensed prior to 2012 or 2013?

 8         A.     As I stated in previous

 9    answers, information can be collected by a

10    multitude of individuals, including

11    pharmacists, interns, loss prevention, people

12    in the compliance department.  There could be

13    information passed from insurance companies

14    about a specific provider as well, too.  So

15    there would be multiple individuals

16    potentially collecting that information.

17              MR. KOBRIN:  I can't hear you,

18         Peter.  I don't know if you're talking

19         to us or if you're talking to Chris.

20    QUESTIONS BY MR. MOUGEY:

21         Q.     Mr. Miller, your answer

22    encompasses hundreds of people, correct, sir?

23              MR. KOBRIN:  Object to form.

24         Beyond the scope.

25              THE WITNESS:  For those --
```

```
 1          for -- to include those who could be
 2          exposed to that information, yes, it
 3          could be.
 4   QUESTIONS BY MR. MOUGEY:
 5          Q.    I didn't say "could be
 6   exposed."  I asked you who's -- which
 7   departments are responsible for collecting
 8   data of whether or not a prescriber was
 9   licensed.
10              And your answer to me included
11   pharmacist, interns, loss prevention, people
12   in the compliance department.
13              That is hundreds of people, is
14   it not, sir?
15              MR. KOBRIN:  Object to form.
16        Beyond the scope.
17              THE WITNESS:  That could be --
18          that could have received that
19          information?  Yes, it could be.
20   QUESTIONS BY MR. MOUGEY:
21          Q.    Was there a specific field that
22   these hundreds of people would note, or it
23   could be noted, that a doctor had lost his
24   license or was suspended?
25              MR. KOBRIN:  Object to form.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Asked and answered.

 2                   THE WITNESS:  On the patient --

 3              on the prescriber profile, there is a

 4              probation form that could be used to

 5              limit prescribing information, yes.

 6    QUESTIONS BY MR. MOUGEY:

 7         Q.    Is that prior to 2012?  Prior

 8    to 2013?

 9         A.    To my -- to my knowledge, that

10    information has always been present under the

11    prescriber profile.

12         Q.    And, sir, when you say -- when

13    you indicated to your knowledge, you

14    recognize you're testifying on behalf of HBC,

15    correct?  Or Giant Eagle?

16                   MR. KOBRIN:  Object to form.

17                   THE WITNESS:  That is correct,

18              yes.

19    QUESTIONS BY MR. MOUGEY:

20         Q.    Okay.  So prescriber license is

21    suspended.  Is the -- that data is collected,

22    I'm going to put down here, by the pharmacy

23    department, loss prevention, compliance, from

24    various sources.

25                   Is that accurate?
```

```
 1              MR. KOBRIN:  Object to form.
 2         Misrepresents prior testimony.
 3              THE WITNESS:  Yes, it could be
 4         collected by individuals that are in
 5         the pharmacy department.  There could
 6         be individuals by loss prevention in
 7         contact with regulatory boards.
 8         Compliance could get updates from
 9         regulatory boards as well.
10              Interns may have information.
11         Pharmacists may have information.  But
12         interns, pharmacists, technicians, I
13         would classify them being under the
14         pharmacy department.
15    QUESTIONS BY MR. MOUGEY:
16         Q.    All right.  So I have written
17    down here "collected by pharmacists, loss
18    prevention, compliance, interns, technicians,
19    from various sources."
20              Is that accurate?
21              MR. KOBRIN:  Object to form.
22              I just want a standing
23         objection.  He's not testifying to
24         your notes, is he, Peter?  Is that
25         your position?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                  I just want to clarify.  His
 2          testimony is his statements only, and
 3          his testimony is not your notes.  I
 4          can hardly read them.
 5                  So I just want to have that as
 6          a standing objection.
 7   QUESTIONS BY MR. MOUGEY:
 8          Q.    Mr. Miller, is it your
 9   testimony, sir, what I've indicated here on
10   this chart, that the prescriber license,
11   whether or not it's suspended, is collected
12   by pharmacists, loss prevention, compliance,
13   interns, technicians, from various sources?
14   Did I get that correctly?
15                  MR. KOBRIN:  As I -- object to
16          form.  I'm going to say again, because
17          you added it that time as if to deny
18          the standing objection.  You said
19          "here on this chart."
20                  He's not testifying to your
21          chart, and he's not testifying to your
22          notes, Peter.
23                  I mean, do you want to have
24          that as a standing objection?
25                  MR. MOUGEY:  You can object as
```

1        much as you want.

2               MR. KOBRIN:  I'll keep

3        objecting then to it, but the concern

4        I have here is that you're going to

5        get frustrated with that objection.

6               If you don't want to have it as

7        a standing objection, I'll keep

8        objecting, but he's not testifying to

9        your notes here on this chart.

10              MR. MOUGEY:  No, you can have a

11       standing objection.  I just figured

12       you just wanted to keep objecting.

13              MR. KOBRIN:  I don't want to

14       interfere any more than I have to,

15       Peter.

16              MR. MOUGEY:  Yes, you've made

17       that clear.

18  QUESTIONS BY MR. MOUGEY:

19       Q.    Mr. Miller, what I'm asking

20  you, sir, is, did I capture accurately on my

21  notes that whether or not a prescriber's

22  license was suspended is collected by the

23  pharmacists, loss prevention, compliance,

24  interns and technicians from various sources?

25  Is that -- is that accurate, sir?

Highly Confidential - Subject to Further Confidentiality Review

1          MR. KOBRIN:  Object to form.

2          THE WITNESS:  I also included

3     others in the pharmacy department in

4     previous answers as well, too,

5     including there could be members of a

6     third-party team that work with

7     insurances that might have had that

8     information, in addition to the

9     pharmacists, interns, technicians,

10    pharmacy district leaders who also are

11    in the pharmacy department could have

12    obtained that information from a

13    regulatory authority as well.

14  QUESTIONS BY MR. MOUGEY:

15    Q.    All right.  The prescriber

16  profile information, prescriber notes,

17  whether or not the prescriber license is

18  suspended, are your answers from earlier

19  today regarding the retention periods on the

20  local RX.com data warehouses, are they the

21  same as this morning or is there different

22  treatment of the prescriber data?

23          MR. KOBRIN:  Object to form.

24          THE WITNESS:  The information

25    that would be retained on the local

Highly Confidential - Subject to Further Confidentiality Review

1        server would be correct.

2              To the time frame that a --

3        that information would be on an RX.com

4        server, I am not familiar with, as the

5        prescriber information is maintained

6        on the local server and by our central

7        host through the LexisNexis.

8              So I'm not aware of what -- of

9        how long information is retained on a

10       PDX server since the prescriber's

11       profiles are maintained elsewhere.

12              And there are certain aspects

13       to a prescriber profile that are

14       retained in data ware -- in data

15       warehouse.

16              To the individual that if a

17       license was suspended or not, I can't

18       answer that question if that was -- if

19       that's retained in the thousands of

20       tables that are in data warehouse.

21   QUESTIONS BY MR. MOUGEY:

22       Q.    All right, sir.  When I --

23   talking about the prescriber data test -- in

24   your testimony, you said that the prescriber

25   information is maintained on the local server

1    and by our central host.

2              Did I get that right?

3         A.    That -- once we started using

4    LexisNexis, that is correct.

5         Q.    Is it stored at both?

6         A.    Once I would pull information

7    down from the central host, that information

8    would -- that information would remain on the

9    local server as well.

10        Q.    Okay.  But the entire -- the

11   data pull in its entirety went to the central

12   server, correct, sir?

13        A.    That is -- from LexisNexis,

14   that is correct.

15        Q.    And, sir, you're not sure

16   whether or not that central server that

17   stored the initial data pull from LexisNexis

18   on the prescriber information is the same as

19   the data warehouse, correct?

20             MR. KOBRIN:  Object to form.

21             THE WITNESS:  That is correct.

22   QUESTIONS BY MR. MOUGEY:

23        Q.    And only as information was

24   pulled at the store level about prescriber

25   data was it then stored at the local level,

1  correct?

2        A.     If it was -- once it -- once

3  that information was pulled from the central

4  host, that information would be stored on the

5  local server.

6        Q.     Do you know how long -- if a

7  prescriber profile was, say, filled out and

8  populated in 2015, and that prescriber did

9  not write a prescription that was filled at

10  Giant Eagle for three years, would the

11  profile have changed or been updated if a

12  patient presented a hardcopy prescription in

13  2018?

14        A.     When -- during the search of

15  that profile, it would -- came back to the

16  central host to pull any updated information.

17        Q.     When you said "it" came, it was

18  a automatic part of the system that the

19  prescriber profile would be updated with any

20  new information from LexisNexis?

21        A.     That is -- that's correct.

22        Q.     How often was the -- were the

23  updates performed?

24        A.     I'm sorry, collecting -- or

25  getting addition -- new information from

Highly Confidential - Subject to Further Confidentiality Review

1    LexisNexis, just to clarify your question?

2        Q.    Yes.

3              That was monthly, right?

4        A.    That was roughly monthly,

5    correct.

6        Q.    When the data was imported from

7    LexisNexis onto the central server, were all

8    of the prescriber profiles automatically

9    updated on a monthly basis?

10       A.    Do you mean on the local

11   server?

12             MR. KOBRIN:  Object to form.

13   QUESTIONS BY MR. MOUGEY:

14       Q.    No, because they didn't go to

15   the local server until the -- until they were

16   pulled up with a specific prescription,

17   correct?

18       A.    That is correct.

19             So your -- just to clarify your

20   question, do you mean on the -- on the

21   central server, the central host?

22       Q.    Yes, sir.  Exactly.  So let me

23   ask it again.

24             Would -- as data from

25   LexisNexis was imported to the central server

1    on a monthly basis for prescriber profiles,

2    would all prescriber profiles be updated in

3    Giant Eagle's system?

4         A.    Those profiles that would be on

5    the central host would be updated with that

6    information.

7         Q.    Wouldn't all of the -- all of

8    the prescriber profiles be on the central

9    server?

10        A.    As I previously stated in our

11   prior answer, information would be updated on

12   local servers when that prescriber would have

13   been -- would be researched or repulled up,

14   which would update information from the

15   central server.

16        Q.    So the prescriber profiles

17   would only be updated as they were -- let's

18   do it this way.

19             Hardcopy prescription presents

20   on a prescriber that hasn't been pulled in

21   six months.  Is that profile only updated as

22   it's pulled from the -- at the store level?

23             MR. KOBRIN:  Object to form.

24             THE WITNESS:  That is our

25        knowledge, correct.

1    QUESTIONS BY MR. MOUGEY:

2         Q.    Was there a step in the process

3    that the store level had to update the

4    prescriber profile after 2012 or 2013, or

5    would it automatically update?

6         A.    I'm not aware of an additional

7    step.

8              MR. KOBRIN:  Peter, we've been

9         going for about an hour since the last

10        break.  If you have a point where you

11        want to break, we should probably

12        break for lunch.

13             MR. MOUGEY:  I'm close.  Let me

14        just finish this line.

15             MR. KOBRIN:  Okay.

16   QUESTIONS BY MR. MOUGEY:

17        Q.    If a pharmacist is -- let me

18   do -- at the store level, a prescription is

19   being filled, could anyone collect data on

20   that prescriber across all HBC stores -- or,

21   I'm sorry, Giant Eagle stores?

22        A.    To what -- to clarify the

23   question, what information across the stores?

24        Q.    Any information.

25             Could a -- at the store level,

1    could prescriber information, for example,

2    how many OxyContin scripts a specific

3    prescriber had written in the last 30 days,

4    could that be collected at the store level?

5         A.     There would be reports at the

6    store level that could run the prescriber

7    utilization.

8         Q.     Yes, sir.

9                And I didn't mean -- you

10   mean -- when you say "could," could be run,

11   you mean if there was a specific query or

12   question from the store level, that they

13   could ask for a report to be run, correct?

14        A.     There is reporting built into

15   the dispensing software that would allow a

16   pharmacy team member to run that report.

17        Q.     Right.

18               But as far as a feature on the

19   system, if I wanted -- if I was at the store

20   level and I wanted to search prescriber X,

21   how many oxy prescriptions they had written

22   over the last 30 days, could I do that at the

23   point of fill at the store level?

24        A.     For -- at the store level,

25   unique to that store, yes, a pharmacy team

Highly Confidential - Subject to Further Confidentiality Review

1    member could do that report.

2         Q.    Right.

3              So if a -- at the store level,

4    the pharmacist, technician or intern could

5    not search prescriber X for how many

6    OxyContin prescriptions he had over the prior

7    30 days across all the Giant Eagle stores?

8              MR. KOBRIN:  Object to form.

9              THE WITNESS:  That is correct.

10             MR. MOUGEY:  Okay.  That's a

11        good stopping place, thank you, for

12        lunch.

13             MR. KOBRIN:  All right.  How

14        much time?

15             What have we got on the record

16        right now?

17             VIDEOGRAPHER:  It's the

18        videographer.  Can we go off the

19        record just so I can do the math real

20        quick?

21             MR. KOBRIN:  Absolutely.

22             VIDEOGRAPHER:  The time right

23        now is 1:41 p.m.  We are off the

24        record.

25         (Off the record at 1:41 p.m.)

Highly Confidential - Subject to Further Confidentiality Review

1    VIDEOGRAPHER:  The time right

2    now is 2:29 p.m.  We're back on the

3    record.

4    (Miller Exhibit 4 marked for

5    identification.)

6  QUESTIONS BY MR. MOUGEY:

7    Q.    Mr. Miller, would you please

8  grab exhibit -- or, I'm sorry, the folder

9  that's marked 1356 out of your box?

10    And Mr. Miller, once you get

11  there, if you'd -- on the bottom right-hand

12  side are what we call Bates numbers.  If

13  you'd go to 818.

14    A.    I'm sorry.  You said 818,

15  correct?

16    Q.    I did, yes, sir.

17    A.    Roughly what year?

18    MR. KOBRIN:  This is in 1356,

19    right?

20    MR. MOUGEY:  Yes.

21  QUESTIONS BY MR. MOUGEY:

22    Q.    Are you there, Mr. Miller?

23    A.    I am, yes, sir.

24    Q.    Okay.  I believe these look to

25  be what I think are screenshots in patient

```
 1   profiles.

 2              Do I have that right?

 3       A.     Yes, this would be screenshots

 4   in the computer dispensing system prior to

 5   RapidFill, prior to that 2013 time frame.

 6       Q.     I thought RapidFill migration

 7   was 2015-2016.

 8       A.     That was Workflow.

 9       Q.     Okay.  Well, explain to me what

10   we're looking at.

11       A.     This is -- this is a screenshot

12   of, again, still a PDX product that was the

13   dispensing software up and to the conversion

14   of RapidFill in the 2013 time frame.

15       Q.     I know I already asked this,

16   but is the migration from Workflow to

17   RapidFlow {sic} or from RapidFlow to

18   Workflow?

19       A.     The conversion was from

20   RapidFill in approximately that 2013 time

21   frame to Workflow in that 2015-2016 time

22   frame.

23       Q.     Okay.  All right.  So this

24   screenshot was consistent on Giant Eagle's

25   system from the early 2000s up to 2013?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.      That is correct.

 2          Q.      Okay.  And are you familiar

 3   with -- if I use DUR, or drug utilization

 4   review reports, what that is?

 5          A.      I am, yes.

 6          Q.      Okay.  Explain to me what your

 7   understanding of a DUR is.

 8          A.      A drug utilization review would

 9   be using different data elements, whether it

10   be OARRS or -- I'm sorry, PDMP, patient

11   profile, the actual prescription itself,

12   performing clinical -- clinical assessment on

13   that therapy.

14                  Things to look out for would be

15   overuse or underuse of the medication,

16   dosing, drug-drug interactions, drug-allergy

17   interactions, drug-disease state

18   interactions, therapeutic duplication, you

19   know, early use or even, in a lot of cases,

20   lack of a refill.  So a patient may be

21   noncompliant on a blood pressure medication.

22                  The drug utilization review

23   would be for the pharmacist to exercise their

24   professional judgment in making sure a

25   therapy is correct for that patient.
```

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    How did Giant Eagle identify

2  issues that you just walked through pertinent

3  to the DURs?

4    A.    Outside of the pharmacist

5  exercising their professional judgment on

6  each prescription, there was certain data

7  elements that the computer software system or

8  the dispensing software would also assist the

9  pharmacist in flagging certain DURs.

10    Q.    Okay.  Let's cover the first

11  one first, the pharmacist exercising their

12  professional judgment.

13          That, in large part, is the

14  pharmacist manually reviewing, for example,

15  the patient's prescription history, correct?

16    A.    That would be one data element

17  of that, correct.

18    Q.    Okay.  And explain to me what

19  some of the other data elements are.

20          MR. KOBRIN:  Object to form.

21      Beyond the scope.

22          THE WITNESS:  It would be

23      the -- it would be the actual

24      prescription the patient would

25      present, or in case -- in some cases a

```
 1          refill of a prescription that a
 2          patient already had on their profile.
 3               It could contain data elements
 4          insofar as the Prescription Drug
 5          Monitoring Program, or in Ohio it's
 6          referred to as OARRS.
 7               There would be not -- the
 8          patient profile could be reviewed for
 9          previous history.  Patients -- the
10          patient demographic information could
11          be reviewed insofar as allergy
12          information or past disease states.
13               Those would all be information
14          that the pharmacist could review in
15          exercising a DUR.
16     QUESTIONS BY MR. MOUGEY:
17          Q.    Were there specific data fields
18     collected on the DURs identified in the Ohio
19     Administrative Code, for example?
20               MR. KOBRIN:  Object to form.
21               THE WITNESS:  Are you
22          referencing -- are you referencing the
23          DU -- the Ohio Administrative Code
24          prescription drug review?  Is that
25          what you're referencing?
```

```
 1    QUESTIONS BY MR. MOUGEY:

 2         Q.     Yes.  And if you'd like to look

 3    at it, I have a copy for you.

 4         A.     Yeah, could we pull that up

 5    just for reference?

 6              (Miller Exhibit 5 marked for

 7         identification.)

 8    QUESTIONS BY MR. MOUGEY:

 9         Q.     Sure.

10              Why don't we keep -- Gina,

11    let's keep what's on the screen.

12              But, Mr. Miller, if you'd

13    please pull out of your file Document 163.

14         A.     163, correct?

15         Q.     Yes.

16         A.     Okay.  I have it out, sir.

17         Q.     Okay.  And so what you've

18    pulled out, you see, sir, is Ohio

19    Administrative Code 4729, correct?

20         A.     The 5-20, correct?

21         Q.     Yes.

22         A.     Yes, sir.

23         Q.     Okay.  And these are the Ohio

24    Administrative Code DURs identified at this

25    point in time, correct?
```

```
 1              MR. KOBRIN:  Object to form.

 2         Beyond the scope.

 3              THE WITNESS:  I can't specify

 4         to this time, as the date in the top

 5         left corner has 2/2/21.  I assume

 6         that's the date this was printed.

 7              But I'm seeing an effective

 8         date of 3/1/17 at the end, correct?

 9    QUESTIONS BY MR. MOUGEY:

10         Q.    Yes.

11              So --

12         A.    Okay.

13         Q.    -- if we compare these DURs,

14    which in large part have been consistent over

15    time, correct, Mr. Miller?

16              MR. KOBRIN:  Object to form.

17         Beyond the scope.

18              THE WITNESS:  Without seeing

19         previous copies of this Ohio

20         Administrative Code, I would have to

21         agree that relatively, yes, they would

22         be the same over time.

23    QUESTIONS BY MR. MOUGEY:

24         Q.    Okay.  Thank you.

25              And now if I go to the computer
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    screen that's still on the monitor for -- and
 2    that is a screenshot of Giant Eagle's system
 3    used at the store level, where would the
 4    pharmacist, technician or the intern review,
 5    for example, 7, abuse and misuse?
 6              MR. KOBRIN:  Object to form.
 7              THE WITNESS:  I mean, it could
 8         be multiple -- it could be in multiple
 9         different areas.  It could
10         be on the -- the first would be
11         looking at the quantity -- the drug in
12         the quantity dispensed.
13              It could be also the patient
14         profile, which is one, two, three,
15         four -- the fifth tab over on the
16         bottom where it says "profiles."
17         Could be looking at previous therapy
18         there for the patient.
19              So you could look at if a
20         prescription was going to be -- was
21         being refilled early.  Excuse me.
22              The first tab on the left-hand
23         side is -- where it says "check RX,"
24         that would initiate the drug
25         utilization review from the computer
```

1      dispensing system as well.

2              And then also as part of the

3          drug utilization review, a pharmacist

4          can -- could -- could review the OARRS

5          database as well, too.

6   QUESTIONS BY MR. MOUGEY:

7      Q.     And by reviewing the OARRS

8   database, you're talking about going to a

9   third-party website managed by the State of

10  Ohio pharmacy board.  The pharmacists could

11  also go there to review various sorts of

12  information, correct?

13     A.     During this time frame, that is

14  correct.  Starting in early 2019, the PDMP,

15  or OARRS, was integrated into the dispensing

16  software where a pharmacist would not have to

17  go to a separate website to get that data.

18     Q.     That would be Giant Eagle's

19  system would scrape data off of OARRS and

20  incorporate it into its own system?

21             MR. KOBRIN:  Object to form.

22             THE WITNESS:  In a relatively

23         simple speaking form, that would be

24         correct.

25

1    QUESTIONS BY MR. MOUGEY:

2         Q.    Okay.  So did Giant Eagle at

3    any point in time retain any third-party

4    vendors to assist it with collecting data and

5    presenting it at the store level to assist

6    with DUR reviews?

7         A.    The third-party information

8    was -- was used by PDX from a company that's

9    called Medi-Span for that clinical

10   information with -- regarding database of DUR

11   review.

12        Q.    And when did Giant Eagle begin

13   using Medi-Span?

14        A.    To clarify, that was -- PDX

15   would use Medi-Span per -- within the

16   dispensing software.

17        Q.    Meaning that PDX would

18   interface with Medi-Span and pull data from

19   Medi-Span's databases?

20        A.    That is correct.

21        Q.    And where -- in what year did

22   PDX begin interfacing with Medi-Span and

23   pulling data into PDX?

24        A.    I do not know what specific

25   year.

1    Q.    A general time -- how about

2  just broaden it up.

3          When did -- when did Giant

4  Eagle begin using Medi-Span in its DUR

5  reviews?

6    A.    To clarify, PDX would use

7  Medi-Span to update the -- to update the

8  computer software, to pull that information

9  into the database --

10   Q.    Well, when did the

11  relationship --

12         MR. KOBRIN:  Hey, hey, hey,

13    hey, hey.

14  QUESTIONS BY MR. MOUGEY:

15   Q.    When did the Medi-Span --

16         MR. KOBRIN:  Let the witness

17    finish, Peter.

18  QUESTIONS BY MR. MOUGEY:

19   Q.    When did the Medi-Span

20  relationship begin?  When did they start

21  using Medi-Span?  When did Giant Eagle start

22  using Medi-Span?

23   A.    So to clarify my previous -- to

24  clarify as I previous answered, PDX used

25  Medi-Span.  Giant Eagle never owned, from my

1  knowledge, owned a relationship directly with

2  Medi-Span.  That information would flow

3  through PDX.

4        Q.     When did Giant Eagle begin

5  incorporating Medi-Span data into its system?

6        A.     Again, as I mentioned

7  previously, PDX pulls the information from

8  Medi-Span.  Giant Eagle does not.  It's

9  not --

10        Q.     I didn't ask you that you, sir.

11  That's not what I asked you, sir.  And I'm

12  going to ask for more time unless you start

13  answering the questions I asked.

14             The simple question I asked

15  you, sir, was, when did Medi -- when did

16  Giant Eagle begin to use Medi-Span data into

17  its system?

18             MR. KOBRIN:  There's no need to

19        harass the witness, Peter.

20             THE WITNESS:  As I stated

21        before, PDX uses the Medi-Span data

22        for their dispensing software.

23  QUESTIONS BY MR. MOUGEY:

24        Q.     Yeah, I get that.

25             And when did that data begin

1    being incorporated into Giant Eagle's system?

2         A.     I do not know a specific date.

3         Q.     You don't even have a general

4    time frame of when Medi-Span data began

5    populating in Giant Eagle's system?

6         A.     I can't -- I can't speculate,

7    but I could give you a best guess estimate,

8    if that's what you're asking.

9              MR. KOBRIN:  I don't want you

10        to speculate or give a guess.  If you

11        don't know, you don't know.

12   QUESTIONS BY MR. MOUGEY:

13        Q.     Would you agree with me,

14   Mr. Miller, that the Medi-Span data was

15   incorporated into Giant Eagle's DUR review?

16        A.     Yes, I would agree with that

17   statement.

18        Q.     And you would agree with me

19   that the data pulled from Medi-Span was

20   collected and included into PDX?

21        A.     That is correct.

22        Q.     And that the store-level

23   pharmacists, interns, technician, use data

24   from Medi-Span in its DUR analysis at Giant

25   Eagle?

```
 1          A.      Along with the professional

 2     judgment of the pharmacist, yes, that would

 3     be correct.

 4          Q.      Do you have an understanding of

 5     when PDX began incorporating Medi-Span data

 6     into the services it provided for Giant

 7     Eagle?

 8          A.      I do not know that specific

 9     date.

10          Q.      And when you say "specific

11     date," you don't even have a time frame, like

12     a year?

13          A.      It would be -- to my best

14     recollection, it was prior to -- it started

15     prior to 2010 at some point.  To give you --

16     I can't give you a specific year.

17          Q.      Were there specific data fields

18     on Giant Eagle's system that captured

19     information on drug-to-drug interactions?

20          A.      So I can provide you an

21     accurate answer, do you mean that -- that

22     flag for specific actions or notes relating

23     to the judgment -- professional judgment of

24     the pharmacist?

25          Q.      Either/or.
```

```
 1              MR. KOBRIN:  Object to form.
 2              THE WITNESS:  Once we -- once
 3         we converted to RapidFill, there --
 4         the DUR notes were fully captured
 5         within the computer system.  That
 6         would show drug-drug interaction,
 7         drug-allergy interaction, therapeutic
 8         duplication, et cetera.
 9    QUESTIONS BY MR. MOUGEY:
10         Q.    All right.  When you say "DUR
11    notes," was there a specific DUR notes
12    section?
13         A.    There was, yes, a free-form
14    section where a pharmacist could enter their
15    notes regarding professional judgment of that
16    DUR.
17         Q.    Were there multiple DUR section
18    notes on different DURs or just one?
19         A.    There was just one.
20         Q.    So I think we've identified
21    three different notes fields so far.  We have
22    the DUR notes, we have the prescriber notes,
23    and we have the patient notes.
24              Have I -- do I have that stated
25    accurately?
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1        A.    Yes, we -- you know, in the

 2   course of -- in the course of this time

 3   frame, yes, I believe those are the three

 4   notes fields we've identified so far.

 5        Q.    And if you need to

 6   differentiate between any of those notes

 7   fields, let me know.

 8              But once those notes are

 9   entered at the store level, can they be

10   deleted at any point in time in the future?

11        A.    Notes regarding a patient

12   profile could be updated or deleted as -- as

13   applicable.  Same thing with notes in the

14   patient -- or, I'm sorry, in the prescriber

15   profile could be updated or deleted as

16   needed.

17              Notes related to DURs could not

18   be deleted.

19        Q.    And how long were the notes

20   regarding DURs maintained on Giant Eagle's

21   database?

22              MR. KOBRIN:  Object to form.

23              THE WITNESS:  They were

24         maintained on the local -- they were

25         maintained on the local server for at
```

```
1          least two years plus the current year.
2    QUESTIONS BY MR. MOUGEY:
3          Q.     All right.  Prior to the
4    conversion to RapidFill, was there a notes
5    for DURs?
6          A.     There were -- there were notes
7    that could be captured in the patient profile
8    itself.  At this current time with the
9    computer system, the DUR screen was printed
10   out and would follow that screen down to --
11   down to the pharmacist, when they would
12   review the prescription at verification step.
13              The notes then related to that
14   DUR could be documented on the DUR printout
15   itself, or they could also be documented on
16   the hard copy of the prescription itself.
17         Q.     Prior to the conversion to
18   RapidFill, there was not a field on the
19   database capturing notes regarding DUIs
20   {sic}; is that accurate?
21              MR. KOBRIN:  Object to form.
22              THE WITNESS:  Other than --
23         other than the DUR screen printouts
24         that would follow the prescription
25         down or the patient profile notes or
```

1          the hard copy, there wasn't a specific

2          field within the dispensing software

3          up until 2000 -- the 2013 time frame

4          that electronically captured a DUR

5          note.

6    QUESTIONS BY MR. MOUGEY:

7          Q.     All right.  The DUR Section B

8    printed out.  You mean literally it was

9    printed out off at the -- at the store level?

10         A.     That is correct.

11         Q.     And so if an issue was

12   presented with a DUI {sic}, it was printed

13   out, and then the store-level pharmacist,

14   tech or intern would make notes regarding the

15   issues --

16         A.     To --

17                MR. KOBRIN:  Object to form.

18                THE WITNESS:  To clarify your

19         question, you mean DUR, not DUI?

20                MR. MOUGEY:  DUR, yes, thank

21         you.

22                THE WITNESS:  Sorry.  I

23         thought -- just to clarify.

24                That is correct, they would

25         be -- that DUR review screen would be

1          printed out at the local level and

2          retained at the local level.

3     QUESTIONS BY MR. MOUGEY:

4          Q.     So once it was printed out and

5     retained, where do you -- retained where?

6          A.     It would be filed in -- filed

7     along with the hard copy of the prescription.

8          Q.     All right.  Where?

9          A.     In the -- in the pharmacy.

10         Q.     Where?

11         A.     At the local store.

12         Q.     Right.

13                Where would they --

14         A.     At the local store.

15         Q.     In what?  Would they -- in a

16    notebook?  In a manila folder?  In a storage

17    cabinet?  Where were they kept?

18                MR. KOBRIN:  Object to form.

19                THE WITNESS:  Well, they were

20         kept -- at first, until you get to

21         a -- they get filed in piles of a

22         hundred, in a batch of a hundred, in

23         numerical order.  And then once

24         that -- once the current batch of a

25         hundred is filled, so once you are at

1      zero to 99, you file that in a -- in

2      a -- what's referenced as a California

3      folder, so a manila folder.  They get

4      referenced by date and by prescription

5      numbers, and then they're kept in a

6      drawer in a pharmacy.

7  QUESTIONS BY MR. MOUGEY:

8      Q.    Okay.  If you wanted to go find

9  a DUR printout on patient John Smith in the

10 paper files, how would you find it?

11         MR. KOBRIN:  Object to form.

12     Beyond the scope.

13         THE WITNESS:  You would

14     reference the prescription number it

15     was tied to and then go pull that

16     hardcopy prescription with the DUR

17     printout.

18 QUESTIONS BY MR. MOUGEY:

19     Q.    Where was the -- and I

20 apologize.  I thought you said they were kept

21 from -- in numerical order 1 to 100.

22     A.    The bounds of prescriptions

23 are, that's correct.

24     Q.    And where is the link between

25 the 1 through 100?  In batches of a hundred,

1    how do you identify where a specific

2    prescription number is?

3               MR. KOBRIN:  Object to form.

4          Beyond the scope.

5               THE WITNESS:  The prescription

6          numbers are, to my best knowledge,

7          seven digits in length.  The full --

8          the starting number of 600000 would

9          start, and then 600099 would be the

10         last one, and they would be bundled

11         together.

12              So the outside of the manila

13         folder would reference the starting

14         prescription number in that -- in that

15         batch and then the last prescription

16         number in that batch.

17   QUESTIONS BY MR. MOUGEY:

18         Q.    Okay.  So when you say they're

19   kept in 1 to 100, that means the number in

20   those California files are the same as the

21   prescription number?

22         A.    The -- in a sense, the first

23   four numbers would all be the -- would all be

24   the same, and then the last three numbers

25   would be different in that batch, meaning

1    1 -- meaning 00 through 99.

2         Q.    Okay.  You explain to me in

3    your own words how you find -- if I wanted to

4    find John Smith's DUR as a patient from a

5    prior issue that arose during the analysis of

6    whether or not to fill a prescription, how do

7    I find that specific DUR?

8              MR. KOBRIN:  Object to form.

9         Beyond the scope.

10             THE WITNESS:  And to clarify

11        your question, you mean prior to the

12        2013 time frame, correct?

13   QUESTIONS BY MR. MOUGEY:

14        Q.    We're talking about the

15   printed-out DURs right now.  So prior to

16   2013, how do I find John Smith's DUR?

17        A.    I would go into John Smith's

18   profile, look at the prescription number, and

19   I would pull that -- I would manually pull

20   that hardcopy prescription with the DUR note

21   to it.

22        Q.    So the DUR prescriptions -- I'm

23   sorry, DUR printed-out copy are kept by

24   prescription number?

25        A.    It would be attached to that

1    prescription, correct.

2         Q.    If the DURs are not kept by

3    prescription number, how am I going to find

4    John Smith's printed-out DUR?

5              MR. KOBRIN:  Object to form.

6              THE WITNESS:  The DUR notes

7         are -- in a sense are bound to the

8         hardcopy prescription for that

9         patient.

10   QUESTIONS BY MR. MOUGEY:

11        Q.    I get it.  I understand.

12             How do I find that specific

13   prescription and that specific DUR?

14             MR. KOBRIN:  Object to form.

15        Beyond the scope.  Asked and answered.

16             THE WITNESS:  I would access --

17        I would access the folder in which

18        those prescriptions are kept, and the

19        DUR notes would be along with the

20        hardcopy prescription.

21   QUESTIONS BY MR. MOUGEY:

22        Q.    And is the -- so the folders

23   are organized by prescription number?

24        A.    That is correct.

25        Q.    So when you said sequentially

1    one to a hundred, that is the same -- that

2    series and the prescription numbers is a

3    bridge between the 1 through 100?

4              MR. KOBRIN:  Object to form.

5              THE WITNESS:  So thinking of

6         prescription number as being seven

7         digits in length, the first four --

8         the first four digits for that bundle

9         would all be the same.  The last three

10        digits, from 000 to 099, would

11        correspond to that individual folder.

12   QUESTIONS BY MR. MOUGEY:

13        Q.    If I wanted to review the DURs

14   for a specific prescriber, is that possible?

15             MR. KOBRIN:  Object to form.

16        Beyond the scope.

17             THE WITNESS:  To clarify,

18        during this -- during the time frame

19        that we've previously been discussing?

20   QUESTIONS BY MR. MOUGEY:

21        Q.    Yes.  The printout version, the

22   same one we've been talking about.  The

23   California folders with the sequential

24   numbers.

25             How do you -- how do I pull

1    DURs for specific prescribers out of the

2    printout version?

3         A.    Other than accessing the

4    printout version for prescriptions written by

5    that provider, that's no report to show DURs

6    tied to a prescriber.

7         Q.    Yes, sir.

8              And how would I go find those

9    at the local level in a Giant Eagle pharmacy?

10   How would I find the printed-out versions for

11   specific prescribers?

12             MR. KOBRIN:  Object to form.

13        Beyond the scope.

14             THE WITNESS:  I could run a

15        report by prescriber utilization which

16        would have prescription numbers that I

17        could go manually pull those

18        prescriptions written by a certain

19        prescriber, if needed.

20   QUESTIONS BY MR. MOUGEY:

21        Q.    Okay.  So post-2013, were there

22   specific fields that addressed the DURs in

23   the document that I have in front of you,

24   which is exhibit -- I'm sorry -- 163 that

25   I --

```
 1              GINA VELDMAN:  Peter, that has
 2         been marked as Exhibit 4 and 5.
 3              MR. MOUGEY:  Okay.  Gina, is
 4         1356, the folder 1356, is that 4?
 5              GINA VELDMAN:  Yes.
 6              MR. MOUGEY:  And 163 is 5?
 7              GINA VELDMAN:  Correct.
 8              MR. MOUGEY:  Okay.  Thank you.
 9    QUESTIONS BY MR. MOUGEY:
10         Q.    Okay.  So post-2013, RapidFill,
11    were there specific fields addressing the
12    utilization in DURs in Exhibit Number 5?
13              MR. KOBRIN:  Object to form.
14              Do you understand which one
15         he's looking at as Exhibit 5, Chris?
16              THE WITNESS:  We're referencing
17         4729 5-20, correct?
18    QUESTIONS BY MR. MOUGEY:
19         Q.    Yes, sir.
20              So in Exhibit 5, which is
21    administrative code 4729, were there specific
22    fields addressing DURs in RapidFill?  I'm
23    sorry, in Workflow?
24         A.    No, you're fine.
25              Referencing each nine of these
```

1    aspects, correct?

2          Q.      Yes.

3          A.      There were some -- there were

4    some DUR fields directly related to each one,

5    and some of them would be the professional

6    judgment of a pharmacist to review.

7          Q.      All right.  Tell me which DUR

8    fields were used to avoid or resolve

9    potential problems highlighted in each one of

10   these nine.

11         A.      Sure.  There was a -- I'm

12   sorry, do you mean the system flag -- the

13   computer system flagging it or do you mean

14   the resolution insofar as in a note field?

15         Q.      Both.

16         A.      The computer software would

17   look under at underutilization or

18   overutilization and would recognize

19   therapeutic duplications of drugs.  It would

20   look at drug and disease state

21   contraindications, drug-drug interactions.

22   It would look at high dose or underdose, so

23   incorrect drug dose.  It would check drug

24   allergy information.  It would look at

25   duration of therapy.  Abuse/misuse could be

1  determined insofar as high dose.  It could

2  be -- it could be util -- the abuse/misuse

3  could be determined by a multitude of the

4  previous DURs, in addition to early refills.

5        And that's where a pharmacist

6  would exercise their professional judgment.

7  There's not a specific flag that I am aware

8  of in the computer system that says

9  abuse/misuse in a DUR screen.

10     Q.    Your testimony, sir, was the

11  computer software would look at prospective

12  drug utilization reviews, and it would

13  recognize, and you gave me a laundry list of

14  things it would recognize.

15        What I'm asking you, sir, is,

16  how would those -- how would that information

17  populate in Giant Eagle's system?

18     A.    Under each -- during the drug

19  utilization review screen, the list -- the

20  DURs would be listed on one side of the

21  screen by type.

22     Q.    There you go.

23        So the DURs would have a list

24  on the screen under the DUR tab; is that

25  right?

```
 1          A.     Yes.  That would be -- it
 2   wouldn't necessarily say DUR tab, but the DUR
 3   screen.
 4          Q.     DUR screen.
 5                 And would the lists on the DUR
 6   screen, was it similar to the 1 through 9 on
 7   Exhibit 5?
 8          A.     Yes, it was -- it was similar.
 9          Q.     And similar meaning each one,
10   number 1, overutilization, underutilization,
11   2, therapy duplication, those would be
12   checked if there was an issue on the DUR
13   review?
14                 MR. KOBRIN:  Object to form.
15                 THE WITNESS:  Regarding that
16          there was a specific -- a specific
17          alert that said food/nutritional
18          supplement drug interaction or, as I
19          previously mentioned, abuse or misuse,
20          I don't know -- I don't recall then
21          there being specific fields for those
22          two, but these tools would flag in
23          addition to the professional judgment
24          of the pharmacist.
25
```

1   QUESTIONS BY MR. MOUGEY:

2       Q.      And once the pharmacist looked

3   at the flags, was there an additional field

4   indicating that they had been resolved?

5       A.      There was a -- there was a

6   free-form note field that the pharmacist can

7   enter their notes, yes.

8       Q.      And what was the criteria for a

9   box or a field being checked for each of the

10  DURs?

11          MR. KOBRIN:  Object to form.

12          THE WITNESS:  DURs that were

13      flagged of the severe or critical

14      nature relating to the Medi-Span

15      criteria would require a pharmacist to

16      enter DUR notes.

17  QUESTIONS BY MR. MOUGEY:

18      Q.      So, for example, which one of

19  these DUR fields do you believe, if any,

20  would a opiate cocktail be identified under?

21          MR. KOBRIN:  Hold on.  Object

22      to form.  Beyond the scope.  Seeks

23      expert opinion evidence.

24  QUESTIONS BY MR. MOUGEY:

25      Q.      Go ahead, Mr. Miller.

```
 1          A.      Without understanding --
 2   without understanding how the Medi-Span data
 3   works, I can't answer that question.
 4          Q.      That makes two of us.
 5                  It's kind of important to have
 6   that Medi-Span information when you figure
 7   out what the formulas are and how these
 8   fields are populated, correct, sir?
 9                  MR. KOBRIN:  Object to form.
10          Beyond the scope.
11                  THE WITNESS:  I can't -- I
12          can't speculate.  I can't speculate
13          that answer.
14   QUESTIONS BY MR. MOUGEY:
15          Q.      So cocktails.  You understand
16   if I said opiate cocktail, what that is?
17          A.      I do.
18          Q.      And what is your understanding
19   of what an opiate cocktail is?
20          A.      To my -- to my recollection,
21   it's an opioid -- a benzodiazepine in a --
22   some form of a muscle relaxant.
23          Q.      And how did the Giant Eagle
24   system flag a DUR for an opiate cocktail at
25   any point in time?
```

```
 1                    MR. KOBRIN:  Object to form.
 2           Beyond the scope.
 3                    THE WITNESS:  A -- while
 4           exercising professional judgment, a
 5           pharmacist has the ability to review a
 6           patient profile.
 7      QUESTIONS BY MR. MOUGEY:
 8           Q.    So other than manually
 9      reviewing a patient profile, was there
10      anywhere in HBC -- I'm sorry, Giant Eagle's
11      system that identified or highlighted an
12      opiate cocktail?
13                    MR. KOBRIN:  Object to form.
14           Beyond the scope.
15                    THE WITNESS:  I can't speculate
16           in certain time terms that it would
17           flag as a therapeutic duplication, but
18           regarding a specific flag of a drug
19           cocktail, I'm not aware of such a
20           flag, other than the -- for the
21           pharmacist exercising their
22           professional judgment reviewing the
23           patient profile.
24      QUESTIONS BY MR. MOUGEY:
25           Q.    Other than manually reviewing
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   the patient profile for drug cocktails, are
 2   you aware of any field that would collect and
 3   highlight at the store level a drug cocktail?
 4   An opiate cocktail, I'm sorry.
 5              MR. KOBRIN:  Object to form.
 6        Beyond the scope.
 7              THE WITNESS:  The data -- the
 8        data in the OARRS -- in the OARRS
 9        database would show multiple
10        controlled substances filled for an
11        individual patient.
12   QUESTIONS BY MR. MOUGEY:
13        Q.    Again, that's a manual review
14   by the pharmacist, correct, sir?
15              MR. KOBRIN:  Object to form.
16        Beyond the scope.
17              THE WITNESS:  Reviewing --
18        reviewing an OARRS profile would be a
19        manual review by a pharmacist.
20   QUESTIONS BY MR. MOUGEY:
21        Q.    Other than a manual review, did
22   Giant Eagle's system flag for opiate
23   cocktails?
24              MR. KOBRIN:  Object to form.
25        Beyond the scope.
```

1          THE WITNESS:  As I -- as I

2     previously answered, a pharmacist

3     exercising their professional judgment

4     in review of a patient profile.

5  QUESTIONS BY MR. MOUGEY:

6     Q.    So other than the review of the

7  patient profile or OARRS, which are both

8  manual reviews, is there any data field that

9  collected and highlighted opiate cocktails?

10          MR. KOBRIN:  Object to form.

11     Beyond the scope.

12          THE WITNESS:  As I previously

13     answered, other -- other than a

14     pharmacist conducting use of their

15     professional judgment of review of a

16     patient profile and reviewing the

17     PDMP.

18  QUESTIONS BY MR. MOUGEY:

19     Q.    No, there's no specific field

20  collecting data on opiate cocktails in Giant

21  Eagle's system.  Correct, sir?

22          MR. KOBRIN:  Object to form.

23     Beyond the scope.

24          THE WITNESS:  As I previously

25     stated, other than -- other than a

Highly Confidential - Subject to Further Confidentiality Review

```
 1            pharmacist reviewing the profile,

 2            exercising their professional

 3            judgment, and exercising their

 4            professional judgment in reviewing a

 5            PDMP profile, there's no specific

 6            field.

 7   QUESTIONS BY MR. MOUGEY:

 8        Q.    There's no specific field

 9   highlighting an opiate cocktail on Giant

10   Eagle's system, other than the manual

11   reviews, correct, sir?

12            MR. KOBRIN:  Object to form.

13        Beyond the scope.  Asked and answered.

14            THE WITNESS:  As I previously

15            stated, other than a pharmacist

16            exercising their professional judgment

17            in reviewing the patient profile, a

18            pharmacist exercising their

19            professional judgment in reviewing the

20            PDMP profile of the patient, there's

21            no specific field listing a drug

22            cocktail.

23   QUESTIONS BY MR. MOUGEY:

24        Q.    Is there a specific field on

25   Giant Eagle's system identifying
```

1    prescriptions for multiple opiates, other

2    than a manual review?

3              MR. KOBRIN:  Object to form.

4         Beyond the scope.

5              THE WITNESS:  Based on the

6         Medi-Span data and the review of the

7         patient profile, multiple opioids

8         would appear as a therapeutic

9         duplication in the DUR.

10   QUESTIONS BY MR. MOUGEY:

11        Q.    Was there a specific field

12   highlighting prescriptions for multiple

13   opiates at the same time for one patient?

14             MR. KOBRIN:  Object to form.

15        Beyond the scope.  Asked and answered.

16             THE WITNESS:  During the drug

17        utilization review process, multiple

18        opioids would flag as a therapeutic

19        duplication.

20   QUESTIONS BY MR. MOUGEY:

21        Q.    I just want to make sure we're

22   saying the same thing, because what I'm

23   asking you, sir, is not during the DUR review

24   process, which to me is a manual review.

25             What I'm asking you is, is

Highly Confidential - Subject to Further Confidentiality Review

1    there a specific field that captures multiple

2    opiate prescriptions to the same patient at

3    the same time?

4              MR. KOBRIN:  Object to form.

5              THE WITNESS:  Again, to

6         clarify, multiple opioids, in addition

7         to a manual review, would be flagged

8         by the -- by using the Medi-Span as

9         therapeutic duplication as a DUR -- as

10        a drug utilization review.

11   QUESTIONS BY MR. MOUGEY:

12        Q.    Yes, sir, I understand that

13   Medi-Span and PDX collected data and put that

14   into a DUR report, but are multiple -- are

15   multiple opiate prescriptions for the same

16   patient, at the same time, is that

17   specifically flagged in Giant Eagle's system?

18             MR. KOBRIN:  Object to form.

19        Beyond the scope.  Asked and answered.

20             I'm a little confused now, too,

21        Peter.  And I know that my

22        understanding might not be as

23        important as yours and the witness'.

24             But I think he's answered this

25        pretty clearly.  I'll let him take

Highly Confidential - Subject to Further Confidentiality Review

```
 1         another shot at it.
 2              If you're talking to me, Peter,
 3         you're muted.
 4              MR. MOUGEY:  No, I'm not.
 5              Go ahead, Mr. Miller.
 6              THE WITNESS:  As I have
 7         previous stated, in addition to the
 8         manual review of the patient profile
 9         with the pharmacist exercising their
10         professional judgment, and in addition
11         to a manual review of a pharmacist
12         utilizing OARRS profile information,
13         multiple opioids would appear as a
14         therapeutic duplication using the
15         Medi-Span data analytics that would
16         appear during the drug utilization
17         review process.
18    QUESTIONS BY MR. MOUGEY:
19         Q.    And during that process, is
20    there a specific field that's flagged for the
21    duplication?
22              MR. KOBRIN:  Object to form.
23         Beyond the scope.
24              THE WITNESS:  As I have
25         previously answered, the specific
```

Highly Confidential - Subject to Further Confidentiality Review

1          field would be therapeutic

2          duplication, as flagged by the

3          Medi-Span analytical data.

4    QUESTIONS BY MR. MOUGEY:

5          Q.    Mr. Miller, where would I find

6    a list of the specific fields that were

7    captured identifying red flags at Giant

8    Eagle?

9          A.    I'm sorry, can you reask your

10   question or clarify?  I'm not understanding

11   what you mean by "a list."

12         Q.    Well, are you familiar with the

13   terms "red flags" in the context of opiate

14   prescriptions?

15         A.    I am.

16         Q.    Is that a term that's used at

17   Giant Eagle, meaning red flags?

18              MR. KOBRIN:  Object to form.

19              THE WITNESS:  I would say that

20         the term would -- I would say the term

21         would be used outside of Giant Eagle

22         as well.

23   QUESTIONS BY MR. MOUGEY:

24         Q.    Oh, yeah, no, I'm not

25   suggesting that the term "red flags" is just

1    specific and only used at Giant Eagle.

2                 What I'm asking you is, sir, is

3    the term "red flags" used at Giant Eagle in

4    the context of opiate prescriptions?

5         A.      In context of just opioids?

6    No.  In the context of controlled substances

7    and even -- and even noncontrolled

8    substances?  Yes.

9         Q.      And where would I be able to

10   identify a list of the different red flags in

11   the context of controlled substance

12   prescriptions on Giant Eagle's system?

13                MR. KOBRIN:  Beyond the scope.

14        Objection.  Beyond the scope.

15                THE WITNESS:  Mr. Mougey, to

16        clarify your question, do you mean

17        within the dispensing system?

18   QUESTIONS BY MR. MOUGEY:

19        Q.      Within the dispensing system.

20        A.      There are free-form notes that

21   pharmacists can enter exercising their

22   professional judgment regarding red flags,

23   which can be documented in notes related to

24   fill the prescription, image notes,

25   documentation on a hard copy, documentation

```
 1    in the patient profile, and documentation in

 2    the prescriber profile if needed.  In

 3    addition to any of the DUR notes that we

 4    previously discussed.

 5         Q.    All right.  Mr. Miller, if

 6    you'd open, please, folder marked 1310.

 7              (Miller Exhibit 6 marked for

 8         identification.)

 9              MR. KOBRIN:  Will this be

10         marked as an exhibit?

11              MR. MOUGEY:  Yes.

12              MR. KOBRIN:  6?

13              MR. MOUGEY:  6.

14              MR. KOBRIN:  All right.

15    QUESTIONS BY MR. MOUGEY:

16         Q.    Do you recognize this document,

17    Mr. Miller?

18         A.    May I have just a second to

19    review it, please?

20         Q.    Sure.

21         A.    Yes, I'm vaguely familiar with

22    this document.

23         Q.    All right.  Sir, if you'd

24    please turn to the -- about six or seven

25    pages in.  It's Bates number 806.
```

1          A.      Okay.  I'm with you.

2          Q.      Sir, it's titled the

3     "Controlled Substance Dispensing Guideline."

4                  Do you see that?

5          A.      I do, yes.

6          Q.      And the -- underneath the

7     purpose of this document is to "Provide

8     guidelines for the proper dispensing of

9     controlled substances that support the

10    corresponding responsibility mandate placed

11    upon pharmacists to exercise due diligence in

12    the decision to fill or not to fill a

13    controlled substance prescription."

14                 Do you see that, sir?

15         A.      I do.

16         Q.      And, sir, if you'd turn to the

17    next page, Bates number 807.

18                 About three-quarters of the way

19    down the page, titled "Appropriateness of

20    Controlled Substance Prescriptions, open

21    paren, Red Flags, close paren," do you see

22    that, sir?

23         A.      I do.

24         Q.      And on Bates number 807 begins

25    a list of ten red flags at Giant Eagle,

1    correct, sir?

2              MR. KOBRIN:  Object to form.

3              THE WITNESS:  In the paragraph

4         above, in the DEA-written opinion,

5         these were my best -- in my best

6         knowledge, red flags that were within

7         that opinion.

8    QUESTIONS BY MR. MOUGEY:

9         Q.    Yes, sir, thank you.

10             And that Giant Eagle

11   incorporated into its controlled substance

12   dispensing guidelines as of 2013, correct,

13   sir?

14             MR. KOBRIN:  Objection.  Beyond

15        the scope.

16             THE WITNESS:  That is correct.

17   QUESTIONS BY MR. MOUGEY:

18        Q.    So I'd like to walk through

19   these list of ten, sir.

20             Number 1, prescriptions written

21   together for oxy, hydro, plus benzos, plus a

22   muscle relaxer.

23             At any point in time, was there

24   a field collected -- field collecting

25   combination of those drugs at Giant -- on

Highly Confidential - Subject to Further Confidentiality Review

```
 1   Giant Eagle's system?

 2            MR. KOBRIN:  Object to form.

 3        Asked and answered.

 4            THE WITNESS:  In addition to a

 5        pharmacist exercising a professional

 6        judgment of reviewing a patient

 7        profile, a PDMP profile, and the

 8        ability to document in various note

 9        fields.

10   QUESTIONS BY MR. MOUGEY:

11        Q.    So the answer to my question is

12   no, sir, correct?

13            MR. KOBRIN:  Object to form.

14            THE WITNESS:  I'm sorry, could

15        you repeat your question, sir?

16   QUESTIONS BY MR. MOUGEY:

17        Q.    The answer to my question is,

18   no, sir, correct?  That there's not specific

19   fields for these three drugs written in

20   combination together on the Bates number 807,

21   correct, sir?

22            MR. KOBRIN:  Object to form.

23            Peter, do you mean a specific

24        field for someone to make a note in or

25        for someone to see a pop-up?
```

1          We're talking about fields in

2      all these different contexts, and I

3      can't even keep track of what you're

4      asking, particularly when you're

5      saying you want a specific field.

6   QUESTIONS BY MR. MOUGEY:

7      Q.     Do you know what a field in a

8   database is, Mr. Miller?

9      A.     It could be -- it could be --

10  it could be a note field.  It could be a

11  checkbox.  It could be -- there's multiple --

12  there could be multiple fields within, you

13  know, a computer software program.

14     Q.     Do you understand what a

15  database is?

16     A.     I do.

17     Q.     Do you think a database and a

18  software program are the same thing?

19     A.     I do not.

20     Q.     Okay.  So do you understand

21  that a specific field delineating a fact is a

22  useful way to track important information?

23          MR. KOBRIN:  Object to form.

24      Beyond the scope.

25          THE WITNESS:  I can't speculate

1          what would be useful.  Pharmacists

2          have the ability to exercise their

3          professional judgment.

4     QUESTIONS BY MR. MOUGEY:

5          Q.     Okay.  So outside of the notes

6     field, you can't point us to anything

7     specific tracking the combination of those

8     three drugs on Bates number 807 under

9     number 1 of the red flag list, correct?

10              MR. KOBRIN:  Object to form.

11              THE WITNESS:  Outside of a

12         pharmacist exercising their

13         professional judgment, reviewing data

14         that would be available in the OARRS

15         or the PDMP database, in addition to

16         the pharmacist being able to document

17         those -- information on various note

18         fields, if you're asking if there's a

19         specific field that is marked within

20         the computer system for combination

21         therapy, there's -- outside of the

22         fields that I previously mentioned and

23         the databases previously mentioned,

24         there's no specific field that is

25         marked as "combination therapy."

1    QUESTIONS BY MR. MOUGEY:

2         Q.    What does number 2, lack of

3    individualization of dosing, mean to you,

4    Mr. Miller?

5         A.    It means that a prescriber, in

6    their course of action, writes the same

7    prescription for every patient.

8         Q.    Is there any field on Giant

9    Eagle's system that would assist the -- at

10   the store level a search for a prescriber

11   writing the same prescription for every

12   patient?

13        A.    There's a report that users at

14   the local store level can run regarding

15   prescription utilization by prescribers.

16        Q.    Do they have the ability to run

17   it at the store level, or do they have to ask

18   someone else to run the report?

19             MR. KOBRIN:  Object to form.

20             THE WITNESS:  They would be

21        able to run -- they would be able to

22        run that report at the store level for

23        information contained on the local

24        server.

25

Highly Confidential - Subject to Further Confidentiality Review

```
 1    QUESTIONS BY MR. MOUGEY:

 2         Q.     And in order to answer a

 3    potential red flag under number 2, lack of

 4    individualization of dosing, they would have

 5    to run another report in addition to

 6    exercising their professional judgment, in

 7    addition to looking at the OARRS database,

 8    and in addition to looking at any third-party

 9    vendor data pull.  Correct, sir?

10              MR. KOBRIN:  Object to form.

11         Beyond the scope.

12              THE WITNESS:  So to clarify

13         your question, pharmacists utilizing

14         OARRS cannot run a report based on a

15         prescriber.  They only have the

16         ability to run information based on a

17         patient.

18    QUESTIONS BY MR. MOUGEY:

19         Q.     Outside of the -- at the store

20    level, manually reviewing various reports,

21    there is not a field on Giant Eagle's system

22    flagging a prescriber writing the same

23    prescription, like OxyContin, for every

24    patient, correct, sir?

25              MR. KOBRIN:  Objection.  Beyond
```

1          the scope.

2               THE WITNESS:  Outside of a

3          pharmacist exercising their

4          professional judgment, being

5          experienced with other prescriptions

6          that are filled within the pharmacy,

7          reviewing -- reviewing other patients'

8          prescriptions, being able to run a

9          report on prescriber utilization, if

10         you're asking if the system flags for

11         lack of individual dosing, the system

12         does not flag based on -- based on an

13         individual dosing.

14   QUESTIONS BY MR. MOUGEY:

15        Q.     Thank you.

16               That's exactly what I'm asking,

17   sir, is, outside of those manual reviews and

18   running reports, is there a system that

19   flags.

20               And so the same question for

21   number 3, multiple prescriptions for the

22   strongest formulations of hydro -- and I

23   never can pronounce the next one.  You help

24   me out?

25        A.     Alprazolam.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.      Yep.

2                  Is there any field at Giant

3    Eagle that specifically flags for the

4    strongest formulizations of hydrocodone and

5    alprazolam?

6                  MR. KOBRIN:  Objection.  Beyond

7          the scope.

8                  THE WITNESS:  Pharmacists have

9          the ability to perform, using their

10         professional judgment, a review a

11         patient profiles.  They have the

12         review of any DUR information that

13         would flag regarding drug-drug

14         interactions or therapeutic

15         duplication, along with the review of

16         the PDMP or OARRS database, in

17         addition to reviewing any previous

18         notes that would be attached to a

19         patient profile or a prescriber

20         profile.

21   QUESTIONS BY MR. MOUGEY:

22         Q.      That's not what I asked.

23                 What I asked you, sir, is there

24   any field at Giant Eagle that specifically

25   flags for the red flag number 3 on the bottom

Highly Confidential - Subject to Further Confidentiality Review

```
 1   of 807?  Yes or no, Mr. Miller?

 2            MR. KOBRIN:  Object to form.

 3       Beyond the scope.  Asked and answered.

 4            THE WITNESS:  As I previously

 5       stated, outside of a pharmacist

 6       exercising their professional judgment

 7       in reviewing of a patient profile,

 8       which includes previous therapy,

 9       pharmacists exercising their

10       professional judgment in reviewing a

11       patient's PDMP or OARRS profile,

12       looking at previous documentation with

13       previous DUR reviews or current DUR,

14       and documentation of notes, if you're

15       asking if there's a specific field

16       that flags in the computer system for

17       a strongest formulations of

18       hydrocodone and alprazolam, there is

19       not.

20   QUESTIONS BY MR. MOUGEY:

21       Q.    Do you have that answer written

22   on like a yellow sticky note or anything on

23   your computer that you're reading over and

24   over again?

25            MR. KOBRIN:  Object to form.
```

```
 1         Argumentative.
 2   QUESTIONS BY MR. MOUGEY:
 3         Q.    Do you have it on a yellow
 4   sticky note or written in front of you that
 5   you're just reading the same answer over and
 6   over again?
 7         A.    I do not.
 8         Q.    Do you have any trouble saying,
 9   no, there's just no specific field, instead
10   of reading me a laundry list of manual
11   searches and reviews that the pharmacist has
12   to review?
13              MR. KOBRIN:  Stop.  Don't
14        answer that.
15              Peter -- Peter, Peter, Peter --
16              {Crosstalk.}
17   QUESTIONS BY MR. MOUGEY:
18         Q.    -- the same answer over and
19   over again?
20              MR. KOBRIN:  Peter, that's a --
21        don't answer that.  You're harassing
22        the witness.  This is inappropriate.
23              He's not giving you the answer
24        you want, you can figure out a way to
25        ask it a different way.  But this is
```

```
 1            totally inappropriate.  It's
 2            harassing.  We're going to stop the
 3            deposition.
 4                 If you want to have your
 5            remaining 30 minutes, you can take
 6            them, but don't use them to harass the
 7            witness.
 8                 MR. MOUGEY:  What's totally
 9            inappropriate is the fact that this
10            witness has clearly been fed an answer
11            to read over and over again that's
12            not --
13                 MR. KOBRIN:  Absolutely not.
14            I'm offended by that premise.  He's
15            not read anything over and over again.
16            You're asking the same questions over
17            and over again, and that's your
18            problem, Peter.
19                 Now, that's your challenge to
20            deal with.  And I'm not going to
21            interfere anymore, but don't harass
22            the witness --
23                 MR. MOUGEY:  His answers are
24            nonresponsive to my questions.
25                 MR. KOBRIN:  They're absolutely
```

```
 1          responsive.  He's --
 2                  MR. MOUGEY:  I'm not asking --
 3     QUESTIONS BY MR. MOUGEY:
 4          Q.     Mr. Miller, let's make sure
 5     we're on the same page.
 6                  I'm not asking for any manual
 7     reviews, and I don't want a laundry list of
 8     manual reviews run by the pharmacist.  Listen
 9     exactly to my question, sir.
10                  Is there a data field that
11     highlights whether or not a request for an
12     opiate prescription being filled or refilled
13     is early?
14                  MR. KOBRIN:  Object to form.
15          Objection.  Beyond the scope.
16     QUESTIONS BY MR. MOUGEY:
17          Q.     Is there a flag that highlights
18     if an opiate prescription is being asked to
19     be refilled early; yes or no?
20          A.     There would be a flag -- there
21     would be -- there would be a flag during the
22     drug utilization review as an early refill.
23                  In addition, if the patient was
24     using a third-party insurance, the insurance
25     company would also flag that prescription as
```

Highly Confidential - Subject to Further Confidentiality Review

1    early to be refilled.

2            In addition to a pharmacist

3    exercising their professional judgment based

4    on looking at previous refill dates.

5        Q.    Yes, sir.  And that's manual,

6    correct?

7        A.    I'm sorry, the pharmacist

8    exercising their professional judgment?

9        Q.    Looking through the

10   prescription history.  Correct?

11       A.    With a pharmacist exercising

12   their professional judgment by reviewing

13   OARRS data in a patient profile, looking at

14   previous refill dates, yes, that would be

15   manual.

16       Q.    Sir, where are the -- where

17   could I see or find a screenshot of the DUR

18   reviews of what's being flagged and what's

19   not?

20       A.    I'm sorry, I don't understand

21   your question.

22       Q.    What part do you not

23   understand?

24            You got the DUR part, right?

25       A.    I do understand the DUR part.

Highly Confidential - Subject to Further Confidentiality Review

```
 1          Q.     You got the DUR review part,

 2    right, Mr. Miller?

 3          A.     I'm asking about the -- the

 4    screenshot of the DUR process.  I'm not sure

 5    what you're asking for.

 6          Q.     Do you know what a screenshot

 7    is?

 8          A.     I do.

 9          Q.     Do you remember earlier

10    mentioning that there was a DUR screen?

11          A.     I do.

12          Q.     Okay.  So where can I find a

13    screenshot of the DUR screen?

14          A.     I mean, as -- you could request

15    the screenshot from PDX as part of their

16    software.

17          Q.     Do you know how to do a

18    screenshot right on your -- on one of the

19    storefront computers of the DUR screen?

20                 MR. KOBRIN:  Object to form.

21          Beyond the scope.

22                 THE WITNESS:  Doing a

23          screenshot of a DUR would require

24          divulging protected health

25          information.
```

```
 1    QUESTIONS BY MR. MOUGEY:

 2          Q.      Do you understand -- you

 3    familiar with the term "redact" information?

 4    You can redact information off of a document?

 5          A.      I am aware of redacted

 6    information.

 7          Q.      Yeah.   Okay.

 8                  So it's -- do you think it's

 9    possible to take a screenshot of the DUR

10    screen at Giant Eagle?

11                  MR. KOBRIN:   Object to form.

12          Beyond the scope.

13                  Are you seeking additional

14          discovery from the witness?

15    QUESTIONS BY MR. MOUGEY:

16          Q.      Go ahead, Mr. Miller.

17          A.      Is it possible to provide a

18    redacted screenshot of a DUR screen?  It is

19    possible.

20          Q.      So as we -- number 5 of the red

21    flags on 808, is there a specific field at

22    Giant Eagle capturing further-than-expected

23    distances of the patient and/or medical

24    provider from the pharmacy?

25                  MR. KOBRIN:   Object to form.
```

```
 1              The objection is beyond the scope.
 2                    THE WITNESS:  We capture the
 3         address of the patient and also the
 4         address of the provider.
 5   QUESTIONS BY MR. MOUGEY:
 6         Q.      And in order to calculate the
 7   distance between the provider and the
 8   patient, you have to do what, Mr. Miller?
 9   Manually calculate the distance, right?
10                    MR. KOBRIN:  Object to form.
11                    THE WITNESS:  The pharmacist
12         would be exercising their professional
13         judgment by looking at information in
14         both the prescriber profile and the
15         patient profile.
16   QUESTIONS BY MR. MOUGEY:
17         Q.      And exercising that
18   professional judgment to determine whether or
19   not further-than-expected distances of the
20   patient and the medical provider would
21   require a manual calculation, correct?
22                    MR. KOBRIN:  Object to form.
23         Beyond the scope.
24                    THE WITNESS:  Determine --
25         determining whether a
```

```
 1          farther-than-expected distance would

 2          have to rely on pharmacists exercising

 3          their professional judgment.

 4   QUESTIONS BY MR. MOUGEY:

 5          Q.     And that professional judgment,

 6   in order to arrive at that number, would be a

 7   manual calculation, right, sir?

 8               MR. KOBRIN:  Object to form.

 9               THE WITNESS:  The pharmacist --

10          utilizing their professional judgment

11          by reviewing the patient profile and

12          medical provider would require a

13          pharmacist to manually calculate the

14          distance.

15   QUESTIONS BY MR. MOUGEY:

16          Q.     Yes, sir.  But what I'm asking

17   you is, is there a field that would collect

18   or capture the distance, based on a formula,

19   between the patient and the medical provider?

20               MR. KOBRIN:  Object to form.

21               That's not what you're asking.

22          It's what you're asking now, Peter.

23               Beyond the scope.

24   QUESTIONS BY MR. MOUGEY:

25          Q.     Go ahead, Mr. Miller.
```

```
 1              MR. MOUGEY:  Josh, I really
 2         don't need anything else -- any color
 3         commentary.
 4              MR. KOBRIN:  I'm sure you
 5         don't.  I'm sure you don't.  You do
 6         great.
 7    QUESTIONS BY MR. MOUGEY:
 8         Q.    Go ahead, Mr. Miller.
 9         A.    I'm sorry, Mr. Mougey, could
10    you reask the question, please?
11         Q.    Yes, for the fourth time.
12              Is there a field that would
13    collect or capture the distance between a
14    patient and a provider on Giant Eagle's
15    system?
16         A.    With a pharmacist exercising
17    their professional judgment by looking at the
18    patient profile and the medical provider
19    profile, a pharmacist could manually
20    calculate that distance.  And they would have
21    the ability to document it in a variety of
22    note fields.
23         Q.    There's no field that
24    specifically calculates the distance between
25    a patient and a provider for the use of the
```

1   pharmacist in their review, correct, sir?

2       A.      Outside of the

3   aforementioned -- or the previous mentioned

4   fields that I discussed about a pharmacist

5   exercising their professional judgment by

6   reviewing the patient profile, the medical

7   provider field to calculate that distance,

8   and documenting -- and potentially

9   documenting that in a notes fields, image

10  note on the hard copy or in a patient

11  profile, there's no specific field within the

12  dispensing software that calculates the

13  distance.

14      Q.      Number 8 red flag.  Is there

15  any red flag on Giant Eagle's system wherein

16  it could be a notation that patients were

17  arriving in groups?

18          MR. KOBRIN:  Object to form.

19      Objection.  Beyond the scope.

20          THE WITNESS:  Pharmacists,

21      while utilizing their professional

22      judgment while in the process of

23      filling prescriptions for that day,

24      would exercise their professional

25      judgment to determine that.

```
 1    QUESTIONS BY MR. MOUGEY:
 2         Q.    Is there a specific field,
 3    Mr. Miller, that the pharmacist can use when
 4    exercising their professional judgment, where
 5    he or she could note that a patient arrived
 6    in groups to have a controlled substance
 7    prescription filled?
 8              MR. KOBRIN:  Object to form.
 9         Objection.  Beyond the scope.
10              We're using "fields" for two
11         different things, Peter.  It seems
12         that fields either means some kind of
13         a red flag that pops up -- I'm going
14         to put this on the record.  It's very
15         confusing -- some kind of red flag
16         that pops up or something that the
17         pharmacist is to fill in.  And it's
18         switching back and forth.  And I think
19         that's causing a lot of the confusion
20         and communication problems between you
21         and the witness.
22              Go ahead.
23              MR. MOUGEY:  I'm not having any
24         communication -- I'm having an answer
25         problem with the question that I
```

1      asked.

2  QUESTIONS BY MR. MOUGEY:

3      Q.    Mr. Miller, I'll repeat the

4  question again after Mr. Kobrin's speaking

5  objection.

6            Is there a specific field that

7  the pharmacist can use when exercising their

8  professional judgment, where he or she could

9  note that a patient arrived in groups to have

10 a controlled substance prescription filled?

11           MR. KOBRIN:  Same objection.

12           THE WITNESS:  While -- while

13      observing constant practice within the

14      pharmacy and a pharmacist exercising

15      their professional judgment,

16      pharmacists would be able to document

17      that practice in several note fields,

18      including fields on the prescription,

19      in image note, on the hard copy, and

20      in patient profiles.

21 QUESTIONS BY MR. MOUGEY:

22      Q.    The answer to my question is

23 no.  Correct, Mr. Miller?

24           MR. KOBRIN:  Object to form.

25      Beyond the scope, and asked and

```
 1           answered.
 2                THE WITNESS:  Outside of a
 3           pharmacist exercising a professional
 4           judgment in being able to document in
 5           various note fields, including fields
 6           for the prescription and image note on
 7           the hard copy, prescriber profiles and
 8           in individual patient profiles,
 9           there's no specific field that
10           would -- in the computer system that
11           would flag for patients arriving in
12           groups.
13                And, gentlemen, I know we only
14           have roughly maybe about a half an
15           hour left, but I do need about a
16           five-minute restroom break, if
17           possible.
18                MR. MOUGEY:  Of course.  Go
19           ahead, Mr. Miller, we'll take a break
20           right here.
21                THE WITNESS:  Thank you so
22           much.
23                VIDEOGRAPHER:  The time right
24           now is 3:36 p.m.  We are off the
25           record.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            (Off the record at 3:36 p.m.)

 2            VIDEOGRAPHER:  The time right

 3       now is 5:53.  We're back on the

 4       record.

 5  QUESTIONS BY MR. MOUGEY:

 6       Q.    Mr. Miller, what all kind of

 7  information do you keep in the notes fields

 8  that -- over at Giant Eagle?

 9       A.    Do you mean specifically or

10  just in general what could be kept in notes

11  fields?

12       Q.    Just what kind of information

13  is kept in the notes fields?  What's

14  collected at Giant Eagle in the notes fields?

15       A.    There could be a lot of

16  different aspects that could be collected in

17  the note fields.

18            If we think about breaking them

19  down in the different note fields, as we

20  previously discussed, there are DUR notes

21  that are related to the drug utilization

22  review process.  Patient profile notes are

23  generalized notes regarding that patient.

24  There could be things in that patient profile

25  note that relate to the billing of
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    prescriptions, to, you know, free-form

 2    allergies that -- a patient may have a dye

 3    allergy that may not always -- that may not

 4    flag because it's an ingredient, so there

 5    could be some allergy information there.

 6              There could be preferences

 7    of -- of -- you know, regarding allergies to

 8    whether -- you know, kind of looking at the

 9    dye allergies of the color of the medication

10    that a patient may have as well.

11              Prescriber notes has different

12    information as well, too, so information such

13    as -- you know, for example, doctor sends

14    over a prescription for amoxicillin capsules,

15    and he gives the okay for substitute the

16    tablets.  That note could be placed in the

17    prescriber profile.

18              Then there's image notes that

19    could be for clarifications on a

20    prescription.  There could be notes on the

21    prescription related to therapy.

22              There are also notes fields

23    that are -- this fill notes and fills for --

24    for all fills of the prescription could be

25    relating to -- anything with regarding
```

Highly Confidential - Subject to Further Confidentiality Review

1 therapy to billing to corresponding

2 responsibility.

3     There's -- the notes fields are

4 used for a multitude of reasons.

5  Q.  And I believe that in response

6 to a number of questions about red flags

7 regarding patients, those are -- responses

8 are kept in the note fields, correct?

9  A.  That would be correct.

10  Q.  In response to DURs regarding

11 patients, some of the analysis you've pointed

12 at the pharmacy level has been -- you've

13 pointed to the notes fields, correct?

14  A.  They would be captured in the

15 DUR note field.

16  Q.  Right.

17     And the -- any red flags

18 regarding prescribers, you've responded by

19 pointing to notes put in the note fields,

20 correct?

21  A.  That is correct.

22  Q.  Any prescriber concerns

23 regarding DURs, you've pointed to notes put

24 in the note fields, correct?

25  A.  Regarding -- I'm sorry, did you

Highly Confidential - Subject to Further Confidentiality Review

1  say prescribers regarding the DUR?

2      Q.     Yes, sir.

3      A.     They could be documented in the

4  note fields, correct.

5      Q.     How about refusals to fill?

6  Are refusals to fill kept in the note fields?

7      A.     They could be in the note

8  fields.  There's also a deactivation.  If you

9  would refuse to fill a prescription, there's

10  a deactive -- let me rephrase that.

11           If the prescription makes it --

12  scanned into the computer system, there

13  are -- there's the deactivate function to

14  deactivate a prescription.  And within that

15  deactivate function, there are radio buttons

16  to choose whether it's the pharmacist

17  deactivating it, a patient taking the

18  prescription back, a prescriber deactivating

19  it.

20           And also within that function,

21  there is also a free-form note field for the

22  pharmacist to enter additional information.

23      Q.     So we've now identified -- I

24  think that's a fourth different notes field,

25  correct?

1      A.      I believe it's maybe the fifth

2   notes field.

3      Q.      Maybe the fifth.

4              So the notes fields at Giant

5   Eagle are very important with the pharmacist

6   exercising their professional judgment,

7   correct, sir?

8              MR. KOBRIN:  Object to form.

9      Beyond the scope.

10  QUESTIONS BY MR. MOUGEY:

11     Q.      Go ahead, Mr. Miller.

12     A.      I would say note fields are a

13  way for a pharmacist to document their

14  professional judgment.

15     Q.      And it's a way for a

16  pharmacist, when exercising their

17  professional judgment, to see what other

18  pharmacists' in the Giant Eagle organization

19  thoughts were on that patient.  Correct, sir?

20     A.      I'm sorry, I don't understand

21  your question.

22     Q.      Well, it's not just one

23  pharmacist putting notes in the note fields.

24  It's the entire Giant Eagle organization

25  putting notes in the note fields, correct?

```
 1              MR. KOBRIN:  Object to form.
 2         Beyond the scope.
 3              THE WITNESS:  Just to clarify
 4         your question, do you mean on an
 5         individual prescription, on a patient,
 6         on a prescriber?  I just want to --
 7         just so I can answer your question
 8         better, sir.
 9    QUESTIONS BY MR. MOUGEY:
10         Q.    Yeah, over time, sir.  Over
11    time, that there are a number of people all
12    across Giant Eagle's organization,
13    pharmacists, techs, interns, that can put
14    notes in the note field, correct?
15         A.    In specific note fields related
16    to specific patients' -- specific
17    prescriptions and specific providers, that is
18    correct.
19         Q.    And one pharmacist's note in a
20    note field could potentially be very helpful
21    to a different pharmacist in Giant Eagle's
22    organization that is filling another
23    prescription at a later time, correct?
24              MR. KOBRIN:  Object to form.
25         Objection is beyond the scope.
```

```
 1              THE WITNESS:  I can't speculate
 2         if it would be helpful or not.  I
 3         think that would be under the
 4         professional judgment of those
 5         pharmacists.
 6   QUESTIONS BY MR. MOUGEY:
 7         Q.    Well, that's why the notes
 8   section would be there, right?  So what one
 9   pharmacist writes down in a note can be used
10   at a later point in time, correct?
11              MR. KOBRIN:  Object to form.
12         Beyond the scope.
13              THE WITNESS:  It could.  It
14         would also be up to that second
15         pharmacist to exercise his or her
16         professional judgment as well.
17   QUESTIONS BY MR. MOUGEY:
18         Q.    Right.
19              In reviewing the notes from --
20   and impressions of the pharmacist that filled
21   the previous description {sic}, correct?
22              MR. KOBRIN:  Object to form.
23         Beyond the scope.  Misrepresents prior
24         testimony.
25              THE WITNESS:  As I previously
```

1          stated, it could -- it's possible that

2          previous notes could help a pharmacist

3          assist in their professional judgment,

4          but that second pharmacist would also

5          be exercising their professional

6          judgment regarding that prescription.

7    QUESTIONS BY MR. MOUGEY:

8          Q.     Are there data tables that

9    collect information for specific DUR that are

10   downloaded and can be organized by patient?

11              MR. KOBRIN:  Object to form.

12         Objection as beyond the scope.

13              THE WITNESS:  Do you mean on

14         the local server?  In data warehouse?

15         I'm just -- just to kind of clarify

16         your question, please.

17   QUESTIONS BY MR. MOUGEY:

18         Q.     Giant Eagle.  Doesn't matter

19   where they are.

20              If a DUR that had been

21   flagged -- is that information stored in any

22   table in Giant Eagle's organization?

23         A.     That information is available

24   on the --

25              MR. KOBRIN:  Same objection.

Highly Confidential - Subject to Further Confidentiality Review

1          THE WITNESS:  That information

2      is available on the local server for a

3      pharmacist to generate a report

4      regarding DUR reviews for a specific

5      patient.

6  QUESTIONS BY MR. MOUGEY:

7      Q.     And how long do you believe

8  that that information is stored on a table

9  for that specific patient?

10     A.     To my best recollection, it

11 would be for two -- for at least two years

12 plus the current year.

13     Q.     Now, if a patient had

14 prescriptions filled at multiple Giant Eagle

15 pharmacies and there were DURs that were

16 flagged, is there a central location where

17 that patient data field is collected in one

18 table?

19     A.     I am unaware if that

20 prescription -- if the DUR information is

21 captured among the RX.com data to be

22 transferred to another location.

23     Q.     Well, forgive me if I have this

24 wrong, but when you said -- when you just

25 testified that the DURs that were flagged, my

1   understanding is that those were stored at a

2   local level, which would be the store,

3   correct?

4          A.      That is correct.

5          Q.      You're not familiar of whether

6   the DUR flags are captured at RX.com?

7          A.      As I previously stated, that is

8   correct.

9          Q.      And you're not aware of whether

10  the DUR flags are stored at the data

11  warehouse?

12         A.      That is correct.

13         Q.      Are the tables that are stored

14  at -- regarding DUR flags at the store

15  location, is that the only place historically

16  that Giant Eagle could find DUR flags by

17  patient?

18         A.      To my best knowledge, that is

19  correct.

20         Q.      If I wanted to log on -- if at

21  the store level I wanted to log on on the PDX

22  system to look at a specific patient history,

23  is there any fields capturing information on

24  historical DURs?

25         A.      Do you mean for a specific

Highly Confidential - Subject to Further Confidentiality Review

1    patient, sir?

2        Q.    Yes, sir.

3        A.    Yes, you would be able to --

4    you would be able to run a report for a

5    specific patient showing all DURs related to

6    that patient for the time period that

7    information is stored on the server.

8        Q.    At that specific store,

9    correct?

10        A.    That is correct.

11        Q.    And, sir, how would I

12    understand about the DURs that are flagged on

13    that local server of what specific

14    information was kept in those tables?

15        A.    I'm sorry, I don't understand

16    your question.

17            Do you mean how you would --

18    could you rephrase your question, please?

19        Q.    What fields are -- let's do it

20    this way.

21            What information is kept in the

22    tables that a per-patient report can be

23    pulled on DUR flags at that specific store?

24        A.    The notes for the -- the notes

25    for the DUR that were entered by the

1  pharmacist would be able to be captured.  The

2  reason for the -- the reason for the DUR, the

3  medication for the DUR, the patient -- the

4  patient info -- the patient and the

5  prescription would be captured.

6      Q.    Okay.  Other than the notes on

7  the DURs, what other information would be

8  kept at the table that a report can be run on

9  a specific patient on the DUR flags at that

10 specific store?

11         MR. KOBRIN:  Object to form.

12     Asked and answered.

13         THE WITNESS:  As I previously

14     answered, the notes related to that

15     DUR, the reason for the DUR, the

16     medication and the patient would show

17     for that information.

18 QUESTIONS BY MR. MOUGEY:

19     Q.    That's it?  Notes and the

20 medication and the patient.  That's all the

21 information that's kept in the table on the

22 DUR flags?

23     A.    The prescription -- the

24 prescription number would be attached to

25 the -- would be attached to the medication.

1      Q.      Okay.  Anything else?

2      A.      And potentially -- and again,

3  to my best recollection, the date the

4  prescription was filled.

5      Q.      How about the actual

6  information pulled from PDX and Medi-Span?

7      A.      As I previously stated, the

8  reason for the DUR would be captured.

9      Q.      In the same table?

10     A.      To my best knowledge, that is

11  correct.

12     Q.      And whether or not the DUR was

13  overridden, would that be in the table?

14     A.      If you are referencing the note

15  that the pharmacist would have entered, yes,

16  that would be captured on the local server

17  data.

18     Q.      No, I'm not referencing another

19  note.  I'm asking you if the reason for the

20  override outside of the notes would be

21  captured.

22     A.      As I previously answered --

23          MR. KOBRIN:  Object to form.

24          THE WITNESS:  -- about the --

25      if you're asking whether or not the

Highly Confidential - Subject to Further Confidentiality Review

```
 1            notes that the pharmacist entered in
 2            the DUR note field would be captured,
 3            that is correct.
 4     QUESTIONS BY MR. MOUGEY:
 5            Q.     Right.
 6                   No, I'm not asking about the
 7     notes.  I get it that everything under the
 8     sun is kept in the notes.
 9                   What I'm asking for, is there a
10     reason for the override, outside of the notes
11     stored in the table?
12                   MR. KOBRIN:  Object to form.
13            Vagueness as to what you mean by
14            "override."
15            THE WITNESS:  If you're -- just
16            to clarify your question.  If you're
17            asking the documentation that the
18            pharmacist entered in the note, which
19            could be the reason why -- what the
20            pharmacist resolved the DUR, that
21            information would be captured within
22            the DUR note field.
23     QUESTIONS BY MR. MOUGEY:
24            Q.     Yes, sir.
25                   Outside of the notes field, if
```

```
 1   the DUR flag is resolved or overridden, is

 2   that captured anywhere else in the tables

 3   that you're referencing?

 4        A.    Outside of the DUR note field,

 5   the reason for the pharmacist resolving the

 6   DUR would not be captured in another spot.

 7             MR. KOBRIN:  How much time have

 8        we got left on the record?

 9   QUESTIONS BY MR. MOUGEY:

10        Q.    Mr. Miller, if -- in the

11   refusal to fill, is there anywhere

12   information is stored or kept, capturing or

13   collecting the reason why a prescription

14   wasn't filled?

15        A.    As I previously mentioned, when

16   a prescription is deactivated, there are

17   radio buttons that the pharmacist can choose

18   if -- stating pharmacist discretion, handed

19   patient hard copy back, prescriber canceled

20   prescription.  And then there is additional

21   open note feeds that a pharmacist can enter

22   additional information there.

23        Q.    Is that answer the same if I

24   narrowed the refusal to fill down as the

25   pharmacist refusing to fill a prescription?
```

 1        A.       To -- just to clarify, just to

 2    make sure we're speaking the same lingo, do

 3    you mean is that radio button data captured

 4    somewhere?

 5        Q.       The reason why.  You've

 6    mentioned several reasons -- you've mentioned

 7    several reasons why a prescription wasn't

 8    filled.

 9             Is there a place that the data

10    is collected per patient for determining over

11    time why prescriptions weren't filled?

12        A.       Yes.  Those radio buttons would

13    be captured on the local server.  And to the

14    best of our knowledge, that information is

15    kept on -- or updated on an -- in a table

16    within data warehouse.

17             MR. MOUGEY:  Sorry.  I'm going

18         to take just a 30-second break and

19         look at an answer.

20             If you want Mr. Kobrin's

21         question about how much time we have,

22         that would be more than fine.

23             VIDEOGRAPHER:  The time right

24         now is 4:11 p.m.  We are off the

25         record.

Highly Confidential - Subject to Further Confidentiality Review

1          (Off the record at 4:11 p.m.)

2          VIDEOGRAPHER:  The time right

3     now is 4:12 p.m.  We are back on the

4     record.

5  QUESTIONS BY MR. MOUGEY:

6     Q.    Mr. Miller, do you believe that

7  documentation with the professional judgment

8  from the pharmacist is required to be notated

9  in Giant Eagle's PDX system?

10          MR. KOBRIN:  Object to form.

11          THE WITNESS:  Mr. Mougey, to

12     clarify your question, what

13     professional judgment?

14  QUESTIONS BY MR. MOUGEY:

15     Q.    Any.

16     A.    I think it's -- you know,

17  it's -- the professional judgment of the

18  pharmacist should be up to the professional

19  judgment of the pharmacist to enter any notes

20  that they feel are necessary.

21     Q.    Mr. Miller, go to Bates

22  number 808 on Exhibit 6.  I think you still

23  have it in front of you.  At the bottom of

24  the page under the documentation.

25     A.    I'm sorry?  Okay.

1      Q.     Are you there under

2   documentation, Mr. Miller, on Bates

3   number 808?

4      A.     That's on -- you said page 808,

5   and then that's page 3 of the document,

6   correct?

7      Q.     It's up on the screen in front

8   of you, Mr. Miller.

9      A.     Page 808, yes.

10     Q.     Okay.  Under documentation it

11  says, "The pharmacist must document the steps

12  they have taken to verify questionable

13  prescriptions, including any calls to the

14  prescriber, conversations with the patient,

15  medication history review, and notate on the

16  prescription itself or in the computer system

17  utilizing appropriate notes fields.  This

18  documentation must include:  name, first and

19  last, of the individual with whom you spoke;

20  date and time of the conversation; the phone

21  number used to call the provider; brief

22  summary of the substantive discussions

23  {sic}."

24             Did I get that right?

25             MR. KOBRIN:  Object to form.

```
1              THE WITNESS:  I see that.

2   QUESTIONS BY MR. MOUGEY:

3       Q.     And the last note on that page,

4   808 of Exhibit 6:  "When accessing a PDMP

5   note, the date and reason for accessing the

6   database."

7              Do you see that, sir?

8       A.     I do.

9       Q.     If a pharmacist, an intern or a

10  tech made a notation on the prescription

11  itself, what happened to the prescription?

12      A.     If a -- if a document -- if it

13  was documented actually on the physical

14  hardcopy prescription, that prescription

15  would be -- would be filed as we've -- had

16  previously discussed.

17      Q.     You mean filed in a paper file,

18  in a manila folder with a hundred other ones,

19  manila folder by manila folder, correct?

20      A.     That is correct.  That's how

21  prescriptions are filed.

22      Q.     And so the store level,

23  pharmacist, intern, techs, had discretion of

24  whether to document questionable

25  prescriptions in hardcopy form filed at the
```

Highly Confidential - Subject to Further Confidentiality Review

1    store level or on the computer system

2    utilizing appropriate note fields.  Correct,

3    sir?

4        A.    Relating to the specific

5    document regarding guidelines, this states

6    that the pharmacist.

7        Q.    So a pharmacist, when

8    documenting the steps that they have taken to

9    verify questionable prescriptions, including

10   calls to the prescriber, conversations with

11   the patient, medication history review, they

12   had the option at Giant Eagle of making a

13   note on the hardcopy prescription which was

14   filed away at the store level or on the notes

15   fields in the computer system.

16       A.    Yes, the pharmacist had the

17   option to document on -- in different ways

18   to -- if they had to verify a questionable

19   prescription.

20       Q.    And if a questionable

21   prescription arose at one of the Giant Eagle

22   pharmacies, yet the documentation was on hard

23   copy in another Giant Eagle pharmacy, that

24   pharmacist would have no way of referencing

25   those handwritten notes on the hardcopy

1    prescription during the fill process,

2    correct?

3              MR. KOBRIN:  Object to form.

4              THE WITNESS:  Are you talking

5         about the same prescription being

6         filled at a different location?

7    QUESTIONS BY MR. MOUGEY:

8         Q.    No, sir.

9              I'm asking if a pharmacist

10   answering questions about a questionable

11   prescription made notes on a hardcopy

12   prescription and those notes were filed away

13   at that specific Giant Eagle, a subsequent

14   pharmacist faced with a questionable

15   prescription from the same patient wouldn't

16   have access to those handwritten notes stored

17   at another Giant Eagle pharmacy, correct?

18        A.    Just to clarify your question,

19   the patient -- the patient would be

20   presenting a new prescription at the other

21   pharmacy?

22        Q.    Yes, a new prescription,

23   another prescription down the line.

24              Pharmacist number 2 would not

25   have access to notes that that pharmacist

1    answered verifying a questionable

2    prescription at another Giant Eagle store

3    prior in time, correct?

4         A.    The pharmacist at store --

5    at -- the second pharmacist would utilize his

6    or her professional judgment regarding that

7    second prescription.

8         Q.    Yes, sir, but that's not what I

9    asked.

10             What I asked was, is that a new

11   prescription that was questionable, presented

12   to a pharmacist at Giant Eagle X, that

13   pharmacist would not have access to notes

14   taken by another pharmacist at another Giant

15   Eagle if they're recorded in hard copy when

16   answering questions about questionable

17   prescriptions in regards to opiates.

18   Correct, sir?

19        A.    Other than that -- the second

20   pharmacist at that location exercising his or

21   her professional judgment, they would not

22   have access to the documented notes.

23             However, they could always call

24   the other pharmacy to get those documented

25   notes on the hard copy.

1    Q.    So essentially the hardcopy

2  notes that were collected store by store by

3  store, patient by patient by patient,

4  prescription by prescription by prescription,

5  were on an island from one Giant Eagle

6  pharmacy to another Giant Eagle pharmacy.

7  Correct, sir?

8              MR. KOBRIN:  Object to form.

9              THE WITNESS:  As I

10        previously -- as I previously stated,

11        that pharmacist at another store would

12        exercise his or her professional

13        judgment, and by seeing the patient

14        profile would be able to recognize

15        that previous prescription was filled

16        at another location, and in theory

17        could call that other location to look

18        at any notes on the hard copy if they

19        felt necessary while exercising their

20        professional judgment.

21  QUESTIONS BY MR. MOUGEY:

22    Q.    Yeah, in theory.  Correct, sir?

23    A.    That would be an option for

24  that pharmacist to do.

25    Q.    Yes, sir.

Highly Confidential - Subject to Further Confidentiality Review

1              As opposed to specific fields

2    for specific red flags that were kept in a

3    database could easily have been referenced by

4    a pharmacist at any of the Giant Eagle

5    locations.  Correct, sir?

6              MR. KOBRIN:  Object to form.

7              THE WITNESS:  I can't -- I

8       can't speculate on that answer, sir.

9    QUESTIONS BY MR. MOUGEY:

10       Q.    I'm not asking you to

11   speculate, sir.

12              We know already that the

13   PDX-system-specific fields, that information

14   is accessible by any pharmacist at any of the

15   Giant Eagle locations.  Correct, sir?

16       A.    Information relating to the

17   patient profile in the prescription history

18   of that patient could, yes.

19       Q.    Yes, sir.

20              So as opposed to the hardcopy

21   notes that are stored in paper, pharmacy by

22   pharmacy, if there were specific fields for

23   red flags in the PDX system, pharmacists from

24   all over Giant Eagle would be able to

25   immediately see prior red flags.  Correct,

1    sir?

2              MR. KOBRIN:  Object to form.

3              THE WITNESS:  I would say that

4         would be -- based on the note fields

5         that are attached on a patient profile

6         or image notes attached to a

7         prescription, which appear on the hard

8         copy as an image note, pharmacists do

9         have the ability to see some notes

10        that would be attached to a

11        prescription within the current

12        computer system.

13   QUESTIONS BY MR. MOUGEY:

14        Q.    But that's not what I'm asking

15   you, sir.

16              What I'm asking you, sir, is

17   about hardcopy notes where the pharmacist

18   performed due diligence pursuant to a

19   questionable prescription that was stored in

20   paper.

21              We on same page?

22        A.    Yes.  The hardcopy prescription

23   is stored in paper, correct.

24        Q.    A specific field for a -- red

25   flags stored on Giant Eagle's database would

1    be easily accessible by any pharmacist,

2    technician or intern at other Giant Eagle

3    locations.  Correct, sir?

4                  MR. KOBRIN:  Object to form.

5         Objection.  Beyond the scope.

6                  THE WITNESS:  Again, if we're

7         talking about a hypothetical

8         situation, I can't speculate -- I

9         can't speculate to that.

10   QUESTIONS BY MR. MOUGEY:

11        Q.    I'm not asking you to

12   speculate, sir.

13                Giant Eagle's system right now,

14   PDX, can be viewed on specific data fields

15   across the entire system per patient,

16   correct?

17        A.    That is correct.

18        Q.    And if fields were created at

19   any point in time at Giant Eagle pertaining

20   to red flags, those red flags could be seen

21   around the entire Giant Eagle system.

22   Correct, sir?

23        A.    Again, I can't speculate on

24   that because I'm not sure what information

25   RX.com would capture to be viewed among the

Highly Confidential - Subject to Further Confidentiality Review

1    Giant Eagle system.

2         Q.    Sir, just like the flags

3    that -- just like fields that have evolved

4    over time, Giant Eagle could have created

5    specific data fields for red flags, and those

6    could be viewed across the entire Giant Eagle

7    system.  Correct, sir?

8              MR. KOBRIN:  Object to form.

9              THE WITNESS:  You're kind of

10        going back to a previous --

11             MR. KOBRIN:  Beyond the scope.

12             THE WITNESS:  To go back to a

13        previous conversation, we license the

14        PDX software.  We would not have the

15        ability to create additional fields

16        within the -- within that software

17        platform.

18             MR. KOBRIN:  I think we're out

19        of time.

20             MR. MOUGEY:  I'm going to

21        get -- I'd like an answer to this last

22        question.

23             MR. KOBRIN:  Yeah, yeah, no,

24        that's fair.  I'm not cutting you off.

25        I just wanted to flag it, to --

Highly Confidential - Subject to Further Confidentiality Review

```
 1              MR. MOUGEY:  Thank you.

 2              MR. KOBRIN:  -- use the term.

 3  QUESTIONS BY MR. MOUGEY:

 4       Q.     I'm not asking you whether or

 5  not fields -- if you had the ability through

 6  a third-party vendor to create fields.

 7              All I'm simply asking you, sir,

 8  is that fields were created on PDX's system;

 9  can be seen by all the pharmacists at Giant

10  Eagle.  Correct, sir?

11       A.     Within the current system, that

12  is correct.

13              MR. MOUGEY:  Thank you.  I

14         don't have any further questions.

15              MR. KOBRIN:  I'll take one

16         quick bathroom break and -- we can

17         take two minutes and then -- if we

18         come back, if I have any redirect,

19         it's going to be very short.

20              MR. MOUGEY:  Hey, just also --

21              MR. KOBRIN:  Should we go off

22         real quick?  Sorry, I think we're

23         still on the record.

24              MR. MOUGEY:  No, I want to stay

25         on the record.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. KOBRIN:  Okay.

 2                    MR. MOUGEY:  My notes on the

 3             handwritten chart that we filled in

 4             I've marked as Miller 7.  And we'll

 5             scan those in like we've done in

 6             previous days and shoot them to the

 7             court reporter.

 8                    MR. KOBRIN:  Okay.  I mean, my

 9             position is pretty clear on the record

10             that that doesn't constitute

11             testimony, but I understand that.

12                    MR. MOUGEY:  So noted.  Thank

13             you.

14                    Do you want to break, you said?

15                    MR. KOBRIN:  Yeah.  Let's go

16             off the record very quickly, if that's

17             okay.

18                    Is that okay with everybody?

19                    Hearing no objection.

20                    VIDEOGRAPHER:  The time right

21             now is 4:26 p.m.  We are off the

22             record.

23                    (Miller Exhibit 7 marked for

24             identification.)

25              (Off the record at 4:26 p.m.)
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                VIDEOGRAPHER:  The time right
 2        now is 4:30 p.m.  We are back on the
 3        record.
 4                CROSS-EXAMINATION
 5   QUESTIONS BY MR. KOBRIN:
 6        Q.    Hi, Mr. Miller.  How are you
 7   doing?
 8        A.    I'm well.  Thank you.
 9        Q.    I just have a couple of quick
10   follow-up questions.  We'll keep it short.
11                Earlier today, plaintiff's
12   counsel asked you about whether Giant Eagle's
13   dispensing system had specific fields,
14   specific dedicated fields, a variety of
15   specific field questions for each red flag
16   that he talked about, some of which were
17   listed in the controlled substance dispensing
18   guideline.
19                Do you remember those
20   questions?
21        A.    I do.
22        Q.    Mr. Miller, do pharmacists at
23   Giant Eagle need a specific field for each of
24   those red flags in order to recognize the red
25   flag when it is presented by a patient with a
```

1    prescription?

2         A.    I don't believe so.

3    Pharmacists have the ability to exercise

4    their professional judgment to identify red

5    flags.  And outside of the list that -- or

6    contained in the dispensing -- the controlled

7    substance dispensing guidelines, there may be

8    other red flags that a pharmacy -- excuse me,

9    a pharmacist discovers while utilizing their

10   professional judgment, such as in the current

11   time frame, a hardcopy prescription may be --

12   may throw up a little bit more of a red flag

13   than receiving a electronic prescription from

14   a prescriber.

15        Q.    Is that because hardcopy

16   prescriptions are not as common as electronic

17   prescriptions for controls?

18        A.    Currently the more -- the trend

19   is to see electronic prescriptions for

20   controls.

21        Q.    Getting back to my initial

22   question, do pharmacists at Giant Eagle need

23   a specific field for each red flag in order

24   to collect the relevant data related to that

25   red flag so that they can safely dispense

Highly Confidential - Subject to Further Confidentiality Review

1    prescriptions?

2         A.     There are adequate note fields

3    within the dispensing software, including an

4    image note, documentation on the hard copy,

5    this fills note, all fills note, any note

6    that could be entered into the prescriber

7    field or a patient profile note that can

8    document the professional judgment of the

9    pharmacist.

10        Q.     Similarly, Mr. Miller, do

11   pharmacists at Giant Eagle need a specific

12   field for every potential red flag in order

13   to decide not to fill a prescription?

14        A.     No.  The pharmacist has the

15   ability to exer -- while exercising their

16   professional judgment to make that

17   determination.

18        Q.     And finally, is it necessary to

19   have specific fields for each red flag in

20   order to successfully address that red flag

21   and either not dispense or resolve it?

22        A.     During the review of that

23   prescription while a pharmacist is exercising

24   their professional judgment, in addition to

25   looking at an external database such as a

Highly Confidential - Subject to Further Confidentiality Review

1    PDMP, the pharmacist has the ability to

2    determine if red flags are present and

3    whether or not to resolve or to fill a

4    prescription.

5        Q.    So they don't need a particular

6    field related to that red flag so that they

7    can check a box or fill in a particular field

8    in order to resolve that issue?

9        A.    That is correct.

10       Q.    Finally, just before I started

11   asking you questions, plaintiff's counsel was

12   asking you questions about the face of a hard

13   copy of a prescription.

14             Do you remember that?

15       A.    I do.

16       Q.    Is it common practice that the

17   prescription gets scanned into the computer

18   system so that the face of the image is

19   copied into the PDX system?

20       A.    Once -- when we made the

21   transition from -- to RapidFill in the 2013

22   time frame, yes, prescription images would be

23   scanned into the computer system.

24       Q.    And if someone makes a notation

25   on the prescription, it's rescanned into the

1    PDX system with that notation on it, isn't

2    it?

3         A.     That's common practice.

4         Q.     So if somebody at another

5    pharmacy wanted to see the hardcopy notation,

6    they wouldn't necessarily have to go to the

7    hardcopy files at the other pharmacy

8    location.  They could look on the computer

9    system and see the scan of the prescription

10   with the notes on it, couldn't they?

11        A.     From the 2013 time frame, that

12   is -- yes.

13             MR. KOBRIN:  Thank you.  That's

14        all I've got.

15             REDIRECT EXAMINATION

16   QUESTIONS BY MR. MOUGEY:

17        Q.     Mr. Miller, just real quick,

18   just a couple of follow-ups.

19             I'm trying to keep track of the

20   manual reviews.

21             So in exercising the

22   professional discretion, a pharmacist would

23   need to review the patient note field,

24   correct, sir?

25        A.     That could be part of the

Highly Confidential - Subject to Further Confidentiality Review

1   professional judgment review.

2        Q.    The prescription note field,

3   correct, sir?

4             MR. KOBRIN:  Object to form.

5        Beyond the scope.

6             THE WITNESS:  That could be

7        part of a pharmacist exercising his or

8        her professional judgment.

9   QUESTIONS BY MR. MOUGEY:

10       Q.    The DUR note field, correct,

11  sir?

12            MR. KOBRIN:  Object to form.

13       Beyond the scope.  Beyond the scope of

14       the topics and beyond the scope of

15       redirect.

16            THE WITNESS:  That could be --

17       that could be an option for the

18       pharmacist to review within their

19       professional judgment.

20  QUESTIONS BY MR. MOUGEY:

21       Q.    And within the professional

22  judgment, a fourth or fifth note field, the

23  refusal to fill note field, correct, sir?

24            MR. KOBRIN:  Object to form.

25       Beyond the scope of the topics and of

1          the redirect.

2               THE WITNESS:  Yes, that is

3          information that the pharmacist could

4          review utilizing their professional

5          judgment.

6     QUESTIONS BY MR. MOUGEY:

7          Q.    And at Giant Eagle, in order to

8     exercise professional judgment of the

9     pharmacist, they would have to look at OARRS

10    data after 2011.  Correct, sir?

11              MR. KOBRIN:  Object to form,

12         and objection as beyond the scope of

13         both the redirect and the topics.

14    QUESTIONS BY MR. MOUGEY:

15         Q.    Correct, sir?

16         A.    That would be part of the

17    pharmacist exercising their professional

18    judgment during a drug utilization review.

19         Q.    And according to your testimony

20    with Mr. Kobrin, you'd also have the

21    pharmacist, in exercising their professional

22    judgment, would also potentially have to look

23    at a hardcopy scan of the prescriptions with

24    notes there.  Correct, sir?

25              MR. KOBRIN:  Object.  Beyond

1          the scope.

2                    THE WITNESS:  While exercising

3          a pharmacist's professional judgment,

4          that is another avenue a pharmacist

5          could review.

6    QUESTIONS BY MR. MOUGEY:

7          Q.     In exercising the scope of

8    their professional judgment, the pharmacist

9    would potentially have to -- also have to

10   look at the patient history.  Correct, sir?

11                   MR. KOBRIN:  Objection.  Beyond

12         the scope of both the redirect and the

13         topics.

14                   THE WITNESS:  That is another

15         avenue where a pharmacist can review

16         information regarding their

17         professional judgment.

18   QUESTIONS BY MR. MOUGEY:

19         Q.     If the pharmacist had questions

20   from a prior prescription, according to you,

21   sir, he or she might have to pick up the

22   phone and call another Giant Eagle pharmacy,

23   have them pull a handwritten note in a paper

24   file to reference that.  Correct, sir?

25                   MR. KOBRIN:  Object to form.

```
 1              Misrepresents prior testimony.  Beyond
 2              the scope of the redirect.  Beyond the
 3              scope of the topics.
 4                   And I think you're out of time
 5              under the case management order, but
 6              continue.
 7    QUESTIONS BY MR. MOUGEY:
 8         Q.    Go ahead, Mr. Miller.
 9         A.    That would be a possibility.
10         Q.    When exercising their
11    professional judgment, the pharmacist would
12    have to also look at information related to
13    the prescriber.  Correct, sir?
14                   MR. KOBRIN:  Object to form,
15              "have to."  Objection, beyond the
16              scope of the redirect and the topics.
17              And objection, we're out of time.
18                   THE WITNESS:  That is -- that
19              is information a pharmacist could
20              review in their utilization of their
21              professional judgment.
22    QUESTIONS BY MR. MOUGEY:
23         Q.    So just in the last three, four
24    minutes, you and I together have identified
25    at least ten different places on Giant
```

 1    Eagle's system, including picking up the

 2    phone and calling another pharmacy, when

 3    exercising their professional diligence with

 4    whether to figure out to fill an opiate

 5    prescription.  Correct, sir?

 6              MR. KOBRIN:  Object to form.

 7         Beyond the scope of the topics and the

 8         redirect.  We're out of time.  And

 9         objection because it misrepresents

10         prior testimony.

11              THE WITNESS:  Those are all

12         things that a pharmacist could review

13         in the exercising of their

14         professional judgment.

15              MR. MOUGEY:  I don't have any

16         further questions.  Thank you.

17              MR. KOBRIN:  Thank you.  Good

18         to go.

19              VIDEOGRAPHER:  The time right

20         now is 4:39 p.m.  We are off the

21         record.

22                   - - - - - - -

23

24

25

1       (Deposition concluded at 4:39 p.m.)

2              MR. KOBRIN:  Yes, I think we

3        probably both want a rough.  Thank

4        you.

5                   - - - - - - -

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE
 2
 3           I, CARRIE A. CAMPBELL, Registered
    Diplomate Reporter, Certified Realtime
 4  Reporter and Certified Shorthand Reporter, do
    hereby certify that prior to the commencement
 5  of the examination, Christopher Miller, was
    duly sworn by me to testify to the truth, the
 6  whole truth and nothing but the truth.
 7           I DO FURTHER CERTIFY that the
    foregoing is a verbatim transcript of the
 8  testimony as taken stenographically by and
    before me at the time, place and on the date
 9  hereinbefore set forth, to the best of my
    ability.
10
             I DO FURTHER CERTIFY that I am
11  neither a relative nor employee nor attorney
    nor counsel of any of the parties to this
12  action, and that I am neither a relative nor
    employee of such attorney or counsel, and
13  that I am not financially interested in the
    action.
14
15
16
             _____
17  CARRIE A. CAMPBELL,
    NCRA Registered Diplomate Reporter
18  Certified Realtime Reporter
    Notary Public
19
20
21
22
23  Dated:  February 19, 2021
24
25
```

```
 1              INSTRUCTIONS TO WITNESS

 2

 3              Please read your deposition over

 4    carefully and make any necessary corrections.

 5    You should state the reason in the

 6    appropriate space on the errata sheet for any

 7    corrections that are made.

 8              After doing so, please sign the

 9    errata sheet and date it.  You are signing

10    same subject to the changes you have noted on

11    the errata sheet, which will be attached to

12    your deposition.

13              It is imperative that you return

14    the original errata sheet to the deposing

15    attorney within thirty (30) days of receipt

16    of the deposition transcript by you.  If you

17    fail to do so, the deposition transcript may

18    be deemed to be accurate and may be used in

19    court.

20

21

22

23

24

25
```

Highly Confidential - Subject to Further Confidentiality Review

1          ACKNOWLEDGMENT OF DEPONENT

2

3

4          I,_____, do

hereby certify that I have read the foregoing

5  pages and that the same is a correct

transcription of the answers given by me to

6  the questions therein propounded, except for

the corrections or changes in form or

7  substance, if any, noted in the attached

Errata Sheet.

8

9

10

11

12  _____

Christopher Miller            Date

13

14

15  Subscribed and sworn to before me this

16  _____ day of _____, 20 _____.

17  My commission expires: _____

18

19  Notary Public

20

21

22

23

24

25

```
1                  - - - - - - -

                        ERRATA

2                  - - - - - - -

3     PAGE    LINE    CHANGE/REASON

4     _____   _____   _____

5     _____   _____   _____

6     _____   _____   _____

7     _____   _____   _____

8     _____   _____   _____

9     _____   _____   _____

10    _____   _____   _____

11    _____   _____   _____

12    _____   _____   _____

13    _____   _____   _____

14    _____   _____   _____

15    _____   _____   _____

16    _____   _____   _____

17    _____   _____   _____

18    _____   _____   _____

19    _____   _____   _____

20    _____   _____   _____

21    _____   _____   _____

22    _____   _____   _____

23    _____   _____   _____

24    _____   _____   _____

25
```

```
 1              - - - - - - -

                LAWYER'S NOTES

 2              - - - - - - -

 3     PAGE    LINE

 4     _____   _____   _____

 5     _____   _____   _____

 6     _____   _____   _____

 7     _____   _____   _____

 8     _____   _____   _____

 9     _____   _____   _____

10     _____   _____   _____

11     _____   _____   _____

12     _____   _____   _____

13     _____   _____   _____

14     _____   _____   _____

15     _____   _____   _____

16     _____   _____   _____

17     _____   _____   _____

18     _____   _____   _____

19     _____   _____   _____

20     _____   _____   _____

21     _____   _____   _____

22     _____   _____   _____

23     _____   _____   _____

24     _____   _____   _____

25
```