```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF OHIO
 2                      EASTERN DIVISION
 3                         - - -
 4    IN RE:  NATIONAL PRESCRIPTION :
      OPIATE LITIGATION               :  MDL No. 2804
 5    _____:  Case No.
                                      :  1:17-md-2804
 6    THIS DOCUMENT RELATES TO:       :
                                      :
 7    The County of Lake, Ohio v.     :  Hon. Dan A. Polster
      Purdue Pharma, LP, et al.       :
 8    Case No. 18-op-45032            :
                                      :
 9    The County of Trumbull, Ohio    :
      v. Purdue Pharma, LP, et al.    :
10    Case No. 1:18-op-45079          :
                                      :
11    Track 3 Cases                   :
      _____:
12
13                 Friday, April 16, 2021
14                  HIGHLY CONFIDENTIAL
         SUBJECT TO FURTHER CONFIDENTIALITY REVIEW
15
16          Remote videotaped deposition of
17    EMILY MOONEY, conducted at the location of the witness
18    in Chardon, Ohio, commencing at 10:02 a.m., on the
19    above date, before Carol A. Kirk, Registered Merit
20    Reporter, Certified Shorthand Reporter, and Notary
21    Public.
22
23
                 GOLKOW LITIGATION SERVICES
24          877.370.3377 ph | 917.591.5672 fax
                    deps@golkow.com
```

```
 1          R E M O T E   A P P E A R A N C E S
 2                      - - -
 3    On behalf of the Plaintiffs:
 4          LEVIN PAPANTONIO THOMAS MITCHELL
            RAFFERTY & PROCTOR P.A.
 5          BY:  JEFF GADDY, ESQUIRE
                 jgaddy@levinlaw.com
 6               LAURA DUNNING, ESQUIRE
                 ldunning@levinlaw.com
 7          316 South Baylen Street, Suite 600
            Pensacola, Florida  32591
 8          205-435-7000
 9
      On behalf of HBC Service Company:
10
            MARCUS & SHAPIRA LLP
11          BY:  MATTHEW R. MAZGAJ, ESQUIRE
                 mazgaj@marcus-shapira.com
12               DAVID ZWIER, ESQUIRE
                 zwier@marcus-shapira.com
13               SCOTT D. LIVINGSTON, ESQUIRE
                 livingston@marcus-shapira.com
14          One Oxford Center, 35th Floor
            301 Grant Street
15          Pittsburgh, Pennsylvania  15219-6401
            412-338-3345
16
17
18    ALSO PRESENT:
19          Jonathan Jaffe, It's-Your-Internet
            Mike Kutys, Document Tech
20          Jeff Fleming, Videographer
21
22
23                      - - -
24
```

```
1                    INDEX TO EXAMINATION

2    WITNESS                                      PAGE

3    EMILY MOONEY

4         CROSS-EXAMINATION BY MR. GADDY               7

          REDIRECT EXAMINATION BY MR. MAZGAJ          321

5         RECROSS-EXAMINATION BY MR. GADDY            331

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                      INDEX TO EXHIBITS
 2    MOONEY            DESCRIPTION                    PAGE
 3    Exhibit 1    Document titled, "Chapter One,       85
                   Introduction to Pharmacy,"
 4                 Bates-stamped HBC_MDL00190685
                   through 190876
 5
      Exhibit 2    Annual Performance Review for       165
 6                 Emily K. Mooney, Bates-stamped
                   GE_TL00015154 through 15164
 7
      Exhibit 3    Performance Appraisal - FY11,       186
 8                 Bates-stamped GE_TL00015205
                   through 15208
 9
      Exhibit 4    Employee evaluation,                193
10                 Bates-stamped GE_TL00015265
                   through 15270
11
      Exhibit 5    Giant Eagle Bonus 2015,             198
12                 Bates-stamped HBC_MDL00191127
                   and 191128
13
      Exhibit 6    Giant Eagle Bonus 2017,             203
14                 Bates-stamped HBC_MDL00191153
                   and 191154
15
      Exhibit 7    Giant Eagle Bonus 2020,             206
16                 Bates-stamped HBC_MDL00191155
                   and 191157
17
      Exhibit 8    PowerPoint titled, "Giant Eagle     208
18                 Pharmacy Welcome Workshop,"
                   Bates-stamped HBC_MDL00191099
19                 through 191106
20    Exhibit 9    Controlled Substance Dispensing     282
                   Guideline, Bates-stamped
21                 HBC_MDL00191292 through 191295
22    Exhibit 10   E-mail from Mr. Miller, dated       299
                   12/4/2016, with attachment,
23                 Bates-stamped HBC_MDL00059191
                   through 59269
24
```

```
 1              INDEX TO EXHIBITS (CONT'D)

 2   MOONEY           DESCRIPTION                    PAGE

 3   Exhibit 11    Metrics reports Bates-stamped     304

                   GE_TL00011878 through 12022

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    - - -

 2            P R O C E E D I N G S

 3                    - - -

 4            THE VIDEOGRAPHER:  We are now on

 5       the record.  My name is Jeff Fleming.

 6       I'm a videographer for Golkow Litigation

 7       Services.  Today's date is April 16,

 8       2021.  The time is 10:02 a.m.

 9            This remote video deposition is

10       being held in the matter of National

11       Prescription Opiate Litigation in the

12       United States District Court, Northern

13       District of Ohio, Eastern Division.  The

14       deponent is Emily Mooney.

15            All parties to this deposition are

16       appearing remotely and have agreed to

17       the witness being sworn in remotely.

18            Due to the nature of remote

19       reporting, please pause briefly before

20       speaking to ensure all parties are heard

21       completely.

22            All appearances will be noted on

23       the stenographic record, and the court

24       reporter is Carol Kirk and will now
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              swear in the witness.

 2                      - - -

 3                    EMILY MOONEY

 4    being by me first duly sworn, as hereinafter

 5    certified, deposes and says as follows:

 6                 CROSS-EXAMINATION

 7    BY MR. GADDY:

 8         Q.    Good morning, Ms. Mooney.  Could

 9    you please state your name.

10         A.    My name is Emily Mooney.

11         Q.    And we had a chance to meet just a

12    moment ago, but my name is Jeff Gaddy.  I'm a

13    lawyer down here in Florida, and I'm going to be

14    asking you some questions today.

15              Have you ever had your deposition

16    taken before?

17         A.    I have not.

18         Q.    Okay.  Have you ever had an

19    opportunity to testify before, whether it's in

20    court or an administrative hearing or anything

21    like that?

22         A.    No, I have not.

23         Q.    Okay.  I'm confident that your

24    attorney has kind of talked to you about ground
```

1    rules and things like that.  But as we go

2    through today, I'm going to ask you some

3    questions, and if you could try to answer out

4    loud and answer verbally as opposed to shaking

5    or nodding your head and things like that, that

6    would help me, and that would also help the

7    court reporter take down your answers, okay?

8           A.    Okay.

9           Q.    And you understand that the oath

10   that you just gave is the same oath you would

11   give if you were actually sitting in a courtroom

12   in front of a judge and jury?

13          A.    I do, yes.

14          Q.    And there's the potential that

15   this testimony that you're giving today could be

16   played for the jury just as if you were in --

17   sitting in the courtroom.

18                Do you have that understanding as

19   well?

20          A.    I do, yes.

21          Q.    I don't know how long we're going

22   to go today.  It will definitely be several

23   hours.  I hope it's not all day.  I also have

24   childcare issues today.  So I have some of the

Highly Confidential - Subject to Further Confidentiality Review

 1   same situations going on that you might have.

 2              But if at any point during today

 3   you want to take a break, whether it's food,

 4   lunch, restroom, whatever, just let me know and

 5   I'm happy to do that, okay?

 6        A.    Yes.

 7        Q.    Okay.  So outside of the context

 8   of testimony, have you ever had the opportunity

 9   to provide an affidavit, a sworn statement,

10   anything like that in relation to your work at

11   Giant Eagle, whether it's a statement to law

12   enforcement or a statement for a Board of

13   Pharmacy hearing or any of those types of

14   things?

15              MR. MAZGAJ:  Object to form.

16        A.    Not that I'm aware of.

17        Q.    And what city and county do you

18   live in?

19        A.    I live in Chardon, Ohio, in Geauga

20   County.

21        Q.    Okay.  And how long have you lived

22   in that city and county?

23        A.    Probably 10 to 12 years.

24        Q.    Okay.  And you anticipate being in

```
 1    that area for the next year or so?

 2         A.    Yes.

 3         Q.    Okay.  And if we needed to get in

 4    contact with you, the address that we had the

 5    materials delivered for the deposition today

 6    would be a good way to get in touch with you?

 7         A.    Yes.

 8               MR. MAZGAJ:  Through her attorney,

 9         but yes.

10         Q.    Ms. Mooney, what did you do to

11    prepare for this deposition today?

12         A.    I spoke with my attorney a couple

13    times.  We went over some things.

14         Q.    Okay.  When you say you spoke with

15    your attorney, do you mean -- are you referring

16    to Matt, who is here with you today?

17         A.    I am, yes.

18         Q.    And how many times did you have a

19    chance to speak with Matt?

20         A.    Probably three or four times.

21         Q.    And when did that process start?

22    About how long ago?

23         A.    Oh, jeez.  I think I was contacted

24    back in February, and I spoke with someone else
```

```
 1    at the law office.  I don't recall his name.

 2    And he just got some information about me and

 3    the store.

 4                MR. MAZGAJ:  Ms. Mooney, I'm just

 5          going to caution you not to discuss

 6          anything that we talked about during

 7          those sessions.  It's protected by the

 8          attorney-client privilege.  So you can

 9          talk about how many times and when, but

10          none of the substance, please.

11                THE WITNESS:  Right.  Okay.

12          A.    So I spoke with this other guy

13    initially.  Then Matt got a hold of me over

14    the -- another call, and then -- and then the

15    last -- or two days this week I spoke with him

16    over Zoom.

17          Q.    Okay.  About how many hours do you

18    think you spent speaking with Matt to get ready

19    for this?

20          A.    Probably 16, 17 hours.

21          Q.    Okay.  Outside of Matt or this

22    other attorney that you said you spoke to

23    initially, have you talked with anybody else to

24    help get ready for this deposition?
```

```
 1          A.    No.

 2          Q.    Okay.  Have you talked to any of

 3  your -- any of your coworkers about the

 4  deposition?

 5          A.    Only that I had to do a

 6  deposition.  Nothing else.

 7          Q.    Okay.  Have you had an opportunity

 8  to review or read any other depositions that

 9  have been taken in this case to help you get

10  ready?

11          A.    No, I have not.

12          Q.    Now, you work for Giant Eagle,

13  correct?

14          A.    I do.

15          Q.    Okay.  And how long have you

16  worked for Giant Eagle?

17          A.    Since 2005.  Yes.  So 16 years.

18          Q.    Okay.  Have you been a pharmacist

19  all of those 16 years?

20          A.    No.

21          Q.    Okay.  When did you become a

22  pharmacist?

23          A.    In 2009.

24          Q.    Okay.  Have you ever been a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    pharmacist for anybody other than Giant Eagle?

 2           A.    I have not.

 3           Q.    Okay.  Have you ever worked for

 4    any -- in any capacity, have you worked for any

 5    pharmacies other than Giant Eagle?

 6           A.    Not a retail pharmacy.  I did work

 7    in a hospital as a PRN for a little while, but

 8    that's it.

 9           Q.    Okay.  What time period was that?

10           A.    In '09, right when I got out of

11    school.

12           Q.    What is a PRN?

13           A.    As needed.  Sorry.  So they would

14    call me if they had someone call off.  I wasn't

15    on the schedule.

16           Q.    Okay.  And that was as a

17    pharmacist?

18           A.    Yes.

19           Q.    Okay.  And how long did you do

20    that?

21           A.    About a year.

22           Q.    Okay.  And help me understand

23    that.  So that's a pharmacy within a hospital?

24           A.    Yes.
```

 1          Q.    Okay.  So --

 2          A.    An inpatient pharmacy.

 3          Q.    You cut out there for a second.

 4   Could you say that again?

 5          A.    Sorry.  It was an inpatient

 6   pharmacy.

 7          Q.    Okay.  So the customer base that

 8   you were filling prescriptions for were patients

 9   at the hospital?

10          A.    Correct.

11          Q.    People weren't coming in off the

12   street with prescriptions?

13          A.    No.

14          Q.    Now, how was it that you started

15   working at Giant Eagle back in 2005?

16          A.    I was interested in the medical

17   field.  I was going to school for pharmacy.  So

18   I thought being a technician would be the next

19   step.

20          Q.    Okay.  What year did you graduate

21   high school?

22          A.    In '03.

23          Q.    Okay.  So at the time you started

24   at Giant Eagle, were you already in college?

```
 1          A.    Uh-huh.

 2          Q.    You have to say yes or no.

 3          A.    Oh, yes.  I'm sorry.

 4          Q.    No, that's fine.

 5                Okay.  So in -- when you decided

 6     to start working at Giant Eagle, you already

 7     knew that you wanted to be a pharmacist?

 8          A.    Correct.  Yes.

 9          Q.    Okay.  And how did you select

10     Giant Eagle over the other retail or independent

11     pharmacies that are out there in the

12     communities?

13          A.    At that time I knew a family

14     friend was an HR manager at the time for a few

15     Giant Eagles.  So she told me I should apply,

16     and got my application.

17          Q.    Okay.  And did you apply to any

18     other pharmacies or just the Giant Eagle where

19     you had a family friend who was in HR?

20          A.    Just Giant Eagle.

21          Q.    Okay.  And you said at the time

22     that you started working at Giant Eagle, that

23     you knew you wanted to be a pharmacist.

24          A.    I knew I wanted to be a
```

```
 1   pharmacist, yes.

 2          Q.   Okay.  Tell me a little bit more

 3   about that.  I mean, how did you decide that you

 4   wanted to be a pharmacist and kind of what

 5   motivated that career path for you.

 6          A.   I have a mother that is very

 7   driven.  No, I've always been interested in the

 8   medical field.  I took a lot of science classes

 9   in high school.  I was a science nerd, for lack

10   of a better word.  And, yes, my mother thought

11   that pharmacy would be a good choice.  So I went

12   that way.

13          Q.   Okay.  And I assume you're happy

14   you did?

15          A.   I am, yes.

16          Q.   Okay.  Good.

17               So let me -- I'm going to go back

18   into your Giant Eagle career and employment

19   there in just a minute, but let me step back and

20   kind of start and do a little bit of a kind of

21   educational background.

22               So you said you graduated high

23   school in '03.  Did you immediately go to

24   college?
```

```
 1          A.    Yes, I did.

 2          Q.    Okay.  And where did you -- where

 3    did you go to college?

 4          A.    The University of Toledo.

 5          Q.    And what did you major in?

 6          A.    Pharmacy.

 7          Q.    Tell me about how that works as

 8    far as -- I mean, do you do your first couple of

 9    years with kind of your general education and

10    the last one or two or three years as pharmacy

11    specific?  How does that work?

12          A.    The University of Toledo has a --

13    I don't know if they still do, but when I went,

14    they had a track program, a six-year program.

15    The first two years is prerequisites.  The last

16    four years are you're in the pharmacy school at

17    that point.  You would apply to get into that.

18    But it is -- you still get your bachelor's

19    degree in that track, as well as the PharmD at

20    the end.

21          Q.    Okay.  So did you get both the

22    undergraduate degree and the PharmD?

23          A.    Yes.

24          Q.    Okay.  And so it's four years to
```

Highly Confidential - Subject to Further Confidentiality Review

1    get the bachelor's degree and then an extra two

2    years to get the PharmD?

3            A.    Right.

4            Q.    Okay.  In your mind is there a

5    difference between the first four years and the

6    last two?  I mean, if somebody asked you about

7    pharmacy school, would you tell them about the

8    whole six years or just the last two?

9            A.    It's actually the last four of the

10   track is in the pharmacy school.  So, yes, the

11   first two years are different than the last four

12   years.  You're in the program during those last

13   four years.  The first two years is getting into

14   the program.

15           Q.    Okay.  Are there any other majors

16   that come out of the pharmacy school other than

17   a major in pharmacy?

18           A.    Yes.  Yes, they have other

19   schools.

20           Q.    Can you give me some examples of

21   some of the others?

22           A.    They have a law school.  There's a

23   medical campus.  I don't -- I'm not sure if the

24   medical campus was a part of it yet when I was

Highly Confidential - Subject to Further Confidentiality Review

```
 1   there, but I know it is now.  Education,

 2   business.

 3            Q.    I think I asked a bad question.

 4                  What I was getting at is, within

 5   the pharmacy school, are there other degrees

 6   that you can come out with?  So is there, like,

 7   a pharmacy tech program, or are there other

 8   degrees or programs within the pharmacy school

 9   other than just getting your PharmD?

10            A.    Yes.  I know there's a few, but

11   the only one I know for sure is you can be,

12   like, a pharmaceutical rep, so then you take

13   business courses.  After applying to the

14   pharmacy school, a lot of -- if they didn't get

15   into pharmacy -- the actual pharmacy school,

16   some people went that route where they did more

17   of the business end and became a pharmaceutical

18   rep.  I know there's a few others, but I can't

19   remember them offhand.

20            Q.    Okay.  I want to ask you just kind

21   of some general -- or start with some general

22   and then maybe a few specific questions about

23   some of the classes that you would have taken in

24   pharmacy school, so just talking about those
```

```
 1    last four years.
 2              Can you just kind of give me in
 3    your own words kind of a general overview of the
 4    types of classes that you took there at Toledo?
 5         A.   Sure.  The first few years in the
 6    pharmacy school we did more general
 7    pharmacology, the different drugs for different
 8    systems, treating different things.  The last
 9    few years we did more focused specialties, so we
10    did pediatrics, oncology, cardiology,
11    pulmonology, GI, renal.  We took a law course.
12              Those are what I can remember
13    offhand.
14         Q.   Okay.  Do you -- you mentioned
15    some of the specific classes or specific areas.
16              Do you recall whether or not you
17    had any specific classes that were just devoted
18    to controlled substances?
19         A.   I think that would be in the law
20    course.  We had a whole year of law, so that
21    comes up quite a bit in that, so ...
22         Q.   Okay.  No.  That's a good point.
23    I'm going to ask you about the law course in
24    just a second, but I'm talking more on the
```

```
 1   pharmacology side.  So you talked about, you

 2   know, oncology, cardiology, pulmonology, renal.

 3   Any classes that kind of were on the class of

 4   drugs of controlled substance outside of the law

 5   context?

 6        A.    Yeah, that would be in the

 7   pharmacology course.  So, I mean, we took two

 8   years of pharmacology.  So we learned about

 9   those there.

10        Q.    Okay.  What does pharmacology

11   mean?

12        A.    It's the study of the drugs.  So

13   we learned how they worked, how -- the

14   administration, the dosing, how they're absorbed

15   by the body, the kinetics, a whole -- we went by

16   class through the drugs.  So it's a thorough

17   review.

18        Q.    Okay.  Did you have any classes on

19   pain management?

20        A.    Not a class.  Just --

21        Q.    Okay.  Did you have any classes on

22   the treatment or the appropriate treatment for

23   conditions like chronic pain?

24        A.    We did go over that in
```

```
 1    pharmacology, so -- on how to treat a patient
 2    for pain.  Yes, that was in the pharmacology
 3    class.
 4          Q.    Okay.  Tell me what you remember
 5    from the pharmacology class about how to treat a
 6    patient for chronic pain.
 7                MR. MAZGAJ:  Objection to form.
 8          A.    It's more the drugs related and
 9    what drugs are used for immediate pain,
10    long-term treatment of pain, extended release
11    forms to -- that someone would take immediately
12    to help treat it.
13                So we don't -- it was more on the
14    dosing and how those medications are given, how
15    we would see them as a pharmacist to determine
16    that it's written correctly and dosed correctly.
17          Q.    Okay.  And tell me what you mean
18    when you -- and what you learned when it came to
19    the proper treatment and dosing as it related to
20    chronic pain patients.
21          A.    I'm not sure I understand what
22    you're asking.  A chronic pain patient would be
23    on a long-acting opiate theoretically.  So we
24    learned about those drugs and how they would be
```

Case: 1:17-md-02804-DAP Doc #: 4217-21 Filed: 12/29/21 23 of 336. PageID #: 564045

```
 1   dosed.

 2        Q.   Okay.  And that's what I'm asking,

 3   is if you were taught that a chronic pain

 4   patient would be on long-acting opiates -- what

 5   did you learn about dosing, length of treatment,

 6   those types of things?

 7        A.    I mean, the dosing for long-term

 8   treatment of pain is different for different

 9   medications.  We can -- I mean, it's different

10   for each medication, so I don't -- I don't

11   really know how to go into that, per se.  But

12   patients can be on a long-term treatment.  And

13   pain is very hard to treat, and they need to be

14   treated.  They may need to be treated long term,

15   so ...

16        Q.    Okay.  And those concepts were

17   taught to you all the way as far back as

18   pharmacy school at Toledo?

19        A.    Right.

20        Q.    Okay.  Is there anything else that

21   you remember from pharmacy school in the

22   education process about treatment of chronic

23   pain patients, anything else that you remember?

24             MR. MAZGAJ:  Objection to form.
```

```
 1              A.    I don't remember anything other

 2    than what I've told you.

 3              Q.    Okay.  You mentioned the pharmacy

 4    law class.  Tell me a little bit about that

 5    class and what it covered.

 6              A.    Well, we do have to take a board

 7    exam, two exams, to become a pharmacist, one of

 8    them being Ohio and federal law.  So we learn

 9    federal laws in regards to the practice of

10    pharmacy, and then also the state's laws, and we

11    do whatever is more stringent.  Usually Ohio law

12    is more stringent than the federal, so we learn

13    that difference so that we can take the Ohio law

14    exam.

15              Q.    Okay.

16              A.    It's in preparation for that.

17              Q.    I'm sorry.  I missed the last

18    thing you said.  Oh, preparation --

19              A.    Preparing us for that exam.

20              Q.    Okay.  Do you recall any education

21    in pharmacy school regarding the identification

22    of red flags related to diversion as it relates

23    to filling controlled substance prescriptions?

24                    MR. MAZGAJ:  Objection to form.
```

```
 1            A.    I'm not sure about that in

 2    pharmacy school.  I can't remember anything like

 3    that.

 4            Q.    Okay.  Okay.  When did you

 5    graduate pharmacy school?

 6            A.    2009.

 7            Q.    Okay.  And you mentioned there

 8    were some boards you had to take.  Did you take

 9    those in 2009?

10            A.    I did.

11            Q.    Okay.  And since you're a

12    pharmacist, I presume you passed your boards?

13            A.    I did, yes.

14            Q.    Okay.  And did you -- when did you

15    start working at Giant Eagle as a pharmacist?

16            A.    Right away, once I passed my

17    boards.  Right away.

18            Q.    Okay.  Let me kind of, again, take

19    a step back, and what I want you to kind of do

20    is give me -- I didn't get a CV or a resumé for

21    you, so I'm hoping that you can kind of give me

22    a general overview of your career at Giant Eagle

23    as far as the different positions that you had

24    and how they've changed over time.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              And so if you don't mind starting
2    in 2005.  And whether it was during school or
3    during the summer or whatever, just kind of let
4    me know what you were doing.  And then I'll come
5    back and probably ask some specific questions
6    about some of the different jobs.
7              Can you do that?
8         A.    Absolutely.  So in 2005, in May of
9    2005, I got hired as a technician at the Chardon
10   Giant Eagle.  So for the summer, I worked there
11   in this area, in Geauga County.
12              I went back to school in August
13   and transferred from this area out to Lucas
14   County.  They had two Giant Eagles in the Toledo
15   area.  So I transferred to one of those stores.
16   And I worked at their Central Avenue location.
17              At this point in 2005, I would
18   have gotten my intern license.  So I became an
19   intern while I was at that store.  So I interned
20   throughout the rest of pharmacy school at the
21   Central Avenue store in Toledo.
22              Once -- my last year in pharmacy
23   school, so that would have been '08, the summer
24   of '08, to when I graduated, I had moved back
```

1   home, which is this area, for my pharmacy

2   rotations.  So I was -- each month I would be at

3   a different location to complete the

4   prerequisites to graduate.

5            But during that time, I still

6   worked in Lake County at a former Giant Eagle

7   that isn't there anymore in Mentor, Ohio.  So I

8   worked there throughout the year as I was

9   completing my rotations.

10           Once I graduated and while I was

11  studying for my boards, I became a graduate

12  intern, and I floated to any store that needed

13  me at that point on the east side of Cleveland.

14           And then once I got my license, I

15  started as a floater pharmacist primarily

16  working in the Mentor-on-the-Lake Giant Eagle,

17  and I worked there -- really, I worked there for

18  a little while -- I would say at least a year --

19  before I got the manager position at the

20  Painesville store in 2012.

21           I've been at the Painesville

22  location since then as the manager.

23      Q.   Okay.  So you've been at one store

24  since 2012?

Highly Confidential - Subject to Further Confidentiality Review

```
 1              A.     Correct.

 2              Q.     Okay.  All right.  So you used --

 3     it sounds like you held several different

 4     positions.  I heard tech.  I heard intern.  I

 5     heard graduate intern, floater, and manager.

 6                     Did I get them all?

 7              A.     Right.

 8              Q.     Okay.  So I'm going to go one by

 9     one and just kind of -- what I'm -- just so you

10     know what I'm getting at here, is I'm trying to

11     understand the differences between the positions

12     within Giant Eagle.

13                     So let's just start at when you

14     were a tech in May of 2005.  Kind of give me an

15     explanation or an overview of what your role and

16     responsibility was as a pharmacy tech.

17              A.     A pharmacy tech is there to assist

18     the pharmacist.  I would -- I did data entry on

19     prescriptions.  I rung out customers, helped

20     find -- customers find product on the shelves,

21     counted the prescriptions out for the

22     pharmacist.  I did insurance billing.  Those are

23     a few things.

24              Q.     Okay.  Any other primary task of a
```

Highly Confidential - Subject to Further Confidentiality Review

1    pharmacy tech that you can think of?  I get that

2    there may be other smaller things, but any other

3    primary job responsibilities of a pharmacy tech

4    that you haven't told us about?

5           A.    No.  I think that covers most of

6    them.  Yes.

7           Q.    Okay.  Today, would that

8    description generally be the same as it was in

9    2005?

10          A.    Yes, yes.  I don't believe

11   anything has changed for the role of a tech.

12          Q.    Okay.  The next thing that I'm

13   going to ask about each of these positions is --

14   obviously, as I'm sure you're aware, this case

15   deals with controlled substances and opiates in

16   particular.  So I'm going to ask you whether or

17   not there was anything specific to those

18   positions, any specific rules or policies with

19   those positions that would relate to opiates.

20              So, for example, you just told me

21   as a tech, you might count medication, right?

22          A.    Uh-huh.

23          Q.    Okay.  So one of the things that

24   I'd be interested in is if there was a rule or a

Highly Confidential - Subject to Further Confidentiality Review

```
 1    procedure that you weren't allowed to count

 2    oxycodone pills, for example.

 3              So with that kind of background

 4    and understanding, were there any particular

 5    rules or regulations or policies in place at

 6    Giant Eagle regarding controlled substances and

 7    opiates in particular that impacted what you did

 8    as a pharmacy tech?

 9              MR. MAZGAJ:  Objection to form.

10         A.   There are a lot of policies at

11    Giant Eagle.  We have the controlled substance

12    policy.  There are quite a few policies that we

13    have in regards to filling medications in

14    general.

15              I mean, there's extra things.  A

16    technician when filling a prescription for a

17    controlled medication.  The medication is --

18    depending on the class, any controlled

19    medication is double counted by the technician

20    and their initials are placed on the label.

21    That's one example.

22              For a C-II medication, the

23    technicians will count the medication, double

24    count the medication, and then also back count
```

1    the stock bottle before giving it to the

2    pharmacist.  And then the pharmacist would also

3    double count the controlled medication or the

4    C-II.

5              So there are a lot of things in

6    place to make sure that the patient gets the

7    correct amount, especially when it comes to the

8    controlled medications.

9         Q.    Okay.  Were there any limitations

10   on pharmacy techs when it came to Schedule II

11   controlled substances as far as data entry or

12   filling, or, you know, handing the prescription

13   to the customer?  Any restrictions as far as the

14   pharmacy tech doing any of those things?

15        A.    No.  They can count the

16   medication.  They can't retrieve the -- a C-II

17   medication is locked in the safe and only a

18   pharmacist can get that for them, but they are

19   permitted to count them.  I mean, other than

20   that, they don't -- they don't check in the

21   orders for that.  Only a pharmacist does that.

22              So that would be the only time

23   that they were handling those medications.

24        Q.    Okay.  So when it comes to

```
 1   Schedule II prescriptions, only a pharmacist can

 2   retrieve the medication; is that right?

 3        A.    Yes.

 4        Q.    Okay.  And you said only a

 5   pharmacist can check it in?

 6        A.    Yes.  If the order comes in, those

 7   are bagged in separate totes, and only the

 8   pharmacist can check those in to our inventory

 9   and put them into the safe.

10        Q.    Gotcha.  When they're delivered to

11   the -- when the bottles are delivered to the

12   store.

13        A.    Yes.

14        Q.    Okay.  So that's -- you don't mean

15   check in like check in a prescription.  You mean

16   check in like a delivery of bottles?

17        A.    Yes, yes.

18        Q.    Okay.

19        A.    The actual prescription, a

20   technician can take --

21        Q.    Okay.

22        A.    -- from the patient.

23        Q.    So a technician can take a

24   patient, a technician can enter the data for a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   C-II prescription, a technician can count a C-II

 2   prescription, and a technician can hand a C-II

 3   prescription to a patient after a pharmacist has

 4   made the decision that the prescription should

 5   be filled.

 6              Is that all correct?

 7              MR. MAZGAJ:  Objection to form.

 8        A.    Yes, that's correct.

 9        Q.    Okay.  The next position that you

10   told me about that you had was as an intern,

11   correct?

12        A.    Yes.

13        Q.    Okay.  Tell me the difference

14   between an intern and a tech.

15        A.    The intern has a few more

16   responsibilities, one being the fact that they

17   do have the ability to counsel a patient under

18   direct supervision of a pharmacist.  Technicians

19   cannot do that.  They cannot make

20   recommendations.  An intern can.  So that is

21   one.

22              They can take prescriptions from a

23   doctor.  If the doctor is calling in the

24   prescription, they can take that prescription
```

1    down.  If we're transferring a prescription to

2    another pharmacy, the intern can do that as well

3    as long as it's not a controlled medication.

4    Interns are not allowed to do that in the State

5    of Ohio.

6              Let's see.  That's -- those are

7    the three big things.

8              Oh, and then now they can immunize

9    under the direct supervision of a pharmacist as

10   well, so ...

11        Q.    Okay.  So it sounds like the same

12   restrictions regarding controlled substances for

13   a tech also apply to an intern; is that right?

14        A.    Right.  Yes.

15        Q.    Okay.  And you mentioned Ohio law.

16   Are these kind of roles and responsibilities for

17   the intern -- from your understanding, are they

18   governed by Ohio law, or are they -- or is this

19   Giant Eagle policy?

20        A.    Ohio law.

21        Q.    Okay.  So Ohio law has these

22   definitions for what the techs and the interns

23   are and are not allowed to do?

24              MR. MAZGAJ:  Objection; calls for

```
 1            a legal conclusion.

 2            A.    Definitely for an intern.  I'm not

 3     familiar with the law for techs.

 4            Q.    Okay.  That's fine.

 5                  The next position you mentioned

 6     was a graduate intern?

 7            A.    Right.

 8            Q.    Okay.  Can you tell me the

 9     difference between a graduate intern and the

10     prior two positions of tech and intern?

11            A.    Basically you're graduated, so you

12     have your degree, but you don't have your

13     license yet, but there's no difference -- you're

14     still an intern, so there's no difference in

15     what you can do.

16            Q.    Okay.  So you still can't get

17     controlled Schedule II drugs out of the safe,

18     right?

19            A.    Correct.

20            Q.    Okay.  But you can still accept a

21     Schedule II prescription, you can enter the data

22     for a Schedule II prescription, you can count a

23     Schedule II prescription, and you can hand a

24     Schedule II prescription to a customer after a
```

```
 1    pharmacist has determined that it should be

 2    filled, correct?

 3            A.    Yes.

 4                  MR. MAZGAJ:  Object to form.

 5            Q.    Okay.  And I presume you could

 6    still counsel a patient under the supervision of

 7    a pharmacist as a graduate intern, right?

 8            A.    Yes.

 9            Q.    And I think you said that once you

10    became licensed, your first role was as a

11    floater?

12            A.    Yes, I was a floater.

13            Q.    Okay.  Tell me what that term

14    means in the context of Giant Eagle.

15            A.    Sure.  It means that I had a

16    regional scheduler, and I'd float to stores that

17    pharmacists were on vacation or there were holes

18    in the schedule.  So I just worked at different

19    stores.  There was no set schedule for me.

20            Q.    Okay.  How many different stores

21    were kind of within the possibility for you to

22    work at while you were a floater?

23            A.    I'm not sure of the number.  When

24    I signed on with Giant Eagle, I signed on for a
```

```
 1   region of Northeast Ohio, so the east side of

 2   Cleveland.  So I'm not sure of the amount of

 3   stores that I went to or that are in that area.

 4        Q.    Okay.  Can you give me a ballpark

 5   as far as is it less than five, less than ten,

 6   less than fifty, understanding that it's an

 7   estimate?

 8        A.    Probably 15 -- 15 to 20 maybe,

 9   different stores.

10        Q.    And over what period of time did

11   you float and have the potential to work at

12   these 15 to 20 stores?

13             MR. MAZGAJ:  Objection to form.

14        A.    From 2009 up until 2012.

15        Q.    Okay.  I know you're a manager

16   now, but does Giant Eagle still use the role of

17   floater?

18        A.    Yes, they do.

19        Q.    Okay.  And do you sometimes still

20   have floaters come and work in your store in

21   Painesville?

22        A.    Yes.

23        Q.    Okay.  When you were a floater

24   from '09 to '12, what would you say the furthest
```

1   was that you ever had to travel to go to a store

2   to work?

3          A.    Forty-five minutes, maybe an hour.

4          Q.    Okay.  As a floater, was there any

5   type of information packet or orientation packet

6   that would have been store specific that you

7   would have been presented on on going to one of

8   these approximately 15 to 20 stores to work at

9   over this period of time?

10         A.    No.  We -- Giant Eagle has

11  policies in place that if -- that makes it

12  easier for floaters to go to different stores

13  because we all work under the same policies.

14               So other than maybe placing a box

15  in a different location -- I mean, that box is

16  going to be in that pharmacy.  So we know where

17  to look, where to find things.  That's usually

18  not an issue.

19         Q.    Okay.  So as far as the layout of

20  the pharmacy, the computer system within the

21  pharmacy, all of that type of thing is pretty

22  standardized across all the Giant Eagles; is

23  that fair?

24         A.    Yes.

```
 1              Q.    Okay.  So let me ask a little bit

 2    of a different question.

 3                    You've been a manager at the

 4    Painesville pharmacy since 2012?

 5              A.    Yes.

 6              Q.    Okay.  I would imagine that while

 7    you probably have new and unique customers who

 8    come in from time to time, you also probably

 9    have a set of customers that you know or

10    recognize when they come in the pharmacy.  Is

11    that generally fair?

12              A.    Yes.

13              Q.    And I would imagine there's

14    patients that you could probably think of off

15    the top of your head that you've helped them for

16    several years and you know the types of

17    medications that they're on, the types of

18    conditions that are being treated, and you know

19    those patients fairly well.

20                    Is that fair?

21              A.    Yes.

22              Q.    Okay.  And I also would imagine

23    there's probably -- you probably have some sense

24    of familiarity with some of the physicians that
```

1    commonly have prescriptions filled at your

2    store; is that true?

3          A.    Yes.  I'm in contact with

4    physicians quite a bit.  Yes.

5          Q.    Okay.  So knowing that that's how

6    it works for you when you've been a manager at

7    this one store in Painesville since 2012 -- so

8    that's kind of the context that I'm asking about

9    for while you were a floater.

10               So when you floated to these

11   approximately 15 to 20 stores from '09 to 2012,

12   was there any type of orientation material or

13   introductory material that would kind of help

14   you become oriented with the patient or

15   physician base for a particular Giant Eagle

16   store?

17               MR. MAZGAJ:  Objection to form.

18         A.    There's nothing like a packet, but

19   that's what you have colleagues for.  The

20   technicians are a great resource, and then the

21   other pharmacists that you work with.  So if I

22   did have questions, they are a great resource

23   for that.

24         Q.    Okay.  So you're telling me that

```
 1    you have colleagues within the store that you

 2    can ask questions to, but there was no

 3    orientation material, information packet, that

 4    would be presented and available to floating

 5    pharmacists at the different stores, correct?

 6         A.    I -- I don't believe you can have

 7    something like that because of HIPAA laws.  You

 8    can't just make a packet of patients.  So, no,

 9    we don't have that.

10         Q.    Is there a store number for the

11    store in Painesville?

12         A.    6377.

13         Q.    Are there any other -- I guess

14    that's the only store you've worked at since

15    2012, right?

16         A.    For the most part, yes.  If I had

17    to help out a friend and pick up a shift, then

18    so be it, but ...

19         Q.    Okay.  Did you go straight from

20    being a floater to being a manager?

21         A.    I did.  Yes.

22         Q.    Okay.  So is there another role in

23    there that you kind of jumped over as far as

24    whether it's a staff pharmacist or something
```

1    like that?

2          A.    I worked -- I told you I worked at

3    Mentor-on-the-Lake -- the Mentor-on-the-Lake

4    Giant Eagle for an extended period.  So I was

5    technically a floater.  That was my job title.

6    But in all respects, I was a staff pharmacist

7    there.  I covered a hole for a very long-term

8    period, definitely over a year.  I'm not sure of

9    the whole time, but I was in the same store for

10   over a year.

11         Q.    Okay.  Do you remember what that

12   store number is?

13         A.    1217.

14         Q.    And are there any differences in

15   the duties of a floating pharmacist and a staff

16   pharmacist, which it sounds like essentially

17   that was the role you were filling at 1217?

18         A.    No.  Essentially, no.  I mean, I

19   was more involved in scheduling when I was

20   there.  Anything more I could do to help with

21   the running of that store's day-to-day, I was

22   more involved in.  As a floater, you just go in

23   for the day.  There I did help out more,

24   particularly with tech schedules and things like

```
 1   that.  But no real difference when it came to

 2   what you did as a pharmacist.

 3          Q.    Okay.  And now as a manager, can

 4   you kind of give me an overview of the

 5   differences in your -- the kind of scope of your

 6   duties and responsibilities as a manager as

 7   opposed to the staff pharmacist or the floater

 8   role?

 9          A.    Sure.  I mean, in -- obviously my

10   job as a pharmacist is the same wherever I am.

11   But as a manager, obviously I was more involved

12   in the day-to-day, staffing, hiring of

13   technicians, scheduling.  I make the

14   pharmacists' schedule, technicians' schedules,

15   making sure that all of my staff is up to date

16   on their CEs and training.  That's in my job

17   title.  More of the managerial aspect of the

18   business, so ...

19          Q.    I'm going to have some more

20   questions about that in a minute, but how do you

21   communicate within Giant Eagle?  And what I'm

22   getting at there is, you know, communications

23   maybe -- I understand that there's PDLs,

24   pharmacy district leader.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    Right.

 2          Q.    You know, and I guess my

 3   understanding is there's a PDL that supervises a

 4   region.  Is that -- do I have that right?

 5          A.    Yes.

 6          Q.    And who's your PDL in Painesville?

 7          A.    Currently it's Christine Yee.

 8          Q.    Okay.  Who was it before her?

 9          A.    Angela Garofalo.

10          Q.    Okay.  Anybody before her?

11          A.    Let's see.  She's been there for a

12   while.  At one point, Adrienne Anthony for a

13   little while.

14          Q.    Okay.  Who would you consider your

15   supervisor?

16          A.    Christine Yee.

17          Q.    So the PDL is the supervisor of

18   the managing pharmacist?

19          A.    Right, of the pharmacists.  Yes.

20          Q.    Of all the pharmacists?

21          A.    Uh-huh.

22          Q.    Okay.  I'm sorry.  You have to say

23   yes or no.

24          A.    Yes.  Sorry.
```

```
 1              Q.    Okay.  Are you the supervisor of

 2    the staff pharmacists within your stores?

 3              A.    No.  Their direct supervisor would

 4    be my boss as well.

 5              Q.    Okay.  If a decision needed to be

 6    made to terminate a staff pharmacist, is that a

 7    decision that you make or the PDL makes?

 8              A.    The PDL.

 9              Q.    Okay.  Okay.  So my original

10    question was, how do you communicate within

11    Giant Eagle, and what I'm getting at is, how

12    would you communicate with your PDL or even

13    further up the chain to corporate.  Is there an

14    e-mail system, an instant messenger type system.

15              Obviously outside of verbal or

16    phone communication, how does that happen?

17              MR. MAZGAJ:  Objection to form.

18              A.    There is an e-mail system with

19    Giant Eagle.  That's my primary way of

20    communicating with anyone.

21              Q.    Okay.  And explain to me how that

22    works.  Because I know there's a lot of folks

23    that work behind the pharmacy counter as far as

24    techs, interns, pharmacists.  Does everybody
```

1    have their own e-mail account?  I know that some

2    entities seem to have a store e-mail account.

3    Explain to me how that works.

4            A.    I do have my own e-mail account

5    with Giant Eagle.  For the most part, we use the

6    store's e-mail for communication.  So, yes, our

7    pharmacy has its own e-mail.

8            Q.    Okay.  Let me ask you this:  Do

9    you ever use a personal e-mail account to

10   communicate with Giant Eagle employees regarding

11   work-related issues?

12           A.    Yes.

13           Q.    Okay.  What types of issues do you

14   use your -- and when I say "personal," I'm

15   talking a Gmail or a Yahoo or something like

16   that.

17                 Are you with me there?

18           A.    Oh, no.  I use my Giant Eagle

19   e-mail.

20           Q.    Okay.  Okay.  Yeah.  So do you

21   have a personal e-mail account, whether it's a

22   Gmail or Yahoo or whatever it is?

23           A.    Yes, I do.

24           Q.    Okay.  Do you use that e-mail for

```
 1   any communications with Giant Eagle employees

 2   for work-related issues?

 3          A.    Not that I'm aware.

 4          Q.    Okay.  And then you have an

 5   individual Giant Eagle account that's just for

 6   Emily Mooney, correct?

 7          A.    Right.

 8          Q.    Okay.  What is that e-mail

 9   address?

10          A.    Emily.mooney@gianteagle.com.

11          Q.    Okay.  Do all pharmacists have an

12   individual e-mail account?

13          A.    I believe so.  Yes.

14          Q.    Okay.  What about pharmacy techs?

15          A.    I don't think so.  No.

16          Q.    What about interns?

17          A.    I don't know that.  I haven't had

18   an intern in a while.  I don't know that.

19          Q.    Okay.  And when you have to

20   communicate with, whether it's your PDL or

21   somebody else, within Giant Eagle that you can't

22   speak to personally in the store, which e-mail

23   account would you primarily use?

24          A.    I primarily use the store's
```

 1    e-mail.

 2           Q.    Okay.  And what is the store's

 3    e-mail account?

 4           A.    I think it's rx.manager, something

 5    with 6377 in it, at gianteagle.com.  I always

 6    have to look it up if I'm giving it out.  It's a

 7    dash I think in there somewhere.

 8           Q.    Okay.  That's fine.  Who all has

 9    the ability to use that e-mail account to send

10    e-mails?

11           A.    Everybody in the pharmacy

12    potentially.

13           Q.    Okay.  And I guess anybody in the

14    pharmacy can read e-mails that come into that

15    account; is that right?

16           A.    Yes.

17           Q.    Okay.  Can you give me a couple of

18    examples of the types of e-mails that you would

19    send from that account?

20                 MR. MAZGAJ:  Objection to form.

21           A.    Okay.  Staffing.  I usually -- I

22    have many e-mails to our recruiter, hiring.  I

23    can -- I send e-mails to our -- my PDL if I have

24    a question.  A lot of them are COVID related

Highly Confidential - Subject to Further Confidentiality Review

```
 1    right now.

 2                What else?  Turning in hours to

 3    HR, asking for help during the day if we need

 4    help with checking or from our central facility.

 5    I mean, day-to-day operations.

 6         Q.    Okay.  And can you give me some

 7    examples of the types of e-mails other than

 8    responses to questions and things like that?

 9    But is that store e-mail account how you receive

10    communications from corporate about policies,

11    procedures, programs, things like that?

12         A.    Yes.

13         Q.    Okay.  Can you give me just some

14    general examples of those types of

15    communications that you would receive through

16    that store e-mail account from up the chain at

17    corporate?

18         A.    Usually --

19                MR. MAZGAJ:  Object to form.

20         A.    -- we have -- I don't know.  I

21    mean, if there's a policy that comes out, they

22    would send it that way.  That's how we

23    communicate or how our PDL would communicate to

24    all of us if there's a meeting, a conference
```

1    call.

2              The president of the, like, Giant

3    Eagle store, like, she'll give an update of what

4    stores -- how the stores are doing, just general

5    information.  That's about it.

6         Q.    Okay.  Now, I kind of want to

7    understand the same couple of concepts as it

8    relates to your individual e-mail account at

9    Giant Eagle.

10             When would you choose to use your

11   individual Giant Eagle e-mail account as opposed

12   to store e-mail account?

13        A.    The things that get sent to my

14   individual account -- definitely hiring related,

15   because I have to usually click a link, and I'm

16   the only one that can do the hiring.  So that

17   sort of thing goes to my personal e-mail.  But

18   then they usually send an e-mail to the store as

19   well to let me know that it's there.  But that's

20   really about it.

21        Q.    Outside of hiring decisions, is

22   there anything that you use your personal e-mail

23   for to communicate up the chain to your PDL or

24   anybody else at corporate?

```
 1          A.    My Giant Eagle e-mail?

 2          Q.    Yes.  Sorry.  Your individual

 3   e-mail at Giant Eagle.  Thank you.

 4          A.    Right.  No, not that I recall

 5   making.

 6               MR. MAZGAJ:  Hey, Jeff, we're

 7          about --

 8          A.    That's what I can remember.

 9               MR. MAZGAJ:  Oh, sorry.  Go ahead.

10               I was going to say, we're an hour

11          in, and I promised Emily I'd check in to

12          make sure she's okay.

13               THE WITNESS:  I'm good.  I'm good.

14          I could use -- well, I could use a quick

15          break, I guess.

16               MR. GADDY:  Yeah, I'm out of

17          coffee, so that's fine.

18               THE WITNESS:  Okay.

19               MR. MAZGAJ:  Perfect.

20               THE VIDEOGRAPHER:  Off the record,

21          11:00 a.m.

22               (Recess taken.)

23               THE VIDEOGRAPHER:  On the record,

24          11:07 a.m.
```

```
 1   BY MR. GADDY:

 2        Q.    Do you have a -- you know what I

 3   mean when I say intranet?

 4        A.    No.

 5        Q.    Like here at my law firm, we have

 6   an intranet where I can go on and I can see a

 7   directory of everybody who works here and their

 8   extension to get to their desk, and there's,

 9   like, a little HR link where I can go and look

10   at -- you know, request time off and those type

11   of -- do you have, like, an online Giant Eagle

12   only intranet?

13        A.    Yes.  We use a Workday system.

14   So, yes, I can see hierarchy and names that way.

15   I've never really used it for that.  But, yes,

16   it is there.

17        Q.    Okay.  What types of things are on

18   that intranet that you do use in your kind of

19   daily job, if anything?

20        A.    Hiring goes through that.

21   Typically that's what I use it most for right

22   now.  Team -- team reviews, pay related.

23              I'm trying to think what else is

24   on there.  Our e-learning, so any of the
```

1    required learning that we have to do for the

2    year is there.  That's what I use it most for.

3              Q.    Okay.  Do you know whether or not

4    policies and procedures are stored on the

5    intranet there?

6              A.    We have another learning -- or

7    another site on our home page.  I don't -- I

8    don't know.  GE Central, I think.  And there's a

9    lot of folders for policies, procedures.  Our

10   incident reporting is there.

11             Q.    Okay.  Is that something -- the

12   policies and procedures that would be stored on

13   that GE Central or whatever it's called, is that

14   something that all of the pharmacists have

15   access to?

16             A.    Yes.  Everybody has access to

17   that.

18             Q.    Okay.  Is that something that

19   you've ever had to access as far as going on and

20   looking at a policy and procedure?

21                   Do you ever recall ever having to

22   do that?

23             A.    Yes.  So Giant Eagle requires us

24   to go over policies at quarterly CQI meetings,

1    which is basically a time when all of the

2    pharmacy can get together and go over -- we go

3    over policies.  We go over any incidents, any

4    new procedures, any -- those would be happening

5    at quarterly meetings, but we do go over the

6    policies -- certain policies.  We pick a couple

7    here and there.

8              We get communication every couple

9    weeks from another person in corporate that

10   sends policies to review or if there's any

11   changes in policy that need to be reviewed at

12   that time.

13             We usually then just put them up

14   in the pharmacy so that the employees can read

15   them as necessary and then sign off that we read

16   them, so ...

17        Q.   Okay.  So as the pharmacy manager,

18   is that something that kind of falls under your

19   purview?  If there's a direction from corporate

20   that "We have a new XYZ policy, everybody needs

21   to read it and acknowledge it," that it's kind

22   of your job to make sure that gets done?

23        A.   Yes.

24        Q.   Okay.  It sounds like you said the

```
 1   standard protocol for that would be to print it

 2   out, put it somewhere, and make sure that

 3   everybody looks at it?

 4        A.    Right.

 5              MR. MAZGAJ:  Objection.

 6        A.    Yeah, we have something that we

 7   hang it in the pharmacy.  We have a board that

 8   we can hang it on.  A lot of them, though, we

 9   just have a counter space that we do that most

10   people look at then and sign it, and then they

11   get filed in the pharmacy.

12        Q.    Is there any type of

13   classification of Giant Eagle stores based on

14   size, volume, busyness, anything like that?

15              MR. MAZGAJ:  Objection to form.

16        A.    I don't believe so.  There's

17   nothing that classifies a store as being any

18   different.

19        Q.    Let me ask you a couple questions

20   about scheduling and staffing of the pharmacy.

21              At one point in time, you

22   mentioned having a regional scheduler when you

23   were a floater, and then I think you also said

24   that you're involved with scheduling of your own
```

```
1    pharmacy.
2              So I guess let's start with your
3    own pharmacy.  Who dictates the staffing levels
4    at your pharmacy in Painesville that you're the
5    manager of?
6         A.   I don't -- I mean, in terms of
7    hours, we have a number, like a labor forecast,
8    that is a baseline, but I don't -- I don't know
9    where that number exactly comes from, but we do
10   have a baseline.
11        Q.   Okay.  How many pharmacists work
12   at a time in the Painesville store?
13        A.   I have three -- there's three of
14   us total in the pharmacy of pharmacists at Giant
15   Eagle in Painesville.  We work four 10s.  So we
16   do have overlap between two of us.  During
17   weekdays between 11:00 and 6:30, there's two
18   pharmacists.
19        Q.   Okay.  What time does the pharmacy
20   open?
21        A.   We open at 9:00 Monday through
22   Friday and close at 9:00.
23        Q.   Okay.  So from Monday to Friday,
24   there's one pharmacist on duty from 9:00 a.m. to
```

```
1    11:00 a.m. and from 6:30 p.m. to 9:00 p.m., and

2    two pharmacists on duty for that time in the

3    middle?

4         A.    Right.

5         Q.    Okay.  What about on the weekends?

6         A.    Weekends it's just one pharmacist.

7    We're open 9:00 to 6:00 on Saturdays, 9:00 to

8    5:00 on Sundays.

9         Q.    And it's just one pharmacist on

10   duty for that entire time?

11        A.    Correct.

12        Q.    Okay.  Who decided -- who made the

13   decision that there should only be one

14   pharmacist from 9:00 to 11:00, two from 11:00 to

15   6:30, and one from 6:30 to 9:00 during the

16   weeks?  Was that a decision that you made or was

17   that, you know, kind of given down to you from

18   your PDL or somebody else from corporate as far

19   as what the staffing needed to be?

20        A.    We get a guide -- a guideline, a

21   suggested schedule, from corporate -- or we have

22   in the past -- but I determine that schedule.

23        Q.    Okay.  Is the schedule that you've

24   implemented, is it the one that was suggested by
```

1   corporate for Painesville?

2       A.    It's pretty close.  Yes.

3       Q.    Okay.  If you were to decide that,

4   you know, Saturdays are pretty hectic and it's

5   tough for one pharmacy to handle the workload

6   and you decided that you wanted a second

7   pharmacist to be working on Saturday, what would

8   be the process to get that done?  Could you just

9   tell one of the other pharmacists they needed to

10  work that second Saturday, or is that something

11  that you'd have to run up the chain through a

12  PDL or someone else at corporate?

13          MR. MAZGAJ:  Objection to form.

14      A.    I imagine I can make that

15  decision.  I wouldn't.  But, yes, I can make

16  that decision.

17      Q.    Okay.  Have you ever had to raise

18  with your PDL or with anybody at corporate

19  issues related to staffing as far as needing

20  more pharmacists?

21      A.    No.

22      Q.    How many -- okay.  So you said

23  your pharmacists work four 10s, so each of

24  those -- each of those days, a pharmacist is

1    working a 10-hour shift; is that right?

2         A.    For the most part.  Sundays are

3    only an eight-hour day and Saturdays are nine.

4    So we just make up those hours during the week

5    as it works out.  So, yes, between 10- and a

6    12-hour shift, depending on how the pharmacist

7    wants to break it up.

8         Q.    And are you the one that is making

9    the decision about which pharmacists are working

10   which days and which shifts?

11        A.    Yes.  I make the pharmacists'

12   schedule, yes.

13        Q.    Okay.  And how does it work if,

14   for example, a pharmacist is out for a week on

15   vacation?  Is that when a floater comes into

16   play?

17        A.    Yes.

18        Q.    Okay.  How does that work?  Do you

19   let a regional scheduler know, or how do you get

20   a floater?

21        A.    Yes.  Our vacations we have to

22   plan out a year or more in advance.  So we

23   submit our vacations to the scheduler so that

24   she can make sure that it's split up evenly

Highly Confidential - Subject to Further Confidentiality Review

1    throughout the year.  So the scheduler knows

2    when we will be going on vacation.  She usually

3    e-mails the store, asks us our needs and what

4    shifts, and then I just submit those to her.

5         Q.    Okay.  Do you have a regular

6    floater that comes into your store, or does it

7    change pretty regularly?

8         A.    It changes.  I mean, most of the

9    floaters, I know who they are, but there's no

10   designated floater for my store.

11        Q.    What is kind of the break and

12   lunch schedule for pharmacists?

13        A.    We don't -- Giant Eagle doesn't

14   have a lunch break.  We don't close the pharmacy

15   for any reason.  We do have overlap, though,

16   during those periods.  So we usually take a

17   lunch, each of us, during -- sometime during

18   that overlap, about 20 minutes or so to eat and

19   come back.

20        Q.    Okay.  Are there any other breaks

21   that are permitted for the pharmacists

22   throughout the day other than the 20 minutes

23   that they may get for lunch?

24        A.    No.  I mean, if they -- if we

1  needed to go -- or, you know, if we need a

2  break, we need to go to the restroom, things

3  like that, we can go at any point.  But this is

4  something that, you know, is what we're used to.

5  I don't feel like I need anything more than

6  that.

7        Q.    I want to kind of ask the same

8  series of questions about pharmacy techs.

9            Are you in charge of scheduling

10  for them also?

11        A.    I am, yes.

12        Q.    Okay.  Let me just kind of start

13  global.

14            How many pharmacy techs work at

15  the Painesville store, period?

16        A.    I honestly -- I don't have an

17  exact number.  I would say around ten at a time.

18        Q.    Okay.  I'm just asking how many

19  are currently on the payroll right now.

20        A.    Let's see.  I would say eight, and

21  then I have two -- three on leave.

22        Q.    Okay.  And is that -- is that

23  fairly normal, about eight to ten pharmacy techs

24  for your store?  Is that low or high?

```
 1          A.    It's normal.  I mean, it can go up

 2   or down depending on the availabilities of my

 3   technicians, if I need to hire more.

 4          Q.    Okay.  How many technicians work

 5   at a time?

 6          A.    We have three techs that start the

 7   day, two to end.  In the middle of the day, we

 8   probably have four to five in the middle of the

 9   day overlapping, depending on the day.

10   Weekends, a little less.  I only have three

11   techs on the weekends.

12          Q.    As far as the other two -- so you

13   said there's three pharmacists at the store, so

14   I assume that's you and two others?

15          A.    Correct.

16          Q.    Okay.  How long have those other

17   two been with you?

18          A.    Lorene is probably -- I don't know

19   exact dates.  Probably five years or so.  And

20   then Matt, two or -- two to three, I would say.

21          Q.    Okay.  Is there a time of day or

22   time of the week that's busier than other times

23   at the pharmacy?

24          A.    Yes.  Mondays are busy usually all
```

Highly Confidential - Subject to Further Confidentiality Review

1   day.  We do the most scripts on Mondays.  Other

2   days it just kind of depends.  Usually Friday

3   mornings are also very busy because doctors'

4   offices close usually earlier on Fridays.

5                That's about it.

6        Q.    Can you give me kind of a general

7   description of the neighborhood or the community

8   that your pharmacy is located in.

9        A.    Sure.  We work -- Giant Eagle is

10  located in a township but pretty close to

11  Painesville City.  So we do have a lot of

12  doctors' offices in the area.  There's a

13  hospital pretty close by, a couple Urgent Cares.

14  We --

15                Is that what you were looking for,

16  just what's in the area?

17       Q.    Yeah, yeah.  And then if you're

18  able to kind of give a general description of

19  the customer base or the population.  Is it, you

20  know, a working class neighborhood or more of a

21  white collar area?  Just kind of your general

22  impression, however you would describe it.

23       A.    In general, it's working class.

24  It's -- we have a -- it's located in -- pretty

```
 1    close to a smaller city, but we have a lot of

 2    patients that come in from, like, rural areas

 3    because there's not really a whole lot in one

 4    area, I guess.  I don't know.  About 25 minutes

 5    in one direction, there's not a whole lot going

 6    on there.

 7         Q.   Okay.  Are there other pharmacies

 8    in the area?

 9         A.   Yes.  There are quite a few.  CVS,

10    Walgreens.  Our closest, Rite Aid.  There's a

11    Drug Mart pretty close.  Those -- I don't think

12    I'm forgetting anything.  No.  Those are really

13    the biggest ones and closest to us, so ...

14         Q.   Do you know any of the pharmacists

15    that work at any of those other pharmacies?

16         A.   Personally, no.  I've spoken with

17    a few when we transfer prescriptions, but I

18    don't know any of them.

19         Q.   Okay.  Other than transferring

20    prescriptions, are there any other reasons that

21    you can think of that you've had to talk to

22    pharmacists at any of those other pharmacies?

23         A.   I mean, that's -- that's usually

24    the biggest reason right now that I can think
```

```
 1   of.  But, I mean, we would call them if we have

 2   questions about patients.

 3               A lot of times we'll get a

 4   prescription with a stamp from another pharmacy

 5   on it.  So if that comes up, I'll usually call

 6   the other pharmacy to see why they didn't

 7   actually fill that prescription there.

 8               Another reason would be to get

 9   patient info if -- or if they didn't accept

10   their insurance at that pharmacy, we would call

11   and get the prescription or get insurance

12   information, things like that.

13         Q.    Okay.  You said a prescription

14   with a stamp on it.  What kind of stamp?

15         A.    So I'm not sure about what other

16   pharmacies do, but my -- at Giant Eagle, any

17   time a hard copy prescription gets brought to

18   the pharmacy, we're required to stamp the

19   prescription, which prompts us to ask for date

20   of birth and allergies.  That's one of our

21   policies.  But a lot of pharmacies have similar

22   things to that.  So that clues me in that

23   they -- a patient had brought their prescription

24   to another pharmacy.  And if I see that, I
```

1    usually want to know why.  So I will call the

2    pharmacy and ask them.

3         Q.    Okay.  Can you tell me another

4    pharmacy that you know uses a stamp system that

5    you've seen before and it's made you call?

6         A.    I can't tell you -- I mean, I

7    think they all do in some form, but I can't tell

8    you for certain, no.

9         Q.    Okay.  Do you remember the last

10   time that you called a pharmacy -- another

11   pharmacy because you saw some indication that a

12   prescription had been taken to a different

13   pharmacy and that pharmacy had not filled the

14   prescription?

15              MR. MAZGAJ:  Objection to form.

16        A.    I can't recall an exact time.

17   Hard copy prescriptions are just not as common

18   right now.  A lot of doctors in the area have

19   moved to electronic prescribing, so we don't

20   really see a lot of those as much, so ...

21        Q.    Okay.  Do you remember any

22   specific occasion where you received a hard copy

23   prescription and saw that it had been taken

24   somewhere else and not filled and you called the

1    other pharmacist to ask about that?

2         A.    I mean, I know I have --

3              MR. MAZGAJ:  Objection.

4              Emily, just a second.

5              Objection; asked and answered.

6         A.    I know I do that, but I can't

7    recall a certain time or instance that I've done

8    that.

9         Q.    Okay.  Can you recall any -- can

10   you recall whether or not you've ever called and

11   talked to a pharmacist at another local store

12   about filling an opiate prescription?

13        A.    Yes.

14        Q.    Okay.  When is the last time you

15   remember doing that?

16        A.    I don't know.  I mean, I do -- I

17   do it pretty -- I mean, it probably has been a

18   little while only because, like I said, we have

19   electronic prescribing, so -- and we have OARRS

20   reporting, which I check every time I check a

21   controlled prescription.

22              So for the most part, I don't need

23   to call -- I don't need to call pharmacies as

24   much as I used to because that information is

```
 1    available to me.  And, like I said, every

 2    prescription for a control that I check, I check

 3    the OARRS report.  So I can see where that

 4    prescription was filled, so --

 5         Q.    Let me ask the question a

 6    different way.  So I'm not limiting it to hard

 7    copy prescriptions.  I'm asking about any

 8    prescription now.

 9              When is the last time you recall

10    calling a pharmacist at another store regarding

11    an opiate prescription?

12              MR. MAZGAJ:  Objection; asked and

13         answered.

14         A.    I mean, I call pharmacies all the

15    time to transfer prescriptions, so I don't --

16    no, I can't recall transferring an opiate.  I

17    don't know an exact time.  So, I mean, I do -- I

18    talk to pharmacies daily.  I can't remember if

19    it was an opiate or not.

20         Q.    Okay.  Well, let me see if I can

21    ask the question differently, because I'm not

22    asking about transfers.

23              So when is the last time that you

24    recall talking to a person at another pharmacy
```

1    about whether or not a prescription for an

2    opiate should be filled for a patient?

3         A.    Like I said, I don't need -- OARRS

4    gives me the ability to see the information that

5    I would call and ask for, or I used to have to

6    call and ask for all the time.  So I really

7    don't remember doing that.  I don't have to do

8    that with OARRS being readily available.

9              So I don't remember the last time

10   that I had to do that.

11        Q.    Okay.

12        A.    I just don't.

13        Q.    It's safe to say it's been -- I

14   mean, OARRS has been around for a long time,

15   right?

16        A.    Right.

17              MR. MAZGAJ:  Objection to form.

18        Q.    Okay.  So safe to say it's been --

19   would it be safe to say that it's been years

20   since you've called another pharmacist to ask

21   them about whether or not you should fill an

22   opiate prescription for a particular patient

23   because you relied on OARRS or other resources

24   that you had available?

```
 1                    MR. MAZGAJ:  Objection; misstates

 2          testimony.

 3          A.    Yeah.  No, I don't -- I know it

 4   hasn't been years, but I don't -- I don't

 5   recall.

 6          Q.    Okay.  With what frequency -- what

 7   period of time -- so for what period of time

 8   have you not needed to call other stores to ask

 9   about whether or not an opiate prescription

10   should have been filled because you could rely

11   on OARRS?

12                    MR. MAZGAJ:  Objection; assumes

13          facts not in evidence.

14          A.    I mean, every time I check a

15   prescription for a controlled medication, being

16   an opiate or not, I check OARRS for that

17   patient.  So, I mean, as long as it's been

18   readily available to me.  I don't know a

19   timeline exactly.

20          Q.    Okay.  Let me try to explain to

21   you what I'm looking for here because I think

22   maybe we're talking past each other.

23                    What I'm trying to figure out is

24   whether or not you -- whether or not calling
```

```
 1   pharmacists at other local stores about whether

 2   or not you should fill a prescription for an --

 3   an opiate prescription for a patient -- I'm

 4   trying to figure out whether or not that's

 5   something you do.  And what I've heard is that

 6   you've said maybe it's something you used to do,

 7   but you really don't have to do it anymore

 8   because of OARRS.

 9            And so I'm trying to get a

10   timeline from back when you became a pharmacist

11   back in 2009 through today, was there a period

12   of time in which you would call other local

13   stores about whether -- you know, to ask

14   questions to determine whether or not to fill an

15   opioid prescription for a customer who has

16   walked into your store, or if that was not

17   something you did and you relied on the OARRS

18   database that's available through the State of

19   Ohio.

20            So with that background, let me

21   start again and ask a new question, okay?

22       A.    Okay.

23       Q.    So was there ever a period of time

24   while you were a pharmacist that it was a
```

1    practice of yours to call pharmacists at other

2    local stores to help you make a decision about

3    whether or not to fill an opiate prescription

4    for a customer in your store?

5            MR. MAZGAJ:  I'm going to object

6        to the colloquy as a misrepresentation

7        of prior testimony.

8        A.    I think I already told you that I

9    do call other stores.  I mean, I gave the

10   example about when it had a stamp on it from

11   another pharmacy.  That's when -- and what would

12   prompt me to call another store.

13           So, yes, in the period of my

14   practice from whenever I started pharmacy to

15   now, I have called pharmacies multiple times in

16   order to figure out where they're filling

17   prescriptions, if there's an issue with a

18   prescription.  That is what I had to do.

19           I also said that once OARRS became

20   more readily available, it was much easier to

21   get that information off of OARRS instead of

22   calling the pharmacies as much.  It has lessened

23   over time because of that resource that we have.

24       Q.    Okay.  You said that it started to

Highly Confidential - Subject to Further Confidentiality Review

```
 1    lessen when OARRS became more readily available.

 2    Generally speaking, when is that time period?

 3    That's all -- I'm trying to build a timeline

 4    here.

 5                   So when did OARRS become more

 6    readily available, to use your language --

 7          A.    Right.

 8          Q.    -- to where you didn't need to

 9    call the stores?

10          A.    I don't know exactly when OARRS

11    came about.  I believe somewhere around 2013.

12    But then in -- 2016 I think is when it was put

13    into the Ohio Administrative Code about how, you

14    know, we need to use this resource, and it was

15    put into our computer system.

16                   So, like I said, every

17    prescription that I check for control is -- I

18    can -- I can automatically check OARRS through

19    my computer system.

20                   Before that, I would log in on my

21    own and I had my own login.  I would have it up

22    while I was checking prescriptions and just

23    toggle back and forth.

24                   If I checked a prescription for a
```

1   control, controlled med, I would input the data

2   myself.  It took longer, but that was and is my

3   process.  It is -- it is a part of my process

4   with every prescription.

5           Q.   When you were calling stores to

6   help you make a determination about whether or

7   not you should fill an opiate prescription for a

8   patient who presented it, how often were you

9   having to call stores?  Not for transfers, not

10  for blood pressure medication or anything else

11  like that, but for opiate prescriptions, how

12  often -- when you were calling stores, how often

13  would you have to do that?

14          MR. MAZGAJ:  Objection to form.

15          A.   I mean, I would say every day.

16  Sometimes multiple times a day.  It just

17  depends.  It depended on the prescriptions.

18          Q.   You're saying that every day or

19  multiple times a day, you would have to call

20  other stores to help you make a decision about

21  whether or not to fill an opioid prescription?

22          MR. MAZGAJ:  Objection;

23          misrepresents testimony.

24          A.   Sometimes I -- yes.  It depends on

1   the day, like I said.  It depends on the

2   prescription.  Like I also said, there were a

3   lot more hard copy prescriptions for controls

4   years ago, and now the push to electronic

5   prescribing has lessened that as well.

6                So, yes, at one point, I'm sure I

7   was every day calling other pharmacies.  But

8   that's a part of my job, to do my due diligence.

9   If I see something like that on a prescription,

10  I will absolutely call.

11          Q.    About how many opiate

12  prescriptions do you see in your pharmacy on a

13  daily basis?

14                MR. MAZGAJ:  Objection; calls for

15          speculation.

16          A.    I don't know the number.  I don't.

17          Q.    Okay.  Can you give me your best

18  estimate knowing that it's an approximation?

19          A.    I don't.  I really don't know.  I

20  can't put a number to it.  I mean, we fill a lot

21  of prescriptions in a day, so I don't know.

22          Q.    Okay.  Do you have the ability to

23  run or pull reports from your dispensing system

24  to look at the number of prescriptions of

```
 1   different types of drugs that you fill, you

 2   know, a day, a week, a month, those types of

 3   things?

 4        A.    Yes.  We have the ability to run

 5   reports.

 6        Q.    Okay.  Is that something that

 7   you've ever done, run a report to see how many

 8   opioid prescriptions your pharmacy has filled

 9   over any particular time period?

10        A.    I don't really -- I'm sure I've

11   done it, but I don't -- it's not something we

12   would normally do.  We would need a reason, I

13   guess, to -- I don't know why I would run a

14   report like that.  So I couldn't tell you how to

15   do it.  I know I could get it, but ...

16        Q.    But you don't know that you've

17   ever done that?

18        A.    No.  I mean, I can run -- I've run

19   a movement report if I have a question about

20   certain drugs.  We take multiple inventories,

21   especially of our C-II prescriptions.  We do

22   monthly audits.

23             So it's not uncommon to run a drug

24   movement report to make sure that -- as a double
```

1    check for counts.  But that's probably the only

2    report I really use when it comes to something

3    like that.

4            Q.    You mentioned earlier that there

5    were several doctors' offices in the area around

6    the pharmacy, correct?

7            A.    Yes.

8            Q.    Can you give us kind of an

9    overview of the types of practices around -- in

10   the area around where your pharmacy is located?

11           A.    I mean, I'm sure you could find

12   any practitioner in the area, multiple

13   specialties.  Like I said, there's a hospital

14   right down the street.  Urgent Cares.  I mean, I

15   don't think there's anything that we don't have

16   around the pharmacy in regards to certain

17   specialties.

18           Q.    Are you aware of whether or not

19   there's any pain clinics in the area around your

20   pharmacy?

21           A.    Yes.  There's -- I'm not -- I know

22   there's one pain clinic down the road, for sure.

23   I don't know whose it is.  I just have passed it

24   before.  But I know there's a couple more in the

1   area as well now.

2          Q.    Are there any particular

3   physicians that you can tell us would be the

4   ones that you fill a large amount or large

5   percentage of opioid prescriptions for?

6                MR. MAZGAJ:  Objection to form.

7          A.    Well, there are a few pain

8   clinics, like I said.  Dr. Pahr, Dr. Mikhail.

9   There's a Dr. Zielinski now too.  Those are the

10  ones I can think of off the top of my head right

11  now.

12         Q.    Okay.  Are there any other

13  physicians that you can think of that you see

14  frequently writing prescriptions for opiates?

15               MR. MAZGAJ:  Objection to form.

16         A.    Like a general practitioner?  Is

17  that --

18         Q.    I'm just asking for anybody that

19  comes to mind to you that you feel like you see

20  a decent amount or a large amount of opiate

21  prescriptions for.

22         A.    Right.

23               MR. MAZGAJ:  Objection to form.

24         A.    Dr. Kousa is one.  In the past,

```
 1    probably Dr. Hanahan, but he doesn't write so

 2    much anymore.  But those are the two that would

 3    come to mind.

 4          Q.    Okay.  I'm going to ask you about

 5    a couple of other folks and ask you if you're

 6    familiar with them or if you've heard of them.

 7          A.    Sure.

 8          Q.    A Dr. Matthew Keum?

 9          A.    Keum?  Is it --

10          Q.    It's K-e-u-m.

11          A.    Oh, Keum.  Yes.

12          Q.    Okay.  And what's his specialty?

13          A.    I think he's a general internal

14    medicine.  I'm not sure, but I think so.

15          Q.    What about a Jerome Yokiel?

16          A.    I've -- yeah, I've heard of that

17    doctor.

18          Q.    Okay.  What's his specialty?

19          A.    I'm not sure.

20          Q.    What about a Ronald Casselberry?

21          A.    No.

22          Q.    A Hyo Kim?

23          A.    Yes.

24          Q.    And what's their specialty?
```

```
 1          A.    I'm not sure.

 2          Q.    Of the physicians that you've

 3   referenced that you're familiar with as far as a

 4   high level of opiate prescribing, are there any

 5   of those that you have had the occasion to speak

 6   with their office regarding an opioid

 7   prescription that they've written?

 8               MR. MAZGAJ:  Objection; misstates

 9          prior testimony.

10          A.    Yes.  I've talk to doctors'

11   offices quite frequently regarding their opiate

12   prescriptions.

13          Q.    Okay.  I may or may not have some

14   more questions about that.

15               Can you kind of pick one or your

16   most recent conversation with one of these

17   physicians or their offices regarding an opiate

18   prescription, and obviously without revealing

19   any personal information, just kind of give me

20   an overview of that conversation.

21          A.    Okay.  I mean, the most recent, it

22   wasn't -- you want one with one of these doctors

23   exactly?  Or is it just something I can -- that

24   comes to mind.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1            Q.    Just give me -- the most recent

 2   one is fine.

 3            A.    Okay.  So recently, in the last

 4   week, a doctor wrote a prescription for an

 5   opiate along with a benzodiazepine, and the

 6   patient has been on both of those before

 7   previously, and then she recently wrote a

 8   prescription for Soma.

 9                  So any time a Soma prescription is

10   prescribed, I call the doctor.  There's a lot of

11   evidence showing that it's just not effective

12   and increases the risk of dependence.  So we --

13   it's practice for all the pharmacists, at least

14   at my store, that we will call the doctor

15   anytime a Soma prescription is prescribed.

16                  She wrote the prescription for a

17   month of it.  We called to double-check and

18   asked why they were prescribing it for that

19   long.  And the doctor actually ended up changing

20   it to a week supply.

21                  So in the short term, we filled

22   that medication, but that was a dialogue that

23   went between us and the doctor's office.

24                  So that's just one example.
```

```
 1              Q.    Okay.  Thanks.  That's helpful.

 2              So did the phone call regarding

 3    the Soma have anything to do with the fact that

 4    there was also a prescription for an opiate and

 5    a benzo, or was it just the Soma alone that made

 6    you call?

 7              A.    Both.  Anytime Soma is prescribed,

 8    we usually call.  But, yes, it's usually -- it

 9    definitely was more of a reason to call, because

10    they're also on those other two medications.

11              Q.    Okay.  Were these -- kind of

12    sticking on the topic of physicians, when you're

13    filling a prescription that's been written by a

14    specific physician, I'm trying to get an

15    understanding of what information you would have

16    about that physician within your system at Giant

17    Eagle.

18              So, for example, would you know

19    that physician's specialty?

20              A.    No, we wouldn't.  In our system,

21    no.

22              Q.    Okay.  I mean, obviously if you're

23    familiar with the doctor, you might know what

24    their particular specialty is, but that's not
```

Highly Confidential - Subject to Further Confidentiality Review

 1   tracked within the software of Giant Eagle?

 2        A.    No, it is not.

 3        Q.    Okay.  Would you have an

 4   understanding of the number of prescriptions

 5   that doctor had written that had been filled at

 6   your store?

 7        A.    Okay.  I'm sorry.  Clarify that

 8   for me, the number that they've written?

 9        Q.    Correct, that had been filled at

10   your particular store.

11        A.    I -- I don't know.  I'm sure

12   there's a report maybe for that.

13        Q.    Okay.

14        A.    But I have never run anything like

15   that.

16        Q.    Okay.  And so I guess the same

17   answer for whether or not you have the

18   information regarding the number of

19   prescriptions that that physician has written

20   that have been filled at all Giant Eagle

21   pharmacies?

22             MR. MAZGAJ:  Objection to form.

23        A.    I don't know.

24        Q.    Okay.  And that's not information

```
 1    that you've ever had at your hands when filling

 2    a prescription, correct?

 3            A.    No.

 4                  MR. MAZGAJ:  Objection to form.

 5            Q.    What about any -- is there any

 6    information or any display within the Giant

 7    Eagle dispensing system or dispensing software

 8    that gives you any information regarding any

 9    disciplinary action against a physician?

10                  MR. MAZGAJ:  Objection to form.

11            A.    So we can look that up.  I mean,

12    we can look up if there is any legal action

13    against a physician.  Usually our -- someone at

14    corporate would probably let us know that as

15    well, but I can't recall something like that

16    happening.  But, I mean, we can, and I have,

17    looked up on the Medical Board site if there was

18    anything against any doctors.

19            Q.    Is it a part of the standard fill

20    practice to always run a search on a physician

21    and determine whether or not there's any

22    disciplinary action?

23            A.    There is no standard or law

24    stating that I need to do that.
```

```
 1              Q.    Okay.  I mean, obviously you could
 2   jump on Google just like I could or anybody else
 3   could and Google, you know, Dr. John Doe and see
 4   whether or not they have anything, but my
 5   question is a little bit different.
 6              What I'm -- I'm asking whether or
 7   not there's anything within the dispensing
 8   software, the dispensing platform that you use
 9   at Giant Eagle, that provides an alert or
10   information that there's any disciplinary action
11   pending or adjudicated against a physician.
12              A.    Not that I'm aware of.  I don't
13   know, I mean, why that would be important to
14   that prescription, you know, as I'm checking it.
15              I mean, when I check a
16   prescription, I look at that.  I mean, I could
17   go over with you how I check a prescription, but
18   that -- I guess I just don't -- I guess I don't
19   understand why you're -- what you're asking.
20   There's nothing in the software.
21              Q.    Okay.  That's all I'm getting at.
22   There's nothing within the dispensing platform
23   or software that gives you that information,
24   right?
```

```
 1            A.    Right.

 2                       - - -

 3        (Mooney Deposition Exhibit 1 marked.)

 4                       - - -

 5   BY MR. GADDY:

 6            Q.    Okay.  Okay.  I am going -- we are

 7   now going to kind of go through, I guess, kind

 8   of the fill process.  And there's a couple of

 9   manuals that I found that I'm hoping are going

10   to help us with that.

11                 So we're going to look at

12   P-HBC-1356, which should be tab number 6 in your

13   binder.  And we'll mark this as Mooney Exhibit

14   Number 1.

15                 And, Ms. Mooney, just let me know

16   when you've found that and you're with me.

17            A.    I've found it.

18            Q.    Okay.  Now, we're going to look at

19   this one and one other.  And I'll just represent

20   to you I didn't find a date on either of these

21   two documents, but I think this is going to be

22   the one that talks about the earlier system.

23                 And as we go through it, we'll see

24   some screenshots from the PDX platform, which I
```

1    understand was the dispensing software that

2    Giant Eagle used for some point in time.  And

3    then I believe you transitioned to another

4    dispensing platform.  And so I think the second

5    manual will walk through that one.

6              Does that -- does that generally

7    make sense?

8         A.    I'm not familiar with this, so I

9    don't --

10        Q.    Okay.  Do you think you've ever

11   seen this before?  It says "Chapter One,

12   Introduction to Pharmacy" at the top.

13        A.    No.

14        Q.    Well, I don't -- I think it's

15   really just going to kind of be a guide for us

16   to help make sure we talk about all the

17   different areas of the Giant Eagle pharmacy.

18              So flip, if you would, please, to

19   the very next page where it says "Welcome and

20   Introduction" at the top.

21              Do you see that?

22              MR. MAZGAJ:  Emily, have you

23         reviewed the document to your

24         satisfaction?  Do you need some more

```
 1          time?

 2              THE WITNESS:  Like I said, I

 3          haven't seen this before, so -- it looks

 4          like a technician handbook, so I

 5          wouldn't have seen this.

 6  BY MR. GADDY:

 7          Q.    Are you with me on the second

 8  page, Ms. Mooney?

 9          A.    Yes, I am on the second page.

10          Q.    Okay.  Do you see at the top it

11  says, "Welcome and Introduction."

12          A.    Yes.

13          Q.    And it says, "Welcome.  Thank you

14  for choosing Giant Eagle.  This manual is

15  intended to help you learn your job and

16  responsibilities as a Giant Eagle pharmacy team

17  member."

18              Do you see that?

19          A.    Yes.

20          Q.    Okay.  So what I want to do next

21  is just flip through the page -- or flip to the

22  next page, and you can see the next sectioned is

23  titled "Pharmacy Layout."

24          A.    Okay.
```

Highly Confidential - Subject to Further Confidentiality Review

         Q.    So can you kind of describe for me
in your own words -- and then we're going to
walk through -- and you can kind of flip the
page and see -- some of the different areas that
they're highlighting about the Giant Eagle
pharmacy.  So we're going to cover some of these
in more detail.

               But I kind of wanted to start with
just your own general description describing the
layout of your pharmacy in Painesville.

         A.    Okay.  The -- our pharmacy does
not look like this one.  Our -- we have
registers similar to that.  There's two
registers at the front of the pharmacy.  We have
a drive-thru probably 15 feet behind those front
registers as well with our will call bins of
prescriptions that are ready to be sold in
between there.

               Our -- the drugs -- the shelving
with the drugs on it are through the middle of
the pharmacy.  Our pharmacy counter is in front
of those.  We have a drop-off prescription -- to
drop off prescriptions on the other side of the
pharmacy counter.

Highly Confidential - Subject to Further Confidentiality Review

1          Our pharmacy itself is a little

2    longer than this one.  I would say more of a

3    rectangle than the square that that one is.

4          Q.    Okay.  Let me ask you a couple

5    questions.  So the drop-off area, you said you

6    have two registers at the drop-off area?

7          A.    No.  We have a separate drop-off

8    area.  We have two registers for pick up.

9          Q.    Gotcha.  Okay.  Are the registers

10   for pick up different -- different systems than

11   kind of the computers that you would have at the

12   drop-off area?

13         A.    It's the same computer.  We have

14   computers available at both.  We just have

15   registers -- which is separate -- at those

16   computers and a designated area.  And then for

17   drop off, we just have a scanner with the

18   computer to scan the prescriptions.

19         Q.    Okay.  And so at the drop-off

20   area, there's just one computer and one scanner?

21         A.    Yes.

22         Q.    Okay.  And who works that drop-off

23   area?

24         A.    Any -- anyone.  Mostly

1   technicians.  If we have the staff to work at a

2   drop-off, it just depends.  We have a help tech

3   that kind of floats.  Like I said, we don't have

4   a lot of drop offs as much anymore, so we open

5   that counter.  But most of the time, those

6   patients will come through the drive-thru or to

7   the actual registers to drop off a prescription.

8   But anyone can take a drop-off script.

9        Q.   So what happens when a script is

10  dropped off?

11       A.   The technician will stamp the

12  prescription, name, date of birth, make sure the

13  patient is in the system.  If they're not, we

14  add in their information, check and see if

15  there's any change to insurance.

16            Once we have all that information,

17  we'll scan the prescription into the computer,

18  and then the script will go to data entry to be

19  inputted into our system.

20       Q.   Okay.  Is that initial time at

21  intake, is that the only time that the

22  prescription is scanned into the computer?

23       A.   Yes.

24       Q.   Okay.  What is scanned in?

```
 1              A.    It takes a copy of it.  We put it

 2     through a scanner, and the front and the back is

 3     copied, photocopied, and then it goes right into

 4     the -- as a digital image into our system.

 5              Q.    Okay.  And so for a hard copy

 6     script -- which I know you've told us is not as

 7     common these days -- the process of receiving

 8     the prescription, entering the -- you know,

 9     stamping it, patient's date of birth and

10     allergies, entering data into the computer and

11     then scanning the prescription, all happens

12     right there at the drop-off counter?

13              A.    Right.

14              Q.    Okay.  This is probably a silly

15     question, but is anything scanned if it's an

16     electronic prescription?

17              A.    No.  It is transmitted

18     electronically.  So it will just automatically

19     show up in our data entry queue to be inputted

20     by the technician.

21              Q.    Okay.  For the drop off, is there

22     anything that changes about that process if

23     we're talking about a Schedule II or

24     Schedule III prescription?  Is there any
```

```
 1    requirement that a pharmacist does the drop-off

 2    procedure and the data entry or any of those

 3    types of things?

 4          A.    No.  There is no -- there is no

 5    difference in the dropping off of the

 6    prescription other than -- I mean, this isn't a

 7    standard or any sort of rule.  It's just

 8    something that I've implemented at our pharmacy,

 9    is that if a technician gets a prescription for

10    a controlled substance, we immediately check and

11    see in their profile when the last time they've

12    had that prescription is.

13               A lot of times if we don't do

14    that -- the patient usually that goes to the

15    doctor and drops their prescription off right

16    away, it doesn't mean that it's ready to be

17    filled.

18               And at my location, we only fill

19    controlled substances a day early.  So a lot of

20    times they will drop off their prescription

21    before that.  So we -- and it's just our

22    practice to check and make sure when the last

23    time they filled it was so that we can tell the

24    patient before they leave if it's -- when it's
```

```
 1    going to be ready.  So if it isn't a day early,

 2    then they have to wait.  We reschedule that

 3    prescription for the later date.

 4            Q.    Okay.  But that's an Emily Mooney

 5    rule, not a Giant Eagle rule?

 6            A.    Yes.

 7                  MR. MAZGAJ:  Objection to form.

 8            Q.    Okay.  You said you do have a

 9    drive-thru at your store?

10            A.    We do.

11            Q.    Okay.  Sorry.  Before I go there,

12    so is there anything different about the

13    drop-off process if we're talking about a new

14    patient versus a repeat patient?

15            A.    No, other than taking -- getting

16    their information and their insurance

17    information, address, phone.  We have to put

18    them into the system.  So that would be the

19    difference.

20            Q.    Okay.  Okay.  So you said your

21    store does have a drive-thru, correct?

22            A.    Yes.

23            Q.    How is it determined as far as who

24    works the drive-thru?  Is that a pharmacist
```

```
 1   thing or a tech thing, or does it matter?

 2         A.    Typically a technician is

 3   working -- that is where they're working, is at

 4   the registers.  They rotate between the two

 5   depending on the time of day.

 6              A pharmacist, though, can rotate

 7   there.  They go -- if they're the help

 8   pharmacists, they would rotate to where they're

 9   needed.  So anyone, like I said, can work

10   dropoff, registers, drive-thru.

11         Q.    Okay.  Is the process for drop-off

12   at the drive-thru the same as the process for

13   drop-off at the counter as far as stamp it,

14   birth date, allergies, scan the prescription

15   front and back end, same as it was in the first

16   place?

17         A.    Right.  Yes, the same.

18         Q.    Okay.

19              MR. MAZGAJ:  We've been going

20         about another hour, Emily.  How are you

21         doing?

22              THE WITNESS:  Sorry.  I could

23         probably be due for a break in the next

24         ten minutes or so.
```

```
 1                    MR. GADDY:  It's up to you.  We'll

 2          be on this document for longer than

 3          that, so -- but whenever you want to

 4          take a break.

 5                    THE WITNESS:  Okay.  We can go to,

 6          like, 12:15 then.

 7                    MR. GADDY:  Okay.

 8  BY MR. GADDY:

 9          Q.    All right.  If you turn the page,

10  there is -- I'm on page -- there's page 4 down

11  at the bottom.  It talks about the will call

12  area.  What's that?

13                    MR. MAZGAJ:  Hey, Jeff.  Will you

14          give me a continuing objection just on

15          this document with lack of foundation?

16                    MR. GADDY:  Sure.

17                    MR. MAZGAJ:  Thanks.

18          A.    Will call is where the

19  prescriptions are stored and then picked up

20  from.

21          Q.    Okay.  And you have that area at

22  your store in Painesville?

23          A.    Right.  Right by the registers.

24  The bins are similar.  The two registers in the
```

```
 1    front, the will call bins, and then the

 2    drive-thru behind it.

 3            Q.    Okay.  So who would work the will

 4    call area?

 5            A.    Like I said, anyone can work those

 6    areas.  Typically a technician would be at the

 7    registers, which encompasses that register and

 8    drive-thru.

 9            Q.    Okay.  The next -- the next

10    section on this page says "Data Entry."  Is that

11    what we've already kind of covered as far as

12    what happens at drop-off, or is this something

13    different?

14            A.    No.  Data entry is the process of

15    entering the prescription, the data from the

16    prescription, into our computer system.

17            Q.    Okay.  Where does -- does that

18    happen at drop-off, or does that happen

19    somewhere else?

20            A.    It can happen at drop-off, but

21    usually that happens on our main line.  Ours is

22    structured where the pharmacist is in the middle

23    of the counter, and then we have two technicians

24    on either side with some distance between.
```

Highly Confidential - Subject to Further Confidentiality Review

```
1              We have a fill station where the

2    technician typically fills prescriptions.  And

3    then the other side is usually just for data

4    entry.  They usually have filled or data entry

5    on both of those computers, depending on the

6    time of day.  But for the most part, we have one

7    spot where they do most of the data entry.

8         Q.   Okay.  Who does the data entry?

9    Is that a tech thing, a pharmacist thing, or

10   either/or?

11        A.   Both.  Typically it's a

12   technician.  Usually it's my strongest

13   technicians.  I have two advanced technicians at

14   my store where they've -- there's a series of

15   tests for technicians, and they've passed all of

16   those tests.  It's a full-time position.  I give

17   them a little more responsibility when it comes

18   to ordering supplies and helping me input

19   scheduling and things like that.

20              They are typically my data entry

21   technicians, but that is something that all of

22   the technicians learn to do, and they all rotate

23   through these stations.

24        Q.   Okay.  What information is entered
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   from a prescription?  And if you don't mind,

 2   just kind of answer generally and then give me

 3   an example of what would be entered from a

 4   typical oxycodone prescription.

 5           A.    Okay.  So they would see the

 6   prescription on the screen.  When we're data

 7   entering a prescription, we select the patient's

 8   name.  That's why we get their information at

 9   drop-off in case they're not in our system.  We

10   get their name by searching by their date of

11   birth.  Next to that is the date that the

12   prescription is written.  We input that date.

13   Then we search for the drug.

14                So in our system, it's easier to

15   search oxycodone.  We usually just type the

16   first three or four letters of the drug along

17   with the strength, so 5 milligrams, oxycodone

18   5 milligrams.

19                We find that.  Select it.  Move to

20   the next, which would be quantity.  We'd input

21   the quantity.  Then the directions.  They'd type

22   out the directions.  After that is the doctor.

23                So they would -- in the fact of a

24   controlled prescriptions, they would search by
```

Highly Confidential - Subject to Further Confidentiality Review

 1    the DEA.  My technicians are trained to know

 2    what to look for on the prescriptions.

 3              So in this case, if the DEA is not

 4    there, we would immediately put that into our

 5    call queue to call the doctor to get that

 6    information because it needs to be on the

 7    prescription.

 8              So on a controlled medication, we

 9    would search by the DEA, pull up the doctor,

10    select it.  And then after that is the day

11    supply.  It's required on a controlled

12    medication to write the duration of therapy on

13    the prescription.  So we make sure that is on

14    there.

15              And then the refills, if there is

16    a refill, obviously OxyContin or oxycodone, you

17    can't put a refill on that, so it would be zero.

18    At that point, you'd check insurance.

19              The next screen will prompt you to

20    put in a diagnosis code, because that is

21    required on a controlled prescription.  So you'd

22    put in the diagnosis code.  If it's not there,

23    again, it would go right into the call queue for

24    a pharmacist to call and clarify the diagnosis.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              After that, you might -- another

 2   screen might pop up to show the actual product

 3   that we have in stock, to select that.  And then

 4   it would be put through -- you'd put your

 5   biometrics down -- or into the computer to send

 6   it off to the pharmacist to do data

 7   verification.

 8         Q.    Okay.  When you said DEA, were you

 9   referring to a DEA registration number for a

10   doctor?

11         A.    Yes, yes.  Every doctor has their

12   own DEA number, and it is required to be on the

13   prescription.

14         Q.    Okay.  And when you said

15   biometrics there at the end, I don't know what

16   you meant by that.

17         A.    Sorry.  Our credentials.  Every --

18   everyone that works in the pharmacy uses their

19   fingerprint to stamp what each person has done

20   so we can track what is being done based on who

21   is doing that in the system.

22              And in order to get to the next

23   screen, you have to put your biometrics in

24   showing that you typed that prescription or you
```

```
 1    data entered that prescription.

 2           Q.    Okay.  And so that's the data

 3    entry process in a nutshell, right?

 4           A.    Right.

 5           Q.    Okay.  And I think you said the

 6    next step from there would be data verification?

 7           A.    Correct, as long as it doesn't go

 8    to third-party rejection.  A lot of

 9    prescriptions, they'll immediately get billed to

10    the third party, their insurance company.  And

11    if they get rejected by the insurance, they

12    would go to that queue first.  But for the most

13    part, they get billed to insurance and then go

14    right to data verification.

15           Q.    Okay.  And what is data

16    verification?

17           A.    That is what the pharmacist does

18    to verify the prescription.

19           Q.    Okay.  And is a pharmacist in

20    charge of data verification for every type of

21    prescription, or is that just a controlled drug

22    thing?

23           A.    Oh, every prescription that is put

24    into the system goes to data verification, every
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    one.
 2            Q.    Okay.  So tell me generally what
 3    happens as it relates to data verification.  And
 4    then if you would, also tell me specifically
 5    what happened -- well, let's just start in
 6    general.
 7                  Tell me generally what happens at
 8    data verification, and then I'm going to ask you
 9    some more questions about controlled substances
10    after that.
11            A.    Okay.  Well, I mean, I can use
12    oxycodone as an example.
13                  So data verification, it's
14    similar.  I put my biometrics in.  A
15    prescription will pop up on my screen.  I have a
16    picture of the hard copy prescription on the
17    right-hand side of the screen, and then what my
18    technician inputted into the system on the
19    left-hand side.
20                  The computer system that we have
21    now, it's pretty nice.  It goes line by line.
22    So I can hit enter to check each line.  So
23    similar to data entry, it is the same.  I'm
24    checking the name and date of birth.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    So when I am checking the name,

 2      I'm making sure that the name is correct, the

 3      date of birth matches.  I also -- in my head,

 4      I'm looking for, you know, age.  Is this a

 5      pediatric patient, an elderly patient?

 6                    Next I would check the drug, make

 7      sure that the drug is what is on the

 8      prescription.  So I check the drug, the

 9      strength, and the form, whatever that may be, a

10      tablet, a capsule, extended release suspension,

11      make sure that those match up.

12                    After that, I check the quantity,

13      the refills, the doctor.  With the doctor and an

14      oxycodone prescription, I make sure that that

15      DEA is there.  I make sure -- MPI helps too, but

16      I need to have the DEA there.  That the

17      prescription is signed.  That happens a lot

18      where it's not signed.

19                    And in the respect of a C-II

20      prescription or a controlled prescription, if

21      it's not signed, then that script is not valid.

22      If it's a hard copy, it would have to go back to

23      the doctor's office to be signed or rewritten.

24                    After I talk to the doctor, I go
```

 1   back through the prescription and make sure the

 2   prescription makes sense, that the dosing is

 3   appropriate for that drug.  And then I'll move

 4   on.

 5             My next screen -- after doing the

 6   check of just the prescription, my next screen

 7   would be my DUR screen, allergies.  Those would

 8   be listed there.

 9             We have -- so if there's -- on a

10   DUR screen, allergies can be one of them.  If

11   the patient has any other medications that are

12   similar to it in the same class that they've

13   recently gotten, I look through that.

14             In this old system, we wouldn't

15   have a DUR screen.  It was a little bit

16   different.  They kind of printed after the fact.

17   So in that case, I would check their profile.

18   And a lot of times, I still check the profile

19   depending on what the DURs are telling me.

20             A lot of times patients are -- the

21   oxycodone example, they might have got

22   5 milligrams last time, this one is for

23   10 milligrams.  So I'm going to put a counsel

24   note in to discuss that with the patient, that

Highly Confidential - Subject to Further Confidentiality Review

1    there was a change in therapy.

2               At this point, I'd also check to

3    see if the patient's filled that before, why the

4    jump.  And you can see if they've filled it in

5    previous times, if they're filling it too early.

6               A lot of times even with a jump

7    from 5 to 10 milligrams, I would do a

8    calculation; "Okay.  So should they have enough

9    filled for getting this prescription at 10

10   milligrams, should they have enough of doubling

11   up on their 5s to get them to a certain date

12   before I fill this?"  These are some of the

13   things going through my head.

14              For an oxycodone prescription, an

15   OARRS tab will show up in my computer system,

16   and I have to click on that, or override it.

17   And I never override it.

18              I'd click on that and check the

19   OARRS report also on this screen, make sure they

20   haven't filled at any other pharmacies, any

21   other doctors.

22              Sometimes dentists, in particular,

23   will write for prescriptions that -- for tooth

24   pain and an immediate need, but they don't --

```
 1   they don't typically check OARRS like I would.

 2   So.

 3              I will see that, you know, they

 4   got an oxycodone prescription just the other day

 5   from a pain management doctor and now they're

 6   getting this.  So that would flag me to check

 7   and call them -- call the doctor.

 8              After the OARRS, as long as

 9   everything checks out okay, I can continue.  The

10   next screen sometimes is billing, but for the

11   most part, that's the last screen I would look

12   at.  It just shows the -- what it's been billed

13   to.  And then I would put it in my biometrics to

14   approve it as well, or reject it to the call

15   queue depending on what the script is or if

16   there's any issues.

17              If there was any change in dose, I

18   would deactivate an old prescription and then

19   put a counsel note, so then I would make sure to

20   speak with the patient and make sure they're

21   aware of a dose change.

22              Any questions I had, I would also

23   put in a counsel note.  If there was a question

24   about an allergy or something like that, I would
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   do that at that screen as well.

 2               I think that covers most of the --

 3   just some of the process with data verification.

 4        Q.    Okay.  Let me ask you a couple

 5   follow-up questions about that while it's still

 6   fresh in your mind, and then we can take a

 7   break, if that's okay.

 8               That whole process that you just

 9   described, the data verification, about how long

10   does that take you?

11        A.    It depends on the prescription

12   obviously.  I mean, there's a lot of what-ifs, a

13   lot of things.  It depends on what I see.  So, I

14   mean, a controlled prescription typically takes

15   longer because I will check that OARRS.  There's

16   more information that needs to be on the

17   prescription than on a standard legend drug.

18               I mean, I would say for a normal

19   maintenance med prescription, I'd say a minute

20   or so, maybe more, depending if there's any

21   interactions, because I can check -- we have

22   tools, if there's an interaction that I can

23   check and make sure that the interaction is

24   something I can counsel them more on or if it's
```

```
 1   something I need to call the doctor on and

 2   change the drug completely.

 3            So I would say on average, about a

 4   minute.  I would say controlled medications,

 5   typically longer just because of the OARRS

 6   report and the more detail that is required

 7   there.  Probably double the time, I would say.

 8       Q.    Okay.  So as far as how long it

 9   takes for you to do the data verification

10   process, you said for a normal non-controlled

11   medication, approximately a minute.  But when

12   we're dealing with a controlled substance, such

13   as an opiate, approximately two minutes to do

14   the data verification process.

15            Is that fair?

16       A.    Yes, as long as there's no issues.

17   Yes.

18       Q.    Okay.  One of the things that I

19   heard you say in your answer that you would look

20   at during the data verification process would be

21   the dosing and the length of treatment, and I

22   think you said you would look at those types of

23   things to see whether or not they made sense.

24            Do you recall that generally?
```

1        A.    Yes.

2        Q.    Okay.  And you agree that those

3   are the types of things that fall within your

4   job responsibilities as far as performing due

5   diligence in carrying out your corresponding

6   obligation regarding whether or not a

7   prescription, particularly for a drug like an

8   opiate, should be filled?

9              MR. MAZGAJ:  Objection to form.

10       A.    I -- it is my corresponding

11  responsibility to do that for every

12  prescription, no matter what.  So that is in my

13  process for every prescription.  I need to know

14  that it makes sense the way that it is written.

15       Q.    You mentioned a couple of times --

16  you used the term "counseling note."  I'm making

17  an assumption that that means talk to the

18  patient when they come to pick up their

19  prescription; is that right?

20       A.    Right.

21       Q.    Okay.  Are there any -- and you've

22  told me about a couple of instances where you do

23  things maybe a little over and above that maybe

24  aren't necessarily required by the company, but

Highly Confidential - Subject to Further Confidentiality Review

1    you like to do them.

2              So I want to understand if there's

3    any Giant Eagle policies, rules, or regulations,

4    and then if there's any, you know, Emily Mooney

5    policies, procedures, or regulations regarding

6    counseling as it relates to opioid drugs.

7              So why don't you kind of first

8    tell me your particular way to do things and

9    then whether or not you do those because you

10   think they're the right thing to do or you do

11   them because there's a Giant Eagle policy that

12   tells you you have to.

13             Does that make sense?

14        A.   Right.

15        Q.   And I'm specifically asking about

16   counseling as it relates to opioid drugs.

17        A.   Okay.

18             MR. MAZGAJ:  Objection to form.

19        A.   There is a standard from Giant

20   Eagle in place for counseling, and I don't think

21   it's an Emily Mooney thing so much as a company

22   thing.

23             I -- Giant Eagle is very dedicated

24   to the safety of the customers.  I think as a

```
1    company, they go over and above to where, for

2    example, changing in dose for counseling

3    purposes, I flag that in our computer system to

4    counsel every time.

5              And typically -- I mean, even

6    before this system -- it would be a note on the

7    bag to -- it's not technically counseling even

8    just to state that this is a different dosage

9    than what they have gotten before.

10             So really that's -- it's not so

11   much a counsel.  Sometimes it leads to

12   counseling because they do have questions.  And

13   then in that case, you'd ask the pharmacist.

14   But the Giant Eagle's system has so many

15   safeguards.

16             I mean, just putting in change in

17   dose, that automatically brings a pharmacist to

18   the counter to talk to the patient when

19   typically -- and it maybe it's not something

20   that a pharmacist needs to technically state to

21   the patient.  I don't know if that makes sense.

22             But they do go kind of over and

23   above.  The system has so many safeguards that

24   something as simple as just stating that this is
```

Highly Confidential - Subject to Further Confidentiality Review

1   a change in dose than last time, which a

2   technician could essentially tell them that, is

3   now put into our system that the pharmacist will

4   address it.  So I like --

5         Q.    I'm sorry.  I didn't mean to cut

6   you off.

7               I'm guess I'm trying to

8   understand.  Is there a Giant Eagle policy that

9   directs that any time there's a change in dose

10  for medication, counseling is required?

11        A.    No.  More so that -- like, if

12  there is a change like that, you have to offer

13  the right to counsel.  I'm just using it as an

14  example, that technically, I mean, we can tell

15  the patient that, but our system is built so

16  that we're automatically going to the counter to

17  ask them if they have -- or follow up and ask

18  questions right away.

19        Q.    Is there any policy within Giant

20  Eagle that every patient who fills an opiate

21  script should receive counseling?

22        A.    Well, it's Ohio law to offer

23  counseling at every transaction.  So it's all

24  encompassing.  Which we do.  Our technicians at

Highly Confidential - Subject to Further Confidentiality Review

1  will call will ask if we -- if the patient

2  requires counseling or if they have any

3  questions.  So we offer counseling to every

4  patient.

5        Q.    Okay.  My question is a little bit

6  different.

7              Is there any requirement from

8  Giant Eagle that you must counsel the patient,

9  whether the patient wants it or not, that you're

10  not letting that script out the door until you

11  talk to that patient about an opioid

12  prescription?

13             Is there any policy like that in

14  place at Giant Eagle?

15             MR. MAZGAJ:  Objection to form.

16        A.    Like I said, we have to offer to

17  counsel for every prescription.  It's not

18  required to counsel on an opioid prescription

19  unless there is -- or if the pharmacist feels

20  there's a need to require counseling on that

21  prescription, whatever it may be.

22             As a change in dose, yes, I would

23  make sure that we're counseling on something

24  like that.  If there is a duplication with

Highly Confidential - Subject to Further Confidentiality Review

 1    another drug that they were on prior, I will

 2    definitely counsel and make sure that that

 3    patient knows that they can't take both

 4    medications, or one or the other, things like

 5    that.

 6              But there's no requirement with

 7    Giant Eagle, per se, because the state requires

 8    us to do that.  So Giant Eagle will require that

 9    based on the state laws.

10         Q.    Okay.  When you say --

11              MR. MAZGAJ:  Hey, Jeff.  It's

12         12:30.

13              MR. GADDY:  Yeah.  I'm close,

14         Matt.  Just a couple more.

15              MR. MAZGAJ:  Okay.

16    BY MR. GADDY:

17         Q.    When you say "offer to counsel,"

18    does that mean that when they're handed the

19    prescription, the customer is asked whether or

20    not they'd like to speak with the pharmacist

21    about their prescription?

22         A.    Yes.  Before -- as we're putting

23    the prescription -- checking the patient out in

24    will call at the register, they have to sign off

1    on the right to counsel if they refuse or they

2    accept.

3              Obviously if they have a question,

4    we require it, and we'll make sure that we do

5    the counseling.  But if it's a normal

6    prescription or any prescription that there's no

7    questions from the pharmacist, we still have to

8    offer counseling.

9         Q.    Okay.  And the patient has the

10   ability to say, "No thanks, I'm good" and just

11   take their prescription and leave?

12        A.    Right.

13              MR. MAZGAJ:  Objection to form.

14              MR. GADDY:  Okay.  We can go ahead

15         and take a break now.  How long do you

16         want -- I'm sorry.  Go ahead and go off

17         the record.

18              THE VIDEOGRAPHER:  Off the record,

19         12:32 p.m.

20                    - - -

21        Thereupon, at 12:32 p.m. a luncheon

22         recess was taken until 12:56 p.m.

23                    - - -

24

```
 1                              Friday Afternoon Session

                                April 16, 2021

 2                              12:56 p.m.

 3                       -  -  -

 4               THE VIDEOGRAPHER:  On the record,

 5          12:56 p.m.

 6   BY MR. GADDY:

 7          Q.    Ms. Mooney, this process of data

 8   verification that you described to us before we

 9   broke for lunch, is that generally the process

10   or the time period in which you're doing what I

11   think you called your due diligence in trying to

12   make a determination about whether or not a

13   prescription for a drug like opiates should or

14   should not be filled?

15          A.    Yes.  During the DVP process would

16   be when I would be doing that.

17          Q.    Okay.  And are there ever

18   occasions throughout your career as a Giant

19   Eagle pharmacist that you have made a decision

20   not to fill a prescription for an opiate?

21          A.    Absolutely.

22          Q.    Can you tell me -- I'm trying to

23   find out how often that's occurred.  So can you

24   tell me an approximate number of times you've
```

```
 1   refused to fill an opiate prescription, or if

 2   it's easier to tell me number of times per week

 3   or per month, knowing that it would be an

 4   approximation.  I'm trying to get a number from

 5   you.

 6              MR. MAZGAJ:  Objection to form.

 7        A.    I -- like, I can't give you a

 8   number per se, and it depends on what you are

 9   constituting "not filling."  A lot of the

10   time -- I mean, I don't fill prescriptions

11   multiple times a day, especially when it comes

12   to filling a patient's prescription too soon.

13   I -- like I said, I will only fill a

14   prescription a day early that is for a

15   controlled medication.

16              So there's many, many times a day

17   that I am rescheduling those prescriptions for

18   when they are due instead of filling them.

19        Q.    Okay.  Well, that's helpful.  So

20   let's put those into one category.

21              And you said -- and I can't

22   remember if this is an Emily Mooney policy or if

23   this is a Giant Eagle policy.  But you told us

24   earlier that you would only fill controlled
```

Highly Confidential - Subject to Further Confidentiality Review

1    prescriptions, I think, one day before they

2    would be -- before they would be up; is that

3    right?

4           A.    Right.

5           Q.    Okay.  Is that a Giant Eagle

6    policy, or is that your personal policy?

7           A.    No.  That's just doing my due

8    diligence.  They don't put that stipulation on

9    my practice.

10          Q.    Okay.  So that's a decision that

11   you make to make sure that you are doing things

12   as appropriately as possible?

13          A.    Right, and I'm supported by the

14   company.  Yes.

15          Q.    Okay.  Okay.  So setting aside

16   prescriptions that you maybe get two or three or

17   four or more days early and that you say, "Okay.

18   Well, I'll look at these closer to time."  But

19   what I want to know is whether or not there are

20   any prescriptions for opiates that you have been

21   presented with during the course of your career

22   as a Giant Eagle pharmacist that you made a

23   determination that, "No, this prescription

24   should not be filled based on a reason other

Highly Confidential - Subject to Further Confidentiality Review

1    than it being a day or two early."

2              Does that make sense?

3         A.    Yes.  And that happens quite

4    frequently too.  An example like I gave earlier

5    with a dentist's office in particular or ER

6    prescriptions, those doctors don't typically see

7    the patient as much, and they don't always check

8    an OARRS report before giving them a narcotic or

9    an opiate.

10             And in that case, I make sure that

11   the doctor that wrote that new prescription for

12   the breakthrough pain or whatever it is, that

13   they are already on a long-term opiate or that

14   they've had that recently.

15             And in that case, after that

16   discussion, the doctor usually chooses not to

17   fill the prescription, and then we don't fill

18   it.

19             So that happens quite frequently

20   too.

21        Q.    Okay.  Outside of dentists and

22   emergency room doctors, are there any other

23   types of physicians that you often have issues

24   with them not checking OARRS or not being as

Highly Confidential - Subject to Further Confidentiality Review

1    familiar with the history of the patient?

2              MR. MAZGAJ:  Objection to form.

3         A.    Yes.  I mean, over the years,

4    those have gone down.  Like I said earlier, most

5    doctors, most physicians now will put checking

6    OARRS into their practice.  So I don't have as

7    many of those as I used to, but it has happened,

8    and in the past especially.

9         Q.    And was that, you know, also a

10   problem prior to OARRS being up and running

11   where you would have issues where doctors may

12   not be as familiar with the history of their

13   patient and cause you to maybe have to do a

14   little bit more due diligence as the pharmacist?

15        A.    Yes.  There is a huge difference

16   in my -- the way I practice then to now.  I used

17   to be on the phone a lot with doctors' offices,

18   with pharmacies, trying to figure out if -- you

19   know, if it was a new patient that I wasn't

20   familiar with, things like that, I would have to

21   do a little bit more digging.  And I did all the

22   time, so ...

23        Q.    Okay.  So if you had to tell me

24   over the past -- let's just say over the past

Highly Confidential - Subject to Further Confidentiality Review

```
 1   month, do you believe that you've refused to

 2   fill any opiate prescriptions over the past

 3   month not for the early refill issue, but

 4   because you determined that the prescription

 5   shouldn't be filled?

 6        A.    Yes.

 7              MR. MAZGAJ:  Objection to form.

 8        Q.    Approximately how many times over

 9   the past month do you think you've done that?

10              MR. MAZGAJ:  Objection to form.

11        A.    I don't know.  Probably -- I mean,

12   at least once a week I would say I end up with

13   something like that, something similar to that

14   situation.

15        Q.    Okay.  And when you -- when you

16   tell me -- again, and this is totally

17   approximate.  I'm not holding you specifically

18   to this number.  But when you tell me "about

19   once a week," are you talking about for your

20   whole pharmacy or just for you?

21        A.    Me, or at least being there when

22   something like that happened.  Maybe not me in

23   particular, but one of the pharmacists I'm

24   working with that day.
```

1      Q.    Okay.  And is that approximately

2  once a week as far as refusing to fill an opiate

3  prescription, not because it's been presented by

4  a patient a few days too early but because

5  you've otherwise determined it shouldn't be

6  filled, is that fairly consistent going back in

7  time, that once a week?

8      A.    Like I said, it was more back when

9  OARRS was not readily available or the

10  physicians did not use it as much I did, so ...

11      Q.    Okay.  So pre-2013ish, it would

12  have been more than once a week, and 2013ish

13  forward, approximately once a week; is that

14  fair?

15          MR. MAZGAJ:  Objection to form.

16      A.    No.  Even moving past 2013.  I

17  mean, I know I was using OARRS as soon as it

18  became available.  I don't know if physicians

19  were.  And so I found a lot of things on there

20  that I don't think that the physicians were

21  aware of, so ...

22      Q.    Okay.  So safe to say that it was

23  more than once a week, and as OARRS became

24  available and maybe as people became familiar

Highly Confidential - Subject to Further Confidentiality Review

1    with it, that slowly got down to where it

2    averaged out about once a week to where it is

3    now?

4            A.    Right.

5                  MR. MAZGAJ:   Objection to form.

6            Q.    Okay.   I would presume that from

7    time to time during the course of your due

8    diligence process during the data verification

9    step, that there's -- you've had occasions -- I

10   think you've already said this -- to call

11   doctors and ask them about the circumstances in

12   which they've written an opiate prescription?

13           A.    Yes.

14           Q.    Okay.   Can you kind of just give

15   me an example of how that conversation goes as

16   far as who you -- who makes the call, whether

17   it's you or a tech, who you speak with at the

18   physician's office, if there's a standard, or if

19   it changes from time to time.

20           A.    Typically if I have an issue with

21   a prescription, I call myself, especially

22   regarding opiate prescriptions and controlled

23   medications.   I usually talk to a secretary or a

24   medical assistant or a nurse.   It just -- it

Highly Confidential - Subject to Further Confidentiality Review

1   depends on the office.  And I usually have to

2   leave a message with them.  They talk to the

3   doctor, and then they get back to me.  It just

4   depends on the office.

5          Q.    Okay.  And what types of questions

6   are you usually asking to the secretary or the

7   physician's assistant or the nurse?

8          A.    I mean, it depends on the

9   prescription and what my -- let's see.

10                So one example of something more

11  recent within the last year or so is -- and it's

12  not -- is patients that will call in

13  prescriptions posing as an office where they'll

14  call in a prescription and they know the

15  doctor's DEA.  They know the necessary

16  information that the pharmacy would need to call

17  in a prescription for a medication that's

18  controlled.

19                And so now typically, too, any

20  medications that are controlled and called in

21  and left on my voicemail, I will typically call

22  the doctor's office using our own pharmacy

23  number that we have on the doctor's file and not

24  the number that's written -- or that we've

Highly Confidential - Subject to Further Confidentiality Review

1    recorded from our messages.

2              So I verify -- I call that office,

3    "Hey, this patient, I just got a prescription on

4    my voicemail for this.  I just want to clarify

5    that this prescription did indeed come from this

6    office."  And I can find out that way if the

7    prescription is legitimate to fill.  I've caught

8    a few prescriptions, fake prescriptions, called

9    in that way.  So that's one way I can call and

10   verify.

11             Q.    Okay.  Have there ever been

12   occasions where you've called doctors' offices

13   with questions regarding the dosage that was

14   written?  Let me just leave it at that.

15             A.    Yes.  Yes.  I have called on

16   medications in the past.  If they're high doses

17   or -- but that's not as typical.  It more -- day

18   supply is another one that I will call on.  Some

19   patients are on a 90-day supply of long-acting

20   pain medication.

21             In this case, I usually -- if I

22   don't -- if I haven't seen the patient before --

23   and, you know, prior to OARRS and even after, if

24   I see that they've jumped from a 30-day to a

```
 1   90-day prescription, I call, and I ask them why

 2   they're doing this.

 3              And usually I get some information

 4   from their chart to document the necessity to

 5   fill 90 days' worth of a prescription opiate.

 6   I've done that before.

 7              So any change that's not a

 8   normal -- and as I'm checking, I don't -- and I

 9   see as an issue, I will call on.

10        Q.    And for those issues where you

11   would call regarding dosage or change in therapy

12   and those types of things, are you also calling

13   and speaking with the secretary or the assistant

14   or the nurse and leaving a message for the

15   doctor to have those questions answered?

16        A.    Yes.  I usually leave a message.

17        Q.    Okay.  How often do you actually

18   talk to the doctor?

19        A.    That depends, but it is more

20   infrequent.  Usually I'm speaking with the

21   nurse.  The only time I end up usually talking

22   to the physicians are on weekends.  If I have a

23   pertinent question and will not fill a -- you

24   know, a controlled medication on the weekend,
```

Highly Confidential - Subject to Further Confidentiality Review

1   usually it's the doctor on call.  So I speak

2   with the doctors more on weekends than I do

3   during the week.

4        Q.    During the week, it's typically

5   secretary, assistant, nurse, correct?

6        A.    Right.

7        Q.    Okay.  Has there ever been an

8   occasion that you can remember that you called a

9   physician's office regarding an opiate

10  prescription and they gave -- they told you that

11  it was okay to fill the prescription, but you

12  still decided that you weren't comfortable

13  filling it and you still refused to fill the

14  prescription?

15       A.    I -- not -- I don't recall

16  anything that can come to mind.  I don't know.

17       Q.    Okay.  Is there any way or any

18  requirement within Giant Eagle that you document

19  the fact that you've refused to fill a

20  prescription for an opiate?

21       A.    Yes.

22            MR. MAZGAJ:  Objection to form.

23       A.    I can document -- any time I

24  deactivate a prescription in someone's profile,

Highly Confidential - Subject to Further Confidentiality Review

1    you have to put in a note as to what happened or

2    why, and then we have to put our initials -- so

3    while it's more of a note standard so that we

4    know who wrote that note, who did the -- who

5    deactivated the prescription.  So, yes, there is

6    notes in our system for that.

7         Q.    Okay.  So if a prescription for

8    oxycodone comes in, as we already kind of

9    covered, the first thing that's going to happen

10   is that -- or one of the first things that is

11   going to happen is that prescription is going to

12   be entered, right, so it's in the Giant Eagle

13   system, correct?

14        A.    Right.

15        Q.    Okay.  And then if you are doing

16   your data verification process and for whatever

17   reason you determine that you're not going to

18   fill the prescription within the system, you

19   have to deactivate the prescription; is that

20   right?

21        A.    Yes.  Yes.  It's called

22   deactivating in our system.

23        Q.    Okay.  And when you deactivate a

24   prescription, is there a requirement that you

Highly Confidential - Subject to Further Confidentiality Review

1    make a note?

2          A.    Yes.

3          Q.    Does the software force you to

4    make a note before you move on?

5          A.    Yes.

6          Q.    Okay.  And is there -- what would

7    you call -- and I think we'll cover this in a

8    little bit, but I know there's different areas

9    within the software where you can make notes.

10                Is there a -- what title would you

11   give to this notes area where you are being

12   forced to enter?  Is this a deauthorization note

13   or a patient note?

14         A.    Reason for deactivation.  It's

15   just giving a reason to deactivate.

16         Q.    Okay.  And I think I heard you say

17   that you'd put your initials in there and then

18   you would make a note?

19         A.    Right.  Giant Eagle has a notes

20   standard, and so you would put in either a "P"

21   or a "T" for pharmacist or technician.  The

22   first letter would be your first name, your full

23   last name, and then the date.  So any time you

24   put a note in the system, that is what you're

1    using.

2         Q.    Okay.  And I assume this is like a

3    free flow text box?  It's not like there's a

4    drop-down menu of reasons to pick, right?

5         A.    Right.

6         Q.    Okay.  Can you give me an example

7    of what you might put in that text box if you

8    made a determination that there's not a

9    legitimate reason for an opiate script and so

10   you're not going to fill it?

11        A.    Well, just, for example, the

12   calling a dentist's office, I would put spoke

13   with -- "Spoke with so and so at dental office,

14   doctor decided not to fill," and I would put in

15   my credentials and deactivate the prescription.

16        Q.    Okay.  Is there any other

17   information that goes into that deactivation

18   notes field other than the reason that you're

19   not filling the prescription?

20        A.    No.

21        Q.    It's not like a general notes

22   field where you could put, you know, different

23   information about other things?  It's specific

24   to that one issue of deactivating the

Highly Confidential - Subject to Further Confidentiality Review

1    prescription?

2          A.    Right.  We have a notes tab to put

3    other notes, if necessary, for other medications

4    or for the patient.

5          Q.    Okay.  As it relates to the data

6    verification process, let me ask you some

7    questions about some of the other areas that you

8    might either make or look at notes.

9                So what notes do you have

10   available to you that may have been entered by

11   other pharmacists or other technicians while

12   you're going through the data verification

13   process?

14               MR. MAZGAJ:  Objection to form.

15         A.    As -- in data verification on the

16   screen of -- on the DUR screen where I see

17   interactions and where the OARRS is available,

18   there's also a notes field.  It's in the bottom

19   left-hand corner of the screen that shows all

20   the notes that are in the patient's file.

21               So, I mean, typical notes -- this

22   just comes to mind -- is like if I'm checking a

23   prescription, sometimes people are on two

24   strengths of a medication, a thyroid medication,

1    and that will flag in our DUR screen that it's a

2    duplicate -- it's a duplicate drug, and we have

3    a note or we'll put a note in that we know that

4    this patient has been on two strengths.  So

5    things like that.  To help us in the checking

6    process, those are available on that DUR screen.

7           Q.    Okay.  Is there a title for that

8    notes field?  Is that DUR notes?  Is that

9    patient notes.  Or do you know?

10          A.    There is -- you can have notes --

11   there's a notes tab, and you can have notes

12   appear at different -- you can make a general

13   note to have them appear at every step

14   throughout the fill process, or you can make

15   them show up for, you know, certain -- at

16   certain times.

17                If it's a note on the patient that

18   we need at will call, we can select that it's

19   just for will call when we ring out a patient.

20   But in the DUR screen, it shows the general

21   patient notes.

22          Q.    Okay.  And the type of information

23   that's going to be in the general patient notes

24   would be one of the examples that you just gave

```
 1   like on different multiple medications of

 2   different strengths for maybe a thyroid

 3   condition?

 4        A.    Right.  It can be --

 5              MR. MAZGAJ:  Objection to form.

 6        Q.    You can go ahead.

 7        A.    Yes.  It can be for any of those

 8   sort of things, any note that we would want to

 9   make on a patient.

10        Q.    Okay.  Are there any other notes

11   areas?  We've got the deactivation note.  We've

12   got the general notes that you say are going to

13   display during the DUR process.

14              Any other areas that you can make

15   notes that you would have available to look at

16   during that data verification process?

17        A.    We make -- we do make notes on the

18   image.  So like if we spoke with the doctor's

19   office regarding anything about the

20   prescription, an allergy that we wanted to

21   clarify, a clarification on the directions, if

22   something is illegible, any reason why we would

23   call the doctor, we document that on our image

24   note.  So that is attached to the prescription.
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Q.     Help me understand that.  That's a

 2   note -- is that a note field, or is that where

 3   you're making entries on top of the prescription

 4   that's been scanned in or --

 5              A.     Let me -- so with our previous

 6   system, before we were able to scan hard copies

 7   into the computer system, any time we had a

 8   question on a prescription, any time we spoke

 9   with a doctor's office, with a pharmacy, we

10   didn't -- you know, those note fields in our old

11   system weren't there.  All of our documentation

12   was done on the prescription itself.  So we

13   would make notes all over those prescriptions.

14                  Our computer system now still

15   makes -- let's us make those notes, but it's in

16   a field that if we printed the prescription from

17   our computer system, the notes would be bulleted

18   at the bottom of it.

19                  So we still do those same notes.

20   They're just attached to the prescription in a

21   file, like, instead of written on the

22   prescription itself.

23              Q.     Okay.  At what point in time did

24   the system change to where you were able to scan
```

1    and upload hard copy prescriptions?

2         A.    Somewhere around 2013, '14 maybe

3    is when we got the new prescription system, the

4    new -- our new pharmacy system.

5         Q.    From some of the other depositions

6    that have happened, I have a general

7    understanding that there was a period of time in

8    which the system that you used was a PDX system,

9    and you also had an rx.com system that kind of

10   also ran in the background.

11              Do you know what I'm referring to

12   there?

13        A.    Yes.  We use a PDX system.  I

14   remember rx.com, but I don't really know what

15   that is.

16        Q.    Okay.  Do you still use Rx.com

17   now?

18        A.    No.  I don't know -- I don't know

19   really what that is.

20        Q.    Okay.  If you pull up a patient

21   today who comes into your store, are you able to

22   see their history across -- let me give you a

23   couple of options.

24              Can you see their history within

Highly Confidential - Subject to Further Confidentiality Review

1    your particular Giant Eagle store?  Can you see

2    it within all Giant Eagle stores?  Or can you

3    see it within all other chains as well outside

4    of Giant Eagle?

5              MR. MAZGAJ:  Objection.  Objection

6         to form.

7         A.    We -- we can see all prescriptions

8    filled at Giant Eagle.

9         Q.    Okay.  And how long has that been

10   the case?

11        A.    I'm not sure of a time period.

12   Quite a few years now.  I don't know how long.

13        Q.    Okay.  So if you were to look at a

14   patient who has had a prescription filled at a

15   separate Giant Eagle pharmacy, are you able to

16   see hard copy prescriptions that have been

17   scanned in at that other Giant Eagle pharmacy?

18        A.    Yes.  We can see the original

19   prescription from the other pharmacy.  Yes.

20        Q.    Okay.  If you look at that

21   prescription that was filled at another Giant

22   Eagle pharmacy, are you able to see the bullet

23   point notes that you said would be displayed

24   below the prescription for scripts in your own

1    store?

2              MR. MAZGAJ:  Objection to the line

3         of questioning as duplicative of

4         30(b)(6) testimony.

5              You may answer.

6         A.    Yes.  We can see the notes

7    underneath that the other pharmacy has written.

8         Q.    Okay.  The deactivation notes that

9    you talked about, are you able to see those

10   across the chain?

11        A.    I -- we can see that something has

12   been deactivated.  Yes, because we can click on

13   the deactivation -- yes, you can see the notes.

14        Q.    Okay.  So if a patient came in and

15   presented you with a hard copy prescription for

16   oxycodone, you would have the ability to get

17   onto your system, see that they'd been at the

18   Giant Eagle a couple miles away the day before,

19   and that a prescription for oxycodone had been

20   deactivated?  You would have the ability to see

21   that?

22        A.    Yes, we could see that.

23        Q.    Okay.

24        A.    Through that way and from the

Highly Confidential - Subject to Further Confidentiality Review

1  prescription, so ...

2         Q.    Okay.  And do you have the ability

3  to see which particular pharmacist refused or

4  deactivated the prescription the day before and

5  any notes that they made?

6         A.    We can definitely see the notes.

7  I'm not sure on the pharmacist.  I'm not sure

8  about that.

9         Q.    I was just referring to -- you

10  said it was standard to insert first initial,

11  last name, those types of things.  Is that going

12  to be included in the note?

13         A.    That I could see, like, on the

14  notes.  Yes.  So if the note is there, we can

15  see the note.

16         Q.    Okay.  Let's go back to this

17  Exhibit Number 1 that we were looking at before

18  the lunch break.  I'm just going to ask you

19  about a couple other areas.

20             If you look at page 6 of that

21  document, there's a section at the top that says

22  "Fast Movers."

23             Is that an area that you have

24  within your store?

```
 1            A.    We do not.

 2            Q.    At the bottom of the page, there's

 3    an area that says "Final Verification."

 4                  Is that different than what we

 5    already talked about?

 6            A.    It is.  Yes.

 7            Q.    Okay.  And what is the final

 8    verification process?

 9            A.    So final verification is also a

10    pharmacist.  It does not have to be the same

11    pharmacist that checked the prescription and

12    data verified the prescription.  This is just

13    verifying that the correct medication goes into

14    the bag and then to the patient.

15                  So at final verification, I

16    would -- the prescription has already been

17    filled by the technician.  I would scan the

18    bottle.  At my computer, the prescription will

19    come up at my screen.  I can see an image of the

20    drug in the bottle.  I verify that picture to

21    what is in the bottle.

22                  At this time, I also would verify

23    the quantity.  I would eyeball the quantity and

24    make sure it looks like this amount is in the --
```

Highly Confidential - Subject to Further Confidentiality Review

 1   that was written on the label is in the bottle.

 2   For a controlled medication, I -- any controlled

 3   medication, I would verify that it was double

 4   counted, where our technician will put their

 5   checkmarks next to the quantity to show that

 6   it's been double counted.

 7             For a C-II prescription, we

 8   also -- the technician double counts.  They also

 9   back count the stock bottle that they're given,

10   and that number is written down.  And then the

11   pharmacist will also double count -- physically

12   count a C-II, a Schedule II drug.  And then we

13   also put our initials at the quantity on the

14   label showing that we double counted it.

15             There's also a prompt on our

16   screen that makes us double count, that says

17   that we double counted.  So we check that off

18   before I can put in my biometrics.

19             And then once I do that, the

20   screen will also come up with our perpetual

21   inventory, which is our running inventory of all

22   the C-IIs that we have.  And I put in the amount

23   that we have left in the stock bottle and in the

24   safe, make sure that that is the same.  And then

Highly Confidential - Subject to Further Confidentiality Review

1    it will let me finish checking that

2    prescription.

3              At that point, I would check the

4    prescription number and the patient name to

5    verify that it's all going in the correct bag

6    with the correct label, and then it's ready to

7    be picked up by the patient.

8          Q.    Okay.  And that process that we've

9    kind of gone through over the course of the

10   morning from a prescription being presented and

11   the data being entered through this final

12   verification where the prescription is ready to

13   go to the patient, about how long does that

14   process take from start to finish specifically

15   for a controlled substance?

16         A.    I'm not sure.  All of our

17   prescriptions go into our queue time related.

18   So it just depends on when the patient is coming

19   back to pick up the prescription.  So this whole

20   process could go over a longer period of time,

21   depending on when that prescription is due to be

22   filled.

23         Q.    Okay.  Sorry.  I was going to say

24   that's a fair answer.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              So let's go under the assumption

 2   that the patient drops it off and tells you

 3   they're waiting.  I presume those are the

 4   prescriptions that you probably put at the top

 5   of the queue as opposed to the person that's

 6   coming back the next day, right?

 7         A.    Right.

 8         Q.    Okay.  So if you have --

 9         A.    We need to give a wait time of

10   ten -- I mean, we could probably do one

11   prescription in ten minutes or so is an adequate

12   time to make sure.  Not all of them get done in

13   ten minutes.  If there's any problems or any of

14   those issues with calling the doctor that I

15   mentioned before, so -- but I would say we could

16   have a waiter -- a waiting prescription out to

17   the patient most of the time in 10 to 15

18   minutes.

19         Q.    Okay.  So obviously there could be

20   anomalies or different circumstances that may

21   come up during the verification process, but

22   generally speaking, if everything goes smoothly,

23   a person who drops off a prescription for a

24   controlled substance and says they're going to
```

1   be waiting should be able to get that

2   prescription filled within ten minutes; is that

3   fair?

4              MR. MAZGAJ:  Objection to form,

5        misstates testimony.

6        A.    Yes.  We can do that -- any

7   prescription in that time.  Yes.

8        Q.    Okay.  We've covered some of this

9   already, but I want to talk a little bit more

10  about some of the workflow process.  So I think

11  we're on page 6 now.  Can you just flip one page

12  to page 8 if it's double-sided.  It should be

13  just one page.  You can see at the top of the

14  page it says "Workflow."

15       A.    Uh-huh.

16       Q.    And then in the box down below, it

17  has a -- you know, a visual of some of the steps

18  that we just went through as far as drop-off,

19  data entry, data verification, final

20  verification.

21             Do you see all of that there?

22       A.    Yes.  I see it.

23       Q.    The first thing that Giant Eagle

24  put under the Workflow section, it says, "Many

```
1    of our pharmacies are very busy and sometimes

2    hectic places."

3              Do you see that?

4              MR. MAZGAJ:  Objection.  The

5         document speaks for itself.

6         A.    Where is that?

7         Q.    The very first sentence under

8    Workflow.

9         A.    Oh, okay.  I see.  I'm sorry.  I

10   was looking at the graph -- or the chart.  Okay.

11        Q.    Yeah.  Do you see that under

12   Workflow where it says, "Most of our pharmacies

13   are very busy and sometimes hectic places"?

14        A.    Yes, I see that.

15        Q.    Okay.  Do you agree with that

16   statement that Giant Eagle put into this manual

17   talking about their pharmacies?

18        A.    I think over the course of the

19   day, it can be busy and not busy.  I don't think

20   it's hectic, but I -- I do believe that we are

21   busy all day, and that a good thing.  I like

22   that we are working and we're helping.  So, yes,

23   we are busy, but not hectic.

24        Q.    Okay.  You've told us about
```

Highly Confidential - Subject to Further Confidentiality Review

1   filling prescriptions.  What other pharmacy

2   tasks do you have that you have to complete

3   during the course of a day outside of filling

4   prescriptions?

5        A.    Well, right now we're right in the

6   middle of a pandemic.  So we are giving COVID

7   shots to our community, which is great.  So we

8   do that every day during the week, Monday

9   through Friday.  We -- my store in particular

10  gives the vaccine between 1:00 and 3:00 Monday

11  through Friday, and it works out really well.

12  We also do other immunizations.  We pretty much

13  can do most adult immunizations and children as

14  well.

15           We also have medication therapy

16  management, MTM, where it's nice, we can call --

17  we have a program -- Outcomes is what it's

18  called -- where we can find patients, and

19  insurance companies partner with these companies

20  so that we can offer counseling to them.  So we

21  call them and do counseling on all of their

22  medications.  We can suggest changes to therapy

23  based on what they tell us, and we can contact

24  the doctor for those.

Highly Confidential - Subject to Further Confidentiality Review

1              Those are just a few of the things

2    that we do.

3         Q.    And do you get input from

4    corporate as far as the amount of immunizations

5    you should be trying to accomplish in any given

6    time period?

7         A.    We have targets, goals for the

8    year per pharmacy, that corporate does put out

9    for us.  It's just more of -- yeah, a goal for

10   us to get to, so ...

11        Q.    Okay.  And who can give the

12   immunization shots?  Is that pharmacists or

13   techs, or all of the above?

14        A.    Pharmacists can, and then interns

15   can under the pharmacist.  So as long as we're

16   there to help, we can -- we can supervise them

17   giving it.

18        Q.    Okay.  As far as the MTMs, the

19   medication therapy management, likewise, do you

20   get goals or quotas given to you from corporate

21   as far as how much of that activity should be

22   performed per store?

23             MR. MAZGAJ:  Objection to form.

24        A.    Yes.  We do have goals for that as

Highly Confidential - Subject to Further Confidentiality Review

1    well.

2          Q.    Okay.  And who's doing that job?

3    Is that another thing that the pharmacist is

4    doing, or is that something that a tech is

5    doing?

6          A.    It depends.  It is the pharmacists

7    ultimately.  Sometimes technicians can make the

8    calls if -- to check in.  One being the example

9    if we filled an antibiotic for a patient, they

10   can call and check -- call the patient a few

11   days later to see how the medication is going.

12   If they have questions, then they would be

13   referred to the pharmacists.

14         Q.    Okay.  So the pharmacists are

15   filling prescriptions.  They're giving

16   immunizations with goals from corporate in mind.

17   They're doing MTMs with goals from corporate in

18   mind.  What other tasks are the pharmacists

19   doing while they're on the clock?

20              MR. MAZGAJ:  Objection; misstates

21        testimony.

22         A.    I mean, I have schedules to write.

23   I have people to hire.  I can answer questions

24   from patients that come into the pharmacy.  I

1    still help where needed.  If we have techs on

2    break, I like to ring register.  I'm on the

3    phone with doctors' offices calling for refills,

4    with questions.  Insurance billing and issues I

5    can do as well.

6              There's always something to do.

7         Q.    Okay.  Any other tasks that you

8    can think of -- and not necessarily you, because

9    I know you're the manager, but any other tasks

10   that the staff pharmacists are participating in

11   outside of the ones that you've told us about

12   already?

13        A.    I mean, if the pharmacist is in --

14   I mean, it depends on who the pharmacist is

15   working, but they're equipped to handle

16   anything, even if it's directed towards me.

17   Even hiring, my staff pharmacist can do that as

18   well if I'm not there.  So they're there to me

19   and the pharmacy.

20        Q.    Can you flip with me, please, to

21   page 60 of the document you have there.  And let

22   me know when you're there.

23        A.    I'm there.

24        Q.    Okay.  And this -- the title at

```
1    the top of the page is "Introduction to

2    Drop-off."  I wanted to ask you a couple

3    questions about the type of information that you

4    collect when a new prescription is dropped off.

5    So I think you've already told me about date of

6    birth and allergies and also the name.

7               Is there any other information

8    that you would get from a new patient who's

9    dropping off a new prescription?

10              MR. MAZGAJ:  Objection to form.

11         A.   We collect their name, their date

12   of birth, allergies, their address, phone

13   number, their insurance information.

14         Q.   Do you take any type of medical

15   history when a new patient comes in with a new

16   prescription?

17         A.   We take their allergies to

18   medications.

19         Q.   Okay.  Anything other than that?

20         A.   No.

21         Q.   Okay.  Do you require

22   identification?

23         A.   We -- a lot of patients do give us

24   their ID to fill in that information, but we
```

1    don't require it.

2         Q.   Do you get any type of

3    prescription history from a new patient?  Is

4    that something that you collect?

5         A.   If it is a new patient --

6              MR. MAZGAJ:  Objection to form.

7         A.   If it's a new patient, usually the

8    pharmacist checking the prescription will make a

9    note of that and counsel the patient if that

10   medication list is not dropped off with it,

11   which isn't always the case.

12             Most of the time now we -- most

13   patients do give all of their prescriptions or

14   drop off all of their prescriptions, or at least

15   the med list if it's something new, at the data

16   verification screen.

17             Another -- in the DURs, we can see

18   some -- if there's a medication that they

19   received somewhere else, it will tell us if

20   there's an interaction with that drug so we can

21   see if it -- based on the insurance, what other

22   medications they're on.  And if it flags, we can

23   counsel them as well.

24        Q.   Okay.  So my question is a little

1    bit different.

2              I'm asking whether or not there's

3    a requirement that you ask the patient who

4    brings in -- who's a new patient, brings in a

5    new prescription, whether or not there's a

6    requirement that the Giant Eagle tech or

7    pharmacist ask them about a prescription

8    history.

9         A.    No, there's no requirement.

10        Q.    Okay.  Is a new patient who brings

11   in a new prescription asked questions about any

12   chronic conditions they may have?

13        A.    No.

14        Q.    Okay.  Does -- you know, you've

15   told us a couple of times that nowadays you

16   probably get more prescriptions, you know,

17   e-prescriptions.

18              Is that -- that's fair?

19        A.    Right.

20        Q.    Is there any type of -- once you

21   get an e-prescription from a new patient, is

22   there any step in the process where you contact

23   that patient and collect additional information

24   from them, or does the process start with just

1    the information that is provided in the

2    e-prescription?

3              MR. MAZGAJ:  Objection to form.

4        A.    I think -- I don't -- the

5    prescription doesn't really -- it gets entered

6    in by a technician.  We take the information

7    that we need to put them into the system.  If a

8    pharmacist at the data verification process has

9    a question on any of those things, that's when

10   we would either call the patient or call the

11   prescriber to get that information.

12       Q.    Okay.  Flip, if you would, please,

13   to page 62.  And in the middle of the page,

14   there's an entry that says "Presorted Promise

15   Time Organization."

16              Do you see that?

17       A.    Yes.

18       Q.    And underneath there, it says,

19   "There are three baskets at drop-off.  One

20   basket is for waiting prescriptions, one basket

21   is for prescriptions to be picked up later in

22   the day, and the third basket is for

23   prescriptions to be picked up tomorrow or

24   later."

```
 1                   Do you see that?

 2          A.    Yes.

 3          Q.    Is that the system that is still

 4   used at Giant Eagle and particularly at your

 5   store?

 6          A.    No, it is not.

 7                MR. MAZGAJ:  Objection.

 8          Q.    Okay.  Was that procedure ever

 9   used at your store or a store that you worked

10   at?

11          A.    Yes.  It was before -- I don't --

12   this must be really -- this is old.  I don't

13   know.  I barely -- I remember this, but I barely

14   remember this, so ...

15          Q.    Okay.  Go down to the second

16   paragraph that starts with "The PPT time."

17                Do you see that?

18                Are you with me?

19          A.    Yes.

20          Q.    Okay.  It says, "The PPT time is

21   standardized in stores.  Waiting prescriptions

22   are assigned a PPT time of 15 minutes from

23   drop-off, and later prescriptions are assigned

24   to be completed 90 minutes from drop-off."
```

```
 1                  Do you see that?

 2         A.    I see that.

 3         Q.    Okay.  Is there a presorted

 4   promise time or any type of promise time system

 5   in place at your store at Giant Eagle now as far

 6   as a communication that's standard to the

 7   customer about how long it will take to fill

 8   their prescription?

 9                  MR. MAZGAJ:  Objection to form.

10         A.    There's nothing -- I don't -- I

11   don't know what this is, but the -- right now

12   our system allows us to select "urgent waiting."

13   I believe there's "e-script."  There's a "today"

14   selection.  There's a "future date."  And then

15   there's a "future two-day."  I think that's all

16   of them.

17                  I don't -- I know -- I think

18   urgent immediately shows up.  We have color

19   codes.  Urgent immediately shows up as red in

20   our system and will be prioritized to the top of

21   our queue.

22                  Waiters will be right below urgent

23   in our system and are prioritized in our queue

24   that way.  Today I think is an hour or so.
```

```
 1   E-scripts might still be 90 minutes if they come

 2   through.  And then future date obviously is

 3   tomorrow.  Usually, like, the next day -- next

 4   business day after 12:00, because they might be

 5   filled at our off-site pharmacy.

 6                  So, yes, we have things like that

 7   built into the system to prioritize the work.

 8          Q.    Okay.  And so with those -- so

 9   what it sounds like is the prescriptions are

10   classified based on when the patient needs the

11   prescription?

12          A.    Yes.  We ask them when they drop

13   off the prescription or the -- if they're

14   e-prescribed, our system has something in place

15   where maintenance medications will usually be

16   put to the next day, and prescriptions that are

17   more of an urgent need are prioritized for that

18   day to be filled.

19          Q.    Okay.  And you mentioned some

20   times for some of the different types of

21   classifications.  So what is the time that a

22   waiter is supposed to be able to have their

23   prescription filled?

24          A.    I can't remember how long that is,
```

1    honestly, in the queue.  They get put to the top

2    anyway of our queue.  So they're usually dealt

3    with in the time that's needed, but I can't

4    remember what time is actually assigned to it.

5         Q.    Okay.  Well, what is the time that

6    an urgent prescription is supposed to be able to

7    be filled?

8         A.    That's just automatically put to

9    the top of our queue.  So it's -- urgents go

10   above waiting.  So they're just the one that --

11   it will automatically go to the top of anyone's

12   work queue so that it's dealt with first.

13   There's no time on that.

14        Q.    Okay.  And you said that these

15   prescriptions will be color coded based on the

16   time in which the customer has indicated that

17   they need the prescription to be filled?

18             MR. MAZGAJ:  Objection to form.

19        A.    We have like a bar at the top of

20   our screen for how much -- which prescriptions

21   are in which queue.  So if you are behind on

22   that time, it will -- if you're all on time,

23   it's green.  And then it will turn to red if

24   you're overdue for that time period.

Highly Confidential - Subject to Further Confidentiality Review

1          Q.    Okay.  So you -- okay.  I'm just

2    trying to visualize this, and maybe we'll see a

3    screenshot of it later and that will help us,

4    but I didn't see one when I was looking at some

5    of this material.

6               So what screen or dashboard is

7    this where you're seeing the queue?  Is this

8    just on the normal computer screen, or is this

9    somewhere else within the pharmacy?

10         A.    It's just the main screen on our

11   EPS program.  So it will -- it has like a -- it

12   shows how many prescriptions are in product ver,

13   how many are in fill, how many are in data entry

14   and data ver.  There might be a few other boxes,

15   but those are the ones that we pay attention to.

16   And it just shows how many are in there

17   throughout the day.

18         Q.    Okay.  And are all of those

19   different scripts that you may see in the

20   different stages of being filled, are they all

21   color coded based on whether or not it's a

22   waiter, or whether or not it's urgent or whether

23   or not it's an e-script?

24         A.    Yes.  Every prescription is coded

Highly Confidential - Subject to Further Confidentiality Review

1    in one of those buckets.

2         Q.    Okay.  Does each individual script

3    that you can see in each stage of the process

4    have a clock on it or any type of timer on it

5    that you can see so that you can know where you

6    are in the process?

7              MR. MAZGAJ:  Objection to form.

8         A.    So, like, up in the top corner, it

9    will show -- like if something flips to red like

10   it's waiting, I believe it gives, like, how

11   overdue it is, but we don't -- we don't really

12   look at that.

13             Sometimes -- I mean, even if you

14   put something in our call queue that was a

15   waiter but we had a question on it, when we get

16   that question answered and put it back into our

17   workflow, it still has the time on it from a day

18   ago that -- when it was a waiter.  It still has

19   that same time associated to it.  So, you know,

20   it could say a day overdue just by putting it

21   back into workflow.

22             So we don't really look at the

23   timing of it, more than the system sorts it for

24   us.  Whether -- you know, if it's -- I more look

1    at what's waiting that people are coming in

2    today for and what is future dated that we don't

3    have to address it right away, if that makes

4    sense.

5          Q.    Okay.  I'm not sure if you

6    answered my question or not.  So let me try it

7    one more time.

8                For each script that you can see

9    at different stages, can you see a clock or a

10   timer on each script or -- you've already told

11   us that you see an overall status bar at the top

12   that is either green or switches to red if you

13   get behind.

14               So my question is about each

15   individual script.  Can you see a timer or a

16   clock on each of them?

17         A.    No, there's no timer or clock on

18   the prescription.  If I looked in each

19   individual queue, it would probably have the

20   time associated with whatever bucket you're in,

21   so that would probably be the only way to look

22   at what time it's due.

23         Q.    Okay.  And as far as the overall

24   status bar, that's at the top of this screen?

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    MR. MAZGAJ:  Objection to form.

 2          A.    There's no time.  I mean, it might

 3    say something is overdue.  But like I said, I

 4    don't -- I don't really look at that.  I look at

 5    the buckets in front of me.  If I'm red, then I

 6    know I need to do -- to catch up.

 7          Q.    And I might be asking bad

 8    questions.  I'm not trying to figure out what

 9    you're looking at or what you're focusing on.

10                I'm trying to understand what the

11    system looks like and what it displays, because,

12    you know, there's many -- many folks that work

13    at Giant Eagle.  I've never seen this screen

14    before.

15                So that's what I'm trying to get

16    an understanding of, is what it looks like and

17    what it's displaying.  And then we can talk

18    later about where you focus your attention.

19                But this status bar that you've

20    said is either green or red that tells you where

21    you are or how you're doing based on your queue,

22    where is that status bar?

23                    MR. MAZGAJ:  Objection; misstates

24          testimony.
```

```
 1              A.   The bar is at the top of the
 2   screen.  And then I have my main bar in the
 3   middle of the screen that shows what's in each
 4   bucket, data entry, data ver.
 5              Q.   Okay.  So at the top of the
 6   screen, there's a horizontal bar that goes
 7   across the screen, correct?
 8              A.   Right.
 9              Q.   Okay.  And what are the options
10   for what color that bar could be?
11              A.   Green, yellow, red.
12              Q.   Okay.  What does green mean?
13              A.   It means that you're caught up
14   with what you're doing.  It's -- nothing is
15   overdue.  You're on time.
16              Q.   What does yellow mean?
17              A.   I'm not really sure.  I would say
18   it's probably close to a wait time, but -- I
19   think.  I don't know what that constitutes,
20   yellow, but that's my guess.
21              Q.   What does red mean?
22              A.   That you're overdue for a wait
23   time.
24              Q.   Okay.  Other than the bar turning
```

1    red, is there any other way that you and the

2    other pharmacists or the other pharmacy techs

3    are notified that you're behind?  Is there --

4    does it flash?  Is there a beep?  Is there an

5    e-mail that comes out that's standardized, or

6    anything else that happens to tell you you're

7    behind?

8                MR. MAZGAJ:  Objection; misstates

9         testimony.

10        A.    No, there's nothing else.

11        Q.    Okay.  What do y'all within the

12   store -- if you were to communicate to another

13   pharmacist or a tech that the bar has turned

14   red, how would you say that to somebody else in

15   the store?

16        A.    That we're in the red, so -- or

17   fills in red.

18        Q.    Okay.  And if somebody says,

19   "We're in the red" or "Fills in red," what does

20   that mean?

21        A.    That we need to do what we can to

22   help, whatever it may be.  So if data entry is

23   in red, the help pharmacist or the help

24   technician would concentrate on getting those

Highly Confidential - Subject to Further Confidentiality Review

 1    prescriptions entered into the system.

 2                    If fill was in red, we might have

 3    another one of our technicians that typically

 4    data enters to prioritize filling for about 10

 5    or 15 minutes, something like that.

 6           Q.    And is the time that it takes to

 7    fill a prescription something that is monitored

 8    by Giant Eagle corporate as far as one of the

 9    metrics that they look at for stores?

10                    MR. MAZGAJ:  Objection to form,

11           assumes facts.

12           A.    I don't know.  I've never -- I've

13    never had them ask me about that.  So I -- I

14    don't think so.

15                    MR. MAZGAJ:  Emily, we've been

16           going another hour.  How are you doing?

17                    THE WITNESS:  I could use a

18           bathroom break.

19                    MR. GADDY:  Sounds good.

20                    THE VIDEOGRAPHER:  Off the record,

21           1:57 p.m.

22                    (Recess taken.)

23                    THE VIDEOGRAPHER:  On the record,

24           2:04 p.m.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    - - -

 2          (Mooney Deposition Exhibit 2 marked.)

 3                    - - -

 4    BY MR. GADDY:

 5          Q.    Ms. Mooney, I'm going to turn now

 6    to a document that would have been delivered

 7    this morning.  It's document P-HBC-1432.  I

 8    think if you look at the upper right-hand

 9    corner, it's going to be one of your performance

10    reviews.

11                And let me know when you've found

12    the one that says 1432.

13          A.    Got it.

14          Q.    Do you see at the top of the page,

15    it says, "Annual Performance Review" for you,

16    for Emily K. Mooney?

17          A.    Yes.

18          Q.    Okay.  And you have -- you undergo

19    performance reviews at Giant Eagle on a periodic

20    basis, right?

21          A.    Annually, yes.

22          Q.    Okay.  Annually.  And I guess you

23    have an understanding that you are evaluated

24    based on certain criteria that Giant Eagle
```

1    corporate has proposed; is that right?

2         A.    Yes.

3         Q.    Okay.  And I've had the

4    opportunity to review a couple of these, and it

5    looks like the format that I understand it to be

6    in is corporate has proposed a criteria.  They

7    propose a way to measure whether or not you were

8    successful with what they propose, and then you

9    actually see the results as far as whether or

10   not you actually met that goal.

11               Does that sound about right?

12               MR. MAZGAJ:  Emily, take your time

13        to review the document if you need to.

14               THE WITNESS:  Okay.

15        A.    Yes.

16        Q.    Okay.  And then it also looks like

17   there's a place where you get to make some

18   comments about your performance on any

19   particular goal, correct?

20        A.    Yes.

21        Q.    Okay.  And let's just look at the

22   very first one up on -- up on the page.  You see

23   about halfway down it says, "Respect for team

24   members."

Highly Confidential - Subject to Further Confidentiality Review

```
 1         A.    Yes.

 2         Q.    Okay.  And it says -- under "What

 3    will you do," it says that the goal there was to

 4    "improve customer safety."

 5               Do you see that?

 6         A.    Yes.

 7         Q.    And then the next section asked

 8    how you'd measure that goal and it says,

 9    "Eliminate quality policy violations," and it

10    has some examples there, and it says, "Execute

11    all quality improvement measures."

12               Do you see that?

13         A.    Yes.

14               MR. MAZGAJ:  Objection to form.

15         Q.    And then over on the right -- to

16    the right of that, it asks, "What actually

17    happened?"  And it gives the results of your

18    performance on that particular metric.

19               Do you see that?

20         A.    I do.

21         Q.    And then below -- just below that,

22    we see the date range that this is for.  I'm not

23    sure why that wasn't at the top of the page.

24    But it looks like this time period that you're
```

1    being evaluated here is between July of '13

2    through June of '14.

3                    Do you see that?

4          A.     Uh-huh.

5                    MR. MAZGAJ:  Objection to form.

6          Q.     I'm sorry, Ms. Mooney.  You've got

7    to say yes or no.

8          A.     Yes.

9          Q.     Okay.  And then just below that,

10   it says you did a self evaluation, indicated

11   that you had met expectations.  And then below

12   that, you got to enter a comment saying that you

13   and your store significantly improved where it

14   comes to customer safety, eliminating MedSelect

15   and point-of-sale errors.

16                   Do you see that?

17         A.     I do see that.

18         Q.     Okay.  And that's the type of

19   process that you would go through for each of

20   these criteria that corporate has spelled out

21   for you to be evaluated on on your annual

22   performance review, correct?

23         A.     Yes.

24         Q.     Okay.  Turn the page, if you

Highly Confidential - Subject to Further Confidentiality Review

```
 1    would.

 2              MR. MAZGAJ:  Jeff, before we --

 3         Jeff, is this meant to be Exhibit 8?

 4         This is the second one you've entered,

 5         right?  I just wanted to make sure I'm

 6         not missing anything.

 7              MR. GADDY:  Yeah.  Thanks.  We'll

 8         mark this as Exhibit Number 2.

 9              MR. MAZGAJ:  Okay.  Great.  I just

10         wanted to make sure I wasn't missing

11         anything.  Thank you.

12    BY MR. GADDY:

13         Q.   If you'd turn with me, please,

14    Ms. Mooney, to the second page.  Do you see in

15    the middle of the page, there's a section that

16    says "Operational Excellence"?

17         A.   Okay.

18         Q.   And do you see that the goal

19    that's been provided there is "Improve customer

20    satisfaction."

21              Do you see that?

22         A.   Yes, I see that.

23         Q.   And then when it asks how you will

24    measure the success with this goal that's been
```

Highly Confidential - Subject to Further Confidentiality Review

1   provided by corporate, it says, "Achieve overall

2   satisfaction goal for the store."  It says,

3   "Achieve pharmacy overall satisfaction goal.

4   Achieve overall satisfaction for pharmacy core

5   experience focus areas," which it lists as

6   "friendliness" and the "time to fill

7   prescription."

8            Do you see that?

9            MR. MAZGAJ:  Objection; assumes

10       facts not in evidence.

11       A.    Yes, I see that.

12       Q.    Okay.  Do you recall that during

13   the fiscal year from July '13 through June of

14   '14, that one of the things corporate was

15   evaluating you on was your performance on scores

16   related to the time to fill a prescription?

17            MR. MAZGAJ:  Objection to form.

18       A.    I see that they put that in as a

19   marker, but that's one piece of a score.  These

20   surveys from the patient has a few things that

21   they answer survey questions about.  It's a

22   grocery store.  Every department has these

23   customer satisfaction scores.  It's listed this

24   far down for a reason.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                    I mean, our patient safety is the
 2      number one goal with Giant Eagle and for the
 3      company.  That's why it's listed first.  I mean,
 4      my safety is meets expectations.
 5                    This is just one piece of the
 6      grocery store part -- I mean, we are a grocery
 7      store, so that is -- that is a focus, is
 8      customer service, yes, but not at the expense of
 9      safety.
10                    MR. GADDY:  Okay.  I'm going to
11           move to strike that as nonresponsive.
12      BY MR. GADDY:
13           Q.    Ms. Mooney, my question is whether
14      or not you see that one of the criteria that
15      corporate was evaluating you on during this time
16      period was the time to fill a prescription.
17                    Do you see that?
18           A.    Yes, I see that, and --
19           Q.    Okay.  And do you have a general
20      understanding that that was a metric that
21      corporate was looking at and that they were
22      getting feedback from their customers on whether
23      or not they were happy with the time it took for
24      the pharmacy to fill a prescription.
```

1          Did you have a general

2    understanding of that?

3          MR. MAZGAJ:  Objection;

4      foundation.

5      A.   I don't -- I don't know.  I mean,

6    it's a metric here.  I'm not -- I don't remember

7    that being a metric.  It's not a focus of mine.

8    It's part of a review.  So that would not have

9    been a focus of mine on this review.

10     Q.   Okay.  I'm not asking if it was a

11   focus of yours.

12          I'm asking whether or not you are

13   aware by seeing it on this evaluation and by

14   making comments regarding this evaluation that

15   it was a metric that corporate was tracking

16   about whether or not customers were satisfied

17   with the time it took for your pharmacy to fill

18   a prescription?

19          Were you aware of that?

20     A.   I -- this document has made me

21   aware of this.  I see it.  Yes, I can read that.

22     Q.   Okay.

23          And over in the section that says

24   "What actually happened," it has a couple scores

1   at the top, and then it says, "Time to fill

2   prescription was 66 percent over current three

3   months' period up 13 percent from the previous

4   three months."

5                    Do you see that?

6                    MR. MAZGAJ:  Objection to form.

7           A.    I do see that.

8           Q.    So it looks like in this

9   evaluation, your pharmacy had improved their

10  score when it came to customer satisfaction with

11  the time it took to fill a prescription.

12                   Do you see that?

13          A.    I see what's written there, yes.

14  I don't -- I can read it.

15          Q.    Okay.  Did your pharmacy district

16  leader ever speak with you or any of the other

17  pharmacists about the types of metrics that

18  corporate was using to evaluate you and evaluate

19  your pharmacy?

20                   MR. MAZGAJ:  Objection;

21          foundation.

22          A.    This -- this review was done by my

23  store manager.  This isn't my PDL.  So this

24  is -- this is the manager of the store, Lisa.

1    So, no, my PDL did not speak with me about this.

2          Q.    Okay.  I'm sorry.  I wasn't asking

3    in the context of this document.  I was asking

4    generally.

5                Did your PDL ever speak with you

6    or other pharmacists about the metrics that

7    corporate was evaluating from your store?

8                MR. MAZGAJ:  Objection; compound,

9          lack of foundation.

10         A.    No, not that --

11         Q.    I'm sorry.  We keep talking over

12   each other.

13         A.    I said I'm not aware of my PDL

14   talking to me about this, no.

15         Q.    Okay.  Were you aware of the fact

16   that there were metrics that corporate was

17   looking at for your pharmacy?

18               MR. MAZGAJ:  Objection; assumes

19         facts, lack of foundation.

20         A.    We have a customer service score.

21   What metrics -- I don't understand what you're

22   asking.  I'm sorry.

23         Q.    That's fine.

24               So my question is whether or not

1    you are aware that corporate was reviewing

2    metrics from your store in whatever form that

3    was.

4              MR. MAZGAJ:  Objection; lack of

5         foundation, assumes facts.

6         A.    I mean, corporate does track

7    metrics.  I don't -- I don't know which ones --

8    I'm not -- I wasn't aware of them tracking time

9    to fill, if that's what you're asking.

10        Q.    What metrics does corporate track

11   that you're aware of?

12             MR. MAZGAJ:  Objection; form.

13        A.    From a performance review, I

14   don't --

15        Q.    I'm not asking in the context of

16   performance review.  You just said, "I mean

17   corporate does track metrics," and I'm asking

18   what you have an understanding of that corporate

19   tracks regarding your pharmacy.

20        A.    I know they track my

21   prescriptions, my labor, what -- how many

22   immunizations I do.  The amount of incidents for

23   safety is important.  That's usually -- the more

24   pharmacy related is what I'm really looking for

1    and what I am more aware of.  There's the safety

2    of the customer.  I mean, and then the typical

3    business markers that are listed here as well.

4    I mean, what is listed here is what they track.

5         Q.    Okay.  And can you flip the page

6    for me, please, to the Bates number on the

7    bottom right-hand corner that says -- ends in

8    156.

9         A.    Okay.

10        Q.    And do you see in the middle of

11   the page it says, "Profitable Growth."

12        A.    Yes.

13        Q.    And below that, another facet that

14   corporate was evaluating you on was whether or

15   not there was an increase in store operating

16   profit.

17               Do you see that?

18               MR. MAZGAJ:  Objection; misstates

19        the document.

20        A.    That's the goal, to increase store

21   operating profit.

22        Q.    Okay.  And that was a goal that

23   you as the pharmacy manager for the pharmacists

24   were being evaluated on here by Giant Eagle,

```
 1   correct?

 2         A.    That is the goal, yes.

 3         Q.    Okay.  And then when it asks how

 4   are you going to measure that, it says, "Achieve

 5   actual versus budget operating profit for the

 6   store."

 7               Do you see that?

 8         A.    Yes.

 9         Q.    Then there's some entries over on

10   the right regarding the budget and the actual

11   profit, indicating that it looks like you came

12   up $13,000 short of the budget for the operating

13   profit that you were shooting for.

14               Do you see that?

15               MR. MAZGAJ:  Objection to form.

16         A.    Right.

17         Q.    Okay.  And in the next entry down,

18   do you see the next goal is to "Increase sales"?

19         A.    Okay.

20         Q.    And the -- how that is going to be

21   measured is whether or not you achieve the sales

22   target goal for the store.

23               Do you see that?

24               MR. MAZGAJ:  Objection; misstates
```

1          the document.

2          A.    I do.

3          Q.    Okay.  And over to the right, when

4    it asks what actually happened, it indicates

5    that the Rx sales -- what does "Rx" mean?

6          A.    That is our prescription sales.

7          Q.    Okay.  So it says, "The

8    prescription sales were over $5.4 million."

9                Do you see that?

10         A.    I see that.

11         Q.    And your budgeted sales were

12   5.3 million, and you notice -- noted that you

13   met and exceeded your goal by over 2 percent.

14               Do you see that?

15               MR. MAZGAJ:  Objection; misstates

16         the document.

17         A.    I see the difference in the

18   2 percent, yes.

19         Q.    Okay.  And you rated yourself,

20   said -- gave yourself a 3, that you met the

21   expectations, or you said the store was close to

22   target sales.  The "pharmacy exceeded budgeted

23   sales for fiscal year 2014 which was a great

24   improvement over fiscal year 2013."

Highly Confidential - Subject to Further Confidentiality Review

1                    Do you see that?

2          A.    I see that.

3          Q.    If you flip to the top of the next

4    page, I want to look at the next facet on which

5    Giant Eagle was evaluating you as a pharmacist.

6    At the top of the page, do you see where it says

7    "Increase Script Volume"?

8          A.    Yes.

9          Q.    And that was the goal that was

10   presented here that Giant Eagle corporate was

11   evaluating you on, correct?

12                MR. MAZGAJ:  Objection; misstates

13         the document.

14         A.    The increased script volume, I see

15   that, yes.

16         Q.    Okay.  And the way to measure that

17   was they were asking you to achieve an increased

18   script volume over the previous year.

19                Do you see that?

20                MR. MAZGAJ:  Objection; misstates

21         the document.

22         A.    Yes.  We were just increasing the

23   volume over last year.  Yes, I see that.

24         Q.    Okay.  And then over on the

```
 1    right-hand column as far as "What actually

 2    happened," it indicates that the total

 3    prescriptions filled were 126,000 and change,

 4    which fell a little bit short of the budgeted of

 5    133,000 and change.

 6              Do you see that?

 7         A.   I do see that.

 8         Q.   Okay.  So corporate had given you

 9    a goal of filling 133,326 scripts during this

10    fiscal year, and it looks like you fell just

11    short of that.

12              Do you see that?

13         A.   I do see that.

14         Q.   Okay.  And down here in the

15    comments, it looks like you provided what looks

16    to be a reasonable explanation.  You said,

17    "While scripts have decreased, we discontinued

18    free antibiotics and diabetic medications in the

19    last year.  I believe this is responsible for

20    the decrease in prescriptions."

21              Do you see that?

22         A.   I do see that.

23         Q.   You go on to say that "Since our

24    sales have increased, I believe this number" --
```

```
 1   meaning the script number -- "does not have the

 2   same weight as in previous years."

 3              Do you see that?

 4       A.    Yes, I see that.

 5       Q.    Could you turn with me, please, to

 6   the Bates ending 159.

 7              Down at the bottom of the page, it

 8   says, "Level 3 Dealing with Ambiguity."

 9              Do you see that?

10       A.    I do.

11       Q.    Okay.  And I'm really just going

12   to ask you about the comment that you made

13   there.  You say, "Every day is different in the

14   pharmacy.  If you can't multitask, your

15   pharmacy" -- and you say "with."  I think you

16   meant "will."

17              But it says, "Every day is

18   different in the pharmacy.  If you can't

19   multitask, your pharmacy will struggle."

20              Do you see that?

21       A.    I do believe you need to

22   multitask, yes.

23       Q.    Okay.  You go on to say, "I'm

24   lucky to have a good group of pharmacists that
```

Highly Confidential - Subject to Further Confidentiality Review

1    can do this effectively."

2            Right?

3        A.    Right.  I do have a good team.

4        Q.    What do you mean when you say that

5    as a pharmacist, if you can't multitask, the

6    pharmacy will struggle?

7        A.    I believe that you need to be able

8    to do many things and focus on many things.

9    That's what a pharmacist does.  We're dealing

10   with customers, insurance, prescribers, and

11   checking prescriptions, and we need to do that

12   in a safe way.

13            So it's really important to be

14   able to multitask, to prioritize tasks, to make

15   sure that we get the correct medication to the

16   patients and to keep them safe.

17            So there's a lot that we have to

18   do, but it's something I enjoy doing and so do

19   the people that I work with.  So it's -- it's

20   not difficult to be able to do what is asked of

21   us and what I want to do as a pharmacist and go

22   over and above to do this.

23            So I absolutely agree.  If you

24   can't multitask, if you're not willing to do

1    that and work for that, it is a struggle, but

2    I'm looking up.  I don't have to worry about

3    that.

4         Q.   Ms. Mooney, I think you might have

5    some papers on the microphone.  We're getting a

6    lot of feedback from you.

7         A.   Sorry.

8         Q.   No, that's fine.  I just -- I know

9    it's hard for Carol sometimes to hear.

10              Now, from a general perspective,

11   you have an understanding that your performance

12   on these annual performance evaluations can

13   impact your pay and your advancement at Giant

14   Eagle; is that fair?

15              MR. MAZGAJ:  Objection to form.

16        A.    I disagree with that.  I think

17   that they -- the performance review, from what I

18   understand, does not have -- that I know of,

19   have any effect on my pay.  It might have to do

20   with advancement, but I've never seen it have to

21   do with my pay.

22        Q.    Okay.  So let me ask it a little

23   bit differently.

24              You have a general understanding

1    that your performance on these annual

2    performance reviews can impact your career at

3    Giant Eagle as far as how you progress through

4    the company or other aspects of your job at

5    Giant Eagle?

6            MR. MAZGAJ:  Objection; compound.

7        A.    I see these reviews as being

8    something that I can improve on for myself year

9    to year.

10           I get feedback from my -- from

11   whomever is doing the review for me, and then

12   use that to grow over the next year.  So I see

13   these more as a review just of myself and how to

14   do better.

15       Q.    Okay.  Do you have a general

16   understanding that your performance on these

17   reviews can impact your advancement through the

18   company, meaning if you do really well, you may

19   have good things happen to you career-wise.  If

20   you consistently don't do very well, you might

21   have not-so-good things happen to you

22   career-wise; is that fair?

23       A.    I see that.

24           MR. MAZGAJ:  Objection to form.

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    Since they do generally well, I

 2    see it more as something that I can work on on

 3    my own.

 4            Q.    Okay.  So was the answer to my

 5    question yes, that if you do well, you think it

 6    will positively impact your career?  If you

 7    don't do well, you think it may not positively

 8    impact your career?

 9            MR. MAZGAJ:  Objection;

10        foundation.

11            A.    To some extent.  I mean, I don't

12    have a lot of -- I mean, anyone that's done

13    these reviews has not explained anything of any

14    weight in affecting where I would go in the

15    company.  So I'm not aware of that.

16            Q.    Do you strive to meet the goals

17    that are set for you by corporate?

18            MR. MAZGAJ:  Objection; form.

19            A.    I see those goals as something to

20    look to, yes.  That's what a goal is.  So I want

21    to do my best, especially when it comes to

22    safety and working with others and making sure I

23    run a good pharmacy and have a good team.  Those

24    are important to me.  So I focus on a few of
```

1    these throughout the year.

2          So I use these as something that I

3    can work towards.  I usually pick something like

4    safety or the team -- team building as something

5    to do better each year, workflow, things like

6    that.

7          Q.    So, yes, you strive to meet the

8    goals that are set for you by corporate?

9          MR. MAZGAJ:  Objection; asked and

10         answered.

11         A.    I strive to look towards those

12    goals that I just told you, yes.

13         MR. GADDY:  Let's look at

14         P-HBC-1440, which is going to be in that

15         same group that was delivered this

16         morning.

17              We'll mark this as Exhibit

18         Number 3.

19                   - - -

20    (Mooney Deposition Exhibit 3 marked.)

21                   - - -

22    BY MR. GADDY:

23         Q.    Tell me when you've found this

24    one, Ms. Mooney.

```
 1          A.    Oh, I do.  I have it.

 2          Q.    Okay.  And you see this one at the

 3   top --

 4               MR. GADDY:  And, Matt, we got

 5          several of these with her Social

 6          Security number on it.  Obviously, we

 7          don't need that.  If you want to --

 8               MR. MAZGAJ:  Oh, sorry about that.

 9          Yep.  Thank you.

10               MR. GADDY:  If you want to swap

11          these out and make a note about that.

12               MR. MAZGAJ:  We will.

13               MR. GADDY:  And then obviously

14          we'll be fine with that.

15               MR. MAZGAJ:  Thank you.

16   BY MR. GADDY:

17          Q.    Ms. Mooney, you see this looks

18   like your performance appraisal, it looks like,

19   in fiscal year 2011?

20          A.    Okay.

21          Q.    And you see it lists you -- at

22   that point in time, you were a floater, correct?

23          A.    Yes.

24          Q.    Okay.  And what I really wanted to
```

```
 1    ask you about was a couple of the comments.

 2    This is on the second page.

 3                   MR. MAZGAJ:  Emily, take the time

 4         that you need with the document.

 5                   THE WITNESS:  Okay.

 6         Q.    Okay.  Do you see the comment

 7    section on kind of the top half of the second

 8    page?

 9         A.    Yes.

10         Q.    You say -- in the first one where

11    it says to describe strengths, you say, "I work

12    well with others, can work in most any

13    environment, busy or slow stores."

14              What do you mean by that?

15         A.    The change of pace.  I can work

16    well either way, by being busy or slow.  I can

17    always find something -- something to do,

18    something to work on.

19         Q.    Okay.  Again, you reference

20    multitask.  You say, "I can multitask."  And we

21    looked at that another time, and you've already

22    told us how important that is for a pharmacist,

23    correct?

24         A.    Yes, I can multitask.  I can do a
```

Highly Confidential - Subject to Further Confidentiality Review

1   lot of things.  Yes.

2           Q.    Okay.  In your experience over the

3   course of your career as a pharmacist, have you

4   had the opportunity to see -- whether it's in

5   your own store or maybe it's during the period

6   of time that you were floating and going to 15

7   to 20 stores on kind of a rotating basis, have

8   you had the opportunity to see or come into

9   contact with pharmacists who maybe multitasking

10  was not a strength for them?

11          MR. MAZGAJ:  Objection; misstates

12          testimony, foundation.

13          A.    No.  I mean, for the most part, I

14  think Giant Eagle pharmacists can adapt well to

15  any environment.  I haven't had any issue

16  working with anybody.  So, yeah, I would say, in

17  general, most pharmacists can do that.

18          Q.    Okay.  I'm not -- I'm not asking

19  you in general.  I'm asking whether or not

20  there's ever been a course during the time while

21  you've been with Giant Eagle that you've run

22  into a pharmacist that you, you know, made a

23  determination that they can't really multitask,

24  and maybe they cut corners.  And maybe -- just

Highly Confidential - Subject to Further Confidentiality Review

1    like there's folks that are high performers and

2    low performers at probably every profession in

3    the world, I'm asking whether or not you've ever

4    run into any low performers as far as

5    pharmacists in the Giant Eagle world.

6             MR. MAZGAJ:  Objection; compound,

7         foundation, misstates testimony.

8         A.    Yeah, I think I'm -- you're

9    generalizing that -- I mean, I don't -- I don't

10   see any low performers.  I mean, Giant Eagle

11   doesn't -- I don't know.  Every pharmacist I've

12   worked with does not cut corners, like you said.

13   Absolutely not.  We take our jobs really

14   seriously.  We have a license to take our jobs

15   seriously.  So, no, I don't.

16        Q.    Have you in your time ever had to

17   recommend a pharmacist be terminated or

18   disciplined?

19        A.    Not that I can recall.

20        Q.    Okay.  Are you aware of any

21   pharmacist within Giant Eagle ever being

22   terminated?

23             MR. MAZGAJ:  Objection; form.

24             Are you talking about for cause

```
 1              or -- I mean -- sorry.  Sorry.

 2         A.    I don't -- I don't know.  I mean,

 3    I know of people not working for the pharmacy

 4    anymore, but I don't know reasons why they're

 5    not working.  So I don't know if I know of

 6    someone terminated.

 7         Q.    Let me ask you about the next

 8    comment that you make on here.  It's in the

 9    "Developmental Opportunities" section.

10              Do you see that?

11         A.    Yes.

12         Q.    It says, "I would like to work on

13    better mystery shop scores.  Extra mile

14    continues to evade me."

15              Do you see that?

16         A.    Yes.

17         Q.    Can you explain to me what you're

18    referring to there as far as "mystery shop

19    scores"?

20         A.    Yes.  Mystery shop was something

21    Giant Eagle used a long time ago, so in 2012,

22    '13, where they would have people come to the

23    pharmacy, ask for, like, a recommendation or a

24    product, or they would be rung out at the
```

```
 1  pharmacy for something that they bought in the

 2  store.

 3              Giant Eagle -- I like that they

 4  push, you know, customer service, to talk to the

 5  customer.  So when -- for the pharmacy anyway,

 6  we would go out into the store and help the

 7  customers.  We still do that.  It kind of brings

 8  us to -- like puts a face to the pharmacist and

 9  gets us out into the store to help customers.

10              So it was just kind of like an

11  added step to try to get us out there and

12  working with customers.  And then they would

13  score us on -- I'm not sure on what exactly.  It

14  wasn't always the pharmacists.  It was

15  technicians too that they would focus on.

16              I can't remember exactly what the

17  extra mile is in regards to that, but that was

18  the gist of the mystery shop.

19       Q.    Okay.  So it was some type of

20  program where somebody would come in undercover,

21  for lack of a better word, pretend to be a real

22  customer, but really they're evaluating how your

23  customer service skills were.

24              Is that a fair description?
```

```
 1              A.     Right.

 2              Q.     Okay.  Has there ever been any

 3      program at Giant Eagle that you're aware of

 4      where they would do anything with kind of a

 5      mystery shopper type context to it where they

 6      would present a controlled substance

 7      prescription, and that you would be evaluated on

 8      kind of your due diligence process or your

 9      evaluation of filling that prescription?  Are

10      you aware of Giant Eagle ever having a program

11      like that for prescriptions as opposed to

12      picking items off a shelf?

13              A.     Absolutely not.  I think there's

14      just way too many legal issues with that.  I

15      don't even know how you could do something like

16      that, so no.

17                     MR. GADDY:  I'll move to strike

18              everything after "absolutely not."

19                            - - -

20         (Mooney Deposition Exhibit 4 marked.)

21                            - - -

22      BY MR. GADDY:

23              Q.     There's one more of these I want

24      to look at.  Look at P-HBC-1446.  It's going to
```

Highly Confidential - Subject to Further Confidentiality Review

1   be in the same envelope from this morning.

2           Let me know when you've got it.

3       A.    I have it.

4       Q.    Okay.  Do you see your name at the

5   top left where it says "Pharmacy Team Leader"?

6       A.    Yes.

7           MR. MAZGAJ:  Take the time you

8       need, Emily.

9       Q.    And over on the right-hand side,

10  it has your location number, the 6377,

11  Painesville Supermarket, and it has a date range

12  of July through September 2020.

13          Do you see that?

14      A.    Yes, I see that.

15      Q.    Okay.  I want to ask you about

16  the -- an entry you made on the third page of

17  this document in response to a "Mid-year Focus

18  Question," which is at the top of the third

19  page.

20          MR. MAZGAJ:  Emily, have you had a

21      chance to review the document to your

22      needs?

23          THE WITNESS:  No.

24          MR. MAZGAJ:  Okay.  Take your

```
 1          time.

 2   BY MR. GADDY:

 3          Q.    Are you ready, Ms. Mooney?

 4          A.    Yes.

 5          Q.    Okay.  You see the top of page 3,

 6   it says, "Mid-year Focus Question"?

 7          A.    Yes.

 8          Q.    And then there's a question, it

 9   says, "Consider our core values."  It says, "In

10   the comment box below, please describe how you

11   demonstrated these core values in your role."

12                Do you see that?

13          A.    Yes.

14          Q.    And then under the response, you

15   have five different entries or five different,

16   what I'd call, headings.  You say, "Be Kind,"

17   and then a couple lines down, it says, "Think

18   Team," and it says, "Step Up," and it says,

19   "Work Smart," and then it says, "Live Well."

20                Do you see those different

21   headings?

22          A.    I do.

23          Q.    Okay.  And are those some of the

24   core values that it's being referred to at Giant
```

```
 1   Eagle?

 2          A.    Those -- yes.  At the beginning,

 3   yes.

 4          Q.    Okay.  And under the "Step Up"

 5   value, you indicated that "I try to encourage my

 6   team to take pride in our store metrics and to

 7   step up and help."

 8                Do you see that?

 9          A.    I do, yes.  In this instance, I

10   was -- I really push the team involvement in the

11   immunizations.  So this one in particular, we

12   had a poster, a whole board, made to try to get

13   the whole team involved in getting immunizations

14   out to the community, so that was that one.

15          Q.    Okay.  And so this was in, it

16   looked like, July to September of last year.  So

17   what type of immunizations are you talking about

18   that you were pushing the team to get out and

19   perform?

20          A.    Flu shots in particular, but we

21   also have SHINGRIX, the shingles vaccine.  Those

22   are -- were our two big ones at that time.

23          Q.    And these aren't immunizations

24   that Giant Eagle gives out for free, are they?
```

```
 1           A.    No, they're not.

 2           Q.    Okay.

 3           A.    Most of them are covered by

 4   insurance, especially the flu shots.  There's

 5   really no copay on the flu shots.  Insurance

 6   usually covers that.

 7           Q.    Sure.  And insurance is paying

 8   Giant Eagle when they administer these things,

 9   correct?

10           A.    Yes.

11           Q.    Okay.  Now, as a pharmacist, you

12   are eligible to receive an annual bonus; is that

13   correct?

14           A.    I am.

15           Q.    Okay.  And are you aware that

16   there's different criteria that are looked at to

17   determine the size of your bonus each year?

18               MR. MAZGAJ:  Objection to form.

19           A.    I usually get an e-mail every

20   couple years about those metrics.  Yes.

21           Q.    And I don't want to get into

22   specific numbers, but you agree that over the

23   last several years, you've gotten a bonus of

24   several thousand dollars at the end of the year
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   based on your performance as it relates to those

 2   metrics that corporate would tell you about?

 3              MR. MAZGAJ:  Objection to form.

 4        A.    Yes, I have gotten a bonus, and

 5   it's just something that comes in my account

 6   once a year.  So, yes, that is how I see my

 7   bonus.

 8        Q.    But -- I mean, you're not

 9   quibbling with the fact that it's thousands of

10   dollars, right?

11        A.    I agree with you.  Yes, I do get a

12   bonus every year.

13              MR. GADDY:  Let's look at tab --

14         I'm sorry.  I can't remember if we

15         marked that last one as an exhibit.  I

16         think that would have been Exhibit

17         Number 4.

18              MR. MAZGAJ:  It would have been 4,

19         yeah.

20              MR. GADDY:  Okay.  We'll mark that

21         one as Exhibit Number 4.

22                        - - -

23      (Mooney Deposition Exhibit 5 marked.)

24                        - - -
```

```
 1   BY MR. GADDY:

 2        Q.    And then as Exhibit Number 5,

 3   Ms. Mooney, I'm going to go to your tab 17.

 4   It's P-HBC-1385.

 5        A.    Where is that at?  I'm sorry.

 6        Q.    It's going to be back in the

 7   binder.

 8        A.    Oh, in the binder of the -- and

 9   what tab was that?

10        Q.    17.

11        A.    Okay.  Sorry.

12        Q.    And we'll mark this as

13   Exhibit Number 5.  It should say, "Giant Eagle

14   Bonus 2015 Pharmacy."

15              Let me know when you've got that.

16        A.    I see it.  Yes.

17        Q.    And at the top under the

18   "Purpose," it says, "The pharmacy bonus program

19   is designed to encourage team members to work as

20   a team toward a common goal of improving company

21   profitability and prescription volume."

22              Do you see that?

23        A.    I see that.

24              MR. MAZGAJ:  If you need to review
```

 1           the document, Emily, please do so.

 2           Q.    Do you see under the Roman

 3    Numeral II, it talks about a pharmacy team

 4    leader bonus calculation.

 5                Do you see that heading?

 6           A.    I do, yes.

 7           Q.    Okay.  Is it fair to say that

 8    that's your role; you're a pharmacy team leader?

 9           A.    Yes, I'm a team leader.

10           Q.    Okay.  And for bonus percentages

11    underneath there and then on the right, there's

12    a minimum bonus of 1 percent, a target of

13    2 percent, and a maximum of 3 percent.

14                Do you see that?

15           A.    Yes, I can see that.

16           Q.    Okay.  And then this policy in the

17    next section gives you the pharmacy performance

18    modifiers that are being looked at to determine

19    the size of the bonus that's given to somebody

20    in the position of pharmacy team leader.

21                Do you see that?

22           A.    I do.

23           Q.    Okay.  And the first metric or

24    modifier that's listed there that dictates a --

1    the size of the bonus is the "Prescription Unit

2    Volume."

3              Do you see that?

4              MR. MAZGAJ:  Objection to the

5         description of the document.

6         A.    I see the prescription unit

7    volume, yes.

8         Q.    And do you see that as a

9    pharmacist fills more prescriptions, the amount

10   of their bonus increases?

11             MR. MAZGAJ:  Objection; form.

12        A.    I do see that their bonus would go

13   up if they filled more prescriptions.

14        Q.    Okay.  And do you see that the

15   second pharmacy performance modifier that is

16   included for somebody in your role of a pharmacy

17   team leader is "Profitability"?

18        A.    I see profitability listed, yes.

19        Q.    And there's two different

20   measurements that are listed there.  The first

21   says, "Generate a direct business line profit

22   and show a positive increase over the last

23   fiscal year."

24             Do you see that?

```
 1              A.    I see the lines, yes.

 2              Q.    And the next one is "Dollars per

 3    prescription, goals will be specific per

 4    location."

 5                    Do you see that?

 6              A.    I do.

 7              Q.    And so you understand that the

 8    more profit, meaning the more sales, that a

 9    pharmacist generates for Giant Eagle, the bigger

10    the bonus will be for that pharmacist?

11                    Do you see that?

12                    MR. MAZGAJ:  Objection.

13              Objection; foundation.  I'll leave it at

14              that.

15              A.    I do.  I do see that under

16    profitability.

17              Q.    And one way to increase the profit

18    and increase the sale is to fill more

19    prescriptions, correct?

20                    MR. MAZGAJ:  Objection; form.

21              A.    Yes.  If you fill more

22    prescriptions, you would have more profit.

23              Q.    And, therefore, the pharmacist

24    would have a bigger bonus, correct?
```

1          A.    By this sheet, yes.

2                    - - -

3          (Mooney Deposition Exhibit 6 marked.)

4                    - - -

5     BY MR. GADDY:

6          Q.    Okay.  Let's look at tab 19 in

7     your binder.  That's going to be P-HBC-1389.

8                    And that last one should have been

9     Exhibit 5.  So this will be Exhibit Number 6.

10                   And, Ms. Mooney, do you see this

11    is the Giant Eagle 2017 bonus program?

12                   Do you see that?

13         A.    Yes, I see that.

14         Q.    Okay.  And, again, under the

15    "Purpose," it says, "The bonus program is

16    designed to encourage team members to work as a

17    team toward a common goal of improving company

18    profitability and prescription volume."

19                   Did I read that correctly under

20    "Purpose"?

21         A.    I see that.  Yes.

22         Q.    Okay.  And it looks like the two

23    primary goals or metrics or modifiers for

24    determining a bonus are the same, "Prescription

1    Volume" and "Profitability."

2              Do you see that?

3              MR. MAZGAJ:  Objection to form.

4         A.    Yes, I'm reading that.

5         Q.    Okay.  And, again, with

6    "Prescription Unit Volume," the more

7    prescriptions that a pharmacist fills, the

8    bigger their bonus, correct?

9              MR. MAZGAJ:  Objection;

10         foundation.

11         A.    Yes.  That would -- yes.

12         Q.    Okay.  And, again, under

13    "Profitability," do you see that the same

14    general concept applies, the more income that

15    the pharmacist generates for the business, the

16    bigger their bonus.

17              Do you see that?

18              MR. MAZGAJ:  Objection;

19         foundation.

20         A.    I see that.  Yes.

21         Q.    And it looks like here under the

22    "Measurement" section, there was an item added

23    to this one that we didn't see on the last one

24    for achieving the immunization goal that you

Highly Confidential – Subject to Further Confidentiality Review

```
 1    talked about a few moments ago.

 2              Do you see that?

 3         A.    Yes.  They are putting the

 4    immunization goals on there.  My goals are a

 5    little different for doing that.  I'm not --

 6    more to get the immunizations out to the

 7    community, but I see that on there.

 8         Q.    Okay.  Well, regardless of how you

 9    see it, the way that corporate saw it was that

10    the more -- if a pharmacist achieved their

11    immunization goal for the year, they would

12    increase the bonus that they paid to that

13    pharmacist, correct?

14         A.    I see -- yes.

15              MR. MAZGAJ:  Objection.

16         Objection; foundation.

17         Q.    Okay.  And as far as the increase

18    of -- prescription volume increasing the bonus,

19    that would include prescriptions for opiates

20    such as oxycodone or hydrocodone combination

21    products or the like, correct?

22              MR. MAZGAJ:  Objection; form.

23         A.    Oxycodone, opiate prescriptions

24    are a part of the prescriptions, yes, even in a
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   small amount.  Yes.

 2                        - - -

 3        (Mooney Deposition Exhibit 7 marked.)

 4                        - - -

 5   BY MR. GADDY:

 6           Q.    Okay.   Look at your tab number 20,

 7   which is going to be P-HBC-1390.

 8                 So if that was Exhibit 6, this

 9   should be Exhibit Number 7, please.

10                 MR. MAZGAJ:  Emily, how are you

11           doing?  Do you need a break any time

12           soon?

13                 THE WITNESS:  No.  What time is

14           it?  Yeah, probably like ten minutes or

15           so would be good.  In about ten minutes,

16           maybe, we can take a break.

17                 MR. GADDY:  We can do one right

18           after this document, if that's okay with

19           you?

20                 THE WITNESS:  Okay.  That would be

21           great.

22   BY MR. GADDY:

23           Q.    Okay.   You see this one that we're

24   marking as Number 7 says, "Giant Eagle Bonus
```

1    2020."

2                    Do you see that?

3         A.    Yes, I see that.

4         Q.    So this would have been the bonus

5    program as of last year, right?

6         A.    That's what it says, yes.

7         Q.    Okay.  And under "Purpose," it's

8    still talking about this "common goal of

9    improving company profitability and prescription

10   volume."

11                   Do you see that?

12        A.    Yes, I see that.

13        Q.    And, again, if you look under the

14   pharmacy performance metrics or modifiers that

15   are being looked at to determine the size of the

16   bonus, we're continuing to see increased

17   prescription fills leads to increased bonus for

18   a pharmacist, correct?

19             MR. MAZGAJ:  Objection to form.

20        A.    Yes.  These are measurable items.

21   Yes, I see that.

22        Q.    Okay.  And, again, we continue to

23   see that increased profitability, meaning

24   achieving immunization goals, engaging in

1  increased auto fills.  This is even talking

2  about text enrollments for customers.  Hitting

3  those types of metrics will also cause an

4  increase in bonus amount for the pharmacist,

5  correct?

6              MR. MAZGAJ:  Objection to form.

7         A.    Yes, and also increased safety

8  with this one.  So that's good.

9              MR. GADDY:  Okay.  That's all the

10          questions I have about this document,

11          Ms. Mooney.  Did you want to go ahead

12          and take that break now?

13              THE WITNESS:  Yeah, that would be

14          great.

15              MR. GADDY:  Okay.

16              THE VIDEOGRAPHER:  Off the record,

17          2:57 p.m.

18              (Recess taken.)

19              THE VIDEOGRAPHER:  On the record,

20          3:08 p.m.

21                   - - -

22       (Mooney Deposition Exhibit 8 marked.)

23                   - - -

24

1    BY MR. GADDY:

2         Q.    Ms. Mooney, let's please go to

3    tab 7 in your binder, which is going to be

4    P-HBC-1399.  And we'll mark this as Exhibit

5    Number 8.

6         A.    Okay.

7         Q.    And let me know when you got

8    there.

9         A.    I do.  Yes.

10        Q.    Okay.  It looks like a Giant Eagle

11   PowerPoint presentation.  Again, I don't have a

12   date on this one, but I think it's going to have

13   some screenshots of the new -- or maybe I should

14   say the current software dispensing platform

15   that you utilize.  And so I just want to ask you

16   some questions about that.

17             So there is a page number at the

18   bottom right.  Can you turn with me to page 98,

19   and you should have a slide that says

20   "Introduction to EPS II."

21        A.    Okay.

22        Q.    Do you know what EPS II is?

23        A.    That's my pharmacy software

24   system.

```
 1           Q.    Okay.  How long have you been

 2    using EPS II?

 3                 MR. MAZGAJ:  Objection to

 4           foundation and the document.

 5           A.    I'm not sure.  Probably 2014,

 6    around about.

 7           Q.    Okay.  If you look at the next

 8    slide on the next page, it says, "EPS II

 9    Overview."  It says, "New software will replace

10    the current Legacy version of PDX."

11                 And that was the version you used

12    before this, PDX; is that right?

13           A.    Yes.

14                 MR. MAZGAJ:  Objection to form.

15           Q.    Okay.  Turn the page with me to

16    page 101 where it should say "EPS II Screens."

17                 Do you see that?

18           A.    Yes, I see that.

19           Q.    Is that a screen you recognize?

20           A.    Not -- it's not the same as my

21    screen, but similar.  It's similar.

22           Q.    Is there anything materially

23    different about it?  I mean, any information

24    that you have on your screen that you don't see
```

1   here?

2         A.    I don't think so.  I mean, more

3   just the -- maybe just the layout of it.  Yeah.

4   I mean, for the most part, it's the same order

5   entry/data entry.  I don't know -- that's

6   different.  I don't know what that is, but there

7   is an order entry, a will call, a data entry, so

8   it's similar.

9         Q.    Okay.  Let's keep going through a

10  couple of these, and let me let you comment on

11  them.

12             So the next screen on the next

13  page says, "Data Entry," if you flip the page.

14             And do you see that?

15        A.    Yes.

16        Q.    So I guess my first question is,

17  what we see in the bottom left-hand corner of

18  that slide, is that the old data entry version?

19        A.    Yes.  That was our old system.

20        Q.    Okay.  So this was the old PDX

21  that the EPS II replaced, right?

22        A.    Yes.

23        Q.    Okay.  And so this -- in the top

24  right-hand section of this screen, is that your

Highly Confidential - Subject to Further Confidentiality Review

```
 1   current data entry screen?

 2         A.    Similar, yes.  Pretty close.

 3         Q.    Okay.  And so when you were

 4   talking to us before about how you would enter

 5   the patient name and scan in the prescription,

 6   and enter the instructions from the

 7   prescription, that's what we're seeing here,

 8   correct?

 9         A.    Right.

10         Q.    Okay.  You told us before that you

11   had the ability to make notes about the

12   prescription that would have shown up as bullet

13   points.  Where does that happen?

14         A.    It would -- it's a box that would

15   be underneath where that prescription is, so

16   that's not on this screen.  But it's a box that

17   would be below -- below that prescription that

18   was scanned in where it would say, "Add Image

19   Note."

20         Q.    Okay.  And is it a -- is it a text

21   box that you would see there on the screen, or

22   is it something you click and a text box pops

23   up?

24         A.    You would see the box at the
```

Highly Confidential - Subject to Further Confidentiality Review

1    bottom of the screen.  It will be in yellow.

2         Q.    Okay.  And you click in it and you

3    can make whatever notes you want to make?

4         A.    If you add the image note, that's

5    a button you would click to add.  If you want to

6    view the box, anything else -- because you can

7    add multiple notes.  You can click on the box to

8    view those.

9         Q.    Anything else that's jumping out

10   at you about this data entry template here

11   that's different as far as what you actually use

12   now today in the store?

13        A.    I mean, everything is kind of in a

14   different spot.  We have more controls to

15   view -- low profile prescriber, insurance, the

16   notes box.  Yeah.  I mean, there's -- nothing is

17   jumping out at me.  But, again, things are kind

18   of different spatially than what I'm used to,

19   so ...

20        Q.    Okay.  In addition to the image

21   notes that you indicated is on your screen at

22   your store, is there another notes field on this

23   screen?

24        A.    There is one right on the top

```
 1    there, on the top right.  It's "Notes," so you

 2    can write a note specific for that fill.  You

 3    can have -- check the box to write a note for

 4    all fills of that prescription.

 5              I believe you can -- usually those

 6    are for the prescription itself.  Then if you

 7    click on the patient note, that will bring up

 8    their notes from the profile.  So there's a few

 9    that you can click through there and then add to

10    if needed.

11              If I -- you can do it from this

12    screen or from the data verification screen.  If

13    I had a note for counseling for the patient, I

14    would put it in that "This Fill" note and check

15    that counsel box.  But those -- that's where I

16    would put the notes.

17         Q.   Okay.  You told us earlier, I

18    think you said, for every Schedule II

19    prescription, you check OARRS; is that right?

20         A.   For every controlled prescription,

21    I check OARRS.

22         Q.   Okay.

23         A.   And for --

24         Q.   I'm sorry.  Go ahead.
```

Highly Confidential - Subject to Further Confidentiality Review

1          A.     Sorry.  Anything that's on OARRS,

2    including Gabapentin, which isn't scheduled, I

3    check.  So anything that is reported there, I

4    will check.

5          Q.     Okay.  Is there anywhere within

6    the software that you are -- that you are

7    required to make a note or check a box that you

8    checked OARRS or the PDMP?

9          A.     Yes.  We can write in those notes,

10   "verified OARRS, checked OARRS," and then put

11   our notes standard after that showing that we

12   did indeed check it.

13              Now that it's integrated into our

14   system and we -- it won't let us go to the next

15   screen until we do check the OARRS.  But before

16   that, yes, we always put a note in that it was

17   verified with the time -- or the date that we

18   did and for what medication we did.

19          Q.     Okay.  Let me ask you a couple

20   questions about that, and let me kind of tell

21   you where I'm going here before I go there to

22   make this a little more efficient.

23              Again, you've told us throughout

24   the course of the day about some things that you

1    do that kind of seem to be maybe a little above

2    and beyond that maybe isn't required by the

3    software or the policies or procedures of

4    corporate, and so I want to make sure that I

5    understand the difference between the two.  And

6    then I also want to understand this OARRS being

7    built in.

8                    So let me -- let me start with

9    this:  Currently there is a -- the system

10   requires you to check OARRS before filling a

11   controlled prescription; is that correct?

12         A.    Yes.  You can -- you have to

13   double-click on the link to OARRS.  You can

14   override that, but I don't do that.  I check

15   OARRS every time.  So, yes, it's built into the

16   system.  It makes it a little more user

17   friendly.

18                    Before that, we would have to log

19   in to our own OARRS account.  I would just have

20   another screen up on my computer, and as I was

21   checking the prescription, I would input the

22   information into OARRS.

23         Q.    Okay.  But the way the system is

24   now is in order to advance through the process

Highly Confidential - Subject to Further Confidentiality Review

1   of filling the prescription, you must

2   double-click on the OARRS website?

3           A.    Yes.

4           Q.    Okay.  Is there anything that you

5   have to do other than double-clicking on the

6   OARRS website in order to move forward through

7   the process?

8                 MR. MAZGAJ:  Object to form.

9           A.    The process of checking a

10  prescription?

11          Q.    Well, I'm asking do you -- is

12  there required -- does the system force you to

13  search for the name of the patient?  Does the

14  system automatically populate the information

15  for the patient?  What happens after you

16  double-click on OARRS in the process of filling

17  a controlled prescription?

18          A.    Well, the OARRS is built into the

19  system during the data verification screen.

20  This is the data entry screen where all of that

21  information is already inputted.

22                For the pharmacist checking the

23  prescription, we would -- yes, we have to click

24  on anything that's a fault in the system.  An

Highly Confidential - Subject to Further Confidentiality Review

1    allergy would be one.  OARRS is another one.

2    Any other DURs that come up that flag, we have

3    to acknowledge each one or override them before

4    we can go to the next screen.

5             So there's a lot of systems in

6    place for us to do another check on that

7    prescription, whether it be interactions or

8    duplicate therapy, allergies, all of those would

9    be in the DUR field of the data verification

10   screen.

11        Q.    Okay.  And I apologize, because

12   I've kind of gone off on a tangent because you

13   mentioned OARRS.  So I'm not worried about this

14   screen or the document that's up on the screen

15   right now.

16             What I'm trying to make sure I

17   understand is this process that you're telling

18   me about that OARRS is built into the system.

19             So let me first ask, when did

20   OARRS become a requirement within the dispensing

21   system where you had to double-click on the

22   OARRS link in order to move forward?  When did

23   that happen?

24        A.    I'm not sure, really.  A few years

1  ago.

2          Q.    Okay.  So as of approximately two

3  years ago when that became a requirement of the

4  system, when you double-click on the OARRS link,

5  what is the next thing that you see?  What pops

6  up?  Is it the home page for OARRS?  Is it

7  something different?  What do you see?

8          A.    No.  It is --

9              MR. MAZGAJ:  Objection to form.

10         A.    It brings you to that patient's

11 OARRS report.

12         Q.    Got it.

13         A.    Directly to it.

14         Q.    Okay.  And is there anywhere from

15 that report that you would ever need to navigate

16 from, or is all the information for that patient

17 displayed right there on that OARRS report?

18         A.    In regards to the drugs that are

19 put into OARRS, everything is on that report for

20 that patient.

21         Q.    Okay.  Are there other reports

22 within OARRS that you as a pharmacist have

23 access to?  For example, can you pull a report

24 on a doctor in OARRS?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     No.  OARRS is just the reporting

2     system for drugs that are filled.  I'm not aware

3     of anything we can do with doctors.

4          Q.     Okay.  But when you see a report

5     for a particular patient, it will give you

6     information about what other prescriptions

7     they've had filled, correct?

8          A.     Correct.

9          Q.     And it will give you reports about

10    other doctors -- about the doctors that have

11    filled those prescriptions?  It will give you

12    that doctor's name, correct?

13              MR. MAZGAJ:  Objection to form.

14         A.     Yes.  It will give you the

15    doctor's information.  Yes.

16         Q.     So from looking at OARRS, you

17    could determine whether or not a patient has

18    been going to different doctors and getting

19    multiple prescriptions for opiates?  That's the

20    type of thing that you could determine by

21    looking at a patient report in OARRS, correct?

22         A.     Yes.  I can see the patient -- the

23    different prescribers, the drug, the amounts,

24    the duration, what pharmacy it was filled at.  I

```
 1    have the pharmacy information if I need to call

 2    them.  I have the doctor information.  All of

 3    that is in the report.

 4          Q.    Okay.  And I think you -- I think

 5    you've answered this, but I just want to make

 6    sure.  If you were looking at Jane Doe's

 7    prescription history and you see that she's had

 8    a particular prescription filled by Dr. Smith,

 9    are you able to click on Dr. Smith or run a

10    report for Dr. Smith and see all of the

11    prescriptions that Dr. Smith has had filled

12    throughout the State of Ohio?

13          A.    No.  I would assume that would be

14    another HIPAA issue with patient --

15          Q.    I'm just worried about what your

16    capabilities are or are not.

17          A.    Right.

18          Q.    So you do not have the ability to

19    run a doctor report within OARRS, correct?

20          A.    No.

21          Q.    Okay.  Kind of the same question

22    as it relates to a pharmacy.  If you saw that a

23    particular patient had filled prescriptions --

24    had prescriptions filled at a particular
```

Highly Confidential - Subject to Further Confidentiality Review

1    pharmacy, do you have the ability within OARRS

2    to either click on that pharmacy or run a report

3    of that pharmacy and see all of the

4    prescriptions filled by that pharmacy within

5    OARRS?

6              MR. MAZGAJ:  Objection to form.

7         A.    Not that I'm aware of.

8         Q.    Okay.  Is it fair to say that the

9    only report that you as a pharmacist have access

10   to in OARRS is a patient report?

11        A.    Yes.

12        Q.    Okay.  Can we look at the next

13   slide.  It's going to be page 103, and it says

14   "DUR Check."  And on this slide, are we seeing

15   the same thing where bottom left is the old

16   system, top right is the new -- new format?

17        A.    Yes.  The DUR screen in the new

18   system has changed a lot from this.  But

19   generally, yes, the script would be listed on

20   the left and the DURs would be listed like that

21   in red on the right.

22        Q.    Okay.  So let me just ask you

23   generally, what is a DUR?

24        A.    A drug utilization review.  So

1    it's going to look at things like that where

2    it's a therapeutic duplication, an allergy,

3    someone filling too much, too little,

4    overutilization, underutilization, drug

5    interactions, things like that.

6          Q.    Let me ask you this, at what point

7    in the process do you see the DURs?

8                MR. MAZGAJ:  Objection; asked and

9          answered.

10         A.    It's on the second screen after I

11   verify the prescription.

12         Q.    Okay.  And what you see when the

13   DURs are alerted or for a pop or flag, is

14   something we see similar to what we see on this

15   slide where you see them in a different color

16   with a notification for you, correct?

17         A.    Yes.

18         Q.    Okay.  And the ones that we see

19   here look like they're colored red.  Are they

20   all colored red, or is there a color coding

21   system?

22         A.    No.  There's some yellow.  If

23   there's like a -- that aren't really related so

24   much to -- it might be like a different NDC or a

1    different manufacturer was used last time than

2    to this time.  That's not technically a DUR.  It

3    just points out a difference or -- it just

4    points out a change, but it doesn't mean that

5    it's something that needs to be addressed as

6    much as the red ones would.  We have to override

7    those.  There's a button on there that you click

8    through those.  You have to override each one of

9    those showing that you looked at each one.

10              MR. GADDY:  Okay.  Mike, do you

11         mind blowing up that screen on the

12         right.

13   BY MR. GADDY:

14         Q.    Okay.  So there's some that are

15   red, some that are yellow.  Any other colors for

16   DURs?

17         A.    I don't think so.

18         Q.    Okay.  Do any of the DURs have a

19   requirement where you must do some type of entry

20   or make some type of entry in order for it to be

21   cleared and continue through the process?

22         A.    Giant Eagle has a standard in --

23   where we do have to write some response to these

24   things.  So for this, for example -- well, this

Highly Confidential - Subject to Further Confidentiality Review

```
 1   one is not great.

 2              Okay.  So one of the

 3   therapeutics -- say that therapeutic duplication

 4   with the Simvastatin was a 10-milligram tablet

 5   filled on 4/2 of '08 and this prescription now

 6   is for the 20-milligram tablet.  We have to

 7   override these, so we hit that button, or we can

 8   enter through them as well.

 9              When we -- once we've done that,

10   the "complete" button in the corner lights up

11   where we can put in our biometrics, and then a

12   box pops up to where we have to put in our

13   documentation.

14              We also can put in our

15   documentation to do this -- the fill notes,

16   which is what I typically do so that there's a

17   note in both places.  So in this case, if it

18   were a 10-milligram to a 20-milligram, I could

19   say as a counsel note -- and there's a button

20   usually on this screen as well to counsel.  It's

21   not on this picture.

22              But as I'm checking it, I would

23   look at the patient's profile, see that the

24   10-milligram tablet is deactivated in their
```

Highly Confidential - Subject to Further Confidentiality Review

1   profile.  And then I'll make a note in this box

2   here, "Dose increase from 10-milligram to

3   20-milligram."  And then my -- I deactivate the

4   10-milligram in the profile.  And I can -- I

5   usually say that as well just in case it was a

6   mistake so it could be looked at if the patient

7   doesn't know of a change.

8            But we -- I hit the counsel

9   button.  I write that note in the box in the

10  bottom left-hand corner.  And then when I put my

11  biometrics in for complete, another box shows

12  up, and I put the same note -- I usually just

13  copy and paste it also into that box so that

14  it's a record in both places, in the counsel and

15  then on that fill note as well.

16           So, yes, there's documentation.

17  And Giant Eagle expects us to write some sort of

18  documentation.  Writing "okay" or "approved" is

19  not acceptable.  So they want to see what

20  your -- what you are seeing on the screen and

21  your thought process in approving a

22  prescription, so ...

23       Q.   Okay.  Let me just ask, is that

24  note process -- is that required by the

Highly Confidential - Subject to Further Confidentiality Review

1    dispensing software in order to move through the

2    process?

3              A.    You do have to put --

4              MR. MAZGAJ:  Objection; form.

5              A.    You don't have to put anything

6    here, but to get through the screen, you have to

7    write something.

8              Q.    Okay.

9              A.    But Giant Eagle makes sure that we

10   are writing our thoughts on why that medication

11   is going through.  And then that's where I would

12   put my counsel notes as well, so ...

13             Q.    Okay.  So the software requires

14   some type of note to be entered, and you're

15   telling me that Giant Eagle has a policy that it

16   has to be a good, thorough note; is that fair?

17             A.    Yes.

18             Q.    Okay.  Okay.  Can you tell me

19   what -- the different types of DURs that could

20   pop or alert for opiate-related prescriptions.

21             A.    Well, usually it is like

22   over/underuse.  If -- we can see when the

23   patient filled it last.  It will show up just

24   like how this is on this screen with the

Highly Confidential - Subject to Further Confidentiality Review

1    Simvastatin.  It will show up the last fill or

2    as a therapeutic duplication as well.  It can be

3    on a couple screens.

4              There's also some dosing in there

5    where it will flag to check dosing.  If it's a

6    high dose, sometimes -- the computer takes the

7    quantity and the day's supply and calculates a

8    dose kind of in the background.  So it's

9    something to go off of.

10              For pediatric patients in

11    particular, all of their dosing is based on

12    weight.  So that's another thing that will flag,

13    is high dose in pediatrics.

14              I'm trying to think.  Those are

15    the few I can think of.

16         Q.    Okay.  I understand the pediatric

17    issues.  So let me ask you about dosing for

18    adults.

19              What is the trigger or what is the

20    criteria that would make a dosing DUR alert for

21    an opiate-related script?

22         A.    Well, it wouldn't so much trigger

23    a high dose.  I mean, opiates, you -- some

24    people can take large doses.

```
 1                    If they're a cancer patient that
 2    are on, you know, long-term treatment and
 3    breakthrough pain meds, they can be on very high
 4    doses of these meds.  So there's really no
 5    maximum dose, per se.
 6                    But, I mean, in my checking
 7    process, I do look at those dosings.  You see
 8    that the scripts -- their last script shows up,
 9    is it consistent with their last prescription
10    dosing, things like that.
11            Q.    And, again, I appreciate you
12    telling me your personal practices, which is
13    fine, but I'm really just trying to understand
14    the system and how the dispensing system works.
15                    So I'm going to ask you a couple
16    questions about the pediatrics in just a second,
17    but what I hear you telling me about adults is
18    there would not be a DUR that would flag for
19    dosing as it relates to an opiate prescription
20    for adults, that there's no maximum trigger
21    amount that's going to make that alert show.  Is
22    that correct?
23            A.    I don't --
24                    MR. MAZGAJ:  I'm going to object.
```

```
 1              Wait.  Wait.  Emily, just a second.
 2                   I'm going to object to -- Emily is
 3         only here as a fact witness.  She can
 4         only speak to her own facts.  So she
 5         hasn't been designated as a
 6         representative of the company.  So she
 7         can answer your questions based off of
 8         her personal experience.
 9                   So the instruction is improper.
10                   With that, Emily, you can answer
11         the question again.
12         A.    I don't know that.  I believe
13    there's something there, but I'm not completely
14    sure.  There are max dosing DURs, but I'm not
15    sure on that.
16         Q.    Do you recall ever seeing a dosing
17    DUR for an adult with an opiate prescription?
18         A.    Like -- I mean, I did -- those
19    DURs show up with the dosing that the patient
20    has been on before.  So that's how you -- that's
21    how I would interpret that.  Most opiates don't
22    have a high dose or max dose listed with them,
23    but if there was a max dose on a drug, it would
24    be in the DUR system.
```

```
 1              Q.    Do you recall ever seeing a max

 2    dose on an opiate prescription for an adult?

 3                    MR. MAZGAJ:  Objection to form.

 4              A.    I don't.  I don't know offhand.

 5              Q.    You indicated that you may see

 6    DURs for opiate prescriptions for a pediatric,

 7    correct?

 8              A.    No.  I -- I said I see a lot of

 9    max dosing for pediatric patients.

10              Q.    Okay.  Were you talking about

11    opiates when you said that?

12              A.    No.

13              Q.    Okay.

14              A.    I -- I'm just saying in general we

15    see that a lot for pediatric patients when we're

16    discussing the DURs.

17              Q.    Okay.

18              A.    Max dosing for pediatric patients,

19    that flags a lot because it's weight-based

20    dosing.

21              Q.    Okay.  Well, I'm asking you

22    specifically about opiate prescriptions.

23                    Is there any particular DUR for

24    opiate prescriptions related to dosing that you
```

1    would see for a pediatric patient?

2                MR. MAZGAJ:  Objection to form.

3          A.    Again, I'm not sure -- I mean, I'm

4    sure -- like I said before, a lot of opiates

5    don't have max dosing.  I don't -- I don't know.

6          Q.    Are there ever any DURs -- I think

7    you told us -- you told us over and

8    underutilization.  You referenced dosing, but

9    we've covered that.

10                Any other DURs that you recall

11   seeing for opiate prescriptions?

12         A.    I think I told you those two.  The

13   therapeutic duplication, over and

14   underutilization.  Those are usually those DURs

15   that I see.

16         Q.    Any others that you can think of?

17         A.    Not that I can think of offhand.

18         Q.    Okay.  What type of scenario is

19   going to make a therapeutic duplication DUR

20   trigger for an opiate prescription?

21         A.    If they've had another

22   prescription filled in that same class, so

23   another opiate filled.

24         Q.    Okay.  Do they have to be

Highly Confidential - Subject to Further Confidentiality Review

```
 1   currently --

 2           A.    They also flag other controlled

 3   meds as well.

 4           Q.    Do they have to be currently on

 5   that other medication in order for it to flag,

 6   or if they've had a prescription filled several

 7   months ago for a 30-day supply, would it still

 8   flag?

 9           A.    It would still flag.  It doesn't

10   have to be right away.

11           Q.    Okay.  So in that scenario, the

12   explanation may be they've exhausted their

13   medication from six months ago, this is a new

14   prescription for a new event and, therefore,

15   there is no duplication.

16                 Is that -- do I have that

17   generally right?

18           A.    Correct.

19                 MR. MAZGAJ:  Objection to form.

20           A.    If there's a therapeutic

21   duplication from months ago, then, yes, I would

22   override that DUR and make that statement in my

23   note.

24           Q.    Okay.  How far back could you see
```

1  a therapeutic duplication DUR for opiates?  I

2  mean, if they had a script filled at Giant Eagle

3  four years earlier for an opiate, are you still

4  going to see that duplication DUR?

5            MR. MAZGAJ:  Objection to form.

6       A.    Giant Eagle's system keeps three

7  years of records in the system at a time, so I

8  wouldn't -- I would assume that there is nothing

9  from four years back, that it wouldn't be a

10 duplication at that point.  The medication would

11 have been expired, so ...

12      Q.    Okay.  What period of time are you

13 going to see a duplication?  One year, eighteen

14 months, two years?

15      A.    I don't know that information.

16      Q.    Okay.  Under what scenario would

17 you see an underutilization DUR related to an

18 opiate prescription?

19      A.    If the patient got a prescription

20 months ago, would have been out of it in a

21 month, those would flag for an underutilization.

22 If the patient was on the same dose or given the

23 same dose and I saw that it wasn't filled for

24 months, that would trigger me to make a call to

Highly Confidential - Subject to Further Confidentiality Review

1   the doctor because that patient probably would

2   be treatment naive, again, at that point and

3   might not be okay at the same dose as what they

4   were given and were on.  So that would be an

5   underutilization DUR.

6        Q.    I'm not following you.  Can you

7   give me a real life example of how that happens?

8        A.    Sure.  Say a patient was on

9   morphine 15 milligrams, twice a day, so a

10  long-acting opiate.  Patients that are on

11  morphine are usually titrated there by taking a

12  short-acting prescription first, an oxycodone or

13  a hydrocodone or something like that, to treat a

14  severe pain.

15            Patients are usually transferred

16  over to a long-acting opiate, mostly cancer

17  patients or something like that, that need it

18  for the long term.

19            So if I saw a patient on morphine

20  15 milligrams, twice a day, and the patient was

21  getting it consistently month to month, no

22  issues, long-term therapy, and then it stops,

23  and they weren't getting it for three months.

24  And then they come in with a new prescription

1    for morphine 15 milligrams, twice a day.  That's

2    concerning to me because if this patient was off

3    of those medications -- that medication three

4    months and then started at that morphine dose,

5    it could be dangerous.  So I would call the

6    doctor.

7              Here, you know, the patient was in

8    the hospital or in rehab for three months and so

9    they weren't getting their prescriptions filled

10   with us, as long as I had that documented, I

11   know that that patient is still on that dose and

12   I can dispense it to them.

13             If they weren't on that, then they

14   would have to be restarted as a treatment naive

15   patient given, you know, an oxycodone

16   prescription short-acting and tapered to that

17   dose.

18        Q.   Okay.  Thanks.  That was helpful.

19             So is that scenario that you just

20   ran through one in which you may get a DUR for

21   underutilization if after a three-month gap a

22   prescription for 15-milligram morphine was

23   brought in?

24        A.   Right.  That would be an

 1  underutilization DUR.

 2       Q.   Okay.  And the last one that you

 3  told me you may see for an opiate prescription

 4  was overutilization.

 5            Can you give me an example or

 6  explain to me the context in which you would see

 7  an overutilization DUR?

 8       A.   Sure.

 9            MR. MAZGAJ:  Objection to form.

10       A.   Those --

11            MR. MAZGAJ:  Opioid specific,

12       Jeff?  Sorry.  You didn't say opioid.

13       Do you want opioid?

14            MR. GADDY:  Yes.  Thanks, Matt.

15  BY MR. GADDY:

16       Q.   Opiate related, please.

17       A.   Okay.  In that case, yes, it would

18  come up as a DUR.  This happens a lot to -- not

19  so much at my store because we fill

20  prescriptions a day early, but sometimes it

21  comes up where they -- a DUR shows this patient

22  has accumulated so and so tablets over the last

23  whatever time period, and it will show that in

24  the DUR.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                   So it's just another flag for me
 2   to check the profile and see when they filled
 3   those or to look at the OARRS report and make
 4   sure that it makes sense.
 5                   So that DUR comes up, but it's not
 6   usually -- it's usually in relation to the
 7   therapeutic duplication in a way because that
 8   patient has been on that for a long time.  So
 9   they add up the tablets that they might have
10   extra over those months.
11          Q.    Okay.  So the example that you're
12   thinking of when you would see an
13   overutilization would be if somebody came in
14   several days early to have their prescription
15   filled, correct?
16          A.    Right.
17          Q.    Okay.  Did we cover all of the
18   ones that I think you said you would commonly
19   see or expect to see for opiate-related
20   prescriptions?
21          A.    The ones that I can recall.
22          Q.    Okay.  Do you ever check for any
23   DURs that don't alert there on the screen?
24                   MR. MAZGAJ:  Objection to form.
```

1        A.    I don't -- I mean, the DURs will

2    flash on the screen.  I mean, like, are you

3    asking if I do any extra checks?

4        Q.    Right.  I'm just asking if there's

5    any drug utilization reviews that you perform

6    outside of the ones that alert on the screen.  I

7    know you've told us a lot today about the

8    process that you personally go through.  I was

9    wondering if there was anything else that came

10   to mind.

11       A.    Right.  No, I don't believe so.  I

12   mean, I check the profile.  I check through the

13   DURs, the OARRS.  That's usually the review

14   that's done with the drugs.  So, no, I don't --

15   I can't think of anything else.

16       Q.    Okay.  Is there ever a DUR for

17   drug-to-drug interaction that you may expect to

18   see for an opiate-related prescription?

19       A.    I mean, so the one that comes to

20   me would be patients on Percocet or Norco, which

21   is hydrocodone and acetaminophen or oxycodone

22   and acetaminophen combo in one pill.

23             We would get, like, a flag, like,

24   an -- I mean, we could get a flag, like, on the

Highly Confidential - Subject to Further Confidentiality Review

1    Tylenol, if they're on another medication that

2    contains Tylenol, if they're on a -- or if they

3    have an allergy to Tylenol or an allergy to one

4    of the components in the med.

5              I mean, that's another one, I

6    guess, too.  Patients say they're allergic to

7    codeine but they're getting a Percocet

8    prescription, so we verify if there really is a

9    true allergy or if they've had the Percocet

10   before.  That's another one.

11             I'm trying to think.  I mean, I

12   think it's mostly just with the Tylenol products

13   on it, not with the drugs.

14        Q.    Are you familiar with the term

15   "cocktail" as it relates to are prescription

16   drugs specifically involving an opiate?

17        A.    Yes.  I'm familiar with the --

18   yes, the opiate with the benzodiazepine and the

19   Soma prescription.

20             Is that what you're saying, if it

21   flags with that?

22        Q.    I'm kind of changing topics.  I'm

23   asking --

24        A.    It would relate to that too, but

Highly Confidential - Subject to Further Confidentiality Review

1    it would put all the controlled meds in the DUR

2    flag.

3              But, yes, I am familiar with that.

4    I'm sorry.

5         Q.    Okay.  So what is the

6    significance, from your perspective, of a

7    cocktail prescription, that combination of an

8    opiate, a benzo, and a muscle relaxer?

9         A.    Well, I mean, it is something that

10   would stand out to me, mostly the Soma as that

11   third part of the cocktail.  When looking at a

12   patient, you have to individualize the patient

13   and what they're being treated for.

14              I have a lot of patients that

15   have -- have chronic pain, but then also have

16   anxiety, are being treated by a psychiatrist,

17   and require a benzodiazepine for anxiety.

18              So those two together -- while

19   that is something that flags to me, those two

20   together can -- when you look at the profile,

21   when you look at the patient, when you look at

22   the OARRS report and see what doctors are

23   prescribing those, that isn't so much of an

24   issue.

```
 1                  But adding that Soma in -- like I
 2   said earlier today, any time that Soma is
 3   prescribed, I call the doctor right away.  There
 4   is very little evidence that Soma helps a pain
 5   patient and can only increase the risk of abuse
 6   and dependency on those meds.
 7                  So when I see that -- and over the
 8   years, I don't see it as much because I've
 9   called so many doctors, they are probably sick
10   of me preaching to me.  So I don't really see
11   that so much anymore, because I think I've
12   done -- and my partners at Giant Eagle have
13   really done our due diligence there to make a
14   difference in how they're treating pain
15   patients.  I don't -- I don't see it so much.
16   And when I do, we usually don't dispense the
17   Soma portion of the script.
18         Q.    Okay.  Let me see if I can kind of
19   unpack everything you said there.
20                  So I think you said that you
21   recognize an opiate -- a prescription for an
22   opiate, a benzodiazepine, and a muscle relaxer
23   to be what is referred to as a cocktail,
24   correct?
```

```
 1              A.    Yes.

 2              Q.    Okay.  And I think you indicated

 3    that you do have some patients that you believe,

 4    based on all the circumstances, may

 5    appropriately be on a dual combination of an

 6    opiate and a benzodiazepine; is that fair?

 7              A.    Yes.

 8              Q.    Okay.  And I think what I heard

 9    you to say, that what troubled you the most is

10    the addition of the Soma or the muscle relaxer,

11    correct?

12              A.    Right.

13              MR. MAZGAJ:  Objection; misstates

14         the testimony.

15              Q.    Okay.  Do you agree that just the

16    prescription for the opiate with the

17    benzodiazepine is a flag that you need to look

18    at and investigate further?

19              MR. MAZGAJ:  Objection to form.

20              A.    Those two prescriptions, yes.  If

21    received together, and any time a patient is on

22    both, I do look at those both to make sure I'm

23    not missing anything.  I do another check.

24              Q.    Okay.  If you saw a prescription
```

1    come in for an opiate plus a Soma, you will

2    agree that's also a flag that you would look at

3    and do further investigation before deciding to

4    fill that dual combination, correct?

5              MR. MAZGAJ:  Objection to form.

6         A.    Yes.  I call the doctor every time

7    I receive a Soma prescription.

8         Q.    Okay.  And would you agree that if

9    you saw a prescription for Soma in combination

10   with an opiate, that would increase the level of

11   concern you have?

12             MR. MAZGAJ:  Objection --

13        A.    Absolutely.

14             MR. MAZGAJ:  -- misstates

15        testimony.

16        Q.    Let me see if I can understand a

17   little bit about the spacing or the potential

18   time between these different prescriptions being

19   presented that would cause you to have this

20   concern.

21             Because obviously not all

22   prescriptions may be presented at the same time;

23   is that fair?

24             MR. MAZGAJ:  Objection to form.

1      A.    Right.

2      Q.    So, for example, if an opiate

3   prescription was presented on day one, and if on

4   day eight, you know, one week later, the same

5   patient came in and presented a prescription for

6   a benzodiazepine, would that pique your

7   interest, would that flag to you, as something

8   that you need to look at?  Now you have a

9   patient with an opiate prescription, let's say

10   it was a 30-day prescription, and now they're

11   having a second prescription presented for

12   benzodiazepine.

13          So even though they weren't

14   presented at the same time, is that still going

15   to be something that flags or piques your

16   interest for you to look into further?

17          MR. MAZGAJ:  Objection to form.

18      A.    Yes.  So any time that that's

19   presented, I mean, we would see that on the DUR

20   screen, and I would look into that further.

21   Yes.

22      Q.    Okay.  How many days apart do

23   these prescriptions have to be in order for it

24   to be something for you to look into?

```
 1                     So you just said a week apart

 2      you're going to look into them.  Are you going

 3      to look into them if it's two weeks apart?  Is

 4      it if the medications are overlapping in the

 5      time that they would be on them?  Is that the

 6      trigger?

 7                     Can you help me understand that?

 8                     MR. MAZGAJ:  Objection to form.

 9           A.     Anytime those drugs are taken by

10      the same patient, they are looked at relative to

11      the entire patient.  So anytime that

12      prescription is presented, I -- with the DURs,

13      that would flag to me to do another check to see

14      which doctor -- or is the same doctor

15      prescribing this?  What kind of doctor is this?

16      What -- why are they getting this?

17                     Yes, so that's what I look for

18      through the DUR review and on the patient

19      profile.  So anytime those are dropped off in

20      any relative time, those would flag to me.

21           Q.     Gotcha.  So would it be fair to

22      say that if there was ever overlapping

23      prescriptions -- whether it's one week, two

24      weeks, 30 days, whatever, whether there's
```

1    overlapping prescriptions for an opiate and a

2    Soma, for example, that's going to be the type

3    of thing that's going to pique your interest and

4    cause you to do further investigation, correct?

5                    MR. MAZGAJ:  Objection to form.

6            A.    Right.  Those would cause me to do

7    more evaluation.

8            Q.    Okay.  So those -- seeing the

9    duplicate prescription for an opiate and a Soma

10   over -- you know, at the same period of time,

11   whether it's one week, two weeks or 30 days,

12   that's going to be a red flag for you to

13   evaluate further, correct?

14                   MR. MAZGAJ:  Objection to form.

15           A.    Yes, I would do another check

16   on -- an extra check to see what prescriber is

17   doing -- or what the prescriber is doing, make a

18   call, document why the patient would be on

19   those.  Yes.

20           Q.    Okay.  And same thing when we're

21   talking about an opiate and a benzodiazepine, as

22   long as there's overlapping therapy there,

23   whether it's a week apart that they're

24   presented, two weeks apart, or 30 days apart, if

Highly Confidential - Subject to Further Confidentiality Review

1    there's an overlapping therapy for an opiate and

2    a benzodiazepine, again, that's going to be a

3    red flag for you that's going to cause you to do

4    additional research, correct?

5                MR. MAZGAJ:  Objection to form.

6          A.    Yes, I would do additional

7    research anytime those drugs showed up in the

8    system.  I mean, even if it was more than a

9    month out.  Anxiety meds, you know, they might

10   not be taking it daily, but they still have

11   those in their possession to where if they take

12   something as needed, it would be important to

13   know, even in the last six months to a year,

14   that these medications are being given, because

15   if a patient gets an intermittent prescription,

16   has surgery, gets a pain medication, and the

17   doctor didn't let them know that the two

18   medications interact and can cause harm when

19   used together, that's what I do as part of my

20   practice, is to make sure that that patient

21   knows that those two shouldn't be taken

22   together.  That's another -- another example.

23         Q.    So even seeing those two drugs

24   prescribed as far apart as six months or year,

Highly Confidential - Subject to Further Confidentiality Review

1   you're still going to see that as a potential --

2   as a flag and as something that you're going to

3   look into further and make sure you do your due

4   diligence on?  Is that a fair encapsulation of

5   what you said?

6          A.    I would --

7                MR. MAZGAJ:  Objection to form.

8          A.    I would do my due diligence.  That

9   is part of my due diligence, yes, especially for

10  a benzodiazepine, that it is important to go

11  that far back, so yes.

12         Q.    I think I heard you say that you

13  may have some DURs that would alert if you had

14  these cocktail drugs presented; is that correct?

15         A.    Yes.  I think any controlled med

16  will flag.  They don't really know what it is,

17  like, labeled as.  I don't know -- I don't know

18  if it shows up as a certain -- under a certain

19  heading like the therapeutic duplication, but

20  anytime -- those drugs all show up in my DUR.  I

21  mean, I don't know what they're under and what

22  heading or if they're yellow or red.  But they

23  do show up in the DUR and then also in the

24  profile, so ...

Highly Confidential - Subject to Further Confidentiality Review

1        Q.    Okay.  Well, let me stick with the

2    DUR for now, and I want to make sure I

3    understand what you're saying.

4              So if a patient presents a

5    prescription for a benzodiazepine and you're

6    going through your verification process and you

7    get to the DUR screen, and that patient, say,

8    three months earlier had a prescription for an

9    opiate for about a 30-day supply, would you --

10   are you telling me that you would see a DUR

11   there that tells you that there was the earlier

12   opiate prescription?

13             MR. MAZGAJ:  Objection to form.

14        A.    Yes.  It's -- something is in

15   there showing that drug.  I don't know what it's

16   titled, what the link is, but it might even just

17   be the fact that it was a controlled medication

18   and it flags.  But, yes, it is in the DUR.

19        Q.    Okay.  Same question.  If a

20   patient presents a Soma prescription and you're

21   going through the verification page, are you

22   going to get an alert in the DUR process that

23   there was a prior script for an opiate?

24        A.    I'm not sure about that.  I don't

 1    know.  I don't fill a lot of Soma anymore.  Like

 2    I said, usually I can talk prescribers out of

 3    it.  So I don't -- I don't know about that one.

 4          Q.    Is the reverse true where if you

 5    have a prescription presented for an opiate and

 6    the prescribing history includes a

 7    benzodiazepine or a Soma, that you're going to

 8    see an alert that those drugs have been

 9    previously prescribed when you get to the DUR

10    section?

11              MR. MAZGAJ:  Objection to form.

12          A.    Definitely the controlled meds.

13    Again, I'm not sure on the Soma.

14              MR. MAZGAJ:  Emily, we've been

15          going another hour.  Are you okay?

16              THE WITNESS:  I can take a break,

17          five minutes or so.

18              MR. GADDY:  Okay.  Sounds good.

19              THE VIDEOGRAPHER:  Off the record,

20          4:05 p.m.

21              (Recess taken.)

22              THE VIDEOGRAPHER:  On the record,

23          4:13 p.m.

24

1   BY MR. GADDY:

2          Q.    Ms. Mooney, we talked a little bit

3   about red flags a few minutes ago.  Can you tell

4   me what your definition is of a red flag in the

5   context of filling an opiate prescription.

6               MR. MAZGAJ:  Objection to form.

7          A.    Well, I mean, a red flag is

8   anything that would, in my judgment as a

9   pharmacist and my due diligence as a pharmacist,

10  come up as strange or something that needs to be

11  looked into with regarding opiate or controlled

12  prescriptions in general.

13         Q.    Would you agree that when you see

14  a red flag under that definition to you, that

15  that means you should stop and investigate

16  further?

17              MR. MAZGAJ:  Objection to form.

18         A.    Yes.  I think I mentioned a lot of

19  times how many things I stop at to make the best

20  decision when it comes to filling prescriptions.

21         Q.    Sure.  No, you're exactly right,

22  and I don't know that we always put the term

23  "red flag" on it when you were talking about

24  those things, but you'll agree that those types

1    of things that would make you kind of press

2    pause and go into a little bit more

3    investigation, those are red flags in this

4    context, correct?

5                MR. MAZGAJ:  Objection to form.

6          A.    I don't know what -- I mean, I do

7    extra checks on -- but, I mean, a red flag, does

8    that just mean I stop?  Then, yes, there are

9    things that cause me to stop when reviewing a

10   prescription.

11         Q.    Can you give me a list, just kind

12   of like a bullet point list, of potential red

13   flags that you may be looking out for when it

14   comes to making a decision about filling an

15   opiate prescription?

16         A.    Sure.

17                MR. MAZGAJ:  Objection to form.

18         A.    Sure.  I -- let's see.  If it's a

19   doctor I'm not aware of, if it's a new patient

20   that I haven't -- that we haven't filled for

21   before, a drug that isn't commonly prescribed

22   for pain, high doses or quantities of that drug,

23   multiple doctors.  I think that's a few that I

24   can think of right away.  Different dosing.

```
 1              Q.    What do you mean by "different
 2    dosing"?
 3              A.    Just the dose of -- or directions
 4    that look strange or supplies from -- a
 5    short-term supply and then following by another
 6    prescription right after, duplicate
 7    prescriptions.  I think that's about it, that I
 8    can think of.
 9              Q.    Okay.  I wrote down a doctor
10    you're not familiar with, a new patient that
11    you're not familiar with, a new drug that's not
12    commonly prescribed for pain, high dosages or
13    high quantities of a drug, multiple doctors
14    prescribing a drug and different dosings.
15              Anything else that you can think
16    of that you're kind of on the lookout for as far
17    as red flags for determining whether or not to
18    fill an opiate prescription?
19              MR. MAZGAJ:  Object to form.
20              A.    Not -- obviously the combos that
21    we were talking about earlier, that would be one
22    too.  I think that's a pretty good list.
23              Q.    When you say "combos," you're
24    talking about the opiate with the benzo, the
```

1    opiate with the Soma, or all three together?

2         A.    Right.  A combo of a few of the

3    meds, yes.

4         Q.    Okay.  And do you agree that

5    identifying and evaluating these types of red

6    flags in looking at an opiate prescription is a

7    critical part of the corresponding

8    responsibility that you have as a pharmacist?

9         A.    It is my corresponding

10   responsibility.  I do that with every

11   prescription that I check, so yes.

12        Q.    And you agree that's something

13   that you have to do as a pharmacist as part of

14   your corresponding responsibility, right?

15        A.    Right.  That is my job as a

16   pharmacist, to make sure that I get the

17   prescription, the right prescription to the

18   patient safely.  So that is my responsibility.

19        Q.    Okay.  And do you agree that all

20   red flags that you identify for a particular

21   prescription need to be resolved to your

22   satisfaction prior to you making the decision to

23   fill that particular prescription?

24        A.    Yes, that is my decision, and I'm

```
 1    thankful that my company supports my decision in

 2    that.

 3           Q.    And is it within -- let me ask it

 4    this way:  Do you agree that the steps or the

 5    information that you learned during the

 6    investigation of any red flags should be

 7    documented?

 8               MR. MAZGAJ:  Objection to form.

 9           A.    Yeah, I do document.  Like I was

10    saying earlier when I went through the DURs, any

11    DUR that I check, I have to make a note as to

12    why I'm okay with that and proceed forward, so

13    yes.

14           Q.    Okay.  So I think -- the question

15    I asked is, if you agree that any information

16    you learned during your investigations of red

17    flags should be documented, and your answer is,

18    "Yes, they should be documented," right?

19           A.    Yes, I document --

20           Q.    Right.

21           A.    -- any --

22           Q.    Well, I think, yes, you agree they

23    should be documented, and then the step further

24    is, yes, you actually do document, correct?
```

1          A.    Yes, I document.  Yes.

2          Q.    Okay.  If there was -- if we were

3    to take a particular prescription that you made

4    a decision to fill and we were looking for --

5    let's just say this particular prescription

6    presented numerous red flags, and you

7    investigated each of those red flags, resolved

8    those red flags, and determined that this was

9    appropriate to fill, where would be the best

10   place to look within the documentations that

11   you've done to see the documentation that led to

12   your resolving those flags and filling the

13   prescription?

14          Does that make sense?

15          MR. MAZGAJ:  Objection to form.

16          A.    Yes, that makes sense.

17          Well, they would be in a few

18   areas.  It would just depend on what -- what I

19   was investigating.  So if it was an issue with

20   the dosing, the doctor, the directions,

21   something like that, I would be calling the

22   doctor, and that documentation would be put in

23   the image note on the prescription.

24          If I was looking into patients,

Highly Confidential - Subject to Further Confidentiality Review

```
 1    I'd document that I checked the OARRS.  If --

 2    any separate note or any counseling notes would

 3    be documented in the notes field on that

 4    prescription.  So there's --

 5          Q.    That's --

 6          A.    -- quite a few places.  Sorry.

 7          Q.    Sorry.  I didn't mean to interrupt

 8    you.

 9                You said -- first you said the

10    image notes, which I'm with you there.  That's

11    the bullet points under the prescription scanned

12    in, right?

13          A.    Right.

14          Q.    Okay.  And then you said -- I

15    thought you just said the next one would be

16    notes on the prescription.

17                Is that the same thing, or is that

18    somewhere different?

19          A.    Well, the first one I said would

20    be an image note on the prescription, so that --

21    if you printed the prescription, those notes

22    would -- from the scan, you would see those

23    notes --

24          Q.    Okay.
```

```
 1            A.    -- underneath the script.

 2                  So that's the image note.  And

 3    that would be dealing with the mechanics of the

 4    prescription, if it was a clarification on the

 5    actual script itself.

 6            Q.    Okay.  And then you said the --

 7                  MR. MAZGAJ:  Emily, do you need to

 8            finish that prior question?  You were

 9            cut off, and I just want to make sure

10            you had a chance to finish your answer.

11            A.    Oh.  No, that's okay.  I'm okay.

12            Q.    Okay.  So notes regarding the

13    prescription, you said if you looked into the

14    doctor, you called the doctor, that stuff would

15    be on the image notes.

16                  Then you said that you may look

17    into the patient, check OARRS, those notes would

18    be where?

19            A.    Those should be on the -- "this

20    fill" and note field for that prescription.

21    It's called a "this fill" note.

22            Q.    Can you spell that?  "This fill,"

23    t-h-i-s?

24            A.    Uh-huh.
```

1        Q.    Okay.

2        A.    Yes.

3        Q.    Is that on the patient profile, or

4    where is that?

5        A.    It's attached to the prescription.

6    And, yes, in the patient profile.  So all those

7    are retrievable in the profile.

8        Q.    Okay.  But that's different than

9    the image notes?

10       A.    It is.

11       Q.    Okay.  And you've already told us

12   about the DUR notes, right?

13       A.    Yes.

14       Q.    And that's a third place, right?

15       A.    It is.

16       Q.    Okay.  Is there a fourth or a

17   fifth or a sixth place that we may find your

18   documentation about clearing red flags for any

19   one particular prescription?

20       A.    So, I mean, there's call notes

21   too.  So if the prescription was ever in our

22   call queue, there's notes in the calls on those

23   prescriptions, but then those -- the resolution

24   would be on the image note on the prescription.

Highly Confidential - Subject to Further Confidentiality Review

1    And then there's patient notes as well, just

2    general notes.  There's a tab in the profile

3    that can be used.

4            Q.    Okay.  So the call note, you might

5    have a -- you might put a call in the queue to

6    call a doctor and ask him a question, and you

7    might make some notes there.  But what you're

8    telling me is the resolution of the issue that

9    you were calling about would actually be in the

10   image notes, so that would be the better place

11   to look?

12           A.    Right.

13           Q.    Okay.  And then as far -- what are

14   we going to find in the patient notes that we

15   wouldn't find in the image notes, the this fill

16   notes or the DUR notes?

17           A.    Those would be just general notes

18   in regard to the patient.  Like I was saying

19   earlier with two strengths of levothyroxine, the

20   thyroid medication, that's what they're

21   maintained on.  We could write a note in their

22   general patient note that the patient is on both

23   doses so that it's easier, you know, checking

24   their prescriptions, we're not constantly

1    counseling them on the same thing every month,

2    so to avoid duplication in our counseling.

3         Q.    Okay.  You've told us about some

4    things that are available through the software

5    to help you through this decision-making process

6    in investigation of red flags as far as OARRS

7    or, you know, notes that you can see on the

8    prescription or whatnot.

9              I want to ask whether or not there

10   are any reports that you have access to through

11   Giant Eagle that you ever utilized to help you

12   make the decision about whether or not you can

13   resolve certain red flags that may appear.

14             MR. MAZGAJ:  Objection to form.

15        A.    I'm not aware of any reports in

16   general.

17        Q.    Is it ever your practice to pull

18   any reports from the dispensing system to help

19   you in your decision about whether or not to

20   fill an opiate prescription?

21             MR. MAZGAJ:  Objection to form.

22        A.    No, I don't have any reports.  I

23   don't -- I don't have any or use any.

24        Q.    Okay.  Have you -- has it ever

1   been your practice to request from either your

2   PDL or further up the chain in corporate reports

3   or information that could help you make a

4   decision about filling a particular

5   prescription?

6             MR. MAZGAJ:  Objection to form.

7        A.    No.

8        Q.    Is that something that would even

9   occur to you to do, to ask your PDL or corporate

10  to run a chain-wide report on a doctor or

11  something similar to that?

12       A.    No.  I mean, I take each

13  prescription as it is individually to the

14  patient.  So, I mean, I take each on its own.

15  So I don't -- I don't know if those -- I don't

16  see myself having a need for a report like that.

17       Q.    Okay.  I've had the opportunity to

18  talk with several of the other folks at Giant

19  Eagle, some of the corporate level folks about

20  some of the programs they have place, not only

21  for dispensing and pharmacy-related issues,

22  but --

23       A.    You're cutting -- I can't hear

24  anything right now.  I don't know why.

Highly Confidential - Subject to Further Confidentiality Review

```
 1                (Discussion held off the record.)

 2         Q.    I've had the opportunity to talk

 3   to them not only about some of the pharmacy or

 4   dispensing issues, but also issues related to

 5   distribution.

 6                So one of the things that I've

 7   learned -- and I'll just make this

 8   representation to you -- is that there is a

 9   corporate level threshold report that they use

10   at the corporate level to look at the amount of

11   drugs that are being distributed from the Giant

12   Eagle related distribution centers to the

13   pharmacies.

14                So let me just first ask you, are

15   you familiar with that threshold-based report?

16                MR. MAZGAJ:  Objection to the

17           testimony of counsel and the

18           representation.

19         A.    I'm not familiar with that.

20         Q.    Okay.  During the course of your

21   work as a pharmacy manager, has anybody ever

22   talked to you about the threshold for any

23   controlled substance that relates to your

24   particular store?
```

```
 1                    MR. MAZGAJ:  Objection to form.

 2          A.    I think I remember -- I think I

 3   remember an ordering issue at one point that may

 4   have had to do with that, a threshold or some

 5   sort, but I really wasn't involved in it.  So I

 6   don't -- I think it was -- like, the corporate

 7   end handled it, but that's the extent of it.

 8          Q.    Okay.  Outside of that one

 9   issue --

10          A.    No.  I'm sorry.  Go ahead.

11          Q.    Okay.  Outside of that one issue,

12   you're not aware of anybody communicating with

13   you about your store's threshold or giving you

14   guidance on where you are as it relates to the

15   threshold or anything like that?

16                    MR. MAZGAJ:  Objection;

17          foundation.

18          A.    No.

19                    MR. MAZGAJ:  Assumes facts not in

20          evidence.

21          A.    No, nothing like that.

22          Q.    Have you ever had the occasion to

23   run reports on the number of prescriptions that

24   you've filled?  Have you ever had the need to do
```

1    that?

2              MR. MAZGAJ:  Objection; asked and

3         answered.

4         A.    No.

5         Q.    What about inventory reports?  Is

6    that ever something that you would have the need

7    to run in helping you make a determination about

8    whether or not to fill a prescription?

9              MR. MAZGAJ:  Objection to form.

10        A.    I don't really see the correlation

11   between my inventory and deciding to fill

12   something.  I run inventory reports for audits

13   and for inventory purposes, but I don't for that

14   reason.

15        Q.    I'm with you.  I don't either.

16   I'm just making sure.

17              Have you ever had the occasion to

18   run a doctor report within your store in trying

19   to determine -- to make a decision about whether

20   or not to fill an opiate prescription?

21              MR. MAZGAJ:  Objection to form.

22        A.    No.  I don't -- I've never used a

23   doctor report.

24        Q.    What do you recall about that time

1    that there was communication to you regarding a

2    threshold issue?  What do you remember about

3    that?

4              MR. MAZGAJ:  Objection to form.

5         A.    I told you what I remembered.  I

6    remember a mention when ordering, but I don't

7    recall anything else.

8         Q.    You mentioned earlier the COVID-19

9    pandemic, I think, as it revolved around

10   immunizations and things like that.

11             Do you also have an understanding

12   that the country is in the midst of an opioid

13   epidemic?

14             MR. MAZGAJ:  Objection to form.

15        A.    I've heard of the term.  I mean,

16   in publications, but I don't -- I don't know the

17   difference between a pandemic and an epidemic,

18   so I don't -- I don't really know what that

19   means, per se.  I do know there's a problem with

20   opiates and that people can abuse them if

21   that's -- but that's as far as my knowledge goes

22   there.

23        Q.    Okay.  What do you mean when you

24   say that there's a problem with opiates and that

```
 1   people can abuse them?

 2        A.    I mean, I think that it's known,

 3   thus the "epidemic."  I don't know exactly what

 4   it means, but that there are people that do

 5   abuse opioids.  That's why we have all of these

 6   safeguards in place and checks as pharmacists to

 7   make sure that we're not contributing to any

 8   abuse.

 9             And I know myself, I do my due

10   diligence, and I know that I -- me and my

11   company, we aren't contributing to that.  So I

12   feel -- I feel good as a person knowing that I

13   don't contribute to that.

14        Q.    Have you ever seen evidence of

15   the -- what you call the problem of people

16   abusing opiates in your community?

17        A.    Yes.  Yes, I have.

18        Q.    Okay.  In what form?

19        A.    My father, for one, was addicted

20   to painkillers.  So I saw it firsthand, what

21   that can do.

22        Q.    Okay.  In what other forms have

23   you seen it?

24             And I'm sorry about that.
```

```
 1            A.     No, that's okay.

 2                   That's my firsthand experience

 3     when it comes to opioid abuse.  So that's the

 4     only one that I know of.

 5            Q.    Okay.  Are you aware that it's an

 6     issue -- the problem, as you put it, with opioid

 7     abuse within the State of Ohio?

 8                   MR. MAZGAJ:  Objection to form;

 9            calls for expert testimony.

10            A.     Again, I only know my firsthand

11     experience.  I know that it was easy for him to

12     get that, but I don't know anything else.

13            Q.     Have you seen any evidence of drug

14     abuse or drug-seeking behavior at your stores?

15                   MR. MAZGAJ:  Objection to form;

16            vague.

17            A.     I mean, I have refused to fill

18     prescriptions in the past if I'm not comfortable

19     filling them.  That's my choice as a pharmacist.

20     I'm supported by that with my company.

21                   So I feel confident in my ability

22     to determine if those prescriptions are okay to

23     fill, that they're valid and used for the right

24     purposes.  So I have no problem telling someone
```

1  no, but the majority of my patients are getting

2  their meds appropriately and using them

3  appropriately.

4           MR. GADDY:  I'm going to move to

5       strike that as nonresponsive.

6       Q.   My question is, have you seen

7  evidence of drug abuse or drug-seeking behavior

8  within your store?

9           I think you told us earlier you've

10  had instances where you've had people call in to

11  your store and pose as a doctor's office and try

12  to call in an opiate prescription.

13           Is that fair?

14           MR. MAZGAJ:  Objection to form,

15       compound; asked and answered.

16           You can provide an answer, Emily.

17       A.   I mean, yes, that is something

18  that has happened, but it -- I mean, it

19  wasn't -- I was thinking you meant like a C-II

20  prescription where there -- I mean, yes, I have

21  refused to fill something that someone has come

22  in with a prescription for until I've talked to

23  the doctor.

24           That happens a lot where someone

1    can come in on the weekend and want a script

2    filled when they know I'll need to talk to a

3    doctor first and I refuse to fill it.

4              So, I mean, if that's considered a

5    seeker, in your term, I have refused to fill

6    medications for that reason.

7         Q.    And you've also seen evidence

8    within your store of people trying to

9    impersonate doctors' offices in order to have

10   you fill prescriptions for opiates.

11             Is that fair?

12             MR. MAZGAJ:  Objection; form.

13        A.    I mean, the called-in prescription

14   was for a Gabapentin prescription, and then

15   for -- so, I mean, you can't call in an -- like

16   the C-II opiates.  You can't call in a

17   prescription for that.  So that's where I'm

18   getting tied up, I think.

19             You can call in a prescription for

20   a C-III through V prescriptions; tramadol,

21   benzodiazepines, things like that.  So, yes, in

22   that case, I've had that happened where they've

23   called in prescriptions for those drugs and I've

24   caught that.

Highly Confidential - Subject to Further Confidentiality Review

1    Q.    Have you either seen or become

2  aware of robbery attempts at Giant Eagle

3  pharmacies where the pharmacy was the target of

4  a robbery and specifically pills were the target

5  of the robbery?

6    A.    No.

7    Q.    Have you interacted with any

8  customers at your pharmacy that you suspected to

9  be addicted to opiates?

10    MR. MAZGAJ:  Objection to form.

11    A.    That's a hard question because

12  addiction and dependency -- I mean, I have a lot

13  of patients that are dependent on opiates.

14  You're going to become dependent on opiates.

15    I think addiction seems more along

16  the lines of abuse, and I don't -- I don't know

17  anyone that has abused it of my patients that

18  I've dispensed to.

19    Q.    Have you seen or become aware of

20  drug paraphernalia, such as needles, on Giant

21  Eagle property?

22    A.    Yes, that, I have seen sometime --

23  one instance, one of the store managers saw one

24  in the bathroom and then another in the parking

```
 1   lot.

 2          Q.    Have you --

 3          A.    I think two issues there.

 4          Q.    Have you seen or suspected that

 5   you ever saw a drug deal on Giant Eagle

 6   property?

 7                MR. MAZGAJ:  Objection to form.

 8          A.    I have not --

 9                MR. MAZGAJ:  Vague.

10          A.    -- seen a drug deal.

11          Q.    Have you seen or become aware of

12   individuals overdosing and receiving treatment

13   on Giant Eagle property?

14          A.    I am aware of one -- one time I

15   believe someone overdosed in the parking lot,

16   and that was only one instance.

17          Q.    Do you know if they had to

18   administer Naloxone to that person?

19                MR. MAZGAJ:  Objection.

20          A.    I am not sure.  I don't know.

21          Q.    Have you ever suspected that one

22   of your patients or somebody seeking a

23   prescription from you might be intending to sell

24   their pills?
```

Highly Confidential - Subject to Further Confidentiality Review

1            A.    No.  If that were the case, I

2    wouldn't dispense the medication to them.  I've

3    never been aware of anything like that.

4            Q.    Well, and I'm making the

5    assumption that you wouldn't have dispensed the

6    medication.  But my question is if you ever came

7    to that conclusion and, therefore, did not

8    dispense the medication?

9            A.    Right.  No, I've never had that

10   happen.

11           Q.    Okay.  Have you ever had any

12   contact with law enforcement regarding an

13   opiate-related issue at your store?

14           A.    Yeah, I -- I mean, I used to -- I

15   mean, years ago especially, but I -- Lake County

16   Narcotics is right down the street.  If I

17   suspect anything that I think warrants a call, I

18   just give them a call.  I have all their

19   information, their business cards.  So they're

20   pretty easy to talk to.

21           Q.    About how many times have you had

22   to call the Lake County Narcotics office

23   regarding opiate-related issues at your store?

24           A.    It's been a long time now.  I

1    mean, probably four or five times -- I don't --

2    that I'm remembering that I've called them and

3    given them information to look into a patient.

4         Q.    Has there ever been a time in your

5    job as a pharmacist revolving around an

6    opiate-related prescription that you've been

7    scared at work or after work?

8              MR. MAZGAJ:  Objection to form.

9         A.    I mean, I've been yelled at a few

10   times.  I've had experience with patients when

11   it comes to those prescriptions.  They don't

12   usually make much of a fuss, I guess.  Usually

13   they know there's rules in place, that we put in

14   place.

15             If something is too early or if I

16   need to get ahold of a doctor, they're usually

17   pretty understanding when it comes to something

18   like that.  Or if it's an issue, the ones that

19   are no good, if I present an issue, they usually

20   just walk away, so ...

21        Q.    Okay.  What do you mean when you

22   say you've been yelled at and had experience

23   with those patients?  What's the context for

24   that?

Highly Confidential - Subject to Further Confidentiality Review

```
 1            A.    Well, I work in a grocery store

 2   and deal with customers and co-pays and

 3   insurance.  So a lot of patients aren't happy to

 4   come to the pharmacy to have to pay for those

 5   things.  So, I mean, day to day there's usually

 6   some unhappy customers when it comes to the

 7   pharmacy and their prescriptions.

 8            Q.    And to the extent I didn't say

 9   this earlier, I'm asking specifically in the

10   context of opiate-related prescriptions.

11                 So is there any time in the

12   context of an opiate-related prescription,

13   whether it's, you know, not filling a

14   prescription for a customer or worried about

15   what a customer is going to do with the

16   prescription, or whatever, that it's kind of

17   caused you to be uncomfortable or scared in your

18   role as a pharmacist?

19                 MR. MAZGAJ:  Objection to form.

20            A.    No, I don't -- I can't recall

21   anything that I've been nervous about.  Like I

22   said, most patients are -- they might not be

23   happy about it, but they're understanding.  If

24   there's some follow up that I need to do or if
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1   they're not getting their prescription on time,

 2   I -- they know they have to wait for it, so ...

 3              MR. GADDY:  I think I'm getting

 4         pretty close to the end.  If it's okay,

 5         why don't we take about five minutes,

 6         and I think I've got two or three quick

 7         topics left, if that's okay with

 8         everybody.

 9              MR. MAZGAJ:  Sounds good.

10              THE VIDEOGRAPHER:  Off the record,

11         4:48 p.m.

12              (Recess taken.)

13              THE VIDEOGRAPHER:  On the record,

14         4:57 p.m.

15   BY MR. GADDY:

16         Q.   I've seen some stuff in some of

17   the documents, Ms. Mooney, about a controlled

18   drug record box that is kept in every store.

19              Do you know what I'm talking about

20   there?

21         A.   I do, yes.

22         Q.   What is that?

23         A.   It is our record year to year.  We

24   get a new box every year that has our dispensing
```

Highly Confidential - Subject to Further Confidentiality Review

1    guideline in it.  It has month-to-month

2    recording of orders, C-II prescription orders,

3    and then other controlled meds also

4    month-to-month, but separated.

5              There's also our inventory -- our

6    monthly audits, our yearly inventory, any

7    outdate returns.  That's what I can think of

8    right now.

9         Q.    Okay.  When you say C-II

10   prescription orders, do you mean where you order

11   drugs from the distribution center?

12        A.    Yes.  Through our CSOS, we can

13   order -- those -- our 222s from.  Those are all

14   filed by month.

15        Q.    Okay.  I was just making sure you

16   weren't talking about prescriptions, hard copy

17   prescriptions.

18        A.    No.  I'm sorry.  Just the drug

19   ordering.

20        Q.    Okay.  Where are the

21   prescriptions, the hard copy prescriptions?  Are

22   they filed somewhere in the store?

23              MR. MAZGAJ:  Objection.  It's

24        duplicative of 30(b)(6) testimony.

1        A.    Yes, those are kept in the store.

2    They're filed in packs of 100, maybe even more

3    now since we get more e-scripts than hard

4    copies, and then those files are kept in boxes

5    and then kept for ten years.

6        Q.    Okay.  Do you print out a hard

7    copy of an e-script and file it also, or just

8    the hard copies that are hand brought into the

9    store?

10        A.    We used to, but I believe -- I

11    don't know when, but the State of Ohio changed

12    that to where we don't have to print any longer.

13        Q.    Okay.  Where are those hard copy

14    scripts within your store?  And what I'm -- I'm

15    just trying to get at whether or not they're --

16    where you would have to go to get them.

17        A.    Right.  The most recent

18    prescriptions are kept in the pharmacy.  We have

19    drawers that store them in case we need them in

20    a recent time, but our storage is upstairs above

21    the store in a locked room.  I'm the only one

22    that has a key to that.

23        Q.    Okay.  Approximately what time

24    period is going to be there in the pharmacy in

Highly Confidential - Subject to Further Confidentiality Review

1   the drawers; the last week, the last month, the

2   last year?

3           A.    For a C-II prescription, probably

4   quite a few months.  Yeah, I mean, I would say

5   definitely six months' worth in the pharmacy.

6           Q.    Okay.  Is there anything that

7   you -- do you ever have a need to go into the

8   controlled drug record box?

9           A.    I do it most days, because with

10  ordering, I check in those orders and then file

11  the 222 and the order sheets in that box.  So I

12  use that box daily.

13          Q.    Okay.  Do you use the box for

14  anything other than ordering?

15          A.    Like I said, my monthly audits are

16  filed there.  I do -- we have a perpetual

17  inventory of our C-IIs, but then also do monthly

18  audits.  So those are all filed there, and then

19  our yearly inventory as well.

20          Q.    Okay.  Other than the drug orders

21  and those things you just told me about, any

22  other reason that you go into that box?

23          A.    Oh, not that I can think of right

24  now.

```
 1              Q.    Okay.  You told me that your

 2    controlled substance dispensing guidelines are

 3    in that box.  We've also spent several hours

 4    today with you kind of telling me about all the

 5    different hoops that you jump through for

 6    different steps in the process.

 7              Do you ever, during the course of

 8    your work, pull out those dispensing guidelines

 9    and use them to help you make a decision about

10    whether or not to fill an opiate prescription?

11              MR. MAZGAJ:  Objection to form.

12         A.    I use my own judgment, my

13    professional judgment, to fill the

14    prescriptions.  I know that I am -- I know what

15    Giant Eagle's guidelines are.  We share the same

16    views there as to how to fill a prescription.

17    So I don't need to use those guidelines because

18    I already use them in my practice.

19         Q.    Okay.  So the answer to the

20    question is, no, you don't ever pull out the

21    controlled substance dispensing guidelines and

22    flip through them and use them to help you make

23    a decision about whether or not to fill an

24    opiate prescription, fair?
```

```
 1          A.    Right.

 2                      - - -

 3      (Mooney Deposition Exhibit 9 marked.)

 4                      - - -

 5  BY MR. GADDY:

 6          Q.    Those guidelines are tab number 2

 7  in your binder.  It's going to P-HBC-28.

 8                MR. GADDY:  I forget what number

 9          we're on.  I think this is number 9,

10          Exhibit Number 9.

11  BY MR. GADDY:

12          Q.    Do you see -- do you have those

13  guidelines in front of you?

14          A.    Yes.  "Controlled Substance

15  Dispensing Guidelines," yes.

16          Q.    Do you know whether or not there's

17  ever any updates to these guidelines if they get

18  reissued every year under your box?

19          A.    I'm not aware of any updates.

20          Q.    Okay.  At the top of the page, it

21  says, "Purpose."  It says, "To provide

22  guidelines for the proper dispensing of

23  controlled substances that support the

24  corresponding responsibility mandate placed upon
```

 1    pharmacists to exercise due diligence in the

 2    decision to fill or not to fill a controlled

 3    substance prescription."

 4            Do you see that?

 5        A.    Yes, I do.

 6        Q.    Okay.  And that's -- we've talked

 7    today about some of the things that you do when

 8    exercising due diligence, right?

 9        A.    Right.

10        Q.    If you turn to about two-thirds of

11    the way down the second page, you'll see a

12    section that says, "Appropriateness of

13    Controlled Substance Prescriptions," and then in

14    parentheses it says, "Red Flags."

15            Do you see that?

16        A.    Yes, I do.

17        Q.    Okay.  And some of these specific

18    red flags you've mentioned and talked about

19    already, and some of them maybe haven't been

20    discussed.  And so I just want to ask you a

21    couple questions about some of them and whether

22    or not they're the types of things that you look

23    at, and if so, how.

24            So the first one that we see there

Highly Confidential - Subject to Further Confidentiality Review

1    under number 1 is the combo prescription that we

2    spent some time talking about.

3                Do you see that?

4        A.    Yes.

5        Q.    And you've already talked to us

6    about how that -- how those different

7    combinations of those drugs are something that

8    you look at, and you told us about the tools

9    that you use to look for those, correct?

10       A.    I did, yes.

11       Q.    Okay.  The second one says, "Lack

12   of individualization of dosing."

13                Do you see that?

14       A.    Yes.

15       Q.    Okay.  Do you understand what's

16   being communicated there?

17       A.    I see that as each -- I mean, I

18   check as an individualized person.  Each person

19   is an individual.

20                So you're saying what?  I don't --

21   I mean, are you saying that the -- so I'm just

22   reading this.  The act of individualized dosing,

23   is that -- yes, you would want to start at the

24   lowest effective dose and go up from there.

```
 1                    So I think we talked about that

 2    before, too, with patient dosing and how when

 3    I'm checking a prescription, I'm making sure

 4    that they're not getting morphine without first

 5    being started on a lower dose, immediate release

 6    breakthrough pain dose, of like oxycodone or

 7    hydrocodone.  So, yes, that is what I look for.

 8          Q.    Okay.  Would you agree that it

 9    would be a red flag if you had a particular

10    doctor who for every patient that they saw, they

11    wrote them the exact same prescription for the

12    exact same drug for the exact same length of

13    time for the exact same dosage, that the drug --

14    the prescriptions that he or she was writing

15    were not individualized to the patient?

16                    Do you agree that that would be a

17    red flag and something that you would want to

18    look at and examine further?

19                    MR. MAZGAJ:  Objection to form.

20          A.    So there's a lot of doctors in the

21    area, particularly pain clinics and pain

22    doctors, that do choose to prescribe certain

23    drugs.  I think that they're familiar with them,

24    that it gives them the best outcomes.
```

1                   So while, yes, I see how that

2     would be something I would look into, but I look

3     into any opiate prescription -- since that's

4     what we're talking about, I look into that

5     anyway, but I don't see that as a reason not to

6     fill, because I take other things into account.

7                   Like I said, there's a lot of good

8     pain management doctors that do stick to a few

9     drugs that they're comfortable with, and I don't

10    see anything wrong with that.  But it's based on

11    the individual.  So, I mean, I don't -- I'm

12    looking at it as a picture for the patient.  So

13    I don't -- I don't know if that would be

14    something I would see to just not fill a

15    prescription for someone.

16          Q.    Okay.  So the question I asked was

17    whether if you had a particular doctor that was

18    writing the same script for the same dose for

19    the same length of time for every patient that

20    he or she saw, would that be something you'd

21    want to look into further.  And I think I

22    understood you to say, yes, it's something you

23    would want to look into further, but it may not

24    be determinative.

Highly Confidential - Subject to Further Confidentiality Review

```
 1              Is that fair?
 2       A.    Right.  I would definitely look
 3   into that further, as I do any time, and then --
 4   yes, but that would not be a reason to not give
 5   the prescription to the patient on its own.
 6       Q.    Okay.  What would be the way that
 7   you would discover that a doctor was writing the
 8   same prescription for the same drug for the same
 9   length of time for the same dosage unit to every
10   patient that he saw?
11              How would you become aware of that
12   information?
13              MR. MAZGAJ:  Objection to form.
14       A.    I mean, I'm familiar with a lot of
15   the doctors in the area that I dispense
16   prescriptions for.  But like I said, I mean,
17   it's an individualized dose.  I mean, each
18   person has to be taken on its own.  So it's -- I
19   see what this is, but on its own, it doesn't
20   represent the big picture for that patient.
21       Q.    But my question is a little bit
22   different.
23              I'm asking how you would become
24   aware that a doctor is writing the same script
```

1    for the same drug for the same length of time

2    for the same dose for every patient?

3              And I think the first thing you

4    said is you're familiar with the doctors.  Other

5    than being familiar with the doctors, is there

6    any other way that you would become aware of

7    that?

8              MR. MAZGAJ:  Objection to form.

9         A.    I mean -- yeah, I mean, if I get

10   prescriptions from that doctor, multiple, then I

11   can see a trend.

12        Q.    Okay.  So it would be spotting a

13   trend based on receiving multiple prescriptions

14   from the same doctor and noticing that they were

15   all the same?

16        A.    Right.

17        Q.    Okay.  If you turn the page, at

18   the top there's requests for early refills.  I

19   think we've talked about that.

20              The next one is one I don't think

21   we've talked about today.  It says, "Further

22   than expected distances of the patient or

23   medical provider from the pharmacy."

24              Do you see that?

Highly Confidential - Subject to Further Confidentiality Review

1          A.     I do, yes.

2          Q.     Is that a particular red flag that

3    you look for in determining whether or not to

4    fill an opiate prescription?

5                 MR. MAZGAJ:  Objection to form.

6          A.     Again, yes, that is something I

7    would look at, in taking in each prescription as

8    an individual prescription.  Our location where

9    my store is located, it's -- and I've called on

10   a lot of these to double-check and to clarify.

11                But what I see most of the time --

12   we have a pretty large rural area, about 45

13   minutes -- anywhere between 25 and an hour away

14   from the store, but the clinics -- where they

15   don't really have doctors' offices or any

16   specialties.  So patients traveling to see their

17   doctor from those areas are not -- not a huge

18   concern for me in most respects.

19                Yes, in some -- that's always

20   something in the back of my head.  But when I

21   see where the patient lives versus where they're

22   coming to get treatment, I see why they would

23   come to our pharmacy.  That's not something,

24   again, that I would not fill a prescription for

Highly Confidential - Subject to Further Confidentiality Review

1    them after looking into.

2          Q.    Is there a particular distance

3    that you would say, "Okay.  This is a flag to

4    me.  I need to figure out why their doctor is so

5    far away or why the patient lives so far away"?

6                Is there any particular distance?

7    Is it being in a different county, being out of

8    state, anything like that that you say, "All

9    right.  This is now a flag that I need to

10   investigate"?

11               MR. MAZGAJ:  Objection to form.

12         A.    I mean, any prescription that's

13   out of state, I am definitely making a call to

14   the prescriber.  I don't really get a whole lot

15   of those anymore.  I mean, I remember years ago,

16   we would get some from out of state.  Again, I

17   would call, make sure the prescription was a

18   valid document as necessary.

19               But -- I mean, usually -- usually

20   I don't have a whole lot of those.  Maybe the

21   west side is probably the farthest distance, the

22   west side of Cleveland.  So that's probably

23   about maybe an hour away.

24               I don't really have too many past

 1    that that I remember.

 2           Q.    Okay.  So anything within that

 3    distance is not really going to pique your

 4    interest as being an outlier or anything

 5    unusual.  Is that fair?

 6           A.    No, not necessarily.  I mean, I

 7    take all of that into consideration, especially

 8    if it's with -- as a new patient to the pharmacy

 9    or a doctor I'm not aware of.  So one of these

10    in combo with another.

11                 I mean, it doesn't mean that I

12    don't look at that.  I do.  But I am very

13    familiar with the area.  I've lived here all my

14    life.  So I do -- I do know a little more about

15    that.

16           Q.    Okay.  Let's look at the next on

17    the list.  It says -- number 6 says,

18    "Overwhelming percentage of the pharmacy

19    business is devoted to filling controlled

20    substances."

21                 Do you see that?

22           A.    Oh, yes.

23           Q.    Are you -- are you tracking within

24    the store on a daily basis what percentage of

Highly Confidential - Subject to Further Confidentiality Review

1   your prescription fills are controlled versus

2   non-controlled and weighing that percentage into

3   whether or not you fill any particular opiate

4   prescription?

5              MR. MAZGAJ:  Objection to form.

6        A.    No, I don't track that.  I

7   don't -- I don't track that.  But I don't think

8   an overwhelming percentage of my business is

9   devoted to that.  So I don't think that's

10  something I have to worry about.

11       Q.    Do you know how this factor,

12  number 6, would be used to make a decision on an

13  individual prescription for an individual

14  patient regarding an opiate script?

15             MR. MAZGAJ:  Objection to form.

16       A.    I could imagine that patients

17  would go to a place that would fill their

18  prescriptions without any checks on why or if

19  it's correct.  And, again, that's just me

20  imagining, because I don't do any of those

21  things, so ...

22       Q.    Right.  But this is a Giant Eagle

23  policy --

24       A.    Right.

```
 1              Q.    -- distributed to Giant Eagle

 2    stores.

 3                    I can't figure out how this factor

 4    is helpful.  And maybe I'm missing something.

 5                    But I'm saying if you as a

 6    pharmacist can explain to me how number 6 would

 7    help any pharmacist make a decision about

 8    whether or not to fill or not fill any

 9    individual opiate prescription.

10                    Can you tell me how it would help?

11                    MR. MAZGAJ:  Objection; lack of

12            foundation.

13              A.    I don't -- I don't know.  I mean,

14    my -- my business is not devoted --

15    overwhelmingly devoted to filling controlled

16    substances.  So I just don't see that as

17    something that would pertain to me.  So I don't

18    know.

19              Q.    Do you know any Giant Eagles that

20    do fall into that category?

21              A.    I do not.

22              Q.    Okay.  Number 7 says, "Failure to

23    contact and/or follow up with other pharmacists

24    for not filling prescriptions from the
```

```
1   particular provider in question."

2              Do you see that?

3       A.    Yes.

4       Q.    Okay.  So let me -- let me ask you

5   kind of a question about that.

6              Do you have anywhere within the

7   dispensing platform where there's any

8   documentation that other pharmacies would not be

9   filling prescriptions for any particular

10  prescriber?

11      A.    I think we've said earlier -- I

12  mean, there's nothing that's been put out that

13  we don't fill a prescription for a particular

14  provider.  I've never -- and I've never had that

15  come from anyone at Giant Eagle.

16              I will say that if there's

17  anything that comes up at a store -- I don't

18  know -- a suspicious prescription or something

19  like that, that's when we would use e-mail to

20  contact our group in the area or region to where

21  they'll mention something like that.

22              Every once in a while our --

23  Rick Shaheen, who is in charge of, you know, the

24  loss prevention -- and he will send out
```

 1    something, but it's not -- we won't not fill a

 2    prescription for a prescriber.

 3          Q.    Have you ever asked up the chain

 4    to your PDL or to corporate and asked that any

 5    particular prescriber be blocked and made the

 6    case that you shouldn't fill any

 7    prescriptions -- and obviously I'm talking about

 8    opiates -- for a particular prescriber?

 9              Have you ever done that?

10          A.    No, I have not.

11          Q.    Are you aware of anybody at Giant

12    Eagle at the pharmacy level that has done that?

13          A.    No, I'm not.

14          Q.    Okay.  So number 7 seems to be

15    talking about talking to other pharmacists who

16    won't fill prescriptions from a provider, and it

17    sounds like, from what you're telling me, that

18    doesn't really apply at Giant Eagle.  Is that

19    fair?

20          A.    No, I'm not saying that.  I mean,

21    this is based on -- for the pharmacist.  I mean,

22    this is a guideline for the pharmacist.  So I

23    mean, like I'm saying, it's individualized to

24    the patient and also with the pharmacist.  And I

Highly Confidential - Subject to Further Confidentiality Review

1    think at the end of this document -- I mean,

2    Giant Eagle supports us in whatever we decide to

3    do as a pharmacist.  So --

4            Q.    I hear you.  My question is about

5    number 7.  It says, "Failure to follow up with

6    pharmacists who don't fill prescriptions from a

7    provider" -- I assume that means the health care

8    provider in question.

9                  And what I thought I heard you

10   tell me is that Giant Eagle doesn't have a

11   blanket refusal-to-fill-type program where you

12   don't refuse prescriptions from particular

13   providers.

14           A.    Right.

15           Q.    Okay.

16                 MR. MAZGAJ:  Objection to form.

17           Q.    So if you don't have a program

18   where you have a blanket refusal to fill for

19   providers, then help me understand how a

20   pharmacist is going to use number 7 when filling

21   a prescription at Giant Eagle and trying to make

22   a decision about whether or not to fill an

23   opiate prescription.

24           A.    Well, it says "other pharmacists."

Highly Confidential - Subject to Further Confidentiality Review

1  So I interpret that -- I mean, a pharmacist

2  could choose not to fill a prescription.

3          Q.    Okay.  That's a fair

4  clarification.

5                Have you ever made the decision

6  not to fill prescriptions from a certain health

7  care provider?

8          A.    No, I have not.

9          Q.    Okay.  Are you aware of any

10 pharmacist at Giant Eagle that has ever made the

11 decision to not fill prescriptions from any

12 certain physician or health care provider?

13         A.    No, I'm not.

14         Q.    Number 8 says, "Filling

15 prescriptions for patients who arrive in

16 groups."

17                Is that something that you look at

18 in making your determination about whether or

19 not to fill an opiate prescription?

20         A.    I haven't experienced that one

21 myself in regards to prescriptions.  So, no, I

22 haven't -- I don't know of that.  But, yes, that

23 would look very suspicious.

24         Q.    Okay.  Number 9 says, "Cash

1    transactions on controlled substances."

2             Again, I don't think that's

3    something we mentioned.  Is that something that

4    would pique your interest?

5        A.    Years ago, yes, where patients

6    wouldn't want to use their insurance.  Now a lot

7    of -- a lot of patients don't have insurance,

8    and they use discount cards for their

9    prescriptions.

10            So that is a little, I think,

11   outdated in relevance to practice right now,

12   especially now too with the -- with OARRS being

13   so readily available, it kind of shows us now if

14   there's going to be a double billing to a cash

15   and then to an insurance.

16            So that one, I think, was more

17   relevant years ago than it is now.

18       Q.    Okay.  And then the last one on

19   here says, "Verification that a prescription is

20   legitimate is not satisfied simply because the

21   provider performed blood tests and MRIs on the

22   patient."

23            Do you see that?

24       A.    Yes.

```
 1            Q.    Okay.  Again, is there -- how does

 2    that help a pharmacist make a determination

 3    about whether or not to fill an opiate

 4    prescription?

 5            A.    I think this is more that -- just

 6    showing that the patient is an established

 7    patient, which would make sense.  I don't have

 8    any other real comment on that one.

 9                        - - -

10        (Mooney Deposition Exhibit 10 marked.)

11                        - - -

12    BY MR. GADDY:

13            Q.    Okay.  Let's look at tab 21, which

14    is going to be P-HBC-5017.  We'll mark it as

15    Exhibit Number 10.

16                  Let me know when you've got that.

17                  MR. MAZGAJ:  Is there anything she

18            should focus on first?

19                  MR. GADDY:  We'll look at the

20            cover, and then I'll tell her where to

21            go.

22            A.    Okay.

23            Q.    Do you see at the top of the page

24    it's an e-mail from Chris Miller from back in
```

1    December of 2016, and the subject is "Weekly

2    Notes."

3                  Do you see that?

4         A.    Okay.  Yes.

5         Q.    There's going to be several

6    attachments, and some of them are related to

7    some of these metrics issues that we've been

8    discussing before.  What I want to do is just

9    show you one of those pages and ask you if

10   you've ever seen it before or anything like

11   that.

12                  So I'm going to turn -- I think

13   the easiest way to find it is the Bates number

14   at the bottom right-hand corner ends in 9210.

15                  MR. MAZGAJ:  Objection to the

16              document as being outside the Track 3

17              jurisdictions and foundation.

18        Q.    Are you with me, Ms. Mooney?

19        A.    Yeah.  I don't even know what the

20   store is, so I -- what store is this?

21        Q.    Let me just ask you some general

22   questions, and maybe we can move on pretty

23   quickly.

24                  Do you see at the top of this it

1    says, "Customer Satisfaction Scorecard"?

2           A.    Yes.

3           Q.    Okay.  And I think you told us

4    earlier that, you know, because you work for a

5    business and they have customers, that one of

6    the things that the company focuses on is

7    improving customer satisfaction.  Is that fair?

8           A.    Yes.

9           Q.    Okay.  And I think you told us

10   that one of the things you have an understanding

11   that the company does from time to time is

12   conduct surveys, voice-of-customer-type feedback

13   processes in order to get input from the

14   customers on where the company is doing good and

15   where the company has room to improve.

16                Is that fair?

17                MR. MAZGAJ:  Objection; misstates

18        the testimony.

19           A.    Yes.

20           Q.    Okay.  And this one -- again, this

21   is just a template.  I didn't pick this one for

22   any particular reason.  I think it's the first

23   one in a list of a bunch, if you flip through

24   the next couple of pages.

```
 1                 But do you see at the top left, it

 2    says "Giant Eagle Pharmacy."  Then it says,

 3    "Customer Satisfaction Scorecard."  It looks

 4    like this is for a store in Chippewa.  And the

 5    very top entry says, "Retail index, current

 6    three periods."

 7                 Do you see that?

 8         A.    Uh-huh.

 9         Q.    And then for this particular one,

10    the second entry down says, "Where should I

11    focus?"  And then there are two entries there,

12    one for "Speed and Ease of Checkout" and the

13    second says "Time to Fill from Order."

14                 Do you see that?

15                 MR. MAZGAJ:  Objection;

16           foundation.  You haven't even

17           established that she's seen this.

18         A.    Yeah, I mean, this isn't my store,

19    and I don't -- I don't know where this is from

20    exactly, so ...

21         Q.    Have you ever seen a customer

22    satisfaction scorecard like this from your

23    store?

24         A.    I don't recall one.  I mean, this
```

Highly Confidential - Subject to Further Confidentiality Review

1    is probably quite a few years old.  So I

2    don't -- I don't even remember what's on these.

3    I mean, I can read this from this, but, I mean,

4    I don't -- I don't even remember this.

5            Q.    Okay.  Do you ever get feedback

6    from anybody regarding your store's performance

7    on the customer satisfaction surveys?

8            A.    So our metric, I guess, is just

9    the amount of surveys that we receive, and then

10   we are scored on that.  But I don't -- I

11   don't -- every once in a while I see a

12   breakdown, but it's not -- I don't know.  I

13   mean, it's not -- it's not broken down like

14   this.  So I don't really -- I mean, I don't

15   really know what is on those -- on those

16   surveys.

17           Q.    Okay.  So I understand that one of

18   the things the company wants you to do is have

19   people fill out surveys, right?

20           A.    Right.

21                MR. MAZGAJ:  Objection to form.

22           Q.    Okay.  And what I'm asking is

23   whether or not there's anybody, whether it's

24   your PDL, whether it's somebody else from

Highly Confidential - Subject to Further Confidentiality Review

1   corporate, whether it's anybody, who ever comes

2   and says, "Okay. Regardless of how many surveys

3   were filled out, here's the results of the

4   survey. Here's the areas we did really well in.

5   Here's the areas that we need to focus on as we

6   move through the survey process."

7               Does that process ever happen?

8        A.    It doesn't. I mean, I get sent --

9   I think I get sent something when it comes to

10  the surveys. I don't even -- I don't know what

11  it is that they look at. I just -- I mean, we

12  don't have this.

13       Q.    Okay. Let's look at tab

14  number 16, which is going to be P-HBC-37.

15       A.    Okay.

16             MR. GADDY: We'll mark this as

17             Exhibit 11, I think.

18                     - - -

19       (Mooney Deposition Exhibit 11 marked.)

20                     - - -

21  BY MR. GADDY:

22       Q.    Let me know when you're there,

23  Ms. Mooney.

24       A.    Yeah. I have the tab up.

```
 1              Q.    Okay.  I want to look at a couple

 2    of these other metric reports and just see if

 3    it's the type of thing that you're familiar

 4    with.

 5              Let's look at page -- it looks

 6    like this one actually does have page numbers.

 7    So I'm on page 32.

 8              And about a quarter of the way

 9    down the page, there's an entry for store 6377

10    in Painesville, which is I think where you told

11    us you work, correct?

12              A.    Okay.  Yes.

13              MR. MAZGAJ:  Objection to

14         foundation of the document.

15              Q.    Do you see that?

16              A.    Yes, I do.

17              Q.    Okay.  And it has some numbers

18    there, the P9 to P11 is 80 percent, something is

19    0 percent, so on and so forth.  And then it

20    talks about areas to focus on.  And the first

21    area noted is "Pharmacy Team Member

22    Professionalism," and the next is "Time to Fill

23    from Order."

24              Do you see that?
```

```
 1                    MR. MAZGAJ:  Objection.  The

 2            document speaks for itself.

 3       A.    Yes, I see that.

 4       Q.    Okay.  And are these types of

 5  reports or scores for your store the type of

 6  thing that you've ever seen before?

 7       A.    I can tell you I see my retail

 8  index score.  I will focus on complaints in

 9  regards to team member interactions, but that's

10  how I take these surveys.

11            So, I mean, I don't -- I don't

12  know -- I mean, I don't know where you're going

13  with this.  But, yes, I look at those scores.

14  But the only thing that is important to me with

15  these is that I address customer complaints.

16            So if I have a customer complaint

17  in the pharmacy team member professionalism, I

18  will address that with the customer and then

19  with my team member.

20            So that's how I take these

21  customer service scores.  I just take them at

22  face value, but I address each patient.

23       Q.    Okay.  But you are provided with

24  your retail index scores and the areas to focus
```

1   on and those types of things, correct?

2        A.    I mean, this report says it.  I'm

3   familiar with my score.  The areas for focus, I

4   don't -- I don't -- I don't really see those or

5   maybe really don't address those so much, as

6   much as individualized customer complaints.

7             So if those come to me, which come

8   to me in a different -- by a different avenue,

9   those are important for me to address.

10            My score here -- I mean, it's --

11  the score is fine.  So I don't think I need to

12  look any further than that, and I don't.

13       Q.    Okay.  I'm not asking what you do

14  with the scores.  I'm not asking what you think

15  is important or not important about the scores.

16            I'm just asking whether or not you

17  were told about your scores in the different

18  areas of this Rx retail index report.

19       A.    I am sent my scores.  I don't look

20  at -- there's no areas for focus sent to me that

21  I'm aware of.

22       Q.    Okay.  But you're aware of how you

23  scored in the different areas related to

24  complaints or time to fill an order or

```
1    professionalism or wait time issues with

2    customers, those types of things?

3           A.    No.  I just said I'm aware of my

4    retail index score because that is sent to me on

5    a weekly basis, along with a number of surveys,

6    but I'm not aware of any of those breakdowns

7    that you mentioned.

8           Q.    Okay.  Let's go next to -- I lost

9    the page numbering.  This page ends in Bates

10   number 929.  At the top it says, "Pharmacy

11   Customer Service Scorecard."

12              MR. MAZGAJ:  Objection;

13         foundation.

14          A.    Hold on.  I am --

15          Q.    I've got a different page up.  My

16   mine ends in 11929 in the same document.

17              MR. MAZGAJ:  Right.

18              Same objection.

19          Q.    Ms. Mooney, are you looking at a

20   page that says, "Pharmacy Customer Service

21   Scorecard" at the top and it's a horizontal --

22          A.    I don't -- I don't know where

23   you're at.  I have a 11929.  In what tab are you

24   at?  I don't --
```

```
 1            Q.    Same one.  Tab --

 2            A.    16?

 3            Q.    Tab 16, yes.

 4            A.      Ending in 11929, I have

 5   "Bencivengo VOC" at the top.

 6               MR. MAZGAJ:  Yeah, it appears

 7            there's a number of 11929s, four pages.

 8               MR. GADDY:  Oh.  Sorry, Matt.

 9            It's an Excel, so it's got the same

10            Bates number on it over and over again.

11               MR. MAZGAJ:  Got it.  Got it.  Got

12            it.  That's going to be tough.

13               MR. GADDY:  Yeah.

14               MR. MAZGAJ:  It looks like it's

15            about, I would say, 20 pages in.

16            A.    Okay.  So I see a bunch of

17   Pharmacy Customer Service scorecards, but what

18   am I looking at?

19            Q.    So I'm looking at the one that's

20   for your particular store, 6377, which is about

21   the one, two, three, four -- it should be the

22   fifth page in.

23            A.    Okay.

24            Q.    I want to make sure we're looking
```

1    at the same thing.  At the top in red it says,

2    "Pharmacy Customer Service Scorecard."  Below

3    that, it says, "Negative Customer Service

4    Incidents."

5              Is that what you're looking at?

6         A.   Right.

7         Q.   Okay.  And then on the left-hand

8    side of the page at the top, it says, "Week

9    Ending 6/6/2015."

10             Correct?

11        A.   Yes.

12        Q.   Okay.  And then the left -- the

13   far left-hand column is Rx number, and about

14   two-thirds, three-fourths of the way down the

15   page, there's an entry for 6377, which is you,

16   right?

17        A.   Right.

18             MR. MAZGAJ:  Object to foundation

19        and the document.

20        Q.    Is this a -- do you see or receive

21   this pharmacy customer service scorecard?

22        A.    Yeah, I think these get sent.

23   But, I mean, I don't -- like I said, other than

24   the number and the fact that the incidents come

Highly Confidential - Subject to Further Confidentiality Review

1  to me separately, I don't really -- I don't

2  really look at these.

3          Q.    Okay.  But my question is simply

4  whether or not these are sent to you so that you

5  have the opportunity to look at them if you'd

6  like to.

7          A.    I mean, I've seen one before, but

8  I don't know with what -- how often these are

9  sent to me.  I don't.  I honestly -- they're so

10 hard to read.  I -- yeah, I've seen them, but I

11 don't know when they're sent.

12         Q.    Okay.  And it looks -- if you look

13 at the first couple of entries, there's an entry

14 for the "Store Segmentation," and it's either

15 signature or traditional.

16               What's the difference there?

17         A.    I have no idea.

18               MR. MAZGAJ:  Objection;

19         foundation.

20         Q.    Okay.  And then it -- there's an

21 entry for "PDL," and you told us that Angie was

22 your PDL for a period of time, correct?

23         A.    Yes, Angela was.

24               MR. MAZGAJ:  Objection to form.

1          Q.    Okay.  And then there's -- it

2     looks like in pink at the top, there's entries

3     for any negative customer service incidents that

4     have occurred during the current week.

5                Do you see that?

6                MR. MAZGAJ:  Objection;

7          foundation.

8          A.    Yes, I can see that.

9          Q.    Okay.  And it looks like there's

10    potential entries for -- you know, the second

11    one is related to HIPAA privacy issues, correct?

12                MR. MAZGAJ:  Objection;

13          foundation.

14          A.    Okay.  Yes.

15          Q.    There's an entry for pricing for

16    the prescription.

17                Do you see that?

18                MR. MAZGAJ:  Same objection.

19          A.    Yes.

20          Q.    Next to that there's an entry for

21    any negative customer service incidents

22    regarding promise time for a prescription.

23                Do you see that?

24                MR. MAZGAJ:  Objection.

```
 1          A.    Okay.

 2          Q.    Do you see that?

 3          A.    Yes.

 4          Q.    Okay.  If we go down a couple, do

 5   you see towards the end of the pink section,

 6   there's an entry for whether or not there were

 7   any complaints regarding the wait time for a

 8   prescription?

 9          A.    Okay.

10                MR. MAZGAJ:  Same objection.

11          Q.    Do you see that

12          A.    I do.

13          Q.    And then if you go over and look

14   in the blue section, do you see that they

15   have -- it kind of looks like it's the same

16   entries and just asking how many complaints or

17   negative customer service incidents there have

18   been year to date for all of these things,

19   including the pricing issue, the promise time,

20   the wait time for a prescription, and those

21   types of things.

22                Do you see that?

23                MR. MAZGAJ:  Objection;

24          foundation.
```

```
1              A.     Yes.

2              Q.     And I think you told us earlier

3     that one of the things you focus on when you

4     receive feedback from corporate, it would be

5     issues related to customer complaints, and

6     you're wanting to make sure that you're aware of

7     these issues and you have the opportunity to

8     talk to your team members and the customers

9     about any of those issues, right?

10                    MR. MAZGAJ:  Objection; misstates

11             the testimony.

12             A.     Yes.  As a complaint, yes.  I

13    mean, they use a different avenue to do that.

14    So when I actually receive a complaint, I can

15    deal with that.

16                    MR. MAZGAJ:  Mr. Videographer, can

17             we get a run time?

18                    THE VIDEOGRAPHER:  6 hours, 37

19             minutes, Counsel.

20                    MR. MAZGAJ:  Thank you.

21    BY MR. GADDY:

22             Q.     Okay.  If you keep flipping past

23    the pages of pharmacy customer service

24    scorecard, you'll get to another spreadsheet
```

1    that starts.  And it has two charts, one on --

2    two charts on the page, one with a blue heading

3    and one with an orange heading.

4              MR. MAZGAJ:  May I renew my

5         objection based on foundation.  You

6         haven't established that she's ever seen

7         any of these documents, and she's here

8         in her individual capacity.

9         Q.    Let me know, Ms. Mooney, when you

10   find that next type of chart.

11        A.    Yes.  I see the chart.

12        Q.    Okay.  And, again, I want to look

13   at the results for your store.  So one, two,

14   three, four -- it's the fifth page in.

15        A.    Right.  I see it.

16        Q.    Okay.  And you see that it -- at

17   the top of the one that I'm looking at, it says,

18   "Comparison 6/29/14 through 6/6/15."

19              Do you see that at the top?

20        A.    Yes.

21        Q.    And do you see about three-fourths

22   of the way down, there's an entry for store

23   6377.

24              Do you see that?

```
 1          A.    Uh-huh.  Yes.

 2          Q.    Okay.  Do you recognize this

 3   chart?  Is this information that you were

 4   provided by either your PDL or anybody else at

 5   Giant Eagle?

 6          A.    Like I said before, I could have

 7   had this sent to me, but I just look at a -- at

 8   the score and take it for what it is, a score.

 9   And then I deal with negative and positive

10   complaints separately when they come through via

11   e-mail.  So, again, I don't really look at

12   these.

13          Q.    Okay.  But these are examples of

14   the pharmacy customer service index scores that

15   you were sent, and then obviously you can

16   determine to do whatever you want with it.

17                Is that fair?

18          A.    I can determine that I don't

19   really look at them, yes, for that.

20          Q.    Okay.  After you get them, there's

21   no requirement from corporate that you do

22   anything with them?  You've got them.  You can

23   do with them what you want, correct?

24          A.    Right.  It's a score, a value
```

1    assigned.

2              Q.    Okay.  And if we look at your row

3    for 6377 on this particular report, again, it

4    has your PDL listed there as Angela.  It has the

5    count as far as the number of surveys that were

6    done.  It indicates your overall score at

7    78 percent.

8                    Do you see that?  Are you tracking

9    with me?

10             A.    Yes.  I'm reading that.

11             Q.    Okay.  And then as far as some of

12   the other information that it provides, it has

13   an overall -- it has the overall satisfaction

14   score of 78 percent out of 104 respondents.  And

15   then there's a satisfaction score of 75 percent

16   as it relates to time to fill a prescription

17   from an order based on 102 respondents.

18                   Do you see that?

19                   MR. MAZGAJ:  Objection; assumes

20          facts not on the face of the document.

21             A.    I see this.  I'm reading this.

22   Yes.

23             Q.    Okay.  And what you've told us is

24   that you get this information and you see this

1    score, but it's not something that you do

2    anything with or focus on, fair?

3          A.    Right.  I never even have been

4    told of that score.  It's not used in my

5    practice, so I don't know anything about that.

6          Q.    Okay.  And then the next thing

7    that you received is a score of 76 percent on

8    the issue of pharmacy team member friendliness

9    out of 104 responses.

10               Do you see that?

11               MR. MAZGAJ:  Objection to form.

12         A.    Again, I'm -- yes, I'm reading

13   that.

14         Q.    Okay.  And, again, these are

15   reports and scores that you get on a weekly

16   basis, I think you said, and then you either

17   disregard --

18         A.    I didn't say weekly.  I don't know

19   when I received these, but -- no, I did not say

20   weekly basis.

21         Q.    Okay.  I'm sorry.

22               Do you know how frequently you get

23   your scores and your performance on the customer

24   satisfaction surveys?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    I -- like I said, I -- the overall

 2   score gets sent to me weekly.  These breakdowns,

 3   I don't know.  And if I have a negative

 4   complaint, it is sent to me separately, and I

 5   deal with those on an individual basis.

 6               Those other scores have -- I mean,

 7   I've been managing for years, and none of them

 8   have ever come up to me, so I don't -- I don't

 9   look at these.  So you can take that for what it

10   is.

11          Q.    Okay.

12          A.    I just see the original score.

13          Q.    Okay.  Well, and we can't really

14   say they never came up because we saw one year

15   that was one of the factors on which you were

16   evaluated on your annual performance review,

17   right?

18          A.    Is the overall score.

19          Q.    Okay.

20          A.    Yeah.

21          Q.    Well, specifically you were

22   evaluated on your performance on the time to

23   fill from order.

24               Do you recall that?
```

```
 1          A.    No.

 2                MR. MAZGAJ:  Objection to form.

 3          Q.    Okay.  Would you just defer to the

 4    evaluation document for whether or not you were

 5    specifically evaluated on your store's

 6    performance on the customer satisfaction survey

 7    on the time to fill from an order?

 8                MR. MAZGAJ:  Objection to form.

 9          A.    I have never -- I have never been

10    evaluated on a time to fill.  My overall score

11    is listed on there.  I don't -- I don't know

12    anything about a time to fill score being on one

13    of my evaluations.

14          Q.    Okay.  Okay.  Well, I knew I

15    didn't make up the weekly thing.  So weekly you

16    get your overall score.  And at some other

17    frequency, you get a more detailed report that

18    gives you your score in different areas.

19                Is that fair?

20          A.    Sure.

21          Q.    Okay.  And you either look at it

22    or you don't.  And I guess what you're telling

23    us is that you don't really pay it much

24    attention.
```

```
 1                    Is that fair?

 2        A.    Right.

 3             MR. MAZGAJ:  Objection to form.

 4        A.    And I don't get evaluated on my

 5   time to fill score.

 6        Q.    Okay.

 7        A.    I have never been evaluated on a

 8   time to fill score.

 9             MR. GADDY:  Thank you, Ms. Mooney.

10        I don't have any more questions for you

11        today.

12             THE WITNESS:  Thank you.

13             MR. MAZGAJ:  All right.  I'm going

14        to have a little bit of -- a couple

15        questions, and for the sake of

16        everyone's Friday afternoon, I think

17        I'll just jump right into it.

18                    - - -

19             REDIRECT EXAMINATION

20   BY MR. MAZGAJ:

21        Q.    Ms. Mooney, can you please go to

22   tab 2, which I believe was marked as Exhibit 9.

23             Are you with me?

24        A.    Yes.
```

1      Q.    I think you referred to this

2   section of the Controlled Substance Dispensing

3   Guideline in your testimony, but we didn't walk

4   through it, so let's go to page 4 of that

5   document.  And if you could just read that

6   paragraph for me real quick, and we'll talk

7   about it, out loud.

8      A.    Okay.  "Giant Eagle supports the

9   professional judgment of each pharmacy team

10  member.  If after performing required due

11  diligence and in the exercise of his or her

12  professional judgment, a pharmacist determines

13  that a prescription should not be filled, Giant

14  Eagle will support the decision.  No team member

15  may try to coerce a Giant Eagle pharmacist to

16  fill a prescription that in his or her

17  professional judgment and after appropriate

18  investigation should not be filled.  Any

19  coercion will be considered an ethics violation

20  and will be reported and disciplined according

21  to the Giant Eagle code of ethics."

22     Q.    Okay.  And then just generally,

23  has this been your experience while working for

24  Giant Eagle?

```
 1              A.    Yes, completely.  I have the full

 2    support of the company for my expertise as a

 3    pharmacist.  I think it shows in the fact that I

 4    have worked for Giant Eagle my entire career,

 5    that they have the same morals, ethics that I

 6    do, and I wouldn't -- I couldn't morally,

 7    ethically, legally work for a company that does

 8    not share those values.

 9              Q.    So as far as values, what do you

10    mean by that?  What's kind of the core value

11    that drives your practice?

12              A.    Solely, I want to help people.  I

13    do.  I've always been that way.  I have a family

14    of three girls, and I want to show my girls that

15    you're supposed to do the right thing and help

16    people.  And fortunately I have a job that I can

17    do that in, and I can show them how important

18    that is for them as they grow.

19              Q.    And so helping -- and I'm going to

20    combine two things here.  I think that you

21    testified correctly that you assess each

22    prescription of each patient individually; is

23    that accurate?

24              A.    I do.  Yes.
```

```
 1              Q.    Okay.

 2              A.    I take many things into account.

 3              Q.    So when you're helping individual

 4    people, why is it important to treat each

 5    patient and each prescription individually?

 6              A.    I'm not a robot.  I am a

 7    professional with a degree, with a license.  And

 8    I think I owe it to every patient to give them

 9    and give their prescription my full attention

10    and my expertise so that they get the

11    prescription, the dose that they need, and come

12    back for that reason, is to keep them safe.

13              Q.    Yeah, and so I guess as a general

14    matter, you would never fill a prescription that

15    you didn't think was safe?

16              A.    Never.

17              Q.    Okay.  And another word that you

18    said in there was "license."  Is it my -- is it

19    correct that any individual prescribing a

20    prescription, especially an opioid, must have a

21    license to do so?

22              A.    Yes.  They would need a license to

23    do so.

24              Q.    Okay.  So you only distribute --
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1    or dispense opioid medications that are written

 2    by someone who is licensed to do so?

 3           A.    Correct.

 4           Q.    And that goes back to the DEA

 5    number being required, and you're checking to

 6    make sure that they are a licensed and active

 7    medical professional; is that correct?

 8           A.    Yes.

 9           Q.    Okay.  So back to Exhibit 9 again.

10    So we go through, and you talked about

11    performing due diligence.  You have the support

12    of Giant Eagle.

13                 The next part is about, "No team

14    member may coerce a Giant Eagle pharmacist to

15    fill a prescription that in his or her

16    professional judgment and after appropriate

17    investigation should not be filled."

18                 Has anyone ever coerced you into

19    filling a prescription that you didn't think was

20    appropriate?

21           A.    No.

22           Q.    Now, if a customer comes in and

23    complains about you not filling an opioid

24    prescription, does that change your evaluation
```

Highly Confidential - Subject to Further Confidentiality Review

1   of an individual prescription?

2          A.    No.  No.  They --

3          Q.    How do you treat -- we just went

4   over for a while the customer surveys.  We --

5   you touched on it a little bit, that you would

6   address individualized negative -- or negative

7   reports.

8                Can you walk us through how that

9   might look?

10         A.    If a negative or customer

11  complaint comes into the pharmacy, it would come

12  through as an e-mail with -- from a customer

13  care agent, someone -- like a 1-800 number that

14  they would call and put a complaint in.  They

15  document that complaint and then send it to the

16  pharmacy with the patient's info.

17               So then I can read through the

18  complaint, associate what's going on to that

19  complaint, and then deal with -- deal with that

20  complaint, calling the customer back, seeing if

21  we can make something right, re-teaching to

22  employees.

23         Q.    So I take it that you take

24  customer complaints very seriously; is that

```
 1    true?

 2           A.    I do.  Yes.

 3           Q.    But would a customer complaint

 4    ever change your professional judgment and cause

 5    you to change a decision on an opiate

 6    prescription?

 7           A.    No.

 8           Q.    Okay.

 9           A.    No.

10           Q.    We talked -- or you talked a bit

11    today about your bonus.  I want to talk about

12    that briefly.  And I guess the financials of

13    Giant Eagle in general.

14                 Has anyone ever told you, Emily

15    Mooney, that the Painesville pharmacy needs to

16    make more money?

17           A.    Never.

18           Q.    Have you been told to -- well, let

19    me do it this way.  Have you been told that you

20    need to sell more scripts?

21           A.    Never.

22           Q.    How would you do that if -- even

23    if they told you you had to sell more

24    prescriptions, how do you do that?  Do you have
```

1    a marketing budget?

2            A.    No, I do not.  I don't know how to

3    do that.  In those reports -- or for my review

4    at the end of the year, my PDL will give me that

5    information to fill in on my report.  But for

6    the most part, I don't know, and I'm not

7    involved in that portion.  I'm given a number,

8    and that's what I put into my report.

9            Q.    Right.

10           A.    And that's the extent of it.

11           Q.    So the insinuation earlier seemed

12   to be that in order to fill more prescriptions,

13   you would have to -- or you could be motivated

14   to fill more prescriptions by ignoring red flags

15   or filling improper prescriptions.

16               Does that -- is that something

17   that you've ever seen at Giant Eagle?

18               MR. GADDY:  Objection to form.

19           A.    No, I've never -- I've never seen

20   that.  I've never been asked to fill more, and

21   I've never been told to fill something that I

22   did not feel comfortable in filling, so ...

23           Q.    Okay.  So I didn't want to use the

24   document, but please go to tab 17.  And I won't

Highly Confidential - Subject to Further Confidentiality Review

1    go through all of these, but this was marked as

2    Exhibit 5.

3             And you recall reviewing the Giant

4    Eagle Bonus 2015 Pharmacy document with counsel

5    earlier?

6        A.    Yes.

7        Q.    Okay.  So before we get into that,

8    do you know how much your bonus is?

9        A.    It's roughly about $6,000 a year,

10   give or take, and depending on the year.

11       Q.    Okay.  And let me just ask you

12   point-blank whether you would do anything to

13   jeopardize your license for that amount of

14   money?

15       A.    Absolutely not.  I would not.

16       Q.    Would you -- would you fill

17   illegitimate prescriptions in order to receive

18   approximately $6,000 a year?

19       A.    No, I would not.

20       Q.    And how about this:  If Giant

21   Eagle found out that you were filling

22   illegitimate prescriptions, what would they do?

23             MR. GADDY:  Objection to form.

24       A.    They would terminate my

1   employment.

2          Q.   Okay.  So on this Exhibit 5, Giant

3   Eagle's Bonus 2015 Pharmacy, there's only one

4   take-home that I want to try and figure out.

5               Is the bonus available under this

6   policy unlimited?

7          A.   No.  I think it caps out at a

8   certain amount.

9          Q.   Okay.  Right.  So there isn't --

10  it isn't an unlimited amount of bonus that you

11  can receive.  There is a small percentage of

12  your overall salary that is available even if

13  you hit these metrics; is that right?

14         A.   Right.  That's my understanding.

15         Q.   Okay.  Let's see.  Let's go to

16  tab 6.

17              Are you with me?

18         A.   Uh-huh.

19         Q.   I believe this is Exhibit 1.

20              Have you ever seen this document

21  before?

22         A.   No, I have not.

23         Q.   So do you know when it was

24  published or disseminated?

Highly Confidential - Subject to Further Confidentiality Review

```
 1          A.    No, I do not.

 2          Q.    Okay.  Go to tab 7, please.

 3          A.    Okay.

 4          Q.    I have this down as Exhibit 8.

 5                Have you seen this document

 6   before?

 7          A.    No, I have not.

 8          Q.    Do you know when it was published

 9   or disseminated?

10          A.    No, I do not.

11                MR. MAZGAJ:  Okay.  That's all I

12          have.

13                Thank you, Ms. Mooney.

14                      - - -

15                RECROSS-EXAMINATION

16   BY MR. GADDY:

17          Q.    Ms. Mooney, real quick.  Your

18   counsel asked you about the fact that all the

19   prescriptions for opiates that are presented to

20   you have been written by a licensed physician.

21                Do you recall that?

22          A.    Yes, I do.

23          Q.    Okay.  Despite the fact that

24   you're presented with prescriptions written by
```

Highly Confidential - Subject to Further Confidentiality Review

1   licensed doctors, you've still had the occasion

2   to determine that some of those prescriptions

3   were not appropriate to be filled, and you have,

4   in fact, refused to fill some of those

5   prescriptions on occasion, correct?

6           A.    Yes, for reasons talked about

7   earlier.  Yes.  There's still prescriptions that

8   I wouldn't fill.

9               MR. GADDY:  Thank you, Ms. Mooney.

10          That's all I have.

11              THE VIDEOGRAPHER:  Off the record,

12          6:07 p.m.

13              (Signature reserved.)

14                  - - -

15          Thereupon, at 6:07 p.m., on Friday,

16   April 16, 2021, the deposition was concluded.

17                  - - -

18

19

20

21

22

23

24

```
 1                    CERTIFICATION

 2

 3          I, Carol A. Kirk, Registered Merit Reporter and

 4   Certified Shorthand Reporter, do hereby certify that

 5   prior to the commencement of the examination,

 6   EMILY MOONEY was duly remotely sworn by me to testify

 7   to the truth, the whole truth, and nothing but the

 8   truth.

 9          I DO FURTHER CERTIFY that the foregoing is a

10   verbatim transcript of the testimony as taken

11   stenographically by me at the time, place, and on the

12   date hereinbefore set forth, to the best of my

13   ability.

14          I DO FURTHER CERTIFY that I am neither a

15   relative nor an employee nor attorney nor counsel of

16   any of the parties to this action, and that I am

17   neither a relative nor employee of such attorney or

18   counsel, and that I am not financially interested in

19   the action.

20

21

22   _Carol A Kirk_____

     Carol A. Kirk, RMR, CSR

23   Notary Public

     Dated:  April 21, 2021

24
```

Highly Confidential - Subject to Further Confidentiality Review

```
 1              DEPOSITION ERRATA SHEET

 2

 3

 4   Case Caption:  National Prescription Opiate Litigation

                    County of Lake, Ohio v. Purdue

 5                  County of Trumbull, Ohio v. Purdue

 6

 7        DECLARATION UNDER PENALTY OF PERJURY

 8

 9        I declare under penalty of perjury that I

10   have read the entire transcript of my deposition taken

11   in the captioned matter or the same has been read to

12   me, and the same is true and accurate, save and except

13   for changes and/or corrections, if any, as indicated

14   by me on the DEPOSITION ERRATA SHEET hereof, with the

15   understanding that I offer these changes as if still

16   under oath.

17

18                      _____

                        EMILY MOONEY

19

20   SUBSCRIBED AND SWORN TO

21   before me this _____ day

22   of _____, A.D. 20____

23

                 _____

24               Notary Public
```

```
1              DEPOSITION ERRATA SHEET

2  Page No._____Line No.____Change to:_____

3  _____

4  Reason for change:_____

5  Page No._____Line No.____Change to:_____

6  _____

7  Reason for change:_____

8  Page No._____Line No.____Change to:_____

9  _____

10  Reason for change:_____

11  Page No._____Line No.____Change to:_____

12  _____

13  Reason for change:_____

14  Page No._____Line No.____Change to:_____

15  _____

16  Reason for change:_____

17  Page No._____Line No.____Change to:_____

18  _____

19  Reason for change:_____

20  Page No._____Line No.____Change to:_____

21  _____

22  Reason for change:_____

23

    SIGNATURE_____DATE:_____

24         EMILY MOONEY
```

Highly Confidential - Subject to Further Confidentiality Review

1             DEPOSITION ERRATA SHEET

2    Page No._____Line No.____Change to:_____

3    _____

4    Reason for change:_____

5    Page No._____Line No.____Change to:_____

6    _____

7    Reason for change:_____

8    Page No._____Line No.____Change to:_____

9    _____

10   Reason for change:_____

11   Page No._____Line No.____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No.____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No.____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No.____Change to:_____

21   _____

22   Reason for change:_____

23

     SIGNATURE_____DATE:_____

24           EMILY MOONEY