Page 1

1            IN THE UNITED STATES DISTRICT COURT
2               NORTHERN DISTRICT OF OHIO
3                   EASTERN DIVISION
4
                   ~~~~~~~~~~~~~~~~~~~~
5
6       IN RE:  NATIONAL PRESCRIPTION    MDL No. 2804
        OPIATE LITIGATION
7                                    Case No. 17-md-2804
8                                    Judge Dan Aaron
        This Document Relates To:     Polster
9
10      The County of Lake, Ohio v.
        Purdue Pharma L.P., et al.
11      Case No. 18-op-45032
12
        The County of Trumbull, Ohio v.
13      Purdue Pharma L.P., et al.,
        Case No. 18-op-45079
14
15      Track 3 Cases
16
                   ~~~~~~~~~~~~~~~~~~~~
17
18           Remote videotaped deposition of
                  GEORGE P. PAVLICH
19
20
21                December 14, 2020
                     9:01 a.m.
22
23
24         Renee L. Pellegrino, RPR, CLR
25             (Appearing Remotely)

```
 1    REMOTE APPEARANCES:
 2    On behalf of the Plaintiffs:
          Spangenberg Shibley & Liber
 3        PETER H. WEINBERGER, ESQ.
          1001 Lakeside Avenue E
 4        Suite 1700
          Cleveland, Ohio  44114
 5        (216) 600-0114
          pweinberger@spanglaw.com
 6           - and -
          Napoli Shkolnik
 7        HUNTER SHKOLNIK, ESQ.
          270 Munoz Rivera Avenue
 8        Hato Rey, Puerto Rico  00918
          (212) 397-1000
 9        hunter@nsprlaw.com
             - and -
10        The Lanier Law Firm
          MILDRED CONROY, ESQ.
11        6810 Cypress Creek Parkway
          New York, New York  10022
12        (800) 723-3216
          mildred.conroy@lanierlawfirm.com
13           - and -
          Simmons Hanly Conry
14        LAURA S. FITZPATRICK, ESQ.
          112 Madison Avenue, 7th Floor
15        New York, New York  10016-7416
          (212) 257-8482
16        lfitzpatrick@simmonsfirm.com
17    On behalf of the Ohio Board of Pharmacy and the
      Witness:
18        Ohio Attorney General's Office
          HENRY APPEL, ESQ.
19        30 East Broad Street
          16th Floor
20        Columbus, Ohio  43215
          (614) 466-8600
21        henry.appel@ohioattorneygeneral.com
22                        ~ ~ ~ ~ ~
23
24
25
```

```
                                              Page 3
 1    REMOTE APPEARANCES, CONT'D:
 2    On behalf of Walmart:
          Jones Day
 3        JASON Z. ZHOU, ESQ.
          77 West Wacker
 4        Suite 3500
          Chicago, Illinois  60601-1692
 5        (312) 269-4097
          jzhou@jonesday.com
 6
      On behalf of Giant Eagle:
 7        Marcus & Shapira LLP
          ROBERT BARNES, ESQ.
 8        One Oxford Centre, 35th Floor
          Pittsburgh, Pennsylvania  15219
 9        (412) 338-3344
          rbarnes@marcus-shapira.com
10
      On behalf of CVS Indiana, LLC and CVS Rx Services,
11    LLC:
          Zuckerman Spaeder LLP
12        DANIEL MOYLAN, ESQ.
          100 East Pratt Street
13        Suite 1000
          Baltimore, Maryland  21202-1031
14        (410) 949-1159
          dmoylan@zuckerman.com
15            - and -
          Zuckerman Spaeder LLP
16        STEVEN HERMAN, ESQ.
          1800 M Street NW
17        Suite 1000
          Washington, D.C.  20036-5807
18        (202) 778-1883
          sherman@zuckerman.com
19
      On behalf of Walgreens:
20        Bartlit Beck
          KATHERINE SWIFT, ESQ.
21        54 West Hubbard Street
          Chicago, Illinois  60654
22        (312) 494-4410
          kate.swift@bartlitbeck.com
23
24                    ~ ~ ~ ~ ~
25
```

1   REMOTE APPEARANCES, CONT'D

2   On behalf of Rite-Aid:

        Morgan Lewis & Bockius LLP

3       JAMES NORTEY, ESQ.

        1000 Louisiana Street, Suite 4000

4       Houston, Texas  77002-5006

        (713) 890-5472

5       james.nortey@morganlewis.com

6   ALSO PRESENT:

7       Clint Thomas, Technical Support

        Robert Rudis, Videographer

8       Nicole Dehner, Esq., Ohio Board of Pharmacy

9                       ~ ~ ~ ~ ~

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1                      TRANSCRIPT INDEX

2

3    APPEARANCES ...................................2

4    INDEX OF EXHIBITS .............................6

5    INDEX OF OBJECTIONS ..........................7

6

7    EXAMINATION OF GEORGE P. PAVLICH:

8    BY MR. BARNES ...............................11

9    BY MS. SWIFT ...............................273

10   BY MR. MOYLAN ..............................324

11   BY MR. NORTEY ..............................337

12   BY MR. ZHOU ................................359

13

14   AFTERNOON SESSION ..........................103

15

16   REPORTER'S CERTIFICATE .....................364

17

18   EXHIBIT CUSTODY - RETAINED BY COURT REPORTER

19

20

21

22

23

24

25

Page 6

1                    INDEX OF EXHIBITS

2

3      Number              Description                   Marked

4

5    Exhibit 1      Notice of Videotape Deposition    13
                    of George Pavlich

6

     Exhibit 56     Walgreens Pharmacy Inspection      280
7                   Reports Beginning Bates Stamp
                    BOP_MDL1801987

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF OBJECTIONS
2
3    Objection ......................................41
     Objection ......................................54
4    Objection ......................................69
     Objection ......................................70
5    Objection ......................................70
     Objection ......................................75
6    Objection .....................................111
     Objection .....................................112
7    Objection .....................................213
     Objection .....................................222
8    Objection .....................................222
     Objection .....................................224
9    Objection .....................................224
     Objection .....................................226
10   Objection .....................................233
     Objection .....................................235
11   Objection .....................................236
     Objection .....................................236
12   Objection .....................................237
     Objection .....................................240
13   Objection .....................................244
     Objection .....................................246
14   Objection .....................................247
     Objection .....................................247
15   Objection .....................................247
     Objection .....................................248
16   Objection .....................................251
     Objection .....................................251
17   Objection .....................................253
     Objection .....................................253
18   Objection .....................................254
     Objection .....................................254
19   Objection .....................................259
     Objection .....................................261
20   Objection .....................................262
     Objection .....................................264
21   Objection .....................................264
     Objection .....................................266
22   Objection .....................................271
     Objection .....................................271
23   Objection .....................................318
24
25

1              INDEX OF OBJECTIONS, CONT'D

2

3    Objection ...................................331

     Objection ...................................361

4    Objection ...................................361

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE VIDEOGRAPHER:  Good morning.

2   We are now going on the record at 9:01 a.m.

3   December 14, 2020.  Please note that the

4   microphones are sensitive and may pick up

5   whispering and private conversations.  Please

6   mute your microphone whenever possible.  Audio

7   and video recording will continue to take place

8   unless all parties agree to go off the record.

9          This is media unit one of the video

10  recorded deposition of George Pavlich taken by

11  counsel for Defendant in the matter of In Re:

12  National Prescription Opiate Litigation, filed

13  in the United States District Court, Northern

14  District of Ohio, Eastern Division, MDL Number

15  2804, Case Number 17-md-2804.  This deposition

16  is being held remotely.

17          My name is Robert Rudis from the

18  firm Veritext Legal Solutions and I am the

19  videographer.  Our court reporter today is

20  Renee Pellegrino, also from Veritext.  I am not

21  related to any party in this action nor am I

22  financially interested in the outcome.

23          Counsel and everyone attending

24  remotely will please now state their

25  appearances and affiliations for the record.

1    If there are any objections to proceeding,

2    please state them at the time of your

3    appearance, beginning with the noticing

4    attorney.

5              MR. BARNES:  Good morning.  Robert

6    Barnes for Giant Eagle.

7              MR. NORTEY:  Good morning.  This is

8    James Nortey for Rite-Aid.

9              MR. MOYLAN:  Daniel Moylan with

10   Steve Herman, Zuckerman Spaeder, for CVS.

11             MS. SWIFT:  Kate Swift for

12   Walgreens.

13             MR. ZHOU:  Good morning.  Jason

14   Zhou, Jones Day, for Walmart.

15             MR. WEINBERGER:  Peter Weinberger

16   from the Spangenberg firm for the Plaintiffs.

17             MS. CONROY:  Mildred Conroy for the

18   Plaintiffs.

19             THE WITNESS:  George Pavlich for

20   myself.

21             MR. APPEL:  Henry Appel.  I'm with

22   the Ohio Attorney General's Office.  I'm

23   representing Mr. Pavlich as a witness.  I'm

24   also representing the interests of the State of

25   Ohio Board of Pharmacy.  And I also have Nicole

Page 11

1  Dehner on the line.  She is in-house counsel

2  with the Board of Pharmacy.

3            THE VIDEOGRAPHER:  I believe that's

4  it.  Will our court reporter please swear in

5  the witness?

6            THE COURT REPORTER:  Due to the

7  need for this deposition to take place

8  remotely, will the parties stipulate that the

9  court reporter may swear in the witness over

10  virtual videoconference and that the witness

11  has confirmed that he is, in fact, George

12  Pavlich?

13            MR. WEINBERGER:  Yes.

14            MR. BARNES:  Yes for Defendants,

15  unless one of my colleagues has an objection.

16       GEORGE P. PAVLICH, of lawful age, called

17  for examination, as provided by the Federal Rules

18  of Civil Procedure, being by me first duly sworn,

19  as hereinafter certified, deposed and said as

20  follows:

21        EXAMINATION OF GEORGE P. PAVLICH

22  BY MR. BARNES:

23       Q.    Good morning, Mr. Pavlich.

24       A.    Good morning.

25       Q.    My name is Robert Barnes.  I

1   represent Giant Eagle.  Giant Eagle has been

2   sued, along with four other chain pharmacies,

3   CVS, Walgreens, Rite-Aid, and Walmart.  I may

4   sometimes refer to the group of us, these five

5   companies, as the pharmacy Defendants.  Is that

6   okay with you if I use that term?  I mean all

7   five of Giant Eagle, CVS, Walgreens, Rite-Aid

8   and Walmart.  Can we proceed with that

9   understanding?

10          A.    We can.

11          Q.    Thank you.

12                Could you please state your full

13   name, sir, and your current address, city only,

14   please?

15          A.    George Paul Pavlich; 3146

16   Autumnwood Trail, Poland, Ohio.

17          Q.    Mr. Pavlich, do you understand that

18   you are appearing today pursuant to a notice of

19   deposition and a subpoena that was served and

20   accepted by the State Board of Pharmacy on your

21   behalf?

22          A.    I'm aware.

23          Q.    And have you received a binder of

24   exhibits that were shipped directly to your

25   home?

Page 13

1        A.     Two boxes.

2        Q.     Two boxes, okay.  Have you had an

3   opportunity to look over those exhibits before

4   your deposition today?

5        A.     Yes.  I opened the two boxes.

6   There was one big binder and A through L, I

7   believe, sealed envelopes.  I have them here.

8        Q.     Okay.  If you could put the binder

9   in front of you.  We'll be going through some of

10  those exhibits.

11       A.     Here.

12                -   -   -   -   -

13              (Thereupon, Deposition Exhibit 1,

14              Notice of Videotape Deposition of

15              George Pavlich, was marked for

16              purposes of identification.)

17                -   -   -   -   -

18       Q.     Okay.  If you flip to Exhibit 1,

19  please.  On the third page there's a notice of

20  videotape deposition of George Pavlich.  Do you

21  see that?  It's been marked Pavlich Exhibit 1.

22       A.     I got it.

23       Q.     And are you testifying today

24  pursuant to that notice and the subpoena that

25  was served on the Board of Pharmacy?

Page 14

1         A.    I am.

2         Q.    You'll see, Mr. Pavlich, that most

3    of these exhibits have been already marked.

4    Most of them are marked Edwards with an exhibit

5    number, and that's because they were used in the

6    Friday deposition of Trey Edwards, and rather

7    than remark them, I just decided to use the same

8    exhibits for your deposition.  So when I refer

9    to an exhibit, if I say Edwards 2, it's because

10   it was used in Trey Edwards' recent deposition.

11   Okay?

12        A.    Understood.

13        Q.    Now, Mr. Pavlich, have you ever been

14   deposed before?

15        A.    Yes.

16        Q.    How many times?

17        A.    One time I remember specifically.

18        Q.    And when was that approximately?

19        A.    It was over the Overholt Pharmacy.

20        Q.    So that was quite a while ago?

21        A.    Well, I retired March 1st, 2012.

22   It was, I believe, in 2011.

23        Q.    Okay.  Do you generally recall how

24   the deposition proceeds?  I will ask you

25   questions.  If you would please wait for me to

Page 15

1    finish my question, make sure that you hear and

2    understand it.  If you don't hear it properly or

3    don't understand it, please ask me to restate it

4    or assist you in understanding it; otherwise,

5    I'll assume that you fully heard the question

6    and fully understood it and are giving your most

7    truthful response.

8              Can we agree on that?

9       A.    We can agree.

10      Q.    Now, besides being deposed, have you

11   testified in evidentiary hearings or court

12   proceedings?

13      A.    Yes, all courts, federal through

14   municipal.

15      Q.    Approximately how many times have

16   you testified?

17      A.    Oh, hundreds.

18      Q.    Okay.  And is your -- when was your

19   most recent court testimony?

20      A.    Just prior -- you talking trial or

21   just --

22      Q.    Any court.

23      A.    I would say January 2012 was the

24   last case I was finishing, Evankovich.

25      Q.    Evankovich, that was the name of the

1   case?

2          A.    Yeah.  I believe I was in the court

3   under some preliminary issues.  It could have

4   been late 2011.  I'm not specific.

5          Q.    All right.  When testifying today,

6   please make sure to give verbal responses

7   because the court reporter cannot take down head

8   nods and things of that nature.  If you need a

9   break at any time, let me know.

10              This is, of course, a remote

11   deposition due to the current pandemic.  If we

12   have any technical difficulties on anybody's

13   part, we'll stop and take a break and try and

14   fix that.  Communications other than with your

15   counsel during this remote deposition are

16   prohibited.

17              Can you please confirm with me that

18   you are alone and testifying from your home?

19          A.    I'm alone.

20          Q.    What did you do to prepare for your

21   deposition, Mr. Pavlich?

22          A.    I briefly went through this big

23   binder.

24          Q.    Did you do so with the assistance of

25   Mr. Appel, your counsel?

1          A.     No.

2          Q.     Did you talk to Mr. Edwards or

3     anybody else about your deposition?

4          A.     No.

5          Q.     Do you have an understanding of the

6     nature of the lawsuit that you're testifying in,

7     the opioids lawsuit?

8          A.     I have an understanding.

9          Q.     What is your understanding?

10         A.     That multiple pharmacy chains are

11    being held accountable for opiate dispensings

12    in excess of what is legitimate in the state of

13    Ohio.

14         Q.     Did you get that understanding from

15    news reports?

16         A.     Yes, I did.

17         Q.     Was your understanding in any way

18    based upon discussions with lawyers for the

19    counties, Lake and Trumbull County?

20         A.     No.

21         Q.     Can you tell us about your

22    educational background, Mr. Pavlich, beginning

23    with college?

24         A.     I graduated from Youngstown State

25    University in 1974.  I went -- I graduated from

1   the DEA academy in October of '84.  I was a

2   Youngstown policeman for ten years, two years

3   blue, eight years narcotics special

4   investigation.  Went to the Board of Pharmacy

5   in 1987, and attended National Association of

6   Drug Diversion Investigator seminars and

7   classes throughout my career.

8          Q.     Okay.  Let's back up for a second.

9                 What was your degree in from

10  Youngstown State University in 1974?

11         A.     Criminal justice.

12         Q.     And did you do any post-undergrad

13  work at any college or university?

14         A.     No.

15         Q.     What was your first job out of

16  Youngstown State in 1974?

17         A.     Youngstown Police Department.  I

18  was hired in 1977.

19         Q.     Okay.  What did you do from '74 to

20  '77?

21         A.     I worked in an aluminum factory as

22  a laborer.

23         Q.     And you were ten years at the

24  Youngstown Police Department, you said two years

25  in the blue division?

1        A.     Yes, two years patrol, blue

2    division.

3        Q.     Speed patrol, is that what you're

4    referring to?

5        A.     Yeah, patrol car.

6        Q.     Okay.  And eight years in the

7    narcotics branch; is that what you said?

8        A.     Well, just prior to narcotics

9    division, I went to juvenile division, were a

10   plain clothes detective down there, and then

11   went to narcotics, which was called the strike

12   force special investigation unit, and I was

13   assigned to that division.

14       Q.     And you were a detective in the

15   strike force special investigative unit for

16   eight years?

17       A.     I was a patrolman assigned as a

18   plain clothes officer working detective-type

19   cases, investigative.

20       Q.     Were you always a patrolman rank

21   with the narcotics division --

22       A.     Yes.

23       Q.     -- in that eight years?

24       A.     Yes.

25       Q.     Okay.  Now, as a plain clothes

1  patrolman working in that division, did you do

2  investigations, drug investigations, in the

3  Youngstown area?

4       A.    Yes, most specifically

5  pharmaceuticals.

6       Q.    What county is Youngstown in, sir?

7       A.    Mahoning.

8       Q.    Was most of your work in Mahoning

9  County?

10      A.    Yes.

11      Q.    And what types of pharmaceutical

12  investigations did you perform while with the

13  Youngstown Police Department narcotics division?

14      A.    Anything specifically related to

15  prescription/prescriber issues, going into

16  pharmacies, looking at false prescriptions,

17  illegal prescriptions, street diversion by

18  non-health professionals, all of that.  I was

19  pretty much the main guy in that unit that did

20  that.

21      Q.    I see.  How many other patrolmen or

22  detectives were in the unit that worked pharmacy

23  diversion or pharmaceutical diversion?

24      A.    Other than one detective that was

25  in charge of the unit, we were all patrolmen.

Page 21

1   They hadn't given us promotional tests for a

2   long time so we did not reach the rank, but we

3   were assigned there and there was probably 15

4   working vice and narcotics.

5        Q.    And what types of prescription

6   diversion cases did you investigate and

7   prosecute in that role?  You said generally

8   prescriptions and prescriber issues, illegal

9   prescriptions and street diversion.  I was

10  scribbling notes while you were talking, but I

11  just want to make sure I fully understand.  What

12  is street diversion of pharmaceuticals?  What

13  are you referring to?

14       A.    Well, diversion of a prescription

15  would be where an individual would obtain a

16  prescription from a physician and then divert

17  those prescription drugs to illicit sources, or

18  create a false prescription off of a legitimate

19  prescription; a doctor writes 30 tablets of

20  Percocet and they photocopy it or reproduce it

21  and take it to pharmacy A, B, C, D, and instead

22  of filling it once, they fill it four times,

23  and then they would go out and sell the drugs

24  or use them themselves.

25       Q.    And do you recall in that time frame

Page 22

1  while you were at the Youngstown Police

2  Department where your leads came from mostly?

3  Did you have confidential informants or did you

4  hear from other sources about these types of

5  activities?

6       A.    I was pretty aggressive in the

7  street.  I had numerous confidential

8  informants.  I would speak with pharmacists

9  constantly, asking them if they would see

10  things that were out of -- not the scope of

11  legitimate medical practice involving a

12  physician or prescriptions coming in that

13  looked like they were false, and then I would

14  investigate.

15       Q.    Do you recall some of the company

16  names for the pharmacists that you dealt with?

17       A.    I spoke to pharmacists from

18  independents to all the chains in Mahoning

19  County.  I also would go into other counties,

20  but primarily in Mahoning.

21       Q.    I gave you the list of names of the

22  pharmacy Defendants.  Would you have worked with

23  pharmacists from the pharmacy Defendants in that

24  time period with respect to getting leads for

25  diversion behavior?

Page 23

1          A.     Sure, I would have.

2          Q.     Did you find the pharmacists for the

3     pharmacy Defendants to be cooperative with you

4     and provide you with leads for investigation of

5     diversion?

6          A.     Yes, I did.

7          Q.     Were they generally cooperative and

8     were they interested in stamping out diversion?

9          A.     They were, and if they weren't, I

10    would take appropriate actions.

11         Q.     Now, you said that you were ten

12    years with Youngstown Police.  That takes you to

13    1987.  You started with the Ohio Board of

14    Pharmacy in '87?

15         A.     Yes.  I had worked with, who then

16    became the number two man in Columbus, Tim

17    Benedict.  He was assigned as a field agent.

18    He was a pharmacist, too, in Mahoning County

19    and multiple other counties, and I had met him

20    through the course of investigations or -- I

21    don't know how many years it was, but -- and

22    through that acquaintance I ended up being

23    offered a position with the Board of Pharmacy.

24         Q.     And what was the position you took

25    in 1987 with the board?

1       A.    Field agent.  Compliance agent I
2    think the title officially was.
3       Q.    With what duties?  What were your
4    duties?
5       A.    To investigate, regulate and
6    inspect all pharmaceuticals, institutions and
7    facilities and individuals in the state of
8    Ohio, specifically, though, being assigned to
9    northeast Ohio.
10      Q.    Which would encompass what counties?
11      A.    Well, when I was first hired, I had
12   from Ashtabula -- I'm not going to name all the
13   counties because I can't think of them all.
14   Ashtabula, Trumbull, Mahoning, Columbiana and
15   Jefferson County, and straight across to Wayne
16   and Medina County, excluding Cuyahoga and Lake
17   County.  That was another agent.  We only had
18   like eight field agents.
19      Q.    And were you a field agent with the
20   board from 1987 until you retired in March of
21   2012?
22      A.    Yes, but my -- the board had hired
23   a few more agents in my specific counties
24   probably in the last six years or eight --
25   maybe longer.  I don't recall.  I ended up

Page 25

1   having Trumbull County, Mahoning County,

2   Columbiana County and Jefferson County as my

3   four specific counties that I would conduct

4   inspections and investigations in, though I was

5   sent a lot of counties by my supervisor to help

6   or assist or conduct specific investigations.

7        Q.   Did you assist in Lake County from

8   time to time?

9        A.   I did.

10       Q.   Did you work with Mr. Trey Edwards,

11  Agent Trey Edwards, from time to time in Lake

12  County?

13       A.   Yes.  I also trained him.

14       Q.   You mentioned earlier the National

15  Association of Drug Diversion Investigators.

16  You said you took some courses with them?

17       A.   Yes.  Every year they would have a

18  national meeting involving -- I don't know how

19  many states were affiliated with it.  They were

20  all over the United States, from California to

21  Maine.  And they would have a national

22  conference for like three days, and I would

23  attend those, and they would give a good

24  picture of diversion that was happening through

25  the United States and different aspects of

Page 26

 1   investigations and regulatory compliance.  As a

 2   matter of fact, I was named national

 3   investigator in '04, I won that award.

 4          Q.    And was that for the quality of your

 5   work?

 6          A.    It was quality and quantity of

 7   investigations involving lots of physicians and

 8   pharmacists and healthcare professionals and

 9   street people.

10          Q.    And did you -- you said you trained

11   Trey Edwards.  Did you at some point in time

12   have those responsibilities to train new agents?

13          A.    I pretty much trained everyone.

14   When I got hired, I was the first of two hired

15   by Tim Benedict and Bob Cole, my immediate

16   supervisor, to go out and do things

17   aggressively.

18          Q.    Okay.  And besides training agents,

19   did you also train -- provide training sessions

20   for members of the board or agents for the board

21   from time to time?

22          A.    Members of the board?

23          Q.    Yes.

24          A.    Field agents.  I trained pretty

25   much pharmacists to field agents, pretty much

Page 27

1    taught them all.

2         Q.    Have you ever had anything to do

3    with the Lake County Narcotics Agency?

4         A.    Anything to do with them other

5    than, you know, I might have gone up there on a

6    couple of their cases for insight or

7    assistance.  I know one case I worked with Trey

8    Edwards was Dr. Peter Franklin and Overholt

9    Pharmacy.  That was pretty much toward the end

10   of my career.  It was a large case.

11        Q.    And in your work as an agent for the

12   board, doing all those duties you just testified

13   to, did you need to become familiar with the

14   Ohio Revised Code and the Ohio Administrative

15   Code sections that regulate the pharmacy

16   industry?

17        A.    I did.

18        Q.    Now, you've referenced several times

19   the Franklin Overholt Pharmacy matter.  Was that

20   a particularly complex matter, a long

21   investigation?

22        A.    Very complex.

23        Q.    What made it complex?

24        A.    The massiveness of prescribing and

25   dispensing of opiates.

Page 28

1      Q.    We'll get into that matter a little

2   bit later.

3              I want to just talk to you a little

4   bit about diversion of pharmaceuticals.  What

5   types -- in your experience, what types of

6   diversion are there in Ohio with respect to the

7   diversion of pharmaceuticals?  I mean, what --

8   can you give us some examples of the common

9   things that you saw and investigated?

10      A.    Well, top of the hill is all

11   prescriptions must be legitimately prescribed

12   for a legitimate medical purpose.  That would

13   be the prescriber.

14              Next would be corresponding

15   responsibilities to the pharmacists, what is

16   prescribed by a physician and the pharmacist

17   has, under Administrative Code 4729-5-30, which

18   I used commonly in conversations or whatever,

19   the manner of issuance.  Pharmacists should not

20   take on its face value prescriptions that are

21   written without thinking of legitimate medical

22   purpose and corresponding responsibility.

23              Then next you have people in the

24   street who would get a legitimate prescription,

25   legally authorized, and divert it in various

1   fashions and forms, creating multiple copies,

2   creating their own type of format, signature,

3   so on and so forth, and then the selling of

4   those prescriptions or the drugs from the

5   prescriptions and/or the actual prescription.

6        Q.   Okay.  You mentioned earlier

7   prescribers.  Did you investigate prescribers

8   not fulfilling their function?  I guess that's

9   the first thing that you mentioned.  That's a

10  prescriber responsibility to issue the

11  prescription for a legitimate purpose.  Did you

12  investigate physicians and healthcare

13  professionals that failed to follow that

14  obligation?

15       A.   More than anyone else at the board.

16  Approximately -- I'm going to guess -- in my 25

17  years I investigated which resulted in the

18  indictment and/or conviction of 90 prescribers.

19       Q.   And what were these prescribers,

20  these 90 prescribers, generally doing?

21       A.   Not prescribing to legitimate

22  medical practice standards.

23       Q.   So a lot of prosecutions.  Were

24  those all criminal prosecutions or were some

25  civil?

Page 30

1      A.    No.  I'm talking criminal

2  prosecutions in federal and state court.  It

3  was a lot.  I was very busy.

4      Q.    And these 90 prescribers or so, did

5  some of them go to jail for their conduct?

6      A.    Yes.

7      Q.    Where generally did these

8  investigative leads come from for these 90 or so

9  prescribers that you prosecuted?  How did those

10  investigations normally start?

11      A.    As I taught younger agents, you

12  must work the street, you must work the

13  pharmacies.  You work the pharmacies to get

14  leads from pharmacists.  They're there every

15  day looking at these things.  You follow up.

16  For an example, a bad prescription.  You go and

17  find the person that passed that bad

18  prescription and then you question them and see

19  the basis of legitimate medical practice from

20  the physician to that person.

21      Q.    All right.  So it sounds like a lot

22  of the leads came from pharmacists in the

23  pharmacies because they were on the front line,

24  so to speak?

25      A.    I did my best to make friends with

Page 31

1    all pharmacists and anyone else that I

2    encountered.  I was very straightforward with

3    everyone.  And they would call me, and -- I

4    would get a lot of phone calls, yes.  And to

5    the best of my ability, I tried to investigate

6    everything, going after the biggest fires

7    first, and trickle it on down, if I could, to

8    small things, but small things a lot of times

9    led to big things.

10        Q.    Do you recall getting or befriending

11   pharmacists at any of the pharmacy Defendants'

12   locations, including Giant Eagle?

13        A.    Yes.

14        Q.    And did they -- did the Giant Eagle

15   pharmacists provide leads to you that resulted

16   in prosecutions of bad actors, including doctors

17   and street-level people?

18        A.    All pharmacists did at all the

19   chains, including independents.  I can't be

20   specific as to what Giant Eagle pharmacists

21   told me or CVS, but I will tell you I was in

22   all of the pharmacies, and I would receive 20,

23   25 calls a day on different things, not only

24   Ohio Revised Code criminal violations but

25   administrative things, too, questioning what do

1  you think about this or that.  So, you know,

2  I'm trying to answer you to say pharmacists in

3  all stores cooperated, and if they didn't

4  cooperate, I would go to that store and ask

5  them what their specific issue was with not

6  reporting something and then I would document

7  it on an inspection report.  If I asked for a

8  profile, let's say a patient profile or a

9  physician dispensing profile, and I didn't get

10  it within a reasonable time, three days, or

11  immediately, I would go to that store and

12  confront the responsible pharmacist or

13  pharmacist on duty and say, "I've requested

14  this.  Where is it?"  In 90 -- high 90 percent

15  of the cases I would get everything I needed

16  immediately from chains or independents.  I'd

17  have no problems.

18        Q.    I see.  So if they didn't respond as

19  fast as you wanted, you would confront them and

20  make sure you got what you needed?

21        A.    I would make a personal visit to

22  that specific location and meet with each

23  pharmacy, whether it was a chain or an

24  independent, had a responsible person, it was

25  called, for the specific terminal distributor

Page 33

1   license.  I would try to meet with them

2   specifically, but if not, the individual

3   pharmacist and/or a supervisor for that a lot

4   of times change.

5           Q.    Did the doctors or other subscribers

6   similarly provide leads to you or was it mostly

7   from the pharmacists?

8           A.    I would get calls from some doctors

9   as to, Agent Pavlich, I see patients lining up

10  outside this office.  I don't think something

11  is going on here that's legitimate.  I'm in the

12  same practice building.  You might want to look

13  into this.  Or a pharmacist again calling about

14  what they thought was not legitimate.

15          Q.    You referenced a couple of minutes

16  ago getting 20 to 25 calls a day from

17  pharmacists not only related to potentially

18  illegitimate prescriptions but also just calls

19  about complying with the regulations.  Is that

20  what you said?

21          A.    Yeah.  20 to 25 calls from

22  everywhere, I mean whether it was someone in

23  the street -- it was related to a lot of

24  different things.  My phone was pretty busy.

25          Q.    But would pharmacists call you not

Page 34

1    only to say, hey, I think we got an illegitimate

2    script here, but would they call you and ask for

3    your advice about compliance issues, like how do

4    I comply with this regulation or that

5    regulation?

6         A.    Many times, and understand I'm not

7    a pharmacist, but I was pretty familiar with

8    administrative and criminal code, so I was the

9    guy.  If they didn't call Columbus, they called

10   me.

11        Q.    I see.  In your 25 years with the

12   board, Mr. Pavlich, were you able to observe the

13   forms of diversion changing over time to react

14   perhaps to law enforcement efforts?  Do you

15   understand my question?

16        A.    I do.

17        Q.    Did the forms of diversion change

18   over time in your 25 years?

19        A.    Yes.  It increased quite a bit from

20   when I first started from Youngstown Police

21   Department to when I ended my career.

22   Increased in a way -- some physicians were just

23   blatant about it, and some would -- for an

24   example, a doctor by the name of Orr was

25   dispensing opiate amphetamine prescriptions for

Page 35

```
 1   diet out of his office thinking no one is going
 2   to find out, I'm giving it all out of my
 3   office, no pharmacist is going to be able to
 4   call on me because they're not going to take a
 5   prescription to the pharmacy.  So, you know,
 6   that was one way of doing diversion and hoping
 7   no one finds out.
 8              And then there was -- you know,
 9   there was physicians that prescribed diet
10   drugs, which was real big for a long time till
11   we put a stop to that to the best of our
12   abilities.
13              And then the opiates.
14              You know, a lot of good practicers,
15   practicing physicians out there, but it was
16   pretty bad for a while.
17        Q.    When you referenced a lot of good
18   doctors or a lot of good practicing physicians
19   out there, was that your experience,
20   Mr. Pavlich, that most physicians practiced in
21   good faith and it was just a small number of bad
22   doctors that caused a lot of the problems?
23        A.    Yes.
24        Q.    You referenced Dr. Orr and
25   prescribing out of his office so that it
```

Page 36

1    wouldn't -- the prescriptions wouldn't go to the

2    pharmacies.  How was his conduct uncovered if it

3    wasn't through the pharmacists because they

4    weren't bringing the prescriptions to the

5    pharmacists?

6          A.    This goes back to the early part of

7    my career with the state.  I believe I got

8    information from probably someone picked up

9    with diet pills, being amphetamines, Adipex for

10   an example, and from that I believe it led to

11   where did you get them.  They were in a vial or

12   whatever, unmarked to a pharmacy.  And from

13   that, then I -- let me think about this for a

14   second.  I ran reports for manufacturers who

15   sell that particular drug, Adipex or

16   phentermine, and I noticed that doctor was

17   purchasing huge volumes of these drugs, and

18   then I said to myself, oh, I see what's going

19   on, he's just bringing the patients in, getting

20   cash, which I found out, and then giving the

21   pills directly to them, and no one knows but

22   him and his patients that he was giving it to,

23   and his office staff.

24                So that resulted in an

25   investigation that resulted in me writing a

Page 37

1   search warrant for his office and going in and

2   pulling every single patient file out of that

3   office.

4        Q.    Was that a technique that you were

5   able to apply later in your career?  And by that

6   I mean starting with information related to the

7   drugs being purchased from the manufacturers and

8   tracing it down to the doctors.

9        A.    Yeah.  It wasn't an easy process

10  then.  We didn't have a system -- if you're

11  familiar with OARRS.  Everything was manual.

12  So if I -- if I had 500 patients, I would have

13  to manually enter them into an Excel system,

14  and all the prescriptions or all the specific

15  drugs, the quantities, so on and so forth, like

16  an OARRS report, and manually do this.  And my

17  secretary was -- it wasn't an easy thing, but

18  that's how we did it, and that's how I put

19  together that case on Dr. Orr.

20       Q.    Later -- I think OARRS came in in

21  early 2006.  Do you recall that?

22       A.    I don't remember the date.  I'll

23  take your word on 2006.

24       Q.    Do you recall OARRS being a

25  beneficial tool for your criminal law

Page 38

1   enforcement investigations in terms of having

2   ready access to prescription information that

3   used to be manual?

4        A.    Best tool I ever had.

5        Q.    So was that a dramatic shift in your

6   ability to investigate criminal behavior

7   involving pharmaceutical diversion?

8        A.    Dramatic.

9        Q.    How so?  Can you tell us?

10       A.    Well, if I'm investigating Dr. A

11  and I want to see where all the patients are

12  taking all their prescriptions, all I had to do

13  was run a report on him.  Instead of making

14  phone calls to 50 pharmacies in a set radius, I

15  get a report on it.

16            Or if I was investigating patient B

17  and wanted to see what he was doing, I'd print

18  his profile through OARRS and it would show me

19  that he went to Dr. A, B, C, D, E and took the

20  prescriptions to pharmacy E, F, so on and so

21  forth down the line.  I found everything

22  immediately instead of making 50 phone calls

23  for every pharmacy asking them do you have this

24  patient, do you have this doctor's

25  prescriptions.  It made it simple.

Page 39

1      Q.    Did it speed up your criminal

2  investigations?

3      A.    It did.

4      Q.    We'll get into OARRS shortly, but I

5  want to ask you a few more general questions.

6            Can you describe the type of

7  criminal activity that occurs in the

8  pharmaceutical diversion area?  What types of

9  crimes are occurring or did occur in your 25

10  years there?

11      A.    Trafficking in drugs, illegal

12  processing of drug documents, drug abuse.

13  Those are probably the top three.

14      Q.    The top three.  Then trafficking in

15  drugs, trafficking in pharmaceuticals, what did

16  you see in your experience?  What types of

17  criminal trafficking was occurring while you

18  were a board agent?

19      A.    Illegal prescribing, illegal

20  dispensing, illegal selling, illegal self-use.

21  That's pretty much it.

22      Q.    Okay.  And illegal processing, what

23  does that mean?  What are you referring to?

24      A.    You get a prescription for -- from

25  a legitimate prescriber for ten tablets of

1   Percocet, a Schedule II controlled substance,

2   and before you take it to the pharmacy, it's

3   written out in black by the doctor and you put

4   a zero next to the 10, and you take it in and

5   you give it to the pharmacist, and instead of

6   getting 10, you get 100.  That's illegal

7   processing.

8        Q.    So you get -- it starts with a

9   legitimate prescription that is altered

10  fraudulently in some way?

11       A.    Well, it could also be you create

12  it, the prescription, and bring it in, or

13  duplicating a legitimate prescription and

14  bringing it in.  An example would be if you get

15  the ten tablets of Percocet from a doctor, you

16  take it to a copy machine, you run it off ten

17  times and you take it to ten different

18  pharmacies.  And if the pharmacist calls the

19  office with a question about, you know, this

20  looks like a photocopy, and he calls the office

21  and asks the nurse do you have a prescription

22  for George Pavlich for ten tablets of Percocet,

23  and the nurse looks at the file, yes, he was

24  issued a prescription for this, and they fill

25  it.  And unless the nurse catches that ten

Page 41

1   pharmacists called me about the same

2   prescription from ten different pharmacies,

3   they get filled.

4       Q.   I see.  So in that type of

5   circumstance, the pharmacist is doing what he

6   can to verify but not knowing that the focal

7   point, the nurse who is checking, isn't telling

8   him or the other pharmacists that I got nine

9   other calls before yours?

10              MR. WEINBERGER:  Objection as to

11   form.

12       Q.   Did I understand that correctly,

13   Mr. Pavlich?

14       A.   Yes, that is true.  Pharmacists

15   rely upon the source of the prescription, being

16   the physician, to legitimize what they have in

17   front of them if they call.  I mean, there was

18   times when -- I can think of one doctor that

19   his nurse kept legitimizing all these

20   prescriptions from someone who was

21   photocopying, and I had to go pay that

22   physician a visit and I explained to him what

23   was going on.

24       Q.   Did your investigations involve

25   multiple agencies from time to time?  And I'll

1  break that down for you.  Did you ever work with

2  the DEA?

3       A.    Yes, I did.  I was actually working

4  right out of their task force office for a

5  number of years.

6       Q.    Were you on the task force?

7       A.    Not assigned, but I worked out of

8  their office a number of years.  I worked with

9  one specific person that was assigned down

10  there and one specific person from the

11  Youngstown Police Department that was assigned

12  pharmaceuticals out of their unit, and Mahoning

13  County Drug Task Force, Trumbull County Drug

14  Task Force, Columbiana County.  I worked with

15  all of them.

16       Q.    Okay.  I want to just direct your

17  attention, Mr. Pavlich, to some of the

18  information that we have regarding the State

19  Board of Pharmacy.

20            Now, you spent 25 years of your

21  career with the State Board of Pharmacy.  How

22  would you describe the roles of the State Board

23  of Pharmacy in terms of regulating and

24  enforcing the drug laws in Ohio?

25       A.    During my career, aggressive,

Page 43

1    compliant, and professional.

2         Q.    Was the Board of Pharmacy the

3    primary regulator and law enforcement agency for

4    the pharmaceutical industry in Ohio during your

5    career?

6         A.    State-wise, in my opinion, yes.

7         Q.    It sounds like others might have a

8    different opinion.

9         A.    Well, you got the federal

10   government, the DEA.  They had a compliance

11   unit up in Cleveland that relied on us to help

12   them with a lot of things.  You had Youngstown

13   Police Department, which is, you know, the city

14   that relied on me helping them work cases.  I

15   had a lot of experience, so I was pretty much

16   in demand to help different agencies do

17   different things.  I had issues with some.  You

18   know, if they didn't want to do it a certain

19   way, then I wouldn't work with them anymore.

20        Q.    Did the DEA inspect pharmacies in

21   Ohio or was that the board's function?

22        A.    They had gone in some that I know

23   of.  I don't know to what extent they did it.

24   They pretty much sat in their office up in

25   Cleveland.

Page 44

1      Q.    Okay.  What I'm getting at is I just

2  want to understand, was it a normal function of

3  the DEA to inspect pharmacies in Ohio or was

4  that primarily the board's function?

5      A.    Primarily the board.

6      Q.    Does the board also have an

7  important licensing function?

8      A.    You couldn't dispense drugs without

9  a board license or a DEA license.

10     Q.    So that was one of the roles that

11 the board played, the licensing of pharmacies

12 and renewals of pharmacy licenses; am I correct?

13     A.    The board licensed all terminal

14 distributors, wholesale providers, anywhere

15 that pharmaceuticals were in the state of Ohio

16 from a first aid unit to a major manufacturer.

17     Q.    And you mentioned the DEA also

18 provided registration.  Would that be the

19 same --

20     A.    Not everywhere would have a DEA

21 license.  Only if you were specific into use or

22 the dispensing or the prescribing of controlled

23 substances did they come into play.

24     Q.    You used the term "terminal

25 distributor of dangerous drugs," TDDD.  I've

Page 45

1    seen that reference.  In layman's terms, is that

2    a pharmacy or is that too narrow of a

3    description?

4           A.    No.  That would be a pharmacy.

5           Q.    Are there other entities that are

6    included in that TDDD description?

7           A.    Anywhere where the drugs would go

8    in, and they would terminate at that particular

9    location; in other words, terminate being

10   dispensed or administered would be a terminal

11   distributor of dangerous drugs.

12          Q.    Are there a lot of doctors' offices

13   that have TDDD license -- licenses?

14          A.    Now?  I'm not sure now.  Then there

15   were some that had it.  There were some that

16   were, oh, let's say for purposes of, in their

17   words, a lot of times trying to help their

18   patients out.  They would have stock of certain

19   wholesale purchased medications and then

20   provide them to their patients for a nominal

21   fee, but not the majority of physicians.

22          Q.    Is one of the roles of the board

23   when you were there for 25 years -- was it one

24   of their primary roles to enforce the Ohio

25   Revised Code regarding drug offenses and

Page 46

1    controlled substances and dangerous drugs?

2           A.    Yes.

3           Q.    I put in this exhibit binder Edwards

4    Exhibit 2.  If you want to flip to it in your

5    binder.

6           A.    Yes.

7           Q.    If you go to page 4 of this

8    exhibit --

9           A.    Okay.

10          Q.    -- there's a page called "Role of

11   the Board," and it says, "Charged with enforcing

12   key chapters of the Ohio Revised Code,"

13   including drug offenses, pure food and drug

14   laws, controlled substances and pharmacists,

15   dangerous drugs.  Was that what you understood

16   the role of the board to be in your 25 years

17   there?

18          A.    Yes.

19          Q.    And on the next page it has further

20   information about the role of the board broken

21   down between administration, communication and

22   education and law enforcement.  Administration

23   includes licensing and regulating pharmacists,

24   pharmacy interns and locations that store

25   dangerous drugs, like pharmacies, EMS, physician

1    offices, wholesalers.  Does that strike you as

2    accurate from your 25 years at the board, that

3    that's what the board was charged with doing,

4    including all the way down to enforcing the drug

5    laws and rules for the state of Ohio?

6         A.    Yes.  That there completes the

7    total picture.

8         Q.    Okay.  There's a reference on

9    pages -- on page 6 to the agency structure,

10   having a licensing department, a legal affairs

11   department, policy and communication, compliance

12   and enforcement department, and an OARRS

13   department.  Do you recall that being the

14   structure of the board while you were there?

15        A.    Not initially when I got hired was

16   there an OARRS department, but when I left

17   there was an OARRS department.  Yes, that's

18   pretty much it.

19        Q.    Okay.  The next few pages, 7 through

20   9, they talk about field staff, and they start

21   with an agent, then they have a specialist.  Do

22   you recall the distinction while you were

23   working as an agent between agents and

24   specialists?

25        A.    Yes.

Page 48

1          Q.    You were not a specialist; am I

2     correct?

3          A.    Correct.

4          Q.    What was a specialist from your

5     experience?  What was the difference between a

6     specialist and an agent?

7          A.    An agent was like myself, a former

8     law enforcement person.  A specialist was a

9     licensed pharmacist.  We had similar but

10    different duties and inspection facilities,

11    though we could all go into each other's

12    facilities when necessary or someone wasn't

13    available, like I would go into pharmacies a

14    lot, a specialist would go into hospitals and

15    nursing homes.  But because I was with the

16    board a long time, I, a lot of times, would go

17    into hospitals and those types of facilities to

18    not only assist a specialist but do things.

19    Similar but different.

20         Q.    I see.  One of the first duties

21    mentioned on page 7 of an agent is to inspect

22    pharmacies.

23              Do you see that?

24         A.    That's the first one noted, yes.

25         Q.    Was that an important function of

1    the board agents, to inspect the pharmacies that

2    were licensed by the board?

3          A.    To me it was very important, and we

4    were required to do 50 full -- not just to walk

5    in and say hello, 50 full inspections every

6    year.

7          Q.    And if you did that for the 25 years

8    you were there, that would give you what, about

9    1,200 inspections?

10         A.    Your math is better than mine, but

11   it was a lot.  More -- I had a hard time doing

12   them.

13         Q.    Now, you made a distinction.  You

14   said they weren't just stop in and say hello.

15   They were actual full inspections.  What do you

16   recall a full inspection involving?

17         A.    A full inspection would be I would

18   go in there -- and on inspection sheets there

19   was a little column to the left on the manual

20   sheet, and, as I recall, it would start off

21   licenses and go all the way down and encompass

22   just about every aspect of what you would need

23   to look at in a pharmacy to meet administrative

24   regulatory compliance.

25         Q.    All right.  We'll get into

Page 50

1    inspections in a little bit.  I want to just

2    finish this document.

3                If you go to page 10, there's a

4    section called "Investigations:  Criminal."

5                Are you with me?

6        A.    Oh, I see it, "Investigations:

7    Criminal," okay.

8        Q.    Do you see it says there, "Drug

9    Diversion:  Any criminal act involving a

10   prescription drug.  Includes theft of drugs,

11   tampering with drugs, deception to obtain

12   dangerous drugs, illegal processing of drug --

13   of drug" -- I guess they mean or, "of drug or

14   drug documents."

15               Do you see that?

16       A.    Yes.

17       Q.    Does that cover the four primary

18   types of criminal investigations that you

19   conducted in your 25 years at the board?  Is

20   there anything missing is what I'm getting at?

21       A.    There's self-abuse by a physician,

22   where they would write prescriptions, give it

23   to someone, have them fill them, bring them

24   back to them and they were using them.  So

25   self-abuse I would have added into that little

Page 51

1   category.

2          Q.    Okay.  Anything else?

3          A.    That's a diversion.

4                I don't know why they don't have

5   trafficking in drugs, but I didn't write this.

6   Apparently Mr. Wimberly did.

7          Q.    Do you know Mr. Wimberly?

8          A.    I know him.

9          Q.    And what was his position at the

10  board?

11         A.    He was a field agent.  He's now a

12  supervisor, I believe.

13         Q.    Okay.  But you would add self-abuse

14  by doctors and trafficking --

15         A.    I would.  I would have put that

16  there.

17         Q.    Okay.

18         A.    I mean, obviously they're both

19  diversions of drugs.  If you get a legitimate

20  prescription and you divert it by selling it,

21  that's trafficking in drugs.

22         Q.    Okay.

23         A.    Or you illegally use it for

24  yourself.  That's diversion of drugs.

25         Q.    Okay.  The last part of this

Page 52

1   pamphlet or document speaks about OARRS, and

2   it's pages 11 through 24.  OARRS would have been

3   in effect for the last six years of your career

4   approximately, if we assume OARRS started in

5   2006?

6           A.    Yeah.  That would be about -- well,

7   I left March 1st of 2012, so in January and

8   February I was pretty much wrapping things up.

9   I was finishing the Evankovich case, the

10  Overholt case.  I wasn't really going out doing

11  inspections or anything.  So really '06, '07,

12  '08, '09, '10, and I don't know when they

13  started in '06.  So maybe six years, yeah.

14          Q.    About six years.

15                What did you learn about OARRS in

16  those -- let's call it those six years?  Was

17  OARRS a discretionary or a mandatory system

18  while you were an agent?

19          A.    It was mandatory that all

20  pharmacies comply and produce electronic

21  documentation to the State Board of Pharmacy in

22  Columbus.

23          Q.    Are you speaking of in the 2011-2012

24  time period, because what I'm getting at is --

25  and I'll be more specific.  When did it become

Page 53

1  mandatory that an OARRS report be run and under

2  what conditions?

3          A.    I don't remember how often they

4  compiled OARRS reports from specific stores,

5  but I know from chains to independents, a

6  dispensing pharmacy had to electronically send

7  all their dispensing controlled substances, and

8  there might have been another -- like Soma was

9  not a controlled substance at the time --

10  electronically to the Board of Pharmacy.  It

11  was every two weeks, every month.  I'm not

12  exactly recalling that.  And if they did not

13  send it, then I think Columbus would make a

14  phone call and try to ascertain what was the

15  problem.  But everyone had to comply, at least

16  to my knowledge.

17          Q.    Okay.  And it wasn't only pharmacies

18  providing this information, doctors and

19  wholesalers were also providing information to

20  the OARRS database; is that correct?

21          A.    No.  Doctors did not have to

22  provide -- unless they were dispensing

23  medications out of their office.  They might

24  have been.  I'm not familiar with that.

25          Q.    Okay.

Page 54

1        A.    But wholesalers had to comply.

2        Q.    And they provided their wholesale

3    sales information to the Board of Pharmacy on a

4    periodic basis in addition to the pharmacies

5    reporting their dispensing information?

6              MR. WEINBERGER:  Objection as to

7    form.

8        Q.    You can answer, sir.

9        A.    I'm not positive on wholesalers but

10   I'm pretty sure they had to comply.

11       Q.    Okay.  Did you develop an

12   understanding over time of when a pharmacist or

13   a doctor was required to access the OARRS

14   database and run a report on a patient under

15   certain conditions?

16       A.    Doctor or a pharmacist?

17       Q.    Yes.

18       A.    I know they had responsibilities to

19   look for a patient profile.  I don't know

20   how -- I can't recall how frequently they were

21   required to do it, if it was every patient or a

22   random sampling of patients, but I know when I

23   went in and talked to a pharmacist for an

24   investigation or a physician on a patient for

25   an investigation, when OARRS was up and

Page 55

1    running, that would be one of the questions I

2    would ask them, did you run an OARRS report.

3    You know, I don't recall the exact standard.

4         Q.    Understood.

5              If you look at page 14 and 15 of

6    this Edwards Exhibit 2, you see there's a

7    presentation of when a pharmacist must query

8    OARRS.  Now, on page 14 this is listed as

9    effective February 1 of 2016, and by then you

10   had been retired almost four years.  I don't

11   mean for this to be a memory test for you, but

12   I'm just seeing if this jogs your memory as to

13   what was in effect prior to your retirement in

14   terms of when a pharmacist must query OARRS.

15             Do you recognize any of these

16   conditions or you don't recall, either one?

17        A.    Am I looking at 14?

18        Q.    Page 14, yes.  It has a caption "RPh

19   must query OARRS" on Exhibit 2.

20        A.    I'm going to hold this up.  You

21   tell me if I got the right thing.  It doesn't

22   look like what you're talking about.

23        Q.    It's that same document that has

24   Wimberly on it.

25        A.    This document (indicating)?

Page 56

1        Q.     No.

2        A.     Well, that's 14 in my folder.

3        Q.     Yeah.  I'm sorry.  I meant page 14.

4   If I said Exhibit 14 --

5        A.     Oh, you said --

6        Q.     I misspoke.  Sorry.

7        A.     Going back --

8        Q.     Go back to Exhibit 2, page 14.

9        A.     Okay, Exhibit 2, page 14.  That's

10  better.  Sorry.  I might have misunderstood

11  you.

12       Q.     That's fine.

13       A.     Okay.  There we go.  I got it.

14       Q.     And I just was wanting you to take a

15  look at some of those conditions of when a

16  pharmacist must query OARRS, recognizing that

17  this text begins effective February 1 of 2016.

18  I just wanted to see if it jogged your memory in

19  any way as to when you recall pharmacists were

20  supposed to check OARRS while you were an agent

21  before your retirement in 2012.

22       A.     I don't recall this at all as

23  something that was brought to my attention when

24  I worked, these specifics.  Like I say, I

25  wasn't familiar with it.

Page 57

1        Q.    Okay.  Same on page 15, are you also
2    not familiar with these conditions?
3        A.    No, I'm not familiar.
4        Q.    All right.  I think I know the
5    answer.  If you would look at page 15 and 17
6    that has "Prescriber must query OARRS."  Are you
7    also not familiar with these -- these
8    conditions, Mr. Pavlich?
9        A.    They all make sense, but I don't
10   remember anything specific like this during my
11   time.  I mean, we might have talked about this
12   during staff meetings, but I don't remember
13   anything laid out like this.
14       Q.    Okay.  How about I direct your
15   attention to Exhibit 3 in the same binder.
16       A.    That's the tab marked 3, right?
17       Q.    Yes.
18       A.    Okay.  Go ahead.
19       Q.    Do you know Steven Schierholt?  Was
20   he the executive director while you were still
21   an agent?
22       A.    I don't know him.
23       Q.    I'm sorry.  Do you know
24   Mr. Schierholt?
25       A.    I don't know him.

Page 58

1          Q.    Oh, I'm sorry.  I didn't hear your

2    answer.

3                If you look at page 3 of this

4    exhibit, Mr. Pavlich -- they're not numbered

5    so --

6          A.    Yeah, I got it.

7          Q.    -- under Priority number 2, "Ensure

8    routine inspections and enhance capacity to

9    conduct administrative and criminal

10   investigations."

11               Do you see that?

12         A.    I see it.

13         Q.    Now, the second paragraph below that

14   states, "Currently, board agents and specialists

15   are charged with conducting inspections as well

16   as investigations of individuals and entities in

17   violation of Ohio laws and rules."

18               Is that what you understood your

19   role was as an agent as well as specialists in

20   terms of conducting inspections of pharmacies

21   while you were an agent?

22         A.    Conducting inspections and

23   investigations in violation of Ohio law and

24   rules, yep, that was my duty.

25         Q.    If you flip to the next page, at the

Page 59

1  top, the first full paragraph, you see where it

2  states, "Routine inspections allow board staff

3  to review facilities to ensure they comply with

4  security, recordkeeping and other rules designed

5  to deter and detect the diversion of

6  prescription drugs, including opioids.  Routine

7  inspections provide the opportunity to correct

8  problems before they escalate to a complaint

9  requiring a more time-intensive investigation."

10         Is that consistent with your

11  understanding of what the purpose of

12  inspections of pharmacies was when you were an

13  agent with the board, Mr. Pavlich?

14      A.    Well, I take exception to routine

15  inspections provide the opportunity to correct

16  problems before they escalate to a complaint

17  requiring a more time-intensive investigation.

18  To a small extent, true, but if I walked into a

19  pharmacy -- we'll use Overholt Pharmacy -- and

20  saw prescriptions to the extent of what was

21  going on in there, there would be no correction

22  of problems, there would be prosecution of

23  problems.  So I'm not in total agreement with

24  the wording, just like the standard today

25  versus when I worked may be different in

Page 60

1   approaching investigations or creating

2   investigations than when I worked.

3        Q.   But that first sentence in that

4   paragraph, sounds like you agree with it, that

5   the purpose of the inspection was to ensure

6   compliance with security, recordkeeping and

7   other rules designed to deter and detect the

8   diversion of prescription drugs, including

9   opioids?

10       A.   Yes.

11       Q.   Did the OARRS database evolve over

12  time while you were there, I guess those six

13  years, the last six years of your career?  Did

14  you see it change in any way?

15       A.   Got more data in it.

16       Q.   In what way?  What was the

17  additional data?

18       A.   Well, when it first started, it had

19  nothing, and by the end of my career, it had

20  all this data from all these locations in its

21  database, so if I was looking for me at the

22  beginning, there would be nothing, but if I

23  went out over the course of a number of years

24  and visited a number of doctors, obviously

25  there would be more data in there and it would

Page 61

1  show this.  I mean, I can't think of any -- I

2  mean, it got faster, it worked quicker, it was

3  easier to access.

4       Q.    Okay.  Could you tell from the OARRS

5  data whether a prescription is legitimate or

6  not?

7       A.    Just from the data?  To an extent,

8  yes.

9       Q.    How so?

10      A.    Well, I would always need to look

11  at the actual prescription, always.  That's the

12  written bible, the actual prescription.  But if

13  I looked at a database from OARRS using my name

14  and it showed that I got an oxycodone

15  prescription from Dr. A and took it to pharmacy

16  B, C, D and F, I'd think something was wrong.

17  Or I went to Dr. A, B, C, D and got oxycodone

18  prescriptions from all four with, let's say, a

19  month supply for each prescription, I would

20  think something is wrong and that would result

21  in me going to pharmacy A, B, C and D, finding

22  those prescriptions and see what's going on and

23  why physicians -- four physicians had issued

24  four prescriptions for the same drug in a

25  30-day supply to one specific patient.

1      Q.    And would you also -- I'm sorry.
2  Were you done?
3      A.    Yeah.
4      Q.    Okay.  Would you also want to talk
5  to the doctors to see why they issued the
6  prescription?
7      A.    I always did.
8      Q.    Okay.  And why did you always talk
9  to the doctors in your investigation?
10      A.    To determine legitimate medical
11  purpose, which was a requirement to charge
12  someone, legitimate medical purpose.  If
13  there's no legitimate medical purpose, then the
14  prescription, on its face value, is illegal.
15  So if I went to Dr. A and said did you write
16  this for patient George Pavlich, and he said
17  yes.  And what was the reason you wrote it?
18  Well, he had severe back pain.  Okay.  And then
19  I'd go to B and ask him did you write this for
20  George Pavlich?  Yes.  And for what reason?  He
21  has severe back pain.  Well, when you wrote
22  this, did you know that Dr. A wrote him a
23  30-day supply?  No, I did not.  Then it would
24  go right on down the line and I would charge
25  however.  And if it involved a physician, then

1   I would charge him, too.

2        Q.    Okay.  So the OARRS database could

3   provide some information that something might be

4   wrong, which would require further

5   investigation, including talking to doctors?

6        A.    Yes.  On its face it was an

7   enlightening experience to look at it that way,

8   but then it would require follow-up to

9   complete, beyond a reasonable doubt requirement

10  in the Ohio Revised Code.

11       Q.    Okay.  Can the OARRS database

12  identify the top prescribers, the top patients

13  getting controlled substance prescriptions,

14  things of that nature?

15       A.    It could identify -- I'm trying to

16  recall how this thing worked.  I could run a

17  physician profile if I had a question and it

18  would provide me the specific for prescribing

19  during a specific time frame.  For an example,

20  Dr. A, I want to see what he prescribed for the

21  first three months in '06 for oxycodone, and I

22  believe it could produce it.

23       Q.    Mr. Pavlich, or Agent Pavlich, were

24  pharmacists able to do that the same as you in

25  terms of being an investigative agent?  Could

Page 64

1    they go in and run physician profiles in OARRS

2    or was that something only the investigative

3    agents could do?

4         A.    I know agents could do it.  I don't

5    know initially when it started, but later on --

6    again, if it started in '06 -- I'm not sure

7    exactly when it went up.  But the pharmacists

8    could input a patient's name and see if that

9    patient was going to other pharmacies or

10   doctors.  I don't know to what extent or time

11   frame.  I don't recall.

12        Q.    Okay.  But what I was getting at is

13   could a pharmacist pull up a doctor and say, "I

14   want to see everything Dr. Smith has been up to

15   in the last couple years; regardless of the fact

16   that I only have his one patient in front of me,

17   I want to see his whole dispensing or his whole

18   prescribing history for a certain time frame"?

19   Do you know if that was accessible by

20   pharmacists or you don't recall?

21        A.    I don't -- I don't think it was

22   accessible, but I'm not certain.  I know it was

23   for patient specific.

24        Q.    Does the -- did the board while you

25   were there have subpoena powers?

Page 65

1          A.     I'm not sure.  I believe they did.

2     I'm not sure.  I believe they did but I'm not

3     sure.

4          Q.     Was it one of the primary board

5     functions to not only gather the OARRS data but

6     also to analyze it for investigative leads?

7          A.     I don't know what they did down in

8     Columbus.  I know I would analyze what I

9     specifically asked for.

10          Q.     Do you recall getting leads from the

11     OARRS department based upon their analyses of

12     the OARRS data?

13          A.     No.  I don't recall getting

14     anything from the OARRS department unless I

15     specifically asked for it.

16          Q.     You testified earlier, Agent

17     Pavlich, that you were familiar with the Ohio

18     Revised Code and the Ohio Administrative Code,

19     correct?

20          A.     Not as well as I was in 2012, but

21     I'm sort of familiar.

22          Q.     Would you flip to Exhibit 5, please,

23     in the binder?

24          A.     Okay.

25          Q.     Were the legal requirements for

Page 66

1    pharmacies contained either in the Ohio Revised

2    Code or the Ohio Administrative Code based on

3    your experience?

4         A.    This is the administrative code.  I

5    mean, there might be a corresponding code in

6    the Ohio Revised Code, but I'm looking at this

7    and this is all I know.

8         Q.    But when you were doing your job as

9    an agent, including inspecting pharmacies, were

10   you attempting to enforce the Ohio

11   Administrative Code and whatever statutory

12   provisions back up that Administrative Code?

13        A.    Yes.  Like this code I know would

14   have a corresponding federal code.  How it

15   relates to Ohio Revised Code would be if you

16   left your pharmacy wide open and had no

17   security and let anyone access the place, then

18   that would be, in my opinion, a violation of

19   the criminal code.

20        Q.    Are you familiar with this security

21   requirement from the Ohio Administrative Code in

22   Section 4729-9-05, and I'll read Subsection A,

23   "All licensees and registrants shall provide

24   effective and approved controls and procedures

25   to deter and detect theft and diversion of

Page 67

1   dangerous drugs.  In order to determine whether

2   a licensee or registrant has provided effective

3   and approved controls against diversion, the

4   State Board of Pharmacy shall use the security

5   requirements set forth in Rule 4729-9-11 of the

6   Administrative Code as standards for the

7   security controls and operating procedures

8   necessary to deter and detect diversion."

9            Are you familiar with that security

10  requirement, Agent Pavlich?

11       A.   I am.

12       Q.   Is that the main security

13  requirement required of pharmacies licensed in

14  the state of Ohio, that they shall provide

15  effective and approved controls and procedures

16  to detect theft and diversion of dangerous

17  drugs?  Was that the main requirement that was

18  being enforced when you were doing your duties

19  as an agent?

20       A.   For security requirements, yes.

21       Q.   Okay.  And it says in Subsection B,

22  "Substantial Compliance with the Standards Set

23  Forth in Rule 4729-9-11 of the Administrative

24  Code may be deemed sufficient by the State Board

25  of Pharmacy after evaluation of the overall

1    security system and needs of the applicant,

2    licensee or registrant.  In evaluating the

3    overall security system of a licensee,

4    registrant or applicant, the State Board of

5    Pharmacy may consider any of the following

6    factors as deemed relevant for compliance with

7    security requirements," and then it lists 14

8    separate requirements.

9            Do you recognize this

10   Administrative Code section, Mr. Pavlich?

11       A.   I agree I recognize it.

12       Q.   So what do you understand in

13   paragraph A -- go back to A, "Effective and

14   Approved Controls and Procedures to Deter and

15   Detect Theft and Diversion of Dangerous Drugs"

16   -- what does that mean in your experience?

17       A.   Well, only a licensed pharmacist in

18   the state of Ohio shall access and control the

19   access of a pharmacy by means that prevent

20   diversion, theft of drugs.  And that would be

21   electronic barricade, physical barricade, key

22   control access to the electronic and key

23   control barricades.  That pretty much covers

24   it.

25       Q.   But the controls were broader than

Page 69

1   that, were they not, in terms of not only

2   physical security controls?  Wouldn't it also

3   include internal controls in the pharmacy to

4   prevent theft and diversion?

5            MR. WEINBERGER:  Objection.  Form.

6        Q.    When I'm referring to, Mr. Pavlich,

7   in paragraph B, "Substantial Compliance," the

8   substantial compliance provision and the factors

9   that are considered, if you look over those 14

10  factors, you'll see that that begins with the

11  type of activity conducted, the type and form of

12  dangerous drugs handled, the quantity of

13  dangerous drugs handled, location of the

14  premises, type of building construction, type of

15  vaults and safes, types of closures on vaults

16  and safes and secure enclosure, adequacy of key

17  control systems, adequacy of electronic

18  detection and alarm systems, extent of

19  unsupervised public access to the facility,

20  adequacy of supervision over authorized

21  employees having access to areas containing

22  dangerous drugs, procedures for handling

23  business guests, availability of local police

24  protection, and number 14, adequacy of the

25  licensee's, registrant's or applicant's system

Page 70

1   for monitoring the receipt, manufacture,

2   distribution, and disposition of dangerous drugs

3   in its operation.

4           So the reason I read all 14 of

5   those is I wanted to ask you, do you understand

6   those to not only include physical controls

7   like barricades, but also operational controls,

8   like systems for monitoring dangerous drugs?

9           MR. WEINBERGER:  Objection.  Form.

10          Q.   You can answer.

11          A.   I'm trying to think how to answer

12  this thing.  I agree under this section that

13  all of those standards are in place to not only

14  protect the theft or diversion of drugs but the

15  documentation, being computers, being profiles,

16  being prescriptions; anything that should be

17  held in confidentiality falls under security

18  requirements.

19          Q.   Okay.

20          MR. WEINBERGER:  Objection.  Move

21  to strike.

22          Q.   The term "substantial compliance,"

23  what do you recall that term to mean based upon

24  your experience?

25          A.   I don't recall it.

1      Q.    Do you recall as an agent evaluating

2  pharmacies' compliance with the security

3  requirement by considering the type of activity

4  conducted and the type and form of dangerous

5  drugs handled and the quantity of dangerous

6  drugs handled?  Was that something that was a

7  factor -- were these factors evaluated when

8  considering whether pharmacies were adhering to

9  the security requirement?

10      A.    I don't know.  I don't think I

11  understand what you're saying.

12      Q.    Okay.  Let me put it this way:  When

13  you went in for your pharmacy inspections, the

14  50 a year that you said you did, was one of the

15  things that you were trying to make sure is that

16  the pharmacies were adhering to the code

17  requirements with respect to effective controls

18  and procedures to detect and prevent theft and

19  diversion?  Is that the primary purpose of those

20  inspections?

21      A.    Right.  I would look at is

22  everything secured so that anyone who should

23  not have access is prevented from having

24  access.

25      Q.    And did it matter to you whether or

Page 72

1    not the pharmacy was only handling certain types

2    of drugs or -- in only certain quantities?  Was

3    that part of your evaluation?

4         A.    No.  It would include all drugs

5    except OTC drugs, over-the-counter drugs,

6    those.  Anything that had a federal legend on

7    it would be required secured.

8         Q.    You said earlier that you thought

9    that there was a federal counterpart to the

10   security requirement.  What were you thinking of

11   specifically?

12        A.    I don't recall the federal code.  I

13   didn't usually use it.  But usually it's -- it

14   mirrors what's in the Administrative Code, like

15   4729-5-30, Manner of Issuance.  I know there is

16   a federal code that is the manner of issuance.

17   So usually they mirror off of each other.

18        Q.    Okay.  So you believe that in the

19   Code of Federal Regulations there's a security

20   requirement that mirrors the Ohio security

21   requirement?

22        A.    I'm pretty sure.

23        Q.    If you go to the third page of this

24   Exhibit 5, the third physical page, there's an

25   Ohio Code Section 4729-9-11, Security and

Page 73

1    Control of Dangerous Drugs.

2              Do you see that?

3         A.    Where are you at, 4729-5-11?

4         Q.    No.  -9-11.  It's the third physical

5    page of Exhibit 5.  In the top left it should

6    say 4729-9-11.

7         A.    One, two, three.  We're counting

8    the back side of pages, are we?

9         Q.    No.

10        A.    No, you're not counting the back

11   side of pages.  Okay, I got it, 4729-9-11.

12        Q.    Okay, we're there.

13             Are you familiar with this Ohio

14   code provision?

15        A.    I'm sure I was more familiar in the

16   past, but yes.  Okay.  Go ahead.

17        Q.    Now, was this code section something

18   that you had in mind and were attempting to

19   enforce compliance with when you did pharmacy

20   inspections?

21        A.    Yes.

22        Q.    There's Section A of this.  It has

23   the caption "In a pharmacy," and under 1 it

24   says, "Except as provided in paragraph (A)(2) of

25   this rule, a pharmacist shall provide personal

Page 74

1   supervision of dangerous drugs, exempt

2   narcotics," et cetera.  Is that a provision that

3   you recall?  I'll call it the supervision

4   requirement.

5          A.    Yes.

6          Q.    All right.  So how did you

7   understand that rule to apply when you were

8   doing your inspections?  What were you looking

9   for?

10         A.    I was looking for all records and

11  drugs to be secured within an environment

12  controlled by a licensed pharmacist with no

13  access to non-authorized personnel.

14         Q.    Okay.  When a pharmacist could not

15  supervise, say when the pharmacy was closed,

16  were you looking for certain requirements to be

17  met?

18         A.    Yes.

19         Q.    And what were those requirements?

20         A.    A secure barricade or electronic

21  barricade.

22         Q.    Are you familiar with the term "drug

23  utilization review"?

24         A.    Yes.

25         Q.    What do you understand that to be?

Page 75

1    And I'll call it a DUR.  What is a DUR?

2          A.    Drug utilization review would be an

3    examination of a patient profile, a doctor

4    profile, a dispensing profile, a purchase

5    profile, a sales profile.

6          Q.    Is that something that you looked

7    for in your inspections, whether or not the

8    pharmacists were conducting DURs?

9          A.    Yes.

10          Q.    Is the DUR a mechanism to -- in your

11    experience, a mechanism to detect unusual usage

12    and questionable disposition of pharmaceuticals

13    or suspicious orders of pharmaceuticals?

14              MR. WEINBERGER:  Objection.

15              Go ahead.

16          A.    Yes.

17          Q.    In your experience, besides

18    performing a DUR, was there anything that you

19    recall that you wanted to see pharmacists

20    performing when they were filling prescriptions

21    in order to detect unusual usage, questionable

22    disposition and/or suspicious orders besides

23    doing the DUR?

24          A.    Yes.  The actual face value of the

25    prescription itself, did it look like it was

1   legitimate in the mind of a licensed

2   pharmacist.

3       Q.    All right.  Anything else that you

4   recall you had in mind from a compliance

5   perspective with regard to pharmacists trying to

6   detect suspicious orders or unusual usage or

7   questionable disposition of prescriptions

8   besides the DUR and looking at the face value of

9   the prescription?

10      A.    Well, the actual patient

11  themselves.  I mean, if a patient came in and

12  looked like they were loaded or high, should I

13  say, I wouldn't dispense it.

14      Q.    Okay.  I just want to make sure I --

15      A.    You know, those three factors, drug

16  utilization review, actual prescription,

17  patient character.  Those are the three things

18  I would be looking at.

19      Q.    And did you tell the pharmacies when

20  you were doing the inspections that that's what

21  you expected them to be doing in terms of

22  complying with these code provisions?

23      A.    I said a lot of things when I was

24  doing inspecting.  I don't remember those three

25  catch phrases.  I'm sure they were part of

Page 77

1   conversations, but I didn't specifically walk

2   in and say this, this, and this.

3          Q.    If you go to the last page of

4   Exhibit 5 -- and by last page, I mean last

5   physical page.

6          A.    Which one?

7          Q.    Exhibit 5.

8          A.    Okay, I got it, 5.

9          Q.    It's Code Section 4729-9-02, Minimum

10  Standards for a Pharmacy.  Do you recall this

11  code provision, Agent Pavlich?

12         A.    Yes.

13         Q.    And can you summarize for us what

14  minimum standards for a pharmacy were from the

15  Ohio Code perspective?

16         A.    Summarized would be that they have

17  all the operational means available to them to

18  practice pharmacy legally in the state of Ohio.

19         Q.    Is this something that you covered

20  in your inspections, and that is that they were

21  complying with this Ohio Administrative Code

22  provision for minimum standards, that's

23  something you specifically checked for?

24         A.    I would say yes.

25         Q.    They appear to cover things like

Page 78

1   library, equipment, stock of drugs, prescription

2   container, space and fixtures, hours and

3   personnel.  Is that something you looked at

4   during your inspections, each of those items?

5        A.    I would have.  I wouldn't possibly

6   document each and every single little thing on

7   my inspection sheet, but if I walked in and

8   they didn't have a law book, I would note

9   library not up to standard.  If they didn't

10  have a way of documenting a prescription in a

11  file, I would document it.  If they didn't have

12  lights on in the pharmacy, I would document it.

13  But I didn't document each and every thing on

14  every inspection I would observe.

15       Q.    The last section -- or the next to

16  last section refers to personnel, Subsection G.

17  It says, "The pharmacy shall be appropriately

18  staffed to operate in a safe and effective

19  manner pursuant to Section 4729.55."

20            Did you look at things like the

21  qualifications and licensing of the pharmacists

22  and support personnel?

23       A.    Always.

24       Q.    Agent Pavlich, are you familiar with

25  some pharmacies having what are called pharmacy

1    loss prevention departments?

2         A.    Yes, I'm familiar.

3         Q.    And do you recall specifically the

4    pharmacy Defendants in this case having pharmacy

5    loss prevention departments?

6         A.    I'm not familiar with every single

7    one of them, loss prevention, but I'm certain

8    they had them.

9         Q.    So, for example, Giant Eagle, do you

10   recall an individual by the name of Rick Shaheen

11   being the head of their pharmacy loss prevention

12   department?

13        A.    I do not.

14        Q.    Do you recall working with Giant

15   Eagle's loss prevention department in connection

16   with pharmacy diversion matters?

17        A.    I do not.

18        Q.    What about any of the other pharmacy

19   Defendants, Rite-Aid, CVS, Walmart, Walgreens?

20        A.    I could tell you I probably spoke

21   to people in their loss prevention chain --

22   chains, but I primarily dealt with the

23   pharmacist and the pharmacy supervisors.  I

24   didn't have too much to do with their loss

25   prevention, unless I really had to, but I can't

1  speak accurately to that.

2       Q.    All right.  Understood.

3            Did you view having a loss

4  prevention department as a good internal

5  control to prevent theft and diversion?

6       A.    No.  I actually thought -- this is

7  my opinion.  I actually thought the loss

8  prevention unit was more a facade than actually

9  the staff pharmacist and the pharmacy

10  supervisor who would be on-site.  I didn't have

11  much use for the loss prevention people.

12       Q.    I see.

13       A.    They didn't give me any

14  information.  They would never call my office

15  or call me and say, hey, we see this, we see

16  that.  Everything they were doing was, in my

17  opinion, internal.  I can't recall one time

18  getting a call.

19       Q.    So you worked primarily with the

20  pharmacists and the pharmacy supervisors rather

21  than --

22       A.    That's right.

23       Q.    And is that because they were more

24  on the ground in terms of your investigation?

25       A.    That's who I held responsible.  And

Page 81

1    they weren't there.  I have no idea where loss

2    prevention was.

3                    MR. BARNES:  I know we're breaking

4    at 11:30, as agreed, for Mr. Appel, but we've

5    been at it for an hour and 50 minutes and I

6    think we should probably take a break, use the

7    restroom, get some water, things of that

8    nature.

9                    THE VIDEOGRAPHER:  Going off the

10   record at 10:50.  This marks the end of media

11   unit number 1.  Thank you.

12                        (Recess had.)

13                    THE VIDEOGRAPHER:  We are back on

14   the record at 11:00.  This begins media unit

15   number 2.

16   BY MR. BARNES:

17        Q.    Hello, Agent Pavlich.  We're back

18   after a short break.

19                    I want to direct your attention to

20   the licensing issue.  We spoke earlier about

21   pharmacies needing to be licensed.  Were you

22   involved at all in the licensing process for

23   pharmacies?

24        A.    The process?  The only process I

25   was involved in, it was sent to me and I would

Page 82

1   bring it to a pharmacy to license them.  I had

2   nothing to do with anything down in the office.

3          Q.    I see.  So you were never part of

4   the licensing division of the board in terms of

5   processing applications and checking on

6   qualifications and things of that nature?

7          A.    No.

8          Q.    Did you have an understanding of

9   what it took to get a license to be a pharmacy

10  in Ohio?

11         A.    Not really.

12         Q.    But in your inspections you checked

13  to make sure that they had an active license?

14         A.    My inspection involved that I would

15  bring the TDDD license, the terminal

16  distributor license, to a location that they

17  said was a pharmacy, and I would walk in and

18  look for a human being that had a Board of

19  Pharmacy registration license that they were a

20  pharmacist and then I would give them the

21  license after my inspection.

22         Q.    So you took the pharmacy license and

23  manually handed it to the licensed pharmacist?

24         A.    That is correct.  If there was no

25  pharmacist, they didn't get a license for a

Page 83

1   pharmacy.

2        Q.    I see.  I take it you were also not

3   involved at all with the licensing of the

4   pharmacists themselves, that was something

5   outside of your agent duties?

6        A.    Totally outside my duty.

7        Q.    But in your inspections you would

8   check on the active status license for the

9   pharmacist in charge; is that right?

10       A.    I would ask them for their ID card

11  or look at their ID card that would be on the

12  wall with their board certificate, and look at

13  its current status, if it was for the year

14  2020, 2019, so on.  And if they did not have

15  one there, the ID card that would show it, not

16  just the board plaque, I would call Columbus

17  and ask if they had a valid license, because I

18  caught a few pharmacists that weren't up to

19  standard.

20       Q.    Okay.  If you look at Exhibit 6 in

21  this binder, these are some code provisions,

22  Ohio Revised Code provisions related to terminal

23  distributor licenses, and I want to just ask you

24  if you've seen them before.

25       A.    I'm familiar with this code.

Page 84

1          Q.    4729.54, the terminal distributor

2     license provision?

3          A.    Yes, I'm familiar with this.  Make

4     note, though, it says 12-7-20, so this has been

5     updated a lot I guess since I retired in 2012.

6     There's -- there's changes to this probably and

7     that's where it shows 12-7-20.

8          Q.    But in the -- in your 25 years as an

9     agent, you understood that the revised code

10    required pharmacies to have licenses, and in

11    order to get a license, they had to submit an

12    application to the board?

13         A.    I'm familiar with that.

14         Q.    Okay.  Are you familiar with the

15    couple pages after this first page?  There's a

16    provision 4729.55, Terminal Distributor License

17    Requirements.

18         A.    I'm looking at it.  I don't know

19    how familiar I am with this particular section,

20    but go ahead.

21         Q.    Well, let me ask you this generally.

22    I understand that you retired in 2012, but what

23    did you understand the pharmacy license

24    requirements to be generally?

25         A.    A pharmacy license was a document

Page 85

1    that authorized them to dispense and sell

2    prescription and controlled substances from

3    that location and to document the sale and

4    dispensing of those substances from that

5    location.

6         Q.    Okay.  If you look at .55, 4729.55,

7    you see there's a list of requirements to get a

8    license, and the first requirement, under A, is

9    "equipped as to land, buildings, and equipment

10   to properly carry on the business of a terminal

11   distributor of dangerous drugs within the

12   category of licensure approved by the board."

13   Is that something that you recall being a

14   pharmacy license requirement?

15        A.    Well, if they didn't have a

16   building, they wouldn't have got a license,

17   they wouldn't be on land and they would have to

18   have equipment in order to proceed, so yes.

19        Q.    Okay.  Under B it says, "A

20   pharmacist, licensed healthcare professional

21   authorized to prescribe drugs, other person

22   authorized by the board will maintain

23   supervision and control over the possession and

24   custody of dangerous drugs and controlled

25   substances that may be acquired by or on behalf

Page 86

1    of the applicant."

2              Do you recall that being a

3    requirement that -- for a pharmacy to have a

4    licensed pharmacist on board to provide

5    supervision and control over the dangerous

6    drugs?

7         A.    In a pharmacy a licensed pharmacist

8    was required, yes.

9         Q.    Okay.  And Subsection C, "Adequate

10   safeguards are assured to prevent the sale or

11   other distribution of dangerous drugs by any

12   person other than a pharmacist or licensed

13   healthcare professional authorized to prescribe

14   drugs," was that a requirement when you were an

15   agent with the board, having adequate

16   safeguards?

17        A.    I would say, yes.

18        Q.    Okay.  And D references adequate

19   safeguards to practice pharmacy in a safe and

20   effective manner.  Is your answer the same, that

21   that was a requirement when you were an agent?

22        A.    Yes.

23        Q.    If you flip to the next page,

24   4729.551, the Licensing of Retail Sellers, is

25   this a general license requirement for all

Page 87

1  retail pharmacies?

2          A.    That's what it says.

3          Q.    Could pharmacies be disciplined if

4  they failed to comply with the board's -- the

5  Ohio laws and the board's rules related to the

6  operation of a pharmacy?

7          A.    Yes.

8          Q.    Could the license be suspended or

9  revoked, restricted or limited for failure to so

10  comply?

11          A.    Yes.

12          Q.    If you look at the next page on

13  this, 4729.57, Disciplinary Actions - Terminal

14  Distributor, are you familiar with that code

15  provision or were you familiar with it when you

16  were an agent?

17          A.    I'm familiar with it.

18          Q.    And do you recall that being

19  something that could occur if you found

20  violations in the pharmacies, you could cause

21  the pharmacy license to be suspended or revoked

22  if the violation was serious?

23          A.    I could send a report down to the

24  board and they could cause it.

25          Q.    Right.  But you would be the one

Page 88

1    finding the violation and instigating the

2    matter, right?

3         A.    I would write a report and send it

4    down, and if they determined it was valid, we

5    would proceed with disciplinary action.

6         Q.    And did that happen from time to

7    time in your career, you caused a pharmacy

8    license to be suspended or revoked because of a

9    violation of board rules?

10        A.    Yes.

11        Q.    In order to get a license renewed by

12   the board, a pharmacy has to show continuing

13   compliance with board rules and regulations; is

14   that correct?

15        A.    They'd have to send their money in

16   first and then they'd get consideration.

17        Q.    So there's a fee, but it's not a

18   question of you just have to comply at the time

19   of the original license, you have to continue to

20   comply to get renewed; is that correct?

21        A.    To whatever standard they require

22   down at the board office.  It had nothing to do

23   with me.

24        Q.    Okay.  There's a licensing renewal

25   provision in 4729.58.  It's the last page of

Page 89

1   Exhibit 6.  Do you recognize this provision?

2          A.    I'm not familiar with it, but it's

3   in front of me.

4          Q.    Now, the board also had a division

5   that regulated and licensed the pharmacists,

6   correct?

7          A.    Yes.  I don't know if you would

8   call it a division or a person.

9          Q.    Is Exhibit 7 -- do you recognize

10  these code provisions that govern the practice

11  of pharmacists, including license applications,

12  examinations and qualifications?  Is that

13  something that you were familiar with?

14         A.    No.

15         Q.    No, you weren't familiar with that?

16         A.    I had nothing to do with their

17  applications or their examination, zero

18  involvement.

19              May I say something?

20         Q.    Sure, if it's part of your answer.

21         A.    As I'm sitting here thinking with

22  my little brain, you know, I think I testified

23  earlier that I didn't have no conversation with

24  anybody, but I did speak with -- what was it,

25  two days ago -- Attorney Appel and Nicole,

```
 1   board staff lawyer, or chief lawyer.  You know,
 2   I don't want it to be misconstrued that I
 3   didn't talk with anyone.  I did speak with them
 4   on the telephone.  Or no.  I did it on a Zoom.
 5   I did it on a Zoom with them.  And there was
 6   one other attorney there, too, from the board
 7   office, but I don't recall her name.  I don't
 8   want you to think I didn't talk to anybody.  It
 9   was like 40 minutes.
10        Q.    Okay.  And that was to prepare for
11   your deposition?
12        A.    I don't know if it was so much
13   prepare, just talk about a couple things.  It
14   wasn't really -- I didn't even look at the
15   folder with them.  I didn't look at anything
16   with them.  We just talked in generalities, was
17   I comfortable, do I understand, you know, what
18   my duties were when I worked, is my memory bank
19   still functioning, those type of things.  Never
20   looked at an exhibit with them, no, never, not
21   one time.
22        Q.    Are those the only attorneys that
23   you spoke to about your deposition?
24        A.    Those three, two females and a
25   male.
```

Page 91

1          Q.     All at the Board of Pharmacy?

2          A.     Well, they were at their homes.  I

3     don't know if they're all affiliated with the

4     Board of Pharmacy.

5          Q.     But you understood them to be

6     lawyers representing the Board of Pharmacy?

7          A.     I understood two of them to work

8     for the Board of Pharmacy and one being from

9     the AG office, but I could be wrong there.

10              MR. APPEL:  Bob, this is Henry

11     Appel.  I'll represent that it was Michelle

12     Siba, Nicole Dehner and I spoke with the

13     witness a couple of days ago with general

14     witness prep and I did at least speak briefly

15     with the witness this morning prior to his

16     testimony.

17              MR. BARNES:  Okay.

18          Q.     Mr. Pavlich, are you familiar with

19     the Ohio code provisions that regulate the

20     practice of pharmacies, specifically in terms of

21     what pharmacists and pharmacies are supposed to

22     do and comply with?

23          A.     I'm sure there's a standard in

24     place, but I'm not familiar with it at this

25     point.

Page 92

1          Q.     Okay.  Do you recall as an agent --
2     did you believe that the practice of pharmacy
3     involved the exercise of professional judgment
4     by pharmacists?
5          A.     Absolutely.
6          Q.     In what regard did it involve the
7     exercise of professional judgment?
8          A.     A pharmacist is a healthcare
9     professional who graduated from a licensed
10    institution for the practice of pharmacy, and
11    they are to use all of their training and
12    expertise to dispense prescriptions prescribed
13    legitimately, with a corresponding
14    responsibility to the manner of issuance for a
15    legitimate prescription.  That's what I would
16    think.
17         Q.     Okay.  Do you recall any code
18    provisions that defined the practice of pharmacy
19    and what it meant to exercise professional
20    judgment specifically?
21         A.     You're really testing my memory
22    here.  I would say 4729-5-30, Manner of
23    Issuance, pretty well covers corresponding
24    responsibility of a pharmacist to a prescriber
25    for legitimate practice by the prescriber and

Page 93

1   dispensing by a pharmacist.  That code I used

2   extensively.  That's why I remember it so well.

3         Q.    Well, look at Exhibit 8.  I just

4   want to make sure I have your testimony as to

5   whether or not you recognize these code

6   provisions or don't recognize them.  Exhibit 8,

7   the first pages are 4729.01 of the revised code.

8              Do you recognize this code

9   provision?

10        A.    It's been updated, but I'm in

11  belief that it was there when I worked.

12        Q.    Do you see under Subsection B it

13  speaks of "'Practice of pharmacy' means

14  providing pharmacist care requiring specialized

15  knowledge, judgment, and skill derived from the

16  principles of biological, chemical, behavioral,

17  social, pharmaceutical and clinical sciences"?

18  I'll stop right there.  Is that something that

19  you recall as an agent, knowing that the code

20  had this definition of what it meant to practice

21  pharmacy?

22        A.    Not all those specifics.

23        Q.    What do you recall, if not those

24  specifics?

25        A.    That a pharmacist shall

1   legitimately dispense prescriptions authorized

2   by a legitimate prescriber and they use their

3   knowledge and expertise in dispensing

4   prescriptions.  All these other words that are

5   coming into play here, maybe the pharmacists

6   used them, maybe they didn't, individual basis.

7        Q.    There's a listing here of what

8   pharmacist care means, and it includes

9   interpreting prescriptions.  Is that something

10  that you recall when you were an agent, that

11  that's something that pharmacists did?

12       A.    Yeah.  They would interpret a

13  prescription.

14       Q.    And they dispensed drugs and drug

15  therapy-related devices; is that right?

16       A.    Yes.

17       Q.    They compounded drugs?

18       A.    Not all of them.  That would be few

19  and far in between as a norm, though they were

20  all capable of it I'm sure.

21       Q.    Did they provide counseling to

22  individuals regarding drug therapy?

23       A.    Yes.

24       Q.    All I'm getting at is, if you don't

25  recall the specific code section, are these

Page 95

1  things that pharmacists did when you were

2  involved as an agent, these were part of the

3  professional practice of pharmacy?

4       A.   I would hope so.  If they didn't, I

5  would take action.

6       Q.   Okay.  You mentioned a couple of

7  times the manner of processing prescriptions.

8  If you flip to Exhibit 10 --

9       A.   Manner of Issuance, but go ahead.

10  10, I'm there.  That's it.  No.  That's manner

11  of processing a prescription.  I thought it was

12  4729-5-11, but who knows.  They could have

13  changed things.

14       Q.   All right.  I just want to go

15  through this.  Do you recognize Exhibit 10 as

16  containing code provisions from the Ohio

17  Administrative Code governing the manner of

18  processing prescriptions that pharmacists were

19  required to follow?

20       A.   I don't remember it stated this

21  way, but go ahead.

22       Q.   All right.  Let's look at A.  "A

23  prescription, to be valid, must be issued for a

24  legitimate medical purpose by an individual

25  prescriber acting in the usual course of his/her

1  professional practice."

2          Do you recall that code provision?

3      A.    Yeah, I remember those words.

4      Q.    And what did it mean to you as an

5  agent that the prescriber, an individual

6  prescriber acting in the usual course of his or

7  her professional practice?  How did you

8  interpret this language?

9      A.    The prescriber would have to be

10  licensed and they would issue a prescription

11  for a legitimate medical purpose in the course

12  of an examination of the patient.

13      Q.    And is it an accurate statement,

14  then, Agent Pavlich, that the primary

15  responsibility for issuing a prescription rests

16  with the initial prescriber, the doctor who

17  examines the patient?

18      A.    No.  It can also rest with the

19  person who has a corresponding responsibility

20  to that physician who dispenses medications to

21  a patient.

22      Q.    Right.  We'll get to that.  That's

23  the second sentence.

24      A.    Well, you asked me primarily and I

25  think it's twofold.

Page 97

1          Q.    All right.  But the prescriber
2    issues the prescription, and under paragraph --
3    the first sentence of paragraph A, is it the
4    prescriber's initial responsibility to issue
5    valid prescriptions for legitimate medical
6    purposes?  Now we'll get to the second sentence.
7    I'm just trying to see what your interpretation
8    is of the first sentence.
9          A.    Yeah, the prescriber would have to
10   issue a valid prescription.
11         Q.    Okay.  All right.  The beginning of
12   the second -- I'm sorry.  The second sentence
13   says, "The responsibility for the proper
14   prescribing is upon the prescriber."
15               Are you with me so far?
16         A.    Gotcha.
17         Q.    But there's a reference to "A
18   corresponding responsibility rests with the
19   pharmacist who dispenses the prescription," and
20   you've mentioned that several times.  Is that
21   the source of the corresponding responsibility?
22         A.    That was part of my bible, yes.
23         Q.    "An order purporting to be a
24   prescription issued not in the usual course of
25   bona fide treatment of a patient is not a

Page 98

1   prescription and the person knowingly dispensing

2   such a purported prescription, as well as the

3   person issuing it, shall be subject to the

4   penalties of law."

5           Did you have cause in your career

6   to enforce these provisions on prescribers and

7   pharmacists?

8       A.   Many times.

9       Q.   Did you investigate and prosecute

10  doctors for failing in their responsibility to

11  issue legitimate prescriptions?

12      A.   Many times.

13      Q.   Did you investigate and prosecute

14  pharmacists for failing to meet their

15  corresponding responsibility?

16      A.   Also many times.

17      Q.   Okay.  There's a reference in here

18  to the person -- "and the person knowingly

19  dispensing such a purported prescription, as

20  well as the person issuing it, shall be subject

21  to the penalties of law."  What does the term

22  "knowingly" mean in that provision based upon

23  your experience as an agent?

24      A.   You're talking a person knowingly

25  dispensing such a purported prescription, is

Page 99

1  that what you're referring to?

2      Q.    Yes.   I'm focusing on the term

3  "knowingly."  What, in your experience as an

4  agent, did that mean in terms of your

5  investigations and prosecutions?

6      A.      Knowingly is one of the four

7  culpable mental states, so that's the second

8  highest tier.  Purposefully is the highest

9  tier.  So to me that's a pretty high

10  requirement, knowingly dispensing.  Not

11  negligently.  It's knowingly.

12      Q.    And what would the pharmacist have

13  to know in order to have it be a violation of

14  the law?

15      A.    That they're knowingly giving

16  medication, controlled or a dangerous drug, to

17  a patient based upon a valid prescription.

18  They know it by the document in front of them.

19  And if they don't, they need to make a phone

20  call or you verify what you have.

21      Q.    Is it accurate to say that

22  pharmacists, in order to violate that provision,

23  would have to know that the prescription was not

24  legitimate?

25      A.    Well, knowledge, yes.

Page 100

1          Q.     If you focus --

2          A.     There are mistakes.  And I will

3  tell you that -- I mean, I'm human.  I've made

4  mistakes.  Whether it's they're busy, they're

5  not paying attention, they're distracted.  We

6  all make mistakes.  But not -- as I -- as I

7  would speak to pharmacists, I would tell them,

8  "Hey, anybody can fill a bad script, it could

9  get by, I understand, but when you fill one and

10  you fill two and you fill ten and you fill 20,

11  then that's not a mistake."  But I could see

12  error in judgment on things, and that happens.

13  I used to miss stuff, and I'm far from being a

14  pharmacist, but, as they say, shit happens.

15          Q.     These code provisions continue in

16  paragraph B and it sets forth five subsections

17  that a pharmacist, when dispensing a

18  prescription, must do, and in order of listing,

19  "Ensure that patient information is profiled

20  pursuant to Rule 4729-5-18.  Can we call that

21  the patient profile requirement?

22          A.     Yes.

23          Q.     And what did you understand that to

24  mean?  If it helps, these code provisions are

25  right behind these pages.  4729-5-18 is called

Page 101

1    Patient Profiles, and it's right behind Section

2    5-21, if it helps refresh --

3           A.    With reference to 18, that whatever

4    they were dispensing was being prepared in a

5    patient profile, in other words, the date, the

6    drug, the quantity, the doctor, so on and so

7    forth.  That's a profile.

8           Q.    So part of this code provision as to

9    how pharmacists are supposed to dispense

10   medications, prescriptions, the number one step

11   is have a patient profile that meets certain

12   requirements in Code Section 5-18, correct?

13          A.    Correct.

14          Q.    Is that something that you looked

15   for in your inspections, to make sure that the

16   pharmacies had patient profiles in their

17   systems, either computerized or otherwise?

18          A.    Yes, computerized or, like in my

19   early career, manually a lot of times --

20          Q.    Okay.

21          A.    -- which would be a paper copy, a

22   paper profile.

23          Q.    So you were enforcing these code

24   Sections, 5-21 and 5-18, during your

25   inspections, correct?

Page 102

1          A.    Yeah, I would be looking at them.

2          Q.    The second step says, "Perform

3   prospective drug utilization review pursuant to

4   4729-5-20."

5               MR. BARNES:  And we'll have to stop

6   there because we promised Mr. Appel that we

7   would take a half-hour break so he can take

8   care of some personal matters, so we'll take --

9   we're going to take our lunch, I guess, 11:30

10  to 12:30, and resume at 12:30.

11              THE WITNESS:  Whatever you need.  I

12  can go if you want.

13              MR. BARNES:  No.  We told Henry --

14  he needs a half hour, I think, to take care of

15  some childcare matters.  Is that right, Henry?

16              MR. APPEL:  Yes.  I've got to get a

17  kid on the bus by noon and make sure he's fed

18  and ready.

19              MR. BARNES:  All right.  We'll see

20  everybody at 12:30.

21

22              (Luncheon recess taken.)

23

24

25

1           THE VIDEOGRAPHER:  We are back on

2    the record at 12:31 and this marks the

3    beginning of media unit number 3.

4                   - - - - -

5                 AFTERNOON SESSION

6      CONTINUED EXAMINATION OF GEORGE P. PAVLICH

7    BY MR. BARNES:

8         Q.    Good afternoon, Mr. Pavlich.  We're

9    back after a lunch break, and when we left, we

10   were dealing with Exhibit 10, 4729-5-21, Manner

11   of Processing a Prescription, and we were on

12   Section B(2), the second step of what the

13   regulation requires a pharmacist to do, and that

14   says, "Perform drug utilization review pursuant

15   to 4729-5-20."

16              Is that what you recall being the

17   second step of the regulatory requirement for

18   processing a prescription?

19        A.    Yes.

20        Q.    Now, a couple pages back is Section

21   5-20, Prospective Drug Utilization Review.  Are

22   you with me?

23        A.    I'm with you.

24        Q.    Okay.  And you see that this sets

25   forth, I'll call it, the DUR requirements, which

Page 104

1    is step one of the manner of processing

2    regulation.  Does this regulation look familiar

3    to you and is it something that you were aware

4    of as part of your enforcement and compliance

5    inspections?

6           A.    I'm aware of it, yes.

7           Q.    Okay.  And the DUR process, I think

8    you told us a little bit about that earlier.

9    The DUR process includes things like evaluating

10   over-utilization or under-utilization,

11   therapeutic duplication, drug disease state

12   contraindications, drug-drug interactions,

13   incorrect drug dosage, drug allergy

14   interactions, abuse/misuse, inappropriate

15   duration of drug treatment, and food-nutritional

16   supplements.  Is that how you understood DUR

17   when you were an agent?

18          A.    Those are things the pharmacists

19   would be doing with their DUR.  I didn't get

20   into all of those specifics.

21          Q.    But you knew that that was something

22   that the DUR encompassed from a regulatory

23   standpoint; is that correct?

24          A.    Yes.

25          Q.    And this DUR regulation continues in

Page 105

1   B, subsection B.  It says, "A pharmacist, using

2   professional judgment, shall take appropriate

3   steps to avoid or resolve the potential

4   problem."  I guess if there is a problem.  It

5   says, "These steps may include requesting and

6   reviewing an OARRS report or another state's

7   report, pursuant to paragraph (D) of this rule,

8   and/or consulting with a prescriber and/or

9   counseling the patient."

10             What do you understand this

11  provision of the DUR regulation to require a

12  pharmacist to do?  And I'm specifically talking

13  about when you were doing your inspections.

14      A.     Responsibility was solely to the

15  pharmacist who dispensed the prescription and

16  manually initialed and placed their initials on

17  a prescription.  They had the responsibility of

18  what they dispensed off of that prescription,

19  not the four other or two other pharmacists

20  working in there.  They were responsible for

21  that prescription.

22      Q.     And this regulation, Subsection B,

23  references professional judgment, which we've

24  talked about, and it says it may include

25  requesting and reviewing an OARRS request or

                                        Page 106

1    another state's report.  And so part of the DUR

2    process could include an OARRS report under some

3    circumstances.  Is that how you understood it,

4    that it was within the professional judgment of

5    the pharmacist to request an OARRS report?

6          A.    Yes.

7          Q.    And, similarly, it was also within

8    the professional judgment of the pharmacist,

9    depending upon his DUR review, to either consult

10   with the prescriber and/or counsel the patient?

11   I mean, that's -- I'm just reading the

12   regulation, but is that how you understood it,

13   that as part of the DUR process, it was up to

14   the pharmacist to determine whether or not he

15   was going to investigate any problems -- in his

16   judgment he could either consult with the

17   prescriber or counsel the patient?

18         A.    Yes.

19         Q.    Down below, in Subsection D, it

20   references requesting an OARRS report, and it --

21   under D, 1 through 6, there are six factors or

22   conditions here for when the pharmacist should

23   request an OARRS report.  Now, I know you

24   retired in March of '12, but I want to ask you,

25   do you recognize any of these six conditions as

Page 107

1  being applicable for when you were an agent?

2  And I know OARRS was in place for about six

3  years when you were an agent.  So take a look at

4  1 through 6 and see if they jog your memory as

5  to something that was in -- was applicable in

6  the last six years of your career.

7         A.     What attachment is this?

8         Q.     I'm sorry?

9         A.     What attachment are we talking

10  about here?

11        Q.     We're talking about Exhibit 10 and

12  we're on the page -- approximately page 4,

13  4729-5-20.

14        A.     Wait a minute.  Okay.  I'm there.

15        Q.     Down at the bottom, the bottom third

16  of the page is Subsection D.  Do you see that?

17        A.     Yes, I see it.

18        Q.     And underneath D, there's D-1

19  through D-6, and I wanted you to take a look at

20  the 1 through 6 and tell me for each one if

21  that's something that you remembered being part

22  of the regulations when you were an agent.

23        A.     Well, I don't know if they were all

24  there when I was an agent because this thing is

25  effective 3-1-2017 on the back page of that.

Page 108

1       Q.    Correct, but below that there's
2  prior effective dates going all the way back to
3  '76.
4       A.    Yeah, I see that.  So I'm saying I
5  don't know to what extent it is the same as
6  when I was an agent.
7       Q.    So --
8       A.    I'm looking at them.
9       Q.    Okay.  For example, number 1 says,
10 essentially, check OARRS if a patient adds a new
11 or different reported drug.  Is that something
12 that you recall?
13      A.    No.  I don't know how a patient
14 would add a new or reported drug to their
15 therapy that was not previously included unless
16 they brought in a new prescription and that's
17 their way of reporting it.  You know, I don't
18 understand what one means.
19      Q.    What about two, an OARRS report has
20 not been reviewed for the patient during the
21 preceding 12 months; do you recall that
22 requirement or that condition for requesting an
23 OARRS report?
24      A.    I don't recall a time frame as to
25 if it was every patient they had to do an OARRS

1    report or every five dispensings or ten.  I

2    don't recall what the exact requirement was.

3    That's what this says but I don't recall this.

4          Q.    Well, number three and four speak of

5    a prescriber or a patient being located outside

6    the usual pharmacy geographic area.

7                Do you see those two things?

8          A.    I see them.

9          Q.    Did you have any understanding of

10   what it meant to be outside the usual pharmacy

11   geographic area?

12         A.    Oh, I understand what it means.

13         Q.    What does it mean in your

14   experience?

15         A.    Well, if a patient is coming to

16   Mahoning County with a prescription from

17   Florida, from Ashtabula, Lake County, and I was

18   a pharmacist, I would be questioning why are you

19   you driving all this distance or why are you

20   obtaining a prescription, especially a

21   controlled substance prescription, from such a

22   long geographic area.  I would be calling it

23   into question.

24         Q.    Okay.  Did the board have a set

25   number of miles that defined the term "outside

1  the usual pharmacy geographic area" --

2       A.    No.

3       Q.    -- or was it subjective based upon

4  pharmacy judgment?

5       A.    Based on judgment.

6       Q.    Okay.  So whether a prescriber or a

7  patient is outside the usual pharmacy geographic

8  area is something that was up to the pharmacist

9  to determine based upon his knowledge and

10  experience?

11       A.    Yes.  I mean, if a pharmacist in a

12  pharmacy in Mahoning County got a prescription

13  from the Cleveland Clinic from a pain

14  management doctor, it would come to my

15  attention if I was looking at the

16  prescriptions, but I wouldn't null and void it.

17  But if it came from a general practice doctor,

18  family practice doctor, from Cleveland, and

19  they're filling it in Mahoning County, that

20  would draw attention to me.

21       Q.    And so under this regulation, that

22  if those types of factors are present in the

23  judgment of the pharmacist, what he's supposed

24  to do under the regulation is check OARRS; is

25  that correct?

Page 111

1          A.    That would be one thing.

2          Q.    Well, that's why I'm looking

3     specifically at the regulation.  Subsection D

4     says, "Prior to dispensing an outpatient

5     prescription for a reported drug, the pharmacist

6     shall request and review an OARRS report

7     covering at least the one-year time period," and

8     then it lists the six types of circumstances.

9     So what I'm getting at is, if a pharmacist

10    thinks the prescriber is outside the usual

11    pharmacy geographic area, what he's supposed to

12    do in his judgment is to say I'm going to check

13    OARRS or I should check OARRS, according to the

14    regulation, right?

15              MR. WEINBERGER:  Objection to form.

16              Go ahead.

17         Q.    You can answer.

18         A.    Well, if it was the first time the

19    patient walked in the pharmacy, and it was the

20    beginning of their career to divert drugs, and

21    the pharmacist runs an OARRS report and they

22    had never seen another doctor or diverted any

23    drugs by any means, the OARRS report is going

24    to show nothing, and then if they did it,

25    covering at least a one-year period or whenever

1    they do it again, they would have no knowledge

2    the first time the patient walked in the

3    pharmacy if it was the first time.

4         Q.    I understand.  That's a function of

5    how the OARRS database works, though, right?

6         A.    Yeah.  I mean, that's -- what's

7    inputted is what's kicked back, so the

8    beginning of someone doing something may not

9    show, but if they run it a year later or six

10   months later and this person is on the road to

11   destruction, it may come up.  It will come up,

12   not may.  It will.

13        Q.    But from pharmacy to pharmacy and

14   the pharmacist to pharmacist, applying this

15   regulation -- this regulatory term, "outside the

16   usual pharmacy geographic area," is a

17   pharmacy-specific and pharmacist-specific facts

18   and circumstances judgment call; am I correct?

19              MR. WEINBERGER:  Objection.

20        A.    Yes.

21        Q.    Paragraph five says, "A pharmacist

22   has reason to believe the patient has received

23   prescriptions for reported drugs for more than

24   one prescriber in the preceding three months,

25   unless the prescriptions are from prescribers

Page 113

1    who practice at the same physical location."

2              How did you understand that

3    provision to operate when you were an agent?

4         A.    Well, that's the initial flag as to

5    patients seeing multiple doctors and getting

6    multiple controlled substances.  It doesn't

7    necessarily mean, when you see two different

8    prescribers on a patient, that it's taboo,

9    because a patient can go to a family practice

10   doctor and then also be seeing a pain

11   management doctor, could also be seeing someone

12   else, but those doctors then should be having

13   conversation as to what they're prescribing for

14   their specific patient.  If a family practice

15   doctor is prescribing opiates, hopefully the

16   pain management doctor isn't, or is in

17   conjunction with that prescribing of the first

18   doctor.  That's my understanding.  And it would

19   catch my attention right away when I look at a

20   profile and I would see one, two, three, four

21   different doctors.  And if I then saw similar

22   opiates, you know, like an oxycodone or a

23   Methadone or a hydromorphone, it would really

24   get my attention then.

25         Q.    Right.  And then you would want to

1  investigate further to see if those

2  prescriptions were legitimate by talking to

3  doctors?

4          A.    I had a set form that I would go

5  see the doctor with and it had like eight

6  questions or so specific to what I wanted to

7  know; were you aware looking at this profile of

8  this doctor when you were prescribing this

9  medication similar to that doctor, and they

10  would yes or no me and proceed with my

11  investigation by what their answers were.

12          Q.    Well, in your experience, how would

13  a pharmacist have reason to believe that the

14  patient has been -- has received prescriptions

15  for reported drugs from more than one prescriber

16  in the preceding three months?

17          A.    Well, before OARRS, pharmacists

18  used to communicate with each other, and -- or

19  they would get a prescription and maybe it

20  might have a mark on it from, let's say, a

21  Rite-Aid, and they bring it to a Walgreens, and

22  the pharmacist sees that they went to a

23  Rite-Aid, so they're going to call it, but it

24  wasn't dispensed, and ask them, hey, why didn't

25  you dispense this drug, and the pharmacist said

Page 115

1  for various reasons and explained to them.  And

2  then that pharmacist may or may not fill that

3  prescription.  Maybe they didn't have that drug

4  in stock.  I mean, there's various factors that

5  come into play.  But when OARRS came into

6  existence, it was a whole different utilization

7  review process.

8       Q.    Okay.  And then the last factor,

9  number six, "Patient is exhibiting signs of

10  potential abuse or diversion.  This includes,

11  but is not limited to, over-utilization, early

12  refills, appears overly sedated or intoxicated

13  upon presenting a prescription for a reported

14  drug, or an unfamiliar patient requesting a

15  reported drug by specific name, street name,

16  color, or identifying marks."

17            How did you understand that portion

18  of the regulation to operate?

19       A.    Well, I would ask a pharmacist, if

20  his patient is getting 900 Dilaudid, what's he

21  look like when he walks in the pharmacy, you

22  know, or -- you know, what was their condition,

23  were they in there with anybody else, how did

24  they pay for this prescription, did they pay

25  cash or were they doing insurance.  I mean,

1    there's various questions I would ask regarding

2    these factors.  And, I mean, I used to see some

3    of these patients coming into these pharmacies

4    and question the pharmacist myself; this guy

5    doesn't look like he's consuming this quantity

6    of drugs, what do you think, and proceed.

7           Q.    Did some of these things come up in

8    the drug utilization review process?  For

9    example, over-utilization, that's something that

10   was looked at in the DUR process?

11          A.    Yes.

12          Q.    And then these other factors,

13   appears overly sedated or intoxicated, that's a

14   fact-specific time of presentation of

15   prescription factor, is that correct, and it's

16   somewhat subjective?

17          A.    Well, that's the observation I

18   guess you would say.

19          Q.    Okay.  Go to Subsection G on the

20   next page, if you flip the page over.  We've

21   seen this similar type provision.  It's not

22   exactly the same.  But this is the -- another

23   provision talking about the validity of a

24   prescription must be issued for a legitimate

25   medical purpose by an individual prescriber

Page 117

1    acting in the usual course of his or her

2    professional practice.  We've seen that similar

3    language elsewhere, correct?

4         A.    Correct.

5         Q.    And then it says, "The

6    responsibility for the proper prescribing is

7    upon the prescriber, but a corresponding

8    responsibility rests with the pharmacist who

9    dispenses the prescription.  Based upon

10   information obtained during a prospective drug

11   utilization review, a pharmacist shall use

12   professional judgment when making a

13   determination about the legitimacy of a

14   prescription."

15              So doing the drug utilization

16   review, which is in the earlier portion of this

17   regulation, based upon that information, did

18   you understand that the regulation required the

19   pharmacist to then use their professional

20   judgment as to whether or not a prescription

21   was legitimate?

22        A.    Yeah.  In some cases you didn't

23   even have to.  Yes, I understand the drug

24   utilization review by a pharmacist, but in some

25   cases you didn't even have to use the drug

Page 118

1   utilization review to determine legitimate

2   medical purpose.  For an example, a dentist

3   writing an Adipex, which is a weight

4   amphetamine, that should come immediately into

5   concern rather than even using a utilization

6   review, or a family practice doctor prescribing

7   multiple controlled pain medication

8   prescriptions versus a pain management doctor.

9   All of these factors would come into review by

10  myself, not a pharmacist, and immediately

11  should come to the attention of a corresponding

12  responsibility of a pharmacist to a doctor.

13          Q.    Okay.  So you're saying there are

14  some circumstances where you don't even need to

15  do a DUR, there are certain things that would

16  lead you to believe that they should call a

17  prescription into question?

18          A.    Right, not legitimate medical

19  purpose.  I mean, right on its face value would

20  be called into question.

21          Q.    But ultimately the pharmacist has to

22  use their professional judgment based upon the

23  information that they have, correct?

24          A.    Yes, they should.

25          Q.    And they're not required to dispense

Page 119

1    a prescription of doubtful, questionable or

2    suspicious origin?  Do you see that final

3    sentence in the regulation?  In other words,

4    they can exercise their professional judgment

5    and refuse to fill or exercise their

6    professional judgment and fill?  Is that how you

7    understood it?

8         A.    You know, I held pharmacists to

9    that expectation always; you're responsible,

10   you put your initials, you dispense the drug,

11   you're responsible.  I had pharmacists,

12   though -- I had a pharmacy supervisor one time

13   tell me -- I remember -- specifically saying,

14   "Well, he wrote it.  We're just dispensing it."

15   And I referred him back to corresponding

16   responsibility.  I remember distinctly talking

17   to him about that.  And he didn't know what to

18   say then.  And I remember bringing out the law

19   book and putting it right in front of him, and

20   said, "Yeah, really."  And he passed.  He's

21   deceased now.  He worked for one of your

22   chains.  And that pretty much solved my

23   problems with pharmacists whenever they would

24   say, "Well, I'm just dispensing it.  You know,

25   he wrote it."  And I would go, "Yeah, really,

1   corresponding responsibility.  What does that

2   say?"  That's how I addressed it.

3        Q.   Okay.  So you had to set some

4   pharmacists straight on what their corresponding

5   responsibility was from time to time?

6        A.   Yeah.  You know, it was -- there

7   was some laxity before I became an agent with

8   the board and Bob Cole became the agent

9   supervisor.  There was a lot of things going

10  on, and Bob Cole, who was a former special

11  agent with DEA, became my supervisor and

12  everything changed.  And we were told here's

13  how you're going to handle these things, not

14  like it was done in the past.  And that's how

15  we handled it.  I mean, the older pharmacists

16  were kind of set in their ways when I first

17  came to the board, and they got a rude

18  awakening when the first two agents, myself and

19  Christopher Reed, were hired.  Things changed.

20       Q.   So beginning in 1987, the board got

21  tougher on its enforcement of the Ohio rules and

22  regulations?

23       A.   Extremely tougher.  Tim Benedict

24  went down to Columbus.  He was the pharmacist

25  assigned to my geographic -- he went down,

Page 121

1   became the number two guy.  Frank Wickham was

2   the director.  He was a pharmacist.  And we

3   were told in short to go out there and enforce

4   the criminal and administrative code, show no

5   favoritism.  And I showed no favoritism.  If it

6   was an independent or if it was a chain, I

7   treated them all the same.  I treated them all

8   very fair.  And I would tell them, "Your bible

9   is that utilization and these prescriptions.

10  You follow that, you'll never have a problem

11  with me.  You don't, deal with it."

12       Q.    And that was a much stricter regimen

13  than pre-1987; is that what you're saying?

14       A.    Yeah, at least in my -- my

15  knowledge.  I mean, I wasn't here in 19 --

16  before 1987.  I was on the Youngstown Police

17  Department.

18       Q.    Okay.  And did pharmacists get in

19  line after 1987 with the new, stricter

20  enforcement?

21       A.    Oh, yeah.  They realized who I was.

22  I mean, I had a pharmacist supervisor one time

23  tell me, "Are you a pharmacist," trying to

24  intimidate me.

25            And I went, "No."

```
                                              Page 122
 1               And he goes, "Are you a health
 2    professional?"
 3               And I said, "No."
 4               And he said, "Well, who are you to
 5    tell me that I can't -- or can't dispense this
 6    or dispense this?"
 7               And I said, "I'm the guy that's
 8    going to put you in prison if you do."
 9               Never had another trouble with that
10    pharmacist ever.  So word spread.
11          Q.   Okay.  Go back to 5-20 of this
12    regulation, the prospective -- I'm sorry, not
13    5-20.  That's the prospective drug utilization
14    review.  There's another, 5-21, the first page
15    of Exhibit 10.  And we were going down the five
16    steps for the prescription process.  We're now
17    on the third step, ensure the drug is labeled.
18    What did you understand the labeling requirement
19    to be?  And if it helps, 5-16 is attached a
20    couple pages behind here.
21          A.   Patient name, patient address;
22    doctor's name, if controlled substance, the
23    name of the drug, the quantity of the drug, day
24    supply, refills if so noted, pharmacist
25    initials.
```

1      Q.    Is that something that you checked

2  in your inspections of the pharmacies, to make

3  sure they were complying with this step three,

4  manner of processing a prescription or meeting

5  the labeling requirements?

6      A.    Yes.

7      Q.    The fourth step is "Ensure that a

8  patient is given an offer to counsel pursuant to

9  4729-5-22."

10          Did you enforce the patient

11  counseling regulation as part of your

12  inspections?

13      A.    Yes.

14      Q.    And then the step five, the last

15  step listed here, is "Ensure that a prescription

16  is filed pursuant to 4729-5-09."

17          Is that a recordkeeping requirement

18  that you enforced in your inspections?

19      A.    Yes.

20      Q.    Mr. Pavlich, other than these five

21  steps, are you aware of Ohio law or regulations

22  requiring a pharmacist to follow any other steps

23  other than these five listed steps in the

24  regulation?

25      A.    I believe there's a section

Page 124

1    somewhere that says they shall report to the

2    Board of Pharmacy or local law enforcement

3    criminal activity.

4         Q.    Okay.  But in terms of --

5         A.    And/or theft of drugs.

6         Q.    All right.  But in terms of how they

7    were supposed to process specific prescriptions,

8    the regulation pretty specifically lists five

9    separate steps, and my question to you is, are

10   you aware of any other step that Ohio law said

11   the pharmacist must follow in processing a

12   prescription beyond these five steps?

13        A.    I don't know unless you

14   specifically direct me to it.  I'm not aware.

15        Q.    Now, Mr. Pavlich, the board had a

16   right to randomly and, without notice, inspect

17   pharmacies as a condition of getting their

18   license from the board; is that correct?

19        A.    Within their hours of operation,

20   yes.

21        Q.    I want to direct your attention to

22   Exhibit 11, and this is Administrative Code

23   Section 4729:5-3-03, Inspections and Corrective

24   Actions.

25              Do you recognize this as the

Page 125

1  regulation that empowers the Board of Pharmacy

2  to send in agents to inspect pharmacies?

3          A.     I am by looking at it.

4          Q.     All right.  Does it jar your memory

5  as to this is the regulation that gave the board

6  the authority to inspect?

7          A.     To the best of my knowledge, yes.

8          Q.     Paragraph A says that "An entity

9  licensed by the State Board of Pharmacy as a

10  terminal distributor of dangerous drugs is

11  subject to an on-site inspection by the board."

12  So these inspections you understood were

13  physical visits by the agents to the stores, not

14  remote, check the record type things, they were

15  actually on-site inspections?

16          A.     Right.  An inspection is an

17  on-site.

18          Q.     It says, "An authorized board agent

19  may, without notice, carry out an on-site

20  inspection or investigation of an entity

21  licensed by the board.  Upon verification of the

22  board agent's credentials, the agent shall be

23  permitted to enter the licensed entity."

24                  Is that how you recall it worked?

25  I guess you said you did 50 inspections a year

Page 126

1    for about 25 years.

2         A.    I mean, I was required to.  I mean,

3    I pretty much did the best I could to do 50 a

4    year, full inspections.  Wait a minute.  Let me

5    get out one of my Board of Pharmacy cards here,

6    as a matter of fact.

7         Q.    Are these the credentials you would

8    show the pharmacist when you showed up?

9         A.    Well, this is one of the cards I

10   would give them.  This is with my retirement

11   stuff there.  And it says, "You are requested

12   to permit the above-named agent to inspect all

13   drug stocks and records pursuant to ORC Section

14   3719.27 and OAC Rule 4729-5-29."  That was on

15   my card.  And when I would go to a pharmacy,

16   I'd pretty much hand them my card and say, "I'm

17   here to do an inspection," even if they knew

18   me.  I would pass these things out like lot

19   lottery tickets.

20        Q.    And were your inspections normally

21   without notice?

22        A.    Yeah.  Yes.

23        Q.    And was there a reason for that, why

24   you did it without notice?

25        A.    Well, I didn't want them to get all

1    tidy and neat before I walked in the door.

2         Q.    Okay.  So you would show your

3    credentials, show your card, and then you had a

4    full right under the Ohio laws to make a full

5    inspection of the pharmacy?

6         A.    Correct.

7         Q.    Subsection B of this regulation

8    says, "Submission of an application for a

9    license as a terminal distributor of dangerous

10   drugs with the State Board of Pharmacy

11   constitutes permission for entry and on-site

12   inspection by an authorized board agent."

13             Did you ever have to resort to that

14   provision if you encountered resistance to your

15   inspection?

16        A.    I would generally say no.  I'm not

17   going to say that it never happened, that I

18   didn't have a pharmacist or pharmacist try to

19   throw us out, because it did happen.

20        Q.    Okay.  Do you recall any of those

21   incidences as we sit here today or --

22        A.    Oh, I remember very clearly Kinsman

23   Pharmacy, which was an independent store.  I

24   walked in with my agent supervisor and two

25   other agents and they got very confrontational

Page 128

1  with us.  They lost the pharmacy and both

2  pharmacists lost their licenses over that and a

3  few other things.  But that was Kinsman

4  Pharmacy and that was around late 1990s.

5        Q.    In what county was Kinsman Pharmacy

6  located?

7        A.    Trumbull.

8        Q.    And what were they doing that caused

9  them to lose their license?

10       A.    Trafficking in drugs, illegal

11  processing of drug documents, a lot of that

12  type of stuff.

13       Q.    According to this regulation, if you

14  as an inspector identified a violation -- and

15  I'm looking at Subsection C -- you were supposed

16  to provide a written report and you had a right

17  to demand a written response from the pharmacy

18  if you found a potential violation; is that

19  right?

20       A.    Yes.  I would document what I

21  found, whether it was minor, you know, like

22  something minor.  You know, not all the

23  prescriptions have the pharmacist's manual

24  initials.  They had computer initials.  So I

25  would note it.  If it was something major, I

Page 129

1   might not say anything initially and leave the

2   pharmacy and regroup or call my supervisor,

3   should I say, and say, "I see a lot of problems

4   in here.  What do you think?"  And then proceed

5   at that time.  But most normally I would

6   document on the inspection sheet what was

7   happening.

8        Q.    We'll get to those in a second.

9              And if you found a violation -- or

10  the violations could include violating any rule

11  of the board or any provision of Chapter 4729

12  of the code, as listed in the regulation here?

13       A.    Yes.  I usually would write that

14  code down.  I had -- I would try to be very

15  thorough when I did an inspection and I wanted

16  to bring something to the attention of the

17  pharmacist.  I wouldn't just say, "Hey, you

18  don't have manual initials on here."  I would

19  put that code to that manual initial

20  requirement.  That's how I did it.

21       Q.    One potential violation listed here

22  is violation of any provision of the Federal

23  Drug Abuse Control laws or regulations.  So you

24  were not only looking for violations of Ohio

25  law, you were looking for violations of federal

Page 130

1   law?

2        A.     I would sometimes list both, yes,

3   federal and state code; sometimes, not always.

4   Like if -- I would give -- I couldn't find

5   their DEA license or I couldn't find their 222

6   forms, which was their order forms for ordering

7   controlled substances, and I couldn't find them

8   or I couldn't find the order they were in, you

9   know, something like that, I might list the

10  federal code, too.

11       Q.    But you could cite a pharmacy for

12  not complying with federal laws as well as Ohio

13  laws, correct?

14       A.     I could, but I didn't for general

15  things.  It wasn't my forte.  I would go

16  after -- I didn't go after smoke.  I went after

17  fires.

18       Q.    Now, when you did your inspections,

19  did you follow a manual?  Did the board have a

20  manual for its agents that provided what they

21  were supposed to be doing in their inspections

22  and the regulations and statutory citations that

23  supported the different areas?  Do you remember

24  a manual of any sort or guidelines or checklists

25  for inspections?

1       A.    No.  I had a law book, which was

2   called The Drug Laws of Ohio, and was about

3   that thick (indicating), and all the codes and

4   regulations, federal, state, administrative,

5   you name it, was in it, and my boss told me go

6   out and enforce them.  I worked with him for a

7   couple of months, got an idea what I needed to

8   do, and that was it.  There was no specific

9   guideline other than what was on the inspection

10  report, left column.  You know, it had -- I

11  don't know -- 20 things documented, license,

12  different things, recordkeeping.  You know, you

13  kind of use it as a small guideline, but I did

14  my own thing.

15       Q.    Well, Exhibit 12 has an inspection

16  guide for outpatient pharmacies that was taken

17  from the board website.  Now, it's dated 2020,

18  well after you retired.  I just want to know if

19  you've ever seen an inspection guide like this

20  for when you were working at the board?

21       A.    Never.

22       Q.    Never?

23       A.    Never.  We never had one of these.

24  We were pretty much turned loose.  Not

25  everybody did inspections the same as each one,

1   as -- like I said, I tried to be very thorough

2   on a full inspection, but I seen inspections by

3   other agents, even when I was working and I

4   would go I'd be ashamed to turn those in, and

5   like one word, "okay."  I mean, come on.

6          Q.    You had higher standards for --

7          A.    That was my personal way of doing

8   what I did.  I didn't want my boss in Columbus

9   or during an administrative hearing or some

10  other process bring something to my attention

11  and say, "What's this mean?"  I knew what I

12  wrote because I wrote it up, at least I tried

13  to.  You know, I tried to be thorough.  You

14  know, I seen inspection reports and I'm like,

15  boy, you're lucky I'm not your supervisor.

16         Q.    Okay.  Was there an inventory

17  regulation that required the pharmacies to

18  conduct inventories on a certain periodic basis?

19         A.    Yes.

20         Q.    Is it shown in Exhibit 13?

21         A.    Yes, controlled substances

22  inventory requirement.  I think it was every

23  two years, but don't hold me to that.

24         Q.    Well, as of 3-1 of '19 it says

25  annual now, but is it your recollection that

Page 133

1    when you were an agent that it was two years?

2          A.    It could have been one year.  Off

3    the top of my head I was saying two years they

4    had to do one, but --

5          Q.    Okay.  And so that was a regulatory

6    requirement, actually physically count your

7    controlled substance inventories at least once a

8    year, if not every two years?

9          A.    Yes.  The purpose of that was if I

10   had to go in there and do an audit, I have a

11   starting and an ending base.

12         Q.    Okay.  And Section D of this

13   regulation says that the inventory records shall

14   be maintained for a period of three years from

15   the completion date of the inventory and made

16   readily retrievable.

17               Is that your recollection of

18   recordkeeping requirements imposed by the

19   board, three years for inventory records?

20         A.    Yeah, that sounds about right.

21         Q.    Do you know why it was set at three

22   years and not some other time period?

23         A.    Pharmacists used to maintain

24   records a lot more than three years, but --

25   they would go like seven years, from what I

                                          Page 134

1   recall.  Three years was usually the scope of

2   what would be, in my case, a criminal

3   investigation doing a fallback.  I mean, if you

4   can't figure something out within a three-year

5   window, then you're not too good at what you're

6   doing.  So it might have been why that was in

7   place.  I don't know.  I didn't write this.

8        Q.    In your inspections did you ever

9   recall seeing pharmacies do inventories more

10  than annually, as required by the regulations?

11       A.    I would say yeah, sometimes.  If

12  they had a theft of drugs or something, they

13  would do an inventory.  If they had something

14  they found suspicious, like, you know, some

15  recordkeeping problem, they would do an

16  inventory.

17       Q.    But if you -- if you had a pharmacy

18  that was doing regular inventory, say on a

19  monthly basis instead of yearly or biannually,

20  did you view that as a good control?

21       A.    I would view it as a good control.

22  I know pharmacy supervisors or chains would go

23  in there and do things like that.

24       Q.    Now, the reason why you're here

25  today, Mr. Pavlich, is because you conducted

Page 135

1   some investigations of the retail pharmacies

2   owned by the pharmacy Defendants, including

3   Giant Eagle.  Do you recall inspecting Giant

4   Eagle pharmacies in Trumbull County?

5          A.    I did.

6          Q.    If you look at Exhibit 14, this is a

7   table that I had prepared based upon inspection

8   reports produced by the Board of Pharmacy, and

9   you see you're listed number 2 under William

10  Edwards, Trey Edwards -- you're listed as having

11  conducted 21 inspections of Giant Eagle

12  pharmacies from 11-26 of '91 to 12-1 of '11.

13  None of them were done in Lake County and all 21

14  were done in Trumbull County.

15              Do you see that?

16         A.    I see it.

17         Q.    Does that seem accurate to you, that

18  the pharmacies that you inspected, the Giant

19  Eagle pharmacies were all in Trumbull County and

20  it was approximately 21 or so inspections in

21  that 20-year time period?

22         A.    Based on this, yes.

23         Q.    Okay.  And you didn't inspect Giant

24  Eagle pharmacies in Lake County because that was

25  not your area, your geographic area; is that

Page 136

1    right?

2         A.    That's correct, what would be

3    called a normal, full inspection.  I only did

4    it in my county unless I was specifically sent

5    somewhere to do something by my boss.  I would

6    do them only in my geographic.

7         Q.    I see.  Okay.  Exhibit 16 are the

8    inspection reports that you prepared for Giant

9    Eagle pharmacies in Trumbull County.  There's

10   approximately, as I said, 21 of them.  Have

11   you -- Exhibit 16.  Are you with me?

12        A.    Okay, I gotcha.

13        Q.    Do these appear to be your

14   inspection reports signed by you on the dates

15   indicated for your inspections of Giant Eagle

16   pharmacies?  In other words, is this your

17   handwriting?

18        A.    I'm looking.  I'm looking.  Those

19   are my inspection signatures, yes.

20        Q.    And your handwriting on the

21   inspection reports; is that right?

22        A.    Yes.

23        Q.    Okay.  Giant Eagle had six

24   pharmacies in Trumbull County.  Of the 21

25   inspections that you did, 11 were done at store

1   number 1419 on Elm Road in Warren.  How did you

2   choose which pharmacies to inspect and on what

3   periodic basis?  How did you end up with 21

4   inspections of the six Giant Eagle pharmacies in

5   Trumbull County and how did you determine who

6   was going to get inspected more or less?

7        A.    I didn't determine who should get

8   inspected more or less.  I just -- in my

9   travels -- let's say I was at an independent a

10  couple blocks from one of the chains, so I

11  might have been in that pharmacy six months ago

12  and I'd go back in because it was convenient

13  and close.  I would try to do every pharmacy,

14  though during that time period -- and that

15  was -- I don't remember -- a year or two --

16  sometimes I fell behind.  I was pretty busy.

17  But I didn't have any set pattern to go do one

18  store more than another unless I had something

19  specific I was looking at.  Then I might be in

20  there a few more times.  But I didn't have any

21  standard that I was going to go to Rite-Aids or

22  Giant Eagle or Walgreens this month, that

23  month, this year, that year.  I did them as I

24  did them.

25        Q.    And, generally speaking, you would

Page 138

1   try to inspect every pharmacy about every one to

2   two years you said, give or take?

3         A.    I tried but I didn't always fall --

4   you know, I mean, I forget how many sites I

5   had.  I mean, I had first aid, EMS, pharmacies.

6   You name it, I was responsible.  I didn't do

7   the hospitals.  I didn't do nursing homes.  But

8   think of all the other facilities in those

9   counties I had to inspect, issuing new

10  licenses, and do 40 or 50 investigations that I

11  carried at a time.  So I did the best I could.

12        Q.    Okay.  The first inspection in

13  Exhibit 16 is of a Giant Eagle in Niles, Ohio,

14  store number 1405.

15        A.    I know this pharmacist very well,

16  excellent pharmacist.

17        Q.    Who is the pharmacist?

18        A.    Edward Louis Ting.  He now runs an

19  independent pharmacy in Kinsman, Ohio.  At

20  least when I retired he did.  Excellent

21  pharmacist.  His father was a doctor.

22        Q.    And by excellent does that

23  include -- well, why don't you tell me what you

24  mean by excellent?

25        A.    When I walked in the pharmacy,

1  practiced professionally, was courteous, was

2  not evasive, was everything I would do if I was

3  a pharmacist and a state agent came walking

4  into my pharmacy.

5       Q.   Was he always cooperative with you

6  in the inspections?

7       A.   He was excellent.

8       Q.   Did Pharmacist Ting ever assist you

9  or provide you with any leads concerning

10 potential diversion at his pharmacy?

11      A.   He did.

12      Q.   And can you give me some examples of

13 what he would give you leads on?

14      A.   Well, he gave me -- I know

15 specifically on Kinsman Pharmacy.  I mean, he

16 worked hand and fist with me when I was doing

17 that specific investigation.  He owned an

18 independent pharmacy in Kinsman.  He wasn't

19 working for Giant Eagle at that time.  But

20 Eddie Ting was well above board, never ever

21 questioned anything.  His wife is a pharmacist

22 too, now that I think about it.

23      Q.   And the five times that you

24 inspected this store, did you find Pharmacist

25 Ting to be open and honest with you and fully

Page 140

1    cooperative and provide you with whatever
2    records you asked for?
3           A.    Well, I guess it would be
4    documented in my inspection report, what I
5    found or knew.  I can't remember every specific
6    incident, but I always considered him an
7    excellent pharmacist in generality.
8           Q.    Okay.  This first inspection report
9    is way back in 1991, so this is -- it's going
10   back some time.  I've read this report and it
11   includes a barricade report at the back of it.
12   Am I correct that this was a clean inspection
13   for this store at this point in time?
14          A.    Yes.
15          Q.    And so we see this index of 1
16   through 35 items along the left.  You referenced
17   that earlier.  Are these the areas of inspection
18   that you had the right to inspect, in your
19   judgment, every time you went in to one of the
20   pharmacies?
21          A.    Yes.
22          Q.    And did you use your judgment, your
23   best judgment, in picking whichever areas you
24   were going to focus on, including in a full
25   inspection?  Was it up to you to say I'm going

Page 141

1   to do these items and not those items for
2   whatever reason, but something in your judgment
3   that you were able to do as an agent?
4        A.    I pretty much tried to follow that.
5        Q.    Okay.  And so if there was a problem
6   in the inspection, it would be noted somewhere
7   in the inspection report, perhaps as a follow-up
8   item that you wanted the pharmacist to deal
9   with, correct?
10       A.    Yeah.  It would just be an
11  attention-drawing thing I might -- I wouldn't
12  pink sheet him.  There's two ways of doing it.
13  Well, there's three ways.  You could proceed in
14  a criminal investigation.  But a clean
15  inspection would just document some highlights
16  for the board's purpose, like what kind of
17  hardware they have in the pharmacy for their
18  computer system, what type of barricade they
19  got, that type of thing.  Then if I found
20  something minor, you know, maybe a few
21  prescriptions without manual initials, I might
22  note it but I wouldn't pink sheet them.  But if
23  I found something a step above that, then I
24  would issue them what's called a pink sheet,
25  that came with white, green, pink and yellow, I

                                    Page 142

1   think, sheets, four-fold, and I would give them

2   a pink sheet and they would have to write an

3   explanation of how they were going to correct

4   the deficiency as to what I noted on the pink

5   sheet.  That's pretty much it, yeah.  I sort of

6   followed that, but that wasn't written in stone

7   that we had to, but that's what I did.

8           Q.    Going forward in this exhibit, if

9   you go about five or six pages into it, it's got

10  a Bates number ending in 0646.

11          A.    Where am I looking for, 0646?

12          Q.    The bottom right.  It starts with

13  BOP_MDL2800646.  I'm just focusing on the last

14  four numbers.

15          A.    Okay, I got it.  I got it.  Giant

16  Eagle at Elm Road.

17          Q.    Yes.  This is store 1419, personnel

18  Daniel Yocum.

19          A.    I remember him.

20          Q.    Did you have the same opinion of

21  Pharmacist Yocum that you did of Pharmacist

22  Ting?

23          A.    I believe I did.  I don't remember

24  him as well as I remember Pharmacist Ting, but

25  I do recall his name.  I recall his name.  I

1    can't say as specific for Pharmacist Ting.

2         Q.    Now, this is an inspection in March

3    of '95.  Is this also a clean inspection of this

4    Giant Eagle pharmacy, 1419?

5         A.    Yeah, but this might not have been

6    a full inspection.  This might have been just

7    sort of a half walk-through.  Let me see.

8    Yeah, it was only an hour and a half.  So you

9    look at the other one, it was two hours with

10   Ting.  So, you know, I counted it as a full

11   inspection, but it was a short full inspection.

12        Q.    Page 2 of this inspection references

13   controlled II drugs being secured in a pharmacy

14   safe with a perpetual inventory completed daily

15   and monthly.  Why would you note the fact that

16   controlled substances were being secured and

17   were subject to perpetual inventories daily and

18   monthly?  Is that a factor that you found

19   notable in your inspection?

20        A.    I don't know why I noted it.  It's

21   been a long time.

22        Q.    Are those good controls, to have

23   perpetual inventories daily and monthly for

24   controlled substances?

25        A.    Yeah.  It makes it easier when

Page 144

1    you're looking.

2         Q.    And it's above the regulatory

3    requirement, correct?  We saw that --

4         A.    Right.

5         Q.    It's either annual or biannual.

6         A.    Right, four and above, but it's

7    excellent.

8         Q.    Go forward to page 9944, a couple

9    pages after the one we were just at.  There's an

10   inspection of Giant Eagle store 1405 in Niles,

11   Ohio, Pharmacist Jeffrey Michael Mymo.  Do you

12   remember him?

13        A.    No, I do not.  He's not the

14   pharmacist that did this inspection with me.

15   It was Rick Jeren.  See the responsible person.

16   That's his signature down there.  Look, Rick --

17   that's another pharmacist that worked in the

18   store with him.  I can't say I recall Rick

19   Jeren.

20        Q.    Okay.  Is this a clean inspection,

21   Agent Pavlich, that Giant Eagle store?

22        A.    It's a clean inspection, but there

23   was a complaint noted on here that I had to

24   follow up on.

25        Q.    Did you follow up to your

Page 145

1    satisfaction?

2         A.    I did.

3         Q.    And did it change your clean

4    inspection conclusion for that store?

5         A.    No.  I didn't pink sheet him so it

6    didn't change my perspective.

7         Q.    All right.  Go forward to page 0652.

8    Is this another one of your inspection reports,

9    this time for store 1419, 2-6 of '96?

10        A.    Yes.

11        Q.    And the responsible person is Brent

12   Swipas.  Do you remember him?

13        A.    I remember him very well, and his

14   wife was a pharmacist also.

15        Q.    Was Mr. Swipas a cooperative

16   pharmacist and assisted you in your inspection

17   in any way he could?

18        A.    Oh, yeah, Brent was a good

19   pharmacist, excellent.

20        Q.    Did he provide leads or tips for

21   investigating diversion?

22        A.    He did.

23        Q.    And is this a clean inspection?

24        A.    Well, to the extent to what I wrote

25   here, I was primarily there for a large drug

1  destruction at that facility.  That's what took

2  up most of my time.  That's why you see such a

3  short inspection.  But I noted that the last

4  full inspection, I was in there in March of

5  '95.  So I was there more for drug destruction

6  than I was for anything else.

7       Q.    What happens in a drug destruction

8  and why are you called in for a drug

9  destruction?

10      A.    I would be called in to document

11  everything on the DEA -- I forget the name of

12  the code -- or not the code, the number on that

13  form.  I would complete an entire drug listing

14  of everything that was expired or whatever,

15  update it and document it and then forward it

16  off to DEA up in the Cleveland office and

17  destroy all the drugs right there in the

18  pharmacy, or in the bathroom, should I say,

19  after I documented everything.

20      Q.    There's a form, a DEA form attached

21  about four pages in to this.  It's 0658.  Is

22  this the DEA form you're talking about?

23      A.    Oh, yeah, that's it.  Brent Swipas

24  has signed in on it.

25      Q.    But why go through this?  Why

1    doesn't the pharmacy or pharmacist just flush

2    the drugs themself?  Why call you in and fill

3    out this form and --

4         A.    Because at the time we were

5    required to go there and do this.  We were

6    required to do this.  I mean, then it came to

7    the point where pharmacists, with another

8    accountable pharmacist, could do it.  They

9    would send a list down to the Board of

10   Pharmacy, if I remember how this worked, and

11   then the pharmacy board would send them a

12   letter back granting them the ability to

13   destroy the drugs.  But in the beginning this

14   is what we had to do.

15        Q.    Is this part of the full accounting

16   process for controlled substances?

17        A.    Part of it, yes.  They would keep

18   this record for the three years or whatever, so

19   in case there was an audit or whatever,

20   accountability need, this would come into

21   account.

22        Q.    I see.  Okay.  The next inspection

23   is on page 0660, this time of store 1419, and

24   we're now in 1997.  It looks like another --

25   well, actually, this appears to be a shortage

                                                        Page 148

1   report.

2               Do you see that?

3        A.    Yeah.  It looks like they were

4   short methylphenidate hydrochloride

5   five-milligram five tablets.

6        Q.    And are these typically reported to

7   you by the pharmacy, saying we have a shortage,

8   you need to come in and take a look?

9        A.    Typically, yes.  Pharmacists would

10  call me or a pharmacy supervisor.  I mean,

11  those were the two primary -- I never got a

12  call from like corporate or loss prevention.

13  They didn't call me.  It would be the

14  pharmacist or pharmacy supervisor.

15       Q.    So for a shortage you needed to fill

16  out a DEA 106, which is attached to this report?

17       A.    Yes.  And then I would forward it

18  or sometimes I would have the pharmacist mail

19  it to the Board of Pharmacy and I would give a

20  copy to the board down in Columbus.

21       Q.    All right.  So that really wasn't an

22  inspection, it was more of we've got a shortage?

23       A.    Yeah.  And then I might have looked

24  at a few things.  I didn't really document it

25  extensively.  How long was I there?  An hour

                                          Page 149

1    and a half.  Yeah, that's pretty much what I

2    was in there for.

3         Q.    Okay.  Go to the next inspection on

4    page 0666.  This is a loss report; is that

5    right?  You were contacted by Pharmacist Swipas

6    concerning a shortage?

7         A.    Yes.

8         Q.    So same thing, you filled out a DEA

9    106?

10        A.    Yes.

11        Q.    There's a reference that you did an

12   in-house security review with Bill Dobich, Giant

13   Eagle security?

14        A.    Yeah, I remember Billy.  I remember

15   him.  He was a pretty good guy.  I don't know

16   what his title was.  He might have been a loss

17   prevention guy.  But I did -- I do recall him.

18        Q.    And did he appear to be competent in

19   terms of what he was doing in terms of loss

20   prevention efforts at the pharmacies, the Giant

21   Eagle pharmacies?

22        A.    Yes, he must of have because I

23   remember him.

24        Q.    All right.  Go to the next

25   inspection, 0670, store 1419.  It looks like you

1   were requesting specific patient information

2   from the pharmacist and you were documenting it.

3   Am I reading that correct?

4        A.    Okay.  Yes.  I did request specific

5   information.  Trumbull Mahoning Medical Group,

6   which was north of them, a physician facility.

7   I don't recall the specifics of this, though.

8   This is a long time ago.

9        Q.    This is listed as a partial

10  inspection up above under "Personnel."

11       A.    I see it.  I don't recall the

12  specifics on it, though.

13       Q.    Go to the next inspection, 0640,

14  store 1419.

15       A.    Yes.

16       Q.    This looks like a barricade

17  inspection.

18       A.    You know what?  They must have --

19  what's the date here?  '99.  They must have

20  relocated their pharmacy in that specific store

21  to a different area in the pharmacy and created

22  a new barricade.  I don't remember.

23       Q.    But when something like that occurs,

24  the board agent comes in to approve the new

25  location; is that right?

1          A.    Yes.  Yes, that is correct.  They

2    would call me.

3          Q.    And you approved this -- in this

4    instance you approved the new location?

5          A.    Yep.  I wrote approved on a

6    barricade inspection, that is correct.

7          Q.    Go to page 0672.  It's another

8    inspection, store 1419.

9          A.    Boy, I was in here a lot.  Go

10   ahead.

11         Q.    Pharmacist Swipas requested a

12   destruction of controlled substances and looks

13   like another instance where you were called in

14   to, I guess, oversee the destruction and fill

15   out the appropriate forms; is that right?

16         A.    Yeah.  I didn't oversee them.  I

17   did them.  I would count -- yeah, I was there

18   what, 11:15 to 12:30, an hour and 15 minutes.

19   So I would do it all.  They would have it

20   secured in the pharmacy and then I would

21   document it all on the federal form and then I

22   would go with the pharmacist to the men's room

23   and flush it when I was all done.

24         Q.    Let's move forward to the next

25   inspection, 9956 page.  We're now in the year

1  2000.  You're back in store 1405 in Niles, Ohio.

2  This is a full inspection and Todd Tuttle is the

3  pharmacist.

4      A.    I know Todd.  I recall.

5      Q.    What do you recall about Pharmacist

6  Tuttle?

7      A.    Very good pharmacist.

8      Q.    Did he cooperate with you at all

9  times in your inspections?

10     A.    Yes, he did.

11     Q.    Did he provide leads for diversion

12  investigations?

13     A.    I would say, yes.  You know, I got

14  a lot of phone calls.  I would say he never --

15  he doesn't come into my mind as someone who

16  caused me concern, we'll put it that way.

17     Q.    Was this a clean inspection, this

18  full inspection?

19     A.    They weren't putting the full name

20  of the agent calling in prescriptions, which I

21  find that, unless it's extensive, something I

22  just document and bring to their attention.

23  You know, like one of the nurses or whoever in

24  a doctor's office would call in a prescription

25  for whatever on a patient.  You're supposed to

1   mark Sue Smith.  If you just mark Smith, then

2   there's five Smiths in the office.  I don't

3   know who the hell called it in.  So that's why

4   they were required to put first and last name.

5       Q.   So you called that to their

6   attention?

7       A.   I did.  And I noted number 37.  And

8   then they weren't putting some documentation on

9   the counseling log that I wanted them to do.

10  But I didn't issue a pink sheet.  It wasn't

11  that serious.

12      Q.   So a clean inspection with some

13  minor requests for corrections?

14      A.   Attention to detail, yes.

15      Q.   Okay.  The next inspection is on

16  page 9962.  This is now July of '02, store 1405,

17  in Niles, where Mr. Tuttle, pharmacist, full

18  inspection.  Is this a clean inspection, sir?

19      A.   Yes, it is.  Wait a minute.  It

20  looks very clean to me.

21      Q.   The reference on page 1 to pharmacy

22  profile records, and on page 3 to patient

23  profiles and perpetual inventories, these are

24  observations made by you in your inspection that

25  you felt were worthy of memorializing?

Page 154

1          A.    Yes.  To call to my attention if I

2     needed to in the future for whatever.  You

3     know, sometimes I went into more details on

4     things.  You could see I documented a pretty

5     good inspection.  I would, you know -- every

6     pharmacy was different.  You know, I would

7     document not exactly the same thing all the

8     time.  I tried to be thorough, but everyone is

9     a little different, just like our kids.

10          Q.    Do you normally do a barricade

11     inspection when you are out doing your on-site

12     inspections?

13          A.    Not necessarily normally.  This

14     one, new pharmacy moved from within the same

15     building I noted on the first page.  So they

16     had moved from one spot to another spot.  I

17     remember this store.  It's right there in

18     downtown Niles.

19          Q.    In your inspections, Agent Pavlich,

20     did you have cause to look at dispensing records

21     and drug utilization review records from time to

22     time?

23          A.    Yes.

24          Q.    Were you seeking to enforce those

25     manner of prescribing regulations that we went

Page 155

1    over a little while ago?

2         A.    Sure.

3         Q.    Go to page 0676, another inspection,

4    store 1419.

5         A.    Swipas, and there's his wife

6    pharmacist, Kimberly.

7         Q.    And was this a clean inspection?

8         A.    It looked like it had a destruction

9    and it did.  Yes, I mean this was an inspection

10   but not as thorough as the last one I just did.

11   This was more I spent a heck of a long time in

12   there destroying and counting prescription

13   drugs for destruction.

14        Q.    Go to the next inspection on page

15   9844.

16        A.    Okay.

17        Q.    This is store 4056 in Warren, Ohio,

18   looks like Brad Edwin Daugherty, pharmacist.

19              Do you see that?

20        A.    Yeah.  I'm trying to place him.  I

21   remember Cathy Rozzi but I can't place

22   Daugherty.

23        Q.    Here you pink sheet several items

24   that you wanted follow-up on, and on page 9853

25   there appears to be a response from the Giant

1  Eagle pharmacist, 9853 and 9855 and 57.  So this

2  was an inspection of -- a full inspection where

3  you wanted follow-up, correct?

4          A.    Yep, I did.

5          Q.    And did you get the follow-up that

6  you wanted in writing from Pharmacist Daugherty?

7          A.    Yes, I did.

8          Q.    And were you satisfied with his

9  response?  I guess there was an issue involving

10  a copy of a prescription that was found in the

11  copier or something.  Do you recall this

12  incident?

13          A.    Yes, I do, as a matter of fact.

14          Q.    And did the Giant Eagle pharmacist

15  provide you the information you needed in order

16  to resolve the matter?

17          A.    Yes.  He provided me with a written

18  answer.  As a matter of fact, he even

19  apologized.  Yep, he did.  I remember that

20  incident.

21          Q.    You also had some follow-up requests

22  for the labeling on the third page of this

23  report.  You wanted more information concerning

24  the computerized labeling?

25          A.    I don't remember this part.

Page 157

1          Q.    He seems to provide a response on

2     page 9855.

3          A.    He was really thorough, articulate

4     in his responses.  I'm looking at them.  I

5     don't remember these other little details, but

6     I do remember that prescription that was in the

7     copier, and he called the doctor or something,

8     if I remember correctly, and the doctor said

9     just destroy it, and he did, not to my liking.

10         Q.    That's something he shouldn't have

11    done?

12         A.    No.

13         Q.    You're supposed to keep a record of

14    it?

15         A.    Yeah.  That's a drug document.  Not

16    that he specifically dispensed anything off of

17    it and should have kept a record of it, but

18    should not have destroyed a drug document

19    however it was obtained by him.

20         Q.    All right.  And you called him on it

21    and he sent a letter apologizing and explaining

22    the circumstances?

23         A.    Right.  He did, and, you know, I

24    don't remember any problems with him.

25         Q.    And so those matters in that report

1   were resolved to your satisfaction?

2        A.   Yes.  Not only my satisfaction but

3   the satisfaction of -- I believe Tim Benedict

4   or Bob Cole in Columbus reviewed any pink sheet

5   inspections that were issued and they

6   maintained the file, and then when the answer

7   came in, they would compare it to the

8   inspection sheet, specifically what was noted

9   to what was answered, and if there was a

10  problem with the answer, then I'd get a call.

11       Q.   We have a few more inspections.

12            Beginning on page 9822 is an

13  inspection of Giant Eagle store number 4002 in

14  Youngstown.  My only question related to this

15  inspection is was it a clean inspection?

16       A.   Yeah.  Todd Tuttle was there.

17       Q.   Marcie Swanson is the responsible

18  person.  Do you remember her?

19       A.   Yeah, I remember Marcie.

20       Q.   What did you think of Marcie?

21       A.    I think she was a fine pharmacist.

22  I don't recall any issues with her that I

23  recall.  I am getting old so bear with me.

24       Q.   Go forward to page 9974.  It's an

25  inspection of Giant Eagle store 1405 in Niles,

Page 159

1    Ohio.

2          A.    9974.  Is that after 9822?

3          Q.    Yes.  Yes.  They're not in

4    necessarily --

5          A.    Oh, okay.

6          Q.    -- numerical order so you have to

7    flip through.

8          A.    I got it, okay.

9          Q.    This is an inspection of 1405, store

10   1405, on 2-12 of '08.  Was this a clean

11   inspection, Agent Pavlich?

12         A.    It looks like it on its face.  I

13   would say it was.  I remember Stephanie.

14         Q.    Stephanie was a pharmacist at this

15   store?

16         A.    She was a responsible pharmacist at

17   that store.

18         Q.    And did you find her to be a

19   cooperative and professional pharmacist?

20         A.    I did.

21         Q.    The last couple of inspections that

22   we have -- go to page 9830.  This is an

23   inspection of Giant Eagle store 4002 on 2-1 of

24   2010.  There are several listed pharmacists.

25   Ken Hiywa, H-I-Y-W-A --

1        A.    Yeah.

2        Q.    -- do you remember him?

3        A.    No, I do not.  I do not remember

4  the second one.  I know the third one.  He was

5  a hospital pharmacist sometime during my

6  career.  Mike Rubesich, I know him.  He was an

7  excellent pharmacist.  Tina Wheeler, I can't

8  place her.  And Todd Tuttle, he was a good

9  pharmacist, too.

10        Q.    Okay.  The second page -- well, this

11  is a clean inspection, correct?

12        A.    Yeah.

13        Q.    The second page of this inspection

14  references daily log reports filed and signed by

15  the pharmacist.  Is that a form of internal

16  control that you found to be good internal

17  control?

18        A.    This is 9832?

19        Q.    Yes.

20        A.    And it's the second page?

21        Q.    Yes.

22        A.    What are you referring to?

23        Q.    In the middle it says, "All daily

24  log reports are filed and RPh signed."

25        A.    At the end of the day they print a

1   printout and the pharmacist is required to sign

2   it.

3           Q.     Is that a good internal control in

4   your experience?

5           A.     Well, it was required by the board,

6   but as far as if the pharmacy dispensed 500

7   prescriptions, at the end of the day they would

8   print a log like that with the 500 dispensings

9   in it, and to say that the pharmacist

10  specifically went through each and every

11  dispensing, that never happened.  They would

12  just sign off on it and say this is what came

13  out of -- per se, this is what came out of our

14  computer dispensing system and I'm verifying

15  that fact.

16          Q.     Okay.  But my question is, what you

17  said, that's something that the board required.

18  And did the board require it because it was a

19  form of controlling --

20          A.     It was a form of looking back on

21  accountability versus hard copy.

22          Q.     Okay.  At the bottom of page 9832

23  there's a reference to "new seven camera video

24  system recently installed in the store."  Is

25  that a form of internal controls that you found

1    to be good -- something good to have in the

2    pharmacies?

3         A.    Yes.

4         Q.    Video cameras?

5         A.    Yes.

6         Q.    Did it -- was it because the cameras

7    were helpful in detecting theft and diversion?

8         A.    Yes.

9         Q.    Did you find that to be so in

10   actuality in your investigations, that you were

11   able to pull video cameras and inspect them to

12   see what was going on?

13        A.    Yes, I did, or put my own in or the

14   board's cameras in.  But yes, very helpful.

15        Q.    Okay.  We have two more inspections;

16   actually, three more.  I'll try to be summary on

17   these.

18              Page 9237, an inspection on 3-8 of

19   2011 of Giant Eagle store 4051.  Is this a

20   clean inspection of that Giant Eagle store?

21        A.    Yes.  Mike Madgar, very good

22   pharmacist.

23        Q.    Do you recognize the other

24   pharmacists, Tim Lewis or Heather Hammer?

25        A.    No, I don't recognize them but I

Page 163

1   recognize Mike.

2        Q.    Was Mike Madgar a cooperative

3   pharmacist?

4        A.    Yes.

5        Q.    Did he behave professionally in your

6   experience and provide you with investigative

7   leads?

8        A.    Very good.

9        Q.    The second to last inspection report

10  is on page 0766.

11       A.    Okay.

12       Q.    Now, there's two pink sheet items,

13  29 and 12, and there's a Giant Eagle response on

14  page 0778.  Now, you wanted some documentation

15  follow-up from the Giant Eagle pharmacy at this

16  time, for example, for an inventory.  You

17  couldn't find some inventory in the records?

18       A.    I see it.  I couldn't find it.  I

19  don't recall this particular -- either one of

20  those pharmacists.  I don't remember them.

21       Q.    Barbara McAnany, M-c-A-N-A-N-Y, or

22  Brenton Cornwell?

23       A.    I don't recall.  I don't remember

24  either one of them.

25       Q.    But did you -- were you satisfied

Page 164

1   with the Giant Eagle pharmacists' follow-up?

2        A.    Apparently.  Replied within 20

3   days.  This must be it right here.

4        Q.    Page 0778 is the reply?

5        A.    Yes, it is.

6        Q.    Were you satisfied with that reply

7   and did it resolve the items that you wanted

8   followed up on?

9        A.    Must have been.

10        Q.    And then the last inspection, Agent

11   Pavlich, is on page 0684 dated 12-1 of '11.

12   This is store 1419 in Warren, Ohio.  Is this a

13   clean inspection?

14        A.    Yes, it was clean, and I remember

15   Linda Rhodes.

16        Q.    And Linda Rhodes, R-H-O-D-E-S?

17        A.    Right.  Good pharmacist.

18        Q.    Was she cooperative with you and did

19   she provide investigative leads to you?

20        A.    She was cooperative with me during

21   this inspection.  Like I say, I don't recall

22   each pharmacist that ever called me, but I

23   recall her, so, and I recall nothing bad about

24   her.

25        Q.    I have a few follow-up questions,

Page 165

1    Agent Pavlich.

2             After going through all of the

3    requirements and going through all of your

4    inspection reports, is it a fair statement that

5    Giant Eagle pharmacies met the requirements for

6    its Ohio licenses for all of its stores at all

7    times and that no license was ever suspended or

8    revoked?

9         A.   Well, I can't answer that last part

10   because I don't recall, but Giant Eagle

11   pharmacy never caused me any grief.  If I

12   requested something, I talked to the pharmacist

13   and they were always cooperative that I recall,

14   and I think their supervisor at that time was

15   Rick Gray and he was always very cooperative.

16   I don't recall having any major problems with

17   him, not that I didn't.  I'm just not recalling

18   it.

19        Q.   But do you recall -- I think you

20   inspected these pharmacies in Trumbull County 21

21   times and part of these inspections include

22   checking licenses.  Do you recall any Giant

23   Eagle pharmacy license being suspended or

24   revoked for a violation of Ohio law?

25        A.   I would say I don't.

Page 166

1          Q.    Is it a fair statement that as far

2     as you know, based upon your inspections, that

3     Giant Eagle pharmacies met the security

4     requirements imposed by Ohio law?

5          A.    Yes.

6          Q.    In fact, in some ways did the Giant

7     Eagle pharmacies have better controls than those

8     required by the Ohio security requirement?

9          A.    They met the standard.

10          Q.    In your multiple visits to Giant

11     Eagle stores, did you ever observe in any way

12     that they were not adequately staffed with

13     professional pharmacists and pharmacy

14     technicians?  Did you ever see anything that

15     caused you concern about the staffing levels?

16          A.    Well, put it this way, sometimes I

17     saw pharmacy levels of dispensing that they

18     could have sure used another pharmacist in

19     there at times than be overworked and burden

20     pharmacists or couple of pharmacists that were

21     in there.  But that wasn't my call.  I'm just

22     giving my opinion.

23          Q.    Is that something, if you observed

24     it, you would have put it in your inspection

25     reports?

1          A.     No, not necessarily.  That was an

2     opinion.  Didn't say anything ever in a code

3     that I know of that they had to have a certain

4     number of pharmacists for a certain volume of

5     prescriptions.  My sister-in-law is a

6     pharmacist also.  And I would walk in stores

7     and see hundreds of prescriptions being

8     dispensed in a day and they would have one

9     pharmacist working in the store.  To me, in my

10    opinion, it was extra pharmacists needed on

11    that staff, but that was my opinion.

12         Q.     Are you speaking specifically of

13    some pharmacy or a Giant Eagle pharmacy?  I'm

14    trying to make sure I understand.

15         A.     I'm not -- I'm speaking in

16    generality because I can't recall a specific

17    location as to, oh, wow, they did a thousand

18    scripts and they had one pharmacist working

19    during an eight-hour shift.  I'm just telling

20    you in general what I would see at times, and I

21    would go, man, I feel sorry for this pharmacist

22    working in here doing all of this, all of this

23    responsibility and everything with five, four,

24    three techs running around.  And they're

25    responsible for all of this.  They don't get

1   paid enough to do all of that in my opinion.

2          Q.    I just want to make sure I

3   understand that these are some unknown

4   pharmacies in your general experience?

5          A.    All pharmacies in general.  All

6   pharmacies that I would walk in, I would see

7   high volumes of scripts, whether it was a chain

8   or even an independent, and I would see one

9   pharmacist trying to maintain all of this, do

10  all these records and deal with me.  I know it

11  was in my head many a times saying, man, I feel

12  sorry for this pharmacist.

13         Q.    But there's nothing in the code or

14  the regulations --

15         A.    No.

16         Q.    -- that say --

17         A.    That's why it was not noted in my

18  inspection report.  They filled a thousand

19  prescriptions on January 2nd and there was only

20  one pharmacist in here filling them all.  There

21  was nothing noted because there was nothing in

22  the code that I can recall, administrative

23  or -- well, more administrative than anything,

24  specific to prescriptions and how many

25  pharmacists.  You asked me and I'm telling you

Page 169

1    what I think -- what I thought.

2         Q.    Agent Pavlich, in your experience in

3    inspecting Giant Eagle pharmacies, is it a fair

4    statement that Giant Eagle pharmacies complied

5    with the manner of processing prescription

6    requirements, including the drug utilization

7    reviews that we went over earlier today?

8         A.    Yes.

9         Q.    Did you ever see any evidence that

10   Giant Eagle pharmacists were filling

11   illegitimate prescriptions?

12        A.    Oh, I'm sure there was, but I just

13   don't recall.  I mean, that was 25 years of

14   work.  I just don't recall off the top of my

15   head.  You'll have to be more specific.

16        Q.    Were Giant Eagle pharmacies ever the

17   targets of a criminal investigation as far as

18   you know?

19        A.    Giant Eagle pharmacies?

20        Q.    Right.

21        A.    So you're asking me whether

22   corporate was involved, and I would say no,

23   involving me.

24        Q.    Is it your view that, based upon

25   your inspections of Giant Eagle pharmacies, that

1    Giant Eagle pharmacies were operating lawfully

2    at all times?

3          A.    If they weren't, I would have taken

4    a case number or I would have documented it.  I

5    don't recall anything specific.

6          Q.    Did you ever see any evidence that

7    Giant Eagle or its pharmacists were knowingly

8    filling prescriptions that were not legitimate?

9          A.    I mean, there could have been.  I

10   just don't -- you're going to have to bring me

11   a specific case number or something.  I'm not

12   going to say every single pharmacy I walked in

13   I never found a false prescription, I never

14   found a problem.  I couldn't answer that that

15   way.

16         Q.    Would you have to look at your

17   inspection reports in order to find that?

18         A.    Yeah.  I would have to go through

19   25 years of inspection reports and

20   investigative reports to find out if I had a

21   pharmacist in there that caused me grief.

22   Right off the top of my head I'm not thinking

23   of one.

24         Q.    All right.  But sitting here today,

25   can you recall ever an incident where a Giant

Page 171

1   Eagle pharmacist knowingly filled a prescription

2   that was not legitimate?

3        A.    I can't recall one.

4        Q.    Did Giant Eagle and its pharmacists

5   actively assist you and the board with

6   anti-diversion efforts?

7        A.    They did what I requested of them.

8        Q.    Do you hold similar conclusions for

9   the other pharmacy Defendants, CVS, Rite-Aid

10  Walgreens and Rite-Aid?  Were they generally

11  cooperative with you in your investigations?

12       A.    Well, since I'm under oath, I would

13  say I had no problems with Giant Eagle, no

14  problems with CVS, no problems with Walgreens,

15  no problems with Walmart.  I had some issues

16  with Rite-Aid.

17       Q.    Okay.  Is that in connection with

18  the Overholt Pharmacy/Dr. Franklin matter?

19       A.    No.  That involved -- well, for

20  one, it involved one of their supervisors,

21  who's now deceased.  He used to give me a

22  little bit of trouble when I would ask for

23  things and sort of, I guess the term would be,

24  drag his feet, and he was the one that I

25  confronted the one time.  And I was working a

Page 172

1   doctor case in Boardman, Ohio, and he said, "He

2   wrote it.  We're just supposed to fill it."

3   And that's when I told him about corresponding

4   responsibility and manner of issuance, and I

5   said, "I'm going to hold you responsible then

6   for everything I pull out of here and you'll

7   get criminally charged."  And I didn't have too

8   much trouble with him after that.  That was

9   one.

10          And then there was another one,

11  Rite-Aid pharmacist supervisor, that caused me

12  grief up in the Trumbull County area when I

13  would do things and started dragging her feet,

14  not as quick as other, you know, chain

15  pharmacist supervisors.  I don't remember her

16  name.  It was Patty -- Patty something -- Patty

17  something or another.  Let's see.  Wait a

18  minute.

19          Q.    What are you looking at?

20          A.    One of my old directories, one of

21  my address books that I still have.  Patricia

22  Mendenhall.  I had a little bit of issues with

23  her always trying to get -- trying to always

24  get what I needed done, whether it was a record

25  or something, and it just wasn't as easy, you

Page 173

1    know.  Like I would call Rick Gray from Giant
2    Eagle and get it done right away.  It was
3    always a little bit of trouble.  I don't know
4    if it was her or if it was the other guy or if
5    it was corporate, but I always had a little bit
6    of trouble.  Not all the time, but I'm under
7    oath and I'm telling you what I'm telling you.
8         Q.    But with -- I appreciate those
9    detailed descriptions of the two Rite-Aid
10   supervisors.  Did you believe that -- we've
11   already covered Giant Eagle, but the other
12   pharmacy Defendants, did you believe that they
13   were operating lawfully at all times while you
14   were an agent?
15        A.    Yes.  I believed all of the chains
16   were operating responsibly.  I just brought up
17   two individuals that made my life a little
18   harder sometimes.
19        Q.    And did these same chain pharmacies
20   actively assist you and law enforcement with
21   anti-diversion efforts?
22        A.    They would provide me whatever I
23   requested.
24        Q.    Now, Agent Pavlich, you mentioned a
25   couple of times this Dr. Franklin/Overholt

Page 174

1    Pharmacy.  Can you tell us how that

2    investigation began?

3                  (Technical difficulties.)

4                  THE COURT REPORTER:  I'm sorry.

5    This is the court reporter.  There was some

6    rustling of papers and after your first

7    statement I couldn't hear.  If you could repeat

8    that, please.

9                  MR. BARNES:  Sure.  That was my

10    fault.

11         Q.    Do you recall the

12    Dr. Franklin/Overholt Pharmacy matter, Agent

13    Pavlich?

14         A.    Yes, I recall it.

15         Q.    Was that one of the most significant

16    prosecutions, investigations and prosecutions

17    you were involved with in your career?

18         A.    Most significant?  Well, I had a

19    lot of them.  That was -- at the same time I

20    was investigating that, I was doing a million

21    and a quarter doses dispensed by an independent

22    pharmacy in Mahoning County when I got a call

23    from Joanne Predina, who was a specialist with

24    the Board of Pharmacy.  She got a call, if I

25    recall, from a doctor or someone working in the

Page 175

1    jail in Lake County, and they had a docket in

2    there.  And I remember his name, Joey

3    Harrington.  And she told me that he was

4    getting dispensed to him an enormous amount of

5    opiates.  And I remember 900 8-milligram

6    Dilaudid tablets was one of them, and then

7    there was oxycodone, Methadone.  He was getting

8    all kind of stuff.  And he was showing no signs

9    in the jail of any withdrawal or anything if he

10   was consuming all this.  And she said -- I

11   said, "Well, why you calling me?  It's in Lake

12   County."

13           And she said, "Well, apparently he

14   got them all dispensed out of Overholt

15   Pharmacy," which I didn't know about this

16   dispensing going on.

17           And I said, "Really?"

18           And that was the start, I was going

19   to do Overholt Pharmacy.  And the agent

20   responsible -- the doctor's office, Dr. Peter

21   Franklin, was in Geauga County.  And that was

22   Frank Bodi's responsibility.  And apparently

23   Frank Bodi knew about this doctor and

24   apparently Frank Bodi had an open case on him,

25   but did nothing, did nothing, and -- with his

Page 176

1    case, and he retired shortly thereafter.  But I

2    opened the case on Overholt Pharmacy.  And then

3    my supervisor, field supervisor, Jim Reye,

4    called me and said, "Hey, you're really good at

5    doctor cases.  I want you to do Overholt

6    Pharmacy and Dr. Peter Franklin, though it's

7    not in your county."

8                And I told him, "Look.  I'm doing a

9    million and a quarter doses of internet

10   prescriptions out of this store and all these

11   other things I got to do.  I can't do this."

12               And he said, "Yeah, you can do it."

13               And I got it and I worked it, and I

14   -- well, I convicted three pharmacists from

15   Overholt Pharmacy; the owner, Ken Overholt;

16   Andrea Luchette, staff pharmacist; and Robert

17   Graves, another staff pharmacist.  He sold his

18   store because he was going to lose his license

19   for the store.  And I was going to indict Peter

20   Franklin, the doctor, and his wife, who was the

21   office manager in his office, stabbed him in

22   the chest with a steak knife and killed him,

23   thinking it was going to end the investigation.

24   Well, she's in state prison now for murder.

25   And that, in a nutshell, was a very difficult

Page 177

1    case to put together.

2         Q.    How many years did it take you?

3         A.    I can't remember the case number on

4    that.  I think it was an '07 case number, and

5    it was toward the end of '07, if I remember

6    correctly, because I was doing Evankovich, the

7    internet case, and that was '06.  And I

8    finished that case.  They finally pled.  If I

9    remember, December of 2011 or January of 2012 I

10   was done, because Evankovich was done then,

11   too.  But -- so it took three plus years.

12        Q.    I want to back up for a minute.

13        A.    Four years.

14        Q.    Four years?

15        A.    Yeah, probably.  I'm thinking it

16   was an '07 case, and it was the end of '07, if

17   I remember.  Yeah, it would be about four

18   years.

19        Q.    You mentioned the Evankovich case.

20   Can you spell that name?

21        A.    His name was Gary Evankovich,

22   E-V-A-N-K-O-V-I-C-H.  He owned -- he owned two

23   pharmacies, but the other pharmacy wasn't

24   involved because it was a different pharmacist.

25   The store that he was doing his activity out of

1  that I stumbled upon was Mill, M-I-L-L, Creek

2  Pharmacy.  It was located in Youngstown, Ohio,

3  Mahoning County.

4        Q.    And that involved the internet, an

5  internet pharmacy?

6        A.    Yeah.  It involved him dispensing,

7  with a totally separate computer system in his

8  pharmacy, a magnitude, as I remember, a million

9  and a quarter doses of drugs out of his

10  pharmacy.

11        Q.    What kind of drugs?

12        A.    All non-controlled or I would have

13  taken it federal because I met with the FBI on

14  this, and because there was no controlled

15  substances involved, they're like, oh, no

16  controlled drugs, you know -- I go a million

17  and a quarter doses and you don't want to do

18  this.  So I ended up taking it through Mahoning

19  County and administratively took his license.

20        Q.    I see.  What were the main drugs

21  involved in that investigation and prosecution?

22        A.    Dangerous drugs, which are

23  prescription drugs but not controlled.  There

24  was a lot.  But primarily it was Fioricet,

25  which was a non-controlled drug, it was a pain

1   drug; a lot of sexually enhancing drugs, like

2   Viagra, Cialis, a lot, those type of drugs.  I

3   can't remember all of them specifically unless

4   I had the report in front of me.  And, I mean,

5   this report, like the Overholt/Dr. Franklin

6   case, I wrote thousands of pages, thousands.  I

7   wrote all the search warrants for all those

8   cases, which was voluminous in itself, the

9   search warrants.  They were massive.  And those

10  are two independents.  They had nothing to do

11  with chains.

12       Q.    These were Gary Evankovich

13  pharmacies, two independent pharmacies?

14       A.    No.  Gary Evankovich had two

15  independent pharmacies, but he was doing it all

16  out of one, unbeknown to his partner at the

17  other one.  He owned -- they owned together two

18  pharmacies.  It was Mill Creek Pharmacy that

19  was that problem.  Then there was a different

20  pharmacy.

21       Q.    Was there a period of time when

22  internet pharmacies were a problem in terms of

23  distributing -- I'm sorry, dispensing controlled

24  substances, including opioids?

25       A.    Yes.

Page 180

1          Q.     Do you recall the approximate time
2     period when they were a problem?
3          A.     They were a problem when I was
4     investigating that pharmacy.  That was in '06.
5     I believe Raul Romea, who was a specialist with
6     the Board of Pharmacy, also had a case going on
7     with internet dispensing.
8          Q.     How significant of a problem was it?
9          A.     Oh, it was -- well, a million and a
10    quarter doses, that's pretty significant in a
11    range of -- I believe I covered only nine
12    months of dispensing.  I think it was nine
13    months that I looked at.
14               See, what happened was this
15    pharmacist, once I went in there and saw what
16    was going on -- I went into his pharmacy and I
17    seen this huge stack of -- it was Viagra and
18    Cialis and all that stuff, and I'm like what
19    the hell.  And I looked at his files and I
20    couldn't find legitimacy for this, and -- you
21    know, I'm looking in his computer and I
22    couldn't find anything.  Here he had a computer
23    hidden under the thing that he would slide out
24    and do the internet dispensing, and there was
25    no legitimacy to it because a patient must have

Page 181

1    a face-to-face with a physician in order to be
2    dispensed a prescription legitimately in the
3    state of Ohio.
4              So I said, "Oh, Gary," and I left.
5    And I went and got a specialist, Bill Winsley
6    at the time, who eventually became executive
7    director, and brought him in with me.  And then
8    I find out he purged the computer on me.  So
9    now it really got tough because I had no
10   printout.  I had to do it with manual
11   prescriptions that he had stored off-site in a
12   different facility.  Talk about diversion.
13   That was diversion.
14        Q.    Okay.  But my question relates to
15   internet pharmacies dispensing controlled
16   substances, including opioids.
17        A.    I didn't have a case with that.
18        Q.    You didn't have a case with that?
19        A.    Internet prescription dispensing.
20   The only internet prescriptions I had, which I
21   brought to your attention, was Gary
22   Evankovich/Mill Creek Pharmacy.  I don't recall
23   if -- I think they did have, but I don't recall
24   specifics.
25        Q.    Okay.  Getting back to the

                                          Page 182

1    Dr. Franklin thing, it sounds like the source

2    you were describing was an inmate by the name of

3    Joey Harrington at the Lake County Jail, that

4    was how the investigation began, and then you

5    ended up with both cases, Dr. Franklin and the

6    Overholt Pharmacy?

7            A.    Yeah.  I remember -- I mean, there

8    was a number of people involved.  I started out

9    with 50 profiles, broke it down to 20,

10   targeting 20 that were the worst of the worst.

11   But Joey Harrington was the king of the whole

12   thing, number one most drugs I ever seen

13   prescribed for one person in my life, career.

14   In my 35-year career I have never seen drugs

15   prescribed like that for anybody.

16           Q.    What kind of drugs were being

17   prescribed for him?

18           A.    Dilaudid, eight-milligram, 900

19   tablets in a 30-day supply.  So that's 30

20   tablets of 8-milligram Dilaudid in a day.  That

21   alone would kill a herd of elephants.

22   Methadone, another opiate; diazepine, if I

23   believe correctly; oxycodone, probably two

24   different types.  It was unbelievable.  When I

25   got that phone call, I was like -- I mean, I'm

1   talking to a pharmacist, Joanne Predina, who

2   was the best of the best as a specialist, and

3   I'm saying you got to be reading this wrong,

4   this can't be right.  And she was right.  That

5   was the profile.

6           Q.    Would you look at Exhibit 18 in the

7   binder, please?

8           A.    My name is in there I see.

9           Q.    I asked Agent Edwards about this,

10  and the reason I'm showing you this is, does

11  this refresh your recollection as to the

12  approximate time in which the Franklin --

13  Dr. Franklin/Overholt investigation began, in or

14  about June of 2008?

15          A.    Well, I said I took a case out and

16  I was pretty much on line when I said late

17  2007.  So, yeah, this would be right there in

18  the time frame.

19          Q.    And once you began your

20  investigation, did you work with Agent Edwards

21  in this investigation?

22          A.    A little bit.

23          Q.    But you were the agent in charge

24  and -- is that correct?

25          A.    I was the agent in charge of

Page 184

1    Dr. Peter Franklin and Overholt Pharmacy.  I

2    was the one that documented everything and

3    wrote all the search warrants.

4         Q.    Speaking of search warrants, would

5    you look at Exhibit 19, please?

6         A.    Search warrants, this is mine.  I

7    wrote this.  And I know it was big.  Yeah, it

8    is big.  Yes, this is it.  And I had my name as

9    the affiant.  Sergeant Jeff Orr, he was in

10   charge of the Trumbull County Drug Task Force.

11   And Trey Edwards was on here, too.  But I

12   was -- I was the guy that wrote this thing.

13        Q.    It's a very detailed search warrant.

14   If you go to page 5736 --

15        A.    I was a very detailed guy.

16        Q.    -- Synopsis, it says, "On March 19th

17   of 2008 this agent was requested by OSBP

18   regional agent supervisor Jim Reye, R-E-Y-E, to

19   combine the investigation of Overholt's Pharmacy

20   with the Dr. Peter Franklin investigation, which

21   was previously assigned to and not investigated

22   by retiring OSBP Agent Frank Bodi."

23             Was there a problem or an issue

24   about why Agent Bodi did not investigate

25   Dr. Franklin?

Page 185

1          A.     Not everybody is capable of doing
2    an extensive massive doctor investigation.  I
3    just happened to be really good at it.  I had
4    already indicted and convicted probably 50
5    doctors, including the Mahoning County Coroner.
6    Frank just wasn't capable of putting all these
7    things together.  And my supervisor in Columbus
8    knew it and he started pressuring him and Frank
9    decided to retire.  And I had already received
10   the call -- this is -- what date was this,
11   March 19, 2008, when Jim Reye called me and
12   said to combine the two.  I had already, I
13   believe, taken out a case number of '07 late,
14   when Joanne had called me and said Joey
15   Harrington.  And I intended to go into Overholt
16   Pharmacy and do my thing if I had not already.
17   So Frank just wasn't good at this.
18          Q.     So you took it over?
19          A.     Yeah, unwillingly, but I got it.
20          Q.     And that was unusual to combine
21   investigations in this manner, combining a
22   doctor investigation with a pharmacy
23   investigation?
24          A.     Yeah, it was unusual, but I
25   combined them because my supervisor told me to

1   do both of them together, and that's why I did

2   it that way.  I would have broken it off if

3   there was other multiple locations, multiple

4   pharmacies that were going to happen, and then

5   I would have broken it off with a case number

6   for a Giant Eagle, a CVS, a Walgreens, so on

7   and so forth, but because it was just one

8   independent based on what my investigation

9   started to show, I kept it like it is.

10          Q.    How massive was Dr. Franklin's

11  prescribing of controlled substances?

12          A.    The worst of the worst.  The worst

13  of the worst that I have investigated, and I

14  did 80, 90 doctors, the worst.

15          Q.    Can you give us a sense of the

16  numbers, though?  Are we talking a handful of

17  prescriptions, hundreds of prescriptions,

18  thousands of prescriptions?

19          A.    Thousands.  If I'm guessing right,

20  if I can remember, you know -- I'm under oath

21  and I'm just trying to recall -- it's been a

22  few years -- 10,000 prescriptions in a window

23  of what I put together, 10,000.  I mean, you're

24  looking at one patient, 900 Dilaudid

25  8-milligram tablets.  There is no human in this

Page 187

1   world that can consume 900 tablets in 30 days

2   of 8 milligram, not counting Methadone, all the

3   other drugs he was getting, oxycodone.  There's

4   no -- I mean, as soon as I heard this, I

5   thought, oh, my God, who the hell wrote this

6   and who the hell dispensed this.

7        Q.    And in your search warrant on the

8   next paragraph you state that the review

9   confirmed that Dr. Franklin authorized 15,298

10  controlled substance prescriptions during the

11  period 4-10 of '06 through 6-4 of '08, so a

12  little more than two years, these over 15,000

13  controlled substance prescriptions.  Was that

14  the time window that you had narrowed your

15  investigation down to?

16       A.    Yes.  I couldn't remember, you

17  know, off the top of my head, but if I put it

18  in this affidavit, that's what it was.

19       Q.    In your experience, is that a

20  massive amount of controlled substance

21  prescriptions?

22       A.    It is in my opinion, from one

23  doctor, it is in my opinion, and this doesn't

24  count patients -- this is only at Overholt

25  Pharmacy.  This doesn't count -- other

1   pharmacies were filling scripts, but more in

2   the realm of what I considered to be

3   legitimate.  I mean, not every patient got 900

4   Dilaudid 8-milligram.  I mean, patients would

5   get, you know, 60 tablets, which would be BID,

6   twice a day.  And your chains probably filled

7   some of them, I know they filled some of them,

8   but nothing I found was in a criminal element

9   to the extent of this store.  If I remember

10  correctly, this store filled -- 50 or 60

11  percent of all the prescriptions I found coming

12  out of that office were filled at Overholt's

13  Pharmacy.  As a matter of fact, I remember he

14  had written on the prescriptions after whenever

15  "Fill only at Overholt Pharmacy," because there

16  was no questions asked.  That's how bad it was.

17          Q.    I see.

18          A.    And they were driving from Lake

19  County, Ashtabula, everywhere, to Trumbull

20  County to fill these things.  That's how bad it

21  was.

22          Q.    And you said the doctor's office was

23  in Geauga County?

24          A.    Geauga.

25          Q.    Geauga?

Page 189

1      A.    Yes.   That's -- that's just above
2  Trumbull County, up there.
3      Q.    I see.   And Dr. Franklin was
4  specifically directing his patients to Overholt?
5      A.    Right.   He was -- I mean, there was
6  a Giant Eagle -- wait a minute.   Let me think
7  about this.   I'm pretty sure there was a Giant
8  Eagle.   You came down his driveway to the main
9  street there and there was a Giant Eagle right
10  there.   It was a Rite-Aid, and there was a
11  Giant Eagle up the street, or it was a
12  Rite-Aid.   And they weren't really filling
13  them.   I mean, they had a couple in there, a
14  few, but they caught on right away.   But I
15  wasn't going to get the call because that
16  wasn't my county.   Frank Bodi got the call.
17  Hey, we see some suspicious prescriptions.   And
18  obviously, you know, it ended up -- I ended up
19  getting all this.
20      Q.    Your search warrant in the next
21  paragraph references many pharmacists
22  questioning Dr. Franklin's prescriptions.
23          Do you see that?
24      A.    No.
25      Q.    On the bottom of page 5736.

Page 190

1          A.     5736.

2          Q.     This is in your search warrant.

3          A.     Okay.

4          Q.     It says, "This agent investigated

5    various sources who reported that Dr. Franklin's

6    patients were selling their medications."  Down

7    at the bottom, "Some patients had criminal

8    histories involving deception to obtain

9    prescription medications, and many pharmacists,

10   including a pain management physician,

11   questioned the volume of doses and combinations

12   of controlled drugs" --

13         A.     Right.

14         Q.     So did you actually go back to

15   pharmacists in the area and --

16         A.     I not only talked to pharmacists,

17   but I talked to sources.  Lake County obviously

18   had information on this, where Trey Edwards

19   was.  So I spoke to people or sources that they

20   had, and, as a matter of fact, Trey Edwards

21   provided me with a physician who was a pain

22   management doctor.  The name was Piszel.  It's

23   right here in my document.  And he was

24   flabbergasted by what he saw.  I mean, he was

25   like taken back and said, "Wow."

Page 191

1          Q.     In talking to other pharmacists in

2     the area, were you able to determine that

3     pharmacists had complained about Dr. Franklin

4     for some time?

5          A.     Yes.

6          Q.     And were some of those pharmacists

7     from the pharmacy Defendants?

8          A.     Yes.

9          Q.     Do you know whether or not the

10    pharmacists were told to stop dispensing for

11    Dr. Franklin at any point in time in the

12    investigation?

13         A.     Not by me.  They were never told by

14    me to stop dispensing.

15         Q.     Why not?

16         A.     I don't know about anybody else

17    telling them to, whether it was Edwards or Bodi

18    or the Board of Pharmacy.  Not by me.

19         Q.     Why wouldn't you tell a pharmacist

20    to stop dispensing for Dr. Franklin if there

21    was -- if he was under investigation?

22         A.     Because if they can't catch on that

23    I'm in there pulling prescriptions on

24    Dr. Franklin, that's not for me to tell them

25    what to do.  Pharmacists weren't dispensing.  I

```
 1   didn't have to tell them.  They were telling me
 2   when I walked in and said, "I'm Agent Pavlich.
 3   I'm not assigned to this county but I'm
 4   investigating Dr. Franklin, and I'm here to
 5   pull profiles and prescriptions on patients."
 6   And they knew right then.  But they weren't
 7   really dispensing, those chains up there and
 8   independents up there.  Why do you think the
 9   patients drove, you know, 50 miles down the
10   road to go to Overholt?  Because they weren't
11   getting it dispensed up there.  They were
12   getting it at Overholt.  They were compliant.
13   I didn't charge anybody in any of those chains
14   or independents up there or anywhere else with
15   a crime, only at Overholt Pharmacy, because
16   that's where it was.  There were -- in my
17   opinion, they were all compliant, because if
18   they weren't, I would have charged them,
19   period.
20          Q.    Did you retain a medical expert in
21   your investigation?
22          A.    Dr. Piszel, pain management doctor.
23          Q.    Why did you need a medical expert?
24          A.    Well, based on my college
25   education, I didn't have a medical degree, so
```

1   when I did criminal cases on doctors, I always

2   found a medical expert.  If it was a judgment

3   call as to what they were prescribing, what

4   combinations they were prescribing, what

5   quantities they were prescribing, I need

6   another doctor, and I always tried to get one

7   that was a little bit more qualified than the

8   one that was prescribing, whereas Franklin was

9   a family practice doctor and Piszel was a pain

10  management expert.  So you get the pain

11  management expert to say this guy doesn't know

12  what he's doing and it's way out of whack.  And

13  that's what I did.  And Piszel started

14  reviewing things for me.

15       Q.    Did you need a medical expert in

16  order to determine the legitimacy of the

17  prescriptions?

18       A.    No.  I pretty much figured that out

19  myself.

20       Q.    But you did retain a medical expert

21  to review the prescriptions for you as part of

22  the investigation?

23       A.    Yes, because I was going to indict

24  the doctor, so when you indict the doctor, you

25  want a medical expert to concur with what

Page 194

1    you're thinking.

2         Q.    If you look at the top of page 5741

3    of your search warrant --

4              MR. APPEL:  Sorry.  This is Henry

5    Appel.  Just a quick question.  When do you

6    want to take a break?  We've been going for

7    over two hours now.

8              MR. BARNES:  Let me finish with

9    this search warrant, which should just take a

10   few minutes.

11             THE WITNESS:  I'm fine.  Go as long

12   as you want.

13             THE VIDEOGRAPHER:  I need to break

14   for the media unit soon, so --

15             MR. BARNES:  All right.  Let me ask

16   a few questions.

17        Q.    You see, Mr. Pavlich, that your

18   search warrant says, "Prior to meeting

19   Dr. Sidari, this agent met with pharmacists from

20   Rite-Aid, Giant Eagle and Walmart in

21   Middlefield, Ohio.  These same pharmacists

22   stated they filed many complaints with the local

23   police and former Agent Bodi since 2006

24   regarding excessive quantities and combinations

25   of controlled drugs prescribed by Dr. Franklin

Page 195

1   to his patients.  These various pharmacists in

2   Middlefield, Ohio confirmed that they refused to

3   dispense medication for the majority of patients

4   issued prescriptions by Dr. Franklin.  The

5   pharmacies all stated that the patients they

6   turned away were now having their prescriptions

7   dispensed at Overholt's Pharmacy."

8              And that's pretty much consistent

9   with what you just described to me?

10      A.    That is.  I don't remember writing

11  this in here, but yeah, that's sworn under

12  oath, that's what I recall now that I put it

13  there.  That's true.

14      Q.    Page 5749 has some of the details of

15  your checking with Walmart and Rite-Aid and

16  Giant Eagle pharmacists I guess reflecting some

17  of the summary information we just covered on

18  page 5741.

19      A.    5749.  I was very thorough.  I

20  mean, I went everywhere and I did everything I

21  needed to do to lock in.  And once I was locked

22  and loaded, it was over for the pharmacist and

23  the doctor.  And if you look here, very

24  interesting.  This does bring memories back to

25  me on page 5749.  The medical board

1    investigator, Jeff Lewis, and DEA diversion

2    investigator, Scott Brinks, had gone in and

3    warned the doctor about his prescribing drugs,

4    warned him.  This is -- I had a conversation

5    with them later on during my investigation.

6                   MR. BARNES:  All right.  Why don't

7    we take a ten-minute break.  It's 2:43.  We'll

8    get back on at 2:53.

9                        (Recess had.)

10                  THE VIDEOGRAPHER:  We are going off

11   the record at 2:43 and this marks the end of

12   media unit number 3.

13                       (Recess had.)

14                  THE VIDEOGRAPHER:  We are back on

15   the record at 2:58.  This marks the beginning

16   of media unit number 4.

17   BY MR. BARNES:

18        Q.    Mr. Pavlich, we're back after a

19   short break.

20                  You mentioned in your earlier

21   testimony before the break that you had

22   convicted the coroner of Mahoning County?

23        A.    That is correct.

24        Q.    What was he doing?

25        A.    A lot of bad things.  He was

1   writing controlled substances for a patient

2   specific, at least one that I remember, and

3   then getting the drugs back to him by the

4   patient's husband, and then he was

5   redistributing them.  He was convicted in

6   Trumbull County by Prosecutor Dennis Watkins,

7   Chris Becker.

8        Q.    Did his controlled substance

9   prescriptions include opioids?

10        A.    Yes.  I believe it was oxycodone

11   I'm thinking, oxycodone prescriptions.

12        Q.    What magnitude are we dealing with?

13   Was it anything like Dr. Franklin?

14        A.    No.  No one compared to Dr.

15   Franklin.  His volume was off the chart.

16        Q.    But who was this coroner?  What was

17   his name?

18        A.    Nathan Belinky, B-E-L-I-N-K-Y.

19        Q.    And for what period of time was he

20   writing bad scripts or diverting controlled

21   substances?

22        A.    It was in the '90s.  I don't

23   remember exact time frame here.  I would have

24   to look at my scrapbook over there.

25        Q.    Okay.  And you said earlier that you

```
                                    Page 198
 1   had in your career investigated or convicted
 2   about 90 doctors?
 3        A.    Give or take for various things,
 4   self-abuse, you know, over-prescribing.  I
 5   mean, there was a lot of cases I did.  I did a
 6   lot.
 7             Probably the other biggest one was
 8   in -- if we're talking Trumbull County, there
 9   was three -- three physicians, Masters,
10   Sherman, and Theisler.  They were working out
11   of a pain clinic.  That was a pretty big case.
12   Nothing compared to Franklin, but it was pretty
13   big.
14        Q.    And what was the name of that pain
15   clinic?
16        A.    I don't recall.  It was on East
17   Market Street, I believe, just on the outer
18   edge of Warren there.  It might have been
19   Howland.  I can't think of the name of the
20   clinic, but those are the three doctors.
21   Diesler took me to trial -- he lost -- Sherman
22   pled, and Masters died before I could convict
23   him.
24        Q.    What were they convicted of doing?
25        A.    Trafficking, illegal processing of
```

Page 199

1   drugs.

2          Q.     Including opioids?

3          A.     Yes, sir.

4          Q.     Do you recall any specifically?

5          A.     The normal, oxycodone drugs.  Those

6   were the primary ones, oxycodone, if I remember

7   correctly.

8          Q.     In what kind of volumes were these

9   three doctors prescribing?

10         A.     I caught them pretty early on, but

11  it was substantial.  It was enough to make them

12  plead or go to trial and be convicted.  I just

13  don't remember the volume on that case.  That

14  was -- that was before the internet case and

15  before the Franklin/Overholt case.

16         Q.     Did you become familiar in your job

17  with the sources of pharmaceutical diversion in

18  Trumbull County and Lake County?

19         A.     Not Lake County.  Just Trumbull.

20         Q.     And what were the primary sources of

21  diversion in your experience?

22         A.     Prescribers illegally prescribing,

23  pharmacists improper dispensing, patients

24  diverting prescription medication.  Those would

25  be the three top.

Page 200

1        Q.    The patients, what type of diversion

2   did the patients engage in in your experience?

3        A.    Well, they would get their

4   prescription and they would sell their drugs.

5   So they would have maybe an insurance company

6   pay for their prescription.  Let's say it was

7   only 60 tablets of Percodan, or let's say it

8   was 90 tablets of Percodan or Percocet, which

9   is an oxycodone opiate.  But they only really

10  needed one tablet a day.  They didn't need

11  three a day.  So they would sell 60 a month,

12  make a nice profit, and use 30 for themselves.

13  And then if the doctor ran a drug check on

14  them, it would show that they had oxycodone in

15  their system.  Who would know but me if I put

16  it together.

17       Q.    Was that a problem in Trumbull

18  County, patients diverting their own

19  prescriptions?

20       A.    It's a problem everywhere.

21       Q.    Did you believe at any time that any

22  of the pharmacy Defendants were the source of

23  pharmaceutical diversion?

24       A.    Pretty broad question, don't you

25  think?  There was prescriptions filled at all

Page 201

1    the chains, all the independents and pretty

2    much say that maybe at some time or another

3    were diverted.  I mean, I would never make a

4    broad answer to say no.

5         Q.    I see.  I think I misspoke in my

6    questioning.  It is too broad of a question.

7    What I meant to say was did you at any time ever

8    believe that any of the chain pharmacies,

9    including the pharmacy Defendants, were causing

10   diversion in Trumbull County?

11        A.    Only if I charged and convicted

12   someone, and that would be in the records of

13   the Board of Pharmacy on cases I did.

14        Q.    Okay.  Now, you had occasion --

15   getting back to Dr. Franklin, you had occasion

16   to conduct some inspections of the Overholt

17   Pharmacy as part of your investigation, didn't

18   you?

19        A.    There was one major inspection we

20   did.  It was about a month or so after I was

21   directed to put them together.  And I went in

22   there with Specialist Predina, and about three

23   or four field agents, including my supervisor,

24   Jim Reye, who was a field supervisor.

25        Q.    If you look at Exhibit 53 in your

Page 202

1    binder, there's an inspection report for the

2    Overholt Pharmacy.  It's dated 4-15 of '08.

3            Do you see that?

4        A.    I see it.

5        Q.    Is this the inspection you just

6    referenced, the major inspection that you did

7    early in your investigation?

8        A.    Let me see.  Okay.  This was April

9    15th of '08, and if I recall, it was March

10   something that I was assigned both cases.  And,

11   yes, this is after I gathered some details.

12   And on this particular one it shows Dave

13   Gallagher, Joanne Predina, Tom Mish, and I

14   think Jim Reye were with me when I went in

15   there.  And then -- this is Joanne's

16   handwriting on page 1.  She started to write it

17   out and I let it go.

18       Q.    Did you find any problems when you

19   did this inspection?

20       A.    Yeah.  There was a lot of problems.

21   They were well noted.  Everything was noted.  I

22   had -- Joanne the pharmacist, of course, the

23   specialist, I had her documenting this so that

24   I didn't -- I was throwing things at her and

25   she would, you know, do a summary on a blank

Page 203

1    sheet of paper, and then she went and compiled

2    this.  And there were scripts we took out of

3    there.  There was a bunch of prescriptions we

4    took out of there.

5         Q.    The pharmacist on location at the

6    time are Robert Graves and Andrea Luchette.  I

7    think you referenced both of them as

8    subsequently being convicted for their

9    participation in this matter?

10        A.    All three pharmacists are noted

11   that were convicted.

12        Q.    Including Ken Overholt?

13        A.    Luchette.

14        Q.    Can you tell us in general what

15   happened during this inspection and how was it

16   different from some of the inspections that

17   we've gone over?

18        A.    Well, they knew there was a

19   problem.  We'll put it that way.  I don't walk

20   in a pharmacy with four or five other people to

21   say hello.  They knew what I was gathering,

22   obviously, and they were cooperative.  I mean,

23   what else were they going to do?  And I got

24   everything I needed out of there.  And I

25   believe -- let me think back here.  I believe

1  Joanne and I interviewed -- I don't know if

2  Graves was in there at the time.  But I

3  remember I think Luchette and Overholt were

4  there.  This is signed by Andrea Luchette I

5  see.  I don't know if Ken Overholt was there or

6  not.  But I know we interviewed for sure Ken

7  Overholt and Andrea Luchette.

8       Q.    Did you tell them they were being

9  investigated for improperly dispensing

10  controlled substance prescriptions written by

11  Dr. Franklin?

12       A.    I told them I was conducting an

13  investigation regarding prescribing by

14  Dr. Franklin and I'm here investigating them at

15  this point, too.  I believe that's what I told

16  them.  And I believe I interviewed -- like I

17  say, if I remember correctly, Andrea signed

18  this, so she was there, and I believe Joanne.

19  I know Joanne and -- I interviewed her.

20       Q.    And did you tell them that they were

21  being investigated for filling prescriptions for

22  high doses of multiple narcotics combined with

23  amphetamines and other narcotics?

24       A.    I did.

25       Q.    Is this a good example of, I'll call

1   it, a bad inspection, it's not the kind of

2   inspection you want to get?

3          A.    The worst of the worst.

4          Q.    And did you remove a lot of patient

5   records from this pharmacy, Overholt Pharmacy,

6   during this inspection?

7          A.    A lot, a very voluminous amount,

8   original prescriptions and I believe patient

9   profiles, too.

10         Q.    There was a subsequent inspection of

11  the same pharmacy.  If you look at Exhibit 20 --

12         A.    20?

13         Q.    20, yes.

14         A.    This is after -- this is -- he's --

15  he sold the pharmacy.

16         Q.    Oh, I see.

17         A.    This is not during -- this is --

18  the guns have been fired and the battle is over

19  with this inspection.

20         Q.    This is the new guy who bought the

21  pharmacy after --

22         A.    Yeah.  This is with him, yeah.

23  Yeah, that was just an issuance of the new TDDD

24  license.  It says right on there.  That's the

25  new terminal distributor license being issued.

Page 206

1   That's what that is.

2         Q.    All right.  So this is post --

3   post-Franklin or post-Overholt?

4         A.    Yeah.  He knew it was coming down

5   and he knew he was going to probably lose his

6   store license, and he sold it, which was okay,

7   I guess.  The board issued it.  So I didn't

8   take license on the pharmacy.

9         Q.    You allowed him to sell it?

10        A.    I didn't.  The Board of Pharmacy

11  allowed it, not me.  I would have had a

12  citation issued to take the pharmacy license,

13  too, as I did the three pharmacists' personal

14  licenses.  But, you know, obviously this

15  happened before their final conviction.  He was

16  still -- yeah, he was still a pharmacist

17  because his name is on the front sheet, Ken

18  Overholt, RPh, 03-2-13266, so he was still

19  licensed pending the actual revocation of his

20  license.  This is '09.

21        Q.    In your experience, Agent Pavlich,

22  would you inform pharmacists in the area if a

23  doctor was under investigation before he was

24  actually charged or convicted?

25        A.    Well, I wouldn't make a roundabout

```
 1   phone call to everybody and tell them, hey.  I
 2   didn't have to.  If I went to one pharmacy and
 3   pulled scripts out, believe me, they spread the
 4   word.  So the answer is no.
 5          Q.   Okay.  You referenced Joe Harrington
 6   being the -- kind of the impetus of the Franklin
 7   investigation.  Is this the Joe Harrington shown
 8   in Exhibit 30, his pre-sentence report?
 9          A.   He was a bad boy.  Oh, yeah, that's
10   Joey.  That's him.
11          Q.   And he was convicted and sentenced
12   for his role in the Franklin/Overholt matter?
13          A.   No.  I did not handle his case.
14   That was out of -- I believe Lake County
15   handled this.  I don't -- I'm not sure.  I
16   didn't handle it.  Yeah, this is Lake County
17   Adult Probation.  So no, I didn't have anything
18   to -- all I did was get information that I
19   needed from Mr. Harrington and told him you got
20   to deal with these guys up in Lake County and
21   I'm going to deal with everything else, so
22   cooperate, and he did.
23          Q.   Do you remember a -- an incident
24   involving John Mullin, M-U-L-L-I-N?
25          A.   Big John Mullins, yes, I remember.
```

1  John Wayne Mullins was his name, if I remember

2  correctly.  That was in Trumbull County.

3      Q.    And is Exhibit 34 your search

4  warrant for John Wayne Mullins -- I guess it's

5  with an S, M-U-L-L-I-N-S.

6      A.    Yes.  This is another one of mine.

7  I wrote it.

8      Q.    Do you recall this investigation

9  being instigated by a Rite-Aid pharmacist?

10     A.    If I wrote it in here, it was.  I

11 don't recall who.  I recall there was -- it

12 came out of Girard, Ohio, which was in Trumbull

13 County, and there were some fake prescriptions

14 and a Captain Bigowsky had called me and I

15 worked with him to put this together on John

16 Wayne.

17     Q.    Look at page 3644, please.

18     A.    Okay, I'm here.

19     Q.    At the top there's a reference to

20 Rite-Aid pharmacy 2452, and it says, "Pharmacist

21 Ross stated he had dispensed controlled

22 medications for prescriptions in June and August

23 2010 that were issued in the name of the

24 following patient, which he later discovered

25 were not authorized or written prescriptions

Page 209

1    issued by the following prescribers."

2              Does that refresh your recollection

3    that the Mullins investigation began with a tip

4    from a Rite-Aid pharmacist?

5         A.    Yes.  I knew it was a pharmacy in

6    Girard.  I just couldn't remember which one.

7    Yes, this is true.

8         Q.    And then the next exhibit, 35, is a

9    news release regarding Dr. Masters, Dr. Sherman

10   and Dr. Theisler?

11        A.    There they are, yes, '04.  It was

12   '04.  Another big case.

13        Q.    And that was the name of the pain

14   management -- or clinic was Pain Management

15   Associates; is that right?

16        A.    That's what Dennis Watkins noted so

17   I'm agreeing with him.  He was the best.  And I

18   said East Market Street and that's where it

19   was, East Market.

20        Q.    This investigation involved

21   pre-signed prescriptions to patients for

22   Schedule II and III controlled substances.  Am I

23   reading it --

24        A.    Part of it did.  Part of it did.

25   What was going on was -- I'll give you the

Page 210

```
 1    short window.  Masters and Sherman were M.D.s.
 2    Theisler was a chiropractor I believe.  Let me
 3    look here.  Wait a minute.  He didn't have
 4    prescribing privileges so he probably was a
 5    chiropractor.  And Masters was sickly.  So he
 6    would go in the office and take a hundred or
 7    whatever blank prescriptions and sign his name,
 8    Dr. Masters, and then Theisler would get his
 9    patients to come in, and he'd be the doctor,
10    but he wasn't an M.D., and then he would use
11    the blank prescription and fill in what he
12    wanted for the patient to get, controlled
13    substances.  And then the patients would go out
14    and fill them.  And then, you know, me as a
15    pharmacist, if I'm standing in a pharmacy and a
16    guy comes in and a signature looks like
17    Dr. Masters, which they're very good at
18    detecting, they filled them, until I caught on
19    to what was going on.
20              I got a call -- as a matter of
21    fact, I remember who called me.  Her name was
22    Vogren.  She was a Rite-Aid pharmacist.  I
23    believe it was Rite-Aid.  Yeah, it was a
24    Rite-Aid pharmacist.  Her name was Vogren.  I
25    don't remember her first name.  It could have
```

Page 211

1   been Joanne.  And she said, "You know, there's

2   something odd here, you know.  I know the

3   doctor is in the hospital."  How she knew this

4   I don't remember, but -- "and I'm getting

5   prescriptions from his office with his

6   signature on them."  And I'm like, "Really?"

7                  I started looking into it, and then

8   I found that -- what I realized was he was

9   pre-signing prescriptions, Theisler was using

10  them, and Dr. Sherman, who was a younger

11  doctor, was self-abusing drugs that -- I mean,

12  very powerful opiate drugs that he was having

13  shipped into the office on the alleged fact

14  that he was dispensing them to patients.  He

15  was using them himself.  He was a big-time IV

16  user, opiate abuser.  That's what that case

17  involved.  And I took them out of Trumbull

18  County.  Everything was done in Trumbull

19  County.

20       Q.    In your experience as an agent, did

21  you become familiar with pharmacies that

22  substantial percentages of their prescriptions

23  were controlled substance prescriptions?  I

24  guess Overholt Pharmacy would be an example of

25  that.

Page 212

1          A.    Overholt was the king.  Yeah, there

2    was a number of problems out there with

3    pharmacies.  To be honest, I had a lot of

4    problems with independents, a lot, a lot of

5    independent practicing pharmacists, too.  I had

6    a lot of cases on them, not only in my counties

7    but I was sent out to other counties to work

8    cases and big problems.

9          Q.    What types of problems?

10         A.    Let's put it this way.  What's an

11   independent -- or not an independent.  What's a

12   chain pharmacist have to gain by filling a

13   bunch of prescriptions for a physician in a

14   chain pharmacy where he's on salary?  What's he

15   got to gain versus an independent who's making

16   a volume of money?  That's how I looked at it.

17   That's how I -- I mean, what do I know, but I

18   tell you that's how I look at it.

19         Q.    What types of problems did you

20   observe with the independent pharmacies?  You

21   said that you had a lot of problems with the

22   independents.

23         A.    Yeah.  Illegal processing of drug

24   documents, theft of drugs, trafficking in

25   drugs, all of the above.  I mean, I had a lot

Page 213

1    of problems in independent stores.

2         Q.    And, in your view, were the

3    independent pharmacies a substantial source of

4    pharmaceutical diversion in Lake and Trumbull

5    Counties and surrounding counties?

6              MR. WEINBERGER:  Objection.

7         A.    I can't speak for counties I didn't

8    work.

9         Q.    Okay.

10        A.    Trumbull County, they were at

11   Overholt Pharmacy.  I mean, that jumps right

12   out at me.  There was another pharmacy that was

13   filling scripts for this Masters.  It was an

14   independent.  It was like the next plaza up.  I

15   can't think of the name of it.  Something Mart.

16   And -- maybe Drug Mart or something.  It wasn't

17   a chain.  And the owner was not a pharmacist.

18   He had pharmacists working in there.  But he

19   closed.  He closed.  So --

20        Q.    The problems that you saw at the

21   independent pharmacies, did you attribute that

22   to not having any oversight, any corporate-type

23   oversight?

24        A.    No.  I attributed it to greed.

25   Every case I ever worked, every case I ever

1   worked had three factors, greed, self-abuse or

2   sex, every case, not all three in the same case

3   but those three factors always came into play,

4   at least to my best memory.  So an independent

5   has no oversight besides the owner of the

6   store, who's happy to fill all the scripts he

7   can fill and make a profit.  Sure, a chain has

8   supervisors, corporate office.  But what's he

9   got to gain?  You know, what do I got to gain,

10  you know?  I'm getting my salary if I fill one

11  script or a hundred, at least my thinking.

12          MR. BARNES:  I don't have any

13  further questions, Mr. Pavlich.  Thank you for

14  your time.  Some of my co-counsel may have some

15  questions.  I think Walgreens counsel -- Kate,

16  do you have questions?

17          MS. SWIFT:  I do.

18          MR. BARNES:  Do you want to take a

19  short break before you start?

20          MS. SWIFT:  Yeah.  Can we take not

21  even five minutes, just a couple of minutes, so

22  I can get myself organized a little bit?

23          MR. WEINBERGER:  This is Pete.  How

24  long are you going to be?

25          MS. SWIFT:  I'm going to do it as

Page 215

1    fast as I can, Pete.  I'm terrible at
2    predicting so I'll try to over-predict and say
3    an hour and then hopefully everyone will be
4    happily surprised.
5              MR. WEINBERGER:  Henry, Mr. Appel
6    --
7              MR. APPEL:  Yes.
8              MR. WEINBERGER:  -- what's our
9    situation on time with this witness because
10   I've got some significant cross-examination?
11             MR. APPEL:  I can stay -- I have --
12   my understanding is there's a cap from the
13   court on the number of hours for the
14   deposition, but, you know, I don't know how
15   much time we have left on that.
16             George, do you have any limits on
17   your time today?
18             THE WITNESS:  No.  I hope I'm
19   getting paid for this.  That's all I could say.
20             MR. APPEL:  You know what, me too.
21             MR. MOYLAN:  And for CVS, I
22   think -- this is Dan Moylan.  I think we may
23   have around 20 minutes to a half an hour,
24   probably no more than that.
25             MR. NORTEY:  And for Rite-Aid --

Page 216

1  this is James Nortey.  We're going to have

2  about 25 minutes of questions.

3          MR. WEINBERGER:  So, Mr. Appel --

4  am I pronouncing your name correctly?  I don't

5  want to mispronounce it.

6          MR. APPEL:  Appel.

7          MR. WEINBERGER:  Mr. Appel, so the

8  seven-hour limit is really with respect to

9  depositions of the parties and I'm not aware of

10  any limitation with respect to third-party

11  witnesses.  So in view of the fact that we're

12  talking about the possibility of my not being

13  able to get to examine this witness until 5 or

14  5:30, and because I've got probably several

15  hours, what's your -- what are your thoughts?

16          MR. BARNES:  Before you answer,

17  Henry, I will have to interpose.  It's my

18  understanding that all depositions are limited

19  to seven hours, unless there's some agreement

20  in advance or as directed by the court.  I

21  don't think Plaintiffs noticed this --

22  cross-noticed this deposition at all, did they?

23          MR. WEINBERGER:  We didn't

24  cross-notice it, but that has nothing to do

25  with -- I'm not required to cross-notice a

1   deposition in order to cross-examine the

2   witness that you've subpoenaed.  I have a

3   right -- if there's any possibility that

4   this -- that you intend to play this deposition

5   at trial -- I'm not sure that you could, but

6   let's assume that you attempted to do so -- I

7   have a right to cross-examine this witness.

8   You can't cut off my time limitation in order

9   to do that.  I mean, you took five hours.

10                  MR. BARNES:  Right.  I was the

11  noticing party.  I was the one that went

12  through all of the exhibits I needed to go

13  through.  You didn't -- Plaintiffs didn't

14  notice -- cross-notice, like they did with DEA,

15  for example.  I notice they cross-noticed --

16                  MR. WEINBERGER:  Well, that's

17  different.  That's -- you know, that was

18  pursuant to a Touhy letter and pursuant to

19  negotiations with the Department of Justice.

20  That has nothing to do with what's going on in

21  this deposition.

22                  MS. FITZPATRICK:  Pete, just to add

23  in -- this is Laura Fitzpatrick -- we -- you

24  all recently noticed the FDA deposition and

25  Plaintiffs did not cross-notice and there were

Page 218

1   no issues with us asking questions.

2           MR. BARNES:  I'm not trying to

3   prevent you from asking questions.  I'm saying

4   that, in fairness to the witness and his

5   counsel, it's my understanding that all

6   depositions are limited to seven hours.

7           MR. WEINBERGER:  Well, that's

8   exactly my point.  That's why I'm discussing

9   this up front with Mr. Appel.  You know, our

10  position -- I've made my position known, and if

11  in the break you want to talk with Agent

12  Pavlich about coming back for a further

13  deposition, you know, we're happy to entertain

14  that conversation, but I'm not going to end

15  this deposition without having the full and

16  complete right to do my cross-examination.

17          MR. APPEL:  How many hours are you

18  expecting your cross to take?

19          MR. WEINBERGER:  Several hours.

20          MR. APPEL:  Is that two or six?

21          MR. WEINBERGER:  No.  Several means

22  two or three.

23          MR. APPEL:  I'll tell you what.

24  We're on a break anyways.  Why don't I give --

25  I'll -- I'm going to give my client a phone

```
                                        Page 219
 1   call, we'll talk for a second about this, and
 2   then we can -- and then I will get back on, all
 3   right?
 4             MR. WEINBERGER:  Very good.  Thank
 5   you.
 6             THE VIDEOGRAPHER:  This marks the
 7   end of media unit number 4.  Going off the
 8   record at 3:33.
 9                  (Recess had.)
10             THE VIDEOGRAPHER:  We are back on
11   the record at 3:44.  This begins media unit
12   number 5.
13             MR. WEINBERGER:  Mr. Barnes, you're
14   passing the witness to me?
15             MR. BARNES:  I am.
16        EXAMINATION OF GEORGE P. PAVLICH
17   BY MR. WEINBERGER:
18        Q.   Good afternoon, Agent Pavlich.  My
19   name is Peter Weinberger and I'm privileged to
20   represent Lake and Trumbull Counties in this
21   particular deposition in this case.  I
22   appreciate your patience in sitting for this
23   deposition and, so, you know, I will try to make
24   this as brief as possible, and if you want to
25   take a break at any time, just let me know and
```

```
                                              Page 220

1    we can stop.  Fair enough?

2          A.    I'm ready when you are.

3          Q.    All right.  Very good.

4                Can you hear me okay?  Is there any

5    problem with transmission?

6          A.    No.  I don't see your video.

7          Q.    Okay.  Well, I think -- can you see

8    me now?

9          A.    Negative.

10         Q.    All right.  Well, I think you have

11   to adjust your screen with the arrow going one

12   way or the other at the top so that you can see

13   me.

14         A.    Not that I need to, but I don't

15   know what you're talking about, "one way or the

16   other."

17               THE VIDEOGRAPHER:  On the top it

18   says "gallery view" or "speaker view."  I think

19   if you go to speaker view, you will see who is

20   speaking.

21               THE WITNESS:  All right.  So what

22   do I do here now?

23               MR. WEINBERGER:  Can you hear me

24   now or can you see me now?

25               THE WITNESS:  No.  Which one do I
```

Page 221

1   click on?  Which one are you?

2              THE VIDEOGRAPHER:  Speaker view,

3   the very top right.

4              THE WITNESS:  Yeah, I clicked

5   speaker view and it's got --

6              MR. WEINBERGER:  Spangenberg Law is

7   what my screen shows.  That's my law firm.

8              THE WITNESS:  I don't see it.

9              MR. THOMAS:  This is Clint, the

10  tech.  I mean, if we want to go off the record,

11  we can go off the record, we can work on this.

12  If the witness is fine with proceeding, we can

13  also just proceed.

14             THE WITNESS:  Yeah, I don't need to

15  look at him.

16             MR. THOMAS:  Let's just proceed

17  then.

18      Q.    Agent Pavlich, it's obvious from

19  your testimony today that you have spent a great

20  deal of your career while at the Ohio Board of

21  Pharmacy trying to stem the tide of the opioid

22  epidemic, true?

23      A.    True.

24      Q.    So let's talk a little bit about the

25  opioid epidemic for a few minutes.

1          You will agree with me that we have

2     been suffering from an opioid epidemic in this

3     country for about 20 years?

4               MR. BARNES:  Objection to form.

5          A.    I have no idea how many years the

6     epidemic --

7          Q.    At least as long as you've been

8     working at the Ohio -- as long as you worked in

9     your career at the Ohio Board of Pharmacy,

10    correct?

11         A.    There has been a problem with abuse

12    of opiate drugs during my time frame.

13    Epidemic, I don't understand.

14         Q.    Well, epidemic in the sense of more

15    and more and larger groups of people, numbers of

16    people, suffering the effects of opioid

17    addiction.  If I define it that way, can we

18    agree?

19               MR. BARNES:  Objection to form.

20         A.    I agree there's a problem out

21    there.

22               MR. WEINBERGER:  Who is objecting

23    to form?

24               MR. BARNES:  That would be me.

25               MR. WEINBERGER:  I don't know who

Page 223

1    "me" is.

2              MR. BARNES:  Bob Barnes.

3              MR. WEINBERGER:  So are you

4    suggesting that I'm not entitled to

5    cross-examine this witness?

6              MR. BARNES:  No.  I'm suggesting

7    that -- I'm objecting to the form of your

8    question, just like you objected to the form of

9    some of mine.

10             MR. WEINBERGER:  I was objecting to

11   form because you were not -- there were times

12   when you were not engaging in direct

13   examination.

14             MR. BARNES:  As you are.

15             MR. WEINBERGER:  Well, I'm entitled

16   to cross this witness.

17             MR. BARNES:  I'm objecting to form.

18             MR. WEINBERGER:  Are you suggesting

19   I'm not entitled to cross this witness?

20             MR. BARNES:  I'm suggesting that

21   your question is improper so I'm objecting to

22   form.

23        Q.   Agent Pavlich, can we agree that the

24   over-prescribing and over-dispensing of opioid

25   prescription pills contributed greatly to the

Page 224

1    opioid problem, as you've described it?

2              MR. BARNES:   Object to form.

3    You're asking this witness for a legal

4    conclusion, an expert conclusion, and so I

5    object on both bases.

6         Q.    You can answer.

7         A.    It's not the sole problem.  There's

8    drugs that come across the border from Mexico.

9    They're opiates.  It's not the sole problem.

10        Q.    But the over-prescribing and

11   over-dispensing of opioid prescription pills has

12   been a problem in our country for at least the

13   last 15 to 20 years, correct?

14             MR. BARNES:   Objection to form.

15        A.    I'm not knowledgeable as to what

16   extent you're talking about.

17        Q.    Well, in your -- can we agree that

18   the problem with the over-prescribing and

19   over-dispensing of prescription opioid pills

20   began with the development and marketing of

21   OxyContin in the late 1990s by Purdue

22   Pharmaceuticals?

23        A.    OxyContin was a problem.

24        Q.    And you're aware of the fact, are

25   you not, if you keep up with this in the

Page 225

1    newspapers, that just in the last 30 days,
2    Purdue Pharmaceuticals pled guilty to three
3    federal -- to indictments involving three
4    federal offenses.  Are you aware of that?
5         A.    I'm aware of them pleading to
6    something.  I don't know the extent.
7         Q.    Well, we know, and the records
8    reflect, that Purdue pled guilty to mail fraud
9    involving the fraudulent promotion of OxyContin
10   as a non-addictive drug.  Are you aware of that?
11        A.    Nope, I am not.
12        Q.    Are you aware of the fact that
13   Purdue Pharmaceuticals pled guilty to bribing
14   doctors?
15        A.    No, I am not.
16        Q.    Well, you're well familiar with
17   Purdue Pharmaceuticals, are you not?
18        A.    I am.  Not well but I know they
19   produced OxyContin.
20        Q.    Well, there was a time in the past
21   when you had contact with Purdue Pharmaceuticals
22   relating to one of your investigations, right?
23        A.    I don't recall specifically talking
24   to anybody at Purdue Pharmaceuticals.
25        Q.    But we can agree that OxyContin, the

1    prescription -- the marketing and prescription

2    of OxyContin was a significant factor in the

3    opioid prescription problems in our country,

4    true?

5                    MR. BARNES:  Object to form.

6        A.    Marketing was probably a factor.

7        Q.    Now, in your materials, Agent

8    Pavlich, there's an Exhibit 4, which we're going

9    to -- which I'd ask that you pull up.

10       A.    That's not in the binder.  You're

11   talking about the sealed documents?

12       Q.    Well, I think Exhibit -- I don't

13   know where Exhibit 4 is.

14                    MR. WEINBERGER:  Bob, is it in the

15   sealed documents or is it --

16       A.    These are marked A through L.

17       Q.    We're looking at Exhibit 4.

18       A.    Okay.  Sorry.

19       Q.    That's okay.

20       A.    Okay, I see it.

21       Q.    Now, this is the title page -- and

22   we're going to bring it up on the screen.  This

23   is -- this is Exhibit 4, Defendants' Deposition

24   Exhibit 4, Edwards 4.  This came from documents

25   that were subpoenaed by the Defendant pharmacies

Page 227

1   from the Ohio Board of -- Ohio State Board of

2   Pharmacy.

3           Do you understand that?

4      A.    I understand that.

5      Q.    Okay.  And they've marked this

6   Exhibit 4, and they went over parts of Exhibit 4

7   at the deposition of Mr. Edwards last Friday.

8   First of all, you see from the title page it

9   says, "OARRS, a Guide for Law Enforcement,

10  presented by the Ohio State Board of Pharmacy

11  and the Ohio Office of Criminal Justice

12  Services."

13          Do you see that?

14     A.    Yeah, I see that.

15     Q.    The Ohio State Board of Pharmacy is

16  the government organization that you worked for,

17  correct?

18     A.    Not at this time, but yes.

19     Q.    That you worked for in the past.  I

20  understand you left there in 2012, right?

21     A.    Right.

22     Q.    And so this -- I'll represent to you

23  that this is an official document from the Ohio

24  State Board of Pharmacy and the Ohio Office of

25  Criminal Justice Services.  Do you know what

Page 228

1   that department is, the Ohio Office of Criminal

2   Justice Services?

3        A.    I have no idea.

4        Q.    All right.  But you're certainly

5   familiar with who the Ohio State Board of

6   Pharmacy is, correct?

7        A.    I'm familiar who they are.

8        Q.    And you know Trey Edwards as a

9   colleague of yours and somebody who you trained

10  as a compliance agent, correct?

11       A.    Yes.

12            MR. THOMAS:  Real quick, counsel,

13  your mic is kind of -- is going in and out in

14  quality right now.  Are you like leaning away

15  from your microphone now or anything like that?

16            MR. WEINBERGER:  I am not, but is

17  this better?

18            MR. THOMAS:  Yes, that sounds

19  better.  Thank you.

20            MR. WEINBERGER:  All right.  I'll

21  stay close to the screen.

22       Q.    Now, if you would go to the -- go to

23  page 3 of this PowerPoint presentation.  This

24  appears to be a video entitled "Red Flag."  Do

25  you -- have you ever seen a video produced by

Page 229

1    the Ohio State Board of Pharmacy that is

2    entitled "Red Flag"?

3         A.    No.

4         Q.    In the context of dispensing, what

5    does -- what does a red flag mean?

6         A.    I have no idea.  I never used it.

7         Q.    All right.  Fair enough.  Let's go

8    on to page 5 of this presentation.  This slide

9    defines drug diversion as any criminal act

10   involving a prescription drug, includes theft of

11   drugs, tampering with drugs, deception to obtain

12   dangerous drugs, and illegal processing of drug

13   documents.  Do you agree with that?

14        A.    You need to talk closer to the

15   screen, but I agree these are four concepts.

16        Q.    Okay.  I've got my volume turned up

17   all the way.  Hopefully this will work.

18             MR. THOMAS:  We might need to go

19   off the record because your mic -- it sounds

20   like your mic is having a lot of issues.

21   Counsel, if you're okay going off the record, I

22   can try and help you out with fixing it.

23             MR. WEINBERGER:  Sure.  That would

24   be great.  Let's go off the record.

25             THE VIDEOGRAPHER:  We are going off

Page 230

1    the record at 3:57 p.m.

2                    (Recess had.)

3            THE VIDEOGRAPHER:  We are back on

4    the record at 3:59.

5    BY MR. WEINBERGER:

6        Q.    Agent Pavlich, can you hear me well

7    enough now?

8        A.    Yeah, I can hear you.

9        Q.    Great.  Thank you.  Thanks for the

10   technical support.

11            Let's go to page 7 of this

12   PowerPoint presentation.  This slide from the

13   Ohio Board of Pharmacy defines and categorizes

14   controlled substances, and I want to look

15   specifically at Schedule II.  So can we agree,

16   Agent Pavlich, that Schedule II controlled

17   substances have a high potential for abuse,

18   although it may have some medically acceptable

19   use?

20       A.    I agree.

21       Q.    And in terms of Schedule II drugs,

22   we're talking about many of the drugs that we've

23   talked about so far in your deposition,

24   including OxyContin, oxycodone, hydrocodone,

25   correct?

Page 231

1          A.     Correct.

2          Q.     And in terms of the description --

3          A.     Hydrocodone is not a Schedule II

4     when I was working.  Hydrocodone is a Schedule

5     II -- it's I think now a Schedule II.

6          Q.     Correct.  As of 2014 it was a -- it

7     became a Schedule II.

8          A.     There you go.

9          Q.     You are correct.

10              With respect to Schedule II drugs,

11    is it generally well known in the

12    pharmaceutical industry, according to your

13    knowledge, that these drugs have a high

14    potential for abuse?

15         A.     Yes.

16         Q.     Let's go then to -- okay.  We're

17    going to go to -- I'm going to use the Bates

18    numbers -- 26952.  It's about four or five pages

19    beyond this.  This slide is -- talks about the

20    background of the scope of drug abuse problems,

21    and it says, "Prescription opioids are

22    associated with more fatal overdoses than any

23    other prescription or illegal drug, including

24    cocaine, heroin, and marijuana combined."

25              Do you agree with that?

Page 232

1      A.     I don't have an opinion.

2      Q.     Well, if that's a statement that

3  comes out of the Ohio State Board of Pharmacy,

4  do you have any reason to disagree with that?

5      A.     I don't have an opinion to this.  I

6  have no prior knowledge of this and I don't

7  know if it is or not.  I have no opinion.

8      Q.     All right.  We are now going to go

9  to page 13 of this exhibit.  That is the page we

10 just went through.  Sorry.  We are going now to

11 page 14, which is the very next page.  Do you

12 have that in front of you or on the screen?  Do

13 you see it on the screen?

14     A.     I'm not even looking at my book.

15 I'm looking at the screen, yes.

16     Q.     So this is a graph that shows

17 unintentional drug overdose deaths of Ohio

18 residents by the specific drug involved from

19 2000 to 2011, and in the line below that that's

20 darkened or highlighted, there's -- it says,

21 "Still more deaths from prescription opioids

22 than from cocaine, heroin, and marijuana

23 combined."  From your experience, did -- have

24 you ever seen statistics that would serve the

25 basis for this graph?

Page 233

1          A.      No.

2          Q.      Let's go to the next slide.  Again,

3    it says the "Scope of the Drug Abuse Problem.

4    The number of drug overdose deaths in Ohio

5    increased 440 percent from 1999 to 2011, from an

6    average rate of less than 1 death per day to

7    approximately 5 deaths per day."

8                  Were you aware of that, sir, or do

9    you agree with this statement?

10         A.      I'm not aware of this and I

11   don't -- I don't know if it's true or not.

12         Q.      Well, if it is true -- I want you to

13   assume it is true and it's being published by

14   the Ohio State Board of Pharmacy.  Going back to

15   my earlier question as to whether or not we have

16   an opioid epidemic in Ohio, do you believe that

17   if this statement is true, that it is true that

18   we have an epidemic?

19                 MR. BARNES:  Object to form.

20         A.      I don't have an opinion either way,

21   to be honest with you.  I don't know who

22   compiled these statistics and it had nothing to

23   do with me and I don't work for the Board of

24   Pharmacy anymore.  So I have no knowledge or

25   scope regarding this.

Page 234

1     Q.    Let's go on to the very next page,

2  which is page 15.  I'm sorry.  Page 17.  So this

3  slide from the Ohio Board of Pharmacy says that

4  "In 2008, there were 14,800 prescription

5  painkiller deaths," and that for every one

6  death, there was ten treatment admissions for

7  abuse, 32 emergency department visits for misuse

8  or abuse, 130 people who abused -- who abuse or

9  are dependent, and 825 non-medical users.

10  Apparently this comes from the Center for

11  Disease Control.

12          Having seen these statistics, sir,

13  do you agree that there was an opioid epidemic

14  at least as of 2008 in this country?

15     A.    I've never seen these statistics,

16  and whoever compiled them would agree that

17  there was a problem, but it has nothing to do

18  with me and I've never seen this before.

19     Q.    All right.  Let's go on to the next

20  slide, page 18 of the slide.  And apparently, as

21  you can see, this slide presentation was, at

22  least in part, written or produced for a

23  presentation being made by Mr. Edwards.  We can

24  agree with that?

25     A.    I can agree with that.

Page 235

1        Q.    All right.  Now, this slide, again

2   it has as part of the background the "Scope of

3   Drug Abuse Problem."  And it says there, "Enough

4   pain relievers were prescribed in Ohio in 2012

5   for every man, woman, and child to receive 56.1

6   milligrams of daily morphine equivalent doses."

7   Do you have any reason to disagree with that?

8              MR. BARNES:  Object to form.

9        A.    I have no idea who compiled this,

10  had nothing to do with me, and that's all I

11  could tell you.

12       Q.    Well --

13       A.    I'm not going to agree to something

14  that I am not personally involved in.  I have

15  no reason to doubt whoever created this, but it

16  had nothing to do with me and I ain't going to

17  agree to something that I didn't personally

18  prepare or investigate.

19       Q.    Well, Agent Pavlich, from, let's

20  say, 1987 to 2012 you were an Ohio Board of

21  Pharmacy agent and you were associated with the

22  DEA federal task force, correct?

23       A.    I was an Ohio Board of Pharmacy

24  agent and I worked in conjunction with other

25  agents on the DEA and Mahoning County Drug Task

Page 236

1   Force, yes.

2        Q.    So during the course of that work

3   did you ever come to understand what the per

4   capita dosage of Schedule II opioids was in any

5   of the counties where you worked?

6        A.    No.

7        Q.    Do you believe it was excessive

8   during that time frame?

9             MR. BARNES:  Object to form.

10       A.    Excessive is a big word.  I knew

11  there was a problem.  To what point, to

12  excessiveness, I don't know.

13       Q.    Well, would 92 doses per capita, in

14  other words, for every man, woman and child in

15  Trumbull County, if there were 92 doses of

16  opioids per year, per capita, would that be an

17  overwhelmingly large number?

18            MR. BARNES:  Object to form.

19       A.    I don't know.  I really don't know.

20       Q.    Let's look at the next slide, Agent

21  Pavlich.  This is a slide that's entitled

22  "Prescription Analgesic Doses Per Capita," and

23  the description of the map is that it shows the

24  per capita prescription analgesic dosage rate.

25  In 2012 the statewide average per capita dosage

Page 237

1   rate was 67.7 doses per person, and then you can

2   go to the map and see what the per capita rate

3   was per county in 2012.  Trumbull has 92 doses

4   per capita.

5            Do you see that?

6        A.   I do now.

7        Q.   And Lake County has 64.6 doses per

8   capita, right?

9        A.   Yes.

10        Q.   So what that means is that for every

11   man, woman and child in Trumbull County, there

12   was enough -- there were enough opioid

13   analgesics dispensed that every man, woman and

14   child could have received 92, if you're using a

15   per capita number, correct?

16        A.   Well, whoever compiled the

17   statistics believed so.  I did not compile

18   these statistics.

19        Q.   Well, if that is the case in 2012,

20   Trumbull County had 92 dosage units per capita,

21   can we agree that that is because there was

22   over-prescribing and over-dispensing of drugs in

23   that county?

24            MR. BARNES:  Object to form.

25        A.   I have no idea how these statistics

1   were compiled.  I cannot answer something that

2   I did not investigate or compile myself.

3        Q.    Well, have you ever -- have you had

4   any contact with Mr. Edwards over the last five

5   years?

6        A.    No.  I had no contact with

7   Mr. Edwards since I retired.

8        Q.    All right.  Fair enough.

9              Let's go on to slide 20.  This

10  slide describes the scope of the drug abuse

11  problem and says that the "Kids and" -- "Kids

12  and Drugs:  The big picture.  More than 2,000

13  teens begin abusing prescription drugs each

14  day.  Teens abuse prescription drugs more than

15  any other illicit drug, including marijuana.

16  33 percent of teens say they believe it's okay

17  to use prescription drugs that were not

18  prescribed to them to deal with injury, illness

19  or pain."

20             Do you agree -- did you experience

21  any of this while you were working as an agent

22  for the Ohio State Board of Pharmacy?

23       A.    No.  I never experienced any of

24  this and I don't agree with this.

25       Q.    All right.  Go on to the next slide,

1   slide 21.  Do you agree that prescription drugs

2   are the most commonly abused drugs among 12 and

3   13-year-olds?

4           A.    Not in my neighborhood.

5           Q.    Do you agree that one in five teens

6   who admit to abusing prescription drugs say they

7   began before age 14?

8           A.    No, I don't agree.

9           Q.    What about the final statement, that

10  20 percent of high school seniors, 1 in 5,

11  report using prescription drugs in the past year

12  without a prescription?

13          A.    I would probably agree to that.

14          Q.    Let's go on to the next slide.

15  Again, this continues on with the problems of

16  drug misuse and abuse among kids.  The statement

17  summarizes it with respect to peer influence.

18  "49 percent of teens who abuse prescription

19  drugs report getting them from friends."

20              Do you agree with that?

21          A.    I don't know what percentage it is,

22  but I believe it would be one of the factors,

23  yes.

24          Q.    And that's an incident of diversion,

25  isn't it, or an example of diversion?

Page 240

1          A.     That's an example of trafficking in

2     drugs.

3          Q.     Right.  And would you agree, sir,

4     that the more drugs that are dispensed, the more

5     likely -- the higher the risk of diversion?

6                 MR. BARNES:  Object to form.

7          A.     No, I wouldn't agree to that.

8          Q.     So let's use the example -- let's

9     use an example of a -- an adult who has

10    dispensed 60 pills after a surgery and ends up

11    taking three or four of those pills and

12    determines that they no longer need them for

13    pain, post-surgical pain, but leaves those drugs

14    in his medicine cabinet, accessible to

15    teenage -- to his teenage children.

16                Have you ever heard of that

17    happening?

18         A.     Yeah, I've heard of that happening.

19         Q.     Okay.  And is that a form of

20    diversion?

21         A.     That's a form of theft of drugs.

22         Q.     Is that the result of

23    over-dispensing of medication?

24         A.     No.

25         Q.     Okay.  Let's go on to the next

Page 241

1   slide, slide 23.  So here the Ohio State Board

2   of Pharmacy says that there's family influence

3   associated with kids and drugs, that 40

4   percent -- 42 percent of teens who abuse

5   prescription drugs report getting them from

6   their relatives.

7               Did you know that or do you agree

8   with it?

9        A.    Getting them, what's that define?

10  Does that mean they gave it to them, they stole

11  it from them, they mis- -- they lost them?  I

12  don't know.  I can't agree to that.

13       Q.    Do you agree with the statement that

14  about 1 in 14 say their parents don't care as

15  much if they catch them abusing prescription

16  drugs rather than illegal drugs?

17       A.    No, I don't agree to that because I

18  know what I taught my daughter and that's not

19  true.

20       Q.    All right.  Do you agree that 27

21  percent of teens and 16 percent of parents say

22  abusing prescription drugs is safer than abusing

23  street drugs?

24       A.    No, I don't agree with that either.

25       Q.    Let's go on to then page 53 of this

Page 242

1   slide presentation.  Now, this is a chart from

2   the Ohio State Board of Pharmacy of patients

3   receiving prescriptions for opioids in the state

4   of Ohio.  Do you see the numbers, 2 million

5   starting in 2007 and then going up to over 3

6   million in 2012?

7           A.    I see that graph.

8           Q.    Now, Overholt's -- the shutdown of

9   the Overholt's Pharmacy that occurred as a

10  result of your investigation and the subsequent

11  indictments, when did that occur?

12          A.    I don't know exactly when you're

13  talking occurred.  It began in approximately

14  March of 2008, to the best of my knowledge, and

15  concluded with the conviction of the three

16  pharmacists just prior to my retirement on

17  March 1st of 2012.

18          Q.    My question was, when, in your

19  opinion, did the -- was the dispensing -- the

20  large dispensing of drugs -- when did that end

21  in terms of this pharmacy?

22          A.    It pretty much ended when I went

23  into the pharmacy and did the inspection and

24  made them aware that I'm looking at everything.

25          Q.    And what year was that?

1          A.     2008.

2          Q.     And with respect to the Dr. Franklin

3     investigation, when did -- when did he stop

4     prescribing these large quantities of opioids as

5     a result of your investigation?

6          A.     When I went in his office with the

7     search warrant, I believe.  That was pretty

8     much the end of his career.

9          Q.     And what year was that?

10          A.     That was, I believe, in 2008, but

11     don't hold me to it.  2008.

12          Q.     Now, with respect to the internet

13     store, you talked about that you investigated

14     and I think shut down in 2006 where you talked

15     about 1.25 million doses out of that store.

16     That was 2006 when that was shut down, right?

17          A.     Approximately, yes, around that

18     time period.

19          Q.     So these statistics, this graph

20     showing this amount of -- this number of

21     patients receiving prescriptions for opioids,

22     this begins in 2007, long after you've already

23     shut down this internet store, correct?

24          A.     Well, what you missed was the

25     internet pharmacy was not an opiate dispensing

1   pharmacy.  Those were legend prescription

2   drugs.  Legend prescription drugs are drugs

3   required by prescription, but they do not fall

4   into Schedule II, III, IV or V category.  The

5   internet pharmacy was no prescription

6   controlled substances.

7          Q.     Fair enough.  Thank you for

8   correcting me.  That's very -- I very much

9   appreciate that.

10              So if we look at these numbers on

11  this graph, it shows an increasing number of

12  patients receiving prescriptions for opioids

13  from 2007 until 2012, right?

14         A.     That's what the graph shows.

15         Q.     And this internet pharmacy and the

16  investigation of Overholt's and Dr. Franklin

17  probably had very little effect on these

18  numbers, correct?

19              MR. BARNES:  Object to form.

20         A.     I don't know if it did or not, to

21  be honest with you.  I don't know.

22         Q.     And the per capita numbers of doses

23  per capita in Trumbull County that -- where

24  we -- that were shown on this map previously,

25  that was from 2012.  Do you remember that?

Page 245

1          A.     Yeah, I remember what it had on the

2     map.

3          Q.     Right.  So by 2012 these -- this

4     Dr. Franklin's illegal conduct and that of the

5     Overholt's Pharmacy had nothing to do with those

6     per capita numbers, did it?

7          A.     Again, I don't -- I don't know if

8     they did or not.  All I did was my job on that

9     particular pharmacy and doctor.

10          Q.     All right.

11          A.     I don't know if it affected any of

12     these statistics.

13          Q.     All right.  Let's look at the next

14     slide.  This shows the number of opioid doses

15     dispensed between 2007 and 2013.  It looks like

16     2007 starts at about 600 million doses

17     dispensed, to 2013, where it levels off at

18     800,000 doses.

19               Have I read that correctly?

20          A.     I agree that that's what it shows.

21          Q.     All right.  And go on to the next

22     slide.  This is the number of opioid

23     prescriptions written starting in 2007, over 11

24     million, peaking in 2008 at over 12 and a half

25     million, and then dropping and then increasing

Page 246

1    again to 12 million in 2012, correct?

2         A.    That's what I'm looking at.

3         Q.    All during the time frame that you

4    were working as an agent for the Ohio State

5    Board of Pharmacy, right?

6         A.    I was working from '07 until March

7    1st of 2012, yes.

8         Q.    Right.  And so can we agree now,

9    sir, that the opioid problem was related

10   directly to the number of opioid prescriptions

11   written and the opioid pills dispensed?

12            MR. BARNES:  Object to form.

13        A.    I cannot agree to something that I

14   didn't compile nor can I agree of all illicit

15   opiate drugs that were crossing, for example,

16   the Mexican border and coming into Ohio on top

17   of this.  I can't agree to that.

18        Q.    Well, have you heard of the gateway

19   effect --

20        A.    No.

21        Q.    -- of -- isn't it true, Agent

22   Pavlich, that the prescription and the use of

23   opioid drugs can lead ultimately to the use of

24   illicit drugs, such as heroin and fentanyl?

25        A.    I have heard that, yes.

Page 247

1          Q.    Do you agree with that?

2                MR. BARNES:  Object to form.

3          A.    Well, I agree if you drink a beer,

4    it could lead to alcohol -- so I guess that

5    would be true.

6          Q.    So if you -- if you take opioid

7    prescription drugs, like OxyContin, and become

8    addicted to them, and then can find a cheaper

9    source of feeding that addiction, like illicit

10   drugs, it stands to reason that there is this

11   gateway effect from opioid prescription drugs to

12   illicit drugs, true?

13               MR. BARNES:  Object to form.

14               Pete, you're trying to turn this

15   witness into an expert witness.  I think you're

16   wasting a lot of time here going through a

17   document that postdates his retirement.  I

18   don't know how many times --

19               MR. WEINBERGER:  We don't need a

20   speaking objection.  You know that's improper

21   under our CMO rules regarding depositions.

22               MR. BARNES:  Object to form.

23         A.    So what are you asking here?

24         Q.    Do you agree with the statement that

25   prescription opioid drugs are a gateway to the

                                                    Page 248

1    use of illicit drugs like fentanyl and heroin?

2              MR. BARNES:   Object to form.

3         A.   I agree that anything can lead to

4    something worse, that's what I agree to,

5    anything.  From driving poorly you can get

6    killed in an auto accident.  One thing can lead

7    to another.  But that -- I don't -- I didn't

8    compile this.  I don't agree to this.  I don't

9    have no idea how this was compiled and I have

10   nothing to do with anything involving what

11   you're showing me so far, best I can tell you.

12   You're asking me questions beyond my scope.

13        Q.   Agent Pavlich, are you familiar with

14   the term "trilogy"?

15        A.   No.

16        Q.   Are you familiar with the

17   combination of opioids, muscle relaxants and

18   sleeping pills as enhancing the opioid effects

19   of opioids?

20        A.   I've heard that in my career.

21        Q.   Have you ever investigated any

22   pharmacy or prescriber who was prescribing the

23   combination of those three classes of drugs?

24        A.   I'm sure I have, but I don't recall

25   any one specific.

Page 249

1        Q.     Now, this slide presentation -- just
2    give me one moment here -- has a presentation of
3    examples of criminal activity at the pharmacy
4    level, and if you look at slide number 70 -- so
5    this presentation includes various case studies.
6    This particular case study is about a pharmacy
7    technician, Jacob M., who the local police
8    department contacts the board when they conduct
9    a traffic stop and find within the suspect's car
10   prescription bottles with various patient names,
11   pharmacy documents, Walgreens receipts, and a
12   blank prescription pad.  The prescription pad
13   comes back to a fictional pain management clinic
14   with a fake address and a disconnected phone
15   number.  The suspect, a Walgreens pharmacy
16   technician, tells police that he stole the pad
17   from a friend's house and used it to fill
18   fraudulent prescriptions.
19           Next slide.  During the suspect's
20   interview by the board, he admits to the
21   following:  Ordering the blank prescription pad
22   online using fictitious doctor's information,
23   entering the doctor into the Walgreens computer
24   system, filling prescriptions in the name of
25   patients whose insurance paid full price for

Page 250

1   them, consuming, trading and gifting the

2   medications he obtained.

3              Next slide.  The investigation

4   concludes that the suspect diverted 4,460

5   tablets of oxycodone, OxyContin, hydrocodone,

6   Carisoprodol and other medications.  Due to the

7   complexity of the crime and the degree of

8   insurance fraud, he was indicted federally on

9   13 counts.  And you could read the rest of it.

10              Does this case sound familiar to

11  you?

12       A.    To me, no.

13       Q.    You were not involved in this

14  investigation?

15       A.    Not that I remember.  I never took

16  a case like this to the federal court.  I

17  wouldn't have found it big enough personally.

18  I would have indicted this person in Trumbull

19  County or the county that I was working in.

20  This never came to my attention, no.

21       Q.    Can we agree, Agent Pavlich, that

22  the retail pharmacy chains' distribution and

23  dispensing of pills significantly contributed to

24  an opioid epidemic in this country?

25              MR. BARNES:  Object to form.

Page 251

1          A.    I can't openly agree to something
2     that broad, no.
3          Q.    Did the number of opioid pills
4     dispensed by retail pharmacies increase year to
5     year from 2000 to 2012 while you were working as
6     an agent for the Ohio State Board of Pharmacy?
7          A.    I don't know.  I never compiled
8     that particular statistic, so I'm unaware of
9     the fact of it.
10         Q.    Has the opioid addiction problem
11    caused serious damages to our communities,
12    including Trumbull and Lake County?
13              MR. BARNES:  Object to form.
14         A.    I'm sure problems have arisen from
15    it.
16         Q.    Now, in your role as an agent for
17    the Board of Pharmacy, have you become generally
18    familiar with the Controlled Substances Act that
19    was passed by Congress in 1970?
20         A.    I'm familiar.
21         Q.    And do you agree that it was passed
22    because of the recognition at that time that
23    unless the manufacture, distribution and
24    dispensing of prescription opioids was
25    controlled, these prescriptions will get

Page 252

1  diverted into the hands of people who are not

2  legitimate patients with legitimate medical

3  needs for opioids?

4         A.    I have no idea why they set that

5  Controlled Substance Act into motion.

6              MR. WEINBERGER:  Can we bring up

7  Plaintiffs' Exhibit Number 1, please?

8              MS. SWIFT:  Pete, this is Kate

9  Swift.  Did you share these or are you going to

10  share these with those of us who are

11  participating?

12             MR. WEINBERGER:  I'm about to share

13  it on the screen.

14             MS. SWIFT:  But beyond just sharing

15  it on the screen.  Can you send us copies?

16             MR. WEINBERGER:  Sure.  We're

17  looking for Plaintiffs' Exhibit Number 1.

18  Whoever is doing the tech for me, if you would

19  pull that up.

20             THE WITNESS:  I see it.

21             MR. APPEL:  This is Henry Appel.

22  Has a copy of the exhibits been provided to me?

23             MR. BARNES:  This is Bob Barnes.  I

24  was not provided any copies of any exhibits,

25  although I was asked to provide copies, that I

Page 253

1  did provide, including the entire binder to all

2  counsel.  Pete, is there a reason why these

3  haven't been shared?

4            MR. WEINBERGER:  I'll withdraw the

5  question.

6        Q.    If the -- if Congress, at the time

7  that they passed the Controlled Substances Act,

8  made a finding that the illegal importation,

9  manufacture, distribution and possession of

10  improper use of controlled substances have a

11  substantial and detrimental effect on the health

12  and general welfare of the American people,

13  would you have any reason to disagree with that?

14            MR. BARNES:  Object to form.

15        A.    I would have no reason to agree

16  with that.

17        Q.    No reason to agree or disagree?

18        A.    To disagree.

19        Q.    All right.  Can we agree that

20  diversion of opioids leads to opioid misuse and

21  addiction?

22            MR. BARNES:  Object to form.

23        A.    Okay, I agree.

24        Q.    You've seen that, haven't you?

25        A.    I've seen it.

1      Q.    Opioid addiction and diversion of

2   opioid prescription affects the health and

3   safety of communities like Lake and Trumbull

4   Counties, true?

5      A.    To an extent, but I don't know what

6   extent.

7      Q.    So to prevent diversion, the

8   Controlled Substances Act imposes obligations on

9   all distributors and pharmacies to develop

10  systems to prevent that diversion, true?

11           MR. MOYLAN:   Objection to form.

12           MR. BARNES:   Object to form.   Pete,

13  he already said he has no idea why the

14  Controlled Substance Act was passed, and so I

15  don't know why you are trying to get him to say

16  something after --

17           MR. WEINBERGER:   Speaking

18  objections, Mr. Barnes, are not permitted, so

19  please refrain --

20           MR. BARNES:   We have a limited

21  amount of time.   If you're going to -- if the

22  witness says he has no knowledge of an area,

23  why would you waste everybody's time?

24           MR. WEINBERGER:   You are

25  mischaracterizing his testimony.   Please stop

Page 255

1    with your speaking objections.

2              MR. BARNES:  I'm making an

3    objection to save time and efficiency here.

4         Q.    Are you aware of the fact, Agent

5    Pavlich, that the Controlled Substances Act

6    imposes obligations on distributors and

7    pharmacies to develop systems that prevent

8    diversion?

9         A.    No.  Beyond my scope.  Beyond my

10   classification of what I did.  I don't know.

11        Q.    Fair enough.

12              Do you realize that these retail

13   pharmacy chains act as both distributors and

14   dispensers of controlled substances?

15        A.    Define distributors.

16        Q.    Where they're buying directly from

17   manufacturers and then distributing to their own

18   pharmacies, that's what I mean.  Do you

19   understand that?

20        A.    Okay.  I know pharmacies buy

21   directly from manufacturers and they distribute

22   legitimately based on prescriptions.  That's

23   what I know.

24        Q.    All right.  And are you aware of the

25   fact that the retail pharmacies who have been

1  sued in this case were both distributors and

2  dispensers of opioid drugs?

3      A.   Well, I know that pharmacies

4  purchase drugs and they dispense them.  That's

5  all I know.

6      Q.   All right.  But are you aware of the

7  fact that, for example, CVS and Walgreens and

8  Walmart were buying opioid drugs, prescription

9  drugs, directly from manufacturers as opposed to

10  going through third-party distributors?

11      A.   All I know is they would purchase

12  from wholesalers.  That's all I know.

13      Q.   So you weren't aware that they were

14  buying directly from manufacturers?

15      A.   I know that they were purchasing

16  from wholesalers.  I don't know specific

17  wholesalers off the top of my head.  I know

18  they were purchasing them for dispensing in

19  their pharmacies.

20      Q.   Right.  So --

21      A.   If they found something illicit, I

22  would have investigated it.

23      Q.   So you've never investigated whether

24  or not these Defendant retail pharmacies

25  purchased directly from manufacturers, correct?

Page 257

1      A.     I mean, they could have.  I don't
2  know.
3      Q.     Are you aware of the obligation of
4  distributors to set up suspicious order
5  monitoring systems to monitor the distribution
6  of drugs from their distribution centers to
7  their retail pharmacies?
8      A.     No.  That was beyond my class.
9  That would have been out of the office in
10  Columbus.
11      Q.     So who in the -- at the office in
12  Columbus would have been in charge of looking at
13  the distribution conduct of the pharmacies?
14      A.     During my career, probably my
15  immediate -- or my supervisor in Columbus,
16  Robert Cole, C-O-L-E.
17      Q.     Robert Cole.  Did you ever discuss
18  with Mr. Cole whether or not the Ohio State
19  Board of Pharmacy ever investigated the
20  distribution practices of any of these Defendant
21  pharmacies?
22      A.     Not to my knowledge did I.
23      Q.     Now, let's talk then about the
24  obligations of these pharmacies as dispensers.
25            You understand that dispensing is

Page 258

1    what pharmacists do when they fill

2    prescriptions and sell the prescriptions to

3    customers?

4           A.    Yes, I understand that aspect.

5           Q.    Do you understand that the

6    Controlled Substances Act requires that

7    pharmacies that dispense controlled substances

8    have an obligation to provide effective controls

9    and procedures to guard against theft and

10   diversion?

11          A.    Yes.

12          Q.    Do you agree that the Controlled

13   Substances Act and the regulations under the

14   CFR, the Code of Federal Regulations, require

15   the retail pharmacies to create and maintain

16   records and data that keeps track of every

17   prescription opioid?

18          A.    Yes.

19          Q.    Do you understand that that has been

20   the case ever since 1970, when the Controlled

21   Substances Act went into existence?

22          A.    I believe it happened before that,

23   they would keep records.

24          Q.    Right.  And so the -- the dispensing

25   of opioids by these retail pharmacies requires

Page 259

1    that they create and maintain data and records

2    regarding every prescription they dispense,

3    true?

4              MR. BARNES:  Object to form.

5         A.    I would believe so, yes.

6         Q.    And that is what is required of

7    every local pharmacy by their -- by the

8    corporation, or at the corporate level that owns

9    these pharmacies, correct?

10        A.    Records must be maintained of

11   controlled substances, yes.

12        Q.    Right.  And these records keep track

13   of the -- of the name of the opioid dispensed,

14   true?

15        A.    True.

16        Q.    The dosage?

17        A.    True.

18        Q.    The number of pills dispensed?

19        A.    True.

20        Q.    The prescribing doctor?

21        A.    True.

22        Q.    The patient's name, address, age and

23   other identifying information?

24        A.    True.

25        Q.    The number of refills?

1          A.     True.

2          Q.     Whether or not the opioids are

3    prescribed in combination with benzodiazepines

4    or muscle relaxants?

5          A.     I don't know if they maintain their

6    records in that order.

7          Q.     Well, a retail pharmacy, who's

8    keeping track of their dispensing data, should

9    be able to have data on patients who receive

10   opioids and combinations of these other drugs,

11   true?

12         A.     Well, that depends upon the

13   sophistication of your software system.  You

14   can create during the month of December all

15   dispensings, but can it sort it out like an

16   OARRS system?  I don't know.  I don't work for

17   a wholesaler.

18         Q.     Well, you have -- well, you don't

19   work for a retail pharmacy either, right?

20         A.     Or a retail pharmacy should I say.

21   Sorry.

22         Q.     Now, you did tell us in your direct

23   examination that when OARRS came into

24   existence -- I want to use your descriptive

25   term -- on its face, the OARRS data was an

Page 261

1   enlightening experience, using your terms,

2   right?

3        A.    Yes, it was.

4        Q.    And it was enlightening because you

5   were able to look at data and sort data through

6   OARRS that would tell you all sorts of

7   information about patients and prescribers,

8   true?

9             MR. BARNES:  Object to form.

10       A.    True.

11       Q.    One of the other things it might

12  tell you, and you used this example, is whether

13  or not the patient paid with cash or insurance,

14  right?

15       A.    I don't recall if it listed that.

16  I can't recall that.

17       Q.    But that would be an important part

18  of data that the retail pharmacies would

19  probably be keeping, right?

20       A.    It would show in a retail pharmacy

21  profile, but I don't remember it being in the

22  OARRS profile, best I can answer.

23       Q.    Right.  But if the retail pharmacy's

24  dispensing data kept track of it, that would be

25  a useful piece of information, right?

1          A.     Yeah, to an extent it would be

2     useful to me, to me.

3          Q.     So between 1987 and 2006, when this

4     OARRS system came online in the state of Ohio,

5     did you ever, in the course of your

6     investigation, ask any of the pharmacies that

7     you investigated what data they had available to

8     them or that was stored by their corporate

9     offices?

10         A.     Never asked that question, no.

11         Q.     But if -- if the kinds of data that

12    is accumulated and stored in the OARRS system

13    was also data that was available for a

14    particular retail pharmacy, both locally and

15    nationally, that would indicate all sorts of

16    trends and important information that a

17    pharmacy -- pharmacist might be able to use to

18    determine whether or not a particular

19    prescription was problematic, true?

20               MS. SWIFT:  Object to form.

21         A.     Shorten that question.

22         Q.     Sure.

23               If, as you have stated, the

24    pharmacies are accumulating data with every

25    dispensed prescription, you would have

Page 263

1    information about the patient history and

2    opioids, true?

3         A.    If I was physically in the

4    pharmacy, yes.

5         Q.    At the corporate level or at the

6    pharmacy level, if you had the data available

7    through software and through algorithms created

8    with that software, you should be able to

9    identify prescription history of opioids with

10   respect to a particular patient, right?

11        A.    I'd be able to create a patient

12   profile.

13        Q.    You should be able to create a

14   prescriber profile, right?

15        A.    Again, if it had the technical

16   abilities, yes.

17        Q.    Well, haven't you learned over the

18   years as -- in your position that the pharmacy

19   business is very much data driven?

20        A.    Data?

21        Q.    Data driven, yes.

22        A.    Define your word for data.

23        Q.    That the way in which pharmacies

24   operate is based, to a large extent, on the data

25   they accumulate.

Page 264

1          A.    I don't know.

2          Q.    Well, if -- if dispensing data was

3     accumulated at the corporate level of, let's

4     say, CVS or Walgreens, both for all the local

5     dispensing and for dispensing nationwide, it

6     would help their pharmacists, for example,

7     identify bad doctors, wouldn't it?

8               MS. SWIFT:  Object to form,

9     foundation.

10          A.    I don't think so, but --

11          Q.    You don't think that a data system

12    of CVS would help identify bad doctors who were

13    working out of opioid pill mills?

14               MR. BARNES:  Objection to form.

15          A.    Well, when I would walk in a

16    pharmacy, the computer never talked to me.  It

17    was a pharmacist that talked to me.  That's who

18    I would identify.

19          Q.    Which reminds me of the fact that

20    when we went through all of the inspection

21    reports, Agent Pavlich, one of the -- one of the

22    sections was noting the hardware that was being

23    utilized.  Do you recall that?

24          A.    Yes.

25          Q.    You never investigated what data was

Page 265

1   available to pharmacists that had been

2   accumulated at the corporate level from all this

3   dispensing data, correct?

4       A.    No, I never investigated that.

5       Q.    But we do know that once OARRS came

6   into existence, there was a lot of data that was

7   available and could be used to help pharmacists

8   determine whether or not a particular

9   prescription should be flagged or was

10  problematic, true?

11      A.    Yes.  OARRS would help in that

12  respect.

13      Q.    Now, the advantage that OARRS has is

14  that there's data across all the various

15  pharmacies that are dispensing opioids, true?

16      A.    Yes, true.

17      Q.    But what I have been engaging -- the

18  conversation I have been engaging you in up

19  until now is about the data available to a

20  particular retail pharmacy chain based upon

21  their own data.  Do you understand that?

22      A.    Yeah, I do, but I have no idea what

23  they compiled at HQ or whatever.  I never was

24  at one of those HQs.

25      Q.    You say HQ.  You mean headquarters?

Page 266

1      A.     Yeah, their headquarters where

2  you're saying all this data was going, I was

3  never in one of those places, never in my

4  career.

5      Q.     Right.  So your investigation never

6  included what data might be available at the

7  headquarters of CVS, Walgreens, Walmart,

8  Rite-Aid or Giant Eagle, true?

9      A.     Never, never asked to be there and

10  never was there.

11      Q.     So the fact that, for example,

12  Mr. Barnes' client, Giant Eagle, had all these

13  inspections that, for the most part, passed

14  muster has nothing to do with what data they had

15  at the corporate level regarding their

16  dispensing data and what data they might have

17  supplied to their pharmacist, correct?

18          MR. BARNES:  Object to form.

19      A.     You're losing me here, but all I

20  know is the individual locations where I issued

21  an inspection was for the individual location.

22  What they did with their data, what they did

23  with their information, I have no idea.  I

24  mean, it could have gone into hyperspace.  I

25  have no idea.

1          MR. APPEL:  Sorry to interrupt.

2   This is Henry.  We are about -- had about two

3   hours since our last break.  Would it be

4   appropriate to take another break now?

5          MR. WEINBERGER:  Sure.

6          MALE VOICE:  Do you have an idea of

7   how much more time you have?

8          MR. WEINBERGER:  It shouldn't be

9   too much longer.

10          THE VIDEOGRAPHER:  We are going off

11   the record at 4:58.  This marks the end of

12   media unit number 5.

13              (Recess had.)

14          THE VIDEOGRAPHER:  We are back on

15   the record at 5:12.  This marks the beginning

16   of media unit 6.

17   BY MR. WEINBERGER:

18      Q.    Agent Pavlich, going back to OARRS,

19   which you described is an enlightening

20   experience in terms of the data and information

21   it can provide -- that was your description,

22   correct?

23      A.    Yes, enlightening.

24      Q.    Yes.  So once it came into

25   existence, the pharmacist can use the data to

Page 268

1    determine if a prescription is legitimate or

2    not, true?

3          A.    Not necessarily on that basis

4    alone.

5          Q.    But it is a --

6          A.    It's a tool.

7          Q.    It's a tool for the pharmacist to

8    use and then determine whether or not additional

9    due diligence must be performed on that

10   prescription, right?

11         A.    Yes.  To certain aspects, true.

12         Q.    And one of the ways to perform due

13   diligence is to contact the doctor and call the

14   doctor's office to confirm the diagnosis, the

15   reason for the prescription, and other important

16   information, true?

17         A.    Yes.  Those are some of the

18   questions.

19         Q.    What other due diligence could be

20   performed?  What other questions could be asked?

21         A.    You could ask the doctor if they're

22   aware of other doctors prescribing the same

23   drug, did there records indicate that they

24   actually authorized, for an example, a

25   telephone prescription for this particular

Page 269

1    controlled substance or did someone in their

2    office illegally telephone this in without

3    their knowledge.  I mean, there's lots of

4    questions you can ask specific to a

5    prescription.

6           Q.    Right.

7                 And you also mentioned that in some

8    instances pharmacists can call other pharmacies

9    in the area to determine whether or not a

10   similar prescription for that same patient has

11   been filled, right?

12          A.    That is true.

13          Q.    And that happens, right?

14          A.    Yes.

15          Q.    You've seen that in your experience,

16   right?

17          A.    Yes.

18          Q.    Now, the enlightening experience of

19   OARRS and the data in OARRS is that you can use

20   that data to look at the prescribing habits of

21   the doctor, right?

22          A.    Yes.

23          Q.    You can look at the patient profile,

24   right?

25          A.    Yes.

Page 270

1        Q.     Similar to the information that you

2    get when you're -- when you're performing a DUR,

3    right?

4        A.     More amplified.

5        Q.     You can determine the distance --

6    can use the data to determine the distance that

7    the patient traveled from his home to the

8    pharmacy?

9        A.     Yes, I believe you can do that.

10   Yes.

11       Q.     Can you use the data to determine

12   the distance between the doctor's -- the

13   prescribing doctor's office and the pharmacy?

14       A.     Well, it would be an approximation.

15   If the doctor's office is in Cleveland and the

16   pharmacy is in Trumbull County, I know it's a

17   long distance.  I don't know how many miles,

18   but I know it's a long distance.

19       Q.     You can determine whether the

20   patient in the past has paid for opioids with

21   cash or with the use of insurance?

22       A.     I'm not sure on that, what OARRS --

23   if it had that data or not.  I am not sure on

24   that.

25       Q.     You can determine the prior history

```
                                          Page 271
 1   of the patient with respect to dosage strengths
 2   and number of pills of opioids previously
 3   dispensed, true?
 4         A.    Yes.
 5         Q.    And you can determine that same
 6   information or prescriber history with respect
 7   to doses, strengths and number of pills
 8   dispensed to that -- by that prescriber to his
 9   or her patients, true?
10         A.    Yes.
11         Q.    All of this data helps the
12   pharmacist determine whether additional due
13   diligence must be performed on a particular
14   prescription before it's dispensed, true?
15               MS. SWIFT:  Object to the form.
16         A.    Yes, if they ran an OARRS report.
17         Q.    And all of this is then done or
18   should be done by the pharmacist in order for
19   the pharmacist to fulfill his or her
20   corresponding obligation to ensure that the
21   prescription dispensed is for a legitimate
22   medical purpose, true?
23               MR. BARNES:  Object to form.
24         A.    If they have the data in front of
25   them, true.  If they didn't run an OARRS
```

Page 272

1    report, they wouldn't know.

2         Q.    Right.

3              Have you done any investigation of

4    any of the retail pharmacies regarding what

5    written policies they have that governs the

6    conduct of their pharmacists who dispense

7    opioids?

8         A.    I would say no.  All I know is they

9    have -- every pharmacy had a law book in their

10   library, which are the drug laws of the State

11   of Ohio, and they were to comply with those

12   drug laws.

13        Q.    And if the pharmacist had written

14   policies that defined what red flags they should

15   be -- that the pharmacist should be looking at

16   from their own internal compilation of

17   dispensing data, you have no knowledge of that,

18   correct?

19        A.    No, I had no knowledge of their

20   internal memos or documents.  None that I

21   recall.

22        Q.    And your investigations never

23   revealed any of those policies to you, did they?

24        A.    No.  I would say it had not.

25        Q.    And your -- just like your

Page 273

1   investigations never revealed what data systems

2   the pharmacies had to keep track of their

3   dispensing data and to run algorithms on that

4   data, correct?

5        A.   My inspections would show what

6   software they had in the pharmacy.  Beyond that

7   extent, I just documented what software they

8   had.  I -- I'm computer dumb.

9        Q.   But what information in terms of

10  data analysis that software provided, you would

11  have no idea, correct?

12       A.   Yeah.  Correct.

13            MR. WEINBERGER:  All right, sir.

14  Those are all the questions I have.  Thanks for

15  your time.

16            EXAMINATION OF GEORGE P. PAVLICH

17  BY MS. SWIFT:

18       Q.   Thank you very much for your time

19  today and I'll try to keep it as short as

20  possible.  My name is Kate Swift and I am going

21  to ask you questions principally about Walgreens

22  this afternoon.

23            First I'd like to ask you some

24  questions about the inspections you performed

25  when you were at the Board of Pharmacy.  Is one

Page 274

1  of the purposes of those inspections to ensure

2  that a pharmacy is complying with the rules

3  around dispensing prescription medications like

4  opioids?

5      A.    Yes.

6      Q.    Is one of the purposes of the

7  inspections that you performed for the Board of

8  Pharmacy to ensure that a pharmacy is complying

9  with the rules around preventing theft and

10  diversion?

11      A.    Yes.

12      Q.    And I think you testified about this

13  earlier, but do you understand diversion to mean

14  the movement of prescription medications like

15  opioids from legitimate channels to illegitimate

16  channels or illicit channels?

17      A.    I agree, yes.

18      Q.    You testified a number of times

19  today that you tried to be very thorough in your

20  inspections, right, sir?

21      A.    Yes.

22      Q.    I believe I heard you say at one

23  point this morning that you consider yourself to

24  be aggressive or you did when you were

25  inspecting pharmacies for the Board of Pharmacy;

Page 275

1   is that fair?

2          A.    I was very aggressive.

3          Q.    You were aggressive in making sure

4   that you did thorough inspections to determine

5   whether a pharmacy was in compliance with the

6   Board of Pharmacy's rules and regulations?

7          A.    Yes.  No matter chain or

8   independent, I treated them all equal.

9          Q.    When you conducted inspections for

10  the Ohio Board of Pharmacy, did you make sure to

11  review whatever you needed to review in order to

12  give yourself comfort that that pharmacy was

13  complying with the Ohio Board of Pharmacy's

14  rules and regulations?

15         A.    I always tried to be thorough and

16  document anything that I found was not

17  legitimate.

18         Q.    If there was something that you

19  wanted to review and you couldn't for whatever

20  reason, did you document that as well?

21         A.    I don't know what I couldn't

22  review.  If I asked a pharmacist to produce

23  something, they always -- at least in the

24  majority of everything that I requested I got.

25         Q.    I believe I heard you testify that

Page 276

1   you never had occasion to ask a pharmacy's

2   headquarters for data that it might be

3   analyzing; is that right?

4          A.    Yes.  I never -- I mean, I'm not,

5   you know, on the life on my child saying I

6   never did that, but I'm telling you I don't

7   recall any time I communicated directly with

8   corporate.

9          Q.    When you found evidence of diversion

10  going on at a pharmacy, you definitely made note

11  of that in your inspection reports, correct?

12         A.    I made note of that and would

13  thoroughly investigate it in multiple ways.

14         Q.    And you might even start a

15  prosecution-type investigation.  You testified

16  about that with respect to Mr. Overholt's

17  pharmacy, right?

18         A.    Yes.  I would conduct an

19  inspection.  If I found multiple illicit

20  prescriptions, for an example, I would question

21  the pharmacist who's present or pharmacists

22  that are present, and if I determined at that

23  point I needed to conduct an investigation, I

24  would call Columbus, get a case number,

25  document it, and proceed.  And if it resulted

1    in something criminal, I would take it to the

2    prosecutor for that specific county, most of

3    the times at the common pleas court but I had

4    taken cases to federal court.

5          Q.     Would you agree with me, sir, that

6    it's very important for agents like yourself to

7    do those things when they find evidence of

8    diversion at a pharmacy, that's important for

9    protecting the public safety?

10          A.     Absolutely.

11          Q.     If you found anything amiss with

12   respect to the way a pharmacy was maintaining or

13   using its data, would you have made note of

14   that?

15          A.     Oh, yeah, I would have made note of

16   it.

17          Q.     And you testified at length about

18   Mr. Overholt's pharmacy in particular and the

19   fact that that pharmacy was not maintaining

20   controls against diversion, right?

21          A.     Absolutely they were not.

22          Q.     And you did something about it,

23   right?  You weren't going to stand by and let

24   that happen, fair?

25          A.     No.  I was immediately on top of

Page 278

1    it.

2          Q.    I believe I heard you say that you

3    trained a number of the agents at the Board of

4    Pharmacy.  Do I have that right?

5          A.    I trained every new agent at the

6    Board of Pharmacy after 1987, including a

7    couple of specialists, not to the practice of

8    pharmacy but to investigative technique.

9          Q.    Understood.  And did you train those

10   agents and specialists to be as aggressive and

11   thorough in their inspections as you were in

12   yours?

13         A.    Not everybody listened to me and

14   used my aggressive technique.  Some had

15   different types of personalities than me.  And

16   some just weren't as capable.  Not that I was a

17   superstar, but some just weren't as capable to

18   do large-scope investigations.

19         Q.    Do you believe that, by and large,

20   the agents and specialists who conduct

21   inspections of pharmacies for the Ohio Board of

22   Pharmacy take the job seriously?

23         A.    Not as seriously as I did, all of

24   them.  Some, but not all.

25         Q.    All right.  Let's talk about a

Page 279

1   particular inspection.  I'm going to show you

2   what should be in -- you've got the envelopes,

3   right?

4           A.    Oh, the envelopes, yes.

5           Q.    A through L.

6           A.    Which one?

7           Q.    We're going to start with the letter

8   A and I will introduce it using the Exhibit

9   Share software.

10              MS. SWIFT:  Renee, can I trouble

11  you to tell me where we are with the exhibits,

12  if you know?

13              THE COURT REPORTER:  I don't know.

14  I would have to just go on Exhibit Share.

15          (Discussion had off the record.)

16              MR. THOMAS:  Kate, I believe the

17  last exhibit from the Edwards deposition, they

18  just added them to the end, and I believe the

19  last number was 55.

20              MS. SWIFT:  Well, how about if I

21  start with 56?  And I'm going to introduce --

22  let's see if I can add.  Everybody should get a

23  copy of that that they could look at.

24              MR. THOMAS:  And remember to please

25  refresh your Exhibit Share so the exhibit shows

Page 280

1  up in the marked exhibit folder.

2          MS. SWIFT:  Thank you.  I will.  I

3  appreciate that.

4                -   -   -   -   -

5          (Thereupon, Deposition Exhibit 56,

6          Walgreens Pharmacy Inspection

7          Reports Beginning Bates Stamp

8          BOP_MDL1801987, was marked for

9          purposes of identification.)

10               -   -   -   -   -

11      Q.    And, Mr. Pavlich, you are welcome to

12  open, yes, that envelope that has the A on it,

13  and that will be Exhibit 56 for the record.

14          Sir, would you agree with me that

15  Exhibit 56 is a set of inspection reports for a

16  Walgreens pharmacy on West Market Street in

17  Warren, Ohio?

18      A.    Yes.  It looks like 804 West Market

19  Street.

20      Q.    And several of these are your

21  inspection reports, correct, sir?

22      A.    Let's see if they're all mine.

23  They're not all mine.  I have a distinct G and

24  then Pavlich.  Toward the end they're not.

25      Q.    But the first several reports are

Page 281

1   your inspection reports?

2          A.    Yes, the first several.  Yes.

3          Q.    You mentioned a couple of times

4   today that your inspection reports followed a

5   standard format.  And is that the format that we

6   see in Exhibit 56?

7          A.    Let's see.

8          Q.    In particular, I'm talking about the

9   list of 37 items along the left-hand side of the

10  page.

11         A.    Yeah, I see the items.  This

12  particular inspection, I was only there a half

13  hour.  They had a barricade.  That's why.  I

14  was just looking at their barricade.  So this

15  first inspection was primarily just for their

16  barricade.  This might have been --

17         Q.    I think it was a new store.

18         A.    Yeah, it was a brand-new store.

19  I'm looking at it here trying to figure this

20  out, why I was only there a half hour.  That's

21  why.

22         Q.    And we'll get to the details of the

23  specific reports in a minute, but first I'd like

24  to ask you just about the format of the reports,

25  so not the actual specific content.

1          You can see that each of these has

2   information about the store, such as the

3   address and phone number, at the top of each

4   page.

5          Do you see that?

6      A.    Yes.

7      Q.    And that was a standard for your

8   inspection reports?

9      A.    Yes.  In the far left, yes.

10     Q.    And then they also -- the form

11  includes a spot to note the responsible person

12  at the pharmacy.

13         Do you see that?

14     A.    Well, it had responsible person.

15  That would be the one that signed for the

16  terminal distributor license for that location,

17  and then if there was another pharmacist

18  working there, in this particular case it's a

19  supervisor who was there.  This thing wasn't

20  even -- it was hollow inside.  I just came to

21  see specifically how they were going to do what

22  they were going to do.

23     Q.    And there's room for additional

24  personnel to be noted below the name and address

25  of the pharmacy.  That's all standard?

Page 283

1          A.     Right, standard.

2          Q.     Then focusing on the list of 37

3     items on the left-hand side of the page, is that

4     a list of the things the inspector is supposed

5     to address during the inspection?

6          A.     It's a guide.

7          Q.     If you would, please, sir, are there

8     items in that list that relate to theft or

9     diversion, and if so, can you identify them?

10         A.     Theft or diversion?  Well, security

11    would fall into the possibility of theft or

12    diversion.  Improper dispensing would fall into

13    that category, illegal sales, illegal

14    purchases, improper Rx's, DEA inventory.  That

15    pretty much covers it.

16         Q.     You see number 10 in the list,

17    accountability?

18         A.     Yeah, accountability would also be

19    part of what I would document.

20         Q.     What does that mean, accountability,

21    in this context?

22         A.     Accountability is are the

23    pharmacists maintaining records for -- if you

24    purchased a thousand tablets of oxycodone, you

25    have records to indicate that you dispensed 500

Page 284

1  and there's 500 in stock.  That would be

2  accountability.  That would be what I would

3  call a true level of accountability, a zero

4  balance inventory.

5       Q.    Does accountability also relate to

6  just standard recordkeeping, not necessarily

7  inventory and making sure you've got as much as

8  you're supposed to have, but just keeping

9  records?

10       A.    Yes.

11       Q.    Then if you look at number 11 and

12  number 20 on the list, 11 is improper dispensing

13  and 20 is improper Rx's.  What is the difference

14  between those two?

15       A.    Well, improper dispensing would be

16  the pharmacist dispensed a medication and they

17  shouldn't have.  They dispensed -- there was 30

18  tablets prescribed and they dispensed 90.  That

19  would be improper.  And improper Rx's would be

20  they received a prescription from not a

21  legitimate doctor, like a dentist writing diet

22  drugs.  That would be an improper Rx.  So

23  there's a distinction between the two.

24       Q.    And number 15 is illegal sales.

25  What does that mean in this context?

Page 285

1      A.    Let me think about that.  It would
2  probably be they sold drugs, let's say, from
3  one pharmacy to another pharmacy without a
4  proper paper trail.  The pharmacy across the
5  street has a patient that needs something,
6  Fioricet tablets, and they're short, and they
7  call over to his buddy across the street and
8  says, Can you give me a hundred tablets of this
9  drug, and they said sure, and they give it to a
10 tech and she brings it across the street.
11 Well, if there's no paperwork, then it's an
12 improper procedure.
13      Q.    Got it.  That's helpful.
14            Is something like you just
15 described, where one pharmacy sells a
16 particular medication to another pharmacy, is
17 that proper under certain circumstances, like
18 if there is a proper paper trail?
19      A.    Well, if there's a proper paper
20 trail, one terminal distributor can
21 distribute -- can sell to another.
22      Q.    Got it.  All right.
23            Take a look, if you would, please,
24 at number 37 on the list, which says,
25 "Counseling."  What does that mean?

1      A.     37, counseling.  Oh, are they

2  asking the patient do you have any questions of

3  the pharmacist.  Is the pharmacist counseling

4  the patient while I'm in the pharmacy and the

5  patient says if I take this drug and this drug,

6  what will happen, and the pharmacist counsels

7  them.  That's what that is.

8      Q.    I noticed, in looking through the

9  reports that you conducted on the Walgreens

10  pharmacies, that this list of 37 changed over

11  time, it got longer.  Is that consistent with

12  your recollection?

13     A.     No.  I didn't remember that.  Oh,

14  it did get longer.

15     Q.     Yeah.  Take a look, if you would, at

16  -- there's a report in here dated March 29th,

17  2010.

18     A.     Yeah, I see it.

19     Q.     So the first one we looked at was in

20  the year 2000, so then this one, March 29th,

21  2010, is about ten years later, and you can see

22  there are now 40 items on the list, right?

23     A.     I never noticed that.  That's news

24  to me.

25     Q.     Well, let's look at -- I'd like to

1  ask you about the things that got added.  I

2  think it's more or less the same, though you can

3  take a look for yourself.  You don't have to

4  take my word for it.  So up until 37, and then

5  38, 39, 40 are -- PSE sales is 38, OARRS is 39,

6  and confidentiality is 40, correct?

7         A.    That's what it says.

8         Q.    What is the reference to PSE sales,

9  if you know?  What does that mean?

10         A.    I must have missed that class

11  because I have no idea what that is.  I'm

12  trying to think, PSE.  I have no idea.

13         Q.    If I say pseudoephedrine, does that

14  jog your memory?

15         A.    It could be.

16         Q.    But you don't know?

17         A.    I'm guessing.  I'm taking your word

18  for it.

19         Q.    We've talked a bit about OARRS

20  today, but in this context, meaning when OARRS

21  appears in this list of items on the left-hand

22  side of an inspection report form, what does

23  that mean?

24         A.    That probably means they're

25  utilizing OARRS in their dispensing practice.

Page 288

1      Q.    And then number 40, confidentiality,

2  what does that mean in this context of the Board

3  of Pharmacy inspection report form?

4      A.    I have no idea why they put that in

5  there.  Confidentiality would be -- to my -- to

6  my feeling, would fall under security, you

7  know, but -- you know, everything is secure and

8  confidential, but I don't know.  I don't recall

9  ever documenting this, or did I.  I don't know.

10  I don't think so.  Listen, I must have been

11  sleeping.  I'm telling you.  I missed this.

12      Q.    Then underneath the list there's a

13  check box and you can see sometimes it's checked

14  and sometimes it's not, and the check box is

15  next to something that says, "Pink sheet issued

16  for numbers."  And is it -- am I intuiting

17  correctly that if the box is checked, that means

18  the inspector has found an issue during the

19  inspection?

20      A.    Yeah.  That's a written -- what we

21  called a written notice of compliance that

22  needed to be addressed and written in a reply

23  to the Ohio State Board of Pharmacy as to a

24  corrective procedure.  So it would be X'd, and

25  then what specifically I wanted to bring to

1   their attention, I would put number 11,

2   improper dispensing, and 28, Rx initial and

3   date.  So that's what that is.

4        Q.    And you answered my next question,

5   which was when that check box refers to a pink

6   sheet being issued for numbers, what that means

7   is an issue with one of the 1 through 37 or 1

8   through 40 itemized issues there; is that right?

9        A.    Yes, specific to whatever I circled

10  or numbered, I'm bringing their attention to

11  it.

12        Q.    And you can see with respect to this

13  report in March of 2010, there's a check box --

14  the check box is marked for numbers 11 and 28,

15  and the 11 appears to refer to improper

16  dispensing?

17        A.    Yeah.

18        Q.    And I think if you follow along

19  through, 28 refers to initial and date, as you

20  can see on the next page?

21        A.    Right.

22        Q.    That's all very helpful.

23              If the box next to the pink sheet

24  notation is not checked, does that mean that

25  you didn't find any issues in the course of the

Page 290

1    inspection that were --

2         A.    It meant that I found no issues

3    that I wanted a written reply on.  Now, I might

4    have found some issues that I would bring to

5    the attention of the pharmacist in the course

6    of my inspection, whether orally or in writing,

7    but not everything that I would find I would

8    document.  You know, if I -- I don't know.  If

9    I would find something -- if I had a pharmacist

10   that I thought was really doing a good job, and

11   I could tell usually within the first half an

12   hour -- if I got a pharmacist that's doing a

13   good job, I would orally tell them something to

14   correct or whatever and put it in writing.

15   Pink sheet -- you got to understand,

16   pharmacists, you know, they took some of the

17   time these things personal, and if I didn't

18   think it needed to be documented in a written

19   reply, I did not do it.

20        Q.    Is it fair to say that if there was

21   no check mark next to the -- strike that.

22             If you decided not to issue a pink

23   sheet, meaning there was no -- the box was not

24   checked, did that generally mean that the

25   pharmacy -- you had determined the pharmacy was

Page 291

1   in compliance with the rules and regulations?

2         A.    Yes.

3         Q.    Okay.  Then just to finish out the

4   format of these reports, there's a large amount

5   of lined space kind of in the middle of the

6   page, and that's where you documented your

7   findings as you went through the inspection?

8         A.    Yes.

9         Q.    And then there's a signature line at

10  the bottom, one for the signature of person in

11  charge.  Is that a signature for somebody who

12  works at the pharmacy?

13        A.    That's a signature for only a

14  pharmacist.

15        Q.    Then there's a signature of

16  inspector.  And for many of these that's you,

17  correct?

18        A.    That's me.

19        Q.    I believe you testified earlier

20  today that the handwriting we see on these

21  reports is yours; is that right?

22        A.    On this one but not the next one

23  (indicating).

24        Q.    The ones that you signed, is that

25  typically your handwriting?

Page 292

1          A.     These are mine.  Distinctive G

2     P-A-V-L-I-C-H, that was mine.

3          Q.     Is this the format that you used to

4     conduct inspections throughout the time that you

5     were an agent for the Board of Pharmacy?

6          A.     Yes.  Some more extensive than

7     others, some less documentation, sometimes more

8     documentation.  All depends how much time I had

9     on my hands, for one thing, and how much

10    problem I saw.  I mean, sometimes I would go

11    into a pharmacy and I just was very impressed

12    most of the time, most of the time.  And I was

13    thorough, but I was -- I could be thorough in

14    an hour in some pharmacies.  In some I would

15    like to spend a weekend with them.

16         Q.     Did you -- when you were completing

17    these inspection reports, did you do it while

18    you were at the pharmacy?

19         A.     Oh, always, yes.

20         Q.     Did you have a clipboard so that you

21    could stand there and literally fill it out

22    while you were there with the pharmacist?

23         A.     Well, I didn't carry a clipboard

24    and 14 pens in my pocket.  I just kind of put

25    the sheet down and I would go and -- like the

1   first one, licensing, see if they had their

2   licensing on the wall and if they had their

3   personal ID there or on their person, and then

4   I would go, you know, sometimes down the line,

5   sometimes jumping here or there.  You know, it

6   all depends.  I used to have a good feel for

7   the pharmacy.  You know, it's like when I was a

8   policeman, you walked in very nice-looking

9   houses and you walked in very bad-looking

10  houses, so, you know --

11       Q.    Okay.  Now I'd like you to please

12  turn back to the very beginning of Exhibit 56,

13  this document we've been looking at, and I want

14  to ask you some questions about the reports that

15  you did for this Walgreens pharmacy in Warren,

16  Ohio.

17            This Walgreens on West Market

18  Street is in Trumbull County, correct, sir?

19       A.    Yes, it is.

20       Q.    On this first one we see the name of

21  Scott W. Weamer under the responsible person?

22       A.    Yes, I know him, and I don't

23  know -- I don't recall the supervisor, but I

24  know the pharmacist that signed this.  This was

25  Paul McEvey.

1          Q.     What do you -- what did you think of

2     Mr. Weamer, the responsible pharmacist?

3          A.     A very capable pharmacist.  He

4     later on became a policeman.  And he had a wife

5     that was a pharmacist.  Paul McEvey -- again, I

6     don't remember the supervisor, but Paul McEvey,

7     another very capable, good pharmacist.

8          Q.     And Mr. Weamer and Mr. McEvey, the

9     two Walgreens pharmacists listed in this report

10    in Exhibit 56, it sounds like you had a good

11    working relationship with them; is that true?

12         A.     Yes.

13         Q.     Did they provide you tips on bad

14    doctors, forged prescriptions, patients who

15    might have been diverting their prescription

16    medications?

17         A.     I believe they had.  I can't

18    remember specific cases, but they were good

19    pharmacists, yes.

20         Q.     And one more question about just the

21    standard format on these inspection reports.

22    You testified a minute ago that if the box is

23    not checked at the bottom of the page for the

24    pink sheet, that that tends to mean the pharmacy

25    is in compliance, based on your inspection, with

Page 295

1    the rules and regulations?

2        A.    Yes.

3        Q.    Does it also mean that you didn't

4    find any evidence of theft or diversion at that

5    pharmacy during that inspection?

6        A.    That is true.  What it means in a

7    nutshell is during my inspection I found

8    nothing that I would account for that would

9    require a written reply, but it does not mean

10   that there is no diversion or theft in that

11   pharmacy because I did not do an audit.  And an

12   audit -- the only way I would know if there was

13   non-accountability is doing a beginning audit

14   and an ending audit and getting the in-between.

15   So an inspection is good, it gives you a

16   snapshot, but it's not a motion picture film,

17   in other words.

18       Q.    Were there times when the Board of

19   Pharmacy would require an audit like you just

20   described?

21       A.    It's not that they would require

22   it.  It would be I would require it if I

23   found -- well, let's just say that Paul McEvey

24   said -- calls me up and says, "George, I just

25   bought five 500-tablet bottles of oxycodone and

Page 296

1  they were put on the shelf and I have four, and

2  I know I didn't dispense that."  Well, that

3  would result in an audit.

4       Q.    Is that the kind of thing that the

5  Walgreens pharmacists would do if they could not

6  account for one of their bottles of oxycodone,

7  they would give you a call?

8       A.    Well, they would -- an individual

9  pharmacist would call me sometimes about bad

10 prescriptions and things and they would call me

11 about something like that and/or they had an

12 excellent -- I don't know the supervisor, but

13 Brian Joyce was their supervisor and he was

14 excellent.  He called me on everything and

15 never interfered.  I mean, he was right on

16 board.  He was an independent pharmacist, at

17 one time had his own store, and then he started

18 working for Walgreens as a staff pharmacist and

19 then became a supervisor.  And he was

20 excellent.

21      Q.    Got it.  All right.  Take a look at

22 the second page of Exhibit 56, which is -- it

23 appears to be -- you'll have to tell me if I've

24 got this right -- a full inspection for the

25 store when it was first opened; is that correct?

1          A.     Wait a minute.  All right.  Yeah,
2     the first one, there was nothing there.  I
3     think I got a phone call in to see where they
4     were going to put the pharmacy and if it looked
5     like it was going to be okay inside during
6     construction because I put under construction.
7     Now, this one, this is the follow-up, because I
8     gave them the inspection -- I think the
9     license.  Yeah, I would have gave them the
10    license and the inspection, the first one, and
11    this is the follow-up after it was built and
12    ready to roll, so, yeah, a month later.
13         Q.     And you can see where it says under
14    "Personnel" towards the top of the page, "Full
15    inspection, new store"?
16         A.     Yeah, and that "F" up there, I must
17    have done that.
18         Q.     You made a note in the first page of
19    this inspection report, which is dated March
20    13th, 2000 -- there's a note about a metal track
21    not able to slide.  I should have you read
22    because it's your handwriting, not mine.
23         A.     "The barricade consists of three
24    metal draw-down curtains.  The curtains are
25    secured from within the pharmacy.  Note:  One

1   metal track is not able to slide lock into the

2   framework."  Oh, yeah, I remember this.  "The

3   wrong track was affixed in the window.  It

4   appears that the tracks were misinstalled by

5   the contractor."  Okay.  Yeah.  It wasn't -- it

6   wasn't going to be within compliance of

7   security that -- when I did a barricade

8   inspection, I mean, I pulled on the barricade

9   to see if it pulled out from the wall.  I

10  checked the tracks to make sure everything

11  locked secure and I found the problem there.

12       Q.   And then you can see, if you flip

13  ahead a few pages to the page with the number

14  ending 1994, there's a note at the bottom of

15  your prescription room barricade inspection

16  report that you advised Pharmacist Weamer to

17  correct this concern immediately with respect to

18  the --

19       A.   Yeah.  As a matter of fact, I

20  thought -- I thought -- if I remember this

21  correctly, I thought they had someone arrive at

22  the store while I was there.  They were going

23  to correct it.  So I -- I don't believe I

24  issued a pink sheet.

25       Q.   It doesn't appear that you did.

Page 299

```
 1        A.    No, I did not.

 2        Q.    The box isn't checked.

 3        A.    And I think that's because they had

 4  someone come into the store -- I remember

 5  this -- and they were going to correct it, but

 6  I still documented what I found when I was

 7  there.  They were very good.  I mean, I would

 8  say Walgreens was right on top of things.

 9        Q.    Walgreens was right on top of things

10  as a general matter; is that right?

11        A.    Walgreens was on top of things in

12  compliance as far as I'm concerned.

13        Q.    All right.  Now I want to ask you

14  some questions about the report that is dated

15  July 18th, 2002, and it starts right after that

16  barricade inspection report that we were just

17  looking at.

18        A.    Started right after it?

19        Q.    It's the page ending 1995.

20        A.    Yeah, I see that, and after the

21  barricade -- the barricade inspection was

22  conducted on 3-13-00.  This is 7-18-02.

23        Q.    Correct.

24        A.    We are on the same page.  That's

25  quite a while later.
```

Page 300

1        Q.    Yes.  The July 2002 report, it does

2    have the box checked next to the pink sheet.

3              Do you see that?

4        A.    Yeah, I see it.

5        Q.    And it looks like the pink sheet was

6    issued for numbers 3 and 10, correct?

7        A.    Yes, it was.

8        Q.    Number 3 is record system and number

9    10 is accountability, correct?

10       A.    Yes.

11       Q.    Right.  I want to ask you about what

12   was going on here.  In your written report it

13   looks like you had requested prescriber

14   utilization reports for two prescribers, a

15   doctor and a dentist.

16             Do you see that there?

17       A.    I see it, Nalluri and Sabatini.

18       Q.    What is a prescriber utilization

19   report?

20       A.    It's a computer-generated printout

21   for a specific prescriber or a specific patient

22   that would provide me from one time period to

23   another time period everything they dispensed

24   out of that pharmacy.

25       Q.    Why would you have requested that

Page 301

1    from this Walgreens in 2002?

2         A.    Because obviously I was looking at

3    Dr. Nalluri and Dr. Sabatini for something or

4    another.

5         Q.    You were investigating the two

6    doctors for something; is that right?

7         A.    Pretty much, probably true.

8         Q.    So you go on to write that this

9    pharmacy -- and we're still at the Walgreens at

10   804 West Market Street in Warren, Ohio -- the

11   pharmacy had not provided the records you

12   requested.

13              Do you see that?

14        A.    Yep, I see it.  That was a

15   different doctor.  That was Sherman and

16   Masters.

17        Q.    You make a note further down on the

18   page about an earlier request that the pharmacy

19   hadn't responded to with respect to Dr. Sherman

20   and Dr. Masters; is that right?

21        A.    That's true.

22        Q.    And in that part of the note you

23   say, "This is the second time this year that

24   records were never provided," right?

25        A.    That's what I wrote.  I don't

Page 302

1  recall it but that's what I wrote so that's

2  true.

3       Q.    When you were requesting records for

4  Dr. Sherman and Dr. Masters, was that in

5  connection with the investigation you testified

6  about earlier today regarding those two doctors?

7       A.    I would say yes.

8       Q.    All right.  There are -- I'd like

9  for you to confirm for me that other than the

10  issue with respect to this Walgreens not

11  providing these records you requested in a

12  timely fashion, there are no other issues noted

13  in this particular inspection report?

14       A.    No.  No.  I -- I was probably a

15  little ticked off --

16       Q.    I wondered.

17       A.    -- to say the least, because not

18  only did -- if you notice, not only did I write

19  number 3 and number 10, but I highlighted "Pink

20  sheet issued for number."  There's a highlight

21  there.

22       Q.    You also capitalized some of the

23  words, which I took to be for emphasis.

24       A.    Yeah.  I could tell by my -- what I

25  wrote here that I had an issue.

Page 303

1          Q.     And that is --

2          A.     I knew Kathleen Mongine.  She was

3    another good pharmacist.  But, you know, things

4    get lost in a pharmacy, things get misplaced,

5    people forget, I forget, but when it's the

6    second time they did it, I really brought it to

7    their attention.

8          Q.     And then if you'll turn a couple of

9    pages further in to the page ending 1999,

10   there's a letter from a Walgreens pharmacy

11   supervisor named Julie Bickers.

12              Do you see that?

13         A.     I see it.

14         Q.     Did you know Ms. Bickers?

15         A.     No, I don't know.  This looks like

16   it's out of Cleveland.  I don't know her.

17         Q.     She writes in this letter to the

18   Ohio Board of Pharmacy that she is responding to

19   the inspection report by you, Mr. George

20   Pavlich, correct?

21         A.     That's what she's saying, yes.

22         Q.     And then in the second paragraph she

23   says, "The cause of the delay in obtaining

24   records for the agent has been rectified, the

25   agent has been informed of the corrective

Page 304

1   action, and a system for preventing future

2   delays has been put into place both at the local

3   and the corporate level," correct?

4        A.    That's what it says.

5        Q.    This letter is dated July 25th,

6   2002, correct?

7        A.    Yes.

8        Q.    That's just about a week after the

9   date of the inspection report itself?

10       A.    Stand by.

11             Go ahead.

12       Q.    The letter from Ms. Bickers is dated

13  just about a week after the date on your

14  inspection report, correct?

15       A.    Yeah.  They have, I think, ten days

16  to reply.

17       Q.    Would you agree with me,

18  Mr. Pavlich, that --

19       A.    20 days.  20 days they have.

20       Q.    So Walgreens responded much more

21  quickly than they were even required?

22       A.    They were lightning fast.

23       Q.    Would you agree with me that this

24  Walgreens also addressed your concerns as

25  quickly as they presumably could?

Page 305

1      A.    That's what they are so noting in

2  this document.  I don't recall this

3  specifically, but yes, very fast reply.

4      Q.    If the issue with not providing

5  records when you had asked for them had

6  continued, would you have continued to document

7  it?

8      A.    Yes.  This would have been a step

9  up, more aggressive.

10      Q.    Then turn to the next page.

11      A.    There's a problem here type of

12  issue.

13      Q.    If you turn to the next page, the

14  next report is dated August 9th, 2006.

15      A.    Okay.

16      Q.    And I see Mr. Joyce is listed on

17  this one.  Do you see his name as the

18  responsible person?

19      A.    Yes.  He was a staff pharmacist

20  then and he was the responsible person so he

21  signed for the license.

22      Q.    And then I see Kathleen -- is it

23  Mongine?

24      A.    Mongine.

25      Q.    Do you know either of the other two

Page 306

1    people who are listed above Ms. Mongine's name?

2         A.    No.   One was an intern, and the

3    other one, odd that I wouldn't remember that

4    name but I can't recall him.

5         Q.    This inspection report from 2006

6    makes reference to the fact that there was a

7    drive-up window.  Where is that?  It's the first

8    page, about two-thirds of the way down, "The

9    pharmacy has a two-bay drive-up service window."

10   Why would you note that in your inspection

11   report?

12        A.    Maybe I never saw one with two

13   bays.  I don't remember back in '06.  Maybe I

14   found it to be unique, a two-bay drive-up

15   service window.  You know, most of the time I

16   would just see them driving up next to a window

17   attached right to the building itself.  So

18   maybe that's why I did it.  I don't remember.

19        Q.    Did you ever have occasion to

20   observe at pharmacies things about their

21   location or other aspects of the pharmacy, such

22   as a drive-up window, that might lead them to

23   have a higher volume of prescriptions and other

24   sales?  Is that the kind of thing you paid

25   attention to?

Page 307

1          A.    No.  I don't think -- you know, I

2     mean, that's a convenience thing.  As I recall,

3     that was strictly for that purpose,

4     convenience.  Pharmacies would rather you walk

5     in the building and maybe buy something on top

6     of what you're getting dispensed versus a

7     two-bay window.

8          Q.    This August 2006 inspection report

9     of the Walgreens on West Market in Warren also

10    makes note of an incident complaint at the

11    bottom of the first page, carrying over to the

12    second page.

13              Do you see that?

14         A.    Yeah, I see that.

15         Q.    What is that about?

16         A.    I'm not recalling this.

17         Q.    Can I trouble you, sir, to read into

18    the record, because I struggle a little bit with

19    your handwriting?

20         A.    Really?  I got straight A's in

21    handwriting.

22         Q.    It's better than mine.

23         A.    This is my college handwriting.  "A

24    patient" -- I'll read from the beginning here.

25    I'm sorry.  "On this" -- page 1, "On this date

Page 308

1   an incident complaint was reviewed."  Page 2, I

2   put "on" but it should be "An OSBP case number

3   20061489, a patient profile on the person

4   reporting this incident was requested.  The RPh

5   explained that excessive hydrocodone/APAP based

6   on multiple doctors in the Walgreens and later

7   discovered Rite-Aid and CVS pharmacies resulted

8   in them reporting the information to the

9   prescriber.  The RPh corresponding

10  responsibility with the prescriber was properly

11  followed and this incident complaint is found

12  to be unfounded.  A written request of the

13  specific patient profile was provided and

14  received."

15          You know, I don't recall this.

16      Q.    Does it suggest to you that somebody

17  had complained?

18      A.    Yeah.

19      Q.    Like maybe a patient had complained

20  that they weren't getting their prescription

21  filled?

22      A.    You know, that happened a lot.  I

23  would get these patients calling me up saying

24  this, that or whatever, and, hey, I didn't get

25  90 tablets, I got 60, you know, or the

1   pharmacist was discourteous to me.  I mean, I

2   know which pharmacists were hotheaded and which

3   ones were extremely professional, and I

4   addressed it and concluded it was unfounded.

5        Q.    Does it suggest to you that somebody

6   was complaining that they couldn't get their

7   opioid prescription filled and they complained

8   about that?

9        A.    It could have been that.  It could

10  have been -- you know -- and if it was,

11  probably high 90 percentile it was an opiate,

12  high 90 percentile.  The complaint calls that I

13  would get -- it wasn't just being discourteous,

14  it was I was short my drugs, it was this, that,

15  whatever, and when I would go there, I'd look,

16  most of the time it was a controlled substance.

17       Q.    Am I correct that your conclusion in

18  this instance was that the Walgreens pharmacist

19  was doing what they were supposed to be doing?

20       A.    That was my conclusion.

21       Q.    Okay.  Let's take a look at the

22  March 29th, 2010 report again.

23            MR. MOYLAN:  Kate, before we go on

24  to another report, I'm just wondering if you

25  have a sense of how much more time you'll be

Page 310

1    using.

2             MS. SWIFT:  Half an hour.

3             MR. APPEL:  This is Henry.  I do

4    want to just point out that the -- that under

5    docket 643, page 8, it discusses the time frame

6    for the redirect, and it is minute for minute.

7    So, you know, I assume that Plaintiff used 90

8    minutes.  We'll assume that.  And it also

9    indicates that -- on page 7 -- time should be,

10   you know, divided amongst the parties if

11   there's any questions.  So it may not be a bad

12   idea to go off the record if you wish to

13   coordinate with the other Defendants.

14            MS. SWIFT:  Well, with respect, as

15   I tried to explain before Pete Weinberger's

16   questioning, we saved our questioning, meaning

17   questioning by Walgreens, Rite-Aid, CVS and any

18   of the other pharmacies who wanted to ask

19   questions, in an attempt to streamline things

20   and as a courtesy both to the witness and to

21   Plaintiffs' counsel, because we did not know

22   that Plaintiffs' counsel were going to have any

23   questions at all.  They didn't have any

24   questions at all on Friday for that board

25   pharmacy witness.  And had I known that someone

Page 311

1   was going to take that position, we might have

2   done something differently.  I'm trying to

3   accommodate folks in a way that makes sense.

4   But it certainly wasn't to waive the remaining

5   time that we had.

6           MR. APPEL:  I appreciate that, and

7   I actually -- you're, in fact, correct.  There

8   was 34 minutes remaining on the 6:26, there's

9   six hours and 26 minutes, and so there's 34

10  minutes remaining.  I'm just pointing out that

11  I'm looking at these rules and, you know -- you

12  know, the judge has foreseen using this.  So,

13  you know, you might want to coordinate amongst

14  the defense counsel off the record how much

15  time each party will get because I think, you

16  know, you've certainly used at least some of

17  that 90 minutes.

18          MS. SWIFT:  And who is speaking

19  right now?

20          MR. APPEL:  This is Henry Appel

21  from the AG's office.

22          MS. SWIFT:  I'm sorry.  I didn't

23  recognize your voice, Henry.

24          Are you suggesting -- and we can go

25  off the record in just one second, but are you

                                          Page 312

1   saying that when we get to seven hours, you're

2   going to cut us off, or what is your position

3   on that?

4             MR. APPEL:  Oh, no.  The order says

5   that the Plaintiffs would have seven hours --

6   I'm sorry, the Defendants would have a combined

7   seven hours, that Plaintiffs would have 90

8   minutes, and then the -- then your -- the

9   Defendants would have an additional 90 minutes,

10  because it's minute for minute of what was used

11  by the opposing party.

12            MS. SWIFT:  Okay.  So I think we're

13  nowhere near the limit.

14            MR. APPEL:  Yeah.  I'm just saying

15  you may not hit the limit yet, but if you're

16  saying you have another half hour, you know, as

17  a professional courtesy, I'm letting you know

18  that this is -- you know, we would like to at

19  least look at this, because the judge has set

20  it out.  I mean, we're already at 6:00.  I

21  mean, you know, if we're -- yeah, this could

22  easily drag on till 9 or 10:00 otherwise.  I

23  want to have some professional courtesy on

24  this, but --

25            MS. SWIFT:  I understand.  What I'm

Page 313

1   trying to say is I think that Bob Barnes

2   stopped questioning at someplace well south of

3   seven hours.

4                MR. BARNES:  Yeah, about five

5   hours.

6                MS. SWIFT:  That's what I thought.

7   So I didn't think we were anywhere near bumping

8   up on that upper limit, but perfectly happy to

9   see what we can do to streamline things, Henry.

10  If folks want to go off the record, the group

11  of us can -- you know, we can circle up and see

12  what we can do to streamline.

13               MR. APPEL:  Actually -- you know, I

14  actually may be mistaken.  You're right.  It

15  might have been 6 hours and 26 minutes total,

16  including the one hour and 12 minutes.  So I

17  do -- so there was actually more time.

18               MS. SWIFT:  Okay.  Thank you.  I

19  appreciate that, Henry.  And I don't mean to --

20  I wasn't trying to -- well, I guess I was

21  trying to correct you, but --

22               MR. APPEL:  That's what opposing

23  counsel is for.  Well, I'm not even opposing

24  counsel.  I'm representing a witness.

25               MS. SWIFT:  But I really do mean

Page 314

1   it, that we are happy to take a minute amongst

2   ourselves and see if we can streamline things.

3   I'm happy to do that if it gets us out of here

4   faster.

5           Why don't we go off the record for

6   five minutes hopefully.

7           THE VIDEOGRAPHER:  Going off the

8   record at 6:13.  This marks the end of media

9   unit number 6.

10          (Recess had.)

11          THE VIDEOGRAPHER:  We are back on

12  the record at 6:27.  This marks the beginning

13  of media unit 7.

14  BY MS. SWIFT:

15      Q.    Mr. Pavlich, sitting here today, do

16  you recall ever having any issues with the

17  systems Walgreens used to dispense prescription

18  medication such as opioids?

19      A.    No.

20      Q.    Do you recall ever having any issues

21  with the systems that Walgreens used for

22  maintaining records and data?

23      A.    No.

24      Q.    You never investigated a Walgreens

25  pharmacy for violations of Ohio law, correct,

Page 315

1    sir?

2          A.    For Ohio law for what?

3          Q.    Violations of Ohio law.

4          A.    Well, I investigated -- not that I

5    recall.  I have conducted investigations in

6    Walgreens for different things, like some

7    prescriptions that were in there, theft of

8    drugs by a technician or a pharmacist, but --

9    those things.

10         Q.    You never -- well, let me ask it

11   this way --

12         A.    Yeah, ask it a better way.

13         Q.    You testified earlier about when you

14   went into the Overholt Pharmacy, that was sort

15   of a different situation than what you had seen

16   elsewhere, and I think you said you didn't even

17   check the box for leaving a pink sheet, you just

18   went immediately to an investigation and

19   prosecution?

20         A.    They got a pink sheet at Overholt

21   Pharmacy when I went in on that particular day

22   with four or five other people.  But yeah, I

23   was with a determination when I went into that

24   pharmacy looking for trafficking in drugs,

25   illegal processing.

Page 316

1        Q.    Did you ever have an investigation
2    like that at a Walgreens pharmacy?
3        A.    No, not that I recall.
4        Q.    You're not aware of Walgreens ever
5    being the subject of any criminal or civil
6    investigations due to alleged diversion of
7    controlled substances, correct, sir?
8        A.    Walgreens specific, no.
9        Q.    You concluded, based on your
10   inspections of the Walgreens pharmacies in
11   Northeast Ohio, that Walgreens was operating
12   lawfully; is that fair?
13       A.    I found them to be very compliant.
14       Q.    You testified earlier that you
15   investigated or prosecuted something along the
16   lines of 90 prescribers in your 25 years at the
17   Board of Pharmacy?
18       A.    Approximately 90.  Could have been
19   80.  It was in that range.  It was a lot.
20       Q.    Would you agree that those roughly
21   90 prescribers contributed to diversion, misuse
22   and abuse of prescription opioids in Northeast
23   Ohio?
24       A.    They were contributing to lots of
25   things, yeah, I would agree.

Page 317

1        Q.      You also, I believe, testified that

2    you had occasion to investigate patients who

3    were either abusing, misusing or diverting their

4    prescription medications, right?

5        A.      Lots of them, yes.

6        Q.      Would you agree with me that those

7    patients contributed to diversion, misuse and

8    abuse of prescription opioids in Northeast Ohio?

9        A.      Yes.

10        Q.      You testified earlier that opioids

11   sometimes come into Northeast Ohio from Mexico

12   illegally, correct, sir?

13        A.      Outside the state, yes.

14        Q.      You agree with me that when opioids

15   come into the state from Mexico or other foreign

16   places illegally, that contributes to diversion,

17   misuse and abuse of opioids in Northeast Ohio?

18        A.      Yeah, I would agree to that.

19        Q.      Mr. Weinberger asked you some

20   questions about something he referred to as the

21   gateway theory.  Do you remember those

22   questions?

23        A.      Yes, I remember him asking me.

24        Q.      Would you agree with me,

25   Mr. Pavlich, that the vast majority of people

1  who use prescription opioids according to a

2  doctor's prescription never use heroin?

3         MR. WEINBERGER:  Objection.

4      A.    I don't know if that's true.  I

5  don't know.  I would think you abuse one drug,

6  you can abuse another.

7      Q.    You're not a medical doctor, are

8  you, Mr. Pavlich?

9      A.    No.  Far from it.

10     Q.    Do you have any expertise at all in

11 epidemiology?

12     A.    No.

13     Q.    Have you ever conducted a study on

14 the likelihood of people to turn from

15 prescription opioids to misuse of opioids to

16 heroin or anything like that?

17     A.    No, never have.

18     Q.    You don't have any expertise in

19 addiction medicine; is that fair?

20     A.    Other than arresting people, that's

21 about the extent of it.

22     Q.    You don't have any idea what the

23 actual numbers are regarding people who start on

24 prescription opioids and later turn to illegal

25 drugs, correct?

```
                                                  Page 319
 1          A.      No.
 2          Q.      No, I'm not correct or no, you don't
 3     know?
 4          A.      No, I don't know.
 5          Q.      You testified earlier about a Dr.
 6     Orr.  Do you remember that testimony?
 7          A.      Yes.  Your voice got screeched.
 8          Q.      You remember your testimony this
 9     morning about a Dr. Orr?
10          A.      Orr, yes.
11          Q.      How do you spell that doctor's name?
12          A.      O-R-R.
13          Q.      Do you know what the doctor's first
14     name is?
15          A.      Dennis.
16          Q.      Do you know whether he was
17     convicted?
18          A.      I believe he was.
19          Q.      You said that you've been involved
20     in investigating and prosecuting pharmacists,
21     and I believe a moment ago you mentioned
22     something about a Walgreens pharmacy technician.
23     Do you have any personal knowledge of any
24     Walgreens pharmacist or pharmacy technician
25     being prosecuted?
```

Page 320

1      A.    I can't remember the name, but I

2   remember -- because Brian Joyce was there with

3   me.  I mean, I had cases all over the place,

4   but I remember the pharmacy technician that was

5   working at the main -- Route 224 and Route 7 in

6   Boardman, Ohio.  She was stealing out of their

7   automatic dispensing machine, I believe it was,

8   hydrocodone.  And Brian Joyce called me and

9   said, "I think we have a problem here."

10            And I went in, and I can't remember

11   if I used their cameras, which I think I did,

12   but I'm not sure if I used our cameras, the

13   Board of Pharmacy.  And I caught her in the

14   act.  And then -- live, and then I brought her

15   in the interview room and she confessed.

16      Q.    Is it fair to say that the

17   circumstance you're aware of involving a

18   Walgreens technician stealing drugs, a Walgreens

19   pharmacist brought it to your attention?

20      A.    Yeah.  That's what I would expect.

21      Q.    And that is, in fact, what happened

22   in that circumstance?

23      A.    That's, in fact, what happened.  I

24   don't know if it was Brian Joyce that called me

25   or a staff pharmacist, but I believe it was

Page 321

1   Brian.  I had a very good working relationship
2   with him.
3         Q.    Is that the only circumstance you
4   can think of involving a Walgreens tech stealing
5   drugs or anything like that?
6         A.    With Walgreens, yeah.  That one
7   comes right to my mind, but I -- you know, I
8   could have done ten.  I don't remember.
9         Q.    Any time something like that has
10  happened, has the pharmacy, the chain pharmacy,
11  cooperated in your investigation?
12        A.    Walgreens?
13        Q.    Yes.
14        A.    Yes.  Very cooperative.
15        Q.    Have you ever talked to
16  Mr. Weinberger prior to today, the Plaintiffs'
17  lawyer who questioned you?
18        A.    No, I have not.
19        Q.    Have you ever talked to -- I'm going
20  to name a couple of other lawyers and I just
21  want to know if you've ever talked to them
22  before.
23              Hunter Shkolnik or Frank Gallucci?
24        A.    No.
25        Q.    Have you ever talked to any lawyers

Page 322

1   on behalf of Lake County, Trumbull County,

2   Cuyahoga County, or Summit County?

3        A.    In relation to this?

4        Q.    Yes.

5        A.    No.

6        Q.    You testified this morning that

7   pharmacists should use their knowledge and

8   expertise in filling prescriptions on an

9   individual basis.  Would you agree with me that

10  pharmacists are supposed to do that prescription

11  by prescription one at a time?

12       A.    Absolutely.

13       Q.    You mentioned a scrapbook earlier

14  today.  Do you have a scrapbook related to cases

15  that you worked on when you were at the Board of

16  Pharmacy?

17       A.    Yeah.  I sort of kept a little

18  trophy thing of cases, but it's not as

19  extensive as what I had compiled during my

20  career.  There was a few things.  I got a

21  scrapbook over there with all the newspaper

22  clippings.  It's about -- it's thick.  It's

23  about that thick (indicating).

24       Q.    I'm just going to ask, if you would,

25  please, sir, not to destroy that or throw it

Page 323

1    away.  We may ask for a copy of it.  That will

2    be something that we can talk to the lawyers

3    about, but my only request to you is will you

4    please not throw it away or destroy it?

5           A.    I didn't plan on it.

6           Q.    I figured.

7           A.    It's my career gold medal, I guess

8    you would say.

9           Q.    You mentioned a pharmacy that had

10   the word "mart" in it that you said was not a

11   chain pharmacy that had been involved, I

12   believe, in some kind of criminal activity.  Do

13   you remember that?

14          A.    I mentioned a pharmacy that was

15   involved in some other criminal activity?

16          Q.    And it had the word "mart" in the

17   name.

18          A.    Oh, yeah.  I thought that -- when I

19   did the investigation on Masters, Sherman and

20   Theisler, there was a pharmacy in the plaza

21   right up from them, where I was pulling a lot

22   of scripts out of, but they were also

23   cooperating with me at the same time.  I put

24   that case together pretty quick because of the

25   aspect of how the case -- one doctor wasn't

Page 324

1  even around and I'm getting the scripts out of

2  there.  So I was working with that pharmacy,

3  but they closed.  It wasn't Drug Mart.  It was

4  --

5       Q.    Was it MedSmart?

6       A.    It might have been MedSmart.  Yeah,

7  that might have been it.

8            MS. SWIFT:  That's all I have.

9  Thank you very much, sir.  I don't think I'm

10 the last one, but I'm done.  So thank you for

11 your time.  I appreciate it.

12           THE WITNESS:  I've been in a lot of

13 battles.  I'm used to this.

14        EXAMINATION OF GEORGE P. PAVLICH

15 BY MR. MOYLAN:

16      Q.    Agent Pavlich, my name is Daniel

17 Moylan.  I'm going to have some questions

18 regarding CVS.

19           Is it fair to say that during your

20 work at the Board of Pharmacy you had occasion

21 to inspect CVS pharmacies from time to time?

22      A.    Oh, yeah.  I was in them, all of

23 them in my territory.

24      Q.    And as with all of your inspections,

25 you tried to be thorough and diligent when you

Page 325

1    conducted those inspections?

2         A.    Best of my abilities.

3         Q.    And if you noted any issues during

4    one of those inspections, those would be

5    documented in your inspection reports for CVS

6    pharmacies, correct?

7         A.    That is absolutely correct.

8         Q.    We're not going to spend time going

9    through specific reports the way you have

10   earlier today, but thinking back over the course

11   of your career, do you believe your inspections

12   of CVS pharmacies were generally favorable?

13        A.    The majority were favorable.  Did

14   I -- you know, I mean, I had a few incidents in

15   CVS stores.  I mean, I could think of one right

16   off the top of my head involving a technician.

17   And I had a pharmacist at a CVS store, had a

18   problem with him, got him arrested and

19   convicted.  But the majority, the large

20   majority of CVS stores were compliant and

21   accountable and the pharmacists were good.

22        Q.    With respect to the pharmacy

23   technician that you mentioned, what do you

24   remember about that case?

25        A.    I remember it was in -- the main

1  street in Hubbard, Ohio.  Jim Romeo was the

2  pharmacist in charge.  There was a technician

3  in there.  And I'm trying to think of the drug

4  she was taking.  I believe it was -- I think it

5  was a combination of drugs.  It might have been

6  Soma and hydrocodone.  And the pharmacist

7  called me -- I believe it was the pharmacist

8  direct, because I knew Jim Romeo.  He was an

9  absolutely great pharmacist.  And he would call

10 me about a lot of things.  And he told me there

11 was a theft of drugs in there.  And I believe I

12 talked to the CVS supervisor, too.  So what I

13 did was I set a camera up and did a number of

14 things like that and I wanted to catch her

15 live.  And Jim was very thorough in

16 documenting, putting the bottles on the shelf,

17 and I caught her live.

18      Q.    So as a result of Pharmacist Romeo

19 contacting you and providing those forms of

20 assistance, it helped you in your investigation

21 to catch the pharmacy technician?

22      A.    Without him, I, first of all,

23 wouldn't have known, either him or the

24 supervisor.  I can't remember.  But he was very

25 articulate.

Page 327

1          Q.     Okay.  And with respect to the CVS

2     pharmacist that you mentioned who was convicted,

3     what was that -- the nature of that incident?

4          A.     Well, the one -- you know, you get

5     these things that come to the top of your head.

6     His name was Gary -- I can't think of his last

7     name, but it was the CVS Pharmacy in downtown

8     Warren, sat right on the corner there, right up

9     the street from the courthouse.  And there was

10    a pharmacist in there and he was filling --

11    well, I sent an undercover in.  He was a very

12    poor recordkeeper.  Probably the messiest CVS I

13    was in.  And that was what kind of tripped my

14    trigger mechanism, should I say, to start

15    looking at them.  And one thing led to another

16    and I ended up sending an undercover female in

17    there, and she went in there and promised him

18    sex if he would give -- fill prescriptions,

19    illegal prescriptions obviously.  And he did.

20    And I charged him in Trumbull County and

21    convicted him.

22          Q.     Apart from the two cases that you've

23    described involving the pharmacy technician that

24    Mr. Romeo or the pharmacy supervisor brought to

25    your attention and the other case involving the

Page 328

1   pharmacist who was caught through the undercover

2   operation, is it fair to say that over the

3   course of your career, your general experience

4   with CVS pharmacies is that they've been

5   cooperative and they have had essentially clean

6   records in their inspections?

7          A.    I mean, clean records in the

8   respect that, I mean, they might have got a

9   pink sheet here and there, but I was very

10  comfortable in most, if not all of their

11  pharmacies.  That was one exception, the one in

12  Warren.  But again, no major issues with the

13  pharmacy specific.

14         Q.    With respect to the inspection

15  process that you went through, did you find CVS

16  pharmacies' pharmacists to be responsive to your

17  request for information?

18         A.    Yes, them and -- I can't think of

19  the supervisor.  I believe she was a female.

20  I'd have to look in my little directory there.

21  They were always cooperative.  Never gave me,

22  you know, a hard time about anything.

23         Q.    And apart from your inspections, did

24  CVS pharmacists provide tips and information for

25  your investigations?

1   A. Yeah.  I can't remember every

2 specific tip and information, but I got calls.

3 I remember Jim Romeo specific.  He called me

4 about everything.  I mean, if it had a fly on

5 it, he would call me.  He was great.  And all

6 that information, you know, I would sort and

7 work out, and sometimes it was nothing and

8 sometimes it led to a big thing.

9   Q. To the best of your knowledge, did

10 the Board of Pharmacy ever deny a license

11 application for a CVS pharmacy?

12   A. Not to my knowledge.  I mean, they

13 could have.  I don't recall anyone in my

14 territory specific.

15   Q. Okay.  So you're unaware of any

16 denial?

17   A. Yeah.  It would have not been my

18 call.  When they file an application, it would

19 have been a call in Columbus.  It was not --

20 when it comes to me, it's going to get issued,

21 unless I get there and, you know, it's a shack

22 in the middle of a field that I'm not going to

23 issue the license.  But not to my knowledge.

24   Q. Just to make sure the record is

25 clear, as you're sitting here today, you're

Page 330

1  unaware of any instance where a CVS pharmacy was

2  denied a license application?

3      A.   I'm unaware.  I cannot recall one.

4  I'm not saying it never happened, but --

5      Q.   Similar question.  You're unaware of

6  any instance where a CVS pharmacy was denied a

7  license renewal?

8      A.   Nothing off the top of my head that

9  I can recall, no.

10      Q.   To the best of your knowledge,

11  there's not been a CVS pharmacy in Trumbull or

12  Lake County that's had its license suspended?

13      A.   I don't know about Lake County, but

14  in Trumbull County I can't recall one.

15      Q.   And to the best of your knowledge,

16  you're not aware of a pharmacy in -- a CVS

17  pharmacy in Trumbull County or Lake County

18  that's had its license revoked?

19      A.   Can't account for Lake County, but

20  as far as Trumbull County, I can't recall one

21  getting revoked.

22      Q.   Did CVS pharmacies have a computer

23  system when you inspected that was approved by

24  the Ohio Board of Pharmacy?

25      A.   Yes.

Page 331

1      Q.    And as part of your inspections,
2    would you inspect the computer system used in
3    the pharmacies?
4      A.    I'm far from being a computer
5    wizard.  I would see the functionality of the
6    computer system, see how it functioned, note
7    that it functioned, note the software.  Pretty
8    much beyond that -- you know, that's my extent.
9    When I went to college, we didn't have
10   computers.  We didn't even have a calculator.
11   They were using slide rules.  So, you know, it
12   wasn't my forte.  I just would document what
13   minimal I could document.  But they always --
14   they all seemed to be operational.  I can't
15   even remember the software they used.
16     Q.    Okay.  But to the best of your
17   recollection, you found, when you did these
18   inspections, that the computer systems used in
19   CVS pharmacies were generally acceptable?
20             MR. WEINBERGER:  Objection.
21     A.    I would say they were acceptable or
22   I would have noted it.
23     Q.    You testified a little bit earlier
24   today that you really didn't know what the
25   corporate data systems the chains used in their

Page 332

1  headquarters might have been.  Do you remember

2  that testimony?

3          A.    Yes.

4          Q.    In your inspections of CVS

5  pharmacies, is it fair to say that you never

6  provided any written guidance that CVS needed a

7  corporate-wide computer system to analyze data

8  about patients or prescribers or prescriptions

9  of concern?

10         A.    I would have never -- never gone to

11 that extent, no.

12         Q.    Okay.  And, similarly, is it also

13 fair to say that you wouldn't have provided any

14 oral guidance to a CVS that it had to use a

15 company-wide computer program to identify

16 patients or prescribers or prescriptions of

17 concern?

18         A.    That would not be coming from me.

19         Q.    And is that -- are those answers the

20 same for the other pharmacy Defendants, that you

21 wouldn't have provided written or oral guidance

22 to that effect?

23         A.    To the best of my knowledge, I

24 would not have done that to a corporate level.

25 I would only be specific to the store I was at.

Page 333

1        Q.    And to the extent you provided any

2   oral guidance, that would be noted in your

3   reports, I gather?

4        A.    Not that I know of.  I mean, who

5   knows over 25 years, but not that I recall.

6        Q.    And for sure if it was any kind of

7   an issue that you considered to be significant,

8   you would note that in your reports; is that

9   fair?

10        A.    I would have noted something in my

11   report to something that I found unique.

12        Q.    Understood.

13              To the best of your knowledge, did

14   the Ohio Board of Pharmacy ever issue written

15   guidance that pharmacies needed a company-wide

16   computer program to identify patients,

17   prescribers or prescriptions of concern?

18        A.    They could have.  I wasn't at that

19   grade --

20        Q.    Okay.  But you're not aware --

21        A.    -- or institute it.  It wasn't my

22   call.

23        Q.    But as you're sitting here today,

24   you're not aware that the Board of Pharmacy ever

25   did that?

1          A.     I'm not aware.

2          Q.     I think you testified earlier that

3    prescriptions and prescription logs were two

4    types of documentation that pharmacies were

5    required to have.  Did I understand that right?

6          A.     Yes.  A prescription is the hard

7    copy, as it was called, and prescription logs

8    is the specific documentation compiled based on

9    the hard copy.

10         Q.     Is it fair to say that pharmacists

11   were not required to document every action that

12   they took with respect to a specific

13   prescription?  Is that fair?

14         A.     They would have to document what

15   they dispensed specifically and that label

16   would be affixed to that prescription.

17         Q.     Understood.  So just to take an

18   example, if a pharmacist asked the patient

19   questions, there wasn't a requirement that

20   that -- that Q&A be recorded in the records of

21   the pharmacy?

22         A.     I would see that sometimes, the

23   pharmacist had a specific question and I would

24   see documentation.  I used to tell pharmacists,

25   "Prescriptions are your bible.  To me, that's

Page 335

1   your bible.  You document everything on the

2   prescription and we're never going to have a

3   problem.  If you don't, don't tell me later you

4   forgot.  It's now or never."  And that's pretty

5   much -- you know, a pharmacist might mark on

6   the back of the prescription the

7   contraindicated drugs that that patient, you

8   know, couldn't take and all those type of

9   things, you know.  But it wasn't a regular

10  thing.  They would go into their computer and

11  put things like that, they're allergic to this

12  or that or whatever.

13      Q.    But in terms of the steps that a

14  pharmacist could take, there wasn't a

15  requirement that, when you conducted

16  inspections, that every step would have to be

17  documented in order for you to pass the pharmacy

18  in that inspection?

19      A.    No.  There was no step-by-step

20  documentation, no.  Pharmacists, they had a

21  certain thing they had to do, they had certain

22  requirements, and -- for recordkeeping, for

23  manner of issuance, for all of those things,

24  and I would look and see if they were in

25  compliance.  And if they weren't, I would

1    orally bring it to their attention if it was

2    minor or I would document it on the

3    prescription and then -- or on the inspection

4    sheet.

5         Q.    And to take another example, if a

6    pharmacist called the doctor's office to check

7    on a specific patient or prescription, there

8    wasn't a requirement that you had that that

9    would have to be documented in every case; is

10   that fair?

11        A.    No, but I know I had -- I would

12   tell pharmacists, you know, it's a good idea to

13   document that down there because if a

14   pharmacist said to me, "Well, I called the

15   doctor's office and he said these scripts were

16   good," and I look at the back of the script and

17   I go, "And you documented that where," and

18   said, "If you don't write it on the script, how

19   do I know you're not telling me a lie now?"  So

20   you know, I kind of preached things.  You know,

21   I was like a little preacher out there to these

22   guys, far from being a pharmacist, but I tried

23   to keep them out of trouble.  I had enough

24   trouble out there, and I wanted to keep

25   pharmacists good so I had less trouble out

Page 337

1   there.

2          Q.    So it sounds like you preferred

3   seeing pharmacists that documented those kind of

4   steps so that you and they could tell later what

5   they had done; is that fair?

6          A.    Right.  It's like my memory now.

7   Do I remember this or do I remember that?

8   Hell, no, I don't remember this or that, but if

9   you write it down and you document it, there it

10  is and I got it, you know, and that's how I

11  preached to them.

12         Q.    Understood.

13               But there was no regulatory

14  requirement that came out of the administrative

15  code that --

16         A.    Not that I can recall, the

17  step-by-step procedural things, yeah, you got

18  to document or put it someplace in the

19  computer, the patient has allergies or allergic

20  reactions to certain drugs, yeah, you got to

21  put that in there, but not a step by step, no.

22  It's the manner of issuance of a prescription

23  and that's what you follow.

24               MR. MOYLAN:  Sir, that's all the

25  questions I have.  So I think we may have one

Page 338

1   more questioner and we very much appreciate

2   your time.

3           EXAMINATION OF GEORGE P. PAVLICH

4   BY MR. NORTEY:

5       Q.    Good evening, Mr. Pavlich.  My name

6   is James Nortey and I'll be the next questioner,

7   but before I begin, I just wanted to check and

8   see if you needed a quick break.  I don't think

9   my questions will be very long, but I also know

10  you've been going for a while.

11      A.    I don't need a break.

12          MR. ZHOU:  And before you start,

13  James, I'll just say that I have a few

14  questions as well so you won't be the last,

15  unfortunately.

16          THE WITNESS:  I'm good to go if

17  you're ready to go.

18      Q.    Mr. Pavlich, I take it from earlier

19  testimony that you certainly inspected several

20  Rite-Aid pharmacies during your career; is that

21  right?

22      A.    Yes.

23      Q.    And similar to the other pharmacies,

24  if you had any issues or concerns with Rite-Aid

25  stores, you would document those in your

Page 339

1  inspection reports, right?

2       A.     Yeah, I would document it, to an

3  extent.

4       Q.     Earlier today you identified two

5  Rite-Aid personnel who I believe, in your view,

6  were not as responsive as you would have liked.

7  Do you recall that testimony?

8       A.     Yes.

9       Q.     Were those the only instances where

10 a Rite-Aid pharmacist hadn't been as responsive

11 as you would have liked?

12      A.     Those were the only two pharmacy

13 supervisors that I had a little issue with in

14 their attitude and approach and my requests.

15 One is deceased, and I don't know where the

16 female is now, but -- and I remember, you know,

17 just one particular incident with the one

18 that's deceased.  And the female, I just had --

19 I just had problems with her.  She just -- you

20 know, I would say I needed something or I've

21 got to get something or go in someplace, and it

22 was always like she was dragging her feet on

23 the floor to get it done with me.  I just -- I

24 used to get a knot in my stomach when I had to

25 call her about something.  And, you know, that

Page 340

1    has no reflection on the individual pharmacist.

2    That's just those two.

3         Q.    I appreciate that, Agent Pavlich.

4              For the supervisor that's now

5    deceased, do you recall his name?

6         A.    Yes.  James Chalfin, C-H-A-L-F-I-N,

7    Jim we called him.  And I remember the location

8    where it was at.  It was a Rite-Aid in the

9    Newport Plaza.  It was right on the border of

10   Youngstown and Boardman.  And I arrested a

11   pharmacist, I indicted and convicted a

12   pharmacist that was in that store in relation

13   to this conversation.

14        Q.    And do you recall the name of the

15   pharmacist that was arrested?

16        A.    John Perry.  I took him to federal

17   court.

18        Q.    And this was inside a Rite-Aid

19   store?

20        A.    A Rite-Aid store at Newport Plaza.

21   It's not there anymore, but that's where it

22   was.  It was on Market Street in -- just across

23   the border from Youngstown.  It was right on

24   the dividing line.  Newport Plaza Rite-Aid.

25        Q.    Now, was this in relation to an

Page 341

1   inspection involving a doctor case?

2        A.    No.  This was in relation to an

3   investigation involving the pharmacist that was

4   working there, John Perry.  And I was in there

5   and -- to shorten the whole thing, he was

6   diverting drugs for cash.  He was filling bad

7   scripts, so on and so forth.  And I also was in

8   there on a doctor that I was working on in

9   Boardman and he had scripts in there that I was

10  going to pull out.

11            And Mr. Chalfin came into the

12  pharmacy and I started telling him we got a

13  problem here and we're going to address this

14  problem on this particular doctor out in

15  Boardman.  I talked to him covertly regarding

16  the pharmacist, but that was another issue.

17  And he said to me -- and I could remember this

18  conversation so well -- "What are you talking

19  to us about?  We're just dispensing these

20  prescriptions.  He wrote them."

21            And I'm like, "Really?"

22            And he's like, "Yeah."  He goes,

23  "We're just dispensing it.  You know, the

24  doctor is responsible.  He wrote it.  I don't

25  know what he wrote it for or whatever."

Page 342

1           And I told Mr. Chalfin, "You better

2    go in your law book over there and look at

3    corresponding responsibility on manner of

4    issuance, and after you look at that, you're

5    going to understand what I'm talking to you

6    about and you better make sure you have a

7    corresponding responsibility understanding with

8    yourself and all your pharmacists if you're

9    going to dispense prescriptions just because

10   you got a piece of paper from a doctor.  You

11   better use all your powers in your practice of

12   pharmacy to determine if it's good or bad."

13   And I never had a problem with him again.

14       Q.    You predicted my very next question,

15   so to the extent that you didn't have a problem

16   with that supervisor after you had a

17   conversation, were you able to work on any other

18   inspections or investigations related to that

19   Rite-Aid?

20       A.    Yes.  I did a number of cases out

21   of all the chains, and he was very cooperative

22   after that.  We didn't really have a problem.

23   You know, I had a certain way of getting the

24   attention of people, and he was one of them.

25   So I didn't have any more problems with

1    Rite-Aid.  I got that all done.  I just had a

2    problem with the other pharmacy supervisor for

3    Rite-Aid when it came to, you know, doing --

4    getting things done, you know, going into a

5    pharmacy and they got someone stealing drugs

6    out of there, they got a shortage

7    accountability.  You know, she would just not

8    make it as easy as a Walgreens pharmacist or

9    this one or -- supervisor, always wanted to be

10   standing on my feet when I'm in there, always

11   wanted to bring her loss prevention guy, Mark,

12   whatever his name was, into the pharmacy, you

13   know, just like -- like a company mother or

14   something, you know, and it just aggravated me.

15   Maybe it was our personality.  She was

16   aggressive and I was obviously very aggressive,

17   too.  So it could have been just that, but I --

18   I used to get a knot in my stomach over her,

19   Ms. Mendenhall.

20          Q.    I want to come back to

21   Ms. Mendenhall in a second.  I want to focus

22   first on this Rite-Aid near the Boardman plaza.

23   You also referenced a Rite-Aid employee who was

24   arrested just a few minutes ago.  Do you recall

25   that?

Page 344

1        A.     Yes.   His name was John Perry.   He

2   was a registered pharmacist in the State of

3   Ohio, and as a matter of fact, he lived across

4   the street one house over from me in my

5   development.

6        Q.     And how did you first learn about

7   John Perry?

8        A.     You know, I can't remember

9   specifically if it was I was in the store and

10  saw some unusual prescriptions or I was working

11  someone out in the street and they provided

12  information that led to the investigation on

13  him, because I know on that particular

14  pharmacist I sent someone in undercover with a

15  false prescription and with marked money.   And

16  he filled it.   And then when I went in to get

17  him, he had the money in his pocket.   But what

18  initiated it, I can't -- it was one of those

19  two things.

20       Q.     Do you recall if any other employees

21  at Rite-Aid ever provided a tip related to this

22  arrest?

23       A.     No.   I don't think I got a tip.

24  I'm pretty certain it was either seeing

25  prescriptions or getting the information from

Page 345

1    someone in the street.  I didn't get a tip on

2    that.  I mean, I got help.  I believe

3    Mr. Chalfin was the supervisor then and he --

4    you know, he kept confidentiality when I told

5    him what was happening.  So I didn't have no

6    problem on that respect from corporate or

7    anyone.  I did my job and they let me free rein

8    it.

9         Q.    You predicted some of my next

10   questions, but just so the record is clear, when

11   you told Mr. Chalfin about the specific

12   behavior, was he cooperative in assisting you?

13        A.    I had his full attention when I

14   started talking to him.  Jim was -- I mean, I'm

15   not a small guy.  I'm six foot one, 200 pounds.

16   And he was a lot bigger than me.  And, you

17   know, he liked to -- he liked being a

18   supervisor.  You know, he had his rough way

19   about him a little bit.  And I just finally had

20   enough of it and got his attention on this

21   particular prescription issue, manner of

22   issuance and corresponding responsibility.  And

23   I never had another time to have to talk to him

24   again about it.

25        Q.    I understand but I want to stay with

1  this arrest very, very briefly.  In what ways

2  did Mr. Chalfin assist you in handling the

3  arrest of the Rite-Aid employee?

4       A.    He kept confidentiality.  He never

5  disclosed what I was going to do to the

6  pharmacist, which was pass him a bad script,

7  give him cash, and take him down in the

8  pharmacy during operational hours, which was

9  late at night, as I remember.  It was dark.  He

10  provided me with another -- he brought in

11  another pharmacist to work in the pharmacy when

12  I went in and got that pharmacist and took him

13  in the back room.  He was fully cooperative,

14  and, you know, records that I needed, whatever

15  in the pharmacy, I got complete cooperation.

16       Q.    Did you ever instruct Mr. Chalfin

17  not to fire the employee?

18       A.    No.  He fired him right then and

19  there.

20       Q.    That was my next question.  After

21  that employee was fired, terminated, do you

22  recall any other incidences of similar behavior

23  at this Rite-Aid store?

24       A.    At that Rite-Aid store, no.

25       Q.    And do you recall any other behavior

Page 347

1   like this at any Rite-Aid store in Trumbull
2   County?
3          A.     Oh, boy.   That was in Mahoning
4   County, the one I'm talking about.   In Trumbull
5   County, I mean, I -- you're talking about a
6   long span of time.   I could have had issues.   I
7   had -- I'm sure I had issues.   I just can't
8   think of, you know, anything in particular.   I
9   just remember -- I remember I was at the
10  Rite-Aid with Patty Mendenhall and she brought
11  in her loss prevention guy and just -- you
12  know, I was trying to get a tech, I think it
13  was, that was stealing out of the pharmacy,
14  and, oh, my goodness, she just made my life so
15  miserable in there, just not giving me a free
16  rein, wanted to be, you know, touchy feely,
17  handy, you know, on top of me, on top of
18  everything I was doing.   And it was not my
19  style.   You know, my style is I'm the Lone
20  Ranger.   You know, I go do my thing.   It was a
21  Rite-Aid right on the entrance into Warren.   It
22  was on the right-hand side going in right off
23  of Interstate -- right off the main interstate
24  there.   And that was Patty Mendenhall.   But it
25  was a technician and it was a theft of drugs.

Page 348

1          And there was, you know, other

2     places I'm sure, but I just can't think of

3     them.  That was in Trumbull County.

4          Q.    So we've talked about two cases.  Is

5     it fair to say that to the best of your current

6     recollection, these are the only two Rite-Aid

7     cases you can recall right now?

8          A.    Off the top of my head, yeah.  They

9     just seemed to pop in there.  I'm sure there

10    was other cases.  I'm trying to think of it as

11    I'm talking to you, but, you know, those two;

12    John Perry, because he was my neighbor across

13    the street, and that particular one, because I

14    just -- I remember that case with her in there

15    on that technician because, you know, I was so

16    aggravated that I said, boy, if I don't have to

17    work with her anymore, I'm not going to work

18    with her.  And that was pretty much what I can

19    recall.

20         Q.    I appreciate that.

21              In your inspection regarding

22    Patricia Mendenhall, once you were able to talk

23    to her, were you able to resolve that

24    inspection, that investigation?

25         A.    Yeah.  I resolved the investigation

Page 349

1    and I'm certain I brought it down to the

2    Trumbull County Prosecutor's Office.  It wasn't

3    as aggravating for me.  There was an agent

4    south of or southwest of me that had tremendous

5    problems with her, tremendous.  That was Agent

6    David Gallagher.  They were at -- they were at

7    a great level of disagreement on things.  That

8    was just one incident with me.  But Agent

9    Gallagher and her were really at odds on

10   things.

11        Q.   To be clear, Agent Pavlich, when you

12   talked about having trouble, this was in terms

13   of the responsiveness to your request, right?

14        A.   Yeah.  It was the response to an

15   investigation in that pharmacy that I clearly

16   recall just not being comfortable with how I

17   was doing what I wanted to do and -- I wouldn't

18   call it obstructing me.  I would just call it

19   very close supervision on her part of a person

20   who didn't work for Rite-Aid and she's trying

21   to supervise me.  You know, it was like what --

22   you know, you're not even law enforcement.  I'm

23   handling this.  Stay out of this.  Let me

24   finish and you can have your pharmacy back.  It

25   was just an aggravating experience.  And I --

Page 350

1    and I wouldn't speak badly about someone if I

2    wasn't aggravated over it.  And I wouldn't

3    recall it so well if I wasn't aggravated over

4    it.  And I was.  But overall, I didn't have any

5    bad experiences with Rite-Aid other than those

6    two that I can think of off the top of my head.

7          Q.    Generally speaking, those

8    inspections, other than those two, were

9    generally favorable and positive; is that right?

10         A.    Yes, unless I issued a pink sheet,

11   which you don't have examples you're showing

12   me.  But yeah.  Generally, I had personally,

13   myself as a field agent, no issues with

14   Rite-Aid in general.  I got along with the

15   majority of -- there was another pharmacy

16   supervisor, Tim Reik, I believe his name was.

17   It was with an R, R-E-I-K, or something like

18   that.  And I got along with him fine.  And I

19   got along with the majority, if not all of the

20   Rite-Aid pharmacists.

21         Q.    Thank you.

22               And then, lastly, the technician

23   you were working with under Patricia

24   Mendenhall's supervision, do you recall the

25   technician's name?

Page 351

1      A.    No.  That -- that I do not recall.

2   Sorry.

3      Q.    That's quite all right.

4          Do you recall about what time

5   period this incident with the technician,

6   Patricia Mendenhall, would have been?

7      A.    I would say it was within the ten

8   years before I retired.  It was somewhere in

9   there, because Tim Reik was the guy that I

10  usually dealt with.  And then she was south of

11  me.  She worked -- she was a supervisor south

12  of me, and in some way, how or another there

13  was a reorganization and she ended up getting

14  that area there, and, you know, we just had to

15  get to an understanding who's doing what.

16     Q.    And since you retired in 2012, is it

17  your testimony that this would have happened

18  sometime after 2002?

19     A.    No.  Before.  Ten years prior to my

20  retirement.

21     Q.    I see.

22     A.    I'm guessing.  I'm guessing.  I

23  know I took it to the Trumbull County

24  Prosecutor, but names and dates -- I might have

25  it in my scrapbook.  Who knows.

Page 352

1        Q.    I understand it's been quite some
2   time.
3              The incident with John Perry, do
4   you recall about when that occurred?
5        A.    Yeah.  That was -- that was when
6   Jim Philamena was the prosecutor in Mahoning
7   County, and he got federally convicted in the
8   late '90s, so it was before -- it was somewhere
9   in the mid '90s when that occurred, because he
10  was trying to fix the pharmacy case on John
11  Perry, and I went and took the case to the
12  federal prosecutor up in Cleveland, because I
13  had that ability to do that, working with the
14  DEA task force.  And I went up there and saw
15  Nancy Kelly -- she was an assistant U.S.
16  Attorney up there -- and took the case to her.
17  And he was convicted.
18       Q.    Just in summary, since 2002 you
19  can't recall at this time any negative
20  incidences or issues with a Rite-Aid pharmacy
21  that you personally inspected; is that right?
22       A.    Yeah, not off the top of my head.
23  Nothing is jumping out other than what I
24  already brought to your attention.
25       Q.    Mr. Pavlich, would you say that

1    Rite-Aid pharmacies generally complied with the

2    Board of Pharmacy's security requirements?

3        A.    Yes, I would say they generally

4    complied.

5        Q.    And would you also agree that they

6    generally had controls in place that met the

7    Board of Pharmacy's requirements?

8        A.    I would say they generally had

9    controls in place, yes.

10       Q.    And, as you said before, since 2002

11   you're not aware of anyone at a Rite-Aid

12   pharmacy that was knowingly filling illegitimate

13   opioid prescriptions, right?

14       A.    Well, if I dug in the records, I

15   might be able to find things, but if I found

16   it, I would have had them indicted and/or

17   convicted.  You know, I'm just trying to do

18   this off the top of my head after eight years

19   retired on top of that.

20       Q.    I understand, Mr. Pavlich, but

21   certainly if you found something, it would have

22   been reflected in your reports, correct?

23       A.    Oh, it would have been documented

24   in a case number, incident report, and heavy

25   documentation, especially if I took it to

                                                       Page 354

1    court.

2          Q.     Agent Pavlich, you testified that

3    you tried to develop a lot of professional

4    relationships with pharmacists in your

5    investigations.  Do you recall that?

6          A.     I tried to resolve.  I didn't catch

7    it.

8          Q.     Sure.

9                 You tried to develop relationships,

10   professional relationships with pharmacists?

11         A.     I tried.  I tried.  That was part

12   of my -- my secret.  That was part of how I did

13   so many physician, you know, criminal cases,

14   among other things.  Pharmacists were my eyes

15   and ears out there.  I couldn't be everywhere.

16   I mean, I had, you know, hundreds of sites I

17   was responsible for.  So I relied on them, and

18   I got the word out that cooperate with me and

19   keep good records and you're not going to have

20   any problem with me, but don't let me find out

21   that you're not telling me something later on

22   because I'm going to hold you with

23   corresponding responsibility if you don't.  And

24   believe me, my phone was ringing.

25         Q.     Thank you, Agent Pavlich.

Page 355

1           I believe you also developed

2   professional relationships with Rite-Aid

3   pharmacists as well; is that right?

4        A.    Right, I did, with all pharmacists.

5        Q.    Do any specific ones come to mind at

6   this time?

7        A.    Boy, I'm drawing a blank here.  No.

8   I just -- nothing is flashing in the old brain

9   here.

10        Q.    It's been a long day.

11        A.    Yeah.  I mean, I've been here,

12   sitting here for a long time.  If I really

13   thought about it, I probably would come up with

14   a number of names because I had good

15   relationships, not that I was looking to make

16   relationships.  I was extremely fair with all

17   chains and independents.  I kept them same

18   level.  There was no, oh, I feel sorry for the

19   independent person or chain.  I was fair.  And

20   I let the pharmacists know this, you know.

21   Your scripts are your bible, your documentation

22   is part of that bible and I'm the guy that's

23   going to read it; and if you're not doing it

24   right, I'm going to be the guy that's going to

25   tell you you're not doing it right.  That's how

Page 356

1    I -- that's how I preached it religiously.

2          Q.    Thank you, Mr. Pavlich.  Just a few

3    more questions.

4                To your recollection, since 2002,

5    Rite-Aid and Rite-Aid pharmacists generally

6    cooperated with you during your investigations,

7    right?

8          A.    Generally, yes.

9          Q.    And, similarly, they would follow

10   your recommendations when you gave them?

11         A.    If I saw something that I thought

12   needed my attention or their attention, should

13   I say, and drew my attention, yes, they would

14   correct it.

15         Q.    And would you agree that Rite-Aid

16   and Rite-Aid pharmacists actively assisted the

17   law enforcement with anti-diversion efforts?

18         A.    I don't know about all law

19   enforcement, but I would get calls from

20   Rite-Aid pharmacists, yes, on various issues

21   that they would want to tell me about.

22         Q.    And earlier today we had spent

23   considerable time regarding the Overholt

24   Pharmacy, but you referenced a Rite-Aid store

25   near Dr. Franklin's practice.  Do you recall

Page 357

1    that testimony?

2        A.    Yeah.  There was a Rite-Aid

3    pharmacy and a Giant Eagle, I'm pretty

4    positive.  I know for sure there was a Giant

5    Eagle up there near Franklin's office and I

6    know I was in them.

7        Q.    And you mentioned that at some point

8    the Rite-Aid store (audio distortion) on to what

9    was happening.  Do you recall that testimony?

10       A.    What?  You broke up.

11       Q.    I believe your testimony was that

12   they were able to catch on to what was

13   happening.  Do you recall that?

14       A.    I still can't make out what you're

15   saying.

16       Q.    Sure.  Catch on.  The Rite --

17       A.    Oh, catch on, is that what you're

18   saying?

19       Q.    Yes, sir.

20       A.    Yeah.

21       Q.    What did you mean by catch on?

22       A.    Someone would come in with a

23   prescription at those pharmacies, because I

24   remember interviewing those pharmacists, and

25   someone would come in with a Franklin

1    prescription and they had caught on to what was

2    going on in that office and had called the --

3    Agent Bodi, that was assigned to that

4    geographic, about what they're seeing, they're

5    seeing these prescriptions in high volumes and

6    combinations of opiates, and they caught on

7    that this is not a good idea; no matter if the

8    agent is responding or not, don't fill them.

9    And that's how they all ended up trickling,

10   what, 30 miles down the road to Overholt in a

11   completely different other county because they

12   weren't going to fill them.  I mean, they

13   filled a few, you know, but they were pretty

14   much in compliance, the few they filled.  They

15   were like minimal numbers and things like that.

16   So they caught on.

17        Q.    And is it your professional judgment

18   that these Rite-Aid employees acted properly in

19   this incident?

20        A.    Absolutely.

21        MR. NORTEY:  I think, Agent

22   Pavlich, those are all my questions.  I will go

23   ahead and pass to my colleague, Mr. Zhou.

24        EXAMINATION OF GEORGE P. PAVLICH

25   BY MR. ZHOU:

                                    Page 359

1        Q.    Good evening, Dr. Pavlich.  My name

2    is Jason Zhou and I represent Walmart in this

3    matter.

4              MR. APPEL:  This is Henry Appel.

5    I'm going to need at least a few minute break.

6              MR. ZHOU:  Okay.  Absolutely.  You

7    need five, ten?

8              MR. APPEL:  Let's go with five.

9              MR. ZHOU:  Sounds good.

10             THE VIDEOGRAPHER:  Going off the

11   record at 7:25.  This ends media unit seven.

12                  (Recess had.)

13             THE VIDEOGRAPHER:  We are back on

14   the record at 7:30.  This marks the beginning

15   of media unit number 8.

16   BY MR. ZHOU:

17        Q.    Good morning, Agent Pavlich.  My

18   name is Jason Zhou and I represent Walmart in

19   this matter, as I mentioned a few moments ago.

20   I believe I am the last attorney that you'll

21   have to speak with today so I'll do my best to

22   try and keep this as short as possible for all

23   of our sakes.

24             As with the other pharmacy

25   Defendants we've talked about today, you've

1    inspected Walmart pharmacies in the course of

2    your career at the Ohio Board of Pharmacy,

3    correct?

4         A.    I have.

5         Q.    And, generally speaking, did you

6    find in the course of your inspections that

7    Walmart pharmacies were in compliance with the

8    board's rules and regulations?

9         A.    I, in general, yes, did.  If I

10   didn't, I would have so noted it.

11        Q.    And do you recall any of those

12   Walmart pharmacies causing you any significant

13   concerns?

14        A.    No.  I got along pretty well inside

15   the Walmart pharmacies with their pharmacists

16   and their supervision.

17        Q.    And do you recall ever having any

18   issues with the computer systems that Walmart

19   used to dispense prescription medications such

20   as opioids?

21        A.    No.  I don't recall any issues with

22   their system.

23        Q.    And how about the computer systems

24   Walmart used to maintain its prescription

25   records and data; do you recall any issues with

Page 361

```
 1   those systems?

 2        A.    No, I do not.

 3              MR. WEINBERGER:  Objection.

 4        Q.    And were those computer systems that

 5   Walmart pharmacies used approved by the board?

 6              MR. WEINBERGER:  Objection.

 7        A.    I'm not the guy that approves it at

 8   the board.  I just document it.  The board had

 9   their own office approval level person down

10   there.

11        Q.    Have you ever interacted with

12   Walmart pharmacists in the course of your

13   investigation of potential diversion?

14        A.    Oh, yeah.

15        Q.    And I assume you've also interacted

16   with Walmart pharmacists in the course of your

17   inspections of Walmart pharmacies?

18        A.    Yes.

19        Q.    What was your general impression of

20   the Walmart pharmacists that you interacted

21   with?

22        A.    Very cooperative.  I never had a

23   problem that I can recall at any Walmart

24   pharmacy with any issues that were needed to be

25   addressed.
```

Page 362

```
 1        Q.    And, generally speaking, did you
 2   find Walmart's pharmacists to be good, diligent
 3   pharmacists?
 4        A.    I did.
 5              MR. ZHOU:  Thank you, Agent
 6   Pavlich.  That's all the questions I have for
 7   you today.
 8              THE WITNESS:  Wow.
 9              MR. ZHOU:  I told you I'd try and
10   keep it brief.
11              THE WITNESS:  You're my hero.
12              THE VIDEOGRAPHER:  So we are done
13   and we are off the record at 7:33.  And this
14   concludes today's testimony given by George
15   Pavlich.  Thank you very much, sir.  The total
16   number of media units used was eight and will
17   be retained by Veritext Legal Solutions.  Thank
18   you.
19              MR. APPEL:  George is going to not
20   waive and we'll read.
21
22        (Deposition concluded at 7:33 p.m.)
23                     - - - - -
24
25
```

1  Whereupon, counsel was requested to give

2  instruction regarding the witness' review of

3  the transcript pursuant to the Civil Rules.

4

5               SIGNATURE:

6  Transcript review was requested pursuant to

7  the applicable Rules of Civil Procedure.

8

9               TRANSCRIPT DELIVERY:

10  Counsel was requested to give instruction

11  regarding delivery date of transcript.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 364

1                    REPORTER'S CERTIFICATE

2    The State of Ohio,    )

3                          ) SS:

4    County of Cuyahoga.   )

5

6            I, Renee L. Pellegrino, a Notary Public

7    within and for the State of Ohio, duly

8    commissioned and qualified, do hereby certify

9    that the within named witness, GEORGE P. PAVLICH,

10   was by me first duly sworn to testify the truth, the

11   whole truth and nothing but the truth in the cause

12   aforesaid; that the testimony then given by the

13   above referenced witness was by me reduced to

14   stenotypy in the presence of said witness;

15   afterwards transcribed, and that the foregoing is a

16   true and correct transcription of the testimony so

17   given by the above referenced witness.

18           I do further certify that this

19   deposition was taken at the time and place in the

20   foregoing caption specified and was completed

21   without adjournment.

22

23

24

25

1          I do further certify that I am not a

2    relative, counsel or attorney for either party,

3    or otherwise interested in the event of this

4    action.

5          IN WITNESS WHEREOF, I have hereunto set

6    my hand and affixed my seal of office at

7    Cleveland, Ohio, on this 17th day of December, 2020.

8

9

10

11    *Renee L. Pellegrino*

12

13    Renee L. Pellegrino, Notary Public

14    within and for the State of Ohio

15

16    My commission expires October 12, 2025.

17

18

19

20

21

22

23

24

25

```
                                                          Page 366
 1                         Veritext Legal Solutions
                               1100 Superior Ave
 2                                Suite 1820
                            Cleveland, Ohio 44114
 3                          Phone: 216-523-1313
 4
       December 17, 2020
 5
       To: Henry Appel, Esq.
 6
       Case Name: National Prescription Opiate Litigation - Track 3
 7
       Veritext Reference Number: 4367745
 8
       Witness:  George Pavlich        Deposition Date:  12/14/2020
 9
10     Dear Sir/Madam:
11
       Enclosed please find a deposition transcript.  Please have the witness
12
       review the transcript and note any changes or corrections on the
13
       included errata sheet, indicating the page, line number, change, and
14
       the reason for the change.  Have the witness' signature notarized and
15
       forward the completed page(s) back to us at the Production address
16     shown
17     above, or email to production-midwest@veritext.com.
18
       If the errata is not returned within thirty days of your receipt of
19
       this letter, the reading and signing will be deemed waived.
20
21     Sincerely,
22     Production Department
23
24
25     NO NOTARY REQUIRED IN CA
```

Page 367

1              DEPOSITION REVIEW
            CERTIFICATION OF WITNESS
2

    ASSIGNMENT REFERENCE NO: 4367745
3   CASE NAME: National Prescription Opiate Litigation - Track 3
    DATE OF DEPOSITION: 12/14/2020
4   WITNESS' NAME: George Pavlich
5        In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7        I have made no changes to the testimony
    as transcribed by the court reporter.
8

    _____        _____
9   Date                    George Pavlich
10       Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12
        They have read the transcript;
13      They signed the foregoing Sworn
            Statement; and
14      Their execution of this Statement is of
            their free act and deed.
15
        I have affixed my name and official seal
16
    this _____ day of_____, 20____.
17
                    _____
18                  Notary Public
19                  _____
                    Commission Expiration Date
20
21
22
23
24
25

Page 368

1                    DEPOSITION REVIEW
                 CERTIFICATION OF WITNESS
2
     ASSIGNMENT REFERENCE NO: 4367745
3    CASE NAME: National Prescription Opiate Litigation - Track 3
     DATE OF DEPOSITION: 12/14/2020
4    WITNESS' NAME: George Pavlich
5          In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6    my testimony or it has been read to me.
7          I have listed my changes on the attached
     Errata Sheet, listing page and line numbers as
8    well as the reason(s) for the change(s).
9          I request that these changes be entered
     as part of the record of my testimony.
10
           I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
     that both be appended to the transcript of my
12   testimony and be incorporated therein.
13   _____         _____
     Date                    George Pavlich
14
           Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
     the referenced witness did personally appear
16   and acknowledge that:
17         They have read the transcript;
           They have listed all of their corrections
18             in the appended Errata Sheet;
           They signed the foregoing Sworn
19             Statement; and
           Their execution of this Statement is of
20             their free act and deed.
21         I have affixed my name and official seal
22   this _____ day of_____, 20____.
23         _____
           Notary Public
24
           _____
25         Commission Expiration Date

Page 369

```
1                    ERRATA SHEET
            VERITEXT LEGAL SOLUTIONS MIDWEST
2                ASSIGNMENT NO: 4367745
3     PAGE/LINE(S) /        CHANGE        /REASON
4     _____
5     _____
6     _____
7     _____
8     _____
9     _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19

      _____        _____
20    Date                    George Pavlich
21    SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22    DAY OF _____, 20_____ .
23                    _____
                      Notary Public
24

                      _____
25                    Commission Expiration Date
```

[& - 20]                                                                    Page 1

**&**

**&**   2:2 3:7 4:2

**0**

**00918**   2:8
**02**   153:16
**03-2-13266**   206:18
**04**   26:3 209:11,12
**06**   52:11,13 63:21
   64:6 177:7 180:4
   187:11 306:13
**0640**   150:13
**0646**   142:10,11
**0652**   145:7
**0658**   146:21
**0660**   147:23
**0666**   149:4
**0670**   149:25
**0672**   151:7
**0676**   155:3
**0684**   164:11
**07**   52:11 177:4,5
   177:16,16 185:13
   246:6
**0766**   163:10
**0778**   163:14 164:4
**08**   52:12 159:10
   187:11 202:2,9
**09**   52:12 206:20

**1**

**1**   6:5 13:13,18,21
   55:9 56:17 73:23
   81:11 106:21
   107:4,18,20 108:9
   140:15 153:21
   202:16 233:6
   239:10 241:14
   252:7,17 289:7,7
   307:25
**1,200**   49:9

**1.25**   243:15
**10**   40:4,6 50:3
   52:12 95:8,10,15
   103:10 107:11
   122:15 283:16
   300:6,9 302:19
**10,000**   186:22,23
**100**   3:12 40:6
**1000**   3:13,17 4:3
**1001**   2:3
**10016-7416**   2:15
**10022**   2:11
**103**   5:14
**106**   148:16 149:9
**10:00**   312:22
**10:50**   81:10
**11**   5:8 52:2 124:22
   135:12 136:25
   164:11 245:23
   284:11,12 289:1
   289:14,15
**11-26**   135:12
**1100**   366:1
**111**   7:6
**112**   2:14 7:6
**11:00**   81:14
**11:15**   151:18
**12**   106:24 108:21
   131:15 163:13
   239:2 245:24
   246:1 313:16
   365:16
**12-1**   135:12
   164:11
**12-7-20**   84:4,7
**12/14/2020**   366:8
   367:3 368:3
**12:30**   102:10,10
   102:20 151:18
**12:31**   103:2

**13**   6:5 132:20
   232:9 239:3 250:9
**130**   234:8
**13th**   297:20
**14**   1:21 9:3 55:5,8
   55:17,18 56:2,3,4
   56:8,9 68:7 69:9
   69:24 70:4 135:6
   232:11 239:7
   241:14 292:24
**14,800**   234:4
**1405**   138:14
   144:10 152:1
   153:16 158:25
   159:9,10
**1419**   137:1 142:17
   143:4 145:9
   147:23 149:25
   150:14 151:8
   155:4 164:12
**15**   21:3 55:5 57:1
   57:5 151:18
   224:13 234:2
   284:24
**15,000**   187:12
**15,298**   187:9
**15219**   3:8
**15th**   202:9
**16**   136:7,11 138:13
   241:21
**16th**   2:19
**17**   1:7 9:15 57:5
   234:2 366:4
**1700**   2:4
**17th**   365:7
**18**   1:11,13 101:3
   183:6 234:20
**1800**   3:16
**1820**   366:2
**18th**   299:15

**19**   121:15 132:24
   184:5 185:11
**1970**   251:19
   258:20
**1974**   17:25 18:10
   18:16
**1977**   18:18
**1987**   18:5 23:13,25
   24:20 120:20
   121:13,16,19
   235:20 262:3
   278:6
**1990s**   128:4
   224:21
**1991**   140:9
**1994**   298:14
**1995**   299:19
**1997**   147:24
**1999**   233:5 303:9
**19th**   184:16
**1st**   14:21 52:7
   242:17 246:7

**2**

**2**   5:3 14:9 46:4
   55:6,19 56:8,9
   58:7 73:24 81:15
   103:12 135:9
   143:12 242:4
   308:1
**2,000**   238:12
**2-1**   159:23
**2-12**   159:10
**2-6**   145:9
**20**   31:22 33:16,21
   100:10 131:11
   135:21 164:2
   182:9,10 205:11
   205:12,13 215:23
   222:3 224:13
   238:9 239:10
   284:12,13 304:19

304:19 367:16
368:22 369:22
**200** 345:15
**2000** 152:1 232:19
251:5 286:20
297:20
**2002** 299:15 300:1
301:1 304:6
351:18 352:18
353:10 356:4
**20036-5807** 3:17
**2006** 37:21,23 52:5
194:23 243:14,16
262:3 305:14
306:5 307:8
**20061489** 308:3
**2007** 183:17 242:5
243:22 244:13
245:15,16,23
**2008** 183:14
184:17 185:11
234:4,14 242:14
243:1,10,11
245:24
**2010** 159:24
208:23 286:17,21
289:13 309:22
**2011** 14:22 16:4
162:19 177:9
232:19 233:5
**2011-2012** 52:23
**2012** 14:21 15:23
24:21 52:7 56:21
65:20 84:5,22
177:9 227:20
235:4,20 236:25
237:3,19 242:6,17
244:13,25 245:3
246:1,7 251:5
351:16

**2013** 245:15,17
**2014** 231:6
**2016** 55:9 56:17
**2019** 83:14
**202** 3:18
**2020** 1:21 9:3
83:14 131:17
365:7 366:4
**2025** 365:16
**21** 135:11,13,20
136:10,24 137:3
165:20 239:1
**212** 2:8,15
**21202-1031** 3:13
**213** 7:7
**216** 2:5
**216-523-1313**
366:3
**222** 7:7,8 130:5
**2227** 365:12
**224** 7:8,9 320:5
**226** 7:9
**23** 241:1
**233** 7:10
**235** 7:10
**236** 7:11,11
**237** 7:12
**24** 52:2
**240** 7:12
**244** 7:13
**2452** 208:20
**246** 7:13
**247** 7:14,14,15
**248** 7:15
**25** 29:16 31:23
33:16,21 34:11,18
39:9 42:20 45:23
46:16 47:2 49:7
50:19 84:8 126:1
169:13 170:19
216:2 316:16

333:5
**251** 7:16,16
**253** 7:17,17
**254** 7:18,18
**257-8482** 2:15
**259** 7:19
**25th** 304:5
**26** 311:9 313:15
**261** 7:19
**262** 7:20
**264** 7:20,21
**266** 7:21
**269-4097** 3:5
**26952** 231:18
**27** 241:20
**270** 2:7
**271** 7:22,22
**273** 5:9
**28** 289:2,14,19
**280** 6:6
**2804** 1:6,7 9:15,15
**29** 163:13
**29th** 286:16,20
309:22
**2:43** 196:7,11
**2:53** 196:8
**2:58** 196:15
**2nd** 168:19

**3**

**3** 1:15 57:15,16
58:3 103:3 153:22
196:12 228:23
242:5 300:6,8
302:19 366:6
367:3 368:3
**3-1** 132:24
**3-1-2017** 107:25
**3-13-00** 299:22
**3-8** 162:18
**30** 2:19 21:19
61:25 62:23

182:19,19 187:1
200:12 207:8
225:1 284:17
358:10
**312** 3:5,22
**3146** 12:15
**318** 7:23
**32** 234:7
**324** 5:10
**33** 238:16
**331** 8:3
**337** 5:11
**338-3344** 3:9
**34** 208:3 311:8,9
**35** 140:16 182:14
209:8
**3500** 3:4
**359** 5:12
**35th** 3:8
**361** 8:3,4
**364** 5:16
**3644** 208:17
**37** 153:7 281:9
283:2 285:24
286:1,10 287:4
289:7
**3719.27** 126:14
**38** 287:5,5
**39** 287:5,5
**397-1000** 2:8
**3:33** 219:8
**3:44** 219:11
**3:57** 230:1
**3:59** 230:4

**4**

**4** 46:7 107:12
196:16 219:7
226:8,13,17,23,24
226:24 227:6,6
**4,460** 250:4

**4-10**   187:11
**4-15**   202:2
**40**   90:9 138:10
  241:3 286:22
  287:5,6 288:1
  289:8
**4000**   4:3
**4002**   158:13
  159:23
**4051**   162:19
**4056**   155:17
**41**   7:3
**410**   3:14
**412**   3:9
**42**   241:4
**43215**   2:20
**4367745**   366:7
  367:2 368:2 369:2
**440**   233:5
**44114**   2:4 366:2
**45032**   1:11
**45079**   1:13
**466-8600**   2:20
**4729**   129:11
**4729-5-09**   123:16
**4729-5-11**   73:3
  95:12
**4729-5-18**   100:20
  100:25
**4729-5-20**   102:4
  103:15 107:13
**4729-5-21**   103:10
**4729-5-22**   123:9
**4729-5-29**   126:14
**4729-5-30**   28:17
  72:15 92:22
**4729-9-02**   77:9
**4729-9-05**   66:22
**4729-9-11**   67:5,23
  72:25 73:6,11

**4729.01**   93:7
**4729.54**   84:1
**4729.55**   84:16 85:6
**4729.55.**   78:19
**4729.551**   86:24
**4729.57**   87:13
**4729.58.**   88:25
**4729:5-3-03**
  124:23
**49**   239:18
**494-4410**   3:22
**4:58**   267:11

**5**

**5**   65:22 72:24 73:5
  77:4,7,8 216:13
  219:12 229:8
  233:7 239:10
  267:12
**5-16**   122:19
**5-18**   101:12,24
**5-20**   103:21
  122:11,13
**5-21**   101:2,24
  122:14
**50**   38:14,22 49:4,5
  71:14 81:5 125:25
  126:3 138:10
  182:9 185:4
  188:10 192:9
**500**   37:12 161:6,8
  283:25 284:1
  295:25
**53**   201:25 241:25
**54**   3:21 7:3
**55**   85:6 279:19
**56**   6:6 279:21
  280:5,13,15 281:6
  293:12 294:10
  296:22
**56.1**   235:5

**57**   156:1
**5736**   184:14
  189:25 190:1
**5741**   194:2 195:18
**5749**   195:14,19,25
**5:12**   267:15
**5:30**   216:14

**6**

**6**   5:4 47:9 83:20
  89:1 106:21 107:4
  107:19,20 267:16
  313:15 314:9
**6-4**   187:11
**60**   188:5,10 200:7
  200:11 240:10
  308:25
**600**   245:16
**600-0114**   2:5
**60601-1692**   3:4
**60654**   3:21
**614**   2:20
**64.6**   237:7
**643**   310:5
**67.7**   237:1
**6810**   2:11
**69**   7:4
**6:00**   312:20
**6:13**   314:8
**6:26**   311:8
**6:27**   314:12

**7**

**7**   5:5 47:19 48:21
  89:9 230:11 310:9
  314:13 320:5
**7-18-02**   299:22
**70**   7:4,5 249:4
**713**   4:4
**723-3216**   2:12
**74**   18:19

**75**   7:5
**76**   108:3
**77**   3:3 18:20
**77002-5006**   4:4
**778-1883**   3:18
**7:25**   359:11
**7:30**   359:14
**7:33**   362:13,22
**7th**   2:14

**8**

**8**   93:3,6 175:5
  182:20 186:25
  187:2 188:4 310:5
  359:15
**80**   186:14 316:19
**800**   2:12
**800,000**   245:18
**804**   280:18 301:10
**825**   234:9
**84**   18:1
**87**   23:14
**890-5472**   4:4

**9**

**9**   47:20 312:22
**9-11**   73:4
**90**   29:18,20 30:4,8
  32:14,14 186:14
  198:2 200:8
  284:18 308:25
  309:11,12 310:7
  311:17 312:7,9
  316:16,18,21
**900**   115:20 175:5
  182:18 186:24
  187:1 188:3
**90s**   197:22 352:8,9
**91**   135:12
**92**   236:13,15 237:3
  237:14,20

**9237** 162:18
**949-1159** 3:14
**95** 143:3 146:5
**96** 145:9
**9822** 158:12 159:2
**9830** 159:22
**9832** 160:18
161:22
**9844** 155:15
**9853** 155:24 156:1
**9855** 156:1 157:2
**99** 150:19
**9944** 144:8
**9956** 151:25
**9962** 153:16
**9974** 158:24 159:2
**9:01** 1:21 9:2
**9th** 305:14

**a**

**a.m.** 1:21 9:2
**aaron** 1:8
**abilities** 35:12
263:16 325:2
**ability** 31:5 38:6
147:12 352:13
**able** 34:12 35:3
37:5 63:24 141:3
162:11 191:2
216:13 260:9
261:5 262:17
263:8,11,13
297:21 298:1
342:17 348:22,23
353:15 357:12
**absolutely** 92:5
277:10,21 322:12
325:7 326:9
358:20 359:6
**abuse** 39:12 50:21
50:25 51:13
104:14 115:10

129:23 198:4
214:1 222:11
230:17 231:14,20
233:3 234:7,8,8
235:3 238:10,14
239:16,18 241:4
316:22 317:8,17
318:5,6
**abused** 234:8
239:2
**abuser** 211:16
**abusing** 211:11
238:13 239:6
241:15,22,22
317:3
**academy** 18:1
**acceptable** 230:18
331:19,21
**accepted** 12:20
**access** 38:2 54:13
61:3 66:17 68:18
68:19,22 69:19,21
71:23,24 74:13
**accessible** 64:19
64:22 240:14
**accident** 248:6
**accommodate**
311:3
**account** 147:21
295:8 296:6
330:19
**accountability**
147:20 161:21
283:17,18,20,22
284:2,3,5 295:13
300:9 343:7
**accountable** 17:11
147:8 325:21
**accounting** 147:15
**accumulate**
263:25

**accumulated**
262:12 264:3
265:2
**accumulating**
262:24
**accurate** 47:2
96:13 99:21
135:17
**accurately** 80:1
**acknowledge**
367:11 368:16
**acquaintance**
23:22
**acquired** 85:25
**act** 50:9 229:9
251:18 252:5
253:7 254:8,14
255:5,13 258:6,13
258:21 320:14
367:14 368:20
**acted** 358:18
**acting** 95:25 96:6
117:1
**action** 9:21 88:5
95:5 304:1 334:11
365:4
**actions** 23:10
87:13 124:24
**active** 82:13 83:8
**actively** 171:5
173:20 356:16
**activities** 22:5
**activity** 39:7 69:11
71:3 124:3 177:25
249:3 323:12,15
**actors** 31:16
**actual** 29:5 49:15
61:11,12 75:24
76:10,16 206:19
281:25 318:23

**actuality** 162:10
**add** 51:13 108:14
217:22 279:22
**added** 50:25
279:18 287:1
**addicted** 247:8
**addiction** 222:17
247:9 251:10
253:21 254:1
318:19
**addictive** 225:10
**addition** 54:4
**additional** 60:17
268:8 271:12
282:23 312:9
**address** 12:13
122:21 172:21
249:14 259:22
282:3,24 283:5
341:13 366:15
**addressed** 120:2
288:22 304:24
309:4 361:25
**adds** 108:10
**adequacy** 69:16
69:17,20,24
**adequate** 86:9,15
86:18
**adequately** 166:12
**adhering** 71:8,16
**adipex** 36:9,15
118:3
**adjournment**
364:21
**adjust** 220:11
**administered**
45:10
**administration**
46:21,22
**administrative**
27:14 28:17 31:25

34:8 49:23 58:9
65:18 66:2,4,11,12
66:21 67:6,23
68:10 72:14 77:21
95:17 121:4
124:22 131:4
132:9 168:22,23
337:14
**administratively**
178:19
**admissions** 234:6
**admit** 239:6
**admits** 249:20
**adult** 207:17 240:9
**advance** 216:20
**advantage** 265:13
**advice** 34:3
**advised** 298:16
**affairs** 47:10
**affiant** 184:9
**affidavit** 187:18
**affiliated** 25:19
91:3
**affiliations** 9:25
**affixed** 298:3
334:16 365:6
367:15 368:21
**aforesaid** 364:12
**afternoon** 5:14
103:5,8 219:18
273:22
**ag** 91:9
**ag's** 311:21
**age** 11:16 239:7
259:22
**agencies** 41:25
43:16
**agency** 27:3 43:3
47:9
**agent** 23:17 24:1,1
24:17,19 25:11

27:11 33:9 39:18
47:21,23 48:6,7,21
51:11 52:18 56:20
57:21 58:19,21
59:13 63:23,25
65:16 66:9 67:10
67:19 71:1 77:11
78:24 81:17 83:5
84:9 86:15,21
87:16 92:1 93:19
94:10 95:2 96:5
96:14 98:23 99:4
104:17 107:1,3,22
107:24 108:6
113:3 120:7,8,11
125:18,22 126:12
127:12,24 133:1
139:3 141:3
144:21 150:24
152:20 154:19
159:11 164:10
165:1 169:2
173:14,24 174:12
175:19 183:9,20
183:23,25 184:17
184:18,22,24
190:4 192:2
194:19,23 206:21
211:20 218:11
219:18 221:18
223:23 226:7
228:10 230:6,16
235:19,21,24
236:20 238:21
246:4,21 248:13
250:21 251:6,16
255:4 264:21
267:18 278:5
292:5 303:24,25
324:16 340:3
349:3,5,8,11

350:13 354:2,25
358:3,8,21 359:17
362:5
**agent's** 125:22
**agents** 24:18,23
26:12,18,20,24,25
30:11 47:23 49:1
58:14 64:3,4
120:18 125:2,13
127:25 130:20
132:3 201:23
235:25 277:6
278:3,10,20
**aggravated** 343:14
348:16 350:2,3
**aggravating** 349:3
349:25
**aggressive** 22:6
42:25 274:24
275:2,3 278:10,14
305:9 343:16,16
**aggressively** 26:17
**ago** 14:20 33:16
89:25 91:13
137:11 150:8
155:1 294:22
319:21 343:24
359:19
**agree** 9:8 15:8,9
60:4 68:11 70:12
222:1,18,20
223:23 224:17
225:25 229:13,15
230:15,20 231:25
233:9 234:13,16
234:24,25 235:13
235:17 237:21
238:20,24 239:1,5
239:8,13,20 240:3
240:7 241:7,12,13
241:17,20,24

245:20 246:8,13
246:14,17 247:1,3
247:24 248:3,4,8
250:21 251:1,21
253:15,17,19,23
258:12 274:17
277:5 280:14
304:17,23 316:20
316:25 317:6,14
317:18,24 322:9
353:5 356:15
**agreed** 81:4
**agreeing** 209:17
**agreement** 59:23
216:19
**ahead** 57:18 73:16
75:15 84:20 95:9
95:21 111:16
151:10 298:13
304:11 358:23
**aid** 4:2 10:8 12:3,7
44:16 79:19
114:21,23 138:5
171:9,10,16
172:11 173:9
189:10,12 194:20
195:15 208:9,20
209:4 210:22,23
210:24 215:25
266:8 308:7
310:17 338:20,24
339:5,10 340:8,18
340:20,24 342:19
343:1,3,22,23
344:21 346:3,23
346:24 347:1,10
347:21 348:6
349:20 350:5,14
350:20 352:20
353:1,11 355:2
356:5,5,15,16,20

356:24 357:2,8 358:18

**aids** 137:21

**ain't** 235:16

**al** 1:10,13

**alarm** 69:18

**alcohol** 247:4

**algorithms** 263:7 273:3

**alleged** 211:13 316:6

**allergic** 335:11 337:19

**allergies** 337:19

**allergy** 104:13

**allow** 59:2

**allowed** 206:9,11

**altered** 40:9

**aluminum** 18:21

**american** 253:12

**amiss** 277:11

**amount** 175:4 187:20 205:7 243:20 254:21 291:4

**amphetamine** 34:25 118:4

**amphetamines** 36:9 204:23

**amplified** 270:4

**analgesic** 236:22 236:24

**analgesics** 237:13

**analyses** 65:11

**analysis** 273:10

**analyze** 65:6,8 332:7

**analyzing** 276:3

**andrea** 176:16 203:6 204:4,7,17

**annual** 132:25 144:5

**annually** 134:10

**answer** 32:2 54:8 57:5 58:2 70:10 70:11 86:20 89:20 111:17 156:18 158:6,10 165:9 170:14 201:4 207:4 216:16 224:6 238:1 261:22

**answered** 158:9 289:4

**answers** 114:11 332:19

**anti** 171:6 173:21 356:17

**anybody** 17:3 89:24 90:8 100:8 115:23 182:15 191:16 192:13 225:24

**anybody's** 16:12

**anymore** 43:19 233:24 340:21 348:17

**anyways** 218:24

**apap** 308:5

**apart** 327:22 328:23

**apologized** 156:19

**apologizing** 157:21

**apparently** 51:6 164:2 175:13,22 175:24 234:10,20

**appear** 77:25 136:13 149:18 298:25 367:11 368:15

**appearance** 10:3

**appearances** 2:1 3:1 4:1 5:3 9:25

**appearing** 1:25 12:18

**appears** 115:12 116:13 147:25 155:25 228:24 287:21 289:15 296:23 298:4

**appel** 2:18 10:21 10:21 16:25 81:4 89:25 91:10,11 102:6,16 194:4,5 215:5,7,11,20 216:3,6,6,7 218:9 218:17,20,23 252:21,21 267:1 310:3 311:6,20,20 312:4,14 313:13 313:22 359:4,4,8 362:19 366:5

**appended** 368:11 368:18

**applicable** 107:1,5 363:7

**applicant** 68:1,4 86:1

**applicant's** 69:25

**application** 84:12 127:8 329:11,18 330:2

**applications** 82:5 89:11,17

**apply** 37:5 74:7

**applying** 112:14

**appreciate** 173:8 219:22 244:9 280:3 311:6 313:19 324:11 338:1 340:3

348:20

**approach** 339:14

**approaching** 60:1

**appropriate** 23:10 105:2 151:15 267:4

**appropriately** 78:17

**approval** 361:9

**approve** 150:24

**approved** 66:24 67:3,15 68:14 85:12 151:3,4,5 330:23 361:5

**approves** 361:7

**approximate** 180:1 183:12

**approximately** 14:18 15:15 29:16 52:4 107:12 135:20 136:10 233:7 242:13 243:17 316:18

**approximation** 270:14

**april** 202:8

**area** 20:3 39:8 109:6,11,22 110:1 110:8 111:11 112:16 135:25,25 150:21 172:12 190:15 191:2 206:22 254:22 269:9 351:14

**areas** 69:21 130:23 140:17,23

**arisen** 251:14

**arrest** 344:22 346:1,3

**arrested** 325:18 340:10,15 343:24

arresting  318:20
arrive  298:21
arrow  220:11
articulate  157:3
  326:25
ascertain  53:14
ashamed  132:4
ashtabula  24:12
  24:14 109:17
  188:19
asked  32:7 65:9,15
  96:24 140:2
  168:25 183:9
  188:16 252:25
  262:10 266:9
  268:20 275:22
  305:5 317:19
  334:18
asking  22:9 38:23
  169:21 218:1,3
  224:3 247:23
  248:12 286:2
  317:23
asks  40:21
aspect  49:22 258:4
  323:25
aspects  25:25
  268:11 306:21
assigned  19:13,17
  21:3 23:17 24:8
  42:7,9,11 120:25
  184:21 192:3
  202:10 358:3
assignment  367:2
  368:2 369:2
assist  15:4 25:6,7
  48:18 139:8 171:5
  173:20 346:2
assistance  16:24
  27:7 326:20

assistant  352:15
assisted  145:16
  356:16
assisting  345:12
associated  231:22
  235:21 241:3
associates  209:15
association  18:5
  25:15
assume  15:5 52:4
  217:6 233:13
  310:7,8 361:15
assured  86:10
attached  122:19
  146:20 148:16
  306:17 368:7
attachment  107:7
  107:9
attempt  310:19
attempted  217:6
attempting  66:10
  73:18
attend  25:23
attended  18:5
attending  9:23
attention  42:17
  56:23 57:15 81:19
  100:5 110:15,20
  113:19,24 118:11
  124:21 129:16
  132:10 141:11
  152:22 153:6,14
  154:1 181:21
  250:20 289:1,10
  290:5 303:7
  306:25 320:19
  327:25 336:1
  342:24 345:13,20
  352:24 356:12,12
  356:13

attitude  339:14
attorney  2:18 10:4
  10:22 89:25 90:6
  352:16 359:20
  365:2
attorneys  90:22
attribute  213:21
attributed  213:24
audio  9:6 357:8
audit  133:10
  147:19 295:11,12
  295:13,14,19
  296:3
august  208:22
  305:14 307:8
authority  125:6
authorize  368:11
authorized  28:25
  69:20 74:13 85:1
  85:21,22 86:13
  94:1 125:18
  127:12 187:9
  208:25 268:24
auto  248:6
automatic  320:7
autumnwood
  12:16
availability  69:23
available  48:13
  77:17 262:7,13
  263:6 265:1,7,19
  266:6
ave  366:1
avenue  2:3,7,14
average  233:6
  236:25
avoid  105:3
awakening  120:18
award  26:3
aware  12:22 104:3
  104:6 114:7

123:21 124:10,14
216:9 224:24
225:4,5,10,12
233:8,10 242:24
255:4,24 256:6,13
257:3 268:22
316:4 320:17
330:16 333:20,24
334:1 353:11

**b**

**b**  21:21 38:16,19
  61:16,17,21 62:19
  67:21 69:7 85:19
  93:12 100:16
  103:12 105:1,1,22
  127:7 197:18
back  18:8 36:6
  50:24 56:7,8
  62:18,21 66:12
  68:13 73:8,10
  81:13,17 103:1,9
  103:20 107:25
  108:2 112:7
  119:15 122:11
  137:12 140:9,10
  140:11 147:12
  152:1 161:20
  177:12 181:25
  190:14,25 195:24
  196:8,14,18 197:3
  201:15 203:25
  218:12 219:2,10
  230:3 233:14
  249:13 267:14,18
  293:12 306:13
  314:11 325:10
  335:6 336:16
  343:20 346:13
  349:24 359:13
  366:15

**background** 17:22
231:20 235:2
**bad** 30:16,17
31:16 35:16,21
100:8 164:23
188:16,20 196:25
197:20 205:1
207:9 264:7,12
293:9 294:13
296:9 310:11
341:6 342:12
346:6 350:5
**badly** 350:1
**balance** 284:4
**baltimore** 3:13
**bank** 90:18
**barbara** 163:21
**barnes** 3:7 5:8
10:5,6 11:14,22,25
81:3,16 91:17
102:5,13,19 103:7
174:9 194:8,15
196:6,17 214:12
214:18 216:16
217:10 218:2
219:13,15 222:4
222:19,24 223:2,2
223:6,14,17,20
224:2,14 226:5
233:19 235:8
236:9,18 237:24
240:6 244:19
246:12 247:2,13
247:22 248:2
250:25 251:13
252:23,23 253:14
253:22 254:12,18
254:20 255:2
259:4 261:9
264:14 266:12,18
271:23 313:1,4

**barricade** 68:21
68:21 74:20,21
140:11 141:18
150:16,22 151:6
154:10 281:13,14
281:16 297:23
298:7,8,15 299:16
299:21,21
**barricades** 68:23
70:7
**bartlit** 3:20
**bartlitbeck.com**
3:22
**base** 133:11
**based** 17:18 65:11
66:2 70:23 98:22
99:17 110:3,5,9
117:9,17 118:22
135:7,22 166:2
169:24 186:8
192:24 255:22
263:24 265:20
294:25 308:5
316:9 334:8
**bases** 224:5
**basis** 30:19 54:4
94:6 132:18
134:19 137:3
232:25 268:3
322:9
**bates** 6:7 142:10
231:17 280:7
**bathroom** 146:18
**battle** 205:18
**battles** 324:13
**bay** 306:9,14
307:7
**bays** 306:13
**bear** 158:23
**beck** 3:20

**becker** 197:7
**beer** 247:3
**befriending** 31:10
**began** 174:2 182:4
183:13,19 209:3
224:20 239:7
242:13
**beginning** 6:7 10:3
17:22 60:22 97:11
103:3 111:20
112:8 120:20
147:13 158:12
196:15 267:15
280:7 293:12
295:13 307:24
314:12 359:14
**begins** 56:17 69:10
81:14 219:11
243:22
**behalf** 2:2,17 3:2,6
3:10,19 4:2 12:21
85:25 322:1
**behave** 163:5
**behavior** 22:25
38:6 345:12
346:22,25
**behavioral** 93:16
**belief** 93:11
**believe** 11:3 13:7
14:22 16:2 36:7
36:10 51:12 63:22
65:1,2 72:18 92:2
112:22 114:13
118:16 123:25
142:23 158:3
173:10,12 180:5
180:11 182:23
185:13 197:10
198:17 200:21
201:8 203:25,25
204:15,16,18

205:8 207:3,14
210:2,23 233:16
236:7 238:16
239:22 243:7,10
258:22 259:5
270:9 274:22
275:25 278:2,19
279:16,18 291:19
294:17 298:23
317:1 319:18,21
320:7,25 323:12
325:11 326:4,7,11
328:19 339:5
345:2 350:16
354:24 355:1
357:11 359:20
**believed** 173:15
237:17
**belinky** 197:18
**benedict** 23:17
26:15 120:23
158:3
**beneficial** 37:25
**benzodiazepines**
260:3
**best** 30:25 31:5
35:11 38:4 125:7
126:3 138:11
140:23 183:2,2
209:17 214:4
242:14 248:11
261:22 325:2
329:9 330:10,15
331:16 332:23
333:13 348:5
359:21
**better** 49:10 56:10
166:7 228:17,19
307:22 315:12
342:1,6,11

**beyond** 63:9
124:12 231:19
248:12 252:14
255:9,9 257:8
273:6 331:8
**biannual** 144:5
**biannually** 134:19
**bible** 61:12 97:22
121:8 334:25
335:1 355:21,22
**bickers** 303:11,14
304:12
**bid** 188:5
**big** 13:6 16:22
31:9 35:10 184:7
184:8 198:11,13
207:25 209:12
211:15 212:8
236:10 238:12
250:17 329:8
**bigger** 345:16
**biggest** 31:6 198:7
**bigowsky** 208:14
**bill** 149:12 181:5
**billy** 149:14
**binder** 12:23 13:6
13:8 16:23 46:3,5
57:15 65:23 83:21
183:7 202:1
226:10 253:1
**biological** 93:16
**bit** 28:2,4 34:19
50:1 104:8 171:22
172:22 173:3,5
183:22 193:7
214:22 221:24
287:19 307:18
331:23 345:19
**black** 40:3
**blank** 202:25
210:7,11 249:12

**blatant** 34:23
**blocks** 137:10
**blue** 18:3,25 19:1
**board** 2:17 4:8
10:25 11:2 12:20
13:25 18:4 23:13
23:23,25 24:20,22
26:20,20,22 27:12
29:15 34:12 39:18
42:19,21,22 43:2
44:5,6,9,11,13
45:22 46:11,16,20
47:2,3,14 48:16
49:1,2 50:19
51:10 52:21 53:10
54:3 58:14 59:2
59:13 64:24 65:4
67:4,24 68:4 82:4
82:18 83:12,16
84:12 85:12,22
86:4,15 87:24
88:9,12,13,22 89:4
90:1,6 91:1,4,6,8
109:24 120:8,17
120:20 124:2,15
124:18 125:1,5,9
125:11,18,21,22
126:5 127:10,12
129:11 130:19
131:17,20 133:19
135:8 139:20
147:9,11 148:19
148:20 150:24
161:5,17,18 171:5
174:24 180:6
191:18 195:25
201:13 206:7,10
221:20 222:9
227:1,1,10,15,24
228:5 229:1

**blocks** 249:21 355:7
230:13 232:3
233:14,23 234:3
235:20,23 238:22
241:1 242:2 246:5
249:8,20 251:6,17
257:19 273:25
274:7,25 275:6,10
275:13 278:3,6,21
288:2,23 292:5
295:18 296:16
303:18 310:24
316:17 320:13
322:15 324:20
329:10 330:24
333:14,24 353:2,7
360:2 361:5,8,8
**board's** 43:21 44:4
87:4,5 141:16
162:14 360:8
**boardman** 172:1
320:6 340:10
341:9,15 343:22
**bob** 26:15 91:10
120:8,10 158:4
223:2 226:14
252:23 313:1
**bockius** 4:2
**bodi** 175:23,24
184:22,24 189:16
191:17 194:23
358:3
**bodi's** 175:22
**bona** 97:25
**book** 78:8 119:19
131:1 232:14
272:9 342:2
**books** 172:21
**bop** 6:7 142:13
280:8
**border** 224:8
246:16 340:9,23

**boss** 131:5 132:8
136:5
**bottles** 249:10
295:25 296:6
326:16
**bottom** 107:15,15
142:12 161:22
189:25 190:7
291:10 294:23
298:14 307:11
**bought** 205:20
295:25
**box** 288:13,14,17
289:5,13,14,23
290:23 294:22
299:2 300:2
315:17
**boxes** 13:1,2,5
**boy** 132:15 151:9
207:9 347:3
348:16 355:7
**brad** 155:18
**brain** 89:22 355:8
**branch** 19:7
**brand** 281:18
**break** 16:9,13 42:1
81:6,18 102:7
103:9 194:6,13
196:7,19,21
214:19 218:11,24
219:25 267:3,4
338:8,11 359:5
**breaking** 81:3
**brent** 145:11,18
146:23
**brenton** 163:22
**brian** 296:13
320:2,8,24 321:1
**bribing** 225:13
**brief** 219:24
362:10

**briefly** 16:22
91:14 346:1
**bring** 40:12 50:23
82:1,15 114:21
129:16 132:10
152:22 170:10
195:24 226:22
252:6 288:25
290:4 336:1
343:11
**bringing** 36:4,19
40:14 119:18
289:10
**brings** 285:10
**brinks** 196:2
**broad** 2:19 200:24
201:4,6 251:2
**broader** 68:25
**broke** 182:9
357:10
**broken** 46:20
186:2,5
**brought** 56:23
108:16 173:16
181:7,21 303:6
320:14,19 327:24
346:10 347:10
349:1 352:24
**buddy** 285:7
**building** 33:12
69:14 85:16
154:15 306:17
307:5
**buildings** 85:9
**built** 297:11
**bumping** 313:7
**bunch** 203:3
212:13
**burden** 166:19
**bus** 102:17

**business** 69:23
85:10 263:19
**busy** 30:3 33:24
100:4 137:16
**buy** 255:20 307:5
**buying** 255:16
256:8,14

**c**

**c** 21:21 38:19
61:16,17,21 86:9
128:15 163:21
177:22 257:16
292:2 340:6
**ca** 366:25
**cabinet** 240:14
**calculator** 331:10
**california** 25:20
**call** 31:3 33:25
34:2,9 35:4 41:17
52:16 53:14 74:3
75:1 80:14,15,18
83:16 89:8 99:20
100:20 103:25
112:18 114:23
118:16 129:2
147:2 148:10,12
148:13 151:2
152:24 154:1
158:10 166:21
173:1 174:22,24
182:25 185:10
189:15,16 193:3
204:25 207:1
210:20 219:1
268:13 269:8
276:24 284:3
285:7 296:7,9,10
297:3 326:9 329:5
329:18,19 333:22
339:25 349:18,18

**called** 11:16 19:11
32:25 34:9 41:1
46:10 50:4 78:25
100:25 118:20
131:2 136:3
141:24 146:8,10
151:13 153:3,5
157:7,20 164:22
176:4 185:11,14
208:14 210:21
288:21 296:14
320:8,24 326:7
329:3 334:7 336:6
336:14 340:7
358:2
**calling** 33:13
109:22 152:20
175:11 308:23
**calls** 31:4,23 33:8
33:16,18,21 38:14
38:22 40:18,20
41:9 152:14
295:24 309:12
329:2 356:19
**camera** 161:23
326:13
**cameras** 162:4,6
162:11,14 320:11
320:12
**cap** 215:12
**capable** 94:20
185:1,6 278:16,17
294:3,7
**capacity** 58:8
**capita** 236:4,13,16
236:22,24,25
237:2,4,8,15,20
244:22,23 245:6
**capitalized** 302:22
**captain** 208:14

**caption** 55:18
73:23 364:20
**car** 19:5 249:9
**card** 83:10,11,15
126:15,16 127:3
**cards** 126:5,9
**care** 93:14 94:8
102:8,14 241:14
**career** 18:7 27:10
34:21 36:7 37:5
42:21,25 43:5
52:3 60:13,19
88:7 98:5 101:19
107:6 111:20
160:6 174:17
182:13,14 198:1
221:20 222:9
243:8 248:20
257:14 266:4
322:20 323:7
325:11 328:3
338:20 360:2
**carisoprodol**
250:6
**carried** 138:11
**carry** 85:10
125:19 292:23
**carrying** 307:11
**case** 1:7,11,13
9:15 15:24 16:1
27:7,10 37:19
52:9,10 79:4
134:2 147:19
170:4,11 172:1
175:24 176:1,2
177:1,3,4,7,8,16
177:19 179:6
180:6 181:17,18
183:15 185:13
186:5 198:11
199:13,14,15

207:13 209:12
211:16 213:25,25
214:2,2 219:21
237:19 249:5,6
250:10,16 256:1
258:20 276:24
282:18 308:2
323:24,25 325:24
327:25 336:9
341:1 348:14
352:10,11,16
353:24 366:6
367:3 368:3
cases 1:15 19:19
21:6 27:6 32:15
43:14 117:22,25
176:5 179:8 182:5
193:1 198:5
201:13 202:10
212:6,8 277:4
294:18 320:3
322:14,18 327:22
342:20 348:4,7,10
354:13
cash 36:20 115:25
261:13 270:21
341:6 346:7
catch 76:25
113:19 191:22
241:15 326:14,21
354:6 357:12,16
357:17,21
catches 40:25
categorizes 230:13
category 51:1
85:12 244:4
283:13
cathy 155:21
caught 83:18
189:14 199:10
210:18 320:13

326:17 328:1
358:1,6,16
cause 87:20,24
98:5 154:20
303:23 364:11
caused 35:22 88:7
128:8 152:16
165:11 166:15
170:21 172:11
251:11
causing 201:9
360:12
center 234:10
centers 257:6
centre 3:8
certain 43:18
45:18 54:15 64:18
64:22 72:1,2
74:16 79:7 101:11
118:15 132:18
167:3,4 268:11
285:17 335:21,21
337:20 342:23
344:24 349:1
certainly 228:4
311:4,16 338:19
353:21
certificate 5:16
83:12 364:1
368:11
certification 367:1
368:1
certified 11:19
certify 364:8,18
365:1
cetera 74:2
cfr 258:14
chain 12:2 32:23
79:21 121:6 168:7
172:14 173:19
201:8 212:12,14

213:17 214:7
265:20 275:7
321:10 323:11
355:19
chains 17:10 22:18
31:19 32:16 53:5
79:22 119:22
134:22 137:10
173:15 179:11
188:6 192:7,13
201:1 250:22
255:13 331:25
342:21 355:17
chalfin 340:6
341:11 342:1
345:3,11 346:2,16
change 33:4 34:17
60:14 145:3,6
366:13,14 368:8
369:3
changed 95:13
120:12,19 286:10
changes 84:6
366:12 367:7
368:7,9
changing 34:13
channels 274:15
274:16,16
chapter 129:11
chapters 46:12
character 76:17
charge 20:25
62:11,24 63:1
83:9 183:23,25
184:10 192:13
257:12 291:11
326:2
charged 46:11
47:3 58:15 172:7
192:18 201:11
206:24 327:20

chart 197:15
242:1
cheaper 247:8
check 56:20 83:8
108:10 110:24
111:12,13 125:14
200:13 288:13,14
289:5,13,14
290:21 315:17
336:6 338:7
checked 77:23
82:12 123:1
288:13,17 289:24
290:24 294:23
298:10 299:2
300:2
checking 41:7
82:5 165:22
195:15
checklists 130:24
chemical 93:16
chest 176:22
chicago 3:4,21
chief 90:1
child 235:5 236:14
237:11,14 276:5
childcare 102:15
children 240:15
chiropractor
210:2,5
choose 137:2
chris 197:7
christopher
120:19
cialis 179:2 180:18
circle 313:11
circled 289:9
circumstance 41:5
320:17,22 321:3
circumstances
106:3 111:8

112:18 118:14
157:22 285:17
**citation** 206:12
**citations** 130:22
**cite** 130:11
**city** 12:13 43:13
**civil** 11:18 29:25
316:5 363:3,7
367:5 368:5
**class** 257:8 287:10
**classes** 18:7
248:23
**classification**
255:10
**clean** 140:12
141:14 143:3
144:20,22 145:3
145:23 152:17
153:12,18,20
155:7 158:15
159:10 160:11
162:20 164:13,14
328:5,7
**clear** 329:25
345:10 349:11
**clearly** 127:22
349:15
**cleveland** 2:4
43:11,25 110:13
110:18 146:16
270:15 303:16
352:12 365:7
366:2
**click** 221:1
**clicked** 221:4
**client** 218:25
266:12
**clinic** 110:13
198:11,15,20
209:14 249:13

**clinical** 93:17
**clint** 4:7 221:9
**clipboard** 292:20
292:23
**clippings** 322:22
**close** 137:13
228:21 349:19
**closed** 74:15
213:19,19 324:3
**closer** 229:14
**closures** 69:15
**clothes** 19:10,18
19:25
**clr** 1:24
**cmo** 247:21
**cocaine** 231:24
232:22
**code** 27:14,15
28:17 31:24 34:8
45:25 46:12 63:10
65:18,18 66:2,2,4
66:5,6,11,12,13,14
66:15,19,21 67:6
67:24 68:10 71:16
72:12,14,16,19,25
73:14,17 76:22
77:9,11,15,21
83:21,22,25 84:9
87:14 89:10 91:19
92:17 93:1,5,7,8
93:19 94:25 95:16
95:17 96:2 100:15
100:24 101:8,12
101:23 121:4
124:22 129:12,14
129:19 130:3,10
146:12,12 167:2
168:13,22 258:14
337:15
**codes** 131:3

**cole** 26:15 120:8
120:10 158:4
257:16,17,18
**colleague** 228:9
358:23
**colleagues** 11:15
**college** 17:23
18:13 192:24
307:23 331:9
**color** 115:16
**columbiana** 24:14
25:2 42:14
**columbus** 2:20
23:16 34:9 52:22
53:13 65:8 83:16
120:24 132:8
148:20 158:4
185:7 257:10,12
257:15 276:24
329:19
**column** 49:19
131:10
**combination**
248:17,23 260:3
326:5
**combinations**
190:11 193:4
194:24 260:10
358:6
**combine** 184:19
185:12,20
**combined** 185:25
204:22 231:24
232:23 312:6
**combining** 185:21
**come** 30:8 44:23
110:14 112:11,11
115:5 116:7 118:4
118:9,11 132:5
147:20 148:8
152:15 210:9

224:8 236:3 299:4
317:11,15 327:5
343:20 355:5,13
357:22,25
**comes** 150:24
210:16 232:3
234:10 249:13
321:7 329:20
**comfort** 275:12
**comfortable** 90:17
328:10 349:16
**coming** 22:12 94:5
109:15 116:3
188:11 206:4
218:12 246:16
332:18
**commission**
365:16 367:19
368:25 369:25
**commissioned**
364:8
**common** 28:8
277:3
**commonly** 28:18
239:2
**communicate**
114:18
**communicated**
276:7
**communication**
46:21 47:11
**communications**
16:14
**communities**
251:11 254:3
**companies** 12:5
**company** 22:15
200:5 332:15
333:15 343:13
**compare** 158:7

compared 197:14
198:12
competent 149:18
compilation
272:16
compile 237:17
238:2 246:14
248:8
compiled 53:4
203:1 233:22
234:16 235:9
237:16 238:1
248:9 251:7
265:23 322:19
334:8
complained 191:3
308:17,19 309:7
complaining 309:6
complaint 59:8,16
144:23 307:10
308:1,11 309:12
complaints 194:22
complete 63:9
146:13 218:16
346:15
completed 143:14
364:20 366:15
completely 358:11
completes 47:6
completing 292:16
completion 133:15
complex 27:20,22
27:23
complexity 250:7
compliance 24:1
26:1 34:3 43:10
47:11 49:24 60:6
67:22 68:6 69:7,8
70:22 71:2 73:19
76:4 88:13 104:4
228:10 275:5

288:21 291:1
294:25 298:6
299:12 335:25
358:14 360:7
compliant 43:1
192:12,17 316:13
325:20
complied 169:4
353:1,4
comply 34:4 52:20
53:15 54:1,10
59:3 87:4,10
88:18,20 91:22
272:11
complying 33:19
76:22 77:21 123:3
130:12 274:2,8
275:13
compounded
94:17
computer 128:24
141:18 161:14
178:7 180:21,22
181:8 249:23
264:16 273:8
300:20 330:22
331:2,4,6,18 332:7
332:15 333:16
335:10 337:19
360:18,23 361:4
computerized
101:17,18 156:24
computers 70:15
331:10
concepts 229:15
concern 118:5
152:16 166:15
298:17 332:9,17
333:17
concerned 299:12

concerning 139:9
149:6 156:23
concerns 304:24
338:24 360:13
concluded 242:15
309:4 316:9
362:22
concludes 250:4
362:14
conclusion 145:4
224:4,4 309:17,20
conclusions 171:8
concur 193:25
condition 108:22
115:22 124:17
conditions 53:2
54:15 55:16 56:15
57:2,8 106:22,25
conduct 25:3,6
30:5 36:2 58:9
132:18 201:16
245:4 249:8
257:13 272:6
276:18,23 278:20
292:4
conducted 50:19
69:11 71:4 134:25
135:11 275:9
286:9 299:22
315:5 318:13
325:1 335:15
conducting 58:15
58:20,22 75:8
204:12
conference 25:22
confessed 320:15
confidential 22:3
22:7 288:8
confidentiality
70:17 287:6 288:1
288:5 345:4 346:4

confirm 16:17
268:14 302:9
confirmed 11:11
187:9 195:2
confront 32:12,19
confrontational
127:25
confronted 171:25
congress 251:19
253:6
conjunction
113:17 235:24
connection 79:15
171:17 302:5
conroy 2:10 10:17
10:17
conry 2:13
consider 68:5
274:23
considerable
356:23
consideration
88:16
considered 69:9
140:6 188:2 333:7
considering 71:3,8
consistent 59:10
195:8 286:11
consists 297:23
constantly 22:9
constitutes 127:11
construction
69:14 297:6,6
consult 106:9,16
consulting 105:8
consume 187:1
consuming 116:5
175:10 250:1
cont'd 3:1 4:1 8:1
contact 225:21
238:4,6 268:13

**contacted** 149:5
**contacting** 326:19
**contacts** 249:8
**contained** 66:1
**container** 78:2
**containing** 69:21
  95:16
**content** 281:25
**context** 229:4
  283:21 284:25
  287:20 288:2
**continue** 9:7 88:19
  100:15
**continued** 103:6
  305:6,6
**continues** 104:25
  239:15
**continuing** 88:12
**contractor** 298:5
**contraindicated**
  335:7
**contraindications**
  104:12
**contributed**
  223:25 250:23
  316:21 317:7
**contributes**
  317:16
**contributing**
  316:24
**control** 68:18,22
  68:23 69:17 73:1
  80:5 85:23 86:5
  129:23 134:20,21
  160:16,17 161:3
  234:11
**controlled** 40:1
  44:22 46:1,14
  53:7,9 63:13
  74:12 85:2,24
  99:16 109:21

113:6 118:7
122:22 130:7
132:21 133:7
143:13,16,24
147:16 151:12
178:12,14,16,23
178:25 179:23
181:15 186:11
187:10,13,20
190:12 194:25
197:1,8,20 204:10
208:21 209:22
210:12 211:23
230:14,16 244:6
251:18,25 252:5
253:7,10 254:8,14
255:5,14 258:6,7
258:12,20 259:11
269:1 309:16
316:7
**controlling** 161:19
**controls** 66:24
  67:3,7,15 68:14,25
  69:2,3 70:6,7
  71:17 143:22
  161:25 166:7
  258:8 277:20
  353:6,9
**convenience** 307:2
  307:4
**convenient** 137:12
**conversation**
  89:23 113:13
  196:4 218:14
  265:18 340:13
  341:18 342:17
**conversations** 9:5
  28:18 77:1
**convict** 198:22
**convicted** 176:14
  185:4 196:22

197:5 198:1,24
199:12 201:11
203:8,11 206:24
207:11 319:17
325:19 327:2,21
340:11 352:7,17
353:17
**conviction** 29:18
  206:15 242:15
**cooperate** 32:4
  152:8 207:22
  354:18
**cooperated** 32:3
  321:11 356:6
**cooperating**
  323:23
**cooperation**
  346:15
**cooperative** 23:3,7
  139:5 140:1
  145:15 159:19
  163:2 164:18,20
  165:13,15 171:11
  203:22 321:14
  328:5,21 342:21
  345:12 346:13
  361:22
**coordinate** 310:13
  311:13
**copier** 156:11
  157:7
**copies** 29:1 252:15
  252:24,25
**copy** 40:16 101:21
  148:20 156:10
  161:21 252:22
  279:23 323:1
  334:7,9
**corner** 327:8
**cornwell** 163:22

**coroner** 185:5
  196:22 197:16
**corporate** 148:12
  169:22 173:5
  213:22 214:8
  259:8 262:8 263:5
  264:3 265:2
  266:15 276:8
  304:3 331:25
  332:7,24 345:6
**corporation** 259:8
**correct** 44:12 48:2
  48:3 53:20 59:7
  59:15 65:19 82:24
  88:14,20 89:6
  101:12,13,25
  104:23 108:1
  110:25 112:18
  116:15 117:3,4
  118:23 124:18
  127:6 130:13
  136:2 140:12
  141:9 142:3 144:3
  150:3 151:1,6
  156:3 160:11
  183:24 196:23
  222:10 224:13
  227:17 228:6,10
  230:25 231:1,6,9
  235:22 237:15
  243:23 244:18
  246:1 256:25
  259:9 265:3
  266:17 267:22
  272:18 273:4,11
  273:12 276:11
  280:21 287:6
  290:14 291:17
  293:18 296:25
  298:17,23 299:5
  299:23 300:6,9

[correct - criminal]

303:20 304:3,6,14
309:17 311:7
313:21 314:25
316:7 317:12
318:25 319:2
325:6,7 353:22
356:14 360:3
364:16
**correcting** 244:8
**correction** 59:21
**corrections** 153:13
366:12 368:17
**corrective** 124:23
288:24 303:25
**correctly** 41:12
157:8 177:6
182:23 188:10
199:7 204:17
208:2 216:4
245:19 288:17
298:21
**corresponding**
28:14,22 66:5,14
92:13,23 96:19
97:18,21 98:15
117:7 118:11
119:15 120:1,4
172:3 271:20
308:9 342:3,7
345:22 354:23
**counsel** 9:11,23
11:1 16:15,25
106:10,17 123:8
214:14,15 218:5
228:12 229:21
253:2 310:21,22
311:14 313:23,24
363:1,10 365:2
**counseling** 94:21
105:9 123:11
153:9 285:25

286:1,3
**counsels** 286:6
**count** 133:6
151:17 187:24,25
**counted** 143:10
**counter** 72:5
**counterpart** 72:9
**counties** 17:19
22:19 23:19 24:10
24:13,23 25:3,5
138:9 212:6,7
213:5,5,7 219:20
236:5 254:4
**counting** 73:7,10
155:12 187:2
**country** 222:3
224:12 226:3
234:14 250:24
**counts** 250:9
**county** 1:10,12
17:19 20:6,9
22:19 23:18 24:15
24:16,17 25:1,1,2
25:2,7,12 27:3
42:13,13,14
109:16,17 110:12
110:19 128:5
135:4,13,14,19,24
136:4,9,24 137:5
165:20 172:12
174:22 175:1,12
175:21 176:7
178:3,19 182:3
184:10 185:5
188:19,20,23
189:2,16 190:17
192:3 196:22
197:6 198:8
199:18,18,19
200:18 201:10
207:14,16,20

208:2,13 211:18
211:19 213:10
235:25 236:15
237:3,7,11,20,23
244:23 250:19,19
251:12 270:16
277:2 293:18
322:1,1,2,2 327:20
330:12,13,14,17
330:17,19,20
347:2,4,5 348:3
349:2 351:23
352:7 358:11
364:4 367:10
368:15
**couple** 27:6 33:15
64:15 84:15 90:13
91:13 95:6 103:20
122:20 131:7
137:10 144:8
159:21 166:20
173:25 189:13
214:21 278:7
281:3 303:8
321:20
**course** 16:10
23:20 60:23 95:25
96:6,11 97:24
117:1 202:22
236:2 262:5
289:25 290:5
325:10 328:3
360:1,6 361:12,16
**courses** 25:16
**court** 1:1 5:18
9:13,19 11:4,6,9
15:11,19,22 16:2,7
30:2 174:4,5
215:13 216:20
250:16 277:3,4
279:13 340:17

354:1 367:7
**courteous** 139:1
**courtesy** 310:20
312:17,23
**courthouse** 327:9
**courts** 15:13
**cover** 50:17 77:25
**covered** 77:19
173:11 180:11
195:17
**covering** 111:7,25
**covers** 68:23 92:23
283:15
**covertly** 341:15
**create** 21:18 40:11
258:15 259:1
260:14 263:11,13
**created** 150:21
235:15 263:7
**creating** 29:1,2
60:1
**credentials** 125:22
126:7 127:3
**creek** 2:11 178:1
179:18 181:22
**crime** 192:15
250:7
**crimes** 39:9
**criminal** 18:11
29:24 30:1 31:24
34:8 37:25 38:6
39:1,7,17 50:4,7,9
50:18 58:9 66:19
121:4 124:3 134:2
141:14 169:17
188:8 190:7 193:1
227:11,25 228:1
229:9 249:3 277:1
316:5 323:12,15
354:13

**criminally** 172:7

**cross** 215:10
216:22,24,25
217:1,7,14,15,25
218:16,18 223:5
223:16,19

**crossing** 246:15

**culpable** 99:7

**current** 12:13
16:11 83:13 348:5

**currently** 58:14

**curtains** 297:24,24

**custody** 5:18
85:24

**customers** 258:3

**cut** 217:8 312:2

**cuyahoga** 24:16
322:2 364:4

**cvs** 3:10,10 10:10
12:3,7 31:21
79:19 171:9,14
186:6 215:21
256:7 264:4,12
266:7 308:7
310:17 324:18,21
325:5,12,15,17,20
326:12 327:1,7,12
328:4,15,24
329:11 330:1,6,11
330:16,22 331:19
332:4,6,14

**cypress** 2:11

**d**

**d** 21:21 38:19
61:16,17,21 86:18
105:7 106:19,21
107:16,18,18,19
111:3 133:12
164:16

**d.c.** 3:17

**daily** 143:14,17,23
160:14,23 235:6

**damages** 251:11

**dan** 1:8 215:22

**dangerous** 44:25
45:11 46:1,15,25
50:12 67:1,16
68:15 69:12,13,22
70:2,8 71:4,5 73:1
74:1 85:11,24
86:5,11 99:16
125:10 127:9
178:22 229:12

**daniel** 3:12 10:9
142:18 324:16

**dark** 346:9

**darkened** 232:20

**data** 60:15,17,20
60:25 61:5,7 65:5
65:12 258:16
259:1 260:8,9,25
261:5,5,18,24
262:7,11,13,24
263:6,19,20,21,22
263:24 264:2,11
264:25 265:3,6,14
265:19,21 266:2,6
266:14,16,16,22
267:20,25 269:19
269:20 270:6,11
270:23 271:11,24
272:17 273:1,3,4
273:10 276:2
277:13 314:22
331:25 332:7
360:25

**database** 53:20
54:14 60:11,21
61:13 63:2,11
112:5

**date** 37:22 101:5
133:15 150:19
185:10 289:3,19
304:9,13 307:25
363:11 366:8
367:3,9,19 368:3
368:13,25 369:20
369:25

**dated** 131:17
164:11 202:2
286:16 297:19
299:14 304:5,12
305:14

**dates** 108:2 136:14
351:24

**daugherty** 155:18
155:22 156:6

**daughter** 241:18

**dave** 202:12

**david** 349:6

**day** 3:2 10:14
30:15 31:23 33:16
61:25 62:23
122:23 160:25
161:7 167:8
182:19,20 188:6
200:10,11 233:6,7
238:14 315:21
355:10 365:7
367:16 368:22
369:22

**days** 25:22 32:10
89:25 91:13 164:3
187:1 225:1
304:15,19,19
366:18

**dea** 18:1 42:2
43:10,20 44:3,9,17
44:20 120:11
130:5 146:11,16
146:20,22 148:16

**date** 149:8 196:1
217:14 235:22,25
283:14 352:14

**deal** 121:11 141:8
168:10 207:20,21
221:20 238:18

**dealing** 103:10
197:12

**dealt** 22:16 79:22
351:10

**dear** 366:10

**death** 233:6 234:6

**deaths** 232:17,21
233:4,7 234:5

**deceased** 119:21
171:21 339:15,18
340:5

**december** 1:21 9:3
177:9 260:14
365:7 366:4

**deception** 50:11
190:8 229:11

**decided** 14:7
185:9 290:22

**deed** 367:14
368:20

**deemed** 67:24
68:6 366:19

**defendant** 9:11
226:25 256:24
257:20

**defendants** 11:14
12:5 22:22,23
23:3 31:11 79:4
79:19 135:2 171:9
173:12 191:7
200:22 201:9
226:23 310:13
312:6,9 332:20
359:25

**defense** 311:14
**deficiency** 142:4
**define** 222:17
241:9 255:15
263:22
**defined** 92:18
109:25 272:14
**defines** 229:9
230:13
**definitely** 276:10
**definition** 93:20
**degree** 18:9
192:25 250:7
**dehner** 4:8 11:1
91:12
**delay** 303:23
**delays** 304:2
**delivery** 363:9,11
**demand** 43:16
128:17
**denial** 329:16
**denied** 330:2,6
**dennis** 197:6
209:16 319:15
**dentist** 118:2
284:21 300:15
**deny** 329:10
**department** 18:17
18:24 20:13 22:2
34:21 42:11 43:13
47:10,11,12,13,16
47:17 65:11,14
79:12,15 80:4
121:17 217:19
228:1 234:7 249:8
366:22
**departments** 79:1
79:5
**dependent** 234:9
**depending** 106:9

**depends** 260:12
292:8 293:6
**deposed** 11:19
14:14 15:10
**deposition** 1:18
6:5 9:10,15 11:7
12:19 13:4,13,14
13:20 14:6,8,10,24
16:11,15,21 17:3
90:11,23 215:14
216:22 217:1,4,21
217:24 218:13,15
219:21,23 226:23
227:7 230:23
279:17 280:5
362:22 364:19
366:8,11 367:1,3
368:1,3
**depositions** 216:9
216:18 218:6
247:21
**derived** 93:15
**describe** 39:6
42:22
**described** 195:9
224:1 267:19
285:15 295:20
327:23
**describes** 238:10
**describing** 182:2
**description** 6:3
45:3,6 231:2
236:23 267:21
**descriptions** 173:9
**descriptive** 260:24
**designed** 59:4 60:7
**destroy** 146:17
147:13 157:9
322:25 323:4
**destroyed** 157:18

**destroying** 155:12
**destruction**
112:11 146:1,5,7,9
151:12,14 155:8
155:13
**detail** 153:14
**detailed** 173:9
184:13,15
**details** 154:3
157:5 195:14
202:11 281:22
**detect** 59:5 60:7
66:25 67:8,16
68:15 71:18 75:11
75:21 76:6
**detecting** 162:7
210:18
**detection** 69:18
**detective** 19:10,14
19:18 20:24
**detectives** 20:22
**deter** 59:5 60:7
66:25 67:8 68:14
**determination**
117:13 315:23
**determine** 62:10
67:1 106:14 110:9
118:1 137:5,7
191:2 193:16
262:18 265:8
268:1,8 269:9
270:5,6,11,19,25
271:5,12 275:4
342:12
**determined** 88:4
276:22 290:25
**determines** 240:12
**detrimental**
253:11
**develop** 54:11
254:9 255:7 354:3

354:9
**developed** 355:1
**development**
224:20 344:5
**devices** 94:15
**diagnosis** 268:14
**diazepine** 182:22
**died** 198:22
**diesler** 198:21
**diet** 35:1,9 36:9
284:21
**difference** 48:5
284:13
**different** 25:25
31:23 33:24 40:17
41:2 43:8,16,17
48:10,19 59:25
108:11 113:7,21
115:6 130:23
131:12 150:21
154:6,9 177:24
179:19 181:12
182:24 203:16
217:17 278:15
301:15 315:6,15
358:11
**differently** 311:2
**difficult** 176:25
**difficulties** 16:12
174:3
**dilaudid** 115:20
175:6 182:18,20
186:24 188:4
**diligence** 268:9,13
268:19 271:13
**diligent** 324:25
362:2
**direct** 42:16 57:14
81:19 124:14,21
223:12 260:22
326:8

**directed** 201:21
216:20
**directing** 189:4
**directly** 12:24
36:21 246:10
255:16,21 256:9
256:14,25 276:7
**director** 57:20
121:2 181:7
**directories** 172:20
**directory** 328:20
**disagree** 232:4
235:7 253:13,17
253:18
**disagreement**
349:7
**disciplinary** 87:13
88:5
**disciplined** 87:3
**disclosed** 346:5
**disconnected**
249:14
**discourteous**
309:1,13
**discovered** 208:24
308:7
**discretionary**
52:17
**discuss** 257:17
**discusses** 310:5
**discussing** 218:8
**discussion** 279:15
**discussions** 17:18
**disease** 104:11
234:11
**dispense** 44:8
76:13 85:1 92:12
94:1 101:9 114:25
118:25 119:10
122:5,6 195:3
256:4 258:7 259:2

272:6 296:2
314:17 342:9
360:19
**dispensed** 45:10
94:14 105:15,18
114:24 157:16
161:6 167:8
174:21 175:4,14
181:2 187:6
192:11 195:7
208:21 237:13
240:4,10 245:15
245:17 246:11
251:4 259:13,18
262:25 271:3,8,14
271:21 283:25
284:16,17,18
300:23 307:6
334:15
**dispensers** 255:14
256:2 257:24
**dispenses** 96:20
97:19 117:9
**dispensing** 27:25
32:9 34:25 39:20
44:22 53:6,7,22
54:5 64:17 75:4
85:4 93:1 94:3
98:1,19,25 99:10
100:17 101:4
111:4 119:14,24
154:20 161:11,14
166:17 175:16
178:6 179:23
180:7,12,24
181:15,19 191:10
191:14,20,25
192:7 199:23
204:9 211:14
223:24 224:11,19
229:4 237:22

240:23 242:19,20
243:25 250:23
251:24 256:18
257:25 258:24
260:8 261:24
264:2,5,5 265:3,15
266:16 272:17
273:3 274:3
283:12 284:12,15
287:25 289:2,16
320:7 341:19,23
**dispensings** 17:11
109:1 161:8
260:15
**disposition** 70:2
75:12,22 76:7
**distance** 109:19
270:5,6,12,17,18
**distinct** 280:23
**distinction** 47:22
49:13 284:23
**distinctive** 292:1
**distinctly** 119:16
**distortion** 357:8
**distracted** 100:5
**distribute** 255:21
285:21
**distributing**
179:23 255:17
**distribution** 70:2
86:11 250:22
251:23 253:9
257:5,6,13,20
**distributor** 32:25
44:25 45:11 82:16
83:23 84:1,16
85:11 87:14
125:10 127:9
205:25 282:16
285:20

**distributors** 44:14
254:9 255:6,13,15
256:1,10 257:4
**district** 1:1,2 9:13
9:14
**diversion** 18:6
20:17,23,23 21:6,9
21:12,14 22:25
23:5,8 25:15,24
28:4,6,7 34:13,17
35:6 38:7 39:8
50:9 51:3,24 59:5
60:8 66:25 67:3,8
67:16 68:15,20
69:4 70:14 71:19
79:16 80:5 115:10
139:10 145:21
152:11 162:7
171:6 173:21
181:12,13 196:1
199:17,21 200:1
200:23 201:10
213:4 229:9
239:24,25 240:5
240:20 253:20
254:1,7,10 255:8
258:10 274:10,13
276:9 277:8,20
283:9,10,12 295:4
295:10 316:6,21
317:7,16 356:17
361:13
**diversions** 51:19
**divert** 21:16 28:25
51:20 111:20
**diverted** 111:22
201:3 250:4 252:1
**diverting** 197:20
199:24 200:18
294:15 317:3
341:6

**divided** 310:10
**dividing** 340:24
**division** 1:3 9:14
  18:25 19:2,9,9,13
  19:21 20:1,13
  82:4 89:4,8
**dmoylan** 3:14
**dobich** 149:12
**docket** 175:1
  310:5
**doctor** 21:19
  34:24 36:16 40:3
  40:15 41:18 54:13
  54:16 64:13 75:3
  96:16 101:6
  110:14,17,18
  111:22 113:10,11
  113:15,16,18
  114:5,8,9 118:6,8
  118:12 138:21
  157:7,8 172:1
  174:25 175:23
  176:5,20 185:2,22
  187:23 190:22
  192:22 193:6,9,24
  193:24 195:23
  196:3 200:13
  206:23 210:9
  211:3,11 245:9
  249:23 259:20
  268:13,21 269:21
  284:21 300:15
  301:15 318:7
  323:25 341:1,8,14
  341:24 342:10
**doctor's** 38:24
  122:22 152:24
  175:20 188:22
  249:22 268:14
  270:12,13,15
  318:2 319:11,13

336:6,15
**doctors** 31:16 33:5
  33:8 35:18,22
  37:8 45:12 51:14
  53:18,21 60:24
  62:5,9 63:5 64:10
  98:10 113:5,12,21
  114:3 185:5
  186:14 193:1
  198:2,20 199:9
  225:14 264:7,12
  268:22 294:14
  301:6 302:6 308:6
**document** 1:8 32:6
  50:2 52:1 55:23
  55:25 78:6,11,12
  78:13 84:25 85:3
  99:18 128:20
  129:6 141:15
  146:10,15 148:24
  151:21 152:22
  154:7 157:15,18
  190:23 227:23
  247:17 275:16,20
  276:25 283:19
  290:8 293:13
  305:2,6 331:12,13
  334:11,14 335:1
  336:2,13 337:9,18
  338:25 339:2
  361:8
**documentation**
  52:21 70:15 153:8
  163:14 292:7,8
  334:4,8,24 335:20
  353:25 355:21
**documented**
  131:11 140:4
  146:19 154:4
  170:4 184:2 273:7
  290:18 291:6

299:6 325:5
  335:17 336:9,17
  337:3 353:23
**documenting**
  78:10 150:2
  202:23 288:9
  326:16
**documents** 39:12
  50:14 128:11
  212:24 226:11,15
  226:24 229:13
  249:11 272:20
**doing** 27:12 29:20
  35:6 38:17 41:5
  47:3 49:11 52:10
  66:8 67:18 74:8
  75:23 76:20,21,24
  80:16 104:19
  105:13 112:8
  115:25 117:15
  128:8 130:21
  132:7 134:3,6,18
  139:16 141:12
  149:19 154:11
  167:22 174:20
  176:8 177:6,25
  179:15 185:1
  193:12 196:24
  198:24 252:18
  290:10,12 295:13
  309:19,19 343:3
  347:18 349:17
  351:15 355:23,25
**door** 127:1
**dosage** 104:13
  236:4,24,25
  237:20 259:16
  271:1
**doses** 174:21
  176:9 178:9,17
  180:10 190:11

204:22 235:6
  236:13,15,22
  237:1,3,7 243:15
  244:22 245:14,16
  245:18 271:7
**doubt** 63:9 235:15
**doubtful** 119:1
**downtown** 154:18
  327:7
**dr** 27:8 35:24
  37:19 38:10,19
  61:15,17 62:15,22
  63:20 64:14
  171:18 173:25
  174:12 175:20
  176:6 179:5 182:1
  182:5 183:13
  184:1,20,25
  186:10 187:9
  189:3,22 190:5
  191:3,11,20,24
  192:4,22 194:19
  194:25 195:4
  197:13,14 201:15
  204:11,14 209:9,9
  209:10 210:8,17
  211:10 243:2
  244:16 245:4
  301:3,3,19,20
  302:4,4 319:5,9
  356:25 359:1
**drag** 171:24
  312:22
**dragging** 172:13
  339:22
**dramatic** 38:5,8
**draw** 110:20
  297:24
**drawing** 141:11
  355:7

**drew** 356:13
**drink** 247:3
**drive** 306:7,9,14
  306:22
**driven** 263:19,21
**driveway** 189:8
**driving** 109:19
  188:18 248:5
  306:16
**dropping** 245:25
**drove** 192:9
**drug** 18:6 20:2
  25:15 36:15 39:12
  39:12 42:13,13,24
  45:25 46:13,13
  47:4 50:8,10,12,13
  50:13,14 61:24
  74:22 75:2 76:15
  94:14,22 99:16
  101:6 102:3
  103:14,21 104:11
  104:12,12,13,13
  104:15 108:11,14
  111:5 114:25
  115:3,14,15 116:8
  117:10,15,23,25
  119:10 122:13,17
  122:23,23 126:13
  128:11 129:23
  131:2 145:25
  146:5,7,8,13
  154:21 157:15,18
  169:6 178:25
  179:1 184:10
  200:13 212:23
  213:16 225:10
  229:9,10,12
  231:20,23 232:17
  232:18 233:3,4
  235:3,25 238:10
  238:15 239:16

268:23 272:10,12
285:9 286:5,5
318:5 324:3 326:3
**drugs** 21:17,23
  29:4 35:10 36:17
  37:7,15 39:11,15
  44:8,25 45:7,11
  46:1,15,25 50:10
  50:11,12 51:5,19
  51:21,24 59:6
  60:8 67:1,17
  68:15,20 69:12,13
  69:22 70:2,8,14
  71:5,6 72:2,4,5,5
  73:1 74:1,11 78:1
  85:11,21,24 86:6
  86:11,14 94:14,17
  111:20,23 112:23
  114:15 116:6
  124:5 125:10
  127:10 128:10
  134:12 143:13
  146:17 147:2,13
  155:13 178:9,11
  178:16,20,22,23
  179:1,2 182:12,14
  182:16 187:3
  190:12 194:25
  196:3 197:3 199:1
  199:5 200:4
  211:11,12 212:24
  212:25 222:12
  224:8 229:11,11
  229:12 230:21,22
  231:10,13 237:22
  238:12,13,14,17
  239:1,2,6,11,19
  240:2,4,13,21
  241:3,5,16,16,22
  241:23 242:20
  244:2,2,2 246:15

246:23,24 247:7
247:10,11,12,25
248:1,23 256:2,4,8
256:9 257:6
260:10 284:22
285:2 309:14
315:8,24 318:25
320:18 321:5
326:5,11 335:7
337:20 341:6
343:5 347:25
**due** 11:6 16:11
  250:6 268:9,12,19
  271:12 316:6
**dug** 353:14
**duly** 11:18 364:7
  364:10
**dumb** 273:8
**duplicating** 40:13
**duplication**
  104:11
**dur** 75:1,1,10,18
  75:23 76:8 103:25
  104:7,9,16,19,22
  104:25 105:11
  106:1,9,13 116:10
  118:15 270:2
**duration** 104:15
**durs** 75:8
**duties** 24:3,4
  27:12 48:10,20
  67:18 83:5 90:18
**duty** 32:13 58:24
  83:6

---
**e**
---

**e** 2:3 38:19,20
  164:16 177:22
  184:18,18 197:18
  257:16 350:17
**eagle** 3:6 10:6 12:1
  12:1,7 31:12,14,20

79:9 135:3,4,11,19
135:24 136:9,15
136:23 137:4,22
138:13 139:19
142:16 143:4
144:10,21 149:13
149:21 156:1,14
158:13,25 159:23
162:19,20 163:13
163:15 164:1
165:5,10,23 166:3
166:7,11 167:13
169:3,4,10,16,19
169:25 170:1,7
171:1,4,13 173:2
173:11 186:6
189:6,8,9,11
194:20 195:16
266:8,12 357:3,5
**eagle's** 79:15
**earlier** 25:14 29:6
  65:16 72:8 81:20
  89:23 104:8
  117:16 140:17
  169:7 196:20
  197:25 233:15
  274:13 291:19
  301:18 302:6
  315:13 316:14
  317:10 319:5
  322:13 325:10
  331:23 334:2
  338:18 339:4
  356:22
**early** 36:6 37:21
  101:19 115:11
  199:10 202:7
**ears** 354:15
**easier** 61:3 143:25
**easily** 312:22

east 2:19 3:12
  198:16 209:18,19
eastern 1:3 9:14
easy 37:9,17
  172:25 343:8
eddie 139:20
edge 198:18
education 46:22
  192:25
educational 17:22
edward 138:18
edwards 14:4,6,9
  14:10 17:2 25:10
  25:11 26:11 27:8
  46:3 55:6 135:10
  135:10 183:9,20
  184:11 190:18,20
  191:17 226:24
  227:7 228:8
  234:23 238:4,7
  279:17
edwin 155:18
effect 52:3 55:13
  244:17 246:19
  247:11 253:11
  332:22
effective 55:9
  56:17 66:24 67:2
  67:15 68:13 71:17
  78:18 86:20
  107:25 108:2
  258:8
effects 222:16
  248:18
efficiency 255:3
efforts 34:14
  149:20 171:6
  173:21 356:17
eight 18:3 19:6,16
  19:23 24:18,24
  114:5 167:19

182:18 353:18
  362:16
either 55:16 66:1
  101:17 106:9,16
  144:5 163:19,24
  233:20 241:24
  260:19 305:25
  317:3 326:23
  344:24 365:2
electronic 52:20
  68:21,22 69:17
  74:20
electronically 53:6
  53:10
element 188:8
elephants 182:21
elm 137:1 142:16
email 366:17
emergency 234:7
emphasis 302:23
employee 343:23
  346:3,17,21
employees 69:21
  344:20 358:18
empowers 125:1
ems 46:25 138:5
enclosed 366:11
enclosure 69:16
encompass 24:10
  49:21
encompassed
  104:22
encountered 31:2
  127:14
ended 23:22 24:25
  34:21 178:18
  182:5 189:18,18
  242:22 327:16
  351:13 358:9
ends 240:10
  359:11

enforce 45:24
  66:10 73:19 98:6
  121:3 123:10
  131:6 154:24
enforced 67:18
  123:18
enforcement
  34:14 38:1 43:3
  46:22 47:12 48:8
  104:4 120:21
  121:20 124:2
  173:20 227:9
  349:22 356:17,19
enforcing 42:24
  46:11 47:4 101:23
engage 200:2
engaging 223:12
  265:17,18
enhance 58:8
enhancing 179:1
  248:18
enlightening 63:7
  261:1,4 267:19,23
  269:18
enormous 175:4
ensure 58:7 59:3
  60:5 100:19
  122:17 123:7,15
  271:20 274:1,8
enter 37:13 125:23
entered 368:9
entering 249:23
entertain 218:13
entire 146:13
  253:1 367:5 368:5
entities 45:5 58:16
entitled 223:4,15
  223:19 228:24
  229:2 236:21
entity 125:8,20,23

entrance 347:21
entry 127:11
envelope 280:12
envelopes 13:7
  279:2,4
environment
  74:11
epidemic 221:22
  221:25 222:2,6,13
  222:14 233:16,18
  234:13 250:24
epidemiology
  318:11
equal 275:8
equipment 78:1
  85:9,18
equipped 85:9
equivalent 235:6
errata 366:13,18
  368:7,10,18 369:1
error 100:12
escalate 59:8,16
especially 109:20
  353:25
esq 2:3,7,10,14,18
  3:3,7,12,16,20 4:3
  4:8 366:5
essentially 108:10
  328:5
et 1:10,13 74:2
evaluated 71:7
evaluating 68:2
  71:1 104:9
evaluation 67:25
  72:3
evankovich 15:24
  15:25 52:9 177:6
  177:10,19,21
  179:12,14 181:22
evasive 139:2

**evening** 338:5
359:1
**event** 365:3
**eventually** 181:6
**everybody** 102:20
131:25 185:1
207:1 278:13
279:22
**everybody's**
254:23
**evidence** 169:9
170:6 276:9 277:7
295:4
**evidentiary** 15:11
**evolve** 60:11
**exact** 55:3 109:2
197:23
**exactly** 53:12 64:7
116:22 154:7
218:8 242:12
**examination** 5:7
11:17,21 75:3
89:17 96:12 103:6
215:10 218:16
219:16 223:13
260:23 273:16
324:14 338:3
358:24
**examinations**
89:12
**examine** 216:13
217:1,7 223:5
**examines** 96:17
**example** 30:16
34:24 36:10 40:14
63:19 79:9 108:9
116:9 118:2
163:16 204:25
211:24 217:15
239:25 240:1,8,9
246:15 256:7

261:12 264:6
266:11 268:24
276:20 334:18
336:5
**examples** 28:8
139:12 249:3
350:11
**excel** 37:13
**excellent** 138:16
138:20,22,24
139:7 140:7 144:7
145:19 160:7
296:12,14,20
**exception** 59:14
328:11
**excess** 17:12
**excessive** 194:24
236:7,10 308:5
**excessiveness**
236:12
**excluding** 24:16
**executed** 368:10
**execution** 367:14
368:19
**executive** 57:20
181:6
**exempt** 74:1
**exercise** 92:3,7,19
119:4,5
**exhibit** 5:18 6:5,6
13:13,18,21 14:4,9
46:3,4,8 55:6,19
56:4,8,9 57:15
58:4 65:22 72:24
73:5 77:4,7 83:20
89:1,9 90:20 93:3
93:6 95:8,15
103:10 107:11
122:15 124:22
131:15 132:20
135:6 136:7,11

138:13 142:8
183:6 184:5
201:25 205:11
207:8 208:3 209:8
226:8,12,13,17,23
226:24 227:6,6
232:9 252:7,17
279:8,14,17,25,25
280:1,5,13,15
281:6 293:12
294:10 296:22
**exhibiting** 115:9
**exhibits** 5:4 6:1
12:24 13:3,10
14:3,8 217:12
252:22,24 279:11
**existence** 115:6
258:21 260:24
265:6 267:25
**expect** 320:20
**expectation** 119:9
**expected** 76:21
**expecting** 218:18
**experience** 28:5
35:19 39:16 43:15
48:5 63:7 66:3
68:16 70:24 75:11
75:17 98:23 99:3
109:14 110:10
114:12 161:4
163:6 168:4 169:2
187:19 199:21
200:2 206:21
211:20 232:23
238:20 261:1
267:20 269:15,18
328:3 349:25
**experienced**
238:23
**experiences** 350:5

**expert** 192:20,23
193:2,10,11,15,20
193:25 224:4
247:15
**expertise** 92:12
94:3 318:10,18
322:8
**expiration** 367:19
368:25 369:25
**expired** 146:14
**expires** 365:16
**explain** 310:15
**explained** 41:22
115:1 308:5
**explaining** 157:21
**explanation** 142:3
**extensive** 152:21
185:2 292:6
322:19
**extensively** 93:2
148:25
**extent** 43:23 59:18
59:20 61:7 64:10
69:18 108:5
145:24 188:9
224:16 225:6
254:5,6 262:1
263:24 273:7
318:21 331:8
332:11 333:1
339:3 342:15
**extra** 167:10
**extremely** 120:23
309:3 355:16
**eyes** 354:14

**f**

**f** 38:20 61:16
297:16 340:6
**facade** 80:8
**face** 28:20 62:14
63:6 75:24 76:8

118:19 159:12
181:1,1 260:25
**facilities** 24:7
48:10,12,17 59:3
138:8
**facility** 69:19
146:1 150:6
181:12
**fact** 11:11 26:2
64:15 116:14
126:6 143:15
156:13,18 161:15
166:6 188:13
190:20 210:21
211:13 216:11
224:24 225:12
251:9 255:4,25
256:7 264:19
266:11 277:19
298:19 306:6
311:7 320:21,23
344:3
**factor** 71:7 115:8
116:15 143:18
226:2,6
**factors** 68:6 69:8
69:10 71:7 76:15
106:21 110:22
115:4 116:2,12
118:9 214:1,3
239:22
**factory** 18:21
**facts** 112:17
**failed** 29:13 87:4
**failing** 98:10,14
**failure** 87:9
**fair** 121:8 165:4
166:1 169:3 220:1
229:7 238:8 244:7
255:11 275:1
277:24 290:20

316:12 318:19
320:16 324:19
328:2 332:5,13
333:9 334:10,13
336:10 337:5
348:5 355:16,19
**fairness** 218:4
**faith** 35:21
**fake** 208:13
249:14
**fall** 138:3 244:3
283:11,12 288:6
**fallback** 134:3
**falls** 70:17
**false** 20:16 21:18
22:13 170:13
344:15
**familiar** 27:13
34:7 37:11 53:24
56:25 57:2,3,7
65:17,21 66:20
67:9 73:13,15
74:22 78:24 79:2
79:6 83:25 84:3
84:13,14,19 87:14
87:15,17 89:2,13
89:15 91:18,24
104:2 199:16
211:21 225:16
228:5,7 248:13,16
250:10 251:18,20
**family** 110:18
113:9,14 118:6
193:9 241:2
**far** 94:19 97:15
100:13 161:6
166:1 169:17
230:23 248:11
282:9 299:12
318:9 330:20
331:4 336:22

**fashion** 302:12
**fashions** 29:1
**fast** 32:19 215:1
304:22 305:3
**faster** 61:2 314:4
**fatal** 231:22
**father** 138:21
**fault** 174:10
**favorable** 325:12
325:13 350:9
**favoritism** 121:5,5
**fbi** 178:13
**fda** 217:24
**february** 52:8
55:9 56:17
**fed** 102:17
**federal** 11:17
15:13 30:2 43:9
66:14 72:6,9,12,16
72:19 129:22,25
130:3,10,12 131:4
151:21 178:13
225:3,4 235:22
250:16 258:14
277:4 340:16
352:12
**federally** 250:8
352:7
**fee** 45:21 88:17
**feeding** 247:9
**feel** 167:21 168:11
293:6 355:18
**feeling** 288:6
**feely** 347:16
**feet** 171:24 172:13
339:22 343:10
**fell** 137:16
**felt** 153:25
**female** 327:16
328:19 339:16,18

**females** 90:24
**fentanyl** 246:24
248:1
**fictional** 249:13
**fictitious** 249:22
**fide** 97:25
**field** 23:17 24:1,18
24:19 26:24,25
47:20 51:11 176:3
201:23,24 329:22
350:13
**figure** 134:4
281:19
**figured** 193:18
323:6
**file** 37:2 40:23
78:11 158:6
329:18
**filed** 9:12 123:16
160:14,24 194:22
**files** 180:19
**fill** 21:22 40:24
50:23 100:8,9,10
100:10,10 115:2
119:5,6 147:2
148:15 151:14
172:2 188:15,20
210:11,14 214:6,7
214:10 249:17
258:1 292:21
327:18 358:8,12
**filled** 41:3 149:8
168:18 171:1
188:6,7,10,12
200:25 210:18
269:11 308:21
309:7 344:16
358:13,14
**filling** 21:22 75:20
110:19 168:20
169:10 170:8

188:1 189:12
204:21 212:12
213:13 249:24
322:8 327:10
341:6 353:12
**film** 295:16
**final** 119:2 206:15
239:9
**finally** 177:8
345:19
**financially** 9:22
**find** 23:2 30:17
35:2 130:4,5,7,8
139:24 152:21
159:18 162:9
163:17,18 170:17
170:20 180:20,22
181:8 202:18
247:8 249:9 277:7
289:25 290:7,9
295:4 328:15
353:15 354:20
360:6 362:2
366:11
**finding** 61:21 88:1
253:8
**findings** 291:7
**finds** 35:7
**fine** 56:12 158:21
194:11 221:12
350:18
**finish** 15:1 50:2
194:8 291:3
349:24
**finished** 177:8
**finishing** 15:24
52:9
**fioricet** 178:24
285:6
**fire** 346:17

**fired** 205:18
346:18,21
**fires** 31:6 130:17
**firm** 2:10 9:18
10:16 221:7
**first** 11:18 18:15
24:11 26:14 29:9
31:7 34:20 44:16
48:20,24 59:1
60:3,18 63:21
84:15 85:8 88:16
93:7 97:3,8
111:18 112:2,3
113:17 120:16,18
122:14 138:5,12
140:8 153:4
154:15 174:6
210:25 227:8
273:23 280:25
281:2,15,23
286:19 290:11
293:1,20 296:25
297:2,10,18 306:7
307:11 319:13
326:22 343:22
344:6 364:10
**fist** 139:16
**fitzpatrick** 2:14
217:22,23
**five** 12:4,7 100:16
109:1 112:21
122:15 123:14,20
123:23 124:8,12
139:23 142:9
148:5,5 153:2
167:23 203:20
214:21 217:9
231:18 238:4
239:5 295:25
313:4 314:6
315:22 359:7,8

**fix** 16:14 352:10
**fixing** 229:22
**fixtures** 78:2
**flabbergasted**
190:24
**flag** 113:4 228:24
229:2,5
**flagged** 265:9
**flags** 272:14
**flashing** 355:8
**flip** 13:18 46:4
58:25 65:22 86:23
95:8 116:20 159:7
298:12
**floor** 2:14,19 3:8
339:23
**florida** 109:17
**flush** 147:1 151:23
**fly** 329:4
**focal** 41:6
**focus** 100:1 140:24
343:21
**focusing** 99:2
142:13 283:2
**fold** 142:1
**folder** 56:2 90:15
280:1
**folks** 311:3 313:10
**follow** 29:13 30:15
63:8 95:19 121:10
123:22 124:11
130:19 141:4,7
144:24,25 155:24
156:3,5,21 163:15
164:1,25 289:18
297:7,11 337:23
356:9
**followed** 142:6
164:8 281:4
308:11

**following** 68:5
208:24 209:1
249:21
**follows** 11:20
**food** 46:13 104:15
**foot** 345:15
**force** 19:12,15
42:4,6,13,14
184:10 235:22
236:1 352:14
**foregoing** 364:15
364:20 367:13
368:18
**foreign** 317:15
**foreseen** 311:12
**forged** 294:14
**forget** 138:4
146:11 303:5,5
**forgot** 335:4
**form** 41:11 54:7
69:5,11 70:9 71:4
111:15 114:4
146:13,20,20,22
147:3 151:21
160:15 161:19,20
161:25 222:4,19
222:23 223:7,8,11
223:17,22 224:2
224:14 226:5
233:19 235:8
236:9,18 237:24
240:6,19,21
244:19 246:12
247:2,13,22 248:2
250:25 251:13
253:14,22 254:11
254:12 259:4
261:9 262:20
264:8,14 266:18
271:15,23 282:10
287:22 288:3

**format** 29:2 281:5
281:5,24 291:4
292:3 294:21
**former** 48:7
120:10 194:23
**forms** 29:1 34:13
34:17 130:6,6
151:15 326:19
**forte** 130:15
331:12
**forth** 29:3 37:15
38:21 67:5,23
100:16 101:7
103:25 186:7
341:7
**forward** 142:8
144:8 145:7
146:15 148:17
151:24 158:24
366:15
**found** 36:20 38:21
87:19 128:18,21
129:9 134:14
140:5 141:19,23
143:18 156:10
160:16 161:25
170:13,14 188:8
188:11 193:2
211:8 250:17
256:21 275:16
276:9,19 277:11
288:18 290:2,4
295:7,23 298:11
299:6 306:14
308:11 316:13
331:17 333:11
353:15,21
**foundation** 264:9
**four** 12:2 21:22
25:3 50:17 55:10
61:18,23,24 99:6

105:19 109:4
113:20 142:1,14
144:6 146:21
167:23 177:13,14
177:17 201:23
203:20 229:15
231:18 240:11
296:1 315:22
**fourth** 123:7
**frame** 21:25 63:19
64:11,18 108:24
183:18 197:23
222:12 236:8
246:3 310:5
**framework** 298:2
**frank** 121:1
175:22,23,24
184:22 185:6,8,17
189:16 321:23
**franklin** 27:8,19
171:18 173:25
174:12 175:21
176:6,20 179:5
182:1,5 183:12,13
184:1,20,25 187:9
189:3 191:3,11,20
191:24 192:4
193:8 194:25
195:4 197:13,15
198:12 199:15
201:15 204:11,14
206:3 207:6,12
243:2 244:16
357:25
**franklin's** 186:10
189:22 190:5
245:4 356:25
357:5
**fraud** 225:8 250:8
**fraudulent** 225:9
249:18

**fraudulently**
40:10
**free** 345:7 347:15
367:14 368:20
**frequently** 54:20
**friday** 14:6 227:7
310:24
**friend's** 249:17
**friends** 30:25
239:19
**front** 13:9 30:23
41:17 64:16 89:3
99:18 119:19
179:4 206:17
218:9 232:12
271:24
**fulfill** 271:19
**fulfilling** 29:8
**full** 12:12 49:4,5
49:15,16,17 59:1
126:4 127:4,4
132:2 136:3
140:24 143:6,10
143:11 146:4
147:15 152:2,18
152:19 153:17
156:2 218:15
249:25 296:24
297:14 345:13
**fully** 15:5,6 21:11
139:25 346:13
**function** 29:8
43:21 44:2,4,7
48:25 112:4
**functionality**
331:5
**functioned** 331:6
331:7
**functioning** 90:19
**functions** 65:5

**further** 46:19 63:4
114:1 214:13
218:12 301:17
303:9 364:18
365:1
**future** 154:2 304:1

**g**

**g** 78:16 116:19
280:23 292:1
**gain** 212:12,15
214:9,9
**gallagher** 202:13
349:6,9
**gallery** 220:18
**gallucci** 321:23
**gary** 177:21
179:12,14 181:4
181:21 327:6
**gateway** 246:18
247:11,25 317:21
**gather** 65:5 333:3
**gathered** 202:11
**gathering** 203:21
**geauga** 175:21
188:23,24,25
**general** 39:5 86:25
91:13 110:17
130:14 167:20
168:4,5 203:14
253:12 299:10
328:3 350:14
360:9 361:19
**general's** 2:18
10:22
**generalities** 90:16
**generality** 140:7
167:16
**generally** 14:23
21:7 23:7 29:20
30:7 84:21,24
127:16 137:25

171:10 231:11
251:17 290:24
325:12 331:19
350:7,9,12 353:1,3
353:6,8 356:5,8
360:5 362:1
**generated** 300:20
**geographic** 109:6
109:11,22 110:1,7
111:11 112:16
120:25 135:25
136:6 358:4
**george** 1:18 5:7
6:5 9:10 10:19
11:11,16,21 12:15
13:15,20 40:22
62:16,20 103:6
215:16 219:16
273:16 295:24
303:19 324:14
338:3 358:24
362:14,19 364:9
366:8 367:4,9
368:4,13 369:20
**getting** 22:24
31:10 33:16 36:19
40:6 44:1 50:20
52:24 63:13 64:12
65:10,13 80:18
94:24 111:9 113:5
115:20 124:17
158:23 175:4,7
181:25 187:3
189:19 192:11,12
197:3 201:15
211:4 214:10
215:19 239:19
241:5,9 295:14
307:6 308:20
324:1 330:21
342:23 343:4

344:25 351:13
**giant** 3:6 10:6 12:1
12:1,7 31:12,14,20
79:9,14 135:3,3,11
135:18,23 136:8
136:15,23 137:4
137:22 138:13
139:19 142:15
143:4 144:10,21
149:12,20 155:25
156:14 158:13,25
159:23 162:19,20
163:13,15 164:1
165:5,10,22 166:3
166:6,10 167:13
169:3,4,10,16,19
169:25 170:1,7,25
171:4,13 173:1,11
186:6 189:6,7,9,11
194:20 195:16
266:8,12 357:3,4
**gifting** 250:1
**girard** 208:12
209:6
**give** 16:6 25:23
28:8 40:5 49:8
50:22 80:13 82:20
126:10 130:4
138:2 139:12,13
142:1 148:19
171:21 186:15
198:3 209:25
218:24,25 249:2
275:12 285:8,9
296:7 327:18
346:7 363:1,10
**given** 21:1 123:8
362:14 364:12,17
**gives** 295:15
**giving** 15:6 35:2
36:20,22 99:15

166:22 347:15
**go** 9:8 21:23 22:19
26:16 30:5,16
32:4,11 36:1
41:21 45:7 46:7
48:11,13,14,16
49:18,21 50:3
56:8,13 57:18
62:19,24 64:1
68:13 72:23 73:16
75:15 77:3 84:20
95:9,14,21 102:12
111:16 113:9
114:4 116:19
119:25 121:3
122:11 126:15
130:15,16 131:5
132:4 133:10,25
134:22 137:12,17
137:21 142:9
144:8 145:7
146:25 147:5
149:3,24 150:13
151:7,9,22 155:3
155:14 158:24
159:22 167:21
170:18 178:16
184:14 185:15
190:14 192:10
194:11 199:12
202:17 210:6,13
217:12 220:19
221:10,11 228:22
228:22 229:7,18
229:24 230:11
231:8,16,17 232:8
233:2 234:1,19
237:2 238:9,25
239:14 240:25
241:25 245:21
279:14 292:10,25

293:4 301:8
304:11 309:15,23
310:12 311:24
313:10 314:5
335:10 336:17
338:16,17 339:21
342:2 347:20
358:22 359:8
**god** 187:5
**goes** 36:6 122:1
341:22
**going** 9:2 13:9
20:15 24:12 29:16
31:6 33:11 35:1,3
35:4 36:18 37:1
41:23 52:10 55:20
56:7 59:21 61:21
61:22 64:9 81:9
102:9 106:15
108:2 111:12,23
114:23 120:9,13
122:8,15 127:17
137:6,21 140:9,24
140:25 142:3,8
162:12 165:2,3
170:10,12 172:5
175:16,18 176:18
176:19,23 180:6
180:16 186:4
189:15 193:23
194:6 196:10
203:23 206:5
207:21 209:25
210:19 214:24,25
216:1 217:20
218:14,25 219:7
220:11 226:8,22
228:13 229:21,25
231:17,17 232:8
232:10 233:14
235:13,16 242:5

247:16 252:9
254:21 256:10
266:2 267:10,18
273:20 276:10
277:23 279:1,7,21
282:21,22 297:4,5
298:6,22 299:5
300:12 310:22
311:1 312:2 314:7
321:19 322:24
324:17 325:8,8
329:20,22 335:2
338:10 341:10,13
342:5,9,7 343:4
346:5 347:22
348:17 354:19,22
355:23,24,24
358:2,12 359:5,10
362:19
**gold** 323:7
**good** 9:1 10:5,7,13
11:23,24 25:23
35:14,17,18,21
80:4 103:8 134:5
134:20,21 143:22
145:18 149:15
152:7 154:5 160:8
160:16 161:3
162:1,1,21 163:8
164:17 176:4
185:3,17 204:25
210:17 219:4,18
220:3 290:10,13
293:6 294:7,10,18
295:15 299:7
303:3 321:1
325:21 336:12,16
342:12 354:19
355:14 358:7
359:1,9,17 362:2

**goodness** 347:14
**gotcha** 97:16
136:12
**govern** 89:10
**governing** 95:17
**government** 43:10
227:16
**governs** 272:5
**grade** 333:19
**graduated** 17:24
17:25 92:9
**granting** 147:12
**graph** 232:16,25
242:7 243:19
244:11,14
**graves** 176:17
203:6 204:2
**gray** 165:15 173:1
**great** 221:19
229:24 230:9
326:9 329:5 349:7
**greatly** 223:25
**greed** 213:24
214:1
**green** 141:25
**grief** 165:11
170:21 172:12
**ground** 80:24
**group** 12:4 150:5
313:10
**groups** 222:15
**guard** 258:9
**guess** 29:8,16
50:13 60:12 84:5
102:9 105:4
116:18 125:25
140:3 151:14
156:9 171:23
195:16 206:7
208:4 211:24
247:4 313:20

323:7
**guessing** 186:19
287:17 351:22,22
**guests** 69:23
**guidance** 332:6,14
332:21 333:2,15
**guide** 131:16,19
227:9 283:6
**guideline** 131:9,13
**guidelines** 130:24
**guilty** 225:2,8,13
**guns** 205:18
**guy** 20:19 34:9
116:4 121:1 122:7
149:15,17 173:4
184:12,15 193:11
205:20 210:16
343:11 345:15
347:11 351:9
355:22,24 361:7
**guys** 207:20
336:22

## h

**h** 2:3 159:25
164:16 177:22
292:2 340:6
**habits** 269:20
**half** 102:7,14
143:7,8 149:1
215:23 245:24
281:12,20 290:11
310:2 312:16
**hammer** 162:24
**hand** 126:16
139:16 281:9
283:3 287:21
347:22 365:6
**handed** 82:23
**handful** 186:16
**handle** 120:13
207:13,16

**handled** 69:12,13
71:5,6 120:15
207:15
**handling** 69:22
72:1 346:2 349:23
**hands** 252:1 292:9
**handwriting**
136:17,20 202:16
291:20,25 297:22
307:19,21,23
**handy** 347:17
**hanly** 2:13
**happen** 88:6
127:19 186:4
277:24 286:6
**happened** 127:17
161:11 180:14
185:3 203:15
206:15 258:22
308:22 320:21,23
321:10 330:4
351:17
**happening** 25:24
129:7 240:17,18
345:5 357:9,13
**happens** 100:12
100:14 146:7
269:13
**happily** 215:4
**happy** 214:6
218:13 313:8
314:1,3
**hard** 49:11 161:21
328:22 334:6,9
**harder** 173:18
**hardware** 141:17
264:22
**harrington** 175:3
182:3,11 185:15
207:5,7,19

**hato** 2:8
**head** 16:7 79:11
  133:3 168:11
  169:15 170:22
  187:17 256:17
  325:16 327:5
  330:8 348:8 350:6
  352:22 353:18
**headquarters**
  265:25 266:1,7
  276:2 332:1
**health** 20:18 122:1
  253:11 254:2
**healthcare** 26:8
  29:12 85:20 86:13
  92:8
**hear** 15:1,2 22:4
  58:1 174:7 220:4
  220:23 230:6,8
**heard** 15:5 187:4
  240:16,18 246:18
  246:25 248:20
  274:22 275:25
  278:2
**hearing** 132:9
**hearings** 15:11
**heather** 162:24
**heavy** 353:24
**heck** 155:11
**held** 9:16 17:11
  70:17 80:25 119:8
**hell** 153:3 180:19
  187:5,6 337:8
**hello** 49:5,14
  81:17 203:21
**help** 25:5 43:11,16
  45:17 229:22
  264:6,12 265:7,11
  345:2
**helped** 326:20

**helpful** 162:7,14
  285:13 289:22
**helping** 43:14
**helps** 100:24 101:2
  122:19 271:11
**henry** 2:18 10:21
  91:10 102:13,15
  194:4 215:5
  216:17 252:21
  267:2 310:3
  311:20,23 313:9
  313:19 359:4
  366:5
**henry.appel** 2:21
**herd** 182:21
**hereinafter** 11:19
**hereunto** 365:5
**herman** 3:16
  10:10
**hero** 362:11
**heroin** 231:24
  232:22 246:24
  248:1 318:2,16
**hey** 34:1 80:15
  100:8 114:24
  129:17 176:4
  189:17 207:1
  308:24
**hidden** 180:23
**high** 32:14 76:12
  99:9 168:7 204:22
  230:17 231:13
  239:10 309:11,12
  358:5
**higher** 132:6
  240:5 306:23
**highest** 99:8,8
**highlight** 302:20
**highlighted**
  232:20 302:19

**highlights** 141:15
**hill** 28:10
**hired** 18:18 24:11
  24:22 26:14,14
  47:15 120:19
**histories** 190:8
**history** 64:18
  263:1,9 270:25
  271:6
**hit** 312:15
**hiywa** 159:25
**hold** 55:20 132:23
  171:8 172:5
  243:11 354:22
**hollow** 282:20
**home** 12:25 16:18
  270:7
**homes** 48:15 91:2
  138:7
**honest** 139:25
  212:3 233:21
  244:21
**hope** 95:4 215:18
**hopefully** 113:15
  215:3 229:17
  314:6
**hoping** 35:6
**hospital** 160:5
  211:3
**hospitals** 48:14,17
  138:7
**hotheaded** 309:2
**hour** 81:5 102:7
  102:14 143:8
  148:25 151:18
  167:19 215:3,23
  216:8 281:13,20
  290:12 292:14
  310:2 312:16
  313:16

**hours** 78:2 124:19
  143:9 194:7
  215:13 216:15,19
  217:9 218:6,17,19
  267:3 311:9 312:1
  312:5,7 313:3,5,15
  346:8
**house** 11:1 149:12
  249:17 344:4
**houses** 293:9,10
**houston** 4:4
**howland** 198:19
**hq** 265:23,25
**hqs** 265:24
**hubbard** 3:21
  326:1
**huge** 36:17 180:17
**human** 82:18
  100:3 186:25
**hundred** 210:6
  214:11 285:8
**hundreds** 15:17
  167:7 186:17
  354:16
**hunter** 2:7,9
  321:23
**husband** 197:4
**hydrochloride**
  148:4
**hydrocodone**
  230:24 231:3,4
  250:5 308:5 320:8
  326:6
**hydromorphone**
  113:23
**hyperspace**
  266:24

**i**

**idea** 81:1 131:7
  222:5 228:3 229:6
  235:9 237:25

248:9 252:4 254:13 265:22 266:23,25 267:6 273:11 287:11,12 288:4 310:12 318:22 336:12 358:7

**identification** 13:16 280:9

**identified** 128:14 339:4

**identify** 63:12,15 263:9 264:7,12,18 283:9 332:15 333:16

**identifying** 115:16 259:23

**ii** 40:1 143:13 209:22 230:15,16 230:21 231:3,5,5,7 231:10 236:4 244:4

**iii** 209:22 244:4

**illegal** 20:17 21:8 39:11,19,19,20,20 39:22 40:6 50:12 62:14 128:10 198:25 212:23 229:12 231:23 241:16 245:4 253:8 283:13,13 284:24 315:25 318:24 327:19

**illegally** 51:23 199:22 269:2 317:12,16

**illegitimate** 33:18 34:1 169:11 274:15 353:12

**illicit** 21:17 238:15 246:14,24 247:9

247:12 248:1 256:21 274:16 276:19

**illinois** 3:4,21

**illness** 238:18

**immediate** 26:15 257:15

**immediately** 32:11 32:16 38:22 118:4 118:10 277:25 298:17 315:18

**impetus** 207:6

**important** 44:7 48:25 49:3 261:17 262:16 268:15 277:6,8

**importation** 253:8

**imposed** 133:18 166:4

**imposes** 254:8 255:6

**impressed** 292:11

**impression** 361:19

**improper** 199:23 223:21 247:20 253:10 283:12,14 284:12,13,15,19 284:19,22 285:12 289:2,15

**improperly** 204:9

**inappropriate** 104:14

**incidences** 127:21 346:22 352:20

**incident** 140:6 156:12,20 170:25 207:23 239:24 307:10 308:1,4,11 327:3 339:17 349:8 351:5 352:3 353:24 358:19

**incidents** 325:14

**include** 69:3 70:6 72:4 105:5,24 106:2 129:10 138:23 165:21 197:9

**included** 45:6 108:15 266:6 366:13

**includes** 46:23 50:10 94:8 104:9 115:10 140:11 229:10 249:5 282:11

**including** 31:12,16 31:19 46:13 47:4 59:6 60:8 63:5 66:9 89:11 135:2 140:24 169:6 179:24 181:16 185:5 190:10 199:2 201:9,23 203:12 230:24 231:23 238:15 251:12 253:1 278:6 313:16

**incorporated** 368:12

**incorrect** 104:13

**increase** 251:4

**increased** 34:19 34:22 233:5

**increasing** 244:11 245:25

**independent** 32:24 121:6 127:23 137:9 138:19 139:18 168:8 174:21 179:13,15 186:8 212:5,11,11 212:15,20 213:1,3

213:14,21 214:4 275:8 296:16 355:19

**independents** 22:18 31:19 32:16 53:5 179:10 192:8 192:14 201:1 212:4,22 355:17

**index** 5:1,4,5 6:1 7:1 8:1 140:15

**indiana** 3:10

**indicate** 262:15 268:23 283:25

**indicated** 136:15

**indicates** 310:9

**indicating** 55:25 131:3 291:23 322:23 366:13

**indict** 176:19 193:23,24

**indicted** 185:4 250:8,18 340:11 353:16

**indictment** 29:18

**indictments** 225:3 242:11

**individual** 21:15 33:2 79:10 94:6 95:24 96:5 116:25 266:20,21 296:8 322:9 340:1

**individuals** 24:7 58:16 94:22 173:17

**industry** 27:16 43:4 231:12

**influence** 239:17 241:2

**inform** 206:22

**informants** 22:3,8

**information** 36:8
37:6 38:2 42:18
46:20 53:18,19
54:3,5 63:3 80:14
100:19 117:10,17
118:23 150:1,5
156:15,23 190:18
195:17 207:18
249:22 259:23
261:7,25 262:16
263:1 266:23
267:20 268:16
270:1 271:6 273:9
282:2 308:8
328:17,24 329:2,6
344:12,25
**informed** 303:25
**initial** 96:16 97:4
113:4 129:19
289:2,19
**initialed** 105:16
**initially** 47:15
64:5 129:1
**initials** 105:16
119:10 122:25
128:24,24 129:18
141:21
**initiated** 344:18
**injury** 238:18
**inmate** 182:2
**input** 64:8
**inputted** 112:7
**inside** 282:20
297:5 340:18
360:14
**insight** 27:6
**inspect** 24:6 43:20
44:3 48:21 49:1
124:16 125:2,6
126:12 135:23
137:2 138:1,9

140:18 162:11
324:21 331:2
**inspected** 135:18
137:6,8 139:24
165:20 330:23
338:19 352:21
360:1
**inspecting** 66:9
76:24 135:3 169:3
274:25
**inspection** 6:6
32:7 48:10 49:16
49:17,18 60:5
78:7,14 82:14,21
125:11,16,20
126:17 127:5,12
127:15 129:6,15
131:9,15,19 132:2
132:14 135:7
136:3,8,14,19,21
138:12 140:4,8,12
140:17,25 141:6,7
141:15 143:2,3,6
143:11,11,12,19
144:10,14,20,22
145:4,8,16,23
146:3,4 147:22
148:22 149:3,25
150:10,13,17
151:6,8,25 152:2
152:17,18 153:12
153:15,18,18,24
154:5,11 155:3,7,9
155:14 156:2,2
158:8,13,15,15,25
159:9,11,23
160:11,13 162:18
162:20 163:9
164:10,13,21
165:4 166:24
168:18 170:17,19

201:19 202:1,5,6
202:19 203:15
205:1,2,6,10,19
242:23 264:20
266:21 276:11,19
279:1 280:6,15,21
281:1,4,12,15
282:8 283:5
287:22 288:3,19
290:1,6 291:7
292:17 294:21,25
295:5,7,15 296:24
297:8,10,15,19
298:8,15 299:16
299:21 302:13
303:19 304:9,14
306:5,10 307:8
325:5 328:14
335:18 336:3
339:1 341:1
348:21,24
**inspections** 25:4
49:5,9,15 50:1
52:11 58:8,15,20
58:22 59:2,7,12,15
71:13,20 73:20
74:8 75:7 76:20
77:20 78:4 82:12
83:7 101:15,25
104:5 105:13
123:2,12,18
124:23 125:12,15
125:25 126:4,20
130:18,21,25
131:25 132:2
134:8 135:11,20
136:15,25 137:4
139:6 152:9
154:12,19 158:5
158:11 159:21
162:15 165:21

166:2 169:25
201:16 203:16
266:13 273:5,24
274:1,7,20 275:4,9
278:11,21 292:4
316:10 324:24
325:1,4,11 328:6
328:23 331:1,18
332:4 335:16
342:18 350:8
360:6 361:17
**inspector** 128:14
283:4 288:18
291:16
**installed** 161:24
**instance** 151:4,13
309:18 330:1,6
**instances** 269:8
339:9
**instigated** 208:9
**instigating** 88:1
**institute** 333:21
**institution** 92:10
**institutions** 24:6
**instruct** 346:16
**instruction** 363:2
363:10
**insurance** 115:25
200:5 249:25
250:8 261:13
270:21
**intend** 217:4
**intended** 185:15
**intensive** 59:9,17
**interacted** 361:11
361:15,20
**interactions**
104:12,14
**interested** 9:22
23:8 365:3

**interesting** 195:24
**interests** 10:24
**interfered** 296:15
**intern** 306:2
**internal** 69:3 80:4
　80:17 160:15,16
　161:3,25 272:16
　272:20
**internet** 176:9
　177:7 178:4,5
　179:22 180:7,24
　181:15,19,20
　199:14 243:12,23
　243:25 244:5,15
**interns** 46:24
**interpose** 216:17
**interpret** 94:12
　96:8
**interpretation**
　97:7
**interpreting** 94:9
**interrupt** 267:1
**interstate** 347:23
　347:23
**interview** 249:20
　320:15
**interviewed** 204:1
　204:6,16,19
**interviewing**
　357:24
**intimidate** 121:24
**intoxicated** 115:12
　116:13
**introduce** 279:8
　279:21
**intuiting** 288:16
**inventories** 132:18
　133:7 134:9
　143:17,23 153:23
**inventory** 132:16
　132:22 133:13,15

133:19 134:13,16
134:18 143:14
163:16,17 283:14
284:4,7
**investigate** 21:6
22:14 24:5 29:7
29:12 31:5 38:6
98:9,13 106:15
114:1 184:24
235:18 238:2
276:13 317:2
**investigated** 28:9
29:17 184:21
186:13 190:4
198:1 204:9,21
243:13 248:21
256:22,23 257:19
262:7 264:25
265:4 314:24
315:4 316:15
**investigating**
38:10,16 145:21
174:20 180:4
192:4 204:14
301:5 319:20
**investigation** 18:4
19:12 23:4 27:21
36:25 54:24,25
59:9,17 62:9 63:5
80:24 114:11
125:20 134:3
139:17 141:14
169:17 174:2
176:23 178:21
182:4 183:13,20
183:21 184:19,20
185:2,22,23 186:8
187:15 191:12,21
192:21 193:22
196:5 201:17
202:7 204:13

206:23 207:7
208:8 209:3,20
242:10 243:3,5
244:16 250:3,14
262:6 266:5 272:3
276:15,23 302:5
315:18 316:1
321:11 323:19
326:20 341:3
344:12 348:24,25
349:15 361:13
**investigations**
20:2,2,12 23:20
25:4,6 26:1,7
30:2 38:1 39:2
41:24 50:4,6,18
58:10,16,23 60:1,2
99:5 135:1 138:10
152:12 162:10
171:11 174:16
185:21 225:22
272:22 273:1
278:18 315:5
316:6 328:25
342:18 354:5
356:6
**investigative**
19:15,19 30:8
63:25 64:2 65:6
163:6 164:19
170:20 278:8
**investigator** 18:6
26:3 196:1,2
**investigators**
25:15
**involve** 41:24 92:6
**involved** 62:25
81:22,25 82:14
83:3 92:3 95:2
169:22 171:19,20
174:17 177:24

178:4,6,15,21
182:8 209:20
211:17 232:18
235:14 250:13
319:19 323:11,15
**involvement** 89:18
**involving** 22:11
25:18 26:7 38:7
49:16 50:9 156:9
169:23 190:8
207:24 225:3,9
229:10 248:10
320:17 321:4
325:16 327:23,25
341:1,3
**issuance** 28:19
72:15,16 92:14,23
95:9 172:4 205:23
335:23 337:22
342:4 345:22
**issue** 29:10 32:5
81:20 96:10 97:4
97:10 98:11
141:24 153:10
156:9 184:23
288:18 289:7
290:22 302:10,25
305:4,12 329:23
333:7,14 339:13
341:16 345:21
**issued** 40:24 61:23
62:5 95:23 97:24
116:24 158:5
195:4 205:25
206:7,12 208:23
209:1 266:20
288:15 289:6
298:24 300:6
302:20 329:20
350:10

**issues** 16:3 20:15
21:8 34:3 43:17
97:2 158:22
171:15 172:22
218:1 229:20
289:8,25 290:2,4
302:12 314:16,20
325:3 328:12
338:24 347:6,7
350:13 352:20
356:20 360:18,21
360:25 361:24
**issuing** 96:15 98:3
98:20 138:9
**item** 141:8
**itemized** 289:8
**items** 78:4 140:16
141:1,1 155:23
163:12 164:7
281:9,11 283:3,8
286:22 287:21
**iv** 211:15 244:4

**j**

**jacob** 249:7
**jail** 30:5 175:1,9
182:3
**james** 4:3 10:8
216:1 338:6,13
340:6
**james.nortey** 4:5
**january** 15:23
52:7 168:19 177:9
**jar** 125:4
**jason** 3:3 10:13
359:2,18
**jeff** 184:9 196:1
**jefferson** 24:15
25:2
**jeffrey** 144:11
**jeren** 144:15,19

**jim** 176:3 184:18
185:11 201:24
202:14 326:1,8,15
329:3 340:7
345:14 352:6
**joanne** 174:23
183:1 185:14
202:13,22 204:1
204:18,19 211:1
**joanne's** 202:15
**job** 18:15 66:8
199:16 245:8
278:22 290:10,13
345:7
**joe** 207:5,7
**joey** 175:2 182:3
182:11 185:14
207:10
**jog** 107:4 287:14
**jogged** 56:18
**jogs** 55:12
**john** 207:24,25
208:1,4,15 340:16
341:4 344:1,7
348:12 352:3,10
**jones** 3:2 10:14
**jonesday.com** 3:5
**joyce** 296:13
305:16 320:2,8,24
**judge** 1:8 311:12
312:19
**judgment** 92:3,7
92:20 93:15
100:12 105:2,23
106:4,8,16 110:4,5
110:23 111:12
112:18 117:12,20
118:22 119:4,6
140:19,22,23
141:2 193:2
358:17

**julie** 303:11
**july** 153:16 299:15
300:1 304:5
**jumping** 293:5
352:23
**jumps** 213:11
**june** 183:14
208:22
**justice** 18:11
217:19 227:11,25
228:2
**juvenile** 19:9
**jzhou** 3:5

**k**

**k** 177:22 197:18
350:17
**kate** 10:11 214:15
252:8 273:20
279:16 309:23
**kate.swift** 3:22
**katherine** 3:20
**kathleen** 303:2
305:22
**keep** 147:17
157:13 224:25
258:23 259:12
273:2,19 336:23
336:24 354:19
359:22 362:10
**keeping** 260:8
261:19 284:8
**keeps** 258:16
**kelly** 352:15
**ken** 159:25 176:15
203:12 204:5,6
206:17
**kept** 41:19 157:17
186:9 261:24
322:17 345:4
346:4 355:17

**key** 46:12 68:21
68:22 69:16
**kicked** 112:7
**kid** 102:17
**kids** 154:9 238:11
238:11 239:16
241:3
**kill** 182:21
**killed** 176:22
248:6
**kimberly** 155:6
**kind** 120:16
131:13 141:16
175:8 178:11
182:16 199:8
205:1 207:6
228:13 291:5
292:24 296:4
306:24 323:12
327:13 333:6
336:20 337:3
**kinds** 262:11
**king** 182:11 212:1
**kinsman** 127:22
128:3,5 138:19
139:15,18
**knew** 104:21
126:17 132:11
140:5 175:23
185:8 192:6
203:18,21 206:4,5
209:5 211:3
236:10 303:2
326:8
**knife** 176:22
**knot** 339:24
343:18
**know** 16:9 23:21
25:18 27:5,7 32:1
35:5,8,14 40:19
43:13,18,22,23

51:4,7,8 52:12
53:5 54:18,19,22
55:3 57:4,19,22,23
57:25 62:22 64:4
64:5,10,19,22 65:7
65:8 66:7,13
71:10 72:15 76:15
81:3 84:18 89:7
89:22 90:1,12,17
91:3 99:13,18,23
106:23 107:2,23
108:5,13,17
113:22 114:7
115:22,22 119:8
119:17,24 120:6
124:13 128:21,22
130:9 131:10,11
131:12,18 132:13
132:14 133:21
134:7,14,22 138:4
138:15 139:14
141:20 143:10,20
149:15 150:18
152:4,13,23 153:3
154:3,5,6 157:23
160:4,6 166:2
167:3 168:10
169:18 172:14
173:1,3 175:15
178:16 180:21
184:7 186:20
187:17 188:5,7
189:18 191:9,16
192:9 193:11
198:4 200:15
202:25 204:1,5,6
204:19 206:14
210:14 211:1,2,2
212:17 214:9,10
215:14,14,20
217:17 218:9,13

219:23,25 220:15
222:25 225:6,7,18
226:13 227:25
228:8 232:7
233:11,21 236:12
236:19,19 239:21
241:7,12,18
242:12 244:20,21
245:7,11 247:18
247:20 251:7
254:5,15 255:10
255:20,23 256:3,5
256:11,12,15,16
256:17 257:2
260:5,16 264:1
265:5 266:20
270:16,17,18
272:1,8 275:21
276:5 279:12,13
287:9,16 288:7,7,8
288:9 290:8,8,16
293:4,5,7,10,22,23
293:24 295:12
296:2,12 303:3,14
303:15,16 305:25
306:15 307:1
308:15,22,25
309:2,10 310:7,10
310:21 311:11,12
311:13,16 312:16
312:17,18,21
313:11,13 318:4,5
319:3,4,13,16
320:24 321:7,21
325:14 327:4
328:22 329:6,21
330:13 331:8,11
331:24 333:4
335:5,8,9 336:11
336:12,19,20,20
337:10 338:9

339:15,16,20,25
341:23,25 342:23
343:3,4,7,13,14
344:8,13 345:4,17
345:18 346:14
347:8,12,16,17,19
347:20 348:1,11
348:15 349:21,22
351:14,23 353:17
354:13,16 355:20
355:20 356:18
357:4,6 358:13
**knowing** 41:6
93:19
**knowingly** 98:1,18
98:22,24 99:3,6,10
99:11,15 170:7
171:1 353:12
**knowledge** 53:16
93:15 94:3 99:25
110:9 112:1
121:15 125:7
231:13 232:6
233:24 242:14
254:22 257:22
269:3 272:17,19
319:23 322:7
329:9,12,23
330:10,15 332:23
333:13
**knowledgeable**
224:15
**known** 218:10
231:11 310:25
326:23
**knows** 36:21 95:12
333:5 351:25

**l**

**l** 1:24 13:6 178:1,1
197:18 207:24,24
208:5,5 226:16

257:16 279:5
292:2 340:6 364:6
365:13
**l.p.** 1:10,13
**label** 334:15
**labeled** 122:17
**labeling** 122:18
123:5 156:22,24
**laborer** 18:22
**laid** 57:13
**lake** 1:10 17:19
24:16 25:7,11
27:3 109:17
135:13,24 175:1
175:11 182:3
188:18 190:17
199:18,19 207:14
207:16,20 213:4
219:20 237:7
251:12 254:3
322:1 330:12,13
330:17,19
**lakeside** 2:3
**land** 85:9,17
**language** 96:8
117:3
**lanier** 2:10
**lanierlawfirm.com**
2:12
**large** 27:10 145:25
236:17 242:20
243:4 263:24
278:18,19 291:4
325:19
**larger** 222:15
**lastly** 350:22
**late** 16:4 128:4
183:16 185:13
224:21 346:9
352:8

**laura** 2:14 217:23
**law** 2:10 34:14
37:25 43:3 46:22
48:8 58:23 78:8
98:4,21 99:14
119:18 123:21
124:2,10 129:25
130:1 131:1
165:24 166:4
167:5 173:20
221:6,7 227:9
272:9 314:25
315:2,3 342:2
349:22 356:17,18
**lawful** 11:16
**lawfully** 170:1
173:13 316:12
**laws** 42:24 46:14
47:5 58:17 87:5
127:4 129:23
130:12,13 131:2
272:10,12
**lawsuit** 17:6,7
**lawyer** 90:1,1
321:17
**lawyers** 17:18
91:6 321:20,25
323:2
**laxity** 120:7
**layman's** 45:1
**lead** 118:16
246:23 247:4
248:3,6 306:22
**leads** 22:2,24 23:4
30:8,14,22 31:15
33:6 65:6,10
139:9,13 145:20
152:11 163:7
164:19 253:20
**leaning** 228:14

**learn** 52:15 344:6
**learned** 263:17
**leave** 129:1
**leaves** 240:13
**leaving** 315:17
**led** 31:9 36:10
327:15 329:8
344:12
**left** 47:16 49:19
52:7 66:16 73:5
103:9 131:10
140:16 181:4
215:15 227:20
281:9 282:9 283:3
287:21
**legal** 9:18 47:10
65:25 224:3
362:17 366:1
369:1
**legally** 28:25
77:18
**legend** 72:6 244:1
244:2
**legitimacy** 117:13
180:20,25 193:16
**legitimate** 17:12
21:18 22:11 28:12
28:21,24 29:11,21
30:19 33:11,14
39:25 40:9,13
51:19 61:5 62:10
62:12,13 76:1
92:15,25 94:2
95:24 96:11 97:5
98:11 99:24 114:2
116:24 117:21
118:1,18 170:8
171:2 188:3 252:2
252:2 268:1
271:21 274:15
275:17 284:21

**legitimately** 28:11
92:13 94:1 181:2
255:22
**legitimize** 41:16
**legitimizing** 41:19
**length** 277:17
**letter** 147:12
157:21 217:18
279:7 303:10,17
304:5,12 366:19
**letting** 312:17
**level** 31:17 249:4
259:8 263:5,6
264:3 265:2
266:15 284:3
304:3 332:24
349:7 355:18
361:9
**levels** 166:15,17
245:17
**lewis** 4:2 162:24
196:1
**lfitzpatrick** 2:16
**liber** 2:2
**library** 78:1,9
272:10
**license** 33:1 44:9,9
44:21 45:13 82:1
82:9,13,15,16,19
82:21,22,25 83:8
83:17 84:2,11,16
84:23,25 85:8,14
85:16 86:25 87:8
87:21 88:8,11,19
89:11 124:18
127:9 128:9 130:5
131:11 165:7,23
176:18 178:19
205:24,25 206:6,8
206:12,20 282:16
297:9,10 305:21

329:10,23 330:2,7
330:12,18
**licensed** 44:13
48:9 49:2 67:13
68:17 74:12 76:1
81:21 82:23 85:20
86:4,7,12 89:5
92:9 96:10 125:9
125:21,23 206:19
**licensee** 67:2 68:2
68:3
**licensee's** 69:25
**licensees** 66:23
**licenses** 44:12
45:13 49:21 83:23
84:10 128:2
138:10 165:6,22
206:14
**licensing** 44:7,11
46:23 47:10 78:21
81:20,22 82:4
83:3 86:24 88:24
293:1,2
**licensure** 85:12
**lie** 336:19
**life** 173:17 182:13
276:5 347:14
**lightning** 304:22
**lights** 78:12
**liked** 339:6,11
345:17,17
**likelihood** 318:14
**liking** 157:9
**limit** 216:8 312:13
312:15 313:8
**limitation** 216:10
217:8
**limited** 87:9
115:11 216:18
218:6 254:20

**limits** 215:16
**linda** 164:15,16
**line** 11:1 30:23
  38:21 62:24
  121:19 183:16
  232:19 291:9
  293:4 340:24
  366:13 368:7
  369:3
**lined** 291:5
**lines** 316:16
**lining** 33:9
**list** 22:21 85:7
  130:2,9 147:9
  281:9 283:2,4,8,16
  284:12 285:24
  286:10,22 287:21
  288:12
**listed** 55:8 123:15
  123:23 129:12,21
  135:9,10 150:9
  159:24 261:15
  294:9 305:16
  306:1 368:7,17
**listen** 288:10
**listened** 278:13
**listing** 94:7 100:18
  146:13 368:7
**lists** 68:7 111:8
  124:8
**literally** 292:21
**litigation** 1:6 9:12
  366:6 367:3 368:3
**little** 28:1,3 49:19
  50:1,25 78:6
  89:22 104:8 154:9
  155:1 157:5
  171:22 172:22
  173:3,5,17 183:22
  187:12 193:7
  214:22 221:24

244:17 302:15
307:18 322:17
328:20 331:23
336:21 339:13
345:19
**live** 320:14 326:15
  326:17
**lived** 344:3
**llc** 3:10,11
**llp** 3:7,11,15 4:2
**loaded** 76:12
  195:22
**local** 69:23 124:2
  194:22 249:7
  259:7 264:4 304:2
**locally** 262:14
**located** 109:5
  128:6 178:2
**location** 32:22
  45:9 69:13 82:16
  85:3,5 113:1
  150:25 151:4
  167:17 203:5
  266:21 282:16
  306:21 340:7
**locations** 31:12
  46:24 60:20 186:3
  266:20
**lock** 195:21 298:1
**locked** 195:21
  298:11
**log** 153:9 160:14
  160:24 161:8
**logs** 334:3,7
**lone** 347:19
**long** 21:2 27:20
  35:10 48:16
  109:22 143:21
  148:25 150:8
  155:11 194:11
  214:24 222:7,8

243:22 270:17,18
338:9 347:6
355:10,12
**longer** 24:25
  240:12 267:9
  286:11,14
**look** 13:3 33:12
  49:23 54:19 55:5
  55:22 56:15 57:5
  58:3 61:10 63:7
  69:9 71:21 75:25
  78:20 82:18 83:11
  83:12,20 85:6
  87:12 90:14,15
  93:3 95:22 104:2
  107:3,19 113:19
  115:21 116:5
  135:6 143:9
  144:16 148:8
  154:20 170:16
  176:8 183:6 184:5
  194:2 195:23
  197:24 201:25
  205:11 208:17
  210:3 212:18
  221:15 230:14
  236:20 244:10
  245:13 249:4
  261:5 269:20,23
  279:23 284:11
  285:23 286:15,25
  287:3 296:21
  309:15,21 312:19
  328:20 335:24
  336:16 342:2,4
**looked** 22:13
  61:13 75:6 76:12
  78:3 90:20 101:14
  116:10 148:23
  155:8 180:13,19
  212:16 286:19

297:4
**looking** 20:16
  30:15 55:17 60:21
  66:6 74:8,10,16
  76:8,18 84:18
  102:1 108:8
  110:15 111:2
  114:7 125:3
  128:15 129:24,25
  136:18,18 137:19
  142:11 144:1
  157:4 161:20
  172:19 180:21
  186:24 211:7
  226:17 232:14,15
  242:24 246:2
  252:17 257:12
  272:15 281:14,19
  286:8 293:8,9,13
  299:17 301:2
  311:11 315:24
  327:15 355:15
**looks** 40:20,23
  147:24 148:3
  149:25 150:16
  151:12 153:20
  155:18 159:12
  210:16 245:15
  280:18 300:5,13
  303:15
**loose** 131:24
**lose** 128:9 176:18
  206:5
**losing** 266:19
**loss** 79:1,5,7,11,15
  79:21,24 80:3,7,11
  81:1 148:12 149:4
  149:16,19 343:11
  347:11
**lost** 128:1,2 198:21
  241:11 303:4

**lot** 25:5 29:23 30:3
30:21 31:4,8 33:3
33:23 35:14,17,18
35:22 43:12,15
45:12,17 48:14,16
49:11 76:23 84:5
101:19 120:9
126:18 128:11
129:3 133:24
151:9 152:14
174:19 178:24
179:1,2 196:25
198:5,6 202:20
205:4,7 212:3,4,4
212:6,21,25
229:20 247:16
265:6 308:22
316:19 323:21
324:12 326:10
345:16 354:3
**lots** 26:7 269:3
316:24 317:5
**lottery** 126:19
**louis** 138:18
**louisiana** 4:3
**luchette** 176:16
203:6,13 204:3,4,7
**lucky** 132:15
**lunch** 102:9 103:9
**luncheon** 102:22

**m**

**m** 3:16 163:21
178:1 207:24
208:5 249:7
**m.d.** 210:10
**m.d.s.** 210:1
**machine** 40:16
320:7
**madam** 366:10
**madgar** 162:21
163:2

**madison** 2:14
**magnitude** 178:8
197:12
**mahoning** 20:7,8
22:18,20 23:18
24:14 25:1 42:12
109:16 110:12,19
150:5 174:22
178:3,18 185:5
196:22 235:25
347:3 352:6
**mail** 148:18 225:8
**main** 20:19 67:12
67:17 178:20
189:8 320:5
325:25 347:23
**maine** 25:21
**maintain** 85:22
133:23 168:9
258:15 259:1
260:5 360:24
**maintained**
133:14 158:6
259:10
**maintaining**
277:12,19 283:23
314:22
**major** 44:16
128:25 165:16
201:19 202:6
328:12
**majority** 45:21
195:3 275:24
317:25 325:13,19
325:20 350:15,19
**making** 38:13,22
117:12 212:15
255:2 275:3 284:7
**male** 90:25 267:6
**man** 23:16 167:21
168:11 235:5

236:14 237:11,13
**management**
110:14 113:11,16
118:8 190:10,22
192:22 193:10,11
209:14,14 249:13
**manager** 176:21
**mandatory** 52:17
52:19 53:1
**manner** 28:19
72:15,16 78:19
86:20 92:14,22
95:7,9,10,17
103:10 104:1
123:4 154:25
169:5 172:4
185:21 335:23
337:22 342:3
345:21
**manual** 37:11 38:3
49:19 128:23
129:18,19 130:19
130:20,24 141:21
181:10
**manually** 37:13,16
82:23 101:19
105:16
**manufacture** 70:1
251:23 253:9
**manufacturer**
44:16
**manufacturers**
36:14 37:7 255:17
255:21 256:9,14
256:25
**map** 236:23 237:2
244:24 245:2
**march** 14:21
24:20 52:7 106:24
143:2 146:4
184:16 185:11

202:9 242:14,17
246:6 286:16,20
289:13 297:19
309:22
**marcie** 158:17,19
158:20
**marcus** 3:7,9
**marijuana** 231:24
232:22 238:15
**mark** 114:20
153:1,1 290:21
335:5 343:11
**marked** 6:3 13:15
13:21 14:3,4
57:16 226:16
227:5 280:1,8
289:14 344:15
**market** 198:17
209:18,19 280:16
280:18 293:17
301:10 307:9
340:22
**marketing** 224:20
226:1,6
**marks** 81:10 103:2
115:16 196:11,15
219:6 267:11,15
314:8,12 359:14
**mart** 213:15,16
323:10,16 324:3
**maryland** 3:13
**massive** 179:9
185:2 186:10
187:20
**massiveness** 27:24
**masters** 198:9,22
209:9 210:1,5,8,17
213:13 301:16,20
302:4 323:19
**materials** 226:7

**math** 49:10
**matter** 9:11 26:2
27:19,20 28:1
71:25 88:2 126:6
156:13,16,18
171:18 174:12
188:13 190:20
203:9 207:12
210:20 275:7
298:19 299:10
344:3 358:7 359:3
359:19
**matters** 79:16
102:8,15 157:25
**mcanany** 163:21
**mcevey** 293:25
294:5,6,8 295:23
**md** 1:7 9:15
**mdl** 1:6 9:14
**mdl1801987** 6:7
280:8
**mdl2800646**
142:13
**mean** 12:6 28:7
33:22 37:6 39:23
41:17 50:13 51:18
55:11 57:11 61:1
61:2 66:5 68:16
70:23 76:11 77:4
96:4 98:22 99:4
100:3,24 106:11
109:13 110:11
112:6 113:7 115:4
115:25 116:2
118:19 120:15
121:15,22 126:2,2
132:5,11 134:3
138:4,5,24 139:15
147:6 148:10
155:9 169:13
170:9 179:4 182:7

182:25 186:23
187:4 188:3,4
189:5,13 190:24
195:20 198:5
201:3 203:22
211:11 212:17,25
213:11 217:9
221:10 229:5
241:10 255:18
257:1 265:25
266:24 269:3
274:13 276:4
283:20 284:25
285:25 287:9,23
288:2 289:24
290:24 292:10
294:24 295:3,9
296:15 298:8
299:7 307:2 309:1
312:20,21 313:19
313:25 320:3
325:14,15 328:7,8
329:4,12 333:4
345:2,14 347:5
354:16 355:11
357:21 358:12
**meaning** 287:20
290:23 310:16
**means** 68:19 77:17
93:13 94:8 108:18
109:12 111:23
218:21 237:10
287:24 288:17
289:6 295:6
**meant** 56:3 92:19
93:20 109:10
201:7 290:2
**mechanism** 75:10
75:11 327:14
**medal** 323:7

**media** 9:9 81:10
81:14 103:3
194:14 196:12,16
219:7,11 267:12
267:16 314:8,13
359:11,15 362:16
**medical** 22:11
28:12,21 29:22
30:19 62:10,12,13
95:24 96:11 97:5
116:25 118:2,18
150:5 192:20,23
192:25 193:2,15
193:20,25 195:25
234:9 252:2
271:22 318:7
**medically** 230:18
**medication** 99:16
114:9 118:7 195:3
199:24 240:23
284:16 285:16
314:18
**medications** 45:19
53:23 96:20
101:10 190:6,9
208:22 250:2,6
274:3,14 294:16
317:4 360:19
**medicine** 240:14
318:19
**medina** 24:16
**medsmart** 324:5,6
**meet** 32:22 33:1
49:23 98:14
**meeting** 25:18
123:4 194:18
**meetings** 57:12
**meets** 101:11
**members** 26:20,22
**memorializing**
153:25

**memories** 195:24
**memory** 55:11,12
56:18 90:18 92:21
107:4 125:4 214:4
287:14 337:6
**memos** 272:20
**men's** 151:22
**mendenhall**
172:22 343:19,21
347:10,24 348:22
351:6
**mendenhall's**
350:24
**mental** 99:7
**mentioned** 25:14
29:6,9 44:17
48:21 95:6 97:20
173:24 177:19
196:20 269:7
281:3 319:21
322:13 323:9,14
325:23 327:2
357:7 359:19
**messiest** 327:12
**met** 23:19 74:17
165:5 166:3,9
178:13 194:19
353:6
**metal** 297:20,24
298:1
**methadone** 113:23
175:7 182:22
187:2
**methylphenidate**
148:4
**mexican** 246:16
**mexico** 224:8
317:11,15
**mic** 228:13 229:19
229:20

michael 144:11
michelle 91:11
microphone 9:6
  228:15
microphones 9:4
mid 352:9
middle 160:23
  291:5 329:22
middlefield
  194:21 195:2
midwest 366:17
  369:1
mike 160:6 162:21
  163:1,2
mildred 2:10
  10:17
mildred.conroy
  2:12
miles 109:25 192:9
  270:17 358:10
mill 178:1 179:18
  181:22
milligram 148:5
  175:5 182:18,20
  186:25 187:2
  188:4
milligrams 235:6
million 174:20
  176:9 178:8,16
  180:9 242:4,6
  243:15 245:16,24
  245:25 246:1
mills 264:13
mind 73:18 76:1,4
  152:15 321:7
  355:5
mine 49:10 184:6
  208:6 223:9
  280:22,23 292:1,2
  297:22 307:22

minimal 331:13
  358:15
minimum 77:9,14
  77:22
minor 128:21,22
  141:20 153:13
  336:2
minute 107:14
  126:4 153:19
  172:18 177:12
  189:6 196:7 210:3
  281:23 294:22
  297:1 310:6,6
  312:10,10 314:1
  359:5
minutes 33:15
  81:5 90:9 151:18
  194:10 214:21,21
  215:23 216:2
  221:25 310:8
  311:8,9,10,17
  312:8,9 313:15,16
  314:6 343:24
mirror 72:17
mirrors 72:14,20
mis 241:11
mischaracterizing
  254:25
misconstrued 90:2
miserable 347:15
mish 202:13
misinstalled 298:4
misplaced 303:4
mispronounce
  216:5
missed 243:24
  287:10 288:11
missing 50:20
misspoke 56:6
  201:5

mistake 100:11
mistaken 313:14
mistakes 100:2,4,6
misunderstood
  56:10
misuse 104:14
  234:7 239:16
  253:20 316:21
  317:7,17 318:15
misusing 317:3
moment 249:2
  319:21
moments 359:19
money 88:15
  212:16 344:15,17
mongine 303:2
  305:23,24
mongine's 306:1
monitor 257:5
monitoring 70:1,8
  257:5
month 53:11
  61:19 137:22,23
  200:11 201:20
  260:14 297:12
monthly 134:19
  143:15,18,23
months 63:21
  108:21 112:10,24
  114:16 131:7
  137:11 180:12,13
morgan 4:2
morganlewis.com
  4:5
morning 9:1 10:5
  10:7,13 11:23,24
  91:15 274:23
  319:9 322:6
  359:17
morphine 235:6

mother 343:13
motion 252:5
  295:16
move 70:20
  151:24
moved 154:14,16
movement 274:14
moylan 3:12 5:10
  10:9,9 215:21,22
  254:11 309:23
  324:15,17 337:24
mullin 207:24
mullins 207:25
  208:1,4 209:3
multiple 17:10
  23:19 29:1 41:25
  113:5,6 118:7
  166:10 186:3,3
  204:22 276:13,19
  308:6
municipal 15:14
munoz 2:7
murder 176:24
muscle 248:17
  260:4
muster 266:14
mute 9:6
mymo 144:11

**n**

n 163:21,21
  177:22 197:18
  207:24 208:5
  340:6
nalluri 300:17
  301:3
name 9:17 11:25
  12:13 15:25 24:12
  34:24 61:13 64:8
  79:10 90:7 115:15
  115:15 122:21,22
  122:23 131:5

138:6 142:25,25
146:11 152:19
153:4 172:16
175:2 177:20,21
182:2 183:8 184:8
190:22 197:17
198:14,19 206:17
208:1,23 209:13
210:7,21,24,25
213:15 216:4
219:19 249:24
259:13,22 273:20
282:24 293:20
305:17 306:1,4
319:11,14 320:1
321:20 323:17
324:16 327:6,7
338:5 340:5,14
343:12 344:1
350:16,25 359:1
359:18 366:6
367:3,4,15 368:3,4
368:21
**named** 26:2
126:12 303:11
364:9
**names** 22:16,21
249:10 351:24
355:14
**nancy** 352:15
**napoli** 2:6
**narcotics** 18:3
19:7,8,11,21 20:13
21:4 27:3 74:2
204:22,23
**narrow** 45:2
**narrowed** 187:14
**nathan** 197:18
**national** 1:6 9:12
18:5 25:14,18,21
26:2 366:6 367:3

368:3
**nationally** 262:15
**nationwide** 264:5
**nature** 16:8 17:6
63:14 81:8 82:6
327:3
**near** 312:13 313:7
343:22 356:25
357:5
**neat** 127:1
**necessarily** 113:7
154:13 159:4
167:1 268:3 284:6
**necessary** 48:12
67:8
**need** 11:7 16:8
27:13 49:22 61:10
99:19 102:11
118:14 147:20
148:8 192:23
193:5,15 194:13
200:10 220:14
221:14 229:14,18
240:12 247:19
338:11 359:5,7
**needed** 32:15,20
131:7 148:15
154:2 156:15
167:10 172:24
195:21 200:10
203:24 207:19
217:12 275:11
276:23 288:22
290:18 332:6
333:15 338:8
339:20 346:14
356:12 361:24
**needing** 81:21
**needs** 68:1 102:14
252:3 285:5

**negative** 220:9
352:19
**negligently** 99:11
**negotiations**
217:19
**neighbor** 348:12
**neighborhood**
239:4
**never** 80:14 82:3
90:19,20 111:22
121:10 122:9
127:17 131:21,22
131:23,23 139:20
148:11 152:14
161:11 165:11
170:13,13 182:14
191:13 201:3
229:6 234:15,18
238:23 250:15,20
251:7 256:23
262:10 264:16,25
265:4,23 266:3,3,5
266:9,9,10 272:22
273:1 276:1,4,6
286:23 296:15
301:24 306:12
314:24 315:10
318:2,17 328:21
330:4 332:5,10,10
335:2,4 342:13
345:23 346:4
361:22
**new** 2:11,11,15,15
26:12 108:10,14
108:16 121:19
138:9 150:22,24
151:4 154:14
161:23 205:20,23
205:25 278:5
281:17,18 297:15

**newport** 340:9,20
340:24
**news** 17:15 209:9
286:23
**newspaper** 322:21
**newspapers** 225:1
**nice** 200:12 293:8
**nicole** 4:8 10:25
89:25 91:12
**night** 346:9
**niles** 138:13
144:10 152:1
153:17 154:18
158:25
**nine** 41:8 180:11
180:12
**nods** 16:8
**nominal** 45:20
**non** 20:18 74:13
178:12,25 225:10
234:9 295:13
**noon** 102:17
**nope** 225:11
**norm** 94:19
**normal** 44:2 136:3
199:5
**normally** 30:10
126:20 129:5
154:10,13
**nortey** 4:3 5:11
10:7,8 215:25
216:1 338:4,6
358:21
**north** 150:6
**northeast** 24:9
316:11,22 317:8
317:11,17
**northern** 1:2 9:13
**notable** 143:19
**notarized** 366:14

notary 364:6
365:13 366:25
367:10,18 368:15
368:23 369:23
notation 289:24
note 9:3 78:8 84:4
128:25 141:22
143:15 276:10,12
277:13,15 282:11
297:18,20,25
298:14 301:17,22
306:10 307:10
331:6,7 333:8
366:12
noted 48:24
122:24 141:6
142:4 143:20
144:23 146:3
153:7 154:15
158:8 168:17,21
202:21,21 203:10
209:16 282:24
302:12 325:3
331:22 333:2,10
360:10
notes 21:10
notice 6:5 12:18
13:14,19,24
124:16 125:19
126:21,24 216:24
216:25 217:14,14
217:15,25 288:21
302:18
noticed 36:16
216:21,22 217:15
217:24 286:8,23
noticing 10:3
217:11
noting 264:22
305:1

nsprlaw.com 2:9
null 110:16
number 6:3 9:14
9:15 14:5 23:16
35:21 42:5,8 58:7
60:23,24 69:24
81:11,15 101:10
103:3 108:9 109:4
109:25 115:9
121:1 135:9 137:1
138:14 142:10
146:12 153:7
158:13 167:4
170:4,11 177:3,4
182:8,12 185:13
186:5 196:12,16
212:2 215:13
219:7,12 233:4
236:17 237:15
243:20 244:11
245:14,22 246:10
249:4,15 251:3
252:7,17 259:18
259:25 267:12
271:2,7 274:18
276:24 278:3
279:19 282:3
283:16 284:11,12
284:24 285:24
288:1 289:1
298:13 300:8,8
302:19,19,20
308:2 314:9
326:13 342:20
353:24 355:14
359:15 362:16
366:7,13
numbered 58:4
289:10
numbers 142:14
186:16 222:15

231:18 242:4
244:10,18,22
245:6 288:16
289:6,14 300:6
318:23 358:15
368:7
numerical 159:6
numerous 22:7
nurse 40:21,23,25
41:7,19
nurses 152:23
nursing 48:15
138:7
nutritional 104:15
nutshell 176:25
295:7
nw 3:16

**o**

o 164:16 177:22
257:16 319:12
oac 126:14
oarrs 37:11,16,20
37:24 38:18 39:4
47:12,16,17 52:1,2
52:4,15,17 53:1,4
53:20 54:13,25
55:2,8,14,19 56:16
56:20 57:6 60:11
61:4,13 63:2,11
64:1 65:5,11,12,14
105:6,25 106:2,5
106:20,23 107:2
108:10,19,23,25
110:24 111:6,13
111:13,21,23
112:5 114:17
115:5 227:9
260:16,23,25
261:6,22 262:4,12
265:5,11,13
267:18 269:19,19

270:22 271:16,25
287:5,19,20,25
oath 171:12 173:7
186:20 195:12
object 224:2,5
226:5 233:19
235:8 236:9,18
237:24 240:6
244:19 246:12
247:2,13,22 248:2
250:25 251:13
253:14,22 254:12
259:4 261:9
262:20 264:8
266:18 271:15,23
objected 223:8
objecting 222:22
223:7,10,17,21
objection 7:3,3,4,4
7:5,5,6,6,7,7,8,8,9
7:9,10,10,11,11,12
7:12,13,13,14,14
7:15,15,16,16,17
7:17,18,18,19,19
7:20,20,21,21,22
7:22,23 8:3,3,4
11:15 41:10 54:6
69:5 70:9,20
75:14 111:15
112:19 213:6
222:4,19 224:14
247:20 254:11
255:3 264:14
318:3 331:20
361:3,6
objections 5:5 7:1
8:1 10:1 254:18
255:1
obligation 29:14
257:3 258:8
271:20

**obligations** 254:8
255:6 257:24
**observation**
116:17
**observations**
153:24
**observe** 34:12
78:14 166:11
212:20 306:20
**observed** 166:23
**obstructing**
349:18
**obtain** 21:15 50:11
190:8 229:11
**obtained** 117:10
157:19 250:2
**obtaining** 109:20
303:23
**obvious** 221:18
**obviously** 51:18
60:24 189:18
190:17 203:22
206:14 301:2
327:19 343:16
**occasion** 201:14
201:15 276:1
306:19 317:2
324:20
**occur** 39:9 87:19
242:11
**occurred** 242:9,13
352:4,9
**occurring** 39:9,17
**occurs** 39:7
150:23
**october** 18:1
365:16
**odd** 211:2 306:3
**odds** 349:9
**offenses** 45:25
46:13 225:4

**offer** 123:8
**offered** 23:23
**office** 2:18 10:22
33:10 35:1,3,25
36:23 37:1,3
40:19,20 42:4,8
43:24 53:23 80:14
82:2 88:22 90:7
91:9 146:16
152:24 153:2
175:20 176:21,21
188:12,22 210:6
211:5,13 214:8
227:11,24 228:1
243:6 257:9,11
268:14 269:2
270:13,15 311:21
336:6,15 349:2
357:5 358:2 361:9
365:6
**officer** 19:18
**offices** 45:12 47:1
262:9
**official** 227:23
367:15 368:21
**officially** 24:2
**oh** 15:17 36:18
45:16 50:6 56:5
58:1 109:12
121:21 127:22
145:18 146:23
159:5 167:17
169:12 178:15
180:9 181:4 187:5
205:16 207:9
277:15 279:4
286:1,13 292:19
298:2 312:4
323:18 324:22
347:3,14 353:23
355:18 357:17

361:14
**ohio** 1:2,10,12 2:4
2:17,18,20 4:8
9:14 10:22,25
12:16 17:13 23:13
24:8,9 27:14,14
28:6 31:24 42:24
43:4,21 44:3,15
45:24 46:12 47:5
58:17,23 63:10
65:17,18 66:1,2,6
66:10,15,21 67:14
68:18 72:20,25
73:13 77:15,18,21
82:10 83:22 87:5
91:19 95:16
120:21 123:21
124:10 127:4
129:24 130:12
131:2 138:13,19
144:11 152:1
155:17 159:1
164:12 165:6,24
166:4,8 172:1
178:2 181:3
194:21 195:2
208:12 221:20
222:8,9 227:1,1,10
227:11,15,23,24
228:1,5 229:1
230:13 232:3,17
233:4,14,16 234:3
235:4,20,23
238:22 241:1
242:2,4 246:4,16
251:6 257:18
262:4 272:11
275:10,13 278:21
280:17 288:23
293:16 301:10
303:18 314:25

315:2,3 316:11,23
317:8,11,17 320:6
326:1 330:24
333:14 344:3
360:2 364:2,7
365:7,14 366:2
**ohioattorneygen...**
2:21
**okay** 12:6 13:2,8
13:18 14:11,23
15:18 18:8,19
19:6,25 26:18
29:6 39:22 42:16
44:1 46:9 47:8,19
50:7 51:2,13,17,22
51:25 53:17,25
54:11 56:9,13
57:1,14,18 61:4
62:4,8,18 63:2,11
64:12 65:24 67:21
70:19 71:12 72:18
73:11,12,16 74:14
76:14 77:8 83:20
84:14 85:6,19
86:9,18 88:24
90:10 91:17 92:1
92:17 95:6 97:11
98:17 101:20
103:24 104:7
107:14 108:9
109:24 110:6
115:8 116:19
118:13 120:3
121:18 122:11
124:4 127:2,20
132:5,16 133:5,12
135:23 136:7,12
136:23 138:12
140:8 141:5
142:15 144:20
147:22 149:3

150:4 153:15
155:16 159:5,8
160:10 161:16,22
162:15 163:11
171:17 181:14,25
190:3 197:25
201:14 202:8
206:6 207:5
208:18 213:9
220:4,7 226:18,19
226:20 227:5
229:16,21 231:16
238:16 240:19,25
253:23 255:20
291:3 293:11
297:5 298:5
305:15 309:21
312:12 313:18
327:1 329:15
331:16 332:12
333:20 359:6
**old** 158:23 172:20
355:8
**older** 120:15
**olds** 239:3
**once** 21:22 133:7
180:15 183:19
195:21 265:5
267:24 348:22
**ones** 199:6 291:24
309:3 355:5
**online** 249:22
262:4
**op** 1:11,13
**open** 66:16 139:25
175:24 280:12
**opened** 13:5 176:2
296:25
**openly** 251:1
**operate** 78:18
113:3 115:18

263:24
**operating** 67:7
170:1 173:13,16
316:11
**operation** 70:3
87:6 124:19 328:2
**operational** 70:7
77:17 331:14
346:8
**opiate** 1:6 9:12
17:11 34:25
182:22 200:9
211:12,16 222:12
243:25 246:15
309:11 366:6
367:3 368:3
**opiates** 27:25
35:13 113:15,22
175:5 224:9 358:6
**opinion** 43:6,8
66:18 80:7,17
142:20 166:22
167:2,10,11 168:1
187:22,23 192:17
232:1,5,7 233:20
242:19
**opioid** 221:21,25
222:2,16 223:24
224:1,11,19 226:3
233:16 234:13
237:12 245:14,22
246:9,10,11,23
247:6,11,25
248:18 250:24
251:3,10 253:20
254:1,2 256:2,8
258:17 259:13
264:13 309:7
353:13
**opioids** 17:7 59:6
60:9 179:24

181:16 197:9
199:2 231:21
232:21 236:4,16
242:3 243:4,21
244:12 248:17,19
251:24 252:3
253:20 258:25
260:2,10 263:2,9
265:15 270:20
271:2 272:7 274:4
274:15 314:18
316:22 317:8,10
317:14,17 318:1
318:15,15,24
360:20
**opportunity** 13:3
59:7,15
**opposed** 256:9
**opposing** 312:11
313:22,23
**oral** 332:14,21
333:2
**orally** 290:6,13
336:1
**orc** 126:13
**order** 67:1 75:21
84:11 85:18 88:11
97:23 99:13,22
100:18 130:6,8
156:15 159:6
170:17 181:1
193:16 217:1,8
257:4 260:6
271:18 275:11
312:4 335:17
**ordering** 130:6
249:21
**orders** 75:13,22
76:6
**organization**
227:16

**organized** 214:22
**origin** 119:2
**original** 88:19
205:8
**orr** 34:24 35:24
37:19 184:9 319:6
319:9,10
**osbp** 184:17,22
308:2
**otc** 72:5
**outcome** 9:22
**outer** 198:17
**outpatient** 111:4
131:16
**outside** 33:10 83:5
83:6 109:5,10,25
110:7 111:10
112:15 317:13
**overall** 67:25 68:3
350:4
**overdose** 232:17
233:4
**overdoses** 231:22
**overholt** 14:19
27:8,19 52:10
59:19 171:18
173:25 174:12
175:14,19 176:2,5
176:15,15 179:5
182:6 183:13
184:1 185:15
187:24 188:15
189:4 192:10,12
192:15 199:15
201:16 202:2
203:12 204:3,5,7
205:5 206:3,18
207:12 211:24
212:1 213:11
315:14,20 356:23
358:10

**overholt's** 184:19
188:12 195:7
242:8,9 244:16
245:5 276:16
277:18
**overly** 115:12
116:13
**oversee** 151:14,16
**oversight** 213:22
213:23 214:5
**overwhelmingly**
236:17
**overworked**
166:19
**owned** 135:2
139:17 177:22,22
179:17,17
**owner** 176:15
213:17 214:5
**owns** 259:8
**oxford** 3:8
**oxycodone** 61:14
61:17 63:21
113:22 175:7
182:23 187:3
197:10,11 199:5,6
200:9,14 230:24
250:5 283:24
295:25 296:6
**oxycontin** 224:21
224:23 225:9,19
225:25 226:2
230:24 247:7
250:5

**p**

**p** 1:18 5:7 11:16
11:21 103:6
219:16 273:16
292:2 324:14
338:3 358:24
364:9

**p.m.** 230:1 362:22
**pad** 249:12,12,16
249:21
**page** 13:19 46:7,10
46:19 47:9 48:21
50:3 55:5,8,18
56:3,8,9 57:1,5
58:3,25 72:23,24
73:5 77:3,4,5
84:15 86:23 87:12
88:25 107:12,12
107:16,25 116:20
116:20 122:14
143:12 144:8
145:7 147:23
149:4 151:7,25
153:16,21,22
154:15 155:3,14
155:24 156:22
157:2 158:12,24
159:22 160:10,13
160:20 161:22
162:18 163:10,14
164:4,11 184:14
189:25 194:2
195:14,18,25
202:16 208:17
226:21 227:8
228:23 229:8
230:11 232:9,9,11
232:11 234:1,2,2
234:20 241:25
281:10 282:4
283:3 289:20
291:6 294:23
296:22 297:14,18
298:13 299:19,24
301:18 303:9
305:10,13 306:8
307:11,12,25
308:1 310:5,9

366:13,15 368:7
369:3
**pages** 47:9,19 52:2
73:8,11 84:15
93:7 100:25
103:20 122:20
142:9 144:9
146:21 179:6
231:18 298:13
303:9
**paid** 168:1 215:19
249:25 261:13
270:20 306:24
**pain** 62:18,21
110:13 113:10,16
118:7,8 178:25
190:10,21 192:22
193:9,10 198:11
198:14 209:13,14
235:4 238:19
240:13,13 249:13
**painkiller** 234:5
**pamphlet** 52:1
**pandemic** 16:11
**paper** 101:21,22
203:1 285:4,18,19
342:10
**papers** 174:6
**paperwork** 285:11
**paragraph** 58:13
59:1 60:4 68:13
69:7 73:24 97:2,3
100:16 105:7
112:21 125:8
187:8 189:21
303:22
**parents** 241:14,21
**parkway** 2:11
**part** 16:13 36:6
51:25 72:3 76:25
82:3 89:20 95:2

97:22 101:8 104:4
106:1,13 107:21
123:11 147:15,17
156:25 165:9,21
193:21 201:17
209:24,24 234:22
235:2 261:17
266:13 283:25
301:22 331:1
349:19 354:11,12
355:22 368:9
**partial** 150:9
**participating**
252:11
**participation**
203:9
**particular** 36:15
45:8 84:19 163:19
202:12 219:21
245:9 249:6 251:8
262:14,18 263:10
265:8,20 268:25
271:13 277:18
279:1 281:8,12
282:18 285:16
302:13 315:21
339:17 341:14
344:13 345:21
347:8 348:13
**particularly** 27:20
**parties** 9:8 11:8
216:9 310:10
**partner** 179:16
**parts** 227:6
**party** 9:21 216:10
217:11 256:10
311:15 312:11
365:2
**pass** 126:18
335:17 346:6
358:23

passed 30:17 119:20 251:19,21 253:7 254:14 266:13

passing 219:14

patience 219:22

patient 32:8 37:2 38:16,24 54:14,19 54:21,24 61:25 62:16 64:9,16,23 75:3 76:10,11,17 96:12,17,21 97:25 99:17 100:19,21 101:1,5,11,16 105:9 106:10,17 108:10,13,20,25 109:5,15 110:7 111:19 112:2,22 113:8,9,14 114:14 115:9,14,20 122:21,21 123:8 123:10 150:1 152:25 153:22 180:25 186:24 188:3 197:1 205:4 205:8 208:24 210:12 249:10 261:13 263:1,10 263:11 269:10,23 270:7,20 271:1 285:5 286:2,4,5 300:21 307:24 308:3,13,19 334:18 335:7 336:7 337:19

patient's 64:8 197:4 259:22

patients 33:9 36:19,22 37:12 38:11 45:18,20 54:22 63:12 113:5

116:3 187:24 188:4 189:4 190:6 190:7 192:5,9 195:1,3,5 199:23 200:1,2,18 209:21 210:9,13 211:14 242:2 243:21 244:12 249:25 252:2 260:9 261:7 271:9 294:14 308:23 317:2,7 332:8,16 333:16

patricia 172:21 348:22 350:23 351:6

patrol 19:1,3,5

patrolman 19:17 19:20 20:1

patrolmen 20:21 20:25

pattern 137:17

patty 172:16,16,16 347:10,24

paul 12:15 293:25 294:5,6 295:23

pavlich 1:18 5:7 6:5 9:10 10:19,23 11:12,16,21,23 12:15,17 13:15,20 13:21 14:2,13 16:21 17:22 33:9 34:12 35:20 40:22 41:13 42:17 57:8 58:4 59:13 62:16 62:20 63:23,23 65:17 67:10 68:10 69:6 77:11 78:24 81:17 91:18 96:14 103:6,8 123:20 124:15 134:25 144:21 154:19

159:11 164:11 165:1 169:2 173:24 174:13 192:2 194:17 196:18 206:21 214:13 218:12 219:16,18 221:18 223:23 226:8 230:6,16 235:19 236:21 246:22 248:13 250:21 255:5 264:21 267:18 273:16 280:11,24 303:20 304:18 314:15 317:25 318:8 324:14,16 338:3,5 338:18 340:3 349:11 352:25 353:20 354:2,25 356:2 358:22,24 359:1,17 362:6,15 364:9 366:8 367:4 367:9 368:4,13 369:20

pay 41:21 115:24 115:24 200:6

paying 100:5

peaking 245:24

peer 239:17

pellegrino 1:24 9:20 364:6 365:13

penalties 98:4,21

pending 206:19

pennsylvania 3:8

pens 292:24

people 26:9 28:23 31:17 79:21 80:11 182:8 190:19 203:20 222:15,16 234:8 252:1

253:12 303:5 306:1 315:22 317:25 318:14,20 318:23 342:24

percent 32:14 188:11 233:5 238:16 239:10,18 241:4,4,21,21

percentage 239:21

percentages 211:22

percentile 309:11 309:12

percocet 21:20 40:1,15,22 200:8

percodan 200:7,8

perfectly 313:8

perform 20:12 102:2 103:14 268:12

performed 268:9 268:20 271:13 273:24 274:7

performing 75:18 75:20 270:2

period 22:24 52:24 111:7,25 133:14,22 135:21 137:14 179:21 180:2 187:11 192:19 197:19 243:18 300:22,23 351:5

periodic 54:4 132:18 137:3

permission 127:11

permit 126:12

permitted 125:23 254:18

perpetual 143:14 143:17,23 153:23

**perry** 340:16
341:4 344:1,7
348:12 352:3,11
**person** 30:17,20
32:24 42:9,10
48:8 85:21 86:12
89:8 96:19 98:1,3
98:18,18,20,24
112:10 144:15
145:11 158:18
182:13 237:1
250:18 282:11,14
291:10 293:3,21
305:18,20 308:3
349:19 355:19
361:9
**personal** 32:21
73:25 102:8 132:7
206:13 290:17
293:3 319:23
**personalities**
278:15
**personality**
343:15
**personally** 235:14
235:17 250:17
350:12 352:21
367:11 368:15
**personnel** 74:13
78:3,16,22 142:17
150:10 282:24
297:14 339:5
**perspective** 76:5
77:15 145:6
**pete** 214:23 215:1
217:22 247:14
252:8 253:2
254:12 310:15
**peter** 2:3 10:15
27:8 175:20 176:6
176:19 184:1,20

219:19
**pharma** 1:10,13
**pharmaceutical**
20:11,23 38:7
39:8 43:4 93:17
199:17 200:23
213:4 231:12
**pharmaceuticals**
20:5 21:12 24:6
28:4,7 39:15
42:12 44:15 75:12
75:13 224:22
225:2,13,17,21,24
**pharmacies** 12:2
20:16 30:13,13,23
31:22 36:2 38:14
40:18 41:2 43:20
44:3,11 46:25
48:13,22 49:1
52:20 53:17 54:4
58:20 59:12 64:9
66:1,9 67:13 71:2
71:8,16 76:19
78:25 81:21,23
84:10 87:1,3,20
91:20,21 101:16
116:3 123:2
124:17 125:2
131:16 132:17
134:9 135:1,4,12
135:18,19,24
136:9,16,24 137:2
137:4 138:5
140:20 149:20,21
162:2 165:5,20
166:3,7 168:4,5,6
169:3,4,16,19,25
170:1 173:19
177:23 179:13,13
179:15,18,22
181:15 186:4

188:1 195:5 201:8
211:21 212:3,20
213:3,21 226:25
251:4 254:9 255:7
255:18,20,25
256:3,19,24 257:7
257:13,21,24
258:7,15,25 259:9
261:18 262:6,24
263:23 265:15
269:8 272:4 273:2
274:25 278:21
286:10 292:14
306:20 307:4
308:7 310:18
316:10 324:21
325:6,12 328:4,11
328:16 330:22
331:3,19 332:5
333:15 334:4
338:20,23 353:1
357:23 360:1,7,12
360:15 361:5,17
**pharmacist** 23:18
28:16 32:12,13
33:3,13 34:7 35:3
40:5,18 41:5 48:9
54:12,16,23 55:7
55:14 56:16 64:13
68:17 73:25 74:12
74:14 76:2 79:23
80:9 82:20,23,25
83:9 85:20 86:4,7
86:12 92:8,24
93:1,14,25 94:8
97:19 99:12
100:14,17 103:13
105:1,12,15 106:5
106:8,14,22
109:18 110:8,11
110:23 111:5,9,21

112:14,14,17,21
114:13,22,25
115:2,19 116:4
117:8,11,19,24
118:10,12,21
120:24 121:2,22
121:23 122:10,24
123:22 124:11
126:8 127:18,18
129:17 138:15,16
138:17,21 139:3,8
139:21,24 140:7
141:8 142:21,21
142:24 143:1
144:11,14,17
145:14,16,19
147:1,8 148:14,18
149:5 150:2
151:11,22 152:3,5
152:7 153:17
155:6,18 156:1,6
156:14 158:21
159:14,16,19
160:5,7,9,15 161:1
161:9 162:22
163:3 164:17,22
165:12 166:18
167:6,9,18,21
168:9,12,20
170:21 171:1
172:11,15 176:16
176:17 177:24
180:15 183:1
191:19 195:22
202:22 203:5
206:16 208:9,20
209:4 210:15,22
210:24 212:12
213:17 262:17
264:17 266:17
267:25 268:7

271:12,18,19
272:13,15 275:22
276:21 282:17
284:16 286:3,3,6
290:5,9,12 291:14
292:22 293:24
294:2,3,5,7 296:9
296:16,18 298:16
303:3 305:19
309:1,18 315:8
319:24 320:19,25
325:17 326:2,6,7,9
326:18 327:2,10
328:1 334:18,23
335:5,14 336:6,14
336:22 339:10
340:1,11,12,15
341:3,16 343:8
344:2,14 346:6,11
346:12
**pharmacist's**
128:23
**pharmacists** 22:8
22:16,17,23 23:2
26:8,25 28:15,19
30:14,22 31:1,11
31:15,18,20 32:2
33:7,17,25 36:3,5
41:1,8,14 46:14,23
56:19 63:24 64:7
64:20 75:8,19
76:5 78:21 80:20
83:4,18 89:5,11
91:21 92:4 94:5
94:11 95:1,18
98:7,14 99:22
100:7 101:9
104:18 105:19
114:17 119:8,11
119:23 120:4,15
121:18 128:2

133:23 147:7
148:9 159:24
162:24 163:20
164:1 166:13,20
166:20 167:4,10
168:25 169:10
170:7 171:4
176:14 189:21
190:9,15,16 191:1
191:3,6,10,25
194:19,21 195:1
195:16 199:23
203:10 206:13,22
212:5 213:18
242:16 258:1
264:6 265:1,7
269:8 272:6
276:21 283:23
290:16 294:9,19
296:5 309:2
319:20 322:7,10
325:21 328:16,24
334:10,24 335:20
336:12,25 337:3
342:8 350:20
354:4,10,14 355:3
355:4,20 356:5,16
356:20 357:24
360:15 361:12,16
361:20 362:2,3
**pharmacy** 2:17
4:8 6:6 10:25 11:2
12:5,20 13:25
14:19 17:10 18:4
20:22 21:21 22:22
22:23 23:3,14,23
27:9,15,19 31:11
32:23 35:5 36:12
38:20,23 40:2
42:19,21,23 43:2
44:12 45:2,4

46:24 49:23 52:21
53:6,10 54:3
59:19,19 61:15,21
66:16 67:4,25
68:5,19 69:3
71:13 72:1 73:19
73:23 74:15 77:10
77:14,18 78:12,17
78:25 79:4,4,11,16
79:18,23 80:9,20
82:1,9,17,19,22
83:1 84:23,25
85:14 86:3,7,19
87:6,21 88:7,12
91:1,4,6,8 92:2,10
92:18 93:13,21
95:3 109:6,10
110:1,4,7,12
111:11,19 112:3
112:13,13,16,17
115:21 119:12
124:2 125:1,9
126:5,15 127:5,10
127:23 128:1,4,5
128:17 129:2
130:11 134:17,22
135:2,8 137:11,13
138:1,19,25 139:4
139:10,15,18
141:17 143:4,13
146:18 147:1,10
147:11 148:7,10
148:14,19 150:20
150:21 151:20
153:21 154:6,14
161:6 163:15
165:11,23 166:13
166:17 167:13,13
170:12 171:9,18
173:12 174:1,12
174:22,24 175:15

175:19 176:2,6,15
177:23 178:2,5,8
178:10 179:18,20
180:4,6,16 181:22
182:6 184:1,19
185:16,22 187:25
188:13,15 191:7
191:18 192:15
195:7 200:22
201:9,13,17 202:2
203:20 205:5,5,11
205:15,21 206:8
206:10,12 207:2
208:20 209:5
210:15 211:24
212:14 213:11,12
221:21 222:9
227:2,10,15,24
228:6 229:1
230:13 232:3
233:14,24 234:3
235:21,23 238:22
241:2 242:2,9,21
242:23 243:25
244:1,5,15 245:5,9
246:5 248:22
249:3,6,11,15
250:22 251:6,17
255:13 257:19
259:7 260:7,19,20
261:20 262:14,17
263:4,6,18 264:16
265:20 270:8,13
270:16 272:9
273:6,25 274:2,8,8
274:25 275:5,10
275:12 276:10,17
277:8,12,18,19
278:4,6,8,22 280:6
280:16 282:12,25
285:3,3,4,15,16

286:4 288:3,23
290:25,25 291:12
292:5,11,18 293:7
293:15 294:24
295:5,11,19 297:4
297:25 300:24
301:9,11,18 303:4
303:10,18 306:9
306:21 310:25
314:25 315:14,21
315:24 316:2,17
319:22,24 320:4
320:13 321:10,10
322:16 323:9,11
323:14,20 324:2
324:20 325:22
326:21 327:7,23
327:24 328:13
329:10,11 330:1,6
330:11,16,17,24
332:20 333:14,24
334:21 335:17
339:12 341:12
342:12 343:2,5,12
346:8,11,15
347:13 349:15,24
350:15 352:10,20
353:12 356:24
357:3 359:24
360:2 361:24
**pharmacy's**
261:23 275:6,13
276:1 353:2,7
**phentermine**
36:16
**philamena** 352:6
**phone** 31:4 33:24
38:14,22 53:14
99:19 152:14
182:25 207:1
218:25 249:14

282:3 297:3
354:24 366:3
**photocopy** 21:20
40:20
**photocopying**
41:21
**phrases** 76:25
**physical** 68:21
69:2 70:6 72:24
73:4 77:5 113:1
125:13
**physically** 133:6
263:3
**physician** 21:16
22:12 28:16 30:20
32:9 41:16,22
46:25 50:21 54:24
62:25 63:17 64:1
96:20 150:6 181:1
190:10,21 212:13
354:13
**physicians** 26:7
29:12 34:22 35:9
35:15,18,20 45:21
61:23,23 198:9
**pick** 9:4
**picked** 36:8
**picking** 140:23
**picture** 25:24 47:7
238:12 295:16
**piece** 261:25
342:10
**pill** 264:13
**pills** 36:9,21
223:25 224:11,19
240:10,11 246:11
248:18 250:23
251:3 259:18
271:2,7
**pink** 141:12,22,24
141:25 142:2,4

145:5 153:10
155:23 158:4
163:12 288:15
289:5,23 290:15
290:22 294:24
298:24 300:2,5
302:19 315:17,20
328:9 350:10
**piszel** 190:22
192:22 193:9,13
**pittsburgh** 3:8
**place** 9:7 11:7
66:17 70:13 91:24
107:2 134:7
155:20,21 160:8
304:2 320:3 353:6
353:9 364:19
**placed** 105:16
**places** 266:3
317:16 348:2
**plain** 19:10,18,25
**plaintiff** 310:7
**plaintiffs** 2:2
10:16,18 216:21
217:13,25 252:7
252:17 310:21,22
312:5,7 321:16
**plan** 323:5
**plaque** 83:16
**play** 44:23 94:5
115:5 214:3 217:4
**played** 44:11
**plaza** 213:14
323:20 340:9,20
340:24 343:22
**plead** 199:12
**pleading** 225:5
**pleas** 277:3
**please** 9:3,5,24
10:2 11:4 12:12
12:14 13:19 14:25

15:3 16:6,17
65:22 174:8 183:7
184:5 208:17
252:7 254:19,25
279:24 283:7
285:23 293:11
322:25 323:4
366:11,11
**pled** 177:8 198:22
225:2,8,13
**plus** 177:11
**pocket** 292:24
344:17
**point** 26:11 41:7
91:25 140:13
147:7 191:11
204:15 218:8
236:11 274:23
276:23 310:4
357:7
**pointing** 311:10
**poland** 12:16
**police** 18:17,24
20:13 22:1 23:12
34:20 42:11 43:13
69:23 121:16
194:23 249:7,16
**policeman** 18:2
293:8 294:4
**policies** 272:5,14
272:23
**policy** 47:11
**polster** 1:8
**poor** 327:12
**poorly** 248:5
**pop** 348:9
**portion** 115:17
117:16
**position** 23:23,24
51:9 218:10,10
263:18 311:1

312:2
**positive** 54:9
350:9 357:4
**possession** 85:23
253:9
**possibility** 216:12
217:3 283:11
**possible** 9:6
219:24 273:20
359:22
**possibly** 78:5
**post** 18:12 206:2,3
206:3 240:13
**postdates** 247:17
**potential** 105:3
115:10 128:18
129:21 139:10
230:17 231:14
361:13
**potentially** 33:17
**pounds** 345:15
**powerful** 211:12
**powerpoint**
228:23 230:12
**powers** 64:25
342:11
**practice** 22:11
29:22 30:19 33:12
77:18 86:19 89:10
91:20 92:2,10,18
92:25 93:13,20
95:3 96:1,7
110:17,18 113:1,9
113:14 117:2
118:6 193:9 278:7
287:25 342:11
356:25
**practiced** 35:20
139:1
**practicers** 35:14

**practices** 257:20
**practicing** 35:15
35:18 212:5
**pratt** 3:12
**pre** 121:13 207:8
209:21 211:9
**preached** 336:20
337:11 356:1
**preacher** 336:21
**preceding** 108:21
112:24 114:16
**predict** 215:2
**predicted** 342:14
345:9
**predicting** 215:2
**predina** 174:23
183:1 201:22
202:13
**preferred** 337:2
**preliminary** 16:3
**premises** 69:14
**prep** 91:14
**prepare** 16:20
90:10,13 235:18
**prepared** 101:4
135:7 136:8
**prescribe** 85:21
86:13
**prescribed** 28:11
28:16 35:9 63:20
92:12 182:13,15
182:17 194:25
235:4 238:18
260:3 284:18
**prescriber** 20:15
21:8 28:13 29:10
39:25 57:6 92:24
92:25 94:2 95:25
96:5,6,9,16 97:1,9
97:14 105:8
106:10,17 109:5

110:6 111:10
112:24 114:15
116:25 117:7
248:22 263:14
271:6,8 300:13,18
300:21 308:9,10
**prescriber's** 97:4
**prescribers** 29:7,7
29:18,19,20 30:4,9
63:12 98:6 112:25
113:8 199:22
209:1 261:7
300:14 316:16,21
332:8,16 333:17
**prescribing** 27:24
29:21 35:25 39:19
44:22 63:18 64:18
97:14 113:13,15
113:17 114:8
117:6 118:6
154:25 186:11
193:3,4,5,8 196:3
198:4 199:9,22
204:13 210:4
223:24 224:10,18
237:22 243:4
248:22 259:20
268:22 269:20
270:13
**prescription** 1:6
9:12 20:15 21:5
21:14,16,17,18,19
28:24 29:5,11
30:16,18 35:5
38:2 39:24 40:9
40:12,13,21,24
41:2,15 50:10
51:20 59:6 60:8
61:5,11,12,15,19
62:6,14 75:25
76:9,16 78:1,10

85:2 92:15 94:13
95:11,23 96:10,15
97:2,10,19,24 98:1
98:2,19,25 99:17
99:23 100:18
103:11,18 105:15
105:17,18,21
108:16 109:16,20
109:21 110:12
111:5 114:19
115:3,13,24
116:15,24 117:9
117:14,20 118:17
119:1 122:16
123:4,15 124:12
152:24 155:12
156:10 157:6
169:5 170:13
171:1 178:23
181:2,19 190:9
199:24 200:4,6
210:11 223:25
224:11,19 226:1,1
226:3 229:10
231:21,23 232:21
234:4 236:22,24
238:13,14,17
239:1,6,11,12,18
241:5,15,22 244:1
244:2,3,5 246:22
247:7,11,25
249:10,12,12,21
251:24 254:2
256:8 258:17
259:2 262:19,25
263:9 265:9 268:1
268:10,15,25
269:5,10 271:14
271:21 274:3,14
284:20 294:15
298:15 308:20

309:7 314:17
316:22 317:4,8
318:1,2,15,24
322:10,11 334:3,6
334:7,13,16 335:2
335:6 336:3,7
337:22 344:15
345:21 357:23
358:1 360:19,24
366:6 367:3 368:3
**prescriptions**
20:16,17 21:8,9
22:12 28:11,20
29:4,5 33:18
34:25 36:1,4
37:14 38:12,20,25
41:20 50:22 59:20
61:18,22,24 63:13
70:16 75:20 76:7
92:12 94:1,4,9
95:7,18 97:5
98:11 101:10
110:16 112:23,25
114:2,14 118:8
121:9 124:7
128:23 141:21
152:20 161:7
167:5,7 168:19,24
169:11 170:8
176:10 181:11,20
186:17,17,18,22
187:10,13,21
188:11,14 189:17
189:22 191:23
192:5 193:17,21
195:4,6 197:9,11
200:19,25 203:3
204:10,21 205:8
208:13,22,25
209:21 210:7
211:5,9,22,23

212:13 242:3
243:21 244:12
245:23 246:10
249:18,24 251:25
255:22 258:2,2
276:20 294:14
296:10 306:23
315:7 322:8
327:18,19 332:8
332:16 333:17
334:3,25 341:20
342:9 344:10,25
353:13 358:5
**presence** 364:14
**present** 4:6 110:22
276:21,22
**presentation** 55:7
116:14 228:23
229:8 230:12
234:21,23 242:1
249:1,2,5
**presented** 227:10
**presenting** 115:13
**pressuring** 185:8
**presumably**
304:25
**pretty** 20:19 22:6
26:13,24,25 27:9
33:24 34:7 35:16
39:21 43:15,24
47:18 52:8 54:10
68:23 72:22 92:23
99:9 119:22 124:8
126:3,16 131:24
137:16 141:4
142:5 149:1,15
154:4 180:10
183:16 189:7
193:18 195:8
198:11,12 199:10
200:24 201:1

242:22 243:7
283:15 301:7
323:24 331:7
335:4 344:24
348:18 357:3
358:13 360:14
**prevent** 68:19
69:4 71:18 80:5
86:10 218:3 254:7
254:10 255:7
**prevented** 71:23
**preventing** 274:9
304:1
**prevention** 79:1,5
79:7,11,15,21,25
80:4,8,11 81:2
148:12 149:17,20
343:11 347:11
**previously** 108:15
184:21 244:24
271:2
**price** 249:25
**primarily** 22:20
44:4,5 79:22
80:19 96:24
145:25 178:24
281:15
**primary** 43:3
45:24 50:17 65:4
71:19 96:14
148:11 199:6,20
**principally** 273:21
**principles** 93:16
**print** 38:17 160:25
161:8
**printout** 161:1
181:10 300:20
**prior** 15:20 19:8
55:13 91:15 108:2
111:4 194:18
232:6 242:16

270:25 321:16
351:19
**priority** 58:7
**prison** 122:8
176:24
**private** 9:5
**privileged** 219:19
**privileges** 210:4
**probably** 21:3
24:24 36:8 39:13
79:20 81:6 84:6
177:15 182:23
185:4 188:6 198:7
206:5 210:4
215:24 216:16
226:6 239:13
244:17 257:14
261:19 285:2
287:24 301:7
302:14 309:11
327:12 355:13
**probation** 207:17
**problem** 53:15
105:4,4 121:10
134:15 141:5
158:10 170:14
179:19,22 180:2,3
180:8 184:23
200:17,20 203:19
220:5 222:11,20
224:1,7,9,12,18,23
233:3 234:17
235:3 236:11
238:11 246:9
251:10 292:10
298:11 305:11
320:9 325:18
335:3 341:13,14
342:13,15,22
343:2 345:6
354:20 361:23

**problematic**
262:19 265:10
**problems** 32:17
35:22 59:8,16,22
59:23 106:15
119:23 129:3
157:24 165:16
171:13,14,14,15
202:18,20 212:2,4
212:8,9,19,21
213:1,20 226:3
231:20 239:15
251:14 339:19
342:25 349:5
**procedural** 337:17
**procedure** 11:18
285:12 288:24
363:7 367:5 368:5
**procedures** 66:24
67:7,15 68:14
69:22 71:18 258:9
**proceed** 12:8
85:18 88:5 114:10
116:6 129:4
141:13 221:13,16
276:25
**proceeding** 10:1
221:12
**proceedings** 15:12
**proceeds** 14:24
**process** 37:9 81:22
81:24,24 104:7,9
106:2,13 115:7
116:8,10 122:16
124:7 132:10
147:16 328:15
**processing** 39:12
39:22 40:7 50:12
82:5 95:7,11,18
103:11,18 104:1
123:4 124:11

128:11 169:5
198:25 212:23
229:12 315:25
**produce** 52:20
63:22 275:22
**produced** 135:8
225:19 228:25
234:22
**production** 366:15
366:17,22
**professional** 43:1
85:20 86:13 92:3
92:7,9,19 95:3
96:1,7 105:2,23
106:4,8 117:2,12
117:19 118:22
119:4,6 122:2
159:19 166:13
309:3 312:17,23
354:3,10 355:2
358:17
**professionally**
139:1 163:5
**professionals**
20:18 26:8 29:13
**profile** 32:8,8,9
38:18 54:19 63:17
75:3,4,4,5,5
100:21 101:5,7,11
101:22 113:20
114:7 153:22
183:5 261:21,22
263:12,14 269:23
308:3,13
**profiled** 100:19
**profiles** 64:1 70:15
101:1,16 153:23
182:9 192:5 205:9
**profit** 200:12
214:7

**program** 332:15
333:16
**prohibited** 16:16
**promised** 102:6
327:17
**promotion** 225:9
**promotional** 21:1
**pronouncing**
216:4
**proper** 97:13
117:6 285:4,17,18
285:19
**properly** 15:2
85:10 308:10
358:18
**prosecute** 21:7
98:9,13
**prosecuted** 30:9
316:15 319:25
**prosecuting**
319:20
**prosecution** 59:22
178:21 276:15
315:19
**prosecutions**
29:23,24 30:2
31:16 99:5 174:16
174:16
**prosecutor** 197:6
277:2 351:24
352:6,12
**prosecutor's** 349:2
**prospective** 102:3
103:21 117:10
122:12,13
**protect** 70:14
**protecting** 277:9
**protection** 69:24
**provide** 23:4
26:19 31:15 33:6
45:20 53:22 59:7

59:15 63:3,18
66:23 67:14 73:25
86:4 94:21 128:16
139:9 140:1
145:20 152:11
156:15 157:1
163:6 164:19
173:22 252:25
253:1 258:8
267:21 294:13
300:22 328:24
**provided** 11:17
44:18 54:2 67:2
73:24 130:20
156:17 190:21
252:22,24 273:10
301:11,24 308:13
332:6,13,21 333:1
344:11,21 346:10
**providers** 44:14
**providing** 53:18
53:19 93:14
302:11 305:4
326:19
**provision** 69:8
73:14 74:2 77:11
77:22 84:2,16
87:15 88:25 89:1
93:9 96:2 98:22
99:22 101:8
105:11 113:3
116:21,23 127:14
129:11,22
**provisions** 66:12
76:22 83:21,22
89:10 91:19 92:18
93:6 95:16 98:6
100:15,24
**pse** 287:5,8,12
**pseudoephedrine**
287:13

**public** 69:19 277:9
364:6 365:13
367:10,18 368:15
368:23 369:23
**published** 233:13
**puerto** 2:8
**pull** 64:13 162:11
172:6 192:5 226:9
252:19 341:10
**pulled** 207:3 298:8
298:9
**pulling** 37:2
191:23 323:21
**purchase** 75:4
256:4,11
**purchased** 37:7
45:19 256:25
283:24
**purchases** 283:14
**purchasing** 36:17
256:15,18
**purdue** 1:10,13
224:21 225:2,8,13
225:17,21,24
**pure** 46:13
**purged** 181:8
**purported** 98:2,19
98:25
**purporting** 97:23
**purpose** 28:12,22
29:11 59:11 60:5
62:11,12,13 71:19
95:24 96:11
116:25 118:2,19
133:9 141:16
271:22 307:3
**purposefully** 99:8
**purposes** 13:16
45:16 97:6 274:1
274:6 280:9

**pursuant** 12:18
13:24 78:19
100:20 102:3
103:14 105:7
123:8,16 126:13
217:18,18 363:3,6
**put** 13:8 35:11
37:18 40:3 46:3
51:15 71:12
119:10 122:8
129:19 152:16
153:4 162:13
166:16,24 177:1
186:23 187:17
195:12 200:15
201:21 203:19
208:15 212:10
288:4 289:1
290:14 292:24
296:1 297:4,6
304:2 308:2
323:23 335:11
337:18,21
**putting** 119:19
152:19 153:8
185:6 326:16
**pweinberger** 2:5

**q**

**q&a** 334:20
**qualifications**
78:21 82:6 89:12
**qualified** 193:7
364:8
**quality** 26:4,6
228:14
**quantities** 37:15
72:2 193:5 194:24
243:4
**quantity** 26:6
69:12 71:5 101:6
116:5 122:23

**quarter** 174:21
176:9 178:9,17
180:10
**query** 55:7,14,19
56:16 57:6
**question** 15:1,5
30:18 34:15 40:19
63:17 88:18
109:23 116:4
118:17,20 124:9
158:14 161:16
181:14 194:5
200:24 201:6
223:8,21 233:15
242:18 253:5
262:10,21 276:20
289:4 294:20
330:5 334:23
342:14 346:20
**questionable**
75:12,21 76:7
119:1
**questioned** 139:21
190:11 321:17
**questioner** 338:1,6
**questioning** 31:25
109:18 189:22
201:6 310:16,16
310:17 313:2
**questions** 14:25
39:5 55:1 114:6
116:1 164:25
188:16 194:16
214:13,15,16
216:2 218:1,3
248:12 268:18,20
269:4 273:14,21
273:24 286:2
293:14 299:14
310:11,19,23,24
317:20,22 324:17

334:19 337:25
338:9,14 345:10
356:3 358:22
362:6
**quick** 172:14
194:5 228:12
323:24 338:8
**quicker** 61:2
**quickly** 304:21,25
**quite** 14:20 34:19
299:25 351:3
352:1

**r**

**r** 164:16 184:18
319:12,12 350:17
350:17
**radius** 38:14
**ran** 36:14 200:13
271:16
**random** 54:22
**randomly** 124:16
**range** 180:11
316:19
**ranger** 347:20
**rank** 19:20 21:2
**rate** 233:6 236:24
237:1,2
**raul** 180:5
**rbarnes** 3:9
**reach** 21:2
**react** 34:13
**reactions** 337:20
**read** 66:22 70:4
140:10 245:19
250:9 297:21
307:17,24 355:23
362:20 367:5,6,12
368:5,6,17
**readily** 133:16
**reading** 106:11
150:3 183:3

209:23 366:19
**ready** 38:2 102:18
220:2 297:12
338:17
**real** 35:10 228:12
**realize** 255:12
**realized** 121:21
211:8
**really** 52:10,11
79:25 82:11 90:14
92:21 113:23
119:20,25 148:21
148:24 157:3
175:17 176:4
181:9 185:3
189:12 192:7
200:9 211:6 216:8
236:19 290:10
303:6 307:20
313:25 331:24
341:21 342:22
349:9 355:12
**realm** 188:2
**reason** 62:17,20
70:4 112:22
114:13 126:23
134:24 141:2
183:10 232:4
235:7,15 247:10
253:2,13,15,17
268:15 275:20
366:14 368:8
369:3
**reasonable** 32:10
63:9
**reasons** 115:1
**recall** 14:23 21:25
22:15 24:25 31:10
37:21,24 47:13,22
49:16,20 54:20
55:3,16 56:19,22

63:16 64:11,20
65:10,13 70:23,25
71:1 72:12 74:3
75:19 76:4 77:10
79:3,10,14 80:17
85:13 86:2 87:18
90:7 92:1,17
93:19,23 94:10,25
96:2 103:16
108:12,21,24
109:2,3 125:24
127:20 134:1,9
135:3 142:25,25
144:18 149:17
150:7,11 152:4,5
156:11 158:22,23
163:19,23 164:21
164:23,23 165:10
165:13,16,19,22
167:16 168:22
169:13,14 170:5
170:25 171:3
174:11,14,25
180:1 181:22,23
186:21 195:12
198:16 199:4
202:9 208:8,11,11
225:23 248:24
261:15,16 264:23
272:21 276:7
288:8 293:23
302:1 305:2 306:4
307:2 308:15
314:16,20 315:5
316:3 329:13
330:3,9,14,20
333:5 337:16
339:7 340:5,14
343:24 344:20
346:22,25 348:7
348:19 349:16

350:3,24 351:1,4
352:4,19 354:5
356:25 357:9,13
360:11,17,21,25
361:23
**recalling** 53:12
165:17 307:16
**receipt** 70:1
366:18
**receipts** 249:11
**receive** 31:22
235:5 260:9
**received** 12:23
112:22 114:14
185:9 237:14
284:20 308:14
**receiving** 242:3
243:21 244:12
**recess** 81:12
102:22 196:9,13
219:9 230:2
267:13 314:10
359:12
**recognition**
251:22
**recognize** 55:15
68:9,11 89:1,9
93:5,6,8 95:15
106:25 124:25
162:23,25 163:1
311:23
**recognizing** 56:16
**recollection**
132:25 133:17
183:11 209:2
286:12 331:17
348:6 356:4
**recommendations**
356:10
**record** 9:2,8,25
81:10,14 103:2

125:14 147:18
157:13,17 172:24
196:11,15 219:8
219:11 221:10,11
229:19,21,24
230:1,4 267:11,15
279:15 280:13
300:8 307:18
310:12 311:14,25
313:10 314:5,8,12
329:24 345:10
359:11,14 362:13
368:9
**recorded** 9:10
334:20
**recording** 9:7
**recordkeeper**
327:12
**recordkeeping**
59:4 60:6 123:17
131:12 133:18
134:15 284:6
335:22
**records** 74:10
126:13 133:13,19
133:24 140:2
153:22 154:20,21
163:17 168:10
201:12 205:5
225:7 258:16,23
259:1,10,12 260:6
268:23 283:23,25
284:9 301:11,24
302:3,11 303:24
305:5 314:22
328:6,7 334:20
346:14 353:14
354:19 360:25
**rectified** 303:24
**red** 228:24 229:2,5
272:14

redirect 310:6

redistributing 197:5

reduced 364:13

reed 120:19

refer 12:4 14:8 289:15

reference 45:1 47:8 97:17 98:17 101:3 149:11 153:21 161:23 208:19 287:8 306:6 366:7 367:2 368:2

referenced 27:18 33:15 35:17,24 140:16 202:6 203:7 207:5 343:23 356:24 364:13,17 367:11 368:15

references 86:18 105:23 106:20 143:12 160:14 189:21

referred 119:15 317:20

referring 19:4 21:13 39:23 69:6 99:1 160:22

refers 78:16 289:5 289:19

refills 115:12 122:24 259:25

reflect 225:8

reflected 353:22

reflecting 195:16

reflection 340:1

refrain 254:19

refresh 101:2 183:11 209:2

279:25

refuse 119:5

refused 195:2

regard 76:5 92:6

regarding 42:18 45:25 94:22 116:1 194:24 204:13 209:9 233:25 247:21 259:2 266:15 272:4 302:6 318:23 324:18 341:15 348:21 356:23 363:2,11

regardless 64:15

regimen 121:12

regional 184:18

registered 344:2

registrant 67:2 68:2,4

registrant's 69:25

registrants 66:23

registration 44:18 82:19

regroup 129:2

regular 134:18 335:9

regulate 24:5 27:15 91:19

regulated 89:5

regulating 42:23 46:23

regulation 34:4,5 103:13 104:2,2,25 105:11,22 106:12 110:21,24 111:3 111:14 112:15 115:18 117:17,18 119:3 122:12 123:11,24 124:8 125:1,5 127:7

128:13 129:12 132:17 133:13

regulations 33:19 72:19 88:13 107:22 120:22 123:21 129:23 130:22 131:4 134:10 154:25 168:14 258:13,14 275:6,14 291:1 295:1 360:8

regulator 43:3

regulatory 26:1 49:24 103:17 104:22 112:15 133:5 144:2 337:13

reik 350:16 351:9

rein 345:7 347:16

relate 283:8 284:5

related 9:21 20:14 33:17,23 37:6 83:22 87:5 94:15 158:14 246:9 322:14 342:18 344:21

relates 1:8 66:15 181:14

relating 225:22

relation 322:3 340:12,25 341:2

relationship 294:11 321:1

relationships 354:4,9,10 355:2 355:15,16

relative 365:2

relatives 241:6

relaxants 248:17 260:4

release 209:9

relevant 68:6

relied 43:11,14 354:17

relievers 235:4

religiously 356:1

relocated 150:20

rely 41:15

remaining 311:4,8 311:10

remark 14:7

remember 14:17 37:22 53:3 57:10 57:12 76:24 93:2 95:20 96:3 119:13 119:16,18 127:22 130:23 137:15 140:5 142:19,23 142:24 144:12 145:12,13 147:10 149:14,14,23 150:22 154:17 155:21 156:19,25 157:5,6,8,24 158:18,19 159:13 160:2,3 163:20,23 164:14 172:15 175:2,5 177:3,5,9 177:17 178:8 179:3 182:7 186:20 187:16 188:9,13 195:10 197:2,23 199:6,13 204:3,17 207:23 207:25 208:1 209:6 210:21,25 211:4 244:25 245:1 250:15 261:21 279:24 286:13 294:6,18 298:2,20 299:4

306:3,13,18
317:21,23 319:6,8
320:1,2,4,10 321:8
323:13 325:24,25
326:24 329:1,3
331:15 332:1
337:7,7,8 339:16
340:7 341:17
344:8 346:9 347:9
347:9 348:14
357:24
**remembered**
107:21
**reminds** 264:19
**remote** 1:18 2:1
3:1 4:1 16:10,15
125:14
**remotely** 1:25
9:16,24 11:8
**remove** 205:4
**renee** 1:24 9:20
279:10 364:6
365:13
**renewal** 88:24
330:7
**renewals** 44:12
**renewed** 88:11,20
**reorganization**
351:13
**repeat** 174:7
**replied** 164:2
**reply** 164:4,6
288:22 290:3,19
295:9 304:16
305:3
**report** 32:7 37:16
38:13,15 53:1
54:14 55:2 87:23
88:3 105:6,7
106:1,2,5,20,23
108:19,23 109:1

111:6,21,23 124:1
128:16 131:10
140:4,8,10,11
141:7 148:1,16
149:4 156:23
157:25 163:9
168:18 179:4,5
202:1 207:8
239:11,19 241:5
271:16 272:1
286:16 287:22
288:3 289:13
294:9 297:19
298:16 299:14,16
300:1,12,19
302:13 303:19
304:9,14 305:14
306:5,11 307:8
309:22,24 333:11
353:24
**reported** 108:11
108:14 111:5
112:23 114:15
115:13,15 148:6
190:5
**reporter** 5:18 9:19
11:4,6,9 16:7
174:4,5 279:13
367:7
**reporter's** 5:16
364:1
**reporting** 32:6
54:5 108:17 308:4
308:8
**reports** 6:7 17:15
36:14 53:4 132:14
135:8 136:8,14,21
145:8 160:14,24
165:4 166:25
170:17,19,20
264:21 276:11

280:7,15,21,25
281:1,4,23,24
282:8 286:9 291:4
291:21 292:17
293:14 294:21
300:14 325:5,9
333:3,8 339:1
353:22
**represent** 12:1
91:11 219:20
227:22 359:2,18
**representing**
10:23,24 91:6
313:24
**reproduce** 21:20
**request** 105:25
106:5,23 111:6
150:4 301:18
308:12 323:3
328:17 349:13
368:9,11
**requested** 32:13
126:11 151:11
165:12 171:7
173:23 184:17
275:24 300:13,25
301:12 302:11
308:4 363:1,6,10
**requesting** 105:5
105:25 106:20
108:22 115:14
150:1 302:3
**requests** 153:13
156:21 339:14
**require** 63:4,8
88:21 105:11
161:18 258:14
295:9,19,21,22
**required** 49:4
54:13,21 67:13
72:7 84:10 86:8

95:19 117:18
118:25 126:2
132:17 134:10
147:5,6 153:4
161:1,5,17 166:8
216:25 244:3
259:6 304:21
334:5,11 366:25
**requirement**
62:11 63:9 66:21
67:10,13,17 71:3,9
72:10,20,21 74:4
85:8,14 86:3,14,21
86:25 99:10
100:21 103:17
108:22 109:2
122:18 123:17
129:20 132:22
133:6 144:3 166:8
334:19 335:15
336:8 337:14
**requirements**
65:25 67:5,20
68:7,8 70:18
71:17 74:16,19
84:17,24 85:7
101:12 103:25
123:5 133:18
165:3,5 166:4
169:6 335:22
353:2,7
**requires** 103:13
258:6,25
**requiring** 59:9,17
93:14 123:22
**residents** 232:18
**resistance** 127:14
**resolve** 105:3
156:16 164:7
348:23 354:6

**resolved** 158:1
348:25
**resort** 127:13
**respect** 22:24 28:6
71:17 216:8,10
231:10 239:17
243:2,12 263:10
265:12 271:1,6
276:16 277:12
289:12 298:17
301:19 302:10
310:14 325:22
327:1 328:8,14
334:12 345:6
**respond** 32:18
**responded** 301:19
304:20
**responding** 303:18
358:8
**response** 15:7
128:17 155:25
156:9 157:1
163:13 349:14
**responses** 16:6
157:4
**responsibilities**
26:12 28:15 54:18
**responsibility**
28:22 29:10 92:14
92:24 96:15,19
97:4,13,18,21
98:10,15 105:14
105:17 117:6,8
118:12 119:16
120:1,5 167:23
172:4 175:22
308:10 342:3,7
345:22 354:23
**responsible** 32:12
32:24 80:25
105:20 119:9,11

138:6 144:15
145:11 158:17
159:16 167:25
172:5 175:20
282:11,14 293:21
294:2 305:18,20
341:24 354:17
**responsibly**
173:16
**responsive** 328:16
339:6,10
**responsiveness**
349:13
**rest** 96:18 250:9
**restate** 15:3
**restricted** 87:9
**restroom** 81:7
**rests** 96:15 97:18
117:8
**result** 61:20
240:22 242:10
243:5 296:3
326:18
**resulted** 29:17
31:15 36:24,25
276:25 308:7
**resume** 102:10
**retail** 86:24 87:1
135:1 250:22
251:4 255:12,25
256:24 257:7
258:15,25 260:7
260:19,20 261:18
261:20,23 262:14
265:20 272:4
**retain** 192:20
193:20
**retained** 5:18
362:17
**retire** 185:9

**retired** 14:21
24:20 55:10 84:5
84:22 106:24
131:18 138:20
176:1 238:7 351:8
351:16 353:19
**retirement** 55:13
56:21 126:10
242:16 247:17
351:20
**retiring** 184:22
**retrievable** 133:16
**returned** 366:18
**revealed** 272:23
273:1
**review** 59:3 74:23
75:2 76:16 102:3
103:14,21 106:9
111:6 115:7 116:8
117:11,16,24
118:1,6,9 122:14
149:12 154:21
187:8 193:21
275:11,11,19,22
363:2,6 366:12
367:1 368:1
**reviewed** 108:20
158:4 308:1
**reviewing** 105:6
105:25 193:14
**reviews** 169:7
**revised** 27:14
31:24 45:25 46:12
63:10 65:18 66:1
66:6,15 83:22
84:9 93:7
**revocation** 206:19
**revoked** 87:9,21
88:8 165:8,24
330:18,21

**rey** 2:8
**reye** 176:3 184:18
185:11 201:24
202:14
**rhodes** 164:15,16
**rick** 79:10 144:15
144:16,18 165:15
173:1
**rico** 2:8
**right** 16:5 30:21
42:4 49:25 55:21
57:4,16 62:24
71:21 74:6 76:3
80:2,22 83:9
87:25 88:2 93:18
94:15 95:14,22
96:22 97:1,11
100:25 101:1
102:15,19 111:14
112:5 113:19,25
118:18,19 119:19
124:6,16 125:4,16
127:4 128:16,19
133:20 136:1,21
140:18 142:12
144:4,6 145:7
146:17 148:21
149:5,24 150:25
151:15 154:17
157:20,23 164:3
164:17 169:20
170:22,24 173:2
183:4,4,17 186:19
189:5,9,14 190:13
190:23 192:6
194:15 196:6
205:24 206:2
209:15 213:11
217:3,7,10 218:16
219:3 220:3,10,21
221:3 225:22

227:20,21 228:4
228:14,20 229:7
232:8 234:19
235:1 237:8 238:8
238:25 240:3
241:20 243:16
244:13 245:3,10
245:13,21 246:5,8
253:19 255:24
256:6,20 258:24
259:12 260:19
261:2,14,19,23,25
263:10,14 266:5
268:10 269:6,11
269:13,16,21,24
270:3 272:2
273:13 274:20
276:3,17 277:20
277:23 278:4,25
279:3 283:1
285:22 286:22
289:8,21 291:21
296:15,21,24
297:1 299:8,9,10
299:13,15,18
300:11 301:6,20
301:24 302:8
306:17 311:19
313:14 317:4
321:7 323:21
325:15 327:8,8
334:5 337:6
338:21 339:1
340:9,23 346:18
347:21,22,22,23
348:7 349:13
350:9 351:3
352:21 353:13
355:3,4,24,25
356:7

ringing 354:24
risk 240:5
rite 4:2 10:8 12:3
12:7 79:19 114:21
114:23 137:21
171:9,10,16
172:11 173:9
189:10,12 194:20
195:15 208:9,20
209:4 210:22,23
210:24 215:25
266:8 308:7
310:17 338:20,24
339:5,10 340:8,18
340:20,24 342:19
343:1,3,22,23
344:21 346:3,23
346:24 347:1,10
347:21 348:6
349:20 350:5,14
350:20 352:20
353:1,11 355:2
356:5,5,15,16,20
356:24 357:2,8,16
358:18
rivera 2:7
road 112:10 137:1
142:16 192:10
358:10
robert 3:7 4:7 9:17
10:5 11:25 176:16
203:6 257:16,17
role 21:7 46:10,16
46:20 58:19
207:12 251:16
roles 42:22 44:10
45:22,24
roll 297:12
romea 180:5
romeo 326:1,8,18
327:24 329:3

room 151:22
282:23 298:15
320:15 346:13
ross 208:21
rough 345:18
roughly 316:20
roundabout
206:25
route 320:5,5
routine 58:8 59:2
59:6,14
rozzi 155:21
rph 55:18 160:24
206:18 308:4,9
rpr 1:24
rubesich 160:6
rude 120:17
rudis 4:7 9:17
rule 67:5,23 73:25
74:7 100:20 105:7
126:14 129:10
rules 11:17 47:5
58:17,24 59:4
60:7 87:5 88:9,13
120:21 247:21
274:2,9 275:6,14
291:1 295:1
311:11 331:11
360:8 363:3,7
367:5 368:5
run 38:13 40:16
53:1 54:14 55:2
63:16 64:1 112:9
271:25 273:3
running 55:1
167:24
runs 111:21
138:18
rustling 174:6
rx 3:10 284:22
289:2

rx's 283:14 284:13
284:19

s

s 2:14 164:16
208:5,5 366:15
368:8,8 369:3
sabatini 300:17
301:3
safe 78:18 86:19
143:14
safeguards 86:10
86:16,19
safer 241:22
safes 69:15,16
safety 254:3 277:9
sakes 359:23
salary 212:14
214:10
sale 85:3 86:10
sales 54:3 75:5
283:13 284:24
287:5,8 306:24
sampling 54:22
sat 43:24 327:8
satisfaction 145:1
158:1,2,3
satisfied 156:8
163:25 164:6
save 255:3
saved 310:16
saw 28:9 59:20
113:21 144:3
166:17 180:15
190:24 213:20
292:10 306:12
344:10 352:14
356:11
saying 71:11 108:4
118:13 119:13
121:13 133:3
148:7 168:11

183:3 218:3 266:2
276:5 303:21
308:23 312:1,14
312:16 330:4
357:15,18
**says** 46:11 50:8
67:21 73:24 78:17
84:4 85:19 87:2
97:13 102:2
103:14 105:1,5,24
108:9 109:3 111:4
112:21 117:5
124:1 125:8,18
126:11 127:8
132:24 133:13
160:23 184:16
190:4 194:18
205:24 208:20
220:18 227:9
231:21 232:20
233:3 234:3 235:3
238:11 241:2
254:22 285:8,24
286:5 287:7
288:15 295:24
297:13 303:23
304:4 312:4
**schedule** 40:1
209:22 230:15,16
230:21 231:3,4,5,7
231:10 236:4
244:4
**schierholt** 57:19
57:24
**school** 239:10
**sciences** 93:17
**scope** 22:10 134:1
231:20 233:3,25
235:2 238:10
248:12 255:9
278:18

**scott** 196:2 293:21
**scrapbook** 197:24
322:13,14,21
351:25
**screeched** 319:7
**screen** 220:11
221:7 226:22
228:21 229:15
232:12,13,15
252:13,15
**scribbling** 21:10
**script** 34:2 100:8
214:11 336:16,18
346:6
**scripts** 167:18
168:7 188:1
197:20 203:2
207:3 213:13
214:6 323:22
324:1 336:15
341:7,9 355:21
**se** 161:13
**seal** 365:6 367:15
368:21
**sealed** 13:7 226:11
226:15
**search** 37:1 179:7
179:9 184:3,4,6,13
187:7 189:20
190:2 194:3,9,18
208:3 243:7
**second** 18:8 36:14
58:13 96:23 97:6
97:12,12 99:7
102:2 103:12,17
129:8 160:4,10,13
160:20 163:9
219:1 296:22
301:23 303:6,22
307:12 311:25
343:21

**secret** 354:12
**secretary** 37:17
**section** 50:4 66:22
68:10 70:12 72:25
73:17,22 77:9
78:15,16,19 84:19
94:25 101:1,12
103:12,20 123:25
124:23 126:13
133:12
**sections** 27:15
101:24 264:22
**secure** 69:16 74:20
288:7 298:11
**secured** 71:22
72:7 74:11 143:13
143:16 151:20
297:25
**security** 59:4 60:6
66:17,20 67:4,7,9
67:12,20 68:1,3,7
69:2 70:17 71:2,9
72:10,19,20,25
149:12,13 166:3,8
283:10 288:6
298:7 353:2
**sedated** 115:12
116:13
**see** 13:21 14:2
20:21 22:9 30:18
32:18 33:9 34:11
36:18 38:11,17
39:16 41:4 48:20
48:23 50:6,8,15
55:6 56:18 58:11
58:12 59:1 60:14
61:22 62:5 63:20
64:8,14,17 69:10
73:2 75:19 80:12
80:15,15 82:3
83:2 85:7 93:12

97:7 100:11
102:19 103:24
107:4,16,17 108:4
109:7,8 113:7,20
114:1,5 116:2
119:2 129:3 135:9
135:15,16 136:7
140:15 143:7
144:15 146:2
147:22 148:2
150:11 154:4
155:19 162:12
163:18 166:14
167:7,20 168:6,8
169:9 170:6
172:17 178:20
180:14 183:8
188:17 189:3,17
189:23 194:17
201:5 202:3,4,8
204:5 205:16
220:6,7,12,19,24
221:8 226:20
227:8,13,14
232:13 234:21
237:2,5 242:4,7
252:20 279:22
280:22 281:6,7,11
282:1,5,13,21
283:16 286:18,21
288:13 289:12,20
291:20 293:1,20
297:3,13 298:9,12
299:20 300:3,4,16
300:17 301:13,14
303:12,13 305:16
305:17,22 306:16
307:13,14 313:9
313:11 314:2
331:5,6 334:22,24
335:24 338:8

351:21

**seeing** 55:12 113:5
113:10,11 134:9
337:3 344:24
358:4,5

**seeking** 154:24

**seen** 45:1 83:24
111:22 116:21
117:2 131:19
132:2,14 180:17
182:12,14 228:25
232:24 234:12,15
234:18 253:24,25
269:15 315:15

**sees** 114:22

**self** 39:20 50:21,25
51:13 198:4
211:11 214:1

**sell** 21:23 36:15
85:1 200:4,11
206:9 258:2
285:21

**sellers** 86:24

**selling** 29:3 39:20
51:20 190:6

**sells** 285:15

**seminars** 18:6

**send** 53:6,13 87:23
88:3,15 125:2
147:9,11 252:15

**sending** 327:16

**seniors** 239:10

**sense** 57:9 186:15
222:14 309:25
311:3

**sensitive** 9:4

**sent** 25:5 81:25
136:4 157:21
212:7 327:11
344:14

**sentence** 60:3
96:23 97:3,6,8,12
119:3 207:8

**sentenced** 207:11

**separate** 68:8
124:9 178:7

**sergeant** 184:9

**serious** 87:22
153:11 251:11

**seriously** 278:22
278:23

**serve** 232:24

**served** 12:19
13:25

**service** 306:9,15

**services** 3:10
227:12,25 228:2

**session** 5:14 103:5

**sessions** 26:19

**set** 38:14 67:5,22
109:24 114:4
120:3,16 133:21
137:17 252:4
257:4 280:15
312:19 326:13
365:5

**sets** 100:16 103:24

**seven** 133:25
161:23 216:8,19
218:6 312:1,5,7
313:3 359:11

**severe** 62:18,21

**sex** 214:2 327:18

**sexually** 179:1

**shack** 329:21

**shaheen** 79:10

**shapira** 3:7

**shapira.com** 3:9

**share** 252:9,10,12
279:9,14,25

**shared** 253:3

**sharing** 252:14

**sheet** 49:20 78:7
129:6 141:12,22
141:24 142:2,5
145:5 153:10
155:23 158:4,8
163:12 203:1
206:17 288:15
289:6,23 290:15
290:23 292:25
294:24 298:24
300:2,5 302:20
315:17,20 328:9
336:4 350:10
366:13 368:7,10
368:18 369:1

**sheets** 49:18 142:1

**shelf** 296:1 326:16

**sherman** 3:18
198:10,21 209:9
210:1 211:10
301:15,19 302:4
323:19

**shibley** 2:2

**shift** 38:5 167:19

**shipped** 12:24
211:13

**shit** 100:14

**shkolnik** 2:6,7
321:23

**short** 81:18 121:3
143:11 146:3
148:4 196:19
210:1 214:19
273:19 285:6
309:14 359:22

**shortage** 147:25
148:7,15,22 149:6
343:6

**shorten** 262:21
341:5

**shortly** 39:4 176:1

**show** 38:18 61:1
83:15 88:12
111:24 112:9
121:4 126:8 127:2
127:3 186:9
200:14 261:20
273:5 279:1

**showed** 61:14
121:5 126:8

**showing** 175:8
183:10 243:20
248:11 350:11

**shown** 132:20
207:7 244:24
366:16

**shows** 84:7 202:12
221:7 232:16
236:23 244:11,14
245:14,20 279:25

**shut** 243:14,16,23

**shutdown** 242:8

**siba** 91:12

**sickly** 210:5

**sidari** 194:19

**side** 73:8,11 281:9
283:3 287:22
347:22

**sign** 161:1,12
210:7

**signature** 29:2
144:16 210:16
211:6 291:9,10,11
291:13,15 363:5
365:12 366:14

**signatures** 136:19

**signed** 136:14
146:24 160:14,24
204:4,17 209:21

282:15 291:24
293:24 305:21
367:13 368:18
**significant** 174:15
174:18 180:8,10
215:10 226:2
333:7 360:12
**significantly**
250:23
**signing** 211:9
366:19
**signs** 115:9 175:8
**similar** 48:9,19
113:21 114:9
116:21 117:2
171:8 269:10
270:1 330:5
338:23 346:22
**similarly** 33:6
106:7 332:12
356:9
**simmons** 2:13
**simmonsfirm.com**
2:16
**simple** 38:25
**sincerely** 366:21
**single** 37:2 78:6
79:6 170:12
**sir** 12:13 20:6 54:8
153:18 199:3
233:8 234:12
240:3 246:9
273:13 274:20
277:5 280:14,21
283:7 293:18
307:17 315:1
316:7 317:12
322:25 324:9
337:24 357:19
362:15 366:10

**sister** 167:5
**sit** 127:21
**site** 80:10 125:11
125:15,17,19
127:11 154:11
181:11
**sites** 138:4 354:16
**sitting** 89:21
170:24 219:22
314:15 329:25
333:23 355:12
**situation** 215:9
315:15
**six** 24:24 52:3,13
52:14,16 60:12,13
106:21,25 107:2,6
111:8 112:9 115:9
136:23 137:4,11
142:9 218:20
311:9 345:15
**skill** 93:15
**sleeping** 248:18
288:11
**slide** 180:23 229:8
230:12 231:19
233:2 234:3,20,20
234:21 235:1
236:20,21 238:9
238:10,25 239:1
239:14 241:1,1
242:1 245:14,22
249:1,4,19 250:3
297:21 298:1
331:11
**small** 31:8,8 35:21
59:18 131:13
345:15
**smith** 64:14 153:1
153:1
**smiths** 153:2

**smoke** 130:16
**snapshot** 295:16
**social** 93:17
**software** 260:13
263:7,8 273:6,7,10
279:9 331:7,15
**sold** 176:17 205:15
206:6 285:2
**sole** 224:7,9
**solely** 105:14
**solutions** 9:18
362:17 366:1
369:1
**solved** 119:22
**soma** 53:8 326:6
**somebody** 228:9
291:11 308:16
309:5
**someplace** 313:2
337:18 339:21
**somewhat** 116:16
**soon** 187:4 194:14
**sophistication**
260:13
**sorry** 56:3,6,10
57:23 58:1 62:1
97:12 107:8
122:12 167:21
168:12 174:4
179:23 194:4
226:18 232:10
234:2 260:21
267:1 307:25
311:22 312:6
351:2 355:18
**sort** 65:21 130:24
142:5 143:7
171:23 260:15
261:5 315:14
322:17 329:6

**sorts** 261:6 262:15
**sound** 250:10
**sounds** 30:21 43:7
60:4 133:20 182:1
228:18 229:19
294:10 337:2
359:9
**source** 41:15
97:21 182:1
200:22 213:3
247:9
**sources** 21:17 22:4
190:5,17,19
199:17,20
**south** 313:2 349:4
351:10,11
**southwest** 349:4
**space** 78:2 291:5
**spaeder** 3:11,15
10:10
**span** 347:6
**spangenberg** 2:2
10:16 221:6
**spanglaw.com** 2:5
**speak** 22:8 30:24
80:1 89:24 90:3
91:14 100:7 109:4
213:7 350:1
359:21
**speaker** 220:18,19
221:2,5
**speaking** 52:23
137:25 167:12,15
184:4 220:20
247:20 254:17
255:1 311:18
350:7 360:5 362:1
**speaks** 52:1 93:13
**special** 18:3 19:12
19:15 120:10

**specialist** 47:21
48:1,4,6,8,14,18
174:23 180:5
181:5 183:2
201:22 202:23
**specialists** 47:24
58:14,19 278:7,10
278:20
**specialized** 93:14
**specific** 16:4 24:23
25:3,6 31:20 32:5
32:22,25 37:14
42:9,10 44:21
52:25 53:4 57:10
61:25 63:18,19
64:23 94:25
112:17,17 113:14
114:6 115:15
116:14 124:7
131:8 137:19
139:17 140:5
143:1 150:1,4,20
167:16 168:24
169:15 170:5,11
197:2 232:18
248:25 256:16
269:4 277:2
281:23,25 289:9
294:18 300:21,21
308:13 316:8
325:9 328:13
329:2,3,14 332:25
334:8,12,23 336:7
345:11 355:5
**specifically** 14:17
20:4,14 24:8 33:2
65:9,15 72:11
77:1,23 79:3
91:20 92:20
105:12 111:3
119:13 124:8,14

136:4 139:15
157:16 158:8
161:10 167:12
179:3 189:4 199:4
225:23 230:15
282:21 288:25
305:3 334:15
344:9
**specifics** 56:24
93:22,24 104:20
150:7,12 181:24
**specified** 364:20
**speed** 19:3 39:1
**spell** 177:20
319:11
**spend** 292:15
325:8
**spent** 42:20
155:11 221:19
356:22
**spoke** 22:17 79:20
81:20 90:23 91:12
190:19
**spot** 154:16,16
282:11
**spread** 122:10
207:3
**ss** 364:3
**stabbed** 176:21
**stack** 180:17
**staff** 36:23 47:20
57:12 59:2 80:9
90:1 167:11
176:16,17 296:18
305:19 320:25
**staffed** 78:18
166:12
**staffing** 166:15
**stamp** 6:7 280:7
**stamping** 23:8

**stand** 277:23
292:21 304:10
**standard** 55:3
59:24 78:9 83:19
88:21 91:23
137:21 166:9
281:5 282:7,25
283:1 284:6
294:21
**standards** 29:22
67:6,22 70:13
77:10,14,22 132:6
**standing** 210:15
343:10
**standpoint** 104:23
**stands** 247:10
**start** 30:10 47:20
49:20 175:18
214:19 276:14
279:7,21 318:23
327:14 338:12
**started** 23:13
34:20 52:4,13
60:18 64:5,6
172:13 182:8
185:8 186:9
193:13 202:16
211:7 296:17
299:18 341:12
345:14
**starting** 37:6
133:11 242:5
245:23
**starts** 40:8 142:12
245:16 299:15
**state** 9:24 10:2,24
12:12,20 17:12,24
18:10,16 24:7
30:2 36:7 42:18
42:21,22 43:6
44:15 47:5 52:21

67:4,14,24 68:4,18
77:18 104:11
125:9 127:10
130:3 131:4 139:3
176:24 181:3
187:8 227:1,10,15
227:24 228:5
229:1 232:3
233:14 238:22
241:1 242:2,3
246:4 251:6
257:18 262:4
272:10 288:23
317:13,15 344:2
364:2,7 365:14
367:10 368:15
**state's** 105:6 106:1
**stated** 95:20
194:22 195:5
208:21 262:23
**statement** 96:13
165:4 166:1 169:4
174:7 232:2 233:9
233:17 239:9,16
241:13 247:24
367:13,14 368:19
368:19
**states** 1:1 9:13
25:19,20,25 58:14
59:2 99:7
**statewide** 236:25
**statistic** 251:8
**statistics** 232:24
233:22 234:12,15
237:17,18,25
243:19 245:12
**status** 83:8,13
**statutory** 66:11
130:22
**stay** 215:11 228:21
345:25 349:23

**steak** 176:22
**stealing** 320:6,18
  321:4 343:5
  347:13
**stem** 221:21
**stenotypy** 364:14
**step** 101:10 102:2
  103:12,17 104:1
  122:17 123:3,7,14
  123:15 124:10
  141:23 305:8
  335:16,19,19
  337:17,17,21,21
**stephanie** 159:13
  159:14
**steps** 105:3,5
  122:16 123:21,22
  123:23 124:9,12
  335:13 337:4
**steve** 10:10
**steven** 3:16 57:19
**stipulate** 11:8
**stock** 45:18 78:1
  115:4 284:1
**stocks** 126:13
**stole** 241:10
  249:16
**stomach** 339:24
  343:18
**stone** 142:6
**stop** 16:13 35:11
  49:14 93:18 102:5
  191:10,14,20
  220:1 243:3 249:9
  254:25
**stopped** 313:2
**store** 32:4,11
  46:24 127:23
  136:25 137:18
  138:14 139:24
  140:13 142:17

144:10,18,21
145:4,9 147:23
149:25 150:14,20
151:8 152:1
153:16 154:17
155:4,17 158:13
158:25 159:9,15
159:17,23 161:24
162:19,20 164:12
167:9 176:10,18
176:19 177:25
188:9,10 206:6
214:6 243:13,15
243:23 281:17,18
282:2 296:17,25
297:15 298:22
299:4 325:17
332:25 340:12,19
340:20 344:9
346:23,24 347:1
356:24 357:8
**stored** 181:11
  262:8,12
**stores** 32:3 53:4
  125:13 165:6
  166:11 167:6
  213:1 325:15,20
  338:25
**straight** 24:15
  120:4 307:20
**straightforward**
  31:2
**streamline** 310:19
  313:9,12 314:2
**street** 2:19 3:12,16
  3:21 4:3 20:17
  21:9,12 22:7 26:9
  28:24 30:12 31:17
  33:23 115:15
  189:9,11 198:17
  209:18 241:23

280:16,19 285:5,7
285:10 293:18
301:10 326:1
327:9 340:22
344:4,11 345:1
348:13
**strengths** 271:1,7
**stricter** 121:12,19
**strictly** 307:3
**strike** 19:11,15
  47:1 70:21 290:21
**structure** 47:9,14
**struggle** 307:18
**studies** 249:5
**study** 249:6
  318:13
**stuff** 100:13
  126:11 128:12
  175:8 180:18
**stumbled** 178:1
**style** 347:19,19
**subject** 98:3,20
  125:11 143:17
  316:5
**subjective** 110:3
  116:16
**submission** 127:8
**submit** 84:11
**subpoena** 12:19
  13:24 64:25
**subpoenaed** 217:2
  226:25
**subscribed** 367:10
  368:14 369:21
**subscribers** 33:5
**subsection** 66:22
  67:21 78:16 86:9
  93:12 105:1,22
  106:19 107:16
  111:3 116:19
  127:7 128:15

**subsections**
  100:16
**subsequent** 205:10
  242:10
**subsequently**
  203:8
**substance** 40:1
  53:9 63:13 109:21
  122:22 133:7
  187:10,13,20
  197:8 204:10
  211:23 252:5
  254:14 269:1
  309:16
**substances** 44:23
  46:1,14 53:7 85:2
  85:4,25 113:6
  130:7 132:21
  143:16,24 147:16
  151:12 178:15
  179:24 181:16
  186:11 197:1,21
  209:22 210:13
  230:14,17 244:6
  251:18 253:7,10
  254:8 255:5,14
  258:6,7,13,21
  259:11 316:7
**substantial** 67:22
  69:7,8 70:22
  199:11 211:22
  213:3 253:11
**sue** 153:1
**sued** 12:2 256:1
**suffering** 222:2,16
**sufficient** 67:24
**suggest** 308:16
  309:5
**suggesting** 223:4,6
  223:18,20 311:24

**suite** 2:4 3:4,13,17
  4:3 366:2
**summarize** 77:13
**summarized** 77:16
**summarizes**
  239:17
**summary** 162:16
  195:17 202:25
  352:18
**summit** 322:2
**superior** 366:1
**superstar** 278:17
**supervise** 74:15
  349:21
**supervision** 69:20
  74:1,3 85:23 86:5
  349:19 350:24
  360:16
**supervisor** 25:5
  26:16 33:3 51:12
  80:10 119:12
  120:9,11 121:22
  127:24 129:2
  132:15 148:10,14
  165:14 172:11
  176:3,3 184:18
  185:7,25 201:23
  201:24 257:15
  282:19 293:23
  294:6 296:12,13
  296:19 303:11
  326:12,24 327:24
  328:19 340:4
  342:16 343:2,9
  345:3,18 350:16
  351:11
**supervisors** 79:23
  80:20 134:22
  171:20 172:15
  173:10 214:8
  339:13

**supplements**
  104:16
**supplied** 266:17
**supply** 61:19,25
  62:23 122:24
  182:19
**support** 4:7 78:22
  230:10
**supported** 130:23
**supposed** 56:20
  91:21 101:9
  110:23 111:11
  124:7 128:15
  130:21 152:25
  157:13 172:2
  283:4 284:8
  309:19 322:10
**sure** 15:1 16:6
  21:11 23:1 32:20
  45:14 54:10 64:6
  65:1,2,3 71:15
  72:22 73:15 76:14
  76:25 82:13 89:20
  91:23 93:4 94:20
  101:15 102:17
  123:3 155:2
  166:18 167:14
  168:2 169:12
  174:9 189:7 204:6
  207:15 214:7
  217:5 229:23
  248:24 251:14
  252:16 262:22
  267:5 270:22,23
  275:3,10 284:7
  285:9 298:10
  320:12 329:24
  333:6 342:6 347:7
  348:2,9 354:8
  357:4,16

**surgery** 240:10
**surgical** 240:13
**surprised** 215:4
**surrounding**
  213:5
**suspect** 249:15
  250:4
**suspect's** 249:9,19
**suspended** 87:8,21
  88:8 165:7,23
  330:12
**suspicious** 75:13
  75:22 76:6 119:2
  134:14 189:17
  257:4
**swanson** 158:17
**swear** 11:4,9
**swift** 3:20 5:9
  10:11,11 214:17
  214:20,25 252:8,9
  252:14 262:20
  264:8 271:15
  273:17,20 279:10
  279:20 280:2
  310:2,14 311:18
  311:22 312:12,25
  313:6,18,25
  314:14 324:8
**swipas** 145:12,15
  146:23 149:5
  151:11 155:5
**sworn** 11:18
  195:11 364:10
  367:10,13 368:14
  368:18 369:21
**synopsis** 184:16
**system** 37:10,13
  52:17 68:1,3
  69:25 141:18
  161:14,24 178:7
  200:15 249:24

  260:13,16 262:4
  262:12 264:11
  300:8 304:1
  330:23 331:2,6
  332:7 360:22
**systems** 69:17,18
  70:8 101:17
  254:10 255:7
  257:5 273:1
  314:17,21 331:18
  331:25 360:18,23
  361:1,4

**t**

**tab** 57:16
**table** 135:7
**tablet** 200:10
  295:25
**tablets** 21:19
  39:25 40:15,22
  148:5 175:6
  182:19,20 186:25
  187:1 188:5 200:7
  200:8 250:5
  283:24 284:18
  285:6,8 308:25
**taboo** 113:8
**take** 9:7 11:7 16:7
  16:13 21:21 23:10
  28:20 35:4 37:23
  40:2,4,16,17 56:14
  59:14 81:6 83:2
  95:5 102:7,7,8,9
  102:14 105:2
  107:3,19 138:2
  148:8 177:2 194:6
  194:9 196:7 198:3
  206:8,12 210:6
  214:18,20 218:18
  219:25 247:6
  267:4 277:1
  278:22 285:23

286:5,15 287:3,4
296:21 309:21
311:1 314:1
334:17 335:8,14
336:5 338:18
346:7
**taken** 9:10 102:22
131:16 170:3
178:13 185:13
190:25 277:4
364:19
**takes** 23:12
**talk** 17:2 28:3
47:20 62:4,8 90:3
90:8,13 181:12
218:11 219:1
221:24 229:14
257:23 278:25
323:2 345:23
348:22
**talked** 54:23 57:11
90:16 105:24
165:12 190:16,17
230:23 243:13,14
264:16,17 287:19
321:15,19,21,25
326:12 341:15
348:4 349:12
359:25
**talking** 15:20
21:10 30:1 55:22
63:5 98:24 105:12
107:9,11 114:2
116:23 119:16
146:22 183:1
186:16 191:1
198:8 216:12
220:15 224:16
225:23 226:11
230:22 242:13
281:8 341:18

342:5 345:14
347:4,5 348:11
**talks** 231:19
**tampering** 50:11
229:11
**targeting** 182:10
**targets** 169:17
**task** 42:4,6,13,14
184:10 235:22,25
352:14
**taught** 27:1 30:11
241:18
**tddd** 44:25 45:6,13
82:15 205:23
**tech** 221:10
252:18 285:10
321:4 347:12
**technical** 4:7
16:12 174:3
230:10 263:15
**technician** 249:7
249:16 315:8
319:22,24 320:4
320:18 325:16,23
326:2,21 327:23
347:25 348:15
350:22 351:5
**technician's**
350:25
**technicians** 166:14
**technique** 37:4
278:8,14
**techs** 167:24
**teenage** 240:15,15
**teens** 238:13,14,16
239:5,18 241:4,21
**telephone** 90:4
268:25 269:2
**tell** 17:21 31:21
38:9 55:21 61:4
76:19 79:20 100:3

100:7 107:20
119:13 121:8,23
122:5 138:23
174:1 191:19,24
192:1 203:14
204:8,20 207:1
212:18 218:23
235:11 248:11
260:22 261:6,12
279:11 290:11,13
296:23 302:24
334:24 335:3
336:12 337:4
355:25 356:21
**telling** 41:7 167:19
168:25 173:7,7
191:17 192:1
276:6 288:11
336:19 341:12
354:21
**tells** 249:16
**ten** 18:2,23 23:11
39:25 40:15,16,17
40:22,25 41:2
100:10 109:1
196:7 234:6
286:21 304:15
321:8 351:7,19
359:7
**tends** 294:24
**term** 12:6 44:24
70:22,23 74:22
98:21 99:2 109:25
112:15 171:23
248:14 260:25
**terminal** 32:25
44:13,24 45:10
82:15 83:22 84:1
84:16 85:10 87:13
125:10 127:9
205:25 282:16

285:20
**terminate** 45:8,9
**terminated** 346:21
**terms** 38:1 42:23
45:1 55:14 58:20
63:25 69:1 76:21
80:24 82:4 91:20
99:4 124:4,6
149:19,19 179:22
230:21 231:2
242:21 261:1
267:20 273:9
335:13 349:12
**terrible** 215:1
**territory** 324:23
329:14
**test** 55:11
**testified** 15:11,16
27:12 65:16 89:22
274:12,18 276:15
277:17 291:19
294:22 302:5
315:13 316:14
317:1,10 319:5
322:6 331:23
334:2 354:2
**testify** 275:25
364:10
**testifying** 13:23
16:5,18 17:6
**testimony** 15:19
91:16 93:4 196:21
221:19 254:25
319:6,8 332:2
338:19 339:7
351:17 357:1,9,11
362:14 364:12,16
367:6,7 368:6,9,12
**testing** 92:21
**tests** 21:1

| | | | |
|---|---|---|---|
| texas 4:4 | 282:19 292:9 | 37:20 41:18 53:13 | 177:15 194:1 |
| text 56:17 | 296:4 306:24 | 57:4 61:1,16,20 | 197:11 214:11 |
| thank 12:11 81:11 | 307:2 322:18 | 64:21 70:11 71:10 | 325:10 |
| 214:13 219:4 | 327:15 329:8 | 81:6 89:22 90:8 | thinks 111:10 |
| 228:19 230:9 | 335:10,21 341:5 | 92:16 96:25 | third 13:19 72:23 |
| 244:7 273:18 | 347:20 | 102:14 104:7 | 72:24 73:4 107:15 |
| 280:2 313:18 | things 16:8 22:10 | 116:6 129:4 | 122:17 156:22 |
| 324:9,10 350:21 | 26:16 28:9 30:15 | 132:22 138:8 | 160:4 216:10 |
| 354:25 356:2 | 31:8,8,9,23,25 | 139:22 142:1 | 256:10 |
| 362:5,15,17 | 33:24 43:12,17 | 158:20,21 165:14 | thirds 306:8 |
| thanks 230:9 | 48:18 52:8 63:14 | 165:19 169:1 | thirty 366:18 |
| 273:14 | 71:15 76:17,23 | 177:4 180:12 | thomas 4:7 221:9 |
| theft 50:10 66:25 | 77:25 78:20 81:7 | 181:23 189:6 | 221:16 228:12,18 |
| 67:16 68:15,20 | 82:6 90:13,19 | 192:8 198:19 | 229:18 279:16,24 |
| 69:4 70:14 71:18 | 95:1,13 100:12 | 200:25 201:5 | thorough 129:15 |
| 80:5 124:5 134:12 | 104:9,18 109:7 | 202:14 203:7,25 | 132:1,13 154:8 |
| 162:7 212:24 | 116:7 118:15 | 204:3 213:15 | 155:10 157:3 |
| 229:10 240:21 | 120:9,13,19 | 214:15 215:22,22 | 195:19 274:19 |
| 258:9 274:9 283:8 | 125:14 126:18 | 216:21 220:7,10 | 275:4,15 278:11 |
| 283:10,11 295:4 | 128:3 130:15 | 220:18 226:12 | 292:13,13 324:25 |
| 295:10 315:7 | 131:11,12 134:23 | 231:5 243:14 | 326:15 |
| 326:11 347:25 | 148:24 154:4 | 247:15 264:10,11 | thoroughly 276:13 |
| theisler 198:10 | 171:23 172:13 | 274:12 281:17 | thought 33:14 |
| 209:10 210:2,8 | 176:11 185:7 | 285:1 287:2,12 | 72:8 80:6,7 95:11 |
| 211:9 323:20 | 188:20 193:14 | 288:10 289:18 | 169:1 187:5 |
| themself 147:2 | 196:25 198:3 | 290:18 294:1 | 290:10 298:20,20 |
| theory 317:21 | 202:24 261:11 | 297:3,8 299:3 | 298:21 313:6 |
| therapeutic | 277:7 283:4 287:1 | 304:15 307:1 | 323:18 355:13 |
| 104:11 | 290:17 296:10 | 311:15 312:12 | 356:11 |
| therapy 94:15,22 | 299:8,9,11 303:3,4 | 313:1,7 315:16 | thoughts 216:15 |
| 108:15 | 306:20 310:19 | 318:5 320:9,11 | thousand 167:17 |
| thick 131:3 322:22 | 313:9 314:2 315:6 | 321:4 324:9 | 168:18 283:24 |
| 322:23 | 315:9 316:25 | 325:15 326:3,4 | thousands 179:6,6 |
| thing 29:9 37:17 | 322:20 326:10,14 | 327:6 328:18 | 186:18,19 |
| 55:21 63:16 70:12 | 327:5 335:9,11,23 | 334:2 337:25 | three 25:22 32:10 |
| 78:6,13 107:24 | 336:20 337:17 | 338:8 344:23 | 39:13,14 63:21 |
| 111:1 131:14 | 343:4 344:19 | 347:8,12 348:2,10 | 73:7 76:15,17,24 |
| 141:11,19 149:8 | 349:7,10 353:15 | 350:6 358:21 | 90:24 109:4 |
| 154:7 180:23 | 354:14 358:15 | thinking 28:21 | 112:24 113:20 |
| 182:1,12 184:12 | think 24:2,13 32:1 | 35:1 72:10 89:21 | 114:16 123:3 |
| 185:16 248:6 | 33:10 34:1 36:13 | 170:22 176:23 | 133:14,19,21,24 |

134:1,4 141:13
147:18 162:16
167:24 176:14
177:11 198:9,9,20
199:9,25 200:11
201:22 203:10
206:13 214:1,2,3
218:22 225:2,3
240:11 242:15
248:23 297:23
**throw** 127:19
322:25 323:4
**throwing** 202:24
**ticked** 302:15
**tickets** 126:19
**tide** 221:21
**tidy** 127:1
**tier** 99:8,9
**till** 35:10 312:22
**tim** 23:16 26:15
120:23 158:3
162:24 350:16
351:9
**time** 10:2 14:17
16:9 21:2,25
22:24 25:8,8,11,11
26:11,21,21 32:10
34:13,18 35:10
41:25,25 48:16
49:11 52:24 53:9
54:12 57:11 59:9
59:17 60:12 63:19
64:10,18 80:17
88:6,7,18 90:21
108:24 111:7,18
112:2,3 116:14
119:12 120:5,5
121:22 129:5
133:22 135:21
137:14 138:11
139:19 140:10,13

140:19 143:21
145:9 146:2 147:4
147:23 150:8
154:8,21,22
155:11 163:16
165:14 171:25
173:6 174:19
179:21 180:1
181:6 183:12,18
187:14 191:4,11
197:19,23 200:21
201:2,7 203:6
204:2 211:15
214:14 215:9,15
215:17 217:8
219:25 222:12
225:20 227:18
236:8 243:18
246:3 247:16
251:22 253:6
254:21,23 255:3
267:7 273:15,18
276:7 286:11
290:17 292:4,8,12
292:12 296:17
300:22,23 301:23
303:6 306:15
309:16,25 310:5,9
311:5,15 313:17
321:9 322:11
323:23 324:11,21
324:21 325:8
328:22 338:2
345:23 347:6
351:4 352:2,19
355:6,12 356:23
364:19
**timely** 302:12
**times** 14:16 15:15
21:22 27:18 31:8
33:4 34:6 40:17

41:18 45:17 48:16
95:7 97:20 98:8
98:12,16 101:19
137:20 139:23
152:9 165:7,21
166:19 167:20
168:11 170:2
173:13,25 223:11
247:18 274:18
277:3 281:3
295:18
**tina** 160:7
**ting** 138:18 139:8
139:20,25 142:22
142:24 143:1,10
**tip** 209:3 329:2
344:21,23 345:1
**tips** 145:20 294:13
328:24
**title** 24:2 149:16
226:21 227:8
**today** 9:19 12:18
13:4,23 16:5
59:24 127:21
134:25 169:7
170:24 215:17
221:19 273:19
274:19 281:4
287:20 291:20
302:6 314:15
321:16 322:14
325:10 329:25
331:24 333:23
339:4 356:22
359:21,25 362:7
**today's** 362:14
**todd** 152:2,4
158:16 160:8
**told** 31:21 102:13
104:8 120:12
121:3 131:5 172:3

175:3 176:8
185:25 191:10,13
204:12,15 207:19
326:10 342:1
345:4,11 362:9
**tom** 202:13
**tool** 37:25 38:4
268:6,7
**top** 28:10 39:13,14
59:1 63:12,12
73:5 133:3 169:14
170:22 187:17
194:2 199:25
208:19 220:12,17
221:3 246:16
256:17 277:25
282:3 297:14
299:8,9,11 307:5
325:16 327:5
330:8 347:17,17
348:8 350:6
352:22 353:18,19
**total** 47:7 59:23
313:15 362:15
**totally** 83:6 178:7
**touchy** 347:16
**tough** 181:9
**tougher** 120:21,23
**touhy** 217:18
**tracing** 37:8
**track** 1:15 258:16
259:12 260:8
261:24 273:2
297:20 298:1,3
366:6 367:3 368:3
**tracks** 298:4,10
**trading** 250:1
**traffic** 249:9
**trafficking** 39:11
39:14,15,17 51:5
51:14,21 128:10

198:25 212:24
240:1 315:24
**trail** 12:16 285:4
285:18,20
**train** 26:12,19
278:9
**trained** 25:13
26:10,13,24 228:9
278:3,5
**training** 26:18,19
92:11
**transcribed**
364:15 367:7
**transcript** 5:1
363:3,6,9,11
366:11,12 367:5
367:12 368:5,11
368:17
**transcription**
364:16
**transmission**
220:5
**traveled** 270:7
**travels** 137:9
**treated** 121:7,7
275:8
**treatment** 97:25
104:15 234:6
**tremendous** 349:4
349:5
**trends** 262:16
**trey** 14:6,10 25:10
25:11 26:11 27:7
135:10 184:11
190:18,20 228:8
**trial** 15:20 198:21
199:12 217:5
**trickle** 31:7
**trickling** 358:9
**tried** 31:5 132:1
132:12,13 138:3

141:4 154:8 193:6
274:19 275:15
310:15 324:25
336:22 354:3,6,9
354:11,11
**trigger** 327:14
**trilogy** 248:14
**tripped** 327:13
**trophy** 322:18
**trouble** 122:9
171:22 172:8
173:3,6 279:10
307:17 336:23,24
336:25 349:12
**true** 41:14 59:18
195:13 209:7
221:22,23 226:4
233:11,12,13,17
233:17 241:19
246:21 247:5,12
254:4,10 259:3,14
259:15,17,19,21
259:24 260:1,11
261:8,10 262:19
263:2 265:10,15
265:16 266:8
268:2,11,16
269:12 271:3,9,14
271:22,25 284:3
294:11 295:6
301:7,21 302:2
318:4 364:16
**trumbull** 1:12
17:19 24:14 25:1
42:13 128:7 135:4
135:14,19 136:9
136:24 137:5
150:5 165:20
172:12 184:10
188:19 189:2
197:6 198:8

199:18,19 200:17
201:10 208:2,12
211:17,18 213:4
213:10 219:20
236:15 237:3,11
237:20 244:23
250:18 251:12
254:3 270:16
293:18 322:1
327:20 330:11,14
330:17,20 347:1,4
348:3 349:2
351:23
**truth** 364:10,11,11
**truthful** 15:7
**try** 16:13 33:1
53:14 127:18
129:14 137:13
138:1 162:16
215:2 219:23
229:22 273:19
359:22 362:9
**trying** 32:2 45:17
63:15 70:11 71:15
76:5 97:7 121:23
155:20 167:14
168:9 172:23,23
186:21 218:2
221:21 247:14
254:15 281:19
287:12 311:2
313:1,20,21 326:3
347:12 348:10
349:20 352:10
353:17
**turn** 132:4 247:14
293:12 303:8
305:10,13 318:14
318:24
**turned** 131:24
195:6 229:16

**tuttle** 152:2,6
153:17 158:16
160:8
**twice** 188:6
**two** 13:1,2,5 18:2
18:24 19:1 23:16
26:14 53:11 73:7
89:25 90:24 91:7
100:10 105:19
108:19 109:7
113:7,20 120:18
121:1 127:24
132:23 133:1,3,8
137:15 138:23
141:12 143:9
148:11 162:15
163:12 173:9,17
177:22 179:10,13
179:14,17 182:23
185:12 187:12
194:7 218:20,22
267:2 284:14,23
294:9 300:14
301:5 302:6
305:25 306:8,9,12
306:14 307:7
327:22 334:3
339:4,12 340:2
344:19 348:4,6,11
350:6,8
**twofold** 96:25
**type** 19:18 29:2
39:6 41:4 69:11
69:11,14,14 71:3,4
90:19 116:21
125:14 128:12
141:18,19 179:2
200:1 213:22
276:15 305:11
335:8

**types** 20:11 21:5
22:4 28:5,5 39:8
39:16 48:17 50:18
69:15 72:1 110:22
111:8 182:24
212:9,19 278:15
334:4
**typically** 148:6,9
291:25

**u**

**u** 207:24 208:5
**u.s.** 352:15
**ultimately** 118:21
246:23
**unaware** 251:8
329:15 330:1,3,5
**unbeknown**
179:16
**unbelievable**
182:24
**uncovered** 36:2
**undercover**
327:11,16 328:1
344:14
**undergrad** 18:12
**underneath**
107:18 288:12
**understand** 12:17
15:2,3 21:11 34:6
34:15 41:12 44:2
68:12 70:5 71:11
74:7,25 84:22,23
90:17 100:9,23
105:10 108:18
109:12 112:4
113:2 115:17
117:18,23 122:18
167:14 168:3
222:13 227:3,4,20
236:3 255:19
257:25 258:4,5,19

265:21 274:13
290:15 312:25
334:5 342:5
345:25 352:1
353:20
**understanding**
12:9 15:4 17:5,8,9
17:14,17 54:12
59:11 82:8 109:9
113:18 215:12
216:18 218:5
342:7 351:15
**understood** 14:12
15:6 46:15 55:4
58:18 80:2 84:9
91:5,7 104:16
106:3,12 119:7
125:12 278:9
333:12 334:17
337:12
**unfamiliar** 115:14
**unfortunately**
338:15
**unfounded** 308:12
309:4
**unintentional**
232:17
**unique** 306:14
333:11
**unit** 9:9 19:12,15
20:19,22,25 42:12
43:11 44:16 80:8
81:11,14 103:3
194:14 196:12,16
219:7,11 267:12
267:16 314:9,13
359:11,15
**united** 1:1 9:13
25:20,25
**units** 237:20
362:16

**university** 17:25
18:10,13
**unknown** 168:3
**unmarked** 36:12
**unsupervised**
69:19
**unusual** 75:11,21
76:6 185:20,24
344:10
**unwillingly**
185:19
**update** 146:15
**updated** 84:5
93:10
**upper** 313:8
**usage** 75:11,21
76:6
**use** 12:6 14:7
21:24 39:20 44:21
51:23 59:19 67:4
72:13 80:11 81:6
92:11 94:2 117:11
117:19,25 118:22
131:13 140:22
200:12 210:10
230:19 231:17
238:17 240:8,9
246:22,23 248:1
253:10 260:24
262:17 267:25
268:8 269:19
270:6,11,21 318:1
318:2 322:7
332:14 342:11
**useful** 261:25
262:2
**user** 211:16
**users** 234:9
**usual** 95:25 96:6
97:24 109:6,10
110:1,7 111:10

112:16 117:1
**usually** 72:13,13
72:17 129:13
134:1 290:11
351:10
**utilization** 74:23
75:2 76:16 102:3
103:14,21 104:10
104:10 115:6,11
116:8,9 117:11,15
117:24 118:1,5
121:9 122:13
154:21 169:6
300:14,18
**utilized** 264:23
**utilizing** 287:25

**v**

**v** 1:10,12 177:22
177:22 244:4
292:2
**valid** 83:17 88:4
95:23 97:5,10
99:17
**validity** 116:23
**value** 28:20 62:14
75:24 76:8 118:19
**various** 28:25
115:1,4 116:1
190:5 195:1 198:3
249:5,10 265:14
356:20
**vast** 317:25
**vaults** 69:15,15
**verbal** 16:6
**verification**
125:21
**verify** 41:6 99:20
**verifying** 161:14
**veritext** 9:18,20
362:17 366:1,7
369:1

veritext.com.
366:17
versus 59:25 118:8
161:21 212:15
307:6
viagra 179:2
180:17
vial 36:11
vice 21:4
video 9:7,9 161:23
162:4,11 220:6
228:24,25
videoconference
11:10
videographer 4:7
9:1,19 11:3 81:9
81:13 103:1
194:13 196:10,14
219:6,10 220:17
221:2 229:25
230:3 267:10,14
314:7,11 359:10
359:13 362:12
videotape 6:5
13:14,20
videotaped 1:18
view 80:3 134:20
134:21 169:24
213:2 216:11
220:18,18,19
221:2,5 339:5
violate 99:22
violating 129:10
violation 58:17,23
66:18 87:22 88:1
88:9 99:13 128:14
128:18 129:9,21
129:22 165:24
violations 31:24
87:20 129:10,24
129:25 314:25

315:3
virtual 11:10
visit 32:21 41:22
visited 60:24
visits 125:13
166:10 234:7
vogren 210:22,24
voice 267:6 311:23
319:7
void 110:16
volume 167:4
190:11 197:15
199:13 212:16
229:16 306:23
volumes 36:17
168:7 199:8 358:5
voluminous 179:8
205:7

**w**

w 159:25 293:21
wacker 3:3
wait 14:25 107:14
126:4 153:19
172:17 189:6
210:3 297:1
waive 311:4
362:20
waived 366:19
walgreens 3:19
6:6 10:12 12:3,7
79:19 114:21
137:22 171:10,14
186:6 214:15
249:11,15,23
256:7 264:4 266:7
273:21 280:6,16
286:9 293:15,17
294:9 296:5,18
299:8,9,11 301:1,9
302:10 303:10
304:20,24 307:9

308:6 309:18
310:17 314:17,21
314:24 315:6
316:2,4,8,10,11
319:22,24 320:18
320:18 321:4,6,12
343:8
walk 49:4 77:1
82:17 143:7 167:6
168:6 203:19
264:15 307:4
walked 59:18 78:7
111:19 112:2
127:1,24 138:25
170:12 192:2
293:8,9
walking 139:3
walks 115:21
wall 83:12 293:2
298:9
walmart 3:2 10:14
12:3,8 79:19
171:15 194:20
195:15 256:8
266:7 359:2,18
360:1,7,12,15,18
360:24 361:5,12
361:16,17,20,23
walmart's 362:2
want 21:11 28:3
33:12 38:11 39:5
42:16 43:18 44:2
46:4 50:1 62:4
63:20 64:14,17
76:14 81:19 83:23
90:2,8 93:4 95:14
102:12 106:24
113:25 124:21
126:25 131:18
132:8 168:2 176:5
177:12 178:17

193:25 194:6,12
205:2 214:18
216:5 218:11
219:24 221:10
230:14 233:12
260:24 293:13
299:13 300:11
310:4 311:13
312:23 313:10
321:21 343:20,21
345:25 356:21
wanted 32:19
38:17 56:18 70:5
75:19 107:19
114:6 129:15
141:8 153:9
155:24 156:3,6,23
163:14 164:7
210:12 275:19
288:25 290:3
310:18 326:14
336:24 338:7
343:9,11 347:16
349:17
wanting 56:14
warned 196:3,4
warrant 37:1
184:13 187:7
189:20 190:2
194:3,9,18 208:4
243:7
warrants 179:7,9
184:3,4,6
warren 137:1
155:17 164:12
198:18 280:17
293:15 301:10
307:9 327:8
328:12 347:21
washington 3:17

waste 254:23
wasting 247:16
water 81:7
watkins 197:6
209:16
way 17:17 34:22
35:6 40:10 43:19
47:4 49:21 56:19
60:14,16 63:7
71:12 78:10 95:21
108:2,17 132:7
140:9 145:17
152:16 166:11,16
170:15 186:2
193:12 203:19
212:10 220:12,15
222:17 229:17
233:20 263:23
277:12 295:12
306:8 311:3
315:11,12 325:9
342:23 345:18
351:12
wayne 24:15 208:1
208:4,16
ways 120:16
141:12,13 166:6
268:12 276:13
346:1
we've 81:4 105:23
116:20 117:2
148:22 173:10
194:6 203:17
230:22 287:19
293:13 348:4
359:25
weamer 293:21
294:2,8 298:16
website 131:17
week 304:8,13

weekend 292:15
weeks 53:11
weight 118:3
weinberger 2:3
10:15,15 11:13
41:10 54:6 69:5
70:9,20 75:14
111:15 112:19
213:6 214:23
215:5,8 216:3,7,23
217:16 218:7,19
218:21 219:4,13
219:17,19 220:23
221:6 222:22,25
223:3,10,15,18
226:14 228:16,20
229:23 230:5
247:19 252:6,12
252:16 253:4
254:17,24 267:5,8
267:17 273:13
317:19 318:3
321:16 331:20
361:3,6
weinberger's
310:15
welcome 280:11
welfare 253:12
went 16:22 17:25
18:4 19:9,11
38:19 54:23 60:23
61:17 62:15 64:7
71:13 114:22
120:24,25 121:25
130:16 140:19
154:3,25 161:10
169:7 180:15,16
181:5 195:20
201:21 202:14
203:1 207:2
217:11 227:6

232:10 242:22
243:6 258:21
264:20 291:7
315:14,18,21,23
320:10 327:17
328:15 331:9
344:16 346:12
352:11,14
west 3:3,21 280:16
280:18 293:17
301:10 307:9
whack 193:12
wheeler 160:7
whereof 365:5
whichever 140:23
whispering 9:5
white 141:25
wholesale 44:14
45:19 54:2
wholesaler 260:17
wholesalers 47:1
53:19 54:1,9
256:12,16,17
wickham 121:1
wide 66:16 332:7
332:15 333:15
wife 139:21
145:14 155:5
176:20 294:4
william 135:9
wimberly 51:6,7
55:24
window 134:5
186:22 187:14
210:1 298:3 306:7
306:9,15,16,22
307:7
winsley 181:5
wise 43:6
wish 310:12

withdraw 253:4
withdrawal 175:9
witness 2:17 10:19
10:23 11:5,9,10
91:13,14,15
102:11 194:11
215:9,18 216:13
217:2,7 218:4
219:14 220:21,25
221:4,8,12,14
223:5,16,19 224:3
247:15,15 252:20
254:22 310:20,25
313:24 324:12
338:16 362:8,11
363:2 364:9,13,14
364:17 365:5
366:8,11 367:1,4
367:11 368:1,4,15
witnesses 216:11
witness' 366:14
wizard 331:5
woman 235:5
236:14 237:11,13
won 26:3
wondered 302:16
wondering 309:24
word 37:23 122:10
132:5 207:4
236:10 263:22
287:4,17 323:10
323:16 354:18
wording 59:24
words 45:9,17
94:4 96:3 101:5
119:3 136:16
236:14 295:17
302:23
work 18:13 20:8
25:10 26:5 27:11
30:12,12,13 42:1

43:14,19 91:7
169:14 183:20
212:7 213:8
221:11 229:17
233:23 236:2
260:16,19 324:20
329:7 342:17
346:11 348:17,17
349:20
**worked** 18:21
20:22 22:22 23:15
27:7 42:7,8,14
56:24 59:25 60:2
61:2 63:16 80:19
90:18 93:11
119:21 125:24
131:6 139:16
144:17 147:10
176:13 208:15
213:25 214:1
222:8 227:16,19
235:24 236:5
322:15 351:11
**working** 19:18
20:1 21:4 42:3
47:23 79:14
105:20 131:20
132:3 139:19
167:9,18,22
171:25 174:25
198:10 213:18
222:8 231:4
238:21 246:4,6
250:19 251:5
264:13 282:18
294:11 296:18
320:5 321:1 324:2
341:4,8 344:10
350:23 352:13
**works** 112:5
291:12

**world** 187:1
**worse** 248:4
**worst** 182:10,10
186:12,12,12,13
186:14 205:3,3
**worthy** 153:25
**wow** 167:17
190:25 362:8
**wrapping** 52:8
**write** 50:22 51:5
62:15,19 88:3
129:13 134:7
142:2 202:16
301:8 302:18
336:18 337:9
**writes** 21:19
303:17
**writing** 36:25
118:3 156:6
195:10 197:1,20
284:21 290:6,14
**written** 28:21 40:3
61:12 128:16,17
142:6 156:17
188:14 204:10
208:25 234:22
245:23 246:11
272:5,13 288:20
288:21,22 290:3
290:18 295:9
300:12 308:12
332:6,21 333:14
**wrong** 61:16,20
63:4 91:9 183:3
298:3
**wrote** 62:17,21,22
119:14,25 132:12
132:12 145:24
151:5 172:2 179:6
179:7 184:3,7,12
187:5 208:7,10

301:25 302:1,25
341:20,24,25

| x |
| --- |

**x'd** 288:24

| y |
| --- |

**y** 159:25 163:21
184:18 197:18
**yeah** 16:2 19:5
33:21 37:9 52:6
52:13 56:3 58:6
62:3 94:12 96:3
97:9 102:1 108:4
112:6 117:22
119:20,25 120:6
121:14,21 126:22
133:20 134:11
141:10 142:5
143:5,8,25 145:18
146:23 148:3,23
149:1,14 151:16
151:17 155:20
157:15 158:16,19
160:1,12 170:18
176:12 177:15,17
178:6 182:7
183:17 184:7
185:19,24 195:11
202:20 205:22,22
205:23 206:4,16
207:9,16 210:23
212:1,23 214:20
221:4,14 227:14
230:8 240:18
245:1 262:1
265:22 266:1
273:12 277:15
281:11,18 283:18
286:15,18 288:20
289:17 297:1,9,12
297:16 298:2,5,19

299:20 300:4
302:24 304:15
307:14 308:18
312:14,21 313:4
315:12,22 316:25
317:18 320:20
321:6 322:17
323:18 324:6,22
329:1,17 337:17
337:20 339:2
341:22 348:8,25
349:14 350:12
352:5,22 355:11
357:2,20 361:14
**year** 25:17 49:6
71:14 83:13 111:7
111:25 112:9
125:25 126:4
133:2,8 134:4
135:21 137:15,23
137:23 151:25
182:14 236:16
239:3,11 242:25
243:9 251:4,5
286:20 301:23
**yearly** 134:19
**years** 18:2,2,3,23
18:24 19:1,6,16,23
23:12,21 24:24
29:17 34:11,18
39:10 42:5,8,20
45:23 46:16 47:2
49:7 50:19 52:3
52:13,14,16 55:10
60:13,13,23 64:15
84:8 107:3,6
126:1 132:23
133:1,3,8,14,19,22
133:24,25 134:1
138:2 147:18
169:13 170:19

177:2,11,13,14,18
186:22 187:12
222:3,5 224:13
238:5 263:18
286:21 316:16
333:5 351:8,19
353:18
**yellow**  141:25
**yep**  58:24 151:5
156:4,19 301:14
**yocum**  142:18,21
**york**  2:11,11,15,15
**younger**  30:11
211:10
**youngstown**  17:24
18:2,10,16,17,24
20:3,6,13 22:1
23:12 34:20 42:11
43:12 121:16
158:14 178:2
340:10,23

**z**

**z**  3:3
**zero**  40:4 89:17
284:3
**zhou**  3:3 5:12
10:13,14 338:12
358:23,25 359:2,6
359:9,16,18 362:5
362:9
**zoom**  90:4,5
**zuckerman**  3:11
3:15 10:10
**zuckerman.com**
3:14,18

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.